# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**OBEL CRUZ-GARCIA,**
      Petitioner,

  v.

**LORIE DAVIS, Director,**
Texas Department of
Criminal Justice,
Correctional Institutions Division,

      Respondent.

Case No. 4:17-CV-03621

District Judge Vanessa D. Gilmore

# PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

Nadia Wood (MN 0391334)
Assistant Federal Defender
Office of Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
Nadia_Wood@fd.org

## THIS IS A CAPITAL CASE

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Petitioner Obel Cruz-Garcia, through counsel, pursuant to all rights available under Article I § 9 and Article III of the United States Constitution; the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; 28 U.S.C. § 2201, and 28 U.S.C. § 2241 et seq., including 28 U.S.C. § 2254, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

i

# TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................. 1

PARTIES ................................................................................................. 1

PROCEDURAL HISTORY ..................................................................... 1

PRELIMINARY STATEMENT .............................................................. 3

CLAIMS FOR RELIEF ........................................................................... 9

Claim 1      Mr. Cruz-Garcia's Sixth Amendment right to effective
             assistance of counsel was violated. ................................. 9

    A.   Trial counsel's investigation and pre-trial preparation
             fell below prevailing professional norms. ...................... 9

    B.   Trial counsel's investigation, preparation, and
             performance during the guilt/innocence phase was
             ineffective. ............................................................... 17

        1.   Trial counsel failed to retain a DNA expert. ............... 17

            a.   DNA evidence from the suppression hearing
                  and trial. ................................................... 18

            b.   Evidence from an independent DNA expert
                  undermines the State's evidence. ........................ 23

        2.   Trial counsel failed to investigate and present
             evidence that countered the State's version of the
             offense and to impeach the credibility of the
             State's witnesses. ......................................... 30

        3.   Trial counsel failed to obtain unredacted copies of
             various law enforcement reports. .................................. 36

        4.   Trial counsel failed to investigate and present
             evidence that Mr. Cruz-Garcia had an ongoing
             consensual sexual relationship with Diana Garcia ....... 36

        5.   Trial counsel failed to investigate and present
             evidence that Diana Garcia and Arturo Rodriguez
             continued selling drugs for Mr. Cruz-Garcia ................ 38

C. Trial counsel's investigation, preparation, and performance during the punishment phase was ineffective.................................................................. 39

  1. Trial counsel failed to sufficiently investigate and present mitigation evidence. .......................................... 40

      a. Trial counsel failed to hire a mitigation specialist or consult with appropriate experts. ...... 40

      b. Trial counsel failed to investigate available evidence by refusing to review the District Attorney's file, failing to request copies of the documents subpoenaed by the DA, and not making timely, appropriate record requests. ......... 41

      c. Investigation into Mr. Cruz-Garcia's life, including, but not limited to, investigation into his life in the Dominican Republic and Puerto Rico and his lengthy incarceration in Puerto Rico, was inadequate. ............................... 43

      d. After a constitutionally inadequate punishment phase investigation, trial counsel's presentation during punishment phase was cursory at best......................................... 45

      e. A plethora of mitigation evidence, and evidence that showed he would not be a future danger, was available for trial counsel to discover with minimal effort. ................................... 47

  2. Trial counsel failed to conduct a thorough and independent investigation, present relevant and available evidence, and rebut State witness's testimony related to extraneous offenses. ..................... 88

      a. Saul Flores murder................................... 88

      b. Kidnapping in Puerto Rico. .................................... 91

      c. Betico........................................................ 92

  3. Trial counsel were ineffective throughout the punishment phase testimony......................................... 92

D.  Trial counsel were ineffective during jury selection. ........... 95

    1.  Trial counsel's stipulation to remove potential jurors with apparently strongly held views of the death penalty before voir dire violated Mr. Cruz-Garcia's Sixth Amendment right to a jury drawn from a fair cross section of his community. ................... 96

    2.  Trial counsel's stipulation to exclude jurors and failure to create a full record of the exclusions denied Mr. Cruz-Garcia's right to effective assistance of counsel under the Sixth and Fourteenth Amendments. ............................................... 98

    3.  Trial counsel was ineffective when they agreed not to mention that the victim is a child and failed to explore potential juror's attitudes towards a case with both a child victim and sexual assault. ............... 101

    4.  Trial counsel were ineffective throughout the entire process of selecting a jury. ................................ 103

E.  Trial counsel were ineffective for failing to recognize the significance of Mr. Cruz-Garcia's foreign nationality and seek the assistance of the Dominican Republic Consulate in defending this case, in violation of the Sixth Amendment. .................................... 107

    1.  Trial counsel knew that Mr. Cruz-Garcia is a citizen of the Dominican Republic. ............................. 108

    2.  Both national and state bar guidelines highlight the steps that need to be taken in representing a foreign national in a capital case. ................................ 109

F.   Trial counsel were ineffective by failing to object on due process grounds to the state's introduction of extraneous offenses at the guilt/innocence phase of trial. ................................................................ 112

G.   Trial counsel were ineffective when they failed to object to the trial court's ex parte meeting with a juror during punishment phase deliberations. .......................... 114

H.   Trial counsel were ineffective for failing to investigate juror misconduct. ................................................. 114

I.   Trial counsel were ineffective for failing to object, and to federalize, constitutional errors at Mr. Cruz-Garcia's trial. ...................................................... 115

J.   Trial counsel's errors were prejudicial. ............................. 117

Claim 2   Direct Appeal counsel was ineffective. ...................................... 118

A.   Direct appeal counsel failed to make sure that the Texas Court of Criminal Appeals had a complete record for review. ................................................. 118

B.   Direct appeal counsel provided ineffective assistance by failing to challenge the trial court's improper ex parte meeting with a holdout juror during punishment phase deliberations. .......................... 118

C.   Direct appeal counsel was ineffective for failing to raise that the State obtained Mr. Cruz-Garcia's conviction and death sentence without providing his guaranteed consular notification under the Vienna Convention on Consular Relations. .................................... 119

Claim 3   The State obtained Mr. Cruz-Garcia's death sentence by knowingly soliciting false testimony in violation of his constitutional rights ................................................. 119

A.   The State knew, or should have known, that it was presenting false testimony regarding DNA evidence. ....... 120

1.   Trial testimony regarding DNA. .................................. 121

2.   Post-Conviction developments regarding DNA. .......... 122

v

B.    The State knowingly solicited false testimony from
      Johnny Lopez.................................................................. 125

C.    The State knowingly solicited false testimony from
      Mr. Santana on several topics material to trial................ 127

      1.    Mr. Santana's involvement and participation in
            the murder of Angelo Garcia........................................ 127

      2.    Mr. Santana's criminal history. ................................... 128

      3.    Favorable treatment in exchange for testimony. ........ 128

      4.    Cause and manner Saul Flores's death. ...................... 128

      5.    Extraneous rape. .......................................................... 130

D.    The State knowingly solicited false testimony from
      Diana Garcia and Arturo Rodriguez that they were not
      selling drugs for Mr. Cruz-Garcia at the time of the
      offense. .............................................................................. 131

E.    The State knowingly solicited false testimony from
      Angelita Rodriguez............................................................ 132

F.    The State knowingly solicited false testimony from
      Officer U.P. Hernandez that there were no ransom
      demands.............................................................................. 132

G.    The State knowingly solicited false testimony
      regarding a kidnapping in Puerto Rico. ............................ 133

H.    False testimony solicited by the State was material. ........ 133

Claim 4    Mr. Cruz-Garcia's rights to due process of law and a fair
           trial were violated when the trial court admitted
           unreliable DNA evidence............................................... 133

Claim 5    Mr. Cruz-Garcia's rights to present a defense and to cross
           examine witnessES were violated when the trial court
           refused to allow him to present evidence regarding the
           unreliability of the DNA evidence................................. 139

Claim 6    Mr. Cruz-Garcia's rights under the Eighth and Fourteenth
           Amendments were violated when his conviction was
           secured based on inaccurate and unreliable DNA evidence. ... 141

| | | |
|---|---|---|
| Claim 7 | Jurors committed misconduct during the punishment phase of Mr. Cruz-Garcia's trial. | 142 |
| | A. Jurors discussed the evidence on the courthouse elevator. | 142 |
| | B. Jurors discussed the evidence and a potential verdict during breaks in the trial. | 144 |
| | C. The jury foreman brought a Bible to the deliberation room and read passages to other members of the jury to influence them to vote for death. | 145 |
| Claim 8 | The trial court's ex parte meeting with a holdout juror during punishment phase deliberations violated Mr. Cruz-Garcia's due process rights. | 148 |
| | A. During penalty phase deliberations, Angela Bowman became a holdout juror for life | 148 |
| | B. The trial court held an ex parte meeting with Juror Bowman. | 150 |
| | C. The trial court did not inform trial counsel of the details of the ex parte conversation with Juror Bowman. | 152 |
| | D. Juror Bowman contacted trial counsel because she was distraught over her decision to capitulate during punishment phase deliberations. | 153 |
| Claim 9 | Mr. Cruz-Garcia's rights under the Sixth and Fourteenth Amendments were violated when he was unable to confront witnesses. | 155 |
| Claim 10 | The State obtained Mr. Cruz-Garcia's conviction and death sentence without providing his guaranteed consular notification, under the Vienna Convention on Consular Relations, in violation of the Fifth, Sixth, and Fourteenth Amendments. | 160 |

A. As a foreign national detained and on trial for capital murder in the United States, Mr. Cruz-Garcia had the right to be notified of his right to consular access under the Vienna Convention on Consular Relations. ...... 161

B. The State violated the Vienna Convention in Mr. Cruz-Garcia's case. ................................................................... 162

Claim 11      The State obtained Mr. Cruz-Garcia's conviction by withholding material exculpatory evidence from trial counsel, which violates the Sixth, Eighth, and Fourteenth Amendments. ........................................................... 167

Claim 12      Mr. Cruz-Garcia's constitutional right to a grand jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments was violated............. 170

Claim 13      Mr. Cruz-Garcia's constitutional right to a petit jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments was violated............. 171

Claim 14      The Harris County jury system discriminated in the selection of jurors in violation of the Equal Protection Clause of the Fourteenth Amendment...................................... 173

Claim 15      Contrary to the Supreme Court mandate in *Batson v. Kentucky*, the State improperly used peremptory challenges to systematically exclude racial minorities from serving on the jury. ................................................... 174

A. Latoya Johnson, venireperson No. 89. .............................. 174

B. Melinda Dixon, venireperson No. 98. ................................ 176

C. Johnny Bermudez, venireperson No. 92. .......................... 177

D. Gilberto Vazquez, venireperson No. 115. .......................... 177

Claim 16      Excluding jurors from Mr. Cruz-Garcia's venire without conducting adequate voir dire violated his right to a fair and impartial jury under *Witherspoon*...................................... 178

Claim 17      The State engaged in improper, inflammatory, and unduly prejudicial voir dire.................................................. 180

         A.   The prosecutor repeatedly compared Mr. Cruz-Garcia to Charles Manson and Adolf Hitler, invoking a racially-charged imagery of extermination of minorities.............................................................. 181

         B.   The prosecutor repeatedly invoked the Boston marathon bombing during voir dire as well as other well-publicized crimes. ........................................................ 182

         C.   The prosecutor repeatedly asked commitment questions of prospective jurors despite the trial court's warning to stop................................................................ 184

         D.   The prosecutor repeatedly and improperly suggested to the potential jurors that Mr. Cruz-Garcia had a criminal history that would be revealed during the punishment phase. ............................................... 185

         E.   The prosecutor specifically targeted women with biased, discriminatory questions. ....................................... 186

Claim 18      Portions of the record necessary for review and resolution of this petition are missing, in violation of Mr. Cruz-Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments. ............................................................ 187

Claim 19      Mr. Cruz-Garcia was not present during portions of his trial, violating his constitutional rights................................... 188

Claim 20      The State used inconsistent theories of the offense  and prosecution at a co-defendant's trial, violating  Mr. Cruz-Garcia's Rights constitutional rights. ....................................... 189

Claim 21      The trial judge presiding over the case had a conflict of interest, violating Mr. Cruz-Garcia's constitutional rights. .... 190

Claim 22      Repeated emotional outbursts from the gallery rendered Mr. Cruz-Garcia's conviction and death sentence fundamentally unfair................................................................ 191

Claim 23      Testimony was translated incorrectly to the jury, violating Mr. Cruz-Garcia's constitutional rights................................... 192

Claim 24      The trial court prohibited Mr. Cruz-Garcia from presenting powerful mitigation evidence to the jury in violation of the Eighth and Fourteenth Amendments. ....................................... 193

Claim 25    Prosecutors made numerous inappropriate and inflammatory comments throughout the trial, denying Mr. Cruz-Garcia his right to due process and fair trial. ................ 196

Claim 26    Prosecutors engaged in misconduct by using the subpoena power of the court to investigate the case, violating  Mr. Cruz-Garcia's constitutional rights. .......................................... 199

Claim 27    Mr. Cruz-Garcia is actually innocent. ....................................... 200

Claim 28    The punishment phase jury instructions restricted the evidence that the jury could determine was mitigating, violating Mr. Cruz-Garcia's constitutional rights. .................. 200

Claim 29    The trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence, violating Mr. Cruz-Garcia's constitutional rights. .................. 201

Claim 30    Mr. Cruz-Garcia's death sentence was imposed based on Texas's unconstitutionally vague first special issue in violation of his rights under the Eighth and Fourteenth Amendments. .......................................................................... 202

Claim 31    Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated based on Texas's arbitrary and discriminatory system of administering the death penalty. .... 203

PRAYER FOR RELIEF ................................................................... 204

VERIFICATION BY ATTORNEY ...................................................... 206

CERTIFICATE OF SERVICE .......................................................... 207

EXHIBITS LIST ........................................................................... 208

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the U.S. District Court for the Southern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Cruz-Garcia was convicted and sentenced and the district where he remains in custody.

## PARTIES

Petitioner Obel Cruz-Garcia is an inmate of the Texas Department of Criminal Justice (TDCJ). Mr. Cruz-Garcia's TDCJ number is 999584 and he is housed at the Polunsky Unit, Livingston, Texas.

Respondent Lorie Davis is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Cruz-Garcia.

## PROCEDURAL HISTORY

On July 15, 2013, a Harris County, Texas, jury convicted Mr. Cruz-Garcia of the capital murder of Angelo Garcia, Jr. 23 RR 102.  The same jury sentenced Mr. Cruz-Garcia to death on July 19, 2013. 27 RR 9–12. A motion for new trial was filed, which was denied on September 20, 2013. 29 RR 28. On October 28, 2015, the Texas Court of Criminal Appeals (CCA) denied his appellate claims and affirmed his conviction and sentence. *Cruz-Garcia v. State*, No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015); Ex. 1; Ex. 2. Subsequently, the United States Supreme Court denied his petition for writ of certiorari. *Cruz-Garcia v. Texas*, 136 S. Ct. 1518, 2016 WL 361842 (Apr. 4, 2016).

1

Mr. Cruz-Garcia, through appointed counsel, the Office of Capital and Forensic Writs (OCFW), filed an application for a writ of habeas corpus on August 27, 2015. Ex. 3. The OCFW filed a motion to recuse Judge Renee Magee from presiding over the state habeas proceedings on January 21, 2016, because she had personal knowledge of disputed evidentiary facts. That recusal motion was later denied.[1]

In ruling on the application for writ of habeas corpus, the trial court did not hold a hearing. On December 29, 2016—leaving even the caption "State's Proposed Findings of Fact" unchanged—the trial court adopted the State's version of the facts and the law verbatim and forwarded the writ to the CCA.

While his initial application was pending before the CCA, Mr. Cruz-Garcia filed a subsequent application on May 2, 2016. Ex. 4. He argued that the DNA evidence on which the State relied had been discredited by the State's own expert and that his conviction was based on false, misleading, and scientifically invalid testimony. The CCA entered an order on November 1, 2017, denying both the initial application and dismissing the subsequent application. *Ex parte Cruz-Garcia*, No. WR-85,051-02-03, 2017 WL 4947132, at *2 (Tex. Crim. App. Nov. 1, 2017); Ex. 5. The Supreme Court denied his petition for writ of certiorari. *Cruz-Garcia v. Texas*, 138 S. Ct. 2601, 2018 WL 707020 (June 4, 2018).

After the CCA denied Mr. Cruz-Garcia's applications for post-conviction relief, his OCFW attorneys moved for appointment of counsel to represent Mr. Cruz-Garcia

---

[1] The OCFW also later filed a Petition for Writ of Mandamus regarding the handling of the recusal motion, which was denied.

2

in federal habeas corpus proceedings. ECF No. 1. This Court granted the motion on December 20, 2017, and appointed the Federal Public Defender's Office for the Northern District of Texas to represent Cruz-Garcia. ECF No. 2. This Court then granted an Unopposed Motion to Enter a Scheduling Order and set the deadline for Cruz-Garcia's habeas petition as November 1, 2018, and the deadline for amendments to his petition as May 1, 2019. ECF No. 9, 11.

## PRELIMINARY STATEMENT

The jury that sat in judgment over Obel Cruz-Garcia did not hear significant exculpatory and mitigating evidence that would have called into question his guilt and suitability for a death sentence. Instead, they were presented with unreliable, inaccurate, and incomplete evidence, much of which has since been discredited by post-conviction developments. The combination of ineffective assistance of counsel, prosecutorial misconduct, and trial court error renders Cruz-Garcia's conviction and death sentence unconstitutional, and a new trial is warranted.

Late in the evening of September 30, 1992, two masked intruders entered the apartment of cocaine dealers Diana Garcia and Arturo Rodriguez. During the home invasion, Garcia was sexually assaulted and her son, six-year-old Angelo Garcia Jr., was kidnapped. When officers from the Houston Police Department (HPD) arrived, they found the apartment in disarray. They collected a variety of evidence, including Garcia's clothing and a cigar found in the living room, and transported Garcia to a local hospital for a sexual assault examination. HPD, in conjunction with the FBI, began processing evidence and searching for the suspects based on the description from Garcia and Rodriguez: two black males.

3

Early in its investigation, HPD uncovered that Garcia and Rodriguez had lied to them the night of the incident. While they initially claimed not to be drug dealers, they later admitted to dealing cocaine and identified their supplier as a Hispanic man originally from the Dominican Republic—Obel Cruz-Garcia. However, despite both seeing Cruz-Garcia on a weekly basis, neither Garcia nor Rodriguez would ever identify Cruz-Garcia as one of the intruders. Over a month after his disappearance, Angelo Garcia Jr.'s body was found on the banks of Goose Creek in Baytown, Texas. The case remained unsolved for years.

Investigators sent the evidence collected from the scene to the old HPD crime lab for testing, a lab best known for mishandling, misanalysing, and contaminating DNA evidence, including in some instances outright faking DNA results. The lab's incompetence and malfeasance led to multiple defendants later being exonerated based on the shoddy work performed there, and it was eventually closed in 2002. Three of the lab employees who handled or tested the evidence in this case were implicated in the scandal: Joseph Chu, Baldev Sharma, and Deetrice Wallace.  Chu had nine allegations of misconduct made against him, Sharma five, and Wallace was later convicted of three counts of tampering with a government record. The testing by the notorious HPD crime lab produced no beneficial leads for investigators in this case. Yet the fact that the lab, and these specific employees, handled and tested this evidence raises serious concerns about contamination and the utility of DNA evidence in this case.

In 2007, the case was reopened. Evidence that was previously tested and stored at the HPD crime lab was sent to a new lab, Orchid Cellmark, for DNA testing. It inculpated Cruz-Garcia, and he was indicted the following year for capital murder.

Cruz-Garcia's capital murder trial began in 2013. The State presented evidence that Cruz-Garcia and Rogelio Aviles-Barroso were the masked intruders who entered the apartment in 1992, and that Carmelo Martinez Santana waited in the car and later participated in the murder of Angelo Garcia, Jr. The State's case against Cruz-Garcia rested largely on three pieces of evidence. First, the DNA evidence that was matched to Cruz-Garcia. ***Despite the disgraced HPD crime lab handling and testing this evidence, the trial court refused to allow trial counsel to present evidence regarding the negligence, incompetence, and malfeasance that occurred there***. Second, the testimony of Santana, who described Cruz-Garcia as the ringleader of the group who directed the events. Third, the testimony of Angelita Rodriguez, Cruz-Garcia's wife in 1992 and Santana's cousin, who claimed that Cruz-Garcia had confessed to committing the offense. The jury found Cruz-Garcia guilty of capital murder and later sentenced him to death.

Developments in post-conviction cast serious doubt over the jury's verdict and significantly change the evidentiary landscape used to convict Cruz-Garcia. DNA evidence presented at trial linked Cruz-Garcia to the vaginal swabs from the sexual assault kit, Garcia's underwear, and the cigar found in the apartment. However, after trial, the State issued an amended DNA report, contradicting the trial testimony. This report was generated after problems were identified regarding the way that labs

analyzed DNA results with multiple contributors present. In the amended report, ***the prior results linking Cruz-Garcia to the vaginal swabs from Garcia were recanted.*** Now, no conclusions can be made regarding that DNA. Additionally, that amended report noted that, again contrary to trial testimony, no conclusions could be made regarding the minor component of the DNA found on Garcia's underwear, thereby establishing the presence of an unknown person's DNA.

While the amended report noted that Cruz-Garcia could not be excluded as a possible contributor to the DNA found on Garcia's underwear, new evidence not presented to the jury offers an innocuous reason for its presence—assuming the evidence that passed through the disgraced HPD crime lab has any probative value at all. Multiple witnesses have provided statements that Cruz-Garcia and Garcia were having a consensual sexual relationship at the time of the offense. Troublingly, during Cruz-Garcia's trial, the state presented testimony that a consensual relationship was not occurring, misleading the jury.

Santana's testimony does not withstand scrutiny either. His eventual trial testimony was wildly contradictory compared to his other statements to the police, casting his credibility into serious doubt at the outset. But significant new developments cast create even further doubt about his credibility. The State allowed him to misrepresent his criminal history during trial, where he lied about critical facts regarding a previous assault that he committed while trying to kidnap a child. Santana's misrepresentations led the trial court to hold that the conviction was inadmissible. During the punishment phase, Santana purported to inculpate Cruz-

Garcia in a second capital murder. However, new witness statements and evidence from that autopsy conclusively establish that Santana lied during his testimony regarding the cause and manner of death. And, the prospect that Santana had an undisclosed deal looms large; he testified to participating in two capital murders, but astonishingly he was never tried for either of them.

Angelita Rodriguez's testimony that Cruz-Garcia confessed to her fairs no better. Unbeknownst to the jury, she was interviewed multiple times by law enforcement, and did not mention this supposed confession and instead disclaimed any knowledge of how Angelo Garcia Jr. died. Moreover, she also mislead the jury regarding the circumstances surrounding Cruz-Garcia's alleged confession to her.

Similarly, significant and readily-available mitigation evidence, or evidence rebutting that he would be a future danger, was not presented to the jury because trial counsel failed conduct a reasonable pre-trial investigation into Cruz-Garcia's life history. Had they conducted a reasonable investigation, they could have presented evidence that when Cruz-Garcia was serving prison time in Puerto Rico, he was given tremendous privileges and trust in the prison not conferred on most other inmates. Cruz-Garcia was also allowed to work in the "corporation" area, which allowed inmates access to power tools and other potentially dangerous objects that were used for making furniture. Only inmates who were well-behaved, hard-working, and had earned trust were permitted to work there. He spent years with no incidents and was generally a model inmate.

Many of Cruz-Garcia's friends and family remain in either the Dominican Republic or Puerto Rico, yet trial counsel spent minimal time gathering information from there. Had they done so, they would have learned that Cruz-Garcia had to grow up very early in life. When he was very young, Cruz-Garcia's father was in a serious car accident, spent months in a coma and having multiple surgeries. In the meantime, Cruz-Garcia's mother left the country and abandoned him. As the eldest child, Cruz-Garcia had to care of his siblings and his bed-ridden father. As he grew up, many people in the community considered Cruz-Garcia to be a provider, a caretaker and someone that they could rely on when in need.

Moreover, trial counsel failed to consult with experts to present the jury with information regarding the impact of his life history and significant trauma that he experienced—none of which the jury heard. The defense team presented a bare-bones mitigation case with just a couple of live witnesses, omitting critical components of his background that support a life sentence.

In short, the evidence as it was presented to the jury bears little resemblance to reality. The jury was deprived of the tools to assess the utility, or lack thereof, of the DNA evidence, repeatedly mislead regarding Cruz-Garcia's actions around the time of the crime and after, exposed to outright lies regarding extraneous offenses, and left in the dark about Cruz-Garcia's trials and tribulations that informed the man he became later in life. In light of the wealth of new evidence never presented to the jury, Mr. Cruz-Garcia's conviction and sentence of death should be vacated.

## CLAIMS FOR RELIEF

**Claim 1        Mr. Cruz-Garcia's Sixth Amendment right to effective assistance of counsel was violated.**

1.    In violation of the Sixth Amendment, Mr. Cruz-Garcia's trial counsel provided him with ineffective assistance. U.S. CONST. amend. VI. Trial counsel's performance was deficient and prejudicial in light of prevailing professional standards and United States Supreme Court precedent. *Strickland v. Washington*, 466 U.S. 688 (1984); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) (hereinafter "2003 ABA Death Penalty Guidelines". Counsel were ineffective regarding the investigation, preparation for, and presentation at all stages of Mr. Cruz-Garcia's trial, including pre-trial proceedings, jury selection, and the guilt/innocence and punishment phases of trial.

2.    Trial counsel's failures were the product of negligence or a failure to conduct a reasonable investigation of the facts and law in preparation for Mr. Cruz-Garcia's trial.

3.    Trial counsel were ineffective for the following non-exclusive reasons.

### A.    Trial counsel's investigation and pre-trial preparation fell below prevailing professional norms.

4.    Trial counsel's investigation into, and preparation for, Mr. Cruz-Garcia's trial fell below prevailing professional norms. As a result, trial counsel were not adequately prepared to represent Mr. Cruz-Garcia, and in turn the jury did not hear significant exculpatory evidence and evidence that would have militated against the death penalty. It also prevented trial counsel from presenting

significant impeachment evidence regarding the State's critical witness, among other reasons detailed herein.

5. Trial counsel failed to maintain a proper workload and as a result were prevented from devoting the time needed to adequately prepare for Mr. Cruz-Garcia's trial. *See* 2003 ABA Death Penalty Guidelines, 6.1.

6. Trial counsel represented Mr. Cruz-Garcia on a flat-fee arrangement in violation of professional standards. *See* 2003 ABA Death Penalty Guidelines, 9.1(B)(1).

7. After learning that Mr. Cruz-Garcia was a citizen of the Dominican Republic, trial counsel failed to make appropriate efforts to inform him of his right to communicate with the consular office. *See* 2003 ABA Death Penalty Guidelines, 10.6. This prevented Mr. Cruz-Garcia from having access to valuable consular resources and assistance.

8. Trial counsel failed to conduct a thorough and independent investigation into issues of guilt/innocence and punishment and failed to utilize a mitigation specialist. *See* 2003 ABA Death Penalty Guidelines, 4.1, 10.7, 10.11. In support, Mr. Cruz-Garcia shows the following:

    a. In early 2010, after Mr. Cruz-Garcia was indicted for capital murder, but prior to the State's decision to seek the death penalty, the trial court appointed Mike Fosher and Mario Madrid to represent him. CR 8, 11.

b.  Around one month later, in April 2010, Mr. Cruz-Garcia's family retained Steven Shellist and Christian Capitaine, and the trial court removed Mr. Fosher and Mr. Madrid as counsel. CR 19–21.

c.  For over a year, from April 2010 to August 2011, Mr. Shellist and Mr. Capitaine focused their investigation on the DNA testing they believed would be the focus of the State's case. Because the State had not indicated it would seek death, Mr. Shellist and Mr. Capitaine conducted no punishment-phase investigation and did not hire a mitigation specialist. *See* Ex. 6.

d.  After the State decided to seek the death penalty against Mr. Cruz-Garcia, Mr. Shellist and Mr. Capitaine withdrew from the case because neither were on the list of approved capital counsel. CR 326; 4 RR 6–7; Ex. 6 ¶2.

e.  The same day, on August 31, 2011, the trial court appointed Skip Cornelius as lead counsel and Mario Madrid as second chair counsel. CR at 57–58.

f.  According to billing records, counsel waited almost nine months, until May 2012, to begin investigating the case. Ex. 7 at 6.

g.  Finally, in May 2012, counsel retained the Houston-based private investigation firm of J.J. Gradoni and Associates. Mr. Gradoni also received assistance from a licensed investigator, Edna Velez, who worked for the firm. Though the investigators were tasked with

11

interviewing family, friends, and other witnesses who could provide mitigation information, the investigators were not qualified as mitigation specialists. Nor does it appear that counsel believed they were operating as mitigation specialists for the defense team. Mr. Gradoni confirms as much, focusing on his firm's many years of experience in guilt/innocence investigations. Ex. 8 at ¶2. Mitigation investigation was at best a secondary assignment, and limited at that, as they were instructed merely "to get as much beneficial information that we could about the defendant's upbringing, family members, etc." *Id.*

h.  During the remainder of 2012, the investigators worked a total of only seventy-one hours on Mr. Cruz-Garcia's case. Ex. 7 at 6–7.

i.  Mr. Cruz-Garcia was born in the Dominican Republic and spent a considerable amount of time living in Puerto Rico as well, making both places critical to the investigation of Mr. Cruz-Garcia's life history.

j.  Trial counsel were clearly aware of the potential importance of the Dominican Republic and Puerto Rico to the investigation. In their motion to justify investigation expenses, counsel stated that "investigators will in all likelihood be required to go to Puerto Rico to properly investigate this case. Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case." CR at 384–85.

k.  There is no indication that the trial team ever traveled to Puerto Rico. Despite initially identifying Puerto Rico as an important setting in Mr. Cruz-Garcia's life, investigators only spoke to two witnesses from the island—both by phone. In June 2012, investigators conducted a single phone interview with Mr. Cruz-Garcia's brother, Joel. After the June 2012 interview, investigators only conducted two follow-up conversations with Joel, in June and July 2013, in preparation for him to be a witness at trial. Investigators interviewed Mr. Cruz-Garcia's common law partner, Dorca, by phone after the trial had begun, the jury was seated, and the testimony was about to start, on July 5, 2013.  The investigators state they have no recollection of counsel suggesting they travel to Puerto Rico. Ex. 8 at ¶¶4–5. There are no records or memos to indicate that other witnesses from Puerto Rico were contacted or that attempts were made to collect records relating to Cruz-Garcia's life history in Puerto Rico.

l.  During 2013, the investigators conducted witness interviews in and around the Houston area, primarily between April and July 2013. Ex. 7 at 10–11, 46–49. Investigators also conducted phone interviews of family witnesses in the Dominican Republic and traveled to the Dominican Republic one time from May 5–9, 2013, for in-person interviews. *Id.* at 26.

13

m. In mid-2012, trial counsel filed motions asking for expenses for "investigation" and for "mental health and mitigation." CR 384, 387. The "investigation" motion requested funds for using Gradoni and Associates. *Id.* at 384. The "mental health and mitigation" motion sought funds for an expert witness related to mental health and mitigation issues. *Id.* at 387. Trial counsel indicated they retained psychologist Dr. Susana Rosin to function essentially as a mitigation specialist.

n. Trial counsel's "mental health and mitigation" motion states that Dr. Rosin had been retained to do "testing, review of documents, consultation, and possible testimony" relating to "issues of mental health and mitigation." CR at 387. In support of the motion, counsel attached a letter from Dr. Rosin in which she stated that, based on her understanding of her role on the case and its complexity, her role would involve approximately sixty to seventy hours of work. *Id.* at 390. The trial court approved funds up to $17,400 for this purpose. *Id.* at 389.

o. However, trial counsel did not ask Dr. Rosin to function as a mitigation specialist on the defense team.  After receiving approval for expenses for Dr. Rosin in July 2012, counsel did not have her perform any work on the case *for nearly a year*, until May 2013. Other than a phone call with the investigators on January 6, 2013 (for which Dr. Rosin did not bill time), Dr. Rosin reviewed records for two hours on May 9, 2013, and evaluated Cruz-Garcia for three hours on May 15, 2013. Ex. 7 at 21. She

then spoke with counsel for an hour on June 27, 2013 and prepared an expert report in an hour on July 1, 2013. *Id.* at 21. Thus, in total, Dr. Rosin performed only seven hours of work on Mr. Cruz-Garcia's case.

9. The lack of a thorough, independent investigation into both stages of Mr. Cruz-Garcia's trial had a significant impact on the ultimate presentation of evidence to the jury. A sizeable quantity of critical records were either not requested or not reviewed, and numerous witnesses with crucial information pertaining to the guilt/innocence and punishment phases were not interviewed. A social history of Mr. Cruz-Garcia's life was never adequately developed.

10. Trial counsel also failed to consult with and present necessary expert witnesses, s*ee* 2003 ABA Death Penalty Guidelines, 10.7, 10.11(F)(2), including, but not limited to:

    a.  An expert regarding DNA evidence;

    b.  An expert or someone familiar with interpreting Mr. Cruz-Garcia's record from his time in prison in Puerto Rico;

    c.  An expert who could have explained to the jury the impact of the complex trauma Mr. Cruz-Garcia suffered;

    d.  An expert familiar with the history of migration from the Dominican Republic to Puerto Rico who could have explained Mr. Cruz-Garcia's life as a migrant in a larger socio-economic context and cultural pressures;

15

e.  A neuropsychologist to determine whether Mr. Cruz-Garcia suffers from issues with cognitive functioning, executive functioning, or other potential factors relating to his brain functioning;

f.  A physician who could have evaluated Mr. Cruz-Garcia for presence of physical conditions that may impair his cognitive functioning, such as vascular dementia caused by high blood pressure or other conditions that warrant a life sentence;

g.  A culturally competent expert who could explain to the jury the Dominican Republic's culture and customs, particularly concerning masculinity, traditional gender roles, marriage, divorce, and child rearing;

h.  A substance abuse expert; neuropsychiatrist; toxicologist; medical examiner or pathologist; forensic specialist; and an expert in religious studies.

11.  Some, but not all, consequences of trial counsel's failure to retain certain experts are detailed in subsequent sections.

12.  Trial counsel failed to review files made available to them by the District Attorney's Office.

13.  Trial counsel failed to move to quash pre-trial subpoenas that the District Attorney's Office was using to improperly investigate the case and to move to suppress the evidence they gathered as a result of misuse of the subpoenas.

**B.     Trial counsel's investigation, preparation, and performance during the guilt/innocence phase was ineffective.**

14.    Mr. Cruz-Garcia specifically incorporates all other allegations in this claim of ineffective assistance by this specific reference including, but not limited to, the Section detailing that trial counsel's investigation and pre-trial preparation was below prevailing professional norms. *See* Section Claim 1A above.

**1.  Trial counsel failed to retain a DNA expert.**

15.    DNA evidence was the crucial factor that led to Mr. Cruz-Garcia's arrest and conviction. It amounted to the only physical evidence relating to the 1992 death of Angelo Garcia, Jr., which tied Mr. Cruz-Garcia to the offense over fifteen years later. Without this evidence, Mr. Cruz-Garcia likely would not have been tried for the offense. Yet, Mr. Cruz-Garcia's trial counsel failed to retain a DNA expert.

16.    Had trial counsel done so, they could have presented testimony at the suppression hearing that the very issues that lead to the closure of the HPD crime lab in 2002 were present in Mr. Cruz-Garcia's case, which would have led to the suppression of the DNA evidence.

17.    Moreover, an independent review of the DNA evidence in this case would have revealed problems with the DNA testing and analysis later performed by Orchid Cellmark, calling into question the statistical and scientific validity of the DNA evidence presented by the State.

18.     Further, even if the DNA evidence was not suppressed and was ultimately admitted at trial, the aforementioned evidence could have been presented to undermine the State's DNA evidence during the guilt/innocence phase.

### a. DNA evidence from the suppression hearing and trial.

19.     Prior counsel for Mr. Cruz-Garcia, Mr. Shellist and Mr. Capitaine, filed a Motion for Continuance in January 2011 to allow time for an independent DNA expert to review the State's DNA evidence. CR 221–31; Ex. 6 at ¶4. Mr. Shellist and Mr. Capitaine recognized that because DNA was the only physical evidence linking Mr. Cruz-Garcia to the crime, "evaluating the integrity of the DNA evidence would be crucial in determining whether or not Cruz-Garcia could be connected to the sexual assault of Diana Garcia and the kidnapping and subsequent death of her son." Ex. 6 at ¶3; CR 227. Mr. Shellist and Mr. Capitaine were also aware that specific employees of the HPD crime lab who had handled evidence in Mr. Cruz-Garcia's case had since been found to have engaged in serious, and in some cases criminal, misconduct. CR 227–28; Ex. 6 at ¶3.

20.     Mr. Shellist and Mr. Capitaine contacted Dr. Elizabeth Johnson, a private forensic scientist and DNA analyst, to consult with them about the DNA evidence in the case and review the DNA testing performed by the State. CR at 229; Ex. 6 at ¶4; Ex. 9 at 2. Had that review produced helpful results, they intended to use that information to suppress the State's DNA evidence. Alternatively, they intended to present Dr. Johnson as a witness at trial or to

consult with her for assistance in cross-examining the State's witnesses pertaining to DNA. Ex. 6 at ¶5.

21.   When Mr. Shellist and Mr. Capitaine withdrew from Mr. Cruz-Garcia's case, they told new counsel—Mr. Cornelius and Mr. Madrid—that they would be happy to consult about the case and share their thoughts and ideas for Cruz-Garcia's defense. Ex. 6 at ¶6. Trial counsel declined to consult with them about the case. *Id.* Trial counsel did not retain Dr. Johnson or any other DNA expert to review the DNA testing performed in Mr. Cruz-Garcia's case.

22.   Trial counsel filed a Motion to Suppress Results of All DNA Testing on June 14, 2013, asserting that Mr. Cruz-Garcia's rights to a fair trial and due process of law would be violated if the court admitted DNA evidence "that was stored and/or processed by the former now defunct HPD crime lab." CR 454–56. The motion explained that the DNA evidence the State sought to introduce had been submitted to the now-defunct HPD crime lab before being sent to other labs for testing. *Id.* at 454–55. And, that the HPD crime lab was the subject of various investigations and reports (including the Bromwich Report), which found rampant false testing results, mishandling of evidence, misconduct, criminal activity, and incompetence, including in the time period in which the HPD crime lab handled the DNA evidence in Mr. Cruz-Garcia's case. *Id.* at 455.

23.   The trial court held a suppression hearing on June 19, 2013. 16 RR.

24.    At the suppression hearing, former HPD Sergeant Eric Mehl testified that several items of evidence that had been collected around of the crime, including a cigar that had been recovered at the scene of the crime, a sexual assault kit that was taken from Diana Garcia the night of the assault, a cutting from Diana Garcia's panties, and blood samples taken from Diana Garcia and Arturo Rodriguez.  These items were stored in the HPD property room and at the former HPD crime lab. 16 RR 30–35. According to Sgt. Mehl, there did not appear to be issues with their storage or handling. *Id.* Sgt. Mehl sent these items to forensic testing lab Orchid Cellmark for analysis. *Id.*

25.    Orchid Cellmark's analysis showed that Mr. Cruz-Garcia could not be excluded as a contributor to the DNA on the cigar; that Mr. Cruz-Garcia could not be excluded as a contributor to the mixture DNA profile obtained from the sperm cell fraction of the vaginal swabs; and that the DNA profile obtained from the sperm cell fraction of the panties was a mixture of at least two individuals, to which Cruz-Garcia could not be excluded as a contributor to the major component. 16 RR 91–92. Similar testimony regarding DNA evidence was later presented at Mr. Cruz-Garcia's trial. 20 RR 33–68.

26.    The subsequently closed HPD crime lab was actively involved in testing the evidence used against Mr. Cruz-Garcia. 16 RR 68, 85–87, 95.

27.    Several specific HPD crime lab analysts were involved in the handling of DNA evidence in Mr. Cruz-Garcia's case. Courtney Head testified that a criminalist named Joseph Chu had obtained a hair sample from a suspect in 1992 and also

had received buccal swabs from Mr. Cruz-Garcia in 2010. 16 RR 85–86. Ms. Head also testified that a former HPD crime lab employee named B. Sharma was the main DNA analyst on the extractions taken from the sexual assault kit in 1992. *Id.* at 86–87, 97. Ms. Head further testified that another HPD crime lab employee named Deetrice Wallace initially received the sexual assault kit and did some screening to detect blood or semen. *Id.* at 98.

28.   Mr. Cruz-Garcia offered evidence that investigations into the workings of the HPD crime lab over the time period that the lab was in possession of evidence his case had resulted in scathing reports of malfeasance at the lab, including contamination of evidence and incorrect analyses, and the eventual closure of the lab. 16 RR 16–18. Specific individuals who had handled evidence in the case were found, through these investigations, to have committed misconduct in their work at the lab. *Id.* at 17, 108.

29.   Mr. Cruz-Garcia submitted several reports of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room, Michael Bromwich; the HPD Internal Affairs Division investigation summary; employee complaint histories of Joseph Chu and Baldev Sharma; and judgments of conviction of Deetrice Wallace. 16 RR 21. These records demonstrated that Joseph Chu had received nine allegations of misconduct as an employee of the HPD crime lab and that he had, on several occasions, failed to report DNA statistics properly. Defense Ex. 8–9; 17 RR 14–15. The records also showed that Baldev Sharma had received five allegations of misconduct

21

as an employee of the HPD crime lab, including an allegation of criminal activity; that he had been cited for violations of competence and truthfulness; and that the DNA/Serology Section of the lab was a "total disaster" under his management. Defense Ex. 2–3, 8–9; 17 RR 15–16. The records further demonstrated that, as an employee with the Department of Public Safety, Deetrice Wallace had been convicted of three counts of tampering with a governmental record. Defense Ex. 17; 17 RR 16.

30. Trial counsel conceded they could not show that the type of mishandling of evidence detailed in the investigative reports and employee records occurred with respect to any of the evidence in Cruz-Garcia's case. 16 RR 18, 108.

31. In ruling on counsel's Motion to Suppress, the trial court concluded that "the DNA evidence that relates to Orchid Cellmark testing is sufficiently reliable and relevant and is admissible." 17 RR 4. Specifically, the court found that the sexual assault kit was sealed when Sgt. Mehl retrieved it from the HPD property room annex and sent it to Orchid Cellmark in 2007 and that "there is no evidence in this case that any of the . . . DNA evidence in question was stored in a manner or placed in a location that is alleged to be subject to contamination, mishandling, or malfeasance by the HPD property room or the old HPD Crime Lab." *Id.* at 7, 12.

32. The trial court found that the Bromwich Report submitted by trial counsel detailed myriad issues with the DNA Serology Section of the old HPD crime lab, including "deficiency in documentation of procedures, mistakes in

performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standard of operating procedures." 7 RR 13. However, the trial court held that "[n]o issues have been identified in the Bromwich Report or in this hearing or in any discovery that the Court has been made aware of that there were any concerns addressed in those items regarding the evidence in this case." *Id.*

### b. Evidence from an independent DNA expert undermines the State's evidence.

33.   Newly presented evidence in post-conviction significantly changes the evidentiary landscape regarding DNA evidence. Daniel Hellwig is the Laboratory Director of Sorenson Forensics, a private forensic lab in Salt Lake City, Utah, that provides forensic DNA casework services for entities including crime labs, law enforcement agencies, and courts throughout the country. Ex. 10 at ¶1. Had trial counsel retained an independent DNA analyst such as Mr. Hellwig to review the results of the DNA testing performed in Mr. Cruz-Garcia's case, they would have discovered that the same issues detailed in the Bromwich Report—including improper storage of evidence and errors in analyzing mixture DNA profiles and calculating statistical probabilities— were, in fact, present in Mr. Cruz-Garcia's case, not only with regard to the

HPD crime lab's initial handling of the evidence but also with regard to the testing performed later by Orchid Cellmark.

34. Mr. Hellwig's review of the chain of custody documentation uncovered serious concerns about the integrity of the probative pieces of evidence in Mr. Cruz-Garcia's case—specifically, the sexual assault kit and the cutting of the panties from which incriminating DNA evidence was later discovered.

35. Contrary to the testimony of Sgt. Mehl and Matt Quartaro at the suppression hearing and trial, the Orchid Cellmark chain of custody documentation revealed that the outer FedEx box in which Orchid Cellmark received the sexual assault kit was sealed, the sexual assault kit itself was *unsealed* when it was received by Orchid Cellmark. This sexual assault kit was in the custody of HPD for approximately fifteen years before it was sent to Orchid Cellmark. Furthermore, although the manila envelope containing the cutting from the panties was identified as a sealed container, two integral pieces within that sealed package were noted as unsealed. The unsealed envelopes contained within this package housed the cutting from the panties and the known blood sample from Arturo Rodriguez. Ex. 10 at ¶¶9, 10.

36. This failure to adhere to basic chain of custody protocols calls into doubt the overall reliability of the evidence handling in Cruz-Garcia's case. Ex. 10 at ¶¶10, 23.

37. Mr. Hellwig determined that Orchid Cellmark failed to follow prevailing guidelines with regard to the inclusion of Arturo Rodriguez in the mixture

DNA profile obtained from the cutting of the panties. Instead of being identified as Arturo Rodriguez by Orchid Cellmark, the second contributor to the mixture found on the cutting of the panties should have been correctly described "unknown." Ex. 10 at ¶14. Furthermore, Orchid Cellmark failed to report any statistical evaluation with respect to the inclusion of Arturo Rodriguez in the mixture DNA profile. This failure directly contradicts the Scientific Working Group on DNA Analysis Methods (SWGDAM) guidelines, which state that any inclusion (or non-exclusion) must be reported along with a statistical weight to aid the trier of fact in the strength of the inclusion. Because Orchid Cellmark did not do a statistical calculation on this DNA mixture, they should not have included Arturo Rodriguez as a possible contributor to this mixture. *Id.* at ¶¶12–14. The State conceded this point in its amended DNA report issued well after Mr. Cruz-Garcia's trial and after his initial state post-conviction application was filed. Ex. 11 at 2.

38.   In addition, the DNA mixture obtained from the cutting of the panties was only detected in four of fifteen DNA loci and at very low levels. As such, it is very unlikely that any of these loci would be deemed suitable for statistical analysis, and, thus, it would be impossible to obtain the required statistical weight. The comparison between the cutting of the panties and Arturo Rodriguez should, therefore, have been deemed inconclusive. Ex. 10 at ¶13.

39.   Thus, testimony at trial that Arturo Rodriguez was the second contributor to the mixture DNA profile obtained from the sperm cell fraction from the cutting

of the panties was misleading, and trial counsel should have countered it with their own DNA expert. Based on the genetic material recovered, there is insufficient information for a laboratory to conclude that Arturo Rodriguez, rather than an unknown contributor, was the second source of the male DNA present in this mixture. Ex. 10 at ¶¶14, 24.

40. Mr. Hellwig also found that Orchid Cellmark failed to follow the SWGDAM guidelines with regard to the lab's statistical analysis of the sperm cell fraction of the vaginal swab—similar to the conclusion issued in the amended lab report well after trial. Ex. 11. When utilizing the statistical method used in this analysis, the Combined Probability of Inclusion (CPI), it is essential to evaluate the DNA profile obtained to ensure that no allelic dropout has occurred—that is, that no DNA information is "missing" from the profile due to minute amounts of input DNA or DNA degradation—as this will invalidate the CPI statistic. With regard to the sperm cell fraction of the vaginal swab, there are several DNA loci that appear to be at a low enough level that the Orchid Cellmark laboratory should have precluded them from statistical analysis. There are even indications of missing alleles where the laboratory still improperly utilized this DNA locus for statistical analysis, raising concerns of allelic dropout. Ex. 10 at ¶¶15–16.

41. The SWGDAM guidelines recommend incorporation of a stochastic threshold to ensure that no allelic dropout is occurring. However, Orchid Cellmark

apparently failed to utilize a stochastic threshold in this case, again bringing in to question the analysis of the vaginal swab. Ex. 10 at ¶16.

42. Additionally, Orchid Cellmark violated fundamental principles of forensic analysis by providing two separate statistical analyses for the DNA profile obtained from the vaginal swab, one for the inclusion of Arturo Rodriguez and another for the inclusion of Mr. Cruz-Garcia.  It is essential that evaluation of the unknown evidentiary DNA profile occur with no bias from the known samples that will be compared. Essentially, an unknown evidentiary profile should be evaluated for suitability for comparison as well as statistical analysis before introducing the known, potential suspect samples. Conversely, in this case, the statistics were changed for the subsequent inclusion of Cruz-Garcia. This practice is a violation of both SWGDAM guidelines as well as fundamental principles of forensic analysis.  It is essential to do everything possible to remove interpretational bias, and Orchid Cellmark's failure to do so calls into question the comparison as well as the statistics generated as a result of this comparison. Ex. 10 at ¶¶17, 25.

43. HPD criminalist Courtney Head testified that she compared Cruz-Garcia's DNA profile to the DNA profiles that Orchid Cellmark had obtained from the evidentiary samples, rather than performing DNA testing on the evidentiary items herself. 21 RR 159–60. However, a laboratory's reanalysis of the work of another forensic DNA laboratory runs counter to best scientific practice.  The analysis and interpretation of forensic DNA profiles should be done utilizing

27

the procedures, protocols, and interpretation thresholds of the laboratory that originally processed and created the profiles. Ex. 10 at ¶18.

44.   It would be impossible for the HPD laboratory to evaluate for stochastic dropout when Orchid Cellmark did not appear to use a stochastic threshold in its original interpretation. Ex. 10 at ¶19.

45.   Furthermore, the HPD laboratory could not have a thorough understanding of the validation documentation, procedures, and thresholds specific to the Orchid Cellmark laboratory processing necessary to accurately reinterpret this profile. Without intimate knowledge of, and proper adherence to, the validated procedures, thresholds, and specifications of the Orchid Cellmark laboratory at the time of its interpretation, the HPD laboratory would not be utilizing the interpretation that is unique to the laboratory that the data was created in and interpreted under.  Ex. 10 at ¶19.

46.   In its reinterpretation of the DNA mixture obtained from the vaginal swab, the HPD laboratory also questionably (1) *excluded* a DNA marker in its statistical calculations that was originally included by the Orchid Cellmark interpretation and (2) *included* a DNA marker that was originally excluded by the Orchid Cellmark interpretation. There is no documentation that explains the reason behind this interpretation decision by the HPD laboratory. Such an action is another example of the problems that stem from HPD's reinterpreting data that was not generated at its own laboratory. Ex. 10 at ¶20.

47. The findings of Mr. Hellwig's review indicate that the very types of issues detailed in the Bromwich Report—and in the disciplinary reports of specific HPD crime lab employees who handled evidence in this case—*did* exist with regard to the handling and testing of DNA evidence in this case. The failure of HPD and Orchid Cellmark to adhere to basic best practices and prevailing guidelines calls into question the entirety of the handling and analysis of DNA evidence in this case.

48. Had trial counsel retained an independent DNA expert, they also would have been able to effectively rebut or cross-examine the State's expert, Mr. Quartaro, who provided false testimony about the source of DNA and the possibility of cross-contamination from the cigar to the panties. Contrary to Mr. Quartaro's testimony, even if it were possible to reliably determine that Mr. Cruz-Garcia's DNA was present in the sperm fraction, it does not mean that DNA came from sperm. DNA from epithelial (skin) cells is also present in the sperm fraction. 21 RR 120. Trial counsel would also be able to rebut Mr. Quartaro's false testimony that Mr. Cruz-Garcia's sperm would have been necessary to contaminate the items from the sexual assault kit and the panties. 21 RR 139. While both the vaginal swab and the cutting from Ms. Garcia's panties showed the presence of sperm, because they were mixture DNA samples, contrary to the State's argument at trial, it cannot be said that it was Mr. Cruz-Garcia's sperm. DNA analysis does not identify the source of DNA, and someone else's sperm—the unknown contributor—could have been mixed

with Mr. Cruz-Garcia's skin cells (or other DNA source) and produced the result here.

49.    Trial counsel's failure to retain an independent DNA expert to review the DNA testing performed in this case—a case in which the State's case for guilt rested primarily on DNA evidence and in which counsel were aware of myriad problems at the lab that initially handled the evidence—was objectively unreasonable. Had trial counsel done so at the suppression hearing, the evidence would not have been admitted at trial. Had the DNA evidence still been admitted, counsel could have presented this evidence to effectively undermine the State's theory at the guilt/innocence phase.

50.    Mr. Cruz-Garcia specifically incorporates all other allegations in other portions of this petition relating to DNA evidence.

### 2. Trial counsel failed to investigate and present evidence that countered the State's version of the offense and to impeach the credibility of the State's witnesses.

51.    Trial counsel's failure to investigate and prepare for the guilt/innocence phase led to them either not locating, or overlooking, a significant amount of evidence that was readily-available to counter the State's version of events and impeach the credibility of the State's witnesses.

52.    Trial counsel's ineffectiveness in this regard includes, but is not limited to, the following allegations.

53.    **Carmelo Martinez Santana aka "Rudy."** Mr. Santana testified for the State during both the guilt/innocence and punishment phases. He is the cousin of Angelita Rodriguez, Mr. Cruz-Garcia's wife at the time of the offense. 20 RR

117. Mr. Santana is from the Dominican Republic. He came to the United States when he was around eighteen years old to sell drugs and was serving a seventeen-year federal prison sentence at the time of his testimony. *Id.* at 118–19. At the guilt phase, he testified that Mr. Cruz-Garcia directed and participated in the events cumulating in the death of Angelo Garcia, Jr. *Id.* at 135–64. Trial counsel were ineffective in the following non-exclusive ways with regard to Mr. Santana:

a. Trial counsel failed to investigate and impeach Mr. Santana's credibility and fitness to testify with his mental health history. Just one month prior to his interview by the FBI, in April 2011, Mr. Santana sent a letter to this Court, the United States District Court for the Southern District of Texas, explaining that he planned to appeal his sentence due to his "continued incompetence" that was supported by "a plethora of medical records that illustrate my undeniable incompetence." Ex. 12. The letter further explained that his appeal would be filed with the "aid of an inmate assistant," as "[i]n light of [his] illness" he was unable to file such a motion. *Id.* The letter also showed motive for cooperating with the FBI, as Mr. Santana was seeking to set aside his plea and the remainder of his sentence. In addition, Mr. Santana's prior counsel filed a motion with this Court stating that he "has reason to believe that a psychiatric examination is necessary to determine if Defendant is competent." Ex. 13. The Court granted the motion. Ex. 14.

b.  Trial counsel failed to impeach Mr. Santana with his available criminal history.

c.  During a hearing outside the presence of the jury, Mr. Santana testified that he was convicted of assault in 1992. 21 RR 20. He claimed that the victim was a boy. *Id.* at 21. The trial court refused to allow trial counsel to cross-examine Mr. Santana with this conviction, based in large part on the victim being a male. *Id.* at 25.[2] In fact, *the victim was a female*, and the prior conviction would have been admitted had counsel corrected the misconception.

d.  Trial counsel failed to investigate and present evidence regarding Mr. Santana's credibility and character for untruthfulness.

e.  Trial counsel failed to impeach Mr. Santana's statement that he did not receive, and did not ask for, a deal in exchange for his testimony. 21 RR 12. Mr. Cruz-Garcia has a good-faith basis to believe that Mr. Santana requested and received favorable treatment in exchange for his testimony.

f.  While trial counsel did attempt to establish that Mr. Santana had provided previous inconsistent statements regarding both his role and the facts of what occurred the night and days surrounding the offense,

---

[2] Relatedly, the trial court did allow the defense to cross-examine Mr. Santana regarding a 1991 assault as a crime of moral turpitude because the victim was a woman. 21 RR 28.

trial counsel failed to utilize all the available evidence from those statements and other witnesses to impeach Mr. Santana's version of events and rebut his testimony.

g.   Trial counsel failed to utilize available records and evidence from other witnesses to establish that Mr. Santana testified falsely at trial.

h.   Trial counsel failed to investigate and use for impeachment the supplemental *Brady* notice provided by the State on the eve of trial, on June 26, 2013. It stated that "[a] presumptive test for blood on the complainant Angelo Garcia, Jr.'s, clothing was negative." CR 482.

54.   **Angelita Rodriguez.** Ms. Rodriguez was Mr. Cruz-Garcia's wife at the time of the offense and testified during the guilt/innocence phase. She was also friends with Diana Garcia and Arturo Rodriguez, and she went to visit them the morning after Angelo Garcia, Jr., was kidnapped. 20 RR 98. She testified that Mr. Cruz-Garcia left for Puerto Rico the day after she found out about the kidnapping and this trip was not planned. *Id.* at 102. She next saw Mr. Cruz-Garcia "about two months" later in Santo Domingo, Dominican Republic. *Id.* at 105. According to her testimony, she contacted him through his family to ask for a divorce, and Mr. Cruz-Garcia told her that he did not want a divorce. *Id.* at 105–06. She also testified that during this conversation Mr. Cruz-Garcia told her that he had killed Angelo Garcia, Jr. *Id.* at 107. Trial counsel were ineffective in the following nonexclusive ways with regard to Ms. Rodriguez:

a. Trial counsel failed to present evidence of Ms. Rodriguez's inconsistent statements. On multiple occasions, Ms. Rodriguez was interviewed by various law enforcement agents. In contrast to her later trial testimony, she consistently told agents that she had no knowledge of the disappearance of Angelo Garcia, Jr., and that she had no knowledge of Mr. Cruz-Garcia's whereabouts. These interviews occurred *after* she claimed that Mr. Cruz-Garcia confessed to her.

b. Trial counsel failed to investigate and impeach Ms. Rodriguez with evidence that a few months after leaving the country, she was residing with Mr. Cruz-Garcia in the Dominican Republic at her mother's house. Ex. 15.

c. Trial counsel failed to investigate and present evidence that Ms. Rodriguez provided misleading evidence regarding the frequency, amount, and circumstances of her locating and staying with Mr. Cruz-Garcia in the Dominican Republic.

d. Trial counsel failed to investigate and present evidence that, contrary to Ms. Rodriguez's testimony, Mr. Cruz-Garcia was already planning on returning to Puerto Rico and then to the Dominican Republic prior to the charged offense. *See* 20 RR 99–100 (testifying that Mr. Cruz-Garcia's trip to Puerto Rico was unplanned).

    e.   Trial counsel failed to investigate and present evidence that Ms. Rodriguez received favorable treatment and benefits from the District Attorney's Office based on her testimony.

    f.   Trial counsel failed to investigate and present evidence regarding Ms. Rodriguez's criminal history, credibility, and character for untruthfulness.

    g.   Trial counsel failed to utilize available records and evidence from other witnesses to establish that Ms. Rodriguez testified falsely at trial.

55.    **Police Reports and law enforcement investigation.** A significant amount of exculpatory and impeachment evidence exists regarding law enforcement's investigation into the offense that was not investigated and presented to the jury by trial counsel, including but not limited to:

    a.   Law enforcement records outline a "second theory" for the offense involving "a drug rip-off committed by Mr. Cruz-Garcia." Ex. 16.[3] This was not developed through trial counsel's investigation or at Mr. Cruz-Garcia's trial.

    b.   While Angelo Garcia was still missing, the FBI received a ransom demand for $30,000. Ex. 17. The caller appeared sophisticated, adding that he knew that the telephone would be tapped.

---

[3] This report is heavily redacted and Mr. Cruz-Garcia anticipates seeking discovery of an unredacted version.

c.  Another law enforcement lead was a caller stating that the caller knew where Angelo Garcia, Jr., was and that the caller could provide information for $10,000. Ex. 18. Neither lead was developed through trial counsel's investigation or at Mr. Cruz-Garcia's trial. In fact, State's witnesses denied that any ransom demand was ever received. 19 RR 79.

d.  According to law enforcement, "Diana [Garcia] and Arturo [Rodriguez] have been untruthful throughout the investigation with regard to the events inside the apartment and the identity of the suspects." Ex. 19.

e.  According to a confidential informant, the "crook in [the] Angelo Garcia case" was in New York City in 1996. Ex. 20.

### 3. Trial counsel failed to obtain unredacted copies of various law enforcement reports.

56.  A significant number of the various law enforcement files are heavily redacted, blocking access to significant potentially exculpatory or impeachment evidence. Trial counsel's failure to locate and request unredacted copies of these reports constituted ineffective assistance.

### 4. Trial counsel failed to investigate and present evidence that Mr. Cruz-Garcia had an ongoing consensual sexual relationship with Diana Garcia.

57.  Over the course of Mr. Cruz-Garcia's trial, the State argued and presented evidence that the presence of his DNA on the sexual assault kit taken from Diana Garcia was proof that he raped her. There was also testimony suggesting that Mr. Cruz-Garcia and Ms. Garcia were *not* involved in a

36

consensual relationship. 19 RR 21; 20 RR 133. In closing argument, the State asked:

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth—and there is no evidence of that—where is the DNA of the guy who raped Diana?  Where is it?  Why don't we have it?  If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

23 RR 82.

58.    Such an argument was viable only due to trial counsel's failure to investigate and uncover evidence that Mr. Cruz-Garcia and Ms. Garcia were, in fact, engaged in a consensual sexual relationship, which could have explained the presence of his DNA.[4]

59.    That sexual relationship was ongoing close in time to the kidnapping and murder of Angelo Garcia, Jr.

60.    Brothers Cesar Rios, Jose Valdez, and Hector Saavedra were friends of Mr. Cruz-Garcia, whom they called Chico, as well as Diana Garcia and Arturo Rodriguez. Ex. 21 at ¶2; Ex. 22 at ¶¶2-3; Ex. 23 at ¶¶2, 6. The three brothers were aware that, during this time period, Mr. Cruz-Garcia was having an ongoing sexual relationship with Ms. Garcia.  Ex. 22 at ¶4 ("To my knowledge, Diana was also messing around with other guys, including Chico . . . . The time

---

[4] Mr. Cruz-Garcia does not concede that this DNA evidence was reliable. *See* Claim 3; Claim 4; Claim 5; Claim 6.

period that Chico and Diana were having sex was around the same time Angelo was kidnapped."); Ex. 21 at ¶3 ("Around the time Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana."); Ex. 23 at ¶6 ("I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel."). Mr. Rios was also aware that Mr. Cruz-Garcia had been at Ms. Garcia's apartment earlier on the day of the kidnapping. Ex. 21 at ¶3.

61.    Although Mr. Rios was interviewed by HPD detectives and identified in police reports, neither he nor his two brothers were ever properly interviewed by trial counsel. Ex. 21 at ¶8; Ex. 22 at ¶6; Ex. 23 at ¶7.

### 5. Trial counsel failed to investigate and present evidence that Diana Garcia and Arturo Rodriguez continued selling drugs for Mr. Cruz-Garcia.

62.    According to the State, Mr. Cruz-Garcia's motive for committing the offense was that Diana Garcia and Arturo Rodriguez had recently stopped selling drugs for him. 18 RR 33.

63.    Diana Garcia testified that they had stopped selling drugs for Mr. Cruz-Garcia shortly before the offense, estimating that it was two or three weeks prior. 18 RR 133–34.

64.    Arturo Rodriguez testified that he and Ms. Garcia stopped selling drugs for Mr. Cruz-Garcia "about a month to a month-and-a-half" prior to the offense. 19 RR 33. He testified that Mr. Cruz-Garcia "didn't like it very much" when he informed him that they would no longer sell drugs. 18 RR 204.

65.     Trial counsel failed to investigate and uncover readily-available evidence that Ms. Garcia and Mr. Rodriguez were still dealing drugs for Mr. Cruz-Garcia at the time of the offense.

66.     Police reports indicate that Ms. Garcia and Mr. Rodriguez *were still selling drugs as of the day of the incident*. Ex. 24 at 1–2, 4. These police reports indicate that a man named Thomas Thoms and his girlfriend, Tracy Pressley, bought cocaine from Diana Garcia on the night Angelo Garcia was kidnapped. *Id.* at 1. Ms. Pressley described the transaction to detectives, and her statement was corroborated by Anita Dorr, a relative who was at the couple's house until approximately 9:00 p.m. on the night of the kidnapping. *Id.* Furthermore, detectives received a call from an anonymous woman who stated that she was close to the family and informed the detectives that Ms. Garcia and Mr. Rodriguez were selling drugs out of their apartment up until the night of the incident. *Id.* at 4.

## C.     Trial counsel's investigation, preparation, and performance during the punishment phase was ineffective.

67.     Mr. Cruz-Garcia specifically incorporates all other allegations in this ineffective assistance claim by this specific reference, including but not limited to the Section detailing that trial counsel's investigation and pre-trial preparation was below prevailing professional norms. *See* Section I.A, *supra*.

68.     Trial counsel failed to 1) sufficiently investigate and present mitigation evidence; 2) sufficiently investigate and present evidence that Mr. Cruz-Garcia would not be a future danger; 3) conduct a thorough and independent

investigation into extraneous offenses, impeach witnesses, and present rebuttal witnesses; and 4) generally failed to perform up to the standard of the profession from start to finish, from failing to make an opening statement to t failing to object to an anti-sympathy instruction in the jury charge.

69.   Trial counsel were ineffective at the punishment phase for the following nonexclusive reasons.

### 1.   Trial counsel failed to sufficiently investigate and present mitigation evidence.

70.   Trial counsel failed to hire a mitigation specialist, consult with experts, conduct a thorough investigation, and present compelling mitigation evidence as expected by the standards of the profession. As shown here, vast quantities of mitigation evidence were available to counsel, from records with *Skipper* evidence to lay witness statements and expert testimony. Unfortunately for Mr. Cruz-Garcia, trial counsel failed to perform such basic tasks as reviewing the DA file.

### a.   Trial counsel failed to hire a mitigation specialist or consult with appropriate experts.

71.   Counsel failed to sufficiently conduct the required comprehensive investigation into potential mitigation evidence on Mr. Cruz-Garcia's behalf. As an initial matter, counsel failed to retain the assistance of a qualified mitigation specialist. Trial counsel hired fact investigators and instructed them to focus on "beneficial" information. Ex. 8 at ¶2. Trial counsel also retained a psychologist, Dr. Rosin, to ostensibly work as a mitigation specialist, but she did not perform any work in that role. Instead, she provided a basic

psychological evaluation of Mr. Cruz-Garcia, based solely on a conversation. This was a relatively narrow and defined task, and not the broad-reaching investigative role of a mitigation specialist. In total, Dr. Rosin performed only seven hours of work on Cruz-Garcia's case. Ex. 7 at 7, 21; *see also* Section I.A.¶8. It is apparent that at no time did counsel hire another mitigation specialist for the defense.

> **b. Trial counsel failed to investigate available evidence by refusing to review the District Attorney's file, failing to request copies of the documents subpoenaed by the DA, and not making timely, appropriate record requests.**

72.   Even without a mitigation specialist, however, trial counsel had an independent duty to investigate. Trial counsel have a "general duty to investigate [that] takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death." *Strickland*, 466 U.S. at 706. Some, but not all, of the ways that the trial counsel breached that duty are discussed herein.

73.   At the time of Cruz-Garcia's capital murder trial in Harris County, the District Attorney's Office maintained an "open-file" policy, meaning that the defense had the opportunity to review all non-privileged files in the State's possession. 16 RR 5. Further, it appears that the policy was communicated directly to Mr. Cornelius and Mr. Madrid. 20 RR 186 ("Tise: I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's open to you . . . . I told you, Skip, you need to come by and see my file.") Despite this policy and the invitation, trial counsel refused to review those files.

74.   When, mid-trial, an argument arose about whether a particular FBI report had
      been provided to the defense, counsel stated "I don't have a responsibility to go
      through your file and figure out what's in your file. I don't have to do that . . . .
      I'm not going to go try to figure out what's in your file . . . . I'm not going to go
      through 20 boxes of DNA records." 20 RR 186. At this point, the court went off
      the record, ending the discussion.

75.   During the state post-conviction investigation, counsel were asked about the
      statements made on the record and why they had not reviewed the open file.
      Counsel Skip Cornelius responded by email:

> I remember being pissed that Ms. Tise attempted to make
> it my responsibility to come to her office and go through
> her file and figure out what I was entitled to. I told her I
> want what I am entitled to and it is up to her to figure
> that out and give it to me. She said that every lawyer in
> town comes to her office and figures out what they want
> and she gives it to them. I said I was not letting her off
> the hook by her reversing the responsibility, it is her
> responsibility to give me the discovery that I am entitled
> to, not up to me to be smart enough to ask for the right
> things.

Ex. 3 at 58.

76.   Trial counsel also failed to request copies of the documents subpoenaed by the
      District Attorney's office.[5] The District Attorney issued a subpoena to FBI

---

[5] Mr. Cruz-Garcia does not concede that these subpoenas were proper, but
having receive the documents pursuant to a subpoena, the District Attorney was
obligated to provide copies of them to trial counsel. *See* Claim 26.

Agent Juan DeJesus Rodriguez in Puerto Rico, Ex. 35, and in response received a copy of the entire file of Mr. Cruz-Garcia's incarceration in Puerto Rico, Ex. 36 at 2. The subpoena was filed on the court's docket, 1 CR 39, so trial counsel knew, or should have known, about it. Despite being aware of this (and other) subpoenas issued in this case, trial counsel failed to request that the District Attorney provide them with copies. The District Attorney then failed to provide copies of these documents to trial counsel. Because trial counsel failed to review the District Attorney's file and failed to specifically ask for copies of the subpoenaed documents, besides many other helpful documents in the DA file, trial attorney did not review the incarceration documents from Puerto Rico received in response to the subpoena.

77.     Nor did trial counsel made any attempts to get these records independently from the Puerto Rico Department of Corrections. There is no indication in the investigation files that any attempts were made to contact officials or other witnesses from the Puerto Rican prison where Cruz-Garcia was held.

> **c.  Investigation into Mr. Cruz-Garcia's life, including, but not limited to, investigation into his life in the Dominican Republic and Puerto Rico and his lengthy incarceration in Puerto Rico, was inadequate.**

78.     Cruz-Garcia had spent much of the 1990s residing both in Puerto Rico and the Dominican Republic. He had a partner and child in Puerto Rico and his brother lived there as well. Further, counsel knew that from 2001 until being extradited to Houston, Cruz-Garcia had been imprisoned in Puerto Rico.

43

79.   More than two years before trial, in December 2010, the State had notified the defense that it intended to use a 2001 conviction in San Juan, Puerto Rico, as aggravating evidence at trial. 1 CR at 71; *see also* 1 CR at 196. About a month later, in January 2011, the State also had notified the defense that it intended to use information about discipline Mr. Cruz-Garcia received while incarcerated in Puerto Rico as aggravating evidence at trial. 2 CR at 283.

80.   Counsel were clearly aware of the potential importance of Puerto Rico as a source of information about Mr. Cruz-Garcia. *See* Section I.A., *supra.* Counsel were aware not only of potential mitigating family witnesses in Puerto Rico but also of the need to investigate Mr. Cruz-Garcia's time in prison while in Puerto Rico.

81.   Yet despite this information, trial counsel failed to conduct any meaningful investigation in Puerto Rico. Trial counsel retained investigators J.J. Gradoni and Edna Velez, who started working on the case in May 2012. Ex. 7 at 6. Based on review of the billing records and interview memos created by the investigators, it appears their investigation was focused almost exclusively on interviewing family and friends in the Dominican Republic and witnesses in Houston.[6] Although the investigators briefly traveled to the Dominican

---

[6] The instructions given to the investigators and the timeline of when and which witnesses were contacted are factual issues best resolved through live testimony of trial counsel and the investigators at an evidentiary hearing.

Republic for on-the-ground investigation, no similar trip to Puerto Rico was even attempted.

82.    Other than two or three phone calls to Cruz-Garcia's immediate family in Puerto Rico, there is no indication in the investigation files that any attempts were made to contact officials or other witnesses from the Puerto Rican prison where Mr. Cruz-Garcia was held.

83.    Likewise, there is no indication that any attempts were made to request records from Mr. Cruz-Garcia's time in Puerto Rico (in or out of prison), except for a belated May 17, 2013, request for copies of Mr. Cruz-Garcia's kidnapping conviction (and not incarceration records).

### d. After a constitutionally inadequate punishment phase investigation, trial counsel's presentation during punishment phase was cursory at best.

84.    When Mr. Cruz-Garcia's trial began, the investigation of his case had been done without the assistance of a mitigation specialist or of any expert consultation beyond a single psychological evaluation.

85.    During the punishment phase of trial, the defense ultimately presented the live testimony of just two witnesses, Mr. Cruz-Garcia's brother, Joel, and son, Abel, and the testimony of Mr. Cruz-Garcia's wife, Mirella, via video.[7] 26 RR

---

[7] In addition to these three witnesses, counsel presented testimony from a young man who had known Mr. Cruz-Garcia in the Harris County jail. 26 RR 80. However, this man had literally walked off the street and introduced himself to counsel on the morning of his testimony. 26 RR 81. While fortuitous, his presence as a witness was not due to any planning or investigation by trial counsel and, thus, should not be

8, 32, 66. The testimony via video feed, complicated by poor connection and sound quality issues and the need for interpreter, was incoherent at best. Trial counsel presented no experts who could have provided broader context and insight into Mr. Cruz-Garcia's life and character. The entire sentencing case for the defense spans barely 70 pages of the transcript.

86.     This presentation fell far short of the kind of robust mitigation presentation anticipated in a capital case. It barely touched on Mr. Cruz-Garcia's life history and character.

87.     The State meanwhile presented testimony from a Puerto Rican Department of Corrections official, who stated that on one occasion Mr. Cruz-Garcia was disciplined for possession of a cell phone, a homemade rope, and a map of Puerto Rico. 24 RR 118–29. The official testified that he believed Mr. Cruz-Garcia was attempting to escape through a broken window in his prison cell. *Id.* Trial counsel failed to present any testimony about Mr. Cruz-Garcia's conduct while incarcerated in Puerto Rico, either to dispute the statements made by the State's witness or to offer *Skipper* evidence of Mr. Cruz-Garcia's good conduct while in prison as reflected in his records.

---

weighed in considering the punishment phase investigation and presentation they put forward.

        **e.  A plethora of mitigation evidence, and evidence that showed he would not be a future danger, was available for trial counsel to discover with minimal effort.**

88.    Had trial counsel conducted a thorough sentencing investigation under the prevailing standard of practice, they would have presented a significantly more complete and compelling explanation of Mr. Cruz-Garcia's life story including, but not limited to, the information detailed in the following subsections.

        **i.  FBI, INS, and DEA records would have demonstrated that Mr. Cruz-Garcia served as a confidential informant for the United States Government.**

89.    Had counsel requested records from government agencies, they would have been able to show that Mr. Cruz-Garcia served as a confidential informant for the United States Government. Ex. 46. Although the document from U.S. Department of Justice is heavily redacted, it begins with "As per your request I am submitting a list with case number of aliens prosecuted as a result of the assistance rendered by confidential informant Obel Julian CRUZ-Garcia" and then continues for onto the next page. *Id*. As a result of his activities—often at risk to himself—federal agencies were able to make numerous arrests. *Id*.

90.    These records would have also shown that the U.S. Government repeatedly trusted Mr. Cruz-Garcia to enter the country legally for the purpose of providing "significant public benefit." In fact, even obtaining a copy of Mr. Cruz-Garcia's passport—which his family had and would have gladly provided, had trial counsel asked—would have also shown he was repeatedly issued permission to enter the country for "significant public benefit." These

admissions into the country were for the purpose of providing support to United States federal agencies with the apprehension of serious drug traffickers.

91. Either a passport or immigration records would have also shown that Mr. Cruz-Garcia entered the country legally and was in Puerto Rico for one of these assignments when he was arrested for kidnapping.

92. Records from government agencies would have also shown that Mr. Cruz-Garcia was making a living legally and receiving payments from the U.S. Government for the services he provided, contradicting testimony at trial that he did not have legal employment.

93. Thus, records of federal agencies—which trial counsel failed to request——would have provided information relevant to both future dangerousness and mitigation special issues.

### ii. Records from Puerto Rico in the DA's file.

94. Trial counsel could have obtained records from Puerto Rico by requesting those records with the client's permission or simply by reviewing the file at the District Attorney's Office. Those records—readily available to trial counsel but never obtained—would have provided information relevant to both future dangerousness and mitigation special issues.

95. First, the records indicate that numerous institutions where Mr. Cruz-Garcia was housed in Puerto Rico reported finding no instances of disciplinary actions or grievances filed against Mr. Cruz-Garcia. Ex. 38 at 8 (no disciplinary

complaints from October 31, 2005 to November, 3, 2008); *Id.* at 9 (no grievances from 2005 to 2010), *Id.* at 10 (no disciplinary complaints), *Id.* at 11 (same).

96.   Next, the records reflect that rather than being a disciplinary problem, Mr. Cruz-Garcia was the opposite. Mr. Cruz-Garcia earned numerous recommendations for good time credit based on his behavior and hard work. *Id.* at 1, 4, 6, 7, 12, 14, 16, 18, 20, 21. From October 2005 to July 2009, Mr. Cruz-Garcia received frequent commendations for his hard work at the prison. *Id.* In total, Mr. Cruz-Garcia received 204 days of credit for his behavior. One notation specifically observed that:

> This prison performs risky jobs and for this reason we are asking for this good conduct time to compensate him for the effort that he makes and by this means help create an example so that other prisoners will give their best.

*Id.* at 6.

### iii.   Witnesses from Puerto Rico Department of Correction.

97.   Had even a cursory investigation taken place into Mr. Cruz-Garcia's incarceration in Puerto Rico, counsel would have discovered numerous officials and employees within the Puerto Rican justice system willing to speak on Mr. Cruz-Garcia's behalf. This evidence would have provided a rebuttal to the State's argument that Mr. Cruz-Garcia presented a future danger based on allegations of disciplinary infractions while incarcerated in Puerto Rico. Interviewing officials and employees in the Puerto Rican justice system also would have uncovered mitigating evidence of his character because Mr. Cruz-

Garcia stood out to them as one of the best behaved, most trusted, and well-respected inmates.

98. For example, multiple witnesses who work as chaplains at the facilities where Mr. Cruz-Garcia was housed were available to testify regarding Mr. Cruz-Garcia's positive behavior in prison and the resulting trust and freedoms that were bestowed upon him. Chaplain Irma Iglesias Cruz has worked in the Puerto Rico Department of Correction for roughly forty years. She supervises about sixty other prison workers, including chaplains in other facilities, and oversees the orientation of new chaplains coming in to work in an institutional setting for the first time. Ivan Negron Vera has worked as a chaplain for the Department of Correction for seventeen years. From 2000 to 2012, he supervised roughly two thousand chaplains serving the various facilities run by the Department. He regularly counsels both inmates and correctional facility staff and guards. Jimmy Osorio has been a pastor for thirty years and has volunteered as a chaplain with the Department of Correction for about twenty-two years. And Luis Gonzales Martinez has volunteered as a chaplain at multiple facilities in San Juan for about twenty-eight years.

99. These four chaplains each got to know Mr. Cruz-Garcia as a volunteer helping with religious services and taking care of the chapel. Each agrees that in the many years they have worked in the criminal justice system, Mr. Cruz-Garcia stands out to them as one of the best behaved, most trusted, and well-respected inmates.

100. As experienced chaplains, they had witnessed other inmates trying to con their way into positions of trust or pretend to be religious. But each believes through their experiences with Mr. Cruz-Garcia that he is a genuine and honest person. To them, Mr. Cruz-Garcia's faith is real, as was the encouragement and support he gave to other inmates. At the time, the chaplains noted Mr. Cruz-Garcia's leadership skills and how he worked hard to help others become better people and productive inmates. He got along well with other inmates and staff. He seemed to be a loving and caring person.

101. Because of Mr. Cruz-Garcia's good behavior, he earned the respect of guards, staff, and other inmates. He was given a significant role in the church services of the prison. He was the most trusted inmate in the chapel and would assist in all matters dealing with the prison's religious services. Mr. Cruz-Garcia would help get the chapel ready for worship services and clean up after, moving about freely. He took part in music services and led Bible studies.

102. None of the chaplains remember Mr. Cruz-Garcia being written up for discipline problems or being considered dangerous. None ever witnessed or heard of him committing any violence; he would not have been given so much freedom if he had. And this was not due to the lack of opportunity—while in prison in Puerto Rico, Mr. Cruz-Garcia was housed in general population and he was frequently left alone outside his cell.

103. Mr. Cruz-Garcia was given tremendous privileges and trust in the prison not conferred on most other inmates. For example, multiple chaplains at various

times gave Mr. Cruz-Garcia the keys to the chapel or their offices and allowed him to move around unsupervised.

104. Mr. Cruz-Garcia was also allowed to work in the "corporation" area, which allowed inmates access to power tools and other potentially dangerous objects that were used for making furniture. Only inmates who were well-behaved, hard-working, and had earned trust were permitted to work there.

105. In fact, if anything, Mr. Cruz-Garcia was seen as a calming influence who helped to maintain order. He would convince other inmates to pay attention to correctional staff and to follow the rules. Correctional staff felt Mr. Cruz-Garcia made their jobs easier through his influence on other inmates. When Mr. Cruz-Garcia was moved into segregation because he was being extradited to Texas, he maintained this attitude.

106. Copies of the letters found in the DA file support Chaplain's view that Mr. Cruz-Garcia maintained his faith even as he was incarcerated in Houston: he continued to take Bible courses by correspondence and engage in nearly daily religious exchanges via post with friends and family. Had trial counsel reviewed the DA file, these letters could have been presented to the jury.

107. Overall, these chaplains would have testified that Mr. Cruz-Garcia had a tremendous, positive impact on the lives of other inmates and of correctional staff while in prison in Puerto Rico. In addition to being a trustworthy and hard worker, Mr. Cruz-Garcia acted as a leader and a counselor to help other inmates obey prison rules.

108.   None of the chaplains were contacted by anyone on Mr. Cruz-Garcia's defense team. Had they been, each would have been willing to come to Houston as a witness on Mr. Cruz-Garcia's behalf. One would have raised his own money to fly to Houston if the defense could not afford the ticket. Further, the seriousness of the charges he faced would not have deterred their speaking about the person they knew he had become. They could have talked about conversations they had had with Mr. Cruz-Garcia where he indicated remorse for the bad decisions he had made in his life prior to being in prison. And they could have told the jury about the depth of his faith and the way he had touched their lives.

109.   Had an investigation been conducted in Puerto Rico, counsel also could have secured the testimony of Dr. Alejandro Lebron, a clinical psychologist who counseled Cruz-Garcia while he was in prison there. Dr. Lebron has worked in the field for roughly forty years and, at the time he knew Mr. Cruz-Garcia, was providing mental health support and assistance to inmates. Mr. Cruz-Garcia began seeing Dr. Lebron by choice. That is, he was not ordered to receive counseling, but instead had sought out therapy on his own.

110.   Like the chaplains, Dr. Lebron observed that Mr. Cruz-Garcia's faith was genuine and thoughtful. He also felt that his dealings with Mr. Cruz-Garcia gave him a new perspective on the Bible and using religion as a common ground to connect with patients. Dr. Lebron's experience in dealing with Mr. Cruz-Garcia was that he was open and honest and was not a troublemaker. He

witnessed Mr. Cruz-Garcia have access to other prison staff and civilians, and never felt he posed a danger to anyone. He never knew of Mr. Cruz-Garcia to cause any trouble.

111.   Dr. Lebron was never contacted by anyone on Mr. Cruz-Garcia's defense team. Had he been, he would have testified at Mr. Cruz-Garcia's capital trial. Even knowing the charge of capital murder, Dr. Lebron would have told the jury about the Mr. Cruz-Garcia he knew: "a deeply spiritual man, who believed that doing good work and living a good Christian life was the most important thing he could do." Having worked with prison populations, and knowing Mr. Cruz-Garcia in the years after the crime occurred, Dr. Lebron would have communicated that he had witnessed inmates change and that, even if guilty, he believed Mr. Cruz-Garcia was no longer the same individual.

112.   Moreover, one of the witnesses that trial counsel actually interviewed—Mr. Cruz-Garcia's common law wife Dorca—could have provided helpful information in this regard had she been interviewed earlier than in the middle of the trial and more thoroughly. Dorca had been with Mr. Cruz-Garcia during the time he was in prison and had visited him there frequently with their daughter. She recalls the jail guards were friendly with Mr. Cruz-Garcia. She also remembers that Mr. Cruz-Garcia worked hard to continue to provide as much as he could for his family, even though he was in prison. He would make hammocks, key chains, and other items to sell and then send the money to Dorca and their daughter.

113.   None of this information about Mr. Cruz-Garcia's conduct and life in prison in Puerto Rico was presented to his capital jury. In failing to conduct an investigation into a clear avenue of potentially beneficial information, counsel's performance under the standards for capital counsel was deficient. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty").

### iv.   Witnesses that were available locally in Houston and ready and willing to testify.[8]

114.   Had trial counsel conducted a meaningful mitigation investigation, they could have offered the testimony of three brothers who knew Mr. Cruz-Garcia and had very positive dealings with him while he lived in Houston. Cesar Rios, Jose Valdez, and Hector Saavedra remember Mr. Cruz-Garcia as being a good friend with a big heart. Mr. Cruz-Garcia was close to the brothers' parents, and they remember him helping their family out often. Mr. Cruz-Garcia would bring the family groceries or buy clothes and books for the brothers for school. He would ask Hector, who was younger, about his grades and encourage him to study. When Hector did well in school, Mr. Cruz-Garcia would give him pocket money or a small gift.

115.   Mr. Cruz-Garcia treated Cesar, Jose, Hector, and their parents like family. They remember Mr. Cruz-Garcia sharing meals with them and being part of

---

[8] The information in this section is based in part on Exhibits 21–23.

their lives, much in the way they themselves would bring food and support to their relatives in Mexico. His generosity struck them, both for the size (he gave Cesar his first car) and because he never asked for anything in return.

116.    Particularly memorable for the brothers was the time that Mr. Cruz-Garcia helped Cesar get proper medical attention for a gunshot wound, saving Cesar's arm. Cesar had been shot, and his family took him to a nearby hospital. Mr. Cruz-Garcia joined the family there, and the hospital intended to amputate the arm. Mr. Cruz-Garcia helped get the family to a different hospital, where Cesar was able to receive treatment that saved his arm. Mr. Cruz-Garcia even paid for the medical treatment because Cesar did not have any insurance. This was just another example of how the brothers felt that Mr. Cruz-Garcia treated them like family.

117.    The brothers lived in Houston at the time of trial and would have been available to testify had they been contacted. Testimony such as this would have provided meaningful mitigation evidence at Mr. Cruz-Garcia's punishment phase.

### v.    Available social history mitigation evidence[9]

118.    Trial counsel failed to conduct a thorough mitigation investigation which would have enabled them to present a comprehensive, multigenerational social history for Mr. Cruz-Garcia.

---

[9] The information in this section is based in part on Exhibits 39–45.

## FATHER

119.   Obel's[10] father, Valerio Julian Cruz Santos, was born on January 28, 1938 in the village of Boba in the Dominican Republic to Ramona Santos and Regino Cruz. His family lived in a small house with wooden floors and a roof made of zinc. He had no water or electricity in his home. He endured several hurricanes of the kind that were typical to the Caribbean islands, but which nevertheless brought unwelcome devastation. The destruction was so extreme that his neighbors were forced to move out of their home after several hurricanes battered the area.

120.   Valerio spent his early years living with his father on his farm, where they lived off the land.

121.   Aged fifteen, Valerio quit school to work as a bulldozer driver, along with some of his brothers. During this time, he also played the accordion in the streets for change and was often ridiculed for doing so. At twenty-two, he joined the Navy of the Dominican Republic in a bid to create a better life for himself and to escape the extreme poverty that had oppressed and stifled his childhood.

122.   Valerio had several wives and partners throughout his life but he met Obel's mother, Dhalia when he was stationed in Santo Domingo. They got married and had four children together. They lived in a small home in the heart of the city that Valerio built. It was a very humble home in a high crime area.

---

[10] First names will used in this section to avoid confusion between individuals with the same last name.

## GROWING UP IN THE DOMINICAN REPUBLIC

123. **Relationship with Mother and Father:** Obel Cruz-Garcia was born on July 8, 1967 in Santo Domingo, the Dominican Republic. He was born to father, Valerio Julian Cruz Santos, and mother, Dhalia Margarita Garcia Martinez.

124. Valerio and Dhalia met in 1957 while Valerio was working at a medical clinic near where she lived. Dhalia was fourteen when they met. They had four children together – Noemi, Obel (Mr. Cruz-Garcia), Natalia, and Joel (his brother, who testified at trial). Valerio recalls that he was the sole provider for the family, while Dhalia would stay home and take care of the kids. The fact that Valerio was in the military meant that the family could eat for $5 USD in the navy store. Valerio remembers their relationship as being very loving and that they were very happy. Years later, when married to his second wife, Dorca, Valerio would describe Dhalia to her as a very humble, simple woman and as a good woman who loved her children.

125. Yet, there was another, darker side to Valerio and Dhalia's relationship. Valerio suspected that Dhalia suffered from bi-polar disorder, which had gone undiagnosed throughout her life. His suspicion stemmed from Dhalia's extreme mood swings, and the fact that she could turn vicious and violent towards her family at a moment's notice. When Obel was a young boy, Dhalia threw a heavy rock, hitting him on the top of his head, cracking it open and causing scars that remain to the present date. She threw objects at her other children too but Obel got it worse. Obel's father reacted angrily when he witnessed his children being hurt by their mother, and he would yell at her in

58

a futile attempt to make her stop, but this usually only resulted in Dhalia turning her aggression toward him instead.

126.   Valerio, too, suffered from depression and stress over his lifetime.

127.   **Valerio was in a serious car accident.** When Obel was a young child, his father was changing a car tire on the edge of a busy road in Santo Domingo when he was hit by a car. He was rescued by a military helicopter but was declared to be dead. He was taken to a morgue before someone realized that he still had a pulse. Dorca remembers that everyone thought that he had died. They rushed him to the Dario Contreras Hospital in Santo Domingo where he lay comatose for two or three months. Valerio never walked the same after the accident.

128.   During this time, Obel would visit his father every day. He walked to the hospital alone and on foot so that he could bathe and look after him. Other patients noticed how gentle Obel was with his father and would ask him to help them out as well.

129.   **The end of Valerio and Dhalia's marriage.** Not only did this accident almost rob Obel of his father, it would also turn out to be the catalyst which sparked the end of his parents' 15-year marriage. While Dhalia was praying for her husband to wake up from his coma, she discovered that her husband had been living a double life. Valerio, she found out, was a "womanizer." She stumbled upon this fact when two of his secret lovers turned up at hospital, only to run into the family.

130. Dhalia discovered that Valerio had taken Obel with him on a number of surreptitious visits to these other women's houses. Obel, while young at the time, had nevertheless understood that this was something that his mother could never know about. He had been bribed into secrecy with ice cream and snacks.

131. The news of Valerio's affairs was something that Dhalia did not know how to handle. She confided in her sister, Dulce, who told her that she was still young, and that she still had time to start again and to create a new life, away from Valerio and his lies. Dhalia packed up and left for Venezuela to be with her sister, leaving Valerio and all four children behind. Obel and his siblings did not have much physical contact with their mother in the years that followed, although they spoke to her over the phone often. Idalia Perez De La Cruz only remembered Dhalia visiting her children on one occasion. However, Dhalia did send money and clothes to her children.

132. Valerio's womanizing ways did not cease when Dhalia departed. With Dhalia absent, and Valerio incapacitated from the accident, he realized that the family needed some assistance looking after the household. He hired a woman to assist with the housekeeping and childcare. Yet, once he returned home from the hospital, the two became romantically involved, and she subsequently became pregnant and gave birth to a baby girl named Annie Cruz Martinez. Valerio was not prepared to take on the responsibility of yet another child, so he did not ever acknowledge Annie to be his daughter. Instead, Valerio and his

60

children moved in with Valerio's mother, Ramona, in Nagua, leaving the woman and Annie behind. The move from Santo Domingo to Nagua was difficult for the children, given that it meant a move from a busy, capital city, to a small, rural community.

133.   After a few years had passed, Dhalia came back for her daughters. She took Noemi back to Venezuela with her first, and then later Natalia. Obel and Joel, however, stayed with their father.

134.   **Abandonment by mother.** Dhalia's swift departure from Obel's life left him quietly devastated. He put on a happy face in front of his family, and mostly hid the fact that he felt sad from his family" Yet, Mirella Perez Garcia (who became his partner shortly after) understood that Obel felt abandoned. She sensed this from the comments that he made about his mother's departure, but also from the fact that Obel, once they had children of their own, was determined to give them a better, more secure, childhood than his own.

135.   Obel's father, too, remembered that there were occasions that Obel told him that he missed his mother. Obel also confided in both of his sisters, Noemi and Natalia, that he felt that their mother had abandoned him. Years later, Obel begged his mother and sisters to return to the Dominican Republic, but they refused because they had established themselves in Venezuela.

136.   Dorca noticed that Obel was very sad when his mother left. As he grew older, he stopped mentioning his mother and her abandonment so much. Yet, the birth of his own children brought the grief associated with the loss of his

mother flooding back to him. Trying to move on from what had happened to him as a child, Obel asked his partner, Mirella, if she, as a mother, was capable of abandoning their children.

137. **Obel stepped into the role of parental-figure.** Dhalia's departure not only robbed Obel of his mother, it also meant that Obel was required to step into her shoes for the rest of his siblings, given that he was the eldest child. Obel took care of his father while he was still in hospital, bathing him and giving him injections, because Valerio did not trust anyone else to do it. After he had done that, Obel would return home to take care of his siblings, which included changing and washing Joel's diapers. He cooked and cleaned. He was only a child, but now he was also head of the household. Some of the Marines from Valerio's work managed to scrape some money together to help Obel and his siblings get by while Valerio was in the hospital.

138. Even after Valerio brought his kids to Boba to live with his grandmother, Ramona, Obel had to take care of the family. His younger brother, Joel, also noticed that their parents' separation forced Obel to grow up too fast. Some of their neighbors in Bella Vista also observed that not once did they see Obel playing when he was a child, and instead, that he was always working or making fishing nets. They also noticed that the family did not celebrate Obel's birthday, but that instead his birthday passed each year without remark.

139. **Valerio was a strict, distant, and abusive father.** Valerio's military background translated into strict parenting, and his children considered him

to rule with an "iron hand." He kept his children isolated, as he banned them from visiting the homes of the neighbors, and made sure they always kept close to home. Before marrying Dorca, he would not physically punish his kids, but he changed after he married.

140.   Joel Cruz-Garcia, who testified at trial but was not asked in-depth questions about family life, recalls Valerio became abusive to Obel. Obel was the eldest child, which meant that he was often subjected to the harshest punishment. After he married Dorca, Valerio stripped Obel from his caregiving duties and was harder on him in order to make his wife feel better about her place in the household.

141.   On one occasion, Valerio whipped Obel with a tamarind stick, causing him such significant injuries that Obel was bedridden for two days as a result. This punishment came after Valerio had found out that Obel had been ganged up on by some older children in the neighborhood, and that Obel had defended himself with a stick. After Obel had fought off his attackers, his fear of reprisals from his father caused him to hide out at his grandmother, Ramona's, for a couple of nights.

142.   **Stepmother.** On December 19, 1982, Valerio got remarried. His second wife—Dorcas Noelia de la Cruz Fana—worked as a teacher, and in later years, ended up as Director of the school at which she worked. Valerio and Dorca had known one another since they were small children. They reconnected in Nagua, when they were both working at the local medical clinic. Valerio was in charge of

treating individuals with leprosy, while Dorca was responsible for giving vaccinations and obtaining fecal samples to check for parasites.

143. During these years, the family still did not have much money to get by. They did not have electricity in the home until 1983. Dorca remembers studying and grading papers using kerosene and gas lamps. The water they drank was from a hole in the ground.

144. Valerio and Dorca had two children together: Menagen Cruz-Santos and Jelissa Yelietza Cruz. Obel babysat for his half-siblings, when he was not at school or out fishing with his father. He was a kind and loving older sibling, often surprising Menny and Yeli with ice-cream, sweets or bags of goodies that he had brought back from the capital. Even years later, when Obel had moved away from the Dominican Republic to Puerto Rico, he went out of his way to send back money for Menny and Yeli.

145. Dorca also acknowledged that the abandonment by Obel's mother was hard for him and that she couldn't fill that void. Yet, Dorca made it apparent to Obel that he was less important, less loved, than her own children.

146. **Fishing & working.** Obel's elevation to head of the family also meant that he was now required to work alongside his father during the hours that he was not at school. This meant going out on the fishing boats with his father almost every day. Throughout his childhood and teenage years, Obel practically lived at sea. Each morning before school, he got up at around 5am to walk the two kilometers to their yolita, or small wooden fishing boat, and to assist his father

in casting out the fishing nets. At the end of the school day, he returned with his father and the other fishermen to repeat the routine from the morning. Once they made it home in the evenings, they had time to cook the food they had caught before they collapsed in bed.

147.   During one fishing trip when Obel was a teenager, the boat overturned and Valerio plunged into the water. It was the third time that the boat had flipped over that day. Obel saw that his father had become trapped under their overturned boat. Facing the prospect of watching his father drown, Obel jumped into the water and managed to pull his father to safety. The other men who had been fishing with them helped to turn the boat back over in order to bring it back to shore.

148.   **Childhood; head injuries; poverty.** Obel spent his childhood living in the capital of the Dominican Republic, Santo Domingo. The family then moved to the City of Nagua.

149.   When he was a small child, Obel fell from the roof of his family home and hit his head. This resulted in a bruise to his head and a broken leg. Obel would have a number of other incidents involving head injuries during his life. Obel was in a serious car accident, when his pickup truck hit a coconut tree and flipped over. The truck was totaled and Obel was rushed to a hospital in Nagua.

150.   Growing up in the Dominican Republic, the family was very poor. The money that Valerio made from his military career was not enough for them to get by, and Joel remembers his brother, Obel, often having to try to scavenge for food

so that the family did not go hungry. The family had no running water in their home; instead, they had to pump water from a well in order to drink and bathe. There was a hole in the back for people to go to the bathroom. The families had to keep the hole for the bathroom and the well a certain distance apart because when it rained the contaminated water would overflow and steep into their drinking water. Many people in the neighborhood did not have electricity.

151. **Drug / alcohol use during developmental period.** Obel drank alcohol with his father from a young age. Valerio sometimes took Obel along with him to the military base during his time in the Navy. There, while still only young, Obel drank beers and whiskey with his father and the other Marines. His father's favorite drink was rum and coconut water, and Obel often sat and drank a glass of rum alongside him. At 12, Obel tried marijuana for the first time. He found this unpleasant, as it caused him to experience extreme paranoia. He tried marijuana again, at 15. As he got older, he started to use marijuana on the weekends, once he had moved away from the Dominican Republic to Puerto Rico.

152. **Church & religion.** Religion was a constant and formative presence in Obel's childhood. He was a regular at the local church. The family church was called Iglesia Evangelica Metodista Libre. Angela De La Cruz Falla remembered that Obel went to church frequently. Valerio remembered that his son was very religious growing up.

153. **Relationship with Mari.** When he was around 13 years old, Obel started dating a neighbor of his, Mari Perez. They had an innocent relationship. They dated for a few months, until Mari left by boat for Puerto Rico, as many people were doing around that time. Much later, they reconnected and had a daughter together, named Estefany Cruz. Although they grew apart, Obel continued to provide Mari and Estefany with money.

154. **Relationship with older woman / sexual abuse.** Obel's innocent teen relationship with Mari was interrupted without consent by Lufracina Norberto, a woman who was in her 40s and a prostitute. Obel was selling fish on the side of the road when she asked him for a ride home on his moped because she was scared of walking in the street alone at night. He agreed, and once Obel dropped her home, she invited him into her house, where she gave him a warm plate of food. At that point, she sexually abused Obel. This continued for a while, as Obel would go to her house in the evenings after he had been out fishing. When Valerio found out, he confronted Lufracina, after which she ceased all contact with Obel.

155. **Relationship with Mirella.** Obel met Mirella Perez Garcia at a wake for her uncle in Nagua. After exchanging glances from across the room, they started talking and very quickly began a romantic relationship.

156. Mirella quickly fell in love with Obel She remembers that they had a very close relationship. After about two or three weeks of dating, in 1988, they got married in a shotgun wedding. Mirella's aunt had been furious to discover

them alone together in her house and kicked Mirella out of the house. Obel quit school so that he could work full time to take care of her. He had been attending Liceo Maria Trinidad Sanchez in Nagua. He dropped out when he was in the 10th grade.

157. After he dropped out of school, Obel worked to take care of his family. Mirella described that he fished between 4am and 9am, returning home for a nap, and that he would then go out again between 3pm and 11pm, or possibly even later at night.

158. One time, after Obel and Mirella had been out fishing, they were driving back in their green pickup truck. When they got back to their house, they noticed a lot of people on the street, crowded around the house opposite their own. It turned out that a 6-year-old child, named Hector Alexander Santos (but known by most as "Wandy"), had been hit by a car when he was crossing the busy street. Obel "jumped into action. He ran to the child, picked him up, and carried him to get medical help." He used his truck to get Wandy to the nearest hospital.

159. Menagen Valerio de la Cruz remembers that it was Obel who saved that child's life. Wandy is now an adult, but he still has the scars from that accident. He still remembers Obel very fondly. He would have gladly come to testify, had trial counsel contacted him.

160. On another occasion, when Obel and Mirella were driving from the capital to Bella Vista, Obel spotted a child begging on the side of the road. He pulled over

68

and asked the child where his parents were. The child responded that his parents were very poor and that he needed help. Obel responded by buying the child a meal, clothes and then taking him home. He stayed in touch with the child, and continued to help the child and his family.

## MOVE TO PUERTO RICO

161. **The yola to Puerto Rico.** At age 19, Obel moved to Puerto Rico in search of a better life for himself and his young family. They were struggling to get by on the money that Obel was earning in the Dominican Republic. Mirella recalls:

162. These boat journeys were dangerous, as sometimes they would overturn and passengers would have to swim to shore. Other times, they ran out of gas halfway through the journey, and the boat would have to return to the Dominican Republic. However, Obel's boat successfully made the journey.

163. Valerio was sad to have Obel leave, but knew that a lot of people were moving from the Dominican Republic to Puerto Rico.

164. **Coffee farm in Puerto Rico.** Upon arrival in Puerto Rico, Obel had to work at a coffee farm in order to pay off his debt for the journey to Puerto Rico. He was essentially "sold" to a coffee farmer to pay off his debt for the journey, like an indentured servant. The planation was located in Barrio Miraflores, in the city of Lares. The farm employed around 200 workers, most of whom were Dominican immigrants. The farm harvested coffee, citrus and bananas.

165.   The work was grueling, and the working conditions were terrible. Obel spent long days under the blazing sun, picking coffee and cutting bananas down from the trees. Cutting the bananas down was particularly difficult, as the workers were required to climb steeps hills, and they sometimes lost their footing and tumbled down significant drops. By the end of each day, Obel would be covered with and ant bites from giant ants that fell out of the branches of trees. The sap turned his fingers black and he could barely breathe from the spray and pesticides. Magpies or "pica pica" picked at the workers while they picked the coffee. Obel earned $5 per day for his work.

166.   **Escape from the farm.** After around two months on the farm, Obel found that he could not take it anymore. He escaped from the farm by hiding in one of the banana trucks until it reached Rio Piedras. Here, he found himself alone, without money and without papers. As luck would have it, he chanced upon Mirella's brother, Dario, who, while not in a position to help Obel, did tell him that one of Obel's former neighbors from the Dominican Republic, named Piruca, was living nearby. By this point, Obel had not eaten for two days. Desperate and alone, he turned up at Piruca's house, where he was relieved to find a much needed warm welcome from Piruca.

167.   **Employment.** Obel started working alongside Piruca and Dona Pipi in a cafeteria that they owned in Rio Piedras, called Cafeteria 23. He worked there for around two years. At the cafeteria, he worked for Isabel Martinez, who was the cousin of Angelita Rodriguez, who became his wife. After he left Cafeteria

23, Obel started working for Angelita's father, Victoriano Rodriguez, who
owned a construction company and did contract work.

168.    For Obel, seeking employment as an undocumented Dominican in the late
1980s and 1990s in Puerto Rico was no small matter. He managed to find a
range of jobs as a gardener, collecting and recycling cans, and working as a real
estate agent—all jobs that were part of the informal economy and paid very
little.

169.    **Marriage to Angelita Rodriguez.** In 1985, Obel met Angelita Rodriguez.
After a couple of months, Angelita moved into Obel's room and they became
legally married around 1987. Obel's family did not approve of his relationship
with Angelita. Obel's brother, Joel, noticed that it was around this time that
Obel's behavior changed for the negative, and that he started socializing with
an unsavory crowd. In addition, Valerio once commented to Obel's son, Obelito
that he should stay away from Angelita because she practiced witchcraft. It
was around this time in Puerto Rico that Obel became a different person.

## MOVE TO HOUSTON, TEXAS

170.    In 1989, Obel moved to Houston, Texas in search of a better life, and to find
better opportunities than he had had in Puerto Rico. A friend named Ramon
encouraged him to make the move. He struggled at first in Texas, as he did not
speak English.

171.    Joel had also made the move to the United States. During those years, the
United States government was providing Residency to those who worked in

agriculture. Joel obtained residency and opened his own business, doing landscaping and making cheese. He employed Obel for some time.

172. Obel also took care of Rudy's wife, Margarita Perez, who had followed Rudy to the States. Rudy would often get violent with her when he was high and she would call Obel for help. Obel would come and try to control Rudy and would sometimes take Margarita out of the apartment. He looked out for her and she describes him as a very good friend who was always there for her and her son Junior.

## RETURN TO PUERTO RICO

173. Obel returned to Puerto Rico in October 1992. Obel had been sending money to his father to continue building a house for him and Angelita. Obel and Angelita went back to the Dominican Republic where they temporarily stayed with Obel's aunt, Tia Nilsa, in Santo Domingo. They later stayed in Obel's hometown, Boba, and then Angelita's hometown in Higuey while Obel worked as a driver. Obel introduced Angelita as his wife to his friends and family in the Dominican Republic. They split amicably in 1993, mostly over dispute whether to live in Higuey closer to Angelita's family, or closer to Obel's family.

174. **Reconnection with Mirella.** Mirella had also moved to Puerto Rico because she was searching for a better life and a way out of poverty. Then, in the early 1990s, both Obel and Mirella found themselves in Puerto Rico at the same time. Around 1993 or 1994, they were reunited by Obel's brother, Joel, who invited them both over to dinner. Mirella had previously given birth to their

72

child, Obelito. Obel and Mirella reconnected and resumed their romantic relationship almost immediately. They picked up the relationship where they had left it many years before. The relationship moved fast, and Obel moved into Mirella's home in Rio Piedras. Obel was a devoted husband. On days when he was not working himself, he stayed home to cook, clean the house, do the washing, paint houses and take care of Mirella. He went out of his way to make Mirella feel special, particularly on her birthday. The couple were happy together.

175.   They had a second child together, Abel Cruz-Perez. Abel loved his father and thought that he had a good life with him. His father was always affectionate and loving towards him and his older brother. Abel felt safe around his father, and remembered that his father was often talking about God and teaching his children to be good to other people. Obel often brought gifts home with him for the family when he finished work, sometimes bringing a flower for Mirella or toys for the children. Even when they were short on cash, Obel found a way to surprise them and to show his affection.

176.   They built a home together, and Obel helped with the construction himself. The couple lived together for around two years in Rio Pedra, in Puerto Rico, before they moved back to Santo Domingo, in the Dominican Republic. In 1996, Mirella left Puerto Rico and returned to the Dominican Republic. When Obel moved back to the Dominican Republic, he moved back in with Mirella and

their two children. The family moved from Nagua to Santo Domingo, where he resided with permanently until his arrest in 2002 in Puerto Rico.

177. From 1996 to 1997, Obel's mother, Dhalia, spent a year living at Obel's house. However, the many years of living apart had taken a toll on their relationship, and mother and son were distant and unfamiliar to one another. This was particularly true when compared to the bond between Obel and his father. During periods when Valerio had become sick while Obel had been living in Puerto Rico, Obel had rushed back home to be by his side.

## INCARCERATION IN PUERTO RICO.

178. In 2001, Obel was arrested and sentenced to 16 years in a Puerto Rico prison. He was moved between many prisons throughout Puerto Rico during this time. He was exposed to asbestos when held at one them.

179. Daisy Melendez was a supervisor of Baymon Prison while Obel was incarcerated there, and she saw that Obel was forced to confront his demons, and face up to the fact that he had a problem with the drug subculture. He was remorseful and repentant; she witnessed him cry, and saw his pain and regret. She saw that, at this point, he really began his life with God. Obelito visited his father in prison most Saturdays between 2005 and 2008, and he witnessed the same transformation in his father, who was becoming more and more religious.

vi.   **Consulting with expert witnesses and presenting their testimony would have put Mr. Cruz-Garcia's life and individual characteristics in context for the jury.**

180.   Trial counsel failed to retain or consult with any experts that could have humanized Mr. Cruz-Garcia for the jury. In particular, counsel did not retain a neuropsychologist who could have conducted a proper assessment of cognitive deficits exhibited by Mr. Cruz-Garcia.

181.   Trial counsel did not retain a culturally competent expert, who could explain to the jury the Dominican Republic's culture and customs, particularly concerning masculinity, traditional gender roles, marriage, divorce, and child rearing. An expert familiar with the history of migration from the Dominican Republic to Puerto Rico could have explained Mr. Cruz-Garcia's life as a migrant in a larger socio-economic context and cultural pressures.

182.   Trial counsel did not retain an expert on trauma who could have explained to the jury, after reviewing the available social history evidence set out above and interviewing the client, that what Mr. Cruz-Garcia experienced was more than just "a rough childhood." Mr. Cruz-Garcia experienced repetitive, prolonged, and cumulative traumatic events that involved direct harm, exploitation, and maltreatment including neglect, abandonment, and antipathy by primary caregivers during developmentally vulnerable times in his life. The result is complex trauma.

### vii.    Effects of complex trauma.

183.   Mr. Cruz-Garcia suffers from complex post-traumatic stress disorder, a

psychological disorder that can develop in response to prolonged, repeated

experience of interpersonal trauma in a context in which the individual has

little or no chance of escape. Had trial counsel hired an expert in the field, they

would have been able to present the following information to the jury.

184.   Throughout **childhood and early adolescence**, Mr. Cruz-Garcia

experienced repeated traumatic experiences, including but not limited to:

   a.  Witnessing domestic violence due to his mother's violent behavior;

   b.  Witnesses his father's infidelity and mother's extreme jealousy of any
       potential suitors. His mother insisted that Obel spy on his father by
       accompanying him, even at a very young age, to inappropriate adult
       establishments, so that Obel could report back to her what had
       transpired. Obel was caught in the middle;

   c.  Constant chaos and discord due to tumultuous parental relationship;

   d.  Physical abuse by his mother;

   e.  Mother's emotional abuse, shaming, constant pressure to report to her
       on father's activities;

   f.  Extreme poverty, particularly after father was injured in a car accident
       and mother abandoned Obel and other children;

   g.  Father's excessive drinking, alcoholism;

   h.  Exposure to and consumption of alcohol from very young age that was
       encouraged and forced by his parents;

   i.  Endangerment and exposure to inappropriate behavior by his father;

   j.  Obel was forced to work and do demanding physical, menial tasks at a
       very young age;

k. Father's accident when Obel was very young that changed course of family's life. Father was in such a bad shape that he initially was taken to morgue. He remained in a coma for several months, followed by prolonged hospital stay and numerous surgeries;

l. Father's accident precipitated the meeting of his wife (Obel's mother) and his mistresses, resulting in the mother abandoning the father in the hospital and leaving the children to fend for themselves;

m. Neglect and lack of supervision. Obel and other children were left to own resources, no adult took on parental or supervising role after father's accident and mother's abandonment. The only support came from non-relatives: the godmother;

n. Obel was "parentified" child, forced to become "man of the house" and younger siblings' caretaker, as well as also father's caretaker at hospital. But later, he would become his father's "crutch.";

o. Unable to protect sister from being in the streets and being with older men;

p. An accident and injury derailed his education. Obel fell from high wall, broke his leg, and was in cast for a year;

q. Learning, cognitive, and behavioral issues at school, extreme anxiety, later shame for being oldest in class;

r. Loss of father as a provider, financial stability; then, with move to Boba/Nagua, loss of familiar surroundings, godmother's support, pet that provided emotional support; and

s. Natural disasters, such as hurricanes while living alone in a rickety shack with tin roof and no electricity or running water with siblings.

185.   Throughout **late adolescence and adulthood,** Mr. Cruz-Garcia experienced

repeated traumatic experiences, including but not limited to:

    a.   Many near death experiences at sea, while fishing. His own life and father's life were at constant risk and their boat capsized several times in shark infested waters. They made at least one crossing of the channel between the Dominican Republic and Puerto Rico, the Mona Passage. The 80 mile straight between the islands is one of the most difficult passages in the Caribbean. It is fraught with variable tidal currents created by the large islands on either side of it, and crossing it in a small boat with only oars is a near death experience by itself;

    b.   Secondary trauma caused by exposure to severe illnesses/deformity such as leprosy, gonorrhea, syphilis, tuberculosis, etc. as a helper at father's dispensary. Secondary traumatic stress is the emotional duress that results when an individual hears about the firsthand trauma experiences of another. Its symptoms mimic those of post-traumatic stress disorder (PTSD). Accordingly, individuals affected by secondary stress may find themselves re-experiencing personal trauma or notice an increase in arousal and avoidance reactions related to the indirect trauma exposure. They may also experience changes in memory and perception; alterations in their sense of self-efficacy; a depletion of personal resources; and disruption in their perceptions of safety, trust, and independence;

    c.   Several car accidents;

    d.   Forced into a live-in relationship, start a family with mother of sons at early age;

    e.   Victim of many violent assaults, attacks at gun point, a machete, theft related crimes, including robberies and home invasion, etc. He was severely injured during at least one of them;

    f.   Wife raped by attackers in his presence;

    g.   Loss (his wife was 5-6 months pregnant during above attack, miscarried a girl);

    h.   Several hurricanes in DR and PR;

    i.   Sold as a slave by wife's cousin in PR – forced into involuntary servitude;

      j. Life threatening illness from perforated ulcer while in custody in PR with limited access to medical facilities and poor quality of care.

186. Cultural mores and traditions, familial views related to manhood and gender and other relationships, such as emphasis on masculinity and traditional gender roles, obviously affected Mr. Cruz-Garcia's upbringing. The effects of these include, but are not limited to the following:

    a. Father constantly telling Obel "you are a man," meaning that Obel was expected to:

        i. Have relationships (including fathering children) with several women concurrently

        ii. Drink

        iii. Have a large family with many half-siblings

        iv. Be the family's provider

    b. Dramatic income disparity in the society and relationship between "haves" and "have nots" resulted in Mr. Cruz-Garcia perceiving those with money (godmother) as benefactors.

187. Mr. Cruz-Garcia identified with his father. That, combined with of all the above, strongly shaped and influenced his identity.

188. Trauma does not always dissipate in its effects but rather can trickle down from generation to generation—intergenerational trauma. The people at the highest risk of trauma and those with the most difficulty working through it have experienced their own trauma but also have come from a family where there was a trauma in their parents and often in their parents' parents. Where trauma has been untreated, what is fairly common is that the untreated trauma in the parent is transmitted through the child through the attachment bond and through the messaging about self and the world, safety, and danger.

189. Mr. Cruz-Garcia experienced adverse effects of intergenerational trauma. Prior to his birth, as a member of the military his father fought during a civil war. He was apprehended and nearly killed by civilians. Little is known about his mother's experiences. However, the fact that she abandoned her four young children and left them to fend for themselves to go work as a prostitute in Venezuela could be a sign of a traumatic past. Moreover, her behavior towards the family prior to her leaving them may point to mental illness.

190. Mr. Cruz-Garcia was likely exposed to neurotoxins:

   a. Alcohol forced on him by his father from when he was as young as six, with adverse effects on his developing brain;

   b. Father built house on squatter land – there were no services in neighborhood;

   c. Obel worked construction with father from early age;

   d. He then worked on a coffee plantation as an adolescent and was exposed to pesticides.

191. Mr. Cruz-Garcia shows evidence of cognitive functioning deficits:

   a. Has word finding difficulties;

   b. Exhibits slow processing speed;

   c. Mispronounced some words;

   d. Severe difficulty with initial registration, immediate retention and recall (both words and numbers);

   e. Concrete thinking, difficulty abstracting;

   f. Extreme difficulty copying a drawing, very slow;

   g. Did not do well in school;

> **viii.    Migration from Dominican Republic to Puerto Rico and then to the U.S. as a response to struggle with poor economic conditions and desire for a better life.**

192.  Trial counsel could have consulted with an expert familiar with the history of migration from the Dominican Republic to Puerto Rico, and the connection between that migration and the drug trade. Mr. Cruz-Garcia's journey from Dominican Republic to Puerto Rico and then to United States was part of a well-recognized pattern that was influenced by a desire for a better life and struggling with poor economic conditions. An anthropologist or sociologist familiar with this topic could have provided the jury of wealth of information to put Mr. Cruz-Garcia's life story into context and to better understand why that story mitigated against the death penalty.

193.  For example, Dr. Gina Perez is a professor of anthropology at Oberlin College in Ohio. Ex. 41. Dr. Perez's research focus includes substantial work on the issue of migration in and around Puerto Rico. She is particularly familiar with the experience of Dominican migrants coming to Puerto Rico in the 1980s and 1990s. She was available to testify at Mr. Cruz-Garcia's trial had she been contacted by trial counsel and would have provided the following information.

    a)    *Cruz-Garcia's Early Life in the Dominican Republic.*

194.  Raised in a rural area of the Northeastern region of the Dominican Republic in the early 1960s, Mr. Cruz-Garcia's kin network and household was large, fluid, and included extended family members. Like much of the Dominican population at the time, Mr. Cruz-Garcia's family was involved in agricultural

work. They owned a modest plot of land where they raised food for their families and to sell to earn money. The men in Mr. Cruz-Garcia's family were also fishermen, an important economic activity that fed their family and provided reliable income. The family's economic security through the early 1960s reflects not only the industriousness of the family, but also national political economic policies that characterized the Dominican economy under the Dictator Rafael Trujillo from 1930-1961 that supported small-scale agricultural production by family farmers and limited the mobility of rural workers to ensure a robust supply of agricultural labor. At a very early age, Mr. Cruz-Garcia was expected to and actively participated in agricultural work, fishing, and helping to care for younger relatives.

195.   Mr. Cruz-Garcia's childhood and development were particularly distinguished by the separation of his parents and his mother leaving to return to Venezuela. From the time that Mr. Cruz-Garcia's father returned to live with his extended family with Mr. Cruz-Garcia and his siblings, it was clear that Mr. Cruz-Garcia took on an important role of caring for his brother and sisters by cooking, babysitting, making useful items for the household, fishing, and working with his father and uncle. He was a good and hard worker helping his father provide for the family. Mr. Cruz-Garcia was someone who protected his family, helped others, and from a very early age took on roles that exceeded his age.

196.   In addition, Cruz-Garcia's view of what constituted family and family relationships was also impacted by his native country. While having large

families, multiple partners, and households headed by one parent is not unusual throughout Latin America and the Caribbean, the Dominican Republic has a particularly unique history of family size. Indeed, throughout his thirty-one year dictatorship, Rafael Trujillo implemented policies to encourage population growth by enforcing strict controls of emigration from the Dominican Republic, encouraging European immigration to the island, and "systematic encouragement of childbirth" and, consequently, large families to ensure a large and available labor pool for agricultural and industrial work. The existence of large families with a range of household arrangements, therefore, was both state-sanctioned and culturally acceptable in the Dominican Republic and throughout the Caribbean.

197.    However, as a young man in his late teenage years in the Dominican Republic, Mr. Cruz-Garcia was like many young men struggling to work in a changing economy. While the Dominican economy in the 1960s and early 1970s was still largely defined by large numbers of workers in agricultural labor and subsistence economy, the late 1970s and 1980s witnessed unprecedented economic changes that had a dramatic impact on the economic, social, and cultural lives of residents on the island and throughout the Caribbean. Economic hardship increasingly defined life in the Dominican Republic in the late 1970s and 1980s. According to anthropologist Jorge Duany, "employment and underemployment, the rising cost of living, a chaotic transportation system, near collapse of basic public service like electricity, running water,

housing, health care and education" made life very difficult for Dominicans in general, and those residing in rural areas in particular.[11]

### b) *Emigration in the Dominican Republic.*

198.   In addition to deteriorating economic and social conditions, changes in Dominican migration also define the decades of the 1960s, 1970s, and 1980s. From 1930-1961, movement within the Dominican Republic and emigration were severely restricted under Rafael Trujillo. Beginning in 1966, however, these restrictions were lifted, and Dominicans increasingly engaged in internal and international migration. According to Ramona Hernandez, while it was virtually impossible for Dominicans to apply for a passport for more than thirty years, by the late 1960s, anyone who wanted a passport could apply and acquire one. These changes led to significant internal migration with those residing in rural areas often moving to urban centers like Santo Domingo. It also led to substantial emigration, legally and illegally. By the 1980s, migration was such a defining feature of Dominican life that Dominicans refer to this massive movement and displacement as "irse para los paises" (literally "moving to the countries").

199.   By the mid-1980s, when Cruz-Garcia began to court Mirella Pérez Garcia, he was one of many young Dominicans engaged in internal migration in search of work, unsuccessfully seeking employment in an economy that increasingly

---

[11] Jorge Duany, *Dominican Migration to Puerto Rico: A Transnational Perspective* (2005).

employed women more than men, and considering migration as a way to search for a better life. In 1986, like thousands of other Dominicans, Cruz-Garcia traveled on a yola to Puerto Rico. Not only was Puerto Rico an increasingly popular destination for Dominican migrants, it also held the possibility of getting legal documents that would allow him to travel to and live legally in the United States. These ideas of a better a life and the possibility of chaning one's status to go to the United States circulated widely in the Dominican Republic in the 1980s and led Cruz-Garcia and tens of thousands of others to leave the Dominican Republic for Puerto Rico.

*c)      Life and Work in Puerto Rico.*

200.   While Puerto Rico was often regarded as "a springboard for the U.S.," the cultural, linguistic, and historical ties between Puerto Rico and the Dominican Republic make it attractive and reasonable for Dominicans to remain and reside there.

201.   One element that was especially notable about Mr. Cruz-Garcia's migration experience was the degree to which he maintained connection with his family in the Dominican Republic.

202.   Although Dominican migrants began to arrive in Puerto Rico in significant numbers in the 1980s and 1990s seeking a better life, Puerto Rico also was experiencing significant economic, social, and political problems that constrained migrants' experiences. Beginning in the mid-late 1970s, Puerto Rico was in economic crisis. The impact of the oil crisis on the island and the devaluation of the American dollar in the early 1970s, as well as the failure of

Puerto Rico's industrialization program to provide adequate jobs for its growing population, led to increased unemployment and underemployment.

203.   As many scholars have noted, the failure of the formal economy to provide jobs for its population, and the social and economic marginalization that ensues, leads to the development and growth of the informal or underground economy. This is certainly the case in Puerto Rico.

204.   Beginning in the 1980s and 1990s, Dominican migrants increasingly comprised a large number of surplus laborers involved in the informal economy in Puerto Rico. Often they worked off the books as domestic workers, in construction, landscaping and gardening, and providing childcare. When Mr. Cruz-Garcia's wife arrived in Puerto Rico to join him in 1994, she worked cleaning houses. Mr. Cruz-Garcia worked in a range of jobs in the informal economy, including working as a gardener and even collecting cans to trade in for money when times were hard.

205.   For Mr. Cruz-Garcia, seeking employment as an undocumented Dominican in the late 1980s and 1990s in Puerto Rico was no small matter. He managed to find a range of jobs as a gardener, collecting and recycling cans, and working as a real estate agent—all jobs that were part of the informal economy and paid very little. Like so many Dominican migrants, Cruz-Garcia lived in low-rent neighborhoods like Barrio Obrero, where he could draw on networks with other co-nationals and managed to send money back to the Dominican Republic to help support his wife and their son. Given Cruz-Garcia's demonstrated

86

commitment to financially provide for his extensive families, both in the Dominican and in Puerto Rico, it is not surprising that turning to the drug economy became yet another source of generating income. As the possibilities for formal employment diminished for all residents on the island, the drug economy grew in Puerto Rico, the Dominican Republic, and the United States. And like many with experiences in the informal economy and limited economic possibilities, selling drugs seemed like a reasonable strategy. Indeed, this was and continues to be a gamble many take in spite of the dangers involved.

### ix.    Conclusions

206.    The above testimony (or what would have been punishment phase testimony, had trial counsel been effective) is substantially different and more compelling that the brief life history details provided by Mr. Cruz-Garcia's trial counsel through the testimony of Mr. Cruz-Garcia's brother, wife, and son. Trial counsel's failure to conduct a reasonable and thorough investigation into Mr. Cruz-Garcia's life history and to consult with an appropriate expert witness meant that ample information was left out of the punishment phase presentation heard by the jury. This absence impaired the jury's ability to effectively weigh the presence of mitigation warranting a life sentence and prejudiced Mr. Cruz-Garcia's capital punishment trial.

### 2. Trial counsel failed to conduct a thorough and independent investigation, present relevant and available evidence, and rebut State witness's testimony related to extraneous offenses.

207. Trial counsel failed to conduct a thorough and independent investigation into extraneous offenses. As set forth more fully in Claim 3, much of the testimony that the State presented about extraneous offenses was false. Had counsel conducted a constitutionally sound inquiry, they would have been able to effectively impeach the State's witnesses and rebut their testimony.

#### a. Saul Flores murder.

208. Trial counsel failed to thoroughly investigate Saul Flores's murder despite being put on notice that the State intended to introduce testimony and evidence about it. The State presented five lay witnesses and an expert, along with dozens of exhibits related to this extraneous offense. Trial counsel did not present a single rebuttal witness and failed to follow basic procedure for impeaching a witness.

#### i. Johnny Lopez testimony.

209. As set forth more fully in Claim 3B, Johnny Lopez's testimony at trial was completely contradictory to the statement he gave police in 1989. Ex. 29.

210. Trial counsel was ineffective in impeaching Johnny Lopez with his prior inconsistent statement. Trial counsel elicited all the responses necessary to show that the witness disagrees with his prior statement, 25 RR 51–55, but then, instead of finishing the process and reading the statement to the jury to impeach Mr. Lopez, counsel switched to a new line of questioning. 25 RR 56.

Instead of actually impeaching the witness, all trial counsel succeeded in doing was creating more evidence adverse to Mr. Cruz-Garcia.

211.   Trial counsel then failed to present rebuttal witnesses who could have testified that Johnny Lopez gave a completely different statement in 1989. Mr. Lopez was interviewed by two officers, R.E. Gonzales and A.C. Alonzo, the same officers who were involved in investigating Mr. Cruz-Garcia's case. Because they interviewed Mr. Lopez in 1989, they could have testified about Mr. Lopez told them then, and such testimony would not be hearsay because it would be offered for purposes of impeachment.

### ii.   Trial counsel failed to obtain available records and make objections to the introduction of certain evidence.

212.   Trial counsel failed to investigate available records on Saul Flores. Trial counsel failed to request the complete offense report and request the results of the DNA testing performed. Trial counsel failed to request updates on the progress of the investigation that the State witness testified had happened since Mr. Santana came forth with his information about the Saul Flores murder.

213.   Trial counsel failed to review the DA file and discover dozens of photos of Saul Flores that could have been used to impeach testimony regarding injuries Mr. Cruz-Garcia allegedly inflicted.

### iii. A thorough investigation would have revealed that Rudy Santana's testimony about Saul Flores murder is false.

214. As set forth more fully in Claim 3C, Rudy Santana gave dramatic testimony about Saul Flores's murder that was completely false. It was directly contradicted by autopsy report, photographs, and witness affidavits.

215. In particular, Rudy Santana testified that Mr. Cruz-Garcia's girlfriend, Elizabeth Ramos was the source of conflict between Mr. Cruz-Garcia and Mr. Flores. 25 RR 74. He testified that "Saul had taken some drugs, he had gone to Elizabeth's apartment, and he wanted to have some type of love relationship with her." *Id.* Ms. Ramos called Mr. Cruz-Garcia and told him about it; Mr. Cruz-Garcia was furious, and immediately went to her apartment. *Id.* According to Mr. Santana, Mr. Cruz-Garcia then killed Mr. Flores elsewhere. The State used this testimony to argue in closing that Mr. Cruz-Garcia "killed that 18-year-old guy for nothing more than he hit on his girlfriend." 26 RR 174.

216. Had counsel conducted an adequate investigation, they would have been able to locate and interview Elizabeth Ramos. She would have testified that she does not know Saul Flores. Ex. 30. She was never "courted" by Flores. Mr. Cruz-Garcia never picked up Flores—or any other man—from her apartment under the circumstances described in the testimony. At that time, she was living with her mother, in her mother's apartment. She is certain she would have remembered if several men arrived to remove another man interested in "some type of love relationship." *Id.*

217.   Mr. Santana also testified that Mr. Cruz-Garcia killed Mr. Flores in a rather gruesome manner, inflicting all manner of injuries. Had counsel requested the records, consulted experts, and hired a medical examiner or a pathologist to testify, he would have been able to present testimony explaining that the injuries shown in the photos and the autopsy report (a small abrasion, bruised face) are inconsistent with the injuries Mr. Santana testified were inflicted ("completely destroyed hands," cigarette burns, injected drugs).

218.   Trial counsel failed to investigate and present evidence of Mr. Santana's character for untruthfulness or present testimony in the form of an opinion about his character.

### b.  Kidnapping in Puerto Rico.

219.   Trial counsel failed to investigate the extraneous offense for which Mr. Cruz-Garcia was incarcerated. Trial counsel failed to uncover records that would have substantiated the testimony the defense was not allowed to introduce at trial: that Mr. Cruz-Garcia was working on behalf of law enforcement agencies at the time of the offense, October 11, 2001.

220.   Specifically, Mr. Cruz-Garcia was admitted to Puerto Rico a couple of weeks prior, on September 21, 2001, for 90 days for "significant public benefit." This type of benefit is typically used to allow noncitizens to appear for and participate in a civil or criminal legal proceeding in the United States. Significant public benefit parole might be granted, for example, to allow a key witness with no legal means of entering the United States to be paroled into the country long enough to testify in a criminal prosecution for drug trafficking.

221. Again, trial counsel failed to obtain those records, investigate the testifying witnesses, and present any rebuttal witnesses or experts. Here, counsel could have introduced testimony of a retired DEA agent who could have put the actions of Mr. Cruz-Garcia that day in context of a multi-agency operation gone sideways and their informant being caught in the middle of it. Trial counsel did none of that.

### c. Betico.

222. During the punishment phase, Mr. Santana testified that Mr. Cruz-Garcia, along with others, broke into "Betico's" [12] house. 25 RR 66. According to Mr. Santana, Mr. Cruz-Garcia stole drugs and money from Betico, beat him, and raped his wife. *Id.* at 70.

223. Trial counsel failed to conduct a thorough investigation, locate any information about Betico and the alleged rape, and present any rebuttal testimony.

224. Trial counsel failed to make any objection to introduction of such highly prejudicial, inflammatory testimony.

### 3. Trial counsel were ineffective throughout the punishment phase testimony.

225. Trial counsel failed to make an opening statement at the start of the punishment phase of the trial.

---

[12] Spelled phonetically in the transcript as "Patiko" but spelled as "Betico" on the State's notice of intent to use prior bad acts. The notice does not provide the name of Betico's wife. CR 414.

226.   Trial counsel failed to review the DA file, which contained relevant and helpful evidence that could have been presented in the punishment phase. This evidence includes, but not limited to: Puerto Rico prison records, religious letters from prison, and documents related to Saul Flores murder, including photographs that would have directly rebutted graphic (and false) testimony by Rudy Santana (*see* Claim 3C). These photographs were not introduced at trial as exhibits.

227.   Trial counsel were ineffective for failing to raise a Confrontation Clause challenge with respect to Dr. Wolf's testimony. Dr. Wolf testified regarding work conducted by others, who did not testify at trial, regarding the death of Saul Flores. Mr. Cruz-Garcia specifically incorporates all other allegations in the Confrontation Clause Claim 9 by this specific reference.

228.   Trial counsel were ineffective for failing to object to improper introduction of the extraneous victim impact testimony or ask for an instruction to disregard this testimony. *Payne v. Tennessee*, 501 U.S. 808 (1991) does not contemplate admission of evidence concerning a person who is not the victim for whose death the defendant has been indicted and tried. This evidence is irrelevant under Rule 401 and article 37.071, and the danger of unfair prejudice from "extraneous victim impact evidence" is unacceptably high.

229.   During Mr. Cruz-Garcia's punishment phase, **Manuel Buten**, a witness to an extraneous offense, testified about his family members' ongoing mobility issues and continuing emotional issues, such as nervousness, feelings of insecurity,

inability to continue working, etc. RR 24 at 42. Likewise, **Andres Castillo Buten** also offered improper extraneous victim impact evidence, testifying that he still has problems to this day. 24 RR 95–96, 97. Trial counsel failed to object to the introduction of this improper and unfairly prejudicial evidence or ask for a limiting instruction, rendering ineffective assistance of counsel.

230.   Trial counsel were ineffective for failing to failing to object to the introduction of false testimony at the mitigation phase of trial. The State introduce false testimony from several witnesses during the punishment phase. Mr. Cruz-Garcia specifically incorporates all other allegations in the Confrontation Clause Claim 9 by this specific reference. Trial counsel failed to raise objections to this testimony.

231.   Trial counsel failed to challenge the reasonableness and adequacy of the State's notice of intent to use extraneous offenses and prior bad acts under Tex. Code Crim. P. Art. 37.07 § 3(g), including, but not limited to, lack of timely notice necessary to investigate the alleged conduct, lack of names of the victims, lack of precise dates, etc.

232.   Trial counsel failed to file before trial or orally make motions in limine on the record challenging the introduction of extraneous offenses and bad acts during the punishment phase of the trial and failed to ask for a hearing on the record. Before extraneous offenses may be introduced during the punishment phase of a capital murder trial, the State must "clearly prove" to the trial court that an offense was committed and that the accused was the perpetrator. Trial counsel

failed to demand that the State present such proof before evidence of extraneous offenses and bad acts was introduced to the jury, either before or during the trial.

233. Trial counsel failed to object to the introduction of testimony about sexual assault of an unknown woman by the defendant. 25 RR 70. Trial counsel should have challenged the introduction of this testimony when a notice of this alleged bad act did not include the name of the victim, the evidence was not subjected to a hearing, and the testimony had no indicia of reliability and was unfairly prejudicial. Trial counsel failed to require that the State meet its burden to prove that an offense was committed and that the accused was the perpetrator.

234. Trial counsel was ineffective when they failed to secure (and assist) witnesses to testify in person and instead presented testimony of a key mitigation witness—Mireya Perez-Garcia—via a poor video connection. Her image was cutting in and out and the jury had a difficult time hearing her, especially when coupled with an interpreter's translation. 26 RR 9.

235. Trial counsel failed to object to anti-sympathy instruction in the jury charge.

**D. Trial counsel were ineffective during jury selection.**

236. Mr. Cruz-Garcia specifically incorporates all other allegations in this ineffective assistance claim by this specific reference, including but not limited to the Section detailing that trial counsel's investigation and pre-trial preparation was below prevailing professional norms. *See* Section I.A.

1. **Trial counsel's stipulation to remove potential jurors with apparently strongly held views of the death penalty before voir dire violated Mr. Cruz-Garcia's Sixth Amendment right to a jury drawn from a fair cross section of his community.**

237.   Under the Sixth Amendment, a jury must be drawn from a fair cross-section of the community.

238.   Mr. Cruz-Garcia's trial counsel stipulated with the prosecution to excuse prospective jurors based on views about the death penalty expressed in the inherently imprecise and unreliable exercise of supplying answers on a juror questionnaire.

239.   This practice of agreeing to strike venire members without a record of grounds or judicial oversight falls outside the prevailing professional norms of capital defense practice.

240.   At least 150 potential jurors responded to summonses and returned completed questionnaires for this case. However, counsel agreed to excuse approximately 80 of these citizens based solely on their questionnaire responses. Even though some of these excusals were stipulated based on scheduling, hardships, or other questionnaire responses not related to death penalty attitudes, the majority were apparently based on attitudes toward the death penalty.

241.   Counsel failed to make a detailed record of reasons for the stipulations.

242.   Individuals with strongly held death penalty opinions comprise a distinctive group because they are sufficiently numerous and distinct from those with other views. Contemporaneous empirical evidence reflects the significance of this distinctive group. A May 2012 scientific survey of registered voters in

Texas, conducted by the University of Texas in conjunction with the Texas Tribune, found the following categories of death penalty attitudes:

1. Strongly support 42%

2. Somewhat support 31%

3. Somewhat oppose 11%

4. Strongly oppose 10%

5. Don't know 5%

243. As shown here, the group of people with strong views on the death penalty are numerous, comprising a majority of the population. Thus, the practice of systematically excluding those with apparently stronger death penalty views must result in venires that underrepresent people with such views as compared to the community.

244. The systematic exclusion by pre-trial stipulation, as a means to that end, is simultaneously overbroad and under-inclusive. It is overbroad because not everyone who indicates death scruples is ineligible to serve on a capital jury, as they might be rehabilitated at voir dire. It is under-inclusive because, as here, the inability of some jurors to be death-qualified can arise in the course of voir dire questioning even when it was wholly hidden on the questionnaire. The voir dire process, after the court has explained the legal requirements, is essential and is sufficient to serve the State interest at stake.

245. Circumstances created a financial motive for Mr. Cruz-Garcia's trial counsel to participate in the extra-judicial process. Jury selection often is the longest,

and therefore the most expensive, part of a capital trial. Stipulated strikes based on presumed death-disqualification saves time and therefore reduces costs. Because Mr. Cruz-Garcia's counsel took the case on a flat-fee basis, the less time they invested into the case, the higher their effective rate per hour would be.

246.    The systematic exclusion of potentially qualified jurors without voir dire or judicial oversight, reflected in this record, violated Mr. Cruz-Garcia's Sixth Amendment rights to be tried by a fair and impartial jury drawn from a fair cross section of the community.

247.    The secret process resulted in the exclusion of two sub-groups: those with pro-death views, and those with reservations or doubts about the death penalty.

248.    It was fundamentally unfair to deprive Mr. Cruz-Garcia of a trial by a jury selected from a fair cross-section of the community.

**2.   Trial counsel's stipulation to exclude jurors and failure to create a full record of the exclusions denied Mr. Cruz-Garcia's right to effective assistance of counsel under the Sixth and Fourteenth Amendments.**

249.    Texas allows both the defendant and prosecution a total of fifteen peremptory challenges. TEX. CODE CRIM. PROC. art. 35.15. Here, trial counsel and the prosecution engaged in negotiated stipulations effectively allowing them to share approximately 80 additional removals by agreement without presentation to the court. In most instances, these agreed exclusions were based solely on the questionnaire without the benefit of individual voir dire

examination. Others were stipulated removals as the result of voir dire that were not counted as peremptory challenges.

250.   Trial counsel failed to create a proper record for grounds for removal, as the discussions about the questionnaires were held off the record. 5 RR 99 ("Have both sides had an opportunity to review the questionnaires in this case and make agreements as to those questionnaires?"). The court indicated that there was a further discussion at the bench, also off the record. *Id.* After resuming the discussion on the record, the prosecutor, the judge, and trial counsel disagreed as to which jurors were strikes for cause (the basis of which was left entirely off the record) and which ones were stipulated dismissals. *Id.*

251.   Here, the trial counsel further failed in his duties, saying that he agreed with the prosecutor's strike for cause, and the trial court considered them excusals by agreement. 5 RR 100. Dismissing a juror for cause, however, is not the same as stipulating to removal of the jurors.

252.   Among those dismissed by the judge, after that discussion was held off the record, were potential jurors like Anita Payne, venireperson No. 18. Nothing in her questionnaire or the few questions she asked during group voir dire suggested a basis for dismissal for cause. Likewise, Meghan Mehl, venireperson No. 20, had little to suggest a basis for removal for cause. The same goes for Monica Lara, venireperson No. 8, and several others. Some expressed hesitancy about the death penalty that did not rise to the level of "cause" sufficient to grant a strike. *See, e.g.*, Venireperson No. 8 statement, 5

RR 83 ("I'm not for the death penalty, so I might possibly be swayed. I don't want to go 100 percent, but I'm not for it. So, it would be a little difficult for me.").

253.   Trial counsel failed to hold the State to its burden of qualifying every juror and make a record of the basis on which the jurors were being struck. Instead, counsel acquiesced to removals, off the record, without any basis for strikes, or attempt to further explore the potential juror's attitudes toward the death penalty.

254.   This was not an isolated incident—throughout the voir dire, counsel stipulated to removals without any explanation of the basis for them, including removals of Hispanic and other minority jurors. For example, trial counsel inexplicably stipulated to the removal of Rachel Willis, a Hispanic woman and venireperson No. 11. After brief questioning by the court about some answers on her questionnaire, the State withdrew its motion to strike for cause. 5 RR 105–06. Yet the very next morning, without any further questioning and just before her scheduled individual voir dire, trial counsel agreed to excuse Rachel Willis with no statement as to the reasons. 6 RR 4. The same situation repeated with venireperson No. 54, Elsy Quinanilla, also a Hispanic woman. The court clarified a few answers on her questionnaire in a short voir dire and denied the State's motion to strike. 5 RR 117–18. She was later dismissed "by agreement between the State and the defense" without further record. 7 RR 251. This excusal of Hispanic jurors without voir dire or a thorough record is particularly

egregious given that Hispanics were already dramatically underrepresented in the jury venire.

255.   This and other similar failures to create a record, conduct individual voir dire, and rehabilitate the jurors, falls below the standard of care for competent capital defense advocacy.

256.   Mr. Cruz-Garcia was prejudiced by this practice because, but for the deficient performance, at least one death-scrupled juror could have been rehabilitated and ultimately seated.

257.   The failure to follow the established rules governing peremptory challenges also violates Mr. Cruz-Garcia's right to due process and a fair trial. Moreover, the failure to create a record deprived him of the ability to raise these issues on appeal.

> **3.   Trial counsel was ineffective when they agreed not to mention that the victim is a child and failed to explore potential juror's attitudes towards a case with both a child victim and sexual assault.**

258.   The instant offense involved a child victim and sexual assault, both likely to cause many jurors difficulty remaining fair and impartial.

259.   Despite this, trial counsel agreed to the State's motion in limine to abstain from referencing the fact that the victim was a child, and the court granted the State's motion. 5 RR 5.

260.   Notwithstanding the order that prohibited references that *this* case involved a child victim, counsel was free to explore potential jurors' attitudes toward sitting in judgment in a hypothetical case. And certainly nothing prohibited

counsel from asking jurors if they could be open-minded in a case that involved a sexual assault allegation.

261. The need to do so was illustrated vividly by volunteered testimony from one of the potential jurors: "I think I can be open—I know I can be open-minded in this case, which is a murder. I think I wouldn't be too open-minded it if it was a rape or something like that. Because I did have a niece that got raped." 6 RR 161 (voir dire of Adela Rodriguez, venireperson No. 22).

262. Even though Mr. Cruz-Garcia was being tried for capital murder of a child, the State relied on the allegation that Mr. Cruz-Garcia sexually assaulted Diana Garcia to place him at the scene of the kidnapping. The discussion of rape and sexual assault was a major, unavoidable part of the case, yet counsel asked zero questions of the potential jurors about their own experiences (or those of their loved ones) about sexual assault.

263. At the same time as defense counsel was avoiding any mention of child victims even in hypothetical cases, the State was invoking cases with multiple child victims: Boston marathon bombing, the Candy Man case, the Andrea Yates case. Counsel failed to voir dire and diffuse potential jurors' bias with respect to emotionally-charged issues of child victims and sexual assault.

264. As a result of counsel's deficient performance, Mr. Cruz-Garcia was prejudiced because he did not receive a trial from a fair, impartial, and unprejudiced jury.

### 4. Trial counsel were ineffective throughout the entire process of selecting a jury.

265. Trial counsel failed to request discovery about the jury selection system for the grand jury that indicted Mr. Cruz-Garcia.

266. Trial counsel failed to investigate and raise a fair cross-section challenge to the system that selected the grand jury under the federal and state constitutions. *See* Claim 12. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

267. The trial court granted the discovery motion that requested a list of the witnesses that provided grand jury testimony, and a transcript of the grand jury testimony itself, after any witness called by the State of Texas had testified. Trial counsel failed to actually secure the materials made available by the order and obtain a list of witnesses, the transcripts of their testimony, some other alternative record of the proceedings in the absence of transcripts, or further discovery as needed to receive relevant information about the grand jury.

268. Trial counsel failed to request discovery about the jury selection system in advance of trial.

269. Trial counsel failed to move to quash the jury venire on the ground that it did not represent a fair cross-section of the community. *See* Claim 12. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

103

270.  Trial counsel failed to investigate and raise a fair cross-section challenge to the system that selected the petit jury under the federal and state constitutions. *See* Claim 13. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

271.  Trial counsel failed to investigate and challenge the deliberate discrimination in the jury system that produced Obel Cruz-Garcia's venire. *See* Claim 14. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

272.  Trial counsel failed to oppose the State's motion in limine to preclude "any reference to the fact that the victim was a child." 5 RR 5. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

273.  Trial counsel failed to conduct an effective voir dire necessary to impanel a fair and impartial jury because counsel did not ask any questions about the potential jurors' ability to remain impartial in a case involving a child abduction, murder, and rape. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

274.  Trial counsel failed to raise *Batson* objections when the State exercised peremptory challenges against minority jurors Latoya Johnson, No. 89; Melinda Dixon, No. 98; Johnny Bermudez, No. 92; and Gilberto Vazquez, No. 115. *See* Claim 15. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

275.    Trial counsel stipulated to removal of potential jurors with apparently strongly held views of the death penalty based only on their answers to the questionnaire or very limited group voir dire by the court.

276.    Trial counsel failed to create a full record of the basis for challenges for cause, objections to the voir dire, etc, and failed to ensure an adequate record existed for subsequent review of Mr. Cruz-Garcia's claims.

277.    Trial counsel failed to object to portions of the trial being conducted off the record. *See* Claim 18. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

278.    Trial counsel failed to raise objections to the exclusion of jurors who voiced general objections to the death penalty or expressed conscientious or religious scruples against it. *See* Claim 16. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

279.    Trial counsel failed to voir dire and rehabilitate jurors who voiced general objections to the death penalty or expressed conscientious or religious scruples against it. *See* Claim 16. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

280.    Trial counsel failed to effectively voir dire jurors about their views on the death penalty. *See* Claim 16. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

281.    Trial counsel waived the two-day notice of jurors under Rule 34.04 of the Texas Code of Criminal Procedure. 11 RR 5.

282.   Trial counsel failed to effectively investigate potential jurors and discover potential biases prior to voir dire.

283.   Trial counsel failed to object to the State's repeated invocations and comparisons of Mr. Cruz-Garcia to Charles Manson and Adolf Hitler during voir dire. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

284.   Trial counsel failed to object to the State's repeated references to the Boston Marathon bombing, Andrea Yates, and the Candy Man during voir dire. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

285.   Trial counsel failed to timely object to the State using commitment questions with respect to "the defendant." *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim. When counsel finally objected and the motion was granted, trial counsel failed to re-raise the objection when the State continued to ask commitment questions.

286.   Trial counsel failed to object to the State's repeated suggestions that Mr. Cruz-Garcia had a criminal history that would be revealed during the punishment phase. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

287.   Trial counsel failed to object to the State's biased questioning during voir dire targeting women, such as asking married women about their husbands' views

on death penalty. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

288. Trial counsel failed to exercise a peremptory challenge on Jennifer Sims, who previously served on a capital jury and sentenced a defendant to death.

289. Trial counsel failed to make objections on the basis of the federal constitution.

### E. Trial counsel were ineffective for failing to recognize the significance of Mr. Cruz-Garcia's foreign nationality and seek the assistance of the Dominican Republic Consulate in defending this case, in violation of the Sixth Amendment.

290. As a citizen of the Dominican Republic, Mr. Cruz-Garcia is entitled to certain protections under the Vienna Convention on Consular Relations (VCCR).[13] Here, Mr. Cruz-Garcia was denied effective assistance of counsel in this case when his trial attorneys failed to recognize and act on his rights under the VCCR by contacting the Dominican Republic consulate concerning his prosecution, thereby depriving him of all the benefits that consular involvement would have provided.

291. At the time of Mr. Cruz-Garcia's capital trial in 2013, reasonably competent counsel would have known the significance of Mr. Cruz-Garcia's foreign

---

[13] Specifically, Mr. Cruz-Garcia is entitled to be apprised of his right to contact authorities from his home country if he has been arrested, detained, or indicted. Vienna Convention on Consular Relations Art. 36(1)(b), April 24, 1963, 21 U.S.T. 77, TIAS 6820. Ensuring that this right is properly enforced is crucial in ensuring that foreigners of any nationality, including United States citizens, receive fair treatment when detained outside of their home countries.

nationality, ensured that he was apprised of his rights under the VCCR, and made every effort to involve the Dominican Republican consulate in defending his case.

### 1. Trial counsel knew that Mr. Cruz-Garcia is a citizen of the Dominican Republic.

292. In addition to the information available to trial counsel through Mr. Cruz-Garcia himself—who speaks no English and has a foreign passport—trial counsel had objective information in their possession confirming that Mr. Cruz-Garcia is a foreign national. In particular, counsel had a copy of Mr. Cruz-Garcia's 2010 Probable Cause Order, which states that he is not a United States citizen.[14] Ex. 25.

293. Through discovery, trial counsel had access to numerous police and other state-issued reports indicating that Mr. Cruz-Garcia is a citizen of the Dominican Republic. A supplemental police report provided to trial counsel identifies Mr. Cruz-Garcia as a national of the Dominican Republic. Ex. 26 at ¶9. Moreover, on June 19, 2013, the prosecution filed a Notice to Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction stating that "[t]he defendant

---

[14] As discussed at length in Claim 10, this Order incorrectly identified Mr. Cruz-Garcia as being from Dominica rather than the Dominican Republic. Nevertheless, this Order provides evidence of Mr. Cruz-Garcia's foreign nationality. Furthermore, given trial counsel's later efforts to locate and speak with family members of Mr. Cruz-Garcia's in the Dominican Republic, it is clear that counsel knew where their client was from.

is a citizen of the Dominican Republic who entered the United States as well as the Commonwealth of Puerto Rico on multiple occasions since the late 1980s illegally and remained in both locations for periods of time as an undocumented alien." *Id.*

294.   This information would have been sufficient to place counsel on notice that they were defending a non-United States citizen. Consequently, prevailing norms of professional practice dictated that trial counsel take certain steps in their representation of Mr. Cruz-Garcia.

### 2. Both national and state bar guidelines highlight the steps that need to be taken in representing a foreign national in a capital case.

295.   By 2013, it was standard practice within the capital defense community to enlist the help of a foreign consulate in defending a foreign national in a capital case. Ex. 26 at ¶8. Even by the mid-2000s, this practice was so well accepted that the steps that effective counsel should take in representing a foreign national in a capital case were codified in both the 2003 ABA Death Penalty Guidelines as well as in the State Bar of Texas Guidelines and Standards for Texas Capital Counsel, Guideline 10.3 (hereinafter "Texas Guidelines").

296.   As soon as trial counsel were aware that Mr. Cruz-Garcia was born outside of the United States, they incurred an obligation under the ABA Guidelines to seek consular assistance on his behalf. The ABA Guidelines specifically state that counsel representing a foreign national must "immediately advise the client of his or her right to communicate with the relevant consular office; and obtain the consent of the client to contact the consular office. After obtaining

consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest." 2003 ABA Death Penalty Guidelines, Guideline 10.6.

297. These obligations would have attached as soon as trial counsel suspected Mr. Cruz-Garcia's Dominican Republic nationality based on his family background and birthplace. Even in cases where nationality is in dispute, counsel have an obligation to try to determine nationality in order to assess whether additional steps must be taken to appropriately represent the individual. *Id.*

298. In addition to the ABA, the State Bar of Texas has also adopted guidelines highlighting trial counsel's additional obligations in defending a foreign national in a capital case. *Texas Guidelines*, Guideline 10.3. The Texas Guidelines specifically concerned with the representation of a foreign national are more extensive than the corresponding section within the ABA Guidelines, requiring counsel to "[i]mmediately advise the client of his or her right to communicate with the relevant consular office, and "[o]btain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest." If counsel is unable to obtain consent, counsel should "exercise his or her best professional judgment under the circumstances." *Id.*

299. Trial counsel did not inform Mr. Cruz-Garcia of his right to communicate with the Dominican Republic Consulate, even though "Guideline 10.6 unequivocally states that counsel should advise a foreign national client of her right to

communicate with consular officials." Ex. 26 at ¶10. Despite the myriad of professional guidelines clearly outlining counsel's obligations in representing a foreign national, trial counsel never made an attempt to communicate with the Dominican Republic Consulate on Mr. Cruz-Garcia's behalf.

300.  Upon learning that Mr. Cruz-Garcia was a citizen of the Dominican Republic, reasonably diligent counsel would have contacted the nearest consulate in order to confirm his citizenship status and eligibility for consular assistance. The Dominican Republic Consulate would have offered services and means of support had they known Mr. Cruz-Garcia was facing the death penalty. Ex. 27. Officers of the Dominican Republic Consulate were available to assist, but trial counsel never contacted the consulate, in clear contravention of the ABA Guidelines.

301.  At the time of Mr. Cruz-Garcia's trial, the Dominican Republic consulate was unaware of Mr. Cruz-Garcia's arrest, prosecution, and death sentence. Had the consulate been informed, multiple services would have been made available to Mr. Cruz-Garcia's defense team, including assistance contacting family members, locating witnesses or records in the Dominican Republic, sending out documents and letters to the court, being present in court, and otherwise supporting Mr. Cruz-Garcia. Ex. 27. Had it been contacted by the defense team, the Dominican Republic consulate would have sought to assist trial counsel in its representation of Mr. Cruz-Garcia in whatever way possible, including in facilitating trial counsel's mitigation investigation—assistance

particularly needed by the defense in the absence of a qualified mitigation specialist.

302.   In addition, had the consulate been involved in this case from the start, they could have sought to use their political influence to negotiate with the State to seek a life sentence for Mr. Cruz-Garcia. Consular officials are often successful in persuading prosecutors to waive the death penalty in exchange for a guilty plea. Ex. 26 at ¶15.

303.   Given the significant ways consular assistance can positively impact a defendant's capital case, there is no doubt that failure to seek such assistance—especially when the obligation to do so is codified by various professional guidelines—is prejudicial.

304.   Trial counsel wholly failed to fulfill their obligations under prevailing norms of both national and state professional practice in failing to advise Mr. Cruz-Garcia of his right to consular access, seek out consular assistance in the defense of his case, and communicate to the court that the State failed to properly warn Mr. Cruz-Garcia of his rights under the VCCR.

F.    **Trial counsel were ineffective by failing to object on due process grounds to the state's introduction of extraneous offenses at the guilt/innocence phase of trial.**

305.   The trial court wrongfully admitted evidence of an extraneous offense at the guilt/innocence phase of trial in violation of Mr. Cruz-Garcia's due process rights.  Trial counsel's failure to object on due process grounds constituted ineffective assistance in violation of the Sixth Amendment.

306.   During the guilt/innocence phase of trial, the State sought to introduce evidence that, approximately one week after the crime at issue, Mr. Cruz-Garcia failed to appear for a court setting on an unrelated felony drug charge, resulting in bond forfeiture. 19 RR 105, 110–11.  Trial counsel objected to the evidence under Texas Rules of Evidence 403 and 404(b), but did not argue that the introduction of an extraneous felony offense at the guilt/innocence phase of a capital murder trial violated Mr. Cruz-Garcia's due process rights. *Id.* at 119, 122.  The trial court recognized that the "extraneous offense" was "prejudicial," *id.* at 115, but nevertheless admitted the bond forfeiture paperwork and the docket sheet for the drug case, with only the name of the offense redacted, *id.* at 121, 123–24, 141; *see also* State's Ex. 36. The court also allowed FBI Agent Eric Johnson to testify to the bond forfeiture. *Id.* at 141–42.

307.   The admissibility of evidence under state law is not determinative of a federally protected right cognizable on habeas corpus. The trial court's improper admission of an extraneous felony offense in Mr. Cruz-Garcia's capital murder trial resulted in fundamental unfairness, and therefore violated his due process rights.

308.   Trial counsel's failure to make a constitutional objection to the improper admission constituted ineffective assistance.

### G.   Trial counsel were ineffective when they failed to object to the trial court's ex parte meeting with a juror during punishment phase deliberations.

309.   During the punishment phase deliberations at Mr. Cruz-Garcia's trial, the court held an ex parte meeting with a holdout juror who supported a life sentence. *See* Claim 8.

310.   By this specific reference, Mr. Cruz-Garcia incorporates all facts and allegations in Claim 8, which relates to the trial court's ex parte conversation with Juror Bowman.

311.   Trial counsel failed to object to the ex parte meeting, failed to request an opportunity to question the juror, and failed to move for a mistrial.

312.   Trial counsel's failures constituted ineffective assistance.

### H.   Trial counsel were ineffective for failing to investigate juror misconduct.

313.   The jurors at Mr. Cruz-Garcia's trial repeatedly committed misconduct by discussing the case outside of deliberations. *See* Claim 7.

314.   On one occasion, the trial court informed trial counsel that a local attorney had observed two jurors discussing the case on the courthouse elevator. The trial court provided the witness' contact information should counsel want to further investigate the misconduct.

315.   Trial counsel never contacted the local attorney, questioned the individual jurors about the misconduct, or moved for a mistrial.

316.   By this specific reference, Mr. Cruz-Garcia specifically incorporates all facts and allegations in Claim 7, relating to the jury misconduct.

114

317.   Trial counsel's failures constituted ineffective assistance.

**I.   Trial counsel were ineffective for failing to object, and to federalize, constitutional errors at Mr. Cruz-Garcia's trial.**

318.   Throughout this petition, Mr. Cruz-Garcia has raised a number of constitutional violations regarding his conviction and sentence of death.

319.   To the extent that this Court determines that trial counsel's failure to object, or to properly object under the applicable provision of the United States Constitution prevents review of that claim, Mr. Cruz-Garcia alleges that trial counsel's failure to do so was the product of negligence or a failure to conduct a thorough investigation of law in preparation for trial. This includes, but is not limited to, the following constitutional claims:

a.   Claim 5, that Mr. Cruz-Garcia's rights to present a defense and to cross examine witnesses were violated when the trial court refused to allow him to present evidence regarding the unreliability of the DNA evidence. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

b.   Claim 9, that Mr. Cruz-Garcia's rights under the Sixth and Fourteenth Amendments were violated when he was unable to confront witnesses against him. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

c.   Claim 24, that Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated when the trial court prohibited him from presenting powerful mitigating evidence. Mr. Cruz-Garcia

specifically incorporates by this reference all facts and allegations in that claim.

d. Claim 21, that Mr. Cruz-Garcia's rights under the Fifth and Fourteenth Amendments were violated when his trial judge had a conflict of interest. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

e. Claim 19, that Mr. Cruz-Garcia's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when he was not present during portions of his trial. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

f. Claim 22, that Mr. Cruz-Garcia's rights under the Fifth, Sixth, and Fourteenth Amendments were violated when repeated, emotional outbursts from the gallery rendered his conviction and sentence fundamentally unfair. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

g. Claim 23, that Mr. Cruz-Garcia's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when testimony was translated incorrectly to the jury. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

h. Claim 25, that Mr. Cruz-Garcia's rights under the Fifth and Fourteenth Amendments were violated by the State's improper closing argument.

Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

i.   Claim 26, Mr. Cruz-Garcia's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutors engaged in misconduct by issuing improper, extra-judicial subpoenas to gather evidence, which was then introduced at Mr. Cruz-Garcia's trial.

**J.   Trial counsel's errors were prejudicial.**

320.   By this specific reference, Mr. Cruz-Garcia incorporates all facts and allegations contained in the entirety of this ineffective assistance of counsel claim.

321.   Taken both individually and cumulatively, trial counsel's performance in representing Mr. Cruz-Garcia was deficient and prejudicial.

322.   Trial counsel's failure to investigate, prepare and present evidence and argument at the above stages of Mr. Cruz-Garcia's trial constituted deficient performance under prevailing professional standards.

323.   But for trial counsel's deficient performance, there is a reasonable probability that Mr. Cruz-Garcia would not have been convicted or sentenced to death.

324.   Trial counsel's errors undermine the confidence in the outcome.

325.   For these non-exclusive reasons, Mr. Cruz-Garcia's Sixth Amendment right to effective assistance of counsel was violated.

**Claim 2          Direct Appeal counsel was ineffective.**

326.  In violation of the Sixth, Eighth, and Fourteenth Amendments, Mr. Cruz-Garcia's appellate counsel, Wayne Hill, was ineffective on direct appeal. Counsel performed deficiently and there is a reasonable probability that, absent counsel's errors, Mr. Cruz-Garcia would have received relief on direct appeal. Counsel's omissions were the product of negligence or a failure to conduct reasonable investigation into the applicable law.

327.  Counsel was ineffective for the following non-exhaustive list of reasons:

   **A.    Direct appeal counsel failed to make sure that the Texas Court of Criminal Appeals had a complete record for review.**

328.  The juror questionnaires and information cards as well as several volumes of Reporter's Record and Exhibits were not transmitted to the Texas Court of Criminal Appeals by the trial court, and thus were unavailable to that court for review during the adjudication of Mr. Cruz-Garcia's direct appeal and post-conviction writ. Mr. Hill failed to recognize these deficiencies and correct the record. As a result, the Texas Court of Criminal Appeals made its rulings on direct appeal and writ petitions without the benefit of full record.

   **B.    Direct appeal counsel provided ineffective assistance by failing to challenge the trial court's improper ex parte meeting with a holdout juror during punishment phase deliberations.**

329.  During the punishment phase deliberations at Mr. Cruz-Garcia's trial, the court held an ex parte meeting with a holdout juror who supported a life sentence. *See* Claim 8.

330. By this specific reference, Mr. Cruz-Garcia incorporates all facts and allegations in Claim 8, relating to the trial court's improper ex parte meeting with Juror Bowman.

331. Direct appeal counsel failed to challenge the trial court's improper ex parte meeting with the juror. Direct appeal counsel's failure constituted ineffective assistance, in violation of Mr. Cruz-Garcia's constitutional rights.

**C.    Direct appeal counsel was ineffective for failing to raise that the State obtained Mr. Cruz-Garcia's conviction and death sentence without providing his guaranteed consular notification under the Vienna Convention on Consular Relations.**

2. In Claim 10, Mr. Cruz-Garcia alleges that his conviction and death sentence were unconstitutionally obtained when he did not receive his guaranteed consular notification under the Vienna Convention on Consular Relations.

3. By this specific reference, Mr. Cruz-Garcia specifically incorporates all facts and allegations in Claim 10.

4. To the extent that this Court determines that the claim could have been raised on direct appeal, Mr. Cruz-Garcia alleges that direct appeal counsel's failure to do so constituted ineffective assistance.

**Claim 3      The State obtained Mr. Cruz-Garcia's death sentence by knowingly soliciting false testimony in violation of his constitutional rights.**

332. Under the Fourteenth Amendment to the United States Constitution, a defendant's due process rights are violated if his conviction or sentence are obtain through the use of false testimony. U.S. CONST. amed. XIV; *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The prosecutor presenting false testimony

need not have actual knowledge of its falsity; it is enough that they should have known. *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Giglio v. United States*, 405 U.S. 150, 154 (1972). This protection includes false testimony which goes to the credibility of the witness. *Napue*, 360 U.S. at 269.

333. The State obtained Mr. Cruz-Garcia's conviction and sentence of death by soliciting false testimony that it knew, or should have known, was false for the following non-exclusive reasons.

### A. The State knew, or should have known, that it was presenting false testimony regarding DNA evidence.

334. The case against Mr. Cruz-Garcia was a cold case that was ostensibly solved in reliance on DNA evidence, which has now been shown to be false and unreliable. Without the DNA evidence, the State's case against Mr. Cruz-Garcia falls apart.

335. The inculpatory DNA evidence that the State relied upon at trial was false. Mr. Cruz-Garcia's conviction reflects widespread problems with the way labs nationwide had been making "DNA mixture" interpretations until recently. After the FBI blew the whistle with respect to these serious flaws in methodology, the Texas Forensic Science Commission ("FSC") took up the issue. Ex. 28 at 1. The FSC's attention then prompted labs to revisit their calculations; in Mr. Cruz-Garcia's case, amended lab reports followed. Ex. 11.

336. According to the amended lab report at issue, the DNA evidence that the State presented inculpating Mr. Cruz-Garcia was demonstrably false. No conclusions can now be drawn with respect to one of the two reputedly

inculpatory items of DNA evidence presented at trial.  With respect to the second item, the amended lab report now points to a second unknown contributor to the DNA mixture—most likely belonging to the actual perpetrator. This new evidence casts considerable doubt on Mr. Cruz-Garcia's guilt and wholly undermines any confidence in the result of his capital murder trial.

### 1. Trial testimony regarding DNA.

337.    DNA was the only physical evidence linking Mr. Cruz-Garcia to the offense.

338.    The State presented the testimony of Matt Quartaro, a DNA analyst at forensic testing lab Orchid Cellmark, which conducted the DNA analysis in this case in 2007 and 2008.[15] Mr. Quartaro testified to Cellmark's analysis of items of evidence that had been collected during the investigation, including a cigar that had been recovered from Ms. Garcia and Mr. Rodriguez's apartment, vaginal swabs from a sexual assault kit that was taken from Ms. Garcia the night of the assault, and a cutting from Ms. Garcia's panties. 21 RR 105–20. Mr. Quartaro testified that Cellmark's analysis resulted in a finding that Mr. Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction obtained from the vaginal swabs was a mixture of multiple individuals, from which neither Mr. Cruz-Garcia nor Mr. Rodriguez could be excluded as contributors; and that the sperm cell fraction obtained

---

[15] See Claim 9.

from the cutting of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia was a major contributor and Mr. Rodriguez could not be excluded as a minor contributor. *Id.* at 119–20.

339.   The State also presented the testimony of Courtney Head, a criminalist with the HPD crime lab. Ms. Head testified that in 2010 she had performed a DNA extraction on a buccal swab taken from Mr. Cruz-Garcia and compared the DNA profile she obtained of Mr. Cruz-Garcia to the DNA profiles that Cellmark had obtained from the cigar, the vaginal swabs, and the panties.   21 RR 156–59. Ms. Head testified that based on her comparisons, Mr. Cruz-Garcia could not be excluded as a contributor to the DNA found on the cigar; that Mr. Cruz-Garcia could not be excluded as a contributor to the mixture DNA profile obtained from the sperm cell fraction of the vaginal swabs; and that the DNA profile obtained from the sperm cell fraction of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia could not be excluded as a contributor to the major component. *Id.* at 161–62.

340.   The State relied heavily on this DNA evidence during closing argument. *See* 23 RR 36 ("Probably the most damning corroboration for the defendant in this case is the DNA evidence.").

### 2.   Post-Conviction developments regarding DNA.

341.   On August 21, 2015, it became generally known in Texas that the methodology Texas labs had been using to calculate DNA mixtures might be problematic. On that day, the FSC announced to members of the Texas criminal justice community its "concerns involv[ing] the interpretation of DNA results where

multiple contributors may be present, commonly referred to as DNA mixture interpretation." Ex. 28 at 1. Specifically, these concerns involved the widespread failure of Texas labs to calculate the "Combined Probability of Inclusion" using the current consensus methodology so as to determine the odds that a particular person had left DNA at a crime scene. *Id.*

342. In the wake of the announcement, the Houston Forensic Science Center (formerly the HPD crime lab) revisited the DNA analysis that had been performed before Mr. Cruz-Garcia's trial. That query resulted in an amended laboratory report, which was sent to post-conviction counsel on November 3, 2015. Ex. 11.

343. The amended lab report reveals serious issues with the two seemingly inculpatory pieces of DNA evidence upon which the State's case depends. The amended lab report notes that, with respect to the vaginal swabs taken from Ms. Garcia, "***No conclusions will be made given the excessive number of contributors to this DNA mixture***." Ex. 11 at 2 (emphasis added). As for the sperm cell fraction of the DNA mixture taken from her panties, the amended lab report notes that, while Mr. Cruz-Garcia cannot be excluded as a possible contributor to the major component of the DNA mixture, "***[n]o conclusions will be made regarding the minor component of this DNA mixture due to insufficient data.***" *Id.* (emphasis added).[16]

---

[16] As to the DNA profile obtained from the cigar that was recovered from Ms. Garcia and Mr. Rodriguez's apartment, the amended lab report is consistent with the DNA

344. State's expert Mr. Quartaro provided false testimony about the source of DNA and the possibility of cross-contamination from the cigar to the panties. Contrary to Mr. Quartaro's testimony, even if it were possible to reliably determine that Mr. Cruz-Garcia's DNA was present in the sperm fraction, it does not mean that DNA came from sperm. DNA from epithelial (skin) cells is also present in the sperm fraction. Trial counsel would also be able to rebut Mr. Quartaro's false testimony that Mr. Cruz-Garcia's sperm would have been necessary to contaminate the items from the sexual assault kit and the panties. 21 RR 139. While both the vaginal swab and the cutting from Ms. Garcia's panties showed the presence of sperm, because they were mixture DNA samples, contrary to the State's argument at trial, it cannot be said that it was Mr. Cruz-Garcia's sperm. DNA analysis does not identify the source of DNA, and someone else's sperm—the unknown contributor—could have been mixed with Mr. Cruz-Garcia's skin cells (or other DNA source) and produced the result here.

---

analysts' trial testimony that Mr. Cruz-Garcia cannot be excluded as a contributor. Because testimony at trial established that Mr. Cruz-Garcia was a frequent visitor to the apartment and had, in fact, visited the apartment earlier on the day of the crime, this evidence is neither inculpatory nor exculpatory. Moreover, there is no tie between the cigar and the crimes charged: neither Ms. Garcia nor Mr. Rodriguez suggested, for instance, that one of the two assailants smoked a cigar before, during, or after the assaults. In other words, that evidence is not relevant to the identity of the masked individual who sexually assaulted Ms. Garcia.

345.   The State's testimony regarding DNA evidence was false. First, the State's witnesses misled the jury by claiming that Mr. Cruz-Garcia was a contributor to the DNA mixture found on the vaginal swabs. Second, the State's witnesses misled the jury by claiming that Mr. Rodriguez, instead of an unknown assailant, must have been the second contributor to the DNA mixture found on the cutting of the panties. Third, it presented false testimony that Mr. Cruz-Garcia's sperm must be was present. Fourth, it presented false testimony that DNA contamination between items like a cigar and panties would not be possible because sperm would be necessary.

346.   The State knew, or should have known, that this testimony was false. The false DNA evidence was developed and presented by members of the prosecution team. Moreover, the erroneous mixture interpretation standards were utilized and implemented by State actors to create false DNA interpretations.

**B.      The State knowingly solicited false testimony from Johnny Lopez.**

347.   The State called Johnny Lopez to testify about Saul Flores's murder. 25 RR 41. Mr. Lopez testified that he first learned of Mr. Flores' death when a detective came to talk to him in jail. *Id.* at 46. Mr. Lopez testified that the investigators "asked some questions about [Flores], how long [Lopez] knew him, some stuff, other things like that. They showed [Lopez] some pictures of him and some other people." *Id.* at 47. Mr. Lopez also testified that Mr. Flores was having problems with Mr. Cruz-Garcia and that Mr. Flores was on the run from Mr. Cruz-Garcia. *Id.* at 50–51.

348.   On cross, Mr. Lopez denied that back in 1989 he told the police that Mr. Flores was running from Shorty. 25 RR 52 ("Never said nothing like that."). He denied knowing Shorty. *Id.* at 54. He testified that in 1989, the detectives showed him a photograph of Mr. Cruz-Garcia and that he told them that that's the person Mr. Flores was running from. *Id.* at 54–55.

349.   He testified that he met with prosecutors several times before trial. 25 RR 55.

350.   The State knew that Mr. Lopez made a statement in 1989 that directly contradicted his testimony at trial. In 1989, it was Mr. Lopez who contacted HPD detectives, offering information with regard to Mr. Flores' murder. Ex. 29. Back then, Mr. Lopez told the detectives that Mr. Flores was a drug dealer for "Shorty" until they had a falling out. Mr. Flores had stolen a half ounce of cocaine that belonged to Shorty, and Shorty had tied him up with some wire in an apartment. Mr. Flores managed to get his legs untied and leaped out of a second story window. Shorty looked for him for about a month, until Mr. Flores was found dead. During the month Mr. Flores was hiding from Shorty, Mr. Flores would never stay in one particular place. Several times Shorty caught up with Mr. Flores, who managed to escape. Mr. Lopez told the detectives in 1989 that he did not want to have anything to do with Shorty.

351.   The HPD report also notes that Mr. Lopez identified Alfonso Faustino Cervantes from several photographs shown to him during that interview and that Mr. Lopez knows Cervantes only as "Shorty." Ex. 29.

352.   The HPD account of Mr. Lopez's interview does not mention Mr. Cruz-Garcia at all. *Id.*

353.   The State offered Mr. Lopez's false testimony, which was entirely contradicted by his prior statement (while neglecting to provide the statement in the *Brady* notice that only listed Mr. Lopez's criminal history).

### C.   The State knowingly solicited false testimony from Mr. Santana on several topics material to trial.

354.   The State knowingly presented false testimony from Carmelo Martinez Santana on numerous topics, including but not limited to those enumerated in this section.

### 1.   Mr. Santana's involvement and participation in the murder of Angelo Garcia.

355.   The State questioned Mr. Santana about his knowledge and participation in the kidnapping of Angelo Garcia. 20 RR 116–75; 21 RR 5–15. However, his testimony is directly contradicted by previous statements he made to the Houston Police Department. These statements were listed on the *Brady* notice produced by the State shortly before trial. CR 447–50.

356.   Mr. Santana also testified falsely regarding the cause and manner of death. According to his testimony, Angelo Garcia Jr. was stabbed and covered in blood. 20 RR 151–52. However, the shirt the victim was wearing shows no evidence of stab wounds, and the supplemental *Brady* notice provided by the State on the eve of trial, on June 26, 2013, stated that "[a] presumptive test for blood on the complainant Angelo Garcia, Jr.'s, clothing was negative." CR 482.

### 2.  Mr. Santana's criminal history.

357.  During a hearing outside the presence of the jury, Mr. Santana testified that he was convicted of an assault in 1992 that occurred in Harris County. 21 RR 20. He claimed that the victim was a boy. *Id.* at 21. The trial court refused to allow trial counsel to cross-examine Mr. Santana with this conviction, based in large part on the victim being a male. *Id.* at 25. In fact, *the victim was a female*, and the prior conviction would have been admitted had the State not allowed Mr. Santana to provide false testimony regarding a conviction in its jurisdiction.

### 3.  Favorable treatment in exchange for testimony.

358.  The State solicited testimony from Mr. Santana that he did not receive, and did not ask for, a deal in exchange for his testimony. 21 RR 12. Mr. Cruz-Garcia has a good-faith basis to believe that the State knew that Mr. Santana requested and received favorable treatment in exchange for his testimony.

### 4.  Cause and manner Saul Flores's death.

359.  During the punishment phase, the State called Mr. Santana to testify about the murder of Saul Flores. Mr. Santana testified that Mr. Cruz-Garcia's girlfriend "Elizabeth"[17] was the source of conflict between Mr. Cruz-Garcia and Mr. Flores. 25 RR 74. He testified that "Saul had taken some drugs, he had gone to Elizabeth's apartment, and he wanted to have some type of love

---

[17] Identified by another witness as Elizabeth Ramos. 25 RR 23.

relationship with her." *Id.* Ms. Ramos called Mr. Cruz-Garcia and told him about it; Mr. Cruz-Garcia was furious, and immediately went to her apartment. *Id.*

360.   Mr. Santana then testified that they removed Mr. Flores from Ms. Ramos's apartment and took him to another apartment. *Id.* at 76–77. He then gave a graphic description of the abuse that followed: "his hands were completely destroyed," "they were injecting him with drugs," and finally, Mr. Cruz-Garcia got on top of Mr. Flores and broke his neck. *Id.* at 81–82. Mr. Santana was very insistent: "I saw it perfectly when he broke his neck." *Id.* at 82. His testimony was haunting: "I can't get it out of my mind how he and Richard, that Richard was injecting drugs into him over here and he completely destroyed his hands." *Id.*

361.   On cross-examination, Mr. Santana's testimony continued to escalate. He testified that Mr. Cruz-Garcia hit Flores's hands "several times, many times," that "he tore them," and now also "burning him with cigarettes" while "injecting drugs into him." *Id.* at 93. "[W]hat I can remember is he would hit him a lot on one and then he would also hit him on the other hand." *Id.* "He burned him. He would burn him . . . I can't tell you how many times." *Id.*

362.   This dramatic testimony was completely false. It was directly contradicted by the autopsy report, photographs, and witness affidavits.

363.  Dr. Wolf testified[18] that there were no broken bones on either of Mr. Flores's
      hands and only one small abrasion existed on the left hand. 25 RR 113. There
      were no cigarette burns anywhere on the body. *Id.* at 114. There were no fresh
      needle marks. *Id.* at 115. Mr. Flores did not have a broken neck. *Id.*
      Photographs of his hands, which again the State failed to disclose with the
      *Brady* notice, show virtually no injuries.

364.  Post-conviction counsel was also able to locate Elizabeth Ramos, who allegedly
      was the cause that precipitated this murder. Ms. Ramos provided a sworn
      declaration that she does not know Saul Flores. Ex. 30. She was never
      "courted" by Flores. Mr. Cruz-Garcia never picked up Flores—or any other
      man—from her apartment under the circumstances described in the
      testimony. At that time, she was living with her mother, in her mother's
      apartment. She is certain she would have remembered if several men arrived
      to remove another man interested in "some type of love relationship." *Id.*

              **5.  Extraneous rape.**

365.  During the punishment phase, Mr. Santana testified that Mr. Cruz-Garcia,
      along with others, broke into "Betico's" [19] house. 25 RR 66. According to Mr.

---

[18]  Relatedly, Mr. Cruz-Garcia challenges that this evidence violated the
Confrontation Clause. Claim 9.

[19] Spelled phonetically on the transcript as "Patiko" but spelled as "Betico" on the
State's notice of intent to use prior bad acts. The notice does not provide the name of
Betico's wife. CR 414.

Santana, Mr. Cruz-Garcia stole drugs and money from Betico, beat him, and raped his wife. *Id.* at 70.

366.   Upon information and belief, this testimony was false, and the State was, or should have been, aware of this falsity.

**D.   The State knowingly solicited false testimony from Diana Garcia and Arturo Rodriguez that they were not selling drugs for Mr. Cruz-Garcia at the time of the offense.**

367.   During the guilt/innocence phase, both Diana Garcia and Arturo Rodriguez testified that they had stopped selling drugs for Mr. Cruz-Garcia prior to the offense. 18 RR 33, 1133–34. This testimony was false, and the State was in possession of evidence of its falsity.

368.   Police reports indicate that Ms. Garcia and Mr. Rodriguez *were still selling drugs as of the day of the incident*. Ex. 24 at 1–2, 4. These police reports indicate that a man named Thomas Thoms and his girlfriend, Tracy Pressley, bought cocaine from Diana Garcia on the night Angelo Garcia was kidnapped. *Id.* at 1. Ms. Pressley described the transaction to detectives, and her statement was corroborated by Anita Dorr, a relative who was at the couple's house until approximately 9:00 p.m. on the night of the kidnapping. *Id.* Furthermore, detectives received a call from an anonymous woman who stated that she was close to the family and informed the detectives that Ms. Garcia and Mr. Rodriguez were selling drugs out of their apartment up until the night of the incident. *Id.* at 4.

### E. The State knowingly solicited false testimony from Angelita Rodriguez.

369. On multiple occasions, Ms. Rodriguez was interviewed by various law enforcement agents. In contrast to her later trial testimony, she consistently told agents that he had no knowledge of the disappearance of Angelo Garcia, Jr., and that she had no knowledge of Mr. Cruz-Garcia's whereabouts. These interviews occurred *after* she claimed that Mr. Cruz-Garcia confessed to her.

370. The State presented false testimony when Ms. Rodriguez testified regarding the frequency, amount, and circumstances of her locating Mr. Cruz-Garcia in the Dominican Republic. Contrary to her testimony, a few months after leaving the country, Ms. Rodriguez was residing with Mr. Cruz-Garcia in the Dominican Republic at her mother's house. Ex. 15. Contrary to Ms. Rodriguez's testimony that Mr. Cruz-Garcia's trip to Puerto Rico was unplanned, 20 RR 99–100, Mr. Cruz-Garcia was already planning on returning to Puerto Rico and then to Dominican Republic prior to the charged offense.

### F. The State knowingly solicited false testimony from Officer U.P. Hernandez that there were no ransom demands.

371. During guilt/innocence phase, the State presented testimony that there was never a ransom demand after Angelo Garcia went missing. 19 RR 79. In fact, there were at least two. Ex. 17; Ex. 18. The State knew, or should have been aware, that this testimony was false.

### G. The State knowingly solicited false testimony regarding a kidnapping in Puerto Rico.

372. During the punishment phase, the State presented testimony that Mr. Cruz-Garcia was involved in incident where he attempted to shoot Manuel Buten, and then kidnapped Andres Castillo Buten and William Garay Martinez. 24 RR 14–43, 78–117. The State also presented testimony that these witnesses were never involved in the drug trade.

373. Upon information and belief, this testimony was false, and the State was, or should have been, aware of this falsity.

### H. False testimony solicited by the State was material.

374. Mr. Cruz-Garcia incorporates, by this specific reference, all facts and allegations in the instant claim related to the State knowingly soliciting false testimony. Based on these facts and in light of the record from trial, this false testimony was material.

375. Based on the State's knowing use of false testimony during Mr. Cruz-Garcia's guilt/innocence and punishment phase, Mr. Cruz-Garcia's due process rights under the Fourteenth Amendment were violated.

## Claim 4    Mr. Cruz-Garcia's rights to due process of law and a fair trial were violated when the trial court admitted unreliable DNA evidence.

376. Defendants have a right to a fair trial. U.S. CONST. amend VI.

377. Admission of unreliable evidence violates the Due Process Clause of the Fourteenth Amendment. U.S. CONST. amend XIV.

378. Trial counsel filed a Motion to Suppress Results of All DNA Testing on June 14, 2013, asserting that Mr. Cruz-Garcia's rights to a fair trial and due process of law would be violated if DNA evidence was admitted "that was stored and/or processed by the former now defunct HPD crime lab." CR 454–56. The motion explained that the DNA evidence the State sought to introduce was submitted to the now-defunct HPD crime lab before being sent to other labs for testing. *Id.* at 454–55. And, that the HPD crime lab was the subject of various investigations and reports (including the Bromwich Report), which found rampant false testing results, mishandling of evidence, misconduct, criminal activity, and incompetence, including in the time period in which the HPD crime lab handled the DNA evidence in Mr. Cruz-Garcia's case. *Id.* at 455.

379. The trial court held a suppression hearing on June 19, 2013. 16 RR 1.

380. The subsequently closed HPD crime lab was actively involved in testing the evidence later used against Mr. Cruz-Garcia. 16 RR 68, 85–87, 95.

381. At the suppression hearing, former HPD Sergeant Eric Mehl testified that while working in the HPD cold case squad in 2007, he decided to reinvestigate the death of Angelo Garcia, Jr., from fifteen years earlier. 16 RR 29–30. Sgt. Mehl retrieved several items of evidence from storage that had been collected at the time of the crime, including a cigar that had been recovered at the scene of the crime, a sexual assault kit that was taken from Diana Garcia the night of the assault, a cutting from Diana Garcia's panties, and blood samples taken from Diana Garcia and Arturo Rodriguez. These items were stored in the HPD

property room and at the former HPD crime lab. *Id.* at 30–35. According to Sgt. Mehl, there did not appear to be issues with their storage or handling. *Id.* Sgt. Mehl sent these items to forensic testing lab Orchid Cellmark for analysis. *Id.*

382.   Sgt. Mehl further testified that in 2008, he sent a DNA sample from Mr. Cruz-Garcia to Orchid Cellmark for analysis and comparison to the DNA profiles obtained from the items of evidence. *Id.* at 38–39. After performing this analysis, Orchid Cellmark reported back to Sgt. Mehl that the DNA profile obtained from the cigar matched that of Mr. Cruz-Garcia, that the major component of the DNA mixture obtained from the cutting of the panties belonged to Mr. Cruz-Garcia, and that Mr. Cruz-Garcia could not be excluded as a contributor to the DNA mixture found on the vaginal swab.  *Id.* at 39.

383.   The State then presented the testimony of Matt Quartaro, a DNA analyst at Orchid Cellmark. 16 RR 49. Orchid Cellmark's analysis of the DNA evidence provided by Sgt. Mehl resulted in a finding that Mr. Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction obtained from the vaginal swabs was a mixture of multiple individuals, to which Mr. Cruz-Garcia and Arturo Rodriguez could not be excluded as contributors; and that the sperm cell fraction obtained from the cutting of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia was a major contributor and Arturo Rodriguez could not be excluded as a minor contributor. *Id.* at 54–60.

384. Finally, the State presented testimony from Courtney Head, a criminalist with the HPD crime lab. Ms. Head testified that in 1992, the HPD crime lab had performed DNA extractions on the evidence and reference samples collected in the case and that those extractions were sent to Genetic Design Lab in California for testing. 16 RR 84. In 2010, Ms. Head performed a DNA extraction on a buccal swab taken from Mr. Cruz-Garcia. *Id.* at 89–90. Ms. Head then compared the DNA profile she obtained of Cruz-Garcia to the DNA profiles that Orchid Cellmark had obtained from the evidentiary samples. *Id.* at 91. Ms. Head did not herself perform any DNA testing on the items of evidence; rather, she relied solely on the DNA profiles obtained by Orchid Cellmark. *Id.* Based on her comparison of Mr. Cruz-Garcia's DNA profile to Orchid Cellmark's findings, Ms. Head also found similar results to Orchid Cellmark's testing. *Id.* at 91–92.

385. Ms. Head also testified to the involvement of several specific HPD crime lab analysts in the handling of DNA evidence in Mr. Cruz-Garcia's case. Ms. Head testified that a criminalist, Joseph Chu, had obtained a hair sample from a suspect in 1992 and also had received buccal swabs from Mr. Cruz-Garcia in 2010. 16 RR 85–86. Ms. Head also testified that a former HPD crime lab employee, B. Sharma, was the main DNA analyst on the extractions taken from the sexual assault kit in 1992. *Id.* at 86–87, 97. Ms. Head further testified that another HPD crime lab employee, Deetrice Wallace, initially received the sexual assault kit and did some screening to detect blood or semen. *Id.* at 98.

386. Mr. Cruz-Garcia offered evidence that investigations into the workings of the HPD crime lab, over the time period that the lab was in possession of evidence his case, had resulted in scathing reports of malfeasance at the lab, including contamination of evidence and incorrect analyses, and the eventual closure of the lab. 16 RR 16–18. Specific individuals who had handled evidence in the case were found through these investigations to have committed misconduct in their work at the lab. *Id.* at 17, 108.

387. Mr. Cruz-Garcia submitted several reports of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room, Michael Bromwich; the HPD Internal Affairs Division investigation summary; employee complaint histories of Joseph Chu and Baldev Sharma; and judgments of conviction of Deetrice Wallace. *Id.* at 20–21. These records demonstrated that Joseph Chu had received nine allegations of misconduct as an employee of the HPD crime lab and that he had on several occasions failed to report DNA statistics properly. Defense Ex. 8–9; 17 RR 14–15. The records also showed that Baldev Sharma had received five allegations of misconduct as an employee of the HPD crime lab, including an allegation of criminal activity; that he had been cited for violations of competence and truthfulness; and that the DNA/Serology Section of the lab was a "total disaster" under his management. Defense Ex. 2–3, 8–9; 17 RR 15–16. The records further demonstrated that, as an employee with the Department of Public Safety,

Deetrice Wallace had been convicted of three counts of tampering with a governmental record. Defense Ex. 17; 17 RR 16.

388. During the suppression hearing, Mr. Cruz-Garcia offered eight exhibits in support of his motion to suppress. 16 RR 20–21.

    a. Defense Exhibit 2: Second Bromwich Report

    b. Defense Exhibit 3: Third Bromwich Report

    c. Defense Exhibit 4: Fourth Bromwich Report

    d. Defense Exhibit 5: Fifth Bromwich Report

    e. Defense Exhibit 6: Final Bromwich Report

    f. Defense Exhibit 7: Summary of Recommendations regarding HPD crime lab

    g. Defense Exhibit 8: Internal Affairs Division general investigation summary

    h. Defense Exhibit 9: Internal complaints report

389. Prior to the trial beginning, Mr. Cruz-Garcia offered an additional ten exhibits into evidence, which the court allowed for purposes of the motion to suppress hearing. 18 RR 23–24.

390. In ruling on counsel's Motion to Suppress, the trial court held that "the DNA evidence as it relates to Orchid Cellmark testing is sufficiently reliable and relevant and is admissible." 17 RR 4.[20]

---

[20] The court found that the Bromwich Report submitted by trial counsel detailed myriad issues with the DNA Serology Section of the old HPD crime lab, including

391.   Mr. Cruz-Garcia specifically incorporates by reference the factual basis regarding the unreliability of the DNA evidence found in Claim 1, Claim 3, Claim 5, and Claim 6.

392.   In violation of the Sixth Amendment, Mr. Cruz-Garcia's right to a fair trial was violated when this DNA evidence was admitted. *See* U.S. CONST. amend. VI;

393.   In violation of the Fourteenth Amendment, Mr. Cruz-Garcia's due process rights were violated when this DNA evidence was admitted. U.S. CONST. amend. XIV

**Claim 5**      **Mr. Cruz-Garcia's rights to present a defense and to cross examine witnesses were violated when the trial court refused to allow him to present evidence regarding the unreliability of the DNA evidence.**

394.   The Sixth Amendment guarantees a criminal defendant the right to confront witnesses against him. U.S. CONST. amend. VI.

395.   "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the

---

"deficiency in documentation of procedures, mistakes in performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standard of operating procedures." 17 RR 13. However, the court held that "[n]o issues have been identified in the Bromwich Report or in this hearing or in any discovery that the Court has been made aware of that there were any concerns addressed in those items regarding the evidence in this case." *Id*. Mr. Cruz-Garcia disputes this finding. *See* Claim 1.

Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

396. Trial counsel repeatedly requested permission to cross-examine witnesses and present evidence regarding the reliability of DNA evidence in his case, all of which were denied. *See, e.g.*, 18 RR 24–25; 20 RR 59, 66; 21 RR 123, 125–27.

397. These requests related to the history of evidence mishandling, incompetence, and unprofessional behavior by members of the HPD crime lab that led to its closure, as well as the issues with the Genetic Design lab.

398. Trial counsel requested to call Michael Bromwich as a witness to testify regarding his various reports and findings, which outlined issues with the HPD crime lab that led to its closure, including describing it as a "train wreck." 18 RR 20, 24. Trial counsel also requested to put on evidence of the allegations of misconduct, incompetence, and criminal behavior of three HPD crime lab employees involved in the handling of DNA evidence in this case—Joseph Chu, Baldev Sharma, and Deetrice Wallace. 17 RR 15–17, 18 RR 23–24.

399. Trial counsel specifically requested permission to present defense exhibits offered for purposes of the motion to suppress to the jury. 18 RR 24. This included the various versions of the Bromwich report, as well as the specific examples of misconduct, incompetence, and criminal behavior by those employees who handled the evidence in Mr. Cruz-Garcia's case.

400.  This testimony would have allowed Mr. Cruz-Garcia to present evidence including, but not limited to the "deficiency in documentation of procedures, mistakes in performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standard of operating procedures." 17 RR 13.

401.  Mr. Cruz-Garcia specifically incorporates, by this specific reference, the evidence presented during the motion to suppress hearing that he was prohibited from presenting to the jury, which is contained in a previous claim. *See* Claim 4.

402.  Mr. Cruz-Garcia's rights to confront and cross-examine witnesses and to present a meaningful defense were violated.

**Claim 6      Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated when his conviction was secured based on inaccurate and unreliable DNA evidence.**

403.  The Eighth Amendment imposes a requirement of heightened reliability in death penalty cases. U.S. CONST. amend. VIII.

404.  A conviction and sentence of death obtained through materially inaccurate evidence violates the Eighth Amendment prohibition against cruel and unusual punishment. U.S. CONST. amend. VIII.

405.  Admission of unreliable evidence used to convict a defendant violates the Due Process Clause of the Fourteenth Amendment. U.S. CONST. amend. XIV.

406.  Mr. Cruz-Garcia incorporates by this specific reference, as set forth in other portions of this petition, all other allegations regarding the inaccurate and unreliable DNA evidence used to convict him, as found in Claim 1, Claim 3, Claim 4, and Claim 5. This includes, but is not limited to, the history of unreliable testing and malfeasance that led to the closure of the HPD Crime lab, as well as the amended DNA report establishing that the DNA results presented at trial were false, misleading, and unreliable. *See* Ex. 11.

407.  Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated based on the unreliability of the DNA evidence used to convict him.

**Claim 7      Jurors committed misconduct during the punishment phase of Mr. Cruz-Garcia's trial.**

408.  Mr. Cruz-Garcia's rights to an impartial jury and due process under the Sixth and Fourteenth Amendments were violated when jurors repeatedly discussed the case outside of deliberations, as well as when the jury foreman read passages from the Bible to influence other jurors to vote for a death verdict.

409.  On multiple occasions, members of Mr. Cruz-Garcia's jury discussed the case outside of deliberations.

**A.      Jurors discussed the evidence on the courthouse elevator.**

410.  On the morning of July 16, 2013, the first day of the punishment phase of trial, local attorney Michael Casaretto was waiting for the elevator at the Harris County Criminal Courthouse when he overheard a conversation between two

jurors. The jurors, who were wearing their badges at the time, were already in conversation when Mr. Casaretto arrived, so he could not be sure how long they had been speaking. However, it was clear to him that they were discussing the merits of the case for which they were jurors, including the evidence that had been presented, and how they felt about it. Ex. 31 at ¶¶2–3. Mr. Casaretto was "immediately troubled by the possibility that the two jurors were discussing an ongoing case publicly and outside the presence of other jurors." *Id.* at ¶4. Mr. Casaretto took down the court information from the jurors' badges and went to the 337th District Court to discuss what he witnessed with Judge Renee McGee. *See id.* at ¶¶4–5.

411.   Mr. Casaretto met with Judge McGee off the record in her chambers. He described what he had seen and heard on the elevator and explained that, as an officer of the court, he "felt it necessary to report to her conduct that appeared to . . . reach the level of juror misconduct."   Ex. 31 at ¶5.   Mr. Casaretto provided his contact information and told Judge McGee he would be willing to speak with any of the attorneys regarding the incident. *Id.* at ¶5.

412.   Following the meeting, the trial court summarized the discussion on the record. 24 RR 3–6. The trial court characterized the conversation as "possibly . . . innocuous" and stated that the jurors "did not seem to be conspiring." *Id.* at 3–4.   However, this is not consistent with Mr. Casaretto's level of concern about the incident.   Ex. 31 at ¶¶7, 9 (describing the conversation as "blatant" misconduct and "extremely important")). The court provided Mr. Casaretto's

contact information should counsel for either side choose to contact him. Trial counsel Skip Cornelius represented that he would call Mr. Casaretto to follow up on the issue and place a summary of their conversation on the record.  24 RR 5. However, trial counsel never contacted Mr. Casaretto. Ex. 31 at ¶6. Nor did counsel poll the jury, question the individual jurors involved in the misconduct, or move for a mistrial.

### B. Jurors discussed the evidence and a potential verdict during breaks in the trial.

413.  The jurors also repeatedly discussed the evidence in the jury room during breaks. Sharon Alexander was selected as an alternate juror. She sat through all of the guilt/innocence and punishment phase evidence at trial, but was prohibited from sitting in on the deliberations. Ex. 32 at ¶¶1, 4.  She recalls that "we would talk as a jury about the case and what was going on . . . during breaks, when we were in the jury room waiting." *Id.* at ¶4.

414.  The jurors also discussed a potential verdict. Juror Alexander recalls "learning from the other jurors that one of the jurors in particular was having a hard time voting for the death penalty. That was one of the things [they] talked about during the trial when [they] were together." *Id.* at ¶5. Because Juror Alexander was an alternate, and did not participate in deliberations, she could only have known these details if they were communicated to her outside of deliberations.

**C.    The jury foreman brought a Bible to the deliberation room and read passages to other members of the jury to influence them to vote for death.**

415.    Jurors also engaged in misconduct during deliberations. Following Mr. Cruz-Garcia's death verdict, juror Angela Bowman contacted trial counsel Mario Madrid to inform him that, among other things, the jury foreman, Matthew Clinger, had brought a Bible into the deliberation room and read passages in an attempt to influence others to vote for the death penalty. CR 541. Juror Bowman stated that the Bible reading appeared to sway other jurors in favor of a death verdict. *Id.*

416.    Defense investigator J.J. Gradoni later interviewed Juror Bowman about the use of the Bible during deliberations. She repeated the information she had provided to Mr. Madrid and signed an affidavit consistent with those statements. CR 553–56. Gradoni also conducted a recorded interview with Juror Clinger wherein he confirmed that he brought his personal Bible to the deliberations and read select passages to fellow juror Casey Lynn Guillotte, who was struggling to reach a decision on the special issues. *Id.* at 633–36.

417.    The passages included Genesis 9, "a lot of places in Deuteronomy," and Romans 13. *Id.* at 634. Parts of Genesis 9 directly call for the death penalty: "I will demand an accounting for the life of another human being. '*Whoever sheds human blood, by humans shall their blood be shed*; for in the image of God has God made mankind." *Genesis* 9:5-6 (New International Version) (emphasis added). The Book of Deuteronomy likewise calls for the death penalty on

numerous occasions. *See Deuteronomy* 13:5 (for inciting rebellion against the Lord), 17:12 (for refusing to obey the decision of a judge or priest), 18:20 (for false prophecy), 19:16-19 (for perjury), 21:18-21 (for disobedience to one's parents), 22:13-21 (for falsely claiming virginity at the time of marriage), 22:22-24 (for committing adultery). Romans 13 indicates that because God created the governing authorities, God has implicitly endorsed the law of the governing authorities. *See Romans* 13 (New International Version).

418.   Juror Clinger stated that he believed that his reading of these passages "made a difference with [Juror Guillotte]," who eventually voted for a death verdict. CR 636. Juror Clinger initially agreed to sign an affidavit memorializing his conversation with the investigator, *id.* at 612, but later refused, saying corporate counsel at his work had advised him not to sign the affidavit and to provide live testimony instead. *Id.*

419.   In an about-face, Juror Clinger later signed an affidavit for the State, CR 599–601, contradicting the statements he made in his recorded interview. *Compare id.* at 635 ("JJ: So did you read from the Bible or did you quote it from memory? MC: No, I read. JJ: Read it from the Bible."), *with id.* at 600 ("At no point did I read directly from the Bible.") and *id.* at 635–36 ("JJ: So, after you read that [passage] was [Juror Guillotte] able to say Death? MC: Uh, after I read that . . . she was able to move on from the first question. . . . It made a difference with [Juror Guillotte]. I don't know if it made a difference with anyone else."), *with*

*id.* at 600 ("I do not believe [Juror Guillotte] or any other juror changed their answers to the Special Issues based on this brief exchange.")).

420.   Juror Guillotte also signed an affidavit for the State confirming that Juror Clinger brought his Bible to the deliberation room, but contradicting the timing of the event, as laid out in Juror Clinger's two statements. *Compare* CR 597 (Juror Guillotte stating that Juror Clinger brought out his Bible "[a]fter we had come to a unanimous decision on all three special issue [sic] and before . . . Clinger[] signed the verdict form"), *with id.* at 635 (Juror Clinger stating the jury "still talked about a lot more stuff throughout the course of the day" after the Bible reading) *and id.* at 600 (Juror Clinger stating that the jury "went back to discussing the facts of the case and deliberating the answers to the Special Issues presented to us" after the Bible reading)).

421.   Appellate counsel for Mr. Cruz-Garcia filed a Motion for New Trial on the basis of juror misconduct on August 19, 2013. CR at 538–40. He submitted as exhibits the affidavits from Juror Bowman, investigator Gradoni, and trial counsel Mr. Madrid, as well as the transcript of the recorded interview with Juror Clinger. *Id.* at 602–64.  In its response to the Motion for New Trial, the State submitted the affidavit from Juror Clinger contradicting his previous recorded statement and the affidavit from Juror Guillotte contradicting Clinger's interview *and* his affidavit. *Id.* at 597–601.

422.   Mr. Cruz-Garcia's counsel requested a live evidentiary hearing. *Id.* at 580–82. The trial court denied Mr. Cruz-Garcia the opportunity to call witnesses at a

live evidentiary hearing, refused to admit the transcript of the Juror Clinger interview because it was not authenticated, credited the evidence submitted by the State, and denied the Motion for New Trial. *Id.* at 584; 29 RR 26–32.

423.   Under the Sixth and Fourteenth Amendments, a criminal defendant has a right to an impartial jury and due process of law. In accordance with these rights, jurors may not discuss the case outside of deliberations and may not be exposed to external influences outside the evidence presented in court.  This jury's discussions of the evidence outside the deliberation room and with an alternate juror, as well as its exposure to external influences, violated Mr. Cruz-Garcia's rights under the Sixth and Fourteenth Amendments.

**Claim 8        The trial court's ex parte meeting with a holdout juror during punishment phase deliberations violated Mr. Cruz-Garcia's due process rights.**

424.   During punishment phase deliberations at Mr. Cruz-Garcia's trial, the court held an ex parte meeting with a holdout juror who supported a life sentence. The ex parte meeting violated Mr. Cruz-Garcia's due process right to be present at critical stages of trial.  Moreover, the instructions that the trial court gave the holdout juror during the meeting were unconstitutionally coercive.

### A.   During penalty phase deliberations, Angela Bowman became a holdout juror for life

425.   Following three days of punishment phase testimony, the jury retired to deliberate on the afternoon of Thursday, July 18, 2013.  26 RR 176.  Unable to reach a decision that afternoon, the jury was sequestered overnight in a local hotel.  *Id.* at 177.  They returned to deliberate the following morning.  When

148

jury foreman Matthew Clinger polled the jury for the first time early Friday, approximately one-third of the jurors favored death, one-third favored life, and one-third were undecided. CR 609; *id.* at 623–24. Although it unclear where most of the jurors fell in that group, it is certain that Juror Angela Bowman "was one of the most adamantly opposed" to sentencing Mr. Cruz-Garcia to death.  *Id.* at 639; *see also id.* at 611; Ex. 33 at ¶2.

426.   Just before noon on Friday, the jury sent out two notes to the trial court requesting clarification on Mr. Cruz-Garcia's parole eligibility should he receive a life sentence and an explanation of the definition of "society" in the first special issue. CR 510–11.

427.   Throughout the day on Friday, several jurors changed their votes to death and Juror Bowman "felt a great deal of pressure from the others" as it became clear that she was the last remaining holdout. *Id.* at 611.  Bowman "tried to explain to the other jurors why [she] felt . . . death was not the appropriate punishment, but after several hours and one night of being sequestered, it was pretty clear [she] was not going to change anyone's mind." Ex. 33 at ¶2. She became "real emotional" and "upset" in her pleas with the other jurors, until "she would just basically break down." CR 628, 638 [Trans. of Juror Clinger Interview]. The other members of the jury told Bowman she was simply "holding up the process" and "taking it too personally."  *Id.* at 611.

428.   At 3:20 p.m. on Friday afternoon, Juror Bowman sent out a note asking to meet with the judge. CR 512 ("May I please speak to judge. Angela Bowman.").

429. Upon receiving the note, the trial court went on the record to discuss the note with the State and trial counsel. Although no one knew why Juror Bowman requested to speak with the judge, trial counsel suggested she may simply have a conflict with spending another night in sequestration. Rather than speak to Juror Bowman in the presence of Mr. Cruz-Garcia and his counsel, the trial court decided to meet with Juror Bowman ex parte in her chambers with only the court reporter present. Trial counsel did not object to the ex parte meeting. 27 RR 3–4.

**B.    The trial court held an ex parte meeting with Juror Bowman.**

430. The trial court called Juror Bowman into her chambers to discuss the note. Juror Bowman immediately relayed to the court that she was the sole holdout juror: "I just – I am the only juror that's completely – I can't agree. I can't agree with the questions. I can't answer the same questions with everyone else and I feel pressured. And I don't want to hold them up." 27 RR 5. When Bowman suggested that the court replace her with an alternate juror, the court instructed her on the law with regard to the use of alternates in the case of a holdout juror:

> Well, there is a manner that we have to proceed with. And just because you can't deliberate with them or – you are not saying you can't deliberate, but because your answers to the questions are different from them does not qualify that you can just sub out with an alternate. That's not what an alternate is for. There is a long list of things that I would have to go through. And I don't want to go through those with you because I don't want to try to figure out what you need to do to get off the jury. You shouldn't have to figure

out what you want to do.  Those things, unfortunately, that would have to happen to you, and I don't want it to happen to you, like falling gravely ill, or something like that.  And that's the only way that an alternative would replace you, is for you to become completely disabled."

*Id.*

431.    The court further instructed Juror Bowman that she must continue to deliberate with the other jurors.  *Id.* at 5–6 ("Just having a different opinion than the other jurors at this point, that doesn't exclude you from being a juror. So, you are going to have to continue to deliberate with them."). Juror Bowman explained that the only agreement she could reach with the other jurors was on Special Issue No. 2, whether Mr. Cruz-Garcia "actually caused, intended, or anticipated" the death of the decedent. "No. 1 and 3, they're all – you know, they are all different. I am the only one with the different opinion.  And I am not changing my stance on that.  I'm not.  And they're not." 27 RR 6.

432.    When Juror Bowman stated "it could be years" before the jurors reached a unanimous verdict, the court "instruct[ed]" her that she would be required to deliberate until the court told them to stop and that "generally, that can be a pretty long period of time." 27 RR 6. The court explained that arrangements had been made for the jury to be sequestered Friday night and into the weekend, if necessary. *Id.* The court further reminded Juror Bowman of the court's instructions at voir dire and stated, "If the evidence leads you to a certain way, that's the way you should answer it, even though it might result in something that bothers you."  *Id.* at 7.

433.    The court again instructed Juror Bowman:

> So, I'd like you to go back and continue your deliberations
> with the jury and continue trying to reach an agreement
> with the jury, if you can. Do not violate your conscious [sic].
> And answer those questions according to where the
> evidence leads you."

*Id.* at 7–8.

434.    Juror Bowman again pleaded with the court to do something about the fact
that she had reached an impasse with the rest of the jurors: "Judge, I don't
want to have to stay another night. I really don't know." 27 RR 8. Despite Juror
Bowman repeatedly telling the court that she could not come to an agreement
with the rest of the jurors on either of the special issues, the court again
instructed her to return to the jury room "to find out whether you can reach a
verdict or not." The court added that whether Juror Bowman had to spend
another night in sequestration was "completely in the hands of the entire jury."
*Id.*

435.    When Juror Bowman returned to deliberations, she informed the rest of the
jury that the judge had instructed her that "you're here until y'all reach a
verdict."  CR 629.

### C.    The trial court did not inform trial counsel of the details of the ex parte conversation with Juror Bowman.

436.    The court never went back on the record to inform counsel of the ex parte
instructions it had just given to the lone holdout juror. According to trial
counsel, Mario Madrid, the court simply "stated that Ms. Bowman questioned
how long deliberations would last." CR 606. Trial counsel never objected to the

ex parte meeting or the supplemental instructions given to Juror Bowman and did not request that the juror be brought in for further questioning.

437. Approximately one hour after the court's meeting with Juror Bowman, the jury returned a unanimous death verdict. CR 523 (returning a death verdict at 4:30 p.m. on July 19, 2013).

### D. Juror Bowman contacted trial counsel because she was distraught over her decision to capitulate during punishment phase deliberations.

438. Later that evening, Juror Bowman contacted trial counsel Mario Madrid. According to Mr. Madrid, Bowman "was distraught over her decision to capitulate during the punishment phase deliberations and change her vote from life in prison to the death penalty." CR 606; *see also id.* at 610. Importantly, Juror Bowman relayed to Mr. Madrid that she "was pressured into changing her position on the life v. death decision." *Id.*; *see also id.* at 608 (Gradoni recounting Bowman's statement that she was "the subject of undue pressure from other members of the jury to change her vote to favor the death penalty.").

439. Based on this information, which ostensibly was not consistent with his previous understanding of the ex parte meeting, Mr. Madrid submitted an affidavit in support of Mr. Cruz-Garcia's Motion for New Trial, recounting the events and stating, "[I]t is my opinion that the defendant must be granted a new trial, or a new trial on punishment because the death verdict returned in

this matter was decided in a manner other than the fair expression of the juror's opinion." CR 573.

440. The trial court denied a request for live evidentiary hearing, accepted portions of affidavits from certain jurors and Madrid, and denied the Motion for New Trial after brief oral argument from appellate counsel. CR 584, 665; 29 RR 26–28.

441. This ex parte communication violated Mr. Cruz-Garcia's due process right to be present during a trial court's communications with a sitting juror.

442. The trial court's meeting with a holdout juror during the punishment phase of a death penalty trial constitutes a critical stage of the proceedings because a single holdout juror has the power to command a life sentence.

443. The meeting bore a reasonably substantial relation to Mr. Cruz-Garcia's opportunity to defend against the death penalty, and his absence from the ex parte communications between the judge and holdout juror prevented him from receiving a fair and just hearing.

444. Mr. Cruz-Garcia's due process rights prohibit the trial court from improperly coercing the jury. The trial court's various instructions to Juror Bowman outside the presence of counsel and the rest of the jury were impermissibly coercive and violated Mr. Cruz-Garcia's due process rights.

**Claim 9**     **Mr. Cruz-Garcia's rights under the Sixth and Fourteenth Amendments were violated when he was unable to confront witnesses.**

445.   Under the Sixth and Fourteenth Amendments to the United States Constitution, defendants have the right to confront witnesses against them. The Sixth Amendment includes a "bedrock procedural guarantee" that "'[in] all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42, (2004) (quoting U.S. CONST. amend. VI). Testimonial statements of witnesses are not admissible unless the witness is both unavailable to testify and the defendant had a prior opportunity to cross-examine that witness. *Id.* at 53–54. Results of forensic analysis are testimonial statements for purposes of the Sixth Amendment. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009). This Sixth Amendment right applies to state trials through the Fourteenth Amendment. *See id.* at 309 (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)).

446.   Mr. Cruz-Garcia's right to confront witnesses against him was repeatedly violated, including but not limited to, when the following testimonial statements by non-testifying witnesses were used against him:

447.   Matt Quartaro testified regarding lab work done by others, who did not testify at trial, during both the guilt/innocence phase and during a pre-trial suppression hearing.

    a.   Matt Quartaro testified during a pretrial suppression hearing and also during the guilt/innocence phase. 16 RR 48-79; 21 RR 103–42.

155

b.  During the guilt/innocence phase, Mr. Quartaro testified that he was a supervisor of forensics at Orchid Cellmark in Dallas, Texas. 21 RR 103. Cellmark's testing in Mr. Cruz-Garcia's case included the sexual assault kit, Diana Garcia's panties, as well as a cigar recovered from the scene. *Id.* at 106. This evidence was received from the Houston Police Department. *Id.* at 130.

c.  Other analysts and employees from Cellmark did not testify, and Mr. Cruz-Garcia did not previously cross-examine them. The results of the other Cellmark employees' work was presented to the jury.

d.  Cellmark was "able to obtain a complete DNA profile from an unknown male from the cigar."[21] *Id.* at 109.

e.  Cellmark's testing of the epithelial fraction of the vaginal swab was consistent with Diana Garcia, the sperm cell fraction was consistent with coming from more than one individual, and Arturo Rodriguez could not be exclude as a possible contributor. *Id.* at 111–12. The unknown male donor from the cigar could not be excluded as a potential contributor. *Id.* at 112.

f.  Cellmark also tested a cutting from Ms. Garcia's panties, and the epithelial fraction was consistent with her. *Id.* The sperm cell fraction

---

[21] These results were later determined to be inaccurate and unreliable. *See* Claim 3.

was a mixture sample, and the major component was consistent with DNA profile from the cigar. *Id.*

g.  Cellmark received samples from various suspects to conduct comparisons, including Candido Lebron, Bienviendo Melo, Leonardo German, Carmelo Martinez, and Obel Cruz-Garcia. *Id.* at 115–18.

h.  Cellmark matched Mr. Cruz-Garcia's DNA profile to the DNA profile from the cigar and the major profile from the cutting from Ms. Garcia's panties, and also found that he could not be excluded as a possible donor to the sperm fraction to the DNA swab *Id.* at 118–19.

i.  Through Mr. Quartaro, the State admitted a number of exhibits that were collected and/or analyzed by others. *See, e.g.*, *id.* at 120, 124.

j.  Mr. Quartaro provided substantially similar testimony during a pre-trial suppression hearing regarding the DNA evidence. 16 RR 48–79.

k.  As evidenced by the various reports and documentation created by Cellmark, numerous other employees and analysts actually performed significant portions of the work, and Mr. Quartaro testified regarding their work. During the suppression hearing, he explained that at Cellmark, they "work as a team format, so [he] didn't perform every step along the way." *Id.* at 52–53.

l.  Cellmark's results were also utilized by the HPD Crime Lab and offered at trial to provide additional inculpatory evidence regarding DNA. 21 RR 142–73.

157

448.   Dr. Dwayne Wolf testified regarding work conducted by others, who did not
testify at trial, regarding the death of Angelo Garcia, Jr.

   a.   Dr. Dwayne Wolf was called as a witness by the State during the
guilt/innocence phase of trial. 20 RR 4–33. At the time of trial, Dr. Wolf
was the deputy chief medical examiner in Harris County, Texas. *Id.* at
5. He began working at that office in 2001. *Id.* at 6.

   b.   Dr. Wolf did not conduct the 1992 autopsy of Angelo Garcia, Jr. The
autopsy was conducted by Dr. Vladimir Parungao, who was employed
by the Harris County Institute of Forensic Sciences at that time. *Id.* at
6.

   c.   Dr. Parungao did not testify, and Mr. Cruz-Garcia did not previously
cross-examine him. The results of Dr. Parungao's work were presented
to the jury.

   d.   Dr. Wolf reviewed the work of Dr. Parungao. *Id.* at 6. He reviewed the
autopsy report, autopsy photographs, scene photographs, and the
investigator's report—none of which Dr. Wolf was involved in creating,
collecting, or otherwise had personal knowledge of. *Id.* at 7. This was
"pretty much the extent of the information" Dr. Wolf had. *Id.*

   e.   Through Dr. Wolf, the State admitted a number of exhibits that were
collected by others. *See, e.g.*, *id.* at 10–13.

   f.   Dr. Wolf testified that the "[m]anner of [Angelo Garcia's] death was
homicide." *Id.* at 12.

158

449.  Dr. Wolf testified regarding work conducted by others, who did not testify at trial, regarding the death of Saul Flores.

    a.  Dr. Wolf again testified during the punishment phase regarding the 1989 autopsy of Saul Flores, which was conducted by Dr. Narula. 25 RR 97–115. Dr. Wolf was not personally involved in the autopsy of either Angelo Garcia, Jr., or Saul Flores. *Id.* at 110–11.

    b.  Dr. Narula did not testify, and Mr. Cruz-Garcia did not previously cross-examine him. The results of Dr. Narlua's work were presented to the jury.

    c.  Dr. Wolf reviewed Dr. Narula's autopsy report, Dr. Narlua's findings, autopsy photographs, scene photographs, and the investigator's report. *Id.* at 100–01.

    d.  Through Dr. Wolf, the State admitted a number of exhibits that were collected by others. *See, e.g.*, *id.* at 102–10.

    e.  Dr. Wolf testified that Mr. Flores death was consistent with ligature strangulation, as well as variety of other injuries. *Id.* at 104–10.

    f.  Dr. Wolf also testified to the toxicology results from Mr. Flores, which showed that he had the presence of cocaine in his blood. *Id.* at 111. Dr. Wolf did not conduct or order the toxicology tests.

450.  Therefore, in violation of the Sixth and Fourteenth Amendments, Mr. Cruz-Garcia's right to confront witness against him was violated. *See* U.S. CONST.

amend. VI; U.S. CONST. amend. XIV; *Melendez-Diaz*, 557 U.S. at 311; *Crawford*, 541 U.S. at 42.

**Claim 10**    **The State obtained Mr. Cruz-Garcia's conviction and death sentence without providing his guaranteed consular notification, under the Vienna Convention on Consular Relations, in violation of the Fifth, Sixth, and Fourteenth Amendments.**

451.    State authorities and their agents—unreasonably and in violation of federal constitutional mandates—failed to properly inform Mr. Cruz-Garcia during and after his arrest of his right to seek the assistance of the Dominican Consulate as required by Article 36(1)(b) of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (VCCR).

452.    Law enforcement agents and the prosecution were aware at the time of Mr. Cruz-Garcia's arrest, and throughout his prosecution for capital murder, that Mr. Cruz-Garcia is a Dominican national who had not been naturalized.

453.    Rather than providing Mr. Cruz-Garcia the opportunity to contact his country's consulate, the State instead notified a different, incorrect country of Mr. Cruz-Garcia's arrest.

454.    As a result, Mr. Cruz-Garcia was wrongly led to believe his home country had been notified.

455.    Had Mr. Cruz-Garcia been properly provided his right to alert the Dominican consulate of his arrest, the Dominican government would have offered Mr. Cruz-Garcia and his legal team support and assistance.

456.   As a result of state authorities' failure to properly apprise Mr. Cruz-Garcia of his right to consular notification, and the prejudice stemming therefrom, Mr. Cruz-Garcia's conviction and sentence of death were rendered in violation of his rights to equal protection, due process, and the effective assistance of counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

A.    **As a foreign national detained and on trial for capital murder in the United States, Mr. Cruz-Garcia had the right to be notified of his right to consular access under the Vienna Convention on Consular Relations.**

457.   The Vienna Convention is an international treaty that governs the relationship between individual nations and foreign consular officials. The treaty is designed to ensure that foreign nationals facing prosecution outside of their countries of citizenship are advised of the right to communicate with representatives from their home countries. In 1963, the United States and several other nations entered into an agreement about this basic right, which was codified in Article 36 of the Vienna Convention on Consular Relations. Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77. Article 36 of the Vienna Convention requires that when a foreign national is arrested, the country detaining him must: (1) inform the consulate of the foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of his rights under Article 36 without

delay. Vienna Convention on Consular Relations, Article 36(1)(b), April 24, 1963, 21 U.S.T. 77.

458.   As a result, the United States Department of State has recognized that the Vienna Convention "contains obligations of the highest order and should not be dealt with lightly," requiring notification to take place "as quickly as possible, and, in any event, no later than the passage of a few days." Hernan de J. Ruiz-Bravo, *Suspicious Capital Punishment*, 3 SAN DIEGO JUST. J. 396–97 (1995) (quoting Department of State File L/M/SCA: Department of State Digest, October 24, 1973, p. 161).

**B.   The State violated the Vienna Convention in Mr. Cruz-Garcia's case.**

459.   The State violated the Vienna Convention in this case when it failed to properly inform Mr. Cruz-Garcia of his rights under the Convention, despite the fact that state actors knew Mr. Cruz-Garcia is a foreign national and a citizen of the Dominican Republic. Instead, the State erroneously informed Mr. Cruz-Garcia that his home country had been contacted when the State had actually informed the wrong country.

460.   On February 12, 2010, shortly after Mr. Cruz-Garcia's extradition to the United States, the State of Texas issued a finding of Probable Cause for further detention of Mr. Cruz-Garcia on the charge of capital murder. Ex. 25. This same document also contained "Statutory Warnings by Magistrate," relating specifically to the magistrate's duty under the Vienna Convention to advise non-nationals of their constitutional rights. As Mr. Cruz-Garcia does not speak

English, this document was also signed by interpreter Manuel Barrios. *Id.* When asked by the Court, Mr. Cruz-Garcia affirmed that he wanted the State to notify his country's consular officials. *Id.*

461.   However, on the section of the form detailing warnings under the Vienna Convention, the box next to "mandatory notification" is checked, and the court clerk is advised to notify "Dominica."[22] *Id.* As a result, a notification was sent to the Commonwealth of Dominica on February 12, 2010. *Id.*

462.   It appears Mr. Cruz-Garcia received a second set of magistrate warnings on February 16, 2010, in which the court again included the notification warning that Mr. Cruz-Garcia had a right to contact his consulate for assistance. Ex. 34. Although signed by Mr. Cruz-Garcia, there is no indication whether, and how, these warnings were translated to him. Further, as he had just days before been told that a notice was being sent to his country, it is reasonable to conclude that at this second magistrate warning, Mr. Cruz-Garcia believed his

---

[22] Dominica, an island nation in the Caribbean, is one of several countries that the State Department requires be notified automatically when a foreign national is arrested, detained, or taken into custody. *See* Bureau of Consular Affairs, U.S. DEPARTMENT OF STATE, *Countries and Jurisdictions with Mandatory Notifications*, *available at* https://travel.state.gov/content/travel/en/consularnotification/ QuarantinedForeignNationals/countries-and-jurisdictions-with-mandatory-notifications.html (last visited Oct. 11, 2018). On the other hand, the Dominican Republic, of which Mr. Cruz-Garcia is a citizen, does not require mandatory notification. Rather, a Dominican Republic citizen must be advised of his rights to have his consulate notified on his behalf, and then United States actors must facilitate access to the consulate if the individual so requests.

consulate had already been contacted for him. He had no reason to again request that his consulate be contacted.

463. The court's error, in not correctly identifying Mr. Cruz-Garcia's country of origin and advising him of his right to contact his consulate, was compounded when the Court received notice back from the Commonwealth of Dominica that it was the incorrect country to be contacted. Ex. 25 at 4.

464. On September 12, 2010, a notation was made that the notification had been sent to the "wrong embassy." *Id.* Yet there is no evidence that the discovery of this error led to the State either notifying the Dominican Republic of Mr. Cruz-Garcia's arrest or notifying Mr. Cruz-Garcia that he could request assistance from his consulate. *See* Ex. 27 at 1 ("[T]his office has no records whatsoever of a consular notification of Mr. Cruz-Garcia's arrest.").

465. Because of this error, Mr. Cruz-Garcia was not properly notified of his right to communicate with the Dominican Republic consulate. Rather than accurately determine Mr. Cruz-Garcia's citizenship—which would have been a simple matter of communicating with law enforcement and prosecutors who were aware that Mr. Cruz-Garcia was born in the Dominican Republic—the Court instead relied on an improper translation by the interpreter assigned to communicate for Mr. Cruz-Garcia. The mistake in identifying Mr. Cruz-Garcia's correct country, and the resulting incorrect consular notification, worked to deprive Mr. Cruz-Garcia of his rights under the Vienna Convention.

466. Had Mr. Cruz-Garcia been properly apprised of his rights, he immediately would have sought counsel and assistance from the Dominican Republic consulate in defending his capital case, as he indicated he desired to do at the first probable cause hearing.

467. Had Dominican consular officials known that one of their nationals was facing a death sentence in the United States, they would have provided considerable assistance to Mr. Cruz-Garcia throughout both the pretrial and trial process. Ex. 27.

468. The Dominican Republic has been previously involved in providing various kinds of assistance in criminal cases, ranging from ensuring proper legal representation and contacting family members, to assistance in the judicial process, to assisting defense counsel directly in the development of the case by helping to locate witnesses or records in the Dominican Republic. *Id.* Given the absence of a mitigation specialist on the defense team, consular assistance could have potentially corrected some of the deficiency in investigation that occurred as a result.

469. Indeed, there is every reason to believe Mr. Cruz-Garcia suffered prejudice purely on account of his inability to speak English and the failure to receive robust translation and interpretation services throughout the judicial process, as evidenced by the communication failure during the probable cause hearing.

470. Further, had the Dominican Republic been notified at the time of Mr. Cruz-Garcia's arrest in 2010 and become involved in assisting on his case, its

consulate could have influenced the State's willingness to accept a guilty plea in exchange for a life sentence or to have foregone seeking the death penalty at all. Consular officials are often successful in persuading prosecutors to seek a life sentence. Ex. 26 at ¶15.

471.   Even had the State still chosen to seek death in spite of the consulate's involvement, the consulate nevertheless could have provided Mr. Cruz-Garcia with invaluable support throughout his confinement and trial. For example, the consulate could have helped Mr. Cruz-Garcia make informed choices about how to proceed, both by explaining the intricacies of local criminal procedure and by providing information necessary to help prepare his defense. Ex. 27. In addition, they could have assisted trial counsel in obtaining mitigating information from Mr. Cruz-Garcia's family and friends and served as a necessary Spanish-speaking liaison to assist in the investigative process. *Id.* Consular agents could have helped the defense investigators locate witnesses in the Dominican Republic who were not interviewed, or assist in travel arrangement for witnesses the defense wished to testify at trial. *Id.* Or, had counsel reasonably made efforts to procure records from Mr. Cruz-Garcia's time in prison in Puerto Rico, which are in Spanish, a consular agent could have assisted in reviewing or translating these documents. *Id.*

472.   Therefore, Mr. Cruz-Garcia's constitutional rights were violated.

**Claim 11**     **The State obtained Mr. Cruz-Garcia's conviction by withholding material exculpatory evidence from trial counsel, which violates the Sixth, Eighth, and Fourteenth Amendments.**

473.   Mr. Cruz-Garcia rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated when the Harris County District Attorney's Office failed to provide trial counsel with exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1963).

474.   The trial court granted defense counsel's motion for discovery and disclosure of Brady evidence. CR 183. In response, the State produced a *Brady* notice on June 3, 2013, and then another supplemental notice on June 27, 2013. *Id.* at 447–50; 482–83.

475.   Notwithstanding its constitutional obligations under *Brady* and the trial court order, upon information and belief, State actors, their agents, or those working in conjunction with the State withheld material exculpatory evidence from the defense including, but not limited to, the following:

   a.   Promises of benefit or leniency afforded to Rudy Santana, Angelita Rodriguez, Johnny Lopez, and other witnesses for the state. The existence of a special deal is evidenced, in part, by the fact that Mr. Santana confessed to two capital murders and yet was not even charged. Ms. Rodriguez was able to remain in this country legally even though her criminal charges should have made her subject to immediate deportation.

167

b.  Mr. Cruz-Garcia has received and/or collected numerous reports from various law enforcement and federal agencies. However, significant portions of this reports are redacted, including portions that appear to contain exculpatory evidence. *See, e.g.*, Ex. 16–18.

c.  Evidence that Mr. Cruz-Garcia was a confidential informant for any state or federal agency.

d.  Law enforcement reports showing that a second theory of the case existed and that other, unnamed individuals claim knowledge of the events. Ex. 16.

e.  Documents received in response to a subpoena issued by the District Attorney's office to Juan DeJesus, FBI – Puerto Rico Field Office. Ex. 35.

f.  Evidence that Mr. Santana's Legal Permanent Resident status was revoked.

g.  Documents provided to immigration authorities to facilitate Ms. Rodriguez remaining in this country.

h.  Medical and mental health records on Mr. Santana.

i.  Grand jury witness lists, transcripts, and notes.

j.  Memo by Eric Johnson documenting that Angelita and Obel Cruz-Garcia were living together in the Dominican Republic with her mother a few months after leaving the country.

k.  Evidence of criminal charges filed against Ms. Rodriguez in federal court for evading prosecution and fleeing the jurisdiction.

l.   Prior inconsistent statement made by Johnny Lopez to the Houston Police Department in 1989.

m.   Evidence that Ms. Rodriguez was also criminally charged in federal court in 1993 and that an arrest warrant was issued for her arrest.

n.   At the time of trial, Ms. Rodriguez had an open case in Harris County related to bond forfeiture: she forfeited a $25,000 bond and a default judgment was entered against her, but not yet collected.

o.   Witnesses who provided statements contradicting the testimony of State's witnesses.

p.   Potentially exculpatory or impeachment records regarding the death of Saul Flores.

q.   Any other exculpatory material not yet provided, whether it constitutes exculpatory evidence at either the guilt/innocence phase or punishment phase of trial, or any evidence impeaching the credibility of the State's witnesses.

476.   Harris County is notorious for ongoing systemic problems concerning the disclosure of exculpatory evidence.

477.   The failure to turn over material, exculpatory evidence violated Mr. Cruz-Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments.

**Claim 12**      **Mr. Cruz-Garcia's constitutional right to a grand jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments was violated.**

478.   Mr. Cruz-Garcia was indicted by the grand jury twice, first in 2008 and then again in 2013. At that time, Texas employed the "key man" system of grand jury selection, which it finally abolished two years after Mr. Cruz-Garcia's trial in 2015, the last state in the nation to do so. Rather than picking from a pool of randomly selected residents to hear criminal cases, judge-appointed commissioners were allowed to nominate prospective jurors under a system the Supreme Court has called "susceptible of abuse."

479.   Based on information and belief, there was discrimination in the selection of the grand jury and the grand jury foreperson that indicted and re-indicted Mr. Cruz-Garcia. The grand jurors were selected using the key man system, which was unconstitutional as it was predisposed to selecting grand jurors with connections to the criminal justice system and law enforcement. Moreover, the key man system discriminated against the Hispanic population who were unconstitutionally underrepresented.

480.   Upon obtaining discovery of the identities of the key men and the grand jurors who were nominated for grand jury duty in Harris County during relevant time periods, Mr. Cruz-Garcia will show that his rights to equal protection, to due process of law, and to a grand jury drawn from a fair cross-section of the community under the Sixth and Fourteenth Amendments were violated.

**Claim 13**      **Mr. Cruz-Garcia's constitutional right to a petit jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments was violated.**

481.   Harris County systemically excludes Hispanics from the jury pool to the extent that jury venires average less than 25% Hispanic representation—when the percentage of Hispanics in the community population exceeds 40%—which violates the Constitution's fair-cross-section requirement. *Duren v. Missouri*, 439 U.S. 357 (1979).

482.   Jury venires must be representative of a cross-section of the community. Whenever there is an underrepresentation of a segment of society on a jury list, there is a denial of equal opportunity or equal participation. Hispanics constitute a distinctive, cognizable group in the community.

483.   Hispanics were underrepresented in Mr. Cruz-Garcia's jury venire compared to the percentage of Hispanics in the community. At the time of Mr. Cruz-Garcia's trial in 2013, Harris County's population was 4,325,413, of which 1,851,606 people, or 42.81%, were Hispanic.[23] The petit jury venire from which Mr. Cruz-Garcia's jury was selected was made up of 150 people. Of those, 28 people, or 18.67%, were Hispanic. The absolute difference between the percentage of Hispanics in the general population and the percentage of Hispanics in Mr. Cruz-Garcia's jury venire is 24.14%.

---

[23] Texas Department of State Health Services, Texas Population, 2013 (Estimates), *available at* http://dshs.texas.gov/chs/popdat/ST2013.shtm (last accessed Oct. 27, 2018).

484. This large discrepancy in the percentage of Hispanics represented in jury venires in Harris County persisted over a number of a years. Five years prior to Mr. Cruz-Garcia's trial, in 2008, the population of Harris County was 3,965,716 people. Of those, 1,664,403, or 41.96%, were Hispanic.[24]

485. During the 2008 capital trial in Harris County of Mabry Landor, the petit jury venire was 195 people, of which 43, or 22% were Hispanic. Petition for Writ of Habeas Corpus, *Landor v. Davis*, 16-cv-03384 (ECF No. 10) (S.D. Texas, Oct. 31, 2017). This represents an absolute difference of 19.96%.

486. Upon information and belief, this large discrepancy occurred not just in Mr. Cruz-Garcia's case, but in other venires in Harris County over a significant period of time.

487. The cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized.

488. Disproportionate exclusion of Hispanics from jury venires in Harris County constitutes infringement of Mr. Cruz-Garcia's constitutional right to a jury drawn from a fair cross section of the community in violation of the Sixth and Fourteenth Amendments.

489. The Sixth Amendment, applied to the States through the Due Process Clause of the Fourteenth Amendment, forbids any substantial underrepresentation of

---

[24] Texas Department of State Health Services, Texas Population, 2008, *available at* http://dshs.texas.gov/chs/popdat/ST2008.shtm (last accessed Oct. 27, 2018).

minorities, regardless of the motive, and Mr. Cruz-Garcia does not need to demonstrate purposeful discrimination to show that his constitutional right to a jury selected from a fair cross-section was violated.

**Claim 14**      **The Harris County jury system discriminated in the selection of jurors in violation of the Equal Protection Clause of the Fourteenth Amendment.**

490.   The jury system that produced the petit jury venire from which Mr. Cruz-Garcia's jury was selected discriminated in the selection of jurors in violation of the Equal Protection Clause of the Fourteenth Amendment.

491.   The Equal Protection Clause of the Fourteenth Amendment prohibits underrepresentation of minorities in juries by reason of intentional discrimination.

492.   To show that an equal protection violation has occurred in the context of jury selection, Mr. Cruz-Garcia must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs—Hispanics.

493.   As alleged above in Claim 13, Hispanics have been systematically under-represented in the Harris County jury venires.

494.   Hispanics are intentionally discriminated against in this process.

495.   The jury system employed by Harris County results in substantial underrepresentation of Hispanics in jury venires, including the jury venire from which Mr. Cruz-Garcia's petit jury was selected, violating Mr. Cruz-Garcia's constitutional rights.

**Claim 15**      **Contrary to the Supreme Court mandate in *Batson v. Kentucky*, the State improperly used peremptory challenges to systematically exclude racial minorities from serving on the jury.**

496.    In violation of the Sixth, Eighth, and Fourteenth Amendments and contrary to *Batson v. Kentucky*, 476 U.S. 79 (1986), the Harris County District Attorney's Office improperly used peremptory challenges to systematically exclude African-Americans and Hispanics, women, poor people or the unemployed, and other cognizable groups from serving on the jury. These include, but are not limited to, the discriminatory strikes of venirepersons Latoya Johnson, Melinda Dixon, Johnny Bermudez, and Gilberto Vazquez.

**A.    Latoya Johnson, venireperson No. 89.**

497.    The State exercised a peremptory challenge against Latoya Johnson, a 33-year-old black woman and No. 89 on the venire. Ms. Johnson answered questions on the jury questionnaire and during voir dire similarly to white men and women whom the State did not strike. For example, her answers to Question 67 on the questionnaire regarding her attitudes toward the death penalty were nearly identical to that of Larry Jordan, a white man who was accepted by the state and seated on the jury:

| Latoya Johnson's Answers | | Larry Jordan's Answers | | Questions |
|---|---|---|---|---|
| Agree | Disagree | Agree | Disagree | |
|  | ✓ |  | ✗ | 1. Any person, man or woman, young or old, who commits capital murder should pay with his own life. |
|  | ✓ |  | ✗ | 2. Capital punishment has never been effective in preventing crime. |
| ✓ |  | ✗ |  | 3. We must have capital punishment for some crimes. |
|  | ✓ |  | ✗ | 4. I do not believe in capital punishment under any circumstances. |
|  | ✓ |  | ✗ | 5. Capital punishment is not necessary in modern civilization. |
|  | ✓ |  | ✗ | 6. Life imprisonment is more effective than capital punishment. |
|  | ✓ |  | ✗ | 7. Execution of criminals is a disgrace to civilized society. |
| ✓ |  | ✗ |  | 8. Capital punishment is just and necessary. |
| ✓ |  | ✗ |  | 9. Capital punishment gives the criminal what he deserves. |
|  | ✓ | ✗ |  | 10. Capital punishment is justified only for premeditated murder. |
|  | ✓ |  | ✗ | 11. Capital punishment should be available as punishment for more crimes than it is now. |

498. The only part of Question 67 that Ms. Johnson answered differently was that she disagreed that capital punishment is justified only for premediated murder. As the District Attorney pointed out repeatedly during voir dire (including during voir dire of Larry Jordan, 5 RR 268), Texas does not require premeditation for capital murder, only intentional murder, which can be formed in a split second.

499. Like Larry Jordan, Ms. Johnson answered Question 65 on the juror questionnaire that her decision on whether to assess the death penalty would depend upon the facts and circumstances of a particular case.

175

500. Like Larry Jordan, during her voir dire, Ms. Johnson agreed with many of the prosecutor's statements. In response to questions, she candidly stated that while she may have her own opinions, she will follow what the law says: "I will go with what the law says, if that's what the law says. You know, I will always have my own opinions, but I can look at the law and follow the law." 11 RR 154.

501. Despite the similarities in her responses and attitudes towards the death penalty to seated white jurors, Ms. Johnson was stricken from the jury through an exercise of the State's peremptory challenge.

**B.    Melinda Dixon, venireperson No. 98.**

502. The State exercised a peremptory challenge on Melinda Dixon, a 38-year-old black woman and No. 98 on the venire. On her questionnaire, Ms. Dixon indicated that she is "strongly in favor of capital punishment as an appropriate punishment" but like Larry Jordan, a white man who was accepted by the State and seated on the jury, her "decision on whether to assess the death penalty would depend upon the facts and circumstances of a particular case."

503. During her voir dire, Ms. Dixon repeatedly insisted that she can and will follow the law. 12 RR 189. Her responses demonstrated that she is able to distinguish between personal feelings and following the law: while answering that it would be her preference to not have death penalty if she were the one in charge, "like a Governor of Texas," she also recognized that she was "not the one that's in charge. This is the law. That's the way it goes." *Id.* at 201, 212.

504.    Despite the similarities in her responses and attitudes towards the death penalty to seated white jurors, Ms. Dixon was stricken from the jury through an exercise of the State's peremptory challenge.

### C.    Johnny Bermudez, venireperson No. 92.

505.    The State exercised a peremptory challenge against Johnny Bermudez, a 44-year-old Hispanic man and No. 92 on the venire. He stated in his questionnaire that he would assess the death penalty in an appropriate case. He reiterated during his voir dire that he believed that the death penalty "in certain circumstances it has its merits." 11 RR 235. Johnny Bermudez rated himself a six on the "scale of one to ten, one being definitely opposed [to death penalty] and never have it, shouldn't be in existence, to ten . . . being very much for it." *Id.*

506.    Mr. Bermudez also repeatedly stated that he could follow the law and impose the death penalty because even though he "may have personal feelings against it, but the law is the law, whether [he] agrees with it or not. . . . Like a 35-mile an hour speed limit, it's the law whether [he thinks] it should be that or not." *Id.* at 239.

507.    Despite the similarities in his responses and attitudes towards the death penalty to seated white jurors, Mr. Bermudez was stricken from the jury through an exercise of the State's peremptory challenge.

### D.    Gilberto Vazquez, venireperson No. 115.

508.    The State exercised a peremptory challenge against Gilberto Vazquez, a 55 year-old Hispanic male and No. 115 on the venire. His questions on both the

questionnaire and the voir dire were similar to those of white men and women who the State chose not to strike. On his questionnaire, he reported that his decision to assess punishment would depend on circumstances of a particular case. He clarified during voir dire that he could sit in judgment of another person, that he would keep an open mind, and that he could answer the special issues in a manner that would result in the death penalty. 11 RR 114, 116.

509.   During voir dire, Mr. Vazquez also testified that if it were up to him—if he were "a king of Texas," as the prosecutor suggested—he would still have the death penalty. 13 RR 158. He would impose it in "an appropriate case." When asked to look at Mr. Cruz-Garcia and think about whether he would be able "to answer those special issues in a way that would lead to [Mr. Cruz-Garcia's] death," Gilberto Vazquez answered that yes, he could.

510.   Despite the similarities in his responses and attitudes towards the death penalty to seated white jurors, Mr. Vazquez was stricken from the jury through an exercise of the State's peremptory challenge.

**Claim 16      Excluding jurors from Mr. Cruz-Garcia's venire without conducting adequate voir dire violated his right to a fair and impartial jury under *Witherspoon*.**

511.   The United States Supreme Court in *Witherspoon v. Illinois* recognized that to allow the State to remove from the panel any member who has moral qualms about the death penalty would unfairly cause the jury to be "uncommonly willing to condemn a man to die." 391 U.S. 510, 521 (1968). Failure to follow

this protection violates the Sixth and Fourteenth Amendments to the constitution.

512.  Numerous individuals were excluded from Mr. Cruz-Garcia's venire simply because they voiced general objections to death penalty or expressed conscientious or religious scruples against its infliction.[25] For example, the

---

[25] Specifically, Mr. Cruz-Garcia alleges that the following jurors were excluded in violation of his constitutional rights: Tracy Canada, No. 6; Salvador Gonzalez, No. 7; Monica Lara, No. 8; Michael Trulove, No. 10; Rachel Willis, No. 11; Anthony Bayer, No. 12; Claude Limbrick, No. 15; Ronald Abellera, No. 16; Nathan Gurley, No. 17; Anita Payne, No. 18; Tsepio Masemene, No. 19; Meghan Mehl, No. 20; Abdon Avilla, No. 21; Edwin Paragas, No. 24; Katherine Mcclendon, No. 27; Santiago Rosa, No. 29; Hazel Houston, No. 30; Randi Malone, No. 31; Dennis Fisher, No. 32; Jose Martinez, No. 33; Allyn Emert, No. 34; Darlene Chorba, No. 36; Dana Towse-Paulk, No. 37; David Limerick, No. 42; Christopher Clark, No. 44; Donna Chambers, No. 45; Michael Lowrance, No. 52; Elsy Quintanilla, No. 54; Virginia Manuel, No. 55; David Ball, No. 56; Martha Perez, No. 57; Todd Chaykovsky, No. 58; Nathalie Ortiz, No. 59; Bobby Mixon, No. 60; Lori Sullivan, No. 61; Theron Norris, No. 63; Alvin Tyler, No. 65; Josephine Hillegeist, No. 66; Simone Goodall, No. 67; Karen Taylor, No. 68; Patricia Rivera Lopez, No. 69; Veronica Eardley, No. 71; Darrell Davis, No. 73; Linda Powell, No. 74; Sandy Domingo, No. 75; Latoya Collins, No. 77; Bennett Walker, No. 78; Mary Gonzales, No. 79; Rosa Perez, No. 82; Michael Zimbaldi, No. 87; Brian Peters, No. 88; Esmaeil Jahangiri, No. 90; Johnny Bermudez, No. 92; Lindsey Hammon, No. 94; Aurora Zamarripa, No. 99; Rebecca Turner, No. 100; Sandra Thomas, No. 105; Joel Tellez, No. 106; Salima Badarpura, No. 108; Evon Armagon, No. 111; Jeffrey Hutto, No. 112; David Hunt, No. 113; Diana Hare-Ganchev, No. 114; Wayne Crumhorn, No. 116; James Browning, No. 118; Lashandra Williams, No. 119; Fredy Solorzano, No. 120; Lewis Pittman, No. 121; Michaeline Basutro, No. 122; Eric Anciso, No. 123; Danny Hendrix, No. 124; Roland Williams, No. 125; Tahimima Mostafa, No. 126; Thurston Williams, No. 130; Darshana Patel, No. 131; Antonio Granados, No. 132; Sean Riley, No. 133; Richard Moreno, No. 134; Karen Dowty, No. 135; William Dukes, No. 138; Benito Toscano, No. 142; Chaz Roney, No. 144; William Blesner, No. 145; Alcus Greer, No. 146; Sara Sparks, No. 147.

State moved to strike for cause (and the court granted those motions, off the record, 5 RR 100) Monica Lara, No. 8, after she stated "I'm not for the death penalty, so I might possibly be swayed. I don't want to go 100 percent, but I'm not for it. So, it would be a little difficult for me," 5 RR 83, and Meghan Mehl, No. 20, who stated "I feel the same way. I put that I'm opposed, but in a few cases I'm for it [in the questionnaire], but not if I have to make the decision. I would be swayed to go against the death penalty." 5 RR 82. They were subsequently excused without any attempt to determine whether they could nonetheless could obey the oath as a juror and return a verdict of death.

513.   Exclusion of dozens of jurors like that from Mr. Cruz-Garcia's venire violated his right to a fair and impartial jury. To the extent the trial court granted motions to strike these jurors for cause, Mr. Cruz-Garcia's right to due process and fair trial were also violated.

**Claim 17**      **The State engaged in improper, inflammatory, and unduly prejudicial voir dire.**

514.   In violation of Mr. Cruz-Garcia's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, the State conducted inflammatory, discriminatory, and unduly prejudicial voir dire. The manner in which the State conducted the voir dire biased and prejudiced the jury against Mr. Cruz-Garcia for the following nonexclusive reasons.

### A. The prosecutor repeatedly compared Mr. Cruz-Garcia to Charles Manson and Adolf Hitler, invoking a racially-charged imagery of extermination of minorities.

515. The prosecutor repeatedly compared the defendant to Adolf Hitler or Charles Manson, suggesting that such men (and by association, Mr. Cruz-Garcia) are evil, the worst of the worst, and deserve the most severe punishment. These were not isolated remarks; the State repeatedly made use of these analogies throughout the voir dire, including with two of the seated jurors. 12 RR 22, 163–64.

516. Similar exchanges occurred invoking Charles Manson and Adolf Hitler with other potential jurors. *See* 6 RR 26–27; 8 RR 95; 11 RR 202; 12 RR 261; 13 RR 217; 14 RR 222–23, 262–63.

517. The repeated comparisons to Charles Manson, a white supremacist, and Adolf Hitler are especially inflammatory because the child victim in this case, as well as the key witnesses (his parents), were racial minorities. The prosecutor improperly injected considerations of racial and ethnic animus into the jury trial system.

518. Building on the foundation laid in the voir dire, the prosecutor would subsequently invoke these considerations during closing argument: "I will also ask you that you remember those conversations that we had with each of you individually over the last month or so back in jury selection." 26 RR 145. Echoing the voir dire—"Charles Manson or Hitler . . . they have been evil

inside"—the prosecutor would then argue that "Obel Cruz-Garcia is a monster. He is an evil person who likes to torture and taunt his victims." *Id.* at 175.

519. The demonstrably biased, inflammatory voir dire by the State violated Mr. Cruz-Garcia's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, including the right to a fair and impartial jury.

**B.      The prosecutor repeatedly invoked the Boston marathon bombing during voir dire as well as other well-publicized crimes.**

520. Less than 8 weeks before the start of voir dire in Mr. Cruz-Garcia case, during the annual Boston Marathon on April 15, 2013, two homemade pressure cooker bombs detonated near the finish line of the race, killing three people, including an 8-year old boy, and injuring several hundred others, including 16 who lost limbs. This event shocked the nation; images of wounded and screaming people filled every newspaper, TV, and smart phone. This is the event—and strong emotions such as anger, horror, and revulsion at the perpetrators associated with it—that the State chose to repeatedly and systematically invoke during voir dire, including with potential, as well as later seated, jurors. 7 RR 27, 104; 8 RR 138; 10 RR 13, 139; 11 RR 189, 145; 12 RR 157, 251; 13 RR 209.

521. This invocation of the horror and associated emotions was done using nearly identical phrasing from one potential juror to the next.

522. The demonstrably biased, inflammatory voir dire by the State violated Mr. Cruz-Garcia's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, including the right to a fair and impartial jury.

523. Likewise, the prosecutor repeatedly invoked "the Candy Man case" with a child victim during voir dire—including with those seated as jurors—as an example of a case where the facts are so egregious that "anyone who can do that, is always going to be a threat to society:" 5 RR 174, 223, 289; 7 RR 144; 9 RR 180;

524. Moreover, throughout the voir dire, including the voir dire of several seated jurors, the prosecutor also repeatedly brought up Andrea Yates, a woman who drowned her five children.7 RR 73, 151, 220;  9 RR 83, 185; 12 RR 115.

> Q. You are probably familiar -- do you remember the Andrea Yates case --
>
> A. Yes.
>
> Q.    -- where she drowned her five kids. Tragic situation. Clearly, she committed those acts.
>
> A. Right.

525. The Andrea Yates case involved crimes against children where the prosecution sought the death penalty and the Candy Man case involves a crime against a child where the defendant received the death penalty and was executed. As the State acknowledged during voir dire, the Andrea Yates case was local and well-publicized, involved five children as victims, and was very likely to evoke strong emotions in the jury.

526. These repeated invocations of cases with child victims were especially inappropriate because the prosecutor moved—and was granted—a motion to preclude the defense from referencing that the victim in this case is a child: "I'm asking that there not be any reference to the fact that the victim was a child because it's not an element in the indictment." 5 RR 5.

527. These actions were inappropriate, inflammatory, and violated Mr. Cruz-Garcia's right to an impartial jury and fair trial.

C. **The prosecutor repeatedly asked commitment questions of prospective jurors despite the trial court's warning to stop.**

528. During voir dire, the prosecutor repeatedly and improperly asked the venirepersons, including those later seated jurors, to commit that "the defendant"—Mr. Cruz-Garcia—was the one who was in charge out of the three defendants and that he controlled the crime scene.

529. Some, but not all, of these venirepersons who were asked to commit in this manner were seated on the jury. 5 RR 162, 171, 282–83; *see also* 6 RR 184–85.

530. When defense counsel finally raised this issue in a verbal motion in limine on the record, the court agreed that the prosecutor tended "to state that it is the defendant that controls the scene." 7 RR 7. The court admonished the prosecutor and ordered that it would be more appropriate to "ask the juror if they agree or disagree that a defendant could control the scene as to what happened. A slight distinction, but that's what I would request, that you stay away from getting them to commit on that, that the defendant does control the scene." *Id.* at 8.

531. The prosecutor continued, undeterred: "Actually, the person who has the most control over what evidence is presented in a case is the defendant in that case. He chooses what he leaves behind." 9 RR 33. By this point, even the juror being questioned thought it was too suggestive of guilt and the juror objected and interrupted the voir dire: "But you just said 'the defendant.' And that's

presuming guilt. . . . You just presumed guilt." *Id.* (Maura Denman, Venireperson No. 62). As the juror astutely pointed out, echoing the court's earlier ruling, "actually, the perpetrator who actually committed it, whether it's the defendant or not." *Id.*

532. The trial court intervened and said "We're all assuming. These are hypotheticals. We're not talking about this defendant." *Id.* No mention of hypotheticals or hypothetical defendants has been made prior to this statement by the prosecutor about "the defendant" controlling the scene, which was not even phrased as a question.

533. Repeated attempts to ask commitment questions violated Mr. Cruz-Garcia's right to an impartial jury.

> **D.   The prosecutor repeatedly and improperly suggested to the potential jurors that Mr. Cruz-Garcia had a criminal history that would be revealed during the punishment phase.**

534. The State also violated Mr. Cruz-Garcia's right to an impartial jury by repeatedly suggesting during voir dire he had criminal history, even if the jury heard nothing about it during the first stage of the trial: "So, can you see how that other evidence—a lot of jurors are like: Well, we didn't hear anything about criminal history, so he must not have any, during the guilt phase. But that's not true because usually you won't hear about that until the punishment phase, if there is any." 6 RR 16.

535. With the venireperson who ended up being seated on the jury, the prosecutor both suggested that criminal history exists and questioned the existence of

mitigation: "And in the guilt phase, certain things like the defendant's criminal history, good things about the defendant, if there are any of those, those kinds of things are not going to come into play usually until the punishment phase of the trial." 12 RR 14 (voir dire of Jennifer Sims, seated juror).

**E.  The prosecutor specifically targeted women with biased, discriminatory questions.**

536. In violation of the Sixth, Eighth, and Fourteenth Amendments, the District Attorney's questioning of women was biased, discriminatory, and was designed to develop a line of testimony that would produce a neutral reason for a strike for cause or to justify a peremptory. While in 2013 women comprised 50.20% of the population of Harris County, they comprised 46.67% of Obel Cruz-Garcia's jury venire.

537. The State targeted already underrepresented women with biased questions unrelated to their qualifications as jurors, such as "Do you know how your husband feels about the death penalty?" 9 RR 120 (voir dire of Patricia Lopez, venireperson No. 69, by the State). The State asked the same question about their husband's feelings to other women as well: Donna Chambers, venireperson 45, 8 RR 45; Nancee Pyper, venireperson 64, 9 RR 169; Casey Guillotte, venireperson 84, 10 RR 184; Sharon Alexander, venireperson 149, 15 RR 157. None of the married men in the venire were asked about how their wives feel about the death penalty. This question, targeting only women, has no bearing on whether a juror is able to be fair and impartial.

**Claim 18** **Portions of the record necessary for review and resolution of this petition are missing, in violation of Mr. Cruz-Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments.**

538. In violation of his rights under the Sixth, Eighth, and Fourteenth Amendments, significant portions of the record of Mr. Cruz-Garcia's case are missing.

539. Even though the trial court issued an order to include juror questionnaires and information cards as a supplement to the official clerk's record, the questionnaire for venireperson No. 25 was not made part of that record. Moreover, the questionnaire does not appear to be in trial counsel's records, appellate counsel's records, state post-conviction counsel's records, or the District Attorney's file. The State exercised a peremptory strike on venireperson No. 25, Linda Genaw. The missing questionnaire contains information that could potentially serve as a basis for several claims raised in this petition, such as *Batson*.

540. Many parts of the trial were conducted off the record. To give just a few examples, the judge and counsel repeatedly engaged in off the record conferences and decision-making about venire strikes (5 RR 5), motions in limine (*id.*), making juror questionnaires part of the record (*id.* at 250), unknown matters, (*see, e.g.*, 6 RR 133, 142, 186; 22 RR 11), among other examples.

541. The juror questionnaires and information cards as well as several volumes of the Reporter's Record and Exhibits were not transmitted to the Texas Court of

Criminal Appeals by the trial court, and thus were unavailable to that court for review during adjudication of Mr. Cruz-Garcia's direct appeal and post-conviction writ.

**Claim 19** **Mr. Cruz-Garcia was not present during portions of his trial, violating his constitutional rights.**

542.   In violation of the Fifth, Sixth, and Fourteenth Amendments, Mr. Cruz-Garcia was not present during meaningful proceedings during his trial.

543.   For example, during the punishment phase, Mr. Cruz-Garcia was not present while the trial court was explaining to the prosecutors and trial counsel about potentially improper conversations between jurors. 24 RR 3; *see also* Claim 8.

544.   At the beginning of the record, the trial court noted that "I just want to make it clear the defendant is not present." 24 RR 3. The trial court explained that a local lawyer, Michael Casaretto, approached her because he overheard two jurors discussing the case in the elevator. *Id.* at 3–4. The discussion appeared to revolve around one to of the juror's struggles with the decision-making process at the guilt phase. *Id.* at 4. After this discussion concluded, Mr. Cruz-Garcia returned to the courtroom. *Id.* at 6.

545.   As a result, his conviction and death sentence violated the applicable constitutional protections, namely the Fifth, Sixth, and Fourteenth Amendments.

**Claim 20**     **The State used inconsistent theories of the offense and prosecution at a co-defendant's trial, violating Mr. Cruz-Garcia's Rights constitutional rights.**

546.   In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Mr. Cruz-Garcia's conviction was unconstitutionally obtained when the State presented inconsistent theories of the events and prosecution during the subsequent trial of his codefendant.

547.   Rogelio Aviles-Barroso was Mr. Cruz-Garcia's codefendant.

548.   During Mr. Cruz-Garcia's trial, the State presented testimony that Rogelio Aviles-Barroso was involved in the offense for which Mr. Cruz-Garcia was convicted and sentenced to death.

549.   Subsequently, Mr. Aviles-Barroso was tried for capital murder in Cause No. 1364839, in the 337th District Court in Harris County, Texas.

550.   The guilt/innocence phase in Mr. Aviles-Barroso's trial began on January 29, 2014.

551.   Mr. Aviles-Barroso was convicted of capital murder on February 4, 2014.

552.   Because the State elected not to seek the death penalty against Mr. Aviles-Barroso, he was automatically sentenced to life in prison.

553.   During the course of Mr. Aviles-Barroso's trial, the State presented testimony that was inconsistent with the testimony offered at Mr. Cruz-Garcia's trial. Those inconsistencies include, but are not limited to, the following. The testimony differed with respect to the offense in question, circumstances

surrounding the preceding and subsequent time to the offense in question, as well as differences in the law enforcement investigation into the offense.

554.   As a result, Mr. Cruz-Garcia's conviction and death sentence violated the applicable constitutional protections, namely the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Claim 21    The trial judge presiding over the case had a conflict of interest, violating Mr. Cruz-Garcia's constitutional rights.**

555.   In violation of the Fifth and Fourteenth Amendments, Mr. Cruz-Garcia's trial judge had a conflict of interest that created an impermissible risk of actual bias.

556.   Mr. Cruz-Garcia was tried in the 337th Judicial District Court of Harris County, Texas. His trial court judge was Renee Magee. 1 RR 1.

557.   Prior to being elected judge of that court, Judge Magee served for twenty-one years as an Assistant District Attorney in Harris County, Texas—from 1992 to 2012. *See* Renee Magee for 184th District Court 2018, http://www.judgereneemagee.com/about-renee (last visited October 31, 2018). During her time in the District Attorney's Office, Judge Magee had significant involvement in capital murder prosecutions, including trying ten capital murder cases to jury. *Id.* She also served for twelve years as a felony district court chief, supervising other prosecutors in the office in four district courts. *Id.* She took the bench in the 337th District Court on January 1, 2013.

558.  Mr. Cruz-Garcia was initially indicted on November 20, 2008. CR 6. At that time, Judge Magee was still a member of the Harris County District Attorney's Office, and would be for approximately four more years.

559.  Jury selection, which Judge Magee presided over, began on June 3, 2013—barely over six months after Judge Magee left the District Attorney's Office.

560.  Judge Magee's service and role in the District Attorney's Office created a conflict of interest and an impermissible risk of bias. As a result, Mr. Cruz-Garcia's conviction and death sentence violated the applicable constitutional protections, namely the Fifth and Fourteenth Amendments.

**Claim 22**     **Repeated emotional outbursts from the gallery rendered Mr. Cruz-Garcia's conviction and death sentence fundamentally unfair.**

561.  In violation of the Fifth, Sixth, and Fourteenth Amendments, Mr. Cruz-Garcia's conviction was unconstitutionally obtained due to repeated, emotional outbursts from the gallery during trial. These outbursts include, but are not limited to, the following occurrences.

562.  During the guilt/innocence phase, a bench conference occurred where trial counsel explained that there were audible reactions from the victim's family during testimony. Trial counsel stated that "there's no excuse for the family being here crying and making sounds and all this stuff in front of the jury." 20 RR 14. The outburst was noticeable, and the State agreed to have the family removed. *Id.* The trial court also commented that "I don't think [the outbursts are] appropriate." *Id.*

563. Later the same day, another emotional outburst occurred. During testimony, the trial court was forced to stop the proceedings and remove the jury. 20 RR 107. The trial court directly addressed the audience:

> I realize the testimony in this case is emotional, but if you cannot hold your emotions in and be quiet in the courtroom, then you will have to leave the courtroom. And that includes the family. I'm sorry to say that, but we cannot have this jury swayed by emotion and emotional outbursts. Okay? So, if you feel that you can't keep from having that happen, you will need to step out.

*Id.* at 108.

564. These repeated, emotional outbursts from the gallery resulted in Mr. Cruz-Garcia's conviction and death sentence being fundamentally unfair. As a result, his conviction and death sentence violated the applicable constitutional protections, namely the Fifth, Sixth, and Fourteenth Amendments.

**Claim 23      Testimony was translated incorrectly to the jury, violating Mr. Cruz-Garcia's constitutional rights.**

565. In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Mr. Cruz-Garcia's conviction was unconstitutionally obtained when witness testimony was translated incorrectly to the jury.

566. Numerous witnesses during Mr. Cruz-Garcia's trial testified in Spanish and had their answers translated into English for the jury by interpreters. 18 RR 194; 19 RR 4; 20 RR 80, 116; 21 RR 4; 24 RR 14, 43, 78, 98, 118; 25 RR 59; 26 RR 8.

567.   Repeatedly during Mr. Cruz-Garcia's trial, the interpreters had to correct their translations of what the witness said. 20 RR 94, 144, 159–60, 165; 24 RR 36, 49–50, 60; 25 RR 61; 26 RR 12, 26.

568.   Outside of these corrections, the jury was aware that the interpreters were not accurately translating the testimony from the Spanish-speaking witnesses. During deliberations for the guilt/innocence phase, the jury sent a note to the court that the interpreters were not translating the testimony correctly. The trial court read the note into the record, in which the jury asked "[a]re we only allowed to consider the interpreter's response of the witness in English and not the Spanish response as heard by Spanish-speaking jury members." 23 RR 100.

569.   After conferring with the lawyers, the trial court responded to the jury note that "[t]he interpreter's response is the official record and evidence in the case." 23 RR 100. Trial counsel and the State did not object to this response. *Id.*

570.   The jury was then forced to determine Mr. Cruz-Garcia's guilt and sentence based on inaccurate translations of what the witnesses actually testified.

571.   As a result, Mr. Cruz-Garcia's conviction and death sentence violated the applicable constitutional protections, namely the Fifth, Sixth, Eighth, and Fourteenth Amendments.

**Claim 24**      **The trial court prohibited Mr. Cruz-Garcia from presenting powerful mitigation evidence to the jury in violation of the Eighth and Fourteenth Amendments.**

572.   Juries in death penalty trials must be permitted to consider any aspects of a defendant's character that could be the basis for a sentence less than death.

573.    The trial court prevented Mr. Cruz-Garcia from presenting compelling mitigation evidence to the jury—certificates establishing that he completed multiple religious courses while incarcerated prior to the instant case, and testimony from a police officer that Mr. Cruz-Garcia acted as a government informant for the FBI, DEA, and INS. In doing so, the court violated Mr. Cruz-Garcia's constitutional rights under the Eighth and Fourteenth Amendments.

574.    During the punishment phase of trial, Mr. Cruz-Garcia sought to introduce Bible certificates he had earned while incarcerated in a Puerto Rican prison. 26 RR 55–58. This evidence would have supported the testimony of Angel Meza, a trustee at the Harris County jail who was incarcerated with Mr. Cruz-Garcia pre-trial and testified that Mr. Cruz-Garcia is a "Man of God." 26 RR 81–85.

575.    The State objected that the Bible certificates were hearsay. 26 RR 58. Mr. Cruz-Garcia's counsel urged the trial court to admit the certificates because there was no suggestion that they were not authentic and, given that it was the punishment phase of a death penalty trial, the court should view the certificates as a question of weight, not admissibility. *Id.* at 57.

576.    The trial court found the certificates to be relevant but excluded them on hearsay grounds. 26 RR 57.

577.    Also during the punishment phase, the State presented testimony of Agent Juan DeJesus Rodriguez, an officer with the Puerto Rican Police. 21 RR 44. Agent Rodriguez testified that he investigated Mr. Cruz-Garcia as a suspect in

a kidnapping case. *Id.* at 46. During cross examination, Mr. Cruz-Garcia's counsel asked Agent Rodriguez about his knowledge of Mr. Cruz-Garcia's role as an informant for the FBI, DEA, and INS. *Id.* at 69. The State objected on relevance grounds and the trial court conducted a hearing outside the presence of the jury. *Id.* at 69–71. Agent Rodriguez testified in this hearing that he had confirmed with federal agents that Mr. Cruz-Garcia was an informant. The trial court determined that the evidence was relevant to Mr. Cruz-Garcia's mitigation case but sustained the State's objection on hearsay grounds. *Id.* at 71–74.

578.   Mr. Cruz-Garcia had the right to present to the jury any evidence that might lead the jury to conclude that a sentence other than death was appropriate. Under these circumstances, the trial court erred by preventing him from presenting mitigation evidence to the jury.

579.   The jury may well have found this evidence to weigh against imposing a death sentence. The religious study certificates would serve to show that Mr. Cruz-Garcia could be a productive member of the prison population if sentenced to life, a rebuttal of the State's theme that he was a future danger. In the absence of the Bible certificates showing that Mr. Cruz-Garcia was immersed in religious study after the crime occurred in 1992, but before being charged with capital murder, the jury was limited in its ability to consider the mitigating effect of Mr. Cruz-Garcia's faith.  Moreover, the evidence that Mr. Cruz-Garcia acted as a government informant for multiple United States law enforcement

agencies, and assisted in the arrest and prosecution of other criminals, could have persuaded the jury that Mr. Cruz-Garcia merited a life sentence.

580.   The trial court's rulings violated Mr. Cruz-Garcia's rights under the Eight and Fourteenth Amendments.

**Claim 25      Prosecutors made numerous inappropriate and inflammatory comments throughout the trial, denying Mr. Cruz-Garcia his right to due process and fair trial.**

581.   Clearly established federal law holds that prosecutorial misconduct, such as inappropriate comments during arguments, warrants habeas relief when the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

582.   Throughout Mr. Cruz-Garcia's trial, the prosecutor made numerous unwarranted characterizations that violated Mr. Cruz-Garcia's constitutional rights.

583.   During closing argument for the guilt/innocence phase of the trial, the prosecutor invoked the Bible as a litmus test for invoking evil and wickedness and guilt: "The 28th Chapter of Proverbs says: The wicked flee so [sic] no one pursues them, but the righteous are as bold as lions. Ladies and gentlemen, there is the wicked right there." 23 RR 95.

584.   Then, during the closing for the punishment phase, the prosecutor told the jury "I will tell you right now, if it were up to Roger alone, Angelo would still be alive." 26 RR 163–64. From this argument, based on nothing in the record but

the prosecutor's opinion, the jury would logically surmise that there was inadmissible evidence, which, if revealed, would show them other acts or character traits of the defendant that they should know about.

585.   During voir dire, as alleged more fully in Claim 17, the prosecutor repeatedly compared the defendant to Adolf Hitler and Charles Manson, suggesting that such men (and by association, Mr. Cruz-Garcia) are evil, the worst of the worst, and deserve the most severe punishment. The prosecutor also repeatedly invoked gruesome, well-known cases with multiple child victims: the Boston Marathon bombing, the Andrea Yates case, the Candy Man case. *See* Claim 17. Mr. Cruz-Garcia specifically incorporates by this reference all facts and allegations in that claim.

586.   Building on the foundation laid in the voir dire, the prosecutor would subsequently invoke these considerations during closing argument for the punishment phase: "I will also ask you that you remember those conversations that we had with each of you individually over the last month or so back in jury selection." 26 RR 145. Echoing the voir dire—"Charles Manson or Hitler . . . they have been evil inside"—the prosecutor would then argue that Mr. Cruz-Garcia is evil, less than human, and deserves to die because of that: "Those are just the facts. And they are the facts that you need to base your decision on. Obel Cruz-Garcia is a monster. He is an evil person who likes to torture and taunt his victims." *Id.* at 175. The prosecutor thus urged the jury to rely not on

the jury charge, not on the applicable law, but on raw emotions and anger in reaching their sentencing decision.

587.   The prosecutor also argued that while he and the jurors are human beings, the person they would be executing is something less than: "many of us and many of you probably would like to think that there aren't people in the world that can do the kind of things that you have heard about over the last two weeks. Surely there aren't t*hose type of people*. Those type of people can't exist because *you and I as human beings* can't really fathom that." 26 RR 154 (emphasis added).

588.   The prosecutor improperly injected considerations of racial and ethnic animus into the jury trial system by appealing to the jury's sense of nationalism while the fate of a foreign-born defendant, who doesn't speak English, was in their hands. The theme of "us versus them" (or Americans versus foreigners) is how the prosecutor opened the closing argument: "we live in the United States of America, the best country in the entire world. And thank God for that. We get to live with freedoms that so many people do not get to live with. We get to, hopefully, walk around *in our streets* and feel safe. We get to live out *our dreams* because this is America." 26 RR 142 (emphasis added). The prosecutor made that argument to a jury acutely aware that Mr. Cruz-Garcia is a foreigner, and this is not his country and these are not his streets.

589.   These comments were sufficient to create prejudicial error, violating Mr. Cruz-Garcia's rights to due process under the Fifth and Fourteenth Amendments.

**Claim 26**     **Prosecutors engaged in misconduct by using the subpoena power of the court to investigate the case, violating Mr. Cruz-Garcia's constitutional rights.**

590. Mr. Cruz-Garcia's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutors engaged in misconduct by issuing improper, extra-judicial subpoenas. In criminal cases during pre-trial, the State may not issue subpoenas to discover documents in third-party possession. *Martin v. Darnell*, 960 S.W.2d 838, 842 (Tex. App. 1997).

591. During pre-trial, the prosecutors in the present case issued non-judicial subpoenas that were meant to secure attendance of witnesses at trial to order production of documents. For example, the prosecutors issued a subpoena to the FBI Puerto Rico Field Office for "a certified copy of the complete file on former inmate Obel Cruz Garcia." Ex. 36. This was a misuse of subpoena power, which is reserved to the trial court and not the District Attorney's office.

592. The prosecutors misused subpoenas to order production of countless documents they otherwise would not be able to obtain, such as Diana Garcia's medical records. Upon information and belief, prosecutors did not provide copies of any of the documents they obtained to the defense counsel.

593. The prosecutors then used the evidence obtained through the improper use of the subpoena power such as prison records from Puerto Rico to argue—and prevail—on the argument that Mr. Cruz-Garcia presents a future danger. Mr. Cruz-Garcia's trial was thus undermined by prosecutorial misconduct.

**Claim 27          Mr. Cruz-Garcia is actually innocent.**

594.  In violation of the Eighth and Fourteenth Amendments, Obel Cruz-Garcia is actually innocent of the offense for which he has been convicted. He was erroneously convicted based on, for example, the withholding of evidence, false testimony, ineffectiveness of trial counsel, prosecutorial misconduct, and other errors and failures that occurred at the trial which led to an erroneous conviction as discussed in this petition. Even apart from any violation of rights which occurred at trial, the evidence would establish that, as a matter of fact, Obel Cruz-Garcia did not commit the offense for which he has been convicted, and that someone else killed the victim. As a result, his conviction and death sentence are unconstitutional and he is entitled to habeas corpus relief.

**Claim 28          The punishment phase jury instructions restricted the evidence that the jury could determine was mitigating, violating Mr. Cruz-Garcia's constitutional rights.**

595.  In violation of the Eighth and Fourteenth Amendments, Mr. Cruz-Garcia's jury was precluded from considering mitigating evidence.

596.  Capital juries must be able to fully consider mitigating evidence that provides a basis for a sentence less than death, and jurors cannot be prohibited from considering potentially mitigating evidence.

597.  Texas's statute governing capital trials, Article 37.071 of the Texas Code of Criminal Procedure, places unconstitutional restrictions on the jury's ability to consider mitigating evidence. Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness.*" TEX. CODE

CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). No definition of "moral blameworthiness" is provided.

598.   As directed by the statute, the trial court gave this statutorily required instruction during the punishment phase. CR 513.

599.   This prevented the jury from giving mitigating effect to any evidence that it determined was not related to "moral blameworthiness".

600.   As a result, Mr. Cruz-Garcia's death sentence violated the Eighth and Fourteenth Amendments.

**Claim 29**   **The trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence, violating Mr. Cruz-Garcia's constitutional rights.**

601.   In violation of the Eighth and Fourteenth Amendments, Mr. Cruz-Garcia's jury was not told that a vote by one juror could result in a life sentence.

602.   Under Texas law, if a jury is unable to answer any of the special issues unanimously—and in such a way that a death sentence would result—during a capital murder trial, the defendant is automatically sentenced to life in prison. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

603.   Under Texas law, however, the jury cannot be informed of the consequences should it fail to answer a special issue: "The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues." TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1).

604. This unconstitutional statute is particularly problematic in Mr. Cruz-Garcia's case. Juror Bowman was a holdout during the punishment phase and explained to the trial court that she was unable to reach a verdict. *See* Claim 8. Had she not received misleading instructions, she may well have continued her holdout, which would have led to a life sentence being imposed.

605. As a result, Mr. Cruz-Garcia's death sentence violated the Eighth and Fourteenth Amendments.

**Claim 30**   **Mr. Cruz-Garcia's death sentence was imposed based on Texas's unconstitutionally vague first special issue in violation of his rights under the Eighth and Fourteenth Amendments.**

606. In violation of the Eighth and Fourteenth Amendments, Mr. Cruz-Garcia's was sentenced to death based on the arbitrary and unconstitutionally vague first special issue.

607. Texas employs a sentencing scheme which requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). Those terms are not further defined.

608. The unconstitutionally vague special issue fails to provide the required guided discretion to the sentencer. As a result, Mr. Cruz-Garcia's death sentence violated the Eighth and Fourteenth Amendments.

**Claim 31**   **Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated based on Texas's arbitrary and discriminatory system of administering the death penalty.**

609.   In violation of the Sixth, Eighth, and Fourteenth Amendments, Mr. Cruz-Garcia's constitutional rights were violated based on Texas's arbitrary and discriminatory system for administering the death penalty.

610.   Arbitrary systems of imposing death sentences are unconstitutional.

611.   Discriminatory systems of imposing death sentences are unconstitutional.

612.   Texas's death penalty system provides prosecutors with wide discretion in determining which capital murder cases to seek death sentences.

613.   In Texas, only a small fraction of murder cases result in death sentences.

614.   Because of this discretion, arbitrary and unconstitutional factors, such as race, ethnicity, and geography play large roles in who is sentenced to death.

615.   Statistics show that race is a motivating factor in the death penalty in Texas.

616.   The discriminatory nature of the death penalty in Harris County is particularly striking, based on the race of the defendant.

617.   The last fourteen defendants sentenced to death in Harris County were all non-white races, excluding white defendants already on death row who received a new trial.

618.   Such a disparity is statistically significant, and cannot be attributed to mere chance.

619.   The last white defendant to receive a new death sentence in Harris County was Anthony Shore, on November 15, 2004.

620.  Four of Texas's 254 counties—Harris, Dallas, Bexar, and Tarrant account for a disproportionately high number of death sentences.

621.  A significant percentage of counties in Texas have not sentenced someone to death since 1976, when the death penalty was reinstated.

622.  As a result, Mr. Cruz-Garcia's death sentence violated the Sixth, Eighth, and Fourteenth Amendments.


## PRAYER FOR RELIEF

WHEREFORE, Obel Cruz-Garcia, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2.  Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3.  Allow Petitioner to respond to any procedural or affirmative defenses, and to any other argument that the Respondent may raise;

4.  Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the allegations raised by his Petition;

5.     Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28

       U.S.C. § 2254 Cases; and

6.     That this Court grant such other relief as law and justice require.


Respectfully submitted,

DATE: October 31, 2018                    JASON D. HAWKINS
                                          Federal Public Defender

                                          by

                                          **/s/ Jeremy Schepers**
                                          Jeremy Schepers (TX 24084578)
                                          Supervisor, Capital Habeas Unit

                                          **/s/ Nadia Wood**
                                          Nadia Wood (MN 0391334)
                                          Assistant Federal Defender

                                          Office of Federal Public Defender
                                          Northern District of Texas
                                          525 S. Griffin St., Ste. 629
                                          Dallas, TX 75202
                                          214-767-2746
                                          214-767-2886 (fax)
                                          Nadia_Wood@fd.org

                                          *Counsel for Petitioner*

## VERIFICATION BY ATTORNEY

I, the undersigned, am the attorney appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Obel Cruz-Garcia in these proceedings. I have met with Mr. Cruz-Garcia, consulted with other staff in the Federal Defender's Office regarding the case, and directed experts and investigators regarding the circumstances of Mr. Cruz-Garcia's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on October 31, 2018.

Subscribed by me October 31, 2018,
in Dallas, Texas.

N. Wood

Nadia Wood

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for a Writ of Habeas Corpus has been served by CM/ECF upon counsel for Respondent on October 31, 2018:

> Postconviction Litigation Division
> Office of the Attorney General
> P.O. Box 12548
> Capitol Station
> Austin, TX 78711

**_/s/ Nadia Wood_**
Nadia Wood (MN 0391334)
Assistant Federal Defender

## EXHIBITS LIST

Ex. 1: Opening Brief on Direct Appeal

Ex. 2: Direct Appeal Opinion

Ex. 3: Initial State Writ of Habeas Corpus

Ex. 4: Subsequent State Writ of Habeas Corpus

Ex. 5: State Habeas Opinion

Ex. 6: Affidavit of Steven Shellist

Ex. 7: Cornelius Billing Records

Ex. 8: Letter from Gradoni & Associates

Ex. 9: Trial Affidavit of Dr. Elizabeth Johnson

Ex. 10: Affidavit of Daniel Hellwig

Ex. 11: Amended DNA Report

Ex. 12: Santana Letter to court

Ex. 13: Santana Motion for Psychiatric Examination

Ex. 14: Santana Order for Competency Evaluation

Ex. 15: Eric Johnson Memo

Ex. 16: Second Theory Report

Ex. 17: $30,000 Ransom Call

Ex. 18: $10,000 Ransom Call

Ex. 19: Stephens Report

Ex. 20: Notepad

Ex. 21: Affidavit of Cesar Rios

Ex. 22: Affidavit of Jose Valdez

Ex. 23: Affidavit of Hector Saavedra

Ex. 24: Excerpts of Police Reports

Ex. 25: Probable Cause Findings and Warnings

Ex. 26: Affidavit of Sandra Babcock

Ex. 27: Dominican Republic Consulate Letter

Ex. 28: Texas Forensic Science Commission Letter

Ex. 29: Johnny Lopez Statement

Ex. 30: Declaration of Elizabeth Ramos

Ex. 31: Affidavit of Michael Casaretto

Ex. 32: Affidavit of Sharon Alexander

Ex. 33: Affidavit of Angela Bowman

Ex. 34: Second Magistrate Warning

Ex. 35: Subpoena to Juan DeJesus Rodriguez

Ex. 36: Subpoena for Cruz-Garcia file

Ex. 37: 1994.06.13 Angelita Rodriguez Statement to FBI

Ex. 38: Excerpts of Puerto Rico Jail Records

Ex. 39: Declaration of Dorcus Noelia De La Cruz Fana

Ex. 40: Affidavit of Lorenzo Villalba-Rolon

Ex. 41: Affidavit of Dr. Gina Perez

Ex. 42: Declaration of Jose de la Cruz

Ex. 43: Declaration of Menagen Valerio De la Cruz Santos

Ex. 44: Declaration of Valerio Julian De la Cruz Santos

Ex. 45: Declaration of Alejandro Lebron

Ex. 46: US DOJ CI Records