Document 18-1   Filed on 07/01/19 in TXSD   Page 1 of 129   AP 77,025
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/12/2014 5:27:44 PM
Accepted 9/15/2014 3:53:10 PM
ABEL ACOSTA
CLERK

AP - 77,025

IN THE TEXAS COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

OBEL CRUZ-GARCIA
Appellant

VS.

THE STATE OF TEXAS
Appellee

# APPELLANT'S  BRIEF

Appealed from the 337TH  District Court
Harris County, Texas

Trial Court Cause Number:

1384794

DEATH PENALTY APPEAL

WAYNE T. HILL
Texas Bar No: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77027
Tel: (713) 623-8312  Fax: (713) 626-0182
wthlaw@aol.com

Oral argument is not  requested

EXHIBIT 1 Page 001

## IDENTITY OF PARTIES AND COUNSEL

**Presiding Judge at Trial**
Honorable Renee Magee
337th Judicial District Court
1201 Franklin
Houston, Texas 77002

**Trial attorneys for State**
Natalie Tise
Justin Wood
Assistant District Attorneys
1201 Franklin
Houston, Texas 77002

**On Appeal:**
Alan Curry
Assistant District Attorney
1201 Franklin
Houston, Texas 77002

**Trial Attorneys for Appellant**
R.P. Cornelius
2028 Buffalo Terrace
Houston, Texas 77019

Mario Madrid
440 Louisiana, Suite 1225
Houston, Texas 77002

**On appeal:**
Wayne T. Hill
4615 Southwest Freeway, Suite 600
Houston, Texas 77027

**The Appellant**
Obel Cruz-Garcia

i

EXHIBIT 1 Page 002

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL                    i

TABLE OF CONTENTS                                  ii

ISSUES PRESENTED                                   iii

INDEX OF AUTHORITIES                               iv

SUMMARY OF ARGUMENTS                               v

STATEMENT OF THE CASE                              vi

RECORD CITATIONS                                   vi

STATEMENT REGARDING ORAL ARGUMENT                  vi

STATEMENT OF FACTS IN THE CASE                     1

POINT OF ERROR #1                                  61

POINT OF ERROR #2                                  70

POINT OF ERROR #3                                  76

POINT OF ERROR #4                                  89

POINT OF ERROR #5                                  93

POINT OF ERROR # 6                                 95

POINT OF ERROR # 7                                 98

POINT OF ERROR # 8                                 101

POINT OF ERROR # 9                                 103

POINT OF ERROR # 10                                105

POINT OF ERROR # 11                                106

POINT OF ERROR # 12                                107

PRAYER FOR RELIEF                                  117

CERTIFICATE OF WORD COUNT COMPLIANCE               118

CERTIFICATE OF SERVICE                             118

EXHIBIT 1 Page 003

## ISSUES PRESENTED FOR REVIEW

**POINT OF ERROR NUMBER ONE**
**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS THE STATE'S DNA EVIDENCE WHERE THE STATE FAILED TO ESTABLISH A PROPER CHAIN OF CUSTODY DUE TO THE INVOLVEMENT OF THE HOUSTON POLICE DEPARTMENT CRIME LAB WHICH WAS SHUT DOWN AND WIDELY CRITICIZED IN THE REPORT OF INDEPENDENT INVESTIGATOR MICHAEL R. BROMWICH COMMISSIONED TO REVIEW AND EVALUATE THE HOUSTON POLICE DEPARTMENT CRIME LABORATORY AND PROPERTY ROOM (CR-III-454)**

**POINT OF ERROR NUMBER TWO**
**THE TRIAL COURT ERRED IN DENYING APPELLANT THE RIGHT TO CONFRONT AND CROSS EXAMINE HIS ACCUSERS AND THUS THE OPPORTUNITY TO PRESENT A DEFENSE BASED IN PART ON EVIDENCE CRITICAL OF THE HOUSTON POLICE DEPARTMENT CRIME LAB AND PROPERTY ROOM DURING HIS MOTION TO SUPPRESS AND AT TRIAL (CR-III-454-456)(R-XXXI-DX2/3/4)R-XVI-21);(R-XXXII-DX5/6)(R-XVI-21);(R-XXXIII-DX6)(R-XVI-21);(R-XXXIV-DX7-19)(R-XVI-21)**

**POINT OF ERROR NUMBER THREE**
**THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN APPELLANT'S CONVICTION FOR THE OFFENSE OF CAPITAL MURDER (CR-I-2)(CR-III-484-507)(CR-III-530)**

**POINT OF ERROR NUMBER FOUR**
**THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO INTRODUCE EVIDENCE OF AN EXTRANEOUS OFFENSE [POSSESSION OF A CONTROLLED SUBSTANCE] BY PERMITTING THE STATE SHOW THAT APPELLANT FAILED TO APPEAR FOR A COURT SETTING ON OCTOBER 8, 1992 ON AN UNRELATED FELONY CHARGE AND THAT HIS BOND WAS FORFEITED ON THAT CHARGE ALL TO SHOW FLIGHT ON THE PART OF APPELLANT AT HIS CAPITAL MURDER TRIAL EVEN THOUGH THERE WAS NO CHARGE OF CAPITAL MURDER FILED AGAINST APPELLANT UNTIL 2008. (R-XIX-111,113,115,119,122-124,126,128,129,141,142)**

iii

EXHIBIT 1 Page 004

**POINT OF ERROR NUMBER FIVE**
THE TRAIL COURT ERRED WHEN OVER APPELLANT'S OBJECTION IT ADMITTED THE EXTRANEOUS OFFENSE EVIDENCE [SET FORTH IN THE PREVIOUS POINT OF ERROR] BECAUSE UNDER RULE 403 OF THE TEXAS RULES OF EVIDENCE ITS PROBATIVE VALUE, IF ANY, WAS OUTWEIGHED BY THE PREJUDICIAL EFFECT OF ITS ADMISSION DURING APPELLANT'S CAPITAL MURDER TRIAL.(R-XIX-111,113,115,119,122-124,125,126-128,129,141,142)

**POINT OF ERROR NUMBER SIX**
THE TRIAL COURT ERRED WHEN IT PROHIBITED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE INCLUDING BIBLE STUDY CERTIFICATES DURING THE PUNISHMENT PHASE OF THE TRIAL THUS PREVENTING APPELLANT FROM PRESENTING A COMPLETE DEFENSE (R-XXVI-55-58)(R-XXXIV-DX48-55)

**POINT OF ERROR NUMBER SEVEN**
THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE THAT HE WAS AN INFORMANT FOR THE FBI, DEA OR INS(R-XXIV-70-74)

**POINT OF ERROR NUMBER EIGHT**
THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT INJECTING FACTS OUTSIDE THE RECORD (R-XXIII-80)

**POINT OF ERROR NUMBER NINE**
THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT ASKING THE JURY TO CONVICT APPELLANT OF CAPITAL MURDER AS A PARTY BECAUSE THAT WAS WHAT THE STATE BELIEVED ACTUALLY HAPPENED - THAT APPELLANT DIRECTED AND ENCOURAGED. (R-XXIII-92)

**POINT OF ERROR NUMBER TEN**
THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT WHICH WAS OUTSIDE THE RECORD AND INJECTED HER PERSONAL BELIEF THAT IF IT HAD BEEN UP TO THE CO-DEFENDANT, ANGELO GARCIA WOULD STILL BE ALIVE (R-XXVI-163-165)

**POINT OF ERROR NUMBER ELEVEN**
THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR MISTRIAL BASED UPON THE IMPROPER JURY ARGUMENT OF THE PROSECUTOR WHEN SHE WENT OUTSIDE THE RECORD (R-XXVI-171,172)

EXHIBIT 1 Page 005

**POINT OF ERROR NUMBER TWELVE**

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR NEW TRIAL BASED UPON JURY MISCONDUCT DURING THE PUNISHMENT DELIBERATIONS WHERE THE JURY FOREMAN INFLUENCED THE DELIBERATION BY QUOTING FROM HIS BIBLE ABOUT THE CORRECTNESS OF THE DEATH PENALTY THUS CONSTITUTING AN IMPERMISSIBLE OUTSIDE INFLUENCE (CR-III-522,538)**

EXHIBIT 1 Page 006

# INDEX OF AUTHORITIES

## CONSTITUTIONS

| | |
|---|---|
| U.S. Constitution Fifth Amendment | 88 |
| U.S. Constitution Sixth Amendment | 70,74,76,97,100,115 |
| U.S. Constitution Fourteenth Amendment | 67,74,76,97,100 |

## STATUTES

| | |
|---|---|
| Texas Penal Code - Section 19.03 | 85 |
| Texas Code of Criminal Procedure - Article 37.071 | 95 |
| Texas Code of Criminal Procedure - Article 64.03 | 68 |
| Texas Rules of Evidence - 102 | 96 |
| Texas Rules of Evidence - 104(e) | 97 |
| Texas Rules of Evidence - 401 | 75 |
| Texas Rules of Evidence - 403 | 93 |
| Texas Rules of Evidence - 404(b) | 91 |
| Texas Rules of Evidence - 606(b) | 114,116 |
| Texas Rules of Evidence - 611(b) | 74 |
| Texas Rules of Evidence - 803(11) | 96 |
| Texas Rules of Evidence - 803(13) | 96 |
| Texas Rules of Evidence - 803(19) | 96 |
| Texas Rules of Evidence - 804(3) | 97 |
| Texas Rules of Evidence - 803(21) | 100 |
| Texas Rules of Appellate Procedure - 21.3© | 113 |
| Texas Rules of Appellate Procedure - 21.3(f) | 113 |
| Texas Rules of Appellate Procedure - 21.3(h) | 114 |
| Texas Rules if Appellate Procedure - 21.7 | 114 |
| Texas Rules of Appellate Procedure - 38.1 (f) & (I) | 65,70,100 |

## CASE LAW

| | |
|---|---|
| Borjan v. State | 107 |
| Brandley v. State | 91 |
| Brooks v. State | 86 |
| Brown v. State | 105 |
| Burks v. U.S. | 89 |
| Campbell v. State | 104 |
| Canady v. State | 102,104 |
| Cantrell v. State | 91 |

EXHIBIT 1 Page 007

| | |
|---|---|
| Casey v. State | 94 |
| Clewis v. State | 86 |
| Chambers v. Mississippi | 98 |
| Colyer v. State | 116 |
| Damron v. State | 92 |
| Douglas v. Alabama | 74 |
| Druery v. State | 69 |
| Garrison v. State | 102,104 |
| Garza v. State | 88 |
| Gollihar v. State | 85 |
| Greene v. Massey | 89 |
| Hicks v. State | 92 |
| Hightower v. State | 85 |
| Holmes v. South Carolina | 70,76,98 |
| Hudson v. United States | 88 |
| In re Winship | 85 |
| Jackson v. Virginia | 86 |
| Laster v. State | 87 |
| Lockett v. Ohio | 97 |
| Love v. State | 75 |
| Martin v. State | 100 |
| McCullen v. State | 85 |
| McQuarrie v. State | 115 |
| Montgomery v. State | 68 |
| Mozon v. State | 94 |
| Mullaney v. Wilbur | 85 |
| Naraviz v. State | 87 |
| Norris v. State | 68 |
| Oliver v. Quarterman | 116 |
| Parker v. Gladden | 117 |
| Portier v. State | 76 |
| Ramson v. State | 105 |
| Ray v. State | 76 |
| Reed v. State | 75 |
| Remmer v. State | 117 |
| Reyes v. State | 115 |
| Routier v. State | 68 |
| Skipper v. South Carolina | 97 |
| State v. Harrington | 117 |
| Stearn v. State | 104 |
| Stobaugh v. State | 89 |
| Turner v. Louisiana | 117 |
| Turner v. State | 100 |
| Williams v. State | 104 |
| Winn v. State | 88 |

EXHIBIT 1 Page 008

# SUMMARY OF ARGUMENT

**POINT OF ERROR #1**
The State did not establish a proper chain of custody regarding sixteen year old DNA evidence which involved the disgraced Houston Police Department Crime Lab and Property Room. The trial court prevented Appellant from questioning the State's witnesses regarding the collection, storage and transportation of this DNA evidence.

**POINT OF ERROR #2**
The trial court denied Appellant's right to confront and cross examine his accusers when it did not allow him to question the State's witnesses about problems in the HPD Crime Lab and Property Room and did not permit Appellant to introduce documentary evidence to establish his defense.

**POINT OF ERROR #3**
The evidence was insufficient to sustain the jury's guilty verdict where there was no evidence establishing the actual cause of death and the remaining evidence was seriously undermined and did not amount to proof beyond a reasonable doubt.

**POINT OF ERROR #4**
The admission of an extraneous offense (bond forfeiture) alleged to have occurred in 1992 was admitted as evidence of "flight" in Appellant's 2013 capital murder trial even though no charge was pending against Appellant for capital murder in 1992 and Appellant was not charged with capital murder until 2008.

**POINT OF ERROR #5**
The probative value, if any, of the admission of the extraneous offense noted in Point of Error #4 , was outweighed by its prejudicial effect on the jury.

**POINT OF ERROR #6**
The exclusion of Appellant's mitigating evidence showing his attendance at Bible Study classes prevented him from presenting a meaningful and complete defense.

**POINT OF ERROR #7**
The exclusion of Appellant's mitigating evidence confirming that he was an informer for the FBI, DEA or INS prevented him from presenting a meaningful and complete defense.

**POINT OF ERROR #8**
The State's argument injected facts outside the record.

**POINT OF ERROR #9**
The State's argument injected the prosecutor's personal opinion of Appellant's guilt.

EXHIBIT 1 Page 009

**POINT OF ERROR # 10**
The State's argument injected the prosecutor's personal belief of Appellant's culpability.

**POINT OF ERROR # 11**
The State's argument was outside the record.

**POINT OF ERROR # 12**
An improper outside influence requiring a new trial occurred when the jury foreman quoted Scripture from his Bible during punishment deliberations.

EXHIBIT 1 Page 010

## STATEMENT OF THE CASE

On September 5, 2008, Appellant was charged by complaint with the 1992 murder of Angelo Garcia, Jr. while in the course of and attempting to commit the kidnapping of Angelo Garcia, Jr. (CR-I-4)  On April 19, 2013, Appellant was indicted for capital murder in this case. (CR-I-2)  A jury  found Appellant guilty of capital murder as alleged in the indictment. (CR-III-506)  The jury returned answers to the Special Issues submitted at the punishment phase which resulted in the trial court sentencing Appellant to death. (CR-III-513-527,530) Appellant filed a Motion for New Trial alleging jury misconduct. (CR-III-538) After conducting a hearing (by affidavits), the trial court denied Appellant's Motion for New Trial. (CR-III-665)

## RECORD DESIGNATION

Record citations are designated:

Clerk's Record            (CR-vol-page)

Reporter's Record     (R-vol-page)

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested

EXHIBIT 1 Page 011

## STATEMENT OF FACTS IN THE CASE

## MOTION TO SUPPRESS

Prior to trial, the court asked for an explanation as to what exactly was being pursued in the suppression hearing regarding DNA.  The prosecutor noted that there was "Brady" material associated with the old crime lab investigation, including internal memos from the District Attorney's office and the Bromwich Report which was provided to Appellant.  When the trial court asked exactly what was sought to be suppressed, Appellant's counsel made an opening statement to outline the items for the court. (R-XVI-16)  1) Some of the people that handled the evidence in this case were severely criticized as a result of the HPD Crime Lab investigation.  2), Although the State had the evidence re-examined by an independent lab, Appellant's counsel noted that he had no confidence in the HPD Crime Lab. (R-XVI-17)  3), Specific evidence consisting of a pair of panties and a cigar from which a DNA profile were determined or handled by the HPD Crime Lab for latter cuttings or swabs were items produced by HPD Crime Lab or sent to Orchid Cellmark for analysis. (R-XVI-17) Appellant's counsel noted that because the HPD Crime Lab had been completely closed, the trial court should not have any confidence in any items transferred from that now closed lab to anywhere else for fear of contamination. (R-XVI-18)  Appellant argued that no evidence even handled by the HPD Crime Lab should be trusted for evaluation even by an independent crime lab and the Appellant sought to suppress it as a result. (R-XVI-18) This would include evidence testimony from Orchid Cellmark. (R-XVI-18)  Appellant offered Defendant's Exhibits 2 through 9, which included various reports regarding the Bromwich Report, and

1

EXHIBIT 1 Page 012

the HPD Crime Lab investigation.  These items were admitted in evidence at the pretrial hearing. (R-XVI-21)

The State responded that it followed the recommendations of the Bromwich Report in this case and sent all the evidence out to an independent lab so that they could start from scratch and do their own testing. (R-XVI-22)  The State's position with regard to the contamination issue was that it could not have happened because the old HPD crime lab didn't have a sample of Appellant's DNA at that time - because he was in Puerto Rico.

By agreement, the State made a proffer regarding the testimony of Gloria Kologinczok who performed the sexual assault examination in this case. (R-XVI-23, 24)  In 1992, this was one of the first sexual assault nurse examiners [SANE].  She performed an examination on Diana Garcia. (R-XVI-25)  The examination was performed on October 1, 1992, at St. Joseph's Hospital in Houston, Texas. (R-XVI-25)  The sexual assault evidence collection kit was turned over to Officer W. T. Bredemeyer of the Houston Police Department. (R-XVI-25)

The State then called Eric Mehl a retired Houston Police Department Homicide investigator. (R-XVI-26)  In 2004, Mehl was assigned to a cold case squad within the homicide division of the Houston Police Department. (R-XVI-28)  Mehl would look for cases that required DNA analysis to go any further. (R-XVI-29)  He became familiar with a case that involved the homicide of six year old boy named Angelo Garcia, Jr. (R-XVI-29)  The homicide of Angelo Garcia, Jr. also indicated that his mother had been sexually assaulted during the course of the events back in 1992. (R-XVI-29)  In September, 2007, Mehl set out to find the evidence that he wanted to ship to Orchid Cellmark for analysis. (R-XVI-30)  The

2

EXHIBIT 1 Page 013

evidence was a cigar that had been left at the scene of the crime, as well as the rape kit which was taken from Diana Garcia, which included cuttings from a pair of underpants. (R-XVI-30) The cigar had been stored at the HPD property room (not the crime laboratory). (R-XVI-30) The cigar was inside a plastic ziplock bag which was then inside a brown evidence envelope that had been sealed. (R-XVI-31) No damage to the evidence bag or its contents was noted. (R-XVI-31) The rape kit was located in the HPD annex building on the 24th Floor (also not stored in the crime laboratory room). (R-XVI-32) No damage to the rape kit or the bag it was stored in was noted. (R-XVI-33) The items were then packaged by Mehl and sent to Orchid Cellmark. (R-XVI-33) Evidence which was stored at the crime laboratory, included a cutting from the panties, biological samples from Arturo Rodriguez and Diana Garcia.   The individual bags which contained the evidence were not opened by Mehl. (R-XVI-35) Blood samples for potential DNA analysis belonging to Diana Garcia, Arturo Rodriguez and others were also preserved. (R-XVI-35)

Mehl said that from 1992 no contact had been made with Appellant, Obel Cruz Garcia, because he had fled the country. (R-XVI-36) As a result, there was no DNA sample from Appellant at any time in the 1990's after this crime had occurred. (R-XVI-36, 37) When Mehl shipped off the evidence to Orchid Cellmark on October 2, 2007, the State still did not have possession of a DNA sample from Appellant. (R-XVI-37) Subsequently, in 2008, it was learned that Appellant was in custody in Puerto Rico. (R-XVI-37) The FBI in Puerto Rico went to the prison where Appellant was being held and obtained a DNA sample from him on May 23, 2008. (R-XVI-38) By May 23, 2008, all the original evidence that might

3

EXHIBIT 1 Page 014

have contained biological material had already been shipped off to Orchid Cellmark for analysis. (R-XVI-38)  When Mehl obtained the DNA sample from Appellant, he did not open the package but rather repackaged the original FedEx package into another one and sent it to Orchid Cellmark. (R-XVI-39)  The results of the testing revealed that the cigar contained DNA matching Appellant.  A cutting from the panties contained a mixture and the major DNA profile obtained from the sperm fraction belonged to Appellant. (R-XVI-39)  Appellant also was not excluded as a contributor to the vaginal swab taken in the case. (R-XVI-39) Mehl acknowledged that in 1992, DNA testing was in its infancy. (R-XVI-40)  Mehl stated that at that time the type of DNA evidence that was being considered was blood and semen. He indicated that HPD was not necessarily looking for epithelial cells on items like cigars. (R-XVI-40, 41)  Mehl indicated that had he been the investigator in 1992, he would not have even thought to look for DNA on the cigar. (R-XVI-41)

**During cross-examination, Mehl acknowledged that items that had been extracted from Diana Garcia were stored by HPD Crime Lab.  This included the blood and cutting from the underpants.** (R-XVI-43, 44)  Mehl was unaware of where blood samples would have been taken from Diana Garcia, whether or not it was part of the rape kit. (R-XVI-44) **Mehl admitted that at some point the rape kit would have gone through the crime lab. (R-XVI-44)  Blood was extracted from Arturo Rodriguez for elimination purposes and that was also done at the HPD Crime Lab. (R-XVI-45)** In response to the court's question, Mehl said that he sent the entire rape kit, along with the things that the crime lab removed from the rape kit which was the crotch of the panties. (R-XVI-46)

4

EXHIBIT 1 Page 015

Matt Quartaro, a supervisor of forensics at Cellmark Forensics in Dallas, Texas, testified that he conducted part of the testing on Appellant's case when he received evidence on October 3, 2007. (R-XVI-49)  This witness did not observe anything irregular about the evidence. (R-XVI-50)  Cellmark performed its own DNA extraction from the samples submitted.  Essentially, they set aside extractions that had been taken by HPD. (R-XVI-51)  The lab took their own cuttings from the panties to do a DNA analysis. (R-XVI-52)  At the time the initial shipment was received, this laboratory had not received any of Appellant's DNA profile or any of his associates. (R-XVI-52)  The laboratory started from scratch with the items. (R-XVI-53)  The initial testing revealed that there was a third unknown individual who was a male whose DNA was found on the vaginal swab and the cigar. (R-XVI-55)  The witness indicated that the unknown profile from the cigar couldn't be excluded as a contributor to the vaginal swab. (R-XVI-55)  It was only a single source DNA on the cigar, meaning there was only one person's DNA present. (R-XVI-56)  Arturo Rodriguez was a contributor to the male DNA in the panties because he could not be excluded as a minor contributor.  The major contributor was the unknown male. (R-XVI-57)

On May 28, 2008, the laboratory obtained a full DNA profile from Appellant. (R-XVI-59)  The witness indicated that the profile of Appellant matched the profile from the sperm fraction of the panties and to the cigar. (R-XVI-59)  When asked about the possibility of contamination, the witness indicated without having the defendant's DNA to contaminate it with, he could not see a way that Appellant's DNA profile could have shown up on the evidence. (R-XVI-61)  While the witness indicated that the storage conditions, even the

5

EXHIBIT 1 Page 016

freshest ones, could have made it more difficult to obtain a DNA profile, he didn't see it compromising the evidence. (R-XVI-62) The witness agreed that you would have had sperm cells on the cigar or the cigar could have contaminated the panties. (R-XVI-63) The witness also indicated that the storage conditions would not change the DNA to some else's DNA, it would just break up the DNA to where they were not able to obtain results from it. (R-XVI-66)

During cross-examination, this witness acknowledged that the tested evidence had been in HPD's possession at one point. (R-XVI-67) **Quartaro noted that there was evidence of active testing by the HPD crime lab. (R-XVI-68)** This witness admitted that even though two people had touched the cigar, it's possible that only a DNA profile from one person would be obtained. (R-XVI-72) **The witness also acknowledged that he could not tell when a sperm cell was deposited, just whose DNA was there. (R-XVI-72, 73)**

The State and Appellant stipulated that Appellant gave his consent to provide blood, hair and saliva sample on February 16, 2010. A further stipulation was that the District Attorney's office obtained buccal swabs from Appellant on February 18, 2010. (R-XVI-78)

Courtney Head worked for the Houston Police Department Crime Lab. (R-XVI-79) Her employment with the crime lab was not related in any way to the HPD crime lab in 1992. (R-XVI-82) Head testified that there was a letter from the HPD crime lab in 1992 indicating that extractions from the evidence of the vaginal swab in the crotch panties were sent to Genetic Design Lab for analysis. (R-XVI-85) In the 1992 Genetic Design Lab letter there was no cigar or any extraction from that cigar in evidence. (R-XVI-85) This witness, who

6

EXHIBIT 1 Page 017

was familiar with Joseph Chew from the Houston Police Department Crime Lab, stated that she was unaware of any DNA analysis he performed on the evidence in this case. (R-XVI-85) At one point in 1992, Chew obtained a hair sample from Appellant. (R-XVI-86) Chew was also in receipt of some buccal swabs of Appellant from Michael Webb on February 18, 2010. (R-XVI-86) B. Sharma who previously worked with the Houston Police Department Crime Lab conducted some DNA analysis on some of the extractions from the rape kit in October, 1992. (R-XVI-87) Sharma's comments in her analysis indicated that the male fraction of DNA was too degraded to make or form any conclusions back in October, 1992. (R-XVI-87) The witness noted that with time and advancements the ability to analyze DNA improved and the techniques had improved as well. (R-XVI-89) In October, 2010, this witness became involved in the case prior to performing extractions on buccal swabs belonging to Appellant. (R-XVI-90) Based on her work alone, she was able to obtain a DNA profile for Appellant. (R-XVI-90) Head performed a DNA test on the cigar that had been recovered and compared it to the DNA profile of Appellant and found that he could not be excluded as a contributor to the DNA on that cigar. (R-XVI-91) The same results occurred when Appellant's DNA profile was compared against the evidence received which was the sperm fraction from the panties from Diana Garcia. (R-XVI-92)

**During cross-examination, the witness confirmed that the letter marked State's Exhibit No. 4 revealed that the evidence in the case, including a vaginal swab from Diana Garcia, the crotch from the panties of Diana Garcia, and blood from various individuals was handled by the Houston Police Department Crime Lab. (R-XVI-95)**

7

EXHIBIT 1 Page 018

The trial court ruled that the evidence was admissible. (R-XVI-111)  There was a discussion between the court and Appellant's counsel regarding what the theory of admissibility for disciplinary records and crime lab problems was. (R-XVI-115)  Appellant raised the issue of contamination. (R-XVI-117)

The trial court found that the DNA evidence that related to Orchid Cellmark testing was sufficiently reliable and relevant and was therefore admissible. (R-XVII-4)  The court admitted the DNA from the cigar found at the crime scene, one sexual assault kit taken from Diana Garcia by Gloria Kologinczok, and certain blood samples taken from Diana Garcia, Arturo Garcia, Candido Lebrom, Bienviendo Melo, Leonardo German, and Carmelo Martinez. (R-XVII-5)  **The court denied the Motion to Suppress. (R-XVII-5, 6)  The court also found that evidence that was extracted and examined by the old HPD Crime Lab would not be admitted. (R-XVII-7)  The court found that testing done by the old HPD Crime Lab on blood samples was not admissible, but testing performed by Orchid Cellmark Laboratory on those samples was admissible. (R-XVII-8)**  The trial court also found that none of the evidence stored was placed in a location where contamination mishandling or malfeasance by the HPD Crime Lab was shown. (R-XVII-12)  The court noted the Bromwich Report concerning the old HPD Crime Lab found that all of the specific recommendations made in the Bromwich Report were followed in this case. (R-XVII-13)  **The court held that the Bromwich Report would not be admitted because there was nothing specific about this case. (R-XVII-13, 14)  The court held the evidence was not admissible. (R-XVII-14)**  The court then went on to hold that impeachment of several of the

8

EXHIBIT 1 Page 019

State's would be witnesses Mr. Chew and Dr. Sharma would not be allowed because they were not even going to testify. (R-XVII-14, 15) **The trial court indicated it would allow wide cross examination concerning the evidence, but it would not allow the defense to go into the Bromwich Report or the closure of the HPD Crime Lab or the reasons for the closure of the lab or the impeachment of witnesses at the laboratory that do not testify. (R-XVII-17, 18)** Appellant's counsel then made a record of what he had tried to do to get certain things into evidence or have them suppressed. (R-XVIII-19) He went further to point out that the reasoning behind wanting to get evidence of the Bromwich Report and the old crime lab problems was because to show the jury the inherent unreliability of anything that the crime lab touched. (R-XVIII-21) Defendant's Exhibit No. 19, which was the entire original file from what was Genetic Design, which was the crime lab that had the original cuttings from the original rape kit. (R-XVIII-22) He also discussed the fact that there was a DNA profile developed in 1993 by Genetic Design, but an analysis was never compared to the buccal swab of the Appellant and he wanted to cross examine the State's witnesses or call his own witnesses to state that was a DNA profile that was never resolved in the case. (R-XVIII-22, 23) Appellant's Exhibits 10 through 19 were offered and admitted. **The trial court said that her ruling remained the same. (R-XVIII-23, 24)** Appellant made it clear to the record that his intent was to offer these items before the jury, but understanding the court's ruling he would not do that. (R-XVIII-24) .

9

EXHIBIT 1 Page 020

## THE GUILT / INNOCENCE PHASE OF THE TRIAL

Appellant pled "Not Guilty" to the charge of capital murder. (R-XVIII-17,18)

HPD officer James Devereaux was dispatched to 6705 Fairway just before midnight on September 30, 1992. (R-XVIII-48)  This officer met Diana Garcia and Arturo Rodriguez and learned that their son was missing. (R-XVIII-50)  The officer described Ms. Garcia as excited, hysterical and really nervous and scared. (R-XVIII-50)

During cross examination, the witness indicated that he put out a description on the air  that there were two black males, one wearing a mask, and the description of the vehicle as well.  No height, weight or age was broadcast. (R-XVIII-55)  He learned from others at the apartment complex that there may have been drugs being dealt at the apartment. (R-XVIII-56)  This information was turned over to homicide detectives. (R-XVIII-56)  He indicated that the police believed that the Complainants knew who their attackers were and that it was possibly drug related. (R-XVIII-57)

Sergeant C. E. Elliott with the Houston Police Department Homicide Division made the scene involving a 7-year old boy who had been kidnaped. (R-XVIII-63)  One picture from the scene depicted that a door had been kicked in. (R-XVIII-69)  Elliot explained that the bedroom was in complete disarray and that it had been ransacked as if someone were looking for something or searching for stuff. (R-XVIII-71)  Elliott described a clock radio wire (SX#22) which had been used to tie someone up in the house. (R-XVIII-74)  There was a pillow (SX#25) that had blood on it. (R-XVIII-75)  The officer described Arturo Rodriguez as having been pistol whipped. (R-XVIII-75)  A handgun (SX#26) that was found unfired

10

EXHIBIT 1 Page 021

in the bedside table. (R-XVIII-76)  The detective observed a cigar in the living room area of the apartment.  He thought this was significant because neither of the adults in the apartment were smokers. (R-XVIII-79)  Elliott testified that even though HPD looked for fingerprints, none were found on the immobile surfaces in the home. (R-XVIII-82)  The police put out a broadcast with the description of the child. (R-XVIII-84)  The FBI became involved in the case. (R-XVIII-84) opined that the individuals responsible for taking Angelo, did so to bring pressure on the mother and father (believing that it was a drug related situation). (R-XVIII-87)  Initially, both parents denied drug involvement.  Diana Garcia was transported to St. Joseph's Hospital for a sexual assault kit and then transferred to the homicide division. (R-XVIII-89)  On November 5, 1992, Elliot was notified that Angelo Garcia's body was found in Baytown by a crabber.  The body was found in a mud flat, in a desolate marsh area of Baytown. (R-XVIII-91)  The identity of Angelo Garcia was later confirmed by dental records. (R-XVIII-92)  The officer indicated that Obel Cruz Garcia or "Chico" was developed pretty quickly as a primary suspect. (R-XVIII-94)

During cross-examination, Elliott acknowledged that he had concerns about the two Complainants being truthful with him. (R-XVIII-98)  Elliott admitted that the description put out by patrol officers was that they were looking for two black males. (R-XVIII-99, 100)  The two Complainants, who were both Hispanic, identified the individuals as black as opposed to Hispanic or black Hispanic. (R-XVIII-101)  Elliott attempted to explain away the fact that these two individuals described the two assailants as black, by claiming that it was cultural and that people who are Hispanic people from Mexico may not be able to describe

11

EXHIBIT 1 Page 022

a black from Columbia who is Hispanic. (R-XVIII-101)  Elliott became defensive when Appellant's counsel began questioning why he could not be more specific in his report, while maintaining that he thought that they meant black Hispanics. (R-XVIII-102, 103)  After asking several times, Elliott finally admitted that he never wrote in his report that the assailants were black Hispanics. (R-XVIII-105)  Elliott also stated that the female complainant stated the suspect used English but spoke with a unknown foreign accent. (R-XVIII-106)  Although he was trying to suggest that the suspects were Spanish speaking, he acknowledged that he interviewed Garcia in English and she described a foreign accent. (R-XVIII-108)  Elliott never took information concerning the color of the masks that were worn by the assailants. (R-XVIII-108, 109)  Elliott again acknowledged  that he knew the Complainants were not being truthful with him. (R-XVIII-109)  Elliott also found that the scene suggested it was a drug related offense. (R-XVIII-110, 111)  Elliott described a chrome plated .25 automatic pistol that was found in a bedside drawer. (R-XVIII-112)

On redirect examination, Elliott stated that he was just trying to get something basic out to the patrol units. (R-XVIII-113)  Elliott explained cultural identification and stated that on the evening when he left he was looking for a Caribbean islander, black Hispanic, or Columbian of that nature Hispanic black. (R-XVIII-117)  Elliott stated that he believed that the Complainant (Diana Garcia) did not get a good look at both individuals. (R-XVIII-118)  She had seen one of the individuals in a mask, but did not see the other one. (R-XVIII-118)

Diana Garcia testified that her first husband was Angelo Garcia, Sr. (R-XVIII-123)  She testified that she had an affair Jose Arturo Rodriguez. (R-XVIII-124, 125)  She

12

EXHIBIT 1 Page 023

eventually moved in with him, along with her son, Angelo, Jr. (R-XVIII-125) Garcia knew that Rodriguez was involved in cocaine. (R-XVIII-126)  A while after she moved in with Rodriguez, she learned that he was drug dealing. (R-XVIII-128)   Garcia also became involved in the drug dealing by helping Rodriguez. (R-XVIII-128) She identified "Chico" as the person who sold them drugs. (R-XVIII-129)  She stated that they sold drugs out of their first residence on Winfrey, as well as the second one where Angelo was abducted. (R-XVIII-130) The Winfrey location had been broken into because individuals thought they had lots of money because they were selling drugs. (R-XVIII-131)  She did not make a police report because she realized she was drug dealing at the time. (R-XVIII-131)  She described a vehicle parked for about two weeks by her second residence on Fairway thinking that it was staking out the place. (R-XVIII-132, 133)  There were times when Chico brought drugs over to them at their Fairway location, but they did not want to sell anymore. (R-XVIII-134) When Arturo called Chico and told him to come back and get the drugs, she was not sure what happened.  She stated that it was two or three weeks later that her son Angelo was kidnaped. (R-XVIII-134)  Garcia described Chico bringing his wife Angelita over to the house and playing with little Angelo. (R-XVIII-134, 135)  Garcia even helped them get an apartment because Chico had a problem with his credit. (R-XVIII-136)  She went so far as to sign the lease on their apartment for them. (R-XVIII-136)  There were times when Chico would come over to her apartment along with a friend (Rudy) who was related to Angelita. (R-XVIII-138)  Rudy worked for Chico and did what he was told. (R-XVIII-138)  She identified State's Exhibit No. 83 as being Chico, State's Exhibit No. 86 was Angelita, State's

13

EXHIBIT 1 Page 024

Exhibit No. 85 was Rudy, State's Exhibit No. 87 was a picture of a witness and State's Exhibit No. 88 was a picture of Arturo. All the pictures were of the individuals at that time. (R-XVIII-142) Garcia described that they were able to get by with their drug dealing money and that neither one of them had to work. She indicated that Arturo was able to buy a vehicle. (R-XVIII-143) Once they stopped selling drugs, they had difficulty making the payments on the vehicle. (R-XVIII-144) She was involved in dealing to people on a regular basis and had a group of people that were fairly regular and known to her. (R-XVIII-144) On September 30, 1992, Arturo and his brother were outside and Chico came by for a visit. (R-XVIII-145) Angelo was six years old at the time and in first grade. (R-XVIII-145) On the evening of September 30, 1992, Angelo wanted to sleep in his parents' room. (R-XVIII-146) Angelo went to bed wearing a t-shirt and Batman shorts. (R-XVIII-147) Angelo slept on a little pallet on the floor next to this witness's bed. (R-XVIII-148) While asleep, Garcia heard a bang and woke up. Rodriguez got up and walked towards the living room and then was backing up into the bedroom. (R-XVIII-149) He was walking backwards because there was a gun pointed at him. (R-XVIII-150) The man holding the gun was described as a big man with big shoulders.(R-XVIII-150) The man was wearing a long sleeve shirt, but Garcia could still see his skin. He was also wearing a ski mask. (R-XVIII-151) The man spoke but she was unable to understand what he was saying. (R-XVIII-152) She described the man as dark and black. (R-XVIII-152) She said the man didn't speak Spanish or English. (R-XVIII-152) The man started beating Arturo and told her to turn over face down. (R-XVIII-152) Garcia was tied up but she did not know who did that. (R-XVIII-153) After she was face

14

EXHIBIT 1 Page 025

down, she noticed another man come into the room. (R-XVIII-153) She heard her son saying "Mommy," calling out for her. (R-XVIII-155) She saw the second man in the doorway with a gun, but she was unable to identify that person. (R-XVIII-156) The second man, who was touching her, put a blanket or pillow over her face and raped her. (R-XVIII-157) She described her rape taking place in front baby Angelo while the tall man kept beating Arturo. (R-XVIII-158) Garcia described Arturo as unconscious with a pillowcase stuffed in his mouth. His head was covered with a pillow. (R-XVIII-159) His hands had been tied with an alarm clock wire. (R-XVIII-159) Before leaving, the men took several items, including Arturo's wallet, a bracelet, and some cash. (R-XVIII-160) She thought that the individuals looked around the apartment for 10 or 15 minutes looking for something. (R-XVIII-161) The second man who had come into the room never said anything. Garcia never got a look at him and she never saw his face because she was face down. (R-XVIII-162) As soon as she untied Arturo, Garcia looked down and saw that baby Angelo was not there. (R-XVIII-163) As they walked out of the bedroom, one of the other men (the tall one) was coming back into the apartment. They walked back towards the bedroom and the man left. (R-XVIII-164) This witness was taken to the hospital where a rape kit was prepared. She indicated that the man had ejaculated in her. (R-XVIII-165) After she had been raped, she placed her underwear back. (R-XVIII-165) Garcia acknowledged that when police asked her about drug dealing, she lied to them because she was afraid. (R-XVIII-166) She did state that she told the truth about everything else. (R-XVIII-166) Garcia went to the police station and eventually told them that Chico was her drug supplier. (R-XVIII-167) Her phone calls were being tapped

15

EXHIBIT 1 Page 026

by police and at one point Angelita Rodriguez, Chico's wife called her. (R-XVIII-167) Angelita called trying to help her. (R-XVIII-167) When Angelita came to help, Garcia noticed that Chico was not with her. (R-XVIII-167, 168) In November 1992, Garcia was told that the police had found Angelo's body. (R-XVIII-168) Garcia identified the clothing (SX#61) worn by Angelo on September 30, 1992. (R-XVIII-169) The witness identified the individuals in color as dark black. (R-XVIII-172) Garcia identified Appellant in Court as Obel Cruz Garcia ("Chico"). (R-XVIII-172) She described his skin color as dark black. (R-XVIII-172

During cross-examination, Garcia acknowledged that for a year and half to two years they sold cocaine and that was how they made a living. (R-XVIII-176) During that entire time, they received their cocaine from Chico. (R-XVIII-177) She stated that Chico would come to her apartment one or two times per week. (R-XVIII-179) She knew of no reason why Chico would be mad at her or Arturo. (R-XVIII-179) She stated that she met Chico through Arturo. (R-XVIII-180) Garcia described herself as brown and the tall person who came into the room as darker so they're black. (R-XVIII-182) She indicated that she never saw the second man who entered the bedroom so she could not say whether he was black, brown or white. (R-XVIII-182) She couldn't understand Spanish or English from him. (R-XVIII-184) She did not recall giving the police any description of the second man who had come into the room. (R-XVIII-184) Garcia indicated that Chico had been over to her apartment earlier that day. (R-XVIII-184) She indicated that Arturo and her were not selling drugs at that time, so Chico would not have left drugs with him. (R-XVIII-185) She did tell

16

EXHIBIT 1 Page 027

the police that there was a $4,000 piece of jewelry (Arturo's bracelet) which was taken that day. (R-XVIII-185, 186) Garcia's purse, which was on top of a table, was not touched at all. (R-XVIII-186) Garcia acknowledged that the police questioned her for several days, but she stated that on the second day she told the police about the drug dealing even though she had denied it the first night. (R-XVIII-188) Garcia admitted the .25 automatic pistol was hers. (R-XVIII-191) Garcia told the jury that it had been a few months between the first burglary at her old location (Winfrey) and the one on Fairway on September 30, 1992. (R-XVIII-192) She stated that drugs and money had been taken during the first burglary. (R-XVIII-192)

Jose Arturo Rodriguez testified that he and Diana Garcia had been together for 26 or 27 years. (R-XVIII-195) Rodriguez stated that after coming to Houston from Mexico and California, he became involved in drugs. (R-XVIII-197) He and Garcia started selling cocaine just to live a better life. (R-XVIII-198) Rodriguez identified Appellant in Court as "Chico." (R-XVIII-199) Rodriguez identified a picture of him and Appellant (SX#83). (R-XVIII-200) Rodriguez described his relationship with Appellant as friendly and a business relationship. (R-XVIII-201) Rodriguez was unable to remember that he and Diana Garcia helped Chico with an apartment or that he remembered where Chico and his wife Angelita lived. (R-XVIII-202) He stated that he sold drugs for about three years. (R-XVIII-202) Rodriguez became concerned at one point ibn 1992 because a car was parked down the street from his residence. This scared Rodriguez and he told Appellant about it and of his intention to stop selling drugs. (R-XVIII-204) Rodriguez said that he never had any problems with Appellant. He denied that Appellant ever left drugs at his house after he stopped selling

17

EXHIBIT 1 Page 028

drugs. (R-XVIII-204)   Rodriguez stated that when he was sleeping on the night of September 30, 1992, he heard a noise that sounded like a kick. (R-XVIII-207)  When he went to check on the noise, he was confronted by someone wearing a mask and pointing a gun at him. (R-XVIII-208)  Rodriguez was unable to see the face of that individual. (R-XVIII-209) He described the individual as tall and like a colored person. (R-XVIII-209)  The man was telling him to go back, go back.  The individual was speaking in English, but Rodriguez did not understand what he was telling him. (R-XVIII-210)  He was unsure whether the person was actually saying it in English or Spanish, but he said he understood that he needed to go. (R-XVIII-211)  Rodriguez described the man as having an accent, but not like his. (R-XVIII-211)  Rodriguez was taken into the bedroom where his wife was being raped.  Rodriguez was beaten with a gun. (R-XVIII-212)   Rodriguez stated that he did not see the face of the individual that was raping his wife because he was also wearing a mask. (R-XVIII-214) Rodriguez stated that little Angelo didn't even know what was going on. (R-XVIII-215) Rodriguez stated that the person that was raping his wife never said anything. (R-XVIII-215) Rodriguez stated that it ended when he felt baby Angelo being taken by the arm.  He actually said that he did not see it, it felt like it and he heard it. (R-XVIII-215)  Rodriguez stated that on the night that Angelo was abducted, he never saw Chico again until his appearance in court. (R-XVIII-219)  Rodriguez indicated that neither he, nor Diana Garcia, smoked cigars. He was aware that police found a cigar in his house on the night of September 30, 1992. (R-XIX-4)

     During cross-examination, Rodriguez indicated that he had only been selling drugs

EXHIBIT 1 Page 029

for about two years. He denied saying three years the day before during this testimony. (R-XIX-6) Rodriguez then stated that he had sold drugs for about four years and that he had sold drugs for other people as well. (R-XIX-6) Rodriguez indicated that he could not recall whether the police questioned him and asked whether this incident involved drugs. He stated that he was only making about $560 a week selling cocaine. He then stated that the .25 automatic pistol that was in the apartment may have belonged to the person that threatened him. When asked if it was Diana Garcia's gun, he indicated it was not and that he was sure about that. (R-XIX-9) Rodriguez denied having seen Appellant earlier in the day when Angelo was abducted. (R-XIX-11) When asked whether he had an argument at a store involving a tall black man and a Hispanic man on the day Angelo was taken, Rodriguez stated that he did not remember. (R-XIX-12) Rodriguez acknowledged that some people were Hispanic, others were black, and some were white, and that he knew the differences. (R-XIX-12) Rodriguez admitted that when he spoke to officer Hernandez, he stated that the man behind the mask was not a Mexican nor a white man because the way the man spoke, he spoke like a black man. (R-XIX-13) Rodriguez acknowledged that he concentrated on the one black man that was threatening him. (R-XIX-14) He stated that he did see the person that was raping his wife, but he did not know who it was. (R-XIX-15) Rodriguez said that after the police interrogated him, and he told them what he did, then he and the police thought it would be Appellant that was responsible. (R-XIX-15, 16) When questioned about the color of the mask worn by the man, Rodriguez stated that it was either blue or black. When cross-examined about whether he told police that it was brown or black, he stated that

19

EXHIBIT 1 Page 030

he did not recall saying that. (R-XIX-17) (R-XIX-18) Rodriguez identified the only picture showing blood on a pillow (SX#25). He also stated that he did not require stitches or bandages or treatment of any kind for the injuries claimed. (R-XIX-19) Rodriguez denied telling the police that he was not involved in drugs. He said he always told them what he did. (R-XIX-21) Rodriguez said that he went back to the police over a three to four week period, every day. (R-XIX-22) Again Rodriguez said in front of the jury that he never denied being a drug dealer when he talked to the police. (R-XIX-24)   Rodriguez was then asked specifically about the conversation he had with officer Hernandez and again denied that he ever told Hernandez that he was not involved in drugs. (R-XIX-24) Rodriguez denied telling Hernandez that he didn't know why anyone would enter his apartment and beat them up. (R-XIX-24) Rodriguez stated the first time his home was burglarized on Winfrey, he was unable to remember if drugs or money were taken. (R-XIX-29) Rodriguez also acknowledged that on direct examination the day before in court, he said he had been hit two or three times in the head and never lost consciousness. (R-XIX-33)

Gloria Kologinczok, a registered nurse, became a sexual assault nurse examiner (SANE) 1985. (R-XIX-38) This witness described how a SANE examination takes place. (R-XIX-38 - 42) This witness stated that in October, 1992, she performed a sexual assault examination on Diana Garcia while working at St. Joseph's Hospital. (R-XIX-42, 43) Some of the items in the sexual assault kit (SX#33) contained panties, vaginal swabs and smears, and a known saliva sample, and a blood sample. (R-XIX-46, 47) During her examination with Garcia, this witness did not note any physical injury to Diana Garcia or any physical

EXHIBIT 1 Page 031

trauma either. (R-XIX-48)  She stated that it was not unusual to have an examination that did

not show physical trauma or physical injury. (R-XIX-49)  This witness completed the rape

kit and submitted it at 4:25 a.m. on the morning of October 1, 1992. (R-XIX-49)

During cross-examination, this witness indicated that she was only testifying from her

notes and not her independent recollection.  She acknowledged that it was not her job to be

the judge or the jury in determining whether someone was sexually assaulted or not, it was

only her job to collect the information. (R-XIX-50)

Deputy W. T. Bredemeyer, with the Precinct 4 Constable's Office, testified that on

September 30, 1992, he responded to a call at 6705 Fairway in Houston, Texas. (R-XIX-55)

He met with Diana Garcia who was pretty upset, crying and had a hard time communicating.

(R-XIX-57)  He also observed Arturo Rodriguez who had been assaulted. (R-XIX-57)  The

only thing Bredemeyer could remember was that the door had been broken in. (R-XIX-58)

He transported Ms. Garcia to St. Joseph's Hospital for a sexual assault kit and took

possession of it after it was completed. (R-XIX-58)  He identified State's Exhibit No. 33 as

that sexual assault kit. (R-XIX-59)  He received the kit from the nurse Gloria Kologinczok.

(R-XIX-59)  He took the kit to the homicide division and then to the HPD property room for

storage. (R-XIX-59)

HPD Officer, U. P. Hernandez, was assigned to the homicide division in September,

1992. (R-XIX-64)  Hernandez interviewed two of the Complainants in a kidnaping incident.

(R-XIX-65)  He took statements from each of these individuals on October 1, 1992. (R-XIX-

66)  He interviewed Arturo Rodriguez and Diana Garcia. (R-XIX-67)  Rodriguez's statement

21

EXHIBIT 1 Page 032

was taken at 4:26 a.m. Rodriguez did not speak English. (R-XIX-67) Ms. Garcia's statement was taken at 6:28 a.m. and she did speak English. (R-XIX-67) Hernandez was the first Spanish speaking officer to be able to speak with Rodriguez. (R-XIX-68) Hernandez described both witnesses as having been through a very traumatic event. (R-XIX-69) Rodriguez told Hernandez that one of the men in the room was a black man. (R-XIX-69) Hernandez stated that black Columbians and black Dominicans (or individuals from those countries) have a different accent that people who speak Spanish from Mexico. (R-XIX-70) He stated that he believed that both witnesses' statements were consistent with each other. (R-XIX-71) When Hernandez questioned Arturo Rodriguez about being a drug dealer, Rodriguez denied it several times. (R-XIX-72,73) When Hernandez spoke with Diana Garcia, she did admit to the drug dealing after first denying it. (R-XIX-73) Garcia said she would quit lying and tell him the truth. (R-XIX-74) She identified Chico and Angelita as her supplier. (R-XIX-74) Hernandez was able to determine that "Chico" was Obel Cruz Garcia. (R-XIX-74) Hernandez explained that Garcia and Rodriguez were really deep into drug dealing, otherwise the assaults would not have occurred the way they did. (R-XIX-75, 76) He stated that from his experience he knew that right from the beginning. (R-XIX-76) When Rodriguez described the mask being worn by the man, he said it was either brown or black, but the lighting was not so good. (R-XIX-77) During his investigation, Hernandez received a tip about the Rendon Auto Shop. (R-XIX-84) By October 5, 1992, officers had not been able to find Obel Cruz Garcia. (R-XIX-85) On November 5, 1992, Hernandez spoke with the owner Rogelio Rendon. (R-XIX-85) Hernandez saw Mr. Rendon drive up to his shop

22

EXHIBIT 1 Page 033

accompanied by Candido LeBron. (R-XIX-86) Hernandez indicated that Angelita Rodriguez was the wife of Obel Cruz Garcia. (R-XIX-89)

During cross-examination, Appellant's counsel questioned Hernandez about how he related the description of the individuals involved. (R-XIX-95, 96) In his report, Hernandez noted that the individual that they were looking for was not a Mexican nor was he a white man and that the individual identified as he spoke like a black man. (R-XIX-97) (R-XIX-98) Even as Ms. Garcia spoke to this witness about her son being abducted, she did not immediately tell the truth about the drug business. (R-XIX-99) He indicated that finding the child was the number one priority. (R-XIX-100) Hernandez also acknowledged that Arturo Rodriguez volunteered to him that he had no idea why anybody would break into the house and assault him and assault his wife. (R-XIX-101) Appellant's counsel was prohibited from questioning the witness about whether it would be just an oversight on the part of Rodriguez or that he was lying. (R-XIX-101, 102) He also noted that at page 2.023 of his offense report, Diana Garcia had described the mask being worn by the tall black man as a red and white. (R-XIX-104)

Eric Johnson testified that in 1992 he was assigned to the Violent Crime Squad in the Houston division of the FBI. (R-XIX-134) He was assigned to the abduction or kidnaping investigation of Angelo Garcia, Jr. (R-XIX-135) He spoke to individuals involved in the investigation, including Diana Garcia and Arturo Rodriguez. (R-XIX-137) He stated that the number one priority was to locate the child. (R-XIX-138) He stated that Appellant was developed as a suspect early on in the case. (R-XIX-138, 139) The agent testified that

23

EXHIBIT 1 Page 034

initially they used surveillance and interviews were conducted in an effort to find Appellant, but they were unsuccessful. (R-XIX-139)  The investigation led to Angelita Rodriguez, Appellant's wife. (R-XIX-140)  He stated that he knew that Appellant was to appear in a court on October 8, 1992, but he did not appear. (R-XIX-140)  He noted that the court date was one week after Angelo Garcia, Jr. went missing. (R-XIX-142)  The agent stated that at some point his investigation shifted from Houston to Puerto Rico. (R-XIX-144)

Linda Hernandez testified that in 1992 she was having a relationship with an individual she knew as Charles whose real name was Bienviendo Melo (R-XIX-148)  She identified a picture of Charlie (SX#89). (R-XIX-150)  Hernandez stated the last time that she had contact with Charlie was some 11 years ago. (R-XIX-151, 152)  She stated that Charlie was involved in drug dealing with "Chico "who was Obel Cruz Garcia. (R-XIX-152)  From observing the two individuals, Hernandez said that Appellant was the one in charge. (R-XIX-153)  She identified the person that she knew to be Rudy who was also dealing drugs with Appellant.  Rudy's actual name was noted as Carmelo Martinez Santana. (R-XIX-154)  The witness indicated that both Charles and Rudy did whatever Appellant told them to do. (R-XIX-155)  She described Rudy's complexion as dark and they would often mistake him as being black. (R-XIX-155)  She said that in places like Puerto Rico, the Dominican Republic or Columbia individuals refer to people as black because they have dark skin. (R-XIX-156)  She recounted how in the early  morning hours of October 1, 1992, the police came and talked with her and Charlie. (R-XIX-156)  Hernandez stated that the police believed that they had information regarding the case, but they actually didn't. (R-XIX-157)  She stated that she

24

EXHIBIT 1 Page 035

was home asleep when this incident took place. (R-XIX-157)  She stated that they slept until she received a telephone call from Appellant. (R-XIX-159)  Appellant was asking for a ride, but Hernandez told Charlie not to do it and he did not. (R-XIX-159)  Hernandez said that Appellant had mentioned that he was in Baytown when he needed the ride. (R-XIX-159) Rudy was with Appellant when Hernandez received the call at about 2:00 a.m. (R-XIX-160) Appellant indicated that he still needed the use of a vehicle and Hernandez said that "We told them they could use it, they just had to come over." (R-XIX-160)  She stated that Appellant and Rudy arrived at her house in a taxi somewhere between 2:30 a.m. and 3:00 a.m. (R-XIX-162)  She stated that they came and got the car and only stayed a brief period of time. Rudy was acting real nervous. (R-XIX-163)  She stated that Appellant did not seem nervous. (R-XIX-163)  She described Appellant's look as a scary one. (R-XIX-163)  Appellant borrowed a gold car in the early morning hours of October 1, 1992.  It was brought back a few days later by Rudy. (R-XIX-168)  The witness indicated that when the car was brought back, it was very dirty.  She noticed it because Charlie was real clean and always kept it clean. (R-XIX-169)  She stated that after October 1, 1992, she did not Appellant again.  Hernandez had a conversation with Angelita (R-XIX-170)  Angelita ended up staying at a hotel not at this witness's house. (R-XIX-171)  The witness indicated that she thought it was strange that Angelita would not stay in her own home after October 1, 1992. (R-XIX-171)  This witness then identified Appellant in the courtroom. (R-XIX-172)

During cross-examination, she described Rudy as having a light complexion.  She also said that her mom didn't really trust Rudy. (R-XIX-173)  It bothered this witness that Rudy

EXHIBIT 1 Page 036

always wanted to take her son to the store with him, She never allowed this. (R-XIX-173)

John Swaim, a retired Houston Police Department officer, testified that he was involved in the Angelo Garcia, Jr. case in 1992. (R-XIX-177)  On October 5, 1992, Swaim went to a location in Humble attempting to investigate a possible drug supplier and to find Chico. (R-XIX-180) His investigation revealed that Chico and another Hispanic male moved out over the weekend which would have been October 3rd or 4th. (R-XIX-181)  When the officer learned that Chico may have been back at the apartment on October 6th, he went there and the door was answered by Candido LeBron. (R-XIX-185)  The officer was suspicious of LeBron because he spoke with a Spanish accent which people from the Virgin Islands don't use. (R-XIX-185)  Swaim identified a photograph of LeBron. (R-XIX-185)  Later in the investigation, this individual was actually identified as Rogelio Aviles. (R-XIX-187)

Randy Rhodes, with the Baytown Police Department, testified that on November 4, 1992, at about 5:00 p.m., he responded to the scene of a body in a waterway. (R-XIX-192) Evidence from the scene included a pair of shorts with a Batman logo on it and a t-shirt. (R-XIX-203)

Dr. Dwayne Wolf, the Deputy Chief Medical Examiner for Harris County, Texas, testified that he was familiar with Dr. Vladimir Parungao who was employed by the Harris County Institute of Forensics Sciences in 1992. (R-XX-6)  Dr. Wolf testified that the cause of death is the injury or disease that initiates the sequence of events that culminates in death. (R-XX-7)  He stated that manner of death is listed as either natural, accidental, suicidal, or homicide and a fifth category of undetermined. (R-XX-8)  He stated that in some cases the

EXHIBIT 1 Page 037

cause of death is going to be undetermined, but that a manner of death could still be determined by looking at the investigation and all the circumstances surrounding what happened to the individual. (R-XX-9)  Dr. Wolf reviewed the 1992 autopsy of Angelo Garcia, Jr done by Dr. Parungao and did not find any injuries on the bones, such as cut marks, bullet holes. (R-XX-11)  After reviewing everything, Dr. Wolf concluded that his opinion was that the manner of death was a homicide. (R-XX-12)  He testified that the remains found of the decedent were consistent with the body being submerged in water for up to five weeks. (R-XX-12)  Dr. Wolf was asked what would happen if there had been blood on an item of clothing that was submerged in water for several weeks.  Dr. Wolf indicated that blood washes away. (R-XX-15)

During cross-examination, Dr. Wolf was asked about bones that were found at the scene and that 18 of the 24 rib bones were located. (R-XX-17)  After having Dr. Wolf show the various location of the different bones that were recovered, Appellant's counsel asked Dr. Wolf if he agreed that he couldn't conclude that the person was stabbed or shot or beaten to death.  Dr. Wolf agreed. (R-XX-20)  He also stated he had no prior medical records so he did not know what type of health the child was in prior to death.  He also indicated that he could not tell whether the person had drowned. (R-XX-20)  He stated he could not tell whether this individual drowned or not based on the examination of the remains. (R-XX-20) When asked a hypothetical question whether the child could have been out fishing, could someone have accidently fell out of a boat and drowned, the doctor indicated that was possible. (R-XX-21)

EXHIBIT 1 Page 038

On redirect examination, Dr. Wolf, in response to the Prosecutor's questions, indicated that his evaluation of this case was predicated upon the investigator's report and the fact that the child had been taken from his home and he didn't simply wander away. (R-XX-24)

During re-cross examination, Dr. Wolf acknowledged that all of the information he had received regarding the abduction of the child and it being done in a violent manner is all based on what somebody else had told him and was not based upon any medical evaluation that he performed. (R-XX-31)

Eric Mehl, a former officer with the Houston Police Department, testified that in 1993 he was reassigned to the homicide division. (R-XX-35)  In 2004, HPD started a cold case squad within the homicide division. (R-XX-35)  Mehl looked for cases that would have possible DNA that could be tested. (R-XX-37)  Mehl testified that when he saw that Diana Garcia was listed as a victim along with her son, he thought that there might be DNA that could be tested. (R-XX-38)  He evaluated what articles of evidence he needed to send off to a private lab for testing. (R-XX-39)  When asked if back in 1992 DNA was in its infancy, as far as using it for law enforcement purposes, Mehl responded "It was."  He had never even thought of using DNA technology to solve a crime over at HPD at that time. (R-XX-40)  When asked if in 1992 he would have collected a cigar from the scene because of DNA, he responded he would have collected the cigar, but not for DNA purposes. (R-XX-41)  He stated that DNA was not what was being thought about, but rather blood and semen. (R-XX-42)  Mehl stated that he did not have a DNA sample from Appellant because he was not

EXHIBIT 1 Page 039

available to give one. (R-XX-42) Mehl said that he opened the case in September, 2007 and that he wanted to obtain a CODIS for the DNA profile that he could have entered into the CODIS System which is the Combined DNA Index System. (R-XX-43) He stated that he went to the HPD property room and recovered the cigar which was packed in a plastic bag within a large manila type envelope. (R-XX-45) He took the cigar and put in the cold case storage room located at 1100 Goliad. (R-XX-46) Mehl also retrieved the sexual assault evidence kit (SX#33) from the property annex room located at 1200 Travis. (R-XX-46) He took the sexual assault kit which appeared to be in good condition and sealed up and put it in a shipping box. He then shipped it to a private lab Orchid Cellmark. (R-XX-47) The items, including the sexual assault kit, the cigar, the cutting from the panties were sent to Orchid Cellmark to develop a DNA profile from them, as well as to develop Diana Garcia's and Arturo Rodriguez's DNA profile for comparison. (R-XX-48) On December 5, 2007, an analysis was received by Mehl. (R-XX-48) Even after comparison, as of January 16, 2008, there was still an unidentified male profile which was found on the evidence. (R-XX-49) Mehl, with the assistance of the FBI in Puerto Rico, obtained a DNA sample from Appellant. (R-XX-50) The FBI sent the sample by FedEx to Mehl who in turn sent it to Orchid Cellmark via FedEx. (R-XX-50) The DNA sample from Appellant was obtained by HPD on May 23, 2008. (R-XX-51) Mehl left the DNA in the sealed packaging and sent it directly to Orchid Cellmark with instructions to develop the DNA profile of Appellant and compare it against the DNA profile that was developed in this case. (R-XX-51) The results of that testing were received by Mehl on July 30, 2008. (R-XX-52) Once Mehl had the results, he

EXHIBIT 1 Page 040

contacted Diana Garcia and Arturo Rodriguez and interviewed them regarding the case. (R-XX-54)  On September 5, 2008, Mehl filed a capital murder charge against Appellant. (R-XX-56)

Prior to cross-examination, Appellant's counsel approached the bench and pointed out that the officer said that DNA was not even thought about at HPD in 1992 and that he wanted to question him about that. (R-XX-56)  The court indicated that would be done outside the presence of the jury. (R-XX-58)  While the court was attempting to determine exactly what Mehl had said on direct examination, the court reiterated that it was not going to allow Appellant to go into the crime lab situation. (R-XX-59)  Outside the presence of the jury, Mehl acknowledged that the crime lab was processing evidence in 1992 and it was being processed to solve crimes. (R-XX-61)  The trial court ruled that in order to not leave a wrong impression on the jury, Appellant would be allowed to question the officer about the fact that the crime lab did process DNA, but he was not allowed to go into any details about the crime lab. (R-XX-62, 63)  The trial court specifically noted for the record that the Prosecutor left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD crime lab for DNA analysis.  Appellant's counsel again reurged his desire to go into a more deep evaluation of genetic design and the HPD crime lab studies which was denied by the trial court. (R-XX-66)

Appellant cross-examined Eric Mehl regarding his role in the case. (R-XX-66)  Mehl admitted that in 1992 HPD did have a crime lab that was processing evidence for DNA analysis. (R-XX-67)  He also admitted that in this very case, items were submitted to the

30

EXHIBIT 1 Page 041

HPD crime lab for processing of DNA. (R-XX-67) Mehl admitted that when he went to see Diana Garcia he told her about the results of the DNA testing in this case. (R-XX-68)

Griselle Guzman, with the FBI, testified that her work centered on San Juan, Puerto Rico. (R-XX-71) In May, 2008, she received an assignment to obtain a buccal swab from Appellant. (R-XX-73) On May 21, 2008, this agent took a buccal swab from Appellant. (R-XX-74) After sealing the buccal swabs, this agent submitted the items as evidence. (R-XX-76, 77) The court admitted State's Exhibit Nos. 65 and 66 into evidence. (R-XX-77) Guzman stated that she sent her report along with the evidence in a FedEx envelope to Detective Eric Mehl with the Houston Police Department. (R-XX-78)

Angelita Rodriguez, from the Dominican Republic, testified that her ex-husband was Appellant, Obel Cruz Garcia. (R-XX-82) She identified Appellant in court. (R-XX-82) She stated that Appellant was originally from Dominican. (R-XX-84) She stated that she knew her husband by the name of Obel and also "Chico." (R-XX-84) She stated that she knew an individual by the name of "Rudy" who was actually her cousin, Carmelo Martinez. (R-XX-85) This witness introduced her cousin to Appellant. (R-XX-85) At some point after the couple arrived in Houston, she suspected that Appellant was involved with drugs. (R-XX-87) Rodriguez suspected that Appellant was using and dealing drugs. She also knew him to occasionally smoke cigars. (R-XX-88) Rodriguez stated that her relationship with Appellant was different in the United States than what it was in Puerto Rico. (R-XX-89) She indicated that at some point she met a couple by the name of Diana Garcia and Arturo Rodriguez. (R-XX-89) Rodriguez stated that at one point she even began dealing drugs with Appellant and

31

EXHIBIT 1 Page 042

that she had a case for drugs which she ended up being convicted of. (R-XX-92) Rodriguez and Appellant lived in Humble at the time that they knew Garcia and Rodriguez. (R-XX-94) The apartment they stayed in was actually rented for them by Diana Garcia. (R-XX-94) Rodriguez stated that the couple owned two cars, a blue Thunderbird and an Oldsmobile. (R-XX-95)  In September, 1992, Diana was at her home in Humble when she saw a news broadcast that Angelo Garcia was missing. (R-XX-97)  Rodriguez woke up Appellant and told him about the news, but he did not respond.  When she stated that she wanted to go over to Diana's, Appellant told her to go if she wanted to. (R-XX-98)  Rodriguez stated that Appellant did not go with her and it seemed strange that he acted so calmly about that news. (R-XX-98)  At that point, Appellant told his ex-wife that he was leaving to go to Puerto Rico. (R-XX-99)  She stated that Appellant simply said that he had to leave and that it was not a planned trip. (R-XX-100)  Appellant made the comment that he had to leave, but that if she stayed the police would come and get her. (R-XX-100)  On the evening before the abduction of Angelo, Rodriguez stated that she went to bed around 9:00 p.m. and that Appellant was there at the apartment in Humble. (R-XX-101)  She stated that because of a fight months before, they stayed in separate rooms and she was unaware of when Appellant may have left the apartment that night. (R-XX-102)  When she woke up the next morning, Appellant was at the apartment. (R-XX-102)  Once Appellant left for Puerto Rico, he never returned to Houston. (R-XX-103)  Rodriguez testified that Appellant had an upcoming court date which he missed it.  She stated that he had never missed court dates before. (R-XX-103, 104) Rodriguez left Houston and went to Santa Domingo where she found Appellant.  She went

32

EXHIBIT 1 Page 043

there wanting a divorce. (R-XX-105)  Appellant told Rodriguez that he would not give her a divorce. (R-XX-106)  She stated that Appellant insulted her and then told her that he was going to harm her family. (R-XX-106)  Rodriguez asked Appellant whether he had anything to do with Angelo.  Appellant said that he did and that he had killed him. (R-XX-107)  When Rodriguez was asked "Did he say anything about why he had done it", she stated that she did not remember what else he said. (R-XX-107)

During cross-examination, Rodriguez stated that on May 3rd when two defense investigators came to her salon, she told them she didn't have to talk to them or answer their questions. (R-XX-109)  She stated that when she was asked questions by the investigators, she did not tell them anything about Appellant confessing to murdering the little boy. (R-XX-110)  She admitted that she had previously met with the detective and a district attorney along with her own lawyer about this case. (R-XX-110, 111)  Although Rodriguez related how she had discussed a number of things with these individuals in the investigation, she stated that she was scared and that's why she forgot to mention that Appellant had confessed to her about killing the boy. (R-XX-112)

Carmelo Martinez Santana testified that he was originally from the Dominican Republic. (R-XX-172)  He stated that Angelita Rodriguez was his cousin and Appellant was her ex-husband. (R-XX-118)  He stated he came to the United States in the late 1980's to sell drugs. (R-XX-118)  At the time of this trial, this witness was serving time in a federal penitentiary for trafficking drugs. (R-XX-119)  Santana met Appellant through his cousin Angelita Rodriguez. (R-XX-119)  He stated that Appellant came to the United States with

33

EXHIBIT 1 Page 044

him to sell drugs. (R-XX-120)  While living with Appellant in Houston, both were using

cocaine. (R-XX-122)  When Santana began using cocaine, he became addicted, Appellant

took over control of the drug selling operation. (R-XX-123)  He described Appellant as

somebody who nobody would mess around with because he controls everything. (R-XX-123)

Santana said that on one occasion he was especially frightened by Appellant because he had

taken him by the neck and tied him up.  Appellant told him that he was going to kill him

because he thought he was taking customers away from him. (R-XX-124)  Santana said that

when Appellant and his wife moved to Humble he would stay with them at times.  He

described Appellant having a 4-door Chevrolet, blue in color, as well as Angelita having a

Thunderbird. (R-XX-128)  He said that sometimes Appellant would loan his cars to people

who worked for him. (R-XX-128)  Santana said the he would often lend his cars to an

individual named Charlie (SX#37). (R-XX-129)  Santana said that Appellant had guns,

including a .45. (R-XX-129)  In 1992, Santana said that Appellant also had a .22 rifle. (R-XX-129)  Santana testified that Appellant would often go to Diana and Arturo's apartment

for the purpose of drugs. (R-XX-132)  Santana described the relationship between Appellant

and his wife and Arturo and Diana as close friends. (R-XX-133)  He was not aware of any

romantic relationship between Appellant and Diana. (R-XX-133)  Santana said that

Appellant was fairly open about the fact that he was not faithful to his wife Angelita

Rodriguez. (R-XX-134)  On the evening that Angelo was taken, Santana said that Appellant

said that he wanted to go and get his drugs and money from Diana and Arturo. (R-XX-135)

Santana stated that on that evening, he along with Appellant and an individual named Roger

EXHIBIT 1 Page 045

went in Appellant's blue Chevrolet 4-door car to Diana's to pick up the money. (R-XX-137) Once they arrived at Diana's apartment, Appellant and Roger left Santana sitting in the car behind the apartment. (R-XX-137) Santana said that Appellant had him move over to the driver's seat to wait there for him. He said that Appellant took a .45 pistol with him, along with Roger. (R-XX-141) He described Roger as tall and having a strong build and being larger than Chico (Appellant). (R-XX-142) He also described Roger as having a dark complexion. (R-XX-142) Santana stated that Roger had a small pocket knife with him and also said that both individuals had black masks. He wasn't exactly sure what masks they had that night. (R-XX-143) Appellant and Roger were gone for about a half hour and when they returned, Appellant had a little boy in his arms. He also saw the .45 caliber weapon at that time. (R-XX-143) Santana got up from his seat and asked Appellant "What's going on? Why do you have the little boy?" He stated that the little boy was Angelo Garcia, Jr. Santana stated that Appellant said he (referring to Angelo Garcia) "saw". (R-XX-144) Santana told Appellant to take the child back to his mother. (R-XX-145) Appellant told Santana that he had raped Diana and that Arturo had been beaten. (R-XX-145) Santana kept wanting Appellant to take the child back to his mother and Appellant left for about 5 minutes. (R-XX-146) Santana could not recall whether Appellant had the boy with him when he went to the mother. He stated that it's that he may have had the boy in his own arms at the time. (R-XX-146) When Appellant came back to the car, Roger was with him. (R-XX-146) Santana moved to the back seat and sat with Angelo Garcia. (R-XX-147) Santana described Appellant driving the car holding while holding a gun. (R-XX-148) Appellant

EXHIBIT 1 Page 046

drove to Baytown. (R-XX-148)  He stated that Appellant drove the car to a street where

ended. (R-XX-148)  Santana believed that Appellant was going to kill the little boy. (R-XX-149)  Appellant said " Bory, you already know what you have to do" (R-XX-149)  As they

were walking, Santana became ill, actually defecating. (R-XX-150)  Santana heard a scream

from the little boy.  When Santana walked back towards the car, he saw the body of the little

boy. (R-XX-151)  Appellant then ordered Bory and Santana to put the body in the back seat -

which they did. (R-XX-152)  They drove around Baytown and came to an area near a river

where they were ordered to dump the body into the river. (R-XX-153)  Appellant told Bory

and Santana to get something so that the body would sink under the water. (R-XX-153)  As

they were driving away, Santana said the tires on the vehicle were blowing up, eventually all

four tires blew up. (R-XX-155)  They all then went to a motel on 225. (R-XX-155)  On the

next day, while they were at Chico's house in Humble, Appellant said that he was leaving

Houston. (R-XX-158)  On that next morning, Appellant took his car to the Rendon garage

to get new tires. (R-XX-161)  After cleaning up the car, it was sold. (R-XX-161)  Appellant

used the money from the sale of the car to buy a plane ticket either to Puerto Rico or the

Dominican. (R-XX-162)  Santana drove Appellant to the airport on Friday, then went back

to his Appellant's apartment in Humble. (R-XX-162)  Other than seeing Appellant in jail

where he was currently housed, Santana said he had not seen Appellant since dropping him

off at the airport. (R-XX-164)  Santana stated a couple of years ago while he was doing

prison time in Pennsylvania, an FBI agent named Bill Eversol came to see him and that was

the first time he told the whole story about that night. (R-XX-165)  Santana said that no

EXHIBIT 1 Page 047

promises were made to him to testify and he knew he could get in a lot of trouble because of his involvement. (R-XX-166)   Santana said that as they drove on Highway 59 North, Appellant told him to throw the knife away which he did. (R-XX-166)  The Prosecutor then had Rogelio Aviles Barroso (SX#34) brought into court to stand next to Appellant. (R-XX-167)

William Ebersol, with the Federal Bureau of Investigations, testified that he was asked to interview Carmelo Martinez at a prison in Pennsylvania. (R-XX-176)  Ebersol hoped that Martinez would have information about Appellant.  Ebersol did not realize that he was going to be receiving first-hand knowledge about the killing. (R-XX-178)  The touchstone event which seemed to change Martinez's view of things was when the agent showed him the photographs of the victim in this case. (R-XX-179)  The agent purposely did not disclose a lot of the details of the case in an effort to give Martinez to supply information about the case. (R-XX-180)

Carmelo Martinez Santana was recalled as a State's witness. (R-XXI-4)  Santana then identified Appellant as Obel Cruz Garcia also known as "Chico." (R-XXI-6)  Santana then identified a photograph of Roger, "Bory". (SX#91). (R-XXI-7)  He described Roger in 1992 as a big man with a bulky build. (R-XXI-8)  He also identified Angelo (SX#31). (R-XXI-11)  Santana testified that he had no type of deal for his testimony in this case. (R-XXI-12)  When questioned about his concern of leaving the federal penitentiary in Pennsylvania and being secured because he was going to testify against Appellant, this witness said he did not remember.  The prosecutor then stated *"I think Agent Ebersol will."* (R-XXI-13)

37

EXHIBIT 1 Page 048

During cross-examination, this witness reluctantly acknowledged that he never had any type of charge in this case. He attempted to avoid answering the questions of whether he had ever been charged in this matter by saying he did not care and he was there to tell the truth. (R-XXI-15, 16)

The witness admitted that Appellant was in Puerto Rico when he first came to the United States and began using drugs and selling drugs and that Appellant was not part of that. (R-XXI-32) Santana denied that it was inconsistent that on the one hand he tried blaming Appellant for his problems while staying with Appellant through thick and thin. (R-XXI-33, 34)

During cross-examination, this witness denied saying that he described the place where the little boy was killed as an area near where Diana Garcia and he had lived. (R-XXI-35, 36) Yet, during his direct examination by the State, he said that there's where we used to live before Ms. Diana and I we were neighbors. (R-XXI-9) Santana denied telling the FBI agents when they first came to visit him that he was familiar with the Baytown area because he used to sell drugs in that area. (R-XXI-37) He stated that he was able to recall the specific route that they took when they took the little boy 21 years ago, just based on just one trip there. (R-XXI-37) This witness again said that he was not familiar with Baytown and that he had not sold drugs to people in Baytown. (R-XXI-38) Once again, Santana said that he never told the jury that the place where the boy was killed was near where he and Diana used to live. (R-XXI-38, 39) He also denied telling the jury the day before that (Appellant) slept with his wife Angelita on the night that the young boy was killed. (R-XXI-40)

EXHIBIT 1 Page 049

During further cross-examination, he stated that Appellant stayed up the rest of the night using drugs. (R-XXI-40)  The witness then attempted to explain that "go to sleep" meant go to the apartment. (R-XXI-42)  Santana stated that it was possible that he and Appellant had been to Diana's apartment earlier in the day of the killing. (R-XXI-43) Santana then said that Appellant used a pay phone to call a taxi after the young boy was killed. (R-XXI-44)  Santana said he told the FBI that all four tires blew on their vehicle.  He stated that he did not recall telling the FBI that only two of the tires blew on the car. (R-XXI-45)  Appellant's counsel questioned Santana about whether he had told the FBI that he had defecated that night.  The witness again attempted to sidestep the question, but eventually said he did not remember. (R-XXI-48)  Santana said that the time Appellant was gone from the car to Diana's apartment on that night was 30 to 40 minutes.  He denied telling the FBI that it was 5 to 10 minutes because he said that's not how it was. (R-XXI-49)  When questioned about the demeanor of the young boy, Santana said that he was not crying and that he was very calm because we're family. (R-XXI-50)  When Appellant was carrying the little boy, he did not have a mask on. (R-XXI-51)  When questioned about whether the boy was left with him in the car when Appellant went back to the mother's apartment, this witness was unsure of whether the boy stayed with him or went with Appellant. (R-XXI-51)  He denied telling the FBI that Appellant had given the boy to Rogelio. (R-XXI-51)  Santana said that Appellant had a firearm and Rogelio had a pocket knife. (R-XXI-52)  When asked where he was when the little boy was killed, Santana said that he was walking. (R-XXI-54)

Santana could not say where Roger or Rogelio was at the very point in time that the

EXHIBIT 1 Page 050

little boy screamed. (R-XXI-55)   Santana responded to questions about the location of

Rogelio by stating that "*I have always believed that Rogelio is the one who killed him*

*because he ordered it.   He is the one who told him you know what you have to do.*" (R-XXI-

57)   Santana said that he may have told the FBI that Rogelio exited the vehicle and took

Angelo to the driver's side rear of the car. (R-XXI-57)   Again, Santana said that he believed

that Rogelio killed the boy, but he did not actually see him kill the boy. (R-XXI-60)   Santana

stated to the jury that he felt threatened by Appellant when they got back from the boy's

killing. (R-XXI-61)   He admitted that he told the FBI that Appellant, Rogelio and Martinez

made a pact never to tell what had happened and wasn't based upon threats. (R-XXI-61)

William Ebersol, with the FBI, was recalled for cross-examination. (R-XXI-64)

Ebersol stated that he and Agent Mike Hawthorne went to interview Martinez in prison. (R-

XXI-65)   Ebersol testified that the interview with Martinez was not recorded / it was an oral

conversation. (R-XXI-65)   He stated that he took notes of the conversation he had with

Santana Martinez. (R-XXI-66)   Ebersol agreed that he and Hawthorne did the very best they

could to record what was said during the conversation. (R-XXI-67)   Ebersol stated that he

had no problem communicating with Martinez when they interviewed him. (R-XXI-68)   He

stated that he stood by the accuracy of the report that he made concerning this interview as

reflected in the 302 document. (R-XXI-68)   Ebersol agreed that a traumatic event like

defecating would not have been something he left out of his report. (R-XXI-69)   He stated

he never recalled Martinez ever saying that he defecated. (R-XXI-69)   Ebersol also

contradicted Martinez when he related that on page 9 of his report that Martinez told him he

EXHIBIT 1 Page 051

was familiar with Baytown because that is where he sold drugs. (R-XXI-69)  He also stated

that Martinez told him that he was familiar with Baytown because he had been there many

times and had friends there for the purpose of dealing drugs. (R-XXI-70)  He also stated that

there was a reference to the fact that Martinez said that when Rogelio and Chico returned,

it was approximately 5 to 10 minutes later and that Appellant was holding Angelo. (R-XXI-

71)  He also stated that in the report Martinez told him he believed that Appellant handed

Angelo to Rogelio. (R-XXI-71)  Ebersol agreed that one of the ways to determine if an

individual played a role in an offense was to see where they were at the time the killing

actually took place. (R-XXI-72)  Ebersol said that Martinez told him that Rogelio exited the

vehicle and took Angelo to the driver's side rear area of the vehicle. (R-XXI-73)  He also

stated that while Martinez did not say he saw Rogelio stab or slash Angelo, he did hear

Angelo cry out one time, then heard Angelo say "*UH*" and then he heard him hit the ground.

(R-XXI-74)  He also said that the very next thing was that he said that Chico (Appellant) was

at the front of the car looking around.  To which Ebersol said, yes, that is what Martinez told

him. (R-XXI-74)  Ebersol also said that Martinez told him that in order to try and get the

body to go under water, they had to put blocks on it. (R-XXI-74)  When Ebersol interviewed

Martinez, Martinez only said that there were two tires that blew out on the car, he never

mentioned the third or a fourth tire blowing out. (R-XXI-75)  He also said that the

individuals, Appellant, Rogelio and Martinez made a pact never to tell what happened that

night. (R-XXI-76)  He characterized the agreement as referring to an agreement amongst the

three parties, not a threat. (R-XXI-76)  He also noted that Martinez said that when they got

41

EXHIBIT 1 Page 052

back to the apartment, Appellant went in to sleep with Angelita. (R-XXI-77) Ebersol noted that if there had been any mention of drug use as Martinez claimed, Appellant had stayed up all night using drugs, he would have typed it in his report. (R-XXI-77)

Micah Webb, an investigator with the Harris County District Attorney's Office, testified that he assisted in the preparation of Appellant's case for trial. (R-XXI-84. 85) Webb stated that after the FBI had interviewed Martinez in jail, locating Rogelio Aviles became more important. (R-XXI-90) After interviewing this individual known as Candido LeBron or Roger, Webb participated in preparing capital murder charges against Rogelio Aviles Barroso. (R-XXI-91) Webb also took a buccal swab from Appellant on February 16, 2010.

Matt Quattaro, a supervisor of forensics at Orchid Cellmark in Dallas, Texas, testified that Orchid was an independent lab that performed DNA testings on specimens from criminal cases around the country. (R-XXI-103) Quattaro testified that a DNA analysis was done in the Obel Cruz Garcia case. (R-XXI-105) Orchid Cellmark first received evidence in the case on October 3, 2007. (R-XXI-105) The evidence which was sent to Orchid Cellmark by Detective Mehl included a cigar, sexual assault kit, and referenced samples from Diana Garcia and Arturo Rodriguez. (R-XXI-106) At that point in time, no sample from Appellant had been received. (R-XXI-106) The initial evaluation of the cigar revealed two referenced samples, neither of them matched, so they had an unknown male contributor. (R-XXI-109) The sexual assault kit was tested and DNA from Diana Garcia was found, as well as Arturo Rodriguez not being excluded as a possible contributor. Since there was a mixture, this left

EXHIBIT 1 Page 053

another unidentified male contributor. (R-XXI-112)  The profile of the cigar could also not be excluded as a contributor to the vaginal swab. (R-XXI-113)  Testing was done on the cutting from a pair of panties and the results were that Diana Garcia's DNA was located on them. (R-XXI-113)   Again there was a mixture of semen on the panties and Arturo Rodriguez could not be excluded as one of the minor contributors to the sample. (R-XXI-114)  The major profile or contributor to the most of the DNA was an unknown individual whose DNA was also on the cigar. (R-XXI-114)  Additional evidence was received from Sergeant Mehl on December 7, 2007. (R-XXI-115)  Other samples were sent in for testing. (R-XXI-115)  On May 28, 2008, Orchid Cellmark received a referenced sample from Appellant, Obel Cruz Garcia. (R-XXI-115)  The swabs were sent from Gracel Guzman from the FBI as documented in State's Exhibit No. 95. (R-XXI-119)  The DNA profile from the cigar matched the DNA profile that came from Appellant. (R-XXI-119)  Appellant could not be excluded as a possible donor to the sperm fractions of the vaginal swabs, and the DNA that was obtained from the cutting of the panties as well. (R-XXI-119, 120)  Appellant was identified as the major contributor to the profile found on the panties. (R-XXI-120)

During cross-examination, this witness agreed that Orchid Cellmark had quality control procedures to assure that they are getting the best and most accurate results from their testing. (R-XXI-128)   He agreed that quality control is in place to try and avoid contamination. (R-XXI-128)  The witness detailed the steps taken to try and avoid any type of contamination of the DNA sampling under test. (R-XXI-129, 130)  He agreed that Orchid Cellmark could not control or attempt to control other labs quality control. (R-XXI-130)

43

EXHIBIT 1 Page 054

When asked whether or not the evidence was handled by the HPD crime lab, the witness stated that he could tell it was somewhere before it was sent to him, but he did not know who beforehand. (R-XXI-130) He stated that he did not know Appellant and that the sample that he received was marked with Appellant's name on it. (R-XXI-130) The samples that he received were simply in an envelope with his name on it. (R-XXI-131) He stated that he did not know exactly where that came from but that somebody else provided that to him. (R-XXI-131) He stated that epithelial cells which were being examined are not observable by the naked eye, but could be seen with a microscope. (R-XXI-132) The same held true for the sperm fractions which are microscopic. (R-XXI-132) Quattaro stated with regard to the sperm cell there was no way to tell where that really came from, that he had to rely on the labeling that somebody else gave him. (R-XXI-134) He agreed that prior to receiving the evidence, he did not know how it was placed, where it was placed, when it was placed, how it was collected and how it was stored before it got to him. (R-XXI-134) He could not indicate whether the spermatozoa was the result of consensual sex or a sexual assault. (R-XXI-134) He confirmed that the epithelial cells which were collected in 1992 were not examined until 2007, some 15 years later. (R-XXI-135)

During re-direct examination, the witness said that he made no observation of anything indicating that the evidence had been tampered with. (R-XXI-136. 137) He testified that Orchid Cellmark had received a large cutting from the crotch of the panties and that they in turn took a smaller portion or cutting from that for testing. (R-XXI-137, 138) He stated that he could not contaminate evidence to create a DNA sample with someone's DNA that

44

EXHIBIT 1 Page 055

he did not have at the time. (R-XXI-138)

During re-cross examination, this witness admitted and agreed that contamination does occur. It doesn't necessarily mean that people are evil. (R-XXI-140) When he received the evidence, there was no HPD notations of quality control procedures for assurances connected with the evidence. (R-XXI-141)

Courtney Head, a criminal specialist with the Houston Police Department Crime Laboratory, testified that with the exception of identical twins, everybody's DNA is unique to that specific individual. (R-XXI-145) She explained the difference between a known sample or referenced sample and an evidence sample which is collected and submitted for analysis. (R-XXI-146) She identified State's Exhibit No. 64 (already in evidence) as a t-shirt that was submitted in this case and tested. (R-XXI-154) No blood was detected on the t-shirt. (R-XXI-155) She testified that in a hypothetical case where the item had been in water for 30 plus days and exposed to the elements, she would not expect blood to be on the item. (R-XXI-155) She testified that there was a known sample which had been taken from Appellant but which never was seen or touched by Orchid Cellmark. (R-XXI-156) The witness stated that she performed extractions on the items. (R-XXI-157) She stated that she compared the referenced samples to the evidence. She stated that she compared the known profile with the profile that Orchid Cellmark had generated on the same sample. (R-XXI-159) She ultimately made comparisons between the known referenced sample, the DNA profile of Obel Cruz Garcia, and those three items. She found that Appellant could not be excluded as a contributor to the DNA profile that came from the cigar. (R-XXI-161) She also found that

EXHIBIT 1 Page 056

Appellant could not be excluded as a possible contributor to the DNA mixture found in the sperm fraction from the vaginal swab of Diana Garcia. (R-XXI-162) Likewise, she stated that Appellant could not be excluded as a contributor to the major component of the profile from the DNA found on the panties of Diana Garcia. (R-XXI-162)

During cross-examination Head acknowledged that she had not personally performed any testing on the cigar, the vaginal swabs, or the cutting from the panties. (R-XXI-172) She admitted that there was no quality control or technical review of her because she didn't do any work on them. (R-XXI-172) She stated that she simply reviewed their work. (R-XXI-172)

Appellant was found guilty of capital murder. (R-XXIII-102)

## PUNISHMENT PHASE OF THE TRIAL

Manuel Buten testified that he was from Puerto Rico. (R-XXIV-15) Buten was married and had children, including a stepson named William. (R-XXIV-15) He stated that he had a food truck business in 2001. The name of his business was "El Tropical." (R-XXIV-17) In 2001, along with his brother Andres Castillo Buten and his stepson, William Garay Martinez, Mr. Buten operated the food truck. (R-XXIV-18) In October, 2001, while at the food truck, a man and woman came up and ordered food. That same man later came up and said that he liked the music and asked Buten to "pump up the volume." (R-XXIV-22) Buten identified Appellant as the individual who requested that the music be turned up. He stated that Appellant kept asking him to come down and turn the music up himself, which would require him to come out of the truck. (R-XXIV-24) Appellant later came up to the

46

EXHIBIT 1 Page 057

truck and pulled out a .38 revolver and tried to fire it twice, but it did not fire. (R-XXIV-25) Buten took off running towards the back leaving the keys to the truck as he ran away. (R-XXIV-26) Buten was told that Appellant had taken the boys from the truck and had left. (R-XXIV-26) He flagged down police to ask them to look for William and Andres. (R-XXIV-27) Appellant later called Buten and said that in order to release the boys he would have to supply Appellant with 2 kilos of drugs. (R-XXIV-29) When Buten said that he sold mofango and fried plantains, a woman got on the line and said that's how they would return the kids as mofango and chopped meat. (R-XXIV-29) Buten said that he went to the police station and while there Appellant contacted him. Appellant was unaware that Buten was at the police station and threatened to kill the boys if he did go to the police station. (R-XXIV-31) In speaking with Appellant, Appellant told him that Buten had to give him 75 Kilos and a $150,000 cash. (R-XXIV-32) In a subsequent conversation with Appellant, Buten asked to speak with the boys to make sure that they were alive and he did so. (R-XXIV-33) In yet another phone conversation, Appellant threatened to kill the boys if Buten was inside a police station. (R-XXIV-36) Appellant also stated that he would see his family on the news. (R-XXIV-37) The police came up with a plan to try and trick Appellant into thinking that Buten was going to meet him at another location. (R-XXIV-38) He made believe that he was honking the horn and arguing with other drivers that were around him even though he was actually at the police station. (R-XXIV-38) The police went to an area where Appellant was supposed to be to meet Buten. (R-XXIV-39) At the scene, the police watched and observed somebody they thought was talking on the phone. They gave chase and the person crashed

47

EXHIBIT 1 Page 058

the car. (R-XXIV-40)   Appellant had said during conversations with Buten that if he continued with his "bullshit" he was going to read about his family in the paper the next morning. (R-XXIV-40)   A few hours later, the boys were released. (R-XXIV-40)   The individuals were kidnapped for approximately three days. (R-XXIV-41)   Upon their release, William had marks on his face and Andres' head was swollen because he had been hit on the head with a pipe. (R-XXIV-41)   William and Andres' toes were smashed with a hammer and they were taken to the hospital. (R-XXIV-42)

Sergeant Juan DeJesus Rodriguez from the Puerto Rico Police Department testified that he was involved in a kidnapping case involving Appellant in October, 2001.   He identified Appellant in Court. (R-XXIV-45, 46)   DeJesus arranged for Buten to come to his office so that they could monitor calls made by Appellant and assist in the apprehension of him. (R-XXIV-47)   Since there was no technology to trace the calls or record them, Buten would explain to the police what was being said. (R-XXIV-48)   DeJesus would counsel and advise Buten about what to say in response to questions during the conversation . (R-XXIV-48)   DeJesus had Buten receive "signs of life" indicating that the subjects William and Andres were alive by placing them on the phone. (R-XXIV-49)   DeJesus then explained the scenario that played out involving Buten and Appellant. (R-XXIV-52 - 54)   Appellant was ultimately found hiding in a tree and was taken into custody by the police. (R-XXIV-54)   DeJesus said that he, along with his partner Melvin Torres, interviewed Appellant. (R-XXIV-58)   After Appellant was allowed to call the woman he was married to in 2001, both individuals were released. (R-XXIV-59)   Appellant was filed on for kidnapping, a gun case,

EXHIBIT 1 Page 059

and a knife case. Another individual, Pablo Esquivez was implicated in the kidnapping as well. (R-XXIV-65) Appellant pled guilty and received a 16 year prison sentence. (R-XXIV-65)

During cross-examination, DeJesus was asked whether or not it seemed odd that an individual who owned a small food truck would be asked to supply a $1,000 in cash and 100 kilos of cocaine to secure the release of these individuals. (R-XXIV-76, 77) He said in his training and experience that type of question would be asked to people that might have that type of stuff. (R-XXIV-77) He did further investigate to see if these people were involved with drugs. (R-XXIV-77) He stated that it turned out that Buten was not involved in drugs. (R-XXIV-77)

Andres Castillo Buten testified that he had a small food truck just like his brother Manuel Buten. (R-XXIV-79) Buten identified Appellant as an individual he came into contact with on October 11, 2001 at a food truck. (R-XXIV-81) He stated that after eating his meal, Appellant came up and produced a weapon and pointed it at his brother. (R-XXIV-82) When his brother ran off after Appellant tried to shoot at him, Appellant kept Willie and this witness. (R-XXIV-83) Buten then described how he and the other were kidnapped. (R-XXIV-85) He was thrown to the ground and into a house by Appellant. (R-XXIV-86) He was also assaulted by Appellant inside the house. (R-XXIV-86) Buten was able to identify Appellant because Appellant had taken the hood off of his head and he observed Appellant's face. (R-XXIV-87) Buten described Appellant having sex with the women he was at the food truck with. He stated that he had sex right in front of him. (R-XXIV-90) Buten also

49

EXHIBIT 1 Page 060

described Appellant hitting him with a mallet on his feet. (R-XXIV-91, 92)  Buten also observed Willie and that he had been beaten up as well. (R-XXIV-93)  He described Appellant as being the person in charge while all this was going on. (R-XXIV-94) Buten was eventually released and he eventually found a patrol car and told him what happened. (R-XXIV-95)

William Garay Martinez also testified about his kidnapping on October 11, 2001 while at the food truck in Puerto Rico. (R-XXIV-99)  He testified that after Appellant attempted to shoot Manuel and Manuel got away, Appellant told the others to get the two that were up there which were this witness and Buten. (R-XXIV-102. 103)  He identified Appellant in court. (R-XXIV-102)  Martinez was taken to a house, along with the other individual who had been kidnapped, where he was assaulted. (R-XXIV-106)  When Appellant left the room momentarily, the other individual did nothing to this witness. (R-XXIV-108)  He described having been hit by Appellant with a revolver and also being cut by a knife that Appellant had with him.  He also described other threats made by Appellant. (R-XXIV-109)  This witness remembered times when Appellant told him that he was going to kill him. (R-XXIV-113)  This witness again identified Appellant as the person that had kidnapped him. (R-XXIV-116)

Officer Efrain Hernandez with the Department of Corrections in Puerto Rico testified that he has always worked on medical services at the Unit. (R-XXIV-120)  On October 10, 2003, this witness stated that he inspected the cell of Appellant. (R-XXIV-120)  When Hernandez inspected Appellant's prison cell, he noticed something irregular. (R-XXIV-123)  He noticed that window pane fell out of Appellant's window when touched by a rubber

50

EXHIBIT 1 Page 061

mallet. (R-XXIV-124) Inside Appellant's cell a rope made up of bed sheets as well as a map of Puerto Rico were found. He stated that the space opened by the window was enough for an individual to climb out. (R-XXIV-125) He explained that these items were not permissible for inmates to have in their cells. (R-XXIV-127) When Appellant was searched after being detained in the prison unit, a cell phone was found in his possession. (R-XXIV-128) Again, this was a prohibited item. (R-XXIV-128)

During cross-examination, this witness acknowledged that the main purpose of the window which was made of metal was for ventilation. He also noted that if an individual jumped out of the window, he would still be in a restricted area within the institution, not the free world. (R-XXIV-136)

James Kennedy with the Houston Police Department that on July 1, 1989, he worked in the Crime Scene Unit. (R-XXV-7) He went to the scene at 123 Winkler in Houston, Texas on that date. (R-XXV-7) He was investigating a dead body found in an apartment complex dumpster at that location. (R-XXV-8) He identified the body as being a Hispanic male. (R-XXV-9) State's Exhibit No. 118 showed three ligature strangulation marks on the deceased's neck on the left side.

Tina Perez testified that when she was sixteen she got separated from her current husband and got involved in some stuff that she was not proud of, notably drugs. (R-XXV-23) The individuals she was involved with was Elizabeth Ramos, who was a girlfriend of Appellant. (R-XXV-24) She stated that she would get drugs through Ramos who in turn received them from Appellant. (R-XXV-24) Perez then identified Appellant in court. (R-

51

EXHIBIT 1 Page 062

XXV-26)  In 1989, when she was hanging around with Appellant, she knew some of his other friends, including "Shorty," Rudy, Saul, and a guy named Robert, whose real name was Leo. (R-XXV-26)  She described Rudy as Appellant's right hand man and that they were inseparable. (R-XXV-27)  She described Appellant as being the person of those individuals who was kind of in charge or the boss. (R-XXV-28)  One time, Perez went to an apartment on Winkler and when she went in to buy drugs, she saw a body in the tub of the apartment. (R-XXV-30)  She noticed when she went into the apartment that stuff was scattered everywhere. (R-XXV-31)  She remembered seeing the body bound with the hands tied behind his head and his feet were also bound and he was face down. (R-XXV-32)  She identified the body as Saul. (R-XXV-33)  She later told the police what she had seen.  After seeing Saul's body in the tub, Perez changed and started going back to school.  She subsequently saw Appellant and he told her not to say anything. (R-XXV-35)

Johnny Lopez stated he was in a common law relationship with Lupita Marie Martinez. (R-XXV-42)  After high school, Lopez went into the army for four years. (R-XXV-43)  Lopez eventually got into drugs and ended up going to jail. (R-XXV-44)  In 1989, Lopez knew Saul Flores. (R-XXV-45)  Lopez learned that Saul had died while Lopez was in jail. (R-XXV-46)  State's Exhibit No. 122 was identified as a picture of Saul. (R-XXV-48)  Lopez then identified Appellant in the courtroom. (R-XXV-49)  Lopez said that his friend Saul would run away whenever he would see Appellant coming towards him. (R-XXV-51)

During cross-examination, Lopez denied that he told the police in 1989 that he was actually running from "Shorty." (R-XXV-52)  Appellant's counsel then questioned him about

52

EXHIBIT 1 Page 063

the number of times he had met face to face with the prosecutors concerning this case. (R-XXV-54, 55)  Appellant's counsel then questioned this witness about his criminal history. (R-XXV-55- 57)

Carmelo Martinez Santana ("Rudy"),who had testified during the guilt phase of the trial, testified again on punishment. (R-XXV-60)  Rudy again identified Appellant in court. (R-XXV-61)  He testified about a previous incident when Appellant and Cesar tied him up. (R-XXV-61)  Appellant and Cesar took Rudy and placed him in a bathtub because Appellant thought that Rudy was taking his drug customers away from him. (R-XXV-63)  When Rudy produced money from his pocket he was released. (R-XXV-64)  He testified that he was aware of other robberies or burglaries where masks were worn. (R-XXV-65) Rudy described a situation where Appellant and he went to an individual's apartment (Batiko) to break in. (R-XXV-66)  State's Exhibit Nos. 126 and 127 were shown to Rudy.  He identified them as Batiko's apartment. (R-XXV-68)  Rudy explained that Bory also known as Roger went along with Appellant. (R-XXV-69)  The two came back to Rudy's car with drugs and money from the apartment. (R-XXV-70)  When Appellant returned to the car, he stated that he had raped Batiko's woman and he had beaten Batiko up. (R-XXV-70)  He went on to say that there were other times when apartments were robbed and burglarized. (R-XXV-71)  Rudy described Saul Flores as an individual who worked with both of them selling drugs. (R-XXV-72)  He stated that Appellant met Saul through another Mexican named "Shorty." (R-XXV-72)  Rudy also described that at one point Saul had taken some drugs to Appellant's girlfriend's apartment. Appellant's girlfriend (Elizabeth) called Appellant and told him about

EXHIBIT 1 Page 064

the fact that Saul was trying to court her and this made Appellant furious. (R-XXV-75) Rudy went to Elizabeth's apartment, along with Robert and the Appellant. (R-XXV-76) Saul was placed in the car and driven to an apartment complex on Winkler. (R-XXV-76) This was an apartment there that was used to sell drugs. (R-XXV-77) The group went upstairs into the apartment. (R-XXV-77) On the way to the apartment on Winkler, the group picked up another individual Richard. (R-XXV-78) Once inside the apartment, Appellant began beating Saul. (R-XXV-79) In addition to the beating they were giving Saul, he was also injected with drugs. (R-XXV-81) He then stated that Obel Cruz-Garcia broke Saul's neck. (R-XXV-82) Subsequently, Saul's body was moved and placed in the dumpster outside. (R-XXV-85) Rudy said the first time he told anybody about this was when he spoke with his attorney, Mr. Castro. (R-XXV-85)

During cross-examination, Martinez denied reaching out to law enforcement in 2011 to talk about this case. He stated that they appeared unannounced to discuss the matter with him. (R-XXV-87) When asked whether he had any pending cases against him, Martinez attempted to sidestep the question by saying he was just there to tell the truth. Martinez stated that the incident involving him had occurred prior to the incident involving the death of Angelo. (R-XXV-89) Martinez described himself as the getaway driver in the case involving Batiko. (R-XXV-90) He admitted that it was the same thing he did when baby Angelo was taken. (R-XXV-90) He acknowledged staying with Appellant even after the baby's case, even helping him to clean up the car that was used to transport the body. (R-XXV-91) He stated that he took Appellant to the airport and then resumed his drug business

EXHIBIT 1 Page 065

himself. (R-XXV-91, 92)

On re-direct examination, Martinez said that he had not been promised anything by the State to get him to testify against Appellant. (R-XXV-95)

Dr. Dwayne Wolf, Deputy Chief Medical Examiner for Harris County, testified that the Saul Flores autopsy was performed July 1, 1989, Dr. Narula. (R-XXV-100)  Dr. Wolf found that the injuries sustained by Saul Flores were consistent with ligature strangulation. He also described some contusions around the eyes. (R-XXV-108)  Dr. Wolf testified that a toxicology test was performed and Saul Flores' body contained cocaine in his blood. (R-XXV-111)

Micah Webb testified again at the punishment phase of this trial. (R-XXV-116) Webb, as part of his investigation in this case, went to the Harris County jail to speak with Carmelo Martinez Santana. (R-XXV-117)  During the interview, Martinez provided new information to the investigator regarding an unrelated murder. (R-XXV-118)

During cross-examination, Webb confirmed that Martinez had not been charged in any of the cases he testified to. (R-XXV-122)

Darryl Novak with the Harris County Sheriff's Department testified that he was employed as a detention officer. (R-XXV-123)  On September 23, 2012, this detention officer had interaction with Appellant. (R-XXV-126)  He identified Appellant in court. (R-XXV-127)  On September 23, 2012, Appellant was given a razor to use, one the day of the week when inmates received razors. (R-XXV-128)   After the razors are used, they are collected as part of a count. (R-XXV-128)  When this witness retrieved Appellant's razor he

EXHIBIT 1 Page 066

noticed that it had been altered. (R-XXV-131)  Appellant was brought up on disciplinary action of altering the razor. (R-XXV-133)

David Davis, Jr., with the Harris County Sheriff's Department, testified that he was a jailer and a classification supervisor. (R-XXV-144) He testified that Appellant was booked into the Harris County Jail on February 12, 2010, and he was assigned as a high risk inmate and placed into administrative separation. (R-XXV-145)  Davis described the restrictions placed on an individual in that type of housing arrangement. (R-XXV-146) This witness then testified that a razor blade is a prohibitive weapon in the penal institution. (R-XXV-147) He stated that if an individual chose to charge Appellant with something lesser than that it was basically an act of kindness on the part of the officer. (R-XXV-147)

Bonnie Fiveash, testified that she classified inmates and offenders for statewide placement. (R-XXV-149)  She testified that she had 21 years experience with the Texas Department of Criminal Justice, all of which was classifying offenders. (R-XXV-150)  She testified that while her and her committee make an initial assignment and custody level of the offenders, once they reach a particular facility it depends on the behavior where that inmate goes from there. (R-XXV-151)  She then testified regarding the general categories of G-1 through G-5 regarding general prison populations. (R-XXV-154)  She stated that most inmates convicted of capital murder, and not sentenced death, start out as a G-3 inmate. (R-XXV-156)  She stated that based on the information sheet, Appellant would be classified as a G-3 offender. (R-XXV-157)  She testified that Appellant would be with other inmates as a G-3 offender. (R-XXV-159)

EXHIBIT 1 Page 067

The State pointed out through this witness that Appellant could be housed with somebody in prison for a DWI 3rd, as well as a white collar theft case. (R-XXV-160)  The State then elicited testimony from this witness regarding the ability of the Appellant to be in contact with other individuals, including employees of the prison system. (R-XXV-161) She also brought out that guards within the prison unit do not have weapons and they could be in the company of capital murderers and have no way to defend themselves. (R-XXV-166) The State made it a point to point out that inmates can buy Blue Bell ice cream while they are in prison. (R-XXV-169)  The State also referenced a security officer at the Wynn Unit named Susan Canfield who was on horseback and when an escaped occurred and her horse was hit by a car causing Canefield to be killed. (R-XXV-174)

During cross-examination, Appellant's counsel asked the obvious question which was "Have we left out any nightmare scenarios in this conversation?" to which the witness indicated, "No, sir." (R-XXV-178)  She also acknowledged that in her opinion TDC was competent in handling inmates. (R-XXV-179)  She did not indicate that she had a reason to think that there was anything "wack" in terms of the Texas Department of Criminal Justice's ability to deal with inmates. (R-XXV-179)  She indicated that she would have a vote of confidence for other individuals who worked at TDC. (R-XXV-179)  This witness also indicated what would happen to individuals who had disciplinary problems while in prison. (R-XXV-180, 181)  Ultimately, the witness agreed that if an individual's conduct was bad enough they could be placed in individual segregated units away from everyone else. (R-XXV-182)  Fiveash stated that TDC was not going to risk the safety of other offenders or

EXHIBIT 1 Page 068

staff. (R-XXV-182) She also pointed out that if an individual attempted to escape he would be ordered to stop first and then the guards would shoot the individual. This also applied to individuals who worked in the field and that was why guards carry rifles on the horses. (R-XXV-183) This witness indicated that she was not trying to make any kind of admission to the jury that TDC just can't handle its business or can't handle the inmates. She indicated that she was not there to sway them either way. (R-XXV-186) When asked "I guess the fear from our standpoint might be that through your testimony, the jury is getting the impression that it's just too dangerous to send anybody to TDC." The witness said, "No, sir." Initially, when counsel commented that "These situations that – – these catastrophic situations that occur at TDC, even though they have occurred there, these are not the normal things that happen at TDC, are they?" To which the witness indicated, "No." (R-XXV-186)

The State rested its case at punishment. (R-XXV-202)

The first witness for Appellant, Mireya Perez-Garcia testified via Skype from the Dominican Republic. (R-XXVI-9) She testified that she met Appellant when she was 15 and that after dating for several weeks she married him. (R-XXVI-12) She described how Appellant would fish with his father for a living at the time. (R-XXVI-13) Appellant left about six months after marrying this witness to go to Puerto Rico for a better life. (R-XXVI-13) She continued her relationship again with him in 1994 in Puerto Rico. (R-XXVI-13) Garcia and Appellant had a family in Rio Pedra, Puerto Rico. (R-XXVI-14) She stated that Appellant worked in real estate and was a very hard worker. (R-XXVI-15) She described him as sincere and noble and an impeccable person. She stated that he interacted with all of

58

EXHIBIT 1 Page 069

the friends that he had from church. (R-XXVI-15)  She described how as a member of the church, Appellant would go and do mission work with others at the church. (R-XXVI-16) Appellant and his wife owned their own home. (R-XXVI-17)  She described Appellant as an excellent father because he wanted to be the best he could for his children. (R-XXVI-18) Appellant like to read his bible and especially read psalms. (R-XXVI-19)

When this witness was asked whether she was aware that her son was in prison or not, she said "No, no, no." (R-XXVI-29)  She stated that she did not know about his life at that time. (R-XXVI-29)  This witness indicated that she was aware that Appellant had married a woman by the name of Dorka. (R-XXVI-29)

Joel Cruz-Garcia, Appellant's brother, testified that his father suffered an injury which made him leave the military and become a fisherman.  He said that the parents stayed together for 17 years and then his mother moved to Venezuela when Obel, the Appellant, was about 12 years of age. (R-XXVI-35)  He described Appellant as a good brother who cared for him and they had a good relationship. (R-XXVI-36)  He  described his relationship with his brother over the years and gave an opinion that Appellant was a good father to his son. (R-XXVI-39)  During cross-examination, he said that Appellant stayed with his wife Mireya for six months and left for Puerto Rico for a better life and when he left his wife was pregnant with their first child. (R-XXVI-44)  Appellant's brother explained how Appellant came back to Puerto Rico and had a relationship with Angelita.  He also testified that later he resumed his relationship with his first wife Mireya.  He also testified that Appellant who left Mireya again and then established a relationship with Dorka. (R-XXVI-49)

59

EXHIBIT 1 Page 070

Appellant called Abel Cruz-Perez. (R-XXVI-66)  He testified that Appellant was his father.  He also stated that he was married and had a little girl of his own. (R-XXVI-68)  This witness described the relationship he had with his father and the type of work that his father did when he was younger. (R-XXVI-69-70)  Abel described the house where they grew up and the relationship he had with his father and how he helped build a church in town. (R-XXVI-73)

Angel Meza testified that he and Appellant met while in jail. (R-XXVI-81)  This witness stated that he was a trustee at the jail and would feed Appellant when he was in lock down. (R-XXVI-82)  When he would visit Appellant in the jail, Appellant was talking about his bible. (R-XXVI-83)  This witness would have face to face contact for about two months with Appellant during which time he described Appellant as a man of God.  He stated that Appellant tried to help him in every possible way he could. (R-XXVI-85)

During cross-examination, the witness recognized that there was a difference between someone talking a good game versus having lived and made choices. (R-XXVI-87)  He agreed that was a pretty important distinction. (R-XXVI-87)

While the jury was deliberating , a juror sent out a note to speak with the Judge privately.(R-XXVII-3)  The trial court discussed Ms. Bowman's matter in chambers without other parties present. (R-XXVII-4, 5, 6)  The juror expressed concern about reaching an agreement, stating that she was at a different opinion and that she was not changing her stance on that. (R-XXVII-6)  The court indicated that she needed to keep deliberating.  The jury returned a verdict which resulted in the assessment of the death penalty. (R-XXVII-11)

EXHIBIT 1 Page 071

The trial court sentenced Appellant to death. (R-XXVIII-4)

## POINT OF ERROR NUMBER ONE

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS THE STATE'S DNA EVIDENCE WHERE THE STATE FAILED TO ESTABLISH A PROPER CHAIN OF CUSTODY DUE TO THE INVOLVEMENT OF THE HOUSTON POLICE DEPARTMENT CRIME LAB WHICH WAS SHUT DOWN AND WIDELY CRITICIZED IN THE REPORT OF INDEPENDENT INVESTIGATOR MICHAEL R. BROMWICH COMMISSIONED TO REVIEW AND EVALUATE THE HOUSTON POLICE DEPARTMENT CRIME LABORATORY AND PROPERTY ROOM (CR-III-454)**

### STATEMENT OF FACTS

Prior to trial, Appellant filed a Motion to Suppress Results of all DNA Testing. (CR-III-454) The Motion, in part, stated that Appellant was anticipating that the State would seek to introduce evidence that the Appellant's DNA was found at the scene of the alleged crime - specifically from physical evidence recovered from a witness who claimed to have been sexually assaulted and from a cigar allegedly found at the scene of the alleged sexual assault. The DNA evidence was submitted to the former, now defunct, HPD Crime Lab for processing. The Motion went on to state that this same evidence was later submitted to other labs for testing and the State would seek to offer the results of such testing. Appellant pointed out that various investigations and reports had been generated over the years as to the incompetence of the employees and former, now defunct, HPD Crime Lab itself which led to its complete closing. These investigations included the time period that the DNA evidence in this case was handled by the now defunct HPD Crime Lab. The investigations found rampant false test results, mishandling of evidence, improper police procedure, misconduct, criminal activity, and incompetence. Appellant asserted that he would be denied

61

EXHIBIT 1 Page 072

a fair trial and Due Process if any evidence was admitted at his trial that was stored and / or processed by the former, now defunct, HPD Crime Lab. (CR-III-454,455)

A hearing was held on the Motion to Suppress. (R-XVI-17)  When the trial court inquired as to the scope of the Motion to Suppress, Appellant's counsel noted that: 1).  Some of the people that handled the evidence in this case were severely criticized as a result of the Houston Police Department Crime Lab Investigation; 2). Although the State had the evidence re-examined by an independent lab, he had no confidence in the HPD Crime Lab, and 3). Specific evidence consisting of a pair of panties and a cigar from which a DNA profile were determined or handled by the HPD Crime lab for latter cuttings or swabs were items produced by the HPD Crime Lab or sent to Orchid Cellmark for analysis. (R-XVI-16) Appellant urged the trial court to suppress all the DNA results because the HPD Crime Lab had been completely closed, and therefore, the court should not have any confidence in any items transferred from that now-closed lab to anywhere else for fear of contamination. (R-XVI-18)  Appellant further argued that no evidence even handled by the HPD Crime Lab should be trusted for evaluation, even by an independent crime lab - this would include testimony from Orchid Cellmark. (R-XVI-18)  The trial court admitted Defense Exhibits 2 through 9 into evidence on the Motion to Suppress. (R-XVI-21)  These exhibits included reports from the ***Bromwich Report*** and the Houston Police Department Crime Lab Investigation. (R-XVI-21) The State responded that it had followed the recommendations of the ***Bromwich Report*** and had the evidence sent out to an independent lab to do its own testing. The prosecutor argued that the lab didn't have a sample of Appellant's DNA

EXHIBIT 1 Page 073

[because he was in Puerto Rico] and therefore contamination could not have occurred. (R-XVI-22)

Physical evidence, consisting of cuttings from a pair of panties, was recovered by Gloria Kologinczok, a nurse at St. Joseph's Hospital when she performed a sexual assault examination on Diana Garcia on October 1, 1992. (R-XVI-25)  This evidence was stored at the Houston Police Department Crime Laboratory until 2007, when it was retrieved by HPD Cold Case Investigator, Eric Mehl. (R-XVI-30,32,35) Mehl testified that he did not open the evidence envelope which contained the cuttings, but rather re-packaged it and sent it to Orchid Cellmark for analysis. (R-XVI-35)  A cigar which had been recovered at Diana Garcia's residence on October 1, 1992, also remained in storage at the Houston Police Department Property Room until its retrieval by Mehl in 2007. (R-XVI-30)  Mehl testified that by the date a sample of Appellant's DNA was obtained, all the biological evidence had already been in Orchid Cellmark's possession. (R-XVI-38)

During cross examination, Mehl acknowledged items extracted from Diana Garcia had, in fact, been stored by the Houston Police Department Crime Lab, including blood and a cutting from her panties. (R-XVI-43,44) Mehl further admitted that at some point the rape kit would have gone through the Crime Lab. (R-XVI-44)

**Matt Quartaro from Orchid Cellmark confirmed that HPD sent DNA extractions taken in this case to Orchid Cellmark.  He testified Orchid  took its own cutting from the panties which had been through the Houston Police Department Crime Lab. (R-XVI-51)** On May 28, 2008, Orchid obtained a full DNA profile from Appellant. Quartaro

EXHIBIT 1 Page 074

testified that profile of Appellant matched the profile from the sperm fraction of the panties and the cigar. (R-XVI-59) **Quartaro confirmed that there had been active testing of the evidence by the HPD Crime Lab.** (R-XVI-68) He went on to note that even if two people had come into contact with the cigar, it was possible that only a DNA profile from one person would be obtained. He also confirmed that there was no way to establish when a sperm cell would have been deposited - only whose DNA it was. (R-XVI-72,73)

Courtney Head from the Houston Police Department Crime Laboratory testified that there was a letter indicating that in 1992 extractions from the evidence of the vaginal swab in the crotch panties were sent to Genetic Design Lab. (R-XVI-85) **There was no testimony from officials at Genetic Design Lab regarding the evidence. Courtney admitted that she knew Joseph Chew (HPD Crime Lab) and confirmed that Chew had obtained a hair sample from Appellant on October 7, 1992.** (R-XVI-86) **Chew did not testify.** She also stated that another **Crime Lab analyst (B. Sharma) performed an analysis on the rape kit on October 28, 1992 and found the male fraction of the DNA sample was too degraded to form any conclusions. Sharma did not testify.** (R-XVI-87) Head testified that Appellant could not be excluded as contributor to the DNA on the cigar or the sperm fraction from the panties. (R-XVI-92) **During cross examination, Head again admitted that biological evidence, including a vaginal swab from the crotch of the panties and blood from various individuals had been handled by the Houston Police Department Crime Laboratory. (R-XVI-95)**

**The trial court denied Appellant's Motion to Suppress. (R-XVII-5,6) (CR-III-**

64

EXHIBIT 1 Page 075

**456)** The court ruled that evidence extracted by the old HPD Crime lab would not be admitted, but that testing performed by Orchid Cellmark on those items would be. (R-XVII-8) The court precluded Appellant from presenting the ***Bromwich Report*** to the jury - finding the report had nothing specific about this case. The court also prevented Appellant from impeaching HPD Crime Lab analysts Joseph Chew or B. Sharma because they were not going to testify. (R-XVII-14,1517,18) **Appellant was also prevented from mentioning the closure of the Houston Police Department Crime Lab.** (R-XVII-22,23,24)

Throughout the course of the trial, Appellant relied on his pre-trial Motion to Suppress to address physical and testimonial evidence offered by the State. Appellant also relied upon his pre-trial Motion to Suppress when he would lodge additional objections concerning the admissibility of DNA evidence. The Motion to Suppress and those additional objections are grouped together under this Point of Error pursuant to **Rule 38.1 (f) and (i) of the Texas Rules of Appellate Procedure** to avoid the unnecessary repetition of arguments in support of the issues or points presented for review. In addition to the record made during the pre-trial Motion to Suppress, the following matters are included under this Point of Error:

A     Appellant was instructed that he was not allowed to cross examine Detective Eric Mehl concerning the Houston Police Department Crime Lab (R-XX-59)

B     The trial court ruled that in order to not leave a wrong impression on the jury, Appellant would be allowed to question the officer about the fact that the Crime Lab did process DNA, but he was not allowed to go into any details about the Crime Lab. (R-XX-62,63)

C     The trial court specifically noted for the record that the prosecutor left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD Crime Lab for DNA analysis. (R-XX-66)

65

EXHIBIT 1 Page 076

D       Appellant's counsel again reurged his request to go into a more deep evaluation of Genetic Design and the HPD Crime Lab studies which was denied by the trial court. (R-XX-66)

E       During FBI Agent Griselle Guzman's testimony, Appellant objected to the introduction of State's Exhibits 65 and 66 [buccal swabs taken from Appellant] noting that the basis for his objection was covered by his Motion to Suppress - he otherwise had no further objections. (R-XX-77)

F       Appellant objected to the introduction of State's Exhibit # 33 [sexual assault kit results] and State's Exhibit # 95 [cutting of panties] reiterating the issues that were previously stated and made reference to a breach in the chain of custody of the items. (R-XXI-123)

G       Over Appellant's objections, the trial court admitted State's Exhibits 95, 33, 33A, 33B, 33C and 33D [panties from the sexual assault kit, the vaginal swabs, and smears from the sexual assault kit, and saliva samples of Diana Garcia and the blood sample of Diana Garcia] (R-XXI-124)

H       The trial court reiterated that certain questions were allowed and others would not be permitted. Specifically, the trial court stated it would not allow in the results of the Houston Crime Lab or any testing that was done by the HPD Crime Lab. (R-XXI-125-127)

I        Over Appellant's objections, the trial court admitted State's Exhibit # 70 - the report from Courtney Head with the Houston Police Department Crime Lab regarding her DNA analysis in this case. (R-XXI-152)

J        State's Exhibits # 76 and 77 [buccal swabs collected from Appellant] were admitted when Appellant commented "no additional objections". (R-XXI-157)

K       State's Exhibit # 92 [DNA statistics] State's Exhibit# 96 [DNA summary on cigar] and State's Exhibit # 97 [DNA summary on vaginal swabs] were all admitted over Appellant's objections.

L        The trial court prevented Appellant from cross examining Head concerning quality control that existed on other things when they ran by the crime lab. (R-XXI-173)

EXHIBIT 1 Page 077

## ARGUMENT AND AUTHORITIES

**The Fourteenth Amendment to the Constitution of the United States** provides that no State shall deprive any person of life, liberty, or property, without **due process of law**.

As noted above, Appellant's Motion to Suppress contained several sub-parts which are addressed herein, beginning with the Chain of Custody Issue.

### Chain of Custody Objections

In the instant "Cold Case" appeal, the State of Texas prosecuted Appellant in 2013 for a crime alleged to have occurred in 1992. Evidence, consisting of cuttings from a pair of women's panties, a vaginal swab and a cigar, was tested for the presence of biological evidence to be compared with people who may have been associated with the evidence. Appellant's counsel urged the trial court to suppress the evidence because, among other reasons, there was no showing of a proper and adequate chain of custody. (R-XXI-123) Several issues came into play as Appellant sought to exclude evidence allegedly connecting Appellant to the crime scene from September 30, 1992, including **[1]** the fact that the **Houston Police Department Crime Lab** processed evidence recovered from the crime scene - sexual assault kit from Diana Garcia; a hair sample from Appellant; DNA extractions from Diana Garcia and Arturo Rodriguez **[2] Genetic Design** which processed some of the evidence was no longer in business and there was no evidence offered to explain what had been done to the evidence while in the possession of the company. The State was allowed to use evidence which had not been shown to have been maintained in a proper and adequate chain of custody. Chain of custody complaints are **generally viewed** as going to the weight,

67

EXHIBIT 1 Page 078

not the admissibility, of the evidence. **Norris v. State, 507 SW2d 796 (Tex. Crim. App. 1974)** In the instant appeal, Appellant submits that the trial court abused its discretion in allowing the DNA evidence to be admitted at trial. **Montgomery v. State, 810 SW2d 372 (Tex. Crim. App. 1990)** The amendments to the Code of Criminal Procedure relating to post-conviction DNA testing are instructive. **Article 64.03** provides that the trial must find that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect". Appellant submits that the stringent prerequisite set forth under **64.03** should apply with equal force to the State of Texas when it relies upon 21 year-old biological evidence in the prosecution of a capital murder case. The State provided no proof concerning what had happened to the biological evidence sent to Genetic Design. Likewise, the State failed to offer any proof establishing a proper chain of custody of the evidence while in the possession of the Houston Crime Lab and Property Room. Numerous individuals, including detective Mehl, had access to, and handled, the evidence without being able to provide any meaningful information regarding the chain of custody. A complete chain of custody must be maintained in order to ensure that biological evidence was collected and preserved properly. **Routier v. State, 273 SW3d 241 (Tex. Crim. App. 2008)** Appellant's efforts to introduce numerous documents concerning the Crime Lab fiasco (Def. Ex's 2-19) is intertwined with this chain of custody issue. The second ***Bromwich Report*** (5/31/2005) (Def. Ex. 2) noted that it is already clear, however, that the circumstances that led to the troubling crisis of confidence in the Crime Lab are complex and deeply rooted in the history of the Crime Lab and HPD as a whole over

68

EXHIBIT 1 Page 079

the past two decades. (R-XVI-21)(R-XXXI-15)  The third **Bromwich Report** (6/30/2005)

Def. Ex. 3) addressed the storage room at the HPD Property Room where high temperatures

and high humidity created problems.  The **Bromwich Report** also noted that the chain of

custody forms were cumbersome and archaic and increased the chances of errors and risk of

misplaced evidence.  R-XVI-21)(R-XXXI-59)   Appellant submits that there was a

insurmountable gap in the chain of custody - so much so that the admission of the evidence

violated Appellant's right to due process.  The trial court simply excised the HPD Crime Lab

out of the evidentiary equation in this case.  In light of the fact that Mr. Chu at the HPD

Crime Lab had Appellant's hair sample from 1992 and the HPD lab did testing on the panties

before sending them off to other labs, Appellant submits the trial court erred in not granting

his Motion to Suppress.  The question remains: What happened to all the DNA evidence

during the 15 years it was in HPD's custody?

　　　This Court has stated that a trial court has great discretion in the admission of

evidence at trial, and although the evidentiary rules do not specifically address proper chain

of custody, they do state that identification for admissibility purposes is satisfied if the

evidence is sufficient to support a finding that the matter in question is what its proponent

claims.  Absent evidence of tampering or other fraud, problems in the chain of custody do

not affect the admissibility of evidence.  Instead, such problems affect the weight that the fact

finder should give the evidence, **which may be brought out and argued by the parties**.

**Druery v. State. 225 SW3d 491 (Tex. Crim. App. 2007)** Unfortunately, in the instant case,

the trial court did not allow the very evidence needed to raise the question of chain of custody

EXHIBIT 1 Page 080

in a meaningful way. Therefore, Appellant had no evidence to bring to the attention of the jury to argue that point. The trial court abused its discretion in admitting the DNA evidence, comparisons and testimony based thereon. Appellant was denied a meaningful opportunity to present a complete defense for the jury's consideration in violation of the **Sixth Amendment.. Holmes v. South Carolina, 476 U.S. 1 (2006)**

## POINT OF ERROR NUMBER TWO

**THE TRIAL COURT ERRED IN DENYING APPELLANT THE RIGHT TO CONFRONT AND CROSS EXAMINE HIS ACCUSERS AND THUS THE OPPORTUNITY TO PRESENT A DEFENSE BASED IN PART ON EVIDENCE CRITICAL OF THE HOUSTON POLICE DEPARTMENT CRIME LAB AND PROPERTY ROOM DURING HIS MOTION TO SUPPRESS AND AT TRIAL (CR-III-454-456)(R-XXXI-DX2/3/4)R-XVI-21);(R-XXXII-DX5/6)(R-XVI-21);(R-XXXIII-DX6)(R-XVI-21);(R-XXXIV-DX7-19)(R-XVI-21)**

## STATEMENT OF FACTS

Pursuant to **Rule 38.1 (f) & (i) of the Texas Rules of Appellate Procedure** and to avoid repetition, Appellant again incorporates the entirety of the preceding Point of Error for this Court's consideration of this Point of Error.

During the Motion to Suppress hearing, and subsequently throughout the trial, Appellant sought to introduce evidence concerning the Houston Police Department Crime Lab and Property Room which were shuttered and closed in the wake of a crime lab scandal which first came to light when a Houston television station (**KHOU**) uncovered wrongdoing. Appellant presented significant documentary evidence in the form of independent reports which were extremely critical of the HPD Crime Lab to the trial court. (R-XVI-21) Appellant complained that the trial court was denying him the right to confront and cross

EXHIBIT 1 Page 081

examine his accusers in violation of the **Sixth Amendment** and his right to a fair trial with

**Due Process**. (CR-III-455)  In addition to the record made during the pre-trial Motion to

Suppress, the following matters are again included under this Point of Error:

A    Appellant was instructed that he was not allowed to cross examine Detective Eric Mehl concerning the Houston Police Department Crime Lab (R-XX-59)

B    The trial court ruled that in order to not leave a wrong impression on the jury, Appellant would be allowed to question the officer about the fact that the Crime Lab did process DNA, but he was not allowed to go into any details about the Crime Lab. (R-XX-62,63)

C    The trial court specifically noted for the record that the prosecutor left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD Crime Lab for DNA analysis. (R-XX-66)

D    Appellant's counsel again reurged his request to go into a more deep evaluation of Genetic Design and the HPD Crime Lab studies which was denied by the trial court. (R-XX-66)

E    During FBI Agent Griselle Guzman's testimony, Appellant objected to the introduction of State's Exhibits 65 and 66 [buccal swabs taken from Appellant] noting that the basis for his objection was covered by his Motion to Suppress - he otherwise had no further objections. (R-XX-77)

F    Appellant objected to the introduction of State's Exhibit # 33 [sexual assault kit results] and State's Exhibit # 95 [cutting of panties] reiterating the issues that were previously stated and made reference to a breach in the chain of custody of the items. (R-XXI-123)

G    Over Appellant's objections, the trial court admitted State's Exhibits 95, 33, 33A, 33B, 33C and 33D [panties from the sexual assault kit, the vaginal swabs, and smears from the sexual assault kit, and saliva samples of Diana Garcia and the blood sample of Diana Garcia] (R-XXI-124)

H    The trial court reiterated that certain questions were allowed and others would not be permitted. Specifically, the trial court stated it would not allow in the results of the Houston Crime Lab or any testing that was done by the HPD Crime Lab. (R-XXI-125-127)

71

EXHIBIT 1 Page 082

I      Over Appellant's objections, the trial court admitted State's Exhibit # 70 - the report from Courtney Head with the Houston Police Department Crime Lab regarding her DNA analysis in this case. (R-XXI-152)

J      State's Exhibits # 76 and 77 [buccal swabs collected from Appellant] were admitted when Appellant commented "no additional objections". (R-XXI-157)

K      State's Exhibit # 92 [DNA statistics] State's Exhibit# 96 [DNA summary on cigar] and State's Exhibit # 97 [DNA summary on vaginal swabs] were all admitted over Appellant's objections.

L      The trial court prevented Appellant from cross examining Head concerning quality control that existed on other things when they ran by the crime lab. (R-XXI-173)

## THE BROMWICH REPORT

Michael R. Bromwich was appointed to conduct an independent investigation of the Houston Police Department Crime Lab and Property Room stemming from the **KHOU** report. A sampling of the comments from the various stages of Mr. Bromwich's investigation is included to acquaint this Court with the problems Appellant sought to introduce before the jury in this trial.

In the Second Report on the HPD Crime Lab, dated May 31, 2005, Bromwich's mandate was to conduct a comprehensive and independent investigation of the crime lab. It was noted that the problems with the HPD Crime lab first surfaced in 2002, based on a **KHOU T.V.** report. Shortly thereafter, profound deficiencies were found in the operations section. As a result, HPD suspended DNA analysis by the crime lab. (R-XXXI-DX2)(R-XVI-21) Bromwich concluded that it is already clear, however, that the circumstances that led to the troubling crisis of confidence in the Crime Lab are complex and deeply rooted in the history of the Crime Lab and HPD as a whole over the past two decades. (R-XXXI-

EXHIBIT 1 Page 083

DX2)(R-XVI-21) In the Third Report, dated June 30, 2005, issues were made of the fact that high temperatures and high humidity were problems in the HPD Property Room, and the chain of custody of custody forms are cumbersome and archaic increasing the chances of errors and risk of misplaced evidence. (R-XXXI-DX3)(R-XVI-21)  In his Fourth report, dated January 4, 2006, Bromwich stated that **the review of serology and DNA analysis has shown a near total breakdown in the forensic science foundation in those sections for at least a 15 year period from 1987-2002.  There was a pervasive pattern involving repeated failures to report results on scientific testing, including results that were exculpatory**; general failure to use appropriate scientific controls to ensure reliability of reported results. (R-XXXI-DX4)(R-XVI-21)  In the Fifth Report, there was a disturbing revelation about a Harris County capital murder case. In referencing the capital murder case against Derrick Leon Jackson, the report noted that DNA analysts in many cases tended toward reporting only those results that, from their perspective, were "safe" in the sense that they were consistent with other evidence in the case or with the investigators' expectations. (R-XXXII-DX5)(R-XVI-21) Appellant submits that the existence of this form of "evidence shaping" should have been available for the jury to consider in evaluating the integrity and veracity of the evidence. The Final Report, dated June 13, 2007, included a portion pointing out that contamination of a victim's (DNA) reference sample should have been a pristine single-source, yet the victim's reference sample was contaminated at some point in time in the handling of the sample. (R-XXXII-DX6)(R-XVI-21)  These are but a few of the examples uncovered in **Bromwich's Independent Investigation of the HPD Crime Lab**. Additional documentation was offered by Appellant all in support of his Motion to Suppress

EXHIBIT 1 Page 084

Evidence, including HPD Internal Affairs Investigations; City of Houston internal complaints and memos.  The trial court refused to allow Appellant to use or make reference to any of these matters during trial (CR-III-456)(R-XVII-5,6,14)

## ARGUMENT AND AUTHORITIES

**Rule 611(b) of the Texas Rules of Evidence,** regarding the scope of cross examination, provides that a witness may be cross-examined on any matter relevant to the issue in the case, including credibility. **Rule 611(b)** differs from the federal rule which limits cross examination to the scope of direct examination.

The **Sixth Amendment** guarantees Appellant the right of confrontation and cross examination.  **The Fourteenth Amendment** guarantees **Due Process** to the accused.

## LIMITATION OF CROSS EXAMINATION

In the instant case, Appellant was denied a full and fair opportunity to cross examine the State's witnesses on critically important issues pertaining to DNA scientific evidence. Appellant was prohibited from inquiring into the very areas he needed to educate the jury about the validity of the scientific evidence relied upon by the State.  Appellant was not permitted to inquire about any matters relating to the HPD Crime Lab, including quality controls or methodology. The Confrontation Clause of the **Sixth Amendment**, applicable to the states by virtue of the **Fourteenth Amendment**, guarantees the right of the accused to be confronted by the witnesses against him. The primary interest secured by the Confrontation Clause is the right of cross examination. **Douglas v. Alabama, 380 U.S. 415 (1965)** Cross examination is the cornerstone of the criminal trial process and, as such, a

74

EXHIBIT 1 Page 085

defendant must be given wide latitude. **Love v. State, 861 SW2d 899 (Tex. Crim. App. 1993)** In the instant case, Appellant was specifically provided with "Brady" material by the State, but then denied the opportunity to use that very information during his cross examination of the State's witnesses. In addition to the denial of his right to confront and cross examine these witnesses, Appellant was denied the opportunity to present a complete and meaningful defense. **Holmes v. South Carolina, 476 U.S. 1 (2006)**

### EXCLUSION OF EXCULPATORY EVIDENCE

The State provided Appellant with a "Brady Notice" which included references to the ***Bromwich Report***. (CR-II-447) Appellant's counsel sought to introduce this exculpatory evidence before the jury, but the trial court denied Appellant's proffer. Before evidence is admissible, it must be relevant. Evidence is relevant within the meaning of **Rule 401 of the Texas Rules of Evidence** if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In determining whether evidence is relevant, courts look to the purpose for offering the evidence and whether there is a direct or logical connection between the offered evidence and the proposition sought to be proved. So long as there is any logical nexus, the evidence will pass the relevancy test. Furthermore, evidence merely tending to affect the probability of the truth or falsity of a fact in issue is logically relevant. Evidence is relevant even if it only provides a small nudge in proving or disproving a fact of consequence to the trial. **Reed v. State, 59 SW3d 278 (Tex. App. - Fort Worth, 2001)**

Appellant was faced with 16 year-old DNA evidence which began its journey into

EXHIBIT 1 Page 086

the courtroom at the Houston Police Department Crime Lab and Property Room. Custody of the DNA evidence then went elsewhere (Genetic Design) before returning. The independent investigation of the HPD facilities was documented in ***The Bromwich Report*** which , along with other documentary evidence, Appellant sought to introduce into evidence as part of his defense. Defense Exhibits 2-9 were excluded from evidence and were never viewed or considered by the jury when it passed on the integrity and validity of the State's DNA evidence used to connect Appellant to this capital murder case. The exclusion of this evidence amounted to a violation of Appellant's right to compel the attendance of witnesses in his favor. **Potier v. State, 68 SW3d 657 (Tex. Crim. App. 2002)**

The trial court erred when it denied Appellant the opportunity to present affirmative exculpatory evidence **[Bromwich Report, etc.]** in support of his defense.  Whether rooted directly in the **Due Process Clause of the Fourteenth Amendment** or in the **Compulsory Process or Confrontation Clause of the Sixth Amendment**, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" **Holmes v. South Carolina, 547 U.S. (2006); Ray v. State, 178 SW3d 833 (Tex. Crim. App. 2005)** Appellant submits that he was not afforded these constitutional protections during his trial.

## POINT OF ERROR NUMBER THREE

## THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN APPELLANT'S   CONVICTION FOR THE OFFENSE OF CAPITAL MURDER (CR-I-2)(CR-III-484-507)(CR-III-530)

### STATEMENT OF FACTS

The Statement of Facts appearing at the beginning of this brief, along with those

EXHIBIT 1 Page 087

appearing below, will be used in conjunction with this Point of Error.

Appellant was charged with the offense of capital murder in the death of Angelo Garcia, Jr. The indictment contained two paragraphs alleging that Appellant, while in the course of committing or attempting to commit the kidnapping of Angelo Garcia, Jr., intentionally caused the death of Angelo Garcia, Jr., by: [1] stabbing Angelo Garcia, Jr., with a deadly weapon, namely a sharp instrument, and [2] an unknown manner and means. (CR-I-2)

The jury charge included a "parties" charge, naming Rogelio Aviles and/or Carmelo Martinez-Santana, as possible actors. (CR-III-484-507) The jury was instructed on the lesser-included offenses of murder and aggravated kidnapping. (CR-III-484-507) Appellant was found guilty of capital murder as charged in the indictment. (CR-III-506)

The State's witnesses contradicted themselves, and each other, concerning significant issues relied upon by the State to secure a conviction for capital murder in this case.

Identity became an issue from the outset when the first responding officer put out a description of two black males. There were no additional comments that the individuals the police would be looking for were Hispanic or from the Carribean. (R-XVIII-55) This issue was compounded when homicide officer C.E. Elliott confirmed that police were looking for two black males, but then tried to explain away the conflict (Appellant is not Black) by claiming that the descriptions were a result of "cultural" differences. (R-XVIII-101) Elliott finally admitted during cross examination that he never put any information in his offense report reflecting about the cultural issue - he did not modify the description of the alleged assailants to include any other race or ethnicity. (R-XVIII-105) Elliott confirmed that Diana

EXHIBIT 1 Page 088

Garcia did not get a good look at the individuals she claimed assaulted her and Arturo Rodriguez. (R-XVIII-118) **Sufficiency Issues: The witnesses specifically stated two black males were the perpetrators. Although the police could have given more detailed descriptors in the offense report, they did not - two black males were always the suspects. Arturo Rodriguez told police the man spoke like a black man.**

The truthfulness of Diana Garcia was immediately cast into doubt when she lied to responding officers about her drug dealing from her residence. (R-XVIII-166) This fact was obvious the officer Elliott who initially interviewed her about the facts of the case. (R-XVIII-109) Elliott stated he knew Garcia was not being truthful with him. (R-XVIII-109) It was only later that Garcia would admit that she, and Arturo Rodriguez, made a living selling cocaine. (R-XVIII-143) In fact, Garcia later admitted that she knew Arturo Rodriguez (with whom she was having an affair) was involved in cocaine and she became involved in drug dealing with him. (R-XVIII-126,128) Garcia acknowledged that her drug dealing took place at their first residence on Winfrey, as well as the Fairway address. (R-XVIII-130) Garcia testified that Appellant was a frequent visitor at their apartment (two times a week) and had been there earlier in the day on September 30, 1992. (R-XVIII-138,145,179,184) **Garcia knew of no reason why Appellant would be mad at her or Arturo Rodriguez.** (R-XVIII-179) Garcia claimed that she saw a second man in the doorway of her bedroom, but she was unable to identify him. (R-XVIII-156) She could not say whether the second man was black, brown or white. (R-XVIII-182) **Garcia could not identify who tied her up.** (R-XVIII-153) **Sufficiency Issue: Garcia lied to the police about her involvement as a drug dealer. Her**

78

EXHIBIT 1 Page 089

claim that Appellant was at her apartment weekly, and earlier on that day, provides an alternate explanation for the presence of the cigar. As noted during final argument, her story about an armed man wearing a mask coming in with a cigar doesn't make sense. Additionally, the presence of spermatozoa, while it may prove sexual contact, doesn't prove sexual assault. The SANE nurse verified that Garcia sustained no physical injuries. Although Garcia personally knew Appellant, she did not allude to him by description, or otherwise, as her "attacker".

According to officer Elliott, Arturo Rodriguez lied to the police about his drug dealing. (R-XVIII-109) Garcia tried to contradict that impression by claiming that he had always told the police that he was involved in drugs. (R-XIX-21,24) Although Rodriguez told the jury the previous day that he had sold drugs for three years, he tried to claim it was only two years when cross examined. (R-XIX-6) Rodriguez then stated that he sold drugs for four years. (R-XIX-6) Rodriguez stated that he and Diana Garcia sold drugs just to have a better life. (R-XVIII-198) Rodriguez described his relationship with Appellant as friendly and a business relationship. He said he never had any problems with Appellant. (R-XVIII-201,204) Rodriguez was contradicted by Garcia concerning several issues: Garcia said her son, Angelo, was aware of what was taking place , while Rodriguez said Angelo was not aware at all. (R-XVIII-155) (R-XVIII-215); Garcia admitted the .25 handgun was hers., while Rodriguez tried to claim it may have belonged to the assailants.(R-XVIII-191)(R-XIX-9); Garcia claimed that Rodriguez went unconscious, but Rodriguez claimed he had been hit in the head three times and never lost consciousness. (R-XVIII-159)(R-XIX-3). Although Garcia testified that Appellant came to their residence during the afternoon of September 30,

79

EXHIBIT 1 Page 090

1992, Rodriguez denied having seen Appellant earlier that day. (R-XVIII-184)(R-XIX-11) Rodriguez claimed he could not remember if he had an argument that same day at a store with a tall black man and a Hispanic male. (R-XIX-11,12) Rodriguez said he saw the person who was raping his wife, but he did not know who it was. (R-XIX-15)  **Sufficiency Issues: This witness lied to the police about being a drug dealer, then tried telling the jury he had been honest with the police and admitted his involvement with drugs.  His testimony was contradicted by Garcia's testimony about how the events allegedly took place.  Rodriguez never had a problem with Appellant and did not offer any reason why Appellant would steal drugs or money from them or take Angelo, Jr. or sexually assault Diana Garcia. He didn't recall seeing Appellant at the apartment earlier in the day as his wife testified.  Curiously, when he was asked if Appellant and Garcia ever dated, he paused before stating - not that I know of. Recalling that Rodriguez described the intruders as black, it is questionable that he  could not remember if he had an argument at a store with a tall black man and a Hispanic male earlier that same day.**

SANE nurse, Gloria Kologinczok, who performed a sexual assault examination on Gloria Garcia, found no evidence of physical injury or trauma to Garcia. (R-XIX-48) **Sufficiency Issue: No medical verification that a sexual assault occurred.**

HPD officer U.P. Hernandez interviewed Arturo Rodriguez. Hernandez contradicted the earlier testimony from Rodriguez when he claimed he had been honest with police about his drug dealing. (R-XIX-24,72,72)   Hernandez acknowledged that this was a huge inconsistency between his testimony and that of Diana Garcia ,who eventually did admit to

80

EXHIBIT 1 Page 091

being a drug dealer. (R-XIX-98)  In fact, Hernandez documented in his offense report that Rodriguez denied being involved with drugs at all. (R-XIX-101)  **Sufficiency Issue: The police found Rodriguez to be untruthful with them during the investigation.**

Dr. Dwayne Wolf, the deputy chief medical examiner for Harris County, Texas, could not state how Angelo Garcia, Jr. died. (R-XX-20)  Dr. Wolf admitted that he had no medical records establishing Garcia's earlier health history.  He could not even say whether Garcia had drowned. (R-XX-20)  Wolf ruled Garcia's death a homicide based not on medical findings, but rather the investigator's report of what had allegedly transpired. (R-XX-24,31) The State simply did not establish the cause of death through verifiable medical evidence. **Sufficiency Issue: No proof to establish either of the allegations in the indictment concerning how Angelo Garcia, Jr. supposedly died.**

Eric Mehl, a retired HPD officer, testified that in 2007, he initiated a "cold case" file in this matter. (R-XX-43)  Mehl testified on direct examination that he never even thought of using DNA technology to solve a crime over at HPD back in 1992. (R-XX-40)  The trial court found that the prosecutor had left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD Crime Lab for analysis. (R-XX-66)  Mehl then admitted that in 1992,  HPD did have a crime lab that was processing evidence for DNA.  He further admitted that in this very case, items were submitted to the HPD Crime Lab for processing of DNA. (R-XX-67) **Sufficiency Issue: Mehl did not offer concrete testimony regarding the previous collection, storage or transportation of the biological evidence relating to the HPD Crime Lab prior to him sending it to Orchid Cellmark.**

81

EXHIBIT 1 Page 092

Angelita Rodriguez, Appellant's ex-wife, testified that when she went to bed on the evening of September 30. 1992, Appellant was at home.  She testified he was also home when she woke up the next morning. (R-XX-101,102(R-XX-92)  Appellant and Rodriguez had a fight months before and they no longer shared the same bedroom. (R-XX-102)  The next morning Appellant told Rodriguez he was leaving her and going to Puerto Rico - never to return to Houston. (R-XX-99)  When Rodriguez went after Appellant, she claimed that he simply confessed that he had killed Angelo Garcia, Jr. (R-XX-107)  Incredibly, Rodriguez said she did not remember what else he said. (R-XX-107)  Rodriguez conveniently claimed that she was scared when defense investigators approached her in 2012 for an interview - stating that's why she forgot to mention that Appellant had confessed to her. (R-XX-112)

**Sufficiency Issues: Appellant's ex-wife had reason to despise Appellant for his infidelity and for leaving her to go to Puerto Rico.  Her specific memory that in 1992 Appellant only confessed to killing Angelo Garcia, Jr. and nothing more, is questionable at best. She conveniently forgot to tell defense investigators this "fact" when interviewed.**

Carmelo Martinez Santana "Rudy", the cousin of Angelita Rodriguez was serving a seventeen year federal prison sentence in Pennsylvania for drugs and weapons, when he had a visit from the FBI. (R-XX-119)  Santana stated that he was not personally aware of a romantic relationship between Appellant and Diana Garcia.  He testified that Appellant did not hide the fact that he was unfaithful to Santana's cousin [Appellant's wife]. (R-XX-134) Santana claimed that he accompanied Appellant and "Roger" to Garcia's apartment where the other two went in wearing masks. (R-XX-143)  Santana went on to share details of what Appellant allegedly said when he exited the apartment and got back in the car - claiming that

EXHIBIT 1 Page 093

a young boy accompanied Appellant and Roger.  Santana was careful to posture himself as an unwitting passenger while telling the jury he was so upset by what was happening, that he defecated. (R-XX-150)  This detail ,which Santana used to exemplify how horrified he was, escaped him when he told his story to FBI Agent Ebersol at the federal prison. (R-XXI-69)  Additional impeachment of Santana included his claim that he had never been to Baytown before that night, but was able to provide precise directions how to get there. Santana denied selling drugs in Baytown as well. (R-XXI-37,38)  This recollection, along with his remembrance of how many tires blew out on their car when leaving Baytown, was contradicted by the testimony of FBI Agent Ebersol. (R-XXI-69,70,75)  Santana's claim that they stayed up all night doing drugs was contradicted again by Agent Ebersol who stated that Santana claimed that when he and Appellant returned to Humble, Appellant went to sleep with Angelita. (R-XXI-40,77)  Throughout cross examination, Santana attempted to avoid answering the question about him not being charged with anything as a result of his involvement, by saying he just wanted to tell the truth and that he had no "deal" with the State to give his testimony. (R-XXI-12,15,16)  Santana told the jury that he believed that Rogelio was actually the person responsible for killing Angelo Garcia, Jr. (R-XXI-57) FBI Agent Ebersol would later tell the jury that Santana acknowledged that the boy went off with Rogelio and that he recalled Appellant actually being at the front of the car. (R-XXI-71-74) **Sufficiency Issues: Serving a seventeen year federal prison sentence, this witness was contradicted by FBI Agent Ebersol on critical points of his testimony against Appellant. He wanted the jury to believe that he had no deal to provide testimony and just wanted**

83

EXHIBIT 1 Page 094

to tell the truth. Santana believes Rogelio "Bory" killed Angelo Garcia, Jr. No evidence that Appellant caused the death of Angelo Garcia, Jr.

Linda Hernandez knew Santana "Rudy" through Bienviendo Melo "Charlie". She described how her own mother didn't trust Rudy. She was especially bothered by the fact that Rudy always wanted to take her son to the store with him. She never allowed this to happen. (R-XIX-173) **Sufficiency Issue: Hernandez provides insight into Santana's bad character and his interest in being alone with her young son. This further discredits Santana's testimony.**

The State's DNA evidence offered through Matt Quattaro from Orchid Forensics could not exclude Appellant as a possible contributor to the DNA found on a cigar found at Diana Garcia's apartment and as a major contributor to a mixture found on a cutting from a pair of underwear worn by Garcia. (R-XXI-112-119) Quattaro admitted during cross examination that he had no personal knowledge concerning what, if any, quality controls existed at other labs (HPD Crime lab) where the evidence had been previously stored for over 15 years. (R-XXI-130) He acknowledged that prior to receiving the evidence from the HPD Crime Lab, he did not know how it was collected or how or where it was stored - there were no notations concerning previous quality control, (R-XXI-134,141) Quattaro certainly could not specify that the presence of spermatozoa was a result of consensual sex or assault. (R-XXI-134) Courtney Head (HPD Crime Lab) who served as a "reviewer", testified that Appellant could not be excluded as a contributor on the evidence (cigar, vaginal swab and cutting from the panties) (R-XXI-161,162) On cross examination, Head admitted that she was only a "reviewer" and because she had not performed any testing, her work was not

84

EXHIBIT 1 Page 095

subject to quality control or technical review. (R-XXI-172) **Sufficiency Issues: State did not establish a proper chain of custody of all the biological evidence in this case. Defense evidence was never permitted which would have allowed the jury to consider and decide, what part, if any, the HPD Crime Lab played in this case.**

## INSUFFICIENT EVIDENCE TO PROVE APPELLANT'S GUILT

The jury was instructed that it could not convict appellant of capital murder unless it found each and every element of the offense charged beyond a reasonable doubt and if the State failed to do so, it must acquit the defendant [Appellant]. (CR- III-503)

## ARGUMENT AND AUTHORITIES

**Section 19.03(2) of the Texas Penal Code**, provides that a person commits an offense if the person commits murder as defined under **Section 19.01(b)(1)** and the person intentionally commits the murder in the course of committing or attempting to commit kidnapping. The State is obligated to prove beyond a reasonable doubt that Appellant had the specific intent to cause the death of Angelo Garcia, Jr.

The burden of proof is on the State to establish beyond a reasonable doubt that Appellant committed the offense alleged. **Hightower v. State, 389 SW2d 674 (Tex. Crim. App. 1965); McCullen v. State, 372 SW2d 693 (Tex. Crim. App. 1964)** This burden of proof is on the State to prove each and every element of the offense beyond a reasonable doubt. **Mullaney v. Wilbur, 421 US 684 (1975) In re Winship, 397 US 358 (1970)**

In Texas criminal jurisprudence, the concept of "legal sufficiency" of the evidence is based upon the law of due process. See: **Gollihar v. State, 46 SW3d 243 (Tex. Crim.**

EXHIBIT 1 Page 096

App.2001) citing *In re Winship*, 397 U.S. 358, where the court expressed it as follows: We expressly hold that the **Due Process Clause** protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

Sufficiency of the evidence is measured by the standard enunciated by the United States Supreme Court in **Jackson v. Virginia, 443 US 307 (1979)**: whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

In **Brooks v. State, 323 SW3d 893 (Tex .Crim. App. 2010)** this Court held there is no meaningful distinction between a **Clewis v. State, 922 SW2d 126 (Tex. Crim. App. 1996)** factual sufficiency standard and a **Jackson v. Virginia, 443 U.S. 307 (1979)** legal sufficiency standard. This Court announced that the **Jackson v. Virginia** legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. The court noted that it bears emphasizing that a rigorous and proper application of the **Jackson v. Virginia** legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is "barely distinguishable" or indistinguishable from a **Jackson v. Virginia** legal-sufficiency standard). Reversal and acquittal are required under this standard of review, if, after considering all the evidence the jury's finding of guilt is not a rational finding.

In her concurring opinion in **Brooks**, Judge Cochran noted that the **Jackson** Court

86

EXHIBIT 1 Page 097

stated the correct standard must incorporate the prosecution's burden of proof - beyond a reasonable doubt - in a due-process review. The court noted that a reasonable doubt has often been described as one based on reason which arises from the evidence of lack thereof. A reasonable doubt might arise because the verdict is manifestly against the great weight and preponderance of the credible evidence or because there is nothing more than a mere scintilla of evidence to support some element of the offense. Judge Cochran, cited **Black's Law Dictionary**, which states that legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." Judge Cochran went on to state that in criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a fact finder in concluding that *every element* of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. After giving proper deference to the role of the trier of fact, an appellate court must uphold the verdict unless a rational fact finder must have had a reasonable doubt as to any essential element. **Laster v. State, 275 SW3d at 518, citing Narvaiz v. State, 840 SW2d 415 (Tex. Crim. App. 1992)**

The complete record in this case fails to establish beyond a reasonable doubt that Appellant intentionally and knowingly caused the death of Angelo Garcia, Jr. as alleged in the indictment. There is no proof in the record to establish that Angelo Garcia, Jr. came to his death as alleged in the indictment.

In the absence of proof beyond a reasonable doubt that Appellant was responsible for

87

EXHIBIT 1 Page 098

the death of Angelo Garcia, Jr., a conviction for the offense of capital murder cannot withstand appellate review and the entry of a judgment of acquittal by the reviewing court. The evidence offered by the State's witnesses did not enhance the weight or sufficiency of the evidence on this issue. Viewing the evidence in the light most favorable to the verdict, the appellate court determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

An appellate court must always address challenges to the sufficiency of the evidence. **Garza v. State, 715 SW2d 642 (Tex. Crim. App.)** Such a review must be conducted when a legal sufficiency challenge is raised, even if the conviction must be reversed on other grounds, because a finding that the evidence is legally insufficient to support the conviction prevents a retrial under the double jeopardy clause of the **Fifth Amendment. Hudson v. U.S., 522 U.S. 93 (1977)** If this Court finds that the verdict is contrary to the evidence presented at trial, this Court can reverse the conviction and enter a judgment of acquittal. **Texas Code of Criminal Procedure, Art. 44.25; Texas Rules of Appellate procedure 43.2(c).**

Whether viewed individually, or collectively, the issues addressed in this Point of Error require reversal based on legally insufficient evidence. Appellant submits that this result will be reached after the Court conducts a rigorous and proper application of **Jackson** and **Brooks**. The jury's verdict was not based on a rational review of the evidence. **Winn v. State, 871 SW2d 756 (Tex. App. - Corpus Christi 1993)**

Appellant submits that even though a jury is charged with the responsibility of determining the credibility of witnesses and the weight to be given their testimony, in this

88

EXHIBIT 1 Page 099

case, as a matter of **Due-Process**, this appellate court should find that the verdict is not right or just, and therefore it cannot stand. Appellant submits that when this Court conducts its **Due-Process** review of the sufficiency of the evidence to support the conviction, even when viewing the evidence in the light most favorable to the verdict, it must find that no rational trier of fact could have found the essential elements of the crime of capital murder in this case beyond a reasonable doubt. **Stobaugh v. State, 02-11-00157-CR (Tex. App. - Fort Worth, January 23, 2014)** citing: **Jackson v. Virginia.**

Where the evidence is insufficient to sustain a conviction on appeal, double jeopardy bars a retrial. **Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).**

## POINT OF ERROR NUMBER FOUR

**THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO INTRODUCE EVIDENCE OF AN EXTRANEOUS OFFENSE [POSSESSION OF A CONTROLLED SUBSTANCE] BY PERMITTING THE STATE SHOW THAT APPELLANT FAILED TO APPEAR FOR A COURT SETTING ON OCTOBER 8, 1992 ON AN UNRELATED FELONY CHARGE AND THAT HIS BOND WAS FORFEITED ON THAT CHARGE ALL TO SHOW FLIGHT ON THE PART OF APPELLANT AT HIS CAPITAL MURDER TRIAL EVEN THOUGH THERE WAS NO CHARGE OF CAPITAL MURDER FILED AGAINST APPELLANT UNTIL 2008. (R-XIX-111,113,115,119,122-124,126,128,129,141,142)**

## STATEMENT OF FACTS

During the guilt / innocence phase of the trial, the State sought to introduce evidence showing that on October 8,1992, Appellant failed to appear for a court setting on an unrelated felony drug charge which was pending in the 337th District Court of Harris County, Texas. (R-XIX-105-120) Appellant's bond was forfeited on this unrelated case in the 337th District Court of Harris County, Texas. (R-XIX-111123,124,126) The State

89

EXHIBIT 1 Page 100

theorized that this evidence established "flight" on the part of Appellant, and was therefore relevant to Appellant's charge of capital murder. (R-XIX-120)

Appellant objected to the introduction of this extraneous offense as violating **Rule 404(b)**. (R-XIX-119,124,125,126,128,129,141)  Appellant also made a **403** objection that the extraneous offense was not relevant and that any probative value was outweighed by its prejudice to Appellant. (R-XIX-122,124,129)   The trial court found that the proffered evidence constituted an extraneous offense - ***"So, it's still an extraneous offense. I think it is still prejudicial and it was an unproven offense in that it was still only a charged offense. He was not convicted of it or anything."*** (R-XIX-115)  The prosecutor conceded this fact as well - ***"It's clearly an extraneous offense***, *which is what **404(b)** is for, and it creates exceptions outside of character conformity."* (R-XIX-120)

The trial court ordered that the docket sheet be redacted to remove any reference to the actual felony charge pending against Appellant from 1992. (R-XIX- 123,124). The trial court also ordered that the FBI Agent who was testifying when the documents were admitted, could not mention the existence of a federal flight to avoid prosecution warrant issued after Appellant failed to appear in the 337th District Court on October 8,1992. The documents admitted for the jury's consideration still contained the printed designation "337th" at the top of the docket sheet. (R-XIX-123,124,126)(SX #36)(R-XXX-42) Despite the trial court's effort to conceal that fact, the jury, realizing that Appellant's capital murder case was in the 337th District Court, could easily conclude that the offense Appellant bond forfeited on was a felony. (R-XXX-42)(SX #36) FBI Agent Eric Johnson was then allowed

90

EXHIBIT 1 Page 101

to discuss the contents of State's Exhibit #36 before the jury, explaining that Appellant failed to appear in court on October 8, 1992 to answer an un-related pending drug charge. (R-XIX-141,142)

## ARGUMENT AND AUTHORITIES

**Rule 404(b) of the Texas Rules of Evidence** provides that: "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....." **"Flight"** is not listed in **Rule 404(b)** as an exception to the rule prohibiting the admission of extraneous offenses during the State's case-in-chief.

The State argued that evidence of Appellant's failure to appear for an unrelated drug charge in 1992 was relevant to show "flight" on the part of Appellant regarding the capital murder case on trial. It is critically important to understand the juxtaposition of the 1992 drug charge and the 2008 capital murder charge. When Appellant did not appear in 1992 at his court setting in the 337th District Court (where he was charged with possession of a controlled substance) there were no pending charges against Appellant for capital murder or aggravated kidnapping. When Appellant did not appear in the 337th District Court on October 8, 1992, his bond was forfeited and a new bond was set by the court in the amount of only $10,000.00. (SX # 36)(R-XXX-42). Appellant was not charged with capital murder until September 5, 2008. (CR-I-4)

In **Cantrell v. State, 731 SW2d 84 (Tex. Crim. App. 1987)** this Court held that the

91

EXHIBIT 1 Page 102

forfeiture of an accused's bail bond **may** be proved as **tending to show** flight. (emphasis added) Appellant submits on appeal, as he did in the trial court below, that there is a critical distinction between showing an individual bond-forfeited on the very case he is being tried for, versus showing an individual bond-forfeited on an unrelated charge, especially where the charge for which that person is on trial did not exist at the time of the bond forfeiture - and in fact did not exist until 16 years later [1992 to 2008]. In **Cantrell,** this Court went on to note that the general rule in all English speaking jurisdictions is that an accused person is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The admission of court documents from the 1992 case pending in the 337th District Court clearly constituted evidence of a prohibited extraneous offense.

Extraneous transactions must be analyzed for relevance within the context of the facts and circumstances of the individual case in order to determine admissibility. **Cantrell, citing: Brandley v. State, 691 SW2d 699 (Tex. Crim. App. 1985)** In the instant appeal, Appellant had not been adjudicated on the 1992 drug charge when he went to Puerto Rico. Angelita Rodriguez testified that Appellant left for Puerto Rico shortly after the disappearance of Angelo Garcia, Jr. - her testimony on this point made evidence of the extraneous offense completely irrelevant.   This Court has long held that to support admission of evidence of flight it must appear that the flight has some legal relevance to the offense under prosecution. **Hicks v. State, 199 SW 487 (Tex. Crim. App. 1917)** The reasoning from this Court's opinion in **Damron v. State, 125 SW 396 (Tex. Crim. App.**

92

EXHIBIT 1 Page 103

**1910)** is instructive: Evidence of flight is admissible, where one is charged with an offense, on the ground, in substance that it is some evidence of guilt, and amounts to a quasi admission of guilt of the offense charged. If, however, the flight is in respect to another and different offense, it ought not be considered as evidence of the guilt of an offense in which there was no flight. Appellant submits the trial court erred in admitting evidence of the 1992 extraneous offense and bond forfeiture in his capital murder trial.

## POINT OF ERROR NUMBER FIVE

**THE TRAIL COURT ERRED WHEN OVER APPELLANT'S OBJECTION IT ADMITTED THE EXTRANEOUS OFFENSE EVIDENCE [SET FORTH IN THE PREVIOUS POINT OF ERROR] BECAUSE UNDER RULE 403 OF THE TEXAS RULES OF EVIDENCE ITS PROBATIVE VALUE, IF ANY, WAS OUTWEIGHED BY THE PREJUDICIAL EFFECT OF ITS ADMISSION DURING APPELLANT'S CAPITAL MURDER TRIAL.(R-XIX-111,113,115,119,122-124,125,126-128,129,141,142)**

### STATEMENT OF FACTS

The Statement of Facts appearing in the previous Point of Error are re-incorporated for consideration under this Point of error

### ARGUMENT AND AUTHORITIES

**Rule 402 of the Texas Rules of Evidence** provides, in part, that evidence which is not relevant is inadmissible. **Rule 403** states that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...

The trial court was obviously concerned, and rightfully so, that the admission of the extraneous offense was prejudicial to Appellant. The trial court, in deciding whether to

93

EXHIBIT 1 Page 104

admit the evidence noted: "Because at this point still we may have testimony from the complainants that he was involved in drugs. We don't have any admission from the defendant that he was involved in drugs. So, it's still an extraneous offense. I think it is still prejudicial and it was an unproven offense in that it was still only a charged offense. He was not convicted of it or anything." (R-XIX-115)   The prejudice to Appellant is underscored by the fact that the State had another witness [Angelita Rodriguez] who could testify that Appellant went Puerto Rico shortly after Angelo Garcia, Jr. went missing, but without referencing the extraneous offense which the State of Texas fought to have admitted before the jury under the theory that it constituted "flight" by Appellant. (R-XIX-117)

Where an appellant objects based on **Rule 403**, that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice..... the trial court has no discretion as to whether or not to engage in the balancing process. **Mozon v. State, 991 SW2d 841 (Tex. Crim. App. 1999)** Probative value refers to the inherent probative force of an item of evidence - that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation - coupled with the proponent's need for that item of evidence. **Casey v. State, 215 SW3d 870 (Tex. Crim. App. 2007)**  In the instant appeal, the trial court's initial comments regarding the prejudicial effect of the extraneous offense evidence (R-XIX-115) were compounded, not cured, by determining the amount of information the jury learned.  The probative value [which Appellant asserts was non-existent] was clearly outweighed by the admission of the extraneous offense which sought to establish that Appellant left Harris County, Texas shortly after Angelo Garcia, Jr.

94

EXHIBIT 1 Page 105

went missing - a fact subject to alternative proof not spotlighting an extraneous offense.

Appellant submits that he is entitled to relief under both Points of Error addressing the admission of evidence of an the extraneous offense.

## POINT OF ERROR NUMBER SIX

**THE TRIAL COURT ERRED WHEN IT PROHIBITED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE INCLUDING BIBLE STUDY CERTIFICATES DURING THE PUNISHMENT PHASE OF THE TRIAL THUS PREVENTING APPELLANT FROM PRESENTING A COMPLETE DEFENSE (R-XXVI-55-58)(R-XXXIV-DX48-55)**

### STATEMENT OF FACTS

During the punishment phase of the trial, Appellant sought to introduce Bible certificates he had earned while incarcerated in a Puerto Rican prison. (R-XXVI-55-58)(R-XXXIV-DX48-55)  These certificates were offered as mitigating evidence for the jury's consideration of the Special Issues they were called upon to answer.  The State objected that the Bible certificates constituted hearsay. (R-XXVI-58)  Appellant's counsel urged the trial court to admit the Bible certificates because there was no suggestion that they were not Appellant's certificates and, given that it was the punishment phase of a capital murder trial, the court should view it as a question of weight, not admissibility. (R-XXVI-57)  The trial court found the Bible certificates to be relevant, but excluded them on hearsay grounds. (R-XXVI-58)

### ARGUMENT AND AUTHORITIES

**Article 37.071 of the Texas Code of Criminal Procedure** requires the jury to answer Special Issues at the conclusion of the punishment phase of a capital murder trial where the death penalty is in issue. **Article 37.071** instructs the jury that in deliberating on

95

EXHIBIT 1 Page 106

the issues submitted.......**it shall consider all evidence** admitted at the guilt or innocence stage and the punishment stage, **including evidence of the defendant's background or character** or the circumstances of the offense **that** militates for or **mitigates against the imposition of the death penalty.** Concerning "mitigation", the jury is asked: **Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment........be imposed.** The jury is further charged that **it shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.**

In the instant appeal, Appellant sought to introduce mitigating evidence in the form of Bible certificates. **Rule 102 of the Texas Rules of Evidence - Purpose & Construction** states: These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined. Appellant submits that the Bible certificates were admissible under the following Rules: **Rule 803(11)** - the Bible certificates contained facts relating to Appellant's personal or family history maintained by the religious organization providing spiritual guidance to incarcerated individuals ; **Rule 803(13)** - the Bible certificates also provided a statement of fact concerning Appellant's personal or family history even if not "contained" in any particular format. **Rule 803(19)** - Appellant's brother was aware of his brother's

96

EXHIBIT 1 Page 107

involvement in Bible classes which formed part of Appellant's reputation concerning personal or family history.  The Bible certificates could also have been admitted pursuant to **Rule 804(3)** as statements of personal or family history.

The State's hearsay objection should have been overruled. The State would have been free to address the weight and credibility of the Bible certificates before the jury pursuant to **Rule 104(e)**  The exclusion of the Bible certificates preventing Appellant from giving meaningful context to the testimony of Angel Meza. Meza was a trustee at the Harris County Jail while Appellant was awaiting trial on this capital murder charge.  Appellant would meet with Meza and talk about his Bible.  Meza described Appellant as a "Man of God" who tried to help him in every way he could. (R-XXVI-81-85)  In the absence of the Bible certificates showing that Appellant was immersed in religious study after 1992, but before being charged with capital murder, the jury had no meaningful way to consider the limited testimony of Meza as a mitigating factor.  Appellant submits that the Bible certificates were improperly excluded in violation of the **Eighth and Fourteenth Amendments** by preventing him from presenting mitigation evidence as recognized in **Skipper v. South Carolina, 476 U.S. 1 (1986) The Eighth and Fourteenth Amendments** require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record........that the defendant proffers as a basis for a sentence less than death. **Lockett v. Ohio, 438 U.S. 586 (1978)** Appellant further urges this Court to find that in the instant case the hearsay rule (if found to apply) must yield, because the State had no sufficient basis for doubting the reliability of the hearsay and it

EXHIBIT 1 Page 108

could have aided the jury in its determination of a material issue. **Chambers v. Mississippi, 410 U.S. 284 (1972)** In disallowing the introduction of the Bible certificates, especially in light of Meza's testimony, the trial court violated **Appellant's Sixth Amendment** by not affording him a "meaningful opportunity to present a complete defense". **Holmes v. South Carolina, 547 U.S. 319 (2006)**

### POINT OF ERROR NUMBER SEVEN

**THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE THAT HE WAS AN INFORMANT FOR THE FBI, DEA OR INS (R-XXIV-70-74)**

### STATEMENT OF FACTS

The State presented testimony from Agent Juan DeJesus Rodriguez (hereinafter Agent DeJesus) with the Police of Puerto Rico. (R-XXI-44)  After testifying about an investigation he conducted which involved Appellant as a suspect in the kidnapping of Andres Buten and William Garay. (R-XXIV-46)  The details of the investigation are set forth in the Statement of Facts in this Brief.

At the commencement of his cross examination of Agent DeJesus, Appellant's counsel asked the witness about his knowledge of Appellant's role as an informant for the FBI, DEA or INS. (R-XXIV-69)  The State objected that the this evidence was irrelevant. (R-XXIV-69)  The trial court called the parties to the bench and stated: Does it have to do with the fact that - - - I can see some relevance, but not getting into anything that he is not supposed to get into. (R-XXIV-69)  The trial court conducted a hearing into the matter outside the presence of the jury. (R-XXIV-70,71)

EXHIBIT 1 Page 109

Mr. C:  Okay. Did you have a conversation with my client after he was in custody wherein he informed you that he was some sort of informant for either the FBI, the DEA, or INS?

DeJesus:  Yes.

Mr. C:  And did you attempt to confirm whether that was true or not?

DeJesus:  Yes.

Mr. C:  Were you able to confirm that it was true?

DeJesus:  The agents said that he cooperated with the agency, but it was never confirmed in writing.

Mr. C:  So, it was confirmed, but you didn't get anything in writing?

DeJesus:  Yes.

Mr. C:  Was the defendant claiming that he was acting in this capacity when these events occurred for which he got convicted in Puerto Rico?

DeJesus:  Yes.

Mr. C:  But that was never confirmed to you; is that what you're saying?

DeJesus:  No.

Mr. C:  Not orally or in writing, or was it confirmed orally but not in writing?

DeJesus:  Orally that he had cooperated with them, but not in writing.

Mr. C:  Okay. Let me see if I can be certain of this. Orally that he had cooperated - - - strike that. Orally that - - - somebody from the United States government confirmed that he was cooperating with them during the course of these events for which he was arrested and got convicted or just that he cooperated with them in the past?

DeJesus:  That he had cooperated previously.

The State renewed its objection that the testimony was irrelevant hearsay.

99

EXHIBIT 1 Page 110

The trial court asked: Do you find it mitigating in any way?  We're here for punishment. Is that mitigation punishment - - - is that mitigation evidence?

Although the trial court found that the evidence may be relevant to mitigation in some form or fashion in this case, it sustained the State's objection on the basis that the proffered evidence was hearsay. (R-XXIV-71-74)

## ARGUMENT AND AUTHORITIES

In addition to the Argument and Authorities supplied below, Appellant incorporates the Argument and Authorities relied upon in the previous  Point of Error  for this Court's consideration of this Point of Error pursuant to **Rule 38.1(f) & (i) of the Texas Rules of Appellate Procedure** to avoid duplication and repetition of argument.

**Rule 803(21) of the Texas Rules of Evidence** allows for testimony concerning reputation of a person's character among associates or in the community. This Court has held that discussions with other police officers are sufficient to qualify a witness on reputation. **Turner v. State, 810 SW2d 423 (Tex. Crim. App. 1991) citing: Martin v. State, 449 SW2d 257 (Tex. Crim. App. 1970)** Reputation must at least partially based on a discussion of matters other than the actions or offenses for which the defendant is being tried.

The trial court clearly recognized that Appellant's proffered evidence was mitigating. (R-XXIV-71-74)

Appellant submits that the relationship between fellow law enforcement officials cooperating in an investigation establishes the reliability of the information needed to

100

EXHIBIT 1 Page 111

overcome any concern the State might have concerning the reliability of that very information. The confirmation provided to Agent DeJesus in the instant appeal is not the sort of information that would be disseminated to others outside the law enforcement community. Keeping in mind that this evidence was offered during the punishment phase of Appellant's death penalty trial, the trial court's refusal to admit this evidence was, at the very least, an abuse of discretion. Appellant submits that prohibiting Agent DeJesus from testifying that he had confirmed Appellant's role as a law enforcement informer violated the **Sixth, Eighth and Fourteenth Amendments** by preventing Appellant from presenting mitigation evidence to the jury tasked with answering the Special Issues presented to it in accordance with **Article 37.071.** As noted in the preceding Point of Error , Appellant again relies upon the Supreme Court's holdings in **Lockett v. Ohio; Chambers v. Mississippi; and Holmes v. South Carolina** to show he was not afforded a "meaningful opportunity to present a complete defense.

## POINT OF ERROR NUMBER EIGHT

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT INJECTING FACTS OUTSIDE THE RECORD (R-XXIII-80)**

### STATEMENT OF FACTS

During her final summation to the jury, the prosecutor assailed Appellant's defense by claiming that it had only given " half truths" when presenting its case. (R-XXIII-80)

The prosecutor stated: *"I'm responsible for the whole story and you hold me accountable.* ***I will tell you the whole story****. And I'm not going to leave out and talk about*

101

EXHIBIT 1 Page 112

*half of what a witness said and not talk about the whole thing, I promise you that. That's*

*my job.* ***Let me give you another example, another example of half the story. The SANE***

***nurse. She came here and she said: Well, there were no injuries.*** *Wow, that must mean*

*Obel Cruz-Garcia is guilty— is not guilty of capital murder according to the defense*

*attorneys. No. Let's talk about what else the SANE nurse said. And* ***I want to say she said***

***95% ----- it is a very high percentage– of rape cases that she does SANE nurse***

***examinations on—*** *"* (R-XXIII-80)

Appellant objected that the prosecutor's argument was outside the record. (R-XXIII-80)The trial court overruled Appellant's objection. (R-XXIII-80)

### ARGUMENT AND AUTHORITIES

Permissible jury argument falls into one of four areas. **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000)** The four areas of proper argument are:

1.   Summation of the evidence;

2.   Reasonable deduction from the evidence;

3.   An answer to the argument of opposing counsel; or

4.   A plea for law enforcement.

In the instant appeal, the prosecutor's comments fell outside the permissible scope of final argument set out above. The Prosecutor's comments were outside the record and amounted to unsworn testimony being provided to the jury. The testimony of the SANE nurse was critically important to the State's case because she was the individual who began the evidentiary chain of custody of by performing a sexual assault examination on Diana

102

EXHIBIT 1 Page 113

Garcia.  The evidence, including all results of testing on items taken by the SANE nurse,

were contested throughout trial.  The State obviously felt compelled to try and dispel  any

doubt created by the absence of "injuries" found by the SANE nurse when she examined

Garcia.  In asserting that 95% of the SANE examinations do not reveal injuries, the

prosecutor misstated the testimony and went outside the record.  The SANE nurse actually

stated that: "I mean, it doesn't have to be physical injury or bruising or anything to say that

there was a sexual assault. I mean, that doesn't mean that there's not going to be some

assault. I mean, the crime lab will analyze the evidence that I have collected otherwise."

When asked if it was common for her not to find physical injury or trauma in the

examinations that she performs, Kologinczok stated that most of the sexual assault exams

that she performed didn't find bruising or other injuries.  She did not further quantify her

response. (R-XIX-49) Appellant submits that the State's comments fell outside the accepted

scope of final argument. **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000);**

**Garrison v. State, 528 SW2d 837 (Tex. Crim. App. 1975)**

### POINT OF ERROR NUMBER NINE

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT ASKING THE JURY TO CONVICT APPELLANT OF CAPITAL MURDER AS A PARTY BECAUSE THAT WAS WHAT THE STATE BELIEVED ACTUALLY HAPPENED - THAT APPELLANT DIRECTED AND ENCOURAGED.  (R-XXIII-92)**

### STATEMENT OF FACTS

During her continuing summation to the jury, the Prosecutor discussed all the

different ways the jury could find Appellant guilty of capital murder as set forth in the

EXHIBIT 1 Page 114

court's jury charge. The Prosecutor then stated that what "we" believe happened is the defendant directed and encouraged. (R-XXIII-92) The trial court overruled Appellant's objection that this argument was improper because it put the beliefs of the prosecutors into the argument. The trial court overruled Appellant's objection and made no further comment to the jury. (R-XXIII-92)

## ARGUMENT AND AUTHORITIES

The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at the trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence. **Stearn v. State, 487 SW2d 734 (Tex. Crim. App. 1972)**

As noted in the preceding Point of Error, to receive the stamp of approval of this Court, jury arguments must be within the four areas set forth in **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000); Campbell v. State, 610 SW2d 754 (Tex. Crim. App. 1980)**

It is not proper for the personal beliefs of the prosecutor (individually or collectively) to be presented to the jury as part of its consideration of the case. A prosecutor may not inject personal opinion of guilt into the jury argument. **Williams v. State, 1989 WL 97549 (Tex. App. [14th Dist.] 1989)** not designated for publication. The State's argument went outside the record and invited the jury to consider and weigh the prosecutor's unique knowledge and evaluation of the evidence in rendering its verdict. Appellant submits that the trial court erred when it failed to sustain Appellant's objection. **Garrison v. State, 528**

EXHIBIT 1 Page 115

SW2d 837 (Tex. Crim. App. 1975)

Unlike **Cannady,** where the trial court gave an instruction to disregard, in the instant appeal the jury was allowed unfettered consideration of the State's argument. **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000)** In the absence of an instruction to disregard the improper argument, the error asserted under this Point of Error was not cured. **Ramson v. State, 920 SW2d 288 (Tex. Crim. App. 1996)**

## POINT OF ERROR NUMBER TEN

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT WHICH WAS OUTSIDE THE RECORD AND INJECTED HER PERSONAL BELIEF THAT IF IT HAD BEEN UP TO THE CO-DEFENDANT, ANGELO GARCIA WOULD STILL BE ALIVE (R-XXVI-163-165)**

### STATEMENT OF FACTS

During her punishment summation, the prosecutor argued:

*"Because I will tell you right now, if it were up to Roger alone, Angelo would still be alive."* (R-XXVI-163,164)   Appellant objected that the comments were outside the record and there was no evidence to support it. (R-XXVI-164)   The trial court overruled Appellant's objection. (RE-XXVI-164,165)

### ARGUMENT AND AUTHORITIES

As noted in Point of Error Number Eight above, there are four recognized and permissible areas of final argument.   Error is found when facts not supported by the record are injected in the argument.   Reversal will follow if the complained-of argument is extreme or manifestly improper. **Brown v. State, 270 SW3d 564 (Tex. Crim. App. 2008)** When

EXHIBIT 1 Page 116

the prosecutor made the factual statement set forth above, she injected evidence outside the record into the jury deliberation process. **In Stearn v. State, 487 SW2d 734 (Tex. Crim. App. 1972)** this Court reversed a conviction when the prosecutor stated in his argument to the jury that "we couldn't bring you all the circumstances surrounding the arrest". In that case, the Court concluded that the jury would logically surmise from the complained of argument that there was inadmissible evidence which, if revealed, would show them other acts committed by the appellant during the arrest that they should know about. Similarly, in the instant case, the prosecutor left the distinct impression that she knew "Roger" never intended to cause the death of Angelo Garcia, Jr. This constituted an improper argument that went outside the record. This punishment phase argument was extreme and manifestly improper requiring reversal.

## POINT OF ERROR NUMBER ELEVEN

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR MISTRIAL BASED UPON THE IMPROPER JURY ARGUMENT OF THE PROSECUTOR WHEN SHE WENT OUTSIDE THE RECORD (R-XXVI-171,172)**

### STATEMENT OF FACTS

Continuing with her punishment summation to the jury, the prosecutor said:

*"What else? They want to minimize the escape attempt. Justin talked to you about that. What do you think happened after he attempted to escape? You think he might have wound up in administrative segregation. I bet he did."* (R-XXVI-171)

Appellant objected this argument was outside the record. (R-XXVI-171,172) When the prosecutor responded that it was invited argument, the trial court sustained Appellant's

EXHIBIT 1 Page 117

objection and admonished the prosecutor to stay within the record. (R-XXVI-172) Appellant asked for an instruction to the jury to disregard the prosecutor's comment. The trial court granted the instruction, but denied Appellant's Motion for Mistrial. (R-XXVI-172)

## ARGUMENT AND AUTHORITIES

Appellant incorporates the Argument and Authorities set forth in the preceding Point of Error in support of this Point of Error again complaining of the State's improper jury argument. The sarcasm inherent in the prosecutor's comment constituted an argument outside the record. While the trial court recognized this fact and admonished the prosecutor, it did not go far enough in providing relief to Appellant. A prosecutor may not use final argument to invite the jury to speculate about matters that are outside of or unsupported by the record. See: **Borjan v. State, 787 SW2d 53 (Tex. Crim. App. 1990)**

## POINT OF ERROR NUMBER TWELVE

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR NEW TRIAL BASED UPON JURY MISCONDUCT DURING THE PUNISHMENT DELIBERATIONS WHERE THE JURY FOREMAN INFLUENCED THE DELIBERATION BY QUOTING FROM HIS BIBLE ABOUT THE CORRECTNESS OF THE DEATH PENALTY THUS CONSTITUTING AN IMPERMISSIBLE OUTSIDE INFLUENCE (CR-III-522,538)**

## STATEMENT OF FACTS

The jury charge at the punishment phase of the trial included the following instructions:

*"During your deliberations upon the "Special Issues", you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor*

107

EXHIBIT 1 Page 118

*mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence."* (CR-III-522)

*"In arriving at the answers to the "Special Issues" submitted, it will not be proper for you to fix the same by lot, chance, or any other method than by a full, fair and free exchange of the opinion of each individual juror."* (CR-III-522)

*"You are the exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given to their testimony, but you are bound to receive the law from the Court which has been given to you and you are bound thereby."* (CR-III-522)

After the jury began its deliberations at the punishment phase of the trial, the court received a note indicating that one of the jurors needed to speak with the judge. (CR-III-512)  The note stated: *"May I please speak to judge"*.  The Note  was signed by Angela Bowman and the Foreman of the Jury.  The Clerk's file stamp reflects the date of July 19, 2013 at 3:20 p.m. (CR-III-512)  In response to the note, the trial court summoned the parties to the bench and announced that she would visit with Ms. Bowman in her chambers to find out what Bowman wanted to discuss. (R-XXVII-4)  The court interviewed Ms. Bowman outside the presence of the other jurors.  Bowman expressed her concerns to the court by relating that she was the only juror who could not agree with th questions - that she couldn't answer the same questions with everyone else and that she felt pressured.  Bowman stated that she didn't want to hold the jury up and asked whether she could be replaced by one of the alternates. (R-XXVII-5)  The trial court acknowledged that Bowman's answers were different from the rest of the jury, but indicated to her that her situation didn't qualify for replacing her with an alternate. (R-XXVII-5)  When the court told Bowman she would not

EXHIBIT 1 Page 119

be replaced and would have to continue deliberating with the others, Bowman said she didn't think she would ever come to an agreement - we're never coming to an agreement. (R-XXVII-6)  Bowman told the court that she was not in agreement with the other jurors concerning Special Issues 1 & 3.  Bowman confirmed that she was the only one with the different opinion.  She told the court that she was not changing her stance and neither were the remaining jurors. (R-XXVII-6)  The court again told Bowman that she would have to continue deliberating and it could take a pretty long period of time. (R-XXVII-6)  Bowman was told that if no verdict was reached that day, she and the other jurors would be staying again that night and the next. (R-XXVII-6)  At that juncture, the court made comments to Bowman that the jury is not being asked to vote to give the death penalty or not give the death penalty.  When Bowman was told to continue her deliberations, she said didn't want to have to stay another night. The court again told Bowman she had to continue deliberating. (R-XXVII-8)

The Clerk's record reflects that the jury returned its punishment verdict on July 19, 2013 at 4:30 p.m. a little more than one hour after the court received the note from the juror. (CR-III-663)  The jury's answers to the Special Issues resulted in the trial court sentencing Appellant to DEATH. Formal sentencing took place on July 22, 2013. (R-XXVIII-4)

On the evening of July 19, 2013 (the same day that the jury returned its punishment verdict) Mario Madrid, one of Appellant's trial attorneys, received a phone call from Angela Bowman - the juror who had expressed her concerns to the trial court judge earlier that day. In an Affidavit provided by Mr. Madrid, he related how Ms. Bowman told him that she was distraught over her decision to capitulate during the punishment phase deliberations by

EXHIBIT 1 Page 120

changing her vote from life in prison to the death penalty. Bowman stated that she had been pressured to change her position on the life vs. death decision. She said her decision was especially complicated by virtue of the fact that her daughter was suffering from a fever and she (Bowman) was unable to attend to her because of being sequestered. Bowman went on to complain that the jury Foreman improperly influenced the jury by quoting from his Bible during the decision-making process. Bowman believed the Foreman's introduction of the Bible into the process ended up swaying other jurors toward death rather than life in prison. (CR-III-541,542) Mr. Madrid also provided his professional opinion that a new trial or new trial on punishment was mandated because the death verdict returned in this matter was decided in a manner other than the fair expression of the juror's opinion. Madrid further noted, that in his opinion, the jury had received other evidence in the form of Biblical passages (not evidence admitted at trial) and that this constituted jury misconduct requiring relief. (CR-III-541,542)

On August 19, 2013, Appellant filed a Motion for New Trial. (CR-III-538) The Motion for New Trial included the Affidavits of Mario Madrid [referenced above] and private investigator, J.J. Gradoni who interviewed Angela Bowman as well as jury Foreman, Matthew Clinger. Gradoni's Affidavit noted that when speaking with the Foreman, Clinger readily admitted that he had read Romans 13, Genesis 9 and from Deuteronomy while other jurors were present. When Gradoni asked Clinger if he felt that his Bible verses changed a juror's vote, Clinger responded that he thought the Bible verses were contributing factors. (CR-III-554) Angela Bowman's Affidavit included in the Motion for New Trial, reaffirmed that her punishment vote was not her true and honest verdict. (CR-III-555) Bowman stated

EXHIBIT 1 Page 121

that Clinger's use of his Bible did influence other jurors. She explained how exasperated she became over her inability to know the current status of her daughter's health - concerned that she might have had pneumonia. Bowman noted that as soon as she left court, she took her daughter to the emergency room. Ultimately, Bowman said she was unduly pressured by other members of the jury to change her vote because she was taking too long and holding up the process and wasting their time. Bowman stated that her verdict was not a true and honest expression of her belief in the evidence supporting the special issues that called for the death penalty. She believed that jury misconduct deprived Appellant of a fair and impartial trial.

After the Motion for New Trial was filed, Appellant requested a live hearing to present live testimony in support of his Motion for New Trial. (CR-III-580)(R-XXIX-3) The trial court denied Appellant's request for a live hearing. (CR-III-584)(R-XXIX-3-4) The State of Texas opposed Appellant's Motion for New Trial. (CR-III-585) In compliance with the trial court's prior ruling, Appellant filed Affidavits in support of his Motion for New Trial and Supplement to his Motion for New Trial. (CR-III-602)  The affidavits submitted by Appellant included: 1). A certified copy of Mario Madrid's Affidavit; 2). A certified copy of the first affidavit from J.J. Gradoni; 3). A certified copy of Angela Bowman's affidavit; and 4) A second affidavit from J.J. Gradoni with a transcript of his interview of jury Foreman, Matthew Clinger, accompanied by the compact disc [CD] of that interview. (CR-III-603)

The trial court conducted a hearing (restricted to affidavits) on Appellant's Motion for New Trial and Supplement to the Motion for New Trial. (R-XXIX-3-33)

111

EXHIBIT 1 Page 122

During the hearing, the court admitted the State's affidavits in opposition to Appellant's request for a new trial. (R-XXIX-16,28) (R-XXXV) (SX#1 & 2)   When Appellant sought to introduce affidavits in support of his Motion for New Trial, the trial court admitted the affidavits of Mario Madrid (Def #1); J.J. Gradoni (Def # 2) and Angela Bowman (Def # 3) (R-XXIX-26) The second affidavit of J.J. Gradoni (Def # 4) which included the authenticated transcript of Gradoni's entire taped interview of jury foreman, Matthew Clinger, was not admitted. (R-XXIX-26)  This exhibit (Def # 4) is before this Court on the Bill of Exception made in the trial court below.(R-XXIX-26-32)  Appellant urges this Court to review and compare the sworn affidavit of Matthew Clinger prepared on behalf of the State (R-XXXV/SX#2) with the content of his recorded statement give to investigator, J.J. Gradoni. (R-XXXV/Def # 4) Clinger's written affidavit asserting he did not read his Bible out loud and the Bible did not influence other jurors, appears to be contradicted by his own words beginning  on page 22 of the transcript of that interview:

MC:    Yeah, but I had my Bible there too. I had it in my overnight bag.
JJ:    So did you read the Bible or did you quote it from memory?
MC:    No, I read it.
JJ:    Read it from the Bible?
MC:    Yeah
JJ:    Did it offend anybody?
MC:    Uh, no one said that, no.
MC:    And as I..I kind of qualified it by saying, you know, I'm not trying...as I said, Im not trying to be offensive. I just think, I think this will be helpful to Casey [referring to Casey Guillotte] and so, I just want to share it.
JJ:    So, after you read that was Casey able to say death?
MC:    Uh, after I read that she was able to move, that was, we were finishing up talking about the first question and she was able to move on from the first question. Uh, we still talked about a lot more stuff throughout the course of the day, but she was able to move on...
JJ:    No, no, that helped her to move on to question number two?

112

EXHIBIT 1 Page 123

MC:   Correct. (Page 22)

CK:   And the people were listening, I guess, when you were saying this, and did it help them to understand? You think it made a difference to them?

MC:   It made a difference to Casey. I don't know if it made a difference with anyone else.

CK:   Did it make a difference to you?

MC:   Uh, it felt good to be able to kind of share what I had, you know, what I had researched and spent time processing. I, I had already, that was a path I'd been down a number of times already (Page 23)

JJ:   So, but in your opinion, Cas, it is Casey?

MC:   Casey.

JJ:   Casey was able to come to peace with the first question after the scriptures?

MC:   Not just that, I mean, there were probably nine of the twelve that shared something during that time. And she, it was not just the scriptures. (Page 27)

As J.J. Gradoni is finishing his conversation with Matthew Clinger, the following concern is expressed by Clinger:

MC:   Alright, thank ya'll. Pleasure to meet you. Just curious if, I mean was the, you asked me about the scripture thing (unintelligible) Was that a problem at all of just kind of a...?  (Page 33)

The trial court denied Appellant's Motion for New Trial. (CR-III-665)(R-XXIX-31-33)

## ARGUMENT AND AUTHORITIES

**Rule 21.3 of the Texas Rules of Evidence** provides that a defendant must be granted a new trial, or a new trial on punishment, for any of the following reasons:

**Rule 21.3(c)** - when the verdict has been decided by lot or in any manner other than the fair expression of the juror's opinion;

**Rule 21.3(f)** - when, after retiring to deliberate, the jury has received other evidence; when a juror has talked with anyone about the case.

EXHIBIT 1 Page 124

**Rule 21.3(h)** - when the verdict is contrary to the law and evidence.

**Rule 21.7 of the Texas Rules of Appellate Procedure** states that the court may receive evidence by affidavit or otherwise.

**Rule 606(b) of the Texas Rules of Evidence** provides that upon inquiry into the validity of a verdict.....a juror may not testify as to any matter or statement occurrinbg during the jury's deliberation........However, a juror may testify: (1) whether an outside influence was improperly brought to bear upon any juror.

## FAILURE TO PROVIDE A LIVE WITNESS HEARING

This court has held that it would not apply a *per se* rule that a trial court must hear live testimony whenever there is a factual dispute in affidavits and a party asks for testimony. **Holden v. State, 201 SW3d 761 (Tex. Crim. App. 2006)** However, this court has also held that a trial court abuses its discretion in failing to hold a hearing when a defendant presents a motion for new trial raising matters not determinable from the record. **Reyes v. State, 849 SW2d 812 (Tex. Crim. App. 1993)** In the instant appeal, a juror came forward during guilt / innocence deliberations to notify the court of problems inside the jury room.   In response, the trial court focused on the need for the jury to continue its deliberations - sending Ms. Bowman back into the jury room.  Appellant submits that this "early warning signal" should have prompted the trial court to hold a live hearing on Appellant's Motion for New Trial to determine the cause of the problems Ms. Bowman tried to express to the court.  The trial court abused its discretion in failing to provide a full and complete "live" hearing to Appellant so that all the issues raised in the Motion for New Trial

114

EXHIBIT 1 Page 125

could be addressed through the testimony of live witnesses subject to contemporaneous cross examination. **Reyes v. State, 849 SW2d 812 (Tex. Crim. App. 1993)**

On numerous occasions, Appellant requested a live hearing to decide the merits of his Motion for New Trial. The trial court denied Appellant's requests, instead Ordering that Appellant and the State of Texas prepare affidavits to be submitted to the court for its consideration of the Motion for New Trial. (R-XXIX-4,6)  Appellant's investigator, J.J. Gradoni. Conducted post-trial interviews with the jurors. Ms. Bowman, who came forward to speak with the trial judge during guilt/innocence deliberations, provided an affidavit. Jury Foreman, Matthew Clinger had a lengthy recorded conversation with Mr. Gradoni. During the interview, Clinger was asked whether he felt that his Bible verses changed a juror's vote.  Clinger responded that he thought the Bible verses were contributing factors. (CR-III-554)  When Mr. Gradoni subsequently contacted Mr. Clinger to obtain a sworn affidavit from him in accordance with his interview, Clinger told Gradoni that his corporate counsel advised him against signing an affidavit, but to appear live in front of the court. (R-XXIX-8)

Appellant objected to the court's failure to provide Appellant with a live hearing on his Motion for New Trial at which witnesses would testify under oath as violating his **Sixth Amendment** right to confrontation. (R-XXIX-9) Appellant also objected that he was denied **Due Process** when the jury ignored the trial court's instructions set out above. (R-XXIX-9) The trial court erred and abused its discretion in failing to provide a full and complete hearing on Appellant's Motion for New Trial. **McQuarrie v. State, 380 SW3d 145 (Tex.**

EXHIBIT 1 Page 126

**Crim. App. 2012)** Appellant submits that in the interest of justice, this Court should abate the appeal and order the trial court to conduct a supplemental hearing at which sworn testimony from in-person witnesses would be received and made part of this record.

## OUTSIDE INFLUENCE IMPROPERLY BROUGHT TO BEAR ON JURY

A review of the documentation in support of Appellant's Motion for New Trial supports a finding that an outside influence was introduced before the jury when the foreman shared Bible scripture with the jury during punishment deliberations.

In **Oliver v. Quarterman, 541 F3d 329 (C.A. 5th Cir.)** The court noted that the **Sixth Amendment** forbids a jury from being exposed to external influences during its deliberations. In **Oliver**, the court held that the jury's consultation of Bible passages was external influence on the jury's deliberation. In the instant appeal, the trial court was presented with more than adequate evidence to establish that an outside influence [Bible scripture] during the jury's deliberation. (R-XXIX-3-33)(R-XXXV) In **Colyer v. State, 428 SW3d 117 (Tex. Crim. App. 2014)** this Court defined the permissible areas of inquiry pursuant to **Rule 606(b) of the Texas Rules of Evidence**. The Court reaffirmed that juror testimony regarding an outside influence was a proper area for post-trial consideration by the court. Appellant sought to further develop his complaint at a Motion for New Trial, but was prevented from doing so when the trial court both limited the hearing to affidavits and refused to admit the affidavit of J.J. Gradoni along with the un-edited tape recording of his interview of jury foreman, Matthew Clinger. (See original CD presented on Appellant's Bill of Exception)(R-XXXV) The evidence developed against a defendant shall come from the

116

EXHIBIT 1 Page 127

witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation and cross examination. The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the integrity of all that is embraced in the constitutional concept of trial by jury. **Oliver, citing: Parker v. Gladden, 385 US 363 (1966) and Turner v. Louisiana, 379 US 466 (1965)** The Supreme Court has held that in a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. **Remmer v. US, 347 US 227 (1954)** A juror is exposed to an external influence when the juror reads information not admitted into evidence, such as....prejudicial statements from others. This issue has even been addressed in a sister state when the Supreme Court of Tennessee found a constitutional error when the jury foreman buttressed his argument for imposition of the death penalty by reading to the jury selected Bible passages. See: **State v. Harrington, 627 SE2d 345 (Tenn. 1981)**

## PRAYER FOR RELIEF

Appellant prays this Court will review each Point of Error raised herein and grant him relief as follows: Appellant prays the Court set aside the jury's verdict on the charge of capital murder and enter a judgment of acquittal . In the alternative, without waiving the foregoing prayer for relief, Appellant prays the Court enter an Order remanding this case to the trial court for a new trial. Further in the alternative, without waiving any of the foregoing prayers for relief, Appellant prays the Court enter an Order remanding this case to the trial court for a new trial on the issue of punishment. Without waiving the foregoing,

EXHIBIT 1 Page 128

Appellant prays this Court remand this case to the trial court for a new hearing on Appellant's Motion for New Trial with instructions to receive live testimony.

Respectfully submitted,

Wayne T. Hill
SBOT: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77027
Phone: (713) 623-8312
Fax:    (713) 626-0182
Email:  wthlaw@aol.com

## CERTIFICATE OF COMPLIANCE

This Brief is in compliance with Rule 9.4(2)(a) & (3) of the Texas Rules of Appellate Procedure.  The total word count shown in the computer program used to prepare this document is 35,103..

Wayne T. Hill

## CERTIFICATE OF SERVICE

On this 12TH day of September, a  true and correct copy of this Brief was mailed to the Harris County District Attorney's Office - Appellate Division, 1201 Franklin, 6th Floor, Houston, Texas 77027.

Wayne T. Hill

118

EXHIBIT 1 Page 129