# IN THE 337th DISTRICT COURT

# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| **EX PARTE** )<br>**Obel Cruz-Garcia,** )<br>            **APPLICANT** )<br> )<br> ) | **Trial Cause No.**<br>**1384794 — A** |

## INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS
## (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)

OFFICE OF CAPITAL WRITS
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**FILED**
Chris Daniel
District Clerk

AUG 2 8 2015
Time: 11:34
Harris County, Texas
By _____
        Deputy

EXHIBIT 3 Page 001

: 000002

# TABLE OF CONTENTS

APPLICATION FOR A WRIT OF HABEAS CORPUS .......................................... 1

PROCEDURAL HISTORY ................................................................................... 4

    A. Trial Court Proceedings .............................................................................. 4

    B. State Appellate Proceedings ....................................................................... 5

    C. State Habeas Proceedings ........................................................................... 6

STATEMENT OF FACTS ..................................................................................... 6

    A. Guilt/Innocence Phase of Trial .................................................................. 6

    B. Punishment Phase of Trial .......................................................................... 8

    C. Information Uncovered in Post-Conviction Investigation ............................ 9

STANDARD OF CARE ...................................................................................... 10

    A. Ineffective Assistance of Trial Counsel .................................................... 10

    B. Ineffective Assistance of Appellate Counsel ............................................. 13

    C. Scope of the Waiver of Attorney-Client Privilege .................................... 14

ARGUMENT ...................................................................................................... 17

CLAIM ONE: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY
FAILED TO PRESENT EVIDENCE FROM A DNA EXPERT TO CHALLENGE
THE DNA EVIDENCE PRESENTED AT TRIAL ............................................. 17

    A. DNA Evidence and Trial Counsel's Attempt to Suppress ........................... 18

        1.    Suppression Hearing ........................................................................... 20

        2.    Trial ................................................................................................... 24

    B. Findings of Post-Conviction Review by DNA Expert .................................. 24

        1.    Chain of Custody ................................................................................ 24

        2.    The Mixture DNA Profile ................................................................... 25

i

EXHIBIT 3 Page 002

3. The Vaginal Swabs ........................................................................ 26

4. The HPD Crime Lab's Reinterpretation of the Orchid Cellmark Data.. ....................................................................................................... 28

C. Trial Counsel Performed Ineffectively by Failing to Retain an Independent DNA Expert ................................................................................................. 30

1. Deficient Performance ................................................................... 30

2. Prejudice ....................................................................................... 32

CLAIM TWO: TRIAL COUNSEL PERFORMED INEFFECTIVELY BY FAILING TO INVESTIGATE AND PRESENT REASONABLE DOUBT AT THE GUILT/INNOCENCE PHASE OF TRIAL .................................................... 35

A. Cruz-Garcia Had an Ongoing Consensual Sexual Relationship with Diana Garcia ...................................................................................................... 36

B. Diana Garcia and Arturo Rodriguez Had Not Stopped Selling Drugs for Cruz-Garcia ................................................................................................ 38

C. Trial Counsel Performed Ineffectively by Failing to Investigate and Present this Evidence at Trial .................................................................................. 39

1. Deficient Performance ................................................................... 39

2. Prejudice ....................................................................................... 41

CLAIM THREE: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT CRUZ-GARCIA WOULD NOT BE A FUTURE DANGER .......................................................................... 42

A. Trial Counsel Performed Ineffectively in Failing to Review the District Attorney's File and Identify Evidence that Cruz-Garcia Would Not Be a Future Danger ..................................................................................................... 43

1. Relevant Facts ............................................................................... 44

2. Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance and Should Not Be Afforded Deference Because It Was Based on a Misunderstanding of the Law .......................... 48

ii

EXHIBIT 3 Page 003

3. Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance Because Trial Counsel Has an Affirmative Duty to Investigate in Preparation for Trial.............................. 51

4. Trial Counsel's Failure to Inspect the District Attorney's File Prejudiced Cruz-Garcia.................................................................................. 53

B. Trial Counsel Were Ineffective for Failing to Investigate and Present Testimony from Puerto Rican Prison Officials and Other Witnesses To Rebut the State's Case ................................................................................................... 53

1. Trial Counsel's Investigation .............................................................. 54

2. Available Evidence to Rebut Future Danger...................................... 56

C. Trial Counsel's Failure to Review the Prosecution's File and Sufficiently Investigate Prejudiced the Defense.................................................................... 62

CLAIM FOUR: TRIAL COUNSEL PERFORMED INEFFECTIVELY IN FAILING TO SUFFICIENTLY INVESTIGATE AND PRESENT MITIGATION EVIDENCE............................................................................................................. 66

A. Trial Counsel's Investigation.......................................................................... 67

1. Fact Investigation .............................................................................. 68

2. Mitigation Specialist and Expert Witnesses...................................... 70

B. Counsel's Failure to Retain a Mitigation Specialist, Ensure a Sufficient Investigation of Lay Witnesses, or Consult with Necessary Expert Witnesses Constitutes Deficient Performance .................................................................... 72

C. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Early Life History ..................................... 77

1. Available Lay Witness Testimony ...................................................... 79

2. Available Expert Witness Testimony................................................. 83

D. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence to Rebut the Prosecution's Aggravating Evidence .......... 96

EXHIBIT 3 Page 004

E. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Ability to Contribute Productively in Prison ........................................................................................................ 98

F. Conclusion .................................................................................................. 99

CLAIM FIVE: CRUZ-GARCIA'S CONVICTION AND DEATH SENTENCE ARE UNLAWFUL BECAUSE THEY WERE OBTAINED IN VIOLATION OF THE PROVISIONS OF THE VIENNA CONVENTION ON CONSULAR RELATIONS ..................................................................................................... 100

A. As A Foreign National Detained and On Trial for a Capital Offense in the United States, Cruz-Garcia Had a Right to Be Notified of His Right to Consular Access under the Vienna Convention on Consular Relations ......................... 101

B. In Texas, the Vienna Convention Conveys an Individually Enforceable Right ............................................................................................................... 102

C. The State Violated the Vienna Convention in Cruz-Garcia's Case ........... 103

D. Cruz-Garcia was Prejudiced as a Result of the Violation of His Rights under the Vienna Convention ................................................................................... 107

E. Conclusion ............................................................................................... 108

CLAIM SIX: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RECOGNIZE THE SIGNIFICANCE OF CRUZ-GARCIA'S FOREIGN NATIONALITY AND SEEK THE HELP OF THE DOMINICAN REPUBLIC CONSULATE IN DEFENDING THIS CASE ..................................................... 109

A. Trial Counsel's Failure to Apprise Cruz-Garcia of His Right to Consular Access and To Seek Assistance from the Dominican Republic in Defending His Case Was Objectively Unreasonable and Constitutes Deficient Performance 111

1.    Trial Counsel Knew that Cruz-Garcia Is a Citizen of the Dominican Republic ......................................................................................................... 111

2.    Both National and State Bar Guidelines Highlight the Steps That Need to Be Taken in Representing a Foreign National in a Capital Case ........... 112

3.    Trial Counsel Failed to Act in Accordance with the Recommendations of the ABA Guidelines, the Texas State Bar Guidelines, and Other Available

iv

EXHIBIT 3 Page 005

Legal Materials in Representing Cruz-Garcia, Which Constitutes Deficient Performance Under *Strickland v. Washington* ........................................... 116

B. Trial Counsel's Failure to Involve the Dominican Republic Consulate in This Case Prejudiced Cruz-Garcia's Defense................................................. 117

C. Trial Counsel Were Ineffective for Failing to Ensure That Cruz-Garcia's VCCR Rights Were Protected by the State and for Failing to Raise This Issue at Trial ............................................................................................................ 120

D. Conclusion ................................................................................................. 121

CLAIM SEVEN: CRUZ-GARCIA'S DUE PROCESS RIGHTS TO A FAIR TRIAL WERE VIOLATED BY CONSTITUTIONAL ERRORS RELATING TO THE COURT'S EX PARTE DISCUSSION WITH A SINGLE JUROR............ 121

A. Relevant Facts............................................................................................ 122

B. Cruz-Garcia's Due Process Rights Were Violated When the Trial Court Failed to Inform Trial Counsel of the Details of Its Conversation with Juror Bowman and Instead Instructed Her to Resume Deliberations....................... 124

C. Appellate Counsel Provided Ineffective Assistance in Failing to Raise the Foregoing Errors on Direct Appeal ................................................................ 129

D. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Object or Request the Trial Court Report Its Conversation with Juror Bowman on the Record .................................................................................................. 131

CLAIM EIGHT: CRUZ-GARCIA'S RIGHTS TO A FAIR TRIAL WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE JUROR MISCONDUCT .................................................................................................. 133

A. Relevant Facts............................................................................................ 134

B. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Interview Casaretto or Take Other Action...................................................... 136

CLAIM NINE: JURORS IN CRUZ-GARCIA'S TRIAL COMMITTED MISCONDUCT THAT VIOLATED CRUZ-GARCIA'S RIGHT TO A FAIR TRIAL .............................................................................................................. 139

A. Scripture Reading During Punishment-Phase Deliberations...................... 140

v

EXHIBIT 3 Page 006

: 000007

1. Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Constitutes an Improper Outside Influence .......................... 145

2. Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Prejudiced Cruz-Garcia........................................................ 146

B. Jurors Committed Misconduct by Discussing the Case Outside of Deliberations ................................................................................................... 148

1. Jurors' Conversations with an Unauthorized Person Raise a Presumption of Prejudice to Cruz-Garcia..................................................... 149

C. Conclusion ................................................................................................... 150

CLAIM TEN: TRIAL COUNSEL'S CUMULATIVE DEFICIENT PERFORMANCE OVER THE COURSE OF TRIAL PREJUDICED CRUZ-GARCIA........................................................................................................... 150

CLAIM ELEVEN: CRUZ-GARCIA'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING ............................................................................................. 151

A. The Texas Statute and Cruz-Garcia's Jury Instructions............................. 152

B. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence ................ 153

C. Conclusion ................................................................................................... 156

CLAIM TWELVE: CRUZ-GARCIA'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE........................................................................ 157

A. The Supreme Court Has Invalidated Jury Instructions That Place an Undue Burden on the Sentencer Before Finding Mitigating Circumstances.............. 159

B. Texas's 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence........................................................................ 160

C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations ................................................................................................... 161

vi

EXHIBIT 3 Page 007

D. Conclusion ................................................................................. 164

CLAIM THIRTEEN: CRUZ-GARCIA'S DEATH SENTENCE WAS
ARBITARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S
ANSWER TO THE UNCONSTITUTIONALLY VAGUE FIRST SPECIAL
ISSUE .............................................................................................. 164

    A. The First Special Issue is Unconstitutionally Vague and Fails to Narrow the
    Class of Death-Eligible Defendants ................................................ 165

CLAIM FOURTEEN: CRUZ-GARCIA'S DEATH SENTENCE IS
UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'S
ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY ..... 168

    A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied
    Arbitrarily .................................................................................... 169

    B. Texas's Death Penalty Scheme Is Unconstitutional ..................... 171

        1.    Geography ....................................................................... 171

        2.    Race ............................................................................... 175

    C. Conclusion .................................................................................. 178

PRAYER FOR RELIEF ...................................................................... 179

EXHIBIT 3 Page 008

# TABLE OF AUTHORITIES

## Federal Cases

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) .............................. 154, 155, 156

*Allen v. United States*, 164 U.S. 492 (1896) ................................... 125, 162

*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006) ........................... 130

*Arizona v. Washington*, 434 U.S. 497 (1978) ........................................ 162

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ............................................. 164

*Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995) .................................. 52

*Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003) ............................... 15

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ................................................ 11

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................... 43

*Brewer v. Quarterman*, 550 U.S. 286 (2007) ....................................... 157

*Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) .................................. 30, 39

*California v. Brown*, 479 U.S. 538 (1987) ............................................ 170

*Cornejo v. County of San Diego*, 504 F.3d 853 (9th Cir. 2007) ........................... 102

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) ....................................... 11

*Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) ..................................... 115

*Downum v. United States*, 372 U.S. 734 (1963) ................................... 162

*Evitts v. Lucey*, 469 U.S. 387 (1985) ............................................ 13, 131

*Foster v. Neilson*, 27 U.S. 253 (1829) ................................................ 102

*Furman v. Georgia*, 408 U.S. 238 (1972) ............................................ 169

*Gandara v. Bennett*, 528 F.3d 823 (11th Cir. 2008) .............................. 102

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ...................................... 166, 171

*Gregg v. Georgia*, 428 U.S. 153 (1976) ..................... 166, 169, 170, 174

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) ............................. 49

*Harrington v. Richter*, 562 U.S. 86 (2011) ..................................... 11, 12

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ......................................... 49

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D.
  687 (C.D. Cal. 1988) .................................................................. 15

*Jenkins v. United States*, 380 U.S. 445 (1965) .................................... 125

*Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001) ............................. 15

*Jones v. Kemp*, 706 F.Supp. 1534 (N.D. Ga. 1989) .............................. 147

*Jurek v. Texas*, 428 U.S. 262 (1976) .............................................. passim

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ..................................... 49

*Laughner v. United States*, 373 F.2d 326 (5th Cir. 1967) ......................... 15

*Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876 (E.D. Pa. 1976) ............ 15

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................ 152

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ......................................... 125

viii

EXHIBIT 3 Page 009

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ......................................................... 166

*McCleskey v. Kemp*, 481 U.S. 279 (1987) .................................................. 154, 166

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ............................................ 159, 160

*Medellín v. Texas*, 552 U.S. 491 (2008) ................................................................ 102

*Mills v. Maryland*, 486 U.S. 367 (1988) ................................................. 159, 160, 170

*Moore v. Illinois*, 408 U.S. 786 (1972) .................................................................. 50

*Morgan v. Illinois*, 504 U.S. 719 (1992) ......................................................... 121, 133

*Murphy v. Netherland*, 116 F.3d 97 (4th Cir. 1997) ............................................ 115

*Osagiede v. United States*, 543 F.3d 399 (7th Cir. 2008) ..................................... 120

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................. 11

*Penry v. Johnson*, 532 U.S. 782 (2001) .......................................................... 156, 171

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ........................................................... passim

*Porter v. McCollum*, 558 U.S. 30 (2009) .......................................................... passim

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998) .................................................... 145

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) ....................................... 150

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008) ....................................... 13, 130

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................. 11, 12, 52

*Rummell v. Estelle*, 590 F.2d 103 (5th Cir. 1979) ....................................... 30, 39

*Sears v. Upton*, 130 S. Ct. 3259 (2010) ...................................................... 72, 96, 99

*Skipper v. South Carolina*, 476 U.S. 1 (1986) .......................................... 155, 157

*Smith v. Robbins*, 528 U.S. 259 (2000) ..................................................... 13, 130

*Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801 (11th Cir. 1995) ............................................................................................................. 50

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................... passim

*Tennard v. Dretke*, 542 U.S. 274 (2004) .............................................. 66, 154, 168

*United States v. Bagley*, 473 U.S. 667 (1985) ...................................................... 49

*United States v. Basham*, Cr. No. 4:02-992-JFA, 2012 WL 1130657 (D.S.C. Apr. 4, 2012) ................................................................................................................ 15

*United States v. Cervantes*, 706 F.3d 603 (5th Cir. 2013) .................................... 150

*United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988) ................................ 50

*United States v. Pinson*, 584 F.3d 972 (10th Cir. 2009) .................................. 14, 15

*United States v. Rhodes*, 569 F.2d 384 (5th Cir. 1978) ......................................... 50

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ...................... 128

*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) ................................. 130

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ...................................................... 10

*Walbey v. Quarterman*, 309 Fed. App'x 795 (5th Cir. 2009) ............................... 99

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................ passim

*Williams v. Taylor*, 529 U.S. 362 (2000) ......................................................... passim

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ....................................... 170, 171

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................ 178

ix

EXHIBIT 3 Page 010

: 000011

### State Cases

*Alabama v. Lewis*, 36 So. 3d 72 (Ala. Crim. App. 2008) ........................................ 16

*Barnett v. State*, 189 S.W.3d 272 (Tex. Crim. App. 2006).................................... 125

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ........................................ 32

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007) ................................... 166

*Ex parte Bryant*, 448 S.W.3d 29 (Tex. Crim. App. 2014)....................................... 10

*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)............................... 100

*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) ...................................... 100

*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012) ..................................... 10

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).............. 12, 13, 52, 65

*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012).................................... 10

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ................................ 13

*Ex parte Medellín*, 223 S.W.3d 315 (Tex. Crim. App. 2006).............................. 103

*Ex parte Miles*, 359 S.W.3d 647 (Tex. Crim. App. 2012)...................................... 50

*Ex parte Napper*, 322 S.W.3d 202 (Tex. Crim. App. 2010)................................... 31

*Ex parte Overton*, 444 S.W. 3d 632 (Tex. Crim. App. 2014)................................. 10

*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)................. 13, 130, 139

*Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997) ........................... 130, 139

*Ex parte Troha*, 462 So.2d 953 (Ala. 1984) ........................................................ 147

*Ex parte Welborn*, 785 S.W.2d 391 (Tex. Crim. App. 1990).............................. 151

*Ex parte Woods*, 176 S.W.3d 224 (Tex. Crim. App. 2005)................................... 75

*Givens v. State*, 749 S.W.2d 954 (Tex. App.—Fort Worth 1988)......................... 49

*Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex. 2000)................... 136

*Granados v. State*, 85 S.W.3d 217 (Tex. Crim. App. 2002)....................... 137, 145

*Granviel v. State*, 552 S.W.2d 107 (Tex. Crim. App. 1976) .............................. 167

*Green v. State*, 840 S.W.2d 394 (Tex. Crim. App. 1992)............................. 124, 129

*Harm v. State*, 183 S.W.3d 403 (Tex. Crim. App. 2006) ...................................... 48

*Howard v. State*, 941 S.W.2d 102 (Tex. Crim. App. 1996)................. 124, 125, 128

*In re Dean*, 711 A.2d 257 (N.H. 1998) .................................................................. 16

*Joseph v. State*, 3 S.W.3d 627 (Tex. App.—Houston [14th Dist.] 1999).............. 14

*Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975)............................... 167, 170

*Ledezma v. State*, 626 NW.2d 134 (Iowa 2001) ................................................... 115

*Lucero v. State*, 246 S.W.3d 86 (Tex. Crim. App. 2008) ............................. 146, 147

*Maryland Am. Gen. Ins. Co. v. Blackmon*, 639 S.W.2d 455 (Tex. 1982) .............. 14

*McQuarrie v. State*, 380 S.W.3d 145 (Tex. Crim. App. 2012)............................. 145

*Meza v. State*, 206 S.W.3d 684 (Tex. Crim. App. 2006)........................................ 14

*Montoya v. State*, 810 S.W.2d 160 (Tex. Crim. App. 1989) ................................ 124

*Ocon v. State*, 284 S.W.3d 880 (Tex. Crim. App. 2009).............. 133, 136, 138, 149

*People v. Harlan*, 109 P.3d 616 (Colo. 2005) ..................................................... 147

*Quinn v. State*, 958 S.W.2d 395 (Tex. Crim. App. 1997)..................................... 149

EXHIBIT 3 Page 011

*Ryser v. State*, 453 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2014) ............... 145

*State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981) ............................................. 147

*Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992) .................................... 50

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) ..................................... 10

*Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002) ........................................ 115

*Waldrip v. Head*, 532 S.E.2d 380 (Ga. 2000) ....................................................... 16

*West v. Solito*, 563 S.W.2d 240 (Tex. 1978) ......................................................... 14

**Statutes**

TEX. CODE CRIM. PROC. art. 37.071 ............................................................. passim

TEX. R. EVID. 503 .................................................................................................. 14

TEX. R. EVID. 801 .................................................................................................. 40

**Other Authority**

ABA, *ABA Standards for Criminal Justice* (3d ed. 1993) ...................... 12, 132, 136

ABA, Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report* (September 2013) ................................................. 42, 165, 176

ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ............................. passim

ABA, *Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456* (2010) ..................................................................................................... 16

Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty*, http://works.bepress.com/ adam_gershowitz/5 (2009) ............................................................................. 173

Attorney General of Texas, *Summary of Requirements Pertaining to Foreign Nationals*, Magistrate's Guide to Consular Notification Under the Vienna Convention ................................................................................................... 102

Christopher Slobogin, *Capital Punishment and Dangerousness*, *in* MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119 (Robert F. Schopp et al. eds., 2009) ......................................................................... 167

Cindy Galway Buys et. al., *Do Unto Others: The Importance of Better Compliance with Consular Notification Rights*, 21 DUKE J. COMP. & INT'L L. 461 (2011) . 102

David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007) ......................................................................... 175

Hernan de J. Ruiz-Bravo, *Suspicious Capital Punishment*, 3 SAN DIEGO JUST. J. 396 (1995) ...................................................................................................... 102

Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009) .................................................. 175

xi

EXHIBIT 3 Page 012

Jack Glaser, et al., *Possibility of Death Sentence Has Divergent Effect on Verdicts for Black and White Defendants* (June 24, 2009) ............................................ 177

John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4 (Aug. 1995) ........................................................................................... 77, 83

Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010) ............................ 173

Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305 (2009) ................................................................................................................ 173

Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012 ...................... 168

Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845 (1989-1990) .............. 167

Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUS. L. REV. 131 (2012) ............................................ 176

Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008) ......................................................................................... 176

State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ......................................................................................... passim

State Bar of Tex., *Supplementary Guidelines and Standards for the Mitigation Function of Defense Teams in Texas Capital Cases* (June 2015) .......... 74, 76, 78

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 .................................................................................. 100, 101, 110

William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51 (2003) ........................................................................................................................... 161

xii

EXHIBIT 3 Page 013

: 000014

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

The maxim that "death is different" has become a standing principle in our law that capital cases require the utmost care and scrutiny to ensure a defendant's rights have not been infringed before imposing a sentence of death. The need for such attention is never more true than in the case of a foreign national, unable to speak English and unfamiliar with the rights and privileges afforded to defendants in the United State justice system. Reading nothing but the cold record of Obel Cruz-Garcia's trial, one might presume that despite his position as a foreign national who could not speak English, his rights were still fully honored and safeguarded. That presumption falls away, however, as post-conviction investigation has revealed numerous instances in which Cruz-Garcia was denied his constitutional rights to consular assistance, effective legal representation, and a fair trial.

First, Cruz-Garcia's conviction rests on faulty DNA evidence—the only physical evidence tying him to a more than twenty-year-old crime—that should have been suppressed. The prosecution presented evidence that Cruz-Garcia's DNA was found on a sexual assault kit taken from one of the surviving victims, Diana Garcia. Trial counsel moved to suppress this evidence, citing as grounds the fact that the Houston Police Department (HPD) crime lab, which originally stored and handled the evidence in Cruz-Garcia's case, was later found to have had widespread and serious problems in storage and analysis of DNA evidence during the time that evidence in Cruz-Garcia's case was in its possession. However, because counsel could point to no evidence that any of the systemic problems at the HPD lab had occurred with respect to any of the evidence in Cruz-Garcia's case, the trial court ruled the DNA evidence admissible.

1

EXHIBIT 3 Page 014

Yet Cruz-Garcia's trial counsel failed to develop and present evidence that the very errors in storage and analysis of DNA evidence endemic to the HPD crime lab were, in fact, present in Cruz-Garcia's case, including alarmingly improper storage of the two key pieces of evidence and erroneous statistical calculations in analyzing the evidence. Had trial counsel presented evidence of these errors in support of their motion to suppress, the DNA evidence would likely have been suppressed, obliterating the State's case against Cruz-Garcia. Even if the DNA evidence had still been admitted at trial, evidence from a DNA expert that there was a second unknown contributor to the DNA evidence and testimony that Cruz-Garcia had an ongoing consensual sexual relationship with Diana Garcia could have persuaded the jury there was an innocent explanation for the presence of Cruz-Garcia's DNA and that the unknown second contributor was the true assailant. But the jury never heard this evidence.

Additionally, the jury never heard evidence that would have undermined the State's theory of Cruz-Garcia's motive. The State argued that Cruz-Garcia abducted and killed Diana Garcia's son, Angelo, in retaliation after she and her husband stopped selling drugs for him. Yet the jury did not hear evidence that Diana Garcia and her husband never stopped selling drugs—that, in fact, they were selling drugs on the day of the crime. This evidence would have directly contradicted the State's theory of motive. Given his admitted friendship with the victims, without prescribing a motive for Cruz-Garcia to commit the crime the State's theory of his guilt would have made no sense.

All of this evidence taken together at the guilt/innocence phase would have presented an entirely different evidentiary picture and created a reasonable doubt in the minds of the jurors.

Counsel's lack of effective assistance also extended to their presentation at the penalty phase of trial. At punishment, the jury heard from just three of Cruz-

EXHIBIT 3 Page 015

Garcia's family members, who provided basic details about his family background, and a fourth witness who had met Cruz-Garcia in the Harris County jail and came to court on his own initiative to testify. However, significantly more evidence was available that the jurors never heard—evidence that would likely have changed their verdict from death to life in prison.

Inexplicably, trial counsel declined to review the District Attorney's file, which remained open to them throughout the course of their representation. Had they done so, they would have discovered records of Cruz-Garcia's time in prison in Puerto Rico. These records indicated that Cruz-Garcia had an impeccable disciplinary record over the nearly ten years he spent there and could have been presented to the jury to strongly support an answer of "No" to the first Special Issue. The jurors also never heard from prison personnel who knew Cruz-Garcia well and would have spoken glowingly of him as one of the most trusted and well-respected inmates they had ever encountered. Such testimony would surely have made a difference to the jury's assessment of whether Cruz-Garcia would present a risk of committing future acts of violence if sentenced to life in prison.

Trial counsel also failed to retain a mitigation specialist, who could have provided invaluable assistance in investigating and preparing mitigation evidence. The jury thus never heard from myriad family members who could have provided them with a more complete picture of who Cruz-Garcia was. Nor did the jury hear expert testimony that could have explained Cruz-Garcia's life history in the context of his cultural background

Finally, Cruz-Garcia, a citizen of the Dominican Republic who can neither speak nor understand English, was deprived of due process when the State failed to properly inform him of his right to seek consular assistance, in violation of the Vienna Convention on Consular Relations.

3

EXHIBIT 3 Page 016

These and other constitutional errors rendered Cruz-Garcia's trial fundamentally unfair. Because of these errors, Cruz-Garcia must be granted a new trial.

## I.

## PROCEDURAL HISTORY

Obel Cruz-Garcia is confined under a sentence of death pursuant to the judgment of the 337th District Court, Harris County, Texas, case number 1384794, which was rendered on July 19, 2013 (3 CR at 104) and entered on July 22, 2013 (28 RR at 3-6).[1]

### A. Trial Court Proceedings

Cruz-Garcia was indicted on November 20, 2008, on the charge of capital murder for intentionally and knowingly causing the death of Angelo Garcia while in the course of committing kidnapping. (1 CR at 6.) Cruz-Garcia was extradited from Puerto Rico in early 2010 to stand trial in Houston, Texas. Initially, attorneys Mike Fosher and Mario Madrid were selected as appointed counsel in February 2010. (1 CR at 8, 11.) About a month later, in April 2010, Cruz-Garcia's family retained Steven Shellist and Christian Capitaine as counsel for Cruz-Garcia, and Mr. Fosher and Mr. Madrid were removed. (1 CR at 19-21.)

However, the State later determined that it would seek death against Cruz-Garcia. (4 RR at 9.) Neither Mr. Shellist nor Mr. Capitaine were on the approved list of capital counsel and withdrew from the case on August 31, 2011. (2 CR at 326; 4 RR at 6-7.) Attorney Skip Cornelius was appointed as first chair and attorney Mario Madrid was appointed as second chair counsel that same day. (1 CR at 57-58.) Cruz-Garcia was represented at trial by Mr. Cornelius and Mr. Madrid. (1 RR at 3.)

---

[1] "CR" refers to the Clerk's Record in Cruz-Garcia's trial. "RR" refers to the Reporter's Record in Cruz-Garcia's trial.

EXHIBIT 3 Page 017

: 000018

Voir dire commenced on June 3, 2013, with the general panel and individual voir dire, and concluded on June 17, 2013. (5 RR; 15 RR.) On June 19, 2013, the Court held a hearing on the defense's motion to suppress DNA evidence. (16 RR at 16.) The defense presented argument, and the State presented witness testimony and argument. (16 RR at 16-21, 26-99.) After consideration, the Court denied the defense's motion to suppress. (17 RR at 5.)

The guilt/innocence phase of trial began on July 8, 2013, with Cruz-Garcia entering a plea of not guilty. (18 RR.) After four days of testimony, the State rested its case. (21 RR at 174.) The defense rested without presenting any witnesses or testimony of its own. (*Id.* at 175.) Both sides presented closing arguments, and the jury returned with a verdict finding Cruz-Garcia guilty of capital murder on July 15, 2013. (23 RR at 101.)

The punishment phase of Cruz-Garcia's trial began on July 16, 2013. (24 RR at 7.) The State presented its case for punishment and rested on July 17, 2013. (25 RR at 202.) The defense presented its punishment case through the testimony of four witnesses on July 18, 2013. (26 RR at8-93.) The same day, both sides rested and presented closing argument. (*Id.* at 105, 141.) Jury deliberations commenced, with the jury being sequestered that evening. The next day, the jury returned with a verdict, and Cruz-Garcia was formally sentenced to death on July 22, 2015. (27 RR at 9; 28 RR at 3.)

**B. State Appellate Proceedings**

On July 22, 2013, this Court appointed attorney Wayne Hill to represent Cruz-Garcia for purposes of the direct appeal. (3 CR at 536.) Hill filed a motion for new trial on August 19, 2013, and argument was heard on the motion on September 20, 2013. The Court denied the defendant's request for live testimony in support of his motion and denied the motion. (*Id.* at 28.) An appellate brief was filed with the Court of Criminal Appeals (CCA) on September 15, 2014. The State

5

EXHIBIT 3 Page 018

filed its response on April 15, 2015. Oral argument was waived. At the filing of this Application, the appeal continues to be under consideration by the CCA.

### C. State Habeas Proceedings

On July 22, 2013, this Court appointed the Office of Capital Writs (OCW) to represent Cruz-Garcia in his post-conviction habeas litigation, pursuant to Article 11.071, section 2 of the Code of Criminal Procedure. (3 CR at 535.) In order to facilitate the investigation into Cruz-Garcia's case, the trial court granted OCW motions: (1) to receive access to items sealed in the clerk's record; (2) to be allowed to inspect physical exhibits offered at trial; (3) to receive copies of all sealed materials and juror questionnaires; and (4) for the disclosure of certain potentially exculpatory or mitigating materials from the District Attorney's file. The trial court also granted a single ninety-day extension of time for Cruz-Garcia to file his application.

This Application follows.

## II.

## STATEMENT OF FACTS

Cruz-Garcia was indicted on November 20, 2008, for the 1992 murder of Angelo Garcia. (1 CR at 6.) In early 2010, he was extradited from Puerto Rico to face trial for capital murder. Trial presentations began on July 8, 2013, more than twenty years after the crime and nearly five years after the indictment. (18 RR at 29.)

### A. Guilt/Innocence Phase of Trial

During the guilt/innocence phase of trial, the State presented testimony from Angelo Garcia's mother, Diana Garcia. (18 RR at 120.) Diana testified that on the night of September 30, 1992, two men entered the bedroom where she, her common-law husband, Arturo Rodriguez, and her six-year-old son, Angelo, were sleeping. (*Id.* at 144-53.) Diana testified that one of the men beat Arturo

6

EXHIBIT 3 Page 019

unconscious while the other one sexually assaulted her. (*Id.* at 153-58.) She stated that when the men then left, she discovered that Angelo was gone. (*Id.* at 162-63.) Arturo Rodriguez testified to the incident as well. (*Id.* at 205-219.) Diana and Arturo testified that Cruz-Garcia was a friend of theirs for whom they had sold drugs, but that they had stopped selling a few weeks before the crime occurred. (*Id.* at 129-38, 199-205.) They testified that the men who assaulted them were wearing masks and that they were unable to identify them. (*Id.* at 151-62, 208-15.)

The State also presented the testimony of several law enforcement officers who participated in the initial investigation into the crime as well as a nurse who performed a sexual assault exam of Diana Garcia the night of the crime. (*See generally* 18 RR–19 RR.) The investigation led to the discovery of Angelo Garcia's remains on the shore of Goose Creek in Baytown on November 4, 1992. (19 RR at 191-92.) The State also presented the testimony of Eric Mehl, a former HPD sergeant who reopened the investigation in 2007 while working in the cold case unit. (20 RR at 42-43.)

The State presented the testimony of an alleged co-conspirator named Carmelo Martinez Santana, who went by the name Rudy. (20 RR at 116.) Rudy claimed that on the night of the incident, he, Cruz-Garcia, and a third man named Roger drove to Diana Garcia's apartment and that Cruz-Garcia and Roger entered the apartment while he waited in the car. (*Id.* at 135-41.) Rudy testified that after about thirty minutes, Cruz-Garcia and Roger came back to the car and that Cruz-Garcia was carrying Angelo Garcia. (*Id.* at 143-44.) Rudy stated that they drove to Baytown, where Cruz-Garcia ordered Roger to kill Angelo, which he did. (*Id.* at 148-51.) Rudy testified that they then drove to another location close to a river, where Cruz-Garcia ordered him and Roger to dump Angelo's body into the river. (*Id.* at 152-53.)

7

EXHIBIT 3 Page 020

: 00021

Angelita Rodriguez, Cruz-Garcia's wife at the time of the incident, also testified that Cruz-Garcia confessed the crime to her a few months after it occurred. (20 RR at 107.)

Finally, the State presented the testimony of two DNA analysts who testified that Cruz-Garcia's DNA was present on items of evidence recovered from the crime scene, including the sexual assault kit of Diana Garcia. (21 RR at 103-73.)

The defense did not present any affirmative evidence at the guilt/innocence phase. (21 RR at 173.)

### B. Punishment Phase of Trial

At punishment, the State presented evidence of an extraneous kidnapping in Puerto Rico for which Cruz-Garcia was convicted in 2002. (24 RR at 14-117.) The State also presented evidence of an uncharged extraneous murder in Houston in 1989. (25 RR at 4-122.)

In addition, the State presented testimony from a correctional officer from the Puerto Rican prison where Cruz-Garcia was previously held. (24 RR at 118.) He testified that Cruz-Garcia was reprimanded for possessing a cell phone, rope, and a map, which the officer believed he planned to use for an escape attempt. (*Id.* at 124-28.) The State also presented testimony from a Harris County jail guard, who testified that Cruz-Garcia once failed to promptly return a razor blade that was checked out to him. (25 RR at 130-36.) The State additionally presented the testimony of a Texas Department of Criminal Justice (TDCJ) employee, who testified generally about the inmate classification system. (*Id.* at 149-89.)

Finally, the State presented victim impact testimony from Diana Garcia. (25 RR at 190-201.)

The defense presented the testimony of Cruz-Garcia's wife Mirella, brother Joel, and son Abel. (26 RR at 8-79.) These witnesses provided basic information about Cruz-Garcia's background—that he grew up in the Dominican Republic,

8

EXHIBIT 3 Page 021

moved to Puerto Rico as a young man, and later immigrated to the United States. (*Id.*) They testified that Cruz-Garcia was loving, generous, and hard-working, and that he was a good father. (*Id.*)

Finally, Angel Meza, a young man who met Cruz-Garcia while incarcerated at the Harris County Jail, testified that Cruz-Garcia had had a positive impact on him. (26 RR at 81-92.)

### C. Information Uncovered in Post-Conviction Investigation

Post-conviction counsel have uncovered significant evidence that was not presented at Cruz-Garcia's trial. Consultation with an independent DNA expert has revealed that numerous errors occurred in the handling and analysis of the DNA evidence in Cruz-Garcia's case—information which could have led to the suppression of the DNA evidence altogether or to an entirely different theory being presented to the jury at the guilt/innocence phase. Additionally, several witnesses were available who could have testified to Cruz-Garcia's ongoing sexual relationship with Diana Garcia, which would have provided the jury with an alternative explanation for the presence of his DNA on the sexual assault kit.

Post-conviction investigation has also uncovered substantial information that could have been presented at the punishment phase to sway the jury in favor of a life sentence. This includes voluminous records from Cruz-Garcia's time in prison in Puerto Rico indicating that Cruz-Garcia had an impeccable disciplinary record during his nearly ten years there, as well as testimony from personnel who worked in the prison that Cruz-Garcia was a model inmate. Additionally, many of Cruz-Garcia's family members in both the Dominican Republic and Puerto Rico were never interviewed by the defense team, but could have provided the jury with a much more robust picture of Cruz-Garcia's life history and his role in their family. Additionally, expert witness testimony was available to explain the relevance of Cruz-Garcia's life story to the mitigation question.

9

EXHIBIT 3 Page 022

Finally, post-conviction investigation has uncovered numerous instances of juror misconduct that infringed upon Cruz-Garcia's right to a fair trial.

## III.

## STANDARD OF CARE

### A. Ineffective Assistance of Trial Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Cruz-Garcia must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Bryant*, 448 S.W.3d 29, 39 (Tex. Crim. App. 2014); *Ex parte Overton*, 444 S.W. 3d 632, 640 (Tex. Crim. App. 2014) (granting habeas relief pursuant to *Strickland*); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

To establish deficiency, Cruz-Garcia must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688); *Ex parte Bryant*, 448 S.W.3d at 39. A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

10

EXHIBIT 3 Page 023
: 000024

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting that the *ABA Standards* "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA *Standards for Criminal Justice*] as "guides to determining what is reasonable."'" (quoting *Wiggins*, 539 U.S. at 524)). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Cruz-Garcia's trial, his attorneys' obligations were governed by "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common custom[s]." *Harrington v. Richter*, 562 U.S. 86, 88 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ("*ABA Guidelines*"), the ABA *Standards for Criminal Justice* (3d ed. 1993) ("*ABA*

11

EXHIBIT 3 Page 024

Standards"), and the State Bar of Texas *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ("*Texas Guidelines*").

Trial counsel have a duty to undertake reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Once capital trial counsel completes the necessary pretrial investigation, he or she must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1. The Court of Criminal Appeals holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

To establish prejudice, Cruz-Garcia "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). Cruz-Garcia need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury

12

EXHIBIT 3 Page 025

heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

State post-conviction courts must analyze a capital punishment phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence]." *Id.* at 43. The Court of Criminal Appeals has "adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

## B. Ineffective Assistance of Appellate Counsel

Ineffective assistance of appellate counsel claims are governed by *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("[T]he proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*."); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (holding the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007). Appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza v. State*, 206 S.W.3d 684, 689 (Tex.

13

EXHIBIT 3 Page 026

Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error").

## C. Scope of the Waiver of Attorney-Client Privilege

Cruz-Garcia recognizes that raising specific issues of ineffective assistance of counsel as developed in this Application operates as a limited waiver of privileged information; however, he asserts his right to have all privileged information not directly relevant to his claims remain privileged.

Under the Texas Rules of Evidence, confidential communications between a client and his attorney are privileged. TEX. R. EVID. 503(b)(1)(A) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between the client . . . and the client's lawyer."). The privileged nature of communications between client and attorney remains intact, even upon the termination of the attorney-client relationship. *See Maryland Am. Gen. Ins. Co. v. Blackmon*, 639 S.W.2d 455, 458 (Tex. 1982).

The privilege between attorney and client is not absolute. It is "well-established . . . that when an attorney's professional conduct is challenged by the client, the privilege is waived so far as necessary to defend the attorney's character." *West v. Solito*, 563 S.W.2d 240, 245 n.3 (Tex. 1978). In the context of criminal law, courts across the nation have consistently "held that a claim of ineffective assistance of counsel by a defendant against a former attorney waives the attorney-client privilege." *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999) (citing *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967)); *see also United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009).

However, any waiver of the attorney-client privilege only applies to communications relevant to the claim of ineffective assistance of counsel.

14

EXHIBIT 3 Page 027

*Laughner*, 373 F.2d at 327 (noting where "the client alleges a breach of duty to him by the attorney, . . . he thereby waives the privilege as to all communications *relevant* to that issue" (emphasis added)). Courts have consistently limited the scope of these waivers, permitting disclosure of only those confidential communications that are "*necessary* to prove or disprove [the client's] claims." *Pinson*, 584 F.3d at 978 (emphasis added).[2]

---

[2] *See also Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) ("Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question."); *Johnson v. Alabama*, 256 F.3d 1156, 1179 (11th Cir. 2001) ("[A] habeas petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel *relevant* to assessing the reasonableness of those decisions in the circumstances." (emphasis added)); *United States v. Basham*, Cr. No. 4:02-992-JFA, 2012 WL 1130657 at *6 (D.S.C. Apr. 4, 2012) (unpublished) ("[T]he Government will not use and will not make copies of any material or information in trial counsel's files that is not *related or relevant* to a claim in Basham's § 2255 Motion." (emphasis added)); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687, 692 (C.D. Cal. 1988) (rejecting "the suggestion made by some parties that 'selective' disclosure should not be allowed, that if the exception is permitted to be invoked, *all* attorney-client communications should be disclosed" as "directly contrary to the reasonable necessity standard"); *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876, 886-87 (E.D. Pa. 1976) ("In almost any case when an attorney and a former client are adversaries in the courtroom, there will be a credibility contest between them. This does not entitle the attorney to rummage through every file he has on that particular client (regardless of its relatedness to the subject matter of the present case) and to publicize any confidential communication he comes across which may tend to impeach his former client. At the very least, the word 'necessary' in the disciplinary rule requires that the probative value of the disclosed material be great enough to outweigh the potential damage the disclosure will cause to the client and the legal profession."); *Alabama v. Lewis*, 36 So. 3d 72, 77-78 (Ala. Crim. App. 2008) (noting that, by alleging "ineffective assistance of counsel during the trial and direct appeal of these cases, the defendant waived the benefits of both the attorney-client privilege and the work product privilege, but

15

EXHIBIT 3 Page 028

Predecessor counsel's duty to limit disclosure to information relevant to the claim of ineffective assistance also flows from counsel's continuing duty to the former client. Both the *ABA Guidelines* and the *Texas Guidelines* stipulate that, "[i]n accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client." *ABA Guidelines*, Guideline 10.13; *Texas Guidelines*, Guideline 11.8. ABA Formal Opinion 10-456 states that, in the context of an ineffective assistance of counsel claim, lawyers may disclose information "reasonably necessary" for resolution of the ineffectiveness claim. ABA Standing Comm. on Ethics & Prof'l Responsibility, *Formal Opinion 10-456*, at 5 (2010). However, the opinion further states that it is "highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable." *Id.*

---

*only* with respect to matters *relevant* to his allegations of ineffective assistance of counsel" (second emphasis added)); *Waldrip v. Head*, 532 S.E.2d 380, 387 (Ga. 2000) ("[W]e hold that a habeas petitioner who asserts a claim of ineffective assistance of counsel makes a limited waiver of the attorney-client privilege and work product doctrine and the state is entitled only to counsel's documents and files *relevant* to the specific allegations of ineffectiveness." (emphasis added)); *In re Dean*, 711 A.2d 257, 258-59 (N.H. 1998) ("We hold that claims of ineffective assistance of counsel, whether brought in a motion for new trial or in a habeas corpus proceeding, constitute a waiver of the attorney-client privilege to the extent *relevant* to the ineffectiveness claim; the waiver is a limited one." (emphasis added)).

16

EXHIBIT 3 Page 029

## IV.

## ARGUMENT

## CLAIM ONE

## TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PRESENT EVIDENCE FROM A DNA EXPERT TO CHALLENGE THE DNA EVIDENCE PRESENTED AT TRIAL

The State's case against Cruz-Garcia at the guilt/innocence phase rested largely on DNA evidence, the only physical evidence linking Cruz-Garcia to the crime. Indeed, the State presented evidence that Angelo Garcia's 1992 murder had remained unsolved until 2008, when the HPD obtained a DNA sample from Cruz-Garcia and compared it to evidence collected at the time of the crime. Recognizing the importance of the DNA evidence to the State's case for guilt, trial counsel filed a pretrial motion to suppress the DNA evidence. In support of this motion, counsel cited to the fact that, through multiple investigations, the "now defunct HPD crime lab" had been found to have engaged in improper handling and testing of DNA evidence during the time that that lab was in possession of the DNA evidence in Cruz-Garcia's case.

After a hearing, the trial court denied counsel's motion to suppress the DNA evidence, finding that counsel had presented no evidence that the general issues of malfeasance at the HPD crime lab had affected the lab's handling of evidence in this case. Had trial counsel retained an independent DNA analyst to review the DNA testing performed by the State, they could have presented testimony at the suppression hearing that, in fact, the very issues endemic to the HPD crime lab in the early 1990s were present here. Moreover, such a review also would have revealed problems in the DNA testing and analysis performed later by Orchid Cellmark, calling into question the statistical and scientific validity of the DNA evidence presented by the State. Had trial counsel presented this testimony at the

17

EXHIBIT 3 Page 030

: 00031

suppression hearing, there is a reasonable probability that the DNA evidence would have been suppressed.

Furthermore, even if the DNA evidence had not been suppressed, trial counsel could have presented this testimony to substantially undermine the State's case for guilt. Trial counsel performed ineffectively by failing to present a DNA expert to challenge the DNA evidence presented in Cruz-Garcia's case. Thus, Cruz-Garcia's conviction was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and the appropriate remedy is a new trial.

## A. DNA Evidence and Trial Counsel's Attempt to Suppress

Cruz-Garcia was indicted in November 2008 after HPD obtained a DNA sample from him and compared it to the DNA profile obtained from the sexual assault kit of Diana Garcia and from a cigar that was found at her house after Angelo Garcia was kidnapped. (1 CR at 6; 20 RR at 51, 55-56.) Prior counsel for Cruz-Garcia, Mr. Shellist and Mr. Capitaine, filed a Motion for Continuance in January 2011 to allow time for an independent DNA expert to review the State's DNA evidence. (2 CR at 221; Ex. 4 [Aff. of Steven Shellist] at ¶4.) Mr. Shellist and Mr. Capitaine recognized that because DNA evidence was the only physical evidence linking Cruz-Garcia to the crime, "evaluating the integrity of the DNA evidence would be crucial in determining whether or not Cruz-Garcia could be connected to the sexual assault of Diana Garcia and the kidnapping and subsequent death of her son." (Ex. 4 at ¶3 [Aff. of Shellist]; 2 CR at 227.) Mr. Shellist and Mr. Capitaine were also aware that specific employees of the HPD crime lab who had handled evidence in Cruz-Garcia's case had since been found to have engaged in serious, and in some cases criminal, misconduct. (2 CR at 227-28; Ex. 4 at ¶3 [Aff. of Shellist].) Mr. Shellist and Mr. Capitaine therefore knew that retaining an

18

EXHIBIT 3 Page 031

: 000032

independent forensic DNA expert to review the State's handling and processing of the DNA evidence would be necessary to render effective assistance of counsel and guarantee Cruz-Garcia a fair trial. (Ex. 4 [Aff. of Shellist at ¶3.)

To that end, Mr. Shellist and Mr. Capitaine contacted Dr. Elizabeth Johnson, a private forensic scientist and DNA analyst, to consult with them about the DNA evidence in the case. (2 CR at 229; Ex. 4 at ¶4 [Aff. of Shellist]; Ex. 32 at p. 2 [Trial Affidavit of DNA Expert Johnson].) Dr. Johnson provided an affidavit in support of the Motion for Continuance detailing the amount of time she would need to review the DNA evidence in the case. (Ex. 4 at ¶4 [Aff. of Shellist]; Ex. 32 at p. 2 [Trial Affidavit of DNA Expert Johnson].) Mr. Shellist and Mr. Capitaine intended to have Dr. Johnson review the DNA testing performed by the State. (2 CR at 229; Ex. 4 at ¶4 [Aff. of Shellist].) Had that review produced helpful results, they intended to use that information to suppress the DNA evidence. Alternatively, they intended to present Dr. Johnson as a witness at trial or to consult with her for assistance in cross-examining the State's witnesses pertaining to DNA. (Ex. 4 at ¶5 [Aff. of Shellist].)

When Mr. Shellist and Mr. Capitaine withdrew from Cruz-Garcia's case, they told new counsel that they would be happy to consult with him about the case and share their thoughts and ideas for Cruz-Garcia's defense. (Ex. 4 at ¶6 [Aff. of Shellist].) Trial counsel declined to consult with them about the case. (*Id.*) Trial counsel did not retain Dr. Johnson or any other DNA expert to review the DNA testing performed in Cruz-Garcia's case.

On June 14, 2013, trial counsel filed a Motion to Suppress Results of All DNA Testing. (3 CR at 454-456.) A suppression hearing was held on June 19, 2013. (16 RR at 1.)

19

EXHIBIT 3 Page 032

: 000033

### 1. Suppression Hearing

At the suppression hearing, the State presented testimony from Eric Mehl, a retired HPD sergeant. (16 RR at 26.) Sgt. Mehl testified that while working in the HPD cold case squad in 2007, he decided to reinvestigate the death of Angelo Garcia fifteen years earlier. (*Id.* at 29-30). Sgt. Mehl retrieved several items of evidence from storage that had been collected at the time of the crime, including a cigar that had been recovered at the scene of the crime, a sexual assault kit that was taken from Diana Garcia the night of the assault, a cutting from Diana Garcia's panties, and blood samples taken from Diana Garcia and Arturo Rodriguez. Sgt. Mehl sent these items to forensic testing lab Orchid Cellmark for analysis. (*Id.* at 30-35.) Sgt. Mehl testified that the cigar had been stored at the HPD property room and that the sexual assault kit had been stored in the property room annex. (*Id.* at 30-32.) According to Sgt. Mehl, the sexual assault kit was sealed in a plastic bag, and there did not appear to be any problems with the storage of this item of evidence, nor with the storage of the cigar. (*Id.* at 30-33.) Sgt. Mehl also stated that the cutting from the panties and the blood samples from Diana Garcia and Arturo Rodriguez had been stored at the HPD crime lab and that each of these items was in individually sealed plastic bags and stored together in a larger bag. (*Id.* at 33-35.)

Sgt. Mehl further testified that in 2008, he obtained a DNA sample from Cruz-Garcia and also sent it to Orchid Cellmark for analysis and comparison to the DNA profiles obtained from the items of evidence. (16 RR at 38-39.) After performing this analysis, Orchid Cellmark reported back to Sgt. Mehl that the DNA profile obtained from the cigar matched that of Cruz-Garcia, that the major component of the DNA mixture obtained from the cutting of the panties belonged to Cruz-Garcia, and that Cruz-Garcia could not be excluded as a contributor to the DNA mixture found on the vaginal swab. (*Id.* at 39.)

20

EXHIBIT 3 Page 033

The State then presented the testimony of Matt Quartaro, a DNA analyst at Orchid Cellmark. (16 RR at 49.) Quartaro testified that when he received the evidence in this case from Sgt. Mehl, there did not appear to be any problems in the packaging of the evidence. (*Id.* at 49-50, 60.) Orchid Cellmark's analysis of the DNA evidence provided by Sgt. Mehl resulted in a finding that Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction obtained from the vaginal swabs was a mixture of multiple individuals, to which Cruz-Garcia and Arturo Rodriguez could not be excluded as contributors; and that the sperm cell fraction obtained from the cutting of the panties was a mixture of at least two individuals, to which Cruz-Garcia was a major contributor and Arturo Rodriguez could not be excluded as a minor contributor. (*Id.* at 54-60.)

Finally, the State presented testimony from Courtney Head, a criminalist with the HPD crime lab. Head testified that in 1992, the HPD crime lab had performed DNA extractions on the evidence and reference samples collected in the case and that those extractions were sent to Genetic Design Lab in California for testing. (16 RR at 84.) In 2010, Head performed a DNA extraction on a buccal swab taken from Cruz-Garcia. (*Id.* at 89-90.) Head then compared the DNA profile she obtained of Cruz-Garcia to the DNA profiles that Orchid Cellmark had obtained from the evidentiary samples. (*Id.* at 91.) Head did not herself perform any DNA testing on the items of evidence; rather, she relied solely on the DNA profiles obtained by Orchid Cellmark. (*Id.*) Based on her comparison of Cruz-Garcia's DNA profile to Orchid Cellmark's findings, Head found that Cruz-Garcia could not be excluded as a contributor to the DNA on the cigar; that Cruz-Garcia could not be excluded as a contributor to the mixture DNA profile obtained from the sperm cell fraction of the vaginal swabs; and that the DNA profile obtained from the sperm cell fraction of the panties was a mixture of at least two

21

EXHIBIT 3 Page 034

: 000035

individuals, to which Cruz-Garcia could not be excluded as a contributor to the major component. (*Id.* at 91-92.)

Head also testified to the involvement of several specific HPD crime lab analysts in the handling of DNA evidence in Cruz-Garcia's case. Head testified that a criminalist named Joseph Chu had obtained a hair sample from a suspect in 1992 and also had received buccal swabs from Cruz-Garcia in 2010. (16 RR at 85-86.) Head also testified that a former HPD crime lab employee named B. Sharma was the main DNA analyst on the extractions taken from the sexual assault kit in 1992. (*Id.* at 86-87, 97.) Head further testified that another HPD crime lab employee named Deetrice Wallace initially received the sexual assault kit and did some screening to detect blood or semen. (*Id.* at 98.)

In response to this testimony, the defense argued that investigations into the workings of the HPD crime lab over the time period that the lab was in possession of evidence in Cruz-Garcia's case had resulted in scathing reports of malfeasance at the lab, including contamination of evidence and incorrect analyses, and the eventual closure of the lab. (16 RR at 16-18.) Additionally, trial counsel argued that specific individuals who had handled evidence in Cruz-Garcia's case were found through these investigations to have committed misconduct in their work at the lab. (*Id.* at 17, 108.) In support of their motion, trial counsel also submitted several reports of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room, Michael Bromwich; the HPD Internal Affairs Division investigation summary; employee complaint histories of Joseph Chu and Baldev Sharma; and judgments of conviction of Deetrice Wallace. (*Id.* at 21; 18 RR at 28.) These records demonstrated that Joseph Chu had received nine allegations of misconduct as an employee of the HPD crime lab and that he had on several occasions failed to report DNA statistics properly. (Defense Ex. 8-9; 17 RR at 14-15.) The records also showed that Baldev Sharma had received five

22

EXHIBIT 3 Page 035

allegations of misconduct as an employee of the HPD crime lab, including an allegation of criminal activity; that he had been cited for violations of competence and truthfulness; and that the DNA/Serology Section of the lab was a "total disaster" under his management. (Defense Ex. 2-3, 8-9; 17 RR at 15-16.) The records further demonstrated that, as an employee with the Department of Public Safety, Deetrice Wallace had been convicted of three counts of tampering with a governmental record. (Defense Ex. 17; 17 RR at 16.) Nevertheless, trial counsel conceded they could not show that the type of mishandling of evidence detailed in the investigative reports and employee records occurred with respect to any of the evidence in Cruz-Garcia's case. (16 RR at 18, 107.)

In ruling on counsel's Motion to Suppress, the trial court held that "the DNA evidence as it relates to Orchid Cellmark testing is sufficiently reliable and relevant and is admissible." (17 RR at 4.) Specifically, the court found that the sexual assault kit was sealed when Sgt. Mehl retrieved it from the HPD property room annex and sent it to Orchid Cellmark in 2007 and that "there is no evidence in this case that any of the...DNA evidence in question was stored in a manner or placed in a location that is alleged to be subject to contamination, mishandling, or malfeasance by the HPD property room or the old HPD Crime Lab." (*Id.* at 7, 12.) The court found that the Bromwich Report submitted by trial counsel detailed myriad issues with the DNA serology section of the old HPD crime lab, including "deficiency in documentation of procedures, mistakes in performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standard of operating procedures." (*Id.* at 13.) However, the court held that "[n]o issues have

23

EXHIBIT 3 Page 036
: 00037

been identified in the Bromwich Report or in this hearing or in any discovery that the Court has been made aware of that there were any concerns addressed in those items regarding the evidence in this case." (*Id.*)

### 2. Trial

The State again presented the testimony of Sgt. Mehl, Quartaro, and Head at trial. Their testimony largely mirrored the testimony they gave at the suppression hearing. (20 RR at 33-68; 21 RR at 103-73.)

### B. Findings of Post-Conviction Review by DNA Expert

Daniel Hellwig is the Laboratory Director of Sorenson Forensics, a private forensic lab in Salt Lake City, Utah, that provides forensic DNA casework services for entities including crime labs, law enforcement agencies, and courts throughout the country. (Ex. 2 at ¶1 [Aff. of Daniel Hellwig].) Had trial counsel retained an independent DNA analyst such as Mr. Hellwig to review the results of the DNA testing performed in Cruz-Garcia's case, they would have discovered that the same issues detailed in the Bromwich Report—including improper storage of evidence and errors in analyzing mixture DNA profiles and calculating statistical probabilities—were, in fact, present in Cruz-Garcia's case, not only with regard to the HPD crime lab's initial handling of the evidence, but with regard to the testing performed later by Orchid Cellmark as well.

### 1. Chain of Custody

Mr. Hellwig's review of the chain of custody documentation uncovered serious concerns about the integrity of the probative pieces of evidence in Cruz-Garcia's case—specifically, the sexual assault kit and the cutting of the panties from which incriminating DNA evidence was later discovered. Contrary to the testimony of Sgt. Mehl and Matt Quartaro at the suppression hearing and trial, the Orchid Cellmark chain of custody documentation revealed that the evidence bag containing the sexual assault kit that housed the vaginal swabs was *unsealed* prior

EXHIBIT 3 Page 037

to laboratory processing. While the outer FedEx box in which Orchid Cellmark received the sexual assault kit was sealed, the sexual assault kit itself was unsealed when it was received by Orchid Cellmark. This sexual assault kit was in the custody of HPD for approximately fifteen years before it was sent to Orchid Cellmark. Furthermore, although the manila envelope containing the cutting from the panties was identified as a sealed container, two integral pieces within that sealed package were noted as unsealed. The unsealed envelopes contained within this package housed the cutting from the panties and the known blood sample from Arturo Rodriguez. (Ex. 2 at ¶¶9, 10 [Aff. of Hellwig].)

The fact that key pieces of evidence—including the sexual assault kit—were received unsealed by Orchid Cellmark undoubtedly calls into question the integrity of the physical evidence in Cruz-Garcia's case. Moreover, the fact that an unsealed known sample—the blood of Arturo Rodriguez—was housed together with an unsealed piece of evidence—the cutting from the panties—is also alarming and against best scientific practice. Ultimately, this failure to adhere to basic chain of custody protocols calls into doubt the overall reliability of the evidence handling in Cruz-Garcia's case. (Ex. 2 at ¶¶10, 23 [Aff. of Hellwig].)

## 2. The Mixture DNA Profile

Mr. Hellwig further found that the comparison between Arturo Rodriguez and the mixture DNA profile obtained from the cutting of the panties should have been deemed inconclusive and that, therefore, the second contributor to this mixture should correctly have been described as "unknown." Orchid Cellmark failed to follow prevailing guidelines with regard to its inclusion of Arturo Rodriguez in the mixture DNA profile obtained from the cutting of the panties. Furthermore, Orchid Cellmark failed to report any statistical evaluation with respect to the inclusion of Arturo Rodriguez in the mixture DNA profile. This failure directly contradicts the Scientific Working Group on DNA Analysis

25

EXHIBIT 3 Page 038

Methods (SWGDAM) guidelines, which state that any inclusion (or non-exclusion) must be reported along with a statistical weight to aid the trier of fact in the strength of the inclusion. Because Orchid Cellmark did not do a statistical calculation on this DNA mixture, they should not have included Arturo Rodriguez as a possible contributor to this mixture. (Ex. 2 at ¶¶12-14 [Aff. of Hellwig].)

Furthermore, the DNA mixture obtained from the cutting of the panties was only detected in four of fifteen DNA loci and at very low levels. It is, therefore, very unlikely that any of these loci would be deemed suitable for statistical analysis, and, thus, it would be impossible to obtain the required statistical weight. The comparison between the cutting of the panties and Arturo Rodriguez should, therefore, have been deemed inconclusive. (Ex. 2 at ¶13 [Aff. of Hellwig].)

Testimony at trial that Arturo Rodriguez was the second contributor to the mixture DNA profile obtained from the sperm cell fraction from the cutting of the red panties was, therefore, misleading. The second contributor to this mixture should correctly have been described as an unknown source. Based on the genetic material recovered, there is insufficient information for a laboratory to conclude that Arturo Rodriguez, rather than an unknown contributor, was the second source of the male DNA present in this mixture. (Ex. 2 at ¶¶14, 24 [Aff. of Hellwig].)

### 3. The Vaginal Swabs

Mr. Hellwig also found that Orchid Cellmark failed to follow the SWGDAM guidelines with regard to the lab's statistical analysis of the sperm cell fraction of the vaginal swab. When utilizing the statistical method used in this analysis, called the Combined Probability of Inclusion (CPI), it is essential to evaluate the DNA profile obtained to ensure that no allelic dropout has occurred—that is, that no DNA information is "missing" from the profile due to minute amounts of input DNA or DNA degradation—as this will invalidate the CPI statistic. With regards to the sperm cell fraction of the vaginal swab, there are several DNA loci that

26

EXHIBIT 3 Page 039

appear to be at a low enough level that the Orchid Cellmark laboratory should have precluded them from statistical analysis. There are even indications of missing alleles where the laboratory still improperly utilized this DNA locus for statistical analysis, raising concerns of allelic dropout. (Ex. 2 at ¶¶15-16 [Aff. of Hellwig].)

The SWGDAM guidelines recommend incorporation of a stochastic threshold to ensure that no allelic dropout is occurring. However, Orchid Cellmark apparently failed to utilize a stochastic threshold in this case. In fact, the laboratory chose to preclude the use of only one DNA locus from the statistical calculation when there are definite questions as to the allelic dropout at several other DNA loci. (Ex. 2 at ¶16 [Aff. of Hellwig].)

Additionally, Orchid Cellmark violated fundamental principles of forensic analysis by providing two separate statistical analyses for the DNA profile obtained from the vaginal swab, one for the inclusion of Arturo Rodriguez and another for the inclusion of Cruz-Garcia. It is essential that evaluation of the unknown, evidentiary DNA profile occur with no bias from the known samples that will be compared. Essentially, an unknown evidentiary profile should be evaluated for suitability for comparison as well as statistical analysis before introducing the known, potential suspect samples. Conversely, in this case, the statistics were changed for the subsequent inclusion of Cruz-Garcia. This practice is a violation of both SWGDAM guidelines as well as fundamental principles of forensic analysis. It is essential to do everything possible to remove interpretational bias toward any individual by analyzing the evidentiary DNA profiles previous to and blind to the analysis and subsequent comparison to the known sample. Orchid Cellmark's failure to do so calls into question the comparison as well as the statistics generated as a result of this comparison. (Ex. 2 at ¶¶17, 25 [Aff. of Hellwig].)

27

EXHIBIT 3 Page 040

### 4. The HPD Crime Lab's Reinterpretation of the Orchid Cellmark Data

HPD criminalist Courtney Head testified that she compared Cruz-Garcia's DNA profile to the DNA profiles that Orchid Cellmark had obtained from the evidentiary samples, rather than performing DNA testing on the evidentiary items herself. (21 RR at 91.) The HPD crime lab's reinterpretation of data and DNA profiles that were generated by Orchid Cellmark approximately three years prior to the issuing of the HPD report presents a further problem in the DNA analysis performed in Cruz-Garcia's case. A laboratory's reanalysis of the work of another forensic DNA laboratory runs counter to best scientific practice. The analysis and interpretation of forensic DNA profiles should be done utilizing the procedures, protocols, and interpretation thresholds of the laboratory that originally processed and created the profiles. (Ex. 2 at ¶18 [Aff. of Hellwig].)

In addition to the problems in Orchid Cellmark's initial interpretation and reporting of the DNA profile from the sperm cell fraction of the vaginal swab, HPD's reinterpretation of this profile is itself problematic. It would be impossible for the HPD laboratory to evaluate for stochastic dropout when Orchid Cellmark did not appear to use a stochastic threshold in its original interpretation. Furthermore, the HPD laboratory could not have a thorough understanding of the validation documentation, procedures, and thresholds specific to the Orchid Cellmark laboratory processing necessary to accurately reinterpret this profile. Without intimate knowledge of and proper adherence to the validated procedures, thresholds, and specifications of the Orchid Cellmark laboratory at the time of its interpretation, the HPD laboratory would not be utilizing the interpretation that is unique to the laboratory that the data was created in and interpreted under. (Ex. 2 at ¶19 [Aff. of Hellwig].)

Additionally, in its reinterpretation of the DNA mixture obtained from the vaginal swab, the HPD laboratory *excluded* a DNA marker in its statistical

28

EXHIBIT 3 Page 041

calculations that was originally included by the Orchid Cellmark interpretation and *included* a DNA marker that was originally excluded by the Orchid Cellmark interpretation. There is no documentation that explains the reason behind this interpretation decision by the HPD laboratory. Such an action is another example of the problems that stem from HPD's reinterpreting data that was not generated at its own laboratory. (Ex. 2 at ¶20 [Aff. of Hellwig].)

Furthermore, while reinterpreting the two single source profiles (the cigar and the major component of the sperm cell fraction from the panties), the HPD laboratory increased the rarity of the profile by including two DNA loci in its statistical calculations that were previously not reported in the Orchid Cellmark report. It is problematic that the original laboratory that created the profile did not denote these two markers as suitable for comparison (and thus suitable for statistical calculation) in any way. It is impossible to be sure that the use of these two markers in the statistical calculation was proper since Orchid Cellmark originally interpreted the profiles in question and did not sufficiently document the suitability of these markers for comparison to remove any doubt. This practice further illustrates the problems with HPD's interpreting data that was not generated by its own laboratory. (Ex. 2 at ¶¶21, 26 [Aff. of Hellwig].)

The findings of Mr. Hellwig's review indicate that the very types of issues detailed in the Bromwich Report—and in the disciplinary reports of specific HPD crime lab employees who handled evidence in this case—*did* exist with regard to the handling and testing of DNA evidence in this case. The failure of HPD and Orchid Cellmark to adhere to basic best practices and prevailing guidelines calls into question the entirety of the handling and analysis of DNA evidence in this case.

29

EXHIBIT 3 Page 042

### C. Trial Counsel Performed Ineffectively by Failing to Retain an Independent DNA Expert

Trail counsel's failure to retain an independent DNA expert to review the DNA testing performed in this case—a case in which the State's case for guilt rested primarily on DNA evidence and in which counsel were aware of myriad problems at the lab that initially handled the evidence—was objectively unreasonable. Moreover, counsel's failure to retain a DNA expert prejudiced Cruz-Garcia. Had the problems in the handling and analysis of the DNA evidence in this case been presented at the suppression hearing, there is a reasonable probability that the evidence would not have been admitted at trial. Even had the evidence still been admitted, counsel could have presented this evidence to effectively undermine the State's theory at the guilt/innocence phase. There is, therefore, a reasonable probability that, had trial counsel retained an independent DNA expert, the outcome of Cruz-Garcia's trial would have been different.

### 1. Deficient Performance

Investigation and preparation are the keys to effective representation. Counsel must engage in a reasonable amount of pretrial investigation and make an independent investigation of the facts and circumstances involved in the case. *Rummell v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979); *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994). Trial counsel have a duty "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7(A); *see also id.* at cmt. (noting the "importance of defense counsel's duty to take seriously the possibility of the client's innocence, to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses"). From the fruits of that investigation, counsel also must present all possible legal claims and defenses and, in doing so, present them as forcefully as possible. *ABA Guidelines*, Guideline 10.8; *see also id.* at

30

EXHIBIT 3 Page 043

cmt. ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.").

Here, the State's case rested largely on DNA evidence. Counsel were clearly aware of the myriad problems that existed in the HPD crime lab's storing, handling, and testing of DNA evidence during the time period that the lab possessed the DNA evidence in this case. Trial counsel were also aware that specific individuals at the HPD crime lab who handled the DNA evidence in this case had histories of serious misconduct and malfeasance. Moreover, the need for an independent DNA analyst had already been flagged by prior counsel, and an available expert already had been identified. In light of these facts, trial counsel could have had no strategic reason for failing to retain an independent DNA analyst.

Significantly, the Court of Criminal Appeals has previously found counsel performed deficiently when they failed to retain an independent DNA expert. *See Ex parte Napper*, 322 S.W.3d 202, 247-48 (Tex. Crim. App. 2010). That case similarly involved problematic DNA testing by the HPD crime lab. *Id.* at 224. The Court found deficient performance for counsel's failure to retain an independent DNA expert, even though the problems with the crime lab had not become public knowledge at the time of the defendant's 2001 trial. *Id.* at 246. In that case, the Court found that, had trial counsel retained an independent DNA expert, "he would have known that the HPD Crime Lab failed to adhere to accepted practices…, and he would have understood that [the] statistical frequency estimate was probably incorrect." *Id.* at 247. The same is true in this case with respect to the handling and analysis of the DNA evidence both by the HPD crime lab and by Orchid Cellmark. Counsel's failure to present a DNA expert thus constituted deficient performance under prevailing professional norms.

31

EXHIBIT 3 Page 044

## 2. Prejudice

There can be no doubt that trial counsel's failure to retain a forensic DNA analyst to review the State's DNA evidence prejudiced Cruz-Garcia. An expert like Mr. Hellwig could have provided relevant, persuasive testimony to challenge the reliability of the State's DNA evidence. Indeed, expert witness testimony is one of the most powerful tools at an attorney's disposal to present a compelling claim. *Coble v. State*, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010).

In denying trial counsel's motion to suppress the DNA evidence, the trial court pointed to the fact that, although counsel had presented substantial evidence of the many problems that existed at the HPD crime lab at the time the lab was in possession of evidence in Cruz-Garcia's case, as well as evidence of misconduct by specific HPD crime lab employees who had handled evidence in this case, counsel presented no evidence that any of those problems actually existed with respect to the DNA evidence in this case. Had trial counsel retained an independent DNA expert, they could have presented testimony at the suppression hearing that, in fact, some of the very issues flagged by the independent investigation of the lab were present in the handling and analysis of DNA evidence in Cruz-Garcia's case.

Specifically, such an expert could have testified to serious problems in the chain of custody of two key pieces of evidence in this case. An expert would have informed the court that the sexual assault kit was unsealed when it was received by Orchid Cellmark and that the cutting from the panties was housed unsealed together with the unsealed reference sample of Arturo Rodriguez. Moreover, these key pieces of evidence had potentially been stored in this state for roughly fifteen years. Given the significance of the DNA evidence in this case, identifying such basic problems in its storage and handling necessarily would have called into question its reliability in inculpating Cruz-Garcia.

32

EXHIBIT 3 Page 045

Furthermore, an expert also could have testified that Orchid Cellmark improperly included Arturo Rodriguez as a second contributor to the mixture DNA profile obtained from the cutting of the panties and that, instead, this second contributor profile should have properly been described as coming from an unknown source. This information would have been crucial for the Court to consider, as an unknown contributor to the DNA mixture in the sexual assault kit opens the door to the possibility that this unknown contributor was, in fact, the true perpetrator of the assault against Diana Garcia. By identifying Arturo Rodriguez as the second male contributor to the genetic material obtained from the physical evidence, the lab not only flouted best scientific practices, it also removed the possibility—which based on a correct interpretation of the DNA testing exists— that an unknown male contributed to the DNA present in the sexual assault testing. In ignoring this possibility, the lab's actions call into question the overall integrity of the DNA test results that incriminate Cruz-Garcia. This is precisely the sort of information that the Court concluded had not been presented in ruling that none of the clearly identified problems with the HPD crime lab appeared to have tainted the evidence involved in Cruz-Garcia's case.

A DNA expert could have testified further to the fact that Orchid Cellmark violated SWGDAM guidelines in its calculation of statistical conclusions regarding the mixture DNA sample obtained from the vaginal swabs and that the HPD crime lab violated best scientific practice by reinterpreting the data obtained by Orchid Cellmark, rendering its results unreliable. This testimony also would have called into serious doubt the integrity of the evidence itself and the competence of the analysis performed by HPD and Orchid Cellmark. Had trial counsel presented this testimony, there is a reasonable probability that the trial court would have granted their Motion to Suppress the DNA evidence.

33

EXHIBIT 3 Page 046

Without the DNA evidence, the State's case for guilt would have rested entirely on the testimony of Carmelo Martinez Santana (Rudy) and Angelita Rodriguez, both of whom had substantial credibility issues. Rudy was a convicted felon serving a seventeen-year federal prison sentence for possession of drugs and a firearm, who also had a prior conviction for assault in the early 1990s, and whose testimony at trial conflicted in many respects from the statement he gave to FBI agents. (*See, e.g.*, 21 RR at 29-31, 45-57, 68-72.) Rudy placed himself at the scene, yet he was never charged with anything in relation to the crime and had an obvious incentive to point the finger at Cruz-Garcia. Moreover, without the DNA evidence, Rudy's testimony itself would likely have been inadmissible as accomplice-witness testimony under Article 38.14 of the Texas Code of Criminal Procedure.

Likewise, Angelita Rodriguez, Cruz-Garcia's ex-wife, gave testimony that departed significantly from the statement she gave to police. (20 RR at 110-13.) Notably, Angelita Rodriguez admitted to having been involved in the drug-dealing activities of Cruz-Garcia, Diana Garcia, and Arturo Rodriguez; as such, she could have had any number of motives to testify against Cruz-Garcia. Therefore, had the trial court suppressed the results of the DNA testing in this case, there is a reasonable probability that the result of Cruz-Garcia's trial would have been different. Indeed, had this evidence been suppressed, it is likely that the charges against Cruz-Garcia would have been dropped. At trial, the DNA evidence—problematic as it is—was the only compelling evidence implicating Cruz-Garcia in this more than twenty-year-old crime.

Furthermore, even if the Court had still ruled the DNA evidence admissible, defense counsel could have presented a DNA expert at trial to substantially undermine the State's theory. Specifically, trial counsel could have presented such an expert to contest the inclusion of Arturo Rodriguez as the second contributor to

34

EXHIBIT 3 Page 047

the mixture DNA profile obtained from the cutting of the panties and to testify that this second contributor should properly be described as unknown. Had trial counsel simultaneously presented available testimony from friends of Cruz-Garcia, Diana Garcia, and Arturo Rodriguez to confirm that Cruz-Garcia had an ongoing consensual sexual relationship with Diana Garcia to explain the presence of Cruz-Garcia's DNA on the evidentiary items,[3] the presence of an unknown contributor to the DNA mixture found on the cutting of the panties would have entirely "alter[ed] the entire evidentiary picture" presented at trial. *See Strickland*, 466 at 695. Counsel could have argued to the jury that this second unknown contributor, and not Cruz-Garcia, was the perpetrator of the sexual assault and, thereby, the kidnapping and murder of Angelo Garcia. There is a reasonable probability that, had trial counsel presented this testimony, the result at trial would have been different. Because Cruz-Garcia was prejudiced by trial counsel's deficient performance, he must be granted a new trial.

### CLAIM TWO

### TRIAL COUNSEL PERFORMED INEFFECTIVELY BY FAILING TO INVESTIGATE AND PRESENT REASONABLE DOUBT AT THE GUILT/INNOCENCE PHASE OF TRIAL

The State's theory at the guilt/innocence phase of trial was that Cruz-Garcia had sexually assaulted Diana Garcia and kidnapped Angelo Garcia in retaliation for Diana and Arturo Rodriguez having recently stopped selling drugs for him. In support of this theory, the State presented DNA evidence that linked Cruz-Garcia to the scene of the crime, as well as testimony from Diana and Arturo that they had stopped selling drugs for Cruz-Garcia shortly before the crime occurred. Evidence was available at the time of trial that would have effectively countered the State's theory that Cruz-Garcia was the perpetrator of the sexual assault and, thereby, the

---

[3] See Claim Two, *post.*

35

EXHIBIT 3 Page 048

kidnapping of Angelo. Additional evidence was available that would have substantially undermined the State's theory of Cruz-Garcia's motive for committing the crime. This evidence would have established reasonable doubt for the jury as to Cruz-Garcia's guilt, yet trial counsel failed to conduct a reasonable investigation to uncover and utilize this evidence. Trial counsel's failure to investigate and present evidence creating a reasonable doubt at the guilt/innocence phase constituted ineffective assistance of counsel. Thus, Cruz-Garcia's conviction was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and the appropriate remedy is a new trial.

## A. Cruz-Garcia Had an Ongoing Consensual Sexual Relationship with Diana Garcia

At trial, the State argued the presence of Cruz-Garcia's DNA in the sexual assault kit was evidence that he raped Diana Garcia and committed the kidnapping and murder of Angelo Garcia. Though lacking any evidence to support their argument, counsel attempted to suggest that the presence of Cruz-Garcia's DNA on the cutting of the panties and the vaginal swabs was the result of a consensual sexual encounter with Diana. On cross-examination, trial counsel asked Arturo whether Diana had a dating relationship with Cruz-Garcia. (19 RR at 21.) Arturo answered, "That I know of, no." (*Id.*) In crossing Orchid Cellmark DNA analyst Matt Quartaro, trial counsel established that the witness could not tell whether sperm ended up on the pieces of evidence through consensual sex or sexual assault or how long the sperm cells had been there. (21 RR at 134-35.) In closing argument, trial counsel again suggested that Cruz-Garcia and Diana could have had a consensual sexual relationship. (23 RR at 48-50.)

Trial counsel did not, however, present any evidence to support their suggestion that Cruz-Garcia had a consensual sexual relationship with Diana. In

36

EXHIBIT 3 Page 049

closing argument, the State easily dismissed trial counsel's suggestion of a consensual relationship between Cruz-Garcia and Diana. The State asked,

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth—and there is no evidence of that—where is the DNA of the guy who raped Diana? Where is it? Why don't we have it? If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

(23 RR at 82.)

While a DNA expert could have testified to the presence of an unknown contributor in the mixture DNA profile obtained from the cutting of the panties in support of the theory that an unknown male was "the guy who raped Diana,"[4] other witnesses available at the time of trial could have testified that Cruz-Garcia had an ongoing consensual sexual relationship with Diana at the time to explain the presence of his DNA on the items of evidence. Brothers Cesar Rios, Jose Valdez, and Hector Saavedra were friends of Cruz-Garcia, whom they called Chico, as well as Diana and Arturo. (Ex. 20 at ¶2 [Aff. of Cesar Rios]; Ex. 24 at ¶¶2-3 [Aff. of Jose Valdez]; Ex. 21 at ¶¶2, 6 [Aff. of Hector Saavedra].) In fact, Valdez was friends with Diana and Arturo before he met Cruz-Garcia. (Ex. 24 at ¶3 [Aff. of Valdez].) Around the time that Angelo was kidnapped, Valdez was himself having a sexual relationship with Diana. (*Id.* at ¶4; Ex. 21 at ¶6 [Aff. of Saavedra].) The three brothers were aware that, during this time period, Cruz-Garcia was also having an ongoing sexual relationship with Diana. (Ex. 24 at ¶4 [Aff. of Valdez] ("To my knowledge, Diana was also messing around with other guys, including Chico....The time period that Chico and Diana were having sex was around the same time Angelo was kidnapped."); Ex. 20 at ¶3 [Aff. of Rios] ("Around the time

---

[4] See Claim One, *ante.*

37

EXHIBIT 3 Page 050

Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana."); Ex. 21 at ¶6 [Aff. of Saavedra] ("I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel.").) Rios was also aware that Cruz-Garcia had been at Diana's apartment earlier on the day that Angelo was kidnapped. (Ex. 20 at ¶3 [Aff. of Rios].) Although Rios was interviewed by HPD detectives and identified in police reports, neither he nor his two brothers were ever properly interviewed by trial counsel. (Ex. 20 at ¶8 [Aff. of Rios]; Ex. 24 at ¶6 [Aff. of Valdez]; Ex. 21 at ¶7 [Aff. of Saavedra].)

## B. Diana Garcia and Arturo Rodriguez Had Not Stopped Selling Drugs for Cruz-Garcia

The only motive that the State provided for its theory that Cruz-Garcia sexually assaulted Diana and kidnapped Angelo was that Diana and Arturo had recently stopped selling drugs for him. In its opening statement, the State suggested that it was after Diana and Arturo informed investigators that they had recently stopped selling drugs for Cruz-Garcia that investigators initially began to consider him a suspect. (18 RR at 33.) Diana testified that she and Arturo had sold drugs for Cruz-Garcia but had decided to stop shortly before the incident occurred. (*Id.* at 133.) She stated that in fact, two or three weeks before Angelo was kidnapped, Cruz-Garcia brought drugs to their house even though they had told him they wanted to stop dealing, and Arturo called him and told him to take the drugs back. (*Id.* at 133-34.)

Arturo also testified that he and Diana had stopped selling drugs for Cruz-Garcia. (18 RR at 203.) Arturo testified that Cruz-Garcia "didn't like it very much" when he told him he was going to stop selling drugs for him and that he knew this because he "could see it in his face" even though Cruz-Garcia never said anything to him about it. (*Id.* at 204.) Arturo testified that it had been "about

38

EXHIBIT 3 Page 051

a month to a month-and-a-half" prior to the incident that he had stopped selling drugs. (19 RR at 33.)

This testimony was the only evidence the State presented to explain why Cruz-Garcia would have committed a crime of this nature against people who were close friends and business associates of his. Yet evidence was available that Diana and Arturo had not, in fact, stopped selling drugs for Cruz-Garcia at the time Angelo was kidnapped. Police reports that trial counsel obtained from the State through discovery indicated that Diana and Arturo were still selling drugs as of the day of the incident. (Ex. 33 at pp. 1-2, 4 [Excerpts of Police Reports].) These police reports indicate that a man named Thomas Thoms and his girlfriend, Tracy Pressly, bought cocaine from Diana Garcia on the night Angelo Garcia was kidnapped. (*Id.* at p. 1.) Pressly described the transaction to detectives, and her statement was corroborated by Anita Dorr, a relative who was at Diana and Arturo's house until approximately 9:00 p.m. on the night Angelo was kidnapped. (*Id.*) Furthermore, detectives received a call from an anonymous woman who stated that she was close to the family and informed the detectives that Diana and Arturo were selling drugs out of their apartment up until the night of the incident. (*Id.* at p. 4.)

### C. Trial Counsel Performed Ineffectively by Failing to Investigate and Present this Evidence at Trial

Counsel's failure to sufficiently investigate and present evidence to counter the State's theory at the guilt/innocence phase of trial was objectively unreasonable and prejudiced Cruz-Garcia.

### 1. Deficient Performance

Counsel must engage in a reasonable amount of pretrial investigation and make an independent investigation of the facts and circumstances involved in the case. *Rummell*, 590 F.2d at 104; *Bryant*, 28 F.3d at 1415. The 2003 ABA

39

EXHIBIT 3 Page 052

: 000053

Guidelines—the prevailing professional norms at the time of Cruz-Garcia's trial—instruct counsel "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7(A). Specifically, counsel must "investigate all sources of possible impeachment of defense and prosecution witness." *Id.* at cmt. Counsel also must present all possible legal claims and defenses and, in doing so, present them as forcefully as possible. *ABA Guidelines*, Guideline 10.8; *see also id.* at cmt. ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.").

While trial counsel attempted to suggest that Cruz-Garcia had a consensual sexual relationship with Diana, they failed to present readily-available testimony from Rios, Valdez, and Saavedra that in fact he did. Counsel could have had no strategic reason for failing to present this testimony, as it would have supported a theory they themselves attempted to advance at trial. Moreover, counsel never even interviewed these witnesses. Counsel's failure to interview available witnesses who were known associates of Cruz-Garcia, Diana, and Arturo, was objectively unreasonable.

Similarly, trial counsel's failure to impeach Diana and Arturo with evidence that they continued to deal drugs up to the time of Angelo's kidnapping was also unreasonable. This evidence was in trial counsel's possession, as it was in the discovery materials counsel obtained from the State, and was admissible at trial as impeachment evidence. TEX. R. EVID. 801. Trial counsel's failure to use this readily-available evidence to counter the State's motive theory was objectively unreasonable.

EXHIBIT 3 Page 053

## 2. Prejudice

Had trial counsel conducted a reasonable investigation, they would have uncovered evidence that would have substantially undermined the State's theory at the guilt/innocence phase. Testimony of Cruz-Garcia's ongoing consensual sexual relationship with Diana would have provided an innocent explanation for the presence of his DNA on the items of evidence collected from the crime. Had trial counsel also presented the testimony of a DNA expert at trial to show that the second contributor to the mixture DNA profile obtained from the cutting of the panties was in fact an unknown contributor,[5] trial counsel could have pointed to this unknown contributor as the actual perpetrator of the sexual assault and kidnapping. This evidence would have thus created reasonable doubt in the minds of the jurors and would have changed the outcome of the trial.

Moreover, evidence that Diana and Arturo were still actively selling drugs at the time of the crime would have substantially undermined the State's only theory of motive. Without the testimony that Diana and Arturo had stopped selling drugs for Cruz-Garcia, the State would have had no theory to explain why Cruz-Garcia would have committed the charged offense against his close friends.

Had trial counsel presented evidence of Cruz-Garcia's consensual sexual relationship with Diana and of the fact that Diana and Arturo were still selling drugs at the time of the crime, there is a reasonable probability that the result of Cruz-Garcia's trial would have been different. Because trial counsel rendered ineffective assistance during the guilt/innocence phase, Cruz-Garcia's sentence must be vacated.

---

[5] See Claim One, *ante*.

41

EXHIBIT 3 Page 054

: 000055

## CLAIM THREE

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT CRUZ-GARCIA WOULD NOT BE A FUTURE DANGER

Texas's unique sentencing scheme requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1).[6] Unlike in most other states where jurors weigh aggravating and mitigating circumstances to determine whether a sentence of death is appropriate, Texas juries must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of mitigation. *Id.* at § 2(b)-(e). The sentencing structure consequently places the first special issue of future dangerousness "at the center of the jury's punishment decision." *See Jurek v. Texas*, 428 U.S. 262, 274-75 (1976) (reviewing Texas's first special issue and stating that "prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system"); American Bar Association Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report*, at 307 (Sept. 2013) ("ABA Texas Assessment Report").

Because of the importance of the first special issue, it is incumbent upon trial counsel to present a rebuttal to the State's case. However, Cruz-Garcia's trial counsel failed to conduct a reasonable investigation that would have led to evidence vital to rebut the State's assertion that Cruz-Garcia would be a future danger. Counsel committed deficient performance first in failing to review the District Attorney's file relating to Cruz-Garcia's case and second in failing to

---

[6] If jurors answer this question, referred to as Special Issue One, with a "Yes," jurors are asked to answer another Special Issue. If the jurors answer "No" to this question, the defendant is automatically sentenced to a life sentence.

42

EXHIBIT 3 Page 055

conduct any investigation in Puerto Rico, where Cruz-Garcia had lived and had been imprisoned for nearly a decade. Because of this failure, substantial evidence was not presented to Cruz-Garcia's jury that would have led to a finding that the State had not met their burden under the first special issue. Counsel's ineffective assistance in this regard violated Cruz-Garcia's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law. Accordingly, his sentence must be reversed.

## A. Trial Counsel Performed Ineffectively in Failing to Review the District Attorney's File and Identify Evidence that Cruz-Garcia Would Not Be a Future Danger

At the time of Cruz-Garcia's capital murder trial in Harris County, the District Attorney's Office maintained an "open-file" policy, meaning that the defense had the opportunity to review all non-privileged files in the State's possession. Despite this policy, trial counsel refused to review those files. Trial counsel asserted on the record that they believed the prosecution had a duty to *deliver* any relevant files to the defense under *Brady v. Maryland*. 373 U.S. 83 (1963). This, however, was an incorrect understanding of the law.

Because of this mistake, counsel failed to review the files in the possession of the State. Had counsel done so, they would have discovered records in the State's possession pertaining to Cruz-Garcia's incarceration in Puerto Rico. These records establish that Cruz-Garcia had significant good behavior in his near decade in prison there—a fact especially relevant to the jury's determination of Cruz-Garcia's likelihood of committing acts of violence if sentenced to life in prison. Counsel's failure to review the District Attorney's file—or to independently investigate Cruz-Garcia's incarceration in Puerto Rico—constituted deficient performance. This deficiency led to the absence of compelling evidence to refute

43

EXHIBIT 3 Page 056

: 00057

the State's argument that Cruz-Garcia would be a future danger, prejudicing Cruz-Garcia's trial.

### 1. Relevant Facts

During the investigation of Cruz-Garcia's case and through trial, the District Attorney's office held open their file to defense counsel for inspection. (Ex. 30 [DA Open File Notice].) Although the District Attorney did make copies and deliver certain materials it believed necessary under *Brady v. Maryland*, as well as any materials specifically requested by counsel, the District Attorney otherwise required counsel to come review the materials in their offices. (Ex. 31 [Emails between DA Tise and Defense Counsel].)

Cruz-Garcia's trial counsel, Mr. Cornelius and Mr. Madrid, regularly practice in Harris County and were familiar with this policy by the Harris County District Attorney's office. Even if they were not already aware of the policy, however, the policy had been made known to their predecessor counsel, Mr. Shellist and Mr. Capitaine. (Ex. 31 at 9-10, 12 [Emails between DA Tise and Defense Counsel].) Further, it appears that the policy was communicated directly to Mr. Cornelius and Mr. Madrid. (20 RR 186 ("Tise: I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's open to you. . . . I told you, Skip, you need to come by and see my file.").) The District Attorney took the step of placing in her file multiple copies of a note stating:

> Obel Cruz Garcia and Rogelio Aviles Barroso are co-defendants. My file on both cases remained open to defense counsel up to and during the trial. Photos, witness statements, evidentiary items, lab reports, and other items were all stored together in my office and were available for review before and during the trial.

(Ex. 30 [DA Open File Notice].)

Trial counsel made no objection to the open file policy or being required to travel to the District Attorney's offices to review their file. As late as the day

44

EXHIBIT 3 Page 057

before trial began, at a pretrial setting, counsel communicated to the court that they were happy with the discovery process that had being occurring.

> I'm very convinced that there isn't anything left for the defendant to discover. I believe that I have been given access to every piece of evidence the State has, everything in their file other than work product. So, I'm not feeling the need to have any testimony or any hearing on discovery . . . . I know the State has some continuing responsibility to turn things over to us, but I think they are complying with that.

(16 RR 4-5). At no point before trial did counsel object or inform the court that the open file policy was unacceptable. Yet, counsel also continued to decline to review the District Attorney's files in Cruz-Garcia's case (making their assertions that they believed there was nothing left to discover without foundation). Ultimately, despite the District Attorney's clear statements that it was not delivering the entire file and that trial counsel needed to review the file, it appears counsel believed they were under no duty to review the prosecution's file and that it was incumbent on the prosecution to deliver any relevant materials to them. Mid-trial, an argument arose about whether a particular FBI report had been provided to the defense. Counsel stated "I don't have a responsibility to go through your file and figure out what's in your file. I don't have to do that . . . . I'm not going to go try to figure out what's in your file . . . . I'm not going to go through 20 boxes of DNA records." (20 RR 186.) At this point, the court went off the record, ending the discussion. In post-conviction investigation, counsel were asked about the statements made on the record and why they had not reviewed the open file. Counsel Skip Cornelius responded by email:

> I remember being pissed that Ms. Tise attempted to make it my responsibility to come to her office and go through her file and figure out what I was entitled to. I told her I want what I am entitled to and it is up to her to figure that out and give it to me. She said that every lawyer in town comes to her office and figures out what they want and

45

EXHIBIT 3 Page 058

she gives it to them. I said I was not letting her off the hook by her reversing the responsibility, it is her responsibility to give me the discovery that I am entitled to, not up to me to be smart enough to ask for the right things. . . . In the past some DAs have had an "open file" policy which puts the burden on you to figure out what you are entitled to, however how do you know if you are seeing all they have, or what comes in later? If they say they had an open file policy and showed you everything and would have copied anything you wanted they can then claim it is your fault if you don't have something. I don't play that game and, as I told you in our meeting, received full support by the Michael Morton Act which was passed a very short time after our trial.

While counsel's statements explain his belief that the State was required to disclose evidence to the defense, it does not address counsel's failure to object to the open file policy prior to trial or their failure to accept the policy and make reasonable effort to review the District Attorney's file. This failure is all the more strange, as counsel did in fact go to the District Attorney's offices and review some files relating to their presentation in this case. Despite counsel's statement on the record of "I'm not going to go through 20 boxes of DNA records" (20 RR at 186), according to counsel in their post-conviction interview, they had actually done just that—they went to the District Attorney's office to review the dozens of boxes held relating to the investigation of the HPD Crime Lab's DNA testing in the 1980s and 1990s.

However, counsel did not then or at any other time review the six or seven boxes of materials in Cruz-Garcia's case. Counsel has stated in post-conviction that the only documents they reviewed from the State were the ones provided to them and that all of those materials are in their trial file of this case. Specifically, counsel did not recall being provided or reviewing any substantial documents written in Spanish.

46

EXHIBIT 3 Page 059

Post-conviction counsel for Cruz-Garcia were afforded the same open file policy by the District Attorney's office. Counsel traveled to that office and reviewed the file boxes associated with Cruz-Garcia's case. Upon inspection, counsel discover a full banker's box worth of documents in Spanish that appeared to be records from Cruz-Garcia's incarceration in Puerto Rico in the decade before he was extradited to Houston for his capital trial. Review of those records has revealed significant evidence of Cruz-Garcia's positive behavior while in prison which would have been instrumental in rebutting the State's argument that Cruz-Garcia would constitute a future danger under the first special issue.

First, the records indicate that numerous institutions where Cruz-Garcia was housed in Puerto Rico reported finding no instances of disciplinary actions or grievances filed against Cruz-Garcia. (Ex. 34 [Excerpts of Puerto Rico Jail Records] at 8 (no disciplinary complaints from October 31, 2005 to November, 3, 2008), 9 (no grievances from 2005 to 2010), 10 (no disciplinary complaints), 11 (same).) Next, the records reflect that rather than being a disciplinary problem, Cruz-Garcia was the opposite. Cruz-Garcia earned numerous recommendations for good time credit based on his behavior and hard work. (*Id.* at 1, 4, 6, 7, 12, 14, 16, 18, 20, 21.) From October 2005 to July 2009, Cruz-Garcia received frequent commendation for his hard work at the prison. (*Id.*) In total, Cruz-Garcia received 204 days of credit for his behavior. One notation specifically observed that:

> This prison performs risky jobs and for this reason we are asking for this good conduct time to compensate him for the effort that he makes and by this means help create an example so that other prisoners will give their best.

(*Id.* at 6.) None of the records discussed above appear in Cruz-Garcia's trial file. Nor does it appear that trial counsel made any attempts to get these records independently from the Puerto Rico Department of Corrections.

47

EXHIBIT 3 Page 060

: 000061

At trial, the State presented testimony from a Puerto Rican Department of Corrections official, who stated that on one occasion Cruz-Garcia received discipline for possession of a cell phone, a homemade rope, and a map of Puerto Rico. (24 RR at 118-29.) The official testified that he believed Cruz-Garcia was attempting to escape through a broken window in his prison cell. (*Id.*) No other testimony was given about Cruz-Garcia's conduct while incarcerated in Puerto Rico, either to dispute the statements made by the State's witness or to offer evidence of Cruz-Garcia's good conduct while in prison as reflected in his records.

## 2. Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance and Should Not Be Afforded Deference Because It Was Based on a Misunderstanding of the Law

Trial counsel committed deficient performance by misunderstanding the law relating to the State's disclosure requirement under *Brady*, believing that the prosecution had to go further than merely make available its files to the defense and to actually *deliver* them. This is an incorrect understanding of the law, both because an open-file policy has repeatedly been held to comport with the strictures of *Brady*, and also because trial counsel could not assume that all relevant information would necessarily constitute materials required to be disclosed under *Brady*.

First, "an open-file policy . . . generally satisfies the prosecution's duty to disclose exculpatory evidence." *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006).[7] "[I]f the prosecutor opens his files for examination by defense

---

[7] Cruz-Garcia believes the holding in *Harm v. State* continues to be good law. However, should an open file policy be found to not fulfill the requirements of *Brady*, Cruz-Garcia asserts that the Harris County District Attorney's Office committed constitutional error when it failed to provide his trial counsel with the entirety of the Puerto Rican prison records and all other records the District Attorney's office believed it had sufficiently disclosed through the use of an open file policy.

48

EXHIBIT 3 Page 061
00062

counsel, he fulfills his duty to disclose exculpatory evidence." *Givens v. State*, 749 S.W.2d 954, 957 (Tex. App.—Fort Worth 1988, pet. ref'd); *see also, e.g., United States v. Bagley*, 473 U.S. 667, 675 (1985) (noting "[t]he prosecutor *is not required* to deliver his entire file to defense counsel," and suggesting that an open-file policy goes above and beyond a prosecutor's legal obligations (emphasis added)).

To provide objectively reasonable assistance, trial counsel must have a firm and consistent understanding of relevant legal standards. *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."); *see also Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("[A] tactical or strategic decision is unreasonable," for the purposes of establishing an ineffective assistance of counsel claim, "if it is based on a failure to understand the law.").

In this case, trial counsel incorrectly believed that the District Attorney's office was required to deliver its files to the defense. This belief, however, was not based on reasonable interpretation of the law as it existed at the time of Cruz-Garcia's trial. Trial counsel indicate that they were justified in their position that they had no duty to inspect the District Attorney's file by pointing to the passage of the Michael Morton Act. However, that act was enacted *after* Cruz-Garcia's trial. Thus, the change in Texas law created by the act to require the kind of disclosure envisioned by trial counsel did not take effect until after Cruz-Garcia's trial. Instead of supporting counsel's conduct, the passage of the Michael Morton Act further explains why counsel was unreasonable in believing prior to that change in law that the District Attorney was under a duty to disclose their entire file. It is also telling that trial counsel failed to object to the District Attorney's open file

49

EXHIBIT 3 Page 062

policy during pretrial proceedings when the issue of discovery arose, waiting instead to complain about the policy mid-trial, only after the time for a prudent review of relevant materials had long passed.

Next, trial counsel's misunderstanding of the law was itself no justification to refuse to inspect the District Attorney's file. It is unlikely, even under trial counsel's misinterpretation of *Brady*, that the District Attorney would have been required to deliver *all* the materials it had chosen to make available for counsel's inspection. Under *Brady*, the prosecutor is only required to disclose evidence that is "favorable to an accused," otherwise defined by the courts as evidence that is exculpatory, impeaching, or mitigating. *Ex Parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) ("Favorable evidence includes exculpatory evidence and impeachment evidence. Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence.") (citing *Harm*, 183 S.W.3d at 408); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). While this might include some portions of the District Attorney's file, courts have frequently held that evidence that does not fit neatly into these categories need not be disclosed. *See, e.g., Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."); *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801, 824 (11th Cir. 1995) ("The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."); *United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir. 1988) ("The Government has no obligation to disclose possible theories of the defense to a defendant."); *United States v. Rhodes*, 569 F.2d 384, 388 (5th Cir. 1978) (The "inability of certain eyewitnesses to positively identify [the defendant]" is neither

50

EXHIBIT 3 Page 063

"obviously exculpatory" nor "clearly supportive of a claim of innocence," and the prosecution has no duty to disclose it.).

Without already knowing the full contents of the District Attorney's file, it would have been impossible for trial counsel to ensure there was no potentially beneficial information within that file that had not been disclosed to them. Thus, even under counsel's misinterpretation of *Brady*, it was unreasonable and not strategic to refuse to travel to the District Attorney's offices in the Harris County courthouse to inspect the entire file held open for counsel. Specifically, while the Puerto Rican prison records contained in the State's files are unquestionably favorable to Cruz-Garcia, it would be purely speculative to assume the District Attorney would have recognized that fact and provided copies to the defense. It was incumbent upon Cruz-Garcia's trial counsel, as experienced capital attorneys, both to know the strictures of *Brady* and to otherwise make diligent investigation of all information available to them. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty").

Trial counsel's insistence that the prosecutor deliver her files to the defense revealed a flawed understanding of *Brady* and is especially inconsistent with what is expected of trial counsel in a death penalty case. By not having a firm understanding of relevant legal standards, trial counsel failed to provide objectively reasonable assistance. Under these circumstances, trial counsel's performance was deficient and should be afforded no deference.

### 3. Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance Because Trial Counsel Has an Affirmative Duty to Investigate in Preparation for Trial

Regardless of the issue of disclosure of materials under *Brady*, trial counsel have a "general duty to investigate [that] takes on supreme importance to a

51

EXHIBIT 3 Page 064

: 00065

defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death." *Strickland*, 466 U.S. at 706. This duty to investigate is independent of a prosecutor's disclosure obligations under *Brady*, and it is certainly not lessened in the context of an open-file policy. "In determining whether counsel conducted a reasonable investigation, an appellate court's initial inquiry is whether a reasonable investigation should have uncovered the mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d at 396 (citing *Baxter v. Thomas*, 45 F.3d 1501, 1513 (11th Cir. 1995)). At minimum, a reasonable investigation would have involved reviewing the evidence in the files that the prosecution expressly made available. *Rompilla*, 545 U.S. at 387 n.6 ("Any investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.") (quoting *ABA Standards for Criminal Justice*, Prosecution Function and Defense Function 4-4.1 (3d ed. 1993)). If they had done so, trial counsel would have uncovered valuable evidence to present to the jury, including Cruz-Garcia's Puerto Rico prison records, which reveal an image of Cruz-Garcia sharply different than that painted by the prosecution. Under these circumstances, trial counsel's failure to review the prosecution's file on Cruz-Garcia was unreasonable.

Thus, trial counsel's failure to investigate and present evidence from the prosecution's file, including the Puerto Rican prison records, was not a strategic decision and should not be accorded deference. *Compare Baxter*, 45 F.3d at 1513 (if "the failure to put this evidence before the jury was a *tactical choice* by trial counsel . . . . that decision is afforded a 'strong presumption of correctness'") (emphasis in original). Trial counsel's failure to review the State's file constitutes deficient performance that prejudiced Cruz-Garcia.

52

EXHIBIT 3 Page 065

### 4. Trial Counsel's Failure to Inspect the District Attorney's File Prejudiced Cruz-Garcia

Counsel's failure to inspect the file held open by the District Attorney, or to independently secure Cruz-Garcia's Puerto Rico prison records through reasonable investigation, prejudiced the presentation at Cruz-Garcia's penalty phase of trial. In the absence of the information uncovered in those files, the State was able to present the testimony of the Puerto Rican prison official largely unchallenged. As discussed more fully below, had counsel obtained Cruz-Garcia's prison records, they could have used the records to present the jury with a competing account of Cruz-Garcia's time in prison. Counsel might have used them to cross-examine the prison official to show that he was not familiar with Cruz-Garcia's record and to discredit his belief that Cruz-Garcia had planned an escape. Or counsel might have presented the records through the testimony of an expert witness who could have used the information therein to draw an opinion about Cruz-Garcia's lack of future danger in prison. Had such information been presented to the jury, there is a reasonable probability that at least one juror would have voted for a life sentence instead of death.

### B. Trial Counsel Were Ineffective for Failing to Investigate and Present Testimony from Puerto Rican Prison Officials and Other Witnesses To Rebut the State's Case

Trial counsel were aware that Cruz-Garcia had spent seven years prior to his extradition to Houston in 2008 in Puerto Rico serving a sentence of sixteen years for a kidnapping conviction. In addition, counsel were aware that the State intended to use evidence relating to this conviction and an alleged escape attempt while in jail in Puerto Rico as aggravating evidence during the punishment phase of his capital trial. Despite this knowledge, counsel failed to conduct a sufficient investigation into available witnesses and records relating to Cruz-Garcia's time in Puerto Rico. And as discussed above, had counsel performed effectively in

53

EXHIBIT 3 Page 066

: 00067

reviewing the files held by the District Attorney's office, they would have learned, at a minimum, that there was potential positive information regarding Cruz-Garcia's time in prison in Puerto Rico—information that could have rebutted the State's aggravating evidence and provided reasonable doubt as to Cruz-Garcia's likelihood of future danger.

### 1. Trial Counsel's Investigation

During the punishment phase, the prosecution presented testimony that Cruz-Garcia had been convicted of a kidnapping in 2001 in San Juan, Puerto Rico, for which he was sentenced to sixteen years in prison. (24 RR at 19-26, 64-68.) As early as December 2010, the State had notified the defense that it intended to use this conviction as aggravating evidence at trial. (1 CR at 71; *see also* 1 CR at 196.) The State also presented testimony at trial from a Puerto Rican Department of Corrections official, who stated that Cruz-Garcia received discipline for possession of a cell phone, a homemade rope, and a map of Puerto Rico. (24 RR at 118-29.) The official testified that he believed Cruz-Garcia was attempting to escape through a broken window in his prison cell. (*Id.*) The State had notified the defense in January 2011 (more than two years before trial) that it intended to use this information as aggravating evidence at trial. (2 CR at 283.) The State again notified the defense of its intent to use the extraneous conviction and bad acts evidence on May 15, 2013. (2 CR at 413.)

Despite this information, trial counsel failed to conduct any meaningful investigation in Puerto Rico. Trial counsel retained investigators J.J. Gradoni and Edna Velez, who started working on the case in May 2012. (Ex. 28 at 6 [Cornelius Billing Voucher].) Based on review of the billing records and interviews memos created by the investigators, it appears their investigation was focused almost exclusively on interviewing family and friends in the Dominican Republic and

54

EXHIBIT 3 Page 067

witnesses in Houston.[8]    Although the investigators traveled to the Dominican Republic for on-the-ground investigation, no similar trip was made to Puerto Rico. The only interviews listed in the investigation files as being conducted of Puerto Rican witnesses were phone calls with Cruz-Garcia's brother Joel—once in June 2012 and again in July 2013, shortly before trial—and with Dorca Capellan, Cruz-Garcia's common law wife—on July 5, 2013, days before trial began.  There is no indication in the investigation files that any attempts were made to contact officials or other witnesses from the Puerto Rican prison where Cruz-Garcia was held. Likewise, there is no indication that any attempts were made to request records from Cruz-Garcia's time in Puerto Rico (in or out of prison), except for a May 17, 2013, request for copies of Cruz-Garcia's kidnapping conviction.

Yet counsel were clearly aware of the potential importance of Puerto Rico as a source of information about Cruz-Garcia.  Counsel knew that Cruz-Garcia had spent much of the 1990s residing both in Puerto Rico and the Dominican Republic. He had a partner and child in Puerto Rico and his brother lived there as well. Further, counsel knew that from 2001 until being extradited to Houston, Cruz-Garcia has been imprisoned in Puerto Rico.

In their motion to the Court to justify investigation expenses, filed in July 2012, counsel stated: "[I]nvestigators will in all likelihood be required to go to Puerto Rico to properly investigate this case.  Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case." (2 CR at 384-85.)  Counsel were thus aware not only of potential mitigating family witnesses in Puerto Rico but also of the need to investigate Cruz-Garcia's time in prison while in Puerto Rico.

---

[8] The instructions given to the investigators and the timeline of when and which witnesses were contacted are factual issues best resolved through live testimony of trial counsel and the investigators at an evidentiary hearing.

EXHIBIT 3 Page 068

Further, as previously discussed, had counsel performed effectively by inspecting the file held at the District Attorney's office, they would have had access to Puerto Rican prison records that indicated Cruz-Garcia had a history of positive, productive behavior while in prison.

Armed with this knowledge, reasonable capital counsel would have seen the potential opportunity for mitigating evidence arising from Cruz-Garcia's time in Puerto Rico, and investigated accordingly.[9] By failing to conduct any such investigation, counsel missed a clear opening to pursue favorable evidence on behalf of their client, failing to meet professional norms for capital counsel. *See ABA Guidelines*, Guideline 10.7, 10.11.

### 2. Available Evidence to Rebut Future Danger

Had even a cursory investigation taken place in Puerto Rico, counsel would have discovered numerous officials and employees within the Puerto Rican justice system willing to speak on Cruz-Garcia's behalf. The picture this testimony would have painted for the jury would have directly refuted the State's argument that Cruz-Garcia would be likely to commit future acts of violence if given a life sentence.

---

[9] There is no reason to believe that counsel had a strategic reason for their failure to investigate in Puerto Rico. Following the conclusion of the case, counsel submitted a motion and memo in support of being paid twice the usual capital defense flat fee rate. (Ex. 28 at 1, 13-16 [Cornelius Billing Records].) In the motion, counsel reiterated that the case "involves numerous extraneous offense [sic], both in Texas and in Puerto Rico. Defendant's family lives in Puerto Rico and he has witnesses in Puerto Rico, as well as in Texas and other cities." (*Id.* at 13.) In the memo supporting the motion, counsel again noted that witness were to be found in both the Dominican Republic and Puerto Rico, that Cruz-Garcia had been in prison in Puerto Rico, and that prison officials from Puerto Rico testified at his trial. (*Id.* at 16.) Despite using these facts as justification for why additional fees were warranted for such a complex case, counsel failed to ensure that any investigation of Puerto Rican witnesses, prison officials, or other evidence was conducted.

56

EXHIBIT 3 Page 069

For example, multiple witnesses who work as chaplains at the facilities where Cruz-Garcia was housed were available to testify regarding Cruz-Garcia's positive behavior in prison and the resulting trust and freedoms that were bestowed upon him. Chaplain Irma Iglesias Cruz has worked in the Puerto Rico Department of Correction for roughly forty years. She supervises about sixty other prison workers, including chaplains in other facilities, and oversees the orientation of new chaplains coming in to work in an institutional setting for the first time. (Ex. 15 at ¶1 [Aff. of Irma Iglesias Cruz].) Ivan Negron Vera has worked as a chaplain for the Department of Correction for seventeen years. From 2000 to 2012, he supervised roughly two thousand chaplains serving the various facilities run by the Department. He regularly counsels both inmates and correctional facility staff and guards. (Ex. 18 at ¶¶1-2 [Aff. of Ivan Negron Vera].) Jimmy Osorio has been a pastor for thirty years and has volunteered as a chaplain with the Department of Correction for about twenty-two years. (Ex. 19 at ¶1 [Aff. of Jimmy Osorio].) And Luis Gonzales Martinez has volunteered as a chaplain at multiple facilities in San Juan for about twenty-eight years. (Ex. 17 at ¶1 [Aff. of Luis Gonzales Martinez].)

These four chaplains each got to know Cruz-Garcia as a volunteer helping with religious services and taking care of the chapel. Each agrees that in the many years they have worked in the criminal justice system, Cruz-Garcia stands out to them as one of the best behaved, most trusted, and well-respected inmates they recall. (Ex. 15 at ¶10 [Aff. of Iglesias Cruz]; Ex. 17 at ¶5 [Aff. of Gonzales Martinez]; Ex. 18 at ¶14 [Aff. of Negron Vera]; Ex. 19 at ¶6 [Aff. of Osorio].)

As experienced chaplains, they had witnessed other inmates trying to con their way into positions of trust or pretend to be religious. But each believes through their experiences with Cruz-Garcia that he is a genuine and honest person. To them, Cruz-Garcia's faith is real, as was the encouragement and support he

57

EXHIBIT 3 Page 070

gave to other inmates. At the time, the chaplains noted Cruz-Garcia's leadership skills and how he worked hard to help others become better people and productive inmates. He got along well with other inmates and staff. He seemed to be a loving and caring person. (Ex. 15 at ¶5 [Aff. of Iglesias Cruz]; Ex. 17 at ¶2 [Aff. of Gonzales Martinez]; Ex. 18 at ¶4 [Aff. of Negron Vera]; Ex. 19 at ¶¶2, 6 [Aff. of Osorio].)

Because of Cruz-Garcia's good behavior, he earned the respect of guards, staff, and other inmates. He was given a significant role in the church services of the prison. He was the most trusted inmate in the chapel and would assist in all matters dealing with the prison's religious services. Cruz-Garcia would help get the chapel ready for worship services and clean up after, moving about freely. He took part in music services and led Bible studies. (Ex. 15 at ¶3 [Aff. of Iglesias Cruz]; Ex. 18 at ¶4 [Aff. of Negron Vera]; Ex. 19 at ¶¶2, 6 [Aff. of Osorio].)

None of the chaplains remember Cruz-Garcia being written up for discipline problems or being considered dangerous. None ever witnessed or heard of him committing any violence; he would not have been given so much freedom if he had. And this was not due to the lack of opportunity—while in prison in Puerto Rico, Cruz-Garcia was housed in general population and he was frequently left alone outside his cell. (Ex. 15 at ¶6 [Aff. of Iglesias Cruz]; Ex. 17 at ¶3 [Aff. of Gonzales Martinez]; Ex. 18 at ¶5 [Aff. of Negron Vera]; Ex. 19 at ¶3 [Aff. of Osorio].)

Cruz-Garcia was given tremendous privileges and trust in the prison not conferred on most other inmates. For example, multiple chaplains at various times gave Cruz-Garcia the keys to the chapel or their offices and allowed him to move around unsupervised. As one chaplain noted:

> Let me be clear, not everyone is given these types of duties. We only gave them to the people we truly trusted and confided in because they

58

EXHIBIT 3 Page 071

> were given important keys. I can count on my hand the number of individuals that I have given this level of responsibility, the level of responsibility that I gave Obel, and I would still have fingers left over. That is how much I trusted him.

(Ex. 18 at ¶6 [Aff. of Negron Vera]; *see also* Ex. 15 at ¶5 [Aff. of Iglesias Cruz]; Ex. 17 at ¶3 [Aff. of Gonzales Martinez]; Ex. 19 at ¶3 (Aff. of Osorio].) Cruz-Garcia was also allowed to work in the "corporation" area, which allowed inmates access to power tools and other potentially dangerous objects that were used for making furniture. Only inmates who were well-behaved, hard-working, and had earned trust were permitted to work there. (Ex. 17 at ¶3 [Aff. of Gonzales Martinez]; Ex. 18 at ¶7 [Aff. of Negron Vera]; Ex. 19 at ¶¶3, 4 [Aff. of Osorio].)

In fact, if anything, Cruz-Garcia was seen as a calming influence who helped to maintain order. He would convince other inmates to pay attention to correctional staff and to follow the rules. Correctional staff felt Cruz-Garcia made their jobs easier through his influence on other inmates. (Ex. 18 at ¶8 [Aff. of Negron Vera].) When Cruz-Garcia was moved into segregation because he was being extradited to Texas, he maintained this attitude:

> I thought that Obel would find it very difficult to maintain his faith and conviction after he was moved into segregation. To the contrary, even after Obel was transferred into a segregated cell, we could hear him, from our chapel, giving sermons to the other inmates in segregation. He took the initiative to lead services. His faith never failed him. We were all so proud of him. Everyone would listen to him. I knew his faith and beliefs were strong.

(Ex. 15 at ¶8 [Aff. of Iglesias Cruz].)

Overall, these chaplains would have testified that Cruz-Garcia had a tremendous, positive impact on the lives of other inmates and of correctional staff while in prison in Puerto Rico. In addition to being a trustworthy and hard worker, Cruz-Garcia acted as a leader and a counselor to help other inmates obey prison rules. (Ex. 18 at ¶¶10, 12 [Aff. of Negron Vera].) As one chaplain stated:

EXHIBIT 3 Page 072

I have to stress the he gained tremendous trust and confidence from the jail staff and the chaplains. During my time working at the [prison], I never heard any complaints about Obel or knew him to have any disciplinary problems. Obel was well respected by everyone in the facility, including jail administrators, guards, and other inmates.

(Ex. 17 at ¶3 [Aff. of Gonzales Martinez].)

None of the chaplains were contacted by anyone on Cruz-Garcia's defense team. Had they been, each would have been willing to come to Houston as a witness on Cruz-Garcia's behalf. One would have raised his own money to fly to Houston if the defense could not afford the ticket. (Ex. 15 at ¶11 [Aff. of Iglesias Cruz]; Ex. 17 at ¶6 [Aff. of Gonzales Martinez]; Ex. 18 at ¶15 [Aff. of Negron Vera]; Ex. 19 at ¶7 [Aff. of Osorio].) Further, the seriousness of the charges he faced would not have deterred their speaking about the person they knew he had become. They could have talked about conversations they had had with Cruz-Garcia where he indicated remorse for the bad decisions he had made in his life prior to being in prison. And they could have told the jury about the depth of his faith and the way he had touched their lives. (Ex. 15 at ¶9 [Aff. of Iglesias Cruz]; Ex. 17 at ¶4 [Aff. of Gonzales Martinez]; Ex. 18 at ¶¶9, 12, 13 [Aff. of Negron Vera].)

Had an investigation been conducted in Puerto Rico, counsel also could have secured the testimony of Dr. Alejandro Lebron, a clinical psychologist who counseled Cruz-Garcia while he was in prison there. Dr. Lebron has worked in the field for roughly forty years and, at the time he knew Cruz-Garcia, was providing mental health support and assistance to inmates. Cruz-Garcia began seeing Dr. Lebron by choice. That is, he was not ordered to receive counseling, but instead had sought out therapy on his own. (Ex. 16 at ¶¶1-2 [Aff. of Dr. Alejandro Lebron].)

60

EXHIBIT 3 Page 073

Like the chaplains, Dr. Lebron observed that Cruz-Garcia's faith was genuine and thoughtful. He also felt that his dealings with Cruz-Garcia gave him a new perspective on the Bible and using religion as a common ground to connect with patients. (Ex. 16 at ¶¶3-4 [Aff. of Dr. Lebron].) Dr. Lebron's experience in dealing with Cruz-Garcia was that he was open and honest and was not a troublemaker. He witnessed Cruz-Garcia have access to other prison staff and civilians, and never felt he posed a danger to anyone. He never knew of Cruz-Garcia to cause any trouble. (*Id.* at ¶5.)

Dr. Lebron was never contacted by anyone on Cruz-Garcia's defense team. Had he been, he would have testified at Cruz-Garcia's capital trial. Even knowing the charge of capital murder, Dr. Lebron would have told the jury about the Cruz-Garcia he knew: "a deeply spiritual man, who believed that doing good work and living a good Christian life was the most important thing he could do." Having worked with prison populations, and knowing Cruz-Garcia in the years after the crime occurred, Dr. Lebron would have communicated that he had witnessed inmates change and that, even if guilty, he believed Cruz-Garcia was no longer the same individual. (Ex. 16 at ¶¶7-8 [Aff. of Dr. Lebron].)

With sufficient investigation, these potential witnesses—and likely others—could have been located in the Puerto Rico prison system to speak about Cruz-Garcia's good behavior and likelihood that he would not commit future acts of violence. Moreover, one of the witnesses that was interviewed—Cruz-Garcia's common law wife Dorca—could have provided helpful information in this regard had she been interviewed earlier than the eve of trial. Dorca had been with Cruz-Garcia during the time he was in prison and had visited him there frequently with their daughter. (Ex. 12 at ¶¶11-12 [Aff. of Maria Capellain Romero].) She recalls the jail guards were friendly with Cruz-Garcia. Specifically, she remembers that the guards trusted Cruz-Garcia enough to bend the rules for him, allowing the two

EXHIBIT 3 Page 074

of them to hug when she would go to visit him. (*Id.* at ¶11.) She also remembers that Cruz-Garcia worked hard to continue to provide as much as he could for his family, even though he was in prison. He would make hammocks, key chains, and other items to sell and then send the money to Dorca and their daughter. (*Id.* at ¶4.)

None of this information about Cruz-Garcia's conduct and life in prison in Puerto Rico was presented to his capital jury. In failing to conduct an investigation into a clear avenue of potentially beneficial information, counsel's performance under the standards for capital counsel was deficient. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty"). Further, the resulting absence of this information to be considered by the jury prejudiced Cruz-Garcia's trial.

## C. Trial Counsel's Failure to Review the Prosecution's File and Sufficiently Investigate Prejudiced the Defense

In combination, trial counsel's failure to review the District Attorney's file and their failure to independently investigate potential witnesses and evidence in Puerto Rico significantly prejudiced the punishment phase of Cruz-Garcia's trial. Substantial evidence existed that, had it been presented, would have likely changed at least one juror's vote to life.

During the State's case at punishment, the prosecution put forward evidence that Cruz-Garcia committed an extraneous, uncharged murder; was convicted of kidnapping in Puerto Rico; and had commit other assaults and violent behavior toward individuals before and after the capital murder. (*See* 24 RR at 64-68; 25 RR at 32-36, 59-71.) However, all of these incidents occurred a decade or more before his trial and while he was not in prison. Following his conviction for kidnapping, Cruz-Garcia spent nearly a decade in prison in Puerto Rico, and then

EXHIBIT 3 Page 075

spent time awaiting his trial in the Harris County jail. From that period, the prosecution offered only two incidents of negative conduct.

First, an official from the Puerto Rico Department of Correction testified that Cruz-Garcia was written up for possession of a cell phone, rope, and a map, which the official believed was an escape attempt. (24 RR at 124-28.) However, while Cruz-Garcia's classification was changed due to the incident, there was no evidence that any other disciplinary action resulted. (24 RR at 128.) Next, the State presented testimony from a Harris County jail corrections officer. (25 RR at 122.) The officer testified that Cruz-Garcia had been written up once during his more than three years in Harris County jail because Cruz-Garcia tried to keep a razor blade he had checked out instead of returning it. (25 RR at 130-36.) However, it was common for inmates to get in trouble for this and Cruz-Garcia was simply charged thirteen cents for the cost of the razor and lost seven days of commissary and visitation. (25 RR at 136-39.)

Yet, despite the limited evidence presented regarding Cruz-Garcia's likelihood of committing violence while in prison with a life sentence, the State was able to argue the point largely uncontested by evidence from the defense. In the absence of evidence regarding Cruz-Garcia's decade of good behavior and earning the trust of prison officials in Puerto Rico, the State was able to put significant weight on the two incidents they had presented. At closing, the prosecution argued:

> They were sheets that had been designed in a way to form a rope that you could get down from the second floor of that prison cell. And what else did they find? A map of Puerto Rico and a cell phone on the defendant's person.

> Ladies and gentleman, this is not a man who just has been sitting in prison leading Bible study and finding God. This was a man, back in 2001, that was trying to find a way to get out of there. And they want

63

EXHIBIT 3 Page 076

you to think that that's not a factor in considering whether Obel Cruz-Garcia will be a continuing threat to society.

(26 RR at 155.)  The prosecution stated further:

You know all about Obel Cruz-Garcia's history.  Knowing him, knowing that he is the kind of man who will kill you for the smallest thing, like flirting with his girlfriend.  Why do you think he was hoarding razor blades?  You can make your own conclusion.

(26 RR at 173.)  Ultimately, the prosecution stated to the jury that the evidence they presented was uncontroverted and proved beyond a reasonable doubt that Cruz-Garcia was likely to commit future acts of violence, meeting the burden for the first special issue.

Had counsel performed a reasonable investigation by reviewing the District Attorney's file and conducting an investigation into witnesses and evidence in Puerto Rico, the jury would have heard evidence directly refuting the State's case in the first special issue. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). First—and most significantly—the testimony of witnesses from the Puerto Rican prison system and the records from Cruz-Garcia's time there would have provided clear and convincing evidence that Cruz-Garcia was unlikely to be a danger of violence if given a life sentence. This evidence would have established for the jury that Cruz-Garcia had not engaged in any violence with other inmates or jail staff in the decade he was in prison. It would have shown that besides the alleged escape attempt, Cruz-Garcia had received no other disciplinary actions or grievances. The jury would have been able to compare the State's allegations with the fact that Cruz-Garcia was given liberal access to the prison and to power tools and other dangerous objects, and that Cruz-Garcia had not acted out or abused these privileges. This evidence would have directly rebutted the State's assertion that if Cruz-Garcia were housed

64

EXHIBIT 3 Page 077

in the general population, he would have a dangerous level of access to visitors, other inmates, and potential weapons. (25 RR 157-78).

Next, this evidence would have specifically helped to mitigate and rebut the State's argument that Cruz-Garcia was attempting to escape when he was found with a rope and map in his cell. Though counsel cross-examined the prison official regarding flaws in his account of Cruz-Garcia's alleged escape plan, a more compelling indictment of the incident would have been for the jury to learn that Cruz-Garcia was not only granted more access to prison areas than other prisoners, he even had earned the privilege of possessing the chaplains' keys. With this information, it is likely that at least one juror would have found it improbable that Cruz-Garcia would have plotted an escape through his cell window when he literally possessed keys that likely provided an easier means to attempt an escape.

Ultimately, all the evidence available regarding Cruz-Garcia's time spent in the Puerto Rico prison system would have painted a far different picture than the jury heard about Cruz-Garcia's likelihood of conforming to a positive role in prison. The jury would have heard direct evidence of the type of positive contributions Cruz-Garcia was capable of toward other inmates, prison staff, and the prison system as a whole. As a result of trial counsel's deficient performance, the resulting presentation of evidence to the jury during Cruz-Garcia's capital trial bore little resemblance to Cruz-Garcia's true behavior while incarcerated. Under these circumstances, there is "a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Ex parte Gonzales*, 204 S.W.3d at 393-94.

65

EXHIBIT 3 Page 078

## CLAIM FOUR

## TRIAL COUNSEL PERFORMED INEFFECTIVELY IN FAILING TO SUFFICIENTLY INVESTIGATE AND PRESENT MITIGATION EVIDENCE

Capital counsel are required to conduct a far-reaching, exhaustive investigation into their client's life history for potential mitigation evidence that will motivate a jury to vote for life over death. *ABA Guidelines*, Guideline 10.7 cmt. (describing the "extensive and generally unparalleled investigation" required of capital counsel). Indeed, mitigating evidence can be *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added). To accomplish this task, professional norms for capital counsel have come to recognize it as standard practice to retain the use of a mitigation specialist. *ABA Guidelines*, Guideline 4.1. In addition, when considering how to present mitigating information to the jury, counsel must consult with and present testimony from any expert witnesses necessary to explain "medical, psychological, sociological, cultural" or other mitigating themes. *ABA Guidelines*, Guideline 10.11(F).

In Cruz-Garcia's case, counsel failed to sufficiently conduct the required comprehensive investigation into potential mitigation evidence on Cruz-Garcia's behalf. As an initial matter, counsel failed to retain the assistance of a qualified mitigation specialist. Additionally, the investigation that was conducted failed to explore any available mitigation evidence in Puerto Rico, where Cruz-Garcia had lived at various points in his life and had been imprisoned in the decade before being brought to Houston for trial. Counsel also failed to interview numerous family members in the Dominican Republic who could have provided the jury with a more robust picture of Cruz-Garcia's life history and his role in their family.

66

EXHIBIT 3 Page 079

Furthermore, counsel failed to consult with potential expert witnesses, beyond a single psychological evaluation, who might have shed light for the jury on the reason the information from his life history was mitigating. For all these reasons, counsel's performance in investigating Cruz-Garcia's case was deficient. Cruz-Garcia's punishment phase of trial was prejudiced by the absence of significant mitigating information. Had that information been presented, there is a reasonable probability that at least one juror would have voted for life instead of death. Because of counsel's ineffective assistance, Cruz-Garcia's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law were violated. Accordingly, his sentence must be reversed.

### A. Trial Counsel's Investigation

In early 2010, after Cruz-Garcia was indicted for capital murder and extradited from Puerto Rico but before the State had decided to seek the death penalty, attorneys Mike Fosher and Mario Madrid were selected as appointed counsel. (1 CR at 8, 11.) About a month later, in April 2010, Cruz-Garcia's family retained Steven Shellist and Christian Capitaine as counsel for Cruz-Garcia, and Mr. Fosher and Mr. Madrid were removed. (1 CR at 19-21.) From April 2010 to August 2011, Mr. Shellist and Mr. Capitaine focused their investigation of the case on the DNA testing they believed would be the focus of the State's case. Because the State had not indicated it would seek death, Mr. Shellist and Mr. Capitaine conducted no punishment-phase investigation whatsoever and did not hire a mitigation specialist. (Ex. 4 [Affidavit of Steven Shellist].)

At some point, however, the State determined that it would seek death against Cruz-Garcia. (4 RR at 9.) Because neither Mr. Shellist nor Mr. Capitaine were on the approved list of capital counsel, they withdrew from the case on August 31, 2011. (2 CR at 326; 4 RR at 6-7.) That same day, attorney Skip

EXHIBIT 3 Page 080

Cornelius was appointed as first chair and attorney Mario Madrid was appointed as second chair counsel. (1 CR at 57-58.)

### 1. Fact Investigation

Despite being appointed to a case that had already been pending for over a year and a half and whose crime had occurred twenty years earlier, it does not appear counsel made efforts to begin investigating the case until May 2012. (Ex. 28 at 6 [Cornelius Billing Records].) That month, counsel retained the Houston-based private investigation firm of J.J. Gradoni and Associates, who had a licensed investigator named Edna Velez who could speak Spanish. Though the investigators were tasked with interviewing family, friends, and other witnesses that could provide mitigation information, it does not appear the investigators were qualified as mitigation specialists or that counsel believed they were operating as mitigation specialists for the defense team. The Gradoni and Associates website regarding their capital murder defense services makes no mention of mitigation, focusing instead on elements of fact-based investigation. *See* Capital Murder Defense, at http://www.gradoni.com/capital-murder-defense.html (last visited on August 12, 2015). Further, Gradoni's responses to post-conviction inquiry make clear their many years of experience in guilt/innocence investigations meant they were not given much direction in that regard from counsel. (Ex. 35 at ¶2 [Letter from Gradoni & Associates].) Mitigation investigation appears to have been a secondary assignment, as they were instructed merely "to get as much beneficial information that we could about the defendant's upbringing, family members, etc." (*Id.*)

During the remaining seven months of 2012, the investigators worked a total of only fifty-six hours on Cruz-Garcia's case. (Ex. 28 at 6-7 [Cornelius Billing Records].) This included only twenty-five hours of interviews of Cruz-Garcia and family members in the Dominican Republic and Venezuela. (*Id.*) Regarding

68

EXHIBIT 3 Page 081

witnesses in Puerto Rico, the interviews conducted included a single phone interview with Cruz-Garcia's brother, Joel, in June 2012.

During 2013, the investigators conducted numerous witness interviews in and around the Houston area, primarily between April and the start of trial in July 2013. (Ex. 28 at 10-11, 46-49 [Cornelius Billing Records].) In addition, investigators conducted phone interviews of family witnesses in the Dominican Republic and traveled to the Dominican Republic from May 5-9, 2013, for in-person interviews. (*Id.* at 26.)

In contrast, investigators performed virtually no investigation into family and other witnesses or other evidence in Puerto Rico. After the June 2012 interview of Cruz-Garcia's brother Joel, investigators only record two follow-up conversations with him in June and July 2013 in preparation for him to be a witness at trial. Cruz-Garcia's common law partner, Dorca, was interviewed by phone on July 5, 2013, just days before trial began. The investigators state they have no recollection of counsel suggesting they travel to Puerto Rico. (Ex. 35 at ¶¶4-5 [Letter from Gradoni & Associates].) There are no records or memos to indicate that other witnesses from Puerto Rico were contacted or that attempts were made to collect records relating to Cruz-Garcia's life history in Puerto Rico.

Yet counsel were clearly aware of the potential importance of Puerto Rico as a source of information about Cruz-Garcia. In their motion to justify investigation expenses, counsel stated that "investigators will in all likelihood be required to go to Puerto Rico to properly investigate this case. Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case." (2 CR at 384-85.) As discussed more fully in Claim Three, *ante*, counsel were thus aware not only of potential mitigating family witnesses in Puerto Rico but also of the need to investigate Cruz-Garcia's time in prison while in Puerto Rico, as the State had already indicated

69

EXHIBIT 3 Page 082

their intent to use what it alleged to be an escape attempt against Cruz-Garcia at the punishment phase of trial.

## 2. Mitigation Specialist and Expert Witnesses

Around the same time that investigators were retained and began work on the case in mid-2012, counsel submitted motions to the Court asking for out-of-court expenses for "investigation" and for "mental health and mitigation." (2 CR at 384, 387.) The "investigation" motion requested funds for using Gradoni and Associates. (2 CR at 384.) The "mental health and mitigation" motion sought funds for an expert witness related to mental health and mitigation issues. (2 CR at 387.) Trial counsel has indicated that they were aware of the need to retain a mitigation specialist as part of the defense team on Cruz-Garcia's case. However, counsel stated they were unable to find a mitigation specialist who both spoke Spanish and was willing to work at the fee rate typically approved by Harris County courts. Instead, counsel indicated that they retained psychologist Dr. Susana Rosin to provide essentially the same function as a mitigation specialist.

Counsel's "mental health and mitigation" motion supports this fact, as counsel states in the motion that Dr. Rosin had been retained to do "testing, review of documents, consultation, and possible testimony" relating to "issues of mental health and mitigation." (2 CR at 387.) In support of the motion, counsel attached a letter from Dr. Rosin in which she stated that based on her understanding of her role on the case and its complexity, her work would involve approximately sixty to seventy hours of work. (2 CR at 390.) The Court approved funds up to $17,400 for this purpose. (2 CR at 389.) It appears that because the atypical use of a Ph.D. psychologist in the role of mitigation specialist would mean a significantly higher hourly rate, special approval was sought from presiding Judge Belinda Hill before the Court authorized the expense. (*Id.*)

70

EXHIBIT 3 Page 083

However, whatever counsel's original intent, the work performed by Dr. Rosin on Cruz-Garcia's case makes clear she did not serve the function of mitigation specialist for the defense team, and counsel did not attempt to use her as such. After receiving approval for expenses for Dr. Rosin in July 2012, counsel did not have her perform any work on the case until May 2013. Other than a phone call with the investigators on January 6, 2013 (for which Dr. Rosin did not bill time), Dr. Rosin reviewed records for two hours on May 9, 2013, and evaluated Cruz-Garcia for three hours on May 15, 2013. (Ex. 28 at 7, 21 [Cornelius Billing Records].) She then spoke with counsel for an hour on June 27, 2013 and prepared an expert report in an hour on July 1, 2013. (*Id.* at 21.) Thus, in total, Dr. Rosin performed only seven hours of work on Cruz-Garcia's case. Her role appears to have been that of providing a standard psychological evaluation of the client—a relatively narrow and defined task—and not the broad-reaching investigative role of a mitigation specialist.

It is unclear why counsel failed to use Dr. Rosin as a mitigation specialist or when that decision was made. However, what is clear is that at no time did counsel hire any other mitigation specialist for the defense. Nor does it appear counsel consulted with any other potential expert witnesses for Cruz-Garcia's case. Nor did counsel at any time return to the Court to express inability to find a suitable mitigation specialist, to ask the Court to appoint a mitigation specialist, or to ask for extra funding to secure a mitigation specialist outside the normal Harris County-approved fee structure. As a result, when Cruz-Garcia's trial began, the investigation of his case had been done without the assistance of a mitigation specialist or of any expert consultation beyond a single psychological evaluation.

EXHIBIT 3 Page 084

: 000085

## B. Counsel's Failure to Retain a Mitigation Specialist, Ensure a Sufficient Investigation of Lay Witnesses, or Consult with Necessary Expert Witnesses Constitutes Deficient Performance

To provide effective assistance, trial counsel must conduct a reasonable investigation into potential mitigating evidence. *Wiggins*, 539 U.S. at 522-23. This reasonable investigation must occur prior to deciding on a punishment phase strategy:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. Trial counsel cannot insulate their decision from collateral attack by claiming that it was a strategic choice not to pursue or present mitigating evidence if they did not first complete a reasonable investigation. *Sears v. Upton*, 130 S. Ct. 3259, 3265 (2010) (per curiam); *Williams v. Taylor*, 529 U.S. at 396.

Counsel's failure to retain a qualified mitigation specialist to assist in the investigation of Cruz-Garcia's case falls below standard professional norms for capital counsel in Texas. The use of a mitigation specialist as part of the defense team is a particularly indispensable piece of their duty to investigate. The commentary to the ABA Guidelines explains both the function of a mitigation specialist and why that role must be filled by someone qualified to undertake that function. The length of the discussion of this role is itself notable and worth recounting to underscore the significance the mitigation specialist role has on the defense team.

72

EXHIBIT 3 Page 085

A mitigation specialist is also an *indispensable member* of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death.

For all of these reasons the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase."

ABA Guidelines, Guideline 4.1 cmt. (footnotes omitted) (emphasis added).

Particularly in Cruz-Garcia's case, given his Dominican nationality and history of living there and in Puerto Rico, a mitigation specialist would have been helpful to

73

EXHIBIT 3 Page 086

: 000087

identify and interview witnesses in a culturally competent manner, and to be able to recognize information relevant to Cruz-Garcia's particular life history. *See* State Bar of Tex., *Supplementary Guidelines and Standards for the Mitigation Function of Defense Teams in Texas Capital Cases*, Guideline 5.1(B)-(C) (June 2015) ("*Texas Supplementary Guidelines*").

Yet trial counsel failed to retain a mitigation specialist as part of their defense team, despite understanding the importance of having one. Counsel went so far as to retain a psychologist, ostensibly to fill this role, and to get special permission from the presiding judge to cover the expense. Instead of seventy hours of work, however, the defense psychologist performed only seven. While counsel may have had a strategic reason to limit the psychologist's actual work on the case to only seven hours rather than use her as a mitigation specialist, that reason does not explain counsel's failure to secure an actual qualified mitigation specialist. Though counsel indicate in post-conviction that they were unable to find someone willing to work for the hourly rate typically approved by Harris County courts, this is not a strategic reason justifying failure to retain a mitigation specialist. First, counsel were able to obtain special permission from the presiding judge for the increased expense of using a psychologist. Thus, they should have had every reason to believe similar permission could have been obtained to pay for a mitigation specialist. Yet counsel did not ever request such funding. Nor did counsel ever file a motion with the Court explaining their inability to retain a mitigation specialist and asking the Court to intervene or assist. Next, when the decision was made to not use Dr. Rosin beyond her single evaluation, counsel neither asked for a continuance nor asked for assistance in finding a mitigation specialist at that point.

These actions resulted in the failure of counsel to retain the assistance of an integral part of the defense team. As will be discussed below, the absence of a

74

EXHIBIT 3 Page 087

mitigation specialist likely contributed to the fact that several areas of mitigation evidence were not investigated by counsel. Indeed, the full extent of the prejudice caused to Cruz-Garcia by the absence of a mitigation specialist can only be estimated. Because counsel were aware of their professional obligation to retain a mitigation specialist but failed to do so, counsel's performance in the investigation of this case was deficient.

Separate from the issue of a mitigation specialist, counsel is nonetheless required to conduct a thorough investigation into their client's background. *Porter*, 558 U.S. at 39; *Williams*, 529 U.S. at 396. The ABA Guidelines echo this constitutional requirement. They direct that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7(A). Furthermore, the commentary instructs counsel that investigation regarding potential punishment phase issues "requires extensive and generally unparalleled investigation into personal and family history." *Id.* at cmt. When trial counsel's initial investigation provides beneficial mitigating evidence, professional norms require that they follow up on those leads. *Wiggins*, 539 U.S. at 524, 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Ex parte Woods*, 176 S.W.3d 224, 226 (Tex. Crim. App. 2005) ("While *Strickland* does not require defense counsel to investigate each and every potential lead, or present any mitigating evidence at all, it does require attorneys to put forth enough investigative efforts to base their decision not to present a mitigating case on a thorough understanding of the available evidence.").

In this case, counsel knew (or should have known) that Cruz-Garcia spent significant time in Puerto Rico, both living there and being incarcerated there prior to trial. Given this knowledge, counsel should have had every reason to believe

75

EXHIBIT 3 Page 088

some investigation in Puerto Rico, beyond the two individuals interviewed by phone, would be necessary. Further, nothing in counsel's files indicate they learned something to justify a decision not to investigate in Puerto Rico. Certainly, capital counsel must make strategic decisions regarding resources and how to allocate investigation efforts. However, counsel knew as early as July 2012 that investigation in Puerto Rico was necessary. (*See* 2 CR at 384.) Counsel's investigators did not travel to the Dominican Republic until May 2013. (Ex. 28 at 26 [Cornelius Billing Records].) There was significant time in between those two dates to facilitate investigation in Puerto Rico. Further, counsel did not spend the entirety of the investigation funds for which they had gotten pre-approval, nor did they seek extra funds from the Court to fund a trip to Puerto Rico. For these reasons, counsel's failure to investigate thoroughly, particularly in Puerto Rico, was not based on any strategic decisions, but was instead deficient performance failing to meet the prevailing standards for capital counsel.

Finally, counsel performed deficiently in failing to consult with potential expert witnesses, beyond a single psychological evaluation, who might have provided compelling testimony regarding the mitigation themes investigation into Cruz-Garcia's life history uncovered. Professional norms at the time of Cruz-Garcia's trial instructed capital counsel that they should consider retaining experts to provide "medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense." *ABA Guidelines*, Guideline 10.11(F)(2); *Texas Supplementary Guidelines*, Guideline 5.1(B), 10.11.

It is not enough to simply gather the facts of a defendant's life story and then present it through lay witness testimony. An expert must also be retained to synthesize that information into a coherent psycho-social narrative for presentation to the jury. *See ABA Guidelines*, Guideline 10.11 (commentary) (noting the

76

EXHIBIT 3 Page 089

importance of presenting "the client's complete social history" at punishment). Such an expert uses his or her particularized expertise relevant to the defendant to present the social history developed by a mitigation specialist in a cohesive narrative. John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4, 10 (Aug. 1995) ("[P]ersuasive expert testimony must . . . enable the jury to see the world from your client's perspective, i.e., to appreciate his subjective experience.").

In Cruz-Garcia's case, counsel failed to consult with any expert witnesses besides Dr. Rosin. While the decision not to use Dr. Rosin any further, or even to cease investigation into potential mental health evidence based on her evaluation, may be the type of decision based on investigation that is considered strategic, no reasonable or strategic grounds serve as a basis for counsel's failure to consult with any other potentially valuable expert witnesses. Mental health evidence is not the only area of mitigation capital counsel is expected to investigate and about which to retain an expert for assistance. *See Texas Guidelines*, Guideline 11.7 (requiring counsel to consider expert witnesses relating to "medical, psychological, sociological, cultural," or other potential mitigation topics). As will be discussed, expert testimony could have assisted Cruz-Garcia's jury with understanding the mitigating impact of his life history. Counsel's failure to investigate potential expert testimony therefore fell short of the prevailing standards for capital counsel and constituted deficient performance.

### C. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Early Life History

Counsel's deficient performance in their investigation of Cruz-Garcia's case for mitigation information particularly prejudiced his opportunity to explain to the jury why Cruz-Garcia's early life history warranted a life sentence over death.

EXHIBIT 3 Page 090

Whether through the absence of a mitigation specialist or thorough investigation, the defense ultimately only presented the live testimony of Cruz-Garcia's brother Joel and son Abel and the testimony of Cruz-Garcia's wife Mirella via internet video feed during the punishment phase of trial.[10]  (26 RR at 8, 32, 66.)  While their testimony touched on Cruz-Garcia's life history and character, the presentation fell far short of the kind of robust mitigation presentation anticipated in a capital case.

Possibly the most important duty of capital trial counsel is to present evidence to explain how their client's life story explains and mitigates what led the client to the present scenario. *See Wiggins*, 539 U.S. at 523-24 (recognizing the importance of social history presentations in capital cases); *ABA Guidelines*, Guideline 10.11(F)(2); *Texas Guidelines*, Guideline 11.7(F)(2); *Texas Supplementary Guidelines*, Guideline 5.1(B), 10.11.  Presentation of this evidence educates the jury and allows it to make an informed decision when determining which punishment to assess in a capital case. *See ABA Guidelines*, Guideline 4.1 cmt. ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to a jury's decision at the punishment phase.").

Numerous lay witnesses—some who had been interviewed by counsel and some who had not—were available to explain how Cruz-Garcia had gone from a poor child in the Dominican Republic to being involved in the drug trade in the

---

[10] In addition to these three witnesses, counsel presented testimony from a young man who had known Cruz-Garcia in the Harris County jail.  (26 RR at 80.) However, this young man literally walked off the street and introduced himself to counsel on the morning of his testimony.  (26 RR at 81.)  While fortuitous, his presence as a witness was not due to any planning or investigation by trial counsel and, thus, should not be weighed in considering the punishment phase investigation and presentation they put forward.

78

EXHIBIT 3 Page 091

: 00092

United States. Expert testimony was also available to explain how this life trajectory was not unique to Cruz-Garcia, but was explainable by an understanding of the culture and historical setting in which Cruz-Garcia developed. All of this evidence would have presented a significantly more complete and compelling explanation of Cruz-Garcia's life story than the presentation of Cruz-Garcia's brother, wife, and son offered by trial counsel. (*See* 26 RR at 8, 32, 66.)

## 1. Available Lay Witness Testimony[11]

Although defense investigators had traveled to the Dominican Republic and interviewed some of Cruz-Garcia's family members, the defense presentation at punishment was largely absent of the many family members willing to testify on Cruz-Garcia's behalf and who could speak of his early life. For example, Cruz-Garcia's father and step-mother, Valerio and Dorcas, had spoken with defense investigators and were willing to come testify. (Ex. 10 at ¶13 [Aff. of Valerio Julian de la Cruz Santos]; Ex. 6 at ¶12 [Aff. of Dorcas Noelia de la Cruz Fana].) So was Cruz-Garcia's half-brother Menagen, who had spoken with an investigator by phone. (Ex. 8 at ¶6 [Aff. of Menagen Valerio de la Cruz].) Cruz-Garcia's half-sister Yeli and his uncle Jose were also available and willing to testify for Cruz-Garcia, and neither were interviewed prior to trial. (Ex. 7 at ¶8 [Aff. of Dorcas Yelietza de la Cruz]; Ex. 9 at ¶10 [Aff. of Jose de la Cruz].) Finally, two of the three defense witnesses who did testify—Cruz-Garcia's brother Joel and wife Mirella—were only interviewed briefly and could have provided more information about Cruz-Garcia's origins. (Ex. 5 at ¶¶3-5 [Aff. of Joel Cruz-Garcia]; Ex. 11 at ¶¶3-4 [Aff. of Mirella Perez Garcia].)

---

[11] For ease of reference, these witnesses will typically be referred to by their first name.

79

EXHIBIT 3 Page 092

Had these individuals testified, the jury would have learned substantially more information about the good son, brother, and father he was, and how the circumstances of his early life shaped who he would become.

Cruz-Garcia was born to Valerio de la Cruz Santos and his wife Dahlia in the Dominican Republic. Like many in the Dominican Republic, the men in Cruz-Garcia's family had numerous children with multiple women. Valerio was trained as a paramedic in the military and then worked as a civilian medic, which is how he met Cruz-Garcia's mother. They married, had Cruz-Garcia, his sisters Noemi and Natalia, and his brother Joel, and lived in Santo Domingo. (Ex. 10 at ¶¶2-6 [Aff. of Valerio]; Ex. 9 at ¶2 [Aff. of Jose].)

When Cruz-Garcia was ten years old, his father and mother separated. Valerio had been hurt in a car accident, and Dahlia's family convinced her he would not be able to support the family anymore. They decided to separate, and Dahlia moved back to Venezuela where her family was. (Ex. 10 at ¶7 [Aff. of Valerio].) When Cruz-Garcia's father and mother separated, Cruz-Garcia and his siblings moved with their father from Santo Domingo to a small village on the northern coast where his father's family lived. There they lived with uncles, aunts, grandparents, and numerous other family members. (Ex. 5 at ¶7 [Aff. of Joel]; Ex. 10 at ¶8 [Aff. of Valerio]; Ex. 9 at ¶4 [Aff. of Jose].)

Cruz-Garcia was a hard worker and was loved by his family and friends. He was a happy youth, respectful, and well-behaved. He was hard working, but laid back. His uncle remembers fondly how they would pick mangos together or work in the rice fields. Cruz-Garcia went to church often. He got along with friends and neighbors, who to this day remember him fondly. (Ex. 10 at ¶8 [Aff. of Valerio]; Ex. 6 at ¶¶6, 9 [Aff. of Noelia]; Ex. 9 at ¶6 [Aff. of Jose].)

The loss of his mother impacted the way Cruz-Garcia approached the world. He became more serious, keeping his feelings hidden, and focusing instead on

80

EXHIBIT 3 Page 093

always providing for his family. His brother felt that Cruz-Garcia grew up very fast to act like a parent to him and the other siblings. His wife could later tell that it left an emptiness in Cruz-Garcia, driving him to value family. When his father took interest in his stepmother, Cruz-Garcia encouraged their romance and ultimate marriage, taking messages back and forth between them. (Ex. 5 at ¶8 [Aff. of Joel]; Ex. 6 at ¶5 [Aff. of Noelia]; Ex. 11 at ¶6 [Aff. of Mirella].)

When Cruz-Garcia's mother left, he took on a share of his father's responsibility to raise and provide for the rest of the family. (Ex. 11 at ¶7 [Aff. of Mirella].) Both he and his father would work and fish to take care of everyone. The family subsisted on fishing and growing rice and fresh foods, which they also sold. Cruz-Garcia would get up early in the morning to go fishing before school and then again after school until dark. When he was not working, he would help around the house, cooking and taking care of the other children. He would make them hammocks or take them fishing. To them, he was a very loving older brother who gave them good memories of their childhood. (Ex. 5 at ¶7 [Aff. of Joel]; Ex. 6 at ¶7 [Aff. of Noelia]; Ex. 9 at ¶5 [Aff. of Jose]; Ex. 7 at ¶4 [Aff. of Yeli]; Ex. 8 at ¶3 [Aff. of Menagen]; Ex. 11 at ¶¶5, 8 [Aff. of Mirella].)

Cruz-Garcia was caring and protective. He had a reputation in the family as being the one who would help you if you needed it. He would stand up for his younger siblings to other kids, or give his siblings the best food because they were younger. He was also brave. One time when he was out fishing with his father, the boat turned over, trapping Valerio. Cruz-Garcia pulled his father to safety even though he was only nine years old. (Ex. 5 at ¶8 [Aff. of Joel]; Ex. 10 at ¶9 [Aff. of Valerio]; Ex. 9 at ¶7 [Aff. of Jose].)

Cruz-Garcia left the Dominican Republic when he was nineteen and immigrated to Puerto Rico to work for a better life for him and his family. Around that time, a lot of people were going to Puerto Rico for the opportunity to find

81

EXHIBIT 3 Page 094
: 000095

better work and to eventually get to the United States. His family missed him, but understood that Cruz-Garcia would be able to make a better life in the United States. Cruz-Garcia's brother Joel also moved to Puerto Rico a few years later, as did his half-brother Menagen. Even after leaving for Puerto Rico, though, Cruz-Garcia continued to always send money back for his family. (Ex. 5 at ¶¶9-10 [Aff. of Joel]; Ex. 10 at ¶10 [Aff. of Valerio]; Ex. 6 at ¶10 [Aff. of Noelia]; Ex. 8 at ¶2 [Aff. of Menagen]; Ex. 11 at ¶¶9-10 [Aff. of Mirella].)

It was in Puerto Rico that Cruz-Garcia met Angelita Rodriguez and her cousin Rudy. They introduced him into the world of selling drugs and eventually took him with them to the United States. Drugs were ubiquitous in Puerto Rico in the 1980s, and Cruz-Garcia saw it as the only way someone from a rural fishing village in the Dominican Republic would become successful. (Ex. 5 at ¶¶10, 14 [Aff. of Joel].)

Despite getting involved in criminal activity and the drug trade, Cruz-Garcia continued to also maintain the side of himself that was the protective, hard-working, caregiver of his family. Over the years he would travel often to the Dominican Republic and Puerto Rico to see family. He worked multiple jobs to earn money for them. No job was too small; family remembers him collecting cans to trade in for money. Even while in prison, Cruz-Garcia used his time to make hammocks and other items to sell to provide for his family. He worked in his local community, giving to churches or people who needed money for food or medical care. He continued to encourage his other siblings to work hard and live good lives. One time, Cruz-Garcia jumped in when a boy was hit by a car and ran the boy to a hospital, saving his life. He continued to be loved and respected by the people who knew him, who saw him as a happy, genuine person. (Ex. 5 at ¶11 [Aff. of Joel]; Ex. 12 at 4 [Aff. of Dorca]; Ex. 10 at ¶11 [Aff. of Valerio]; Ex. 7 at ¶¶5-6 [Aff. of Yeli]; Ex. 8 at ¶4 [Aff. of Menagen].)

EXHIBIT 3 Page 095

It was this side of Cruz-Garcia that his family members would have shared with his capital jury. Each would have shared their disbelief that the man they knew could have been involved in the crime—not to question the jury's guilty verdict but rather to explain that there was another side to Cruz-Garcia that was completely different than the picture being portrayed by the State. (Ex. 10 at ¶12 [Aff. of Valerio]; Ex. 6 at ¶11 [Aff. of Noelia]; Ex. 9 at ¶10 [Aff. of Jose]; Ex. 8 at ¶7 [Aff. of Yeli]; Ex. 7 at ¶¶4, 6 [Aff. of Menagen]; Ex. 11 at ¶14 [Aff. of Mirella].)

## 2. Available Expert Witness Testimony

Just as Cruz-Garcia's punishment phase of trial was prejudiced by the absence of the testimony discussed above, his capital trial was also prejudiced by counsel's failure to consult with and present the testimony of an expert witness to explain the relevance of Cruz-Garcia's life story to the mitigation question the jury was being asked to answer. Like any subject matter that is not immediately intuitive, a defendant's life story must be explained to the jury in a way that illuminates why it is relevant to moral culpability. It is not sufficient to present a parade of witnesses discussing the defendant's history—an expert must also be hired to give that life history context.

> In other words, you have to give the fact-finder a view of the crime from the defendant's perspective. If you don't, you run the risk of making your client seem "otherly," frightening and thus expendable. What you strive for is to enable the fact-finder to look through your client's eyes and to walk, at least for a few minutes, in his shoes.

Blume, *supra* at 10.

For example, trial counsel might have consulted with an expert familiar with the history of migration from the Dominican Republic to Puerto Rico, and the connection between that migration and the drug trade. It is likely that an average juror, without any other information, would consider Cruz-Garcia's decision to

83

EXHIBIT 3 Page 096

: 000097

leave the Dominican Republic and travel to Puerto Rico and the United States, where he became involved in selling drugs, as an aggravating fact about him. In actuality, Cruz-Garcia's journey was part of a well-recognized pattern that was influenced by a desire for a better life and struggling with poor economic conditions. An anthropologist or sociologist familiar with this topic could have provided the jury of wealth of information to put Cruz-Garcia's life story into context and to better understand why that story mitigated against the death penalty.[12]

### a. Cruz-Garcia's Early Life in the Dominican Republic

Raised in a rural area of the Northeastern region of the Dominican Republic in the early 1960s, Cruz-Garcia's kin network and household was large, fluid, and included extended family members. Like much of the Dominican population at the time, Cruz-Garcia's family was involved in agricultural work. They owned a modest plot of land where they raised food for their families and to sell to earn money. The men in Cruz-Garcia's family were also fishermen, an important economic activity that fed their family and provided reliable income. The family's economic security through the early 1960s reflects not only the industriousness of the family, but also national political economic policies that characterized the Dominican economy under the Dictator Rafael Trujillo from 1930-1961 that supported small-scale agricultural production by family farmers and limited the mobility of rural workers to ensure a robust supply of agricultural labor. At a very early age, Cruz-Garcia was expected to and actively participated in agricultural

---

[12] For example, Dr. Gina Perez is a professor of anthropology at Oberlin College in Ohio. Dr. Perez's research focus includes substantial work on the issue of migration in and around Puerto Rico. She is particularly familiar with the experience of Dominican migrants coming to Puerto Rico in the 1980s and 1990s. She was available to testify at Cruz-Garcia's trial had she been contacted by trial counsel. (Ex. 3 at ¶¶1-5, 32 [Aff. of Dr. Gina Perez].)

EXHIBIT 3 Page 097

work, fishing, and helping to care for younger relatives. (Ex. 3 at ¶10 [Aff. of Dr. Perez].)

Cruz-Garcia's childhood and development were particularly distinguished by the separation of his parents and his mother leaving to return to Venezuela. From the time that Cruz-Garcia's father returned to live with his extended family with Cruz-Garcia and his siblings, it was clear that Cruz-Garcia took on an important role of caring for his brother and sisters by cooking, babysitting, making useful items for the household, fishing, and working with his father and uncle. He was a good and hard worker helping his father provide for the family. Cruz-Garcia was someone who protected his family, helped others, and from a very early age took on roles that exceeded his age. (Ex. 3 at ¶11 [Aff. of Dr. Perez].)

In addition, Cruz-Garcia's view of what constituted family and family relationships was also impacted by his native country. While having large families, multiple partners, and households headed by one parent is not unusual throughout Latin America and the Caribbean, the Dominican Republic has a particularly unique history of family size. Indeed, throughout his thirty-one year dictatorship, Rafael Trujillo implemented policies to encourage population growth by enforcing strict controls of emigration from the Dominican Republic, encouraging European immigration to the island, and "systematic encouragement of childbirth" and, consequently, large families to ensure a large and available labor pool for agricultural and industrial work. The existence of large families with a range of household arrangements, therefore, was both state-sanctioned and culturally acceptable in the Dominican Republic and throughout the Caribbean. Although by Dominican standards, Cruz-Garcia was from a small family (one of four full siblings), he was surrounded by a large extended family of aunts, uncles, cousins, and grandparents. His father was one of twenty-four children. Further, it was not uncommon for men to have large families with more than one woman.

85

EXHIBIT 3 Page 098

His uncle, for example, described having eight children with four different women. (Ex. 3 at ¶12 [Aff. of Dr. Perez].)

Cruz-Garcia was raised within this rich extended family, and his relatives described him as helpful, loving, responsible, and industrious. With his uncle and father, Cruz-Garcia fished, helped with farm animals, and helped with agricultural work. In 1980, Cruz-Garcia's father met and eventually married Dorcas Noelia de la Cruz Faña. Once Dorcas and Valerio married, they had two daughters, who described Cruz-Garcia as someone who was a caretaker and who was loving and generous with them as they were growing up in the Dominican Republic. His willingness to care for his siblings and to use his hands to make things for others and cook for them define Cruz-Garcia's childhood as someone who from early on cared for people in the ways he could. (Ex. 3 at ¶¶13-14 [Aff. of Dr. Perez].)

However, as a young man in his late teenage years in the Dominican Republic, Cruz-Garcia was like many young men struggling to work in a changing economy. While the Dominican economy in the 1960s and early 1970s was still largely defined by large numbers of workers in agricultural labor and subsistence economy, the late 1970s and 1980s witnessed unprecedented economic changes that had a dramatic impact on the economic, social, and cultural lives of residents on the island and throughout the Caribbean. Foreign investment in the Dominican Republic, robust foreign aid, expansion of the island's industrialization program, and high commodity prices for Dominican goods meant that the economy expanded at unprecedented rates. But economic growth was also accompanied by growing unemployment caused, in part, by the rising number of uprooted rural workers unable to rely on past economic strategies of subsistence agriculture and agricultural production for their wages and incomes. Economic hardship increasingly defined life in the Dominican Republic in the late 1970s and 1980s. According to anthropologist Jorge Duany, "employment and underemployment,

86

EXHIBIT 3 Page 099

the rising cost of living, a chaotic transportation system, near collapse of basic public service like electricity, running water, housing, health care and education" made life very difficult for Dominicans in general, and those residing in rural areas in particular.[13] (Ex. 3 at ¶16 [Aff. of Dr. Perez].)

### b. Emigration in the Dominican Republic

In addition to deteriorating economic and social conditions, changes in Dominican migration also define the decades of the 1960s, 1970s, and 1980s. From 1930-1961, movement within the Dominican Republic and emigration were severely restricted under Rafael Trujillo. Beginning in 1966, however, these restrictions were lifted, and Dominicans increasingly engaged in internal and international migration. According to Ramona Hernandez, while it was virtually impossible for Dominicans to apply for a passport for more than thirty years, by the late 1960s, anyone who wanted a passport could apply and acquire one. In fact, she writes, "The granting of passports made concrete the opening of the door and, through the opening of the door, emigration was tacitly encouraged by the ruling structure of the Dominican Republic."[14] These changes led to significant internal migration with those residing in rural areas often moving to urban centers like Santo Domingo. It also led to substantial emigration, legally and illegally. By the 1980s, migration was such a defining feature of Dominican life that Dominicans refer to this massive movement and displacement as "irse para los paises" (literally "moving to the countries"). (Ex. 3 at ¶17 [Aff. of Dr. Perez].)

While New York City was and continues to be the principal destination for Dominican migrants, Puerto Rico is the second largest destination for Dominican

---

[13] Jorge Duany, *Dominican Migration to Puerto Rico: A Transnational Perspective* (2005).

[14] Ramona Hernandez, *The Mobility of Workers Under Advanced Capitalism: Dominican Migration to the United States* (2002).

87

EXHIBIT 3 Page 100

: 00101

migrants.  Between 1966-2002, nearly 119,000 Dominicans were legally admitted to San Juan, constituting 12% of Dominican migration to the US between 1961-2002.  This substantial growth of the Dominican population in Puerto Rico reached an apex in 1991 and 1996 with more than 9,000 Dominicans legally migrating to the island.  Dominicans were the largest and most visible minority on the island. Notably, these numbers do not include the thousands of undocumented Dominicans who arrived on the island, either by overstaying a tourist visa or by entering illegally by boat, crossing the forty-five mile Mona Passage separating the Eastern Dominican Republic from Western Puerto Rico.  Both documented and undocumented Dominican migration to Puerto Rico has made San Juan the city with the largest number of Dominicans outside of the Dominican Republic and second only to New York City.  (Ex. 3 at ¶18 [Aff. of Dr. Perez].)

By the mid-1980s when Cruz-Garcia began to court Mirella Pérez Garcia, he was one of many young Dominicans engaged in internal migration in search of work, unsuccessfully seeking employment in an economy that increasingly employed women more than men, and considering migration as a way to mejorarse la vida, or to search for a better life.  In 1986, like thousands of other Dominicans, Cruz-Garcia traveled on a yola (a makeshift raft/boat) to Puerto Rico.  Not only was Puerto Rico an increasingly popular destination for Dominican migrants, it also held the possibility of getting legal documents that would allow him to travel to and live legally in the United States.  These ideas of a better a life and the possibility of regularizing one's status to go to the United States circulated widely in the Dominican Republic in the 1980s and led Cruz-Garcia and tens of thousands of others to leave the Dominican Republic for Puerto Rico.  (Ex. 3 at ¶19 [Aff. of Dr. Perez].)

EXHIBIT 3 Page 101

: 00102

### c. Life and Work in Puerto Rico

While Puerto Rico was often regarded as "a springboard for the U.S.," the cultural, linguistic, and historical ties between Puerto Rico and the Dominican Republic make it attractive and reasonable for Dominicans to remain and reside there. Undocumented Dominicans arriving to the island often entered through rural areas of Western Puerto Rico but eventually made their way to urban areas like San Juan. This is precisely what Cruz-Garcia did as he and others made their way to neighborhoods in Rio Piedras and Santurce, which experienced significant population growth during the 1980s as increasing numbers of Dominican emigrants arrived seeking work in the formal and informal economy to support themselves and their families in the Dominican Republic. (Ex. 3 at ¶21 [Aff. of Dr. Perez].)

One element that was especially notable about Cruz-Garcia's migration experience was the degree to which he maintained connection with his family in the Dominican Republic. While migration is a feature that defines human experiences across millennia, since the 1990s, migration scholars have identified a distinctiveness of migration patterns in the late 20th century that is not about uprooting and leaving one's home behind. Instead, new migration patterns are increasingly transnational in character, meaning they involve the development, maintenance, and reproduction of migrant networks, households, economic, and affective ties across time and space. According to Jorge Duany, "Dominican transnationalism is most forcefully expressed through long-distance kinship networks, households and child-rearing practices," a phenomena that has been well-documented by many scholars.[15] These transnational practices are not unique to Dominican migrants, but the particular experiences, hardships, and opportunities

---

[15]  Jorge Duany, *Quisqueya on the Hudson: The Transnational Identity of Dominicans in Washington Heights* (1994).

89

EXHIBIT 3 Page 102

: 00103

of Dominican migrants in Puerto Rico is one that many scholars, writers, politicians, and journalists have explored in great detail. (Ex. 3 at ¶22 [Aff. of Dr. Perez].)

Although Dominican migrants began to arrive in Puerto Rico in significant numbers in the 1980s and 1990s seeking a better life, Puerto Rico also was experiencing significant economic, social, and political problems that constrained migrants' experiences. Beginning in the mid-late 1970s, Puerto Rico was in economic crisis. The impact of the oil crisis on the island and the devaluation of the American dollar in the early 1970s, as well as the failure of Puerto Rico's industrialization program to provide adequate jobs for its growing population, led to increased unemployment and underemployment. In response to the deepening economic crisis, the island and U.S. federal government developed specific economic policies in Puerto Rico in order to attract high tech and capital-intensive industries to the island. And while this strategy did, indeed, create new jobs and possibilities for Puerto Rican workers, these jobs required high levels of education and failed to generate enough jobs for the large numbers of unskilled workers and the unemployed. In response, the local Puerto Rican government focused on expanding employment opportunities in the public sector to compensate for diminishing employment opportunities in the private sector. Thus by 1992, one-third of the island's labor force was employed in the public sector. (Ex. 3 at ¶23 [Aff. of Dr. Perez].)

As many scholars have noted, the failure of the formal economy to provide jobs for its population, and the social and economic marginalization that ensues, leads to the development and growth of the informal or underground economy. This is certainly the case in Puerto Rico. According to sociologist Sudhir Venkatesh, "At its core, the underground economy is a widespread set of activities, usually scattered and not well-integrated, through which people earn money that is

90

EXHIBIT 3 Page 103

not reported to the government and that, in some cases, may entail criminal behavior."[16]　According to historian Marisol LeBrón, "The informal economy encompasses semi-legal activities such as unlicensed day cares, food peddlers or car repair operations operating out of someone's home to illicit organizations dedicated to drugs, robbery, sex work and gambling. In Puerto Rico, high levels of unemployment combined with low labor force participation rates indicate that the informal economy, alongside migration and federal assistance, played a key role in absorbing surplus laborers and stabilizing the Puerto Rican economy." (Ex. 3 at ¶24 [Aff. of Dr. Perez].)

Beginning in the 1980s and 1990s, Dominican migrants increasingly comprised a large number of surplus laborers involved in the informal economy in Puerto Rico.　Often they worked off the books as domestic workers, in construction, landscaping and gardening, and providing childcare. When Cruz-Garcia's wife arrived in Puerto Rico to join him in 1994, she worked cleaning houses. Cruz-Garcia worked in a range of jobs in the informal economy, including working as a gardener and even collecting cans to trade in for money when times were hard. These economic activities, however, are often concomitant with illicit economic strategies, and the growth of the drug-based informal economy became a source of income for a number of Puerto Ricans, much to the consternation of Puerto Rican and American officials. It also became a source of income for some Dominican residents on the island who, like poor, socially, racially, and politically-marginalized Puerto Rican residents on the island, faced significant resentment, discrimination and isolation from mainstream Puerto Rican society. (Ex. 3 at ¶25 [Aff. of Dr. Perez].)

---

[16] Sudhir Alladi Venkatesh, *Off the Books: The Underground Economy of the Urban Poor* (2009).

91

EXHIBIT 3 Page 104

The existence of underground economies is not new. In fact, as sociologist Sudhir Venkatesh notes, they are a familiar feature of many communities, and their participants span the race, class, and gender spectrum, seeking to make ends meet. The dominant perception circulating in mainstream society, however, focuses on some underground economic activities as aberrant, anti-social, and diametrically opposed to mainstream values. Researchers have tackled this question and many have demonstrated how "hustling," "getting paid," and making ends meet are all survival strategies for people to address their individual and collective needs. Sudhir Venkatesh writes, "Gangs and mafias anchor our popular imagination of underground trading, but the reality is far more complicated." Some activities, he continues, "such as snow shoveling or weekend poker games are so ingrained that they are not really perceived as 'underground economic activity' even though participants can make substantial earning from them and they might produce some financial gain for a wider circle of families, friends and neighbors." Yet other underground activities are readily stigmatized and are the objects of police surveillance and repression. This is certainly the case of the underground drug economies. And the response by local law enforcement in Puerto Rico and U.S. federal officials had a dramatic impact on the lives of poor communities on the island, many of whom were Dominican and who were increasingly stigmatized by mainstream Puerto Rican society as being the source of all social and economic ills facing the island in the 1980s and 1990s. (Ex. 3 at ¶26 [Aff. of Dr. Perez].)

According to Jorge Duany, Dominican immigration in the 1980s and 1990s generated significant hostility and contributed to the development of anti-Dominican discourse. "The figure of the Dominican—especially the undocumented immigrant—appears as the Other par excellence: a strange, dangerous, and incomprehensible character who occupies a marginal and clandestine status." This perception and stigmatization of Dominican immigrants

92

EXHIBIT 3 Page 105

continues into the present, with recent investigative reports documenting on the ways these perceptions have contributed to employment discrimination, economic and social marginalization, and isolation among Dominicans in Puerto Rico. (Ex. 3 at ¶27 [Aff. of Dr. Perez].)

For Cruz-Garcia, seeking employment as an undocumented Dominican in the late 1980s and 1990s in Puerto Rico was no small matter.  He managed to find a range of jobs as a gardener, collecting and recycling cans, and working as a real estate agent—all jobs that were part of the informal economy and paid very little. Like so many Dominican migrants, Cruz-Garcia lived in low-rent neighborhoods like Barrio Obrero, where he could draw on networks with other co-nationals and managed to send money back to the Dominican Republic to help support his wife and their son.   Given Cruz-Garcia's demonstrated commitment to financially provide for his extensive families, both in the Dominican and in Puerto Rico, it is not surprising that turning to the drug economy became yet another source of generating income.  As the possibilities for formal employment diminished for all residents on the island, the drug economy grew in Puerto Rico, the Dominican Republic, and the United States.  And like many with experiences in the informal economy and limited economic possibilities, selling drugs seemed like a reasonable strategy.  Indeed, this was and continues to be a gamble many take in spite of the dangers involved.  "If we look beyond the surface, we find an element of necessity, of pragmatic logic, even while laws are broken and even while the standards of a just life are constantly changing."  (Ex. 3 at ¶¶28-29 [Aff. of Dr. Perez].)

### d.  Conclusions Regarding Cruz-Garcia's Life Trajectory

Given the background and historical context of Cruz-Garcia's life story, a suitable expert could have provided compelling information to explain why his emigration to Puerto Rico and the United States, and his involvement in the drug

EXHIBIT 3 Page 106

: 000107

trade, were mitigating rather than aggravating. For example, on its face the fact that Cruz-Garcia had multiple children with multiple partners, and was maintaining those relationships at the same time, would likely have seemed to average American jurors as an aggravating fact. Indeed, the State argued as much to the jury at closing argument during the punishment phase. (26 RR at 171.) In contrast, an expert could have explained that having large extensive families with multiple partners was not culturally unusual. What's more, the fact that Cruz-Garcia maintained these relationships in multiple countries while often traveling and/or living elsewhere, was not a sign that he disregarded his family but was the opposite. Transnational migration patterns mean that families can still keep strong, loving bonds despite being great distances apart. Indeed, Cruz-Garcia's family members recalled how he was an excellent provider, never forgetting his family back at home. When he was with his family, his wife in the Dominican Republic recalled that he was an excellent father, participating in school and homework, taking his children to church and parks, and cooking for his family. Similarly, Cruz-Garcia's partner in Puerto Rico also noted how dedicated Cruz-Garcia was as a provider and father. This was even true while Cruz-Garcia was in jail, where he would make hammocks, key chains, and other items to sell in order to make money for his family. This transnational strategy is a familiar one for many migrants: they are sometimes part of multiple households with multiple partners. And while they are not physically present, they remain integral parts of family life through the remittances they send to their households. While not necessarily typical American traits of a good spouse and father, these efforts by Cruz-Garcia to provide for all of his family exhibit a very recognizable pattern of responsible and positive behavior when viewed in the appropriate culture context. (Ex. 3 at ¶¶28, 30 [Aff. of Dr. Perez].)

94

EXHIBIT 3 Page 107

: 000108

Next, an expert could have explained why Cruz-Garcia's entrance into the drug trade in Puerto Rico was more akin to earning money under the table for gardening work or manual labor than to joining the mafia. Being a migrant is never easy. To be poor, undocumented, socially-marginalized, and regarded as the source of economic and social problems while one struggles to meet one's familial responsibilities is even more difficult. These are precisely the conditions in which Cruz-Garcia found himself in Puerto Rico in the late 1980s and 1990s. Like thousands of Dominicans seeking a better life in Puerto Rico, Cruz-Garcia arrived by boat in Puerto Rico and successfully found jobs that paid little and had little social status, jobs in the informal economy that employed thousands of undocumented immigrants in Puerto Rico. As Puerto Rico's economy continued to experience uncertainty, the informal drug economy provided some certainty and economic security for many already on the economic margins. Cruz-Garcia's income-generating activities certainly fall outside what mainstream society regards as legitimate work. But upon closer examination, they also reflect the strategies people often turn to in order to meet their obligations as a father, son, brother, uncle, and community member in severely constrained circumstances. Rather than aberrations or pathology, these actions suggest the lengths people often go to in order to provide a decent life for themselves and their families. And given the constrained conditions in which he lived and worked, it is notable how all of Cruz-Garcia's family members praise him for his industriousness, his ability to meet his responsibilities as a father and a provider, and his generosity to family, church, and community across borders. (Ex. 3 at ¶¶29-31 [Aff. of Dr. Perez].)

Such testimony is substantially different and more compelling that the brief life history details provided by Cruz-Garcia's trial counsel through the testimony of Cruz-Garcia's brother, wife, and son. While counsel did present some mitigation evidence, their failure to conduct a reasonable and thorough

95

EXHIBIT 3 Page 108

investigation into Cruz-Garcia's life history and to consult with an appropriate expert witness meant that ample information was left out of the punishment phase presentation heard by the jury. This absence impaired the jury's ability to effectively weigh the presence of mitigation warranting a life sentence and prejudiced Cruz-Garcia's capital punishment trial. *See Sears*, 130 S. Ct. at 3266 ("We have certainly never held that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.").

### D. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence to Rebut the Prosecution's Aggravating Evidence

Likely due to the absence of a qualified mitigation specialist, counsel's investigation into potential witnesses who could shed light on Cruz-Garcia's time in the United States was also deficient and prejudiced the punishment phase of trial. As previously discussed, the investigators selected by counsel appear to have a background in fact investigation. Because of this, though their investigation included interviewing numerous witnesses in and around the Houston area, those interviews largely focused on investigating the details of the crime or other bad acts alleged by the State. Few witnesses were asked about their overall experience with Cruz-Garcia, and no witnesses from Cruz-Garcia's time in Houston were presented during the punishment phase of trial. As a result, the narrative put forward by the State of Cruz-Garcia being an evil drug king-pin who committed violent acts went almost completely unchallenged. Counsel missed an opportunity to rebut the State's narrative by presenting testimony from witnesses of their own, who could have offered a strikingly different impression of Cruz-Garcia.

For example, counsel could have offered the testimony of three brothers who knew Cruz-Garcia and had very positive dealings with him while he lived in

96

EXHIBIT 3 Page 109

: 00110

Houston. Cesar Rios, Jose Valdez, and Hector Saavedra remember Cruz-Garcia as being a good friend with a big heart. (Ex. 20 at ¶6 [Aff. of Cesar Rios]; Ex. 24 at ¶5 [Aff. of Jose Valdez]; Ex. 21 at ¶¶4-5 [Aff. of Hector Saavedra].) Cruz-Garcia was close to the brothers' parents, and they remember him helping their family out often. Cruz-Garcia would bring the family groceries or buy clothes and books for the brothers for school. He would ask Hector, who was younger, about his grades and encourage him to study. When Hector did well in school, Cruz-Garcia would give him pocket money or a small gift. (*Id.*)

Cruz-Garcia treated Cesar, Jose, Hector, and their parents like family. They remember Cruz-Garcia sharing meals with them and being part of their lives, much in the way they themselves would bring food and support to their relatives in Mexico. His generosity struck them, both for the size (he gave Cesar his first car) and because he never asked for anything in return. (Ex. 20 at ¶6 [Aff. of Rios]; Ex. 24 at ¶5 [Aff. of Valdez; Ex. 21 at ¶¶4-5 [Aff. of Saavedra].) Particularly memorable for the brothers was the time that Cruz-Garcia helped Cesar get proper medical attention for a gunshot wound, saving Cesar's arm. Cesar had been shot, and his family took him to a nearby hospital. Cruz-Garcia joined the family there, and the hospital intended to amputate the arm. Cruz-Garcia helped get the family to a different hospital, where Cesar was able to receive treatment that saved his arm. Cruz-Garcia even paid for the medical treatment because Cesar did not have any insurance. This was just another example of how the brothers felt that Cruz-Garcia treated them like family. (Ex. 20 at ¶7 [Aff. of Rios]; Ex. 21 at ¶3 [Aff. of Saavedra].)

Testimony like this would have provided meaningful mitigation evidence at Cruz-Garcia's punishment phase. Such testimony would benefit from a live evidentiary hearing to fully develop the available witnesses and evidence on Cruz-Garcia's behalf. Rather than attempting to rebut the State's evidence regarding the

97

EXHIBIT 3 Page 110

crime or other extraneous acts, such witnesses could have been employed to divert the jury's focus from the State's argument in aggravation to an argument of why Cruz-Garcia's character and background exhibit sufficiently mitigating circumstances to warrant a life sentence. The development of these types of witnesses and punishment phase themes is precisely the role undertaken by a qualified mitigation specialist, and its importance to a capital case is precisely why having a mitigation specialist as part of the defense team is now part of the standard of care for capital defense. *ABA Guidelines*, Guideline 4.1 cmt. Counsel's failure to develop any testimony along these lines prejudiced Cruz-Garcia's trial, and his sentence should therefore be reversed.

### E. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Ability to Contribute Productively in Prison

Lastly, as discussed in Claim Three, *ante*, counsel's failure to conduct a reasonable investigation in Puerto Rico meant that substantial evidence that would have led the jury to answer the first special issue negatively was never presented to the jury. That same evidence would have been compelling from a mitigation perspective as well. Had the various prison staff testified regarding their interactions with Cruz-Garcia, the jury would have learned that Cruz-Garcia had been a model inmate for nearly a decade in the Puerto Rican prison system. (Ex. 19 at ¶6 [Aff. of Jimmy Osorio]; Ex. 18 at ¶14 [Aff. of Ivan Negron Vera]; Ex. 17 at ¶5 [Aff. of Luis Gonzales Martinez]; Ex. 15 at ¶10 [Aff. of Irma Iglesias Cruz]; Ex. 16 at ¶4 [Aff. of Dr. Lebrón].)

The witnesses would have testified that Cruz-Garcia had been a positive influence on other inmates' behavior, encouraging them to follow rules and even leading them in religious services. (Ex. 18 at ¶¶8, 10, 12 [Aff. of Negron Vera], Ex. 15 at ¶8 [Aff. of Iglesias Cruz].) Cruz-Garcia made a positive contribution to

98

EXHIBIT 3 Page 111

: 00112

the daily workings of the prison, helping with church services and working in the prison factory. (Ex. 19 at ¶¶3, 4, 6 [Aff. of Osorio]; Ex. 18 at ¶¶4, 7 [Aff. of Negron Vera]; Ex. 15 at ¶3 [Aff. of Iglesias Cruz]; Ex. 17 at ¶3 [Aff. of Gonzales Martinez].) Finally, Cruz-Garcia continued to contribute to his family even though he was in prison, maintaining relationships with his children and trying to provide for them by making goods to sell. Ex. 12 at ¶¶4, 11-12 [Aff. of Dorca].

In addition to being significant evidence on the question of future dangerousness, this evidence is mitigating in its own right. Had the jury heard this evidence, there is a reasonable probability that at least one juror would have been found mitigating the positive acts Cruz-Garcia had accomplished while in prison. Rather than believing his crimes warranted the death penalty, that juror might have been persuaded that a life sentence would allow Cruz-Garcia to continue contributing to society through positive behavior in prison. Because counsel failed to develop this evidence, Cruz-Garcia lost the opportunity to present that argument to the jury, prejudicing his trial.

**F. Conclusion**

Trial counsel's presentation of some mitigating evidence does not automatically mean that they provided Cruz-Garcia with effective assistance. *See Sears*, 130 S. Ct. at 3266. Instead, that presentation must be judged by counsel's investigation and their failure to investigate where evidence would have motivated objectively reasonable counsel to investigate. Cruz-Garcia's counsel failed to conduct the thorough, searching inquiry into his background that is mandated by relevant case law and the ABA and Texas Guidelines. *See Porter*, 558 U.S. at 39; *Williams*, 529 U.S. at 396; *ABA Guidelines*, Guideline 10.7(A); *Texas Guidelines*, Guideline 11.1(A)(3)(b). As a result, substantial evidence was missing from Cruz-Garica's punishment phase of trial. *See Walbey v. Quarterman*, 309 Fed. App'x 795, 802 (5th Cir. 2009) (not published) ("This standard clearly contemplates that

99

EXHIBIT 3 Page 112

even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete." (emphasis in original)). Had that evidence been presented, when compared with the testimony the jury did hear, there is a reasonable probability that a least one juror would have voted for a life sentence. *See Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

**CLAIM FIVE**

**CRUZ-GARCIA'S CONVICTION AND DEATH SENTENCE ARE UNLAWFUL BECAUSE THEY WERE OBTAINED IN VIOLATION OF THE PROVISIONS OF THE VIENNA CONVENTION ON CONSULAR RELATIONS**

State authorities and their agents—unreasonably and in violation of state law and state and federal constitutional mandates—failed to properly inform Cruz-Garcia during and after his arrest of his right to seek the assistance of the Dominican Consulate as required by Article 36(1)(b) of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (VCCR). Law enforcement agents and the prosecution were aware at the time of Cruz-Garcia's arrest and throughout his prosecution for capital murder that Cruz-Garcia is a Dominican national who had not been naturalized. Yet instead of correctly providing Cruz-Garcia the opportunity to contact his country's consulate, the State instead notified a different, incorrect country of Cruz-Garcia's arrest. As a result, Cruz-Garcia was led to incorrectly believe his home country had been notified and was thus prejudiced by state authorities' unlawful acts. Had Cruz-Garcia been properly provided his right to alert the Dominican consulate of his arrest, the Dominican government would have offered Cruz-Garcia support and assistance, and there is a reasonable probability he would have received a sentence other than death. As a result of state authorities' failure to properly apprise Cruz-Garcia of

100

EXHIBIT 3 Page 113

his right to consular notification, and the prejudice stemming therefrom, Cruz-Garcia's conviction and sentence of death were rendered in violation of his rights to equal protection, due process, and the effective assistance of counsel as guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Consequently, Cruz-Garcia's conviction and sentence of death are unlawful and should be overturned.

### A. As A Foreign National Detained and On Trial for a Capital Offense in the United States, Cruz-Garcia Had a Right to Be Notified of His Right to Consular Access under the Vienna Convention on Consular Relations

The Vienna Convention is an international treaty that governs the relationship between individual nations and foreign consular officials. Among its primary purposes is to ensure that foreign nationals facing prosecution outside of their countries of citizenship are advised of the right to communicate with representatives from their home countries. In 1963, the United States and several other nations entered into an agreement about this basic right. This agreement was codified in Article 36 of the Vienna Convention on Consular Relations. Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77.

Article 36 of the Vienna Convention requires that when a foreign national is arrested, the country detaining him must: (1) inform the consulate of the foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of his rights under Article 36 without delay. Vienna Convention on Consular Relations, Article 36(1)(b), April 24, 1963, 21 U.S.T. 77. In addition, the United States Department of State has recognized that:

> The Vienna Convention contains obligations of the highest order and should not be dealt with lightly. Article 36, paragraph 1 (b), requires the authorities of the receiving state to notify the consular post of the sending state without delay of the arrest or commitment of a national of the sending state, if that national so requests. While there is no

101

EXHIBIT 3 Page 114

> precise definition of delay, it is the Department's view that such notification should take place as quickly as possible, and, in any event, no later than the passage of a few days.

Hernan de J. Ruiz-Bravo, *Suspicious Capital Punishment*, 3 SAN DIEGO JUST. J. 396-97 (1995) (quoting Department of State File L/M/SCA: Department of State Digest, October 24, 1973, p. 161).

## B. In Texas, the Vienna Convention Conveys an Individually Enforceable Right

While the Supreme Court has not yet ruled definitively as to whether the Vienna Convention, on the whole, is self-executing,[17] all lower courts that have examined the issue have responded in the affirmative. *See* Cindy Galway Buys et. al., *Do Unto Others: The Importance of Better Compliance with Consular Notification Rights*, 21 DUKE J. COMP. & INT'L L. 461, 480 (2011) ("every lower court that has considered the issue has expressly held that the VCCR is self-executing"); *see also Cornejo v. County of San Diego*, 504 F.3d 853, 856 (9th Cir. 2007); *Gandara v. Bennett*, 528 F.3d 823, 828 (11th Cir. 2008).

In Texas, the fact that the Vienna Convention conveys binding obligations onto state actors in their dealings with foreign nationals does not appear to be in dispute. *See, e.g.*, Attorney General of Texas, *Summary of Requirements Pertaining to Foreign Nationals*, Magistrate's Guide to Consular Notification Under the Vienna Convention, at 6 (advising state actors that "when foreign nationals are arrested or detained, they must be advised of the right to have their consular officials notified"); *see also* Attorney General of Texas, *Detained Foreign Nationals and Consular Notification*, available at

---

[17] A treaty is self-executing if it is directly enforceable in the United States without the need for additional legislation to ensure implementation. *See Foster v. Neilson*, 27 U.S. 253, 314 (1829). "What we mean by 'self-executing' is that the treaty has automatic domestic effect as federal law upon ratification." *Medellín v. Texas*, 552 U.S. 491, 505 n.2 (2008).

102

EXHIBIT 3 Page 115

: 00115

https://www.texasattorneygeneral.gov/cj/detained-foreign-nationals-and-consular-notification (last visited August 23, 2015).

But while Texas state actors and courts appear to recognize the treaty to be self-executing, the Court of Criminal Appeals has not yet explicitly stated whether a violation of the Vienna Convention creates an individually enforceable legal right. In *Ex Parte Medellín*, the CCA deliberately sidestepped the question, stating "[a]s an initial matter, while we recognize the competing arguments before us concerning whether Article 36 confers privately enforceable rights, a resolution to that issue is not required for our determination of whether *Avena* is enforceable in this Court." *Ex parte Medellín*, 223 S.W.3d 315, 330 (Tex. Crim. App. 2006) *aff'd sub nom. Medellín v. Texas*, 552 U.S. 491 (2008).

In that case, the CCA examined whether a judgment from the International Court of Justice (ICJ) concerning the Vienna Convention constituted binding federal law. There, the Court found that it did not, and found that an ICJ judgment stating that claims under the Vienna Convention were not intended to be subject to state procedural default had no effect on Texas state habeas procedure. Correspondingly, the Court found that a claim under the Vienna convention *can* be waived on state habeas. For a claim to be waived, it must necessarily exist. Thus precedent suggests that, while subject to waiver, the Vienna convention may create individually enforceable legal rights.

### C. The State Violated the Vienna Convention in Cruz-Garcia's Case

The State violated the Vienna Convention in Cruz-Garcia's case, as Cruz-Garcia was never properly informed of his rights under the Convention. Although state authorities knew that Cruz-Garcia was a foreign national and a citizen of the Dominican Republic, they did not properly inform him that he had the right to seek consular assistance. Instead, the State acted erroneously by informing Cruz-Garcia

103

EXHIBIT 3 Page 116

that his home country had been contacted, when in fact the State informed a different, incorrect country.

On February 12, 2010, shortly after Cruz-Garcia's extradition to the United States, the State of Texas issued a finding of Probable Cause for further detention of Cruz-Garcia on the charge of capital murder. (Ex. 26 [Probable Cause Finding and Warnings].) This same document also contained "Statutory Warnings by Magistrate," relating specifically to the magistrate's duty, under the Vienna Convention, to advise non-nationals of their constitutional rights. As Cruz-Garcia does not speak English, this document was also signed by interpreter Manuel Barrios. *Id.* When asked by the Court, Cruz-Garcia affirmed that he wanted the State to notify his country's consular officials. (*Id.*)

However, on the section of the form detailing warnings under the Vienna Convention, the box next to "mandatory notification" is checked, and the court clerk is advised to notify "Dominica."[18]

---

[18] Dominica, an island nation in the Caribbean, is one of several countries that the State Department requires be notified automatically when a foreign national is arrested, detained, or taken into custody. *See* Bureau of Consular Affairs, U.S. Department of State, *Countries and Jurisdictions with Mandatory Notifications, available at* http://travel.state.gov/content/travel/english/consularnotification/countries-and-jurisdictions-with-mandatory-notifications.html (last visited July 31, 2015). The Dominican Republic, on the other hand, of which Cruz-Garcia is in fact a citizen, does not require mandatory notification. Rather, a Dominican Republic citizen must be advised of his rights to have his consulate notified on his behalf, and then United States actors must facilitate access to the consulate if the individual so requests.

EXHIBIT 3 Page 117

: 00118

If you are not a United States citizen, you may be entitled to have us notify your country's consular representative here in the United States. Do you want us to notify your country's consular officials? (check one)

☐ NO.

☐ YES. What country? _____ . If you are a citizen of a country that requires us to notify your country's consular representative, we shall notify them as soon as possible.

☑ MANDATORY NOTIFICATION: CLERK, NOTIFY _Domiaica_ _____ (Country) CONSULATE.

If you are a foreign national, please provide the following information:

Mr./Ms: _____

(father's name [surname]/ mother's maiden name / first name) _____   Date of birth (mm/dd/yy) _____

Place of birth _____

Passport number _____   Date of passport issuance _____   Place of passport issuance _____

This proceeding was interpreted by:  _Manuel Barrios_   (Print name of interpreter)

**ORDER**

*Id.*

As a result, a notification was sent to the Commonwealth of Dominica on February 12, 2010.  (Ex. 26 at 2 [Probable Cause Findings and Warnings].)  It appears Cruz-Garcia received a second set of magistrate warnings on February 16, 2010, in which the court again included the notification warning that Cruz-Garcia had a right to contact his consulate for assistance.  (Ex. 27 [Second Magistrate Warning].)  Although signed by Cruz-Garcia, there is no indication whether and how these warnings were translated to him.  Further, as he had just days before been told that a notice was being sent to his country, it is reasonable to conclude that at this second magistrate warning Cruz-Garcia already believed his consulate was being contacted for him.  He therefore had no reason to again request that his consulate be contacted.

The Court's error in not correctly identifying Cruz-Garcia's country of origin and advising him of his right to contact his consulate was compounded when the Court received notice back from the Commonwealth of Dominica that it was the incorrect country to be contacted.  (Ex. 26 at 4 [Probable Cause Findings and Warnings].)  On September 12, 2010, a notation was made that the notification had been sent to the "wrong embassy."  (*Id.*)  Yet there is no evidence that the discovery of this error led to either notifying the Dominican Republic of Cruz-Garcia's arrest or notifying Cruz-Garcia that he could request assistance from his

105

EXHIBIT 3 Page 118

: 00119

consulate. (*See* Ex. 25 at 1 [DR Consulate letter] "[T]his office has no records whatsoever of a consular notification of Mr. Cruz-Garcia's arrest").

Because of this error, Cruz-Garcia was not properly notified of his right to communicate with the Dominican Republic consulate. Rather than accurately determine Cruz-Garcia's citizenship—which would have been a simple matter of communicating with law enforcement and prosecutors who were aware that Cruz-Garcia was born in the Dominican Republic—the Court instead relied on what must have been an improper translation by the interpreter assigned to communicate for Cruz-Garcia. As a result, Cruz-Garcia likely believed that his consulate had been notified but declined to become involved in his case. The mistake in identifying Cruz-Garcia's correct country and the resulting incorrect consular notification worked to deprive Cruz-Garcia of his rights under the Vienna Convention.[19]

Given that Cruz-Garcia never properly received his rightful statutory warnings, his failure to raise this claim at trial or in direct appeal proceedings should not be held against him. Indeed, Cruz-Garcia was likely under the impression that his home consulate had been notified of his arrest and detention. As the court apparently thought that Cruz-Garcia was from Dominica, and as Dominica requires automatic notification from the United States when one of its citizens is arrested, Cruz-Garcia was likely led incorrectly to believe that his home

---

[19] Importantly, this circumstance distinguishes Cruz-Garcia's case from other Vienna Convention violations. Whereas courts have previously held in some cases that the mere failure to inform a defendant of his consular notification rights does not rise to reversible error, in Cruz-Garcia's case the State took the affirmative step of informing Cruz-Garcia that they were notifying his consulate and then erroneously failed to do so. The error caused by the State's action (as opposed to inaction) leading to Cruz-Garcia's lack of consular notification—notification that would very likely have resulted in consular assistance—demands the reversal of Cruz-Garcia's conviction and sentence.

EXHIBIT 3 Page 119

country was notified of his arrest. Given the court's error in determining his country of origin, however, Cruz-Garcia could not have known that his rights under the Vienna Convention had been violated. Thus, this Court should find this claim not to be waived.

Further, this Court should find that Cruz-Garcia's rights under the Vienna Convention were violated, and his conviction and sentence of death should be vacated, without a showing of harm, given the serious nature of the constitutional violation. However, should a harm showing be required, Cruz-Garcia was substantially prejudiced by the violation of his right to consular notification on the Vienna convention.

### D. Cruz-Garcia was Prejudiced as a Result of the Violation of His Rights under the Vienna Convention

Had Cruz-Garcia been properly apprised of his rights, he immediately would have sought counsel and assistance from the Dominican Republic consulate in defending his capital case. Indeed, had Dominican consular officials known that one of their nationals was facing a death sentence in the United States, they would have provided considerable assistance to Cruz-Garcia throughout both the pretrial and trial process. (Ex. 25 [Dominican Republic Consulate Letter].) The Dominican Republic has been previously involved in providing various kinds of assistance in criminal cases, ranging from ensuring proper legal representation and contacting family members, to assistance in the judicial process, to assisting defense counsel directly in the development of the case by helping to locate witnesses or records in the Dominican Republic. (*Id.*) Given the absence of a mitigation specialist on the defense team, as discussed in Claim Four, *ante*, consular assistance could have potentially corrected some of the deficiency in investigation that occurred as a result. Indeed, there is every reason to believe Cruz-Garcia suffered prejudice purely on account of his inability to speak English

107

EXHIBIT 3 Page 120

: 00121

and the failure to receive robust translation and interpretation services throughout the judicial process, as evidenced by the communication failure during the probable cause hearing.

Further, had the Dominican Republic been notified at the time of Cruz-Garcia's arrest in 2010 and become involved in assisting on his case, its consulate could have influenced the State's willingness to accept a guilty plea in exchange for a life sentence or to have foregone seeking the death penalty at all. Consular officials are often successful in persuading prosecutors to seek a life sentence. (Ex. 1 at ¶15 [Aff. of Sandra Babcock].)

Even had the State still chosen to seek death in spite of the consulate's involvement, the consulate nevertheless could have provided Cruz-Garcia with invaluable support throughout his confinement and trial. For example, the consulate could have helped Cruz-Garcia to make informed choices about how to proceed, both by explaining the intricacies of local criminal procedure and by providing information necessary to help prepare his defense. [Ex. 25 [Dominican Republic Consulate Letter].) In addition, they could have assisted trial counsel in obtaining mitigating information from Cruz-Garcia's family and friends and served as a necessary Spanish-speaking liaison to assist in the investigative process. (*Id.*) Consular agents could have helped the defense investigators locate witnesses in the Dominican Republic who were not interviewed, or assist in travel arrangement for witnesses the defense wished to testify at trial. (*Id.*) Or, as discussed in Claim Three, *ante*, had counsel reasonably made efforts to procure the records from Cruz-Garcia's time in prison in Puerto Rico, which are in Spanish, a consular agent could have assistance in reviewing or translating these documents. (*Id.*)

**E. Conclusion**

If not for the violation of Cruz-Garcia's rights under the Vienna Convention, there is a reasonable likelihood that the outcome of his proceedings would have

108

EXHIBIT 3 Page 121

been different. Because Cruz-Garcia was never afforded his proper notification, he should not be required to show specific harm, as the violation of the Vienna Convention itself constitutes a fundamental error. If a harm analysis is warranted, given the State conduct in creating the error, the violation should be considered the type of constitutional error that presumes harm in the absence of showing harmless error by the State. In this case, because Cruz-Garcia's rights were violated from the time of his extradition in 2010—meaning that he lost the opportunity for assistance from his home country in securing adequate legal representation early in the process, assistance in persuading the State not to seek the death penalty, and assistance in investigating and presenting his defense at trial—the State cannot prove beyond a reasonable doubt that he was not harmed by the deprivation of his Vienna Convention rights. Rather, the violation substantially and injuriously affected the fairness of the proceedings and prejudiced Cruz-Garcia. Even should Cruz-Garcia be required to affirmatively show harm, the circumstances in this case clearly establish that prejudice.

Under international law, the recognized remedy for a treaty violation is to restore the status quo ante, and return the parties to the position they would have occupied had the violation not taken place. Cruz-Garcia should be restored to the position he occupied before the State failed to properly inform him of his rights under the Vienna Convention. As a result, his conviction and sentence of death must be reversed.

## CLAIM SIX

### TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RECOGNIZE THE SIGNIFICANCE OF CRUZ-GARCIA'S FOREIGN NATIONALITY AND SEEK THE HELP OF THE DOMINICAN REPUBLIC CONSULATE IN DEFENDING THIS CASE

Cruz-Garcia, the defendant in the instant case, is a citizen of the Dominican Republic. As such, Cruz-Garcia is entitled to certain protections under

109

EXHIBIT 3 Page 122

international law, namely the Vienna Convention on Consular Relations (VCCR).[20]
In addition, Cruz-Garcia is entitled to the effective assistance of counsel in
defending his capital case. *Strickland*, 466 U.S. at 694. Here, both of these rights
were violated. First, Cruz-Garcia received inadequate warning regarding his rights
to consular access under the VCCR, which itself is a violation of his rights under
international law. (*See* Claim Five, *ante*.) Second, Cruz-Garcia was denied the
effective assistance of counsel in this case when his trial attorneys failed to contact
the Dominican Republic consulate concerning his prosecution, thereby depriving
him of all the benefits that consular involvement would have accrued. In addition,
trial counsel were ineffective in that they made no effort to remedy the State's
violation of Cruz-Garcia's rights under the VCCR, thereby failing to raise this
significant issue at trial to preserve it for appeal.

There is no doubt that consular involvement would have greatly benefited
Cruz-Garcia's defense. Indeed, had trial counsel involved the Dominican Republic
consulate in their defense of this case from the start, there is a significant
possibility that the outcome of this proceeding would have been different. As
such, trial counsel's failure to involve the Dominican Republic in Cruz-Garcia's
defense was prejudicial. Therefore, Cruz-Garcia's rights under the United States
and Texas Constitutions, as well as international, federal, and state law, were
violated, and his conviction and sentence of death must be overturned.

---

[20]Specifically, Cruz-Garcia is entitled to be apprised of his right to contact
authorities from his home country if he has been arrested, detained, or indicted.
Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T.
77, Art. 36(1)(b). Ensuring that this right is properly enforced is crucial in
ensuring that foreigners of any nationality, including United States citizens, receive
fair treatment when detained outside of their home countries.

EXHIBIT 3 Page 123

A. **Trial Counsel's Failure to Apprise Cruz-Garcia of His Right to Consular Access and To Seek Assistance from the Dominican Republic in Defending His Case Was Objectively Unreasonable and Constitutes Deficient Performance**

At the time of Cruz-Garcia's capital trial in 2013, reasonably competent counsel should have known the significance of Cruz-Garcia's foreign nationality, ensured that Cruz-Garcia was apprised of his rights under the VCCR, and made every effort to involve the Dominican Republican consulate in defending his case.

1. **Trial Counsel Knew that Cruz-Garcia Is a Citizen of the Dominican Republic**

In addition to the information available to trial counsel through Cruz-Garcia himself—who speaks no English and has a foreign passport—trial counsel had objective information in their possession confirming that Cruz-Garcia was a foreign national.

In particular, counsel had a copy of Cruz-Garcia's 2010 Probable Cause Order, which states that Cruz-Garcia is not a United States citizen.[21]   (Ex. 26 [Probable Cause Findings and Warnings].)  Furthermore, through discovery, trial counsel had access to numerous police and other state-issued reports indicating that Cruz-Garcia is a citizen of the Dominican Republic.

> A supplemental police report drafted by Officer E.S. Mehl on October 8, 2008 identifies Mr. Cruz Garcia as a national of the Dominican Republic. ... On June 19, 2013, the prosecution filed a Notice to Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction. This notice indicates that "[t]he defendant is a citizen of the Dominican Republic who entered the United States as well as the Commonwealth of Puerto Rico on multiple occasions since the late

---

[21] As discussed at length in Claim Five, *ante,* this Order incorrectly identified Cruz-Garcia as being from Dominica rather than the Dominican Republic. Nevertheless, this Order provides evidence of Cruz-Garcia's foreign nationality. Furthermore, given trial counsel's later efforts to locate and speak with family members of Cruz-Garcia's in the Dominican Republic, it is clear that counsel knew where their client was from.

111

EXHIBIT 3 Page 124

: 00125

1980s illegally and remained in both locations for periods of time as an undocumented alien."

(Ex. 1 at ¶9 [Aff. of Sandra Babcock].)

This information would have been sufficient to place counsel on notice that they were defending a non-United States citizen. Consequently, prevailing norms of professional practice dictated that trial counsel take certain steps in their representation of Cruz-Garcia.

## 2. Both National and State Bar Guidelines Highlight the Steps That Need to Be Taken in Representing a Foreign National in a Capital Case

According to Sandra Babcock, a clinical professor of law at Cornell University and a licensed attorney in Texas with over twenty years of capital defense experience, by 2013 it was standard practice within the capital defense community to enlist the help of a foreign consulate in defending a foreign national in a capital case. (Ex. 1 at ¶8 [Aff. of Babcock].) Indeed, this practice was so well accepted that by the mid-2000s, the steps that would need to be taken in representing a foreign national in a capital case were codified in both the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, as well as in the guidelines governing the obligations of counsel in capital cases promulgated by the State Bar of Texas in 2006. *See Texas Guidelines*, Guideline 10.3.

### a. The American Bar Association Guidelines Highlight the Professional Obligations that Attach When Representing a Foreign National

The starting point for any inquiry into the reasonableness and quality of legal representation in a capital case is the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. (Ex. 1 at ¶10 [Aff. of Babcock]; *Strickland*, 466 U.S. at 688.) As soon as trial counsel were aware that Cruz-Garcia was born in the Dominican Republic to parents also from the Dominican Republic, they incurred an obligation under the

112

EXHIBIT 3 Page 125

: 000125

ABA Guidelines to seek consular assistance on his behalf. The Guidelines specifically state:

> A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.
>
> B. Unless predecessor counsel has already done so, counsel representing a foreign national should:
>
> 1. *immediately advise the client of his or her right to communicate with the relevant consular office; and*
>
> 2. *obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.*

*ABA Guidelines*, Guideline 10.6 (emphasis added).

These additional obligations would have attached as soon as trial counsel suspected Cruz-Garcia's Dominican Republic nationality based on his family background and birthplace. Even in cases where nationality is in dispute, counsel incur an obligation to try to determine nationality in order to assess whether additional steps must be taken to appropriately represent the individual. The ABA Guidelines explain:

> Subsection A is included in the Guideline to emphasize that the determination of nationality may require some effort by counsel. A foreign government might recognize an American citizen as one of its nationals on the basis of an affiliation (e.g. one grandparent of that nationality) that would not be apparent at first glance.

*ABA Guidelines*, Guideline 10.6. The fact that the ABA Guidelines suggest that counsel has an obligation to determine nationality in cases where it is not immediately apparent only further emphasizes the significance of recognizing a defendant's foreign nationality in a capital case.

113

EXHIBIT 3 Page 126

: 00127

**b. Guidelines Adopted by the State Bar of Texas in 2006 Emphasize the Significance of Taking Certain Additional Steps in Representing a Foreign National in a Capital Case**

In addition to the ABA, the State Bar of Texas has also adopted guidelines highlighting trial counsel's additional obligations in defending a foreign national in a capital case. *Texas Guidelines*, Guideline 10.3. These guidelines are specifically tailored to the representation of capital defendants in Texas, thus embodying the most up-to-date norms of professional practice in this state. The section of the Texas Guidelines specifically concerned with the representation of a foreign national is in fact more extensive than the corresponding section within the ABA Guidelines. This section reads as follows:

**GUIDELINE 10.3 Additional Obligations of Counsel Representing a Foreign National**

A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B. Counsel representing a foreign national should:

1. Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

2. If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission to withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.

3. Immediately advise the client of his or her right to communicate with the relevant consular office; and

4. Obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

114

EXHIBIT 3 Page 127

: 00128

> Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.

*Id.* As the above text makes clear, prevailing norms of professional practice in Texas recognize that it is incumbent on trial counsel to take certain steps in representing a foreign national in a capital case. Accordingly, failure to take such steps falls below the threshold of reasonable professional practice and is objectively unreasonable.

### c. Basic Legal Research Would Have Revealed the Significance of Taking Additional Steps in the Representation of a Foreign National in a Capital Case

Finally, basic legal research would have quickly revealed the importance of seeking consular assistance. By the time trial counsel were preparing Cruz-Garcia's defense, it had already been established in neighboring jurisdictions that the failure to seek consular assistance on behalf of a foreign national facing the death penalty can fall below minimum standards of legal representation. *See Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (granting post-conviction relief because it was ineffective assistance for trial counsel not to "inform Petitioner he could have obtained financial, legal and investigative assistance from his consulate"); *cf. Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) (remanding non-capital case to determine if trial attorney's failure to "notify Deitz of his right to contact the Mexican consulate...deprived him of the effective assistance of counsel"); *see also Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (in capital cases, treaties such as the VCCR "are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national"); *Ledezma v. State*, 626 NW.2d 134, 152 (Iowa 2001) (observing that "all criminal defense attorneys representing foreign nationals should be aware of the right to consular access . . . and should advise their clients of this right").

115

EXHIBIT 3 Page 128

By the time of Cruz-Garcia's capital trial, therefore, there was a well-developed and readily accessible body of legal materials emphasizing the indispensable significance of consular assistance in capital cases.

### 3. Trial Counsel Failed to Act in Accordance with the Recommendations of the ABA Guidelines, the Texas State Bar Guidelines, and Other Available Legal Materials in Representing Cruz-Garcia, Which Constitutes Deficient Performance Under *Strickland v. Washington*

There is no indication in trial counsel's records that Cruz-Garcia was ever informed of his right to communicate with the Dominican Republic Consulate, even though "Guideline 10.6 unequivocally states that counsel should advise a foreign national client of her right to communicate with consular officials." (Ex. 1 at ¶10 [Aff. of Babcock].) Despite the myriad professional guidelines clearly outlining counsel's obligations in representing a foreign national, trial counsel's post-conviction representations confirm that they never made an attempt to communicate with the Dominican Republic Consulate on Cruz-Garcia's behalf. Indeed, trial counsel believed that the Dominican Republic was "aware" of this case because, prior to trial, one of Cruz-Garcia's ex-wives was involved in trying to procure a visa from the Dominican Republic to come and testify on Cruz-Garcia's behalf.

Upon learning that Cruz-Garcia was a citizen of the Dominican Republic, reasonably diligent counsel would have contacted the nearest consulate in order to confirm his citizenship status and eligibility for consular assistance. The Dominican Republic Consulate would have offered services and means of support had they known Cruz-Garcia was facing the death penalty. (Ex. 25 [Dominican Republic Consulate Letter].) Officers of the Dominican Republic Consulate were available to assist, but trial counsel never contacted the consulate, in clear contravention of the ABA Guidelines.

116

EXHIBIT 3 Page 129

: 00130

Under the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and prevailing Texas practice, competent defense counsel would have notified Mr. Cruz Garcia of his rights under Article 36 of the Vienna Convention. After obtaining Mr. Cruz Garcia's consent, they would have notified consular officials of his detention and sought assistance from the consulate. *If Mr. Cruz Garcia's trial counsel failed to take these actions, that failure was objectively unreasonable.*

(Ex. 1 at ¶8 [Aff. of Babcock] (emphasis added).)

Particularly here, where multiple sources articulate the obligations that competent counsel ought to take in representing a foreign national, trial counsel's failure to undertake any of these vital steps must be viewed as meeting the first prong of the ineffectiveness enquiry under *Strickland*.

## B. Trial Counsel's Failure to Involve the Dominican Republic Consulate in This Case Prejudiced Cruz-Garcia's Defense

Had trial counsel acted in accordance with their professional obligations and sought to notify and involve the Dominican Republic consulate in Cruz-Garcia's defense, there is a reasonable likelihood that the outcome of the proceeding would have been different.

Post-conviction counsel for Cruz-Garcia contacted the Dominican Republic and learned that the consulate was unaware of Cruz-Garcia's arrest, prosecution, and death sentence. In a letter written on Cruz-Garcia's behalf, dated August 13, 2015, the consulate states, "In the case of Mr. Obel Cruz-Garcia, this office has no records whatsoever of a consular notification of Mr. Cruz-Garcia's arrest, in accordance to Vienna Convention stipulations." (Ex. 25 [Dominican Republic Consulate Letter].) The letter goes on to explain the significance of consular notification under the Vienna Conventions, and highlights the fact that the consulate could have been of great assistance had it been contacted by Cruz-Garcia's trial counsel in a timely fashion.

117

EXHIBIT 3 Page 130

: 00131

The Vienna Convention…[helps to guarantee foreign nationals]…the protection of their rights, proper legal representation and the opportunity to contact family members who can participate in the judicial procedure and aid in the investigations; the consular agents can also work with the defendant's lawyers to locate witnesses or records in the Dominican Republic.  The [VCCR] also allows the Consulate to send documents and letters to the court, and to be present in court, to support the foreign national and protect the rights of the defendant.

. . . If Mr. Cruz-Garcia had contacted our offices and requested our help, this consulate general would have provided Mr. Cruz-Garcia with whatever partial or total assistance it could [provide], at that moment, as stated above.

According to our experience, consular intervention can make the difference in a legal procedure. There are many examples of cases to prove the big difference such assistance can make in the fate of a person accused of committing a crime.

(Ex. 25 [Dominican Republic Consulate Letter].)

Had it been contacted by the defense team, the Dominican Republic consulate would have sought to assist trial counsel in its representation of Cruz-Garcia in whatever way possible.  Specifically, the consulate could have been of significant assistance in facilitating trial counsel's mitigation investigation in the Dominican Republic, and could have helped to ensure that counsel could gain access to records, individuals, and facilities in the Dominican Republic that may have assisted in Cruz-Garcia's defense—assistance particularly needed by the defense in the absence of a qualified mitigation specialist.  (*See* Claim Four, *ante.*)

In addition, had the consulate been involved in this case from the start, they could have sought to use their political influence to negotiate with the State to seek a life sentence for Cruz-Garcia.   Consular officials are often successful in persuading prosecutors to waive the death penalty in exchange for a guilty plea. (Ex. 1 at ¶15 [Aff. of Babcock].)

118

EXHIBIT 3 Page 131

: 00132

Furthermore, consular involvement would have made a significant impact on the mitigation investigation in this case. Had counsel been working with the consulate from the start, they could have received considerable help in locating witnesses in the Dominican Republic; securing statements from said witnesses; and bringing them to the United States to testify on Cruz-Garcia's behalf at trial. (*See* Claim Four, *ante*, for the many available mitigation witnesses in the Dominican Republic that trial counsel failed to locate and interview.)

Indeed, had the Consulate been involved, it is highly likely that trial counsel would have been able to present a far more robust punishment-phase case than they ultimately brought before the jury. Had the jury had the opportunity to see and hear from more members of Cruz-Garcia's family in the Dominican Republic, a reasonable likelihood exists that they would have voted for life rather than death. Without consular assistance in securing and presenting these witnesses, however, the jury was left with an incomplete picture of Cruz-Garcia's many family connections within the Dominican Republic.

Ultimately, it is difficult to know exactly what shape consular involvement may take in assisting in the defense of a capital case. Nevertheless, what is clear is that consular involvement can have a decisive positive impact on a case's outcome.

> The assistance provided by consular officials varies from case to case. I have been involved in at least two-dozen cases in which consular officials have interceded with prosecutors prior to trial to persuade them not to seek the death penalty. In most of these cases, the prosecution decided to waive the death penalty in exchange for a guilty plea. In other cases, consular officials have been instrumental in obtaining mitigating evidence from the national's home country that has a decisive impact on the penalty phase defense. Consular officials have also recruited legal counsel to represent foreign nationals facing the death penalty where trial counsel lacks the requisite experience or competence to defend a capital case.

(Ex. 1 at ¶15 [Aff. of Babcock].)

119

EXHIBIT 3 Page 132

: 00133

Given the significant ways consular assistance can positively impact a defendant's capital case, there is little doubt that failure to seek such assistance—especially when the obligation to do so is codified by various professional guidelines—is prejudicial. Had the consulate been involved in the defense of Cruz-Garcia's case, there is a reasonable likelihood that at least one juror would have been moved to vote for life rather than death. As such, Cruz-Garcia received ineffective assistance of counsel in the defense of his capital case, and his conviction and death sentence should be overturned.

## C. Trial Counsel Were Ineffective for Failing to Ensure That Cruz-Garcia's VCCR Rights Were Protected by the State and for Failing to Raise This Issue at Trial

Upon appointment to this case, trial counsel should have immediately ensured that Cruz-Garcia's rights under the VCCR were protected during his arrest and detainment. *See Osagiede v. United States*, 543 F.3d 399 (7th Cir. 2008) (finding trial counsel ineffective for failing to seek a remedy for an Article 36 violation and remanding for prejudice determination). Had trial counsel been diligent in their pretrial review of Cruz-Garcia's case, they would have realized that the State of Texas mistakenly listed Cruz-Garcia as coming from the country of Dominica on his probable cause form. (*See* Claim Five, *ante*; Ex. 25 [Probable Cause Findings and Warnings].) Had trial counsel caught this obvious error, they could have informed the Court during Cruz-Garcia's trial that his rights under the Vienna Convention were violated. In raising the issue before the court, trial counsel not only would have preserved the issue on direct appeal, but also would have given the Court the opportunity to correct the error. In so doing, the Court could have ordered the Dominican Republic Consulate contacted and ordered a continuance of the proceeding until such time as Cruz-Garcia had the opportunity to communicate with them and receive any assistance they were able to offer. In

120

EXHIBIT 3 Page 133

: 00134

failing to both preserve this issue and notify the Court about this error, counsel were ineffective.

### D. Conclusion

Trial counsel wholly failed their obligations under prevailing norms of both national and state professional practice in failing to advise Cruz-Garcia of his right to consular access; seek out consular assistance in the defense of his case; and communicate to the Court that the State failed to properly warn Cruz-Garcia of his rights under the Vienna Conventions. Such failures on the part of trial counsel deprived Cruz-Garcia of his right to effective representation under the Sixth Amendment to the United States Constitution and necessarily impacted the outcome of his capital case. As a result, his conviction and sentence of death were rendered in violation of state, federal, and international law, and should be overturned.

## CLAIM SEVEN

### CRUZ-GARCIA'S DUE PROCESS RIGHTS TO A FAIR TRIAL WERE VIOLATED BY CONSTITUTIONAL ERRORS RELATING TO THE COURT'S EX PARTE DISCUSSION WITH A SINGLE JUROR

The right to an impartial and fair jury is paramount in a capital case. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). Yet in Cruz-Garcia's case, error by the trial court invaded the sanctity of the jury's deliberations and placed a thumb on the scale for a death verdict. During punishment phase deliberations, Juror Bowman was a lone holdout for a life sentence and sent a note requesting to speak with the Court. During that conversation, which was on the record but happened privately in the judge's chambers without counsel present, the Court effectively gave Juror Bowman supplemental instructions telling her to attempt to agree with the rest of the jury. This information was never communicated to trial counsel, who lost the opportunity to object or ask for an end to deliberations. As a result,

EXHIBIT 3 Page 134

Cruz-Garcia's due process rights were violated under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law. Accordingly, his sentence must be reversed.

## A. Relevant Facts

On July 19, 2013, on the second day of the jury's deliberations at the punishment phase of trial, the Court received a note from Juror Bowman asking to speak with the judge. (27 RR at 3.) The note did not give any indication of what the juror wished to speak about. After showing the note to both the State and defense counsel, the Court asked either party if they objected to her speaking with Juror Bowman in private in her chambers. Both sides agreed that was the proper way to determine what the juror needed to speak about. (*Id.*) However, neither side discussed what the Court should do once she learned what the issue was.

The Court brought Juror Bowman to her chambers and halted deliberations. (27 RR at 4.) Juror Bowman then explained to the judge:

> I'm sorry. I don't mean to waste your time. You are important, Judge, and everything like that. I just -- I am the only juror that's completely -- I can't agree. I can't agree with the questions. I can't answer the same questions with everyone else and I feel pressured. And I don't want to hold them up. So, I feel like maybe they can exchange me out with one of the alternates.

(*Id.* at 4-5.) The Court explained to the juror that having a different opinion than the other jurors did not disqualify her as a juror and that she would essentially have to become disabled to be replaced by an alternate. (*Id.* at 5-6.) The juror continued, though:

> Here's my thing. I don't think I'll ever come to an agreement. We're never going to come to an agreement. They all have the same answers. The only question -- the only answer I'm in agreement with them is No. 2. No. 1 and 3, they're all -- you know, they are all different. I am the only one with the different opinion. And I am not changing my stance on that. I'm not. And they are not.

122

EXHIBIT 3 Page 135

So, I mean, if we keep on going to deliberations, it could be years, I
mean, because I'm not the type of person --

(27 RR at 6.) The Court interrupted, instructing Juror Bowman that she needed to
continue deliberating until the Court told her to stop. The Court explained that
multiple nights of hotel lodging had been booked in case the jury needed to be
sequestered more than the night they had already been sequestered. (*Id.* at 6-7.)
The Court further instructed:

> If the evidence leads you to a certain way, that's the way you should
> answer it, even though it might result in something that bothers you.
> That's why we don't ask you to vote to give the death penalty or to
> not give the death penalty.
>
> So, I'd like you to go back and continue your deliberations with the
> jury and continue trying to reach an agreement with the jury, if you
> can.

(27 RR at 7.) Juror Bowman closed the conversation by stating: "Judge, I don't
want to have to stay another night. I really don't know." (*Id.* at 8.) The Court
replied: "That's completely in the hands of the entire jury. You have to deliberate
back there and try to find out whether you can reach a verdict or not. Okay?" (*Id.*)

After indicating that Juror Bowman was sent back to deliberations, the
record is silent, resuming after deliberations have concluded and the jury is brought
back with their verdict later that same day. (27 RR at 8.) There is no indication in
the record that the Court informed either the State or defense counsel about the
content of the conversation with Juror Bowman. Nor is there any indication in the
record of objections by defense counsel, asking the Court to put on record what
Juror Bowman had said and what the Court had instructed her.

In post-conviction investigation, trial counsel was asked to review the
transcript of the in-chambers conversation with Juror Bowman. Trial counsel have
stated that they were not told by the Court that Juror Bowman was a holdout vote
and wanted to stop deliberating. Trial counsel recalls an informal conversation

123

EXHIBIT 3 Page 136

with the judge outside the courtroom, in which the judge stated that Juror Bowman was having a hard time. In his affidavit filed with the motion for new trial, counsel Mario Madrid stated the court only informed them that Juror Bowman "questioned how long deliberations would last." (35 RR at 28 (Def Ex. 1).) Counsel were not given the specifics that Juror Bowman stated she could not come to an agreement with the other jurors, was not going to change her opinion, and wanted to stop deliberating for that reason. Both counsel state that if they had known Juror Bowman was a holdout juror who desired to stop deliberations, they would have asked the court to end deliberations and enter a life sentence.

### B. Cruz-Garcia's Due Process Rights Were Violated When the Trial Court Failed to Inform Trial Counsel of the Details of Its Conversation with Juror Bowman and Instead Instructed Her to Resume Deliberations

The Court's failure to inform defense counsel about the content of the conversation with Juror Bowman prejudiced Cruz-Garcia's right to a fair trial in two ways. First, this failure prevented counsel from being able to object to the Court's private instructions to Juror Bowman, which operated essentially as an impermissible coercive *Allen* charge. Next, the failure to inform counsel denied them the opportunity to request that the Court end deliberations based on Juror Bowman's holdout vote.

Article 37.071(e) of the Texas Code of Criminal Procedure states that a court shall enter a life sentence if the jury is unable to answer one of the special issues. TEX. CODE CRIM. PROC. art. 37.071; *Montoya v. State*, 810 S.W.2d 160, 166 (Tex. Crim. App. 1989). The court may do so when it determines a jury has been deliberating "for such a time as to render it altogether improbable that it can agree." *Howard v. State*, 941 S.W.2d 102, 121 (Tex. Crim. App. 1996). There is no set time for deliberations, though. *Id.*; *Green v. State*, 840 S.W.2d 394, 407 (Tex. Crim. App. 1992). It is within the court's discretion to continue deliberations

124

EXHIBIT 3 Page 137

if it believes it could be productive. It may also issue a supplemental charge to the jury known as an *Allen* or "dynamite" charge. *See Allen v. United States*, 164 U.S. 492 (1896). Such a charge essentially reminds jurors of the object of deliberations—to come to an agreement if possible—and that jurors should be open to being persuaded to change their vote. *Howard*, 941 S.W.2d at 123.

As the term "dynamite" suggests, however, an *Allen* charge carries the risk of coercing jurors into changing their vote not based on deliberation or consideration of the evidence, but instead based on the court instructing them to do so. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (reversing a conviction where the court, after two hours of deliberations, instructed the jury: "You have got to reach a decision in this case."); *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006) ("While such a charge is permissible in both the federal system and Texas courts, trial courts must be careful to word it and administer it in a non-coercive manner."). This has been found particularly true for *Allen* charges that single out the fewer holdout jurors in the instruction. *See Lowenfield v. Phelps*, 484 U.S. 231, 238 (1988); *Barnett*, 189 S.W.2d at 278 (reversing a conviction where the trial court singled out two holdout jurors and asked them if they would be able to change their vote). It is for this reason that proper supplemental charges have focused on instructing all jurors to reevaluate their opinions based on the divided deliberations. *Howard*, 941 S.W.2d at 123.

In the present case, the Court's discussion with Juror Bowman and instructions to her to return to the deliberation room created a situation where the Court was essentially giving Juror Bowman—and only Juror Bowman—a coercive *Allen* charge. By instructing Juror Bowman to "continue trying to reach an agreement with the jury," the Court singled Juror Bowman out as being the juror that needed to consider changing her vote. Indeed, this was the message that was received by Juror Bowman from her conversation with the Court. (Ex. 14 at ¶4

125

EXHIBIT 3 Page 138

[Aff. of Juror Bowman] ("I do not remember her exact words to me, but I understood that she was telling me I had to go back into deliberations and see whether I could find it within myself to vote with the other jurors, without violating my conscience.").)   Juror Bowman was sent back to deliberations with this instruction, and the rest of the jury did not receive any supplemental instructions.   Juror Bowman's subsequent change of her vote to agree with the other jurors in assigning the death penalty is directly linked to the Court's instruction to her.   (*Id.* ("Ultimately, I went back to deliberations like the judge instructed me to and thought about whether I could find a way to agree with the rest of the jurors.   Because of all the pressure from other jurors and my daughter being sick, I decided to change my vote to death.").)

The instruction given to Juror Bowman was, therefore, independently an error by the Court.   In addition, the Court gave the instructions outside the presence of the State and defense counsel and failed to report the entire conversation and instructions back to the defense.   The U.S. Supreme Court reversed a case under strikingly similar circumstances.   The gravity of the error expressed in the Supreme Court opinion bears repeating at length.

> The District Judge suggested that he meet alone with the jury foreman and counsel acquiesced.   The transcript of the meeting, which was initially impounded but released for purposes of the appeal, contained several references by the foreman to the jury's deadlock, as well as an exchange suggesting the strong likelihood that the foreman carried away from the meeting the impression that the judge wanted a verdict "one way or the other."   The judge's report to counsel summarizing the discussion made no reference to either of these matters.

> We find this sequence of events disturbing for a number of reasons.   Any ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error.   This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise.   First, it is difficult to contain, much less to anticipate, the

126

EXHIBIT 3 Page 139
: 00140

direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury -- all the more so when counsel are not present to challenge the statements. Second, any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants. Here, there developed a set of circumstances in which it can fairly be assumed that the foreman undertook to restate to his fellow jurors what he understood the judge to have implied regarding the resolution of the case in a definite verdict "one way or the other." There is, of course, no way to determine precisely what the foreman said when he returned to the jury room.

Finally, the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel. While all counsel acquiesced to the judge's ex parte conference with the jury foreman, they did so on the express understanding that the judge merely intended -- as no doubt at the time he did -- to receive from the foreman a report on the state of affairs in the jury room and the prospects for a verdict. Certainly none of the parties waived the right to a full and accurate report of what transpired at the meeting nor did they agree that the judge was to repeat the instructions as to his understandable reluctance to accept the jury's inability to reach a verdict. Because neither counsel received a full report from the judge, they were not aware of the scope of the conversation between the foreman and the judge, of the judge's statement that the jury should continue to deliberate in order to reach a verdict, or of the real risk that the foreman's impression was that a verdict "one way or the other" was required. Counsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction. Thus, it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone -- undesirable as that procedure is -- which constitutes the error; rather, it is the fact that the ex parte discussion was inadvertently allowed to drift into what

127

EXHIBIT 3 Page 140

: 00141

> amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

*United States v. United States Gypsum Co.*, 438 U.S. 422, 460-62 (1978) (internal citations omitted). For the same reasons expressed in the Supreme Court's opinion, the trial court's private meeting with Juror Bowman in Cruz-Garcia's case, and her instructions to return to deliberations in an attempt to agree with the other jurors, constitute error. The instructions, though almost certainly given with the benign purpose of encouraging Juror Bowman to continue deliberations, instead likely caused a coercive effect on her vote. *Howard*, 941 S.W.2d at 124 (noting that, even if unintended, "a trial court might engender coercion by actively identifying jurors with minority viewpoints and tacitly instructing them to reexamine their perspectives."). In her affidavit filed with the motion for new trial, Juror Bowman's description of feeling like the "last holdout" and that she was "holding up the process" is indicative that her mindset during the end of deliberations was the she was the one who was required to change her vote. (35 RR at 36 (Def. Ex. 3).) The other jurors "weren't changing their minds" and, significantly, had not been asked to reconsider their votes as Juror Bowman had. (*Id.*) Like the juror in *United State Gypsum Co.*, there is a real risk that Juror Bowman left the judge's chambers believing that she had to come to agreement with the other jurors. 438 U.S. at 461.

Further, by conducting the conversation in private and not reporting back the language of her instruction to Juror Bowman, the Court prevented trial counsel from having the opportunity to weigh in on those instructions or request to correct any mistaken impression about what she was required to do. And this was not the only opportunity lost to counsel.

128

EXHIBIT 3 Page 141

: 00142

In failing to report to counsel that Juror Bowman was a holdout juror who did not wish to continue deliberating, the Court deprived counsel of the opportunity to ask the Court to end deliberations.  Unlike most cases, the failure of the jury to reach a unanimous sentencing verdict in a capital case does not result in a mistrial.  Rather, the Court is instructed by statute to enter a life sentence.  TEX. CODE. CRIM. PROC. art. 37.071.  While a court has broad discretion to continue deliberations, that necessarily means the court has discretion to end deliberations where called for.  *See Green*, 840 S.W.2d at 407.  In the present case, trial counsel have stated they would have asked the Court to end deliberations had they known the details of the conversation with Juror Bowman.  Because a juror's decision regarding the special issues in a death penalty case necessary impact an individual, moral judgment of the evidence (particularly regarding mitigation), the Court might have been amenable to argument from counsel regarding the need to avoid undue pressure on the jury to come to unanimity and that ending deliberations was the appropriate step given Juror Bowman's comments.  We cannot presently know how the Court would have ruled, had such arguments been presented to it, because trial counsel were never given the opportunity.

For both the error in the instructions given to Juror Bowman—substantively and by being done in private, individually—and the missed opportunity of counsel to object and to request an end to deliberations, Cruz-Garica's due process rights to a fair trial proceeding were infringed.  As such, his sentence should be vacated and his case remanded for a new trial.

## C. Appellate Counsel Provided Ineffective Assistance in Failing to Raise the Foregoing Errors on Direct Appeal

It is well established that criminal defendants are entitled to effective assistance of counsel during their direct appeals.  The effectiveness of appellate counsel is determined using the two-prong *Strickland* standard.  *See Robbins*, 528

129

EXHIBIT 3 Page 142

: 000143

U.S. at 285; *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008); *Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006); *Ex parte Santana*, 227 S.W.3d at 704-05. Appellate counsel is considered ineffective if counsel's performance was objectively unreasonable, and this deficient performance prejudiced the defendant. *See Ries*, 522 F.3d at 531; *Amador*, 458 F.3d at 411.

Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an appellate brief. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); *accord Ries*, 522 F.3d at 531-32; *see Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the Texas Guidelines outlines the duties of appellate counsel, stating that counsel must "review the appellate record for all reviewable errors" and prepare "a well-researched and drafted appellate brief." *Texas Guidelines*, Guideline 12.2(A)(8).

In the present case, full development and litigation of the foregoing errors regarding Juror Bowman's instructions will require an evidentiary hearing with live testimony from trial counsel concerning what information they received from the Court regarding the conversation with Juror Bowman and what they would have done had they been provided the complete transcript. Thus, these issues are properly raised and preserved for review in this Application and collateral proceeding. *See Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (noting that claims relying on outside-the-record evidence are best raised on habeas). However, certain information forming the basis of this claim was available in the record of trial. Should the issues herein be found to have been waived by not having been pled in Cruz-Garcia's direct appeal proceedings, he should be found to have received ineffective assistance of appellate counsel.

130

EXHIBIT 3 Page 143

First, the transcript of the conversation between the Court and Juror Bowman was part of the trial record and had even been included in the motion for new trial proceedings shortly after trial. (35 RR at 11 (State's Ex. 3).) It was clear from that record that trial counsel had not been made part of the conversation and that the contents of the conversation had not been reported back to counsel on the record. Further, trial counsel Mr. Madrid referenced the incident in his affidavit, filed with the motion for new trial by direct appeal counsel. In that affidavit, Mr. Madrid stated that the Court had only informed counsel that Juror Bowman "questioned how long deliberations would last." (35 RR at 28 (Def Ex. 1).) Thus, it would have been reasonable to assume from this notation that counsel had not been informed of the full extent of Juror Bowman's conversation with the Court.

Based on this information, direct appeal counsel knew or should have known of the Court error in its instructions to Juror Bowman and the failure to disclose the conversation to trial counsel. There is no reasonable, strategic ground to have failed to raise this meritorious issue on appeal. Thus, appellate counsel's performance fell below the reasonable standards of professional conduct and prejudiced Cruz-Garcia's appeal. *Lucey*, 469 U.S. at 394 n.6 ("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all.") As a result, Cruz-Garcia's must be granted a new direct appeal process.

**D. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Object or Request the Trial Court Report Its Conversation with Juror Bowman on the Record**

Trial counsel has a duty to object to trial errors and establish a record reflecting adverse rulings by the court. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at

131

EXHIBIT 3 Page 144

trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.") (internal citation omitted); *ABA Standards*, Standard 4-7.1(d) (defense counsel "has a duty to have the record reflect adverse rulings"). In a capital trial, trial counsel has a duty to "protect[] the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited." *ABA Guidelines*, Guideline 10.8(A)(3)(c). The ABA Guidelines advise that trial counsel in a capital case should "know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings." *Id.* at cmt.

As discussed above, trial counsel were not told of the Court's full conversation with Juror Bowman. At an evidentiary hearing on this Application, it is anticipated that counsel will state that the Court informally told them after the conversation with Juror Bowman that she was having a hard time and asked how long deliberations would last. In light of that explanation from the Court, it is likely counsel did not believe any formal recitation of these facts on the record was necessary by the Court.

However, should it be determined that the errors herein complained of were not properly preserved by trial counsel, it should be found that Cruz-Garcia received ineffective assistance of trial counsel through their failure to request to be present at the meeting with Juror Bowman or a recitation of the conversation on the record. Counsel knew that Juror Bowman had some issue sufficient to warrant sending a note to speak with the Court. Upon learning that Juror Bowman was having a hard time with deliberations, counsel should have exercised all due diligence to preserve the rights of their client. Following the guidelines and norms for capital counsel, Cruz-Garcia's trial counsel should have requested the Court

132

EXHIBIT 3 Page 145

give a full accounting of the conversation on the record in order to determine whether any error existed that might prejudice Cruz-Garcia's case. Because counsel failed to do so, and no reasonable, strategic grounds exist to have done so, they provided ineffective assistance of counsel. Cruz-Garcia's sentence should be reversed and his case remanded for a new trial.

## CLAIM EIGHT

## CRUZ-GARCIA'S RIGHTS TO A FAIR TRIAL WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE JUROR MISCONDUCT

In a capital case, a defendant's right to a fair and impartial jury is paramount. *See Morgan*, 504 U.S. at 727. This fairness is not only necessary in the selection of the jury, but also in a requirement that they do not receive outside information or make decisions about the case outside of the deliberation room. "A juror must make decisions at the guilt and punishment phases using information obtained in the courtroom: the law, the evidence, and the trial court's mandates." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Notably, during Cruz-Garcia's trial, it came to light that two jurors had a discussion outside of deliberations about the case. This was reported to the Court by an attorney not connected to the proceedings. Yet trial counsel did not investigate this event further, neither speaking with the attorney nor requesting the jurors themselves be questioned. Counsel also did not raise any objections or request for mistrial based on the jurors' misconduct. This failure constitutes deficient performance that prejudiced Cruz-Garcia's right to a fair trial. His rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law were violated. Accordingly, his conviction and sentence must be reversed.

133

EXHIBIT 3 Page 146

: 000147

## A. Relevant Facts

On the morning of July 16, 2013, during Cruz-Garcia's capital trial, an attorney unrelated to the case named Michael Casaretto came to the 337th District Court and asked to speak with the Court in chambers. (24 RR at 3.) Casaretto reported to the Court that he had seen and heard two jurors in Cruz-Garcia's case talking to each other that same morning, and felt he should report it to the Court. (*Id.*)

After speaking with Casaretto in chambers, the Court put a summary of the conversation on the record, with both the State and defense counsel present. (24 RR at 3.) The Court reported that Casaretto had described the two jurors and what they were wearing that day. However, the description the Court gave minimized the seriousness of the conversation between the jurors, reporting that Casaretto had "said they were having what was possibly an innocuous conversation." (*Id.*) The Court reported that Casaretto had heard the jurors speaking about other jurors struggling with the case and about words of encouragement from the older of the two jurors. (*Id.* at 3-4.) Any implication of seriousness was minimized, though, when the Court stated that Casaretto had said: "There was nothing specific about the issues discussed and they did not seem to be conspiring. He said he could not tell if they were actually talking about evidence." (*Id.* at 4.)

The Court stated that it was notifying the State and defense counsel "to do whatever you want with the information and make them available. [Casaretto] is obviously available if you need to speak to him further." (24 RR at 3.) The Court was satisfied that was all the information Casaretto had, but gave both parties Casaretto's name and phone number if they wished to speak with him. (*Id.* at 5.) The Court again stated "he said it probably or possibly was innocuous and he wanted to report it just because . . ." (*Id.*) Trial counsel then stated: "I will call him just to make sure and put whatever he tells me on the record." (*Id.*)

134

EXHIBIT 3 Page 147

At no time did counsel ask to poll the jury, interview the individual jurors, remove the individual jurors, or for a mistrial. Nor did counsel ask for a brief continuance in order to speak with Casaretto before continuing the trial. Nor did the Court independently interview the two jurors identified by Casaretto to determine whether the conversation was a more serious case of juror misconduct. Instead, the Court simply re-issued the usual warning to the entire jury at the beginning of that morning's presentation that the jury was not to speak amongst themselves or to anyone else about the evidence or any other matter relating to the case. (24 RR at 6-7.)

Trial counsel ultimately failed to do the one thing they said they would— contact Casaretto directly. After leaving the court that day, Casaretto was not contacted again by the Court, the State, or defense counsel. (Ex. 36 at ¶¶6, 10 [Aff. of Michael Casaretto].) Had counsel spoken with him, they would have learned that, contrary to the innocuous conversation the Court understood had occurred, Casaretto believed the jurors' conversation was serious misconduct. (*Id.* at ¶7.)

When Casaretto encountered the jurors coming to court that day, they were already in conversation, so Casaretto could not have known how long they had been speaking. But he could hear them clearly and it was evident they were discussing the case for which they were jurors. Though he did not know the case, and thus did not understand what exactly the jurors were talking about, it was unmistakably about the merits of the case. They were speaking about evidence they had heard, including how they felt about it. (Ex. 36 at ¶¶2-3 [Aff. of Casaretto].)

While the Court's recounting of how Casaretto came to the Court to inform it of the jurors' conduct was mostly accurate, the way the Court explained it left the impression on the record that Casaretto was not particularly concerned about

135

EXHIBIT 3 Page 148

the conversation but was simply exercising all due diligence. Had counsel spoken with Casaretto directly as they said they would, rather than relying on the Court's recounting, they would have learned the opposite was true. Casaretto would have stated that he was "immediately troubled by the possibility that two jurors were discussing an ongoing case publicly and outside the presence of the other jurors." (Ex. 36 at ¶4 [Aff. of Casaretto].) Indeed, he had told the Court that, as an officer of the court, he felt it necessary to report conduct that appeared to reach the level of juror misconduct. (*Id.* at ¶5.)

Before this occurrence, Casaretto had never before had to report juror misconduct, nor has he since—highlighting the significance of his actions in this case and how blatant he must have considered the misconduct. (Ex. 36 at ¶7 [Aff. of Casaretto].) Indeed, when interviewed in post-conviction, Casaretto was shocked to learn that these were jurors serving on a capital trial, that there was no motion for a mistrial by the defense, and that the judge did not remove the jurors. (*Id.* at ¶8.)

## B. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Interview Casaretto or Take Other Action

Trial counsel has a duty to object to trial errors. *See ABA Guidelines*, Guideline 10.8, cmt.; *ABA Standards*, Standard 4-7.1(d). Moreover, trial counsel has a duty to "protect[] the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited." *ABA Guidelines*, Guideline 10.8(A)(3)(c).

It is well understood that jurors are prohibited from discussing the facts of a case or their opinions outside of deliberations. *Ocon*, 284 S.W.3d at 884; *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 371 (Tex. 2000) ("None of the rules contemplate that the jury may begin deliberating during a trial break. On the contrary, the approved jury instructions direct courts to admonish the jury against

136

EXHIBIT 3 Page 149

informal discussions of the case."). Such conversations are especially concerning because "where a sitting juror makes statements outside of deliberations that indicate bias or partiality, such bias can constitute jury misconduct that prohibits the accused from receiving a fair and impartial trial." *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002). Should such conversations occur, the trial court is authorized to make an inquiry of the juror as to his or her intent or bias and to grant a motion for mistrial based on the allegations of misconduct. *Id.* at 236.

In the present case, trial counsel acted unreasonably and failed to meet prevailing standards for capital counsel by failing to either interview Casaretto or take other action when they learned that two jurors had been speaking about the case outside of deliberations. Professional standards required that capital counsel at a minimum interview a fellow attorney held out to them as available—they were even given Casaretto's phone number—and who they were told observed possible juror misconduct. *See Texas Guidelines*, Guideline 11.2 (A)(2) (requiring counsel to "thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted"). Counsel seemed to know this was required on their part when they indicated to the Court they would contact Casaretto, but they then failed to do so.

Had counsel interviewed Casaretto, they would have learned how serious Casaretto (as the direct observer of the conversation) felt the jurors' misconduct was. At that point, they could have requested a mistrial or other remedial action to protect their client's rights to a fair and impartial verdict. Even with just the information learned from the Court's description of its conversation with Casaretto, counsel could have requested a mistrial or to remove the two jurors. At a minimum, counsel should have requested the Court interview the two jurors in question to determine if more action was necessary. *See Ocon*, 284 S.w.3d at 886

137

EXHIBIT 3 Page 150

: 00151

(noting that it is incumbent upon the party alleging juror misconduct to request an inquiry of the jury).

Cruz-Garcia's right to a fair trial was prejudiced by counsel's deficient performance in multiple ways. First, Cruz-Garcia lost the opportunity to complain of error related to the two jurors' conversation and the impact that had on their verdict. *See Ocon*, 284 S.W.3d at 885 ("Though requesting lesser remedies is not a prerequisite to a motion for mistrial, when the movant does not first request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured by the less drastic alternative."). Second, Cruz-Garcia lost the opportunity to investigate whether jurors were impacted by that discussion or other discussions outside of deliberations. In the conversation as noted by the Court, the younger of the two jurors thanked the older of the two for providing "words of encouragement" the day before. (24 RR at 4.) No investigation occurred into whether the referenced conversation the day before happened in or out of deliberations, or how it impacted the jurors.

Finally, the overall failure to investigate this issue prevented counsel from evaluating the incident as part of a broader issue of jury misconduct in this case. In the motion for new trial, Cruz-Garcia identified misconduct on the part of the jury foreman for improperly reading Bible passages to influence jury deliberations. (3 CR at 549, 555.) In post-conviction, Cruz-Garcia has learned that jurors impermissibly discussed deliberations with an alternate juror outside the deliberation room. (*See* Claim Nine, *post*.)

When viewed alongside these other incidents of jury misconduct, the conversation between jurors outside of deliberations observed by Casaretto takes on even more significance. With reasonable investigation, counsel might have developed the pattern of juror misconduct and brought it to the Court's attention,

138

EXHIBIT 3 Page 151

requiring a mistrial.[22] Instead, counsel failed to investigate the jurors' discussion of the case outside of deliberations and object to the potential negative impact to Cruz-Garcia's right to a fair trial. Because of this ineffective assistance of counsel, Cruz-Garcia's conviction and sentence should be reversed.

## CLAIM NINE

## JURORS IN CRUZ-GARCIA'S TRIAL COMMITTED MISCONDUCT THAT VIOLATED CRUZ-GARCIA'S RIGHT TO A FAIR TRIAL

Jurors in Cruz-Garcia's trial committed serious misconduct that violated Cruz-Garcia's right to a fair trial. Specifically, the jury foreman read Bible passages commanding the death penalty for murderers during the punishment phase deliberations, and he and another juror indicated that his reading of scripture made the difference in changing another juror's vote from life to death. Moreover, jurors violated the trial court's instructions by discussing the case outside of deliberations on multiple occasions. These incidents of misconduct impacted the jurors' deliberations and, thereby, prejudiced Cruz-Garcia. Due to the jurors' misconduct, Cruz-Garcia's conviction and death sentence were unlawfully and unconstitutionally imposed in violation of his applicable state and federal

---

[22] In the present case, full and fair litigation of the foregoing errors must necessarily include testimony from trial counsel regarding their failure to contact Casaretto. Thus, it is more appropriate that this claim of ineffective assistance be raised on habeas proceedings rather than on direct appeal. *Ex parte Torres*, 943 S.W.2d at 475. However, direct appeal counsel was, or should have been, aware of the record of the failure of counsel to request a mistrial or other remedial action by the Court after having been informed of Casaretto's report to the Court. (*See* 24 RR at 3-6.) Should it be determined that appellate counsel caused this error to be waived by failing to raise the issue on direct appeal, that failure constitutes deficient performance that prejudiced Cruz-Garcia's rights. *Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). This ineffective assistance warrants a new direct appeal process.

139

EXHIBIT 3 Page 152

Constitutional rights, state statutory law, and United States Supreme Court and state case law. Therefore, his conviction and sentence must be vacated.

## A. Scripture Reading During Punishment-Phase Deliberations

On the afternoon of Friday, July 19, 2013, the jury returned a verdict of death. (3 CR at 523-27.) Later that evening, Juror Bowman contacted trial counsel Mr. Madrid and informed him, among other things, that the jury foreman had quoted from the Bible during the punishment-phase deliberations and that the reading of scripture had appeared to sway other jurors in favor of a death verdict. (*Id.* at 541.) Juror Bowman repeated this information in an interview with defense investigator J.J. Gradoni and also attested to these facts in an affidavit provided to appellate counsel and submitted in support of a Motion for New Trial. (*Id.* at 553-56.)

Mr. Gradoni and defense investigator Cindy Klein conducted a recorded interview of the foreman, Juror Clinger. In that interview, Juror Clinger stated that he brought out his Bible during punishment-phase deliberations on Friday morning. (3 CR at 633.) Juror Clinger stated that he read from Romans 13, Genesis 9, and "a lot of places in Deuteronomy." (*Id.* at 634.) Juror Clinger stated that he read these passages as the jurors were finishing up their deliberation on the first special issue. (*Id.* at 635.) Juror Clinger explained that another juror who went to his church, Juror Guillote, had been struggling in deliberations and that after he read from the Bible, Juror Guillote was able to answer the first special issue and move on to the second. (*Id.* at 633, 635.) Juror Clinger stated that his reading of scripture "made a difference with [Juror Guillote]." (*Id.* at 636.)

Romans 13 reads:

Let everyone be subject to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God. Consequently, whoever rebels against the authority is rebelling against what God has instituted, and

140

EXHIBIT 3 Page 153

those who do so will bring judgment on themselves. For rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear of the one in authority? Then do what is right and you will be commended. For the one in authority is God's servant for your good. But if you do wrong, be afraid, for rulers do not bear the sword for no reason. They are God's servants, agents of wrath to bring punishment on the wrongdoer. Therefore, it is necessary to submit to the authorities, not only because of possible punishment but also as a matter of conscience.

This is also why you pay taxes, for the authorities are God's servants, who give their full time to governing. Give to everyone what you owe them: If you owe taxes, pay taxes; if revenue, then revenue; if respect, then respect; if honor, then honor.

Let no debt remain outstanding, except the continuing debt to love one another, for whoever loves others has fulfilled the law. The commandments, "You shall not commit adultery," "You shall not murder," "You shall not steal," "You shall not covet," and whatever other command there may be, are summed up in this one command: "Love your neighbor as yourself." Love does no harm to a neighbor. Therefore love is the fulfillment of the law.

And do this, understanding the present time: The hour has already come for you to wake up from your slumber, because our salvation is nearer now than when we first believed. The night is nearly over; the day is almost here. So let us put aside the deeds of darkness and put on the armor of light. Let us behave decently, as in the daytime, not in carousing and drunkenness, not in sexual immorality and debauchery, not in dissension and jealousy. Rather, clothe yourselves with the Lord Jesus Christ, and do not think about how to gratify the desires of the flesh.

*Romans* 13 (New International Version).

Genesis 9 reads:

Then God blessed Noah and his sons, saying to them, "Be fruitful and increase in number and fill the earth. The fear and dread of you will fall on all the beasts of the earth, and on all the birds in the sky, on every creature that moves along the ground, and on all the fish in the sea; they are given into your hands. Everything that lives and moves

141

EXHIBIT 3 Page 154

: 00155

about will be food for you. Just as I gave you the green plants, I now give you everything.

"But you must not eat meat that has its lifeblood still in it. And for your lifeblood I will surely demand an accounting. I will demand an accounting from every animal. And from each human being, too, I will demand an accounting for the life of another human being.

> *"Whoever sheds human blood,*
> *by humans shall their blood be shed;*
> *for in the image of God*
> *has God made mankind.*

As for you, be fruitful and increase in number; multiply on the earth and increase upon it."

Then God said to Noah and to his sons with him: "I now establish my covenant with you and with your descendants after you and with every living creature that was with you—the birds, the livestock and all the wild animals, all those that came out of the ark with you— every living creature on earth. I establish my covenant with you: Never again will all life be destroyed by the waters of a flood; never again will there be a flood to destroy the earth."

And God said, "This is the sign of the covenant I am making between me and you and every living creature with you, a covenant for all generations to come: I have set my rainbow in the clouds, and it will be the sign of the covenant between me and the earth. Whenever I bring clouds over the earth and the rainbow appears in the clouds, I will remember my covenant between me and you and all living creatures of every kind. Never again will the waters become a flood to destroy all life. Whenever the rainbow appears in the clouds, I will see it and remember the everlasting covenant between God and all living creatures of every kind on the earth."

So God said to Noah, "This is the sign of the covenant I have established between me and all life on the earth."

The sons of Noah who came out of the ark were Shem, Ham and Japheth. (Ham was the father of Canaan.) These were the three sons of Noah, and from them came the people who were scattered over the whole earth.

142

EXHIBIT 3 Page 155

: 00155

Noah, a man of the soil, proceeded to plant a vineyard. When he drank some of its wine, he became drunk and lay uncovered inside his tent. Ham, the father of Canaan, saw his father naked and told his two brothers outside. But Shem and Japheth took a garment and laid it across their shoulders; then they walked in backward and covered their father's naked body. Their faces were turned the other way so that they would not see their father naked.

When Noah awoke from his wine and found out what his youngest son had done to him, he said,

> "Cursed be Canaan!
>  The lowest of slaves
>  will he be to his brothers."

He also said,

> "Praise be to the LORD, the God of Shem!
>  May Canaan be the slave of Shem.
>  May God extend Japheth's territory;
>  may Japheth live in the tents of Shem,
>  and may Canaan be the slave of Japheth."

After the flood Noah lived 350 years. Noah lived a total of 950 years, and then he died.

*Genesis* 9 (New International Version) (emphasis added).

Juror Clinger agreed to sign an affidavit memorializing his statements to the defense investigators. (3 CR at 612.) However, when Mr. Gradoni attempted to arrange to have Juror Clinger sign the affidavit, Juror Clinger informed him that his corporate counsel at work had advised him not to sign the affidavit and to instead give live testimony before the court. (*Id.*) After refusing to sign an affidavit for the defense for this stated reason, Juror Clinger instead signed an affidavit for the State that was submitted in support of the State's Reply to Defendant's Motion for New Trial. (*Id.* at 599-601.)

The affidavit Juror Clinger provided to the State directly contradicts his statements made to the defense investigators. (*Compare* 3 CR at 635 ("JJ: So did

143

EXHIBIT 3 Page 156

: 00157

you read from the Bible or did you quote it from memory? MC: No, I read. JJ: Read it from the Bible. MC: Yeah....After I read that...she was able to move on from the first question.") with *id.* at 600 ("At no point did I read directly from the Bible.") and *id.* at 635-36 ("JJ: So, after you read that was [Juror Guillote] able to say Death? MC: Uh, after I read that she was able to move, that was, we were finishing up talking about the first question and she was able to move on from the first question. Uh, we still talked about a lot more stuff throughout the course of the day, but she was able to move on... JJ: No, no, that helped her move on to question number two. MC: Correct....CK: And the people were listening, I guess, when you were saying this, and did it help them understand? You think it made a difference to them? MC: It made a difference with [Juror Guillote]. I don't know if it made a difference with anyone else.") with *id.* at 600 ("I do not believe [Juror Guillote] or any other juror changed their answers to the Special Issues based on this brief exchange.").) Given Juror Clinger's about-face in his description of these events between his candid conversation with the defense investigators and his providing an affidavit to the State, and the fact that his explanation for not signing an affidavit for the defense is belied by his signing an affidavit for the State, the statements in his affidavit that he did not read from the Bible and that the discussion of scripture did not impact Juror Guillote's verdict are not credible.

Juror Guillote also provided an affidavit to the State in support of its Reply to Defendant's Motion for New Trial. Juror Guillote's affidavit also contradicted both Juror Clinger's statements made to the defense investigators and the affidavit he provided to the State. Juror Guillote stated that Juror Clinger opened his Bible "[a]fter we had come to a unanimous decision on all three special issue questions and before the jury foreman, [] Clinger, signed the verdict form." (3 CR at 597.) Conversely, Juror Clinger told investigators that after he read from the Bible, "we still talked about a lot more stuff throughout the course of the day." (*Id.* at 635.)

144

EXHIBIT 3 Page 157

Likewise, his affidavit stated that after this exchange took place, "we went back to discussing the facts of the case and deliberating the answers to the Special Issues presented to us." (*Id.* at 600.) Juror Clinger stated in his affidavit that this exchange took place "[a]t one point during the discussion Friday morning"; likewise, he told the investigator that he brought out his Bible "about 10:00 AM Friday morning." (*Id.* at 599, 633.) The jury's verdict form was not signed and filed with the clerk until 4:30 p.m. on Friday, July 19, 2013. (*Id.* at 523-27.) Juror Guillote's claim that the discussion of the Bible verses took place "[a]fter we had come to a unanimous decision on all three special issue questions" is, therefore, not credible. (*Id.* at 597.)

### 1. Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Constitutes an Improper Outside Influence

Jurors must only "use the law, the evidence, and the trial court's mandates as [their] ultimate guides in arriving at decisions as to guilt or innocence and as to punishment." *McQuarrie v. State*, 380 S.W.3d 145, 153 (Tex. Crim. App. 2012) (quoting *Granados*, 85 S.W.3d at 235). "The Sixth Amendment right to a trial by jury . . . implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* (quoting *Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998)) (internal quotations omitted). Texas courts have found improper outside influence where jurors have brought outside-the-record information to bear on their deliberations. *See, e.g., id.* at 154 (holding that a juror's internet research of the effects of date rape drugs constituted an outside influence); *Ryser v. State*, 453 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2014) (holding that a juror's consultation of a dictionary to obtain definitions of a word contained in the jury instructions constituted an

145

EXHIBIT 3 Page 158

outside influence). Before the jurors retired to deliberate at the punishment phase, the trial court instructed them:

> During your deliberations upon the Special Issues, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence. . . . You are the exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

(26 RR at 101.) Juror Clinger's reading of scripture constituted an improper outside influence, as it violated the trial court's charge to not consider, discuss, nor relate matters not in evidence and to be bound only by the law of the court.

## 2. Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Prejudiced Cruz-Garcia

In *Lucero v. State*, the court declined to decide whether the jury foreman's Bible reading constituted an "outside influence" because it found that the Bible reading did not affect the jury's verdict. 246 S.W.3d 86, 95 (Tex. Crim. App. 2008). The jury foreman in that case read only from *Romans* 13. *Id.* at n.4. The court found this passage of Biblical scripture to be "essentially an admonishment to follow man's law." *Id.* at 95. In finding that the scripture reading was harmless, the court relied on an affidavit provided by one of the jurors stating that "[t]here was no passage read suggesting that a murderer should be executed under Biblical law. There was no Bible passage read about the principal of a limb for a limb or an eye for an eye or tooth for a tooth." *Id.* at 93. Conversely, in this case, just such a passage was read: "Whoever sheds human blood, by humans shall their blood be shed." (3 CR at 634; *Genesis* 9:6.)

In finding the Biblical scripture reading harmless, the *Lucero* court also relied on the fact that the reading occurred near the beginning of jury deliberations.

146

EXHIBIT 3 Page 159

246 S.W.3d at 95. Conversely, in this case, the scripture reading occurred not at the outset of deliberations but on the second day of deliberations, after the jury had been sequestered overnight and, specifically, while the jurors "were finishing up talking about the first question." (3 CR at 522, 599, 633.)

Finally, in finding the Biblical scripture reading harmless, the *Lucero* court relied on the fact that affidavits submitted by the jurors in the case indicated that the scripture had no effect on the jury's verdict. 246 S.W.3d at 95. In this case, the opposite is true. Juror Clinger told the defense investigator that after he read from the Bible, Juror Guillote "was able to move on from the first question" to answer special issue number two and that the scripture reading "made a difference with [Juror Guillote]." (3 CR at 635-36.)

Courts throughout the country have found prejudice where jurors have consulted Biblical scripture during deliberations. *See, e.g., Jones v. Kemp*, 706 F.Supp. 1534, 1559-60 (N.D. Ga. 1989) (reversing death sentence where jurors brought Bible into deliberations); *Ex Parte Troha*, 462 So.2d 953, 954 (Ala. 1984) (reversing rape conviction where juror consulted with his minister brother for scripture references during deliberations); *People v. Harlan*, 109 P.3d 616, 622, 634 (Colo. 2005) (vacating death sentence where jurors researched Bible verses, brought a Bible into the jury room during deliberations, and shared a verse stating that "whoever kills a man shall be put to death"); *State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981), *cert. denied*, 457 U.S. 1110 (1982) (new sentencing hearing required where jury foreman read Biblical passages during punishment-phase deliberations). In this case, the jury foreman read from a passage of scripture that commands the death penalty for murderers and candidly told the defense investigators that his reading of scripture made a difference to another juror in her deliberation of the special issues. It is thus clear that Juror Clinger's reading of scripture prejudiced Cruz-Garcia, and the proper remedy is a new punishment trial.

147

EXHIBIT 3 Page 160

## B. Jurors Committed Misconduct by Discussing the Case Outside of Deliberations

Jurors at Cruz-Garcia's trial were instructed on the first day of trial that they were not to discuss amongst themselves or with anyone else any subject connected with the trial or to form or express any opinion about the trial until the end of trial. (18 RR at 96.) Jurors were reminded of this instruction throughout the course of the trial, before retiring to deliberate at each phase, and before being sequestered overnight at the punishment phase. (18 RR at 146-47, 194; 19 RR at 206; 20 RR at 187; 21 RR at 176-77; 22 RR at 14; 23 RR at 28, 105; 24 RR at 6-7; 25 RR at 86 202; 26 RR at 101, 177.) Jurors violated these instructions by discussing the case outside of deliberations on multiple occasions.

On the morning of the first day of the punishment phase, Michael Casaretto, a defense attorney not connected to Cruz-Garcia's case, overheard two members of Cruz-Garcia's jury discussing the case in the elevator lobby of the Harris County District Courthouse.[23] (Ex. 36 at ¶¶2-3 [Aff. of Casaretto]; 24 RR at 3-4.) Although Casaretto was not familiar with the facts of Cruz-Garcia's case, it was apparent to him that the jurors were discussing the case itself and their thoughts about the evidence. (*Id.*) Casaretto approached the trial court that same morning to report the incident. (24 RR at 3.) Casaretto was deeply troubled by what he perceived to be an obvious violation of the jurors' obligations during trial and blatant misconduct. (Ex. 36 at ¶4 [Aff. of Casaretto].)

Following this incident, the trial court again admonished the jurors not to discuss anything about the trial amongst themselves or with anyone else prior to deliberations. (24 RR at 6-7.) Yet jurors continued to discuss the case outside of deliberations. (Ex. 13 at ¶4 [Aff. of Juror Alexander].) According to Juror Alexander, an alternate juror in Cruz-Garcia's case, they "would talk as a jury

---

[23] For a more extended discussion of this incident, *see* Claim 8, *ante.*

148

EXHIBIT 3 Page 161

: 00162

about the case and what was going on, some during the trial and some after the trial was over. We would talk during breaks, when we were in the jury room waiting." (*Id.*) Juror Alexander

> learn[ed] from the other jurors that one of the jurors in particular was having a hard time voting for the death penalty. That was one of the things we talked about during the trial when we were together. The rest of the jurors had to work really hard to convince her. I remember her struggle was something that the jurors talked about during the trial because we knew the decision had to be unanimous.

(Id. at ¶5.) Because Juror Alexander was an alternate and did not participate in deliberations, she could only have known the details of those deliberations as they were going on through discussions with the other jurors outside of deliberations.

### 1. Jurors' Conversations with an Unauthorized Person Raise a Presumption of Prejudice to Cruz-Garcia

The seated jurors' conversations with an alternate juror about the case and about the deliberative process violate Article 36.22 of the Texas Code of Criminal Procedure, which states, "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." When a juror communicates with an unauthorized person about the case at trial, there is a presumption of injury to the defendant. *Ocon*, 284 S.W.3d at 884; *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997). Juror Alexander, as an alternate, was an unauthorized person and was not permitted to participate in deliberations. Because seated jurors discussed the case and their deliberations with Juror Alexander during trial, prejudice to Cruz-Garcia is presumed. Moreover, in this case, the jurors' discussion of their deliberations outside the deliberation room was particularly prejudicial. Juror Bowman discussed both with the trial court and in the affidavit she supplied to appellate counsel post-trial the fact that she was the lone holdout juror for a life verdict and felt pressured to agree with the other jurors. (27 RR at 5-6; 3 CR at 555-56.) Discussion of Juror Bowman's status as a holdout

EXHIBIT 3 Page 162

juror with persons outside the seated jury during the deliberation process would only have added to the pressure she faced as a holdout. Thus, the State cannot overcome the presumption that Cruz-Garcia was prejudiced by the jurors' discussion of the case with an unauthorized person.

### C. Conclusion

Misconduct committed by jurors in Cruz-Garcia's case, individually and cumulatively, violated his right to a fair trial. Juror Clinger's reading of scripture during the punishment-phase deliberations constituted an improper outside influence and impacted the verdict of at least one of the other jurors. The jurors' discussion of the case and of deliberations with an alternate juror outside of deliberations violated the Court's repeated instructions and Texas law and raises a presumption of prejudice. Because Cruz-Garcia was prejudiced by multiple instances of juror misconduct, he must be granted a new trial.

**CLAIM TEN**

**TRIAL COUNSEL'S CUMULATIVE DEFICIENT PERFORMANCE OVER THE COURSE OF TRIAL PREJUDICED CRUZ-GARCIA**

Instances of ineffective assistance of counsel should not only be individually analyzed under *Strickland*, but also evaluated cumulatively with other instances where counsel's performance was deficient and prejudiced the defendant's case. *See United States v. Cervantes*, 706 F.3d 603, 619 (5th Cir. 2013) ("The cumulative error doctrine provides for reversal when an aggregation of non-reversible errors, *i.e.*, plain and harmless errors that do not individually warrant reversal, cumulatively deny a defendant's constitutional right to a fair trial."); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby"); *Ex parte Welborn*, 785 S.W.2d 391, 396 (Tex. Crim. App. 1990) (en banc) ("Although, no one instance in

150

EXHIBIT 3 Page 163

the present case standing alone is sufficient proof of ineffective assistance of counsel, counsel's performance taken as a whole does compel such a holding.").

As noted in the preceding claims, trial counsel performed deficiently in investigating and presenting evidence at both the pre-trial and the guilt/innocence phases of trial, as well as failing to sufficiently investigate and present vital evidence to support a sentence of life in prison for Cruz-Garcia during the punishment phase. Each instance of deficient performance individually prejudiced Cruz-Garcia at trial. Moreover, when viewed collectively, these errors create a cumulative effect that deprived Cruz-Garcia of a constitutionally sound trial. *See Strickland*, 466 U.S. at 686. The cumulative prejudice of counsel's deficiencies during pre-trial proceedings, the guilt/innocence phase, and the punishment phase of Cruz-Garcia's trial violated Cruz-Garcia's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Considering these instances of deficient performance in conjunction, there is a reasonable probability that taken as a whole they affected the outcome of Cruz-Garcia's trial. *See Strickland*, 466 U.S. at 686. Thus, even if the court were to determine that Cruz-Garcia was not prejudiced by any of these failures individually, their combined effect requires a new trial. Accordingly, Cruz-Garcia's conviction and sentence must be reversed.

### CLAIM ELEVEN

### CRUZ-GARCIA'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

151

EXHIBIT 3 Page 164

: 000165

less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original). The *Lockett* Court's decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605. Texas's statute governing capital trials gives rise to this risk by expressly limiting the evidence that a jury may consider mitigating, in violation of the Eighth and Fourteenth Amendments. Cruz-Garcia's sentence therefore violates his applicable rights under the Texas and United States Constitutions, as well as state statutory law and United States Supreme Court case law and state case law. Accordingly, Cruz-Garcia's sentence should be vacated.

### A. The Texas Statute and Cruz-Garcia's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. With respect to the mitigating circumstances special issue, the court must instruct the jury that, if it answers that a circumstance warrants a sentence of life imprisonment rather than a sentence of death, the defendant will receive a life sentence. TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(2)(A)-(B). Furthermore, the court must instruct the jury to answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree, and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3). In addition to these procedural instructions, Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). No definition of

152

EXHIBIT 3 Page 165

: 000165

"moral blameworthiness" is provided, nor are additional instructions given as to the relationship between this instruction and the demands of the special issue itself.

As directed by the statute, the trial court in Cruz-Garcia's case gave the statutorily required instructions during the punishment phase of trial and before the jury retired to deliberate. (*See* 3 CR at 513.) In particular, the Court's charge included the following:

> In deliberating on Special Issue No. 3 you shall consider all the evidence admitted at the trial, including but not limited to evidence of the defendant's background, character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."

(*Id.* at 516-517.)   In addition, tracking Article 37.071, the charge immediately instructed further: "You shall consider mitigating evidence to be evidence that you might regard as reducing *as reducing the Defendant's moral blameworthiness.*" (*Id.* (emphasis added).)   The State then emphasized this definition in closing argument at punishment, stating:

> Mr. Cornelius -- I'm sorry I have to differ with him -- is incorrect when he says mitigation is not defined.   It says right here in the charge: Mitigation is anything that removes -- I'm sorry -- the moral blameworthiness of the defendant.   Removes or alleviates his moral blameworthiness.   For what? For murdering Angelo Garcia.   That's what mitigation is.   And I'm not just making it up.   It's in your charge.

(26 RR at 169-170.)

## B. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence

The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007).   "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful,

153

EXHIBIT 3 Page 166

: 00167

mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of that mitigating evidence which the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating. As the Court said in *Tennard v. Dretke*: "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 542 U.S. at 285 (internal quotations omitted); *see also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," *viz.*, that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"). For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett*, 438 U.S. at 604). Importantly, the *Skipper* Court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4. Even still, it could "hardly be disputed" that the evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4; *see also Abdul-Kabir*, 550 U.S. at

154

EXHIBIT 3 Page 167

259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence.").

At the punishment phase, Cruz-Garcia presented evidence that, while mitigating in nature, could have yet been considered by the jury to bear no relationship to his legal or moral blameworthiness for the capital crime. For example, evidence that Cruz-Garcia was a loving brother, husband, and father, who had done charitable works while living in the Dominican Republic, could reasonably have been discounted by the jury as not having any relationship to his culpability for the crime. This evidence, though unrelated to Cruz-Garcia's blameworthiness, bolstered the argument that Cruz-Garcia nevertheless was a worthwhile person, undeserving of a death sentence. Such evidence is meaningful for jurors when deciding whether to impose a sentence of death. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) (*Penry I*) ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence by calling upon jurors to "consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). In Cruz-Garcia's case, this error was made even more prejudicial by the prosecution's reliance on the truncated definition of mitigation evidence in their closing argument. (26 RR at 171 ("Happy birthday pictures do not take away his moral blameworthiness for killing Angelo Garcia, do they?").)

155

EXHIBIT 3 Page 168

: 00169

Texas's instruction precluded jurors from considering mitigating evidence unrelated to Cruz-Garcia's "moral blameworthiness," a limitation wholly at odds with three decades of Supreme Court precedent. Were any of Cruz-Garcia's jurors to credit such evidence—that is, evidence they found to warrant a life sentence but that did not reduce Cruz-Garcia's moral blameworthiness for the crime—that juror necessarily and untenably would violate the Court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001) (*Penry II*). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Cruz-Garcia's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

## C. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Cruz-Garcia's trial, the jury was prohibited from giving effect—meaningful or otherwise—to mitigating evidence falling outside the boundaries specified in their instructions, and this prohibition thereby unconstitutionally limited the jury's ability to give their "reasoned moral response." *See also Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

Although the Supreme Court has upheld Texas's capital punishment statute, it did so "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry I*, 492 U.S. at 318. Since then, the Court has repeatedly expressed its concerns "regarding the extent to

156

EXHIBIT 3 Page 169

which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007). In this case, application of the Texas capital punishment statute impaired Cruz-Garcia's right to have *all* mitigating evidence considered by the jurors as they assessed whether he deserved a life or death sentence. *Penry I*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced."). Therefore, Cruz-Garcia's death sentence should be reversed.

## CLAIM TWELVE

**CRUZ-GARCIA'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE**

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society [hereinafter "first special issue"]; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased [hereinafter "party complicity special issue"]; (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole [hereinafter "mitigating circumstances special issue"]. TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1)-(2), (e)(1).

The court must sentence a defendant to death if the jury unanimously answers "Yes" to the first two special issues and "No" to the third special issue. Furthermore, the jury must be instructed as to these unanimity requirements. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2), (f)(2). By contrast, if the jury answers

157

EXHIBIT 3 Page 170

"No" to either of the first two special issues or a "Yes" to the third special issue, then the court must sentence the defendant to life imprisonment. TEX. CODE CRIM. PROC. art. 37.071, § 2(g). These answers need not be unanimous; instead, the jury may find *against* the first special issue or party complicity or *in favor of* mitigating circumstances so long as ten or more jurors agree. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2), (f)(2). This contrast is generally known as the 10-12 Rule.

In addition to these circumstances, the court also must sentence the defendant to life imprisonment without parole if the jury is unable to answer any of the special issues consistent with these guidelines. TEX. CODE CRIM. PROC. art. 37.071, § 2(g). Under Texas law, however, the jury cannot be informed of the consequences should it fail to answer a special issue: "The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues." TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1). Jurors thus remain free to speculate—or to be persuaded to make assumptions by their peers equally ignorant as to the law's requirements—that a failure to answer a special issue will produce a mistrial. As Texas's capital sentencing scheme misinforms the jury by bringing outside, impermissible considerations to bear on the verdict, Texas's statute deprived Cruz-Garcia of his constitutional rights under the principles of the Eighth and Fourteenth Amendments, the tenets of the federal and state Constitutions, and the holdings of applicable state and federal case law.[24]

---

[24] The defense filed a pretrial motion objecting to the statutory scheme of the 10-12 Rule. (1 CR at 43.) The Court denied the defense's motion and all objections were overruled. (4 RR at 19.) Appellate counsel appealed the trial court's error in denying the defense motion. (*See* Appellate Opening Brief, Issue No. 47, at 131.) This claim is therefore raised here in order to further preserve review of this constitutional error at Cruz-Garcia's trial.

EXHIBIT 3 Page 171

## A. The Supreme Court Has Invalidated Jury Instructions That Place an Undue Burden on the Sentencer Before Finding Mitigating Circumstances

Two Supreme Court cases—*Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990)—stand for the proposition that a capital sentencing scheme cannot unduly burden a sentencer before he finds the presence of a mitigating circumstance.

In *Mills*, the Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. The Maryland scheme consisted of a verdict form in three sections: In Section I, the jury was asked whether it found unanimously one or more aggravating factors (out of ten aggravating factors listed), *Mills*, 486 U.S. at 385-86; in Section II, the jury was asked whether it found unanimously one or more mitigating factors, *id.* at 386-88; in Section III, the jury was asked to balance the aggravating factor(s) it found against the mitigating factor(s) it found, *id.* at 388-89. To proceed to Section II, the jury had to find unanimously one or more aggravating factors; if not, a life sentence would result. *Id.* at 386-88. To proceed to Section III upon completing Section II, the jury had to find unanimously one or more mitigating factors; if not, a death sentence would result. *Id.* at 389. Because a reasonable juror could have interpreted the instruction and accompanying verdict form as requiring unanimous agreement respecting each mitigating circumstance, the *Mills* Court adjudged this scheme unconstitutional. *Id.* at 384 ("Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."). Indeed, the Maryland scheme bore the additional risk that, even if all twelve jurors believed *some* mitigating circumstance

159

EXHIBIT 3 Page 172

: 00173

existed, the jury would be prevented from giving effect to any such circumstance unless they unanimously agreed on *which* circumstance(s) existed.

In *McKoy*, the Court likewise confronted a sentencing scheme that unduly burdened the jury's ability to reach a life sentence. The North Carolina sentencing scheme—more so than the Maryland one at issue in *Mills*—explicitly required the jury to find unanimously the presence of a mitigating factor. *Id.* at 435. This unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," violating the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

### B. Texas's 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence

Inconsistent with *Mills* and *McKoy*, Texas's 10-12 Rule permits a minority of a capital jury to impermissibly sway the verdict toward a sentence of death. It is perfectly within the realm of possibility that a majority of Cruz-Garcia's twelve jurors would have, at some point in the penalty phase deliberations, voted for a life sentence, but that a death sentence would have resulted by operation of the 10-12 Rule. Consider the following hypothetical: Jurors 1 through 5 initially would answer "No" to the future dangerousness special issue but, fearing a mistrial, they change their votes to "Yes," while Jurors 6 through 10 initially would answer "Yes" to the mitigating circumstances special issue but, also fearing a mistrial, they change their votes to "No." At each stage of the deliberations, both minorities-of-five are well short of the ten votes needed to reach a life sentence, yet together they constitute ten votes in favor of a life sentence.

One might suppose that jurors would surmise the actual outcome in the event that they fail to agree to an extent necessary to conclude their deliberations—that is, twelve votes for death or ten or more votes for life—but this supposition is

160

EXHIBIT 3 Page 173

belied by ample evidence collected by the Capital Jury Project in its interviews with capital jurors. As summarized in a 2003 article by that Project's principal investigator, 66% of interviewed Texas capital jurors incorrectly thought that they had to be convinced beyond a reasonable doubt on findings of mitigation; 73% incorrectly assumed that any findings on mitigation had to be unanimous; and 68% incorrectly believed that death was required if the defendant was determined to be dangerous in the future—the highest level of misunderstanding among the fourteen jurisdictions surveyed by the Capital Jury Project. William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51, 68, 71, 72-73 (2003). That Cruz-Garcia's jurors would presume a mistrial upon their failure to agree at sentencing is not merely thinkable, it is *probable*. The Texas sentencing scheme, by hiding from the jury the consequences of falling short of ten and twelve votes, gives rise to the very risk which animated the Court in *Mills* and *McKoy*. The 10-12 Rule, then, serves as an impediment to even a majority of jurors who desire a life sentence for the defendant, and it thereby tramples upon the protections of the Eight and Fourteenth Amendments. As the 10-12 Rule is an integral part to Texas's capital sentencing scheme, the scheme itself cannot withstand constitutional scrutiny.

### C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations

In addition to violating Supreme Court precedent in *Mills* and *McKoy* by giving improper weight to a minority voice among the jurors, Texas's 10-12 Rule functions as an impermissible outside influence which acts upon the jury as they deliberate. The rule misleads jurors as to the result of their failure to reach a statutorily-prescribed agreement and coerces them to favor a death sentence on the basis of considerations independent of a case's merits.

EXHIBIT 3 Page 174

A feature of American jurisprudence—one broadly understood by the public—is that when a jury is unable to agree, a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963). Because this option is both costly and cumbersome, the law expects that jurors will enter into their deliberations able to be swayed in their opinions. *Allen*, 164 U.S. at 501 . A reasonable juror should feel the weight of the instructions from the trial court and, consistent with their convictions, attempt to avoid an impasse.

In a capital case, the shadow of a mistrial understandably looms larger. Jurors cannot help but be aware of those cases' more involved procedures, improved safeguards, and greater expense. They experience first-hand the care taken by the State and the defense to select from the venire twelve jurors suitable for the high stakes of a capital trial. They are told to expect—and they usually sit through—a long trial with copious amounts of evidence and lengthy testimony from lay and expert witnesses alike. They are led to believe that distinguished and doubtlessly high-priced experts from a wide range of disciplines are not only available to testify but relevant to the trial's outcome.

In this setting a reasonable juror would be reluctant to force a mistrial, especially at that stage of the proceedings when the defendant's culpability already has been unanimously agreed to. But while the guilt/innocence phase of a capital trial tracks the public's understanding of the criminal law—*viz.*, acquittals and convictions must be unanimous—the penalty phase does not. Moreover, after being informed by the court that ten votes are necessary to answer the special issues in a way that favors a life sentence, it would be strange for a juror to conclude that fewer than ten such votes would achieve the very same result.

In Cruz-Garcia's case in particular, this scheme worked to deceive the jurors about the true nature of their deliberations and to influence their ultimate verdict

162

EXHIBIT 3 Page 175

: 00176

based on something other than a true deliberation on the evidence. The jurors noted the expense and effort that had gone into the trial, and assumed that the absence of a verdict would jeopardize all that work, causing a mistrial. (Ex. 23 at ¶5 [Aff. of Juror Torres] ("I think we all felt strongly that we had invested so much time and effort, and that it was our civic duty to support the process through to the final conclusion. There was, from what it appeared, no expense spared by the court to reach a conclusion."); Ex. 13 at ¶5 [Aff. of Juror Alexander].) The jurors did not know how long deliberations would last, but assumed it could take days or weeks if an agreement was not reached. (Ex. 14 at ¶5 [Aff. of Juror Bowman]; Ex. 22 at ¶3 [Aff. of Juror Sanchez].) For the juror who wished to vote for life without parole rather than death, the instructions created an untenable position where she believed her choice was to agree with the other jurors or to cause a mistrial. (Ex. 14 at ¶¶5, 7 [Aff. of Juror Bowman].) Rather than a debate about the merits of the evidence, in which each juror understood they were allowed to vote their conscience without interfering with the judicial system, Cruz-Garcia's punishment verdict ultimately rested on the jurors' discussion about how long one juror would continue to assert her opinion and the believed negative consequences if she did so. (Ex. 14 at ¶5 [Aff. of Juror Bowman]; Ex. 22 at ¶3 [Aff. of Juror Sanchez]; Ex. 23 at ¶5 [Aff. of Juror Torres].)

Texas's sentencing scheme not only denies jurors information about the effect of their vote but, by omission, invites them to assume that the consequence for failure to reach agreement pursuant to the 10-12 Rule is a costly mistrial, regardless of any one juror's belief that a life sentence is appropriate. For such a juror *not* to labor under this misapprehension demands a counter-intuition both unreasonable and nowhere else presumed in the law. Thus, rather than operate as an incentive to reach a verdict in a capital case, the 10-12 Rule functions as an outside influence against a juror's vote for mercy.

163

EXHIBIT 3 Page 176

## D. Conclusion

For the reasons stated above, the Texas death penalty scheme violates the principles of the Eighth and Fourteenth Amendments, the tenets of the federal and state Constitutions, and the holdings of applicable state and federal case law. Accordingly, Cruz-Garcia's death sentence was impermissibly imposed and should be vacated.

## CLAIM THIRTEEN

### CRUZ-GARCIA'S DEATH SENTENCE WAS ARBITARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE FIRST SPECIAL ISSUE

Texas employs a unique sentencing scheme which requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). The ABA has long recognized the problems with this first special issue. *See Barefoot v. Estelle*, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting) (citing the ABA amicus brief for the claim that jurors are not well suited to predict the probability of a defendant committing criminal acts of violence in the future). Most recently, the ABA released The Texas Capital Punishment Assessment Report, which called on Texas to "abandon altogether the use of the 'future dangerousness' special issue" as it and other aspects of the Texas sentencing scheme "place limits on a juror's ability to give full consideration to any evidence that might serve as a basis for a sentence less than death." ABA Texas Assessment Report at viii, xxxix ("ABA Texas Assessment Report").

Among the ABA's concerns with the Texas scheme is that the key terms of the first special issue are undefined. *See* ABA Texas Assessment Report at 308. Additionally, the ABA notes that juries must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of

164

EXHIBIT 3 Page 177

: 00178

mitigation, thus placing the first special issue "at the center of the jury's punishment decision." ABA Texas Assessment Report at 307.

The concerns raised by the ABA are consistent with violations of Cruz-Garcia's Eighth and Fourteenth Amendment rights as articulated in Supreme Court doctrine. The first special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the death penalty, and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death. As such, Cruz-Garcia's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights and United States Supreme Court and state case law, and must therefore be reversed.

## A. The First Special Issue is Unconstitutionally Vague and Fails to Narrow the Class of Death-Eligible Defendants

Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the first special issue. TEX. CODE CRIM. PROC. art. 37.071. As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder case." ABA Texas Assessment Report at viii.

The Supreme Court has long held that juror discretion must be channeled in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). In *Godfrey v. Georgia*, the Court held that a state's aggravating factors must not be defined in such a way that people of ordinary sensibilities could find that nearly every murder

165

EXHIBIT 3 Page 178

met the stated criteria. 446 U.S. 420, 428-29 (1980). In order to avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer." *McCleskey*, 481 U.S. at 303 (internal citations and quotation omitted); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

While the first special issue is not presented to the jury until the punishment phase of trial, it must be found beyond a reasonable doubt before mitigating evidence may be considered. TEX. CODE CRIM. PROC. art. 37.071 § 2(b)–(e). Accordingly, it acts as a *de facto* determinant of death-eligibility and therefore must meaningfully narrow the class of death-eligible defendants.

Texas does not statutorily define the key terms in the first special issue. Rather, the terms are left to be interpreted according to their ordinary meaning. *See Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007). Absent a statutory definition to the contrary, the term "probability" is reasonably understood to mean some "likelihood of the occurrence of any particular form of an event." *Granviel v. State*, 552 S.W.2d 107, 117 n. 6 (Tex. Crim. App. 1976); *see also Jurek v. State*, 522 S.W.2d 934, 945 (Tex. Crim. App. 1975) (Odom, J., dissenting) *aff'd sub nom. Jurek v. Texas*, 428 U.S. 262 (1976) ("The statute does not require a particular degree of probability but only directs that some probability need be found.").

Neither is the degree of violence specified. "Criminal acts of violence" could reasonably range from capital murder all the way down to simple assault. *See* Christopher Slobogin, *Capital Punishment and Dangerousness, in* MENTAL

166

EXHIBIT 3 Page 179

DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119, 121, 125 (Robert F. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and "criminal acts of violence"). Essentially, the jury charged with determining Cruz-Garcia's fate was asked to determine whether there is any likelihood that Cruz-Garcia might commit *any* act of violence in the future that poses a continuing threat to society. Professionals, however, are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person that was just convicted of a violent crime. *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials,* 54 ALB. L. REV. 845, 849 (1989-1990) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional. That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another."). Even when predictions are based on actuarial data, which are now considered to be slightly more accurate than clinical determinations, a defendant's risk of committing future acts of criminal violence is phrased in terms of non-zero probabilities. *See, e.g.,* Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines,* J. FORENSIC PSYCHOL. PRAC., May 2012, at 272 ("[Mental Health Professionals] are encouraged to communicate level of risk using categorical levels of low, moderate, and high.").

The fact that every person has a non-zero probability of committing future acts of violence shows that the first special issue fails to narrow the class of death-eligible defendants. Moreover, the fact that any capital defendant is found *not* to be a future danger is evidence that the determination is based on caprice rather than reason. In Cruz-Garcia's case, the fact that this dubious determination had to be made beyond a reasonable doubt before the jury was presented with the mitigation special issue limited the jury's ability to give full consideration to evidence that

167

EXHIBIT 3 Page 180

might serve as a basis for a sentence less than death. *See Tennard*, 542 U.S. at 278 ("It is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing the sentence.").

As a result, Cruz-Garcia's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, and therefore must be reversed.

**CLAIM FOURTEEN**

**CRUZ-GARCIA'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'S ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY**

As actors within Texas's criminal justice system, prosecutors exercise considerable discretion. Partly as a consequence of this discretion, a small minority of Texas's counties are responsible for an overwhelming majority of the death sentences that have been assessed in the past thirty-nine years. In addition to this geographic disparity—a disparity that cannot be explained merely by reference to county populations—Texas's system of administering the death penalty also reflects disparities based on race and ethnicity, particularly in Harris County where Cruz-Garcia was convicted. Thus, whereas sentences of death are perforce reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one. As Cruz-Garcia received his capital sentence by operation of this arbitrary system, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Cruz-Garcia's sentence therefore violates his applicable rights under the Texas and United States Constitutions, just as it violates Texas statutory law and United States Supreme Court and Texas case law. Accordingly, Cruz-Garcia's sentence should be reversed.

168

EXHIBIT 3 Page 181

: 00182

## A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

Over forty years ago, the Supreme Court briefly suspended imposition of the death penalty throughout the United States. *See Furman v. Georgia*, 408 U.S. 238, 239 (1972) (per curiam). Four years later, the Court validated newly-enacted capital punishment statutes which included safeguards against the "arbitrariness and caprice" that had animated the Court in *Furman*. *Gregg*, 428 U.S. at 189 (plurality opinion) ("*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). While capital juries would enjoy some discretion in reaching their determinations regarding sentencing, their discretion under the new statutes would be "'controlled by clear and objective standards so as to produce non-discriminatory application.'" *Id.* at 196 (quoting *Coley v. State*, 204 S.E.2d 612, 615 (Ga. 1974)). Accordingly, the plurality in *Gregg* supposed, juries' decisions no longer would suffer from a lack of guidance and narrowing considerations as to who should receive the death penalty, and this, in turn, would do away with the arbitrariness which *Furman* found constitutionally intolerable. *Id.* at 309 (Stewart, J., concurring) (likening imposition of a death sentence to "being struck by lightning"); *see also Jurek*, 522 S.W.2d at 940 ("If discretion in the assessment of punishment under a statute can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman* will be met."), *aff'd sub nom. Jurek v. Texas*, 428 U.S. 262 (1976).

In the intervening decades, the Supreme Court has continued to examine capital sentencing schemes to determine whether they include suitable safeguards to prevent the arbitrary assignment of death sentences. *See, e.g., California v.*

169

EXHIBIT 3 Page 182

: 00183

*Brown*, 479 U.S. 538, 541 (1987); *Mills*, 486 U.S. at 374. At the same time, the Court has rejected mandatory sentencing determinations in capital cases because "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (internal citations omitted); *see also Penry I*, 492 U.S. at 319 ("*Eddings* [*v. Oklahoma*] makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger*, [481 U.S. 393 (1987)]."). Far from being contradictory, the simultaneous pursuit of these objectives ensures that death is a penalty neither wanton nor freakish. And while certain procedural reforms—bifurcated capital trials, a narrowing of death-eligible crimes, appellate review for sentencing proportionality—continue to pass constitutional muster, others have proven themselves inadequate to the task of "minimiz[ing] the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. *Compare Jurek*, 428 U.S. at 275 (approving Texas's guided-discretion statute), *with Penry I*, 492 U.S. at 328 (disapproving same); *compare Gregg*, 428 U.S. at 189 (approving Georgia's guided-discretion statute), *with Godfrey*, 446 U.S. at 432-33 (plurality opinion) (disapproving same).

In a nutshell, then, capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson*, 428 U.S. at 303. When these schemes lack such standards, or when such standards fail in their application, or when "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," it cannot be maintained that the imposition of a death sentence was "based on reason rather than caprice or

170

EXHIBIT 3 Page 183

emotion." *Godfrey*, 446 U.S. at 433.

## B. Texas's Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas's death penalty statute in *Jurek v. Texas* in 1976, having concluded that the state's bifurcation of the guilt/innocence and penalty phases and narrowing of death-eligible crimes "provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek*, 428 U.S. at 276. This judgment has not withstood the scrutiny of later cases. *See, e.g.*, *Penry I*, 492 U.S. at 302 (invalidating Texas's statute for failing to instruct juries that they may consider mitigating evidence); *Penry II*, 532 U.S. at 782 (invalidating Texas's supplemental instruction on mitigation for failing to provide the jury with a sufficient mechanism to consider mitigating evidence). Were a court to review the current operation of Texas's capital punishment system, it would find the same "struck by lightning" phenomenon which so troubled the Court in *Furman*.

In 2013, 1,151 murders were committed in Texas. Tex. Dep't Pub. Safety, *Index Crime Analysis 2013*, http://dps.texas.gov/crimereports/13/citCh3.pdf (last visited August 19, 2015). And yet, only nine death sentences were assessed by Texas juries in that same year.[25] Tex. Dep't Crim. Just., *Offenders on Death Row*, https://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last visited August 19, 2015). The number of death sentences assessed throughout the state has declined significantly in the past three decades. *See id.* Within these statistics, however, one finds at work factors that have no place in the "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

## 1. Geography

Since 1976, 1,092 defendants have been sentenced to death in Texas. Tex.

---

[25] Similarly disparate statistics are expected for 2014 and 2015. As of this filing, however, crime statistics for 2014 have not yet been published.

171

EXHIBIT 3 Page 184

: 00185

Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death from Each County*,

http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html

(last visited August 19, 2015).  Collectively, less than half of Texas's 254 counties account for these 1,092 sentences.  *Id.* (listing 120 Texas counties).  Four counties—Harris, Dallas, Bexar, and Tarrant—account for over 50% of these defendants, as well as for almost 49% of those who have been executed.  Tex. Dep't Crim. Justice, *County of Conviction for Executed Offenders*, https://www.tdcj.state.tx.us/death_row/dr_county_conviction_executed.html (last visited June 15, 2015) (257 out of 526).  In the past thirty-nine years, 214 of Texas's 254 counties (84%) have sentenced someone to death three times or less, or not at all.  Tex. Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death         from         Each         County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited August 19, 2015).

Texas is not alone in this phenomenon.   Multiple studies conducted throughout the country have identified intra-state geographic discrepancies in the imposition of the death penalty.[26]  *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010) (discussing studies in Arizona, Missouri, Pennsylvania, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For*

---

[26] These observations are, of course, distinct from the *inter*-state geographic discrepancies in the imposition of the death penalty.  *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique.  The result is that—not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty—significant discrepancies exist among the death penalty jurisdictions.").

EXHIBIT 3 Page 185

: 00185

*Eliminating Counties' Role in the Death Penalty*, http://works.bepress.com/ adam_gershowitz/5 (2009).  In one study, the researchers found that, over a four-year period in Missouri, 76% of cases charged as either first-degree murder, second-degree murder, or involuntary manslaughter met that State's statutory definition to be eligible for the death penalty.  Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-11 (2009).  However, only 5% of those cases occasioned a death penalty trial.  *Id.* at 309.  As a result, prosecutors throughout the state made the decision not to seek death in 95% of death-eligible cases.  *Id.*  This discretion was not spread evenly, however, as prosecutors in the City of St. Louis and Jackson County (where Kansas City is located) charged capital cases far less frequently (6.5%) than prosecutors in the rest of the state (20%).[27]  *Id.* at 344.

In *Jurek* and in *Gregg*, the Supreme Court considered whether impermissible arbitrariness in capital sentencing resulted from prosecutorial discretion to choose those cases in which a death sentence would be sought.  *Gregg*, 428 U.S. at 199; *Jurek*, 428 U.S. at 274.  The Court determined that this decision-making served to remove defendants from the risk of death and did not violate the U.S. Constitution, provided the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."  *Gregg*, 428 U.S. at 199.  Justice White, in his concurrence, noted that the decision of prosecutors would likely reflect that of juries and be rooted in the seriousness of the offense:

---

[27]  A commission created to examine the fairness of New Jersey's capital punishment system likewise noted its concerns regarding "the existence of variability among counties in the application of the death penalty."  N.J. Death Penalty Study Comm., *New Jersey Death Penalty Commission Report* 43 (2007), *available at* http://www.njleg.state.nj.us/ committees/dpsc_final.pdf.

EXHIBIT 3 Page 186

: 00187

> Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

The experience of the last thirty-nine years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. It strains credulity to believe that Texas's four most populous counties—where 50% of Texas's post-1976 death-row cases originated—have had as many heinous crimes within their geographical limits as have Texas's 250 remaining counties. Far more likely, factors such as ideology, experience litigating capital cases, and resource availability exert significant influence on prosecutors' decisions to seek the death penalty. *See* Gershowitz, *supra* at 11-15 (noting several instances in which prosecutors have declined to pursue the death penalty based on resource limitations).

The influence of these factors within Texas's capital punishment system has undermined the Supreme Court's expectations, voiced in *Jurek*, that this system would be an "evenhanded, rational, and consistent" one. *Jurek*, 428 U.S. at 276. Thirteen years after *Jurek*, the Court began to recognize the error in its assumption that Texas's system would, in practice, answer the several concerns expressed by a majority of the justices in *Furman*. *Compare Jurek*, 428 U.S. at 272 (expressing confidence that the Texas Court of Criminal Appeals would "interpret [the statutory special issue] so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"), *with Penry I*, 492 U.S. at 318 (finding inadequate and therefore unconstitutional the statutory special

174

EXHIBIT 3 Page 187

: 00188

issues). The geographic disparities in the imposition of the death penalty in Texas offer equally compelling grounds to abandon the belief that prosecutorial discretion will produce a consistent application of the law.

## 2. Race

In addition to geography, studies continue to show that race is a motivating factor both behind the seeking of death sentences and behind jury verdicts in capital cases. *See, e.g.*, David Baldus, et al., *Race and Proportionality Since McCleskey v. Kemp (1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims).

This fact is especially evident in the application of the death penalty in Harris County, where Cruz-Garcia was convicted. In the last decade, the only defendants sentenced to death in Harris County have been of non-white races, except for white defendants already on death row receiving a re-trial. What's more, preliminary analysis of TDCJ data suggests that Harris County did not even choose to seek a new death sentence against a white defendant in the past decade. Given that in that same decade there were over 1,300 convictions for murder and capital murder, it raises a reasonable inference that the complete absence of seeking and/or receiving a death sentence for white defendants in Harris is attributable in some manner to race-based decision-making.

This improper decision-making extends to juries in Harris County as well. One study specific to Texas examined the influence of race in Harris County capital cases from 1992 to 1999. Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008). Using statistical techniques

175

EXHIBIT 3 Page 188

: 00189

to control for potential confounders,[28] the study showed that "black defendants who committed crimes *less* likely to lead to a death trial tended to face a capital trial *more* frequently than their white and Hispanic counterparts." ABA Texas Assessment Report (citing Phillips, 45 HOUS. L. REV. at 830). A defendant also faced increased odds of receiving a death sentence if he was black than if he was white or Hispanic. Phillips, 45 HOUS. L. REV. at 834. The study also confirmed that, in Harris County within the eight-year period, those convicted of killing a white victim were more likely to receive a death sentence than those convicted of killing a black victim. *Id.*

A subsequent study conducted largely the same analysis for the period beginning January 1, 2001, and ending February 15, 2008. Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUS. L. REV. 131, 134 (2012). While the race of the defendant no longer appeared to influence the prosecution's charging decisions and the juries' sentencing decisions, the race of the victim still proved to be a controlling factor. *Id.* at 148. Specifically, this study found that "the death penalty was imposed on behalf of white victims at more than twice the rate one would expect if the system were blind to race, and . . . on behalf of white female victims at more than five times the rate one would expect if the system were blind to race and gender." *Id.* at 150.

In a third, national study—one that used a controlled experiment to examine the subtle influence of race on juror decision-making—researchers at the University of California at Berkeley found that members of a random sample of 276 adults were more inclined, after reviewing a file summary of a triple-murder

---

[28] Potential confounders include "the social characteristics of the defendant, the social characteristics of the victim, and the legal dimensions of the case." Phillips, 45 HOUS. L. REV. at 822-27.

176

EXHIBIT 3 Page 189

case and being told that the maximum punishment was death, to find a defendant guilty based on the evidence provided if the defendant had a name traditionally associated with minorities (e.g., Darnel, Lamar, Terrell) than if he had a more race-neutral name (e.g., Andrew, Frank, Peter). Jack Glaser, et al., *Possibility of Death Sentence Has Divergent Effect on Verdicts for Black and White Defendants* 5-6 (June        24,        2009),        *available*        *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1428943. By contrast, other members of that same random sample were no more likely, after reviewing that same file and being told that the maximum punishment was life without possibility of parole, to find a defendant guilty if his name happened to be one traditionally associated with minorities. *Id.*

Although the precise causal mechanism at work only could be guessed at, the researchers nevertheless postulated that "a more severe penalty raises the juror's estimated 'cost' of a wrongful conviction." *Id.* (citing N. Kerr, *Severity of Prescribed Penalty and Mock Jurors' Verdicts*, 36 J. PERSONALITY & SOC. PSYCH. 1431 (1978)). Or, perhaps, "for participants with Black defendants, wrongful conviction was a lesser concern, and instead the death penalty reinforced the brutality of the crime." *Id.* at 6. Still more perverse, "capital punishment may feel more appropriate for Black defendants, given that they are overrepresented on death row, and [] research has indicat[ed] that convicted capital defendants who look more stereotypically Black are more likely to be given a death sentence." *Id.* (citing Jennifer L. Eberhardt, et al., *Looking Deathworthy*, 17 PSYCH. SCI. 383 (2006)).

Whatever the participants' motivation, the conclusion compelled by these statistics and studies is inescapable: Race continues to influence the imposition of the death penalty, regardless of whether that influence is conscious or unconscious. When a law is applied in such a way that it becomes more directed at a "particular

177

EXHIBIT 3 Page 190

: 00191

class of persons"—particularly when that class of persons is distinguished by race—the application of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

## C. Conclusion

For the foregoing reasons, Texas's death penalty scheme is unconstitutional. Therefore, Cruz-Garcia's sentence of death should be vacated.

178

EXHIBIT 3 Page 191

: 00192

## V.

## PRAYER FOR RELIEF

WHEREFORE, Obel Cruz-Garcia prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of his claims;

2. Vacate his death sentence and conviction;

3. Grant any other relief that law or justice may require.

Respectfully submitted,[29]

DATED:     August 27, 2015

By _Robert Romig_

Robert Romig
Post-Conviction Attorney


By _____

Joanne Heisey
Post-Conviction Attorney

---

[29] The OCW wishes to acknowledge post-conviction fellow Laura Schaefer for her contribution to this pleading.

179

EXHIBIT 3 Page 192

: 00193

STATE OF TEXAS §
COUNTY OF DALLAS §

VERIFICATION

BEFORE ME, the undersigned authority, on this day personally appeared Robert Romig, who upon being duly sworn by me testified as follows:

1.    I am a member of the State Bar of Texas.

2.    I am the duly authorized attorney for Obel Cruz-Garcia, having the authority to prepare and to verify Obel Cruz-Garcia's Application for Post-Conviction Writ of Habeas Corpus.

3.    I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

_____
Robert Romig

SUBSCRIBED AND SWORN TO BEFORE ME on this 27th day of August, 2015.



ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018
Notary without Bond

_____
Notary Public, State of Texas

180

EXHIBIT 3 Page 193

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Application for Writ of Habeas Corpus to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on August 27, 2015, at Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Robert Romig_

Robert Romig

181

EXHIBIT 3 Page 194
: 00195