# IN THE 337th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

COURTESY COPY

### AND

This document contains some pages that are of poor quality at the time of imaging.

## IN THE TEXAS COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

| | | |
|---|---|---|
| _____ | ) | Trial Cause No. |
| | ) | 1384794 |
| EX PARTE | ) | |
| Obel Cruz-Garcia, | ) | MAY 04 2016 |
| APPLICANT | ) | |
| | ) | |
| _____ | ) | Abel Acosta, Clerk |

## SUBSEQUENT APPLICATION FOR A WRIT OF HABEAS CORPUS FILED PURSUANT TO ART. 11.071, § 5, AND ART. 11.073 OF THE TEXAS CODE OF CRIMINAL PROCEDURE

### This is a death penalty case.

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocfw.texas.gov)
Post-Conviction Attorney
GRETCHEN SWEEN (No. 24041996)
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Applicant*

EXHIBIT 4 Page 001

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

II.     FACTUAL BACKGROUND................................................ 3

A.      The State's Evidence at Trial.............................................. 3

        1.      The State's eyewitness testimony exculpates Mr. Cruz-Garcia........... 3

        2.      The State's DNA evidence seemed to inculpate Mr. Cruz-Garcia ...... 4

B.      Evidence Uncovered in Post-Conviction......................................... 6

        1.      The new scientific evidence supports the defense's theory ................. 6

        2.      The new scientific evidence bolsters other evidence only uncovered
                during the post-conviction investigation ............................................ 8

III.    LEGAL STANDARDS ........................................................... 9

IV.     CLAIMS FOR RELIEF ......................................................... 12

A.      Mr. Cruz-Garcia Is Entitled to Relief under Article 11.073......................... 12

        1.      The amended lab report was not available to Mr. Cruz-Garcia at trial,
                and it also contradicts scientific evidence the State relied on at trial........... 12

        2.      The relevant scientific evidence was not ascertainable through the
                exercise of reasonable diligence as of the date Mr. Cruz-Garcia filed his Initial
                Application.................................................................................................. 13

        3.      The new scientific evidence would be admissible under the Texas Rules
                of Evidence ....................................................................................... 14

        4.      Had the new scientific evidence been presented at trial, Mr. Cruz-
                Garcia would not have been convicted........................................................ 15

B.      Mr. Cruz-Garcia Is Entitled to a New Trial Because His Conviction Was
        Based on False, Misleading, and Scientifically Invalid Testimony ............. 19

        1.      The Chabot/Chavez standard................................................................. 19

i

EXHIBIT 4 Page 002

2.    Chabot/Chavez standard is satisfied.................................................. 21

V.    PRAYER FOR RELIEF ................................................................. 25

CERTIFICATE OF COMPLIANCE ..................................................... 27

CERTIFICATE OF SERVICE .......................................................... 27

EXHIBIT 4 Page 003

# TABLE OF AUTHORITIES

**Federal**

*Brady v. Maryland*, 373 U.S. 83 (1963)................................................... 22
*Johnson v. Mississippi*, 486 U.S. 578 (1988).......................................... 20
*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................... 22
*Smith v. Cain*, 132 S. Ct. 627 (2012) ................................................... 22
*Townsend v. Burke*, 334 U.S. 736 (1948) .............................................. 20

**State**

*Blake v. State*, 971 S.W.2d 451 (Tex. Crim. App. 1998)........................ 18
*Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010)..................... 20
*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009)............ 19, 20, 21
*Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012)............ 19, 20, 22
*Ex parte Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996). ............ 20, 24
*Ex parte Ghahremani*, 332 S.W.3d 470 (Tex. Crim. App. 2011)...... 20, 24
*Ex parte Graf*, AP-77003, 2013 WL 1232197 (Tex. Crim. App. Mar. 27, 2013).. 23
*Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012)......... 22, 23
*Ex parte Oranday-Garcia*, 410 S.W.3d 865 (Tex. Crim. App. 2013)........ 10
*Ex parte Robbins*, 478 S.W.3d 678 (Tex. Crim. App. 2015)......... 10, 13, 14, 23
*Ex parte Weinstein*, 421 S.W.3d 656 (Tex. Crim. App. 2014)......... 20, 22

**Statutes**

TEX. CODE CRIM. PROC. art. 11.071 ....................................................... 10
TEX. CODE CRIM. PRO. art. 11.073 ................................................... 10, 12
TEX. R. EVID. 703 ............................................................................... 15

**Other Authorities**

*Texas reviewing thousands of DNA cases that used outdated method for calculating odds*, Dallas Morning News (Jan. 31, 2016)....................................... 7

EXHIBIT 4 Page 004

## SUBSEQUENT APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a death penalty case.

### I.    INTRODUCTION

The case against Obel Cruz-Garcia was a cold case that was ostensibly "cracked" in reliance on DNA evidence that has now been debunked. Without that false, scientifically unreliable evidence, the State's case against Mr. Cruz-Garcia collapses.

Twenty-two years after the fact, on July 15, 2013, Mr. Cruz-Garcia was convicted of the 1992 capital murder of Angelo Garcia. 23 RR at 101.[1] The State's DNA evidence was the *only* physical evidence purportedly linking Mr. Cruz-Garcia to the crime. Indeed, the State presented evidence that Angelo Garcia's 1992 murder had gone unsolved until 2008, when the Houston Police Department ("HPD") obtained a DNA sample from Mr. Cruz-Garcia and compared it to evidence collected years ago at the crime scene. 20 RR at 51, 55-56.

The reputedly inculpatory DNA evidence that the State relied upon at trial has, however, proven to be false. Mr. Cruz-Garcia's conviction reflects widespread problems with the way labs nationwide had been making "DNA mixture" interpretations until recently. After the FBI blew the whistle with respect to these

---

[1] "RR" refers to the Reporter's Record in Mr. Cruz-Garcia's trial.

1

EXHIBIT 4 Page 005

serious flaws in methodology, the Texas Forensic Science Commission ("FSC") took up the issue. *See* Ex. A at 1. The FSC's attention then prompted labs to revisit their calculations; in many instances, amended lab reports followed. For instance, we now know that the DNA evidence used to convict Mr. Cruz-Garcia was false. *See* Ex. B [Email from Harris County ADA Lori DeAngelo (Nov. 3, 2015)]; Ex. C at 1 [Amended Laboratory Rpt. (Nov. 3, 2015)].

According to the amended lab report at issue here, no conclusions can now be drawn with respect to one of the two reputedly inculpatory items of DNA evidence presented at trial. With respect to the second item, the amended lab report now points to a second unknown contributor to the DNA mixture—most likely belonging to the actual perpetrator. This new evidence casts considerable doubt on Mr. Cruz-Garcia's guilt and wholly undermines any confidence in the result of his capital murder trial. The amended lab report was not provided to Mr. Cruz-Garcia's counsel until after his Initial Application was filed.

This Subsequent Application raises two distinct constitutional and statutory claims for relief based on the newly available scientific evidence as follows:

- New scientific evidence establishes by a preponderance of the evidence under Article 11.073 that Mr. Cruz-Garcia would not have been convicted.

- Additionally, because the State relied on false, misleading, and scientifically invalid testimony, Mr. Cruz-Garcia's right to due process under *Ex parte Chabot* and *Ex parte Chavez* was violated.

Each of these claims entitles Mr. Cruz-Garcia to a new trial.

2

EXHIBIT 4 Page 006

## II.   FACTUAL BACKGROUND

### A. The State's Evidence at Trial

At trial, the State presented both eyewitness testimony that tended to

exculpate Mr. Cruz-Garcia and DNA evidence that was characterized as inculpatory.

### 1.   The State's eyewitness testimony exculpates Mr. Cruz-Garcia

The State presented evidence from the two surviving eyewitnesses/crime

victims.  First, the decedent's mother, Diana Garcia, testified that, on the night of

September 30, 1992, two men entered the bedroom where she, her common-law

husband, Arturo Rodriguez, and her son, Angelo, were sleeping.  18 RR at 120, 144-

53.  Ms. Garcia testified that one of the men beat Mr. Rodriguez unconscious while

the other one sexually assaulted her.  *Id.* at 153-58.  Second, Mr. Rodriguez testified

about the incident.  *Id.* at 205-219.  Both Ms. Garcia and Mr. Rodriguez testified that

Mr. Cruz-Garcia was a friend of theirs for whom they had sold drugs.  *Id.* at 129-38,

199-205.  Both testified that Mr. Cruz-Garcia frequently visited their apartment, and

Ms. Garcia testified that, according to Mr. Rodriguez, Mr. Cruz-Garcia had been at

their apartment earlier that day.  *Id.* at 138, 144-45, 201.

Ms. Garcia and Mr. Rodriguez further testified that the men who assaulted

them were wearing masks and that ***they were unable to identify them***.  *Id.* at 151-

62, 208-15.

Moreover, two HPD officers who responded to the scene testified that Ms.

Garcia and Mr. Rodriguez described their attackers as two black males.  *Id.* at 54,

3

EXHIBIT 4 Page 007

102.  Yet Mr. Cruz-Garcia is a light-skinned Latino from the Dominican Republic. 3 RR at 76.

In sum, the testimony of the eyewitnesses did not inculpate Mr. Cruz-Garcia; that evidence did the opposite.  Therefore, that evidence had to be countered by other evidence to suggest any basis for convicting Mr. Cruz-Garcia.

### 2.  The State's DNA evidence seemed to inculpate Mr. Cruz-Garcia

The State also presented the testimony of Matt Quartaro, a DNA analyst at forensic testing lab Orchid Cellmark, which conducted the DNA analysis in this case in 2007 and 2008.  Mr. Quartaro testified to Orchid Cellmark's analysis of items of evidence that had been collected during the criminal investigation, including a cigar that had been recovered from Ms. Garcia and Mr. Rodriguez's apartment, vaginal swabs from a sexual assault kit that was taken from Ms. Garcia the night of the assault, and a cutting from Ms. Garcia's panties.  21 RR at 105-20.  Mr. Quartaro testified that Orchid Cellmark's analysis resulted in a finding that Mr. Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction obtained from the vaginal swabs was a mixture of multiple individuals, from which neither Mr. Cruz-Garcia nor Mr. Rodriguez could be excluded as contributors; and that the sperm cell fraction obtained from the cutting of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia was a major contributor and Mr. Rodriguez could not be excluded as a minor contributor.  *Id.* at 119-20.

4

EXHIBIT 4 Page 008

The State then presented the testimony of Courtney Head, a criminalist with the HPD crime lab. Ms. Head testified that in 2010 she had performed a DNA extraction on a buccal swab taken from Mr. Cruz-Garcia and compared the DNA profile she obtained of Mr. Cruz-Garcia to the DNA profiles that Orchid Cellmark had obtained from the cigar, the vaginal swabs, and the panties. 21 RR at 156-59. Ms. Head testified that based on her comparisons, Mr. Cruz-Garcia could not be excluded as a contributor to the DNA found on the cigar; that Mr. Cruz-Garcia could not be excluded as a contributor to the mixture DNA profile obtained from the sperm cell fraction of the vaginal swabs; and that the DNA profile obtained from the sperm cell fraction of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia could not be excluded as a contributor to the major component. 21 RR at 161-62.

At trial, defense counsel suggested (but failed to substantiate) that Ms. Garcia had had a consensual sexual relationship with Mr. Cruz-Garcia; this theory was offered as an alternative explanation for the presence of his DNA on the vaginal swabs and the panties. *See, e.g.*, 19 RR at 21; 21 RR at 134-35; 23 RR at 48-50. However, the State's experts had testified that the second contributor to the DNA mixtures on these two items was Ms. Garcia's husband, Mr. Rodriguez, leaving no alternative party to point to as the actual perpetrator of the sexual assault other than Mr. Cruz-Garcia. Therefore, defense counsel's argument did not substantiate the

5

EXHIBIT 4 Page 009

position that he was not guilty.  In closing argument, the State emphasized this *ipse dixit*, invoking its DNA evidence as the necessary link in the chain supporting the State's version of events:

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth—and there is no evidence of that—where is the DNA of the guy who raped Diana?  Where is it?  Why don't we have it?  If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

The only physical evidence that seemed to connect Mr. Cruz-Garcia to the crime was the DNA evidence.

### B. Evidence Uncovered in Post-Conviction

#### 1. The new scientific evidence supports the defense's theory

The DNA evidence that was used to convict Mr. Cruz-Garcia has now been superseded by new DNA evidence.

On August 21, 2015, it became generally known in Texas that the methodology Texas labs had been using to calculate DNA mixtures might be problematic.  On that day, the FSC announced to members of the Texas criminal justice community its "concerns involv[ing] the interpretation of DNA results where multiple contributors may be present, commonly referred to as DNA mixture interpretation."  Ex. A at 1.  Specifically, these concerns involved the widespread failure of Texas labs to calculate the "Combined Probability of Inclusion" using the current consensus methodology so as to determine the odds that a particular person

6

EXHIBIT 4 Page 010

had left DNA at a crime scene. *Id.* The muted announcement has since led to a scandal—and the need to revisit thousands of convictions that had hinged on DNA evidence.[2]

In the wake of the announcement, the Houston Forensic Science Center (formerly the HPD crime lab) revisited the DNA analysis that had been performed before Mr. Cruz-Garcia's trial. That query resulted in an amended laboratory report, which was sent to post-conviction counsel on November 3, 2015. *See* Ex. B; Ex. C at 1. That is, news that the specific evidence used to convict Mr. Cruz-Garcia was false reached his post-conviction attorneys over two months after his Initial Application under Article 11.071 had been filed.

The amended lab report that post-conviction counsel received reveals serious issues with the two seemingly inculpatory pieces of DNA evidence upon which the State's case depends. The amended lab report notes that, with respect to the vaginal swabs taken from Ms. Garcia, *"**No conclusions will be made given the excessive number of contributors to this DNA mixture**."* Ex. C at 2 (emphasis added). As for the sperm cell fraction of the DNA mixture taken from her panties, the amended lab report notes that, while Mr. Cruz-Garcia cannot be excluded as a possible

---

[2] *See, e.g., Texas reviewing thousands of DNA cases that used outdated method for calculating odds*, Dallas Morning News (Jan. 31, 2016), *available at http://www.dallasnews.com/news/crime/headlines/20160131-texas-reviewing-thousands-of-dna-cases-that-used-outdated-method-for-calculating-odds.ece.*

7

EXHIBIT 4 Page 011

contributor to the major component of the DNA mixture, *"[n]o conclusions will be made regarding the minor component of this DNA mixture due to insufficient data." Id.* (emphasis added).[3]

## 2. The new scientific evidence bolsters other evidence only uncovered during the post-conviction investigation

Before receiving the amended lab report, Mr. Cruz-Garcia had uncovered new evidence during the post-conviction investigation that supports the theory that the defense had offered at trial regarding the appropriate inference suggested by the DNA evidence. New evidence, presented in his Initial Application, shows that Ms. Garcia had, in fact, been having an ongoing consensual sexual relationship with Mr. Cruz-Garcia before the crime occurred. Several lay witnesses who knew both Ms. Garcia ("Diana") and Mr. Cruz-Garcia ("Chico")[4] at the time of the crime have attested to the affair:

---

[3] As to the DNA profile obtained from the cigar that was recovered from Ms. Garcia and Mr. Rodriguez's apartment, the amended lab report is consistent with the DNA analysts' trial testimony that Mr. Cruz-Garcia cannot be excluded as a contributor. Because testimony at trial established that Mr. Cruz-Garcia was a frequent visitor to the apartment and had, in fact, visited the apartment earlier on the day of the crime, this evidence is neither inculpatory nor exculpatory. Moreover, there is no tie between the cigar and the crimes charged: neither Ms. Garcia nor Mr. Rodriguez suggested, for instance, that one of the two assailants smoked a cigar before, during, or after the assaults. In other words, that evidence is not relevant to the identity of the masked individual who sexually assaulted Ms. Garcia.

[4] Throughout trial, starting with the State's opening statement, Mr. Cruz-Garcia was referred to as "Chico." *See, e.g.,* 18 RR at 33 ("sitting in that interview room, Diana Garcia told the officers: We sold drugs for that man, Obel Cruz-Garcia; Chico, as he was known by many of his friends and associates.")

8

EXHIBIT 4 Page 012

- "Diana was also messing around with other guys, including Chico....The time period that Chico and Diana were having sex was around the same time Angelo was kidnapped." Ex. D at ¶4.

- "Around the time Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana." Ex. E at ¶3;

- "I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel." Ex. F at ¶6.

This evidence is now corroborated by the new DNA evidence.

Although Mr. Cruz-Garcia's counsel had argued at trial that Mr. Cruz-Garcia's DNA was left during a consensual sexual encounter, the jury could not have credited this theory at trial in the face of the State's unrebutted testimony that the DNA of only two men was found in Ms. Garcia's panties—the other being her husband, Mr. Rodriguez, who was allegedly being beaten during the sexual assault. Therefore, the jury could only draw one reasonable conclusion from that evidence: since, under the circumstances, Mr. Rodriguez could not have perpetrated the sexual assault, the likely perpetrator of the sexual assault was Mr. Cruz-Garcia. But that reasonable inference becomes wholly *unreasonable* in light of the amended lab report that suggests an unknown third-party was the rapist.

### III.   LEGAL STANDARDS

Under Article 11.071, of the Texas Code of Criminal Procedure, a court can consider the merits of a subsequent application for habeas relief if:

> the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously

9

EXHIBIT 4 Page 013

considered application filed under this article or Article 11.07 because
the factual or legal basis for the claim was unavailable on the date the
applicant filed the previous application

TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(1).

Article 11.073 also provides a new legal basis for habeas relief "where the
applicant can show by the preponderance of the evidence that he or she would not
have been convicted if the newly available scientific evidence had been presented at
trial." *Ex parte Robbins*, 478 S.W.3d 678, 690 (Tex. Crim. App. 2015). The
applicant must also establish "that the facts he alleges are at least minimally
sufficient to bring him within the ambit of the new legal basis for relief." *Ex parte
Oranday-Garcia*, 410 S.W.3d 865, 867 (Tex. Crim. App. 2013).

Article 11.073 provides for a procedure related to certain scientific evidence
that "(1) was not available to be offered by a convicted person at the convicted
person's trial; or (2) contradicts scientific evidence relied on by the state at trial."
TEX. CODE OF CRIM. PRO. art. 11.073(a). The Court may grant relief on an
application for a writ of habeas corpus filed in the manner provided for by, *inter alia*,
Article 11.071. The application must contain specific facts indicating that:

> (A)  relevant scientific evidence is currently available and was
> not available at the time of the convicted person's trial because the
> evidence was not ascertainable through the exercise of reasonable
> diligence by the convicted person before the date of or during the
> convicted person's trial; and

> (B)  the scientific evidence would be admissible under the Texas
> Rules of Evidence at a trial held on the date of the application; and

10

EXHIBIT 4 Page 014

(2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.

*Id.* art. 11.073(b).

Because this is a subsequent application, Mr. Cruz-Garcia must also show that "a claim or issue could not have been presented previously in an original application" because it is "based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application[.]" *Id.* (c). In making the determination

as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the field of scientific knowledge, a testifying expert's scientific knowledge, or a scientific method on which the relevant scientific evidence is based has changed since:

(1) the applicable trial date or dates, for a determination made with respect to an original application; or

(2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

*Id.* art. 11.073(d).

The inquiry focuses on "the State's evidence" at trial. *Ex parte Robbins*, 478 S.W.3d at 690.

11

EXHIBIT 4 Page 015

## IV.   CLAIMS FOR RELIEF

Mr. Cruz-Garcia is entitled to relief on the following claims:

- New scientific evidence establishes by a preponderance of the evidence under Article 11.073 that Mr. Cruz-Garcia would not have been convicted.

- Because the State relied on false, misleading, and scientifically invalid testimony, Mr. Cruz-Garcia's right to due process under *Ex Parte Chabot* and *Ex Parte Chavez* was violated.

### A. Mr. Cruz-Garcia Is Entitled to Relief under Article 11.073

Mr. Cruz-Garcia easily satisfies the prerequisites for relief under Article 11.073.

### 1. The amended lab report was not available to Mr. Cruz-Garcia at trial, and it also contradicts scientific evidence the State relied on at trial

The scientific evidence at issue here "was not available to be offered by a convicted person at the convicted person's trial" *and* it "contradicts scientific evidence relied on by the state at trial." TEX. CODE OF CRIM. PRO. art. 11.073(a). Either of these facts are a basis for granting relief. Mr. Cruz-Garcia's trial began in June 2013, and the amended lab report was not even generated until November 2015. *See* Ex. B.

Moreover, the findings contained in the amended lab report clearly contradict the scientific evidence the State relied on at trial. At trial, the State presented testimony that Mr. Cruz-Garcia and Ms. Garcia's husband, Mr. Rodriguez, were the two contributors to the sperm cell DNA mixtures found on the vaginal swabs and on the cutting from the panties. The HPD lab has now amended its findings to state that

12

EXHIBIT 4 Page 016

no conclusions can be made with respect to the DNA mixture found on the vaginal swabs and that the DNA mixture found on the cutting from the panties contains a second unknown contributor, rather than the victim's husband, Mr. Rodriguez. Accordingly, Mr. Cruz-Garcia has met the requirements of Article 11.073(a)(2). *See Ex parte Robbins*, 478 S.W.3d at 690 (finding that the requirements of Article 11.073(a)(2) were met where the medical examiner had testified for the State that the complainant's cause of death was homicide by asphyxiation but later reevaluated her opinion and found the cause of death to be undetermined).

### 2. The relevant scientific evidence was not ascertainable through the exercise of reasonable diligence as of the date Mr. Cruz-Garcia filed his Initial Application

The new scientific evidence presented in this Subsequent Application was not ascertainable through the exercise of reasonable diligence as of the date Mr. Cruz-Garcia filed his Initial Application. Mr. Cruz-Garcia filed his Initial Application on August 28, 2015; the amended lab report was not issued and sent to post-conviction counsel until November 3, 2015. Ex. B; Ex. C at 1.

In his Initial Application, Mr. Cruz-Garcia alleged that his trial counsel were ineffective for failing to retain an independent DNA expert to review the State's DNA evidence. In support of this allegation, Mr. Cruz-Garcia filed an affidavit from DNA analyst Daniel Hellwig, who attested that the second contributor to the DNA mixture found on the panties should properly have been described as unknown. The

13

EXHIBIT 4 Page 017

fact that Mr. Cruz-Garcia presented this evidence from his own retained expert in support of a claim raised in his Initial Application does not mean that the findings contained in the amended lab report were "ascertainable through the exercise of reasonable diligence" at the time he filed his Initial Application. This Court recently construed Article 11.073 for the first time in *Ex parte Robbins*. The Court held that the medical examiner's changed opinion was not ascertainable for the purposes of the statute even though similar testimony was actually before the jury at trial through a retained defense expert. *Id.*, 478 S.W.3d at 692 ("The State argues Moore's re-evaluated opinion was available at trial because the same information was presented by the defense through Dr. Bux. We disagree. The relevant evidence is the State's evidence on Tristen's cause of death. It has changed."). Accordingly, the findings contained in the amended lab report were not "ascertainable through the exercise of reasonable diligence" at the time Mr. Cruz-Garcia filed his Initial Application even though he presented similar findings from his own expert in support of his Initial Application. Mr. Cruz-Garcia has thus satisfied the requirements of Article 11.073(b)(1)(A).

### 3. The new scientific evidence would be admissible under the Texas Rules of Evidence

Just as Mr. Quartaro's and Ms. Head's original findings as to the DNA analysis were admissible at Mr. Cruz-Garcia's trial, the findings contained in the amended lab report would be equally admissible, thus satisfying Article

EXHIBIT 4 Page 018

11.073(b)(1)(B). *See* TEX. R. EVID. 703 (permitting qualified experts to "base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed").

### 4. Had the new scientific evidence been presented at trial, Mr. Cruz-Garcia would not have been convicted

The new scientific evidence in the amended lab report goes to the very heart of the sufficiency of the evidence used to convict Mr. Cruz-Garcia.

There can be little doubt that, had the findings contained in the amended lab report been presented at Mr. Cruz-Garcia's trial, he would not have been convicted. The false DNA evidence the State presented at trial was the only physical evidence linking Mr. Cruz-Garcia to the crime. More specifically, the State's case for guilt was based on a nexus among Mr. Cruz-Garcia's semen, a sexual assault, and the murder. Although Mr. Cruz-Garcia's trial counsel suggested that Mr. Cruz-Garcia's DNA was left during a consensual sexual encounter, the jury could not have credited this defense at trial in the face of unrebutted testimony by the State's expert that the two contributors to the sperm cell DNA mixture found on the vaginal swabs and the cutting of the panties were Mr. Cruz-Garcia and Ms. Garcia's husband, Mr. Rodriguez. Mr. Quartaro's false testimony at trial rendered the defense theory of a consensual relationship impossible. But if the jury had been told that the sperm cell

EXHIBIT 4 Page 019

DNA mixture found on the cutting from the panties contained a second unknown contributor, Mr. Cruz-Garcia would not have been convicted.[5]

The State relied heavily on the DNA evidence—or, more accurately, it relied on the *lack* of evidence of an unknown contributor to the DNA mixture—to argue that Mr. Cruz-Garcia must be guilty:

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth—and there is no evidence of that—where is the DNA of the guy who raped Diana? Where is it? Why don't we have it? If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

23 RR at 82. The State's argument rested squarely on the testimony of Mr. Quartaro, who told the jury that the second contributor to the sperm cell DNA mixture found on the vaginal swabs and on the panties was Ms. Garcia's husband, Mr. Rodriguez. The amended lab report has belied this testimony. According to the amended lab report, the second contributor to the DNA mixture found on the panties is not the victim's husband but rather an unknown person, which supports the theory that an unknown male raped Diana Garcia, as the defense had argued at trial.[6]

---

[5] This new evidence must be evaluated in tandem with the new evidence presented in Mr. Cruz-Garcia's Initial Application that Mr. Cruz-Garcia had an ongoing consensual sexual relationship with Ms. Garcia. *See* p. 9, *supra*.

[6] Moreover, in light of the fact that Ms. Garcia was having a consensual affair with Mr. Cruz-Garcia at the time, as is now confirmed by mutual acquaintances, it defies the imagination to suggest that Ms. Garcia would have failed to recognize him

16

EXHIBIT 4 Page 020

Aside from the false testimony of Mr. Quartaro and Ms. Head, the State relied on scant corroboration. The only other evidence of Mr. Cruz-Garcia's guilt came by way of testimony from an alleged co-conspirator and convicted felon named Carmelo Martinez Santana and Mr. Cruz-Garcia's ex-wife, Angelita Rodriguez.[7] Both of these individuals were known drug dealers with substantial credibility issues. And the testimony of both of these individuals departed significantly from their prior statements to law enforcement.

These witnesses were repeatedly impeached with prior inconsistent statements and impeached by omission. For example, Ms. Rodriguez testified on direct as to a purported inculpatory statement by Mr. Cruz-Garcia, but on cross-examination she was devastatingly impeached by her complete failure to mention this purported confession in a 2008 interview with investigating police officers and an Assistant District Attorney, during which she was accompanied by her lawyer. *See* 20 RR at 110-13.

Mr. Santana, the alleged accomplice—also a convicted violent felon and unrepentant drug trafficker—did not fare any better on the witness stand. *See* 21 RR

---

as the assailant—even if he had been wearing a mask during the sexual assault. *See* Exs. D-F.

   [7] The only other allegedly corroborating evidence to which the State cited in its Closing was the testimony of Linda Hernandez; she only claimed that she had received a call from Mr. Cruz-Garcia from Baytown, and the State argued that this occurred after Angelo Garcia, Jr. had been killed in Baytown. 23 RR 36-37. Such evidence is not fairly characterized as "corroborating."

17

EXHIBIT 4 Page 021

at 16 (Mr. Santana implicated himself in a capital murder while acknowledging that he had not been charged with anything in relation to the offense); *id.* at 29-31 (Mr. Santana was impeached with prior federal drug and weapons convictions for which he was serving a sentence of over seventeen years, as well as a Harris County assault conviction.).[8] Mr. Santana was also repeatedly impeached with prior inconsistent statements to law enforcement about material details about the crime. *See, e.g., id.* at 45-57, 68-75.

Moreover, the testimony of Mr. Santana was inconsistent with that of Ms. Garcia as to material details. *Compare* 18 RR at 151 *with* 21 RR at 48-49 (Mr. Santana described masks worn by the perpetrators as being women's stockings, while Ms. Garcia described ski masks). Thus, the DNA evidence was the only credible evidence implicating Mr. Cruz-Garcia in this twenty-two-year-old crime. The State most likely recognized this fact, which is why it expressly emphasized the significance of the DNA as corroborating evidence in its closing:

> ***Probably the most damning corroboration for the defendant in this case is the DNA evidence.*** You know that there is DNA evidence that the defendant's DNA was on the panties of Diana Garcia's the night of that sexual assault, the defendant's DNA is on the vaginal swabs taken after the rape of Diana Garcia on September 30th, 1992, the same time the kidnapping of Angelo Garcia, Jr. taking place and ultimately his death. That is corroboration that tends to connect the defendant to the commission of the offense.

---

[8] As the CCA has emphasized, the "testimony of an accomplice is inherently untrustworthy and should be viewed with caution." *Blake v. State*, 971 S.W.2d 451, 463 (Tex. Crim. App. 1998).

18

23 RR at 36 (emphasis added).

If the jurors, however, had heard the new evidence contained in the amended lab report—showing that the DNA mixture found in the vaginal swab could not be associated with any particular contributor and that the DNA mixture found on the panties contained a second unknown contributor—they almost certainly would have found at least a reasonable doubt as to Mr. Cruz-Garcia's guilt. Therefore, Mr. Cruz-Garcia is entitled to relief under Article 11.073.

### B. Mr. Cruz-Garcia Is Entitled to a New Trial Because His Conviction Was Based on False, Misleading, and Scientifically Invalid Testimony

Additionally, Mr. Cruz-Garcia is entitled to a new trial under *Ex parte Chabot*, 300 S.W.3d 768, 770-71 (Tex. Crim. App. 2009) and *Ex parte Chavez*, 371 S.W.3d 200, 207-08 (Tex. Crim. App. 2012). Specifically, the State violated Mr. Cruz-Garcia's rights to a fair trial, to due process, and to avoid cruel and unusual punishment when it used false DNA evidence to secure his conviction and death sentence. *Id.* Because the factual basis—*i.e.*, the amended lab report—under which Mr. Cruz-Garcia raises this claim was unavailable at the time he filed his Initial Application, this claim meets the strictures of Article 11.071, § 5(a)(1).

### 1. The Chabot/Chavez standard

The *Chabot/Chavez* standard does not require proof that the State **knew** that the testimony at issue was false. An applicant must only show "whether the testimony, taken as a whole, gives the jury a false impression." *Chavez*, 371 S.W.3d

EXHIBIT 4 Page 023

at 208. The State denies due process where, as here, the State uses false testimony to obtain a particular sentence, regardless of the State's intent. *Estrada v. State*, 313 S.W.3d 274, 287-88 (Tex. Crim. App. 2010) (citing, *inter alia*, *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (finding death sentence based on "materially inaccurate" evidence violates Eighth Amendment); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (finding conviction based on "materially untrue" information violates due process "whether caused by carelessness or design")); *see also Chabot*, 300 S.W.3d at 771. To be entitled to habeas relief on the basis of false evidence, an applicant must show that (1) false evidence was presented at trial; and (2) the false evidence was material to the jury's verdict. *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014).

When evaluating claims of false evidence in the post-conviction context, the Court of Criminal Appeals has, in two scenarios both inapplicable here, required that the defendant establish an additional burden—that the error was not harmless. *See Ex parte Ghahremani*, 332 S.W.3d 470, 481 (Tex. Crim. App. 2011) (describing the two scenarios). If the habeas applicant was unable to raise the issue at trial or on direct appeal, this additional burden does not apply. *Id.* at 481-82; *Chabot*, 300 S.W.3d at 770-71; *Ex parte Fierro*, 934 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

EXHIBIT 4 Page 024

### 2. Chabot/Chavez standard is satisfied

#### a. The State relied on false testimony

The primary evidence against Mr. Cruz-Garcia was the testimony of the State's experts linking Mr. Cruz-Garcia's sperm to a sexual assault and then to the murder. Mr. Cruz-Garcia has now shown that the testimony the State relied on to establish this vital link was false, misleading, and scientifically invalid.

First, the State's witnesses misled the jury by claiming that Mr. Cruz-Garcia was a contributor to the DNA mixture found on the vaginal swabs. Second, Mr. Quartaro misled the jury by claiming that Mr. Rodriguez, instead of an unknown assailant, must have been the second contributor to the DNA mixture found on the cutting of the panties. This testimony was false.

In short, the DNA evidence that was reputedly inculpatory has since been amended and corrected, thereby rendering Mr. Quartaro's and Ms. Head's germane trial testimony false.

#### b. False evidence was material to the jury's verdict

The false evidence was material to the State's case, which resulted in the jury's guilty verdict. To show that the State's presentation of false testimony is material, an "applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment." *Chabot*, 300 S.W.3d at 771 (quoting *Fierro*, 934 S.W.2d at 374-75). False testimony is material if there is a "reasonable likelihood" that it affected the judgment of the jury. "[A]n applicant

21

EXHIBIT 4 Page 025

who proves, by a preponderance of the evidence, a due-process violation stemming from a use of *material* false testimony necessarily proves harm because a false statement is material only if there is a reasonable likelihood that the false testimony affected the judgment of the jury." *Weinstein*, 421 S.W. at 665 (emphasis in original). The standard of materiality is the same for knowing and unknowing use of false testimony. *See Chavez*, 371 S.W.3d at 207.[9] Thus, the question is whether it was reasonably likely that the DNA evidence affected the judgment of the jury. That effect was reasonably likely here.

---

[9] Some opinions of this Court have questioned whether this materiality standard is too lenient on the petitioner for unknowing use of false testimony claims. *See Weinstein*, 421 S.W.3d at 669 (Keller, P.J., concurring); *see also Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring) (agreeing with Presiding Judge Keller that "unknowing use of . . . false testimony" should have a "mid-level standard" of materiality, between the lenient standard for knowing use of false testimony and the "Herculean task" of proving bare actual innocence claims). This view, if adopted by a majority of this Court, would make the materiality standard for unknowing use of false testimony akin to the *Brady* standard. Under *Brady*, "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (citing *Brady*, 373 U.S. 83, 87 (1963)). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Under either materiality standard, Mr. Cruz-Garcia was denied due process, as falsely inculpatory evidence certainly undermines confidence in the outcome of his trial.

22

EXHIBIT 4 Page 026

As discussed above, the DNA evidence was the only physical, and only compelling, evidence linking Mr. Cruz-Garcia to the crime. There is a reasonable likelihood that the false DNA evidence affected the jury because that evidence suggested a degree of certainty about guilt that was otherwise absent. The false DNA evidence plainly contributed to the jury's verdict.

The Court of Criminal Appeals has found it proper to reverse convictions when a jury was misled because an expert espoused an unreliable scientific theory or other factors rendered the expert's testimony unreliable. *See, e.g., Ex parte Graf*, AP-77003, 2013 WL 1232197 (Tex. Crim. App. Mar. 27, 2013) (expert testimony is deemed false where critical aspects of the testimony are disproven); *Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring) (stating that due process is violated where a critical part of an expert's testimony is shown to be "highly questionable"); *id.* at 849-50 (Cochran, J., concurring) (stating that due process is violated where expert opinion on critical disputed issue is shown to be unreliable).

Where false testimony essentially cut off Mr. Cruz-Garcia's only defense to the murder, there is a reasonable likelihood that the false testimony could have affected the judgment of the jury, and a new trial should be granted. *See Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011).

23

EXHIBIT 4 Page 027

### c. Mr. Cruz-Garcia need not prove the error was "not harmless" because this Chabot claim could not have been made at trial or on direct appeal

Mr. Cruz-Garcia has no obligation to prove that the error in using the false DNA evidence was not harmless because he had no means to raise this claim in the trial court or on direct appeal. *See Ghahremani*, 332 S.W.3d at 481-82; *cf. Fierro*, 934 S.W.2d at 375 (expressly limiting holding to situations where the habeas applicant could have raised the issue on direct appeal because he knew about the false testimony from the outset).

Mr. Cruz-Garcia had no way of knowing at trial or during his direct appeal that the DNA evidence about which Mr. Quartaro and Ms. Head testified at trial was false. He only obtained this information when post-conviction counsel received an amended lab report from the Harris County District Attorney's Office on November 3, 2015—over two years after sentencing and over a year after the brief was filed in his direct appeal. Ex. B; Ex. C at 1.

Here, as in *Ghahremani*, Mr. Cruz-Garcia could not have raised the matter at trial or on appeal. Therefore, he need only show materiality, not that the error was harmful. And because Mr. Cruz-Garcia has established that (1) the State relied on false evidence to obtain his conviction; and (2) the false evidence was material, he is entitled to habeas relief under *Chabot*.

24

EXHIBIT 4 Page 028

## V.    PRAYER FOR RELIEF

For the foregoing reasons, Mr. Cruz-Garcia prays that this Court:

1. Find that the requirements of Section 5 of Article 11.071 have been satisfied;

2. Issue an order remanding the case to the convicting court for an evidentiary hearing for the purpose of examining the merits of these claims; and

3. Grant any other relief that law or justice requires.

Respectfully submitted,

DATED:    May 2, 2016

*/s/ Benjamin Wolff*
Benjamin Wolff

25

EXHIBIT 4 Page 029

STATE OF TEXAS           §
COUNTY OF TRAVIS         §

VERIFICATION

   BEFORE ME, the undersigned authority, on this day personally appeared Gretchen Sween, who upon being duly sworn by me testified as follows:

   1.     I am a member of the State Bar of Texas.

   2.     I am the duly authorized attorney for Obel Cruz-Garcia, having the authority to prepare and to verify Mr. Cruz-Garcia's Subsequent Application for Post-Conviction Writ of Habeas Corpus.

   3.     I have prepared and have read the foregoing Subsequent Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true to the best of my knowledge.

Signed under penalty of perjury:

_____
Gretchen S. Sween

SUBSCRIBED AND SWORN TO BEFORE ME on May 2, 2016.

_____
Notary Public, State of Texas



ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

Notary without Bond

26

EXHIBIT 4 Page 030

## CERTIFICATE OF COMPLIANCE

This pleading complies with Tex. R. App. P. 9.4. According to the word count function of the computer program used to prepare the document, the brief contains 6,181 words excluding the items not to be included within the word count limit.

/s/ *Gretchen S. Sween*
Gretchen S. Sween

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Subsequent Application for a Writ of Habeas Corpus to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002

Court of Criminal Appeals
201 W. 14th Street
Austin, Texas 78701

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on May 2, 2016, at Austin, Texas.

/s/ *Gretchen S. Sween*
Gretchen S. Sween

27

EXHIBIT 4 Page 031

# EXHIBIT A

EXHIBIT 4 Page 032

**TEXAS FORENSIC**
**SCIENCE COMMISSION**
*Justice Through Science*

1700 North Congress Ave., Suite 445
Austin, Texas 78701

August 21, 2015

Members of the Texas Criminal Justice Community:

This letter provides notification to the community regarding an issue of potential concern to judges, criminal prosecutors, criminal defense lawyers, victims and defendants in the Texas criminal justice system.   The concerns involve the interpretation of DNA results where multiple contributors may be present, commonly referred to as DNA mixture interpretation.  The attached document details the origin and scope of the concerns.

While the Commission assesses the issues described in the attached document, we recommend any prosecutor, defendant or defense attorney with a currently pending case involving a DNA mixture in which the results could impact the conviction consider requesting confirmation that Combined Probability of Inclusion/Exclusion (referred to as "CPI" or "CPE") was calculated by the laboratory using current and proper mixture interpretation protocols.  If the laboratory is unable to confirm the use of currently accepted protocols for the results provided, counsel should consider requesting a re-calculation of CPI/CPE.

The extent to which any closed criminal cases may require re-analysis will be a subject of Commission review and subsequent notification to the stakeholder community.

If you have any questions regarding these issues, please contact the Commission's general counsel, Lynn Garcia, at 512-936-0649 or lynn.garcia@fsc.texas.gov.

Sincerely,

Vincent J.M. Di Maio, MD
Presiding Officer

**Unintended Catalyst: the Effects of 1999 and 2001 FBI STR Population Data Corrections on an Evaluation of DNA Mixture Interpretation in Texas**

1.  FBI Data Corrections: What Do They Mean?

In May 2015, the Federal Bureau of Investigation ("FBI") notified all CODIS laboratories it had identified minor discrepancies in its 1999 and 2001 STR Population Database. Laboratories across the country have used this database since 1999 to calculate DNA match statistics in criminal cases and other types of human identification. The FBI attributed the discrepancies to two main causes: (a) human error, typically due to manual data editing and recording; and (b) technological limitations (*e.g.*, insufficient resolution for distinguishing microvariants using polyacrylamide gel electrophoresis), both of which were known limitations of the technology. The FBI has provided corrected allele frequency data to all CODIS laboratories.

In May and June 2015, Texas laboratories notified stakeholders (including prosecutors, the criminal defense bar and the Texas Forensic Science Commission) that the FBI allele frequency data discrepancies were corrected. The immediate and obvious question for the criminal justice community was whether these discrepancies could have impacted the outcome of any criminal cases. The widely accepted consensus among forensic DNA experts is the database corrections have *no impact* on the threshold question of whether a victim or defendant was *included or excluded* in any result. The next questions were whether and to what extent the probabilities associated with any particular inclusion changed because of the database errors.

The FBI conducted empirical testing to assess the statistical impact of the corrected data. This testing concluded the difference between profile probabilities using the original data and the corrected data is less than a two-fold difference in a full and partial profile. Testing performed by Texas laboratories also supports the conclusion the difference is less than two-fold. For example, in an assessment performed by one Texas laboratory, the maximum factor was determined to be 1.2 fold. In other words, after recalculating cases using the amended data, the case with the *most substantially affected* Combined Probability of Inclusion/Exclusion ("CPI")[1] statistical calculation (evaluated for a mixed sample) changed from a 1 in 260,900,000 expression of probability to a 1 in 225,300,000 expression of probability.

Amended allele frequency tables are publicly available for anyone to compare the calculations made using the previously published data and the amended allele frequencies, though expert assistance may be required to ensure effective use of the tables.[2]

2.  The Impact of FBI Database Errors on DNA Mixture Interpretation Using CPI

As part of their ongoing commitment to accuracy, integrity and transparency, many Texas laboratories offered to issue amended reports to any stakeholder requesting a report using the corrected FBI allele frequency data. Some prosecutors have submitted such requests to laboratories, particularly for pending criminal cases. As expected, the FBI corrected data have not had an impact exceeding the

---

[1] The Combined Probability of Inclusion/Exclusion is commonly referred to as either "CPI" or "CPE." They are referred to jointly in this document as "CPI" for ease of reference.

[2] https://www.fbi.gov/about-us/lab/biometric-analysis/codis/amended-fbi-str-final-6-16-15.pdf

EXHIBIT 4 Page 034

two-fold difference discussed above. However, because analysts must issue *signed amended reports* with the new corrected data, they may only issue such reports if they believe *the analyses and conclusions in the report comply with laboratory standard operating procedures*. For cases involving DNA mixtures, many laboratories have changed their interpretation protocols and related procedures using CPI. To reiterate, changes in mixture interpretation protocols are <u>unrelated</u> to the FBI allele frequency data corrections discussed above. However, when issuing new reports requested because of the FBI data corrections, the laboratory's use of current mixture protocols may lead to different results if the laboratory had a different protocol in place when the report was originally issued. Changes in mixture interpretation have occurred primarily over the last 5-10 years and were prompted by several factors, including but not limited to mixture interpretation guidance issued in 2010 by the Scientific Working Group on DNA Analysis ("SWGDAM").

The forensic DNA community has been aware of substantial variance in mixture interpretation among laboratories since at least 2005 when the National Institute of Standards and Technology ("NIST") first described the issue in an international study called MIX05. Though NIST did not expressly flag which interpretation approaches were considered scientifically acceptable and which were not as a result of the study, it has made significant efforts to improve the integrity and reliability of DNA mixture interpretation through various national training initiatives. These efforts have ultimately worked their way into revised standard operating procedures at laboratories, including laboratories in Texas. Based on the MIX05 study, we know there is variation among laboratories in Texas and nationwide, including differences in standards for calculation of CPI that could be considered scientifically acceptable. However, we also know based on a recent audit of the Department of Forensic Sciences ("DFS") in Washington, DC that some of the "variation" simply does not fall within the range of scientifically acceptable interpretation. This finding does not mean laboratories or individual analysts did anything wrong intentionally or even knew the approaches fell outside the bounds of scientific acceptability, but rather the community has progressed over time in its ability to understand and implement this complex area of DNA interpretation appropriately.

While in many cases the changed protocols may have no effect, it is also possible changes to results may be considered material by the criminal justice system, either in terms of revisions to the population statistics associated with the case or to the determination of inclusion, exclusion or an inconclusive result. The potential range of interpretive issues has yet to be assessed, but the potential impact on criminal cases raises concerns for both scientists and lawyers. We therefore recommend any prosecutor, defendant or defense attorney with a currently pending case involving a DNA mixture in which the results could impact the conviction consider requesting confirmation that CPI was calculated by the laboratory using current and proper mixture interpretation protocols. If the laboratory is unable to confirm the use of currently accepted protocols for the results provided, counsel should consider requesting a re-analysis of CPI.

The Texas Forensic Science Commission is currently in the process of assembling a panel of experts and criminal justice stakeholders to determine what *guidance and support* may be provided to assist Texas laboratories in addressing the challenging area of DNA mixture interpretation. In particular, a distinction must be made between acceptable variance in laboratory interpretation policies and protocols and those approaches that do not meet scientifically acceptable standards. An emphasis on statewide collaboration and stakeholder involvement will be critical if Texas is to continue to lead the nation in tackling challenging forensic problems such as those inherent in DNA mixture interpretation.

# EXHIBIT B

EXHIBIT 4 Page 036

**Joanne Heisey**

| | |
|---|---|
| **From:** | DeAngelo, Lori <DEANGELO_LORI@dao.hctx.net> |
| **Sent:** | Tuesday, November 03, 2015 10:02 AM |
| **To:** | Joanne Heisey |
| **Attachments:** | 105758592-2010-11899-5-DNA.PDF |

Hi Joanne.  The trial prosecutor in Obel Cruz-Garcia received the attached amended DNA report earlier this morning and asked that I get it to his writ attorney.

Also, I eventually plan on filing an extension for my answer – the 120 days is up New Year's Eve.  I will be asking for a 60-day extension, which would be February 29, 2016.  Please let me know if you have any objection to this.

And while I'm thinking about it, our phone numbers changed office wide.  My direct line is 713-274-5986.

Thank you,
Lori

1

EXHIBIT 4 Page 037

# EXHIBIT C

EXHIBIT 4 Page 038



# Houston Forensic Science Center

**Forensic Analysis Division**
**Biology Section**
1200 Travis Street, Houston, Texas 77002
(713) 308-2600



FORENSIC TESTING
ISO/IEC 17025

| | | | |
|---|---|---|---|
| **Incident Number:** | 105758592 | **Report Date:** | |
| **Forensic Case Number:** | 2010-11899 | | November 03, 2015 |

## Amended Laboratory Report #5

The report dated October 18, 2010 (OLO Supplement #84) has been amended with corrections and/or additions. Under Results and Interpretations, the statistics for item HP07-0014-01 and HP07-0014-07 (sperm fraction) have been changed to reflect an update to the FBI Popstats database, and the source statement has been removed. The conclusion for Item HP07-0014-02 (sperm fraction) has changed to reflect current interpretation guidelines. A conclusion for item 3.1 has been added. The note statement for loci D2S1338 and D19S433 has been removed. The assigned analyst has changed from Courtney Head to Robin Guidry. The original report is available at the Houston Forensic Science Center upon request.

Offense: Murder

Previous Analysis: Genetic Design DNA Report dated February 4, 1993; Genetic Design DNA Report dated February 23, 1994; Orchid Cellmark DNA Report HP07-0014, dated November 27, 2007; Orchid Cellmark DNA Report HP07-0014-A, dated December 31, 2007; Orchid Cellmark DNA Report HP07-0014-B, dated July 25, 2008; Orchid Cellmark DNA Report HP07-0014-C, dated April 20, 2011; Orchid Cellmark DNA Report HP07-0014-D, dated June 15, 2011; Laboratory Reports dated November 16, 1992 (OLO Supplement #28), December 1, 1992 (OLO Supplement #31), May 13, 1993 (OLO Supplement #33), February 24, 1994 (OLO Supplement #37), December 10, 2007 (OLO Supplement #48), October 18, 2010 (OLO Supplement #84), January 13, 2011, and June 25, 2013

Requesting Officer: R. W. Chappell

Lab #: L92-10367

## ITEMS OF EVIDENCE:

3           Known buccal swabs - Obel Cruz-Garcia

3.1         Portion of known buccal swabs – Obel Criz-Garcia

The Houston Forensic Science Center is accredited by ANSI-ASQ National Accreditation Board/FQS in the following forensic testing categories: Drugs, Toxicology, Biology and Firearms.

EXHIBIT C Page 1

EXHIBIT 4 Page 039

| Incident Number: | 105758592 | Houston Forensic Science Center |
| Forensic Case Number: | 2010-11899 (5) | Report Date: November 03, 2015 |

Item 3.1 was compared to the following DNA profiles previously reported by Orchid Cellmark in Report HP07-0014, dated November 27, 2007:

HP07-0014-01: Cigar
HP07-0014-02: Vaginal swabs from Diana Garcia (sperm fraction)
HP07-0014-07: Panties: crotch - red from Diana Garcia (sperm fraction)

## RESULTS AND INTERPRETATIONS:
The DNA was extracted and amplified using polymerase chain reaction (PCR). The following STR loci were analyzed: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, and FGA, along with the sex determining marker Amelogenin.

### HP07-0014-01 (Cigar)
A full, single-source male DNA profile was obtained from this item. OBEL CRUZ-GARCIA cannot be excluded as a possible contributor to the DNA profile obtained from this item. The probability that a randomly chosen unrelated individual would be included as a possible contributor to this DNA profile is approximately 1 in 6.0 quintillion for Caucasians, 1 in 700 quintillion for African Americans, and 1 in 100 quintillion for Southwest Hispanics.

### HP07-0014-02 (Vaginal swabs from Diana Garcia (sperm fraction))
A mixture of DNA from at least three individuals, at least one of whom is male, was obtained from this item. No conclusions will be made given the excessive number of contributors to this DNA mixture.

### HP07-0014-07 (Panties: crotch - red from Diana Garcia (sperm fraction))
A mixture of DNA from at least two individuals, at least one of whom is male, was obtained from this item. OBEL CRUZ-GARCIA cannot be excluded as a possible contributor to the major component of this DNA mixture. The probability that a randomly chosen unrelated individual would be included as a possible contributor to the major component of this DNA mixture is approximately 1 in 6.0 quintillion for Caucasians, 1 in 700 quintillion for African Americans, and 1 in 100 quintillion for Southwest Hispanics. No conclusions will be made regarding the minor component of this DNA mixture due to insufficient data.

### Item 3.1 (Portion of known buccal swabs - Obel Cruz-Garcia)
A full, single-source male DNA profile was obtained from this item.

## DISPOSITION:
All DNA extracts and any remaining portions are being retained in the laboratory. Any other items will be returned to the submitting agency.

*Robin D. Guidry*

Robin Guidry
Supervisor - Forensic Biology
Assigned Analyst

The prosecutor and defense counsel may obtain additional documents related to this case by submitting a request to Triage@HoustonForensicScience.org . Requests should state the requestor's connection to the case and include full contact information.

EXHIBIT 4 Page 040

EXHIBIT C Page 2

Incident Number: 105758592

Forensic Case Number: 2010-11899 (5)

Houston Forensic Science Center

Report Date: November 03, 2015

| Case Items | D8S1179 | D21S11 | D7S820 | CSF1PO | D3S1358 | TH01 | D13S317 | D16S539 | D2S1338 | D19S433 | vWA | TPOX | D18S51 | Amel | D5S818 | FGA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 Portion of known buccal swabs – Obel Cruz-Garcia | 10,16 | 30.2,31 | 8,11 | 11 | 16,18 | 6,8 | 11,12 | 9,11 | 17,20 | 13,14 | 16,17 | 8 | 13,18 | X,Y | 12 | 22 |

SF=Sperm Fraction; EF=Epithelial Fraction,
NR = No interpretable result; ( ) = Minor allele; ^ = Allele below stochastic threshold
~ = Allele below stochastic threshold, but suitable for statistics, assuming single-source
INC = Inconclusive/activity that could not be confirmed as real or artifactual

EXHIBIT C Page 3

EXHIBIT 4 Page 041

# EXHIBIT D

EXHIBIT 4 Page 042

## AFFIDAVIT OF JOSE MARTIN VALDEZ

I, Jose Martin Valdez, state and declare as follows:

1. My name is Jose "Joe" Valdez. I have known Obel Cruz-Garcia since around 1989. I have always known Obel by his nickname, Chico.

2. I was the first one in my family to meet Chico. I met him through another friend when we all went out to eat. That first time we hung out, we just really got along. After that we started hanging out often. I would say we hung out almost every day. After I got locked up, Chico started talking to my brother Cesar.

3. In the years leading up to the kidnapping of Angelo Garcia, I was friends with Diana Garcia and Arturo Rodriguez. I actually knew them before I met Chico. We lived in the same apartment complex for a while. Cesar and I would go over there sometimes and Diana would cook for us. She'd make us breakfast, lunch, and dinner sometimes. I did not know Chico at this time. I met him later.

4. Diana and I would have sex together sometimes. When I first started messing around with Diana, she was with Arturo. What happened was that she caught him messing around with another woman. She came to me and wanted to have sex, so we did. After that, we would have sex any chance we got, though it was hard because Arturo was around sometimes. Diana and I would often have sex, even though she was with Arturo. To my knowledge, Diana was also messing around with other guys, including Chico. I was not surprised that she was messing around with other guys. I found out about Chico and Diana messing around from my family. The time period that Chico and Diana were having sex was around the same time Angelo was kidnapped.

1



EXHIBIT 4 Page 043

5. Chico was a good friend to me and my family.  Back in those days, we would not like to bring our friends around our family, but Chico was different.  He would come around.  He treated my mom and dad with the utmost respect.  I remember he would come over and tell my parents, "Let's go out to eat somewhere nice."  He would take them out to eat at these nice restaurants.  He would buy them gifts for Christmas.  He treated my parents like they were his parents.  He was really good to them and very respectful.  He would tell us to be respectful to them.  Whenever I was in prison, Chico would send me money for commissary.  He was generous like that with everyone.  I believe he paid for Diana and Arturo's phone.

6. After Angelo was kidnapped, I was interviewed by some detectives from the Houston Police Department, but I was never contacted or interviewed by anyone on Chico's defense team.  Had I been interviewed by Chico's defense team, I would have told them everything that I have stated in this affidavit and would have testified if they had asked me to be a witness.

7. I have read and reviewed this two-page affidavit.


I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on August 20 , 2015 in Harris County , Houston, Texas.

Jose M Valdez

Jose Martin Valdez

Subscribed and sworn to before me on August 20 , 2015.

Notary Public, State of Texas

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2016

Notary without Bond

2

J. V.

EXHIBIT 4 Page 044

EXHIBIT D Page 2

# EXHIBIT E

EXHIBIT 4 Page 045

## AFFIDAVIT OF CESAR AMADO RIOS

I, Cesar Amado Rios, state and declare as follows:

1. My name is Cesar Amado Rios. I have known Obel Cruz-Garcia since around 1990 or so. We got to know each other through mutual friends. I have always known Obel by his nickname, Chico.

2. At the time that Angelo Garcia was kidnapped, I knew Chico well. I had lived with him and his wife, Angelita, when they lived in an apartment called the Willow Creek Apartments. I lived there for a year or two around 1992. I also knew Diana Garcia and Arturo Rodriguez and Diana's son, Angelo.

3. Around the time Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana. Other people knew about it as well. On the day Angelo was kidnapped, Chico was over at Diana's apartment earlier in the day.

4. I remember I saw Chico that morning, the day it all happened. Later that night, Chico called me and asked me to go to Diana's house. This happened before the kidnapping occurred. Chico told me to go get some stuff out of a safe and take it to a motel off of 225. When I got back to the apartment, the cops were there. Diana told me later that the kidnapping happened right after I left, because she thought it was me at the door, like I had walked out and was trying to coming back inside.

5. I heard that the people who did this ransacked Diana and Arturo's apartment, like they were looking for something. That's why I never understood why people thought Chico was involved. He knew I had already gone over and moved the stuff from the safe, so if it were him he would not have had any reason to look for something else.

$CR$ 1

EXHIBIT 4 Page 046

6. Chico had a big heart and was a good friend to me. He was close to my parents and would do anything to help them out. He was really respectful and treated us like family. He bought me my first car. It was a 1983 Buick Regal that he gave me as a gift.

7. I was shot three times with a twelve gauge shotgun in 1991. I was shot in the arm and the back. I called Diana, and Diana called Chico. Diana came to pick me up at my friend's place where I had run after I got shot. Diana drove me to the hospital and Chico met us at the hospital. The first hospital said they had to amputate my arm, but Chico said no. We ended up going to Southeast Memorial Hospital, and they said they could save my arm. But I did not have insurance. Chico said he would take care of it. He put down the title of his car and went and got some money, and he told the hospital to operate.

8. After Angelo was kidnapped, I was interviewed by some detectives from the Houston Police Department. I remember talking to one person on the defense team briefly, but I never spoke with them again after that. I was around and would have been happy to help Chico. I was available to testify during Chico's trial in July 2013. Had I been interviewed by Chico's defense team, I would have told them everything that I have stated in this affidavit and would have testified to the same had I been called as a witness.

2 _CM_

EXHIBIT 4 Page 047

9.  I have read and reviewed this three-page affidavit.


I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _August 13_, 2015 in _Harris County_, Houston, Texas.


_Cesar Amado Rios_

Cesar Amado Rios


Subscribed and sworn to before me on _August 13_, 2015.


Notary Public, State of Texas

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

**Notary without Bond**


3

EXHIBIT 4 Page 048

# EXHIBIT F

EXHIBIT 4 Page 049

## AFFIDAVIT OF HECTOR SAAVEDRA

I, Hector Saavedra, state and declare as follows:

1. My name is Hector Saavedra. I was born November 21, 1977. I am thirty-seven years old. I currently work at Pioneer Waste Services. I have been working there for about three years.

2. I knew Obel Cruz-Garcia through my brother, Cesar Rios. I first met Obel in or around 1990 when I was about thirteen years old. My brother and I always called Obel by his nickname, "Chico." I knew Obel well when I was thirteen to fifteen years old.

3. When I was about fourteen years old, in 1991, my brother Cesar got shot in the arm. I was asleep when it happened because I had school the next day. Obel was not with Cesar when he got shot, but he came with us when we took him to the hospital. At the first hospital we went to, they told us that they probably would have to amputate Cesar's arm. Obel was shocked and told us that we needed to go to a different hospital for a second opinion. Cesar and I both told Obel that, either way, we did not have the money to pay for Cesar's treatment. Obel told us not to worry about it. We went to another hospital, Memorial Hermann Southeast Hospital, off of Scarsdale Boulevard, where they were able to treat Cesar without needing to amputate. As he promised, Obel paid for Cesar's treatment and hospital bills. It was not even that he had that much money lying around – I remember Obel saying that he would sell one of his cars, if he had to, to pay for Cesar's medical bills. He just treated us like family. I remember seeing all this firsthand, as a child, in the hospital.

4. Obel was really good about helping out with our parents. For example, sometimes when Obel would go to the grocery store, he would pick up milk

1

EXHIBIT 4 Page 050

EXHIBIT F Page 4.5.

and food to drop off with my family. It was a way of showing respect for our parents because we were so close, like family, in the same way that my family would bring food when we would go to visit our relatives in Mexico. Obel was like a family member. He would come over and eat with us. He was very respectful and very supportive of me and my family.

5. Obel also seemed to take a personal interest in me and my wellbeing, like a little brother. He would ask me about school and football. I know he didn't have family here, so I think we were like his family while he was here. Obel would always tell me to study, and he stressed how important it was for me to pay attention and do well in school. When I got a report card, Obel would want to see it to make sure I had good grades. If I earned good grades, Obel would reward me with pocket-money or a gift. If I ever needed anything for school, like clothes or books, Obel would make sure to get it for me. Overall, I just knew Obel to be a great and generous person. He never asked for anything in return for all the good deeds he did for me and my family.

6. Also around this time, I knew of Diana Garcia, her boyfriend Arturo, and her son Angelo. I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel. Diana would come see Joe at the house where I lived, and I knew they were sleeping together. When Joe went to jail, I knew that Diana and Obel were together.

7. No one from Obel's defense team ever contacted me to ask me about Obel. If they had, I gladly would have told them everything I know about what a good guy Obel was. I happily would have testified at trial, had I been asked.

8. I have read and reviewed this three-page affidavit.

2

H.S.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on August 13, 2015 in Harris County, Houston, Texas.

_Hector Sevaadra_

Hector Sevaadra

Subscribed and sworn to before me on August 13, 2015.

Notary Public, State of Texas

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

Notary without Bond

3

EXHIBIT 4 Page 052