**AFFIDAVIT OF SANDRA L. BABCOCK**

I, Sandra Babcock, state and declare as follows:

1. My name is Sandra Babcock. I am a Clinical Professor at Cornell University Law School, where I teach a legal clinic on international human rights. I am an attorney licensed to practice in the states of Texas and Minnesota, the United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court. I received my J.D. from Harvard Law School in 1991.
2. A substantial part of my teaching and scholarship is devoted to the study of the application of international norms in U.S. death penalty cases. I have taught courses on international law and the death penalty at Northwestern Law School and at Tulane University Law School's summer program in Amsterdam. I am the founder and director of *Death Penalty Worldwide,* a publicly available database that tracks developments in the laws and practice of capital punishment in ninety-three countries and territories around the world, available at www.deathpenaltyworldwide.org. I have also published several articles regarding the intersection of human rights norms and the death penalty, including *The Mandatory Death Penalty in Malawi: The Unrealized Promise of Kafantayeni*, with Ellen Wight, in Peter Hodgkinson and Kerry Ann Akers, THE LIBRARY OF ESSAYS ON CAPITAL PUNISHMENT (Ashgate 2014); *The Limits of International Law: Efforts to Enforce Rulings of the International Court of Justice in U.S. Death Penalty Cases*, 62 SYRACUSE L. REV. 183 (2012); *International Standards on the Death Penalty*, 28 THOMAS M. COOLEY L. REV. 103 (2011); *Human Rights Advocacy in United States Capital Cases*, in THE CONTEMPORARY HUMAN RIGHTS MOVEMENT IN THE UNITED STATES (2007); *The Global Debate on*

*the Death Penalty,* in American Bar Association, Human Rights (Spring 2007); *The Growing Influence of International Tribunals, Foreign Governments and Human Rights Perspectives in United States Death Penalty Cases,* in Center for Capital Punishment Studies, Occasional Papers vol. 2 (August 2005); *The Role of International Law in United States Death Penalty Cases*, 15 Leiden J. Int'l Law (2002); and *L'application du droit international dans les executions capitals aux Etats-Unis: de la théorie à la pratique,* in La peine capitale et le droit international des droits de l'homme, Université Panthéon-Assas (Paris II) (2003).

3. I have been licensed to practice law in Texas since 1992. I worked at the Texas Resource Center, a non-profit organization established to defend individuals facing the death penalty in that state, from 1991 to 1995. In 1992, I became the first attorney in the United States to challenge the state's failure to comply with Article 36 of the Vienna Convention on Consular Relations ("Vienna Convention"), in a capital case out of Angelina County, Texas (*Faulder v. Johnson*). Later that year, I raised a Vienna Convention claim in a Harris County case involving Mexican national Ricardo Aldape Guerra. After leaving the Resource Center, I continued to serve as counsel in numerous death penalty cases in Texas, most of which involved foreign nationals facing the death penalty. I litigated Vienna Convention claims in the Fifth Circuit Court of Appeals, the U.S. Supreme Court, the Inter-American Commission on Human Rights, and the Inter-American Court on Human Rights. From 2000 to 2006, I was the Director of the Mexican Capital Legal Assistance Program (MCLAP), a program established by the Mexican Foreign Ministry to defend the rights of Mexican nationals facing capital punishment in the United States. I represented Mexico before the International Court of Justice in *Avena and Other Mexican Nationals (Mex.*

    *v. U.S.)*, 2004 I.C.J. 12 (Mar. 31), involving violations of the Vienna Convention in the cases of 51 Mexican nationals sentenced to death in the United States.

4. Since 1992, I have personally represented at least 10 foreign nationals facing the death penalty in the United States, including the petitioner in *Medellin v. Texas*, 552 U.S. 491 (2008). I have consulted with attorneys representing foreign nationals facing the death penalty in at least one hundred cases. I have been invited to speak at multiple national conferences and training seminars for capital defense attorneys regarding the representation of foreign nationals facing the death penalty. I estimate that I have given at least thirty lectures on this topic over the last twenty years. I have also trained consular officials from Europe and Mexico regarding best practices in consular assistance. I have argued cases involving violations of Article 36 of the Vienna Convention in the Texas Court of Criminal Appeals as well as the Supreme Courts of California, Minnesota, Nevada, and New Mexico. I have testified as an expert on the application of the Vienna Convention in death penalty cases in the state courts of California, Oklahoma and Georgia.
5. My C.V. is attached to this affidavit.
6. I have been asked by current post-conviction counsel for Obel Cruz García, the Office of Capital Writs (OCW), to review various documents relating to Mr. Cruz García's capital murder prosecution in the 337th District Court of Harris County, Texas. Specifically, counsel has asked me to render an opinion on the prevailing standard of care in Texas in 2011-2013 for capital trial counsel representing a non-national client.
7. The list of materials I have reviewed includes: (1) Supplemental police report authored by E.S. Mehl on October 8, 2008; (2) Order by the 262nd District Court dated February 2, 2010 finding probable cause to detain Mr.

Cruz Garcia; (3) Notice to Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction; and (4) a copy of Mr. Cruz García's passport issued by the Dominican Republic.

8. In my opinion, and based on my review of the records provided, counsel knew that their client was from the Dominican Republic. Under the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and prevailing Texas practice, competent defense counsel would have notified Mr. Cruz García of his rights under Article 36 of the Vienna Convention. After obtaining Mr. Cruz García's consent, they would have notified consular officials of his detention and sought assistance from the consulate. If Mr. Cruz García's trial counsel failed to take these actions, that failure was objectively unreasonable.

**Evidence of Mr. Cruz García's Foreign Nationality**

9. Several documents confirm Mr. Cruz García's foreign nationality, and all of these would have been available to counsel well before the start of Mr. Cruz García's capital murder trial. On Febrary 12, 2010, the 262nd District Court of Harris County issued an Order finding probable cause to detain Mr. Cruz García. The Order indicates that Mr. Cruz García is a foreign national, although it incorrectly identifies him as a national of Dominica—a Caribbean island in the Lesser Antilles. The order also indicates that Mr. Cruz García required an interpreter—another indicia of foreign nationality. A supplemental police report drafted by Officer E.S. Mehl on October 8, 2008 identifies Mr. Cruz García as a national of the Dominican Republic. Finally, on June 19, 2013, the prosecution filed a Notice to Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction. This notice indicates that "[t]he defendant is a citizen of the Dominican Republic who

entered the United States as well as the Commonwealth of Puerto Rico on multiple occasions since the late 1980s illegally and remained in both locations for periods of time as an undocumented alien."

**Standard of Practice in Texas Capital Cases Involving Foreign Nationals**

10. The starting point for any inquiry into the reasonableness and quality of legal representation in a capital case is the American Bar Association's "Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases." The United States Supreme Court has observed that the ABA Guidelines establish the "prevailing norms of practice" that serve to measure counsel's performance. *Wiggins v. Smith*, 539 U.S. 510, 522-24 (2003) (finding counsel ineffective for failing to investigate defendant's background). The 2003 ABA Guidelines specifically address counsel's obligations when representing a foreign national client facing the death penalty. Guideline 10.6 unequivocally states that counsel should advise a foreign national client of her right to communicate with consular officials. Guideline 10.6 further advises counsel to seek and obtain a foreign national client's consent to contact consular officials, and to follow through by informing the consular office of her client's detention. Guideline 10.6 reads:

> **GUIDELINE 10.6—ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL**
>
> A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B. Unless predecessor counsel has already done so, counsel representing a foreign national should:

1. immediately advise the client of his or her right to communicate with the relevant consular office; and

2. obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

a. Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.

11. In 2006, the Texas State Bar adopted Guideline 10.6 (B) in its Guidelines for Death Penalty Representation ("SBOT Guidelines").[1] SBOT Guideline 10.3 reads as follows:

**GUIDELINE 10.3 Additional Obligations of Counsel Representing a Foreign National**

A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B. Counsel representing a foreign national should:

1. Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

---

[1] The Texas Court of Criminal Appeals has cited the SBOT Guidelines in assessing the prevailing standard of practice in Texas. *See, e.g., Ex parte Van Alstyne*, 239 S.W.3d 815, 822 (Tex. Crim. App. 2007); *Ex Parte Medina*, 361 S.W. 3d 633 (Tex. Crim. App. 2011).

> 2. If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission to withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.
>
> 3. Immediately advise the client of his or her right to communicate with the relevant consular office; and
>
> 4. Obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest. Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.

12. The duties outlined in the ABA and SBOT guidelines stem from Article 36 of the Vienna Convention on Consular Relations. Article 36(b) imposes an obligation on state authorities to advise a detained foreign national of his right to have the consulate notified of his detention. Article 36 (a) and (b) further provide that detained foreign nationals have the right to communicate with consular officials. Article 36 (c) of the Vienna Convention on Consular Relations confers rights on consular officers to visit their nationals and arrange for their legal representation.

13. The rights set forth in Article 36, and counsel's corresponding duties under the ABA and SBOT Guidelines, are no mere formality. The Commentary to Guideline 10.6 offers a useful explanation of the range of services that consular officials can provide:

> As a practical matter, consuls are empowered to arrange for their nationals' legal representation and to provide a wide range of other services. These include, to name a few, enlisting the diplomatic assistance of their country to communicate with the State Department and international and domestic tribunals (e.g., through amicus briefs), assisting in investigations abroad,

> providing culturally appropriate resources to explain the American legal system, and arranging for contact with families and other supportive individuals. As a legal matter, a breach of the obligations of the Vienna Convention or a bilateral consular convention may well give rise to a claim on behalf of the client.

American Bar Association, Standards for the Appointment and Performance of Defense Counsel in Death Penalty Cases, February, 2003 *( footnotes omitted)*.

14. Consular involvement can literally make the difference between life and death in capital cases—even those involving highly aggravated crimes. Accordingly, the Commentary to the ABA Guidelines observes that "[e]nlisting the consulate's support after obtaining the client's consent to do so should therefore be viewed by counsel as an important element in defending a foreign national at any stage of a death penalty case." Both the ABA and SBOT Guidelines highlight the importance of counsel's duties in this regard by insisting that counsel should *immediately* notify her client of the right to consular notification and communication, and should *immediately* notify the consulate once the client's consent has been obtained.

15. The assistance provided by consular officials varies from case to case. I have been involved in at least two dozen cases in which consular officials have interceded with prosecutors prior to trial to persuade them not to seek the death penalty. In most of these cases, the prosecution decided to waive the death penalty in exchange for a guilty plea. In other cases, consular officials have been instrumental in obtaining mitigating evidence from the national's home country that has a decisive impact on the penalty phase defense. Consular officials have also recruited legal counsel to represent foreign nationals facing the death penalty where trial counsel lacks the requisite experience or competence to defend a capital case.

16. Numerous courts have recognized the significance of consular assistance in capital prosecutions and have found trial attorneys ineffective for failing to inform foreign national clients of their consular rights. More than a decade ago, the Oklahoma Court of Criminal Appeals acknowledged the "significance and importance" of consular assistance in the case of a Mexican national, and declared:

> It is evident from the record before this Court that the Government of Mexico would have intervened in the case, assisted with Petitioner's defense, and provided resources to ensure that he received a fair trial and sentencing hearing...We believe trial counsel, as well as representatives of the State who had contact with Petitioner prior to trial and knew he was a citizen of Mexico, failed in their duties to inform Petitioner of his right to contact his consulate.

*Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002). In 2007, the Oklahoma Court of Criminal Appeals found trial counsel ineffective for failing to present mitigating evidence that they could have obtained with the assistance of lawyers working with the Mexican consulate. *Marquez Burrola v. State*, 157 P.3d 749, 766 n.20 (Okla. Crim. App. 2007).

17. As the above discussion makes clear, Mr. Cruz García's defense team should have been aware of their obligations to advise him of his right to seek consular assistance. They should likewise have been aware of their corresponding obligation to advise the consulate of his detention. It seems highly likely that Mr. Cruz García would have consented, given that he requested that his consulate be notified of his detention during his probable cause hearing on February 12, 2010. By August 2011, when trial counsel was appointed to represent Mr. Cruz García, it was standard practice for Texas capital defense attorneys to seek the assistance of consular officials when representing a foreign national.

18. In 2008, the U.S. Court of Appeals for the Seventh Circuit found trial counsel had rendered deficient performance by failing to notify his foreign national client of his consular rights and by failing to raise the issue in court. *Osagiede v. United States,* 543 F. 3d 399 (7th Cir. 2008). In support of its conclusion, the court cited Illinois state guidelines that had adopted language similar to SBOT Guideline 10.3, and held that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable." *Id.* at 411 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). It noted that Vienna Convention claims had been the subject of litigation in several high profile cases leading to widespread local and national media coverage.[2] *Id.* The court concluded that "[i]n this climate, we believe that Illinois criminal defense attorneys representing a foreign national in 2003 should have known to advise their clients of the right to consular access and to raise the issue with the presiding judge." *Id.*

19. It is inconceivable that a Texas capital defense lawyer in 2011 could be unaware of his obligations to facilitate a foreign national client's exercise of his consular rights. Whether counsel's failure to fulfill their duties derived from ignorance or inattentiveness matters little; in either case, their performance fell well below an objective standard of reasonableness when measured against prevailing professional norms.

20. I have read and reviewed this eleven-page affidavit.

---

[2] The same is true in Texas. *See, e.g.,* Bill Mears, *Mexican National Executed in Texas*, CNN, July 7, 2011; Allen Turner and Rosanna Ruiz, *Medellin Executed for Rape, Murder of Houston Teens,* HOUST. CHRON., Aug. 5, 2008; Ginger Thompson, *An Execution in Texas Strains Ties With Mexico and Others,* N.Y. TIMES, August 16, 2002, at A6; *Appeals Court Clears Way for Canadian's Execution in Texas,* CNN, Dec, 10, 1998.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 12th of August, 2015 in Ithaca, New York.

Sandra L. Babcock

Subscribed and sworn before me this 12th of August, 2015, in Ithaca, New York.

Erica J. Russell

ERICA J. RUSSELL
Notary Public - State of New York
No. 01RU6287379
Qualified in Chemung County
My Commission Expires August 05, 2017

**SANDRA L. BABCOCK**

Cornell Law School
148 Myron Taylor Hall
Ithaca, NY 14853
Tel. 607-255-5278
slb348@cornell.edu

March 18, 2015

**TEACHING**

**Clinical Professor, Cornell Law School** 2014-present
Teach clinical courses on international human rights. Supervise students on wide variety of human rights projects, including litigation before international tribunals, advocacy before UN bodies, prisoners' rights work in Malawi, capital defense work in the United States, and human rights advocacy in a variety of other countries. Represent Mexican nationals facing execution and advise the Government of Mexico regarding the defense of Mexican nationals on death row within the United States.

**Fulbright-Toqueville Distinguished Chair, Université de Caen** Fall 2014
First clinical professor awarded the top Fulbright fellowship in France, for a project involving the comparative study of clinical legal education in France and the United States. Taught international human rights clinic and seminar on international gender rights to French masters students. Gave series of lectures on human rights and clinical education.

**Clinical Professor, Center for International Human Rights, Northwestern University Law School** 2006-2014
Taught clinical course on human rights advocacy as well as doctrinal classes in the field of human rights. Recipient of Dean's Teaching Award.

**Tulane Law School/University of Amsterdam** 2004-2012
Amsterdam, The Netherlands
Taught courses on international women's rights and international law and the death penalty

**University of Addis Ababa, Ethiopia** Dec. 2008
Taught course on gender and international human rights

**EXPERIENCE**

**Reprieve (London)** Sept – Dec. 2012
*Senior Fellow*
Consultant to international team of lawyers providing legal assistance to prisoners facing the death penalty.

**Mexican Capital Legal Assistance Program** 2000-2006
*Director*
Directed a national program funded by Mexico to assist Mexican nationals facing capital punishment in the United States. Advised the Mexican Foreign Ministry

and Mexican consular officers in the U.S., supervised the work of 14 attorneys, consulted with trial and post-conviction attorneys, experts and investigators, met with diplomats and consular officials, organized training seminars for consular officials and defense attorneys, negotiated with prosecutors, and represented the Government of Mexico in state and federal courts around the United States. Counsel for the Government of Mexico in litigation on behalf of 54 Mexican nationals before the International Court of Justice in *Avena And Other Mexican Nationals (Mex. v. U.S.).*

**Hennepin County Public Defender** 1995-1999
Minneapolis, MN
*Assistant Public Defender*
Trial lawyer. Represented criminal defendants in state court facing felony and misdemeanor charges.

**Texas Capital Resource Center** 1991-1995
Austin, TX
*Supervising Attorney*
Litigated capital cases in state and federal habeas corpus proceedings. Represented four foreign nationals under sentence of death; conducted investigation in Mexico, Vietnam, and Canada; and worked closely with government officials to enlist their support of foreign citizens on death row. Wrote briefs, habeas corpus petitions, and petitions for writ of certiorari, often under the pressure of an imminent execution date. Conducted evidentiary hearings, investigated guilt and punishment phases of capital cases, and argued before the United States Court of Appeals for the Fifth Circuit.

**EDUCATION**

**Harvard Law School,** J.D., June 1991
CIVIL RIGHTS/CIVIL LIBERTIES LAW REVIEW, Executive Editor
Harvard Human Rights Program

**Johns Hopkins University**, B.A. in International Relations, June 1986
Phi Beta Kappa
Harry S. Truman Fellow
Watson Fellow

**Bologna Center, Johns Hopkins School of Advanced International Studies,** 1984-1985

**HONORS AND AWARDS**

Awarded the Cesare Beccaria medal by the International Society of Social Defense and Humane Criminal Policy for my commitment to the defense of individuals facing the death penalty, Dec. 2009

Awarded the *Aguila Azteca* by the Government of Mexico, May 2003, for legal assistance provided to Mexico and Mexican nationals facing the death penalty in the United States. The *Aguila Azteca* is the highest honor bestowed by the Government of Mexico upon citizens of foreign countries.

Minnesota Association of Criminal Defense Lawyers, Outstanding Legal Achievement Award, February 25, 2006.

Outstanding Legal Service Award, National Coalition to Abolish the Death Penalty, October 2004.

Access to Justice Award, Minnesota Hispanic Bar Association, October 23, 2003.

Volunteer Award, Minnesota Advocates for Human Rights, June 2004.

1997 "Public Defender of the Year," Hennepin County Public Defender's Office.

Recognized as one of the outstanding criminal defense lawyers in the State of Minnesota by *Minnesota Law and Politics* magazine for five consecutive years.

**PUBLICATIONS**

*Le droit international et la peine de mort: Dans le flou entre la théorie et la pratique,* in « Vers l'interdiction absolue de la peine de mort : perspectives philosophiques et juridiques », Ecole Normale Supérieure, France (forthcoming 2015).

*Death Penalty Worldwide*, http://www.deathpenaltyworldwide.org/index-cihr.cfm. The death penalty worldwide project includes a comprehensive database on the laws and practices of 90 countries and two territories that continue to apply the death penalty. It represents the first attempt by any academic institution to compile this information and make it available to the public. Three years of research went into the project, which also includes information on various topics of international law and the death penalty. Financial support for the database was received from the European Union, through the World Coalition Against the Death Penalty, as well as the Proteus Action League. The database was launched in Strasbourg at the Council of Europe on April 14, 2010, and is continually updated.

*The Mandatory Death Penalty in Malawi: The Unrealized Promise of Kafantayeni*, with Ellen Wight, in Peter Hodgkinson and Kerry Ann Akers, THE LIBRARY OF ESSAYS ON CAPITAL PUNISHMENT (Ashgate 2013).

*The Limits of International Law: Efforts to Enforce Rulings of the International Court of Justice in U.S. Death Penalty Cases*, 62 SYRACUSE L. REV. 183 (2012).

*International Standards on the Death Penalty*, 28 THOMAS M. COOLEY L. REV. 103 (2011).

*Human Rights Advocacy in United States Capital Cases*, in THE CONTEMPORARY HUMAN RIGHTS MOVEMENT IN THE UNITED STATES (2007).

*The Global Debate on the Death Penalty*, in AMERICAN BAR ASSOCIATION, HUMAN RIGHTS, Spring 2007.

*The Growing Influence of International Tribunals, Foreign Governments and Human Rights Perspectives in United States Death Penalty Cases*, in CENTER FOR CAPITAL PUNISHMENT STUDIES, OCCASIONAL PAPERS vol. 2 (August 2005).

*The Role of International Law in United States Death Penalty Cases*, 15 LEIDEN J. INT'L LAW (2002).

*L'application du droit international dans les executions capitals aux Etats-Unis: de la théorie à la pratique*, in LA PEINE CAPITALE ET LE DROIT INTERNATIONAL DES DROITS DE L'HOMME, Université Panthéon-Assas (Paris II) (2003)(in English with introduction in French).

Co-author, *Namibia: Constructive Engagement and the Southern Africa Peace Accords*, 2 HARV. HUM. RTS. J. 149 (1989).

**GRANTS RECEIVED:**

February 2013: Received grant in the amount of $4,000 from the Northwestern Program of African Studies to research laws and practices of African states that retain the death penalty.

September 2010-August 2012: Received three annual grants in the amount of $10,000 (each) from the Proteus Action League for research relating to the *Death Penalty Worldwide* database.

May 2012: Obtained a 3-year grant from the European Union in the amount of $100,000 for ongoing research associated with the *Death Penalty Worldwide* database.

September 2011: Received $4,000 from the French Embassy for ongoing research associated with the *Death Penalty Worldwide* database and translation of database into French

2010: European Union funded an independent researcher to assist me in completing the *Death Penalty Worldwide* database in the amount of 50,400 euros

**LANGUAGES** Proficient in French and Spanish, conversational Italian and German

**RECENT LECTURES AND PRESENTATIONS (not a complete list):**

Speaker, "Foreign Nationals Facing Capital Punishment," Expert meeting organized by the UN High Commissioner on Human Rights, Geneva, Switzerland, June 16, 2015.

Moderator, "Framing the Issues—Women, Prison, and Gender-Based Violence," 2015 Women and Justice Conference, Washington, D.C., April 15, 2015.

Panelist, "Human Rights in Western Sahara: The Right to Self-Determination," United Nations, Geneva, March 10, 2015.

Speaker, "La peine de mort aux États-Unis," University of Tours, Tours, France, December 4, 2014.

Speaker, "Pourquoi la peine de mort survit-elle en Amérique ? *Etats-Unis v Mexique*," Association France-Amériques, Paris, France, December 2, 2014.

Leçon Inaugurale, "Cliniques juridiques, l'enseignement du droit et accès à la justice," Inaugural lecture as Fulbright-Toqueville chair at Université de Caen, Basse-Normandie, November 19, 2014.

Guest lecture, "Les cliniques juridiques aux États-Unis," University of Paris-Nanterre, Paris, France, October 20, 2014.

Speaker, "Politique, morale et légalité de la peine de mort au XXIème siècle," Caen Memorial (World War II Museum), Caen, France, October 8, 2014.

Speaker, "Global Politics, Morality, and the Declining Use of the Death Penalty," Illinois Wesleyan University, Feb. 6, 2014.

Speaker, "Fair Trial and Due Process Guarantees in the Use of the Death Penalty," Expert Seminar on Moving Away from the Death Penalty in Southeast Asia, Seminar with Southeast Asian Governments organized by the UN High Commissioner on Human Rights, Bangkok, Oct. 22-23, 2013.

Speaker, "La nécessité de reviser les guaranties des roits des personnes passibles de la peine de mort," (delivered in French), Ecole Normale Supérieure, Paris, Oct. 18, 2013.

Speaker and Chair, "Legal Representation in Capital Cases," Fifth World Congress Against the Death Penalty, Madrid, June 14, 2013.

Closing speaker, "Contra las penas crueles e inhumanas y la pena de muerte," Real Academia de Bellas Artes, Madrid, June 11, 2013.

"Réflexions sur la peine de mort," Speech delivered at the French Ministry of Foreign Affairs, Quai d'Orsay, Paris, on the occasion of World Day Against the Death Penalty, Oct. 9, 2012.

"Methods of Execution as Cruel, Inhuman or Degrading Treatment or Punishment," Presentation given at expert meeting with UN Special Rapporteurs on Torture and on Extrajudicial, Summary and Arbitrary Executions, June 26, 2012, Harvard Law School, Cambridge, MA.

"The Death Penalty Worldwide: Prospects for Reform and Abolition," Cornell Law School, April 13, 2012.

Speaker, "Le droit à la vie et la fourniture de substances létales," and "Les resistances à la abolition de la peine capital", at workshop hosted by the College de France, Paris, entitled "La protection international du droit à la vie: Mobiliser le système penal?", Nov. 18, 2011.

Speaker, "Estrategias de litigio en casos de pena de muerte," Congreso Sobre Abolición Universal de la Pena de Muerte y Otros Tratos o Penas Cureles, Inhumanos o Degradantes, Law Faculty of the University of Buenos Aires, Sept. 21, 2011.

Speaker, "Cross-Examination and Other Litigation Strategies in the U.S. Criminal Justice System," Defensoría General de la Nación, Buenos Aires, Sept. 20, 2011.

Panelist, L'iniezioine letale e la pena di morte," Hands off Cain, Rome, Italy, Dec. 3, 2010.

Speaker, "Reflecciones sobre la pena de muerte," Academic Network Against the Death Penalty, Madrid, Spain, Oct. 4, 2010.

Speaker, "Reflections on the Death Penalty," 16th International Seminar of the Brazilian Institute of Criminal Sciences, Sao Paulo, Brazil, Aug. 26, 2010.

Panelist, "Abolition of the Death Penalty," 16th International Seminar of the Brazilian Institute of Criminal Sciences, Sao Paulo, Brazil, Aug. 27, 2010.

Panelist, "Author Meets Reader – The Next Frontier: National Development, Political change, and the Death Penalty in Asia," Law and Society Association, Chicago, May 28, 2010.

Panelist, "Innovative Models and Solutions: Reducing Prison Overcrowding through Paralegals and Other Programmes," United Nations Office on Drugs and Crime 12th Quinquennial Congress, Salvador, Brazil, Apr. 15, 2010.

Moderator, "Privatization of Prisons: Global Trends and the Growing Debate," United Nations Office on Drugs and Crime 12th Quinquennial Congress, Salvador, Brazil, Apr. 14, 2010.

Panelist, "Death Penalty: Abolition or Moratorium," United Nations Office on Drugs and Crime 12th Quinquennial Congress, Salvador, Brazil, Apr. 13, 2010.

Panelist, "Promoting Abolition Through Academic Research and Collaboration," World Congress Against the Death Penalty, Geneva, Switzerland, Feb. 25, 2010.

Panelist, "Conditions and Limits for International Legal Cooperation Regarding the Death Penalty," Conference sponsored by the Centro de Estudios Políticos y Constitucionales, Madrid, Spain, Dec. 11, 2010 (Presentation given in Spanish).

Speaker, "International Legal Standards and the Death Penalty" and "Challenges in the Application of the Death Penalty: The U.S. Experience," at seminar sponsored by the Moroccan Ministry of Justice and the Centre for Capital Punishment Studies, Rabat, Morocco, Oct. 5-7, 2009.

Panelist, "Unfinished Business: Human Rights Treaties and the Obama Administration," panel organized by the Journal of International Human Rights, Feb. 3, 2009.

Panelist, "International Policy in the Obama Administration," panel organized by Amnesty International and the International Law Society, Jan. 23, 2009.

Panelist: "Retos para el Derecho Internacional post-Medellin y retos para el Estado Mexicano en espera de próximas ejecuciones," Universidad Iberoamericana, October 30, 2008, Mexico City, Mexico.

Presentation for Military Commissions Lawyers on "International Human Rights Law and the Military Commissions Act," American Civil Liberties Union, September 29, 2008, New York, NY

Panelist, "Relevance of the Use of the Inter-American System for the Protection of Human Rights", at Conference entitled "The United States and the Inter-American Human Rights System, organized by Columbia University Law School and the Center for Justice and International Law, New York, NY, April 7, 2008

Panelist, "The Quest for International Justice," at A Celebration of Public Interest, Harvard Law School, March 13-15, 2008.

Speaker, "Client to Cause: locating our work, identifying the tensions, pedagogic opportunities and goals," Annual Human Rights Clinicians Conference, March 1, 2008.

Yale Law School, September 20, 2006, "Enforcing International Law in U.S. Death Penalty Cases: From The Hague to Houston."

Keynote Speaker, Amnesty International Human Rights Awards Dinner, University of St. Thomas School of Law, April 19, 2006.

"La Pena de Muerte en Estados Unidos," Mexican Foreign Ministry, Instituto Matias Romero, lectures given to students in diplomatic academy in 2001, 2002, 2004, and 2005, Mexico City, México.

"International Standards on the Death Penalty," at the International Leadership Conference on the Death Penalty in Tokyo, Japan, Dec. 7, 2005.

Keynote Speaker, NAACP Legal Defense Fund Annual Conference for Capital Defense Lawyers, Airlie, Virginia, July 23, 2004.

Ford Foundation: "Close to Home: Human Rights and Social Justice Advocacy in the United States," Panelist, "Human Rights and U.S. Law," June 21, 2004, New York, New York.

University of Westminster School of Law, London, October 14, 2003, "The Growing Influence of International Tribunals, Foreign Governments and Human Rights Perspectives in United States Death Penalty Cases."

Avocats San Frontières, "Del Proceso penal inquisitivo hacia el acusatorio," Bogotá, Colombia, August 4, 2003.

Canadian Department of Foreign Affairs, "Transcending Barriers: 25th Anniversary of International Transfer of Offenders Program," Presentation on Prisoner Exchange Treaties, Ottawa, Canada, May 23, 2003.