## DECLARACIÓN JURADA DE IRMA IGLESIAS CRUZ

Yo, Irma Iglesias Cruz, digo y declaro lo siguiente:

1. Mi nombre es Irma Iglesias Cruz. Yo trabajo tiempo completo como un capellán de la prisión institucional en las instalaciones de Bayamón en San Juan, Puerto Rico. Superviso a unas sesenta personas en la Instalación 448 en Bayamón, además de supervisar a capellanes en siete otras instituciones. Superviso la orientación de capellanes nuevas que vienen a trabajar en el entorno institucional. En estas orientaciones, revisamos las normas y procedimientos de ministrar en un establecimiento penitenciario. Me hago cargo también de papeles activos en diferentes clases de religión, incluyendo clases de la Biblia. Superviso los eventos en la capilla y también sirvo como predicadora y consejera. He trabajado como capellán en el Departamento de Corrección y Liberación de Puerto Rico por aproximadamente cuarenta años.

2. La primera vez que conocí a Obel Cruz-García fue a los fines de los años 2000, cuando él se ubicaba en Bayamón. Yo llegué a conocerlo muy bien a lo largo de unos cuatro años. Obel y yo nos íbamos conociendo a través de nuestro trabajo junto en la capilla, así como asistir servicios religiosos juntos y nuestro estudio de la Biblia y sesiones de consejería.

3. Durante el tiempo que Obel fue encarcelado en Bayamón, trabajó como mi asistente. En el tiempo que nos conocimos, fue el preso más confiado en la capilla, y me asistió en todos los asuntos de los servicios religiosos de la instalación. Limpió mi oficina y la capilla. También supervisó a otros encarcelados que asistieron los servicios religiosos de la instalación. Él tomó un papel muy activo ayudando a otras personas encarceladas, actuando como un consejero para ellos. Obel también trabajó en el

1

EXHIBIT 105 Page 001

mantenimiento general de la cárcel, ayudando asegurar que la capilla estuvo lista para los servicios. Con frecuencia, Obel se quedó solo en la instalación.

4. Debido a las fuertes creencias y las convicciones religiosas de Obel, fue muy querido y respetado por las otras personas encarceladas, y también por el personal de la institución. Incluso al superintendente de la prisión le gustó y él confió sinceramente a Obel.

5. Obel tuvo la confianza general del personal penitenciario. Ninguna institución correccional permitirá a cualquiera de caminar por la instalación sin supervisión. Un preso debe tener toda la confianza para tener ese grado de libertad, y tuvimos esa confianza en Obel. De hecho, Obel tuvo las llaves de mi oficina. Le di las llaves porque los necesitó para mantener y cuidar la capilla. En todo el tiempo que conocí Obel, nunca actuó de manera inapropiada, se portó mal, o quedó redactado. Nosotros capellanes, en general, somos una comunidad muy conservativa, y el hecho de que Obel ganó nuestra confianza es notable y demuestra mucho sobre su carácter. Además, como capellán de la prisión, estoy acostumbrada a tratar con muchas personas encarceladas, y creo que me he convertido en una persona que puede distinguir entre personas de buen o mal carácter. Por lo general puedo decir si un preso me está tratando de engañar o manipular. Creo que Obel fue sincero en su fe y sus creencias religiosas. Nada de lo que dijo o hizo nunca me dio una razón para dudar a él.

6. En algún momento antes de que Obel fuera trasladado a Houston, fue trasladado a una celda segregada. Antes de este tiempo, siempre había estado en la población general. Me sorprendió que fue trasladado, ya que nunca había tenido ningunos problemas disciplinarios. Obel me dijo que fue trasladado a la segregación, ya que era sospechoso en un caso de

Houston. Por lo que yo sabía, no lo movieron debido al mal comportamiento. Él nunca se comportó de manera inapropiada durante el tiempo que lo conocí. Por lo que yo sé, su comportamiento en la cárcel fue impecable.

7. Obel se mantuvo muy religioso a lo largo de la totalidad de su pena de prisión. Él oraba con otros encarcelados, y también les predicaba. Obel bien ayudaba que los otros presos analizaran y hablaran de las cosas que ellos experimentaban. Él les aconsejaba y los cuidaba.

8. Yo pensaba que Obel iba tener dificultades de mantener su fe y convicción después de que fue trasladado a la segregación. Por el contrario, incluso después de que Obel fue trasladado a una celda segregada, podríamos escucharlo, desde nuestra capilla, dando sermones a los demás encarcelados en segregación. Él tomó la iniciativa de dirigir los servicios. Su fe nunca lo falló. Todos estábamos muy orgullosos de él. Todo el mundo le hizo caso. Yo sabía que su fe y sus creencias eran fuertes.

9. Obel no era solo un buen oyente, sino que también era dedicado y cariñoso. A veces también me ayudó a pensar bien en mi propia fe y creencia en Dios. Estoy agradecida que Obel me diera la confianza para predicarle a él. Yo sé que Dios ha transformado a Obel, y yo siempre he estado muy impresionada con la fuerza de su creencia.

10. En mis más de cuarenta años de trabajo en las prisiones y centros de detención en Puerto Rico, he trabajado con miles de presos. Obel se destaca como uno de los presos mejores portados y más confiados que he conocido durante todo mi tiempo de trabajo en las cárceles y centros de detención.

11. Nunca fui contactada por los abogados litigantes de Obel. Si yo hubiera sido contactada, habría hecho cualquier cosa que podía para ayudarle a

EXHIBIT 105 Page 003

3

Obel. Si me hubieran llamado como testigo, habría testificado al contenido de esta declaración jurada.

12. He leído y revisado esta declaración jurada de cuatro páginas.

*[signature]*
Irma Iglesias Cruz

TESTIMONIO NÚM. _____

Jurado y suscrito ante mí por **Irma Iglesias Cruz,** mayor de edad, casada, y vecina de Toa Baja, y a quien DOY FE de conocer personalmente, hoy día 21 de agosto de 20 15, en San Juan, Puerto Rico.

*[signature]*
ABOGADO - NOTARIO

RECIBO
04880498
9397
10/21/2013
$5.00
$5 Sello Asistencia Legal
52568-2013-1021-48096713

EXHIBIT 105 Page 004

# CERTIFICATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, state and declare as follows:

1. My name is Adrián de la Rosa. I currently live in Austin, Texas. I am fluent in both English and Spanish.
2. I am a native Spanish speaker, born in Big Spring, Texas. Spanish was my first language, and I speak Spanish regularly with several family members. I also took formal Spanish classes for native speakers during high school and college. I am able to speak, read, and write in Spanish proficiently.
3. I am a Post-Conviction Investigator at the Office of Capital Writs (OCW) in Austin, Texas. As part of my investigation, I was asked by the OCW to translate several English-language affidavits into Spanish.
4. The attached notarized affidavit signed by Irma Iglesias Cruz is the Spanish-language affidavit I translated from an English-language affidavit provided to me by the OCW. The English-language version of the affidavit is also here attached.
5. I declare under penalty of perjury under the laws of the State of Texas that the signed document is a true and correct translation of the English-language text that I originally received.

Executed on August 25, 2016

_____
Adrián de la Rosa

Subscribed and sworn to before me on August 25, 2015

_____
Notary Public, State of Texas



JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017

Notary without Bond

EXHIBIT 105 Page 005

# AFFIDAVIT OF IRMA IGLESIAS CRUZ

I, Irma Iglesias Cruz, state and declare as follows:

1. My name is Irma Iglesias Cruz. I work fulltime as an institutional prison chaplain at the Bayamón facility in San Juan, Puerto Rico. I supervise about sixty people in the 448 Facility in Bayamón in addition to chaplains in seven other institutions. I oversee the orientation of new chaplains coming to work in the institutional setting. In these orientations, we go over the norms and procedures of ministering in a correctional facility. I also take on active roles in different religious classes, including Bible classes. I supervise the events in chapel and also serve as a preacher and a counselor. I have worked as a chaplain in the Puerto Rico Department of Correction and Liberation for roughly forty years.

2. I first met Obel Cruz-Garcia in the late 2000s when he was housed at Bayamón. I got to know him very well over the course of about four years. Obel and I came to know one another through our work together in the chapel, as well as through attending religious services together and our Bible study and counseling sessions.

3. While Obel was incarcerated at Bayamón, he served as my assistant. In the time that we knew one another, he was the most trusted inmate in the chapel, and assisted in all matters dealing with the facility's religious services. He cleaned my office and the chapel. He also supervised other inmates who made their way to the facility's religious services. He took a very active role in helping with other inmates, serving as a type of counselor for them. Obel also performed general maintenance duties, helping to ensure that the chapel was ready for services. He was often left alone in the facility.

4. Because of Obel's strong religious beliefs and convictions, he was extremely well-liked and respected by other inmates, as well as the institutional staff. Even the prison's superintendent was fond of and sincerely trusted Obel.

5. Obel had the overall trust and confidence of the prison staff. No correctional institution will allow just anyone to walk around the facility without supervision. An inmate must have total trust in order to have that degree of freedom, and Obel had that. In fact, Obel had keys to my office. I gave him keys because he needed them in order to maintain and take care of the chapel. In the entire time I knew Obel, he never acted inappropriately, misbehaved, or got written up. We chaplains, generally speaking, are a very conservative people, and the fact that Obel won our trust is remarkable and shows a lot about his character. Furthermore, as a prison chaplain, I am used to dealing with inmates, and I believe that I have become a good judge of character. I usually can tell if an inmate is trying to 'con' or manipulate me. I believe that Obel was sincere in his faith and his religious beliefs. Nothing he said or did ever gave me a reason to doubt him.

6. At some point before Obel was transferred to Houston, he was transferred to a segregated cell. Before this time, he had always been in general population. I was surprised when he was transferred, since he had never had any disciplinary problems. Obel told me he was transferred to segregation because he was suspected in a case from Houston. As far as I knew, he was not moved due to bad behavior. He never behaved inappropriately during the time that I knew him. As far as I know, his behavior in jail was impeccable.

2

EXHIBIT 105 Page 007

7. Obel remained very religious throughout the entirety of his prison sentence. He would pray with and preach to other inmates. Obel was very good at helping other inmates analyze and talk about the things that they were going through. He counseled them and took care of other inmates.

8. I thought that Obel would find it very difficult to maintain his faith and conviction after he was moved into segregation. To the contrary, even after Obel was transferred into a segregated cell, we could hear him, from our chapel, giving sermons to the other inmates in segregation. He took the initiative to lead services. His faith never failed him. We were all so proud of him. Everyone would listen to him. I knew his faith and beliefs were strong.

9. Not only was Obel a good listener, but he was also dedicated and loving. At times, he also helped me think through my own faith and belief in God. I am grateful to Obel for giving me the confidence to preach to him. I know that God has transformed Obel, and I have always been very impressed by the strength of his belief.

10. In my forty-plus years working in prisons and detention centers in Puerto Rico, I have worked with thousands of inmates. Obel stands out as one of the best behaved and most trusted inmates I have met during my entire time working in jails and detention facilities.

11. I was never contacted by Obel's trial attorneys. If I had been contacted, I would have done anything I could to help Obel. Had I been called as a witness, I would have testified to the contents of this affidavit.

12. I have read and reviewed this four-page affidavit.

_____
Irma Iglesias Cruz

SWORN TO AND SUBSCRIBED BEFORE ME by Irma Iglesias Cruz, of legal age, married, and resident of Toa Baja, and who I know personally and I can attest, this day August 21, 2015 , in San Juan , Puerto Rico

_____

Attorney—Notary

4

EXHIBIT 105 Page 009