# DECLARACIÓN JURADA DE IVÁN NEGRÓN VERA

Yo, Iván Negrón Vera, digo y declaro lo siguiente:

1. Mi nombre es Iván Negrón Vera. Yo trabajo como capellán de la prisión en el Departamento de Correcciones en San Juan, Puerto Rico. He trabajado allí durante diecisiete años. Yo soy un ministro reconocido y ordenado con una licenciatura en Teología. Estudié en el Seminario Teológico Autónomo de San Juan, Puerto Rico.

2. Durante parte de mi tenencia en el Departamento de Correcciones, supervisé a 2,000 capellanes que servían las diferentes instalaciones por unos doce años, desde 2000 hasta 2012. En mi papel actual de capellán hoy día, tiendo a las vidas espirituales de los encarcelados de todos los orígenes y credos. También ayudo a las personas con pensamientos suicidas, los que tienen problemas familiares e incluso ayudo con la inserción laboral. También tiendo a las necesidades del personal de la institución correccional, incluyendo los guardias.

3. La primera vez que conocí a Obel fue alrededor de 2005-2006 cuando fue encarcelado en la cárcel Rio Piedra 352. Creo que estaba allí desde 2005 hasta 2010. Trabajé con Obel en sesiones de asesoramiento, así como los estudios religiosos. Me relacioné con él casi todos los días. Después de eso, me trasladé a la cárcel de Bayamón, pero todavía me mantuve en contacto con Obel. Yo lo conocí hasta que fue extraditado a Houston.

4. Cuando primero conocí a Obel, fue evidente la cantidad de interés que tenía en la religión. Basado en mis experiencias anteriores interactuando con personas encarceladas, yo sabía que Obel era alguien para mirar porque él mostraba habilidades de liderazgo y sus

_INV_

EXHIBIT 106 Page 001

testimonios personales fuertes con respecto a la religión eran muy impactantes. Él completamente ganó mi respeto y confianza y la confianza de varias otras personas en la instalación, los demás encarcelados y también el personal de la institución los guardias.

5. Mientras Obel se encontraba en Río Piedra, fue ubicado en la población general y se quedaba solo fuera de su celda con frecuencia. Durante el tiempo que lo conocía, nunca escuché ninguna queja acerca de él, ni supe que tuvo problemas disciplinarios. Debido a su comportamiento y buen trabajo, Obel tenía la confianza de mi y otros miembros del personal penitenciario, tanto como la confianza de los demás individuos encarcelados.

6. Yo tenía tanta confianza en Obel que le di las llaves de mi oficina, que necesitaba para sus funciones manteniendo la capilla. Para los servicios de la capilla, Obel llegaba temprano para desbloquear y abrir la capilla, encender el aire acondicionado, y preparar la capilla para los servicios. Permítanme ser claro, no se le da a cualquiera estos tipos de deberes. Nosotros solamente los dábamos a la gente que confiábamos verdaderamente por la razón que tenían acceso a llaves muy importantes. Puedo contar en mi mano el número de individuos que he dado este nivel de responsabilidad, el nivel de responsabilidad que le di a Obel, y todavía tendría dedos sobrantes. Eso es lo mucho que confiaba en él. Nunca he tenido ninguna razón para no hacerlo.

7. Obel también se permitió la oportunidad de trabajar en la fabricación de muebles mientras que él estaba encarcelado. De nuevo, esto era un privilegio dado a las personas encarceladas que se comportaban bien y no causaban ningún problema. Especialmente teniendo en cuenta el grado de acceso de este programa a las herramientas eléctricas y otras

EXHIBIT 106 Page 002

máquinas afiladas, solo los encarcelados de mayor confianza se dieron este privilegio.

8. Obel no solo fue bien comportado, pero también ayudaba mantener el orden en la prisión. Era respetado por los otros encarcelados tanto como el personal, y era capaz de convencer a los otros encarcelados que presten atención a los guardias y sigan las reglas. Muchos de los guardias que yo conocía sentían que Obel hizo sus vidas más fáciles asegurándose de que todo el mundo prestaba atención a las reglas de la facilidad. Y, a pesar de que era tan querido por el personal penitenciario, ninguno de los otros encarcelados resentían a Obel por eso. Lo querían y respetaban también.

9. Yo bauticé a Obel en 2008, cuando aún estaba en la institución de Río Piedra. Obel a veces hablaba de haber tomado malas decisiones antes de ser encarcelado, cuando él no tenía a Dios en su vida. Antes de redescubrir su fe, a veces hablaba de un "vacío" o sensación de que algo faltaba en su vida. Yo creo que estos sentimientos se derivaron de no tener a Dios siempre en su vida.

10. Mientras encarcelado, la fe de Obel en Dios fue muy claro y evidente, tanto en la forma en que habló durante los servicios de la capilla, sino también en su alcance a otras personas encarceladas. Yo personalmente vi que Obel cambió las vidas de otras personas encarceladas con sus discusiones acerca de Dios y sus creencias. Les tocó las vidas de tantas personas con su fe y sus creencias en Dios, y yo incluiría a yo mismo como una de esas personas.

11. Movieron a Obel entre diferentes instalaciones durante el tiempo que estuvo encarcelado en Puerto Rico, pero esto es común para las

EXHIBIT 106 Page 003

personas en cárceles aquí. Por lo que yo sé, esto no tenía nada que ver con la conducta de Obel en la cárcel.

12. Yo soy todavía agradecido a Obel porque hizo tanto para ayudar a mí y también al resto del personal de la prisión. Estoy agradecido por la influencia positiva que tuvo en otras personas encarceladas en Rio Piedra durante el tiempo que se encuentró allí.

13. Obel todavía me escribe cartas. A pesar de que sus circunstancias son tan difíciles en este momento, el sigue mostrando el amor y apoyo. En sus cartas siempre pregunta cómo me va y expresa interés en mi vida. Estoy, y siempre he sido, impresionado con el grado de sensibilidad que tiene Obel.

14. En mis diecisiete años de trabajar con los presos y personas encarceladas, he trabajado con miles de personas. Obel se destaca como uno de los mejores educados y más de confianza de todas las personas con las que he trabajado en los centros penitenciarios. Él ha dejado una impresión muy importante en mi vida como capellán.

15. Nunca fui contactado por abogados litigantes de Obel. Si yo hubiera sido contactada, habría hecho cualquier cosa que podía para ayudar a Obel. Habría juntado el dinero para viajar a Houston, si el equipo de defensa no tenía fondos para traerme. Si me hubieran llamado como testigo, yo habría testificado del contenido de esta declaración jurada.

EXHIBIT 106 Page 004

16. He leído y revisado esta declaración jurada de cinco páginas.

Yo declaro bajo pena de perjurio y bajo las leyes de *Puerto Rico* que lo anterior es verdadero y correcto según mi mejor conocimiento y que esta declaración jurado fue ejecutada el __11__ de *Agosto* 2015 en *San Juan, Puerto Rico*

_____
Iván Negrón Vera

Aff. Num. 19-288

Jurado y afirmado ante mi este __11__ día __Agosto__, 2015.

_____
Firma del Notario Público

Imprimir, Escribir o Sello del Notario Público Comisionado:




9397
08/06/2015
$5.00
$5 Sello Asistencia Legal
50593-2015-0806-57483674

EXHIBIT 106 Page 005

## CERTIFICATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, state and declare as follows:

1. My name is Adrián de la Rosa. I currently live in Austin, Texas. I am fluent in both English and Spanish.

2. I am a native Spanish speaker, born in Big Spring, Texas. Spanish was my first language, and I speak Spanish regularly with several family members. I also took formal Spanish classes for native speakers during high school and college. I am able to speak, read, and write in Spanish proficiently.

3. I am a Post-Conviction Investigator at the Office of Capital Writs (OCW) in Austin, Texas. As part of my investigation, I was asked by the OCW to translate several English-language affidavits into Spanish.

4. The attached notarized affidavit signed by Iván Negrón Vera is the Spanish-language affidavit I translated from an English-language affidavit provided to me by the OCW. The English-language version of the affidavit is also here attached.

5. I declare under penalty of perjury under the laws of the State of Texas that the signed document is a true and correct translation of the English-language text that I originally received.

Executed on August 25, 2015

Adrián de la Rosa

Subscribed and sworn to before me on August 25, 2015

Notary Public, State of Texas



JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017
Notary without Bond

EXHIBIT 106 Page 006

# AFFIDAVIT OF IVÁN NEGRÓN VERA

I, Iván Negrón Vera, state and declare as follows:

1. My name is Iván Negrón Vera. I work as a prison chaplain at the Department of Corrections in San Juan, Puerto Rico. I have worked there for seventeen years. I am a recognized and ordained minister with a bachelor's degree in Theology. I studied at the Seminario Teológico Autónomo in San Juan, Puerto Rico.

2. During my tenure at the Department of Corrections, I supervised 2,000 chaplains serving the different facilities for roughly twelve years, from 2000 through 2012. In my current chaplain role, I tend to the spiritual lives of those incarcerated from all backgrounds and faiths. I also help individuals with suicidal thoughts, those having family problems and even help with job placement. I also tend to the needs of the correctional facility staff, including guards.

3. I first met Obel around 2005-2006 when he was housed at the Rio Piedra jail 352. I believe he was housed there from 2005 to 2010. I worked with Obel in counseling sessions, as well as religious studies. I interacted with him nearly every day. After that, I moved to Bayamon jail, but I still kept in contact with Obel. I knew him until he was extradited to Houston.

4. When I first met Obel, it was obvious how much interest he had in religion. Based on my prior experiences interacting with incarcerated individuals, I knew Obel was someone to watch because he showed leadership skills and his strong personal testimonies regarding religion were very impactful. He completely earned my confidence and the confidence of several other individuals at the facility, both inmates and facility staff and guards.

1

EXHIBIT 106 Page 007

5. While Obel was housed at Rio Piedra, he was housed in general population and was frequently left alone outside of his cell. During the time that I knew him, I never had any complaints about him or knew him to have any disciplinary problems. Because of his behavior and good work, Obel had the trust of myself and other prison staff, as well as the other incarcerated individuals.

6. I had so much trust and confidence in Obel, I gave him the keys to my office, which he needed for his chapel duties. For chapel, Obel would arrive early to unlock and open the chapel, turn on the air conditioning, and prepare the chapel for services. Let me be clear, not everyone is given these types of duties. We only gave them to the people we truly trusted and confided in because they were given important keys. I can count on my hand the number of individuals that I have given this level of responsibility, the level of responsibility that I gave Obel, and I would still have fingers left over. That is how much I trusted him. I never had any reason not to.

7. Obel also was allowed the opportunity to work making furniture while in jail. Again, this was a privilege given to incarcerated individuals that behaved well and did not cause any problems. Especially considering how much access this program gave to power tools and other sharp machinery, only the most trusted inmates were given this privilege.

8. Not only was Obel well behaved, but he also helped to maintain order in the prison. He was respected by other inmates as well as staff, and was able to convince other inmates to pay attention to the correctional staff and follow the rules. Many of the corrections officers that I knew felt that Obel made their lives much easier by making sure that everyone in the facility followed the rules. And, even though he was so well liked by the correctional staff,

2

EXHIBIT 106 Page 008

none of the other inmates seemed to resent him for it. They liked and respected him, too.

9. I baptized Obel in 2008, while he was still at the Rio Piedra facility. Obel sometimes talked about having made bad decisions before he was incarcerated, when he did not have God in his life. Before Obel rediscovered his faith, he sometimes talked about an "emptiness" or feeling like something was missing in his life. I believe that these feelings stemmed from his not always having God in his life.

10. While incarcerated, Obel's faith in God was very clear and evident, both in the way that he spoke during chapel services, but also in his outreach to other incarcerated individuals. I personally saw him change other inmates' lives with his discussions about God and his beliefs. He touched so many people's lives with his faith and beliefs in God, and I would include myself as one of those people.

11. Obel was moved between different facilities during the time he was incarcerated in Puerto Rico, but this is common for inmates here. As far as I know, this had nothing to do with Obel's conduct in prison.

12. I am still grateful to Obel because he did so much to help me and the rest of the prison staff. I am grateful for the positive influence that he had on other inmates at Rio Piedra during the time he was housed there.

13. Obel still writes me letters. Even though his circumstances are so difficult right now, he continues to show love and support. In his letters he always asks how I am doing and expresses interest in my life. I am, and always have been, impressed with how sensitive Obel is.

14. In my seventeen years working with prisoners and incarcerated individuals, I have worked with thousands of people. Obel stands out as one of the best behaved and most trustworthy of all the people I have worked with in

3

EXHIBIT 106 Page 009

correctional facilities.  He has left a very important impression in my life as a chaplain.

15. I was never contacted by Obel's trial attorneys.  If I had been contacted, I would have done anything I could to help Obel.  I would have raised the money to fly to Houston, if the trial team could not afford to bring me.  Had I been called as a witness, I would have testified to the contents of this affidavit.

16. I have read and reviewed this five-page affidavit.

I declare under penalty of perjury under the laws of Puerto Rico that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on ___ of August, 2015 in _____.

_____

Iván Negrón Vera

Subscribed and sworn to before me on this ____ day _____, 2015.

_____

Notary Public

4

EXHIBIT 106 Page 010