# EXPERT DECLARATION OF DR. CLAUDIA AHUMADA DEGRATI, PH.D.

I, Claudia Ahumada Degrati, Ph.D., declare as follows:

1. My name is Claudia Ahumada Degrati, Ph.D. I am a practicing clinical and forensic psychologist. In my practice, I assess and treat individuals, some of whom have an acquired brain injury or suffer from depression, anxiety, PTSD, and other mental disorders. My clinical experience also includes providing psychotherapy to individuals who have been exposed to domestic violence and sexual, physical, and emotional abuse. In addition, I conduct psychological and neuropsychological evaluations and assessments and provide forensic consultation on mental health issues. I am fully bilingual in English and Spanish and many of my patients are immigrants, particularly from Latin America. The factual statements I make in this declaration are true and correct to the best of my knowledge and experience.

2. Obel Cruz-Garcia is an inmate in the custody of Texas Department of Criminal Justice (TDCJ). Current counsel for Obel Cruz Garcia requested that I conduct a psychosocial assessment of Obel to identify and describe psychologically significant traumatic events in Obel's life and evaluate and explain the effects, if any, of those events on his cognitive, psychological, and emotional development and social functioning. My findings, analysis, and conclusions are set forth in this Declaration.

## EXECUTIVE SUMMARY

3. Obel's traumatic life experiences began with a childhood characterized by neglect, parentification at a young age, exposure to alcohol at a very young age, abandonment, and other traumatic and stressful events. From childhood and early adolescence to adulthood, Obel Cruz Garcia suffered chronic, repeated, trauma with its long-lasting consequences and effects on somatic, cognitive, affective, and behavioral areas of functioning.

## BACKGROUND AND QUALIFICATIONS

4. My professional qualifications are fully expressed in my curriculum vitae appended to this report. Brief highlights include the following:

    a. I am a clinical psychologist licensed to practice in the State of California. I also hold a temporary license to practice in the state of Texas. I received my Bachelor of Arts degree, with a major in liberal arts and minor in Spanish, from Prescott College in Prescott, Arizona, in 1998. I received my Master of Arts in Clinical Psychology from Ryokan College in 2000. In

1

Exhibit 110 Page 001

2004, I received a Ph.D. in Clinical Psychology from Pacifica Graduate Institute in Santa Barbara, California. In 2017, I received a certificate in Clinical Neuropsychology from Fielding Graduate University.

b. Between 2000 and 2003, and between 2006 and 2007, I worked at the Crime Victim Counseling Center in Cerritos, California as a psychological assistant. I provided individual and family psychotherapy to child, adolescent, and adult victims of crime experiencing high-risk stressors including domestic violence and sexual, physical, and emotional abuse. I also assessed and provided treatment plans for children, adolescents, and adults exhibiting symptoms of mental disorders including anxiety, depression, and posttraumatic stress disorder (PTSD).

c. Between 2005 and 2007, I worked for Barbara Cort Counter, Ph.D., Inc., a private clinical and forensic psychological practice in Beverly Hills, California. As a psychological assistant, I provided individual psychotherapy as well as forensic consultations and evaluations for state and federal court cases.

d. I have been an approved service provider for two Regional Centers in Southern California. From 2011 until 2013, I provided services at the North Los Angeles County Regional Center in Van Nuys. From 2013 until 2015 I provided psychological services at Harbor Regional Center in Torrance. Regional centers are private, non-profit organizations contracting with the State of California for the provision of services to persons with developmental disabilities. At the regional centers, I conducted reevaluations of the regional center's clients and evaluations of regional center applicants to determine eligibility for services by assessing whether the clients or applicants have a developmental disability as defined by California law and regulations.

e. Since 2007, I have maintained a private practice in clinical and forensic psychology, until recently in Beverly Hills, and currently in Fullerton, California. In my practice, I assess and treat individuals, some of whom have an acquired brain injury or suffer from depression, anxiety, PTSD, and other mental disorders. My clinical experience also includes providing psychotherapy to individuals who have been exposed to domestic violence and sexual, physical, and emotional abuse. I also conduct psychological and neuropsychological evaluations and assessments and provide forensic consultation on mental health issues. I am fully bilingual in English and

2

Exhibit 110 Page 002

Spanish and many of my patients are immigrants, particularly from Latin America.

    f. From 2011 until 2017, I served as an adjunct faculty member at the Pacifica Graduate Institute in Carpinteria, California. I taught and provided case consultation and supervision to doctoral-level students on multiculturalism and cultural diversity issues arising in psychotherapy.

## REFERRAL QUESTION AND SCOPE OF EVALUATION

5. Current counsel for Obel Cruz Garcia requested that I conduct a psychosocial assessment of Obel to identify and describe psychologically significant traumatic events in Obel's life and evaluate and explain the effects, if any, of those events on his cognitive, psychological, and emotional development and social functioning.

6. To perform the requested tasks, I conducted four clinical interviews of Obel in a confidential meeting room at Texas Department of Criminal Justice (TDCJ) Polunsky Unit, in Livingston, Texas on October 15, 2018; October 16, 2018; February 28, 2019 and March 1, 2019, for a total of approximately twenty three hours. In addition, I reviewed numerous declarations and court testimony of family members and other individuals who observed Obel's experiences, development, and functioning. These are the types of materials and information upon which psychologists rely to reach reliable opinions and clinical conclusions about a person's history and functioning.

## MATERIALS REVIEWED

7. In preparing this report and reaching the expert opinions contained herein, I have reviewed, among other materials:

    a. Excerpts from state writ and accompanying exhibits;

    b. Punishment phase trial transcripts (volumes 24-28);

    c. Declarations from witnesses in Dominican Republic;

    d. Declarations from witnesses in Puerto Rico;

    e. Declaration of Noemi Cruz-Garcia;

8. On the basis of my review of these materials and interviews, I provide the following opinions and conclusions.

3

Exhibit 110 Page 003

# MR. OBEL CRUZ-GARCIA'S LIFE HISTORY

9. Obel Cruz Garcia was born on July 8, 1967, in Santo Domingo, Dominican Republic, to Valerio Julian de la Cruz Santos and Dalia Garcia.

## Early Childhood

10. Obel is the second of his parent's four children. In birth order they are: Noemi, Obel, Natalia and Joel. When Obel was a young child, the family lived in a house that his father built in the Maquiteria neighborhood of Santo Domingo. Valerio cleared what was at the time a small piece of scrubland and claimed it for himself and his family. Initially, the house was precariously built with wood planks. Later, Valerio re-built it with cement blocks.

11. Obel's mother, Dalia was a homemaker and his father was the sole bread winner. Valerio was a paramedic in the navy; he worked shifts at the military base and his job was well regarded. Valerio also liked to drink and had affairs with many women. Based on information obtained from multiple sources in the Dominican Republic, Obel's father's womanizing and multiple affairs were one of the cultural mores common in the Dominican Republic. Valerio's father and his father's father had many children with multiple women. Obel's great grandfather had 36 children with different women. Despite the cultural and familial underpinnings of Valerio's behavior, it still caused tremendous tension between Obel's parents and exposed him to situations that were highly inappropriate for a child.

12. Valerio's excesses were drinking and womanizing. He began sharing his drinks with Obel when Obel was a five-year-old child. Valerio would tell Obel that he was a man already and have him drink rum and sometimes whisky.

13. When Obel was about five years old, his father had an accident that was to change life Obel's and his family's life forever. Valerio was hit by a car while on the side of the road and was injured so severely that when he was taken to the hospital, they thought he was dead. Valerio was placed in the morgue until one of Obel's uncles went to identify him and realized he was not dead. Valerio had seven broken ribs, a broken leg and an injured spleen. His recovery was long and arduous. He was hospitalized for a long time and had many surgeries. Afterwards, Obel became his father's crutch. During Valerio's hospitalization, Obel would go back and forth from home to the hospital and help tend to his father. After the accident, Valerio would tell Obel he had become the man of the house now. Because of his injuries,

4

Exhibit 110 Page 004

Valerio was declared officially disabled and could no longer work for the navy.

## Abandonment by Mother

14. After Valerio's accident, Dalia became aware of his multiple affairs. Valerio was unrepentant and made it clear that he intended to continue to see other women. With the support of her family, Dalia decided to leave her husband and children and join her older sister in Venezuela. Obel was six or seven years old when his mother abandoned the family. The loss of his mother was devastating to Obel. Valerio hired a neighborhood woman to help but the brunt of household duties fell on Obel and his older sister, Noemi. They cleaned and cooked and cared for their younger siblings, including Joel, who was still in diapers.

## Move to a Rural Village

15. After some time, Valerio decided to move with the children to his mother's house in the small rural village of Boba, so that he could have help. Moving to Boba was another life-changing event for Obel, who was around 10 years old. He left behind life as he knew it in Santo Domingo, the capital, to live in a small fishing village in a rural area of the country. There was no electricity or running water in Boba. At night, the house was lit by an oil lamp. The family obtained water from a small well or "cacimba." A hole in the yard served as the toilet. During storms, the runoff from the latrine contaminated the cacimba. Nor were there any phones in the village. Obel brought his dog with him but in Boba the dog barked constantly and was tied outside until he set himself free and attacked a pig. Obel was devastated when his pet was sent back to Santo Domingo. Not having his dog with him felt like another tremendous loss to him.

16. The residents of Boba fed their families by fishing and farming and everyone, even the children, were expected to help. When Obel and his family moved to Boba, they initially lived with his paternal grandmother, Ramona Santos, who lived in a small two-bedroom wooden house with her second husband. Their large extended family lived in the area and it was not uncommon for other people to stay overnight in the already crowded home. Ramona cooked using firewood and gathering wood for cooking became one of Obel's chores.

17. Valerio frequently took Obel with him to fish in order to feed the family. They left very early in the mornings, before school. Sometimes they went fishing out to sea for three or four days. On the fishing trips they brought food such

5

Exhibit 110 Page 005

as bread, salami and sardines and alcohol to "keep warm." They fished in the deep waters off the coast and tried to keep land in sight. They were often caught in rough seas. Several people described an incident in which the boat capsized and Obel jumped in the water to rescue his father who had fallen in the water. Obel became an avid and skillful fisherman. He and his father also worked in the fields tending to and gathering rice crops. In Boba, Obel attended a small village school. He fished with his father in the morning and attended class in the afternoon. Obel's teacher, Altagracia Mosquea, remembers his nervousness and anxiety whenever he was required to speak in front of the class. He would break into a cold sweat when called upon to go up to the board. Obel would volunteer to walk a sick classmate home in order to leave school.

18. While living in Boba, Obel and his siblings had no direct contact with their mother. Dalia sent some money back via her parents, which Valerio would collect when he made monthly medical visits to Santo Domingo. When Obel was approximately twelve, Dalia sent for his older sister, Noemi, to join her in Venezuela. She promised to send for Obel shortly thereafter and he was excited about going to live with his mother and older sister. However, according to Noemi, Dalia never really intended to bring Obel to live with her. Obel felt rejected and abandoned anew.

19. Valerio set up a dispensary in Boba, which had previously had no place to go for medical attention. People from the area and neighboring villages went there for his services. Obel became his father's assistant of sorts and watched as his father cared for illnesses of all kinds. Valerio taught Obel how to give injections and clean wounds.

**Abandonment by Father**

20. Valerio met a local teacher named Dorca. They later married and moved to a nearby village called Bella Vista where they built a house. Like Boba, it had no running water, electricity, or telephone. Up until the time Valerio married Dorca, Obel and his father went everywhere together; Obel was his father's crutch, his right hand. They worked together; they ate and even drank together. Valerio's marriage caused tremendous change in Obel's relationship with his father and left a gaping hole in Obel's life. Dorca was jealous of Valerio's relationship with his children and in particular his relationship with Obel. When she complained about the children, Valerio disciplined them harshly to placate her. Obel felt as if Dorca had stolen his father away from

6

Exhibit 110 Page 006

him. The loss of his close relationship with his father was extremely painful for Obel. Valerio fathered two children with Dorca.

21. When Obel was 13 years old, he was seduced by a 40-year-old woman. She lived in the village and was considered a prostitute who frequently preyed on the young men in the area.

22. During his time in the area of Nagua, Obel worked as a fisherman, in the fields, and in construction for several years. His work in the fields included planting and gathering rice and other crops. Another of his agricultural tasks was applying pesticides on the crops. He would first fill the pump's container with pesticide using a can that he had hand-dipped into the pesticide. He then sprayed the chemicals using the pump he carried on his back. Spraying pesticides was also one of his tasks later on, when he worked in the coffee fields in Puerto Rico. Sometimes he sprayed an herbicide and other times an insecticide. In the fields, there was no water to wash off the chemicals. Using them frequently caused him a headache; sometimes he also felt nauseated.

**Forced Marriage**

23. Obel was 18 when he met Mireya Perez Garcia. She lived in a nearby village and went to Boba to attend her uncle's funeral. Although he liked her, he was not planning to start a serious relationship with her. Mireya's family forced them to move in together after one of her sisters told others they had had sex, even though they both denied it. Cultural mores in the area dictate that once a young woman has been "dishonored" the man is obliged to take her as his wife. Obel did not feel ready to take on the responsibility of starting a family of his own; he lived at home with his father. Still, he followed the tradition and took Mireya as his common-law wife. Obel's family did not approve of the relationship. His stepmother, Dorca in particular, disliked Mireya as Obel's partner. This made it very difficult for Obel to have Mireya live with him in his father's house. They went to live in a small house her family lent them in nearby Los Naranjos.

24. Obel continued to work in whatever he could find in order to support his new wife but they had a hard time making ends meet. His friend and neighbor Piruquiru "Piruca" Acosta saw how hard Obel worked. He would go out to sea with a group of other fishermen on his father's boat. Some days the catch was very small and there was not much fish to distribute among them. Food was very scarce for Obel in those days yet he shared his food and the fish he caught with other people such as his friends Piruca. People who knew him

7

Exhibit 110 Page 007

described Obel as generous, nice, and hardworking. He was willing to go fishing even when other fishermen would not because the sea was too rough. At one point Valerio no longer allowed Obel to take his boat fishing and with that, severely curtailed Obel's chances of making a living as a fisherman. Obel was certain his stepmother was behind his father's decision.

### Move to Puerto Rico

25. When Mireya became pregnant with their first child, they agreed Obel should leave and go to Puerto Rico in search of work, as so many other Dominican migrants did. His chances in Puerto Rico were better than in the impoverished village of Boba; from Puerto Rico he would send money for her and their baby. Obel did not have the money to go to Puerto Rico so he helped a carpenter make the "yola," the yawl that would take him and other migrants from the Dominican Republic to Puerto Rico. The journey was full of dangers.

26. Obel was 19 when the boat left Punta Cana in the Dominican Republic and crossed the Mona Passage to arrive in Puerto Rico. The passage connects the Atlantic Ocean and the Caribbean Sea. The area is fraught with variable tidal currents and strong winds. The crossing on a yola is not for the faint of heart. Locals call it el mar de los muertos, "the sea of the dead" because of the many boating accidents and deaths caused by the severe storms and currents in the shark infested waters. Despite the dangers, Dominican migrants like Obel take to the boats in hopes of reaching U.S. territory in search of a better life. Obel's plan was to work there long enough to save money to buy a small fishing boat and equipment so he could support his family in the Dominican Republic.

### Abandonment by Common-Law Wife

27. Obel was working in Puerto Rico when he learned through his father than Mireya, although still pregnant with his child, was with another man. The news completely devastated Obel. He felt as if all the dangers he had faced to make it to Puerto Rico and all the sacrifices he had made to send some money to her for his unborn child had been in vain. In that moment, he felt "everything a body can feel." His entire body felt like a gaping wound. He sought to alleviate his pain the way he had learned from his father and drank an entire bottle of Bacardi (rum) in a single long gulp. He stayed in Puerto Rico but his spirit was crushed. From then on, his drinking intensified.

8

Exhibit 110 Page 008

28. As an undocumented immigrant in Puerto Rico Obel faced discrimination and had a difficult time navigating the differences between Puerto Rican and Dominican cultures. Locals call Dominicans and other undocumented immigrants by the pejorative name of "mojados" (wetbacks). Obel felt a great sense of unease and anxiety not knowing when he might be spotted and caught by "la migra" (immigration officers). He tried hard to speak and act like a local to go undetected.

29. When Obel first arrived in Puerto Rico, one of Mireya's cousins told him he had found a job for him at a coffee plantation. Obel was required to work long hours each day, seven days a week, and to live in barracks housing on the plantation with up to 15 other workers. Obel earned 50 or 60 dollars for two weeks of grueling work. He and another 15 workers slept on a mattress on the floor of a warehouse that was used as a deposit for fertilizer, herbicides, the pumps used to spray the chemicals, and other agricultural products and equipment. The place reeked from the chemicals and the unbathed body-odor of the workers. The workday started at 6 am and ended at 3 pm. Work was exhausting, it included clearing the land by cutting down trees and loading the wood onto trucks, clearing brush and weeds using a machete, digging holes for the coffee plants, planting them, spraying pesticides and spreading fertilizer. The workers were also expected to harvest and load banana bunches onto trucks. Obel and the other workers were charged for their food such as rice and coffee. They were only given green bananas for free. They were not given gloves or any other protective equipment or supplies. The company sold them all their supplies including the boots and machetes they needed to perform their work. Obel's hands and feet were covered with blisters. Still, he needed to earn more money to send home so he asked for extra work. He often worked a couple of extra hours each day cutting guinea grass. This sometimes supplemented his income up to 80 dollars. Obel sent most of his earnings to his father with the belief that he would pass it on to Mireya. After several months of living and working under those conditions, and despondent after learning that Mireya was with someone else, Obel left the plantation and moved to Rio Piedras, Puerto Rico.

## Attempt to Start a New Life

30. From then on, during his time in Puerto Rico Obel worked in whatever he could find; as a cook at a restaurant; as a gardener; loading and unloading cargo; in construction; painting and roofing. He also gathered aluminum cans that he sold for recycling and gathered other metals that he could sell, such

9

Exhibit 110 Page 009

as copper. He would also take down, haul away and sell aluminum awnings damaged by the frequent storms that battered Puerto Rico. In Rio Piedras, Obel reunited with his neighbor from Bella Vista, Piruca. A friend of Piruca, Salome, helped Obel obtain employment as a cook in a restaurant.

31. At the restaurant, Obel met Angelita Rodriguez. They started a relationship and eventually married. Obel went to work in construction with Angelita's father, Victoriano. Obel's job was mixing cement and building cement roofs. Obel and Angelita were together about five years. From Puerto Rico Obel moved with Angelita to Texas.

32. In or around 1992, they moved back to the Dominican Republic. They moved in with Angelita's family in Higuey. There, they started a tourist bus company. Obel's job was driving a bus while Angelita, her mother and aunts, were in charge of administration and financial matters.

33. Throughout his life Obel experienced many environmental stressors. He lived through several violent storms, one of them at sea, and had at least two serious car accidents. One of them was in the Dominican Republic. As he was driving a pickup truck, he tried to avoid hitting a bus head on and crushed against a palm tree instead. In this accident a metal shaft pierced his foot. The other accident happened in Puerto Rico. On a rainy day, he was the passenger in a car travelling from Rio Piedras to Santurce when they collided with another car. Obel was propelled out of the car through the windshield. People who came to the scene were surprised to see he was alive. He left running despite being hurt because he was undocumented. His eyebrow was bleeding from a cut and he had pieces of glass embedded in the skin of his forehead. Since he could not go to the hospital and seek treatment because of his legal status, a woman held the flaps of skin on both sides of the injury on his eyebrow with a drop of Crazy Glue. He had pieces of windshield glass in his forehead for a long time.

## CLINICAL OBSERVATIONS

34. During my clinical interviews with Obel, which were conducted in Spanish, he was cooperative and polite and appeared to try to respond to my questions as best as he was able. He was well-groomed for all the interviews; it appears he expends considerable effort maintaining his cleanliness. He mentioned that it is important to him to smell and look clean. He carried with him a small towel that he took out at times to wipe perspiration from his hands or wipe his tears. When he arrived into the interview room the first time, he walked and moved with some difficulty which he attributed to using a brace on his right knee. He complained of having a

10

Exhibit 110 Page 010

painful right knee and reported he was being evaluated for knee replacement surgery. His movements were slowed in general throughout most of the interviews, although he became fidgety at times.

35. The cognitive and psychological impact of the deprivation, neglect and significant trauma he experienced as a child were apparent throughout the clinical interviews. He exhibited verbal problems including an impoverished vocabulary, word finding difficulties, and misuse of some words. As he had difficulty finding words, he could not think of how to say mail box, for instance. He did not seem to know the meaning of the word "season" when asked what season it was as part of the Mental Status Examination. The Mini-Mental State Examination (MMSE) is a standardized, widely used, screening instrument designed to detect gross impairment in general cognitive functioning. He mispronounced some words, such as "incienso" (incense) and said "insencio" instead. He also said "ibanos" instead of "ibamos" (we used to go/we would go) as well as "comíanos" instead of "comíamos" (we used to eat/we would eat). There were other instances of his substituting "m" with "n." However, it should be noted that this substitution in certain words is not entirely uncommon among some Spanish speakers. His vocal tone was normal and his rate of speech was somewhat rapid. The latter is likely a characteristic of his Caribbean origin.

36. During our interviews, Obel exhibited a number of symptoms associated with a traumatic response. He had darting pupils and became agitated at times. He also reported suspicion of others that reflected hypervigilance. Eye contact was initially somewhat poor until rapport was established, it became subsequently appropriate. However, he continued to cover his face sometimes, particularly in the beginning of the first interview, when the topic of conversation caused him significant distress or embarrassment. He did not appear to be responding to external stimuli during the interviews. His prevailing mood was sad in general and anxious at times. His thought content demonstrated sadness and religiosity. He reported suffering from frequent nightmares. He mentioned having flashbacks of "what happened in court" but did not explain what he meant by that despite being asked follow up questions. He appeared to not understand what flashbacks are notwithstanding attempts to explain. He indicated that his mind races sometimes but that he prays and cries out for God's help to cope. He denied suicidal or homicidal ideation.

11

Exhibit 110 Page 011

37. He exhibited and reported memory and attention deficits during the clinical interviews. It is well understood that trauma has profound effects on memory. He said he used to have to write everything, such as people's names, down in a notebook because he would otherwise forget. Some of the accounts regarding his life history were lacking in detail. Even though he was cooperative during interviews, obtaining the details of his traumatic experiences required significant effort on my part.

## CONCLUSIONS

38. Years of repeated and prolonged adverse experiences profoundly affected Obel Cruz Garcia. Chronic and repeated exposure to traumatic and stressful events throughout his life, particularly during his developmental period, shaped and substantially impaired his cognitive, psychological, and social functioning and behaviors. The most significant traumatic events in Obel's life, even among a myriad of others included the chaos, parental discord and maternal abandonment in which he grew up.

39. Obel's father, even though Obel was only a child, made him feel complicit in his secret liaisons. His father's easy-going and friendlier attitude, compared to his mother's, made Obel idealize his father. However, Valerio's womanizing and drinking exposed Obel to sexual abuse and started him early on the road to alcohol abuse and addition. In doing so, Valerio normalized what were dangerous situations for a child.

40. Yet the most significant turning points in Obel's life and perhaps the most traumatic experiences for him were his father's accident and his mother's abandonment not long after. Obel was still a child when Valerio had such a serious accident that medical personal thought he was dead and placed him in the hospital's morgue until they realized he was not. Later, Dalia left the country and moved to Venezuela, leaving her children without a mother. From then on, despite his young age, Obel was propelled into a parental role, forced to become a caretaker for his younger siblings. Obel also had to care for his father, who would not allow anyone other than Obel take care of his personal hygiene. From then on, Obel was to become not only his siblings' father of sorts, but his father's "crutch." The abandonment by his mother was repeated when his mother sent for his older sister to join her in Venezuela, while falsely promising to send for Obel soon. He suffered the loss of both mother and sister and was left feeling unwanted and unworthy.

12

Exhibit 110 Page 012

41. After Obel's father remarried, Obel was rejected anew by his stepmother, who treated him and his siblings harshly. She demanded that Obel's father prioritize his relationship with her and her biological children at the expense of his previously close relationship with Obel.

42. As described in detail throughout his life history above, the long list of traumatic incidents to which Obel was exposed in childhood and adolescence include: familial patterns of trauma and poverty; what appears to be maternal mental illness and stress; extreme poverty and related environmental deprivation; child labor, abandonment, and neglect; repeated exposure to pesticides and other neurotoxins, including alcohol as a child; early loss of sense of safety, loss of his father as a protector and income-earner, loss of familiar surroundings when his family moved from the capital to a rural area, etc.. Each of these traumatic events alone may detrimentally impact an individual's cognitive and behavioral development, however, the presence and interaction of multiple traumatic incidents had an exponential effect on Obel's development and subsequent functioning.

43. Research (Herman, 1997; van der Kolk, 2009) has shown that traumatic childhood experiences like those experienced by Obel Cruz Garcia are the kind of adverse childhood experiences powerfully linked to detrimental effects on adult health. The Adverse Childhood Experiences (ACE) study by Kaiser Permanente and the Center for Disease Control was based on a questionnaire regarding adverse childhood experiences including abuse, neglect, poverty, family dysfunction, and other traumatic experiences such as those of Obel Cruz Garcia. The ACE study identified factors that set the stage for illness including mental illness. The study confirmed an unequivocal and highly significant link between repeated traumatization in childhood and depression, alcoholism, drug abuse and sexual promiscuity, as well as various medical illnesses including heart disease, cancer, stroke and diabetes.

44. In late adolescence and adulthood Obel's exposure to trauma and stress continued. The experiences described above in more detail include: extreme poverty and lack of access to services and resources; many near-death experiences at sea, while fishing, his and his father's lives were at constant risk, their boat capsized at sea in shark infested waters; while helping his father tend to patients that suffered from severe illnesses, he was exposed not only to those illnesses, but also saw severe deformities; felt forced into a live-in relationship and started a family at a young age; suffered the dangers of crossing the Mona Passage on a frail boat, as he and many Dominican risk

13

Exhibit 110 Page 013

their lives in search of a better life in Puerto Rico; faced discrimination and fear of being detected as an undocumented alien in Puerto Rico; learned his common-law wife was being unfaithful while pregnant with their child; survived tropical storms in the Dominican Republic, Puerto Rico and at sea, and experienced at least two serious car accidents. He also continued to be exposed to neurotoxins, particularly in the form of pesticides and other agro-chemicals.

45. Exposure to such chronic, multiple and severe instances of trauma, in combination with a genetic predisposition to substance abuse, set the stage for his resorting, early on, to the coping method that is common in victims of trauma: self-soothing and self-medicating his symptoms with alcohol and ultimately, drugs. Also early on, however, he followed not only the familial and cultural mores of having multiple relationships and children with several women, but felt obliged to support them at significant personal cost to him. Despite the numerous parallel relationships, the women in his life whose declarations I read continue to describe him as a loving father and caring husband.

46. In adulthood, religion became not only a source of comfort and hope for him, but when it helped him with a severe addiction to heroin while in prison in Puerto Rico, it became his lifeline. Currently on death row, his religious faith continues to sustain him. There have been several executions since he was sentenced, a recent one was that of his friend Joey, but he still holds out hope and feels at peace. God, he said, provides him everything he needs. He believes in the power of prayer because he has seen his prayers answered. Even though on death row life is not without temptation, he remains firm in his commitment to God. He tries to inspire faith and hope in others. He, in turn, is inspired by the likes of preacher and motivational speaker Nick Vujicic who was born without arms or legs. As a result, Vujicic cannot care for himself and must rely on others for his basic needs. Obel thinks that if someone like "Nick" can remain hopeful and continue to have faith, so should he. Just remembering this makes him appreciate that he can walk, write, shower… whenever he feels his motivation is flagging he prays and praises God, sometimes out loud, and looks at Nick's photograph. He had it with him among other pictures during our last interview. On the opposite side, he had glued a picture he asked the guards to take of him with his arms raised so as to "lend them to Nick," he said. It seems as though Obel Cruz Garcia has found in religion an adaptive way of coping with the sequelae of the chronic,

14

Exhibit 110 Page 014

severe and repeated traumatic life experiences he has had to live through since childhood.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     July 1, 2019
              Fullerton, California

_____
Claudia Ahumada Degrati, PhD.

# Claudia Ahumada Degrati, Ph. D.
CLINICAL AND FORENSIC PSYCHOLOGY
Bilingual Spanish/English

1440 N. Harbor Blvd., Fullerton CA 92835
Tel./ Fax (562) 381-2370 - Mobile (562) 760-0160 - mail@DrDegrati.com

## CURRICULUM VITAE

**LICENSURE**  Clinical Psychology, 2007 (California: PSY 21691)

**LANGUAGES**  English and Spanish

**PRIVATE PRACTICE**  Psychological Evaluations and Assessments
Neuropsychological Evaluations
Mental Health & Psychosocial Consultation
Psychosocial Histories
Victim Outreach
Psychotherapy
Clinical supervision

**EDUCATION**

Ph.D., Clinical Psychology, 2004. Pacifica Graduate Institute. Carpinteria, California

Neuropsychology Postdoctoral Certificate Program, 2017.
    Fielding Graduate University. Santa Ana, California

M. A., Clinical Psychology. Ryokan College, Los Angeles, California

B. A., Liberal Arts. Minor: Spanish. Prescott College, Prescott, Arizona

Interpersonal Neurobiology (IPNB) Certificate.
    Mindsight Institute, Los Angeles, California

Journalism, Universidad Nacional de Cordoba. Cordoba, Argentina

Interpretation and Translation in Spanish/English Certificate.
    University of California, Los Angeles (UCLA), Los Angeles, California

**PROFESSIONAL EXPERIENCE**

**PRIVATE PRACTICE**                                                                                   2007 – Present
**Forensic and Clinical Psychology.** _Mental Health and Psychosocial Consultation_, specializing in Latino cases. _Mitigation Consultation_ with emphasis on psychological functioning and mental health issues. _Psychosocial Histories_. _Victim Outreach_. Capital and Non-Capital Cases, State and Federal Courts at Trial, Sentencing, Appellate, and Habeas Levels. _Psychological and Sentencing Evaluations. Neuropsychological Evaluations. Psychological Assessments._ Regional Center approved vendor. Assess for developmental disabilities including Intellectual Disability and Autism Spectrum Disorders by administering, scoring and interpreting psychometric tests and utilizing other psychodiagnostic techniques. _Psychotherapy and Clinical Supervision._ Treatment of Depression, Anxiety, Posttraumatic Stress Disorder (PTSD), Adjustment Disorder, Domestic Violence, Sexual, Physical and Emotional Abuse. Treatment, Evaluations, Assessments and other services provided in English and Spanish.

**PACIFICA GRADUATE INSTITUTE**                                                                  2011 – 2017
**Adjunct Faculty.** PhD Depth Psychology with Emphasis on Psychotherapy Program. Face to Face Consultation with Emphasis on Cultural Diversity Course. Teach and provide case consultation and supervision to doctoral students regarding multiculturalism and cultural diversity issues.

Exhibit 110 Page 016

**BARBARA CORT COUNTER, PH. D., INC. AND ASSOCIATES**                     2005 – 2007
**Psychological Assistant.** Provided psychological consultation and evaluation as well as mitigation services in capital and non-capital, state and federal court cases, at all levels of court proceedings. Prepared Psychosocial Histories. Conducted research and investigation. Victim outreach services. Provided individual psychotherapy.

**VICTIMS OF CRIME COUNSELING CENTER**                     2000 – 2003    2006 – 2007
**Psychological Assistant.** Conducted initial evaluations and assessments. Diagnosed and developed treatment plans. Provided individual and family psychotherapy to children, adolescent and adult victims of crime mainly for treatment of depression, anxiety, posttraumatic stress disorder (PTSD), domestic violence, sexual, physical and emotional abuse, in Spanish and English. Complied with documentation requirements of the State of California. Prepared written reports for social workers, attorneys and other professionals.

**LOS ANGELES COUNTY SUPERIOR COURTS**                                1994 - 2007
**Interpreter and Translator.** Court interpreter, certified by the State of California and the Administrative Office of the United States Courts (State and Federal certification). Approved translator for the County of Los Angeles.

**CAREER ADVANCEMENT CENTERS - Los Angeles, CA**                    1991 - 1994
**Bilingual Vocational Rehabilitation Counselor.** Managed a large caseload. Provided counseling to Spanish and English speaking injured workers. Conducted vocational testing. Prepared vocational rehabilitation plans for state approval. Provided job development services. Implemented rehabilitation plans and supervised clients. Wrote periodic progress reports. Conducted training workshops in English and Spanish.

**EDUCATIONALLY RELEVANT PUBLICATIONS**

Degrati, C. A. (2009). *Maps to the soul: Stories Latinas tell of their migration journey,* Saarbruken, Germany: VDM Publishing House Ltd.

**PRESENTATIONS AND LECTURES**

Office of the Federal Public Defender, Los Angeles, CA. "Psychological Trauma" Nov 2008

Pacifica Graduate Institute, Carpinteria, CA. "Multicultural Issues in Psychotherapy" May 2009

Office of the Public Defender, Los Angeles, CA. "Mitigation Investigations in Latin America" Oct 2009

Public Defender's Office, Clark County, NV. "Mitigation with Mexican Nationals" April 2011

Public Defender's Office, Washoe County, NV. "Mitigation with Mexican Nationals" April 2011

**PROFESSIONAL MEMBERSHIPS**

American Psychological Association (APA) - Division of Law and Psychology (41, APA)

Los Angeles Psychological Association (LACPA)

California Psychological Association (CPA)

Global Association for Interpersonal Neurobiology Studies (GAINS)

Exhibit 110 Page 017