REPORTER'S RECORD

**VOLUME 5 OF 35 VOLUMES**

TRIAL COURT CAUSE NO. 1384794

COURT OF CRIMINAL APPEALS NO. AP-77,025


| | | |
|---|---|---|
| OBEL CRUZ-GARCIA | ) | IN THE DISTRICT COURT |
| Appellant | ) | |
| | ) | |
| VS. | ) | HARRIS COUNTY, TEXAS |
| | ) | |
| THE STATE OF TEXAS | ) | |
| Appellee | ) | 337TH JUDICIAL DISTRICT |



* * * * * * * * * * * * * * * * * *

**VOIR DIRE PROCEEDINGS**

* * * * * * * * * * * * * * * * * *



On the 3rd day of June, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Renee Magee, Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by computer-aided transcription/stenograph shorthand.

```
 1                    A P P E A R A N C E S

 2


 3
        MS. NATALIE TISE
 4      SBOT NO. 00795683
        MR. Justin Wood
 5      SBOT NO. 24039247
        Assistant District Attorneys
 6      1201 Franklin
        Houston, Texas  77002
 7      PHONE:  713.755.5800
        ATTORNEYS FOR THE STATE OF TEXAS
 8

 9
             - AND -
10

11
        MR. R.P. 'SKIP' CORNELIUS
12      SBOT NO. 04831500
        2028 Buffalo Terrace
13      Houston, Texas  77019-2408
        PHONE:  713.237.8547
14
        MR. MARIO MADRID
15      SBOT NO. 00797777
        440 Louisiana, Suite 1225
16      Houston, Texas  77002-1659
        PHONE:  713.877.9400
17      ATTORNEYS FOR THE DEFENDANT

18

19

20      Rolando Hernandez
        Marilu Flores,
21      Interpreters

22

23

24

25
```

1  **I N D E X**
**VOLUME 5**
2  **(VOIR DIRE PROCEEDINGS)**

3  **JUNE 3, 2013**

                                                     **PAGE/VOL.**
4  Pretrial proceedings                              4      5

5  State's Motion in Limine                          4      5

6  GEORGE MOCK, NO. 9............................ 7      5
   Venireperson excused by agreement of both
7  parties

8  NATHALIE ORTIZ, NO. 59....................... 7      5
   Venireperson excused by agreement of both
9  parties

10 Court's General Instructions to Panel of ..... 8    5
   Prospective Jurors
11
   JOHN HOLIK, NO. 1............................ 104    5
12 Venireperson excused by agreement of both
   parties
13
   KURT VONPOLNSKI, NO. 3...................... 104    5
14 Venireperson excused by agreement of both
   parties
15
   TRACY CANADA, NO. 6......................... 104    5
16 Venireperson excused by agreement of both
   parties
17
   MONICA LARA, NO. 8.......................... 104    5
18 Venireperson excused by agreement of both
   parties
19
   MICHAEL TRULOVE, NO. 10..................... 104    5
20 Venireperson excused by agreement of both
   parties
21
   ANTHONY BAYER, NO. 12....................... 104    5
22 Venireperson excused by agreement of both
   parties
23
   RONALD ABELLERA, NO. 16..................... 104    5
24 Venireperson excused by agreement of both
   parties

25

1    ANITA PAYNE, NO. 18........................... 104    5
     Venireperson excused by agreement of both
2    parties

3    MEGHAN MEHL, NO. 20........................... 104    5
     Venireperson excused by agreement of both
4    parties

5    LEONA MARSHALL, NO. 23........................ 104    5
     Venireperson excused by agreement of both
6    parties

7    JAMES FULLER, NO. 26.......................... 104    5
     Venireperson excused by agreement of both
8    parties

9    KATHERINE MCCLENDON, NO. 27................... 104    5
     Venireperson excused by agreement of both
10   parties

11   SANTIAGO ROSA, NO. 29......................... 104    5
     Venireperson excused by agreement of both
12   parties

13   HAZEL HOUSTON, NO. 30......................... 104    5
     Venireperson excused by agreement of both
14   parties

15   DARLENE CHORBA, NO. 36........................ 104    5
     Venireperson excused by agreement of both
16   parties

17   MERCEDIA ROSE, NO. 39......................... 105    5
     Venireperson excused by agreement of both
18   parties

19   NICHOLAS CARCZ, NO. 47........................ 105    5
     Venireperson excused by agreement of both
20   parties

21   JEREMIAH NEUNEKER, NO. 48..................... 105    5
     Venireperson excused by agreement of both
22   parties

23   DAMIAN MCWILLIAMS, NO. 49..................... 105    5
     Venireperson excused by agreement of both
24   parties

25

1  CHAD CULOTTA, NO. 50......................... 105   5
   Venireperson excused by agreement of both
2  parties

3  MELVIN KIZZEE, NO. 51........................ 105   5
   Venireperson excused by agreement of both
4  parties

5  VIRGINIA MANUEL, NO. 55...................... 105   5
   Venireperson excused by agreement of both
6  parties

7  LORI SULLIVAN, NO. 61........................ 105   5
   Venireperson excused by agreement of both
8  parties

9  THERON NORRIS, NO. 63........................ 105   5
   Venireperson excused by agreement of both
10 parties

11 ALVIN TYLER, NO. 65.......................... 105   5
   Venireperson excused by agreement of both
12 parties

13 JOSEPHINE HILLEGEIST, NO. 66................. 105   5
   Venireperson excused by agreement of both
14 parties

15 SIMONE GOODALL, NO. 67....................... 105   5
   Venireperson excused by agreement of both
16 parties

17 VERONICA EARDLEY, NO. 71..................... 105   5
   Venireperson excused by agreement of both
18 parties

19 DARRELL DAVIS, NO. 73........................ 105   5
   Venireperson excused by agreement of both
20 parties

21 SANDY DOMINGO, NO. 75........................ 105   5
   Venireperson excused by agreement of both
22 parties

23 LATONYA COLLINS, NO. 77...................... 105   5
   Venireperson excused by agreement of both
24 parties

25

1   MARY GONZALEZ, NO. 79......................... 105   5
    Venireperson excused by agreement of both
2   parties

3   JACQUELINE JOHNSON, NO. 80.................... 105   5
    Venireperson excused by agreement of both
4   parties

5   MINH LE, NO. 81............................... 105   5
    Venireperson excused by agreement of both
6   parties

7   ROSA PEREZ, NO. 82............................ 105   5
    Venireperson excused by agreement of both
8   parties

9   CHRISTOPHER JOHNSON, NO. 85................... 105   5
    Venireperson excused by agreement of both
10  parties

11  ABDON AVILA, NO. 21........................... 108   5
    State's challenge for cause granted
12
    DENNIS FISHER, NO. 32......................... 110   5
13  State's challenge for cause granted

14  JOSE MARTINEZ, NO. 33......................... 111   5
    State's challenge for cause granted
15
    DAVID LIMERICK, NO. 42........................ 115   5
16  State's challenge for cause granted

17  KAREN TAYLOR, NO. 68......................... 123   5
    State's challenge for cause granted
18

19  **(INDIVIDUAL QUESTIONING OF PROSPECTIVE JURORS)**

    <u>PROSPECTIVE JURORS</u>
20                                       VOIR DIRE   PAGE/VOL.
    JOSHUA CALUAG, NO. 2                 145,146         5
21                                       179             5
    Accepted as a Juror                          192     5
22
    TRAVIS BOLLOM, NO. 4                 194,196         5
23                                       232             5
    Defense Challenge for Cause                  244     5
24                                       244             5
    Court's ruling                               252     5
25                                       254             5
    Defense strike                               255     5

| | | | |
|---|---|---|---|
| LARRY JORDAN, NO. 5 | 257,258 | | 5 |
| | 295 | | 5 |
| Accepted as a Juror | | 309 | 5 |
| SALVADOR GONZALEZ, NO. 7 | 311,313 | | 5 |
| State's Challenge for Cause | | 331 | 5 |
| Court's ruling | | 331 | 5 |
| Reporter's Certificate | | 334 | 5 |
| Word Glossary............................End of Volume | | | |

**ALPHABETICAL VENIREPERSON INDEX**

| | **VOIR DIRE** | **PAGE/VOL.** | |
|---|---|---|---|
| ABELLERA, RONALD, NO. 16...................... 104 | | | 5 |
| Venireperson excused by agreement of both parties | | | |
| AVILA, ABDON, NO. 21......................... 108 | | | 5 |
| State's challenge for cause granted | | | |
| BAYER, ANTHONY, NO. 12...................... 104 | | | 5 |
| Venireperson excused by agreement of both parties | | | |
| BOLLOM, TRAVIS, NO. 4 | 194,196 | | 5 |
| | 232 | | 5 |
| Defense Challenge for Cause | | 243 | 5 |
| | 244 | | 5 |
| Court's ruling | | 252 | 5 |
| | 254 | | 5 |
| Defense strike | | 255 | 5 |
| CALUAG, JOSHUA, NO. 2 | 144,146 | | 5 |
| | 179 | | 5 |
| Accepted as a Juror | | 192 | 5 |
| CANADA, TRACY, NO. 6......................... 104 | | | 5 |
| Venireperson excused by agreement of both parties | | | |
| CARCZ, NICHOLAS, NO. 47...................... 104 | | | 5 |
| Venireperson excused by agreement of both parties | | | |
| CHORBA, DARLENE, NO. 36...................... 104 | | | 5 |
| Venireperson excused by agreement of both parties | | | |

COLLINS, LATONYA, NO. 77...................... 105   5
Venireperson excused by agreement of both
parties

CULOTTA, CHAD, NO. 50......................... 104   5
Venireperson excused by agreement of both
parties

DAVIS, DARRELL, NO. 73........................ 105   5
Venireperson excused by agreement of both
parties

DOMINGO, SANDY, NO. 75........................ 105   5
Venireperson excused by agreement of both
parties

EARDLEY, VERONICA, NO. 71..................... 105   5
Venireperson excused by agreement of both
parties

FISHER, DENNIS, NO. 32........................ 109   5
State's challenge for cause granted

FULLER, JAMES, NO. 26......................... 104   5
Venireperson excused by agreement of both
parties

GONZALEZ, MARY, NO. 79........................ 105   5
Venireperson excused by agreement of both
parties

GONZALEZ, SALVADOR, NO. 7          311,313        5
State's Challenge for Cause               330   5
Court's ruling                            330   5

GOODALL, SIMONE, NO. 67....................... 105   5
Venireperson excused by agreement of both
parties

HILLEGEIST, JOSEPHINE, NO. 66................. 105   5
Venireperson excused by agreement of both
parties

HOLIK, JOHN, NO. 1............................ 104   5
Venireperson excused by agreement of both
parties

HOUSTON, HAZEL, NO. 30........................ 104   5
Venireperson excused by agreement of both
parties

JOHNSON, CHRISTOPHER, NO. 85.................. 105   5
Venireperson excused by agreement of both
parties

JOHNSON, JACQUELINE, NO. 80................... 105   5
Venireperson excused by agreement of both
parties

JORDAN, LARRY, NO. 5                  256,258        5
                                      294             5
Accepted as a Juror                          308     5

KIZZEE, MELVIN, NO. 51........................ 104   5
Venireperson excused by agreement of both
parties

LARA, MONICA, NO. 8........................... 104   5
Venireperson excused by agreement of both
parties

LE, MINH, NO. 81.............................. 105   5
Venireperson excused by agreement of both
parties

LIMERICK, DAVID, NO. 42....................... 115   5
State's challenge for cause granted

MANUEL, VIRGINIA, NO. 55...................... 104   5
Venireperson excused by agreement of both
parties

MARSHALL, LEONA, NO. 23....................... 104   5
Venireperson excused by agreement of both
parties

MARTINEZ, JOSE, NO. 33........................ 111   5
State's challenge for cause granted

MCCLENDON, KATHERINE, NO. 27.................. 104   5
Venireperson excused by agreement of both
parties

MCWILLIAMS, DAMIAN, NO. 49.................... 104   5
Venireperson excused by agreement of both
parties

MEHL, MEGHAN, NO. 20.......................... 104   5
Venireperson excused by agreement of both
parties

```
 1
     MOCK, GEORGE, NO. 9............................ 7      5
 2   Venireperson excused by agreement of both
     parties
 3
     NEUNEKER, JEREMIAH, NO. 48.................... 104    5
 4   Venireperson excused by agreement of both
     parties
 5
     NORRIS, THERON, NO. 63....................... 105     5
 6   Venireperson excused by agreement of both
     parties
 7
     ORTIZ, NATHALIE, NO. 59...................... 7       5
 8   Venireperson excused by agreement of both
     parties
 9
     PAYNE, ANITA, NO. 18......................... 104     5
10   Venireperson excused by agreement of both
     parties
11
     PEREZ, ROSA, NO. 82.......................... 105     5
12   Venireperson excused by agreement of both
     parties
13
     ROSA, SANTIAGO, NO. 29....................... 104     5
14   Venireperson excused by agreement of both
     parties
15
     ROSE, MERCEDIA, NO. 39....................... 104     5
16   Venireperson excused by agreement of both
     parties
17
     SULLIVAN, LORI, NO. 61....................... 105     5
18   Venireperson excused by agreement of both
     parties
19
     TAYLOR, KAREN, NO. 68........................ 123     5
20   State's challenge for cause granted
21   TRULOVE, MICHAEL, NO. 10..................... 104     5
     Venireperson excused by agreement of both
22   parties
23   TYLER, ALVIN, NO. 65......................... 105     5
     Venireperson excused by agreement of both
24   parties
25
```

1   VONPOLNSKI, KURT, NO. 3...................... 104   5
    Venireperson excused by agreement of both
2   parties

3                         **EXHIBIT INDEX**
    **NUMBER      DESCRIPTION       OFFERED      ADMITTED         VOL.**
4
    DX - 1    Questionnaire      250          250              5
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Open court, defendant present, no jury
 2               panel)
 3                    THE COURT:  We're present in Cause
 4  No. 1384794, the State of Texas vs. Obel Cruz-Garcia.
 5  And the charge is capital murder.  Present here in the
 6  courtroom is Mr. Cruz-Garcia.  Is that correct, sir?  Is
 7  that your correct name, sir?
 8                    THE DEFENDANT:  Yes, ma'am.
 9                    THE COURT:  Have you been sworn in?  Let's
10  make sure you get sworn in right now.
11                    (Defendant sworn)
12                    THE COURT:  You can have a seat.
13                    And present with Mr. Cruz-Garcia is his
14  attorney, Skip Cornelius, who is first chair.  And
15  assisting him is Mario Madrid, present in the courtroom
16  as well.
17                    For the prosecution is Natalie Tise.  And
18  assisting her as second chair is Mr. Justin Wood,
19  assistant district attorney Justin Wood.
20                    And Mary Ann Rodriguez is taking down the
21  voir dire in this case.
22                    I'd like to go over some -- before we bring
23  the jury in -- the jury is in the hallway.  They were
24  given questionnaires on Friday to complete, which 85
25  questionnaires were completed, and they were ordered to
```

1    return to this courtroom this morning and they're

2    waiting in the hallway.

3              Let's go over a few pretrial matters first.

4    As to the indictment, the indictment I have on this case

5    alleges six different paragraphs.  And, State, do you

6    intent to proceed on all six of those paragraphs?

7              MS. TISE:  No, Your Honor.  We're just

8    going to proceed on the two kidnapping paragraphs, the

9    kidnapping with a sharp instrument alleged as the deadly

10   weapon and the kidnapping with the unknown manner and

11   means.

12             THE COURT:  So, in sequential order, the

13   first two paragraphs?

14             MS. TISE:  That's correct, Your Honor.

15             THE COURT:  Then you're abandoning the

16   third, fourth, fifth, and sixth paragraphs at this time?

17             MS. TISE:  That's correct.

18             THE COURT:  And that will be granted.

19             And secondly, there is this morning a

20   State's Motion in Limine filed.  Have you had an

21   opportunity to get a copy of that?

22             MR. CORNELIUS:  No.

23             MS. TISE:  Actually, I haven't -- I was

24   going to address that.

25             THE COURT:  Mr. Cornelius, if you will get

1  your copy and refer to that.

2              (Discussion off the record)

3              THE COURT:  I'm going to give you

4  approximately an hour, if we have the time, to go back

5  through this and do some negotiating after I have done

6  my voir dire.  So, let's get this Motion in Limine

7  completed.

8              MR. CORNELIUS:  Where is it?

9              MS. TISE:  I don't know where I laid it,

10  but I did file the Motion in Limine.  And the part that

11  was relevant to voir dire is the part where I'm asking

12  that there not be any reference to the fact that the

13  victim was a child because it's not an element in the

14  indictment.

15              THE COURT:  All right.

16              MR. CORNELIUS:  Okay.  I will agree to

17  that.

18              THE COURT:  You're okay with that?  All

19  right.  Mr. Cornelius, then I'm going to grant that.

20  That's the only one that's in reference to the voir

21  dire.  The other areas in the Motion in Limine that were

22  covered was that they are asking to approach on any

23  prior convictions or extraneous acts of misconduct on

24  the part of any State's witness, including but not

25  limited to Deetrice Wallace.  That will be granted.  And

1   then any reference to a polygraph examination being

2   taken or being offered to any witness or suspect.  And

3   that will be granted as well as to voir dire and

4   throughout the trial.  Just approach on any of those

5   areas.  And, of course, you just agreed to it, but I'm

6   going to grant as well, in reference to voir dire, the

7   fact that the complainant in this case is a child.

8   Okay?

9                    MR. CORNELIUS:  Okay.

10                   THE COURT:  So, I'm signing that right now.

11  Thank you.

12                   MR. CORNELIUS:  No problem.

13                   THE COURT:  Next, I want to put on the

14  record regarding waiver of service of the venire panel.

15  The venire panel, it's my understanding, was served on

16  the defendant in custody last week, but, Mr. Cornelius,

17  you had said you were waiving service of that venire

18  panel.  Is that still your position?

19                   MR. CORNELIUS:  Yes.

20                   THE COURT:  Okay.  I don't have the

21  evidence of the service of it.  So, we're going to

22  put -- we're going to have the record reflect that you

23  waive service of that venire panel.

24                   Mr. Cruz-Garcia, are you also agreeing to

25  waive service of the venire panel?

 1                     THE DEFENDANT:  Yes.

 2                     THE COURT:  Thank you, sir.

 3                     And before we bring the panel in and I

 4     begin my voir dire, is there an agreement as to two of

 5     the jurors, what I show is Juror No. 9, that would be

 6     George Mock, George William Mock, and Juror No. 59, that

 7     would be Nathalie Ortiz?  Is there an agreement to

 8     release both of those jurors prior to the Judge's voir

 9     dire at this point?  Is that correct?

10                     MS. TISE:  Yes.

11                     MR. CORNELIUS:  Can I have just a second to

12     explain to my client?

13                     THE COURT:  Yes.

14                     (Pause)

15                     MR. CORNELIUS:  Yes, Judge, that's our

16     agreement.

17                     THE COURT:  Okay.  Mr. Cruz-Garcia, I know

18     you have been speaking with your attorney,

19     Mr. Cornelius, but is that also your agreement that

20     Juror No. 9, George Mock, and Juror No. 59, Nathalie

21     Ortiz, will be excused by agreement prior to the Judge's

22     voir dire in this case?

23                     THE DEFENDANT:  Yes, ma'am.

24                     THE COURT:  Okay.  Very good.  Then we'll

25     do that.

1              Anything else that needs to go on the

2    record at this time?

3              MR. WOOD:  Judge, just for the record, the

4    State had been supplied a criminal history summary of

5    the venire panel.  We have summarized that and also

6    provided a copy to the defense.  And I believe they

7    should have that in their possession.

8              MR. CORNELIUS:  We do.

9              THE COURT:  Do you have that,

10   Mr. Cornelius?

11             MR. CORNELIUS:  We do.

12             THE COURT:  And anything that the defense

13   would like to put on the record at this time?

14             MR. CORNELIUS:  Not at this time, Judge.

15             THE COURT:  We're ready for the panel?

16             MR. CORNELIUS:  Yes, Your Honor.

17             MS. TISE:  Yes, Your Honor.

18             (Open court, defendant and jury panel

19              present)

20             THE BAILIFF:  That's the five, Your Honor.

21             THE COURT:  Deputy, could I see you at the

22   bench for just a moment?

23             (At the Bench, off the record)

24         **VOIR DIRE EXAMINATION BY THE COURT**

25             THE COURT:  Good morning, ladies and

1    gentlemen.

2              VENIREPERSONS:  Good morning (in unison).

3              THE COURT:  I'm Judge Renee Magee and I'm

4    the judge in the 337th District Court.  This is not my

5    normal courtroom.  This is our ceremonial courtroom.

6    And the reason we're here today is because we have

7    called such a large group for purposes of a capital

8    murder trial where the State is seeking the death

9    penalty.  And I think you all have been made aware of

10   that in terms of when you came in last Friday.

11             I want to thank you for coming in last

12   Friday to a normal jury duty and finding out you were

13   called as a juror to a case involving a death penalty.

14   It's a little bit more of a lengthy process.  We're

15   going to explain some of that today and hopefully you

16   will understand a lot more of what's going.  We'll go

17   over our schedule today.  And probably a lot of you

18   won't go past today in terms of this process.

19             Because of the questionnaires that you

20   filled out on Friday and now the lawyers have had an

21   opportunity to review those questionnaires, that cuts

22   down on a lot of time that you have to be here at the

23   courthouse.  And so, for that reason, it was really

24   important that we do that and that you are back here

25   today.

1           After reviewing the questionnaires this

2   morning, before I even start to talk, there has been

3   agreements based on the questionnaires as to two jurors.

4   And so, I'm going to call those jurors forward at this

5   time.  It's Juror No. 9.  And Juror No. 9 is George

6   William Mock.  Are you present?  And Juror No. 59,

7   Nathalie Ortiz.

8           Juror No. 9 and 59, there's been an

9   agreement amongst the lawyers and the defendant that you

10  are excused from jury duty service at this time.  And if

11  you need a work excuse, we can get those from the clerks

12  right here.  So, please stand up No. 9 and No. 59.  Yes.

13  Okay.  If you need the work excuse, you can get it up

14  here.  If you don't, you are excused at this time.

15          So, as to the rest of you, that doesn't

16  mean that it's going to be a terribly long day.  The way

17  our schedule is going to work today is I'm going to talk

18  to you for an hour, an hour-and-a-half.  I'm going to go

19  over some of the concepts.  This portion of the trial is

20  called voir dire.  And voir dire literally means to

21  speak the truth.  In terms of, we need to find out from

22  you if there is anything about you or your background

23  that would prevent you from being a fair and impartial

24  juror in the type of case that's about to come before

25  you.

1             And having said that, we don't get to go

2    into a lot of the details about the case that's going to

3    be tried, the State of Texas vs. Obel Cruz-Garcia.  You

4    will know that it is, obviously, a capital murder where

5    the State is seeking the death penalty.  And I will read

6    to you what the indictment alleges.  It's a charging

7    instrument, but past that, we can't go into any of the

8    details, the facts and circumstances of the case.

9             So, we're going to ask you as general

10   concepts whether you can follow the law and get a

11   commitment from you.  And we also need you to be very

12   truthful and forthcoming if there are things in your

13   past or background, or just that you know about just

14   yourselves that would prevent you from being fair and

15   impartial.

16             So, having said that, let me explain a

17   little bit about the difference between a capital murder

18   case where the State is seeking a death penalty versus

19   other types of jury service.  The first one, since

20   you've already been made aware of that, there is a

21   questionnaire that is allowed to be completed under the

22   law and that you-all have completed.  With that, we

23   don't need to go over a bunch of the questions that you

24   answered in there because they have those answers and

25   they know how your thoughts are on that, but if

1   something has changed in regard to some of those

2   answers, then we need to know that today.  And then,

3   additionally, we need to know if -- we're going to

4   probably ask some questions from the information that

5   you already provided to us and maybe expound a little

6   bit on the law.  We're going to explain to you how the

7   case will come about in terms of the different parts of

8   the trial.

9                What we have is a bifurcated trial system.

10  And we begin with the guilt-innocence phase.  There is

11  going to be parts that are associated with just a

12  regular trial.  It would be the guilt-innocence phase,

13  but the second phase is what many of you are probably

14  not aware of.  And that's the punishment phase, if we

15  get there, how a capital jury actually reaches the

16  determination as to whether the death penalty is to be

17  assessed or not.  Okay?

18                In addition to the questionnaires,

19  something that is different between a capital murder

20  where the State is seeking the death penalty and just a

21  regular case is that we get to do an individual voir

22  dire here in front of the Court.  And what that means

23  we'll be talking to each person individually.  Not

24  today, but there will probably be some that stay for an

25  individual voir dire today, but then in continuing days.

1    That's going to take a period of time.

2                    Generally a voir dire takes about two weeks

3    in a capital case.  That doesn't mean that you will be

4    coming back every day for two weeks.  That means we'll

5    try to eliminate a number of people that could not -- we

6    already know could not be fair and impartial in this

7    type of case today through agreements.  And then we'll

8    split the rest of those people up over a period of time

9    and bring you in on certain days and have the individual

10   voir dire completed by the attorneys.  And that's the

11   time that the attorneys will actually get to talk to

12   you.  Today, it's just to go being the Judge, myself,

13   voir diring and going over some concepts of the law.

14   And I need to know if you can follow those concepts of

15   law.

16                    Then we'll talk about scheduling more

17   towards the end.  We'll be selecting twelve jurors and

18   two alternates in this case.  And for purposes of

19   actually when the trial begins, it will not be the

20   evidence beginning until July 8th.  So, we have a couple

21   of weeks that we're going to be selecting a voir dire

22   and -- a jury and then we'll be going through some

23   preliminary motions and hearings.  And then the actual

24   evidence will begin on July 8th.

25                    I will be asking about scheduling as we get

1  towards the end of today.  Keep that in your mind, July

2  8th.  And then I anticipate it will probably be two

3  weeks from that date that we'll have an ending or an

4  actual disposition on this case.

5              Everybody clear on that?  Of course, we can

6  go back over it when we get to scheduling.

7              Okay.  So, first having said that this is

8  not my normal courtroom.  If we go past noon today,

9  we're going to move to the courtroom across the way and

10  then the evidence will be heard in my normal courtroom

11  down on the 15th floor.  We'll go over that if you make

12  it to that stage as well.

13              So, general legal concepts.  How many of

14  you have been on a jury or gone through jury service

15  before?

16              (Show of hands)

17              THE COURT:  And how many in a criminal

18  case?

19              (Show of hands)

20              THE COURT:  Very good.

21              I'm sure that was one of the questions that

22  was on the questionnaires.  And the lawyers may have

23  some additional questions regarding your jury service,

24  but just in general, I want to be going over the general

25  concepts that apply to all cases.

1            Let's see if I can get this to work.

2            So, I put -- can y'all see the screens on

3    either side of you there?

4            These are just general concepts that do

5    apply to all cases and not necessarily just a death

6    penalty case.  The first one that we're going to cover

7    is presumption of innocence.

8            Now, we all have heard that, that everyone

9    has a presumption of innocence, but the law provides --

10   and it's for each individual person that's out there

11   that's before the Court in any capacity -- that you have

12   the presumption of innocence.  And what that does is it

13   means that the State has the burden, the entire burden

14   of proving and providing evidence to the jury to prove

15   you guilty.  And the defendant, a charged individual,

16   does not have to put any evidence forth at all.  So,

17   they are presumed innocent from the day that they are

18   charged up until the time, if that does happen, that the

19   State has actually provided the evidence to you, the

20   jury.

21           And so, a lot of people come in -- and we

22   hear it all the time, that when they come into a

23   courtroom they are kind of wondering:  Hey, wonder what

24   that guy did; hey, I wonder which one of those guys is

25   the defendant at the table, seeing if they can pick

```
 1  people out.
 2              Well, that's not the way the law provides.
 3  Even though that may be what your common sense, you
 4  want -- immediately you want to go to, but the law
 5  provides that we have to presumed them innocent.  And
 6  that's our legal system.  And that's there for each
 7  individual one of us, it's in place.
 8              So, what I need to know, can you-all
 9  provide this defendant the presumption of innocence, and
10  even though we have talked about that the charge is
11  capital murder, set that aside and require that the
12  State bring to you evidence and not at any time shift
13  that burden to the defendant just because there is an
14  alleged charge at this point?  Can everybody promise me
15  that they will provide this defendant the presumption of
16  innocence?
17              Everyone in the first row?
18              VENIREPERSONS:  Yes (in unison).
19              THE COURT:  Everyone in the second row?
20              VENIREPERSONS:  Yes (in unison).
21              THE COURT:  And please raise your hand.  I
22  need you to be -- kind of speak up.  We've got like 85
23  people in here.  So, if you can't, I need to know that
24  now.
25              And anyone on the third row that cannot
```

1    provide the presumption of innocence?

2                   On the fourth row?

3                   And the fifth row?

4                   Okay.  The fifth row.  What is your number?

5                   VENIREPERSON:  50.

6                   THE COURT:  No. 50.  Let me stop you just a

7    second.  Hold your thought, No. 50.

8                   I forgot to introduce everyone here.  We

9    already went over that on the record, but let me

10   introduce everyone to you.  And the reason that made me

11   think about that, No. 50, is because I'm going to be

12   referring to you as your juror number instead of your

13   name.  That is for Mary Ann Rodriguez, one of the most

14   important people here in the courtroom.  She's in the

15   red suit sitting right down there.  She's taking down

16   everything that we say on voir dire.  And she has to be

17   able to identify who is saying it.  So, with a roomful

18   of this many people, we're going to call you by number

19   instead of name.  All right?

20                  And let me introduce the lawyers as well in

21   this case.  Representing the defendant, Obel

22   Cruz-Garcia, is Mr. Skip Cornelius.

23                  MR. CORNELIUS:  Good morning.

24                  VENIREPERSONS:  Good morning (in unison).

25                  THE COURT:  Assisting him as second chair

```
 1   is Mr. Mario Madrid.

 2                MR. MADRID:  Good morning.

 3                VENIREPERSONS:  Good morning (in unison).

 4                THE COURT:  And then present at counsel

 5   table as well is Mr. Obel Cruz-Garcia.

 6                Sir, could you please stand up?

 7                (Defendant complies)

 8                VENIREPERSONS:  Good morning (in unison).

 9                THE COURT:  And representing the State,

10   assistant district attorney Natalie Tise.

11                MS. TISE:  Good morning.

12                VENIREPERSONS:  Good morning (in unison).

13                THE COURT:  And her assistant, Justin Wood.

14                MR. WOOD:  Hi.

15                VENIREPERSONS:  Good morning (in unison).

16                THE COURT:  Before I go into that

17   presumption of innocence question, does anybody here

18   know any of these individuals?  Hands up, anyone?

19                Okay.  In the back, your number, sir?

20                VENIREPERSON:  85.

21                THE COURT:  And which of these persons do

22   you know?

23                VENIREPERSON:  I know Mr. Cornelius.

24                THE COURT:  Okay.  And anything about the

25   relationship with Mr. Cornelius that would prevent you
```

1  from being a fair and impartial juror in this case?

2              VENIREPERSON:  I've grown up in the same

3  church and I know his children.

4              THE COURT:  And, obviously, we all have

5  relationships.  We don't come in here, you know, with a

6  blank slate.  We're going to know other people, but is

7  your relationship, just the knowledge of Mr. Cornelius

8  in your church or neighborhood, is that something that

9  you feel would lean you and give a bias for him or

10  against him in this trial?

11             VENIREPERSON:  I don't think so.

12             THE COURT:  Okay.  Well, that's another

13  thing we're going to cover here because we need answers.

14  Even though that might be what you would normally say

15  out in the real world, for the record we're going to

16  need you to say "yes" or "no" because I would hate for

17  you to get up here in the comfortable seats in the jury

18  box and then all of a sudden determine, you know what,

19  that's kind of seeping in my mind and I'm leaning more

20  towards Mr. Skip Cornelius because I know him.  And I

21  would hate for that to happen.  So, I need an answer

22  from you, a "yes" or "no."

23             VENIREPERSON:  No.

24             THE COURT:  So, you could be a fair and

25  impartial juror even though you know Mr. Cornelius?

 1                    VENIREPERSON:  Correct.

 2                    THE COURT:  All right.  Very good.

 3                    Anybody else on that issue?

 4                    Yes, juror number in the back?

 5                    VENIREPERSON:  82.

 6                    THE COURT:  I'm sorry.  What was your --

 7                    VENIREPERSON:  82.

 8                    THE COURT:  82.  Yes, ma'am.  And which of

 9    these individuals do you know?

10                    VENIREPERSON:  I don't know him, but

11    Mr. Cornelius.

12                    THE COURT:  Okay.  So, you've just heard of

13    him; is that what you're saying?

14                    VENIREPERSON:  No.  Actually I've used part

15    of his information in a class that I taught.

16                    THE COURT:  Okay.  I can barely hear you.

17    Part of a class, is that what you said?

18                    VENIREPERSON:  Yes, that I taught.

19                    THE COURT:  You have taught.  He was a

20    student?

21                    VENIREPERSON:  No.  I used him as an

22    example.

23                    THE COURT:  As an example.  So, you like

24    reviewed some type of case he has been on or something

25    like that.  Anything about that situation that would

1  cause you to be -- prevent you from being a fair and

2  impartial juror on this type of case?

3              VENIREPERSON:  Yes, possibly.

4              THE COURT:  Okay.  Once again, I don't need

5  you to go into the details of it, if that makes you

6  uncomfortable, but I do need a more definite answer.

7  "Yes, possibly" is not going to be sufficient for me at

8  this time.  And only you know the answer.  So, it would

9  or it would not?

10              VENIREPERSON:  Yes.

11              THE COURT:  Okay.  Very good.  I appreciate

12  that, Juror No. 82.

13              Okay.  Anyone else?

14              And juror number?

15              VENIREPERSON:  30.  I barely can understand

16  what you're saying.

17              THE COURT:  I'm sorry.  Good point.  Am I

18  louder, more clear now?  Juror No. 30, can you hear me

19  now?

20              VENIREPERSON:  A little clearer, but I have

21  a hearing problem anyway.

22              THE COURT:  Okay.  We're going to turn up

23  the mic.  Hopefully that will help.

24              Other than Juror No. 30, is anybody else

25  having a problem hearing what I am saying?  It's a large

1   courtroom.  And like I said, we have to come up here

2   because we have a large group.  Is that better?

3                    VENIREPERSON:  Yes.

4                    THE COURT:  I will try not to get too close

5   to the microphone.

6                    Thank you, Juror No. 30.

7                    Anyone else on the issue of knowing an

8   individual that's before the Court here in trial?  Any

9   of the lawyers or the defendant?  Okay.  Very good.

10                    So, going back to Juror No. 50.  And you

11   had a question, Juror No. 50, on the presumption of

12   innocence.  You raised your hand.

13                    VENIREPERSON:  I don't remember the

14   question now.

15                    THE COURT:  Well, I was going through and

16   asking each row in a group whether they felt that they

17   could give the defendant the presumption of innocence

18   and follow the law on the presumption of innocence,

19   which requires that you do -- as you see up there on the

20   slide, that the accused is presumed to be innocent and

21   the jury must afford the presumption of innocence unless

22   and until convinced beyond a reasonable doubt by

23   evidence that the State provides that he is guilty and

24   the burden never shifts to the accused.

25                    Do you feel that you can follow that law?

```
 1              VENIREPERSON:  That is very difficult, Your
 2    Honor.  I don't know that I can follow it.
 3              THE COURT:  Okay.  Once again, I'm going
 4    to --
 5              VENIREPERSON:  I don't think I can. It's
 6    prejudgment.
 7              THE COURT:  Well, I'm going to have to get
 8    yes, you can, or, no, you cannot.
 9              VENIREPERSON:  No.
10              THE COURT:  Okay.  Thank you, Juror No. 50.
11              And does anyone else -- I think we were to
12    row number five.  Does anyone else feel that they --
13    like Juror No. 50, that they could not provide this
14    defendant the presumption of innocence and require the
15    State to provide the evidence?
16              Yes, Juror No. 30.  You have your hand up,
17    Juror No. 30.
18              VENIREPERSON:  Yes.
19              THE COURT:  Can you hear me now?
20              VENIREPERSON:  Yeah, I hear you.
21              THE COURT:  You had your hand up for what
22    reason?
23              VENIREPERSON:  The question about could you
24    follow the presumption of innocence.
25              THE COURT:  Do you feel that you could,
```

1    ma'am?

2              VENIREPERSON:  No.

3              THE COURT:  So, you are saying you could

4    not give the defendant in this case the presumption of

5    innocence and follow that law; is that correct, Juror

6    No. 30?

7              VENIREPERSON:  Yes.

8              THE COURT:  Okay.  Thank you, ma'am.

9              I had another hand over here to the right.

10             Was there another hand?

11             Yes, what is your number, ma'am?

12             VENIREPERSON:  79.  May I be excused?

13             THE COURT:  For what purpose, ma'am?

14             VENIREPERSON:  To use the restroom.

15             THE COURT:  If you have to use the restroom

16   right now, we have to take a break.  We can't go

17   forward.  Is it an emergency?

18             VENIREPERSON:  Yes, ma'am, because it --

19             THE COURT:  All right.  Would you please

20   escort her out, Deputy?  We'll take a short break until

21   she comes back.

22             (Recess taken)

23             (Open court, defendant and jury panel

24              present)

25             THE COURT:  Thank you, Deputy Perry.

1          Juror No. 79, for the record, is back in

2   the courtroom.

3          And I want to apologize first.  There is a

4   lot of very specific rules, obviously what you are

5   observing now, that are associated with the trial in a

6   capital case.  And we do have to do everything together.

7   So, if somebody leaves, we have to completely break and

8   not proceed until that person is back in the courtroom.

9   So, let's proceed and we'll get through this as quickly

10  as possible.

11         The next concept that I want to cover is --

12  and let me make sure.  Since we had that break, I'm not

13  sure if I got to the last couple of rows.  Anyone on

14  that last row starting with you, Juror No. 79, can you

15  give this defendant the presumption of innocence and

16  follow the law as to the presumption of innocence?  The

17  row there beginning with No. 79.

18              VENIREPERSON:  That was the question?

19              THE COURT:  Yes.

20         The fifth row.  Okay.  Everyone else on the

21  fifth row.  Anyone that could not give the presumption

22  of innocence to this defendant and follow the law as to

23  the presumption of innocence?  Very good.

24         We'll go on.  The next concept that we're

25  going to cover is basically the one regarding an

1    indictment.  We touched on it just a little bit.  An

2    indictment is a charging instrument.  And it's no

3    different in many ways than a traffic ticket.  When you

4    get stopped for speeding and the officer gives you a

5    ticket, it's his allegation saying this is what I'm

6    alleging you did and now you have your day in court.

7    And you have to go and appear in court.  You might agree

8    with him, but you might disagree with him.  And you have

9    the right to a trial in the state of Texas, a trial by

10   jury, even on a speeding ticket.

11              So, it is simply an allegation and it

12   provides notice to an individual of what you are alleged

13   to have done.  Just like in a traffic ticket, if they

14   give you a ticket and say you were going 70 in a 50 and

15   you get to court and they say:  Oh, you are charged with

16   aggravated assault, wouldn't that confuse you?  Of

17   course it would be because that's not what they told you

18   you were charged with.  So, the indictment is the same

19   thing.  It sets out as elements what the State has to

20   prove and what the defendant is charged with in each

21   case.

22              Having said that, it is no evidence

23   whatsoever.  You only hear evidence from the witness

24   stand here or evidence as admitted, perhaps physical

25   evidence, through the witness stand, but that is the

1  only thing that you can use to get you to the point

2  where you either believe or do not believe that evidence

3  has been presented beyond a reasonable doubt.  In other

4  words, an indictment is not evidence that you can use in

5  any way, shape, or form to get you there.

6           Is that clear to everybody?

7           And so, the concept of the indictment, what

8  I want to know first is, can everybody commit to me that

9  they will not hold the indictment as evidence against

10 the defendant?  Anybody that could not, is going to come

11 in here and say that they believe the indictment is

12 evidence against the defendant in some way?

13          Okay.  And further, that they will not use

14 that indictment in any way, shape, or form as evidence

15 against the defendant in meeting the burden beyond a

16 reasonable doubt.  That's completely up to the State

17 through witness or testimony or physical evidence that

18 comes in through the witness stand.

19          Does everyone understand that?  Can

20 everyone give me a commitment that you will follow the

21 law in regards to indictments?

22          VENIREPERSONS:  Yes (in unison).

23          THE COURT:  Thank you.

24          The next concept -- and we're going to

25 cover it briefly -- is the burden of proof.  The burden

1   of proof in all criminal cases is on the State.  It

2   doesn't shift to the defendant.  And it is a standard of

3   beyond a reasonable doubt.  In other words, the State,

4   as we talked about, has to prove to you beyond a

5   reasonable doubt each element that's alleged in an

6   offense in order for you to return a verdict of guilty.

7   If they do not prove even one of the elements of an

8   offense, then you would be required to return a verdict

9   of not guilty.  Okay?

10          But is there a definition for that standard

11  beyond a reasonable doubt?  Well, courts have gone back

12  and forth over the years.  And they did, at one time,

13  provide us a definition, but they've changed that and

14  they don't have a definition anymore.  What it is -- we

15  know what it's not more than what it is.  We know it's

16  not 100 percent.  So, it's not an absolute certainty.

17  And you couldn't be absolutely certain as to any detail

18  unless you actually saw it yourself.  And if you were a

19  witness, you couldn't be a juror in the case.  So, we

20  know that in a criminal case it's not to an absolute

21  certainty.

22          Is there anyone that would require the

23  State to prove to an absolute certainty their burden of

24  proof before you could find a defendant guilty in a

25  criminal case?  Anyone here on this jury?

1           (Show of hands)

2           THE COURT:  Okay.  And your number, sir?

3           VENIREPERSON:  51.

4           THE COURT:  51.

5           Okay.  And I have another hand behind you.

6  What is your number, sir?

7           VENIREPERSON:  49.

8           THE COURT:  And another one.  No. 47?

9           VENIREPERSON:  Yes.

10          THE COURT:  Let me get back to you on

11  those, but let me finish with the total concept of

12  beyond a reasonable doubt.  So, we know that it is not

13  beyond all possible doubt and we know it's not to a 100

14  percent certainty.  It's also not beyond a shadow of a

15  doubt, which is something you hear on TV sometimes, like

16  Perry Mason and such.  There's no concept in our -- at

17  least in the state of Texas in the legal system that is

18  beyond a shadow of a doubt.  And it a high standard.

19  And there are other standards you've probably heard.  By

20  a preponderance of the evidence.  That's the standard

21  they use in civil cases, which is about 51 percent or

22  so.  And there is clear and convincing evidence and the

23  State has to prove that in taking away your children or

24  certain other family law type decisions, but in criminal

25  cases, in all criminal cases, all the way from a

1   speeding ticket all the way up to a capital murder case,

2   the standard is beyond a reasonable doubt.

3              So, having heard that then Jurors No. 47,

4   49, and 51, there isn't any real definition, so I'm not

5   going to tell you that your definition is wrong, but

6   what I can tell you is that it is not 100 percent

7   certainty.  And if you are going to require that the

8   State prove to you by 100 percent certainty, you are

9   never going to get there.

10             So, Juror No. 47, is that what your

11   standard would be, 100 percent certainty?

12             VENIREPERSON:  Yes.

13             THE COURT:  Okay.  Thank you, sir.

14             And how about Juror No. 49?

15             VENIREPERSON:  Yes.

16             THE COURT:  So, you'd require 100 percent

17   certainty even though under the law you know that's not

18   the proper standard?

19             VENIREPERSON:  Yes.

20             THE COURT:  Thank you, Juror No. 49.

21             And how about 51?

22             VENIREPERSON:  Yes.

23             THE COURT:  Don't let me answer your

24   question for you.  Your answer is what?

25             VENIREPERSON:  I'd require 100 percent.

```
 1                    THE COURT:  You would require 100 percent
 2   certainty even though you understand the law does not
 3   require 100 percent certainty?
 4                    VENIREPERSON:  Yes.
 5                    THE COURT:  Okay.  Anyone else on the panel
 6   feel like Jurors 47, 49, and 51?
 7                    (Show of hands)
 8                    THE COURT:  Okay.  Let me go row-by-row
 9   here.
10                    In the white shirt, your juror number
11                    ?VENIREPERSON:  23.
12                    THE COURT:  Juror No. 23.
13                    And juror number -- over here to the right,
14   sir, juror number?
15                    VENIREPERSON:  26.
16                    THE COURT:  As I go by your number --
17   because we need to make sure we get it on the record.
18   Juror No. 23, you are saying that you would require to
19   an absolute certainty a burden on the State before you
20   could find an individual guilty on a criminal case?
21                    VENIREPERSON:  Yes.
22                    THE COURT:  Even though the law does not
23   require that?
24                    VENIREPERSON:  Yes.
25                    THE COURT:  Now, having said what the law
```

 1  does not require and not giving you a definition, what

 2  the law envisions is that it's within each individual

 3  juror to determine what beyond a reasonable doubt is.

 4  And so, it would be upon your own conscience as to what

 5  beyond a reasonable doubt is.  All right?  No

 6  definition, but we do know it's not 100 percent

 7  certainty.

 8              And you still feel the same as that, Juror

 9  No. 23?

10              VENIREPERSON:  Yes.

11              THE COURT:  Juror No. 26, tell me how you

12  feel, sir.

13              VENIREPERSON:  Yes.

14              THE COURT:  Tell me how you feel.

15              VENIREPERSON:  I wouldn't -- in this case,

16  it have to be 100 percent.

17              THE COURT:  So, this case shouldn't be any

18  different from any other criminal case.  We're not to

19  the part where you are considering the death penalty.

20              VENIREPERSON:  I know, but certain things,

21  you know...

22              THE COURT:  Juror No. 26, you are saying in

23  any criminal case that you would require an absolute

24  certainty?

25              VENIREPERSON:  Not every single one, no.

1            THE COURT:  Okay.

2            VENIREPERSON:  You stated that -- you were

3   mentioning this case, we haven't gotten to that.

4            THE COURT:  We haven't gotten to any of the

5   details on it.  And so, let me make sure that you

6   understand.

7            VENIREPERSON:  I understand.

8            THE COURT:  The first part of the case,

9   what we call the guilt-innocence phase is exactly like

10  every other criminal case, where the State has to put on

11  evidence and you have to be convinced as a juror beyond

12  a reasonable doubt as to the elements of the offense.

13  And then if you are convinced beyond a reasonable doubt

14  as to those elements, then you will return a verdict of

15  guilty.  And it's only -- and it would have to be

16  unanimous with all 12 jurors.  And it's only if you got

17  to that point that you would then start through the

18  punishment phase, which we are going to talk about here

19  in detail.  It's not a vote of, you know, yes death

20  penalty, no death penalty.  You'll answer certain

21  questions.  And there's burdens of proof associated with

22  those as well.  So, this shouldn't -- your answers to

23  this shouldn't be any different than any other criminal

24  case.  Okay?

25            And so, Juror No. 26, are you saying you

1   would still require absolute certainty before you could

2   return a verdict of guilty on a case?

3                   VENIREPERSON:  Yes.

4                   THE COURT:  Okay.  Thank you, sir.

5                   On the next row starting with Juror No. 29

6   and all the way over to 46, do we have anyone who feels

7   the same?

8                   (Show of hands)

9                   THE COURT:  Okay.  I'm going to get to the

10  back row.  So, hold on.  We'll go row by row.

11                  And your hand is up?

12                  VENIREPERSON:  I have a question.

13                  THE COURT:  Juror number?

14                  VENIREPERSON:  18.

15                  THE COURT:  Juror No. 18.  Yes, ma'am.

16                  VENIREPERSON:  So, to me if it's a

17  reasonable doubt, if I'm not 100 percent sure, that's my

18  definition of reasonable doubt.  Is that not true?

19                  THE COURT:  Well, in theory, I guess, it

20  would be true.  However, there is -- there is law that

21  says it's not an absolute certainty.  It's not 100

22  percent, but then there is no definition as well.  So,

23  if in your mind it is 100 percent, then it's 100

24  percent.  However, that's one of the things that, I

25  imagine, both the State and the defense would want to

1   know in terms of your feelings towards beyond a

2   reasonable doubt during voir dire.  That's why we're

3   here.  Okay?  There is no real definition for it.  We

4   just know it's a high standard.  Okay.  That was a very

5   good question, No. 18.

6                   So, on the third row, 29 through 46, do we

7   have any hands?  No.

8                   And then on the fourth row, 47 through 64?

9   And, ma'am, your hand is up.  What is your number?

10                  VENIREPERSON:  39.

11                  THE COURT:  Juror No. 39.  All right.  And

12   tell me how you feel, Juror No. 39.

13                  VENIREPERSON:  I just believe that the

14   State should, you know, prove 100 percent, you know,

15   certain that, you know, the defendant is guilty.  That

16   person's life is on -- I guess, you know, at stake.  So,

17   therefore, you know, they should -- the prosecutor

18   should prove 100 percent certainty that that person is

19   guilty.

20                  THE COURT:  Okay.  Thank you very much,

21   Juror No. 39.  I appreciate that.

22                  Anyone else on that row all the way over to

23   46?

24                  All right.  And the next row, then,

25   starting with 47 and going to 64.

1                    (Show of hands)

2                    THE COURT:  What is your number, sir, in

3  the blue shirt?

4                    VENIREPERSON:  48.

5                    THE COURT:  No. 48.  And tell me how you

6  feel, sir.

7                    VENIREPERSON:  I need 100 percent, to be

8  100 percent certain before I can judge someone.

9                    THE COURT:  Before you could judge someone

10  in general?

11                    VENIREPERSON:  Yes, ma'am.

12                    THE COURT:  Okay.  As to the burden beyond

13  a reasonable doubt, you are saying that you would

14  require of the State 100 percent certainty before you

15  could return a verdict of guilty; is that what you're

16  saying?

17                    VENIREPERSON:  Yes, ma'am.

18                    THE COURT:  Thank you, Juror No. 48.

19                    Anyone else on that row in the center and

20  the way over through 64?

21                    And then in the next row, 65 through 82?

22  Beginning with 65 through 82.

23                    (Show of hands)

24                    THE COURT:  Okay.  I saw a hand up back

25  here.  Yes, your juror number, ma'am?

 1                    VENIREPERSON:  71.

 2                    THE COURT:  Okay.  Juror No. 71, tell me

 3     how you feel about the burden of proof?

 4                    VENIREPERSON:  I feel exactly 100 percent,

 5     like Juror 39.  She said exactly what I was going to

 6     say.  In order for me, my conscience to be able to live

 7     with myself, in any criminal case I believe that the

 8     State has to prove 100 percent that person is guilty.

 9     And that's just how I feel.

10                    THE COURT:  Very good.  And I appreciate

11     your comments, Juror No. 71.  Thank you very much.

12                    Next?

13                    What is your number, sir?

14                    VENIREPERSON:  72.

15                    THE COURT:  How do you feel, sir?

16                    VENIREPERSON:  In a capital murder case,

17     I'm not going to leave the State any wiggle room.  So,

18     if their case has an inconsistency in the evidence or I

19     have to presume, it's going to be a not guilty.

20                    THE COURT:  Okay.  I see you're probably

21     reading my last little bullet point there.  It is not

22     necessarily an inconsistency in evidence.  I'm kind of

23     jumping ahead of myself here, but the bottom line is you

24     would be -- as jurors, you would be the trier of facts.

25     And if a witness -- if there is two witnesses in the

1  case that observed different things or saw different

2  things or related different things to you, the law says

3  that's not necessarily a reasonable doubt.  I'm sure it

4  depends on what exactly they're talking about, but

5  say -- have you ever had a traffic accident where there

6  was a number of different witnesses?  But you talk to

7  the witnesses and they all saw a little bit different

8  thing that happened.  That's what that bullet point is

9  referring to.

10             Inconsistencies themselves are not

11  necessarily reasonable doubt.  It's up to the jurors to

12  determine which witness -- if they do believe the

13  witness, which one they believe and how much because the

14  jury can believe each witness all of what they say, none

15  of what they say, or some of what they say.  You know, a

16  jury might believe that the witness is a very credible

17  person, but did not have the opportunity to view it as

18  well as another witness that they listened to.  And the

19  testimony may be inconsistent between the two witnesses,

20  but it doesn't necessarily present reasonable doubt if

21  the jury believes one over the other.

22             Does that make sense?

23             VENIREPERSON:  Yes, ma'am.

24             THE COURT:  So, that's what that bullet

25  point is about.  But you bring up a good point, Juror

1    No. 72.  And your feeling is you would have to have 100

2    percent certainty, no inconsistency whatsoever?

3                    VENIREPERSON:  No, ma'am, that's not what

4    I'm saying.

5                    THE COURT:  Okay.

6                    VENIREPERSON:  I'm saying the State has to

7    have an airtight case beyond a reasonable doubt.  They

8    cannot have an area that's uncovered, which is a link to

9    the crime or physical evidence established, but they've

10   got to prove it to me.  Not 100 percent.  I'm a

11   scientist.  Nothing is 100 percent.

12                   THE COURT:  There you go.  You are not

13   saying 100 percent.  You're saying it's a very high

14   burden.

15                   VENIREPERSON:  Yes, ma'am.

16                   THE COURT:  I think we all would agree with

17   that.  It's the highest burden that the legal system

18   has.  So, thank you for your comments, Juror No. 72.

19                   And on across that row, is there anyone

20   else?

21                   Juror No. -- are you 79 in the green shirt?

22                   VENIREPERSON:  Yes, ma'am, I am.

23                   THE COURT:  Okay.  The reason I asked that

24   is there was a 78 -- is there a 78?

25                   VENIREPERSON:  That's the --

```
 1                    THE COURT:  Okay.  You two are transposed.
 2  Very good.
 3                    VENIREPERSON:  It's against my beliefs, so
 4  I could not go --
 5                    THE COURT:  The reasonable doubt issue is
 6  against your beliefs?
 7                    VENIREPERSON:  Yes.
 8                    THE COURT:  So, you are not able to judge
 9  people for personal, moral, or religious reasons?
10                    VENIREPERSON:  Yes.
11                    THE COURT:  Okay.  I appreciate you
12  bringing that up, No. 79.  And you probably said that in
13  your questionnaire.  Is that right?
14                    VENIREPERSON:  Yes, ma'am.
15                    THE COURT:  And that's why I haven't really
16  touched on that, but that's a very important issue.
17                    MR. CORNELIUS:  Is that Juror 78 or 79?
18  I'm confused.
19                    VENIREPERSON:  79, sir.
20                    THE COURT:  They are transposed, 78 and 79,
21  in seated order.
22                    So, Juror No. 79 said for personal, moral,
23  or religious beliefs she could not judge another
24  individual.  And so, beyond a reasonable doubt, it
25  doesn't matter, you couldn't sit in judgment at all,
```

```
 1    right?
 2                    VENIREPERSON:  No, ma'am.
 3                    THE COURT:  Thank you, Juror No. 79.
 4                    I'm going to ask -- let me finish the
 5    beyond a reasonable doubt question and then I'll come
 6    back and I'll ask in general the whole panel about that
 7    individual question.
 8                    Anyone else on 80 to 82 have a problem with
 9    beyond a reasonable doubt?
10                    Yes, sir, what is your number?
11                    VENIREPERSON:  81.
12                    THE COURT:  How do you feel?
13                    VENIREPERSON:  I believe I'd need 100
14    percent certainty.
15                    THE COURT:  Speak up, sir.
16                    VENIREPERSON:  I need 100 percent
17    certainty.
18                    THE COURT:  Okay.  All right.  Thank you,
19    Juror No. 81.
20                    And back in the back row on the left, juror
21    number?
22                    VENIREPERSON:  65.
23                    THE COURT:  65.  Yes, Juror No. 65.
24                    VENIREPERSON:  I'm the same as the lady,
25    religious person.  I cannot make a judgment.
```

```
 1                    THE COURT:  Can't sit in judgment?
 2                    VENIREPERSON:  Right.
 3                    THE COURT:  All right.  Let me rephrase
 4    that and see if you agree with what I have to say.  For
 5    religious, personal, or moral reasons you could not sit
 6    in judgment of another individual?
 7                    VENIREPERSON:   Right.
 8                    THE COURT:  Okay.
 9                    VENIREPERSON:  It should be stated on my
10    questionnaire as well.
11                    THE COURT:  All right.  Very good.  Thank
12    you, Juror No. 65.
13                    And I'm trying not to rehash everything
14    that's on the questionnaire.  So, if you put that on
15    your questionnaire, we don't need to go over it again,
16    but if anything from your questionnaire has changed,
17    then we need to talk about it.
18                    Okay.  I'll go back to that back row.  Your
19    hand is up.  What is your number, ma'am?
20                    VENIREPERSON:  Juror No. 80.
21                    THE COURT:  What is your comment?
22                    VENIREPERSON:  I would need to be 100
23    percent certain.
24                    THE COURT:  Okay.  So, even though the law
25    does not require that you are 100 percent certain, your
```

1  definition of beyond a reasonable doubt would require

2  you to be 100 percent certain?

3           VENIREPERSON:  Yes.

4           THE COURT:  Thank you, Juror No. 80.

5           And in the very last row, 83 through 87,

6  over here to the left, anyone on that beyond a

7  reasonable doubt question?

8           And 88 through 95 in the center?  Okay.  We

9  only go up to 85.  So, we just have the last three over

10 there.

11          MR. CORNELIUS:  You have one hand up.

12          THE COURT:  That was on -- that was on

13 No. 82.

14          VENIREPERSON:  Yes, ma'am.  On reflection

15 different from my questionnaire, I now believe on

16 religious grounds that I couldn't make a judgment.

17          THE COURT:  Thank you, No. 82.

18          All right.  And just in general -- because

19 I don't want to miss anybody if it reflects something

20 different on your questionnaire -- is there anyone that

21 can't for more, religious, or personal reasons sit in

22 judgment of another individual?  Okay.  If you've got it

23 in your questionnaire, that's fine.

24          No. 51, I think we already have you.  Thank

25 you, sir.

```
 1                   And then the others that we wrote down, but
 2      nobody in addition.  I saw a hand over here.  What is
 3      your number?
 4                   VENIREPERSON:  82.
 5                   THE COURT:  We've got you, 82.
 6                   And, No. 23, we got you as well.  Thank
 7      you, ma'am.
 8                   All right.  Let's go on to the next concept
 9      then.  And before we get into capital murder, I'm going
10      to go over -- let me pause that.  There's one more
11      concept I want to cover.  And that is the right to
12      remain silent, our Fifth Amendment constitutional right
13      to remain silent.  We need to make sure that each and
14      every one of you can give this defendant his
15      constitutional right, the right to remain silent, which
16      does attach to each and every single one of us.
17                   And the basis, once again, in this right is
18      to hold the State to the burden of proving to you beyond
19      a reasonable doubt.  Our legal system is so different
20      than many across the globe.  In many places, when you
21      are coming to court, you have to prove yourself
22      innocent.  It's not the State that has the burden.  You
23      have the burden to prove yourself innocent.  And here in
24      the United States, it's a founding concept of not only
25      our legal system, but our country.  And so, you know, a
```

1   lot of times you hear taking the Fifth like it's a dirty

2   word, but it's not at all.  It is a concept that we not

3   only have ourselves, but we have to give each individual

4   person that's charged in our legal system that same

5   right.  Okay?

6               And the right is that you are not going to

7   hold it against him for any reason if he chooses not to

8   testify.  And that doesn't prevent somebody from

9   testifying if they want to, but it just says that he has

10  no burden whatsoever if he doesn't want to testify.  And

11  you can't consider that failure to testify for any

12  reason.  That will be in your instructions.  And I'm

13  going to ask you to commit to it today.  You know, it's

14  not the way the majority of us were brought up, always

15  to hear two sides of the story.  But this is one of

16  those ideas that is a -- that is a legal concept that

17  you have to wrap your head around, even though normally

18  if you had a dispute in front of you, you'd want to hear

19  both sides.

20              But it's not that far of a leap because the

21  way that it works is if -- say, the State puts on their

22  evidence, but they don't quite get there, they just

23  don't quite have you convinced beyond a reasonable

24  doubt.  You can't use the defendant's failure to

25  testify, if he doesn't stand up then and say something,

1    to push the State over the edge and say:  I didn't

2    really think they got there, they didn't convince me

3    beyond a reasonable doubt, but now that he didn't

4    testify, well, sure he's got something to hide.  You

5    can't do that.

6              Our legal system envisions that that would

7    be one of the prime examples as to why you wouldn't want

8    to testify.  That's what lawyers help defendants in

9    making determinations.  And frequently, lawyers will

10   advise clients.  That might be one reason a person

11   doesn't want to testify, because his lawyer tells him

12   not to, but any lawyer worth his salt, if they sat there

13   and they learned the State couldn't make their case, why

14   would you advise your client to get up and say anything

15   at that point?  Because if a jury is going to follow the

16   law, there would be an acquittal at that point.

17              Everybody agree?

18              And there is many other reasons why an

19   individual might not want to testify.  It's one of the

20   most scariest things, I'm told, that you can do.  Snakes

21   and speaking in public.  And so, a lot of people don't

22   represent themselves well, if they are not used to

23   speaking in public, getting up in a busy courtroom and

24   having to testify in front of individuals they don't

25   know.  So, there's a lot of reasons why, but you are not

1   even to -- it's not even up to you to think about that.

2   You would be instructed that you can't hold a failure to

3   testify against the defendant if he chooses not to.  And

4   anybody in the jury room that did start talking about,

5   you shut them down right away that that's not to be

6   considered.

7                   So, I've got to commit you.  Can everybody

8   provide to this defendant, as you would want yourself,

9   the Fifth Amendment right not to testify if he chooses

10  not to?

11                  Everyone on the first row, can you do so?

12                  Yes, juror number?

13                  VENIREPERSON:  I'm 3.  You know, I think in

14  a capital murder case when you are asking me to judge a

15  man's life, that would -- I would have a problem with

16  him not defending his own.

17                  THE COURT:  Okay.  So, when you say you

18  would have a problem with it, that means you would

19  consider it?

20                  VENIREPERSON:  I could if it's close.  Now,

21  like you are saying, if they have not gotten up there

22  and done their part -- I know he don't have to get up

23  there.  Same thing as a game plan, but if it is close

24  and there is some evidence out there that suggests there

25  might be -- he might be in the wrong place at the wrong

1  time, then I would have a problem with it.

2            THE COURT:  So, there is two scenarios

3  here.  The State did not make their burden and he

4  doesn't testify, are you saying you would hold it

5  against him if they didn't make their burden?

6            VENIREPERSON:  I'm not saying I would hold

7  him against if they didn't -- no, no, no.

8            THE COURT:  You would be fine in that

9  circumstance?

10            VENIREPERSON:  If they did not come

11  prepared, I would not hold it against him.

12            THE COURT:  Okay.  What if they had a

13  slam-dunk case and they met their burden and he doesn't

14  testify?

15            VENIREPERSON:  Well, if they've got a

16  slam-dunk case, he doesn't really need to testify, does

17  he?

18            THE COURT:  Exactly.  So, you are saying

19  that only if it was super close, you are not sure if

20  they made their burden?

21            VENIREPERSON:  That's right, if it's out

22  there that they've got some evidence that suggests that,

23  yes, he is in the wrong place at the wrong time.

24            THE COURT:  So, I've got to ask you -- to

25  me, what you are describing is a reasonable doubt, that

1   you would have a reasonable doubt whether they have met

2   their burden or not.  In that specific instance, you

3   might use his failure to testify against him?

4               VENIREPERSON:  I would expect him to get up

5   and testify.  If it's leaning towards him --

6               THE COURT:  So, I've got to ask you:  Can

7   you give me your commitment that you would not use the

8   defendant's failure to testify, if that does

9   transpire -- and I can't tell what's going to happen,

10  but if the defendant chose not to testify, can you

11  commit to me that you would not use that in a close

12  case, slam-dunk case, or any other type of case?

13              VENIREPERSON:  I can't give you that

14  commitment.

15              THE COURT:  Okay.  Very good.  And juror

16  number?

17              VENIREPERSON:  3.

18              THE COURT:  3.  All right.  Thank you, sir.

19              Anyone else on the front row?

20              And your juror number, ma'am?

21              VENIREPERSON:  No. 8.

22              THE COURT:  Okay.

23              VENIREPERSON:  I just have a question.

24              THE COURT:  Okay.

25              VENIREPERSON:  Based on what you just said

1   in regards to him testifying, if I had a change from

2   what you say, do I need to let you know, off my

3   questionnaire?

4              THE COURT:  If it's different than in your

5   questionnaire.

6              VENIREPERSON:  It is different.  I have

7   changed what I said.

8              THE COURT:  In your questionnaire, Juror

9   No. 8, you said what?

10             VENIREPERSON:  That I would hold it against

11  him if he didn't testify for himself.  And I have

12  changed that.  I don't agree with that now.

13             THE COURT:  Okay.  Very good.  So, you

14  could follow the law and provide the Fifth Amendment

15  constitutional right that the defendant has and not hold

16  it against him if he fails to testify?

17             VENIREPERSON:  Yes, ma'am.

18             THE COURT:  Okay.  Thank you, Juror No. 8.

19             Anyone else on the front row?

20             And let's go to the second row.  No. 13

21  through 28.

22             Yes, Juror No. 16.

23             VENIREPERSON:  I'm okay with him having the

24  right to, you know, plead the Fifth, but if he doesn't

25  testify, you know, on his behalf, I would have a hard

1  time being completely 100 percent on board with the

2  prosecution or defendant's case.  That would be a hard

3  thing for me to do, to judge him if he can't talk about

4  himself.

5           THE COURT:  Okay.  I'm kind of unclear on

6  what you're saying.  You're saying that you wouldn't

7  hold anything against him, but you --

8           VENIREPERSON:  Yes.  It's a criminal case

9  and his life is on the line.  I would expect him to

10 talk, say something, you know, defend himself, not just

11 his lawyers.

12           THE COURT:  Like I said, most of us were

13 raised kind of with that concepts.  Mom always said --

14 came in the room, the lamp was broken -- okay, what

15 happened, I want both of you to tell me your sides.  But

16 we're talking in a legal concept.  Can you -- even

17 knowing that might be your inclination in a real-world

18 situation, can you promise me that you wouldn't hold it

19 against him if you got to that --

20           VENIREPERSON:  It's hard to know, but just

21 with my personal emotions on that, I may be swayed.

22           THE COURT:  We don't want to get you up

23 here and get you in an uncomfortable position.  So, your

24 "probably no" is probably a good call on what you would

25 do.  And we don't want to do anything that would cause

1    to violate your conscience.  So, Juror No. 16, you're

2    saying you probably would not be able to afford him his

3    Fifth Amendment right.  Is that correct?

4                    VENIREPERSON:  Correct.

5                    THE COURT:  Anyone else on that row?

6                    And then row number three, 29 through 46,

7    anyone on the Fifth Amendment?

8                    And 47 through 64, the next row?

9                    And the next row, 65 through 82, other

10   than -- nobody else on that row except Juror No. 82?

11   And you know what, Juror No. 82, we've got you.  That's

12   all right.

13                   Okay.  And then 83, 84, and 85, anything on

14   that right to remain silent?

15                   Okay.  So, now let's go to capital murder.

16   I'll turn this back on.  We're going to talk a little

17   bit about capital murder and just what it means in the

18   state of Texas.  A capital murder, and the way it's

19   different from just a standard murder or a regular

20   murder, is that it is a murder plus something else.  And

21   a murder is the intentional taking of a human life

22   without legal justification.  Like, self-defense or

23   accident or something like that.  So, it's the

24   intentional taking of a human life.  That's murder.

25                   And then you have to add an aggravating

1   circumstance to it to get capital murder.  I just have

2   some suggestions down there below, but all of the

3   aggravating circumstances, if you will, that make a type

4   of murder into a capital murder are set out by statute

5   by out Legislature.  And there is a number of different

6   types.  I'm going to go through a couple of them.

7   Murder of a child under the age of 6.  Murder during the

8   course or committing certain felonies, of committing or

9   attempting to commit certain felonies.  Murder of a

10  public servant during the scope of his employment.

11  Murder of two or more individuals during the same

12  criminal episode.  Those are types of aggravating

13  circumstances that would attach to what we would call a

14  murder that would elevate it up to the level of capital

15  murder in the state of Texas.

16               And the only two types of punishment for a

17  capital murder, if it qualifies under one of those

18  aggravating circumstances, is life in prison or the

19  death penalty.  And then the State makes the decision,

20  looking at all the stuff that they have to look at and

21  the evidence in the case, whether they're actually going

22  to seek the death penalty or not.  Because not all

23  capital murders get to this point where we're looking at

24  potentially seeking of the death penalty.  Not we, but

25  the State.

1           So, in this particular case, I'm going to

2   read you through the indictment and reminding you that

3   the indictment is just the charging instrument.  I'm

4   going to read you what the State is alleging they are

5   going to proceed on against this defendant.

6           The duly organized Grand Jury of Harris

7   County, Texas, presents in the District Court of Harris

8   County, Texas, that in Harris County, Texas -- that's

9   one of your first elements -- Obel Cruz-Garcia,

10  hereafter styled the defendant -- would be element

11  number two where they would have to identify the

12  individual that they're alleging committed that

13  offense -- hereafter styled the defendant, heretofore on

14  or about September 30, 1992 -- so, they are alleging a

15  date that they are going to prove to you -- did then and

16  there unlawfully, while in the course of committing and

17  attempting to commit the kidnapping -- so, they are

18  alleging that there's one of these aggravating

19  circumstances, that it happened during a kidnapping --

20  of Angelo Garcia, Jr. -- that's another of a certain, a

21  certain named individual -- intentionally cause the

22  death of Angelo Garcia, Jr. -- that same named

23  individual -- by stabbing Angelo Garcia, Jr. with a

24  deadly weapon, namely, a sharp instrument.  And that

25  last short paragraph, by stabbing with a deadly weapon,

1  sharp instrument, we call that the manner and means

2  where they have to allege how it happened.

3              And they have two paragraphs that are out

4  of the same criminal circumstances that they are

5  alleging.  So, two different ways but the same charge

6  and the same set of circumstances.

7              It is further presented that Obel

8  Cruz-Garcia, hereafter styled the defendant, heretofore

9  on or about September 30, 1992, did then and there

10 unlawfully, while in the course of committing and

11 attempting to commit the kidnapping of Angelo Garcia,

12 Jr., intentionally cause the death of Angelo Garcia,

13 Jr., by an unknown manner and means.

14             So, there is two paragraphs, but they are

15 alleging the same set of circumstances in two different

16 ways.  And they do that for purposes of notice and

17 proof.  Okay?

18             So, having said that and reminding you that

19 you are not to hold the indictment against the defendant

20 in any way, shape, or form -- that's not evidence,

21 that's just notice.  They are saying this is what I

22 intend to prove.  And you can see the way that the State

23 is alleging the capital murder, the part of the statute

24 they are proceeding in this particular case.  It would

25 be that part of the statute that allows them to proceed

1  when there is a murder that they are alleging was

2  committed during the course and commission or attempted

3  course and commission of committing another felony,

4  which would be the kidnapping.  Okay?

5              Any questions on that?  So, you see how we

6  got to that charge anyway?

7              Yes.  What's your number, ma'am?

8              VENIREPERSON:  71.  Just a quick question.

9  You said this was 1992?

10              THE COURT:  I did.

11              VENIREPERSON:  Why so -- just, why so long?

12              THE COURT:   We can't go into why so long.

13  You know, not that I even get to know why so long, but I

14  can tell you that you've probably seen all kind of shows

15  on cold cases.  There is a million and one reasons it

16  could be old.  And we can't go into those now, but

17  you'll probably find out if you are a juror on this

18  case, or, you know, even if you came in and sat and

19  listened to the evidence if you are not a juror in this

20  case.  That will all be unfolding, but I can tell you

21  that the murder, the offense of murder has no statute of

22  limitations on it, and neither does capital murder.  So,

23  you know, we could potentially have cases that are much

24  older.  And sometimes we do see cases that are much

25  older than that.  We can't go into that right now.  All

1  right?  But that was the date, on or about September

2  30th, 1992.

3              And it will be your job, as I talked about

4  before, to go through and these other two -- I'm going

5  to point out two and three, those are just examples.

6  So, we'll go on from there.  It will be your job, if you

7  make it on the jury, to determine the credibility of the

8  witnesses.  And there is some rules associated with

9  witness credibility.  And one of them is that you --

10 like we said before, you can believe all, none, or some

11 of what a witness says.

12             And Juror No. 72, yes, sir.

13             VENIREPERSON:  Yes, ma'am.  What is the

14 current age of the defendant?

15             THE COURT:  We can't go into that.  I don't

16 actually know myself, but there will be, you know,

17 evidence of it, but I can't tell you what that is.  We

18 can't go into the facts, like I'm saying.

19             So, anyway, back to credibility of

20 witnesses.  So, as a jury you can determine whether you

21 believe all, some, or part of what a witness says.  And

22 you are the ultimate triers of the facts, if you

23 believe this person or you don't.  So, we're going to

24 talk a little bit about witnesses in general.  And the

25 one -- specifically we're going to go into some

1  discussion about accomplice witness testimony as well

2  because there is specific laws associated with

3  accomplice witness testimony.

4           But the first thing I need to ask you is

5  about the credibility of the witnesses.  What the law

6  envisions is that even though you can decide all, none,

7  or some of what a witness believes {sic}, you have to

8  wait till they testify.  In other words, you can't

9  prejudge them as they are coming in.  You can't take an

10  individual that may have a certain occupation or a

11  certain station in life and give them either greater

12  credibility based on that or lesser credibility based on

13  that, without first hearing their testimony.

14           And once you hear their testimony and you

15  hear their life story or their experience or their

16  schooling, or whatever, if you want to give them

17  credibility for what they say, then you can do it; but

18  you can prejudge them as they are walking in.  And one

19  of the areas we frequently hear, this prejudging if you

20  will, is in regards to police officers.  And it goes

21  both ways.  Some people say:  I wouldn't believe any cop

22  that took the stand because, you know, I had this bad

23  experience with a police officer, and, you know, they're

24  all that way.  And then you get other people who will

25  say:  You know, my next-door neighbor is a police

1   officer and he's the best guy I've ever known.  And so,

2   for that reason, I'm going to believe any police officer

3   that takes the stand.

4                So, can you see why the law envisions that

5   you have to really wait before you judge any witness to

6   see who it is, to see what they have to say, and to see

7   if you believe them or not as to what they say?  And you

8   use all those same things that you would use every day.

9   When you come across a person and you are speaking with

10  them, there is cues they give off and you judge them

11  every single day, whether you believe it or not.  You

12  may return into a person that you say:  Well, they

13  couldn't meet my eye and I just don't know if I can

14  believe what they say, or they were so jittery and just

15  the way they said it, I'm not believing what they said.

16               So, you have an opportunity to view that

17  witness.  You may have a witness take the stand, which

18  normally you might say to yourself:  Well, he's a police

19  officer and I'm -- normally I might be inclined to give

20  him a little extra credit because he's a police officer,

21  but once he takes the stand, you find out it was his

22  first day on the job, he didn't do -- you know, he

23  really didn't complete all of his training, and he --

24  besides, he was behind that police car, he couldn't see

25  everything clearly.

```
 1                    So, do you see the reason why the law
 2   envisions that you wait and see what they have to say
 3   before you judge them and before you pass judgment on
 4   their credibility?  And so, I need a commitment from
 5   each of you that you will do that and not prejudge any
 6   witness.
 7                    Can I get that commitment from everyone on
 8   the first row?
 9                    VENIREPERSONS:  Yes (in unison).
10                    THE COURT:  I guess just tell me if you
11   can't.
12                    On the second row?  That's going to be 13
13   through 28.
14                    No. 29 through 46, the third row?
15                    No. 47 through 64, the fourth row?
16                    No. 65 through 82?
17                    And are you on that row, ma'am?  What is
18   your number?
19                    VENIREPERSON:  67.
20                    THE COURT:  No. 67, how do you feel?
21                    VENIREPERSON:  I'm not going to judge him,
22   period.  Guilty or not guilty, I don't want anything to
23   do with this case and I believe only God could judge and
24   that is the only person.
25                    THE COURT:  Okay.  Thank you.  And you
```

1    probably put that in your questionnaire, didn't you?

2              VENIREPERSON:  I did.  I put a lot of stuff

3    in that questionnaire.

4              THE COURT:  We don't need to go over it all

5    right now.  That would be forever, but thank you for

6    bringing that up, Juror No. 67.

7              And in the back, 83 through 85?

8              Okay.  Very good.

9              All right.  So, then let's go quickly into

10   the law of parties.  The reason we're going to go over

11   law of parties first is because we are going to talk

12   about accomplice witness, but it really has to do with

13   parties.

14              In the state of Texas, you've probably

15   heard about -- like accomplices, when more than one

16   person commits a crime, acting altogether, with the

17   understanding that everybody knew it was going on and

18   everybody had different roles.  That's what the law

19   envisions under what we call the law of parties.  In

20   Texas, there isn't different levels of charging where

21   you would say:  Okay.  You are charged as accomplice

22   number one or accomplice number two to this offense.

23   You are all charged with the same criminal offense if

24   you played a role in committing that offense and you

25   knew that that offense was going to be committed.

1             Let me read to you specifically what the

2    code says about the law of parties.  And it's right up

3    there for you.  A person is criminally responsible as a

4    party to an offense if the offense is committed by his

5    own conduct or by the conduct of another for which he is

6    criminally responsible or by both.

7             And then if you jump down here it tells you

8    when you are criminally responsible for the conduct of

9    another.  A person is criminally responsible for an

10   offense committed by the conduct of another if, acting

11   with intent to promote or assist the commission of the

12   offense, he solicits, encourages, direct, aids, or

13   attempts to aid the other person to commit the offense,

14   or if in the manner -- excuse me -- or if in the attempt

15   to carry out a conspiracy to commit one felony another

16   felony is committed by one of the conspirators, all

17   conspirators are guilty of the felony actually committed

18   if the offense was committed in furtherance of the

19   unlawful purpose and was one that should have been

20   anticipated as a result of the carrying out of that

21   conspiracy.  And you see up here, the second bullet

22   point:  Each party to the offense may be charged with

23   the commission of the offense.

24             Let me give you a hypothetical, a good

25   example, taking it away from capital murder.  Just in

1  general this is a hypothetical.  Let's assume that a

2  group of four guys go out and they -- they're all short

3  on money and they all say:  Hey, there is a bank down at

4  the corner and we need to rob that bank.  And one of

5  them is the mastermind.  Will put the mastermind as the

6  guy who owned the car.  But he says:  I'm the driver of

7  the car, I know the city, so I'm going to stay out in

8  the car.  So, he is the driver, the getaway driver if

9  you will.

10          And then you have a third guy who's pretty

11  big, a bruiser guy.  And he knows what's going on.  He

12  is part of the planning, too.  He needs that money, but

13  he's just going to stand at the doorway of the bank and

14  make sure that there's nobody coming.  Especially when

15  the police start coming, he is going to round everybody

16  up and get them in the car and they're going to get

17  away.

18          And there is a second guy who goes into the

19  bank and his task is to get all the hostages and put

20  them on the floor and watch them and make sure that

21  nobody tries to make a getaway and nobody pushes the

22  buzzer alerting the police.  And then there's the last

23  guy, which we're going to call number one.  And he is

24  the one who actually goes up to the teller, holds the

25  gun on her, and takes the money.

1           So, we have four different roles, but

2   they're all acting together to effect the same purpose,

3   committing the same crime.  And so, they -- in the state

4   of Texas, the law envisions that they would all be

5   charged with the aggravated robbery of that bank, even

6   the guy who is sitting in the car as the getaway driver,

7   as long as they were aware of what was going on and all

8   took part in the conspiracy.

9           Does that make sense to everybody?

10          VENIREPERSONS:  Yes (in unison).

11          THE COURT:  So, that's what the law of

12  parties is all about.  And that law may be applicable in

13  this case.  So, we're going to talk about accomplice

14  witness testimony.  What happens when all four are

15  charged and somebody decides they want to come forward

16  and say:  Hey, I would like to testify for the State.

17  Yes, I was part of this, but I'm going to follow my

18  sword, I'm going to, you know, take my punishment, and I

19  will tell you what everybody else did.  Well, there is

20  certain law associated with that type of witness in the

21  state of Texas.  And that's in our Code of Criminal

22  Procedure, 38.14.

23          So, now as the triers of fact, the jury

24  can, once again, take that witness and believe all of

25  what they say, none of what they say, or some of what

1  they say.  And they can base it on all the same things

2  they base every other witness' testimony on.  Okay?  But

3  they are tasked with not considering it at all under

4  certain circumstances.

5              This is what the code reads:  A conviction

6  cannot be had upon the testimony of an accomplice unless

7  his testimony is corroborated by other evidence tending

8  to connect the Defendant with the offense committed.

9  Okay?  And number two is:  The corroboration is not

10 sufficient if it merely shows the commission of the

11 offense.  Okay?

12             So, in other words, there has to be

13 corroborating evidence that the State provides to you

14 that would indicate -- and it can be a scintilla of

15 evidence, but the evidence has to connect the defendant,

16 the charged defendant, the one that's not testifying,

17 you know -- so you have one person on the stand who is a

18 defendant, but he's charged in a different case and he's

19 testifying, that's your accomplice.

20             So, you can't even consider his testimony

21 if there is not other evidence that would tend to

22 connect the person who is on trial with the crime as

23 well.

24             Does that make sense?  And that would be up

25 for the jury to determine, whether you believe that

1   there is.  Okay?  So, that's the law associated with

2   that.  Everybody understand that?  Anybody feel they

3   could not follow that law as it's set out as to both law

4   of parties and accomplice witness testimony?

5                   Going on row number one?

6                   Row number two?

7                   And you can kind of understand why the law

8   is that way.  So you just don't have people trying to

9   point fingers add somebody else and take the blame off

10  of them, maybe.  Right?  But you definitely want to hold

11  that witness to -- not hold them to a higher standard of

12  credibility issues, but that there be something to

13  connect him.  And then you can consider it.  If you

14  believe that that connection is there, you can consider

15  it just like every other witness in terms of believing

16  all of what he says, none of what he says, or some of

17  what he says.  Okay?

18                  Row number three, 29 through 46, anyone

19  have any issue with that whatsoever?  Can you commit to

20  me that you will follow the law as I have set out for

21  law of parties and accomplice witness' testimony?

22                  And row numbers 47 through 64?

23                  Row numbers 65 through 82?

24                  And 83, 84, and 85?

25                  Okay.  Very good.

```
 1                  Now, the only other thing I have to say in
 2   terms of the guilt-innocence stage of the trial is that
 3   you may be asked to consider lesser offenses at that
 4   stage.  That won't become aware -- we won't become aware
 5   of whether there's going to be lesser offenses included
 6   in your jury charge until well, well into the evidence.
 7   And, obviously, you would consider them if they came
 8   before you on the guilt-innocence stage.
 9                  And my main question as to that is to --
10   you know, clearly on a capital murder where there is
11   allegations such as there are in this indictment, there
12   could potentially be a lesser offense included in the
13   jury charge of just a straight murder, a regular murder,
14   not a capital murder.  There could potentially be a
15   lesser charge of just kidnapping and not attached to a
16   murder.  So, things like that.
17                  And what I'm going to ask for your
18   commitment on this time:  Can you keep an open mind as
19   to those lesser offenses, if they do come before you,
20   and the full range of punishment on them, if they do
21   come before you?  It would be something that's less than
22   the capital punishment.  Okay?  So, anything less than a
23   capital would not be a sentence of death that's even
24   available.  Okay?
25                  Is everybody clear on that?
```

1          VENIREPERSON:  No.

2          THE COURT:  I heard a "no."

3          VENIREPERSON:  I didn't quite understand

4   you.

5          THE COURT:  I'm just asking if you can keep

6   an open mind to any lesser offenses, in terms of if they

7   come before you.  The attorneys may have more questions

8   on that as we go along, but there's a number of --

9   obviously, in any charged offense, there is -- there

10  could be lesser charges that are included after all of

11  the evidence comes in that you might be allowed to

12  consider.  And if you were able to consider those

13  offenses, if they come into jury charge, can you keep an

14  open mind to a lesser range of punishment than capital?

15          VENIREPERSON:  Yes.

16          THE COURT:  Okay.  And anybody that could

17  not?

18          All right.  Very good.  So, let's go on.

19  If we get to the punishment stage in this case, I'm

20  going to go through how we get to the decision made on

21  whether life in prison or the death penalty is assessed.

22  And many people think that you have to vote on that,

23  that would be really hard for me to do.  It is a

24  difficult process in and of itself, but it's not exactly

25  what most people think.

1              What they do -- what the law has set out is

2    there are what we call special issues that have to be

3    answered by the jury.  And they're based on the evidence

4    that you have heard in both the guilt stage of the

5    trial, and if you get to the punishment stage you can

6    hear additional witnesses.  So, that's what the answers

7    would be based on, the facts that come from the witness

8    stand, once again.

9              And there is three of them.  They are up

10   there on the board right now.  And you would have to

11   answer each individual one of these as a group, as a

12   jury.  And it would be the responses -- and I'll tell

13   you, there are not going to be any secrets as to how the

14   responses will affect the ultimate decision as to

15   whether life in prison or the death penalty is assessed.

16   So, you would be aware of it.  As a jury, you don't vote

17   life or death.  You answer the questions and those

18   questions result in the verdict.

19              Okay?  Does that make sense to everybody?

20              All right.  So, the first question, if we

21   got to the guilt stage of this trial, would be:  Do you

22   find from the evidence beyond a reasonable doubt that

23   there is a probability the defendant would commit

24   criminal acts of violence that would constitute a

25   continuing threat to society?

1          Okay.  A lot of legal mumbo-jumbo.  Sounds

2   like it.  What do you see first off?  Well, first off,

3   you see there is a burden of proof in this particular

4   special issue.  And that is, once again, the State has

5   the burden of proof to prove to you beyond a reasonable

6   doubt whatever it is.  Whatever the answer is, "yes" or

7   "no," they've got to prove it to you beyond a reasonable

8   doubt.  Do you find from the evidence beyond a

9   reasonable doubt that there is a probability the

10  defendant would commit criminal acts of violence that

11  would constitute a continuing threat to society?

12          And there is only two answers, "yes" or

13  "no."  Let's break it down just a little bit more.

14  That's where I go to my next slide.

15          Probability.  Probability is not defined

16  either.  Sorry, folks.  That's one of those things, just

17  like beyond a reasonable doubt, they are leaving it up

18  to the jury, but they give you some parameters.  It's

19  going to be more than a possibility.  What would a

20  possibility be?  Maybe something might happen.  But it's

21  not to an absolute certainty, once again.  So

22  probability falls somewhere between possibility and

23  certainty.

24          Does that make sense to everybody?

25          But other than that, it's not defined.

1   It's not defined for you as an individual, it's not

2   defined for you as a jury.  And when that happens, the

3   jury is tasked with assigning an ordinary course of

4   verbiage that you would use in ordinary life to that

5   word.  So, probablity.

6            Whether there is a probability the

7   defendant would commit criminal acts of violence.  And I

8   have that kind of highlighted on there.  Criminal acts

9   of violence aren't defined either for the jury, but it

10  is set out that it doesn't necessarily have to mean that

11  another -- you would have to believe beyond a reasonable

12  doubt that another murder would be committed.  It's not

13  that high.  It doesn't necessarily have to be a criminal

14  act of violence against another individual.  It could be

15  against property or something like that.  But other than

16  that, it's not really defined.  So, criminal acts of

17  violence are not defined for you.

18            So, that's -- I'm not giving you a lot of

19  guidance there, but what I am telling you is that it

20  does not have to -- you do not have to be convinced

21  beyond a reasonable doubt that another murder would be

22  committed.

23            And also, in addition to that, society is

24  not defined, you know.  And some argue that there are

25  different levels of society as to in small groups, in a

1   neighborhood, or society in general, or even within some

2   type of institution or something, that all these types

3   of things are society, but it's not defined for you.

4   So, as to Special Issues No. 1 -- and we call that

5   Special Issues No. 1 our future danger issue.  So, it's

6   basically asking you in longer terms:  Do you think this

7   individual might be a future danger?  Is there a

8   probability that he is a future danger?  And that's why

9   we call it the future danger issue.  And you are held to

10  these words and this standard.

11              And if you answer that "yes" -- and it has

12  to be a unanimous "yes."  That's the only way you would

13  go on and continue on.  If you answer that question "no"

14  as a jury -- and it doesn't even have to be unanimous

15  no.  If ten out of the twelve jurors answer that

16  question "no," then everybody stops and the result of

17  that is that life imprisonment is the penalty that's

18  assessed.  Okay?  The death penalty is off the table at

19  that point.  So, Special Issue No. 1, that's what it is.

20              Anybody have any questions on that?

21              Yes, your number?

22              VENIREPERSON:  38.

23              THE COURT:  Yes.

24              VENIREPERSON:  37.  Sorry.

25              THE COURT:  It's okay.

1          VENIREPERSON:  My question is, if we were

2    to get to that point would the jury get information on

3    what has happened in the intervening years since the

4    crime was committed?

5          THE COURT:  Well, I can tell you this.

6    There is a punishment phase just like there is a guilt

7    phase.  And both the State and the defendant have the

8    ability to bring further evidence before you.  Okay?

9    So, the defense would have the opportunity to bring what

10   we call mitigating evidence, if they wanted to; things

11   that make him less blameworthy.  And the State would

12   have the ability to bring forth other activity that's

13   been going forth in his life.  I don't know if there is

14   going to be that or not.  Maybe there's a big void where

15   nothing really happened, I don't know.  But that's where

16   you would hear it, if it's going to be heard.  And if

17   they want you to consider something, the State has the

18   burden of providing that to you.  You can't just assume

19   something happened and think there's got to be something

20   else out there and I'll hold it against him.  That

21   evidence has to be brought to you by the State and

22   proven beyond a reasonable doubt.  Okay?

23          VENIREPERSON:  Okay.  And you're allowed to

24   be given that information?

25          THE COURT:  Yes, you are, in the punishment

1    phase.  Good question.

2              Any other questions regarding that Question

3    No. 1, Special Issue No. 1?

4              All right.  So, going back to the special

5    issues.  The second one is -- and I left out one word

6    here -- do you find from the evidence beyond a

7    reasonable doubt that the defendant actually caused the

8    death of the deceased or did not actually cause the

9    death of the deceased but intended to kill the deceased

10   or another or anticipated that a human life would be

11   taken?

12             Okay.  So, once again, you only get to this

13   Special Issue No. 2 if the answer to Question No. 1 is

14   what?

15             VENIREPERSONS:  Yes (in unison).

16             THE COURT:  Yes.  So, if you find the first

17   one, that there is a probability he would be a future

18   danger, then you go to Special Issue No. 2.  If you say

19   "no" to that first one, you stop.

20             So, as to Special Issue No. 2, here we're

21   talking about, once again, the parties issue.  Okay?

22   So, you are to first determine whether the defendant

23   actually caused the death of the deceased.  And so, if

24   there is not a party issue, or you believe even if there

25   is a party issue, that the charged defendant was the one

1  who actually caused the death of the person that was

2  murdered, then the answer is clearly going to be "yes"

3  there.  Okay?

4          But say, for instance, in that bank robbery

5  scenario that you have a situation where somebody gets

6  killed, maybe one of the hostages.  Let's assume one of

7  the hostages.  I think it was person number two that was

8  the one in charge of the hostages.  And he had a gun and

9  everybody knew they were carrying guns and the

10 conspiracy was that we need to get away with this.  And

11 so, if somebody, you know, were carrying guns, you need

12 to use them if you need to.

13         And so, you find out in that hypothetical

14 situation that the number two man had to take out one of

15 the hostages and shoot him because that person was

16 running for the alarm.  And so, the person that's before

17 you and charged and you're sitting on a jury is the guy

18 that's in the car.  Okay?  So, that is where this

19 situation would come in play, where your answers -- and

20 it has to be proven, once again, beyond a reasonable

21 doubt by the State that the person that's on trial

22 either, one, actually killed the deceased or intended to

23 kill the deceased or another.

24         So, say they went in and they thought the

25 teller was going to be killed and it really was one of

1  the hostages, it would meet that burden here.  So, even

2  if it might not be the individual that was killed that

3  the guy out in the car intended, but there was another

4  person killed, it could apply here.  Or anticipated that

5  a human life was taken -- would be taken.  Okay?

6           So, does that make sense to everybody?  You

7  go through them step-by-step and you determine if the

8  person on trial, with the evidence that the State has

9  brought to you beyond a reasonable doubt, proven to you

10 that you can answer "yes" to this question.  If you

11 can't answer "yes" to that question unanimously, by all

12 jurors, then you answer it "no."  And it only takes ten

13 to answer "no."  It doesn't take a unanimous verdict to

14 answer "no."

15           And, once again, if you answer "no" to that

16 question, you stop.  And the result of that would be --

17 a sentence of life would be imposed, not the death

18 penalty.

19           Okay.  So, here we are.  Issue No. 1,

20 Special Issue No. 1, future danger; Special Issue No. 2,

21 what we call the parties issue.  Okay?  Does anybody

22 have any questions as to that parties issue?  Are you

23 thoroughly confused at this point?

24           You are?  I see you're shaking your head.

25 Are you really confused or are you just tired?

```
 1                    VENIREPERSON:  We're freezing.

 2                    VENIREPERSONS:  It's cold (in unison).

 3                    THE COURT:  Oh, you are cold.  That's to

 4     keep you awake, I think.  I don't know.  I'm not cold,

 5     necessarily, do we need to adjust the temperature in

 6     here?

 7                    VENIREPERSONS:  No (in unison).

 8                    THE COURT:  Some people like it cold.

 9                    So, going on, then.  Let's assume that you

10     have answered Question No. 1 "yes" and you've answered

11     Question No. 2 "yes" at this point, because the State

12     has proven to you beyond a reasonable doubt as to each

13     of those questions, then we go on to Special Issue

14     No. 3.  And I'm going to -- Special Issue No. 3 is what

15     we call the mitigation.  And it asks:  Do you find from

16     the evidence, taking into consideration all of the

17     evidence, including the circumstances of the offense,

18     the defendant's character and background, and the

19     personal moral culpability of the defendant, there is a

20     sufficient mitigating circumstance or circumstances to

21     warrant that a sentence of life imprisonment rather than

22     a death sentence be imposed?

23                    Okay.  So, you can see why we call this the

24     mitigation issue.  On this particular issue, there is no

25     burden of proof on either side.  The defendant doesn't
```

1  have a burden of proof, but he doesn't still have a

2  burden of proof on this either.  You might find that

3  there will be no evidence put forth, but if there is

4  going to be evidence of mitigation, this is where you

5  would consider it.  Okay?

6            And so, from the perspective of the legal

7  system, at this point it's very close to being assessed

8  a death penalty case.  So, you see, you've already

9  answered the first two questions "yes" or you wouldn't

10 even be here.  And so, it's only if you answer this

11 question "no" that the death penalty would result.

12 Okay?  And if the answer is "yes" on this last question,

13 then life in prison results.

14            So, let's go through it a just a little

15 bit.  When taking into consideration all of the

16 evidence, including the circumstances of the offense --

17 so, you can take, obviously, the circumstances of the

18 present charged offense, but you can also take into

19 account the defendant's characteristic and background --

20 you may hear evidence as to that in the punishment

21 stage -- and the personal moral culpability of the

22 defendant.  It might be at this point where you'd

23 consider something like -- okay - he was the guy in the

24 car, you know, even though he knew somebody might be

25 killed, maybe because he wasn't the one that pulled the

1  trigger, maybe that might be mitigation.  That's just a

2  circumstance.  You don't all have to agree.  The jurors

3  don't have to agree on what circumstance it is that you

4  find mitigating, but you would have to have at least

5  twelve votes to be "yes" that there is no mitigating

6  circumstance and ten votes for no, which would be, yes,

7  there is a mitigating circumstance.

8                   So, they are asking:  Is there any

9  mitigating circumstance that would prevent you from

10 assessing a death sentence?  And if you answer -- I'm

11 sorry.  Don't let me confuse you.  These get all

12 confusing.  Whether taking into consideration all the

13 evidence, including the circumstance of the offense,

14 there is a sufficient mitigating circumstance that the

15 death penalty should not be imposed.  I was reading the

16 wrong page here.  Then he's got one foot on death row.

17 And if they are twelve votes for "no," hey, is there no

18 mitigation, that means he's going to death row.  But if

19 there is only ten votes, that's all that's required for

20 a "yes."  And that would be, yes, there is mitigation

21 here, and, yes, he should not go to death row.  And that

22 would be your answer on that question.

23                   And they don't really -- the legal system

24 has not assigned a specific definition for what a

25 mitigating circumstance is, but it is something that

1   would reduce the defendant's blameworthiness.  That's

2   basically what it is.  So, it's not telling you what

3   should and shouldn't be, but in your own mind as a juror

4   it would be something that to you would reduce the

5   defendant's blameworthiness.  Okay?  And then, of

6   course, it would have to be a sufficient reduction in

7   that blameworthiness to where you feel a death penalty

8   should not be assessed.

9           Any questions on that third issue?  Not at

10  all?  Y'all are just tired, I know.  So, does everybody

11  understand the way that the questions need to be

12  answered and -- what the result would be if the

13  questions were answered in a certain manner?  Anybody

14  that doesn't understand that?

15          Does anybody feel -- and this is the

16  question I want to commit you on.  Does everyone feel --

17  other than the ones we've heard from -- feel they can

18  commit to following the law as to those special issues

19  knowing that in a proper case the answer to their

20  questions may result in assessing the death penalty?

21          (Show of hands)

22          THE COURT:  I have a couple of hands.

23          Juror number on this first row?

24          VENIREPERSON:  I'm No. 6.  And I

25  believe that my answers would be swayed because I do not

1   support the death penalty.

2              THE COURT:  Did you put that in your

3   questionnaire?

4              VENIREPERSON:  I did.

5              THE COURT:  All right.  So, you feel that

6   you -- knowing what your answers would result in, you

7   would be swayed to kind of go back door?

8              VENIREPERSON:  Absolutely.  That's just

9   being honest.

10             THE COURT:  I appreciate that.  That's

11  exactly were we're here, Juror No. 6.

12             Anybody else feel -- that didn't put on

13  their -- because I'm going to get a lot of hands, I

14  think.  If you put on your questionnaire that you felt

15  that way, we don't really need to hear from you.

16  Because, believe me, these lawyers have been going over

17  the questionnaires with a fine-tooth comb, but if you've

18  changed your mind and you really want to make sure the

19  Court is aware of how you feel, that you feel strongly,

20  please raise your hand.

21             So, juror number?

22             VENIREPERSON:  39.

23             THE COURT:  39.

24             VENIREPERSON:  You know, I sway also to,

25  you know, just change and say:  Well, no, I can't go

1   with this, but even though, you know, the evidence may

2   be overwhelming.  And I have already said that, you

3   know, 100 percent persuaded that the prosecutor would

4   have to prove their case before I -- 100 percent before

5   I would go with them, but deep down in my heart, I would

6   not want to go that way because I do not support the

7   death penalty.

8               THE COURT:  So, your answers to these

9   questions would be swayed based on what you know they

10  would result in?

11              VENIREPERSON:  Yes.

12              THE COURT:  And not by the evidence?

13              VENIREPERSON:  Not really by the evidence.

14              THE COURT:  And thank you, Juror No. 39.

15              Anybody else feel the way Juror No. 39

16  does?

17              And what is your number, ma'am?

18              VENIREPERSON:  20.

19              THE COURT:  Yes.

20              VENIREPERSON:  I feel the same way.  I put

21  that I'm opposed, but in a few cases I'm for it, but not

22  if I have to make the decision.  I would be swayed to go

23  against the death penalty.

24              THE COURT:  Okay.  Very good.  Thank you,

25  No. 20.

```
 1                    And over here on the left, juror number?
 2              VENIREPERSON:   47.
 3              THE COURT:   Juror 47?
 4              VENIREPERSON:   Yes.
 5              THE COURT:   Same thing?
 6              VENIREPERSON:   Yes.
 7              THE COURT:   Thank you, Juror No. 47.
 8                    I think we had a lot of you already written
 9    down as to that.
10                    And juror number in the front row?
11              VENIREPERSON:   No. 8.   I'm not for the
12    death penalty, so I might possibly be swayed.   I don't
13    want to go 100 percent, but I'm not for it.   So, it
14    would be a little difficult for me.
15              THE COURT:   Well, see, that's exactly why
16    the questions are phrased the way they are and why the
17    system is set up that way.   Because the law doesn't
18    envision you voting for the death penalty or not.   It
19    envisions that you would answer questions and those
20    questions have to be -- the answers to those questions
21    have to be based on the evidence.   So, the evidence
22    would lead you to the correct, not your feelings on the
23    death penalty.   So, it needs to be based on what you
24    hear from the witness stand and not your feelings on the
25    death penalty.
```

1          So, if you feel that's what you are going

2    to do, then I probably need to hear from you, Juror

3    No. 8, unless you already put it on your juror form.

4          VENIREPERSON:  I will say that I will be

5    swayed, most likely, only because I'm not for it and I

6    just don't feel that we can judge somebody and give them

7    the maximum sentence.

8          THE COURT:  And I appreciate your honesty,

9    Juror No. 8.

10         All right.  And so, at this time I have

11   covered everything we need to cover in terms of the

12   special issues.  These last several slides were showing

13   the jury's answers to the questions.  If you look up

14   there.  The future danger issue:  Twelve votes to answer

15   "yes" and it has to be unanimous and then you would go

16   on.  Ten votes or more is a "no."

17         The parties issue is your second one.

18   Twelve votes to answer "yes," must be unanimous.  Ten or

19   more votes to answer "no."  And, of course, you would

20   stop after each of these if your answers are "no."

21         And then the third issue is mitigation.

22   Twelve votes to answer "no" and ten or more votes to

23   answer "yes."  Future danger "no," if the answer is

24   "no," then it's life in prison.  If the parties issue is

25   "no," then it's life in prison.  However, once you get

1   to the last issue, which is the mitigation issue, if you

2   answer that "yes," after there have been two previous

3   "yes" answers, it's life.  And if you answer it "no," it

4   results in the death penalty.  Okay?  And I wanted to

5   make sure everyone was clear on that.

6               Okay.  So, let's talk about some scheduling

7   here.  Like I said, we're going to sit down -- and I'm

8   going to give you a break here in just a moment so you

9   can go out and use the restroom, maybe grab a quick bite

10  to eat, not long.  Because at this point, the lawyers

11  and the Court are going to get together and see from

12  your answers today and reviewing the questionnaires

13  again whether we can eliminate any more jurors from the

14  process without spending a lot more of your time.

15              However, then those that are not eliminated

16  are going to be broken down in groups.  We're going to

17  hear four jurors on individual voir dire this afternoon.

18  And however many else are left, will be split up in some

19  days in the future.  And after the individual voir dire,

20  then you will know specifically whether or not you are

21  going to be seated on this jury.  And then you will be

22  released until July 8th.  And July 8th is when evidence

23  will begin in this case.  And I anticipate that it will

24  be two weeks from that date, July 8th, before you will

25  be released from your jury service.

```
 1                    Having said that, what I need to know from
 2    you today is if there is anybody that has something
 3    like, you know, surgery or your honeymoon or wedding and
 4    a honeymoon, something very serious.  I can't give
 5    everybody work excuses or we would have absolutely no
 6    jurors.  And you understand that?  I appreciate
 7    everybody's time so far, but it has to be a pretty
 8    serious circumstance that we would take into
 9    consideration in whether we can excuse you or not.
10                    So, starting in the first row, anyone that
11    would like to make me aware of a circumstance that would
12    interfere with this process?
13                    And juror number?
14                    VENIREPERSON:  10.
15                    THE COURT:  10.
16                    VENIREPERSON:  I put it on the
17    questionnaire, but I'm scheduled to move for work
18    starting July 1st to Arizona.
19                    THE COURT:  Okay.  Thank you, sir.  July 1,
20    Arizona.  And you are actually physically going to be
21    moved at that point, it's not like you're start a
22    vacation or anything at that point, but --
23                    VENIREPERSON:  That is correct.  That's the
24    day I'm supposed to report to work.
25                    THE COURT:  So, you're going to be moving
```

 1  between now and then, physically moving?

 2              VENIREPERSON:  Well, my family is coming

 3  after I'm gone.  So, I'm going to get started and then

 4  the family is moving two weeks after that.

 5              THE COURT:  Okay.  Thank you, Juror No. 10.

 6              Juror No. 5.

 7              VENIREPERSON:  5.  I put this on my

 8  application.  My brother has just been moved into

 9  hospice and he may not make it the next few weeks.

10              THE COURT:  Okay.  And so -- and I realize

11  that's a very important, you know, personal item, and

12  something that I don't want you to be distracted for as

13  well.  I mean, this is very important, too.  As

14  important as that is -- and I know that it may be quick

15  or it may be a longer period of time -- do you feel that

16  it's something that would distract you to the point

17  where you couldn't pay full attention to this case and

18  give this case the attention that it needs if you were

19  to be called as a juror?

20              VENIREPERSON:  Well, if it happened during

21  the time of the trial, that would be a problem.

22              THE COURT:  Sure.  And it would be.  And I

23  don't know what stage or how long the prognosis is on

24  your brother, but --

25              VENIREPERSON:  Weeks.

1            THE COURT:  Just weeks.  Okay.  So, it's

2  something that could potentially be completed by the

3  time we got started?

4            VENIREPERSON:  Right.

5            THE COURT:  If that's the case, do you feel

6  that it still would be --

7            VENIREPERSON:  No.  I wouldn't have a

8  problem.

9            THE COURT:  So, we'll bring that -- of

10  course, the lawyers are paying attention to this and

11  we'll discuss that.  I appreciate it, Juror No. 5.

12            Anyone else on the front row?

13            And on the second row, No. 13 through 28?

14            (Show of hands)

15            THE COURT:  Okay.  A couple of hands.  I'll

16  go one-by-one.

17            Yes, on the far left in the blue shirt,

18  No. 13.

19            VENIREPERSON:  When we filled out the

20  questionnaire, gave all our stuff about kids and -- my

21  kids are way too old to be a problem, but what I failed

22  to notice was a duty in the other direction.  I'm solely

23  responsibile for my father who is 88 years old.

24            THE COURT:  Okay.

25            VENIREPERSON:  At this moment, he's fine,

1  and he's in a retirement home with medical personnel on

2  the staff, but if something happened to him, I've got a

3  problem.  He has been in intensive care once already

4  this year.

5           THE COURT:  Okay.  You know, this is not

6  something you're going to be in jail or anything.  We'll

7  release you every afternoon.  And I know that's not your

8  concern, but you will be able to go about your normal

9  affairs.  And, you know, you will be here during the

10  normal eight-hour day.  We usually start around 9:00,

11  9:30, and then we'll break by 5:00 each day, but it is a

12  concern, obviously, if something happens to where he

13  went into the hospital.  So, we'll -- bringing that to

14  the lawyers' attention, we'll take into consideration.

15  Thank you, Juror No. 13.

16           And someone else on that row?

17           No. 16.

18           VENIREPERSON:  Yes.  Going out of state two

19  times in July.  I've got a wedding from July 2nd through

20  the 9th.  And I have a mandatory work training program

21  from the 19th through the 27th.  I put that in the

22  questionnaire.

23           THE COURT:  That's a long wedding.  2nd

24  through the 9th.  Are you getting married?

25           VENIREPERSON:  I'm a groomsman.

1          THE COURT:  Okay.  So, it's like a

2   destination type wedding?

3          VENIREPERSON:  Yes, ma'am.

4          THE COURT:  And are those prepaid tickets?

5          VENIREPERSON:  They are, yeah.

6          THE COURT:  What's the second date?

7          VENIREPERSON:  The second one is like the

8   19th through the 27th.

9          THE COURT:  That's just -- that's for work?

10          VENIREPERSON:  Mandatory training that's

11   also out of state.  That one also has been booked and

12   paid for.

13          THE COURT:  Okay.  All right.  Thank you

14   for telling us that.  I don't know if we'll be able to

15   do anything about it, but we'll certainly take it into

16   consideration.

17          All right.  And into the middle.  Juror

18   No. 18.

19          VENIREPERSON:  18.  So, I thought I

20   understood we would be required to be here a few times

21   before the 8th, before July 8th.  Is that correct?

22          THE COURT:  Yes.  If you are called back

23   into an individual voir dire.  So, in other words, there

24   will be some people released today that we probably

25   won't talk to any further, but the people who don't get

1   released will have one day that we'll do an individual

2   voir dire and you will be assigned that date today,

3   before you leave today.  And you will come back to the

4   courtroom across the hallway.  And then after the

5   lawyers speak to you, then there will be a decision made

6   as to whether you will be a juror seated that will hear

7   the case.  And then we'll recess -- I mean, you won't

8   come back until July 8th.

9                 VENIREPERSON:  I'm scheduled to go to

10  college orientation with my daughter June 10th through

11  12th.

12                THE COURT:  Where is that?

13                VENIREPERSON:  UT.

14                THE COURT:  I think that's something we can

15  work with, Juror No. 18.  Because I don't know if that's

16  a weekend or not, but we have some leeway in scheduling

17  people to come back for individual voir dire.  So, I

18  don't think that should be a problem.  Okay?  Appreciate

19  you telling us.

20                And someone else?

21                Juror number?

22                VENIREPERSON:  22.

23                THE COURT:  Yes.

24                VENIREPERSON:  I'm going through a divorce.

25  And I don't have a set date as to when I'm supposed to

1   go to court, but it's supposed to be sometime this

2   month.

3                    THE COURT:  Okay.  So, you may have -- it

4   will be sometime this month?

5                    VENIREPERSON:  This month, yes.

6                    THE COURT:  I don't think that's going to

7   be a problem either.  Because we should be able to

8   schedule around you for the individual voir dire.

9                    VENIREPERSON:  Okay.

10                   THE COURT:  Thank you, No. 22.

11                   And then No. 23.  Yes, ma'am.

12                   VENIREPERSON:  Yes.  I have just been

13  experiencing some anxiety and I know I didn't put that

14  on my questionnaire, but since I filled out the

15  application or the questionnaire on Friday and stuff,

16  it's just really...

17                   THE COURT:  I appreciate that.  That's not,

18  you know, a valid reason for us to excuse you, but I

19  think some of the other answers that you provided may be

20  sufficient for that.  Okay?  No. 23.

21                   And anybody else on that row?

22                   No. 24.

23                   VENIREPERSON:  We have a family reunion

24  July 30th.

25                   THE COURT:  Where is that located?

 1                VENIREPERSON:  Washington DC.

 2                THE COURT:  Let's see.  I don't have my

 3   calendar, but if we start the 8th, I think that's the

 4   week -- we should be finish by then.  Okay?  So, I don't

 5   think that will be an issue, Juror No. 24.  I appreciate

 6   you bringing that to our attention.  I don't think it

 7   will be a problem.

 8                VENIREPERSON:  Thank you.

 9                THE COURT:  Thank you.

10                Anyone else over here, 25 through 28?

11                Okay.  The next row?  We'll get you in the

12   back.  Let me go row-by-row.  We're not going to forget

13   about you.

14                Okay.  47, nothing?  48?  I think all you

15   guys are okay.  So, anything on 52 over?  52 -- what is

16   your number in the white, ma'am?

17                VENIREPERSON:  36.

18                THE COURT:  36.  Okay.

19                VENIREPERSON:  I have a wedding in Chicago

20   July 12th.  That's my brother and I'm in the wedding.

21                THE COURT:  July 12th?

22                VENIREPERSON:  I already have airplane

23   tickets.

24                THE COURT:  Is that a weekend?

25                THE WITNESS:  It's a Friday, but it's in

 1  Chicago and I leave the 10th.

 2              THE COURT:  Okay.  Thank you.

 3              Anyone else on that row that I missed?

 4              No. 39?

 5              VENIREPERSON:  Yes.

 6              THE COURT:  You are okay, Juror No. 39.

 7              And anyone else on that row?

 8              And so, 47 through 51?  I think you guys

 9  are fine.

10              I'm sorry.  Juror No. 29, can I talk to

11  you?  You're No. 29?  Okay.  I missed you.

12              VENIREPERSON:  I have a daughter that's 11

13  and she's paralyzed with cerebral palsy and I have to

14  take her to the doctor twice or three times a week.

15              THE COURT:  Are you her only caregiver?

16              VENIREPERSON:  My wife, but she can't

17  drive.  I'm the driver.

18              THE COURT:  So -- and she's how old, 12?

19              VENIREPERSON:  She's 11.

20              THE COURT:  All right.  Thank you, Juror

21  No. 29.

22              All right.  47 through 51, I think you guys

23  are fine.  You don't need to raise your hand.

24              No. 30, yes.

25              VENIREPERSON:  Well, I'm a diabetic and I'm

1   going -- like right now, I have not taken my medication.

2              THE COURT:  I think you are okay, No. 30.

3   Thank you.

4              So, 52 through 59, do we have anybody

5   there?

6              And 60 through 64?  Nobody over there.

7              65 through 69?

8              Okay.  In the red shirt, ma'am.

9              VENIREPERSON:  In my questionnaire I put

10  many reasons on why I can't do it and one of them is

11  being someone close to me is on trial for murder right

12  now.

13             THE COURT:  Okay.  You are No. 67?

14             VENIREPERSON:  Yes.

15             THE COURT:  Thank you, ma'am.

16             And next door, you are No. 68?

17             VENIREPERSON:  Yes, ma'am.  My husband and

18  I own a small business.  And at the beginning of the

19  year, we have an appointment in France on July 9th to

20  further our business.  And then from -- we've got some

21  other facilities that they want to go visit past that.

22             THE COURT:  Is this something that your

23  husband can do without you?

24             VENIREPERSON:  No.

25             THE COURT:  Why is that?

```
1              VENIREPERSON:  Because it's the part of the
2   business that I handle.
3              THE COURT:  Okay.  And so, the dates in
4   July are when?
5              VENIREPERSON:  We have to be there July
6   9th.
7              THE COURT:  How long will you be there?
8              VENIREPERSON:  It's looking like two weeks.
9   They want us to go to their facility in Germany.
10             THE COURT:  Thank you, No. 68.
11             And let's see.  Anyone from 70 to 77?
12             Yes.  Okay.  Starting with the lady in the
13  yellow.  Yes.
14             VENIREPERSON:  I don't know if it will be a
15  conflict or not, but right now at my job I have some
16  mandatory training.  I'm a pilot and the FFA required
17  that I do this training once a year.
18             THE COURT:  What's your number, ma'am?
19             VENIREPERSON:  71.
20             THE COURT:  Thank you.
21             VENIREPERSON:  And the problem is with us
22  hiring a lot of pilots, there is a good chance they move
23  my training date.  If they do that, it will be in July.
24  And that's mandatory per FAA or I can't fly.  So, I
25  don't know if it's going to happen or not, but next week
```

1  I'm scheduled at the end of the week.  If they move it,

2  I'll have to move it to July and I don't know when in

3  July.

4              THE COURT:  How long is that training?

5              VENIREPERSON:  Two days.

6              THE COURT:  Thank you, Juror No. 71.

7              And next door.  Let's see.  You're 74; is

8  that right?

9              VENIREPERSON:  73.

10             THE COURT:  What did you have?

11             VENIREPERSON:  I have scar tissue and right

12  now I'm taking medicine for it.

13             THE COURT:  And is that something that

14  would prevent you from sitting and being able to pay

15  your full attention to this case?

16             VENIREPERSON:  Yes, ma'am.

17             THE COURT:  Thank you, Juror No. 73.

18             Let's see anyone else towards the end of

19  that row?

20             And then 78 through 82?

21             Juror No. 78, anything on you?  78 with the

22  yellow shirt.

23             VENIREPERSON:  Yes.

24             THE COURT:  Anything?  Any conflict.

25             VENIREPERSON:  No, not for the excuses.

```
 1              THE COURT:  All right.  And then Juror
 2   No. 79, I've already got you.
 3              80, 81, and 82.  I think we're good on that
 4   side.
 5              How about 83, 84, and 85?  Anything over
 6   here, 83, 84 or 85?  Nothing.
 7              Okay.  What we're going to do now is we're
 8   going to take -- let's see.  That clock is wrong.  I
 9   keep -- I show it is 11:58 now.  I'm going to give you
10   till 12:45 to take a 45-minute break and then meet back
11   in the hallway and JJ, the bailiff, will bring you back
12   in altogether.
13              We're going to be doing some court business
14   while you are out, so please don't step in.  I wouldn't
15   want you to overhear something you are not supposed to
16   hear concerning the case.  All right?  Thank you.
17              And there is a -- on the second floor,
18   there is a snack shop.  And, of course, there is
19   restrooms down the hall.
20              All right.  You're release till 12:45.
21              (Recess)
22              (Open court, defendant present, no jury
23               panel)
24              THE COURT:  We're back on the record in
25   Cause No. 1384794, State of Texas vs. Obel Cruz-Garcia.
```

1  And the jury -- the venire panel has taken a break and

2  is waiting in the hallway.

3              Present for the defendant is Mr. Skip

4  Cornelius as counsel.  The defendant is present at

5  counsel table.  Mario Madrid, his second chair, is

6  present as well in the courtroom.  And the prosecutors,

7  Justin Wood and Natalie Tise, are present.

8              Have both sides had an opportunity to

9  review the questionnaires in this case and make

10 agreements as to those questionnaires?

11             MS. TISE:  Yes, Your Honor.

12             MR. CORNELIUS:  Yes, we have, Judge.

13             THE COURT:  Okay.  And for the record,

14 after discussion at the bench, these are the numbers

15 that I have that we have either agreed to or -- let's

16 just go with the agreed to first.  And that would be

17 No. 1, Juror No. 1, John Holik, is agreed.  Juror No. 9,

18 George Mock is agreed.  He was agreed previously in the

19 day.  Juror No. 10, Michael Trulove, is agreed to be

20 excused.  No. 12, Anthony Bayer.  No. 27, Katharine

21 McClendon.  No. 29, Santiago Rosa, agreed.  No. 36,

22 Darlene Chorba.  No. 55, Virginia Manuel.  No. 59,

23 Nathalie Ortiz, was agreed earlier in the day.  No. 63,

24 Theron Norris.  No. 66, Josephine Hillegeist.  No. 73,

25 Darrell Davis.  No. 75, Sandy Domingo.  No. 77, Latonya

1  Collins.  No. 85, Christopher Johnson.

2              Are those all the agreements at this point,

3  State?

4              MS. TISE:  Judge, I have a number of others

5  that I thought we had agreed to.

6              MR. CORNELIUS:  Yeah, I did do.

7              THE COURT:  Those were for cause.  I have a

8  bunch of causes.  I wasn't going to put on the cause,

9  right?  I had them marked --

10              MR. CORNELIUS:  I think I agreed to every

11  single one of them.

12              MS. TISE:  He agreed to all of the causes.

13              THE COURT:  I will put them all down as

14  agreements and not cause.  Because I thought you were

15  moving for cause on those and I granted the cause.

16              MR. CORNELIUS:  She was and I agreed to it.

17  You can do it either way.  I agreed they should be

18  removed for cause.

19              THE COURT:  Okay.  Then I will include

20  those others, which will include Juror No. 3, John

21  Vonplonski.  Juror No. 6, Tracy Canada.  Juror No. 8,

22  Monica Lara.  Juror No. 16, Ronald Abellera.  Juror

23  No. 18, Anita Payne.  Juror No. 20, Meghan Mehl.  Juror

24  No. 23, Leona Marshall.  Juror No. 26, James Fuller.

25  Juror No. 30, Hazel Houston.  Juror No. 39, Mercedia

1    Rose.   Juror No. 47, Nicolas Karcz.   Juror No. 48,

2    Jeremiah Neuneker.   49, Damon McWilliams.   50, Chad

3    Culotta.   51, Melvin Kizzee.   65, Alvin Tyler.   67,

4    Simone Goodall.   71, Veronica Eardley.   79, Mary

5    Gonzalez.   80, Jacqueline Johnson.   81, Minh Le.   82,

6    Rosa Perez.

7                   MS. TISE:  In addition, Judge, there is

8    No. 61.

9                   MR. WOOD:  By agreement.

10                  THE COURT:  By agreement; is that correct?

11                  MR. CORNELIUS:  Let me get there.

12                  THE COURT:  That's Lori Sullivan?

13                  MS. TISE:  Yes.

14                  MR. CORNELIUS:  Correct.

15                  MS. TISE:  Those are all by agreement.

16                  THE COURT:  All right.  And for the record,

17   Mr. Obel Cruz-Garcia, are these your agreements as well,

18   that these jurors that I have just listed should all be

19   excused?

20                  THE DEFENDANT:  Yes, ma'am.

21                  THE COURT:  Thank you.

22                  Bring in the jury panel.

23                  (Open court, defendant and jury panel

24                   present)

25                  THE COURT:  Back on the record in Cause

1   No. 1384794, the State of Texas vs. Obel Cruz-Garcia.

2   And the venire is back in the courtroom.  Present with

3   Mr. Obel Cruz-Garcia at counsel table --

4                   THE BAILIFF:  We've got some more coming.

5                   THE COURT:  Oh, I'm sorry.

6                   (Pause)

7                   THE BAILIFF:  That's everyone, Your Honor.

8                   THE COURT:  Thank you, Deputy Perry.

9                   Okay.  Now back on the record in Cause

10  No. 1384794, the State of Texas vs. Obel Cruz-Garcia.

11  Mr. Obel Cruz-Garcia is present at counsel table along

12  with his counsel, Skip Cornelius and Mario Madrid.

13  Present for the State is Mr. Justin Wood and Natalie

14  Tise, the assistant district attorneys.  And the venire

15  is now back in the courtroom.

16                  And having completed my voir dire, ladies

17  and gentlemen, and having had an opportunity to -- the

18  lawyers have discussed and have agreed to certain

19  dismissals and I'm going to go through those at this

20  time.  However, we have three groups of people.  I'm

21  going to call out a number of names first that are going

22  to be excused right away.  And having said that, I would

23  like to do it in as orderly a fashion as possible.

24  Obviously, we're down to an even smaller place that we

25  all have to try to conduct business in.  And I'm sorry

1  about that, but there is somebody already using the

2  courtroom across the hallway.  So, we were kicked into

3  the smaller one early.

4           So, I'm going to excuse those people first.

5  And if you need any type of work excuse, you can come up

6  here.  And the folks up here, the clerks can give you a

7  work excuse.  If you need something for a Metro bus, you

8  need to get with Deputy Perry, but there is going to be

9  a little over 30 of you, I think, that I'm excusing

10 right off the bat.  And I would appreciate if you could

11 be cognizant that we're going to try to continue and do

12 court business here so we can get everybody finished up

13 today as quickly as possible.

14           My second group is a group of 12 that I do

15 need to address an issue at the bench one-by-one right

16 after that.  And I will call you up.  It's like a

17 one-question deal for those 12.  And after that, there

18 may be further strikes that excuse people.

19           That will lead us to the third group.  And

20 those will be the people that will be coming back for

21 individual voir dire.  And I'm going to have to break

22 you up into specific days and assign you a date to come

23 back.  So, as you can see there's going to be a lot

24 going on for the next few minutes.

25           So, first off, let me excuse, for the

1   record, the following jurors.  And as I call your name,

2   you can start coming up and getting an excuse if you

3   want or leaving the courtroom if you want to.  I want to

4   thank you for your jury service.  When I call your name,

5   you are released from this jury service.  And all the

6   admonishments that I have given to you, you can now

7   disregard.  Your jury service will be complete.

8               THE BAILIFF:  I'll have the work excuses in

9   the hallway.

10              THE COURT:  All right.  I'm corrected.

11  Instead of coming up here to the clerks, the bailiff is

12  going to have the work slips out in the hallway for you.

13  So you can just go straight out in the hallway and then

14  head on your way if you want to.  He should also have

15  the Metro bus passes out there if you need them.  Okay?

16              So, these persons are excused:  John Edward

17  Holik, Juror No. 1.  Kurt Vonpolnski, Juror No. 3.

18  Tracy Canada, Juror No. 6.  Monica Lara, Juror No. 8.

19  George Mock, No. 9, was excused earlier.  Michael

20  Trulove, Juror No. 10.  Anthony Bayer, Juror No. 12.

21  Ronald Abellera, Juror No. 16.  Anita Payne, Juror

22  No. 18.  Meghan Mehl, Juror No. 20.  Leona Marshall,

23  Juror No. 23.  James Fuller, Juror No. 26.  Katherine

24  McClendon, Juror No. 27.  Santiago Rosa, Juror No. 29.

25  Hazel Houston, Juror No. 30.  Darlene Chorba, Juror

1   No. 36.  Mercedia Rose, Juror No. 39.  Nicholas Carcz,

2   Juror No. 47.  Jeremiah Neuneker, Juror No. 48.  Damian

3   McWilliams, Juror No. 49.  Chad Culotta, Juror No. 50.

4   Melvin Kizzee, Juror No. 51.  Virginia Manuel, Juror

5   No. 55.  Nathalie Ortiz was excused before, No. 59.

6   Lori Sullivan, Juror No. 61.  Theron Norris, Juror

7   No. 63.  Alvin Tyler, Juror No. 65.  Josephine

8   Hillegeist, Juror No. 66.  Simone Goodall, Juror No. 67.

9   Veronica Eardley, No. 71.  Darrell Davis, No. 73.  Sandy

10  Domingo, 75.  Latonya Collins, 77.  Mary Gonzalez, 79.

11  Jacqueline Johnson, 80.  Minh Le, 81.  Rosa Perez,

12  No. 82.  And Christopher Johnson, No. 85.

13              So, we'll give all those jurors a chance to

14  get out in the hallway here.  And there are two doors

15  you can go out, folks, too.

16              Now, the next group, I do have a group of

17  12 and I'm going to be calling you up individually.  And

18  we're going to be going pretty quickly about that.  It's

19  a question over your questionnaire.  The first one is

20  Juror No. 11.  Could you please approach the bench?  And

21  could I have the lawyers at the bench, please?

22              (At the Bench, on the record)

23              THE COURT:  And you are -- for the record,

24  you are Ms. Rachel Willis, Juror No. 11?

25              VENIREPERSON:  Yes, ma'am.

1            THE COURT:  Thank you.

2            On your questionnaire, I believe it's on

3    Question No. 33, it says:  Do you have any moral,

4    religious, or personal beliefs that would prevent you

5    from returning a verdict which would result in the

6    execution of another human being?

7            And you marked "yes" on your questionnaire.

8            VENIREPERSON:  I meant to put "no."

9            THE COURT:  Okay.  So, you meant to put

10   "no."  And sometimes not understanding the whole

11   process --

12           VENIREPERSON:  I --

13           THE COURT:  Let me finish.  Not

14   understanding the whole process, you may not -- I was

15   going to see if your answer was still "yes" concerning

16   that, but you are telling me now that you do not have

17   any moral, religious, or personal beliefs that would

18   prevent you from returning a verdict which may result in

19   the execution of another human being?

20           VENIREPERSON:  Correct.

21           THE COURT:  All right.  Thank you.  Juror

22   No. 11, you may have a seat.

23           All right.  So, are you withdrawing?

24           MS. TISE:  Yes.

25           THE COURT:  Withdrawing any objections on

1  that one.

2              (Open court, defendant and jury panel

3               present)

4              THE COURT:  Next is Juror No. 21, Abdon

5  Avila, Jr.

6              (At the Bench, on the record)

7              THE COURT:  Juror No. 21, Mr. Avila, Jr.?

8              VENIREPERSON:  Yes.

9              THE COURT:  Thank you for your time, sir.

10  We're interested in the one question, which was Question

11  No. 33.  And the question was:  Do you have any moral,

12  religious, or personal beliefs that would prevent you

13  from returning a verdict which would result in the

14  execution of another human being?

15              Having now gone through and learned of the

16  process regarding that, do you still feel that you would

17  not -- you would still have a moral, religious, or

18  personal belief that would prevent you from answering

19  those special issues in a manner that might result in

20  the execution or the death penalty for another human

21  being?

22              VENIREPERSON:  I still do.

23              THE COURT:  You still feel that way?

24              VENIREPERSON:  Yes.

25              THE COURT:  So, then you could not sit and

```
 1   it would violate your conscience to sit and have to
 2   answer those questions?
 3                   VENIREPERSON:  Correct.
 4                   THE COURT:  Do you have any questions,
 5   Mr. Cornelius?
 6                   MR. CORNELIUS:  No.
 7                   MS. TISE:  No, Your Honor.
 8                   THE COURT:  Thank you.  You may have a
 9   seat.
10                   Do you have a motion?
11                   MS. TISE:  There is a motion, Judge.
12                   THE COURT:  That will be granted as to
13   No. 21 for cause.
14                   (Open court, defendant and jury panel
15                    present)
16                   THE COURT:  No. 32, Juror No. 32.
17                   (At the Bench, on the record)
18                   THE COURT:  Juror No. 32, your name is
19   Dennis Fisher; is that correct?
20                   VENIREPERSON:  Yes.
21                   THE COURT:  One of the questions on your
22   jury information that you filled out -- well, as to two
23   questions.  On No. 32, it says:  Do you have any
24   religious, moral, or ethical considerations that would
25   prevent you from sitting in judgment of another person?
```

1   And you checked "yes."  Do you still feel that way or

2   after learning the process have you changed your mind?

3                   VENIREPERSON:  Yes.  I do feel that way

4   because I'm kind of against the death penalty.  I'm very

5   concerned about sitting on a jury that could -- because

6   of the death penalty.

7                   THE COURT:  Okay.  And your feelings

8   towards the death penalty?

9                   And then Question No. 33:  Do you have any

10  moral, religious, or personal beliefs that would prevent

11  you from returning a verdict which would result in the

12  execution of another human being?  You have checked

13  "yes," that you do have beliefs that would prevent you

14  from doing so.  After hearing the process, do you still

15  feel that same way?

16                  VENIREPERSON:  Yes, I do.

17                  THE COURT:  So, it would violate your

18  conscience to sit in judgment and reach a verdict and

19  answer those special issues in a manner that would

20  result in the execution of an individual?

21                  VENIREPERSON:  Yes, it would.

22                  THE COURT:  Do you have any questions,

23  Mr. Cornelius?

24                  MR. CORNELIUS:  No.

25                  THE COURT:  Thank you, sir.  You may have a

```
 1   seat.
 2                   MS. TISE:  We have a motion.
 3                   THE COURT:  32 will be granted as to cause.
 4                   (Open court, defendant and jury panel
 5                    present)
 6                   THE COURT:  Juror No. 33.  That's Jose
 7   Martinez, Juror No. 33.
 8                   (At the Bench, on the record)
 9                   THE COURT:  Okay.  Mr. Martinez, you are
10   Juror No. 33, Jose Martinez, Jr., correct?
11                   VENIREPERSON:  Yes, ma'am.
12                   THE COURT:  As to Question No. 32 and 33,
13   we want to make sure that your answers are correct.
14                   32 is:  Do you have any religious, moral,
15   or ethical considerations that would prevent you from
16   sitting in judgment of another person?  You checked
17   "yes."  And I want to know if you still felt that way.
18                   VENIREPERSON:  Yes.
19                   THE COURT:  After learning the entire
20   process, you still feel that way?
21                   VENIREPERSON:  Yes.
22                   THE COURT:  Do you have any moral,
23   religious, or personal beliefs that would prevent you
24   from returning a verdict of which would result in the
25   execution of another human being?  Now having been
```

1  described the process, do you understand that and do you

2  feel the same way, that you would not be able to answer

3  those special issues in a manner that would result in

4  the execution of a human being under any circumstances?

5              VENIREPERSON:  No.

6              THE COURT:  Okay.  So, your answer to that

7  is it still "yes"?

8              VENIREPERSON:  Yes.

9              THE COURT:  Thank you, sir.  You may have a

10  seat.

11              MS. TISE:  Motion.

12              THE COURT:  And as to No. 33, that will be

13  granted as to cause.

14              (Open court, defendant and jury panel

15               present)

16              THE COURT:  Juror No. 37.

17              (At the Bench, on the record)

18              THE COURT:  Okay.  Juror No. 37, Dana

19  Towse-Paulk?

20              VENIREPERSON:  Yes.

21              THE COURT:  All right.  And, ma'am, we're

22  here just on one of the questions in your questionnaire,

23  No. 33.  It reads:  Do you have any moral, religious, or

24  personal beliefs that would prevent you From returning a

25  verdict which would result in the execution of another

1  human being?  And you have marked here "yes."  Do you

2  feel that way?

3              VENIREPERSON:  I think based on what I

4  heard and to answer those sequential questions, I think

5  I would -- I would not be morally opposed.  I would be

6  able to.

7              THE COURT:  You would not be morally

8  opposed?

9              VENIREPERSON:  Correct.

10             THE COURT:  Let me make sure I understand

11 you.  So, your answer here that you do have a moral,

12 religious, or personal reason is not correct; you

13 actually do not have a moral, personal, or religious

14 belief that would prevent you in the proper case from

15 returning a verdict, answering those special issues,

16 that might result in the death of another individual in

17 the proper case?

18             VENIREPERSON:  In the proper case, yes.

19             THE COURT:  Okay.  Very good.

20             Any questions?

21             MS. TISE:  Can I just ask --

22             THE COURT:  Sure.

23             MS. TISE:  As a juror, you will have to

24 take an oath to answer the questions honestly.  Will you

25 be able to take that oath and answer the questions

```
 1   honestly if you knew that honest answer may lead you to
 2   assess the death penalty against this defendant?
 3                 VENIREPERSON:  It would not be easy, so
 4   I --
 5                 MS. TISE:  Would you be able to take the
 6   oath?
 7                 VENIREPERSON:  Yes, I'd be able to take the
 8   oath.
 9                 MS. TISE:  You believe you would be able to
10   answer the questions honestly, no matter where that
11   takes you?
12                 VENIREPERSON:  Yes.
13                 MS. TISE:  Even if it takes you to assess a
14   death sentence, you can do that?
15                 VENIREPERSON:  Yes.
16                 MS. TISE:  You can do that?
17                 VENIREPERSON:  Yes.
18                 MS. TISE:  All right.  Thank you.
19                 VENIREPERSON:  Thank you.
20                 THE COURT:  Have a seat.  And the motion as
21   to 37 will be denied.
22                 (Open court, defendant and jury panel
23                  present)
24                 THE COURT:  Juror No. 42, David Limerick.
25                 (At the Bench, on the record)
```

1           THE COURT:  Mr. Limerick -- let me make
2    sure.  You're David D. Limerick, Juror No. 42?
3           VENIREPERSON:  Yes.
4           THE COURT:  Okay.  Sir, I'm referring to
5    Questions No. 32 and 33.  And both of them, your answer
6    was "yes" on the questionnaire.  The first one is:  Do
7    you have any religious, moral, or ethical consideration
8    that would prevent you from sitting in judgment of
9    another person?  And you checked "yes."
10          And the second one is:  Do you have any
11   moral, religious, or personal beliefs that would prevent
12   you from returning a verdict which would result in the
13   execution of another human being?  You checked "yes."
14          After hearing all of the process in the
15   case and learning of the special issues, are your
16   answers still "yes" or have they changed?
17          VENIREPERSON:  Yes.
18          THE COURT:  So, you would not be able to
19   return a verdict, even answering the special issues in a
20   manner that you know would result in a human being
21   receiving the death penalty even in a proper case?  Is
22   that a "yes"?
23          VENIREPERSON:  Yes.
24          THE COURT:  Any questions, State?
25          MR. CORNELIUS:  No.

1          MS. TISE:  No.

2              THE COURT:  Okay.  Thank you.

3          MS. TISE:  Motion.

4              THE COURT:  As to No. 42, that will be

5    granted for cause.

6              (Open court, defendant and jury panel

7               present)

8              THE COURT:  And Juror No. 45, Donna

9    chambers.

10             (At the Bench, on the record)

11             THE COURT:  Okay.  Ms. Chambers, Juror

12   No. 45, Donna Chambers.

13             We're referring to two questions in your

14   questionnaire.  The first one is No. 32.  You said:  I'm

15   not sure at this time.  And the question was:  Do you

16   have any religious, moral, or ethical consideration that

17   would prevent you from sitting in judgment of another

18   person?  After hearing the voir dire and further

19   explanation of how a capital murder sentencing scheme

20   works, can you answer that question "yes" or "no" at

21   this time?  Do you have any religious or ethical

22   consideration that would prevent you from sitting in

23   judgment of another person?

24             VENIREPERSON:  No.

25             THE COURT:  So, you could sit in judgment

1 of another person, even a capital murder defendant?

2                VENIREPERSON:  Yes.

3                THE COURT:  You need to answer for the

4 court reporter.

5                And the second one, you checked "yes" to

6 this answer -- to this question.  Do you have any moral,

7 religious, or personal beliefs that would prevent you

8 from you returning a verdict which would result in the

9 execution of another human being.  You answered "yes"

10 that you do have personal beliefs or religious or moral

11 beliefs that would prevent you from doing so.  Is that

12 still your answer?

13                VENIREPERSON:  No.  I'm okay with it.

14                THE COURT:  So, your answer has changed and

15 what you're saying is you do not have moral or religious

16 or personal beliefs that would prevent you from

17 answering the questions in a manner -- if it was a

18 proper case, to answer the special issues in a manner

19 that you know would result in the death of individual,

20 an execution?

21                VENIREPERSON:  Yeah, correct.

22                THE COURT:  You are okay with that?

23                VENIREPERSON:  Yes.

24                THE COURT:  Do you have any questions,

25 Ms. Tise?

```
 1                  MS. TISE:  No.

 2                  THE COURT:  Okay.  Very good.  You can have

 3     a seat, ma'am.

 4                  45 will be denied.

 5                  (Open court, defendant and jury panel

 6                   present)

 7                  THE COURT:  54, Elsy Quintanilla.

 8                  (At the Bench, on the record)

 9                  THE COURT:  Ms. Quintanilla, Juror No. 54.

10     We're referring to the questionnaire, Ms. Quintanilla.

11     Question No. 33 is what we have a concern with.  You

12     listed the answer "yes" to this question.  Do you have

13     any moral, religious, or personal beliefs that would

14     prevent you from returning a verdict which would result

15     in the execution of another human being?  And you

16     answered "yes," that you do have those personal,

17     religious, or moral beliefs that would prevent you from

18     doing so.  Do you still feel that way after listening to

19     the process of a capital trial?

20                  VENIREPERSON:  After the process, no.

21                  THE COURT:  I'm sorry?

22                  VENIREPERSON:  After listening to the

23     process, no.

24                  THE COURT:  I could not understand.

25                  VENIREPERSON:  After learning the process,
```

1    no.

2                    THE COURT:  After learning the process, no.

3    Tell me what you feel after learning the process that's

4    somehow different.

5                    VENIREPERSON:  Because it's not based on

6    "yes" or "no."  You know, of course it's a decision that

7    not only I will make, but I will be presented with the

8    evidence.  And after I see the series of questions, then

9    I think I will be able to decide.

10                   THE COURT:  So, you feel that after I've

11   explained the fact that you follow the evidence and that

12   is what you base the answers to those questions on, you

13   feel you can do that?  Could you take an oath to

14   truthfully answer those questions based on the evidence?

15                   VENIREPERSON:  Yes, ma'am.

16                   THE COURT:  And then knowing that the

17   answers to those questions might cause a verdict of

18   death to be issued by this Court, you are okay with

19   that, if it was the proper case then, correct?

20                   VENIREPERSON:  Correct.

21                   THE COURT:  Okay.  Any questions?

22                   MS. TISE:  No, Your Honor.

23                   THE COURT:  Okay.  Thank you,

24   Ms. Quintanilla.

25                   All right.  So, No. 54 is denied.

```
 1                    (Open court, defendant and jury panel

 2                     present)

 3                    THE COURT:  Okay.  Bobby Mixon, No. 60.

 4                    (At the Bench, on the record)

 5                    THE COURT:  Mr. Mixon, how are you?  We're

 6      getting close to the end.  Okay?  We're going to focus

 7      in on two questions.  Actually, just one question on

 8      your questionnaire.  It's No. 33.  And your answer to

 9      the question was "yes."  And the question is:  Do you

10      have any moral, religious, or personal beliefs that

11      would prevent you from returning a verdict which would

12      result in the execution of another human being?

13                    Now, after learning the capital murder

14      process and the special issues that have to be answered,

15      is your answer to that still "yes"?

16                    VENIREPERSON:  Yes.

17                    THE COURT:  You have a moral, religious, or

18      personal belief that would prevent you from doing so?

19                    VENIREPERSON:  It would not, no.

20                    THE COURT:  Tell me how you feel.

21                    VENIREPERSON:  Okay.

22                    THE COURT:  Tell me how you feel.  After

23      I've explained the way it works, how it's different to

24      you.

25                    VENIREPERSON:  That I could impose if it
```

1    was the death penalty.  It kind of confused me.

2                    THE COURT:  That's all right.  That's what

3    we're here to talk about.  Primarily we focused on the

4    punishment phase because it would be after you got past

5    the guilt-innocence phase.  So, it's only if a person is

6    found guilty of capital murder that you would actually

7    go into the punishment phase.

8                    But those special issues we talked about,

9    you have to take an oath to say that I would truthfully

10   answer these special issues as per the evidence that

11   came to you, that was presented to you.  And what you

12   are telling me here in this question that you could not

13   do that without violating your conscience because you

14   have a moral, religious, or a personal belief that would

15   prevent you from doing so.  Is that still the way you

16   feel?

17                   VENIREPERSON:  No, it's not.  It wouldn't

18   prevent me from opposing it.

19                   THE COURT:  So, in a proper case, you would

20   not have any moral, religious, or personal belief that

21   prevent you from returning a verdict -- in other words,

22   answering those special issues -- in a manner that you

23   knew was going to result in the death penalty for an

24   individual?

25                   VENIREPERSON:  I wouldn't have a prolem.

```
 1              THE COURT:  Any questions?
 2              MS. TISE:  No questions.
 3              THE COURT:  Mr. Cornelius.
 4              MR. CORNELIUS:  No questions.
 5              THE COURT:  You may have a seat.  Thank
 6  you.
 7              Mr. Mixon, that's denied.
 8              (Open court, defendant and jury panel
 9               present)
10              THE COURT:  No. 68, Karen Taylor.
11              (At the Bench, on the record)
12              THE COURT:  Ms. Taylor, Juror No. 68.
13  We're going to focus in on one of the answers that you
14  gave in your questionnaire.  It's No. 32.  The question
15  was:  Do you have any religious, moral, or ethical
16  consideration that would prevent you from sitting in
17  judgment of another?
18              And your answer was "yes."  And can you
19  tell me what those considerations are that you couldn't
20  sit in judgment on an individual?
21              VENIREPERSON:  Some of it -- well, I know
22  by law, you know, people need be punished if they are
23  guilty.
24              THE COURT:  There are people in our society
25  that because of their religious beliefs or personal
```

 1 | beliefs or just morally they don't feel like they can
 2 | sit in judgment of another person.  And I'm not going to
 3 | put you in that position.  If you are going to -- if you
 4 | are in the jury box and then you'd have to violate your
 5 | conscience by doing something that you moral, ethically,
 6 | or religiously can't do, then I'm not going to put you
 7 | there.  It that what you are telling me, that you have
 8 | these feelings that are that strong that would violate
 9 | your conscience, even if the evidence was the proper
10 | case for it, the death penalty, or even a guilty
11 | verdict?  Could you sit in judgment of another person?
12 | VENIREPERSON:  Yes -- well, yes and no.
13 | I'm kind of wishy-washy on that.  You know, you need --
14 | you need a "yes" or "no."
15 | THE COURT:  I would err on the side of
16 | caution.  If you think you might, then -- you know, I
17 | don't want to put the words in your mouth.  You don't
18 | get second chances once you are in there.  You've got to
19 | deal with it.
20 | VENIREPERSON:  Right.
21 | THE COURT:  If you feel like it could
22 | violate your conscience, you know, that might lead you
23 | to your answer.  I don't know.
24 | VENIREPERSON:  Yeah.
25 | THE COURT:  But I do need to get a "yes" or

1    "no" from you.

2              VENIREPERSON:  Okay.  Yeah, I think it

3    would really bother me.

4              THE COURT:  Okay.  Very good.  And I

5    appreciate your service.  Thank you, Ms. Taylor.

6              MS. TISE:  Motion.

7              THE COURT:  Juror No. 68, that will be

8    granted.

9              (Open court, defendant and jury panel

10              present)

11             THE COURT:  No. 74, Linda Powell.

12             (At the Bench, on the record)

13             THE COURT:  Ms. Powell, how are you?

14             VENIREPERSON:  Okay.

15             THE COURT:  We'll focus on just one

16   question in your questionnaire.  The question is:  Do

17   you have any moral, religious, or personal beliefs that

18   would prevent you from returning a verdict which would

19   result in the execution of another human being?  And

20   your answer on the questionnaire was yes, that you did.

21             After further explanation and now knowing

22   the process that you have to answer these special

23   issues, is your answer still "yes" to that?

24             VENIREPERSON:  No.

25             THE COURT:  You feel like you've changed

1   your mind?  So, let me make sure that I'm clear.  So,

2   you're saying in the proper case, if the evidence was

3   brought to you, there could be a proper case in your

4   mind where you knowing if you answered the special

5   issues in a manner that might result in the execution of

6   an individual --

7                    VENIREPERSON:  Yes.

8                    THE COURT:  -- you would be okay with that

9   morally, ethically, and religiously?

10                   VENIREPERSON:  Yes.

11                   THE COURT:  Do you have any questions,

12  Ms. Tise?

13                   MS. TISE:  Now, if you are asked to be a

14  juror, if you among the ones that are selected, you will

15  have to take an oath.  And the oath is that you have to

16  agree to follow the evidence wherever it leads you.  And

17  I don't want to put you in a position where you take an

18  oath and it might violate your conscience.  If the

19  evidence leads you to answer the questions the way that

20  leads to the death penalty, can you take an oath to

21  follow that evidence wherever it leads?

22                   VENIREPERSON:  I believe I could, yes.

23                   MS. TISE:  Even if you know your answers

24  are going to mean the execution of another individual?

25                   VENIREPERSON:  Yes.

1           MS. TISE:  Okay.

2           THE COURT:  Thank you.  You may have a

3  seat.

4           That will be denied.

5           (Open court, defendant and jury panel

6            present)

7           THE COURT:  Juror No. 76, Angela Bowman.

8           (At the Bench, on the record)

9           THE COURT:  Hi, Ms. Bowman.

10           VENIREPERSON:  Hi.

11           THE COURT:  Good morning -- or good

12  afternoon.

13           We're going to focus in on No. 32.  And it

14  says:  Do you have any religious, moral, or ethical

15  considerations that would prevent you from sitting in

16  judgment of another person and you checked "yes."  Do

17  you still feel that way?

18           VENIREPERSON:  No.

19           THE COURT:  So, how do you feel at this

20  time?  How is it different?

21           VENIREPERSON:  I mean, right is right,

22  wrong is wrong.  And, I mean, after going -- after you

23  read out the steps of the process, the no, no, yes, I

24  mean, I would just make my decision based upon that.

25           THE COURT:  The evidence that comes to you?

1              VENIREPERSON:  Yes.

2              THE COURT:  Now, there were several jurors

3    that said even though the evidence might be presented to

4    me, because I know that the answers are going to result

5    in a certain thing happening, I might be influenced by

6    my beliefs about -- my strong feelings against the death

7    penalty or against sitting in judgment of another

8    person.

9              Do you feel that way based on the answers,

10   that you have a religious, moral, or ethical

11   consideration against sitting in judgment of another?

12              VENIREPERSON:  No.

13              THE COURT:  The next question is:  Do you

14   have any moral, religious, or personal beliefs that

15   would prevent you from returning a verdict which would

16   result in the execution of another human being?  And you

17   put again "yes."

18              Now that you know that process, it becomes

19   a lot more important.  Your answer of "yes" indicates to

20   me that you might have an issue with some of those

21   special issues.  Is that accurate or not?

22              VENIREPERSON:  No.  I mean, after you

23   explained the process earlier and how you said the

24   ten -- if it was ten for "no" and 12 for the other

25   side --

```
 1                     THE COURT:  All right.

 2                     VENIREPERSON:  If it was just a basic death

 3  or -- death sentence or life in prison, then, you

 4  know -- then, I mean -- because I wasn't 100 percent

 5  sure how it worked, but after you explained it today, I

 6  mean, I think that the outcome could be pretty fair.

 7                     THE COURT:  Okay.  So, let the lawyers ask

 8  you a couple of questions if they have any questions.

 9  But at this time you are changing that answer to "no" on

10  both of these questions, right?

11                     VENIREPERSON:  Yes.

12                     THE COURT:  That you do not have any

13  religious, moral, or ethical considerations that would

14  prevent you sitting in judgment or returning a verdict

15  that might result in the execution, if it was the proper

16  case?

17                     VENIREPERSON:  Yeah.

18                     THE COURT:  Do you have any questions?

19                     MS. TISE:  I do, Judge.

20             I'm listening to you and I heard you say

21  that you understand the process and it would be no, no,

22  yes.  And then I heard you say it would be to -- the

23  result of not life as opposed to death.  I heard you say

24  those things.  And so, I'm a little concerned because it

25  sounds to me a little -- you seem to be a little
```

1   predetermined or leaning toward one answer as opposed to

2   the other.

3                   VENIREPERSON:  No.

4                   MR. CORNELIUS:  Well, I have to object.

5   That's what the law is.  They have a burden to prove

6   these things.  And unless they prove them, she's

7   supposed to answer them in favor of the defendant.

8                   THE COURT:  And it would be -- you know,

9   both lawyers are correct.  It would be in a proper case.

10  We just talked about whether you could ever reach that

11  verdict.  Is there any evidence that the State would be

12  able to present to you or not, Ms. Bowman?  We're not

13  presupposing that you should vote that way without any

14  evidence, but I think the question is:  Is there any

15  amount of evidence that the State would be able to

16  present where you could find yourself answering those

17  questions in a manner that you know might result in the

18  execution of an individual?

19                  VENIREPERSON:  You mean would my answer

20  "no" be based upon personal beliefs or personal

21  feelings?  No.

22                  THE COURT:  Okay.  Do you have any further

23  questions?

24                  MS. TISE:  Okay.  I'm trying to determine

25  whether or not there is a situation where you could

1   answer "yes" to the first question, or whether you have

2   a preconceived idea that the answers are going to be no,

3   no, yes.

4                    VENIREPERSON: Knowing the scenario and

5   knowing the situation and the right decision, then

6   absolutely yes.

7                    MS. TISE:  So, you have an open mind at

8   this point?

9                    VENIREPERSON:  Uh-huh.

10                   MS. TISE:  And you're willing to follow the

11  evidence wherever it takes you?

12                   VENIREPERSON:  Uh-huh.

13                   THE COURT:  Answer "yes" or "no" so we can

14  take it down.  "Uh-huh" is real unclear on the record.

15                   VENIREPERSON:  Yes.

16                   MS. TISE:  So, if the evidence takes you to

17  an answer of the first issue as "yes," you believe he is

18  a continuing threat to society, could you answer that

19  knowing that it would lead to the death penalty?

20                   VENIREPERSON:  Right.

21                   MS. TISE:  Okay.  And if the evidence takes

22  you that there is no sufficient mitigation in the case,

23  you could answer that "no" knowing that will lead to the

24  death penalty?

25                   VENIREPERSON:   Yes.

```
 1                    THE COURT:  Okay.  Thank you, ma'am.  You
 2    can have a seat.
 3                    All right.  As to those questions, your
 4    motion is denied.
 5                    MS. TISE:  Okay.
 6                    THE COURT:  Let me make sure I've got this
 7    right.  The ones that I'm denying are the ones that I'm
 8    granting.  I can't remember which -- 74 is granted for
 9    denial.  Is that the --
10                    MS. TISE:  I'm sorry?
11                    THE COURT:  Was 74 granted for denial?
12                    MS. TISE:  Denial.
13                    THE COURT:  That was my denial.  I thought
14    so.  And this was a denial.
15                    Okay.  So, I show that 11, 37, 45, 54, 60,
16    74, and 76 are all denied, correct?  And then I'm going
17    to grant for cause:  21, 32, 33, 42, and 68.  Okay.  We
18    are clear on that and we'll excuse this group right now.
19                    (Open court, defendant and jury present)
20                    THE COURT:  Okay.  Folks, there is going to
21    be another small group here that's going to be excused
22    for the duration of this case.  Your duty as a juror in
23    this case is now completed and you're free to go.  And
24    Deputy Perry will meet you outside with your work excuse
25    or Metro bus pass, if you need it.
```

```
 1                And those jurors that can now leave are:

 2    Juror No. 21, Abdon Avila; Juror No. 32, Dennis Fisher;

 3    Juror No. 33, Jose Martinez, Jr.; Juror No. 42, David

 4    Limerick, Jr.; and 68, Karen Taylor.

 5                Now, the rest of you, we're going to break

 6    up into groups of four.  We'll hear four jurors this

 7    afternoon.  And those are going to be the first four on

 8    our list after these are deleted.  Hang on.

 9                So, I think the first four that we are

10    going to hear today are going to be Joshua Caluag,

11    Travis Bollom, Larry Jordan, and Salvador Gonzales.

12                And the rest of you are going to go home

13    today, but will come back at a different time.  And

14    we're going to give that time right now.

15                Deputy, if you can take the four that are

16    going to be heard today into the witness room, I would

17    appreciate it.

18                So, we have Juror No. 2, Mr. Caluag; No. 4,

19    Mr. Bollom; 5, Mr. Jordan; and 7, Mr. Gonzalez that have

20    been taken back to the witness room.  Is that correct,

21    Deputy?

22                THE BAILIFF:  Right.

23                THE COURT:  So, starting with No. 11,

24    Rachel Willis.  Ms. Willis, can you come up, please?

25                (At the Bench, on the record)
```

```
 1                    THE COURT:  Ms. Willis, you are to return
 2   tomorrow, June 4th, at 9:00 a.m. in this courtroom.  All
 3   right.
 4                    VENIREPERSON:  Thank you.
 5                    THE COURT:  Thank you, Ms. Willis.
 6                    (Open court, defendant and jury panel
 7                     present)
 8                    THE COURT:  And William McPherson.
 9                    (At the Bench, on the record)
10                    THE COURT:  Mr. McPherson, you will need to
11   return to this courtroom tomorrow at 9:00 a.m. straight
12   up here.  Okay?  And you will do the individual voir
13   dire and you will learn if you are actually on this jury
14   or not.  All right?
15                    (Open court, defendant and jury panel
16                     present)
17                    VENIREPERSON:  The 15th or --
18                    THE COURT:  Not on the 15th.
19                    So, every one that I tell to return, I'm
20   going to give a time and a date.  It will be back to
21   this courtroom on the 20th floor.  We're not in the
22   ceremonial courtroom, but we're in Project Court No. 1,
23   which is directly across the hall from the ceremonial
24   courtroom.  And you will return here at the time and
25   date that I give.  And I'm giving you a sheet of paper
```

1  that gives all the contact information and everything on

2  it.

3           I'm going to wait for Deputy Perry to come

4  back in.  So we make sure we have everybody on the same

5  page.

6           It's at that time that there will be an

7  individual voir dire of each of you.  It will only take

8  approximately one hour, but you may be here a little bit

9  longer.  What I'm doing is bringing back people in

10 groups of four.  And so, you could be potentially here

11 as long as four hours, but not likely.  Many times it

12 goes quickly once we do the individual voir dire and

13 the -- after a few questions or a shorter amount of time

14 than an hour, there may be an agreement to excuse you or

15 to have you as a juror.  So, we need everybody here at

16 the same time, the group of four.  We're bringing one

17 part of the group at 9:00 a.m. and one at 1:00 a.m.

18 {sic}.  At that time you will find out if you are

19 actually on the jury or not.  Okay?

20           Deputy, do you want to give any further

21 instructions than what's on here?

22           THE BAILIFF:  As long as they come to this

23 courtroom tomorrow, wait in the hallway, and we'll take

24 it from there.

25           THE COURT:  Okay.  Juror No. 14, Nancianne

 1   Kirkpatrick.

 2              June 4th at 9:00 a.m. tomorrow morning here

 3   in this courtroom.

 4              And Claude Limbrick, Juror No. 15.

 5   Tomorrow at 1:00 p.m.

 6              THE BAILIFF:  Tomorrow wait for us out in

 7   the hallway.

 8              THE COURT:  Nathan Gurley, No. 17.

 9   Tomorrow at 1:00 p.m.

10              THE BAILIFF:  Tomorrow wait for us out in

11   the hallway.

12              THE COURT:  Juror No. 19, Masemene.  That

13   will be tomorrow at 1:00 p.m.

14              THE BAILIFF:  Tomorrow wait for us out in

15   the hallway.

16              THE COURT:  Adela Rodriguez, Juror No. 22.

17              Edwin Paragas, Juror No. 24.

18              VENIREPERSON:  The bus --

19              THE COURT:  Deputy Perry is going -- if you

20   need bus passes to get here on your day, he can help you

21   out right now.  If you need an excuse for today showing

22   that you were in jury service, he can get that for you

23   as well as you leave.

24              Juror No. 25, Linda Genaw.

25              That will be for June 5th.  That is on

1   Wednesday at 9:00 a.m.  Thank you.

2                 Juror No. 28, Olga Sanchez.

3                 Ms. Sanchez, that will be for June 5th at

4   9:00 a.m.

5                 VENIREPERSON:  Thank you.

6                 THE COURT:  Thank you.

7                 Randy Malone, Juror No. 31.

8                 This is for June 5th.  That's Wednesday.

9   At 9:00 a.m.

10                 VENIREPERSON:  Thank you.

11                 THE COURT:  Allyn Emert, Juror No. 34.

12                 That's for June 5th, Wednesday, at 9:00

13   a.m.  Back here in this courtroom.  Thank you.

14                 Marcella Johnson, Juror No. 35.

15                 Okay.  Ms. Johnson, this is Wednesday, June

16   5th at 1:00 p.m.

17                 VENIREPERSON:  Thank you.

18                 THE COURT:  Juror No. 37, Dana Towse-Paulk.

19                 This is for June 5th, Wednesday, at 1:00

20   p.m.  Thank you.

21                 Mr. Scott Brown, Juror No. 38.

22                 Mr. Brown, this is Wednesday, June 5th at

23   1:00 p.m.  Thank you, sir.

24                 Juror No. 40, Wayne Anthony Montgomery.

25                 Mr. Montgomery, that's for June 5th,

1    Wednesday, at 1:00 p.m. back up here in this courtroom.

2                    VENIREPERSON:  Thank you.

3                    THE COURT:  Thank you.

4                    Juror No. 41, Stephen McDonald.

5                    Mr. McDonald, that is Thursday, June 6th,

6    at 1:00 p.m.

7                    VENIREPERSON:  I'm not disqualified about

8    knowing you when you were a kid swimmer.

9                    THE COURT:  You didn't say anything about.

10                   VENIREPERSON:  They never ask about the

11   judge.

12                   THE COURT:  Let's make everyone aware of

13   that.

14                   Counsel, can I see you?

15                   (At the Bench, on the record)

16                   THE COURT:  Mr. McDonald knew me as a child

17   swimmer.  Is that going to affect anybody?

18                   Mr. McDonald, do you think that's going to

19   affect you in any way, one side or the other?

20                   VENIREPERSON:  You were a hell of a

21   back-stroker.

22                   MR. WOOD:  She won't disagree.

23                   THE COURT:  I don't disagree on that, but

24   do you think it will influence you?

25                   VENIREPERSON:  I don't think so.  I don't

```
 1   see why.
 2                   THE COURT:  Mr. Cornelius, did you have any
 3   questions?
 4                   Mr. McDonald was saying he knew me as a
 5   back-stroker when I was child swimmer.
 6                   MR. CORNELIUS:  Was she any good?
 7                   VENIREPERSON:  Pretty damn good.
 8                   MR. CORNELIUS:  That doesn't affect me in
 9   any way.
10                   THE COURT:  Okay.  And so, then we'll see
11   you back on June 6th, Mr. McDonald.  Thank you.
12                   (Open court, defendant and jury panel
13                    present)
14                   THE COURT:  Okay.  Juror No. 43, Lena
15   Taylor.
16                   VENIREPERSON:  I have a problem with
17   June 6th and June 7th.  Can we move it to next week?
18                   THE COURT:  You have what?
19                   VENIREPERSON:  I have a problem coming in
20   tomorrow or Thursday or Friday.
21                   THE COURT:  I need to get an agreement.
22                   Counsel, may I see you.
23                   Ms. Taylor has a conflict with the date I
24   assigned her, June 6th, 2013, at 9:00 a.m.  Will you
25   both agree to take her out of order and bring her in
```

 1   next week?  Because I think we'll have some people next

 2   week.

 3                  MR. CORNELIUS:  No objection.

 4                  MS. TISE:  No objections.

 5                  THE COURT:  No objections from the State.

 6   And I'm going to ask the defendant.

 7                  Mr. Obel Cruz-Garcia, do you have any

 8   objections to taking Ms. Taylor out of order and

 9   assigning her to a June 8th date instead of June 6th for

10   individual voir dire?

11                  THE DEFENDANT:  No.

12                  THE COURT:  For the record, the defendant

13   said no.

14                  Ms. Taylor, we'll give you June 8th.  Is

15   that the Monday?  It's going to be 9th.  Make sure I got

16   this right.  It's June 10th.  And we'll have a few, so

17   I'll put you June 10th at 9:00 a.m., Ms. Taylor.

18                  VENIREPERSON:  Yes, ma'am.  I'll be here.

19                  THE COURT:  Thank you, ma'am.

20                  No. 44, Christopher Clark.

21                  Okay.  Mr. Clark, we're going to assign you

22   June 6th, this Thursday, at 9:00 a.m.

23                  Donna Chambers, No. 45.

24                  Yours will be June 6th, Thursday, at 9:00

25   a.m. right back here.  Thank you.

```
 1                    VENIREPERSON:  Uh-huh.

 2                    THE COURT:  Ashia Brown, No. 46.

 3                    Yours will be June 6th, Thursday, at 9:00

 4   a.m.  Thank you, ma'am.  See you then.

 5                    No. 52, Michael Lowrance.

 6                    June 6th at 1:00 p.m.

 7                    VENIREPERSON:  Thank you for saying my name

 8   right.

 9                    THE COURT:  Thank you.

10                    No. 53, Rick Zink.

11                    Mr. Zink, this Thursday, June 6th, at 1:00

12   p.m. right back here.

13                    VENIREPERSON:  Okay.

14                    THE COURT:  Thank you, sir.

15                    Elsy Quintanilla.  And then after

16   Ms. Quintanilla, David Ball.

17                    Okay.  Ms. Quintanilla, you are going to be

18   June 6th at 1:00.

19                    VENIREPERSON:  1:00 p.m.

20                    THE COURT:  1:00 p.m. right back here.

21                    VENIREPERSON:  Thank you.

22                    THE COURT:  And, Mr. Ball, this Thursday,

23   June 6th at 1:00 p.m.  Go to the hallway and wait there

24   and JJ will be here and escort you in.

25                    VENIREPERSON:  I couldn't move it to
```

```
 1   Friday?
 2                   THE COURT:  I have to do it by agreement.
 3   Is there a big conflict with it?
 4                   VENIREPERSON:  I have to go to Oklahoma
 5   City tomorrow and the next day for business, coming back
 6   on Thursday.
 7                   THE COURT:  Mr. Cornelius and Ms. Tise, it
 8   is okay if we trade Mr. David Ball the last slot on June
 9   6th, Thursday, for the first slot the next day on, June
10   7th?
11                   MR. CORNELIUS:  No objection.
12                   MR. WOOD:  No objections.
13                   THE COURT:  Mr. Cruz-Garcia, do you have
14   any objection to moving potential juror David Ball from
15   June 6th to June 7th for individual voir dire?
16                   THE DEFENDANT:  No.
17                   THE COURT:  Thank you.  His response was no
18   for the record.
19                   So, we'll give your, Mr. Ball, June 7th at
20   9:00 a.m.
21                   VENIREPERSON:  Thank you.
22                   THE COURT:  You are welcome.  We try to
23   accommodate.
24                   VENIREPERSON:  Thanks again.
25                   THE COURT:  Martha Perez.
```

```
 1                    June 6th at 1:00 p.m., Ms. Perez.  That
 2   will be right back here in this courtroom.  Okay.  Thank
 3   you very much.
 4                    VENIREPERSON:  Thank you.
 5                    THE COURT:  Todd Chaykosky.
 6                    Mr. Chaykosky, that's going to the June
 7   7th, Friday, at 9:00 a.m.
 8                    VENIREPERSON:  Okay.
 9                    THE COURT:  Very good.  Thank you very
10   much, sir.
11                    VENIREPERSON:  Thank you.
12                    THE COURT:  Bobby Mixon.
13                    Sir, that's going to be this Friday, June
14   7th, at 9:00 a.m.
15                    VENIREPERSON:  Okay.
16                    THE COURT:  We'll see you then.  Thank you.
17                    Maura Denman, Juror No. 62.
18                    Ms. Denman, you will be this Friday, June
19   7th, at 9:00 a.m.  Thank you.
20                    Nancy Pyper.
21                    And then we have Patricia Rivera.
22                    Ms. Pyper, you will be June 7th, this
23   Friday, at 1:00 p.m. right back here.  Thank you, ma'am.
24                    Ms. Rivera, this Friday, June 7th, at 1:00
25   p.m.
```

1              VENIREPERSON:  Okay.

2              THE COURT:  Right back here.  Thank you.

3              VENIREPERSON:  Thank you.

4              THE COURT:  Clarence Anderson, Juror

5    No. 70.

6              And then Keith Bowers.

7              Mr. Anderson, you are going to be this

8    Friday, June 7th, at 1:00 p.m. right back here in this

9    courtroom.  Thank you, sir.

10             And Mr. Bowers --

11             VENIREPERSON:  Yes, ma'am.

12             THE COURT:  -- 1:00 p.m. right up here,

13   Project Court 1 on the 20th floor, on Friday, the 7th.

14             VENIREPERSON:  Friday.  This is this coming

15   Friday?

16             THE COURT:  Yes.  Is that good?

17             VENIREPERSON:  Yes.

18             THE COURT:  Thank you.

19             VENIREPERSON:  You are very well organized,

20   in my opinion.

21             THE COURT:  We try not to spend too much of

22   your time.  Thank you.

23             And Linda Powell.  We're going into Monday

24   now.  The 10th.  Okay.  I didn't have all of these

25   filled out.

1                    Ms. Powell, you be Monday, the 10th, at

2      9:00 a.m.   Okay?   That's June 10th, 9:00 a.m.   We'll see

3      you then.

4                    Angela Bowman.

5                    You will be on June 10th.   That's Monday,

6      Ms. Bowman.

7                    VENIREPERSON:   Okay.

8                    THE COURT:   At 9:00 a.m.

9                    VENIREPERSON:   Okay.

10                   THE COURT:   Thank you.

11                   VENIREPERSON:   Thank you, Your Honor.

12                   THE COURT:   And Bennett Walker.

13                   Mr. Walker, you are going to be on June

14     10th, Monday, and we'll put you at 9:00 a.m.   Okay?

15     Thank you, Mr. Walker.   We'll see you then.

16                   And Donald Shoultz and Casey Guillotte.

17                   So, I have Monday afternoon, correct?   I

18     have four Monday morning so far, correct?   These two are

19     at 1:00 p.m., June 10th.   And that's Mr. Donald --

20     Monday, June 10th, at 1:00 p.m. right here.   Thank you,

21     sir.

22                   And Casey Guillotte.   Pretty name.   June

23     10th, 2013, at 1:00 p.m.   Just arrive here right outside

24     this courtroom and the bailiff will be there to bring

25     you in.

1                    VENIREPERSON:  Thank you.

2                    THE COURT:  Thank you.

3                    Okay.  Let's take a break, get back, and

4    we'll get going.

5                    (Recess)

6                    (Open court, defendant present, no jury

7                     panel)

8                    THE COURT:  Are we ready to proceed with

9    the first one, No. 2?

10                   MS. TISE:  Yes, Judge.

11                   THE COURT:  Please call Joshua Caluag.

12                   (Pause)

13                   (Venireperson sworn)

14                   THE COURT:  We're back on the record in

15   Cause No. 1384794, State of Texas versus Obel

16   Cruz-Garcia.  And Mr. Cruz-Garcia is present at counsel

17   table along with his counsel, Mr. Skip Cornelius and

18   Mario Madrid.  And for the record, Justin Wood and

19   Natalie Tise, the prosecutors, are both present in the

20   courtroom.  We're continuing with individual voir dire

21   at this time.

22                   Juror No. 2, Joshua Casas Caluag, is the

23   first juror that will be questioned.  And Mr. Caluag,

24   you have been sworn in.  Is that correct?

25                   VENIREPERSON:  Correct.

1        **JOSHUA CALUAG, VENIREPERSON NO. 2,**

2   was called as a prospective juror, and testified as

3   follows:

4                    **VOIR DIRE EXAMINATION**

5   **BY THE COURT:**

6        Q.   First, I'm going to ask you for purposes of the

7   record if you are the same person that was Juror No. 2

8   in the general venire in the State of Texas vs. Obel

9   Cruz-Garcia?  You were Juror No. 2, correct?

10       A.   Yes.

11       Q.   Okay.  And this is just a continuation of voir

12  dire, Mr. Callan.  There is no right or wrong answers to

13  your questions.  Both of the lawyers are going to get an

14  opportunity to talk with you and just see how you feel

15  about certain aspects.  We may go over a lot of the same

16  questioning that I did in my voir dire or we touched on

17  in your questionnaire, but they might delve into it a

18  little bit deeper.  In doing so, if there is anything

19  that you are uncomfortable with or if you need them to

20  rephrase, just please ask them to do so.

21            And I'm going to ask you one question.  Do

22  you have any religious, personal, or moral reasons you

23  would not be able to sit on a jury where the death

24  penalty is a possible punishment?

25       A.   No, ma'am.

1    Q.   Okay.  And do you know of any reason why you

2    couldn't be fair and impartial to both sides in a

3    criminal case?

4    A.   No.

5    Q.   Have any of your answers from your

6    questionnaire changed at this point?

7    A.   No.

8    Q.   Very good, sir.

9         THE COURT:  I'm going to turn it over to

10   Ms. Tise.

11        MS. TISE:  Thank you, Judge.

12                  **VOIR DIRE EXAMINATION**

13   **BY MS. TISE:**

14   Q.   Good afternoon.

15   A.   Good afternoon.

16   Q.   So, is it Caluag?  Is that --

17   A.   Caluag.

18   Q.   Caluag.  Okay.  So, kind of like the drink with

19   a "G" on the end?

20   A.   Right.

21   Q.   Okay.  I think I can remember that.

22        My name is Natalie Tise.  I'm a prosecutor.

23   And this is Justin Wood.  He's also a prosecutor.  And

24   the two of us are going to be handling this case

25   together.  Okay?

1     A.   Okay.

2     Q.   This is Steve Walsh over here.  He's an intern

3 who works for our office.  He's a law student.  And

4 he'll also be assisting us.

5          So, what do you think, Mr. Caluag, when you

6 got your questionnaire on Friday and saw this was a

7 death penalty case?

8     A.   I was surprised at first.  This is my first

9 jury duty.  So, getting a case as big as this, I wasn't

10 expecting it.

11    Q.   So, you just got dropped right in the grease on

12 your first jury service, right?

13    A.   Yes.

14    Q.   I will just let you in on a little secret.

15 Most of the time when you come down here, you are not

16 going to have to fill out that big questionnaire.  This

17 is something different because it's a death penalty

18 case.

19          And the issues that are involved are really

20 important.  And so, I'm sure you understand why we have

21 this process in place, so that we can kind of get to

22 know the people that are going to be on the jury and

23 decide and make a decision about who would be a fair and

24 impartial jury to decide this very important issue in

25 this case.

1          Do you think you will be able to do that?

2     A.   Yes.

3     Q.   Okay.  I want to talk to you a little bit about

4  your feelings on the death penalty.  First of all, do

5  you understand from the Judge's voir dire the difference

6  between a capital murder case and a regular murder case?

7     A.   Yes.

8     Q.   Okay.  Do you understand that in a regular

9  murder case, the death penalty is not going to be an

10  option at all?  Okay?

11     A.   Okay.

12     Q.   Most of the murder cases that happen in Harris

13  County that you hear about are not capital murder cases.

14  If a man gets jealous of his wife and he kills her,

15  usually that is not going to be a capital murder case.

16  Okay?  If a person wants to get revenge or gets in a bar

17  fight with someone, usually that's not going to be a

18  capital murder case.  That's what we're going to call a

19  regular murder case.  And in that case, the range of

20  punishment is going to be anywhere from five to life.

21          Do you understand that?

22     A.   Yes.

23     Q.   The difference between a regular murder case

24  and a capital murder case is a capital case is a murder

25  plus something else.  Okay?  And in this case, the plus

1   is a kidnapping.   A murder committed in the course of a

2   kidnapping.

3                    Do you understand that?

4       A.   Yes.

5       Q.   That plus can be different things.   It can be a

6   murder committed in the course of other types of crimes

7   or it could be a murder of a police officer, a murder of

8   a child under 10.   There is various different types of

9   capital murder.   Okay?

10      A.   Okay.

11      Q.   But there always has to be an aggravating

12  circumstance that elevates a regular murder to a capital

13  case where the death penalty is an option.

14                   Makes sense?

15      A.   Yes.

16      Q.   Okay.   And in this particular case, we have a

17  capital murder case.   And so, obviously, life and death

18  are the two possible punishments.   And because this case

19  happened in 1992, life without parole is not an option

20  on the case.

21                   Do you understand that?

22      A.   Not exactly.   Could you explain?

23      Q.   Okay.   In the last few years, the Texas

24  Legislature has enacted law that allows us to sentence

25  capital murderers who don't get the death penalty to

1    life without parole.  However, back in 1992, that was

2    not the law.  And we have to go by the law that was in

3    place in 1992.  Okay?

4        A.   Okay.

5        Q.   So, life without parole is not an option.

6        A.   Okay.

7        Q.   So, the two possible punishments that you will

8    be considering is life with the possibility of parole

9    after a period of time or the death penalty.

10       A.   Okay.

11       Q.   Make sense?

12       A.   Yes.

13       Q.   Okay.  So, I just want to get some general

14   feelings from you about what you think of the death

15   penalty.  And, I guess, if you were the boss and you

16   were in charge of Texas, would you have the death

17   penalty, if it was all up to you and nobody else?

18       A.   I think the death penalty for me isn't a

19   problem.  I think if a person deserves such punishment,

20   I think it should be applied.

21       Q.   Okay.  And I'm confused a little bit because on

22   your questionnaire, I think you said that you were

23   generally opposed to the death penalty.  Is that right?

24       A.   Not -- I guess to a certain degree.

25       Q.   There is no right or wrong answer.  And I know

1  these are hard issues to -- you know, you don't go

2  around every day thinking to yourself:  Wow, I wonder

3  how I feel about the death penalty.

4           But I'm curious because you checked on your

5  questionnaire:  I'm opposed to capital punishment except

6  in a few cases where it may be appropriate.

7       A.   Right.  Like I said, if it's deserving or based

8  on the evidence, then I would have no problem

9  considering that.

10      Q.   And you also said:  I'm opposed to the death

11 penalty, but could vote to assess it in a proper case.

12      A.   Yes.

13      Q.   Is that still how you feel?

14      A.   Yes.

15      Q.   So, generally, it's something that you are not

16 in favor of; is that correct?

17      A.   Yes.  It wouldn't be something that I would

18 automatically, I guess, go with or decide, but it's

19 something that I wouldn't dismiss right away as a

20 possible outcome or the result.

21      Q.   Okay.  So, you feel like it's something that

22 you could do if the evidence led you to answer the

23 special issues the Judge talked as a "yes" and a "no"?

24      A.   Yes.

25      Q.   Okay.  What kinds of cases -- in saying you

1  think it would be okay in certain types of cases, what

2  kind of cases, if you were in charge, do you think would

3  be the kinds of cases you would have the death penalty

4  for?

5       A.   Well, a capital murder case is pretty much --

6  something that's severe, that would be the kind of case

7  that I would consider.  I would say that would be the

8  type.

9       Q.   Okay.  Where would you rank yourself on a scale

10 of one to ten as to how you feel about the death

11 penalty, with one being absolutely totally and

12 completely opposed to it and ten being I would give the

13 death penalty every time I could?

14      A.   I would say I would be right in between, the

15 five.

16      Q.   Okay.  Have your feelings ever changed on the

17 death penalty or have you always kind of felt this same

18 way?

19      A.   It's always been the same.

20      Q.   Have you ever felt like you were opposed to the

21 death penalty at any point in your life?

22      A.   No, ma'am.

23      Q.   How about your family, how do members of your

24 family feel about it?

25      A.   I'm not exactly sure how they feel about it.

1    Q.   It's not something that comes up in dinner

2  table conversation?

3    A.   No.

4    Q.   Okay.  This question is very important because

5  what we're dealing with here is not something in a

6  vacuum.  We're dealing with real people and real issues

7  and there is a real case out there.  Okay?  I want you

8  to take a look across the courtroom at this man sitting

9  over here.  You see him?

10    A.   Yes.

11    Q.   That's Obel Cruz-Garcia, the defendant in this

12  case.  And I want you to think about it and I want you

13  to tell me that at the end of the day if the questions

14  in this case lead you to answer "yes" or "no" -- "yes"

15  and "no;" yes, that he is a continuing threat, and, no,

16  there is no mitigation, can you follow the evidence in

17  the case and answer the questions that way knowing that

18  it will lead to the death of that man sitting right

19  there?

20    A.   I can.

21    Q.   Okay.  He's a living, breathing, thinking human

22  being.  He may have a family.  He may have friends.  You

23  may see some of them testify.  But at the end of the day

24  if the evidence leads you to answer those questions

25  "yes" and "no," you can do that?

 1      A.   If the evidence leads me, yes.

 2      Q.   And I'm leaving out the middle question because

 3  that's something we'll spend a little more time talking

 4  about, the second issue.  But you can follow the

 5  evidence in this case and do that knowing that it will

 6  lead to his death?

 7      A.   Yes, ma'am.

 8      Q.   So, I want to talk to you a little bit about

 9  some of the things that you can expect in trial.  Okay?

10  The trial will happen in two phases.  There is a guilt

11  phase and a punishment phase.  And they're sort of like

12  two little separate trials.  Okay?  And some evidence

13  is admissible in the guilt phase, but not admissible in

14  the punishment phase.  Do you understand that?

15      A.   Yes.

16      Q.   Okay.  For instance, a person's criminal

17  history, most of the time you don't hear about in the

18  guilt phase of the trial.  But that would be something

19  that if it existed you would hear about in punishment.

20  Do you see how that works?

21      A.   Uh-huh, yes.

22      Q.   And during the guilt phase of the trial, there

23  are elements that we have to prove.  And the Judge

24  talked to you about those elements and listed them out

25  on the board.  Do you remember that?

1        A.   I do.

2        Q.   And those are important because those are the

3   things that we absolutely have to prove in the case.

4   Okay?  So, you can kind of look at a criminal case in

5   two ways -- in one way with two columns.  The stuff in

6   this column are the elements, the things that we have to

7   prove.  Okay?  And then over here in the second column

8   are things that you might wonder about, like I wonder.

9   Like, I wonder why he did it or I wonder where the

10  weapon is that he did it with.  Those are I-wonder

11  things, but they're not elements of the case.  Okay?

12       A.   Okay.

13       Q.   That's important because the law only requires

14  us to prove up the elements to you beyond a reasonable

15  doubt.  Do you understand why that would be the case?

16       A.   Yes.

17       Q.   Okay.  It's generally the case because we're

18  not always going to be able to satisfy all your

19  I-wonders.  We're human beings.  People in the case have

20  perfections, strengths and weaknesses.  We don't follow

21  people around and capture them on video committing a

22  crime.  So, we're limited in that way, but there are

23  certain things that we absolutely have to prove beyond a

24  reasonable doubt.

25                    Can you follow that standard, that only the

1    elements in the case have to be proven by a reasonable

2    doubt?

3         A.   Yes.

4         Q.   And are you okay with the fact that at the end

5    of the case you may just be kind of wondering about some

6    things, but if they are not elements of the case, can

7    you set that aside, focus on the elements, and decide

8    whether those have been proven to you beyond a

9    reasonable doubt?

10        A.   Yes, I can do that.

11        Q.   Okay.  Also, we have to prove all of this.  And

12   the defendant has no burden of proof.  That's very

13   important.  It's his constitutional right.  His

14   attorneys can sit there and not say a single thing

15   through the entire trial.  Are you comfortable with

16   that?

17        A.   Yes.

18        Q.   Because the burden of proof starts with us and

19   it stays with us throughout the whole case.  And Justin

20   and I are here to carry that burden.  Do you recognize

21   that the defense has no burden of proof?

22        A.   I do.

23        Q.   Okay.  And can you hold us to our burden and

24   not place any burden on the defense?

25        A.   Yes.

1     Q.   Okay.  And that extends to the punishment phase

2  of the trial as well.  One of the things that you said

3  on your questionnaire is that you felt like a defendant

4  in a criminal case should be required to present some

5  evidence to prove his innocence.

6     A.   Right.

7     Q.   Can you tell me a little bit about that?

8     A.   I guess just like we talked about in court, we

9  were raised to hear both sides of the story.  So, that's

10  where that's coming from.

11     Q.   Okay.  So, do you feel differently about that

12  now?

13     A.   Yeah.  I think now that I think about it, I

14  would want to hear his side of the story if he has

15  something to say.

16     Q.   Okay.  Well, if he decides not to say anything,

17  do you understand you can't hold that against him?

18     A.   Right.  If he decides not to show any evidence

19  or defend himself, I would be okay with that.

20     Q.   You'd be comfortable with that?

21     A.   Yes.

22     Q.   Okay.  Some of the evidence that you might see

23  in this case -- you know, you heard what the elements

24  are.  We have to prove it happened on a certain day.

25  Okay?  And its on or about.  So, you know, close is

1    okay.  We have to prove that it happened in Harris

2    County, Texas.  We have to prove the identity of the

3    defendant and the identity of the victim and how the

4    crime happened.  Okay?

5        A.   Okay.

6        Q.   We have to prove that it is a murder and we

7    have a manner and means in the case.  In this case, the

8    manner and means, one of the options that you have is

9    that it's unknown.  Okay?  I'm going to talk to you a

10   little bit more about that in a few minutes, but knowing

11   that those are the elements, what kind of evidence do

12   you think you might hear in a capital murder case?

13       A.   Exactly what happened that led them to the

14   action that they took, perhaps.

15       Q.   Okay.  Well, not necessarily.  There are a lot

16   of crimes that happen where we don't know the motive.

17   We have no way of proving why someone did a certain type

18   of thing.  We can only prove that they did it.  Okay?

19   And the law doesn't require us to prove motive.  How

20   would you feel if there was no motive presented to you

21   in the case?  Would that bother you?

22       A.   A little bit.  It would be easier to come to a

23   conclusion if I can have some sense of why they did what

24   they did.

25       Q.   Do you feel like if we didn't prove motive to

1   you, that you wouldn't be able to reach a verdict?

2        A.   I don't think so.   I think if the evidence is

3   strong enough that proves they are guilty or not guilty,

4   I think I could come up with a conclusion.

5        Q.   Okay.  So, I want to make sure I understand

6   what you're saying.  Would you start us off a little

7   behind if we didn't prove motive?

8        A.   Not exactly.

9        Q.   Okay.  Well, don't let me put words in your

10  mouth.  Just tell me what you think about that.  If we

11  didn't prove motive to you, would that affect your

12  ability to find the defendant guilty if the evidence

13  pointed you in that direction?

14       A.   No.

15       Q.   No?

16       A.   No.

17       Q.   Okay.  So, have you thought about some of the

18  types of evidence that we might present to you?  There

19  might be pictures, there may be scientific evidence, and

20  there will be witnesses.  Do you understand that

21  witnesses are also a form of evidence?

22       A.   Yes.

23       Q.   Okay.  What kinds of scientific evidence do you

24  think might come into play?

25       A.   Perhaps, DNA results.

1      Q.   Okay.  Do you have any feelings about DNA, any

2   negative or positive feelings about that?

3      A.   No, ma'am.

4      Q.   We may be bring witnesses in to testify.   In

5   fact, I can guarantee there will be witnesses brought in

6   to testify.   One of the things that you will have to

7   consider is their credibility.   Some people have trouble

8   with that.   Do you think you would be a person who would

9   have trouble with that?

10      A.   No, ma'am.

11      Q.   Okay.  When it comes to police officer

12   credibility, the law says that police officers, when

13   they come in the courtroom, are to be treated just like

14   all the other witnesses.   Do you have any feelings about

15   that?

16      A.   No.

17      Q.   Do you think you can do that?

18      A.   Yes.

19      Q.   Have you ever had a bad experience with a

20   police officer?

21      A.   No.

22      Q.   Okay.  So, do you feel pretty neutral about

23   them?

24      A.   I do.

25      Q.   And there may be witnesses who come in and

1    testify and those witnesses are human beings.  And I

2    guarantee not one of them will be perfect.

3         A.   Right.

4         Q.   Some of them will come with baggage of their

5    own, but you have to start them out on equal ground with

6    other witnesses and decide for yourself whether you

7    think they are credible.  Can you do that?

8         A.   Yes.

9         Q.   Who do you think decides what the evidence is

10   going to be in a case?

11        A.   I would say the prosecutor.

12        Q.   You think?

13        A.   Yes.

14        Q.   Well, I guarantee you if I were choosing up the

15   evidence in this case, I would have the most pristine

16   witnesses in the world come in here and testify for you.

17   And everything would be perfect, if I could choose.  But

18   in reality, the person who decides what the evidence is

19   going to be is the person who commits the crime.  Right?

20        A.   Right.

21        Q.   That person decides who sees, who hears, and

22   what evidence is left behind, right?

23        A.   Right.

24        Q.   That person can decide whether there are

25   fingerprints left behind, right, because he can wear

1   gloves?  Right?

2        A.   Right.

3        Q.   I might want to have fingerprints, but I might

4   not have them because it's not my decision, right?

5        A.   Right.

6        Q.   He can decide whether or not he wants to pick

7   somebody who is a friend of his, somebody he trusts to

8   be a witness, commit the crime in front of him, or to

9   commit the crime in front of no one at all, right?

10       A.   Right.

11       Q.   So, it's up to the defendant to choose.

12            The State has the evidence that it has and

13  will tell you the story that we have, but, you know,

14  it's going to be a story that deals with human beings

15  who aren't perfect, evidence that's not perfect.  The

16  question will be whether at the end you can look at that

17  evidence and listen to those human beings and decide

18  whether or not you believe them and decide whether the

19  elements have been proven to you beyond a reasonable

20  doubt.  Does that make sense?

21       A.   Yes.

22       Q.   Do you think that's fair?

23       A.   I do.

24       Q.   Okay.  It's also important to know some of the

25  things that don't come into evidence in a case.  For

1  instance, the offense report that the officers write

2  won't be presented to the jury.  Statements that

3  witnesses give, written or taped statements, they won't

4  be presented to the jury as evidence.  And the reason

5  they won't be is because the law says those are hearsay.

6  The law says that a witness has to take the witness

7  stand and testify so that you can hear them for yourself

8  live.  Okay?  We can't just offer an offense report to

9  take the place of an officer or offer a statement to

10  take the place of a witness.

11           So, I want you to know that, that we're not

12  holding it back from you, it's just evidence that we

13  can't present.  Does that make sense?

14       A.   Yes.

15       Q.   Lots of times officers use information they get

16  from confidential informants, tips, Crime Stoppers tips,

17  word on the street.  Those kinds of things are also not

18  going to be coming before you in evidence because

19  they're hearsay.  We have to put a live witness on the

20  stand and confidential informants and tipsters have a

21  right to privacy that we can't violate.  Make sense?

22       A.   Yes.

23       Q.   Sometimes the witnesses that we have in the

24  case are what we call parties.  And Judge Magee talked

25  to you a little bit about what parties are, accomplices.

1    Did that all make sense to you?

2         A.   It did.

3         Q.   Okay.  So, if Justin and I decide we want to

4    commit an aggravated robbery, we want to rob a bank down

5    the street.  Okay?  And I'm going to drive the car and

6    Justin is going to go inside the bank.  We have an

7    agreement, the two us, don't we?

8         A.   Right.

9         Q.   And even though I might be the one who stays in

10   the car, I'm responsibile for everything Justin did

11   because we had that agreement.  Make sense?

12        A.   Yes.

13        Q.   And if he goes and does something that I didn't

14   necessarily sign up for, unless I abandon that and say:

15   No, I didn't sign up for that, I'm not going to be part

16   of that, then I'm responsible for what he does.  You see

17   how that works?

18        A.   Yes.

19        Q.   And that falls under parties law and the law of

20   co-conspirators.  Okay?

21        A.   Okay.

22        Q.   If I commit an offense -- if Justin commits an

23   offense and I may be in the car and may not have been

24   involved, I'm responsible for the offense he committed,

25   unless I tell him:  I don't want to be part of that.

1    Okay?

2        A.   Okay.

3        Q.   Do you think that's fair?

4        A.   Yes.

5        Q.   If we have an accomplice or a co-conspirator

6    testify, that's fine; but there is special rules that

7    apply.  Okay?

8              First of all, you will have to listen and

9    decide whether you think they are an accomplice or

10   co-conspirator, whether you think they were aiding and

11   assisting the offense, or whether you think that they

12   distanced themselves from it and said:  No, I don't want

13   to be a part of that anymore.  Okay?  If you do think

14   that they're an accomplice or a party, then you have to

15   have corroboration of their testimony before you can

16   consider it.  Okay?  Does that make sense?

17       A.   Yes.

18       Q.   So, if say, for instance, we go commit this

19   robbery and Justin goes in the bank and shoots the clerk

20   and I'm sitting in the car and I knew he was going to go

21   in there and commit the robbery, I knew he had a loaded

22   gun, I know what can happen as a result of that.  So, I

23   should have recognized that could have happened and I

24   never told him:  I don't want any part of that.  Okay?

25       A.   Okay.

1     Q.   So, when he comes out of the bank, we get

2  caught down the road.   Let's say I go and testify

3  against Justin and say:   Yeah, he went into the bank and

4  when he came back out he told me he pulled the trigger

5  and shot the clerk.   Okay?   I'm an accomplice.   I'm a

6  party.   I'm a co-conspirator.   Okay?

7     A.   Correct.

8     Q.   So, you have to have some corroboration of what

9  I say before you can take what I say into account.   Make

10  sense?

11     A.   Yes.

12     Q.   So, let's talk about what could be

13  corroboration.   Corroboration could be that Justin left

14  his fingerprints on the counter by the teller in the

15  bank right there and somebody said:   I saw the gunman

16  and he touched the counter right there right before he

17  pulled the trigger.   That could be corroboration,

18  couldn't it?

19     A.   Yes.

20     Q.   Corroboration could be a witness in the bank

21  saying:   I saw that man, Justin Wood, pull the trigger.

22  You see how that works?

23     A.   Yes.

24     Q.   All kinds of things can be corroboration as

25  long as they tend to connect the defendant to the

1  commission of the offense.  Make sense?

2      A.  Yes.

3      Q.  Do you think that's fair?

4      A.  I do.

5      Q.  You might wonder when you hear from a party or

6  a co-conspirator when they testify whether or not they

7  have -- are getting any special consideration for their

8  testimony.  Okay?  Because you might be wondering, why

9  would that person come in and testify against their

10  co-defendant?  They must be getting something out of the

11  deal.

12          Well, I can tell you that if they are

13  getting something out of the deal that's something that

14  as jurors you will be able to know.  You have a right to

15  know that.  So, it will be brought to your attention.

16  If it's not brought to your attention, then you can

17  safely assume that they are testifying for whatever

18  reason, but they're not getting a special deal in

19  exchange.  Make sense?

20      A.  Yes.

21      Q.  Sometimes if you don't hear from somebody, you

22  can kind of safely assume that maybe they wanted a

23  special deal and didn't get it.  See what I'm saying?

24      A.  Yes.

25      Q.  Now, you saw in the indictment that this case

1  happened in 1992.  Right?

2      A.   Right.

3      Q.   Did that bother you or concern you in any way?

4      A.   No, ma'am.

5      Q.   No?

6           Okay.  What kinds of things do you think,

7  when you have a cold case like this one, might become

8  problematic?  What kind of problems do you think there

9  might be?

10     A.   Perhaps, the evidence -- some of the evidence

11 is lost.

12     Q.   Okay.  That's true.  Sometimes some of the

13 evidence gets lost.

14          Okay.  What about witnesses?  What do you

15 think might happen to them?

16     A.   They could be swayed, perhaps bribed into

17 making testimony.

18     Q.   That's true.  Some people may die.  It's been

19 20 years.  Some people may move away and you can't find

20 them.  Does that seem a possibility?

21     A.   Yes.

22     Q.   What do you think happens in the scientific

23 area?  Do you ever watch any of those cases, cold case,

24 or any of those true to crime stuff?

25     A.   No.

1    Q.   Okay.  What do you think might happen in the

2  area of scientific or technical evidence when you have a

3  cold case?

4    A.   Well, I guess like the evidence that might be

5  lost or tampered with, that they don't have the same

6  importance or significance.

7    Q.   Okay.  What about technology?  Do you think

8  it's the same now as it was in '92?

9    A.   No.  They are a lot more advanced now, of

10 course.

11   Q.   Okay.  Do any of those things bother you?  Do

12 you think any of those things would affect your ability

13 to look at the evidence and determine whether it's

14 there?

15   A.   No.

16   Q.   If there is a witness who is lost or who has

17 moved away or who has died, do you think you can say:

18 Okay.  I get that, but I'm going to look at the evidence

19 that's still left in the case and determine whether or

20 not it's proven beyond a reasonable doubt?

21   A.   I can do that.

22   Q.   See if those elements are met and set that

23 aside.

24   A.   Yes.

25   Q.   Okay.  And improvements in technology, can you

1    look at that and say:  Well, we've gotten a lot more

2    advanced and we're able to do more things than we could

3    back then?

4         A.   Yes.

5         Q.   You'd look at those kinds of things?

6              What about the body of the victim?  How do

7    you think the fact that it's a cold case, that might be

8    affected?

9         A.   I don't know.

10        Q.   Sometimes, you know, a case is cold because the

11   body is lost for a long time.  What do you think that

12   does to the evidence?

13        A.   Changes it or lose some of it.

14        Q.   Sometimes you don't have a body at all.

15        A.   Right.

16        Q.   Or there's decomposition, which causes

17   problems.  Seem reasonable that that would happen?

18        A.   Yes.

19        Q.   If any of those things are the case, can you

20   look past that and look at the evidence that we have in

21   the case and make a decision?

22        A.   Yes.

23        Q.   Because if a body has been sitting for a long

24   period of time and there is decomposition, sometimes it

25   affects your ability to decide.  You can't tell from

1    bones whether someone was stabbed, strangled, or shot.

2    Make sense?

3         A.   Yes.

4         Q.   And that's why in this case we have it pled as

5    a manner and means unknown.  Because the law allows us

6    to prove our case that way, that if we don't know the

7    manner and means, we don't know how the person died, but

8    we can, based on the circumstances, call it a homicide,

9    then that's acceptable under the law, but I want to know

10   if that's acceptable for you.

11        A.   It is acceptable for me.

12        Q.   Because, again, who controls whether or not we

13   find the body right away or five years later?

14        A.   Right.

15        Q.   The defendant.  Makes sense?

16        A.   Yes.

17                  THE COURT:  Ms. Tise, I show you have three

18   minutes.

19                  MS. TISE:  Okay.

20        Q.   (By Ms. Tise) I want to talk to you about the

21   special issues that the Judge talked to you about and

22   just make sure you understand them.  Okay?

23        A.   Okay.

24        Q.   Special Issue No. 1 --

25                  MS. TISE:  And I should have asked to

1  approach.  I apologize.

2              THE COURT:  That's fine.

3      Q.  (By Ms. Tise) Special Issue No. 1 over here is

4  what we call the continuing threat.  And I want you to

5  focus in about a couple of important things about

6  Special Issue No. 1.  All right?

7              First of all, look at the word

8  "probability."  We have to show there is a probability

9  that the defendant would commit criminal acts of

10  violence in the future.  The law doesn't define

11  probability, but I want to know what it means to you.

12     A.  For me, it's -- I want to say it's possible

13  that he will commit crimes.

14     Q.  Okay.  It's not possible and it's not certain.

15  It's somewhere in between.

16     A.  Okay.

17     Q.  A lot of people like to say more likely than

18  not, 51 percent.  What do you think about that?

19     A.  I don't have a comment on that, really.

20     Q.  Okay.  Can you accept, though, it's not a

21  possibility, it's something more than that and something

22  less than a certainty?

23     A.  Yes.

24     Q.  Okay.  And it also says:  Commit criminal acts

25  of violence in the future.  Okay?  How do you feel about

1    that?  Do you think that's something that a person can

2    determine?  Do you feel like you could answer that

3    question?

4         A.   Well, it would be kind of hard.  I wouldn't be

5    able to just assume that they would commit such violence

6    in the future.

7         Q.   Okay.  Absolutely.  You couldn't assume it.

8    So, I want to know whether or not you feel like -- some

9    people say that requires me to predict the future and

10   I'm not comfortable with that.  How do you feel about

11   it?

12        A.   I wouldn't feel comfortable assuming.

13        Q.   You would not?

14        A.   No, ma'am.

15        Q.   Okay.  So, you would not feel comfortable ever

16   answering -- despite the evidence presented to you, ever

17   answering this question "yes"?

18        A.   Well, with the evidence, I would think I can

19   come up with a logical solution as to whether they will

20   commit or not crimes in the future.

21        Q.   What kinds of evidence do you think you would

22   want to have to consider this question?

23        A.   Perhaps background, their personal background,

24   criminal background.

25        Q.   Okay.  That can help.  Is there anything else

1    you can think of that might help?

2         A.   No, ma'am.

3         Q.   What about the circumstances of the crime

4    itself?  The law says that -- the law says that you can

5    look at the nature of the crime itself, and even if the

6    person doesn't have any other criminal history, you can

7    look at those facts of the case and find that it's so

8    egregious that you think that he is still a continuing

9    threat.  In other words, anyone who can do that, is

10   always going to be a threat to society.  Do you see how

11   that might be possible?

12        A.   Yes.

13        Q.   Would you be closed off to that possibility?

14        A.   No.

15        Q.   Are you familiar with the case -- they called

16   it the Candy Man case.  It happened way before you were

17   born, but it was a guy who poisoned his son on Halloween

18   with -- in order to get the insurance money.  He put

19   candy in his pixie stick -- poison in the pixie stick

20   and took the candy out and poisoned his own little

21   child.  That person had no criminal history and was even

22   an upstanding citizen, but the law says that you can

23   look at the facts of case alone.  And in that case, he

24   got the death penalty because the jury said anybody who

25   can kill his own son for the insurance money is always a

1  danger.  Does that make sense?

2      A.  Yes.

3      Q.  Okay.  Also, the continuing acts of violence

4  that they talk about here doesn't mean you think that

5  they're going to go out and commit another murder or

6  even an assault.  The violence can even be a property

7  crime.  If you think the person might get mad in the

8  jail and tear something up or slash someone's tires.

9  Any of those kinds of things.  Do you understand that?

10     A.  Yes.

11     Q.  And "society" means anyone, anywhere, at any

12 time, including in prison.  Okay?

13     A.  Okay.

14     Q.  Do you accept that?

15     A.  Yes.

16     Q.  Looking at the second special issue, this is

17 kind of a are-you-sure-about-it question.  Because to

18 have convicted him of capital murder, you will have to

19 either believe that he was the person who caused the

20 murder himself directly or -- and that he did it

21 intentionally, that his accomplice did it and he knew

22 that it was going to happen.  Okay?

23              So, this question, basically, re-urges

24 that.  You need to look at this question that basically

25 says that you believe the defendant actually caused the

1    death, or if he didn't do it himself he intended for it

2    to happen -- okay -- or he anticipated that a human life

3    would be taken during the course of this offense.   Okay?

4    So, he had to have anticipated it, intended it, or did

5    it himself.

6                Do you recognize that the law allows those

7    three options?

8         A.   Yes.

9         Q.   Okay.   And are you comfortable with that?

10        A.   Yes.

11        Q.   And finally, the mitigation issue.   This

12   question requires you to go back and look at all of the

13   evidence in the case and decide whether or not you think

14   there is anything mitigating.   And there is no burden on

15   this.   It can be any evidence presented.   It could come

16   from our side, it could come from the defense side.   It

17   could be anything that you hear.   The law asks you to

18   look at all of it.   It's sort of a -- this is sort of a

19   loophole at the end where your last -- your last

20   decision to make looking at everything.   Make sense?

21        A.   Yes.

22        Q.   And if you find that there is anything

23   mitigating about the case, anything at all, then you

24   have to answer that question "yes," and that will lead

25   to a life sentence as opposed to the death penalty.

1    Okay?

2        A.   Okay.

3        Q.   So, what kinds of things do you think might

4    come up when we're dealing with the mitigation question?

5        A.   Perhaps the defense might provide their take

6    of -- their side of the story.

7        Q.   Okay.  Sometimes.  You recognize they don't

8    have to?

9        A.   Right.

10       Q.   But sometimes they might.

11            They might put on evidence that they think

12   is mitigating.  Like, perhaps he has a drug history,

13   perhaps he came from a broken home, those kinds of

14   things; but what I want you to think about is mitigation

15   is often two sides of the same coin.  All right?  So,

16   some people might say:  Oh, he was addicted to drugs.

17   That's mitigating.  Some people might say:  He never

18   used drugs in his life, he was totally clean and sober,

19   never had a problem like that.  That's mitigating.  You

20   see how that's two sides of the same coin?

21       A.   Yes.

22       Q.   Some people might say:  Oh, he came from this

23   great, very supportive family, who all came in and

24   testified for him.  That's mitigating.  He has all these

25   people who love and care for him.  Some people might

1    say:  Oh, he came from this terrible, broken home where

2    nobody was there to help him and support him.  That's

3    mitigating.  Again, two sides of the same coin.

4              A skillful defense attorney can present

5    evidence like that and say it's mitigating on either end

6    of the spectrum.  Do you see how that works?

7         A.   Yes.

8         Q.   How do you feel about that?

9         A.   I don't have a comment on that.

10        Q.   So, the question is, is it sufficiently

11   mitigating.

12        A.   Yes.

13        Q.   That's the question.

14             So, as a juror, you will be asked to

15   decide.  The question isn't is there mitigation because

16   anything can be interpreted as mitigation.  The question

17   is:  Is it sufficiently mitigating where you feel that

18   the appropriate thing to do is answer the question

19   leading to a life sentence as opposed to a death

20   sentence.  What do you think?  Does that seem fair?

21        A.   Yes, I think it's fair.

22        Q.   Do you think you can do that?

23        A.   Yes.

24        Q.   Okay.  The big thing about these three

25   questions is that each one is independent and each one

1  must be answered on its own.  So, you can't go back in

2  the jury room and say to yourself:  I've convicted him

3  of capital murder, so of course I think he is a future

4  danger to society.  You can't tie the questions to each

5  other.  You have to look at them independently and make

6  a decision based on the evidence presented.

7           Same thing with mitigation.  You can't say

8  to yourself:  I think he committed capital murder and I

9  convicted him, I think he's a future danger to society.

10 Of course, I don't think there is any mitigation.  That

11 wouldn't be right.  You have to give each question its

12 full weight and listen to the evidence and apply it.

13           Can you do that?

14    A.   Yes.

15           MS. TISE:  Judge, we'll pass the juror.

16           THE COURT:  Mr. Cornelius.

17           MR. CORNELIUS:  Yes, Your Honor.

18           THE COURT:  You may proceed.

19              **VOIR DIRE EXAMINATION**

20 **BY MR. CORNELIUS:**

21    Q.   Mr. Caluag, is it?

22    A.   Yes.

23    Q.   My name is Skip Cornelius.  Mario Madrid on my

24 right.  And our client, Obel Cruz-Garcia, also on my

25 right.

1           We need to ask you some questions, or I do.

2     And I'm not going to be that long.  I don't have that

3     many questions for you.  There are a few things I want

4     to go over with you.

5           You are very close to being on the jury in

6     a capital murder case.  And I don't know how that makes

7     you feel, but it would scare me to death, if I were you.

8     A.   Right.  Definitely not something...

9     Q.   You can probably understand that I don't like

10    to take jurors that are enthusiastic or happy to be on a

11    jury in this kind of a case.  That scares me.  If

12    somebody really wants to be on the jury in a case like

13    this, it seems to me they don't really care that much

14    about the outcome or maybe they care too much.  And it

15    just scares me.  Put it that way.  So, don't let me

16    offend you, but I just want to hear you answer a few

17    questions.

18           The Judge asked earlier today about the

19    presumption of innocence, asked the whole panel about

20    whether they thought the defendant -- whether the jurors

21    could presume the defendant was not guilty.  And, of

22    course, that's the correct answer.  And you are supposed

23    to be able to say, as you sit there now, I have heard no

24    evidence, so I don't have an opinion as to the evidence

25    because I haven't heard any and the law says that I have

1    to presume the defendant is not guilty at this point.

2                 Do you follow all of that?

3        A.   Yes.

4        Q.   You knew all that before you came down here,

5    I'm sure.

6                 But the question to you is, can you really

7    do that?  I mean, as my client sits here today, does he

8    look guilty to you or does something about this make him

9    appear guilty to you?

10       A.   No.  I wouldn't know whether or not he is

11   guilty or not until I hear the evidence.

12       Q.   And you truly feel that way?

13       A.   Yes.

14       Q.   Okay.  I'll take your word for it.

15                You were asked about an answer that you

16   gave in your questionnaire about the defendant

17   presenting evidence or something to that effect.  I know

18   when you filled out this questionnaire, which I have a

19   copy of, you didn't have the Judge's explanations and

20   all the education that you've gotten today about jury

21   service.  And you've never been on a jury before,

22   correct?

23       A.   Correct.

24       Q.   Okay.  So, now you have been told -- and I

25   think you agreed with it, but I want to hear it for

1   myself -- that a person that is accused of a crime

2   doesn't have to prove their innocence.  It's up to the

3   State to prove they're guilty, right?

4       A.   Right.

5       Q.   And did you believe that before you came down

6   here?

7       A.   No.  I always thought that each side would have

8   their evidence and prove whether or not they're guilty.

9       Q.   Okay.  Do you kind of see why that's not the

10  way it is?  Because if we really have a presumption of

11  innocence, if somebody under our constitution and our

12  laws is really presumed innocent, they shouldn't have to

13  prove they're innocent, they're already innocent.  Do

14  you follow me?

15      A.   Yes.

16      Q.   So, that's the basis for this Fifth Amendment

17  that we have or part of the Fifth Amendment that says an

18  accused does not have to testify.  The basis in that is

19  that's because the accused doesn't have to prove their

20  innocence.  You with me?

21      A.   Yes.

22      Q.   The lawyers don't have to do anything either.

23  We're going to do plenty, but we don't have to.  The

24  defendant's presumption of innocence is enough to defend

25  him if the State can't prove their case.  You follow me?

```
 1        A.    Yes.
 2        Q.    For example, they are talking about not having
 3   a motive or what happened since 1992 or who controls
 4   things in a case.   Those could be -- and I don't know
 5   that they are, but they could be excuses for not having
 6   evidence.   And excuses aren't going to cut it.   They're
 7   going to have to have evidence, right?
 8        A.    Right.
 9        Q.    If they don't have evidence, are you going to
10   convict?
11        A.    No.
12        Q.    Okay.   They also don't get any slack or leeway
13   because the case occurred in 1992.   They don't get any
14   extra points for that.   You don't have any idea why
15   we're in trial today on something that allegedly
16   happened in 1992, do you?
17        A.    No.
18        Q.    You don't know it's a cold case, do you?
19        A.    No.
20        Q.    Whatever that means, cold case.
21              Motive.   Let's talk about motive here for a
22   moment.   Motive is sometimes good evidence for the State
23   to have.   And it was correctly said to you that they
24   don't have to prove a motive, but it might be some
25   really good evidence if they could prove a motive.   You
```

1  follow me?

2      A.   Yes.

3      Q.   Okay.   If they don't, they are unable to prove

4  a motive, though, it's not up to you to make one up for

5  them.   You can't jump to that or fill in the blank for

6  them.   They have to fill in their own blanks.   You

7  follow me?

8      A.   Yes.

9      Q.   Would you hold them to that?

10     A.   Yes.

11     Q.   All right.   It was mentioned that we don't have

12  in this case a sentence of either the death penalty or

13  life without parole.   We have, in this case, a sentence

14  of either the death penalty or life in prison.   There

15  may be some events which could occur in the future where

16  the person on trial might become eligible for parole,

17  but even if that happened, I want you to understand that

18  that doesn't mean they get parole.   When you get a life

19  sentence in any case, you get a life sentence.   The

20  patrol board never has to release you.   Did you know

21  that?

22     A.   Not until today.

23     Q.   Well, they don't.   I mean, that's the law.

24  They don't.   Just because somebody becomes eligible for

25  parole in any kind of a case doesn't mean they get

1  paroled.  And neither you, nor I, nor the Judge, or the

2  prosecutors, any of us can control what the board of

3  pardon and paroles does.  And, therefore, the law says a

4  juror is not to consider that fact because it's outside

5  of our control.  You give a life sentence, it's a life

6  sentence.  It's up to somebody else whether there is

7  parole or not.  You follow me on that?

8       A.   Yes.

9       Q.   Is that a problem for you?

10      A.   No.

11      Q.   Would you be more likely to give a person on

12  trial a death sentence than a life sentence knowing that

13  there was the possibility in the future of parole?

14      A.   I would really need to hear the evidence

15  before.

16      Q.   Okay.  Because here's what I'm getting at with

17  that, without going -- I can't like give you a bunch of

18  evidence.

19      A.   Right, right.

20      Q.   I guess I could ask you a hypothetical question

21  and it could include some kind of evidence, but I don't

22  think I need to do that.

23           The questions that you would be answered --

24  asked to answer in a capital case, if you were selected

25  on a jury and if you convicted someone, the questions

1  that they just went over, those three special issues,

2  they don't have anything to do with parole.  I mean, you

3  either answer that you believe the person -- there is a

4  probability that he might be a continuing threat and you

5  don't answer that because there is parole law or not a

6  parole law.  You answer it because the evidence either

7  convinces you that there is a probability that he will

8  be a continuing threat to society or there is not.  You

9  follow me?

10      A.   Yes.

11      Q.   Would you be more likely to answer that

12  question "yes," that he will be a threat because there

13  is a possibility of parole in the case, or will you

14  answer that question just based on what the evidence

15  was?

16      A.   I would answer it based on the evidence.

17      Q.   Okay.  So, the parole law wouldn't affect you

18  on your answer to that question?

19      A.   No.

20      Q.   Would it affect you on either of the other

21  questions?

22      A.   No.

23      Q.   Okay.  All right.  If you were where I am and I

24  was up there where you are and I was giving the same

25  answers as you are giving, and by some weird twist of

1  fate you were defending this man or some other man down

2  here, if you heard the answers that you are giving, that

3  you've given this Court today, they were coming out of

4  my mouth, do you think you'd want to take me as a juror?

5  In other words, would you take yourself as a juror if

6  you were --

7      A.   I wouldn't take myself as a juror mostly

8  because I'm not experienced enough or know enough about

9  the law system.  That's just honestly.

10     Q.   You say you wouldn't take yourself because --

11     A.   No, sir.  Just not experienced enough or know

12  enough about the law system to become an efficient

13  juror.

14     Q.   Okay.  Well, I appreciate your response, your

15  honesty in that, but you are a qualified juror.  You

16  are.  And it might not be a bad idea on any jury in any

17  case to have some young people on the jury and some

18  older people on the jury and all different kinds of

19  people on the jury, so that they can evaluate the case

20  together and they might do a good job together coming up

21  with the right answers.

22          So, I'm not the least bit concerned with

23  your age or your experience.  I'm more concerned with

24  the answers that you are giving.  And you're giving the

25  good answers so far.  Anything about the way you feel

1  that -- other than you admitting that you don't have a

2  lot of experience in the legal system, but anything

3  other than that that would cause me concern in taking

4  you as a juror?

5       A.   I don't have anything that I can think of right

6  now.

7       Q.   Okay.  Is there anything that we haven't asked

8  you that maybe we should have asked you, something

9  that's bothering you, or a question you might have?

10      A.   No.

11           MR. CORNELIUS:  Could I have just a second,

12  Judge?

13           THE COURT:  Yes.

14           (Pause)

15      Q.   (By Mr. Cornelius) A couple of more things and

16  I will be done.

17           The Judge talked today a little bit about

18  proof beyond a reasonable doubt.  And she told the jury

19  panel that there is no definition for what beyond a

20  reasonable doubt means.  You remember that?

21      A.   Yes.

22      Q.   It means whatever it means to you; you know,

23  what constitutes proof beyond a reasonable doubt.  Take

24  that special issue right there.  Well, not No. 3.  Let

25  me put it up there.  No. 3 has no burden of proof.

```
 1                    Let's take No. 1.  It says:  Do you find
 2   from the evidence --
 3                    MR. CORNELIUS:  Do you mind if I approach
 4   the easel?
 5                    THE COURT:  No problem.
 6        Q.   (By Mr. Cornelius) Do you find from the
 7   evidence beyond a reasonable doubt that -- and then it
 8   talks about the probability that the person on trial
 9   would be a continuing threat.  This beyond a reasonable
10   doubt, evidence beyond a reasonable doubt is whatever
11   you say that it is.  Some people -- and you could have
12   all 12 people on the jury have a different definition
13   for what it is.
14                    Somebody might say:  I'm a reasonable
15   person, I have listened to all of the evidence, I have
16   listened to the argument of counsel, I have listened to
17   what everybody on the jury has said, and I'm not
18   convinced that the defendant is guilty, or I'm not
19   convinced that's he's going to be a continuing threat.
20   And I have reasonably listened to what everybody has had
21   to say and I'm not convinced and that's my definition of
22   proof beyond a reasonable doubt.  Okay?
23                    Somebody else might say the evidence just
24   isn't there.  There is no motive.  There is no this,
25   this is no that.  Whatever holes there are in this
```

1  juror's mind about the State's case, that causes me to

2  have a reason reasonable doubt in the case.

3           Or it might be a case where there is no

4  evidence to prove what will happen in the future -- and

5  I'm speaking as a juror -- And it's not proven to me

6  that it's going to be a continuing threat to society.

7  That's that person's definition of proof beyond a

8  reasonable doubt.

9           If you had a reasonable doubt -- let's say,

10  hypothetically, you are picked to serve on the jury,

11  it's a capital murder case, you sit in the jury box with

12  the other jurors, and you listen to the evidence in the

13  case, you listen to what everybody has to say, the

14  State's lawyers, the defense lawyers, the rest of the

15  jurors.  And at the end of the day, you are not

16  convinced beyond a reasonable doubt that the person on

17  trial is guilty, could you find him not guilty?

18       A.   I can.

19       Q.   What if you were on the jury and the jury got

20  hung up?  Let's say -- let's say six people thought he

21  was guilty and you and five others thought he was not

22  guilty.  Could you stick to your guns on that?

23       A.   Yes.

24       Q.   I mean, you'd be reasonable and hear what they

25  have to say, but if you weren't convinced, would you

1    stay that way?

2        A.   I would.

3        Q.   What if it was eleven to one and you were the

4    only one holding out?

5        A.   I would still stick with my guns.

6        Q.   Okay.

7                MR. CORNELIUS:  One more minute, if I

8    might.

9                (Pause)

10               MR. CORNELIUS:  We pass the juror, Judge.

11               Can we approach the bench to talk about

12   what happens next?  We haven't talked about --

13               THE COURT:  Could you please take him out

14   to the side?

15               (Venireperson exits courtroom)

16               (At the Bench, on the record)

17               THE COURT:  I think right now we do the

18   strikes.

19               MR. CORNELIUS:  Do our strikes right now,

20   right?

21               THE COURT:  Yes.

22               MR. CORNELIUS:  Some Judges do it right in

23   front of him.

24               MS. TISE:  As far as challenges for cause,

25   if we have a challenge for cause?

```
 1                    THE COURT:  You can do as it comes up and
 2      then just move -- if it's clear, let's do it right away.
 3                    So, ready on this one?
 4                    MR. CORNELIUS:  Ready.
 5                    (Open court, defendant present, no jury
 6                     panel)
 7                    THE COURT:  What says the State?
 8                    MS. TISE:  The State will accept the juror.
 9                    MR. CORNELIUS:  The defense will accept the
10      juror.
11                    THE COURT:  Very good.  All right.  Bring
12      him back in then.
13                    (Venireperson enters courtroom)
14                    THE COURT:  Mr. Caluag, you will be our
15      Juror No. 1 on the capital murder trial in the State of
16      Texas vs. Obel Cruz-Garcia.  I'm going to give you these
17      instructions that you are -- since you are now a juror
18      in this case, you must not read, watch, or listen to
19      anything regarding this case.  You are not to engage any
20      social media outlets, including Facebook, Twitter,
21      etcetera, about your status as a juror in this case.  If
22      you encounter anything about this case, including but
23      not limit to, casual conversation, stories in the media,
24      or exposure to any type of information or from any
25      source, immediately end the encounter.  You may only
```

1   receive information from official court proceedings.  Do

2   not discuss the case with anyone, including other

3   prospective jurors.

4              We'll give you a jury badge today.  And

5   I'll give you this piece of paper, which will give you

6   the contact number for Deputy JJ Perry, and also for our

7   court coordinator, Joey Debruyn.

8              As I described to you earlier, this trial

9   will begin on July 8th.  It's a little ways off, now.

10  And so, there is going to be a period of time that you

11  are waiting before you appear in court to be a juror on

12  the case.  When you do come back, it's not going to be

13  in this courtroom.  It's going to be in my courtroom

14  down on the 15th floor.  That's in the same building,

15  different floor.  And it will have my name on it.  Okay?

16             You will need to be there by 10:00 a.m.,

17  promptly at 10:00 a.m. on Monday, July 8th.  As I said,

18  I anticipate that the testimony will last probably two

19  weeks in this case.  So, be prepared to give at least

20  eight-hour days for the days that you are here.

21             If you need something for work today,

22  Deputy Perry can get that for you.  If you need a bus

23  pass, he can get that for you.  And as well, make sure

24  that you talk to your employer about the time that you

25  will need off, but don't talk to them anything about the

1   details of the case, just that you are on jury duty.

2             Do you understand all of that, Mr. Caluag?

3             VENIREPERSON:  Yes.

4             THE COURT:  Here are the instructions and

5   all your directions on that, sir.

6             THE BAILIFF:  I'll show him where the other

7   courtroom is.

8             THE COURT:  Very good.  Thank you,

9   Mr. Caluag.

10           And then JJ --

11           THE BAILIFF:  Yes, Your Honor.

12           THE COURT:  -- get Mr. Travis Bollom next

13   at your convenience.

14           For the record, Mr. Cruz-Garcia, I want to

15   make sure that you are in agreement with your counsel as

16   to Juror No. 2.  Do you accept him, Joshua Caluag, as a

17   juror on your case?

18           THE DEFENDANT:  Yes, ma'am.

19           THE COURT:  Very good.  Thank you, sir.

20           (Venireperson sworn)

21       **TRAVIS BOLLOM, VENIREPERSON NO. 4,**

22   was called as a prospective juror, and testified as

23   follows:

24               **VOIR DIRE EXAMINATION**

25   **BY THE COURT:**

1      Q.    Mr. Travis Bollom.  And you are Juror No. 4 on

2   the venire panel that was just seated for the State of

3   Texas vs. Obel Cruz-Garcia.  Is that correct, sir?

4      A.    Yes, ma'am.

5      Q.    All right.  This is a continuation of voir

6   dire.  I just want to remind you of that.  And so, there

7   is no right or wrong answers.  Both of the lawyers from

8   either side are going to have an opportunity, about half

9   an hour, to talk to you, if they need that.  They may be

10  going over some of the same questions that I went over

11  on in voir dire, but maybe go a little deeper into them.

12  If you need them to rephrase anything or you don't

13  understand anything, please feel free to stop them and

14  ask them to do so.

15            I just have a couple of questions.  Do you

16  have any religious, personal, or moral reasons you would

17  not be able to sit on a jury where the death penalty is

18  a possible punishment, sir?

19     A.    No.

20     Q.    Do you know of any reason why you could not be

21  fair and impartial to both sides, the State's side and

22  the defendant's side, in a criminal case?

23     A.    No.

24     Q.    Have any of your answers on the questionnaire

25  changed from when you originally filled it out last

1  Friday?

2      A.   No.

3      Q.   Okay.  Very good.  Then I'll turn you over to

4  the lawyers.

5              THE COURT:  Ms. Tise.

6              MS. TISE:  Thank you, Judge.

7                 **VOIR DIRE EXAMINATION**

8  **BY MS. TISE:**

9      Q.   Good afternoon.

10     A.   How are you doing?

11     Q.   It's been a long day, hadn't it?

12     A.   Yes.

13     Q.   I want to ask you some questions.  And if at

14  any point you don't understand the question I'm asking

15  or if it's complicated or convoluted, just let me know

16  and I'll try to rephrase it.  Okay?

17     A.   Uh-huh.

18     Q.   Just relax.  The whole process here is just to

19  kind of get an idea, a little bit more information about

20  you so we can see whether or not you are a fair and

21  impartial juror who could sit on this case and come to a

22  fair and impartial result.

23     A.   Okay.

24     Q.   Sound fair?

25     A.   Uh-huh.

1       Q.   Okay.  So, what did you think when you first

2  got this questionnaire with all these questions on it

3  and you learned that you were potentially going to be on

4  a capital murder case where death was being sought?

5  What was your reaction?

6       A.   I don't know.  Not that much.  It's like -- I

7  don't know -- bigger case, or whatever, but there wasn't

8  too much of a reaction.

9       Q.   Have you ever come down for jury duty before?

10      A.   No.

11      Q.   Well, I can assure that this is not the norm.

12      A.   Yeah.

13      Q.   This is different than the usual case.

14           And it's because the issues are really

15  important and it's important that we kind of know a

16  little bit more about you before we make our decisions.

17  Does that seem okay?

18      A.   Oh, yeah.  Definitely.

19      Q.   Okay.  So, when the Judge explained to you what

20  a capital murder case is and how it's different than a

21  regular murder case, did you follow that?  Because I

22  know it's a lot of information at once.

23      A.   Uh-huh, yeah.

24      Q.   Did you kind of get it?  Where a capital murder

25  is a murder -- a regular murder, but there is an

1  additional aggravating circumstance that bumps it up to

2  a capital.

3       A.   Yes.

4       Q.   And there is only a handful of cases that are

5  eligible to be bumped up to capital murder.  Did you get

6  that?

7       A.   Yes.

8       Q.   Okay.  And some of the cases are things like a

9  murder committed during another felony like a robbery, a

10 kidnapping, a burglary, the murder of a police officer

11 in the line of duty, a murder of a child under 10.

12 Those are some of the things that are out there for

13 death penalty consideration.  Does that seem reasonable?

14      A.   Yes.

15      Q.   Okay.  So, if you were in charge and you could

16 make all the laws in Texas, would you have the death

17 penalty?

18      A.   Sure.

19      Q.   Okay.  And what kind of crimes do you think you

20 would have the death penalty for?

21      A.   Serious -- maybe, you know, if there was -- if

22 someone committed a serious crime, if there was multiple

23 witnesses that like, you know, definitely could say

24 that's exactly what happened.  I think it's good the way

25 it is.

1    Q.   Okay.  So, you like the way we do to it here in

2  Texas?

3    A.   Uh-huh.

4    Q.   Okay.  And you talked about there being

5  multiple witnesses that can say that's the way it is.

6  Do you feel like the State's burden of proof is higher

7  when it's a death penalty case?

8    A.   No.

9    Q.   Okay.

10    A.   It's just...

11    Q.   You'd be right about that.  Our burden of proof

12  is the same as it is in a traffic ticket case, in the

13  death penalty case.  We still have to prove the

14  elements.  We still have to prove them beyond a

15  reasonable doubt, but we don't have to go up to 100

16  percent certainty.  It's just like any other case.

17            Are you comfortable with that?

18    A.   Yes.

19    Q.   You think that's fair?

20    A.   Uh-huh.

21    Q.   Do you believe you can hold us to the burden of

22  just beyond a reasonable doubt and not hold us to a

23  burden of 100 percent certainty because it's such a

24  serious case?

25    A.   Uh-huh.  I can do that.

1    Q.   So, you are not going to elevate our burden?

2    A.   No.

3    Q.   Fair enough.

4         Have you ever been opposed to the death

5    penalty?

6    A.   No.

7    Q.   What about people in your family, do you have

8    anybody in your family close to you who has strong

9    feelings against the death penalty?

10   A.   Maybe my grandma.

11   Q.   Okay.

12   A.   And that would be religious, or whatever,

13   but...

14   Q.   Okay.

15   A.   I don't know.  Not really.

16   Q.   Okay.  On a scale of one to ten, where would

17   you put yourself if you say one is absolutely opposed to

18   the death penalty and ten is 100 percent for the death

19   penalty?

20   A.   Nine or ten.

21   Q.   Okay.  And I want you to take a look over on

22   the other side of the courtroom.  That man sitting

23   across from me is Obel Cruz-Garcia and he has been

24   charged with capital murder.  He is a living, breathing,

25   thinking human being.  He may have family, he may have

1  friends, he may have people who care about him.  Can

2  you, in this case, make a decision and answer the

3  questions "yes" or "no" -- "yes" and "no" if that's

4  where the evidence leads you knowing that those answers

5  will lead to this defendant receiving the death penalty?

6  Can you do that?

7       A.   Sure.

8       Q.   Okay.  I want to talk to you a little bit about

9  what to expect from the trial process.  Okay?  You've

10  never been a juror before, correct?

11       A.   Yes.

12       Q.   So, I just want to point out that in Texas the

13  law says trials come in two parts.  There is a guilt

14  phase and there is a punishment phase.  Okay?  And

15  they're sort of like two separate mini trials where you

16  can hear different types of evidence.  Make sense?

17       A.   Uh-huh.

18       Q.   The punishment phase, there is usually a lot

19  more evidence that's admissible when it comes to time

20  for you to consider what the appropriate punishment is.

21  For instance, a defendant's criminal history.  Usually

22  in the guilt phase of the trial where you are just

23  deciding whether he is guilty or not, those kinds of

24  things, criminal history, good things about his past,

25  bad things about his past, are not admissible.  Okay?

1    Usually.

2              But in a punishment phase, those things can

3    usually come into play because you need that information

4    to decide what the best punishment is.  Make sense.

5         A.   Yes.

6         Q.   Okay.  Just know there is two different phases,

7    two different steps of evidence that you might hear.

8         A.   Okay.

9         Q.   Okay.  In the guilt phase of trial, we

10   basically have a list of elements that we have to prove.

11   We have to prove the date that it happened.  We have to

12   prove that the defendant committed the crime.  We have

13   to prove that the victim was Angelo Garcia, Jr.  We have

14   to prove that it happened during the course of a

15   kidnapping.  And that Angelo Garcia, Jr. was killed.

16   Okay?  Those are all the things that we need to prove as

17   part of our case and they are listed.  Make sense?

18        A.   Yes.

19        Q.   What's important and what I want to emphasize

20   is, is that's what we have to prove beyond a reasonable

21   doubt, that list of elements.

22        A.   Okay.

23        Q.   There is a lot of other things in a criminal

24   case that you might wonder about.  Okay?  There are

25   things that you have to know in order to come to a

1    verdict of guilty.  And they are the things that you

2    wish you knew but aren't maybe available or aren't

3    presented.  Okay?  So, that happens in every case.

4    Everybody wants to have a perfect story where everything

5    is put into place, but criminal cases are handled by

6    human beings, there are things that impact the evidence

7    that you might be presented.  Okay?

8                    So, the burden of beyond a reasonable doubt

9    applies only to the elements, the list of things we have

10   to prove, the date, the time, how it happened, the

11   defendant, those things, and not those other things.  Do

12   you understand that?

13        A.   Uh-huh.

14        Q.   Why do you think that is?

15        A.   So, it's fair.  Like she was explaining earlier

16   how, you know, one thing is a burden and then that

17   doesn't cross over to the other thing.  So, I don't

18   know.  Just so it's fair.

19        Q.   Okay.  In real life, we don't really follow

20   people around and videotape everything that they do.

21        A.   True.

22        Q.   So, we're not going to have the answers to all

23   of your questions, or else we'd have to videotape

24   everybody all day long and catch them doing the crime so

25   you could see it yourself.  Right?

1   A. Uh-huh.

2   Q. You are never not going to have a doubt in a

3 criminal case.  You'll always have doubts and you will

4 always have things that you wonder about.  That's just

5 life.  That's the way it is.  Okay?

6     But the question is:  Do you have a doubt

7 about an element of the case that we have to prove and

8 is it a reasonable doubt?  Those are the questions.

9 Okay?  So, are you comfortable with the fact that at the

10 end of the trial you might have things you wonder about

11 or wish you knew?

12   A. Well, yeah.

13   Q. And can you accept that if it's not an element

14 of the case and set that aside?

15   A. Sure, yeah.

16   Q. Comfortable with that?

17   A. Uh-huh.

18   Q. Okay.  You understand that as the defendant

19 sits here today he has the presumption of innocence?

20 Okay?

21   A. Yes.

22   Q. If you had to vote right now, what would you

23 vote?

24   A. I don't know.  I don't know if I could.

25   Q. Do you have any evidence?

 1       A.   No.

 2       Q.   Okay.  So, do you have anything to base a

 3   verdict on?

 4       A.   No.

 5       Q.   And you have to give him the benefit of the

 6   doubt until we prove it.

 7       A.   True.

 8       Q.   That's just the way it works.  We're here

 9   willingly to carry our burden.  And we ask you to put us

10   to our burden.  We have to prove it to you.  Are you

11   comfortable with that?

12       A.   Yes.

13       Q.   And can you presume him innocent as he sits

14   here right now?

15       A.   Yeah.

16       Q.   The fact that he is indicted, that's just a

17   piece of paper.

18       A.   True.

19       Q.   Okay.  You have heard no evidence.

20       A.   No.

21       Q.   And you understand that throughout the trial

22   process the defendant doesn't have a burden at all.  His

23   attorneys can sit silent.  I guarantee you they won't,

24   but they could sit silent.  And if I don't prove my

25   case, you have to find him not guilty.

```
 1        A.   Okay.

 2        Q.   And that's the law and I accept that.  And I

 3   ask you if you can accept that as well?

 4        A.   Yes.

 5        Q.   He doesn't have to put on any evidence.

 6        A.   Okay.

 7        Q.   Not in the guilt or the punishment phase.  Is

 8   that okay with you?

 9        A.   Yes.

10        Q.   That includes he doesn't have to testify.

11   That's his Fifth Amendment right.  What do you think

12   about that?

13        A.   I don't know.  I think -- I think I would want

14   to -- you know, if it was my -- if I was on trial, but I

15   can respect that he wouldn't want to.

16        Q.   Okay.  Let me just say this.  It's perfectly

17   acceptable for you as a juror to wonder what he has to

18   say, but you cannot hold it against him if he does not

19   testify under the law.  If you think that you will, it's

20   okay if you feel that way, but you need to tell me.

21        A.   Okay.

22        Q.   The law says you can't hold him exercising his

23   right not to testify against him ever.  If he doesn't

24   have anything to say, you can push me over the top

25   because he didn't explain.  Can you do that?
```

1      A.    Sure.

2      Q.    You can agree that you will not hold the

3  exercise of his right not to testify against him if

4  that's what he wants to do?

5      A.    Yes.

6      Q.    Are you sure?

7      A.    Uh-huh.

8      Q.    What kinds of evidence do you think we might

9  have to -- might present to you in a capital murder

10  case?  What do you think you might see or hear?

11      A.    Lots.  I don't know.  Anything.  The weapon,

12  you know, video, pictures, all sorts of stuff.

13      Q.    Okay.  The law has us proving the elements and

14  sometimes we might have pictures and sometimes we might

15  have videos, sometimes we might not.  Sometimes we might

16  have proof that comes to you of the elements through

17  witness testimony and you might not have a picture.

18  Because thinking about it, most capital murder

19  defendants are not going to commit their crime on

20  camera.  Right?

21      A.    True.

22      Q.    Are you comfortable with that?

23      A.    Yes.

24      Q.    So, if you have witnesses who come in and tell

25  the story to you, can you base a verdict on witness

1  testimony if you believe those witnesses beyond a

2  reasonable doubt?

3       A.   Sure.

4       Q.   Okay.  And you might not have any physical

5  evidence.  Would you be comfortable with that or do you

6  think that because the stakes are so high you are really

7  going to want to have some physical evidence?

8       A.   It can be on witness testimony.

9       Q.   Okay.  What do you think about scientific

10  evidence?  Do you have any ideas about what kind of

11  scientific evidence you might hear?

12       A.   DNA.

13       Q.   Okay.

14       A.   I don't know.  I guess that would be blood

15  also, or whatever.

16       Q.   Okay.  Do you have any preconceived ideas about

17  DNA evidence or anything about that that I need to know?

18       A.   It's more conclusive.

19       Q.   Okay.

20       A.   Pretty much all I know.

21       Q.   Okay.  And it has to be tested, just like

22  anything else.  You have to listen to the experts who

23  talk about it, if there were DNA, and decide whether or

24  not you believe it.

25       A.   Okay.

1    Q.   Would you be able to do that?

2    A.   Yes.

3    Q.   What do you think about police officers?  They

4    may be witnesses in a case.  Do you have any feelings

5    about police officers one way or the other?

6    A.   It's their job to uphold the law.  I trust

7    them.

8    Q.   Okay.  When you say you trust them, the law

9    says that police officers, when they come into the

10   courtroom, they are just like everybody else.

11   A.   Okay.

12   Q.   They are human beings, just like me and you.

13   Some of them are honest, some of them are not.  And you

14   have to wait until they testify to decide whether you

15   believe them or not.  You have to hear about their

16   qualifications and judge their testimony, just like

17   anybody else's.  Some people have trouble doing that.

18   How do you feel about it?

19   A.   That's the way it should be, I guess, that, you

20   know, their testimony wouldn't be any higher than anyone

21   else's that was involved.

22   Q.   Right.  You can give them more credibility

23   after you hear them.  If you go:  Man, he really knows

24   his stuff, I really like that police officer, I have a

25   lot of faith in him.  You might think you have more

 1  faith in him than someone else who testifies, but you

 2  have to wait until they testify to decide that.  Make

 3  sense?

 4      A.  Yes.

 5      Q.  Because otherwise you are just judging a book

 6  by its cover, right?

 7      A.  True.  Yes.

 8      Q.  Okay.  Some of the evidence you might not get

 9  in a capital murder case that I want you to know about

10  is offense reports and witness statements.  Those kinds

11  of things are not admissible.  Those things are pieces

12  of paper that might have a summary of the case on them,

13  but the law says live witnesses have to come in and tell

14  you the story.  I can't just offer an offense report and

15  say:  Here it is, decide.  Or a witness statement.  They

16  have to come take the stand.  So, I want you to know

17  those are things that you won't see.

18      A.  Okay.

19      Q.  Fair enough?

20      A.  Sure.

21      Q.  Also, a lot of times officers get information

22  through confidential informants or tipsters or Crime

23  Stoppers' tips.  Those people have confidentiality and

24  you probably won't see or hear from them.

25      A.  That's a good thing.

1       Q.    That's right.   Seem fair?

2       A.    Yes.

3       Q.    And the Judge talked to you a lot about the law

4    of parties, accomplices, co-conspirators.   Those kinds

5    of terms, we hear those a lot on crime shows and those

6    kinds of things.   Did you understand when she was

7    explaining the law --

8       A.    Uh-huh.

9       Q.    -- on accomplices to you?

10      A.    Yes.

11      Q.    Okay.   Sometimes we have parties or accomplices

12   come in and testify.

13      A.    Okay.

14      Q.    A lot of times, if they want to testify, they

15   want to testify in exchange for a deal.   So, depending

16   on whether a deal can be worked out, you might or might

17   not hear about that.

18      A.    Okay.

19      Q.    Make sense?

20      A.    Yes.

21      Q.    If we don't think we want to make a deal with

22   that person, maybe we won't put them on the stand.

23      A.    Okay.

24      Q.    Okay.   I can tell you if a person has a deal to

25   testify, if we give them a deal in exchange for their

1    testimony, you will hear about it.

2         A.   Okay.

3         Q.   So, don't assume that there is a deal.  You

4    will know it.  It will be presented to you through

5    testimony.

6         A.   Okay.

7         Q.   Okay?

8         A.   Uh-huh.

9         Q.   If you don't hear about it, there is no deal.

10              When you have multiple people who commit a

11   crime, did you understand that there is the person who

12   actually commits the murder, who pulls the trigger or

13   wields the knife or strangles the person -- okay --

14   there is that person, but if there is somebody else who

15   assisted them, who aided them, who encouraged them,

16   there is a whole litany of things that they can do that

17   would make them a party, but it boils down to they

18   helped -- okay -- in some way.

19        A.   Uh-huh.

20        Q.   That person is guilty of the murder the other

21   person committed because they helped them do it.  Okay?

22        A.   Okay.

23        Q.   Make sense?

24        A.   Yes.

25        Q.   And it could be that they helped them before.

1  It could be that they gave them the money to buy the gun

2  to kill the person, knowing that the other person was

3  going to do that.

4       A.   Okay.

5       Q.   Okay.  They don't even have to be there.

6       A.   Uh-huh.

7       Q.   It will be up to the jury to look at the level

8  of involvement of the person and see how significant it

9  is to you.  How much do you think they are involved and

10  what weight do you want to give that?  But at the end of

11  day, they're all guilty of the murder if they assisted

12  and you find that from the evidence.  Sound fair?

13       A.   Yes.

14       Q.   Okay.  With co-conspirators, that's when people

15  agree.  They go out and say:  We're going to commit

16  crime X.  We're going to rob the bank together.  Okay?

17  Me and you.  Nobody is saying anything about a murder in

18  there, did they?  They just said:  We're going to go rob

19  a bank.  Let's say Justin and I do that.  And Justin is

20  going to be the guy who goes into the bank and I'm going

21  to sit outside and watch to make sure the cops don't

22  show up.  Got it?

23       A.   Uh-huh.

24       Q.   So, Justin goes in there and he takes a loaded

25  gun and I know he as a loaded gun.  Do you think that

 1   it's reasonable to assume that I might think something

 2   bad could happen with that loaded gun?

 3        A.   Sure.

 4        Q.   Okay.  And Justin could go in there and kill

 5   someone.  Do you understand that I'm equally responsible

 6   for that?

 7        A.   Yes.

 8        Q.   Okay.  The only exception would be if I have

 9   the opportunity to talk to Justin.  Let's say I followed

10   him in and got worried about him because he had been in

11   there too long.  And Justin says to me:  Man, this is

12   getting out of control, I'm going to kill some of these

13   people.  And I go:  Uh, no, we're not doing that.  I

14   don't want any part of that.  Then I'm abandoning the

15   conspiracy.  So, I might not be responsible for his

16   actions anymore.  Make sense?

17        A.   It would be hard to prove, but, yeah, it makes

18   sense.

19        Q.   Right.  Got it?

20        A.   Uh-huh.

21        Q.   Okay.  This is a cold case.  You heard it

22   happened in 1992.  What kinds of things do you think

23   might happen when a case is cold?  What kind of

24   evidentiary problems do you think might come up?

25        A.   I don't know about the evidence, but like the

 1   witnesses and stuff, that they have to bring that back

 2   into account.  You know, they have to remember and they

 3   have to -- it becomes, you know, like it was yesterday.

 4   They have to relive it all.

 5        Q.   Sure.

 6        A.   It could change -- I don't know about the

 7   evidence, though.  Like, I don't see it changing.

 8        Q.   Okay.  Sometimes, you're right, memories fade.

 9   That can happen.  In addition, sometimes people die,

10   they move away.  There are lots of things that can

11   happen to your witnesses in 20 years.  In addition,

12   evidence can be lost, a body might be out there for

13   many, many years and deteriorate.

14        A.   True.

15        Q.   So, proof of cause of death might not be there

16   anymore.  You can't take bones and decide this was a

17   strangulation like you can when you have a fresh, you

18   know, person that hasn't been abandoned for a long

19   period of time.  See how that works?

20        A.   Yes.

21        Q.   The law lets us plead our case unknown manner

22   and means.  Okay?  We don't have to prove it was a

23   gunshot or strangulation or stabbing.  We can say we

24   don't know how it happened.  We know it was a homicide,

25   but we don't know how it happened.  And the law allows

1    us to do that.

2              In this kind of case, a cold case, is one

3    of the reasons for that.  Sometimes you don't even find

4    a body.  You see how that might --

5         A.   Yes.

6         Q.   -- make it hard to say here is the cause of

7    death?

8              Are you comfortable with an unknown manner

9    and means, not knowing the actual cause?

10        A.   Sure.

11        Q.   As long as I prove the other elements of my

12   case?

13        A.   Uh-huh.

14        Q.   And I'm not saying by bringing this to you that

15   you should give us a pass because it's a cold case.

16   That's not what I'm saying at all.  I'm saying there are

17   elements to prove and I'm asking you to look at those

18   elements and decide whether we prove it beyond a

19   reasonable doubt.  If we don't, you have to let him

20   walk.  But don't put extra burdens on us that the law

21   doesn't require.  Can you promise me you won't do that?

22        A.   Yes.

23        Q.   One of the things I don't have to prove is

24   motive.  The law does not require it.  And that might be

25   one of the things in your I-wonder-what-this-is column,

1    but it's not an element.  So, you may wonder, but will

2    you promise me you won't hold me to a burden to prove

3    those I-wonder questions if they are not on the elements

4    list?

5         A.   Yes.

6         Q.   Who is it that you think decides what the

7    evidence will be in a case?

8         A.   I don't know.  I mean...

9         Q.   Do you think I decide?  I want this wonderful

10   witness and this person --

11        A.   Oh, I see what you're saying.  It has to be

12   fair and it has to be, you know, decide by both sides

13   what is brought to everyone's attention and what is not.

14        Q.   Well, you are right, there are rules for what

15   can be brought up.  You are exactly right, for what's

16   admissible.  But, ultimately, the person who decides

17   what evidence will be left behind at his crime scene is

18   the defendant.  Right?

19        A.   Uh-huh.

20        Q.   If he doesn't want to leave fingerprints, he

21   wears gloves.  If he doesn't want to leave DNA, he wears

22   a condom.  If he doesn't want anybody to see, he waits

23   till no one is around.  Make sense?

24        A.   True.

25        Q.   I don't control the evidence.  Mr. Cornelius

1   and Mr. Madrid don't control the evidence.  The evidence

2   is what the defendant chooses to leave behind.  And

3   that's why it's important that you only look at the

4   elements.  And that's all that I have to prove.  And the

5   I-wonders are things that you have to set aside and

6   focus on what has to be proved.  It's like a puzzle.

7   There's potential pieces that you have to have and those

8   are called the elements.  You might wish you had all of

9   the other pieces so that you had a nice pretty picture,

10  but at the end of the day, if you have the pieces that

11  are essential and are required by the law, and you

12  believe them, and you can determine who the guilty party

13  is by looking at that picture that you have, that's all

14  the law requires.  I want to know if that's all you

15  would require.

16       A.   Sure.

17       Q.   Are you comfortable with that?

18       A.   Yes.

19       Q.   Okay.

20            MS. TISE:  May I approach, Judge?

21            THE COURT:  Yes.

22       Q.   (By Ms. Tise) I told you that the punishment

23  phase of the trial is a whole second independent trial.

24  And you might have other evidence presented to you.  And

25  the issues that you are going to be deciding in the

1    punishment phase, there are three special issues.  Okay?

2    And the first one that you will be presented with is

3    what we call the continuous threat issue or future

4    danger.

5         A.   Okay.

6         Q.   And so, there is framework for having the death

7    penalty.  You just don't go back there and go:  Who

8    votes for death, who votes for life.  You get that?

9         A.   Yes.

10        Q.   There are questions that you have to answer

11   that leads you to one result or another.  The most

12   important thing I want to remember about those special

13   issues is that you have to be open-minded throughout the

14   process in order to be a juror.

15        A.   Okay.

16        Q.   If you can't do that, now is the time to let us

17   know.  Can you do that?

18        A.   Sure.  Yeah.

19        Q.   Okay.  The first issue is the continuing threat

20   issue.  All right?  And there are some things I want you

21   to think about.  First of all, I have the burden --

22   Justin and I have the burden of proof on this issue.  We

23   have to prove to you that Obel Cruz-Garcia is a

24   continuing threat to society.  Okay?  It's on us.  The

25   defense doesn't have to come in here and say:  Oh, no,

1  he is not a threat.  We have to prove it.  Okay?

2       A.   Okay.

3       Q.   Are you comfortable with that?

4       A.   Sure.

5       Q.   All right.  It says here that I have to prove

6  that is a probability that the defendant will commence

7  criminal acts of violence.  Okay?  Probability.  What

8  does that word mean to you?

9       A.   It could happen, it could not happen.

10      Q.   Okay.  Some people say it's not a possibility

11 and it's not a certainty, it's somewhere in the middle.

12 Greater than 50 percent.  A probability.  Are you

13 comfortable with that?

14      A.   Sure.

15      Q.   Okay.  So, also it's commit criminal acts of

16 violence.  That doesn't say criminal acts of violence,

17 in other words he will go out and murder somebody else.

18 I don't have to prove that to you.

19      A.   Sure.

20      Q.   It doesn't even say that I have to prove he

21 hurt another human being, does it?

22      A.   Uh-huh.

23      Q.   It's any act of violence.  It could be a

24 property crime.  I went out and slashed somebody's tires

25 because I was mad at them.  Do you understand that

1  that's what criminal acts of violence --

2       A.   Uh-huh.

3       Q.   -- could be?

4            And also that society is another important

5  consideration.  Okay?

6       A.   Okay.

7       Q.   Criminal acts of violence that would constitute

8  a continuing threat to society.  Now, a lot of people

9  go:  Well, he's in prison.  Society is not affected.

10 How is he going to hurt society?

11           Well, society includes anyone, anywhere, at

12 any time.  And that includes people in prison.

13      A.   Sure.

14      Q.   It includes cellmates.  It includes guards.  It

15 includes clergy, social workers, clinicians, all kinds

16 of people who work in the prison system.  Are you open

17 to considering all kinds of people --

18      A.   Sure.

19      Q.   -- as society?

20      A.   Uh-huh.

21      Q.   This case is a death penalty case that happened

22 in 1992.  So, we'll be going under 1992 law.  What that

23 means is there was no life without parole on a capital

24 murder back in '92.  There was none.  So, in this case,

25 the defendant will be sentenced to either the death

1   penalty or life in prison with the possibility of parole

2   after a certain number of years.

3               Now, nobody can predict what the parole

4   board will do or whether he will get parole.  Okay?  But

5   you need to know that that is the law that we're dealing

6   with.  We're not dealing with the life without parole

7   statute.  Okay?

8       A.   Why?

9       Q.   Because the Legislature changed it recently.

10      A.   No.  I understand that, but why -- if the crime

11  was committed then, why do you go by the laws that were

12  in place then?

13      Q.   That's a decision our Legislature made.  That's

14  Texas law, that you go by the law at the time.  It gives

15  him notice that if he commits a crime.  You don't expect

16  a defendant -- it's fairness to the defendant.  He can't

17  predict the future and know what the law might

18  ultimately be.  He needs to know what the law is at the

19  time he commits the crime, what his possible punishment

20  could be.  Does that make sense?

21      A.   Sure.

22      Q.   But that's what the law is.  We go by 1992.  Do

23  you understand this issue?

24      A.   Uh-huh.

25      Q.   So, one other thing I wanted to talk to you

 1  about.  You have to consider this issue independently.

 2      A.  Okay.

 3      Q.  You can't say to yourself:  Man, I just

 4  committed -- convicted him of capital murder, we just

 5  found him guilty.  Now we're going back here to consider

 6  punishment.  Of course I'm going to say "yes" to this.

 7  Of course he is going to be a threat to society.  I just

 8  convicted him of capital murder.  The law says you can't

 9  do that.  The law says you have to step back and start

10  fresh and go back and look at the evidence again with an

11  open mind to answer this.

12           Are you comfortable with that?

13      A.  Sure.

14      Q.  Okay.  You can, however, base your answer to

15  this question on the evidence you heard in the guilt

16  phase alone, the crime.

17           Do you know about the Candy Man case?  You

18  are too young for that.

19      A.  I have heard of it, but I don't really recall

20  it.

21      Q.  It happened a long time.  And that case is

22  about a guy who poisoned his son's Halloween candy to

23  collect the insurance money.  Changed Halloween for

24  people all over the place.  In that case, the death

25  penalty was on the table.  Okay?  Now, that man had no

1    criminal history, was a stellar citizen, never done a

2    crime in his life, but the jury looked at the evidence

3    and gave him the death penalty because they decided

4    anyone who would do that crime, that crime is so bad, he

5    had to be a danger to others.

6         A.    True.

7         Q.    And you're allowed to do that.  You have to

8    step back and see this anew, you have to have an open

9    mind, you can't have your mind made up going in, but

10   looking at it anew, you can look at all of the evidence

11   of the murder in this case and say to yourself:  Anybody

12   who did that is a future danger now that I look at it

13   fresh.

14        A.    Uh-huh.

15        Q.    Fair?

16        A.    Yes.

17        Q.    Okay.

18             THE COURT:  Three minutes, Ms. Tise.

19             MS. TISE:  Thank you, Judge.

20        Q.    (By Ms. Tise) The second issue that you will be

21   considering -- and it really goes back and asks you to

22   revisit the whole parties theory.  It asks you, if you

23   find the defendant is not the one who actually wielded

24   the gun or the knife, not the actual killer, you have to

25   also find that either -- if he wasn't the actual killer,

1  you have to find that either there is evidence to show

2  that he intended to kill the deceased or there is

3  evidence to show that he anticipated that a human life

4  would be taken.  So, it asks you to go back and look at

5  that party issue again.  And, again, you answer it fresh

6  based on the evidence.

7       A.   Okay.

8       Q.   Okay?  Make sense?

9       A.   Yeah.

10      Q.   And the third special issue is dealing with

11  mitigation.  And this is an issue where there is no

12  burden of proof.  It's nobody's burden, but it asks you

13  to look at it again with an open mind, look at it fresh,

14  don't base your answer to this question on your answer

15  to the other questions.  This is a new question.  Just

16  because you found him a future danger, just because you

17  found him guilty of capital murder, doesn't mean you

18  automatically say:  Well, there's never going to be

19  sufficient mitigation issue for me.  Fair?

20      A.   Yes.

21      Q.   The mitigation could be a lot of things.  And,

22  ultimately, it will be up to you jurors to decide

23  whether you think it's sufficient.  A talented defense

24  attorney can come to you and take one issue and say it's

25  mitigating, and on the other hand it could be

1   aggravating.

2              For instance, let's say there is evidence

3   presented to you that the defendant is a life-long drug

4   user.  Some people might say that's mitigating.  Some

5   people might say that's aggravating.  There might be

6   evidence to you that the defendant came from a broken

7   home.  Or there could be evidence that he came from a

8   nuclear family.  They're all here and love him and

9   support him.

10             You see how that's two sides of the same

11  coin?  And a skillful person can come in and go:  Oh,

12  the broken family is mitigating; oh, the nuclear family

13  that loves each other is mitigating.  It's all how you

14  look at things.  The bottom line is, it will be up to

15  you to decide whether it's mitigating.  And the question

16  will be whether it's sufficiently mitigating.

17  Sufficiently mitigating in light of the crime and all

18  the other evidence that you know about the defendant.

19             Do you see how that works?

20      A.   Yes.

21      Q.   Are you comfortable with that?

22      A.   Yes.

23      Q.   Okay.  I saw in your questionnaire that you

24  have a criminal mischief in your background.

25      A.   Uh-huh.

1      Q.   A long time ago.

2      A.   Yes.

3      Q.   Actually, it started out as carrying out a

4  weapon and I think it was reduced to criminal mischief.

5      A.   Yes.

6      Q.   Reckless conduct.  Can you tell us what

7  happened with that?

8      A.   There were some guys that -- they said they

9  were going to rape this girl that was in the house with

10  us if they got to her and they showed up and tried to

11  break in.  And me and the homeowner both had guns, you

12  know, in case.  And I was trying to -- well, we had

13  already called 911, and, I guess, the police were on

14  their way.

15      Q.   Okay.

16      A.   And I was trying to explain to the police

17  officer that they were sitting, you know, down the

18  street watching what was happening right now.  And he --

19  I don't know.  Something clicked.  I don't know what,

20  but I remembered that I had a loaded gun in my -- right

21  in my waistband.  And I didn't want to be holding it any

22  more talking to him.  And I pulled it out and kind of

23  shoved it at him and...

24      Q.   Shoved at who?

25      A.   The police officer.

1      Q.   Okay.

2      A.   And told him to take it away.  And that wasn't

3  good.

4      Q.   Oh, yeah.  What happened?

5      A.   I got arrested.

6      Q.   Okay.  And what happened on your case?

7      A.   I told them what -- you know, I told them what

8  the situation was and what happened and it got

9  downgraded.

10      Q.   Anything about that experience that you think

11  would come with you into the jury room on this case?

12      A.    Not really.  I just -- just that I know how

13  things work a little bit better, I guess.

14      Q.   Okay.  Your case got reduced and you got a

15  probation, I think, or -- what did you get?

16      A.   It's been a long time.

17      Q.   A fine

18      A.   I think I just got a fine.

19      Q.   Okay.

20      A.   I think it was like a 200-dollar fine.

21      Q.   Okay.

22      A.   I can't really remember, though.

23      Q.   Okay.  You said some things on your

24  questionnaire that we talked about during your voir

25  dire.  And I want to know if you still feel this way.

1   Do you still feel that if we bring a case against

2   someone then they're probably guilty?

3         A.   There wouldn't be a case if they weren't.

4   Yeah.

5         Q.   Okay.  So, remember we were talking about the

6   presumption of innocence earlier, how as he sits here he

7   is presumed innocent until you hear the evidence proving

8   otherwise?

9         A.   Yeah, I understand that.

10        Q.   Do you still feel that way or do you want to

11  talk a little bit more about that?

12        A.   No.  I understand.

13        Q.   Okay.  So, do you feel like just because he is

14  here he is guilty?

15        A.   No.  I don't know.  That's kind of confusing.

16  I'm not saying that just because he's here he is guilty.

17  I'm saying that, you know, it's very possible because

18  there wouldn't be evidence and everything else that was

19  saying so.

20        Q.   Okay.  Well, I have to present the evidence to

21  prove him guilty.

22        A.   Sure.

23        Q.   Okay.  And you, as a juror, would have to

24  presume he's guilty unless it's proven -- I mean,

25  presume him innocent.  I'm sorry.  Presume -- and you

1  had the appropriate reaction.  Presume he's innocent

2  unless I prove it.

3       A.   Yes.

4       Q.   You said you can do that?

5       A.   Yes, ma'am.

6       Q.   Okay.  You understand that the fact that he is

7  here means nothing?  There is probable cause, but that

8  is not the kind of proof that you need as a juror to

9  determine guilt or innocence?

10       A.   Yes, ma'am.

11       Q.   And are you going to -- are you going to go

12  back in the jury room thinking, well, he's probably

13  guilty, or are you going to go back in the jury room

14  thinking the State has to prove it to me?

15       A.   That you have to prove it to me.

16       Q.   And you also said he had to present some

17  evidence.  And we talked about that earlier.  Do you

18  still feel that it's my burden and recognize that the

19  defense -- now that you've heard all of the Judge's voir

20  dire and kind of got the benefit of that, are you

21  comfortable with the fact that they don't have to prove

22  anything?

23       A.   Yes.

24       Q.   And you even circled that on your form, that

25  you believe that.  You also said that you'd like to hear

1  him testify, but now that you've heard the Judge's voir

2  dire and we've talked about that, are you comfortable

3  with the fact that he doesn't have to?

4      A.   Yes.

5      Q.   And you said you would tend to believe a law

6  enforcement officer over a civilian witness.  And we

7  talked about that.  Are you comfortable about the fact

8  they should be treated equally under the law?

9      A.   Yes.

10     Q.   Can you do that?

11     A.   Yes.

12     Q.   You also noted that you have a wife that's

13  expecting?

14     A.   Yes.  Well, she's not my wife, but, yes.

15     Q.   Okay.  But you're suspecting a child?

16     A.   Yes.

17     Q.   Are you going to be able to be here and be

18  present if you are asked to be a juror on this case and

19  give your full attention to the trial?

20     A.   Sure.

21     Q.   Okay.

22     A.   The only thing -- well, the only thing I worry

23  about, it's pretty expensive like right off the bat and

24  not getting paid for two weeks would be a little bit

25  hard, but...

1      Q.   I understand.

2      A.   But other than that, no.

3      Q.   Is that something that would keep you from

4   having an open mind and listening to the evidence in the

5   case?

6      A.   No.

7      Q.   Okay.  You also mentioned that you had a friend

8   in prison for theft.  Is there anything about that

9   situation that you would bring to the table if you were

10  a juror?

11     A.   No.

12            MS. TISE:  I'll pass the juror.

13            THE COURT:  Mr. Cornelius, you may proceed.

14                **VOIR DIRE EXAMINATION**

15  **BY MR. CORNELIUS:**

16     Q.   Mr. Bollom -- am I pronouncing that correctly?

17     A.   Yes, sir.

18     Q.   My name is Skip Cornelius.  Mario Madrid is

19  over here to my right.  And my client is kind of behind

20  me to my right.  The Judge introduced us to you, but I

21  wanted to introduce us again.

22            Okay.  Let me just sort of cut to the chase

23  here.

24     A.   Sure.

25     Q.   I know you got this questionnaire to fill out

1    last Friday and you didn't have the Judge's comments.

2    You just filled it out, answered the questions as you

3    saw fit at the time.  But you know yourself --

4    obviously, I don't know you.  Can you see that it would

5    cause me some concern if you checked -- or, actually,

6    circled the one that said:  I would tend to believe a

7    law enforcement officer over a civilian witness?  I

8    mean, that's what you felt last Friday, right?

9         A.   Okay.  The way I presume that is, you know,

10   officers are -- I would think they would be a better

11   witness, they can recall.  You know, maybe they wrote it

12   down right away and another civilian wouldn't have.

13   That's all I took as...

14        Q.   Okay.  That would be a good reason.  That's a

15   good answer for that.  I accept that.

16             The "C" that you circled:  If the

17   prosecution goes to the trouble to bring someone to

18   trial, the person is probably guilty.

19        A.   Okay.

20        Q.   So, that's the way you felt last Friday.  Why

21   would you feel differently today?

22        A.   Just the way everything has been explained and

23   how they're innocent until proven guilty.

24        Q.   You never heard that before?

25        A.   No, but I -- I've never been here before.  I

1  don't know.

2      Q.   Well, I know that you are smart enough to

3  figure out how these questions are supposed to be

4  answered, particularly the ones the Judge told you.

5      A.   Sure.

6      Q.   I just want you to be honest with me.  I mean,

7  I'm not going to be upset with you.  If you and I don't

8  agree on something, that's fine.  I don't expect you to

9  agree with the way I feel about things, but I don't want

10 you coming off how you really feel just to go along and

11 get along with our process here.

12     A.   Okay.

13     Q.   Because if you really think that somebody

14 that's indicted for capital murder, there's got to be

15 some evidence to prove that and you really think that

16 tends to cause you to think they are guilty, I want to

17 honestly admit that.  If you don't really feel that way,

18 I accept that, too.  I'm going to accept whatever you

19 tell me, but I know you felt that way Friday and now

20 you're saying something different.

21     A.   Can you read me that question?

22          MR. CORNELIUS:  Can I approach the juror,

23 Judge?

24          THE COURT:  Sure.

25     A.   Or I read it myself.

1        Q.   (By Mr. Cornelius) See, this -- not the

2   original, but it's a copy.

3        A.   Okay.

4        Q.   These ones right here.   That's Question 71 and

5   the answers (indicating).

6        A.   I don't know.   I think I would -- I think I

7   answered that way because of the way it's written, that

8   they go through the trouble to bring someone to trial.

9   Of course, there's a possibility that they are guilty,

10  but it's about the same amount of possibility that they

11  are not.   So, I would have not circled that one if I had

12  been thinking that way.

13       Q.   Okay.   But I'm concerned with the way -- and

14  please don't think I'm arguing with you.

15       A.   Sure.

16       Q.   I'm concerned with the way you really were

17  thinking on Friday.

18       A.   Okay.

19       Q.   And worried that you might be thinking that way

20  still.   And not upset with you if you are.   I mean,

21  congratulating you for your honesty, however you are

22  asked the questions, but, you know, if you felt Friday

23  that if the prosecution took the trouble to take someone

24  to trial they are probably guilty, I don't know why you

25  would feel differently today.

1       A.    I don't know.   I think rereading it, just -- I

2   don't know.

3       Q.    Okay.   The next one, the "D:"   A defendant in a

4   criminal case should be required to present some

5   evidence to prove his innocence.

6       A.    I didn't know the law, that they didn't have

7   to.   And that's pretty much all I have to say about

8   that.

9       Q.    But Friday you thought they would have to

10  prove -- they would have to bring some evidence to prove

11  their innocence and today you don't?   You've never heard

12  of the presumption of innocence until today?

13      A.    Well, yes, but I didn't know they didn't have

14  to bring any evidence.

15      Q.    Okay.   How could they be presumed innocent --

16  how could they be presumed innocent if they have to

17  prove their innocence?

18      A.    True.

19      Q.    I'm not fussing at you.   I'm trying to get how

20  you're thinking about that.   You can see that that's --

21  so far three questions are complete shifts today than

22  the way you felt Friday.   Three different things, three

23  shifts.   And I'm wondering have you really shifted your

24  thinking or are you just trying to answer the questions

25  correctly like the law says?

1       A.   I'm not trying to answer the questions

2   correctly, but -- I don't know -- after going over

3   everything we have gone over today, I understand what --

4   I don't know.

5       Q.   You understand what the law says?

6       A.   Yes, sir.

7       Q.   I think you clearly do.  My issue, though, my

8   question is -- and I know you understand what the law

9   says, but do you actually feel that way?

10      A.   Yes, I do.

11      Q.   So, what's changed between Friday and today,

12  other than learning what the law says?  What changed the

13  way you feel?

14      A.   I don't know.

15      Q.   Go to question -- down to "G:"  If a defendant

16  does not testify in a case, I will lean towards guilty

17  because he did not testify.

18      A.   Okay.

19      Q.   So, that's the way you felt Friday?  And is

20  that not the way you feel today?

21      A.   Well, the same thing.  After hearing, you know,

22  that -- it was earlier today that maybe they -- maybe

23  someone told him, you know, you don't need to testify.

24  That would be why I would change my mind.

25      Q.   So, you have changed your mind on that.  Okay.

1          MR. CORNELIUS:  May I approach the witness

2    {sic} again?

3          THE COURT:  Yes.

4     Q.   (By Mr. Cornelius) I will give this back to you

5    if you need it, but a couple more inquiries if I might.

6    On the issue of capital punishment, there was a series

7    of questions that you can agree with or not agree with.

8    And one said:  Any person, man or woman, young or old,

9    who commits capital murder should pay with his own life.

10   And you also had checked, before that, No. 4 that says

11   you are in favor of capital punishment except in a few

12   cases where it may not be appropriate.  And, I would

13   usually vote for the death penalty in a case where the

14   law allows me to do so.

15          You remember checking those?

16    A.   Yes.

17    Q.   And you are entitled to have a very strong

18   opinion about capital punishment.  I'm not trying to

19   change it in any way.  I'm just -- it looks like you are

20   very strong on capital punishment, which you can be, but

21   I'm wondering if my client can get a fair trial with

22   someone that feels as strongly as you do about it.  Not

23   trying to change your opinion.

24    A.   Yes.

25    Q.   You see where I'm going?  I don't want to lose

```
 1  before I've even started.
 2      A.   I understand.
 3      Q.   You also checked the box that says:  Capital
 4  punishment gives the criminal what he deserves.  Capital
 5  punishment should be available as punishment for more
 6  crimes than it is now.  Do you remember checking that
 7  one?
 8      A.   Sure.
 9      Q.   Is that how you feel?
10      A.   Sure.
11      Q.   It says:  I believe the death penalty in Texas
12  is used -- you checked the one that said:  Not often
13  enough.
14      A.   Okay.
15      Q.   Right?
16           Not fussing with you, but that's how you
17  feel, right.
18      A.   Sure.
19      Q.   So, as we sit here today, are you going to say
20  that you can presume that my client is not guilty?
21      A.   No, sir.
22      Q.   You can't say that?
23      A.   You said not guilty?
24      Q.   Yes.
25      A.   Yes, that he is not guilty.
```

1      Q.   Okay.  And if you were to convict him in this

2  case you haven't already committed yourself to giving

3  him the death penalty?

4      A.   No, sir.

5      Q.   All right.

6             MR. CORNELIUS:  May I put one of the

7  posters up, Judge?

8             THE COURT:  Yes.

9      Q.   (By Mr. Cornelius) Here is the question that we

10  ask a lot of people.  Assume with me that you are

11  selected to serve on a capital murder jury.

12      A.   Okay.

13      Q.   A capital murder case.  And in that case, you

14  hear the evidence.  And whatever the evidence is, that's

15  enough to convince you that the person on trial is

16  guilty and you and the other 11 jurors convict him of

17  capital murder.

18      A.   Okay.

19      Q.   And it could be a case where somebody is

20  murdered during a kidnapping, as is what's alleged in

21  this case, or some other capital murder case, but you've

22  just convicted someone of capital murder.  Knowing

23  yourself as you know yourself and knowing how you

24  answered all those questions on Friday, hypothetically

25  if you were in that situation, can you imagine that

1  after convicting somebody of capital murder you would

2  ever answer this question any way other than "yes;" that

3  you would ever conclude that, no, there is not even the

4  probability that he would be a continuing danger?  A

5  person you just convicted of capital murder.

6       A.   I think I would do just like they said before,

7  look at it fresh.  And, you know, on the -- you know,

8  based on the evidence that they gave me, make my

9  decision.

10      Q.   I can agree with all of that, but I'm just

11  wondering whether you looked at it fresh or not, I don't

12  know exactly what that means.  I don't even know that

13  there is any law that says that, but in the hypothetical

14  I'm giving you, which could happen, you are -- let's say

15  next year it happens, you are selected to serve on a

16  jury, and you and 11 other people convict someone of

17  capital murder and then they have to answer this

18  question.  Okay?  Whether they look at it so-called

19  fresh, or however they look at it, they are going to

20  then decide if there is -- if the evidence convinces

21  them that there is the probability -- not a certainty,

22  but the probability that the person they just convicted

23  of capital murder is going to be a continuing threat to

24  society, commit some future criminal act of violence

25  someday.  Can you every imagine yourself saying "no"?

 1      A.    Probably not.

 2      Q.    Okay.  Well, that's okay.  And I'm going to

 3  sort of try to talk you out of it, or whatever, if I can

 4  right now to make sure that's how you feel.  You've

 5  never been put on this spot before, have you?

 6      A.    No.

 7      Q.    Okay.  Well, I'm sorry to have to be the one to

 8  do it.

 9      A.    It's okay.  No problem.

10      Q.    People have said that, people will say that in

11  this case, they will say that if I convict somebody of

12  capital murder, particularly if the allegation is

13  somebody being murdered during the course of a

14  kidnapping, I'm never going -- I don't care what the

15  evidence is, I'm never going to conclude that that

16  person is not going to be a continuing threat.

17      A.    Sure.

18      Q.    I don't care whether he is in prison or out on

19  the street, I'm not ever going to be able to answer this

20  question any other way than "yes" because of what I've

21  convicted him of.  I can look at it fresh, I can look at

22  it anew, I can look at it upside-down, but he's always

23  going to be a continuing threat, and at least there's

24  the probability that he is going to be a continuing

25  threat.

1       A.   Sure.

2       Q.   People have said that.  People will say that.

3  What do you say?

4       A.   Yeah.  If you were convicted of murder, that is

5  in your -- you know, that's in your mind, that's --

6  you've done that before, it would probably happen again,

7  or --

8       Q.   Or something --

9       A.   -- something like it, yes.

10      Q.   It doesn't have to be a murder.  The prosecutor

11 used the example --

12      A.   Any violence.

13      Q.   Violence to property even.

14      A.   Uh-huh.

15      Q.   Slashing tires or something.

16           Okay.  Now, I want you to understand that's

17 not what a juror is supposed to say.  You are not

18 supposed to say -- well, you are supposed to say the

19 truth, whatever the truth is.  I'm sure that what you

20 are telling me, is the truth.  But jurors that are

21 saying:  Yes, honestly if I convict somebody of capital

22 murder, I'm going to always think that there is at least

23 the probability they are going to be a continuing

24 threat.  Okay?  That's an answer that honestly

25 disqualifies you.  Okay?  So, is that the truth?  Is

1    that truly how you feel?

2        A.   I would -- I guess I would have to say yes.

3        Q.   Okay.

4             MR. CORNELIUS:  We have a motion, Judge.

5             MS. TISE:  May I, Judge?

6             THE COURT:  Yes, briefly.

7                     **VOIR DIRE EXAMINATION**

8    **BY MS. TISE:**

9        Q.   The way -- and I just want to know how you

10   really feel, so however you come out on this is fine.

11   But the way you were approached with this question is

12   you were asked to envision a situation where if you

13   found someone guilty of capital murder, you were asked

14   can you envision a situation where you found someone

15   guilty of capital murder you would ever find that they

16   weren't a continuing threat.  Do you remember that?

17       A.   Yes.

18       Q.   And under the law you don't have to be able to

19   envision that situation.  You don't have to be able to

20   come up with a hypothetical in your mind and say:  Here

21   is the situation where I wouldn't do or here is one that

22   I would.  Okay?

23             Let me give you an example that maybe you

24   hadn't thought of.  Because you don't know what the

25   evidence is going to be in this case.  Right?

1      A.    True.

2      Q.    And you might hear evidence in this case where

3  you might decide that that person is not a continuing

4  threat.   Let me give you an example.

5            Have you ever seen the movie "A Time to

6  Kill"?

7      A.    I don't recall it.

8      Q.    Okay.   Probably a little before your time, but

9  it was a real popular movie for a while where a man's

10  daughter was raped by some really brutal, horrible

11  people.   And they went to trial on the case and things

12  about the trial -- I don't remember exactly, but I think

13  the trial did not come out the way this man whose

14  daughter was raped and killed wanted it to.   So, he laid

15  in wait outside the courtroom and he shot the two people

16  who raped and killed his little daughter.   Okay?

17            Now, in that situation, maybe not you, but

18  maybe a lot of people might say to themselves:   You

19  know, he committed a capital murder, that person in the

20  movie.   He killed two people in the same transaction,

21  which is one of the aggravating circumstances that you

22  can get capital murder in Texas.   Make sense?

23      A.    Yes.

24      Q.    But they might say to themselves:   I don't

25  think he should get the death penalty.   He shot the two

1  men who raped and killed his daughter and who just got

2  off for the crime.  I don't think he's a threat to

3  anybody other than those two people he killed and I

4  don't think he will ever do anything like that again.

5           They may also look at the evidence and say:

6  I don't think there is any mitigation here.  Because --

7  I mean, I think there is mitigation here.  Maybe even if

8  he thinks it's a continuing threat.  They might say

9  mitigation because of the horrible thing that happened

10  and his reaction to it.

11           So, do you see the evidence is what

12  determines whether or not you vote "yes" on the first

13  question or "no," and the evidence determines how you

14  decide the second question.  Can you be open to that and

15  follow it?

16      A.   Yes.

17      Q.   I understand as you sit there, you are not able

18  to think of all the ranges of possibilities that might

19  exist in a capital murder.  There are all kinds of

20  capital murders.  And you probably never thought of that

21  example from "A Time to Kill."

22      A.   No.

23      Q.   Does that affect the way you would answer the

24  defense attorney's question on this issue?

25      A.   In that situation --

```
 1              MR. CORNELIUS:  Well, that calls for a
 2   commitment.  If we're just talking about one situation,
 3   it calls for a commitment.  That's improper.
 4              THE COURT:  That will be sustained.
 5      Q.   (By Ms. Tise) I'm asking you if you can keep an
 6   open mind as you sit here to listen to the evidence and
 7   follow where it leads you?
 8      A.   Okay.  True.
 9      Q.   Can you do that?
10      A.   Yes.
11      Q.   Does that change how you would answer the
12   questions that the defense attorney was asking you?  Can
13   you now envision a situation --
14      A.   Yes.
15      Q.   -- where you might not give a knee-jerk "yes"
16   and "no" answer to the special issues?
17      A.   Yes.
18      Q.   And we talked about the fact that when you have
19   a capital murder just because you convict someone of
20   capital murder, those answers in the punishment phase
21   should never be automatic answers.  They're answers that
22   you give based on the evidence that's presented to you
23   and you look at those questions alone and make your
24   decision.
25      A.   Okay.
```

1      Q.   Can you do that?

2      A.   Yes.

3      Q.   I guess what it comes down to is, can you

4  follow the law?  Because there are a lot of things that

5  you might think or feel or you might have a

6  pre-inclination for this or that, but if the law tells

7  you that you have to consider the evidence in the case

8  and look at this completely aside from the fact that you

9  have convicted him of capital murder, can you follow the

10  law and do that?

11      A.   Yes.

12      Q.   And if the law says on the mitigation issue you

13  look at it, you take out the fact that you found he's

14  clearly dangerous to -- he's a continuing threat to

15  human life, you take out the fact that you convicted him

16  of capital murder, you just look at the mitigation issue

17  and you decide that on that alone.  Can you do that?

18      A.   Yes.

19      Q.   In other words, can you follow the law and keep

20  an open mind to all the evidence that you might hear?

21      A.   Yes.

22      Q.   And follow it wherever it might lead, whether

23  it means no death penalty or death penalty, whichever

24  way it goes?

25      A.   Yes.

1              MS. TISE:  I pass the juror.

2              THE COURT:  Mr. Cornelius.

3              MR. CORNELIUS:  I have urged my motion and

4    I have some argument for it, which wouldn't be

5    appropriate in front of the juror.

6              THE COURT:  You may step down for a moment.

7              Go with the bailiff for just a moment while

8    we discuss your situation.

9              (Venireperson exits courtroom)

10             THE COURT:  Mr. Cornelius, you have a

11   motion to strike for cause based on his response to you

12   saying he -- you asking whether he would always answer

13   Special Issue No. 1 "yes" if he found someone guilty of

14   capital murder?

15             MR. CORNELIUS:  Yes.

16             THE COURT:  Okay.

17             MR. CORNELIUS:  And can I --

18             THE COURT:  Yes.  Go ahead.

19             MR. CORNELIUS:  I don't want to appear to

20   be arguing with anybody, but the basis of my motion is

21   these questionnaires are going to be part of the record

22   in the case, so that -- and I want Juror No. 4, Travis

23   Bollom, I definitely want his questionnaire to be a part

24   of the record in the case.  I think they all are

25   automatically, but if I need to mark this particular one

1   and maybe put it in the record, I will.

2              Aren't they all part of the record, the

3   questionnaires?  They will go over to the Court of

4   Appeals with the clerk's file.  All that stuff comes in?

5              THE COURT:  We can also just add it.

6              **(Defense Exhibit No. 1 Offered and**

7               **Admitted)**

8              (Discussion off the record)

9              MR. CORNELIUS:  For the record, Judge, I

10  know you were listening and you have a copy of his juror

11  information form and you saw the answers that he gave

12  all through the form.  And he changed almost all of them

13  with the prosecutor questioning him and then gave poor,

14  if any, reasons why he was changing his answer.  I think

15  he's a vacillating juror, number one.  I'm asking the

16  Court to find he's a vacillating juror, number one.  And

17  that the answers that he has given, both in the

18  questionnaire and to me in my examination of him,

19  disqualify him on the Special Issue No. 1 questions.

20             THE COURT:  Ms. Tise.

21             MS. TISE:  Judge, I think it's not uncommon

22  at all for a juror to change their answers after they

23  have been through the education process.  This person

24  has never been a juror before and I think learned a lot

25  from the process.  I think that his answers on the

1  questionnaire basically just show that, A, he's a

2  law-follower who wants to follow the law, and, B, that

3  he was listening to your voir dire and learned a lot

4  since he filled out his questionnaire.

5           In addition, the way the defense attorney

6  broached the situation with Special Issue No. 1 is he

7  asked the juror to envision a situation where if he

8  found someone guilty of capital murder he would find

9  that they weren't a continuing threat, which is not

10 something that a juror is required to do.  They don't

11 have to have all the realm of possible cases in front of

12 them to envision a situation where they would do that.

13           MR. CORNELIUS:  Well, I don't think that's

14 what was said.  I have to object to the way that was --

15 probably objected when you questioned him with it.  I

16 asked him if he could imagine a situation.  I didn't ask

17 him what that situation was, but if he could ever

18 imagine a situation where he would answer.  That's an

19 appropriate question.

20           MS. TISE:  He doesn't have to be able to

21 say that he can imagine a situation where he would do

22 that.

23           MR. CORNELIUS:  He doesn't have to

24 imagine --

25           THE COURT:  I don't find it inappropriate

1    what the questioning was.  I think the juror was

2    pretty -- under Mr. Cornelius' questions, I think he was

3    pretty straight forward in saying that he thought he

4    would probably always answer it "yes."   And there were

5    several different ways that you rephrased it, but then I

6    also believe that under your questioning, Ms. Tise, that

7    you presented a hypothetical that he thought maybe there

8    is something out there.  So, I think that -- in my

9    opinion, what the Court heard was that there is probably

10   a very small opening of cases that he might be willing

11   to concede he wouldn't answer "yes" on this question if

12   he convicted someone of capital murder.

13            That being said, I don't believe it's

14   enough for cause if he is able to consider at least some

15   type of case in a situation where he would keep an open

16   mind in answering this question.  So, I'm not going to

17   grant your cause.

18            MR. CORNELIUS:  Okay.

19            THE COURT:  You're moving to strike him,

20   though?

21            MR. CORNELIUS:  Yes.  Well, hold on.

22            THE COURT:  Did you want --

23            MR. CORNELIUS:  Do you mean exercise a

24   challenge?

25            THE COURT:  Yes.

1          MR. CORNELIUS:  Well, they haven't accepted

2  him yet and -- I'm sorry to be seated while I'm talking

3  to you.  We haven't gotten that far yet.

4          THE COURT:  Okay.  All right.  So, I'm

5  going to deny the challenge for cause.

6          So, what say you, Ms. Tise?

7          MS. TISE:  Are you going to want to

8  question him further?

9          MR. CORNELIUS:  I want to ask him at least

10 one more question, but if there is anything --

11          THE COURT:  I thought we were all done

12 asking questions, but if you need to ask him some more,

13 that's fine.

14          MR. CORNELIUS:  All I did was make my

15 motion and then that stopped everything, but I haven't

16 passed the witness {sic}.

17          THE COURT:  Let's call him back in then.

18          MR. CORNELIUS:  Do you want me to wait

19 until I'm done to make motions?

20          THE COURT:  No, but I didn't want to make

21 it in front of him.

22          MR. CORNELIUS:  Right.

23          THE COURT:  I didn't want to make my

24 decision in front of him.

25          (Venireperson enters courtroom)

1          THE COURT:  Mr. Bollom, we're going to

2    continue on with further questioning and Mr. Cornelius

3    is going to continue asking you questions.  Okay?

4          VENIREPERSON:  Sure.

5          THE COURT:  Please continue to answer the

6    questions truthfully.

7          You may proceed, Mr. Cornelius.

8                **VOIR DIRE EXAMINATION**

9    **BY MR. CORNELIUS:**

10       Q.   Mr. Bollom, I'm changing the subject here for a

11   second.

12          You know that my client is having things

13   interpreted for him; you can see that, right?

14       A.   Yes.

15       Q.   Does that bother you in any way?

16       A.   No.

17          MR. CORNELIUS:  I pass the juror.

18          THE COURT:  Okay.

19          MR. CORNELIUS:  I have decided not to go

20   any further.

21          THE COURT:  Okay.  Do you have anything

22   further, Ms. Tise?

23          MS. TISE:  Nothing further, Judge.

24          THE COURT:  All right.  So, we'll ask you

25   to step out one more time.  Step out to the hallway,

```
 1   sir, and we'll be right back with you.
 2                  (Venireperson exits courtroom)
 3                  THE COURT:  Ms. Tise.
 4                  MS. TISE:  We will accept the juror.
 5                  MR. CORNELIUS:  We'll exercise a challenge
 6   for cause and ask the Court for an additional challenge
 7   for cause.
 8                  THE COURT:  You are exercising one of your
 9   peremptories?
10                  MR. CORNELIUS:  Yes.
11                  THE COURT:  And then you're going to ask
12   for --
13                  MR. CORNELIUS:  I meant peremptory.  I'm
14   sorry.
15                  THE COURT:  And then you're going to ask
16   for an additional?
17                  MR. CORNELIUS:  I have to -- you know, to
18   perfect that, I have to ask you for it.
19                  THE COURT:  Okay.  Well, obviously, I'll
20   let you exercise one of your peremptories and strike
21   this juror.
22                  In terms of having an additional one, I
23   will grant that.
24                  So, bring the juror in again.  He's getting
25   plenty of exercise today.
```

```
 1                    (Venireperson enters courtroom)

 2              THE COURT:  Okay.  Mr. Bollom, you are

 3   being released from your jury service today.  And what

 4   that means is that we appreciate your time and all of

 5   your effort in coming down here.  All the instructions

 6   that you were under, you are released from those today

 7   and you can talk about your jury service if you want to.

 8   You don't have to come back at all.  And you can get

 9   with Deputy Perry for an excuse for work today if you

10   need it and also a bus pass if you need it.  Your work

11   excuse will be good through 5:00.  We really appreciate

12   all your time.

13              VENIREPERSON:  Thank you.

14              THE COURT:  Thank you, sir.

15                    (Venireperson excused)

16              THE COURT:  So, the record is correct, your

17   challenge for cause was denied.  You did exercise one

18   peremptory and the Court is giving you an additional

19   peremptory.  Okay?  So, you will --

20              MR. CORNELIUS:  Yes, Your Honor.

21              THE COURT:  So, you will have 11, right?

22              MR. CORNELIUS:  Fifteen.

23              THE COURT:  That's right.

24              MR. CORNELIUS:  A total of 16.

25                    (Venireperson sworn)
```

1              **LARRY JORDAN, VENIREPERSON NO. 5,**

2     was called as a prospective juror, and testified as

3     follows:

4                         **VOIR DIRE EXAMINATION**

5     **BY THE COURT:**

6         Q.   Mr. Jordan, you are the same Larry Jordan that

7     was Juror No. 5 in the venire panel in the State of

8     Texas vs. Obel Cruz-Garcia.  Is that correct, sir?

9         A.   Yes.

10        Q.   Very good.

11             We're still in the voir dire process.  So,

12    that means there is no right or wrong answers here.

13    Both of the lawyers from each side get to speak with you

14    about half an hour.  I appreciate your time.  I know

15    it's been a long day.  We're trying to get this over

16    with you for in terms of making sure we don't waste your

17    time.  So, please be truthful with them.

18             Let me go over a couple of real quick

19    questions.  The first one is:  Do you have any

20    religious, personal, or moral reasons why you would be

21    unable to sit on a jury where the death penalty is a

22    possible punishment?

23        A.   No.

24        Q.   The second question is:  Do you know of any

25    reason why you could not be fair and impartial both

1  sides in a criminal case?

2       A.   No.

3       Q.   And have any of your questions from the

4  questionnaire changed?

5       A.   No.

6       Q.   Very good.

7                 THE COURT:   I want to remind the lawyers

8  from both sides that this juror is the one during voir

9  dire advised us that he does have a brother in hospice

10  at this time.

11                Okay.  Mr. Wood, are you going to proceed?

12                MR. WOOD:  Yes, Your Honor.

13                THE COURT:  You may proceed at this time.

14                MR. WOOD:  Thank you.

15                    **VOIR DIRE EXAMINATION**

16  **BY MR. WOOD:**

17       Q.   Good afternoon, Mr. Jordan.  Or almost evening

18  now.

19       A.   Yeah.

20       Q.   Thank you for involuntarily spending your day

21  with us today.  I want to ask you a few questions and

22  just visit with you a little bit more in detail about

23  some of what you wrote in your questionnaire and then

24  about some of the things that we discussed today.  Is

25  that okay?

1      A.   Yes.

2      Q.   First of all, I'll reintroduce myself.   I'm

3  Justin Wood.   And along with Natalie Tise, we'll be

4  trying this case if you are one of the lucky 12 or 14

5  chosen.   Steve Walsh is sitting beside us.   He is our

6  intern and he'll be helping us out.   So, if you end up

7  on the jury, that's who Steve is.

8           I know that you have been down here in this

9  building before for jury service.   Isn't that right?

10     A.   Yes.

11     Q.   You served on a DWI jury; is that right?

12     A.   Yes.   I believe it was in this court.

13     Q.   In Harris County?

14     A.   Yeah, in Harris County.

15     Q.   So, if it was more than a few years ago, it

16  might have been in a different building, but you've been

17  through this process a little bit, right?

18     A.   Yes.

19     Q.   Today has probably been a little bit more

20  involved and detailed than your prior experience.   Is

21  that right?

22     A.   Very much.

23     Q.   Friday when you showed up over there at the

24  Jury Assembly Room and you were given this questionnaire

25  to fill out, what were your initial thoughts when you

1    found out you might be a potential juror in a death

2    penalty case?

3        A.   It's going to require a lot of time.

4        Q.   Well, I appreciate all of you -- you being

5    forthcoming in your questionnaire.  And I'm sorry to

6    hear about your brother.  And we'll make the best

7    attempt to accommodate that.  I apologize for that in

8    advance.

9             But what are your general thoughts about

10   the death penalty when you found out this is the kind of

11   case you might be down here for?

12       A.   I didn't really think about it a lot.  It's

13   going to be a very difficult thing to be a part of.  I'm

14   not against it in the right type of case.

15       Q.   Okay.  And what I hear you saying is that, you

16   know, it would be difficult to serve as a juror.  And I

17   grant you that's probably very true.

18       A.   Correct.

19       Q.   A lot of thought and time goes into this from

20   all parties, but especially from a juror's standpoint.

21       A.   Correct.

22       Q.   And I appreciate that and I appreciate the

23   honesty.

24             You've learned a little bit about what

25   capital murder is today, probably more than you knew

1    before.

2         A.    Right.

3         Q.    And we broke it down a little bit.  I want to

4    visit with you just briefly about that before we go

5    further.

6              The Judge talked about -- a little bit

7    about what murder is in Texas.  And that's the

8    intentional taking of another life without some

9    justification for doing so.  Is that clear?

10        A.    Yes.

11        Q.    And then capital murder is taking it, what I

12   call, one step further and adding some aggravating

13   factor.  I think the Judge gave some very good examples

14   of while in the course of committing kidnapping,

15   burglary, sexual assault, those types of offenses.

16        A.    Yes.

17        Q.    Was that clear?

18        A.    Yes.

19        Q.    She also gave you some examples, you know, one

20   or more persons -- two or more people are killed in the

21   same criminal episode, if a police officer is murdered

22   in the line of duty, a child younger than ten, those

23   examples also qualify for capital murder.

24        A.    Yes.

25        Q.    And under -- in Texas with capital murder,

1  there are -- well, there are essentially two

2  punishments.  The death penalty, if the State is seeking

3  the death penalty, or current law is that if you are not

4  seeking the death penalty and a defendant is found

5  guilty, then the only punishment is life without parole.

6  That is under current law.  However, as you've learned,

7  this is a 1992 case.  So, what happens in that situation

8  is we have to go back to 1992 and try the case under the

9  laws that were in place at that time.  Is that clear?

10      A.   Yes.

11      Q.   So, in 1992 there was no life without parole.

12  That only came on board in 2005.  So, we -- in 1992, it

13  was either the death penalty or if the death penalty was

14  not assessed it's life with parole eligibility after

15  serving a certain number of years.  Do you understand

16  that?

17      A.   Yes.

18      Q.   So, those are kind of the two punishments that

19  we're talking about in this case.  And we'll visit a

20  little bit more about that.

21           If I were to make you king of the day or

22  governor of Texas, in a perfect world would you be for

23  the death penalty or against the death penalty?

24      A.   For.

25      Q.   And are there certain types of crimes or

1   offenses that you would qualify as being okay for the

2   death penalty if you were governor of the day?

3        A.   Yes.

4        Q.   What are some of those offenses?

5        A.   The ones that we're talking about in the rules.

6   I mean, that's -- I agreed with those.

7        Q.   So, you see those as being appropriate type

8   crimes or offenses that might qualify for the death

9   penalty?

10       A.   Yes.

11       Q.   I know it may not be a subject you sit around

12  with your family and discuss, you know, at holidays or

13  whatnot, but have you always held that same position

14  regarding the death penalty, as something that you are

15  generally in favor of in the right type of case?

16       A.   Yes.

17       Q.   What about your family, do they hold the same

18  kind of ideas regarding that or do you know?

19       A.   I really -- I think so, but I'm not sure.  We

20  don't sit and talk about this.

21       Q.   Fair enough.  I can understand that.

22            If I gave you a scale, a scale of one to

23  ten, say one being that you are opposed to the death

24  penalty or do not find it acceptable, and ten being that

25  you feel like it should be given out as often as

1    possible -- do you understand this spectrum?

2         A.   I think so.

3         Q.   One on the low end, of your acceptance for the

4    death penalty, ten on the upper end.  Okay?  And I'm

5    going to tweak it a little bit.  You can't choose five

6    that's --

7         A.   That's the number.

8         Q.   Everybody chooses five.  Everybody would, if

9    they could.  So, if I give you that scale of one to ten

10   without five being an option, where would you fall on

11   that spectrum, would you say?

12        A.   Eight.

13        Q.   I know we've talked a lot about, Mr. Jordan,

14   throughout the day, about the idea of the death penalty

15   and all of these special issues and if you end up as a

16   juror what might happened, all of these what-ifs.

17   Right?

18        A.   Yes.

19        Q.   But it's kind of game time as far as us

20   deciding are you going to be a juror in this case?  And

21   you have been a juror in another case.  You can

22   appreciate the concept that there are some people that

23   are better suited for some types of cases and others

24   that are better suited for other types.  Right?

25        A.   Yes.

1    Q.   If your home was burglarized on Saturday night

2    and you were brought in here for a burglary of a

3    habitation case, you might not be the best juror, right?

4    A.   Right.

5    Q.   What our goal is, obviously, is -- for mine,

6    Natalie's, the defense team, for Mr. Cruz-Garcia, is to

7    find twelve people that are going to be the most fair.

8    And we can talk in general terms and all of that, but,

9    you know, we have the opportunity to visit with you

10   one-on-one, which we don't always get in a normal case,

11   as you probably remember from the DWI trial.

12            So, as you sit here today and as you've

13   been through this process up to this point for this

14   number of hours, I want you to look in this room at

15   Mr. Cruz-Garcia here in the yellow tie and look at him

16   as he sits here before.  If you were chosen as a juror

17   and based on the evidence and the testimony that you

18   hear and you get to that point and you feel there is

19   evidence that allows you to answer the questions in a

20   way that would ultimately lead to his death -- because

21   that's what we're asking you to do at the end of this

22   case, looking at him today, could you do that?  Do you

23   feel like you could do that?

24   A.   I believe I can.

25   Q.   Okay.  Well, you know how that "believe" goes.

1        A.   Yes.

2        Q.   Okay.  You know, it's different when you're

3   talking about a living, breathing human, you know,

4   that's sitting in the same room as you.  So, are you

5   telling me and you're giving me your commitment that if

6   feel like the evidence supports it and you answer those

7   questions in a way that leads to that result that you

8   could do that?

9        A.   Yes.

10       Q.   Thank you.

11            Okay.  We have talked a little bit -- and

12   you have been through this, so you know from your prior

13   experience, too -- the trial is essentially two phases,

14   right?  There is the guilt-innocence phase.  And then

15   upon a finding of guilt in Texas, which is kind of rare,

16   a jury is able to assess punishment in many cases.

17       A.   Yes.

18       Q.   So, in the guilt-innocence phase you were faced

19   with the determining if we, Natalie and I, as

20   representatives of the State of Texas, meet our burden

21   of proof in proving our case to you beyond a reasonable

22   doubt, and you understand that burden of proof lies with

23   us and only with us throughout the trial, right?

24       A.   Yes.

25       Q.   And we have to prove that case beyond a

1    reasonable doubt.  And we'll visit a little bit about

2    that in just a second, but the things I have to prove to

3    you are essentially the elements of the offense.  And

4    that's one of those legal terms we throw around a lot.

5    The elements of the offense are simply those things

6    about the case that have to be proven.  And I think the

7    Judge read that from the indictment.  You know, there is

8    always who, the defendant; when, what time of period

9    we're talking about; where, we have to prove Harris

10   County; and what happened.  And in this case, we're

11   alleging murder committed in the course of a kidnapping.

12   And you heard those elements.  Those are the different

13   things about this case that I have to prove to you.  You

14   understand?

15        A.   Yes.

16        Q.   And those are the items -- or those are the

17   things in this case that I have to prove to you beyond a

18   reasonable doubt.  We talked about that a lot.  But

19   those are the only things that I have to prove to you

20   beyond a reasonable doubt.  Only those elements of the

21   offense.  Is that clear?

22        A.   Yes.

23        Q.   If you recall there are certain things on that

24   list that are not on that list.  You know, as human

25   beings, we want to know someone's motive behind why they

1   did something, right?  That's human instinct, human

2   nature.

3        A.   Yes.

4        Q.   But the motive of the offense in Texas is not

5   one of those things that we have to prove.  Do you

6   understand that?

7        A.   Yes.

8        Q.   While we may want to know that and while

9   evidence, in many cases, reveals that, you may learn a

10  motive in a case, and that's just fine, but that is not

11  something that has to be proven to you beyond a

12  reasonable doubt.  Is that a concept that you are okay

13  with?

14       A.   Yes.

15       Q.   There is also, on that list, that you do not

16  see as something that has to be proven, premeditation.

17  I know there was a portion in your questionnaire in the

18  back that you were given a chance to answer a

19  question -- let's see -- regarding premeditation.

20  No. 67 asks you if capital punishment is justified only

21  for premeditated murder and you had checked that you

22  agreed with that concept.  And that's -- premeditation

23  is something we hear on TV and we talk about and people

24  commonly refer to when we talk about murder, but -- and

25  that's fine.  Some states require that.  That's an

1    element of an offense that some states might require,

2    but in Texas we do not have to prove premeditation.

3                The idea behind that is that intent can be

4    formed in an instant, right?

5        A.   Yes.

6        Q.   Whereas, you may go into a situation with one

7    set of thought, you may -- your intent may change on a

8    dime, and you may be able to intentionally commit an act

9    whereas you did not premeditate that, right?

10       A.   Yes.

11       Q.   Is that an okay concept to you?

12       A.   Yes, fine.

13       Q.   Premeditation is not something that has to be

14   proven.  Again, it may be something you learn through

15   the evidence and it shows to you that a murder might be

16   premeditated and that's fine, but that's not necessarily

17   an element of the offense.

18       A.   I understand.

19       Q.   Is that okay?

20       A.   Yes.

21       Q.   And then that all-familiar term, beyond a

22   reasonable doubt.  You've dealt with that from your

23   prior jury service.  And the Judge spent a great deal of

24   time and was great at explaining what beyond a

25   reasonable doubt is and is not.  You know, like she

1  said, we can't give you a definition of what it is,

2  we're going to require you to rely on your common sense

3  and common reasoning in determining we, as the State of

4  Texas, have met that burden.

5           But the comment I would like to make on

6  that is that the beyond a reasonable doubt standard only

7  goes to each of those elements that we have to prove to

8  you.  Is that clear?

9      A.   Yes.

10     Q.   We have talked about presumption of innocence,

11 that the defendant has no burden and he carries that

12 throughout the entire trial.  And I think that you

13 agreed that was a concept that you were okay with and

14 that you would abide by?

15     A.   Yes.

16     Q.   As well as the Fifth Amendment right not to

17 testify.

18           Now, let's talk about some of the evidence.

19 Now, you've been through a trial.  Obviously, a capital

20 murder trial will be a little bit different than a DWI,

21 but what type of -- what are some of the types of

22 evidence that you might expect to see in a capital

23 murder trial?

24     A.   I don't know.

25     Q.   In your perfect world, you're back to being

1  governor for a day, if you could choose --

2      A.   Witnesses, the murder weapon, forensic evidence

3  that might be available.

4      Q.   See, you answered.  Those are all three big

5  ones.  And you first started out -- most people don't

6  start off with witness testimony.  You want to see the

7  blood and the guts and the hard evidence first, but I

8  appreciate you bringing that up.

9            You understand and appreciate, obviously,

10  that witness testimony is actual evidence.  And in many

11  trials, that may be the only evidence that a jury is

12  able to consider, right --

13      A.   Right.

14      Q.   -- is witness testimony?

15            And the Judge went over a little bit about

16  witness testimony and witness credibility.  Because,

17  ultimately, you and your fellow jurors would be deciding

18  the witnesses' credibility, if you were a juror.  And

19  the rule is that every witness starts out on the same

20  page, starts out on a level playing field, almost like a

21  scale.  You can't give a witness more credibility or

22  less just because of something you know about them until

23  they have started speaking, until they -- something

24  comes out of their mouth and they start testifying,

25  that's when you can start judging their credibility.

1  Does that make sense?

2      A.  Yes.

3      Q.  And that goes for police officers, nuns,

4  priests, prostitutes, whatever it is.  Right?

5      A.  Right.

6      Q.  Now, after that person testifies, no matter

7  what position they told, you can then decide if you give

8  them less credibility or more credibility than another

9  witness.  And there was a note also that I wanted to

10 follow up with with regards to that in your juror

11 questionnaire.  You said that there's a possibility in

12 your mind that some law enforcement or police officers

13 might shade the truth in certain cases.  And I can read

14 it to you exact, but do you remember that question?

15     A.  Not exactly.

16     Q.  Some law enforcement officers shade the truth

17 to make their case better.  And you had circled that as

18 a possibility of something that you might agree with.

19     A.  Yes.

20     Q.  I'm not -- I won't disagree with you because --

21 will you agree with me, Mr. Jordan, that there are good

22 and bad in every profession?  Right?

23     A.  Yes.

24     Q.  And until you hear from a person, until you are

25 able to learn that person's qualifications or learn what

1    kind of job that person did in this particular instance,

2    until you learn those things, you are not able to

3    effectively judge a person's credibility.  Would you

4    agree with that?

5         A.   That's correct.

6         Q.   So, while there might be some law enforcement

7    officers that might do that, will you also agree with me

8    that there are many that are upstanding and do their job

9    every single day?

10        A.   Yes.

11        Q.   And will you give an officer -- a police

12   officer, just like any other witness, the same

13   treatment, and that being will you wait to hear from

14   that police officer or a police officer, if you hear

15   from a police officer, and hear what they have to say

16   before you judge their credibility?

17        A.   Yes.

18        Q.   Have you had any kind of bad experience or

19   negative experience with law enforcement in your

20   background?

21        A.   No.

22        Q.   Other than getting pulled over on a traffic

23   ticket that we never deserve, right?

24        A.   No.

25        Q.   Is there anything in your background, a

1  negative experience or bad experience -- first of all,

2  are there any of those experiences in your background?

3      A.   Yes.

4      Q.   Okay.  Do you care to share about that or --

5      A.    I mentioned it in my questionnaire, but I have

6  a niece's husband who was convicted.  And, you know, I

7  don't know all the details of it, but there was some

8  overzealousness in the prosecution of that.  But I

9  never -- you know, it wasn't something I got deep into

10 or anything, but, you know, the family talks and says,

11 you know --

12     Q.   Right.

13     A.    -- his attorney didn't do the job and things

14 like that, you know, when the prosecution, you know,

15 went forward.  There were some gray areas, but he was

16 convicted.

17     Q.   Was that a Harris County case?

18     A.   No, no.  It was in Illinois.

19     Q.   That brings up a good point.  Law enforcement

20 can mean many things to different people.  It can mean

21 the police officer on the street, it can be me as the

22 D.A., whoever that might be.  It means different things

23 for other people, but is there anything about that

24 experience with your family and your niece's husband

25 that would prevent you from being able to be fair and

1   impartial in this case?

2        A.   No.

3        Q.   Would you be able to listen to the evidence and

4   the testimony in this case and just judge that based on

5   what you hear and not on a past experience or that

6   personal experience?

7        A.   Yes.

8        Q.   And I see you know Johnny Bond.

9        A.   Yes.

10        Q.   You're not going to hold that against the State

11   or give us any more credit for that?

12        A.   He's a great guy.

13        Q.   Yeah.

14             What other types -- you said forensic

15   evidence.  That's a good example as well.  Maybe -- what

16   kinds of forensic evidence comes to your mind?

17        A.   DNA, I guess.

18        Q.   DNA, fingerprints, that type of thing?

19        A.   Yeah.

20        Q.   Well, you've mentioned a lot of good examples

21   of evidence.  There are few things I want to mention

22   that are not evidence that you will hear in this type of

23   case.  You expect that you will hear from police

24   officers and law enforcement and that you know police

25   officers make reports, police reports and offense

1    reports, right?

2        A.   Yes.

3        Q.   That type of -- you will not see evidence -- or

4    you will not see offense reports or police reports

5    admitted as evidence, just like you will not see witness

6    statements, whether they're written or recorded.  You

7    know, you can anticipate that those might be part of a

8    case, too.  Those are also not types of evidence that

9    you will see admitted at trial.  That's what we call

10   hearsay in the legal world.  And while they may be

11   evidence on paper or on tape, the law says that those

12   witnesses have to come into the testimony -- or into the

13   courtroom and testify live so that can you judge their

14   credibility, so that you can say:  We believe them, we

15   believe some of what they said, all of what they said,

16   not just based on what's on paper or on audio recording.

17   Does that make sense?

18       A.   Yes.

19       Q.   Because I say that -- we say that because in

20   every case, no matter how many times we say that, the

21   jurors, the first thing they ask for:  Can we have that

22   police officer's report?  Well, remember, when your

23   buddies back there tell you that, remember what the

24   prosecutor said, that's not evidence.

25       A.   Right.

1     Q.   Judge Magee talked a little bit about -- in her

2    voir dire about the concept of law of parties.  Do you

3    remember her talking about that?

4     A.   Yes.

5     Q.   Where multiple individuals involved in an

6    offense might be charged with the same offense even

7    though they might have different levels of involvement

8    in that offense.  Right?

9     A.   Right.

10     Q.   And the law is that a person can be criminally

11    responsible for the conduct of another if they do

12    certain things, whether that be aiding them, assisting

13    them, helping plan that.  It can be any number of things

14    that might make them criminally responsible for the

15    conduct of what another person does in that offense.

16    Right?

17     A.   Yes.

18     Q.   And the law says that if there are -- if there

19    is more than one person or an additional person or

20    however many persons involved as a party to an offense,

21    they're all charged with the same offense.  Does that

22    make sense?

23     A.   Uh-huh.

24     Q.   And we can talk about hypothetical scenarios of

25    bank robberies, just like the Judge did, but was that a

1  pretty clear concept to you?

2      A.  Yes, it was.

3      Q.  Okay.  Along with that, the Judge spoke to you

4  a little bit about accomplice testimony, when one of

5  those co-conspirators come forward and possibly want to

6  testify in a trial against the charged defendant.

7  Right?  Have you ever heard of that?

8      A.  Yes.

9      Q.  Somebody coming in to testify against their

10  co-defendant.  We call that accomplice testimony.  Well,

11  the law allows that, obviously.  They are a witness just

12  like any other witness can be.  Just like an officer or

13  a civilian witness or a chemist or whomever.  They can

14  be called into court to testify just like any other

15  witness.  And you -- if that happens, you, as a juror,

16  are going to have to judge their credibility just like

17  any other witness.

18              However, the law says that because they are

19  an accomplice, their testimony has to be treated a

20  little differently.  And you can understand why, right?

21  Tell me a little bit why you think their testimony might

22  be treated a little differently.

23      A.  Well, they may be motivated to get more guilt

24  on the other person and try to lessen theirs.

25      Q.  Exactly.  That's exactly right.  And you, as a

1  juror, are going to have to decide that person's

2  credibility, right?

3       A.   Yes.

4       Q.   But the law says to base a conviction on the

5  testimony of an accomplice witness, there has to be some

6  kind of corroborating evidence.   There has to be some

7  extra evidence to tie that defendant to the crime.   Does

8  that make sense?

9       A.   Yes.

10      Q.   And can you think of things that might be

11 corroborating evidence in that situation?

12      A.   I would assume the same as the evidence we

13 talked about before.   Witnesses --

14      Q.   Right.

15      A.   -- DNA evidence.

16      Q.   Right.

17      A.   That type of thing.

18      Q.   Think about it in a context of a bank robbery.

19 An accomplice comes in to testify against his

20 co-defendant and there is, you know, a fingerprint left

21 behind at the bank robbery or a witness -- a teller

22 maybe that comes in and testifies and picks out that

23 person as also being involved in the offense, or, you

24 know, they leave DNA behind, just like you said.   Some

25 type of corroborating evidence that ties that defendant

1  to the offense.

2        A.   Right.

3        Q.   Does that make sense?

4        A.   Yes.

5        Q.   Do you have any problem with that concept of an

6  accomplice witness coming in to -- or accomplice

7  testimony coming into play in a capital murder case?

8        A.   No.

9        Q.   You heard up front, as the Judge told you, that

10  it is alleged that this offense occurred in 1992.  Did

11  that catch you off guard when you heard that?

12        A.   Not really.

13        Q.   Okay.  Well, you can probably envision in your

14  mind several circumstances of how that might happen.

15  You know, possibly a cold case, if you've heard that on

16  TV.  That's something that TV talks about a lot.  There

17  might be any number of reasons why the case could be

18  brought now as opposed to back when the offense

19  occurred.  Right?

20        A.   Yes.

21        Q.   Do you think that with that passage of time a

22  case changes to some extent?  How do you think the

23  passage of time affects the evidence in a case, to be

24  specific?

25        A.   Well, if it's the witness evidence, that could

 1   change because people's memories change.

 2      Q.   People's memories change.

 3           What about just the availability of

 4   witnesses?

 5      A.   Yeah, that changes.

 6      Q.   Some witness may not be around, may be dead,

 7   may have moved and can't be located, that type of thing.

 8      A.   Correct.

 9      Q.   Are those foreseeable circumstances?

10      A.   Yes.

11      Q.   What about with the passage of time, do you

12   think that -- this is almost a silly question, but

13   people also can look different, can't they?

14      A.   Yes.

15      Q.   I assume probably you look a little different

16   than you did 20-plus years ago, right?

17      A.   Yes.

18      Q.   I look a whole lot different than I did 20-plus

19   years ago.  But that might be something that changes

20   when a case is older, right?

21      A.   Yes.

22      Q.   When we're talking about a case involving a

23   victim or a person that's been murdered, think about it

24   in the context -- can you imagine a hypothetical

25   situation where, you know, even if it's -- even if we're

1  talking about a cold case, the body of a victim might be

2  discovered at the time the offense happened.  Right?

3      A.  Yes.

4      Q.  Or it might be discovered at a time in the

5  future.  Correct?

6      A.  Yes.

7      Q.  Or it might never be discovered.  Correct?

8      A.  Right.

9      Q.  Those are rare cases, but that also happens

10 sometimes.  And if we're talking about a case where the

11 body is not recovered immediately at the time of the

12 offense, do you think that that also affects the type of

13 evidence or quality of evidence that is able to be

14 presented to a jury ultimately?

15     A.  I guess it would.  You know, I haven't thought

16 about that a lot.  I guess whatever is presented at the

17 time, I would have to judge it at that time, you know,

18 as to what...

19     Q.  Well, who actually, in your mind -- have you

20 ever thought about who actually controls what evidence

21 there is of a crime?  Who has control of that?

22     A.  I assume it's the prosecutor's office.

23     Q.  That's everyone's assumption.  Right?

24          When, actually, if you think about it, we

25 actually take the evidence as it's given to us, right.

1      A.   Right.

2      Q.   We take the witnesses as they're given to us.

3 In a perfect world, I would always envision, you know,

4 DNA in every case, a crime witnessed by a bus full of

5 nun, you know, whatever the case might be, but, as you

6 can imagine, that isn't the case.

7              So, who actually controls what evidence

8 there is, is the defendant.  Do you see that?

9      A.   I'm not sure I follow that.

10     Q.   Well, who chooses when an offense is committed?

11     A.   Oh.  The defendant.

12     Q.   And who chooses where an offense is committed?

13     A.   The defendant.

14     Q.   So, ultimately, the defendant may be

15 responsible -- I'm not saying -- I'm saying in a

16 hypothetical situation -- with what evidence is

17 available for a prosecutor or for the jury ultimately.

18     A.   Right.

19     Q.   Does that make sense?

20     A.   Yes.

21              MR. CORNELIUS:  Can we have a really quick

22 break?

23              THE COURT:  Okay.

24              (Pause)

25              THE COURT:  You have about ten minutes.

1                    MR. WOOD:   Thank you.

2         Q.   (By Mr. Wood) Mr. Jordan, if you will recall

3    back from when the Judge spoke to you about some of

4    those issues that come up in a punishment phase when

5    we're talking being about the death penalty -- do you

6    remember that?

7         A.   Yeah.

8         Q.   We talked about how the trial in Texas is two

9    parts, there being the guilt-innocence phase and then

10   move on to the punishment phase.   In Texas, as you well

11   know now, in a capital murder trial where we, as the

12   State, are seeking the death penalty, it isn't simply a

13   question once you get back there as jurors, like, are we

14   going to give the defendant the death penalty or not.

15   It's not quite that simple.   And probably thankfully so.

16   There is an actual process for you, as jurors, to go

17   through to determine if that's what ultimately happens.

18   And that's done through those three questions and those

19   three special issues that are presented to you.

20                    Do you remember that?

21        A.   Yes.

22        Q.   And I want to visit with you a little bit about

23   those special issues.   And I can either go to the board

24   or it's on the slide to your --

25        A.   This is fine.

1        Q.   Is that okay?  Are you able to see that?

2        A.   Yeah.

3        Q.   And, specifically, I want to talk to you first

4    about Special Issue No. 1.  And that is what we call the

5    continuing threat issue.  And it simply says:  Do you

6    find from the evidence beyond a reasonable doubt that

7    there is a probability that the defendant would commit

8    criminal acts of violence that would constitute a

9    continuing threat to society?

10                That would be the first question that you

11   as a juror would have to address.  And I want to break

12   that down a little bit, some of those parts of that

13   first special issue.  And the first is that world

14   "probability."  Ultimately, you are deciding, quite

15   simply, is this person a future danger to society or is

16   this person a continuing threat to society?  Right?

17   That's basically the gist, but, specifically, the word

18   "probability."  Does that word mean anything to you

19   specifically?  What does that word mean to you?

20       A.   That there is a chance it might happen.  It may

21   or may not, but there is a chance.

22       Q.   Would you say it's greater than a possibility?

23       A.   I don't know.  I'm not sure I can understand

24   that comparison.  The word "probability" doesn't have a

25   percentage.  If it would happen once in the future, that

1   would be a probability to me.

2       Q.   Okay.  Well, I mean, like the Judge told you

3   before, there is no definition.  Many times it breaks

4   down to it is not necessarily just a possibility.  It's

5   probably a little step further than possibility, but

6   it's  definitely not a certainty.  Would you agree with

7   that?

8       A.   Yes.

9       Q.   Because how do we predict the future with any

10  kind of amount of certainty, right?

11      A.   Right.

12      Q.   The next words I want to focus on are the

13  criminal acts of violence, whether there is a

14  probability that the defendant would commit criminal

15  acts of violence.  That, again, is a pretty broad term,

16  right?  Criminal acts of violence.  A couple points on

17  that.  That is not necessarily the fact that you'd have

18  to find that the defendant would necessarily commit

19  another murder or another capital murder, right?

20      A.   Right.

21      Q.   Although, that would be another act of

22  violence, it doesn't have to go far as being another

23  murder committed.  It can be any kind of act of violence

24  offense.  It doesn't even necessarily have to be

25  offended against a person.  You can possibly find that

1    there might be a probability they might commit acts of

2    property -- or violence against property crimes or

3    related to property crimes, whether it be slashing

4    tires, or it might be words, threats.  That might be

5    perceived as an act of violence.  Do you see that?

6         A.   Yes.

7         Q.   And then whether or not that would constitute a

8    continuing threat to society.  And society means a lot

9    of different things to different people.  Obviously, you

10   and I walking down the street in our normal daily lives,

11   we make up society, right?

12        A.   Yes.

13        Q.   Family, friends, but society expands further

14   than that.  Society can also be perceived as within

15   prison walls.  You know, how someone interacts within

16   their society.  Maybe that's what their concept of

17   society is.  Does that make sense?

18        A.   Yes.

19        Q.   What types of things do you think as a juror

20   that you would look to to answer that question in your

21   mind, whether someone would continue to be a continuing

22   threat to -- or would probably -- would have a

23   probability of being a continuing threat to society?

24   What would you in answering that question?

25        A.    I guess it would be more -- evidence of other

1   things that had happened to that person, you know.

2       Q.   Involving that person?

3       A.   Yeah, yeah.

4       Q.   So, you might look to a history or a

5   background, whether that be other offenses or other acts

6   that that person has committed, right?

7       A.   Yeah.

8       Q.   And that's obviously -- that's correct.  The

9   law also says that while you, as a juror, having found

10  the defendant -- having found the defendant guilty of

11  capital murder before you start assessing these

12  questions, you've got to step back and assess these

13  questions anew, you know.  It's a new phase of the

14  trial.  The law is also clear that you can consider the

15  facts that were presented to you in the guilt-innocence

16  phase of the trial in that second phase of the trial,

17  the punishment phase.  Is that -- do you understand

18  that?

19      A.   Yeah.

20      Q.   So, the underlying facts of the case, what

21  happened in that case that you had convicted the

22  defendant of, can also be considered in the punishment

23  phase, obviously; but the law is also clear in that the

24  law allows you to consider those facts and those facts

25  of that case alone might say to you that that person is

1   a continuing threat to society.  Does that make sense?

2        A.   Yes.

3        Q.   An example that we use a lot, are you familiar

4   with the Candy Man murder?  Have you heard about that?

5        A.   Vaguely, but...

6        Q.   It may jog your memory, but the Candy Man

7   murder was a murder committed by a father who basically

8   laced his kid's Halloween candy with poison in order to

9   cash in on an insurance policy.  And he was subject to

10  being prosecuted for the death penalty.  And, you know,

11  he was a normal, average Joe citizen.  I mean,

12  professional, had a job, and thought highly of by his

13  peers.  But in that situation, the facts of his case

14  alone were allowed to be considered as -- regarding him

15  being a continuing threat to society just based on the

16  facts of that case.  Does that make sense?

17       A.   Yes.

18       Q.   And is that something that you think you would

19  be able to consider just along with -- just as well as

20  you would the other -- like background and other

21  offenses committed?

22       A.   Yes.

23       Q.   Okay.  Now, the second special issue is what

24  the Judge referred to at the parties issue.  And that

25  essentially lays out what we have talked about as far as

1    the law of parties.  You've got to find that beyond a

2    reasonable doubt -- again, that is the burden that we

3    have to prove that issue to you, beyond a reasonable

4    doubt -- that the defendant either actually caused the

5    death of that person, or if he did not actually cause

6    the death, that he either intended to kill that person

7    or another person or should have anticipated that a

8    human life would be taken.  It very much is in line with

9    that -- what we talked about with the law of parties.

10   Does that make sense to you?

11        A.   Yes.

12        Q.   Okay.  And we've talked about that and you said

13   that was a concept you understood?

14        A.   Yeah.

15        Q.   Finally, that Special Issue No. 3, what we call

16   the mitigation issue.  You will notice in this issue

17   there is no beyond a reasonable doubt standard, there is

18   no burden of proof standard, there is technically no

19   burden of proof for this issue.  Okay?

20        A.   Uh-huh.

21        Q.   For the mitigation issue, you are essentially

22   being asked to find that if there is something --

23   generally if there is something that makes the defendant

24   less blameworthy in his past or his background.

25   However, specifically, I will point out, you, as a

1   juror, have to find there is a sufficient mitigating

2   circumstance.  And that's going to have to be something

3   that you determine in your mind to be sufficiently

4   mitigating.  Does that make sense?

5      A.   Yes.

6      Q.   Can you imagine that there are any number of

7   things that you as a juror might find mitigating about a

8   person's background?  Right?  And sometimes you can --

9   those things can play both sides.  You know, you might

10   as a juror, in a right case, might find -- might hear

11   testimony about a history of drug abuse and that might

12   be a sufficient mitigating circumstance.  But at the

13   same time, you know, you might hear that a person has a

14   clean background and doesn't have any of those -- the

15   drug history or anything like that.  And that might be

16   something that you consider.

17         But is there anything about that special

18   issue that you ultimately think you might have a problem

19   answering if it got to that point?

20      A.   No.

21      Q.   Mr. Jordan, just a couple of follow-up things

22   and then I will be done for right now.  I know that we

23   have talked about the DWI trial that you were a juror

24   on.  I know that in your questionnaire you said that you

25   were able to reach a verdict.  Is that correct?

1      A.    Yes.

2      Q.    And in that case, you did not assess

3 punishment.  Is that right?

4      A.    No.

5      Q.    Did the judge assess punishment or what

6 happened there?

7      A.    There was a not guilty.

8      Q.    Okay.  And you were not the foreman in that

9 case; is that right?

10      A.    No.

11      Q.    And there wasn't -- was there anything about

12 that experience and you coming down here on that jury

13 service that would affect you negatively in this case?

14      A.    No.

15      Q.    You didn't want to strangle any fellow jurors?

16      A.    No.

17      Q.    Or prosecutors, particularly?

18            I also show that you are retired, correct?

19      A.    Correct.

20      Q.    For how long?

21      A.    Sixteen years.

22      Q.    Congratulations.

23            And you were in the insurance business

24 before?

25      A.    Life insurance.

1          Q.    Okay.   I noticed you are in a riding club and

2     whatnot.   Do you do those types of things in your time

3     off now?

4          A.    Yeah, I do.   I own a motorcycle and a motor

5     home and we travel.   I fly radio-controlled airplanes.

6          Q.    I ask that because I have had jurors that show

7     they're retired from a particular business and then I

8     find out later they have a side business that is way off

9     the map from anything we have seen on paper.

10         A.    My job is not to have to work again.

11         Q.    Good.   That is how retirement should be.   I

12    always wonder about these people who go into a second

13    career.

14         A.    I may not make it, but that's my new job, not

15    to have to do that again.

16         Q.    And, finally, Mr. Jordan, I know it's a

17    sensitive issue and I told you up front that I

18    apologize, but it is something that we need to talk

19    about as far as your brother goes.   Is he here in

20    Houston?

21         A.    No.   He is in Hot Spring, Arkansas.

22         Q.    Hot springs.

23               And aside from this -- from the possibility

24    of a trial or this commitment, is it an arrangement

25    where you would typically be able to go up there

1  whenever you were needed or on the drop of a hat or --

2      A.   Well, yeah, that would be, you know, ideal.   I

3  would need a few days.

4      Q.   Okay.  And I think to the Judge you had stated

5  that his prognosis, unfortunately, weeks possibly?

6      A.   Yes.  He was diagnosed two months ago and he

7  was stage four then.  And he is -- they have no more

8  treatment for him right now.

9      Q.   Well, again, I'm sorry, so sorry for that.  But

10  I just need to know.  I mean, is it something that you

11  feel like would be on your mind and not allow you to

12  concentrate as fully as you would prefer or what are

13  your feelings about that?  You can just shoot straight

14  with me on that.

15      A.   No, I think I would be okay.  Just when we're

16  talking about it -- I'm sorry.

17      Q.   No.  I'm sorry we have to talk about it.  It's

18  just one of those things I don't want to put you in a

19  situation that you shouldn't be put in.

20      A.   I don't believe it would affect me, no.

21      Q.   Well, I appreciate that response.  I know

22  that's extremely hard.

23             Okay.  Mr. Jordan, I'm going to pass you on

24  to Mr. Cornelius or Mr. Madrid.  Is there anything else

25  that you feel like I need to know before I don't get to

1   talk to you anymore?

2        A.   No.

3        Q.   Okay.  I appreciate your time.

4             THE COURT:  Mr. Cornelius, you may proceed.

5                **VOIR DIRE EXAMINATION**

6   **BY MR. CORNELIUS:**

7        Q.   Mr. Jordan, again, I'm Skip Cornelius.  Mario

8   Madrid is right here.  Obel Cruz-Garcia.  The Judge

9   introduced us.  I just thought I'd introduce myself and

10  my co-counsel and my client again.

11            Almost initially when the prosecutor was

12  talking to you, he asked you about a scale of one to ten

13  and you picked eight.  You remember that?

14       A.   Yes.

15       Q.   What did -- picking eight, what does that mean?

16  Break that down for me, if you can.

17       A.   Can you give me the question again?

18       Q.   Well, I'm not sure exactly how he said it, but

19  he said a scale of one to ten; one being a person that

20  didn't believe in capital punishment at all and ten

21  being a person that believed in it very, very strongly,

22  something like that, where would you fit.  And you said

23  eight.

24       A.   I couldn't pick five, so I picked the middle.

25  I didn't have much --

1      Q.   Okay.

2      A.   -- that I can --

3      Q.   I forgot about the you-can't-pick-five part.

4           MR. CORNELIUS:  May I approach the juror?

5           THE COURT:  Yes.

6      Q.   (By Mr. Cornelius) I'm going to show you a copy

7 of the questionnaire you filled out on Friday.

8           There are two, I guess, scales that -- and

9 do you remember being asked those or having to give an

10 answer?

11     A.   Yes.

12     Q.   The one that is -- Question 64 is the one most

13 like what you were asked just a moment ago.  And, you

14 know, it's a one through five.  Of course, it tells you

15 what one is, what two is.  You weren't given that on

16 your scale of one to ten.  You said:  I'm neither

17 generally opposed to nor generally in favor of capital

18 punishment.  You just sort of put yourself dead smack in

19 the middle.  What -- why did you pick that one?

20     A.    I just read each one of them and that's the one

21 that I felt comfortable checking.

22     Q.   That's the one you felt most akin to?

23     A.   Yes.

24     Q.   And then the one -- the question after that,

25 you know, it's saying you are actually on a jury.  And

1    it's kind of just in a general way asking you how you

2    would view the possibility of giving a death sentence.

3    And, again, you picked the number three:  My decision on

4    whether to assess the death penalty would depend on the

5    facts and circumstances of a particular case.  Is that,

6    again, the one you felt most --

7         A.   Yes.

8         Q.   -- that summarized how you actually feel?

9         A.   Yeah.

10        Q.   Because if we go to two or four -- two is:  I'm

11   opposed to the death penalty, but could do it in a

12   proper case.  And number four said:  I would usually

13   vote for the death penalty in a case where the law

14   allows me to do so.

15             You didn't think those were appropriate?

16        A.   I felt three fit my feelings of it at that

17   time.

18        Q.   Okay.  Well, you can see the eight that you

19   gave on the scale of one to ten, I didn't see that

20   coming.  It seemed like a high number.  I'm just

21   wondering, what does that mean to you, an eight?

22        A.   Again, I can't give you any help on that.

23        Q.   When the -- when you were asked about that

24   scale, you had previously just been asked about if you

25   were the governor for the day, if you would have capital

1  punishment as part of your laws and you said you would.

2      A.   Right.

3      Q.   So, in picking the number eight, were you

4  talking -- were you thinking that you were an eight in

5  having capital punishment as a possible punishment or

6  were you saying that you are an eight on a scale of

7  whether you would give capital punishment as a

8  punishment in a case?

9      A.   You've kind of lost me completely.

10      Q.   Did none of that even pass through your mind?

11      A.   Yeah.  You know, I tried to answer his question

12  at that time as best I could.  And --

13      Q.   Okay.

14      A.   -- I can't rationalize it right now with the

15  information I have right now.

16      Q.   I don't mean to be picking on you.

17      A.   That's all right.  I understand.

18      Q.   It just kind of scared me.

19      A.   It gets confusing to me.

20      Q.   So, when you say that you are neither generally

21  opposed to it or against it, that's what you meant?

22      A.   I think so, es.

23      Q.   Okay.  As you sit there now, is there anything

24  about my client that would cause you to think he's

25  guilty?

1      A.   No.  I haven't heard any evidence.

2      Q.   The fact that he needs an interpreter, does

3  that affect you in terms of his guilt or innocence?

4      A.   No.

5      Q.   Okay.  All right.  The questions about the

6  Fifth Amendment, I think you are good with all of that,

7  but let me hear it for myself.  Do you think that a

8  person that is accused of a crime should have to

9  testify?

10      A.   Absolutely not.

11      Q.   And why is that?

12      A.   It's the State's responsibility to prove guilt.

13      Q.   They don't have to prove their innocence, so

14  why should they have to testify, right?

15      A.   That's correct.

16      Q.   Okay.  The fact that this case allegedly

17  occurred in 1992, and that they're asking you about

18  whether they have to prove motive and how the evidence

19  may have changed, it might be missing witnesses, or

20  whatever, do you think that because it happened in 1992,

21  or whatever happened happened in 1992, that they get any

22  extra benefit from that or it's easier for them to try

23  or you should fill in the blanks for them or anything?

24      A.   No.

25      Q.   I mean, you know that they can choose to try

1   the case or continue to investigate the case.  It's

2   their decision whether they're going to go to trial or

3   not.  We're not making them go to trial, right?

4       A.   Right.

5       Q.   So, if they go to trial, they have to prove it

6   beyond a reasonable doubt just like they'd have to prove

7   it beyond a reasonable doubt if it happened yesterday,

8   right?

9       A.   Right.  I think so.

10      Q.   I mean, you would hold them to the same burden?

11      A.   As I understand it, yes.

12      Q.   Okay.  The proof beyond a reasonable doubt

13  burden, which is the burden.  And the Judge very

14  properly said that it does not mean 100 percent

15  certainty, but it means proof beyond any reasonable

16  doubt.  And you've heard that before.  That was the same

17  burden in the DWI case.

18      A.   Right.

19      Q.   How long ago was the DWI case?

20      A.   I don't know exactly, but it has to be at least

21  three years.

22      Q.   Okay.  Do you remember if they had a definition

23  for what constituted proof beyond a reasonable doubt in

24  the charge the judge gave you?

25      A.   No, I don't remember that.

1    Q.   Okay.  Well, there used to be one and there

2   isn't one now.  Actually, they're used to be one, then

3   there wasn't one, then there was a definition, now there

4   is not a definition.  Because there -- really, it's

5   something that's really hard to define, what constitute

6   proof beyond a reasonable doubt.  And our current

7   legislation, our current laws say that it is whatever

8   the juror, the individual juror believes that it is.

9   Whatever you require to convince you beyond a reasonable

10  doubt is your definition.  So, there could be 12 people

11  on the jury, every one of which could have a different

12  definition and a different requirement for what

13  constitutes proof beyond a reasonable doubt.

14              Can you kind of understand that?

15   A.   Yes.

16   Q.   It might be that a juror might say:  I have a

17  reasonable doubt.  I can't tell you what the reason is

18  or what the specific things are that I doubt, but I'm a

19  reasonable person, I've listened to all of the

20  witnesses, I've viewed all of the evidence in the case,

21  I have listened to prosecutor's arguments in the case,

22  and I've listen to everybody else on the jury, and I'm

23  not convinced; the evidence, nor any of these arguments,

24  convince me beyond a reasonable doubt that the

25  defendant's guilty, and, therefore, I have a reasonable

1    doubt and I'm voting not guilty.  And that may be one

2    juror's belief and their right to do that.

3                    Another juror might say:  I have a

4    reasonable doubt and I will tell you why.  I didn't

5    believe such and such a witness.  Maybe it was a

6    cooperating witness, a co-defendant, and they just

7    didn't believed them.  Thought the witness had too much

8    to gain by coming in here and testifying and putting it

9    on somebody else or pointing the finger at somebody else

10   and they just didn't believe it.  It wasn't enough to

11   corroborate.  Maybe not enough to corroborate the case

12   against the person on trial or not enough to corroborate

13   the witness themselves to be believed.  And that creates

14   a reasonable doubt in the juror's mind.  And if that is

15   their definition of what creates a reasonable doubt,

16   they are entitled to that.  Do you follow me?

17        A.   Yes.

18        Q.   There could be ten other definitions, ten other

19   reasons why somebody has a reasonable doubt.  Do you see

20   any problem with that?

21        A.   No.

22        Q.   I mean, that is our law.  I'm not making it up.

23   That's our law, but are you good with that?

24        A.   Yes.

25        Q.   Okay.  And if you were selected to serve on a

1    jury -- and I'm not trying to tie you to this case --

2    let's say next year.  My hypotheticals have to do with

3    next year.  You are selected to serve on a jury next

4    year and it happens to be a capital murder case.  If the

5    State puts their case on and at the end of their case

6    you have a reasonable doubt, would you be able to vote

7    for not guilty?

8         A.   Yes.

9         Q.   You have done that before, I take it, in the

10   DWI case?

11        A.   Yes.

12        Q.   Now, I have to talk about Johnny Bond for a

13   moment.  How long have you known him?

14        A.   Couple of years.

15        Q.   Couple of years.  I have known him for 40

16   years, 41 years actually.  He was quite a character.  I

17   knew him when he was really thin.  You can't tell him I

18   said that.

19             Do you know anybody else that either works

20   or has worked in the past in the D.A.'s office?

21        A.   No.

22        Q.   The people in your motorcycle club, are some

23   other ones some kind of law enforcement?

24        A.   No.

25        Q.   He is the only one?

1     A.   Well, there may be others, but I don't know.

2     Q.   Okay.  Nothing about that would affect you and

3   the way you vote in this case, right?

4     A.   No.

5     Q.   I know Johnny wouldn't want it to, because I

6   know him.  Did you ever read his book?

7     A.   No.  I don't know he had one.

8     Q.   All right.  Do you have grandkids?

9     A.   Five.

10    Q.   Five.

11         Do you fly in the airplane with your

12   grandkids?

13    A.   No.  Unfortunately, they've never -- I have

14   done it, but they went their own ways.

15    Q.   Okay.  I want to talk to you for a few minutes

16   about the special issues.  And I will be done.  I just

17   have a few more questions to ask you, really.

18         Hypothetical again next year.  Let's say

19   that you are selected to serve on the case and in that

20   case next year, you and the other 11 members of the jury

21   convict someone of capital murder.  Then you have to

22   answer -- the very next thing would be to answer Special

23   Issue No. 1.  You get a new charge -- you get jury

24   instructions, or they call it the charge, on the

25   guilt-innocence part of the case.  And in that will be a

1   verdict sheet.  And let's say in my hypothetical you

2   convict.  So, there is a punishment hearing where you

3   hear everything good about the defendant, everything bad

4   about the defendant, everything the law allows the jury

5   to hear in deciding how to assess the punishment or in

6   deciding how to answer these special issues.  And after

7   you hear all of that, the first order of business would

8   be to answer Special Issue No. 1.  If you answer it

9   "yes," that the person -- in the mind of the jury it's

10   been proven beyond a reasonable doubt that there is a

11   probability he will be a continuing threat, you answer

12   to No. 1 "yes" and then you go to No. 2.  Okay?  But

13   let's just stick with No. 1 for a second.

14              My fear is that I would, through my

15   incompetent, end up with a juror who would automatically

16   always answer No. 1 "yes," that there is at least the

17   probability that the person that they've now convicted

18   of capital murder would be a continuing threat, there's

19   at least the chance or some percentage or some reason to

20   believe that the person would be a continuing threat.

21   That's not way a juror is supposed to feel.  They are

22   supposed to be able to answer that question either way

23   depending on what the evidence is.  But some people have

24   told us if they convict someone of capital murder, they

25   couldn't help but answer the question yes because in

1    their mind the person is always -- there's always going

2    to at least be the probability that they'd be a

3    continuing threat.

4              Do you feel that way or is your mind open

5    to answer either way?

6        A.   No, I don't feel that way.  I think that it

7    depends on what I hear in the case.

8        Q.   Okay.  So, just because you convict someone of

9    capital murder, you wouldn't automatically answer that

10   he would be a continuing threat?

11       A.   No.

12       Q.   Okay.  Now, I'm going to skip to Special Issue

13   No. 3, which is the one about mitigation.  Do you

14   remember it?

15       A.   Yeah.

16       Q.   Should I put it up on the board for you?  I

17   will put it up there.

18              Okay.  Nobody has a burden on this.  I

19   don't have to prove that there is mitigation.  They

20   don't have to disprove that there is mitigation.  You

21   would only get to this question if you've convicted of

22   capital murder, you found there was a probability that

23   the person that you convicted was going to be a

24   continuing threat, and you found and answered "yes" to

25   that second one about either the person on trial did the

1  killing or intended to do the killing or should have

2  known the killing was going to take place, anticipate it

3  was going to take place.  You follow me.

4       A.   Uh-huh.

5       Q.   So, you never even get to this unless both of

6  those questions are answered "yes."  And that person is

7  on their way to the death penalty unless they're bailed

8  out by this mitigation question.  That's what the

9  mitigation question is there for.  Is there something in

10 this case that would turn the juror away from the death

11 penalty, even though they found him guilty, found him to

12 be a continuing threat, and found that he either

13 personally committed the murder or intended for it to

14 happen, or anticipated that it was going to happen.

15 Okay?

16            So, you can see what the Legislature's

17 intent is, is to give you, the jury, a chance to not

18 give a death sentence, even though all of those things

19 were true.  I don't know what you would consider to be

20 mitigating and I'm not entitled to ask you or try to

21 find out what would be mitigating to you.  But are you

22 open to the fact -- to the possibility that there could

23 be things that you would find in that situation that

24 were mitigating and allow you to answer that question

25 "yes" also?  In that instance the "yes" means that you

1    do find a mitigating factor that is sufficient to turn

2    away from the death penalty.  Do you think you could do

3    that?

4         A.   Yes.

5         Q.   Okay.  Any questions about that?

6         A.   No.

7         Q.   Have you thought all this stuff out before

8    today?

9         A.   No, sir.

10        Q.   This is it, huh?  This is the first time

11   anybody's asked you all these insane questions?

12        A.   And it is very difficult.

13        Q.   I agree.

14             MR. CORNELIUS:  Okay.  Could I have just a

15   second, Judge?

16             THE COURT:  Yes.

17             (Pause)

18             MR. CORNELIUS:  I'll pass the juror.

19             THE COURT:  Anything further?

20             MR. WOOD:  Nothing further from this juror,

21   Judge.

22             THE COURT:  Deputy Perry, would you please

23   take the juror out?

24             Mr. Jordan, just step down for a few

25   moments.  I'll discuss this with the lawyers and we'll

1    be right back.

2                    (Venireperson exits courtroom)

3                    THE COURT:  What says the State?

4                    MR. WOOD:  Judge, the State accepts.

5                    MR. CORNELIUS:  Defense accepts.

6                    THE COURT:  Let me make sure I get

7    something on the record here.

8                    As to Mr. Larry Jordan, Juror No. 5,

9    Mr. Obel Cruz-Garcia, do you agree with your counsel and

10   accept this juror, No. 5, Larry Jordan?

11                   THE DEFENDANT:  Yes, ma'am.

12                   THE COURT:  And I wanted to back up just a

13   minute.  There was the previous juror that was -- that

14   you used a peremptory challenge on.  I want to make sure

15   it was on the record.

16                   Juror No. 4, Travis Bollom, Mr. Obel

17   Cruz-Garcia, do you agree with your counsel to move to

18   strike that juror as -- and use one of your peremptory

19   challenges to strike that juror, No. 4, Travis Bollom?

20                   THE DEFENDANT:  Yes.

21                   THE COURT:  Okay.  Very good.  Thank you.

22                   You may bring the juror, No. Five, Larry

23   Jordan, back in, please.

24                   (Venireperson enters courtroom)

25                   THE COURT:  Mr. Jordan, you have been

1    selected to serve as a juror in the trial of the State

2    of Texas vs. Obel Cruz-Garcia, Trial Court Cause

3    No. 1384794.  I'm going to give you some jury

4    instructions.

5              Now that you are a juror in this case, you

6    must not read, watch, or listen to anything regarding

7    this case.  You are not to engage in any social media

8    outlets, including Facebook, Twitter, etcetera, about

9    your status as a juror in this case.  If you encounter

10   anything about this case, including but not limited to,

11   casual conversation, stories in the media, or exposure

12   to any type of information or from any source,

13   immediately end the encounter.  You may own receive

14   information from the official court proceedings.  Do not

15   discuss the case with anyone, including other

16   prospective jurors.

17             You do have an employer that you need to

18   inform, correct, sir?

19             VENIREPERSON:  No.

20             THE COURT:  Okay.  And in case of an

21   emergency, there is the number of Deputy Perry on here

22   and court coordinator, Joseph Debruyn, that you can

23   contact the Court.

24             You are instructed that you are released

25   today and you are to return promptly at 10:00 a.m. on

1    Monday, July 8th, 2013.  And you will return to my

2    courtroom, which is on the 15th floor of this same

3    building.  It's the 337th District Court.  And I have

4    all of this information here for you right here.  Okay?

5                   And so, I wish you luck with your brother,

6    sir.  And I hope that we don't -- you don't have to

7    worry about that in the continuation of this case, that

8    that's all completed.  Okay?

9                   VENIREPERSON:  Okay.

10                  THE COURT:  Thank you, sir.  Have a good

11   day.

12                  And JJ, are you going to show him around?

13                  THE BAILIFF:  Yes.

14                  THE COURT:  Deputy Perry will show -- just

15   briefly give you a juror badge and show you where you

16   are going to be going.

17                  (Venireperson exits courtroom)

18                  THE COURT:  Last juror, that's Juror No. 7,

19   Salvador Gonzalez.

20                  MR. CORNELIUS:  No. 7, yes.

21                  (Venireperson sworn)

22             **SALVADOR GONZALEZ, VENIREPERSON NO. 7,**

23   was called as a prospective juror, and testified as

24   follows:

25                       **VOIR DIRE EXAMINATION**

1  **BY THE COURT:**

2      Q.   Mr. Salvador Gonzalez, you are Juror No. 7 in

3  the venire in the State of Texas vs. Obel Cruz-Garcia.

4  Is that correct, sir?

5      A.   Yes, ma'am.

6      Q.   All right.  And this is -- I want to tell you

7  that this is a continuation of voir dire, which means

8  there is no right or wrong answers here.  The lawyers

9  are going to be given an opportunity to speak with you

10  for about half an hour apiece.  So, it will probably be

11  about another hour.  And I have -- I want you to know

12  that there are no right or wrong answers.  Please be

13  honest with them.  They may cover some topics that I

14  have already covered and question you a little more in

15  depth about them.  They are trying to get to your

16  feelings about certain areas of laws.  So, please be

17  completely honest with them.

18                 And the only questions that I have for you

19  are three.  First, are there any religious, personal, or

20  moral reasons you would not be able to sit on a jury

21  where the death penalty is a possible punishment?

22      A.   No, ma'am.

23      Q.   So, none of those.

24                 Do you know of any reason why you couldn't

25  be fair and impartial to both sides in a criminal case?

1     A.   No, ma'am.

2     Q.   Have any of your answer from the questionnaire

3  filled out last Friday changed, sir?

4     A.   No, ma'am.

5     Q.   If at any time you do not understand a question

6  or you'd like for them to rephrase it, please just ask

7  them.  And I'm going turn over to the lawyers.

8                THE COURT:  Mr. Wood, please proceed.

9                MR. WOOD:  Thank you, Judge.

10                    **VOIR DIRE EXAMINATION**

11  **BY MR. WOOD:**

12     Q.   Good afternoon, Mr. Gonzalez.

13     A.   Good afternoon.

14     Q.   How are you doing?

15     A.   Good.

16     Q.   I'm going to be visiting with you a little bit.

17  And just so that everybody can hear you, I'll just ask

18  that you speak up.  I don't know if that microphone is

19  on.

20                THE COURT:  Tap it and see.  Try it now.

21     Q.   (By Mr. Wood) I want to make sure everybody can

22  hear you.  Okay?

23     A.   That's fine.

24     Q.   You have kind of a quiet voice.

25                Again, I was introduced earlier, but my

1    name is Justin Wood.  And along with Natalie Tise, we'll

2    be trying the case, if you are chosen as one of the 12

3    jurors.  Sitting to my left is Steve Walsh.  He is an

4    intern of ours and he'll be helping us out.

5         A.   Okay.

6         Q.   So, he will be in and out, too.

7              So, it's been a long day, right?

8         A.   Yes, sir, it has.

9         Q.   Lots of sitting around and waiting.

10        A.   Yes, a lot.

11        Q.   Is this your first time down here for this kind

12   of process?

13        A.   Yes, sir.

14        Q.   I wasn't clear on your questionnaire, but you

15   haven't ever been called for jury service before, have

16   you?

17        A.   I have not.  This is my first time.

18        Q.   Well, you picked a big one for your first one.

19              When you showed up on Friday and you were

20   asked to fill out all of these questions, what did you

21   think about that?

22        A.   Well, I mean, I didn't think much of it.  I

23   mean, I thought it was like simple questions.  And after

24   that, they told us to go home and I was like -- I mean,

25   okay.  And once they told us to come back, I was like --

1  I didn't know what to expect.

2      Q.   Right.  Your first time, you thought this might

3  happen in all of these cases, right?

4      A.   Yeah.  I didn't know what to expect.

5      Q.   Well, it's a lot different in a capital murder

6  where we're seeking the death penalty.  Because we want

7  to make sure that we have the best 12 jurors, or 14 with

8  the alternates, that are the best jurors for this case,

9  if that makes sense.

10             And at this point, this is our opportunity

11  to -- this is our only opportunity to get to talk to you

12  one-on-one.

13      A.   Okay.

14      Q.   The Judge got to speak to you this morning and

15  now myself and Mr. Cornelius will get to talk to you

16  one-on-one.  And this is the only time, until the trial

17  is completely over, that we get to talk with you.  And

18  the reason that is important is that we want --

19  obviously, both of us want to get the fairest jury for

20  this case.

21      A.   Right.

22      Q.   But to do that, we have to encourage you to be

23  open and honest with your answers.

24      A.   Okay.

25      Q.   And trust me, Mr. Gonzalez, there is no wrong

1  answer, there is no right or wrong answer.  Nothing that

2  you say is going to offend me or offend Mr. Cornelius or

3  anything like that.  We just want to got your true

4  feelings.  All right?

5      A.  Okay.

6      Q.  So, can you promise that you will give me your

7  honest answers?

8      A.  I'll give you my honest answers.

9      Q.  I appreciate everything that you've shared in

10 your questionnaire.  And we've gotten to go over that.

11 And I'll ask you some specific questions about that.

12     A.  Okay.

13     Q.  But now that you've heard us talk about this

14 for quite some time today, you know there is a

15 difference between murder and capital murder, right?

16     A.  Yes, sir.

17     Q.  Like the Judge told you, murder is -- in Texas,

18 is the intentional taking of another person's life.  As

19 long as there is it no self-defense or anything like

20 that, that's what murder is.  And in Texas, there are

21 certain types of murder that are considered more serious

22 and that are considered as capital murder.  Do you

23 remember the Judge going over that?

24     A.  Yeah.

25     Q.  It's been a long time ago, right?

1      A.   Yeah, it's been a while.

2      Q.   In Texas, if there is a murder plus some kind

3  of something else, some kind of aggravating factor, and

4  in Texas that might be if you kill a child under the age

5  of ten, if you kill a police officer in the line of

6  duty, maybe you kill two or more people in the same

7  scenario, those are examples, but also if you kill

8  another person in the course of committing a robbery, a

9  kidnapping, a burglary.  Those are the types of offenses

10  that Texas considers for capital murder.  Does that make

11  sense?

12      A.   Yeah, it does.

13      Q.   And in Texas, for capital murder, there is two

14  punishments.  There is either the death penalty, or if

15  the case -- if the State does not choose to seek the

16  death penalty, currently there is the option of life

17  without parole.  Not really an option.  If a jury finds

18  the defendant guilty of capital murder where the death

19  penalty isn't being sought, then the punishment is life

20  without parole.  But that's how it is currently.

21           This case, as you have heard, is alleged to

22  have been committed back in 1992.

23      A.   Yes.

24      Q.   I hate to even ask, but, actually, that was the

25  year you were born.

1        A.   Yes, it was.

2        Q.   So, back in 1992, there wasn't that option.

3    There wasn't the option of life without parole.  Back

4    then, if the death penalty was not assessed then the

5    only other option for capital murder was life with

6    parole.  And you would be eligible for parole after

7    serving a certain number of years.  Does that make

8    sense?

9        A.   Kind of.

10       Q.   Okay.  So, it's either the death penalty or if

11   we have -- we have to treat this as the offense happened

12   in '92.  So, the laws that were in place then, that's

13   how we have to operate in this case.

14       A.   Okay.

15       Q.   Does that make sense?

16       A.   Yes, it does.

17       Q.   Because -- well, we won't go into all of that,

18   but that's essentially what the law was back in 1992.

19   So, it's either the death penalty or if the death

20   penalty is not assessed it's life with parole after

21   serving -- or life with the eligibility of parole after

22   a certain number of years.  Does that make sense?

23       A.   Yes, it does.

24       Q.   So, I want to talk to you a little about your

25   feelings on the death penalty.  Because I can only

1  base -- right now, all I can guess is based on what you

2  wrote in your questionnaire.  And from what I can tell

3  from your questionnaire, you probably aren't a huge fan

4  of the death penalty at this point.

5        A.  Yeah, I'm really not.  I mean, I can't decide

6  whether -- which one.  I mean, I'm not against it and

7  I'm not for it.  So, I mean, I'm like in between of it.

8  Because a person deserves his life.  So, I can't choose

9  for him to get the death penalty or not.

10       Q.  Okay.  Well, we're going to talk about that, a

11 little bit about that and maybe figure out some of the

12 reasons behind those feelings.  Because, ultimately,

13 Mr. Gonzalez, you understand that if you are chosen to

14 be a juror on this case, that we -- Natalie and I will

15 be putting forth evidence, you will hear testimony, we

16 will ask ultimately that you return a verdict of guilty;

17 and if that happens, if you are on a jury that finds the

18 defendant guilty of capital murder in Texas, then we go

19 to that second part of the trial, which is the

20 punishment phase.  And you might hear other evidence and

21 other testimony and other witnesses during that phase,

22 but at the end of that trial, you are asked to answer

23 certain questions.  Remember those three questions that

24 the Judge talked about?

25       A.  Yeah, kind of.

1      Q.   And we will talk about.  There are three

2  questions that you have to answer.  And if you answer

3  those questions in a way that could potentially send

4  this person -- that would essentially sentence this

5  person to death, that's essentially what we would be

6  asking you to do.  So, we have to find out if you were

7  the right type of juror for this kind of case.

8                    Remember what we were talking about?

9      A.   Yes.

10     Q.   There are some people that are better suited

11  for other kind of juries or other kinds of cases.  I

12  always give the example that if you got your car broken

13  into on Friday night when you and your buddies were out

14  at dinner and you came in to jury service today, you are

15  probably going to be still pretty heated about that,

16  right?

17     A.   Yes.

18     Q.   Because they never catch whoever breaks into

19  your car, right?

20     A.   Uh-huh.

21     Q.   And that's going to be fresh on your mind.  So,

22  if you came in here and I told you that you were about

23  to be on a jury for a car burglary, you might not be the

24  best juror for that type of case, right?

25     A.   Yeah, probably not.

1    Q.   Because you might be biased because it just

2  happened to you.

3    A.   Exactly.

4    Q.   And that's fine.  There's nothing wrong with

5  that.

6         So, over the course of these questions and

7  us talking with each other and Mr. Cornelius talking, if

8  you tell us that you are not the best type of juror for

9  this kind of case, a death penalty capital murder, then

10  there is no hard feelings over that.  We just want to

11  get your honest response.  Okay?

12    A.   That's fine.

13    Q.   So, I want to visit with you a little bit about

14  your feelings on the death petty.  I know you said

15  you're maybe neither for or against, but there were a

16  few things that you said in your questionnaire.

17  Generally, if I told you today, Mr. Gonzalez, that I was

18  making -- that I had the power to make you governor of

19  the State of Texas today, just you, you don't have to

20  agree with anybody else or ask anybody else.  All right?

21    A.   Right.

22    Q.   And I asked you:  If you were governor for the

23  day, would you have the death penalty as punishment for

24  a capital murder case in your state?

25    A.   I wouldn't.  I wouldn't have it.

1       Q.   Okay.  And why is that?

2       A.   I mean, like I said, I mean, I prefer for the

3   person to have like life in jail than give him the death

4   penalty.  I mean, the crime that he had committed, I

5   mean, I still think he deserves his life regardless,

6   even if it's his whole life in jail.  I mean, that's

7   what I think.

8       Q.   And I know that in your questionnaire you were

9   asked at one point -- the question was whether life

10  imprisonment is more effective than capital punishment

11  and you had said that you agree with that.  Is that

12  correct?

13      A.   What was the question again?

14      Q.   One of the questions -- I know there were a ton

15  of them, but one of the questions that was asked was:

16  Life imprisonment is more effective than -- I'm sorry --

17  yes -- is more effective than capital punishment, like

18  the death penalty.  And you said you agreed with that.

19      A.   Well, yeah, I do.

20      Q.   And is that -- I'm just clarifying.  Is that

21  what you're saying today as well?

22      A.   Yes, sir.

23      Q.   So, Mr. Gonzalez, you heard me say -- and

24  understand, I'm not trying to change your feelings or

25  anything.  I just want to make sure we're clear.

1              You heard me tell you that in Texas there

2    is two punishments, possibly, for capital murder, either

3    the death penalty or life in prison with the possibility

4    of parole in this case.  Is that right?

5         A.   Yes, sir.

6         Q.   Do you remember me telling you that?

7         A.   Yes, sir.

8         Q.   And let me ask you this.  As a juror, is there

9    any -- can you imagine in your mind any set of facts

10   that you could keep an open mind to that would allow you

11   to assess the death penalty in the right case?

12        A.   I don't know.  I mean, there might be, but not

13   that I can think of right now.

14        Q.   Well, you just said earlier, just a couple of

15   minutes ago, that if you were governor of the day and

16   you were given that option, you would say:  No death

17   penalty, because you believe life in prison is more

18   appropriate.

19        A.   True.

20        Q.   Is that accurate?

21        A.   Yes, sir.

22        Q.   You also said in your questionnaire that

23   capital punishment is not necessary in modern

24   civilization.  Is that a statement that you agree with

25   still?

1     A.   Yes, I agree with it.

2     Q.   And you disagreed with the statement that --

3 the statement was:  We must have capital punishment for

4 some crimes.  Do you understand the question?

5     A.   No, I didn't.

6     Q.   Okay.  The statement was:  We must have capital

7 punishment for some crimes.  And you said you disagreed

8 with that.

9     A.   I might change, but -- my answer might change,

10 but I don't really get it right now.

11     Q.   Tell me about that.  How would your answer

12 change or why?

13     A.   It depends on what crime, possibly.  So, I

14 mean, that's why I disagreed with it.

15     Q.   Okay.  So, then, say you are governor for the

16 day again and you we're going to say that the death

17 penalty was okay for capital murder.  What kinds of

18 cases would you think were appropriate for the death

19 penalty?

20     A.   There's so many.  I don't recall which crime.

21     Q.   Well, you said there might be some crimes that

22 you think were worthy of the death penalty, right?

23     A.   There might, but, I mean, not one comes to mind

24 right now as I'm sitting here.  Probably because I'm

25 nervous.

1    Q.   It's okay.

2    A.   Tired.

3    Q.   Yeah.  Maybe -- I can understand tired.  Don't

4  be nervous.  You are doing great.  You're doing exactly

5  what we're asking you to do.  Like I told you, I just

6  want your honest answers.  If that's your honest

7  answers, that's all I ask of you.

8                 So, are you saying as you sit there, as you

9  sit here today, you can't think of any offense in your

10  mind that would be worthy of the death penalty if you

11  were given that option?

12    A.   Yeah, not right now I can't think.

13    Q.   Mr. Gonzalez, would you agree with me that when

14  we talk about the death penalty, sometimes it's easy to

15  say that we support it or that -- you know, if you are

16  talking about with different friends or family members,

17  you might say you support it, right?

18    A.   Yeah, probably.

19    Q.   Some people do that.  It might be easy to say

20  that.

21    A.   Sometimes it's easy to say that.

22    Q.   Would you say having been through what you have

23  been through today, having gone through this process

24  that you sat through all morning and now we're talking

25  about it, you realize, I mean, this is kind of do or die

1   time, right?

2        A.   Yeah, like a serious thing.

3        Q.   Right.   And I appreciate that you appreciate

4   how serious this is.   And I get that you get that.   So,

5   I appreciate that, but now that you are in that chair

6   and you could possibly be the person that we ask to sit

7   right over here in this jury box and ultimately decide

8   whether this defendant should be assessed the death

9   penalty, it's a little different, isn't it?

10       A.   Yeah.   It changes everything.

11       Q.   So, talking about it in theory is a little bit

12   different than saying, I can do it.   Right?

13       A.   Yeah, a whole different ball game.

14       Q.   Well, have you ever heard of, you know, like

15   gut check or check your gut on seeing where you are at

16   on something?

17       A.   Yeah.

18       Q.   Okay.   Well, you are here and you know the

19   seriousness of this process.   Look -- in this courtroom

20   today, look at Mr. Obel Cruz-Garcia.   He is in the

21   yellow tie.   I want you to look at him.   Sitting here

22   today, I mean, you see that he is a living, breathing

23   human being just like you and I.   Right?

24       A.   Uh-huh.

25       Q.   You can imagine he probably has family and

1   friends just like you and I do.  Right?

2        A.   Yes.

3        Q.   Sitting where you are sitting today and knowing

4   what we have discussed and looking at him, do you think

5   ultimately that if I and -- myself and Natalie prove the

6   case to you beyond a reasonable doubt and you have found

7   the defendant guilty as part of the jury and then it

8   goes into that second phase where you are asked to

9   answer those questions and if you feel that the evidence

10  and the testimony leads you to answer those questions in

11  a way that would ultimately lead to this person being

12  executed, do you think that you can do that sitting here

13  looking at him?

14       A.   Honestly, I'd find it hard to be able to do

15  that.  Probably because, I mean, I look deep into it.  I

16  mean, putting myself to it as -- I mean, he probably

17  might have a -- I mean, he does have a family.  So, I

18  mean, I put that towards my -- towards me, too.  I have

19  a family, everybody has family.  So, I put family first,

20  see how they feel, and everything, so...

21       Q.   Right.

22            So, I'm going to ask that question again.

23  Do you think that you have it in you as a person, now

24  that this process is real and that you are looking at

25  the defendant, the person that you will be asked to

1   answer those questions of, do you think that you would

2   be able to do that?  "Yes" or "no"?

3        A.   No, I wouldn't.

4        Q.   Mr. Gonzalez, we're talking about the death

5   penalty and capital punishment -- capital punishment is

6   just another term for that -- and I give you a scale,

7   say I gave you a scale of one to ten, and with one being

8   that you are -- you would never assess the death penalty

9   and ten being that you would hand out the death penalty

10  whenever you could -- so you are very pro death penalty

11  or for the death penalty if you are number ten and

12  number one is at the bottom of the spectrum.  Do you

13  understand that?

14       A.   Uh-huh.

15       Q.   And five is in the middle, but I'm going to not

16  let you be able to choose five.  You can't choose five

17  because that's what most people would do.

18            If I give you that scale of one to ten,

19  where would you fall on that scale?

20       A.   I think I would fall between -- I guess a

21  three.

22       Q.   Three?

23       A.   Three or four.

24       Q.   Okay.  Mr. Gonzalez, do you feel that if you

25  were chosen as a juror that you could stand there and

1  raise your hand and you could take the oath to serve as

2  a juror that could ultimately be faced with answering

3  those questions -- and we can go more into detail about

4  this.  And it's going to be on that screen to your

5  right, too.

6           Do you remember those questions that the

7  Judge put up there in her voir dire?

8      A.   Yes.

9      Q.   That Special Issue No. 1, about whether the

10  defendant would be a continuing threat to society.  And

11  then that second issue, she talked about the parties

12  issue.  And we can visit about that.  And then that

13  third issue regarding mitigation.

14           Do you feel like if you were chosen as a

15  juror that you could take the oath to ultimately answer

16  those questions that could potentially lead to the

17  defendant being executed?  Do you think you could take

18  that oath?

19      A.   I don't think I could take that oath.

20      Q.   Do you feel like that it would just violate

21  your conscience to be able to answer those questions --

22      A.   Yes.

23      Q.   -- in a way that would potentially lead to the

24  death penalty for a person?

25      A.   Yes.  I think it would be, like, in my

1    conscience if I answer it and I can't take it.  So, I

2    mean...

3        Q.   And that's just something that you just don't

4    feel like as a person or as a human being that you could

5    really live with?

6        A.   Yeah, I don't think I could stand having that

7    in my conscience.

8                THE COURT:  And, Mr. Gonzalez, we know that

9    people normally use those words "I don't think,"

10   "probably not," and all that, but we need a definite

11   answer, "yes" or "no," as to Mr. Wood's question.

12       A.   No, I won't be able to take the oath, be able

13   to answer those questions.

14       Q.   (By Mr. Wood) And, Mr. Gonzalez, like I told

15   you, we would never want to force you to do something

16   that would violate your conscience, obviously.  I mean,

17   it's harder in this process, probably, to be honest with

18   your feelings when somebody is asking you these

19   questions and you are on a witness stand.  I don't mean

20   that to be intimidating in any way to you.  So, I really

21   appreciate your honesty because those are -- you've

22   probably never, in your 21 years, had to think about

23   these kinds of questions, right?

24       A.   Never.

25       Q.   Right.

1                    MR. WOOD:  Your Honor, at this time, the

2    State has a motion.

3                    MR. CORNELIUS:  No questions.

4                    THE COURT:  No questions, Mr. Cornelius?

5                    Okay.  All right.  That motion will be

6    granted.

7                    Okay.  Mr. Gonzalez, you are excused as a

8    juror in this case.  And what that means, all the

9    instructions that we have given you, they are now

10   lifted.  You don't have to follow any of those

11   instructions anymore.  And if you need a work excuse for

12   today, you can get one with Deputy Perry over here.  He

13   will have that for you.  And your job as a juror is --

14   your duty as a juror is completely finish.  And we

15   really appreciate your time and effort coming down here.

16   We know it was a very long day today.

17                    VENIREPERSON:  It was.

18                    THE COURT:  All right.  Thank you very

19   much.  You are excused.

20                    VENIREPERSON:  No problem.  Thank you.

21                    (Venireperson excused)

22                    THE COURT:  The State's motion on that

23   juror is granted.  So, Juror No. 7 is for cause.

24                    Okay.  That's the last of our jurors for

25   today.  I just want to go over a couple things on the

1  record.  If the lawyers can turn in the juror

2  questionnaires for the excused jurors, that would help

3  us stay on top of things and probably lighten your load

4  coming back and forth.

5              And also, we went a little bit over, more

6  than an hour, for each juror today.  I would like to

7  kind of bring that back into an hour, if we could.

8              Do both sides feel that you can, that you

9  might be able to shorten it back to an hour?  We have

10  eight people scheduled for each day.  And that means no

11  lunch break if we just hold it to an hour.  So, that

12  brings me up to my second thing.  If everybody could

13  bring something and -- I mean, we may take a 30-minute

14  break or something, but we're not going to have time to

15  do an hour and go out and everything.  So, if you need

16  snacks or a break, let's try to do that so we get

17  through picking this jury.

18              Any objections from either side?

19              MR. CORNELIUS:  No, ma'am.

20              THE COURT:  Okay.  What about the timing

21  issue?  Can I hold you a little bit closer to an hour?

22              MR. CORNELIUS:  You can hold me to my 30

23  minutes.

24              THE COURT:  You haven't taken your full 30

25  minutes.  The State is covering a lot.  And every once

```
 1   in a while, things come up.  I know that can change on a
 2   juror that you need to ask a few more questions of.
 3   Okay.  So, I'm going to give you a five-minute warning.
 4   And let's try to stick to it.  If you need to readdress
 5   something after questioning by the other side, you can
 6   ask to go back.  All right?
 7                  MS. TISE:  We'll try to do that.
 8                  THE COURT:  Very good.
 9                  One more thing.  I'm sorry, Mary Ann.
10                  There is a situation with the DNA hearing.
11   Mr. Cornelius brought to my attention that he is going
12   to require an evidentiary hearing on DNA before we start
13   testimony.  Were you aware of that?
14                  MS. TISE:  I believe Justin talked to Skip
15   about it last week.
16                  THE COURT:  Okay.  If you guys can get
17   together and figure out -- you know, I'm off that very
18   last week of June.  I would like to get it done that
19   week right before, if possible.  If not, we're going to
20   need to do it that very first week in July.  So, just
21   get together on that and see.  Okay?
22                  MS. TISE:  Okay.  Sure.
23                  THE COURT:  Thank you.
24                  We're all excused for today.
25                  (Proceedings recessed)
```

1                    **REPORTER'S CERTIFICATE**

2   THE STATE OF TEXAS   )
    COUNTY OF HARRIS     )
3

4       I, Mary Ann Rodriguez, Official Court Reporter in

5   and for the 337th District Court of Harris County, State

6   of Texas, do hereby certify that the above and foregoing

7   contains a true and correct transcription of all

8   portions of evidence and other proceedings requested in

9   writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13      I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, admitted by the respective parties.

16      WITNESS MY OFFICIAL HAND this the 18th day of

17  August, 2013.

18

19  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
20  Expiration Date:  12/31/2013
    Official Court Reporter
21  337th Court
    1201 Franklin
22  Houston, Texas  77002
    713.755.7746
23

24

25

**'**

**'92** - 169:8, 221:24, 318:12
**'skip'** - 2:11

**/**

**/s** - 334:19

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**1** - 1:11, 6:22, 72:4, 72:5, 72:19, 74:3, 74:13, 76:19, 76:20, 77:10, 86:19, 99:17, 104:17, 132:22, 142:13, 171:24, 172:3, 172:6, 189:1, 192:15, 249:13, 250:6, 250:19, 251:6, 285:4, 304:23, 305:8, 305:12, 305:13, 305:16, 329:9
**10** - 1:19, 8:21, 86:14, 86:15, 87:5, 99:19, 104:20, 149:8, 198:11
**100** - 28:16, 29:13, 30:6, 30:8, 30:11, 30:16, 30:25, 31:1, 31:3, 32:6, 32:16, 34:17, 34:21, 34:23, 35:14, 35:18, 36:7, 36:8, 36:14, 37:4, 37:8, 39:1, 39:10, 39:11, 39:13, 41:13, 41:16, 42:22, 42:25, 43:2, 51:1, 82:3, 82:4, 83:13, 127:4, 199:15, 199:23, 200:18, 300:14
**104** - 1:11, 1:13, 1:15, 1:17, 1:19, 1:21, 1:23, 2:1, 2:3, 2:5, 2:7, 2:9, 2:11, 2:13, 2:15, 5:8, 5:12, 5:20, 5:22, 5:24, 6:3, 6:12, 6:22, 6:24, 7:7, 7:9, 7:15, 7:17, 7:20, 7:22, 7:24, 8:3, 8:9, 8:13, 8:15, 8:21, 9:1
**105** - 2:17, 2:19, 2:21, 2:23, 3:1, 3:3, 3:5, 3:7, 3:9, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:23, 4:1, 4:3, 4:5, 4:7, 4:9, 6:1, 6:5, 6:7, 6:9, 6:14, 6:18, 6:20, 7:1, 7:3, 7:11, 8:5, 8:11, 8:17, 8:23
**108** - 4:11, 5:10
**109** - 6:11
**10:00** - 193:16, 193:17, 310:25
**10th** - 91:10, 94:1, 138:16, 138:17, 142:24, 143:1, 143:2, 143:5, 143:14, 143:19, 143:20, 143:23
**11** - 94:12, 94:19, 105:20, 105:24, 106:22, 130:15, 131:23, 240:16, 241:16, 256:21, 304:20
**110** - 4:12
**111** - 4:14, 7:19
**115** - 4:15, 7:13
**11:58** - 98:9
**12** - 1:21, 5:12, 33:16, 94:18, 99:20, 103:14, 103:17, 104:20, 105:17, 126:24, 189:12, 259:4, 301:10, 314:2, 315:7
**12/31/2013** - 334:20
**1201** - 2:6, 334:21
**1225** - 2:15

**123** - 4:17, 8:19
**12:45** - 98:10, 98:20
**12th** - 91:11, 93:20, 93:21
**13** - 50:20, 60:12, 88:13, 88:18, 89:15
**1384794** - 1:3, 3:4, 98:25, 102:1, 102:10, 144:15, 310:3
**14** - 133:25, 259:4, 315:7
**144,146** - 5:18
**145,146** - 4:20
**15** - 134:4
**15th** - 14:11, 132:17, 132:18, 193:14, 311:2
**16** - 1:23, 5:8, 50:22, 52:1, 89:17, 100:22, 104:21, 256:24
**17** - 134:8
**179** - 4:21, 5:18
**18** - 2:1, 8:9, 34:14, 34:15, 35:5, 90:18, 90:19, 91:15, 100:23, 104:22
**18th** - 334:16
**19** - 134:12
**192** - 4:21, 5:19
**194,196** - 4:22, 5:14
**1992** - 54:14, 55:9, 56:9, 57:2, 149:19, 150:1, 150:3, 168:1, 183:3, 183:13, 183:16, 214:22, 221:22, 222:22, 262:7, 262:8, 262:11, 262:12, 280:10, 299:17, 299:20, 299:21, 317:22, 318:2, 318:18
**19th** - 89:21, 90:8
**1:00** - 133:17, 134:5, 134:9, 134:13, 135:16, 135:19, 135:23, 136:1, 136:6, 139:6, 139:11, 139:18, 139:19, 139:20, 139:23, 141:1, 141:23, 141:24, 142:8, 142:12, 143:19, 143:20, 143:23
**1st** - 86:18

**2**

**2** - 4:20, 5:18, 74:13, 74:18, 74:20, 76:20, 77:11, 131:18, 144:9, 144:22, 145:1, 145:7, 145:9, 194:16, 305:12
**20** - 2:3, 7:24, 82:18, 82:25, 100:23, 104:22, 168:19, 215:11
**20-plus** - 281:16, 281:18
**200-dollar** - 228:20
**2005** - 262:12
**2013** - 1:20, 1:3, 137:24, 143:23, 311:1, 334:17
**2028** - 2:12
**20th** - 132:21, 142:13
**21** - 4:11, 5:10, 107:4, 107:7, 108:13, 130:17, 131:2, 330:22
**22** - 91:22, 92:10, 134:16
**23** - 2:5, 7:17, 31:11, 31:12, 31:18, 32:9, 44:6, 92:11, 92:20, 100:24, 104:23
**232** - 4:23, 5:14
**24** - 92:22, 93:5, 134:17
**24039247** - 2:5
**243** - 5:15
**244** - 4:23, 4:24, 5:15
**25** - 93:10, 134:24
**252** - 4:24, 5:16
**254** - 4:25, 5:16
**255** - 4:25, 5:17
**256,258** - 7:5

**257,258** - 5:1
**26** - 2:7, 6:12, 31:15, 32:11, 32:22, 33:25, 100:24, 104:23
**27** - 2:9, 7:20, 99:20, 104:24
**27th** - 89:21, 90:8
**28** - 50:21, 60:13, 88:13, 93:10, 135:2
**29** - 2:11, 8:13, 34:5, 35:6, 52:6, 60:14, 66:18, 94:10, 94:11, 94:21, 99:21, 104:24
**294** - 7:6
**295** - 5:2
**2nd** - 89:19, 89:23

**3**

**3** - 1:3, 1:13, 9:1, 47:13, 49:17, 49:18, 77:14, 100:20, 104:17, 188:24, 188:25, 290:15, 306:13
**30** - 2:13, 6:24, 21:15, 21:18, 21:24, 22:6, 23:16, 23:17, 24:6, 54:14, 55:9, 94:24, 95:2, 100:25, 103:9, 104:25, 332:22, 332:24
**30-minute** - 332:13
**3047** - 334:19
**308** - 7:6
**309** - 5:2
**30th** - 57:2, 92:24
**31** - 135:7
**311,313** - 5:3, 6:16
**32** - 4:12, 6:11, 108:16, 108:18, 108:23, 110:3, 110:12, 110:14, 114:5, 115:14, 121:14, 125:13, 130:17, 131:2
**33** - 4:14, 7:19, 106:3, 107:11, 109:9, 110:6, 110:7, 110:10, 110:12, 111:12, 111:23, 114:5, 117:11, 119:8, 130:17, 131:3
**330** - 6:17
**331** - 5:4
**334** - 5:5
**337th** - 1:12, 9:4, 311:3, 334:5, 334:21
**34** - 135:11
**35** - 135:14
**36** - 2:15, 5:24, 93:17, 93:18, 99:21, 105:1
**37** - 72:24, 111:16, 111:18, 113:21, 130:15, 135:18
**38** - 72:22, 135:21
**38.14** - 64:22
**39** - 2:17, 8:15, 35:10, 35:11, 35:12, 35:21, 37:5, 81:22, 81:23, 82:14, 82:15, 94:4, 94:6, 100:25, 105:1
**3rd** - 1:20

**4**

**4** - 1:4, 1:5, 4:22, 5:14, 131:18, 194:21, 195:1, 238:10, 249:22, 309:16, 309:19
**40** - 135:24, 303:15
**41** - 136:4, 303:16
**42** - 4:15, 7:13, 113:24, 114:2, 115:4, 130:17, 131:3
**43** - 137:14
**44** - 138:20
**440** - 2:15
**45** - 113:8, 115:12, 117:4, 130:15, 138:23
**45-minute** - 98:10
**46** - 34:6, 35:6, 35:23,

**52** - 6, 60:14, 66:18, 139:2
**47** - 2:19, 5:22, 29:8, 30:3, 30:10, 31:6, 35:8, 35:25, 52:8, 60:15, 66:22, 83:2, 83:3, 83:7, 93:14, 94:8, 94:22, 101:1, 105:2
**48** - 2:21, 8:3, 36:4, 36:5, 36:18, 93:14, 101:1, 105:2
**49** - 2:23, 7:22, 29:7, 30:4, 30:14, 30:20, 31:6, 101:2, 105:3
**4th** - 132:2, 134:2

**5**

**5** - 1:2, 1:1, 1:4, 1:5, 1:6, 1:8, 1:10, 1:11, 1:13, 1:15, 1:17, 1:19, 1:21, 1:23, 2:1, 2:3, 2:5, 2:7, 2:9, 2:11, 2:13, 2:15, 2:17, 2:19, 2:21, 2:23, 3:1, 3:3, 3:5, 3:7, 3:9, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:23, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 4:12, 4:14, 4:15, 4:17, 4:20, 4:21, 4:22, 4:23, 4:24, 4:25, 5:1, 5:2, 5:3, 5:4, 5:5, 5:8, 5:10, 5:12, 5:14, 5:15, 5:16, 5:17, 5:18, 5:19, 5:20, 5:22, 5:24, 6:1, 6:3, 6:5, 6:7, 6:9, 6:11, 6:12, 6:14, 6:16, 6:17, 6:18, 6:20, 6:22, 6:24, 7:1, 7:3, 7:5, 7:6, 7:7, 7:9, 7:11, 7:13, 7:15, 7:17, 7:19, 7:20, 7:22, 7:24, 8:1, 8:3, 8:5, 8:7, 8:9, 8:11, 8:13, 8:15, 8:17, 8:19, 8:21, 8:23, 9:1, 87:6, 87:7, 88:11, 131:19, 257:1, 257:7, 309:8, 309:10
**50** - 3:1, 6:3, 17:5, 17:6, 17:7, 17:11, 22:10, 22:11, 23:10, 23:13, 26:14, 101:2, 105:3, 220:12
**51** - 3:3, 7:7, 29:3, 29:4, 29:21, 30:4, 30:21, 31:6, 43:24, 94:8, 94:22, 101:3, 105:4, 172:18
**52** - 93:15, 95:4, 139:5
**53** - 139:10
**54** - 117:7, 117:9, 118:25, 130:15
**55** - 3:5, 7:15, 99:22, 105:5
**59** - 1:8, 8:7, 7:6, 7:20, 10:6, 10:8, 10:12, 95:4, 99:22, 105:5
**5:00** - 89:11, 256:11
**5th** - 134:25, 135:3, 135:8, 135:12, 135:16, 135:19, 135:22, 135:25

**6**

**6** - 1:15, 5:20, 53:7, 80:24, 81:11, 100:21, 104:18
**60** - 95:6, 119:3, 130:15
**61** - 3:7, 8:17, 101:8, 105:6
**62** - 141:17
**63** - 99:23, 105:7
**64** - 3:9, 8:5, 35:8, 35:25, 36:20, 52:8, 60:15, 66:22, 95:6, 296:12
**65** - 3:11, 8:23, 36:21, 36:22, 41:22, 41:23, 42:12, 52:9, 60:16, 66:23, 95:7, 101:3, 105:7
**66** - 3:13, 6:20, 99:24, 105:8
**67** - 3:15, 6:18, 60:19, 60:20, 61:6, 95:13, 101:3, 105:8, 268:20

**68** - 4:17, 8:19, 95:16, 96:10, 121:10, 121:12, 123:7, 130:17, 131:4
**69** - 95:7
**6th** - 136:5, 137:11, 137:17, 137:24, 138:9, 138:22, 138:24, 139:3, 139:6, 139:11, 139:18, 139:23, 140:9, 140:15, 141:1

## 7

**7** - 1:6, 1:8, 5:3, 6:16, 8:1, 8:7, 131:19, 311:18, 311:20, 311:22, 312:2, 331:23
**70** - 26:14, 96:11, 142:5
**71** - 3:17, 6:9, 37:1, 37:2, 37:11, 56:8, 96:19, 97:6, 101:4, 105:9, 235:4
**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 334:22
**713.877.9400** - 2:16
**72** - 37:14, 39:1, 39:18, 57:12
**73** - 3:19, 6:5, 97:9, 97:17, 99:24, 105:9
**74** - 97:7, 123:11, 130:8, 130:11, 130:16
**75** - 3:21, 6:7, 99:25, 105:10
**76** - 125:7, 130:16
**77** - 3:23, 6:1, 96:11, 99:25, 105:10
**77002** - 2:6, 334:22
**77002-1659** - 2:16
**77019-2408** - 2:13
**78** - 39:24, 40:17, 40:20, 97:20, 97:21
**79** - 4:1, 6:14, 24:12, 25:1, 25:14, 25:17, 39:21, 40:12, 40:17, 40:19, 40:20, 40:22, 41:3, 98:2, 101:4, 105:10
**7th** - 137:17, 140:10, 140:15, 140:19, 141:7, 141:14, 141:19, 141:22, 141:24, 142:8, 142:13

## 8

**8** - 1:10, 1:17, 7:9, 49:21, 50:9, 50:18, 83:11, 84:3, 84:9, 100:21, 104:18
**80** - 4:3, 7:3, 41:8, 42:20, 43:4, 98:3, 101:5, 105:11
**81** - 4:5, 7:11, 41:11, 41:19, 98:3, 101:5, 105:11
**82** - 4:7, 8:11, 20:5, 20:7, 20:8, 21:12, 36:21, 36:22, 41:8, 43:13, 43:17, 44:4, 44:5, 52:9, 52:10, 52:11, 60:16, 66:23, 97:20, 98:3, 101:5, 105:12
**83** - 43:5, 52:13, 61:7, 66:24, 98:5, 98:6
**84** - 52:13, 66:24, 98:5, 98:6
**85** - 4:9, 7:1, 3:24, 16:22, 18:20, 43:9, 52:13, 61:7, 66:24, 98:5, 98:6, 100:1, 105:12
**87** - 43:5
**88** - 43:8, 88:23
**8th** - 13:20, 13:24, 14:2, 85:22, 85:24, 90:21, 91:8, 93:3, 138:9, 138:14, 193:9, 193:17, 311:1

## 9

**9** - 1:6, 8:1, 7:5, 7:20, 10:5, 10:8, 10:12, 99:17, 104:19
**911** - 227:13
**95** - 43:8
**9:00** - 89:10, 132:2, 132:11, 133:17, 134:2, 135:1, 135:4, 135:9, 135:12, 137:24, 138:17, 138:22, 138:24, 139:3, 140:20, 141:7, 141:14, 141:19, 143:2, 143:8, 143:14
**9:30** - 89:11
**9th** - 89:20, 89:24, 95:19, 96:6, 138:15

## A

**abandon** - 164:14
**abandoned** - 215:18
**abandoning** - 4:15, 214:14
**Abdon** - 4:11, 5:10, 107:4, 131:2
**Abellera** - 1:23, 5:8, 100:22, 104:21
**abide** - 270:14
**ability** - 73:8, 73:12, 159:12, 169:12, 170:25
**able** - 17:17, 37:6, 40:8, 52:2, 68:12, 89:8, 90:14, 92:7, 97:14, 111:2, 112:6, 112:25, 113:5, 113:7, 113:9, 114:18, 118:9, 128:12, 128:15, 145:23, 148:1, 155:18, 159:1, 167:14, 170:2, 173:5, 180:23, 195:17, 209:1, 231:17, 242:19, 244:18, 244:19, 246:17, 251:20, 252:14, 266:16, 269:8, 271:12, 272:25, 273:2, 274:25, 275:3, 282:13, 285:1, 289:19, 291:25, 293:25, 303:6, 305:22, 312:20, 327:14, 328:2, 328:16, 329:21, 330:12, 332:9
**above-entitled** - 1:21
**above-styled** - 334:11
**absolute** - 28:16, 28:20, 28:23, 31:19, 32:23, 34:1, 34:21, 70:21
**Absolutely** - 81:8, 173:7, 299:10
**absolutely** - 28:17, 86:5, 129:6, 152:11, 155:3, 155:23, 200:17
**abuse** - 291:11
**accept** - 172:20, 175:14, 192:8, 192:9, 194:16, 204:13, 206:2, 206:3, 233:15, 234:18, 255:4, 309:10
**acceptable** - 171:9, 171:10, 171:11, 206:17, 263:24
**acceptance** - 264:3
**Accepted** - 4:21, 5:2, 5:19, 7:6
**accepted** - 253:1
**accepts** - 309:4, 309:5
**accident** - 38:5, 52:23
**accommodate** - 140:23, 260:7
**accomplice** - 58:1, 58:3, 61:12, 61:21, 61:22, 64:13, 65:6, 65:19, 66:4, 66:21, 165:5, 165:9, 165:14, 166:5, 175:21, 278:4, 278:10,

278:19, 279:5, 279:19, 280:6
**accomplices** - 61:15, 163:25, 211:4, 211:9, 211:11
**account** - 78:19, 166:9, 215:2
**accurate** - 126:21, 323:20
**accused** - 22:20, 22:24, 182:1, 182:18, 182:19, 299:8
**acquittal** - 46:16
**act** - 71:14, 220:23, 241:24, 269:8, 286:21, 286:23, 287:5
**acting** - 61:16, 62:10, 64:2
**action** - 158:14
**actions** - 214:16
**activity** - 73:12
**acts** - 5:23, 69:24, 70:10, 71:7, 71:8, 71:16, 172:9, 172:24, 175:3, 220:7, 220:15, 220:16, 221:1, 221:7, 285:8, 286:13, 286:15, 286:16, 287:1, 288:5
**actual** - 13:23, 14:4, 216:9, 224:24, 224:25, 271:10, 284:16
**add** - 52:25, 66:9, 250:5
**addicted** - 177:16
**adding** - 261:12
**addition** - 12:18, 44:2, 71:23, 101:7, 215:9, 215:11, 251:5
**additional** - 14:23, 69:6, 198:1, 255:6, 255:16, 255:22, 256:18, 277:19
**additionally** - 12:3
**address** - 4:24, 103:15, 285:11
**Adela** - 134:16
**adjust** - 77:5
**admissible** - 154:13, 201:19, 201:25, 210:11, 217:16
**admit** - 234:17
**admitted** - 26:24, 276:5, 276:9, 334:15
**Admitted** - 250:7
**admitting** - 188:1
**admonishments** - 104:6
**advance** - 260:8
**advanced** - 169:9, 170:2
**advise** - 46:10, 46:14
**advised** - 258:9
**affairs** - 89:9
**affect** - 69:14, 136:17, 136:19, 137:8, 159:11, 169:12, 186:17, 186:20, 246:23, 292:13, 294:20, 299:3, 304:2
**affected** - 170:8, 221:9
**affects** - 170:25, 280:23, 282:12
**afford** - 22:21, 52:2
**afternoon** - 85:17, 89:7, 125:12, 131:7, 143:17, 146:14, 146:15, 196:9, 258:17, 313:12, 313:13
**age** - 53:7, 57:14, 187:23, 317:4
**aggravated** - 26:16, 64:5, 164:4
**aggravating** - 52:25, 53:3, 53:12, 53:18, 54:18, 149:11, 198:1, 226:1, 226:5, 245:21, 261:12, 317:3
**ago** - 227:1, 259:15, 281:16, 281:19, 294:6,

296:13, 300:19, 316:25, 323:15
**agree** - 5:16, 26:7, 39:16, 42:4, 46:17, 50:12, 79:2, 79:3, 124:16, 137:25, 207:2, 213:15, 234:8, 234:9, 238:7, 241:10, 272:18, 272:21, 273:4, 273:7, 286:6, 308:13, 309:9, 309:17, 321:20, 322:11, 323:24, 324:1, 325:13
**agreed** - 6:5, 99:15, 99:16, 99:17, 99:18, 99:19, 99:21, 99:23, 100:5, 100:10, 100:12, 100:16, 100:17, 102:18, 181:25, 263:6, 268:22, 270:13, 322:18
**agreeing** - 6:24
**agreement** - 1:6, 1:8, 1:12, 1:14, 1:16, 1:18, 1:20, 1:22, 1:24, 2:1, 2:3, 2:5, 2:7, 2:9, 2:11, 2:13, 2:15, 2:17, 2:19, 2:21, 2:23, 3:1, 3:3, 3:5, 3:7, 3:9, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:23, 4:1, 4:3, 4:5, 4:7, 4:9, 5:9, 5:12, 5:20, 5:22, 5:24, 6:1, 6:3, 6:5, 6:7, 6:9, 6:13, 6:15, 6:19, 6:21, 6:23, 6:25, 7:2, 7:4, 7:8, 7:10, 7:12, 7:15, 7:17, 7:21, 7:23, 7:25, 8:2, 8:4, 8:6, 8:8, 8:10, 8:12, 8:14, 8:16, 8:18, 8:21, 8:23, 9:1, 7:4, 7:7, 7:16, 7:19, 7:21, 10:9, 101:9, 101:10, 101:15, 133:14, 137:21, 140:2, 164:7, 164:11, 194:15
**agreements** - 10:3, 13:7, 99:10, 100:2, 100:14, 101:17
**ahead** - 37:23, 249:18
**aid** - 62:13
**aided** - 1:24, 212:15
**aiding** - 165:10, 277:12
**aids** - 62:12
**airplane** - 93:22, 304:11
**airplanes** - 293:5
**airtight** - 39:7
**akin** - 296:22
**alarm** - 75:16
**alerting** - 63:22
**all-familiar** - 269:21
**allegation** - 26:5, 26:11, 242:12
**allegations** - 67:11
**allege** - 55:2
**alleged** - 4:9, 16:14, 26:12, 28:5, 240:20, 280:10, 317:21
**allegedly** - 183:15, 299:16
**alleges** - 4:5, 11:6
**alleging** - 26:6, 54:4, 54:12, 54:14, 54:18, 55:5, 55:15, 55:23, 56:1, 267:11
**allow** - 294:11, 307:24, 323:10
**allowed** - 11:21, 68:11, 73:23, 224:7, 289:14
**allows** - 55:25, 149:24, 171:5, 176:6, 215:25, 238:14, 265:19, 278:11, 288:24, 297:14, 305:4
**Allyn** - 135:11
**almost** - 250:12, 258:17, 271:20, 281:12
**Almost** - 295:11
**alone** - 174:23, 223:16, 247:23, 248:17, 288:25, 289:14
**Alphabetical** - 5:7

**alternates** - 13:18, 315:8
**altogether** - 61:16, 98:12
**Alvin** - 3:11, 8:23, 101:3, 105:7
**Amendment** - 44:12, 47:9, 50:14, 52:3, 52:7, 182:16, 182:17, 206:11, 270:16, 299:6
**amount** - 128:15, 133:13, 235:10, 286:10
**Anderson** - 142:4, 142:7
**anew** - 224:8, 224:10, 242:22, 288:13
**Angela** - 125:7, 143:4
**Angelo** - 54:20, 54:22, 54:23, 55:11, 55:12, 202:13, 202:15
**Anita** - 2:1, 8:9, 100:23, 104:21
**Ann** - 3:20, 17:13, 333:9, 334:4, 334:19
**answer** - 19:21, 21:6, 21:8, 30:23, 30:24, 33:20, 69:11, 69:17, 70:6, 72:11, 72:13, 72:15, 74:13, 75:2, 76:10, 76:11, 76:12, 76:13, 76:14, 76:15, 78:10, 78:12, 79:10, 79:22, 80:19, 83:19, 84:14, 84:18, 84:19, 84:22, 84:23, 85:2, 85:3, 106:15, 108:2, 109:19, 111:2, 111:6, 112:4, 112:11, 112:24, 112:25, 113:1, 113:10, 114:5, 115:20, 116:3, 116:6, 116:12, 116:14, 116:18, 117:12, 118:14, 119:8, 119:15, 120:10, 121:18, 122:23, 123:20, 123:22, 123:23, 124:19, 126:19, 127:9, 128:1, 128:7, 128:19, 129:1, 129:17, 129:18, 129:23, 150:25, 151:22, 153:14, 153:17, 153:24, 173:2, 176:24, 178:18, 180:16, 180:22, 181:15, 185:24, 186:3, 186:5, 186:6, 186:11, 186:14, 186:16, 186:18, 201:2, 219:10, 223:11, 223:14, 225:5, 225:14, 233:15, 236:24, 237:1, 241:2, 241:17, 242:19, 243:24, 246:23, 247:11, 247:16, 249:12, 250:14, 251:18, 252:4, 252:11, 254:5, 265:19, 266:6, 268:18, 287:20, 296:10, 298:11, 304:22, 305:6, 305:8, 305:11, 305:16, 305:22, 305:25, 306:5, 306:9, 307:24, 313:2, 316:1, 319:22, 320:2, 324:9, 324:11, 327:9, 327:10, 328:1, 329:15, 329:21, 330:1, 330:11, 330:13
**Answer** - 129:13
**answered** - 11:24, 69:3, 77:10, 78:9, 80:12, 80:13, 116:9, 117:16, 119:14, 124:4, 179:1, 185:23, 233:2, 234:4, 235:7, 240:24, 271:4, 306:24, 307:6
**answering** - 107:18, 112:15, 114:19, 116:17, 120:22, 128:16, 173:16, 173:17, 252:16, 287:24, 291:19, 329:2
**answers** - 11:24, 12:2, 19:13, 33:22, 69:6, 70:12, 75:19, 80:25, 81:6, 82:8, 83:20, 84:13, 84:20, 85:3,

85:12, 92:19, 110:13, 114:16, 118:12, 118:17, 121:13, 124:23, 126:4, 126:9, 129:2, 145:12, 146:5, 186:25, 187:2, 187:21, 187:24, 187:25, 195:7, 195:24, 201:4, 203:22, 235:5, 247:20, 247:21, 250:11, 250:17, 250:22, 250:25, 257:12, 312:8, 312:12, 315:23, 316:7, 316:8, 325:6, 325:7
**Anthony** - 1:21, 5:12, 99:20, 104:20, 135:24
**anticipate** - 14:2, 85:23, 193:18, 276:7, 307:2
**anticipated** - 62:20, 74:10, 76:4, 176:2, 176:4, 225:3, 290:7, 307:14
**anxiety** - 92:13
**anyway** - 21:21, 56:6, 57:19
**Ap-77,025** - 1:4
**apiece** - 312:10
**apologize** - 25:3, 172:1, 260:7, 293:18
**Appeals** - 1:4, 250:4
**appear** - 26:7, 181:9, 193:11, 249:19
**Appellant** - 1:7
**Appellee** - 1:12
**applicable** - 64:12
**application** - 87:8, 92:15
**applied** - 150:20
**applies** - 203:9
**apply** - 14:25, 15:5, 76:4, 165:7, 179:12
**appointment** - 95:19
**Appreciate** - 91:18
**appreciate** - 21:11, 35:21, 37:10, 40:11, 81:10, 84:8, 86:6, 88:11, 92:17, 93:5, 103:10, 123:5, 131:17, 187:14, 256:4, 256:11, 257:14, 260:4, 260:22, 264:22, 271:8, 271:9, 294:21, 295:3, 316:9, 326:3, 326:5, 330:21, 331:15
**approach** - 5:22, 6:4, 105:20, 172:1, 189:3, 191:11, 218:20, 234:22, 238:1, 296:4
**approached** - 244:11
**appropriate** - 151:6, 178:18, 201:20, 230:1, 238:12, 249:5, 251:19, 263:7, 297:15, 323:18, 324:18
**are-you-sure-about-it** - 175:17
**area** - 39:8, 168:23, 169:2
**areas** - 5:21, 6:5, 58:19, 274:15, 312:16
**argue** - 71:24
**arguing** - 235:14, 249:20
**argument** - 189:16, 249:4
**arguments** - 301:21, 301:23
**Arizona** - 86:18, 86:20
**Arkansas** - 293:21
**arrangement** - 293:24
**arrested** - 228:5
**arrive** - 143:23
**Ashia** - 139:2
**aside** - 16:11, 156:7, 169:23, 204:14, 218:5, 248:8, 293:23
**aspects** - 145:15
**assault** - 26:16, 175:6, 261:15

**Assembly** - 259:24
**assess** - 113:2, 113:13, 151:11, 266:16, 288:12, 292:2, 292:5, 297:4, 305:5, 323:11, 328:8
**assessed** - 12:17, 68:21, 69:15, 72:18, 78:7, 80:8, 262:14, 318:4, 318:20, 326:8
**assessing** - 79:10, 80:20, 288:11
**assign** - 103:22, 138:21
**assigned** - 79:24, 91:2, 137:24
**assigning** - 71:3, 138:9
**assist** - 62:11
**Assistant** - 2:5
**assistant** - 3:19, 18:10, 18:13, 102:14
**assisted** - 212:15, 213:11
**Assisting** - 17:25
**assisting** - 3:15, 3:18, 147:4, 165:11, 277:12
**associated** - 12:11, 25:5, 33:21, 57:8, 58:2, 64:20, 66:1
**Assume** - 240:10
**assume** - 63:1, 73:18, 75:6, 77:9, 167:17, 167:22, 173:5, 173:7, 212:3, 214:1, 279:12, 281:15, 282:22
**assuming** - 173:12
**assumption** - 282:23
**assure** - 197:17
**attach** - 44:16, 53:13
**attached** - 67:15
**attempt** - 62:14, 260:7
**attempted** - 56:2
**attempting** - 53:9, 54:17, 55:11
**attempts** - 62:13
**attention** - 87:17, 87:18, 88:10, 89:14, 93:6, 97:15, 167:15, 167:16, 217:13, 231:19, 333:11
**attorney** - 3:14, 3:19, 7:18, 18:10, 178:4, 225:24, 247:12, 251:5, 274:13
**attorney's** - 246:24
**attorneys** - 13:10, 13:11, 68:7, 102:14, 156:14, 205:23
**Attorneys** - 2:5, 2:7, 2:17
**audio** - 276:16
**August** - 334:17
**automatic** - 247:21
**automatically** - 151:18, 225:18, 249:25, 305:15, 306:9
**availability** - 281:3
**available** - 67:24, 203:2, 239:5, 271:3, 283:17
**average** - 289:11
**Avila** - 4:11, 5:10, 107:5, 107:7, 131:2
**awake** - 77:4
**aware** - 9:9, 11:20, 12:14, 64:7, 67:4, 69:16, 81:19, 86:11, 136:12, 333:13

### B

**back-stroker** - 136:21, 137:5
**background** - 10:22, 11:13, 77:18, 78:19, 173:23, 173:24, 226:24, 273:20, 273:25, 274:2, 288:5, 289:20, 290:24, 291:8, 291:14

**bad** - 58:22, 160:19, 187:16, 201:25, 214:2, 224:4, 272:22, 273:18, 274:1, 305:3
**badge** - 193:4, 311:15
**baggage** - 161:4
**bailed** - 307:7
**Bailiff** - 8:20, 102:4, 102:7, 104:8, 131:22, 133:22, 134:6, 134:10, 134:14, 194:6, 194:11, 311:13
**bailiff** - 98:11, 104:11, 143:24, 249:7
**ball** - 326:13
**Ball** - 139:16, 139:22, 140:8, 140:14, 140:19
**bank** - 63:3, 63:4, 63:13, 63:19, 64:5, 75:4, 164:4, 164:6, 165:19, 166:1, 166:3, 166:15, 166:20, 213:16, 213:19, 213:20, 277:25, 279:18, 279:21
**bar** - 148:16
**barely** - 20:16, 21:15
**base** - 65:1, 65:2, 118:12, 205:2, 207:25, 223:14, 225:14, 279:4, 319:1
**based** - 10:3, 58:12, 69:3, 69:7, 82:9, 83:21, 83:23, 112:3, 118:5, 118:14, 125:24, 126:9, 128:20, 151:7, 171:8, 179:6, 186:14, 186:16, 225:6, 241:8, 247:22, 249:11, 265:17, 275:4, 276:16, 289:15, 319:1
**Based** - 49:25
**basic** - 127:2
**basis** - 44:17, 182:16, 182:18, 249:20
**bat** - 103:10, 231:23
**Bayer** - 1:21, 5:12, 99:20, 104:20
**become** - 67:4, 168:7, 184:16, 187:12
**becomes** - 126:18, 184:24, 215:3
**begin** - 7:4, 12:10, 13:24, 85:23, 193:9
**beginning** - 13:20, 25:17, 95:18
**Beginning** - 36:22
**begins** - 13:19
**behalf** - 50:25
**behind** - 29:5, 59:24, 159:7, 161:22, 161:25, 217:17, 218:2, 232:19, 267:25, 269:3, 279:21, 279:24, 319:12
**beings** - 155:19, 161:1, 162:14, 162:17, 203:6, 209:12, 267:25
**belief** - 107:18, 112:14, 119:18, 120:14, 120:20, 302:2
**beliefs** - 40:3, 40:6, 40:23, 106:4, 106:17, 107:12, 109:10, 109:13, 110:23, 111:24, 114:11, 116:7, 116:10, 116:11, 116:16, 117:13, 117:17, 119:10, 121:25, 122:1, 123:17, 126:6, 126:14, 128:20
**believes** - 38:21, 58:7, 301:8
**below** - 53:2
**bench** - 8:22, 99:14, 103:15, 105:20, 105:21, 191:11
**Bench** - 8:23, 105:22,

107:6, 108:17, 110:8,
111:17, 113:25, 115:10,
117:8, 119:4, 121:11,
123:12, 125:8, 131:25,
132:9, 136:15, 191:16
**benefit** - 205:5, 230:20,
299:22
**Bennett** - 143:12
**beside** - 259:5
**best** - 59:1, 202:4, 260:6,
265:3, 298:12, 315:7, 315:8,
320:24, 321:8
**better** - 22:2, 228:13,
233:10, 264:23, 264:24,
272:17, 320:10
**between** - 11:17, 12:19,
38:19, 70:22, 87:1, 148:6,
148:23, 152:14, 172:15,
237:11, 316:15, 319:7,
328:20
**beyond** - 22:22, 27:3,
27:15, 28:3, 28:4, 28:11,
29:12, 29:13, 29:14, 29:18,
30:2, 32:3, 32:5, 33:11,
33:13, 35:1, 36:12, 39:7,
40:24, 41:5, 41:9, 43:1,
43:6, 44:18, 45:23, 46:3,
69:22, 70:5, 70:7, 70:8,
70:17, 71:11, 71:21, 73:22,
74:6, 75:20, 76:9, 77:12,
155:14, 155:23, 156:8,
162:19, 169:20, 188:18,
188:19, 188:23, 189:7,
189:9, 189:10, 189:22,
197:10, 199:16, 199:14,
199:22, 202:20, 203:8,
208:1, 216:18, 266:21,
266:25, 267:17, 267:20,
268:11, 269:21, 269:24,
270:6, 285:6, 290:1, 290:3,
290:17, 300:6, 300:7,
300:12, 300:15, 300:23,
301:6, 301:9, 301:13,
301:24, 305:10, 327:6
**bias** - 19:9
**biased** - 321:1
**bifurcated** - 12:9
**big** - 63:11, 73:14, 140:3,
147:9, 147:16, 178:24,
271:4, 314:18
**bigger** - 197:7
**bit** - 9:14, 11:17, 12:6,
26:1, 38:7, 52:17, 57:24,
70:13, 78:15, 133:8, 145:18,
148:3, 150:21, 154:8, 157:7,
158:10, 158:22, 163:25,
187:22, 188:17, 196:19,
197:16, 201:8, 228:13,
229:11, 231:24, 258:22,
259:17, 259:19, 260:24,
261:3, 261:6, 262:20, 264:5,
266:11, 267:1, 270:20,
271:15, 277:1, 278:4,
278:21, 284:22, 285:12,
313:16, 319:11, 321:13,
326:11, 332:5, 332:21
**bite** - 85:9
**blame** - 66:9
**blameworthiness** - 80:1,
80:5, 80:7
**blameworthy** - 73:11,
290:24
**blank** - 19:6, 184:5
**blanks** - 184:6, 299:23
**blood** - 208:14, 271:7
**blue** - 36:3, 88:17
**board** - 51:1, 69:10,
154:25, 184:20, 185:2,
222:4, 262:12, 284:23,
306:16

**Bobby** - 119:3, 141:12
**body** - 170:6, 170:11,
170:14, 170:23, 171:13,
215:12, 216:4, 282:1,
282:11
**boils** - 212:17
**Bollom** - 4:22, 5:14,
131:11, 131:19, 194:12,
194:21, 195:1, 232:16,
249:23, 254:1, 254:10,
256:2, 309:16, 309:19
**Bond** - 275:8, 303:12
**bones** - 171:1, 215:16
**book** - 210:5, 304:6
**booked** - 90:11
**born** - 174:17, 317:25
**boss** - 150:15
**bother** - 123:3, 158:21,
168:3, 169:11, 254:15
**bothering** - 188:9
**bottom** - 37:23, 226:14,
328:12
**Bowers** - 142:6, 142:10
**Bowman** - 125:7, 125:9,
128:12, 143:4, 146:13
**box** - 19:18, 122:4, 190:11,
239:3, 326:7
**Break** - 295:16
**break** - 24:16, 24:20, 25:7,
25:12, 70:13, 85:8, 89:11,
98:10, 99:1, 103:21, 131:5,
144:3, 227:11, 283:22,
285:11, 332:11, 332:14,
332:16
**breaks** - 286:3, 320:18
**breathing** - 153:21,
200:24, 266:3, 326:22
**bribed** - 168:16
**briefly** - 27:25, 244:6,
261:4, 311:15
**bring** - 3:22, 7:3, 13:9,
16:12, 38:25, 73:8, 73:9,
73:12, 88:9, 98:11, 137:25,
143:24, 160:4, 215:1, 229:1,
232:9, 233:17, 235:8,
236:10, 236:14, 255:24,
309:22, 332:7, 332:13
**Bring** - 101:22, 192:11
**bringing** - 40:12, 61:6,
89:13, 93:6, 133:9, 133:16,
216:14, 271:8
**brings** - 274:19, 332:12
**broached** - 251:6
**broad** - 286:15
**broke** - 261:3
**broken** - 51:14, 85:16,
177:13, 178:1, 226:6,
226:12, 320:12
**brother** - 87:8, 87:24,
93:20, 258:9, 260:6, 293:19,
311:5
**brought** - 45:14, 73:21,
76:9, 124:3, 160:5, 167:15,
167:16, 217:13, 217:15,
265:2, 280:18, 333:11
**Brown** - 135:21, 135:22,
139:2
**bruiser** - 63:11
**brutal** - 245:10
**buddies** - 276:23, 320:13
**Buffalo** - 2:12
**building** - 193:14, 259:9,
259:16, 311:3
**bullet** - 37:21, 38:8, 38:24,
62:21
**bumped** - 198:5
**bumps** - 198:1
**bunch** - 11:23, 100:8,
185:17
**burden** - 15:13, 16:13,

22:24, 27:15, 27:25, 28:23,
31:19, 36:12, 37:3, 39:14,
39:17, 44:18, 44:22, 44:23,
45:10, 48:3, 48:5, 48:13,
48:20, 49:2, 70:3, 70:5,
73:18, 76:1, 77:25, 78:1,
78:2, 128:5, 156:12, 156:18,
156:20, 156:21, 156:23,
156:24, 176:14, 188:25,
199:6, 199:11, 199:21,
199:23, 200:1, 203:8,
203:16, 205:9, 205:10,
205:22, 217:2, 219:21,
219:22, 225:12, 230:18,
266:20, 266:22, 270:4,
270:11, 290:2, 290:18,
290:19, 300:10, 300:13,
300:17, 306:18
**burdens** - 33:21, 216:20
**burglarized** - 265:1
**burglary** - 198:10, 261:15,
265:2, 317:9, 320:23
**bus** - 103:7, 104:15,
130:25, 134:18, 134:20,
193:22, 256:10, 283:4
**business** - 95:18, 95:20,
96:2, 98:13, 102:25, 103:12,
140:5, 292:23, 293:7, 293:8,
305:7
**busy** - 46:23
**buy** - 213:1
**buzzer** - 63:22

**C**

**calendar** - 93:3
**Callan** - 145:12
**Caluag** - 4:20, 5:18,
131:10, 131:18, 144:11,
144:22, 144:23, 145:1,
146:16, 146:17, 146:18,
147:5, 179:21, 192:14,
194:2, 194:9, 194:20
**camera** - 207:20
**Canada** - 1:15, 5:20,
100:21, 104:18
**Candy** - 174:16, 223:17,
289:4, 289:6
**candy** - 174:19, 174:20,
223:22, 289:8
**cannot** - 16:25, 23:8, 39:8,
41:25, 65:6, 206:18
**capacity** - 15:11
**Capital** - 239:3, 239:4
**capital** - 3:5, 9:7, 11:4,
11:7:7, 12:15, 12:19, 13:3,
16:11, 25:6, 30:1, 37:16,
44:9, 47:14, 52:15, 52:17,
52:18, 53:1, 53:4, 53:14,
53:17, 53:23, 55:23, 56:22,
62:25, 67:10, 67:14, 67:22,
67:23, 68:14, 115:19, 116:1,
117:19, 119:13, 120:6,
148:6, 148:13, 148:15,
148:18, 148:24, 149:9,
149:12, 149:17, 149:25,
151:5, 152:5, 158:12,
175:18, 179:3, 179:8, 180:6,
185:24, 190:11, 192:15,
197:4, 197:20, 197:24,
198:2, 198:5, 200:24, 207:9,
207:18, 210:9, 221:23,
223:4, 223:8, 225:17,
234:14, 238:6, 238:9,
238:11, 238:18, 238:20,
240:11, 240:13, 240:17,
240:21, 240:22, 241:1,
241:5, 241:17, 241:23,
242:12, 243:21, 244:13,
244:15, 245:19, 245:22,

246:19, 246:20, 247:19,
247:20, 248:9, 248:16,
249:14, 251:8, 252:12,
260:25, 261:11, 261:23,
261:25, 268:20, 270:19,
270:22, 280:7, 284:11,
286:19, 288:11, 295:20,
296:17, 297:25, 298:5,
298:7, 303:4, 304:21,
305:18, 305:24, 306:9,
306:22, 315:5, 316:15,
316:22, 317:10, 317:13,
317:18, 318:5, 319:18,
321:9, 321:24, 322:10,
322:17, 323:2, 323:23,
324:3, 324:6, 324:17, 328:5
**capture** - 155:21
**car** - 59:24, 63:6, 63:7,
63:8, 63:16, 64:6, 75:18,
76:3, 78:24, 164:5, 164:10,
164:23, 165:20, 320:12,
320:19, 320:23
**Carcz** - 2:19, 5:22, 105:1
**care** - 89:3, 177:25,
180:13, 180:14, 201:1,
242:14, 242:18, 274:4
**career** - 293:13
**caregiver** - 94:15
**carries** - 270:11
**carry** - 62:15, 156:20,
205:9
**carrying** - 62:20, 75:9,
75:11, 227:3
**Casas** - 144:22
**case** - 3:21, 4:4, 6:7, 7:22,
9:13, 10:24, 11:2, 11:8,
11:18, 12:7, 12:21, 13:3,
13:7, 13:18, 14:4, 14:18,
15:6, 17:21, 19:1, 20:24,
21:2, 24:4, 25:6, 26:21,
28:19, 28:20, 28:25, 30:1,
31:20, 32:15, 32:17, 32:18,
32:23, 33:3, 33:8, 33:10,
33:24, 34:2, 37:7, 37:16,
37:18, 38:1, 39:7, 46:13,
47:14, 48:13, 48:16, 49:12,
51:2, 51:8, 53:21, 54:1,
55:24, 56:18, 56:20, 60:23,
64:13, 65:18, 68:19, 78:8,
80:19, 82:4, 85:23, 87:17,
87:18, 88:5, 91:7, 97:15,
98:16, 99:9, 112:14, 112:17,
112:18, 114:15, 114:21,
116:18, 118:19, 120:19,
122:10, 124:2, 124:3,
127:16, 128:9, 129:22,
130:22, 130:23, 146:3,
146:24, 147:7, 147:9,
147:18, 147:25, 148:6,
148:9, 148:15, 148:18,
148:19, 148:23, 148:24,
148:25, 149:13, 149:16,
149:17, 149:18, 149:20,
151:11, 152:5, 152:6, 153:7,
153:12, 153:14, 153:17,
154:5, 155:3, 155:4, 155:11,
155:15, 155:17, 155:19,
156:1, 156:5, 156:6, 156:19,
157:4, 157:23, 158:7,
158:12, 158:21, 161:10,
161:15, 162:25, 163:24,
167:25, 168:7, 168:23,
169:3, 169:19, 170:7,
170:10, 170:19, 170:21,
171:4, 171:6, 174:7, 174:15,
174:16, 174:23, 176:13,
176:23, 180:6, 180:11,
180:12, 182:25, 183:4,
183:13, 183:18, 183:20,
184:12, 184:13, 184:19,

184:25, 185:24, 186:13, 187:17, 187:19, 190:1, 190:2, 190:3, 190:11, 190:13, 192:18, 192:19, 192:21, 192:22, 193:2, 193:12, 193:19, 194:1, 194:17, 195:22, 196:21, 197:4, 197:7, 197:13, 197:20, 197:21, 199:7, 199:12, 199:13, 199:16, 199:24, 201:2, 202:17, 202:24, 203:3, 204:3, 204:7, 204:14, 205:25, 207:10, 209:4, 210:9, 210:12, 214:21, 214:23, 215:21, 216:2, 216:12, 216:15, 217:7, 221:21, 221:24, 223:17, 223:21, 223:24, 224:11, 227:12, 228:6, 228:11, 228:14, 229:1, 229:3, 231:18, 232:5, 236:4, 237:16, 238:13, 240:2, 240:13, 240:19, 240:21, 242:11, 244:25, 245:2, 245:11, 248:7, 249:22, 249:24, 252:15, 258:1, 259:4, 260:2, 260:11, 260:14, 262:7, 262:8, 262:19, 263:15, 264:20, 264:21, 265:3, 265:10, 265:22, 266:21, 266:25, 267:6, 267:10, 267:13, 267:17, 268:10, 272:17, 274:17, 275:1, 275:4, 275:23, 276:8, 276:20, 280:7, 280:15, 280:17, 280:22, 280:23, 281:20, 281:22, 282:1, 282:10, 283:4, 283:5, 283:6, 288:20, 288:21, 288:25, 289:13, 289:16, 291:10, 292:2, 292:9, 292:13, 297:5, 297:12, 297:13, 298:8, 299:16, 300:1, 300:17, 300:19, 301:20, 301:21, 302:11, 303:1, 303:4, 303:5, 303:10, 304:3, 304:19, 304:20, 304:25, 306:7, 307:10, 310:5, 310:7, 310:9, 310:10, 310:15, 310:20, 311:7, 312:25, 314:2, 315:8, 315:20, 317:15, 317:21, 318:13, 319:14, 320:7, 320:24, 321:9, 321:24, 323:4, 323:11, 327:6, 331:8
  **cases** - 14:25, 15:5, 28:1, 29:21, 29:25, 56:15, 56:23, 56:24, 82:21, 148:12, 148:13, 151:6, 151:25, 152:1, 152:2, 152:3, 168:23, 198:4, 198:8, 203:5, 238:12, 251:11, 252:10, 264:23, 266:16, 268:9, 272:13, 282:9, 315:3, 320:11, 324:18
  **Casey** - 143:16, 143:22
  **cash** - 289:9
  **casual** - 192:23, 310:11
  **catch** - 203:24, 280:11, 320:18
  **caught** - 166:2
  **caused** - 74:7, 74:23, 75:1, 175:19, 175:25, 290:4
  **causes** - 100:8, 100:12, 170:16, 190:1
  **caution** - 122:16
  **cellmates** - 221:14
  **center** - 36:19, 43:8
  **cerebral** - 94:13
  **ceremonial** - 9:5, 132:22,

132:23
  **certain** - 13:9, 28:17, 29:24, 32:20, 33:20, 35:15, 36:8, 42:23, 42:25, 43:2, 53:8, 53:9, 54:20, 54:21, 58:10, 58:11, 64:20, 65:4, 80:13, 102:18, 126:5, 145:15, 150:24, 152:1, 155:23, 157:24, 158:17, 172:14, 222:2, 262:15, 262:25, 267:23, 272:13, 277:12, 312:16, 316:21, 318:7, 318:22, 319:23
  **certainly** - 90:15
  **certainty** - 28:16, 28:21, 28:23, 29:14, 30:7, 30:8, 30:11, 30:17, 31:2, 31:3, 31:19, 32:7, 32:24, 34:1, 34:21, 35:18, 36:14, 39:2, 41:14, 41:17, 70:21, 70:23, 172:22, 199:16, 199:23, 220:11, 241:21, 286:6, 286:10, 300:15
  **Certificate** - 5:5, 334:1
  **certify** - 334:6, 334:13
  **Chad** - 3:1, 6:3, 101:2, 106:3
  **chair** - 3:14, 3:18, 17:25, 99:5, 326:5
  **challenge** - 4:11, 4:13, 4:14, 4:16, 4:17, 5:11, 6:11, 7:14, 7:19, 8:20, 191:25, 252:24, 253:5, 255:5, 255:6, 256:17, 309:14
  **Challenge** - 4:23, 5:4, 5:15, 6:17
  **challenges** - 191:24, 309:19
  **chambers** - 115:9, 334:12
  **Chambers** - 115:11, 115:12, 138:23
  **chance** - 96:22, 105:13, 268:18, 285:20, 285:21, 305:19, 307:17
  **change** - 122:18
  **change** - 50:1, 81:25, 215:6, 237:24, 238:19, 238:23, 247:11, 250:22, 269:7, 281:1, 281:2, 322:24, 324:9, 324:12, 333:1
  **Changed** - 223:23
  **changed** - 12:1, 28:13, 42:16, 50:7, 50:12, 81:18, 109:2, 114:16, 116:14, 123:25, 146:6, 152:16, 195:25, 222:9, 237:11, 237:12, 237:25, 250:12, 258:4, 299:19, 313:3
  **Changes** - 170:13
  **changes** - 280:22, 281:5, 281:19, 326:10
  **changing** - 127:9, 215:7, 250:14, 254:10
  **character** - 77:18, 303:16
  **characteristic** - 78:19
  **charge** - 3:5, 16:10, 16:14, 55:5, 56:6, 67:6, 67:13, 67:15, 68:13, 75:8, 150:16, 152:2, 198:15, 300:24, 304:23, 304:24
  **charged** - 15:15, 15:18, 26:15, 26:18, 26:20, 45:4, 61:21, 61:23, 62:22, 64:5, 64:15, 65:16, 65:18, 68:9, 74:25, 75:17, 78:18, 200:24, 277:6, 277:21, 278:6
  **charges** - 68:10
  **charging** - 11:6, 26:2, 54:3, 61:20
  **chase** - 232:22

**Chaykosky** - 141:5, 141:6
  **check** - 326:15
  **checked** - 109:1, 109:12, 110:16, 114:9, 114:13, 116:5, 125:16, 151:4, 233:5, 238:10, 239:3, 239:12, 268:21
  **checking** - 238:15, 239:6, 296:21
  **chemist** - 278:13
  **Chicago** - 93:19, 94:1
  **child** - 5:13, 6:7, 53:7, 136:16, 137:5, 149:8, 174:21, 198:11, 231:15, 261:22, 317:4
  **children** - 19:3, 29:23
  **choose** - 161:17, 162:11, 264:5, 271:1, 299:25, 317:15, 319:8, 328:16
  **chooses** - 45:7, 47:3, 47:9, 218:2, 264:8, 283:10, 283:12
  **choosing** - 161:14
  **Chorba** - 2:15, 5:24, 99:22, 104:25
  **chose** - 49:10
  **chosen** - 259:5, 265:16, 314:2, 319:13, 328:25, 329:14
  **Christopher** - 4:9, 7:1, 100:1, 105:12, 138:20
  **church** - 19:3, 19:8
  **circled** - 230:24, 233:6, 233:16, 235:11, 272:17
  **circlemanee** - 48:9, 53:1, 77:20, 79:2, 79:3, 79:6, 79:7, 79:9, 79:13, 79:14, 79:25, 86:8, 86:11, 149:12, 198:1, 291:2, 291:12
  **circumstances** - 11:8, 53:3, 53:13, 53:18, 54:19, 55:4, 55:6, 55:15, 65:4, 77:17, 77:20, 78:16, 78:17, 111:4, 171:8, 174:3, 245:21, 280:14, 281:9, 297:5
  **citizen** - 174:22, 224:1, 289:11
  **city** - 63:7
  **City** - 140:5
  **civil** - 29:21
  **civilian** - 231:6, 233:7, 233:12, 278:13
  **civilization** - 323:24
  **Clarence** - 142:4
  **clarifying** - 322:20
  **Clark** - 138:20, 138:21
  **class** - 20:15, 20:17
  **Claude** - 134:4
  **clean** - 177:18, 291:14
  **clear** - 14:5, 21:18, 27:6, 29:22, 67:25, 85:5, 124:1, 130:18, 192:2, 261:9, 261:17, 262:9, 267:21, 270:8, 278:1, 288:14, 288:23, 314:14, 322:25
  **clearer** - 21:20
  **clearly** - 59:25, 67:10, 75:2, 237:7, 248:14
  **clergy** - 221:15
  **clerk** - 165:19, 166:5
  **clerk's** - 250:4
  **clerks** - 10:11, 103:6, 104:11
  **clicked** - 227:19
  **client** - 7:12, 46:14, 179:24, 181:7, 232:19, 238:21, 239:20, 254:12, 295:10, 298:24
  **clients** - 46:10
  **clinicians** - 221:15

**clock** - 98:8
  **close** - 22:4, 47:20, 47:23, 48:19, 49:11, 78:7, 95:11, 119:6, 157:25, 180:5, 200:8
  **closed** - 174:13
  **closer** - 332:21
  **club** - 293:1, 303:22
  **co** - 164:20, 165:5, 165:10, 166:6, 167:6, 167:10, 211:4, 213:14, 278:5, 278:10, 279:20, 295:10, 302:6
  **co-conspirator** - 165:5, 165:10, 166:6, 167:6
  **co-conspirators** - 164:20, 211:4, 213:14, 278:5
  **co-counsel** - 295:10
  **co-defendant** - 167:10, 278:10, 279:20, 302:6
  **Code** - 64:21
  **code** - 62:2, 65:5
  **cognizant** - 103:11
  **coin** - 177:15, 177:20, 178:3, 226:11
  **cold** - 56:15, 77:2, 77:3, 77:4, 77:8, 168:7, 168:23, 169:3, 170:7, 170:10, 183:18, 183:20, 214:21, 214:23, 216:2, 216:15, 280:15, 282:1
  **collect** - 223:23
  **college** - 91:10
  **Collins** - 3:23, 6:1, 100:1, 105:10
  **column** - 155:6, 155:7, 216:25
  **columns** - 155:5
  **comb** - 81:17
  **comfortable** - 19:17, 156:15, 157:20, 173:10, 173:12, 173:15, 176:9, 199:17, 204:9, 205:11, 207:22, 208:5, 216:8, 218:17, 220:3, 220:13, 223:12, 226:21, 230:21, 231:2, 231:7, 296:21
  **Comfortable** - 204:16
  **coming** - 9:11, 13:4, 44:21, 58:9, 63:14, 63:15, 87:2, 102:4, 103:20, 104:2, 104:11, 137:19, 140:5, 142:14, 157:10, 163:18, 187:3, 187:20, 234:10, 256:5, 278:9, 280:6, 280:7, 292:12, 297:20, 302:8, 331:15, 332:4
  **commence** - 220:6
  **comment** - 42:21, 172:19, 178:9, 270:5
  **comments** - 37:11, 39:18, 233:1
  **commission** - 56:2, 56:3, 62:11, 62:23, 65:10, 167:1
  **commit** - 27:8, 45:13, 47:7, 49:11, 53:9, 54:17, 55:11, 62:13, 62:15, 66:19, 69:23, 70:10, 71:7, 80:16, 80:18, 162:8, 162:9, 164:4, 164:22, 165:18, 165:21, 172:9, 172:13, 173:5, 173:20, 175:5, 207:19, 212:10, 213:15, 220:15, 241:24, 269:8, 285:7, 286:14, 286:18, 287:1
  **Commit** - 172:24
  **commitment** - 11:11, 27:20, 49:7, 49:14, 60:4, 60:7, 67:18, 247:2, 247:3, 266:5, 293:24
  **commits** - 61:16, 161:19, 164:22, 212:12, 222:15,

222:19, 238:9
   **committed** - 54:12, 56:2, 61:25, 62:4, 62:10, 62:16, 62:17, 62:18, 65:8, 71:12, 71:22, 73:4, 149:1, 149:6, 164:24, 179:8, 198:9, 198:22, 202:12, 212:21, 222:11, 223:4, 240:2, 245:19, 267:11, 283:10, 283:12, 286:23, 288:6, 289:7, 289:21, 307:13, 317:22, 322:4
   **committing** - 53:8, 54:16, 55:10, 56:3, 61:24, 64:3, 155:21, 261:14, 317:8
   **common** - 16:3, 270:2, 270:3
   **commonly** - 268:24
   **comparison** - 285:24
   **complainant** - 6:7
   **complete** - 3:24, 59:23, 104:7, 236:21
   **completed** - 3:25, 5:7, 11:21, 11:22, 13:10, 88:2, 102:16, 130:23, 311:8
   **completely** - 25:7, 27:16, 51:1, 152:12, 248:8, 298:9, 312:17, 315:17, 331:14
   **complicated** - 196:15
   **complies** - 18:7
   **computer** - 1:24
   **computer-aided** - 1:24
   **concede** - 252:11
   **concentrate** - 294:12
   **concept** - 25:11, 25:24, 27:7, 27:24, 29:11, 29:16, 44:8, 44:11, 44:24, 45:2, 45:16, 51:16, 264:22, 268:12, 268:22, 269:11, 270:13, 277:2, 278:1, 280:5, 287:16, 290:13
   **concepts** - 10:19, 11:10, 13:13, 13:14, 14:13, 14:25, 15:4, 51:13
   **concern** - 89:8, 89:12, 117:11, 168:3, 188:3, 233:5
   **concerned** - 109:5, 127:24, 187:22, 187:23, 235:13, 235:16
   **concerning** - 98:16, 106:15
   **conclude** - 241:3, 242:15
   **conclusion** - 158:23, 159:4
   **conclusive** - 208:18
   **condom** - 217:22
   **conduct** - 62:5, 62:8, 62:10, 102:25, 227:6, 277:11, 277:15
   **confidential** - 163:16, 163:20, 210:22
   **confidentiality** - 210:23
   **conflict** - 96:15, 97:24, 137:23, 140:3
   **confuse** - 26:16, 79:11
   **confused** - 40:18, 76:23, 76:25, 120:1, 150:21
   **confusing** - 79:12, 229:15, 298:19
   **congratulating** - 235:21
   **Congratulations** - 292:22
   **connect** - 65:8, 65:15, 65:22, 66:13, 166:25
   **connection** - 66:14
   **conscience** - 32:4, 37:6, 52:1, 108:1, 109:18, 120:13, 122:5, 122:9, 122:22, 124:18, 329:21, 330:1, 330:7, 330:16
   **consider** - 45:11, 47:19,

65:20, 66:13, 66:14, 67:3, 67:7, 68:12, 73:17, 78:5, 78:23, 152:7, 160:7, 165:16, 173:22, 185:4, 201:20, 223:1, 223:5, 248:7, 252:14, 271:12, 288:14, 288:24, 289:19, 291:16, 307:19
   **consideration** - 77:16, 78:15, 79:12, 86:9, 89:14, 90:16, 114:7, 115:16, 115:22, 121:16, 126:11, 167:7, 198:13, 221:5
   **considerations** - 108:24, 110:15, 121:19, 125:15, 127:13
   **considered** - 47:6, 288:22, 289:14, 316:21, 316:22
   **considering** - 32:19, 65:3, 150:8, 151:9, 221:17, 224:21
   **considers** - 317:10
   **conspiracy** - 62:15, 62:21, 64:8, 75:10, 214:15
   **conspirator** - 165:5, 165:10, 166:6, 167:6
   **conspirators** - 62:16, 62:17, 164:20, 211:4, 213:14, 278:5
   **constitute** - 69:24, 70:11, 221:7, 285:8, 287:7, 301:5
   **constituted** - 300:23
   **constitutes** - 188:23, 301:13
   **constitution** - 182:11
   **constitutional** - 44:12, 44:15, 50:15, 156:13
   **contact** - 133:1, 193:6, 310:23
   **contains** - 334:7
   **context** - 279:18, 281:24
   **continuation** - 145:11, 195:5, 311:7, 312:7
   **continue** - 72:13, 103:11, 254:2, 254:3, 254:5, 287:21, 300:1
   **continuing** - 12:25, 69:25, 70:11, 129:18, 144:20, 153:15, 172:4, 174:8, 175:3, 186:4, 186:8, 189:9, 189:19, 190:6, 219:19, 219:24, 221:8, 241:4, 241:23, 242:16, 242:23, 242:24, 243:23, 244:16, 245:3, 246:8, 248:14, 251:9, 285:5, 285:9, 285:16, 287:8, 287:21, 287:23, 289:1, 289:15, 305:11, 305:18, 305:20, 306:3, 306:10, 306:24, 307:12, 329:10
   **continuous** - 219:3
   **control** - 185:2, 185:5, 214:12, 217:25, 218:1, 282:21
   **controlled** - 293:5
   **controls** - 171:12, 183:3, 282:20, 283:7
   **convenience** - 194:13
   **conversation** - 153:2, 192:23, 310:11
   **convict** - 183:10, 240:1, 240:16, 241:16, 242:11, 243:21, 247:19, 304:21, 305:2, 305:24, 306:8
   **convicted** - 175:18, 179:2, 179:9, 185:25, 223:4, 223:8, 240:22, 241:5, 241:22, 242:21, 243:4, 248:9, 248:15, 252:12, 274:6, 274:16, 288:21, 305:17, 306:21, 306:23

**convicting** - 241:1
   **conviction** - 65:5, 279:4
   **convictions** - 5:23
   **convince** - 46:2, 240:15, 301:9, 301:24
   **convinced** - 22:22, 33:11, 33:13, 45:23, 71:20, 189:18, 189:19, 189:21, 190:16, 190:25, 301:23
   **convinces** - 186:7, 241:20
   **convincing** - 29:22
   **convoluted** - 196:15
   **cooperating** - 302:6
   **coordinator** - 193:7, 310:22
   **cop** - 58:21
   **cops** - 213:21
   **copy** - 4:21, 5:1, 8:6, 181:19, 235:2, 250:10, 296:6
   **Cornelius** - 2:11, 3:14, 4:22, 4:25, 5:8, 5:16, 5:19, 6:9, 6:12, 6:16, 6:19, 7:11, 7:15, 7:19, 8:8, 8:10, 8:11, 8:14, 8:16, 17:22, 17:23, 18:23, 18:25, 19:7, 19:20, 19:25, 20:11, 40:17, 43:11, 99:4, 99:12, 100:6, 100:10, 100:16, 101:11, 101:14, 102:12, 108:5, 108:6, 109:23, 109:24, 114:25, 121:3, 121:4, 128:4, 137:2, 137:6, 137:8, 138:3, 140:7, 140:11, 144:17, 179:16, 179:17, 179:20, 179:23, 188:11, 188:15, 189:3, 189:6, 191:7, 191:10, 191:19, 191:22, 192:4, 192:9, 217:25, 232:13, 232:15, 232:18, 234:22, 235:1, 238:1, 238:4, 240:6, 240:9, 244:4, 247:1, 249:2, 249:3, 249:10, 249:15, 249:17, 249:19, 250:9, 251:13, 251:23, 252:18, 252:21, 252:23, 253:1, 253:9, 253:14, 253:18, 253:22, 254:2, 254:7, 254:9, 254:17, 254:19, 255:5, 255:10, 255:13, 255:17, 256:20, 256:22, 256:24, 283:21, 294:24, 295:4, 295:6, 295:7, 296:4, 296:6, 308:14, 308:18, 309:5, 311:20, 315:15, 316:2, 321:7, 331:3, 331:4, 332:19, 332:22, 333:11
   **Cornelius'** - 252:2
   **corner** - 63:4
   **Correct** - 20:1, 52:4, 101:14, 106:20, 108:3, 112:9, 118:20, 144:25, 166:7, 181:23, 260:18, 260:21, 281:8, 282:5, 282:7, 292:19
   **correct** - 3:6, 3:7, 4:14, 4:17, 7:9, 24:5, 52:3, 83:22, 86:23, 90:21, 101:10, 108:19, 110:10, 110:13, 112:12, 116:21, 118:19, 128:9, 130:16, 131:20, 143:17, 143:18, 144:24, 145:9, 151:16, 180:22, 181:22, 195:3, 201:10, 256:16, 257:8, 273:5, 288:8, 291:25, 292:18, 299:15, 310:18, 312:4, 322:12, 334:7
   **corrected** - 104:10
   **correctly** - 183:23, 232:16,

236:25, 237:2, 334:14
   **corroborate** - 302:11, 302:12
   **corroborated** - 65:7
   **corroborating** - 65:13, 279:6, 279:11, 279:25
   **Corroboration** - 166:13, 166:20
   **corroboration** - 65:9, 165:15, 166:8, 166:13, 166:17, 166:24
   **counsel** - 18:4, 99:4, 99:5, 102:3, 102:11, 102:12, 144:16, 144:17, 189:16, 194:15, 295:10, 309:9, 309:17, 334:9
   **Counsel** - 136:14, 137:22
   **counter** - 166:14, 166:16
   **country** - 44:25
   **County** - 1:9, 1:23, 54:7, 54:8, 148:13, 158:2, 259:13, 259:14, 267:10, 274:17, 334:2, 334:5
   **Couple** - 303:14, 303:15
   **couple** - 13:20, 25:13, 53:6, 80:22, 88:15, 127:8, 172:5, 188:15, 195:15, 238:5, 257:18, 286:16, 291:21, 323:14, 331:25
   **course** - 6:5, 14:5, 26:17, 53:8, 54:16, 55:10, 56:2, 56:3, 71:3, 80:6, 84:19, 88:10, 98:18, 118:6, 149:1, 149:6, 169:10, 176:3, 179:3, 179:10, 180:22, 202:14, 223:6, 223:7, 235:9, 242:13, 261:14, 267:11, 296:14, 317:8, 321:6
   **Court** - 1:3, 1:4, 1:6, 3:3, 3:9, 3:12, 4:12, 4:15, 4:18, 4:25, 5:3, 5:15, 5:18, 6:10, 6:13, 6:20, 7:2, 7:13, 7:17, 7:24, 8:9, 8:12, 8:15, 8:21, 8:24, 8:25, 9:3, 9:4, 12:22, 14:17, 14:20, 15:11, 16:19, 16:21, 17:6, 17:25, 18:4, 18:9, 18:13, 18:16, 18:21, 18:24, 19:4, 19:12, 19:24, 20:2, 20:6, 20:8, 20:12, 20:16, 20:19, 20:23, 21:4, 21:11, 21:17, 21:22, 22:4, 22:8, 22:15, 23:3, 23:7, 23:10, 23:19, 23:21, 23:25, 24:3, 24:8, 24:13, 24:15, 24:19, 24:25, 25:19, 27:23, 29:2, 29:4, 29:8, 29:10, 30:13, 30:16, 30:20, 30:23, 31:1, 31:5, 31:8, 31:12, 31:16, 31:22, 31:25, 32:11, 32:14, 32:17, 32:22, 33:1, 33:4, 33:8, 34:4, 34:9, 34:13, 34:15, 34:19, 35:11, 35:20, 36:2, 36:5, 36:9, 36:12, 36:18, 36:24, 37:2, 37:10, 37:15, 37:20, 38:24, 39:5, 39:12, 39:16, 39:23, 40:1, 40:5, 40:8, 40:11, 40:15, 40:20, 41:3, 41:12, 41:15, 41:18, 41:23, 42:1, 42:3, 42:8, 42:11, 42:21, 42:24, 43:4, 43:12, 43:17, 44:5, 47:17, 48:2, 48:8, 48:12, 48:18, 48:24, 49:6, 49:15, 49:18, 49:22, 49:24, 50:4, 50:8, 50:13, 50:18, 51:5, 51:12, 51:22, 52:5, 54:7, 56:10, 56:12, 57:15, 60:10, 60:20, 60:25, 61:4, 64:11, 68:2, 68:5, 68:16, 72:23, 72:25, 73:5, 73:25,

74:16, 77:3, 77:8, 80:22,
81:2, 81:5, 81:10, 81:19,
81:23, 82:8, 82:12, 82:14,
82:19, 82:24, 83:3, 83:5,
83:7, 83:15, 84:8, 85:11,
86:15, 86:19, 86:25, 87:5,
87:10, 87:22, 88:1, 88:5,
88:9, 88:15, 88:24, 89:5,
89:23, 90:1, 90:4, 90:6,
90:9, 90:13, 90:22, 91:12,
91:14, 91:23, 92:3, 92:6,
92:10, 92:17, 92:25, 93:2,
93:9, 93:18, 93:21, 93:24,
94:2, 94:6, 94:15, 94:18,
94:20, 95:2, 95:13, 95:15,
95:22, 95:25, 96:3, 96:7,
96:10, 96:18, 96:20, 97:4,
97:6, 97:10, 97:13, 97:17,
97:24, 98:1, 98:24, 99:13,
100:7, 100:13, 100:19,
101:10, 101:12, 101:16,
101:21, 101:25, 102:5,
102:8, 104:10, 105:23,
106:1, 106:9, 106:13,
106:21, 106:25, 107:4,
107:7, 107:9, 107:23,
107:25, 108:4, 108:8,
108:12, 108:16, 108:18,
108:21, 109:7, 109:17,
109:22, 109:25, 110:3,
110:6, 110:9, 110:12,
110:19, 110:22, 111:6,
111:9, 111:12, 111:16,
111:18, 111:21, 112:7,
112:10, 112:19, 112:22,
113:20, 113:24, 114:1,
114:4, 114:18, 114:24,
115:2, 115:4, 115:8, 115:11,
115:25, 116:3, 116:14,
116:22, 116:24, 117:2,
117:7, 117:9, 117:21,
117:24, 118:2, 118:10,
118:16, 118:18, 118:21,
118:23, 119:3, 119:5,
119:17, 119:20, 119:22,
120:2, 120:19, 121:1, 121:3,
121:5, 121:10, 121:12,
121:24, 122:15, 122:21,
122:25, 123:4, 123:7,
123:11, 123:13, 123:15,
123:25, 124:8, 124:11,
125:2, 125:7, 125:9, 125:11,
125:19, 125:25, 126:2,
126:13, 127:1, 127:7,
127:12, 127:18, 128:8,
128:22, 129:13, 130:1,
130:6, 130:11, 130:13,
130:20, 131:23, 132:1,
132:5, 132:8, 132:10,
132:18, 132:22, 133:25,
134:8, 134:12, 134:16,
134:19, 135:6, 135:11,
135:18, 136:3, 136:9,
136:12, 136:16, 136:23,
137:2, 137:10, 137:14,
137:18, 137:21, 138:5,
138:12, 138:19, 139:2,
139:9, 139:14, 139:20,
139:22, 140:2, 140:7,
140:13, 140:17, 140:22,
140:25, 141:5, 141:9,
141:12, 141:16, 142:2,
142:4, 142:12, 142:13,
142:16, 142:18, 142:21,
142:23, 143:10, 143:12,
144:2, 144:8, 144:11,
144:14, 145:5, 146:9,
171:17, 172:2, 179:16,
179:18, 187:3, 188:13,
189:5, 191:13, 191:17,

191:21, 192:1, 192:7,
192:11, 192:14, 194:4,
194:8, 194:12, 194:19,
194:25, 196:5, 218:21,
224:18, 232:13, 234:24,
238:3, 240:8, 244:6, 247:4,
249:2, 249:6, 249:10,
249:16, 249:18, 250:3,
250:5, 250:16, 250:20,
251:25, 252:9, 252:19,
252:22, 252:25, 253:4,
253:11, 253:17, 253:20,
253:23, 254:1, 254:5,
254:18, 254:21, 254:24,
255:3, 255:6, 255:8, 255:11,
255:15, 255:19, 256:2,
256:14, 256:16, 256:18,
256:21, 256:23, 257:5,
258:7, 258:13, 283:23,
283:25, 295:4, 296:5,
308:16, 308:19, 308:22,
309:3, 309:6, 309:12,
309:21, 309:25, 310:2,
310:20, 310:23, 311:3,
311:10, 311:14, 311:18,
312:1, 313:8, 313:20, 330:8,
331:4, 331:18, 331:22,
332:20, 332:24, 333:8,
333:16, 333:23, 334:4,
334:5, 334:20, 334:21
  **court** - 3:1, 8:18, 24:23,
26:6, 26:7, 26:15, 44:21,
92:1, 98:13, 98:22, 101:23,
103:12, 107:2, 108:14,
110:4, 111:14, 113:22,
115:6, 116:4, 117:5, 119:1,
121:8, 123:9, 125:5, 130:19,
132:6, 132:15, 137:12,
144:6, 157:8, 192:5, 193:1,
193:7, 193:11, 259:12,
278:14, 310:14, 310:22,
334:12
  **Court's** - 1:10, 4:24, 5:4,
5:16, 6:17
  **courthouse** - 9:23
  **courtroom** - 3:6, 3:15, 4:1,
9:5, 14:8, 14:9, 14:10,
15:23, 17:14, 22:1, 25:2,
25:8, 46:23, 91:4, 99:6,
102:2, 102:15, 103:2, 104:3,
132:2, 132:11, 132:21,
132:22, 132:24, 133:23,
134:3, 135:13, 136:1, 141:2,
142:9, 143:24, 144:20,
153:8, 160:13, 191:15,
192:13, 193:13, 194:7,
200:22, 209:10, 245:15,
249:9, 253:25, 255:2, 256:1,
276:13, 309:2, 309:24,
311:2, 311:17, 326:19
  **courts** - 28:11
  **cover** - 15:6, 19:13, 25:11,
25:25, 27:25, 44:11, 84:11,
210:6, 312:13
  **covered** - 5:22, 84:11,
312:14
  **covering** - 332:25
  **creates** - 302:13, 302:15
  **credibility** - 57:7, 57:9,
57:19, 58:5, 58:12, 58:17,
60:4, 66:12, 160:7, 160:12,
209:22, 271:16, 271:18,
271:21, 271:25, 272:8,
273:3, 273:16, 276:14,
278:16, 279:2
  **credible** - 38:16, 161:7
  **credit** - 59:20, 275:11
  **Crime** - 163:16, 210:22
  **crime** - 39:9, 61:16, 64:3,
65:22, 73:4, 155:22, 158:4,

161:19, 162:8, 162:9,
168:24, 174:3, 174:5, 175:7,
182:1, 198:22, 202:12,
203:24, 207:19, 211:5,
212:11, 213:16, 217:17,
220:24, 222:10, 222:15,
222:19, 223:16, 224:2,
224:4, 226:17, 246:2, 279:7,
282:21, 283:4, 299:8, 322:4,
324:13, 324:20
  **crimes** - 149:6, 158:16,
172:13, 173:20, 198:19,
239:6, 262:25, 263:8, 287:2,
287:3, 324:4, 324:7, 324:21
  **Criminal** - 1:4, 64:21, 71:8,
221:7, 286:16
  **criminal** - 8:4, 14:17, 28:1,
28:20, 28:25, 29:24, 29:25,
31:20, 32:18, 32:23, 33:10,
33:23, 37:7, 51:8, 53:12,
55:4, 61:23, 69:24, 70:10,
71:7, 71:13, 71:16, 146:3,
154:16, 155:4, 157:4, 172:9,
172:24, 173:24, 174:6,
174:21, 195:22, 201:21,
201:24, 202:23, 203:5,
204:3, 220:7, 220:15,
220:16, 221:1, 224:1,
226:24, 227:4, 236:4, 239:4,
241:24, 258:1, 261:21,
285:8, 286:13, 286:14,
312:25
  **criminally** - 62:3, 62:6,
62:8, 62:9, 277:10, 277:14
  **cross** - 203:17
  **Cruz** - 1:6, 3:4, 3:6, 3:13,
6:24, 7:17, 11:3, 17:22,
18:5, 54:9, 55:8, 98:25,
101:17, 102:1, 102:3,
102:10, 102:11, 138:7,
140:13, 144:16, 145:9,
153:11, 179:24, 192:16,
194:14, 195:3, 200:23,
219:23, 257:8, 265:6,
265:15, 295:8, 309:9,
309:17, 310:2, 312:3,
326:20
  **Cruz-garcia** - 1:6, 3:4, 3:6,
3:13, 6:24, 7:17, 11:3,
17:22, 18:5, 54:9, 55:8,
98:25, 101:17, 102:1, 102:3,
102:10, 102:11, 138:7,
140:13, 144:16, 145:9,
153:11, 179:24, 192:16,
194:14, 195:3, 200:23,
219:23, 257:8, 265:6,
265:15, 295:8, 309:9,
309:17, 310:2, 312:3,
326:20
  **Csr** - 334:19
  **cues** - 59:10
  **Culotta** - 3:1, 6:3, 101:3,
105:3
  **culpability** - 77:19, 78:21
  **curious** - 151:4
  **current** - 57:14, 262:3,
262:6, 301:6, 301:7
  **custody** - 6:16
  **cut** - 183:6, 232:22
  **cuts** - 9:21

# D

  **D.a.'s** - 303:20
  **daily** - 287:10
  **Damian** - 2:23, 7:22, 105:2
  **damn** - 137:7
  **Damon** - 101:2
  **Dana** - 111:18, 135:18
  **danger** - 72:5, 72:7, 72:8,

72:9, 74:18, 76:20, 84:14,
84:23, 175:1, 179:4, 179:9,
219:4, 224:5, 224:12,
225:16, 241:4, 285:15
  **dangerous** - 91:18, 224:7
  **Darlene** - 2:15, 5:24,
99:22, 104:25
  **Darrell** - 3:19, 6:5, 99:25,
105:9
  **Date** - 334:20
  **date** - 14:3, 54:15, 57:1,
85:24, 90:6, 91:2, 91:25,
96:23, 103:22, 132:20,
132:25, 137:23, 138:9,
202:11, 203:10
  **dates** - 96:3
  **daughter** - 91:10, 94:12,
245:10, 245:14, 245:16,
246:1
  **David** - 4:15, 7:13, 113:24,
114:2, 131:3, 139:16, 140:8,
140:14
  **Davis** - 3:19, 6:5, 99:25,
105:9
  **days** - 12:25, 13:9, 85:19,
97:5, 103:22, 193:20, 294:3
  **Dc** - 93:1
  **dead** - 281:6, 296:18
  **deadly** - 4:9, 54:24, 54:25
  **deal** - 103:17, 122:19,
167:11, 167:13, 167:18,
167:23, 211:15, 211:16,
211:21, 211:24, 211:25,
212:3, 212:9, 269:23
  **dealing** - 153:5, 153:6,
177:4, 222:5, 222:6, 225:10
  **deals** - 162:14
  **dealt** - 269:22
  **death** - 9:8, 9:13, 11:5,
11:18, 12:16, 12:20, 15:5,
32:19, 33:19, 33:20, 53:19,
53:22, 53:24, 54:22, 55:12,
67:23, 68:21, 69:15, 69:17,
72:18, 74:8, 74:9, 74:23,
75:1, 76:17, 77:22, 78:8,
78:11, 79:10, 79:15, 79:16,
79:18, 79:21, 80:7, 80:20,
81:1, 82:7, 82:23, 83:12,
83:18, 83:23, 83:25, 85:4,
107:20, 109:4, 109:6, 109:8,
112:16, 113:2, 113:14,
114:21, 116:19, 118:18,
120:1, 120:23, 122:10,
124:20, 126:6, 127:2, 127:3,
127:23, 129:19, 129:24,
145:23, 147:7, 147:17,
148:4, 148:9, 149:13,
149:17, 149:25, 150:9,
150:14, 150:16, 150:18,
150:23, 151:3, 151:10,
152:3, 152:10, 152:13,
152:17, 152:21, 153:18,
154:6, 174:24, 176:1,
176:25, 178:19, 180:7,
182:14, 184:14, 185:12,
195:17, 197:4, 198:13,
198:16, 198:20, 199:7,
199:13, 200:4, 200:9,
200:18, 201:5, 215:15,
216:7, 219:6, 219:8, 221:21,
221:25, 223:24, 224:3,
238:13, 239:11, 240:3,
245:25, 248:23, 257:21,
260:1, 260:10, 262:2, 262:3,
262:4, 262:13, 262:23,
263:2, 263:8, 263:14,
263:23, 264:4, 264:14,
265:20, 284:5, 284:12,
284:14, 289:10, 290:5,
290:6, 297:2, 297:4, 297:11,

297:13, 307:7, 307:10,
307:18, 308:2, 312:21,
315:6, 317:14, 317:16,
317:18, 318:4, 318:10,
318:19, 318:25, 319:4,
319:9, 320:5, 321:9, 321:14,
321:23, 322:3, 322:18,
323:3, 323:11, 323:16,
324:16, 324:18, 324:22,
325:10, 325:14, 326:8,
328:4, 328:8, 328:9, 328:10,
328:11, 329:24

**Debruyn** - 193:7, 310:22

**deceased** - 74:8, 74:9,
74:23, 75:22, 75:23, 225:2

**decide** - 58:6, 118:9,
147:23, 147:24, 151:18,
156:7, 161:6, 161:24, 162:6,
162:17, 162:18, 164:3,
165:9, 170:25, 176:13,
178:15, 202:4, 208:23,
209:14, 210:2, 210:15,
215:16, 216:18, 217:9,
217:12, 225:22, 226:15,
241:20, 245:3, 246:14,
248:17, 272:7, 279:1, 319:5,
326:7

**decided** - 224:3, 254:19

**decides** - 64:15, 157:16,
157:18, 161:9, 161:18,
161:21, 217:6, 217:16

**deciding** - 201:23, 218:25,
264:20, 271:17, 285:14,
305:5, 305:6

**decision** - 53:19, 68:20,
69:14, 82:22, 91:5, 118:6,
125:24, 129:5, 147:23,
162:4, 170:21, 176:20,
179:6, 201:2, 222:13, 241:9,
247:24, 253:24, 297:3,
300:2

**decisions** - 29:24, 197:16

**decomposition** - 170:16,
170:24

**deep** - 82:5, 274:9, 327:15

**deeper** - 145:18, 195:11

**Deetrice** - 5:25

**defend** - 51:10, 157:19,
182:24

**Defendant** - 2:17, 3:8,
3:11, 7:1, 7:23, 18:7, 65:8,
101:20, 138:11, 140:16,
194:18, 309:11, 309:20

**defendant** - 3:1, 6:16,
8:18, 10:9, 15:15, 15:25,
16:9, 16:13, 16:15, 17:21,
22:9, 22:17, 23:14, 24:4,
24:23, 25:15, 25:22, 26:20,
27:10, 27:12, 27:15, 28:2,
28:24, 35:15, 44:14, 47:3,
47:8, 49:10, 50:15, 54:5,
54:10, 54:13, 55:8, 55:19,
57:14, 65:15, 65:16, 65:18,
69:23, 70:10, 71:7, 73:7,
74:7, 74:22, 74:25, 77:19,
77:25, 78:22, 98:22, 99:3,
99:4, 101:23, 107:2, 108:14,
110:4, 111:14, 113:2,
113:22, 115:6, 116:1, 117:5,
119:1, 121:8, 123:9, 125:5,
128:7, 130:19, 132:6,
132:15, 137:12, 138:6,
138:12, 144:6, 153:11,
156:12, 157:3, 158:3,
159:12, 162:11, 166:25,
167:10, 171:15, 172:9,
175:25, 180:20, 180:21,
181:1, 181:16, 189:18,
192:5, 201:5, 202:12,
203:11, 204:18, 205:22,

217:18, 218:2, 220:6,
221:25, 222:16, 224:23,
226:3, 226:6, 226:18, 236:3,
237:15, 262:4, 267:8,
270:11, 278:6, 278:10,
279:7, 279:20, 279:25,
283:8, 283:11, 283:13,
283:14, 284:14, 285:7,
286:14, 286:18, 288:10,
288:22, 290:4, 290:23,
302:6, 305:3, 305:4, 317:18,
319:18, 326:8, 327:7,
327:25, 329:10, 329:17

**defendant's** - 45:24, 49:8,
51:2, 77:18, 78:19, 80:1,
80:5, 182:24, 195:22,
201:21, 301:25

**defendants** - 46:8, 207:19

**defending** - 47:16, 187:1

**defense** - 8:6, 8:12, 34:25,
52:22, 73:9, 156:21, 156:24,
176:16, 177:5, 178:4,
190:14, 192:9, 219:25,
225:23, 230:19, 246:24,
247:12, 251:5, 265:6,
316:19

**Defense** - 4:23, 4:25, 5:15,
5:17, 250:6, 309:5

**define** - 172:10, 301:5

**defined** - 70:15, 70:25,
71:1, 71:2, 71:9, 71:16,
71:17, 71:24, 72:3

**definite** - 21:6, 330:10

**Definitely** - 180:8, 197:18

**definitely** - 66:10, 198:23,
249:23, 286:6

**definition** - 28:10, 28:13,
28:14, 30:4, 30:5, 32:1,
32:6, 34:18, 34:22, 35:3,
43:1, 79:24, 188:19, 189:12,
189:21, 190:7, 270:1, 286:3,
300:22, 301:3, 301:4,
301:10, 301:12, 302:15

**definitions** - 302:18

**deleted** - 131:8

**delve** - 145:17

**denial** - 130:9, 130:11,
130:13, 130:14

**Denial** - 130:12

**denied** - 113:21, 117:4,
118:25, 121:7, 125:4, 130:4,
130:16, 256:17

**Denman** - 141:17, 141:18

**Dennis** - 4:12, 6:11,
108:19, 131:2

**deny** - 253:5

**denying** - 130:7

**depth** - 312:15

**Deputy** - 8:21, 24:20,
24:25, 102:8, 103:8, 130:24,
131:15, 131:21, 133:3,
133:20, 134:19, 193:6,
193:22, 256:9, 308:22,
310:21, 311:14, 331:12

**describing** - 48:25

**deserve** - 273:23

**deserves** - 150:19, 239:4,
319:8, 322:5

**deserving** - 151:7

**despite** - 173:16

**destination** - 90:2

**detail** - 28:17, 33:19,
258:22, 329:3

**detailed** - 259:20

**details** - 11:2, 11:8, 21:5,
33:5, 194:1, 274:7

**deteriorate** - 215:13

**determination** - 12:16

**determinations** - 46:9

**determine** - 19:18, 32:3,
38:12, 57:7, 57:20, 65:25,
74:22, 76:7, 128:24, 169:13,
169:19, 173:2, 218:12,
230:9, 284:17, 291:3

**determines** - 246:12,
246:13

**determining** - 266:19,
270:3

**diabetic** - 94:25

**diagnosed** - 294:6

**die** - 168:18, 215:9, 325:25

**died** - 169:17, 171:7

**difference** - 11:17, 148:5,
148:23, 316:15

**different** - 4:5, 12:7, 12:19,
26:3, 32:18, 33:23, 38:1,
38:2, 38:6, 38:7, 43:15,
43:20, 44:19, 50:4, 50:6,
52:19, 53:5, 55:5, 55:15,
61:18, 61:20, 64:1, 65:18,
71:25, 118:4, 119:23,
125:20, 131:13, 147:17,
149:5, 149:8, 187:18,
189:12, 193:15, 197:13,
197:20, 201:16, 202:6,
202:7, 234:20, 236:22,
252:5, 259:16, 266:2,
267:12, 270:20, 274:20,
274:22, 277:7, 281:13,
281:15, 281:18, 287:9,
301:11, 301:12, 315:5,
325:16, 326:9, 326:12,
326:13

**differently** - 157:11,
233:21, 235:25, 278:20,
278:22

**difficult** - 23:1, 68:24,
83:14, 260:13, 260:16,
308:12

**dime** - 269:8

**dinner** - 153:1, 320:14

**dire** - 3:21, 5:6, 5:11, 5:21,
6:3, 6:6, 7:4, 7:9, 7:22,
10:20, 12:22, 12:25, 13:2,
13:10, 13:21, 17:16, 35:2,
85:17, 85:19, 90:23, 91:2,
91:17, 92:8, 102:16, 103:21,
115:18, 132:13, 133:7,
133:12, 138:10, 140:15,
144:20, 145:12, 145:16,
148:5, 195:6, 195:11,
228:25, 230:20, 231:2,
251:3, 257:11, 258:9, 277:2,
312:7, 329:7

**Dire** - 1:16, 1:2, 4:20, 5:8,
8:24, 145:4, 146:12, 179:19,
194:24, 196:7, 232:14,
244:7, 254:8, 257:4, 258:15,
295:5, 311:25, 313:10

**direct** - 62:12

**direction** - 88:22, 159:13

**directions** - 194:5

**directly** - 132:23, 175:20

**dirge** - 13:13

**dirty** - 45:1

**disagree** - 26:8, 136:22,
136:23, 272:20

**disagreed** - 324:2, 324:7,
324:14

**discovered** - 282:2, 282:4,
282:7

**discuss** - 88:11, 193:2,
249:8, 263:12, 308:25,
310:15

**discussed** - 102:18,
258:24, 327:4

**Discussion** - 5:2, 250:8

**discussion** - 58:1, 99:14

**dismiss** - 151:19

**dismissals** - 102:19

**disposition** - 14:4

**disprove** - 306:20

**disputed** - 45:18

**disqualified** - 136:7

**disqualifies** - 243:25

**disqualify** - 250:19

**disregard** - 104:7

**distanced** - 165:12

**distract** - 87:16

**distracted** - 87:12

**District** - 1:6, 1:12, 2:5,
9:4, 54:7, 311:3, 334:5

**district** - 3:19, 18:10,
102:14

**divorce** - 91:24

**Dna** - 159:25, 160:1,
208:12, 208:17, 208:23,
217:21, 275:17, 275:18,
279:15, 279:24, 283:4,
333:10, 333:12

**doctor** - 94:14

**Domingo** - 3:21, 6:7,
99:25, 105:10

**Donald** - 143:16, 143:19

**done** - 5:5, 26:13, 47:22,
188:16, 224:1, 243:6,
253:11, 253:19, 284:18,
291:22, 303:9, 304:14,
304:16, 333:18

**Donna** - 115:8, 115:12,
138:23

**door** - 58:25, 81:7, 95:16,
97:7

**doors** - 105:14

**doorway** - 63:13

**doubt** - 22:22, 27:3, 27:16,
28:3, 28:5, 28:11, 29:12,
29:13, 29:15, 29:18, 30:2,
32:3, 32:5, 33:12, 33:13,
34:17, 34:18, 35:2, 36:13,
38:3, 38:11, 38:20, 39:7,
40:5, 40:24, 41:5, 41:9,
43:1, 43:7, 44:19, 45:24,
46:3, 48:25, 49:1, 69:22,
70:6, 70:8, 70:9, 70:17,
71:12, 71:21, 73:22, 74:7,
75:21, 76:9, 77:12, 155:15,
155:24, 156:2, 156:9,
162:20, 169:20, 188:18,
188:20, 188:23, 189:7,
189:10, 189:22, 190:2,
190:8, 190:9, 190:16,
190:15, 199:22, 202:21,
203:8, 204:2, 204:6, 204:8,
205:6, 208:2, 216:19,
266:22, 267:1, 267:18,
267:20, 268:12, 269:22,
269:25, 270:6, 285:6, 290:2,
290:4, 290:17, 300:6, 300:7,
300:12, 300:16, 300:23,
301:6, 301:10, 301:13,
301:17, 301:18, 301:24,
302:15, 302:19, 303:6,
305:10, 327:6

**doubts** - 204:3

**down** - 3:20, 9:22, 14:11,
17:15, 44:1, 47:5, 53:2,
62:7, 63:3, 70:13, 82:5,
83:9, 85:7, 85:16, 98:19,
100:13, 102:24, 129:14,
147:15, 164:4, 166:2, 181:4,
182:5, 187:1, 193:14, 197:9,
212:17, 227:17, 233:12,
237:15, 242:22, 248:3,
249:6, 256:5, 259:8, 260:11,
261:3, 285:12, 286:4,
287:10, 292:12, 295:16,

308:24, 314:11, 331:15
**downgraded** - 228:9
**drink** - 146:18
**drive** - 94:17, 164:5
**driver** - 63:6, 63:8, 64:6, 94:17
**drop** - 294:1
**dropped** - 147:11
**drug** - 177:12, 226:3, 291:11, 291:15
**drugs** - 177:16, 177:18
**duly** - 54:6
**dunk** - 48:13, 48:16, 49:12
**duration** - 130:22
**during** - 35:2, 53:7, 53:10, 53:11, 54:19, 56:2, 87:20, 89:9, 154:22, 176:3, 198:9, 202:14, 228:24, 240:20, 242:13, 258:8, 319:21
**duty** - 9:12, 10:10, 88:22, 130:22, 147:9, 194:1, 197:9, 198:11, 261:22, 317:6, 331:14
**Dwi** - 259:11, 265:11, 270:20, 291:23, 300:17, 300:19, 303:10

# E

**Eardley** - 3:17, 6:9, 101:4, 105:9
**early** - 103:3
**easel** - 189:4
**easier** - 158:22, 299:22
**easy** - 113:3, 325:14, 325:19, 325:21
**eat** - 85:10
**edge** - 46:1
**education** - 181:20, 250:23
**Edward** - 104:16
**Edwin** - 134:17
**effect** - 64:2, 181:17
**effective** - 322:10, 322:16, 322:17
**effectively** - 273:3
**efficient** - 187:12
**effort** - 256:5, 331:15
**egregious** - 174:8
**eight** - 89:10, 193:20, 295:13, 295:15, 295:23, 297:18, 297:21, 298:3, 298:4, 298:6, 332:10
**Eight** - 264:12
**eight-hour** - 89:10, 193:20
**either** - 15:3, 27:2, 58:11, 70:16, 71:9, 75:22, 77:25, 78:2, 92:7, 99:15, 100:17, 175:19, 178:5, 182:22, 184:12, 184:14, 186:3, 186:6, 186:20, 195:8, 221:25, 224:25, 225:1, 262:13, 284:23, 290:4, 290:6, 303:19, 305:22, 306:5, 306:25, 307:12, 317:14, 318:10, 318:19, 323:2, 332:18
**element** - 5:13, 28:5, 54:10, 204:7, 204:13, 217:1, 269:1, 269:17
**elements** - 26:19, 28:7, 33:12, 33:14, 54:9, 154:23, 154:24, 155:6, 155:11, 155:14, 156:1, 156:6, 156:7, 157:23, 158:11, 162:19, 169:22, 199:14, 202:10, 202:21, 203:9, 207:13, 207:16, 216:11, 216:17, 216:18, 217:3, 218:4, 218:8, 267:3, 267:5, 267:12,

267:20, 270:7
**elevate** - 53:14, 200:1
**elevates** - 149:12
**eleven** - 191:3
**eligibility** - 262:14, 318:21
**eligible** - 184:16, 184:24, 198:5, 318:6
**eliminate** - 13:5, 85:13
**eliminated** - 85:15
**Elsy** - 117:7, 139:15
**emergency** - 24:17, 310:21
**Emert** - 135:11
**emotions** - 51:21
**emphasize** - 202:19
**employer** - 193:24, 310:17
**employment** - 53:10
**enacted** - 149:24
**encounter** - 192:22, 192:25, 310:9, 310:13
**encourage** - 315:22
**encouraged** - 212:15
**encourages** - 62:12
**end** - 13:17, 14:1, 97:1, 97:16, 119:6, 146:19, 153:13, 153:23, 156:4, 162:16, 176:19, 178:5, 190:15, 192:25, 204:10, 213:10, 218:10, 259:6, 264:3, 264:4, 264:15, 265:21, 303:5, 305:15, 310:13, 319:22
**ending** - 14:3
**enforcement** - 231:6, 233:7, 272:12, 272:16, 273:6, 273:19, 274:19, 275:24, 303:23
**engage** - 192:19, 310:7
**enters** - 192:13, 253:25, 256:1, 309:24
**enthusiastic** - 180:10
**entire** - 15:13, 110:19, 156:15, 270:12
**entitled** - 1:21, 238:17, 302:16, 307:20
**envision** - 83:18, 244:12, 244:14, 244:19, 247:13, 251:7, 251:12, 280:13, 283:3
**envisions** - 32:2, 46:6, 58:6, 59:4, 60:2, 61:19, 64:4, 83:19
**episode** - 53:12, 261:21
**equal** - 161:5
**equally** - 214:5, 231:8
**err** - 122:15
**es** - 298:22
**escort** - 24:20, 139:24
**especially** - 260:20
**Especially** - 63:14
**essential** - 218:11
**essentially** - 262:1, 266:13, 267:3, 289:25, 290:21, 318:18, 320:4, 320:5
**established** - 39:9
**etcetera** - 192:21, 310:8
**ethical** - 108:24, 110:15, 114:7, 115:16, 115:21, 121:15, 125:14, 126:10, 127:13
**ethically** - 122:5, 124:9
**evaluate** - 187:19
**evening** - 258:17
**events** - 184:15
**evidence** - 6:21, 13:20, 13:24, 14:10, 15:14, 15:16, 15:19, 16:12, 22:23, 23:15, 26:22, 26:23, 26:24, 26:25, 27:2, 27:4, 27:9, 27:12,

27:14, 27:17, 29:20, 29:22, 33:11, 37:18, 37:22, 39:9, 45:22, 47:24, 48:22, 53:21, 55:20, 56:19, 57:17, 65:7, 65:13, 65:15, 65:21, 67:6, 68:11, 69:3, 69:22, 70:8, 73:8, 73:10, 73:21, 74:6, 76:8, 77:16, 77:17, 78:3, 78:4, 78:16, 78:20, 79:13, 82:1, 82:12, 82:13, 83:21, 85:22, 118:8, 118:11, 118:14, 120:10, 122:9, 124:2, 124:16, 124:19, 124:21, 125:25, 126:3, 128:11, 128:14, 128:15, 129:11, 129:16, 129:21, 151:8, 151:22, 153:16, 153:24, 154:1, 154:5, 154:12, 157:5, 157:18, 157:22, 158:11, 159:2, 159:12, 159:18, 159:19, 159:21, 159:23, 161:9, 161:15, 161:18, 161:22, 162:12, 162:15, 162:17, 162:25, 163:4, 163:12, 163:18, 168:10, 168:13, 169:2, 169:4, 169:13, 169:18, 170:12, 170:20, 173:16, 173:18, 173:21, 176:13, 176:15, 177:11, 178:5, 179:6, 179:12, 180:24, 181:11, 181:17, 182:8, 183:6, 183:7, 183:9, 183:22, 183:25, 185:14, 185:18, 185:21, 186:6, 186:14, 186:16, 189:2, 189:7, 189:10, 189:15, 189:23, 190:4, 190:12, 201:4, 201:16, 201:19, 202:7, 203:6, 204:25, 205:19, 206:5, 207:8, 208:5, 208:7, 208:10, 208:11, 208:17, 210:8, 213:12, 214:25, 215:7, 215:12, 217:7, 217:17, 217:25, 218:1, 218:24, 223:10, 223:15, 224:2, 224:10, 225:1, 225:3, 225:6, 226:2, 226:6, 226:7, 226:18, 229:7, 229:18, 229:20, 230:17, 232:4, 234:15, 236:5, 236:10, 236:14, 240:14, 241:8, 241:20, 242:15, 244:25, 245:2, 246:5, 246:11, 246:13, 247:6, 247:22, 248:7, 248:20, 265:17, 265:19, 266:6, 268:9, 269:15, 270:18, 270:22, 271:2, 271:7, 271:10, 271:11, 275:3, 275:15, 275:16, 275:21, 275:22, 276:3, 276:5, 276:8, 276:11, 276:24, 279:6, 279:7, 279:11, 279:12, 279:15, 279:25, 280:23, 280:25, 282:13, 282:20, 282:25, 283:7, 283:16, 285:6, 287:25, 299:1, 299:18, 301:20, 301:23, 305:23, 319:15, 319:20, 327:9, 334:8
**evidentiary** - 214:24, 333:12
**exact** - 272:14
**exactly** - 33:9, 37:4, 37:5, 38:4, 68:24, 81:11, 83:15, 149:22, 152:25, 159:8, 198:24, 217:15, 241:12, 245:12, 272:15, 278:25, 295:18, 300:20, 325:4

**Exactly** - 48:18, 158:13, 278:25, 321:3
**examination** - 6:1, 250:18
**Examination** - 8:24, 145:4, 146:12, 179:19, 194:24, 196:7, 232:14, 244:7, 254:8, 257:4, 258:15, 295:5, 311:25, 313:10
**example** - 20:22, 20:23, 62:25, 183:2, 243:11, 244:23, 245:4, 246:21, 275:15, 289:3, 320:12
**examples** - 46:7, 57:5, 261:13, 261:19, 261:23, 275:20, 317:7
**except** - 52:10, 151:5, 238:11
**exception** - 214:8
**exchange** - 167:19, 211:15, 211:25
**excuse** - 10:11, 10:13, 62:14, 86:9, 92:18, 103:4, 103:5, 103:7, 103:18, 103:25, 104:2, 130:18, 130:24, 133:14, 134:21, 256:9, 256:11, 331:11
**excused** - 1:6, 1:8, 1:12, 1:14, 1:16, 1:18, 1:20, 1:22, 1:24, 2:1, 2:3, 2:5, 2:7, 2:9, 2:11, 2:13, 2:15, 2:17, 2:19, 2:21, 2:23, 3:1, 3:3, 3:5, 3:7, 3:9, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:23, 4:1, 4:3, 4:5, 4:7, 4:9, 5:9, 5:12, 5:20, 5:22, 5:24, 6:1, 6:3, 6:5, 6:7, 6:9, 6:13, 6:15, 6:19, 6:21, 6:23, 6:25, 7:2, 7:4, 7:8, 7:10, 7:12, 7:15, 7:17, 7:21, 7:23, 7:25, 8:2, 8:4, 8:6, 8:8, 8:10, 8:12, 8:14, 8:16, 8:18, 8:21, 8:23, 9:1, 7:21, 10:10, 10:14, 24:12, 99:20, 101:19, 102:22, 104:16, 104:19, 105:5, 130:21, 256:15, 331:7, 331:19, 331:21, 332:2, 333:24
**excuses** - 86:5, 97:25, 104:8, 183:5, 183:6
**excusing** - 103:9
**executed** - 327:12, 329:17
**execution** - 106:6, 106:19, 107:14, 107:20, 109:12, 109:20, 110:25, 111:4, 111:25, 114:13, 116:9, 116:20, 117:15, 119:12, 123:19, 124:5, 124:24, 126:16, 127:15, 128:18
**exercise** - 207:3, 252:23, 255:5, 255:20, 255:25, 256:17
**exercising** - 206:22, 255:8
**Exhibit** - 250:6
**exhibits** - 334:15
**exist** - 246:19
**existed** - 154:19
**exits** - 191:15, 249:9, 255:2, 309:2, 311:17
**expands** - 287:13
**expect** - 49:4, 51:9, 154:9, 201:9, 222:15, 234:8, 270:22, 275:23, 315:1, 315:4
**expecting** - 147:10, 231:13
**expensive** - 231:23
**experience** - 58:15, 58:23, 160:19, 187:23, 188:2, 228:10, 259:20, 266:13, 273:18, 273:19, 274:1, 274:24, 275:5, 275:6,

292:12
**experienced** - 187:8, 187:11
**experiences** - 274:2
**experiencing** - 92:13
**experts** - 208:22
**Expiration** - 334:20
**explain** - 7:12, 9:15, 11:16, 12:6, 149:22, 206:25, 227:16
**explained** - 118:11, 119:23, 126:23, 127:5, 197:19, 233:22
**explaining** - 203:15, 211:7, 269:24
**explanation** - 115:19, 123:21
**explanations** - 181:19
**exposure** - 192:24, 310:11
**expound** - 12:5
**extends** - 157:1
**extent** - 280:22
**extra** - 59:20, 183:14, 216:20, 279:7, 299:22
**extraneous** - 5:23
**extremely** - 294:22
**eye** - 59:13

## F

**Faa**- 96:24
**Facebook**- 192:20, 310:8
**faced** - 266:18, 329:2
**facilities** - 95:21
**facility** - 96:9
**fact** - 5:12, 6:7, 64:23, 118:11, 156:4, 160:5, 170:7, 185:4, 204:9, 205:16, 230:6, 230:21, 231:3, 231:7, 247:18, 248:8, 248:13, 248:15, 286:17, 299:2, 299:16, 307:22
**factor** - 261:13, 308:1, 317:3
**facts** - 11:8, 37:24, 57:18, 57:22, 69:7, 174:7, 174:23, 288:15, 288:20, 288:24, 289:13, 289:16, 297:5, 323:9
**fade** - 215:8
**failed** - 88:21
**fails** - 50:16
**failure** - 45:11, 45:24, 47:2, 49:3, 49:8
**Fair**- 200:3, 210:19, 224:15, 225:19, 263:21
**fair** - 10:23, 11:14, 13:6, 19:1, 19:24, 21:1, 127:6, 146:2, 147:23, 162:22, 165:3, 167:3, 178:20, 178:21, 195:21, 196:20, 196:22, 196:24, 199:19, 203:15, 203:18, 211:1, 213:12, 217:12, 238:21, 257:25, 265:7, 274:25, 312:25
**fairest** - 315:19
**fairness** - 222:16
**faith** - 209:25, 210:1
**fall** - 264:10, 328:19, 328:20
**falls** - 70:22, 164:19
**familiar** - 174:15, 269:21, 289:3
**family** - 29:24, 87:2, 87:4, 92:23, 152:23, 152:24, 153:22, 177:23, 200:7, 200:8, 200:25, 226:8, 226:12, 263:12, 263:17, 274:10, 274:24, 325:16,

326:25, 327:17, 327:19
**Family**- 287:13
**fan** - 319:3
**far** - 45:20, 86:7, 88:17, 143:18, 187:25, 191:24, 236:21, 253:3, 264:19, 286:22, 289:25, 293:19
**fashion** - 102:23
**fate** - 187:1
**father** - 88:23, 289:7
**favor** - 128:7, 151:16, 238:11, 263:15, 296:17
**fear** - 305:14
**feelings** - 35:1, 83:22, 83:24, 109:7, 122:8, 126:6, 128:21, 148:4, 150:14, 152:16, 160:1, 160:2, 160:14, 200:9, 209:4, 294:13, 297:16, 312:16, 316:4, 318:25, 319:12, 321:10, 321:14, 322:24, 330:18
**fellow** - 271:17, 292:15
**felonies** - 53:8, 53:9
**felony** - 56:3, 62:15, 62:16, 62:17, 198:9
**felt** - 22:16, 81:14, 110:17, 152:17, 152:20, 157:3, 233:8, 233:20, 234:19, 235:22, 236:22, 237:19, 296:21, 296:22, 297:6, 297:16
**few** - 4:3, 82:21, 87:9, 90:20, 103:24, 133:13, 138:16, 149:23, 151:6, 158:10, 180:3, 180:16, 238:11, 258:21, 259:15, 275:21, 294:3, 304:15, 304:17, 308:24, 321:16, 333:2
**Ffa**- 96:16
**field** - 271:20
**Fifteen**- 256:22
**Fifth**- 44:12, 45:1, 47:9, 50:14, 50:24, 52:3, 52:7, 182:16, 182:17, 206:11, 270:16, 299:6
**fifth** - 4:16, 17:3, 17:4, 25:20, 25:21
**fight** - 148:17
**figure** - 234:3, 319:11, 333:17
**file** - 5:10, 250:4
**filed** - 4:20
**fill** - 147:16, 184:5, 184:6, 232:25, 259:25, 299:23, 314:20
**filled** - 9:20, 88:19, 92:14, 108:22, 142:25, 181:18, 195:25, 233:2, 251:4, 296:7, 313:3
**Finally**- 290:15
**finally** - 176:11, 293:16
**fine** - 43:23, 48:8, 81:17, 88:25, 94:9, 94:23, 165:6, 172:2, 228:17, 228:18, 228:20, 234:8, 244:10, 253:13, 268:10, 268:25, 269:12, 269:16, 284:25, 313:23, 321:4, 321:12
**fine-tooth** - 81:17
**finger** - 302:9
**fingerprint** - 279:20
**fingerprints** - 161:25, 162:3, 166:14, 217:20, 275:18
**fingers** - 66:9
**finish** - 29:11, 41:4, 93:4, 106:13, 331:14
**finished** - 103:12

**first** - 3:14, 4:3, 4:13, 11:19, 14:7, 15:6, 16:17, 25:3, 27:8, 33:8, 47:11, 54:9, 58:4, 58:13, 59:22, 60:8, 61:11, 69:20, 70:2, 74:16, 74:19, 74:22, 78:9, 80:23, 86:10, 99:16, 102:21, 103:4, 103:25, 105:19, 114:6, 115:14, 129:1, 129:17, 131:7, 131:9, 140:9, 144:9, 144:23, 147:8, 147:12, 197:1, 219:2, 219:19, 246:12, 257:19, 271:5, 271:7, 274:1, 276:21, 285:3, 285:10, 285:13, 305:7, 308:10, 314:11, 314:17, 314:18, 315:2, 327:19, 333:20
**First**- 145:6, 148:4, 165:8, 172:7, 219:21, 259:2, 312:19
**Fisher**- 4:12, 6:11, 108:19, 131:2
**fit** - 233:3, 295:22, 297:16
**five** - 8:20, 23:12, 148:20, 152:15, 171:13, 190:21, 264:5, 264:8, 264:10, 295:24, 296:3, 296:14, 328:15, 328:16, 333:3
**Five**- 304:9, 304:10, 309:22
**five-minute** - 333:3
**floor** - 14:11, 63:20, 98:17, 132:21, 142:13, 193:14, 193:15, 311:2
**Flores**- 2:20
**fly** - 96:24, 293:5, 304:11
**focus** - 119:6, 121:13, 123:15, 125:13, 156:7, 172:5, 218:6, 286:12
**focused** - 120:3
**folks** - 70:16, 103:6, 105:15
**Folks**- 130:20
**follow** - 11:10, 13:14, 22:18, 22:25, 23:2, 23:24, 24:5, 25:16, 25:22, 27:20, 46:15, 50:14, 64:17, 66:3, 66:20, 118:11, 124:16, 124:21, 129:10, 153:16, 154:4, 155:20, 155:25, 181:2, 182:14, 182:25, 184:1, 184:7, 185:7, 186:9, 197:21, 203:19, 246:15, 247:7, 248:4, 248:9, 248:19, 248:22, 251:2, 272:10, 283:9, 291:21, 302:16, 307:3, 331:10
**follow-up** - 291:21
**followed** - 214:9
**follower** - 251:2
**following** - 1:20, 80:18, 104:1
**follows** - 145:3, 194:23, 257:3, 311:24
**foot** - 79:16
**force** - 330:15
**foregoing** - 334:6
**foreman** - 292:8
**forensic** - 271:2, 275:14, 275:16
**foreseeable** - 281:9
**forever** - 61:5
**forget** - 93:12
**forgot** - 17:8, 296:3
**form** - 27:5, 27:14, 55:20, 84:3, 159:21, 230:24, 250:11, 250:12
**formed** - 269:4
**forth** - 15:16, 28:12, 73:12,

73:13, 78:3, 319:15, 332:4
**forthcoming** - 11:12, 260:5
**forward** - 10:4, 24:17, 64:15, 252:3, 274:15, 278:5
**founding** - 44:24
**four** - 63:2, 64:1, 64:14, 85:17, 131:6, 131:7, 131:9, 131:15, 133:10, 133:11, 133:16, 143:18, 294:7, 297:10, 297:12, 328:23
**fourth** - 4:16, 17:2, 35:8, 60:15
**framework** - 219:6
**France**- 95:19
**Franklin**- 2:6, 334:21
**free** - 130:23, 195:13
**freezing** - 77:1
**frequently** - 46:9, 58:19, 224:13, 225:5, 225:13, 241:7, 241:11, 241:19, 242:21, 320:21
**Friday**- 3:24, 9:10, 9:12, 9:20, 92:15, 93:25, 137:20, 140:1, 141:7, 141:13, 141:18, 141:23, 141:24, 142:8, 142:13, 142:14, 142:15, 147:6, 196:1, 233:1, 233:8, 233:20, 234:19, 235:17, 235:22, 236:9, 236:22, 237:11, 237:19, 240:24, 269:23, 296:7, 313:3, 314:19, 320:13
**friend** - 162:7, 232:7
**friends** - 153:22, 201:1, 287:13, 325:16, 327:1
**front** - 12:22, 45:18, 46:24, 49:19, 50:19, 83:10, 88:12, 162:8, 162:9, 191:23, 249:5, 251:11, 253:21, 253:24, 280:9, 293:17
**full** - 67:20, 87:17, 97:15, 179:12, 231:19, 283:4, 332:24
**Fuller**- 2:7, 6:12, 100:24, 104:23
**fully** - 294:12
**furtherance** - 62:18
**fussing** - 236:19, 239:16
**Future**- 84:23
**future** - 72:5, 72:7, 72:8, 72:9, 74:17, 76:20, 84:14, 85:19, 172:10, 172:25, 173:6, 173:9, 173:20, 179:3, 179:9, 184:15, 185:13, 190:4, 219:3, 222:17, 224:12, 225:16, 241:24, 282:5, 285:15, 285:25, 286:9

## G

**gain** - 302:8
**game** - 47:23, 264:19, 326:13
**garcia** - 1:6, 3:4, 3:6, 3:13, 6:24, 7:17, 11:3, 17:22, 18:5, 54:9, 55:8, 98:25, 101:17, 102:1, 102:3, 102:10, 102:11, 138:7, 140:13, 144:16, 145:9, 153:11, 179:24, 192:16, 194:14, 195:3, 200:23, 219:23, 257:8, 265:6, 265:15, 295:8, 309:9, 309:17, 310:2, 312:3, 326:20
**Garcia**- 54:20, 54:22, 54:23, 55:11, 55:12, 202:13,

202:15
**Genaw** - 134:24
**general** - 11:9, 14:13, 14:24, 15:4, 36:10, 41:6, 43:18, 57:24, 63:1, 72:1, 145:8, 150:13, 260:9, 265:8, 297:1
**General** - 1:10
**generally** - 150:23, 151:15, 155:17, 263:15, 290:23, 296:17, 298:20
**Generally** - 13:2, 321:17
**gentlemen** - 9:1, 102:17
**George** - 1:6, 8:1, 7:6, 7:20, 10:5, 99:18, 104:19
**Germany** - 96:9
**getaway** - 63:8, 63:21, 64:6
**girl** - 227:9
**gist** - 285:17
**given** - 3:24, 73:24, 104:6, 187:3, 250:17, 259:24, 263:25, 268:18, 282:25, 283:2, 296:15, 312:9, 323:16, 325:11, 331:9
**globe** - 44:20
**Glossary..........................**
**.end** - 5:6
**gloves** - 162:1, 217:21
**goal** - 265:5
**God**- 60:23
**Gonzales** - 131:11
**Gonzalez** - 4:1, 5:3, 6:14, 6:16, 101:5, 105:10, 131:19, 311:19, 311:22, 312:2, 313:12, 315:25, 319:13, 321:17, 322:23, 325:13, 328:4, 328:24, 330:8, 330:14, 331:7
**Goodall** - 3:15, 6:18, 101:4, 105:8
**governor** - 262:22, 263:2, 271:1, 297:25, 321:18, 321:22, 323:15, 324:15
**grab** - 85:9
**Grand**- 54:6
**grandkids** - 304:8, 304:12
**grandma** - 200:10
**grant** - 5:19, 6:6, 130:17, 252:17, 255:23, 260:17
**granted** - 4:11, 4:13, 4:14, 4:16, 4:17, 5:11, 6:11, 7:14, 7:19, 8:20, 4:18, 5:25, 6:3, 100:15, 108:12, 110:3, 111:13, 115:5, 123:8, 130:8, 130:11, 331:6, 331:23
**granting** - 130:8
**gray** - 274:15
**grease** - 147:11
**great** - 177:23, 269:23, 269:24, 275:12, 325:4
**greater** - 58:11, 285:22
**Greater**- 220:12
**green** - 39:21
**groomsman** - 89:25
**ground** - 161:5
**grounds** - 43:16
**group** - 9:7, 22:2, 22:16, 63:2, 69:11, 103:14, 103:19, 105:16, 130:18, 130:21, 133:16, 133:17
**groups** - 71:25, 85:16, 102:20, 131:6, 133:10
**grown** - 19:2
**guarantee** - 160:5, 161:2, 161:14, 205:23
**guard** - 280:11
**guards** - 221:14
**guess** - 34:19, 35:16, 60:10, 150:15, 150:24,

151:18, 157:8, 169:4, 185:20, 208:14, 209:19, 227:13, 228:13, 244:2, 248:3, 275:17, 282:15, 282:16, 287:25, 296:8, 319:1, 328:20
**guidance** - 71:19
**Guillotte**- 143:16, 143:22
**guilt** - 12:10, 12:12, 33:9, 67:2, 67:8, 69:4, 69:21, 73:6, 120:5, 154:10, 154:13, 154:18, 154:22, 201:13, 201:22, 202:9, 206:7, 223:15, 230:9, 266:14, 266:15, 266:18, 278:23, 284:9, 288:15, 299:3, 299:12, 304:25
**guilt-innocence** - 12:10, 12:12, 33:9, 67:2, 67:8, 120:5, 266:14, 266:18, 284:9, 288:15, 304:25
**guilty** - 15:15, 22:23, 28:6, 28:9, 28:24, 31:20, 33:15, 34:2, 35:15, 35:19, 36:15, 37:8, 37:19, 60:22, 62:17, 120:6, 121:23, 122:10, 159:3, 159:12, 180:21, 181:1, 181:8, 181:9, 181:11, 182:3, 182:8, 189:18, 190:17, 190:21, 190:22, 201:23, 203:1, 205:25, 212:20, 213:11, 218:12, 223:5, 225:17, 229:2, 229:14, 229:16, 229:21, 229:24, 230:13, 233:18, 233:23, 234:16, 235:9, 235:24, 237:16, 239:20, 239:23, 239:25, 240:16, 244:13, 244:15, 249:13, 251:8, 262:5, 288:10, 292:7, 298:25, 301:25, 302:1, 303:7, 307:11, 317:18, 319:16, 319:18, 327:7
**Guilty**- 60:22
**gun** - 63:25, 75:8, 165:22, 213:1, 213:25, 214:2, 224:24, 227:20
**gunman** - 166:15
**guns** - 75:9, 75:11, 190:22, 191:5, 227:11
**gunshot** - 215:23
**Gurley**- 134:8
**gut** - 326:15
**guts** - 271:7
**guy** - 15:24, 59:1, 63:6, 63:10, 63:11, 63:18, 63:23, 64:6, 75:17, 76:3, 78:23, 174:17, 213:20, 223:22, 275:12
**guys** - 15:24, 63:2, 93:15, 94:8, 94:22, 227:8, 333:16

## H

**habitation** - 265:3
**half** - 10:18, 195:8, 257:14, 312:10
**hall** - 98:19, 132:23
**Halloween**- 174:17, 223:22, 223:23, 289:8
**hallway** - 3:23, 4:2, 91:4, 98:11, 99:2, 103:2, 104:9, 104:12, 104:13, 105:14, 133:23, 134:7, 134:11, 134:15, 139:23, 254:25
**Hand**- 334:16
**hand** - 16:21, 22:12, 23:16, 23:21, 24:9, 24:10, 29:5, 34:11, 35:9, 36:24, 42:19, 43:11, 44:2, 81:20,

94:23, 225:25, 328:9, 329:1
**handful** - 198:4
**handle** - 96:2
**handled** - 203:5
**handling** - 146:24
**Hands** - 18:18
**hands** - 14:16, 14:19, 29:1, 31:7, 34:8, 35:7, 36:1, 36:23, 80:21, 80:22, 81:13, 88:14, 88:15
**Hang** - 131:8
**happy** - 180:10
**hard** - 50:25, 51:2, 51:20, 68:23, 151:1, 173:4, 214:17, 216:6, 231:25, 271:7, 294:22, 301:5, 321:10, 327:14
**harder** - 330:17
**Harris** - 1:9, 1:23, 54:6, 54:7, 54:8, 148:12, 158:1, 259:13, 259:14, 267:9, 274:17, 334:2, 334:5
**hat** - 294:1
**hate** - 19:16, 19:21, 317:24
**Hazel** - 2:13, 6:24, 100:25, 104:25
**head** - 45:17, 76:24, 104:14
**hear** - 15:22, 20:16, 21:18, 23:19, 23:20, 26:23, 29:15, 45:1, 45:15, 45:18, 58:14, 58:15, 58:19, 69:6, 73:16, 78:20, 81:15, 83:24, 84:2, 85:17, 91:6, 98:16, 131:6, 131:10, 148:13, 154:17, 154:19, 157:9, 157:14, 158:12, 163:7, 167:5, 167:21, 176:17, 180:16, 181:11, 181:25, 185:14, 190:24, 201:16, 202:7, 207:10, 208:11, 209:15, 209:23, 210:24, 211:5, 211:17, 212:1, 212:9, 229:7, 230:25, 240:14, 245:2, 248:20, 260:6, 260:15, 265:18, 268:23, 272:24, 273:13, 273:14, 273:15, 275:5, 275:22, 275:23, 291:10, 291:13, 299:7, 305:3, 305:5, 305:7, 306:7, 313:17, 313:22, 319:15, 319:20
**heard** - 1:21, 14:10, 15:8, 20:12, 29:19, 30:3, 61:15, 68:2, 69:4, 73:16, 80:17, 112:4, 127:20, 127:22, 127:23, 131:16, 157:23, 180:23, 180:25, 187:2, 205:19, 214:21, 223:15, 223:19, 230:19, 231:1, 233:24, 236:11, 252:9, 267:12, 278:7, 280:9, 280:11, 280:15, 289:4, 299:1, 300:16, 316:13, 317:21, 322:23, 323:1, 326:14
**hearing** - 21:21, 21:25, 58:13, 109:14, 114:14, 115:18, 237:21, 305:2, 333:10, 333:12
**hearings** - 13:23
**hears** - 161:21
**hearsay** - 163:5, 163:19, 276:10
**heart** - 82:5
**heated** - 320:15
**held** - 1:23, 72:9, 263:13
**hell** - 136:20
**help** - 21:23, 46:8, 134:20, 173:25, 174:1, 178:2,

297:22, 305:25, 332:2
**helped** - 212:18, 212:21, 212:25
**helping** - 259:6, 277:13, 314:4
**hereafter** - 54:10, 54:13, 55:8
**hereby** - 334:6
**heretofore** - 54:13, 55:8
**Hernandez**- 2:20
**Hi**- 18:14, 125:9, 125:10
**hide** - 46:4
**high** - 29:18, 35:4, 39:13, 71:13, 208:6, 297:20
**higher** - 66:11, 199:6, 209:20
**highest** - 39:17
**highlighted** - 71:8
**highly** - 289:12
**Hillegeist** - 3:13, 6:20, 99:24, 105:8
**himself** - 50:11, 51:4, 51:10, 157:19, 175:20, 176:1, 176:5
**hiring** - 96:22
**history** - 8:4, 154:17, 174:6, 174:21, 177:12, 201:21, 201:24, 224:1, 288:4, 291:11, 291:15
**Hold**- 17:7
**hold** - 27:9, 34:10, 44:18, 45:7, 47:2, 48:4, 48:6, 48:11, 50:10, 50:15, 51:7, 51:18, 55:19, 66:10, 66:11, 73:20, 156:23, 157:17, 184:9, 199:21, 199:22, 206:18, 206:22, 207:2, 217:2, 252:21, 263:17, 275:10, 300:10, 332:11, 332:21, 332:22
**holding** - 163:12, 191:4, 227:21
**holds** - 63:24
**holes** - 189:25
**holidays** - 263:12
**Holik** - 1:11, 6:22, 99:17, 104:17
**home** - 89:1, 131:12, 177:13, 178:1, 226:7, 265:1, 293:5, 314:24
**homeowner** - 227:11
**homicide** - 171:8, 215:24
**honest** - 81:9, 113:1, 209:13, 234:6, 312:13, 312:17, 315:23, 316:7, 316:8, 321:11, 325:6, 330:17
**honestly** - 112:24, 113:1, 113:10, 187:9, 234:17, 243:21, 243:24
**Honestly**- 327:14
**honesty** - 84:8, 187:15, 235:21, 260:23, 330:21
**honeymoon** - 86:3, 86:4
**Honor** - 4:7, 4:14, 8:16, 8:17, 8:20, 23:2, 99:11, 102:7, 108:7, 118:22, 143:11, 179:17, 194:11, 256:20, 258:12, 331:1
**Honorable** - 1:22
**hope** - 311:6
**Hopefully**- 21:23
**hopefully** - 9:15
**horrible** - 245:10, 246:9
**hospice** - 87:9, 258:9
**hospital** - 89:13
**hostages** - 63:19, 75:6, 75:7, 75:8, 75:15, 76:1
**Hot**- 293:21, 293:22
**hour** - 5:4, 10:18, 89:10,

133:8, 133:14, 193:20,
195:9, 257:14, 312:10,
312:11, 332:6, 332:7, 332:9,
332:11, 332:15, 332:21
  **hour-and-a-half** - 10:18
  **hours** - 133:11, 265:14
  **house** - 227:9
  **Houston** - 1:23, 2:6, 2:13,
2:16, 2:13, 6:24, 100:25,
104:25, 293:20, 334:22
  **huge** - 319:3
  **human** - 52:21, 52:24,
74:10, 76:5, 106:6, 106:19,
107:14, 107:20, 109:12,
110:25, 111:4, 112:1,
114:13, 114:20, 116:9,
117:15, 119:12, 123:19,
126:16, 153:21, 155:19,
161:1, 162:14, 162:17,
176:2, 200:25, 203:6,
209:12, 220:21, 225:3,
248:15, 266:3, 267:24,
268:1, 290:8, 326:23, 330:4
  **hung** - 190:20
  **hurt** - 220:21, 221:10
  **husband** - 95:17, 95:23,
274:6, 274:24
  **Hypothetical** - 304:18
  **hypothetical** - 62:24, 63:1,
75:13, 185:20, 241:13,
244:20, 252:7, 277:24,
281:24, 283:16, 305:1
  **hypothetically** - 190:10,
240:24
  **hypotheticals** - 303:2

**I**

  **I-wonder** - 155:10, 217:3
  **I-wonder-what-this-is** -
216:25
  **I-wonders** - 155:19, 218:5
  **idea** - 129:2, 183:14,
187:16, 196:19, 264:14,
269:3
  **ideal** - 294:2
  **ideas** - 45:16, 208:10,
208:16, 263:18
  **identify** - 17:17, 54:11
  **identity** - 158:2, 158:3
  **ifs** - 264:16
  **Illinois** - 274:18
  **imagine** - 34:25, 240:25,
241:25, 251:16, 251:18,
251:21, 251:24, 281:24,
283:6, 291:6, 323:9, 326:25
  **immediately** - 16:4,
192:25, 282:11, 310:13
  **impact** - 203:6
  **impartial** - 10:23, 11:15,
13:6, 19:1, 19:25, 21:2,
146:2, 147:24, 195:21,
196:21, 196:22, 257:25,
275:1, 312:25
  **importance** - 169:6
  **important** - 9:24, 17:14,
40:16, 87:11, 87:13, 87:14,
126:19, 147:20, 147:24,
153:4, 155:2, 155:13,
156:13, 162:24, 172:5,
197:15, 202:19, 218:3,
219:12, 221:4, 315:18
  **impose** - 119:25
  **imposed** - 76:17, 77:22,
79:15
  **imprisonment** - 72:17,
77:21, 322:10, 322:16
  **improper** - 247:3
  **improvements** - 169:25
  **inappropriate** - 251:25

  **inclination** - 51:17, 248:6
  **inclined** - 59:19
  **include** - 100:19, 100:20,
185:21
  **included** - 67:5, 67:12,
68:10, 334:9
  **includes** - 206:10, 221:11,
221:12, 221:14, 221:15
  **including** - 5:24, 77:17,
78:16, 79:13, 175:12,
192:20, 192:22, 193:2,
310:8, 310:10, 310:15
  **incompetent** - 305:15
  **Inconsistencies** - 38:10
  **inconsistency** - 37:18,
37:22, 39:2
  **inconsistent** - 38:19
  **independent** - 178:25,
218:23
  **independently** - 179:5,
223:1
  **Index** - 5:7
  **indicate** - 65:14
  **indicates** - 126:19
  **indicating** - 235:5
  **indicted** - 205:16, 234:14
  **indictment** - 4:4, 5:14,
11:6, 26:1, 26:2, 26:18,
27:4, 27:7, 27:9, 27:11,
27:14, 54:2, 54:3, 55:19,
67:11, 167:25, 267:7
  **indictments** - 27:21
  **individual** - 12:21, 12:25,
13:9, 15:10, 15:15, 16:7,
22:8, 26:12, 31:20, 32:2,
40:24, 41:7, 42:6, 43:22,
45:3, 46:19, 54:12, 54:21,
54:23, 58:10, 69:11, 71:1,
71:14, 72:7, 76:2, 85:17,
85:19, 90:23, 91:1, 91:17,
92:8, 103:21, 109:20,
112:16, 116:19, 120:24,
121:20, 124:6, 124:24,
128:18, 132:12, 133:7,
133:12, 138:10, 140:15,
144:20, 301:8
  **Individual** - 4:18
  **individually** - 12:23,
105:17
  **individuals** - 18:18, 20:9,
46:24, 53:11, 277:5
  **influence** - 136:24
  **influenced** - 126:5
  **inform** - 310:18
  **informants** - 163:16,
163:20, 210:22
  **information** - 12:4, 20:15,
73:2, 73:24, 108:22, 133:1,
163:15, 192:24, 193:1,
196:19, 197:22, 202:3,
210:21, 250:11, 298:15,
310:12, 310:14, 311:4
  **initial** - 259:25
  **innocence** - 12:10, 12:12,
15:7, 15:9, 15:12, 16:9,
16:16, 17:1, 18:17, 22:12,
22:17, 22:18, 22:21, 23:14,
23:24, 24:5, 25:15, 25:16,
25:22, 25:23, 33:9, 67:2,
67:8, 120:5, 157:5, 180:19,
182:2, 182:11, 182:20,
182:24, 204:19, 229:6,
230:9, 236:5, 236:11,
236:12, 236:17, 266:14,
266:18, 270:10, 284:9,
288:15, 299:3, 299:13,
304:25
  **innocent** - 15:17, 16:5,
22:20, 44:22, 44:23, 182:12,
182:13, 205:13, 229:7,

229:25, 230:1, 233:23,
236:15, 236:16
  **inquiries** - 238:5
  **insane** - 308:11
  **inside** - 164:6
  **instance** - 49:2, 75:4,
154:16, 163:1, 165:18,
201:21, 226:2, 273:1,
307:25
  **instant** - 269:4
  **Instead** - 104:11
  **instead** - 17:12, 17:19,
138:9
  **instinct** - 268:1
  **institution** - 72:2
  **instructed** - 47:2, 310:24
  **Instructions** - 1:10
  **instructions** - 45:12,
133:21, 192:17, 194:4,
256:5, 304:24, 310:4, 331:9,
331:11
  **instrument** - 4:9, 11:7,
26:2, 54:3, 54:24, 55:1
  **insurance** - 174:18,
174:25, 223:23, 289:9,
292:23, 292:25
  **intend** - 55:22
  **intended** - 74:9, 75:22,
76:3, 176:1, 176:4, 225:2,
290:6, 307:1, 307:13
  **intensive** - 89:3
  **intent** - 4:6, 62:11, 269:3,
269:7, 307:17
  **intentional** - 52:21, 52:24,
261:8, 316:18
  **intentionally** - 54:21,
55:12, 175:21, 269:8
  **interacts** - 287:15
  **interested** - 107:10
  **interfere** - 86:12
  **intern** - 147:2, 259:6,
314:4
  **interpreted** - 178:16,
254:13
  **interpreter** - 299:2
  **Interpreters** - 2:21
  **intervening** - 73:3
  **intimidating** - 330:20
  **introduce** - 17:8, 17:10,
17:20, 232:21, 295:9
  **introduced** - 232:20,
295:9, 313:25
  **investigate** - 300:1
  **involuntarily** - 258:20
  **involved** - 147:19, 164:24,
209:21, 213:9, 259:20,
277:5, 277:20, 279:23
  **involvement** - 213:8,
277:7
  **involving** - 9:13, 281:22
  **Involving** - 288:2
  **issue** - 20:3, 22:7, 40:5,
40:16, 66:19, 70:4, 72:5,
72:9, 74:21, 74:24, 74:25,
76:21, 76:22, 77:24, 80:9,
84:14, 84:17, 84:21, 84:24,
85:1, 93:5, 103:15, 126:20,
129:17, 147:24, 154:4,
175:16, 176:11, 188:24,
219:3, 219:19, 219:20,
219:22, 222:23, 223:1,
224:20, 225:5, 225:10,
225:11, 225:19, 225:24,
237:7, 238:6, 246:24,
248:12, 248:16, 285:5,
285:13, 288:23, 289:24,
290:3, 290:16, 290:19,
290:21, 291:18, 293:17,
329:11, 329:12, 329:13,
332:21

  **Issue** - 72:19, 74:3, 74:13,
74:18, 74:20, 76:19, 76:20,
77:13, 77:14, 171:24, 172:3,
172:6, 249:13, 250:19,
251:6, 285:4, 290:15,
304:23, 305:8, 306:12,
329:9
  **issued** - 118:18
  **issues** - 66:12, 69:2, 74:5,
80:18, 84:12, 107:19,
109:19, 111:3, 112:15,
114:15, 114:19, 116:18,
119:14, 120:8, 120:10,
120:22, 123:23, 124:5,
126:21, 147:19, 151:1,
151:23, 153:6, 171:21,
186:1, 197:14, 218:25,
219:1, 219:13, 247:16,
264:15, 284:4, 284:19,
284:23, 304:16, 305:6
  **Issues** - 72:4, 72:5
  **item** - 87:11
  **items** - 267:16
  **itself** - 68:24, 174:4, 174:5

**J**

  **Jacqueline-** 4:3, 7:3,
101:5, 105:11
  **jail** - 89:6, 175:8, 322:3,
322:6
  **James-** 2:7, 6:12, 100:24,
104:23
  **jealous** - 148:14
  **Jeremiah-** 2:21, 8:3,
101:2, 105:2
  **jerk** - 247:15
  **jittery** - 59:14
  **Jj-** 98:11, 139:24, 193:6,
194:10, 311:12
  **job** - 57:3, 57:6, 59:22,
96:15, 187:20, 209:6, 273:1,
273:8, 274:13, 289:12,
293:10, 293:14, 331:13
  **Joe-** 289:11
  **joey-** 193:7
  **jog** - 289:6
  **John-** 1:11, 6:22, 99:17,
100:20, 104:16
  **Johnny-** 275:8, 303:12,
304:5
  **Johnson-** 4:3, 4:9, 7:1,
7:3, 100:1, 101:5, 105:11,
105:12, 135:14, 135:15
  **Jordan-** 5:1, 7:5, 131:11,
131:19, 257:1, 257:6,
258:17, 264:13, 272:21,
284:2, 291:21, 293:16,
294:23, 295:7, 308:24,
309:8, 309:10, 309:23,
309:25
  **Jose-** 4:14, 7:19, 110:6,
110:10, 131:3
  **Joseph-** 310:22
  **Josephine-** 3:13, 6:20,
99:24, 105:7
  **Joshua-** 4:20, 5:18,
131:10, 144:11, 144:22,
145:1, 194:16
  **Jr-** 54:20, 54:22, 54:23,
55:12, 55:13, 107:5, 107:7,
110:10, 131:3, 131:4,
202:13, 202:15
  **Judge-** 1:23, 7:15, 8:3,
8:14, 9:3, 13:12, 99:12,
100:4, 101:7, 108:11,
127:19, 144:10, 146:11,
151:23, 154:23, 163:24,
171:21, 179:15, 180:18,
185:1, 188:12, 188:17,

191:10, 196:6, 197:19,
211:3, 218:20, 224:19,
232:20, 234:4, 234:23,
240:7, 244:4, 244:5, 250:9,
250:21, 254:23, 261:6,
261:13, 267:7, 269:23,
271:15, 277:1, 277:25,
278:3, 280:9, 284:3, 286:2,
289:24, 294:4, 295:8,
300:13, 308:15, 308:21,
309:4, 313:9, 315:14,
316:17, 316:23, 319:24,
329:7

**judge** - 9:4, 36:8, 36:9,
40:8, 40:23, 47:14, 51:3,
59:5, 59:10, 60:3, 60:21,
60:23, 84:6, 136:11, 209:16,
273:3, 273:16, 275:4,
276:13, 278:16, 282:17,
292:5, 300:24

**Judge's**- 7:8, 7:21, 148:5,
181:19, 230:19, 231:1,
233:1

**Judges**- 191:22

**judging** - 210:5, 271:25

**judgment** - 40:25, 41:25,
42:1, 42:6, 43:16, 43:22,
60:3, 108:25, 109:18,
110:16, 114:8, 115:17,
115:23, 115:25, 121:17,
121:20, 122:2, 122:11,
125:16, 126:7, 126:11,
127:14

**Judicial**- 1:12

**July**- 13:20, 13:24, 14:1,
85:22, 85:24, 86:18, 86:19,
89:19, 90:21, 91:8, 92:24,
93:20, 93:21, 95:19, 96:4,
96:5, 96:23, 97:2, 97:3,
193:9, 193:17, 311:1,
333:20

**jumbo** - 70:1

**jump** - 62:7, 184:5

**jumping** - 37:23

**June**- 1:20, 1:3, 91:10,
132:2, 134:2, 134:25, 135:3,
135:8, 135:12, 135:15,
135:19, 135:22, 135:25,
136:5, 137:11, 137:17,
137:24, 138:9, 138:14,
138:16, 138:17, 138:22,
138:24, 139:3, 139:6,
139:11, 139:18, 139:23,
140:8, 140:9, 140:15,
140:19, 141:1, 141:6,
141:13, 141:18, 141:22,
141:24, 142:8, 143:2, 143:5,
143:13, 143:19, 143:20,
143:22, 333:18

**juries** - 320:11

**Juror**- 4:21, 5:2, 5:19, 7:6,
7:5, 7:6, 7:20, 10:5, 10:6,
10:8, 21:12, 21:18, 21:24,
22:6, 22:10, 22:11, 23:10,
23:13, 23:16, 23:17, 24:5,
25:1, 25:14, 30:10, 30:14,
30:20, 31:12, 31:18, 32:8,
32:11, 32:22, 33:25, 34:5,
34:13, 34:15, 35:11, 35:12,
35:21, 36:18, 37:2, 37:5,
37:11, 38:25, 39:18, 39:21,
40:17, 40:22, 41:3, 41:19,
41:23, 42:12, 42:20, 43:4,
50:8, 50:18, 50:22, 52:1,
52:10, 52:11, 57:12, 61:6,
60:23, 81:11, 82:14, 82:15,
83:3, 83:7, 84:2, 84:9, 87:5,
87:6, 88:11, 89:15, 90:17,
91:15, 91:21, 93:5, 94:6,
94:10, 94:20, 97:6, 97:17,

97:21, 98:1, 99:17, 99:19,
100:20, 100:21, 100:22,
100:23, 100:24, 100:25,
101:1, 104:17, 104:18,
104:20, 104:21, 104:22,
104:23, 104:24, 104:25,
105:1, 105:2, 105:3, 105:4,
105:6, 105:7, 105:8, 105:20,
105:24, 106:21, 107:4,
107:7, 108:16, 108:18,
110:6, 110:7, 110:10,
111:16, 111:18, 113:24,
114:2, 115:8, 115:11, 117:9,
121:12, 123:7, 125:7, 131:2,
131:3, 131:18, 133:25,
134:4, 134:12, 134:16,
134:17, 134:24, 135:2,
135:7, 135:11, 135:14,
135:18, 135:21, 135:24,
136:4, 137:14, 141:17,
142:4, 144:22, 145:7, 145:9,
192:15, 194:16, 195:1,
249:22, 257:7, 309:8,
309:16, 311:18, 312:2,
331:23

**juror** - 9:13, 10:24, 17:12,
19:1, 19:25, 20:4, 21:2,
21:14, 28:19, 31:10, 31:13,
31:14, 32:3, 33:11, 36:25,
41:20, 47:12, 49:15, 49:20,
56:17, 56:19, 80:3, 81:21,
83:1, 83:10, 84:3, 86:13,
87:19, 91:6, 112:23, 124:14,
130:22, 133:15, 140:14,
144:23, 145:22, 178:14,
179:15, 185:4, 187:4, 187:5,
187:7, 187:13, 187:15,
188:4, 190:5, 191:10, 192:8,
192:10, 192:17, 192:21,
193:11, 194:17, 194:22,
196:21, 201:10, 206:17,
219:14, 229:23, 230:8,
231:18, 232:10, 232:12,
234:22, 243:17, 249:1,
249:5, 250:10, 250:15,
250:16, 250:22, 250:24,
251:7, 251:10, 252:1,
254:17, 255:4, 255:21,
255:24, 257:2, 258:8, 260:1,
260:16, 264:16, 264:20,
264:21, 265:3, 265:16,
271:18, 272:10, 278:15,
279:1, 285:11, 287:19,
288:9, 291:1, 291:7, 291:10,
291:23, 296:4, 301:8,
301:16, 302:3, 305:15,
305:21, 307:10, 308:18,
308:20, 308:23, 309:10,
309:13, 309:18, 309:19,
309:22, 310:1, 310:5, 310:9,
311:15, 311:18, 311:23,
319:14, 320:7, 320:24,
321:8, 323:8, 328:25, 329:2,
329:15, 331:8, 331:13,
331:14, 331:23, 332:1,
332:6, 333:2

**juror's** - 190:1, 260:20,
302:2, 302:14

**Jurors**- 1:10, 4:18, 4:19,
30:3, 31:6

**jurors** - 7:5, 7:8, 10:3,
10:4, 13:17, 33:16, 37:24,
38:11, 72:15, 76:12, 79:2,
85:13, 85:17, 86:6, 101:18,
104:1, 105:13, 126:2, 131:1,
131:6, 167:14, 180:10,
180:20, 190:12, 190:15,
193:3, 225:22, 240:16,
243:20, 271:17, 276:21,
284:13, 284:16, 292:15,

293:6, 310:16, 314:3, 315:7,
315:8, 331:24, 332:2

**jury** - 3:1, 3:23, 8:18, 9:12,
10:10, 11:19, 12:15, 13:22,
14:1, 14:23, 15:14, 15:20,
19:17, 22:21, 24:23, 26:10,
28:25, 38:14, 38:16, 38:21,
46:15, 47:4, 57:7, 57:20,
64:23, 65:25, 67:6, 67:13,
68:13, 69:3, 69:12, 69:16,
70:18, 71:2, 71:3, 71:9,
72:14, 73:2, 75:17, 85:21,
85:25, 98:22, 99:1, 101:22,
101:23, 104:4, 104:5, 104:7,
107:2, 108:14, 108:22,
109:5, 110:4, 111:14,
113:22, 115:6, 117:5, 119:1,
121:8, 122:4, 123:9, 125:5,
130:19, 132:6, 132:13,
132:15, 133:19, 134:22,
137:12, 144:6, 145:23,
147:9, 147:12, 147:22,
147:24, 163:2, 163:4,
174:24, 179:2, 180:5,
180:11, 180:12, 181:20,
181:21, 185:25, 187:16,
187:17, 187:18, 187:19,
188:18, 189:12, 189:17,
190:10, 190:11, 190:19,
192:5, 193:4, 194:1, 195:17,
197:9, 213:7, 224:2, 228:11,
230:12, 230:13, 240:11,
241:16, 256:3, 256:7,
257:21, 259:7, 259:9,
259:11, 266:16, 269:23,
271:11, 282:14, 283:17,
292:12, 296:25, 301:11,
301:22, 303:1, 303:3,
304:20, 304:23, 305:4,
305:9, 307:17, 310:3,
312:20, 314:15, 315:19,
317:17, 319:17, 320:14,
320:23, 326:7, 327:7,
332:17

**Jury**- 54:6, 259:24

**jury's** - 84:13

**justification** - 52:22, 261:9

**justified** - 268:20

**Justin**- 2:4, 3:18, 3:19,
18:13, 99:7, 102:13, 144:18,
146:23, 156:19, 164:3,
164:6, 164:10, 164:22,
165:19, 166:3, 166:13,
166:21, 213:19, 213:24,
214:4, 214:9, 214:11,
219:22, 259:3, 314:1,
333:14

## K

**Karcz**- 101:1

**Karen**- 4:17, 8:19, 121:10,
131:4

**Katharine**- 99:20

**Katharine**- 2:9, 7:20,
104:23

**Keep**- 14:1

**keep** - 67:18, 68:5, 68:13,
77:4, 98:9, 232:3, 247:5,
248:19, 252:15, 323:10

**Keith**- 142:6

**kicked** - 103:2

**kid** - 136:8

**kid's** - 289:8

**kidnapping** - 4:8, 4:9,
4:10, 54:17, 54:19, 55:11,
56:4, 67:15, 149:1, 149:2,
198:10, 202:15, 240:20,
242:14, 261:14, 267:11,
317:9

**kids** - 88:20, 88:21

**kill** - 74:9, 75:23, 174:25,
213:2, 214:4, 214:12, 225:2,
290:6, 317:4, 317:5, 317:6,
317:7

**kill**- 245:6, 246:21

**killed** - 75:6, 75:22, 75:25,
76:2, 76:4, 78:25, 202:15,
245:14, 245:16, 245:20,
246:1, 246:3, 261:20

**killer** - 224:24, 224:25

**killing** - 307:1, 307:2

**kills** - 148:14

**kind** - 15:23, 16:22, 19:19,
37:22, 51:5, 51:13, 56:14,
66:7, 71:8, 81:7, 109:4,
120:1, 122:13, 146:18,
147:21, 152:2, 152:6,
152:17, 155:4, 156:5,
158:11, 167:22, 168:8,
173:4, 175:17, 180:11,
182:9, 184:25, 185:21,
196:19, 197:15, 197:24,
198:19, 208:10, 214:23,
216:2, 227:22, 229:15,
230:8, 230:20, 232:19,
260:10, 262:18, 263:18,
264:19, 266:15, 273:1,
273:18, 279:6, 286:10,
286:23, 297:1, 298:9,
298:18, 301:14, 303:23,
313:24, 314:11, 317:2,
317:3, 319:25, 320:7,
320:11, 321:9, 325:25,
332:7

**Kind**- 318:9

**kinds** - 151:25, 152:3,
159:23, 163:17, 166:24,
168:6, 170:5, 173:21, 175:9,
177:3, 177:13, 187:18,
201:23, 207:8, 210:10,
211:4, 211:6, 214:22,
221:15, 221:17, 246:19,
275:16, 320:11, 324:17,
330:23

**Kind**- 262:21

**Kirkpatrick**- 134:1

**Kizzee**- 3:3, 7:7, 101:3,
105:4

**knee** - 247:15

**knee-jerk** - 247:15

**knife** - 212:13, 224:24

**knowing** - 22:7, 51:17,
80:19, 81:6, 118:16, 123:21,
124:4, 129:5, 129:19,
129:23, 136:8, 153:17,
154:5, 158:10, 185:12,
201:4, 213:2, 216:9, 240:23,
327:3

**Knowing**- 129:4, 240:22

**knowledge** - 19:7

**known** - 59:1, 303:13,
303:15, 307:2

**knows** - 63:11, 209:23

**Kurt**- 1:13, 9:1, 104:17

## L

**laced** - 289:8

**ladies** - 8:25, 102:16

**lady** - 41:24, 96:12

**laid** - 5:9, 245:14

**lamp** - 51:14

**Lara**- 1:17, 7:9, 100:22,
104:18

**large** - 9:7, 21:25, 22:2

**Larry**- 5:1, 7:5, 131:11,
257:1, 257:6, 309:8, 309:10,
309:22

**Last**- 311:18

**last** - 6:16, 9:10, 9:11, 25:13, 25:14, 37:21, 43:5, 43:9, 54:25, 63:22, 78:12, 84:12, 85:1, 140:8, 149:23, 176:19, 193:18, 195:25, 233:1, 233:8, 233:20, 313:3, 331:24, 333:15, 333:18
**Latonya**- 3:23, 6:1, 99:25, 105:10
**law** - 11:10, 11:22, 12:6, 13:13, 13:15, 15:9, 16:2, 16:4, 22:18, 22:25, 24:5, 25:16, 25:22, 27:21, 29:24, 30:17, 31:2, 31:22, 31:25, 32:2, 34:20, 38:2, 42:24, 46:16, 50:14, 58:5, 59:4, 60:1, 61:10, 61:11, 61:18, 61:19, 62:2, 64:4, 64:11, 64:12, 64:20, 66:1, 66:3, 66:7, 66:20, 66:21, 69:1, 80:18, 83:17, 121:22, 128:5, 147:3, 149:24, 150:2, 155:13, 158:19, 160:12, 163:5, 163:6, 164:19, 171:5, 171:9, 172:10, 174:4, 174:22, 176:6, 176:17, 180:25, 184:23, 185:3, 186:5, 186:6, 186:17, 187:9, 187:12, 201:13, 206:2, 206:19, 206:22, 207:13, 209:6, 209:8, 210:13, 211:3, 211:7, 215:21, 215:25, 216:20, 216:24, 218:11, 218:14, 221:22, 222:5, 222:14, 222:17, 222:18, 222:22, 223:8, 223:9, 231:5, 231:8, 233:7, 236:6, 236:25, 237:5, 237:8, 237:12, 238:14, 241:13, 244:18, 248:4, 248:6, 248:10, 248:12, 248:19, 251:2, 262:3, 262:6, 272:12, 272:16, 273:6, 273:19, 275:24, 276:11, 277:2, 277:10, 277:18, 278:11, 278:18, 279:4, 288:9, 288:14, 288:23, 288:24, 290:1, 290:9, 297:13, 302:22, 302:23, 303:23, 305:4, 318:18
**Law**- 274:19
**law-follower** - 251:2
**laws** - 58:2, 182:12, 198:16, 222:11, 262:9, 298:1, 301:7, 312:16, 318:12
**lawyer** - 46:11, 46:12
**lawyers** - 9:20, 10:9, 14:22, 17:20, 22:9, 46:8, 46:9, 51:11, 81:16, 85:10, 88:10, 91:5, 102:18, 105:21, 127:7, 128:9, 145:13, 182:22, 190:14, 195:7, 196:4, 257:13, 258:7, 308:25, 312:8, 313:7, 332:1
**lawyers'** - 89:14
**lays** - 289:25
**Le**- 4:5, 7:11, 101:5, 105:11
**lead** - 83:22, 103:19, 113:1, 122:22, 129:19, 129:23, 153:14, 153:18, 154:6, 176:24, 201:5, 248:22, 265:20, 327:11, 329:16, 329:23
**leading** - 178:19
**leads** - 124:16, 124:19, 124:20, 124:21, 153:24, 154:1, 201:4, 219:11, 247:7, 266:7, 327:10

**lean** - 19:9, 237:16
**leaning** - 19:19, 49:5, 128:1
**leap** - 45:20
**learn** - 132:13, 268:9, 269:14, 272:25, 273:2
**learned** - 46:13, 107:15, 197:3, 250:24, 251:3, 260:24, 262:6
**learning** - 109:2, 110:19, 114:15, 117:25, 118:2, 118:3, 119:13, 237:12
**least** - 29:17, 79:4, 187:22, 193:19, 242:23, 243:22, 252:14, 253:9, 300:20, 305:16, 305:19, 306:2
**leave** - 37:17, 91:3, 94:1, 131:1, 134:23, 217:20, 217:21, 218:2, 279:24
**leaves** - 25:7
**leaving** - 70:17, 104:3, 154:2
**led** - 151:22, 158:13
**leeway** - 91:16, 183:12
**left** - 41:20, 43:6, 74:5, 83:1, 85:18, 88:17, 161:22, 161:25, 166:13, 169:19, 217:17, 279:20, 314:3
**legal** - 14:13, 16:6, 29:17, 39:17, 44:19, 44:25, 45:4, 45:16, 46:6, 51:16, 52:22, 70:1, 78:6, 79:23, 188:2, 267:4, 276:10
**legislation** - 301:7
**Legislature**- 53:5, 149:24, 222:9, 222:13
**Legislature's**- 307:16
**Lena**- 137:14
**lengthy** - 9:14
**Leona**- 2:5, 7:17, 100:24, 104:22
**less** - 67:21, 67:22, 73:11, 172:22, 271:22, 272:8, 290:24
**lessen** - 278:24
**lesser** - 58:12, 67:3, 67:5, 67:12, 67:15, 67:19, 68:6, 68:10, 68:14
**level** - 53:14, 213:7, 271:20
**levels** - 61:20, 71:25, 277:7
**lies** - 266:22
**Life**- 292:25, 322:16
**life** - 35:16, 47:15, 51:9, 52:21, 52:24, 53:18, 58:11, 58:15, 68:21, 69:15, 69:17, 71:4, 72:17, 73:13, 74:10, 76:5, 76:17, 77:21, 78:13, 84:24, 84:25, 85:3, 127:3, 127:23, 148:20, 149:17, 149:19, 150:1, 150:5, 150:8, 152:21, 176:2, 176:25, 177:18, 178:19, 184:13, 184:14, 184:18, 184:19, 185:5, 185:12, 203:19, 204:5, 219:8, 221:23, 222:1, 222:6, 224:2, 225:3, 226:3, 238:9, 248:15, 261:8, 262:5, 262:11, 262:14, 290:8, 316:18, 317:16, 317:19, 318:3, 318:5, 318:20, 318:21, 319:8, 322:3, 322:5, 322:6, 322:9, 322:3, 323:17
**life-long** - 226:3
**lifted** - 331:10
**light** - 226:17
**lighten** - 332:3
**likely** - 84:5, 133:11, 172:17, 185:11, 186:11

**Limbrick**- 134:4
**Limerick**- 4:15, 7:13, 113:24, 114:1, 114:2, 131:4
**Limine**- 1:5, 4:20, 5:6, 5:10, 5:21
**limit** - 192:23
**limitations** - 56:22
**limited** - 5:25, 155:22, 310:10
**Linda**- 123:11, 134:24, 142:23
**line** - 37:23, 51:9, 198:11, 226:14, 261:22, 290:8, 317:5
**link** - 39:8
**list** - 131:8, 202:10, 202:21, 203:9, 217:4, 267:24, 268:15
**listed** - 101:18, 117:12, 154:24, 202:17
**listen** - 162:17, 165:8, 179:12, 190:12, 190:13, 192:18, 208:22, 247:6, 275:3, 301:22, 310:6
**listened** - 38:18, 56:19, 189:15, 189:16, 189:20, 301:19, 301:21
**listening** - 117:18, 117:22, 127:20, 232:4, 250:10, 251:3
**litany** - 212:16
**literally** - 10:20
**live** - 37:6, 163:8, 163:19, 210:13, 276:13, 330:5
**lives** - 287:10
**living** - 153:21, 200:24, 266:3, 326:22
**load** - 332:3
**loaded** - 165:21, 213:24, 213:25, 214:2, 227:20
**located** - 92:25, 281:7
**logical** - 173:19
**Look**- 326:19
**look** - 53:20, 84:13, 153:8, 155:4, 162:16, 169:13, 169:18, 170:1, 170:5, 170:20, 172:7, 174:5, 174:7, 174:23, 175:24, 176:12, 176:18, 179:5, 181:8, 200:21, 213:7, 216:17, 218:3, 223:10, 224:10, 224:12, 225:4, 225:13, 226:14, 241:7, 241:18, 241:19, 242:21, 242:22, 246:5, 247:23, 248:8, 248:13, 248:16, 265:14, 265:15, 281:13, 281:15, 281:18, 287:20, 288:4, 326:20, 326:21, 327:15
**looked** - 224:2, 241:11
**Looking**- 175:16
**looking** - 53:20, 53:23, 96:8, 176:20, 218:13, 224:10, 265:22, 327:4, 327:13, 327:24
**looks** - 238:19
**loophole** - 176:19
**Lori**- 3:7, 8:17, 101:12, 105:6
**lose** - 170:13, 238:25
**lost** - 168:11, 168:13, 169:5, 169:16, 170:11, 215:12, 298:9
**louder** - 21:18
**Louisiana**- 2:15
**love** - 177:25, 226:8
**loves** - 226:13
**low** - 264:3
**Lowrance**- 139:5
**luck** - 311:5

**lucky** - 259:4
**lunch** - 332:11

# M

**ma'am** - 3:8, 7:23, 20:8, 24:1, 24:8, 24:11, 24:13, 24:18, 34:15, 35:9, 36:11, 36:17, 36:25, 38:23, 39:3, 39:15, 39:22, 40:14, 41:2, 42:19, 43:14, 44:7, 49:20, 50:17, 56:7, 57:13, 60:17, 82:17, 90:3, 92:11, 93:16, 95:8, 95:15, 95:17, 96:18, 97:16, 101:20, 105:25, 110:11, 111:21, 117:3, 118:15, 130:1, 138:18, 138:19, 139:4, 141:23, 142:11, 145:25, 152:22, 154:7, 160:3, 160:10, 168:4, 173:14, 174:2, 194:18, 195:4, 230:5, 230:10, 309:11, 312:5, 312:22, 313:1, 313:4, 332:19
**mad** - 175:7, 220:25
**Madrid** - 2:14, 3:15, 18:1, 18:2, 99:5, 102:12, 144:18, 179:23, 218:1, 232:18, 294:24, 295:8
**Magee** - 1:22, 9:3, 163:24, 277:1
**main** - 67:9
**majority** - 45:14
**Malone** - 135:7
**Man** - 174:16, 209:23, 214:11, 223:3, 223:17, 289:4, 289:6
**man** - 75:14, 148:14, 153:8, 153:18, 166:21, 187:1, 200:22, 223:25, 238:8, 245:13
**man's** - 47:15, 245:9
**mandatory** - 89:20, 96:16, 96:24
**Mandatory** - 90:10
**manner** - 4:10, 55:1, 55:13, 62:14, 80:13, 107:19, 109:19, 111:3, 114:20, 116:17, 116:18, 120:22, 124:5, 128:17, 158:7, 158:8, 171:5, 171:7, 215:21, 216:8
**Manuel** - 3:5, 7:15, 99:22, 105:4
**map** - 293:9
**Marcella** - 135:14
**Marilu** - 2:20
**Mario** - 2:14, 3:15, 18:1, 99:5, 102:12, 144:18, 179:23, 232:18, 295:7
**mark** - 249:25
**marked** - 100:9, 106:7, 112:1
**married** - 89:24
**Marshall** - 2:5, 7:17, 100:24, 104:22
**Martha** - 140:25
**Martinez** - 4:14, 7:19, 110:7, 110:9, 110:10, 131:3
**Mary** - 4:1, 6:14, 3:20, 17:13, 101:4, 105:10, 333:9, 334:4, 334:19
**Masemene** - 134:12
**Mason** - 29:16
**mastermind** - 63:5
**matter** - 40:25, 113:10, 272:6, 276:20
**matters** - 4:3
**Maura** - 141:17
**maximum** - 84:7
**Mcclendon** - 2:9, 7:20,

99:21, 104:24
**Mcdonald** - 136:4, 136:5,
136:16, 136:18, 137:4,
137:11
**Mcpherson** - 132:8,
132:10
**Mcwilliams** - 2:23, 7:22,
101:2, 105:3
**mean** - 10:16, 13:3, 71:10,
87:13, 91:7, 124:24, 125:21,
125:22, 125:24, 126:22,
127:4, 127:6, 128:19, 175:4,
181:7, 184:18, 184:23,
184:25, 186:2, 190:24,
217:8, 220:8, 225:17,
229:24, 233:8, 234:6,
235:20, 246:7, 252:23,
263:6, 274:20, 285:18,
285:19, 286:2, 289:11,
294:10, 295:15, 297:21,
298:16, 299:25, 300:10,
300:14, 302:22, 314:22,
314:23, 314:24, 319:5,
319:6, 319:7, 322:2, 322:4,
322:5, 322:6, 323:12,
324:14, 324:23, 325:25,
326:22, 327:15, 327:16,
327:17, 327:18, 330:2,
330:16, 330:19, 332:13
**means** - 4:11, 10:20,
12:22, 13:4, 15:13, 47:18,
52:17, 55:1, 55:13, 79:18,
158:7, 158:8, 171:5, 171:7,
172:11, 175:11, 183:20,
188:20, 188:22, 215:22,
216:9, 221:23, 230:7,
241:12, 248:23, 256:4,
257:12, 274:22, 287:8,
300:15, 307:25, 312:7,
331:8, 332:10
**meant** - 106:8, 106:9,
255:13, 298:21
**media** - 192:20, 192:23,
310:7, 310:11
**medical** - 89:1
**medication** - 95:1
**medicine** - 97:12
**meet** - 59:13, 76:1, 98:10,
130:24, 266:20
**meeting** - 27:15
**Meghan** - 2:3, 7:24,
100:23, 104:22
**Mehl** - 2:3, 7:24, 100:23,
104:22
**Melvin** - 3:3, 7:7, 101:3,
105:4
**members** - 152:23,
304:20, 325:16
**memories** - 215:8, 281:1,
281:2
**memory** - 289:6
**men** - 246:1
**mention** - 275:21
**mentioned** - 184:11,
232:7, 274:5, 275:20
**mentioning** - 33:3
**Mercedia** - 2:17, 8:15,
100:25, 105:1
**merely** - 65:10
**met** - 48:13, 49:1, 169:22,
270:4
**Metro** - 103:7, 104:15,
130:25
**mic** - 21:23
**Michael** - 1:19, 8:21,
99:19, 104:19, 139:5
**microphone** - 22:5,
313:18
**middle** - 90:17, 154:2,
220:11, 295:24, 296:19,
328:15
**might** - 19:14, 26:7, 26:8,
38:16, 46:10, 46:19, 47:25,
49:3, 51:17, 59:18, 59:19,
68:11, 70:20, 72:7, 76:2,
78:2, 78:22, 78:24, 79:1,
83:12, 107:19, 112:16,
118:17, 122:16, 122:22,
124:5, 124:18, 126:3, 126:5,
126:20, 127:15, 128:17,
145:17, 155:8, 157:22,
158:12, 159:18, 159:19,
159:24, 162:3, 164:9, 167:5,
167:8, 168:7, 168:9, 168:15,
169:1, 169:4, 170:7, 174:1,
174:11, 175:7, 177:3, 177:5,
177:10, 177:11, 177:16,
177:17, 177:22, 177:25,
183:24, 184:16, 186:4,
187:16, 187:20, 188:9,
189:14, 189:23, 190:3,
191:8, 202:7, 202:24, 203:7,
204:10, 207:8, 207:9,
207:10, 207:14, 207:15,
207:17, 208:4, 208:11,
209:25, 210:8, 210:12,
211:16, 214:1, 214:15,
214:23, 214:24, 215:12,
215:15, 216:4, 216:24,
218:8, 218:24, 222:17,
226:4, 226:5, 235:19, 238:5,
245:2, 245:3, 245:18,
245:24, 246:8, 246:18,
247:15, 248:5, 248:20,
248:22, 252:10, 259:16,
260:1, 260:11, 263:8,
264:16, 265:3, 269:1,
269:15, 270:22, 271:3,
272:13, 272:18, 273:6,
273:7, 274:22, 276:7, 277:6,
277:7, 277:14, 278:21,
279:10, 280:14, 280:17,
281:19, 282:1, 282:4, 282:7,
283:5, 285:20, 287:1, 287:4,
288:4, 288:25, 291:7, 291:9,
291:10, 291:11, 291:13,
291:15, 291:18, 299:19,
301:16, 302:3, 315:2, 317:4,
319:20, 320:23, 321:1,
323:12, 324:9, 324:21,
324:23, 325:17, 325:19,
327:17, 332:9
**million** - 56:15
**mind** - 14:1, 19:19, 34:23,
67:18, 68:6, 68:14, 80:3,
81:18, 109:2, 124:1, 124:4,
129:7, 189:3, 190:1, 223:11,
224:9, 225:13, 232:4,
237:24, 237:25, 243:5,
244:20, 247:6, 248:20,
252:16, 272:12, 275:16,
280:14, 282:19, 287:21,
291:3, 294:11, 298:10,
302:14, 305:9, 306:1, 306:4,
320:21, 323:9, 323:10,
324:23, 325:10
**minded** - 2:19:13
**mine** - 265:5
**Minh** - 4:5, 7:11, 101:5,
105:11
**mini** - 201:15
**minute** - 191:7, 309:13,
333:3
**minutes** - 103:24, 158:10,
171:18, 224:18, 283:25,
304:15, 323:15, 332:23,
332:25
**mischief** - 226:24, 227:4
**misconduct** - 5:23
**miss** - 43:19
**missed** - 94:3, 94:11
**missing** - 299:19
**mitigating** - 73:10, 77:20,
79:4, 79:5, 79:7, 79:9,
79:14, 79:25, 176:14,
176:23, 177:12, 177:17,
177:19, 177:24, 178:3,
178:5, 178:11, 178:17,
225:25, 226:4, 226:12,
226:13, 226:15, 226:16,
226:17, 291:1, 291:4, 291:7,
291:12, 307:20, 307:21,
307:24, 308:1
**mitigation** - 77:15, 77:24,
78:4, 79:1, 79:18, 79:20,
84:21, 85:1, 129:22, 153:16,
176:11, 177:4, 177:14,
178:15, 178:16, 179:7,
179:10, 225:11, 225:19,
225:21, 246:6, 246:7, 246:9,
248:12, 248:16, 290:16,
290:21, 306:13, 306:19,
306:20, 307:8, 307:9,
329:13
**Mixon** - 119:3, 119:5,
121:7, 141:12
**Mock** - 1:6, 8:1, 7:6, 7:20,
10:6, 99:18, 104:19
**modern** - 323:23
**Mom** - 51:13
**moment** - 8:22, 85:8,
88:25, 183:22, 249:6, 249:7,
296:13, 303:13
**moments** - 308:25
**Monday** - 138:15, 142:23,
143:1, 143:5, 143:14,
143:17, 143:18, 143:20,
193:17, 311:1
**money** - 63:3, 63:12,
63:25, 174:18, 174:25,
213:1, 223:23
**Monica** - 1:17, 7:9,
100:22, 104:18
**Montgomery** - 135:24,
135:25
**month** - 92:2, 92:4, 92:5
**months** - 294:6
**moral** - 40:9, 40:22, 42:5,
77:19, 78:21, 106:3, 106:17,
107:11, 107:17, 108:24,
109:10, 110:14, 110:22,
111:23, 112:11, 112:13,
114:7, 114:11, 115:16,
116:6, 116:10, 116:15,
117:13, 117:17, 119:10,
119:17, 120:14, 120:20,
121:15, 122:5, 123:17,
125:14, 126:10, 126:14,
127:13, 145:22, 195:16,
257:20, 312:20
**morally** - 112:5, 112:7,
122:1, 124:9
**morning** - 4:1, 4:19, 8:25,
9:2, 10:2, 17:23, 17:24,
18:2, 18:3, 18:8, 18:11,
18:12, 18:15, 125:11, 134:2,
143:18, 315:14, 325:24
**Most** - 147:15, 148:12
**most** - 17:13, 46:20,
51:12, 68:25, 84:5, 154:17,
161:15, 207:18, 219:11,
265:7, 271:5, 296:12,
296:22, 297:6, 328:17
**mostly** - 187:7
**motion** - 108:10, 108:11,
110:2, 113:20, 130:4, 244:4,
249:3, 249:11, 249:20,
253:15, 331:2, 331:5,
331:22
**Motion** - 1:5, 4:20, 5:6,
5:10, 5:21, 111:11, 115:3,
123:6
**motions** - 13:23, 253:19
**motivated** - 278:23
**motive** - 158:16, 158:19,
158:20, 158:25, 159:7,
159:11, 183:3, 183:21,
183:24, 183:25, 184:4,
189:24, 216:24, 267:25,
268:4, 268:10, 299:18
**Motive** - 183:21, 183:22
**motor** - 293:4
**motorcycle** - 293:4,
303:22
**mouth** - 122:17, 159:10,
187:4, 271:24
**move** - 14:9, 86:17, 96:22,
97:1, 97:2, 137:17, 139:25,
168:19, 192:2, 215:10,
284:10, 309:17
**moved** - 86:21, 87:8,
169:17, 281:7
**movie** - 245:5, 245:9,
245:20
**moving** - 86:25, 87:1,
87:4, 100:15, 140:14,
252:19
**multiple** - 198:22, 199:5,
212:10, 277:5
**mumbo** - 70:1
**mumbo-jumbo** - 70:1
**murder** - 3:5, 9:8, 11:4,
11:17, 12:19, 16:11, 30:1,
37:16, 44:9, 47:14, 52:15,
52:17, 52:18, 52:19, 52:20,
52:21, 52:24, 53:1, 53:4,
53:14, 53:15, 53:17, 55:23,
56:1, 56:21, 56:22, 62:25,
67:10, 67:13, 67:14, 67:16,
71:12, 71:21, 95:11, 115:19,
116:1, 119:13, 120:6, 148:6,
148:9, 148:12, 148:13,
148:15, 148:18, 148:19,
148:23, 148:24, 149:1,
149:6, 149:7, 149:9, 149:12,
149:17, 152:5, 158:6,
158:12, 175:5, 175:18,
175:20, 179:3, 179:8, 180:6,
190:11, 192:15, 197:4,
197:20, 197:21, 197:24,
197:25, 198:5, 198:9,
198:10, 198:11, 200:24,
207:9, 207:18, 210:9,
212:12, 212:20, 213:11,
213:17, 220:17, 221:24,
223:4, 223:8, 224:11,
225:17, 234:14, 238:9,
240:11, 240:13, 240:17,
240:21, 240:22, 241:1,
241:5, 241:17, 241:23,
242:12, 243:4, 243:10,
243:22, 244:13, 244:15,
245:19, 245:22, 246:19,
247:19, 247:20, 248:9,
248:16, 249:14, 251:8,
252:12, 260:25, 261:7,
261:11, 261:23, 261:25,
267:11, 268:21, 268:24,
269:15, 270:20, 270:23,
271:2, 280:7, 284:11,
286:19, 286:23, 288:11,
289:4, 289:7, 303:4, 304:21,
305:18, 305:24, 306:9,
306:22, 307:13, 315:5,
316:15, 316:17, 316:20,
316:21, 316:22, 317:2,
317:10, 317:13, 317:18,
318:5, 319:18, 321:9,
321:24, 323:2, 324:17
**Murder** - 53:7, 53:9, 53:11

**murdered** - 75:2, 240:20, 242:13, 261:21, 281:23
**murderers** - 149:25
**murders** - 53:23, 246:20
**must** - 22:21, 84:18, 167:10, 179:1, 192:18, 310:6, 324:3, 324:6

# N

**name** - 3:7, 17:13, 17:19, 104:1, 104:4, 108:18, 139:7, 143:22, 146:22, 179:23, 193:15, 232:18, 314:1
**named** - 54:21, 54:22
**namely** - 54:24
**names** - 102:21
**Nancianne** - 133:25
**Nancy** - 141:20
**Natalie** - 2:3, 3:17, 18:10, 99:7, 102:13, 144:19, 146:22, 259:3, 266:19, 314:1, 319:14, 327:5
**Natalie's** - 265:6
**Nathalie** - 1:8, 8:7, 7:7, 7:20, 10:7, 99:23, 105:5
**Nathan** - 134:8
**nature** - 174:5, 268:2
**necessarily** - 15:5, 37:22, 38:3, 38:11, 38:20, 71:10, 71:13, 77:5, 158:15, 164:14, 269:16, 286:4, 286:17, 286:18, 286:24
  **necessary** - 323:23
**need** - 10:11, 10:13, 10:21, 11:11, 11:23, 12:2, 12:3, 13:14, 16:8, 16:22, 16:23, 19:13, 19:16, 19:21, 21:4, 21:6, 31:17, 36:7, 41:13, 41:16, 42:15, 42:17, 42:22, 44:13, 48:16, 50:2, 58:4, 60:4, 61:4, 63:4, 75:10, 75:11, 75:12, 77:5, 80:11, 81:15, 84:2, 84:11, 86:1, 94:23, 103:5, 103:7, 103:8, 103:15, 104:15, 116:3, 121:22, 122:13, 122:14, 122:25, 130:25, 132:10, 133:15, 134:20, 134:21, 137:21, 145:19, 175:24, 180:1, 185:14, 185:22, 193:16, 193:21, 193:22, 193:25, 195:9, 195:12, 202:3, 202:16, 206:20, 208:17, 222:5, 230:8, 237:23, 238:5, 249:25, 253:12, 256:10, 293:18, 294:3, 294:10, 294:25, 310:17, 330:10, 331:11, 332:15, 333:2, 333:4, 333:20
  **needed** - 294:1
  **needs** - 8:1, 63:12, 83:23, 87:18, 222:18, 299:2
**negative** - 160:2, 273:19, 274:1
  **negatively** - 292:13
  **negotiating** - 5:5
**neighbor** - 58:25
**neighborhood** - 19:8, 72:1
**nervous** - 324:25, 325:4
**Neuneker** - 2:21, 8:3, 101:2, 105:2
**neutral** - 160:22
**never** - 22:24, 30:9, 136:10, 165:24, 177:17, 177:19, 181:21, 184:20, 201:10, 204:2, 224:1, 225:18, 233:24, 233:25, 236:11, 242:5, 242:14,

242:15, 246:20, 247:21, 250:24, 273:23, 274:9, 282:7, 304:13, 307:5, 320:18, 328:8, 330:15, 330:22
**Never** - 330:24
**new** - 225:15, 288:13, 293:14, 304:23
**Next** - 6:13, 37:12, 107:4
**next** - 25:11, 25:24, 27:24, 34:5, 35:24, 36:21, 44:8, 52:8, 52:9, 58:25, 70:14, 87:9, 93:11, 95:16, 96:25, 97:7, 103:24, 105:16, 126:13, 137:17, 138:1, 140:5, 140:9, 191:12, 194:12, 236:3, 241:15, 286:12, 303:2, 303:3, 304:18, 304:20, 304:22
**next-door** - 58:25
**nice** - 218:9
**Nicholas** - 2:19, 5:22, 105:1
**Nicolas** - 101:1
**niece's** - 274:6, 274:24
**night** - 265:1, 320:13
**Nine** - 200:20
**Nobody** - 95:6, 213:17, 306:18
  **nobody** - 44:2, 52:10, 63:14, 63:21, 150:17, 178:2, 222:3
  **nobody's** - 225:12
**none** - 38:14, 57:10, 58:6, 64:25, 66:16, 221:24, 298:10, 312:23
  **noon** - 14:8
  **norm** - 197:11
**normal** - 9:5, 9:12, 14:8, 14:10, 89:8, 89:10, 265:10, 287:10, 289:11
  **normally** - 19:14, 45:17, 59:18, 59:19, 330:9
**Norris** - 3:9, 8:5, 99:24, 105:6
**note** - 272:9
  **noted** - 231:12
  **nothing** - 73:15, 93:14, 230:7, 321:4
**Nothing** - 39:11, 98:6, 254:23, 304:2, 308:20, 316:1
  **notice** - 26:12, 55:16, 55:21, 88:22, 222:15, 290:16
  **noticed** - 293:1
  **nuclear** - 226:8, 226:12
  **number** - 13:5, 17:4, 17:12, 17:18, 18:19, 20:4, 21:14, 23:12, 24:11, 29:2, 29:6, 31:10, 31:13, 31:14, 31:16, 34:13, 35:9, 36:2, 36:25, 37:13, 38:6, 41:10, 41:21, 42:19, 44:3, 47:12, 49:16, 49:20, 52:6, 53:5, 54:11, 56:7, 60:18, 61:22, 63:23, 65:9, 66:5, 66:6, 66:18, 68:8, 72:21, 75:7, 75:14, 80:23, 81:21, 82:17, 83:1, 83:10, 86:13, 91:21, 93:16, 96:18, 100:4, 102:21, 193:6, 222:2, 250:15, 250:16, 262:15, 264:7, 265:14, 277:13, 280:17, 291:6, 297:3, 297:12, 297:20, 298:3, 310:21, 318:7, 318:22, 328:11, 328:12
  **numbered** - 1:22, 334:11
  **numbers** - 66:22, 66:23,

99:14
**nun** - 283:5
**nuns** - 272:3

# O

**oath** - 112:24, 112:25, 113:6, 113:8, 118:13, 120:9, 124:15, 124:18, 124:20, 329:1, 329:15, 329:18, 329:19, 330:12
**Obel** - 1:6, 3:4, 11:3, 17:21, 18:5, 54:9, 55:7, 98:25, 101:17, 102:1, 102:3, 102:10, 102:11, 138:7, 144:15, 145:8, 153:11, 179:24, 192:16, 195:3, 200:23, 219:23, 257:8, 295:8, 309:9, 309:16, 310:2, 312:3, 326:20
  **object** - 128:4, 251:14
  **objected** - 251:15
  **objection** - 138:3, 140:11, 140:14
  **objections** - 106:25, 138:4, 138:5, 138:8, 140:12, 332:18
  **observed** - 38:1
  **observing** - 25:5
  **obviously** - 11:4, 19:4, 25:4, 67:7, 68:9, 78:17, 89:12, 149:17, 233:4, 255:19, 265:5, 271:9, 278:11, 288:8, 288:23, 315:19, 330:16
**Obviously** - 102:24, 270:19, 287:9
  **occupation** - 58:10
  **occur** - 184:15
  **occurred** - 183:13, 280:10, 280:19, 299:17, 334:11
  **offend** - 180:16, 316:2
  **offended** - 286:25
  **offense** - 28:6, 28:8, 33:12, 54:13, 56:21, 61:22, 61:23, 61:24, 61:25, 62:4, 62:10, 62:12, 62:13, 62:18, 62:22, 62:23, 65:8, 65:11, 67:12, 68:9, 77:17, 78:16, 78:18, 79:13, 163:1, 163:8, 164:22, 164:23, 164:24, 165:11, 167:1, 176:3, 210:10, 210:14, 267:3, 267:5, 267:21, 268:4, 269:1, 269:17, 275:25, 276:4, 277:6, 277:8, 277:15, 277:20, 277:21, 279:23, 280:1, 280:10, 280:18, 282:2, 282:12, 283:10, 283:12, 286:24, 318:11, 325:9
  **offenses** - 67:3, 67:5, 67:19, 68:6, 68:13, 261:15, 263:1, 263:4, 263:8, 288:5, 289:21, 317:9
  **offer** - 163:8, 163:9, 210:14
  **offered** - 6:2
**Offered** - 250:6
**office** - 147:3, 282:22, 303:20
**officer** - 26:4, 58:23, 59:1, 59:2, 59:19, 59:20, 149:7, 160:11, 160:20, 163:9, 198:10, 209:24, 227:17, 227:25, 231:6, 233:7, 261:21, 273:1, 273:12, 273:14, 273:15, 274:21, 278:12, 317:5
**officer's** - 276:22

**officers** - 58:20, 160:12, 163:1, 163:15, 209:3, 209:5, 209:9, 210:21, 233:10, 272:3, 272:12, 272:16, 273:7, 275:24, 275:25
**official** - 193:1, 310:14
**Official** - 334:4, 334:16, 334:20
**often** - 177:15, 239:12, 263:25
**Oklahoma** - 140:4
**old** - 56:16, 88:21, 88:23, 94:18, 238:8
**older** - 56:24, 56:25, 187:18, 281:20
**Olga** - 135:2
**Once** - 21:4, 23:3
**once** - 44:17, 58:14, 59:21, 64:24, 69:8, 70:4, 70:21, 74:12, 74:21, 75:20, 76:15, 84:25, 89:3, 96:17, 122:18, 133:12, 197:22, 284:13, 285:25, 314:25, 332:25
**One** - 108:21, 157:2, 160:6, 191:7, 216:23, 264:3, 322:14, 333:9
**one** - 5:20, 11:19, 14:21, 15:6, 15:24, 16:7, 17:13, 25:25, 28:7, 28:12, 29:8, 32:25, 34:24, 38:13, 38:21, 43:11, 44:10, 44:14, 44:16, 45:15, 46:7, 46:10, 46:19, 53:17, 54:9, 54:18, 56:15, 57:9, 57:25, 58:18, 61:15, 61:22, 62:15, 62:16, 62:19, 63:4, 63:23, 63:24, 65:16, 65:17, 66:5, 69:11, 70:16, 74:5, 74:17, 74:19, 74:25, 75:6, 75:8, 75:14, 75:22, 75:25, 78:25, 79:16, 84:17, 88:16, 90:7, 90:11, 91:1, 95:10, 100:11, 103:3, 103:15, 103:17, 105:19, 107:1, 107:10, 111:22, 114:6, 114:10, 115:14, 116:5, 119:7, 121:13, 123:15, 128:1, 132:19, 133:8, 133:16, 133:17, 136:19, 144:9, 145:21, 152:10, 152:11, 155:5, 158:8, 161:2, 162:9, 164:9, 168:7, 178:25, 184:4, 191:3, 191:4, 192:3, 200:16, 200:17, 203:16, 209:5, 216:2, 216:25, 217:23, 219:2, 219:11, 222:25, 224:23, 225:24, 233:6, 235:11, 236:3, 238:8, 239:7, 239:12, 240:6, 242:7, 244:21, 245:21, 247:2, 249:25, 250:15, 250:16, 253:10, 254:25, 255:8, 255:20, 255:22, 256:17, 257:19, 258:8, 259:4, 261:12, 261:19, 263:22, 263:23, 264:9, 265:10, 267:4, 268:5, 269:6, 277:19, 278:4, 294:18, 295:12, 295:19, 296:12, 296:14, 296:15, 296:16, 296:19, 296:20, 296:22, 296:24, 297:6, 297:19, 301:1, 301:2, 301:3, 301:11, 302:1, 303:25, 304:7, 306:13, 306:25, 309:18, 314:2, 314:18, 315:12, 315:16, 319:6, 322:9, 322:15, 324:23, 328:7, 328:12, 328:18, 331:12
**one-by-one** - 88:16,

103:15
**one-on-one** - 265:10, 315:12, 315:16
**one-question** - 103:17
**ones** - 80:17, 124:14, 130:7, 234:4, 235:4, 263:5, 271:5, 303:23
**open** - 67:18, 68:6, 68:14, 129:7, 219:13, 221:16, 223:11, 224:8, 225:13, 232:4, 246:14, 247:6, 248:20, 252:15, 306:4, 307:22, 315:23, 323:10, 334:12
**Open** - 3:1, 8:18, 24:23, 98:22, 101:23, 107:2, 108:14, 110:4, 111:14, 113:22, 115:6, 117:5, 119:1, 121:8, 123:9, 125:5, 130:19, 132:6, 132:15, 137:12, 144:6, 192:5
**open-minded** - 219:13
**opening** - 252:10
**operate** - 318:13
**opinion** - 142:20, 180:24, 238:18, 238:23, 252:9
**opportunity** - 4:21, 9:21, 38:17, 59:16, 73:9, 99:8, 102:17, 145:14, 195:8, 214:9, 265:9, 312:9, 315:10, 315:11
**opposed** - 82:21, 112:5, 112:8, 127:23, 128:1, 150:23, 151:5, 151:10, 152:12, 152:20, 176:25, 178:19, 200:4, 200:17, 263:23, 280:18, 296:17, 297:11, 298:21
**opposing** - 120:18
**option** - 148:10, 149:13, 149:19, 150:5, 264:10, 317:16, 317:17, 318:2, 318:3, 318:5, 323:16, 325:11
**options** - 158:8, 176:7
**order** - 4:12, 28:6, 37:6, 40:21, 137:25, 138:8, 174:18, 202:25, 219:14, 289:8, 305:7
**ordered** - 3:25
**orderly** - 102:23
**ordinary** - 71:3, 71:4
**organized** - 54:6, 142:19
**orientation** - 91:10
**original** - 235:2
**originally** - 195:25
**Ortiz** - 1:8, 8:7, 7:7, 7:21, 10:7, 99:23, 105:5
**otherwise** - 210:5, 229:8
**ourselves** - 45:3
**outcome** - 127:6, 151:20, 180:14
**outlets** - 192:20, 310:8
**outside** - 130:24, 143:23, 185:4, 213:21, 245:15
**overhear** - 98:15
**overwhelming** - 82:2
**overzealousness** - 274:8
**own** - 32:4, 47:16, 62:5, 80:3, 95:18, 161:5, 174:20, 174:25, 179:1, 184:6, 238:9, 293:4, 304:14, 310:13
**owned** - 63:6

## P

**page** - 79:16, 133:5, 271:20
**Page/vol** - 1:3, 4:20, 5:8
**paid** - 90:12, 231:24

**palsy** - 94:13
**panel** - 3:2, 6:14, 6:15, 6:18, 6:23, 6:25, 7:3, 8:5, 8:15, 8:18, 24:23, 31:5, 41:6, 98:23, 99:1, 101:22, 102:13, 107:2, 108:14, 110:4, 111:14, 113:22, 115:6, 117:5, 119:1, 121:8, 123:9, 125:5, 132:6, 132:15, 137:12, 144:7, 180:19, 188:19, 192:6, 195:2, 257:7
**Panel** - 1:10
**paper** - 132:25, 193:5, 205:17, 210:12, 276:11, 276:16, 293:9
**Paragas** - 134:17
**paragraph** - 54:25
**paragraphs** - 4:5, 4:6, 4:8, 4:13, 4:16, 55:3, 55:14
**paralyzed** - 94:13
**parameters** - 70:18
**pardon** - 185:3
**parole** - 149:19, 150:1, 150:5, 150:8, 184:13, 184:16, 184:18, 184:25, 185:7, 185:13, 186:2, 186:5, 186:6, 186:13, 186:17, 221:23, 222:1, 222:3, 222:4, 222:6, 262:5, 262:11, 262:14, 317:17, 317:20, 318:3, 318:6, 318:20, 318:21, 323:4
**paroled** - 185:1
**paroles** - 185:3
**Part** - 20:17
**part** - 5:10, 5:11, 5:24, 20:14, 32:19, 33:8, 47:22, 55:23, 55:25, 57:21, 63:12, 64:8, 64:17, 96:1, 133:17, 164:15, 164:25, 165:13, 165:24, 182:17, 202:17, 214:14, 249:21, 249:23, 250:2, 260:13, 276:7, 296:3, 298:1, 304:25, 319:19, 327:7
**particular** - 54:1, 55:24, 70:3, 77:24, 149:16, 249:25, 273:1, 293:7, 297:5
**particularly** - 234:4, 242:12, 292:17
**parties** - 1:7, 1:9, 1:12, 1:14, 1:16, 1:18, 1:20, 1:22, 1:24, 2:2, 2:4, 2:6, 2:8, 2:10, 2:12, 2:14, 2:16, 2:18, 2:20, 2:22, 2:24, 3:2, 3:4, 3:6, 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 3:20, 3:22, 3:24, 4:2, 4:4, 4:6, 4:8, 4:10, 5:9, 5:13, 5:21, 5:23, 5:25, 6:2, 6:4, 6:6, 6:8, 6:10, 6:13, 6:15, 6:19, 6:21, 6:23, 6:25, 7:2, 7:4, 7:8, 7:10, 7:12, 7:16, 7:18, 7:21, 7:23, 7:25, 8:2, 8:4, 8:6, 8:8, 8:10, 8:12, 8:14, 8:16, 8:18, 8:22, 8:24, 9:2, 61:10, 61:11, 61:13, 61:19, 62:2, 64:12, 66:4, 66:21, 74:21, 76:21, 76:22, 84:17, 84:24, 163:24, 163:25, 164:19, 211:4, 211:11, 224:22, 260:20, 277:2, 289:24, 290:1, 290:9, 329:11, 334:9, 334:15
**parts** - 12:7, 12:11, 201:13, 284:9, 285:12
**party** - 62:4, 62:22, 74:24, 74:25, 165:14, 166:6, 167:5, 212:17, 218:12, 225:5, 277:20
**pass** - 60:3, 130:25,

179:15, 191:10, 193:23, 216:15, 232:12, 249:1, 254:17, 256:10, 294:23, 298:10, 308:18
**passage** - 280:21, 280:23, 281:11
**passed** - 253:16
**passes** - 104:15, 134:20
**past** - 9:18, 11:7, 11:13, 14:8, 95:21, 120:4, 170:20, 201:24, 201:25, 275:5, 290:24, 303:20
**Patricia** - 141:21
**patrol** - 184:20
**paulk** - 111:19, 135:18
**pause** - 44:10
**Pause** - 7:14, 102:6, 144:12, 188:14, 191:9, 283:24, 308:17
**pay** - 87:17, 97:14, 238:9
**paying** - 118:10
**Payne** - 2:1, 8:9, 100:23, 104:21
**peers** - 289:13
**penalty** - 9:9, 9:13, 11:5, 11:18, 12:16, 12:20, 15:6, 32:19, 33:20, 53:19, 53:22, 53:24, 68:21, 69:15, 72:17, 72:18, 76:18, 78:8, 78:11, 79:15, 80:7, 80:20, 81:1, 82:7, 82:23, 83:12, 83:18, 83:23, 83:25, 85:4, 107:20, 109:4, 109:6, 109:8, 113:2, 114:21, 120:1, 120:23, 122:10, 124:20, 126:7, 129:19, 129:24, 145:24, 147:7, 147:17, 148:4, 148:9, 149:13, 149:25, 150:9, 150:15, 150:17, 150:18, 150:23, 151:3, 151:11, 152:3, 152:11, 152:13, 152:17, 152:21, 174:24, 176:25, 184:12, 184:14, 195:17, 198:13, 198:17, 198:20, 199:7, 199:13, 200:5, 200:9, 200:18, 200:19, 201:5, 219:7, 221:21, 222:1, 223:25, 224:3, 238:13, 239:11, 240:3, 245:25, 248:23, 257:21, 260:2, 260:10, 262:2, 262:3, 262:4, 262:13, 262:23, 263:2, 263:9, 263:14, 263:24, 264:4, 264:14, 284:5, 284:12, 284:14, 289:10, 297:4, 297:11, 297:13, 307:7, 307:11, 308:2, 312:21, 315:6, 317:14, 317:16, 317:19, 318:4, 318:10, 318:19, 318:20, 318:25, 319:4, 319:9, 319:21, 321:23, 322:4, 322:18, 323:3, 323:11, 323:17, 324:17, 324:19, 324:22, 325:10, 325:14, 326:9, 328:5, 328:8, 328:9, 328:10, 328:11, 329:24
**People** - 155:19, 242:10, 243:2
**people** - 13:5, 13:8, 15:21, 16:1, 16:23, 17:14, 17:18, 19:6, 40:9, 46:21, 58:21, 58:24, 66:8, 68:22, 68:25, 77:8, 90:24, 90:25, 91:17, 102:20, 103:4, 103:18, 103:20, 121:22, 121:24, 133:9, 138:1, 147:22, 153:6, 155:21, 160:7, 168:18, 168:19, 172:17, 173:9,

177:16, 177:17, 177:22, 177:25, 187:17, 187:18, 187:19, 189:11, 189:12, 190:20, 200:7, 201:1, 203:20, 209:17, 210:23, 212:10, 213:14, 214:13, 215:9, 220:10, 221:8, 221:12, 221:16, 221:17, 223:24, 226:4, 226:5, 240:10, 241:16, 242:10, 245:11, 245:15, 245:18, 245:20, 246:3, 261:20, 264:22, 265:7, 268:23, 271:5, 274:20, 274:23, 281:13, 287:9, 293:12, 301:10, 303:22, 305:23, 317:6, 320:10, 325:19, 328:17, 330:9, 332:10
**people's** - 281:1
**People's** - 281:2
**per** - 96:24, 120:10
**perceived** - 287:5, 287:14
**percent** - 28:16, 29:14, 29:21, 30:6, 30:8, 30:11, 30:16, 30:25, 31:1, 31:3, 32:6, 32:16, 34:17, 34:22, 34:23, 34:24, 35:14, 35:18, 36:7, 36:8, 36:14, 37:4, 37:8, 39:2, 39:10, 39:11, 39:13, 41:14, 41:16, 42:23, 42:25, 43:2, 51:1, 82:3, 82:4, 83:13, 127:4, 172:18, 199:16, 199:23, 200:18, 220:12, 300:14
**percentage** - 285:25, 305:19
**peremptories** - 255:9, 255:20
**peremptory** - 255:13, 256:18, 256:19, 309:14, 309:18
**Perez** - 4:7, 8:11, 101:6, 105:11, 140:25, 141:1
**perfect** - 161:2, 161:17, 162:15, 203:4, 255:18, 262:22, 270:25, 283:3
**perfections** - 155:20
**perfectly** - 206:16
**Perhaps** - 159:25, 168:10, 173:23, 177:5
**perhaps** - 26:24, 158:14, 168:16, 177:12, 177:13
**period** - 13:1, 13:8, 60:22, 87:15, 150:9, 170:24, 193:10, 215:19, 267:8
**Perry** - 24:25, 29:16, 102:8, 103:8, 130:24, 133:3, 134:19, 193:6, 193:22, 256:9, 308:22, 310:21, 311:14, 331:12
**person** - 12:23, 15:10, 25:8, 35:18, 37:8, 38:17, 41:25, 45:4, 46:10, 57:23, 59:9, 59:12, 60:24, 61:16, 62:3, 62:9, 62:13, 65:17, 65:22, 75:1, 75:7, 75:15, 75:16, 75:21, 76:4, 76:8, 108:25, 110:16, 114:9, 115:18, 115:23, 116:1, 120:5, 122:2, 122:11, 125:16, 126:8, 145:7, 148:16, 150:19, 160:8, 161:18, 161:19, 161:21, 161:24, 167:9, 171:7, 173:1, 174:6, 174:21, 175:7, 175:19, 182:1, 184:16, 185:11, 186:3, 189:8, 189:15, 190:16, 211:22, 211:24, 212:11, 212:13, 212:14, 212:20, 212:21,

213:2, 213:8, 215:18,
217:10, 217:16, 226:11,
233:18, 238:8, 240:15,
241:5, 241:22, 242:16,
245:3, 245:19, 250:23,
272:6, 272:24, 273:1,
277:10, 277:15, 277:19,
278:24, 279:23, 281:23,
285:15, 285:16, 286:25,
288:1, 288:2, 288:6, 288:25,
290:5, 290:6, 290:7, 291:13,
295:19, 295:21, 299:8,
301:19, 302:12, 305:9,
305:17, 305:20, 306:1,
306:23, 306:25, 307:6,
317:8, 319:8, 320:4, 320:5,
322:3, 326:6, 327:11,
327:23, 327:25, 329:24,
330:4
**person's** - 35:16, 154:16,
190:7, 272:25, 273:3, 279:1,
291:8, 316:18
**personal** - 40:9, 40:22,
42:5, 43:21, 51:21, 77:19,
78:21, 87:11, 106:4, 106:17,
107:12, 107:18, 109:10,
110:23, 111:24, 112:12,
112:13, 114:11, 116:7,
116:10, 116:16, 117:13,
117:16, 119:10, 119:18,
120:14, 120:20, 121:25,
123:17, 126:14, 128:20,
145:22, 173:23, 195:16,
257:20, 275:6, 312:19
**personally** - 307:13
**personnel** - 89:1
**persons** - 18:21, 104:16,
261:20, 277:20
**perspective** - 78:6
**persuaded** - 82:3
**petty** - 321:14
**phase** - 12:10, 12:12,
12:13, 12:14, 33:9, 33:18,
73:6, 73:7, 74:1, 120:4,
120:5, 120:7, 154:11,
154:13, 154:14, 154:18,
154:22, 157:1, 201:14,
201:18, 201:22, 202:2,
202:9, 206:7, 218:23, 219:1,
223:16, 247:20, 266:14,
266:18, 284:4, 284:9,
284:10, 288:13, 288:16,
288:17, 288:23, 319:20,
319:21, 327:8
**phases** - 154:10, 202:6,
266:13
**Phone** - 2:7, 2:13, 2:16
**phrased** - 83:16
**physical** - 26:24, 27:17,
39:9, 208:4, 208:7
**physically** - 86:20, 87:1
**pick** - 15:25, 162:6,
295:24, 296:3, 296:19
**picked** - 190:10, 295:13,
295:24, 297:3, 314:18
**picking** - 295:15, 298:3,
298:16, 332:17
**picks** - 279:22
**picture** - 207:17, 218:9,
218:13
**pictures** - 159:19, 207:12,
207:14
**piece** - 193:5, 205:17
**pieces** - 210:11, 218:7,
218:9, 218:10
**pilot** - 96:16
**pilots** - 96:22
**pixie** - 174:19
**place** - 16:7, 47:25, 48:23,
102:24, 147:21, 150:3,

156:24, 163:9, 163:10,
203:5, 222:12, 223:24,
262:9, 307:2, 307:3, 318:12
  **places** - 44:20
  **plan** - 47:23, 277:13
  **planning** - 329:12
  **play** - 75:19, 159:24,
202:3, 280:7, 291:9
  **played** - 61:24
  **playing** - 271:20
  **plead** - 50:24, 215:21
  **pled** - 171:4
  **plenty** - 182:23, 255:25
  **plus** - 52:20, 148:25,
149:5, 317:2
  **Pm** - 134:5, 134:9, 134:13,
135:16, 135:20, 135:23,
136:1, 136:6, 139:6, 139:12,
139:19, 139:20, 139:23,
141:1, 141:23, 141:25,
142:8, 142:12, 143:19,
143:20, 143:23
  **point** - 7:9, 16:14, 21:17,
27:1, 33:17, 37:21, 38:8,
38:25, 46:15, 46:16, 53:23,
57:5, 62:22, 66:9, 72:19,
73:2, 76:23, 77:11, 78:7,
78:22, 85:10, 86:21, 86:22,
87:16, 100:2, 129:8, 146:6,
152:21, 181:1, 196:14,
201:12, 265:13, 265:18,
274:19, 290:25, 291:19,
315:10, 319:4, 322:9
  **pointed** - 159:13
  **pointing** - 302:9
  **points** - 183:14, 286:16
  **poison** - 174:19, 289:8
  **poisoned** - 174:17,
174:20, 223:22
  **police** - 58:20, 58:23,
58:25, 59:2, 59:18, 59:20,
59:24, 63:15, 63:22, 149:7,
160:11, 160:12, 160:20,
198:10, 209:3, 209:5, 209:9,
209:24, 227:13, 227:16,
227:25, 261:21, 272:3,
272:12, 273:11, 273:14,
273:15, 274:21, 275:23,
275:24, 275:25, 276:4,
276:22, 317:5
  **policy** - 289:9
  **polygraph** - 6:1
  **poor** - 250:13
  **popular** - 245:9
  **portion** - 10:19, 268:17
  **portions** - 334:8
  **position** - 6:18, 51:23,
122:3, 124:17, 263:13,
272:7
  **positive** - 160:2
  **possession** - 8:7
  **possibilities** - 246:18
  **possibility** - 70:19, 70:20,
70:22, 150:8, 168:20,
172:21, 174:13, 185:13,
186:13, 220:10, 222:1,
235:9, 235:10, 272:11,
272:18, 285:22, 286:4,
286:5, 293:23, 297:2,
307:22, 323:3
  **possible** - 25:10, 29:13,
102:23, 103:13, 145:24,
149:18, 150:7, 151:20,
172:12, 172:14, 174:11,
195:18, 222:19, 229:17,
251:11, 257:22, 264:1,
298:5, 312:21, 333:19
  **possibly** - 21:3, 21:7,
83:12, 278:5, 280:15,
286:25, 294:5, 323:2,

324:13, 326:6
  **posters** - 240:7
  **potential** - 140:14, 218:7,
260:1
  **potentially** - 53:24, 56:23,
67:12, 67:14, 88:2, 133:10,
197:3, 320:3, 329:16,
329:23
  **Powell** - 123:11, 123:13,
142:23, 143:1
  **power** - 321:18
  **pre** - 248:6
  **pre-inclination** - 248:6
  **preconceived** - 129:2,
208:16
  **predetermined** - 128:1
  **predict** - 173:9, 222:3,
222:17, 286:9
  **prefer** - 294:12, 322:2
  **prejudge** - 58:9, 58:18,
60:5
  **prejudging** - 58:19
  **prejudgment** - 23:6
  **preliminary** - 13:23
  **premeditate** - 269:9
  **premeditated** - 268:21,
269:16
  **premeditation** - 268:16,
268:19, 268:22, 269:2
  **Premeditation** - 269:13
  **prepaid** - 90:4
  **prepared** - 48:11, 193:19
  **preponderance** - 29:20
  **present** - 3:1, 3:3, 3:13,
3:15, 8:19, 10:6, 18:4,
24:24, 38:20, 78:18, 98:22,
99:4, 99:6, 99:7, 101:24,
102:11, 107:3, 108:15,
110:5, 111:15, 113:23,
115:7, 117:6, 119:2, 121:9,
123:10, 125:6, 128:12,
128:16, 130:19, 132:7,
132:16, 137:13, 144:6,
144:16, 144:19, 157:4,
159:18, 163:13, 178:4,
192:5, 207:9, 229:20,
230:16, 231:18, 236:4
  **Present** - 3:5, 99:3, 102:2,
102:13
  **presented** - 27:3, 55:7,
118:7, 120:11, 126:3,
158:20, 163:2, 163:4,
173:16, 176:15, 179:6,
203:3, 203:7, 212:4, 218:24,
219:2, 226:3, 247:22, 252:7,
282:14, 282:16, 284:19,
288:15
  **presenting** - 181:17
  **presents** - 54:7
  **presiding** - 1:23
  **Presume** - 229:25, 230:1
  **presume** - 37:19, 180:21,
181:1, 205:13, 229:24,
229:25, 233:9, 239:20
  **presumed** - 15:17, 16:5,
22:20, 182:12, 229:7,
236:15, 236:16
  **presumption** - 15:7, 15:9,
15:12, 16:9, 16:15, 17:1,
18:17, 22:11, 22:17, 22:18,
22:21, 23:14, 23:24, 24:4,
25:15, 25:16, 25:21, 25:23,
180:19, 182:10, 182:24,
204:19, 229:6, 236:12,
270:10
  **presupposing** - 128:13
  **pretrial** - 4:3
  **Pretrial** - 1:4
  **pretty** - 63:10, 86:7,
105:18, 127:6, 152:5,

160:22, 218:9, 231:23,
236:7, 252:2, 252:3, 278:1,
286:15, 320:15
  **Pretty** - 137:7, 143:22,
208:20
  **prevent** - 10:23, 11:14,
18:25, 21:1, 45:8, 79:9,
97:14, 106:4, 106:18,
107:12, 107:18, 108:25,
109:10, 109:13, 110:15,
110:23, 111:24, 112:14,
114:8, 114:11, 115:17,
115:22, 116:7, 116:11,
116:16, 117:14, 117:17,
119:11, 119:18, 120:15,
120:18, 120:21, 121:16,
123:18, 125:15, 126:15,
127:14, 274:25
  **previous** - 85:2, 309:13
  **previously** - 99:18, 297:24
  **priests** - 272:4
  **Primarily** - 120:3
  **prime** - 46:7
  **prison** - 53:18, 68:21,
69:15, 78:13, 84:24, 84:25,
127:3, 175:12, 184:14,
221:9, 221:12, 221:16,
222:1, 232:8, 242:18,
287:15, 323:3, 323:17
  **pristine** - 161:15
  **privacy** - 163:21
  **pro** - 328:10
  **probability** - 69:23, 70:9,
70:22, 71:6, 72:8, 74:17,
172:8, 172:11, 186:4, 186:7,
189:8, 220:6, 220:12, 241:4,
241:21, 241:22, 242:24,
243:23, 285:7, 285:14,
285:18, 285:24, 286:1,
286:14, 287:1, 287:23,
305:11, 305:17, 306:2,
306:22
  **Probability** - 70:15, 220:7
  **probable** - 230:7
  **probility** - 71:5
  **probation** - 228:15
  **problem** - 6:12, 21:21,
21:25, 41:8, 47:15, 47:18,
48:1, 87:21, 88:8, 88:21,
89:3, 91:18, 92:7, 93:7,
96:21, 137:16, 137:19,
150:19, 151:8, 177:19,
185:9, 189:5, 242:9, 280:5,
291:18, 302:20, 331:20
  **problematic** - 168:8
  **problems** - 168:8, 170:17,
214:24
  **Procedure** - 64:22
  **proceed** - 4:6, 4:8, 25:8,
25:9, 54:5, 55:25, 144:8,
179:18, 232:13, 254:7,
258:11, 258:13, 295:4,
313:8
  **proceeding** - 55:24
  **Proceedings** - 1:16, 1:24,
1:2, 333:25
  **proceedings** - 1:21, 1:4,
193:1, 310:14, 334:8,
334:14
  **process** - 9:14, 9:18,
68:24, 85:14, 86:12, 106:11,
106:14, 107:16, 109:2,
109:14, 110:20, 111:1,
114:14, 117:19, 117:20,
117:23, 117:25, 118:2,
118:3, 119:14, 123:22,
125:23, 126:18, 126:23,
127:21, 147:21, 196:18,
201:9, 205:22, 219:14,
234:11, 250:23, 250:25,

257:11, 259:17, 265:13,
284:16, 314:12, 325:23,
326:19, 327:24, 330:17
  **profession** - 272:22
  **professional** - 289:12
  **prognosis** - 87:23, 294:5
  **program** - 89:20
  **Project** - 132:22, 142:13
  **prolem** - 120:25
  **promise** - 16:14, 51:18,
216:21, 217:2, 316:6
  **promote** - 62:11
  **promptly** - 193:17, 310:25
  **pronouncing** - 232:16
  **proof** - 27:25, 28:1, 28:24,
33:21, 37:3, 55:17, 70:3,
70:5, 77:25, 78:1, 78:2,
156:12, 156:18, 156:21,
188:18, 188:23, 188:25,
189:22, 190:7, 199:6,
199:11, 207:16, 215:15,
219:22, 225:12, 230:8,
266:21, 266:22, 290:18,
290:19, 300:12, 300:15,
300:23, 301:6, 301:13
  **proper** - 30:18, 80:19,
112:14, 112:17, 112:18,
114:21, 116:18, 118:19,
120:19, 122:9, 124:2, 124:3,
127:15, 128:9, 151:11,
297:12
  **properly** - 300:14
  **property** - 71:15, 175:6,
220:24, 243:13, 287:2,
287:3
  **prosecuted** - 289:10
  **prosecution** - 3:17, 51:2,
233:17, 235:23, 274:8,
274:14
  **prosecutor** - 35:17, 82:3,
146:22, 146:23, 161:11,
243:10, 250:13, 276:24,
283:17, 295:11
  **prosecutor's** - 282:22,
301:21
  **prosecutors** - 99:6,
144:19, 185:2, 292:17
  **Prospective** - 1:10, 4:18,
4:19
  **prospective** - 145:2,
193:3, 194:22, 257:2,
310:16, 311:23
  **prostitutes** - 272:4
  **prove** - 15:14, 26:20, 28:4,
28:7, 28:23, 29:23, 30:8,
35:14, 35:18, 37:8, 39:10,
44:21, 44:23, 54:15, 55:22,
70:5, 70:7, 82:4, 128:5,
128:6, 154:23, 155:3, 155:7,
155:14, 155:23, 156:11,
157:5, 157:24, 158:1, 158:2,
158:6, 158:18, 158:19,
158:25, 159:7, 159:11,
171:6, 182:2, 182:3, 182:8,
182:13, 182:19, 182:25,
183:24, 183:25, 184:3,
190:4, 199:13, 199:14,
202:10, 202:11, 202:12,
202:13, 202:14, 202:16,
202:20, 203:10, 204:7,
205:6, 205:10, 205:24,
214:17, 215:22, 216:11,
216:17, 216:18, 216:23,
217:2, 218:4, 219:23, 220:1,
220:5, 220:18, 220:20,
229:21, 230:2, 230:14,
230:15, 230:21, 234:15,
236:5, 236:10, 236:17,
266:25, 267:2, 267:9,
267:13, 267:17, 267:19,

268:5, 269:2, 270:7, 290:3,
299:12, 299:13, 299:18,
300:5, 300:6, 306:19, 327:5
  **proved** - 218:6
  **proven** - 73:22, 75:20,
76:9, 77:12, 156:1, 156:8,
162:19, 169:20, 190:5,
229:24, 233:23, 267:6,
268:11, 268:16, 269:14,
305:10
  **proves** - 159:3
  **provide** - 16:9, 16:15,
17:1, 23:13, 23:15, 28:13,
47:8, 50:14, 177:5
  **provided** - 8:6, 12:5,
15:19, 92:19
  **provides** - 15:9, 16:2,
16:5, 22:23, 26:12, 65:13
  **providing** - 15:14, 73:18
  **proving** - 15:14, 44:18,
158:17, 207:13, 229:7,
266:21
  **public** - 46:21, 46:23,
53:10
  **pull** - 166:21
  **pulled** - 78:25, 166:4,
166:17, 227:22, 273:22
  **pulls** - 212:12
  **punished** - 121:22
  **punishment** - 12:14,
33:18, 53:16, 64:18, 67:20,
67:22, 68:14, 68:19, 69:5,
73:6, 73:25, 78:20, 120:4,
120:7, 145:24, 148:20,
150:19, 151:5, 154:11,
154:14, 154:19, 157:1,
195:18, 201:14, 201:18,
201:20, 202:2, 202:4, 206:7,
218:22, 219:1, 222:19,
223:6, 238:6, 238:11,
238:18, 238:20, 239:4,
239:5, 247:20, 257:22,
262:5, 266:16, 268:20,
284:4, 284:10, 288:17,
288:22, 292:3, 292:5,
295:20, 296:18, 298:1,
298:5, 298:7, 298:8, 305:2,
305:5, 312:21, 317:19,
319:20, 321:23, 322:10,
322:17, 323:23, 324:3,
324:7, 328:5
  **punishments** - 149:18,
150:7, 262:2, 262:18,
317:14, 323:2
  **purpose** - 24:13, 62:19,
64:2
  **purposes** - 9:7, 13:18,
55:16, 145:6
  **push** - 46:1, 206:24
  **pushes** - 63:21
  **put** - 6:13, 6:22, 8:13,
15:2, 15:16, 33:10, 42:14,
61:1, 61:2, 63:5, 63:19,
78:3, 81:2, 81:12, 81:14,
82:20, 84:3, 86:16, 87:7,
89:21, 92:13, 95:9, 100:8,
100:13, 106:8, 106:9, 122:3,
122:6, 122:17, 124:17,
126:17, 138:17, 143:14,
159:9, 163:19, 174:18,
177:11, 188:25, 200:17,
203:5, 205:9, 206:5, 211:22,
216:20, 240:6, 242:5, 250:1,
294:18, 294:19, 296:18,
306:16, 306:17, 327:18,
327:19, 329:7
  **Put** - 180:15
  **puts** - 45:21, 303:5
  **putting** - 302:8, 319:15,
327:16

  **puzzle** - 218:6
  **Pyper** - 141:20, 141:22

## Q

  **qualifications** - 209:16,
272:25
  **qualified** - 187:15
  **qualifies** - 53:17
  **qualify** - 261:23, 263:1,
263:8
  **quality** - 282:13
  **questioned** - 144:23,
251:15
  **Questioning** - 4:18
  **questioning** - 145:16,
250:13, 252:1, 252:6, 254:2,
333:5
  **questionnaire** - 11:21,
40:13, 42:10, 42:14, 42:15,
42:16, 43:15, 43:20, 43:23,
50:3, 50:5, 50:8, 61:1, 61:3,
81:3, 81:14, 86:17, 88:20,
89:22, 92:14, 92:15, 95:9,
105:19, 106:2, 106:7,
111:22, 114:6, 115:14,
117:10, 119:8, 121:14,
123:16, 123:20, 145:17,
146:6, 147:6, 147:16,
150:22, 151:5, 153:7,
181:16, 181:18, 195:24,
197:2, 226:23, 228:24,
232:25, 249:23, 250:18,
251:1, 251:4, 258:4, 258:23,
259:24, 260:5, 268:17,
272:11, 274:5, 291:24,
296:7, 313:2, 314:14,
316:10, 319:2, 319:3,
321:16, 322:8, 323:22
  **questionnaires** - 3:24,
3:25, 9:19, 9:21, 10:1, 10:3,
12:18, 14:22, 81:17, 85:12,
99:9, 99:10, 249:21, 250:3,
332:2
  **questions** - 11:23, 12:4,
14:21, 14:23, 23:21, 56:5,
68:7, 69:17, 69:18, 72:20,
74:2, 76:22, 77:13, 78:9,
80:9, 80:11, 80:13, 80:20,
82:9, 83:16, 83:19, 83:20,
84:13, 108:2, 108:4, 108:21,
108:23, 109:22, 111:22,
112:4, 112:20, 112:24,
112:25, 113:10, 114:24,
115:13, 116:17, 116:24,
118:8, 118:12, 118:14,
118:17, 118:21, 119:7,
121:1, 121:2, 121:4, 124:11,
124:19, 127:8, 127:10,
127:18, 128:17, 128:23,
130:3, 133:13, 137:3,
145:13, 153:13, 153:17,
153:24, 178:25, 179:4,
180:1, 180:3, 180:17,
185:23, 185:25, 186:21,
195:10, 195:15, 196:13,
197:2, 201:3, 203:23, 204:8,
217:3, 219:10, 225:15,
233:2, 234:3, 235:22,
236:21, 236:24, 237:1,
238:7, 240:24, 247:12,
247:23, 250:19, 252:2,
253:12, 254:3, 254:6,
257:19, 258:3, 258:21,
265:19, 266:7, 284:18,
288:12, 288:13, 299:5,
304:17, 307:6, 308:5,
308:11, 312:18, 314:20,
314:23, 316:11, 319:23,
320:2, 320:3, 321:6, 322:14,

322:15, 327:9, 327:10,
328:1, 329:3, 329:6, 329:16,
329:21, 330:13, 330:19,
330:23, 331:3, 331:4, 333:2
  **Questions** - 114:5
  **quick** - 56:8, 85:9, 87:14,
257:18, 283:21
  **quickly** - 25:9, 61:9,
103:13, 105:18, 133:12
  **quiet** - 313:24
  **Quintanilla** - 117:7, 117:9,
117:10, 118:24, 139:15,
139:16, 139:17
  **quite** - 45:22, 45:23, 68:3,
284:15, 285:14, 303:16,
316:14

## R

  **Rachel** - 105:24, 131:24
  **radio** - 293:5
  **radio-controlled** - 293:5
  **raise** - 16:21, 81:20, 94:23,
329:1
  **raised** - 22:12, 51:13,
157:9
  **Randy** - 135:7
  **range** - 67:20, 68:14,
148:19
  **ranges** - 246:18
  **rank** - 152:9
  **rape** - 227:9
  **raped** - 245:10, 245:14,
245:16, 246:1
  **rare** - 266:15, 282:9
  **rather** - 77:21
  **rationalize** - 298:14
  **re** - 175:23
  **re-urges** - 175:23
  **reach** - 109:18, 128:10,
159:1, 291:25
  **reaches** - 12:15
  **reaction** - 197:5, 197:8,
230:1, 246:10
  **read** - 11:5, 54:2, 54:4,
62:1, 125:23, 192:18,
234:21, 234:25, 267:7,
272:13, 296:20, 304:6,
310:6
  **readdress** - 333:4
  **reading** - 37:21, 79:15
  **reads** - 65:5, 111:23
  **ready** - 8:15, 144:8, 192:3
  **Ready-** 192:4
  **real** - 19:15, 30:4, 35:3,
51:17, 129:14, 153:6, 153:7,
203:19, 245:9, 257:18,
327:24
  **real-world** - 51:17
  **reality** - 161:18
  **realize** - 87:10, 325:25
  **really** - 9:23, 40:15, 46:2,
48:16, 59:5, 59:23, 61:12,
68:23, 71:16, 73:15, 75:25,
76:25, 79:23, 81:15, 81:18,
82:13, 92:16, 123:3, 147:19,
172:19, 180:12, 180:13,
181:6, 182:10, 182:12,
183:25, 185:14, 197:14,
200:15, 203:19, 208:6,
209:23, 209:24, 223:19,
224:21, 228:12, 228:22,
234:10, 234:13, 234:15,
234:17, 235:16, 236:23,
244:10, 245:10, 256:11,
260:12, 263:19, 280:12,
283:21, 301:4, 301:5,
303:17, 304:17, 317:17,
319:5, 324:10, 330:5,
330:20, 331:15

**realm** - 251:11
**reason** - 9:6, 9:23, 17:10, 23:22, 39:23, 45:7, 45:12, 46:10, 59:2, 60:1, 61:10, 92:18, 112:12, 146:1, 163:4, 167:18, 190:2, 195:20, 233:14, 257:25, 301:17, 305:19, 312:24, 315:18
**reasonable** - 22:22, 27:3, 27:16, 28:3, 28:5, 28:11, 29:12, 30:2, 32:3, 32:5, 33:12, 33:13, 34:17, 34:18, 35:2, 36:13, 38:3, 38:11, 38:20, 39:7, 40:5, 40:24, 41:5, 41:9, 43:1, 43:7, 44:19, 45:23, 46:3, 48:25, 49:1, 69:22, 70:5, 70:7, 70:9, 70:17, 71:11, 71:21, 73:22, 74:7, 75:20, 76:9, 77:12, 155:14, 155:24, 156:1, 156:9, 162:19, 169:20, 170:17, 188:18, 188:20, 188:23, 189:7, 189:9, 189:10, 189:14, 189:22, 190:2, 190:8, 190:9, 190:16, 190:24, 198:13, 199:15, 199:22, 202:20, 203:8, 204:8, 208:2, 214:1, 216:19, 266:21, 267:1, 267:18, 267:20, 268:12, 269:22, 269:25, 270:6, 285:6, 290:2, 290:3, 290:17, 300:6, 300:7, 300:12, 300:15, 300:23, 301:6, 301:9, 301:13, 301:17, 301:19, 301:24, 301:25, 302:4, 302:14, 302:15, 302:19, 303:6, 305:10, 327:6
**reasonably** - 189:20
**reasoning** - 270:3
**reasons** - 40:9, 42:5, 43:21, 46:18, 46:25, 56:15, 95:10, 145:22, 195:16, 216:3, 250:14, 257:20, 280:17, 302:19, 312:20, 319:12
**receive** - 193:1, 310:13
**receiving** - 114:21, 201:5
**recently** - 222:9
**recess** - 91:7
**Recess**- 24:22, 98:21, 144:5
**recessed** - 333:25
**Reckless**- 227:6
**recognize** - 156:20, 176:6, 177:7, 230:18
**recognized** - 165:23
**Record**- 1:1, 334:10, 334:13
**record** - 5:2, 6:14, 6:22, 8:2, 8:3, 8:13, 8:23, 17:9, 19:15, 25:1, 31:17, 98:24, 99:13, 101:16, 101:25, 102:9, 104:1, 105:22, 105:23, 107:6, 108:17, 110:8, 111:17, 113:25, 115:10, 117:8, 119:4, 121:11, 123:12, 125:8, 129:14, 131:25, 132:9, 136:15, 138:12, 140:18, 144:14, 144:18, 145:7, 191:16, 194:14, 249:21, 249:24, 250:1, 250:2, 250:8, 250:9, 256:16, 309:7, 309:15, 332:1
**recorded** - 276:6
**recording** - 276:16
**recovered** - 282:11
**red** - 17:15, 95:8

**reduce** - 80:1, 80:4
**reduced** - 227:4, 228:14
**reduction** - 80:6
**refer** - 5:1, 268:24
**reference** - 5:12, 5:20, 6:1, 6:6
**referred** - 289:24
**referring** - 17:12, 38:9, 114:4, 115:13, 117:10
**reflect** - 6:22
**reflection** - 43:14
**reflects** - 43:19, 334:14
**regard** - 12:1
**regarding** - 6:14, 14:23, 25:25, 74:2, 107:16, 192:19, 263:14, 263:18, 268:19, 289:14, 310:6, 329:13
**regardless** - 322:5
**regards** - 27:21, 50:1, 58:20, 272:10
**regular** - 12:12, 12:21, 52:19, 67:13, 148:6, 148:8, 148:19, 148:23, 149:12, 197:21, 197:25
**rehash** - 42:13
**reintroduce** - 259:2
**related** - 38:2, 287:3
**relationship** - 18:25, 19:7
**relationships** - 19:5
**relax** - 196:18
**release** - 7:8, 89:7, 98:20, 184:20
**released** - 85:22, 85:25, 90:24, 91:1, 104:5, 256:3, 256:6, 310:24
**relevant** - 5:11
**religious** - 40:9, 40:23, 41:25, 42:5, 43:16, 43:21, 106:4, 106:17, 107:12, 107:17, 108:24, 109:10, 110:14, 110:23, 111:23, 112:12, 112:13, 114:7, 114:11, 115:16, 115:21, 116:7, 116:10, 116:15, 117:13, 117:17, 119:10, 119:17, 120:14, 120:20, 121:15, 121:25, 123:17, 125:14, 126:10, 126:14, 127:13, 145:22, 195:16, 200:12, 257:20, 312:19
**religiously** - 122:6, 124:9
**relive** - 215:4
**rely** - 270:2
**remain** - 44:12, 44:13, 44:15, 52:14
**remember** - 22:13, 130:8, 146:21, 154:25, 188:20, 215:2, 219:12, 228:22, 229:5, 238:15, 239:6, 244:16, 245:12, 265:11, 272:14, 276:22, 276:23, 277:3, 284:6, 284:20, 295:13, 296:9, 300:22, 300:25, 306:14, 316:23, 323:6, 329:6
**Remember**- 319:23, 320:8
**remembered** - 227:20
**remind** - 195:6, 258:7
**reminding** - 54:2, 55:18
**removed** - 100:18
**Renee**- 1:22, 9:3
**rephrase** - 42:3, 145:20, 195:12, 196:16, 313:6
**rephrased** - 252:5
**report** - 86:24, 163:1, 163:8, 210:14, 276:22
**reported** - 1:24, 334:12
**reporter** - 116:4
**Reporter**- 334:4, 334:20
**Reporter's**- 1:1, 5:5,

334:1, 334:10, 334:13
**reports** - 210:10, 275:25, 276:1, 276:4
**represent** - 46:22
**representatives** - 266:20
**Representing**- 17:21
**representing** - 18:9
**requested** - 334:8
**require** - 16:11, 23:14, 28:22, 30:7, 30:16, 30:25, 31:1, 31:3, 31:18, 31:23, 32:1, 32:23, 34:1, 36:14, 42:25, 43:1, 158:19, 216:21, 216:24, 218:15, 260:3, 268:25, 269:1, 270:2, 301:9, 333:12
**required** - 28:8, 79:19, 90:20, 96:16, 157:4, 218:11, 236:4, 251:10
**requirement** - 301:12
**requires** - 22:19, 155:13, 173:9, 176:12, 218:14
**rereading** - 236:1
**respect** - 206:15
**respective** - 334:15
**response** - 140:17, 187:14, 249:11, 294:21, 321:11
**responses** - 69:12, 69:14
**responsibile** - 88:23, 164:10
**responsibility** - 299:12
**responsible** - 62:3, 62:6, 62:8, 62:9, 164:16, 164:24, 214:5, 214:15, 277:11, 277:14, 283:15
**rest** - 10:15, 13:8, 131:5, 131:12, 190:14
**restroom** - 24:14, 24:15, 85:9
**restrooms** - 98:19
**result** - 62:20, 69:18, 72:16, 76:16, 78:11, 80:12, 80:20, 81:6, 82:10, 106:5, 106:18, 107:13, 107:19, 109:11, 109:20, 110:24, 111:3, 111:25, 112:16, 114:12, 114:20, 116:8, 116:19, 117:14, 119:12, 120:23, 123:19, 124:5, 126:4, 126:16, 127:15, 127:23, 128:17, 151:20, 165:22, 196:22, 219:11, 266:7
**results** - 78:13, 85:4, 159:25
**retired** - 292:18, 293:7
**retirement** - 89:1, 293:11
**return** - 4:1, 28:6, 28:8, 33:14, 34:2, 36:15, 59:12, 114:19, 132:1, 132:11, 132:19, 132:24, 310:25, 311:1, 319:16
**returning** - 106:5, 106:18, 107:13, 109:11, 110:24, 111:24, 112:15, 114:12, 116:8, 117:14, 119:11, 120:21, 123:18, 126:15, 127:14
**reunion** - 92:23
**reveals** - 268:9
**revenge** - 148:16
**review** - 9:21, 99:9
**reviewed** - 20:24
**reviewing** - 10:1, 85:12
**revisit** - 224:22
**Rick**- 139:10
**riding** - 293:1
**Rivera**- 141:21, 141:24
**road** - 166:2

**rob** - 63:4, 164:4, 213:16, 213:18
**robberies** - 277:25
**robbery** - 64:5, 75:4, 164:4, 165:19, 165:21, 198:9, 279:18, 279:21, 317:8
**Rodriguez**- 3:20, 17:13, 134:16, 334:4, 334:19
**Rolando**- 2:20
**role** - 61:24
**roles** - 61:18, 64:1
**Ronald**- 1:23, 5:8, 100:22, 104:21
**room** - 37:17, 47:4, 51:14, 131:16, 131:20, 179:2, 228:11, 230:12, 230:13, 265:14, 266:4
**Room**- 259:24
**roomful** - 17:17
**Rosa**- 2:11, 4:7, 8:11, 8:13, 99:21, 101:6, 104:24, 105:11
**Rose**- 2:17, 8:15, 101:1, 105:1
**round** - 63:15
**row** - 16:17, 16:19, 16:25, 17:2, 17:3, 17:4, 22:16, 23:12, 25:14, 25:17, 25:20, 25:21, 31:8, 34:5, 34:10, 35:6, 35:8, 35:22, 35:24, 36:19, 36:21, 39:19, 41:20, 42:18, 43:5, 47:11, 49:19, 50:19, 50:20, 52:5, 52:6, 52:8, 52:9, 52:10, 60:8, 60:12, 60:14, 60:15, 60:17, 66:5, 66:22, 79:16, 79:18, 79:21, 80:23, 83:10, 86:10, 88:12, 88:13, 89:16, 92:21, 93:11, 93:12, 94:3, 94:7, 97:19
**Row**- 66:6, 66:18, 66:23
**row-by-row** - 31:8, 93:12
**rows** - 25:13
**Rp**- 2:11
**rule** - 271:19
**rules** - 25:4, 57:8, 165:6, 217:14, 263:5
**ruling** - 4:24, 5:4, 5:16, 6:17
**running** - 75:16

### S

**safely** - 167:17, 167:22
**salt** - 46:12
**Salvador**- 3:5, 6:16, 131:11, 311:19, 311:22, 312:2
**Sanchez** - 135:2, 135:3
**Sandy** - 3:21, 6:7, 99:25, 105:9
**Santiago** - 2:11, 8:13, 99:21, 104:24
**sat** - 46:12, 56:18, 325:24
**satisfy** - 155:18
**Saturday** - 265:1
**saw** - 28:18, 36:24, 38:1, 38:7, 44:2, 147:6, 166:15, 166:21, 167:25, 226:23, 233:3, 250:11
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scale** - 152:9, 200:16, 263:22, 264:9, 271:21, 295:12, 295:19, 296:16, 297:19, 297:24, 298:6, 328:6, 328:7, 328:18, 328:19
**scales** - 296:8
**scar** - 97:11

**scare** - 180:7
**scared** - 298:18
**scares** - 180:11, 180:15
**scariest** - 46:20
**scenario** - 75:5, 129:4, 317:7
**scenarios** - 48:2, 277:24
**scene** - 217:17
**schedule** - 9:17, 10:17, 92:8
**scheduled** - 86:17, 91:9, 97:1, 332:10
**scheduling** - 13:16, 13:25, 14:6, 85:6, 91:16
**scheme** - 115:19
**schooling** - 58:16
**scientific** - 159:19, 159:23, 168:22, 169:2, 208:9, 208:11
**scientist** - 39:11
**scintilla** - 65:14
**scope** - 53:10
**Scott** - 135:21
**screen** - 329:4
**screens** - 15:2
**seat** - 3:12, 106:22, 108:9, 110:1, 111:10, 113:20, 117:3, 121:5, 125:3, 130:2
**seated** - 40:21, 85:21, 91:6, 195:2, 253:2
**seats** - 19:17
**second** - 3:18, 7:11, 12:13, 16:19, 17:7, 17:25, 50:20, 60:12, 62:21, 63:18, 74:5, 84:17, 88:13, 90:6, 90:7, 98:17, 99:5, 103:14, 114:10, 116:5, 122:18, 154:4, 155:7, 175:16, 188:11, 218:23, 224:20, 246:14, 254:11, 257:24, 267:2, 288:16, 289:23, 293:12, 305:13, 306:25, 308:15, 319:19, 327:8, 329:11, 332:12
**secondly** - 4:19
**secret** - 147:14
**secrets** - 69:13
**See** - 139:4, 167:23, 169:22, 215:19, 235:1, 271:4
**see** - 8:21, 15:1, 15:2, 22:19, 37:20, 42:4, 55:22, 56:5, 56:24, 59:4, 59:6, 59:24, 60:1, 60:2, 62:21, 70:2, 70:3, 76:24, 77:23, 78:8, 83:15, 85:11, 93:2, 96:11, 97:7, 97:18, 98:8, 103:23, 106:15, 118:8, 136:14, 137:1, 137:10, 137:22, 141:16, 143:2, 143:15, 145:14, 153:9, 153:23, 154:20, 157:22, 164:16, 166:22, 174:10, 177:20, 178:6, 182:9, 196:20, 203:25, 207:10, 210:17, 210:24, 213:8, 215:7, 216:4, 217:11, 217:22, 224:8, 226:10, 226:19, 233:4, 236:20, 238:25, 246:11, 254:13, 263:7, 268:16, 268:19, 270:22, 271:6, 275:8, 276:3, 276:4, 276:5, 276:9, 283:8, 285:1, 287:5, 297:18, 297:19, 302:19, 307:16, 313:20, 326:22, 327:20, 333:21
**seeing** - 15:25, 326:15
**seek** - 53:22, 317:15
**seeking** - 9:8, 11:5, 11:18,

12:20, 53:24, 262:2, 262:4, 284:12, 315:6
**seem** - 127:25, 168:20, 178:20, 197:17, 198:13
**Seem** - 170:17, 211:1
**seeping** - 19:19
**sees** - 161:21
**selected** - 124:14, 185:24, 240:11, 241:15, 302:25, 303:3, 304:19, 310:1
**selecting** - 13:17, 13:21
**self** - 52:22, 316:19
**self-defense** - 52:22, 316:19
**send** - 320:3
**sense** - 16:3, 38:22, 64:9, 65:24, 69:19, 70:24, 76:6, 149:14, 150:11, 158:23, 162:20, 163:13, 163:21, 164:1, 164:11, 165:16, 166:10, 167:1, 167:19, 171:2, 171:15, 175:1, 176:20, 201:16, 202:4, 202:17, 210:3, 211:19, 212:23, 214:16, 214:18, 217:23, 222:20, 225:8, 245:22, 270:2, 272:1, 276:17, 277:22, 279:8, 280:3, 283:19, 287:17, 289:1, 289:16, 290:10, 291:4, 315:9, 317:11, 318:8, 318:15, 318:22
**sensitive** - 293:17
**sentence** - 67:23, 76:17, 77:21, 77:22, 79:10, 84:7, 113:14, 127:3, 149:24, 176:25, 178:19, 178:20, 184:12, 184:13, 184:19, 185:5, 185:6, 185:12, 297:2, 307:18, 320:4
**sentenced** - 221:25
**sentencing** - 115:19
**separate** - 154:12, 201:15
**September** - 54:14, 55:9, 57:1
**sequential** - 4:12, 112:4
**series** - 118:8, 238:6
**serious** - 86:4, 86:8, 198:22, 199:24, 316:21, 326:2, 326:4
**Serious** - 198:21
**seriousness** - 326:19
**servant** - 53:10
**serve** - 190:10, 240:11, 241:15, 260:16, 302:25, 303:3, 304:19, 310:1, 329:1
**served** - 6:15, 259:11
**service** - 6:14, 6:17, 6:21, 6:23, 6:25, 10:10, 11:19, 14:14, 14:23, 85:25, 104:4, 104:5, 104:7, 123:5, 134:22, 147:12, 181:21, 256:3, 256:7, 259:9, 269:23, 292:13, 314:15, 320:14
**serving** - 262:15, 318:7, 318:21
**set** - 16:11, 53:4, 55:6, 55:15, 66:3, 66:20, 69:1, 71:10, 83:17, 91:25, 156:7, 169:22, 204:14, 218:5, 269:7, 323:9
**sets** - 26:19
**several** - 84:12, 126:2, 252:5, 280:14
**severe** - 152:6
**sexual** - 261:15
**shade** - 272:13, 272:16
**shadow** - 29:14, 29:18
**shaking** - 76:24
**shape** - 27:5, 27:14, 55:20

**share** - 274:4
**shared** - 316:9
**sharp** - 4:9, 54:24, 55:1
**sheet** - 132:25, 305:1
**shift** - 16:12, 28:2
**shifted** - 236:23
**shifts** - 22:24, 236:21, 236:23
**shirt** - 31:10, 36:3, 39:21, 88:17, 95:8, 97:22
**shoot** - 75:15, 294:13
**shoots** - 165:19
**shop** - 98:18
**short** - 24:20, 54:25, 63:2
**shorten** - 332:9
**shorter** - 133:13
**shorthand** - 1:25
**shot** - 166:5, 171:1, 245:15, 245:25
**Shoultz** - 143:16
**shoved** - 227:23
**Shoved** - 227:24
**show** - 7:5, 98:9, 130:15, 157:18, 171:17, 172:8, 194:6, 213:22, 225:1, 225:3, 251:1, 292:18, 293:6, 296:6, 311:12, 311:14, 311:15
**Show** - 14:16, 14:19, 29:1, 31:7, 34:8, 36:1, 36:23, 80:21, 88:14
**showed** - 227:10, 259:23, 314:19
**showing** - 84:12, 134:21
**shows** - 56:14, 65:10, 211:5, 269:15
**shut** - 47:5
**sic** - 58:7, 133:18, 238:2, 253:16
**side** - 15:3, 77:25, 98:4, 122:15, 126:25, 136:19, 157:14, 176:16, 177:6, 182:7, 191:14, 195:8, 195:21, 195:22, 200:22, 257:13, 293:8, 332:18, 333:5
**sides** - 45:15, 45:19, 51:15, 99:8, 146:2, 157:9, 177:15, 177:20, 178:3, 195:21, 217:12, 226:10, 258:1, 258:8, 291:9, 312:25, 332:8
**sign** - 164:14, 164:15
**significance** - 169:6
**significant** - 213:8
**signing** - 6:10
**silent** - 44:12, 44:13, 44:15, 52:14, 205:23, 205:24
**silly** - 281:12
**Simone** - 3:15, 6:18, 101:4, 105:8
**simple** - 284:15, 314:23
**simply** - 26:11, 267:5, 284:12, 285:5, 285:15
**single** - 32:25, 44:16, 59:11, 100:11, 156:14, 273:9
**sit** - 40:25, 42:1, 42:5, 43:21, 85:7, 107:25, 108:1, 109:18, 115:25, 121:20, 122:2, 122:11, 145:23, 156:14, 180:23, 190:11, 195:17, 196:21, 205:23, 205:24, 213:21, 239:19, 246:17, 247:6, 257:21, 263:11, 263:20, 265:12, 298:23, 312:20, 325:8, 325:9, 326:6
**sits** - 181:7, 204:19, 205:13, 229:6, 265:16

**sitting** - 17:15, 64:6, 75:17, 97:14, 108:25, 109:5, 110:16, 114:8, 115:17, 115:22, 121:16, 125:15, 126:7, 126:11, 127:14, 153:8, 153:18, 165:20, 170:23, 200:22, 227:17, 259:5, 266:4, 314:9, 324:24, 327:3, 327:12
**Sitting** - 314:3, 326:21, 327:3
**situation** - 20:25, 51:18, 75:5, 75:14, 75:19, 128:25, 129:5, 228:8, 232:9, 240:25, 244:12, 244:14, 244:19, 244:21, 245:17, 246:25, 247:2, 247:13, 249:8, 251:6, 251:7, 251:12, 251:16, 251:17, 251:18, 251:21, 252:15, 262:7, 269:6, 279:11, 281:25, 283:16, 289:13, 294:19, 307:23, 333:10
**six** - 4:5, 4:6, 190:20
**Sixteen** - 292:21
**sixth** - 4:16
**skillful** - 178:4, 226:11
**Skip** - 3:14, 17:22, 19:20, 99:3, 102:12, 144:17, 179:23, 232:18, 295:7, 333:14
**skip** - 306:12
**slack** - 183:12
**slam** - 48:13, 48:16, 49:12
**slam-dunk** - 48:13, 48:16, 49:12
**slash** - 175:8
**slashed** - 220:24
**slashing** - 287:3
**Slashing** - 243:15
**slate** - 19:6
**slide** - 22:20, 70:14, 284:24
**slides** - 84:12
**slips** - 104:12
**slot** - 140:8, 140:9
**smack** - 296:18
**small** - 71:25, 95:18, 130:21, 252:10
**smaller** - 102:24, 103:3
**smart** - 234:2
**snack** - 98:18
**snacks** - 332:16
**Snakes** - 46:20
**so-called** - 241:18
**sober** - 177:18
**social** - 192:20, 221:15, 310:7
**society** - 69:25, 70:11, 71:23, 71:25, 72:1, 72:3, 121:24, 129:18, 174:10, 175:11, 179:4, 179:9, 186:8, 190:6, 219:24, 221:4, 221:8, 221:10, 221:11, 221:19, 223:7, 241:24, 285:9, 285:15, 285:16, 287:8, 287:11, 287:13, 287:16, 287:17, 287:23, 289:1, 289:15, 329:10
**Society** - 221:9, 287:14
**solely** - 88:22
**solicits** - 62:12
**solution** - 173:19
**someday** - 241:25
**someone** - 36:8, 36:9, 89:16, 91:20, 95:11, 148:17, 158:17, 171:1, 185:25, 198:22, 210:1, 214:5, 229:2, 233:17, 235:8, 235:23, 237:23, 238:22, 240:22,

241:16, 244:13, 244:14,
247:19, 249:13, 251:8,
252:12, 287:15, 287:21,
304:21, 305:24, 306:8
**sometime** - 92:1, 92:4
**Sometimes** - 163:23,
167:21, 168:12, 170:10,
170:14, 177:7, 207:15,
211:11, 215:8, 216:3,
325:21
**sometimes** - 29:15, 56:24,
106:10, 170:24, 177:10,
183:22, 207:14, 207:15,
215:9, 282:10, 291:8,
325:14
**somewhere** - 70:22,
172:15, 220:11
**son** - 174:17, 174:25
**son's** - 223:22
**sorry** - 20:6, 21:17, 79:11,
94:10, 102:5, 102:25,
117:21, 130:10, 229:25,
242:7, 253:2, 255:14, 260:5,
294:9, 294:16, 294:17,
322:16, 333:9
**Sorry** - 70:16, 72:24
**sort** - 154:11, 176:18,
201:15, 232:22, 242:3,
296:18
**sorts** - 207:12
**sought** - 197:4, 317:19
**Sound** - 196:24, 213:12
**sounds** - 127:25
**Sounds** - 70:1
**source** - 192:25, 310:12
**speaking** - 7:18, 46:21,
46:23, 59:9, 190:5, 271:23
**special** - 69:2, 70:4, 74:4,
80:18, 84:12, 107:19,
109:19, 111:3, 112:15,
114:15, 114:19, 116:18,
119:14, 120:8, 120:10,
120:22, 123:22, 124:4,
126:21, 151:23, 165:6,
167:7, 167:18, 167:23,
171:21, 175:16, 186:1,
188:24, 219:1, 219:12,
225:10, 247:16, 264:15,
284:19, 284:23, 285:13,
289:23, 291:17, 304:16,
305:6
**Special** - 72:4, 72:5, 72:19,
74:3, 74:13, 74:18, 74:20,
76:20, 77:13, 77:14, 171:24,
172:3, 172:6, 249:13,
250:19, 251:6, 285:4,
290:15, 304:22, 305:8,
306:12, 329:9
**specific** - 25:4, 49:2, 58:2,
79:24, 103:22, 280:24,
301:18, 316:11
**specifically** - 57:25, 62:1,
85:20, 285:3, 285:17,
285:19, 290:25
**spectrum** - 178:6, 264:1,
264:11, 328:12
**speeding** - 26:4, 26:10,
30:1
**spend** - 142:21, 154:3
**spending** - 85:14, 258:20
**spent** - 269:23
**split** - 13:8, 85:18
**spot** - 242:5
**Spring** - 293:21
**springs** - 293:22
**stabbed** - 171:1
**stabbing** - 54:23, 54:25,
215:23
**staff** - 89:2
**stage** - 14:12, 67:2, 67:4,

67:8, 68:19, 69:4, 69:5,
69:21, 78:21, 87:23, 294:7
**stake** - 35:16
**stakes** - 208:6
**stand** - 10:12, 18:6, 26:24,
26:25, 27:18, 45:25, 58:22,
59:3, 59:17, 59:21, 63:13,
65:17, 69:8, 83:24, 163:7,
163:20, 210:16, 211:22,
328:25, 330:6, 330:19
**standard** - 28:2, 28:10,
29:18, 29:20, 30:2, 30:11,
30:18, 35:4, 52:19, 66:11,
72:10, 155:25, 270:6,
290:17, 290:18
**standards** - 29:19
**standpoint** - 260:20
**start** - 10:2, 33:17, 47:4,
63:15, 86:21, 89:10, 93:3,
104:2, 159:6, 161:5, 223:9,
271:6, 271:24, 271:25,
288:11, 333:12
**started** - 87:3, 88:3, 227:3,
239:1, 271:5, 271:23
**starting** - 25:14, 34:5,
35:25, 86:10, 86:18, 131:23
**Starting** - 96:12
**starts** - 156:18, 271:19,
271:20
**state** - 26:9, 29:17, 52:18,
53:15, 61:14, 64:3, 64:21,
89:18, 90:11, 321:24
**State** - 1:11, 2:7, 3:4, 4:5,
8:4, 9:8, 11:3, 11:5, 11:18,
12:20, 15:13, 15:19, 16:12,
18:9, 22:23, 23:15, 26:19,
27:16, 28:1, 28:3, 28:23,
29:23, 30:8, 31:19, 33:10,
34:25, 35:14, 36:14, 37:8,
37:17, 39:6, 44:18, 44:22,
45:21, 46:1, 46:13, 48:3,
53:19, 53:25, 54:4, 55:22,
64:16, 65:13, 70:4, 73:7,
73:11, 73:17, 73:21, 75:21,
76:8, 77:11, 98:25, 100:3,
102:1, 102:10, 102:13,
114:24, 128:11, 128:15,
138:5, 144:15, 145:8,
162:12, 182:3, 182:25,
183:22, 192:7, 192:8,
192:15, 195:2, 230:14,
257:7, 262:2, 266:20, 270:3,
275:10, 284:12, 303:5,
309:3, 309:4, 310:1, 312:3,
317:15, 321:19, 331:2,
332:25, 334:2, 334:5
**State's** - 1:5, 4:11, 4:13,
4:14, 4:16, 4:17, 5:4, 5:11,
6:11, 6:17, 7:14, 7:19, 8:20,
4:20, 5:24, 190:1, 190:14,
195:21, 199:6, 299:12,
331:22
**statement** - 163:9, 210:15,
323:24, 324:2, 324:3, 324:6
**Statements** - 163:2
**statements** - 163:3,
210:10, 276:6
**states** - 268:25, 269:1
**States** - 44:24
**station** - 58:11
**status** - 192:21, 310:9
**statute** - 53:4, 55:23,
55:25, 56:21, 222:7
**stay** - 12:24, 63:7, 191:1,
332:3
**stays** - 156:19, 164:9
**stellar** - 221:1
**Step** - 254:25
**step** - 76:7, 98:14, 223:9,
224:8, 249:6, 254:25,

261:12, 286:5, 288:12,
308:24
**step-by-step** - 76:7
**Stephen** - 136:4
**steps** - 125:23, 202:7
**Steve** - 147:2, 259:5,
259:7, 314:3
**stick** - 174:19, 190:22,
191:5, 305:13, 333:4
**still** - 6:18, 32:8, 34:1,
78:1, 88:6, 106:15, 107:16,
107:17, 107:22, 107:23,
109:1, 109:14, 110:17,
110:20, 111:7, 114:16,
116:12, 117:18, 119:15,
120:15, 123:23, 125:17,
151:13, 169:19, 174:8,
191:5, 199:13, 199:14,
228:25, 229:1, 229:10,
230:18, 235:20, 257:11,
320:15, 322:5, 323:25
**stop** - 17:6, 74:19, 76:16,
84:20, 195:13
**stopped** - 26:4, 253:15
**Stoppers** - 163:16
**Stoppers'** - 210:23
**stops** - 72:16
**stories** - 192:23, 310:11
**story** - 45:15, 58:15,
157:9, 157:14, 162:13,
162:14, 177:6, 203:4,
207:25, 210:14
**straight** - 67:13, 104:13,
132:11, 252:3, 294:13
**strangle** - 292:15
**strangled** - 171:1
**strangles** - 212:13
**strangulation** - 215:17,
215:23
**street** - 163:17, 164:5,
227:18, 242:19, 274:21,
287:10
**strengths** - 155:20
**strike** - 4:25, 5:17, 249:11,
252:19, 255:20, 309:18,
309:19
**strikes** - 103:18, 191:18,
191:19
**stroker** - 136:21, 137:5
**strong** - 122:8, 126:6,
159:3, 200:8, 238:17,
238:20
**strongly** - 81:19, 238:22,
295:21
**student** - 20:20, 147:3
**stuff** - 53:20, 61:2, 88:20,
92:15, 155:5, 168:24,
207:12, 209:24, 215:1,
250:4, 308:7
**styled** - 54:10, 54:13, 55:8,
334:11
**subject** - 254:10, 263:11,
289:9
**sudden** - 19:18
**sufficient** - 21:7, 65:10,
77:20, 79:14, 80:6, 92:20,
129:22, 225:19, 225:23,
291:1, 291:12, 308:1
**Sufficiently** - 226:17
**sufficiently** - 178:10,
178:17, 226:16, 291:3
**suggestions** - 53:2
**suggests** - 47:24, 48:22
**suit** - 17:15
**Suite** - 2:15
**suited** - 264:23, 264:24,
320:10
**Sullivan** - 3:7, 8:17,
101:12, 105:6
**summarized** - 8:5, 297:8

**summary** - 8:4, 210:12
**super** - 48:19
**supplied** - 8:4
**support** - 81:1, 82:6,
178:2, 226:9, 325:15,
325:17
**supportive** - 177:23
**supports** - 266:6
**supposed** - 86:24, 91:25,
92:1, 98:15, 128:7, 180:22,
234:3, 243:17, 243:18,
305:21, 305:22
**surgery** - 86:3
**surprised** - 147:8
**suspect** - 6:2
**suspecting** - 231:15
**sustained** - 247:4
**sway** - 81:24
**swayed** - 51:21, 80:25,
81:7, 82:9, 82:22, 83:12,
84:5, 168:16
**swimmer** - 136:8, 136:17,
137:5
**sword** - 64:18
**sworn** - 3:9, 3:10, 3:11,
144:13, 144:24, 194:20,
256:25, 311:21
**system** - 12:9, 16:6, 29:17,
39:17, 44:19, 44:25, 45:4,
46:6, 78:7, 79:23, 83:17,
187:9, 187:12, 188:2,
221:16

## T

**table** - 15:25, 18:5, 72:18,
99:5, 102:3, 102:11, 144:17,
153:2, 223:25, 232:9
**talented** - 225:23
**talks** - 189:8, 274:10,
280:16
**tampered** - 169:5
**Tap** - 313:20
**tape** - 276:11
**taped** - 163:3
**task** - 63:19
**tasked** - 65:3, 71:3
**taught** - 20:15, 20:18,
20:19
**Taylor** - 4:17, 8:19, 121:10,
121:12, 123:5, 131:4,
137:15, 137:23, 138:8,
138:14, 138:17
**team** - 265:6
**tear** - 175:8
**technical** - 169:2
**technically** - 290:18
**technology** - 169:7,
169:25
**teller** - 63:24, 75:25,
166:14, 279:21
**temperature** - 77:5
**Ten** - 84:16, 84:18
**ten** - 72:15, 76:12, 79:6,
79:19, 84:22, 126:24,
152:10, 152:12, 200:16,
200:18, 200:20, 261:22,
263:23, 263:24, 264:4,
264:9, 283:25, 295:12,
295:19, 295:20, 296:16,
297:19, 302:18, 317:5,
328:7, 328:9, 328:11,
328:18
**tend** - 65:21, 166:25,
231:5, 233:6
**tending** - 65:7
**tends** - 234:16
**term** - 269:21, 286:15,
328:6
**terms** - 9:10, 9:18, 10:21,

12:7, 35:1, 66:15, 67:2, 68:6, 72:6, 84:11, 211:5, 255:22, 257:16, 265:8, 267:4, 299:3
**Terrace**- 2:12
**terrible** - 178:1
**terribly** - 10:16
**tested** - 208:21
**testified** - 145:2, 177:24, 194:22, 257:2, 311:23
**testifies** - 210:1, 272:6, 279:22
**testify** - 45:8, 45:10, 45:11, 45:25, 46:4, 46:8, 46:11, 46:19, 46:24, 47:3, 47:9, 48:4, 48:14, 48:16, 49:3, 49:5, 49:8, 49:10, 50:11, 50:16, 50:25, 58:8, 64:16, 153:23, 160:4, 160:6, 161:1, 161:16, 163:7, 165:6, 166:2, 167:6, 167:9, 182:18, 206:10, 206:19, 206:23, 207:3, 209:14, 210:2, 211:12, 211:14, 211:15, 211:25, 231:1, 237:16, 237:17, 237:23, 270:17, 276:13, 278:6, 278:9, 278:14, 279:19, 299:9, 299:14
**testifying** - 45:9, 50:1, 65:16, 65:19, 167:17, 271:24, 302:8
**testimony** - 27:17, 38:19, 58:1, 58:3, 58:13, 58:14, 64:14, 65:2, 65:6, 65:7, 65:20, 66:4, 66:21, 165:15, 167:8, 168:17, 193:18, 207:17, 208:1, 208:8, 209:16, 209:20, 212:1, 212:5, 265:17, 271:6, 271:10, 271:14, 271:16, 275:4, 276:12, 278:4, 278:10, 278:19, 278:21, 279:5, 280:7, 291:11, 319:15, 319:21, 327:10, 333:13
**Texas**- 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:4, 11:3, 26:9, 29:17, 52:18, 53:15, 54:7, 54:8, 61:14, 61:20, 64:4, 64:21, 98:25, 102:1, 102:10, 144:15, 145:8, 149:23, 150:16, 158:2, 192:16, 195:3, 198:16, 199:2, 201:12, 222:14, 239:11, 245:22, 257:8, 261:7, 261:25, 262:22, 266:15, 266:20, 268:4, 269:2, 270:4, 284:8, 284:10, 310:2, 312:3, 316:17, 316:20, 317:2, 317:4, 317:10, 317:13, 319:18, 321:19, 323:1, 334:2, 334:6, 334:19, 334:22
**thankfully** - 284:15
**theft** - 232:8
**theirs** - 278:24
**themselves** - 38:10, 46:22, 165:12, 245:18, 245:24, 302:13
**theory** - 34:19, 224:22, 326:11
**therefore** - 35:17, 185:3, 301:25
**Theron**- 3:9, 8:5, 99:24, 105:6
**they've** - 28:13, 39:9, 48:15, 48:22, 70:7, 304:13, 305:17
**thin** - 303:17

**thinking** - 151:2, 153:21, 200:25, 207:18, 230:12, 230:14, 235:12, 235:17, 235:19, 236:20, 236:24, 298:4
**thinks** - 246:8
**third** - 4:16, 16:25, 35:6, 60:14, 63:10, 80:9, 84:21, 103:19, 225:10, 329:13
**thoroughly** - 76:23
**thoughts** - 11:25, 259:25, 260:9
**threat** - 69:25, 70:11, 129:18, 153:15, 172:4, 174:9, 174:10, 186:4, 186:8, 186:12, 189:9, 189:19, 190:6, 219:3, 219:19, 219:24, 220:1, 221:8, 223:7, 241:23, 242:16, 242:23, 242:25, 243:24, 244:16, 245:4, 246:2, 246:8, 248:14, 251:9, 285:5, 285:9, 285:16, 287:8, 287:22, 287:23, 289:1, 289:15, 305:11, 305:18, 305:20, 306:3, 306:10, 306:24, 307:12, 329:10
**threats** - 287:4
**Three**- 224:18, 236:22, 328:22, 328:23
**three** - 43:9, 52:6, 57:5, 66:18, 69:9, 94:14, 102:20, 171:17, 176:7, 178:24, 186:1, 219:1, 236:21, 236:22, 271:4, 284:18, 284:19, 297:3, 297:16, 300:21, 312:19, 319:23, 320:1, 328:21
**throughout** - 6:4, 156:19, 205:21, 219:13, 264:14, 266:23, 270:12
**throw** - 267:4
**Thursday**- 136:5, 137:20, 138:22, 138:24, 139:3, 139:11, 139:22, 140:6, 140:9
**ticket** - 26:3, 26:5, 26:10, 26:13, 26:14, 30:1, 199:12, 273:23
**tickets** - 90:4, 93:23
**tie** - 179:4, 265:15, 279:7, 303:1, 326:21
**ties** - 279:25
**timing** - 332:20
**tips** - 163:16, 210:23
**tipsters** - 163:20, 210:22
**tired** - 76:25, 80:10, 325:3
**Tired**- 325:2
**tires** - 175:8, 220:24, 243:15, 287:4
**Tise**- 2:3, 3:17, 4:7, 4:14, 4:17, 4:23, 5:9, 7:10, 8:17, 18:10, 18:11, 99:7, 99:11, 100:4, 100:12, 101:7, 101:13, 101:15, 102:14, 106:24, 108:7, 108:11, 110:2, 111:11, 112:21, 112:23, 113:5, 113:9, 113:13, 113:16, 113:18, 115:1, 115:3, 116:25, 117:1, 118:22, 121:2, 123:6, 124:12, 124:13, 124:23, 125:1, 127:19, 128:24, 129:7, 129:10, 129:16, 129:21, 130:5, 130:10, 130:12, 138:4, 140:7, 144:10, 144:19, 146:10, 146:11, 146:13, 146:22, 171:17, 171:19, 171:20, 171:25, 172:3, 179:15,

191:24, 192:8, 196:5, 196:6, 196:8, 218:20, 218:22, 224:18, 224:19, 224:20, 232:12, 244:5, 244:8, 247:5, 249:1, 250:20, 250:21, 251:20, 252:6, 253:6, 253:7, 254:22, 254:23, 255:3, 255:4, 259:3, 314:1, 333:7, 333:14, 333:22
**tissue** - 97:11
**Today**- 13:12, 259:19
**today** - 9:6, 9:15, 9:17, 9:18, 9:25, 10:17, 12:2, 12:24, 12:25, 13:7, 14:1, 14:8, 45:13, 85:12, 86:2, 90:24, 91:2, 91:3, 103:13, 127:5, 131:10, 131:13, 131:16, 134:21, 180:18, 181:7, 181:20, 183:15, 184:22, 187:3, 188:17, 193:4, 193:21, 204:19, 233:21, 235:25, 236:11, 236:12, 236:21, 237:3, 237:11, 237:20, 237:22, 239:19, 255:25, 256:3, 256:6, 256:9, 258:21, 258:24, 260:25, 265:12, 265:22, 308:8, 310:25, 316:14, 320:14, 321:17, 321:19, 322:21, 325:9, 325:23, 326:20, 326:22, 327:3, 331:12, 331:16, 331:25, 332:6, 333:24
**Todd**- 141:5
**together** - 25:6, 64:2, 85:11, 146:25, 187:20, 213:16, 333:17, 333:21
**tomorrow** - 132:2, 132:11, 133:23, 134:2, 134:13, 137:20, 140:5
**Tomorrow**- 134:5, 134:6, 134:9, 134:10, 134:14
**ton** - 322:14
**took** - 58:22, 64:8, 158:14, 174:20, 233:13, 235:23
**tooth** - 81:17
**top** - 206:24, 332:3
**topics** - 312:13
**total** - 29:11, 256:24
**totally** - 152:11, 177:18
**touched** - 26:1, 40:16, 145:16, 166:16
**toward** - 121:1
**towards** - 13:17, 14:1, 19:20, 35:1, 49:5, 97:18, 109:8, 237:16, 327:18
**Towse**- 111:19, 135:18
**Towse-paulk**- 111:19, 135:18
**Tracy**- 1:15, 5:20, 100:21, 104:18
**trade** - 140:8
**traffic** - 26:3, 26:13, 38:5, 199:12, 273:22
**training** - 59:23, 89:20, 90:10, 96:16, 96:17, 96:23, 97:4
**transaction** - 245:20
**transcription** - 334:7
**transcription/stenograph** - 1:25
**transpire** - 49:9
**transposed** - 40:1, 40:20
**travel** - 293:5
**Travis**- 4:22, 5:14, 131:11, 194:12, 194:21, 195:1, 249:22, 309:16, 309:19
**treat** - 318:11
**treated** - 160:13, 231:8, 278:19, 278:22

**treatment** - 273:13, 294:8
**Trial**- 1:3, 310:2
**trial** - 6:4, 9:8, 10:19, 12:8, 12:9, 12:12, 13:19, 19:10, 22:8, 25:5, 26:9, 65:22, 67:2, 69:5, 69:21, 75:21, 76:8, 87:21, 95:11, 117:9, 154:9, 154:10, 154:18, 154:22, 156:15, 157:2, 183:15, 184:16, 185:12, 189:8, 190:17, 192:15, 193:8, 201:9, 201:22, 202:9, 204:10, 205:21, 206:14, 218:23, 231:19, 233:18, 235:8, 235:24, 238:21, 240:15, 245:11, 245:12, 245:13, 265:11, 266:13, 266:23, 270:12, 270:19, 270:20, 270:23, 276:9, 278:6, 284:8, 284:11, 288:14, 288:16, 291:23, 293:24, 300:2, 300:3, 300:5, 302:12, 306:25, 310:1, 315:16, 319:19, 319:22
**trials** - 154:12, 201:13, 201:15, 271:11
**tried** - 11:3, 227:10, 298:11
**trier** - 37:24
**triers** - 57:22, 64:23
**tries** - 63:21
**trigger** - 79:1, 166:4, 166:17, 166:21, 212:12
**trouble** - 160:7, 160:9, 209:17, 233:17, 235:8, 235:23
**True**- 203:21, 205:7, 205:18, 207:21, 210:7, 215:14, 217:24, 224:6, 236:18, 245:1, 247:8, 323:19
**true** - 34:18, 34:20, 168:12, 168:18, 168:24, 260:17, 307:19, 316:3, 334:7
**Trulove**- 1:19, 8:21, 99:19, 104:20
**truly** - 181:12, 244:1, 334:14
**trust** - 209:6, 209:8, 315:25
**trusts** - 162:7
**truth** - 10:21, 243:19, 243:20, 243:25, 272:13, 272:16
**truthful** - 11:12, 257:17
**truthfully** - 118:14, 120:9, 254:6
**Try**- 313:20
**try** - 13:5, 22:4, 102:25, 103:11, 140:22, 142:21, 196:16, 242:3, 262:8, 278:24, 299:22, 299:25, 307:20, 332:16, 333:4, 333:7
**trying** - 42:13, 66:8, 128:24, 227:12, 227:16, 236:19, 236:24, 237:1, 238:18, 238:23, 257:15, 259:4, 303:1, 312:15, 314:2, 322:24
**turn** - 21:22, 52:16, 146:9, 196:3, 307:10, 308:1, 313:7, 332:1
**Tv**- 29:15, 268:23, 280:16
**tweak** - 264:5
**twelve** - 13:17, 72:15, 79:5, 79:17, 265:7
**Twelve**- 84:14, 84:18, 84:22

**twice** - 94:14
**twist** - 186:25
**Twitter**- 192:20, 310:8
**Two**- 97:5
**two** - 4:8, 4:13, 7:4, 10:3, 13:2, 13:4, 13:18, 14:2, 37:25, 38:19, 40:1, 45:15, 48:2, 53:11, 53:16, 54:11, 55:3, 55:5, 55:14, 55:15, 57:4, 57:5, 61:22, 65:9, 66:6, 70:12, 75:7, 75:14, 78:9, 85:2, 85:24, 87:4, 89:18, 96:8, 105:14, 108:22, 115:13, 119:7, 143:18, 146:24, 149:18, 150:7, 154:10, 154:12, 155:5, 164:7, 177:15, 177:20, 178:3, 193:18, 201:13, 201:15, 202:6, 202:7, 226:10, 231:24, 245:15, 245:20, 245:25, 246:3, 261:20, 262:1, 262:18, 266:13, 284:8, 294:6, 296:8, 296:15, 297:10, 317:6, 317:13, 323:2
**Tyler**- 3:11, 8:23, 101:3, 105:7
**type** - 10:24, 13:7, 20:24, 21:2, 29:24, 49:12, 53:3, 64:20, 72:2, 90:2, 103:5, 152:8, 158:17, 192:24, 252:15, 260:14, 263:7, 263:15, 270:21, 275:18, 275:22, 276:3, 279:17, 279:25, 281:7, 282:12, 310:12, 320:7, 320:24, 321:8
**types** - 11:19, 53:6, 53:12, 53:16, 72:2, 149:6, 149:8, 152:1, 159:18, 201:16, 261:15, 262:25, 264:23, 264:24, 270:21, 275:14, 276:8, 287:19, 293:2, 316:21, 317:9
**typically** - 293:25

## U

**ultimate** - 57:22, 69:14
**ultimately** - 217:16, 222:18, 225:22, 265:20, 271:17, 282:14, 283:14, 283:17, 284:17, 291:18, 319:12, 319:16, 326:7, 327:5, 327:11, 329:2, 329:15
**Ultimately** - 285:14
**unable** - 184:3, 257:21
**unanimous** - 33:16, 72:12, 72:14, 76:13, 84:15, 84:18
**unanimously** - 76:11
**unclear** - 51:5, 129:14
**uncomfortable** - 21:6, 51:23, 145:19
**uncommon** - 250:21
**uncovered** - 39:8
**under** - 11:21, 30:17, 53:7, 53:17, 61:19, 65:3, 111:4, 149:8, 164:19, 171:9, 182:11, 198:11, 206:19, 221:22, 231:8, 244:18, 252:2, 252:6, 256:6, 261:25, 262:6, 262:8, 317:4
**underlying** - 288:20
**understood** - 90:20, 290:13
**unfolding** - 56:20
**unfortunately** - 294:5
**Unfortunately** - 304:13
**unison** - 9:2, 16:18, 16:20, 17:24, 18:3, 18:8, 18:12, 18:15, 27:22, 60:9, 64:10, 74:15, 77:2, 77:7
**United** - 44:24
**unknown** - 4:10, 55:13, 158:9, 171:5, 215:21, 216:8
**unlawful** - 62:19
**unlawfully** - 54:16, 55:10
**unless** - 22:21, 28:18, 65:6, 84:3, 128:6, 164:14, 164:25, 229:24, 230:2, 307:5, 307:7
**up** - 10:12, 10:13, 13:8, 15:18, 16:22, 18:6, 18:18, 19:2, 19:17, 21:22, 22:1, 22:19, 23:16, 23:21, 27:16, 30:1, 34:11, 35:9, 36:24, 38:11, 38:25, 40:12, 41:15, 42:19, 43:9, 43:11, 45:14, 45:25, 46:14, 46:23, 47:1, 47:21, 47:22, 49:4, 51:22, 53:14, 61:6, 62:2, 62:21, 63:16, 63:24, 65:24, 69:9, 70:17, 83:17, 84:13, 85:18, 103:5, 103:6, 103:12, 103:16, 103:22, 104:2, 104:11, 105:17, 131:6, 131:24, 132:12, 136:1, 142:12, 150:17, 153:1, 155:14, 159:4, 161:14, 162:11, 164:14, 164:15, 173:19, 175:8, 177:4, 182:2, 184:4, 185:6, 186:24, 187:20, 188:25, 190:20, 192:1, 198:1, 198:5, 199:15, 213:7, 213:22, 214:24, 217:15, 224:9, 225:22, 226:14, 227:10, 240:7, 244:20, 259:6, 259:23, 264:15, 265:13, 271:8, 272:10, 274:19, 280:9, 284:4, 287:11, 291:21, 293:17, 293:25, 302:22, 305:15, 306:16, 306:17, 309:12, 313:18, 314:19, 329:7, 332:12, 333:1
**uphold** - 209:6
**upper** - 264:4
**upset** - 234:7, 235:20
**upside** - 242:22
**upside-down** - 242:22
**upstanding** - 174:22, 273:8
**urged** - 249:3
**urges** - 175:23
**user** - 226:4
**usual** - 197:13
**Ut**- 91:13

## V

**vacation** - 86:22
**vacillating** - 250:15, 250:16
**vacuum** - 153:6
**Vaguely** - 289:5
**valid** - 92:18
**various** - 149:8
**venire** - 6:14, 6:15, 6:17, 6:23, 6:25, 8:5, 99:1, 102:2, 102:14, 145:8, 195:2, 257:7, 312:3
**Venireperson** - 1:6, 1:8, 1:12, 1:14, 1:16, 1:18, 1:20, 1:22, 1:24, 2:1, 2:3, 2:5, 2:7, 2:9, 2:11, 2:13, 2:15, 2:17, 2:19, 2:21, 2:23, 3:1, 3:3, 3:5, 3:7, 3:9, 3:11, 3:13, 3:15, 3:17, 3:19, 3:21, 3:23, 4:1, 4:3, 4:5, 4:7, 4:9, 5:7, 5:9, 5:12, 5:20, 5:22, 5:24, 6:1, 6:3, 6:5, 6:7, 6:9, 6:13, 6:15, 6:19, 6:21, 6:23, 6:25, 7:2, 7:4, 7:8, 7:10, 7:12, 7:15, 7:17, 7:21, 7:23, 7:25, 8:2, 8:4, 8:6, 8:8, 8:10, 8:12, 8:14, 8:16, 8:18, 8:21, 8:23, 9:1, 17:5, 18:20, 18:23, 19:2, 19:11, 19:23, 20:1, 20:5, 20:7, 20:10, 20:14, 20:18, 20:21, 21:3, 21:10, 21:15, 21:20, 22:3, 22:13, 23:1, 23:5, 23:9, 23:18, 23:20, 23:23, 24:2, 24:7, 24:12, 24:14, 24:18, 25:18, 29:3, 29:7, 29:9, 30:12, 30:15, 30:19, 30:22, 30:25, 31:4, 31:11, 31:15, 31:21, 31:24, 32:10, 32:13, 32:15, 32:20, 32:25, 33:2, 33:7, 34:3, 34:12, 34:14, 34:16, 35:10, 35:13, 36:4, 36:7, 36:11, 36:17, 37:1, 37:4, 37:14, 37:16, 38:23, 39:3, 40:3, 40:7, 40:10, 40:14, 40:19, 41:2, 41:11, 41:13, 41:16, 41:22, 41:24, 42:2, 42:7, 42:9, 42:20, 42:22, 43:3, 43:14, 44:4, 47:13, 47:20, 48:6, 48:10, 48:15, 48:21, 49:4, 49:13, 49:17, 49:21, 49:23, 49:25, 50:6, 50:10, 50:17, 50:23, 51:8, 51:20, 52:4, 56:8, 56:11, 57:13, 60:19, 60:21, 61:2, 68:1, 68:3, 68:15, 72:22, 72:24, 73:1, 73:23, 77:1, 80:24, 81:4, 81:8, 81:22, 81:24, 82:11, 82:13, 82:18, 82:20, 83:2, 83:4, 83:6, 83:11, 84:4, 86:14, 86:16, 86:23, 87:2, 87:7, 87:20, 87:25, 88:4, 88:7, 88:19, 88:25, 89:18, 89:25, 90:3, 90:5, 90:7, 90:10, 90:19, 91:9, 91:13, 91:22, 91:24, 92:5, 92:9, 92:12, 92:23, 93:1, 93:8, 93:17, 93:19, 93:22, 94:5, 94:12, 94:16, 94:19, 94:25, 95:9, 95:14, 95:17, 95:24, 96:1, 96:5, 96:8, 96:14, 96:19, 96:21, 97:5, 97:9, 97:11, 97:16, 97:23, 97:25, 105:25, 106:8, 106:12, 106:20, 107:8, 107:22, 107:24, 108:3, 108:20, 109:3, 109:16, 109:21, 110:11, 110:18, 110:21, 111:5, 111:8, 111:20, 112:3, 112:9, 112:18, 113:3, 113:7, 113:12, 113:15, 113:17, 113:19, 114:3, 114:17, 114:23, 115:24, 116:2, 116:13, 116:21, 116:23, 117:20, 117:22, 117:25, 118:5, 118:15, 118:20, 119:16, 119:19, 119:21, 119:25, 120:17, 120:25, 121:21, 122:12, 122:20, 122:24, 123:2, 123:14, 123:24, 124:7, 124:10, 124:22, 124:25, 125:10, 125:18, 125:21, 126:1, 126:12, 126:22, 127:2, 127:11, 127:17, 128:3, 128:19, 129:4, 129:9, 129:12, 129:15, 129:20, 129:25, 132:4, 132:17, 134:18, 135:5, 135:10, 135:17, 136:2, 136:7, 136:10, 136:20, 136:25, 137:7, 137:16, 137:19, 138:18, 139:1, 139:7, 139:13, 139:19, 139:21, 139:25, 140:4, 140:21, 140:24, 141:4, 141:8, 141:11, 141:15, 142:1, 142:3, 142:11, 142:14, 142:17, 142:19, 143:7, 143:9, 143:11, 144:1, 144:13, 144:25, 145:1, 191:15, 192:13, 194:3, 194:20, 194:21, 249:9, 253:25, 254:4, 255:2, 256:1, 256:13, 256:15, 256:25, 257:1, 309:2, 309:24, 310:19, 311:9, 311:17, 311:21, 311:22, 331:17, 331:20, 331:21
**Venirepersons** - 9:2, 16:18, 16:20, 17:24, 18:3, 18:8, 18:12, 18:15, 27:22, 60:9, 64:10, 74:15, 77:2, 77:7
**verbiage** - 71:4
**verdict** - 28:6, 28:8, 33:14, 34:2, 36:15, 69:18, 76:13, 106:5, 106:18, 107:13, 109:11, 109:18, 110:24, 111:25, 112:15, 114:12, 114:19, 116:8, 117:14, 118:17, 119:11, 120:21, 122:11, 123:18, 126:15, 127:14, 128:11, 159:1, 203:1, 205:3, 207:25, 291:25, 305:1, 319:16
**Veronica** - 3:17, 6:9, 101:4, 105:9
**versus** - 11:18, 144:15
**victim** - 5:13, 158:3, 170:6, 202:13, 281:23, 282:1
**video** - 155:21, 207:12
**videos** - 207:15
**videotape** - 203:20, 203:23
**view** - 38:17, 59:16, 297:2
**viewed** - 301:20
**violate** - 52:1, 108:1, 109:17, 122:4, 122:8, 122:22, 124:18, 163:21, 329:20, 330:16
**violating** - 120:13
**Violence** - 243:13
**violence** - 69:24, 70:10, 71:7, 71:9, 71:14, 71:17, 172:10, 172:25, 173:5, 175:3, 175:6, 220:7, 220:16, 220:23, 221:1, 221:7, 241:24, 243:12, 285:8, 286:13, 286:15, 286:16, 286:22, 286:23, 287:2, 287:5
**Virginia** - 3:5, 7:15, 99:22, 105:4
**visit** - 95:21, 258:22, 261:4, 262:19, 265:9, 267:1, 284:22, 321:13, 329:12
**visiting** - 313:16
**voice** - 313:24
**void** - 73:14
**voir** - 3:21, 5:6, 5:11, 5:20, 6:3, 6:6, 7:4, 7:8, 7:22, 10:20, 12:21, 12:25, 13:2, 13:10, 13:13, 13:21, 17:16, 35:2, 85:17, 85:19, 90:23, 91:2, 91:17, 92:8, 102:16, 103:21, 115:18, 132:12, 133:7, 133:12, 138:10,

140:15, 144:20, 145:11, 145:16, 148:5, 195:5, 195:11, 228:24, 230:19, 231:1, 251:3, 257:11, 258:8, 277:2, 312:7, 329:7
**Voir** - 1:16, 1:2, 4:20, 5:8, 8:24, 145:4, 146:12, 179:19, 194:24, 196:7, 232:14, 244:7, 254:8, 257:4, 258:15, 295:5, 311:25, 313:10
**volume** - 334:10
**Volume** - 1:2, 1:1, 5:6
**Volumes** - 1:2
**Vonplonski** - 100:21
**Vonpolnski** - 1:13, 9:1, 104:17
**vote** - 33:19, 68:22, 69:16, 128:13, 151:11, 204:22, 204:23, 238:13, 246:12, 297:13, 303:6, 304:3
**votes** - 79:5, 79:6, 79:17, 79:19, 84:14, 84:16, 84:18, 84:19, 84:22, 219:8
**voting** - 83:18, 302:1
**Vs** - 1:9
**vs** - 3:4, 11:3, 98:25, 102:1, 102:10, 145:8, 192:16, 195:3, 257:8, 310:2, 312:3

## W

**waistband** - 227:21
**wait** - 58:8, 59:5, 60:2, 133:3, 133:23, 134:6, 134:10, 134:14, 139:23, 209:14, 210:2, 245:15, 253:18, 273:13
**waiting** - 4:2, 99:2, 193:11, 314:9
**waits** - 217:22
**waive** - 6:23, 6:25
**waiver** - 6:14
**waiving** - 6:17
**Walker** - 143:12, 143:13, 143:15
**walking** - 58:18, 287:10
**Wallace** - 5:25
**walls** - 287:15
**Walsh** - 147:2, 259:5, 314:3
**wants** - 148:16, 162:6, 180:12, 203:4, 207:4, 251:2
**warning** - 333:3
**warrant** - 77:21
**Washington** - 93:1
**washy** - 122:13
**waste** - 257:16
**watch** - 63:20, 168:23, 192:18, 213:21, 310:6
**watching** - 227:18
**Wayne** - 135:24
**ways** - 26:3, 55:5, 55:16, 58:21, 155:5, 193:9, 252:5, 304:14
**weaknesses** - 155:20
**weapon** - 4:10, 54:24, 54:25, 155:10, 207:11, 227:4, 271:2
**wear** - 161:25
**wears** - 217:21
**wedding** - 86:3, 89:19, 89:23, 90:2, 93:19, 93:20
**Wednesday** - 135:1, 135:8, 135:12, 135:15, 135:19, 135:22, 136:1
**week** - 6:16, 93:4, 94:14, 96:25, 97:1, 137:17, 138:1, 138:2, 333:15, 333:18,

333:19, 333:20
**weekend** - 91:16, 93:24
**weeks** - 13:2, 13:4, 13:21, 14:3, 85:24, 87:4, 87:9, 88:1, 96:8, 193:19, 231:24, 294:5
**Weeks** - 87:25
**weight** - 179:12, 213:10
**weird** - 186:25
**welcome** - 140:22
**what-ifs** - 264:16
**whatnot** - 263:13, 293:2
**whatsoever** - 26:23, 39:2, 45:10, 66:19
**Whereas** - 269:6
**whereas** - 269:9
**whichever** - 248:23
**white** - 31:10, 93:16
**whole** - 41:6, 106:10, 106:14, 156:19, 180:19, 196:18, 212:16, 218:23, 224:22, 281:18, 322:6, 326:13
**wielded** - 224:23
**wields** - 212:13
**wife** - 94:16, 148:14, 231:12, 231:14
**wiggle** - 37:17
**William** - 7:6, 10:6, 132:8
**willing** - 129:10, 252:10
**willingly** - 205:9
**Willis** - 105:24, 131:24, 132:1, 132:5
**wish** - 203:2, 204:11, 218:8, 311:5
**wishy** - 122:13
**wishy-washy** - 122:13
**withdrawing** - 106:23
**Withdrawing** - 106:25
**Witness** - 93:25, 334:16
**witness** - 5:24, 6:2, 26:23, 26:25, 27:17, 27:18, 28:19, 37:25, 38:12, 38:13, 38:14, 38:16, 38:18, 57:9, 57:11, 57:21, 58:1, 58:3, 58:7, 59:5, 59:17, 60:6, 61:12, 64:14, 64:20, 64:24, 66:4, 66:11, 66:15, 69:7, 83:24, 131:16, 131:20, 162:8, 163:6, 163:10, 163:19, 166:20, 169:16, 207:17, 207:25, 208:8, 210:10, 210:15, 217:10, 231:6, 233:7, 233:11, 238:1, 253:16, 271:6, 271:10, 271:14, 271:16, 271:19, 271:21, 272:9, 273:12, 276:5, 278:11, 278:12, 278:13, 278:15, 278:17, 279:5, 279:21, 280:6, 280:25, 281:6, 302:5, 302:6, 302:7, 302:13, 330:19
**witness'** - 65:2, 66:21
**witnessed** - 283:4
**witnesses** - 37:25, 38:6, 38:7, 38:19, 57:8, 57:20, 57:24, 58:5, 69:6, 159:20, 159:21, 160:4, 160:5, 160:14, 160:25, 161:1, 161:6, 161:16, 163:3, 163:23, 168:14, 198:23, 199:5, 207:24, 208:1, 209:4, 210:13, 215:1, 215:11, 276:12, 281:4, 283:2, 299:19, 301:20, 319:21
**Witnesses** - 271:2, 279:13
**witnesses'** - 271:18
**woman** - 238:8
**wonder** - 15:23, 15:24, 151:2, 155:8, 155:9, 155:10,

167:5, 202:24, 204:4, 204:10, 206:17, 216:25, 217:1, 217:3, 293:12
**wonderful** - 217:9
**wondering** - 15:23, 156:5, 167:8, 236:23, 238:21, 241:11, 297:21
**wonders** - 155:19, 218:5
**Wood** - 2:4, 3:18, 3:19, 8:3, 18:13, 18:14, 99:7, 101:9, 102:13, 136:22, 140:12, 144:18, 146:23, 166:21, 258:11, 258:12, 258:14, 258:16, 259:3, 284:1, 284:2, 308:20, 309:4, 313:8, 313:9, 313:11, 313:21, 314:1, 330:14, 331:1
**Wood's** - 330:11
**word** - 45:2, 71:5, 74:5, 163:17, 172:7, 181:14, 220:8, 285:17, 285:18, 285:19, 285:24
**Word** - 5:6
**words** - 27:4, 28:3, 58:8, 65:12, 72:10, 90:23, 120:21, 122:17, 159:9, 174:9, 187:5, 220:17, 248:19, 286:12, 287:4, 330:9
**workers** - 221:15
**works** - 45:21, 115:20, 119:23, 147:3, 154:20, 164:17, 166:22, 178:6, 205:8, 215:19, 226:19, 303:19
**world** - 19:15, 51:17, 161:16, 262:22, 270:25, 276:10, 283:3, 285:13
**worried** - 214:10, 235:19
**worry** - 231:22, 311:7
**worth** - 46:12
**worthy** - 324:22, 325:10
**Wow** - 151:2
**wrap** - 45:17
**write** - 163:1
**writing** - 334:9
**written** - 83:8, 163:3, 235:7, 276:6
**wrote** - 44:1, 233:11, 258:23, 319:2

## Y

**Y'all** - 80:10
**y'all** - 19:2
**year** - 89:4, 95:19, 96:17, 241:15, 303:2, 303:3, 303:4, 304:18, 304:20, 317:25
**years** - 28:12, 73:3, 88:23, 149:23, 168:19, 171:13, 215:11, 215:13, 222:2, 259:15, 262:15, 281:16, 281:19, 292:21, 300:21, 303:14, 303:15, 303:16, 318:7, 318:22, 330:22
**yellow** - 96:13, 97:22, 265:15, 326:21
**yesterday** - 215:3, 300:7
**you-all** - 11:22, 16:8
**you-can't-pick-five** - 296:3
**young** - 187:17, 223:18, 238:8
**younger** - 261:22
**yourself** - 28:18, 44:21, 44:23, 47:8, 59:18, 128:16, 151:2, 152:9, 161:6, 163:7, 179:2, 179:8, 187:5, 187:10, 200:17, 203:25, 223:3, 224:11, 233:3, 240:2, 240:23, 241:25, 296:18
**yourselves** - 11:14

## Z

**Zink** - 139:10, 139:11