REPORTER'S RECORD

**VOLUME 9 OF 35 VOLUMES**

TRIAL COURT CAUSE NO. 1384794

COURT OF CRIMINAL APPEALS NO. AP-77,025


| | | |
|---|---|---|
| OBEL CRUZ-GARCIA | ) | IN THE DISTRICT COURT |
| Appellant | ) | |
| | ) | |
| VS. | ) | HARRIS COUNTY, TEXAS |
| | ) | |
| THE STATE OF TEXAS | ) | |
| Appellee | ) | 337TH JUDICIAL DISTRICT |


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**VOIR DIRE PROCEEDINGS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


On the 7th day of June, 2013, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Renee Magee,

Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by computer-aided

transcription/stenograph shorthand.

1                    **A P P E A R A N C E S**

2

3

4        MS. NATALIE TISE
         SBOT NO. 00795683
         MR. JUSTIN WOOD
5        SBOT NO. 24039247
         Assistant District Attorneys
6        1201 Franklin
         Houston, Texas  77002
7        PHONE:  713.755.5800
         **ATTORNEYS FOR THE STATE OF TEXAS**
8

9

10               **- AND -**

11

12       MR. R.P. 'SKIP' CORNELIUS
         SBOT NO. 04831500
         2028 Buffalo Terrace
13       Houston, Texas  77019-2408
         PHONE:  713.237.8547
14

15       MR. MARIO MADRID
         SBOT NO. 00797777
         440 Louisiana, Suite 1225
16       Houston, Texas  77002-1659
         PHONE:  713.877.9400
17       **ATTORNEYS FOR THE DEFENDANT**

18

19

20       Rolando Hernandez
         Marilu Flores,
21       **Interpreters**

22

23

24

25

```
 1                        I N D E X
                          VOLUME 9
 2              (VOIR DIRE PROCEEDINGS)

 3   JUNE 7, 2013
                                          PAGE/VOL.
 4
     (INDIVIDUAL QUESTIONING OF PROSPECTIVE JURORS)
 5
     PROSPECTIVE JURORS
 6                                 VOIR DIRE  PAGE/VOL.
     TODD CHAYKOSKY, NO. 58           3,6          9
 7   Excused by agreement             17           9

 8   MAURA DENMAN, NO. 62             19,20        9
                                      49           9
 9   State's strike                        58      9

10   CLARENCE ANDERSON, NO. 70        60,61        9
                                      86           9
11   Defense strike                        111     9

12   PATRICIA RIVERA LOPEZ, NO. 69    113,115      9
                                      129,130      9
13                                    137,151      9
     State's Challenge for Cause            158     9
14   Court's ruling                        159     9

15   NANCEE PYPER, NO. 64             163,164      9
                                      190          9
16   Accepted as a Juror                   213     9

17   KEITH BOWERS, NO. 72             215,218      9
                                      243          9
18   State's strike                        248     9

19   Reporter's Certificate                250     9

20   Word Glossary..............................End of Volume

21          ALPHABETICAL VENIREPERSON INDEX

22                                 VOIR DIRE  PAGE/VOL.
     ANDERSON, CLARENCE, NO. 70       60,61        9
23                                    86           9
     Defense strike                        111     9
24
     BOWERS, KEITH, NO. 72            215,218      9
25                                    243          9
     State's strike                        248     9
```

```
 1
    CHAYKOSKY, TODD, NO. 58          3,6              9
 2  Excused by agreement            17               9

 3  DENMAN, MAURA, NO. 62           19,20            9
                                    49               9
 4  State's strike                         58        9

 5  LOPEZ, PATRICIA RIVERA, NO. 69  113,115          9
                                    129,130          9
 6                                  137,151          9
    State's Challenge for Cause            158       9
 7  Court's ruling                         159       9

 8  PYPER, NANCEE, NO. 64           163,164          9
                                    190              9
 9  Accepted as a Juror                    213       9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Open court, defendant present, no jury
 2               panel)
 3                    THE COURT:  Back on the record in Cause
 4     No. 1384794.  It's Friday, June 7th, and we do have six
 5     jurors to question today.  Present at the courtroom
 6     table is Mr. Obel Cruz-Garcia, and his lawyers, Mr. Skip
 7     Cornelius and Mario Madrid.  Present for the prosecution
 8     is Natalie Tise and Justin Wood.  And we have the
 9     intern, Steve Walsh, for the district attorney's office.
10                    We're ready to proceed with Juror No. 56,
11     David Ball.
12                    MR. CORNELIUS:  58.
13                    THE COURT:  58.  Juror No. 58, Todd
14     Chaykosky.
15                    Please bring him in, deputy.
16                    (Venireperson sworn)
17          TODD CHAYKOSKY, VENIREPERSON NO. 58,
18     was called as a prospective juror, and testified as
19     follows:
20                         VOIR DIRE EXAMINATION
21     BY THE COURT:
22          Q.   Good morning.  Is it Mr. Chaykosky?
23          A.   That's correct.
24          Q.   I want to make sure that you are the same Todd
25     Chaykosky who was Juror No. 58 in the venire that was
```

1  brought over in the State of Texas vs. Obel Cruz-Garcia.

2      A.   That's correct.

3      Q.   And you heard my general Voir dire back on June

4  3rd, Monday, across the hall, in the court across the

5  hallway; is that correct?

6      A.   That's correct.

7      Q.   This is a continuation of that voir dire

8  process.  And the only difference is it's individual

9  voir dire.  One lawyer from each side will have the

10 opportunity to speak with you today and I'll hold them

11 to half an hour apiece --

12     A.   Okay.

13     Q.   -- so we don't take up your whole day.  And I

14 just want to make sure that even though you are under

15 oath, there is really no right or wrong answers here.

16 We want you to tell the truth about your general

17 feelings.  We're going to cover topics that are very

18 similar to the ones I covered and they will be a lot

19 more probing as to your feelings on those topics.  And

20 so, if you need anything rephrased, you don't understand

21 anything, just ask the lawyer to rephrase it.  Okay?

22     A.   Okay.

23     Q.    I do have three questions before we get

24 started generally from the Judge.  Do you have any

25 religious, personal, or moral reasons you would be

 1   unable to sit on a jury where the death penalty is a

 2   possible punishment?

 3        A.   I do not.

 4        Q.   Do you know of any reason why you could not be

 5   fair and impartial to both sides in a criminal case?

 6        A.   I don't believe so, no.

 7        Q.   Okay.  And I'm going to let you answer "I don't

 8   believe so" at this time, but they're both going to be

 9   talking to you about that.  We want to make sure that

10   you can.

11        A.   Sure.

12        Q.   So, and "I don't believe so" is probably not

13   going to be good enough.

14        A.   Okay.  Understood.

15        Q.   Can you say "yes" or "no" right now?

16        A.   Yes.

17        Q.   You could be fair?

18        A.   Yes.

19        Q.   To both sides?

20        A.   Yes.

21        Q.   Okay.  They may ask you a little more about

22   that because obviously you've shown there's something

23   you want to talk about.

24        A.   Sure.

25        Q.   Have you changed any of your answers from the

1  questionnaire that you filled out on that Friday, June

2  May 31st?

3      A.  No, no.

4      Q.  We all have a copy of your questionnaire, the

5  lawyers for each side and I do.  So, if you need one to

6  refer to, we can certainly make that available to you.

7      A.  That would be great.

8              THE COURT:  Is everyone okay with -- I have

9  a copy that does not have any markings on it whatsoever

10  for Juror No. 58.

11              MR. WOOD:  I have no objections.

12              THE COURT:  I will tender that to him.

13      Q.  (By The Court) And I'm going to turn you over

14  to Mr. Wood.

15              THE COURT:  The time is 9:12.  You may

16  begin.

17              MR. WOOD:  Thank you, Your Honor.

18                  **VOIR DIRE EXAMINATION**

19  **BY MR. WOOD:**

20      Q.  Good morning, Mr. Chaykosky.  Is it Chaykosky?

21      A.  That's correct.

22      Q.  Okay.  How are you doing this morning?

23      A.  I'm doing well.

24      Q.  Okay.  Welcome back.

25      A.  Thank you.

1      Q.   Whether voluntarily or involuntarily.

2           Again, my name is Justin Wood.  And Natalie

3    Tise and I will be the ones trying this case to you if

4    you are one of the lucky 12 chosen.

5      A.   Okay.

6      Q.   Steve Walsh back here at the back table, he is

7    a law student, an intern that's working with us this

8    summer.  So, if you are on the jury you would see him

9    coming in and out.  A lot of times people get back in

10   the jury room and wonder who are those people coming in

11   and out of the courtroom.

12           So, Mr. Chaykosky, this part of the

13   trial -- and let me go back and remember.  You have not

14   serve on a prior jury; is that correct?

15     A.   That's correct.

16     Q.   Okay.  As you can probably figure out by now,

17   this process, being a death penalty capital murder, is a

18   little more involved than a typical trial, but this --

19   well, no matter what kind of trial it is, this is our

20   only chance to really get to talk to you and visit with

21   you and find out more about you.  Obviously, with this

22   little questionnaire, I have more information than I

23   typically would, but there will be some things I want to

24   follow up and ask you about that you answered on that.

25   And then some things that were talked about in general

1    with the Judge.

2                So, the moral of the story today is just

3    relax.  This is as informal as we can possibly get in a

4    courtroom environment.  And it's very conversational.

5    And if there is something -- if you have a feeling on

6    one issue or another, please just let me know.  The

7    ultimate goal is for us -- being Natalie and I, the

8    defense team, the Judge -- to find the 12 most fair and

9    impartial, best jurors for this case.  And as we visit

10   today, you may figure out that, hey, you know what, this

11   isn't the best case for me to sit as a juror on.  Maybe

12   I might be better on a DWI or a burglary case or

13   something like that.  And that's fine.  You're not going

14   to offend anybody by your answers or anything like that.

15   So, I just say that up front.  Just be open and honest

16   with your answers.

17                A couple of things I wanted to visit with

18   you about.  I see you are at U of H.  Is that right?

19        A.   That's correct.

20        Q.   In the business school?

21        A.   That's right.

22        Q.   Okay.  Tell me what your responsibilities there

23   are.

24        A.   Assessment and accredit agent for the college.

25   So, every five years they have an external organization

1    come in, do their audit of the college, make sure

2    resources are being used efficiently, and that type of

3    thing.

4        Q.   Okay.  And is that then your background -- how

5    long have you been in that role?

6        A.   Ten years, actually.

7        Q.   Okay.  Now, I see you were born in New York and

8    you have some history there.  Is that right?

9        A.   That's correct.

10       Q.   When did you move to Houston?

11       A.   1992, spring of '92.

12       Q.   Okay.  Have you always been involved in

13   education?

14       A.   No, no.  Marketing research for about three

15   years with a media research company.  And then another

16   seven years or so with a research company dealing with

17   the home building industry.

18       Q.   Okay.  So, your role in the business school is

19   purely administrative, you don't have a professor

20   background or anything like that?

21       A.   That's correct.

22       Q.   Okay.  I also see you got two small ones, nine

23   and five.

24       A.   That's right.

25       Q.   I'm sure they keep you busy.

1      A.   Oh, yes.

2      Q.   Now, one thing of interest that I was going to

3  ask you about was, I see that at some point in the past

4  a friend of yours wife was murdered.

5      A.   That's correct.

6      Q.   I'm sorry to hear that.

7      A.   Yes.

8      Q.   How long ago was that?

9      A.   That was -- I want to say the end of '92,

10  beginning of '93.  So, I was here about a year or so.

11      Q.   Okay.

12      A.   My friend was still in upstate New York at that

13  time.

14      Q.   Okay.  And was that a close friend of yours?

15      A.   Yes.

16      Q.   And basically -- you don't have to go into full

17  detail, but what were the circumstances of that?

18      A.   It turned out that it was -- they lived in an

19  apartment complex.  He worked at night.  It ended up

20  being a neighbor that they had met when they first moved

21  in.  They had become acquaintances with this individual

22  and felt that they had, you know, some sort of, you

23  know, "hi" -- nothing -- not a close relationship, but

24  just a simple, you know, "hi" and they recognized each

25  other.  And it turns out that he came home one evening

1  and the person had broken into the house.

2       Q.   Okay.  And the wife was at home?

3       A.   That's correct.

4       Q.   Okay.  Was that -- so, the neighbor was the one

5  that was prosecuted for the murder?

6       A.   That's correct.

7       Q.   Was the -- did it look like the intent was

8  robbery or --

9       A.   No, no.  It was -- I don't know whether it

10  ended -- I mean, I can't speak to his intent

11  necessarily, but I don't know if it was a sexual

12  assault.  I don't believe anything of that nature

13  occurred.  Potentially he might have been trying to get

14  something in the apartment and discovered her there.

15  Because I think he knew my friend worked at night.

16       Q.   Okay.  So, did you -- was it a situation that

17  that case actually went to trial?

18       A.   That's correct, yes.

19       Q.   Did you have an opportunity to go back upstate

20  or --

21       A.   Obviously, I went back for the services, but,

22  no, I wasn't present for the trial portion of it.

23       Q.   Okay.  But you followed that through the

24  process for your friend?

25       A.   Uh-huh.

1    Q.   Did you feel like they received justice in that

2  case?

3    A.   I'd have to tell you probably not.

4    Q.   Tell me about that.

5    A.   My friend had gone back -- has gone back, I

6  believe, multiple times now.  My understanding is that

7  the sentence was life in prison.  And I saw nothing,

8  based on what I was told, at least by my friend, during

9  the court proceedings and this individual's background,

10  that would have led me to believe that was justice, what

11  he received.

12    Q.   So, did you think he deserved more than that?

13    A.   Yes, I do.

14    Q.   Okay.  Well, I know it's rare and unfortunate

15  that you have to have something hit so close to home,

16  but it probably gives you an unique perspective into the

17  system, too, having gone through it with your friend.

18    A.   Sure.

19    Q.   Is there anything about that particular

20  experience that you think would cause you to be -- I

21  hate to say unfair, but not as fair or impartial in this

22  case, knowing that we're talking about a murder or an

23  alleged murder?

24    A.   No.

25    Q.   Okay.

1       A.   No, not at all.

2       Q.   You would be able to look at this case and

3   judge this case on the facts that you are presented in

4   this courtroom and not bring in that experience and let

5   that weigh in on your decision?

6       A.   That's correct.

7       Q.   Okay.  So, I saw you kind of hesitate.  The

8   Judge was right when she said one of us or both of us

9   would probably follow up on that.  When you hesitated

10  when the Judge asked if you think you could be fair to

11  both sides, I'm going to ask you:  What was that

12  hesitation?

13      A.   I think the hesitation -- or, actually, I know

14  the hesitation is that my wife used to work for the

15  medical examiner's office, forensic testing, for about

16  three years after she came here to Houston.  So, from

17  '93 to the end of '96, beginning of 1997.

18      Q.   Okay.

19      A.   And during her tenure there, she was there at

20  the time with Elizabeth Johnson and there was quite a

21  stir-up at that point about a variety of things.  And I

22  think my experience at least, in conversations with them

23  and going to dinners and different things, is that there

24  are people who do testing correctly and there are people

25  who do testing that may not necessarily be correct.  And

1  I think there is evidence of that here in the city

2  itself.  So, I have some hesitation, I suppose.  Well,

3  certainly I wanted to bring that to light here this

4  morning, but I think I would tend to question a lot of

5  stuff maybe a little more than maybe someone else who

6  didn't have a little bit of insight that I do have.  I'm

7  certainly not a scientist or research scientist or did

8  any of that sort of testing and all, but I think I would

9  be much more critical of that type of information.  So,

10  whether that's good or bad, I certainly wanted to let

11  that be known.

12      Q.   Well, I appreciate you being forthcoming with

13  that, Mr. Chaykosky.  I want to make a couple of points

14  before we go into that.  You know, as a juror, you are

15  the ultimate judge of the facts that are presented to

16  you, the evidence that is presented to you, the

17  witnesses that come before you.  I mean, that is going

18  to be your primary job.

19      A.   Yes.

20      Q.   You and your fellow jurors are going to get to

21  evaluate every witness that takes the stand and figure

22  out whether or not you believe them, whether you find

23  them credible.  And that goes for the evidence as well.

24  So, you know, in a criminal case, as the Judge told you

25  before -- and it's now on that screen beside you --

1  Natalie and I ultimately have the responsibility of

2  proving this case to you beyond a reasonable doubt.  And

3  there are certain things that the Judge read from the

4  indictment, that are now listed beside you, that are the

5  elements of the capital murder in this case that we have

6  to prove to you.  All of those, each one of those items

7  I have to prove to you beyond a reasonable doubt.

8              Now, you know, every witness or every piece

9  of evidence or testimony that comes before you that

10  relates to those, you are going -- you are going to be

11  judging that.  So, we can't go into the specific facts

12  of the case or I can't tell you what witnesses you might

13  hear from, but you see that this offenses is alleged to

14  have occurred back in '92.  That's around the timeframe

15  that we're talking about regarding your concerns.  We're

16  talking about a murder that is alleged to have been

17  committed.  So, you can imagine that you -- in a

18  criminal case, you could potentially hear from a medical

19  examiner --

20      A.   Right.

21      Q.   -- possibly.  And in a -- when we're talking

22  about a capital murder or a murder case, what other

23  types of evidence do you think you might see that might

24  come -- that might come out in a trial?  What might you

25  expect?

1      A.   I would expect photographs, obviously.

2      Q.   Right.

3      A.   Some sort of information with respect to the

4  instrument, the weapon that was used, photos of the

5  scene itself.

6      Q.   What about scientific evidence or forensic

7  evidence?

8      A.   Oh, certainly.  You know, blood-related stuff.

9  I would expect to see quite a bit of that.

10      Q.   DNA, possibly?

11      A.   Right.

12      Q.   Yeah.  And so, it kind of goes to what you were

13  talking about.  And you were saying that you and your

14  wife had a close connection with Elizabeth Johnson back

15  during that time.  And you are intimately familiar with

16  some of those issues that she raised, right?

17      A.   Right.

18      Q.   So, my question to you is that, given that

19  background, given your knowledge, do you think that you

20  would be able to judge the evidence fairly when it was

21  presented to you?

22      A.   Yes, I do.  I certainly would want to know

23  where the evidence was processed, but, yes, I do feel

24  that I could.

25      Q.   Well, and naturally you would probably learn

1  that through testimony.

2      A.   Uh-huh.

3      Q.   But do you think that you would scrutinize that

4  evidence more so given your background and your

5  information that you have personal knowledge of?

6              MR. CORNELIUS:   Judge, can we approach the

7  bench and have a sidebar?

8              (At the Bench, off the record)

9              (Open court, defendant present, no jury)

10             THE COURT:   Okay.  Is it the agreement by

11 both sides that Mr. Todd Chaykosky, Juror No. 58, is to

12 be excused?  State?

13             MR. WOOD:   It is, Your Honor.

14             MR. CORNELIUS:   It is our agreement, Judge.

15             THE COURT:   And Mr. Obel Cruz-Garcia, is

16 your agreement as well?

17             THE DEFENDANT:   Yes, ma'am.

18             THE COURT:   Very good.  Thank you.

19             And what that means, Mr. Chaykosky, is that

20 with the question they covered already, they've

21 determined that they're in agreement that you are to be

22 excused as a juror.  Nothing personal, you understand

23 that.

24             VENIREPERSON:   Certainly.

25             THE COURT:   We completely appreciate you

1  being so honest and bringing forth all of the stuff in

2  your background that both sides wanted to hear.  So, you

3  have done your duty.  You can leave today and not come

4  back on this case.

5              And all of those instructions that I put

6  you under, you are now released from those.  You can

7  speak with whomever you want about your jury service.

8  And I hope that it's favorable.  We couldn't have trials

9  like this without interested and involved citizens like

10  yourself coming down here and doing their duty.  So,

11  thank you very much.

12              VENIREPERSON:  You're very welcome.

13              THE COURT:  Do you need any type of excuse

14  for work or a bus pass?

15              VENIREPERSON:  No.

16              THE COURT:  Okay.  You're free to go.

17  Thank you.

18              (Venireperson excused)

19              THE COURT:  Anybody need a break or

20  anything?  Let me let them finish.

21              (Pause)

22              THE COURT:  All right.  Bring in the next

23  juror, Maura Denman.

24              (Venireperson sworn)

25              **MAURA DENMAN, VENIREPERSON NO. 62,**

1  was called as a prospective juror, and testified as

2  follows:

3  **VOIR DIRE EXAMINATION**

4  **BY THE COURT:**

5      Q.   Good morning, Ms. Denman.  How are you doing?

6      A.   I'm okay.  A little tired.

7      Q.   Are you?  We're all glad that it's Friday.

8      A.   Yes.

9      Q.   Okay.  We want to make sure you are the same

10  Maura Denman, Juror No. 62, from the venire in the State

11  of Texas vs. Obel Cruz-Garcia.

12      A.   That's correct.

13      Q.   And you listened to my voir dire in the

14  ceremonial courtroom across the way on Monday of this

15  week?

16      A.   Yes.

17      Q.   This is the continuation of that process, the

18  voir dire process.  And we are in individual voir dire

19  now.  One lawyer from each side will have the

20  opportunity to speak with you.  I'm going to hold them

21  to half an hour on each person.  So, we shouldn't be

22  here for more than another hour on your case.  They

23  might finish earlier, but you can expect that they

24  probably won't.

25                And even though you are sworn, and we do

1   expect you to tell the truth, but there are no right or

2   wrong answers here because we are asking about your

3   feelings on the law and a little bit about your

4   background, how things might affect you.  So, if there

5   is anything you don't understand, please ask the lawyers

6   to rephrase it.  It's fairly informal.

7                I do have three questions I need to ask of

8   you before they begin.  The first one is, do you have

9   any moral, personal, or religious reasons why you would

10   be unable to sit on a jury where the death penalty is a

11   possible punishment?

12        A.   No, I don't.

13        Q.   Do you know of any reason why you could not be

14   fair and impartial to both sides in a criminal case?

15        A.   No.

16        Q.   And have any of your answers on the

17   questionnaire that you filled out on Friday, May 31st,

18   have any of those changed?

19        A.   Not that I'm aware of.

20        Q.   Very good.  I appreciate that.  I'm going to

21   turn you over to Ms. Tise.

22                THE COURT:  It is 9:31, Ms. Tise.

23                MS. TISE:  Thank you, Judge.

24                **VOIR DIRE EXAMINATION**

25   **BY MS. TISE:**

1      Q.    And it's Dr. Denman, correct?

2      A.    Yes.

3      Q.    Thank you so much for coming back today.  We

4   appreciate it.  I know you don't really feel like you

5   had a choice in the matter, but we really do appreciate

6   you being here and participating in this process.

7      A.    Thank you.

8      Q.    So, what did you think when you got this

9   questionnaire on Friday of last week and saw that this

10   was a death penalty case?

11      A.    I was a little bit shocked.  I really didn't

12   know what to expect when I went to jury duty.  The only

13   other time I've been called for jury duty, I was

14   dismissed within the first 20 minutes, as was everyone.

15   They didn't panel anyone that day.  So, I had no

16   experience.  So, I wasn't really expecting it, you know.

17      Q.    Well, I can tell you this is not the norm most

18   of the time.  We generally only do these questionnaires

19   on capital cases.  So, don't let that deter you from

20   your future jury service, that you are going to have to

21   come in and tell your life story.

22      A.    No.  That's okay.

23      Q.    But I'm sure you can understand how come on

24   capital cases it would be important for us to have a lot

25   of information.

1        A.   Yes.

2        Q.   Because it's an important situation and it's

3    not something people are asked to do every day.  So,

4    your gut reaction was just shocked?

5        A.   Just, I wasn't expecting it.  You know, but if

6    that's what you are looking for and that's what you

7    need, that's what you need, so...

8        Q.   Right.  After you've had time to kind of think

9    about it over the weekend before you came back for the

10   Judge's voir dire, what were your feelings then?

11       A.   A little bit nervous, but at the same time, I

12   consider the whole idea of the jury of your peers and

13   what that means.  And I really hadn't had to think about

14   that that much before.  And it's a serious thing.

15       Q.   Absolutely.

16       A.   And so, I guess what I'm saying, I wouldn't be

17   here if I wasn't willing and able to do this and to

18   approach it in a serious kind of manner.  And so, I

19   thought about it over the weekend.  And everybody who

20   knows that you are going to jury duty says:  Oh, well,

21   tell them this or tell them that and...

22       Q.   To get out --

23       A.   That's not who I am, so...

24       Q.   We appreciate that.  Because a lot of times we

25   find that people come in and they say what they have to

1   say to get off the jury.  And I have actually witnessed

2   my brother and my father having a long discussion about

3   how to get off a jury right at the Thanksgiving dinner

4   table.  And I appreciate people who are willing to come

5   in and give honest answers.  And, you know, if they wind

6   up on the jury, then that's fine.  They respect the

7   process.

8       A.   Yes.  And that is where I am.

9       Q.   Right.  I see that.  And I really do appreciate

10  that.  And that is all this is really about is your

11  honest answers.  And there is no right or wrong answer,

12  just how you really feel.

13           So, I want to ask you if you had really

14  thought about your feelings on the death penalty before

15  you were called down for jury duty on this case?

16      A.   I have not seriously given lots of thought to

17  it since probably college.  I had a class in college

18  called can your conscience be your guide.  It was small

19  liberal arts college and we talked about all kinds of

20  things.  I'm sure we discussed at length in that course,

21  but since then I haven't really.  So, over the weekend,

22  I did consider it and I have never really had any issues

23  with the death penalty --

24      Q.   Okay.

25      A.   -- at all.  I think it just needs -- you know,

1   it's a serious thing and it's not to be used lightly.

2        Q.    Absolutely.

3              So, where would you put your feeling on the

4   death penalty if you had to scale of one to ten and one

5   was just against it, period, extremely, and ten is for

6   it, period, extremely, and if you couldn't choose five

7   because we want you to --

8        A.    Well, you can tell by my answers on the

9   questionnaire where I wrote "depends" out in the margins

10  a lot.  I really think that, again, it isn't used

11  lightly.  So, it really depends on whether it's merited

12  in the case.  So, I'm not against it, out of hand, and

13  I'm not a hundred percent for it because it's not to be

14  used in every case.  So, I think it depends on the

15  situation.

16       Q.    Okay.

17       A.    And so, I guess you could say I'm five, but I

18  don't know if that really describes me.

19       Q.    Okay.  I'm going to let you keep five.

20       A.    I'm not trying to wiggle.  I really honestly

21  think that you can't give a black-and-white answer to a

22  lot of the questions.

23       Q.    And you can't.  And I think you are absolutely

24  right about that.  And I'm going -- I usually say don't

25  choose five because I want to see one side or the other

1    where people come down, but I'm going to let you stick

2    with five because I hear what you're saying and I

3    respect it.

4        A.   Okay.

5        Q.   The Judge talked about the kinds of crimes that

6    the death penalty might be available for.  Were you able

7    to absorb all of that?

8        A.   I think so.

9        Q.   And how do you feel about that?  Do you think

10   those are the kinds of crimes we ought to have the death

11   penalty for?

12       A.   I believe so, yes.

13       Q.   Okay.  It's always got to be a murder.

14       A.   Yeah, but more than --

15       Q.   But a murder plus.  It's more than your

16   ordinary murder.  Ordinary murder is going to be a range

17   of punishment of five to life.  A capital murder has an

18   aggravating circumstance that bumps it up.

19       A.   Uh-huh.

20       Q.   And it's not just any aggravating circumstance.

21   It's the ones that the Legislature has listed.

22       A.   Uh-huh.

23       Q.   And some of them are things like committing the

24   murder while doing another serious felony, like a

25   robbery, a typical convenience store robbery where they

1   shoot the clerk.  That's an aggravated robbery plus a

2   death and that's capital murder.

3        A.   Right.

4        Q.   If you kill a child under 10 years old.  If

5   you -- and that's a new one.  That one wasn't part of

6   the law a while back.  That one has been fairly new.  If

7   you kill a police officer in the line of duty.  Do those

8   sound like the kinds of things we should have the death

9   penalty for?

10       A.   I think it should be considered in the case,

11  yeah.

12       Q.   Okay.  Would you add anything or take anything

13  away or -- that you can think of?

14       A.   To the list of things that were included?

15       Q.   Uh-huh.

16       A.   No, not that I can think of without looking at

17  it and -- yeah.

18       Q.   How do the other members of your family feel

19  about the death penalty?

20       A.   I believe that my husband feels similar to me,

21  but it's not something we talk about.

22       Q.   Sure.

23       A.   And I'm really not aware of how, like, my

24  sister or my mom or anyone extended feels.

25       Q.   So, nobody in your immediate family has really

```
 1    strong feelings against the death penalty that you're

 2    aware of?

 3        A.   Not that I'm aware of, no.

 4        Q.   Okay.  And, you know, we talk about it a lot

 5    just kind of in a vacuum, you know, this is, you know, a

 6    death penalty case, and in theory what do you think

 7    about it, and in theory, you know, do you support it;

 8    but this is the real deal here, where, you know, it's

 9    game time.

10        A.   Yeah.

11        Q.   And so, I want you to take a look over here at

12    Obel Cruz-Garcia, the defendant in this case.  He's

13    sitting right there in the gold tie with the headset on.

14        A.   Yeah.

15        Q.   At the end of this trial, if you answer the

16    special issues in such a way that leads to the death

17    penalty, those answers are going to lead to the

18    execution of that living, breathing human being that is

19    sitting right here in this room with us.

20        A.   I understand that.

21        Q.   And are you comfortable with that?  I guess

22    comfortable is not the word.  It shouldn't be

23    comfortable.

24        A.   No.

25        Q.   But can you do that?
```

1      A.   If the evidence of the case merits it, warrants

2  it, and that is what we're presented with, then, yes.

3      Q.   Okay.  I want to talk to you about some of the

4  things on your questionnaire.

5      A.   Okay.

6      Q.   You talked about what you felt like the goals

7  of punishment were.

8      A.   Yeah.

9      Q.   And you want to talk to me a little bit about

10 your feelings on that?

11     A.   Yeah.  When I looked at that question, I could

12 kind of see, you know, ideally rehabilitation is a

13 wonderful goal that we would all like to see happen, but

14 I don't believe that it's possible in all cases.

15     Q.   Okay.

16     A.   And so, I guess what I was trying to get across

17 in my answer to that is that when you look at individual

18 cases and individual people, it needs to be taken into

19 consideration what is possible or probable in their

20 case.  And if rehabilitation is possible, then I think

21 then that's what you should strive for.  But if it's not

22 possible, then, no.  And so, I can't remember exactly

23 how the question -- what the possible answers were, but

24 I know rehabilitation was one.  And one was about

25 deterrence.  And I personally am not 100 percent

1  convinced that our system is set up in such a way that

2  we really are effectively deterring criminals with the

3  punishments that are handed out.  And so, I guess, what

4  I was trying to say is that that doesn't seem realistic

5  in all cases either.  And so, depending on the case,

6  rehabilitation may not appropriate, deterrence isn't

7  necessarily -- and deterrence is thinking about other

8  people.  It's not thinking about the person who

9  committed the crime.

10      Q.   Right.

11      A.   And so, that's why I answered the way that I

12  did.

13      Q.   Okay.

14      A.   That you want to try to prevent the person who

15  actually committed the crime rather than focusing on

16  deterring other people.

17      Q.   Do you ever think that there are some types of

18  crimes that punishment is also a goal, just the

19  punishment itself, that there are things that you can do

20  and there should be a consequence --

21      A.   There should always be a consequence.

22      Q.   -- that commensurate with what you have done,

23  and sometimes punishment, just for its own sake, is a

24  goal?  How do you feel about that?

25      A.   I think there needs to be a consequence for

1  actions that are taken that require them, but I think in

2  a death penalty case, for instance, I wouldn't use the

3  death penalty for the sake of using the death penalty.

4       Q.   You are not an eye-for-an-eye person, in other

5  words; is that what you're saying?

6       A.   No.   I'm not 100 percent an eye for an eye,

7  correct.

8       Q.   Okay.   Fair enough.

9            And the law doesn't even really allow for

10  that.   Just, you know, it all depends on the

11  circumstances.   And I like the fact that on your

12  questionnaire you made that very clear, that you

13  answered the questions -- a lot of the questions are

14  black-and-white questions, but black-and-white answers

15  are not appropriate to these questions.   There are

16  questions that call for black-and-white answers and

17  black and white is not going to work.

18       A.   I think they can't really be black and white

19  until they're applied to a specific case.   A lot of

20  those questions, anyway.

21       Q.   That's what the law -- that's exactly what the

22  law says.

23       A.   Okay.   I don't like --

24       Q.   Let's talk about some of the -- you talked

25  about how a sentence of life in prison is enough

1  punishment for a person convicted of capital murder, and

2  you agreed with that, but then you said it depends.  Do

3  you believe there are some cases where a sentence of

4  life in prison is not enough punishment?

5      A.   Yes.

6      Q.   Okay.  I want to talk to you some about what to

7  expect in this process and some of this, you know, is

8  stuff that the Judge covered, but I want to talk to you

9  in a little more detail.  First of all, do you

10 understand how the trial process works and how there are

11 two phases, the guilt phase and the punishment phase?

12     A.   Yes.

13     Q.   And you are going to hear different evidence.

14 There is a different goal in each one of those phases.

15 So, the evidence is going to be different.  Do you see

16 how that works?

17     A.   I hadn't really thought about that before, but,

18 yes, I can see how that works.

19     Q.   The goal in the first phase, guilt, is to

20 determine whether the defendant committed this crime.  A

21 lot of times jurors are like:  Why can't we hear all

22 about him in the guilt phase of the trial, all his

23 criminal history, all the good things about him; you

24 know, why can't we hear all of that?  Well, the reason

25 you can't hear all of that is because it's not relevant.

1   It's focused on did he do this crime.  Okay?

2             There are exceptions where prior offenses

3   can come in in guilt, but they're pretty rare.  Okay?

4   Most of the time that's stuff you are going to hear in

5   punishment because it's relevant to the issue of what

6   should happen to him if you decide that he is guilty of

7   this crime.  Does that seems fair?

8       A.   Yeah, makes sense.

9       Q.   So, in the guilt phase of the trial, as you

10  know in a capital murder, you know a little bit about

11  what we're looking at because you heard the Judge talk

12  about the elements.  And I'll put them up on the screen.

13  And you can look at them there on your right if it's

14  easier.  Over here on this other side there is a little

15  screen, or on the big board.  Whatever is easier for

16  you.

17            But those are the elements that I have to

18  show.  And that's all I have to show.  That's all the

19  law requires me to show.  And it's enough.  It's plenty.

20  It covers all of the main issues in the case, but the

21  reason I bring it up is because every criminal case --

22  and I have tried a bunch of them -- you know, there is

23  always things that we don't know.  I don't get to

24  control the evidence.  I don't get to write down my

25  check list of all the things that I would like to have.

1  I don't get to choose the witnesses.  I have the case as

2  it's been brought to me and as I present it to you.

3  Okay?

4            Actually, the person who has the most

5  control over what evidence is presented in a case is the

6  defendant in that case.  He chooses what he leaves

7  behind.  If he doesn't want to leave prints -- I'll give

8  you some examples.

9       A.   But you just said the defendant.  And that's

10 presuming guilt.

11      Q.   I'm sorry?

12      A.   You just presumed guilt.

13            THE COURT:  We're all assuming.  These are

14 hypotheticals.  We're not talking about this defendant.

15            VENIREPERSON:  Okay.

16      Q.   (By Ms. Tise) The defendant in the case that's

17 charged, he's the person who controls the evidence

18 that's left behind.

19      A.   Well, actually, the perpetrator who actually

20 committed it, whether it's the defendant or not.  But I

21 know what you're saying.

22      Q.   I'm not talking about this one.

23      A.   No.  I know.

24      Q.   I'm talking about the defendant in whatever

25 case in my hypothetical.

```
 1              MR. CORNELIUS:  I still have an objection

 2   with the question.  No offense, but that's assuming

 3   whoever it is is guilty.  It's the perpetrator, is what

 4   you are trying to say, but it doesn't necessarily mean

 5   this defendant.

 6        A.   I understand what you're saying.

 7        Q.   (By Ms. Tise) I'm changing it to perpetrator.

 8   Don't think I'm trying to --

 9        A.   No.  I know.  Not in this case.  Talking

10   hypothetically.

11        Q.   Okay.  I'm trying to just give you a

12   hypothetical and I will use the word perpetrator.

13        A.   Okay.

14        Q.   So, the perpetrator in the case, the person who

15   committed the crime -- okay -- is the person who

16   controls what's left behind.

17        A.   Yes.

18        Q.   If he doesn't want to leave fingerprints, he

19   can wear gloves?

20        A.   Gloves.

21        Q.   If he doesn't want to leave semen, he can wear

22   a condom.  If he wants to have no witnesses, he can

23   commit the crime where no one sees or at least try to.

24        A.   Yeah.

25        Q.   Or he can choose to commit the crime in front
```

1  of people he trusts, you know, that he thinks will

2  not --

3       A.   Have his back.

4       Q.   Uh-huh.  Or, he can choose to commit the crime

5  against people he thinks are weak and who won't stand up

6  against him, won't report the crime.  So, there are a

7  lot of things that the defendant can choose and those

8  are -- that determines a lot of the evidence.  Okay?

9       A.   Uh-huh.

10      Q.   Also, the witnesses in the case, I don't get to

11  choose who they are.  They are just who they are.  Okay?

12  And none of them are going to be perfect.  There aren't

13  going to be any perfect police officers or perfect

14  civilians who come to you as witnesses in the case.  But

15  the question that will be before the jury is:  Can you

16  listen to the evidence that you've heard, determine

17  whether you believe it, determine whether your belief is

18  beyond a reasonable doubt, and if so, can you convict

19  the defendant based on that?  Does that seems reasonable

20  and fair to you?

21      A.   Yes.

22      Q.   Okay.  You recognize that if a criminal case

23  was a puzzle, those elements are the pieces that you

24  have to have.  There is a lot of other pieces of the

25  puzzle that are there, but if you don't have them, it's

1   okay, you can set those aside.  So, the law requires you

2   to hold me to having those essential pieces of the

3   puzzle.

4       A.   May I ask a question?

5       Q.   Uh-huh.

6       A.   That last part bothered me maybe because I

7   didn't really understand it and nobody explained it. By

8   unknown manner and means.

9       Q.   Yes.

10      A.   So, you're saying that you have to prove beyond

11  a reasonable doubt that he committed the act of murder

12  and you don't necessarily know how he committed it?

13      Q.   That's true.  The law doesn't require me to

14  show you how he committed it.

15      A.   Okay.

16      Q.   That's one of the options.  One option is sharp

17  instrument and the other is by an unknown manner and

18  means.  How do you feel about that?

19      A.   So, we're being asked to answer both of those

20  then or --

21              THE COURT:  It would be either/or.  The

22  jury would have the -- six could believe that it was by

23  a sharp instrument and six could believe by an unknown

24  manner and means.

25      A.   Okay.  I see what you're saying.

1       Q.   (By Ms. Tise) Are you comfortable with that?

2       A.   I guess.  I had never seen that before, so I

3   didn't exactly know what that meant.

4       Q.   Okay.  Do you think that's unfair?

5       A.   If the evidence shows beyond a reasonable doubt

6   that he committed an act and you don't exactly know how

7   he committed the act, then I think that's okay.

8       Q.   Okay.

9       A.   Yeah.

10       Q.   Do you think or --

11       A.   No.  I mean, if that's what the evidence shows,

12   that murder was committed and that he was the one that

13   committed the murder, whether that's through eyewitness

14   testimony or through confession or whatever, then --

15       Q.   Right.

16       A.   -- then that's okay.  Yeah.

17       Q.   Right.  Okay.

18       A.   Okay.

19       Q.   One of the reasons why we have that, you see

20   that this is a 1992 case.

21       A.   Uh-huh.

22       Q.   I have to talk to you in hypotheticals.

23       A.   Sure.

24       Q.   But can you think of some things about the fact

25   that the date is 1992 that may lead you to why that's an

1 unknown manner and means?

2     A.   Yeah.

3     Q.   What kind of things come to mind?  What

4 kinds --

5     A.   Things happen to evidence.  I mean, evidence

6 gets lost, evidence gets destroyed by elements, things

7 like that.

8     Q.   Sometimes --

9     A.   You've got a high standard you have to go up

10 against if you are going to show it.

11     Q.   That's right.  That's right.  Lots of times in

12 cold cases evidence gets lost, as you said.  Witnesses

13 die.  Sometimes cases are cold because bodies aren't

14 found for a period of time.

15     A.   Yeah.

16     Q.   And when you have a few bones that have been

17 interfered with by the elements or animals, or -- you

18 know, those kinds of things happen and you cannot tell

19 from two or three bones what a cause of death is

20 usually.

21     A.   Yeah.

22     Q.   And so, those are kind of some of the things.

23 The law allows us to plead our case as an unknown manner

24 and means in situations like that because, otherwise,

25 we'd just have to say:  Well, we can't prove how he

1  died, so we have to just not pursue the case.  How do

2  you feel about that?

3       A.   I think you have to do what you have to do with

4  what you are presented, but I think that makes the

5  standard really high because you have to show, without

6  that additional evidence -- you know, I don't think it's

7  impossible by any means.

8       Q.   Okay.  But would you raise our standard because

9  the case is old or because --

10      A.   No.  I'm not saying that.  I'm saying the

11 situation that you are put in is a difficult situation

12 because you have to then present evidence to a jury to

13 make a decision with incomplete evidence.

14      Q.   Okay.

15      A.   And so, the evidence that you have has to show

16 your case.  That's all I'm saying.  I'm not saying it's

17 impossible, I'm not saying that I would need a higher

18 standard or a higher bar.  I'm just saying you're put in

19 a difficult position.

20      Q.   Okay.  And I just want to know how you as a

21 juror, you know, respond to that, how you feel about

22 that, how you react to that.  And I want to know that

23 you can still follow the law and hold me just to the

24 elements.

25      A.   Yes, I can definitely hold you to that.

1     Q.   You know, things like lost evidence or missing

2   witnesses, those are things that every human being --

3   you might go back in the jury room and go:  Well, I wish

4   I could have heard what that person said or I wish I

5   could have seen that.  But what you will be charged to

6   do is look at those elements and decide whether or not

7   what we did present --

8     A.   Uh-huh.

9     Q.   -- you believe beyond a reasonable doubt.

10     A.   Beyond a reasonable doubt.

11     Q.   And whether I met them.

12     A.   Yeah.

13     Q.   And so, what we ask you to do is set aside the

14   I-wonder things.  You know, I wish I knew, I wonder, and

15   just look to the elements and see if they are satisfied.

16     A.   Uh-huh.

17     Q.   Do you think you can do that?

18     A.   I think I can.

19     Q.   Okay.  Sometimes we have accomplices or parties

20   testifying in cases and sometimes we don't.  You might

21   hear about parties in a case and wonder why they didn't

22   testify.  Can you think of reasons why they might not?

23     A.   Yes.

24     Q.   They have a Fifth Amendment right not to.

25     A.   I was going to say, yeah, they've got the right

1  not to testify, but...

2       Q.   And --

3       A.   If they are not living, of course, they're not

4  going to be here to testify, but...

5       Q.   Maybe they want a deal and we're not willing to

6  offer it.  Those kinds of things.  Sometimes you have

7  people testify and you have to evaluate whether you

8  think they are an accomplice or a party.  And you

9  understood the Judge's examples on what a party is?

10      A.   Yes.

11      Q.   And there is a little twist on it called

12 co-conspirator law that's also out there where people

13 can conspire to commit a crime together and then they

14 are responsible for what their co-conspirators do beyond

15 the conspiracy.  That law also has another little

16 exception to it where if you abandon the conspiracy and

17 say:  I don't want to be a part of this anymore, then

18 you are not responsible for what happens after that.

19      A.   Okay.

20      Q.   There is a lot of details like that that the

21 Judge will instruct you on if you are a juror in this

22 case, but what I want to direct your attention to is

23 that you might have to decide whether somebody testifies

24 for you is a party or not --

25      A.   Okay.

1    Q.    -- based on a legal standard.

2              THE COURT:  You've got five minutes.

3              MS. TISE:  Thank you, Judge.

4    Q.    (By Ms. Tise) Do you think you can do that?

5    A.    I think so.

6    Q.    If you find that they are a party, I will tell

7  you now if they're testifying in exchange for a deal,

8  you will know that.

9    A.    I was going to ask, will we know that.

10   Q.    You will know that.

11   A.    Okay.

12   Q.    That will be presented to you.  So, if you

13  don't hear about a deal, then there is no deal.  Okay?

14   A.    Okay.

15   Q.    If you decide that they're a party, then you

16  have to have corroboration of their testimony.

17   A.    Okay.

18   Q.    Okay.  And corroboration doesn't mean you have

19  to have a second person who says what they said.

20   A.    Physical evidence or --

21   Q.    Something totally different.  It could be

22  physical evidence at the scene.  You know, for instance,

23  it could be you have a party who is there who says this

24  is what happened and then you have a gun that's got the

25  defendant's fingerprint on it.  That would be

1  corroboration.  It doesn't have to be a mountain of

2  evidence.  It doesn't have to be evidence that stands

3  alone.  It just has to be something that also shows that

4  the defendant is your guy, the perpetrator in the case.

5      A.   Okay.

6      Q.   Okay?  Are you comfortable with that?

7      A.   Yes.

8      Q.   Okay.  Do you have any strong feelings -- I

9  know you've got a biology background.

10     A.   Uh-huh.

11     Q.   Tell me a little bit about that.

12     A.   Well, I studied general biology in college and

13 then I went off to graduate school and I studied

14 parental care primarily.  I studied ecology, evolution,

15 and animal behavior.  But I worked in the rain forest

16 studying poisonous frogs.

17     Q.   So, I love those poisonous frogs when I go to

18 the -- all those pretty colors.

19     A.   I basically studied the way the mothers take

20 care of the tadpoles.  It's a very different kind of

21 system than frogs that you are familiar with usually.

22     Q.   That's really interesting.

23          So, is there anything about your background

24 where you feel like you would go into a case with

25 scientific evidence, and, you know, be more critical,

1  less critical, or more -- more hesitant to follow it or

2  less hesitant?

3      A.   I don't think so.  I just think that knowing

4  the scientific method helps me interpret what's

5  presented to me.  I don't know that I would change any

6  standards or anything like that.  I think I would be

7  able to understand things that maybe other people on the

8  jury might need more explanation.  Yeah.

9      Q.   Okay.  Did you understand how -- when the Judge

10  went through the special issues how those all worked?

11      A.   Yes.

12      Q.   Basically, the different things that have to be

13  shown.

14           MS. TISE:  Go ahead and put the first one

15  up there.

16      Q.   (By Ms. Tise) There are some key words in

17  there.  First of all, probability.  As a scientist, I

18  don't really have to explain to you what that is.  It's

19  not a certainty and it's not a possibility.

20      A.   Yeah.

21      Q.   In between.

22      A.   Uh-huh.

23      Q.   Criminal acts of violence.  Don't have to be

24  murders, don't have to be, you know, even crimes against

25  people.  Could be slashing somebody's tires out of anger

1  or threatening someone.  Do you think that's a fair

2  standard or do you think that's --

3       A.   Well, it says also they would constitute a

4  continuing threat to society.  And in the case of

5  slashing tires, I don't know.

6       Q.   So, you don't think a property crime could show

7  a person --

8       A.   Maybe it was the specific property crime you

9  listed, slashing a tire; but, no, I understand what's

10  being asked.

11      Q.   And society can include other people in prison,

12  clinicians, other inmates, guards.

13      A.   Okay.

14      Q.   Do you accept that?

15      A.   Yes.

16      Q.   This particular case is a capital that happened

17  in '92.  So, the law in '92 is what we apply.

18      A.   Okay.

19      Q.   And we don't have life without parole in '92.

20  That came in what, 2005.

21      A.   Okay.

22      Q.   So, there is a possibility of parole at 35

23  years or the death penalty.

24      A.   Okay.

25      Q.   Okay.  So, society -- that is why I asked --

1  told you that.  Because society can include prison

2  society or people on the outside?

3       A.   Okay.

4       Q.   Okay.  On the second special issue, it kind of

5  gets you to reaffirm the law of parties.  And what I

6  want to ask you about that is, you see that question

7  gives you the option to send someone to death row even

8  if they are not the person who pulled the trigger or

9  wielded the knife.

10       A.   I understand that.

11       Q.   Okay.  If I show they intended to kill or they

12  anticipated that a human life would be taken.  Are you

13  comfortable with that or are you a person who feels like

14  if they didn't do the act themselves, they should never

15  get the death penalty?

16       A.   Because this isn't the only standard that's

17  deciding whether or not the death penalty will be

18  applied, I think I'm willing to accept it.  Because the

19  other issues are going to help decide if that's

20  appropriate in the case.

21       Q.   And they should.

22       A.   Yeah.

23       Q.   But that wouldn't be an automatic for you?

24       A.   No.

25       Q.   You wouldn't say:  Well, if he is not the

1   actual --

2       A.   No.   It would depend on those other issues.

3       Q.   Okay.   And on the third special issue,

4   mitigation, that's basically the final thing to answer

5   before you decide.   And the thing about mitigation is it

6   has to be sufficient and sufficient in light of, as you

7   can see in the previous sentence, all of the evidence.

8   Okay?

9       A.   Yeah.

10      Q.   So, you look at sufficiency and you also look

11  at the circumstances of the offense.   Is it sufficient

12  in light of that?   Is it sufficient in light of the

13  defendant's character and background?   And then you look

14  at his personal moral culpability.   How responsible is

15  he for what happened.   And that's what sufficiency

16  refers to.

17            So, mitigation is something that can be --

18  I mean, anything could be mitigating.   Would you agree

19  with me?   You could actually -- let me give an example

20  because that's a broad statement.

21      A.   Yeah.

22      Q.   Anything can be mitigating.   Here is why.   You

23  can say the defendant is a drug user and has been

24  addicted to drugs and that's a big problem for him, and

25  that's part of why this crime happened and that's

1    mitigating.  Or, you can say the defendant's been clean

2    and sober his whole life and has never, you know, done

3    any of that kind of stuff and that's mitigating.

4        A.   Uh-huh.

5        Q.   You can say the defendant came from a broken

6    home and had this really sad upbringing, no family

7    support, and that's mitigating.  Or, you can say the

8    defendant has all these people that love him who are

9    here on his behalf and that is mitigating.

10       A.   Uh-huh.

11       Q.   It's all in the way you look at it.  So, that's

12   why the "sufficient" word is really important.  It's not

13   just can you find mitigation because I guarantee you

14   can.  There is always something.  But is it sufficient

15   in light of all the other evidence that you've heard.

16       A.   Uh-huh.

17       Q.   Does that seem reasonable?

18       A.   Yes.

19       Q.   Do you think can you apply that standard?

20       A.   I believe I can.

21       Q.   Okay.

22            MS. TISE:  I'm going to pass the juror.

23            Thank you.

24            THE COURT:  Thank you, Ms. Tise.

25            Mr. Madrid, you may proceed.

1          MR. MADRID:  Thank you, Your Honor.

2                **VOIR DIRE EXAMINATION**

3    **BY MR. MADRID:**

4        Q.   Dr. Denman?

5        A.   Yes.

6        Q.   Is that how people address you or do you they

7    say Ms. Denman?

8        A.   Mainly Ms. Denman, but a lot of people don't

9    know that I have my doctorate.

10       Q.   You work at the Nature Discovery Center?

11       A.   Yes.

12       Q.   And you went to Austin College.  Is that right?

13       A.   That's correct.

14       Q.   That's the kangaroos, right?

15       A.   We're the fighting roos, yes.

16       Q.   My sister went there.  That's why I knew that.

17   I wouldn't have known that otherwise.

18       A.   Okay.

19       Q.   So, you have a science background.

20       A.   Uh-huh.

21       Q.   I mean, I don't myself.  And I couldn't even

22   tell you what ecology is.  That's what I was wondering,

23   but studied I guess --

24       A.   Plants and animals, but primarily --

25       Q.   That's what ecology is.

1     A.   Yes.  Primarily I studied animal behavior.  I

2  studied frogs taking care of their young.  And so, I was

3  out in the rain forest doing my research, watching frogs

4  do what they do.

5     Q.   There was -- it seems like, based on your

6  questionnaire and the questions from Ms. Tise, I guess

7  you put a lot of thought and you said these things

8  aren't black and white.  You'd agree with that?

9     A.   Yeah.

10    Q.   And you think -- I think you think before you

11 speak probably more than most people do.  You have kind

12 of well thought-out -- like, this isn't an easy thing to

13 consider.  You would agree with that?

14    A.   It's definitely not an easy thing.

15    Q.   And, I mean, you had a couple of hesitations

16 and I could see you thinking.  There was one of the

17 questions that was asked about the sentence of life in

18 prison not being enough punishment.

19    A.   Uh-huh.

20    Q.   And it's one of these that's asked in the

21 questionnaire and they ask it both ways.  And let me

22 see.  A sentence of life in prison is enough punishment

23 for a person convicted of capital murder.  And then it

24 asks:  A sentence of life in prison is not enough.  So,

25 it's the same question, whether you agree or disagree.

1   And you agreed both times.

2                  When you were asked the question here by

3   Ms. Tise, I saw you thinking about that.  What were you

4   going to say?

5       A.  Well, just like I think I said a little bit on

6   some of the -- it really depends on the specific

7   situation, those mitigating circumstances, those other

8   special issues, that you can't just automatically say

9   that life in prison isn't going to be enough without

10  knowing those circumstances.

11      Q.  And you had said, when you testified, also on

12  questionnaire, that's why you put "depends" a lot.  You

13  would look at each situation, wouldn't you?

14      A.  Yeah.  I think that's what you are charged

15  with.  I mean, you are in a specific case, you're

16  listening to specific evidence, there's a specific

17  defendant.  I don't think the questions, as they are,

18  apply -- I mean, you can't have one answer across the

19  board.  That's just...

20      Q.  I think that's what the questions are looking

21  for, though, because we're trying to identify people

22  that do have those answers.

23      A.  Yeah.  You are looking for polarized opinions.

24      Q.  Yes.

25      A.  And my opinion is not polarized.

1      Q.   And when we're speaking of this, I'm just

2   talking kind of in the air, but I'm not talking about

3   punishment or guilt or innocence.  You understand that?

4   Do you understand after the Judge on Monday explained

5   this and you spoke with Ms. Tise for a bit, that there

6   is two phases of the trial.

7      A.   Uh-huh.

8      Q.   What do you understand those to be?

9      A.   The first phase is hearing the evidence to

10   determine guilt or innocence.  And if they are guilty,

11   then the punishment phase is to determine what the

12   appropriate punishment will be given the evidence and

13   given mitigating circumstances.

14      Q.   Okay.  So, I think you can almost teach a class

15   on it already.  Because most people wouldn't be able to

16   break it down like that.  That's what it is.  We have

17   guilt-innocence.  And in any case, whether it's a

18   traffic ticket or a DWI or capital murder, in Texas you

19   have -- we have two phases of trial.  And if you find

20   somebody not guilty, everybody goes home, case over.  If

21   you find somebody guilty, we go to the second phase,

22   which is punishment.  Okay?

23           And so, when we are talking about that --

24   and I think you understand this because you even wanted

25   to make it clear that there is a presumption of

1  innocence.  And you understand that, right?

2      A.   Right.

3      Q.   Sitting here today, you presume -- and, you

4  know, I didn't introduce myself.  I'm Mario Madrid and

5  this is Skip Cornelius.  You probably don't remember.

6      A.   Yeah.

7      Q.   This is our client, Obel Cruz-Garcia.

8      A.   Uh-huh.

9      Q.   And so, Mr. Cruz-Garcia, you know, sitting here

10 today, you don't have an opinion as to whether he is

11 guilty or not guilty, do you?

12     A.   No.

13     Q.   And when we talk about punishment, we're not

14 assuming anything, we're not assuming that we're getting

15 to punishment.  I don't want anybody -- you know, when

16 we speak to people, they think, hey, we'll talk about

17 the death penalty.  Because, you know, there are two

18 phases of trial.  And would you agree with that?

19     A.   Yes.

20     Q.   So, you know, that is the first phase.  And I'm

21 pretty sure you understand, besides the fact that you've

22 said it, but because a lot of times when we speak in

23 hypotheticals, the State and the defense, we say things.

24 And I don't think the State means anything by saying,

25 well, the defendant.

1       A.   I knew what she meant.

2       Q.   You're even more careful in saying, well, even

3  in a hypothetical case, the person charged is -- they

4  are the defendant, but they may be not guilty.  Right?

5       A.   Yeah.

6       Q.   So, you understand that, I'm sure.

7            So, if you did get to the phase of finding

8  somebody guilty in a hypothetical capital murder case,

9  you are going to end up having these three special issue

10  questions.  And depending on how you answer, they could

11  lead to death or life in prison.

12      A.   Uh-huh.

13      Q.   And so, you went over the first one, whether

14  there is a probability that somebody will commit

15  criminal acts of violence in the future.  And would you

16  be able to weigh the evidence, the evidence that you

17  heard in the trial and any other kind of evidence in

18  punishment evidence -- and that could be, you know, this

19  person was a great father or husband, or whatever,

20  neighbor, and bad things, this person did all these bad

21  things.  Would you be able to weigh those things and

22  wait before you answer that "yes" or "no," or would it

23  be -- it's a long question, and I'm sorry.  But some

24  people have the feeling, hey, this person committed

25  capital murder, I found him guilty, and I know I have to

1   answer these questions, but, come on, they committed

2   capital murder, so, obviously, they are going to be a

3   continuing threat.  Other people will wait, you know.

4   And I'm wondering where you sit on that.

5        A.   I think I have to wait.

6        Q.   Okay.

7        A.   I think you can't decide what the punishment is

8   without -- I don't know.

9        Q.   You would wait for the evidence?

10       A.   Yeah.  I'm not wired that way.  I'm wired that

11  this is the process and this is what's reasonable and

12  accepted by law, and I can't either presume guilt or

13  presume once guilty what the punishment should be

14  without hearing the evidence.

15       Q.   Okay.  Thank you.  The reason I ask this is

16  because a lot of people are not wired that way.

17       A.   Yeah.

18       Q.   Hey, it's a capital murder -- not even it's a

19  capital murder.  If it's a murder, that person should

20  get the death penalty.  You know, a lot of people in

21  society think that way.  That's why we ask these

22  questions.

23       A.   Too serious.

24       Q.   So, you would be able to follow Special Issue

25  No. 1.  You had a little bit of hesitation on the issue

1  of law of parties, if somebody intended, the second

2  special issue, if somebody intended, whether they

3  intended or they committed the -- for the person to be

4  deceased or they anticipated it.  And you answered that,

5  well, it's all the special issues together.  Okay?  But

6  you had a little bit of hesitation on that, on whether

7  they anticipated, or, you know, they weren't the person

8  that committed, whether it was a shooting, stabbing, or

9  whatever.

10          Did I confuse you with the question.

11     A.   No, you didn't confuse me.  I'm trying to

12  remember what my hesitation was.

13     Q.   The hesitation was you were asked if -- you

14  know, if they weren't the actual -- let's just call them

15  the -- you know, the person that committed the crime,

16  but they were a party, you know, whether it was a bank

17  robbery or whatever, the person driving the car, so they

18  should have -- they should have anticipated or they

19  intended the other person to go in and kill the victim.

20     A.   Right.

21     Q.   Then you had thought about that.

22     A.   I don't have hesitation with respect to whether

23  or not they're held accountable for that, if, in fact,

24  they are proven guilty of that, you know, and to be

25  punished for that.  I -- no, I don't.

1      Q.   Because you would wait till the third question

2  to decide mitigation?  Because this question is just

3  asking if you find from the evidence that -- beyond a

4  reasonable doubt that the defendant actually caused the

5  death or intended to.  So, it's actually a fairly easy

6  question.  I think it is because either you find that

7  they did or they didn't, right?  And then you go to the

8  third question, which is you would look at the

9  mitigating circumstances and decide if they warranted,

10 you know, life in prison or death.

11     A.   Uh-huh.

12     Q.   You could do that?

13     A.   I believe I can.

14     Q.   Do you have any questions of me at all?

15 Because I don't have any more questions.

16     A.   I don't believe so.

17     Q.   Thank you.

18     A.   Thank you.

19          MR. MADRID:  Pass the juror.

20          THE COURT:  Thank you, Mr. Madrid.

21          Okay.  Dr. Denman, would you please step

22 out?  There is a side door here.  The deputy is going to

23 assist you in getting out.

24          VENIREPERSON:  Okay.

25          THE COURT:  We'll be right back with you.

```
 1                    (Venireperson exits courtroom)

 2              THE COURT:  As to Juror No. 62, Maura

 3   Denman, what says the State?

 4              MS. TISE:  Judge, can we have a couple of

 5   minutes?  We're discussing it.

 6              THE COURT:  Yes.

 7              (Pause)

 8              MS. TISE:  We're going to exercise a strike

 9   on Dr. Denman.

10              THE COURT:  All right.  Bring Dr. Denman

11   back in, please.

12                    (Venireperson enters courtroom)

13              THE COURT:  Okay.  Dr. Denman, you are

14   excused as a juror in this case.  We appreciate you

15   coming down today, and all three days that you have been

16   down.  We couldn't do this without good involved

17   citizens like yourself who are willing to give us all of

18   this personal information.  I assure you that this is

19   going to be shredded.

20              VENIREPERSON:  Okay.

21              THE COURT:  So, you have done your duty.

22   You don't have to come back on this case.  And if you

23   need some type of excuse for work, Deputy Perry has that

24   for you.  If you need a bus pass, we have that, too.

25              VENIREPERSON:  Thank you.
```

```
 1              THE COURT:  Thank you very much.

 2              MR. CORNELIUS:  Thank you, ma'am.

 3              VENIREPERSON:  Thank you.

 4              THE COURT:  I need a two-minute break.

 5              (Recess)

 6              (Open court, defendant present, no jury)

 7              THE COURT:  Do both sides agree to proceed

 8  on Juror No. 70, Clarence Anderson, out of order?

 9              MS. TISE:  We do, Judge.

10              MR. CORNELIUS:  We do, too.

11              THE COURT:  Okay.  And, Mr. Obel

12  Cruz-Garcia, do you join your counsel and agree to

13  proceed on Juror No. 70, Clarence Anderson, out of

14  order?

15              MR. CORNELIUS:  Yes, ma'am.

16              THE COURT:  Very good.  Thank you, sir.

17              Please call the juror in, Deputy.

18              (Pause)

19              THE BAILIFF:  69 and 70 are both here.

20              THE COURT:  Who's here?

21              THE BAILIFF:  Both of them, 69 and 70.

22              THE COURT:  I'd have to go through the same

23  with them.  So, let's bring in 70.  We've already got

24  approval on that.  Okay?

25              (Venireperson sworn)
```

1          **CLARENCE ANDERSON, VENIREPERSON NO. 70,**

2    was called as a prospective juror, and testified as

3    follows:

4                    **VOIR DIRE EXAMINATION**

5    **BY THE COURT:**

6         Q.   Good morning, Mr. Anderson.

7         A.   Good morning, Your Honor.

8         Q.   I need to make sure that you are -- let me get

9    your sheet -- you are the same Clarence Leroy Anderson

10   that is Juror No. 70 in the venire brought over on the

11   State of Texas vs. Obel Cruz-Garcia?

12        A.   Yes, ma'am, I am.

13        Q.   And you heard my general voir dire on Monday --

14        A.   Yes, ma'am.

15        Q.   -- in the courtroom across the hallway?

16        A.   Yes, ma'am.

17        Q.   This is a continuation of that voir dire

18   process, wherein one lawyer from each side will get to

19   speak with you.

20        A.   Yes, ma'am.

21        Q.   And they're going to cover some of the same

22   topics that I covered, but it will be a lot more

23   personal to you.

24        A.   Yes, ma'am.

25        Q.   I give them each 30 minutes and I'll hold them

1    to that time.  And there is no right or wrong answers.

2    Even though you're under oath and we expect you to

3    testify truthfully, but there's not a right or wrong

4    answer, just truthfully as to your feelings.

5         A.   Yes, ma'am.

6         Q.   If you have questions you need them to

7    rephrase, please just ask them to do that.

8              And I have three questions that I need to

9    ask you before we continue on.  Do you have any moral,

10   personal, or religious reasons why you would be unable

11   to sit on a jury where the death penalty is a possible

12   punishment?

13        A.   No, ma'am.

14        Q.   Do you know of any reason why you could not be

15   fair and impartial to both sides in a criminal case?

16        A.   No, ma'am.

17        Q.   Have any of your answers from the questionnaire

18   that you filled out last Friday, May 31st, changed?

19        A.   No, ma'am.

20        Q.   Very good.  All of the lawyers, and I also,

21   have a copy of your questionnaire.  So, if you need one

22   just let us know.  All right?

23             THE COURT:  And we're ready to proceed.

24             Mr. Wood, I have 10:21.  Please proceed.

25             MR. WOOD:  Thank you, Your Honor.

**VOIR DIRE EXAMINATION**

**BY MR. WOOD:**

Q.   Good morning, Mr. Anderson

A.   Good morning.

Q.   Welcome back.  How are you doing this morning?

A.   Doing good.

Q.   Good.  Happy Friday to you.

A.   Yes.

Q.   My name, again, is Justin Wood.  And together with Natalie Tise, we'll be the ones trying this case to you if you are one of the lucky ones that are chosen. All right?

A.   Yes, sir.

Q.   Okay.  Steve Walsh back here in the back, he is a law student and an intern of ours for the summer.  And if you are chosen on the jury, you'll probably see him coming in and out of the courtroom a lot, too.

So, just like the Judge said, you know, this is -- we want you to be open and honest with your answers.  Feel free to let us know anything that -- you know, chime in if I say something or ask something that you have feeling on.  This is our chance to really get to know you and get to talk to you one-on-one.

A.   Yes.

Q.   I know you had -- you were on a trial many

1    years ago, several years ago.  Is that right?

2         A.   Yes, sir.

3         Q.   Was that in this building or probably in

4    another building?

5         A.   Actually, it was in the old, the very old

6    courthouse.

7         Q.   Yeah.  That's what I thought.

8              So, you may have a perfect memory of that,

9    but in case you don't remember, this process today is a

10   little different and more intense than that one probably

11   on the liquor violation.

12        A.   Oh, yeah.

13        Q.   And our goal here through this process is to

14   find the 12 of you that will be the most fair and

15   impartial for this kind of case.

16        A.   Yes, sir.

17        Q.   And that's going to be our questions.  I'm

18   going to be asking you some of what you -- about some of

19   what you wrote in your questionnaire, some of what we

20   talked about in general through the Judge, and go about

21   it that way.  Okay?

22        A.   Yes, sir.

23        Q.   So, what did you think Friday -- last Friday

24   when you came in and had to fill out this questionnaire

25   that you might be a juror on a death penalty case?

1      A.   Oh, my God.

2      Q.   You wish you had gotten a DWI trial, huh?

3      A.   I'm not going to say no to that.  I mean, I

4   think it's interesting, but it's a little scary, too.

5      Q.   Understandably, so.  We're talking about some

6   serious consequences, right?

7      A.   Yes, sir.

8      Q.   In a case that obviously is going to be taken

9   seriously.

10      A.   Yes, sir.

11      Q.   Before we get into some of those specifics, I

12   want to ask you a little bit about your background.  I

13   see you work with the City of LaPorte.  Right?

14      A.   Yes, sir.

15      Q.   And you work in animal control?

16      A.   Yes.

17      Q.   So, you work closely in that position with

18   LaPorte Police Department and law enforcement, do you

19   not?

20      A.   Yes, sir.  We're a division of the police

21   department.

22      Q.   Okay.  That's what I thought.

23           Do you -- what is your role there?  What

24   are your duties there at animal control?

25      A.   I'm the supervisor over animal control.  I'm

1    over the officers and street division as well as the

2    shelter.

3        Q.    Okay.  So, you oversee and are involved to some

4    extent in some of the investigations?

5        A.    Yes, sir.

6        Q.    Okay.  And I think you mentioned that through

7    your work there I'm sure you've worked with Belinda

8    Smith over the years?

9        A.    That's her name.  I didn't write it down.  I

10   couldn't think of it till afterwards.  Yes, sir.

11       Q.    And that Belinda, for the record, is the

12   prosecutor here in the office that deals with those

13   cases?

14       A.    Yes, sir.  She handles all of the animal cases

15   for the district attorney's office.

16       Q.    Do you work with her very closely or from time

17   to time?

18       A.    I have met her once.  She taught a class for

19   me.

20       Q.    Okay.

21       A.    As far as any of the cruelty cases, we don't

22   deal with them that much.  The police officers actually

23   handle them since we're a division of them.  And by

24   state law, we can handle -- we can file up to a Class C

25   misdemeanor, but -- and, actually, I think -- I want to

1 say a Class A that could go into a felony.  And so, we

2 actually have our police officers handle those cases.

3 So, I don't deal with her that much.

4     Q.   Okay.  So, nothing about your dealings with her

5 would prevent you from being fair to either side?

6     A.   No, sir.

7     Q.   Okay.  And I know I mentioned your prior jury

8 service.  That was a case you sat on around 15 years

9 ago.  It was a liquor violation or something like that?

10     A.   Yes, sir.

11     Q.   And I saw you were the foreman on that case?

12     A.   Yes, sir.

13     Q.   Anything about that prior jury service that

14 would prevent you from being fair in this case?

15     A.   No, sir.

16     Q.   Okay.  And so, your dad is a police officer,

17 right?

18     A.   Yes, sir.

19     Q.   And that's -- he's still --

20     A.   He officially retired last month.  He had

21 retired from one department several years ago and then

22 was a reserve officer for the City of Clear Lake Shores.

23     Q.   Okay.

24     A.   And he retired at the beginning of this month.

25     Q.   So, what department was he with prior to that?

1    A.   He was with Harris County for a while and then

2  he went to Precinct 8.  He got out of law enforcement

3  for a couple years.  And then he went back to Nassau Bay

4  where he retired.

5    Q.   Okay.  So, you grew up with a dad in law

6  enforcement?

7    A.   Yes, sir.

8    Q.   I'm sure that adds an interesting twist on a

9  childhood.

10    A.   You don't get away with anything.

11    Q.   Right.

12         So, you know, based on that and you working

13  with a lot of police officers on a daily basis, I'm

14  referring to one of your answers in your -- or a couple

15  of your answers in your questionnaire, which I thought

16  was really interesting and also very appropriate.  When

17  asked about certain statements, whether you agree with

18  them or not, one statement that you had said that you

19  agree with is that you would tend to believe a law

20  enforcement officer over a civilian witness.  And then

21  the next statement was:  Some law enforcement shade the

22  truth to make their case better.  And you agreed with

23  both of those.

24    A.   Yes.

25    Q.   Which is actually probably very appropriate,

```
 1  right --
 2       A.   Yes.
 3       Q.   -- based on your background?
 4       A.   Yes.
 5       Q.   Would you agree with me, Mr. Anderson, that,
 6  you know, everybody can potentially shade the truth,
 7  right?
 8       A.   Yes, sir.
 9       Q.   And growing up with a dad in law enforcement
10  and working in law enforcement, are you telling us that
11  naturally you'd give some credit to police officers,
12  right?
13       A.   Yes.
14       Q.   Do you remember when the Judge talked to you on
15  Monday, last -- this past Monday about some of the
16  general concepts of a trial and all of that stuff?
17       A.   Yes, sir.
18       Q.   And she was talking to you about witness
19  credibility and she told you what the rules are.  And
20  the rule is that every witness starts out equal before
21  you've heard them testify.  Right?
22       A.   Yes, sir.
23       Q.   And that applies to police officers,
24  prostitutes, priests, whoever the person might be.
25  Right?
```

1      A.   Yes, sir.

2      Q.   And can you agree with me or would you agree

3 with me that you would treat all witnesses equal, even

4 police officers, until you've heard from them?

5      A.   Yes, sir.

6      Q.   Are you going to give a police officer more

7 credibility just because you know they are a police

8 officer or will you wait to hear -- to hear them and see

9 what they have to say?

10     A.   I would hear what they had to say.

11     Q.   Okay.  Thank you.

12          One quick other item I was going to ask you

13 about.  I see you've got two adult sons.  Is that right?

14     A.   Stepsons, yes.

15     Q.   And one is 35 and how old is the other one?

16     A.   Thirty-nine.

17     Q.   Okay.  And I have to ask this because it's on

18 your questionnaire.  I don't mean to -- I hate to have

19 to pry into your personal business, but I see that one

20 of your sons has had a criminal case in the past?

21     A.   Solicitation of a minor over the Internet, yes,

22 sir.

23     Q.   Was that here locally?

24     A.   Galveston County.

25     Q.   Okay.  How long ago was that?

1      A.   Three years ago, four years ago, three years

2  ago.

3      Q.   Okay.

4      A.   Actually, it was probably four years ago

5  because he waited to go to trial for a while.

6      Q.   Okay.  Did he go to trial on that?

7      A.   He pleaded guilty.

8      Q.   Okay.

9      A.   Served two years.

10      Q.   Okay.  Two years in prison?

11      A.   Yes, sir.

12      Q.   Okay.  And is he out on parole, discharged?

13      A.   He's discharged.  He has to register, but he's

14  discharged.

15      Q.   Okay.  What do you think about that?  What are

16  your thoughts on that, having gone through that

17  experience?  Was that something close to you or --

18      A.   I don't understand it.  It's one of those --

19  the Internet to me is a dangerous thing.  I mean, it's

20  one of those you can get going back and forth on the

21  Internet.  My biggest problem with my son is it's one of

22  those he actually left there and drove 30 minutes.  And

23  in my opinion, in that 30 minutes, where did it not

24  click to him that this was a juvenile.  So, I just don't

25  understand it.

1    Q.   Yeah.  Do you still have a relationship with

2  him or --

3    A.   Yes.

4    Q.   Okay.  Is there anything about having gone

5  through that experience, such a close personal

6  experience, that would affect you to be able to be a

7  fair juror in a criminal case?

8    A.   I don't see that there would be any problem.

9    Q.   Okay.  Because I know sometimes it's hard.  We

10  tell people that you have to check your past background

11  and experiences at the door when you are a juror.

12    A.   Yes, sir.

13    Q.   Well, that's easier said than done sometimes.

14    A.   Yes, sir.

15    Q.   Naturally for some people they aren't able to

16  do that.  And that's fine.  You know, that's just one of

17  those things that we have to dig a little bit and find

18  out.  You think that experience, that personal

19  experience is something that you could set aside and

20  listen to the facts of this case?

21    A.   Each case is different.  I mean, it's one of

22  the things that I think my training has taught me, each

23  case is different.

24    Q.   Okay.  Well, I appreciate that, Mr. Anderson.

25  Sorry I had to ask you about that.

```
 1        A.   That's okay.

 2        Q.   Having been through the process, knowing the

 3  criminal justice system to the extent that you do, I

 4  want to visit with you just briefly about the parts of a

 5  trial and how a trial breaks down.  As you know, a trial

 6  is two parts.  We've got to decide the guilt-innocence

 7  phase of the trial --

 8        A.   Yes.

 9        Q.   -- and then the punishment phase of the trial.

10        A.   Yes.

11        Q.   Obviously, the evidence that is presented to

12  you as a juror is different in each phase as well.   In

13  the guilt phase, we are just focusing on the facts of

14  the case.  We present to you evidence, Natalie and I

15  have the burden of proof of proving the case to you

16  beyond a reasonable doubt, we've got to prove all of

17  those elements of capital murder to you, and our

18  evidence in the guilt phase has to focus in on that

19  case.

20        A.   Yes, sir.

21        Q.   And all of the other stuff, whether it be

22  criminal history, whether it be good things about the

23  defendant, other bad things, whatever it might be, those

24  don't come into play until the punishment phase.  Do you

25  follow me?
```

1      A.   Yes, sir.

2      Q.   Well, on the guilt phase, the Judge read you

3  that indictment.  What we have to prove to you for

4  capital murder are those certain things.  And it's also

5  on that screen to your right.  Those are the items that

6  we have to prove to you beyond a reasonable doubt.  Is

7  that clear?

8      A.   Yes, sir.

9      Q.   Okay.  And you will hold us to our burden on

10  those elements, will you not?

11      A.   Yes, sir.

12      Q.   Now, the Judge told you that -- and you know

13  that -- where you sit right now, the defendant is

14  presumed innocent.

15      A.   Yes, sir.

16      Q.   And he carries that throughout the trial.  He

17  does not have to take the stand.  The defense does not

18  have to call any witnesses.  They can sit there and not

19  question any of our witnesses, if they wanted to.  We

20  know that is not going to happen in this case --

21      A.   Yeah.

22      Q.   -- because these are two very skilled lawyers,

23  but in a vacuum that could happen.

24      A.   Yes, sir.

25      Q.   We carry that burden.  Are you going to -- are

1   you okay with that?  Do you understand that?

2       A.   Yes, sir.

3       Q.   Okay.  And right in line with that, just like I

4   said, the defendant does not have to put forth any

5   evidence, he does not have to take the stand and

6   testify, and he has that Fifth Amendment right not to do

7   so.  And that's something you are also okay -- or are

8   you telling us and I think you agreed on Monday that you

9   are okay with that?

10      A.   I understand taking the Fifth because in some

11  of the cases that I have filed -- and they are all

12  municipal cases and all Class C misdemeanors -- our

13  prosecuting attorney has not made the points that he

14  needed to make and I have seen defendants -- as you

15  know, in most class C cases the defend themselves.

16      Q.   Right.

17      A.   Get up when they would have been better off not

18  saying anything and actually hurting themselves from --

19  by speaking.

20      Q.   Right.

21      A.   So, yeah, I understand that.

22      Q.   So, you've seen it firsthand?

23      A.   Yes, sir.

24      Q.   In your role there at animal control, have you

25  ever had to go into court and testify?

```
 1        A.    Yes, sir.

 2        Q.    Okay.  On few or many occasions?

 3        A.    Few.  I mean, probably 25 over the period.

 4        Q.    How did you like that, being on that witness

 5   stand?

 6        A.    Not really.  I mean...

 7        Q.    Well, you aren't alone.  Most people would

 8   agree with you.  It's a little different experience,

 9   right --

10        A.    Yes.

11        Q.    -- getting up there.  I've had to do it and

12   this is what I do every day.  So, getting up there on

13   that witness stand, immediately nerves set in, right?

14        A.    Yeah.

15        Q.    So, you are going to be able to identify with

16   what some witnesses go through, won't you?

17        A.    Yes, sir.

18        Q.    Okay.  The Judge went over some concepts,

19   Mr. Anderson, in the beginning of trial regarding law of

20   parties and accomplice witnesses.

21        A.    Uh-huh.

22        Q.    Was that -- were those concepts you were

23   generally familiar with?

24        A.    Yes, sir.

25        Q.    And we'll talk a little bit about that in a
```

1   minute, but in talking about the phases of trial, if as

2   a jury the 12 of you decide and convict the defendant

3   and find him guilty, then only at that point, as you

4   know, do you move into the punishment phase of the

5   trial.

6       A.   Yes.

7       Q.   And like I said, at that point you may start

8   hearing evidence of, you know, different things about a

9   defendant, about a defendant's background, you might

10  hear good things, bad things, whatever it is.  You get a

11  fuller picture of who we're talking about at that point.

12              Now, in a capital murder trial, the Judge

13  explained to you -- and I think for some jurors it's

14  comforting and also maybe a little surprising -- that

15  you don't just go back there and say:  We want to assess

16  the death penalty in the case or not.

17      A.   Yeah.

18      Q.   You have to follow those three special issues

19  and answer those questions.  Do you remember that?

20      A.   Yes, sir.

21      Q.   And those are questions that have to be

22  answered independently and individually from each other.

23      A.   Yes, sir.

24      Q.   And to do that, the Judge is going to instruct

25  you that you can evaluate -- you will be asked to

1  evaluate all of the evidence.  You can evaluate the

2  evidence you heard in the guilt phase of the trial, you

3  can evaluate the evidence, if you heard any, in the

4  punishment phase of the trial in coming to a decision on

5  the questions.

6       A.  Yes, sir.

7       Q.  So, I want to visit with you a little bit about

8  those special issues.  On Special Issue No. 1, we call

9  that the continuing threat issue.  And you will be asked

10 again to find beyond a reasonable doubt whether or not

11 we've met our burden on this issue.  And essentially you

12 are going to be asked to decide if there is a

13 probability that the defendant will commit future acts

14 of violence.  And in determining that, there are a few

15 things in that question I want to talk to you about.

16           First of all is that word "probablity."

17 The Judge spoke to you a little bit about that on

18 Monday, but probablity, would you agree with me,

19 Mr. Anderson, is something less than a certainty, right?

20 Probability doesn't mean an absolute certainty.

21      A.  Yes.

22      Q.  But probably a little more than a possibility,

23 right?

24      A.  Yes, sir.

25      Q.  More likely than not, some people say.  A

1    probablity that the defendant will commit criminal acts

2    of violence.  Those words, criminal acts of violence, I

3    don't have to prove to you -- or Natalie and I don't

4    have to prove to you that it's necessarily another

5    murder or capital murder that's committed.  Right?

6         A.   Yes, sir.

7         Q.   Criminal acts of violence can mean many things.

8         A.   Yes, sir.

9         Q.   It can be a crime of -- an act of violence

10   against a person or it may be property.  Maybe it's a

11   threat.  Whatever in your mind constitutes a criminal

12   act of violence.

13        A.   Uh-huh.

14        Q.   Is that clear?

15        A.   Yes, sir.

16        Q.   And then whether or not that would constitute a

17   continuing threat to society.  And society can mean many

18   things.  It can be the streets you and I walk in and

19   live in in Harris County.  It can mean the society

20   within prison, the prison walls, fellow inmates, guards,

21   those people that work in prison.  Would you agree with

22   me?

23        A.   Yes, sir.

24        Q.   And up front, I usually -- I got off track a

25   little bit, but in a capital murder case there is

1    typically two punishments, the death penalty, and if the

2    death penalty is not sought or assessed, then it's --

3    currently it's life in prison with no parole.

4         A.   Yes, sir.

5         Q.   But that's current law.  That law did not go

6    into place until 2005.  So, prior to that, we have to go

7    back and assess the laws that were in place at the time.

8    And as you know, the offense date in this case is

9    alleged to be 1992.  So, we have to look at the laws as

10   they were in '92.  Does that make sense?

11        A.   Yes, sir.

12        Q.   And back in '92, it wasn't life without parole

13   because we didn't have that.  It was life with the

14   possibility of parole or the eligibility of parole after

15   serving a certain number of years.  And in this case,

16   it's 35 years.

17        A.   Okay.

18        Q.   So, that's why we talk about the society,

19   whether it be in prison or out of prison.

20        A.   Yes, sir.

21        Q.   Is that a question that you are comfortable

22   with?  Any questions on that?

23        A.   No.  It seems pretty straight forward.

24        Q.   Okay.  And I ask you that -- you know, when you

25   are asked to decide this question, you, as a jury, will

1   have just convicted the defendant of capital murder in a

2   hypothetical situation in order to get to that --

3        A.   Yes, sir.

4        Q.   -- spot.

5             Well, when doing so and when evaluating

6   that question, will you agree with me, Mr. Anderson,

7   that you are not going to automatically answer that

8   question "yes" just because you found someone guilty,

9   right?

10       A.   No.  I would answer the question the way I felt

11  that it needed to be answered.

12       Q.   Right.  And by evaluating the evidence and --

13       A.   Yes, sir.

14       Q.   -- testimony and what you've learned?

15       A.   Yes, sir.

16       Q.   Okay.  And in that second question, that second

17  special issue, No. 2, that deals with that concept of

18  law of parties.  And, again, it's that same standard of

19  beyond a reasonable doubt.  You, as a jury, have to

20  decide if, first of all, the defendant actually caused

21  the death of the deceased.

22       A.   Yeah.

23       Q.   But if you will recall, the Judge talked about

24  that.  Sometimes it doesn't necessarily have to be the

25  fact that he actually caused the death of the deceased.

1  It can be that he intended to kill that person or

2  possibly another person or should have anticipate that a

3  human life would be taken.  Is that clear to you?

4      A.  Yes, sir.

5      Q.  Okay.  And, again, you have to answer that

6  question independently, too, and evaluate the evidence

7  on that.

8      A.  Yes, sir.

9      Q.  And at that point, you would go on to the third

10 question.  Now, I want you to stop and think about where

11 you would be at as a juror or as a jury in this case, in

12 this situation.  If you had answered -- if you, first of

13 all, found the defendant guilty, you have answered that

14 beyond a reasonable doubt you believe there is a

15 probability that the defendant will commit future acts

16 of violence, so you've answered "yes" to the question.

17 You've answered "yes" to the second question.  You are

18 one question away from, essentially, sending a message

19 to the Judge, who will eventually assess the death

20 penalty, who will execute the defendant.

21     A.  Yes, sir.

22     Q.  So, the answer to this question is the only

23 question that is lingering at this point.  Right?

24     A.  Yes, sir.

25     Q.  And at that point, you've got to step back and

1    the law says that you have to look at -- and it tells

2    you -- all of the evidence.  You've got to look at the

3    circumstances of the offense, you've got to look at the

4    defendant's character and background, if you know

5    something about that, if there is evidence for that.

6    You've got to look at the personal moral culpability of

7    the defendant.  How involved was he, how -- you know,

8    where was he at in this offense.  And in deciding that

9    you've got to say:  Is there some sufficient mitigating

10   circumstance or circumstances that would warrant

11   something less than the death penalty?  And in this

12   case, life in prison with the possibility of parole.

13   It's basically a gut check, and you say:  Is there a

14   mitigating circumstance or circumstances out there that

15   would warrant a life sentence rather than death, and are

16   those circumstances sufficient?

17            Now, think about this.  You know, as far as

18   mitigating circumstances go, we could be talking about,

19   really, any number of things.  Right?

20        A.   Yes, sir.

21        Q.   Any number of things might be considered a

22   mitigating circumstance.  It could be something as

23   extreme as possible mental illness.  Would you agree

24   with me?

25        A.   Yes.

1    Q.   Maybe you learned -- for example, you've been

2  around.   That was kind of down in probably your neck of

3  the woods.   Back when Andrea Yates drowned her five

4  children.

5    A.   Yes, sir.

6    Q.   Do you recall that case?

7    A.   Yes, sir.

8    Q.   It's a sad tragic case that hit home right here

9  in Harris County, but --

10    A.   Yes.

11    Q.   -- she went through a couple of trials, but one

12  of the things that came out in trial, obviously, was her

13  mental illness.   And there wasn't a lot of debate on

14  whether or not she had some serious mental illness.

15    A.   Yeah.

16    Q.   You, as a jury, might consider something like

17  mental illness as a mitigating factor possibly.

18    A.   Yes.

19    Q.   And then you've got to evaluate that with the

20  evidence, but you can imagine that a skilled lawyer

21  could argue that almost anything is a mitigating

22  circumstance, right?

23    A.   Yes, sir.

24    Q.   Maybe you learn that the defendant has a

25  long -- a person has a long history of drug abuse.   A

1    lawyer might say that's a mitigating circumstance, but

2    on the flip-side, you might learn that that person has

3    never been involved in drugs and has been clean and

4    sober their whole entire life.  On the flip-side of

5    that, a lawyer could argue that also is a mitigating

6    circumstance.

7         A.   Yes.

8         Q.   Right?

9         A.   Yes.

10         Q.   So, if you believe there is a mitigating

11    circumstance, you've got to then take it a step further

12    and find that it's a sufficient mitigating circumstance

13    in light of all of the evidence.

14         A.   Yeah.

15         Q.   In light of the offense, the crime --

16         A.   Yes, sir.

17         Q.   -- whatever it might be.

18              Is that something that you would be

19    comfortable answering?

20         A.   Yes, sir.  I don't know how comfortable you can

21    be answering that question, but --

22         Q.   Well --

23         A.   -- I think it's something --

24         Q.   A very good point   Because it's not something

25    that's going to be comfortable.

1        A.    No.

2        Q.    Or easy to do.

3        A.    No.

4        Q.    But something that you could do?

5        A.    Yes.

6        Q.    Okay.  Mr. Anderson, we've talked a lot in

7   general terms, you know.  You know that at the end of

8   this case, first, you know, we would be asking that you

9   find the defendant guilty based on all of the evidence.

10  We would then ask you to evaluate all of the evidence

11  and if the evidence leads you in the direction of

12  answering those questions, "yes," "yes," and "no," that

13  the answers to those questions would essentially lead to

14  the execution of Obel Cruz-Garcia.  Right?

15       A.    Yes, sir.

16       Q.    And you can -- people talk about being in favor

17  of the death penalty and supporting the death penalty as

18  a possible punishment, but you are now very close to

19  being seated on a jury where that is going to be -- it's

20  going to be real.

21       A.    Yes.

22       Q.    So, as you sit here, you know that Obel

23  Cruz-Garcia sits here in this courtroom right there with

24  the headphones on.

25       A.    Yes.

1      Q.   If the evidence led you in a direction that

2   allowed you to answer those questions in that way, could

3   you return -- could you do that?  Looking at the

4   defendant, would you be able to do that?

5      A.   It would be hard, but I would have to answer

6   the questions honestly.

7      Q.   And you would do that based on the evidence and

8   the testimony?

9      A.   Based on the evidence and the testimony.

10            MR. WOOD:  I pass the juror.  Thank you,

11   Mr. Anderson.

12            VENIREPERSON:  Thank you.

13            THE COURT:  Mr. Cornelius, please proceed.

14                **VOIR DIRE EXAMINATION**

15   **BY MR. CORNELIUS:**

16      Q.   Mr. Anderson, I'm Skip Cornelius.  The Judge

17   introduced us the other day.

18      A.   Yes, sir.

19      Q.   Well, this is Obel Cruz-Garcia.  You met him

20   the other day.  Mario Madrid --

21      A.   Yes, sir.

22      Q.   -- my co-counsel across the table from me.

23            I want to hone in on the last question.

24   Can you ever imagine yourself not assessing a death

25   penalty where you've convicted someone of capital

1    punishment?

2          A.   Yes, sir.

3          Q.   Tell me about that.

4          A.   It depends upon the mitigating circumstances.

5    I mean, from what y'all have explained to me, it would

6    be if somebody was involved in something, wasn't

7    expecting it, you know, wasn't accepting the person to

8    die or something, or wasn't -- accidents happen.  You

9    understand what I'm saying?  It would be --

10         Q.   All of those things that you said -- sorry for

11   interrupting.

12         A.   That's fine.

13         Q.   All of those things that you've said indicate

14   to me that the person is not guilty of capital murder.

15         A.   Yes, sir.  I guess it would be.

16         Q.   So -- we'll come back to it.

17         A.   Yes, sir.  No problem.

18         Q.   I'm not giving enough information to answer.

19               Tell me about yourself.  Tell me about the

20   life and times of Clarence Anderson.

21         A.   Lived most my life in LaPorte.  I've been with

22   my job for 28 years.

23         Q.   Since you were 20, I guess?

24         A.   Twenty-one.

25         Q.   Twenty-one.

1       A.   And I wanted to ask a question.  I think I

2   might have answered something wrong.  Did I put 48 or 49

3   on my --

4       Q.   Forty-eight.

5       A.   I'm 49.  I apologize.

6       Q.   You can't be on the jury.  That's it.

7       A.   No.  I'll tell you -- well, if I make a

8   mistake, I'll tell you I made a mistake.  I mean...

9       Q.   Only kidding.

10      A.   I learned a long time ago that, you know, if

11  you mess up, you admit up to it, you know.  And that

12  honesty is the best policy.

13      Q.   Okay.  That's not a problem at all.

14      A.   Okay.

15      Q.   But tell me something more about yourself.

16  What do you do?  Other than working for the police

17  department, what else do you do?

18      A.   I help my parents out quite a bit there.

19  They're in their early seventies.  I normally have

20  dinner with them every night.  I've got two stepsons.

21  Well, I was divorced.  Unfortunately, my ex-wife passed

22  away, but out of the marriage, I manage to keep the two

23  kids.  I've got six grand kids and I enjoy them.  They

24  are all out of state right now.  I'm ready for them to

25  move back.  A little far away.  I like to cook.  I like

1  to go out and do things.

2      Q.  What about your law enforcement friends, do you

3  have friends that you hang out with?  That's kind of a

4  young term.  I don't know why I used that term "hang

5  out."

6      A.  Not really.  I mean, I'm friendly with

7  everybody that I work with and we're friends.  And, I

8  mean, if we need something or something happens, we're

9  there for each other.  But I have always kind of kept my

10  personal life separate from my employment and things

11  like that.  I found it to be -- not that -- I like the

12  people.  I've just found it to be good business.

13      Q.  How many are on the LaPorte Police Department?

14      A.  There are 75 sworn officers and I think a total

15  of 105 in the department.  We're not -- the animal

16  control is not sworn police officers.  We're part of the

17  support services division.

18      Q.  I gave a speech out at Webster about two months

19  ago --

20      A.  Yes, sir.

21      Q.  -- at the police department.  And I was shocked

22  at how large their police department is.

23      A.  It's amazing how much that area has grown down

24  there.

25      Q.  Unbelievable.  Not in size, but --

1       A.    Number, yes.

2       Q.    Has LaPorte done that, too?

3       A.    When I started, there were 35 officers.  And it

4   was probably 50 employees.  So we've better than

5   doubled.

6       Q.    But that's -- don't let me put words in your

7   mouth.  That's not your social circle, that professional

8   circle?

9       A.    No, sir.

10      Q.    So, do I need to worry about an impact that

11  might be on you from the other law enforcement people

12  there that are probably going to find out if you get

13  selected to serve on this jury that you are on a capital

14  murder jury?

15      A.    No, sir.

16      Q.    I know you wouldn't want it to.

17      A.    No.  And I don't feel that it would.

18      Q.    I know you wouldn't want it to.

19      A.    I'm not going to lie to you.  If I get picked,

20  this is not what I'm looking forward to; but I figure

21  it's a service and it's what you are supposed to do and

22  you're supposed to be as honest as you possibly can.

23  And, you know, y'all asked me not to look up the

24  gentleman's name.  I didn't do it.  I want -- because if

25  I was sitting in his shoes, I would want the most honest

1   people that I could get.  And I would want everything

2   followed.  I believe in fair.

3       Q.   So, you don't feel any pressure by the fact

4   that you work for a police department to do what they

5   would be proud of?

6       A.   No, sir.

7       Q.   Okay.

8       A.   I mean...

9       Q.   What about your dad, as a life-long or career

10  police officer, what, if any, impact would that have on

11  you?

12      A.   None that I can think of.

13      Q.   What are his feelings about capital punishment,

14  if you know?

15      A.   I think he supports it.  I mean, you know, but

16  I don't know that -- we've never really discussed it.  I

17  don't know that he thinks that anybody that's convicted

18  of capital punishment needs to have the death penalty.

19  I don't know.  You know, it's not really something we've

20  ever discussed.

21      Q.   Never discussed it?

22      A.   No.  Other than I know he is in support of it,

23  supports capital punishment, you know, but I don't --

24  you know, it's one of those I think it's easy to say

25  that you are in support of it, but I can tell you right

```
1   now that I would -- just sitting in this position, that

2   it actually scares me.  I mean, I will do my best to be

3   fair and impartial as I possibly can and try and come up

4   with the right decision.

5       Q.   I know you would.

6       A.   Yeah.

7       Q.   I know you would.  Do you think that police

8   officers make mistakes?

9       A.   Yes, sir.

10      Q.   I mean, do you know any that don't make

11  mistakes?

12      A.   No, sir.

13      Q.   Not demeaning them in any way.

14      A.   No, no, no.  I mean, nobody is perfect.

15      Q.   You know that there have been problems -- I

16  know you know there have been problems with people being

17  convicted of capital murder that didn't commit the

18  crime.

19      A.   Yes, sir.  There's been cases overturned that

20  I'm aware of.

21      Q.   We're going to plead not guilty in this case,

22  so we have to talk to you about capital punishment

23  stuff --

24      A.   Yes, sir, I understand.

25      Q.   -- because as you know, there is only one jury.
```

1        A.   Yes.

2        Q.   We don't have one jury for guilt-innocence and

3   another jury for punishment in case we lose.

4        A.   Yes, sir.

5        Q.   I don't want to telegraph to you or make you --

6   I'm not as worried about you as the other jurors, but I

7   want to make sure that you and I connect on this.  I'm

8   not thinking I'm going to lose this case and that's why

9   I'm talking to you about punishment.

10       A.   Yes, sir.

11       Q.   I'm planning to do my very best.  I don't know

12  what the jury is going to decide.  And you know that we

13  weren't there, we're not witnesses.

14       A.   Yeah.

15       Q.   The D.A.s weren't there, they are not

16  witnesses.

17       A.   No, sir.

18       Q.   So, neither of us know what the jury is going

19  to decide on guilt or innocence.

20       A.   No, sir.

21       Q.   But we have to talk to you about punishment.

22  I'm going to get back to that in a minute, but I want to

23  talk to you about guilt or innocence now.

24       A.   Yes, sir.

25       Q.   You know the case allegedly happened in '92.

 1      A.   Yes, sir.

 2      Q.   Do you -- I'm sure you realize that probably

 3  makes it a little harder for the State to prove a case

 4  that happened in '92.  Maybe not always, but just in

 5  terms of generally.  You would think it would be a

 6  little bit harder to prove one from '92 than it would be

 7  from like 2012.

 8      A.   I would think so.

 9      Q.   Just because it's harder to find the witnesses,

10  harder to get the witnesses, may not remember things,

11  what's happened to the evidence.

12      A.   Yes, sir.

13      Q.   Do you think that the police sometimes misplace

14  or intentionally or unintentionally mess up the

15  evidence?

16      A.   I would hope they wouldn't do it

17  unintentionally {sic}, but, I mean, I have known

18  evidence that has come up missing.  I've known -- we've

19  had -- not in LaPorte that I know of, but I know other

20  agencies had people that -- had people steal evidence

21  out of an evidence locker.

22      Q.   You know about the HPD Crime Lab, you followed

23  that from years go?

24      A.   I didn't follow it, but I know there was some

25  problems there, yes, sir.

1    Q.   Okay.  Now, what I want to ask is would you

2  be -- I don't know how to phrase this.  Would you cut

3  the State some slack and maybe not require them to come

4  up all the way to their burden of beyond a reasonable

5  doubt because the crime allegedly happened so long ago?

6    A.   No, sir.

7    Q.   I didn't think you would, but you see why I ask

8  that question?

9    A.   No, no.

10    Q.   I mean, that isn't what the law would

11  contemplate.  They have to prove it to the same burden

12  that they have to prove it no matter when it happened --

13    A.   Yes, sir.

14    Q.   -- beyond a reasonable doubt?

15    A.   Yes, sir.

16    Q.   Whatever that means to you.

17    A.   Yes, sir.

18    Q.   Okay.  And you know you decide --

19    A.   Yes, sir.

20    Q.   -- what proof beyond a reasonable doubt is.

21    A.   Yes.  I was surprised that there wasn't a

22  better definition than what there was, but...

23    Q.   Well, we had a definition before.  I mean,

24  you've been in law enforcement long enough probably to

25  know that.  We had a definition for quite a long time,

1  but they did away with it.

2       A.   Yeah.

3       Q.   And said that they need to leave it up to the

4  jury to decide, each individual juror to decide what

5  proof beyond a reasonable doubt is for them.

6       A.   Yes, sir.

7       Q.   It is fairly hard to define.  We had another

8  definition years and years ago, but now we have no

9  definition, so...

10      A.   Yeah.

11      Q.   And so, that's the way it is.

12      A.   Yes, sir.

13      Q.   So, if you are selected to serve,

14  hypothetically, on a capital murder jury, and you heard

15  the evidence in the case and you went back to deliberate

16  with the other jurors and you weren't convinced in your

17  own heart and own mind that the person on trial was

18  guilty and you listened to the other jurors and you had

19  to listen to the evidence and to the State's attorneys,

20  but after thinking about the whole thing, you may think

21  the person on trial might have done it, or maybe

22  probably done it -- did it, but you are not convinced

23  beyond a reasonable doubt, would you find him not

24  guilty?

25      A.   Yes, sir.

1    Q.   I know that you know you are supposed to say

2    that, but could you really do it?

3    A.   I think so.

4    Q.   Okay.  All right.

5    A.   I mean, it's one of those fair is fair, you

6    know.  And if I was -- I put everything as if I was in

7    that case, I would want everybody to be as honest and

8    upfront as they could be.

9    Q.   What if a big part of the case -- that's an

10   improper question.  I can't go into anything that's even

11   potentially part of this case.

12   A.   Yes, sir.

13   Q.   Can't make --

14   A.   Okay.

15   Q.   -- hypotheticals on that without tipping you

16   off about something.

17   A.   Okay.

18   Q.   Has there been anything that happened in your

19   life that you think I ought to know about that might

20   affect how you'd vote on guilt or innocence or on

21   punishment?

22   A.   No, sir.

23   Q.   Any terrible crimes that you've either observed

24   or followed or been a part of or any event that affected

25   you personally or somebody that you know or love that I

1  probably ought to know about?

2      A.   No, sir, nothing I can think of.

3      Q.   Well, I'm glad to know that.

4      A.   I'm glad to be able to answer it that way.

5      Q.   Now, I want to talk to you quickly -- I'm kind

6  of moving into punishment.

7      A.   Yes, sir.

8      Q.   There is this Question No. 70, which if I were

9  the person designing these questionnaires I probably

10  would not put this in here.

11              MR. CORNELIUS:  Judge, can he see your --

12              THE COURT:  Yes.  I have the times written

13  on the front here.  I will turn the page.  It's Question

14  No. 70, you said?

15              MR. CORNELIUS:  Yes.  And that's all I need

16  him to look at.

17              THE COURT:  I will hand it to you

18  (indicating).

19      Q.   (By Mr. Cornelius) Page 11, yes, sir.

20              I want to read it out loud while you are

21  reading because that way it goes into the record.  Do

22  you follow what I'm saying.

23      A.   Yes, sir.

24      Q.   She's writing this down.

25              Please state whether you more closely agree

1   or disagree with the following statements.  I want you

2   to go down to number F.

3        A.   Okay.

4        Q.   A sentence of life in prison for someone

5   convicted of capital murder may or may not be

6   appropriate as it depends on the facts and

7   circumstances.  And you said:  I agree.

8        A.   I'm sorry.  That was a mistake.

9        Q.   No, no.  That's not a mistake.

10       A.   No.  I --

11       Q.   Read it again.  That's the right answer.

12       A.   A sentence of -- okay.  I still agree with

13  that.  I think there is different circumstances.

14       Q.   Right.  If we -- if that were the only question

15  on No. 70, everything would be fine.  And everything is

16  fine anyway on No. 70, but I want to talk to you about

17  it for a second.

18       A.   No problem.

19       Q.   That's the most important part of No. 70 in my

20  mind and you are absolutely dead-certain correct.  But

21  let's go up to number A.  A and B are, frankly, the same

22  question, one is written positively and one is written

23  negatively.  It's basically asking you or asking any

24  juror if life is enough punishment and seeing what you'd

25  say on that.  And you're saying you disagree that life

1    is enough punishment in A, but you are probably saying

2    you disagree because it might not be in every case

3    enough.

4         A.   Yeah.

5         Q.   And the other one, life is not enough, and you

6    agreed, but you're probably not saying in every case

7    it's not enough, you are just saying in some cases it's

8    not enough.  Right?

9         A.   Yes, sir.  My feeling on that -- and if I

10   answered it wrong, that's -- each case is different.

11        Q.   Okay.

12        A.    I mean, that would be the same on any case that

13   I would file in our court.  Each case is different, you

14   know.  I mean, I file charges and after listening to

15   everybody talk in court and everything, and if they were

16   found not guilty or not fined that didn't hurt my

17   feelings at all.

18        Q.   Okay.  Let's go to D.  This is the one I want

19   to ask you about.  And D and E are basically the same

20   questions.  We'll just look at D.

21        A.   Okay.

22        Q.   A sentence of life in prison for someone

23   convicted of capital murder is wasteful to society

24   because we have to support that person in prison with

25   taxpayer money.  And you said you disagreed with that.

1    A.    That it's wasteful?  If it doesn't meet all the

2    three questions, just knowing the three questions now

3    that the gentleman or whoever is -- doesn't actually

4    deserve the death penalty, then why would it be

5    wasteful?

6         Q.    Right.  So, you are -- tell me if I'm right.

7    What you're saying is by picking that disagree is that

8    you are not going to give somebody a death penalty just

9    because it's expensive to keep them in prison?

10        A.    No, sir.

11        Q.    Okay.  That's a great answer for me.  I'm just

12   wanting --

13        A.    No, sir.

14        Q.    -- to talk to you about it.

15        A.    That -- I'm sorry.  That shouldn't enter into

16   the decision.

17        Q.    Okay.  When you answered that questionnaire --

18   as you and I are sitting here now talking about it, have

19   you -- are you just saying that I don't care what it

20   cost, I'm not going to give somebody -- I don't care

21   whether it's more expensive to do the appeals and the

22   process and to try to execute them or more expensive to

23   keep them in prison, I don't really know which one is

24   the most expensive and I don't really care, I'm not

25   going to give them the death penalty just because

1  they'll have to be in prison and we'll have to support

2  them?

3      A.   No, no.

4      Q.   That is what you're saying, right?

5      A.   That is what I'm saying, yes, sir.  You know,

6  it's the taking of somebody's life.  And I don't think

7  that's really got a price tag on it, sir.

8      Q.   All right.  But do you have any knowledge as to

9  whether it's more expensive to go through the whole

10  process of prosecuting someone for the death penalty,

11  giving the death penalty, doing the whole appellate

12  process, which you know from your experience it takes a

13  long time before somebody actually gets executed.

14      A.   Yes, sir.

15      Q.   You know that, right?

16      A.   Yes, sir.

17      Q.   And during that long period of time, they're

18  having to be paid for in prison anyway.

19      A.   Yes, sir.

20      Q.   And so, by the time they get executed, which I

21  don't know if you know what the average -- and I'm not

22  going to tell you, but you know it's a long time.

23      A.   Uh-huh.

24      Q.   It's only from that point that the society

25  would say -- even the first dollar in making this

1  comparison.  And so, there are people -- I will just

2  tell you this.  I think everybody agrees.  There are

3  people on both sides of that saying it's actually more

4  expensive to execute them than it is to support them for

5  the rest of their life.  Plus there are statistics as to

6  how long people can live in prison and how long people

7  have lived in prison, and stuff like that.  You probably

8  know more about that, prison conditions, than a normal

9  person.  But do you have -- have you ever made any study

10  of that yourself or read anything or been told by an

11  expert about costs?

12      A.   No, sir.

13      Q.   Okay.  All right.  That's a long way --

14      A.   What you said, though, it sounds more like --

15  I'm just guessing, but it sounds like it's more to have

16  somebody on the death penalty than it would be to

17  support them in prison.

18      Q.   It doesn't cost very much to support somebody

19  in prison.

20      A.   I wouldn't know, but I know none of this is

21  cheap.

22      Q.   Okay.  All right.  Now I want to talk to you --

23          MR. CORNELIUS:  How much time do I have,

24  Judge?

25          THE COURT:  You began at 46.  So, you still

```
 1   have about -- a little less than ten minutes, eight
 2   minutes.
 3                   MR. CORNELIUS:  Great.
 4        Q.   (By Mr. Cornelius) I want to talk you about the
 5   three questions.  Question No. 1 is on the board.
 6        A.   Yes, sir.
 7        Q.   I'm just going to be straight out up front with
 8   you about what I'm afraid of.
 9        A.   Yes, sir.
10        Q.   And I'm afraid that any juror, not just you --
11   and I'm not picking on you.
12        A.   No.  I understand.
13        Q.   Although the law enforcement full career scares
14   me --
15        A.   Yes, sir.
16        Q.   -- somebody that works in law enforcement on my
17   jury.  And, you know -- you know that I'm going to try
18   this case -- whether you are on the jury or not, I'm
19   going to try this case to a death-qualified jury.
20        A.   Yes, sir.
21        Q.   That means every single person on the jury will
22   have testified under oath that they believe in capital
23   punishment and they can do it.
24        A.   Yes, sir.
25        Q.   Some people have said they believe in it, but
```

1   they can't do it.

2        A.   Yes, sir.

3        Q.   They're not going to ever be on the jury.

4        A.   Yeah.

5        Q.   When you try one of your animal cruelty cases,

6   or whatever, the State doesn't get to have a jury that's

7   death-qualified on that.  That's not an issue.  But I am

8   unfortunate enough to get a death-qualified jury to

9   defend my client in front of.

10       A.   Yes.

11       Q.   So, I don't want to have lost the case before I

12  started.

13       A.   I understand.

14       Q.   One of the questions that I ask anybody that I

15  think has a chance of making the jury is this:  If you

16  find somebody guilty of capital murder -- and earlier

17  when we were talking about this, I asked you to tell me

18  about how -- a case where you wouldn't give him the

19  death penalty.  What you said back to me were situations

20  where it was an accident, or, you know, where he didn't

21  anticipate the person would be killed.  That's not what

22  I'm talking about now.  Those people wouldn't be

23  convicted of capital murder.

24       A.   Yes, sir.

25       Q.   I'm talking about a case where --

1    hypothetically where you and the other jurors hear the

2    evidence and are all convinced beyond a reasonable doubt

3    that the person on trial -- not this guy, some other

4    person on trial -- is guilty of capital murder.  Okay?

5    And so, knowing that he committed a capital murder,

6    you've just convicted him of capital murder in my

7    hypothetical.

8         A.   Uh-huh.

9         Q.   You are being asked this question:  Is there

10   the probability -- not a guaranteed certainty, but is

11   there the probability -- something more than a

12   possibility and less than a certainty, but a

13   probability, is it probable that this person would be a

14   continuing threat to society, either in prison or on the

15   outside.  And there are people that would say:  What

16   somebody has done in the past is the greatest indicator

17   of what they will do in the future.  And so, I'm

18   wondering from you -- and I have to accept your answer,

19   whatever it is -- if you see yourself now in that

20   position, having actually convicted someone of capital

21   murder, that you can actually ever vote a "no" to that

22   question, or will you always say:  Yeah, I'm afraid that

23   if I convicted him, there is at least the probability

24   that he will be a continuing threat?

25        A.   It would depend upon the background.

1     Q.   Okay.

2     A.   And, I mean, yeah -- I mean, if -- you know, I

3  have no clue what any defendant, not just yours, would

4  say, you know, what they have done up to that point,

5  what they have done since that point.  That would have

6  to play a factor in it.

7     Q.   So, I'm not trying to commit you to what you'd

8  have to have or not have to have.

9     A.   Yeah, yeah.

10    Q.   Is there a possibility you could say "no" --

11    A.   Yes.  I feel so.

12    Q.   -- to that question?

13         You don't have a problem with that at all?

14    A.   No.  Like I said, nothing -- how do I say this?

15  There is mitigating factors in everything.

16    Q.   We'll get to mitigation.

17    A.   Okay.  I know, but that's --

18    Q.   This is sort of an empirical thing.  This is

19  not mitigation.

20    A.   Okay.  Sorry.

21    Q.   I'll go straight to mitigation because I think

22  you understand the law of parties and --

23    A.   Yeah.

24    Q.   That Question No. 2 is essentially a further

25  application of the law of parties, but a more committing

1    application.

2        A.   Yes, sir.

3        Q.   So, I don't care about it for this purpose.

4    This is my last thing I'm going to go over with you.

5        A.   Okay.

6        Q.   To get to this mitigation question --

7        A.   Yes, sir.

8        Q.   -- you will have -- and I'm talking about

9    hypothetically next year or something -- you will have

10   convicted the person that's on trial.

11       A.   Okay.

12       Q.   Right?  You wouldn't be in punishment if you

13   hadn't convicted him.

14       A.   Yeah.

15       Q.   You would have convicted the person on trial

16   and you will have answered Special Issue No. 1 "yes,"

17   there is the -- whatever it would take, there is the

18   probability he's going to be a continuing threat.

19       A.   Yes.

20       Q.   You and the other eleven members have decided

21   that.  You will have answered Special Issue No. 2 "yes,"

22   we believe beyond a reasonable doubt that he either

23   personally killed that person or intended that person to

24   be killed or knew the person was going to be killed and

25   just didn't care, you know --

1     A.   Yes, sir.

2     Q.   -- anticipated it.

3     A.   Yes, sir.

4     Q.   So, that person is on his way to a death

5    sentence unless the jury decides to bail him out for

6    whatever reason.  And the Supreme Court, when they

7    mandated this, the Supreme Court of the United States,

8    called it mitigation.

9     A.   Yeah.

10     Q.   The theory behind this is to let a jury who has

11    convicted someone answer the other questions in a way

12    where that person is going to get a death penalty, to

13    step back, take a breath, re-commit themselves to

14    looking at the evidence, and then decide:  Is there some

15    reason why the case ought to be mitigated to a life

16    sentence rather than a death sentence.  Could you ever

17    do that?

18     A.   Yes, sir, I think I can.

19     Q.   You really could?

20     A.   Yes.

21     Q.   I mean, it's hard to say --

22     A.   Yes.

23     Q.   You have not done it yet, but...

24     A.   I mean -- I mean, until I see it, I can't tell

25    you what I'd say one way or the other, but, yeah, I

1  think I could.  It's one of those -- because when you

2  are at that point you would need to -- I would want to

3  look at everything, I would want to make sure that there

4  wasn't something I missed or anything that would put

5  somebody to death when they didn't need to be put to

6  death.

7      Q.  Okay.  Do you have any questions?  Those are

8  all my questions, but if there is something bothering

9  you or any question you have, now is the time.

10     A.  No, sir.  No.  Fascinated by the process, but

11 that's -- no.  I'm good, I think.

12             MR. CORNELIUS:  Pass the juror, Judge.

13             THE COURT:  Sir, if you'll step out this

14 door right here to the side.  The deputy will assist you

15 because I think it's locked.  We'll discuss you and be

16 right back with you.

17             VENIREPERSON:  Okay.

18             (Venireperson exits courtroom)

19             THE COURT:  As to Juror No. 70, Clarence

20 Anderson, what says the State?

21             MR. WOOD:  The State accepts Juror No. 70,

22 Mr. Anderson.

23             THE COURT:  Okay.  And the defense?

24             MR. CORNELIUS:  One second, Judge, if I

25 might.

```
 1                    THE COURT:  Very good.
 2                    (Pause)
 3                    MR. CORNELIUS:  We're going to exercise a
 4    peremptory, Judge.
 5                    THE COURT:  All right.  Granted.  Juror
 6    No. 70, Clarence Leroy Anderson, is excused on a defense
 7    peremptory challenge.
 8                    You may bring him back in, deputy.
 9                    THE BAILIFF:  Yes, Your Honor.
10                    (Venireperson enters courtroom)
11                    THE COURT:  Okay.  Mr. Anderson, you are
12    excused as a juror in the case.  I really appreciate you
13    coming down and sharing all your feelings.
14                    VENIREPERSON:  Thank you, Your Honor.
15                    THE COURT:  All three days with us.
16                    VENIREPERSON:  Yes, ma'am.  Thank you.
17                    THE COURT:  It's a lot of effort to make.
18    And we could not have this process without involved
19    citizens like yourself.
20                    So, I want to release you from all of the
21    instructions that you received orally from me and in
22    writing.
23                    VENIREPERSON:  Yes, ma'am.
24                    THE COURT:  And so, you can talk with
25    anyone you want about the case.  If you need something
```

```
 1   for work today, Deputy Perry can get that for you.  It
 2   will excuse you through 5:00 today.
 3                 VENIREPERSON:  Yes.
 4                 THE COURT:  Also we can get you a bus pass.
 5                 VENIREPERSON:  I don't need a bus pass.
 6   Thank you, Your Honor.
 7                 THE COURT:  Thank you.  Have a good day.
 8                 THE BAILIFF:  Have a good day, sir.
 9                 (Venireperson excused)
10                 THE COURT:  We have 69 back there, but
11   we're still missing 64, correct?
12                 THE BAILIFF:  I couldn't get ahold of her.
13   She only had a work number on there.  I left a message
14   and I haven't heard back from her.
15                 THE COURT:  She's not there?
16                 THE BAILIFF:  No.  He had her coming at
17   1:00.
18                 THE COURT:  Okay.  So, I'm going to ask
19   both sides again:  Is it the agreement that we take
20   Juror No. 69 out of the turn, Patricia Rivera, and do
21   her next?  Is that okay with the State?
22                 MR. WOOD:  No objections.
23                 MR. CORNELIUS:  No objections from the
24   defense.
25                 THE COURT:  Mr. Obel Cruz-Garcia, is it
```

1  your agreement that we proceed on Juror No. 69, Patricia

2  Rivera, out of order?  In other words, we're skipping

3  Nancee Pyper at this point.  Is that your agreement?

4             THE DEFENDANT:  Yes, ma'am.

5             THE COURT:  Very good.

6             Call her in, Deputy.

7             (Venireperson sworn)

8        **PATRICIA RIVERA LOPEZ, VENIREPERSON NO. 69,**

9  was called as a prospective juror, and testified as

10  follows:

11                    **VOIR DIRE EXAMINATION**

12  **BY THE COURT:**

13     Q.   Good afternoon, Ms. Rivera.

14     A.   Good afternoon.

15     Q.   You can have a seat.

16             THE COURT:  Sorry.  Go ahead, Deputy.

17             THE BAILIFF:  Speak directly into the

18  microphone.

19     Q.   (By The Court) And your name is Patricia

20  Rivera?

21     A.   Yes.

22     Q.   You have it also listed as Patricia Lopez?

23     A.   Correct.

24     Q.   Are you Lopez or Rivera?

25     A.   Now I'm Lopez.  I'm married.

1      Q.   Okay.  Now you are Lopez.  Rivera was your

2   maiden name.  So, we're going to call you Patricia

3   Rivera Lopez.

4      A.   That's fine.

5      Q.   You are Juror No. 69 from the general venire

6   panel that was called over in the State of Texas vs.

7   Obel Cruz-Garcia?

8      A.   Correct.

9      Q.   And you heard my general voir dire on Monday of

10  this week, correct?

11     A.   Yes.

12     Q.   This is a continuation of that process, voir

13  dire.  It's when the lawyers individually get to speak

14  with you.  I'm going to allow a lawyer from each side to

15  have half an hour with you.  I'm holding them to that

16  time.

17     A.   Okay.

18     Q.   During that time, they will ask you questions

19  over many of the same topics that I discussed, but it

20  will be more personal, directed towards your feelings on

21  the law.  And you are sworn to tell the truth, but there

22  is really no right or wrong answers.  It's just the

23  truth from your own heart.  And we need to know that so

24  that we can make sure that we seat a fair jury.  If

25  there is any questions they ask that you don't

 1   understand, please ask them to rephrase them.  Okay?

 2        A.   Okay.

 3        Q.   I do have three questions before we get going

 4   here.  The first is:  Do you have any religious,

 5   personal, or moral reasons why you would be unable to

 6   sit on a jury where the death penalty is a possible

 7   punishment?

 8        A.   No.

 9        Q.   Do you know of any reason why you could not be

10   fair and impartial to both sides in a criminal case?

11        A.   No.

12        Q.   Have any of your answers from the questionnaire

13   that you completed on Friday, May 31st changed?

14        A.   No.

15        Q.   Okay.  We all have a copy of your

16   questionnaire.  So, if at any time you need to see that

17   just to see how you answered a question, please ask for

18   it.  I'm going turn you over to Ms. Tise.

19             THE COURT:  And it is 11:18 -- 11:19.

20   Excuse me.

21             MS. TISE:  Thank you, Judge.

22                    **VOIR DIRE EXAMINATION**

23   **BY MS. TISE:**

24        Q.   Good morning.

25        A.   Good morning.

1      Q.   Thank you for coming back to see us today.  I

2  know you really didn't have a choice.

3      A.   Yeah.

4      Q.   But we still appreciate it.

5      A.   That's funny.

6      Q.   My name is Natalie Tise and this is Justin

7  Wood.  He is my co-counsel on this case.  And we work

8  for the State of Texas.  We're the prosecutors.  Okay?

9      A.   Okay.

10     Q.   I want to talk to you a little bit in general

11 about some things that are on your questionnaire and

12 just get your general opinion on capital punishment and

13 criminal cases and that kind of thing.

14     A.   Okay.

15     Q.   I want you to know this isn't a test.  You

16 know, your answer is your answer.  And just be honest.

17 Okay?

18     A.   Okay.

19     Q.   Just relax and be honest like you would if you

20 were talking to somebody you knew.  Okay?

21     A.   Okay.

22     Q.   When you got this questionnaire last week, I

23 guess a week ago from today, and started filling it out,

24 I guess it became pretty obvious pretty quick that this

25 is a death penalty case.

1      A.   Yes.

2      Q.   What went through your mind?  How did you react

3  to that?

4      A.   I really didn't have anything to say because I

5  haven't heard what happened, why people did it, or if

6  they did it.  I was just answering the questions.

7      Q.   Okay.  So, you just kind of took it as just an

8  exercise and answered the questions asked.  No real

9  feelings one way or the other came over you?

10      A.   No, ma'am.

11      Q.   And the reason I ask that is some people will

12  tell us:  Wow, when I saw this, it just gave me a

13  feeling of anxiety or made me nervous, or something like

14  that, but that didn't happen in your particular case?

15      A.   No.

16      Q.   Okay.  And had you really ever thought about

17  what your opinion was on the death penalty prior to that

18  Friday?

19      A.   Actually, three weeks ago I was watching TV and

20  they were talking about that.  So, it just caught my

21  mind.  I'm not really against it or for it, to do it.

22  It just all depends on what happened for me.  I need to

23  hear what's going on and see what I think of the person.

24      Q.   And so, what was it that you were watching on

25  TV that brought this up and made you think about it?

1    A.   It was just a program in Spanish on Univision.

2  And they were talking about lawyers that are against it

3  and lawyers that are for it.

4    Q.   And did the program seem to take a position one

5  way or another?

6    A.   It just put me in between.  Because I agree

7  with some of the stuff the person who agreed on and then

8  I was also thinking about the other side, which is they

9  don't believe in that.

10   Q.   Okay.  So, what kind of things were said in the

11 program that you felt like you agreed with?

12   A.   I think that if you do something, you need to

13 pay for it; but it just all depends on -- like she spoke

14 about on Monday, on the evidence.  And then I cannot

15 judge someone right then and there.  I need to hear what

16 happened, the story, and then make my mind up.

17   Q.   That's a really good position.  And really,

18 that's the position that the law requires you to take,

19 to be open-minded and listen to the evidence and make

20 your decision from there.  And what I hear you saying is

21 that's how you look at it.

22   A.   Yes.

23   Q.   Okay.  Was there anything about the program

24 that stuck out in your mind where it bothered you or

25 made you think negatively towards the death penalty?

1      A.   No.

2      Q.   Okay.  How long would you say you've felt

3  favorably towards the death penalty as a possible

4  punishment in certain types of cases?

5      A.   Never.

6      Q.   So, was it just something you really first

7  thought about three weeks ago when you watched the

8  program?

9      A.   Pretty much, yes.

10      Q.   Okay.  Do you know how members of your family

11  feel about it, people that are close to you?

12      A.   Some are against it and some are in favor.

13      Q.   Okay.  Anything about that that you think might

14  cause you some concerns if you are a juror?  Anybody in

15  your family who might pressure you or --

16      A.   Well, no because whatever happens here is just

17  between me and all of you.  Nobody else has to know

18  about it.

19      Q.   You are absolutely right.  This is not

20  something that you are really allowed to discuss outside

21  of what you hear in the courtroom until after the case.

22      A.   Some people tell me, like before all of this,

23  that I should be against it or for it.  I just listen to

24  what they are saying, not what I -- I don't have to tell

25  them what I believe in this case or in other matters in

1  my life.

2      Q.   That's absolutely right.  And you are just

3  recently married.  Do you know how your husband feels

4  about the death penalty?

5      A.   He is the same as I am.  He needs to hear the

6  evidence.  We've spoken about this because of the

7  program.  So, he told me the same things that I believe

8  in.

9      Q.   Do you think the punishment should fit the

10  crime?  What would be your opinion of that statement?

11      A.   I don't understand.

12      Q.   When you're talking about needing to hear the

13  evidence and hearing the evidence of the crime, hearing

14  evidence about the defendant, good or bad, do you think

15  the punishment should fit the evidence in the case?

16      A.   Yes.

17      Q.   Okay.  And if it's the death penalty, then it's

18  the death penalty, if that's where the evidence leads

19  you?

20      A.   Yes.

21      Q.   I want you to take a look across the courtroom.

22  Obel Cruz-Garcia is sitting right there in the gold tie

23  with the headset on.

24      A.   Uh-huh.

25      Q.   He is the defendant in this case.  And at the

1    end of the trial, Justin and I are going to ask you to

2    follow the law and the evidence, wherever it leads you,

3    and if it leads you to answer those special issues that

4    the Judge talked to you about in the way that it leads

5    to the death penalty, will you be able to do that

6    knowing that Mr. Cruz-Garcia is a living, breathing

7    human being just like me and you?

8         A.   Yes, I would.

9         Q.   He might have family who is here to support

10   him, he might have people who love him.

11        A.   Yes, I understand.

12        Q.   Will you be able to do it?

13        A.   Yes.

14        Q.   Thank you.

15              I want to ask you some things that are on

16   your questionnaire.

17        A.   Okay.

18        Q.   One of the things that you talked about -- and

19   if you need to look at your questionnaire, I think we

20   can maybe find you a blank one if you want to refresh

21   your memory.

22        A.   Okay.

23              THE COURT:   I've got the cover page, but

24   the rest of it (indicating).

25        Q.   (By Ms. Tise) On Page 3 at the bottom, one of

1  the things that you said is:  I believe if you do

2  something wrong, you need to man up to the consequence.

3       A.   Yes.

4       Q.   Okay.  What did you mean by that?

5       A.   I mean not just this particular case, but

6  anything.  Whatever you do in your life, good or bad,

7  it's going to have a consequence.

8       Q.   Okay.

9       A.   If you do something great, you're going to have

10 an award.  It doesn't matter what you do.  If you do

11 something bad, then you are not going to get an award.

12 You might get something else.  Not just in this

13 particular case, but in anything that anybody decides to

14 do in your life.

15      Q.   Okay.  You also -- on Page 9 you were asked

16 what you felt like the objective of punishment for

17 criminal offenses was.

18      A.   I really didn't understand that question.

19      Q.   Okay.

20      A.   I just wrote what I thought an answer would be.

21      Q.   Okay.  And can you tell me what you -- what you

22 wrote?  Because I wasn't able to read some of the words.

23 So, is it because all crimes you see are the same?

24      A.    It needs to stop.  Like, we see something like

25 on what I was thinking, like the shooting, one shooting

1   started and then like this whole massive start --

2   shootings are shootings and then now like it's going

3   to -- the firemen that died.  And then everyone is

4   starting fires.  So, I don't know if that's people that

5   are doing it or not, but I believe that everybody needs

6   to see how we're able to stop crime in this world.  And,

7   I mean, killing somebody, hitting somebody, it doesn't

8   matter, robbing.  That's what I believe.  There needs to

9   be something for that to be stopped.

10      Q.   Okay.  So, the way I'm reading this is you're

11  concerned about crime and violence in our society.

12      A.   Yes.

13      Q.   Is that fair?

14      A.   Yes.

15      Q.   And you think that it needs to be addressed?

16      A.   Yes.

17      Q.   Okay.  I think that's a legitimate concern to

18  have and a legitimate thought about it.  The one thing I

19  want to make sure, though, is if you -- would you agree

20  with me that capital punishment is not always the way to

21  stop it, it's going to depend on the facts of the case?

22      A.   Correct.

23      Q.   Okay.  So, there is different types of

24  punishment and depending on the type of crime

25  committed --

1     A.   Yes.

2     Q.   -- and other factors, that would control your

3   decision on whether or not you would get the death

4   penalty?

5     A.   Yes.

6     Q.   Okay.  One of the things that you said in your

7   questionnaire -- and looking at Page 10, you said:  Any

8   person, man or woman, young or old, who commits capital

9   murder should pay with his own life.  Okay.  And a lot

10  of times people answer these questions before they

11  really know a lot.  I mean, you are forced to.  You are

12  given it before you really know.  You have not heard

13  from the Judge about how the system works.

14          So, I'm concerned about your -- it says:

15  Any person.  And it's the way the question is written.

16  So, it kind of puts you in a position of "yes" or "no"

17  to something extreme, but now that you know how capital

18  murder works and how the trial process works, would you

19  agree with me that that's going to depend on the

20  situation, or do you feel like if we present evidence

21  and you convict someone of capital murder, you are

22  automatically going to give them the death penalty?

23    A.   No.  I'm in between.

24    Q.   Okay.  So, you would -- you would want to hear

25  other evidence to make that decision?

1      A.   Yes.

2      Q.   Okay.  It also asks you -- it says:  Capital

3  punishment has never been effective in preventing crime.

4  And you agreed with that.  What did you mean by that?

5      A.   Well, what I understand of that question is

6  like I have heard a lot of cases that there has been

7  capital murder, but that's not stopping either other

8  people that are still killing other people.

9      Q.   Right.

10     A.   So, I agree that it's not something that is 100

11  percent or 90 percent or 10 percent it's going to

12  reflect on anyone else because it's still happening.

13     Q.   Right.  Do you believe that capital punishment

14  does prevent that one person from committing other

15  crimes once the punishment is --

16     A.   Well, if they do capital murder, they are not

17  going to do it again, but they are never going to learn

18  what they did as well.  So, it's half and half.

19     Q.   Do you think that would affect you, that

20  position would affect you at all in the decisions that

21  you make in the case --

22     A.   No.

23     Q.   -- how much you think it deters other people in

24  society?

25     A.   No.  Because we are only talking about one

1    specific person at this time.

2        Q.   Okay.  Fair enough.

3              Also No. 6, it says:  Life in prison is

4    more effective than capital punishment.  And you said

5    "yes."

6        A.   I agree on that depending on the evidence.

7        Q.   Okay.  Tell me a little bit more about your

8    feelings on that.

9        A.   I believe that -- like I said, I'm halfway in

10   it or against it, because depending on what type of case

11   it is, then I believe that that person should not be

12   dead, they should pay life, like without having freedom.

13   Because once they're dead, they're not going to be here

14   so it's not going to be -- they killed somebody, he's

15   dead, oh, well, that's it.  And I don't think that's the

16   way it should be, not the easy way, depending on the

17   case.

18       Q.   So, you think the death penalty is the easy

19   way?

20       A.   Yes, sometimes.

21       Q.   So, you also said "sometimes."  So, tell me

22   what the opposite side of that would be.

23       A.   Like I said, it's all depending on what type of

24   case it is.

25       Q.   Okay.

1      A.   What the evidence is.  That's why I'm saying

2   sometimes.  Because I'm 50 percent against and 50

3   percent not against it, so...

4      Q.   Okay.  So, I didn't ask you this question at

5   the beginning, but when we talked about where you stood

6   on capital punishment, where would you put yourself on a

7   scale of one to ten?  If you would -- one would be

8   absolutely against the death penalty, and ten would be

9   absolutely in favor of the death penalty.

10      A.   Five.

11      Q.   But I'm going to take five off the table.  So,

12   where would you put yourself?

13      A.   Six.

14      Q.   Okay.  And if you were in charge in the state

15   of Texas and you could make all the laws, would you have

16   the death penalty?  Would it be part of the laws if you

17   were the boss?

18      A.   I don't know.

19      Q.   Okay.  What would be your thinking?  What would

20   be the -- your struggle there?  What would be your

21   thoughts on both sides of that position?

22      A.   I'm just thinking what if one of my family

23   members would be there.

24      Q.   Uh-huh.  Yeah.  Be charged with a capital

25   crime?

1       A.    Yes.

2       Q.    And I see you are getting emotional about that.

3  Do you have some personal experience there you want to

4  tell us about?

5       A.    No.

6       Q.    Okay.   Obviously, that's an important

7  consideration.   You want to be fair.

8       A.    Yes.

9       Q.    And you would want someone you cared about to

10 be treated fair.

11      A.    Yes.

12      Q.    You know, you're very young.   And I know this

13 is -- we're asking you about -- but you also seem like a

14 person who has really thought about things.   But there

15 are a lot of people who will come here and tell us:   You

16 know, I agree with the death penalty, I agree with how

17 the process works, and I like -- I see myself as a

18 law-abiding person, and I like to follow the law, but

19 don't put me in the position where I have to make this

20 decision.   We hear that a lot.   Some people will say

21 that as soon as they get up there.   Do you feel that

22 that's you?

23      A.    Yes.

24      Q.    Okay.   And I'm noting that you are crying and

25 you are visibly emotional and I'm not trying to make you

 1  uncomfortable.

 2       A.   No, no.  I'm fine.

 3       Q.   But, you can support the death penalty and

 4  support the law and be concerned about crime and

 5  punishment, but at the same time feel like you are not a

 6  person who wants to be involved in this process, where

 7  you are the one who has to make the decision.

 8       A.   Correct.

 9       Q.   That is okay.  It's absolutely okay.  I just

10  need you to be honest about it and tell us.  Because if

11  you are chosen to be a juror, you have to take an oath

12  to follow the law.  And if you feel emotionally that

13  would be something you could not do, this is the time to

14  tell us before you are put in the position.

15       A.   That's true.

16       Q.   Okay.  So, that's true that --

17       A.   I would be able to follow it, but I'm still

18  going to feel -- I'm a very emotional person.

19                   **VOIR DIRE EXAMINATION**

20  **BY THE COURT:**

21       Q.   I couldn't hear.  You would be able to

22  follow --

23       A.   I would be able to follow -- I'm -- I would be

24  able to follow the law because that's what you were

25  talking about on Monday and how things work, but I -- I

1  could follow the law on how to go ahead with this

2  process, but that doesn't mean that I'm still not going

3  to feel emotional about it.

4      Q.   Okay.  Let me question her a little bit.

5           Ms. Tise's question was would you be able

6  to take the oath to follow the law and follow the

7  evidence, and wherever that evidence leads you to.  So,

8  if the evidence leads you to answer the questions in a

9  manner that you know would result in the death penalty

10 being handed down to a defendant, do you feel that your

11 emotions are so strong or your feelings are so strong

12 that you would not be able -- that that would interfere

13 and you would not be able to --

14     A.   No.  I would be able to do it.  Like, I would

15 be able to do it, but inside I would still feel

16 emotional, but I will be able to do the right thing on

17 what the evidence is given to me.

18     Q.   Very good.

19          THE COURT:  You can proceed, Ms. Tise.

20          Make sure you keep your voice up so

21 everyone can hear.

22               **VOIR DIRE EXAMINATION**

23 **BY MS. TISE:**

24     Q.   I want you to look across the courtroom again

25 and you see the defendant there.

1      A.   Yes.

2      Q.   You can do it --

3           MR. CORNELIUS:  That's asked and answer,

4  Judge.  We object to the question.  It's been asked and

5  answered.  It was just asked.

6           THE COURT:  Let her finish her question,

7  because she hasn't finished her question yet.

8           Before you answer, I'll rule on the

9  objection.

10          You can finish your question or rephrase

11 it.

12     Q.   (By Ms. Tise) Look across the courtroom.

13     A.   Okay.

14     Q.   And we talked about this earlier, but since

15 then something has happened and you became very

16 emotional.  And I just want to make sure that if the

17 answers to the questions based on the evidence leads you

18 to say "yes," "yes," and "no," you know that's going to

19 lead to the death penalty.

20     A.   Yes.

21     Q.   Correct?

22     A.   Correct.

23     Q.   And can you answer those questions that way if

24 that's where the evidence leads you knowing that it's

25 going to result in his execution?

1     A.    Yes.

2     Q.    Okay.

3          THE COURT:   I will allow that.

4     Q.    (By Ms. Tise) You talked a little bit in your

5 questionnaire about police officer witnesses or you were

6 asked about police officer witnesses.

7     A.    What page is that?

8     Q.    It's on Page 12.   There's two questions about

9 it and I want to ask you a little bit about that.

10    A.    Okay.

11    Q.    Okay.   Do you believe police officer witnesses

12 are the same as other witnesses or do you believe you

13 would give them more or less credibility?

14    A.    They are the same.

15    Q.    Okay.   And so, when they come into the

16 courtroom and take the stand, you would treat them

17 equally?

18    A.    Yes.

19    Q.    Okay.   Question number D says you would be --

20 you would require the defendant to present some evidence

21 to prove his innocence.

22    A.    Correct.

23    Q.    Okay.   Is that true?

24    A.    Yes.

25    Q.    And have you changed your position on that

1  since the Judge talked to you on Friday?

2      A.   No.

3      Q.   Okay.  Do you understand that the law says you

4  have to -- you have to presume him innocent and he

5  doesn't have to present any evidence?

6      A.   Yes, I understand.

7      Q.   Okay.  And I appreciate your honesty on that.

8  That's, you know, something that a lot of people

9  struggle with.  They really feel like that the defendant

10  should present some evidence.  And despite what the law

11  says, that's going to be in the back of their mind when

12  they render a verdict on a case.  Are you one of those

13  people?

14      A.   Yes.

15      Q.   Okay.  You also said that if a defendant

16  doesn't testify in a case, you will lean towards voting

17  guilty because he did not testify.

18      A.   Depending on the evidence.

19      Q.   Okay.  But the law says that regardless of what

20  the evidence is, you cannot hold the fact that he did

21  not testify against him.

22      A.   I understand that.

23      Q.   But despite the law, do you feel like that

24  would be something that you would hold against him?

25      A.   No.

1    Q.    Okay.  You'd go ahead and follow the law?

2    A.    Yes.

3    Q.    But you would still require him to put on some

4    evidence even though the law doesn't require it?

5    A.    Correct.

6              MS. TISE:  May we approach?

7              THE COURT:  Yes.  So we can get this on the

8    record, let's just take the juror out.

9              MS. TISE:  Okay.

10              THE COURT:  Can you step out for just a

11    moment?

12              (Venireperson exits courtroom)

13              THE COURT:  Yes, Ms. Tise.

14              MS. TISE:  I mean, I have other questions

15    for her if she's going to remain in the mix, but I do

16    think -- I don't want to waste the Court's time, is what

17    I'm struggling with.  I don't want to spend time going

18    over the special issues with her --

19              THE COURT:  Are you asking Mr. Cornelius if

20    he wants to agree on her?

21              MR. CORNELIUS:  No.  Yeah.  I don't know if

22    she's -- I'm not going to agree on her.

23              THE COURT:  Okay.  So, you want to question

24    her as well; is that correct?

25              MR. CORNELIUS:  Yes.

```
 1                    THE COURT:  All right.  So, then I'm going
 2   to let him question her.
 3                    MS. TISE:  Okay.
 4                    THE COURT:  And I know she said some
 5   things, but she's kind of waffling her back and forth.
 6   I'll let him question her.  So, go ahead and complete
 7   your questioning.  It's not a waste of the Court's time.
 8                    MS. TISE:  That's what I wanted to do, make
 9   sure you wanted me to do that before --
10                    THE COURT:  Thank you.  I appreciate it.
11                    (Venireperson enters courtroom)
12                    THE COURT:  All right.  Let's proceed.
13                    Ms. Tise, you may proceed.
14        Q.   (By Ms. Tise) Now, that the -- that one
15   particular question, the one about requiring the
16   defendant to put on some evidence in a case --
17        A.   Uh-huh.
18        Q.   -- you have said it unequivocally several
19   times, but I can tell you that the defense is going to
20   talk to you about that.  And I'm trying to kind of cut
21   to the chase and figure out if that's how you feel, that
22   you will require him to present some evidence?
23        A.   Yes.
24        Q.   Okay.  Even though the law says he is not
25   required to?
```

1  A. Yes.

2  Q. And even though the law says he's supposed to

3 be presumed innocent --

4  A. Yes.

5  Q. -- if you don't hear some evidence or see some

6 evidence from him, you would not be able to treat him

7 fairly and presume him innocent?

8  A. Yes.

9  Q. Okay.  Do you have any doubts about that

10 feeling or do you feel strongly about that?

11  A. I feel strongly about that.

12  Q. So, you are not going to change your mind?

13  A. No.

14  Q. That's how you feel?

15  A. Yes.

16  Q. And you understand that the law says they have

17 no burden in this case, they don't have the burden to

18 put on any evidence?

19  A. Yes, I understand.

20  Q. But that is a burden that you have inside of

21 you --

22  A. Yes.

23  Q. -- that you would place on them?

24  A. Correct.

25  Q. And you feel strongly about that?

1       A.   Yes, I do.

2            MS. TISE:   I'm going to pass the juror.

3            THE COURT:   Thank you.

4            Mr. Madrid.

5            MR. MADRID:   Thank you, Your Honor.

6            **VOIR DIRE EXAMINATION**

7   **BY MR. MADRID:**

8       Q.   Good morning.

9       A.   Good morning.

10            MR. MADRID:   Just one moment.

11            (Pause)

12       Q.   (By Mr. Madrid) Good morning, Ms. Lopez.

13       A.   Good morning.

14       Q.   I'm Mario Madrid?.   This is Skip Cornelius.

15            MR. CORNELIUS:   Good morning.

16       Q.   (By Mr. Madrid) This is our client, Obel

17   Cruz-Garcia.   I just want to ask you some questions.

18   You filled out this questionnaire.

19       A.   Okay.

20       Q.   Ms. Tise has asked some questions.   And I will

21   go over some of the same things.   Okay?

22       A.   Okay.

23       Q.   Now, you -- I guess it says you were born in

24   California, lived in Arizona, and you live here now?

25       A.   Correct.

1        Q.   How long have you been here in Texas?

2        A.   Three years.

3        Q.   And you have a little girl, right?

4        A.   Yes.

5        Q.   So, you know, I know this is -- this could be

6   kind of an intimidating experience, especially being

7   young.  I think if I was 24, I'd be sitting up there

8   scared.  Even now I would be if people were asking me

9   questions.  So, I don't want you to feel that way.

10  Because it's just us and we're just looking for, you

11  know, what you believe.

12       A.   Yes.

13       Q.   And it looks like you have some kind of -- just

14  coincidentally to all of this, you happened to watch

15  show on Univision three weeks ago.

16       A.   Yes.

17       Q.   Most people wouldn't walk in here thinking

18  about this to begin with, but, you know...  So, you

19  happened to think about this.  You work at a law firm.

20  They do a little bit of criminal law?

21       A.   Yes, they do.

22       Q.   And so, maybe you have a little bit of

23  knowledge of these things, right?

24       A.   Correct.

25       Q.   But, I mean, you are not -- you're not a

1  lawyer, haven't been to law school.  I don't know if

2  you've been in a courtroom maybe for a traffic ticket or

3  something.

4       A.   No.

5       Q.   Okay.  So, you don't really know how this whole

6  system works other than what you have seen on TV, right?

7       A.   Correct.  Or just traffic.  I had one ticket,

8  yeah, once.

9       Q.   And you understand that in our system, the

10  United States and in Texas, you are innocent until

11  proven guilty.  You probably heard that as a kid your

12  whole life, right?

13       A.   Yes.

14       Q.   And part of what that is, is there is a couple

15  of things.  One, have you ever heard anybody say:  I'm

16  going to take the Fifth or he took the Fifth?

17       A.   No, I have not.

18       Q.   Okay.  What they are referring to when they say

19  that, if you haven't heard it, they are saying they

20  don't have to testify if they are accused of a crime.

21  Have you ever heard of that?

22       A.   Yes.

23       Q.   Why do you think that is?

24       A.   I don't know.

25       Q.   Well, if you remember from Monday -- and you

1  may or may not remember -- the Judge was talking about

2  it and just kind of laid out the framework and the

3  rules, right?

4      A.   Yes.

5      Q.   You remember that?

6      A.   Yes.

7      Q.   And she was talking about murder and then if

8  there was something else, an aggravating circumstance, a

9  kidnapping, robbery, whatever --

10     A.   Uh-huh.

11     Q.   -- then it could become a capital murder,

12 right?

13     A.   Okay.  Yes.

14     Q.   And in any kind of case, whether it's this case

15 or any case down in traffic court, there is two sides.

16 You know the two sides --

17     A.   Yes.

18     Q.   -- the State and then the defendant, right?

19     A.   Correct.

20     Q.   And do you remember what the Judge said, who

21 has to prove what in that process?

22     A.   Well, it would be the State, right?

23     Q.   The State is making the charges, so they have

24 to prove the --

25     A.   That he is guilty.

1    Q.    -- case beyond a reasonable doubt.

2    A.    Okay.

3    Q.    And she explained to you in that process that

4    the defendant is, like you said, innocent until proven

5    guilty, right?

6    A.    Correct.

7    Q.    So, today like sitting here, Obel Cruz-Garcia,

8    he is innocent, right, he is not guilty?

9    A.    Because of what the law says?  Well, yeah.

10   Q.    And what you said when you testified earlier,

11   you were saying you would have to listen to the

12   evidence, right?

13   A.    Correct.

14   Q.    And so, you have not heard any evidence, so you

15   can't --

16   A.    Can't make up my mind.

17   Q.    You can't make up your mind, right?

18         So, in a trial what happens is the State

19   has to put on the case.  The Judge explained to you that

20   the defense doesn't have to put on anything.  But part

21   of that process -- I don't know if you've ever seen

22   anything on Court TV or anything like that.

23   A.    No.

24   Q.    No trials or anything?

25   A.    No.

1    Q.   The way it works, if you are in court, we're

2    kind of sitting like this and the jury is sitting over

3    here and the State brings witnesses and they sit where

4    you are sitting.

5    A.   Okay.

6    Q.   Do you know how that works?

7    A.   Yes.

8    Q.   And then the State asks them questions and then

9    the defense can do what's called cross-examine them.

10   They can ask them questions to try to figure out if they

11   are credible or telling the truth.  Do you follow me?

12   A.   Uh-huh.

13   Q.   So, on -- in that process, that's part of --

14   you know, the defense doesn't have to put on any

15   evidence.  And at that point, they're not putting on any

16   evidence, but they're just questioning the State's

17   evidence.

18   A.   Okay.  I understand.

19   Q.   Right?  But in the process, after the State is

20   done with all their witnesses, the law tells us that the

21   defense can either get up and say:  I call witness A, B,

22   or C, or whatever, or they can say:  Defense rests and

23   they don't put on any evidence.

24   A.   Okay.

25   Q.   Okay.  Why do you think that is?

1      A.   For the good of your client.

2      Q.   No, no.  Why do you think they don't have to

3  put anything on?

4      A.   Because you are not charging him with anything.

5  They are the ones who need to provide to you like he is

6  the one that's guilty.

7      Q.   Yeah.  The State has to prove beyond a

8  reasonable doubt that they are guilty.  So, the defense

9  doesn't have to prove that they are not guilty.  Okay?

10     A.   Okay.

11     Q.   They can contest the charges, but they don't

12  have to put on any evidence.  Do you agree with that or

13  not?

14     A.   Well, I do agree with that, too, so...

15     Q.   And the question that I'm having -- and I know

16  the question that the State has is:  Hold on, you just

17  said -- you just said the opposite of that.

18     A.   Correct.

19     Q.   I don't want to put any words in your mouth.

20  Okay?  Part of me thinks that, one, you are intimidated

21  and scared because you're sitting up here and people are

22  asking you questions and then part of it this is a real

23  serious case.  Okay?  And then another part is that you

24  don't -- nobody would expect you to know what the rules

25  are, you know, in a courtroom or in a case, you know.

1  That's why we have lawyers.  That's why you have a judge

2  that rules, that makes a ruling whether one side or the

3  other side is doing something correctly.  Right?

4       A.   Uh-huh.

5       Q.   And so, nobody would expect you to do that.

6  And we're asking all of those things that I don't think

7  you know and you are trying to answer the best you can.

8  I'm not trying to put any words in --

9       A.   Well, the thing is, what she said, I do believe

10 if he did something wrong and if he believes he didn't

11 do it, then he should speak for himself.  I believe in

12 that.  I could hear that, but what you are explaining to

13 me now, obviously, they are the ones who have to bring

14 the evidence for him to be --

15      Q.   Found guilty beyond a reasonable doubt?

16      A.   -- guilty.  Correct.  So, I believe in that as

17 well.

18      Q.   Can I stop you real quick?

19      A.   Uh-huh.

20      Q.   Those are two different things.  I haven't

21 asked you about that yet, which is kind of like when

22 people say:  I take the Fifth, and that's when they

23 don't testify.  Okay?  But that is one issue.  And the

24 first issue is should -- you know, if the question is,

25 well, if the State is bringing the evidence and the --

1   you know, because of that, they have to prove it beyond

2   a reasonable doubt, the defense doesn't have to put

3   anything on.  And you say you believe in that, right?

4        A.   Yes.

5        Q.   Well, part of putting something on or not

6   putting something on is testifying or not testifying.

7   And that's why that right is there, because a person

8   shouldn't have to prove they are not guilty.  Okay?

9        A.   Correct.

10       Q.   But you said the opposite.  And I'm really

11   trying hard -- I don't want you to think you said that.

12   So, don't agree with me because I'm saying this.

13       A.   I'm not --

14       Q.   If you don't agree with me, you don't have to

15   agree with me.  But the first part you believe -- it

16   sounds like you believe that the State -- I mean the

17   defense does not have to put anything on because it's

18   the State that's bringing the charges, right?  Well, you

19   also said --

20            THE COURT:  Counsel, why don't you -- I

21   know you're asking a bunch of questions, but give her a

22   chance to answer your question because she's not getting

23   it.  I don't think she's answering the question on the

24   record.  You are talking off her answer.

25            MR. MADRID:  Okay.  Thank you.

1    Q.   (By Mr. Madrid) So, I'm going to ask that

2  again.  Do you believe -- and you can tell me "yes" or

3  "no" -- whether the State has the burden to put on the

4  case?

5    A.   Yes.

6    Q.   To prove the case.  I'm sorry.  To prove the

7  case.

8    A.   Yes.

9    Q.   And because of that, the defense does not have

10 to put on any evidence.  Do you agree with that?

11   A.   No.

12   Q.   Okay.  And could you explain that?  Because you

13 said -- you said something differently just a second

14 ago.

15   A.   I believe that if he believes that he is

16 innocent he needs to speak.  Because if everything is

17 against him and he is not guilty, I'm going to get up

18 and say:  You know, I didn't do this.  I believe in that

19 as well.

20   Q.   Okay.  And if -- I'm going to go through -- if

21 you'll let me ask you the question.  Because that's the

22 second part of the question, was whether he should

23 testify or not testify.  Right?

24   A.   Uh-huh.

25   Q.   But fundamentally it's just the first part --

1   and you said this earlier.  You agree the State has the

2   burden to the case beyond a reasonable doubt?

3      A.   Do I agree, you said?

4      Q.   Yes.

5      A.   Yes, I do agree.

6      Q.   And because of that, part of that is the

7   defense doesn't have to put any evidence on.  Okay?  Now

8   what I hear you telling me is:  Yeah, I agree with that,

9   but I'd like to hear the defendant testify.  And a lot

10   of people would like to hear the defendant testify.

11   That's a common feeling.  You know, like people say:

12   Hey, if that was me, I would go testify.  Right?

13      A.   Correct.

14      Q.   Now, they don't -- under the rules and the law,

15   they don't have to testify.  So, this is a big concern

16   because if you were to sit on as a juror, you would get

17   instructions from the Judge that you can't use that, the

18   fact that they didn't testify, as evidence against them.

19   Okay?

20      A.   But that doesn't mean I'm going to be against

21   it because of that.  I am going to listen to the

22   evidence and from there is where I make my own decision

23   on what I believe.

24      Q.   Which is what you would make it on --

25      A.   On the evidence.  Not because -- just because

1  he didn't testify, I'm not going to put:  Okay.  He

2  didn't testify, I'll go directly that he is guilty.  No.

3  Because I'm not going based on that.  I'm going based on

4  the evidence.

5      Q.   So, what I hear you saying is that you would

6  like to -- and we would all like to -- hear what the

7  person accused has to say.

8      A.   Correct.

9      Q.   But you wouldn't use that as evidence, you

10 would look at all of the evidence that the State

11 presents; is that what you're saying?

12     A.   Yes.

13     Q.   And I want you to say it yourself because --

14     A.   No.  That is what I said right now.  I'm going

15 to hear what the State is going to give me as evidence

16 to see if he is guilty or if he is innocent.  I would

17 personally -- like, if they said all of the evidence is

18 against him for him to stand up for himself and say:

19 You know, I didn't do this, or this is what happened.

20 That's what I would like to hear from him, but if you

21 guys and he decides not to do it, it doesn't mean

22 necessarily that he is guilty.  I'm not going to do

23 that.

24     Q.   And you can understand why somebody would -- or

25 could you understand.  I will give some reason why

1   someone would not want to testify.  One, their attorney

2   might say:  Hey, this isn't a good idea, they didn't

3   prove their case.  That could be a reason.

4       A.   Yes.  There's many reasons.  I work for an

5   attorney's office and I understand that part as well.

6       Q.   Or another reason could be they are nervous.

7   Like, if you were sitting up there in your recuse

8   something.

9       A.   Uh-huh.

10      Q.   And the State was -- you know, they have really

11  good attorneys and they wouldn't be trying this case if

12  they weren't good attorneys.  They would be

13  cross-examining you, right?

14      A.   Correct.

15      Q.   And based on your nervousness or intimidation,

16  you might appear to be guilty.

17      A.   Uh-huh.

18      Q.   Right?  So, you can understand there are

19  reasons?

20      A.   Yes.

21      Q.   There is -- you know, it seems like when you

22  had the chance earlier -- hold on just a second.

23              (Pause)

24      Q.   (By Mr. Madrid) There was some -- you were

25  asked some questions on a scale of one to ten, ten being

1   the -- you know, like the strongest feeling for the

2   death penalty and one being you'd never have a death

3   penalty, you said six, correct?

4        A.   Uh-huh.

5        Q.   Do you still feel the same way?

6        A.   Well, I still feel like it's a five.

7        Q.   Okay.

8        A.   But you guys don't give me the option of five.

9        Q.   Okay.  And the reason you say five, why do you

10  say five?

11       A.   Because I haven't heard any evidence.  I don't

12  know what's happened, why he is here.

13       Q.   And so, you would wait before you made a

14  decision on this case, on either side on -- and we're

15  not saying -- you know, a lot of this that we're talking

16  about, you know, is the death penalty, but you

17  understand there are two phases.  There is the

18  guilt-innocence part -- and we're not saying that our

19  client is guilty.  We're not here to say that at all.

20  You know, we're here to defend him and fight this case.

21       A.   Correct.

22       Q.   In the event in any case that our client were

23  found guilty, we'd go to the second part, which is the

24  punishment phase.  Okay?  And so, on either phase of the

25  trial you would -- would you wait and listen to all of

1   the evidence?

2       A.   Yes.

3       Q.   Okay.   Thank you.

4            MR. MADRID:   Pass the juror, Your Honor.

5                   **VOIR DIRE EXAMINATION**

6   **BY THE COURT:**

7       Q.   Okay.   I have a couple questions, Ms. Lopez.

8       A.   Uh-huh.

9       Q.   I'll just tell you the law is --

10      A.   Okay.

11      Q.   -- and then I'm going to ask you a few

12  questions regarding the law in regards to your feelings.

13  And I know that a lot of people come in here and they

14  want to be law-abiding citizens and follow that law.

15  You have told both sides a little bit different things.

16  So, that's why I want to clear it up for my own sake.   I

17  don't care if you can or cannot follow exactly what the

18  law is, but we need to know what's in your heart.

19  Because we don't get you over there in that jury box and

20  you not be able to follow the law.   Okay?

21      A.   Okay.

22      Q.   Let's start with the presumption of innocence.

23  And each individual in our society is presumed innocent

24  of whatever charge that may be brought by the government

25  against them.   And it is completely up to the State, the

1  government, in whatever fashion, whether it's United

2  States government or the state government or the local

3  government to provide the evidence that proves them

4  guilty.  So, as they sit before you today, you must give

5  them the presumption of innocence.  Okay?  That's what

6  the law states, but a lot of people come in here and

7  say:  You know, I have a background, I work at my job, I

8  see plenty of people, whatever the reason is, or the

9  fact that they are indicted, or anything like that, I

10  can't really give them that presumption of innocence, I

11  already think they are starting out a little bit behind.

12  And you mentioned that in one of your answers, that you

13  leaned towards guilty.  Okay?  You can see how that

14  doesn't -- that conflicts with a presumption of

15  innocence.  Okay?

16       A.   That's because I'm not giving a chance, is that

17  what you mean or --

18       Q.   If you lean towards guilty already -- you

19  should be at zero.  If there is a -- if there is a

20  barometer, zero is presuming innocence and guilty is 100

21  percent, you should start at zero when you first see

22  somebody.  And it's up to the State's to get you all the

23  way -- once you start hearing evidence, all the way over

24  to that barometer.  If you look at it like a

25  speedometer, I guess is a better way to say that.  To

1   get you all the way past, over here to -- maybe not 100

2   percent, but to beyond a reasonable doubt.  Okay?

3       A.   Now I understand.

4       Q.   And you're saying you're leaning towards guilty

5   and you have not heard anything.

6       A.   Now I understand.

7       Q.   And it's good that you understand that concept

8   now, but I need to know from -- not only that you

9   understand it, but that you actually can follow that

10  concept because you've told us in a couple different

11  ways that you are not inclined to give the defendant the

12  presumption of innocence, that you are leaning towards

13  guilty.  Is that the way you feel?

14      A.   No, no.  Since I have to hear the evidence, the

15  way you explained it to me now, I can give him the

16  presumption of innocence.

17      Q.   The presumption of innocence?

18      A.   Yes.

19      Q.   And you feel certain you can if you were asked

20  to take an oath on that?

21      A.   Yes.

22      Q.   Okay.  And the second one is requiring the

23  defendant to present evidence.  We talked about it in a

24  couple different forms.  In our courts, testimony is

25  evidence.  So, if the defendant chose to testify, that

1   is evidence.  But there is other evidence, too.  There

2   is physical pieces of evidence.  Like, you know, a gun,

3   or, you know, a blade of glass, anything physical, DNA,

4   you know, pictures, those are all evidence.  And the

5   defendant would be given an opportunity to put that on

6   if he wanted to, if his defense team wanted him to and

7   he decided he wanted to, but he's never required to do

8   that.  In other words, they could sit there the entire

9   trial say nothing, cross-examine no witnesses, and put

10  on no evidence themselves.  There is no requirement that

11  they do so.  And the reason being, once again, going

12  back to it's the burden of the State to prove beyond a

13  reasonable doubt his guilt.

14          But like I said, a lot of people come in

15  and they feel the same way that you talked about

16  feeling, that you are going to require him in one way or

17  another to present some evidence or to testify himself

18  because you probably would do it if you were charged,

19  you said.  Correct?

20       A.   Correct.

21       Q.   So, in both of these situations, I need to ask

22  you -- and I don't care whether you are going to require

23  that or not.  It makes no difference to me whatsoever.

24  We just need to know one way or another.  Will you

25  require the defendant or the defense team to put on some

1  evidence in this case in order for you to find against

2  the State?

3      A.   The evidence the State gives me -- if the State

4  gives me the evidence towards that he is guilty more,

5  then I would require him to give me evidence that he is

6  not.  I would require the defense.

7      Q.   Okay.  And that kind of makes sense, but you

8  are still requiring the State to make their burden.

9  Would you require them to prove to you?

10     A.   Yes.

11     Q.   And then you would be voting for guilty, which

12  would be fair, correct?

13     A.   Correct.

14     Q.   And unless and until -- then at that point you

15  can say that you would require him --

16     A.   Correct.  Well, that would be their option, but

17  if they don't, then I wouldn't be against that if he

18  doesn't.  And I wouldn't be more in favor if he does.

19  It would help me to make my mind up.

20     Q.   Okay.  How about if the State doesn't meet

21  their burden of proof; they get really close, but they

22  are not quite there and you didn't see any evidence from

23  the defense at all?

24     A.   Then that wouldn't affect my decision on what

25  evidence I have already.

1    Q.   What would your decision be in that situation?

2    A.   Keep on hearing the evidence that I do have.

3 That's what I'm going to base it on.

4    Q.   But you wouldn't have any more evidence.  You

5 would have what the State gave you, which is really

6 super close, and then the defense rests.  What happens

7 to your situation then?  You don't have any more

8 evidence.  What is your verdict?

9    A.   Well, it would be -- it would be the death

10 penalty, whatever they -- I would decide on what the

11 evidence that the State gave me only.

12    Q.   That's what I'm trying to tell you.  If the

13 State gets really close to proving their case beyond a

14 reasonable doubt, but not quite there, and then it's

15 time -- they rest, they're finished, and then it's

16 turned over to the defense and they don't have any

17 evidence, what is your -- what is your verdict going to

18 be?  Let's not talk about the death penalty.  Let's talk

19 about the guilt stage.  They get really close to proving

20 that beyond a reasonable doubt and then they rest and,

21 then it's turned over to the defense and you don't hear

22 any evidence whatsoever.  What is your verdict going to

23 be?

24    A.   Guilty.

25    Q.   Why would it be guilty?

1      A.   Because they don't give me enough evidence for

2   me to believe that he is and the State is the one who

3   gave me more than -- and if I believe their evidence is

4   true, then I would -- it would be guilty, but if the

5   State gives me evidence that I don't think it would be

6   guilty for him, even though they have less evidence, I

7   would be in favor that he is guilty.  I don't know if

8   I'm explaining myself.

9      Q.   I think you are fine.  Yeah.

10          Okay.  And let's go on to the very last

11   one, the right to remain silent.  And so, you said you

12   would like to hear him testify.  And that would be

13   evidence, too.  What if he doesn't?  Once again, let's

14   do that same scenario.  The State put on their evidence,

15   gives you a bunch of evidence, it's really close to

16   proving to you beyond a reasonable doubt, doesn't quite

17   get there, but really, really close, and then it's the

18   defense's side and you really want to hear from him, but

19   you don't hear from him.  What is your verdict?

20      A.   It's not going to -- it's not --

21      Q.   Would your verdict be guilty or not guilty in

22   that situation?

23      A.   Guilty.

24      Q.   Okay.  All right.  Thank you very much.

25              THE COURT:  Can you step out?

1                    VENIREPERSON:  Sure.

2                    THE COURT:  Actually, you can stay right

3    here.

4                    Is there a motion from either side?

5                    MS. TISE:  Not from the State.

6                    MR. CORNELIUS:  We need a minute with our

7    client.

8                    THE COURT:  All right.  Why don't you go

9    ahead and step out and we'll be with you in just a

10   minute.

11                   (Venireperson exits courtroom)

12                   MR. CORNELIUS:  We will not make a motion,

13   Judge.

14                   THE COURT:  You are not making a motion?

15                   MR. CORNELIUS:  We're of the opinion that

16   she's confused and we're not making a motion.

17                   THE COURT:  Okay.  Does the State have a

18   motion?

19                   MS. TISE:  Well, I went back and read the

20   questions that you just asked her, Judge, and I think

21   we're in a position where we have to because we're going

22   to have error if we don't.  Because she just said she'd

23   find the defendant guilty even if there wasn't

24   sufficient evidence, even if it got close.  So, out of

25   concern for the record on the case, I think we have to

1    make a motion.

2              THE COURT:  I put sua sponte.  I was just

3    looking at that.  I believe that she could not be a fair

4    juror, I put sua sponte.  So, I will grant your motion

5    for cause on this juror.  And you can bring her back in.

6              MR. CORNELIUS:  Hold on.  Let me get my

7    thing on the record here.

8              THE COURT:  Very good.

9              MR. CORNELIUS:  It's the defense's

10   intention to take her as a juror.  I don't know if the

11   State would have accepted her or not, but we want her as

12   a juror.  We don't feel -- we're satisfied with the

13   answers that she gave us in our questioning.  I know

14   she's vacillated back and forth.  And I'm not arguing

15   with the Judge, not arguing with the State, but I want

16   the record to be clear we want her as a juror and we

17   don't want her disqualified for the reasons the Court

18   disqualified her on the basis of the State's motion.

19   We're not making a motion.  We're clear that we would be

20   happy to waive their understanding of what she said or

21   even the Court's understanding of what she said.  We

22   want her as a juror.  That's it.  That's my record.

23             THE COURT:  Okay.  And I'm going to put on

24   the record that based on the Court's questioning of the

25   juror -- and the Court put it in the most simplest terms

1  that I could.  My hypothetical was that the State had

2  not -- had gotten very close, but had not met the burden

3  of proof beyond a reasonable doubt on the evidence and

4  asked her if the defense -- the defendant did not

5  testify or if the defense provided no evidence

6  whatsoever what her verdict would be and she said

7  guilty.  Both times she said guilty.  For that reason,

8  the Court is of the opinion that she cannot follow the

9  law.  Whether it's a misunderstanding of the law or just

10  her general feelings, she has told me what she would do

11  twice.  And so, I'm going to grant the motion for cause

12  on Juror No. 69, Patricia Rivera Lopez.  Okay.

13            MR. CORNELIUS:  Judge, out of fairness, I

14  never laid down the law.  What if our defensive theory

15  didn't include putting on evidence and we're not

16  concerned with that because we do intend to put on

17  evidence or we do intend to call the defendant?  What if

18  that was not something that's ever going to be a factor

19  in the case?

20            THE COURT:  Well, you can't tell me that

21  now.

22            MR. CORNELIUS:  That's true.

23            THE COURT:  You can't tell me what's going

24  to happen in the future.  And she's already telling me

25  that she's not even going to require them to meet their

1   burden by her answers.

2            MR. CORNELIUS:  Okay.  That's fine.

3            THE COURT:  I just can't see --

4            MR. CORNELIUS:  I have never seen a case

5   where -- decided where the State waived -- I mean the

6   defense waived a Fifth Amendment requirement or the

7   State meet their burden requirement.  I've never seen a

8   case on that.  So, this is new stuff.  I wanted to give

9   you every opportunity to put what you wanted to put in

10  the record.  And I think you quite honestly said, and

11  truthfully said, I can't make those representations to

12  you now because we wouldn't make those decisions now.

13           THE COURT:  Right.

14           MR. CORNELIUS:  But, anyway, I want the

15  record to be complete so that we won't have to explain

16  any more later to somebody else.

17           THE COURT:  Right.  Okay.  And I would sua

18  sponte grant this as well.  The motion is granted by the

19  State, but I totally agree.

20           So, bring the juror back in.

21           (Venireperson enters courtroom)

22           THE COURT:  Ms. Rivera Lopez, you don't

23  need to take the stand.  We're going to excuse you as a

24  juror in this case.

25           VENIREPERSON:  Okay.

1            THE COURT:  And we really appreciate all

2  the time you spent, three days now coming down here; a

3  lot of time and energy.  We could not do this without

4  involved concerned citizens like yourself.  So, we

5  greatly thank you.

6            We put you under some admonishments.

7  You're released from all of those admonishments at this

8  time.  So, you can speak with whomever you want about

9  your experience here in this case.  And if you need

10  something for work today, Deputy Perry can get you the

11  excuse.  It's good through 5:00 today.

12            VENIREPERSON:  All right.  Thank you.

13            THE COURT:  Good luck to you, ma'am.

14            VENIREPERSON:  Thanks.

15            THE COURT:  We have 64 and 72.  We'll start

16  with 64.  Does anybody need a break?

17            MS. TISE:  Ten minutes?

18            THE COURT:  You can take a break, Ms. Tise,

19  if you need to once we get started.  Mr. Wood is going

20  to be handling it, correct?

21            MR. WOOD:  Oh, yeah.  Sure.

22            MR. CORNELIUS:  I'll go to the restroom.

23            THE COURT:  Mr. Wood, are you okay?

24            MR. WOOD:  No.  I'm fine.

25            (Venireperson sworn)

1        **NANCEE PYPER, VENIREPERSON NO. 64,**

2    was called as a prospective juror, and testified as

3    follows:

4                    **VOIR DIRE EXAMINATION**

5    **BY THE COURT:**

6        Q.   Okay.  Ms. Pyper, your name is Nancee Pyper?

7        A.   Yes.

8        Q.   And you are Juror No. 64 in the venire that was

9    brought before this Court on the State of Texas vs. Obel

10   Cruz-Garcia.  Correct?

11       A.   Yes.

12       Q.   This is a continuation of the voir dire

13   process.  And one lawyer from each side will have an

14   opportunity to speak with you.  I'm going to hold them

15   to 30 minutes aside.  Thank you for coming in early.

16       A.   Uh-huh.

17       Q.   And we'll try to get you out of here early.

18       A.   Awesome.

19       Q.   So, they will be asking questions over the same

20   material that I talked about, but more specific to you.

21       A.   Okay.

22       Q.   And even though you are under oath to speak

23   truthfully, there's really no right or wrong answers to

24   this.  They want you to tell your feelings truthfully.

25       A.   Okay.

1      Q.   And if you have any questions about what their

2   questions are, please ask them to rephrase.  I have

3   three questions myself before we get going.

4            Do you have any religious, personal, or

5   moral reasons you would be unable to sit on a jury where

6   the death penalty is a possible punishment?

7      A.   No.

8      Q.   Do you know of any reason why you could not be

9   fair and impartial to both sides in a criminal case?

10     A.   No.

11     Q.   Have any of your answers from the questionnaire

12  changed?

13     A.   No.

14     Q.   We all have a copy of your questionnaire, so

15  let us know if at some point you need that.  They are

16  going to ask you some questions over that probably.

17            THE COURT:  I'll turn you over to Mr. Wood.

18  It is 12:20.

19            MR. WOOD:  Thank you, Your Honor.

20                **VOIR DIRE EXAMINATION**

21  **BY MR. WOOD:**

22     Q.   Good afternoon, Ms. Pyper.

23     A.   Hi.

24     Q.   Welcome back.

25     A.   Thank you.

1       Q.    How are you doing today?

2       A.    Good.

3       Q.    Well, like the Judge said, my name is Justin

4  Wood.  Natalie Tise has stepped out just for a second.

5  She'll be right back.  Together we'll be trying the case

6  if you are chosen to be one of the jurors on the case.

7       A.    Okay.

8       Q.    This is Steve Walsh here in the back.  He is a

9  law student, an intern of ours, and he'll be helping us

10 out throughout the trial.

11      A.    Okay.

12      Q.    Just like the Judge said, this is our chance to

13 get to know you a little bit better.  We have a little

14 better insight after this nice questionnaire, but there

15 will be some questions I ask you specifically from that

16 and then some of the things we talked about in

17 general -- or you talked about in general with the Judge

18 on Monday.

19      A.    Okay.

20      Q.    This jury selection process, I see you have not

21 been down here -- you haven't been on a jury before.

22      A.    Been on a panel similar to this, but never on

23 an actual jury.

24      Q.    Okay.  Cool.  So, you've kind of had a hint at

25 this process.  You can see now that this process for a

1  death penalty capital murder is very involved.

2      A.   Yes.

3      Q.   And rightfully so.  It's a serious case.  And

4  this opportunity for us to be able to visit and talk

5  one-on-one is a good chance to get to know you.  We want

6  to be able to pick -- the defense team and us, we want

7  to pick the best 12 and fairest, most impartial jurors

8  in the case.

9                So, a couple of things up front I wanted to

10  ask you about.  You are a behavior consultant at Cy-Fair

11  ISD.

12      A.   Yes.

13      Q.   What exactly is that?

14      A.   I deal with students who are either on a

15  behavior plan for misconduct, persistent misconduct.

16  I'm a liaison for the school district, for the schools.

17  Cy-Fair is a very large district.  There are five of us

18  that do this.  I have 17 elementary schools that I

19  serve.  And as a request comes in, then I am called out

20  to observe either the teacher or the student and give

21  support and feedback.

22      Q.   Okay.  And prior to that, you were in a

23  classroom?

24      A.   I was in a classroom for four years.  I was a

25  specialized teacher in like alternative behavior for

1    third, fourth, and fifth grade students.

2        Q.   Well, God bless you.  That's one job I could

3    not do, I can tell you.

4                    And you like reality TV.

5        A.   Uh-huh.

6        Q.   That's one thing we probably have in common.

7    What's your favorite?

8        A.   Right now my son has gotten me hooked on the

9    new baking one that's going on.

10       Q.   Well, I'm reality TV junkie, I will admit.  I

11   shy away from any law shows or anything like that.

12   Mindless TV works best.  You've got four kids --

13       A.   Yes.

14       Q.   -- that are currently 18 to 24?

15       A.   Yes.

16       Q.   That's a lot of teenagers at one time.

17       A.   It was.  Yes.  My youngest graduates tomorrow

18   from high school, so...

19       Q.   I was going to ask that.  I saw that.  So,

20   we're not going to interfere with graduation or

21   anything?

22       A.   No.

23       Q.   Well, congratulations on getting all of that

24   done.

25                    The Judge spoke to you a little bit about

1  the case and what kind of case it is and gave a little

2  bit of distinction between capital murder and murder.

3  Did that make sense to you?  Was that new to you?

4       A.   It wasn't new to me.  It was a learning

5  experience.  It was informative to realize the

6  difference and what was involved to make it one or the

7  other.

8       Q.   Right.  And you recall that there is murder and

9  then there are -- there is murder plus something, is

10  what I -- how I refer to it to get to capital murder.

11      A.   Correct.

12      Q.   And if I was to put you in charge of -- you

13  were governor of the day for Texas.  You don't have to

14  agree with your husband or your four kids or anybody

15  else.  And I was to ask you:  Would you have capital

16  punishment, would you have the death penalty as a

17  possible punishment if you were in charge?

18      A.   I believe I would.

19      Q.   Okay.  And Judge went over some of those

20  special cases that rise to the level of capital murder

21  in Texas, whether it be killing a police officer in the

22  line of duty, killing a child younger than ten, two or

23  more people in the same transaction, someone committing

24  a murder in the commission -- during the commission of a

25  serious felony, like burglary or sexual assault,

1  robbery, kidnapping, those types.

2      A.   Right.

3      Q.   Are those the types of offenses you think are

4  appropriate for the death penalty or did you have

5  something else in mind?

6      A.   No.  I think those are appropriate.

7      Q.   As far as your family goes, maybe your

8  husband -- I don't know how often the issue of the death

9  penalty or capital punishment comes up in family

10  discussions, but do you think that's an idea you share

11  with your husband or are there people in your family

12  that have different opinions on that?

13      A.   On the death penalty itself?  I think

14  case-by-case.  I think we pretty much agree, depending

15  on the facts of the case that it is an option.

16      Q.   Right.

17      A.   And an appropriate option in some cases.

18      Q.   Well, if we think about it -- we can think

19  about it and talk about it in a vacuum what our

20  philosophy is on it, and that's fine, and many people

21  do.  But it's a little different when you are going

22  through the process and you are sitting where you are

23  now.  You have been down here now three different days.

24  You are very close to being seated on a jury that would

25  consider the death penalty.  Sit in that box, hear the

1    evidence, and make that decision.

2         A.   Right.

3         Q.   As you sit here today, you know this is Obel

4    Cruz-Garcia, the gentleman over here in the headphones.

5    As you sit here, I want you to look at him and I want

6    you to be able to tell me that if the evidence leads you

7    in the direction, if the evidence shows to you that you

8    have to answer those questions in the punishment phase

9    of the trial after you've found him guilty, that leads

10   you in a direction that would answer those questions,

11   which we'll go over, a "yes," "yes," and a "no," that

12   you know would eventually lead to his execution, would

13   be able to do that?

14        A.   Following those procedures, yes.

15        Q.   Okay.   I appreciate that.

16             A little bit about the trial process.   As

17   the Judge explained to you, the trial is -- a trial in

18   Texas is in two parts.   It's a little different than

19   some states, but in Texas there is the guilt-innocence

20   phase, and in Texas, which is rare from some states, the

21   jury can have the option of assessing the punishment as

22   well.   And in the guilt-innocence phase, there is

23   certain types of evidence that you are going to hear

24   that may be different than the punishment phase.

25        A.   Okay.

1    Q.   For guilt, you are going to hear evidence

2  focused in on the offense.   We can't talk about

3  things -- generally we can't talk about things outside

4  of that.   We've got to focus our evidence in on just the

5  facts of case.   And you heard the Judge explain to you

6  the burden and -- the burden of proof.   That lies with

7  Natalie and I throughout the entire trial.   We have to

8  prove the case to you beyond a reasonable doubt.   And,

9  in fact, we have to prove the elements of capital murder

10  to you.   And they are also on that small screen, too.

11    A.   Okay.

12    Q.   Those are the elements of capital murder that

13  Judge read to you from that indictment on Monday.   We

14  have to prove each and every one of those items to you

15  beyond a reasonable doubt.   And while we carry that

16  burden, those are the only elements or the only things

17  about the case that have to be proven to you beyond a

18  reasonable doubt.   Naturally, you are going to hear --

19  you could hear more than just what relates to those

20  elements, obviously; but you will notice on there that

21  you can see there's the when, the where, the who, the

22  what.   You know, that is all addressed.   But the why is

23  not up there.   Someone's motive behind doing something

24  is not something we have to prove.

25    A.   Okay.

1      Q.   While human instinct is we want to know that,

2  just curiosity tells you, as many children you have

3  dealt with, school children and your own, you probably

4  get to the bottom of that question more times than not.

5  But as a juror that is not one thing that we have to

6  necessarily prove to you.

7      A.   Right.

8      Q.   You may learn that and that is great, but it's

9  not something that you necessarily will.  Is there

10 anything about that that bothers you or are you okay

11 with that?

12     A.   I'm a little bit confused on the part where

13 it's committing and attempting to commit kidnapping.  Is

14 that different as far as an actual kidnapping if it were

15 to have happened?  Is that something that I'd have to

16 consider?

17     Q.   Well, you would be given instructions on what

18 the law on kidnapping is.

19     A.   Okay.

20     Q.   And just -- it could be proven that -- the

21 elements of kidnapping could be met and you've got to

22 believe that that is what -- that we met our burden on

23 that element.  But without going into -- you know, at

24 this point, I can't go into specific facts.

25     A.   Right.

1    Q.   You would have to believe that that element of

2    the offense was proven to you beyond a reasonable doubt.

3    A.   Okay.

4    Q.   There could be any number of facts that relate

5    to that.

6    A.   Okay.

7    Q.   Is that --

8    A.   Uh-huh.

9    Q.   -- okay?

10        Naturally, you are going to hear --

11   potentially hear all different types of evidence, but is

12   there certain evidence that you think you would expect

13   to hear in a criminal case or specifically a capital

14   murder case that would come before you as a jury?  Just

15   in general, not --

16   A.   Just in general?

17   Q.   Yeah.

18   A.   Just the background that led up to the charges.

19   Q.   Okay.  And do you think that might sometimes

20   come through witnesses?

21   A.   Yes.

22   Q.   Many times people think of, you know, photos

23   and murder weapons, and, you know, maybe DNA, or those

24   types of physical or forensic evidence as types of

25   evidence.  And many times people don't think of

1  witnesses and witness testimony as evidence, but the law

2  says that's testimony that -- that's evidence that you

3  are to consider as well.  And naturally so.  It would be

4  strange to have a trial with no witnesses that you could

5  consider as evidence.  So, that's going to be evidence

6  that you are told that you can consider is witness

7  testimony.

8      A.  Okay.

9      Q.  And with witnesses -- and the Judge went over

10  this on Monday -- you, as a jury, your main job is going

11  to be judging the credibility of those witnesses.

12  That's going to be one of your primary duties.  And the

13  Judge explained to you that all witnesses, before they

14  testify, start out on an equal playing field.

15      A.  Right.

16      Q.  You can't give one witness more credibility

17  than the other just because of something you might know

18  about them.  For example, that they are a police officer

19  or a priest or a prostitute or whatever it might be.

20  The instruction is for you to listen to the evidence and

21  the testimony and until you've heard that testimony,

22  only at that point can you start weighing their

23  credibility.  You probably have lots of experience in

24  that.  Is that a concept that you are okay with?

25      A.  Yes.

1        Q.   Okay.  I know that we talked about in a

2  criminal case you can expect some of those witnesses

3  might be law enforcement, police officers and such.  In

4  a criminal trial or in trials that we have almost every

5  time, even though I gave the statement every time,

6  police officers write reports and do offense reports and

7  police reports, and you are going to hear reference to

8  those, obviously; but at the end of the day, those types

9  of things like reports, witness statement, written or

10  recorded, those are not evidence typically that the jury

11  gets to go back and look over and consider.  The law

12  says that a witness has to come into the courtroom and

13  speak from their own mouth and you get to judge their

14  credibility rather than you just reading a report.  So,

15  just so you know that.  If somebody goes back there and

16  says:  Let's ask for that police report, you can remind

17  them that's not evidence.

18        A.   Okay.

19        Q.   In the punishment phase of the trial --

20  obviously, the punishment phase of the trial comes once

21  you have come to a decision as 12 jurors on the guilt

22  phase.  You know, if you have decided beyond a

23  reasonable doubt that we have met our burden on all of

24  those elements, then and only then do you move on to the

25  punishment phase of the trial.  And in the punishment

1  phase, there can be new evidence presented to you,

2  obviously.   Presented to you from the State you might --

3  or from the defense.   Again, the defense does not have

4  to, but you might get to learn about things about the

5  defendant's background, whether that be good or bad, at

6  the punishment phase.   And different from other cases, a

7  death penalty capital murder case, if you are sitting on

8  that jury, the Judge explained to you, which is usually

9  more comforting to jurors to know, you aren't just left

10  to go back there and say:   We're assessing the death

11  penalty or we're not.

12        A.   Right.

13        Q.   You know, there is a framework.   Those

14  questions are laid out for you, those special issues.

15  And we'll talk about those.   There are three of those

16  that you have to answer.

17        A.   Right.

18        Q.   And there is a couple of things about that I

19  want to visit with you about up front.   The rule is you

20  can't -- you have to take each one of those questions

21  individually and evaluate the evidence and the testimony

22  that you had and you heard that relate to those and look

23  at those individually.   And if you answered that first

24  question as a jury with the answer "yes," then you move

25  on to the second question.   If you answer "no," then it

1   stops there.  Because in Texas, there is two different

2   punishments for capital murder, the death penalty, and

3   if the death penalty is not assessed or not sought by

4   the State, then it's a life sentence.  And the current

5   law is that it's life without parole.  However, that

6   only came on board in 2005.  So, before that, it was

7   life with parole elgi -- with parole, but after

8   eligibility comes from serving a certain number of years

9   in prison.

10      A.   Okay.

11      Q.   And because this offense is alleged to have

12  occurred in 1992, we have to take the laws as they were

13  back in '92.  Does that make sense?

14      A.   Yes.

15      Q.   So, we're talking about the death penalty or

16  life in prison with parole eligibility after serving 35

17  years in this case.  So, as a jury, if you are answering

18  those special issues and you answer "no" to the first

19  special issue, then it's a life sentence.

20      A.   Okay.

21      Q.   But if you answer "yes," you move on to the

22  second and so forth.

23            So, my question to you, Ms. Pyper is that

24  you -- hypothetically say you -- not talking about this

25  case, but you are sitting on a jury --

1      A.   Uh-huh.

2      Q.   -- and you have found the defendant guilty, you

3 are moving on to that second phase, the punishment

4 phase, you've heard evidence or new evidence or

5 testimony on different issues and it's now your -- now

6 it's time to make those decisions on the special issues.

7 Will you commit to me, Ms. Pyper, that you aren't going

8 to automatically answer "yes" or "no" to any of those

9 questions just because you have found the defendant

10 guilty?

11     A.   Yes.

12     Q.   Will you agree with me that you will evaluate

13 the evidence and the testimony that's before you in

14 determining your answer to those questions?

15     A.   Yes.

16     Q.   Okay.  Specifically I want to talk to you about

17 Special Issue No. 1.  And this is what we call the

18 continuing threat issue.  And as a jury, you are going

19 to have to answer and find beyond a reasonable doubt

20 whether we've met our burden on this issue.  And it's

21 essentially finding whether or not there is a

22 probability that this person will commit future acts of

23 violence.  And a couple of things about this special

24 issue that I want to visit about is that word

25 "probability."  There's got to be a probability that

1    that will happen.

2              Now, you will agree with me, won't you,

3    that does not necessarily mean certainty, it's not an

4    absolute certainty.

5         A.   Right.

6         Q.   But more than just a possibility.  There's got

7    to be a probablity, maybe more likely than not, whatever

8    your definition of it is, that future acts or other acts

9    of criminal violence would be committed in the future.

10   In talking about criminal acts of violence, now the

11   Judge explained it to you, but I want to visit with you

12   about that.  There isn't a requirement that we show

13   necessarily that another murder or capital murder would

14   be committed.  That's not what that says.  It just says:

15   Other criminal acts of violence.  So, other criminal

16   acts of violence.  So, that can be committed against

17   another person, maybe against someone's property, maybe

18   it's verbal threats, whatever in your mind that you

19   might consider criminal acts of violence.

20              What kind of things do you think would show

21   someone's propensity to commit criminal acts of violence

22   for you?

23        A.   Probably a continuation of some other things

24   you said.  Verbal threats, hurting or insulting in a

25   threatening manner other people.

1  Q. Okay.  Maybe -- so, maybe looking at someone's

2 background?

3  A. Uh-huh.

4  Q. What they've done since or before or whatever?

5  A. Right.  The background, what's happened since

6 that supposed date.

7  Q. So, maybe other -- it might -- it might rise to

8 the level of other offenses, but it don't necessarily

9 have to be prior convictions or anything like that.

10 Would you agree with me?

11  A. Correct.

12  Q. All right.  How about the concept of the

13 fact -- looking at the offense alone, looking at the

14 actual acts committed in the offense.  The law says that

15 you can consider that, too, in considering whether

16 someone has a probability of committing future acts of

17 violence.  And would you agree with me there are some

18 offenses that standing alone might show someone's

19 propensity to commit future violence?

20  A. Sure.

21  Q. Are you familiar with the Candy Man murder?

22  A. No.

23  Q. That situation was where an individual, a

24 father actually poisoned his own son, his own son's

25 Halloween candy.  Poisoned like a pixie stick,

1   essentially.

2        A.   Okay.

3        Q.   And killed his own son for insurance money.

4   Although, it seems unfathomable, that happened.  And in

5   Texas that could be considered capital murder.  And

6   would you agree with me that there are some -- there are

7   some offenses, maybe like that hypothetically for

8   example, that standing alone might show someone's

9   propensity to commit future acts of violence?

10       A.   Yes.

11       Q.   Okay.  And then finally on Special Issue No. 1,

12   it says:  That would constitute a continuing threat to

13   society.  And would you agree with me, Ms. Pyper, that

14   society can mean many different things?

15       A.   Oh, yes.

16       Q.   It can mean the streets that we walk around in

17   in Houston.  It can mean society within prison, whether

18   that be guards, other employees, fellow inmates in

19   prison.

20       A.   Yes.

21       Q.   Okay.  So, as a jury, if you hear evidence that

22   leads you in a direction to answer that question with a

23   "yes," then you would move on to the second question.

24   And the Judge spoke to you a little bit on Monday about

25   the issue -- or the concept of law of parties and

1  accomplices.  And in many ways, this question is very

2  similar to that.

3       A.   Uh-huh.

4       Q.   But just like with that first question, you

5  have to take this second question independently.  You

6  can't just automatically answer "yes" to this question.

7  You have to evaluate this question independently.  And,

8  again, it has that same burden of proof, beyond a

9  reasonable doubt.  And you, as a jury, have to decide

10  first if you believe that the defendant actually caused

11  the death of the deceased in the case.  But then based

12  on some of those ideas of law of parties and

13  accomplices, you heard the Judge tell you it doesn't

14  necessarily have to be them actually causing the death.

15  They could have intended the death of the deceased.

16       A.   Right.

17       Q.   Or possibly even another person.  Or

18  anticipated that a human life would be taken under the

19  circumstances.  Are those concepts that you are

20  comfortable with?

21       A.   Yes.

22       Q.   And a little bit going back on that --

23  actually, let me continue with that and I'll go back to

24  this in a minute.  But after you come to a determination

25  on that question and you, as a jury, evaluated the

1    evidence and the evidence leads you in a direction to

2    answer that question with a "yes," then you move on to

3    the third question.

4         A.   Correct.

5         Q.   Now, if you think about where you are at in the

6    process, you, as a jury, beyond a reasonable doubt have

7    found the defendant guilty, you have answered that first

8    question with a "yes," we believe there is a probability

9    he would be a continuing threat, you have answered that

10   second question with a "yes," that he either actually

11   caused the death, he intended to, or should have

12   anticipated it.  So, you are one question away from

13   essentially sentencing the defendant to the death

14   penalty that would lead to his execution.  So, the third

15   question is an independent question as well.  You've got

16   to step back.  It basically has you evaluate all of the

17   evidence -- and we'll talk about that -- and determine

18   if there is some sufficient mitigating circumstances or

19   circumstance that would warrant something less than the

20   death penalty.  And in this case, we know we're talking

21   a life sentence with parole eligibility after 35 years.

22        A.   Uh-huh.

23        Q.   You follow me?

24        A.   Uh-huh.

25        Q.   One difference is there is no burden of proof.

1    There isn't that beyond a reasonable doubt standard.

2    But the question itself kind of tells you where to look

3    to help answer this question.  The question tells you

4    that you are to evaluate -- as a jury, you are to

5    evaluate all of the evidence.  That can be the

6    circumstances of the actual offense, that can be

7    something you might have learned about the defendant's

8    background or character.  You know, like we talked about

9    in the punishment phase, you might learn some of that.

10   It might be what was his moral culpability in all of

11   this, how involved was he, what role did he play in all

12   of this?

13             And in evaluating all of that, you have to

14   decide if there is some kind of sufficient mitigating

15   circumstance or circumstances that would warrant a life

16   sentence rather than the death penalty.  And you would

17   agree with me, wouldn't you, Ms. Pyper, there are a lot

18   of things that could be considered mitigating

19   circumstances?

20       A.   Sure.

21       Q.   You probably have a lot of insight into this,

22   in dealing with some of the difficult situations that

23   you deal with in the schools.  Sadly, you probably deal

24   with a lot of troubled kids, right?

25       A.   Uh-huh.

1     Q.   That come from some pretty horrible

2  backgrounds.

3     A.   Yes.

4     Q.   You know, many things could be considered a

5  mitigating circumstance.  It could be something as

6  extreme as, you know, mental illness.  That might play a

7  part, right?

8     A.   Yes.

9     Q.   You are probably familiar -- do you remember

10  the Andrea Yates case --

11     A.   Yes.

12     Q.   -- where she drowned her five kids.  Tragic

13  situation.  Clearly, she committed those acts.

14     A.   Right.

15     Q.   She admitted to it, but through her trials,

16  trial of trials, it came out and was evident, her mental

17  illness.  So, that might be a mitigating circumstance

18  that a jury considers.  But a skilled lawyer can say

19  pretty much anything is a mitigating circumstance.  You

20  know, I mean, you can look at this in a real-world

21  example.  A history of drug abuse might be considered a

22  mitigating circumstance, but, on the other hand, someone

23  that's been clean and sober and not used any drugs could

24  also be argued -- arguably a mitigating circumstance.

25     A.   Right.

1    Q.   Or a tight family unit that's in place could be

2    a mitigating circumstance.

3    A.   Correct.

4    Q.   Or a broken background, right?

5    A.   Uh-huh.

6    Q.   Like I was saying before, you deal with kids

7    that have been in some really awful circumstances --

8    A.   Yes.

9    Q.   -- in the line of work that you do.  But not

10   every child who has come from a broken home or grows up

11   with an addiction to drug abuse is going to go out and

12   commit capital murder, are they?

13   A.   No.

14   Q.   So, as a jury, that word "sufficient" has to be

15   taken into consideration because it has to be sufficient

16   in light of all of those things we've talked about -- in

17   light of the offense, in light of all of the evidence --

18   in order for you to say a life sentence is more

19   appropriate than the death sentence.

20            THE COURT:  Five minutes, Mr. Wood.

21            MR. WOOD:  Thank you, Your Honor.

22   Q.   (By Mr. Wood) Is that process something that

23   you think you would be okay with?

24   A.   Uh-huh.

25   Q.   While difficult, that you could do?

1      A.   Yes.

2      Q.   Okay.  Going back to that Special Issue No. 1.

3  You know, that's probably one of the biggest

4  considerations you would have as a juror once you found

5  a person guilty.  And some defense attorneys would say

6  that you have just found someone guilty of capital

7  murder, can you ever envision any circumstance or

8  circumstances where you personally, Ms. Pyper, would say

9  that that person is not a continuing threat to society.

10     A.   Probably not.

11     Q.   Well, that's a difficult thing, especially in a

12  vacuum when you don't know anything.

13     A.   Right.

14     Q.   Are you familiar with the story of "A Time to

15  Kill"?

16     A.   No.  I have heard of it, but...

17     Q.   First a book and then a movie.

18     A.   Uh-huh.

19     Q.   And the circumstances around that case which we

20  have to look at as -- you know, I'm just throwing that

21  out there as a possible hypothetical case.  But that

22  situation -- or in that story, two gentlemen went on

23  trial for raping a man's daughter.  And there was a lot

24  of other stuff going on, but in the course of that, the

25  rape victim's father laid in wait outside of the

1  courtroom and guns down and kills the two rapists.

2  Clearly, in Texas that would be capital murder.  Right?

3  Killing two individuals in the course of, you know, the

4  same transaction, basically.

5           Now, take in this hypothetical situation

6  that this is not a person with a history of criminal

7  activity, this is a father.

8       A.   Right.

9       Q.   In Texas, that would be capital murder.  Now,

10  we can say whether or not we'd seek the death penalty or

11  not, but in a hypothetical situation the State could

12  seek the death penalty in that case.

13      A.   Uh-huh.

14      Q.   Is that a situation --

15           MR. CORNELIUS:  That calls for a

16  commitment.

17           THE COURT:  Yes, I agree.  Don't ask for a

18  commitment on that.  You can use that as a hypothetical,

19  but do not ask a commitment question.

20      Q.   (By Mr. Wood) Considering that hypothetical, or

21  any other set of circumstances, any other set of facts

22  in your mind that you can consider, can you think of a

23  situation where you might not automatically -- where you

24  would not automatically say "yes" to this question just

25  because someone is guilty of capital murder?

1      A.   It would probably depend on the case, but
2  probably.
3      Q.   Yes.  And that's a -- right now where you sit,
4  that's all we can say is that I would have to ask that
5  you evaluate the evidence --
6      A.   The evidence.
7      Q.   -- and the circumstances and the facts and
8  evidence that you hear as a jury.  But can you keep an
9  open mind to that where you sit now, that you would be
10 open to that possibility?
11     A.   Yes.
12     Q.   And that you would only answer that question
13 after you have evaluated the evidence and the facts
14 before you --
15     A.   Yes.
16     Q.   -- in that particular case?
17     A.   Yes.
18     Q.   And they kind of come -- they kind of are very
19 closely related, but the same thing on the mitigation
20 issue, that third special issue question that you would
21 be asked to answer.  Again, will you commit to me that
22 you would not automatically answer that question "no"
23 just because you found somebody guilty of capital
24 murder, just because you have found there's a probablity
25 they will be a continuing threat, that you won't

1   automatically answer that question "no," but that you

2   will evaluate the evidence?

3        A.   Yes.

4        Q.   Ms. Pyper, I'm just about done.  This is the

5   last shot that I have for you to tell me if there is

6   anything that you want to share or there's anything I

7   have not asked that you think I should have asked.

8        A.   No.

9        Q.   Okay.  Well, I sure appreciate your answers and

10  your time.

11       A.   Thank you.

12            MR. WOOD:  I pass the juror.

13            THE COURT:  Mr. Cornelius.

14            MR. CORNELIUS:  Yes, Your Honor.

15            THE COURT:  You may proceed.

16                    **VOIR DIRE EXAMINATION**

17  **BY MR. CORNELIUS:**

18       Q.   Ms. Pyper, I'm Skip Cornelius.  And we're going

19  to get to ask you some questions now.  I hope it doesn't

20  take 30 minutes.  Mario Madrid is across the table as

21  co-counsel.  And Obel Cruz-Garcia is on my right.  Why

22  don't you sit back and tell me about the life and times

23  of Nancee Pyper.

24       A.   I have been a schoolteacher for 21 years.  Part

25  of that time, I worked with difficult children.  For

1  four years, I had third, fourth, and fifth graders from

2  the Cy-Fair district that had either committed a code of

3  conduct violation or persistent misbehaviors.  That

4  would be the reason they would come into my classroom.

5  And I had them the entire school day building social

6  skills and helping them see a reason to be successful

7  back in a regular classroom.

8       Q.   Do you like doing that?

9       A.   I do.

10      Q.   Do you get some success out of it?

11      A.   Hope so.  I feel that we do.

12      Q.   Do the kids sometimes get turned around?

13      A.   Sometimes.  A lot of times it depends on the

14  home front, which is, you know, the -- I can only do

15  what I can during my eight-hour day.

16      Q.   Go back to Montana.  How long did you live in

17  Montana?

18      A.   Less than six months.

19      Q.   Okay.

20      A.   No memory of it other than birthplace.

21      Q.   And so, where did you live?

22      A.   Pretty much in the Houston area most of my

23  life.

24      Q.   Okay.  All right.  Your family, what -- I know

25  you were asked this question before, but anybody in your

 1  family -- or let's not even limit it to family.  Close

 2  friends or relatives.  Has some pronounced feeling about

 3  capital punishment for or against?

 4       A.   Not one way or the other, no.

 5       Q.   Nothing happened in your life that would maybe

 6  have an impact on you as to whether you'd be for it or

 7  against it?

 8       A.   No.

 9       Q.   You ever -- when is the last time you recall

10  ever having a conversation with anybody about capital

11  punishment?

12       A.   Well, of course, talking to my husband about

13  the possibility of this jury.

14       Q.   Before that.

15       A.   Before that?  Don't really have a recollection.

16  I know the last time I was on a panel similar to this

17  was around the Andrea Yates time.

18       Q.   Was it the Andrea Yates panel or a different

19  one?

20       A.   I was actually in the jury room that same day.

21  They supposedly picked the last grouping from a panel

22  similar to this that morning.  I was here in the

23  afternoon.  So, that was obviously --

24       Q.   Pretty close?

25       A.   -- pretty close.

1    Q.   Okay.  Anything off the top that you can think

2  of that maybe I ought to know in deciding whether to

3  agree to put you on the jury?

4    A.   Not that I can think of.

5    Q.   Okay.  I'm going to shift gears a little bit.

6    A.   Okay.

7    Q.   In a normal jury selection, we have a panel and

8  they sit out there and we talk to them at the same time,

9  maybe we have a few individual questions to some of them

10  for some reason, but because this is a capital case we

11  talk to you individually, because people's views on

12  capital punishment are pretty adverse and it's pretty

13  important in a case like this.  Here's my fear on that.

14  We bring you in here -- first of all, we bombard you

15  with questions about capital punishment, we bring you in

16  here and bombard you all about capital punishment, even

17  the defense side does.  And my client is going to plead

18  not guilty.  And we're going to defend him to the best

19  of our ability and try to convince a jury not to convict

20  him.  Do you understand that?

21    A.   Yes.

22    Q.   You think I ought to do that if I'm his lawyer?

23    A.   If you are his lawyer, yeah.  That's what you

24  are here for.

25    Q.   Do you have any problem with that?

1        A.    No.

2        Q.    I mean, we see really unusual answers on these

3    questionnaires.  Not yours, but on questionnaires.  Some

4    people really don't think everybody deserves to have a

5    lawyer.  And so, I'd like to have an understanding with

6    you that I have to do my duty and you expect me to do my

7    duty.

8        A.    Correct.

9        Q.    How would you feel, hypothetically, if you were

10   on the jury and you go back to deliberate on the case

11   and you realized that the State has a pretty good case,

12   but maybe a really good case, maybe you really think the

13   defendant is guilty in that case, but the defense didn't

14   do anything, they were terrible, they didn't ask

15   questions on cross-examination, they didn't call any

16   witnesses, they really didn't do anything to defend

17   their client?  That wouldn't feel very good, would it?

18       A.    No.

19       Q.    And if you convicted that guy knowing he really

20   didn't get a fair trial, how would that make you feel?

21       A.    I would probably put it more on the defense

22   than on the way the trial went.

23       Q.    Well, wouldn't it feel better if both sides --

24   you knew both sides were doing their very best to

25   represent their side?

1          A.    Sure.

2          Q.    Their best to represent the State, we're doing

3     our best to be a defensive team.

4          A.    Uh-huh.

5          Q.    And then you'd fairly evaluate the evidence,

6     and whatever you decide you decide, but that is the way

7     it's supposed to work.   Do you agree with that?

8          A.    Yes.

9          Q.    Okay.  Well, we're going to do that.  I tell

10    you that because I want to understand and I want to feel

11    like that you expect me to do my job.  And also I want

12    you to understand that if I talk to you about capital

13    punishment, it's not because I expect to lose.  It's

14    just that we don't have two juries.  We don't have a

15    jury on guilt or innocence and then if there is a

16    conviction we pick another jury to set the punishment.

17         A.    Correct.

18         Q.    So, if we have questions of jurors about

19    punishment, we have to ask them now.  Before we get into

20    that, though, you know that this allegation is one that

21    alleges that the crime occurred in 1992.  Now, I would

22    be afraid that a jury might give the State come extra

23    credit because it's probably pretty hard or at least

24    harder to try a 1992 case than, let's say, a 2012 case.

25    Maybe not.  There may be a better 1992 than 2012, but

1   just in averages -- and we can't talk about this case at

2   all.  You can see there could be problems with

3   presenting a 1992 case?

4        A.   Possibly, but I would expect the same as if it

5   happened yesterday and was in trial.

6        Q.   You anticipated my question.  I don't want you

7   to -- well, I hope that you wouldn't give the State some

8   extra credit or extra benefit or reduce their burden a

9   little bit because it's a 1992 case.

10       A.   No.

11       Q.   Okay.  There is a scale on our form here.

12   Actually, it's two scales.

13            MR. CORNELIUS:  And, Judge, can she look at

14   your page?

15            THE COURT:  Which page?  Page 11?  No. 70?

16            MR. CORNELIUS:  Page 9.

17            THE COURT:  I will turn to Page 9.  The

18   only thing I have written on here is the times that we

19   started.

20       Q.   (By Mr. Cornelius) We have these two scales on

21   there.  Do you remember them?  I'm not going to ask you

22   to tell me what they are, but do you remember reading

23   that?

24       A.   Yes.

25       Q.   There are two scales.  The first one is asking

1  about your general views -- you see it up there at the

2  top -- general views about capital punishment?

3      A.   Yes.

4      Q.   And the first answer is:  I'm opposed to

5  capital punishment in all cases, and it says some other

6  things.  And the fifth is:  I'm strongly in favor of

7  capital punishment as an appropriate penalty.  And you

8  picked number five.

9      A.   Correct.

10      Q.   Okay.  And I don't have a problem with that,

11  but unless you are telling me that you are strongly in

12  favor of capital punishment in all cases.

13      A.   That's not what's written here.  That's not how

14  I read it.

15      Q.   All right.  Because the second scale doesn't

16  exactly address that, but it comes a lot closer.  It

17  says -- it's talking about determining the punishment

18  and asking you which one of the examples fits and you

19  picked number three.

20      A.   Correct.

21      Q.   Which is basically it depends on the facts.

22  You are not -- it's not that you can do it, it's not

23  that you would always do it.  It's not that you would

24  seldom do it or usually do it.  You just don't know if

25  you would do it or not till you hear the facts.

 1          A.    Exactly.

 2          Q.    Is that the truth?

 3          A.    Yes.

 4          Q.    Okay.  You also made a comment on there -- and

 5     just take my word for it.  You just checked the box that

 6     says our laws are too lenient.

 7          A.    At times, yes.

 8          Q.    At times.  Okay.  Are they ever too harsh?

 9     Ever heard of a case where somebody got more punishment

10     than you thought they should have?

11          A.    I can't think of one.

12          Q.    Okay.  Before she gives that back, I want her

13     to turn to page --

14                THE COURT:  Absolutely.  Just keep it until

15     he is finished with his questions.

16          Q.    (By Mr. Cornelius) Page 11, Question No. 70.  I

17     did not write this questionnaire.  I've not contributed

18     a word to the questionnaire.  I'm not criticizing the

19     questionnaire, but I am -- Question No. 70 is kind of

20     difficult.  Do you remember going through that series of

21     questions?

22          A.    Yes.

23          Q.    Well, the most important one is down here where

24     it says F, number F, it says:  A sentence of life in

25     prison may or may not be the right decision, it depends

1   on the facts of the case.  And that's what you checked.

2        A.   Yes.

3        Q.   You agreed with that --

4        A.   Yes.

5        Q.   -- correct?

6             Okay.  Now, A and B are the same questions,

7   just inverted.  And D and E are the same questions, just

8   inverted.  I don't know why we need to do that, but we

9   have for some reason.  And you said that life

10  imprisonment is not enough.  And I assume you mean in

11  every case.  There may be some cases where life is not

12  enough, might mean the death penalty.

13       A.   Correct.

14       Q.   Okay.  What I want to hone in on a moment is

15  this business about whether it's wasteful -- D, go to

16  D -- whether it's wasteful to support people in prison

17  because that sort of implies that it might be just more

18  logical to give them the death penalty because it costs

19  to much to support them in prison.  And that's kind of

20  what you -- by agreeing with that, that's kind of what

21  you're saying, at least -- let me hear what you're

22  saying.

23       A.   Now that I understand the punishment phase and

24  the choices of how it is determined, life in prison

25  versus the death penalty, I understand a little bit

1   more.   However, I do feel that from my previous

2   knowledge of life in prison that sometimes, you know, it

3   is -- I feel sometimes it is wasteful of taxpayers

4   money.

5        Q.   Okay.  As opposed to giving the death penalty?

6        A.   If it were an option, yes.

7        Q.   Now, making that empirical calculation as to

8   cost, what information would you have that would let you

9   know whether it would cost more to actually prosecute

10  somebody for the death penalty and carry that all the

11  way out through the appellate processes and have to

12  support them all that time -- because you know it takes

13  a long time before somebody actually gets executed.

14       A.   True.

15       Q.   And have to support them all of that time in

16  prison, because it would only after they got executed

17  that it would cost any more money, a dollar more, to

18  continue to support them in prison.  You follow me?

19       A.   Yes.

20       Q.   What are you basing the fact that you think

21  it's more expensive to keep them in prison for however

22  long they would live versus --

23       A.   Hearsay.

24       Q.   Okay.  All right.  Can you see kind of where

25  I'm going with that question?

1        A.   Uh-huh.

2        Q.   I mean, I can't give you any of the facts or

3   statistics or stuff.

4        A.   Right.

5        Q.   But I can tell you that there are people that

6   would tell you that it's more expensive to actually

7   execute somebody than to carry them in prison or provide

8   them their food and prison or whatever.

9        A.   Correct.

10       Q.   Did you know that if they are actually given

11  the death sentence, they go to death row, they don't

12  work, there is no work for the prisoners --

13            MR. WOOD:  Objection, Your Honor.  This is

14  improper.

15            MR. CORNELIUS:  Well, if she knows.

16            THE COURT:  Sustained.

17       Q.   (By Mr. Cornelius) Do you have any -- when

18  you -- of course, we didn't ask anybody if they had any

19  information about this stuff.  And I don't know who

20  would have information about this stuff, but I'm just

21  asking:  Do you know what happens with the prisoners

22  when they are in prison in terms of how they work or if

23  they work?

24       A.   No.

25       Q.   Okay.  All right.  The parole laws.  Because of

1    the fact that this allegedly occurred in '92, we have to

2    go on '92 law.  And at that time if somebody received a

3    life sentence for the offense of capital murder, they

4    have to serve 35 calendar years before they can be

5    consider for parole.  It doesn't mean they get out in 35

6    years.  And the charge that the Judge would give in

7    relation to the parole laws would be that you are

8    entitled to know what the law is, but you are not

9    entitled to consider it in determining what the

10   punishment ought to be.

11               In other words, the law is that a juror has

12   a right to know what the parole laws are, but they can't

13   consider it in deciding to give, say, a death sentence

14   because they don't like the parole laws.  And

15   particularly in a situation where life is involved,

16   because there is no guarantee anyone ever gets parole on

17   a life sentence.  Did you know that?

18        A.   It's a possibility, right?

19        Q.   It's a possibility.  There's no mandatory

20   parole for a life sentence, ever.

21        A.   Right.

22        Q.   And if you add 35 years, whoever it is that is

23   on trial, would you concede they might not live that

24   long in prison?

25        A.   Possibly.

1      Q.   Do you see a life sentence as being a

2  significant punishment?

3      A.   Yes.

4      Q.   All right.  Going back to guilt or innocence.

5  And also in answering Question No. 1 and No. 2, I'll go

6  back in a moment to the actual questions, but there is a

7  proof beyond a reasonable doubt standard.  And you knew

8  that before you came here.  You've heard that term,

9  correct?

10      A.   Yes.

11      Q.   The law doesn't define what that is.  The law

12  has defined it before a couple of different times with a

13  couple of different definitions, but there's not one

14  now.  We've had a definition, not a definition, we had a

15  definition, not a definition.  We've had various things

16  in the law, but for some time now our state offers no

17  definition to the jury.  It's whatever the jury

18  believes in their own heart and their own mind is proof

19  beyond a reasonable doubt.  What it takes for you to be

20  convinced beyond a reasonable doubt.  It can be

21  different for every juror.  On the guilt or innocence

22  part of the case, a juror -- I'm not saying you -- a

23  juror back in the jury room can say at the end of the

24  day:  I have heard all of the evidence in the case, I

25  have listened to every word the State said, I've listen

1   to every word the defense said, I have listened to every

2   word the juror has said, and I'm not convinced the

3   person is guilty, I have a reasonable doubt, I'm a

4   reasonable person, I have reasonably applied everything

5   in this case, and I have a reasonable doubt, I'm not

6   going to convict.  And that might be that person's

7   definition of what constitutes proof beyond a reasonable

8   doubt.

9              Another juror might say in the jury room:

10  I have a reasonable doubt, I'm not going to convict, and

11  I don't feel like I have to tell you why.  And they

12  don't.  I mean, you would not have to tell other jurors

13  why you have a reasonable doubt.  That would be your

14  right.  I would encourage and always encourage the jury

15  to talk to each other and cooperate with each other and

16  respect each other.  Because everybody on the jury has

17  exactly the same right, even the foreman.  No one has

18  any more right than anybody else.

19      A.   Uh-huh.

20      Q.   And I find that if a jury respects each other,

21  it's more likely they'll get a verdict.  I'm not saying

22  that because it's helpful to me or the State.  Just more

23  likely going to get a verdict.  But a juror doesn't have

24  to tell what their reasonable doubt is.  Another juror

25  might say:  Well, I have a reasonable doubt because I

1    didn't believe a particular witness in a case.  And that

2    witness was testifying to something material, an element

3    to the case, and I don't find anything that proves it, I

4    don't believe that witness.

5              For example, hypothetically, the State may

6    call a co-defendant to establish the identity of who

7    committed the crime.  Maybe that's the only way they can

8    prove it.  And the juror says:  I don't believe them,

9    they have too much to gain, I don't believe them, it's

10   just too convenient for them to put it all on the person

11   on trial and that causes me to have a reasonable doubt.

12   That's my reasonable doubt.  And the sky is the limit on

13   the reasons it could be for somebody to have a

14   reasonable doubt.  If everybody on the jury has a

15   reasonable doubt, then the verdict is supposed to be not

16   guilty.  Do you know that?

17        A.   Uh-huh.

18        Q.   And do you agree with that?

19        A.   Yes.

20        Q.   If that -- if you were in that group and had a

21   reasonable doubt, could you vote not guilty?

22        A.   If I had a reasonable doubt, yes.

23        Q.   And can you imagine that happening?

24        A.   Sure.

25        Q.   I mean, if the State doesn't prove it to you,

1  no matter how hard they try, how nice they are, or how

2  professional they are, if they just can't get to your

3  standard, can you vote not guilty?

4      A.   Yes.

5      Q.   Okay.  What if you are -- what if there is only

6  four voting not guilty and eight voting guilty, you've

7  given all eight an opportunity to change your mind, but

8  you are stuck on not guilty, would you hold your

9  position?

10      A.   It would depend on the situation.

11      Q.   Well, maybe  they could change your mind, but

12  what if they didn't change your mind, you still had a

13  reasonable doubt?

14      A.   If we discussed it and my reasonable doubt was

15  changed, I could possibly change the other way myself.

16  You know, I could see it going either way, where they

17  could sway me their way, I could sway them mine.

18      Q.   Well, that's good.  I like that you are

19  reasonable.  I like that.  But my hypothetical is -- I'm

20  affixing you.  I'm saying that everybody has tried

21  everything they could do to sway you either for guilty

22  or for not guilty and you are stuck wherever you are.

23  They are not able -- I mean, after 18 hours of

24  deliberation, 46 hours, whatever the deliberation,

25  whatever it is, you are stuck on the fact that you have

1    a reasonable doubt.

2        A.    Then I stay stuck on reasonable doubt.

3        Q.    Okay.  And even if you are the only one?

4        A.    Uh-huh.

5        Q.    You think you are strong enough to do that?

6        A.    If that was my feeling.

7        Q.    Okay.

8              MR. CORNELIUS:  Can we have -- well, that's

9    all right.

10       Q.    (By Mr. Cornelius) I'm going to go over the

11   special issues with you for a moment.

12       A.    Okay.

13       Q.    That No. 1 -- Mr. Wood did a great job

14   questioning you about No. 1 and anticipating what my

15   question is going to be.  Of course, we do this over and

16   over.  It wasn't a surprise as to what I'm going to ask,

17   put it that way.  I just have to hear it for myself.

18   And I really don't want to try to commit you to a

19   Hollywood movie or a book that someone wrote.  This is

20   what I want to try to commit you to in my hypothetical.

21            I want you to assume that you are selected

22   next year on a capital murder case.  Don't want to talk

23   about this case because I can't.  And you hear the

24   evidence in that case.  Say, it's an alleged murder

25   during a kidnapping or a murder -- some other capital

1  murder, but maybe it's a murder during an alleged

2  kidnapping or an alleged murder during an alleged

3  killing {sic} and you hear all of the evidence in the

4  case and you go back and deliberate and you and all

5  eleven of the other jurors convict that person of

6  capital murder.

7           So, are you with me?  I mean, you are

8  there, you've convicted of him of capital murder.  It's

9  not a movie, it's not a book.

10      A.   Okay.

11      Q.   You have convicted that person.  So, only then

12  would you ever be asked Question No. 1.

13      A.   Right.

14      Q.   And it has to be proven beyond a reasonable

15  doubt, but could you -- as Mr. Wood asked you in that

16  situation, if you're really there, could you imagine

17  yourself ever voting "no" that there is not even the

18  probability that the person would be a continuing

19  threat?

20      A.   It would depend on the facts of the case.

21      Q.   Well, of course it would.  But could you

22  imagine -- I mean, you know you and I don't know you.

23  And you know -- and it's hard for you to even know --

24  I'm going to concede this.  It's hard for you to know

25  what you'd do when you are not there yet, not in the

1  facts.

2       A.   Right.

3       Q.   But --

4       A.   It would depend on the facts of the case and

5  whether or not -- with the background evidence and that,

6  whether I felt that there was a continuing threat, as

7  it's written.

8       Q.   I understand, but could you ever imagine

9  yourself not finding he would be a continuing threat?

10      A.   I'm not sure how to answer that.

11      Q.   Well, let me tell you where I am.  Try to

12  understand from my standpoint, if you don't mind.  I

13  don't want to put somebody on the jury -- just to be

14  honest.  It's not personal against you, but who -- you

15  know, originally you told Mr. Wood that you couldn't

16  imagine finding it not true.  And that's what you

17  originally said to him.  And then he gave you the idea

18  of a Hollywood movie.  And I'm not trying to commit one

19  way or another, but I really want to know.  If it's

20  really not possible -- I mean, some people say the

21  greatest indication of what someone will do in the

22  future is what they have done in the past.  I mean,

23  professionals say that.  And that's -- our law doesn't a

24  allow it to be that way, for you to automatically say

25  there's at least the probablity that they will be a

1  continuing threat, but you know yourself.  And if you

2  have convicted someone of capital murder, are you going

3  to always say "yes" to Special Issue No. 1?

4       A.   No.

5       Q.   You are not?

6            Because -- tell me why, why you wouldn't

7  automatically answer that "yes."

8       A.   Because I'm going to look at the evidence, and,

9  you know, if it's a one-time thing, there might be

10 situations that it might have been a one-time thing, but

11 it falls under the realm of capital murder, that it

12 might be where we feel that life in prison was

13 sufficient.

14      Q.   Okay.  I accept that.

15           Now, I want to move to Special Issue No. 3

16 if Justin will put it back up there.

17           THE COURT:  Five minutes.

18           MR. CORNELIUS:  Pardon me?

19           THE COURT:  Five minutes.

20           MR. CORNELIUS:  Okay.  I will be done.

21      Q.   (By Mr. Cornelius) Now, what I want to talk to

22 you about this, I think -- I know you understand the

23 question.  I want to talk about sufficient, the word

24 "sufficient."  When the Supreme Court mandated this

25 question, everybody has to have this -- every state, the

1    federal government, everyone has to have this question

2    in a capital murder case before the death penalty could

3    ever be inflicted.  A jury has to look at the evidence,

4    stop, take a deep breath, look at all of the evidence

5    again, and decide if there is any reason to turn away

6    from the death penalty.  Because by the time you would

7    be answering this question in a capital case, you

8    would -- and the other jurors would have convicted,

9    found "yes" that the person is going to be a continuing

10   threat, found "yes" that either he caused the death or

11   participated in the death.  Okay?  And now he is on his

12   way to a death sentence except for this one question.

13        A.   Correct.

14        Q.   What I see the State doing in cases past and in

15   this case is talking a lot about what would be

16   sufficient.  And they have a right to talk about that

17   because that's what the question says.  But I want you

18   to understand or see if you agree with me that it's not

19   mitigation that's sufficient to overcome the crime.  I

20   mean, nothing is ever going to overcome the crime or

21   make it all right.  It's what would be -- and, again,

22   it's like reasonable doubt.  It's not defined for you,

23   what would be sufficient.  It just gives you the

24   opportunity to turn away from a death sentence.

25             Again, you wouldn't have to explain why or

1    you could explain why.  Each juror could have a

2    different reason.  They could explain it or not explain

3    it, but it gives the jury an opportunity to say:  This

4    is a horrible crime, he did it, he is on his way to a

5    death sentence, but I find for some reason not to take

6    his life.  Could you do that?

7         A.   Yes.

8         Q.   I mean, if you got that far with it, could you

9    say -- I'm not asking why you would or -- but could you

10   say:  I could vote to essentially -- by this you're

11   voting to take his life or not, but I'm not.

12        A.   Uh-huh.

13        Q.   Could you see yourself doing that?

14        A.   Yes.

15        Q.   Okay.  Do you have any questions?

16        A.   No.

17        Q.   This is your last chance to ask me a question

18   if you have one.

19        A.   No.

20             MR. CORNELIUS:  Okay.  I'll pass the juror,

21   Judge.

22             THE COURT:  Okay.  And if you would step

23   out just a moment this side door.  Deputy Perry is going

24   to help you out there.  We'll be calling you right back

25   in in a few moments.

```
 1                    (Venireperson exits courtroom).

 2                THE COURT:  As to Juror No. 64, Nancee

 3    Pyper, what says the State?

 4                MR. WOOD:  The State accepts Juror No. 64,

 5    Ms. Pyper.

 6                MR. CORNELIUS:  We're going to accept her

 7    also, Judge.

 8                THE COURT:  Very good.

 9                 Bring Ms. Pyper back in, please.

10                (Venireperson enters courtroom)

11                THE COURT:  Ms. Pyper, you have been

12    selected as a juror in this case, the State of Texas vs.

13    Obel Cruz-Garcia.

14                First off, I'm going to give you some

15    admonishments.  It's very similar to the ones we have

16    given you before, but it goes like this.  As a

17    prospective juror, you must not read, watch, or listen

18    to anything regarding this case.  You are not to engage

19    in any social media outlets, including Facebook,

20    Twitter, etcetera, about your status as a juror in this

21    case.  If you encounter anything about this case,

22    including but not limited to casual conversation,

23    stories in the media, or exposure to any type of

24    information or from any source, immediately end the

25    encounter.  You may only receive information from
```

1  official court proceedings.  Do not discuss the case

2  with anyone, including other prospective jurors.

3          It is just best if -- your employer, just

4  tell them you are on jury duty and it will be this

5  amount of time, but don't even talk about the case at

6  all -- same with your husband, same with -- until it is

7  over.  Now, the trial will begin promptly at 10:00 a.m.

8  on Monday July 8th, 2013.  We talked about that date.

9  It's not going to be in this courtroom.  It will be in

10  my courtroom on the 15th floor.  As it says right here,

11  same building.  In fact, Deputy Perry is going to take

12  you down there today after we excuse you and we get the

13  other juror in here.  He will give you a juror badge.

14  You will want to wear that whenever you are in the

15  building.  It does a couple of things couple of things.

16  It tells everybody around you that you are a juror and

17  so they are more likely not to say stuff in front of you

18  that they shouldn't.

19          As you've probably seen in this building,

20  everybody rides the elevators.  So, jurors are on there,

21  prosecutors are on there.  About the only people that

22  aren't are judges and the judge's court staff.  But you

23  are in there with a lot of people.  So, it tells people:

24  Hey, I'm a juror, don't say stuff around me.  It also

25  helps you get through security a little faster.  My

1 understanding is you can go to the front of the line if

2 you have that badge on.  So, that's great.  So, wear it

3 whenever you are here.

4          And be here promptly at 10:00 a.m. on that

5 Monday.  There are two emergency numbers.  Deputy

6 Perry's.  That's his cell number.  And then my court

7 coordinator.  That will be ringing at the courtroom.

8 So, you usually only work during the day, but that's

9 available to you, too, if you need to leave us any

10 instructions.

11          Do you have any questions?

12          VENIREPERSON:  No.

13          THE COURT:  Okay.  Very good.  Good luck to

14 you.  We'll see you on the 8th.

15          (Venireperson exits courtroom)

16          THE COURT:  We're ready for Juror No. 72,

17 Keith Evans Bowers.

18          (Venireperson sworn)

19        **KEITH BOWERS, VENIREPERSON NO. 72,**

20 was called as a prospective juror, and testified as

21 follows:

22                **VOIR DIRE EXAMINATION**

23 **BY THE COURT:**

24     Q.  Good afternoon, Mr. Bowers.

25     A.  Good afternoon.

1      Q.   Thank you for coming in early.  We almost got

2   to you early, but everything sped up.  We should get you

3   out of here earlier.

4      A.   That's good.

5      Q.   I need to make sure you are the same Keith

6   Bowers, Juror No. 72, that was called over in venire of

7   the State of Texas vs. Obel Cruz-Garcia?

8      A.   I am.

9      Q.   Very good.

10           And you heard my general voir dire on

11   Monday, June 3rd.  This is a continuation of that

12   process.  One of the attorneys from each side will have

13   an opportunity to speak with you today.  I'm going to

14   hold them to 30 minutes each.  They might be shorter

15   than that.  And they are going to ask you questions

16   concerning the same topics that I already discussed, but

17   it will be more towards your feelings, very personal to

18   you.  You are under oath to tell the truth, but there's

19   really no right or wrong answer to this.  It's just your

20   general feelings about these laws and these concepts.

21   Okay, sir?

22      A.   Yes, ma'am.

23      Q.   If you have any questions about what they are

24   trying to ask, just ask them to rephrase it because

25   sometimes it's not clear.

 1          Now, I have three questions I want to ask

 2    you.

 3          A.   Who are the three people in the back?

 4          Q.   Well, the prosecutors and other lawyers in the

 5    courthouse.  They frequently sit in to watch different

 6    trials to learn and to --

 7          A.   They're authorized?

 8          Q.   They are authorized.  We have open courtrooms

 9    in the state of Texas.  So, people can come and as they

10    please as long as they are quiet.

11          All right.  And this is the individual voir

12    dire.  The questions that I have for you is, first off,

13    do you have any religious, personal, or moral reasons

14    you would be unable to sit on a jury where the death

15    penalty is a possible punishment?

16          A.   I do not.

17          Q.   And do you know of any reason why you could

18    know be fair and impartial to both sides in a criminal

19    case?

20          A.   No.

21          Q.   Have any of your questions from the

22    questionnaire that you filled out last Friday, May 31st,

23    changed?

24          A.   They have not.

25          Q.   Very good.

1              We each have a copy of your questionnaire.

2    So, if at some point they start asking about it and you

3    need a copy, we'll provide that to you.

4         A.   Thank you.

5         Q.   And Ms. Tise is going to be talking to you.

6              THE COURT:  I have 1:30, Ms. Tise.  You may

7    proceed.

8              MS. TISE:  Thank you, Judge.

9                    **VOIR DIRE EXAMINATION**

10   **BY MS. TISE:**

11        Q.   Good afternoon, Mr. Bowers.  Is that correct?

12        A.   Correct.

13        Q.   Thank you for coming back down here.  We really

14   appreciate your cooperation.  I know you feel like you

15   really didn't have a choice in the matter, but we

16   appreciate that you are participating in the process.

17   And, you know, some people don't show up for jury duty.

18        A.   I feel it's a very important obligation that we

19   have to our legal system.

20        Q.   You are absolutely right.  And I wish more

21   people felt that way.

22        A.   It works only as long as people stay involved.

23        Q.   That's absolutely true.  And we thank you for

24   being here.

25              I wanted to ask you a few questions about

1   your questionnaire.  You say you are a managing director

2   for B & B Suspension Technology Development?

3        A.   Yes, ma'am.

4        Q.   Can you tell me what that is, a little bit more

5   about that?

6        A.   I started a small business about 15 years ago.

7        Q.   Okay.

8        A.   And it's evolved to where we make the hydraulic

9   accumulators that are used on adjustable heights

10  suspension cars.

11       Q.   Okay.

12       A.   It's a very specialized business and we serve

13  Lex LX-47, for instance.  It's more exotic cars like the

14  Porsche 959, etcetera.

15       Q.   Okay.  And what is a forensic -- what is

16  forensic failure analysis mean?

17       A.   If we have a failure in one of our parts, we

18  want to know why.

19       Q.   Okay.

20       A.   They aren't supposed to break, aren't supposed

21  to fail.  And it's my job to figure out what happened.

22       Q.   Okay.  And you have an engineering background,

23  I see.

24       A.   Yes, ma'am.

25       Q.   Okay.  Where did you go to school?

1      A.    McNeese in Lake Charles.

2      Q.    Okay.  Are you originally from Louisiana?

3      A.    I am.

4      Q.    Okay.  What brought you here to Texas?

5      A.    Employment.  I was transferred.  I was working

6   in Baton Rouge and then took a job with Bechtol here in

7   Houston.  And spent most of my career with Bechtol.

8   Took about a five-year sabbatical with MW Kellogg.

9      Q.    Okay.  One of the things that you put on your

10  questionnaire and you kind of put yourself as in the

11  middle with you're generally not opposed to capital

12  punishment and that you will decide capital punishment

13  based on the facts of the case, right?

14     A.    Yes, ma'am.

15     Q.    But there were a couple of questions on the

16  questionnaire that gave me a little bit of concern about

17  where you actually stood on that.  And you understand

18  that the whole purpose of this process is just for us to

19  get a determination of how everybody feels so that we

20  can determine who the best twelve people are to sit in

21  judgment on this case.  So, I'm not here to quibble with

22  your answers or try to get you to answer a question in a

23  way that makes me happy or Mr. Cornelius happy.  I'm

24  just trying to figure out where you are so I can make

25  the appropriate decision with my case.

1        A.   Yes, ma'am.  I understand.  You have a right to

2   have a fair and impartial jury.

3        Q.   And I appreciate that.  I noticed that you said

4   that you felt like capital punishment has never been

5   effective in preventing crime.  Can you elaborate on

6   that a little bit for me?

7        A.   Typically, the time that elapses between the

8   event and the execution is decades and people who were

9   around the event, they are not around or they don't

10  remember.  So, the people that are around at the

11  execution event don't connect the two.  So, it's -- it

12  has been shown that it is not effective in deterrence.

13       Q.   So, how do you think your position on that

14  particular question would affect you if were a juror in

15  this case?

16       A.   It wouldn't.  I mean, the law is the law.  We,

17  the people, have rules.  And if people choose to violate

18  those rules, we have to sanction their behavior,

19  otherwise other people -- you know, we deteriorate into

20  a mob instead of a society.

21       Q.   Fair enough.

22            You also said that you felt like capital

23  punishment was not necessary in modern civilization.

24  Can you tell me what you meant when you said that?

25       A.   There are people that -- I want to call them

1  predators in their psychological makeup.  Man is a very

2  violent creature by nature.  And I'm not sure that

3  eliminating those people from society does anything to

4  the people that are growing up.  It may be better for us

5  to incarcerate them working for the State somehow to

6  help pay for their sustenance and care and keep.  I'm

7  not sure it works.  You know, evidence says, well, it

8  doesn't work, but, on the other hand, there are people

9  that are not going to be rehabilitated.  They are just

10  savages.

11      Q.   So, what do we do with those people?

12      A.   Either lock them up in solitary or you execute

13  them.

14      Q.   Okay.  You talked about a sentence of life in

15  prison.  This kind of goes hand-in-hand with what you

16  were just saying, that a sentence of life in prison for

17  someone convicted of capital murder is wasteful to

18  society because we have to support that person in prison

19  with taxpayer money.  Tell me a little bit more about

20  how you feel about that.

21      A.   Well, I feel it's a fact.  We don't do a good

22  job of utilizing the labor and talents of that

23  individual.  We forget about them, throw them away, and

24  then we take care of them.  For some people, they

25  consider that a pretty good life.  They don't have to

1   worry about anything anymore.

2        Q.   Right.

3        A.   For the rest of us, incarceration is horrible,

4   horrible to think of.

5        Q.   Do you think your feeling on that would affect

6   your decision in the case?

7        A.   No, ma'am.

8        Q.   Okay.  You are not telling us that you would

9   base a decision in this case on any economic factor?

10       A.   No, no.  It's based on the facts of the case.

11       Q.   Okay.  You know, there is some -- there is

12  another question here on Page 12 of the questionnaire

13  where we asked you to circle some statements that you

14  agree with.  And one of the ones that you failed to

15  circle was the question that says:  I would find someone

16  not guilty even if it was unpopular if I thought it was

17  the right decision.

18       A.   I wouldn't consider whether it was popular or

19  unpopular in making my decision.  Public opinion doesn't

20  bother me.

21       Q.   But the question is:  I would find someone not

22  guilty even if it was unpopular if I thought it was the

23  right decision.  So, taking popular or unpopular out,

24  would you find someone not guilty if it was the right

25  decision?

1      A.   Yes.

2      Q.   Okay.  That's why I was confused by that

3  because it sounded like --

4      A.   I understand.  Unintentional oversight on my

5  part.

6      Q.   You said that you have children?

7      A.   Yes.

8      Q.   And you are married?

9      A.   Yes.

10     Q.   How many children do you have?

11     A.   I have two by my first marriage and I have two

12  stepchildren by my second marriage.

13     Q.   Okay.  And one of your children is a

14  psychiatrist or --

15     A.   Yes.  The oldest is a clinical psychologist,

16  PhD, practicing in New York.

17     Q.   Okay.  It looked to me that both of the

18  children worked for you.

19     A.   They are legally employees, yes.  They get paid

20  for their work.

21     Q.   So, your oldest is your daughter and she works

22  for you, but she's also a clinical psychologist?

23     A.   No, no.  Our oldest is not my natural child.

24  It's a stepson.

25     Q.   Oh, okay.  And is that the one that's the

1  clinical psychologist?

2       A.  Yes, it is.

3       Q.  Okay.  So, this is -- these are your kids that

4  are your natural children?

5       A.  Yes.

6       Q.  Okay.  And, you know, it's the elephant in the

7  room and I hate to ask you this question and put you on

8  the spot, but I understand that you have been convicted

9  or you had a brush with the criminal justice.

10      A.  A deferred adjudication.  Successfully

11  completed, completely rehabilitated.  I have a much

12  better relationship with my daughter than most fathers.

13      Q.  Okay.  And how long ago did that happen?

14      A.  Twenty-seven, twenty-eight years.

15      Q.  And what exactly was the deferred adjudication

16  for?

17      A.  It was for incest.  I sexually molested my

18  daughter.

19      Q.  Okay.  How old was she at the time?

20      A.  Twelve.

21      Q.  Okay.  And you received deferred adjudication

22  here in Harris County for that?

23      A.  I did.

24      Q.  Okay.  And went through the process and --

25      A.  Yes.

 1      Q.   And your deferred is terminated?

 2      A.   That is correct.

 3      Q.   Okay.  Have you ever had any other criminal --

 4      A.   No.

 5      Q.   -- any brushes with the criminal justice

 6  system?

 7      A.   No.

 8      Q.   Okay.  And I'm sorry to have to ask you that,

 9  but, you know, I'm not trying to put you on the spot.

10      A.   Ma'am, I have been through enough therapy.  I

11  wanted to change.  I came out of the military during the

12  Vietnam era and I was an emotional wreck, is a good

13  word.  It took me 25 years to get me back.

14      Q.   Okay.  And I understand maybe that's how you

15  know Ken and Judy Minkle (phonetic).  They were your

16  attorneys on the case?

17      A.   Yes.  I was also in therapy with them.

18      Q.   Okay.  So, here is my concern.  And I'll

19  probably -- you are a very intelligent person, I can

20  tell, and very matter of fact.  I don't have to tell you

21  this.  This is my concern.  That your prior experience

22  being on the other side of the table is something that

23  you are not ever going to be able to separate yourself

24  with and that you are going to carry your experience as

25  being on the other side into this case with you.  Tell

1    me how you would respond to that.

2        A.    It caused me to change to a much better person.

3    I was extremely depressed, but hiding it very well.  And

4    I was about to become a basket case from the emotional

5    stress.  I would have committed suicide shortly had I

6    not been incarcerated and forced into therapy.  I was

7    already in therapy from my wife.  Because it was an

8    emotional -- I couldn't feel, let's put it that way.  To

9    suppress the anger that I carried out of the Vietnam

10   era, is what I had to do.  I had to just turn off my

11   feelings.  I was very good at it.  It was a very

12   effective tool for our government to use.  Ruined me.

13   And so, I had to rebuild me.  And I worked very hard at

14   it.  And I don't blame the criminal justice system for

15   what happened.  I caused what happened.  I was the

16   perpetrator.

17       Q.    And as a person who has been through the system

18   and as a person who is and who finds yourself to be

19   rehabilitated --

20       A.    Oh, more than rehabilitated.  Improved

21   significantly.

22       Q.    Okay.  Okay.  Fair enough.  Here is what I'm

23   thinking.  I'm thinking that you might be a person who

24   will go into this case with your mind set that anyone

25   can't change and with your mind set that rehabilitation

1  should be afforded to anyone no matter how heinous the

2  crime because of your personal experiences.  How do you

3  feel about that?

4      A.   I know personally it takes a tremendous effort

5  to change.  You have to want to change.  It's the old

6  horse and watering story.  Some people cannot.  I was

7  very fortunate to come under the care of Dr. David

8  Mindel, who is the founder of Family Therapy in the

9  United States.  He is long dead.  I don't think people

10  can change unless they are forced to change and want to

11  change.  And I don't think most people have the ability,

12  the emotional maturity and strength.  It's scary when

13  you are changing you.  You realize you are a wreck and

14  you want to change to something better.  It's a

15  terrifying process because you don't know what the

16  outcome is.  You have to give up who you are.  Do I

17  think most people can change?  No.  I think in our

18  criminal justice system -- as a matter of fact, my

19  stepson in New York has been in an incarceration

20  intervention program where they evaluate people coming

21  into the system and he decides -- tries to work out a

22  therapy program for those who he believes can be dealt

23  with outside of incarceration.  But it has to be very

24  selective.  I cannot use it as an absolute and blanket.

25      Q.   So, my thought and what we're trying to do is

1   we're trying to find jurors who will follow the

2   evidence.

3        A.   Absolutely.

4        Q.   And who won't base their opinions on their own

5   personal experiences, but will look at the evidence in

6   this case.  So, are you telling me and can you commit to

7   me that you are not going to automatically find

8   that everybody deserves a second chance?

9        A.   Oh, no, ma'am.  That's unreasonable.  I'm a

10  scientist by education and training and history.  I'm a

11  chemical engineer, a very successful project manager and

12  senior executive for Bechtol.  You make decisions based

13  on facts, not wishes.

14       Q.   Okay.  If you were in charge of Texas -- let's

15  say you were king.  So, you didn't even have a

16  Legislature.  You just got to make the laws.  Would you

17  have the death penalty as part of the punishment that

18  was available?

19       A.   If it were the will of the people.

20       Q.   Okay.

21       A.   But if I was a dictator, I had absolute say --

22       Q.   It's all up to you.

23       A.   Well, I don't think we would have near as many

24  capital cases because I would start and educate the

25  children early.  I would help mothers mother.  There

1    would be a different early childhood education.  And

2    grants for people who needed -- or diversions for people

3    who need additional help, but would I have it as the

4    ultimate?  I think so.  That's part of our country's

5    tradition.  You know, we've always had that.  And you go

6    back and look in the very founding and it was used a lot

7    more often than it is today.

8         Q.   Okay.  So, knowing that, where would you put

9    yourself on a scale of one to ten; if one is a person

10   who is opposed to the death penalty all the time in all

11   cases, and ten is a person who is very much in favor of

12   the death penalty, as strongly in favor as you can

13   possibly be?  And I'll take five off the table.

14        A.   Well, give me a six.

15        Q.   Okay.

16        A.   A six is where I'd put myself.

17        Q.   How do other members of your family feel about

18   the death penalty feel, do you know?

19        A.   I don't know if I can answer that question

20   because I have not polled them on this.

21        Q.   Okay.  Fair enough.

22        A.   I know my wife has sat on a jury before.  I'm

23   not sure how that one went out.

24        Q.   Okay.

25        A.   I really don't know.  I think they would be

 1  compassionate, but objective.

 2       Q.   Okay.  And your wife is still with you?

 3       A.   Oh, yes, yes.

 4       Q.   So, she must be a very forgiving person.

 5       A.   Yes.  She's a mother.  Yes.

 6       Q.   Do you feel that you are as forgiving?

 7       A.   No.

 8       Q.   Why not?

 9       A.   I was trained to be able to make hard decisions

10  based on facts.  I was trained throughout my education

11  to make -- follow evidence, make decisions, and judgment

12  on what did the facts say.  It's the scientific

13  principle.

14       Q.   You know, we're talking about this as if it's

15  some -- you know, just a philosophy class.  But I like

16  to bring it back to reality because, you know, you could

17  be on the jury --

18       A.   Yes.

19       Q.   -- that has to follow through and it is not

20  just a philosophical question anymore.

21       A.   Yes, ma'am.  I understand.

22       Q.   So, knowing that, I'm going to ask you to take

23  a look across the courtroom to this guy in the gold tie

24  with the headset on.  That's Obel Cruz-Garcia --

25       A.   Uh-huh.

1     Q.   -- the defendant in this case charged with

2  capital murder.  Look at him and check your gut.

3  Because what Mr. Wood and I want to know is that at the

4  end of the day, if we've proved our case to you and show

5  that the answers to those special issues are "yes,"

6  "yes," and "no," the ones that the Judge talked to you

7  about on Monday --

8     A.   Yes.

9     Q.   -- those answers are going to mean the death

10  sentence for that individual right over there.

11     A.   Yes, ma'am.

12     Q.   He's a living, breathing human being.  He has

13  family or may not.  You may hear that he has family.

14  You may hear that he has children or a mother or a wife

15  who care about him and love him.  You may hear all kinds

16  of things about him.  But at the end of the day, if you

17  answer those questions based on the evidence and it

18  leads you to say "yes," "yes," and "no," that man will

19  be executed.  How do you feel about that?

20     A.   It doesn't bother me emotionally.  You have to

21  remember I served in the military in a time that was

22  very awkward.

23     Q.   And I want to take you back to that --

24     A.   And if the evidence -- I'm not going to cut you

25  any slack.  You have to prove it.

 1      Q.   I hear you.

 2      A.   If there is air and cracks through the case, he

 3  goes through it.  That's the way it is.  If you prove

 4  your case, it's done.

 5      Q.   Right.

 6      A.   It's not a personal decision.  It's what the

 7  evidence says.

 8      Q.   Right.  And I intend to.  But what I want to

 9  know is -- and you talked about your Vietnam experience

10  and you talked about how it changed you and how it made

11  you a different person and how it led to things that I'm

12  sure you wish you could take back.  I'm concerned about

13  that.  Because I'm going to, at the end of this case --

14  I'll make no bones about it.  I'm going to ask you to

15  answer those questions in such a way that it's going to

16  lead to the death of Obel Cruz-Garcia.  And are you

17  going to relive what you went through before with your

18  Vietnam experience and be tortured by that?

19      A.   No.

20      Q.   Why not?  How is it different?

21      A.   I had no choice when I was in the service.  You

22  serve at the will and pleasure of your commanders.  It's

23  a 24-7, 365, 100 percent commitment that you do what you

24  are told.  This concept of illegal orders doesn't apply

25  to people who were doing what they're ordered to do.  On

1    a three-star test, you go down the hall and to room so

2    and so and then do what the two individuals do, ask you

3    to do, or tell you to do, and he doesn't want to know

4    what it is.  You salute, say "yes, sir," and you go do

5    it.

6         Q.   Well, let me just draw some parallels here for

7    you.  Because you weren't forced to enlist, or were you?

8    Were you --

9         A.   Oh, I had a draft notice.  I was going into the

10   service one way or the other.

11        Q.   You were drafted?

12        A.   Absolutely.

13        Q.   All right.  And this is a particular case where

14   once you take that oath of a juror, you are drafted.

15   Okay?  Once you take that oath.  And if you find from

16   the evidence that the answers to those questions are

17   "yes," "yes," and "no," you have no choice.

18        A.   I'm merely an instrument of our system.  It's

19   not my personal choice.  It is the system I agree to

20   live in and support.

21        Q.   Okay.

22        A.   And I believe very strongly in our system of

23   laws and the way it's enforced.  As a matter of fact, I

24   think we need to clean it up a bit, make it more

25   certain.  People behave well under certainty.

1      Q.   What do you mean by that?

2      A.   Well, if they see something that happens, such

3  as embezzlement or financial crimes, and it doesn't get

4  punishment swiftly and severely, they say:  Hmm, that

5  doesn't seem very fair to me.  And you will find those

6  people beginning to transgress on the rest of society in

7  other ways.  Well, he gets away with it, why can't I.

8  So, I believe that clarity and certainty is beneficial.

9  I don't mean being a hard ass.  I mean, there's always

10  room for compassion in our system, but you see people

11  run the red lights.  I mean, I face death by going for

12  his next hit of crack and he T-bones me.  Boom, I knew I

13  was dead.

14      Q.   Yeah.  Well --

15      A.   But he didn't give a damn.

16      Q.   Back when we were doing voir dire, I remember

17  you particularly -- there were a lot of people out there

18  and sometimes people's individual faces don't stay with

19  me when we come back to individual voir dire, but I do

20  remember you because I remember you raised your hand a

21  few times and made some comments on some of the areas of

22  the law.  Can you remember what your concerns were in

23  voir dire?

24      A.   No, ma'am.  I do not recall the exact

25  incidents.

1      Q.   I'm --

2      A.   Perhaps you can help me.

3      Q.   I'm thinking that it had to do with the cold

4  case, the fact that it was in 1992 case.

5      A.   Yeah.

6      Q.   And I believe you had some concerns about that.

7      A.   I do.

8      Q.   And I'd like to flush that out a little bit

9  more with you because, again, you know, you talked to me

10 about, you know, you have very strong feelings and you

11 have talked to me about the fact that you can do this.

12 And you are very convincing, so I -- you know, let's

13 move on to something else and let's talk about some of

14 the things that might concern you if you make it on this

15 jury.

16     A.   I'm concerned about -- and you will obviously

17 answer the questions on the chain of custody.

18     Q.   Uh-huh.

19     A.   And believability of the evidence.

20     Q.   Okay.  What do you mean by that, chain of

21 custody?

22     A.   Exactly what it says.  Whose had their hands on

23 it, what are the records that prove that that evidence

24 was not -- first off, that it was good evidence at the

25 time it was taken.

1      Q.   Uh-huh.

2      A.   And that it has remained pure through this

3   20-something years.

4      Q.   Okay.

5      A.   I mean, who did the work.  What was their

6   credibility.

7      Q.   Okay.  And I understand those concerns.

8      A.   It goes back to my training inbred in me and

9   let's get to the facts.

10     Q.   Right.

11     A.   Get to the facts.

12     Q.   I understand those concerns and those are valid

13  concerns.

14     A.   That's the only concern I have, is the

15  credibility of the State's evidence.

16     Q.   Okay.  Let's try not to talk over each other.

17     A.   Yes, ma'am.

18     Q.   And I'll try to let you finish and not

19  interrupt you.  And if, you know, we can kind of do

20  that, that will work.

21     A.   Sorry.

22     Q.   It's okay.  It's something that you clearly

23  have very strong feelings about.

24     A.   I do.

25     Q.   And that's your right.  That's important stuff.

1    I want to address that by saying that I do remember now

2    you talking about the fact that since the charge was so

3    serious that you were very concerned about the evidence

4    and the quality of the evidence in the case.  Now, it's

5    very common for people to say:  You know what, State,

6    you know, you can come in here on a death penalty case

7    and you better have -- you better be right.  And I

8    agree, we better be right.  But some people will take it

9    a step further and say:  I'm going to require you to

10   prove your case beyond a reasonable doubt, to the point

11   of absolute certainty.  Where do you stand on that?

12        A.   Well, first off, I recognize there is no

13   absolute certainty in this life.  Beyond a reasonable

14   doubt is, of course, a variable thing, but if there is a

15   gap, a big gap, a credible gap it raises a question

16   mark.  And then you have to look at the totality of the

17   evidence.  Is this one area weak, unproven.  You know,

18   nine out of the ten areas are well proven and this one

19   area unproven to some level of doubt.

20        Q.   Okay.

21        A.   Then it becomes the evaluation.  Say, what's

22   the -- I don't want to propensity -- the weight of the

23   various terms.

24             THE COURT:  You have five minutes,

25   Ms. Tise.

1          MS. TISE:  Thank you, Judge.

2     Q.  (By Ms. Tise) And I want to talk to you about

3  two things on that.  So, can you assure me that you are

4  not going to raise my level of proof to something other

5  than beyond a reasonable doubt just because it's a

6  capital murder case?

7     A.  Oh, no, ma'am.  You have the same standard of

8  proof to me in any case.

9     Q.  As I would in a traffic ticket?

10    A.  Absolutely.

11    Q.  Okay.

12    A.  Show me the evidence.

13    Q.  You were talking about what evidentiary

14 evidence needs to be brought, what I would have to

15 prove.  And I'm going to show you what I have to prove.

16 There is a list of the elements in the case.  And you

17 will be able to see them on the right on that small

18 screen or you can look down on the big screen, whatever

19 is more comfortable.  Right there.  Those are the

20 elements of the capital murder case as I've alleged in

21 the indictment, Justin and I.  That's what I have to

22 prove beyond a reasonable doubt.

23    A.  Uh-huh.

24    Q.  Now, the law says that's all I have to prove.

25    A.  Yes.

1      Q.   Are you comfortable with that?

2      A.   Yes, ma'am.

3      Q.   Do you see motive on there anywhere?

4      A.   No.

5      Q.   Are you comfortable with the fact that I don't

6  have to prove motive?

7      A.   Yes, ma'am.

8      Q.   And can you go back in that jury room and if

9  you don't know why the crime happened, can you still

10  convict if those other things are proven to you beyond a

11  reasonable doubt?

12      A.   Yes, if you can prove that he did it.  I don't

13  care why he did it, he did it.

14      Q.   Okay.  Fair enough.  How do you feel about

15  police officer's testimony?

16      A.   I class it as reliable generally.  Always

17  subject to verification.

18      Q.   Okay.

19      A.   If it's in isolation of everything else, if it

20  doesn't fit, one has -- and if the officer has a record

21  of being untruthful or has been accused of being

22  untruthful and unreliable, an unfit officer, if you

23  will, then you have to put a question around what he

24  says.  They are human beings, they are poorly paid for

25  what they do, yet we intrust them with use of lethal

1   force.

2       Q.   That's fair.  And that's exactly what the law

3   requires you to do, to treat them like other witnesses,

4   evaluate their testimony, and decide whether you

5   believe it or not.

6       A.   Yes, ma'am.

7       Q.   I hear you saying you can do that.

8       A.   Oh, yes.

9       Q.   Okay.  You mentioned something in voir dire

10  about the defendant's age.  You had some questions or

11  concerns about that, I believe.  Do you remember that?

12      A.   My only concern there was he a teenager, a

13  juvenile at the time of the alleged crime.

14      Q.   And how would that affect your ability to sit

15  on the jury as -- on a jury in this case?

16      A.   If you prove the case, I answer the questions,

17  the verdict is.  I think it's very sad for a juvenile,

18  if he were a juvenile, to have led a life down that

19  horrible path of taking another one's life, even if it

20  were by accident or unintended, if you will.  But yet,

21  that certainly was part of the risk of perpetrating that

22  crime.

23      Q.   Do you understand the difference between direct

24  and circumstantial evidence?

25      A.   I do.

1      Q.   And how do you feel about circumstantial

2   evidence?

3      A.   It is circumstantial.

4      Q.   And how does that affect your duties as a

5   juror?

6      A.   Well, it has a lower rating in terms of

7   veracity because it is circumstantial.  There's more

8   room for debate about whether it is or is not.  While

9   factual evidence is not debatable, not questionable, it

10  is.  While circumstance are circumstances and they --

11  circumstantial evidence can be less reliable than direct

12  evidence.  I say can be.

13     Q.   The law says that direct evidence and

14  circumstantial evidence are to be treated the same and

15  that the State can prove its case purely through

16  circumstantial evidence.  How do you feel about that?

17     A.   There has got to be good circumstantial

18  evidence to convict.

19     Q.   Well, there has to be circumstantial evidence

20  that convinces you beyond a reasonable doubt.

21     A.   Yes.  Absolutely.  That's the criteria, it has

22  to convince me.

23     Q.   But if you are back there in the jury room, if

24  all you have is circumstantial evidence do you think you

25  could render a verdict of guilty?

1          A.    It depends on the circumstances.  I can't give

2     you a for-example answer.

3          Q.    And I'm asking you to.

4          A.    It would not preclude me from finding the

5     defendant guilty.

6          Q.    And how do you feel about the burden of proof

7     and presumption of innocence?

8          A.    Well, the burden of proof is clearly with the

9     State.

10         Q.    Right.

11         A.    I'm a big believer in our -- that's the reason

12    we had the revolutionary war.  In England, you are

13    guilty until you prove yourself innocent.

14               THE COURT:  Ms. Tise, time is up.  So,

15    let's wrap it up.

16         Q.    (By Ms. Tise) Okay.  Can you afford the

17    defendant his Constitutional rights, the presumption of

18    innocence and the burden of proof being on us?

19         A.    Yes, ma'am, without question.

20               MS. TISE:  I pass the juror.

21               THE COURT:  Thank you, Ms. Tise.

22               Mr. Madrid.

23               MR. MADRID:  Thank you.

24                    **VOIR DIRE EXAMINATION**

25    **BY MR. MADRID:**

1       Q.   Good afternoon, Mr. Bowers.

2       A.   Yes.

3       Q.   How are you doing?  My name is Mario Madrid.

4   This is Skip Cornelius.  We represent Obel Cruz-Garcia.

5   He is our client.

6                I'm going to ask you some questions.  Not a

7   lot.  You filled out the questionnaire.  And Ms. Tise

8   has had the opportunity to talk to you.  And I think I

9   pretty much have an understanding of where you sit, but

10  there are still a few things I want to ask you.  One is

11  not -- maybe not as important as my other questions, but

12  just more out of curiosity.  Some of the people you

13  listed that you admire and you put Elizabeth Warren.  I

14  don't know who that was.  I had to look that up.  She's

15  a senator from Massachusetts.  Am I right?

16      A.   Correct.

17      Q.   I looked her up.  It looks like she went to

18  school at U of H and her husband worked at -- I looked

19  all this up because I didn't know who she was, but I was

20  just wondering -- because I've never heard of -- why you

21  picked her.

22      A.   She has fought tooth and nail for the people

23  against the big banks.

24      Q.   Okay.  In the tarp thing.  Okay.  I read that.

25  I was just wondering.  It's not that important.  I was

1    wondering if there something specific because we're in

2    Texas and she's a senator in Massachusetts.  But I did

3    read that about the tarp.

4              Okay.  Well, you know -- and I think you

5    can tell by the questioning that the State, and anybody

6    in the State's position would have a concern.  I think

7    if you were sitting over here, you would have a concern,

8    right?

9         A.   Right.

10        Q.   That's why Ms. Tise was asking these questions.

11   The first one is because you have been accused of a

12   crime, a serious crime.  And people in your position

13   might feel like -- you didn't say this, but a lot of

14   people would feel they would maybe have a bias or

15   prejudice against the State because they were prosecuted

16   by the same district attorney's office.  You said that

17   you don't have one and that -- that you needed to go

18   through this to be a better person, but I just want to

19   make sure.  Do you have some kind of bias or prejudice

20   towards them, the State?  Like, do you feel like you are

21   going to hold them to a higher standard --

22        A.   No.

23        Q.   -- because of your experience?

24        A.   No, not at all.

25        Q.   I mean, I heard you say -- I guess, the

1  bottom-line is you have been in the military, right?  I

2  heard two things from you.  One, you were in the

3  military; two, you're an engineer.  And I guess in the

4  military you have rules, right?  And the scientific way

5  of looking at things, you have to decide if these things

6  add up to whatever result, right?

7       A.   Okay.

8       Q.   And that's how you would approach this process?

9       A.   Yes.

10      Q.   You would base it on the evidence?

11           And I think you had -- regarding the

12  standard, you would -- you asked a question -- and I

13  don't think it's something you would have to be

14  concerned with if you were on this jury.  The Supreme

15  Court said that you couldn't have the death penalty for

16  17-year-olds and under.  Okay?  And so, we wouldn't be

17  here, the State wouldn't be trying a case if they

18  couldn't try it, is the bottom line.  Okay?

19      A.   Yes.

20      Q.   So, that was the one question you had sitting

21  out here, right?  And I guess because you had looked at

22  Mr. Obel Cruz-Garcia and you just wondered that.  Right?

23      A.   Right.

24      Q.   Do you have any questions of me at all?

25  Because I don't really have any further questions of

1  you.  I think you would go through -- you would go

2  through the elements just like you do at your job,

3  right?

4      A.  Sir, the State has the burden of proof.  You

5  don't have to say a word during the trial if you choose

6  not to.

7      Q.  And that is -- that's completely correct.

8  That's what the law is.  After you get past this, you

9  are going to have to -- you are going to be asked a

10 series of questions.  One regarding mitigation, one

11 regarding whether the defendant caused the death, or

12 somebody else did and he anticipated it, all of these

13 questions.  And so, those are what would lead you to the

14 death penalty.  Could you do that?

15     A.  Yes.

16     Q.  Okay.  And you would always -- you would always

17 judge the evidence, correct?

18     A.  That is correct.

19     Q.  Thank you.

20         MR. MADRID:  Pass the juror.

21         THE COURT:  Thank you, Mr. Madrid.

22         Mr. Bowers, would you please step out?

23 There is a door right over here.  And the bailiff is

24 going to assist you out there.  We'll be right back with

25 you.

```
 1                    (Venireperson exits courtroom)

 2                    THE COURT:  Juror No. 72, Keith Bowers,

 3    what says the State?

 4                    MS. TISE:  The State is going to exercise a

 5    peremptory strike on Mr. Bowers.

 6                    THE COURT:  That will be granted.

 7                    (Venireperson enters courtroom)

 8                    THE COURT:  Mr. Bowers, you are excused as

 9    a juror in this case.  We want to thank you for your

10    time.  Three days down here is a lot, you know, parking,

11    getting here, all the time and attention.  I want to let

12    you know that we will be destroying the personal

13    information that you provided to us.  And thank you for

14    doing that.  We could not conduct these proceedings

15    without interested and concerned citizens like you.  So,

16    we really want to thank you.

17                    You were under a bunch of instructions from

18    me, both in writing and orally.  And you are released

19    from all of those at this time.  So, if you need

20    anything from -- Deputy Perry has work excuses or Metro

21    bus passes if you need them.  But otherwise, you are

22    excused.  You're completely done.

23                    VENIREPERSON:  May I ask you a question?

24    Did you ever know Judge Miron Love?

25                    THE COURT:  Not personally.  He was a judge
```

1    when I was a young prosecutor in this court.

2                  VENIREPERSON:  He married my wife and I in

3    our home.

4                  THE COURT:  He was in the 177th District

5    Court.

6                  VENIREPERSON:  Yes.

7                  THE COURT:  Yes, sir.  Have a good day.

8                  (Proceedings recessed)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2    THE STATE OF TEXAS   )
     COUNTY OF HARRIS     )

3

4        I, Mary Ann Rodriguez, Official Court Reporter in

5    and for the 337th District Court of Harris County, State

6    of Texas, do hereby certify that the above and foregoing

7    contains a true and correct transcription of all

8    portions of evidence and other proceedings requested in

9    writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of

14   the proceedings truly and correctly reflects the

15   exhibits, if any, admitted by the respective parties.

16       I further certify that the total cost for the

17   preparation of this Reporter's Record is $_____ and

18   was paid/will be paid by Harris County, Texas.

19       WITNESS MY OFFICIAL HAND this the 3rd day of

20   September, 2013.

21

22   /s/ Mary Ann Rodriguez
     Mary Ann Rodriguez, Texas CSR 3047

23   Expiration Date:  12/31/2013
     Official Court Reporter

24   337th Court
     1201 Franklin

25   Houston, Texas  77002
     713.755.7746

**'**

**'92** - 9:11, 10:9, 15:14, 45:17, 45:19, 79:10, 79:12, 93:25, 94:4, 94:6, 177:13, 202:1, 202:2
**'93** - 10:10, 13:17
**'96** - 13:17
**'skip'** - 2:11

**/**

**/s** - 250:22

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**1** - 55:25, 77:8, 104:5, 108:16, 178:17, 181:11, 187:2, 203:5, 207:13, 207:14, 208:12, 210:3
**10** - 26:4, 124:7, 125:11
**100** - 28:25, 30:6, 125:10, 152:20, 153:1, 233:23
**105** - 89:15
**10:00** - 214:7, 215:4
**10:21** - 61:24
**11** - 98:19, 196:15, 198:16
**111** - 1:11, 1:23
**113,115** - 1:12, 2:5
**11:18** - 115:19
**11:19** - 115:19
**12** - 7:4, 8:8, 63:14, 76:2, 132:8, 166:7, 175:21, 223:12
**12/31/2013** - 250:23
**1201** - 2:6, 250:24
**1225** - 2:15
**129,130** - 1:12, 2:5
**12:20** - 164:18
**137,151** - 1:13, 2:6
**1384794** - 1:3, 3:4
**15** - 66:8, 219:6
**158** - 1:13, 2:6
**159** - 1:14, 2:7
**15th** - 214:10
**163,164** - 1:15, 2:8
**17** - 1:7, 2:2, 166:18
**17-year-olds** - 246:16
**177th** - 249:4
**18** - 167:14, 206:23
**19,20** - 1:8, 2:3
**190** - 1:15, 2:8
**1992** - 9:11, 37:20, 37:25, 79:9, 177:12, 195:21, 195:24, 195:25, 196:3, 196:9, 236:4
**1997** - 13:17
**1:00** - 112:17
**1:30** - 218:6

**2**

**2** - 80:17, 107:24, 108:21, 203:5
**20** - 21:14, 87:23
**20-something** - 237:3
**2005** - 45:20, 79:6, 177:6
**2012** - 94:7, 195:24, 195:25
**2013** - 1:20, 1:3, 214:8, 250:20
**2028** - 2:12
**21** - 190:24

**213** - 1:16, 2:9
**215,218** - 1:17, 1:24
**24** - 138:7, 167:14
**24-7** - 233:23
**24039247** - 2:5
**243** - 1:17, 1:25
**248** - 1:18, 1:25
**25** - 75:3, 226:13
**250** - 1:19
**28** - 87:22

**3**

**3** - 121:25, 210:15
**3,6** - 1:6, 2:1
**30** - 60:25, 70:22, 70:23, 163:15, 190:20, 216:14
**3047** - 250:22
**31st** - 6:2, 20:17, 61:18, 115:13, 217:22
**337th** - 1:12, 250:25, 250:24
**35** - 45:22, 69:15, 79:16, 90:3, 177:16, 183:21, 202:4, 202:5, 202:22
**365** - 233:23
**3rd** - 4:4, 216:11, 250:19

**4**

**440** - 2:15
**46** - 103:25, 206:24
**48** - 88:2
**49** - 1:8, 2:3, 88:2, 88:5

**5**

**50** - 90:4, 127:2
**56** - 3:10
**58** - 1:6, 1:9, 2:1, 2:4, 3:12, 3:13, 3:17, 3:25, 6:10, 17:11
**5:00** - 112:2, 162:11

**6**

**6** - 126:3
**60,61** - 1:10, 1:22
**62** - 1:8, 2:3, 18:25, 19:10, 58:2
**64** - 1:15, 2:8, 112:11, 162:15, 162:16, 163:1, 163:8, 213:2, 213:4
**69** - 1:12, 2:5, 59:19, 59:21, 112:10, 112:20, 113:1, 113:8, 114:5, 160:12

**7**

**7** - 1:3
**70** - 1:10, 1:22, 59:8, 59:13, 59:19, 59:21, 59:23, 60:1, 60:10, 98:8, 98:14, 99:15, 99:16, 99:19, 110:19, 110:21, 111:6, 196:15, 198:16, 198:19
**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 250:25
**713.877.9400** - 2:16
**72** - 1:17, 1:24, 162:15, 215:16, 215:19, 216:6, 248:2
**75** - 89:14
**77002** - 2:6, 250:25
**77002-1659** - 2:16
**77019-2408** - 2:13
**7th** - 1:20, 3:4

**8**

**8** - 67:2

**86** - 1:10, 1:23
**8th** - 214:8, 215:14

**9**

**9** - 1:2, 1:1, 1:6, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:15, 1:16, 1:17, 1:18, 1:19, 1:22, 1:23, 1:24, 1:25, 2:1, 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 122:15, 196:16, 196:17
**90** - 125:11
**959** - 219:14
**9:12** - 6:15
**9:31** - 20:22

**A**

**abandon** - 41:16
**abiding** - 128:18, 151:14
**ability** - 193:19, 228:11, 241:14
**able** - 13:2, 16:20, 22:17, 25:6, 44:7, 52:15, 54:16, 54:21, 55:24, 71:6, 71:15, 75:15, 86:4, 98:4, 121:5, 121:12, 122:22, 123:6, 129:17, 129:21, 129:23, 129:24, 130:5, 130:12, 130:13, 130:14, 130:15, 130:16, 136:6, 151:20, 166:4, 166:6, 170:6, 170:13, 206:23, 226:23, 231:9, 239:17
**above-entitled** - 1:21
**above-styled** - 250:11
**absolute** - 77:20, 179:4, 228:24, 229:21, 238:11, 238:13
**absolutely** - 24:23, 99:20, 119:19, 120:2, 127:8, 127:9, 129:9, 218:20, 218:23
**Absolutely** - 22:15, 24:2, 198:14, 229:3, 234:12, 239:10, 242:21
**absorb** - 25:7
**abuse** - 83:25, 185:21, 186:11
**accept** - 45:14, 46:18, 106:18, 210:14, 213:6
**accepted** - 55:12, 159:11
**Accepted** - 1:16, 2:9
**accepting** - 87:7
**accepts** - 110:21, 213:4
**accident** - 105:20, 241:20
**accidents** - 87:8
**accomplice** - 41:8, 75:20
**accomplices** - 40:19, 182:1, 182:13
**accountable** - 56:23
**accredit** - 8:24
**accumulators** - 219:9
**accused** - 139:20, 148:7, 240:21, 245:11
**acquaintances** - 10:21
**act** - 36:11, 37:6, 37:7, 46:14, 78:9, 78:12
**actions** - 30:1
**activity** - 188:7
**acts** - 44:23, 54:15, 77:13, 78:1, 78:2, 78:7, 81:15, 178:22, 179:8, 179:10, 179:15, 179:16, 179:19, 179:21, 180:14, 180:16, 181:9, 185:13
**actual** - 47:1, 56:14, 165:23, 172:14, 180:14, 184:6, 203:6
**add** - 26:12, 202:22, 246:6

**addicted** - 47:24
**addiction** - 186:11
**additional** - 39:6, 230:3
**address** - 49:6, 197:16, 238:1
**addressed** - 123:15, 171:22
**adds** - 67:8
**adjudication** - 225:10, 225:15, 225:21
**adjustable** - 219:9
**administrative** - 9:19
**admire** - 244:13
**admit** - 88:11, 167:10
**admitted** - 185:15, 250:15
**admonishments** - 162:6, 162:7, 213:15
**adult** - 69:13
**adverse** - 193:12
**affect** - 20:4, 71:6, 97:20, 125:19, 125:20, 155:24, 221:14, 223:5, 241:14, 242:4
**affected** - 97:24
**affixing** - 206:20
**afford** - 243:16
**afforded** - 228:1
**afraid** - 104:8, 104:10, 106:22, 195:22
**afternoon** - 113:13, 113:14, 164:22, 192:23, 215:24, 215:25, 218:11, 244:1
**afterwards** - 65:10
**age** - 241:10
**agencies** - 94:20
**agent** - 8:24
**aggravated** - 26:1
**aggravating** - 25:18, 25:20, 140:8
**ago** - 10:8, 63:1, 66:9, 66:21, 69:25, 70:1, 70:2, 70:4, 88:10, 89:19, 95:5, 96:8, 116:23, 117:19, 119:7, 138:15, 146:14, 219:6, 225:13
**agree** - 47:18, 50:8, 50:13, 50:25, 53:18, 59:7, 59:12, 67:17, 67:19, 68:5, 69:2, 75:8, 77:18, 78:21, 80:6, 82:23, 98:25, 99:7, 99:12, 118:6, 123:19, 124:19, 125:10, 126:6, 128:16, 134:20, 134:22, 143:12, 143:14, 145:12, 145:14, 145:15, 146:10, 147:1, 147:3, 147:5, 147:8, 161:19, 168:14, 169:14, 178:12, 179:2, 180:10, 180:17, 181:6, 181:13, 184:17, 188:17, 193:3, 195:7, 205:18, 211:18, 223:14, 234:19, 238:8
**agreed** - 31:2, 51:1, 67:22, 75:8, 100:6, 118:7, 118:11, 125:4, 199:3
**agreeing** - 199:20
**agreement** - 1:7, 2:2, 17:10, 17:14, 17:16, 17:21, 112:19, 113:1, 113:3
**agrees** - 103:2
**ahead** - 44:14, 113:16, 130:1, 134:1, 135:6, 158:9
**ahold** - 112:12
**aided** - 1:24
**air** - 52:2, 233:2
**allegation** - 195:20
**alleged** - 12:23, 15:13, 15:16, 79:9, 177:11, 207:24, 208:1, 208:2, 239:20,

241:13
**allegedly** - 93:25, 95:5, 202:1
**alleges** - 195:21
**allow** - 30:9, 114:14, 132:3, 209:24
**allowed** - 86:2, 119:20
**allows** - 38:23
**almost** - 52:14, 83:21, 175:4, 216:1
**alone** - 43:3, 75:7, 180:13, 180:18, 181:8
**Alphabetical** - 1:21
**alternative** - 166:25
**amazing** - 89:23
**Amendment** - 40:24, 74:6, 161:6
**amount** - 214:5
**analysis** - 219:16
**Anderson** - 1:10, 1:22, 59:8, 59:13, 60:1, 60:6, 60:9, 62:3, 68:5, 71:24, 75:19, 77:19, 80:6, 85:6, 86:11, 86:16, 87:20, 110:20, 110:22, 111:6, 111:11
**Andrea** - 83:3, 185:10, 192:17, 192:18
**anger** - 44:25, 227:9
**animal** - 43:15, 50:1, 64:15, 64:24, 64:25, 65:14, 74:24, 89:15, 105:5
**animals** - 38:17, 49:24
**Ann** - 250:4, 250:22
**answer** - 5:7, 23:11, 24:21, 27:15, 28:17, 36:19, 47:4, 51:18, 54:10, 54:22, 55:1, 61:4, 76:19, 80:7, 80:10, 81:5, 81:22, 86:2, 86:5, 87:18, 98:4, 99:11, 101:11, 106:18, 109:11, 116:16, 121:3, 122:20, 124:10, 130:8, 131:3, 131:8, 131:23, 144:7, 145:22, 145:24, 170:8, 170:10, 176:16, 176:24, 176:25, 177:18, 177:21, 178:8, 178:14, 178:19, 181:22, 182:6, 183:2, 184:3, 189:12, 189:21, 189:22, 190:1, 197:4, 209:10, 210:7, 216:19, 220:22, 230:19, 232:17, 233:15, 236:17, 241:16, 243:2
**answered** - 7:24, 29:11, 30:13, 56:4, 76:22, 80:11, 81:12, 81:13, 81:16, 81:17, 88:2, 100:10, 101:17, 108:16, 108:21, 115:17, 117:8, 131:5, 176:23, 183:7, 183:9
**answering** - 84:19, 84:21, 85:12, 117:6, 145:23, 177:17, 203:5, 211:7
**answers** - 4:15, 5:25, 8:14, 8:16, 20:2, 20:16, 23:5, 23:11, 24:8, 27:17, 28:23, 30:14, 30:16, 51:22, 61:1, 61:17, 62:20, 67:14, 67:15, 85:13, 114:22, 115:12, 131:17, 152:12, 159:13, 161:1, 163:23, 164:11, 190:9, 194:2, 220:22, 232:5, 232:9, 234:16
**anticipate** - 81:2, 105:21
**anticipated** - 46:12, 56:4, 56:7, 56:18, 109:2, 182:18, 183:12, 196:6, 247:12
**anticipating** - 207:14
**anxiety** - 117:13
**anyway** - 30:20, 99:16,

102:18, 161:14
**Ap-77,025** - 1:4
**apartment** - 10:19, 11:14
**apiece** - 4:11
**apologize** - 88:5
**appeals** - 101:21
**Appeals** - 1:4
**appear** - 149:16
**Appellant** - 1:7
**appellate** - 102:11, 200:11
**Appellee** - 1:12
**application** - 107:25, 108:1
**applied** - 30:19, 46:18, 204:4
**applies** - 68:23
**apply** - 45:17, 48:19, 51:18, 233:24
**appreciate** - 14:12, 17:25, 20:20, 21:4, 21:5, 22:24, 23:4, 23:9, 58:14, 71:24, 111:12, 116:4, 133:7, 135:10, 162:1, 170:15, 190:9, 218:14, 218:16, 221:3
**approach** - 17:6, 22:18, 134:6, 246:8
**appropriate** - 29:6, 30:15, 46:20, 52:12, 67:16, 67:25, 99:6, 169:4, 169:6, 169:17, 186:19, 197:7, 220:25
**approval** - 59:24
**area** - 89:23, 191:22, 238:17, 238:19
**areas** - 235:21, 238:18
**arguably** - 185:24
**argue** - 83:21, 84:5
**argued** - 185:24
**arguing** - 159:14, 159:15
**Arizona** - 137:24
**arts** - 23:19
**aside** - 36:1, 40:13, 71:19, 163:15
**ass** - 235:9
**assault** - 11:12, 168:25
**assess** - 76:15, 79:7, 81:19
**assessed** - 79:2, 177:3
**assessing** - 86:24, 170:21, 176:10
**Assessment** - 8:24
**assist** - 57:23, 110:14, 247:24
**Assistant** - 2:5
**assume** - 199:10, 207:21
**assuming** - 33:13, 34:2, 53:14
**assure** - 58:18, 239:3
**attempting** - 172:13
**attention** - 41:22, 248:11
**attorney** - 74:13, 149:1
**attorney's** - 3:9, 65:15, 149:5, 245:16
**attorneys** - 96:19, 149:11, 149:12, 187:5, 216:12, 226:16
**Attorneys** - 2:5, 2:7, 2:17
**audit** - 9:1
**Austin** - 49:12
**authorized** - 217:7, 217:8
**automatic** - 46:23
**automatically** - 5:18, 80:7, 124:22, 178:8, 182:6, 188:23, 188:24, 189:22, 190:1, 209:24, 210:7, 229:7
**available** - 6:6, 25:6, 215:9, 229:18
**average** - 102:21
**averages** - 196:1
**award** - 122:10, 122:11

**aware** - 20:19, 26:23, 27:2, 27:3, 92:20
**Awesome** - 163:18
**awful** - 186:7
**awkward** - 232:22

**B**

**background** - 9:4, 9:20, 12:9, 16:19, 17:4, 18:2, 20:4, 43:9, 43:23, 47:13, 49:19, 64:12, 68:3, 71:10, 76:9, 82:4, 106:25, 152:7, 173:18, 176:5, 180:2, 180:5, 184:8, 186:4, 209:5, 219:22
**backgrounds** - 185:2
**bad** - 14:10, 54:20, 72:23, 76:10, 120:14, 122:6, 122:11, 176:5
**badge** - 214:13, 215:2
**bail** - 109:5
**Bailiff** - 59:19, 59:21, 111:9, 112:8, 112:12, 112:16, 113:17
**bailiff** - 247:23
**baking** - 167:9
**Ball** - 3:11
**bank** - 56:16
**banks** - 244:23
**bar** - 39:18
**barometer** - 152:20, 152:24
**base** - 156:3, 223:9, 229:4, 246:10
**based** - 12:8, 35:19, 42:1, 50:5, 67:12, 68:3, 85:9, 86:7, 131:17, 148:3, 149:15, 159:24, 182:11, 220:13, 223:10, 229:12, 231:10, 232:17
**Based** - 86:9
**basing** - 200:20
**basis** - 67:13, 159:18
**basket** - 227:4
**Baton** - 220:6
**Bay** - 67:3
**became** - 116:24, 131:15
**Bechtol** - 220:6, 220:7, 229:12
**become** - 10:21, 140:11, 227:4
**becomes** - 238:21
**began** - 103:25
**begin** - 6:16, 20:8, 138:18, 214:7
**beginning** - 10:10, 13:17, 66:24, 75:19, 127:5, 235:6
**behalf** - 48:9
**behave** - 234:25
**behavior** - 43:15, 50:1, 166:10, 166:15, 166:25, 221:18
**behind** - 33:7, 33:18, 34:16, 109:10, 152:11, 171:23
**beings** - 240:24
**belief** - 35:17
**believability** - 236:19
**believer** - 243:11
**believes** - 144:10, 146:15, 203:18, 228:22
**Belinda** - 65:7, 65:11
**bench** - 17:7
**Bench** - 17:8
**beneficial** - 235:8
**benefit** - 196:8
**beside** - 14:25, 15:4
**best** - 8:9, 8:11, 88:12, 92:2, 93:11, 144:7, 166:7, 167:12, 193:18, 194:24,

195:2, 195:3, 214:3, 220:20
**better** - 8:12, 67:22, 74:17, 90:4, 95:22, 152:25, 165:13, 165:14, 194:23, 195:25, 222:4, 225:12, 227:2, 228:14, 238:7, 238:8, 245:18
**between** - 44:21, 118:6, 119:17, 124:23, 168:2, 221:7, 241:23
**Beyond** - 40:10, 238:13
**beyond** - 15:2, 15:7, 35:18, 36:10, 37:5, 40:9, 41:14, 57:3, 72:16, 73:6, 77:10, 80:19, 81:14, 95:4, 95:14, 95:20, 96:5, 96:23, 106:2, 108:22, 141:1, 143:7, 144:15, 145:1, 147:2, 153:2, 154:12, 156:13, 156:20, 157:16, 160:3, 171:8, 171:15, 171:17, 173:2, 175:22, 178:19, 182:8, 183:6, 184:1, 203:7, 203:19, 203:20, 204:7, 208:14, 230:18, 239:5, 239:22, 240:10, 242:20
**bias** - 245:14, 245:19
**big** - 32:15, 47:24, 97:9, 147:15, 238:15, 239:18, 243:11, 244:23
**biggest** - 70:21, 187:3
**biology** - 43:9, 43:12
**birthplace** - 191:20
**bit** - 14:6, 16:9, 20:3, 21:11, 22:11, 28:9, 32:10, 43:11, 51:5, 52:5, 55:25, 56:6, 64:12, 71:17, 75:25, 77:7, 77:17, 78:25, 88:18, 94:6, 116:10, 126:7, 130:4, 132:4, 132:9, 138:20, 138:22, 151:15, 152:11, 165:13, 167:25, 168:2, 170:16, 172:12, 181:24, 182:22, 193:5, 196:9, 199:25, 219:4, 220:16, 221:6, 222:19, 234:24, 236:8
**black** - 24:21, 30:14, 30:16, 30:17, 30:18, 50:8, black-and-white - 24:21, 30:14, 30:16
**blade** - 154:3
**blame** - 227:14
**blank** - 121:20
**blanket** - 228:24
**bless** - 167:2
**blood** - 16:8
**blood-related** - 16:8
**board** - 32:15, 51:19, 104:5, 177:6
**bodies** - 38:13
**bombard** - 193:14, 193:16
**bones** - 38:16, 38:19, 233:14, 235:12
**book** - 187:17, 207:19, 208:9
**Boom** - 235:12
**born** - 9:7, 137:23
**boss** - 127:17
**bother** - 223:20, 232:20
**bothered** - 36:6, 118:24
**bothering** - 110:8
**bothers** - 172:10
**bottom** - 121:25, 172:4, 246:1, 246:18
**bottom-line** - 246:1
**Bowers** - 1:17, 1:24, 215:17, 215:19, 215:24, 216:6, 218:11, 244:1, 247:22, 248:2, 248:5, 248:8

**box** - 151:19, 169:25, 198:5
**break** - 18:19, 52:16, 59:4, 162:16, 162:18, 219:20
**breaks** - 72:5
**breath** - 109:13, 211:4
**breathing** - 27:18, 121:6, 232:12
**briefly** - 72:4
**Bring** - 18:22, 58:10, 213:9
**bring** - 3:15, 13:4, 14:3, 32:21, 59:23, 111:8, 144:13, 159:5, 161:20, 193:14, 193:15, 231:16
**bringing** - 18:1, 144:25, 145:18
**brings** - 142:3
**broad** - 47:20
**broken** - 11:1, 48:5, 186:4, 186:10
**brother** - 23:2
**brought** - 4:1, 33:2, 60:10, 117:25, 151:24, 163:9, 220:4, 239:14
**brush** - 225:9
**brushes** - 226:5
**Buffalo** - 2:12
**building** - 9:17, 63:3, 63:4, 191:5, 214:11, 214:15, 214:19
**bumps** - 25:18
**bunch** - 32:22, 145:21, 157:15, 248:17
**burden** - 72:15, 73:9, 73:25, 77:11, 95:4, 95:11, 136:17, 136:20, 146:3, 147:2, 154:12, 155:8, 155:21, 160:2, 161:1, 161:7, 171:6, 171:16, 172:22, 175:23, 178:20, 182:8, 183:25, 196:8, 243:6, 243:8, 243:18, 247:4
**burglary** - 8:12, 168:25
**bus** - 18:14, 58:24, 112:4, 112:5, 248:21
**business** - 8:20, 9:18, 69:19, 89:12, 199:15, 219:6, 219:12
**busy** - 9:25

# C

**calculation** - 200:7
**calendar** - 202:4
**California** - 137:24
**Candy** - 180:21
**candy** - 180:25
**cannot** - 38:18, 118:14, 133:20, 151:17, 160:8, 228:6, 228:24
**capital** - 7:17, 15:5, 15:22, 21:19, 21:24, 25:17, 26:2, 31:1, 32:10, 45:16, 50:23, 52:18, 54:8, 54:25, 55:2, 55:18, 55:19, 72:17, 73:4, 76:12, 78:5, 78:25, 80:1, 86:25, 87:14, 90:13, 91:13, 91:18, 91:23, 92:17, 92:22, 96:14, 99:5, 100:23, 104:22, 105:16, 105:23, 106:4, 106:5, 106:6, 106:20, 116:12, 123:20, 124:8, 124:17, 124:21, 125:7, 125:13, 125:16, 126:4, 127:6, 127:24, 140:11, 166:1, 168:2, 168:10, 168:15, 168:20, 169:9, 171:9, 171:12, 173:13, 176:7, 177:2, 179:13, 181:5, 186:12, 187:6, 188:2, 188:9,

188:25, 189:23, 192:3, 192:10, 193:10, 193:12, 193:15, 193:16, 195:12, 197:2, 197:5, 197:7, 197:12, 202:3, 207:22, 207:25, 208:6, 208:8, 210:2, 210:11, 211:2, 211:7, 220:11, 220:12, 221:4, 221:22, 222:17, 229:24, 232:2, 239:6, 239:20
**Capital** - 125:2
**car** - 56:17
**care** - 43:14, 43:20, 50:2, 101:19, 101:20, 101:24, 108:3, 108:25, 151:17, 154:22, 222:6, 222:24, 228:7, 232:15, 240:13
**cared** - 128:9
**career** - 91:9, 104:13, 220:7
**careful** - 54:2
**carried** - 227:9
**carries** - 73:16
**carry** - 73:25, 171:15, 200:10, 201:7, 226:24
**cars** - 219:10, 219:13
**case** - 5:5, 7:3, 8:9, 8:11, 8:12, 11:17, 12:12, 12:22, 13:2, 13:3, 14:24, 15:2, 15:5, 15:12, 15:18, 15:22, 18:4, 19:22, 20:14, 21:10, 23:15, 24:12, 24:14, 26:10, 27:6, 27:12, 28:1, 28:20, 29:5, 30:2, 30:19, 32:20, 32:21, 33:1, 33:5, 33:6, 33:16, 33:25, 34:9, 34:14, 35:10, 35:14, 35:22, 37:20, 38:23, 39:1, 39:9, 39:16, 40:21, 41:22, 43:4, 43:24, 45:4, 45:16, 46:20, 51:15, 52:17, 52:20, 54:3, 54:8, 58:14, 58:22, 61:15, 62:10, 63:9, 63:15, 63:25, 64:8, 66:8, 66:11, 66:14, 67:22, 69:20, 71:7, 71:20, 71:21, 71:23, 72:14, 72:15, 72:19, 73:20, 76:16, 78:25, 79:8, 79:15, 81:11, 82:12, 83:6, 83:8, 85:8, 92:21, 93:3, 93:8, 93:25, 94:3, 96:15, 97:7, 97:9, 97:11, 100:2, 100:6, 100:10, 100:12, 100:13, 104:18, 104:19, 105:11, 105:18, 105:25, 109:15, 111:12, 111:25, 115:10, 116:7, 116:25, 117:14, 119:21, 119:25, 120:15, 120:25, 122:5, 122:13, 123:21, 125:21, 126:10, 126:17, 126:24, 133:12, 133:16, 135:16, 136:17, 140:14, 140:15, 141:1, 141:19, 143:23, 143:25, 146:4, 146:6, 146:7, 147:2, 149:3, 149:11, 150:14, 150:20, 150:22, 155:1, 156:13, 158:25, 160:19, 161:4, 161:8, 161:24, 162:9, 164:9, 165:5, 165:6, 166:3, 166:8, 168:1, 169:14, 169:15, 171:5, 171:8, 171:17, 173:13, 173:14, 175:2, 176:7, 177:17, 177:25, 182:11, 183:20, 185:10, 187:19, 187:21, 188:12, 189:1, 189:16, 193:10, 193:13, 194:10, 194:11, 194:12, 194:13, 195:24, 196:1, 196:3, 196:9, 198:9, 199:1,

199:11, 203:22, 203:24, 204:5, 205:1, 205:3, 207:22, 207:23, 207:24, 208:4, 208:20, 209:4, 211:2, 211:7, 211:15, 213:12, 213:18, 213:21, 214:1, 214:5, 217:19, 220:13, 220:21, 220:25, 221:15, 223:6, 223:9, 223:10, 226:16, 226:25, 227:4, 227:24, 229:6, 232:1, 232:4, 233:2, 233:4, 233:13, 234:13, 236:4, 238:4, 238:6, 238:10, 239:6, 239:8, 239:16, 239:20, 241:15, 241:16, 242:15, 246:17, 248:9
**case-by-case** - 169:14
**cases** - 21:19, 21:24, 28:14, 28:18, 29:5, 31:3, 38:12, 38:13, 40:20, 65:13, 65:14, 65:21, 66:2, 74:11, 74:12, 74:15, 92:19, 100:7, 105:5, 116:13, 119:4, 125:6, 168:20, 169:17, 176:6, 197:5, 197:12, 199:11, 211:14, 229:24, 230:11
**casual** - 213:22
**caught** - 117:20
**caused** - 57:4, 80:20, 80:25, 182:10, 183:11, 211:10, 227:2, 227:15, 247:11
**causes** - 205:11
**causing** - 182:14
**cell** - 215:6
**Center** - 49:10
**ceremonial** - 19:14
**certain** - 15:3, 67:17, 73:4, 79:15, 99:20, 119:4, 153:19, 170:23, 173:12, 177:8, 234:25
**certainly** - 6:6, 14:3, 14:7, 14:10, 16:8, 16:22, 241:21
**Certainly** - 17:24
**certainty** - 44:19, 77:19, 77:20, 106:10, 106:12, 179:3, 179:4, 234:25, 235:8, 238:11, 238:13
**Certificate** - 1:19, 250:1
**certify** - 250:6, 250:13, 250:16
**chain** - 236:17, 236:20
**challenge** - 111:7
**Challenge** - 1:13, 2:6
**chambers** - 250:12
**chance** - 7:20, 62:22, 105:15, 145:22, 149:22, 152:16, 165:12, 166:5, 212:17, 229:8
**change** - 44:5, 136:12, 206:7, 206:11, 206:12, 206:15, 226:11, 227:2, 227:25, 228:5, 228:10, 228:11, 228:14, 228:17
**changed** - 5:25, 20:18, 61:18, 115:13, 132:25, 164:12, 206:15, 217:23, 233:10
**changing** - 34:7, 228:13
**character** - 47:13, 82:4, 184:8
**charge** - 127:14, 151:24, 168:12, 168:17, 202:6, 229:14, 238:2
**charged** - 33:17, 40:5, 51:14, 54:3, 127:24, 154:18, 232:1
**charges** - 100:14, 140:23, 143:11, 145:18, 173:18
**charging** - 143:4

**Charles** - 220:1
**chase** - 135:21
**Chaykosky** - 1:6, 2:1, 3:14, 3:17, 3:22, 3:25, 6:20, 7:12, 14:13, 17:11, 17:19
**cheap** - 103:21
**check** - 32:25, 71:10, 82:13, 232:2
**checked** - 198:5, 199:1
**chemical** - 229:11
**child** - 26:4, 168:22, 186:10, 224:23
**childhood** - 67:9, 230:1
**children** - 83:4, 172:2, 172:3, 190:25, 224:6, 224:10, 224:13, 224:18, 225:4, 229:25, 232:14
**chime** - 62:21
**choice** - 21:5, 116:2, 218:15, 233:21, 234:17, 234:19
**choices** - 199:24
**choose** - 24:6, 24:25, 33:1, 34:25, 35:4, 35:7, 35:11, 221:17, 247:5
**chooses** - 33:6
**chose** - 153:25
**chosen** - 7:4, 62:11, 62:16, 129:11, 165:6
**circle** - 90:7, 90:8, 223:13, 223:15
**circumstance** - 25:18, 25:20, 82:10, 82:14, 82:22, 83:22, 84:1, 84:6, 84:11, 84:12, 140:8, 183:19, 184:15, 185:5, 185:17, 185:19, 185:22, 185:24, 186:2, 187:7, 242:10
**circumstances** - 10:17, 30:11, 47:11, 51:7, 51:10, 52:13, 57:9, 82:3, 82:10, 82:14, 82:16, 82:18, 87:4, 99:7, 99:13, 182:19, 183:18, 184:6, 184:15, 184:19, 186:7, 187:8, 187:19, 188:21, 189:7, 242:10, 243:1
**circumstantial** - 241:24, 242:1, 242:3, 242:7, 242:11, 242:14, 242:16, 242:17, 242:19, 242:24
**citizens** - 18:9, 58:17, 111:19, 151:14, 162:4, 248:15
**City** - 64:13, 66:22
**city** - 14:1
**civilian** - 67:20
**civilians** - 35:14
**civilization** - 221:23
**Clarence** - 1:10, 1:22, 59:8, 59:13, 60:1, 60:9, 87:20, 110:19, 111:6
**clarity** - 235:8
**Class** - 65:24, 66:1, 74:12
**class** - 23:17, 52:14, 65:18, 74:15, 231:15, 240:16
**classroom** - 166:23, 166:24, 191:4, 191:7
**clean** - 48:1, 84:3, 185:23, 234:24
**clear** - 30:12, 52:25, 73:7, 78:14, 81:3, 151:16, 159:16, 159:19, 216:25
**Clear** - 66:22
**Clearly** - 185:13, 188:2
**clearly** - 237:22, 243:8
**clerk** - 26:1
**click** - 70:24
**client** - 53:7, 105:9,

137:16, 143:1, 150:19,
150:22, 158:7, 193:17,
194:17, 244:5
  **clinical** - 224:15, 224:22,
225:1
  **clinicians** - 45:12
  **close** - 10:14, 10:23,
12:15, 16:14, 70:17, 71:5,
85:18, 119:11, 155:21,
156:6, 156:13, 156:19,
157:15, 157:17, 158:24,
160:2, 169:24, 192:24,
192:25
  **Close** - 192:1
  **closely** - 64:17, 65:16,
98:25, 189:19
  **closer** - 197:16
  **clue** - 107:3
  **co** - 41:12, 41:14, 86:22,
116:7, 190:21, 205:6
  **co-conspirator** - 41:12
  **co-conspirators** - 41:14
  **co-counsel** - 86:22, 116:7,
190:21
  **co-defendant** - 205:6
  **code** - 191:2
  **coincidentally** - 138:14
  **cold** - 38:12, 38:13, 236:3
  **College** - 49:12
  **college** - 8:24, 9:1, 23:17,
23:19, 43:12
  **colors** - 43:18
  **comfortable** - 27:21,
27:22, 27:23, 37:1, 43:6,
46:13, 79:21, 84:19, 84:20,
84:25, 182:20, 239:19,
240:1, 240:5
  **comforting** - 76:14, 176:9
  **coming** - 7:9, 7:10, 18:10,
21:3, 58:15, 62:17, 77:4,
111:13, 112:16, 116:1,
162:2, 163:15, 216:1,
218:13, 228:20
  **commanders** - 233:22
  **commensurate** - 29:22
  **comment** - 198:4
  **comments** - 235:21
  **commission** - 168:24
  **commit** - 34:23, 34:25,
35:4, 41:13, 54:14, 77:13,
78:1, 81:15, 92:17, 107:7,
109:13, 172:13, 178:7,
178:22, 179:21, 180:19,
181:9, 186:12, 189:21,
207:18, 207:20, 209:18,
229:6
  **commitment** - 188:16,
188:18, 188:19, 233:23
  **commits** - 124:8
  **committed** - 15:17, 29:9,
29:15, 31:20, 33:20, 34:15,
36:11, 36:12, 36:14, 37:6,
37:7, 37:12, 37:13, 54:24,
55:1, 56:3, 56:8, 56:15,
78:5, 106:5, 123:25, 179:9,
179:14, 179:16, 180:14,
185:13, 191:2, 205:7, 227:5
  **committing** - 25:23,
107:25, 125:14, 168:23,
172:13, 180:16
  **common** - 147:11, 167:6,
238:5
  **company** - 9:15, 9:16
  **comparison** - 103:1
  **compassion** - 235:10
  **compassionate** - 231:1
  **complete** - 135:6, 161:15
  **completed** - 115:13,
225:11
  **completely** - 17:25,

151:25, 225:11, 247:7,
248:22
  **complex** - 10:19
  **computer** - 1:24
  **computer-aided** - 1:24
  **concede** - 202:23, 208:24
  **concept** - 80:17, 153:7,
153:10, 174:24, 180:12,
181:25, 233:24
  **concepts** - 68:16, 75:18,
75:22, 182:19, 216:20
  **concern** - 123:17, 147:15,
158:25, 220:16, 226:18,
226:21, 236:14, 237:14,
241:12, 245:6, 245:7
  **concerned** - 123:11,
124:14, 129:4, 160:16,
162:4, 233:12, 236:16,
238:3, 246:14, 248:15
  **concerning** - 216:16
  **concerns** - 15:15, 119:14,
235:22, 236:6, 237:7,
237:12, 237:13, 241:11
  **conditions** - 103:8
  **condom** - 34:22
  **conduct** - 191:3, 248:14
  **confession** - 37:14
  **conflicts** - 152:14
  **confuse** - 56:10, 56:11
  **confused** - 158:16,
172:12, 224:2
  **congratulations** - 167:23
  **connect** - 93:7, 221:11
  **connection** - 16:14
  **conscience** - 23:18
  **consequence** - 29:20,
29:21, 29:25, 122:2, 122:7
  **consequences** - 64:6
  **consider** - 22:12, 23:22,
50:13, 83:16, 169:25,
172:16, 174:3, 174:5, 174:6,
175:11, 179:19, 180:15,
188:22, 202:5, 202:9,
202:13, 222:25, 223:18
  **consideration** - 28:19,
128:7, 186:15
  **considerations** - 187:4
  **considered** - 26:10, 82:21,
181:5, 184:18, 185:4,
185:21
  **considering** - 180:15
  **Considering** - 188:20
  **considers** - 185:18
  **conspiracy** - 41:15, 41:16
  **conspirator** - 41:12
  **conspirators** - 41:14
  **conspire** - 41:13
  **constitute** - 45:3, 78:16,
181:12
  **constitutes** - 78:11, 204:7
  **Constitutional** - 243:17
  **consultant** - 166:10
  **contains** - 250:7
  **contemplate** - 95:11
  **contest** - 143:11
  **continuation** - 4:7, 19:17,
60:17, 114:12, 163:12,
179:23, 216:11
  **continue** - 61:9, 182:23,
200:18
  **continuing** - 45:4, 55:3,
77:9, 78:17, 106:14, 106:24,
108:18, 178:18, 181:12,
183:9, 187:9, 189:25,
208:18, 209:6, 209:9, 210:1,
211:9
  **contributed** - 198:17
  **control** - 32:24, 33:5,
64:15, 64:24, 64:25, 74:24,
89:16, 124:2

  **controls** - 33:17, 34:16
  **convenience** - 25:25
  **convenient** - 205:10
  **conversation** - 192:10,
213:22
  **conversational** - 8:4
  **conversations** - 13:22
  **convict** - 35:18, 76:2,
124:21, 193:19, 204:6,
204:10, 208:5, 240:10,
242:18
  **convicted** - 31:1, 50:23,
80:1, 86:25, 91:17, 92:17,
99:5, 100:23, 105:23, 106:6,
106:20, 106:23, 108:10,
108:13, 108:15, 109:11,
194:19, 208:8, 208:11,
210:2, 211:8, 222:17, 225:8
  **conviction** - 195:16
  **convictions** - 180:9
  **convince** - 193:19, 242:22
  **convinced** - 29:1, 96:16,
96:22, 106:2, 203:20, 204:2
  **convinces** - 242:20
  **convincing** - 236:12
  **cook** - 88:25
  **Cool** - 165:24
  **cooperate** - 204:15
  **cooperation** - 218:14
  **coordinator** - 215:7
  **copy** - 6:4, 6:9, 61:21,
115:15, 144:14, 218:1,
218:3
  **Cornelius** - 2:11, 3:7, 3:12,
17:6, 17:14, 54:1, 53:5,
59:2, 59:10, 59:15, 86:13,
86:15, 86:16, 98:11, 98:15,
98:19, 103:23, 104:3, 104:4,
110:12, 110:24, 111:3,
112:23, 131:3, 134:19,
134:21, 134:25, 137:14,
137:15, 158:6, 158:12,
158:15, 159:6, 159:9,
160:13, 160:22, 161:2,
161:4, 161:14, 162:22,
188:15, 190:13, 190:14,
190:17, 190:18, 196:13,
196:16, 196:20, 198:16,
201:15, 201:17, 207:8,
207:10, 210:18, 210:20,
210:21, 212:20, 213:6,
220:23, 244:4
  **Correct** - 113:23, 114:8,
123:22, 129:8, 131:21,
131:22, 132:22, 134:5,
136:24, 137:25, 138:24,
139:7, 140:19, 141:6,
141:13, 143:18, 144:16,
145:9, 147:13, 148:8,
149:14, 150:21, 154:19,
154:20, 155:13, 155:16,
163:10, 168:11, 180:11,
183:4, 186:3, 194:8, 195:17,
197:9, 197:20, 199:13,
201:9, 211:13, 218:12,
244:16
  **correct** - 3:23, 4:2, 4:5,
4:6, 6:21, 7:14, 7:15, 8:19,
9:9, 9:21, 10:5, 11:3, 11:6,
11:18, 13:6, 13:25, 19:12,
21:1, 30:7, 49:13, 99:20,
112:11, 114:10, 134:24,
150:3, 155:12, 162:20,
199:5, 203:9, 218:11, 226:2,
247:7, 247:17, 247:18,
250:7
  **correctly** - 13:24, 144:3,
250:14
  **corroboration** - 42:16,
42:18, 43:1

  **cost** - 101:20, 103:18,
200:8, 200:9, 200:17,
250:16
  **costs** - 103:11, 199:18
  **Counsel** - 145:20
  **counsel** - 59:12, 86:22,
116:7, 190:21, 250:9
  **country's** - 230:4
  **County** - 1:9, 1:23, 67:1,
69:24, 78:19, 83:9, 225:22,
250:2, 250:5, 250:18
  **couple** - 8:17, 14:13,
50:15, 58:4, 67:3, 67:14,
83:11, 139:14, 151:7,
153:10, 153:24, 166:9,
176:18, 178:23, 203:12,
203:13, 214:15, 220:15
  **course** - 23:20, 41:3,
187:24, 188:3, 192:12,
201:18, 207:15, 208:21,
238:14
  **court** - 3:1, 4:4, 12:9, 17:9,
59:6, 74:25, 100:13, 100:15,
140:15, 142:1, 214:1,
214:22, 215:6, 249:1,
250:12
  **Court** - 1:3, 1:4, 1:6, 3:3,
3:13, 3:21, 6:8, 6:12, 6:13,
6:15, 17:10, 17:15, 17:18,
17:25, 18:13, 18:16, 18:19,
18:22, 19:4, 20:22, 33:13,
36:21, 42:2, 48:24, 57:20,
57:25, 58:2, 58:6, 58:10,
58:13, 58:21, 59:1, 59:4,
59:7, 59:11, 59:16, 59:20,
59:22, 60:5, 61:23, 86:13,
98:12, 98:17, 103:25, 109:6,
109:7, 110:13, 110:19,
110:23, 111:1, 111:5,
111:11, 111:15, 111:17,
111:24, 112:4, 112:7,
112:10, 112:15, 112:18,
112:25, 113:5, 113:12,
113:16, 113:19, 115:19,
121:23, 129:20, 130:19,
131:6, 132:3, 134:7, 134:10,
134:13, 134:19, 134:23,
135:1, 135:4, 135:10,
135:12, 137:3, 141:22,
145:20, 151:6, 157:25,
158:2, 158:8, 158:14,
158:17, 159:2, 159:8,
159:17, 159:23, 159:25,
160:8, 160:20, 160:23,
161:3, 161:13, 161:17,
161:22, 162:1, 162:13,
162:15, 162:18, 162:23,
163:5, 163:9, 164:17,
186:20, 188:17, 190:13,
190:15, 196:15, 196:17,
198:14, 201:16, 210:17,
210:19, 210:24, 212:22,
213:2, 213:8, 213:11,
215:13, 215:16, 215:23,
218:6, 238:24, 243:14,
243:21, 246:15, 247:21,
248:2, 248:6, 248:8, 248:25,
249:4, 249:5, 249:7, 250:4,
250:5, 250:23, 250:24
  **Court's** - 1:14, 2:7, 134:16,
135:7, 159:21, 159:24
  **courthouse** - 63:6, 217:5
  **courtroom** - 3:5, 7:11, 8:4,
13:4, 19:14, 58:1, 58:12,
60:15, 62:17, 85:23, 110:18,
111:10, 119:21, 120:21,
130:24, 131:12, 132:16,
134:12, 135:11, 139:2,
143:25, 158:11, 161:21,
175:12, 188:1, 213:1,

213:10, 214:9, 214:10,
215:7, 215:15, 231:23,
248:1, 248:7
  **courtrooms** - 217:8
  **courts** - 153:24
  **cover** - 4:17, 60:21, 121:23
  **covered** - 4:18, 17:20,
31:8, 60:22
  **covers** - 32:20
  **crack** - 235:12
  **cracks** - 233:2
  **creature** - 222:2
  **credibility** - 68:19, 69:7,
132:13, 174:11, 174:16,
174:23, 175:14, 237:6,
237:15
  **credible** - 14:23, 142:11,
238:15
  **credit** - 68:11, 195:23,
196:8
  **Crime** - 94:22
  **crime** - 29:9, 29:15, 31:20,
32:1, 32:7, 34:15, 34:23,
34:25, 35:4, 35:6, 41:13,
45:6, 45:8, 47:25, 56:15,
78:9, 84:15, 92:18, 95:5,
120:10, 120:13, 123:6,
123:11, 123:24, 125:3,
127:25, 129:4, 139:20,
195:21, 205:7, 211:19,
211:20, 212:4, 221:5, 228:2,
240:9, 241:13, 241:22,
245:12
  **crimes** - 25:5, 25:10,
29:18, 44:24, 97:23, 122:23,
125:15, 235:3
  **Criminal** - 1:4, 44:23, 78:7
  **criminal** - 5:5, 14:24,
15:18, 20:14, 31:23, 32:21,
35:22, 54:15, 61:15, 69:20,
71:7, 72:3, 72:22, 78:1,
78:2, 78:11, 115:10, 116:13,
122:17, 138:20, 164:9,
173:13, 175:2, 175:4, 179:9,
179:10, 179:15, 179:19,
179:21, 188:6, 217:18,
225:9, 226:3, 226:5, 227:14,
228:18
  **criminals** - 29:2
  **criteria** - 242:21
  **critical** - 14:9, 43:25, 44:1
  **criticizing** - 198:18
  **cross** - 142:9, 149:13,
154:9, 194:15
  **cross-examination** -
194:15
  **cross-examine** - 142:9,
154:9
  **cross-examining** - 149:13
  **cruelty** - 65:21, 105:5
  **Cruz** - 1:6, 3:6, 4:1, 17:15,
19:11, 27:12, 53:7, 53:9,
59:12, 60:11, 85:14, 85:23,
86:19, 112:25, 114:7,
120:22, 121:6, 137:17,
141:7, 163:10, 170:4,
190:21, 213:13, 216:7,
231:24, 233:16, 244:4,
246:22
  **Cruz-garcia** - 1:6, 3:6, 4:1,
17:15, 19:11, 27:12, 53:7,
53:9, 59:12, 60:11, 85:14,
85:23, 86:19, 112:25, 114:7,
120:22, 121:6, 137:17,
141:7, 163:10, 170:4,
190:21, 213:13, 216:7,
231:24, 233:16, 244:4,
246:22
  **crying** - 128:24
  **Csr** - 250:22

  **culpability** - 47:14, 82:6,
184:10
  **curiosity** - 172:2, 244:12
  **current** - 79:5, 177:4
  **custody** - 236:17, 236:21
  **cut** - 95:2, 135:20, 232:24
  **Cy** - 166:10, 166:17, 191:2
  **Cy-fair** - 166:10, 166:17,
191:2

# D

  **dad** - 66:16, 67:5, 68:9,
91:9
  **daily** - 67:13
  **damn** - 235:15
  **dangerous** - 70:19
  **Das** - 93:15
  **Date** - 250:23
  **date** - 37:25, 79:8, 180:6,
214:8
  **daughter** - 187:23, 224:21,
225:12, 225:18
  **David** - 3:11, 228:7
  **days** - 58:15, 111:15,
162:2, 169:23, 248:10
  **dead** - 99:20, 126:12,
126:13, 126:15, 228:9,
235:13
  **dead-certain** - 99:20
  **deal** - 27:8, 41:5, 42:7,
42:13, 65:22, 66:3, 166:14,
184:23, 186:6
  **dealing** - 9:16, 184:22
  **dealings** - 66:4
  **deals** - 65:12, 80:17
  **dealt** - 172:3, 228:22
  **death** - 5:1, 7:17, 20:10,
21:10, 23:14, 23:23, 24:4,
25:6, 25:10, 26:2, 26:8,
26:19, 27:1, 27:6, 27:16,
30:2, 30:3, 38:19, 45:23,
46:7, 46:15, 46:17, 53:17,
54:11, 55:20, 57:5, 57:10,
61:11, 63:25, 76:16, 79:1,
79:2, 80:21, 80:25, 81:19,
82:11, 82:15, 85:17, 86:24,
91:18, 101:4, 101:8, 101:25,
102:10, 102:11, 103:16,
104:19, 105:7, 105:8,
105:19, 109:4, 109:12,
109:16, 110:5, 110:6, 115:6,
116:25, 117:17, 118:25,
119:3, 120:4, 120:17,
120:18, 121:5, 124:3,
124:22, 126:18, 127:8,
127:9, 127:16, 129:16,
129:3, 130:9, 131:19, 150:2,
150:16, 156:9, 156:18,
164:6, 166:1, 168:16, 169:4,
169:8, 169:13, 169:25,
176:7, 176:10, 177:2, 177:3,
177:15, 182:11, 182:14,
182:15, 183:11, 183:13,
183:20, 184:16, 186:19,
188:10, 188:12, 199:12,
199:18, 199:25, 200:5,
200:10, 201:11, 202:13,
211:2, 211:6, 211:10,
211:11, 211:12, 211:24,
212:5, 217:14, 229:17,
230:10, 230:12, 230:18,
232:9, 233:16, 235:11,
238:6, 246:15, 247:11,
247:14
  **death-qualified** - 104:19,
105:7, 105:8
  **debatable** - 242:9
  **debate** - 83:13, 242:8
  **decades** - 221:8

  **deceased** - 56:4, 80:21,
80:25, 182:11, 182:15
  **decide** - 32:6, 40:6, 41:23,
42:15, 46:19, 47:5, 55:7,
57:2, 57:9, 72:6, 76:2,
77:12, 79:25, 80:20, 93:12,
93:19, 95:18, 96:4, 109:14,
156:10, 182:9, 184:14,
195:6, 211:5, 220:12, 241:4,
246:5
  **decided** - 108:20, 154:7,
161:5, 175:22
  **decides** - 109:5, 122:13,
148:21, 228:21
  **deciding** - 46:17, 82:8,
193:2, 202:13
  **decision** - 13:5, 39:13,
77:4, 92:4, 101:16, 118:20,
124:3, 124:25, 128:20,
129:7, 147:22, 150:14,
155:24, 156:1, 170:1,
175:21, 198:25, 220:25,
223:6, 223:9, 223:17,
223:19, 223:23, 223:25,
233:6
  **decisions** - 125:20,
161:12, 178:6, 229:12,
231:9, 231:11
  **deep** - 211:4
  **defend** - 74:15, 105:9,
150:20, 193:18, 194:16
  **Defendant** - 2:17, 17:17,
113:4
  **defendant** - 3:1, 17:9,
27:12, 31:20, 33:6, 33:9,
33:14, 33:16, 33:20, 33:24,
34:5, 35:7, 35:19, 43:4,
47:23, 48:5, 48:8, 51:17,
53:25, 54:4, 57:4, 59:6,
72:23, 73:13, 74:4, 76:2,
76:9, 77:13, 78:1, 80:1,
80:20, 81:13, 81:15, 81:20,
82:7, 83:24, 85:9, 86:4,
107:3, 120:14, 120:25,
130:10, 130:25, 132:20,
133:9, 133:15, 135:16,
140:18, 141:4, 147:9,
147:10, 153:11, 153:23,
153:25, 154:5, 154:25,
158:23, 160:4, 160:17,
178:2, 178:9, 182:10, 183:7,
183:13, 194:13, 205:6,
232:1, 243:5, 243:17,
247:11
  **defendant's** - 42:25,
47:13, 48:1, 76:9, 82:4,
176:5, 184:7, 241:10
  **defendants** - 74:14
  **defense** - 8:8, 53:23,
73:17, 110:23, 111:6,
112:24, 135:19, 141:20,
142:9, 142:14, 142:21,
143:8, 145:2, 145:17, 146:9,
147:7, 154:6, 154:25, 155:6,
155:23, 156:6, 156:16,
156:21, 160:4, 160:5, 161:6,
166:6, 176:3, 187:5, 193:17,
194:13, 194:21, 204:1
  **Defense** - 1:11, 1:23,
142:22
  **defense's** - 157:18, 159:9
  **defensive** - 160:14, 195:3
  **deferred** - 225:10, 225:15,
225:21, 226:1
  **define** - 96:7, 203:11
  **defined** - 203:12, 211:22
  **definitely** - 39:25, 50:14
  **definition** - 95:22, 95:23,
95:25, 96:8, 96:9, 179:8,
203:14, 203:15, 203:17,

204:7
  **definitions** - 203:13
  **deliberate** - 96:15, 194:10,
208:4
  **deliberation** - 206:24
  **demeaning** - 92:13
  **Denman** - 1:8, 2:3, 18:23,
18:25, 19:5, 19:10, 21:1,
49:4, 49:7, 49:8, 57:21,
58:3, 58:9, 58:10, 58:13
  **Department** - 64:18, 89:13
  **department** - 64:21,
66:21, 66:25, 88:17, 89:15,
89:21, 89:22, 91:4
  **depressed** - 227:3
  **Deputy** - 58:23, 59:17,
112:1, 113:6, 113:16,
162:10, 212:23, 214:11,
215:5, 248:20
  **deputy** - 3:15, 57:22,
110:14, 111:8
  **describes** - 24:18
  **deserve** - 101:4
  **deserved** - 12:12
  **deserves** - 194:4, 229:8
  **designing** - 98:9
  **despite** - 133:10, 133:23
  **destroyed** - 38:6
  **destroying** - 248:12
  **detail** - 10:17, 31:9
  **details** - 41:20
  **deter** - 21:19
  **deteriorate** - 221:19
  **determination** - 182:24,
220:19
  **determine** - 31:20, 35:16,
35:17, 52:10, 52:11, 183:17,
220:20
  **determined** - 17:21,
199:24
  **determines** - 35:8
  **determining** - 77:14,
178:14, 197:17, 202:9
  **deterrence** - 28:25, 29:6,
29:7, 221:12
  **deterring** - 29:2, 29:16
  **deters** - 125:23
  **Development** - 219:2
  **dictator** - 229:21
  **die** - 38:13, 87:8
  **died** - 39:1, 123:3
  **difference** - 4:8, 154:23,
168:6, 183:25, 241:23
  **different** - 13:23, 31:13,
31:14, 31:15, 42:21, 43:20,
44:12, 63:10, 71:21, 71:23,
72:12, 75:8, 76:8, 99:13,
100:10, 100:13, 123:23,
144:20, 151:15, 153:10,
153:24, 169:12, 169:21,
169:23, 170:18, 170:24,
172:14, 173:11, 176:6,
177:1, 178:5, 181:14,
192:18, 203:12, 203:13,
203:21, 212:2, 217:5, 230:1,
233:11, 233:20
  **differently** - 146:13
  **difficult** - 39:11, 39:19,
184:22, 186:25, 187:11,
190:25, 198:20
  **dig** - 71:17
  **dinner** - 23:3, 88:20
  **dinners** - 13:23
  **dire** - 4:3, 4:7, 4:9, 19:13,
19:18, 22:10, 60:13, 60:17,
114:9, 114:13, 163:12,
216:10, 217:12, 235:16,
235:19, 235:23, 241:9
  **Dire** - 1:16, 1:2, 1:6, 1:22,
3:20, 6:18, 19:3, 20:24,

49:2, 60:4, 62:1, 86:14, 113:11, 115:22, 129:19, 130:22, 137:6, 151:5, 163:4, 164:20, 190:16, 215:22, 218:9, 243:24
**direct** - 41:22, 241:23, 242:11, 242:13
**directed** - 114:20
**direction** - 85:11, 86:1, 170:7, 170:10, 181:22, 183:1
**directly** - 113:17, 148:2
**director** - 219:1
**disagree** - 50:25, 99:1, 99:25, 100:2, 101:7
**disagreed** - 100:25
**discharged** - 70:12, 70:13, 70:14
**discovered** - 11:14
**Discovery** - 49:10
**discuss** - 110:15, 119:20, 214:1
**discussed** - 23:20, 91:16, 91:20, 91:21, 114:19, 206:14, 216:16
**discussing** - 58:5
**discussion** - 23:2
**discussions** - 169:10
**dismissed** - 21:14
**disqualified** - 159:17, 159:18
**distinction** - 168:2
**district** - 3:9, 65:15, 166:16, 166:17, 191:2, 245:16
**District** - 1:6, 1:12, 2:5, 249:4, 250:5
**diversions** - 230:2
**division** - 64:20, 65:1, 65:23, 89:17
**divorced** - 88:21
**Dna** - 16:10, 154:3, 173:23
**doctorate** - 49:9
**dollar** - 102:25, 200:17
**done** - 18:3, 29:22, 48:2, 58:21, 71:13, 90:2, 96:21, 96:22, 106:16, 107:4, 107:5, 109:23, 142:20, 167:24, 180:4, 190:4, 209:22, 210:20, 233:4, 248:22
**door** - 57:22, 71:11, 110:14, 212:23, 247:23
**doubled** - 90:5
**doubt** - 15:2, 15:7, 35:18, 36:11, 37:5, 40:9, 40:10, 57:4, 72:16, 73:6, 77:10, 80:19, 81:14, 95:5, 95:14, 95:20, 96:5, 96:23, 106:2, 108:22, 141:1, 143:8, 144:15, 145:2, 147:2, 153:2, 154:13, 156:14, 156:20, 157:16, 160:3, 171:8, 171:15, 171:18, 173:2, 175:23, 178:19, 182:9, 183:6, 184:1, 203:7, 203:19, 203:20, 204:3, 204:5, 204:8, 204:10, 204:13, 204:24, 204:25, 205:11, 205:12, 205:14, 205:15, 205:21, 205:22, 206:13, 206:14, 207:1, 207:2, 208:15, 211:22, 238:10, 238:14, 238:19, 239:5, 239:22, 240:11, 242:20
**doubts** - 136:9
**down** - 18:10, 23:15, 25:1, 32:24, 52:16, 58:15, 58:16, 65:9, 72:5, 83:2, 89:23, 98:24, 99:2, 111:13, 130:10, 140:15, 160:14, 162:2,

165:21, 169:23, 188:1, 198:23, 214:12, 218:13, 234:1, 239:18, 241:18, 248:10
**Dr** - 21:1, 49:4, 57:21, 58:9, 58:10, 58:13, 228:7
**draft** - 234:9
**drafted** - 234:11, 234:14
**draw** - 234:6
**driving** - 56:17
**drove** - 70:22
**drowned** - 83:3, 185:12
**drug** - 47:23, 83:25, 185:21, 186:11
**drugs** - 47:24, 84:3, 185:23
**During** - 114:18
**during** - 12:8, 13:19, 16:15, 102:17, 168:24, 191:15, 207:25, 208:1, 208:2, 215:8, 226:11, 247:5
**duties** - 64:24, 174:12, 242:4
**duty** - 18:3, 18:10, 21:12, 21:13, 22:20, 23:15, 26:7, 58:21, 168:22, 194:6, 194:7, 214:4, 218:17
**Dwi** - 8:12, 52:18, 64:2

---

## E

**early** - 88:19, 163:15, 163:17, 216:1, 216:2, 229:25, 230:1
**easier** - 32:14, 32:15, 71:13
**easy** - 50:12, 50:14, 57:5, 85:2, 91:24, 126:16, 126:18
**ecology** - 43:14, 49:22, 49:25
**economic** - 223:9
**educate** - 229:24
**education** - 9:13, 229:10, 230:1, 231:10
**effective** - 125:3, 126:4, 221:5, 221:12, 227:12
**effectively** - 29:2
**efficiently** - 9:2
**effort** - 111:17, 228:4
**eight** - 88:4, 104:1, 191:15, 206:6, 206:7, 225:14
**eight-hour** - 191:15
**Either** - 222:12
**either** - 29:5, 55:12, 57:6, 66:5, 97:23, 106:14, 108:22, 125:7, 142:21, 150:14, 150:24, 158:4, 166:14, 166:20, 183:10, 191:2, 206:16, 206:21, 211:10
**either/or** - 36:21
**elaborate** - 221:5
**elapses** - 221:7
**element** - 172:23, 173:1, 205:2
**elementary** - 166:18
**elements** - 15:5, 32:12, 32:17, 35:23, 38:6, 38:17, 39:24, 40:6, 40:15, 72:17, 73:10, 171:9, 171:12, 171:16, 171:20, 172:21, 175:24, 239:16, 239:20, 247:2
**elephant** - 225:6
**elevators** - 214:20
**eleven** - 108:20, 208:5
**elgi** - 177:7
**eligibility** - 79:14, 177:8, 177:16, 183:21
**eliminating** - 222:3

**Elizabeth** - 13:20, 16:14, 244:13
**embezzlement** - 235:3
**emergency** - 215:5
**emotional** - 128:2, 128:25, 129:18, 130:3, 130:16, 131:16, 226:12, 227:4, 227:8, 228:12
**emotionally** - 129:12, 232:20
**emotions** - 130:11
**empirical** - 107:18, 200:7
**employees** - 90:4, 181:18, 224:19
**employer** - 214:3
**Employment** - 220:5
**employment** - 89:10
**encounter** - 213:21, 213:25
**encourage** - 204:14
**end** - 10:9, 13:17, 27:15, 54:9, 85:7, 121:1, 175:8, 203:23, 213:24, 232:4, 232:16, 233:13
**ended** - 10:19, 11:10
**energy** - 162:3
**enforced** - 234:23
**enforcement** - 64:18, 67:2, 67:6, 67:20, 67:21, 68:9, 68:10, 89:2, 90:11, 95:24, 104:13, 104:16, 175:3
**engage** - 213:18
**engineer** - 229:11, 246:3
**engineering** - 219:22
**England** - 243:12
**enjoy** - 88:23
**enlist** - 234:7
**enter** - 101:15
**enters** - 58:12, 111:10, 135:11, 161:21, 213:10, 248:7
**entire** - 84:4, 154:8, 171:7, 191:5
**entitled** - 1:21, 202:8, 202:9
**environment** - 8:4
**envision** - 187:7
**equal** - 68:20, 69:3, 174:14
**equally** - 132:17
**era** - 226:12, 227:10
**error** - 158:22
**especially** - 138:6, 187:11
**essential** - 36:2
**essentially** - 77:11, 81:18, 85:13, 107:24, 178:21, 181:1, 183:13, 212:10
**establish** - 205:6
**etcetera** - 213:20, 219:14
**evaluate** - 14:21, 41:7, 76:25, 77:1, 77:3, 81:6, 83:19, 85:10, 176:21, 178:12, 182:7, 183:16, 184:4, 184:5, 189:5, 190:2, 195:5, 228:20, 241:4
**evaluated** - 182:25, 189:13
**evaluating** - 80:5, 80:12, 184:13
**evaluation** - 238:21
**Evans** - 215:17
**evening** - 10:25
**event** - 97:24, 150:22, 221:8, 221:9, 221:11
**eventually** - 81:19, 170:12
**evidence** - 14:1, 14:16, 14:23, 15:9, 15:23, 16:6, 16:7, 16:20, 16:23, 17:4, 28:1, 31:13, 31:15, 32:24, 33:5, 33:17, 35:8, 35:16, 37:5, 37:11, 38:5, 38:6,

38:12, 39:6, 39:12, 39:13, 39:15, 40:1, 42:20, 42:22, 43:2, 43:25, 47:7, 48:15, 51:16, 52:9, 52:12, 54:16, 54:17, 54:18, 55:9, 55:14, 57:3, 72:11, 72:14, 72:18, 74:5, 76:8, 77:1, 77:2, 77:3, 80:12, 81:6, 82:2, 82:5, 83:20, 84:13, 85:9, 85:10, 94:11, 94:15, 94:18, 94:20, 94:21, 96:15, 96:19, 106:2, 109:14, 118:14, 118:19, 120:6, 120:13, 120:14, 120:15, 120:18, 121:2, 124:20, 124:25, 126:6, 127:1, 130:7, 130:8, 130:17, 131:17, 131:24, 132:20, 133:5, 133:10, 133:18, 133:20, 134:4, 135:16, 135:22, 136:5, 136:6, 136:18, 141:12, 141:14, 142:15, 142:16, 142:17, 142:23, 143:12, 144:14, 144:25, 146:10, 147:7, 147:18, 147:22, 147:25, 148:4, 148:9, 148:10, 148:15, 148:17, 150:11, 151:1, 152:3, 152:23, 153:14, 153:23, 153:25, 154:1, 154:2, 154:4, 154:10, 154:17, 155:1, 155:3, 155:4, 155:5, 155:22, 155:25, 156:2, 156:4, 156:8, 156:11, 156:7, 156:22, 157:1, 157:3, 157:5, 157:6, 157:13, 157:14, 157:15, 158:24, 160:3, 160:5, 160:15, 160:17, 170:1, 170:6, 170:7, 170:23, 171:1, 171:4, 173:11, 173:12, 173:24, 173:25, 174:1, 174:2, 174:5, 174:20, 175:10, 175:17, 176:1, 176:21, 178:4, 178:13, 181:21, 183:1, 183:17, 184:5, 186:17, 189:5, 189:6, 189:8, 189:13, 190:2, 195:5, 203:24, 207:24, 208:3, 209:5, 210:8, 211:3, 211:4, 222:7, 229:2, 229:5, 231:11, 232:17, 232:24, 233:7, 234:16, 236:19, 236:23, 236:24, 237:15, 238:3, 238:4, 238:17, 239:12, 239:14, 241:24, 242:2, 242:9, 242:11, 242:12, 242:13, 242:14, 242:16, 242:18, 242:19, 242:24, 246:10, 247:17, 250:8
**evident** - 185:16
**evidentiary** - 239:13
**evolution** - 43:14
**evolved** - 219:8
**ex** - 88:21
**ex-wife** - 88:21
**exact** - 235:24
**exactly** - 28:22, 30:21, 37:3, 37:6, 151:17, 166:13, 197:16, 204:17, 225:15, 241:2
**Exactly** - 198:1, 236:22
**Examination** - 3:20, 6:18, 19:3, 20:24, 49:2, 60:4, 62:1, 86:14, 113:11, 115:22, 129:19, 130:22, 137:6, 151:5, 163:4, 164:20, 190:16, 215:22, 218:9, 243:24
**examination** - 194:15

**examine** - 142:9, 154:9
**examiner** - 15:19
**examiner's** - 13:15
**examining** - 149:13
**example** - 47:19, 83:1, 174:18, 181:8, 185:21, 205:5, 243:2
**examples** - 33:8, 41:9, 197:18
**except** - 211:12
**exception** - 41:16
**exceptions** - 32:2
**exchange** - 42:7
**excuse** - 18:13, 58:23, 112:2, 161:23, 162:11, 214:12
**Excuse** - 115:20
**excused** - 17:12, 17:22, 18:18, 58:14, 111:6, 111:12, 112:9, 248:8, 248:22
**Excused** - 1:7, 2:2
**excuses** - 248:20
**execute** - 81:20, 101:22, 103:4, 201:7, 222:12
**executed** - 102:13, 102:20, 200:13, 200:16, 232:19
**execution** - 27:18, 85:14, 131:25, 170:12, 183:14, 221:8, 221:11
**executive** - 229:12
**exercise** - 58:8, 111:3, 117:8, 248:4
**exhibits** - 250:15
**exits** - 58:1, 110:18, 134:12, 158:11, 213:1, 215:15, 248:1
**exotic** - 219:13
**expect** - 15:25, 16:1, 16:9, 19:23, 20:1, 21:12, 31:7, 61:2, 143:24, 144:5, 173:12, 175:2, 194:6, 195:11, 195:13, 196:4
**expecting** - 21:16, 22:5, 87:7
**expensive** - 101:9, 101:21, 101:22, 101:24, 102:9, 103:4, 200:21, 201:6
**experience** - 12:20, 13:4, 13:22, 21:16, 70:17, 71:5, 71:6, 71:18, 71:19, 75:8, 102:12, 128:3, 138:6, 162:9, 168:5, 174:23, 226:21, 226:24, 233:9, 233:18, 245:23
**experiences** - 71:11, 228:2, 229:5
**expert** - 103:11
**Expiration** - 250:23
**explain** - 44:18, 146:12, 161:15, 171:5, 211:25, 212:1, 212:2
**explained** - 36:7, 52:4, 76:13, 87:5, 141:3, 141:19, 153:15, 170:17, 174:13, 176:8, 179:11
**explaining** - 144:12, 157:8
**explanation** - 44:8
**exposure** - 213:23
**extended** - 26:24
**extent** - 65:4, 72:3
**external** - 8:25
**extra** - 195:22, 196:8
**extreme** - 82:23, 124:17, 185:6
**extremely** - 24:5, 24:6, 227:3
**eye** - 30:4, 30:6
**eye-for-an-eye** - 30:4
**eyewitness** - 37:13

**F**

**face** - 235:11
**Facebook**- 213:19
**faces** - 235:18
**fact** - 30:11, 37:24, 53:21, 56:23, 80:25, 91:3, 133:20, 147:18, 152:9, 171:9, 180:13, 200:20, 202:1, 206:25, 214:11, 222:21, 226:20, 228:18, 234:23, 236:4, 236:11, 238:2, 240:5
**factor** - 83:17, 107:6, 160:18, 223:9
**factors** - 107:15, 124:2
**facts** - 13:3, 14:15, 15:11, 71:20, 72:13, 99:6, 123:21, 169:15, 171:5, 172:24, 173:4, 188:21, 189:7, 189:13, 197:21, 197:25, 199:1, 201:2, 208:20, 209:1, 209:4, 220:13, 223:10, 229:13, 231:10, 231:12, 237:9, 237:11
**factual** - 242:9
**fail** - 219:21
**failed** - 223:14
**failure** - 219:16, 219:17
**fair** - 5:5, 5:17, 8:8, 12:21, 13:10, 20:14, 32:7, 35:20, 45:1, 61:15, 63:14, 66:5, 66:14, 71:7, 91:2, 92:3, 97:5, 114:24, 115:10, 123:13, 128:7, 128:10, 155:12, 159:3, 164:9, 166:10, 166:17, 191:2, 194:20, 217:18, 221:2, 235:5, 241:2
**Fair**- 30:8, 126:2, 221:21, 227:22, 230:21, 240:14
**fairest** - 166:7
**fairly** - 16:20, 20:6, 26:6, 57:5, 96:7, 136:7, 195:5
**fairness** - 160:13
**falls** - 210:11
**familiar** - 16:15, 43:21, 75:23, 180:21, 185:9, 187:14
**family** - 26:18, 26:25, 48:6, 119:10, 119:15, 121:9, 127:22, 169:7, 169:9, 169:11, 186:1, 191:24, 192:1, 230:17, 232:13
**Family**- 228:8
**far** - 65:21, 82:17, 88:25, 169:7, 172:14, 212:8
**Fascinated**- 110:10
**fashion** - 152:1
**faster** - 214:25
**father** - 23:2, 54:19, 180:24, 187:25, 188:7
**fathers** - 225:12
**favor** - 85:16, 119:12, 127:9, 155:18, 157:7, 197:6, 197:12, 230:11, 230:12
**favorable** - 18:8
**favorably** - 119:3
**favorite** - 167:7
**fear** - 193:13
**federal** - 211:1
**feedback** - 166:21
**feelings** - 4:17, 4:19, 20:3, 22:10, 23:14, 27:1, 28:10, 43:8, 61:4, 91:13, 100:17, 111:13, 114:20, 117:9, 126:8, 130:11, 151:12, 160:10, 163:24, 216:17, 216:20, 227:11, 236:10, 237:23

**fellow** - 14:20, 78:20, 181:18
**felony** - 25:24, 66:1, 168:25
**felt** - 10:22, 28:6, 80:10, 118:11, 119:2, 122:16, 209:6, 218:21, 221:4, 221:22
**few** - 38:16, 75:2, 77:14, 151:11, 193:9, 212:25, 218:25, 235:21, 244:10
**Few**- 75:3
**field** - 174:14
**fifth** - 167:1, 191:1, 197:6
**Fifth**- 40:24, 74:6, 74:10, 139:16, 144:22, 161:6
**fight** - 150:20
**fighting** - 49:15
**figure** - 7:16, 8:10, 14:21, 90:20, 135:21, 142:10, 219:21, 220:24
**file** - 65:24, 100:13, 100:14
**filed** - 74:11
**fill** - 63:24
**filled** - 6:1, 20:17, 61:18, 137:18, 217:22, 244:7
**filling** - 116:23
**final** - 47:4
**finally** - 181:11
**financial** - 235:3
**fine** - 8:13, 23:6, 71:16, 87:12, 99:15, 99:16, 114:4, 129:2, 157:9, 161:2, 162:24, 169:20
**fined** - 100:16
**fingerprint** - 42:25
**fingerprints** - 34:18
**finish** - 18:20, 19:23, 131:6, 131:10, 237:18
**finished** - 131:7, 156:15, 198:15
**firemen** - 123:3
**fires** - 123:4
**firm** - 138:19
**first** - 10:20, 20:8, 21:14, 31:19, 44:14, 52:9, 53:20, 54:13, 80:20, 81:12, 85:8, 102:25, 115:4, 119:6, 144:24, 145:15, 146:25, 152:21, 176:23, 177:18, 182:4, 182:10, 183:7, 193:14, 196:25, 197:4, 217:12, 224:11, 236:24, 238:12, 245:11
**First**- 31:9, 44:17, 77:16, 187:17, 213:14
**firsthand** - 74:22
**fit** - 120:9, 120:15, 240:20
**fits** - 197:18
**five** - 8:25, 9:23, 24:6, 24:17, 24:19, 24:25, 25:2, 25:17, 42:2, 83:3, 127:11, 150:6, 150:8, 150:9, 150:10, 166:17, 185:12, 197:8, 220:8, 230:13, 238:24
**Five**- 127:10, 186:20, 210:17, 210:19
**five-year** - 220:8
**flip** - 84:2, 84:4
**flip-side** - 84:2, 84:4
**floor** - 214:10
**Flores**- 2:20
**flush** - 236:8
**focus** - 72:18, 171:4
**focused** - 32:1, 171:2
**focusing** - 29:15, 72:13
**follow** - 7:24, 13:9, 39:23, 44:1, 55:24, 72:25, 76:18, 94:24, 98:22, 121:2, 128:18, 129:12, 129:17, 129:22,

129:23, 129:24, 130:1, 130:6, 134:1, 142:11, 151:14, 151:17, 151:20, 153:9, 160:8, 183:23, 200:18, 229:1, 231:11, 231:19
**followed** - 11:23, 91:2, 94:22, 97:24
**following** - 1:20, 99:1
**Following**- 170:14
**follows** - 3:19, 19:2, 60:3, 113:10, 163:3, 215:21
**food** - 201:8
**for-example** - 243:2
**force** - 241:1
**forced** - 124:11, 227:6, 228:10, 234:7
**foregoing** - 250:6
**foreman** - 66:11, 204:17
**forensic** - 13:15, 16:6, 173:24, 219:15, 219:16
**forest** - 43:15, 50:3
**forget** - 222:23
**forgiving** - 231:4, 231:6
**form** - 196:11
**forms** - 153:24
**forth** - 18:1, 70:20, 74:4, 135:5, 159:14, 177:22
**forthcoming** - 14:12
**fortunate** - 228:7
**Forty**- 88:4
**Forty-eight** - 88:4
**forward** - 79:23, 90:20
**fought** - 244:22
**founder** - 228:8
**founding** - 230:6
**four** - 70:1, 70:4, 166:24, 167:12, 168:14, 191:1, 206:6
**fourth** - 167:1, 191:1
**framework** - 140:2, 176:13
**Franklin**- 2:6, 250:24
**frankly** - 99:21
**free** - 18:16, 62:20
**freedom** - 126:12
**frequently** - 217:5
**Friday**- 3:4, 6:1, 19:7, 20:17, 21:9, 61:18, 62:7, 63:23, 115:13, 117:18, 133:1, 217:22
**friend** - 10:4, 10:12, 10:14, 11:15, 11:24, 12:5, 12:8, 12:17
**friendly** - 89:6
**friends** - 89:2, 89:3, 89:7, 192:2
**frogs** - 43:16, 43:17, 43:21, 50:2, 50:3
**front** - 8:15, 34:25, 78:24, 98:13, 104:7, 105:9, 166:9, 176:19, 191:14, 214:17, 215:1
**full** - 10:16, 104:13
**fuller** - 76:11
**fundamentally** - 146:25
**funny** - 116:5
**future** - 21:20, 54:15, 77:13, 81:15, 106:17, 160:24, 178:22, 179:8, 179:9, 180:16, 180:19, 181:9, 209:22

**G**

**gain** - 205:9
**Galveston**- 69:24
**game** - 27:9
**gap** - 238:15
**garcia** - 1:6, 3:6, 4:1, 17:15, 19:11, 27:12, 53:7,

53:9, 59:12, 60:11, 85:14, 85:23, 86:19, 112:25, 114:7, 120:22, 121:6, 137:17, 141:7, 163:10, 170:4, 190:21, 213:13, 216:7, 231:24, 233:16, 244:4, 246:22
**gears** - 193:5
**general** - 4:3, 4:16, 7:25, 43:12, 60:13, 63:20, 68:16, 85:7, 114:5, 114:9, 116:10, 116:12, 160:10, 165:17, 173:15, 173:16, 197:1, 197:2, 216:10, 216:20
**generally** - 4:24, 21:18, 75:23, 94:5, 171:3, 220:11, 240:16
**gentleman** - 101:3, 170:4
**gentleman's** - 90:24
**gentlemen** - 187:22
**girl** - 138:3
**given** - 16:18, 16:19, 17:4, 23:16, 52:12, 52:13, 124:12, 130:17, 154:5, 172:17, 201:10, 206:7, 213:16
**glad** - 19:7, 98:3, 98:4
**glass** - 154:3
**Glossary**..............................
**.end** - 1:20
**gloves** - 34:19
**Gloves** - 34:20
**goal** - 8:7, 28:13, 29:18, 29:24, 31:14, 31:19, 63:13
**goals** - 28:6
**God** - 64:1, 167:2
**gold** - 27:13, 120:22, 231:23
**government** - 151:24, 152:1, 152:2, 152:3, 211:1, 227:12
**governor** - 168:13
**grade** - 167:1
**graders** - 191:1
**graduate** - 43:13
**graduates** - 167:17
**graduation** - 167:20
**grand** - 88:23
**grant** - 159:4, 160:11, 161:18
**Granted** - 111:5
**granted** - 161:18, 248:6
**grants** - 230:2
**Great** - 104:3
**great** - 6:7, 54:19, 101:11, 122:9, 172:8, 207:13, 215:2
**greatest** - 106:16, 209:21
**greatly** - 162:5
**grew** - 67:5
**group** - 205:20
**grouping** - 192:21
**growing** - 68:9, 222:4
**grown** - 89:23
**grows** - 186:10
**guarantee** - 48:13, 202:16
**guaranteed** - 106:10
**guards** - 45:12, 78:20, 181:18
**guess** - 22:16, 24:17, 27:21, 28:16, 29:3, 37:2, 49:23, 50:6, 87:15, 87:23, 116:23, 116:24, 137:23, 152:25, 245:25, 246:3, 246:21
**guessing** - 103:15
**guide** - 23:18
**guilt** - 31:11, 31:19, 31:22, 32:3, 32:9, 33:10, 33:12, 52:3, 52:10, 52:17, 55:12, 72:6, 72:13, 72:18, 73:2, 77:2, 93:2, 93:19, 93:23,

97:20, 150:18, 154:13, 156:19, 170:19, 170:22, 171:1, 175:21, 195:15, 203:4, 203:21
**guilt-innocence** - 52:17, 72:6, 93:2, 150:18, 170:19, 170:22
**Guilty** - 156:24, 157:23
**guilty** - 32:6, 34:3, 52:10, 52:20, 52:21, 53:11, 54:4, 54:8, 54:25, 55:13, 56:24, 70:7, 76:3, 80:8, 81:13, 85:9, 87:14, 92:21, 96:18, 96:24, 100:16, 105:16, 106:4, 133:17, 139:11, 140:25, 141:5, 141:8, 143:6, 143:8, 143:9, 144:15, 144:16, 145:8, 146:17, 148:2, 148:16, 148:22, 149:16, 150:19, 150:23, 152:4, 152:13, 152:18, 152:20, 153:4, 153:13, 155:4, 155:11, 156:25, 157:4, 157:6, 157:7, 157:21, 158:23, 160:7, 170:9, 178:2, 178:10, 183:7, 187:5, 187:6, 188:25, 189:23, 193:16, 194:13, 204:3, 205:16, 205:21, 206:3, 206:6, 206:8, 206:21, 206:22, 223:16, 223:22, 223:24, 242:25, 243:5, 243:13
**gun** - 42:24, 154:2
**guns** - 188:1
**gut** - 22:4, 82:13, 232:2
**guy** - 43:4, 106:3, 194:19, 231:23
**guys** - 148:21, 150:8

## H

**half** - 4:11, 19:21, 114:15, 125:18
**halfway** - 126:9
**hall** - 4:4, 234:1
**Halloween** - 130:25
**hallway** - 4:5, 60:15
**Hand** - 250:19
**hand** - 24:12, 98:17, 185:22, 222:8, 222:15, 235:20
**hand-in-hand** - 222:15
**handed** - 29:3, 130:10
**handle** - 65:23, 65:24, 66:2
**handles** - 65:14
**handling** - 162:20
**hands** - 236:22
**hang** - 89:3, 89:4
**Happy** - 62:7
**happy** - 159:20, 220:23
**hard** - 71:9, 86:5, 96:7, 109:21, 145:11, 195:23, 206:1, 208:23, 208:24, 227:13, 231:9, 235:9
**harder** - 94:3, 94:6, 94:9, 94:10, 195:24
**Harris** - 1:9, 1:23, 67:1, 78:19, 83:9, 225:22, 250:2, 250:5, 250:18
**harsh** - 198:8
**hate** - 12:21, 69:18, 225:7
**headphones** - 85:24, 170:4
**headset** - 27:13, 120:23, 231:24
**hear** - 10:6, 15:13, 15:18, 18:2, 25:2, 31:13, 31:21, 31:24, 31:25, 32:4, 40:21, 42:13, 69:8, 69:10, 76:10,

106:1, 117:23, 118:15, 118:20, 119:21, 120:5, 120:12, 124:24, 128:20, 129:21, 130:21, 136:5, 144:12, 147:8, 147:9, 147:10, 148:5, 148:6, 148:15, 148:20, 153:14, 156:21, 157:12, 157:18, 157:19, 169:25, 170:23, 171:1, 171:18, 171:19, 173:10, 173:11, 173:13, 175:7, 181:21, 189:8, 197:25, 199:21, 207:17, 207:23, 208:3, 232:13, 232:14, 232:15, 233:1, 241:7
**heard** - 1:21, 4:3, 32:11, 35:16, 40:4, 48:15, 54:17, 60:13, 68:21, 69:4, 77:2, 77:3, 96:14, 112:14, 114:9, 117:5, 124:12, 125:6, 139:11, 139:15, 139:19, 139:21, 141:14, 150:11, 153:5, 171:5, 174:21, 176:22, 178:4, 182:13, 187:16, 198:9, 203:8, 203:24, 216:10, 244:20, 245:25, 246:2
**hearing** - 52:9, 55:14, 76:8, 120:13, 152:23, 156:2
**Hearsay** - 200:23
**heart** - 96:17, 114:23, 151:18, 203:18
**heights** - 219:9
**heinous** - 228:1
**held** - 1:23, 56:23
**help** - 46:19, 88:18, 155:19, 184:3, 212:24, 222:6, 229:25, 230:3, 236:2
**helpful** - 204:22
**helping** - 165:9, 191:6
**helps** - 44:4, 214:25
**hereby** - 250:6
**Hernandez** - 2:20
**hesitant** - 44:1, 44:2
**hesitate** - 13:7
**hesitated** - 13:9
**hesitation** - 13:12, 13:13, 13:14, 14:2, 55:25, 56:6, 56:12, 56:13, 56:22
**hesitations** - 50:15
**Hi** - 164:23
**hi** - 10:23, 10:24
**hiding** - 227:3
**high** - 38:9, 39:5, 167:18
**higher** - 39:17, 39:18, 245:21
**himself** - 144:11, 148:18, 154:17
**hint** - 165:24
**history** - 9:8, 31:23, 72:22, 83:25, 185:21, 188:6, 229:10
**hit** - 12:15, 83:8, 235:12
**hitting** - 123:7
**Hmm** - 235:4
**Hold** - 143:16, 159:6
**hold** - 4:10, 19:20, 36:2, 39:23, 39:25, 60:25, 73:9, 133:20, 133:24, 149:22, 163:14, 206:8, 216:14, 245:21
**holding** - 114:15
**Hollywood** - 207:19, 209:18
**home** - 9:17, 10:25, 11:2, 12:15, 48:6, 52:20, 83:8, 186:10, 191:14, 249:3
**hone** - 86:23, 199:14
**honest** - 8:15, 18:1, 23:5,

23:11, 62:19, 90:22, 90:25, 97:7, 116:16, 116:19, 129:10, 209:14
**honestly** - 24:20, 86:6, 161:10
**honesty** - 88:12, 133:7
**Honor** - 6:17, 17:13, 49:1, 60:7, 61:25, 111:9, 111:14, 112:6, 137:5, 151:4, 164:19, 186:21, 190:14, 201:13
**Honorable** - 1:22
**hooked** - 167:8
**hope** - 18:8, 94:16, 190:19, 196:7
**Hope** - 191:11
**horrible** - 185:1, 212:4, 223:3, 223:4, 241:19
**horse** - 228:6
**hour** - 4:11, 19:21, 19:22, 114:15, 191:15
**hours** - 206:23, 206:24
**house** - 11:1
**Houston** - 1:23, 2:6, 2:13, 2:16, 9:10, 13:16, 181:17, 191:22, 220:7, 250:25
**human** - 27:18, 40:2, 46:12, 81:3, 121:7, 172:1, 182:18, 232:12, 240:24
**hundred** - 24:13
**hurt** - 100:16
**hurting** - 74:18, 179:24
**husband** - 26:20, 54:19, 120:3, 168:14, 169:8, 169:11, 192:12, 214:6, 244:18
**hydraulic** - 219:8
**hypothetical** - 33:25, 34:12, 54:3, 54:8, 80:2, 106:7, 160:1, 187:21, 188:5, 188:11, 188:18, 188:20, 206:19, 207:20
**hypothetically** - 34:10, 96:14, 106:1, 108:9, 177:24, 181:7, 194:9, 205:5
**hypotheticals** - 33:14, 37:22, 53:23, 97:15

## I

**I-wonder** - 40:14
**idea** - 22:12, 149:2, 169:10, 209:17
**ideally** - 28:12
**ideas** - 182:12
**identify** - 51:21, 75:15
**identity** - 205:6
**illegal** - 233:24
**illness** - 82:23, 83:13, 83:14, 83:17, 185:6, 185:17
**imagine** - 15:17, 83:20, 86:24, 205:23, 208:16, 208:22, 209:8, 209:16
**immediate** - 26:25
**immediately** - 75:13, 213:24
**impact** - 90:10, 91:10, 192:6
**impartial** - 5:5, 8:9, 12:21, 20:14, 61:15, 63:15, 92:3, 115:10, 164:9, 166:7, 217:18, 221:2
**implies** - 199:17
**important** - 21:24, 22:2, 48:12, 99:19, 128:6, 193:13, 198:23, 218:18, 237:25, 244:11, 244:25
**impossible** - 39:7, 39:17
**imprisonment** - 199:10
**improper** - 97:10, 201:14

**Improved** - 227:20
**inbred** - 237:8
**incarcerate** - 222:5
**incarcerated** - 227:6
**incarceration** - 223:3,
228:19, 228:23
**incest** - 225:17
**incidents** - 235:25
**inclined** - 153:11
**include** - 45:11, 46:1,
160:15
**included** - 26:14, 250:9
**including** - 213:19,
213:22, 214:2
**incomplete** - 39:13
**independent** - 183:15
**independently** - 76:22,
81:6, 182:5, 182:7
**Index** - 1:21
**indicate** - 87:13
**indicating** - 98:18, 121:24
**indication** - 209:21
**indicator** - 106:16
**indicted** - 152:9
**indictment** - 15:4, 73:3,
171:13, 239:21
**individual** - 4:8, 10:21,
19:18, 28:17, 28:18, 96:4,
151:23, 180:23, 193:9,
217:11, 222:23, 232:10,
235:18, 235:19
**Individual** - 1:4
**individual's** - 12:9
**individually** - 76:22,
114:13, 176:21, 176:23,
193:11
**individuals** - 188:3, 234:2
**industry** - 9:17
**inflicted** - 211:3
**informal** - 8:3, 20:6
**information** - 7:22, 14:9,
16:3, 17:5, 21:25, 58:18,
87:18, 200:8, 201:19,
201:20, 213:24, 213:25,
248:13
**informative** - 168:5
**inmates** - 45:12, 78:20,
181:18
**innocence** - 52:3, 52:10,
52:17, 53:1, 72:6, 93:2,
93:19, 93:23, 97:20, 132:21,
150:18, 151:22, 152:5,
152:10, 152:15, 152:20,
153:12, 153:16, 153:17,
170:19, 170:22, 195:15,
203:4, 203:21, 243:7,
243:18
**innocent** - 73:14, 133:4,
136:3, 136:7, 139:10, 141:4,
141:8, 146:16, 148:16,
151:23, 243:13
**inside** - 130:15, 136:20
**insight** - 14:6, 165:14,
184:21
**instance** - 30:2, 42:22,
219:13
**instead** - 221:20
**instinct** - 172:1
**instruct** - 41:21, 76:24
**instruction** - 174:20
**instructions** - 18:5,
111:21, 147:17, 172:17,
215:10, 248:17
**instrument** - 16:4, 36:17,
36:23, 234:18
**insulting** - 179:24
**insurance** - 181:3
**intelligent** - 226:19
**intend** - 160:16, 160:17,
233:8

**intended** - 46:11, 56:1,
56:2, 56:3, 56:19, 57:5,
81:1, 108:23, 182:15,
183:11
**intense** - 63:10
**intent** - 11:7, 11:10
**intention** - 159:10
**intentionally** - 94:14
**interest** - 10:2
**interested** - 18:9, 248:15
**interesting** - 43:22, 64:4,
67:8, 67:16
**interfere** - 130:12, 167:20
**interfered** - 38:17
**intern** - 3:9, 7:7, 62:15,
165:9
**Internet** - 69:21, 70:19,
70:21
**interpret** - 44:4
**Interpreters** - 2:21
**interrupt** - 237:19
**interrupting** - 87:11
**intervention** - 228:20
**intimately** - 16:15
**intimidated** - 143:20
**intimidating** - 138:6
**intimidation** - 149:15
**introduce** - 53:4
**introduced** - 86:17
**intrust** - 240:25
**inverted** - 199:7, 199:8
**investigations** - 65:4
**involuntarily** - 7:1
**involved** - 7:18, 9:12, 18:9,
58:16, 65:3, 82:7, 84:3,
87:6, 111:18, 129:6, 162:4,
166:1, 168:6, 184:11,
202:15, 218:22
**lsd** - 166:11
**isolation** - 240:19
**issue** - 8:6, 32:5, 46:4,
47:3, 54:9, 55:25, 56:2,
77:9, 77:11, 80:17, 105:7,
144:23, 144:24, 169:8,
177:19, 178:18, 178:20,
178:24, 181:25, 189:20
**Issue** - 55:24, 77:8,
108:16, 108:21, 178:17,
181:11, 187:2, 210:3,
210:15
**issues** - 16:16, 23:22,
27:16, 32:20, 44:10, 46:19,
47:2, 51:8, 56:5, 76:18,
77:8, 121:3, 134:18, 176:14,
177:18, 178:5, 178:6,
207:11, 232:5
**item** - 69:12
**items** - 15:6, 73:5, 171:14
**itself** - 14:2, 16:5, 29:19,
169:13, 184:2

**J**

**job** - 14:18, 87:22, 152:7,
167:2, 174:10, 195:11,
207:13, 219:21, 220:6,
222:22, 247:2
**Johnson** - 13:20, 16:14
**join** - 59:12
**Judge** - 1:23, 4:24, 8:1, 8:8,
13:8, 13:10, 14:24, 15:3,
17:6, 17:14, 20:23, 25:5,
31:8, 32:11, 41:21, 42:3,
44:9, 52:4, 58:4, 59:9,
62:18, 63:20, 68:14, 73:2,
73:12, 75:18, 76:12, 76:24,
77:17, 80:23, 81:19, 86:16,
98:11, 103:24, 110:12,
110:24, 111:4, 115:21,
121:4, 124:13, 131:4, 133:1,

140:1, 140:20, 141:19,
147:17, 158:13, 158:20,
159:15, 160:13, 165:3,
165:12, 165:17, 167:25,
168:19, 170:17, 171:5,
171:13, 174:9, 174:13,
176:8, 179:11, 181:24,
182:13, 196:13, 202:6,
212:21, 213:7, 218:8, 232:6,
239:1, 248:24
**judge** - 13:3, 14:15, 16:20,
118:15, 144:1, 175:13,
247:17, 248:25
**Judge's** - 22:10, 41:9
**judge's** - 214:22
**judges** - 214:22
**judging** - 15:11, 174:11
**judgment** - 220:21, 231:11
**Judicial** - 1:12
**Judy** - 226:15
**July** - 214:8
**June** - 1:20, 1:3, 3:4, 4:3,
6:1, 216:11
**junkie** - 167:10
**juries** - 195:14
**Juror** - 1:16, 2:9, 3:10,
3:13, 3:25, 6:10, 17:11,
19:10, 58:2, 59:8, 59:13,
60:10, 110:19, 110:21,
111:5, 112:20, 113:1, 114:5,
160:12, 163:8, 213:2, 213:4,
215:16, 216:6, 248:2
**juror** - 3:18, 8:11, 14:14,
17:22, 18:23, 19:1, 39:21,
41:21, 48:22, 57:19, 58:14,
59:17, 60:2, 63:25, 71:7,
71:11, 72:12, 81:11, 86:10,
96:4, 99:24, 104:10, 110:12,
111:12, 113:9, 119:14,
129:11, 134:8, 137:2,
147:16, 151:4, 159:4, 159:5,
159:10, 159:12, 159:16,
159:22, 159:25, 161:20,
161:24, 163:2, 172:5, 187:4,
190:12, 202:11, 203:21,
203:22, 203:23, 204:2,
204:9, 204:23, 204:24,
205:8, 212:1, 212:20,
213:12, 213:17, 213:20,
214:13, 214:16, 214:24,
215:20, 221:14, 234:14,
242:5, 243:20, 247:20,
248:9
**Jurors** - 1:4, 1:5
**jurors** - 3:5, 8:9, 14:20,
31:21, 76:13, 93:6, 96:16,
96:18, 106:1, 165:6, 166:7,
175:21, 176:9, 195:18,
204:12, 208:5, 211:8, 214:2,
214:20, 229:1
**jury** - 3:1, 5:1, 7:8, 7:10,
7:14, 17:9, 18:7, 20:10,
21:12, 21:13, 21:20, 22:12,
22:20, 23:1, 23:3, 23:6,
23:15, 35:15, 36:22, 39:12,
40:3, 44:8, 59:6, 61:11,
62:16, 66:7, 66:13, 76:2,
79:25, 80:19, 81:11, 83:16,
85:19, 88:6, 90:13, 90:14,
92:25, 93:2, 93:3, 93:12,
93:18, 96:4, 96:14, 104:17,
104:18, 104:19, 104:21,
105:3, 105:6, 105:8, 105:15,
109:5, 109:10, 114:24,
115:6, 142:2, 151:19, 164:5,
165:20, 165:21, 165:23,
169:24, 170:21, 173:14,
174:10, 175:10, 176:8,
176:24, 177:17, 177:25,
178:18, 181:21, 182:9,

182:25, 183:6, 184:4,
185:18, 186:14, 189:8,
192:13, 192:20, 193:3,
193:7, 193:19, 194:10,
195:15, 195:16, 195:22,
203:17, 203:23, 204:9,
204:14, 204:16, 204:20,
205:14, 209:13, 211:3,
212:3, 214:4, 217:14,
218:17, 221:2, 230:22,
231:17, 236:15, 240:8,
241:15, 242:23, 246:14
**justice** - 12:1, 12:10, 72:3,
225:9, 226:5, 227:14,
228:18
**Justin** - 2:4, 3:8, 7:2, 62:9,
116:6, 121:1, 165:3, 210:16,
239:21
**juvenile** - 70:24, 241:13,
241:17, 241:18

**K**

**kangaroos** - 49:14
**Keep** - 156:2
**keep** - 9:25, 24:19, 88:22,
101:9, 101:23, 130:20,
189:8, 198:14, 200:21,
222:6
**Keith** - 1:17, 1:24, 215:17,
215:19, 216:5, 248:2
**Kellogg** - 220:8
**Ken** - 226:15
**kept** - 89:9
**key** - 44:16
**kid** - 139:11
**kidding** - 88:9
**kidnapping** - 140:9, 169:1,
172:13, 172:14, 172:18,
172:21, 207:25, 208:2
**kids** - 88:23, 167:12,
168:14, 184:24, 185:12,
186:6, 191:12, 225:3
**Kill** - 187:15
**kill** - 26:4, 26:7, 46:11,
56:19, 81:1
**killed** - 105:21, 108:23,
108:24, 126:14, 181:3
**Killing** - 188:3
**killing** - 123:7, 125:8,
168:21, 168:22, 208:3
**kills** - 188:1
**kind** - 7:19, 13:7, 16:12,
22:8, 22:18, 27:5, 28:12,
32:8, 38:22, 43:20, 46:4,
48:3, 50:11, 52:2, 54:17,
63:15, 83:2, 89:3, 89:9,
98:5, 116:13, 117:7, 118:10,
124:16, 135:5, 135:20,
138:6, 138:13, 140:2,
140:14, 142:2, 144:21,
155:7, 165:24, 168:1,
179:20, 184:2, 184:14,
189:18, 198:19, 199:19,
199:20, 200:24, 220:10,
222:15, 237:19, 245:19
**kinds** - 23:19, 25:5, 25:10,
26:8, 38:4, 38:18, 41:6,
232:15
**king** - 229:15
**knife** - 46:9
**knowing** - 12:22, 44:3,
51:10, 72:2, 101:2, 106:5,
121:6, 131:24, 194:19,
230:8, 231:22
**knowledge** - 16:19, 17:5,
102:8, 138:23, 200:2
**known** - 14:11, 49:17,
94:17, 94:18
**knows** - 22:20, 201:15

# L

**Lab**- 94:22
**labor** - 222:22
**laid** - 140:2, 160:14, 176:14, 187:25
**Lake**- 66:22, 220:1
**Laporte**- 64:13, 64:18, 87:21, 89:13, 90:2, 94:19
**large** - 89:22, 166:17
**last** - 21:9, 36:6, 61:18, 63:23, 66:20, 68:15, 86:23, 108:4, 116:22, 157:10, 190:5, 192:9, 192:16, 192:21, 212:17, 217:22
**law** - 7:7, 20:3, 26:6, 30:9, 30:21, 30:22, 32:19, 36:1, 36:13, 38:23, 39:23, 41:12, 41:15, 45:17, 46:5, 55:12, 56:1, 62:15, 64:18, 65:24, 67:2, 67:5, 67:19, 67:21, 68:9, 68:10, 75:19, 79:5, 80:18, 82:1, 89:2, 90:11, 95:10, 95:24, 104:13, 104:16, 107:22, 107:25, 114:21, 118:18, 121:2, 128:18, 129:4, 129:12, 129:24, 130:1, 130:6, 133:3, 133:10, 133:19, 133:23, 134:1, 134:4, 135:24, 136:2, 136:16, 138:19, 138:20, 139:1, 141:9, 142:20, 147:14, 151:9, 151:12, 151:14, 151:18, 151:20, 152:6, 160:9, 160:14, 165:9, 167:11, 172:18, 174:1, 175:3, 175:11, 177:5, 180:14, 181:25, 182:12, 202:2, 202:8, 202:11, 203:11, 203:16, 209:23, 221:16, 235:22, 239:24, 241:2, 242:13, 247:8
**law-abiding** - 128:18, 151:14
**laws** - 79:7, 79:9, 127:15, 127:16, 177:12, 198:6, 201:25, 202:7, 202:12, 202:14, 216:20, 229:16, 234:23
**lawyer** - 4:9, 4:21, 19:19, 60:18, 83:20, 84:1, 84:5, 114:14, 139:1, 163:13, 185:18, 193:22, 193:23, 194:5
**lawyers** - 3:6, 6:5, 20:5, 61:20, 73:22, 114:13, 118:2, 118:3, 144:1, 217:4
**lead** - 27:17, 37:25, 54:11, 85:13, 131:19, 170:12, 183:14, 233:16, 247:13
**leads** - 27:16, 85:11, 120:18, 121:2, 121:3, 121:4, 130:7, 130:8, 131:17, 131:24, 170:6, 170:9, 181:22, 183:1, 232:18
**lean** - 133:16, 152:18
**leaned** - 152:13
**leaning** - 153:4, 153:12
**learn** - 16:25, 83:24, 84:2, 125:17, 172:8, 176:4, 184:9, 217:6
**learned** - 80:14, 83:1, 88:10, 184:7
**learning** - 168:4
**least** - 12:8, 13:22, 34:23, 106:23, 195:23, 199:21, 209:25
**leave** - 18:3, 33:7, 34:18, 34:21, 96:3, 215:9

**leaves** - 33:6
**led** - 12:10, 86:1, 173:18, 233:11, 241:18
**left** - 33:18, 34:16, 70:22, 112:13, 176:9
**legal** - 42:1, 218:19
**legally** - 224:19
**Legislature**- 25:21, 229:16
**legitimate** - 123:17, 123:18
**length** - 23:20
**lenient** - 198:6
**Leroy**- 60:9, 111:6
**Less**- 191:18
**less** - 44:1, 44:2, 77:19, 82:11, 104:1, 106:12, 132:13, 157:6, 183:19, 242:11
**lethal** - 240:25
**level** - 168:20, 180:8, 238:19, 239:4
**Lex**- 219:13
**liaison** - 166:16
**liberal** - 23:19
**lie** - 90:19
**lies** - 171:6
**Life**- 126:3
**life** - 12:7, 21:21, 25:17, 30:25, 31:4, 45:19, 46:12, 48:2, 50:17, 50:22, 50:24, 51:9, 54:11, 57:10, 79:3, 79:12, 79:13, 81:3, 82:12, 82:15, 84:4, 87:20, 87:21, 89:10, 91:9, 97:19, 99:4, 99:24, 99:25, 100:5, 100:22, 102:6, 103:5, 109:15, 120:1, 122:6, 122:14, 124:9, 126:12, 139:12, 177:4, 177:5, 177:7, 177:16, 177:19, 182:18, 183:21, 184:15, 186:18, 190:22, 191:23, 192:5, 198:24, 199:9, 199:11, 199:24, 200:2, 202:3, 202:15, 202:17, 202:20, 203:1, 210:12, 212:6, 212:11, 222:14, 222:16, 222:25, 238:13, 241:18, 241:19
**life-long** - 91:9
**light** - 14:3, 47:6, 47:12, 48:15, 84:13, 84:15, 186:16, 186:17
**lightly** - 24:1, 24:11
**lights** - 235:11
**likely** - 77:25, 179:7, 204:21, 204:23, 214:17
**limit** - 192:1, 205:12
**limited** - 213:22
**line** - 26:7, 74:3, 168:22, 186:9, 215:1, 246:1, 246:18
**lingering** - 81:23
**liquor** - 63:11, 66:9
**list** - 26:14, 32:25, 239:16
**listed** - 15:4, 25:21, 45:9, 113:22, 244:13
**listen** - 35:16, 71:20, 96:19, 118:19, 119:23, 141:11, 147:21, 150:25, 174:20, 203:25, 213:17
**listened** - 19:13, 96:18, 203:25, 204:1
**listening** - 51:16, 100:14
**live** - 78:19, 103:6, 137:24, 191:16, 191:21, 200:22, 202:23, 234:20
**Lived**- 87:21
**lived** - 10:18, 103:7, 137:24
**living** - 27:18, 41:3, 121:6, 232:12

**local** - 152:2
**locally** - 69:23
**lock** - 222:12
**locked** - 110:15
**locker** - 94:21
**logical** - 199:18
**Look**- 131:12, 232:2
**look** - 11:7, 13:2, 27:11, 28:17, 32:13, 40:6, 40:15, 47:10, 47:13, 48:11, 51:13, 57:8, 79:9, 82:1, 82:2, 82:3, 82:6, 90:23, 98:16, 100:20, 110:3, 118:21, 120:21, 121:19, 130:24, 148:10, 152:24, 170:5, 175:11, 176:22, 184:2, 185:20, 187:20, 196:13, 210:8, 211:3, 211:4, 229:5, 230:6, 231:23, 238:16, 239:18, 244:14
**looked** - 28:11, 224:17, 244:17, 244:18, 246:21
**looking** - 22:6, 26:16, 32:11, 51:20, 51:23, 90:20, 109:14, 124:7, 138:10, 159:3, 180:1, 180:13, 246:5
**Looking**- 86:3
**looks** - 138:13, 244:17
**Lopez**- 1:12, 2:5, 113:8, 113:22, 113:24, 113:25, 114:1, 114:3, 137:12, 151:7, 160:12, 161:22
**lose** - 93:3, 93:8, 195:13
**lost** - 38:6, 38:12, 40:1, 105:11
**loud** - 98:20
**Louisiana**- 2:15, 220:2
**Love**- 248:24
**love** - 43:17, 48:8, 97:25, 121:10, 232:15
**lower** - 242:6
**luck** - 162:13, 215:13
**lucky** - 7:4, 62:11
**Lx-47**- 219:13

# M

**Ma'am** - 226:10
**ma'am** - 17:17, 59:2, 59:15, 60:12, 60:14, 60:16, 60:20, 60:24, 61:5, 61:13, 61:16, 61:19, 111:16, 111:23, 113:4, 117:10, 162:13, 216:22, 219:3, 219:24, 220:14, 221:1, 223:7, 229:9, 231:21, 232:11, 235:24, 237:17, 239:7, 240:2, 240:7, 241:6, 243:19
**Madrid** - 2:14, 3:7, 48:25, 49:1, 49:3, 53:4, 57:19, 57:20, 86:20, 137:4, 137:5, 137:7, 137:10, 137:12, 137:14, 137:16, 145:25, 146:1, 149:24, 151:4, 190:20, 243:22, 243:23, 243:25, 244:3, 247:20, 247:21
**Magee** - 1:22
**maiden** - 114:2
**main** - 32:20, 174:10
**makeup** - 222:1
**Man** - 180:21, 222:1
**man** - 122:2, 124:8, 232:18
**man's** - 187:23
**manage** - 88:22
**manager** - 229:11
**managing** - 219:1
**mandated** - 109:7, 210:24
**mandatory** - 202:19

**manner** - 22:18, 36:8, 36:17, 36:24, 38:1, 38:23, 130:9, 179:25
**margins** - 24:9
**Marilu** - 2:20
**Mario** - 2:14, 3:7, 53:4, 86:20, 137:14, 190:20, 244:3
**mark** - 238:16
**Marketing** - 9:14
**markings** - 6:9
**marriage** - 88:22, 224:11, 224:12
**married** - 113:25, 120:3, 224:8, 249:2
**Mary** - 250:4, 250:22
**Massachusetts** - 244:15, 245:2
**massive** - 123:1
**material** - 163:20, 205:2
**matter** - 7:19, 21:5, 95:12, 122:10, 123:8, 206:1, 218:15, 226:20, 228:1, 228:18, 234:23
**matters** - 119:25
**maturity** - 228:12
**Maura** - 1:8, 2:3, 18:23, 18:25, 19:10, 58:2
**Mcneese** - 220:1
**mean** - 11:10, 14:17, 34:4, 37:11, 38:5, 42:18, 47:18, 49:21, 50:15, 51:15, 51:18, 64:3, 69:18, 70:19, 71:21, 75:3, 75:6, 77:20, 78:7, 78:17, 78:19, 87:5, 88:8, 89:6, 89:8, 91:8, 91:15, 92:2, 92:10, 92:14, 94:17, 95:10, 95:23, 97:5, 100:12, 100:14, 107:2, 109:21, 109:24, 122:4, 122:5, 123:7, 124:11, 125:4, 130:2, 134:14, 138:25, 145:16, 147:20, 148:21, 152:17, 161:5, 179:3, 181:14, 181:16, 181:17, 185:20, 194:2, 199:10, 199:12, 201:2, 202:5, 204:12, 205:25, 206:23, 208:7, 208:22, 209:20, 209:22, 211:20, 212:8, 219:16, 221:16, 232:9, 235:1, 235:9, 235:11, 236:20, 237:5, 245:25
**means** - 17:19, 22:13, 36:8, 36:18, 36:24, 38:1, 38:24, 39:7, 53:24, 95:16, 104:21
**meant** - 37:3, 54:1, 221:24
**media** - 9:15, 213:19, 213:23
**medical** - 13:15, 15:18
**meet** - 101:1, 155:20, 160:25, 161:7
**members** - 26:18, 108:20, 119:10, 127:23, 230:17
**memory** - 63:8, 121:21, 191:20
**mental** - 82:23, 83:13, 83:14, 83:17, 185:6, 185:16
**mentioned** - 65:6, 66:7, 152:12, 241:9
**merely** - 234:18
**merited** - 24:11
**merits** - 28:1
**mess** - 88:11, 94:14
**message** - 81:18, 112:13
**met** - 10:20, 40:11, 65:18, 77:11, 86:19, 160:2, 172:21, 172:22, 175:23, 178:20
**method** - 44:4

**Metro** - 248:20
**microphone** - 113:18
**middle** - 220:11
**night** - 8:12, 11:13, 15:12, 15:23, 15:24, 19:23, 20:4, 25:6, 40:3, 40:20, 40:22, 41:23, 44:8, 63:25, 68:24, 72:23, 76:9, 82:21, 83:16, 84:1, 84:2, 84:17, 88:2, 90:11, 96:21, 97:19, 100:2, 110:25, 119:13, 119:15, 121:9, 121:10, 122:12, 149:2, 149:16, 173:19, 174:17, 174:19, 175:3, 176:2, 176:4, 179:19, 180:7, 180:18, 181:8, 184:7, 184:9, 184:10, 185:6, 185:17, 185:21, 188:23, 195:22, 199:12, 199:17, 202:23, 204:6, 204:9, 204:25, 210:9, 210:10, 210:12, 216:14, 227:23, 236:14, 245:13
**military** - 226:11, 232:21, 246:1, 246:3, 246:4
**mind** - 38:3, 78:11, 96:17, 99:20, 117:2, 117:21, 118:16, 118:24, 133:11, 136:12, 141:16, 141:17, 155:19, 169:5, 179:18, 188:22, 189:9, 203:18, 206:7, 206:11, 206:12, 209:12, 227:24, 227:25
**minded** - 118:19
**Mindel** - 228:8
**Mindless** - 167:12
**mine** - 206:17
**Minkle** - 226:15
**minor** - 69:21
**minute** - 59:4, 76:1, 93:22, 158:6, 158:10, 182:24
**minutes** - 21:14, 42:2, 58:5, 60:25, 70:22, 70:23, 104:1, 104:2, 162:17, 163:15, 186:20, 190:20, 210:17, 210:19, 216:14, 238:24
**Miron** - 248:24
**misbehaviors** - 191:3
**misconduct** - 166:15
**misdemeanor** - 65:25
**misdemeanors** - 74:12
**misplace** - 94:13
**missed** - 110:4
**missing** - 40:1, 94:18, 112:11
**mistake** - 88:8, 99:8, 99:9
**mistakes** - 92:8, 92:11
**misunderstanding** - 160:9
**mitigated** - 109:15
**mitigating** - 47:18, 47:22, 48:1, 48:3, 48:7, 48:9, 51:7, 52:13, 57:9, 82:9, 82:14, 82:18, 82:22, 83:17, 83:21, 84:1, 84:5, 84:10, 84:12, 87:4, 107:15, 183:18, 184:14, 184:18, 185:5, 185:17, 185:19, 185:22, 185:24, 186:2
**mitigation** - 47:4, 47:5, 47:17, 48:13, 57:2, 107:16, 107:19, 107:21, 108:6, 109:8, 189:19, 211:19, 247:10
**mix** - 134:15
**mob** - 221:20
**modern** - 221:23
**molested** - 225:17
**mom** - 26:24
**moment** - 134:11, 137:10, 199:14, 203:6, 207:11,

212:23
**moments** - 212:25
**Monday** - 4:4, 19:14, 52:4, 60:13, 68:15, 74:8, 77:18, 114:9, 118:14, 129:25, 139:25, 165:18, 171:13, 174:10, 181:24, 214:8, 215:5, 216:11, 232:7
**money** - 100:25, 181:3, 200:4, 200:17, 222:19
**Montana** - 191:16, 191:17
**month** - 66:20, 66:24
**months** - 89:18, 191:18
**moral** - 4:25, 8:2, 20:9, 47:14, 61:9, 82:6, 115:5, 164:5, 184:10, 217:13
**morning** - 3:22, 6:20, 6:22, 14:4, 19:5, 60:6, 60:7, 62:3, 62:4, 62:5, 115:24, 115:25, 137:8, 137:9, 137:12, 137:13, 137:15, 192:22
**Most** - 32:4, 75:7, 138:17
**most** - 8:8, 21:17, 33:4, 50:11, 52:15, 63:14, 74:15, 87:21, 90:25, 99:19, 101:24, 159:25, 166:7, 191:22, 198:23, 222:7, 225:12, 228:11, 228:17
**mother** - 229:25, 231:5, 232:14
**mothers** - 43:19, 229:25
**motion** - 158:4, 158:12, 158:14, 158:16, 158:18, 159:1, 159:4, 159:18, 159:19, 160:11, 161:18
**motive** - 171:23, 240:3, 240:6
**mountain** - 43:1
**mouth** - 90:7, 143:19, 175:13
**move** - 9:10, 76:4, 88:25, 175:24, 176:24, 177:21, 181:23, 183:2, 210:15, 236:13
**moved** - 10:20
**movie** - 187:17, 207:19, 208:9, 209:18
**moving** - 98:6, 178:3
**multiple** - 12:6
**municipal** - 74:12
**murder** - 7:17, 11:5, 12:22, 12:23, 15:15, 15:16, 15:22, 25:13, 25:15, 25:16, 25:17, 25:24, 26:2, 31:1, 32:10, 36:11, 37:12, 37:13, 50:23, 52:18, 54:8, 54:25, 55:2, 55:18, 55:19, 72:17, 73:4, 76:12, 78:5, 78:25, 80:1, 87:14, 90:14, 92:17, 96:14, 99:5, 100:23, 105:16, 105:23, 106:4, 106:5, 106:6, 106:21, 124:9, 124:18, 124:21, 125:7, 125:16, 140:7, 140:11, 166:1, 168:2, 168:8, 168:9, 168:10, 168:20, 168:24, 171:9, 171:12, 173:14, 173:23, 176:7, 177:2, 179:13, 180:21, 181:5, 186:12, 187:7, 188:2, 188:9, 188:25, 189:24, 202:3, 207:22, 207:24, 207:25, 208:1, 208:2, 208:6, 208:8, 210:2, 210:11, 211:2, 222:17, 232:2, 239:6, 239:20
**murdered** - 10:4
**murders** - 44:24
**must** - 152:4, 213:17, 231:4
**Mw** - 220:8

**nail** - 244:22
**name** - 7:2, 62:9, 65:9, 90:24, 113:19, 114:2, 116:6, 163:6, 165:3, 244:3
**Nancee** - 1:15, 2:8, 113:3, 163:1, 163:6, 190:23, 213:2
**Nassau** - 67:3
**Natalie** - 2:3, 3:8, 7:2, 8:7, 15:1, 62:10, 72:14, 78:3, 116:6, 165:4, 171:7
**natural** - 224:23, 225:4
**naturally** - 16:25, 68:11, 174:3
**Naturally** - 71:15, 171:18, 173:10
**nature** - 11:12, 222:2
**Nature** - 49:10
**near** - 229:23
**necessarily** - 11:11, 13:25, 29:7, 34:4, 36:12, 78:4, 80:24, 148:22, 172:6, 172:9, 179:3, 179:13, 180:8, 182:14
**necessary** - 221:23
**neck** - 83:2
**need** - 4:20, 6:5, 18:13, 18:19, 20:7, 22:7, 39:17, 44:8, 58:23, 58:24, 59:4, 60:8, 61:6, 61:8, 61:21, 89:8, 90:10, 96:3, 98:15, 110:2, 110:5, 111:25, 112:5, 114:23, 115:16, 117:22, 118:12, 118:15, 121:16, 122:2, 129:10, 143:5, 151:18, 153:8, 154:21, 154:24, 158:6, 161:23, 162:9, 162:16, 162:19, 164:15, 199:8, 215:9, 216:5, 218:3, 230:3, 234:24, 248:19, 248:21
**needed** - 74:14, 80:11, 230:2, 245:17
**needing** - 120:12
**needs** - 23:25, 28:18, 29:25, 91:18, 120:5, 122:24, 123:5, 123:8, 123:15, 146:16, 239:14
**negatively** - 99:23, 118:25
**neighbor** - 10:20, 11:4, 54:20
**nerves** - 75:13
**nervous** - 22:11, 117:13, 149:6
**nervousness** - 149:15
**never** - 23:22, 37:2, 46:14, 48:2, 84:3, 91:16, 125:3, 125:17, 150:2, 154:7, 160:14, 161:4, 161:7, 165:22, 221:4, 244:20
**Never** - 91:21, 119:5
**New** - 9:7, 10:12, 224:16, 228:19
**new** - 26:5, 26:6, 161:8, 167:9, 168:3, 168:4, 176:1, 178:4
**next** - 18:22, 67:21, 108:9, 112:21, 207:22, 235:12
**nice** - 165:14, 206:1
**night** - 10:19, 11:15, 88:20
**nine** - 9:22, 69:16, 238:18
**Nobody** - 119:17
**nobody** - 26:25, 36:7, 92:14, 143:24, 144:5
**None** - 91:12
**none** - 35:12, 103:20
**norm** - 21:17
**normal** - 103:8, 193:7

**normally** - 88:19
**Nothing** - 17:22, 192:5
**nothing** - 10:23, 12:7, 66:4, 98:2, 107:14, 154:9, 211:20
**notice** - 171:20, 234:9
**noticed** - 221:3
**noting** - 128:24
**number** - 79:15, 82:19, 82:21, 99:2, 99:21, 112:13, 132:19, 173:4, 177:8, 197:8, 197:19, 198:24, 215:6
**Number** - 90:1
**numbered** - 1:22, 250:11
**numbers** - 215:5

**oath** - 4:15, 61:2, 104:22, 129:11, 130:6, 153:20, 163:22, 216:18, 234:14, 234:15
**Obel** - 1:6, 3:6, 4:1, 17:15, 19:11, 27:12, 53:7, 59:11, 60:1, 85:14, 85:22, 86:19, 112:25, 114:7, 120:22, 137:16, 141:7, 163:9, 170:3, 190:21, 213:13, 216:7, 231:24, 233:16, 244:4, 246:22
**object** - 131:4
**objection** - 34:1, 131:9
**Objection** - 201:13
**objections** - 6:11, 112:22, 112:23
**objective** - 122:16, 231:1
**obligation** - 218:18
**observe** - 166:20
**observed** - 97:23
**obvious** - 116:24
**obviously** - 5:22, 16:1, 55:2, 64:8, 83:12, 144:13, 171:20, 175:8, 175:20, 176:2, 192:23, 236:16
**Obviously** - 7:21, 11:21, 72:11, 128:6
**occasions** - 75:2
**occurred** - 11:13, 15:14, 177:12, 195:21, 202:1, 250:11
**offend** - 8:14
**offense** - 34:2, 47:11, 79:8, 82:3, 82:8, 84:15, 171:2, 173:2, 175:6, 177:11, 180:13, 180:14, 184:6, 186:17, 202:3
**offenses** - 15:13, 32:2, 122:17, 169:3, 180:8, 180:18, 181:7
**offer** - 41:6
**offers** - 203:16
**office** - 3:9, 13:15, 65:12, 65:15, 149:5, 245:16
**officer** - 26:7, 66:16, 66:22, 67:20, 69:6, 69:8, 91:10, 132:5, 132:6, 132:11, 168:21, 174:18, 240:20, 240:22
**officer's** - 240:15
**officers** - 35:13, 65:1, 65:22, 66:2, 67:13, 68:11, 68:23, 69:4, 89:14, 89:16, 90:3, 92:8, 175:3, 175:6
**Official** - 250:4, 250:19, 250:23
**official** - 214:1
**officially** - 66:20
**often** - 169:8, 230:7
**old** - 26:4, 39:9, 63:5, 69:15, 124:8, 225:19, 228:5

**oldest** - 224:15, 224:21, 224:23
**Once** - 157:13, 234:15
**once** - 55:13, 65:18, 125:15, 126:13, 139:8, 152:23, 154:11, 162:19, 175:20, 187:4, 234:14
**One** - 4:9, 19:19, 36:16, 37:19, 69:12, 105:14, 110:24, 121:18, 124:6, 139:15, 149:1, 183:25, 216:12, 220:9, 244:10, 246:2, 247:10
**one** - 6:5, 7:4, 8:6, 10:2, 10:25, 11:4, 13:8, 15:6, 20:8, 24:4, 24:25, 26:5, 26:6, 28:24, 31:14, 33:22, 34:23, 36:16, 37:12, 44:14, 50:16, 50:20, 51:18, 54:13, 60:18, 61:21, 62:11, 62:23, 63:10, 66:21, 67:14, 67:18, 69:15, 69:19, 70:18, 70:20, 70:21, 71:16, 71:21, 81:18, 83:11, 87:24, 87:25, 91:24, 92:25, 93:2, 94:6, 97:5, 99:22, 100:5, 100:18, 101:23, 105:5, 109:25, 110:1, 117:9, 118:4, 121:20, 121:25, 122:25, 123:18, 125:14, 125:25, 127:7, 127:22, 129:7, 133:12, 135:14, 135:15, 137:10, 139:7, 143:6, 143:20, 144:2, 144:23, 149:25, 150:2, 152:12, 153:22, 154:16, 154:24, 157:2, 157:11, 163:13, 165:6, 166:5, 167:2, 167:6, 167:9, 167:16, 168:6, 171:14, 172:5, 174:12, 174:16, 176:20, 183:12, 187:3, 192:4, 192:19, 195:20, 196:25, 197:18, 198:11, 198:23, 203:13, 204:17, 207:3, 209:18, 210:9, 210:10, 211:12, 212:18, 219:17, 223:14, 224:13, 224:25, 230:9, 230:23, 234:10, 238:17, 238:18, 240:20, 245:11, 245:17, 246:20, 247:10
**one's** - 241:19
**one-on-one** - 62:23, 166:5
**one-time** - 210:9, 210:10
**ones** - 4:18, 7:3, 9:22, 25:21, 62:10, 62:11, 143:5, 144:13, 213:15, 223:14, 232:6
**Open** - 3:1, 17:9, 59:6
**open** - 8:15, 62:19, 118:19, 189:9, 189:10, 217:8, 250:12
**open-minded** - 118:19
**opinion** - 51:25, 53:10, 70:23, 116:12, 117:17, 120:10, 158:15, 160:8, 223:19
**opinions** - 51:23, 169:12, 229:4
**opportunity** - 4:10, 11:19, 19:20, 154:5, 161:9, 163:14, 166:4, 206:7, 211:24, 212:3, 216:13, 244:8
**opposed** - 197:4, 200:5, 220:11, 230:10
**opposite** - 126:22, 143:17, 145:10
**option** - 36:16, 46:7, 150:8, 155:16, 169:15, 169:17, 170:21, 200:6
**options** - 36:16

**orally** - 111:21, 248:18
**order** - 59:8, 59:14, 80:2, 113:2, 155:1, 186:18
**ordered** - 233:25
**orders** - 233:24
**ordinary** - 25:16
**Ordinary** - 25:16
**organization** - 8:25
**originally** - 209:15, 209:17, 220:2
**otherwise** - 38:24, 49:17, 221:19, 248:21
**ought** - 25:10, 97:19, 98:1, 109:15, 193:2, 193:22, 202:10
**outcome** - 228:16
**outlets** - 213:19
**outside** - 46:2, 106:15, 119:20, 171:3, 187:25, 228:23
**overcome** - 211:19, 211:20
**oversee** - 65:3
**oversight** - 224:4
**overturned** - 92:19
**own** - 29:23, 96:17, 114:23, 124:9, 147:22, 151:16, 172:3, 175:13, 180:24, 181:3, 203:18, 229:4

## P

**page** - 98:13, 121:23, 132:7, 196:14, 196:15, 198:13
**Page** - 98:19, 121:25, 122:15, 124:7, 132:8, 196:15, 196:16, 196:17, 198:16, 223:12
**Page/vol** - 1:3, 1:6, 1:22
**paid** - 102:18, 224:19, 240:24, 250:18
**paid/will** - 250:18
**panel** - 3:2, 21:15, 114:6, 165:22, 192:16, 192:18, 192:21, 193:7
**parallels** - 234:6
**Pardon** - 210:18
**parental** - 43:14
**parents** - 88:18
**parking** - 248:10
**parole** - 45:19, 45:22, 70:12, 79:3, 79:12, 79:14, 82:12, 177:5, 177:7, 177:16, 183:21, 201:25, 202:5, 202:7, 202:12, 202:14, 202:16, 202:20
**Part** - 143:20, 190:24
**part** - 7:12, 26:5, 36:6, 41:17, 47:25, 89:16, 97:9, 97:11, 97:24, 99:19, 127:16, 139:14, 141:20, 142:13, 143:22, 143:23, 145:5, 145:15, 146:22, 146:25, 147:6, 149:5, 150:18, 150:23, 172:12, 185:7, 203:22, 224:5, 229:17, 230:4, 241:21
**participated** - 211:11
**participating** - 21:6, 218:16
**particular** - 12:19, 45:16, 117:14, 122:5, 122:13, 135:15, 189:16, 205:1, 221:14, 234:13
**particularly** - 202:15, 235:17
**parties** - 40:19, 40:21, 46:5, 56:1, 75:20, 80:18,

107:22, 107:25, 181:25, 182:12, 250:9, 250:15
**parts** - 72:4, 72:6, 170:18, 219:17
**party** - 41:8, 41:9, 41:24, 42:6, 42:15, 42:23, 56:16
**Pass** - 57:19, 110:12, 151:4, 247:20
**pass** - 18:14, 48:22, 58:24, 86:10, 112:4, 112:5, 137:2, 190:12, 212:20, 243:20
**passed** - 88:21
**passes** - 248:21
**past** - 10:3, 68:15, 69:20, 71:10, 106:16, 153:1, 209:22, 211:14, 247:8
**path** - 241:19
**Patricia** - 1:12, 2:5, 112:20, 113:1, 113:8, 113:19, 113:22, 114:2, 160:12
**Pause** - 18:21, 58:7, 59:18, 111:2, 137:11, 149:23
**pay** - 118:13, 124:9, 126:12, 222:6
**peers** - 22:12
**penalty** - 5:1, 7:17, 20:10, 21:10, 23:14, 23:23, 24:4, 25:6, 25:11, 26:9, 26:19, 27:1, 27:6, 27:17, 30:2, 30:3, 45:23, 46:15, 46:17, 53:17, 55:20, 61:11, 63:25, 76:16, 79:1, 79:2, 81:20, 82:11, 85:17, 86:25, 91:18, 101:4, 101:8, 101:25, 102:10, 102:11, 103:16, 105:19, 109:12, 115:6, 116:25, 117:17, 118:25, 119:3, 120:4, 120:17, 120:18, 121:5, 124:4, 124:22, 126:18, 127:8, 127:9, 127:16, 128:16, 129:3, 130:9, 131:19, 150:2, 150:3, 150:16, 156:10, 156:18, 164:6, 166:1, 168:16, 169:4, 169:9, 169:13, 169:25, 176:7, 176:11, 177:2, 177:3, 177:15, 183:14, 183:20, 184:16, 188:10, 188:12, 197:7, 199:12, 199:18, 199:25, 200:5, 200:10, 211:2, 211:6, 217:15, 229:17, 230:10, 230:12, 230:18, 238:6, 246:15, 247:14
**people** - 7:9, 7:10, 13:24, 22:3, 22:25, 23:4, 25:1, 28:18, 29:8, 29:16, 35:1, 35:5, 41:7, 41:12, 44:7, 44:25, 45:11, 46:2, 48:8, 49:6, 49:8, 50:11, 51:21, 52:15, 53:16, 54:24, 55:3, 55:16, 55:20, 71:10, 71:15, 75:7, 77:25, 78:21, 85:16, 89:12, 90:11, 91:1, 92:16, 94:20, 103:1, 103:3, 103:6, 104:25, 105:22, 106:15, 117:5, 117:11, 119:11, 119:22, 121:10, 124:9, 124:10, 125:8, 125:23, 128:15, 128:20, 133:8, 133:13, 138:8, 138:17, 143:21, 144:22, 147:10, 147:11, 151:13, 152:6, 152:8, 154:14, 168:23, 169:11, 169:20, 173:22, 173:25, 179:25, 194:4, 199:16, 201:5, 209:20, 214:21, 214:23, 217:3,

217:9, 218:17, 218:21, 218:22, 220:20, 221:8, 221:10, 221:17, 221:19, 221:25, 222:3, 222:4, 222:8, 222:11, 222:24, 228:6, 228:9, 228:11, 228:17, 228:20, 229:19, 230:2, 233:25, 235:6, 235:10, 235:17, 238:5, 238:8, 244:12, 244:22, 245:12, 245:14
**People** - 234:25
**people's** - 193:11, 235:18
**percent** - 24:13, 28:25, 30:6, 125:11, 127:2, 127:3, 152:21, 153:2, 233:23
**peremptory** - 111:4, 111:7, 248:5
**perfect** - 35:12, 35:13, 63:8, 92:14
**Perhaps** - 236:2
**period** - 24:5, 24:6, 38:14, 75:3, 102:17
**perpetrating** - 241:21
**perpetrator** - 33:19, 34:3, 34:7, 34:12, 34:14, 43:4, 227:16
**Perry** - 58:23, 112:1, 162:10, 212:23, 214:11, 248:20
**Perry's** - 215:6
**persistent** - 166:15, 191:3
**person** - 11:1, 19:21, 29:8, 29:14, 30:4, 31:1, 33:4, 33:17, 34:14, 34:15, 40:4, 42:19, 45:7, 46:8, 46:13, 50:23, 54:3, 54:19, 54:20, 54:24, 55:19, 56:3, 56:7, 56:15, 56:17, 56:19, 68:24, 78:10, 81:1, 81:2, 83:25, 84:2, 87:7, 87:14, 96:17, 96:21, 98:9, 100:24, 103:9, 104:21, 105:21, 106:3, 106:4, 106:13, 108:10, 108:15, 108:23, 108:24, 109:4, 109:12, 117:23, 118:7, 124:8, 124:15, 125:14, 126:1, 126:11, 128:14, 128:18, 129:6, 129:18, 145:7, 148:7, 178:22, 179:17, 182:17, 187:5, 187:9, 188:6, 204:3, 204:4, 205:10, 208:5, 208:11, 208:18, 211:9, 222:18, 226:19, 227:2, 227:17, 227:18, 227:23, 230:9, 230:11, 231:4, 233:11, 245:18
**person's** - 204:6
**personal** - 4:25, 17:5, 17:22, 20:9, 47:14, 58:18, 60:23, 61:10, 69:19, 71:5, 71:18, 82:6, 89:10, 114:20, 115:5, 128:3, 164:4, 209:14, 216:17, 217:13, 228:2, 229:5, 233:6, 234:19, 248:12
**personally** - 28:25, 97:25, 108:23, 148:17, 187:8, 228:4, 248:25
**perspective** - 12:16
**phase** - 31:11, 31:19, 31:22, 32:9, 52:9, 52:11, 52:21, 53:20, 54:7, 72:7, 72:9, 72:12, 72:13, 72:18, 72:24, 73:2, 76:4, 77:2, 77:4, 150:24, 170:8, 170:20, 170:22, 170:24, 175:19, 175:20, 175:22, 175:25, 176:1, 176:6, 178:3, 178:4,

184:9, 199:23
**phases** - 31:11, 31:14, 52:6, 52:19, 53:18, 76:1, 150:17
**Phd** - 224:16
**philosophical** - 231:20
**philosophy** - 169:20, 231:15
**Phone** - 2:7, 2:13, 2:16
**phonetic** - 226:15
**photographs** - 16:1
**photos** - 16:4, 173:22
**phrase** - 95:2
**Physical** - 42:20
**physical** - 42:22, 154:2, 154:3, 173:24
**pick** - 166:6, 166:7, 195:16
**picked** - 90:19, 192:21, 197:8, 197:19, 244:21
**picking** - 101:7, 104:11
**picture** - 76:11
**pictures** - 154:4
**piece** - 15:8
**pieces** - 35:23, 35:24, 36:2, 154:2
**pixie** - 180:25
**place** - 79:6, 79:7, 136:23, 186:1
**plan** - 166:15
**planning** - 93:11
**Plants** - 49:24
**play** - 72:24, 107:6, 184:11, 185:6
**playing** - 174:14
**plead** - 38:23, 92:21, 193:17
**pleaded** - 70:7
**pleasure** - 233:22
**plenty** - 32:19, 152:8
**plus** - 25:15, 26:1, 168:9
**Plus** - 103:5
**point** - 10:3, 13:21, 76:3, 76:7, 76:11, 81:9, 81:23, 81:25, 84:24, 102:24, 107:4, 107:5, 110:2, 113:3, 142:15, 155:14, 164:15, 172:24, 174:22, 218:2, 238:10
**points** - 14:13, 74:13
**poisoned** - 180:24
**Poisoned** - 180:25
**poisonous** - 43:16, 43:17
**polarized** - 51:23, 51:25
**police** - 26:7, 35:13, 64:20, 65:22, 66:2, 66:16, 67:13, 68:11, 68:23, 69:4, 69:6, 69:7, 88:16, 89:16, 89:21, 89:22, 91:4, 91:10, 92:7, 94:13, 132:5, 132:6, 132:11, 168:21, 174:18, 175:3, 175:6, 175:7, 175:16, 240:15
**Police** - 64:18, 89:13
**policy** - 88:12
**polled** - 230:20
**poorly** - 240:24
**popular** - 223:18, 223:23
**Porsche** - 219:14
**portion** - 11:22
**portions** - 250:8
**position** - 39:19, 64:17, 92:1, 106:20, 118:4, 118:17, 118:18, 124:16, 125:20, 127:21, 128:19, 129:14, 132:25, 158:21, 206:9, 221:13, 245:6, 245:12
**positively** - 99:22
**possibility** - 44:19, 45:22, 77:22, 79:14, 82:12, 106:12, 107:10, 179:6, 189:10, 192:13, 202:18, 202:19

**possible** - 5:2, 20:11, 28:14, 28:19, 28:20, 28:22, 28:23, 61:11, 82:23, 85:18, 115:6, 119:3, 164:6, 168:17, 187:21, 209:20, 217:15
**Possibly** - 196:4, 202:25
**possibly** - 8:3, 15:21, 16:10, 81:2, 83:17, 90:22, 92:3, 182:17, 206:15, 230:13
**potentially** - 15:18, 68:6, 97:11, 173:11
**Potentially** - 11:13
**practicing** - 224:16
**Precinct** - 67:2
**preclude** - 243:4
**predators** - 222:1
**prejudice** - 245:15, 245:19
**preparation** - 250:17
**present** - 3:1, 11:22, 17:9, 33:2, 39:12, 40:7, 59:6, 72:14, 124:20, 132:20, 133:5, 133:10, 135:22, 153:23, 154:17
**Present** - 3:5, 3:7
**Presented** - 176:2
**presented** - 13:3, 14:15, 14:16, 16:21, 28:2, 33:5, 39:4, 42:12, 44:5, 72:11, 176:1
**presenting** - 196:3
**presents** - 148:11
**presiding** - 1:23
**pressure** - 91:3, 119:15
**presume** - 53:3, 55:12, 55:13, 133:4, 136:7
**presumed** - 33:12, 73:14, 136:3, 151:23
**presuming** - 33:10, 152:20
**presumption** - 52:25, 151:22, 152:5, 152:10, 152:14, 153:12, 153:16, 153:17, 243:7, 243:17
**Pretty** - 119:9, 191:22, 192:24
**pretty** - 32:3, 43:18, 53:21, 79:23, 116:24, 169:14, 185:1, 185:19, 192:25, 193:12, 194:11, 195:23, 222:25, 244:9
**prevent** - 29:14, 66:5, 66:14, 125:14
**preventing** - 125:3, 221:5
**previous** - 47:7, 200:1
**price** - 102:7
**priest** - 174:19
**priests** - 68:24
**primarily** - 43:14, 49:24
**Primarily** - 50:1
**primary** - 14:18, 174:12
**principle** - 231:13
**prints** - 33:7
**prison** - 12:7, 30:25, 31:4, 45:11, 46:1, 50:18, 50:22, 50:24, 51:9, 54:11, 57:10, 70:10, 78:20, 78:21, 79:3, 79:19, 82:12, 99:4, 100:22, 100:24, 101:9, 101:23, 102:1, 102:18, 103:6, 103:7, 103:8, 103:17, 103:19, 106:14, 126:3, 177:9, 177:16, 181:17, 181:19, 198:25, 199:16, 199:19, 199:24, 200:2, 200:16, 200:18, 200:21, 201:7, 201:8, 201:22, 202:24, 210:12, 222:15, 222:16, 222:18
**prisoners** - 201:12, 201:21
**Probability** - 77:20

**probability** - 44:17, 54:14, 77:13, 81:15, 106:10, 106:11, 106:13, 106:23, 108:18, 178:22, 178:25, 180:16, 183:8, 208:18
**probable** - 28:9, 106:13
**probably** - 77:16, 77:18, 78:1, 179:7, 189:24, 209:25
**probing** - 4:19
**problem** - 47:24, 70:21, 71:8, 87:17, 88:13, 99:18, 107:13, 193:25, 197:10
**problems** - 92:15, 92:16, 94:25, 196:2
**procedures** - 170:14
**proceed** - 3:10, 48:25, 59:7, 59:13, 61:23, 61:24, 86:13, 113:1, 130:19, 135:12, 135:13, 190:15, 218:7
**Proceedings** - 1:16, 1:24, 1:2, 249:8
**proceedings** - 1:21, 12:9, 214:1, 248:14, 250:8, 250:13
**process** - 4:8, 7:17, 11:24, 19:17, 19:18, 21:6, 23:7, 31:7, 31:10, 55:11, 60:18, 63:9, 63:13, 72:2, 101:22, 102:10, 102:12, 110:10, 111:18, 114:12, 124:18, 128:17, 129:6, 130:2, 140:21, 141:3, 141:21, 142:13, 142:19, 163:13, 165:20, 165:25, 169:22, 170:16, 183:6, 186:22, 216:12, 218:16, 220:18, 225:24, 228:15, 246:8
**processed** - 16:23
**processes** - 200:11
**professional** - 90:7, 206:2
**professionals** - 209:23
**professor** - 9:19
**program** - 118:1, 118:4, 118:11, 118:23, 119:8, 120:7, 228:20, 228:22
**project** - 229:11
**promptly** - 214:7, 215:4
**pronounced** - 192:2
**proof** - 72:15, 95:20, 96:5, 155:21, 160:3, 171:6, 182:8, 183:25, 203:7, 203:18, 204:7, 239:4, 239:8, 243:6, 243:8, 243:18, 247:4
**propensity** - 179:21, 180:19, 181:9, 238:22
**property** - 45:6, 45:8, 78:10, 179:17
**prosecute** - 200:9
**prosecuted** - 11:5, 245:15
**prosecuting** - 74:13, 102:10
**prosecution** - 3:7
**prosecutor** - 65:12, 249:1
**prosecutors** - 116:8, 214:21, 217:4
**prospective** - 3:18, 19:1, 60:2, 113:9, 163:2, 213:17, 214:2, 215:20
**Prospective** - 1:4, 1:5
**prostitute** - 174:19
**prostitutes** - 68:24
**proud** - 91:5
**prove** - 15:6, 15:7, 36:10, 85:23, 72:16, 73:3, 73:6, 78:3, 78:4, 94:3, 94:6, 95:11, 95:12, 132:21, 140:21, 140:24, 143:7, 143:9, 145:1, 145:8, 146:6, 149:3, 154:12, 155:9, 171:8,

171:9, 171:14, 171:24, 172:6, 205:8, 205:25, 232:25, 233:3, 236:23, 238:10, 239:15, 239:22, 239:24, 240:6, 240:12, 241:16, 242:15, 243:13
**proved** - 232:4
**proven** - 56:24, 139:11, 141:4, 171:17, 172:20, 173:2, 208:14, 238:18, 240:10
**proves** - 152:3, 205:3
**provide** - 143:5, 152:3, 201:7, 218:3
**provided** - 160:5, 248:13
**proving** - 15:2, 72:15, 156:13, 156:19, 157:16
**pry** - 69:19
**psychiatrist** - 224:14
**psychological** - 222:1
**psychologist** - 224:15, 224:22, 225:1
**Public** - 223:19
**pulled** - 46:8
**punished** - 56:25
**punishment** - 5:2, 20:11, 25:17, 28:7, 29:18, 29:19, 29:23, 31:1, 31:4, 31:11, 32:5, 50:18, 50:22, 52:3, 52:11, 52:12, 52:22, 53:13, 53:15, 54:18, 55:7, 55:13, 61:12, 72:9, 72:24, 76:4, 77:4, 85:18, 87:1, 91:13, 91:18, 91:23, 92:22, 93:3, 93:9, 93:21, 97:21, 98:6, 99:24, 100:1, 104:23, 108:12, 115:7, 116:12, 119:4, 120:9, 120:15, 122:16, 123:20, 123:24, 125:3, 125:13, 125:15, 126:4, 127:6, 129:5, 150:24, 164:6, 168:16, 168:17, 169:9, 170:8, 170:21, 170:24, 175:19, 175:20, 175:25, 176:3, 178:3, 184:9, 192:3, 192:11, 193:12, 193:15, 193:16, 195:13, 195:16, 195:19, 195:19, 197:2, 197:5, 197:7, 197:12, 197:17, 198:9, 199:23, 202:10, 203:2, 217:15, 220:12, 221:4, 221:23, 229:17, 235:4
**punishments** - 29:3, 79:1, 177:2
**pure** - 237:2
**purely** - 9:19, 242:15
**purpose** - 108:3, 220:18
**pursue** - 39:1
**put** - 18:5, 24:3, 32:12, 39:11, 39:18, 44:14, 50:7, 51:12, 74:4, 88:2, 90:6, 97:6, 98:10, 110:4, 110:5, 118:6, 127:6, 127:12, 128:19, 129:14, 134:3, 135:16, 136:18, 141:19, 141:20, 142:14, 142:23, 143:3, 143:12, 143:19, 144:8, 145:2, 145:17, 146:3, 146:10, 147:7, 148:1, 154:5, 154:9, 154:25, 157:14, 159:2, 159:4, 159:23, 159:25, 160:16, 161:9, 162:6, 168:12, 193:3, 194:21, 205:10, 207:17, 209:13, 210:16, 220:9, 220:10, 225:7, 226:9, 227:8, 230:8, 230:16, 240:23, 244:13
**puts** - 124:16

**putting** - 142:15, 145:5, 145:6, 160:15
**puzzle** - 35:23, 35:25, 36:3
**Pyper** - 1:15, 2:8, 113:3, 163:1, 163:6, 164:22, 177:23, 178:7, 181:13, 184:17, 187:8, 190:4, 190:18, 190:23, 213:3, 213:5, 213:9, 213:11

## Q

**qualified** - 104:19, 105:7, 105:8
**quality** - 238:4
**questionable** - 242:9
**Questioning** - 1:4
**questioning** - 135:7, 142:16, 159:13, 159:24, 207:14, 245:5
**questionnaire** - 6:1, 6:4, 7:22, 20:17, 21:9, 24:9, 28:4, 30:12, 50:6, 50:21, 51:12, 61:17, 61:21, 63:19, 63:24, 67:15, 69:18, 101:17, 115:12, 115:16, 116:11, 116:22, 121:16, 121:19, 124:7, 132:5, 137:18, 164:11, 164:14, 165:14, 198:17, 198:18, 198:19, 217:22, 218:1, 219:1, 220:10, 220:16, 223:12, 244:7
**questionnaires** - 21:18, 98:9, 194:3
**questions** - 4:23, 20:7, 24:22, 30:13, 30:14, 30:15, 30:16, 30:20, 50:6, 50:17, 51:17, 51:20, 54:10, 55:1, 55:22, 57:14, 57:15, 61:6, 61:8, 63:17, 76:19, 76:21, 77:5, 79:22, 85:12, 85:13, 86:2, 86:6, 100:20, 101:2, 104:5, 105:14, 109:11, 110:7, 110:8, 114:18, 114:25, 115:3, 117:6, 117:8, 124:10, 130:8, 131:17, 131:23, 132:8, 134:14, 137:17, 137:20, 138:9, 142:8, 142:10, 143:22, 145:21, 149:25, 151:7, 151:12, 158:20, 163:19, 164:1, 164:2, 164:3, 164:16, 165:15, 170:8, 170:10, 176:14, 176:20, 178:9, 178:14, 190:19, 193:9, 193:15, 194:15, 195:18, 198:15, 198:21, 199:6, 199:7, 203:6, 212:15, 215:11, 216:15, 216:23, 217:1, 217:12, 217:21, 218:25, 220:15, 232:17, 233:15, 234:16, 236:17, 241:10, 241:16, 244:6, 244:11, 245:10, 246:24, 246:25, 247:10, 247:13
**quibble** - 220:21
**quick** - 69:12, 116:24, 144:18
**quickly** - 98:5
**quiet** - 217:10
**quite** - 13:20, 16:9, 88:18, 95:25, 155:22, 156:14, 157:16, 161:10

## R

**rain** - 43:15, 50:3
**raise** - 39:8, 239:4
**raised** - 16:16, 235:20

**raises** - 238:15
**range** - 25:16
**rape** - 187:25
**raping** - 187:23
**rapists** - 188:1
**rare** - 12:14, 32:3, 170:20
**rather** - 29:15, 82:15, 109:16, 175:14, 184:16
**rating** - 242:6
**re** - 109:13
**re-commit** - 109:13
**react** - 39:22, 117:2
**reaction** - 22:4
**read** - 15:3, 73:2, 98:20, 103:10, 122:22, 158:19, 171:13, 197:14, 213:17, 244:24, 245:3
**Read-** 99:11
**reading** - 98:21, 123:10, 175:14, 196:22
**ready** - 3:10, 61:23, 88:24, 215:16
**reaffirm** - 46:5
**real** - 27:8, 85:20, 117:8, 143:22, 144:18, 185:20
**real-world** - 185:20
**realistic** - 29:4
**reality** - 167:4, 167:10, 231:16
**realize** - 94:2, 168:5, 228:13
**realized** - 194:11
**really** - 4:15, 7:20, 21:4, 21:5, 21:11, 21:16, 22:13, 23:9, 23:10, 23:12, 23:13, 23:21, 23:22, 24:10, 24:11, 24:18, 24:20, 26:23, 26:25, 29:2, 30:9, 30:18, 31:17, 36:7, 39:5, 43:22, 44:18, 48:6, 48:12, 51:6, 62:22, 67:16, 75:6, 82:19, 89:6, 91:16, 91:19, 97:2, 101:23, 101:24, 102:7, 109:19, 111:12, 114:22, 116:2, 117:4, 117:16, 117:21, 118:17, 119:6, 119:20, 122:18, 124:11, 124:12, 128:14, 133:9, 139:5, 145:10, 149:10, 152:10, 155:21, 156:5, 156:13, 156:19, 157:15, 157:17, 157:18, 162:1, 163:23, 186:7, 192:15, 194:2, 194:4, 194:12, 194:16, 194:19, 207:18, 208:16, 209:19, 209:20, 216:19, 218:13, 218:15, 230:25, 246:25, 248:16
**realm** - 210:11
**reason** - 5:4, 20:13, 31:24, 32:21, 55:15, 61:14, 109:6, 109:15, 115:9, 117:11, 148:25, 149:3, 149:6, 150:9, 152:8, 154:11, 160:7, 164:8, 191:4, 191:6, 193:10, 199:9, 211:5, 212:2, 212:5, 217:17, 243:11
**reasonable** - 15:2, 15:7, 35:18, 35:19, 36:11, 37:5, 40:9, 40:10, 48:17, 55:11, 57:4, 72:16, 73:6, 77:10, 80:19, 81:14, 95:4, 95:14, 95:20, 96:5, 96:23, 106:2, 108:22, 141:1, 143:8, 144:15, 145:2, 147:2, 153:2, 154:13, 156:14, 156:20, 157:16, 160:3, 171:8, 171:15, 171:18, 173:2, 175:23, 178:19, 182:9, 183:6, 184:1, 203:7, 203:19,

203:20, 204:3, 204:4, 204:5, 204:7, 204:10, 204:13, 204:24, 204:25, 205:11, 205:12, 205:14, 205:15, 205:21, 205:22, 206:13, 206:14, 206:19, 207:1, 207:2, 208:14, 211:22, 238:10, 238:13, 239:5, 239:22, 240:11, 240:20
**reasonably** - 204:4
**reasons** - 4:25, 20:9, 37:19, 40:22, 61:10, 115:5, 149:4, 149:19, 159:17, 164:5, 205:13, 217:13
**rebuild** - 227:13
**receive** - 213:25
**received** - 12:1, 12:11, 111:21, 202:2, 225:21
**recently** - 120:3
**Recess-** 59:5
**recessed** - 249:8
**recognize** - 35:22, 238:12
**recognized** - 10:24
**recollection** - 192:15
**Record-** 3:3, 17:8, 65:11, 98:21, 134:8, 145:24, 158:25, 159:7, 159:16, 159:22, 159:24, 161:10, 161:15, 240:20
**Record-** 1:1, 250:10, 250:13, 250:17
**recorded** - 175:10
**records** - 236:23
**recuse** - 149:7
**red** - 235:11
**reduce** - 196:8
**refer** - 6:6, 168:10
**reference** - 175:7
**referring** - 67:14, 139:18
**refers** - 47:16
**reflect** - 125:12
**reflects** - 250:14
**refresh** - 121:20
**regarding** - 15:15, 75:19, 151:12, 213:18, 246:11, 247:10, 247:11
**regardless** - 133:19
**regards** - 151:12
**register** - 70:13
**regular** - 191:7
**rehabilitated** - 222:9, 225:11, 227:19, 227:20
**rehabilitation** - 28:12, 28:20, 28:24, 29:6, 227:25
**relate** - 173:4, 176:22
**related** - 16:8, 189:19
**relates** - 15:10, 171:19
**relation** - 202:7
**relationship** - 10:23, 71:1, 225:12
**relatives** - 192:2
**relax** - 8:3, 116:19
**release** - 111:20
**released** - 18:6, 162:7, 248:18
**relevant** - 31:25, 32:5
**reliable** - 240:16, 242:11
**religious** - 4:25, 20:9, 61:10, 115:4, 164:4, 217:13
**relive** - 233:17
**remain** - 134:15, 157:11
**remained** - 237:2
**remember** - 7:13, 28:22, 53:5, 56:12, 63:9, 68:14, 76:19, 94:10, 139:25, 140:1, 140:5, 140:20, 185:9, 196:21, 196:22, 198:20, 221:10, 232:21, 235:16, 235:20, 235:22, 238:1, 241:11

**remind** - 175:16
**render** - 133:12, 242:25
**Renee-** 1:22
**rephrase** - 4:21, 20:6, 61:7, 115:1, 131:10, 164:2, 216:24
**rephrased** - 4:20
**report** - 35:6, 175:14, 175:16
**reported** - 1:24, 250:12
**Reporter-** 250:4, 250:23
**Reporter's-** 1:1, 1:19, 250:1, 250:10, 250:13, 250:17
**reports** - 175:6, 175:7, 175:9
**represent** - 194:25, 195:2, 244:4
**representations** - 161:11
**request** - 166:19
**requested** - 250:8
**require** - 30:1, 36:13, 95:3, 132:20, 134:3, 134:4, 135:22, 154:16, 154:22, 154:25, 155:5, 155:6, 155:9, 155:15, 160:25, 238:9
**required** - 135:25, 154:7
**requirement** - 154:10, 161:6, 161:7, 179:12
**requires** - 32:19, 36:1, 118:18, 241:3
**requiring** - 135:15, 153:22, 155:8
**research** - 9:14, 9:15, 9:16, 14:7, 50:3
**reserve** - 66:22
**resources** - 9:2
**respect** - 16:3, 23:6, 25:3, 56:22, 204:16
**respective** - 250:15
**respects** - 204:20
**respond** - 39:21, 227:1
**responsibilities** - 8:22
**responsibility** - 15:1
**responsible** - 41:14, 41:18, 47:14
**rest** - 103:5, 121:24, 156:15, 156:20, 223:3, 235:6
**restroom** - 162:22
**rests** - 142:22, 156:6
**result** - 130:9, 131:25, 246:6
**retired** - 66:20, 66:21, 66:24, 67:4
**return** - 86:3
**revolutionary** - 243:12
**rides** - 214:20
**rightfully** - 166:3
**ringing** - 215:7
**rise** - 168:20, 180:7
**risk** - 241:21
**Rivera-** 1:12, 2:5, 112:20, 113:2, 113:8, 113:13, 113:20, 113:24, 114:1, 114:3, 160:12, 161:22
**robbery** - 11:8, 25:25, 26:1, 56:17, 140:9, 169:1
**robbing** - 123:8
**Rodriguez-** 250:4, 250:22
**Rolando-** 2:20
**role** - 9:5, 9:18, 64:23, 74:24, 184:11
**room** - 7:10, 27:19, 40:3, 192:20, 203:23, 204:9, 225:7, 234:1, 235:10, 240:8, 242:8, 242:23
**roos** - 49:15
**Rouge-** 220:6

**row** - 46:7, 201:11
**Rp-** 2:11
**Ruined-** 227:12
**rule** - 68:20, 131:8, 176:19
**rules** - 68:19, 140:3,
143:24, 144:2, 147:14,
221:17, 221:18, 246:4
**ruling** - 1:14, 2:7, 144:2
**run** - 235:11

# S

**sabbatical** - 220:8
**sad** - 48:6, 83:8, 241:17
**Sadly** - 184:23
**sake** - 29:23, 30:3, 151:16
**salute** - 234:4
**sanction** - 221:18
**sat** - 66:8, 230:22
**satisfied** - 40:15, 159:12
**savages** - 222:10
**saw** - 12:7, 13:7, 21:9,
51:3, 66:11, 117:12, 167:19
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scale** - 24:4, 127:7,
149:25, 196:11, 197:15,
230:9
**scales** - 196:12, 196:20,
196:25
**scared** - 138:8, 143:21
**scares** - 92:2, 104:13
**scary** - 64:4, 228:12
**scenario** - 157:14
**scene** - 16:5, 42:22
**school** - 8:20, 9:18, 43:13,
139:1, 166:16, 167:18,
172:3, 191:5, 219:25,
244:18
**schools** - 166:16, 166:18,
184:23
**schoolteacher** - 190:24
**science** - 49:19
**scientific** - 16:6, 43:25,
44:4, 231:12, 246:4
**scientist** - 14:7, 44:17,
229:10
**screen** - 14:25, 32:12,
32:15, 73:5, 171:10, 239:18
**scrutinize** - 17:3
**seat** - 113:15, 114:24
**seated** - 85:19, 169:24
**second** - 42:19, 46:4,
52:21, 56:1, 80:16, 81:17,
99:17, 110:24, 146:13,
146:22, 149:22, 150:23,
153:22, 165:4, 176:25,
177:22, 178:3, 181:23,
182:5, 183:10, 197:15,
224:12, 229:8
**security** - 214:25
**see** - 7:8, 8:18, 9:7, 9:22,
10:3, 15:13, 15:23, 16:9,
23:9, 24:25, 28:12, 28:13,
31:15, 31:18, 36:25, 37:19,
40:15, 46:6, 47:7, 50:16,
50:22, 62:16, 64:13, 69:8,
69:13, 69:19, 71:8, 95:7,
98:11, 106:19, 109:24,
115:16, 115:17, 116:1,
117:23, 122:23, 122:24,
123:6, 128:2, 128:17,
130:25, 136:5, 148:16,
152:8, 152:13, 152:21,
155:22, 161:3, 165:20,
165:25, 171:21, 191:6,
194:2, 196:2, 197:1, 200:24,
203:1, 206:16, 211:14,
211:18, 212:13, 215:14,
219:23, 235:2, 235:10,
239:17, 240:3

**seeing** - 99:24
**seek** - 188:10, 188:12
**seem** - 29:4, 48:17, 118:4,
128:13, 235:5
**sees** - 34:23
**seldom** - 197:24
**selected** - 90:13, 96:13,
207:21, 213:12
**selection** - 165:20, 193:7
**selective** - 228:24
**semen** - 34:21
**senator** - 244:15, 245:2
**send** - 46:7
**sending** - 81:18
**senior** - 229:12
**sense** - 32:8, 79:10, 155:7,
168:3, 177:13
**sentence** - 12:7, 30:25,
31:3, 47:7, 50:17, 50:22,
50:24, 82:15, 99:4, 99:12,
100:22, 109:5, 109:16,
177:4, 177:19, 183:21,
184:16, 186:18, 186:19,
198:24, 201:11, 202:3,
202:13, 202:17, 202:20,
203:1, 211:12, 211:24,
212:5, 222:14, 222:16,
232:10
**sentencing** - 183:13
**separate** - 89:10, 226:23
**September** - 250:20
**series** - 198:20, 247:10
**serious** - 22:14, 22:18,
24:1, 25:24, 55:23, 64:6,
83:14, 143:23, 166:3,
168:25, 238:3, 245:12
**seriously** - 23:16, 64:9
**serve** - 7:14, 90:13, 96:13,
166:19, 202:4, 219:12,
233:22
**Served** - 70:9
**served** - 232:21
**service** - 18:7, 21:20, 66:8,
66:13, 90:21, 233:21,
234:10
**services** - 11:21, 89:17
**serving** - 79:15, 177:8,
177:16
**set** - 29:1, 36:1, 40:13,
71:19, 75:13, 188:21,
195:16, 227:24, 227:25
**seven** - 9:16, 225:14
**seventies** - 88:19
**several** - 63:1, 66:21,
135:18
**severely** - 235:4
**sexual** - 11:11, 168:25
**sexually** - 225:17
**shade** - 67:21, 68:6
**share** - 169:10, 190:6
**sharing** - 111:13
**sharp** - 36:16, 36:23
**sheet** - 60:9
**shelter** - 65:2
**shift** - 193:5
**shocked** - 21:11, 22:4,
89:21
**shoes** - 90:25
**shoot** - 26:1
**shooting** - 56:8, 122:25
**shootings** - 123:2
**Shores** - 66:22
**shorter** - 216:14
**shorthand** - 1:25
**shortly** - 227:5
**shot** - 190:5
**Show** - 239:12
**show** - 32:18, 32:19,
36:14, 38:10, 39:5, 39:15,
45:6, 46:11, 138:15, 179:12,

179:20, 180:18, 181:8,
218:17, 232:4, 239:15
**shown** - 5:22, 44:13,
221:12
**shows** - 37:5, 37:11, 43:3,
167:11, 170:7
**shredded** - 58:19
**shy** - 167:11
**sic** - 94:17, 208:3
**side** - 4:9, 6:5, 19:19,
24:25, 32:14, 57:22, 60:18,
66:5, 84:2, 84:4, 110:14,
114:14, 118:8, 116:22,
144:2, 144:3, 150:14,
157:18, 158:4, 163:13,
193:17, 194:25, 212:23,
216:12, 226:22, 226:25
**sidebar** - 17:7
**sides** - 5:5, 5:19, 13:11,
17:11, 18:2, 20:14, 59:7,
61:15, 103:3, 112:19,
115:10, 127:21, 140:15,
140:16, 151:15, 164:9,
194:23, 194:24, 217:18
**significant** - 203:2
**significantly** - 227:21
**silent** - 157:11
**similar** - 4:18, 26:20,
165:22, 182:2, 192:16,
192:22, 213:15
**simple** - 10:24
**simplest** - 159:25
**single** - 104:21
**sister** - 26:24, 49:16
**Sit** - 169:25
**sit** - 5:1, 8:11, 20:10, 55:4,
61:11, 73:13, 73:18, 85:22,
115:6, 142:3, 147:16, 152:4,
154:8, 164:5, 170:3, 170:5,
189:3, 189:9, 190:22, 193:8,
217:5, 217:14, 220:20,
241:14, 244:9
**sits** - 85:23
**Sitting** - 53:3
**sitting** - 27:13, 27:19,
53:9, 90:25, 92:1, 101:18,
120:22, 138:7, 141:7, 142:2,
142:4, 143:21, 149:7,
169:22, 176:7, 177:25,
245:7, 246:20
**situation** - 11:16, 22:2,
24:15, 39:11, 51:7, 51:13,
80:2, 81:12, 124:20, 156:1,
156:7, 157:22, 180:23,
185:13, 187:22, 188:5,
188:11, 188:14, 188:23,
202:15, 206:10, 208:16
**situations** - 38:24, 105:19,
154:21, 184:22, 210:10
**Six** - 127:13
**six** - 3:4, 36:22, 36:23,
88:23, 150:3, 191:18,
230:14, 230:16
**size** - 89:25
**skilled** - 73:22, 83:20,
185:18
**skills** - 191:6
**Skip** - 3:6, 53:5, 86:16,
137:14, 190:18, 244:4
**skipping** - 113:2
**sky** - 205:12
**slack** - 95:3, 232:25
**slashing** - 44:25, 45:5,
45:9
**small** - 9:22, 23:18,
171:10, 219:6, 239:17
**Smith-** 65:8
**sober** - 48:2, 84:4, 185:23
**social** - 90:7, 191:5,
213:19

**society** - 45:4, 45:11,
45:25, 46:1, 46:2, 55:21,
78:17, 78:19, 79:18, 100:23,
102:24, 106:14, 123:11,
125:24, 151:23, 181:13,
181:14, 181:17, 187:9,
221:20, 222:3, 222:18,
235:6
**Solicitation** - 69:21
**solitary** - 222:12
**someone** - 14:5, 45:1,
46:7, 80:8, 86:25, 99:4,
100:22, 102:10, 106:20,
109:11, 118:15, 124:21,
128:9, 149:1, 168:23,
180:16, 185:22, 187:6,
188:25, 207:19, 209:21,
210:2, 222:17, 223:15,
223:21, 223:24
**sometimes** - 29:23, 40:20,
71:9, 71:13, 94:13, 126:20,
126:21, 127:2, 173:19,
191:12, 200:2, 200:3,
216:25, 235:18
**Sometimes** - 38:8, 38:13,
40:19, 41:6, 80:24, 191:13
**son** - 70:21, 167:8, 180:24,
181:3
**son's** - 180:24
**sons** - 69:13, 69:20
**soon** - 128:21
**sorry** - 10:6, 33:11, 54:23,
87:10, 99:8, 101:15, 146:6,
226:8
**Sorry** - 71:25, 107:20,
113:16, 237:21
**sort** - 10:22, 14:8, 16:3,
107:18, 199:17
**sought** - 79:2, 177:3
**sound** - 26:8
**sounded** - 224:3
**sounds** - 103:14, 103:15,
145:16
**source** - 213:24
**Spanish** - 118:1
**speaking** - 52:1, 74:19
**special** - 27:16, 44:10,
46:4, 47:3, 51:8, 54:9, 56:2,
56:5, 76:18, 77:8, 80:17,
121:3, 134:18, 168:20,
176:14, 177:18, 177:19,
178:6, 178:23, 189:20,
207:11, 232:5
**Special** - 55:24, 77:8,
108:16, 108:21, 178:17,
181:11, 187:2, 210:3,
210:15
**specialized** - 166:25,
219:12
**specific** - 15:11, 30:19,
45:8, 51:6, 51:15, 51:16,
126:1, 163:20, 172:24,
245:1
**specifically** - 165:15,
173:13
**Specifically** - 178:16
**specifics** - 64:11
**sped** - 216:2
**speech** - 89:18
**speedometer** - 152:25
**spend** - 134:17
**spent** - 162:2, 220:7
**spoken** - 120:6
**sponte** - 159:2, 159:4,
161:18
**spot** - 80:4, 225:8, 226:9
**spring** - 9:11
**stabbing** - 56:8
**staff** - 214:22
**stage** - 156:19

**stand** - 14:21, 35:5, 73:17, 74:5, 75:5, 75:13, 132:16, 148:18, 161:23, 238:11
**standard** - 38:9, 39:5, 39:8, 39:18, 42:1, 45:2, 46:16, 48:19, 80:18, 184:1, 203:7, 206:3, 239:7, 245:21, 246:12
**standards** - 44:6
**standing** - 180:18, 181:8
**standpoint** - 209:12
**stands** - 43:2
**star** - 234:1
**start** - 76:7, 123:1, 151:22, 152:21, 152:23, 162:15, 174:14, 174:22, 218:2, 229:24
**started** - 4:24, 90:3, 105:12, 116:23, 123:1, 162:19, 196:19, 219:6
**starting** - 123:4, 152:11
**starts** - 68:20
**State** - 1:11, 2:7, 4:1, 17:12, 19:10, 53:23, 53:24, 58:3, 60:11, 94:3, 95:3, 105:6, 110:20, 110:21, 112:21, 114:6, 116:8, 140:18, 140:22, 140:23, 141:18, 142:3, 142:8, 142:19, 143:7, 143:16, 144:25, 145:16, 145:18, 146:3, 147:1, 148:10, 148:15, 149:10, 151:25, 154:12, 155:2, 155:3, 155:8, 155:20, 156:5, 156:11, 156:13, 157:2, 157:5, 157:14, 158:5, 158:17, 159:11, 159:15, 160:1, 161:5, 161:7, 161:19, 163:9, 176:2, 177:4, 188:11, 194:11, 195:2, 195:22, 196:7, 203:25, 204:22, 205:5, 205:25, 211:14, 213:3, 213:4, 213:12, 216:7, 222:5, 238:5, 242:15, 243:9, 245:5, 245:15, 245:20, 246:17, 247:4, 248:3, 248:4, 250:2, 250:5
**state** - 65:24, 88:24, 98:25, 127:14, 152:2, 203:16, 210:25, 217:9
**State's** - 1:9, 1:13, 1:18, 1:25, 2:4, 2:6, 96:19, 142:16, 152:22, 159:18, 237:15, 245:6
**statement** - 47:20, 67:18, 67:21, 120:10, 175:5, 175:9
**statements** - 67:17, 99:1, 223:13
**states** - 152:6, 170:19, 170:20
**States** - 109:7, 139:10, 152:2, 228:9
**statistics** - 103:5, 201:3
**status** - 213:20
**stay** - 158:2, 207:2, 218:22, 235:18
**steal** - 94:20
**step** - 57:21, 81:25, 84:11, 109:13, 110:13, 134:10, 157:25, 158:9, 183:16, 212:22, 238:9, 247:22
**stepchildren** - 224:12
**stepped** - 165:4
**stepson** - 224:24, 228:19
**stepsons** - 88:20
**Stepsons** - 69:14
**Steve** - 3:9, 7:6, 62:14, 165:8
**stick** - 25:1, 180:25

**still** - 10:12, 34:1, 39:23, 66:19, 71:1, 99:12, 103:25, 112:11, 116:4, 125:8, 125:12, 129:17, 130:2, 133:15, 134:3, 150:5, 150:6, 155:8, 206:12, 231:2, 240:9, 244:10
**stir** - 13:21
**stir-up** - 13:21
**stood** - 127:5, 220:17
**stop** - 81:10, 122:24, 123:6, 123:21, 144:18, 211:4
**stopped** - 123:9
**stopping** - 125:7
**stops** - 177:1
**store** - 25:25
**stories** - 213:23
**story** - 8:2, 21:21, 118:16, 187:14, 187:22, 228:6
**straight** - 79:23, 104:7, 107:21
**strange** - 174:4
**street** - 65:1
**streets** - 78:18, 181:16
**strength** - 228:12
**stress** - 227:5
**strike** - 1:9, 1:11, 1:18, 1:23, 1:25, 2:4, 58:8, 248:5
**strive** - 28:21
**strong** - 27:1, 43:8, 130:11, 207:5, 236:10, 237:23
**strongest** - 150:1
**strongly** - 136:10, 136:11, 136:25, 197:6, 197:11, 230:12, 234:22
**struggle** - 127:20, 133:9
**struggling** - 134:17
**stuck** - 118:24, 206:8, 206:22, 206:25, 207:2
**student** - 7:7, 62:15, 165:9, 166:20
**students** - 166:14, 167:1
**studied** - 43:12, 43:13, 43:14, 43:19, 49:23, 50:1, 50:2
**study** - 103:9
**studying** - 43:16
**stuff** - 14:5, 16:8, 18:1, 31:8, 32:4, 48:3, 68:16, 72:21, 92:23, 103:7, 118:7, 161:8, 187:24, 201:3, 201:19, 201:20, 214:17, 214:24, 237:25
**styled** - 250:11
**sua** - 159:2, 159:4, 161:17
**subject** - 240:17
**success** - 191:10
**successful** - 191:6, 229:11
**Successfully** - 225:10
**sufficiency** - 47:10, 47:15
**sufficient** - 47:6, 47:11, 47:12, 48:12, 48:14, 82:9, 82:16, 84:12, 158:24, 183:18, 184:14, 186:14, 186:15, 210:13, 210:23, 210:24, 211:16, 211:19, 211:23
**suicide** - 227:5
**Suite** - 2:15
**summer** - 7:8, 62:15
**super** - 156:6
**supervisor** - 64:25
**support** - 27:7, 48:7, 89:17, 91:22, 91:25, 100:24, 102:1, 103:4, 103:17, 103:18, 121:9, 129:3, 129:4, 166:21, 199:16, 199:19,

200:12, 200:15, 200:18, 222:18, 234:20
**supporting** - 85:17
**supports** - 91:15, 91:23
**suppose** - 14:2
**supposed** - 90:21, 90:22, 97:1, 136:2, 180:6, 195:7, 205:15, 219:20
**supposedly** - 192:21
**suppress** - 227:9
**Supreme** - 109:6, 109:7, 210:24, 246:14
**surprise** - 207:16
**surprised** - 95:21
**surprising** - 76:14
**Suspension** - 219:2
**suspension** - 219:10
**Sustained** - 201:16
**sustenance** - 222:6
**sway** - 206:17, 206:21
**swiftly** - 235:4
**sworn** - 3:16, 18:24, 19:25, 59:25, 89:14, 89:16, 113:7, 114:21, 162:25, 163:2
**system** - 12:17, 29:1, 43:21, 72:3, 124:13, 139:6, 139:9, 218:19, 226:6, 227:14, 227:17, 228:18, 228:21, 234:18, 234:19, 234:22, 235:10

## T

**T-bones** - 235:12
**table** - 3:6, 7:6, 23:4, 86:22, 127:11, 190:20, 226:22, 230:13
**tadpoles** - 43:20
**tag** - 102:7
**talents** - 222:22
**tarp** - 244:24, 245:3
**taught** - 65:18, 71:22
**taxpayer** - 100:25, 222:19
**taxpayers** - 200:3
**teach** - 52:14
**teacher** - 166:20, 166:25
**team** - 8:8, 154:6, 154:25, 166:6, 195:3
**Technology**- 219:2
**teenager** - 241:12
**teenagers** - 167:16
**telegraph** - 93:5
**Ten**- 9:6, 162:17
**ten** - 24:4, 24:5, 104:1, 127:7, 127:8, 149:25, 168:22, 230:9, 230:11, 238:18
**tend** - 14:4, 67:19
**tender** - 6:12
**tenure** - 13:19
**term** - 89:4, 203:8
**terminated** - 216:21
**terms** - 85:7, 94:5, 159:25, 201:22, 238:23, 242:6
**Terrace**- 2:12
**terrible** - 97:23, 194:14
**terrifying** - 228:15
**test** - 116:15, 234:1
**testified** - 3:18, 19:1, 51:11, 60:2, 104:22, 113:9, 141:10, 163:2, 215:20
**testifies** - 41:23
**testify** - 40:22, 41:1, 41:4, 41:7, 61:3, 68:21, 74:6, 74:25, 133:16, 133:17, 133:21, 139:20, 144:23, 146:23, 147:9, 147:10, 147:12, 147:15, 147:18, 148:1, 148:2, 149:1, 153:25,

154:17, 157:12, 160:5, 174:14
**testifying** - 40:20, 42:7, 145:6, 205:2
**testimony** - 15:9, 17:1, 37:14, 42:16, 80:14, 86:8, 86:9, 153:24, 174:1, 174:2, 174:7, 174:21, 176:21, 178:5, 178:13, 240:15, 241:4
**testing** - 13:15, 13:24, 13:25, 14:8
**Texas**- 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 4:1, 19:11, 52:18, 60:11, 114:6, 116:8, 127:15, 138:1, 139:10, 163:9, 168:13, 168:21, 170:18, 170:19, 170:20, 177:1, 181:5, 188:2, 188:9, 213:12, 216:7, 217:9, 220:4, 229:14, 245:2, 250:2, 250:6, 250:18, 250:22, 250:25
**Thanksgiving**- 23:3
**themselves** - 46:14, 74:15, 74:18, 109:13, 154:10
**theory** - 27:6, 27:7, 109:10, 160:14
**therapy** - 226:10, 226:17, 227:6, 227:7, 228:22
**Therapy**- 228:8
**they've** - 17:20, 40:25, 180:4
**thinking** - 29:7, 29:8, 50:16, 51:3, 93:8, 96:20, 118:8, 122:25, 127:19, 127:22, 138:17, 227:23, 236:3
**thinks** - 35:1, 35:5, 91:17, 143:20
**third** - 47:3, 57:1, 57:8, 81:9, 167:1, 183:3, 183:14, 189:20, 191:1
**Thirty**- 69:16
**Thirty-nine**- 69:16
**thought-out** - 50:12
**thoughts** - 70:16, 127:21
**threat** - 45:4, 55:3, 77:9, 78:11, 78:17, 106:14, 106:24, 108:18, 178:18, 181:12, 183:9, 187:9, 189:25, 208:19, 209:6, 209:9, 210:1, 211:10
**threatening** - 45:1, 179:25
**threats** - 179:18, 179:24
**three** - 4:23, 9:14, 13:16, 20:7, 38:19, 54:9, 58:15, 61:8, 70:1, 76:18, 101:2, 104:5, 111:15, 115:3, 117:19, 119:7, 138:15, 162:2, 164:3, 169:23, 176:15, 197:19, 217:1, 217:3, 234:1
**Three**- 70:1, 138:2, 248:10
**three-star** - 234:1
**throughout** - 73:16, 165:10, 171:7, 231:10
**throw** - 222:23
**throwing** - 187:20
**ticket** - 52:18, 139:2, 139:7, 239:9
**tie** - 27:13, 120:22, 231:23
**tight** - 186:1
**timeframe** - 15:14
**tipping** - 97:15
**tire** - 45:9
**tired** - 19:6
**tires** - 44:25, 45:5
**Tise**- 2:3, 3:8, 7:3, 20:21, 20:22, 20:23, 20:25, 33:16, 34:7, 37:1, 42:3, 42:4,

44:14, 44:16, 48:22, 48:24,
50:6, 51:3, 52:5, 58:4, 58:8,
59:9, 62:10, 115:18, 115:21,
115:23, 116:6, 121:25,
130:19, 130:23, 131:12,
132:4, 134:6, 134:9, 134:13,
134:14, 135:3, 135:8,
135:13, 135:14, 137:2,
137:20, 158:5, 158:19,
162:17, 162:18, 165:4,
218:5, 218:6, 218:8, 218:10,
238:25, 239:1, 239:2,
243:14, 243:16, 243:20,
243:21, 244:7, 245:10,
248:4
  **Tise's**- 130:5
  **today** - 3:5, 4:10, 8:2, 8:10,
18:3, 21:3, 53:3, 53:10,
58:15, 63:9, 112:1, 112:2,
116:1, 116:23, 141:7, 152:4,
162:10, 162:11, 165:1,
170:3, 214:12, 216:13,
230:7
  **Todd**- 1:6, 2:1, 3:13, 3:17,
3:24, 17:11
  **together** - 41:13, 56:5,
62:9
  **Together**- 165:5
  **tomorrow** - 167:17
  **took** - 117:7, 139:16,
220:6, 226:13
  **Took**- 220:8
  **tool** - 227:12
  **tooth** - 244:22
  **top** - 193:1, 197:2
  **topics** - 4:17, 4:19, 60:22,
114:19, 216:16
  **tortured** - 233:18
  **total** - 89:14, 250:16
  **totality** - 238:16
  **totally** - 42:21, 161:19
  **towards** - 114:20, 118:25,
119:3, 133:16, 152:13,
152:18, 153:4, 153:12,
155:4, 216:17, 245:20
  **track** - 78:24
  **tradition** - 230:5
  **traffic** - 52:18, 139:2,
139:7, 140:15, 239:9
  **Tragic**- 185:12
  **tragic** - 83:8
  **trained** - 231:9, 231:10
  **training** - 71:22, 229:10,
237:8
  **transaction** - 168:23,
188:4
  **transcription** - 250:7
  **transcription/stenograph**
- 1:25
  **transferred** - 220:5
  **transgress** - 235:6
  **treat** - 69:3, 132:16, 136:6,
241:3
  **treated** - 128:10, 242:14
  **tremendous** - 228:4
  **Trial**- 1:3
  **trial** - 7:13, 7:18, 7:19,
11:17, 11:22, 15:24, 27:15,
31:10, 31:22, 32:9, 52:6,
52:19, 53:18, 54:17, 62:25,
64:2, 68:16, 70:5, 70:6,
72:5, 72:7, 72:9, 73:16,
75:19, 76:1, 76:5, 76:12,
77:2, 77:4, 83:12, 96:7,
96:21, 106:3, 106:4, 108:10,
108:15, 121:1, 124:18,
141:18, 150:25, 154:9,
165:10, 170:9, 170:16,
170:17, 171:7, 174:4, 175:4,
175:19, 175:20, 175:25,

185:16, 187:23, 194:20,
194:22, 196:5, 202:23,
205:11, 214:7, 247:5
  **trials** - 18:8, 83:11,
141:24, 175:4, 185:15,
185:16, 217:6
  **tried** - 32:22, 206:20
  **tries** - 228:21
  **trigger** - 46:8
  **troubled** - 184:24
  **true** - 36:13, 129:15,
129:16, 132:23, 157:4,
160:22, 209:16, 218:23,
250:7
  **True**- 200:14
  **truly** - 250:14
  **trusts** - 35:1
  **truth** - 4:16, 20:1, 67:22,
68:6, 114:21, 114:23,
142:11, 198:2, 216:18
  **truthfully** - 61:3, 61:4,
161:11, 163:23, 163:24
  **Try**- 209:11
  **try** - 29:14, 34:23, 92:3,
101:22, 104:17, 104:19,
105:5, 142:10, 163:17,
193:19, 195:24, 206:1,
207:18, 207:20, 220:22,
237:16, 237:18, 246:18
  **trying** - 7:3, 11:13, 24:20,
28:16, 29:4, 34:4, 34:8,
34:11, 51:21, 56:11, 62:10,
107:7, 128:25, 135:20,
144:7, 144:8, 145:11,
149:11, 156:12, 165:5,
209:18, 216:24, 220:24,
226:9, 228:25, 229:1,
246:17
  **turn** - 6:13, 20:21, 98:13,
112:20, 115:18, 164:17,
196:17, 198:13, 211:5,
211:24, 227:10
  **turned** - 10:18, 156:16,
156:21, 191:12
  **turns** - 10:25
  **Tv**- 117:19, 117:25, 139:6,
141:22, 167:4, 167:10,
167:12
  **Twelve**- 225:20
  **twelve** - 220:20
  **Twenty**- 87:24, 87:25,
225:14
  **twenty** - 225:14
  **twenty-eight** - 225:14
  **Twenty-one**- 87:24, 87:25
  **Twenty-seven**- 225:14
  **twice** - 160:11
  **twist** - 41:11, 67:8
  **Twitter**- 213:20
  **two** - 9:22, 31:11, 38:19,
52:6, 52:19, 53:17, 59:4,
69:13, 70:9, 72:6, 73:22,
79:1, 88:20, 88:22, 89:18,
132:8, 140:15, 140:16,
144:20, 150:17, 168:22,
170:18, 177:1, 187:22,
188:1, 188:3, 195:14,
196:12, 196:20, 196:25,
215:5, 221:11, 224:11,
234:2, 239:3, 246:2, 246:3
  **Two**- 70:10
  **two-minute** - 59:4
  **type** - 9:2, 14:9, 18:13,
58:23, 123:24, 126:10,
126:23, 213:23
  **types** - 15:23, 29:17,
119:4, 123:23, 169:1, 169:3,
170:23, 173:11, 173:24,
175:8
  **typical** - 7:18, 25:25

  **Typically**- 221:7
  **typically** - 7:23, 79:1,
175:10

## U

  **ultimate** - 8:7, 14:15,
230:4
  **ultimately** - 15:1
  **unable** - 5:1, 20:10, 61:10,
115:5, 164:5, 217:14
  **Unbelievable**- 89:25
  **under** - 4:14, 18:6, 26:4,
61:2, 104:22, 147:14, 162:6,
163:22, 182:18, 210:11,
216:18, 228:7, 234:25,
246:16, 248:17
  **Understandably**- 64:5
  **Understood**- 5:14
  **understood** - 41:9
  **unequivocally** - 135:18
  **unfair** - 12:21, 37:4
  **unfathomable** - 181:4
  **unfit** - 240:22
  **unfortunate** - 12:14, 105:8
  **Unfortunately**- 88:21
  **unintended** - 241:20
  **Unintentional** - 224:4
  **unintentionally** - 94:14,
94:17
  **unique** - 12:16
  **unit** - 186:1
  **United** - 109:7, 139:10,
152:1, 228:9
  **Univision** - 118:1, 138:15
  **unknown** - 36:8, 36:17,
36:23, 38:1, 38:23
  **unless** - 109:5, 155:14,
197:11, 228:10
  **unpopular** - 223:16,
223:19, 223:22, 223:23
  **unproven** - 238:17, 238:19
  **unreasonable** - 229:9
  **unreliable** - 240:22
  **untruthful** - 240:21,
240:22
  **unusual** - 194:2
  **up** - 4:13, 7:24, 8:15,
10:19, 13:9, 13:21, 23:6,
25:18, 29:1, 32:12, 32:21,
35:5, 38:9, 44:15, 54:9,
65:24, 67:5, 68:9, 74:17,
75:11, 75:12, 78:24, 88:11,
90:23, 92:3, 94:14, 94:18,
95:4, 96:3, 99:21, 104:7,
107:4, 117:25, 118:16,
122:2, 128:21, 130:20,
138:7, 141:16, 141:17,
142:21, 143:21, 146:17,
148:18, 149:7, 151:16,
151:25, 152:22, 155:19,
166:9, 169:9, 171:23,
173:18, 176:19, 186:10,
197:1, 210:16, 216:2,
218:17, 222:4, 222:12,
228:16, 229:22, 234:24,
243:14, 243:15, 244:14,
244:17, 244:19, 246:6
  **upbringing** - 48:6
  **upfront** - 97:8
  **upstate** - 10:12, 11:19
  **user** - 47:23
  **utilizing** - 222:22

## V

  **vacillated** - 159:14
  **vacuum** - 27:5, 73:23,
169:19, 187:12

  **valid** - 237:12
  **variable** - 238:14
  **variety** - 13:21
  **various** - 203:15, 238:23
  **venire** - 3:25, 19:10, 60:10,
114:5, 163:8, 216:6
  **Venireperson** - 1:21, 3:16,
3:17, 17:24, 18:12, 18:15,
18:18, 18:24, 18:25, 33:15,
57:24, 58:1, 58:12, 58:20,
58:25, 59:3, 59:25, 60:1,
86:12, 110:17, 110:18,
111:10, 111:14, 111:16,
111:23, 112:3, 112:5, 112:9,
113:7, 113:8, 134:12,
135:11, 158:1, 158:11,
161:21, 161:25, 162:12,
162:14, 162:25, 163:1,
213:1, 213:10, 215:12,
215:15, 215:18, 215:19,
248:1, 248:7, 248:23, 249:2,
249:6
  **veracity** - 242:7
  **verbal** - 179:18
  **Verbal** - 179:24
  **verdict** - 133:12, 156:8,
156:17, 156:22, 157:19,
157:21, 160:6, 204:21,
204:23, 205:15, 241:17,
242:25
  **verification** - 240:17
  **versus** - 199:25, 200:22
  **victim** - 56:19
  **victim's** - 187:25
  **Vietnam** - 226:12, 227:9,
233:9, 233:18
  **views** - 193:11, 197:1,
197:2
  **violate** - 221:17
  **violation** - 63:11, 66:9,
191:3
  **violence** - 44:23, 54:15,
77:14, 78:2, 78:7, 78:9,
78:12, 81:16, 123:11,
123:23, 179:9, 179:10,
179:15, 179:19, 179:19,
179:21, 180:17, 180:19,
181:9
  **violent** - 222:2
  **visibly** - 128:25
  **visit** - 7:20, 8:9, 8:17, 72:4,
77:7, 166:4, 176:19, 178:24,
179:11
  **voice** - 130:20
  **void** - 4:7, 4:9, 19:13,
19:18, 22:10, 60:13, 60:17,
114:9, 114:12, 163:12,
216:10, 217:11, 235:16,
235:19, 235:23, 241:9
  **Voir** - 1:16, 1:2, 1:6, 1:22,
3:20, 4:3, 6:18, 19:3, 20:24,
49:2, 60:4, 62:1, 86:14,
113:11, 115:22, 129:19,
130:22, 137:6, 151:5, 163:4,
164:20, 190:16, 215:22,
218:9, 243:24
  **volume** - 250:10
  **Volume** - 1:2, 1:1, 1:20
  **Volumes** - 1:2
  **voluntarily** - 7:1
  **vote** - 97:20, 106:21,
205:21, 206:3, 212:10
  **voting** - 133:16, 155:11,
206:6, 208:17, 212:11
  **vs** - 4:1, 19:11, 60:11,
114:6, 163:9, 213:12, 216:7
  **Vs** - 1:9

## W

**waffling** - 135:5

**wait** - 54:22, 55:3, 55:5, 55:9, 57:1, 69:8, 150:13, 150:25, 187:25

**waited** - 70:5

**waive** - 159:20

**waived** - 161:5, 161:6

**walk** - 78:18, 138:17, 181:16

**walls** - 78:20

**Walsh** - 3:9, 7:6, 62:14, 165:8

**wants** - 34:22, 129:6, 134:20

**war** - 243:12

**warrant** - 82:10, 82:15, 183:19, 184:15

**warranted** - 57:9

**warrants** - 28:1

**Warren** - 244:13

**waste** - 134:16, 135:7

**wasteful** - 100:23, 101:1, 101:5, 199:15, 199:16, 200:3, 222:17

**watch** - 138:14, 213:17, 217:5

**watched** - 119:7

**watching** - 50:3, 117:19, 117:24

**watering** - 228:6

**ways** - 50:21, 153:11, 182:1, 235:7

**weak** - 35:5, 238:17

**weapon** - 16:4

**weapons** - 173:23

**wear** - 34:19, 34:21, 214:14, 215:2

**Webster** - 89:18

**week** - 19:15, 21:9, 114:10, 116:22, 116:23

**weekend** - 22:9, 22:19, 23:21

**weeks** - 117:19, 119:7, 138:15

**weigh** - 13:5, 54:16, 54:21

**weighing** - 174:22

**weight** - 238:22

**welcome** - 18:12

**Welcome** - 6:24, 62:5, 164:24

**whatsoever** - 6:9, 154:23, 156:22, 160:6

**wherein** - 60:18

**white** - 24:21, 30:14, 30:16, 30:17, 30:18, 50:8

**whole** - 4:13, 22:12, 48:2, 84:4, 96:20, 102:9, 102:11, 123:1, 139:5, 139:12, 220:18

**wielded** - 46:9

**wife** - 10:4, 11:2, 13:14, 16:14, 88:21, 227:7, 230:22, 231:2, 232:14, 249:2

**wiggle** - 24:20

**willing** - 22:17, 23:4, 41:5, 46:18, 58:17

**wind** - 23:5

**wired** - 55:10, 55:16

**wish** - 40:3, 40:4, 40:14, 64:2, 218:20, 233:12

**wishes** - 229:13

**Witness** - 250:19

**witness** - 14:21, 15:8, 67:20, 68:18, 68:20, 75:4, 75:13, 142:21, 174:1, 174:6, 174:16, 175:9, 175:12, 205:1, 205:2, 205:4

**witnessed** - 23:1

**Witnesses** - 38:12

**witnesses** - 14:17, 15:12,

33:1, 34:22, 35:10, 35:14, 40:2, 69:3, 73:18, 73:19, 75:16, 75:20, 93:13, 93:16, 94:9, 94:10, 132:5, 132:6, 132:1, 132:12, 142:3, 142:20, 154:9, 173:20, 174:1, 174:4, 174:9, 174:11, 174:13, 175:2, 194:16, 241:3

**woman** - 124:8

**wonder** - 7:10, 40:14, 40:21

**wondered** - 246:22

**wonderful** - 28:13

**wondering** - 49:22, 55:4, 106:18, 244:20, 244:25, 245:1

**Wood** - 2:4, 3:8, 6:11, 6:14, 6:17, 6:19, 7:2, 17:13, 61:24, 61:25, 62:2, 62:9, 86:10, 110:21, 112:22, 116:7, 162:19, 162:21, 162:23, 162:24, 164:17, 164:19, 164:21, 165:4, 186:20, 186:21, 186:22, 188:20, 190:12, 201:13, 207:13, 208:15, 209:15, 213:4, 232:3

**woods** - 83:3

**Word** - 1:20

**word** - 27:22, 34:12, 48:12, 77:16, 178:24, 186:14, 198:5, 198:18, 203:25, 204:1, 204:2, 210:23, 226:13, 247:5

**words** - 30:5, 44:16, 78:2, 90:6, 113:2, 122:22, 143:19, 144:8, 154:8, 202:11

**works** - 31:10, 31:16, 31:18, 104:16, 124:13, 124:18, 128:17, 139:6, 142:1, 142:6, 167:12, 218:22, 222:7, 224:21

**world** - 123:6, 185:20

**worried** - 93:6

**worry** - 90:10, 223:1

**Wow** - 117:12

**wrap** - 243:15

**wreck** - 226:12, 228:13

**write** - 32:24, 65:9, 175:6, 198:17

**writing** - 98:24, 111:22, 248:18, 250:9

**written** - 98:12, 99:22, 124:15, 175:9, 196:18, 197:13, 209:7

**wrote** - 24:9, 63:19, 122:20, 122:22, 207:19

**Y**

**y'all** - 87:5, 90:23

**Yates** - 83:3, 185:10, 192:17, 192:18

**year** - 10:10, 108:9, 207:22, 220:8

**years** - 8:25, 9:6, 9:15, 9:16, 13:16, 26:4, 45:23, 63:1, 65:8, 66:8, 66:21, 67:3, 70:1, 70:4, 70:9, 70:10, 79:15, 79:16, 87:22, 94:23, 96:8, 138:2, 166:24, 177:8, 177:17, 183:21, 190:24, 191:1, 202:4, 202:6, 202:22, 219:6, 225:14, 226:13, 237:3

**yesterday** - 196:5

**York** - 9:7, 10:12, 224:16, 228:19

**young** - 50:2, 89:4, 124:8,

128:12, 138:7, 249:1

**younger** - 168:22

**youngest** - 167:17

**yourself** - 18:10, 58:17, 86:24, 87:19, 88:15, 103:10, 106:19, 111:19, 127:6, 127:12, 148:13, 162:4, 208:17, 209:9, 210:1, 212:13, 220:10, 226:23, 227:18, 230:9, 243:13

**Z**

**zero** - 152:19, 152:20, 152:21