```
1                      REPORTER'S RECORD

2                  VOLUME 16 OF 35 VOLUMES

3                TRIAL COURT CAUSE NO. 1384794

4            COURT OF CRIMINAL APPEALS NO. AP-77,025

5

6    OBEL CRUZ-GARCIA           )  IN THE DISTRICT COURT
                                )
7        Appellant              )
                                )
8                               )
                                )
9    VS.                        )  HARRIS COUNTY, TEXAS
                                )
10                              )
                                )
11   THE STATE OF TEXAS         )
                                )
12       Appellee               )  337TH JUDICIAL DISTRICT

13

14

15                  ******************

16       PRETRIAL PROCEEDINGS AND MOTION TO SUPPRESS

17                  ******************

18

19

20        On the 19th day of June, 2013, the following

21   proceedings came on to be heard in the above-entitled

22   and numbered cause before the Honorable Renee Magee,

23   Judge presiding, held in Houston, Harris County, Texas;

24        Proceedings reported by computer-aided

25   transcription/stenograph shorthand.
```

1              A P P E A R A N C E S

2


3

       MS. NATALIE TISE
4      SBOT NO. 00795683
       MR. JUSTIN WOOD
5      SBOT NO. 24039247
       Assistant District Attorneys
6      1201 Franklin
       Houston, Texas  77002
7      PHONE:  713.755.5800
       **ATTORNEYS FOR THE STATE OF TEXAS**
8


9

            **- AND -**
10


11

       MR. R.P. 'SKIP' CORNELIUS
12     SBOT NO. 04831500
       2028 Buffalo Terrace
13     Houston, Texas  77019-2408
       PHONE:  713.237.8547
14
       MR. MARIO MADRID
15     SBOT NO. 00797777
       440 Louisiana, Suite 1225
16     Houston, Texas  77002-1659
       PHONE:  713.877.9400
17     **ATTORNEYS FOR THE DEFENDANT**

18


19

20     Rolando Hernandez
       Marilu Flores,
21     **Interpreters**

22

23

24

25

```
1                          I N D E X
                           VOLUME 16
2          (PRETRIAL PROCEEDINGS AND MOTION TO SUPPRESS)

3    JUNE 19, 2013
                                              PAGE   VOL.
4    Opening statement by Defense Attorney......... 16    16

5    Defendant rests............................... 21    16

6    Opening statement by State's Attorney......... 21    16

7    STATE'S WITNESSES
                        Direct     Cross    Voir Dire     VOL.
8    Eric Mehl            26         41         -          16

9    Matt Quartaro        48         66         -          16

10   Courtney Head        79         93         -          16
                          98          -         -          16
11
     State rests................................... 99    16
12
     Court's ruling................................ 111   16
13
     Closing Argument by State's Attorney......... 100    16
14   Closing Argument by Defense Attorney......... 107    16

15   Reporter's Certificate....................... 122    16

16   Word Glossary.............................End of Volume

17              ALPHABETICAL WITNESS INDEX
                        Direct     Cross    Voir Dire     VOL.
18   Head, Courtney       79         93         -          16
                          98          -         -          16
19
     Mehl, Eric           26         41         -          16
20
     Quartaro, Matt       48         66         -          16
21
                     EXHIBIT INDEX
22   NUMBER      DESCRIPTION        OFFERED   ADMITTED     VOL.

23   SX - 1      Curriculum Vitae
                 Of Gloria J.
24               Kologinczok        24        25           16
                 (Admitted For Purposes of Motion to Suppress
25               Hearing Only)
```

```
 1   SX - 2    Consent to obtain
                blood, saliva,
 2               hair sample      78        79              16
                (Admitted For Purposes of Motion to Suppress
 3               Hearing Only)

 4   SX - 3    HPD Crime Lab
                evidence submission
 5               form             78        79              16
                (Admitted For Purposes of Motion to Suppress
 6               Hearing Only)

 7   SX - 4    City of Houston
                letter dated
 8               11/30/92         84        84              16
                (Admitted For Purposes of Motion to Suppress
 9               Hearing Only)

10   DX - 2    Second report of
                the independent
11               investigator for
                the Houston Police
12               Department crime
                laboratory and
13               property room    20        21              16
                (Admitted For Purposes of Motion to Suppress
14               Hearing Only)

15   DX - 3    Third report of
                the independent
16               investigator for
                the Houston Police
17               Department crime
                laboratory and
18               property room    20        21              16
                (Admitted For Purposes of Motion to Suppress
19               Hearing Only)

20   DX - 4    Fourth report of
                the independent
21               investigator for
                the Houston Police
22               Department crime
                laboratory and
23               property room    20        21              16
                (Admitted For Purposes of Motion to Suppress
24               Hearing Only)

25
```

| | | | | | |
|---|---|---|---|---|---|
| 1 | DX - 5 | Fifth report of the independent | | | |
| 2 | | investigator for the Houston Police | | | |
| 3 | | Department crime laboratory and | | | |
| 4 | | property room (Admitted For Purposes of Motion to Suppress | 20 | 21 | 16 |
| 5 | | Hearing Only) | | | |
| 6 | DX - 6 | Final report of the independent | | | |
| 7 | | investigator for the Houston Police | | | |
| 8 | | Department crime laboratory and | | | |
| 9 | | property room (Admitted For Purposes of Motion to Suppress | 20 | 21 | 16 |
| 10 | | Hearing Only) | | | |
| 11 | DX - 7 | Summary of recommendations of the independent | | | |
| 12 | | investigator for the HPD crime lab and | | | |
| 13 | | property room (Admitted For Purposes of Motion to Suppress | 20 | 21 | 16 |
| 14 | | Hearing Only) | | | |
| 15 | DX - 8 | Internal Affairs Division general | | | |
| 16 | | investigation summary (Admitted For Purposes of Motion to Suppress | 20 | 21 | 16 |
| 17 | | Hearing Only) | | | |
| 18 | | | | | |
| 19 | DX - 9 | Internal complaints report from chief command/legal | | | |
| 20 | | services (Admitted For Purposes of Motion to Suppress | 21 | 21 | 16 |
| 21 | | Hearing Only) | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
 1                    (Open court, defendant present, no jury

 2               panel)

 3                    THE COURT:  Cause No. 1384794, State of

 4    Texas versus Obel Cruz-Garcia.  And Mr. Cruz-Garcia is

 5    present at counsel table with his two lawyers, Mr. Mario

 6    Madrid and Skip Cornelius.  And present for the State is

 7    Natalie Tise and Justin Wood.  And Steve Walsh is here

 8    as well, their intern.  And we're proceeding on motions

 9    today.

10                    And so, to begin with, do both sides have

11    an oral motion -- I know there are some in the file as

12    well, but are there motions from both sides to adopt all

13    the previously filed motions in Cause No. 1289188,

14    1289189, and 1181910, and consolidate them and to

15    transfer them and to adopt them into 1384794?

16                    MS. TISE:  Yes, Your Honor.

17                    MR. CORNELIUS:  Yes, Your Honor.

18                    THE COURT:  Very good.  That will be

19    granted.

20                    And then part and parcel of that, I do see

21    a number of motions in the file that were -- that were

22    filed from the previous attorney.  And that was Steve

23    Shellist and Christian Capatine

24                    And, Mr. Cornelius, are you adopting those

25    motions?
```

4

```
 1              MR. CORNELIUS:  Yes, Your Honor.  I'm
 2   adopting those motions and asking that those be
 3   transferred to the appropriate cause number.
 4              THE COURT:  That will be granted, too.
 5              So, I'm going to start just going over each
 6   individual one that hasn't been ruled on.  And they're
 7   all mixed up in here.  I want to make sure everything is
 8   covered.
 9              I have a number of different motions for
10   discovery.  Some of them are standard out of the 262nd,
11   that -- you know, obviously, this case was transferred
12   from the 262nd due to a motion on behalf of Mr. Capatine
13   and Mr. Shellist, stating that Judge Bradley should be
14   recused.  And she granted that motion.  So, all of the
15   discovery motions that were already signed out of that
16   court, that they have already been ruled on; but there a
17   number -- a number of different other ones that are
18   above and beyond the standard discovery.
19              Is there anything in any of those motions
20   for discovery that we need to address?
21              MR. CORNELIUS:  Judge, can I just make a
22   blanket statement?
23              THE COURT:  Yes, please do.
24              MR. CORNELIUS:  I'm very convinced that
25   there isn't anything left for the defendant to discover.
```

1  I believe that I have been given access to every piece

2  of evidence the State has, everything in their file

3  other than work product.  So, I'm not feeling the need

4  to have any testimony or any hearing on discovery.

5              THE COURT:  Very good.

6              MR. CORNELIUS:  I know the State has some

7  continuing responsibility to turn things over to us, but

8  I think they are complying with that.

9              THE COURT:  Okay.  Very good.  And did you

10  want to put anything on the record in that regard,

11  State?

12              MS. TISE:  Judge, our file has been open

13  and a number of materials -- boxes of materials were

14  supplied to Christian Capatine and Steve Shellist.  All

15  of the reports, they subpoenaed all of the back data on

16  the DNA stuff.  And all of that stuff was transferred

17  over to Mr. Cornelius.  And in addition to that, we've

18  maintained an open file.  It's still open today.

19  Mr. Cornelius has had access to everything that we have.

20              THE COURT:  Okay.  Very good.

21              So, let's move on now to all -- there are

22  several requests for notice of expert testimony in the

23  file.  One filed on behalf of the State.  And, of

24  course, that was signed.  And one filed on behalf of the

25  defense.  And that was signed.

1              Has there been discovery in that regard

2    where both sides have provided evidence of expert the

3    witnesses that they intend to call to the other side?

4              MS. TISE:  Yes, Your Honor.

5              MR. CORNELIUS:  Yes, Your Honor.

6              THE COURT:  Okay.  Very good.  I can skip

7    over all of those.

8              We're here on the DNA, so that's going to

9    be determined after this hearing.  How about -- okay.

10   All the notices -- there is notice of extraneous

11   offenses.  You've gotten all of those, Mr. Cornelius, I

12   assume.  Correct?

13             MR. CORNELIUS:  I certainly believe I have,

14   Judge.

15             THE COURT:  There is a number of them here

16   in this file.

17             MR. WOOD:  Judge, with regards to that,

18   there were a couple of things that we had updated and

19   amended.  Our 404(b), 609 extraneous notice, I have a

20   copy of that for the defense and I will give

21   Mr. Cornelius -- I left it down on my desk, so I will

22   grab that and give it to him.  It just updates a couple

23   of things regarding jail disciplinary records, which

24   he's already gotten a copy of, but I will make sure that

25   he has that today.

```
 1                    THE COURT:  Okay.  Very good.

 2                    MR. CORNELIUS:  Is that different than the

 3    one -- I just got one the other day.

 4                    MR. WOOD:  Skip, it just added a couple of

 5    different things.  I will have it at lunch.

 6                    MR. CORNELIUS:  All right.

 7                    MS. TISE:  Newly discovered information.

 8                    MR. CORNELIUS:  Okay.

 9                    THE COURT:  It looks like Mr. Capatine --

10    defense's request for a court reporter.  That's

11    obviously going to be granted.  We've had a court

12    reporter the entire time.

13                    It looks like Mr. Capatine also filed a

14    motion to permit the inspection and copying of items

15    covered by Texas Code of Criminal Procedure Article

16    39.14.  And that was ruled on by the judge presiding in

17    the 262nd.  Has that been completed?  It was also agreed

18    upon, it looks like, on December 10th.

19                    MR. CORNELIUS:  Judge, I'm not requesting

20    any kind of a hearing on that.  I'm sure I -- I'm

21    convinced I have everything.

22                    THE COURT:  Okay.  Very good.  I will skip

23    over that one.

24                    There is a defense motion for appointment

25    of investigator.  And that investigator was appointed
```

1  and you've had that investigator; is that correct,

2  Mr. Cornelius?  It was under Mike Fosher, but you've had

3  that investigator and had access to that investigator

4  the entire time.  Is that correct, Mr. Cornelius?

5              MR. CORNELIUS:  Well, not exactly.  I have

6  a different investigator than they had.  And there is my

7  own motion in there about an investigator and it was

8  granted.  You and I have had personal ex parte

9  conversations about expenses on the investigator.

10             THE COURT:  And I have a whole area of

11  files in camera on expenses and all that type of thing.

12  So, I'll not go over those on the record today.

13             MR. CORNELIUS:  Well, I'd like to put

14  something on the record.

15             THE COURT:  Regarding?

16             MR. CORNELIUS:  Regarding that.

17             THE COURT:  Okay.  Go ahead.

18             MR. CORNELIUS:  The record probably already

19  reflects somewhere, but I'm not sure if it was on the

20  record or not.  I have two investigators.  I have one

21  investigator that has investigated the backgrounds of my

22  client and another investigator that has investigated

23  the criminal accusation of my client.  The investigator

24  that has investigated the background, I think he's

25  spoken to every member of the defendant's family,

1  reports to a psychologist who is operating as a

2  psychologist for purposes of evaluating the defendant

3  and also my mitigation specialist giving me advice on

4  mitigation.

5            THE COURT:  Okay.

6            MR. CORNELIUS:  I don't expect her to

7  testify in this case.  I have no reason to think she's

8  going to testify, at least at this point.  You know,

9  it's hard to make a decision before trial starts, but

10  I'll give the State who she is and they contact her if

11  they want to.  There have been no reports issued, but

12  there's going to be a report, which I will give to the

13  State.  I have not gotten it yet.

14            But, anyway, so on the issue of

15  investigation, I actually have two investigators.  They

16  work from the same office, but they have completely

17  different assignments in this case.  Because at the time

18  when I first was put on this case, there was a little

19  bit of confusion in the county about what they would pay

20  and what they wouldn't pay to mitigation experts.  And I

21  simply could not find a mitigation expert that would

22  work in Harris County.  And I talked to people really

23  all over the state.  And the ones that I normally use

24  here, they wouldn't do for what the county was paying.

25  And so, I was very perplexed and met with Judge Burnett,

1   who was then the judge on this case.

2            THE COURT:  Correct.

3            MR. CORNELIUS:  And I said:  Well, I've got

4   to go forward.  And so, I came up with the plan that I

5   have used in the case.  And I'm taking a special moment

6   here to put this in the record because at some point in

7   time somebody's going to question -- the writ writer for

8   sure -- why we didn't have a specific mitigation expert.

9   And we do.  I'm stating that we do.  We have somebody

10  that's not just a mitigation expert, but actually a

11  psychologist.

12           THE COURT:  Very good.

13           Okay.  I'm going on to -- there is a number

14  of motion for continuances in this file.  And, of

15  course, those were granted on previous dates, but there

16  was no motion for continuance on the date that we began

17  the proceedings before me.  And that was back on June

18  3rd.  Correct, Mr. Cornelius?

19           MR. CORNELIUS:  That's correct, Judge.

20           THE COURT:  There was a request -- several

21  requests for additional time in voir dire.  Wasn't

22  handled before voir dire, but, obviously, you were given

23  an opportunity to voir dire individually each juror.

24  And so, anything you want to put on the record about

25  that in regards to how much time you had?  Did you need

1  more time?  Did you feel like you had sufficient time

2  for the jurors that you voir dired?

3              MR. CORNELIUS:  I did, Judge.

4              THE COURT:  Okay.  Very good.

5              I'm pulling out all the motions in limine

6  and we'll just deal with them before trial.  Some of

7  them have to do with extraneous and they have to do with

8  the DNA stuff, which we're going to determine today what

9  happens on that.  But I'm going to handle all of those

10 the morning of trial and we'll just go over those.  It

11 shouldn't take that long.  Obviously extraneous offenses

12 is going to be granted.  Hearsay statements and a number

13 of things that are pretty standard will be granted.

14 Criminal histories on individuals that will be

15 testifying and certain criminal histories that aren't

16 impeachable, but we'll go over that the morning of

17 trial.

18             So, I think that brings us down to the

19 motions to suppress.  And I do still have a number of

20 them in the file.  And one of them is on the DNA that

21 we're addressing today, but I have two general ones that

22 are both filed by you, Mr. Cornelius.  And they have to

23 do with statements, whether written or oral, which are

24 purported to be made by the defendant, any results from

25 any scientific test, including but not limited to

```
 1   fingerprints, blood or urine tests, or any other test
 2   prepared in this case, or any items seized as a result
 3   of defendant's arrest and any other item or information
 4   obtained as a result of the arrest and/or the search of
 5   the defendant by agents of the State of Texas.
 6                   And so, do you intend to address those at
 7   this hearing?
 8                   MR. CORNELIUS:  No, except that we already
 9   had a discussion with Mr. Cruz-Garcia about the swabbing
10   for saliva, which was used to get a DNA profile.  And he
11   consented to that and has admitted he consented to that.
12   I'm not pursuing a hearing on the admissibility of the
13   swab that was taken with our consent or with the
14   defendant's consent.  That would have been covered by
15   that motion.
16                   THE COURT:  Okay.
17                   MR. CORNELIUS:  But I'm not pursuing that
18   part of it.  If the State decides to use the statement
19   by the defendant then --
20                   THE COURT:  I have a notice in the file
21   that they do intend to use the defendant's statement.
22   Is that correct?
23                   MS. TISE:  At this point in time, Judge, we
24   don't unless we decide to do it for impeachment
25   purposes.  At this point this time, it's self-serving
```

1  and it doesn't look like something that we would put in,

2  but I did give notice of it in the event that something

3  should happen in trial that would make it significant.

4          THE COURT:  Okay.  So, I guess, we can just

5  take a break and do a short hearing at that time if it

6  becomes relevant.

7          MR. CORNELIUS:  If I care to pursue it at

8  that time.

9          THE COURT:  Okay.  So, at this time on

10 those particular motions to suppress you are no longer

11 proceeding on those un -- and I know that they are on

12 file in case you need them, but we don't need to have a

13 hearing on them pretrial.  Is that correct?

14         MR. CORNELIUS:  Correct.

15         THE COURT:  I'll make a notation on that.

16         And there is motions to produce records

17 regarding DNA analysis, motions to produce records

18 regarding DNA analysis, and then the motions to suppress

19 on the DNA, and there is a number of those.

20         So, have you gotten all of the records you

21 were seeking on the DNA analysis, Mr. Cornelius?

22         MR. CORNELIUS:  I think so, Judge.

23         THE COURT:  We're ready to proceed then.

24         MR. CORNELIUS:  I don't have any specific

25 requests of anything.  Well, I actually do, but I know

1   where they are and I have had access to them and I'm

2   good on the DNA records.

3                    THE COURT:  Okay.  Very good.  So, then

4   we're ready to proceed on your general motion on the DNA

5   today.  And that is -- can you tell -- can you put on

6   the record for the Court specifically what aspect?  Are

7   we proceeding on chain of custody or are we proceeding

8   on -- what aspects of the DNA?

9                    MS. TISE:  Can I make a couple of

10  statements for the record before we proceed to that,

11  Judge, with regard to the DNA?

12                    THE COURT:  Yes.

13                    MS. TISE:  There is obviously Brady

14  material associated with the old crime lab that dealt

15  with some of the evidence in this case.  And a lot of

16  that would come up in this hearing, but I just wanted to

17  put on the record that we have given Mr. Cornelius --

18  and I believe that he will confirm -- copies of internal

19  memos, disciplinary records on individuals who might

20  have been involved.  We have given him access to all of

21  the boxes and boxes of documents that were done and this

22  office's investigation of the crime lab.  And also

23  exchanged copies of the Bromwich report where it details

24  all of the independent investigation on the crime lab.

25  There has been voluminous materials exchanging hands and

1   I believe Mr. Cornelius will confirm that, that we

2   provided him all of that information specific to the DNA

3   lab.

4              In addition, I'd like to note -- and you

5   didn't mention it in your motion that you found, but we

6   did translate the judgment and sentences from

7   Mr. Cruz-Garcia's convictions in Puerto Rico and we

8   filed well in advance of trial copies of those

9   translations so that we can offer them into evidence as

10  public records, but also with the translated copy so

11  that the jury will be able to read what they are.  And

12  those are -- also should be in the file.

13             THE COURT:  I did see those in the file and

14  made note of them.

15             Did you receive those, Mr. Cornelius?

16             MR. CORNELIUS:  Yes.

17             THE COURT:  Okay.  Very good.

18             And so, in terms of -- did you want to put

19  anything else on the record, Ms. Tise?

20             MS. TISE:  I think that's all, Judge.

21             THE COURT:  Okay.  Very good.

22             And I did show in the file also that she

23  provided all of that Brady information to the defense.

24  And you did receive all of that, Mr. Cornelius,

25  regarding the DNA stuff?

```
 1              MR. CORNELIUS:  Yes.

 2              THE COURT:  And the HPD Crime Lab?

 3              MR. CORNELIUS:  Yes, I have.  I don't

 4   know -- I can't detail everything I have.  I have two

 5   full boxes of stuff about the HPD Crime Lab and the DNA

 6   in this case and the other labs that worked on it.  I've

 7   got a lot of stuff.  I can't imagine they have more than

 8   what I have.

 9              THE COURT:  Okay.

10              MR. CORNELIUS:  But I will be vigilant and

11   make sure I keep looking in case there is something

12   there.

13              THE COURT:  Very good.  I just wanted to

14   make sure that you did receive that.

15              And so, regarding the DNA, then I'm going

16   to -- let's proceed with this motion on the DNA.  And

17   I'm sure that I will figure out exactly what aspect of

18   the DNA that we're seeking to suppress the analysis.

19   Okay.

20              MR. CORNELIUS:  Well, I'm going to tell you

21   right now.  Can I make like an opening statement?  I

22   think it will go a lot faster.

23              THE COURT:  Yes.

24                    DEFENSE OPENING STATEMENT

25              MR. CORNELIUS:  The basis of our motion is
```

1   the fact that the HPD Crime Lab was investigated, some

2   very scathing reports were turned in, the lab was

3   actually closed.  Some of the people, as you will find

4   out through the State's evidence, that actually handled

5   the evidence in the case in some form or fashion are

6   detailed in the investigation and -- well, you will see,

7   if you look through here, a casual look at our evidence,

8   which consists of all the reports from the crime.  We'll

9   show some very unfavorable reports on various people in

10  the crime lab.  And specifically some of the people that

11  handled this particular evidence.

12          I'm aware that the DNA results that the

13  State wants to offer come from a different laboratory,

14  an independent laboratory.  One that I have used before

15  myself.  There is several of these DNA labs that I've

16  used myself and have confidence in, but no confidence in

17  what was then the HPD Crime Lab.

18          The essence of the motion is that the items

19  that were recovered, which are specifically a pair of

20  panties and a cigar, from which a DNA profile or DNA

21  profiles were determined, were handled by the HPD Crime

22  Lab.  Later cuttings or swabs or items produced by the

23  HPD Crime Lab were sent to Orchid Cellmark, which that's

24  the one the State is going to use, Orchid Cellmark, for

25  their analysis.

1           And the gist of our motion is we're arguing

2    that the Court should have no confidence in evidence

3    that was transferred from our now closed crime lab to

4    anywhere else for fear of contamination.  I don't know

5    that I can prove this specific evidence was

6    contaminated.  And I'm not alleging that I can, but the

7    overall -- I mean, the crime lab was, as the evidence

8    will show, completely closed.  I mean, it was closed.

9    And I know that the Court and the general public

10   knowledge -- and it's detailed in here -- is that there

11   were bogus analyses.  I don't know if I got the -- if

12   that's correct phraseology, but there was more than one

13   bogus analysis proven against the crime lab and all

14   kinds of mistakes, as you will see in these reports.

15           And so, based upon that, we're going to

16   argue that the Court should suppress the testimony from

17   Orchid Cellmark because it comes from the HPD Crime Lab.

18   Hopefully, that makes a little sense.

19           Now, I'm going to offer into evidence --

20   there are five -- allegedly five reports from Michael

21   Bromwich, who was an independent investigator who

22   investigated the crime lab.  They start -- Defense No. 2

23   is the second report of the independent investigator.

24   And then 3 is the third report, 4 is the fourth report,

25   5 is the fifth report.  I cannot find a number of the

1   first report.  I'm going to -- so, I left that number

2   open in case I find one, in case there is one.  I

3   haven't talked to Lester, Lester Blizzard, who may know.

4   And Mr. Bromwich has not returned my phone calls,

5   numerous phone calls that I've made to him.  If there is

6   one, I'd like permission to augment the record and put

7   that in there, if there is actually a report number one.

8   I have a feeling it's going to turn out to be a letter

9   that's contained in those other reports.

10                  So, those are the five reports.  Then there

11   is a final report, which is this big thick one, 440

12   pages.  And then I'm offering also a small report, which

13   is the summary of the recommendations of the independent

14   investigator for the HPD Crime Lab and property room,

15   which is the heart of what our motion is.  Stuff stored

16   in the property room and the crime lab itself.  We're

17   offering it -- I forgot which one I marked next.  No. 6

18   is the summary.  No.  I'm sorry.  No. 7 is the summary.

19   6 is the final report.  And 8 is the internal affairs

20   general investigation summary, which I got from the

21   State.  And No. 9 is internal complaints report from the

22   chief command, legal services, which I got from the

23   State, which deals with some of the witnesses in this

24   case.

25                  THE COURT:  No. 8 was the I.A.D. what?

1                   MR. CORNELIUS:   Internal affairs general

2      investigation summary.   And it's short.

3                   THE COURT:   No. 9 was internal complainants

4      filed by individuals?

5                   MR. CORNELIUS:   Yes.   And it shows the

6      findings.

7                   THE COURT:   That was individuals that filed

8      complaints with the Houston Police Department?

9                   MR. CORNELIUS:   No.   These are the

10     complainants about the employees working at the crime

11     lab and some specific findings.

12                  So, I provided the State with copies of

13     Defendant's 2 through 9.

14                  THE COURT:   And you don't have an Exhibit

15     No. 1 that you're offering?

16                  MR. CORNELIUS:   I don't have Exhibit No. 1

17     and I don't know if it exists.   We'll leave that open.

18                  (Discussion off the record)

19                  MR. CORNELIUS:   Okay.   We'll leave that as

20     No. 1 to make the record clear.   And if I come up with

21     another exhibit, I will go to 10.   That will confuse

22     everybody.   No. 10 is actually report number one.

23                  **(Defense Exhibit No. 2 through 9 Offered)**

24                  THE COURT:   Do you have anything else that

25     you are going offer?

1          MR. CORNELIUS:  No, I don't, Judge.

2          THE COURT:  Okay.  Any objections.

3          MS. TISE:  No objection, Judge, for the

4    limited purposes of this hearing.

5          THE COURT:  Okay.  Very good.  So, Defense

6    Exhibits 2, 3, 4, 5, 6, 7, 8, and 9 will be admitted for

7    the limited purposes of this hearing at this time.

8          **(Defense Exhibit No. 2 through 9 Admitted)**

9          THE COURT:  Do you have anything else?

10          MR. CORNELIUS:  I don't, Judge.  We rest.

11          THE COURT:  State, you ready to proceed?

12          Would you like to make an opening?

13          MS. TISE:  I'd just like to make a brief

14    opening, Judge, in response to the defense's argument.

15          THE COURT:  All right.

16           **STATE'S OPENING STATEMENT**

17          MS. TISE:  It is not the State's position

18    or intention to offer any of the witnesses from the

19    crime lab that was in existence in 1992.  It is not our

20    intention to offer a single report issued by that crime

21    lab.

22          What the State has done and what HPD did in

23    this case is exactly what Mr. Bromwich recommended be

24    done in the host of cases that were tested by the old

25    crime lab, and that is that we send the evidence off to

1   an independent lab and have them start from scratch and

2   do their own testing on that evidence and achieve the

3   results.

4          To address the contamination issues by the

5   defense, I believe that we'll be able to show through

6   the witnesses that are here today that there is -- the

7   only contamination issue that would be relevant for

8   trial purposes would be contamination that somehow put

9   the defendant's DNA on to the evidence that we want to

10  present to the jury at trial.  Otherwise, all we're

11  trying to do is show the defendant's DNA was on a rape

12  kit, the complaining witness to the rape panties, and on

13  a cigar that was left behind at the scene.

14         So, the only contamination that's going to

15  be relevant for trial purposes is somehow or another

16  showing that contamination of that evidence was made

17  with the defendant's DNA, which was not in HPD's

18  possession at any time during the old crime lab days.

19  So, to believe that there is a problem with the evidence

20  would be to believe that somehow or another the

21  defendant's DNA popped up out of nowhere and got somehow

22  contaminated on the evidence by employees in 1992 who

23  simply didn't have his DNA.  Because by the time the

24  evidence got shipped off to Orchid Cellmark in 2007, we

25  found a DNA profile that matched the defendant on the

1    rape kit, the panties, and the cigar.

2              So, you'd have to believe that somehow or

3    another the old crime lab contaminated that evidence

4    with the defendant's DNA, which they didn't have a

5    sample of because he was in Puerto Rico at the time.

6              So, that's the issue here.  I believe we

7    can also show that the storage of the evidence in this

8    case was fine and appropriate and there is not going to

9    be a contamination issue also based on the results that

10   the independent labs got.

11             THE COURT:  Okay.  Very good, Ms. Tise.

12             Are you ready to call your first witness?

13             MS. TISE:  Yes.

14             MR. WOOD:  Judge, the first item that we

15   would have is a proffer that we would like to make on

16   the record of a witness by the name of Gloria

17   Kologinczok.  She performed the sexual assault

18   examination in this case.  And Mr. Cornelius has said

19   that it would be acceptable to him for us to make a

20   proffer as to what her testimony would be.  And I'm

21   prepared to do that.

22             And I'll spell that name for you.  It's

23   almost like it sounds, but it's K-o-l-o-g-i-n-c-z-o-k.

24   It's pronounced Kologinczok.

25             And I would like to proceed with that, if

1    that's okay with the Court.

2                    THE COURT:  No objection, Mr. Cornelius?

3                    MR. CORNELIUS:  No objection.

4                    THE COURT:  Very good.  Proceed.

5                    MR. WOOD:  The State's proffer is that

6    Ms. Kologinczok would testify that she currently works

7    as an operations administrator at Memorial Hermann

8    Northwest Hospital.  She also maintains a current law

9    practice.  Ms. Kologinczok became a certified registered

10   nurse in 1979.  She became a certified sexual assault

11   nurse examiner in 1985.  She obtained her J.D. from

12   South Texas College of Law in 1992.

13                   Ms. Kologinczok, in becoming a sexual

14   assault nurse examiner, went through a training program

15   that included classroom training, courtroom training,

16   and on-the-job practical training.  At the time in 1992,

17   she was one of the first sexual assault nurse examiners

18   in the entire Houston area.  Over her career, she has

19   performed over 500 sexual assault examinations.

20                   And at this time, I will offer State's

21   Exhibit 1, a copy of Ms. Kologinczok's CV, into evidence

22   and I will show that --

23                   **(State's Exhibit No. 1 Offered)**

24                   MR. CORNELIUS:  No objection.

25                   THE COURT:  That will be admitted, State's

1    1.

2                    **(State's Exhibit No. 1 Admitted)**

3                    MR. WOOD:  Do you need to see that, Judge?

4                    Further, Your Honor, Ms. Kologinczok would

5    testify that on October 1st of 1992, she was working at

6    St. Joseph's Hospital in Houston, Texas.  On that date,

7    she performed a sexual assault examination on a

8    patient --

9                    THE COURT:  What's the date?  I'm sorry.

10                   MR. WOOD:  Sorry.  October 1st of 1992.

11                   THE COURT:  Okay.

12                   MR. WOOD:  On that date, she performed a

13   sexual assault examination on a patient by the name of

14   Diana Garcia, as she described as a Spanish female with

15   a date of birth of 6-4 of '53.  She would testify that

16   she performed this examination at approximately 3:45

17   a.m. on the date of October 1st, 1992.  On that same

18   date, she turned over the sexual assault evidence

19   collection kit of Diana Garcia to Officer W.T.

20   Bredemeyer of the Houston Police Department.  And,

21   again, that was done on October 1st, 1992 at

22   approximately 4:25 a.m. on that date.

23                   And that concludes the proffer of her

24   testimony for the purposes of this hearing.

25                   THE COURT:  Okay.  Very good.  Call your

 1   next.

 2               MS. TISE:  The State will call Eric Mehl.

 3               (Witness sworn)

 4               THE COURT:  Please take the stand.

 5               Please state your full name for the court

 6   reporter.  And you may proceed.

 7               THE WITNESS:  My name is Eric Mehl,

 8   M-e-h-l.

 9               THE COURT:  You may proceed, Ms. Tise.

10                       **ERIC MEHL,**

11   having been first duly sworn, testified as follows:

12                   **DIRECT EXAMINATION**

13   **BY MS. TISE:**

14       Q.   And tell us how you are employed, Sir.

15       A.   I retired as a sergeant with the Houston Police

16   Department.

17       Q.   And when did you retire?

18       A.   February of 2010.

19       Q.   Can you tell the Court a little bit about your

20   background with the Houston Police Department starting

21   with your early days and the kinds of training that you

22   received over the course of your employment.

23       A.   I joined HPD in 1981.  I spent, after

24   completing the academy, four-and-a-half years in patrol,

25   was promoted to sergeant, spent 14 months as a patrol

1   supervisor.  I was recruited by Homicide in June of 1988

2   and I transferred to Homicide at that time.  I served in

3   Homicide for four years uninterrupted.  And then I was

4   drafted by internal affairs in June of 1992.  I served

5   there until November of '93.  And I returned to Homicide

6   at that time.

7       Q.   Okay.  During the course of your career as a

8   police officer, did you receive training?

9       A.   Yes.

10      Q.   And tell the Court what kind of training you

11  received.

12      A.   We were required to take 40 hours a year of

13  annual in-service training.  And it could be legal

14  issues, it could be defensive driving, it could be

15  updates with regard to DNA, and things like that.

16      Q.   And over the course of your career, have you

17  received training on how to properly handle evidence,

18  how to properly collect it, and how to properly store

19  it?

20      A.   Yes.

21      Q.   And have you received training on that specific

22  to the collection of biological evidence like DNA?

23      A.   Not specific to the biological, no.

24      Q.   Okay.  As a member of the Houston Police

25  Department, did you ultimately get assigned to the cold

1   case squad?

2       A.   I did.

3       Q.   And tell the Court how that happened.

4       A.   In November of 2004, HPD decided that they

5   needed a cold case squad within the Homicide Division

6   and they asked me to do it.

7       Q.   Okay.  And tell us a little bit about what --

8   how that came about.  Just, they asked to go and did

9   they give you any -- basically, it was a new decision,

10  was it not?

11      A.   It was just a squad within the currently

12  existing Homicide Division.

13      Q.   But it was a new thing at the time, was it not?

14      A.   It was.

15      Q.   And did you have any guidance on what you were

16  going to be doing with the cold case squad?

17      A.   Only that I could look at and reinvestigate any

18  case that was at least five years old --

19      Q.   Okay.

20      A.   -- and not cleared.

21      Q.   Did you have some criteria for what kind of

22  cases to look for?

23      A.   I developed my own.

24      Q.   And what did you develop?

25      A.   Going -- well, I had a list of 3,000 -- roughly

1    3,000 uncleared homicide cases that dated back to 1970.

2    I would go through that list and I would find cases that

3    required DNA analysis to go any further.  And I would

4    try to keep a series of cases sent off to private

5    laboratories so they could do the DNA analysis on the

6    evidence that existed.  And while that was going on, I

7    could do the field work on cases that had been returned

8    or cases that did not require DNA analysis.

9        Q.   And at some point while you were following

10   through on that protocol, did you become familiar with a

11   case that involved the homicide of a 6-year-old boy

12   named Angelo Garcia, Jr.?

13       A.   I did.

14       Q.   And how did you discover that case?

15       A.    I actually discovered the case because his

16   mother had been sexually assaulted during the course of

17   the offense back in 1992.  So, it showed -- as well as

18   Angelo Garcia, Jr., his mother showed as a victim on my

19   homicide list.  So, I looked into it based on that.

20       Q.   And that triggered for you that there may be

21   some possible DNA evidence that could be --

22       A.   Yes.

23       Q.   -- could clear the case?

24       A.   Yes.

25       Q.   Okay.  So, what did you do?

1       A.    That was in September of 2007.  I set out to

2  find the evidence that I wanted to ship to Orchid

3  Cellmark for analysis.

4       Q.    Okay.  And were there specific items of

5  evidence that you were interested in?

6       A.    Yes.

7       Q.    Can you tell us what those items were?

8       A.    One was a cigar that had been left at the scene

9  of the crime.  One was the rape kit that been taken from

10 Diana Garcia.  And -- well, the cutting from the panties

11 was in the rape kit, so it -- but that was another

12 thing.

13      Q.    Okay.  And so, were you able to obtain those

14 items of evidence in 2007?

15      A.    I was.

16      Q.    And can you tell the Court where the cigar was

17 being stored at that time?

18      A.    It was in the HPD property room on Goliad.

19      Q.    Okay.  So, it was not in the crime lab property

20 room?

21      A.    It was not, no.

22      Q.    Okay.  And did you have an opportunity to

23 observe the condition that the cigar had been stored in?

24      A.    Yes.

25      Q.    Can you tell us about that?

1      A.   The cigar was in a plastic bag with the case

2  information written on it.  And then further, it was in

3  a large envelope.

4      Q.   Okay.  And would that be the standard brown

5  envelopes that are used for storing evidence from a

6  crime scene?

7      A.   Yes.

8      Q.   Okay.  So, it was inside a plastic ziploc bag,

9  correct?

10     A.   Yes.

11     Q.   And that plastic ziploc bag was stored inside

12  the brown evidence envelope?

13     A.   That's correct.

14     Q.   Okay.  And did the plastic ziploc bag appear to

15  have been unsealed at any point?  Was the seal intact?

16     A.   It was zipped closed, yes.

17     Q.   Okay.  And the brown evidence envelope, what

18  was the condition of that envelope?

19     A.   It was sealed.

20     Q.   Okay.  And did there appear to have been any

21  damage at all to that envelope as if it had been stored

22  in unfavorable conditions, for example?

23     A.   No.

24     Q.   No water damage or anything like that?

25     A.   No.

1    Q.   Okay.  And the cigar itself, did it appear to
2  still be in good condition?
3    A.   It was intact, yes.
4    Q.   Okay.  After you collected the cigar from the
5  property room, the HPD property room on Goliad, what did
6  you do next?
7    A.   Well, when I went to the property room, I
8  wanted to also check out the rape kit.
9    Q.   Okay.
10    A.   But the rape kit was actually in the property
11  room annex on the 24th floor at 1200 Travis.
12    Q.   Okay.  And so, it was also not being stored at
13  the crime lab property room on the top floor at 1200
14  Travis, correct?
15    A.   Correct.
16    Q.   Okay.  It was on the 24th floor in the annex?
17    A.   Yes.
18    Q.   Okay.  And can you tell the Court about what
19  condition that item of evidence was in when you found
20  it?
21    A.   The rape kit was sealed in a plastic bag with
22  case information and all that on it.
23    Q.   Okay.  And was it in any other sort of bags or
24  envelopes in addition to the plastic bag?
25    A.   Well, I didn't open it.

1      Q.   Okay.

2      A.   The rape kit was like a box in a plastic bag,

3  the plastic bag was sealed.  I initialed the plastic

4  bag, but I didn't open it and go through.

5      Q.   You didn't open it at all?

6      A.   No.

7      Q.   Okay.  Did the plastic bag appear to be in good

8  condition?

9      A.   It was.

10      Q.   Did it appear that there had been any problems

11  with the storage of that item of evidence?

12      A.   No.

13      Q.   No water damage or anything like that?

14      A.   No.

15      Q.   Okay.  After you retrieve those items, what did

16  you do with them?

17      A.   I packaged them and sent them to Orchid

18  Cellmark.

19      Q.   Okay.  Do you recall when that happened?

20      A.   October 2nd, 2007 was the ship date.

21      Q.   Okay.  And what else did you do at that point?

22      A.   Well, there were -- my initial call was to the

23  crime lab property custodian herself and she had some

24  other evidence that they had retained in the crime lab.

25  I obtained that and sent portions of that to Orchid

1   Cellmark as well.

2       Q.   Okay.  What are those other items?

3       A.   The cutting from the panties, biological

4   samples on Arturo Rodriguez and Diana Garcia.

5       Q.   And did you learn that those individuals are

6   the parents of the little boy who was murdered in this

7   case?

8       A.   Rodriguez is not --

9       Q.   Step.

10          Diana Garcia is the complainant's

11  biological mother and she was married to Arturo.

12      Q.   Exactly.  I misspoke.  The stepfather and the

13  mother of the little boy --

14      A.   Yes.

15      Q.   -- that was killed in this case.

16          Okay.  And those items that you went and

17  retrieved from the crime lab, those included a cutting

18  from the panties --

19      A.   Yes.

20      Q.   -- correct?

21          And how was it being stored.

22      A.   All the items that I got from the crime lab

23  were in individual plastic bags.

24      Q.   Okay.  And did you open or unseal those bags?

25      A.   I opened the bigger bag.  And then I did not

1  open the bags that would contain the evidence, no.

2       Q.   Okay.  So, they were stored in a larger bag,

3  but each of them was in its own individual plastic bag?

4       A.   Yes.

5       Q.   Okay.  And those individual plastic bags were

6  not opened?

7       A.   Correct.

8       Q.   Okay.  And there were also some DNA samples,

9  you said, blood samples for potential DNA, correct?

10      A.   Yes.

11      Q.   Those were for Diana Garcia and Arturo

12  Rodriguez, correct?

13      A.   Yes, among others.

14      Q.   And those were also individually packaged?

15      A.   Yes.

16      Q.   Now, you say among others.  The others in the

17 case, did you research to determine who those

18 individuals were?

19      A.   Yes.

20      Q.   Okay.  And do you have that information?

21      A.   Their last names were Lebron, Melo, M-e-l-o,

22 German, and Martinez.

23      Q.   Okay.  And do you know who those individuals

24 are?

25      A.   They were known associates of this defendant.

1      Q.   Okay.  And these were individuals that during

2   the original casework by HPD Homicide were interviewed

3   and DNA samples were collected from, correct?

4      A.   Yes.

5      Q.   In your research of this case from 1992 had HPD

6   ever made contact with the defendant, Obel Cruz-Garcia,

7   after the victim in this case was murdered?

8      A.   They had not.

9      Q.   Okay.  And do you know why that was?

10     A.   He fled the country.

11     Q.   Okay.  So, from the date that the homicide

12   happened throughout the entire police investigation in

13   the 90's, Obel Cruz-Garcia was never in the custody of

14   HPD, correct?

15     A.   That is correct.

16     Q.   And HPD was locking for him as the prime

17   suspect in the case, were they not?

18     A.   They were.

19     Q.   They were interviewing his known associates,

20   were they not?

21     A.   They did.

22     Q.   And they were collecting DNA samples from them?

23     A.   They did.

24     Q.   However, they never had a DNA sample from Obel

25   Cruz-Garcia at any time in the 1990s after this crime

1  occurred?

2      A.   That's correct.

3      Q.   When you began working the case and sent this

4  evidence off to Orchid Cellmark for them to determine if

5  they could develop DNA profiles from any of it, did you

6  have the defendant's DNA sample?

7      A.   I did not.

8      Q.   So, as of -- you said it was 2007.  So, was it

9  2007 when you first looked at this case or is that when

10  you shipped it?

11      A.   I shipped it on October 2nd, 2007.

12      Q.   So, as of October 2nd, 2007, HPD still did not

13  have in its possession any DNA sample from Obel

14  Cruz-Garcia?

15      A.   That's correct.

16      Q.   Did that change?

17      A.   It did.

18      Q.   And tell us when that happened.

19      A.   Sergeant Stephens from the narcotic HIDA unit

20  got a court order to obtain a DNA sample from this

21  defendant in Puerto Rico.  And that was in 2008.

22      Q.   And it was Sergeant Stephens who first learned

23  that the defendant was in custody in Puerto Rico in

24  2008?

25      A.   Stephens was one of the original investigators

1    on the case and we had talked, were friends anyway, and

2    he had access to greater databases than I did in an

3    effort to find Obel Cruz-Garcia.  And it was actually

4    Stephens who told me that this defendant was in custody

5    in Puerto Rico and if I wanted DNA from him, there it

6    was.

7         Q.   Okay.  So, how did you -- what efforts did you

8    take in order to obtain his DNA sample?

9         A.   Well, the FBI in Puerto Rico went to the prison

10   where this defendant was being held and obtained a DNA

11   sample from him and sent it to me.

12        Q.   Okay.  Do you know when you received that

13   sample?

14        A.   May 23rd, 2008.

15        Q.   And at that time all of the original evidence

16   that might contain biological material had already been

17   shipped off to Orchid Cellmark for their analysis,

18   correct?

19        A.   Yes.  Their analysis had been completed.

20        Q.   Okay.  And you had received the results of that

21   analysis, correct?

22        A.   Yes.

23        Q.   But at that time, still no sample of the

24   defendant's DNA had been available for them to make a

25   comparison to the evidence, correct?

1   A.   Correct.

2   Q.   So, once you received the defendant's DNA

3   sample in 2008, what did you do?

4   A.   Well, I never opened it.  I knew what was in it

5   because it came from Agent Miller in Puerto Rico.   I

6   just repackaged the original FedEx package into another

7   FedEx box and sent it to Orchid Cellmark.

8   Q.   Okay.  And that was in 2008 as well?

9   A.   Yes, ma'am.

10   Q.   Okay.  Ultimately, did you receive Orchid

11   Cellmark's report as to the results of that testing?

12   A.   I did.

13   Q.   And what did you learn?

14   A.   A full male DNA profile was obtained from the

15   cigar that had been left at the scene and that DNA

16   profile matches that of this defendant.   The sperm

17   fraction from the cutting from the panties is a mixture.

18   A major DNA profile that was obtained from that sperm

19   fraction belongs to this defendant.

20   Q.   Okay.  What did you do next?

21   A.   Well, and also on the vaginal swab he cannot be

22   excluded from that mixture.

23   Q.   Okay.  What happened next?

24   A.   Ultimately, I filed a charge of capital murder

25   against this defendant.

1    Q.   Back in 1992, you were an active homicide

2  investigator, were you not?

3    A.   I was sent to internal affairs in June of 1992,

4  so I wasn't in Homicide during the course of the initial

5  investigation.

6    Q.   But you had been prior to that?

7    A.   Yes.

8    Q.   And then you were again after that?

9    A.   Yes.

10    Q.   In 1992, when homicide detectives were

11  collecting evidence from scenes, is it fair to say that

12  DNA was in its infancy?

13    A.   Yes.

14    Q.   And especially here in Houston, it was an up

15  and coming thing that hadn't really been fully developed

16  at that point?

17    A.   Yes.

18    Q.   And as an investigator in Homicide, when you

19  were thinking of the types of evidence that might be

20  examined for DNA, what kinds of evidence were y'all

21  thinking back then?

22    A.   Blood and semen.

23    Q.   Okay.  Was it even something that people were

24  talking about or considering doing to look for

25  epithelial cells on items like a cigar?

```
 1        A.    No.

 2        Q.    Okay.  If you had at that time been in Homicide

 3   and collected a cigar from a scene, would it even occur

 4   to you to look for DNA on that cigar?

 5        A.    No.

 6        Q.    Okay.  And was that the general thought in

 7   Homicide at that time, from what you remember?

 8        A.    Yeah.  I mean, DNA was something you read about

 9   in books.  And we knew it existed and we tried through

10   various labs in various cases to obtain DNA results and

11   they weren't good.

12        Q.    And from the time you very first retrieved that

13   cigar from the property room, did it appear to you that

14   it had been analyzed or ever even taken out of its

15   original plastic bag?

16        A.    It did not.

17        Q.    Okay.

18              MS. TISE:  Pass the witness, Judge.

19              THE COURT:  Mr. Cornelius.

20                   CROSS-EXAMINATION

21   BY MR. CORNELIUS:

22        Q.    Do we call you still Sergeant Mehl?

23        A.    You can.

24        Q.    All right.  Do you have your report?

25        A.    Yes.
```

1      Q.   Let me see if I can get the dates.  I'm kind of

2  turning to Page 2.098 in the report.

3      A.   Is this something I would have written?

4      Q.   Yes, I think so.

5      A.   Okay.

6      Q.   It's stuff you did.

7      A.   Okay.  Yeah.  Our page numbers are not going to

8  match up.  Can you tell me what supplement it is, or a

9  date?

10     Q.   October 1st, 2007.  And it's the one that says

11 "continued."

12     A.   Okay.

13     Q.   Okay.  Now, I don't mean to take things out of

14 order, but I got a little bit confused.  You went to

15 where to obtain these items that are listed on -- in

16 this part of the report?

17     A.   They came out of the crime lab.

18     Q.   Okay.  All right.  So, are these items that you

19 actually opened and looked at?

20     A.   These items were contained in a larger clear

21 plastic bag.  I opened that bag and then all these items

22 were in their own individual plastic bags.  I did not

23 open them, no.

24     Q.   Okay.  And so, the items were in a plastic bag

25 labeled Rodriguez.  And extract tube, is that blood,

```
 1   extract tube, or do you remember?
 2        A.   I don't know.
 3        Q.   Then a plastic bag that's labeled in quotes
 4   "crotch panties" including a cutting from the panties,
 5   correct?
 6        A.   Correct.
 7        Q.   A plastic bag labeled DNA extracted from panty
 8   crotch of Diana Garcia, male and female fractions.
 9        A.   Correct.
10        Q.   Five extract tubes?
11        A.   Yes, sir.
12        Q.   Who did all of that, do you know?
13        A.   Who took the extractions?
14        Q.   Yes.
15        A.   Crime lab.
16        Q.   Your crime lab?  HPD Crime Lab?
17        A.   Yes.
18        Q.   One sealed plastic bag containing DNA extracted
19   from vaginal swab male and female fractions containing
20   two extracted tubes.  That's a different bag, right?
21        A.   Yes.
22        Q.   And that's done by the HPD Crime Lab?
23        A.   Yes.
24        Q.   One sealed bag labeled DNA extracted from blood
25   of Diana Garcia containing one extract tube.
```

1                    Now, tell me about that.  Where would that

2    come from?  I know you got it from the crime lab, but

3    who would have done that?  Who would have taken Diana's

4    blood in the first place?

5         A.   Well, I don't know.  It may be either when she

6    had the rape kit done or they got biological samples

7    from her at a later date.  I'm not sure.

8         Q.   All right.  If that was done as part of the

9    rape kit -- do you remember if they took blood as part

10   of the rape kit?

11        A.   I don't know.

12        Q.   I don't either.

13                   But if it was done as part of the rape kit,

14   then somehow or another the rape kit, even though you

15   picked it up at 1200 Travis, at some time it went to the

16   crime lab?

17        A.   Yes.

18        Q.   When you picked the rape kit up at 1200 Travis,

19   could you see a notation on there showing it had been to

20   the crime lab?

21        A.   I don't recall.  I'd have to look at it again.

22        Q.   All right.  And then the last one listed here

23   is DNA extracted from blood, Arturo Rodriguez,

24   containing one extract tube.

25                   Do you know where that would have come

1   from?

2        A.   Well, I'm sure the investigator at the time

3   took him to the crime lab to have blood drawn for, you

4   know, elimination purposes.

5        Q.   The HPD Crime Lab?

6        A.   Yes.

7        Q.   Did your investigation reveal that -- whether

8   or not Diana Garcia and Arturo Rodriguez knew

9   Mr. Cruz-Garcia?

10        A.   They did.

11        Q.   Okay.  Then this stuff was packaged and sent to

12   Orchid Cellmark?

13        A.   It was.

14        Q.   Along with the actual sexual assault kit, the

15   cigar, and the extract tubes and the cuttings from the

16   panties?

17        A.   Yes.

18        Q.   Right?

19             Now, these are different cuttings from the

20   panties other than the ones that are listed above that

21   we just went over, right?  These are cuttings that you

22   already had?

23        A.   No.

24        Q.   Look at that on that page and see if it

25   refreshes your memory.

1     A.   The cuttings from the panties would have come

2 from the rape kit.  The panties would have come from the

3 rape kit.

4     Q.   Okay.

5     A.   And then they cut the crotch out for their

6 examination.

7              THE COURT:  So, what exactly did you send

8 to Orchid Cellmark, the stuff that came from the crime

9 lab or the stuff that came out of the rape kit, which

10 was the panties with the skin cells?

11             THE WITNESS:  I sent the entire rape kit, I

12 sent the things that the crime lab removed from the rape

13 kit, which was the crotch of the panties.

14              THE COURT:  Okay.

15     Q.   (By Mr. Cornelius) Okay.  I think I understand.

16            The first group of things we went over was

17 sent in addition to the three items later in this page

18 of the report that says:  The sexual assault kit of

19 Diana Garcia -- whatever was left in the sexual assault

20 kit was sent.

21     A.   That's correct.

22     Q.   The cigar itself.

23     A.   Yes.

24     Q.   And the extract tubes and the cutting from the

25 panties.

```
 1        A.   Yes.
 2        Q.   That cutting and extract tube came from the
 3   panties which were a part of the assault kit?
 4        A.   Yes.
 5        Q.   And was done by the HPD Crime Lab?
 6        A.   Yes.
 7        Q.   Okay.
 8             MR. CORNELIUS:  I pass the witness at this
 9   time.
10             THE COURT:  Okay.  Very good.
11             Do you have anything further, Ms. Tise,
12   from this witness?
13             MS. TISE:  No, Your Honor.
14             THE COURT:  You may step down, Sergeant.
15   Thank you.
16             Call your next.
17             MS. TISE:  State would call Matt Quartaro.
18             (Witness sworn)
19             MS. TISE:  Judge, may this witness be
20   excused?
21             THE COURT:  Yes.
22             Please keep your voice up.  How do you
23   spell your last name?
24             THE WITNESS:  It's spelled Q-u-a-r-t-a-r-o.
25             THE COURT:  Okay.  You may proceed,
```

1    Ms. Tise.

2                          **MATT QUARTARO,**

3    having been first duly sworn, testified as follows:

4                        **DIRECT EXAMINATION**

5    **BY MS. TISE:**

6        Q.   Would you tell the Court how you are employed,

7    Mr. Quartaro?

8        A.   Yes.  I'm a supervisor of forensics at Cell --

9    what's now called Cellmark Forensics in Dallas, Texas.

10       Q.   And is that the same place that used to be

11   called Orchid Cellmark?

12       A.   Yes, it is.

13       Q.   So, when we're referring to it for purposes of

14   this hearing, do you mind if I still call it Orchid

15   Cellmark out of habit?

16       A.   No, not at all.

17       Q.   Okay.  Can you tell the Court a little bit

18   about your background and training?

19       A.   Sure.  I have a master's -- a bachelor's degree

20   and a master's degree in molecular biology.  I have a --

21   let's see.  I started at Orchid Cellmark about

22   11-and-a-half years ago.  I have been working there,

23   initially as an analyst.  In 2005, I was promoted to a

24   supervisor and have been a supervisor since then.

25               To become an analyst, there is a rigorous

1  training program, educational requirements, as well as

2  continuing education that we have to perform every year.

3      Q.   Okay.  And can you tell us what your day-to-day

4  duties involve?

5      A.   Sure.  I supervise a team of ten DNA analysts

6  who perform criminal casework from different agencies

7  around the country.  And I also still perform the duties

8  of analyst as well.  I actually work performing DNA

9  analysis on samples.

10      Q.   Okay.  And were you asked to do that as part of

11  the case against Obel Cruz-Garcia?

12      A.   Yes.

13      Q.   Okay.  And can you recall when that -- when

14  your involvement in the case occurred?

15      A.   Sure.  May I refer to my notes?

16      Q.   Yes, please.

17      A.   Sure.  I believe we received the first shipment

18  of evidence October 3rd, 2007.

19      Q.   Okay.  And had you had any correspondence with

20  Sergeant Mehl prior to receiving that?

21      A.   I don't recall if we did in this particular

22  case, but we had worked together on other cases as part

23  of his involvement with the cold case unit and he would

24  send us evidence in other cases.

25      Q.   Okay.  And can you tell the Court about the

1    condition of the evidence when you received it?

2         A.    Sure.   It was received in a large Federal

3    Express box that was sealed.   Inside there, there were

4    several manilla envelopes and evidence bags containing

5    the evidence that was described earlier.

6         Q.    And was the evidence individually packaged?

7         A.    Yes, it was.

8         Q.    Okay.   And when you received the evidence, did

9    you have anything that triggered in your mind, oh, this

10   wasn't sent to me correctly, it wasn't packaged

11   correctly, contamination would have happened here?

12        A.    There was nothing initially just looking at the

13   evidence that would indicate that any tampering or

14   contamination may have occurred.

15        Q.    Did it appear to be done in the standard way

16   that you receive evidence from Sergeant Mehl or other

17   officers asking you to do DNA tests?   Did it appear to

18   be the standard method of shipping?

19        A.    Yes, that's correct.   It came in via Federal

20   Express.   It was received by our evidence custodian.

21   She would have noted any sort of tampering at that point

22   when she received the evidence.   And there were no notes

23   made in this case.

24        Q.    Okay.   So, after you received the evidence,

25   did --- you heard Sergeant Mehl's testimony that you

1    received, in addition to the original rape kit in the

2    case -- correct?

3        A.   Correct.

4        Q.   -- an individually packaged cigar --

5        A.   Correct.

6        Q.   -- and then some extractions?

7        A.   Some samples that were labeled, yes, DNA

8    extractions or extracted material.

9        Q.   Okay.  And you knew those had come from the HPD

10   Crime Lab?

11       A.   I assumed that they did, but I -- there was

12   nothing on there saying these came from HPD, but I

13   assumed that they did, yes.

14       Q.   Did you rely on the HPD extractions in any way?

15       A.   No, ma'am.  We performed our own DNA

16   extractions from these samples.

17       Q.   So, basically, you set their extractions aside

18   and did not work with those?

19       A.   That's correct.  We did look at the same

20   cutting from the crotch of the panties, but as far as

21   the other samples we tested from the raw evidence itself

22   and not using the DNA extractions that were done

23   previously.

24       Q.   Okay.  And that cutting from the panties is the

25   actual evidence, right?

1     A.   That's correct.

2     Q.   You didn't rely on extractions or whatever they

3  might have received from the panties?

4     A.   That's correct.  We took our own cutting from

5  that crotch of the panties and performed our DNA

6  analysis on our own cutting.

7     Q.   Okay.  And at that time, had you received any

8  extractions or blood samples for the purpose of getting

9  extractions on any suspects in the case?

10    A.   Initially we received reference samples from

11 Diana Garcia, Arturo Rodriguez, and Angelo Garcia.

12 Those are the only reference samples that we were

13 initially given.

14    Q.   Okay.  So, the mother and stepfather of the

15 child and the child?

16    A.   That's correct.

17    Q.   So, any of the defendant's known associates,

18 those samples didn't come to you either at that point?

19    A.   Not in the initial shipment, no.

20    Q.   And you certainly didn't have a sample from the

21 defendant, Obel Cruz-Garcia?

22    A.   No, we did not.

23    Q.   Okay.  So, what did you do in order to analyze

24 that evidence?

25    A.   I work as a team format, so I didn't perform

1   every step along the way, but we -- basically, we

2   screened the sexual assault kit to look for any samples

3   that may have semen on them.  And any of those samples

4   that were positive for semen, we performed DNA testing

5   on.  We also tested a sample from a cigar, a swabbing of

6   a cigar, as well as tested the reference samples in this

7   case for comparison.

8       Q.   Okay.  So, basically, you started from scratch?

9       A.   Yes.

10      Q.   Okay.  What items did you determine had semen

11  on them?

12     A.   The vaginal swabs had semen present, the

13  panties and the panties cutting had semen present on

14  them.

15     Q.   Okay.  Did the cigar have any semen on it?

16     A.   We didn't look for semen on the cigar.

17     Q.   Okay.  So, talking about the vaginal swabs and

18  panties cuttings, what did you do with that, those items

19  of evidence, once you determined that they had semen?

20     A.   We performed a DNA extradition and analyzed the

21  DNA that was present to see if we could develop a DNA

22  profile.

23     Q.   Okay.  And were you able to?

24     A.   Yes, we were.

25     Q.   And just in general -- this hearing isn't

1    really about the ultimate results you received, but in

2    general what results did you receive from the vaginal

3    swab and the panties cuttings?

4         A.   Do you want me to give the initial results or

5    once we already compared all of the parties?

6         Q.   The initial results.  Because at this point,

7    you don't have a sample to compare it to.

8         A.   Correct.  We obtained a DNA profile from an

9    unknown male from the cigar.  From the vaginal swabs,

10   there is an epithelial or skin cell fraction.  That was

11   with Diana Garcia.

12        Q.   Okay.

13        A.   The sperm cell fraction was a mixture of

14   multiple individuals.  Arturo Rodriguez --

15        Q.   The husband of the complainant's mother?

16        A.   That's correct.

17             And the donor of the DNA we obtained from

18   the cigar could not be excluded as a contributor.

19        Q.   So, basically, you had -- in the rape kit

20   vaginal swabs, you had epithelial cells that matched

21   Diana Garcia, which would be expected?

22        A.   Correct.

23        Q.   DNA matching her husband, correct?

24        A.   Correct.

25        Q.   And a third unknown individual, correct?

1      A.   That's correct.

2      Q.   And that third unknown individual was a male?

3      A.   That's correct.

4      Q.   And that DNA from that vaginal swab also, that

5 third unknown male is also the third unknown male whose

6 DNA was on that cigar?

7      A.   I would probably phrase it differently just to

8 be more conservative, but --

9           THE COURT:  There's not three males; is

10 that correct?  There's two males and one female, is that

11 what you're --

12           THE WITNESS:  Yes.

13     Q.   (By Ms. Tise) There's two males and one female.

14           MS. TISE:  Thank you, Judge.

15     Q.   (By Ms. Tise) The third unknown individual --

16 or the third individual unknown -- the only unknown

17 individual was a male, correct?

18     A.   Correct.

19     Q.   And that DNA profile matched the DNA profile

20 from the cigar?

21     A.   Again, I would say that the unknown profile

22 from the cigar couldn't be excluded as a contributor to

23 that vaginal swab.

24     Q.   Okay.  And the DNA that you found from the

25 cigar is a single-source DNA, correct?

1      A.   That's correct.   There was only one

2    individual's DNA present there.

3      Q.   And tell us about what you found on the

4    panties.

5      A.   On the panties, the epithelial fraction or the

6    skin cell fraction was consistent with Diana Garcia.

7      Q.   Okay.

8      A.   The sperm fraction was a mixture of at least

9    two individuals.   The major profile originated from an

10   unknown male.   And this was consistent with the unknown

11   male profile we obtained from the cigar.   And Arturo

12   Rodriguez could not be excluded as a possible

13   contributor to the sample as well.

14     Q.   Okay.   So, on the panties you had epithelial

15   cells that matched Diana Garcia?

16     A.   Correct.

17     Q.   You had male DNA from the same profile or

18   matching the profile from the cigar or cannot being

19   excluded?

20     A.   Correct.

21     Q.   Okay.   And also from the profile on the vaginal

22   swabs, the same unknown male individual?

23     A.   The same unknown male could not be excluded

24   from the cigar, the sperm fraction from the vaginal

25   swab, and the sperm fraction from the panties.

1      Q.    Okay.  And Arturo Rodriguez was also a

2   contributor to the male DNA in the panties?

3      A.    He could not be excluded as a minor

4   contributor.

5      Q.    Okay.  But the major contributor was the

6   unknown male?

7      A.    Correct.

8      Q.    Okay.  You reported on those results?

9      A.    Yes.

10      Q.    And what happened next?

11      A.    Next, we received some reference samples from

12   some different individuals to compare to see if we could

13   obtain -- to see if we could find a match to this

14   unknown profile that we had obtained.

15      Q.    Okay.  And can you tell me whose reference

16   samples you received at that point?

17      A.    Sure.  The next shipment, we obtained reference

18   samples from Candido Lebron, Bienviendo Melo, Leonardo

19   German, and Carmelo Martinez.

20      Q.    And when did you receive those samples?

21      A.    On December 7th, 2007.

22      Q.    Okay.  And did you compare those individuals to

23   the DNA profile that you had obtained from the cigar and

24   the items from the rape kit?

25      A.    Yes.

1    Q.   And can you tell us what result you got?

2    A.   Sure.  Mr. Lebron, Mr. Melo, and Mr. German

3  could be excluded as possible contributors to all of the

4  samples that were tested.  We obtained a really partial

5  profile from Mr. Martinez because what we were provided

6  was a DNA extract.  So, we couldn't make any conclusions

7  about him as a possible contributor at this time.

8    Q.   Okay.  Were you later asked to do that or was

9  that HPD that ultimately got further information?

10   A.   Eventually we were given a swab and compared

11 those as well.

12   Q.   Okay.  And let's go ahead and talk about that.

13 On Martinez, originally you didn't have enough DNA to

14 exclude or include him from those samples?

15   A.   That's correct.

16   Q.   So, what -- can you tell us when you got

17 further DNA or a further sample from Mr. Martinez to

18 compare and determine whether he was included or

19 excluded?

20   A.   Sure.  It was June 2nd of 2011.

21   Q.   Okay.  And when you received that, were you

22 able to get a DNA -- a full DNA profile from Carmelo

23 Martinez?

24   A.   Yes.

25   Q.   And after you got his full DNA profile, were

1  you able to exclude him from being a contributor to the

2  DNA on the cigar, the vaginal swabs, and the panties?

3     A.   Yes.

4     Q.   Okay.  At some point, did you receive a sample

5  from the defendant, Obel Cruz-Garcia, to compare to the

6  results you had obtained?

7     A.   Yes.

8     Q.   And when was that?

9     A.   It was May 28th, 2008.

10    Q.   And were you able to obtain a full DNA profile

11  from the sample you received?

12    A.   Yes.

13    Q.   And what result did you get?

14    A.   The DNA profile we obtained from

15  Mr. Cruz-Garcia, it matched the DNA profile from the

16  cigar.  He could not be excluded as a contributor to the

17  sperm fraction of the vaginal swabs.  And he matched the

18  major profile that we obtained from the sperm fraction

19  of the panties.

20    Q.   And in the case of Obel Cruz-Garcia, you are

21  comfortable using the strong statement that it was a

22  match to the panties and to the cigar?

23    A.   It was a match to -- yes -- to the major

24  profile from the sperm fraction of the panties and to

25  the cigar.  The profiles matched.

1    Q.   And can you tell us the statistics?

2    A.   Sure.  You would expect to find his DNA profile

3  in the North American populations roughly 1 in 1

4  quintillion unrelated individuals.  I was trying to give

5  you the most conservative and that was the least

6  conservative.  Excuse me.

7            So, 1 in 71.5 quadrillion unrelated

8  individuals.  Excuse me.

9    Q.   Okay.  At any point as you received evidence

10  from Sergeant Mehl throughout the course of this DNA

11  work that you did over a period of time, did you have

12  anything in the packaging of the evidence to indicate to

13  you any kind of contamination or mishandling?

14    A.   There is nothing in -- you can't really see

15  contamination from the way the evidence is packaged.

16  All the outermost packaging was sealed and there was

17  nothing, just looking at, that would make you think that

18  anything could have happened.

19    Q.   Can you talk to us a little bit about how,

20  after conducting your analysis, you can assure this

21  Court that the evidence would not have been contaminated

22  with -- by anything that the HPD lab might have done

23  prior to obtaining the defendant's DNA sample?

24    A.   Stating it like that, it's kind of hard for me

25  to say without knowing what the HPD Crime Lab had done

1    with the evidence.

2        Q.   Let me ask you this question.  Let's assume

3    that the HPD lab did not have a sample of the

4    defendant's DNA.  Is there any kind of mishandling that

5    could have been done without a sample defendant's DNA in

6    their possession that would create the kind of results

7    that you got?

8        A.   Without having the defendant's DNA to

9    contaminate with, I don't see a way that his DNA profile

10   could have shown up on this evidence.

11       Q.   Let's say that the evidence back in 1992 was

12   stored in atrocious conditions.  Okay?  And that a

13   tropical storm blew through and there was a leaky roof

14   and the evidence got wet.  Would that somehow make the

15   defendant's DNA appear on that evidence when it wasn't

16   there before?

17       A.    No.  It may make it more difficult to obtain a

18   DNA profile, but it wouldn't change or add to the

19   results from the evidence that we received.

20       Q.    Okay.  Let's say that a person at the crime lab

21   mishandled one piece of evidence, like the cigar, and

22   touched an item from the rape kit with it.  First of

23   all, what kind of tampering like that would have to

24   occur to get the major profile results that you got on

25   the panties?

1    A.   That would be difficult to do because we're

2 basically looking at two different cell types that we're

3 trying to isolate DNA from.  One being epithelial cells

4 or skin cells that you would expect to find on the cigar

5 that someone may have in their mouth.  So, you have

6 saliva and skin cells.  On the second, we did identify

7 sperm on the panties and the vaginal swabs.  So, I don't

8 see a way that, you know, epithelial cells from a cigar

9 could make the sperm cells that we obtained DNA from

10 match the defendant.

11    Q.   Okay.  So, when you test what you believe to be

12 semen, in either the vaginal swabs or the cutting from

13 the panties, what kinds of procedures do you use to

14 isolate the sperm cells from any other kinds of cells?

15    A.   We do what's called a differential extraction.

16 And that's basically an attempt to separate out any of

17 those epithelial cells that are easier to break open and

18 purify, wash away the DNA from the sperm cells that are

19 extremely hearty cells.  They are made to go from one

20 person to another to, you know, have a baby, to create a

21 baby.  So, they are really hearty cells.  So, we use

22 that to our advantage and first break open any

23 epithelial cells that are present.  We wash away, as

24 best we can, any DNA, and, you know, cellular material

25 away from the sperm cells during this differential

1  extraction to, as best we can, separate any epithelial

2  cells from any sperm cells.  And then we isolate the DNA

3  from those two different fractions to do our best to

4  have, you know, any female or epithelial cells in one

5  fraction and any DNA that we obtain from sperm cells in

6  the other.

7      Q.   So, when you were looking at the DNA cells from

8  the panties and the vaginal swabs, you were looking at

9  sperm cells in particular?

10     A.   We were looking at both types.  We had an

11 epithelial fraction and we had a sperm cell fraction.

12 So, we separate those two out.  We still perform DNA

13 testing on both of those fractions, but one would be

14 very rich in epithelial cell DNA and the other would be

15 rich in sperm cell DNA.

16     Q.   Okay.  So, you were looking -- when you found

17 the defendant's DNA profile on the panties, you were

18 looking specifically at sperm cells?

19     A.   They -- his profile showed up in the sperm cell

20 fraction of both of those samples.

21     Q.   Okay.  So, there would have had to have been

22 sperm cells on the cigar for the cigar to have

23 contaminated the panties?

24     A.   Yeah.  When we tested the panties, we saw --

25 when we trying to see how many sperm were present, they

1    are quite a few sperm present.  You would expect to

2    find, you know, a robust profile there.  And we did find

3    a robust DNA profile there.  We had a major profile from

4    that panties cutting that did match the defendant in

5    this case.

6         Q.   And it was such a robust profile you were

7    comfortable saying that it was a match?

8         A.   Yes.  It was a major profile, so we were able

9    to deduce that out and separate it out from any other

10   contributors in that sample.

11        Q.   And those are sperm cells that you were looking

12   at?

13        A.   Yes.  We did our best to isolate the sperm

14   cells themselves.

15        Q.   And looking -- when looking at the cigar, you

16   were looking at the epithelial cells?

17        A.   Correct.

18        Q.   A whole different type of cell?

19        A.   That's correct.

20        Q.   And it was the epithelial cells on the cigar

21   that you were able to say were a match to the defendant?

22        A.   That's correct.

23        Q.   So, what does that indicate to you with regards

24   to contamination?

25        A.   Again, you know, what I stated at the

1  beginning, it looks like they're coming from two

2  different cell types; one from epithelial or skin cells

3  from the cigar where it may have been handled or put in

4  someone's mouth and the other is from the sperm cells

5  that were identified on the panties themselves.

6      Q.   And does the quantity of sperm cells that you

7  saw where you were able to say was the major

8  contributor, also contribute to your opinion?

9      A.   Yeah.  That helps me form my opinion.  Since

10 there were so many sperm cells there, I would expect

11 that to be, you know, a major profile or a good

12 contributor to the sperm cell fraction DNA.

13     Q.   Did you report the results that you received

14 from your testing once you received Obel Cruz-Garcia's

15 DNA and major comparisons?

16     A.   Yes.

17     Q.   Let me ask you this, about storage conditions

18 when it comes to biological evidence.  If you store

19 biological evidence in an unclimate-controlled area in a

20 plastic bag, what can happen to that evidence?

21     A.    If there is any moisture that's trapped in that

22 plastic bag, it could promote any mold or bacteria

23 growth that may be, you know, on that sample and that

24 could degrade your DNA that's on the sample, which would

25 just make it harder to get -- or make it impossible,

1 potentially, to get a DNA profile from that sample.

2     Q.   Okay.  So, basically, you are shooting yourself

3 in the foot, potentially, if you do that, correct?

4     A.   Potentially, yes.

5     Q.   Might not get DNA there, right?

6     A.   Correct.

7     Q.   But it's not going to make somebody else's DNA

8 that wasn't there to begin with all of sudden turn up on

9 that sample?

10     A.   That's correct.  It won't change the DNA to

11 someone else's DNA.  It would just break up the DNA to

12 where you are not able to obtain results from it.

13     Q.   Okay.

14             MS. TISE:  I'm going to pass the witness.

15             THE COURT:   Thank you, Ms. Tise.

16             Mr. Cornelius.

17             MR. CORNELIUS:  Can we take a quick break,

18 Judge?

19             THE COURT:   Sure.

20             (Recess)

21             THE COURT:  You may proceed.

22             MR. CORNELIUS:  Thank you.

23                     **CROSS-EXAMINATION**

24 **BY MR. CORNELIUS:**

25     Q.   Would you spell your last name again for me,

1    please?

2         A.    Yes.   It's Q-u-a-r-t-a-r-o.

3         Q.    Quartaro?

4         A.    Quartaro, yes.

5         Q.    I'm sorry.  I wasn't paying attention.

6         A.    No problem.

7         Q.    My name is Skip Cornelius.  I don't think we've

8    ever met or discussed this case or anything else before,

9    have we?

10        A.    No, sir.

11        Q.    All right.  You said that y'all started from

12   scratch doing your analysis or testing, but you couldn't

13   really start from scratch because you got -- the items

14   that you received to do the testing came from the HPD

15   Crime Lab, right?

16        A.    Yes.  We did test items that came from the

17   crime lab.  What I'm saying is we didn't use any of

18   their DNA extracts or their products of testing in our

19   DNA testing.

20        Q.    But you used their evidence.  The evidence they

21   had in their possession came to you and that's what you

22   used?

23        A.    Yeah, we tested the evidence in the case and it

24   was in HPD's possession at one point.  Yes.

25        Q.    Okay.  And could you tell that that same

1  evidence had been tested by the HPD Crime Lab?

2      A.   I could tell it had been tested because there

3  were some swabs missing and there were swab sticks

4  without the swab heads on them, but I couldn't

5  specifically tell -- I wasn't really concerned with who

6  all had touched the evidence.

7      Q.   Okay.  But it's fair to say that you know there

8  was some active testing by the HPD Crime Lab?

9      A.   Yes.

10     Q.   All right.  Now, why were y'all doing the work

11 for the HPD Crime Lab?  What's your understanding of

12 that?

13     A.   We had a contract with the City of Houston to

14 perform DNA analyses on both -- I mean, on active cases,

15 on cold cases, and several different types of cases.

16 So, we had done so for several years.

17     Q.   And was the HPD Crime Lab shut down at that

18 point, still working, or what was your understanding?

19     A.   Our work with HPD spanned from the time they

20 were closed down till recently.  So, I mean, it spanned

21 several years.

22     Q.   What was your understanding of why the crime

23 lab was shut down?

24     A.   Again, all I know is the anecdotal evidence

25 that I've read in the newspapers.  And, again, reading

1  that was several years ago.  I know there was some

2  issues with --

3                    MS. TISE:  I'll object to anything from

4  that kind of anecdotal evidence as hearsay.  He doesn't

5  have firsthand knowledge of it.

6                    THE COURT:  Unless you have firsthand

7  knowledge, we don't -- just what you heard from somebody

8  else.

9                    THE WITNESS:  Sure.

10                    THE COURT:  I will sustain that.

11                    MR. CORNELIUS:  Actually, Judge, not to

12  argue with you, but just so I don't go anywhere I

13  shouldn't.  Hearsay evidence is actually admissible for

14  purposes of this hearing.  If you don't want to hear it,

15  that's your business, but I'm not going to --

16                    THE COURT:  Well, is it clear from all the

17  documents that you have already put in evidence?

18                    MR. CORNELIUS:  It is.

19                    THE COURT:  I don't want his opinion on

20  what he thinks went wrong, but if it's clear from all of

21  these other documents let's just proceed.

22                    MR. CORNELIUS:  If you don't want to hear

23  it, I totally understand.

24      Q.   (By Mr. Cornelius) All right.  So, when is it

25  that y'all started doing testing for the Houston Police

1   Department?

2        A.   I believe it was either 2003 or 2004.  I don't

3   recall the exact date that the contract started.

4        Q.   Okay.  Among the things that you received were

5   samples from friends and associates of the defendant; is

6   that what you were told?

7        A.   We received them as reference samples.  I

8   didn't know who particularly they were, other than

9   people to see if we could include or exclude.

10        Q.   Okay.  So, what you received from HPD didn't

11   have any language or notification to you as to who these

12   people were, just people for you to try to get profiles

13   on?

14        A.   I can look to see what the notes specifically

15   said when we received the evidence.  Regardless of what

16   it said, it doesn't change the type of testing that we

17   do.  There were just listed as possible suspects.

18        Q.   Okay.  And that group of samples came from the

19   HPD Crime Lab also?

20        A.   They came from Eric Mehl who sent them to us.

21        Q.   Okay.  Now, with respect to the skin cells,

22   epithelial cells, can those be transferred from one

23   person to another?

24        A.   They can, yes.

25        Q.   I mean, for example, if somebody had my skin

1   cell on their hand for some reason or their clothing, or

2   whatever, some friend of mine had my skin cell and that

3   person then touched a cigar or smoked a cigar, could

4   they leave my epithelial cell on the cigar?

5        A.   That's a possibility, but they would also leave

6   their own DNA behind as well.

7        Q.   Why is that?

8        A.   Because they would be touching the sample.

9        Q.   Every time you touch something you leave your

10  epithelial cells?

11       A.   We shed millions of cells every day.  Some

12  people shed more cells than others, depending on how dry

13  their skin is or how oily their skin is, how rough a

14  surface is.  There is different amounts of DNA that are

15  shed every day.  So, just in the course of you rubbing

16  your hands on the chair right there, you are leaving

17  some DNA behind.

18       Q.   So, at crime scenes -- if a suspect is at a

19  crime scene and it isn't where he was, everything he

20  touches is going to have his DNA on it?

21       A.    We may not be able to detect the DNA depending

22  on how much DNA is left behind, but you shed skin cells

23  on everything that you do touch.

24       Q.   Okay.  Then why is it that the police don't get

25  DNA very often at crime scenes?

```
 1         A.   I don't know if that's an accurate statement.

 2         Q.   Okay.  All right.  So, if one person is --

 3    we'll call them a shedder, meaning that they either have

 4    dry skin or for some reason their cells flake off, that

 5    person is definitely going to leave skin cells on most

 6    things that they touch, correct?

 7         A.   That's a pretty general statement.  And, again,

 8    people shed skin cells.  Is it sufficient to obtain a

 9    DNA profile from an item?  That's highly variable with

10    how much they shed, how rough the surface is, how long

11    since they've touched the item.  I mean, there are a lot

12    of variables to know -- or to even give an estimate if

13    it is likely or to get a DNA profile from that.

14         Q.   Okay.  So, why is that you would say that if

15    two people touch a cigar they would both leave their DNA

16    on it?

17         A.   I think that they would both leave their DNA on

18    there.  Would it be in sufficient amounts to obtain a

19    DNA profile, is the main question.

20         Q.   Okay.  Well, maybe I just didn't understand

21    what you were saying.  Two people touch the cigar, is it

22    possible you get a DNA profile for only one of them?

23         A.   It could be possible.

24         Q.   Okay.  With respect to the sperm cells, is

25    there any way that you can test for when the sperm cells
```

1 were deposited?

2      A.   No, we can't tell when it was deposited, just

3 whose DNA is there.

4      Q.   And is there any way you can test -- under what

5 conditions, other than obviously having sex, but under

6 what conditions the sperm cells were left?

7      A.   No.   Again, all we can tell is whose DNA is

8 left behind.

9                MR. CORNELIUS:   I pass the witness at this

10 point, Judge.

11                THE COURT:   Okay.   I'm going to ask a few

12 questions of this witness just to clear some things up

13 for me.

14                Okay.   I think you already testified, but

15 the swabs that you tested and you got back the results

16 of not excluding this defendant's profile from those

17 swabs, did you say that those swabs, you could tell, had

18 already been tested by the HPD Crime Lab?

19                THE WITNESS:   Well, when a sexual assault

20 kit -- there are multiple swabs, swab types.   So, for

21 example -- if I can refer to my notes quickly.

22                There were a total of, looks like, three

23 original vaginal swabs in the sexual assault kit.   One

24 of those did not have the swab head on it anymore, but

25 the two remaining swabs were intact.   So, we then tested

1  one of the intact vaginal swabs.

2             THE COURT:  Okay.  So, the one that didn't

3  have a head on it, you can assume it had already been

4  tested in some way by another crime lab?

5             THE WITNESS:  That's what we assumed.  I

6  don't know that for sure, but it was not there for us to

7  test at this point

8             THE COURT:  All right.  And then so you

9  tested the other two swabs and they came up with you

10 couldn't exclude this defendant, correct?

11            THE WITNESS:  We tested one other swab.

12 There's still one swab remanning for any additional

13 testing.

14            THE COURT:  Okay.  Very good.

15            And then as to the other evidence from the

16 rape kit that -- you were referring to panties and

17 cuttings and -- did you -- I know you received one

18 cutting that already came from another crime lab, that

19 was already cut out presumably those same panties,

20 correct?

21            THE WITNESS:  Correct.

22            THE COURT:  Did you make another cutting

23 from the panties that came out of the sexual assault

24 kit?

25            THE WITNESS:  There is crotch area that was

1  approximately 8 centimeter by 6 centimeters.  And from

2  that there was approximately a 2-and-a-half centimeter

3  by 1-and-a-half centimeter already taken from that

4  sample.

5           THE COURT:  Okay.

6           THE WITNESS:  And so, we took an additional

7  cutting from that sample and tested it.  So, the

8  entire -- the crotch was cut out, one cutting was

9  previously tested, and then we took another cutting from

10 this same crotch area.

11          THE COURT:  Did you test anything

12 additional on the panties itself?

13          THE WITNESS:  No, we did not.

14          THE COURT:  So, you just took the one

15 crotch cutting from the panties that -- and do you know

16 if that was stored separately?  How were those stored?

17 Were they all stored in the same container or what?

18          THE WITNESS:  And there was one crotch of

19 the panties -- a cutting from the crotch of the panties

20 that were stored in a ziploc bag that was separate from

21 the sexual assault kit.

22          THE COURT:  Okay.  So, presumably that's

23 the one that had been already tested from the previous

24 crime lab?

25          THE WITNESS:  It looks like the crotch of

1  the panties was cut out and a portion of that was

2  tested.

3             THE COURT:  Okay.

4             THE WITNESS:  And then we tested another

5  portion of that same cutting.

6             THE COURT:  All right.  So, the crotch of

7  the panties and the actual panties themselves were still

8  in the sexual assault kit, but the small portion was in

9  a separate bag that had already been tested by the other

10 crime lab; is that right?

11            THE WITNESS:  No.  There is -- originally

12 there was a pair of panties in the sexual assault kit.

13            THE COURT:  Sure.  And that's still in the

14 sexual assault kit.

15            THE WITNESS:  There's still an envelope in

16 there that's labeled panties that's stapled on one end

17 and labeled in the sexual assault kit.  We never did

18 anything with that pair of panties that was in the

19 sexual assault kit.  But for -- just for history, so

20 there is a pair of panties, the crotch is taken out, and

21 approximately an 8 centimeter by 6 centimeter cutting of

22 the crotch was taken -- was cut from those original pair

23 of panties.  And then a small portion of that was

24 presumably taken for DNA testing.  And then we took

25 another cutting from this same crotch area for DNA

```
 1    testing.  So, we didn't test the actual small cutting
 2    that the other lab took from there for DNA testing.  We
 3    took another cutting from that same crotch, but not the
 4    portion that was previously tested.
 5                    THE COURT:  Yeah.  And I understand what
 6    you tested.  I'm just wondering where you got that from.
 7    Was it -- so that crotch portion was already cut out and
 8    separated out from the sexual assault kit when you got
 9    it?
10                    THE WITNESS:  That's correct, yes.
11                    THE COURT:  Okay.  Very good.
12                    Does anywhere in your documentation show --
13    and this may have already been asked -- who actually,
14    from the HPD Crime Lab, handled those cuttings?
15                    THE WITNESS:  No, there is not.
16                    THE COURT:  I don't have anything further.
17                    Does anybody have any questions?
18                    MS. TISE:  No.
19                    THE COURT:  All right.  May this witness be
20    excused?
21                    MS. TISE:  Yes, Your Honor.
22                    MR. CORNELIUS:  Yes, Your Honor.
23                    THE WITNESS:  Thank you.
24                    THE COURT:  Thank you, sir.
25                    Call your next.
```

1             MR. WOOD:  Judge, the State will call

2  Courtney Head.  Prior to Ms. Head testifying, we just

3  had a couple of stipulations to read into the record.

4             THE COURT:  Okay.  Very good.  You may

5  proceed.

6             MR. WOOD:  This is something we discussed

7  with Mr. Cornelius before the hearing regarding the

8  defendant's submission to a DNA sample.  I believe --

9  and Mr. Cornelius can agree with this or not agree with

10  this, but on February 16th, 2010, the defendant

11  consented to submit a blood, hair, or saliva sample.

12  There was a signed consent form signed by the defendant.

13  It was interpreted by Rolando Hernandez.  And I will

14  offer that as State's Exhibit 2.

15             And in addition to that, Michael Webb, an

16  investigator with the Harris County District Attorney's

17  Office obtained two buccal swabs from the defendant.

18  Those were submitted to the Houston Police Department

19  Crime Lab on February 18th of 2010.  And the submission

20  form is marked State's Exhibit 3.  And I will submit

21  those for -- or I will offer those into evidence.

22            **(State's Exhibit No. 2 and 3 Offered)**

23             MR. CORNELIUS:  No objection.

24             THE COURT:  No objection to State's Exhibit

25  2 or 3 for purposes of this hearing?

```
 1              MR. CORNELIUS:  That's correct, Judge.
 2              THE COURT:  Okay.  They will both be
 3   admitted, State's Exhibit 2 and State's Exhibit 3.
 4              Okay.  And you may call Courtney Head.
 5              (State's Exhibit No. 2 and 3 Admitted)
 6              (Witness sworn)
 7              THE COURT:  Ms. Head, it's H-e-a-d?
 8              THE WITNESS:  Yes.
 9              THE COURT:  You may proceed, Mr. Wood.
10              MR. WOOD:  Thank you, Your Honor.
11                        COURTNEY HEAD,
12   having been first duly sworn, testified as follows:
13                     DIRECT EXAMINATION
14   BY MR. WOOD:
15        Q.   Good morning, Ms. Head.
16        A.   Good morning.
17        Q.   Can you introduce yourself with your full name
18   for the Court?
19        A.   Sure.  My first name is Courtney.  Last name
20   Head, H-e-a-d.
21        Q.   And, Ms. Head, tell us how you are employed.
22        A.   I'm employed as a criminalist specialist with
23   the Houston Police Department Crime Lab.
24        Q.   How long have you been employed there?
25        A.   About three-and-a-half years.
```

1    Q.   Have you maintained that same position, a

2    criminalist, there at the HPD Crime Lab?

3    A.   Yes.

4    Q.   Tell us a little bit about your background  and

5    first your education.  Tell us where you went to school.

6    A.   Sure.  I have an undergraduate degree from

7    Ouachita Baptist University.  My degree is in biology

8    with a minor in chemistry.  I also have a masters in

9    forensic science with a concentration in forensic

10   molecular biology from George Washington University.

11   Q.   And tell us about your training in the area of

12   DNA analysis.

13   A.   I have been working in DNA analysis since 2002.

14   And I started working in a private forensic DNA

15   laboratory where I received most of my training.  It was

16   made up of mostly readings as well as watching another

17   qualified analyst and doing my own test, practices,

18   doing competency tests, and then oral tests as well.

19   Q.   What are your duties and responsibilities as a

20   criminalist at the Houston Police Department Crime Lab?

21   A.   Well, I'm actually a criminalist specialist, so

22   I'm a supervisor in the laboratory.  I supervise a small

23   group of about nine individuals who do mostly screening,

24   the actual initial testing to determine if like blood or

25   semen might be present on an item.  I'm also the case

1    manager, so I assign all of the cases to every analyst

2    in the lab for DNA or for serology.  I also maintain DNA

3    analysis.  And so, I can write cases, do extractions, do

4    lab techniques, and ultimately write reports.

5        Q.   Are part of your responsibilities there also

6    testifying in court as you are doing today?

7        A.   Yes.

8        Q.   Have you testified as an expert in this area on

9    few or many occasions in the past?

10       A.   I have testified on many occasions.

11       Q.   Regarding the area of DNA analysis, based on

12   your training and experience do you recognize it as a

13   reliable scientific theory or principle?

14       A.   Yes.

15       Q.   Within your lab currently and in your

16   experience, do you currently use a technique known as --

17   and we can talk about this in a little bit, but STR or

18   short random -- tandem repeats?

19       A.   Yes.

20       Q.   And do you know that to be a valid technique in

21   your field in your training and experience?

22       A.   Yes, I do.

23       Q.   Is that also recognized as being valid by the

24   scientific community in which you practice?

25       A.   Yes.

1    Q.   Ms. Head, I want to visit with you a little bit
2  about -- you said you've been with the HPD Crime Lab a
3  little over three years?

4    A.   Yes.

5    Q.   I take it from that you weren't involved in any
6  way, shape, or form with the crime lab back in 1992?

7    A.   No.

8    Q.   I know it's not polite to ask someone's age,
9  but I trust you weren't even around back then?

10   A.   I was -- well, I was around.  I was in seventh
11  grade, I think.

12   Q.   But not at HPD?

13   A.   No.

14   Q.   Okay.  Do you know anything or do you have any
15  dealings or experience with a lab out of California
16  called the Genetic Design Lab?

17   A.   Only in reviewing this case I have seen some
18  report from them, but, otherwise, no.

19   Q.   And your work on this case -- we'll go into
20  what your specific role was in this case, but in your
21  work on this case, did you also have an opportunity to
22  review the work that others had done involving this case
23  in the past?

24   A.   Yes.

25   Q.   And the records and such that go along with

1    that?

2         A.   Yes.

3         Q.   With regards to the Genetic Design Lab, based

4    on your reading of the information on this case was some

5    of the materials involved in this case originally sent

6    off for testing at that California lab back in 1992?

7         A.   Can I check out my notes?

8         Q.   Sure.

9         A.   Everything that I can see from the records that

10   we still had at the crime lab it appears that extracted

11   DNA was sent to Genetic Design.

12        Q.   And I think in our talking about that, you

13   supplied a letter that came from within your crime lab

14   dated November 30th of 1992?

15        A.   That's correct.

16        Q.   And does that detail the evidence that was

17   shipped or sent to Genetic Design Lab requesting that

18   testing be done or analysis be done?

19        A.   Yes, it does.

20             MR. WOOD:  Your Honor, may I approach?

21             THE COURT:  Yes.

22        Q.   (By Mr. Wood) Ms. Head, I'm going to show you

23   State's Exhibit 4.  Is this the letter that you and I --

24   or that you were just referencing (indicating)?

25        A.   Yes.

1              MR. WOOD:  Your Honor, I will offer State's

2    Exhibit 4 into evidence.

3              **(State's Exhibit No. 4 Offered)**

4              MR. CORNELIUS:  No objection.

5              THE COURT:  State's Exhibit 4 will be

6    admitted.

7              **(State's Exhibit No. 4 Admitted)**

8         Q.   (By Mr. Wood) Based on your reading of State's

9    Exhibit 4, Ms. Head, do you see that certain extractions

10   were sent to that lab back in 1992?

11        A.   Yes, I do.

12        Q.   What do you take from that?  What do you mean

13   by extractions?

14        A.   This would mean that the HPD laboratory

15   actually extracted the DNA from the evidentiary samples.

16   So, for example, the vaginal swab and the crotch

17   panties, the DNA was actually extracted out of those

18   samples.  And then for all the blood samples, DNA was

19   extracted from that blood as well.

20        Q.   So, the original evidence, those original

21   evidentiary samples, whether it be the sexual assault

22   kit or the blood or other evidence, that was maintained,

23   based on your assumptions, by the lab that's -- by the

24   HPD itself?

25        A.   Yes.

1    Q.   And only extractions from those evidentiary

2  samples were sent to the Genetic Design Lab?

3    A.   That's correct.

4    Q.   In your reading of -- or in your understanding,

5  that evidence that was sent to the Genetic Design Lab

6  back in 1992, was there a cigar or any extraction or

7  sample of a cigar sent in that evidence?

8    A.   No.  I don't see any listing of a cigar.

9    Q.   Ms. Head, are you familiar with a criminalist

10  by the name of Joseph Chu?

11    A.   Yes, I am.

12    Q.   And have you ever personally worked with

13  Mr. Chu?

14    A.   We do work in the crime lab together.  However,

15  he works in the evidence receiving section on a

16  different floor.  So, the only time I really have

17  interaction with him might be at a lab wide meeting.

18    Q.   And you understand he has been part of the HPD

19  Crime Lab for some time?

20    A.   Yes.

21    Q.   In your review of the information in this case,

22  does it appear that -- does it appear to you that

23  Mr. Chu, Joseph Chu, did any kind of DNA analysis on any

24  of the evidence in the case?

25    A.   Not from what I have reviewed.

1     Q.   And does it appear that he at one point

2  obtained a hair sample from a suspect back in 1992?

3     A.   Yes.

4     Q.   Specifically, October 7th?

5     A.   I'd have to look at my notes.

6     Q.   I think that's based on what you and I had

7  talked.

8     A.   Okay.  Then, yes.

9     Q.   And then he also was in receipt of some buccal

10  swabs of the defendant from Michael Webb back on

11  February 18th of 2010?

12     A.   Yes.

13     Q.   And is that the only two references to Mr. Chu

14  that you have seen in your review of the information in

15  this case?

16     A.   That's correct.

17     Q.   What about an individual by the name of B.

18  Sharma, do you know that person

19     A.   I have no personal knowledge of that person.

20     Q.   Do you understand that that individual has

21  previously worked in the Houston Police Department Crime

22  Lab?

23     A.   Yes.

24     Q.   Did you have -- have you had an opportunity to

25  review a report or work done by B. Sharma back on

1   October 28th of 1992?

2        A.   Yes.

3        Q.   And would you agree with me that B. Sharma did

4   some DNA analysis on some of the extractions from the

5   rape kit in this case back in -- on that date of October

6   of 1992?

7        A.   Yes.

8        Q.   I guess a little bit about the history of DNA.

9   We're talking about 1992.  Would you characterize that

10  as being the very early stages of DNA?

11       A.   Yes.

12       Q.   Suffice it to say that the techniques used back

13  in 1992 were -- are definitely different than what you

14  are experiencing today?

15       A.   Yes.

16       Q.   With regards to B. Sharma's findings from that

17  analysis back in October of 1992, do you recall a

18  finding by B. Sharma that the male fraction DNA was too

19  degraded to make -- form any conclusions?

20       A.   Yes, on certain items.

21       Q.   What does that mean -- what does that mean when

22  he characterizes that as too degraded?

23       A.   That would mean that the DNA -- we're looking

24  for certain links of DNA as far as doing the testing.

25  So, we need for the DNA to be of a certain length in

1   order for us to detect it.  And if the DNA is too

2   degraded, that means that the DNA could be chopped up

3   and it's too small for us to actually be able to use

4   these certain techniques, especially these older

5   techniques needed much longer fragments.

6       Q.   And in your review of the materials, did you

7   actually -- were you actually able to review some of

8   that work that B. Sharma was referencing there?

9       A.   I did find a few of his notes and a couple of

10  pictures in our library.

11      Q.   In your opinion, can you tell us, are his --

12  are his findings that the male fraction DNA at that time

13  was too degraded consistent with the methods that were

14  being used back then?

15      A.   I personally have never used this technique,

16  but in talking and in studies and things that I have

17  learned in graduate school, you would expect to see a

18  certain banding pattern on a DNA profile that would be

19  intact or that you could draw some conclusions from.

20  And in this certain situation, the DNA looks basically

21  like a smear all the way down the photograph.  And so,

22  that would be indicative that the DNA was too degraded.

23                THE COURT:  That it was what?

24                THE WITNESS:  Too degraded.

25      Q.   (By Mr. Wood) And that was based on the method

1  or technique that he was relying on at that time?

2      A.   Yes.

3      Q.   Was that the RFLP testing or was that a

4  different technique?

5      A.   Honestly, I don't know from the notes.  It

6  doesn't actually say it was RFLP.  Based on the notes

7  that I can see, it's a quantitative GEL.  And so, at

8  that point it could have just been a simple GEL trying

9  to determine how many DNA was there versus actually

10  splitting it up and looking at the certain locations on

11  the DNA.

12      Q.   I guess with time and advancements your ability

13  to -- well, analysis has improved or techniques have

14  improved over time; is that correct?

15      A.   Yes, drastically.

16      Q.   Okay.  I want to visit with you a little bit

17  about your personal work on this case.  Okay?

18      A.   Okay.

19      Q.   When was it that you first became involved in

20  this case or asked to become involved in this case?

21      A.   I have to go to a different folder.

22           I first became involved with this case in

23  October of 2010.

24      Q.   And how was it that you became involved?

25      A.   I was asked to perform extraction analysis on a

1  buccal swab.

2      Q.   And did you, in fact, perform the extractions

3  on that buccal swab?

4      A.   Yes, I did.

5      Q.   And who was the buccal swab -- who was that

6  reference sample from?

7      A.   It was from Obel Cruz-Garcia.

8      Q.   And after performing extractions on that

9  reference sample of Obel Cruz-Garcia, what did you do

10 then?

11     A.   After the DNA was extracted, I did some other

12 techniques in the laboratory.  I quantified, basically

13 determined how much DNA was present.  And then I

14 amplified that sample of DNA and ultimately gained a DNA

15 profile that I could analyze and compare to any previous

16 evidentiary samples.

17     Q.   Okay.  So, your work alone, you were able to

18 obtain a DNA profile for Obel Cruz-Garcia, the defendant

19 in this case?

20     A.   Yes.

21     Q.   And after you obtained that profile, you stated

22 that you were able to then compare it against some

23 evidentiary samples?

24     A.   Yes.

25     Q.   Tell me about that.  What did you do to go

```
 1   about that?
 2       A.   I reviewed the case file from Orchid Cellmark
 3   and then I had the DNA profile that I generated from the
 4   buccal swab and I compared that DNA profile to any other
 5   evidentiary samples that were obtained from Orchid
 6   Cellmark.
 7       Q.   So, you, Ms. Head, independently, did not
 8   obtain DNA profiles from evidentiary samples on your
 9   own, you relied on the DNA profiles obtained by Orchid
10   Cellmark; is that right?
11       A.   That's correct.
12       Q.   Specifically, did you compare the DNA profile
13   that you obtained of the defendant, Obel Cruz-Garcia, to
14   an evidentiary sample from a cigar?
15       A.   Yes, I did.
16       Q.   And what basically -- generally what were your
17   findings there with regards to the cigar?
18       A.   Well, the cigar was a single-source DNA
19   profile.  So, the DNA only came from one individual.
20   And when I compared it to the buccal swab from Obel
21   Cruz-Garcia, Obel Cruz-Garcia could not be excluded as a
22   contributor to the DNA on that cigar.
23       Q.   Did you compare his -- the known DNA sample
24   of -- the reference sample of the defendant to other
25   evidentiary items?
```

1       A.    Yes.   I compared it to the sperm fraction of

2   the vaginal swabs from Diana Garcia and also the sperm

3   fraction from the panties, which is described as a

4   crotch-red from Diana Garcia.

5       Q.    With regards to the vaginal swabs of Diana

6   Garcia, what were your findings?

7       A.    Well, the profile obtained from Orchid Cellmark

8   was a mixture of at least three individuals.   And Obel

9   Cruz-Garcia could not be excluded as a possible

10  contributor to the DNA mixture.

11      Q.    And, again, this was sperm fraction DNA; is

12  that correct?

13      A.    Sperm fraction from the vaginal swabs, yes,

14  that's correct.

15      Q.    And with regards to the reference -- the

16  evidentiary sample from the panties, what about that?

17  Was that also sperm fraction?

18      A.    Yes, it was also a sperm fraction.   And the

19  results:   It was a mixture of DNA from at least two

20  individuals, at least one of whom is male.   And Obel

21  Cruz-Garcia could not be excluded as a contributor to

22  the major component of that DNA mixture.

23      Q.    Ms. Head, in your analysis of the case, I

24  guess, it's suffice to say that in the techniques that

25  you used, DNA was not too degraded for you to be able to

1   make findings.  Is that accurate?

2        A.   That is accurate.

3             MR. WOOD:  Your Honor, I will pass the

4   witness at this time.

5             THE COURT:  Mr. Cornelius, you may proceed.

6             MR. CORNELIUS:  One second, if I might,

7   Judge.

8             (Pause)

9                    **CROSS-EXAMINATION**

10  **BY MR. CORNELIUS:**

11       Q.   Okay.  Ms. Head, my name is Skip Cornelius.  I

12  think I've met you before on a different case in the

13  last couple of years.

14       A.   I think that's true.

15       Q.   But we've never discussed this case, right?

16       A.   No.

17            MR. CORNELIUS:  Judge, may I look at the

18  document that came into evidence?

19            THE COURT:  Here is 2 through 4 from the

20  State.

21       Q.   (By Mr. Cornelius) The one marked as State's

22  No. 4, do you have a copy of this yourself?

23       A.   I do.

24       Q.   Now, what do you know about this submission --

25  I guess we can call it a submission form.  What do you

1    know about this?

2         A.   Only that it appears to be a letter generated

3    by Jim Bolding, who I seem to think was one of the

4    supervisors in the crime lab at the time.  And he had

5    been asked to draft this letter in order to describe

6    what exactly was being sent to Genetic Design and to

7    request a certain type of testing.

8         Q.   Okay.  And beyond that, do you know anything

9    about these?

10        A.   No.

11        Q.   So, you don't know how they were obtained?

12        A.   I don't know how the letter was obtained?

13        Q.   No.

14        A.   The sample?

15        Q.   The different extractions.

16        A.   I have some notes on the certain samples and

17   that's all I have.

18        Q.   Okay.  And do any of your notes have to do with

19   Joseph Chu or B. Sharma?

20        A.   Joseph Chu is just what Justin Wood described,

21   the head hair pulling and the receipt of the buccal

22   swab.  B. Sharma --

23        Q.   The receipt of the buccal swab when?

24        A.   In 2010.

25        Q.   Okay.  All right.  Well, that doesn't have

1   anything to do with this letter?

2        A.   No.   These samples, I do believe that Sharma

3   did do -- or at least was involved in the DNA

4   extractions for these samples.

5        Q.   Sharma doesn't work for crime lab any more,

6   right?

7        A.   No.   I actually don't think he is still alive.

8        Q.   Okay.   I guess that's true.

9             Do you know if he was terminated from the

10  crime lab?

11       A.   I don't know.

12       Q.   You don't know about all that stuff?

13       A.   No.

14       Q.   So, you came to work there when?

15       A.   In 2010.

16       Q.   So, in 2010 was the crime lab up and fully

17  operational when you went to work there?

18       A.   Yes.

19       Q.   Okay.   From this letter marked State's Exhibit

20  No. 4, we can determine that the evidence in this case,

21  which would include a vaginal swab from Diana Garcia,

22  the crotch of the panties of Diana Garcia, and blood

23  from various individuals, was handled by the Houston

24  Police Department Crime Lab?

25       A.   Yes.

1      Q.   And Sharma was one of the ones -- Sharma was

2 one of the ones that worked on this case?

3      A.   Yes.

4                MR. CORNELIUS:   Nothing further at this

5 time, Judge.   I'll put the evidence back.

6                THE COURT:   I have a couple questions.

7                All right.   As to Joseph Chu, where was

8 Joseph Chu working when he received the buccal swabs in

9 2010?

10               THE WITNESS:   He currently works in the

11 evidence receiving section.   And mainly that has to do

12 with --

13               THE COURT:   For Orchid Cellmark?

14               THE WITNESS:   No.   For HPD.   He still works

15 at HPD.

16               THE COURT:   Okay.

17               THE WITNESS:   He's entitled a criminalist,

18 however, he works in the section that receives most of

19 the controlled substances.   On occasion, he's actually

20 with the D.A.'s office.   If they have buccal swabs, they

21 don't submit them directly to HPD property room, they

22 can go to our central evidence receiving.   And that's

23 where he works, he receives the buccal swab.

24               THE COURT:   Okay.   And so, your information

25 shows that Joseph Chu received a buccal swab of the

```
 1   defendant in 2010?

 2               THE WITNESS:  Yes.

 3               THE COURT:  And it did not go directly to

 4   Orchid Cellmark?

 5               THE WITNESS:  No.  What I understand is two

 6   buccal swabs were collected from the defendant in this

 7   case.  One several years prior to the one I actually

 8   tested.  And the buccal swab that Orchid Cellmark tested

 9   was this one that was collected previous.  And the one

10   that I tested was collected in 2010.

11               THE COURT:  Okay.  So, the buccal swab that

12   was collected -- that Joseph Chu received in 2010, that

13   was not used for any of the DNA analysis that was

14   done -- performed by Orchid Cellmark?

15               THE WITNESS:  That's correct, to my

16   understanding.

17               THE COURT:  And then you've already

18   testified as to what you believe Sharma's contact with

19   this case was.  And was he the -- according to your

20   notes, was he the main analyst on the items that were

21   tested when they received extractions from the rape kit?

22   Was he the main analyst?

23               THE WITNESS:  He is the main analyst for

24   the DNA testing.

25               THE COURT:  Okay.  Very good.
```

 1                    And as to -- do you show anything, Deetrice

 2   Wallace, was she on any of the testing in this case?

 3                    THE WITNESS:  I do believe that she might

 4   have been involved in -- let me check my notes before I

 5   speak on this.

 6                    THE COURT:  Okay.

 7                    THE WITNESS:  Yes, I believe she initially

 8   received the sexual assault kit and did some screening,

 9   which is the basic detection of blood or semen.  Because

10   she does have some results written on this worksheet

11   that would document what test she did.  And it has the

12   initials D.M.W., which I believe are Deetrice Wallace,

13   but I don't know for sure.  I've never seen her or

14   worked with her.

15                    THE COURT:  Okay.  Anything else?

16                    MR. WOOD:  Just one second, Your Honor.

17                    THE COURT:  Okay.

18                    (Pause)

19                    MR. WOOD:  I'm sorry.  May I ask one

20   follow-up?

21                    THE COURT:  Please proceed.

22                    **REDIRECT EXAMINATION**

23   **BY MR. WOOD:**

24        Q.   Ms. Head, I just had one follow-up question, if

25   you know.  Do you know, based on your review of the

```
 1  information, when the last time the DNA crime lab
 2  handled or dealt with any of the evidence prior to you
 3  becoming involved in 2010?
 4      A.   I can check and see if I can figure that out.
 5  Did you mean the old HPD Crime Lab?
 6      Q.   Yes.
 7      A.   The latest date I can see, just in a brief
 8  quick look of the registries, is 1994.
 9      Q.   Thank you, Ms. Head.
10              MR. WOOD:  I pass the witness, Your Honor.
11              MR. CORNELIUS:  No further questions.
12              THE COURT:  Thank you, Mr. Cornelius.
13              Anything further from this witness at all?
14  May she be excused?
15              MR. WOOD:  No objection.
16              MR. CORNELIUS:  No objection.
17              THE COURT:  You may be excused.  Thank you,
18  Ms. Head.
19              Call your next.
20              MR. WOOD:  State rest, Your Honor.
21              THE COURT:  Okay.  Arguments.  You may
22  proceed since it's your motion, Mr. Cornelius, unless
23  you want to waive.
24              MR. CORNELIUS:  I will just wait and
25  respond to the State, if they have any argument.
```

1        THE COURT:  Okay.  Ms. Tise.

2                    **STATE'S ARGUMENT**

3        MS. TISE:  Thank you, Judge.

4              There are a lot of different issues at play

5    here, so I want to try to compartmentalize them as best

6    I can to address each one of them.

7              The first issue is whether -- and, perhaps,

8    the easiest issue in this case -- is whether or not this

9    evidence should go before the jury.  And it's the

10   State's argument that it certainly should.  It's a

11   question of fact in this case whether or not the jury is

12   going to find the evidence sufficiently reliable and not

13   a question of law.  And, therefore, that that is really

14   the easiest question.  This evidence should go before

15   the jury.

16             But there are a number of things that I

17   think pretty clearly should not go before the jury.  And

18   I want to argue those things now with regards to our

19   motion in limine about some of those things.  First of

20   all, the disciplinary history and the criminal records

21   of Deetrice Wallace, in my opinion, should not go before

22   the jury.  Deetrice Wallace will not be called as a

23   witness in this case.  She'll not be testifying, nor

24   will any of the work that she did at the crime lab be

25   offered by the State.  Because of that, she's not a

1   testifying witness.  So, Rule 609, which allows the

2   defense to impeach someone by their prior convictions,

3   is not going to come into play.  So, her prior

4   conviction is not going to be relevant for impeachment

5   purposes.

6                   It's also not relevant when it comes to the

7   reliability issue because Deetrice Wallace' issues did

8   not happen when she was at HPD.  You have a copy of the

9   I.A.D. history on Deetrice Wallace and you'll see there

10  is nothing in the exhibit that the --

11                  THE COURT:  I don't really have it before

12  me.  I know --

13                  MR. CORNELIUS:  It's down here.  You

14  haven't seen it yet.

15                  THE COURT:  But I do know from your Brady

16  notice that she has criminal convictions for tampering

17  with a governmental record.  I have no idea what those

18  are about.

19                  MS. TISE:  Those happened a great deal of

20  time later when she was working at the D.P.S. Lab and

21  she was responsible for going out and checking on the

22  intoxilyzer instruments.  And she was saying that she

23  had gone when she hadn't.  Over 10 years after --

24                  THE COURT:  Like a timesheet issue?

25                  MS. TISE:  Yes.  Well, she had records

1    where she was indicating I had gone out and checked this

2    intoxilyzer instrument at this location and I checked at

3    this location, where she hadn't done it, so that she

4    could be paid, basically.

5                  There is no evidence, and you won't find it

6    in any of the Bromwich reports, which I invite you to

7    look at, of anything that Deetrice Wallace did during

8    her time at the crime lab to indicate that she did not

9    have competence.  Her file from her previous conviction

10   is full of commendations where she was actually doing a

11   good job at HPD.  And there is no disciplinary history

12   for her at HPD.  It's over 10 years later when she gets

13   in trouble.  And that is simply too remote to have

14   anything to do with this case, especially since she's

15   not testifying.

16                 So, it's our very strong argument that that

17   evidence is not -- I can't even think how it would come

18   into play since she's these not going to be impeached

19   and none of her reports are going to be offered.

20                 B. Sharma also was an analyst at the crime

21   lab who had problems.  When you look at the Bromwich

22   report, you're going to see that most of his problems

23   were supervisory and management problems, and also

24   problems with the fact that when he tested DNA he used

25   really rudimentary techniques that show he missed a lot

1    of stuff.  And so, in the report they talk about things

2    that B. Sharma should have done, he might have gotten

3    better results if he had done this test, or he might

4    have gotten more -- you know, more information if he had

5    done that test, but it's not the kind of -- basically,

6    he's written up for incompetence because he's not using

7    the most modern lab techniques that he could use to get

8    the results that he needed to get.  And he is ultimately

9    seen as ineffective manager who is not really doing his

10   job at the crime lab and he gets removed from his

11   duties.

12            He is not going to be called as a witness,

13   obviously.  I don't even think he is still with us and

14   none of his reports are going to be offered, but there

15   is nothing to indicate any kind of tampering or anything

16   that B. Sharma might have done with the evidence that

17   might have caused it to be comprised in any way.

18            You are going to also see from the Bromwich

19   report some talk from the individuals who did the report

20   about contamination issues at the crime lab.  None of

21   that is relevant to this case because of the way this

22   particular evidence was stored.

23            First of all, the cigar was stored in the

24   HPD property room on Goliad.  It was not stored in the

25   crime lab where the issues happened with the leaking

1   roof that resulted in potential contamination on 36

2   cases.  Those 36 cases are not identified in the

3   Bromwich report, but it does make clear they are cases

4   where they contained clothing evidence that were in

5   cardboard boxes that got wet during one of the tropical

6   storms and were potentially contaminated.  Our cigar

7   wasn't even there.  Our cigar was in the property room

8   on Goliad.  We also know that that cigar never appears

9   to have been unsealed.  It was in its original packaging

10  from when it was collected at the scene.

11              As far as the sexual assault kit goes, we

12  do know that the old crime lab retrieved that and tested

13  it.  You are not going to have the concerns about the

14  contamination issues with the leaky roof because the

15  sexual assault kit was also not stored on the top floor

16  of the HPD Crime Lab.  It was stored in an annex on a

17  lower floor.  In addition, Officer Mehl testified it was

18  in very good condition when he found it and no

19  indication that it had been comprised in any way.

20              In addition, you have the fact that when

21  they analyzed the evidence it shows that contamination

22  is extremely unlikely in this case.  And I know it's

23  confusing with the different DNA samples, so I want to

24  make sure the Court is clear about that.  HPD and the

25  old crime lab never had the defendant's DNA until 2008

1   when he was found in a Puerto Rican prison and a DNA

2   sample was obtained by some federal agents and sent to

3   Eric Mehl.  So, in 2008, that's the first time HPD --

4              THE COURT:  And that one didn't go to the

5   crime lab.  That went to Mehl?

6              MS. TISE:  It went to Eric Mehl.

7              THE COURT:  And he testifies that he sent

8   that to Orchid Cellmark, right?

9              MS. TISE:  And he didn't even open it.  He

10  left it in the packaging that he received from the FBI

11  agent, put it in a FedEx container, and shipped it

12  directly to Orchid Cellmark.

13             THE COURT:  Okay.

14             MS. TISE:  That was in 2008.

15             THE COURT:  This 2010 sample came out of

16  nowhere.  What was that for?

17             MS. TISE:  I will explain.

18             THE COURT:  Okay.

19             MS. TISE:  The Orchid Cellmark got the 2008

20  sample of the defendant that the FBI agent sent from

21  Puerto Rico.

22             In 2010, by that time the defendant had

23  been extradited from Puerto Rico to Houston.  At that

24  time, in order to try to prevent bringing FBI agents

25  from Puerto Rico in to testify that they took a sample

1  from the defendant, we decided to get a separate sample

2  here in Houston and have it tested.  And at that time,

3  the HPD lab was up and running again, so we sent it to

4  them and they tested that 2010 sample.  So, there are

5  two separate DNA samples of the defendant, both of which

6  have been tested and both of which show that he matches

7  DNA on the cigar, he is the major contributor to the DNA

8  on Diana Garcia's panties, and he is a contributor to

9  the DNA on her vaginal swabs.

10           If there was going to be contamination

11 because of a tropical storm coming in and raining down

12 on the top floor of the crime lab, unless it was raining

13 Obel Cruz-Garcia's semen, it's not going to have

14 affected the results that Orchid Cellmark and HPD got.

15 If someone had malicious intent at the crime lab, which

16 there is no evidence that any of the analysts involved

17 in this case did have -- were malicious and just want to

18 rub evidence all over each other, then -- and,

19 therefore, contaminate it, that's a stretch, but let's

20 just give them the benefit of the doubt and say that

21 happened.  Then Matt Quartaro would not have gotten the

22 results that he had gotten.  He got semen, semen on the

23 panties, semen on the vaginal swabs, and epithelial

24 cells on the cigar.  So, it's just not likely.  And not

25 only that, but he's the major contributor and the semen

```
 1   was prolific on the panties and it matches the

 2   defendant.

 3              So, for all these reasons, our position is

 4   that criminal history on Deetrice Wallace is certainly

 5   not admissible because she's not going to testify.  Any

 6   evidence as to the competence of B. Sharma is not

 7   relevant or admissible because she's not going to

 8   testify and his results are not going to be offered to

 9   the jury, or even referred to in any way.  There is no

10   contamination evidence that can be directly linked to

11   this case.  And the Genetic -- thank you, Justin.

12              The Genetic Design Lab from California, who

13   also had their hands on this case, only had their hands

14   on the extraction.  They didn't get the original

15   evidence.  And the leaky roof, you will see from the

16   Bromwich report -- I'm sorry to jump around -- but that

17   happened in the late 1990s, long after the HPD Crime Lab

18   had finished with what they were doing with this case.

19   And the evidence was all stored.

20              Thank you, Judge.

21              THE COURT:  Okay.  Thank you, Ms. Tise.

22              Mr. Cornelius.

23                 **DEFENSE CLOSING STATEMENT**

24              MR. CORNELIUS:  Just a couple of things,

25   Judge.
```

1              What is in evidence as Defendant's No. 9,

2    which I know you haven't seen yet, contains the -- I

3    guess you call it the disciplinary report of Sharma.

4    And there are -- there is one finding of incompetence,

5    two findings of misconduct, and one finding of improper

6    police procedure.

7              And then with respect to Chu, we have two

8    findings -- or one finding of misconduct and one finding

9    of at-fault accident.  There is nothing in terms of --

10   well, all I have been provided is nothing on Deetrice

11   Wallace other than --

12             THE COURT:  You were provided nothing on

13   Deetrice Wallace?

14             MR. CORNELIUS:  Well, I have been finding

15   lots of things on Deetrice Wallace, but not -- there is

16   no discipline while she worked at the crime lab, at

17   least that's what I'm told.  So, her -- the only thing

18   we would seek to offer are convictions, but it happened

19   at a different crime lab.  But in our opinion, it goes

20   to -- as part of the overall part of showing lack of

21   competent in the crime lab or anything that they

22   handled.

23             Another just a couple of quick comments.  I

24   won't make a long argument to the Court.  The testimony

25   is you cannot see contamination, you can't see it.  So,

1  the analyst -- or whatever the proper title is -- from

2  Orchid Cellmark can't -- what he said is he can't

3  testify whether things had been contaminated or not, you

4  can't really see that.  He did testify he didn't

5  think -- he did not think they were contaminated, but he

6  can't say that they weren't.

7            For example, you can see a skin cell.  You

8  can't see if one person passes a skin cell on to

9  something else, their own skin cell or somebody else's

10  skin cell.  You can't really see it with the naked eye.

11  There's a process to try to get a DNA profile from a

12  skin cell or a sperm cell.

13            So, two quick things.  Our argument is that

14  we wish the Court to suppress because of the problem

15  with the HPD Crime Lab as handling this case,

16  including -- in my opinion, including the cigar.  We ask

17  that it all be suppressed, any testimony concerning the

18  results of DNA extraction and identifications be

19  suppressed.  And so, that's number one.

20            The second thing is if you are not going to

21  suppress it, then we've had this hearing also as a

22  proffer to try to determine what you might let into

23  evidence and what you might not let into evidence from

24  the defense standpoint.  If you allow it in, I would

25  like to be able to introduce all of this evidence for

1  the jury to decide, because it will be a fact issue,

2  whether what they would know then, after getting all

3  this evidence about our crime lab that handled this

4  stuff, is sufficient to create in their mind doubt about

5  the results of what finally the State's offering as DNA

6  analysis and comparisons.

7              Among other things that's an issue, I'm not

8  sure how I sponsor Michael Bromwich's report if he won't

9  -- he lives in Washington D.C. -- if he won't take my

10  phone calls or won't come down here.  I suppose I

11  can -- well, I probably can get around that, but that's

12  an issue for me right now.  I've got a couple of weeks

13  to figure that out.

14              But, anyway, I would like to offer all this

15  stuff.  If you allow the State to go forward with the

16  DNA testimony, I would like to make the jury as aware as

17  I can make them as to what the situation was with our

18  crime lab that handled all of this evidence.  And that's

19  it.

20              THE COURT:  Okay.  I did find in the

21  record -- and this was filed by Christian Capatine and

22  Steve Shellist, but it was a State's -- a motion for

23  in-camera inspection the State's file on Deetrice

24  Wallace -- it gives the cause number -- to determine the

25  existence of any evidence favorable to the defendant

1   under Brady v. Maryland.

2              So, have you received everything that you

3   feel you need on those files to determine whether or not

4   there is any Brady information in those files on

5   Deetrice Wallace?

6              MR. CORNELIUS:  Yes.

7              THE COURT:  Okay.  I want to make sure

8   that's noted in here.

9              Okay.  First off, as to the general

10  admission of the DNA evidence, I agree with the State

11  that this evidence is going to come in.  Specifically

12  this cigar evidence, I don't see that the HPD Crime Lab

13  ever handled the cigar.  So, any of the issues as to

14  whether it could have been tainted or contaminated or

15  mis-tested, or whatever, any of these problems don't

16  have anything to do with the cigar.  As far as I

17  understand the testimony, the cigar was kept in the HPD

18  property room over there on Goliad and was in a sealed

19  container up until Eric Mehl decided to get it out and

20  send it to Orchid Cellmark and that was in 2007.

21             MS. TISE:  May I correct the record on

22  that, Judge?  Because there is a -- I don't want the

23  Court to have any misconception.

24             THE COURT:  Okay.  That's what I

25  believe the testimony to be from this hearing.

1          MS. TISE:  Eric Mehl testified that it

2    appeared to have never been taken out of the package,

3    the original packaging.  Now, the crime lab did request

4    some evidence to test from the crime scene and there was

5    a large brown paper bag that was brought over from the

6    property room and there was a sheet

7    individually-packaged, a t-shirt individually packaged,

8    and a cigar individually packaged.  And they tested the

9    sheet for blood and semen and didn't find any.  And then

10   sent that whole thing back over to the property room.

11          So, I do not want there to be any kind of

12   misconception.  They did have it, but there is no

13   indication that they ever tested it or removed from it

14   from its original packaging.

15          THE COURT:  So, what you are saying now is

16   that the cigar in a larger container may have gone over

17   to the HPD Crime Lab.  On what date?  When?

18          MS. TISE:  October 9th of 1992.

19          THE COURT:  Okay.  And that the crime lab

20   at that time tested a sheet and some other evidence in

21   that larger package, but there's no indication they even

22   opened the container containing the cigar?

23          MS. TISE:  Eric Mehl said it was in the

24   original sealed plastic bag.

25          THE COURT:  Okay.

1          MR. CORNELIUS:  Well, that's not what he

2     said.  Did he say it was the original sealed plastic bag

3     or sealed plastic bag?  I mean...

4          THE COURT:  So, I stand corrected.  There

5     may -- it's not that the cigar never went over there as

6     I originally thought, but there is no indication that it

7     was ever tested by the HPD Crime Lab in any way.  And

8     that's not the same with the sexual assault evidence.

9     It looks like, even though it may have been stored

10     long-term in a property room, it, at one point, had gone

11     over to the HPD Crime Lab and at least some samples were

12     taken out of there, at least one swab perhaps, and a

13     cutting from the panties crotch area, and there was some

14     extractions made as to that evidence.

15          I believe all that evidence is admissible.

16     And there may be a question of fact as to whether the

17     jury believes that evidence to be credible, but from

18     what I have heard in this motion to suppress, I'm not

19     going to suppress that evidence, that the jury is going

20     to get to hear it.

21          Now, what else might they get to hear along

22     with it?  And you are telling me that, State, that you

23     don't intend to call Deetrice Wallace, B. Sharma, or

24     Joseph Chu, or any other person from the HPD Crime Lab

25     that might have had contact with this evidence; is that

1   correct?

2              MS. TISE:  My intention is to call Courtney

3   Head, who was not working there back in those days, but,

4   no, I have no intention of calling Deetrice Wallace, B.

5   Sharma, or Joseph Chu, nor offer any report or any

6   findings from those individuals.

7              THE COURT:  I have not had an opportunity

8   to review the Defense exhibits.  And so, before I make

9   my ruling on what actually is admissible, I'm going to

10  review all of this because I don't know what they show

11  or what kind of connection there might be to this case.

12             But, Mr. Cornelius, what would your theory

13  of their admissibility be if you do not have any of

14  these witnesses to call?  How would you consider them to

15  be admissible?  Of course, I can see a felony

16  conviction, if someone testifies, may be admissible, but

17  if they didn't testify, how would you get into these

18  things?  Under what theory?

19             MR. CORNELIUS:  I don't know about the

20  felony conviction.  I will think about that, but I'm not

21  sure where this stuff is -- well, first of all, what --

22  is the objection hearsay?  Is that --

23             THE COURT:  No.  We're talking about in

24  terms of -- in terms of what I'm going to allow you to

25  put in, if anything.  I'm allowing them to put on the

 1   DNA evidence.  So, if I allow you to put on anything to

 2   counter that in terms of trying to establish that it's

 3   contaminated or anything like that, I'm trying to, at

 4   this point, establish what I'm going to allow you to go

 5   into.  I can't see -- if there is not a witness called,

 6   I'm trying to determine what theory you would be

 7   presenting that under.

 8                    MR. CORNELIUS:  Okay.  So, you are not

 9   saying that I need to overcome relevance.  You're saying

10   that I need to overcome hearsay?

11                    THE COURT:  Potentially.  Here with

12   B. Sharma, it looks like disciplinary records.  You

13   know, usually extraneous conduct of even a witness isn't

14   available to impeach them unless there is some other

15   relevance, like motive or something like that.  How

16   would you -- and I guess that's what you are going to,

17   is motive on these -- motive and identity and all those

18   others, 404(b) type scenario where these would be

19   allowed in for any witness testifying.  The Bromwich

20   report is not going to be -- that's something that may

21   come in under, you know, a business record, but it's

22   still going to have to be relevant.  I suppose the

23   relevancy is going to be the challenge of DNA.  So, I

24   have to read through that to see if I feel that would

25   come in.

1          But say the disciplinary records of Sharma,

2  do you plan to call him or do you plan to impeach him

3  as --

4          MR. CORNELIUS:  No.  Well, first of all,

5  I've gotten all this stuff essentially from the State.

6          THE COURT:  I understand that.

7          MR. CORNELIUS:  I don't know what the

8  objection would be that it's unreliable.  I can

9  understand the objection whether it's not relevant, I

10  understand that one, but from a reliance standpoint, I

11  don't know that I have witnesses available to --

12          THE COURT:  So, would you be offering it in

13  like under business records that it's reliable and there

14  is no witnesses here to say what they did, but you are

15  going to try and impeach that witness?  Like B. Sharma,

16  you're going to be trying to impeach that witness under

17  his disciplinary records without having him here to say

18  what he did or didn't do in this case; is what you would

19  be doing?

20          MR. CORNELIUS:  With Sharma, correct.  I

21  don't know how I get into -- I can't make an argument

22  right now how to get into Deetrice.  I don't know how I

23  get into evidence of misconduct that occurred at a

24  different lab.

25          THE COURT:  At a different time 10 years

1    later.  So, that's --

2                 MR. CORNELIUS:  If I'm attacking this lab,

3    I'm not sure how I attack this other lab.

4                 THE COURT:  And --

5                 MR. CORNELIUS:  I'd have to think real hard

6    about a good faith argument to get that in.

7                 THE COURT:  And then Joseph Chu.

8                 MR. CORNELIUS:  The other stuff --

9                 THE COURT:  You would be offering it in

10   simply to impeach the HPD Crime Lab, which they're not

11   really even offering the results from.  So --

12                MR. CORNELIUS:  Yeah, but they handled it.

13                THE COURT:  And I understand.  I know we're

14   still on the record, I'm just -- I have not made my

15   ruling.  I'm trying to contemplate what your arguments

16   will be to convince me that I should let it in, but they

17   are not offering in the results there.  You are offering

18   it in for contamination, but you don't really have a

19   witness that's saying it is contaminated.

20                MR. CORNELIUS:  True, I don't.  And their

21   witnesses testify you couldn't see it anyway.

22                MS. TISE:  But he also testified that from

23   the results he got, contamination is not consistent

24   with --

25                MR. CORNELIUS:  No.  He made a good witness

1    for you.  He made a good witness.

2              THE COURT:  Is there any case law you want

3    me consider in terms of --

4              MR. CORNELIUS:  On a defunct crime lab?  I

5    don't have any cases on that.

6              THE COURT:  It doesn't necessarily have to

7    be the HPD Crime Lab, but on this type of evidence

8    coming in just simply to impeach like a whole agency.

9    Obviously, the HPD Crime Lab was shut down and I can't

10   make an analogy to any other agency that I can think of,

11   but I'm sure there are other crimes and such that that's

12   happened to.  And to allow that in in general just to

13   say that you can imagine how many cases we would just

14   have to throw evidence out if we excluded everything

15   that they ever laid their hands on, but --

16             MR. CORNELIUS:  You are not going to

17   exclude it, though.  You've already ruled you're going

18   to let the evidence in.

19             THE COURT:  Correct, I am going to let the

20   evidence in.

21             MR. CORNELIUS:  So, the case doesn't get

22   thrown out.  I think it's something the jury has the

23   right to know in a case this serious, but I need to

24   isolate whether what I'm trying to overcome is

25   relevance.  Because if your ruling is it's not relevant,

1    then I'm done.  You know, I have offered what I can

2    offer.  I really --

3                  THE COURT:  I need to read them first and

4    need to think through it because I don't know, there may

5    be portions of those reports that are very relevant to

6    what I'm seeing here, what's been testified about here

7    as to extractions and the handling.  From what I hear so

8    far, the crime lab did not have the defendant's profile

9    at the time that they were handling it -- the old crime

10   lab -- that it would be virtually impossible for them to

11   have contaminated those samples with his DNA profile.

12   And even though they had a cigar in a different

13   location, the cigar was epithelial cells and it turned

14   out there were sperm cells on the items that were in the

15   rape kit or the sexual assault kit.

16                  So, that's what I'm hearing, but I don't

17   know what those reports show.  So, let me read through

18   those and see if they bring to light anything else that

19   may be relevant.  And in general, contamination issues

20   maybe that have not been discussed here, but could be

21   extrapolated from some of the evidence that I heard.

22   So, I'm going to withhold my ruling on what exactly I

23   will allow in.  I'll read through that.  And if you have

24   any case law to support it coming in, would you please

25   give to me?

1          MR. CORNELIUS:  Okay.

2          THE COURT:  If you have any case law to

3    support it not coming in, more than what you've already

4    argued -- I know a lot of this is not case law, a lot of

5    it is just common sense and --

6          MS. TISE:  Right.

7          THE COURT:  -- applying the rules, but if

8    there is anything else, please give it to me.  And I'll

9    make my ruling by -- I'll try to make my ruling by that

10   week of July 1st, so you a little time to plan.

11         Is everyone going to be around on that

12   Wednesday of the July 4th week?

13         MR. CORNELIUS:  I'll be around, but not

14   till after lunch.

15         THE COURT:  Okay.

16         MS. TISE:  I will be here.

17         THE COURT:  Okay.  So, I'll try to put it

18   on the record that afternoon, that Wednesday afternoon.

19         MR. CORNELIUS:  Great.

20         But let me ask another question on the

21   record.  If you decide that some part of it or all of it

22   is admissible, do I need to have Bromwich here -- if the

23   objection is hearsay, do I need to have Bromwich here to

24   offer this report or some specific person to offer this

25   report, or any of these documents, or is it going to

1    come in as a public record or some other argument I can

2    come up for its admissibility?

3                    THE COURT:  Okay.  Let's go off the record.

4                    (Proceedings recessed)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2    THE STATE OF TEXAS   )
     COUNTY OF HARRIS     )

3

4        I, Mary Ann Rodriguez, Official Court Reporter in

5    and for the 337th District Court of Harris County, State

6    of Texas, do hereby certify that the above and foregoing

7    contains a true and correct transcription of all

8    portions of evidence and other proceedings requested in

9    writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of

14   the proceedings truly and correctly reflects the

15   exhibits, if any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND this the 2nd day of

17   October, 2013.

18

19   /s/ Mary Ann Rodriguez
     Mary Ann Rodriguez, Texas CSR 3047
20   Expiration Date:  12/31/2013
     Official Court Reporter
21   337th Court
     1201 Franklin
22   Houston, Texas  77002
     713.755.7746
23

24

25

**'**

**'53** - 25:15
**'93** - 27:5
**'skip'** - 2:11

**/**

**/s** - 122:19

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**1** - 1:23, 20:15, 20:16, 20:20, 24:21, 24:23, 25:1, 25:2, 60:3, 60:7
**1-and-a-half** - 75:3
**10** - 20:21, 20:22, 101:23, 102:12, 116:25
**100** - 1:13
**107** - 1:14
**10th** - 7:18
**11-and-a-half** - 48:22
**11/30/92** - 2:6
**111** - 1:12
**1181910** - 3:14
**12/31/2013** - 122:20
**1200** - 32:11, 32:13, 44:15, 44:18
**1201** - 2:6, 122:21
**122** - 1:15
**1225** - 2:15
**1289188** - 3:13
**1289189** - 3:14
**1384794** - 1:3, 3:3, 3:15
**14** - 26:25
**16** - 1:2, 1:1, 1:4, 1:5, 1:6, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:15, 1:18, 1:19, 1:20, 1:24, 2:2, 2:4, 2:6, 2:10, 2:14, 2:18, 2:22, 3:4, 3:7, 3:9, 3:12
**16th** - 78:10
**18th** - 78:19, 86:11
**19** - 1:3
**1970** - 29:1
**1979** - 24:10
**1981** - 26:23
**1985** - 24:11
**1988** - 27:1
**1990s** - 36:25, 107:17
**1992** - 21:19, 22:22, 24:12, 24:16, 25:5, 25:10, 25:17, 25:21, 27:4, 29:17, 36:5, 40:1, 40:3, 40:10, 61:11, 82:6, 83:6, 83:14, 84:10, 85:6, 86:2, 87:1, 87:6, 87:9, 87:13, 87:17, 112:18
**1994** - 99:8
**19th** - 1:20
**1st** - 25:5, 25:10, 25:17, 25:21, 42:10, 120:10, 122:16

**2**

**2** - 2:1, 2:7, 18:22, 20:13, 20:23, 21:6, 21:8, 78:14, 78:22, 78:25, 79:3, 79:5, 93:19
**2-and-a-half** - 75:2
**2.098** - 42:2
**20** - 2:10, 2:14, 2:18, 2:22, 3:4, 3:7, 3:9

**2002** - 80:13
**2003** - 70:2
**2004** - 28:4, 70:2
**2005** - 48:23
**2007** - 22:24, 30:1, 30:14, 33:20, 37:8, 37:9, 37:11, 37:12, 42:10, 49:18, 57:21, 111:20
**2008** - 37:21, 37:24, 38:14, 39:3, 39:8, 59:9, 104:25, 105:3, 105:14, 105:19
**2010** - 26:18, 78:10, 78:19, 86:11, 89:23, 94:24, 95:15, 95:16, 96:9, 97:1, 97:10, 97:12, 99:3, 105:15, 105:22, 106:4
**2011** - 58:20
**2013** - 1:20, 1:3, 122:17
**2028** - 2:12
**21** - 1:5, 1:6, 2:10, 2:14, 2:18, 2:22, 3:4, 3:7, 3:9, 3:12
**23rd** - 38:14
**24** - 1:24
**24039247** - 2:5
**24th** - 32:11, 32:16
**25** - 1:24
**26** - 1:8, 1:19
**262nd** - 4:10, 4:12, 7:17
**28th** - 59:9, 87:1
**2nd** - 33:20, 37:11, 37:12, 58:20

**3**

**3** - 2:3, 2:11, 18:24, 21:6, 78:20, 78:22, 78:25, 79:3, 79:5
**3,000** - 28:25, 29:1
**3047** - 122:19
**30th** - 83:14
**337th** - 1:12, 122:5, 122:21
**36** - 104:1, 104:2
**39.14** - 7:16
**3:45** - 25:16
**3rd** - 10:18, 49:18

**4**

**4** - 2:5, 2:15, 18:24, 21:6, 83:23, 84:2, 84:3, 84:5, 84:7, 84:9, 93:19, 93:22, 95:20
**40** - 27:12
**404(b** - 6:19, 115:18
**41** - 1:8, 1:19
**440** - 2:15, 19:11
**48** - 1:9, 1:20
**4:25** - 25:22
**4th** - 120:12

**5**

**5** - 2:19, 18:25, 21:6
**500** - 24:19

**6**

**6** - 3:1, 19:17, 19:19, 21:6, 75:1, 76:21
**6-4** - 25:15
**6-year-old** - 29:11
**609** - 6:19, 101:1
**66** - 1:9, 1:20

**7**

**7** - 3:5, 19:18, 21:6
**71.5** - 60:7
**713.237.8547** - 2:13
**713.755.5800** - 2:7

**713.755.7746** - 122:22
**713.877.9400** - 2:16
**77002** - 2:6, 122:22
**77002-1659** - 2:16
**77019-2408** - 2:13
**78** - 2:2, 2:4
**79** - 1:10, 1:18, 2:2, 2:4
**7th** - 57:21, 86:4

**8**

**8** - 3:8, 19:19, 19:25, 21:6, 75:1, 76:21
**84** - 2:6

**9**

**9** - 3:10, 19:21, 20:3, 20:13, 20:23, 21:6, 21:8, 108:1
**90's** - 36:13
**93** - 1:10, 1:18
**98** - 1:10, 1:20
**99** - 1:11
**9th** - 112:18

**A**

**ability** - 89:12
**able** - 15:11, 22:5, 30:13, 53:23, 58:22, 59:1, 59:10, 64:8, 64:21, 65:7, 66:12, 71:21, 88:3, 88:7, 90:17, 90:22, 92:25, 109:25
**above-entitled** - 1:21
**above-styled** - 122:11
**academy** - 26:24
**acceptable** - 23:19
**access** - 5:1, 5:19, 8:3, 14:1, 14:20, 38:2
**accident** - 108:9
**according** - 97:19
**accurate** - 72:1, 93:1, 93:2
**accusation** - 8:23
**achieve** - 22:2
**active** - 40:1, 68:8, 68:14
**actual** - 45:14, 51:25, 76:7, 77:1, 80:24
**add** - 61:18
**added** - 7:4
**addition** - 5:17, 15:4, 32:24, 46:17, 51:1, 78:15, 104:17, 104:20
**additional** - 10:21, 74:12, 75:6, 75:12
**address** - 4:20, 12:6, 22:4, 100:6
**addressing** - 11:21
**administrator** - 24:7
**admissibility** - 12:12, 114:13, 121:2
**admissible** - 69:13, 107:5, 107:7, 113:15, 114:9, 114:15, 114:16, 120:22
**admission** - 111:10
**Admitted** - 1:22, 21:8, 25:2, 79:5, 84:7
**admitted** - 12:11, 21:6, 24:25, 79:3, 84:6, 122:15
**adopt** - 3:12, 3:15
**adopting** - 3:24, 4:2
**advance** - 15:8
**advancements** - 89:12
**advantage** - 62:22
**advice** - 9:3
**affairs** - 19:19, 20:1, 27:4, 40:3
**Affairs** - 3:8
**affected** - 106:14
**afternoon** - 120:18

**age** - 82:8
**agencies** - 49:6
**agency** - 118:8, 118:10
**Agent** - 39:5
**agent** - 105:11, 105:20
**agents** - 12:5, 105:2, 105:24
**ago** - 48:22, 69:1
**agree** - 78:9, 87:3, 111:10
**agreed** - 7:17
**ahead** - 8:17, 58:12
**aided** - 1:24
**alive** - 95:7
**allegedly** - 18:20
**alleging** - 18:6
**allow** - 109:24, 110:15, 114:24, 115:1, 115:4, 118:12, 119:23
**allowed** - 115:19
**allowing** - 114:25
**allows** - 101:1
**almost** - 23:23
**alone** - 90:17
**Alphabetical** - 1:17
**amended** - 6:19
**American** - 60:3
**amounts** - 71:14, 72:18
**amplified** - 90:14
**analogy** - 118:10
**analyses** - 18:11, 68:14
**analysis** - 13:17, 13:18, 13:21, 16:18, 17:25, 18:13, 29:3, 29:5, 29:8, 30:3, 38:17, 38:19, 38:21, 49:9, 52:6, 60:20, 67:12, 80:12, 80:13, 81:3, 81:11, 83:18, 85:23, 87:4, 87:17, 89:13, 89:25, 92:23, 97:13, 110:6
**analyst** - 48:23, 48:25, 49:8, 80:17, 81:1, 97:20, 97:22, 97:23, 102:20, 109:1
**analysts** - 49:5, 106:16
**analyze** - 52:23, 90:15
**analyzed** - 41:14, 53:20, 104:21
**anecdotal** - 68:24, 69:4
**Angelo** - 29:12, 29:18, 52:11
**Ann** - 122:4, 122:19
**annex** - 32:11, 32:16, 104:16
**annual** - 27:13
**anyway** - 9:14, 38:1, 110:14, 117:21
**Ap-77,025** - 1:4
**Appeals** - 1:4
**appear** - 31:14, 31:20, 32:1, 33:7, 33:10, 41:13, 50:15, 50:17, 61:15, 85:22, 86:1
**appeared** - 112:2
**Appellant** - 1:7
**Appellee** - 1:12
**applying** - 120:7
**appointed** - 7:25
**appointment** - 7:24
**approach** - 83:20
**appropriate** - 4:3, 23:8
**area** - 8:10, 24:18, 65:19, 74:25, 75:10, 76:25, 80:11, 81:8, 81:11, 113:13
**argue** - 18:16, 69:12, 100:18
**argued** - 120:4
**arguing** - 18:1
**argument** - 21:14, 99:25, 100:10, 102:16, 108:24, 109:13, 116:21, 117:6, 121:1
**Argument** - 1:13, 1:14,

100:2
**Arguments** - 99:21
**arguments** - 117:15
**arrest** - 12:3, 12:4
**Article** - 7:15
**Arturo** - 34:4, 34:11, 35:11, 44:23, 45:8, 52:11, 54:14, 56:11, 57:1
**aside** - 51:17
**aspect** - 14:6, 16:17
**aspects** - 14:8
**assault** - 23:17, 24:10, 24:14, 24:17, 24:19, 25:7, 25:13, 25:18, 45:14, 46:18, 46:19, 47:3, 53:2, 73:19, 73:23, 74:23, 75:21, 76:8, 76:12, 76:14, 76:17, 76:19, 77:8, 84:21, 98:8, 104:11, 104:15, 113:8, 119:15
**assaulted** - 29:16
**assign** - 81:1
**assigned** - 27:25
**assignments** - 9:17
**Assistant** - 2:5
**associated** - 14:14
**associates** - 35:25, 36:19, 52:17, 70:5
**assume** - 6:12, 61:2, 74:3
**assumed** - 51:11, 51:13, 74:5
**assumptions** - 84:23
**assure** - 60:20
**at-fault** - 108:9
**atrocious** - 61:12
**attack** - 117:3
**attacking** - 117:2
**attempt** - 62:16
**attention** - 67:5
**Attorney** - 1:4, 1:6, 1:13, 1:14
**attorney** - 3:22
**Attorney's** - 78:16
**Attorneys** - 2:5, 2:7, 2:17
**augment** - 19:6
**available** - 38:24, 115:14, 116:11
**aware** - 17:12, 110:16

# B

**baby** - 62:20, 62:21
**bachelor's** - 48:19
**background** - 8:24, 26:20, 48:18, 80:4
**backgrounds** - 8:21
**bacteria** - 65:22
**bag** - 31:1, 31:8, 31:11, 31:14, 32:21, 32:24, 33:2, 33:3, 33:4, 33:7, 34:25, 35:2, 35:3, 41:15, 42:21, 42:24, 43:3, 43:7, 43:18, 43:20, 43:24, 65:20, 65:22, 75:20, 76:9, 112:5, 112:24, 113:2, 113:3
**bags** - 32:23, 34:23, 34:24, 35:1, 35:5, 42:22, 50:4
**banding** - 88:18
**Baptist** - 80:7
**Based** - 84:8, 89:6
**based** - 18:15, 23:9, 29:19, 81:11, 83:3, 84:23, 86:6, 88:25, 98:25
**basic** - 98:9
**basis** - 16:25
**became** - 24:9, 24:10, 89:19, 89:22, 89:24
**become** - 29:10, 48:25, 89:20
**becomes** - 13:6
**becoming** - 24:13, 99:3

**began** - 10:16, 37:3
**begin** - 3:10, 66:8
**beginning** - 65:1
**behalf** - 4:12, 5:23, 5:24
**behind** - 22:13, 71:6, 71:17, 71:22, 73:8
**believes** - 113:17
**belongs** - 39:19
**benefit** - 106:20
**best** - 62:24, 63:1, 63:3, 64:13, 100:5
**better** - 103:3
**beyond** - 4:18, 94:8
**Bienviendo** - 57:18
**big** - 19:11
**bigger** - 34:25
**biological** - 27:22, 27:23, 34:3, 34:11, 38:16, 44:6, 65:18, 65:19
**biology** - 48:20, 80:7, 80:10
**birth** - 25:15
**bit** - 9:19, 26:19, 28:7, 42:14, 48:17, 60:19, 80:4, 81:17, 82:1, 87:8, 89:16
**blanket** - 4:22
**blew** - 61:13
**Blizzard** - 19:3
**Blood** - 40:22
**blood** - 2:1, 12:1, 35:9, 42:25, 43:24, 44:4, 44:9, 44:23, 45:3, 52:8, 78:11, 80:24, 84:18, 84:19, 84:22, 95:22, 98:9, 112:9
**bogus** - 18:11, 18:13
**Bolding** - 94:3
**books** - 41:9
**box** - 33:2, 39:7, 50:3
**boxes** - 5:13, 14:21, 16:5, 104:5
**boy** - 29:11, 34:6, 34:13
**Bradley** - 4:13
**Brady** - 14:13, 15:23, 101:15, 111:1, 111:4
**break** - 13:5, 62:17, 62:22, 66:11, 66:17
**Bredemeyer** - 25:20
**brief** - 21:13, 99:7
**bring** - 119:18
**bringing** - 105:24
**brings** - 11:18
**Bromwich** - 14:23, 18:21, 19:4, 21:23, 102:6, 102:21, 103:18, 104:3, 107:16, 115:19, 120:22, 120:23
**Bromwich's** - 110:8
**brought** - 112:5
**brown** - 31:4, 31:12, 31:17, 112:5
**buccal** - 78:17, 86:9, 90:1, 90:3, 90:5, 91:4, 91:20, 94:21, 94:23, 96:8, 96:20, 96:23, 96:25, 97:6, 97:8, 97:11
**Buffalo** - 2:12
**Burnett** - 9:25
**business** - 69:15, 115:21, 116:13

# C

**California** - 82:15, 83:6, 107:12
**camera** - 8:11, 110:23
**Candido** - 57:18
**cannot** - 18:25, 39:21, 56:18, 108:25
**Capatine** - 3:23, 4:12, 5:14, 7:9, 7:13, 110:21
**capital** - 39:24

**cardboard** - 104:5
**care** - 13:7
**career** - 24:18, 27:7, 27:16
**Carmelo** - 57:19, 58:22
**case** - 4:11, 9:7, 9:17, 9:18, 10:1, 10:5, 12:2, 13:12, 14:15, 16:6, 16:11, 17:5, 19:2, 19:24, 21:23, 23:8, 23:18, 28:1, 28:5, 28:16, 28:18, 29:11, 29:14, 29:15, 29:23, 31:1, 32:22, 34:7, 34:15, 35:17, 36:5, 36:7, 36:17, 37:3, 37:9, 38:1, 49:11, 49:14, 49:22, 49:23, 50:23, 51:2, 52:9, 53:7, 59:20, 64:5, 67:8, 67:23, 80:25, 82:17, 82:19, 82:20, 82:21, 82:22, 83:4, 83:5, 85:21, 85:24, 86:15, 87:5, 89:17, 89:20, 89:22, 90:9, 91:2, 92:23, 93:12, 93:15, 95:20, 96:2, 97:7, 97:19, 98:2, 100:8, 100:11, 100:23, 102:14, 103:21, 104:22, 106:17, 107:11, 107:13, 107:18, 109:15, 114:11, 116:18, 118:2, 118:21, 118:23, 119:24, 120:2, 120:4
**cases** - 21:24, 28:22, 29:1, 29:2, 29:4, 29:7, 29:8, 41:10, 49:22, 49:24, 68:14, 68:15, 81:1, 81:3, 104:2, 104:3, 118:5, 118:13
**casework** - 36:2, 49:6
**casual** - 17:7
**caused** - 103:17
**cell** - 54:10, 54:13, 56:6, 62:2, 63:11, 63:14, 63:15, 63:19, 64:18, 65:2, 65:12, 71:1, 71:2, 71:4, 109:7, 109:8, 109:9, 109:10, 109:12
**Cell** - 48:8
**Cellmark** - 17:23, 17:24, 18:17, 22:24, 30:3, 33:18, 34:1, 37:4, 38:17, 39:7, 45:12, 46:8, 48:9, 48:11, 48:15, 48:21, 91:2, 91:6, 91:10, 92:7, 96:13, 97:4, 97:8, 97:14, 105:8, 105:12, 105:19, 106:14, 109:2, 111:20
**Cellmark's** - 39:11
**cells** - 40:25, 46:10, 54:20, 56:15, 62:3, 62:4, 62:6, 62:8, 62:9, 62:14, 62:17, 62:18, 62:19, 62:21, 62:23, 62:25, 63:2, 63:4, 63:5, 63:7, 63:9, 63:18, 63:22, 64:11, 64:14, 64:16, 64:20, 65:2, 65:4, 65:6, 65:10, 70:21, 70:22, 71:10, 71:11, 71:12, 71:22, 72:4, 72:5, 72:8, 72:24, 72:25, 73:6, 106:24, 119:13, 119:14
**cellular** - 62:24
**centimeter** - 75:1, 75:2, 75:3, 76:21
**centimeters** - 75:1
**central** - 96:22
**certain** - 11:15, 84:9, 87:20, 87:24, 87:25, 88:4, 88:18, 88:20, 89:10, 94:7, 94:16
**certainly** - 6:13, 52:20, 100:10, 107:4
**Certificate** - 1:15, 122:1
**certified** - 24:9, 24:10
**certify** - 122:6, 122:13

**chain** - 14:7
**chair** - 71:16
**challenge** - 115:23
**chambers** - 122:12
**change** - 37:16, 61:18, 66:10, 70:16
**characterize** - 87:9
**characterizes** - 87:22
**charge** - 39:24
**check** - 32:8, 83:7, 98:4, 99:4
**checked** - 102:1, 102:2
**checking** - 101:21
**chemistry** - 80:8
**chief** - 3:11, 19:22
**child** - 52:15
**chopped** - 88:2
**Christian** - 3:23, 5:14, 110:21
**Chu** - 85:10, 85:13, 85:23, 86:13, 94:19, 94:20, 96:7, 96:8, 96:25, 97:12, 108:7, 113:24, 114:5, 117:7
**cigar** - 17:20, 22:13, 23:1, 30:8, 30:16, 30:23, 31:1, 32:1, 32:4, 39:18, 40:25, 41:3, 41:4, 41:13, 45:15, 46:22, 51:4, 53:5, 53:6, 53:15, 53:16, 54:9, 54:18, 55:6, 55:20, 55:22, 55:25, 56:11, 56:18, 56:24, 57:23, 59:2, 59:16, 59:22, 59:25, 61:21, 62:4, 62:8, 63:22, 64:15, 64:20, 65:3, 71:3, 71:4, 72:15, 72:21, 85:6, 85:7, 85:8, 91:14, 91:17, 91:18, 91:22, 103:23, 104:6, 104:7, 104:8, 106:7, 106:24, 109:16, 111:12, 111:13, 111:16, 111:17, 112:8, 112:16, 112:22, 113:5, 119:12, 119:13
**City** - 2:5, 68:13
**classroom** - 24:15
**clear** - 20:20, 29:23, 42:20, 69:16, 69:20, 73:12, 104:3, 104:24
**cleared** - 28:20
**clearly** - 100:17
**client** - 8:22, 8:23
**closed** - 17:3, 18:3, 18:8, 31:16, 68:20
**Closing** - 1:13, 1:14, 107:23
**clothing** - 71:1, 104:4
**Code** - 7:15
**cold** - 27:25, 28:5, 28:16, 49:23, 68:15
**collect** - 27:18
**collected** - 32:4, 36:3, 41:3, 97:6, 97:9, 97:10, 97:12, 104:10
**collecting** - 36:22, 40:11
**collection** - 25:19, 27:22
**College** - 24:12
**comfortable** - 59:21, 64:7
**coming** - 40:15, 65:1, 106:11, 118:8, 119:24, 120:3
**command** - 19:22
**command/legal** - 3:11
**commendations** - 102:10
**comments** - 108:23
**common** - 120:5
**community** - 81:24
**compare** - 54:7, 57:12, 57:22, 58:18, 59:5, 90:15, 90:22, 91:12, 91:23
**compared** - 54:5, 58:10, 91:4, 91:20, 92:1

**comparison** - 38:25, 53:7
**comparisons** - 65:15, 110:6
**compartmentalize** - 100:5
**competence** - 102:9, 107:6
**competency** - 80:18
**competent** - 108:21
**complainant's** - 34:10, 54:15
**complainants** - 20:3, 20:10
**complaining** - 22:12
**complaints** - 3:10, 19:21, 20:8
**completed** - 7:17, 38:19
**completely** - 9:16, 18:8
**completing** - 26:24
**complying** - 5:8
**component** - 92:22
**comprised** - 103:17, 104:19
**computer** - 1:24
**computer-aided** - 1:24
**concentration** - 80:9
**concerned** - 68:5
**concerning** - 109:17
**concerns** - 104:13
**concludes** - 25:23
**conclusions** - 58:6, 87:19, 88:19
**condition** - 30:23, 31:18, 32:2, 32:19, 33:8, 50:1, 104:18
**conditions** - 31:22, 61:12, 65:17, 73:5, 73:6
**conduct** - 115:13
**conducting** - 60:20
**confidence** - 17:16, 18:2
**confirm** - 14:18, 15:1
**confuse** - 20:21
**confused** - 42:14
**confusing** - 104:23
**confusion** - 9:19
**connection** - 114:11
**Consent** - 2:1
**consent** - 12:13, 12:14, 78:12
**consented** - 12:11, 78:11
**conservative** - 55:8, 60:5, 60:6
**consider** - 114:14, 118:3
**considering** - 40:24
**consistent** - 56:6, 56:10, 88:13, 117:23
**consists** - 17:8
**consolidate** - 3:14
**contact** - 9:10, 36:6, 97:18, 113:25
**contain** - 35:1, 38:16
**contained** - 19:9, 42:20, 104:4
**container** - 75:17, 105:11, 111:19, 112:16, 112:22
**containing** - 43:18, 43:19, 43:25, 44:24, 50:4, 112:22
**contains** - 108:2, 122:7
**contaminate** - 61:9, 106:19
**contaminated** - 18:6, 22:22, 23:3, 60:21, 63:23, 104:6, 109:3, 109:5, 111:14, 115:3, 117:19, 119:11
**contamination** - 18:4, 22:4, 22:7, 22:8, 22:14, 22:16, 23:9, 50:11, 50:14, 60:13, 60:15, 64:24, 103:20, 104:1, 104:14, 104:21, 106:10, 107:10, 108:25, 117:18, 117:23, 119:19

**contemplate** - 117:15
**continuance** - 10:16
**continuances** - 10:14
**continued** - 42:11
**continuing** - 5:7, 49:2
**contract** - 68:13, 70:3
**contribute** - 65:8
**contributor** - 54:18, 55:22, 56:13, 57:2, 57:4, 57:5, 58:7, 59:1, 59:16, 65:8, 65:12, 91:22, 92:10, 92:21, 106:7, 106:8, 106:25
**contributors** - 58:3, 64:10
**controlled** - 65:19, 96:19
**conversations** - 8:9
**conviction** - 101:4, 102:9, 114:16, 114:20
**convictions** - 15:7, 101:2, 101:16, 108:18
**convince** - 117:16
**convinced** - 4:24, 7:21
**copies** - 14:18, 14:23, 15:8, 20:12
**copy** - 6:20, 6:24, 15:10, 24:21, 93:22, 101:8
**copying** - 7:14
**Cornelius** - 2:11, 3:6, 3:17, 3:24, 4:1, 4:21, 4:24, 5:6, 5:17, 5:19, 6:5, 6:11, 6:13, 6:21, 7:2, 7:6, 7:8, 7:19, 8:2, 8:4, 8:5, 8:13, 8:16, 8:18, 9:6, 10:3, 10:18, 10:19, 11:3, 11:22, 12:8, 12:17, 13:7, 13:14, 13:21, 13:22, 13:24, 14:17, 15:1, 15:15, 15:16, 15:24, 16:1, 16:3, 16:10, 16:20, 16:25, 20:1, 20:5, 20:9, 20:16, 20:19, 21:1, 21:10, 23:18, 24:2, 24:3, 24:24, 41:19, 41:21, 46:15, 47:8, 66:16, 66:17, 66:22, 66:24, 67:7, 69:11, 69:18, 69:22, 69:24, 73:9, 77:22, 78:7, 78:9, 78:23, 79:1, 84:4, 93:5, 93:6, 93:10, 93:11, 93:17, 93:21, 96:4, 99:11, 99:12, 99:16, 99:22, 99:24, 101:13, 107:22, 107:24, 108:14, 111:6, 113:1, 114:12, 114:19, 115:8, 116:4, 116:7, 116:20, 117:2, 117:5, 117:8, 117:12, 117:20, 117:25, 118:4, 118:16, 118:21, 120:1, 120:13, 120:19
**Correct** - 6:12, 10:2, 10:18, 13:14, 32:15, 35:7, 39:1, 43:6, 43:9, 51:3, 51:5, 54:8, 54:22, 54:24, 55:18, 56:16, 56:20, 57:7, 64:17, 66:6, 74:21, 118:19
**correct** - 8:1, 8:4, 10:19, 12:22, 13:13, 18:12, 31:9, 31:13, 32:14, 34:20, 35:9, 35:12, 36:3, 36:14, 36:15, 37:2, 37:15, 38:18, 38:21, 38:25, 43:5, 46:21, 50:19, 51:2, 51:19, 52:1, 52:4, 52:16, 54:16, 54:23, 54:25, 55:1, 55:3, 55:10, 55:17, 55:25, 56:1, 58:15, 64:19, 64:22, 66:3, 66:10, 72:6, 74:10, 74:20, 77:10, 79:1, 83:15, 85:3, 86:16, 89:14, 91:11, 92:12, 92:14, 97:15, 111:21, 114:1, 116:20, 122:7
**corrected** - 113:4
**correctly** - 50:10, 50:11, 122:14

**correspondence** - 49:19
**counsel** - 3:5, 122:9
**counter** - 115:2
**country** - 36:10, 49:7
**county** - 9:19, 9:24
**County** - 1:9, 1:23, 9:22, 78:16, 122:2, 122:5
**couple** - 6:18, 6:22, 7:4, 14:9, 78:3, 88:9, 93:13, 96:6, 107:24, 108:23, 110:12
**course** - 5:24, 10:15, 26:22, 27:7, 27:16, 29:16, 40:4, 60:10, 71:15, 114:15
**court** - 3:1, 4:16, 7:10, 7:11, 26:5, 37:20, 81:6, 122:12
**Court** - 1:3, 1:4, 1:6, 3:3, 3:18, 4:4, 4:23, 5:5, 5:9, 5:20, 6:6, 6:15, 7:1, 7:9, 7:22, 8:10, 8:15, 8:17, 9:5, 10:2, 10:12, 10:20, 11:4, 12:16, 12:20, 13:4, 13:9, 13:15, 13:23, 14:3, 14:6, 14:12, 15:13, 15:17, 15:21, 16:2, 16:9, 16:13, 16:23, 18:2, 18:9, 18:16, 19:25, 20:3, 20:7, 20:14, 20:24, 21:2, 21:5, 21:9, 21:11, 21:15, 23:11, 24:1, 24:2, 24:4, 24:25, 25:9, 25:11, 25:25, 26:4, 26:9, 26:19, 27:10, 28:3, 30:16, 32:18, 41:19, 46:7, 46:14, 47:10, 47:14, 47:21, 47:25, 48:6, 48:17, 49:25, 55:9, 60:21, 66:15, 66:19, 66:21, 69:6, 69:10, 69:16, 69:19, 73:11, 74:2, 74:8, 74:14, 74:22, 75:5, 75:11, 75:14, 75:22, 76:3, 76:6, 76:13, 77:5, 77:11, 77:16, 77:19, 77:24, 78:4, 78:24, 79:2, 79:7, 79:9, 79:18, 83:21, 84:5, 88:23, 93:5, 93:19, 96:6, 96:13, 96:16, 96:24, 97:3, 97:11, 97:17, 97:25, 98:6, 98:15, 98:17, 98:21, 99:12, 99:17, 99:21, 100:1, 101:11, 101:15, 101:24, 104:24, 105:4, 105:7, 105:13, 105:15, 105:18, 107:21, 108:12, 108:24, 109:14, 110:20, 111:7, 111:23, 111:24, 112:15, 112:19, 112:25, 113:4, 114:7, 114:23, 115:11, 116:6, 116:12, 116:25, 117:4, 117:7, 117:9, 117:13, 118:2, 118:6, 118:19, 119:3, 120:2, 120:7, 120:15, 120:17, 121:3, 122:4, 122:5, 122:20, 122:21
**Court's** - 1:12
**Courtney** - 1:10, 1:18, 78:2, 79:4, 79:11, 79:19, 114:2
**courtroom** - 24:15
**covered** - 4:8, 7:15, 12:14
**create** - 61:6, 62:20, 110:4
**credible** - 113:17
**Crime** - 2:3, 16:2, 16:5, 17:1, 17:17, 17:21, 17:23, 18:17, 19:14, 43:15, 43:16, 43:22, 45:5, 47:5, 51:10, 60:25, 67:15, 68:1, 68:8, 68:11, 68:17, 70:19, 73:18, 77:14, 78:19, 79:23, 80:2, 80:20, 82:2, 85:19, 86:21, 95:24, 99:5, 104:16, 107:17,

109:15, 111:12, 112:17, 113:7, 113:11, 113:24, 117:10, 118:7, 118:9
**crime** - 2:9, 2:13, 2:17, 2:21, 3:3, 3:6, 14:14, 14:22, 14:24, 17:8, 17:10, 18:3, 18:7, 18:13, 18:22, 19:16, 20:10, 21:19, 21:20, 21:25, 22:18, 23:3, 30:9, 30:19, 31:6, 32:13, 33:23, 33:24, 34:17, 34:22, 36:25, 42:17, 43:16, 44:2, 44:16, 44:20, 45:3, 46:8, 46:12, 61:20, 67:17, 68:22, 71:18, 71:19, 72:5, 74:4, 74:18, 75:24, 76:10, 82:6, 83:10, 83:13, 85:14, 94:4, 95:5, 95:10, 95:16, 99:1, 100:24, 102:8, 102:20, 103:10, 103:20, 103:25, 104:12, 104:25, 105:5, 106:12, 106:15, 108:16, 108:19, 108:21, 110:3, 110:18, 112:3, 112:4, 112:19, 118:4, 119:8, 119:9
**crimes** - 118:11
**Criminal** - 1:4, 7:15, 11:14
**criminal** - 8:23, 11:15, 49:6, 100:20, 101:16, 107:4
**criminalist** - 79:22, 80:2, 80:20, 80:21, 85:9, 96:17
**criteria** - 28:21
**Cross** - 1:7, 1:17, 41:20, 66:23, 93:9
**Cross-examination** - 41:20, 66:23, 93:9
**crotch** - 43:4, 43:8, 46:5, 46:13, 51:20, 52:5, 74:25, 75:8, 75:10, 75:15, 75:18, 75:19, 75:25, 76:6, 76:20, 76:22, 76:25, 77:3, 77:7, 84:16, 92:4, 95:22, 113:13
**crotch-red** - 92:4
**Cruz** - 1:6, 3:4, 12:9, 15:7, 36:6, 36:13, 36:25, 37:14, 38:3, 45:9, 49:11, 52:21, 59:5, 59:15, 59:20, 65:14, 90:7, 90:9, 90:18, 91:13, 91:21, 92:9, 92:21, 106:13
**Cruz-garcia** - 1:6, 3:4, 12:9, 36:6, 36:13, 36:25, 37:14, 38:3, 45:9, 49:11, 52:21, 59:5, 59:15, 59:20, 90:7, 90:9, 90:18, 91:13, 91:21, 92:9, 92:21
**Cruz-garcia's** - 15:7, 65:14, 106:13
**Csr** - 122:19
**current** - 24:8
**Curriculum** - 1:23
**custodian** - 33:23, 50:20
**custody** - 14:7, 36:13, 37:23, 38:4
**cut** - 46:5, 74:19, 75:8, 76:1, 76:22, 77:7
**cutting** - 30:10, 34:3, 34:17, 39:17, 43:4, 46:24, 47:2, 51:20, 51:24, 52:4, 52:6, 53:13, 62:12, 64:4, 74:18, 74:22, 75:7, 75:8, 75:9, 75:15, 75:19, 76:5, 76:21, 76:25, 77:1, 77:3, 113:13
**cuttings** - 17:22, 45:15, 45:19, 45:21, 46:1, 53:18, 54:3, 74:17, 77:14
**Cv**- 24:21

**D**

**D.a.'s** - 96:20

**Dallas** - 48:9
**damage** - 31:21, 31:24, 33:13
**data** - 5:15
**databases** - 38:2
**date** - 10:16, 25:6, 25:9, 25:12, 25:15, 25:17, 25:18, 25:22, 33:20, 36:11, 42:9, 44:7, 70:3, 87:5, 99:7, 112:17
**Date** - 122:20
**dated** - 2:5, 29:1, 83:14
**dates** - 10:15, 42:1
**day-to-day** - 49:3
**days** - 22:18, 26:21, 114:3
**Dc** - 110:9
**deal** - 11:6, 101:19
**dealings** - 82:15
**deals** - 19:23
**dealt** - 14:14, 99:2
**December** - 7:18, 57:21
**decide** - 12:24, 110:1, 120:21
**decided** - 28:4, 106:1, 111:19
**decides** - 12:18
**decision** - 9:9, 28:9
**deduce** - 64:9
**Deetrice** - 98:1, 98:12, 100:21, 100:22, 101:7, 101:9, 102:7, 107:4, 108:10, 108:13, 108:15, 110:23, 111:5, 113:23, 114:4, 116:22
**defendant** - 3:1, 4:25, 9:2, 11:24, 12:5, 12:19, 22:25, 35:25, 36:6, 37:21, 37:23, 38:4, 38:10, 39:16, 39:19, 39:25, 52:21, 59:5, 62:10, 64:4, 64:21, 70:5, 74:10, 78:10, 78:12, 78:17, 86:10, 90:18, 91:13, 91:24, 97:1, 97:6, 105:20, 105:22, 106:1, 106:5, 107:2, 110:25
**Defendant** - 2:17, 1:5
**defendant's** - 8:25, 12:3, 12:14, 12:21, 22:9, 22:11, 22:17, 22:21, 23:4, 37:6, 38:24, 39:2, 52:17, 60:23, 61:4, 61:5, 61:8, 61:15, 63:17, 73:16, 78:8, 104:25, 119:8
**Defendant's** - 20:13, 108:1
**defense** - 5:25, 6:20, 7:24, 15:23, 22:5, 101:2, 109:24
**Defense** - 1:4, 1:14, 16:24, 18:22, 20:23, 21:5, 21:8, 107:23, 114:8
**defense's** - 7:10, 21:14
**defensive** - 27:14
**definitely** - 72:5, 87:13
**defunct** - 118:4
**degrade** - 65:24
**degraded** - 87:19, 87:22, 88:2, 88:13, 88:22, 88:24, 92:25
**degree** - 48:19, 48:20, 80:6, 80:7
**Department** - 2:9, 2:13, 2:17, 2:21, 3:3, 20:8, 25:20, 26:16, 26:20, 27:25, 70:1, 78:18, 79:23, 80:20, 86:21, 95:24
**deposited** - 73:1, 73:2
**describe** - 94:5
**described** - 25:14, 50:5, 92:3, 94:20
**Description** - 1:22
**Design** - 82:16, 83:3, 83:11, 83:17, 85:2, 85:5,

94:6, 107:12
**desk** - 6:21
**detail** - 16:4, 83:16
**detailed** - 17:6, 18:10
**details** - 14:23
**detect** - 71:21, 88:1
**detection** - 98:9
**detectives** - 40:10
**determine** - 11:8, 35:17, 37:4, 53:10, 58:18, 80:24, 89:9, 95:20, 109:22, 110:24, 111:3, 115:6
**determined** - 6:9, 17:21, 53:19, 90:13
**develop** - 28:24, 37:5, 53:21
**developed** - 28:23, 40:15
**Diana** - 25:14, 25:19, 30:10, 34:4, 34:10, 35:11, 43:8, 43:25, 45:8, 46:19, 52:11, 54:11, 54:21, 56:6, 56:15, 92:2, 92:4, 92:5, 95:21, 95:22, 106:8
**Diana's** - 44:3
**different** - 4:9, 4:17, 7:2, 7:5, 8:6, 9:17, 17:13, 43:20, 45:19, 49:6, 57:12, 62:2, 63:3, 64:18, 65:2, 68:15, 71:14, 85:16, 87:13, 89:4, 89:21, 93:12, 94:15, 100:4, 104:23, 108:19, 116:24, 116:25, 119:12
**differential** - 62:15, 62:25
**differently** - 55:7
**difficult** - 61:17, 62:1
**Dire** - 1:7, 1:17
**dire** - 10:21, 10:22, 10:23
**Direct** - 1:7, 1:17, 26:12, 48:4, 79:13
**directly** - 96:21, 97:3, 105:12, 107:10
**dired** - 11:2
**disciplinary** - 6:23, 14:19, 100:20, 102:11, 108:3, 115:12, 116:1, 116:17
**discipline** - 108:16
**discover** - 4:25, 29:14
**discovered** - 7:7, 29:15
**discovery** - 4:10, 4:15, 4:18, 4:20, 5:4, 6:1
**discussed** - 67:8, 78:6, 93:15, 119:20
**Discussion** - 20:18
**discussion** - 12:9
**District** - 1:6, 1:12, 2:5, 78:16, 122:5
**Division** - 3:8, 28:5, 28:12
**Dmw** - 98:12
**Dna** - 5:16, 6:8, 11:8, 11:20, 12:10, 13:17, 13:18, 13:19, 13:21, 14:2, 14:4, 14:8, 14:11, 15:2, 15:25, 16:5, 16:15, 16:16, 16:18, 17:12, 17:15, 17:20, 22:9, 22:11, 22:17, 22:21, 22:23, 22:25, 23:4, 27:15, 27:22, 29:3, 29:5, 29:8, 29:21, 35:8, 35:9, 36:3, 36:22, 36:24, 37:5, 37:6, 37:13, 37:20, 38:5, 38:8, 38:10, 38:24, 39:2, 39:14, 39:15, 39:18, 40:12, 40:20, 41:4, 41:8, 41:10, 43:7, 43:18, 43:24, 44:23, 49:5, 49:8, 50:17, 51:7, 51:15, 51:22, 52:5, 53:4, 53:20, 53:21, 54:8, 54:17, 54:23, 55:4, 55:6, 55:19, 55:24, 55:25, 56:2, 56:17, 57:2, 57:23, 58:6, 58:13, 58:17, 58:22,

58:25, 59:2, 59:10, 59:14, 59:15, 60:2, 60:10, 60:23, 61:4, 61:5, 61:8, 61:9, 61:15, 61:18, 62:3, 62:9, 62:18, 62:24, 63:2, 63:5, 63:7, 63:12, 63:14, 63:15, 63:17, 64:3, 65:12, 65:15, 65:24, 66:1, 66:5, 66:7, 66:10, 66:11, 67:18, 67:19, 68:14, 71:6, 71:14, 71:17, 71:20, 71:21, 71:22, 71:25, 72:9, 72:13, 72:15, 72:17, 72:19, 72:22, 73:3, 73:7, 76:24, 76:25, 77:2, 78:8, 80:12, 80:13, 80:14, 81:2, 81:11, 83:11, 84:15, 84:17, 84:18, 85:23, 87:4, 87:8, 87:10, 87:18, 87:23, 87:24, 87:25, 88:1, 88:2, 88:12, 88:18, 88:20, 88:22, 89:9, 89:11, 90:11, 90:13, 90:14, 90:18, 91:3, 91:4, 91:8, 91:9, 91:12, 91:18, 91:19, 91:22, 91:23, 92:10, 92:11, 92:19, 92:22, 92:25, 95:3, 97:13, 97:24, 99:1, 102:24, 104:23, 104:25, 105:1, 106:5, 106:7, 106:9, 109:11, 109:18, 110:5, 110:16, 111:10, 115:1, 115:23, 119:11
**document** - 93:18, 98:11
**documentation** - 77:12
**documents** - 14:21, 69:17, 69:21, 120:25
**done** - 14:21, 21:22, 21:24, 25:21, 43:22, 44:3, 44:6, 44:8, 44:13, 47:5, 50:15, 51:22, 60:22, 60:25, 61:5, 68:16, 82:22, 83:18, 86:25, 97:14, 102:3, 103:2, 103:3, 103:5, 103:16, 119:1
**donor** - 54:17
**doubt** - 106:20, 110:4
**down** - 6:21, 11:18, 47:14, 68:17, 68:20, 68:23, 88:21, 101:13, 106:11, 110:10, 118:9
**Dps** - 101:20
**draft** - 94:5
**drafted** - 27:4
**drastically** - 89:15
**draw** - 88:19
**drawn** - 45:3
**driving** - 27:14
**dry** - 71:12, 72:4
**due** - 4:22
**duly** - 26:11, 48:3, 79:12
**during** - 22:18, 29:16, 36:1, 40:4, 62:25, 102:7, 104:5
**During** - 27:7
**duties** - 49:4, 49:7, 80:19, 103:11
**Dx** - 2:7, 2:11, 2:15, 2:19, 3:1, 3:5, 3:8, 3:10

---

**E**

**early** - 26:21, 87:10
**easier** - 62:17
**easiest** - 100:8, 100:14
**education** - 49:2, 80:5
**educational** - 49:1
**effort** - 38:3
**efforts** - 38:7
**either** - 44:5, 44:12, 52:18, 62:12, 70:2, 72:3
**elimination** - 45:4
**employed** - 26:14, 48:6,

79:21, 79:22, 79:24
**employees** - 20:10, 22:22
**employment** - 26:22
**end** - 76:16
**entire** - 7:12, 8:4, 24:18, 36:12, 46:11, 75:8
**entitled** - 1:21, 96:17
**envelope** - 31:3, 31:12, 31:17, 31:18, 31:21, 76:15
**envelopes** - 31:5, 32:24, 50:4
**epithelial** - 40:25, 54:10, 54:20, 56:5, 56:14, 62:3, 62:8, 62:17, 62:23, 63:1, 63:4, 63:11, 63:14, 64:16, 64:20, 65:2, 70:22, 71:4, 71:10, 106:23, 119:13
**Eric** - 1:8, 1:19, 26:2, 26:7, 26:10, 70:20, 105:3, 105:6, 111:19, 112:1, 112:23
**especially** - 40:14, 88:4, 102:14
**essence** - 17:18
**essentially** - 116:5
**establish** - 115:2, 115:4
**estimate** - 72:12
**evaluating** - 9:2
**event** - 13:2
**Eventually** - 58:10
**evidence** - 2:3, 5:2, 6:2, 14:15, 15:9, 17:4, 17:5, 17:7, 17:11, 18:2, 18:5, 18:7, 18:19, 21:25, 22:2, 22:9, 22:16, 22:19, 22:22, 22:24, 23:3, 23:7, 24:21, 25:18, 27:17, 27:22, 29:6, 29:21, 30:2, 30:5, 30:14, 31:5, 31:12, 31:17, 32:19, 33:11, 33:24, 35:1, 37:4, 38:15, 38:25, 40:11, 40:19, 40:20, 49:18, 49:24, 50:1, 50:4, 50:5, 50:6, 50:8, 50:13, 50:16, 50:20, 50:22, 50:24, 51:21, 51:25, 52:24, 53:19, 60:9, 60:12, 60:15, 60:21, 61:1, 61:10, 61:11, 61:14, 61:15, 61:19, 61:21, 65:18, 65:19, 65:20, 67:20, 67:23, 68:1, 68:6, 68:24, 69:4, 69:13, 69:17, 70:15, 74:15, 78:21, 83:16, 84:2, 84:20, 84:22, 85:5, 85:7, 85:15, 85:24, 93:18, 95:20, 96:5, 96:11, 96:22, 99:2, 100:9, 100:12, 100:14, 102:5, 102:17, 103:16, 103:22, 104:4, 104:21, 106:16, 106:18, 107:6, 107:10, 107:15, 107:19, 108:1, 109:23, 109:25, 110:3, 110:18, 110:25, 111:10, 111:11, 111:12, 112:4, 112:20, 113:8, 113:14, 113:15, 113:17, 113:19, 113:25, 115:1, 116:23, 118:7, 118:14, 118:18, 118:20, 119:21, 122:8
**evidentiary** - 84:15, 84:21, 85:1, 90:16, 90:23, 91:5, 91:8, 91:14, 91:25, 92:16
**ex** - 8:8
**exact** - 70:3
**Exactly** - 34:12
**exactly** - 8:5, 16:17, 21:23, 46:7, 94:6, 119:22
**Examination** - 26:12, 48:4, 79:13, 98:22
**examination** - 23:18, 25:7, 25:13, 25:16, 41:20, 46:6,

66:23, 93:9
**examinations** - 24:19
**examined** - 40:20
**examiner** - 24:11, 24:14
**examiners** - 24:17
**example** - 31:22, 70:25, 73:21, 84:16, 109:7
**except** - 12:8
**exchanged** - 14:23
**exchanging** - 14:25
**exclude** - 58:14, 59:1, 70:9, 74:10, 118:17
**excluded** - 39:22, 54:18, 55:22, 56:12, 56:19, 56:23, 57:3, 58:3, 58:19, 59:16, 91:21, 92:9, 92:21, 118:14
**excluding** - 73:16
**Excuse** - 60:6, 60:8
**excused** - 47:20, 77:20, 99:14, 99:17
**Exhibit** - 1:21, 20:14, 20:16, 20:23, 21:8, 24:21, 24:23, 25:2, 78:14, 78:20, 78:22, 78:24, 79:3, 79:5, 83:23, 84:2, 84:3, 84:5, 84:7, 84:9, 95:19
**exhibit** - 20:21, 101:10
**exhibits** - 114:8, 122:15
**Exhibits** - 21:6
**existed** - 29:6, 41:9
**existence** - 21:19, 110:25
**existing** - 28:12
**exists** - 20:17
**expect** - 9:6, 60:2, 62:4, 64:1, 65:10, 88:17
**expected** - 54:21
**expenses** - 8:9, 8:11
**experience** - 81:12, 81:16, 81:21, 82:15
**experiencing** - 87:14
**expert** - 5:22, 6:2, 9:21, 10:8, 10:10, 81:8
**experts** - 9:20
**Expiration** - 122:20
**explain** - 105:17
**Express** - 50:3, 50:20
**extract** - 42:25, 43:1, 43:10, 43:25, 44:24, 45:15, 46:24, 47:2, 58:6
**extracted** - 43:7, 43:18, 43:20, 43:24, 44:23, 51:8, 83:10, 84:15, 84:17, 84:19, 90:11
**extraction** - 62:15, 63:1, 85:6, 89:25, 107:14, 109:18
**extractions** - 43:13, 51:6, 51:8, 51:14, 51:16, 51:17, 51:22, 52:2, 52:8, 52:9, 81:3, 84:9, 84:13, 85:1, 87:4, 90:2, 90:8, 94:15, 95:4, 97:21, 113:14, 119:7
**extracts** - 67:18
**extradited** - 105:23
**extradition** - 53:20
**extraneous** - 6:10, 6:19, 11:7, 11:11, 115:13
**extrapolated** - 119:21
**extremely** - 62:19, 104:22
**eye** - 109:10

# F

**fact** - 17:1, 90:2, 100:11, 102:24, 104:20, 110:1, 113:16
**fair** - 40:11, 68:7
**faith** - 117:6
**familiar** - 29:10, 85:9
**family** - 8:25
**far** - 51:20, 87:24, 104:11,

111:16, 119:8
**fashion** - 17:5
**faster** - 16:22
**fault** - 108:9
**favorable** - 110:25
**Fbi**- 38:9, 105:10, 105:20, 105:24
**fear** - 18:4
**February**- 26:18, 78:10, 78:19, 86:11
**Federal**- 50:2, 50:19
**federal** - 105:2
**Fedex**- 39:6, 39:7, 105:11
**felony** - 114:15, 114:20
**female** - 25:14, 43:8, 43:19, 55:10, 55:13, 63:4
**few** - 64:1, 73:11, 81:9, 88:9
**field** - 29:7, 81:21
**fifth** - 18:25
**Fifth**- 2:19
**figure** - 16:17, 99:4, 110:13
**file** - 3:11, 3:21, 5:2, 5:12, 5:18, 5:23, 6:16, 10:14, 11:20, 12:20, 13:12, 15:12, 15:13, 15:22, 91:2, 102:9, 110:23
**filed** - 3:13, 3:22, 5:23, 5:24, 7:13, 11:22, 15:8, 20:4, 20:7, 39:24, 110:21
**files** - 8:11, 111:3, 111:4
**final** - 19:11, 19:19
**Final**- 3:1
**finally** - 110:5
**findings** - 20:6, 20:11, 87:16, 88:12, 91:17, 92:6, 93:1, 108:5, 108:8, 114:6
**fine** - 23:8
**fingerprints** - 12:1
**finished** - 107:18
**first** - 9:18, 19:1, 23:12, 23:14, 24:17, 26:11, 37:9, 37:22, 41:12, 44:4, 46:16, 48:3, 49:17, 62:22, 79:12, 79:19, 80:5, 89:19, 89:22, 100:7, 105:3, 114:21, 116:4, 119:3
**First**- 61:22, 100:19, 103:23, 111:9
**firsthand** - 69:5, 69:6
**five** - 18:20, 19:10, 28:18
**Five**- 43:10
**flake** - 72:4
**fled** - 36:10
**floor** - 32:11, 32:13, 32:16, 85:16, 104:15, 104:17, 106:12
**Flores**- 2:20
**folder** - 89:21
**follow** - 98:20, 98:24
**follow-up** - 98:20, 98:24
**following** - 1:20, 29:9
**follows** - 26:11, 48:3, 79:12
**foot** - 66:3
**foregoing** - 122:6
**forensic** - 80:9, 80:14
**forensics** - 48:8
**Forensics**- 48:9
**forgot** - 19:17
**form** - 2:4, 17:5, 65:9, 78:12, 78:20, 82:6, 87:19, 93:25
**format** - 52:25
**forward** - 10:4, 110:15
**Fosher**- 8:2
**four** - 26:24, 27:3
**four-and-a-half** - 26:24
**fourth** - 18:24

**Fourth**- 2:15
**fraction** - 39:17, 39:19, 54:10, 54:13, 56:5, 56:6, 56:8, 56:24, 56:25, 59:17, 59:18, 59:24, 63:5, 63:11, 63:20, 65:12, 87:18, 88:12, 92:1, 92:3, 92:11, 92:13, 92:17, 92:18
**fractions** - 43:8, 43:19, 63:3, 63:13
**fragments** - 88:5
**Franklin**- 2:6, 122:21
**friend** - 71:2
**friends** - 38:1, 70:5
**full** - 16:5, 26:5, 39:14, 58:22, 58:25, 59:10, 79:17, 102:10
**fully** - 40:15, 95:16

# G

**gained** - 90:14
**Garcia**- 25:14, 25:19, 29:12, 29:18, 30:10, 34:4, 34:10, 35:11, 43:8, 43:25, 45:8, 46:19, 52:11, 54:11, 54:21, 56:6, 56:15, 92:2, 92:4, 92:6, 95:21, 95:22
**garcia** - 1:6, 3:4, 12:9, 36:6, 36:13, 36:25, 37:14, 38:3, 45:9, 49:11, 52:21, 59:5, 59:15, 59:20, 90:7, 90:9, 90:18, 91:13, 91:21, 92:9, 92:21
**Garcia's**- 106:8
**garcia's** - 15:7, 65:14, 106:13
**Gel**- 89:7, 89:8
**general** - 3:8, 11:21, 14:4, 18:9, 19:20, 20:1, 41:6, 53:25, 54:2, 72:7, 111:9, 118:12, 119:19
**generally** - 91:16
**generated** - 91:3, 94:2
**Genetic**- 82:16, 83:3, 83:11, 83:17, 85:2, 85:5, 94:6, 107:11, 107:12
**George**- 80:10
**German**- 35:22, 57:19, 58:2
**gist** - 18:1
**given** - 5:1, 10:22, 14:17, 14:20, 52:13, 58:10
**Gloria**- 1:23, 23:16
**Glossary**.............................
**.end** - 1:16
**Goliad**- 30:18, 32:5, 103:24, 104:8, 111:18
**governmental** - 101:17
**grab** - 6:22
**grade** - 82:11
**graduate** - 88:17
**granted** - 3:19, 4:4, 4:14, 7:11, 8:8, 10:15, 11:12, 11:13
**great** - 101:19
**Great**- 120:19
**greater** - 38:2
**group** - 46:16, 70:18, 80:23
**growth** - 65:23
**guess** - 13:4, 87:8, 89:12, 92:24, 93:25, 95:8, 108:3, 115:16
**guidance** - 28:15

# H

**habit** - 48:15
**hair** - 2:2, 78:11, 86:2,

94:21
**half** - 26:24, 79:25
**Hand** - 122:16
**hand** - 71:1
**handle** - 11:9, 27:17
**handled** - 10:22, 17:4, 17:11, 17:21, 65:3, 77:14, 95:23, 99:2, 108:22, 110:3, 110:18, 111:13, 117:12
**handling** - 109:15, 119:7, 119:9
**hands** - 14:25, 71:16, 107:13, 118:15
**hard** - 9:9, 60:24, 117:5
**harder** - 65:25
**Harris** - 1:9, 1:23, 9:22, 78:16, 122:2, 122:5
**head** - 73:24, 74:3, 94:21
**Head** - 1:10, 1:18, 78:2, 79:4, 79:7, 79:11, 79:15, 79:20, 79:21, 82:1, 83:22, 84:9, 85:9, 91:7, 92:23, 93:11, 98:24, 99:9, 99:18, 114:3
**heads** - 68:4
**hear** - 69:14, 69:22, 113:20, 113:21, 119:7
**heard** - 1:21, 50:25, 69:7, 113:18, 119:21
**hearing** - 5:4, 6:9, 7:20, 12:7, 12:12, 13:5, 13:13, 14:16, 21:4, 21:7, 25:24, 48:14, 53:25, 69:14, 78:7, 78:25, 109:21, 111:25, 119:16
**hearsay** - 69:4, 114:22, 115:10, 120:23
**Hearsay** - 11:12, 69:13
**heart** - 19:15
**hearty** - 62:19, 62:21
**held** - 1:23, 38:10
**helps** - 65:9
**hereby** - 122:6
**Hermann** - 24:7
**Hernandez** - 2:20, 78:13
**herself** - 33:23
**Hida** - 37:19
**highly** - 72:9
**histories** - 11:14, 11:15
**history** - 76:19, 87:8, 100:20, 101:9, 102:11, 107:4
**Homicide** - 27:1, 27:2, 27:3, 27:5, 28:5, 28:12, 36:2, 40:4, 40:18, 41:2, 41:7
**homicide** - 29:1, 29:11, 29:19, 36:11, 40:1, 40:10
**Honestly** - 89:5
**Honor** - 3:16, 3:17, 4:1, 6:4, 6:5, 25:4, 47:13, 77:21, 77:22, 79:10, 83:20, 84:1, 93:3, 98:16, 99:10, 99:20
**Honorable** - 1:22
**Hopefully** - 18:18
**Hospital** - 24:8, 25:6
**host** - 21:24
**hours** - 27:12
**Houston** - 1:23, 2:6, 2:13, 2:16, 2:5, 2:8, 2:12, 2:16, 2:20, 3:2, 20:8, 24:18, 25:6, 25:20, 26:15, 26:20, 27:24, 40:14, 68:13, 69:25, 78:18, 79:23, 80:20, 86:21, 95:23, 105:23, 106:2, 122:22
**Hpd** - 2:3, 3:6, 16:2, 16:5, 17:1, 17:17, 17:21, 17:23, 18:17, 19:14, 21:22, 26:23, 28:4, 30:18, 32:5, 36:2, 36:5, 36:14, 36:16, 37:12, 43:16, 43:22, 45:5, 47:5,

51:9, 51:12, 51:14, 58:9, 60:22, 60:25, 61:3, 67:14, 68:1, 68:8, 68:11, 68:17, 68:19, 70:10, 70:19, 73:18, 77:14, 80:2, 82:2, 82:12, 84:14, 84:24, 85:18, 96:14, 96:15, 96:21, 99:5, 101:8, 102:11, 102:12, 103:24, 104:16, 104:24, 105:3, 106:3, 106:14, 107:17, 109:15, 111:12, 111:17, 112:17, 113:7, 113:11, 113:24, 117:10, 118:7, 118:9
**Hpd's** - 22:17, 67:24
**husband** - 54:15, 54:23

**I**

**lad** - 19:25, 101:9
**idea** - 101:17
**identifications** - 109:18
**identified** - 65:5, 104:2
**identify** - 62:6
**identity** - 115:17
**imagine** - 16:7, 118:13
**impeach** - 101:2, 115:14, 116:2, 116:15, 116:16, 117:10, 118:8
**impeachable** - 11:16
**impeached** - 102:18
**impeachment** - 12:24, 101:4
**impossible** - 65:25, 119:10
**improper** - 108:5
**improved** - 89:13, 89:14
**in-camera** - 110:23
**in-service** - 27:13
**include** - 58:14, 70:9, 95:21
**included** - 24:15, 34:17, 58:18, 122:9
**including** - 11:25, 43:4, 109:16
**incompetence** - 103:6, 108:4
**independent** - 2:7, 2:11, 2:15, 2:19, 3:1, 3:5, 14:24, 17:14, 18:21, 18:23, 19:13, 22:1, 23:10
**independently** - 91:7
**Index** - 1:17, 1:21
**indicate** - 50:13, 60:12, 64:23, 102:8, 103:15
**indicating** - 83:24, 102:1
**indication** - 104:19, 112:13, 112:21, 113:6
**indicative** - 88:22
**individual** - 4:6, 34:23, 35:3, 35:5, 42:22, 54:25, 55:2, 55:15, 55:16, 55:17, 56:22, 86:17, 86:20, 91:19
**individual's** - 56:2
**individually** - 10:23, 35:14, 50:6, 51:4, 112:7, 112:8
**individually-packaged** - 112:7
**individuals** - 11:14, 14:19, 20:4, 20:7, 34:5, 35:18, 35:23, 36:1, 54:14, 56:9, 57:12, 57:22, 60:4, 60:8, 80:23, 92:8, 92:20, 95:23, 103:19, 114:6
**ineffective** - 103:9
**infancy** - 40:12
**information** - 7:7, 12:3, 15:2, 15:23, 31:2, 32:22, 35:20, 58:9, 83:4, 85:21,

86:14, 96:24, 99:1, 103:4, 111:4
**initial** - 33:22, 40:4, 52:19, 54:4, 54:6, 80:24
**initialed** - 33:3
**initials** - 98:12
**Inside** - 50:3
**inside** - 31:8, 31:11
**inspection** - 7:14, 110:23
**instrument** - 102:2
**instruments** - 101:22
**intact** - 31:15, 32:3, 73:25, 74:1, 88:19
**intend** - 6:3, 12:6, 12:21, 113:23
**intent** - 106:15
**intention** - 21:18, 21:20, 114:2, 114:4
**interaction** - 85:17
**interested** - 30:5
**intern** - 3:8
**internal** - 14:18, 19:19, 19:21, 20:3, 27:4, 40:3
**Internal** - 3:8, 3:10, 20:1
**interpreted** - 78:13
**Interpreters** - 2:21
**interviewed** - 36:2
**interviewing** - 36:14
**intoxilyzer** - 101:22, 102:2
**introduce** - 79:17, 109:25
**investigated** - 8:21, 8:22, 8:24, 17:1, 18:22
**investigation** - 3:9, 9:15, 14:22, 14:24, 17:6, 19:20, 20:2, 36:12, 40:5, 45:7
**investigator** - 2:8, 2:12, 2:16, 2:20, 3:2, 3:6, 7:25, 8:1, 8:3, 8:6, 8:7, 8:9, 8:21, 8:22, 8:23, 18:21, 18:23, 19:14, 40:2, 40:18, 45:2, 78:16
**investigators** - 8:20, 9:15, 37:25
**invite** - 102:6
**involve** - 49:4
**involved** - 14:20, 29:11, 82:5, 83:5, 89:19, 89:20, 89:22, 89:24, 95:3, 98:4, 99:3, 106:16
**involvement** - 49:14, 49:23
**involving** - 82:22
**isolate** - 62:3, 62:14, 63:2, 64:13, 118:24
**issue** - 9:14, 22:7, 23:6, 23:9, 100:7, 100:8, 101:7, 101:24, 110:1, 110:7, 110:12
**issued** - 9:11, 21:20
**issues** - 22:4, 27:14, 69:2, 100:4, 101:7, 103:20, 103:25, 104:14, 111:13, 119:19
**item** - 12:3, 23:14, 32:19, 33:11, 61:22, 72:9, 72:11, 80:25
**items** - 7:14, 12:2, 17:18, 17:22, 30:4, 30:7, 30:14, 33:15, 34:2, 34:16, 34:22, 40:25, 42:15, 42:18, 42:20, 42:21, 42:24, 46:17, 53:10, 53:18, 57:24, 67:13, 67:16, 87:20, 91:25, 97:20, 119:14
**itself** - 19:16, 32:1, 46:22, 51:21, 75:12, 84:24

**J**

**jail** - 6:23
**Jd** - 24:11

**Jim** - 94:3
**job** - 24:16, 102:11, 103:10
**joined** - 26:23
**Joseph** - 85:10, 85:23, 94:9, 94:20, 96:7, 96:8, 96:25, 97:12, 113:24, 114:5, 117:7
**Joseph's** - 25:6
**Jr** - 29:12, 29:18
**judge** - 7:16, 10:1
**Judge** - 1:23, 4:13, 4:21, 5:12, 6:14, 6:17, 7:19, 9:25, 10:19, 11:3, 12:23, 13:22, 14:11, 15:20, 21:1, 21:3, 21:10, 21:14, 23:14, 25:3, 41:18, 47:19, 55:14, 66:18, 69:11, 73:10, 78:1, 79:1, 93:7, 93:17, 96:5, 100:3, 107:20, 107:25, 111:22
**judgment** - 15:6
**Judicial** - 1:12
**July-** 120:10, 120:12
**jump** - 107:16
**June-** 1:20, 1:3, 10:17, 27:1, 27:4, 40:3, 58:20
**juror** - 119:2
**jurors** - 11:2
**jury** - 3:1, 15:11, 22:10, 100:9, 100:11, 100:15, 100:17, 100:22, 107:9, 110:1, 110:16, 113:17, 113:19, 118:22
**Justin-** 2:4, 3:7, 94:20, 107:11

**K**

**keep** - 16:11, 29:4, 47:22
**kept** - 111:17
**killed** - 34:15
**kind** - 7:20, 27:10, 28:21, 42:1, 60:13, 60:24, 61:4, 61:6, 61:23, 69:4, 85:23, 103:5, 103:15, 112:11, 114:11
**kinds** - 18:14, 26:21, 40:20, 62:13, 62:14
**kit** - 22:12, 23:1, 25:19, 30:9, 30:11, 32:8, 32:10, 32:21, 33:2, 44:6, 44:9, 44:10, 44:13, 44:14, 44:18, 45:14, 46:2, 46:3, 46:9, 46:11, 46:13, 46:18, 46:20, 47:3, 51:1, 53:2, 54:19, 57:24, 61:22, 73:20, 73:23, 74:16, 74:24, 75:21, 76:8, 76:12, 76:14, 76:17, 76:19, 77:8, 84:22, 87:5, 97:21, 98:8, 104:11, 104:15, 119:15
**knowing** - 60:25
**knowledge** - 18:10, 69:5, 69:7, 86:19
**known** - 35:25, 36:19, 52:17, 81:16, 91:23
**Kologinczok-** 1:24, 23:17, 23:23, 23:24, 24:6, 24:9, 24:13, 25:4
**Kologinczok's** - 24:21

**L**

**Lab-** 2:3, 16:2, 16:5, 17:1, 17:17, 17:22, 17:23, 18:17, 19:14, 43:16, 43:22, 45:5, 47:5, 51:10, 60:25, 67:15, 68:1, 68:8, 68:11, 68:17, 70:19, 73:18, 77:14, 78:19, 79:23, 80:2, 80:20, 82:2, 82:16, 83:3, 83:17, 85:2,

85:5, 85:19, 86:22, 95:24, 99:5, 101:20, 104:16, 107:12, 107:17, 109:15, 111:12, 112:17, 113:7, 113:11, 113:24, 117:10, 118:7, 118:9
**lab** - 3:6, 14:14, 14:22, 14:24, 15:3, 17:2, 17:10, 18:3, 18:7, 18:13, 18:22, 19:16, 20:11, 21:19, 21:21, 21:25, 22:1, 22:18, 23:3, 30:19, 32:13, 33:23, 33:24, 34:17, 34:22, 42:17, 43:15, 43:16, 44:2, 44:16, 44:20, 45:3, 46:9, 46:12, 60:22, 61:3, 61:20, 67:17, 68:23, 74:4, 74:18, 75:24, 76:10, 77:2, 81:2, 81:4, 81:15, 82:6, 82:15, 83:6, 83:10, 83:13, 84:10, 84:23, 85:14, 85:17, 94:4, 95:5, 95:10, 95:16, 99:1, 100:24, 102:8, 102:21, 103:7, 103:10, 103:20, 103:25, 104:12, 104:25, 105:5, 106:3, 106:12, 106:15, 108:16, 108:19, 108:21, 110:3, 110:18, 112:3, 112:19, 116:24, 117:2, 117:3, 118:4, 119:8, 119:10
**labeled** - 42:25, 43:3, 43:7, 43:24, 51:7, 76:16, 76:17
**laboratories** - 29:5
**laboratory** - 2:9, 2:13, 2:17, 2:21, 3:3, 17:13, 17:14, 80:15, 80:22, 84:14, 90:12
**labs** - 16:6, 17:15, 23:10, 41:10
**lack** - 108:20
**laid** - 118:15
**language** - 70:11
**large** - 31:3, 50:2, 112:5
**larger** - 35:2, 42:20, 112:16, 112:21
**Last-** 79:19
**last** - 35:21, 44:22, 47:23, 66:25, 93:13, 99:1
**late** - 107:17
**latest** - 99:7
**law** - 24:8, 100:13, 118:2, 119:24, 120:2, 120:4
**Law-** 24:12
**lawyers** - 3:5
**leaking** - 103:25
**leaky** - 61:13, 104:14, 107:15
**learn** - 34:5, 39:13
**learned** - 37:22, 88:17
**least** - 9:8, 28:18, 56:8, 60:5, 92:8, 92:19, 92:20, 95:3, 108:17, 113:11, 113:12
**leave** - 20:17, 20:19, 71:4, 71:5, 71:9, 72:5, 72:15, 72:17
**leaving** - 71:16
**Lebron-** 35:21, 57:18, 58:2
**left** - 4:25, 6:21, 19:1, 22:13, 30:8, 39:15, 46:19, 71:22, 73:6, 73:8, 105:10
**legal** - 19:22, 27:13
**length** - 87:25
**Leonardo-** 57:18
**Lester-** 19:3
**letter** - 2:5, 19:8, 83:13, 83:23, 94:2, 94:5, 94:12, 95:1, 95:19
**library** - 88:10
**light** - 119:18

**likely** - 72:13, 106:24
**limine** - 11:5, 100:19
**limited** - 11:25, 21:4, 21:7
**linked** - 107:10
**links** - 87:24
**list** - 28:25, 29:2, 29:19
**listed** - 42:15, 44:22, 45:20, 70:17
**listing** - 85:8
**lives** - 110:9
**location** - 102:2, 102:3, 119:13
**locations** - 89:10
**locking** - 36:16
**long-term** - 113:10
**Look**- 45:24
**look** - 13:1, 17:7, 28:17, 28:22, 40:24, 41:4, 44:21, 51:19, 53:2, 53:16, 70:14, 86:5, 93:17, 99:8, 102:7, 102:21
**looked** - 29:19, 37:9, 42:19
**looking** - 16:11, 50:12, 60:17, 62:2, 63:7, 63:8, 63:10, 63:16, 63:18, 64:11, 64:15, 64:16, 87:23, 89:10
**looks** - 7:9, 7:13, 7:18, 65:1, 73:22, 75:25, 88:20, 113:9, 115:12
**Louisiana**- 2:15
**lower** - 104:17
**lunch** - 7:5, 120:14

**M**

**ma'am** - 39:9, 51:15
**Madrid** - 2:14, 3:6
**Magee** - 1:22
**main** - 72:19, 97:20, 97:22, 97:23
**maintain** - 81:2
**maintained** - 5:18, 80:1, 84:22
**maintains** - 24:8
**major** - 39:18, 56:9, 57:5, 59:18, 59:23, 61:24, 64:3, 64:8, 65:7, 65:11, 65:15, 92:22, 106:7, 106:25
**male** - 39:14, 43:8, 43:19, 54:9, 55:2, 55:5, 55:17, 56:10, 56:11, 56:17, 56:22, 56:23, 57:2, 57:6, 87:18, 88:12, 92:20
**males** - 55:9, 55:10, 55:13, 106:17
**malicious** - 106:15, 106:17
**management** - 102:23
**manager** - 81:1, 103:9
**manilla** - 50:4
**Marilu** - 2:20
**Mario** - 2:14, 3:5
**marked** - 19:17, 78:20, 93:21, 95:19
**married** - 34:11
**Martinez** - 35:22, 57:19, 58:5, 58:13, 58:17, 58:23
**Mary** - 122:4, 122:19
**Maryland** - 111:1
**master's** - 48:19, 48:20
**masters** - 80:8
**match** - 42:8, 57:13, 59:22, 59:23, 62:10, 64:4, 64:7, 64:21
**matched** - 22:25, 54:20, 55:19, 56:15, 59:15, 59:17, 59:25
**matches** - 39:16, 106:6, 107:1
**matching** - 54:23, 56:18

**material** - 14:14, 38:16, 51:8, 62:24
**materials** - 5:13, 14:25, 83:5, 88:6
**Matt** - 1:9, 1:20, 47:17, 48:2, 106:21
**mean** - 18:7, 18:8, 41:8, 42:13, 68:14, 68:20, 70:25, 72:11, 84:12, 84:14, 87:21, 87:23, 99:5, 113:3
**meaning** - 72:3
**means** - 88:2
**meeting** - 85:17
**Mehl** - 1:8, 1:19, 26:2, 26:7, 26:8, 26:10, 41:22, 49:20, 50:16, 60:10, 70:20, 104:17, 105:3, 105:5, 105:6, 111:19, 112:1, 112:23
**Mehl's** - 50:25
**Melo** - 35:21, 57:18, 58:2
**member** - 8:25, 27:24
**Memorial** - 24:7
**memory** - 45:25
**memos** - 14:19
**mention** - 15:5
**met** - 9:25, 67:8, 93:12
**method** - 50:18, 88:25
**methods** - 88:13
**Michael** - 18:20, 78:15, 86:10, 110:8
**might** - 14:19, 38:16, 40:19, 52:3, 60:22, 80:25, 85:17, 93:6, 98:3, 103:2, 103:3, 103:16, 103:17, 109:22, 109:23, 113:21, 113:25, 114:11
**Might** - 66:5
**Mike** - 8:2
**Miller** - 39:5
**millions** - 71:11
**mind** - 48:14, 50:9, 110:4
**mine** - 71:2
**minor** - 57:3, 80:8
**mis** - 111:15
**mis-tested** - 111:15
**misconception** - 111:23, 112:12
**misconduct** - 108:5, 108:8, 116:23
**mishandled** - 61:21
**mishandling** - 60:13, 61:4
**missed** - 102:25
**missing** - 68:3
**misspoke** - 34:12
**mistakes** - 18:14
**mitigation** - 9:3, 9:4, 9:20, 9:21, 10:8, 10:10
**mixed** - 4:7
**mixture** - 39:17, 39:22, 54:13, 56:8, 92:8, 92:10, 92:19, 92:22
**modern** - 103:7
**moisture** - 65:21
**mold** - 65:22
**molecular** - 48:20, 80:10
**moment** - 10:5
**months** - 26:25
**morning** - 11:10, 11:16, 79:15, 79:16
**most** - 60:5, 72:5, 80:15, 96:18, 102:22, 103:7
**mostly** - 80:16, 80:23
**mother** - 29:16, 29:18, 34:11, 34:13, 52:14, 54:15
**Motion** - 1:16, 1:2
**motion** - 3:11, 4:12, 4:14, 7:14, 7:24, 8:7, 10:14, 10:16, 12:15, 14:4, 15:5, 16:16, 16:25, 17:18, 18:1, 19:15, 99:22, 100:19,

110:22, 113:18
**motions** - 3:8, 3:12, 3:13, 3:21, 3:25, 4:2, 4:9, 4:15, 4:19, 11:5, 11:19, 13:10, 13:16, 13:17, 13:18
**motive** - 115:15, 115:17
**mouth** - 62:5, 65:4
**move** - 5:21
**multiple** - 54:14, 73:20
**murder** - 39:24
**murdered** - 34:6, 36:7

**N**

**naked** - 109:10
**name** - 23:16, 23:22, 25:13, 26:5, 26:7, 47:23, 66:25, 67:7, 79:17, 79:19, 85:10, 86:17, 93:11
**named** - 29:12
**names** - 35:21
**narcotic** - 37:19
**Natalie** - 2:3, 3:7
**necessarily** - 118:6
**need** - 4:20, 5:3, 10:25, 13:12, 25:3, 87:25, 111:3, 115:9, 115:10, 118:23, 119:3, 119:4, 120:22, 120:23
**needed** - 28:5, 88:5, 103:8
**never** - 36:13, 36:24, 39:4, 76:17, 88:15, 93:15, 98:13, 104:8, 104:25, 112:2, 113:5
**new** - 28:9, 28:13
**Newly** - 7:7
**newspapers** - 68:25
**next** - 19:17, 26:1, 32:6, 39:20, 39:23, 47:16, 57:10, 57:17, 77:25, 99:19
**Next** - 57:11
**nine** - 80:23
**none** - 102:19, 103:14
**None** - 103:20
**normally** - 9:23
**North**- 60:3
**Northwest** - 24:8
**notation** - 13:15, 44:19
**note** - 15:4, 15:14
**noted** - 50:21, 111:8
**notes** - 49:15, 50:22, 70:14, 73:21, 83:7, 86:5, 88:9, 89:5, 89:6, 94:16, 94:18, 97:20, 98:4
**Nothing** - 96:4
**nothing** - 50:12, 51:12, 60:14, 60:17, 101:10, 103:15, 108:9, 108:10, 108:12
**notice** - 5:22, 6:10, 6:19, 12:20, 13:2, 101:16
**notices** - 6:10
**notification** - 70:11
**November** - 27:5, 28:4, 83:14
**nowhere** - 22:21, 105:16
**number** - 3:21, 4:3, 4:9, 4:17, 5:13, 6:15, 10:13, 11:12, 11:19, 13:19, 18:25, 19:1, 19:7, 20:22, 100:16, 109:19, 110:24
**Number** - 1:22
**numbered** - 1:22, 122:11
**numbers** - 42:7
**numerous** - 19:5
**nurse** - 24:10, 24:11, 24:14, 24:17

**O**

**Obel** - 1:6, 3:4, 36:6, 36:13,

36:24, 37:13, 38:3, 49:11, 52:21, 59:5, 59:20, 65:14, 90:7, 90:9, 90:18, 91:13, 91:20, 91:21, 92:8, 92:20, 106:13
**object** - 69:3
**objection** - 21:3, 24:2, 24:3, 24:24, 78:23, 78:24, 84:4, 99:15, 99:16, 114:22, 116:8, 116:9, 120:23
**objections** - 21:2
**observe** - 30:23
**obtain** - 2:1, 30:13, 37:20, 38:8, 41:10, 42:15, 57:13, 59:10, 61:17, 63:5, 66:12, 72:8, 72:18, 90:18, 91:8
**obtained** - 12:4, 24:11, 33:25, 38:10, 39:14, 39:18, 54:8, 54:17, 56:11, 57:14, 57:17, 57:23, 58:4, 59:6, 59:14, 59:18, 62:9, 78:17, 86:2, 90:21, 91:5, 91:9, 91:13, 92:7, 94:11, 94:12, 105:2
**obtaining** - 60:23
**obviously** - 4:11, 7:11, 10:22, 14:13, 73:5, 103:13
**Obviously** - 11:11, 118:9
**occasion** - 96:19
**occasions** - 81:9, 81:10
**occur** - 41:3, 61:24
**occurred** - 37:1, 49:14, 50:14, 116:23, 122:11
**October** - 25:5, 25:10, 25:17, 25:21, 33:20, 37:11, 37:12, 42:10, 49:18, 86:4, 87:1, 87:5, 87:17, 89:23, 112:18, 122:17
**offense** - 29:17
**offenses** - 6:11, 11:11
**offer** - 15:9, 17:13, 18:19, 20:25, 21:18, 21:20, 24:20, 78:14, 78:21, 84:1, 108:18, 110:14, 114:5, 119:2, 120:24
**Offered** - 1:22, 20:23, 24:23, 78:22, 84:3
**offered** - 100:25, 102:19, 103:14, 107:8, 119:1
**offering** - 19:12, 19:17, 20:15, 110:5, 116:12, 117:9, 117:11, 117:17
**office** - 9:16, 96:20
**Office**- 78:17
**office's** - 14:22
**Officer** - 25:19, 104:17
**officer** - 27:8
**officers** - 50:17
**Official**- 122:4, 122:16, 122:20
**often** - 71:25
**oily** - 71:13
**old** - 14:14, 21:24, 22:18, 23:3, 28:18, 99:5, 104:12, 104:25, 119:9
**older** - 88:4
**on-the-job** - 24:16
**once** - 39:2, 53:19, 54:5, 65:14
**one** - 4:6, 5:24, 7:3, 7:23, 8:20, 11:20, 17:24, 18:12, 19:2, 19:6, 19:7, 19:11, 19:17, 20:22, 24:17, 37:25, 42:10, 43:25, 44:22, 44:24, 55:10, 55:13, 56:1, 61:21, 62:19, 63:4, 63:13, 65:2, 67:24, 70:22, 72:22, 72:22, 74:1, 74:2, 74:11, 74:12, 74:17, 75:8, 75:14, 75:18, 75:23, 76:16, 86:1, 91:19,

92:20, 93:21, 94:3, 96:1,
96:2, 97:7, 97:9, 98:16,
98:19, 98:24, 100:6, 104:5,
105:4, 108:4, 108:5, 108:8,
109:8, 109:19, 113:10,
113:12, 116:10
**One** - 5:23, 17:14, 30:8,
30:9, 43:18, 43:24, 62:3,
73:23, 93:6, 97:7
**ones** - 4:17, 9:23, 11:21,
45:20, 96:1, 96:2
**Open** - 3:1
**open** - 5:12, 5:18, 19:2,
20:17, 32:25, 33:4, 33:5,
34:24, 35:1, 42:23, 62:17,
62:22, 105:9, 122:12
**opened** - 34:25, 35:6,
39:4, 42:19, 42:21, 112:22
**opening** - 16:21, 21:12,
21:14
**Opening** - 1:4, 1:6, 16:24,
21:16
**operating** - 9:1
**operational** - 95:17
**operations** - 24:7
**opinion** - 65:8, 65:9,
69:19, 88:11, 100:21,
108:19, 109:16
**opportunity** - 10:23,
30:22, 82:21, 86:24, 114:7
**oral** - 3:11, 11:23, 80:18
**Orchid** - 17:23, 17:24,
18:17, 22:24, 30:2, 33:17,
33:25, 37:4, 38:17, 39:7,
39:10, 45:12, 46:8, 48:11,
48:14, 48:21, 91:2, 91:5,
91:9, 92:7, 96:13, 97:4,
97:8, 97:14, 105:8, 105:12,
105:19, 106:14, 109:2,
111:20
**order** - 37:20, 38:8, 42:14,
52:23, 88:1, 94:5, 105:24
**original** - 36:2, 37:25,
38:15, 39:6, 41:15, 51:1,
73:23, 76:22, 84:20, 104:9,
107:14, 112:3, 112:14,
112:24, 113:2
**originally** - 58:13, 76:11,
83:5, 113:6
**originated** - 56:9
**Otherwise** - 22:10
**otherwise** - 82:18
**Ouachita** - 80:7
**outermost** - 60:16
**overall** - 18:7, 108:20
**overcome** - 115:9, 115:10,
118:24
**own** - 8:7, 22:2, 28:23,
35:3, 42:22, 51:15, 52:4,
52:6, 71:6, 80:17, 91:9,
109:9

## P

**package** - 39:6, 112:2,
112:21
**packaged** - 33:17, 35:14,
45:11, 50:6, 50:10, 51:4,
60:15, 112:7, 112:8
**packaging** - 60:12, 60:16,
104:9, 105:10, 112:3,
112:14
**Page** - 1:3, 42:2
**page** - 42:7, 45:24, 46:17
**pages** - 19:12
**paid** - 102:4
**pair** - 17:19, 76:12, 76:18,
76:20, 76:22
**panel** - 3:2
**panties** - 17:20, 22:12,

23:1, 30:10, 34:3, 34:18,
39:17, 43:4, 45:16, 45:20,
46:1, 46:2, 46:10, 46:13,
46:25, 47:3, 51:20, 51:24,
52:3, 52:5, 53:13, 53:18,
54:3, 56:4, 56:5, 56:14,
56:25, 57:2, 59:2, 59:19,
59:22, 59:24, 61:25, 62:7,
62:13, 63:8, 63:17, 63:23,
63:24, 64:4, 65:5, 74:16,
74:19, 74:23, 75:12, 75:15,
75:19, 76:1, 76:7, 76:12,
76:16, 76:18, 76:20, 76:23,
84:17, 92:3, 92:16, 95:22,
106:8, 106:23, 107:1,
113:13
**panty** - 43:7
**paper** - 112:5
**parcel** - 3:20
**parents** - 34:6
**part** - 3:20, 12:18, 42:16,
44:8, 44:9, 44:13, 47:3,
49:10, 49:22, 81:5, 85:18,
108:20, 120:21
**parte** - 8:8
**partial** - 58:4
**particular** - 13:10, 17:11,
49:21, 63:9, 103:22
**particularly** - 70:8
**parties** - 54:5, 122:9,
122:15
**Pass** - 41:18
**pass** - 47:8, 66:14, 73:9,
93:3, 99:10
**passes** - 109:8
**past** - 81:9, 82:23
**patient** - 25:8, 25:13
**patrol** - 26:24, 26:25
**pattern** - 88:18
**Pause** - 93:8, 98:18
**pay** - 9:19, 9:20
**paying** - 9:24, 67:5
**people** - 9:22, 17:3, 17:9,
17:10, 40:23, 70:9, 70:12,
71:12, 72:8, 72:15, 72:21
**perform** - 49:2, 49:6, 49:7,
52:25, 63:12, 68:14, 89:25,
90:2
**performed** - 23:17, 24:19,
25:7, 25:12, 25:16, 51:15,
52:5, 53:4, 53:20, 97:14
**performing** - 49:8, 90:8
**perhaps** - 100:7, 113:12
**period** - 60:11
**permission** - 19:6
**permit** - 7:14
**perplexed** - 9:25
**person** - 61:20, 62:20,
70:23, 71:3, 72:2, 72:5,
86:18, 86:19, 109:8, 113:24,
120:24
**personal** - 8:8, 86:19,
89:17
**personally** - 85:12, 88:15
**Phone** - 2:7, 2:13, 2:16
**phone** - 19:4, 19:5, 110:10
**photograph** - 88:21
**phrase** - 55:7
**phraseology** - 18:12
**picked** - 44:15, 44:18
**pictures** - 88:10
**piece** - 5:1, 61:21
**place** - 44:4, 48:10
**plan** - 10:4, 116:2, 120:10
**plastic** - 31:1, 31:8, 31:11,
31:14, 32:21, 32:24, 33:2,
33:3, 33:7, 34:23, 35:3,
35:5, 41:15, 42:21, 42:22,
42:24, 43:3, 43:7, 43:18,
65:20, 65:22, 112:24, 113:2,

113:3
**play** - 100:4, 101:3, 102:18
**point** - 9:8, 10:6, 12:23,
12:25, 29:9, 31:15, 33:21,
40:16, 50:21, 52:18, 54:6,
57:16, 59:4, 60:9, 67:24,
68:18, 73:10, 74:7, 86:1,
89:8, 113:10, 115:4
**police** - 27:8, 36:12, 71:24,
108:6
**Police** - 2:8, 2:12, 2:16,
2:20, 3:2, 20:8, 25:20,
26:15, 26:20, 27:24, 69:25,
78:18, 79:23, 80:20, 86:21,
95:24
**polite** - 82:8
**popped** - 22:21
**populations** - 60:3
**portion** - 76:1, 76:5, 76:8,
76:23, 77:4, 77:7
**portions** - 33:25, 119:5,
122:8
**position** - 21:17, 80:1,
107:3
**positive** - 53:4
**possession** - 22:18,
37:13, 61:6, 67:21, 67:24
**possibility** - 71:5
**possible** - 29:21, 56:12,
58:3, 58:7, 70:17, 72:22,
72:23, 92:9
**potential** - 35:9, 104:1
**potentially** - 66:1, 66:3,
104:6
**Potentially** - 66:4, 115:11
**practical** - 24:16
**practice** - 24:9, 81:24
**practices** - 80:17
**prepared** - 12:2, 23:21
**present** - 3:1, 3:5, 3:6,
22:10, 53:12, 53:13, 53:21,
56:2, 62:23, 63:25, 64:1,
80:25, 90:13
**presenting** - 115:7
**presiding** - 1:23, 7:16
**presumably** - 74:19,
75:22, 76:24
**pretrial** - 13:13
**Pretrial** - 1:16, 1:2
**pretty** - 11:13, 72:7,
100:17
**prevent** - 105:24
**previous** - 3:22, 10:15,
75:23, 90:15, 97:9, 102:9
**previously** - 3:13, 51:23,
75:9, 77:4, 86:21
**prime** - 36:16
**principle** - 81:13
**prison** - 38:9, 105:1
**private** - 29:4, 80:14
**problem** - 22:19, 67:6,
109:14
**problems** - 33:10, 102:21,
102:22, 102:23, 102:24,
111:15
**procedure** - 108:6
**Procedure** - 7:15
**procedures** - 62:13
**Proceed** - 24:4
**proceed** - 13:23, 14:4,
14:10, 16:16, 21:11, 23:25,
26:6, 26:9, 47:25, 66:21,
69:21, 78:5, 79:9, 93:5,
98:21, 99:22
**proceeding** - 3:8, 13:11,
14:7
**Proceedings** - 1:16, 1:24,
1:2, 121:4
**proceedings** - 1:21, 10:17,
122:8, 122:14

**process** - 109:11
**produce** - 13:16, 13:17
**produced** - 17:22
**product** - 5:3
**products** - 67:18
**proffer** - 23:15, 23:20,
24:5, 25:23, 109:22
**profile** - 12:10, 17:20,
22:25, 39:14, 39:16, 39:18,
53:22, 54:8, 55:19, 55:21,
56:9, 56:11, 56:17, 56:18,
56:21, 57:14, 57:23, 58:5,
58:22, 58:25, 59:10, 59:14,
59:15, 59:18, 59:24, 60:2,
61:9, 61:18, 61:24, 63:17,
63:19, 64:2, 64:3, 64:6,
64:8, 65:11, 66:1, 72:9,
72:13, 72:19, 72:22, 73:16,
88:18, 90:15, 90:18, 90:21,
91:3, 91:4, 91:12, 91:19,
92:7, 109:11, 119:8, 119:11
**profiles** - 17:21, 37:5,
59:25, 70:12, 91:8, 91:9
**program** - 24:14, 49:1
**prolific** - 107:1
**promote** - 65:22
**promoted** - 26:25, 48:23
**pronounced** - 23:24
**proper** - 109:1
**properly** - 27:17, 27:18
**property** - 2:10, 2:14, 2:18,
2:22, 3:4, 3:7, 19:14, 19:16,
30:18, 30:19, 32:5, 32:7,
32:10, 32:13, 33:23, 41:13,
96:21, 103:24, 104:7,
111:18, 112:6, 112:10,
113:10
**protocol** - 29:10
**prove** - 18:5
**proven** - 18:13
**provided** - 6:2, 15:2,
15:23, 20:12, 58:5, 108:10,
108:12
**psychologist** - 9:1, 9:2,
10:11
**public** - 15:10, 18:9, 121:1
**Puerto** - 15:7, 23:5, 37:21,
37:23, 38:5, 38:9, 39:5,
105:1, 105:21, 105:23,
105:25
**pulling** - 11:5, 94:21
**purify** - 62:18
**purported** - 11:24
**purpose** - 52:8
**purposes** - 9:2, 12:25,
21:4, 21:7, 22:8, 22:15,
25:24, 45:4, 48:13, 69:14,
78:25, 101:5
**pursue** - 13:7
**pursuing** - 12:12, 12:17
**put** - 5:10, 8:13, 9:18,
10:6, 10:24, 13:1, 14:5,
14:17, 15:18, 19:6, 22:8,
65:3, 69:17, 96:5, 105:11,
114:25, 115:1, 120:17

## Q

**quadrillion** - 60:7
**qualified** - 80:17
**quantified** - 90:12
**quantitative** - 89:7
**quantity** - 65:6
**Quartaro** - 1:9, 1:20,
47:17, 47:24, 48:2, 48:7,
67:2, 67:3, 67:4, 106:21
**questions** - 73:12, 77:17,
96:6, 99:11
**quick** - 66:17, 99:8,
108:23, 109:13

**quickly** - 73:21
**quintillion** - 60:4
**quite** - 64:1
**quotes** - 43:3

# R

**raining** - 106:11, 106:12
**random** - 81:18
**rape** - 22:11, 22:12, 23:1, 30:9, 30:11, 32:8, 32:10, 32:21, 33:2, 44:6, 44:9, 44:10, 44:13, 44:14, 44:18, 46:2, 46:3, 46:9, 46:11, 46:12, 51:1, 54:19, 57:24, 61:22, 74:16, 87:5, 97:21, 119:15
**raw** - 51:21
**read** - 15:11, 41:8, 68:25, 78:3, 115:24, 119:3, 119:17, 119:23
**reading** - 68:25, 83:4, 84:8, 85:4
**readings** - 80:16
**ready** - 13:23, 14:4, 21:11, 23:12
**real** - 117:5
**really** - 9:22, 40:15, 54:1, 58:4, 60:14, 62:21, 67:13, 68:5, 85:16, 100:13, 101:11, 102:25, 103:9, 109:4, 109:10, 117:11, 117:18, 119:2
**reason** - 9:7, 71:1, 72:4
**reasons** - 107:3
**receipt** - 86:9, 94:21, 94:23
**receive** - 15:15, 15:24, 16:14, 27:8, 39:10, 50:16, 54:2, 57:20, 59:4
**received** - 26:22, 27:11, 27:17, 27:21, 38:12, 38:20, 39:2, 49:17, 50:1, 50:2, 50:8, 50:20, 50:22, 50:24, 51:1, 52:3, 52:7, 52:10, 54:1, 57:11, 57:16, 58:21, 59:11, 60:9, 61:19, 65:13, 65:14, 67:14, 70:4, 70:7, 70:10, 70:15, 74:17, 80:15, 96:8, 96:25, 97:12, 97:21, 98:8, 105:10, 111:2
**receives** - 96:18, 96:23
**receiving** - 49:20, 85:15, 96:11, 96:22
**recently** - 68:20
**Recess**- 66:20
**recessed** - 121:4
**recognize** - 81:12
**recognized** - 81:23
**recommendations** - 3:5, 19:13
**recommended** - 21:23
**record** - 5:10, 8:12, 8:14, 8:18, 8:20, 10:6, 10:24, 14:6, 14:10, 14:17, 15:19, 19:6, 20:18, 20:20, 23:16, 78:3, 101:17, 110:21, 111:21, 115:21, 117:14, 120:18, 120:21, 121:1, 121:3
**Record**- 1:1, 122:10, 122:13
**records** - 6:23, 13:16, 13:17, 13:20, 14:2, 14:19, 15:10, 82:25, 83:9, 100:20, 100:25, 115:12, 116:1, 116:13, 116:17
**recovered** - 17:19
**recruited** - 27:1
**recused** - 4:14

**red** - 92:4
**Redirect**- 98:22
**refer** - 49:15, 73:21
**reference** - 52:10, 52:12, 53:6, 57:11, 57:15, 57:17, 70:7, 90:6, 90:9, 91:24, 92:15
**references** - 86:13
**referencing** - 83:24, 88:8
**referred** - 107:9
**referring** - 48:13, 74:16
**reflects** - 8:19, 122:14
**refreshes** - 45:25
**regard** - 5:10, 6:1, 14:11, 27:15
**regarding** - 6:23, 13:17, 13:18, 15:25, 16:15, 78:7
**Regarding**- 8:15, 8:16, 81:11
**Regardless**- 70:15
**regards** - 6:17, 10:25, 64:23, 83:3, 87:16, 91:17, 92:5, 92:15, 100:18
**registered** - 24:9
**registries** - 99:8
**reinvestigate** - 28:17
**relevance** - 115:9, 115:15, 118:25
**relevancy** - 115:23
**relevant** - 13:6, 22:7, 22:15, 101:4, 101:6, 103:21, 107:7, 115:22, 116:9, 118:25, 119:5, 119:19
**reliability** - 101:7
**reliable** - 81:13, 100:12, 116:13
**reliance** - 116:10
**relied** - 91:9
**rely** - 51:14, 52:2
**relying** - 89:1
**remaining** - 73:25
**remanning** - 74:12
**remember** - 41:7, 43:1, 44:9
**remote** - 102:13
**removed** - 46:12, 103:10, 112:13
**Renee**- 1:22
**repackaged** - 39:6
**repeats** - 81:18
**report** - 2:7, 2:11, 2:15, 2:19, 3:1, 3:11, 9:12, 14:23, 18:23, 18:24, 18:25, 19:1, 19:7, 19:11, 19:12, 19:19, 19:21, 20:22, 21:20, 39:11, 41:24, 42:2, 42:16, 46:18, 65:13, 82:18, 86:25, 102:22, 103:1, 103:19, 104:3, 107:16, 108:3, 110:8, 114:5, 115:20, 120:24, 120:25
**reported** - 1:24, 57:8, 122:12
**Reporter**- 122:4, 122:20
**reporter** - 7:10, 7:12, 26:6
**Reporter's**- 1:1, 1:15, 122:1, 122:10, 122:13
**reports** - 5:15, 9:1, 9:11, 17:2, 17:8, 17:9, 18:14, 18:20, 19:9, 19:10, 81:4, 102:6, 102:19, 103:14, 119:5, 119:17
**request** - 7:10, 10:20, 94:7, 112:3
**requested** - 122:8
**requesting** - 7:19, 83:17
**requests** - 5:22, 10:21, 13:25
**require** - 29:8
**required** - 27:12, 29:3
**requirements** - 49:1

**research** - 35:17, 36:5
**respect** - 70:21, 72:24, 108:7
**respective** - 122:15
**respond** - 99:25
**response** - 21:14
**responsibilities** - 80:19, 81:5
**responsibility** - 5:7
**responsible** - 101:21
**rest** - 21:10, 99:20
**rests** - 1:5, 1:11
**result** - 12:2, 12:4, 58:1, 59:13
**resulted** - 104:1
**results** - 11:24, 17:12, 22:3, 23:9, 38:20, 39:11, 41:10, 54:1, 54:2, 54:4, 54:6, 57:8, 59:6, 61:6, 61:19, 61:24, 65:13, 66:12, 73:15, 92:19, 98:10, 103:3, 103:8, 106:14, 106:22, 107:8, 109:18, 110:5, 117:11, 117:17, 117:23
**retained** - 33:24
**retire** - 26:17
**retired** - 26:15
**retrieve** - 33:15
**retrieved** - 34:17, 41:12, 104:12
**returned** - 19:4, 27:5, 29:7
**reveal** - 45:7
**review** - 82:22, 85:21, 86:14, 86:25, 88:6, 88:7, 98:25, 114:8, 114:10
**reviewed** - 85:25, 91:2
**reviewing** - 82:17
**Rflp**- 89:3, 89:6
**Rican**- 105:1
**rich** - 63:14, 63:15
**Rico**- 15:7, 23:5, 37:21, 37:23, 38:5, 38:9, 39:5, 105:21, 105:23, 105:25
**rigorous** - 48:25
**robust** - 64:2, 64:3, 64:6
**Rodriguez**- 34:4, 34:8, 35:12, 42:25, 44:23, 45:8, 52:11, 54:14, 56:12, 57:1, 122:4, 122:19
**Rolando**- 2:20, 78:13
**role** - 82:20
**roof** - 61:13, 104:1, 104:14, 107:15
**room** - 2:10, 2:14, 2:18, 2:22, 3:4, 3:7, 19:14, 19:16, 30:18, 30:20, 32:5, 32:7, 32:11, 32:13, 41:13, 96:21, 103:24, 104:7, 111:18, 112:6, 112:10, 113:10
**rough** - 71:13, 72:10
**roughly** - 28:25, 60:3
**Rp**- 2:11
**rub** - 106:18
**rubbing** - 71:15
**rudimentary** - 102:25
**Rule**- 101:1
**ruled** - 4:6, 4:16, 7:16, 118:17
**rules** - 120:7
**ruling** - 1:12, 114:9, 117:15, 118:25, 119:22, 120:9
**running** - 106:3

# S

**saliva** - 2:1, 12:10, 62:6, 78:11
**sample** - 2:2, 23:5, 36:24, 37:6, 37:13, 37:20, 38:8,

38:11, 38:13, 38:23, 39:3, 52:20, 53:5, 54:7, 56:13, 58:17, 59:4, 59:11, 60:23, 61:3, 61:5, 64:10, 65:23, 65:24, 66:1, 66:9, 71:8, 75:4, 75:7, 78:8, 78:11, 85:7, 86:2, 90:6, 90:9, 90:14, 91:14, 91:23, 91:24, 92:16, 94:14, 105:2, 105:15, 105:20, 105:25, 106:1, 106:4
**samples** - 34:4, 35:8, 35:9, 36:3, 36:22, 44:6, 49:9, 51:7, 51:16, 51:21, 52:8, 52:10, 52:12, 52:18, 53:2, 53:3, 53:6, 57:11, 57:16, 57:18, 57:20, 58:4, 58:14, 63:20, 70:5, 70:7, 70:18, 84:15, 84:18, 84:21, 85:2, 90:16, 90:23, 91:5, 91:8, 94:16, 95:2, 95:4, 104:23, 106:5, 113:11, 119:11
**saw** - 63:24, 65:7
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scathing** - 17:2
**scenario** - 115:18
**scene** - 22:13, 30:8, 31:6, 39:15, 41:3, 71:19, 104:10, 112:4
**scenes** - 40:11, 71:18, 71:25
**school** - 80:5, 88:17
**science** - 80:9
**scientific** - 11:25, 81:13, 81:24
**scratch** - 22:1, 53:8, 67:12, 67:13
**screened** - 53:2
**screening** - 80:23, 98:8
**seal** - 31:15
**sealed** - 31:19, 32:21, 33:3, 43:18, 43:24, 50:3, 60:16, 111:18, 112:24, 113:2, 113:3
**search** - 12:4
**Second** - 2:7
**second** - 18:23, 62:6, 93:6, 98:16, 109:20
**section** - 85:15, 96:11, 96:18
**see** - 3:20, 15:13, 17:6, 18:14, 25:3, 42:1, 44:19, 45:24, 48:21, 53:21, 57:12, 57:13, 60:14, 61:9, 62:8, 63:25, 70:9, 70:14, 83:9, 84:9, 85:8, 88:17, 89:7, 99:4, 99:7, 101:9, 102:22, 103:18, 107:15, 108:25, 109:4, 109:7, 109:8, 109:10, 111:12, 114:15, 115:5, 115:24, 117:21, 119:18
**seeing** - 119:6
**seek** - 108:18
**seeking** - 13:21, 16:18
**seem** - 94:3
**seized** - 12:2
**self** - 12:25
**self-serving** - 12:25
**semen** - 40:22, 53:3, 53:4, 53:10, 53:12, 53:13, 53:15, 53:16, 53:19, 62:12, 80:25, 98:9, 106:13, 106:22, 106:23, 106:25, 112:9
**send** - 21:25, 46:7, 49:24, 111:20
**sense** - 18:18, 120:5
**sent** - 17:23, 29:4, 33:17, 33:25, 37:3, 38:11, 39:7, 40:3, 45:11, 46:11, 46:12, 46:17, 46:20, 50:10, 70:20,

83:5, 83:11, 83:17, 84:10, 85:2, 85:5, 85:7, 94:6, 105:2, 105:7, 105:20, 106:3, 112:10

**sentences** - 15:6

**separate** - 62:16, 63:1, 63:12, 64:9, 75:20, 76:9, 106:1, 106:5

**separated** - 77:8

**separately** - 75:16

**September** - 30:1

**sergeant** - 26:15, 26:25

**Sergeant** - 37:19, 37:22, 41:22, 47:14, 49:20, 50:16, 50:25, 60:10

**series** - 29:4

**serious** - 118:23

**serology** - 81:2

**served** - 27:2, 27:4

**service** - 27:13

**services** - 3:12, 19:22

**serving** - 12:25

**set** - 30:1, 51:17

**seventh** - 82:10

**several** - 5:22, 10:20, 17:15, 50:4, 68:15, 68:16, 68:21, 69:1, 97:7

**sex** - 73:5

**sexual** - 23:17, 24:10, 24:13, 24:17, 24:19, 25:7, 25:13, 25:18, 45:14, 46:18, 46:19, 53:2, 73:19, 73:23, 74:23, 75:21, 76:8, 76:12, 76:14, 76:17, 76:19, 77:8, 84:21, 98:8, 104:11, 104:15, 113:8, 119:15

**sexually** - 29:16

**shape** - 82:6

**Sharma** - 86:18, 86:25, 87:3, 87:18, 88:8, 94:19, 94:22, 95:2, 95:5, 96:1, 102:20, 103:2, 103:16, 107:6, 108:3, 113:23, 114:5, 115:12, 116:1, 116:15, 116:20

**Sharma's** - 87:16, 97:18

**shed** - 71:11, 71:12, 71:15, 71:22, 72:8, 72:10

**shedder** - 72:3

**sheet** - 112:6, 112:9, 112:20

**Shellist** - 3:23, 4:13, 5:14, 110:22

**ship** - 30:2, 33:20

**shipment** - 49:17, 52:19, 57:17

**shipped** - 22:24, 37:10, 37:11, 38:17, 83:17, 105:11

**shipping** - 50:18

**shirt** - 112:7

**shooting** - 66:2

**short** - 13:5, 20:2, 81:18

**shorthand** - 1:25

**show** - 15:22, 17:9, 18:8, 22:5, 22:11, 23:7, 24:22, 77:12, 83:22, 98:1, 102:25, 106:6, 114:10, 119:17

**showed** - 29:17, 29:18, 63:19

**showing** - 22:16, 44:19, 108:20

**shown** - 61:10

**shows** - 20:5, 96:25, 104:21

**shut** - 68:17, 68:23, 118:9

**side** - 6:3

**sides** - 3:10, 3:12, 6:2

**signed** - 4:15, 5:24, 5:25, 78:12

**significant** - 13:3

**simple** - 89:8

**simply** - 9:21, 22:23, 102:13, 117:10, 118:8

**single** - 21:20, 55:25, 91:18

**single-source** - 55:25, 91:18

**situation** - 88:20, 110:17

**skin** - 46:10, 54:10, 56:6, 62:4, 62:6, 65:2, 70:21, 70:25, 71:2, 71:13, 71:22, 72:4, 72:5, 72:8, 109:7, 109:8, 109:9, 109:10, 109:12

**skip** - 6:6, 7:22

**Skip** - 3:6, 7:4, 67:7, 93:11

**small** - 19:12, 76:8, 76:23, 77:1, 80:22, 88:3

**smear** - 88:21

**smoked** - 71:3

**someone** - 62:5, 66:11, 101:2, 106:15, 114:16

**somewhere** - 81:9

**Sorry** - 25:10

**sorry** - 19:18, 25:9, 67:5, 98:19, 107:16

**sort** - 32:23, 50:21

**sounds** - 23:23

**source** - 55:25, 91:18

**South** - 24:12

**Spanish** - 25:14

**spanned** - 68:19, 68:20

**special** - 10:5

**specialist** - 9:3, 79:22, 80:21

**specific** - 10:8, 13:24, 15:2, 18:5, 20:11, 27:21, 27:23, 30:4, 82:20, 120:24

**specifically** - 14:6, 17:10, 17:19, 63:18, 68:5, 70:14

**Specifically** - 86:4, 91:12, 111:11

**spell** - 23:22, 47:23, 66:25

**spelled** - 47:24

**spent** - 26:23, 26:25

**sperm** - 39:16, 39:18, 54:13, 56:8, 56:24, 56:25, 59:17, 59:18, 59:24, 62:7, 62:9, 62:14, 62:18, 62:25, 63:2, 63:5, 63:9, 63:11, 63:15, 63:18, 63:19, 63:22, 63:25, 64:1, 64:11, 64:13, 65:4, 65:6, 65:10, 65:12, 72:24, 72:25, 73:6, 92:1, 92:2, 92:11, 92:17, 92:18, 109:12, 119:14

**Sperm** - 92:13

**splitting** - 89:10

**spoken** - 8:25

**sponsor** - 110:8

**squad** - 28:1, 28:5, 28:11, 28:16

**St** - 25:6

**stages** - 87:10

**stand** - 26:4, 113:4

**standard** - 4:10, 4:18, 11:13, 31:4, 50:15, 50:18

**standpoint** - 109:24, 116:10

**stapled** - 76:16

**start** - 4:5, 18:22, 22:1, 67:13

**started** - 48:21, 53:8, 67:11, 69:25, 70:3, 80:14

**starting** - 26:20

**starts** - 9:9

**State** - 1:11, 2:7, 1:11, 3:3, 3:6, 5:2, 5:6, 5:11, 5:23, 9:10, 9:13, 12:5, 12:18, 17:13, 17:24, 19:21, 19:23,

20:12, 21:11, 21:22, 26:2, 47:17, 78:1, 93:20, 99:20, 99:25, 100:25, 110:15, 111:10, 113:22, 116:5, 122:2, 122:5

**state** - 9:23, 26:5

**State's** - 1:6, 1:7, 1:13, 17:4, 21:16, 21:17, 24:5, 24:20, 24:23, 24:25, 25:2, 78:14, 78:20, 78:22, 78:24, 79:3, 79:5, 83:23, 84:1, 84:3, 84:5, 84:7, 84:8, 93:21, 95:19, 100:2, 100:10, 110:5, 110:22, 110:23

**Statement** - 16:24, 21:16, 107:23

**statement** - 1:4, 1:6, 4:22, 12:18, 12:21, 16:21, 59:21, 72:1, 72:7

**statements** - 11:12, 11:23, 14:10

**stating** - 4:13, 10:9

**Stating** - 60:24

**statistics** - 60:1

**Step** - 34:9

**step** - 47:14, 53:1

**stepfather** - 34:12, 52:14

**Stephens** - 37:19, 37:22, 37:25, 38:4

**Steve** - 3:7, 3:22, 5:14, 110:22

**sticks** - 68:3

**still** - 5:18, 11:19, 32:2, 37:12, 38:23, 41:22, 48:14, 49:7, 63:12, 68:18, 74:12, 76:7, 76:13, 76:15, 83:10, 95:7, 96:14, 103:13, 115:22, 117:14

**stipulations** - 78:3

**storage** - 23:7, 33:11, 65:17

**store** - 27:18, 65:18

**stored** - 19:15, 30:17, 30:23, 31:11, 31:21, 32:12, 34:21, 35:2, 61:12, 75:16, 75:17, 75:20, 103:22, 103:23, 103:24, 104:15, 104:16, 107:19, 113:9

**storing** - 31:5

**storm** - 61:13, 106:11

**storms** - 104:6

**Str** - 81:17

**stretch** - 106:19

**strong** - 59:21, 102:16

**studies** - 88:16

**stuff** - 5:16, 11:8, 15:25, 16:5, 16:7, 42:6, 45:11, 46:8, 46:9, 95:12, 103:1, 110:4, 110:15, 114:21, 116:5, 117:8

**Stuff** - 19:15

**styled** - 122:11

**submission** - 2:3, 78:8, 78:19, 93:24, 93:25

**submit** - 78:11, 78:20, 96:21

**submitted** - 78:18

**subpoenaed** - 5:15

**substances** - 96:19

**sudden** - 66:8

**Suffice** - 87:12

**suffice** - 92:24

**sufficient** - 11:1, 72:8, 72:18, 110:4

**sufficiently** - 100:12

**Suite** - 2:15

**summary** - 3:9, 19:13, 19:18, 19:20, 20:2

**Summary** - 4:5

**supervise** - 49:5, 80:22

**supervisor** - 27:1, 48:8, 48:24, 80:22

**supervisors** - 94:4

**supervisory** - 102:23

**supplement** - 42:8

**supplied** - 5:14, 83:13

**support** - 119:24, 120:3

**suppose** - 110:10, 115:22

**suppress** - 11:19, 13:10, 13:18, 16:18, 18:16, 109:14, 109:21, 113:18, 113:19

**Suppress** - 1:16, 1:2

**suppressed** - 109:17, 109:19

**surface** - 71:14, 72:10

**suspect** - 36:17, 71:18, 86:2

**suspects** - 52:9, 70:17

**sustain** - 69:10

**swab** - 12:13, 39:21, 43:19, 54:3, 55:4, 55:23, 56:25, 58:10, 68:3, 68:4, 73:20, 73:24, 74:11, 74:12, 84:16, 90:1, 90:3, 90:5, 91:4, 91:20, 94:22, 94:23, 95:21, 96:23, 96:25, 97:8, 97:11, 113:12

**swabbing** - 12:9, 53:5

**swabs** - 17:22, 53:12, 53:17, 54:9, 54:20, 56:22, 59:2, 59:17, 62:7, 62:12, 63:8, 68:3, 73:15, 73:17, 73:20, 73:23, 73:25, 74:1, 74:9, 78:17, 86:10, 92:2, 92:5, 92:13, 96:8, 96:20, 97:6, 106:9, 106:23

**sworn** - 26:3, 26:11, 47:18, 48:3, 79:6, 79:12

**Sx** - 1:23, 2:1, 2:3, 2:5

**T**

**t-shirt** - 112:7

**table** - 3:5

**tainted** - 111:14

**tampering** - 50:13, 50:21, 61:23, 101:16, 103:15

**tandem** - 81:18

**team** - 49:5, 52:25

**technique** - 81:16, 81:20, 88:15, 89:1, 89:4

**techniques** - 81:4, 87:12, 88:4, 88:5, 89:13, 90:12, 92:24, 102:25, 103:7

**ten** - 49:5

**term** - 113:10

**terminated** - 95:9

**terms** - 15:18, 108:9, 114:24, 115:2, 118:3

**Terrace** - 2:12

**test** - 11:25, 12:1, 62:11, 67:16, 72:25, 73:4, 74:7, 75:11, 77:1, 80:17, 98:11, 103:3, 103:5, 112:4

**tested** - 21:24, 51:21, 53:5, 53:6, 58:4, 63:24, 67:23, 68:1, 68:2, 73:15, 73:18, 73:25, 74:4, 74:9, 74:11, 75:7, 75:9, 75:23, 76:2, 76:4, 76:9, 77:4, 77:6, 97:8, 97:10, 97:21, 102:24, 104:12, 106:2, 106:4, 106:6, 111:15, 112:8, 112:13, 112:20, 113:7

**testified** - 26:11, 48:3, 73:14, 79:12, 81:8, 81:10, 97:18, 104:17, 112:1, 117:22, 119:6

**testifies** - 105:7, 114:16

**testify** - 9:7, 9:8, 24:6,

25:5, 25:15, 105:25, 107:5, 107:8, 109:3, 109:4, 114:17, 117:21

**testifying** - 11:15, 78:2, 81:6, 100:23, 101:1, 102:15, 115:19

**testimony** - 5:4, 5:22, 18:16, 23:20, 25:24, 50:25, 108:24, 109:17, 110:16, 111:17, 111:25

**testing** - 22:2, 39:11, 53:4, 63:13, 65:14, 67:12, 67:14, 67:18, 67:19, 68:8, 69:25, 70:16, 74:13, 76:24, 77:1, 77:2, 80:24, 83:6, 83:18, 87:24, 89:3, 94:7, 97:24, 98:2

**tests** - 12:1, 50:17, 80:18

**Texas** - 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:4, 7:15, 12:5, 24:12, 25:6, 48:9, 122:2, 122:6, 122:19, 122:22

**themselves** - 64:14, 65:5, 76:7

**theory** - 81:13, 114:12, 114:18, 115:6

**therefore** - 100:1, 106:19

**they've** - 72:11

**thick** - 19:11

**thinking** - 40:19, 40:21

**thinks** - 69:20

**third** - 18:24, 54:25, 55:2, 55:5, 55:15, 55:16

**Third-** 2:11

**three** - 46:17, 55:9, 73:22, 79:25, 82:3, 92:8

**three-and-a-half** - 79:25

**throughout** - 36:12, 60:10

**throw** - 118:14

**thrown** - 118:22

**timesheet** - 101:24

**Tise-** 2:3, 3:7, 3:16, 5:12, 6:4, 7:7, 12:23, 14:9, 14:13, 15:19, 15:20, 21:3, 21:13, 21:17, 23:11, 23:13, 26:2, 26:9, 26:13, 41:18, 47:11, 47:13, 47:17, 47:19, 48:1, 48:5, 55:13, 55:14, 55:15, 66:14, 66:15, 69:3, 77:18, 77:21, 100:1, 100:3, 101:19, 101:25, 105:6, 105:9, 105:14, 105:17, 105:19, 107:21, 111:21, 112:1, 112:18, 112:23, 114:2, 117:22, 120:6, 120:16

**title** - 109:1

**today** - 3:9, 5:18, 6:25, 8:12, 11:8, 11:21, 14:5, 22:6, 81:6, 87:14

**together** - 49:22, 85:14

**took** - 43:13, 44:9, 45:3, 52:4, 75:6, 75:9, 75:14, 76:24, 77:2, 77:3, 105:25

**top** - 32:13, 104:15, 106:12

**total** - 73:22

**totally** - 69:23

**touch** - 71:9, 71:23, 72:6, 72:15, 72:21

**touched** - 61:22, 68:6, 71:3, 72:11

**touches** - 71:20

**touching** - 71:8

**training** - 24:14, 24:15, 24:16, 26:21, 27:8, 27:10, 27:13, 27:17, 27:21, 48:18, 49:1, 80:11, 80:15, 81:12, 81:21

**transcription** - 122:7

transcription/stenograph - 1:25

**transfer** - 3:15

**transferred** - 4:3, 4:11, 5:16, 18:3, 27:2, 70:22

**translate** - 15:6

**translated** - 15:10

**translations** - 15:9

**trapped** - 65:21

**Travis**- 32:11, 32:14, 44:15, 44:18

**trial** - 9:9, 11:6, 11:10, 11:17, 13:3, 15:8, 22:8, 22:10, 22:15

**Trial**- 1:3

**tried** - 41:9

**triggered** - 29:20, 50:9

**tropical** - 61:13, 104:5, 106:11

**trouble** - 102:13

**True**- 117:20

**true** - 93:14, 95:8, 122:7

**truly** - 122:14

**trust** - 82:9

**try** - 29:4, 70:12, 100:5, 105:24, 109:11, 109:22, 116:15, 120:9, 120:17

**trying** - 22:11, 60:4, 62:3, 63:25, 89:8, 115:2, 115:3, 115:6, 116:16, 117:15, 118:24

**tube** - 42:25, 43:1, 43:25, 44:24, 47:2

**tubes** - 43:10, 43:20, 45:15, 46:24

**turn** - 5:7, 19:8, 66:8

**turned** - 17:2, 25:18, 119:13

**turning** - 42:2

**Two**- 72:21

**two** - 3:5, 8:20, 9:15, 11:21, 16:4, 43:20, 55:10, 55:13, 56:9, 62:2, 63:3, 63:12, 65:1, 72:15, 73:25, 74:9, 78:17, 86:13, 92:19, 97:5, 106:5, 108:5, 108:7, 109:13

**type** - 8:11, 64:18, 70:16, 94:7, 115:18, 118:7

**types** - 10:19, 62:2, 63:10, 65:2, 68:15, 73:20

## U

**ultimate** - 54:1

**ultimately** - 27:25, 58:9, 81:4, 90:14, 103:8

**Ultimately** - 39:10, 39:24

**uncleared** - 27:3

**unclimate** - 65:19

**unclimate-controlled** - 65:19

**under** - 8:2, 73:4, 73:5, 111:1, 115:7, 115:21, 116:13, 116:16

**Under** - 114:18

**undergraduate** - 80:6

**unfavorable** - 17:9, 31:22

**uninterrupted** - 27:3

**unit** - 37:19, 49:23

**University** - 80:7, 80:10

**unknown** - 54:9, 54:25, 55:2, 55:5, 55:15, 55:16, 55:21, 56:10, 56:22, 56:23, 57:6, 57:14

**unless** - 12:24, 99:22, 106:12, 115:14

**Unless** - 69:6

**unlikely** - 104:22

**unrelated** - 60:4, 60:7

**unreliable** - 116:8

**unseal** - 34:24

**unsealed** - 31:15, 104:9

**up** - 4:7, 10:4, 14:16, 20:20, 22:21, 40:14, 42:8, 44:15, 44:18, 47:22, 61:10, 63:19, 66:8, 66:11, 73:12, 74:9, 80:16, 88:2, 89:10, 95:16, 98:20, 98:24, 103:6, 106:3, 111:19, 121:2

**updated** - 6:18

**updates** - 6:22, 27:15

**urine** - 12:1

## V

**vaginal** - 39:21, 43:19, 53:12, 53:17, 54:2, 54:9, 54:20, 55:4, 55:23, 56:21, 56:24, 59:2, 59:17, 62:7, 62:12, 63:8, 73:23, 74:1, 84:16, 92:2, 92:5, 92:13, 95:21, 106:9, 106:23

**valid** - 81:20, 81:23

**variable** - 72:9

**variables** - 72:12

**various** - 17:9, 41:10, 95:23

**versus** - 3:4, 89:9

**via** - 50:19

**victim** - 29:18, 36:7

**vigilant** - 16:10

**virtually** - 119:10

**visit** - 82:1, 89:16

**Vitae**- 1:23

**voice** - 47:22

**Voir** - 1:7, 1:17

**voir** - 10:21, 10:22, 10:23, 11:2

**Vol**- 1:3, 1:7, 1:17, 1:22

**Volume** - 1:2, 1:1, 1:16

**volume** - 122:10

**Volumes** - 1:2

**voluminous** - 14:25

**Vs**- 1:9

## W

**wait** - 99:24

**waive** - 99:23

**Wallace** - 98:2, 98:12, 100:21, 100:22, 101:9, 102:7, 107:4, 108:11, 108:13, 108:15, 110:24, 111:5, 113:23, 114:4

**Wallace'** - 101:7

**Walsh** - 3:7

**wants** - 17:13

**wash** - 62:18, 62:23

**Washington** - 80:10, 110:9

**watching** - 80:16

**water** - 31:24, 33:13

**Webb** - 78:15, 86:10

**Wednesday** - 120:12, 120:18

**week** - 120:10, 120:12

**weeks** - 110:12

**wet** - 61:14, 104:5

**whole** - 8:10, 64:18, 112:10, 118:8

**wide** - 85:17

**wish** - 109:14

**withhold** - 119:22

**Witness** - 1:17, 26:3, 26:7, 46:11, 47:18, 47:24, 55:12, 69:9, 73:19, 74:5, 74:11, 74:21, 74:25, 75:6, 75:13, 75:18, 75:25, 76:4, 76:11, 76:15, 77:10, 77:15, 77:23, 79:6, 79:8, 88:24, 96:10,

96:14, 96:17, 97:2, 97:5, 97:15, 97:23, 98:3, 98:7, 122:16

**witness** - 22:12, 23:12, 23:10, 41:18, 47:8, 47:12, 47:19, 66:14, 73:9, 73:12, 77:19, 93:4, 99:10, 99:13, 100:23, 101:1, 103:12, 115:5, 115:13, 115:19, 116:15, 116:16, 117:19, 117:25, 118:1

**Witnesses** - 1:7

**witnesses** - 6:3, 19:23, 21:18, 22:6, 114:14, 116:11, 116:14, 117:21

**wondering** - 77:6

**Wood** - 2:4, 3:7, 6:17, 7:4, 23:14, 24:5, 25:3, 25:10, 25:12, 78:1, 78:6, 79:9, 79:10, 79:14, 83:20, 83:22, 84:1, 84:8, 88:25, 93:3, 94:20, 98:16, 98:19, 98:23, 99:10, 99:15, 99:20

**Word**- 1:16

**works** - 24:6, 85:15, 96:10, 96:14, 96:18, 96:23

**worksheet** - 98:10

**writ** - 10:7

**write** - 81:3, 81:4

**writer** - 10:7

**writing** - 122:9

**written** - 11:23, 31:2, 42:3, 98:10, 103:6

**Wt**- 25:19

## Y

**y'all** - 40:20, 67:11, 68:10, 69:25

**year** - 27:12, 49:2

**years** - 26:24, 27:3, 28:18, 48:22, 68:16, 68:21, 69:1, 79:25, 82:3, 93:13, 97:7, 101:23, 102:12, 116:25

**yourself** - 66:2, 79:17, 93:22

## Z

**ziploc** - 31:8, 31:11, 31:14, 75:20

**zipped** - 31:16