1                          REPORTER'S RECORD

2                     **VOLUME 18 OF 35 VOLUMES**

3                   TRIAL COURT CAUSE NO. 1384794

4              COURT OF CRIMINAL APPEALS NO. AP-77,025

5

6    OBEL CRUZ-GARCIA           )  IN THE DISTRICT COURT
                                )
7         Appellant            )
                                )
8                               )
                                )
9    VS.                        )  HARRIS COUNTY, TEXAS
                                )
10                              )
                                )
11   THE STATE OF TEXAS         )
                                )
12        Appellee             )  337TH JUDICIAL DISTRICT

13

14

15                  *******************

16              **GUILT-INNOCENCE PROCEEDINGS**

17                  *******************

18

19

20        On the 8th day of July, 2013, the following

21   proceedings came on to be heard in the above-entitled

22   and numbered cause before the Honorable Renee Magee,

23   Judge presiding, held in Houston, Harris County, Texas;

24        Proceedings reported by computer-aided

25   transcription/stenograph shorthand.

1                    **A P P E A R A N C E S**

2

3

4        MS. NATALIE TISE
         SBOT NO. 00795683
         MR. JUSTIN WOOD
5        SBOT NO. 24039247
         Assistant District Attorneys
6        1201 Franklin
         Houston, Texas  77002
7        PHONE:  713.755.5800
         **ATTORNEYS FOR THE STATE OF TEXAS**
8

9

         **- AND -**
10

11

         MR. R.P. 'SKIP' CORNELIUS
12       SBOT NO. 04831500
         2028 Buffalo Terrace
13       Houston, Texas  77019-2408
         PHONE:  713.237.8547
14

         MR. MARIO MADRID
15       SBOT NO. 00797777
         440 Louisiana, Suite 1225
16       Houston, Texas  77002-1659
         PHONE:  713.877.9400
17       **ATTORNEYS FOR THE DEFENDANT**

18

19

20       Rolando Hernandez
         Marilu Flores,
21       **Interpreters**

22

23

24

25

**I N D E X**
**VOLUME 18**
**(GUILT-INNOCENCE PROCEEDINGS)**

**JULY 8, 2013**

|  | PAGE | VOL. |
|---|---|---|
| Jurors sworn................................. 26 | 18 |
| Indictment presented......................... 26 | 18 |
| Opening statement by State's Attorney......... 29 | 18 |
| Opening statement by Defense Attorney......... 41 | 18 |

**STATE'S WITNESSES**

|  | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| James Devereaux | 45 | 54 | - | 18 |
| C.E. Elliott | 59 | 98 | - | 18 |
|  | 112 | - | - | 18 |
| Diana Garcia | 120 | 174 | - | 18 |
| Jose Arturo Rodriguez | 194 | - | - | 18 |

| Reporter's Certificate....................... 221 | 18 |
|---|---|

Word Glossary..............................End of Volume

**ALPHABETICAL WITNESS INDEX**

|  | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Devereaux, James | 45 | 54 | - | 18 |
| Elliott, C.E. | 59 | 98 | - | 18 |
|  | 112 | - | - | 18 |
| Garcia, Diana | 120 | 174 | - | 18 |
| Rodriguez, Jose Arturo | 194 | - | - | 18 |

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| SX - 5 | 911 call business records affidavit | 43 | 43 | 18 |
| SX - 6 | CD of 911 call | 43 | 43 | 18 |
| SX - 7 | Aerial map | 53 | 54 | 18 |

| 1  | SX - 8  | 1992 calendar | 95 | 96 | 18 |
|----|---------|---------------|----|----|----|
| 2  | SX - 9  | Photograph    | 67 | 67 | 18 |
| 3  | SX - 10 | Photograph    | 67 | 67 | 18 |
| 4  | SX - 11 | Photograph    | 67 | 67 | 18 |
| 5  | SX - 12 | Photograph    | 67 | 67 | 18 |
| 6  | SX - 13 | Photograph    | 67 | 67 | 18 |
| 7  | SX - 14 | Photograph    | 67 | 67 | 18 |
| 8  | SX - 15 | Photograph    | 67 | 67 | 18 |
| 9  | SX - 16 | Photograph    | 67 | 67 | 18 |
| 10 | SX - 17 | Photograph    | 67 | 67 | 18 |
| 11 | SX - 18 | Photograph    | 67 | 67 | 18 |
| 12 | SX - 19 | Photograph    | 67 | 67 | 18 |
| 13 | SX - 20 | Photograph    | 67 | 67 | 18 |
| 14 | SX - 21 | Photograph    | 67 | 67 | 18 |
| 15 | SX - 22 | Photograph    | 67 | 67 | 18 |
| 16 | SX - 23 | Photograph    | 67 | 67 | 18 |
| 17 | SX - 24 | Photograph    | 67 | 67 | 18 |
| 18 | SX - 25 | Photograph    | 67 | 67 | 18 |
| 19 | SX - 26 | Photograph    | 67 | 67 | 18 |
| 20 | SX - 27 | Photograph    | 67 | 67 | 18 |
| 21 | SX - 28 | Photograph    | 67 | 67 | 18 |
| 22 | SX - 29 | Photograph    | 67 | 67 | 18 |
| 23 | SX - 30 | Photograph    | 67 | 67 | 18 |
| 24 | SX - 31 | Photograph    | 67 | 67 | 18 |
| 25 | SX - 32 | Cigar         | 81 | 82 | 18 |

| # | Exhibit | Description | | | |
|---|---------|-------------|---|---|---|
| 1 | SX - 42 | Apartment lease | 137 | 138 | 18 |
| 2 | SX - 61 | Photograph | 169 | 170 | 18 |
| 3 | SX - 80 | Photograph | 170 | - | 18 |
| 4 | SX - 81 | Photograph | 170 | - | 18 |
| 5 | SX - 83 | Photograph | 140 | 141 | 18 |
| 6 | SX - 84 | Photograph | 171 | 171 | 18 |
| 7 | SX - 85 | Photograph | 140 | 141 | 18 |
| 8 | SX - 86 | Photograph | 140 | 141 | 18 |
| 9 | SX - 87 | Photograph | 140 | 141 | 18 |
| 10 | SX - 88 | Photograph | 140 | 141 | 18 |
| 11 | DX - 10 | Second Report of the | | | |
| 12 | | Independent Investigator For the Houston Police Department Crime | | | |
| 13 | | Laboratory and | | | |
| | | Property Room | 23 | 24 | 18 |
| 14 | | (Admitted For Purposes of Motion to Suppress | | | |
| 15 | | Hearing Only) | | | |
| | DX - 11 | Third Report of the | | | |
| 16 | | Independent Investigator For the Houston Police | | | |
| 17 | | Department Crime Laboratory and | | | |
| 18 | | Property Room | 23 | 24 | 18 |
| | | (Admitted For Purposes of Motion to Suppress | | | |
| 19 | | Hearing Only) | | | |
| 20 | DX - 12 | City of Houston Inter Office | | | |
| 21 | | Communication | 23 | 24 | 18 |
| | | (Admitted For Purposes of Motion to Suppress | | | |
| 22 | | Hearing Only) | | | |
| 23 | DX - 13 | City of Houston Inter Office | | | |
| 24 | | Communication | 23 | 24 | 18 |
| | | (Admitted For Purposes of Motion to Suppress | | | |
| 25 | | Hearing Only) | | | |

```
 1   DX - 14    Memo              23       24              18
                (Admitted For Purposes of Motion to Suppress
 2               Hearing Only)

 3   DX - 15    Memo              23       24              18
                (Admitted For Purposes of Motion to Suppress
 4               Hearing Only)

 5   DX - 16    Judgment          23       24              18
                (Admitted For Purposes of Motion to Suppress
 6               Hearing Only)

 7   DX - 17    Judgment          23       24              18
                (Admitted For Purposes of Motion to Suppress
 8               Hearing Only)

 9   DX - 18    Judgment          23       24              18
                (Admitted For Purposes of Motion to Suppress
10               Hearing Only)

11   DX - 19    LabCorp records   23       24              18
                (Admitted For Purposes of Motion to Suppress
12               Hearing Only)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Open court, defendant present, no jury)
 2              MR. CORNELIUS:  There are some statements I
 3   want to make in the record about looking at the DNA
 4   stuff that the D.A.'s office has --
 5              THE COURT:  Okay.
 6              MR. CORNELIUS:  -- that they've allowed me
 7   to look at.  I just want to cover myself in the record.
 8              THE COURT:  Okay.
 9              MR. CORNELIUS:  And then I'm offering for
10   the purpose of the motion hearing only, on page on the
11   second Bromwich report, one page of the third -- well,
12   it's more than one page.  Three pages of the third
13   report --
14              THE COURT:  I thought that was all in.
15              MR. CORNELIUS:  It is.  But this is
16   highlighted.  And if somebody --
17              THE COURT:  Why don't you just reference it
18   in the record.
19              MR. CORNELIUS:  I wish I had given this to
20   you so you wouldn't have to read the whole report.
21              THE COURT:  Well, I read most of that
22   stuff.
23              MR. CORNELIUS:  I know you did.  And I feel
24   sorry that -- I should have just marked this, but,
25   anyway, it will be easier for whoever looks at this on
```

1   appeal to see what I'm talking about.

2                    THE COURT:  Okay.  What's the gist of it?

3                    MR. CORNELIUS:  Well, Bromwich -- I will

4   put this in the record.  If Bromwich were called as a

5   witness to testify, he would testify that after his

6   investigation and all the work that he was employed to

7   do, the crime lab was a quote, train wreck.  And he

8   further testified that in their studies more than

9   one-third of the DNA cases were flawed.  Not that they

10  had wrong identification -- that only happened in one

11  case -- or that they even had an incorrect profile or

12  should have gotten a profile when they didn't, or vice

13  versa, just that something was wrong.  They didn't write

14  the thing down, according to procedures; they didn't

15  label something correctly.

16                    And then I have -- one, two, three, four --

17  four exhibits to offer of specific instances of

18  contamination in the old crime lab.  They did --

19                    THE COURT:  That was my --

20                    MR. CORNELIUS:  I know you're not going to

21  let them in.  I'm just offering them for the record.

22                    THE COURT:  All right.

23                    MR. CORNELIUS:  I'm trying to streamline

24  and make it easier for whoever does this appeal to

25  see -- and make it easier for whoever is reviewing this

1  from an appellate standpoint to see what I presented you

2  with.

3              THE COURT:   Correct.

4              MR. CORNELIUS:  You see what I'm saying?

5              THE COURT:  Yes.  I'm not offended.  I

6  understand.

7              MR. CORNELIUS:  Well, you shouldn't be.

8              THE COURT:  I mean, it sounds like you are

9  apologizing to me and you don't need to.

10             MR. CORNELIUS:  I'm not apologizing.  I'm

11  just telling you I think -- I'm trying to do the right

12  thing.

13             THE COURT:  Right.

14             MR. CORNELIUS:  And then the three

15  convictions for Deetrice Wallace, copies of those

16  convictions --

17             THE COURT:  Offered in for purposes of the

18  record.

19             MR. CORNELIUS:  Record only.  I know you're

20  not going to let them in.

21             THE COURT:  For that hearing only.

22             MR. CORNELIUS:  What else?

23             Oh, I have the original Genetic Design

24  file.  When I say "original," I mean the original.  The

25  notes, all the photographs, everything concerning the

1 testing.

2                    THE COURT:  From the HPD old crime lab?

3                    MS. TISE:  From the California lab, Genetic

4 Design that the HPD lab sent it to.

5                    MR. CORNELIUS:  Well, it actually comes

6 from LabCorp who bought Genetic Design.  LabCorp in

7 North Carolina, but it has an affidavit supporting --

8 records custodian affidavit explaining all of that.  So,

9 I'm going to offer this stuff.  I know you're not going

10 to let it in because it has to do with the old crime

11 lab, but I'm going to put it in the record and then I

12 don't have to worry about it anymore.  These are all the

13 original --

14                    THE COURT:  But I never heard any of that

15 on the record in the case before because we --

16                    THE BAILIFF:  Quiet, please.

17                    THE COURT:  All I heard on the record was

18 about the fact that Sharma's results said it was too

19 degraded or something.

20                    MR. CORNELIUS:  That's not in here.

21                    THE COURT:  What did the other lab say?

22 They never even tested the --

23                    MS. TISE:  They didn't have the defendant's

24 DNA.  They basically got a hodgepodge of results.  Some

25 of it's degraded and -- nothing definitive.  And, again,

1   just like the crime lab, not anything we intend to go

2   into.

3                   THE COURT:  Right.

4                   MS. TISE:  Or offer their reports in any

5   way.

6                   But I do think we touched on it in the

7   hearing.  They're calling them the California lab.

8                   MR. CORNELIUS:  Right.  And that was

9   correct.

10                  THE COURT:  Okay.  Very good.

11                  MR. CORNELIUS:  Let me, so I don't --

12                  THE COURT:  Lose track.

13                  MR. CORNELIUS:  -- violate anything when I

14  go on the record here.  It appears to me from my reading

15  of all of this stuff that they did -- they didn't find

16  that it was impossible to get a DNA profile.  They just

17  used a different method and they did get a DNA profile

18  from the panties and cuttings from the panties, but they

19  were using some method that only has two loci, rather

20  than 12 to 14 that STR has.  But it's not -- you may

21  know more about this than I do.  Don't think I'm

22  correcting you, but from my reading of this, I don't

23  think it's fair to say they didn't get a DNA profile

24  because they did.

25                  MS. TISE:  I'm not saying they didn't get a

1    DNA profile.  They did not have the defendant's sample

2    to compare it to.  They got results, but they are based

3    on -- you can't look at the loci they are looking at and

4    the loci that Orchid looked at and say -- because we

5    showed it to Courtney Head at HPD and talked to her

6    about it at length.  She was like:  Yeah, I'm not

7    trained on this technique, they are using a completely

8    different strand of DNA.  So, there is just nothing --

9    it's just a hodgepodge of stuff that --

10               THE COURT:  Any of that -- those were

11   individual cuttings that went there to that lab and

12   stayed there.  They didn't come back and retest it.  It

13   was a cut -- it was an extraction done by Sharma that

14   went out there.

15               MS. TISE:  Right.

16               THE COURT:  So, none of that evidence was

17   retested again by Orchid Cellmark.  And Orchid Cellmark

18   never compared their results to that evidence either.

19               MS. TISE:  Right.

20               MR. CORNELIUS:  So, that is my problem with

21   it.  I mean, that's what I would seek to go into, that

22   this stuff was tested by a credible lab, they did get a

23   DNA profile, and just because Orchid Cellmark or the new

24   crime lab used a different procedure, how do we know

25   that if they'd used the D1SA PCR analysis procedure that

```
 1   it would have come back to the defendant?
 2              MS. TISE:  Well, they didn't have the
 3   defendant's DNA sample.
 4              MR. CORNELIUS:  Well, they could do right
 5   now.  They've already got the profile.
 6              THE COURT:  Is that what -- if you wanted
 7   to --
 8              MR. CORNELIUS:  I don't want to do it.  I
 9   don't want to do it.
10              THE COURT:  You just want to object to the
11   fact that they didn't.
12              MR. CORNELIUS:  Exactly.  Exactly.  And if
13   you tell me I can't, I can't.  Certainly I'm going to
14   honor that.  In fact, I'm not going to --
15              THE COURT:  They sent it to Orchid
16   Cellmark --
17              MR. CORNELIUS:  I'm not going to -- no
18   matter what we agree on now, I'm not going to read it
19   without first approaching the bench.
20              THE COURT:  I want to make clear on the
21   record about this.  I'll allow you to put all that in.
22   We will do that in just a minute.  I want to make it
23   clear on the record.  I'm going to allow you a pretty
24   broad area of cross-examination as to contamination and
25   storage on the case -- the evidence in your case, but I
```

1    don't want you to go into, even on cross-examination,

2    anything about the Bromwich report or anything that it

3    contains.  Like any -- well, did you know that the, you

4    know, the property room leaked in 19 whatever.  It has

5    nothing to do with this case.  I don't want you to go

6    any of that stuff on cross-examination.  I think that

7    was Ms. Tise's concern, that even though I didn't let in

8    the report I was letting a bunch stuff on

9    cross-examination that couldn't be corrected without

10   calling witnesses.  I'm not going to.  I think you got

11   that.  Right?

12              MR. CORNELIUS:  I did.  But I thought at

13   our first hearing, I thought you made some comment about

14   I might be able to go into testing that was done by

15   Genetic Design.  And so, that's why I went through all

16   of this.

17              THE COURT:  I don't remember that, but I

18   did consider having certain parts of the report, you be

19   allowed to cross-examine on them, but after reading the

20   case law that the State provided to me, I think it was

21   pretty spot-on that, you know, this stuff is

22   inadmissible.  So, that's what I believe it says and

23   that's what I believe the law is on it.

24              Now, I didn't get anything from you guys.

25   Do you have anything else you want me to consider?  Any

1   case law or anything --

2                   MR. CORNELIUS:  No.

3                   THE COURT:  -- in terms of this?

4                   MR. CORNELIUS:  No.  I'm happy with the

5   record that we have.

6                   THE COURT:  Okay.

7                   MR. CORNELIUS:  I'm not very moved by case

8   law where the defendant is objecting to the introduction

9   of DNA stuff and saying that because they have a Sixth

10  Amendment right to cross-examine their accusers, the

11  case gets reversed or at least that point is turned

12  around because the State doesn't have a Sixth Amendment

13  right.

14                  MS. TISE:  I don't think that's --

15                  THE COURT:  The case law that I read -- did

16  you provide him with the case law?

17                  MR. CORNELIUS:  She did.  And I read it.

18                  THE COURT:  It basically says the Court has

19  a wide discretion of allowing it in, you know, in

20  regards to this, but it held that it was a crime lab

21  issue up in Tarrant County.  You know, the judge there

22  didn't allow them to go into certain things and did not

23  allow it because it was too confusing and misleading to

24  the jury, which I believe that's exactly where we'd go

25  in this case if we start putting the Houston Police

1  Department Crime Lab on because there's so much to go

2  into --

3           MR. CORNELIUS:  I hear you.  I'm not going

4  to argue with you.

5           THE COURT:  -- and then get no result.

6           MR. CORNELIUS:  I just want to be in the

7  position of having argued my point and somebody else can

8  deal with it later.

9           THE COURT:  Okay.  So, let's go.  Let's get

10 them out.  I'd like to arraign the defendant outside the

11 presence of the jury and then put any of that on the

12 record for purposes of that hearing.  So, I don't need

13 to go into my ruling again.

14          MR. CORNELIUS:  Take your gun and shoot me

15 if I go into DNA without first approaching the bench.

16          THE COURT:  I don't have a gun.

17          Is there anything on the motions in limine

18 that we have not covered that you'd like to cover,

19 either side, before we begin the trial?  I have about

20 eight motions in limine here in front of me.  And some

21 of them were each filed by Capitan and Shellist.  And I

22 think there is a State's one here, too. This is the

23 State's.  Any prior convictions, extraneous conduct on

24 the part of any State's witnesses, any hearsay statement

25 made by the defendant, and any other witness without

1  first approaching, any reference to a polygraph

2  examination, any reference to prior convictions.  Just

3  the basic stuff.

4            MS. TISE:  No, ma'am.  That's my motion.

5            MR. CORNELIUS:  If you were to go into an

6  extraneous offense, I don't mean to -- that's going to

7  come out, but like the other murder --

8            MS. TISE:  Right.

9            MR. CORNELIUS:  -- then I would like to be

10  put on notice.

11            MS. TISE:  I would never start talking

12  about the other murder.

13            MR. CORNELIUS:  The rules are different if

14  you go into it on guilt and innocence than in

15  punishment.

16            MR. WOOD:  We talked about it as far as

17  when we make reference to the initial DNA sample

18  obtained by the defendant in Puerto Rico.  I was

19  planning in some thoughts -- I wasn't saying that he was

20  in prison or he was even in prison in Puerto Rico, just

21  that a DNA sample was obtained in Puerto Rico.

22            THE COURT:  That's good.  Not going into

23  that.

24            MR. WOOD:  Right.

25            THE COURT:  So, you-all know what's

1   admissible and what's inadmissible.  I'll certainly rule

2   on objections timely, but I don't want people to blurt

3   out things.

4          MS. TISE:  Do you have any intention of

5   going into Angelo Garcia, Jr.'s paternity?

6          MR. CORNELIUS:  No.

7          MS. TISE:  Okay.  I would have a motion in

8   limine to that.  She's kind of unclear about who his dad

9   is.

10          THE COURT:  It really doesn't matter.  But

11  now you can go into the fact it was a child.  Obviously,

12  that was for voir dire only.  And the fact that the

13  complainant is a child is clearly a fact.

14          All right.  Let's get ready to go then.

15          MR. WOOD:  Judge, I also visited with Skip.

16  I am doing the opening and I'm going to be using one

17  State's exhibit during opening and -- that I intend to

18  offer during our case-in-chief.  And so, Skip's already

19  okayed that and he's aware of that.

20          THE COURT:  Okay.

21          MS. TISE:  We have a PowerPoint with all of

22  the scene photos downloaded, some pictures of the

23  different people so --

24          THE COURT:  For opening?

25          MS. TISE:  I'm not going to use it in

1   opening, but what we're going to do is offer in hard

2   copies of this stuff, but then show it on the screen in

3   the PowerPoint.  And then at the end of the trial, we'll

4   offer the PowerPoint, which will be edited to take out

5   anything that might be found to be -- you know, some of

6   the stuff we might have loaded might not be admitted.

7   So, we don't want to offer the PowerPoint until the end

8   of the trial.

9                    THE COURT:  Okay.

10                   MS. TISE:  But what we've done in other

11  trials, we have a hard copy for you to look at.  But

12  we'll be offering hard copies of scene photos, but then

13  putting the PowerPoint on the screen.  And then our hope

14  is to just offer the PowerPoint at the end.  I don't

15  know that that will have any --

16                   MR. CORNELIUS:  So, you'll have two copies

17  of the pictures or two copies of the stuff.

18                   THE COURT:  Is there going to be an

19  objection at some point?

20                   MR. CORNELIUS:  I need to see them first.

21                   MS. TISE:  There may be a crime scene photo

22  or something that he might object to.

23                   THE COURT:  But you'll offer the hard copy

24  before you do the PowerPoint?

25                   MS. TISE:  No -- well, the actual pictures,

```
 1  yes.  I'll offer them in the traditional way, but then I
 2  want to be able to put them on the screen.
 3              MR. CORNELIUS:  It's faster to do it that
 4  way than through the DOAR.
 5              THE COURT:  You don't need to say:  May I
 6  publish.  If they are in, go ahead and start publishing.
 7              MS. TISE:  Okay.  Then you can obviously
 8  use it.  We'll put photos up for you, too.
 9              MR. CORNELIUS:  I like to go to the DOAR.
10  It gives me time to think.
11              MS. TISE:  You can do it however you want
12  to.
13              THE COURT:  Okay.  Very good.  Thank you.
14              MR. WOOD:  Judge, Friday we came up ahead
15  of time and tested out the 911 call on the system and
16  made sure that the audio was okay.  And some of the IT
17  guys were up here and we figured out that because of
18  interference, it seemed to work better if the other mics
19  were turned off, like the witness mic and your bench.
20  Is that something that you don't mind doing once we
21  offer that 911 and when we start playing that, just
22  muting --
23              THE COURT:  So, I need to mute mine?
24              MR. WOOD:  Yes.
25              THE COURT:  I'm fine with it.  Just tell me
```

 1  when I need to do it.

 2              MR. WOOD:  Okay.

 3              (Pause)

 4              (Open court, defendant present, no jury)

 5              THE COURT:  We're back on the record in

 6  Cause No. 13847894, the State of Texas vs. Obel

 7  Cruz-Garcia.  And present is Mr. Obel Cruz-Garcia at

 8  counsel table, along with his lawyers, Mr. Skip

 9  Cornelius and Mr. Mario Madrid.  Present for the

10  prosecution is Natalie Tise and Justin Wood.

11              And are both sides ready to proceed?

12              MR. WOOD:  State is ready.

13              MR. CORNELIUS:  The defense is ready.

14              THE COURT:  Can we please arraign the

15  defendant outside the presence of the jury at this time?

16              MR. WOOD:  Cause No. 1390130, State of

17  Texas versus Obel Cruz-Garcia.  In the name and by

18  authority of the State of Texas:  The duly organized

19  Grand Jury of Harris County, Texas, presents in the

20  District Court of Harris County, Texas, that in Harris

21  County, Texas, Obel Cruz-Garcia, hereafter styled the

22  Defendant, heretofore on or about September 30, 1992,

23  did then and there unlawfully, while in the course of

24  committing and attempting to commit the kidnapping of

25  Angelo Garcia, Jr., intentionally cause the death of

1   Angelo Garcia, Jr., by stabbing Angelo Garcia, Jr., with

2   a deadly weapon, namely, a sharp instrument.

3                   It is further presented that in Harris

4   County, Texas, Obel Cruz-Garcia, hereafter styled the

5   Defendant, heretofore on or about September 30, 1992,

6   did then and there unlawfully, while in the course of

7   committing and attempting to commit the kidnapping of

8   Angelo Garcia, Jr., intentionally cause the death of

9   Angelo Garcia, Jr. by an unknown manner and means.

10  Against the peace and dignity of the State.  Signed by

11  the Foreman of the Grand Jury.

12                   THE COURT:  And how does the defendant

13  plead?

14                   MR. CORNELIUS:  Not guilty, Your Honor.

15                   THE COURT:  All right.  And Mr. Cornelius,

16  did you wish to put something on the record at this time

17  regarding the hearing that was conducted back in June?

18  I believe it was the 18th or 19th.

19                   MR. CORNELIUS:  Yes, I do, Your Honor.

20                   THE COURT:  All right.  You may proceed.

21                   MR. CORNELIUS:  The record will reflect

22  that the Court made some rulings last week and they have

23  been reduced to writing.  And I have read them and

24  studied them.  And the Court will acknowledge that we

25  had an informal discussion this morning with all parties

1  present about the situation of the record with respect

2  to that hearing.  I'm not now trying to argue with the

3  Court about what your rulings are, but I want to

4  complete my record and make sure that the appellate

5  court knows what steps the defense has gone to to try to

6  get some of these things in evidence or to have them

7  suppressed.

8          I want the Court to know and the record to

9  know that I did meet with Lester Blizzard, an assistant

10  D.A., and he was in charge from the D.A.'s standpoint,

11  Chuck Rosenthal's standpoint, who was the D.A. at the

12  time, of the investigation of the former HPD Crime Lab.

13  He took me to the 12th floor where all of the records

14  that he had access to are stored.  There are exactly 40

15  boxes of records from the crime lab.  He had them

16  cataloged.  He went through all of them, but he never

17  looked at anything concerning this case because this

18  case didn't exist at the time that crime lab

19  investigation was going on, which was 2003 and 2004, I

20  think, the years that Lester was working on it.

21          And so, I didn't read 40 boxes of material

22  because I was assured that since this case didn't even

23  exist, no one was complaining about what happened or

24  didn't happen at the crime lab on this case.  There

25  would have been nothing for Lester to have investigated

1   in this case, but I do know where the boxes are, I know

2   they exist.  I'm very confident none of them have

3   anything to do with this case, however.

4               I'm offering into evidence as a proffer if

5   the Court were to allow me to go -- to offer into

6   evidence the Bromwich reports, which the Court has

7   enumerated them in order.  If you were to allow me to go

8   into them, if you did, I would also call Michael

9   Bromwich as a witness, who would testify basically to

10  two things.  He has no personal knowledge of this case,

11  but he would say that the conclusion of his

12  investigation of the crime lab, it was quote, a train

13  wreck.  And, secondly, that one-third -- more than

14  one-third of the DNA cases studied were flawed in some

15  way or another.  Not that they yielded a false DNA or

16  should have yielded a DNA result or didn't and should

17  have or should have and didn't -- if that's different --

18  but it may be something as simple as just not following

19  procedure or not labeling things correctly, but at

20  least, in his opinion, more than one-third of the cases

21  were flawed, somehow, quote, contaminated.

22               I am offering for purposes of the record a

23  summary one-page -- it's not a summary -- one page of

24  what was offered in evidence as the second report of the

25  independent investigator.  And that's Defense No. 10.

1   And the State has a copy.  Also Defendant's No. 11 is

2   three pages of the third investigative report by

3   Mr. Bromwich.  I'm also offering into evidence

4   Defendant's 12, 13, 14, and 15, which are specific

5   instances of contamination that were found either by the

6   Houston Police Department's investigation themselves or

7   by the crime lab itself, none of which touched the

8   evidence in this case, which I understand to be the

9   genesis of the Court's ruling.  They don't touch the

10  evidence in this case.  I'm not indicating that they do,

11  but I'm indicating that because of all of this and

12  because of the, quote, train wreck of the crime lab,

13  that the defense should be allowed to go into it with

14  the jury to show the inherent unreliability of anything

15  that the crime lab touched.

16          I'm also offering as Defendant's 16, 17,

17  18, the three convictions of Deetrice Wallace, who did

18  have some connection to this case, but they don't

19  prove -- I admit they don't prove that she contaminated

20  evidence.  Three convictions are not from anything she

21  did at the Houston Police Department Crime Lab, but I'm

22  offering them in response to the State's argument that

23  she's not going to be a witness and so we can impeach

24  her.  Pretty convenient if the State can just eliminate

25  any argument or testimony concerning any malfeasance

1   from the crime lab or unprofessionalism or incompetence

2   of the former police crime lab just by not calling the

3   witnesses.  So, I think those convictions are admissible

4   because they go to show the incompetence of the crime

5   lab, but I understand the Court's ruling.

6            The last exhibit is Defendant's 19, which

7   is the entire original file from what was Genetic

8   Design, which was the crime lab that the original

9   cuttings from the original rape kit went for testing.

10  That crime lab, according to the affidavit from the

11  records custodian, was acquired by LabCorp, which is a

12  North Carolina concern.  These are the original

13  handwritten notes of the analyst, the original

14  photographs, all originals of the testing.

15           As we've discussed off the record, we're

16  offering this because in this file the Court will see

17  that Genetic Design did get a DNA profile back in 1993

18  from the panties.  They did get a male fraction and a

19  female fraction.  It was a different form of DNA

20  analysis than the STR that has been recently used in

21  this very case.  But this DNA that was extracted was

22  never compared.  That analysis was never compared on

23  what is to be the known buccal swabs of the defendant.

24  And I would seek to cross-examine the State's witnesses

25  or call my own witnesses to stab that that was a DNA

1  profile that was never resolved in this case.  And we

2  feel that's admissible.

3              We, of course, are not going to go into

4  anything about DNA without first approaching the bench

5  because we understand what the State's objections are

6  and we're not allowed to go into anything concerning the

7  old crime lab without approaching the bench and getting

8  permission.  And so, I will follow that and Mr. Madrid

9  will follow that, but I want all of these things in the

10 record for our appeal, if necessary.

11             THE COURT:  Okay.  So, you are offering

12 Defendant's 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19.

13 Is that correct?

14             MR. CORNELIUS:  Yes, Your Honor.

15             **(Defense Exhibit No. 10 through 19 Offered)**

16             THE COURT:  That's for purposes of the

17 motion to suppress hearing only?

18             MR. CORNELIUS:  Yes.

19             THE COURT:  Any objection from the State?

20             MS. TISE:  No objection for purposes of the

21 hearing.

22             THE COURT:  Then Defendant's 10 through 19

23 will be admitted for purposes of the motion to suppress

24 hearing only.  And having already discussed these items

25 off the record and heard argument from counsel, the

1    motion to suppress ruling stands and it will be denied.

2              Do you have anything further?

3              **(Defense Exhibit No. 10 through 19 Admitted**

4              **For Purposes of Motion to Suppress Hearing**

5              **Only)**

6              MR. CORNELIUS:  Just to make sure that the

7    record is complete.  I am offering them for the motion

8    hearing only right now.

9              THE COURT:  Right.

10             MR. CORNELIUS:  I would offer them in

11   evidence -- I would seek to offer them in evidence at

12   the trial, but I'm taking your ruling that I can't offer

13   them.  So, I don't want the record to look like I'm

14   giving up.  I still seek to offer them before the jury,

15   but I'm subject to your ruling.  So, I don't think I

16   have to offer them anymore.  You know I want to offer

17   them, correct?

18             THE COURT:  That's correct.  And I think

19   the ruling is clear on the record that the motion to

20   suppress is denied and all of the evidence from the old

21   Houston Crime Lab, which is not being offered by the

22   State for any purpose, any relevant purpose, and the

23   Genetics Design LabCorp results are not being offered.

24             And what I have said in my motion to

25   suppress ruling is that if it pertains to the evidence

1   in this case in terms of a contamination or a storage

2   issue, you can cross-examine that.  You can bring

3   forward evidence on it if you would like, but we're not

4   going to go into any of the evidence that's in the

5   Bromwich report, the report itself is not admissible.

6   Any of the details of the Bromwich report that do not

7   pertain to the evidence in this case is not going to be

8   admitted into evidence.  And any of the disciplinary

9   records or criminal records of the persons that worked

10  at the old HPD Crime Lab are not going to be admitted

11  into evidence unless and until one of those -- if a

12  witness is called that makes it relevant.  And if

13  there's something that arises during the trial, please

14  approach before you go into that.

15                  MR. CORNELIUS:  Yes, Your Honor.

16                  THE COURT:  All right.  Anything further we

17  need to put on the record at this time?

18                  MS. TISE:  Nothing from the State.

19                  THE COURT:  Let me check to see if the jury

20  is ready to be brought in.

21                  THE BAILIFF:  Still missing one.

22                  THE COURT:  It appears we're still missing

23  one juror that was supposed to be here at 10:00.  So,

24  we'll take a break.

25                  THE BAILIFF:  I will find out where she's

```
 1    at.
 2                 THE COURT:  We'll take a brief break.  As
 3    soon as she is here, we'll resume.  So, don't go
 4    anywhere.  And we do need to swear the jury in.  We're
 5    ready to proceed.  So, get all of your technology ready
 6    to go.  Off the record.
 7                 (Recess)
 8                 (Open court, defendant and jury present)
 9                 THE COURT:  Please be seated.
10                 Good morning, ladies and gentlemen of the
11    jury.  It's good to see you-all again.  And thank you
12    for being back.  And I hope you-all had a great July 4th
13    weekend and are ready to start hearing some evidence.
14                 First, would you please stand and raise
15    your right hand to be sworn in as jurors?
16                 (Jurors sworn)
17                 THE COURT:  Very well.  You may have a
18    seat.
19                 At this time, will the State please arraign
20    the defendant?
21                 MS. TISE:  Yes, Your Honor.
22                 This is Cause No. 1384794, the State of
23    Texas vs. Obel Cruz-Garcia.  In the name and by
24    authority of the State of Texas:  The duly organized
25    Grand Jury of Harris County, Texas, presents in the
```

1  District Court of Harris County, Texas, that in Harris

2  County, Texas, Obel Cruz-Garcia, hereafter styled the

3  Defendant, heretofore on or about September 30, 1992,

4  did then and there unlawfully, while in the course of

5  committing and attempting to commit the kidnapping of

6  Angelo Garcia, Jr., intentionally cause the death of

7  Angelo Garcia, Jr. by stabbing Angelo Garcia, Jr. with a

8  deadly weapon, namely, a sharp instrument.

9            It is further presented that in Harris

10  County, Texas, Obel Cruz-Garcia, hereafter styled the

11  Defendant, heretofore on or about September 30, 1992,

12  did then and there unlawfully, while in the course of

13  committing and attempting to commit the kidnapping of

14  Angelo Garcia, Jr., intentionally cause the death of

15  Angelo Garcia, Jr. by an unknown manner and means.  It's

16  against the peace and dignity of the State.  It's signed

17  by the Foreman of the Grand Jury.

18            THE COURT:  Thank you, Ms. Tise.

19            Does either side have witnesses in the

20  courtroom?

21            MS. TISE:  Most of our witnesses are not in

22  the courtroom at this time, Judge.

23            THE COURT:  Does either side wish to have

24  witnesses sworn in at this time?

25            MS. TISE:  We can bring a couple of them

1    in.

2                      THE COURT:  Let's get the Rule invoked, if

3    either side wishes to have the Rule invoked at this

4    time.

5                      MR. CORNELIUS:  We do, Your Honor.

6                      MR. WOOD:  We have two witnesses.

7                      THE COURT:  Please raise your right hand to

8    be sworn.

9                      (Witnesses sworn)

10                     THE COURT:  Okay.  The Rule has been

11   invoked.  What that means is you're ordered to leave the

12   courtroom and not reenter unless instructed to do so by

13   the bailiff or by me.  You are not to discuss this case

14   or your testimony with other witnesses or anyone else

15   except the attorneys.  You are not to read any report or

16   comment on the testimony of evidence in the case.  Any

17   witness violating this instruction is subject to being

18   held in contempt of court.

19                     So, at this time, you are excuse.  We'll be

20   calling you in shortly for your testimony.

21                     THE WITNESS:  Thank you, Your Honor.

22                     THE COURT:  In addition, as to -- no.  I'm

23   sorry.  Go ahead, witnesses, leave the courtroom.

24                     As to the reading of the indictment,

25   Mr. Obel Cruz-Garcia, how do you plead to that

1  indictment, guilty or not guilty?

2          MR. CORNELIUS:  The defense pleads not

3  guilty, Judge.

4          THE COURT:  Thank you, sir.

5          State, do you wish to make an opening?

6          MR. WOOD:  Yes, Your Honor.

7          THE COURT:  Please proceed.

8          **STATE'S OPENING STATEMENT**

9          MR. WOOD:  It's November 5th, 1992.  Diana

10  Garcia sits in her apartment.  She hopes that today

11  might be the day that she gets some good news.  It's now

12  been 36 days since her 6-year-old little boy, Baby

13  Angelo as she called him, has been missing.  For 36

14  days, her and her family have been hoping and praying

15  for that good news.  For 36 days.

16          While sitting in her apartment that day on

17  November 5th, she finally did get news when the Houston

18  Police Department officers contacted her.  However, it

19  was not the news that she was hoping for.  It was on

20  that day, as she sat in her apartment, that she learned

21  that the remains of Angelo Garcia, Jr., Baby Angelo, had

22  been found.  He had been found out in Baytown on what

23  was described as a marshy, isolated, garbage-strewn

24  beach.

25          You will learn, ladies and gentlemen, that

1  the 6-year-old little boy body of Angelo Garcia, Jr. had

2  laid there in that water for 36 days.  And when he was

3  recovered, he was basically decomposed, reduced to,

4  essentially, a pile of bones.  And you are going to

5  learn that on the night that Angelo Garcia went missing

6  that he was wearing what he wore to bed, his pajamas, a

7  little t-shirt and some shorts.  And these shorts were

8  significant.  You see, these were his favorite little

9  Batman shorts.  Because Baby Angelo loved Batman and

10 Superman and Spiderman and the things that 6-year-old

11 little boys love.

12          At that time, that was one of the initial

13 ways that they were able to identify those remains.

14 Because you see, those little Batman shorts were still

15 with those skeletal remains when they found him out in

16 Baytown.

17          November 5th, 1992 will always be a day

18 that Diana Garcia remembers.  But that day is just a

19 small piece of this puzzle, ladies and gentlemen.

20 Because the nightmare for Diana Garcia began over a

21 month before that, on September 30th, 1992.  On that

22 date, she was living with her husband, Arturo.  And they

23 were living over in an apartment off of Fairway, which

24 is kind of near 610 and Telephone Road.  And

25 September 30th had been pretty much a normal day for her

1  and her family.  Nothing really out of the ordinary.

2            It came time for bedtime that night and she

3  put Angelo down to bed on a little pallet on the floor

4  of their bedroom.  And not long after that, she went to

5  bed herself and went to sleep.  After watching a little

6  bit of TV, Arturo joined her just a short time later.

7  And the next thing that Diana Garcia remembers is -- or

8  that she recalls is there are two masked intruders

9  inside of her apartment.  And at that point, everything

10  starts happening very quickly.

11            Before she knows it, her and Arturo are

12  forced to lie face-down on the bed.  She knows at least

13  one of them has a gun.  Arturo is being tied up.  She

14  can hear that he is being beaten.  And then she feels

15  her nightgown being lifted and her panties being pulled

16  down.  And as she lays there, she hears the sounds of

17  her husband next to her being beaten and the cries of

18  her little boy, Baby Angelo:  Mommy, mommy.  And that's

19  when one of the men climbed up on top of her and began

20  penetrating her.  Sexually assaulting her there inside

21  of her own apartment.

22            Finally, it stops.  And when she's able to

23  gather herself and she's convinced that the men are gone

24  from her apartment, she then frees herself, -because

25  she's been tied up -- she goes directly to Arturo, who

1   is on the floor.  He is badly beaten and bleeding.  He

2   has been tied up with an electrical cord from the alarm

3   clock.  She gets him free and then goes to find Angelo.

4   Where is Angelo?  He is not in the apartment.  And then

5   that reality hits her and Arturo.  Angelo is gone.

6            And then she snaps into mother mode and she

7   is frantically trying to get her hands on a phone to

8   call 911.  You will hear that her and Arturo leave, she

9   goes next door, and finds a nearby neighbor, and is able

10  to call 911.  And you will hear that call:  My baby,

11  somebody's taken my baby.  Arturo is trying to flag

12  someone down.  And very soon after that, the first

13  Houston Police Department officer arrives on the scene.

14  And that's when the investigation into the kidnapping of

15  Angelo Garcia, Jr. begins.

16            You are going to hear from detectives,

17  several detectives and investigators, that immediately

18  they started trying to piece this story together to do

19  their job, but it was hard because the two suspects wore

20  masks.  Diana and Arturo could not give but just general

21  descriptions of them, height, what they could.

22            Although, the investigators immediately

23  determined that there were items that had gone missing

24  from in that apartment, robbery just didn't seem like

25  the motive there.  And they immediately were suspicious

1   that maybe drugs were involved, but Diana and Arturo

2   denied that initially.  It wasn't until the next day, on

3   October 1st, when they were meeting with Houston Police

4   Department Homicide detectives that Diana and Arturo

5   came clean about their involvement with drugs.

6           They will come in here and they will tell

7   you that.  It isn't something that they were proud of

8   then and it isn't something that they are proud of now.

9   They will tell you that they wish they could give --

10  they would give anything to take that back and to have

11  been more forthcoming.  But sitting in that interview

12  room, Diana Garcia told the officers:  We sold drugs for

13  that man, Obel Cruz-Garcia; Chico, as he was known by

14  many of his friends and associates.

15          And you will learn that Diana and Arturo

16  had stopped selling for the defendant a short time

17  before Angelo's kidnapping or by the time that Angelo

18  went missing.  They had stopped selling.  They thought

19  they were being watched by the police, so they said:  No

20  more.

21          Well, because of this connection to Diana

22  and Arturo and Angelo, the investigators immediately

23  started zeroing in on the defendant, looking at him.

24  They wanted to question him and find out what his side

25  of the story was.  He wasn't the only person they were

1   looking at.  They were looking at every angle.  And

2   you're going to hear that they brought in several people

3   for questioning and they talked to several people.  They

4   gathered hair samples and blood samples from different

5   individual that hopefully might make the connection, but

6   they were looking for the defendant.  They couldn't find

7   him.

8             Very early on in their investigation, they

9   came into contact with the defendant's wife back then,

10  Angelita Rodriguez.  And they learned very early on from

11  Angelita that the defendant was gone.  He had gone to

12  Puerto Rico.  And, ladies and gentlemen, you will hear

13  from Angelita Rodriguez in this trial.  And Angelita

14  Rodriguez will tell you that on the morning after

15  Angelo's kidnapping, the morning after he went missing,

16  on October 1st she is sitting there and she's watching

17  television and she sees the report and the news story of

18  Angelo missing.  Angelita and them were friends with

19  Diana and Arturo.  Obviously, she was taken aback just

20  like any of us would be by that news.

21            She immediately goes to the defendant there

22  in the apartments and says:  Hey, we've got to go over

23  to Diana and Arturo's; Angelo is missing.  A normal

24  reaction by someone that's close to someone.  You will

25  hear from Angelita that the defendant refused to go over

1    there.  And, in fact, how he responded to her request,

2    he told her he was getting a ticket to Puerto Rico.

3    Angelita will tell you that within hours, probably

4    somewhere around 36 hours after Angelo had been

5    kidnapped and had gone missing, the defendant bought a

6    ticket, got on plane to Puerto Rico never to come back.

7    That's how he responded to that news.

8              The investigation did not end there.

9    Detectives continued to investigate the case and do what

10   they could, follow up on leads, but leads really went

11   nowhere.  And it wasn't until 2007, some 15 years after

12   Angelo's murder, that police finally caught a break.

13   You see, with time, with the passage of time came

14   advances in science and in technology.  And in 2007, DNA

15   was much different than it was in 1992.  And in 2007,

16   there were items of evidence submitted for DNA analysis

17   and testing.  There were certain particular items of

18   evidence from the sexual assault kit that was performed

19   on Diana the night of her rape, back on September 30th.

20   There were several of those items of evidence submitted

21   for testing.

22             And also, back on September 30th, 1992 in

23   Diana and Arturo's apartment, the Crime Scene Unit

24   recovered a cigar.  And Diana and Arturo will tell you,

25   and they told officers then:  Hey, we don't smoke

1    cigars, this cigar was not in our house.  It was

2    recovered by the TV.  It had to have been left by one of

3    those men.  That cigar was tagged in 1992.  Well,

4    advances in science allowed them to test that cigar for

5    DNA in 2007 where they weren't able to do that back in

6    '92.  That was also submitted for DNA analysis.

7              Also, around that time, investigators had

8    finally located the defendant and they were able to get

9    a sample of his DNA so that they could maybe compare it

10   against these other items.  And you are going to hear

11   two different DNA analysts come into court and testify

12   that those items from the sexual assault kit from Diana

13   Garcia, they were able to obtain a male DNA profile from

14   certain items in that sexual assault kit.  They were

15   also able to obtain a male DNA profile from that cigar.

16   And guess what?  It matched the same profile from that

17   sexual assault kit.

18             And they will tell you that based on their

19   training and experience that that -- those DNA profiles

20   that they obtained from that evidence matched that of

21   the defendant.  Just another piece of this puzzle,

22   ladies and gentlemen.

23             In addition to that, you are going to hear

24   from a witness named Carmelo Santana, Rudy as most of

25   his friends and family knew him then and now.  And Rudy

1    is going to tell you that he had a connection to several

2    people in this case.  He knew Diana and Arturo, but he

3    had a very close connection with the defendant.   In

4    fact, he was family with the defendant's wife Angelita.

5    And he actually met the defendant back when they all

6    lived in Puerto Rico in the 80s.  And naturally, they

7    were close because Angelita was family.

8              So, he is going to tell you that sometime

9    in the late 80s, he came over to the states, came to

10   Houston.  And shortly after, the defendant and then

11   Angelita joined him.  And very soon after they got to

12   Houston, they became involved in the drug business.  And

13   it happened pretty quickly.  And he is going to tell you

14   that the defendant kind of became the boss of the

15   operations, but that he and the defendant worked

16   side-by-side.  And several people sold for them.  Diana

17   and Arturo being two of those people.  And it was always

18   cocaine.

19             But more importantly, he is going to tell

20   you that he was with the defendant on the night of

21   September 30th, 1992.  And he was with the defendant and

22   another associate of theirs named Rogelio Aviles,

23   otherwise known as Roger.  And they went over to Arturo

24   and Diana's apartment.  Rudy will tell you that he

25   thought they were going over to get some drugs or some

1  money.  Rudy waited in the car.  After some time, the

2  next thing he knows is the defendant is coming down to

3  the car with Angelo in his hands.  He gets to the car

4  and Rudy is, like:  Whoa, wait a minute.  Why do you

5  have the kid?  And he says:  Take Angelo back upstairs.

6  I mean, they knew this kid.  And the defendant leaves

7  and only to return a short time later with Roger and

8  Angelo in tow.

9           And you are going to hear that at point

10  they get in the car, the defendant leaves Angelo -- I

11  mean -- I'm sorry -- Diana and Arturo's apartment and

12  immediately starts heading towards Baytown.  Rudy is

13  going to tell you that they pull off at some point, they

14  pull into kind of a residential neighborhood, pulled

15  down an isolated street, and the defendant stops the

16  car.  He knew at this point this was not going to be

17  good.  They had a kid in the car.  They had the kid in

18  the car.  This was not part of the plan.  He had a

19  really bad feeling.

20           And Rudy is going to tell you that the

21  three men get out of the car and that Rudy starts

22  walking off kind of short distance from the car.  He

23  goes over and defecates in his pants, but hears the

24  defendant say to Roger:  Do what you have to do.  And

25  before long the defendant comes and gets Rudy and Rudy

1   goes over and there is Angelo laying there on the

2   ground, Rudy says lifeless, as best he can tell.  Rudy

3   thinks he has been stabbed because there's blood on

4   Angelo's little shirt.  They load him back into the car

5   and they drive a very short distance, what we know now

6   is a location known as Goose Creek Park in Baytown.

7                And Rudy is going to tell you that at point

8   the defendant, while he's got a gun in his hand, holding

9   the gun on him says:  Dump the body.  Well, Angelo's

10  little body kept floating back up to the top of the

11  water.  And he said:  Weight the body down.  And that's

12  what they did.  And that's where he laid for 36 days.

13  Exposed to all of the elements, decomposing until he was

14  found on November 5th.

15                And Rudy is going to tell you they left

16  there and they had some car issues.  They blew out some

17  tires, they traded out a car.  They ended up that night

18  at the defendant and Angelita's apartment, he and the

19  defendant did.  And the next day, Rudy is going to tell

20  you that the defendant sold off a car that he had, used

21  part of that money, bought a ticket to Puerto Rico, Rudy

22  drove him to the airport, and Rudy never saw him again.

23                Now, Rudy was talked to initially by the

24  police and he didn't tell that full story.  It was many

25  years later when investigators went to talk to him, when

1  they started piecing this story together that they

2  visited with him again.  He was in custody on a federal

3  drug case up in Pennsylvania.  And he finally came

4  clean.  Rudy will tell you that he lived with the guilt

5  of knowing what happened to Angelo for many years and he

6  could not take that information to his grave.  And so,

7  he started talking and he started filling in holes and

8  explaining things that the officers never were able to

9  piece together.

10          And you are going to hear from Rudy.  And

11  you get to judge Rudy's credibility, just like we talked

12  about in jury selection.  And you will hear Rudy tell

13  you that he is going to be testifying free of any kind

14  of promise, any kind of deal, any kind of benefit cut to

15  him.  And you get to decide what pieces of the puzzle

16  Rudy has.

17          At the conclusion of this case, ladies and

18  gentlemen, Natalie and I will be asking you to do

19  exactly what we talked about in jury selection.  We'll

20  be asking you to find whether or not we have met our

21  burden of proof in this case, whether or not we have

22  proven the case to you beyond a reasonable doubt.  And

23  you will get to review all of the evidence and all of

24  the testimony that you have heard in order to gauge

25  that.

1              We'll be asking you to hold the defendant

2   accountable for his actions.  Hold the defendant

3   accountable for the kidnapping and murder of Angelo

4   Garcia, Jr.  And we're going to do that by asking that

5   you find the defendant guilty of capital murder.

6              Thank you.

7              THE COURT:  Mr. Cornelius, would you like

8   to make an opening statement?

9              MR. CORNELIUS:  I would, Judge.

10             THE COURT:  Please proceed.

11              **DEFENSE OPENING STATEMENT**

12             MR. CORNELIUS:  Good morning, ladies and

13   gentlemen.

14             JURORS:  Good morning (in unison).

15             MR. CORNELIUS:  I will make a short opening

16   statement.

17              I guess the greatest fear that a defense

18   lawyer has in a case like this is the fact that there

19   are people that if they are presented with evidence that

20   a child has died and the State points their finger at

21   someone who they say did it, that's the only evidence

22   they need.

23              Now, the law didn't allow us to ask y'all

24   that question.  None of you were asked that specific

25   question.  But the questions that you were asked and the

1    answers that you did give indicated to us that you are

2    not that kind of a person, that you'd require strict

3    evidence and proof beyond a reasonable doubt.   Not a

4    dramatic opening statement by the State talking about

5    little Baby Angelo in his pajamas and all that kind of

6    stuff, but actual evidence.

7                    I think the evidence is going to leave you

8    in this case with four questions that you are going to

9    have to answer.  Serious questions.  The first one would

10   be:  How much credibility are you going to give

11   witnesses that are admitted liars and drug dealers?  And

12   the second one is going to be:  Can you base a capital

13   murder conviction on the testimony of someone who is, by

14   his admission, a co-defendant and who has everything to

15   gain by lying?  And the third one is going to be:  What

16   actually does the so-called DNA evidence prove with

17   respect to this boy?  And the fourth one:  What does the

18   medical evidence show?  What does it show?

19                   You are going to have those four questions

20   to wrestle with, I guarantee.  If the evidence goes as I

21   anticipate, I will be asking you for a verdict of not

22   guilty.

23                   Thank you very much.

24                   THE COURT:  State, please call your first

25   witness.

```
 1              MS. TISE:  Your Honor, at this time the
 2   State would like to offer State's Exhibits 5 and 6.
 3   They are the business records affidavit for a 911 tape
 4   as State's Exhibit 5.  State's Exhibit 6 is the actual
 5   copy of the tape.  I will offer it to defense counsel
 6   for any objection.
 7              (State's Exhibit No. 5 and 6 Offered)
 8              MR. CORNELIUS:  No objections.
 9              MS. TISE:  At this time, we'd like to
10   publish it.
11              THE COURT:  State's Exhibit 5 and State's
12   Exhibit 6 will be admitted.  And you may publish it to
13   the jury at this time.
14              (State's Exhibit No. 5 and 6 Admitted)
15              MS. TISE:  I also have a transcript of the
16   statements of the 911 tape.  I have a copy for each
17   juror to aid them in following along.
18              MR. CORNELIUS:  Judge, I don't see that
19   that's necessary.  It's in English.
20              THE COURT:  Approach the bench.
21              (At the Bench, on the record)
22              THE COURT:  Have you tendered the --
23              MR. CORNELIUS:  She has.  I've read it.  I
24   don't think it's incorrect.  I don't think it's
25   necessary.
```

1          MS. TISE:   As 911 tapes often are, Judge,

2     it's hard to hear.   And so, we'd like to be able to

3     provide a transcript for them to follow along.

4          THE COURT:   You think it would aid and

5     assist the jury in understanding what the transcript is

6     saying?

7          MS. TISE:   I do, Judge.

8          THE COURT:   Is it -- so you have had an

9     opportunity, Mr. Cornelius, to review it?

10          MR. CORNELIUS:   I have.

11          THE COURT:   You don't differ from what --

12     you don't believe it misrepresents the actual tape, do

13     you, sir?

14          MR. CORNELIUS:   No.

15          THE COURT:   Okay.   Very good.   I'm going

16     to allow this then.

17          MS. TISE:   I have a copy for you as well.

18          THE COURT:   Thank you.

19          (Open court, defendant and jury present)

20          THE COURT:   Ladies and gentlemen, the

21     transcript is provided to assist you, if it does, in

22     listening to the 911 tape, but the tape itself is the

23     actual evidence and that's what you will rely on in

24     remembering the testimony from this 911 tape.

25          You may proceed.

```
 1                    (Exhibit published)
 2                    THE COURT:  Deputy, please pick up the
 3   transcripts.
 4                    All right.  Call your first.
 5                    MR. WOOD:  Your Honor, State calls Officer
 6   James Devereaux.
 7                    THE COURT:  And has this witness been
 8   sworn?
 9                    MR. WOOD:  I believe he has, Your Honor.
10                    THE BAILIFF:  Your Honor, the officer has
11   been sworn.
12                    THE COURT:   Please keep your voice up and
13   speak into the microphone.
14                    You may proceed.
15                    MR. WOOD:  Thank you, Your Honor.
16                         JAMES DEVEREAUX,
17   having been first duly sworn, testified as follows:
18                       DIRECT EXAMINATION
19   BY MR. WOOD:
20       Q.   Good morning, Officer Devereaux.
21       A.   Good morning.
22       Q.   Can you please introduce yourself with your
23   full name for the ladies and gentlemen of the jury?
24       A.   James Devereaux.
25       Q.   And can you tell us how you're employed,
```

1    Officer Devereaux?

2        A.   City of Houston Police Department.  I'm a

3    sergeant of police currently assigned to the Robbery

4    Division.

5        Q.   And I'm sorry, Sergeant Devereaux.

6        A.   That's okay.

7        Q.   How long have you been with the Houston Police

8    Department?

9        A.   Thirty-one years.

10       Q.   And you said that your current assignment is a

11   sergeant in the Robbery Division.  Is that right?

12       A.   Yes, sir.

13       Q.   What other assignments or responsibilities have

14   you had within the Houston Police Department?

15       A.   After graduating the police academy, I was

16   sworn in as a police officer and assigned to the

17   Southeast Patrol.  About 13 years later, I promoted to

18   sergeant.  I also worked in patrol as a sergeant.  I was

19   assigned to the Jail Division for a few years, back in

20   patrol, and then transferred to the Robbery Division.

21       Q.   So, how long in total over the 31 years have

22   you been assigned as a patrol officer or in a patrol

23   division?

24       A.   About 14, 15 years.

25       Q.   Generally, Officer Devereaux, what are the

1  responsibilities of a patrol officer as an assignment

2  within HPD?

3      A.   Patrol officers were considered -- I would

4  consider myself like a generalist.  We handle all types

5  of calls for police service.  It includes writing

6  traffic tickets, investigating accidents.  If somebody

7  comes home and finds their home burglarized, we'll run

8  those calls.  Disturbance calls.  Just any type of call

9  for service.  When somebody would call the police, we'll

10 send a uniformed patrol officer.

11     Q.   Sergeant Devereaux, I want to direct your

12 attention back to 1992.  How were you employed back

13 then?

14     A.   In 1992, I was a police officer assigned to the

15 nightshift patrol out in southeast.

16     Q.   Were you working a particular area of town at

17 that time or how does that work?

18     A.   We're assigned to a district, which is a small

19 portion of the city within the district.  It's a smaller

20 area, what we call a beat.  That night I was assigned

21 10's beat, which is the northern portion of our

22 district, which was the 13th district.

23     Q.   Specifically on September 30th, 1992, were you

24 working as a patrol officer on that date?

25     A.   Yes, sir.

1    Q.   Did you have an opportunity to be dispatched to

2  a location of 6705 Fairway that night?

3    A.   Yes, sir.

4    Q.   And are you familiar with that area?

5    A.   Yes, sir.

6    Q.   Is that location a location within Harris

7  County, Texas?

8    A.   Yes, sir.

9    Q.   Do you recall what time or around what time it

10  was that you were dispatched out to that scene?

11    A.   It was at nighttime.  About roughly 11:50,

12  11:49.

13    Q.   Did you arrive at that scene shortly after

14  that?

15    A.   Yes.  Approximately three minutes later.

16    Q.   So, I guess, you were probably somewhere close

17  in the neighborhood?

18    A.   Yes, sir.

19    Q.   When you got to the scene, what do you recall

20  about that specific scene?

21    A.   Well, when we pulled up, I remember there was a

22  male outside trying to wave us down and then there was

23  another female that was on the phone kind of like pacing

24  back and forth and in kind of an excited state.

25    Q.   Describe what -- what was that scene?  Is that

1  residential, business, or what?

2      A.   It was a residential scene at the apartment

3  complex.

4      Q.   Were there others there at the scene other than

5  the male and female that you identified?

6      A.   As we pulled up, there was some extradition

7  people that had come outside, outside their apartment

8  doors.

9      Q.   What about any emergency personnel, was anyone

10 else on the scene?

11     A.   We were the first ones.

12     Q.   Okay.  What did you do first when you arrived?

13     A.   We tried to figure out what was going on.  We

14 got the call as a -- like a robbery, sexual assault

15 call.  And we tried to locate our complainants or our

16 victim and the witnesses, tried to figure out exactly

17 what was going on.

18     Q.   Did you have an opportunity to identify a

19 female individual by the name of Diana Garcia?

20     A.   Yes, sir.

21     Q.   And a male by the name of Arturo Rodriguez?

22     A.   Yes, sir.

23     Q.   Did you learn that anyone had gone missing or

24 possibly had been kidnapped from that location?

25     A.   We were informed that Diana Garcia's son was

1    kidnapped.  He was 7 years old.

2         Q.   Did you personally speak with Diana Garcia?

3         A.   Yes, I did.

4         Q.   And can you describe kind of what her state of

5    mind was when you spoke with her?

6         A.   She was excited, hysterical, really nervous and

7    scared, you know, because of what happened to her and

8    her son and her husband as well.

9         Q.   Do you recall, was she crying or not?

10        A.   Yes, she was.

11        Q.   Was it your impression that the event for which

12   she was excited about had just happened?

13        A.   Yes, sir.

14        Q.   Generally, what did Diana tell you at that

15   time?

16                  MR. CORNELIUS:  Object to the hearsay.

17                  THE COURT:  That will be sustained.

18        Q.   (By Mr. Wood) While visiting with any of the

19   individuals out at the scene, were you able to get any

20   kind of description of possible suspects involved?

21        A.   We received a vague description of the two

22   suspects and some possible vehicle information.

23        Q.   And what did you do with that information?

24        A.   I put out what we call a GB, a general

25   broadcast over the radio.  We send a message to the

1  dispatch as well so if we get a GB number that way that

2  information could be, you know, given out throughout the

3  city and other patrol stations that aren't on our radio

4  channel.

5      Q.   Let me ask about the male individual, Arturo

6  Rodriguez.  What were your observations of Arturo?

7      A.   I remember, you know, from reviewing my report

8  earlier that he had some cuts on the back of his head.

9      Q.   Was he eventually treated or do you know?

10      A.   An ambulance was called out to the scene for

11  him.

12      Q.   Other than putting out that general broadcast,

13  what else did you do while you were out there at that

14  scene?

15      A.   Well, as a patrol officer, as I mentioned

16  earlier, we are just generalists.  This was a fairly --

17  you know, a very serious crime and incident.  So, we

18  contacted our Homicide Division for the kidnapping and

19  also contacted our Juvenile Division since it did

20  involve a juvenile.

21      Q.   Did you stay up there at the scene until

22  someone else arrived or how did that work?

23      A.   Yes, sir, we stayed out at the scene.

24      Q.   What -- did anything -- did Diana Garcia remain

25  there at the scene or was she transported anywhere, if

1    you know?

2         A.    She stayed there for a while and she was

3    eventually taken to the hospital by another police

4    officer.

5         Q.    At some point did you release the scene over to

6    a Homicide sergeant?

7         A.    Yes, sir.

8         Q.    And who was that?

9         A.    Sergeant Elliott.

10        Q.    Sergeant Devereaux, I guess in 1992 how long

11   had you been on patrol at that point?

12        A.    Right at about 10 years.

13        Q.    And over the course of your 31 years, you have

14   spent a lot of time on patrol based on your testimony.

15   Is that right?

16        A.    Yes, sir.

17        Q.    Was this scene and this call-out back on

18   September 30th, 1992, was that -- did that stand out in

19   your mind at all?

20        A.    I've never forgotten this call.  And from the

21   outcome of the call that I realized about 30 days later

22   or so, maybe a little longer, this was probably the most

23   horrific call that I've ever ran in that time period.

24        Q.    And Sergeant Devereaux, you stated that this is

25   an area of town that you worked back then and were

1    familiar with at that time?

2        A.   Yes, sir.

3                MR. WOOD:  Your Honor, may I approach the

4    witness?

5                THE COURT:  Yes.

6        Q.   (By Mr. Wood) Sergeant Devereaux, I'm showing

7    you what's been marked for identification purposes as

8    State's Exhibit 7.  Do you recognize that (indicating)?

9        A.   Yeah.  That's Barnett Stadium, which is the

10   football stadium, the baseball diamonds.  And then the

11   apartment complex is right across the street from

12   Barnett Stadium.

13       Q.   And State's Exhibit 7 is a map of that area or

14   an aerial map?

15       A.   It's an aerial map, yes, sir.

16       Q.   Does that fairly and accurately depict the

17   scene or the general location as you recall it from back

18   in September of 1992?

19       A.   Yes, sir.

20               MR. WOOD:  Your Honor, at this time, I will

21   offer State's Exhibit 7 into evidence after tendering to

22   defense counsel.

23               **(State's Exhibit No. 7 Offered)**

24               MR. CORNELIUS:  No objection.

25               THE COURT:  State's Exhibit 7 will be

1   admitted without objection.

2                    **(State's Exhibit No. 7 Admitted)**

3                    MR. WOOD:  And I'll pass the witness, Your

4   Honor.

5                    THE COURT:  Mr. Cornelius, you may proceed.

6                    **CROSS-EXAMINATION**

7   **BY MR. CORNELIUS:**

8        Q.   Sergeant Devereaux, my name is Skip Cornelius.

9   I don't know if we've met on other cases, but we've

10  never talked about this one, right?

11       A.   No, we haven't, sir.

12       Q.   Do you have your report or did you look at it?

13       A.   Yes, sir, I've reviewed it.

14       Q.   All I'm finding is a couple of pages that you

15  wrote.  Is that correct?

16       A.   Yes, sir.

17       Q.   The description, the general description that

18  you put out, what was it?

19       A.   What we received from the complainants, that

20  the suspects that were described to us as possibly black

21  males, one wearing a mask.  The vehicle description that

22  we put out over the GB.  That's basically all we put

23  out.

24       Q.   So, two black males, one wearing a mask?

25       A.   Possible black males, yes, sir.

1    Q.   Okay.  No height, no weight?

2    A.   If I remember from reviewing my report, she

3  described she only saw one of the suspects and she only

4  remembered him as being tall.

5    Q.   Okay.  I'm not trying to get you to testify to

6  what she said to you or to repeat what she said to you.

7  So, my question is:  What do you think went out over the

8  air as a description?

9    A.   The description that we received, that it was

10 possibly two black males, one was wearing a mask, and

11 the description of the vehicle as well.

12   Q.   So, no height or weight went out over the air?

13   A.   No, sir.

14   Q.   No age?

15   A.   Not that I can remember, sir.

16   Q.   Did you discover that anything had been taken?

17   A.   In the report, there was listed a bracelet and

18 a wallet that was listed as stolen.

19   Q.   Say it again.  I couldn't --

20   A.   Oh, I'm sorry.  In the report, we listed a

21 bracelet, some sort of gold bracelet, and a wallet that

22 was stolen.

23   Q.   Okay.  Did you notice if the man and woman had

24 on jewelry at the time that you talked to them?

25   A.   I don't remember.

1    Q.   Was anything said to you by anyone concerning

2   drugs or this could have had something to do with drugs?

3    A.   There was some mention that there might have

4   been some drugs being dealt out of the apartment.

5    Q.   Okay.  And where did you get that information

6   from?

7    A.   It was somebody inside the complex, like a

8   neighbor, somebody that just came outside.

9    Q.   So, that was obviously pure hearsay?

10   A.   Yes, sir.

11   Q.   But when you were -- when you found that out,

12   did you give that information to Sergeant Elliott?

13   A.   If I remember correctly, yes, we did.

14   Q.   And were there other sergeants or detectives --

15   did they have detectives back in 1992?

16   A.   They were sergeants.  We don't carry the rank

17   of detective, but there were others out there.

18   Q.   Back in 1992, though, was everybody a sergeant

19   or --

20   A.   Yes, they were sergeants then.

21   Q.   Now?

22   A.   Now they are sergeants and then they were

23   sergeants.

24   Q.   Okay.  All right.  Any other sergeants involved

25   in this investigation that you know of?

1      A.   From the Homicide Division, there was some

2 others, but I don't know exactly who they were.

3      Q.   And they would have been privy to the same --

4 or had the opportunity at least to have the same

5 information that Sergeant Elliott got?

6      A.   As far as I know, yes, sir.

7      Q.   Sergeant, were you able to talk to these two

8 individuals in English?

9      A.   If I remember right, we spoke to Diana Garcia

10 in English, if I remember correctly.  The male, I don't

11 remember.

12      Q.   Okay.  Did you gather any information from

13 anyone that these two individuals knew who their

14 attackers were?

15      A.   We thought we -- we thought they knew who they

16 were, but we did not receive any information that they

17 knew them.

18      Q.   Why would you think that?

19      A.   Well, from the information that we received

20 earlier, that it was possibly drug-related.

21      Q.   Okay.  Did you yourself -- what you said, not

22 what somebody else said.  Did you yourself say to these

23 two individuals words to the effect:  Your son's been

24 taken, do you know who it is who did this?  Did you say

25 that to them?

1    A.   Yes, I believe we did.  Or I did.  Because my

2   main concern was with the son at that time.

3    Q.   Okay.  And even after saying that, the best you

4   could get was possibly two black males, one wearing a

5   mask?

6              MR. WOOD:  Objection, Your Honor.  That's

7   back-door hearsay, that response.

8              THE COURT:  That will be sustained.

9    Q.   (By Mr. Cornelius) Okay.  Could you get

10   anything other than that, though?

11    A.   No, sir.

12              MR. CORNELIUS:  Pass the witness at this

13   time, Judge.

14              MR. WOOD:  I have no other questions.

15              THE COURT:  May the witness be excused?

16              MR. CORNELIUS:  As long as he's on-call.

17              THE COURT:  Very good.

18              MR. WOOD:  That's fine.

19              THE COURT:  Officer, you're excused.

20              Please call your next.

21              MS. TISE:  The State will call Sergeant

22   Elliott.

23              THE BAILIFF:  This witness has been sworn,

24   Your Honor.

25              THE COURT:   Thank you.

```
 1              Please speak into the microphone and keep
 2    your voice up.
 3              THE WITNESS:  That's not a problem for me.
 4              THE COURT:  You may proceed, Ms. Tise.
 5              MS. TISE:  I don't think it's a problem for
 6    me either, Judge.
 7                          C.E. ELLIOTT,
 8    having been first duly sworn, testified as follows:
 9                        DIRECT EXAMINATION
10    BY MS. TISE:
11        Q.  Would you introduce yourself to the jury,
12    please, sir?
13        A.  I'm Sergeant C.E. Elliott of the Houston Police
14    Department.
15        Q.  Okay.  And can you tell the jury how long
16    you've been employed by the Houston Police Department?
17        A.  Thirty-six plus years.
18        Q.  Can you tell us a little about where you spent
19    your time in those past 36 years?
20        A.  I graduated from the police academy in March of
21    '77, was assigned to patrol, later transferred to the
22    Accident Division, at the time it was a fatality
23    division unit.  I promoted in November of 1992 to what
24    was then a separate rank of detective.  Like in the
25    military, or the government, G-S6, or whatever, it was
```

1  same pay rate as a sergeant, but you were a detective

2  and not a sergeant.  I had a different badge, a

3  detective badge.  Chief Brown changed all of the

4  detectives to sergeants in, I think, 1984, '85.  It

5  didn't change my job any.  When I made detective, I went

6  to Burglary and Theft, I worked burglary and theft

7  cases.  I later transferred to the fugitive detail and

8  ran felony warrants until 1990, October 1st, 1990.  I

9  reported to nightshift Homicide.  I stayed in nightshift

10  Homicide till October 12th of 1992.  Then I transferred

11  to dayshift Homicide.  And I have been working in the

12  murder squad dayshift ever since.

13      Q.   So, basically, just days after this scene you

14  transferred from nightshift Homicide to dayshift

15  Homicide?

16      A.   Yes.  I was one of the last ones.  We were at

17  that time -- everything changes.  We were in the process

18  of phasing out full-time nightshift units and bringing

19  everyone over to days at that period and I was one of

20  the last ones to leave.

21      Q.   And I guess nothing takes the place of 30 plus

22  years of on-the-job training, but I take you've received

23  a lot of other training over the course of your years

24  with HPD?

25      A.   Thousands of hours.  The department requires 40

1    hours of in-service training a year.  I've never been

2    shy about taking training.  I usually averaged closer to

3    between 60 to 80 hours.  Some years I did special

4    schools, 120 hours to 200 hours of training a year.

5    Through the department, outside agencies, various

6    associations in groups that I belong to.

7         Q.   Where are you currently assigned?

8         A.   Dayshift Homicide.

9         Q.   And can you tell the jury a little bit about

10   how it works?  You have patrol officers who are out at

11   the scene and then you have officers who are assigned to

12   the Homicide Division that have a different role.  Can

13   you kind of explain how those roles work?

14        A.    In Homicide, we don't obviously go out on

15   patrol.  We're a responsive unit.  We respond when

16   patrol calls us to a death or a serious investigation

17   that I'm assigned to.  We do a rotation.  On nightshift

18   in 1992, I just did the nightshift call-out.  Since I

19   was assigned nights, I worked 10:00 to 6:00 or 11:00 to

20   7:00.  And I'd sit in the office and wait for a scene to

21   come in and I'd be assigned to it and I'd go out and

22   investigate the scene.  It's what we call the smoking

23   gun or a clear case, I'd finish it up then.  If it was a

24   who-done-it or had extensive follow-up, I'd pass it on

25   to the dayshift.

1      Q.    Okay.  So, if you didn't have an obvious

2  suspect and the crime wasn't solved immediately that

3  night, the case wouldn't be yours the next day?

4      A.    No.   Nightshift was strictly to respond and

5  conduct the scene investigation.  Like I said, if it

6  could be solved then, we'd solve for continuity sake,

7  but if there was a lot of follow-up to do, obviously,

8  working in the middle of the night you couldn't do much

9  follow-up.

10      Q.    And the patrol officer who comes out to a scene

11  is going to have a completely different role, correct?

12      A.    Correct.

13      Q.    What would be a patrol officer's role?

14      A.    On a major case, to observe and determine what

15  happened and basically hold and secure the scene until

16  Homicide got there.

17      Q.    So, it's not the patrol's job -- the patrol

18  officer's job to take detailed statements of witnesses,

19  correct?

20      A.    No, not at all.

21      Q.    Not their job to go out looking for a suspect,

22  correct?

23      A.    Correct.

24      Q.    Or process the scene?

25      A.    Correct.

1        Q.   Those are all things that Homicide is going to

2   do when y'all get there?

3        A.   Correct.

4        Q.   Okay.  And the goal is to get those patrol

5   officers back on the street to be first responders?

6        A.   Correct.

7        Q.   Okay.  I want to take you back to 1992.  And

8   from what you're telling us, back in the day you were

9   finishing up the end of your term as a nightshift

10   Homicide officer?

11        A.   Yes, ma'am.

12        Q.   Okay.  Do you remember going out to a scene on

13   the night of September 30th, 1992, on Fairway?

14        A.   Very much so, yes.

15        Q.   And why do you say "very much so"?

16        A.   It's one of those things you don't forget.  It

17   was a 7-year-old little boy kidnapped and killed.

18        Q.   And you've seen a lot, I'm sure, in your years

19   as a Homicide detective?

20        A.   Yes.

21        Q.   This one sticks out for you?

22        A.   Yes, ma'am.

23        Q.   Back in September, September 30th, 1992 to be

24   exact, do you recall about what time it was when you

25   were called out to that scene?

1        A.   I was actually called October 1st at 12:35 in

2    the morning.  I was in my office.  Then on nightshifts,

3    it was hurry up and wait.  That's one of the reasons

4    they did away with the nightshift at the time was

5    because you'd just sit around.  Not to be crast, but

6    you'd wait for someone to die.  It was a waste of

7    manpower at the time, but you'd sit there.  And I was

8    first up on the board.  As a matter of fact, I think I

9    was the only one on the board.  I caught the scene at

10   12:35 and grabbed my gear and went out there.

11       Q.   Okay.  And so, at that point in time, the

12   scene -- you learned that the actual incident had

13   happened prior to midnight, correct?

14       A.   Correct.

15       Q.   Patrol officers would come to the scene and

16   secure the location --

17       A.   Right.

18       Q.   -- doing their jobs?

19            And then at some point it was decided that

20   Homicide needed to be brought out there.

21       A.   Yeah.  Back then, preceding cell phones, it

22   would go through dispatch.  It takes time.  If they got

23   the call, I think around 11:50, called, it got to my

24   office at 12:35.  And it wasn't that far out there from

25   the office.  I ran over from -- I come from Riesner,

1    which was where our office was then.  We've moved twice

2    since this case.  I was out there before 1 o'clock.

3         Q.   Okay.  And that location on Fairway, is it in

4    Harris County, Texas?

5         A.   Yes, ma'am.  It's just off the South Loop.

6         Q.   Okay.  And the nature of the call was

7    kidnapping?

8         A.   Yes.

9         Q.   Okay.  When you got there, what did you

10   observe?  Can you tell me first a little bit about the

11   apartment complex we're talking about?

12        A.   It's a small apartment complex.  It's just off

13   the Gulfgate Mall area out 610 between Telephone and

14   Broad on Fairway across the street from Barnett Stadium.

15   It's a big reference point out there.  Like I say, it's

16   an old two-story, U-shaped apartment complex.  Maybe

17   less than 30 units.  I think they had 26 units in it.

18   Three separate buildings in a horseshoe.  The back

19   building was being renovated and was empty.  Two-story,

20   brick concrete, wood apartment complex.  A small,

21   independently-owned complex.

22        Q.   What kind of neighborhood is this, would you

23   describe it?

24        A.   Generally it was middle to lower blue-collar

25   employed, Hispanic.  Mixed community, primarily moving

1    to Hispanics, is the majority at the time.

2    Transitioning from a white area into Hispanic and black.

3    And just part of -- not inner-city because it's outside

4    the loop, but a change in part of Houston at the time.

5         Q.   Okay.  And when you got there, what was going

6    on?

7         A.   Patrol cars were parked out front.  They were

8    securing the scene and holding it.  I talked to the

9    officers at the scene and began my initial

10   investigation.

11        Q.   And did your investigation initially focus

12   largely on the scene itself?

13        A.   In getting information out about the missing

14   child, yes.

15        Q.   Okay.  And I want to talk to you about the

16   scene first and then we'll talk about getting that

17   information out to the public.

18        A.   Okay.

19        Q.   Were pictures taken to document the scene?

20        A.   I'm sorry, what?

21        Q.   Were pictures taken to document the scene?

22        A.   Yes, they were.

23        Q.   Okay.

24             MS. TISE:  May I approach, Your Honor?

25             THE COURT:  Yes.

1       Q.   (By Ms. Tise) I'm going to show you State's

2   Exhibits 9 through 31 (indicating).

3       A.   Okay.

4       Q.   I'll ask if those pictures fairly and

5   accurately reflect the scene that you made that night on

6   Fairway?

7       A.   Yes, they do.

8            MS. TISE:   Your Honor, I'm going to offer

9   State's Exhibits 9 through 31.  And I will show them to

10  defense counsel for any objection.

11           **(State's Exhibit No. 9 through 31 Offered)**

12           MR. CORNELIUS:   No objection, Judge.

13           THE COURT:   Very good.   State's Exhibits 9,

14  10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,

15  24, 25, 26, 27, 28, 29, 30, and 31 will be admitted

16  without objection.

17           Do you wish to publish those at this time?

18           **(State's Exhibit No. 9 through 31 Admitted)**

19           MS. TISE:   I do, Judge.

20           THE COURT:   You may publish them.

21           MS. TISE:   And we're proceeding with a

22  PowerPoint presentation to make it easier for the jury.

23           THE COURT:   Okay.   You may proceed.

24       Q.   (By Ms. Tise) Take a look there on your left,

25  Officer.   You can see State's Exhibit No. 9.   And can

1  you tell the jury what we're looking at here?

2      A.   That is the front door to the scene location,

3  Apartment No. 3 at 6705 Fairway.  You can see the number

4  3 exhibited in the center of the door, which is of note.

5  You will also -- it's got a flash going on it, but the

6  light to the right of the door is off.  It's not

7  functioning.  The door is open and you'll see inside.

8      Q.   All right.  And so, the outside light there was

9  burned out basically?

10      A.   Yes.

11      Q.   Okay.  Taking a look at State's Exhibit No. 10.

12  This is a backed-up picture of that front entrance,

13  correct?

14      A.   Correct.

15      Q.   And what is that there chained on that post out

16  in front of that?

17      A.   It appears to be chained, but it's not

18  actually -- the bicycle has a chain around it.  It's a

19  child's bicycle laid down against the post.  It's got a

20  chain around it, but it appears that Angelo probably

21  tried to lock it up, forgot he had to lock it around the

22  post instead of just locking the chain to the bicycle.

23      Q.   Okay.  Taking a look at State's Exhibit 11 --

24      A.   You see --

25      Q.   -- what are you documenting here?

1        A.   What I'm documenting here -- I'm touching the

2    screen -- I was seeing the door hasp and screws from the

3    doorjamb where the door was kicked open.  People put

4    fantastic locks on their doors and then they screw them

5    into 1-by-4's or light wood in the doorjamb.  And that's

6    actually what gets broken most of the time when the door

7    is forced open, is the doorjamb.  The lock is secure.

8    It's still in a locked position, but there's just

9    nothing there to hold it open and it's kicked off the

10   door.  And that's what you see laying there is the throw

11   that the lock goes through and the screws that have been

12   knocked out of the wood.

13       Q.   And did this indicate to you forced entry?

14       A.   Very much so.

15            THE COURT:  Let me stop you for just a

16   minute.

17            Members of the jury, there's two more

18   pictures -- televisions if you can't see this one well.

19   They were not on before, so I wanted to bring that to

20   your attention.

21            You may proceed.

22       Q.   (By Ms. Tise) Taking a look at State's Exhibit

23   No. 12, can you tell us about what we're doing now as

24   we're proceeding?

25       A.   You are standing in the doorway looking into

1  the apartment.  And it is not a big apartment.  It's a

2  downstairs apartment, one bedroom.  You've got a

3  living -- one room that's kind of a living room, kitchen

4  combination, and then the bedroom's in the background.

5       Q.   Okay.  And that doorway that we can see in the

6  background where it looks like maybe a TV set or

7  something in there, is that the bedroom?

8       A.   Yes.

9       Q.   Okay.  Can you indicate the doorway and the TV

10  set we're talking about in the bedroom area?

11       A.   Here is the door and the TV right there and you

12  can see the bed.

13       Q.   And so, basically it's a two-room apartment?

14       A.   Correct.

15       Q.   One large living room, kitchen combination?

16       A.   Correct.

17       Q.   And then a bedroom with a small bathroom off of

18  it?

19       A.   Correct.

20       Q.   Okay.  Taking a look at State's Exhibit 13.

21       A.   Looking inside the living room area, you see a

22  hat tree there that's got men's and women's hats on it.

23  I'm noting that.  You see the picture of Angelo Garcia,

24  little Angelo, on the wall.  And just the TV or VCR box

25  of some sort there in the living room area.

1      Q.   Did you notice a big difference between the two

2  main living areas of the home as far as the condition?

3      A.   Yes.

4      Q.   Can you tell the jury a little bit about that?

5      A.   The living room was pretty much undisturbed.

6  Everything was where it appeared to be like you'd go off

7  and leave it when you went to bed at night.  The bedroom

8  was in complete disarray, doors were pulled out, turned

9  upside-down, covers on the floor, blankets were thrown

10  down.  It had been ransacked.  And it just looked like

11  someone was in one room searching for stuff, tearing

12  stuff out in the bedroom, and had pretty much just

13  walked through the living room without tearing anything

14  up or looking in there.

15      Q.   Okay.  Take a look at State's Exhibit 14.  And

16  does that kind of illustrate what you are talking about

17  (indicating)?

18      A.   That's the kitchen and that's -- you know, you

19  see the garbage.  It's not turned over.  You see the

20  dish sinks out, but the dishes are washed and there is

21  stuff set out.  That's the way a person might go off and

22  leave their house when they went to bed at night.

23      Q.   Fairly orderly?

24      A.   Fairly orderly.

25      Q.   Taking a look at State's Exhibit 15, just more

1  of the same (indicating).

2      A.   That's a reverse.  You are looking out the

3  front door.  And you can see it's dark outside, but you

4  see the refrigerator is right behind the door, the

5  chair.  A reverse position.  The kitchen has the window

6  over -- or the stove that has the window over it with a

7  filmy curtain or almost transparent curtain, where the

8  other curtain in the living room side where you'd be

9  sitting at night, say, is a bigger window, but it's

10  completely closed and the curtain is off so you couldn't

11  see in if you walked past it.

12      Q.   And State's Exhibit 16, what are you

13  documenting (indicating)?

14      A.   The purse is sitting there apparently

15  undisturbed.  It's just been left alone.

16      Q.   Okay.  And did you learn that was Diana's

17  purse?

18      A.   Yes.

19      Q.   Taking a look at State's Exhibit 17.  What are

20  we looking at (indicating)?

21      A.   That's the dining area of the kitchen here.

22  And over here is the door to the living room -- or to

23  the bedroom.  And you will begin to see on the bottom

24  the disarray of the clothes thrown on the floor and the

25  ransacking.

1     Q.   State's Exhibit 18 (indicating).

2     A.   Looking back into the living room area, you've

3 got the console TV, a hutch with knickknacks on it and

4 personal affects, flowers.  And, again, it's just

5 showing that nothing apparently is really disturbed

6 there.

7     Q.   Okay.  And this television in this State's

8 Exhibit 18 photo, it's one of two TVs in the apartment,

9 correct (indicating)?

10    A.   Correct.

11    Q.   State's Exhibit 19 (indicating).

12    A.   A close-up of the ransacking there.  You can

13 see that the clothes and all are thrown on the floor

14 where you wouldn't normally have dropped clothes on the

15 floor, but you don't leave them in the doorway where you

16 will stumble over them, you know, normally.

17    Q.   State's Exhibit 20, where are we now

18 (indicating)?

19    A.   We're in the bedroom.  And you can see the

20 complete -- the drawers are pulled out.  In later

21 pictures, you will see them turned upside-down or

22 whatever.  Luggage is thrown around.  It's just -- the

23 room looks like someone has searched it.

24    Q.   Okay.  State's Exhibit 21 (indicating).

25    A.   Just the shoes, clothing, a storage box, just

1  the bottom -- that would be in the closet area in the

2  bedroom area.

3       Q.   Anything of note found in that storage box?

4       A.   Nothing.

5       Q.   State's Exhibit 22 (indicating).

6       A.   That's a clock radio, a little clock radio.

7  And you really can't tell it, but there it's been used

8  to tie someone up with.  They used the cord on the clock

9  radio to restrain the people in the house.

10      Q.   And when you observed that clock radio, you

11 could tell that it had been used to tie someone up?

12      A.   Yes.  You still see the knots in it.

13      Q.   Okay.  State's Exhibit 23 (indicating).

14      A.   In the bedroom area you see the second TV, the

15 open door to the bathroom are.  You'll see all the

16 drawers have been pulled out.  And you see a drawer

17 laying on the ground here and the other one laying here

18 like they have been searched.

19      Q.   Okay.  State's Exhibit 24 (indicating).

20      A.   Again, looking in, you've got the drawers, the

21 bed -- it's at an angle and the mattress is kind of

22 pushed over sideways.  Just the disarray in the house

23 from the ransacking.

24      Q.   And in State's Exhibit 25, we've got a little

25 bit better shot of the pillow there on the bed.  And why

1    is that important (indicating)?

2        A.    Well, you've got a little blood on the pillow

3    there.   Where I marked it -- you actually covered it up.

4    There you go.   You've got some blood transferred on the

5    pillow there.

6        Q.    When you arrived at that scene, did you have an

7    opportunity to observe Arturo Rodriguez?

8        A.    Yes.

9        Q.    And what kind of physical condition was he in?

10       A.    In layman terms, it looked like he had been

11   pistol-whipped, beat about the head, knots, lacerations

12   on his head.   And, obviously, someone, you know, had

13   struck him several times in the head and in the back of

14   the head area.

15       Q.    Okay.  And was he bleeding?

16       A.    Yes.

17       Q.    Did y'all actually call an ambulance out to the

18   scene to look him over?

19       A.    The patrolman had called an ambulance, the

20   first responder.   The ambulance came, checked them.

21   They did not transport him.   They treated him, put a

22   bandage on him, and he stayed at the scene.

23       Q.    Okay.  Looking at State's Exhibit 26

24   (indicating).

25       A.    This is the complainant's handgun that's in the

1    bedside table there; unfired, unused except we know

2    obviously there's a weapon in the apartment.  It really

3    looked -- other than we found a gun there, it was fine

4    to have.

5         Q.   Right.  Nothing unusual about someone having a

6    gun for their own protection?

7         A.   Not at all.

8         Q.   State's Exhibit 27 (indicating).

9         A.   More of the ransacking of the apartment.  You

10   can see stuff is -- even one of the drawers looks like

11   it's over here, drawer open there.  Just showing the

12   turmoil that happened in that bedroom.

13        Q.   And there was a lot of it to show?

14        A.   Yes, there was.

15        Q.   We see some more of it in State's Exhibit 28

16   (indicating).

17        A.   Correct.  Again, you see drawers that -- if

18   you're asleep in bed, you're obviously not going to have

19   your dresser drawers piled up on the bed with you in an

20   empty state like that.  You've got to move them off the

21   bed.  So, it's evidence that someone came in there other

22   than the occupants and moved stuff around.

23        Q.   And State's Exhibit 29 (indicating).

24        A.   That is Diana's gown where she had removed it.

25        Q.   Okay.

1     A.   And just the close-up of the bed where she had

2  laid it in the dirty clothes hamper or the -- you know,

3  the carrying thing.

4     Q.   Now, obviously, while you are working this

5  scene and observing things in this location, you are

6  also in communication with the people who lived there?

7     A.   Yes.

8     Q.   And learning from them about what had happened?

9     A.   Yes.

10     Q.   And determining, you know, what's important to

11  your investigation, correct?

12     A.   Correct.

13     Q.   So, during the time that you are in

14  communication with them and you are learning about what

15  had happened that night, did you make note of certain

16  things because of things that they told you?

17     A.   Yes.

18     Q.   For instance, the alarm clock.

19     A.   Yes.

20     Q.   You were given information about how that alarm

21  clock had been used by Diana and Arturo, correct?

22     A.   Correct.

23     Q.   And that's why you photographed it?

24     A.   Yes.

25     Q.   There was a child's red t-shirt that was also

 1  there tied in a knot.  And I don't see a photo of it,

 2  but did you make note of that?

 3      A.   Yes.

 4      Q.   And did you make note of that because Diana had

 5  told you that it had been used to --

 6      A.   Restrain her, yes.

 7      Q.   -- to tie her hands?

 8              MR. CORNELIUS:  Judge, I object to the

 9  hearsay.  Leading and hearsay.

10              THE COURT:  That will be sustained.

11      Q.   (By Ms. Tise) Well, I'll ask it to you this

12  way.  Why did you make note of the red t-shirt?

13      A.   Because Diana told me it --

14              MR. CORNELIUS:  It's still hearsay.  We

15  still object.

16              THE COURT:  Don't go into what somebody

17  else told you.  That's hearsay at this time.

18      A.   In my observations as a trained detective, a

19  t-shirt being knotted at the scene of a kidnapping and

20  hostage situation is something I would suspect was used

21  in the crime, commission of the crime, and I tagged

22  it --

23      Q.   (By Ms. Tise) Okay.

24      A.   -- as evidence.

25      Q.   In addition, was your attention called to an

 1   item that was on the television set in the living room

 2   area of the apartment?

 3        A.   Yes.

 4        Q.   And who called your attention to that item, do

 5   you remember?

 6        A.   I learned it -- Diana and Arturo both, neither

 7   one were smokers.

 8        Q.   Okay.  And was there something in the apartment

 9   that came to your attention that was inconsistent with

10   that?

11        A.   Yes.

12        Q.   And what was it?

13        A.   I observed a cigar that had been lit but put

14   out.  And I know a lot of my friends and all that smoke

15   cigars, they will smoke it and let it go out and almost

16   chew on it like chewing tobacco, but it was an unlit

17   cigar sitting on the edge of the TV and it did not

18   appear that it had been lit when it was set down because

19   it didn't burn back and burn the TV or scar the TV.  I

20   saw no other scarring from burns in the apartment.  It

21   was just out of place.

22        Q.   Okay.  It had been smoked?

23        A.   It had been and had been chewed on.

24        Q.   But it had been put out and put down?

25        A.   Put out or went out at some point just because

1    it wasn't enough drawn and just sat on the TV.  It was

2    just like you take it off and set it there almost like

3    the edge of an ashtray.

4        Q.   And knowing that the individuals who lived in

5    the home didn't smoke, did you make a decision to

6    collect that cigar?

7        A.   Oh, yes.

8        Q.   Okay.  Let's look at State's Exhibit 30.  And

9    is that photo documenting the cigar as you observed it

10   there in the home that night (indicating)?

11       A.   Yes, that's the cigar.  And you see the tip of

12   it is -- how it like went out and it's not burned

13   anything up.  And you can't tell, but you can tell that

14   it had been in someone's mouth, it just wasn't lit and

15   set there.  Distortions -- it wasn't chewed so much as

16   distortions at this end and it was just -- it was not

17   where it belonged.

18       Q.   Okay.  And based on the fairly tidy condition

19   of the living area of the house, did you think it might

20   have been left behind by the perpetrators?

21       A.   Yes.

22            MS. TISE:  Your Honor, may I approach?

23            THE COURT:  Yes.

24       Q.   (By Ms. Tise) Sergeant Elliott, I'm going to

25   show you what's been marked as State's Exhibit 32 and

1  ask you to identify it (indicating).

2       A.   It's the cigar from there, that same cigar.

3       Q.   It was recovered --

4       A.   Yes.

5       Q.   -- from the crime scene and tagged into

6  evidence, was it not?

7       A.   Correct.

8            MS. TISE:  Your Honor, at this time, I

9  offer State's Exhibit 32.  I will tender to defense

10 counsel.

11           **(State's Exhibit No. 32 Offered)**

12           MR. CORNELIUS:  The actual cigar itself, I

13 have no objection to.  Everything else related to it --

14 I have an objection to all the writing anywhere, I have

15 an objection to.

16           MS. TISE:  State's Exhibit 32 is a package

17 that contains the cigar.  And it does have writing on

18 the package.  Are you objecting to that writing?

19           MR. CORNELIUS:  Yeah.

20           MS. TISE:  I'll have it marked, the cigar,

21 individually.  It might get messy.

22           THE COURT:  So, no objection to the cigar

23 itself, State's Exhibit 32?

24           MR. CORNELIUS:  No, Your Honor.

25           THE COURT:  State's No. 32 is admitted

1    without objection.  And that is without the bag or

2    without any of the writing that's on the bag.  Is it

3    still 32, Ms. Tise?

4                    **(State's Exhibit No. 32 Admitted)**

5                    MS. TISE:  Yes, Your Honor.

6                    THE COURT:  You may proceed.

7        Q.   (By Ms. Tise) A Crime Scene Unit was on the

8    scene, correct?

9        A.   Correct.

10       Q.   And they were doing their job, were they not?

11       A.   Correct.

12       Q.   Looking for prints?

13       A.   Correct.

14       Q.   Any of them found on the immobile surfaces in

15   the home?

16       A.   No.

17       Q.   Okay.  Does that surprise you at all?

18       A.   Not at all.

19       Q.   In fact, it's fairly common not to get prints

20   from a crime scene, is it not?

21       A.   That's -- it's a very common occurrence not to

22   get them.  We only get prints, probably -- I'm taking a

23   guess on my part personally -- probably 5 percent of the

24   time.  People just don't transfer their prints like you

25   see all the time.

1      Q.   So, it's not like what people see on TV where
2   there is just prints everywhere and DNA?
3      A.   I wish it was.
4      Q.   And going back to the complainants that you
5   talked to that night, Diana and Arturo.
6      A.   Yes.
7      Q.   What was Diana's emotional condition?
8      A.   She was upset.  She was very emotional.  She --
9   you know, obviously, the assault on her.  And then her
10  child was missing.  She was -- I won't say hysterical,
11  but she was very upset and very emotional about what had
12  happened.
13     Q.   And did you get a physical description of
14  Angelo from Diana?
15     A.   Yes, I did.
16     Q.   Okay.  And can you tell us what that
17  description was?
18     A.   It was 3 foot, 6 inches tall, 35 pounds, Batman
19  shorts, with a white t-shirt with a design on the front.
20  And then the picture.
21     Q.   Okay.  And I have that picture, State's Exhibit
22  31.  And this is a picture that was actually hanging on
23  the wall in their apartment (indicating)?
24     A.   Yes, ma'am.
25     Q.   And y'all took a photo of it; a photo of a

1  photo, basically?

2       A.   Correct.

3       Q.   What did you do with that description?

4       A.   We put out a general broadcast to all the

5  patrol units hoping the child had been taken and left

6  somewhere nearby.  I contacted the Juvenile Division and

7  had them enter into the TCIC/NCIC missing persons

8  database.  I contacted HISD police department requesting

9  that they send units out and do a physical search of

10 Barnett Stadium.  I contacted the FBI and requested

11 their assistance with the kidnapping of a minor child.

12      Q.   And the FBI actually came out and got involved,

13 correct?

14      A.   Yes.

15      Q.   And stayed involved throughout a large part of

16 the investigation, correct?

17      A.   Correct.

18      Q.   Y'all did a foot search of the football stadium

19 across the street?

20      A.   HISD P.D. did since they were familiar with the

21 location, they had keys to the building.  It was closed

22 up, but they sent units out to do that.  We searched the

23 area, like I said, what all we could.

24      Q.   Couldn't find anything?

25      A.   Could not.  Never found a thing.

1       Q.   And you put a trap on the complainants -- the

2   family's phone?

3       A.   At the time that was just a matter of calling

4   Southwestern Bell back then and explaining to them the

5   exigent circumstances, the emergency nature.  And they

6   put a trap on the phone.  Now, a trap is not like a

7   wiretap at that point.  A trap just says what number is

8   calling that number.  It just gives the -- in fact, back

9   then it would be the seven-digit number.  Not the

10  full -- you didn't have to dial ten digits.  And I had

11  them do that.

12      Q.   It's hard to believe things have changed that

13  much in 20 years, isn't it?

14      A.   Twenty-one.

15      Q.   So, you also checked out the immediate family,

16  did you not?

17      A.   Yes.

18      Q.   Okay.  And an officer went out to talk to

19  Diana's ex-husband, correct?

20      A.   Correct.

21      Q.   Okay.  And did anything suspicious arise from

22  that communication?

23      A.   No.  We almost -- we checked all of that, but

24  there was not a custody battle.  I mean, I got the call

25  as a kidnapping.  I was hoping -- I hoped this is just a

1   mom and dad fighting over the kid and the dad has the

2   child.  When I got there and spoke to him and learned

3   that the relationship was -- amicable as a separation or

4   divorce could get and that the father regularly got

5   custody of Angelo and there was no reason for him --

6               MR. CORNELIUS:  Object as not being

7   responsive.

8               THE COURT:  That's sustained.

9       Q.  (By Ms. Tise) Okay.  Anything about the

10  relationship between Diana and her ex-husband, who is

11  Angelo's -- who had raised Angelo that caused you any

12  suspicion?

13      A.  None.

14      Q.  And, in fact, when officers went out to check

15  on him, he was at home in bed?

16      A.  He was, yes.

17              MR. CORNELIUS:  Objection unless he knows

18  of his own personal knowledge.  It sounds like it calls

19  for hearsay to me.

20              THE COURT:  I will let him answer if he

21  knows of his own personal knowledge.

22              THE WITNESS:  I can't answer it, Your

23  Honor.

24      Q.  (By Ms. Tise) So, but that was checked out?

25      A.  Yes, it was.

1    Q.   And there was nothing that raised any red flags

2    there?

3    A.   Correct.

4    Q.   Sergeant Elliott, based on your years of

5    experience, your training, when you got out to that

6    scene that night and you heard what all had happened,

7    what did you think was going on?

8    A.   I thought they took Angelo to bring pressure on

9    the mother and dad, mother and Arturo.

10   Q.   And did you think that was a drug-related

11   situation?

12   A.   Yes.

13   Q.   Okay.  And in talking to people in the

14   neighborhood, did you have reason to believe that drugs

15   had been sold at the apartment?

16   A.   A couple of them, yes.

17   Q.   Okay.  And in your experience this kind of

18   kidnapping can arise out of a drug retaliation type of

19   situation, can it not?

20   A.   Correct.

21   Q.   Because of that, did you talk to Diana and

22   Arturo about your thoughts on that?

23   A.   Yes.

24   Q.   And initially did they tell you that they had

25   been selling drugs?

1      A.   No, they did not.

2      Q.   Okay.  So, where did you go from there?

3      A.   We --

4           MR. CORNELIUS:  Can we approach the bench,

5      Judge, just for a quick second?

6           THE COURT:  Yes.

7           (At the Bench, on the record)

8           MR. CORNELIUS:  I don't want to be

9      insensitive to the jury, but if we're done with the

10     picture of the child, there's no reason for it to be up

11     there.

12          THE COURT:  Unless there is some reason,

13     let's take it down.  Is that it?  Okay.  Thank you.

14          (Open court, defendant and jury present)

15          THE COURT:  You may proceed, Ms. Tise.

16          MS. TISE:  Thank you, Judge.

17     Q.   (By Ms. Tise) So, you have your suspicions --

18     A.   Yes.

19     Q.   -- about what had happened at that apartment?

20     A.   Yes.

21     Q.   Some sort of drug retaliation type of

22     situation, correct?

23     A.   Yes.

24     Q.   So, did you do a search of the apartment for

25     drugs?

1     A.   Yes.

2     Q.   And did you find any?

3     A.   No.

4     Q.   Did you find any large sums of money?

5     A.   No.

6     Q.   Okay.  And, in fact, was a drug dog brought to

7  the location and run on the apartment?

8     A.   It was.

9     Q.   And did the drug dog hit on anything indicating

10  the presence of drugs in the apartment?

11     A.   It did not.

12     Q.   At that point in time, what happened with your

13  investigation?

14     A.   Well, I sent Diana and Arturo -- they

15  ultimately wound up down at Homicide to be interviewed

16  further.

17     Q.   Okay.  Before you did that, did you send Diana

18  to get a rape kit done?

19     A.   Yes.  Officer Bredemeyer -- I had him transport

20  her to the hospital to St. Joseph's for a sexual assault

21  kit.

22     Q.   Okay.  And that happened, right?

23     A.   Yes.  And once that was completed, she was

24  transported to the Homicide Division.

25     Q.   And that was for the purpose of getting

1  detailed statements from her and Arturo?

2      A.   Correct.  We wanted to remove them from the

3  scene, sit them down, get them in a comfortable -- more

4  comfortable situation and where we had all the equipment

5  to take proper statements.

6      Q.   Did you yourself participate in that process?

7      A.   No.

8      Q.   Tell the jury why not.

9      A.   I was at the scene processing the scene.  I did

10  not speak Spanish, which Arturo did.  And that was, as I

11  mentioned earlier, a follow-up on a who-done-it crime.

12  And dayshift investigators were being called in to

13  handle that.

14      Q.   Okay.  So, all of the investigation that took

15  place in the daytime hours was done by other

16  investigators?

17      A.   Correct.

18      Q.   And, basically, when the morning light came,

19  you were off the case; is that right?

20      A.   Well, I spent the day typing.  I had to type

21  enough up to pass on to them and talk to them.  And what

22  I couldn't type, brief them on, but my job was done

23  pretty much to that point.

24      Q.   Okay.  As far as a follow-up investigation?

25      A.   Correct.

1    Q.    Okay.  I want you to fast-forward with me to

2  November 5th and ask you about how this case came back

3  to be something that you were a direct part of.

4    A.    November 5th, we were notified that Angelo

5  Garcia's body was found in Baytown by a crabber.  And

6  Baytown P.D. had investigated the body recovery.  I went

7  to the autopsy, viewed the body, and then went out to

8  the scene of the recovery.

9    Q.    And that scene, can you tell the jury a little

10  bit about it?

11    A.    The recovery scene was -- the address was 1200

12  Missouri in Baytown, which is still in Harris County.

13  It's out off the East Freeway.  It's an ugly scene.  It

14  was a -- one of the water basins, salt water lakes

15  around Baytown of the ship channel.  The reason the body

16  was found is that a cold front had blown in the night

17  before and as the north wind tends to do, it pushed the

18  water out of the bays and dropped the level lower than

19  normal and a local resident of Baytown, a man named Curb

20  was out crabbing and found the body laying what would

21  normally be underwater, but because of the low tide and

22  the wind was laying, you know, out on the mud flat in a

23  marshy, debris-strewn, desolated, isolated area with

24  ugly -- you can see the ship channel factories in the

25  background a mile or two away.  Just, you know, a very

1  lonely, isolated place.

2       Q.   When y'all were out at that scene, who were the

3  primary officers responsible for it?

4       A.   Well, like I said, Baytown did the recovery.

5  Officer -- I think the detective was Wood with Baytown

6  P.D.  They did their death investigation and recovery

7  because they just had a body.  They didn't tie him to --

8  it was an unidentified, skeletal -- not skeletal, but

9  damaged little boy.

10      Q.   And it was apparent it was the body of a child,

11  was it not?

12      A.   Oh, very much so; 3-foot-6.  Not very big.

13      Q.   And ultimately confirmation was made, was it

14  not, who that little boy was?

15      A.   When I went to the morgue, got official

16  confirmation; but the clothing, physical size,

17  characteristics, it was in my mind I knew who it was.

18  And we got dental records and later confirmed the I.D.,

19  but there was no doubt in my mind that it was Angelo

20  Garcia's body.

21      Q.   And is it fair to say that everything matched

22  right down to the little Batman shorts?

23      A.   Yes.

24      Q.   That location there, that little park, are

25  there some major roadways in the area?

```
 1        A.   You can see 146 in the background, the bridge

 2   going across.  And like I said, Missouri Street.  And

 3   there's some apartment complex there.  You can walk down

 4   to -- it's almost like this park area or something.

 5   Like I said, people go down there crabbing,

 6   unfortunately.  I mean...

 7        Q.   And can you basically just drive right down to

 8   the water's edge?

 9        A.   You can get real close to it, yes.

10        Q.   Okay.  Now, you took some photos out there,

11   correct?

12        A.   Polaroids.  So long ago, yes.

13        Q.   Okay.  And you said you also went to the

14   morgue?

15        A.   Yes.

16        Q.   Were you present when Diana was told about

17   this?

18        A.   No.

19        Q.   Okay.  If you were going from Diana and

20   Arturo's apartment out to this location, what roadway

21   would be the most direct route?

22        A.   From Diana's, probably out 225, State Highway

23   225 through Pasadena to 146 that goes over to Baytown.

24        Q.   And then that would be the most direct route,

25   wouldn't it?
```

```
 1        A.    Correct.

 2        Q.    And is that entire route in Harris County,

 3   Texas?

 4        A.    Well within Harris County, Texas, yes.

 5        Q.    It's not even close to the boundaries?

 6        A.    All of State Highway 225 is in Harris County,

 7   Texas.

 8        Q.    Okay.  And 146, right out to that site in

 9   Baytown where the body was found, is also well within

10   Harris County, is it not?

11        A.    Yes, it is.

12        Q.    You know, back in September when this case

13   happened and you were the original detective on that

14   case at the scene, had Homicide honed in on a suspect or

15   a person of interest?

16        A.    In September, no.

17        Q.    Okay.  Do you recall shortly afterward, after

18   learning of the direct connections of the family, an

19   individual by the name of Obel Cruz-Garcia as the

20   primary suspect?

21        A.    Chico, yes.

22        Q.    And that happened pretty quickly, did it not?

23        A.    Yes, it did.

24        Q.    Other people were being looked at, lots of

25   leads were being followed, correct?
```

1    A.   If a name came up, we were checking it.  We

2  weren't going to leave anything -- you know, we were

3  looking for a -- hopefully we were going to recover

4  Angelo Garcia being held somewhere, was our hope.  It

5  didn't happen.

6              MS. TISE:  May I approach, Judge?

7              THE COURT:  Yes.

8    Q.   (By Ms. Tise) I'm going to show you what's been

9  marked as State's Exhibit 8.  It's a calendar, a 1992

10  calendar.  It sets out some of the relevant dates.  Do

11  you think it would be helpful to the jury to have this

12  to assist them as far as dates that things were

13  happening back at that time?

14    A.   Yes, it would because is it starts on the last

15  day of September and runs through the first part of

16  October.

17              MS. TISE:  Judge, at this time, I will

18  offer State's Exhibit 8.

19              **(State's Exhibit No. 8 Offered)**

20              THE COURT:  What says the defense?

21              MR. CORNELIUS:  I'll have an objection,

22  Judge.  Hearsay and relevance.

23              THE COURT:  That will be admitted.  State's

24  Exhibit No. 8 is admitted over objection.

25              Ms. Tise, do you have significant more

1    questions of this witness?  I'm not trying to rush you.

2                    **(State's Exhibit No. 8 Admitted)**

3                    MS. TISE:  This is just about it, Judge.

4                    THE COURT:  All right.  We're going to

5    break following your questioning before

6    cross-examination, Mr. Cornelius.  Okay?

7                    You may proceed.

8        Q.   (By Ms. Tise) In taking a look at State's

9    Exhibit 8, back in 1992, September 30th would have been

10   on a?

11       A.   Wednesday night.  I got it Thursday morning,

12   like I said, at 12:35 a.m.

13       Q.   Basically, a school night, correct?

14       A.   Correct.

15       Q.   A weeknight?

16       A.   Regular weeknight.

17                    MS. TISE:  I'll pass this witness.

18                    THE COURT:  Okay.  We're going to take your

19   lunch break at this time, ladies and gentlemen of the

20   jury.

21                    I want to remind you that you should not

22   talk amongst yourselves or with anyone else on any

23   subject connected with the trial or to form or express

24   any opinion thereon until the end of the trial.

25                    We'll reassume in approximately one hour.

1  Will the lawyers be back by 1:30?

2              You may go with the bailiff.

3              THE BAILIFF:  All rise.

4              (Lunch recess)

5              (Open court, defendant present, no jury)

6              THE COURT:  We're back on the record in

7  Cause No. 1384794, The State of Texas vs. Obel

8  Cruz-Garcia.  And present is Mr. Cruz-Garcia at the

9  table with his lawyers, Skip Cornelius and Mario Madrid.

10  Natalie Tise and Justin Wood are here for the

11  prosecution.

12              Are we ready bring the jury in?

13              MR. CORNELIUS:  Yes, Your Honor.

14              MS. TISE:  The State's ready.

15              THE COURT:  We'll proceed with the same

16  witness, Sergeant Carlos Elliott.

17              All right.  Bring in the jury.

18              (Open court, defendant and jury present)

19              THE COURT:  Please be seated.

20              We're ready to resume with the testimony of

21  Sergeant Carlos Elliott.

22              And did the State pass this witness?

23              MS. TISE:  I did, Judge.

24              THE COURT:  Okay.  Mr. Cornelius, you may

25  proceed.

1          MR. CORNELIUS:  Thank you, Judge.

2                  **CROSS-EXAMINATION**

3    **BY MR. CORNELIUS:**

4      Q.   Sergeant Elliott, we've met before, correct?

5      A.   Yes, sir.

6      Q.   All right.  But we've never talked about this

7    case, right?

8      A.   No, sir.

9      Q.   I'm taking it that the point you're making with

10   the jury is that -- or one of the points is that you had

11   your doubts about whether these two complainants were

12   being truthful with you?

13     A.   Correct.

14     Q.   And I'm sure that you told them that your main

15   focus was to get their -- or the lady's child back,

16   correct?

17     A.   Correct.

18     Q.   And I'm sure you tried to impress on her how

19   important it was for her to tell you the truth, to give

20   you all the information that both of them could give you

21   to help you try to get the child back, correct?

22     A.   Correct.

23     Q.   And at the end of that particular day, though,

24   what was the description that you had of the alleged two

25   assailants?

1      A.   Two dark-complected individuals speaking a

2  language that was not geographically Mexican Spanish

3  type language.

4      Q.   Okay.  In looking through your report, it looks

5  to me that you've written several times in the report

6  that the description was two black males.  Is that not

7  correct, two black males?  I don't know if your report

8  is numbered like mine, but on Page 2.007, that's where

9  your report starts.  That's the number at least on mine.

10  I know they come out of the computer sometimes

11  differently.

12      A.   Are you talking about the report generated by

13  me?

14      Q.   Yes, sir.

15      A.   Okay.

16      Q.   It says "introduction" and you introduce

17  yourself in the report.

18      A.   Oh, you're talking at the very first?

19      Q.   Yeah.  I was going start at the first.

20      A.   It starts on 07, right.  I thought you meant

21  the...

22      Q.   And if you will look --

23      A.   I see.  That's the general initial information

24  that's labeled introduction.

25      Q.   Uh-huh.

1    A.   And that's the information, basically, that I

2   had.

3    Q.   Yeah.

4    A.   And what's relayed over the phone and the

5   initial comments and -- it's -- our computers -- you

6   know, everyone is classified into certain categories

7   whether they fit neatly into that category or not.  They

8   say black males because going out in a patrol unit

9   shortly driving down the street is looking for people.

10  And at a distance, they are looking for white or black,

11  basically, is the first generalization.  And then once

12  you get closer, it's a white, Hispanic, could it be

13  Asian, or whatever.  You know, you're looking for the

14  visual clues to then further funnel it down to

15  different.  So, the general introduction was a black

16  male.  That's what patrol put out because that was the

17  initial general description.

18   Q.   So, are you saying that there was only two

19  kinds of general description, either black or white?

20   A.   No.  I'm saying that's what was furnished to

21  me.

22   Q.   Okay.  And you -- can you direct me in the

23  report where you've written down that it was two

24  dark-skinned people or however you described it awhile

25  ago?

1       A.   They described them as black, but it -- it's
2  almost a cultural thing, Mr. Cornelius.
3       Q.   Well, I will come to that in a minute.  Did
4  they describe them as black males or dark-skinned males?
5       A.   In their limited language, I understood them to
6  be black Hispanic.
7       Q.   Why didn't you write that down?
8       A.   That's -- at the time, we didn't have a black
9  Hispanic race to define in 1992.  We wrote the
10  description of black males, is what they discovered
11  speaking Spanish.
12       Q.   These people were both Hispanic, right, the two
13  people, the two alleged victims?
14       A.   Diana and Arturo?
15       Q.   Yeah.
16       A.   Yes.
17       Q.   You don't know they knew Hispanics from black
18  male?
19       A.   To a Hispanic person from Mexico, a Hispanic --
20  that I know to be Hispanics from Texas, we all speak
21  different languages.  And a Spanish person from Mexico
22  might use words or not know how to describe a black from
23  Columbia who is Hispanic in my mind as Hispanic, or from
24  the islands.  They could be Hispanic -- I mean they call
25  them black, but they mean an entirely different word for

1 black than what you and I mean as two Anglos sitting

2 here talking about it.

3      Q.   Okay.  Are you through with that?

4      A.   Sure.

5      Q.   Okay.  Let me get more specific with my

6 question.  You're trying to put in a police report a

7 description, right?

8      A.   Yes.

9      Q.   And this is a police report that's going to be

10 relied on by not only yourself but any other officer

11 that works on this case, correct?

12      A.   Yes.

13      Q.   Okay.  And it will be relied on by, perhaps,

14 the district attorney's office, maybe the defense bar.

15 Whoever else ever reads your report is going to rely on

16 it and believe you have put down the best description

17 you've gotten, correct?

18      A.   The description I wrote in 1992, the initial

19 description was a black male.

20      Q.   Okay.

21      A.   It quickly becomes apparent they mean black

22 Hispanics.

23      Q.   Why didn't you write that down?

24      A.   Number one, the initial description I had was

25 what they said.  I can't change what they said,

1  Counselor.

2       Q.   Have you read the rest of the report, the other

3  parts of this report, the other interviews that they

4  gave to other sergeants?

5       A.   Not all of them, no, sir.  It does me no good

6  to read what one witness tells another sergeant.

7       Q.   Well, would it do you any good to see if the

8  witness you interviewed tells the same story to the next

9  sergeant that interviews them?

10      A.   I talked to the sergeants and talked to -- the

11 story was consistent.  The story never changed.  They

12 lied about being dope dealers, yes, initially to me.  I

13 don't have a doubt in my mind.  I knew that walking in

14 and told them they were lying.  I understood that

15 though.  They were scared for Angelo.  They didn't want

16 to cause any harm to their baby.

17           MR. CORNELIUS:  I object to being

18 nonresponsive.

19           THE COURT:  That will be sustained.

20           Just answer the question, sir.

21           THE WITNESS:  Yes.

22      Q.   (By Mr. Cornelius) Did you read in any other

23 report where they described --

24           MS. TISE:  Object to any reference to

25 something in another part of the report that wasn't

1  completed by this officer.  It's hearsay.

2              THE COURT:  Okay.  Hearsay is sustained,

3  but I'll let you finish your question.  What was your

4  question?

5     Q.  (By Mr. Cornelius) Did you read any other

6  report where these same two witnesses that you talked to

7  described their attackers as being anything other than

8  two black males?

9              THE COURT:  That will be sustained as

10 hearsay.

11    Q.  (By Mr. Cornelius) Will you agree with me that

12 whatever they've said has been documented in this

13 report, right?

14    A.  Correct.

15    Q.  And if you thought they meant they were black

16 Hispanics, you could have written that in your report,

17 right?

18    A.  At the initial time I knew what I was looking

19 for.  I knew we would have to have something in those

20 initial hours --

21             MR. CORNELIUS:  Objection.  Nonresponsive,

22 Your Honor.

23             THE COURT:  I'll give him a little leeway

24 here.  You've asked an open question.  So, why don't you

25 rephrase your question and we'll try to hold him to just

1    answering that question.

2         Q.   (By Mr. Cornelius) Did you ever write in your

3    report anything that indicated that the two alleged

4    victims were saying their assailants were black

5    Hispanics?

6         A.   Under speech description, a foreign accent.

7         Q.   Okay.  Did you ever write that they were black

8    Hispanics, ever in any report you wrote?

9         A.   No.

10        Q.   Okay.  So, at the end of your initial work on

11   this case, what was recorded -- you said you spent the

12   next day typing the report?

13        A.   Yes, sir.

14        Q.   What was recorded for description, a physical

15   description were two black males, right?

16        A.   With foreign accents, yes.

17        Q.   Okay.  I know you want --

18             MR. CORNELIUS:  Objection.  Nonresponsive,

19   Judge.  I asked him for a specific physical description,

20   not how they spoke.  So, I object to him adding that.

21             MS. TISE:  I'm going to object to speaking

22   objections.

23             THE COURT:  Why don't you both approach the

24   bench.

25             (At the Bench, on the record)

1        THE COURT:  I don't know if that was part

2   of his description or not.  If it's nonresponsive, just

3   object as nonresponsive.  I don't want speaking

4   objections from either side.  And I don't have the

5   stuff -- I don't have his report in front me to be able

6   to see how he described them.  So, I don't know.

7        MR. CORNELIUS:  What I'm saying is physical

8   description doesn't have anything to do with how

9   somebody talks.  No.  I asked -- read it back.  I asked

10  specifically what the physical description was.

11  Physical.  And he added the way they talked.  And so, I

12  objected to it as being nonresponsive.

13        THE COURT:  Well, I don't know if that was

14  part of his physical description, a one-line

15  description, but it's close enough.  And so, let's just

16  move on from this area.  I think you've made your point.

17        (Open court, defendant and jury present)

18      Q.   (By Mr. Cornelius) Can you show me in your

19  report where you recorded anything about the language,

20  the accent?

21      A.   She stated the suspects used English, but spoke

22  with an unknown foreign accent.  That's one place in my

23  narrative.

24      Q.   Can you tell me where that is, please?

25      A.   In my narrative.  Oh, that's the patrol

1   narrative.  Excuse me.  The initial narrative.  Other

2   than on the suspect screen itself under speech --

3                MR. CORNELIUS:  That's nonresponsive.

4        Q.   (By Mr. Cornelius) I'm asking about what you

5   wrote.

6        A.   I entered the suspect screen, Counselor.

7        Q.   Okay.  Where is that in the report?

8        A.   Under "suspects."

9        Q.   Do you have a page number?

10       A.   Suspect screen.  It should be about the second

11  or third page in the report.

12       Q.   Does it have a page number?

13       A.   2.004.

14       Q.   Are you saying, Sergeant, that you filled in

15  the scriptors before Devereaux and Carpenter ever made

16  the scene?

17       A.   Negative, but they do the report.  I go in

18  and -- the initial report is made, their supplement was

19  put in as the original at that time, and then we come

20  back and put our information in there.

21       Q.   When?

22       A.   When I start typing the next morning.  And I

23  can go in and modify it or whatever.  And I make sure

24  the suspect information is put into the suspect screens.

25       Q.   Okay.  Well, did you look at Devereaux and

1    Carpenter's report?

2         A.    Yes.

3         Q.    Okay.  And didn't they say the people spoke

4    English?

5         A.    With a foreign accent.  That's the part I read

6    that's in their report.

7         Q.    Okay.  So, you're not saying they spoke Spanish

8    with a foreign accent.  They spoke English with a

9    foreign accent.  And that's based on what Devereaux and

10   Carpenter wrote?

11        A.    I was just saying they spoke with a foreign

12   accent.  And I have to interpret that by what the

13   witnesses told me.  A foreign accent to Diana Garcia, a

14   Mexican-American heritage, Spanish-speaking woman.

15        Q.    And you interviewed her in English, right?

16        A.    Briefly, yes.  She was -- she had just been

17   sexually assaulted and her child kidnapped.  She was

18   very emotional.

19                   MR. CORNELIUS:  Objection.

20                   THE COURT:  That will be sustained.

21        Q.    (By Mr. Cornelius) Okay.  All right.  Did you

22   get a description of these masks that these men

23   supposedly wore?

24        A.    No, I did not.  I don't recall.

25        Q.    Not even a color?

1       A.   Off the top of my head, I think it was

2   dark-colored, but I don't recall 21 years later.

3       Q.   Okay.  But you have a report, right?  I mean,

4   did you put in the report what you were told?

5            MS. TISE:  I will object because it calls

6   for hearsay.

7            THE COURT:  That's going to be overruled.

8       Q.   (By Mr. Cornelius) Anything in your report

9   about the color of the mask?

10      A.   No.  I sent Diana to the hospital with the

11  patrol unit to have a sexual assault kit.  I sent Arturo

12  downtown to be interviewed by a Spanish-speaking

13  officer.  I got preliminary information at the scene.  I

14  knew they weren't being truthful.  I sent them to be

15  interviewed in detail downtown.

16      Q.   Okay.  After you did all of that, did you go

17  back and put in your report anything about the

18  description of the masks or their clothing?

19      A.   No.

20      Q.   Okay.  So, again, the only physical description

21  we have of the two assailants is two black males; that's

22  it, right?  No clothing, no height, no weight?

23            MS. TISE:  Objection.  That's a compound

24  question.

25            MR. CORNELIUS:  I will ask them one at a

1    time.

2                    THE COURT:   Rephrase it.

3        Q.   (By Mr. Cornelius) Did you get any clothing?

4        A.   No.

5        Q.   Height?

6        A.   No.

7        Q.   Weight?

8        A.   No.

9        Q.   Age?

10       A.   No.   Just speech.

11       Q.   Okay.   Did you make an attempt to determine if

12   either of the people that were allegedly robbed or

13   sexually assaulted were employed?

14       A.   They were not.

15       Q.   Okay.   Did that factor in your thinking about

16   this may have been involving drugs for some reason or

17   another?

18       A.   Yes.

19       Q.   Did you interview the neighbors -- without

20   telling what they said, did you interview neighbors?

21       A.   Yes, some of them.

22       Q.   Did that factor into your belief that this

23   involved drugs?

24       A.   It was an accumulation, yes.

25       Q.   And I noticed that you put in the report that

1    you found it unusual that both of them were wearing gold

2    necklaces.  And I mean Diana and Arturo.  It's on Page

3    2.0 -- it's right in the middle.

4         A.   Yes.

5         Q.   And you described Arturo's necklace as being a

6    rope chain, nugget cross, right?

7         A.   Yes.

8         Q.   And Diana, two small necklaces with a cross and

9    medallion?

10        A.   Yes.

11        Q.   And you've listed the other things in your

12   report that were not stolen, right?

13        A.   Yes.  Like TV and VHS, VCR, or whatever it was.

14        Q.   Yeah.

15        A.   Yes.

16        Q.   What about the pistol?  That obviously wasn't

17   stolen either because there was a picture of it,

18   correct?

19        A.   Correct.

20        Q.   I don't know if you can see that far.  Is that

21   a --

22              MR. CORNELIUS:  Can I approach the witness,

23   Judge?

24              THE COURT:  Yes.

25        Q.   (By Mr. Cornelius) Is that a nickel-plated .25

1  automatic?

2      A.   Oh, no.  I wouldn't call it nickel.  That's

3  a --

4      Q.   Stainless steel?

5      A.   No.  It's a Saturday night special.  It's a

6  chrome, is what I would describe it.

7      Q.   Chrome.  A chrome-plated .25 automatic?

8      A.   I think so, yes, sir.

9      Q.   And it was where?  In a drawer?

10     A.   Yes.

11     Q.   And I think you testified on direct it looked

12  like whoever ransacked that place was looking for

13  something?

14     A.   Correct.

15         MR. CORNELIUS:  We pass the witness at this

16  time, Judge.

17         THE COURT:  What says the State?

18         MS. TISE:  A few follow-up questions.

19         THE COURT:  Very good.  Please proceed.

20              **REDIRECT EXAMINATION**

21  **BY MS. TISE:**

22     Q.   Sergeant Elliott, you said from the get-go you

23  don't do any of the follow-up investigation in the case?

24     A.   Correct.

25     Q.   You did not go down to the station and

1    interview Diana and Arturo in detail?

2         A.   No.

3         Q.   You did not participate in any of the follow-up

4    interviews of any of the individuals who were

5    questioned?

6         A.   No.

7         Q.   You didn't even really know who ultimately they

8    had talked to until reviewing this report at a later

9    date?

10        A.   Correct.

11        Q.   Because you weren't -- I'm sure you had other

12   cases?

13        A.   I caught one a couple of nights later actually,

14   yes.

15        Q.   So, as far as -- before taking Diana to the

16   hospital to do a rape kit and before trying to get the

17   posse out to try to find this little boy, did you have

18   time to sit down and talk to Diana and have her spell

19   out a detailed description of these suspects?

20        A.   No.

21        Q.   Okay.  You're trying to get something basic out

22   there to get things rolling?

23        A.   I wanted -- I was looking for something that I

24   could give to the patrol units to look for.

25        Q.   Right.

1      A.   The description of the little boy, a general

2  description of what they could look for, suspects

3  driving down the street, etcetera.  Just something

4  generally to put out to locate the child.  Nothing to do

5  with a follow-up identification on the suspects.

6      Q.   And it seems to me from the entire report of

7  this incident that it was fairly clear to you officers

8  what Diana was referring to when she mentioned that the

9  individuals had dark skin or were black and a foreign

10  accent?

11      A.   Yes.

12      Q.   Okay.  Now, you as a police officer who worked

13  with all kinds of communities in the city of Houston,

14  black, Hispanics, Asian, white communities, you know

15  what that means, don't you?

16      A.   Yes.

17      Q.   And I want to talk to the jury -- you tried to

18  explain it a little earlier, but I'd like to give you

19  the opportunity to explain it for the people on the jury

20  because not everyone is familiar with that cultural

21  description.

22           So, can you tell us when a Hispanic

23  individual describes someone who is black, are they --

24  is your mind automatically going to an African-American

25  person?

1          MR. CORNELIUS:  Object to the form of the

2  question, Judge.  That's just an opinion on his part and

3  not related to these facts.

4          THE COURT:  Go ahead.

5          MS. TISE:  Okay.

6          THE COURT:  No.  I'm saying, do you have a

7  response?

8          MS. TISE:  I think it's invited by

9  counsel's questions and I'd like to explore this a

10  little bit.

11          MR. CORNELIUS:  Can I respond, Judge?

12          THE COURT:  Go ahead, briefly.

13          MR. CORNELIUS:  My questions were all

14  specific to this case, not what he generally thinks

15  about other people or how people think and things like

16  that, but specifically what was done in this case, is

17  what I was asking.

18          THE COURT:  I think it calls for

19  speculation on the part of this officer.  If you want to

20  develop a little bit more of his experience, I will let

21  you do that, Ms. Tise.

22          MS. TISE:  I'd like to do that, Judge.

23  Thank you.

24     Q.   (By Ms. Tise) In your experience, when an

25  individual in the black community uses the word "black,"

```
1    does that necessarily mean an individual who is

2    African-American?

3         A.   In the black community or --

4         Q.   In the Hispanic community?

5         A.   In the Hispanic community, no.

6         Q.   Okay.  And in your experience, having worked

7    cases in the Hispanics community, what does that term

8    include?

9         A.   People from Columbia have a large group of

10   visually black people.  People from the Islands, the

11   Caribbean speak Spanish, they speak French, they speak

12   Creole, but they look black at a distance.  And it's as

13   different language-wise as my southern drawl is to a

14   Vermonter in upstate Vermont speaking Yankee to me as

15   when a Spanish person from Mexico hears a whole foreign

16   language from someone who's from Dominica, Cuba,

17   Columbia, etcetera.

18              And the people look different to them.

19   Culturally, a Hispanic person covers, to me -- I mean,

20   really, they speak a language, but it's just like

21   there's many forms of Spanish as there are many forms of

22   English.

23        Q.   In your mind when you left that scene that

24   night, were you thinking that you were looking for two

25   African-American suspects or two dark-complected
```

1  Hispanic individuals from another country like Dominica

2  or Puerto Rico?

3       A.   I thought I was looking for a Caribbean

4  Islander, black Hispanic, or Colombian of that nature

5  Hispanic black.

6       Q.   And when you were talking to Diana and getting

7  description at the scene that night, were you nailing it

8  down as to:  And this person number one looked like

9  this, and person number two looked like that, and person

10 number one was wearing this, and person --

11      A.   I could not do that at the scene.  She had just

12 been sexually assaulted.  The violation that went on

13 with that, plus the fact that her 7-year-old child was

14 taken, I needed to remove her from the scene and send

15 her to the hospital and then have her interviewed in a

16 place removed from where the incident occurred, which

17 was the office.  And I had someone else do that.

18      Q.   So, when you talk about descriptions of the

19 individuals out there, you're talking very general?

20      A.   Correct.

21      Q.   You are not even necessarily saying person one

22 was dark-complected and person two was also

23 dark-complected, are you?

24      A.   No.

25      Q.   Because you didn't get down to that kind of

1    nuts and bolts with her?

2        A.   Correct.

3        Q.   Do you even know if Diana got a good look at

4    both of those individuals?

5        A.   I understood she did not get a good look.  That

6    was something else.  She hadn't seen them very well to

7    relay to me.  I know sometimes when you get calmed down,

8    you can give a better description, but at that point,

9    she was so upset that I couldn't get anything from her

10   there at the scene.  And I didn't try.

11       Q.   Okay.  And that's understandable.  I mean, are

12   you -- do you know as you sit here today whether she got

13   a good look at both of those people or one of them or

14   did you even get down to that with her?

15       A.   I knew she got a look at one of them in a mask

16   and never saw the other one.

17       Q.   Okay.  And that was basically based on her

18   statements to you from the get-go, right?

19       A.   Correct.

20       Q.   There were some things taken from their

21   apartment, were there not?

22       A.   Yes.

23       Q.   And, specifically, do you remember what those

24   things were?

25       A.   A wallet with cash and a necklace or a bracelet

1  worth about -- a gold bracelet worth about four grand.

2       Q.   Okay.  And you were asked on cross-examination

3  about your opinion about whether the complainants were

4  telling you the truth as a blanket, general statement.

5  I want to ask you if you felt like that was about

6  something specific or about everything that they said?

7       A.   Other than the reason why this occurred, they

8  were truthful about everything.  All the physical

9  evidence, all the statements, and the motions matched

10  everything that I saw there at the scene, expect they

11  weren't admitting they had some dope dealings.  And I

12  knew that already, so that wasn't that big of a deal

13  with me.  The jewelry that was there seemed to indicate

14  that even, the religious stuff that was left was

15  significant because a lot of times, you know, it's bad

16  karma or bad juju or bad vibes to steal religious stuff.

17  So, they leave the religious stuff alone.  I understood

18  all of that.

19       Q.   And you have had a lot of experience with this

20  type of crime?

21       A.   Yes.

22            MS. TISE:  I pass the witness.

23            THE COURT:  Mr. Cornelius, do you have

24  anything further?

25            MR. CORNELIUS:  Not at this time, Judge,

1  but I will need to have the witness on-call.

2           THE COURT:  Subject to recall.

3           Is this witness then excused subject to

4  recall?

5           MS. TISE:  Yes, Judge.

6           THE COURT:  Okay.  You may step down,

7  subject to recall.

8           Call your next, please.

9           MS. TISE:  The State would call Diana

10  Garcia.

11          THE BAILIFF:  The witness has not been

12  sworn, Judge.

13          THE COURT:  Please step right over here.

14          (Witness sworn)

15          THE COURT:  Ms. Garcia, please keep your

16  voice up and speak into the microphone.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  You may proceed, Ms. Tise.

19          MS. TISE:  Thank you, Judge.

20                   **DIANA GARCIA,**

21  having been first duly sworn, testified as follows:

22               **DIRECT EXAMINATION**

23  **BY MS. TISE:**

24      Q.   Good afternoon.

25      A.   Good afternoon.

```
 1        Q.   Ma'am, will you please introduce yourself to
 2   the ladies and gentlemen of the jury?
 3        A.   My name is Diana Garcia.
 4        Q.   And, Ms. Garcia, how old are you?
 5        A.   Sixty.
 6        Q.   Okay.  And are you married?
 7        A.   I have a common-law husband.
 8        Q.   Okay.  And what's your common-law husband's
 9   name?
10        A.   Jose Arturo Rodriguez.
11        Q.   Okay.  And we call him Arturo.  Is that okay?
12        A.   Yes.
13        Q.   Is that what you call him?
14        A.   Yes.
15        Q.   And you and Arturo are still together, are you
16   not?
17        A.   Yes.
18        Q.   And I want to talk to you a little bit about
19   how y'all got to know each other.  Okay?
20        A.   Okay.
21        Q.   Are you nervous?
22        A.   Yes.
23        Q.   Okay.  We have talked many times, you and I, to
24   get ready for this case, have we not?
25        A.   Yes.
```

1    Q.   Okay.  And we have talked about the importance

2 of you coming here and just telling your story, correct?

3    A.   Yes.

4    Q.   And we have talked about the fact that some of

5 the things in your background are things that you are

6 not proud of?

7    A.   That's true.

8    Q.   Do you remember what I told you about those

9 things?

10    A.   Yes, ma'am.

11    Q.   What did I tell you?

12    A.   Well, I have made some mistakes.  If I could

13 correct them, I would, but it's too late now.

14    Q.   So, you are here to tell the truth?

15    A.   Yes, ma'am.

16    Q.   And you are here to talk about your mistakes,

17 correct?

18    A.   Yes, ma'am.

19    Q.   And this jury will decide what they think and

20 what they believe.  Okay?

21    A.   Yes, ma'am.

22    Q.   I want to talk to you about how you and Arturo

23 met and what was going on in your life at that time.

24         First of all, when did you first get

25 married to your first husband?

1    A.    April 13th, 1970.

2    Q.    And how old were you then?

3    A.    Sixteen going on seventeen.

4    Q.    Okay.  And where did y'all get married?

5    A.    In Rosenberg.

6    Q.    And what was his name?

7    A.    Angelo Garcia, Jr. -- Angelo Garcia, Sr.

8    Q.    Okay.  Angelo Garcia, Sr. and you stayed

9    married for quite some time, did you not?

10    A.    Yes, ma'am.

11    Q.    Where did y'all live mostly?

12    A.    In Stafford.

13    Q.    Okay.  And you and he had some children, did

14    you not?

15    A.    Yes, ma'am.

16    Q.    Can you tell me the names of your children?

17    A.    My daughter's name is Rosalinda Garcia.

18    Q.    Okay.

19    A.    My second son is James Garcia.

20    Q.    Okay.

21    A.    And my third son is Angelo Garcia, Jr.

22    Q.    Okay.  And how old are your children, your

23    older children?

24    A.    Rosie is 40, James is 38, Angelo would have

25    been 27.

1    Q.   Okay.  And Rosie is here with you today, is she

2    not?

3    A.   Yes, ma'am.

4    Q.   She's here in the courtroom?

5    A.   Yes, ma'am.

6    Q.   And your son, where is he?

7    A.   He is working.

8    Q.   Okay.  And you had quite a gap there.  You had

9    some kids and then you had a surprise, didn't you?

10   A.   Thirteen years.

11   Q.   Thirteen years difference?

12              THE COURT:  Hang on just a second.  Let's

13   take a break.  I'm getting some water for you, ma'am.

14   Sorry.  I want to make sure they can pay attention.  One

15   second.  Do you need a break?

16              JUROR:  I'm fine.  If you can give me a

17   minute.

18              THE COURT:  We'll get you some water, too.

19   All right?  It's on the way.

20              Proceed, Ms. Tise.

21   Q.   (By Ms. Tise) So, your two older children and

22   then later on Angelo came along?

23   A.   Yes, ma'am.

24   Q.   Okay.  At some point in time did you have a

25   relationship with someone else besides your husband

1   Angelo, Sr.?

2        A.   Yes, ma'am.

3        Q.   And is that the person that we have been

4   talking about, Arturo?

5        A.   Yes, ma'am.

6        Q.   All right.   And after you met Arturo, what

7   happened?   I mean, what did you -- what happened to your

8   marriage?

9        A.   Excuse me.   Could you repeat the --

10        Q.   Sure.   What happened to your marriage with

11   Angelo, Sr.?

12        A.   I left him to live with Arturo.

13        Q.   Okay.   Were you in love with Arturo?

14        A.   Yes, ma'am.

15        Q.   Okay.   And did you ultimately move in with

16   Arturo?

17        A.   Yes, ma'am.

18        Q.   Okay.   At that time, were your two oldest

19   children grown?

20        A.   Yes, ma'am.

21        Q.   Okay.   Who did Angelo, Jr. live with?

22        A.   Me.

23        Q.   So, he moved in with you and with Arturo?

24        A.   Yes, ma'am.

25        Q.   After you met Arturo, did you find out that he

```
 1   did some things that were not things that you did?

 2        A.   Yes, ma'am.

 3        Q.   What kind of things did Arturo do that weren't

 4   things that you were familiar with at first?

 5        A.   Sell drugs.

 6        Q.   Okay.  And specifically what kind of drugs?

 7        A.   Cocaine.

 8        Q.   Okay.  Had you been involved in anything with

 9   drugs prior to falling in love with Arturo?

10        A.   No, ma'am.

11        Q.   Okay.  Had you used drugs?

12        A.   No, ma'am.

13        Q.   Did you even drink?

14        A.   No, ma'am.

15        Q.   Did Arturo tell you he used drugs or did you

16   find out some other way?

17        A.   I found out some other way.

18        Q.   How did you find out?

19        A.   His attitude.

20        Q.   Okay.  What did you notice about his attitude?

21        A.   He wasn't the same person.

22        Q.   Did he use drugs in front of you?

23        A.   No, ma'am, never.

24        Q.   But was it something that became an issue

25   between the two of you?
```

1          A.    Could you repeat that?

2          Q.    Was it something that became an issue because

3     he was different when he used drugs?

4          A.    Yes, ma'am.

5          Q.    Okay.  And ultimately it was something that he

6     was upfront with you about?

7          A.    Yes, ma'am.

8          Q.    Okay.  So, when you first got with Arturo, was

9     he working?

10         A.    Yes, ma'am.

11         Q.    Were you working?

12         A.    No, ma'am.

13         Q.    All right.  What was Arturo doing when y'all

14    first got together?

15         A.    He was working in a radiator shop.

16         Q.    All right.  What happened with that job?

17         A.    He stayed with it for quite a while and then he

18    was laid off.

19         Q.    All right.  After being laid off, did y'all

20    have some trouble with money?

21         A.    Yes, ma'am.

22         Q.    At what point after you were married did he

23    start selling drugs?  Or after you -- you said he was

24    your common-law husband.  So, you weren't ever

25    technically formally married?

1        A.   No.

2        Q.   But you are still with him today?

3        A.   Yes, ma'am.

4        Q.   At what point after your relationship began and

5   you moved in with Arturo did you find out about the drug

6   dealing?

7        A.   Quite a while.

8        Q.   Okay.  And at first, what did you think?

9        A.   I didn't like the idea.

10       Q.   Okay.  But, eventually, you started helping

11  him, didn't you?

12       A.   Yes, ma'am.

13       Q.   Okay.  And how would you help him?

14       A.   Selling it.

15       Q.   All right.  And was this out on the street or

16  from your apartment?

17       A.   From my apartment.

18       Q.   How long did that go on?

19       A.   Not too long.

20       Q.   All right.  Do you know where Arturo got his

21  drugs?

22       A.   Yes, ma'am.

23       Q.   And how do you know?

24       A.   He told me.

25       Q.   All right.  And did you ever see anyone bring

 1   drugs to him or come to your house with drugs?

 2      A.   Yes, ma'am.

 3      Q.   And can you tell me the name of the person who

 4   supplied Arturo with the drugs that y'all sold?

 5      A.   Chico.

 6      Q.   Okay.  Chico.  When you say Chico, is Chico the

 7   person that you know as Obel Cruz-Garcia?

 8      A.   Yes, ma'am.

 9      Q.   Was that the name that y'all called him back

10   then?

11      A.   Yes, ma'am.

12      Q.   Okay.  How old were you at this time when this

13   was going on in '92?

14      A.   About 30, 32, 34.

15      Q.   Where were y'all living?

16      A.   Fairway.

17      Q.   Okay.  An apartment on Fairway?

18      A.   Yes.

19      Q.   Okay.  Where did you live before you lived in

20   the apartment on Fairway?

21      A.   Winfree or -- I get them mixed up.  It's either

22   Fairway or Winfree.

23      Q.   Okay.  So, you lived in one place first.  Okay?

24      A.   And another place second.

25      Q.   All right.  And were y'all selling drugs in the

1  place that you lived -- the first place?

2      A.   Yes, ma'am.

3      Q.   And while y'all were selling drugs at that

4  first place, before you moved to the second place, the

5  second place being where Angelo was abducted, let's talk

6  about the first place.  Was it close to the second place

7  where Angelo was abducted?

8      A.   Yes, ma'am.

9      Q.   Okay.  And did something happened while y'all

10  lived in that first place -- was it a house or an

11  apartment?

12      A.   Apartment.

13      Q.   Okay.  So, that first apartment that y'all

14  lived in, you said you thought it was Winfree?

15      A.   I can't remember.

16      Q.   It's okay.  It's okay.  That first apartment

17  where y'all were living and selling drugs, did something

18  bad happen?

19      A.   Yes, ma'am.

20      Q.   And do you remember what that was?

21      A.   They broke into our apartment.

22      Q.   Do you know at this time as you sit here who

23  broke into your apartment on Winfree --

24      A.   No, ma'am.

25      Q.   -- the first place?

1          Okay.  And do you know why -- or do you
2    have a thought as to why your apartment got broken into
3    on Winfree?
4         A.   Yes, ma'am.
5         Q.   Why?
6         A.   Because we were selling drugs and they thought
7    we had a lot of money.
8         Q.   When you got back to your apartment after the
9    break-in, did it look like the people who broke in were
10   looking for something?
11        A.   Yes, ma'am.
12        Q.   And did they take anything?
13        A.   I don't remember.  I'm sorry.
14        Q.   And you reported that incident to the police,
15   right?
16        A.   No, ma'am.
17        Q.   No?  Okay.  Why not?
18        A.   We just didn't.
19        Q.   Was it because of the drug dealing?
20        A.   Yes, ma'am.
21        Q.   And you knew whoever broke in was looking for
22   drugs?
23        A.   Yes, ma'am.
24        Q.   After that happened, did y'all move to the
25   second apartment, the one where Angelo was abducted on

1  Fairway?

2       A.   Yes, ma'am.

3       Q.   Okay.  Did y'all move because of the burglary

4  that happened?

5       A.   Yes, ma'am.

6       Q.   And what was happening between you and Arturo

7  about the drug dealing?  Was it something that y'all

8  we're talking about more and more?

9       A.   We wanted to stop --

10              THE REPORTER:  I'm sorry?

11              THE WITNESS:  We wanted to stop.

12      Q.   (By Ms. Tise) All right.  And was there another

13  reason that you were concerned about the dealing on

14  Fairway?

15      A.   I don't think so.

16      Q.   Do you remember a vehicle that had been parked

17  across the street?

18      A.   Yes, ma'am.  It was parked in the stadium up

19  ahead.

20      Q.   Over where that football field is across the

21  street?

22      A.   It had been parked there for about two weeks.

23      Q.   All right.  And what were you and Arturo

24  thinking about that vehicle?

25      A.   We thought it was somebody that wanted to stake

1   us out or...

2        Q.   Like a police stakeout of some sort?

3        A.   Uh-huh.

4        Q.   Did that concern y'all?

5        A.   Yes, ma'am.

6        Q.   After moving to Fairway, y'all continued to

7   deal for a while, correct?

8        A.   Yes, ma'am.

9        Q.   Okay.  But eventually you and Arturo decided to

10  stop?

11       A.   Yes, ma'am.

12       Q.   And did y'all do that?

13       A.   Yes, ma'am.

14       Q.   At some point when you were on Fairway do you

15  remember Chico bringing some drugs over even though you

16  and Arturo had said you wanted to stop dealing?

17       A.   He would stop by the house, but Arturo was the

18  one that made the conversation with him.

19       Q.   Okay.  So, you didn't really talk to him?

20            Do you remember a time when Arturo made you

21  come back and pick up some drugs that he had left with

22  you on Fairway?

23       A.   Yes, ma'am.

24       Q.   Okay.  And Arturo was mad, wasn't he?

25       A.   Yes, ma'am.

1     Q.    And Chico had brought some drugs over and left

2  them there and y'all didn't want to sell them anymore,

3  right?

4     A.    Right.

5     Q.    And Arturo called him and said:  Come back and

6  get the drugs?

7     A.    He did.

8     Q.    And did Chico do that?

9     A.    I don't remember.

10    Q.    Okay.  How long did that incident happen before

11 Angelo was kidnapped?

12    A.    Two, three weeks.

13    Q.    Okay.  Did y'all continue to see Chico from

14 time to time or did he come by to see Arturo?

15    A.    I don't remember.

16    Q.    When he would come, he was -- he was a friend,

17 wasn't he?

18    A.    Yes, ma'am.

19    Q.    He knew Angelo, Baby Angelo, didn't he?

20    A.    Yes, ma'am.

21    Q.    Okay.  And he would talk to Baby Angelo and

22 talk to you and talk to Arturo, didn't he?

23    A.    Yes, ma'am.

24    Q.    And sometimes he would bring his wife with him,

25 wouldn't he?

```
 1        A.    Yes, ma'am.

 2        Q.    What was her name?

 3        A.    Angelita.

 4        Q.    What kind of relationship did you and Angelita

 5   have?

 6        A.    A good one.

 7        Q.    A good one.

 8              And was she nice to Angelo?

 9        A.    Yes, ma'am.

10        Q.    And y'all would socialize together, wouldn't

11   you?

12        A.    Yes, ma'am.

13        Q.    Sometimes y'all went out to clubs?

14        A.    We got together to eat.

15        Q.    Okay.  During the time that you knew Chico and

16   Angelita and you were selling the drugs for Chico, you

17   helped them get into an apartment?

18        A.    Yes, ma'am.

19        Q.    Can you tell us how that happened?

20        A.    He asked me if I could get them an apartment, a

21   lease on an apartment.  I agreed.

22        Q.    Okay.

23        A.    So, I did.

24        Q.    And why did they need your help getting an

25   apartment?
```

```
 1        A.   I didn't ask.

 2        Q.   Okay.  Were they paying the rent or were you

 3   paying the rent?

 4        A.   They were paying the rent.

 5        Q.   Okay.  Do you remember it being something about

 6   their credit?

 7        A.   So he claimed.

 8        Q.   So, Chico claimed?

 9        A.   Yes.

10        Q.   Okay.  So, he told you it was because they had

11   bad credit.  And so, you actually signed the lease on

12   their apartment, didn't you?

13        A.   Yes, ma'am.

14        Q.   And do you know where that apartment was?

15        A.   I don't know.

16        Q.   What part of town was it?

17        A.   It was far.

18        Q.   Okay.

19        A.   It was far from Houston.

20        Q.   Okay.  Far up --

21             MS. TISE:  May I approach?

22             THE COURT:  Yes.

23        Q.   (By Ms. Tise) I'm going to show you what's been

24   marked as State's Exhibit 42.  This is the apartment

25   lease.  And you actually initialed it down here, did you
```

1    not (indicating)?

2        A.   Yes, ma'am.

3        Q.   Okay.  And does that look like the Humble Tree

4    Apartments on Golden Eagle Drive in Humble?

5        A.   Yes, ma'am.

6        Q.   Okay.  And this is dated April 28th of 1992; is

7    it not?

8        A.   Yes, ma'am.

9        Q.   Okay.

10            MS. TISE:   At this time, I will offer

11   State's Exhibit 42.

12            **(State's Exhibit No. 42 Offered)**

13            MR. CORNELIUS:   Objection as to relevance,

14   Your Honor.

15            THE COURT:   What's the relevance, Ms. Tise?

16            MS. TISE:   Later on the apartment will

17   become relevant to the jury, that specific address.

18            THE COURT:   Okay.  So, are you still

19   objecting?

20            MR. CORNELIUS:   Yes.

21            THE COURT:   I will go ahead and admit it

22   over objection.  State's Exhibit No. 42 is admitted.

23            You may proceed.

24            **(State's Exhibit No. 42 Admitted)**

25       Q.   (By Ms. Tise) You helped them get into an

1  apartment.  You thought they were your friends?

2      A.  Yes, ma'am.

3      Q.  In fact, you thought they were pretty good

4  friends, didn't you?

5      A.  Yes, ma'am.

6      Q.  Do you know where Chico is from?

7      A.  I didn't know at the time, but now I do.

8      Q.  Okay.  Did sometimes he come over and bring

9  some of his friends?

10     A.  He would come with other men, yes.

11     Q.  Okay.  And was one of those men someone by the

12  name of Rudy?

13     A.  Yes, ma'am.

14     Q.  Okay.  And who was Rudy to Chico?

15     A.  He was related to Angelita.

16     Q.  So, he was related to Chico's wife, Angelita?

17     A.  Yes, ma'am.

18     Q.  Okay.  And did he, from what you saw of their

19  relationship, also work for Chico?

20     A.  Yes, ma'am.

21     Q.  Okay.  And did he do what Chico said?

22     A.  Yes, ma'am.

23     Q.  In fact, everybody did what Chico said, didn't

24  they?

25     A.  I guess, yes, ma'am.

1     Q.   He's a pretty strong person, isn't he?

2     A.   Yes, ma'am.

3     Q.   And there were other people besides you and

4 Arturo who worked for Chico, weren't there?

5     A.   Yes, ma'am.

6     Q.   And Rudy was one of them, right?

7     A.   Right.

8     Q.   What about Angelita, did you ever see her using

9 cocaine?

10    A.   No, ma'am.

11    Q.   Okay.  Do you know how involved she was in

12 Chico's business?

13    A.   No, ma'am.

14    Q.   Okay.  Do you have an opinion about whether she

15 was involved in Chico's business?  Did you ever see her

16 do anything?

17    A.   No.  No, ma'am.

18    Q.   I want to show you some pictures of some

19 people.  I've got to show them up there before I show

20 them to you on the screen.

21          Let me show you what's marked as State's

22 Exhibit 83 and ask you if you recognize that person

23 (indicating).

24    A.   Yes, ma'am.

25    Q.   Okay.  I'll show you what's been marked as

1    State's Exhibit No. 85 and ask you if you recognize that

2    person (indicating)?

3         A.   Yes, ma'am.

4         Q.   I'm going to mark this as State's Exhibit 86,

5    and ask if you recognize that person (indicating)?

6         A.   Yes, ma'am.

7         Q.   I'll show you State's Exhibit 87.  Do you

8    recognize that person (indicating)?

9         A.   Yes, ma'am.

10        Q.   And 88.  Do you recognize that person

11   (indicating)?

12        A.   Yes, ma'am.

13        Q.   Okay.  And are these photographs fair and

14   accurate pictures of individuals that you knew back in

15   1992, the way they looked at that time?

16        A.   Yes, ma'am.

17             MS. TISE:  I'm going to offer State's 83

18   and 85 through 88.

19             **(State's Exhibit No. 83 and 85 through 88**

20             **Offered)**

21             MR. CORNELIUS:  Objection as to relevance

22   at this time, Judge.

23             THE COURT:  Can you put on the record who

24   the photographs are allegedly of?

25             MS. TISE:  These are photographs of the

1    defendant at the time.

2              THE COURT:  That's 80-what?

3              MS. TISE:  83 is of the defendant at the

4    time.

5              THE COURT:  Okay.  And 85 through 88?

6              MS. TISE:  85 is the person we're calling

7    Rudy at the time.  86 is Angelita at the time.  88 is

8    Arturo at the time.  And 87 is Diana at the time.

9              THE COURT:  Do you have any other

10   objections other than relevance?

11             MR. CORNELIUS:  No.

12             THE COURT:  They will be admitted over your

13   objection.  State's 83, 85, 86, 87, and 88 are admitted.

14             **(State's Exhibit No. 83 and 85 through 88**

15              **Admitted)**

16       Q.  (By Ms. Tise) If you look at the small screen

17   there beside you, you can see the picture on the screen.

18             Who is that picture of, State's Exhibit 83

19   (indicating)?

20       A.  Chico.

21       Q.  Okay.  The person that you know as Chico?

22       A.  Yes, ma'am.

23       Q.  And is that how he looked in 1992?

24       A.  Yes, ma'am.

25       Q.  Let me show you what's been marked as State's

1   Exhibit 86.  Who is that (indicating)?

2        A.   Angelita.

3        Q.   Is that the person you have been talking about

4   as Chico's wife?

5        A.   Yes, ma'am.

6        Q.   Is that how she looked at that time?

7        A.   Yes, ma'am.

8        Q.   I'm going to show what's been marked as State's

9   Exhibit 85, and ask you who that is (indicating)?

10       A.   Rudy.

11       Q.   Okay.  And is that how he looked back in 1992?

12       A.   Yes, ma'am.

13       Q.   And who is this good-looking lady?

14       A.   That's me.

15       Q.   State's Exhibit 87.  Is that how you looked

16   around 1992 (indicating)?

17       A.   Yes, ma'am.

18       Q.   State's Exhibit 88, who is this (indicating)?

19       A.   Arturo.

20       Q.   And is that how Arturo looked back then?

21       A.   Yes, ma'am.

22       Q.   Do you remember what kind of car Chico drove?

23       A.   I'm bad on cars.

24       Q.   Okay.

25       A.   It was a yellow one.

1      Q.   Okay.

2      A.   A silver one.

3      Q.   All right.  And do you remember him having

4  other cars that he drove as well?

5      A.   Yes, ma'am.

6      Q.   Okay.  And did you go out to Chico's house in

7  Humble or his apartment ever, or did he just come to

8  y'all?

9      A.   One time.

10      Q.   Okay.  One time out to his place.

11           And it was a pretty good ways from you out

12  to Humble?

13      A.   Right.

14      Q.   Diana, were you and Arturo making a lot of

15  money selling drugs?

16      A.   No, ma'am.

17      Q.   Okay.  Were you able to get by with the drug

18  dealing y'all were doing?

19      A.   Yes, ma'am.

20      Q.   And neither one of you had to work, correct?

21      A.   Yes, ma'am.

22      Q.   And Arturo was able to buy a vehicle, wasn't

23  he?

24      A.   Yes.

25      Q.   When y'all stopped selling, y'all were having a

1    little trouble making those payments, though, weren't

2    you?

3          A.   Yes, ma'am.

4          Q.   How did it work when Chico would bring drugs

5    for y'all to sell?  What was the arrangement?

6          A.   I don't know.  He would deal with Jose, with

7    Arturo.

8          Q.   Okay.  And your involvement was that you would

9    sometimes be the one to do the transaction when people

10   would come?

11         A.   Yes, ma'am.

12         Q.   Did you know most of the people you dealt with?

13         A.   Yes, ma'am.

14         Q.   Okay.  Had a group of people that were fairly

15   regular?

16         A.   Yes, ma'am.

17         Q.   Okay.  I want to talk to you about the night of

18   September 30th, 1992.  And I want you to tell us a

19   little bit about what was going on in your household

20   that day.

21         A.   The neighbors had made Baby Angelo a picnic

22   table.  Baby Angelo told me his friends were making him

23   a picnic table and he wanted to make his friends some

24   tortillas.

25         Q.   Okay.

1    A.   Arturo and his brother were outside with the

2 neighbors.  Arturo told me Chico came by.  I did not see

3 him, but he told me he had come by.

4    Q.   Okay.  So, did you make the tortillas?

5    A.   Yes, ma'am.

6    Q.   Then what happened?

7         (Brief pause)

8    Q.   Was it a school day that day?

9    A.   Yes, ma'am.

10   Q.   And how old was Angelo, your son?

11   A.   He was 6 years old.  He was going to be 7 in

12 December of that year.

13   Q.   Okay.  And was he going to school?

14   A.   Yes, ma'am.

15   Q.   What grade was he in?

16   A.   First grade.

17   Q.   Where was he going to school?

18   A.   Very close by.  I can't remember the name of

19 the school.

20   Q.   So, do you remember when he came in for the

21 evening?

22   A.   Yes, ma'am.

23   Q.   And what was going on?

24   A.   He was very excited.

25   Q.   About what?

```
 1        A.    About the picnic table --

 2        Q.    Okay.

 3        A.    -- and his friends.

 4              And then we came inside.  I was tired.  I

 5   went to bed.  He followed me.  He said he wanted to

 6   sleep in the same room where we were at.

 7        Q.    Okay.  Where did he usually sleep?

 8        A.    In the sofa bed.

 9        Q.    Okay.  So, that night he wanted to sleep in

10   y'all's room?

11        A.    Yes, ma'am.

12        Q.    So, what did you do?

13        A.    I put him right next to the bed.

14        Q.    Okay.

15        A.    He went to sleep.  He got his school clothes

16   and his lunch bag ready for the following day.

17        Q.    Do you remember what he was wearing when he

18   went to sleep that night?

19        A.    Yes, ma'am.

20        Q.    What was he wearing?

21        A.    A little outfit -- I'm sorry.

22              THE COURT:  Do you want to take a break?

23   Let's take a 10-minute break.  We'll be back a few

24   minutes after 3:00.

25              I want to remind the jurors that you should
```

1  not talk amongst yourselves or with anyone else on any

2  subject connected with the trial or express any opinion

3  thereof until the end of the trial.  We'll be back

4  shortly.

5                THE BAILIFF:  All rise for the jury.

6                (Recess)

7                (Open court, defendant not present, no

8                 jury)

9                THE COURT:  Both sides ready?

10                MS. TISE:  Ready.

11                THE COURT:  Bring out the defendant.

12  Please bring in the jury.

13                THE BAILIFF:  All rise.

14                (Open court, defendant and jury present)

15                THE COURT:  Please be seated.

16                We're ready to proceed with Diana Garcia's

17  testimony.

18                Ms. Tise, you may proceed.

19      Q.   (By Ms. Tise) Ms. Garcia, we were talking at

20  the break about the clothes that Angelo Garcia, Jr. wore

21  to bed that night.

22      A.   He was wearing a t-shirt and some shorts,

23  Batman shorts.

24      Q.   Batman shorts.  Did he like Batman?

25      A.   Spiderman, Batman, Ninja Turtles, yes, ma'am.

1    Q.   Okay.  And do you remember about what time he
2  went to bed?  If you don't, that's okay.
3    A.   No, ma'am.
4    Q.   Okay.  Do you remember about when you went to
5  bed?  Did you go to bed at the same time as Angelo or
6  later?
7    A.   We went to bed at the same time, me and him.
8    Q.   Okay.  And he was sleeping on that little
9  pallet you made for him on the floor?
10   A.   Yes, ma'am.
11   Q.   Did Arturo go to bed at the same time?
12   A.   Later, a little bit later.
13   Q.   Okay.  And when he came to bed, were you still
14  awake?
15   A.   No, ma'am.
16   Q.   Do you remember at some point the TV being on
17  in your bedroom?
18   A.   Yes.  Yes, ma'am.
19   Q.   And that TV in your bedroom, did y'all leave it
20  on a lot when you went to sleep at night?
21   A.   It had an alarm and you could set it at 20
22  minutes, 30 minutes to an hour and it would turn off by
23  itself.
24   Q.   And did you often set that and just let the TV
25  go off?

1      A.    By itself, yes, ma'am.

2      Q.    Was that TV on that night when Arturo went to

3 bed?

4      A.    Yes, ma'am.

5      Q.    Did y'all keep any lights on in your apartment?

6      A.    I don't remember.

7      Q.    Okay.  At some point during the night when you

8 were sleeping, something happened.  What happened?

9      A.    A big bang came inside, like if they had hit

10 something real hard.

11      Q.    And where was it coming from?

12      A.    The living room.

13      Q.    All right.  And did it sound like the door?

14      A.    Yes.

15      Q.    Okay.  Did that wake you up?

16      A.    Yes, ma'am.

17      Q.    What happened after you heard that big bang?

18      A.    Arturo started walking towards the living room

19 and he started walking back.

20      Q.    Okay.  What do you mean by that?

21      A.    He got up from the bed and walked towards the

22 living room.

23      Q.    Then he started walking back?

24      A.    Backwards.

25      Q.    Okay.  So --

```
 1              MS. TISE:  If I may, Judge?
 2              THE COURT:  Yes, you may.
 3       Q.   (By Ms. Tise) He was walking frontward towards
 4  the living room door?
 5       A.   Yes, ma'am.
 6       Q.   And then you saw him going backwards?
 7       A.   Yes, ma'am.
 8       Q.   Did he make it out of the living -- the door to
 9  the living room?
10       A.   No, ma'am.
11       Q.   Okay.  And did you see why he was going
12  backwards?
13       A.   There was a gun pointed at him.
14       Q.   Okay.  And did you see the man holding the gun?
15       A.   A big man.
16       Q.   Okay.  When you say "big," do you mean tall?
17       A.   Very tall.
18       Q.   And do you mean big also in the shoulders?
19       A.   Yes, ma'am.
20       Q.   Okay.  At that point in time, was he the only
21  man that you saw other than Arturo?
22       A.   Yes, ma'am.
23       Q.   Okay.  This big man, you said, had a gun.  Do
24  you remember anything about the gun?
25       A.   To me it was just a gun.
```

1    Q.   A handgun?

2    A.   Yes, ma'am.

3    Q.   And do you remember what the man was wearing?

4    A.   He was wearing a long-sleeved shirt.  I could

5  see the color of his skin because he had long arms.

6    Q.   Okay.  Some of his skin was showing from his

7  shirt?

8    A.   Yes, ma'am.

9    Q.   Okay.  And --

10   A.   He was wearing a mask.

11   Q.   What kind of mask?

12   A.   Just his eyes and his mouth were showing.

13   Q.   Okay.  Do you know what a ski mask is?  Have

14  you heard of ski mask?

15   A.   The one that covers your face?

16   Q.   Uh-huh.

17   A.   Yes.

18   Q.   Is that the kind of mask it was?

19   A.   Yes, ma'am.

20   Q.   So, you could see his eyes, right?  And you

21  could see this area (indicating)?

22   A.   Yes, his lips.

23   Q.   And you could see the skin on his arms?

24   A.   Yes, ma'am.

25   Q.   Was the man talking?

1     A.   He would talk, but I couldn't understand what

2   he would say.

3     Q.   Why not?

4     A.   He had a very different accent.  He didn't

5   speak Spanish right and he didn't speak English right.

6     Q.   Okay.  Or at least the way you were used to?

7     A.   No.  I couldn't understand him.

8     Q.   Okay.  Would you say he had an accent?

9     A.   Yes.

10    Q.   And how would you have described -- or how

11  would you describe that man's skin color?  What color

12  was it to you?

13    A.   Dark.

14    Q.   Okay.

15    A.   Black.

16    Q.   Okay.  When the man put the gun in front of

17  Arturo and Arturo backed up, what happened next?

18    A.   He started beating Arturo.  I was sitting on

19  the bed.  He told me to turn over.

20    Q.   Okay.  This tall man?

21    A.   Yes.  Face down.

22    Q.   Okay.  And where -- at what point did he tell

23  you to turn over?  How close did he get to you?

24    A.   The edge of the bed.

25    Q.   Right up to the edge of the bed?

1     A.   Yes, ma'am.

2     Q.   And were you sitting up?

3     A.   I was sitting on the bed and he told me to lay

4 down back on the bed face down.

5     Q.   And did you do that?

6     A.   Yes, ma'am.

7     Q.   Then what happened?

8     A.   Somebody tied me up.

9     Q.   And do you know who did that?

10     A.   No.  I was face down.

11     Q.   Okay.  At some point did another man come into

12 the room?

13     A.   Yes.

14     Q.   Okay.  And at what point was that?  Was it

15 before you were face down or after?

16     A.   After.

17     Q.   Before you were face down, did you have an

18 opportunity, before the man came into the room, to see

19 something?

20     A.   I saw the man that was hitting and beating up

21 Arturo, I saw his eyes, his lips, and the color of his

22 skin.  And I --

23     Q.   Okay.

24     A.   -- and I kept on -- I kept on talking to him

25 and asking him and he wouldn't answer.  If he would

 1   answer, I wouldn't know what he was saying.  He wouldn't

 2   speak either language --

 3        Q.   Okay.

 4        A.   -- clearly.

 5        Q.   But you understood him when he told you to turn

 6   over?

 7        A.   Yes.

 8        Q.   Okay.  And you said that he was beating Arturo?

 9        A.   Very bad.

10        Q.   And that was happening before and after you

11   turned over face down on the bed?

12        A.   Yes.

13        Q.   Okay.  So, before you laid down face down on

14   the bed, where was Arturo when he was being beaten?

15        A.   He was kneeled down with his head on the bed

16   and they were beating him up.

17        Q.   So, he was down on his knees and he had his

18   head on the bed?

19        A.   Yes, ma'am.

20        Q.   Okay.  Like this (indicating)?

21        A.   Yes, ma'am.

22        Q.   Okay.  And where were you?

23        A.   On the bed sitting down.

24        Q.   Okay.

25        A.   Then he told me to lay down on the bed --

1          Q.   Okay.

2          A.   -- face down.  All I could hear was when they

3     were beating him up.  And then I heard Baby Angelo.

4          Q.   What did you hear Baby Angelo say?

5          A.   He said:  Mommy.

6          Q.   Was he crying?

7          A.   He was calling out for me.

8          Q.   Do you remember someone tying up Arturo?

9          A.   I could only hear when they were beating him up

10    because I was already face down.

11         Q.   Okay.  And do you know what they were beating

12    him with?

13         A.   No, ma'am.

14         Q.   Okay.  Could you hear the sounds of them

15    hitting him?

16         A.   Yes, ma'am.

17         Q.   Did it sound like they were hitting him with

18    something harder than a fist?

19         A.   Very hard.

20         Q.   Okay.  And what was Arturo saying?

21         A.   He would just take it.  He took it.  He would

22    be like, "Oh."  They were hurting him bad.

23         Q.   Okay.  And we're saying "they," at some point a

24    second person came in the room.

25         A.   A second person came in the room.

1     Q.   And before you turned over, you saw something

2   in the doorway?

3     A.   A gun.

4     Q.   Okay.  So, the first person was by the side of

5   the bed, the tall person?

6     A.   He had a gun.

7     Q.   And he was hitting Arturo?

8     A.   Yes, ma'am.

9     Q.   And before you were told to turn over, you saw

10  a gun?

11    A.   I saw another person with a gun towards the

12  bedroom.

13    Q.   Okay.  And that person was in the doorway?

14    A.   In the doorway.

15    Q.   Could you see their full size?

16    A.   No, ma'am.  I couldn't see who the person was.

17    Q.   Could you see what they were wearing?

18    A.   No, ma'am.

19    Q.   Could you see whether they had a mask on?

20    A.   No, ma'am.

21    Q.   But you did see a second gun and another man in

22  the doorway?

23    A.   I saw a second gun and a second hand with a

24  gun.

25    Q.   And at that point you were told to turn over.

1  After you turned over, did the tall man continue to beat

2  Arturo?

3        A.    Yes, ma'am.

4        Q.    What did the second man do?

5        A.    He was the one that tied me up.

6        Q.    Okay.  And you know this -- how do you know

7  that it was the second man?

8        A.    Because the first one was hitting Arturo.

9        Q.    Okay.  And you knew that was continuing on?

10       A.    I could hear it.

11       Q.    Okay.  What did the second man tie you up with?

12       A.    I can't remember, but he tied me up and it

13  wasn't very tight.

14       Q.    So, you could move your hands?

15       A.    I could move.  He was touching me.

16       Q.    Do you remember if he put anything over your

17  head or face?

18       A.    Yes.

19       Q.    Okay.  And who did it, the tall man who came --

20       A.    The one that was touching me.

21       Q.    The second one, he put something over your

22  face.

23             And what did he put over your face?

24       A.    The blanket or pillow.

25       Q.    Okay.  Did he keep you laying face down?

```
 1        A.   Yes, ma'am.

 2        Q.   At some point, did he turn you over?

 3        A.   Yes, ma'am.

 4        Q.   Okay.

 5        A.   He started touching me.  He started touching me

 6   on my butt and then he turned me over and then he raped

 7   me.

 8        Q.   And when he turned you over, is that when he

 9   put the blanket on your face?

10        A.   Yes, ma'am.

11        Q.   And after he turned you over, what did he do?

12        A.   He took off my underwear.

13        Q.   Then what happened?

14        A.   He started raping me.

15        Q.   Could you hear Baby Angelo?

16        A.   Yes.  I could hear Baby Angelo, yes.  He did

17   that monster thing in front of Arturo and Baby Angelo.

18        Q.   Did the first tall man keep beating on Arturo

19   while the rape was happening?

20        A.   Yes, ma'am.

21        Q.   Do you know if Arturo -- or do you think he

22   stayed conscious the whole time?

23        A.   When I got myself untied, I sat down, and I

24   could see Arturo.  He was unconscious.  He had something

25   on his mouth, a pillowcase or something.  He was tied
```

1    up.  I untied him, but I started looking for Baby Angelo

2    and I told him that Baby Angelo was not in place.  I

3    didn't have any clothes on.  We went outside.  We were

4    looking for him.  At some point when we were looking for

5    him, I was untying Baby Angelo -- I was untying Arturo

6    and looking for Baby Angelo.  We were both walking

7    towards the living room.  We could see somebody come

8    back in and we walked back to the bedroom.

9         Q.   And I'm going to talk to you about that a

10   little bit more in just a second, but I want to go back

11   to where you said there was something on Arturo's mouth.

12        A.   A pillowcase.

13        Q.   Okay.  Like inside his mouth or around covering

14   his mouth?

15        A.   Inside his mouth.

16        Q.   Okay.  And was there something over Arturo's

17   head?

18        A.   The pillow.

19        Q.   So, his head was covered?

20        A.   With the pillow.

21        Q.   And his hands were tied?

22        A.   They were tied.

23        Q.   With what?

24        A.   With the alarm clock cord.

25        Q.   Okay.  And you said he appeared to be

1    unconscious?

2         A.   Yes.

3         Q.   After the man raped you, the second man had

4    came in the room, correct?

5         A.   Yes, ma'am.

6         Q.   Did the men do anything else before they left

7    the bedroom?

8         A.   They went through my whole stuff.

9         Q.   Okay.  And do you know how long that took?

10        A.   No, ma'am, I don't.  They took Arturo's wallet.

11   They took his bracelet, I guess a little bit of cash.

12   Because my purse was on top of the table and they didn't

13   take my purse.

14        Q.   Okay.  Do you know what they were looking for?

15   Did they ever say?

16        A.   No, ma'am.

17        Q.   And while they were looking around the bedroom,

18   Arturo was there tied up, was he still in that position

19   over the bed?

20        A.   He was on the floor where Baby Angelo was.

21        Q.   On the pallet?

22        A.   Uh-huh.

23        Q.   And were you still tied with something and you

24   had something over your face; is that correct?

25        A.   Yes, ma'am.

1    Q.   How long do you think they looked around your

2  apartment?

3    A.   It took them a little while.

4    Q.   Okay.

5    A.   I'd say 10, 15 minutes.

6    Q.   And did you get up or try to do anything while

7  they did that?

8    A.   I sat down and talked to the man like I told

9  you, but, no, I didn't get up until after, after they'd

10 done what they did.

11   Q.   So, what did you say to them?

12   A.   Excuse me?

13   Q.   You said you sat down --

14   A.   I sat down on the bed and I kept on seeing him

15 beat up Arturo and then they laid me on the bed face

16 down.

17   Q.   Okay.  So, you sat down and you were talking to

18 the first man who was trying -- who was beating up

19 Arturo?

20   A.   Yes.  I was trying --

21   Q.   But you didn't talk to someone after the rape?

22   A.   (Moves head side to side).

23   Q.   Okay.  I just wanted to clarify that.

24        After you were raped and they were looking

25 around your bedroom and tearing up your bedroom, what

1    were you doing while that happened?

2         A.    I was tied down.    I was in bed tied down.

3         Q.    And you just stayed put?

4         A.    I stayed put.

5         Q.    Okay.    The second man that came in, did he ever

6    talk to you?

7         A.    No, ma'am.

8         Q.    Did he ever say one word to you or anybody else

9    in the room?

10        A.    No, ma'am.

11        Q.    Did you get a look at him ever?

12        A.    No, ma'am.

13        Q.    Could you see his face?

14        A.    No, ma'am.

15        Q.    Why not?

16        A.    I was face down.

17        Q.    Okay.    Any talking that was done was done by

18   the tall man who came in first; is that correct?

19        A.    Yes, ma'am.

20        Q.    When they left your bedroom, how long did you

21   wait before you felt like you could get up?

22        A.    About a minute, not even.    I didn't hear any

23   noise, so I got up?

24        Q.    So, you thought they were gone?

25        A.    Yes, ma'am.

```
 1        Q.   Is that when you untied Arturo?

 2        A.   Yes, ma'am.

 3        Q.   And did he get up?

 4        A.   Yes, ma'am.  He was bleeding a lot.  He had a

 5   lot of blood all over.

 6        Q.   When did you realize that Baby Angelo wasn't in

 7   the room anymore?

 8        A.   As soon as I untied Arturo, I looked down and I

 9   didn't see Baby Angelo.

10        Q.   So, what did you do next?

11        A.   We went outside looking for him.

12        Q.   And you said that when you went into the living

13   room you saw something?

14        A.   As we were -- as I untied Arturo and found out

15   that Baby Angelo was not there, we were walking out the

16   bedroom to the living room and they were coming back.

17   They saw that we were untied and were walking, they

18   left.  So, we walked back to the bedroom.

19        Q.   And how many persons did you see coming back?

20        A.   One.

21        Q.   Okay.  And was it the tall man you saw the --

22        A.   The first tall man.

23        Q.   Okay.  And was he inside your apartment or

24   outside?

25        A.   Inside my apartment.
```

1    Q.   So, you walked into the living room --

2    A.   And he was walking from the front door to the

3 bedroom.

4    Q.   Okay.  He was coming toward the bedroom.  And

5 then what happened?

6    A.   Me and Arturo turned back to the bedroom.

7    Q.   Okay.  And then what happened?

8    A.   We didn't hear any noise, so we walked out and

9 we started looking for Baby Angelo.

10    Q.   Was that tall man gone?

11    A.   Yes, ma'am.

12    Q.   And the tall man, again, was the first man who

13 came in the room that spoke with the funny accent and

14 had the dark skin?

15    A.   Yes, ma'am.

16    Q.   Where did you go look for Baby Angelo?

17    A.   There at the apartments and across the street.

18    Q.   Okay.

19    A.   I screamed out his name, but no response.

20    Q.   And then did you call the police?

21    A.   I think it was my neighbor that called the

22 police.

23    Q.   Okay.  Do you remember making a 911 call?

24    A.   No, I don't.  It was too much for me.

25    Q.   Do you remember the police coming out?

```
1        A.    Yes.

2        Q.    And you talked to them about what had happened?

3        A.    Yes, ma'am.

4        Q.    And you told them about Angelo and you remember

5   them taking you to the hospital?

6        A.    Yes, ma'am.

7        Q.    And you did a rape kit there, didn't you?

8        A.    Yes, ma'am.

9        Q.    When the man was raping you, do you know

10  whether he ejaculated?  Did he finish?

11       A.    Yes, ma'am.

12       Q.    And how do you know that?

13       A.    Because it ran between my legs.

14       Q.    And after it was over when you got up, did you

15  put your underwear back on?

16       A.    Yes, ma'am.

17       Q.    And some kind of clothes to go look for Baby

18  Angelo?

19       A.    I went outside naked.  When I didn't find him,

20  I came back inside and put on my clothes.

21       Q.    Okay.  Then what happened?

22       A.    The police were there already.

23       Q.    Okay.

24       A.    Then the ambulance took me to a hospital.

25       Q.    Okay.  When the police came, do you remember
```

1  them asking you questions about the drug dealing?

2       A.   Yes, ma'am.

3       Q.   And you didn't tell them the truth about the

4  fact that you and Arturo were dealing drugs?

5       A.   No, ma'am.  I lied.

6       Q.   Why?

7       A.   I was afraid.

8       Q.   Did you tell them the truth about everything

9  else?

10      A.   Yes, ma'am.

11      Q.   And are you telling the truth about everything

12 else today?

13      A.   Yes, ma'am.

14      Q.   After this happened that night, what was the

15 next few weeks like?

16      A.   Second to this, terrible.

17      Q.   Do you remember going down to the police

18 station on October 1st, 1992?

19      A.   Day after day, they would come and pick us up

20 for about two to three weeks.

21      Q.   And that first day on October 1st, you quickly

22 decided to go ahead and tell the police about the drug

23 dealing, correct, that very next day, October 1st?

24      A.   Yes, ma'am.

25      Q.   And do you remember them asking you about who

1  your supplier was?

2      A.   Yes, ma'am.

3      Q.   And who did you tell them?

4      A.   Chico.

5      Q.   And do you remember them putting a trap on your

6  phone that intercepted phone calls coming in?

7      A.   Yes, ma'am.

8      Q.   And they were monitoring all your calls?

9      A.   Yes, ma'am.

10     Q.   At some point did Angelita Rodriguez, Chico's

11  wife, call you?

12     A.   Yes, ma'am.

13     Q.   And was she concerned?

14     A.   Yes, ma'am.

15     Q.   Okay.  Did she call you and try to help you?

16     A.   Yes, ma'am.

17     Q.   And she actually came to your apartment, too,

18  didn't she?

19     A.   She did.

20     Q.   Did Rudy come with her?

21     A.   I don't remember, but I do remember Angelita.

22     Q.   And that was just a few days after what

23  happened, wasn't it?

24     A.   Yes, ma'am.

25     Q.   Was Chico with her?

1        A.   No, ma'am.

2        Q.   Did you think that was strange?

3        A.   I didn't think nothing of it.  I was too far

4   out.

5        Q.   You were off on other things.

6             But he was a family friend, wasn't he, you

7   thought?

8        A.   We thought.

9        Q.   And so, Angelita comes to pay her respects and

10  Chico doesn't come?

11       A.   Chico didn't come.

12       Q.   Did he ever call or ask if you needed anything?

13       A.   No, ma'am.

14       Q.   But Angelita did?

15       A.   Yes.

16       Q.   In fact, she called several times over the

17  course of those weeks?

18       A.   She went twice.

19       Q.   Okay.  In November, do you remember getting the

20  call that they had found Angelo?

21       A.   Sergeant Hernandez, yes, came to the apartment.

22       Q.   Okay.  And --

23       A.   And he showed me some photographs of what my

24  baby was wearing.

25       Q.   Did he show you those clothes?

1      A.   Yes, ma'am.

2      Q.   And were you able to identify the clothing that

3  he showed you?

4      A.   Yes, ma'am.

5      Q.   That was the clothes that Angelo was wearing

6  when he was taken?

7      A.   Yes, ma'am.

8              MS. TISE:  May I approach?

9              THE COURT:  Yes.

10     Q.   (By Ms. Tise) I'm going to show you what's been

11  marked as State's Exhibit 61.  Okay?  And you have seen

12  this picture before, I believe.  Okay?  And I want you

13  to tell me if you recognize the clothing in this picture

14  as Angelo's clothing (indicating).  Okay?

15     A.   Okay.  Yes.

16             MS. TISE:  Your Honor, at this time I will

17  offer State's Exhibit 61.

18             **(State's Exhibit No. 61 Offered)**

19             MR. CORNELIUS:  No objection.

20             THE COURT:  State's No. 61 is admitted.

21             Do you wish to publish that?

22             **(State's Exhibit No. 61 Admitted)**

23             MS. TISE:  Yes, Your Honor.

24             THE COURT:  Go ahead and publish it.

25     Q.   (By Ms. Tise) I'm going to show you some

```
 1   happier pictures.  Taking a look at State's Exhibits 80

 2   and 81.  Can you tell me what we're looking at there

 3   (indicating)?

 4       A.   Looking at Baby Angelo and me and my baby.

 5       Q.   Okay.

 6            MS. TISE:  At this time, I'm going to offer

 7   State's Exhibits 80 and 81.

 8            (State's Exhibit No. 80 and 81 Offered)

 9            MR. CORNELIUS:  Objection to relevance,

10   Your Honor.

11            THE COURT:  Let's see.  What's the

12   relevancy?

13            MS. TISE:  Showing --

14            THE COURT:  We already have one.

15            MS. TISE:  Showing him alive.

16            THE COURT:  We already have one.

17            MR. CORNELIUS:  Yes.

18            THE COURT:  I'm going to sustain as to 80

19   and 81.

20       Q.   (By Ms. Tise) I'm going to show you another

21   photo.  This one is marked State's Exhibit 84.  I'll ask

22   you if you've ever seen this person before (indicating)?

23       A.   No, ma'am.

24       Q.   Okay.  Never came over to your house with Chico

25   as far as you know?
```

1      A.   No, ma'am.

2      Q.   Never saw him or had contact with him as far as

3  you know?

4      A.   No, ma'am.

5           MS. TISE:  That's State's Exhibit 84.  And

6  I will offer it.

7           **(State's Exhibit No. 84 Offered)**

8           MR. CORNELIUS:  Objection to relevance,

9  Your Honor.

10          MS. TISE:  May we approach?

11          THE COURT:  Yes.

12          (At the Bench, on the record)

13          MS. TISE:  This is the co-defendant who

14  will be identified later on in the trial.

15          THE COURT:  As being there at the time?

16          MS. TISE:  Yes.  It's the tall man.  And

17  I'm offering the photo because I want to ask her about

18  his skin color.

19          THE COURT:  Okay.  All right.  I will allow

20  that over objection.

21          (Open court, defendant and jury present)

22          THE COURT:  So, State's Exhibit 84 is

23  admitted over objection.

24          **(State's Exhibit No. 84 Admitted)**

25      Q.   (By Ms. Tise) This man in State's Exhibit 84

1   that you have not seen before --

2               MS. TISE:  Judge, may I publish it?

3               THE COURT:  Yes.

4       Q.  (By Ms. Tise) Can you tell me how you would

5   describe his skin color?

6       A.  Dark, black.

7       Q.  Okay.  I want you to take a look across the

8   courtroom and tell me if you see the person that you

9   know to be Chico or Obel Cruz-Garcia in this courtroom.

10      A.  Yes.

11      Q.  Can you point him out for the jury and tell

12  them what he's wearing?

13      A.  He's wearing a suit, gray suit.

14      Q.  Okay.

15              MS. TISE:  Your Honor, may the record

16  reflect the witness has identified the defendant, Obel

17  Cruz-Garcia?

18              THE COURT:  The record will so reflect.

19      Q.  (By Ms. Tise) And how would you describe his

20  skin color?

21      A.  Dark, black.

22      Q.  I'm sorry?

23      A.  Dark, black.

24      Q.  After this happened, Diana, and after you

25  buried your son, what happened with you and Arturo?

1       A.   We left.  I couldn't live with so many

2   memories.  Everywhere I turned, there were memories of

3   my son.

4       Q.   Where did you go?

5       A.   I went to San Antonio for a couple of months

6   and then we moved to the Valley, which we are stationed

7   there.

8       Q.   And you live there now?

9       A.   Yes.

10      Q.   And Arturo found work?

11      A.   Yes.

12      Q.   And what did he do for most of those years?

13      A.   For the past 15 years, he worked as an oil

14  field floor-hand on rigs.

15      Q.   So, he worked on oil rigs?

16      A.   Yes.

17      Q.   Oil patch?

18      A.   Yes, ma'am.

19      Q.   And did you work?

20      A.   Yes, ma'am.

21      Q.   What did you do?

22      A.   Provider.

23      Q.   Okay.  Tell us what you mean by that.

24      A.   A provider is taking care of people who need

25  help to provide for them but they can't do what we can

1   do for them.

2        Q.   Is this like in the home healthcare industry,

3   you were a home healthcare worker?

4        A.   Yes, ma'am.  I was not a maid.  I was a

5   provider for people that are handicapped, elderly people

6   that need help.

7        Q.   Okay.  So, you help take care of them in their

8   homes?

9        A.   Yes, ma'am.

10       Q.   Did you and Arturo ever have anything to do

11  with drugs again?

12       A.   No, ma'am.

13       Q.   Did you ever see Chico ever again?

14       A.   No, ma'am.

15            MS. TISE:  I will pass the witness.

16            THE COURT:  Thank you, Ms. Tise.

17            Mr. Cornelius, you may proceed.

18            MR. CORNELIUS:  Yes, Your Honor.  Could I

19  have just one second?

20            THE COURT:  Yes.

21            (Brief pause)

22            MR. CORNELIUS:  May I proceed?

23            THE COURT:  Yes.

24                     **CROSS-EXAMINATION**

25  **BY MR. CORNELIUS:**

1     Q.   Ms. Garcia, my name is Skip Cornelius.  We've

2  never met or discussed this case or anything else

3  before, have we?

4     A.   No, sir.

5     Q.   Okay.  I'm one of the lawyers in the case, so I

6  have a right to ask you some questions.  Okay?

7     A.   Yes, sir.

8     Q.   If you don't understand my questions or I

9  haven't phrased them very well, just say so and I will

10  rephrase them.  Okay?

11          At the time years ago when you were selling

12  drugs, what kind of drugs were you selling?

13     A.   Cocaine.

14     Q.   Only cocaine?

15     A.   Yes, sir.

16     Q.   Powder or crack or both?

17     A.   Powder.

18     Q.   Powder.

19          And what did it sell for back in 1992?

20     A.   What we were selling was $10, $20.

21     Q.   For how much?

22     A.   A little bit.

23     Q.   A little bit was 10 or $20?

24     A.   Yes.

25     Q.   Was it -- how was it packaged?

1     A.   Little plastic bags.

2     Q.   Who packaged it?

3     A.   Arturo.

4     Q.   So, when you got it, it came in a larger baggie

5  or something.  How did it come to you?

6     A.   I don't know because I didn't prepare it.  I

7  wasn't -- he wasn't giving it to me.  He gave me the

8  small packages.

9     Q.   Okay.  And then where did you keep it?

10    A.   In the location we lived in.

11    Q.   At the house where all this occurred?

12    A.   Yes, sir.

13    Q.   And where in the house?

14    A.   Just in the cabinets.

15    Q.   Pardon?

16    A.   Just in the cabinets.

17    Q.   In the cabinets.

18         And people would come by and you would sell

19 them a 10 or a 20?

20    A.   Yes, sir.

21    Q.   All right.  And that's how you made a living?

22    A.   Yes, sir.

23    Q.   And for how long did y'all do that?

24    A.   For about a year-and-a-half or two.

25    Q.   Okay.  Then what was done with the money?

```
1        A.    Paid bills.
2        Q.    Okay.  But who got the money?  You got the
3   money or Arturo got the money?  Who got the money?
4        A.    Both.
5        Q.    Both.
6              All right.  And you said you got those
7   drugs from Chico?
8        A.    Correction.
9        Q.    Did you say "correct" or "correction"?
10       A.    Correct.
11       Q.    Correct.
12             Okay.  The whole year-and-a-half, or
13   however long it was that you were selling drugs, they
14   always came from Chico?
15       A.    Yes.
16       Q.    And did you have to buy them from Chico or he
17   gave them to you to sell?
18       A.    Had to buy from Chico.
19       Q.    And so, how much did you pay for them?
20       A.    I don't know.  I never deal with him.
21       Q.    Okay.  How many times did you see Chico?
22       A.    Quite a few times.
23       Q.    And what do you mean by "quite a few"?
24       A.    A couple of times.  I had met his wife.  Yes,
25   we saw them a couple of times.
```

1    Q.   Okay.  Well, in a year-and-a-half, what does

2  that mean, "a couple of times"?

3    A.   Maybe once or twice a week.  Maybe more, maybe

4  less.

5    Q.   And in all the time that you saw him, was it

6  always at your apartment or his apartment or did you see

7  him other places?

8    A.   My apartment, other places.

9    Q.   Only once at his apartment?

10    A.   Before we moved to the other place, yes.

11    Q.   Okay.  Approximately how many times did he come

12  to your apartment?

13    A.   Once or twice a week.

14    Q.   And when he came over there, what did he come

15  over there for?

16    A.   He would speak with Arturo.

17    Q.   Was it for drugs?

18    A.   He would speak with Arturo.  I wouldn't know.

19    Q.   So, you never actually talked to him?

20    A.   Yes.

21    Q.   Yes, you did talk to him?

22    A.   Yes.

23    Q.   So, how many times would you say you talked to

24  him?

25    A.   A few times.

1        Q.   A few?

2        A.   A few times.

3        Q.   Okay.  How many does that mean?  Is that once

4   or twice a week?

5        A.   Once or twice a week.

6        Q.   For a year-and-a-half?

7        A.   Yes.

8        Q.   Was there -- did anything happen in this drug

9   transaction that would cause Chico to be mad at you?

10       A.   I didn't know he was mad at us or at me.

11       Q.   So, you know of no reason why he would be mad

12   at you?

13       A.   No.

14       Q.   How about somebody else, was somebody else mad

15   at you?

16       A.   No.

17       Q.   Was there some sort of a problem with the drug

18   relationship between Arturo and someone?

19       A.   Not that I know of, no.

20       Q.   This was not Arturo's child, though, correct?

21       A.   No.

22       Q.   No, I'm incorrect, or, no, it wasn't his child?

23       A.   No.  You are correct, it was not his child.

24       Q.   Okay.  So, as far as you know, you weren't

25   crossways with anyone?

1      A.   I was not crossways with nobody.

2      Q.   Okay.  How did you meet Chico?

3      A.   Through some friends.

4      Q.   What would be the circumstance for you to have

5  met him?  Did it have to do with drugs or something

6  social or what?

7      A.   I wouldn't know, sir, because Arturo met him

8  through friends and I met him through Arturo.

9      Q.   Okay.  So, you actually met him through Arturo?

10      A.   Yes.

11      Q.   When you say someone is black, does that just

12  mean darker skin than yours'?

13      A.   Yes.

14      Q.   Okay.  So, pretty much anybody that has darker

15  skin than yours you call them black?

16      A.   Yes.

17      Q.   Okay.  The big tall man that you described, the

18  first one that came into the -- into your bedroom, you

19  said he was a black man?

20      A.   Yes.

21      Q.   But you're not implying that that means he's of

22  African descent, just darker skin.  I mean, I don't

23  know.  I'm asking you.

24      A.   I'm trying to answer this.

25      Q.   Okay.

1        A.   There is a difference between not knowing

2   people from the other side of -- I don't know

3   Dominicans, Puerto Rico, I don't know the difference

4   between all of them.  I know me, my color, your color,

5   and African-Americans.

6        Q.   Okay.  Well, I'm not trying to tell you what to

7   say.

8        A.   It's just that I'm not familiar with all of the

9   people.  I'm not familiar with a lot of people that are

10  not from -- I've never been around other people.

11       Q.   Okay.

12       A.   I'm sorry.

13       Q.   There's nothing to be sorry for, but tell me if

14  I'm understanding this correctly.  If I'm not, just

15  correct me.  Because, you know, I don't know, I wasn't

16  there.  You know, I don't know anything about this case.

17  You know that, right?  You've never seen me before,

18  right?

19       A.   No.

20       Q.   Okay.  When you describe somebody as being a

21  black man are you just saying they're darker than you

22  are, it doesn't necessarily mean they are African

23  descent or they're Hispanic or they just have a deep sun

24  tan.  You are just saying they are darker than you; is

25  that what you're saying?

1    A.   There is a difference between dark and dark and

2  black.

3    Q.   Okay.  What is that difference to you?

4    A.   There is darker than us.  We're brownish.  And

5  they are darker brownish.  So, to me they are black.

6    Q.   Okay.  Well, are you saying that you are

7  considering yourself to be brown and this person was

8  darker than you so they're black?

9    A.   Yes.

10    Q.   Okay.  But you are not saying that they were

11  necessarily of African descent, I guess.  Is that what

12  you're saying?

13    A.   I'm sorry.  I don't understand how to -- how to

14  answer that.  I already did to the best of my knowledge.

15  That's how I answered it.

16    Q.   Okay.  I will move on.

17         Both of the men that you saw that night --

18  well, let me back up.  Strike that.

19         The second man that entered your bedroom

20  that night, did you ever see his skin at all?

21    A.   No.

22    Q.   So, you never said he's black or brown or white

23  or anything?

24    A.   Not if I recall.  I only saw a gun and a hand

25  coming out of the doorway.

1      Q.   Okay.  So, as far as you recall, you never told

2  anybody it was two black men or two of any color because

3  you only saw actually one of them, right?

4      A.   I did say it.  I said there were two persons in

5  that room.

6      Q.   Yeah.  Did you ever say what color they were?

7      A.   I don't recall.

8      Q.   All right.  Do you remember the police, when

9  you talked to them, asking you for a description of the

10  men, to do the best you could to describe them?

11     A.   Yes, I do remember.

12     Q.   And you know why they would do that, because

13  they're trying to catch them, right?

14     A.   Right.

15     Q.   Do you remember describing the -- well...

16          (Brief pause)

17     Q.   (By Mr. Cornelius) The tall man that you've

18  described that you told the jury about, do you remember

19  saying that he had almost purple lips?

20     A.   I do remember that, sir, yes.

21     Q.   And did you tell us earlier today that that

22  person didn't speak English very well or Spanish very

23  well?

24     A.   He had a very, very strange accent.  I couldn't

25  understand either -- or I couldn't understand Spanish

1  and I couldn't understand his English.

2      Q.   Do you think he was actually speaking Spanish

3  or a language you just didn't understand?

4      A.   I could only understand him when he told me to

5  turn over.

6      Q.   Okay.  But you heard him talk?

7      A.   Yes, I heard him talk, but I couldn't make out

8  what he was saying.  Yes, I did hear.  And I would

9  recognize his voice, too.

10      Q.   You would recognize his voice?

11      A.   (Moves head up and down).

12      Q.   And the other person, you say you didn't hear

13  them talk?

14      A.   No, sir.

15      Q.   Did you give the police any description at all

16  of the other man or did you just not see him?

17      A.   I don't recall giving them any description of

18  the other man.

19      Q.   Okay.  Did you say that Chico had been over to

20  your apartment earlier that day?

21      A.   Yes.

22      Q.   Did you talk to him that day?

23      A.   No.

24      Q.   Did you see him?

25      A.   No.

1    Q.   Somebody just told you that he had been over?

2    A.   Arturo.

3    Q.   When he would come over to your apartment,

4 would he leave drugs there?

5    A.   No.

6    Q.   No?

7    A.   No.  He would sell drugs, but he wouldn't leave

8 drugs there.  Unless that's the same, yes.

9    Q.   Okay.  All right.  Where -- and I don't know if

10 this happened or not, but if he sold Arturo drugs, where

11 were they?

12    A.   I don't recall him selling Arturo that day

13 anything because we were not selling.  At the time, we

14 were not selling drugs.

15    Q.   Y'all had already decided not to sell drugs?

16    A.   Yes.

17    Q.   Okay.  So, basically, y'all didn't have any

18 business transactions with Chico at that point, correct?

19    A.   Correct.

20    Q.   Was your husband upset about Chico coming over

21 that day?

22    A.   Not that I know of.

23    Q.   Did you tell the police that you had a

24 4,000-dollar piece of jewelry taken on that occasion?

25    A.   Yes.

1      Q.    What was that jewelry?

2      A.    It was Arturo's bracelet.

3      Q.    Arturo's bracelet?

4      A.    Yes.

5      Q.    And were you wearing jewelry that night?

6      A.    I don't recall.

7      Q.    And do you know if Arturo was wearing jewelry

8  that night?

9      A.    No.

10     Q.    You say he was or was not?

11     A.    No, he was not.  He had it on top of the

12  dresser.  He had his bracelet and his wallet in the

13  cabinet on top of the dresser.

14     Q.    How about around his neck, did he have anything

15  around his neck?

16     A.    I don't recall.

17     Q.    You're saying your purse was there, but it

18  wasn't touched?

19     A.    It wasn't touched.  It was there on top of the

20  table, the kitchen table.

21     Q.    At the time that you got yourself untied and

22  untied Arturo and you started out of the bedroom, you

23  were going to look for your son, correct?

24     A.    Yes.

25     Q.    And you say that this man that you had seen was

1    coming back in, correct?

2        A.    Right.   He was walking back into the apartment,

3    entering the front door, yes.

4        Q.    And what did he do?

5        A.    He turned back.

6        Q.    The man just decided not to come in the

7    apartment?

8        A.    He just turned back and left.

9        Q.    But y'all, instead of going outside, went back

10   into the bedroom?

11       A.    We walked back to the bedroom.

12       Q.    And you already knew that your son was gone

13   then, right?

14       A.    Yes.

15       Q.    And did you have clothes on then or not?

16       A.    No.

17       Q.    So, how long were you in the bedroom before you

18   went back out to look for your son?

19       A.    When I walked outside without no clothes, I

20   looked around, I came back inside and I put on clothes.

21       Q.    So, when the police got there that night, you

22   said you were afraid so you lied to them about the

23   drugs?

24       A.    Yes.

25       Q.    You didn't have any drugs there, though, that

1   night, did you?

2        A.   No.

3        Q.   And you were concerned about your son, right?

4        A.   Right.

5        Q.   And you didn't have any idea who had taken him?

6        A.   No.

7        Q.   Did the police tell you that night, or maybe it

8   was the next -- did you go to the police -- after you

9   got out of the hospital, did you go to the police

10  station?

11       A.   They drove us to the police station, yes.

12       Q.   So, was that during the daytime the next

13  morning that you made it to the police station?

14       A.   I'm sorry.  I don't recall.  I was too much in

15  shock.

16       Q.   Okay.  That's fine.  Whenever you made it to

17  the police station, whenever that was, did the police

18  sort of confront you with them thinking that this had to

19  do with drugs, the police thinking that?

20       A.   Yes.

21       Q.   So, how long before you told them they were

22  right or that you had at least --

23       A.   That same day.

24       Q.   Okay.  How long did the police question you,

25  though, before you admitted that you were in the drug

1  business?

2      A.   Day-by-day.

3      Q.   What does that mean, "day-by-day"?

4      A.   Every day.

5      Q.   Okay.  I wasn't clear on my question.  How long

6  did the police talk to you and basically accuse you of

7  being in the drug business before you finally admitted

8  you were in the drug business?

9      A.   I'm sorry.  We went to the police station, we

10 admitted it.  They questioned us one day, two days,

11 three days.  Every day.

12     Q.   Oh, okay.  I got you.

13          But when you first went to the police

14 station you denied it, correct?

15     A.   Yes, we denied it.

16     Q.   For how long did you deny it?

17     A.   Not too long, sir.  Not too long.

18     Q.   And what is your recollection on that as to not

19 too long?

20     A.   Just like -- I would say not even half a day.

21     Q.   Okay.  For less than half a day, right?

22     A.   Right.

23     Q.   Was it U.P. Hernandez that interviewed you?  Do

24 you remember that name?

25     A.   Yes.

1     Q.   And you denied it to him at the start, right?

2     A.   Yes.

3     Q.   And he didn't believe you, right?

4     A.   No.

5     Q.   And at some point that same day you decided to

6   tell him the truth?

7     A.   Yes.

8     Q.   Not the same day your son was abducted, the

9   next day, but the same day you got to the police

10   station, right?

11     A.   Sir, I'm sorry.  My son was taken at night,

12   they took me to the hospital.  By the time I knew, it

13   was daylight.  And that's when we started talking.

14              MR. CORNELIUS:  Could I have a moment,

15   Judge?

16              THE COURT:  Yes.

17              (Brief pause)

18              MR. CORNELIUS:  A couple more questions, if

19   I might.

20     Q.   (By Mr. Cornelius) There's a photograph of a

21   .25 semiautomatic pistol in one of the drawers there at

22   the house.  Do you remember that gun?

23     A.   That's mine.  It was mine.

24     Q.   Okay.  And it was loaded, correct?

25     A.   I don't know.  Maybe.

1      Q.   All right.  So, you had a .25 automatic.  Were

2   there any other guns at the house that may have been

3   stolen?

4      A.   Just the .25.

5      Q.   Okay.  And is there any reason why you didn't

6   get that gun to try to go after your son?

7      A.   No.  I didn't think of it.  I was too much in

8   shock, like I told you.  I untied myself, I was untying

9   Arturo, I saw my son wasn't there.  I never stopped and

10  think of getting a gun.  And I'm not a violent person.

11     Q.   Okay.  Did Arturo know that you had a gun?

12     A.   Yes, he knew.

13     Q.   All right.  You said that there was no conflict

14  in the drug -- in your drug-selling life.  And yet, you

15  told the jury earlier that you had another break in.  I

16  don't know when that was, but it was sometime before

17  this one, right?

18     A.   Right.

19     Q.   When was that?

20     A.   Not too long before we moved to that place.

21     Q.   Give us -- just think about it for a minute.

22  Give us your best guesstimate.  I know you probably

23  didn't write the dates down, but how long had it been

24  since you had that break-in at your other place until

25  September 30th, 1992, which is the date that this

1  occurred?

2      A.   A few months, sir.

3      Q.   A few months.

4      A.   I would say very few months.  Like at the most

5  three, two or three months.

6      Q.   Okay.  Was anything taken in that break-in?

7      A.   Rephrase the question.  What break-in?  The

8  first one or the second one?

9      Q.   The first one.  I'm sorry I didn't make that

10  clear.  The first one.

11     A.   No, not that I remember.

12     Q.   Were your drawers pulled out and all your stuff

13  gone through?

14     A.   Everything was the same way as the second time.

15     Q.   Okay.  And when you say nothing was taken, no

16  drugs were taken, no money, nothing?

17     A.   Oh, God, please help me remember.  Yes, I think

18  so.

19     Q.   Tell me what you think.

20     A.   Yes, I think there were drugs taken.

21     Q.   Okay.  What about money?

22     A.   Yes.

23     Q.   And is that why you didn't report it to the

24  police because you didn't want to tell them that your

25  drug money and drugs were taken?

1      A.   That's right.

2      Q.   Did you ever gain any understanding as to who

3  did that?

4      A.   No, sir.

5            MR. CORNELIUS:  Pass the witness, Judge.

6            THE COURT:  Thank you.

7            Ms. Tise, do you have anything else?

8            MS. TISE:  No further questions, Judge.

9            THE COURT:  May this witness be excused

10  subject to recall?

11            MR. CORNELIUS:  Yes, Your Honor.

12            THE COURT:  Subject to recall.  Okay.  You

13  may step down, Ms. Garcia.  You are excused subject to

14  recall.

15            Call your next, please.

16            THE WITNESS:  Thank you.

17            MR. WOOD:  The State calls Arturo

18  Rodriguez.

19            May we approach just briefly?

20            THE COURT:  Yes.

21            (At the Bench, on the record)

22            MR. WOOD:  I think we need like a

23  five-minute break.

24            THE COURT:  Okay.

25            (Open court, defendant and jury present)

1                    THE COURT:  We're going to take a

2    five-minute break.

3                    So, Deputy, can we have the jury taken out?

4                    I want to remind you before you go out that

5    you should not talk amongst yourselves or with anyone

6    else on any subject connected with the trial or to form

7    or express any opinion thereon until the end of the

8    trial.  Okay?  We'll be back at 4:30.

9                    (Recess)

10                    THE BAILIFF:  The witness has not been

11   sworn.

12                    (Witness sworn)

13                    THE COURT:  Mr. Rodriguez, please keep your

14   voice up and speak into the microphone.

15                    You may proceed, Mr. Wood.

16                    MR. WOOD:  Thank you, Your Honor.

17                    **JOSE ARTURO RODRIGUEZ,**

18   having been first duly sworn, testified through the

19   interpreter as follows:

20                    **DIRECT EXAMINATION**

21   **BY MR. WOOD:**

22       Q.   Good afternoon, Mr. Rodriguez.

23       A.   Good afternoon, sir.

24       Q.   Can you introduce yourself with your name,

25   please?

```
1        A.    My name?

2        Q.    Yes.

3        A.    Jose Arturo Rodriguez.

4        Q.    And, Mr. Rodriguez, do most people call you

5   Arturo?

6        A.    Some don't.  Some of them call me Chaparro or

7   Shorty.

8        Q.    I want to ask you, Mr. Rodriguez, a little bit

9   about your family.  Okay?

10       A.    My family, yes.

11       Q.    Tell me, who is your wife?

12       A.    Diana Rodriguez.  I mean Diana Garcia.

13       Q.    How long have you and Diana been together?

14       A.    About 26 or 27, more or less.

15       Q.    Do you and Diana have any kids together?

16       A.    No.

17       Q.    Where do you currently live, Mr. Rodriguez?

18       A.    In Rio Grande City.

19       Q.    How long have you lived there?

20       A.    About two years, more or less.

21       Q.    Where are you from originally?

22       A.    From Mexico.

23       Q.    Are you currently working at this time?

24       A.    Right at this time, no.

25       Q.    What kind of work have you done in the past?
```

1      A.    In the oil field.

2      Q.    Do you have a disability that prevents you from

3   working now?

4      A.    Yes.  I have diabetes, high blood pressure, and

5   cholesterol.

6      Q.    Mr. Rodriguez, at some point did you live here

7   in Houston?

8      A.    Yes.  I was here for about 10 to 15 years --

9      Q.    What --

10     A.    -- around there.

11     Q.    I'm sorry.

12           What brought you to Houston?

13     A.    Well, before I was illegal and then I got my

14   papers and I went to California and one of my brothers

15   was the one that got my papers for me.  He is a citizen.

16     Q.    Did he live here in Houston?

17     A.    No.  He lived in California.

18     Q.    And then how did you end up in Houston?

19     A.    Because I went to Mexico -- that's when I got

20   my papers -- and then I came back here to look for work.

21     Q.    At some point when you were living in Houston,

22   is that when you met Diana?

23     A.    When I came here, I lived with another woman,

24   she died, and I went to California for some time.  And

25   then I came over here and during that time was when I

1    met her.

2         Q.   How did you meet Diana?

3         A.   At a dance.

4         Q.   At some point, did you and Diana start living

5    together?

6         A.   No.  A year more or less.

7         Q.   Are you saying that you started living together

8    after a year, more or less?

9         A.   More or less.

10        Q.   And during that time that you and Diana lived

11   together here in Houston, did Baby Angelo live with you

12   guys, too?

13        A.   No.  At that time, no.  When I met her, no.

14        Q.   But later on, did he live with you guys?

15        A.   Yes.

16        Q.   Back then, when you were living in Houston,

17   what kind of work were you doing?

18        A.   At a radiator shop for cars.

19        Q.   Did you work there at that radiator shop for a

20   long time or a short time?

21        A.   More or less about four to five years.

22        Q.   At some point, Mr. Rodriguez, did you become

23   involved with drugs?

24        A.   Yes.

25        Q.   How did that -- tell me how that happened.

```
 1        A.   Through friends, friends.

 2        Q.   And do you recall approximately when that

 3   happened?

 4        A.   During the time that I was working at that

 5   shop, at the radiator shop.

 6        Q.   Mr. Rodriguez, were you using drugs?

 7        A.   At that time, yes.

 8        Q.   What kind of drugs?

 9        A.   Cocaine.

10        Q.   At some point did you start selling cocaine?

11        A.   Yes.

12        Q.   In the beginning, did Diana know that you were

13   using drugs?

14        A.   No.  I never did it in front of her.

15        Q.   At some point, did she find out?

16        A.   Yes.

17        Q.   When you started selling drugs, did Diana

18   become involved at some point?

19        A.   Yes.

20        Q.   How did that happen?

21        A.   Well, just all of a sudden I got involved in

22   that.

23        Q.   Do you remember, Mr. Rodriguez, why you guys

24   started selling cocaine?

25        A.   Just to live a better life.
```

1    Q.   By a better life, do you mean so you could make

2    more money or have nicer things, or what do you mean?

3    A.   Yes.

4    Q.   Both of those things?

5    A.   Yes, to live better.

6    Q.   Who were you involved in the selling of drugs

7    with?  Who was involved with you?

8    A.   At that time, I was purchasing it from someone

9    else, but that person, we would just see each other at

10   certain stores.  And then later I got involved with that

11   person, Chico.

12   Q.   Mr. Rodriguez, do you see the person that you

13   referred to as Chico here in the courtroom today?

14   A.   Yes.

15   Q.   Can you please point to that person and tell me

16   something that that person is wearing?

17   A.   With my hand?

18   Q.   With your hand is fine, yes.

19   A.   Right there (indicating).

20   Q.   And tell me what the person that you've pointed

21   out is wearing.

22   A.   Like some headphones.

23            MR. WOOD:  Your Honor, may the record

24   reflect the witness has identified the defendant?

25            THE COURT:  The record will so reflect.

1    Q.    (By Mr. Wood) Mr. Rodriguez, it's been a while

2    since you've seen Chico, hasn't it?

3    A.    When I met him?

4    Q.    Let me ask the question better.

5            Today, has it been a long time since you've

6    seen Chico?

7    A.    From today?

8    Q.    Yes.

9    A.    Yes.

10    Q.    Mr. Rodriguez, I'm going to show you what's

11    marked State's Exhibit No. 83.  Do you recognize that

12    (indicating)?

13    A.    Yes.

14    Q.    Is that what you remember Chico looking like

15    back when you lived in Houston?

16    A.    Yes.

17    Q.    Mr. Rodriguez, who is this guy (indicating)?

18    A.    That's me.

19    Q.    Is that what you looked like back then?

20    A.    Yes.

21    Q.    A little less gray hair?

22    A.    And hair.

23    Q.    When you started buying cocaine from the

24    defendant, from Chico, is that the only person you were

25    buying from?

1      A.   Yes.

2      Q.   Would you ever buy any other kind of drug to

3  sell other than cocaine?

4      A.   No.

5      Q.   I want to visit with you a little bit about how

6  that worked.  Can you tell me how much cocaine you would

7  usually buy from Chico?

8      A.   Not a lot.  About an ounce for a week or

9  something.

10     Q.   So, around an ounce a week or something like

11  that?

12     A.   Yes.

13     Q.   Would he bring it to you or would you have to

14  pick it up from him?

15     A.   No.  I had it there at home.

16     Q.   So, when you would buy it from Chico, would he

17  bring the cocaine to you and sell it to you at your

18  place or would you have to go to his house?

19     A.   At times he would bring it to me.

20     Q.   I want to visit a little bit about your

21  relationship with the defendant.  Would you describe it

22  as a friendly relationship?

23     A.   Yes.

24     Q.   So, it wasn't just a business relationship?

25     A.   Yes.

1      Q.    Did you come to know his wife, Angelita?

2      A.    Yes.

3      Q.    Did you and your wife, Diana, hang out with

4  Chico and Angelita?

5      A.    Not frequently.

6      Q.    When you would hang out, what kind of things

7  would you do, if you remember?

8      A.    Just talk about the business.  That's all.

9      Q.    Were Angelita and Diana friends as well?

10     A.    Yes, they got along well.

11     Q.    Did Chico come to know Baby Angelo as well?

12     A.    Yes.

13     Q.    At some point during your friendship with the

14  defendant and Angelita, did you rent an apartment for

15  them?

16     A.    No.

17     Q.    Do you remember you and Diana helping them out

18  with an apartment ever?

19     A.    No.

20     Q.    Do you remember back during that time where

21  Chico and Angelita lived?

22     A.    No.

23     Q.    How long would you say that you and Diana sold

24  cocaine for Chico?

25     A.    Not a lot.  For about three years.

1     Q.   At some point, did you decide to stop selling

2  the drugs?

3     A.   Yes.

4     Q.   Why was that?

5     A.   Because the accused would bother me a lot with

6  the beeper.

7     Q.   When you say "the beeper," did you carry a

8  beeper with you during that time?

9     A.   Well, I wouldn't carry it.  It was my wife,

10  Diana.

11     Q.   So, did Chico give you this beeper?

12     A.   No.  I purchased it.

13     Q.   Okay.  And so, are you saying that Chico would

14  contact you and Diana on the beeper a lot?

15     A.   I would be playing Bingo, and he would bother

16  me.  And also at the dance.

17     Q.   Do you remember at some point when you and

18  Diana thought that the police were watching y'all?

19     A.   Yes.

20     Q.   Tell me about that.

21     A.   Okay.  Where we lived, there was a park where

22  they would play ball, the school kids.  And all the time

23  there was a car looking toward my apartment.

24     Q.   What did you think about that?

25     A.   That the police were watching me.

1    Q.    Did you get scared that something was going to

2 happen?

3    A.    Yes.

4    Q.    How did Chico react when you told him you were

5 going to stop selling drugs for him?

6    A.    He didn't like it very much.

7    Q.    And did he say anything to you -- well, let me

8 back up.

9              Why do you think that he didn't like it

10 very much?

11    A.    I could see it in his face.  I could see it in

12 his features.

13    Q.    Did he ever say anything to you?

14    A.    About that, no.

15    Q.    Leading up to September of 1992, had you had

16 any real problems with Chico at that point?

17    A.    No.

18    Q.    Had he ever threatened you or your family in

19 any way?

20    A.    No.

21    Q.    At some point after you stopped selling cocaine

22 for him, was there a time that he left some drugs at

23 your house?

24    A.    No.

25    Q.    So, there hadn't really been any fight or

1  anything that he was upset about up to that point; is

2  that right?

3      A.   No.

4      Q.   Mr. Rodriguez, I want to direct your attention

5  to September 30th, 1992.

6      A.   I didn't understand the question.

7      Q.   Well, I haven't asked one yet.  I will ask the

8  question.

9                At that time, were you and Diana living at

10  an apartment off of Fairway?

11      A.   Yes.

12      Q.   And was Angelo living there with you?

13      A.   Yes.

14      Q.   On that day, do you remember what you were

15  doing that day?

16      A.   Yes.

17      Q.   Tell me what you were doing.

18      A.   I was working and selling cocaine.

19      Q.   Were you still selling cocaine -- well, let me

20  back up.

21                Do you remember that September 30th, 1992,

22  was the day that Angelo went missing?

23      A.   I didn't understand you very well.

24      Q.   September 30th, 1992, do you remember that

25  being the day that Angelo was kidnapped?

```
 1        A.    Yes.

 2        Q.    And that was a time that you were -- you and

 3    Diana were living off of Fairway, you said?

 4        A.    Yes.

 5        Q.    Now, at that point in time were you and Diana

 6    still selling cocaine?

 7        A.    I didn't understand your question very well.

 8        Q.    At that time were you and Diana still selling

 9    cocaine?

10        A.    In '92?

11        Q.    On the day that Angelo went missing.

12        A.    No, not any more.

13        Q.    On the night that everything happened, what

14    were you doing?

15        A.    Sleeping.

16        Q.    Before you went to sleep, what had you been

17    doing?

18        A.    I was watching TV and I set it to turn off in

19    20 to 30 minutes.

20        Q.    And could you set your TV to do that back then?

21        A.    Yes.  I had set it so it would turn off.

22        Q.    Who else was in the apartment when you went to

23    bed?

24        A.    Before or at that moment?

25        Q.    At the time that you went to bed.
```

1    A.   No one.

2    Q.   Where -- was Diana and Angelo there?

3    A.   Yes.

4    Q.   And what were they doing?

5    A.   He was already asleep.  Both of them were.

6    Q.   Where was Angelo sleeping?

7    A.   In the living room.

8    Q.   Was he -- where was Diana sleeping?

9    A.   On the bed.

10   Q.   Do you remember if Angelo was sleeping in the

11   floor of your bedroom or in the living room?

12   A.   We left him sleeping in the living room and

13   then later on he went over there beside our bed on the

14   floor.

15   Q.   At some point after you went to sleep, do you

16   remember a sound or something waking you up?

17   A.   Before?

18   Q.   I guess after you went to sleep.

19   A.   No.

20   Q.   What woke you up?

21   A.   When I was already asleep, it was the noise at

22   the door through which they came in.

23   Q.   And what noise did you hear?  What did it sound

24   like?

25   A.   Like a kick or something.

1    Q.   When you heard that sound, what did you do

2  next?

3    A.   I got up to see what had happened in the living

4  room.

5    Q.   Did you leave the bedroom and go into the

6  living room?

7    A.   Yes.

8    Q.   What did you see when you left your bedroom?

9    A.   A person that was pointing at me with a gun.

10    Q.   Was it dark in your apartment or was it light

11  in your apartment?

12    A.   Dark-dark?  No.

13    Q.   So, was it dark?

14    A.   I don't remember that very well.

15    Q.   Okay.  Was it nighttime when this was

16  happening?

17    A.   Like 11:00, like 11:30.

18    Q.   Did you get a good look or were you able to

19  look at the person that was pointing the gun at you?

20    A.   No.

21    Q.   What do you remember about that person that was

22  pointing the gun?

23    A.   That his face was covered.

24    Q.   What was his face covered with?

25    A.   With some type of mask, the type that you wear

```
 1    when it's cold.
 2         Q.   Do you remember if it was a dark mask or a
 3    light-colored mask?
 4         A.   It was like black or blue.
 5         Q.   And, Mr. Rodriguez, were you able to look -- to
 6    see any part of that person's face at all or tell
 7    anything about his face?
 8         A.   No.
 9         Q.   Was the person short or tall, or could you
10    tell?
11         A.   He was tall.
12         Q.   Would you say he was a lot taller than you or
13    how would you describe him?
14         A.   Yes, tall.
15         Q.   Were you able to tell anything else about that
16    person?
17         A.   The color of the person.
18         Q.   And what do you remember about that, the color
19    of the person?
20         A.   Like a colored person.
21         Q.   Was the person dark-skinned or light-skinned?
22         A.   Darker than me.
23         Q.   When you encountered that person in the living
24    room, was the person saying anything to you?
25         A.   Yes.
```

1    Q.   Do you remember anything about what the person

2  was saying?

3    A.   Yes.  To go back, to go back.

4    Q.   And did you feel threatened at that point?

5    A.   Yes.

6    Q.   Mr. Rodriguez, at that time, did you see more

7  than one person or just the tall person?

8    A.   At that moment, I saw another person that was

9  raping my wife.

10    Q.   Okay.  Was that -- and I will visit with you

11  about that; but I want to first ask you a couple more

12  questions.

13         When the person was telling you to get

14  back, could you tell anything about that person's voice?

15    A.   Yes.  It was a person that was saying almost

16  everything to me in English.

17    Q.   Was it clear English -- well, let me ask

18  another question.

19         Do you speak -- or did you speak any

20  English back then in 1992?

21    A.   No.

22    Q.   How did you know what the person was telling

23  you or saying to you?

24    A.   Because I couldn't understand what he was

25  telling me.

1    Q.   You said that the person was saying to get

2  back, get back.   Was -- were they saying that in English

3  or Spanish?

4    A.   I don't remember very well if it was in English

5  or Spanish, but that instance one understands that you

6  need to go.

7    Q.   Was the person coming towards you?

8    A.   Yes.

9    Q.   Did the person -- did you think that the person

10  had an accent or no accent?

11    A.   Yes, accent.

12    Q.   Was the accent different than yours?

13    A.   Yes.

14    Q.   Was it an accent like mine or something

15  different?

16    A.   No, different.

17    Q.   Okay.   Did you think that the person was

18  Spanish or Hispanic or did you know?

19    A.   He wasn't Hispanic.   He was like from Central

20  America or something.

21    Q.   So, his accent was different than your accent?

22    A.   Yes.

23    Q.   What do you remember happening next,

24  Mr. Rodriguez?

25    A.   At that moment they knelt me by the bed, they

1    tied me up with a cord, maybe from the alarm clock or

2    from the phone, and they put a cloth or a rag or

3    something on my mouth.  At that moment, I looked like

4    this (indicating).  Everything was very fast.  I saw --

5    I saw the person, the accused, at that moment raping my

6    wife.

7         Q.   Were you able to see the other person that had

8    come into the apartment?

9         A.   At that moment what I recall, I saw like two

10   people.  That's all.  The one that was beating me and

11   the one that was raping my wife.

12        Q.   Okay.  I want to visit with you about the

13   person that was beating you.  What were you being beaten

14   with, do you know?

15        A.   With a gun.

16        Q.   Where were you being struck?

17        A.   At the edge of the bed.  I was like kneeling.

18        Q.   And is this after you had been tied up?

19        A.   I think that it was when they tied me up.

20        Q.   Okay.  And what part of your body were you

21   being hit with the gun?

22        A.   My head.

23        Q.   Were you hit just one time or many times?

24        A.   About two to three times.  And here, the side

25   of my ribs (indicating).

1      Q.    Were you also being kicked or just hit?

2      A.    Kicked me -- first they were beating me with

3  the gun and then they kicked me.

4      Q.    When you say "they," what do you mean?  Was it

5  one person or more than one person?

6      A.    One person.

7      Q.    Was it the person that you described as being

8  tall?

9      A.    Yes.

10      Q.    The one that was wearing the mask that you

11  described; is that right?

12      A.    Yes.

13      Q.    Okay.  During the time that you were being

14  beaten, did you stay down there on the floor?

15      A.    Yes.

16      Q.    While you were being beaten, was the person

17  that was beating you saying anything to you?

18      A.    Yes, like in English.

19      Q.    Was it the same voice that you heard before in

20  the living room?

21      A.    Yes.

22      Q.    During the time that you were being beaten,

23  were you always awake or did you lose consciousness at

24  any point?

25      A.    As I was being beaten?

1      Q.   Yes.

2      A.   No, I did not lose consciousness, but I was all

3 bloody.

4      Q.   Do you remember if they ever -- if the person

5 ever put anything over your head?

6      A.   Yes.   The pillowcase.

7      Q.   Was the pillowcase put over your head after

8 your mouth was tied up or do you remember?

9      A.   That pillowcase was put over me at the moment

10 that I was looking around like this as they were raping

11 my wife.

12      Q.   Okay.  Mr. Rodriguez, I want to ask you:   From

13 where you were, could you tell that someone was raping

14 or sexually assaulting your wife?

15      A.   Yes, I do remember.

16      Q.   Was she making any sounds or crying out in any

17 way?

18      A.   I do not remember.

19      Q.   Okay.  Now, you couldn't -- or could you

20 actually see who was doing that to your wife?

21      A.   I didn't see the person.  I just saw the mask.

22      Q.   So, was the other person in the room also

23 wearing a mask?

24      A.   Yes.

25      Q.   So, did you believe that both of the people

1    inside of the bedroom were wearing masks?

2         A.    Yes.

3         Q.    Do you know where Angelo was while you were

4    being beaten?

5         A.    Right next to me.

6         Q.    And do you recall what he was doing or was he

7    saying anything?

8         A.    Who?  The little boy?

9         Q.    Angelo.

10        A.    No.  He was asleep.  He didn't even know what

11   was going on.

12        Q.    The second person in the room that you said was

13   raping your wife, do you remember him ever saying

14   anything?

15        A.    That person did not speak.

16        Q.    Mr. Rodriguez, how long do you think that this

17   happened?  How long do you think this went on?

18        A.    Seconds.

19        Q.    Do you think it all happened very quickly?

20        A.    Yes.

21        Q.    How did it end?

22        A.    It ended that I felt Baby Angelo, that they

23   took Baby Angelo like by the arm or something.

24        Q.    Could you see that or how do you know that?

25        A.    I didn't see it.  I just felt it and heard it.

1    Q.   Okay.  How was it that you -- let me back up.

2              Were you tied up still at the point with

3    the cord?

4    A.   Yes.

5    Q.   How did you get loose from it?

6    A.   Because my wife at the moment that they left

7    with the baby, she took off the pillowcase.  And at that

8    moment, I got loose and I went out running looking for

9    the child, all full of blood, and I didn't see him.

10   Q.   Was the bedroom that you guys were in, was it a

11   mess?  Had they gone through the bedroom?

12   A.   Everything.

13   Q.   Do you remember if any of your personnel

14   belongings were missing that night?

15   A.   Yes.

16   Q.   What was missing, do you remember?

17   A.   My passport and a bracelet that I had.  That's

18   all that I can recall.

19   Q.   Do you remember if your wallet was missing that

20   night or do you know?

21   A.   I don't recall.  I just know that my passport

22   was missing.

23   Q.   Do you remember Diana eventually calling 911?

24   A.   That, I do not recall.

25   Q.   Okay.  Tell us a little bit about what your

1    injuries were afterwards.

2         A.   That night?

3         Q.   Yes.

4         A.   The beating that they gave me on the head and

5    then a kick that they gave me to my ribs.

6         Q.   Were you treated by the ambulance that came

7    there to look at you?

8         A.   It wasn't an ambulance.  It was firemen.

9         Q.   Okay.

10        A.   And I was very scared and I told them not to

11   treat me, just to leave me alone.

12        Q.   Okay.  So, did they bandage you up and they

13   left?

14        A.   No, nothing.

15        Q.   Okay.  Afterwards, do you remember talking to

16   the police?

17        A.   I don't remember if -- later a Hispanic man did

18   arrive, a policeman, and his last name was Hernandez.

19        Q.   And do you remember talking to him?

20        A.   Yes.  He investigated how everything had

21   happened.

22        Q.   And you and Diana went down to the police

23   station, didn't you?

24        A.   That night?  No.  Later.

25        Q.   And, in fact, you went down to the police

1    station several times in those weeks following?

2        A.   About two to three weeks every day downtown.   I

3    don't remember how long, but more or less.

4        Q.   Arturo, at first you and Diana weren't honest

5    with the police about selling drugs, were you?

6        A.   I didn't understand you.

7        Q.   At first when the police asked you, you and

8    Diana weren't truthful about selling drugs, were you?

9        A.   Not that night.   Later when we went to give a

10   statement and everything.

11       Q.   And why didn't you tell them that night about

12   the drugs?

13       A.   I don't remember.

14       Q.   But you remember telling the police soon after

15   that?

16       A.   Yes.

17       Q.   When you went down to the police station and

18   gave a statement --

19       A.   Yes.

20       Q.   -- do you remember that that statement was to

21   Officer Hernandez?

22       A.   I don't recall if it was to Hernandez or

23   someone else.

24       Q.   All right.   Do you remember the day that

25   Angelo's body was found?

1      A.   About a month, more or less.

2      Q.   And what were you doing that day when you found

3 out the news?

4      A.   At home in my apartment.

5      Q.   Arturo, after the night that Angelo was taken,

6 did the defendant, Chico, ever come and see you and

7 Diana again?

8      A.   No.

9      Q.   Did he ever call and check on Angelo?

10      A.   No.

11      Q.   In fact, after that night, did you ever see him

12 again?

13      A.   No.

14      Q.   Is this the first time that you have seen him

15 since that time?

16      A.   Right now?

17      Q.   Yes.

18      A.   Yes.

19             MR. WOOD:   I pass the witness.

20             THE COURT:   Thank you, Mr. Wood.

21             We're going to break for the day.   It's

22 5:25 and we've had a full day of testimony.

23             And so, jurors, I'm going to admonish you

24 that you are reminded you should not talk amongst

25 yourselves or with anyone else on any subject connected

1  with this trial or to form or express any opinion

2  thereon until the end of the trial.

3            Let's get started again at 10:00 in the

4  morning.  And if you could all plan to be here by, you

5  know, maybe ten minutes till.  We'll plan to start right

6  on time at 10:00.  Okay?

7            And so, Deputy --

8            THE BAILIFF:  Yes, Your Honor.

9            THE COURT:  -- go ahead and take the jury

10 out.

11           THE BAILIFF:  All rise.

12           (Open court, defendant present, no jury)

13           THE COURT:  Mr. Rodriguez, you are ordered

14 to return tomorrow at 9:50.  We'll be starting with your

15 testimony.  Okay?

16           THE WITNESS:  Okay.

17           THE COURT:  All right.  See y'all tomorrow

18 at 10:00.

19           MR. CORNELIUS:  Yes, ma'am.

20           (Proceedings recessed)

21

22

23

24

25

1                      **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS   )
   COUNTY OF HARRIS      )

3

4       I, Mary Ann Rodriguez, Official Court Reporter in

5  and for the 337th District Court of Harris County, State

6  of Texas, do hereby certify that the above and foregoing

7  contains a true and correct transcription of all

8  portions of evidence and other proceedings requested in

9  writing by counsel for the parties to be included in

10 this volume of the Reporter's Record, in the

11 above-styled and numbered cause, all of which occurred

12 in open court or in chambers and were reported by me.

13      I further certify that this Reporter's Record of

14 the proceedings truly and correctly reflects the

15 exhibits, if any, admitted by the respective parties.

16      WITNESS MY OFFICIAL HAND this the 3rd day of

17 October, 2013.

18

19

20 /s/ Mary Ann Rodriguez
   Mary Ann Rodriguez, Texas CSR 3047
21 Expiration Date:  12/31/2013
   Official Court Reporter
22 337th Court
   1201 Franklin
23 Houston, Texas  77002
   713.755.7746

24

25

# $

**$10** - 175:20
**$20** - 175:20, 175:23

# '

**'77** - 59:21
**'85** - 60:4
**'92** - 36:6, 129:13, 206:10
**'skip'** - 2:11

# /

**/s** - 221:20

# 0

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12
**07** - 99:20

# 1

**1** - 65:2
**1-by-4's** - 69:5
**10** - 2:3, 3:11, 20:25, 23:12, 23:15, 23:22, 24:3, 52:12, 67:14, 68:11, 161:5, 175:23, 176:19, 196:8
**10's** - 47:21
**10-minute** - 146:23
**10:00** - 25:23, 61:19, 220:3, 220:6, 220:18
**11** - 2:4, 3:15, 21:1, 23:12, 67:14, 68:23
**112** - 1:10, 1:18
**11:00** - 61:19, 208:17
**11:30** - 208:17
**11:49** - 48:12
**11:50** - 48:11, 64:23
**12** - 2:5, 3:20, 7:20, 21:4, 23:12, 67:14, 69:23
**12/31/2013** - 221:21
**120** - 1:11, 1:19, 61:4
**1200** - 91:11
**1201** - 2:6, 221:22
**1225** - 2:15
**12:35** - 64:1, 64:10, 64:24, 96:12
**12th** - 19:13, 60:10
**13** - 2:6, 3:23, 21:4, 23:12, 46:17, 67:14, 70:20
**137** - 3:1
**138** - 3:1
**13847894** - 17:6
**1384794** - 1:3, 26:22, 97:7
**1390130** - 17:16
**13th** - 47:22, 123:1
**14** - 2:7, 4:1, 7:20, 21:4, 23:12, 46:24, 67:14, 71:15
**140** - 3:5, 3:7, 3:8, 3:9, 3:10
**141** - 3:5, 3:7, 3:8, 3:9, 3:10
**146** - 93:1, 93:23, 94:8
**15** - 2:8, 4:3, 21:4, 23:12, 35:11, 46:24, 67:14, 71:25, 161:5, 173:13, 196:8
**16** - 2:9, 4:5, 21:16, 23:12, 67:14, 72:12
**169** - 3:2
**17** - 2:10, 4:7, 21:16, 23:12, 67:14, 72:19
**170** - 3:2, 3:3, 3:4
**171** - 3:6
**174** - 1:11, 1:19
**18** - 1:2, 1:1, 1:4, 1:5, 1:6,
1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:16, 1:17, 1:18, 1:19, 1:20, 1:23, 1:24, 1:25, 2:1, 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:13, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 21:17, 23:12, 67:14, 73:1, 73:8
**18th** - 18:18
**19** - 2:12, 4:11, 10:4, 22:6, 23:12, 23:15, 23:22, 24:3, 67:14, 73:11
**194** - 1:12, 1:20
**1970** - 123:1
**1984** - 60:4
**1990** - 60:8
**1992** - 2:1, 17:22, 18:5, 27:3, 27:11, 29:9, 30:17, 30:21, 35:15, 35:22, 36:3, 37:21, 47:12, 47:14, 47:23, 52:10, 52:18, 53:18, 56:15, 56:18, 59:23, 60:10, 61:18, 63:7, 63:13, 63:23, 95:9, 96:9, 101:9, 102:18, 137:6, 140:15, 141:23, 142:11, 142:16, 144:18, 166:18, 175:19, 191:25, 204:15, 205:5, 205:21, 205:24, 210:20
**1993** - 22:17
**19th** - 18:18
**1:30** - 97:1
**1st** - 33:3, 34:16, 60:8, 64:1, 166:18, 166:21, 166:23

# 2

**2.0** - 111:3
**2.004** - 107:13
**2.007** - 99:8
**20** - 2:13, 67:14, 73:17, 85:13, 148:21, 176:19, 206:19
**200** - 61:4
**2003** - 19:19
**2004** - 19:19
**2007** - 35:11, 35:14, 35:15, 36:5
**2013** - 1:20, 1:3, 221:17
**2028** - 2:12
**21** - 2:14, 67:14, 73:24, 109:2
**22** - 2:15, 67:14, 74:5
**221** - 1:13
**225** - 93:22, 93:23, 94:6
**23** - 2:16, 3:13, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 67:14, 74:13
**24** - 2:17, 3:13, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 67:15, 74:19
**24039247** - 2:5
**25** - 2:18, 67:15, 74:24, 111:25, 112:7, 190:21, 191:1, 191:4
**26** - 1:4, 1:5, 2:19, 65:17, 67:15, 75:23, 195:14
**27** - 2:20, 67:15, 76:8, 123:25, 195:14
**28** - 2:21, 67:15, 76:15
**28th** - 137:6
**29** - 1:6, 2:22, 67:15, 76:23

# 3

**3** - 68:3, 68:4, 83:18
**3-foot-6** - 92:12
**30** - 2:23, 17:22, 18:5, 27:3, 27:11, 52:21, 60:21, 65:17, 67:15, 80:8, 129:14, 148:22, 206:19
**3047** - 221:20
**30th** - 30:21, 30:25, 35:19, 35:22, 37:21, 47:23, 52:18, 63:13, 63:23, 96:9, 144:18, 191:25, 205:5, 205:21, 205:24
**31** - 2:24, 46:21, 52:13, 67:2, 67:9, 67:11, 67:15, 67:18, 83:22
**32** - 2:25, 80:25, 81:9, 81:11, 81:16, 81:23, 81:25, 82:3, 82:4, 129:14
**337th** - 1:12, 221:5, 221:22
**34** - 129:14
**35** - 83:18
**36** - 29:12, 29:13, 29:15, 30:2, 35:4, 39:12, 59:19
**38** - 123:24
**3:00** - 146:24
**3rd** - 221:16

# 4

**4,000-dollar** - 185:24
**40** - 19:14, 19:21, 60:25, 123:24
**41** - 1:6
**42** - 3:1, 136:24, 137:11, 137:12, 137:22, 137:24
**43** - 1:23, 1:24
**440** - 2:15
**45** - 1:8, 1:16
**4:30** - 194:8
**4th** - 26:12

# 5

**5** - 1:23, 43:2, 43:4, 43:7, 43:11, 43:14, 82:23
**53** - 1:25
**54** - 1:8, 1:16, 1:25
**59** - 1:9, 1:17
**5:25** - 219:22
**5th** - 29:9, 29:17, 30:17, 39:14, 91:2, 91:4

# 6

**6** - 1:24, 43:2, 43:4, 43:7, 43:12, 43:14, 83:18, 145:11
**6-year-old** - 29:12, 30:1, 30:10
**60** - 61:3
**61** - 3:2, 169:11, 169:17, 169:18, 169:20, 169:22
**610** - 30:24, 65:13
**67** - 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24
**6705** - 48:2, 68:3
**6:00** - 61:19

# 7

**7** - 1:25, 50:1, 53:8, 53:13, 53:21, 53:23, 53:25, 54:2, 145:11
**7-year-old** - 63:17, 117:13
**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 221:23
**713.877.9400** - 2:16
**77002** - 2:6, 221:23
**77002-1659** - 2:16
**77019-2408** - 2:13
**7:00** - 61:20

# 8

**8** - 1:3, 2:1, 95:9, 95:18, 95:19, 95:24, 96:2, 96:9
**80** - 3:3, 61:3, 170:1, 170:7, 170:8, 170:18
**80-what** - 141:2
**80s** - 37:6, 37:9
**81** - 2:25, 3:4, 170:2, 170:7, 170:8, 170:19
**82** - 2:25
**83** - 3:5, 139:22, 140:17, 140:19, 141:3, 141:13, 141:14, 141:18, 200:11
**84** - 3:6, 170:21, 171:5, 171:7, 171:22, 171:24, 171:25
**85** - 3:7, 140:1, 140:18, 140:19, 141:5, 141:6, 141:13, 141:14, 142:9
**86** - 3:8, 140:4, 141:7, 141:13, 142:1
**87** - 3:9, 140:7, 141:8, 141:13, 142:15
**88** - 3:10, 140:10, 140:18, 140:19, 141:5, 141:7, 141:13, 141:14, 142:18
**8th** - 1:20

# 9

**9** - 2:2, 67:2, 67:9, 67:11, 67:13, 67:18, 67:25
**911** - 1:23, 1:24, 16:15, 16:21, 32:8, 32:10, 43:3, 43:16, 44:1, 44:22, 44:24, 164:23, 216:23
**95** - 2:1
**96** - 2:1
**98** - 1:9, 1:17
**9:50** - 220:14

# A

**aback** - 34:19
**abducted** - 130:5, 130:7, 131:25, 190:8
**able** - 10:14, 16:2, 30:13, 31:22, 32:9, 36:5, 36:8, 36:13, 36:15, 40:8, 44:2, 50:19, 57:7, 106:5, 143:17, 143:22, 169:2, 208:18, 209:5, 209:15, 212:7
**above-entitled** - 1:21
**above-styled** - 221:11
**academy** - 46:15, 59:20
**accent** - 105:6, 106:20, 106:22, 108:5, 108:8, 108:9, 108:12, 108:13, 114:10, 152:4, 152:8, 164:13, 183:24, 211:10, 211:11, 211:12, 211:14, 211:21
**accents** - 105:16
**access** - 19:14
**Accident** - 59:22
**accidents** - 47:6
**according** - 4:14, 22:10
**accumulable** - 41:2, 41:3
**accumulation** - 110:24
**accurate** - 140:14
**accurately** - 53:16, 67:5
**accuse** - 189:6

**accused** - 203:5, 212:5
**accusers** - 11:10
**acknowledge** - 18:24
**acquired** - 22:11
**actions** - 41:2
**actual** - 15:25, 42:6, 43:4, 44:12, 44:23, 64:12, 81:12
**added** - 106:11
**adding** - 105:20
**addition** - 28:22, 36:23, 78:25
**address** - 91:11, 137:17
**admissible** - 14:1, 22:3, 23:2, 25:5
**admission** - 42:14
**admit** - 21:19, 137:21
**admitted** - 15:6, 23:23, 25:8, 25:10, 42:11, 43:12, 54:1, 67:15, 81:25, 95:23, 95:24, 137:22, 141:12, 141:13, 169:20, 171:23, 188:25, 189:7, 189:10, 221:15
**Admitted** - 1:22, 3:14, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 24:3, 43:14, 54:2, 67:18, 82:4, 96:2, 137:24, 141:15, 169:22, 171:24
**admitting** - 119:11
**admonish** - 219:23
**advances** - 35:14, 36:4
**Aerial** - 1:25
**aerial** - 53:14, 53:15
**affects** - 73:4
**affidavit** - 1:23, 6:7, 6:8, 22:10, 43:3
**afraid** - 166:7, 187:22
**African** - 114:24, 116:2, 116:25, 180:22, 181:5, 181:22, 182:11
**African-american** - 114:24, 116:2, 116:25
**African-americans** - 181:5
**afternoon** - 120:24, 120:25, 194:22, 194:23
**afterwards** - 217:1
**Afterwards** - 217:15
**Age** - 110:9
**age** - 55:14
**agencies** - 61:5
**ago** - 93:12, 100:25, 175:11
**agree** - 9:18, 104:11
**agreed** - 135:21
**ahead** - 16:6, 16:14, 28:23, 115:4, 115:12, 132:19, 137:21, 166:22, 169:24, 220:9
**aid** - 43:17, 44:4
**aided** - 1:24
**air** - 55:8, 55:12
**airport** - 39:22
**alarm** - 32:2, 77:18, 77:20, 148:21, 159:24, 212:1
**alive** - 170:15
**alleged** - 98:24, 101:13, 105:3
**allegedly** - 110:12, 140:24
**allow** - 9:21, 9:23, 11:22, 11:23, 20:5, 20:7, 41:23, 44:16, 171:19
**allowed** - 3:6, 10:19, 21:13, 23:6, 36:4
**allowing** - 11:19
**almost** - 72:7, 79:15, 80:2, 85:23, 93:4, 101:2, 183:19, 210:15
**alone** - 72:15, 119:17, 217:11

**Alphabetical** - 1:15
**ambulance** - 51:10, 75:17, 75:19, 75:20, 165:24, 217:6, 217:8
**Amendment** - 11:10, 11:12
**America** - 211:20
**american** - 108:14, 114:24, 116:2, 116:25
**americans** - 181:5
**amicable** - 86:3
**analysis** - 8:25, 22:20, 22:22, 35:16, 36:6
**analyst** - 22:13
**analysts** - 36:11
**Angelita** - 34:10, 34:11, 34:13, 34:18, 34:25, 35:3, 37:4, 37:7, 37:11, 135:3, 135:4, 135:16, 138:15, 138:16, 139:8, 141:7, 142:2, 167:10, 167:21, 168:9, 168:14, 202:1, 202:4, 202:9, 202:14, 202:21
**Angelita's** - 39:18
**Angelo** - 14:5, 17:25, 18:1, 18:8, 18:9, 27:6, 27:7, 27:14, 27:15, 29:13, 29:21, 30:1, 30:5, 30:9, 31:3, 31:18, 32:3, 32:4, 32:5, 32:15, 33:17, 33:22, 34:18, 34:23, 35:4, 38:3, 38:5, 38:8, 38:10, 39:1, 40:5, 41:3, 42:5, 68:20, 70:23, 70:24, 83:14, 86:5, 86:11, 87:8, 91:4, 92:19, 95:4, 103:15, 123:7, 123:8, 123:21, 123:24, 124:22, 125:1, 125:11, 126:21, 130:5, 130:7, 131:25, 134:11, 134:19, 134:21, 135:8, 144:21, 144:22, 145:10, 147:20, 148:5, 155:3, 155:4, 158:15, 158:16, 158:17, 159:1, 159:2, 159:5, 159:6, 160:20, 163:6, 163:9, 163:15, 164:9, 164:16, 165:4, 165:18, 168:20, 169:5, 170:4, 197:11, 202:11, 205:12, 205:22, 205:25, 206:11, 207:2, 207:6, 207:10, 215:3, 215:9, 215:22, 215:23, 219:5, 219:9
**Angelo's** - 33:17, 34:15, 35:12, 39:4, 39:9, 86:11, 169:14, 218:25
**angle** - 34:1, 74:21
**Anglos** - 102:1
**Ann** - 221:4, 221:20
**answer** - 42:9, 86:20, 86:22, 103:20, 153:25, 154:1, 180:24, 182:14
**answered** - 182:15
**answering** - 105:1
**answers** - 42:1
**anticipate** - 42:21
**Antonio** - 173:5
**anyway** - 3:25
**Ap-77,025** - 1:4
**apartment** - 29:10, 29:16, 29:20, 30:23, 31:9, 31:21, 31:24, 32:4, 32:24, 35:23, 37:24, 38:11, 39:18, 49:2, 49:7, 53:11, 56:4, 65:11, 65:12, 65:16, 65:20, 70:1, 70:2, 70:13, 73:8, 76:2, 76:9, 79:2, 79:8, 79:20, 83:23, 87:15, 88:19, 88:24, 89:7, 89:10, 93:3, 93:20, 118:21, 128:16, 128:17, 129:17, 129:20, 130:11,

130:13, 130:16, 130:21, 130:23, 131:2, 131:8, 131:25, 135:17, 135:20, 135:21, 135:25, 136:12, 136:14, 136:24, 137:16, 138:1, 143:7, 149:5, 161:2, 163:23, 163:25, 167:17, 168:21, 178:6, 178:8, 178:9, 178:12, 184:20, 185:3, 187:2, 187:7, 202:14, 202:18, 203:23, 205:10, 206:22, 208:10, 208:11, 212:8, 219:4
**Apartment** - 3:1, 68:3, 130:12
**Apartments** - 137:4
**apartments** - 34:22, 164:17
**apologizing** - 5:9, 5:10
**apparent** - 92:10, 102:21
**appeal** - 4:1, 4:24, 23:10
**Appeals** - 1:4
**appear** - 79:18
**appeared** - 71:6, 159:25
**Appellant** - 1:7
**appellate** - 5:1, 19:4
**Appellee** - 1:12
**approach** - 25:14, 53:3, 66:24, 80:22, 88:4, 95:6, 105:23, 111:22, 136:21, 169:8, 171:10, 193:19
**Approach** - 43:20
**approaching** - 9:19, 12:15, 13:1, 23:4, 23:7
**April** - 123:1, 137:6
**area** - 9:24, 47:16, 47:20, 48:4, 52:25, 53:13, 65:13, 66:2, 70:10, 70:21, 70:25, 72:21, 73:2, 74:1, 74:2, 74:14, 75:14, 79:2, 80:19, 84:23, 91:23, 92:25, 93:4, 106:16, 151:21
**areas** - 71:2
**argue** - 12:4, 19:2
**argued** - 12:7
**argument** - 21:22, 21:25, 23:25
**arise** - 85:21, 87:18
**arises** - 25:13
**arm** - 215:23
**arms** - 151:5, 151:23
**arraign** - 12:10, 17:14, 26:19
**arrangement** - 144:5
**arrive** - 48:13, 217:18
**arrived** - 49:12, 51:22, 75:6
**arrives** - 32:13
**Arturo** - 1:12, 1:20, 30:22, 31:6, 31:11, 31:13, 31:25, 32:5, 32:8, 32:11, 32:20, 33:1, 33:4, 33:15, 33:22, 34:19, 35:24, 37:2, 37:17, 37:23, 49:21, 51:5, 51:6, 75:7, 77:21, 79:6, 83:5, 87:9, 87:22, 89:14, 90:1, 90:10, 101:14, 109:11, 111:2, 113:1, 121:10, 121:11, 121:15, 122:22, 125:4, 125:6, 125:12, 125:13, 125:16, 125:23, 125:25, 126:3, 126:9, 126:15, 127:8, 127:13, 128:5, 128:20, 129:4, 132:6, 132:23, 133:9, 133:16, 133:17, 133:20, 133:24, 134:5, 134:14, 134:22, 139:4, 141:8, 142:19, 142:20, 143:14, 143:22, 144:7, 145:1, 145:2, 148:11,

149:2, 149:18, 150:21, 152:17, 152:18, 153:21, 154:8, 154:14, 155:8, 155:20, 156:7, 157:2, 157:8, 157:17, 158:18, 158:21, 158:24, 159:5, 160:18, 161:15, 161:19, 163:1, 163:8, 163:14, 164:6, 166:4, 172:25, 173:10, 174:10, 176:3, 177:3, 178:16, 178:18, 179:18, 180:7, 180:8, 180:9, 185:2, 185:10, 185:12, 186:7, 186:22, 191:9, 191:11, 193:17, 194:17, 195:3, 195:5, 218:4, 219:5
**Arturo's** - 34:23, 35:23, 38:11, 93:20, 111:5, 159:11, 159:16, 160:10, 179:20, 186:2, 186:3
**ashtray** - 80:3
**Asian** - 100:13, 114:14
**asleep** - 76:18, 207:5, 207:21, 215:10
**assailants** - 98:25, 105:4, 109:21
**assault** - 35:18, 36:12, 36:14, 36:17, 49:14, 83:9, 89:20, 109:11
**assaulted** - 108:17, 110:13, 117:12
**assaulting** - 31:20, 214:14
**assigned** - 46:3, 46:16, 46:19, 46:22, 47:14, 47:18, 47:20, 59:21, 61:7, 61:11, 61:17, 61:19, 61:21
**assignment** - 46:10, 47:1
**assignments** - 46:13
**assist** - 44:5, 44:21, 95:12
**assistance** - 84:11
**Assistant** - 2:5
**assistant** - 19:9
**associate** - 37:22
**associates** - 33:14
**associations** - 61:6
**assured** - 19:22
**attackers** - 57:14, 104:7
**attempt** - 110:11
**attempting** - 17:24, 18:7, 27:5, 27:13
**attention** - 47:12, 69:20, 78:25, 79:4, 79:9, 124:14, 205:4
**attitude** - 126:19, 126:20
**Attorney** - 1:6
**attorney's** - 102:14
**attorneys** - 28:15
**Attorneys** - 2:5, 2:7, 2:17
**audio** - 16:16
**authority** - 17:18, 26:24
**automatic** - 112:1, 112:7, 191:1
**automatically** - 114:24
**autopsy** - 91:7
**averaged** - 61:2
**Aviles** - 37:22
**awake** - 148:14, 213:23
**aware** - 14:19
**awhile** - 100:24

**B**

**Baby** - 29:12, 29:21, 30:9, 31:18, 42:5, 134:19, 134:21, 144:21, 144:22, 155:3, 155:4, 158:15, 158:16, 158:17, 159:1, 159:2, 159:5, 159:6, 160:20, 163:6, 163:9, 163:15, 164:9, 164:16, 165:17, 170:4, 197:11,

202:11, 215:22, 215:23
**baby** - 32:10, 32:11, 103:16, 168:24, 170:4, 216:7
**back-door** - 58:7
**backed** - 68:12, 152:17
**backed-up** - 68:12
**background** - 70:4, 70:6, 91:25, 93:1, 122:5
**Backwards** - 149:24
**backwards** - 150:6, 150:12
**bad** - 38:19, 119:15, 119:16, 130:18, 136:11, 142:23, 154:9, 155:22
**badge** - 60:2, 60:3
**badly** - 32:1
**bag** - 82:1, 82:2, 146:16
**baggie** - 176:4
**bags** - 176:1
**Bailiff** - 6:16, 25:21, 25:25, 45:10, 58:23, 97:3, 120:11, 147:5, 147:13, 194:10, 220:8, 220:11
**bailiff** - 28:13, 97:2
**ball** - 203:22
**bandage** - 75:22, 217:12
**bang** - 149:9, 149:17
**bar** - 102:14
**Barnett** - 53:9, 53:12, 65:14, 84:10
**base** - 42:12
**baseball** - 53:10
**based** - 8:2, 36:18, 52:14, 80:18, 87:4, 108:9, 118:17
**basic** - 13:3, 113:21
**basis** - 91:14
**bathroom** - 70:17, 74:15
**Batman** - 30:9, 30:14, 83:18, 92:22, 147:23, 147:24, 147:25
**battle** - 85:24
**bays** - 91:18
**Baytown** - 29:22, 30:16, 38:12, 39:6, 91:5, 91:6, 91:12, 91:15, 91:19, 92:4, 92:5, 93:23, 94:9
**beach** - 29:24
**beat** - 47:20, 47:21, 75:11, 157:1, 161:15
**beaten** - 31:14, 31:17, 32:1, 154:14, 212:13, 213:14, 213:16, 213:22, 213:25, 215:4
**beating** - 152:18, 153:20, 154:8, 154:16, 155:3, 155:9, 155:11, 158:18, 161:18, 212:10, 212:13, 213:2, 213:17, 217:4
**became** - 37:12, 37:14, 126:24, 127:2
**become** - 137:17, 197:22, 198:18
**becomes** - 102:21
**bed** - 30:6, 31:3, 31:5, 31:12, 70:12, 71:7, 71:22, 74:21, 74:25, 76:18, 76:19, 76:21, 77:1, 86:15, 146:5, 146:8, 146:13, 147:21, 148:2, 148:5, 148:7, 148:11, 148:13, 149:3, 149:21, 152:19, 152:24, 152:25, 153:3, 153:4, 154:11, 154:14, 154:15, 154:18, 154:23, 154:25, 156:5, 160:19, 161:14, 161:15, 162:2, 206:23, 206:25, 207:9, 207:13, 211:25, 212:17
**bedroom** - 31:4, 70:2,

70:7, 70:10, 70:17, 71:7, 71:12, 72:23, 73:19, 74:2, 74:14, 76:12, 148:17, 148:19, 156:12, 159:8, 160:7, 160:17, 161:25, 162:20, 163:16, 163:18, 164:3, 164:4, 164:6, 180:18, 182:19, 186:22, 187:10, 187:11, 187:17, 207:11, 208:5, 208:8, 215:1, 216:10, 216:11
**bedroom's** - 70:4
**bedside** - 76:1
**bedtime** - 31:2
**beeper** - 203:6, 203:7, 203:8, 203:11, 203:14
**began** - 30:20, 31:19, 66:9, 128:4
**begin** - 12:19, 72:23
**beginning** - 198:12
**begins** - 32:15
**behind** - 72:4, 80:20
**belief** - 110:22
**Bell** - 85:4
**belong** - 61:6
**belonged** - 80:17
**belongings** - 216:14
**Bench** - 43:21, 88:7, 105:25, 171:12, 193:21
**bench** - 9:19, 12:15, 16:19, 23:4, 23:7, 43:20, 88:4, 105:24
**benefit** - 40:14
**beside** - 147:17, 207:13
**best** - 39:2, 58:3, 102:16, 182:14, 183:10, 191:22
**better** - 16:18, 74:25, 118:8, 198:25, 199:1, 199:5, 200:4
**between** - 61:3, 65:13, 71:1, 86:10, 126:25, 132:6, 165:13, 179:18, 181:1, 181:4, 182:1
**beyond** - 40:22, 42:3
**bicycle** - 68:18, 68:19, 68:22
**big** - 65:15, 70:1, 71:1, 92:12, 119:12, 149:9, 149:17, 150:15, 150:16, 150:18, 150:23, 180:17
**bigger** - 72:9
**bills** - 177:1
**Bingo** - 203:15
**bit** - 31:6, 61:9, 65:10, 71:4, 74:25, 91:10, 115:10, 115:20, 121:18, 144:19, 148:12, 159:10, 160:11, 175:22, 175:23, 195:8, 201:5, 201:20, 216:25
**black** - 54:20, 54:24, 54:25, 55:10, 58:4, 66:2, 99:6, 99:7, 100:8, 100:10, 100:15, 100:19, 101:1, 101:4, 101:6, 101:8, 101:10, 101:17, 101:22, 101:25, 102:1, 102:19, 102:21, 104:8, 104:15, 105:4, 105:7, 105:15, 109:21, 114:9, 114:14, 114:23, 115:25, 116:3, 116:10, 116:12, 117:4, 117:5, 172:6, 172:21, 172:23, 180:11, 180:15, 180:19, 181:21, 182:2, 182:5, 182:8, 182:22, 183:2, 209:4
**Black** - 152:15
**blanket** - 119:4, 157:24, 158:9
**blankets** - 71:9
**bleeding** - 32:1, 75:15,

163:4
**blew** - 39:16
**Blizzard** - 19:9
**blood** - 34:4, 39:3, 75:2, 75:4, 163:5, 196:4, 216:9
**bloody** - 214:3
**blown** - 91:16
**blue** - 65:24, 209:4
**blue-collar** - 65:24
**blurt** - 14:2
**board** - 64:8, 64:9
**body** - 30:1, 39:9, 39:10, 39:11, 91:5, 91:6, 91:7, 91:15, 91:20, 92:7, 92:10, 92:20, 94:9, 212:20, 218:25
**bolts** - 118:1
**bones** - 30:4
**boss** - 37:14
**bother** - 203:5, 203:15
**bottom** - 72:23, 74:1
**bought** - 6:6, 35:5, 39:21
**boundaries** - 94:5
**box** - 70:24, 73:25, 74:3
**boxes** - 19:15, 19:21, 20:1
**boy** - 29:12, 30:1, 31:18, 42:17, 63:17, 92:9, 92:14, 113:17, 114:1, 215:8
**boys** - 30:11
**bracelet** - 55:17, 55:21, 118:25, 119:1, 160:11, 186:2, 186:3, 186:12, 216:17
**break** - 25:24, 26:2, 35:12, 96:5, 96:19, 124:13, 124:15, 131:9, 146:22, 146:23, 147:20, 191:15, 191:24, 192:6, 192:7, 193:23, 194:2, 219:21
**break-in** - 131:9, 191:24, 192:6, 192:7
**Bredemeyer** - 89:19
**brick** - 65:20
**bridge** - 93:1
**brief** - 26:2, 90:22
**Brief** - 145:7, 174:21, 183:16, 190:17
**Briefly** - 108:16
**briefly** - 115:12, 193:19
**bring** - 25:2, 27:25, 69:19, 87:8, 97:12, 128:25, 134:24, 138:8, 144:4, 147:12, 201:13, 201:17, 201:19
**Bring** - 97:17, 147:11
**bringing** - 60:18, 133:15
**broad** - 9:24
**Broad** - 65:14
**broadcast** - 50:25, 51:12, 84:4
**broke** - 130:21, 130:23, 131:9, 131:21
**broken** - 69:6, 131:2
**Bromwich** - 3:11, 4:3, 4:4, 10:2, 20:6, 20:9, 21:3, 25:5, 25:6
**brother** - 145:1
**brothers** - 196:14
**brought** - 25:20, 34:2, 64:20, 89:6, 134:1, 196:12
**Brown** - 60:3
**brown** - 182:7, 182:22
**brownish** - 182:4, 182:5
**buccal** - 22:23
**Buffalo** - 2:12
**building** - 65:19, 84:21
**buildings** - 65:18
**bunch** - 10:8
**burden** - 40:21
**burglarized** - 47:7
**Burglary** - 60:6
**burglary** - 60:6, 132:3

**buried** - 172:25
**burn** - 79:19
**burned** - 68:9, 80:12
**burns** - 79:20
**business** - 1:23, 37:12, 43:3, 49:1, 139:12, 139:15, 185:18, 189:1, 189:7, 189:8, 201:24, 202:8
**butt** - 158:6
**buy** - 143:22, 177:16, 177:18, 201:2, 201:7, 201:16
**buying** - 200:23, 200:25

### C

**cabinet** - 186:13
**cabinets** - 176:14, 176:16, 176:17
**calendar** - 2:1, 95:9, 95:10
**California** - 6:3, 7:7, 196:14, 196:17, 196:24
**call-out** - 52:17, 61:18
**calmed** - 118:7
**capital** - 41:5, 42:12
**Capitan** - 12:21
**car** - 38:1, 38:3, 38:10, 38:16, 38:17, 38:18, 38:21, 38:22, 39:4, 39:16, 39:17, 39:20, 142:22, 203:23
**care** - 173:24, 174:7
**Caribbean** - 116:11, 117:3
**Carlos** - 97:16, 97:21
**Carmelo** - 36:24
**Carolina** - 6:7, 22:12
**Carpenter** - 107:15, 108:10
**Carpenter's** - 108:1
**carry** - 56:16, 203:7, 203:9
**carrying** - 77:3
**cars** - 66:7, 142:23, 143:4, 197:18
**case** - 4:11, 6:15, 9:25, 10:5, 10:20, 11:1, 11:7, 11:11, 11:15, 11:16, 11:25, 14:18, 19:17, 19:18, 19:22, 19:24, 20:1, 20:3, 20:10, 21:8, 21:10, 21:18, 22:21, 23:1, 25:1, 25:7, 28:13, 28:16, 35:9, 37:2, 40:3, 40:17, 40:21, 40:22, 41:18, 42:8, 61:23, 62:3, 62:14, 65:2, 90:19, 91:2, 94:12, 94:14, 98:7, 102:11, 105:11, 112:23, 115:14, 115:16, 121:24, 175:2, 175:5, 181:16
**case-in-chief** - 14:18
**cases** - 4:9, 20:14, 20:20, 54:9, 60:7, 113:12, 116:7
**cash** - 118:25, 160:11
**cataloged** - 19:16
**catch** - 183:13
**categories** - 100:6
**category** - 100:7
**caught** - 35:12, 64:9, 113:13
**caused** - 86:11
**Cd** - 1:24
**Ce** - 1:9, 1:17, 59:7, 59:13
**cell** - 64:21
**Cellmark** - 8:17, 8:23, 9:16
**center** - 68:4
**Central** - 211:19
**certain** - 10:18, 11:22, 35:17, 36:14, 77:15, 100:6, 199:10
**certainly** - 14:1
**Certainly** - 9:13
**Certificate** - 1:13, 221:1
**certify** - 221:6, 221:13

**chain** - 68:18, 68:20, 68:22, 111:6
**chained** - 68:15, 68:17
**chair** - 72:5
**chambers** - 221:12
**change** - 60:5, 66:4, 102:25
**changed** - 60:3, 85:12, 103:11
**changes** - 60:17
**channel** - 51:4, 91:15, 91:24
**Chaparro** - 195:6
**characteristics** - 92:17
**charge** - 19:10
**check** - 25:19, 86:14, 219:9
**checked** - 75:20, 85:15, 85:23, 86:24
**checking** - 95:1
**chew** - 79:16
**chewed** - 79:23, 80:15
**chewing** - 79:16
**Chico** - 33:13, 94:21, 129:5, 129:6, 133:15, 134:1, 134:8, 134:13, 135:15, 135:16, 136:8, 138:6, 138:14, 138:19, 138:21, 138:23, 139:4, 141:20, 141:21, 142:22, 144:4, 145:2, 167:4, 167:25, 168:10, 168:11, 170:24, 172:9, 174:13, 177:7, 177:14, 177:16, 177:18, 177:21, 179:9, 180:2, 184:19, 185:18, 185:20, 199:11, 199:13, 200:2, 200:6, 200:14, 200:24, 201:7, 201:16, 202:4, 202:11, 202:21, 202:24, 203:11, 203:13, 204:4, 204:16, 219:6
**Chico's** - 138:16, 139:12, 139:15, 142:4, 143:6, 167:10
**chief** - 14:18
**Chief** - 60:3
**child** - 14:11, 14:13, 41:20, 66:14, 83:10, 84:5, 84:11, 86:2, 88:10, 92:10, 98:15, 98:21, 108:17, 114:4, 117:13, 179:20, 179:22, 179:23, 216:9
**child's** - 68:19, 77:25
**children** - 123:13, 123:16, 123:22, 123:23, 124:21, 125:19
**cholesterol** - 196:5
**chrome** - 112:6, 112:7
**Chrome** - 112:7
**chrome-plated** - 112:7
**Chuck** - 19:11
**cigar** - 35:24, 36:1, 36:3, 36:4, 36:15, 79:13, 79:17, 80:6, 80:9, 80:11, 81:2, 81:12, 81:17, 81:20, 81:22
**Cigar** - 2:25
**cigars** - 36:1, 79:15
**circumstance** - 180:4
**circumstances** - 85:5
**citizen** - 196:15
**city** - 47:19, 51:3, 66:3, 114:13
**City** - 3:20, 3:23, 46:2, 195:18
**claimed** - 136:7, 136:8
**clarify** - 161:23
**classified** - 100:6
**clean** - 33:5, 40:4
**clear** - 9:20, 9:23, 24:19,

61:23, 114:7, 189:5, 192:10, 210:17
**clearly** - 14:13, 154:4
**climbed** - 31:19
**clock** - 32:3, 74:6, 74:8, 74:10, 77:18, 77:21, 159:24, 212:1
**close** - 34:24, 37:3, 37:7, 48:16, 73:12, 77:1, 93:9, 94:5, 106:15, 130:6, 145:18, 152:23
**close-up** - 73:12, 77:1
**closed** - 72:10, 84:21
**closer** - 61:2, 100:12
**closet** - 74:1
**cloth** - 212:2
**clothes** - 72:24, 73:13, 73:14, 77:2, 146:15, 147:20, 159:3, 165:17, 165:20, 168:25, 169:5, 187:15, 187:19, 187:20
**clothing** - 73:25, 92:16, 109:18, 109:22, 110:3, 169:2, 169:13, 169:14
**clubs** - 135:13
**clues** - 100:14
**co** - 42:14, 171:13
**co-defendant** - 42:14, 171:13
**Cocaine** - 126:7, 175:13, 198:9
**cocaine** - 33:18, 139:9, 175:14, 198:10, 198:24, 200:23, 201:3, 201:6, 201:17, 202:24, 204:21, 205:18, 205:19, 206:6, 206:9
**cold** - 91:16, 209:1
**collar** - 65:24
**collect** - 80:6
**Colombian** - 117:4
**color** - 108:25, 109:9, 151:5, 152:11, 153:21, 171:18, 172:5, 172:20, 181:4, 183:2, 183:6, 209:17, 209:19
**colored** - 109:2, 209:3, 209:20
**Columbia** - 101:23, 116:9, 116:17
**combination** - 70:4, 70:15
**comfortable** - 90:3, 90:4
**coming** - 38:2, 122:2, 149:11, 163:16, 163:19, 164:4, 164:25, 167:6, 182:25, 185:20, 187:1, 211:7
**comment** - 10:13, 28:16
**comments** - 100:5
**commission** - 78:21
**commit** - 17:24, 18:7, 27:5, 27:13
**committing** - 17:24, 18:7, 27:5, 27:13
**common** - 82:19, 82:21, 121:7, 121:8, 127:24
**common-law** - 121:7, 121:8, 127:24
**Communication** - 3:21, 3:24
**communication** - 77:6, 77:14, 85:22
**communities** - 114:13, 114:14
**community** - 65:25, 115:25, 116:3, 116:4, 116:5, 116:7
**compare** - 8:2, 36:9
**compared** - 8:18, 22:22
**complainant** - 14:13

**complainant's** - 75:25
**complainants** - 49:15, 54:19, 83:4, 85:1, 98:11, 119:3
**complaining** - 19:23
**completed** - 99:1, 116:25, 117:22, 117:23
**complete** - 19:4, 24:7, 71:8, 73:20
**completed** - 89:23, 104:1
**completely** - 8:7, 62:11, 72:10
**complex** - 49:3, 53:11, 56:7, 65:11, 65:12, 65:16, 65:20, 65:21, 93:3
**compound** - 109:23
**computer** - 1:24, 99:10
**computer-aided** - 1:24
**computers** - 100:5
**concern** - 10:7, 22:12, 58:2, 133:4
**concerned** - 132:13, 167:13, 188:3
**concerning** - 5:25, 19:17, 21:25, 23:6, 56:1
**conclusion** - 20:11, 40:17
**concrete** - 65:20
**condition** - 71:2, 75:9, 80:18, 83:7
**conduct** - 12:23, 62:5
**conducted** - 18:17
**confident** - 20:2
**confirmation** - 92:13, 92:16
**confirmed** - 92:18
**conflict** - 191:13
**confront** - 188:18
**confusing** - 11:23
**connected** - 96:23, 147:2, 194:6, 219:25
**connection** - 21:18, 33:21, 34:5, 37:1, 37:3
**connections** - 94:18
**conscious** - 158:22
**consciousness** - 213:23, 214:2
**consider** - 10:18, 10:25, 47:4
**considered** - 47:3
**considering** - 182:7
**consistent** - 103:11
**console** - 73:3
**contact** - 34:9, 171:2, 203:14
**contacted** - 29:18, 51:18, 51:19, 84:6, 84:8, 84:10
**contains** - 10:3, 81:17, 221:7
**contaminated** - 20:21, 21:19
**contamination** - 4:18, 9:24, 21:5, 25:1
**contempt** - 28:18
**continue** - 134:13, 157:1
**continued** - 35:9, 133:6
**continuing** - 157:9
**continuity** - 62:6
**convenient** - 21:24
**conversation** - 133:18
**conviction** - 42:13
**convictions** - 5:15, 5:16, 12:23, 13:2, 21:17, 21:20, 22:3
**convinced** - 31:23
**copies** - 5:15, 15:2, 15:12, 15:16, 15:17
**copy** - 15:11, 15:23, 21:1, 43:5, 43:16, 44:17
**cord** - 32:2, 74:8, 159:24, 212:1, 216:3

**Cornelius** - 2:11, 3:2, 3:6, 3:9, 3:15, 3:19, 3:23, 4:3, 4:20, 4:23, 5:4, 5:7, 5:10, 5:14, 5:19, 5:22, 6:5, 6:20, 7:8, 7:11, 7:13, 8:20, 9:4, 9:8, 9:12, 9:17, 10:12, 11:2, 11:4, 11:7, 11:17, 12:3, 12:6, 12:14, 13:5, 13:9, 13:13, 14:6, 15:16, 15:20, 16:3, 16:9, 17:9, 17:13, 18:14, 18:15, 18:19, 18:21, 23:14, 23:18, 24:6, 24:10, 25:15, 28:5, 29:2, 41:7, 41:9, 41:12, 41:15, 43:8, 43:18, 43:23, 44:9, 44:10, 44:14, 50:16, 53:24, 54:5, 54:7, 54:8, 58:9, 58:12, 58:16, 67:12, 78:8, 78:14, 81:12, 81:19, 81:24, 86:6, 86:17, 88:4, 88:8, 95:21, 96:6, 97:9, 97:13, 97:24, 98:1, 98:3, 101:2, 103:17, 103:22, 104:5, 104:11, 104:21, 105:2, 105:18, 106:7, 106:18, 107:3, 107:4, 108:19, 108:21, 109:8, 109:25, 110:3, 111:22, 111:25, 112:15, 115:1, 115:11, 115:13, 119:23, 119:25, 137:13, 137:20, 140:21, 141:11, 169:19, 170:9, 170:17, 171:8, 174:17, 174:18, 174:22, 174:25, 175:1, 183:17, 190:14, 190:18, 190:20, 193:5, 193:11, 220:19
**correct** - 7:9, 23:13, 24:17, 24:18, 54:15, 62:11, 62:19, 62:22, 64:13, 68:13, 73:9, 77:11, 77:21, 82:8, 84:13, 84:16, 85:19, 88:22, 93:11, 94:25, 96:13, 98:4, 98:16, 98:21, 99:7, 102:11, 102:17, 111:18, 122:2, 122:13, 122:17, 133:7, 143:20, 160:4, 160:24, 162:18, 166:23, 177:9, 179:20, 179:23, 181:15, 185:18, 186:23, 187:1, 189:14, 190:24, 221:7
**Correct** - 5:3, 62:12, 62:23, 62:25, 63:3, 63:6, 64:14, 68:14, 70:14, 70:16, 70:19, 73:10, 76:17, 77:12, 77:22, 81:7, 82:9, 82:11, 82:13, 84:2, 84:17, 85:20, 87:3, 87:20, 90:2, 90:17, 90:25, 94:1, 96:14, 98:13, 98:17, 98:22, 104:14, 111:19, 112:14, 112:24, 113:10, 117:20, 118:2, 118:19, 177:10, 177:11, 185:19
**corrected** - 10:9
**correcting** - 7:22
**Correction** - 177:8
**correctly** - 4:15, 20:19, 56:13, 57:10, 181:14, 221:14
**counsel** - 17:8, 23:25, 43:5, 53:22, 67:10, 81:10, 221:9
**counsel's** - 115:9
**Counselor** - 103:1, 107:6
**country** - 117:1
**County** - 1:9, 1:23, 11:21, 17:19, 17:20, 17:21, 18:4, 26:25, 27:1, 27:2, 27:10, 48:7, 65:4, 91:12, 94:2, 94:4, 94:6, 94:10, 221:2,

221:5

**couple** - 27:25, 54:14, 87:16, 113:13, 173:5, 177:24, 177:25, 178:2, 190:18, 210:11

**course** - 17:23, 18:6, 23:3, 27:4, 27:12, 52:13, 60:23, 168:17

**court** - 3:1, 17:4, 19:5, 26:8, 28:18, 36:11, 44:19, 88:14, 97:5, 97:18, 106:17, 147:7, 147:14, 171:21, 193:25, 220:12, 221:12

**Court** - 1:3, 1:4, 1:6, 3:5, 3:8, 3:14, 3:17, 3:21, 4:2, 4:19, 4:22, 5:3, 5:5, 5:8, 5:13, 5:17, 5:21, 6:2, 6:14, 6:17, 6:21, 7:3, 7:10, 7:12, 8:10, 8:16, 9:6, 9:10, 9:15, 9:20, 10:17, 11:3, 11:6, 11:15, 11:18, 12:5, 12:9, 12:16, 13:22, 13:25, 14:10, 14:20, 14:24, 15:9, 15:18, 15:23, 16:5, 16:13, 16:23, 16:25, 17:5, 17:14, 17:20, 18:12, 18:15, 18:20, 18:22, 18:24, 19:3, 19:8, 20:5, 20:6, 22:16, 23:11, 23:16, 23:19, 23:22, 24:9, 24:18, 25:16, 25:19, 25:22, 26:2, 26:9, 26:17, 27:1, 27:18, 27:23, 28:2, 28:7, 28:10, 28:22, 29:4, 29:7, 41:7, 41:10, 42:24, 43:11, 43:20, 43:22, 44:4, 44:8, 44:11, 44:15, 44:18, 44:20, 45:2, 45:7, 45:12, 50:17, 53:5, 53:25, 54:5, 58:8, 58:15, 58:17, 58:19, 58:25, 59:4, 66:25, 67:13, 67:20, 67:23, 69:15, 78:10, 78:16, 80:23, 81:22, 81:25, 82:6, 86:8, 86:20, 88:6, 88:12, 88:15, 95:7, 95:20, 95:23, 96:4, 96:18, 97:6, 97:15, 97:19, 97:24, 103:19, 104:2, 104:9, 104:23, 105:23, 106:1, 106:13, 108:20, 109:7, 110:2, 111:24, 112:17, 112:19, 115:4, 115:6, 115:12, 115:18, 119:23, 120:2, 120:6, 120:13, 120:15, 120:18, 124:12, 124:18, 136:22, 137:15, 137:18, 137:21, 140:23, 141:2, 141:5, 141:9, 141:12, 146:22, 147:9, 147:11, 147:15, 150:2, 169:9, 169:20, 169:24, 170:11, 170:14, 170:16, 170:18, 171:11, 171:15, 171:19, 171:22, 172:3, 172:18, 174:16, 174:20, 174:23, 190:16, 193:6, 193:9, 193:12, 193:20, 193:24, 194:1, 194:13, 199:25, 219:20, 220:9, 220:13, 220:17, 221:4, 221:5, 221:21, 221:22

**Court's** - 21:9, 22:5
**Courtney** - 8:5
**courtroom** - 27:20, 27:22, 28:12, 28:23, 124:4, 172:8, 172:9, 199:13

**cover** - 3:7, 12:18
**covered** - 12:18, 75:3, 159:19, 208:23, 208:24
**covering** - 159:13
**covers** - 71:9, 116:19, 151:15

**crabber** - 91:5
**crabbing** - 91:20, 93:5
**crack** - 175:16
**crast** - 64:5
**credibility** - 40:11, 42:10
**credible** - 8:22
**credit** - 136:6, 136:11
**Creek** - 39:6
**Creole** - 116:12
**cries** - 31:17
**crime** - 4:7, 4:18, 6:2, 6:10, 7:1, 8:24, 11:20, 15:21, 19:15, 19:18, 19:24, 20:12, 21:7, 21:12, 21:15, 22:1, 22:2, 22:4, 22:8, 22:10, 23:7, 51:17, 62:2, 78:21, 81:5, 82:20, 90:11, 119:20

**Crime** - 3:12, 3:17, 12:1, 19:12, 21:21, 24:21, 25:10, 35:23, 82:7

**criminal** - 25:9
**Criminal** - 1:4
**Cross** - 1:8, 1:16, 54:6, 98:2, 174:24
**cross** - 9:24, 10:1, 10:6, 10:9, 10:19, 11:10, 22:24, 25:2, 96:6, 111:6, 111:8, 119:2

**Cross-examination** - 54:6, 98:2, 174:24

**cross-examination** - 9:24, 10:1, 10:6, 10:9, 96:6, 119:2

**cross-examine** - 10:19, 11:10, 22:24, 25:2

**crossways** - 179:25, 180:1

**Cruz** - 1:6, 17:7, 17:17, 17:21, 18:4, 26:23, 27:2, 27:10, 28:25, 33:13, 94:19, 97:8, 129:7, 172:9, 172:17

**Cruz-garcia** - 1:6, 17:7, 17:17, 17:21, 18:4, 26:23, 27:2, 27:10, 28:25, 33:13, 94:19, 97:8, 129:7, 172:9, 172:17

**crying** - 50:9, 155:6, 214:16

**Csr** - 221:20
**Cuba** - 116:16
**cultural** - 101:2, 114:20
**Culturally** - 116:19
**Curb** - 91:19
**current** - 46:10
**curtain** - 72:7, 72:8, 72:10
**custodian** - 6:8, 22:11
**custody** - 40:2, 85:24, 86:5
**cut** - 8:13, 40:14
**cuts** - 51:8
**cuttings** - 7:18, 8:11, 22:9

## D

**D.a.'s** - 3:4, 19:10
**D1sa** - 8:25
**dad** - 14:8, 86:1, 87:9
**damaged** - 92:9
**dance** - 197:3, 203:16
**Dark** - 152:13, 172:6, 172:21, 172:23, 203:16
**dark** - 72:3, 99:1, 100:24, 101:4, 109:2, 114:9, 116:25, 117:22, 117:23, 164:14, 182:1, 208:10, 208:12, 208:13, 209:2, 209:21
**dark-colored** - 109:2
**dark-completed** - 99:1, 116:25, 117:22, 117:23
**Dark-dark** - 208:12
**dark-skinned** - 100:24,

101:4, 209:21
**darker** - 180:12, 180:14, 180:22, 181:21, 181:24, 182:4, 182:5, 182:8
**Darker** - 209:22
**database** - 84:8
**date** - 30:22, 47:24, 113:9, 191:25
**Date** - 221:21
**dated** - 137:6
**dates** - 95:10, 95:12, 191:23
**daughter's** - 123:17
**Day-by-day** - 189:2
**day-by-day** - 189:3
**daylight** - 190:13
**days** - 29:12, 29:14, 29:15, 30:2, 39:12, 52:21, 60:13, 60:19, 167:22, 189:10, 189:11
**dayshift** - 60:11, 60:12, 60:14, 61:25, 90:12
**Dayshift** - 61:8
**daytime** - 90:15, 188:12
**deady** - 18:2, 27:8
**deal** - 12:8, 40:14, 119:12, 133:7, 144:6, 177:20
**dealers** - 42:11, 103:12
**dealing** - 128:6, 131:19, 132:7, 132:13, 133:16, 143:18, 166:1, 166:4, 166:23
**dealings** - 119:11
**dealt** - 56:4, 144:12
**death** - 17:25, 18:8, 27:6, 27:14, 61:16, 92:6
**debris** - 91:23
**debris-strewn** - 91:23
**December** - 145:12
**decide** - 40:15, 122:19, 203:1
**decided** - 64:19, 133:9, 166:22, 185:15, 187:6, 190:5
**decision** - 80:5
**decomposed** - 30:3
**decomposing** - 39:13
**deep** - 181:23
**Deetrice** - 5:15, 21:17
**defecates** - 38:23
**defendant** - 3:1, 9:1, 11:8, 12:10, 12:25, 13:18, 17:4, 17:15, 18:12, 22:23, 26:8, 26:20, 33:16, 33:23, 34:6, 34:11, 34:21, 34:25, 35:5, 36:8, 36:21, 37:3, 37:5, 37:10, 37:14, 37:15, 37:20, 37:21, 38:2, 38:6, 38:10, 38:15, 38:24, 38:25, 39:8, 39:18, 39:19, 39:20, 41:1, 41:2, 41:5, 42:14, 44:19, 88:14, 97:5, 97:18, 106:17, 141:1, 141:3, 147:7, 147:11, 147:14, 171:13, 171:21, 172:16, 193:25, 199:24, 200:24, 201:21, 202:14, 219:6, 220:12
**Defendant** - 2:17, 17:22, 18:5, 27:3, 27:11
**defendant's** - 6:23, 8:1, 9:3, 34:9, 37:4
**Defendant's** - 21:1, 21:4, 21:16, 22:6, 23:12, 23:22
**Defense** - 1:6, 20:25, 23:15, 24:3, 41:11
**defense** - 17:13, 19:5, 21:13, 29:2, 41:17, 43:5, 53:22, 67:10, 81:9, 95:20, 102:14
**define** - 101:9

**definitive** - 6:25
**degraded** - 6:19, 6:25
**denied** - 24:1, 24:20, 33:2, 189:14, 189:15, 190:1
**dental** - 92:18
**deny** - 189:16
**department** - 60:25, 61:5, 84:8
**Department** - 3:12, 3:17, 12:1, 21:21, 29:18, 32:13, 33:4, 46:2, 46:8, 46:14, 59:14, 59:16
**Department's** - 21:6
**depict** - 53:16
**Deputy** - 45:2, 194:3, 220:7
**descent** - 180:22, 181:23, 182:11
**Describe** - 48:25
**describe** - 50:4, 65:23, 101:4, 101:22, 112:6, 152:11, 172:5, 172:19, 181:20, 183:10, 201:21, 209:13
**described** - 29:23, 54:20, 55:3, 100:24, 101:1, 103:23, 104:7, 106:6, 111:5, 152:10, 180:17, 183:18, 213:7, 213:11
**describes** - 114:23
**describing** - 183:15
**Description** - 1:22
**description** - 50:20, 50:21, 54:17, 54:21, 55:8, 55:9, 55:11, 83:13, 83:17, 84:3, 98:24, 99:6, 100:17, 100:19, 101:10, 102:7, 102:16, 102:18, 102:19, 102:24, 105:6, 105:14, 105:15, 105:19, 106:2, 106:8, 106:10, 106:14, 106:15, 108:22, 109:18, 109:20, 113:19, 114:1, 114:2, 114:21, 117:7, 118:8, 183:9, 184:15, 184:17
**descriptions** - 32:21, 117:18
**design** - 83:19
**Design** - 5:23, 6:4, 6:6, 10:15, 22:8, 22:17, 24:23
**desolated** - 91:23
**detail** - 60:7, 109:15, 113:1, 113:19
**details** - 25:6
**detective** - 56:17, 59:24, 60:1, 60:3, 60:5, 63:19, 78:18, 92:5, 94:13
**detectives** - 32:16, 32:17, 33:4, 56:14, 56:15, 60:4
**Detectives** - 35:9
**determine** - 62:14, 110:11
**determined** - 32:23
**determining** - 77:10
**develop** - 115:20
**Devereaux** - 1:8, 1:16, 45:6, 45:16, 45:20, 45:24, 46:1, 46:5, 46:25, 47:11, 52:10, 52:24, 53:6, 54:8, 107:15, 107:25, 108:9
**diabetes** - 196:4
**dial** - 85:10
**diamonds** - 53:10
**Diana** - 1:11, 1:19, 29:9, 30:18, 30:20, 31:7, 32:20, 33:1, 33:4, 33:12, 33:15, 33:21, 34:19, 34:23, 35:19, 35:23, 35:24, 36:12, 37:2, 37:16, 38:11, 49:19, 49:25, 50:2, 50:14, 51:24, 57:9,

77:21, 78:4, 78:13, 79:6,
83:5, 83:14, 86:10, 87:21,
89:14, 89:17, 93:16, 93:19,
101:14, 108:13, 109:10,
111:2, 111:8, 113:1, 113:15,
113:18, 114:8, 117:6, 118:3,
120:9, 120:20, 121:3, 141:8,
143:14, 147:16, 172:24,
195:12, 195:13, 195:15,
196:22, 197:2, 197:4,
197:10, 198:12, 198:17,
202:3, 202:9, 202:17,
202:23, 203:10, 203:14,
203:18, 205:9, 206:3, 206:5,
206:8, 207:2, 207:8, 216:23,
217:22, 218:4, 218:8, 219:7
**Diana's** - 37:24, 72:16,
76:24, 83:7, 85:19, 93:22
**die** - 64:6
**died** - 41:20, 196:24
**differ** - 44:11
**difference** - 71:1, 124:11,
181:1, 181:3, 182:1, 182:3
**different** - 7:17, 8:8, 8:24,
13:13, 14:23, 20:17, 22:19,
34:4, 35:15, 36:11, 60:2,
61:12, 62:11, 100:15,
101:21, 101:25, 116:13,
116:18, 127:3, 152:4,
211:12, 211:15, 211:16,
211:21
**differently** - 99:11
**digit** - 85:9
**digits** - 85:10
**dignity** - 18:10, 27:16
**dining** - 72:21
**dire** - 14:12
**Dire** - 1:8, 1:16
**direct** - 47:11, 91:3, 93:21,
93:24, 94:18, 100:22,
112:11, 205:4
**Direct** - 1:8, 1:16, 45:18,
59:9, 120:22, 194:20
**directly** - 31:25
**dirty** - 77:2
**disability** - 196:2
**disarray** - 71:8, 72:24,
74:22
**disciplinary** - 25:8
**discover** - 55:16
**discovered** - 101:10
**discretion** - 11:19
**discuss** - 28:13
**discussed** - 22:15, 23:24,
175:2
**discussion** - 18:25
**dish** - 71:20
**dishes** - 71:20
**dispatch** - 51:1, 64:22
**dispatched** - 48:1, 48:10
**distance** - 38:22, 39:5,
100:10, 116:12
**Distortions** - 80:15
**distortions** - 80:16
**district** - 47:18, 47:19,
47:22, 102:14
**District** - 1:6, 1:12, 2:5,
17:20, 27:1, 221:5
**Disturbance** - 47:8
**disturbed** - 73:5
**Division** - 46:4, 46:11,
46:19, 46:20, 51:18, 51:19,
57:1, 59:22, 61:12, 84:6,
89:24
**division** - 46:23, 59:23
**divorce** - 86:4
**Dna** - 3:3, 4:9, 6:24, 7:16,
7:17, 7:23, 8:1, 8:8, 8:23,
9:3, 11:9, 12:15, 13:17,
13:21, 20:14, 20:15, 20:16,

22:17, 22:19, 22:21, 22:25,
23:4, 35:14, 35:16, 36:5,
36:6, 36:9, 36:11, 36:13,
36:15, 36:19, 42:16, 83:2
**Doar** - 16:4, 16:9
**document** - 66:19, 66:21
**documented** - 104:12
**documenting** - 68:25,
69:1, 72:13, 80:9
**dog** - 89:6, 89:9
**Dominica** - 116:16, 117:1
**Dominicans** - 181:3
**done** - 8:13, 10:14, 15:10,
61:24, 88:9, 89:18, 90:11,
90:15, 90:22, 115:16,
161:10, 162:17, 176:25,
195:25
**door** - 32:9, 58:7, 68:2,
68:4, 68:6, 68:7, 69:2, 69:3,
69:6, 69:10, 70:11, 72:3,
72:4, 72:22, 74:15, 149:13,
150:4, 150:8, 164:2, 187:3,
207:22
**doorjamb** - 69:3, 69:5,
69:7
**doors** - 49:8, 69:4, 71:8
**doorway** - 69:25, 70:5,
70:9, 73:15, 156:2, 156:13,
156:14, 156:22, 182:25
**dope** - 103:12, 119:11
**doubt** - 40:22, 42:3, 92:19,
103:13
**doubts** - 98:11
**down** - 4:14, 31:3, 31:12,
31:16, 32:12, 38:2, 38:15,
39:11, 48:22, 68:19, 71:9,
71:10, 73:21, 79:18, 79:24,
88:13, 89:15, 90:3, 92:22,
93:3, 93:5, 93:7, 100:9,
100:14, 100:23, 101:7,
102:16, 102:23, 112:25,
113:18, 114:3, 117:8,
117:25, 118:7, 118:14,
120:6, 136:25, 152:21,
153:4, 153:10, 153:15,
153:17, 154:11, 154:13,
154:15, 154:17, 154:23,
154:25, 155:2, 155:10,
157:25, 158:23, 161:8,
161:13, 161:14, 161:16,
161:17, 162:2, 162:16,
163:8, 166:17, 184:11,
191:23, 193:13, 213:14,
217:22, 217:25, 218:17
**downloaded** - 14:22
**downstairs** - 70:2
**downtown** - 109:12,
109:15, 218:2
**dramatic** - 42:4
**drawer** - 74:16, 76:11,
112:9
**drawers** - 73:20, 74:16,
74:20, 76:10, 76:17, 76:19,
190:21, 192:12
**drawl** - 116:13
**drawn** - 80:1
**dresser** - 76:19, 186:12,
186:13
**drink** - 126:13
**drive** - 39:5, 93:7
**Drive** - 137:4
**driving** - 100:9, 114:3
**dropped** - 73:14, 91:18
**drove** - 39:22, 142:22,
143:4, 188:11
**drug** - 37:12, 40:3, 42:11,
57:20, 87:10, 87:18, 88:21,
89:6, 89:9, 128:5, 131:19,
132:7, 143:17, 166:1,
166:22, 179:8, 179:17,

188:25, 189:7, 189:8,
191:14, 192:25, 201:2
**drug-related** - 57:20,
87:10
**drug-selling** - 191:14
**drugs** - 33:1, 33:5, 33:12,
37:25, 56:2, 56:4, 87:14,
87:25, 88:25, 89:10, 110:16,
110:23, 126:5, 126:6, 126:9,
126:11, 126:15, 126:22,
127:3, 127:23, 128:21,
129:1, 129:4, 129:25, 130:3,
130:17, 131:6, 131:22,
133:15, 133:21, 134:1,
134:6, 135:16, 143:15,
144:4, 166:4, 174:11,
175:12, 177:7, 177:13,
178:17, 180:5, 185:4, 185:7,
185:8, 185:10, 185:14,
185:15, 187:23, 187:25,
188:19, 192:16, 192:20,
192:25, 197:23, 198:6,
198:8, 198:13, 198:17,
199:6, 203:2, 204:5, 204:22,
218:5, 218:8, 218:12
**duly** - 17:18, 26:24, 45:17,
59:8, 120:21, 194:18
**Dump** - 39:9
**during** - 14:17, 14:18,
25:13, 77:13, 149:7, 188:12,
196:25, 197:10, 202:13,
202:20, 203:8
**During** - 135:15, 198:4,
213:13, 213:22
**Dx** - 3:11, 3:15, 3:20, 3:23,
4:1, 4:3, 4:5, 4:7, 4:9, 4:11

# E

**Eagle** - 137:4
**early** - 34:8, 34:10
**easier** - 3:25, 4:24, 4:25,
67:22
**East** - 91:13
**eat** - 135:14
**edge** - 79:17, 80:3, 93:8,
152:24, 152:25, 212:17
**edited** - 15:4
**effect** - 57:23
**eight** - 12:20
**either** - 8:18, 12:19, 21:5,
27:19, 27:23, 28:3, 59:6,
100:19, 106:4, 110:12,
111:17, 129:21, 154:2,
183:25
**ejaculated** - 165:10
**elderly** - 174:5
**electrical** - 32:2
**elements** - 39:13
**eliminate** - 21:24
**Elliott** - 1:9, 1:17, 52:9,
56:12, 57:5, 58:22, 59:7,
59:13, 80:24, 87:4, 97:16,
97:21, 98:4, 112:22
**emergency** - 49:9, 85:5
**emotional** - 83:7, 83:8,
83:11, 108:18
**employed** - 4:6, 45:25,
47:12, 59:16, 65:25, 110:13
**empty** - 65:19, 76:20
**encountered** - 209:23
**end** - 15:3, 15:7, 15:14,
35:8, 63:9, 80:16, 96:24,
98:23, 105:10, 147:3, 194:7,
196:18, 215:21, 220:2
**ended** - 39:17, 215:22
**English** - 43:19, 57:8,
57:10, 106:21, 108:4, 108:8,
108:15, 116:22, 152:5,
183:22, 184:1, 210:16,

210:17, 210:20, 211:2,
211:4, 213:18
**enter** - 84:7
**entered** - 107:6, 182:19
**entering** - 187:3
**entire** - 22:7, 94:2, 114:6
**entirely** - 101:25
**entitled** - 1:21
**entrance** - 68:12
**entry** - 69:13
**enumerated** - 20:7
**equipment** - 90:4
**essentially** - 30:4
**etcetera** - 114:3, 116:17
**evening** - 145:21
**event** - 50:11
**eventually** - 51:9, 52:3,
128:10, 133:9, 216:23
**everywhere** - 83:2
**Everywhere** - 173:2
**evidence** - 8:16, 8:18,
9:25, 19:6, 20:4, 20:6,
20:24, 21:3, 21:8, 21:10,
21:20, 24:11, 24:20, 24:25,
25:3, 25:4, 25:7, 25:8,
25:11, 26:13, 28:16, 35:16,
35:18, 35:20, 36:20, 40:23,
41:19, 41:21, 42:3, 42:6,
42:7, 42:16, 42:18, 42:20,
44:23, 53:21, 76:21, 78:24,
81:6, 119:9, 221:8
**ex** - 85:19, 86:10
**ex-husband** - 85:19, 86:10
**exact** - 63:24
**exactly** - 11:24, 19:14,
40:19, 49:16, 57:2
**Exactly** - 9:12
**Examination** - 45:18, 59:9,
112:20, 120:22, 194:20
**examination** - 9:24, 10:1,
10:6, 10:9, 13:2, 54:6, 96:6,
98:2, 119:2, 174:24
**examine** - 10:19, 11:10,
22:24, 25:2
**except** - 28:15, 76:1
**excited** - 48:24, 50:6,
50:12, 145:24
**Excuse** - 107:1, 125:9,
161:12
**excuse** - 28:19
**excused** - 58:15, 58:19,
120:3, 193:9, 193:13
**exhibit** - 14:17, 22:6
**Exhibit** - 1:21, 23:15, 24:3,
43:4, 43:7, 43:11, 43:12,
43:14, 45:1, 53:8, 53:13,
53:21, 53:23, 53:25, 54:2,
67:11, 67:18, 67:25, 68:11,
68:23, 69:22, 70:20, 71:15,
71:25, 72:12, 72:19, 73:1,
73:8, 73:11, 73:17, 73:24,
74:5, 74:13, 74:19, 74:24,
75:23, 76:8, 76:15, 76:23,
80:8, 80:25, 81:9, 81:11,
81:16, 81:23, 82:4, 83:21,
95:9, 95:18, 95:19, 95:24,
96:2, 96:9, 136:24, 137:11,
137:12, 137:22, 137:24,
139:22, 140:1, 140:4, 140:7,
140:19, 141:14, 141:18,
142:1, 142:9, 142:15,
142:18, 169:11, 169:17,
169:18, 169:22, 170:8,
170:21, 171:5, 171:7,
171:22, 171:24, 171:25,
200:11
**exhibited** - 68:4
**exhibits** - 4:17, 221:15
**Exhibits** - 43:2, 67:2, 67:9,
67:13, 170:1, 170:7

exigent - 85:5
exist - 19:18, 19:23, 20:2
expect - 119:10
experience - 36:19, 87:5, 87:17, 115:20, 115:24, 116:6, 119:19
Expiration - 221:21
explain - 61:13, 114:18, 114:19
explaining - 6:8, 40:8, 85:4
explore - 115:9
Exposed - 39:13
express - 96:23, 147:2, 194:7, 220:1
extensive - 61:24
extracted - 22:21
extraction - 8:13
extradition - 49:6
extraneous - 12:23, 13:6
eyes - 151:12, 151:20, 153:21

**F**

face - 31:12, 151:15, 153:4, 153:10, 153:15, 153:17, 154:11, 154:13, 155:2, 155:10, 157:17, 157:22, 157:23, 157:25, 158:9, 160:24, 161:15, 162:13, 162:16, 204:11, 208:23, 208:24, 209:6, 209:7
Face- 152:21
face-down - 31:12
fact - 6:18, 9:11, 9:14, 14:11, 14:12, 14:13, 35:1, 37:4, 41:18, 64:8, 82:19, 85:8, 86:14, 89:6, 117:13, 122:4, 138:3, 138:23, 166:4, 168:16, 217:25, 219:11
factor - 110:15, 110:22
factories - 91:24
facts - 115:3
fair - 7:23, 92:21, 140:13
fairly - 51:16, 53:16, 67:4, 80:18, 82:19, 114:7, 144:14
Fairly- 71:23, 71:24
Fairway- 30:23, 48:2, 63:13, 65:3, 65:14, 67:6, 68:3, 129:16, 129:17, 129:20, 129:22, 132:1, 132:14, 133:6, 133:14, 133:22, 205:10, 206:3
falling - 126:9
false - 20:15
familiar - 48:4, 53:1, 84:20, 114:20, 126:4, 181:8, 181:9
family - 29:14, 31:1, 36:25, 37:4, 37:7, 85:15, 94:18, 168:6, 195:10, 195:10, 204:18
family's - 85:2
fantastic - 69:4
far - 13:16, 57:6, 64:24, 71:2, 90:24, 95:12, 111:20, 113:15, 136:17, 136:19, 168:3, 170:25, 171:2, 179:24, 183:1
Far- 136:20
fast - 91:1, 212:4
fast-forward - 91:1
faster - 16:3
fatality - 59:22
father - 86:4
favorite - 30:8
Fbi- 84:10, 84:12
fear - 41:17

features - 204:12
federal - 40:2
felony - 60:8
felt - 119:5, 162:21, 215:22, 215:25
female - 22:19, 48:23, 49:5, 49:19
few - 46:19, 112:18, 146:23, 166:15, 167:22, 177:22, 177:23, 178:25, 179:1, 179:2, 192:2, 192:3, 192:4
field - 132:20, 173:14, 196:1
fight - 204:25
fighting - 86:1
figure - 49:13, 49:16
figured - 16:17
file - 5:24, 22:7, 22:16
filed - 12:21
filled - 107:14
filling - 40:7
filmy - 72:7
Finally- 31:22
finally - 29:17, 35:12, 36:8, 40:3, 189:7
fine - 16:25, 58:18, 76:3, 124:16, 188:16, 199:18
finger - 41:20
finish - 61:23, 104:3, 165:10
finishing - 63:9
firemen - 217:8
first - 9:19, 10:13, 12:15, 13:1, 15:20, 23:4, 32:12, 42:9, 42:24, 45:4, 45:17, 49:11, 49:12, 59:8, 63:5, 64:8, 65:10, 66:16, 75:20, 95:15, 99:18, 99:19, 100:11, 120:21, 122:24, 122:25, 126:4, 127:8, 127:14, 128:8, 129:23, 130:1, 130:4, 130:6, 130:10, 130:13, 130:16, 130:25, 156:4, 157:8, 158:18, 161:18, 162:18, 163:22, 164:12, 166:21, 180:18, 189:13, 192:8, 192:9, 192:10, 194:18, 210:11, 213:2, 218:4, 218:7, 219:14
First- 26:14, 122:24, 145:16
fist - 155:18
fit - 100:7
five - 193:23, 194:2, 197:21
five-minute - 193:23, 194:2
flag - 32:11
flags - 87:1
flash - 68:5
flat - 91:22
flawed - 4:9, 20:14, 20:21
floating - 39:10
floor - 19:13, 31:3, 32:1, 71:9, 72:24, 73:13, 73:15, 148:9, 160:20, 173:14, 207:11, 207:14, 213:14
floor-hand - 173:14
Flores- 2:20
flowers - 73:4
focus - 66:11, 98:15
follow - 23:8, 23:9, 35:10, 44:3, 61:24, 62:7, 62:9, 90:11, 90:24, 112:18, 112:23, 113:3, 114:5
follow-up - 61:24, 62:7, 62:9, 90:11, 90:24, 112:18, 112:23, 113:3, 114:5
followed - 94:25, 146:5

following - 1:20, 20:18, 43:17, 96:5, 146:16, 218:1
follows - 45:17, 59:8, 120:21, 194:19
foot - 83:18, 84:18
football - 53:10, 84:18, 132:20
forced - 31:12, 69:7, 69:13
foregoing - 221:6
foreign - 105:6, 105:16, 106:22, 108:5, 108:8, 108:9, 108:11, 108:13, 114:9, 116:15
Foreman- 18:11, 27:17
forget - 63:16
forgot - 68:21
forgotten - 52:20
form - 22:19, 96:23, 115:1, 194:6, 220:1
formally - 127:25
former - 19:12, 22:2
forms - 116:21
forth - 48:24
forthcoming - 33:11
forward - 25:3, 91:1
four - 4:16, 4:17, 42:8, 42:19, 119:1, 197:21
fourth - 42:17
fraction - 22:18, 22:19
Franklin- 2:6, 221:22
frantically - 32:7
free - 32:3, 40:13
frees - 31:24
Freeway- 91:13
French- 116:11
frequently - 202:5
Friday- 16:14
friend - 134:16, 168:6
friendly - 201:22
friends - 33:14, 34:18, 36:25, 79:14, 138:1, 138:4, 138:9, 144:22, 144:23, 146:3, 180:3, 180:8, 198:1, 202:9
friendship - 202:13
front - 12:20, 66:7, 68:2, 68:12, 68:16, 72:3, 83:19, 91:16, 106:5, 126:22, 152:16, 158:17, 164:2, 187:3, 198:14
frontward - 150:3
fugitive - 60:7
full - 39:24, 45:23, 60:18, 85:10, 156:15, 216:9, 219:22
full-time - 60:18
functioning - 68:7
funnel - 100:14
funny - 164:13
furnished - 100:20

**G**

G-s6 - 59:25
gain - 42:15, 193:2
gap - 124:8
garbage - 29:23, 71:19
garbage-strewn - 29:23
Garcia - 1:11, 1:19, 14:5, 17:25, 18:1, 18:8, 18:9, 27:6, 27:7, 27:14, 27:15, 29:10, 29:21, 30:1, 30:5, 30:18, 30:20, 31:7, 32:15, 33:12, 36:13, 41:4, 49:19, 50:2, 51:24, 57:9, 70:23, 95:4, 108:13, 120:10, 120:15, 120:20, 121:3, 121:4, 123:7, 123:8, 123:17, 123:19, 123:21, 147:19, 147:20, 175:1, 193:13,

195:12
garcia - 1:6, 17:7, 17:17, 17:21, 18:4, 26:23, 27:2, 27:10, 28:25, 33:13, 94:19, 97:8, 129:7, 172:9, 197:19
Garcia's- 49:25, 91:5, 92:20, 147:16
gather - 31:23, 57:12
gathered - 34:4
gauge - 40:24
Gb- 50:24, 51:1, 54:22
gear - 64:10
general - 32:20, 50:24, 51:12, 53:17, 54:17, 84:4, 99:23, 100:15, 100:17, 100:19, 114:1, 117:19, 119:4
generalist - 47:4
generalists - 51:16
generalization - 100:11
Generally- 46:25, 50:14, 65:24
generally - 114:4, 115:14
generated - 99:12
genesis - 21:9
Genetic- 5:23, 6:3, 6:6, 10:15, 22:7, 22:17
Genetics- 24:23
gentlemen - 26:10, 29:25, 30:19, 34:12, 36:22, 40:18, 41:13, 44:20, 45:23, 96:19, 121:2
geographically - 99:2
get-go - 112:22, 118:18
gist - 4:2
given - 3:19, 51:2, 77:20
Glossary............................
.end - 1:14
goal - 63:4
God- 192:17
gold - 55:21, 111:1, 119:1
Golden- 137:4
good-looking - 142:13
Goose- 39:6
government - 59:25
gown - 76:24
grabbed - 64:10
grade - 145:15, 145:16
graduated - 59:20
graduating - 46:15
grand - 119:1
Grand- 17:19, 18:11, 26:25, 27:17
Grande- 195:18
grave - 40:6
gray - 172:13, 200:21
great - 26:12
greatest - 41:17
ground - 39:2, 74:17
group - 116:9, 144:14
groups - 61:6
grown - 125:19
guarantee - 42:20
guess - 36:16, 41:17, 48:16, 52:10, 60:21, 82:23, 138:25, 160:11, 182:11, 207:18
guesstimate - 191:22
Guilt - 1:16, 1:2
guilt - 13:14, 40:4
Guilt-innocence - 1:16, 1:2
guilty - 18:14, 29:1, 29:3, 41:5, 42:22
Gulfgate- 65:13
gun - 12:14, 12:16, 31:13, 39:8, 39:9, 61:23, 76:3, 76:6, 150:13, 150:14, 150:23, 150:24, 150:25, 152:16, 156:3, 156:6, 156:10, 156:11, 156:21,

156:23, 156:24, 182:24,
190:22, 191:6, 191:10,
191:11, 208:9, 208:19,
208:22, 212:15, 212:21,
213:3
**guns** - 191:2
**guy** - 200:17
**guys** - 10:24, 16:17,
197:12, 197:14, 198:23,
216:10

# H

**hair** - 34:4, 200:21, 200:22
**half** - 176:24, 177:12,
178:1, 179:6, 189:20,
189:21
**hamper** - 77:2
**Hand** - 221:16
**hand** - 26:15, 28:7, 39:8,
156:23, 173:14, 182:24,
199:17, 199:18
**handgun** - 75:25, 151:1
**handicapped** - 174:5
**handle** - 47:4, 90:13
**hands** - 32:7, 38:3, 78:7,
157:14, 159:21
**handwritten** - 22:13
**Hang** - 124:12
**hang** - 202:3, 202:6
**hanging** - 83:22
**happier** - 170:1
**happy** - 11:4
**hard** - 15:1, 15:11, 15:12,
15:23, 32:19, 44:2, 85:12,
149:10, 155:19
**harder** - 155:18
**harm** - 103:16
**Harris** - 1:9, 1:23, 17:19,
17:20, 18:3, 26:25, 27:1,
27:9, 48:6, 65:4, 91:12,
94:2, 94:4, 94:6, 94:10,
221:2, 221:5
**hasp** - 69:2
**hat** - 70:22
**hats** - 70:22
**head** - 51:8, 75:11, 75:12,
75:13, 75:14, 109:1, 154:15,
154:18, 157:17, 159:17,
159:19, 161:22, 184:11,
212:22, 214:5, 214:7, 217:4
**Head** - 8:5
**heading** - 38:12
**headphones** - 199:22
**healthcare** - 174:2, 174:3
**hear** - 12:3, 31:14, 32:8,
32:10, 32:16, 34:2, 34:12,
34:25, 36:10, 36:23, 38:9,
40:10, 40:12, 44:2, 155:2,
155:4, 155:9, 155:14,
157:10, 158:15, 158:16,
162:22, 164:8, 184:8,
184:12, 207:23
**heard** - 1:21, 6:14, 6:17,
23:25, 40:24, 87:6, 149:17,
151:14, 155:3, 184:6, 184:7,
208:1, 213:19, 215:25
**Hearing** - 3:14, 3:19, 3:22,
3:25, 4:2, 4:4, 4:6, 4:8, 4:10,
4:12, 24:4
**hearing** - 3:10, 5:21, 7:7,
10:13, 12:12, 18:17, 19:2,
23:17, 23:21, 23:24, 24:8,
26:13
**hears** - 31:16, 38:23,
116:15
**Hearsay** - 95:22, 104:2
**hearsay** - 12:24, 50:16,
56:9, 58:7, 78:9, 78:14,
78:17, 86:19, 104:1, 104:10,

109:6
**Height** - 110:5
**height** - 32:21, 55:1,
55:12, 109:22
**held** - 1:23, 11:20, 28:18,
95:4
**help** - 98:21, 128:13,
135:24, 167:15, 173:25,
174:6, 174:7, 192:17
**helped** - 135:17, 137:25
**helpful** - 95:11
**helping** - 128:10, 202:17
**hereafter** - 17:21, 18:4,
27:2, 27:10
**hereby** - 221:6
**heretofore** - 17:22, 18:5,
27:3, 27:11
**heritage** - 108:14
**Hernandez** - 2:20, 168:21,
189:23, 217:18, 218:21,
218:22
**herself** - 31:5, 31:23,
31:24
**high** - 196:4
**highlighted** - 3:16
**Highway** - 93:22, 94:6
**Hisd** - 84:8, 84:20
**Hispanic** - 65:25, 66:2,
100:12, 101:6, 101:9,
101:12, 101:19, 101:23,
101:24, 114:22, 116:4,
116:5, 116:19, 117:1, 117:4,
117:5, 181:23, 211:18,
211:19, 217:17
**Hispanics** - 66:1, 101:17,
101:20, 102:22, 104:16,
105:5, 105:8, 114:14, 116:7
**hit** - 89:9, 149:9, 212:21,
212:23, 213:1
**hits** - 32:5
**hitting** - 153:20, 155:15,
155:17, 156:7, 157:8
**hodgepodge** - 6:24, 8:9
**hold** - 41:1, 62:15, 69:9,
104:25
**holdi** - 41:2
**holding** - 39:8, 66:8,
150:14
**holes** - 40:7
**home** - 47:7, 71:2, 80:5,
80:10, 82:15, 86:15, 174:2,
174:3, 201:15, 219:4
**homes** - 174:8
**Homicide** - 33:4, 51:18,
52:6, 57:1, 60:9, 60:10,
60:11, 60:14, 60:15, 61:8,
61:12, 61:14, 62:16, 63:1,
63:10, 63:19, 64:20, 89:15,
89:24, 94:14
**honed** - 94:14
**honest** - 218:4
**honor** - 9:14
**Honor** - 18:14, 18:19,
23:14, 25:15, 26:21, 28:5,
28:21, 29:6, 43:1, 45:5,
45:9, 45:10, 45:15, 53:3,
53:20, 54:4, 58:6, 58:24,
66:24, 67:8, 80:22, 81:8,
81:24, 82:5, 86:23, 97:13,
104:22, 137:14, 169:16,
169:23, 170:10, 171:9,
172:15, 174:18, 193:11,
194:16, 199:23, 220:8
**Honorable** - 1:22
**hope** - 15:13, 26:12, 95:4
**hoped** - 85:25
**hopefully** - 34:5, 95:3
**hopes** - 29:10
**hoping** - 29:14, 29:19,
84:5, 85:25

**horrific** - 52:23
**horseshoe** - 65:18
**hospital** - 52:3, 89:20,
109:10, 113:16, 117:15,
165:5, 165:24, 188:9,
190:12
**hostage** - 78:20
**hour** - 96:25, 148:22
**hours** - 35:3, 35:4, 60:25,
61:1, 61:3, 61:4, 90:15,
104:20
**house** - 36:1, 71:22, 74:9,
74:22, 80:19, 129:1, 130:10,
133:17, 143:6, 170:24,
176:11, 176:13, 190:22,
191:2, 201:18, 204:23
**household** - 144:19
**Houston** - 1:23, 2:6, 2:13,
2:16, 3:12, 3:16, 3:20, 3:23,
11:25, 21:6, 21:21, 24:21,
29:17, 32:13, 33:3, 37:10,
37:12, 46:2, 46:7, 46:14,
59:13, 59:16, 66:4, 114:13,
136:19, 196:7, 196:12,
196:16, 196:18, 196:21,
197:11, 197:16, 200:15,
221:23
**Hpd** - 6:2, 6:4, 8:5, 19:12,
25:10, 47:2, 60:24
**Humble** - 137:3, 137:4,
143:7, 143:12
**hurry** - 64:3
**hurting** - 155:22
**husband** - 30:22, 31:17,
50:8, 85:19, 86:10, 121:7,
122:25, 124:25, 127:24,
185:20
**husband's** - 121:8
**hutch** - 73:3
**hysterical** - 50:6, 83:10

# I

**Id** - 92:18
**idea** - 128:9, 188:5
**identification** - 4:10, 53:7,
114:5
**identified** - 49:5, 171:14,
172:16, 199:24
**identify** - 30:13, 49:18,
81:1, 169:2
**illegal** - 196:13
**illustrate** - 71:16
**immediate** - 85:15
**immediately** - 32:17,
32:22, 32:25, 33:22, 34:21,
38:12, 62:2
**immobile** - 82:14
**impeach** - 21:23
**implying** - 180:21
**importance** - 122:1
**important** - 75:1, 77:10,
98:19
**importantly** - 37:19
**impossible** - 7:16
**impress** - 98:18
**impression** - 50:11
**in-service** - 61:1
**inadmissible** - 10:22, 14:1
**inches** - 83:18
**incident** - 51:17, 64:12,
114:7, 117:16, 131:14,
134:10
**include** - 116:8
**included** - 221:9
**includes** - 47:5
**incompetence** - 22:1, 22:4
**inconsistent** - 79:9
**incorrect** - 4:11, 43:24,
179:22

**Independent** - 3:11, 3:16
**independent** - 20:25
**independently** - 65:21
**independently-owned** -
65:21
**Index** - 1:15, 1:21
**indicate** - 69:13, 70:9,
119:13
**indicated** - 42:1, 105:3
**indicating** - 21:10, 21:11,
53:8, 67:2, 71:17, 72:1,
72:13, 72:20, 73:1, 73:9,
73:11, 73:18, 73:24, 74:5,
74:13, 74:19, 75:1, 75:24,
76:8, 76:16, 76:23, 80:10,
81:1, 83:23, 89:9, 137:1,
139:23, 140:2, 140:5, 140:8,
140:11, 141:19, 142:1,
142:9, 142:16, 142:18,
151:21, 154:20, 169:14,
170:3, 170:22, 199:19,
200:12, 200:17, 212:4,
212:25
**Indictment** - 1:5
**indictment** - 28:24, 29:1
**individual** - 8:11, 34:5,
49:19, 51:5, 94:19, 114:23,
115:25, 116:1
**individually** - 81:21
**individuals** - 50:19, 57:8,
57:13, 57:23, 80:4, 99:1,
113:4, 114:9, 117:1, 117:19,
118:4, 140:14
**industry** - 174:2
**informal** - 78:25
**information** - 40:6, 50:22,
50:23, 51:2, 56:5, 56:12,
57:5, 57:12, 57:16, 57:19,
66:13, 66:17, 77:20, 98:20,
99:23, 100:1, 107:20,
107:24, 109:13
**informed** - 49:25
**inherent** - 21:14
**initial** - 13:17, 30:12, 66:9,
99:23, 100:5, 100:17,
102:18, 102:24, 104:18,
104:20, 105:10, 107:1,
107:18
**initialed** - 136:25
**injuries** - 217:1
**inner** - 66:3
**inner-city** - 66:3
**innocence** - 1:16, 1:2,
13:14
**insensitive** - 88:9
**inside** - 31:9, 31:20, 56:7,
68:7, 70:21, 146:4, 149:9,
159:13, 163:23, 165:20,
187:20, 215:1
**Inside** - 159:15, 163:25
**instance** - 77:18, 211:15
**instances** - 4:17, 21:5
**instead** - 68:22, 187:9
**instructed** - 28:12
**instruction** - 28:17
**instrument** - 18:2, 27:8
**intend** - 7:1, 14:17
**intention** - 14:4
**intentionally** - 17:25, 18:8,
27:6, 27:14
**Inter** - 3:20, 3:23
**intercepted** - 167:6
**interest** - 94:15
**interference** - 16:18
**interpret** - 108:12
**interpreter** - 194:19
**Interpreters** - 2:21
**interview** - 33:11, 110:19,
110:20, 113:1
**interviewed** - 89:15,

103:8, 108:15, 109:12,
109:15, 117:15, 189:23
**interviews** - 103:3, 103:9,
113:4
**introduce** - 45:22, 59:11,
99:16, 121:1, 194:24
**introduction** - 11:8, 99:16,
99:24, 100:15
**intruders** - 31:8
**investigate** - 35:9, 61:22
**investigated** - 19:25, 91:6,
217:20
**investigating** - 47:6
**investigation** - 4:6, 19:12,
19:19, 20:12, 21:6, 32:14,
34:8, 35:8, 56:25, 61:16,
62:5, 66:10, 66:11, 77:11,
84:16, 89:13, 90:14, 90:24,
92:6, 112:23
**investigative** - 21:2
**Investigator** - 3:11, 3:16
**investigator** - 20:25
**investigators** - 32:17,
32:22, 33:22, 36:7, 39:25,
90:12, 90:16
**invited** - 115:8
**invoked** - 28:2, 28:3, 28:11
**involve** - 51:20
**involved** - 33:1, 37:12,
50:20, 56:24, 84:12, 84:15,
110:23, 126:8, 139:11,
139:15, 197:23, 198:18,
198:21, 199:6, 199:7,
199:10
**involvement** - 33:5, 144:8
**involving** - 110:16
**Islander** - 117:4
**islands** - 101:24
**Islands** - 116:10
**isolated** - 29:23, 38:15,
91:23, 92:1
**issue** - 11:21, 25:2,
126:24, 127:2
**issues** - 39:16
**item** - 79:1, 79:4
**items** - 23:24, 32:23,
35:16, 35:17, 35:20, 36:10,
36:12, 36:14
**itself** - 21:7, 25:5, 44:22,
66:12, 81:12, 81:23, 107:2,
148:23, 149:1

## J

**Jail**- 46:19
**James**- 1:8, 1:16, 45:6,
45:16, 45:24, 123:19,
123:24
**jewelry** - 55:24, 119:13,
185:24, 186:1, 186:5, 186:7
**job** - 32:19, 60:5, 60:22,
62:17, 62:18, 62:21, 82:10,
90:22, 127:16
**jobs** - 64:18
**joined** - 31:6, 37:11
**Jose**- 1:12, 1:20, 121:10,
144:6, 194:17, 195:3
**Joseph's**- 89:20
**Jr**- 17:25, 18:1, 18:8, 18:9,
27:6, 27:7, 27:14, 27:15,
29:21, 30:1, 32:15, 41:4,
123:7, 123:21, 125:21,
147:20
**Jr.'s**- 14:5
**Judge**- 1:23, 14:15, 16:14,
27:22, 29:3, 41:9, 43:18,
44:1, 44:7, 58:13, 59:6,
67:12, 67:19, 78:8, 88:5,
88:16, 95:6, 95:17, 95:22,
96:3, 97:23, 98:1, 105:19,

111:23, 112:16, 115:2,
115:11, 115:22, 119:25,
120:5, 120:12, 120:19,
140:22, 150:1, 172:2,
190:15, 193:5, 193:8
**judge** - 11:21, 40:11
**Judgment**- 4:5, 4:7, 4:9
**Judicial**- 1:12
**juju** - 119:16
**July**- 1:20, 1:3, 26:12
**June**- 18:17
**Juror**- 124:16
**juror** - 25:23, 43:17
**Jurors**- 1:4, 26:16, 41:14
**jurors** - 26:15, 146:25,
219:23
**jury** - 3:1, 11:24, 12:11,
17:4, 17:15, 21:14, 24:14,
25:19, 26:4, 26:8, 26:11,
40:12, 40:19, 43:13, 44:5,
44:19, 45:23, 59:11, 59:15,
61:9, 67:22, 68:1, 69:17,
71:4, 88:9, 88:14, 90:8,
91:9, 95:11, 96:20, 97:5,
97:12, 97:17, 97:18, 98:10,
106:17, 114:17, 114:19,
121:2, 122:19, 137:17,
147:5, 147:8, 147:12,
147:14, 171:21, 172:11,
183:18, 191:15, 193:25,
194:3, 220:9, 220:12
**Jury**- 17:19, 18:11, 26:25,
27:17
**Justin**- 2:4, 17:10, 97:10
**Juvenile**- 51:19, 84:6
**juvenile** - 51:20

## K

**karma** - 119:16
**keep** - 45:12, 59:1, 120:15,
149:5, 157:25, 158:18,
176:9, 194:13
**kept** - 39:10, 153:24,
161:14
**keys** - 84:21
**kick** - 207:25, 217:5
**kicked** - 69:3, 69:9, 213:1,
213:3
**Kicked**- 213:2
**kid** - 38:5, 38:6, 38:17,
86:1
**kidnapped** - 35:5, 49:24,
50:1, 63:17, 108:17, 134:11,
205:25
**kidnapping** - 17:24, 18:7,
27:5, 27:13, 32:14, 33:17,
34:15, 41:3, 51:18, 65:7,
78:19, 84:11, 85:25, 87:18
**kids** - 124:9, 195:15,
203:22
**killed** - 63:17
**kind** - 14:8, 30:24, 37:14,
38:14, 38:22, 40:13, 40:14,
42:2, 42:5, 48:23, 48:24,
50:4, 50:20, 61:13, 65:22,
70:3, 71:16, 74:21, 75:9,
87:17, 117:25, 126:3, 126:6,
135:4, 142:22, 151:11,
151:18, 165:17, 175:12,
195:25, 197:17, 198:8,
201:2, 202:6
**kinds** - 100:19, 114:13
**kit** - 22:9, 35:18, 36:12,
36:14, 36:17, 89:18, 89:21,
109:11, 113:16, 165:7
**kitchen** - 70:3, 70:15,
71:18, 72:5, 72:21, 186:20
**kneeled** - 154:15
**kneeling** - 212:17

**knees** - 154:17
**knelt** - 211:25
**knickknacks** - 73:3
**knocked** - 69:12
**knot** - 78:1
**knots** - 74:12, 75:11
**knotted** - 78:19
**knowing** - 40:5, 80:4,
181:1
**knowledge** - 20:10, 86:18,
86:21, 182:14
**known** - 22:23, 33:13,
37:23, 39:6
**knows** - 19:5, 31:11,
31:12, 38:2, 86:17, 86:21

## L

**lab** - 4:7, 4:18, 6:2, 6:3,
6:4, 6:11, 6:21, 7:1, 7:7,
8:11, 8:22, 8:24, 11:20,
19:15, 19:18, 19:24, 20:12,
21:7, 21:12, 21:15, 22:1,
22:2, 22:5, 22:8, 22:10, 23:7
**Lab**- 12:1, 21:15, 22:1,
24:21, 25:10
**Labcorp**- 4:11, 6:6, 22:11,
24:23
**label** - 4:15
**labeled** - 99:24
**labeling** - 20:19
**Laboratory**- 3:13, 3:17
**lacerations** - 75:11
**Ladies**- 40:20
**ladies** - 26:10, 29:25,
30:19, 34:12, 36:22, 40:17,
41:12, 45:23, 96:19, 121:2
**lady** - 142:13
**lady's** - 98:15
**laid** - 30:2, 39:12, 68:19,
77:2, 127:18, 127:19,
154:13, 161:15
**lakes** - 91:14
**language** - 99:2, 99:3,
101:5, 106:19, 116:13,
116:16, 116:20, 154:2,
184:3
**language-wise** - 116:13
**languages** - 101:21
**large** - 70:15, 84:15, 89:4,
116:9
**largely** - 66:12
**larger** - 176:4
**last** - 18:22, 22:6, 60:16,
60:20, 95:14, 217:18
**late** - 37:9, 122:13
**law** - 10:20, 10:23, 11:1,
11:8, 11:15, 11:16, 41:23,
121:7, 121:8, 127:24
**lawyer** - 41:18
**lawyers** - 17:8, 97:1, 97:9,
175:5
**lay** - 153:3, 154:25
**laying** - 39:1, 69:10, 74:17,
91:20, 91:22, 157:25
**layman** - 75:10
**lays** - 31:16
**Leading**- 78:9, 204:15
**leads** - 35:10, 94:25
**leaked** - 10:4
**learn** - 29:25, 30:5, 33:15,
49:23, 72:16
**learned** - 29:20, 34:10,
64:12, 79:6, 86:2
**learning** - 77:8, 77:14,
94:18
**lease** - 3:1, 135:21,
136:11, 136:25
**least** - 11:11, 20:20, 31:12,
57:4, 99:9, 152:6, 188:22

**leave** - 28:11, 28:23, 32:8,
42:7, 60:20, 71:7, 71:22,
73:15, 95:2, 119:17, 148:19,
185:4, 185:7, 208:5, 217:11
**leaves** - 38:6, 38:10
**leeway** - 104:23
**left** - 36:2, 39:15, 67:24,
72:15, 80:20, 84:5, 116:23,
119:14, 125:12, 133:21,
134:1, 160:6, 162:20,
163:18, 173:1, 187:8,
204:22, 207:12, 208:8,
216:6, 217:13
**legs** - 165:13
**length** - 8:6
**less** - 65:17, 178:4,
189:21, 195:14, 195:20,
197:6, 197:8, 197:9, 197:21,
200:21, 218:3, 219:1
**Lester**- 19:9, 19:20, 19:25
**letting** - 10:8
**level** - 91:18
**liars** - 42:11
**lie** - 31:12
**lied** - 103:12, 166:5,
187:22
**life** - 122:23, 191:14,
198:25, 199:1
**lifeless** - 39:2
**lifted** - 31:15
**light** - 68:6, 68:8, 69:5,
90:18, 208:10, 209:3,
209:21
**light-colored** - 209:3
**light-skinned** - 209:21
**lights** - 149:5
**limine** - 12:17, 12:20, 14:8
**limited** - 101:5
**line** - 106:14
**lips** - 151:22, 153:21,
183:19
**listed** - 55:17, 55:18,
55:20, 111:11
**listening** - 44:22
**lit** - 79:13, 79:18, 80:14
**live** - 123:11, 125:12,
125:21, 129:19, 173:1,
173:8, 195:17, 196:6,
196:16, 197:11, 197:14,
198:25, 199:5
**lived** - 37:6, 40:4, 77:6,
80:4, 129:19, 129:23, 130:1,
130:10, 130:14, 176:10,
195:19, 196:17, 196:23,
197:10, 200:15, 202:21,
203:21
**living** - 30:22, 30:23, 70:3,
70:15, 70:21, 70:25, 71:2,
71:5, 71:13, 72:8, 72:22,
73:2, 79:1, 80:19, 129:15,
130:17, 149:12, 149:18,
149:22, 150:4, 150:8, 150:9,
159:7, 163:12, 163:16,
164:1, 176:21, 196:21,
197:4, 197:7, 197:16, 205:9,
205:12, 206:3, 207:7,
207:11, 207:12, 208:3,
208:6, 209:23, 213:20
**load** - 39:4
**loaded** - 15:6, 190:24
**local** - 91:19
**locate** - 49:15, 114:4
**located** - 36:8
**location** - 39:6, 48:2, 48:6,
49:24, 53:17, 64:16, 65:3,
68:2, 77:5, 84:21, 89:7,
92:24, 93:20, 176:10
**loci** - 7:19, 8:3, 8:4
**lock** - 68:21, 69:7, 69:11
**locked** - 69:8

**locking** - 68:22
**locks** - 69:4
**lonely** - 92:1
**long-sleeved** - 151:4
**look** - 3:7, 8:3, 15:11, 24:13, 54:12, 67:24, 68:11, 68:23, 69:22, 70:20, 71:15, 71:25, 72:19, 75:18, 80:8, 96:8, 99:22, 107:25, 113:24, 114:2, 116:12, 116:18, 118:3, 118:5, 118:13, 118:15, 131:9, 137:3, 141:16, 162:11, 164:16, 165:17, 170:1, 172:7, 186:23, 187:18, 196:20, 208:18, 208:19, 209:5, 217:7
**looked** - 8:4, 19:17, 71:10, 75:10, 76:3, 94:24, 112:11, 117:8, 117:9, 140:15, 141:23, 142:6, 142:11, 142:15, 142:20, 161:1, 163:8, 187:20, 200:19, 212:3
**Looking-** 70:21, 73:2, 75:23, 82:12, 170:4
**looking** - 3:3, 8:3, 33:23, 34:1, 34:6, 62:21, 68:1, 69:25, 71:14, 72:2, 72:20, 74:20, 95:3, 99:4, 100:9, 100:10, 100:13, 104:18, 112:12, 113:23, 116:24, 117:3, 131:10, 131:21, 142:13, 159:1, 159:4, 159:6, 160:14, 160:17, 161:24, 163:11, 164:9, 170:2, 200:14, 203:23, 214:10, 216:8
**looks** - 3:25, 70:6, 73:23, 76:10, 99:4
**Loop-** 65:5
**loop** - 66:4
**loose** - 216:5, 216:8
**Lose-** 7:12
**lose** - 213:23, 214:2
**Louisiana-** 2:15
**love** - 30:11, 125:13, 126:9
**loved** - 30:9
**low** - 91:21
**lower** - 65:24, 91:18
**Luggage-** 73:22
**lunch** - 96:19, 146:16
**Lunch-** 97:4
**lying** - 42:15, 103:14

**M**

**Ma'am** - 121:1
**ma'am** - 13:4, 63:11, 63:22, 65:5, 83:24, 120:17, 122:10, 122:15, 122:18, 122:21, 123:10, 123:15, 124:3, 124:5, 124:13, 124:23, 125:2, 125:5, 125:14, 125:17, 125:20, 125:24, 126:2, 126:10, 126:12, 126:14, 126:23, 127:4, 127:7, 127:10, 127:12, 127:21, 128:3, 128:12, 128:22, 129:2, 129:8, 129:11, 130:2, 130:8, 130:19, 130:24, 131:4, 131:11, 131:16, 131:20, 131:23, 132:2, 132:5, 132:18, 133:5, 133:8, 133:11, 133:13, 133:23, 133:25, 134:18, 134:20, 134:23, 135:1, 135:9, 135:12, 135:18, 136:13, 137:2, 137:5, 137:8, 138:2,

138:5, 138:13, 138:17, 138:20, 138:22, 138:25, 139:2, 139:5, 139:10, 139:13, 139:17, 139:24, 140:3, 140:6, 140:9, 140:12, 140:16, 141:22, 141:24, 142:5, 142:7, 142:12, 142:17, 142:21, 143:5, 143:16, 143:19, 143:21, 144:3, 144:11, 144:13, 144:16, 145:5, 145:9, 145:14, 145:22, 146:11, 146:19, 147:25, 148:3, 148:10, 148:15, 148:18, 149:1, 149:4, 149:16, 150:5, 150:7, 150:10, 150:19, 150:22, 151:2, 151:8, 151:19, 151:24, 153:1, 153:6, 154:19, 154:21, 155:13, 155:16, 156:8, 156:16, 156:18, 156:20, 157:3, 158:1, 158:3, 158:10, 158:20, 160:5, 160:10, 160:16, 160:25, 162:7, 162:10, 162:12, 162:14, 162:19, 162:25, 163:2, 163:4, 164:11, 164:15, 165:3, 165:6, 165:8, 165:11, 165:16, 166:2, 166:5, 166:10, 166:13, 166:24, 167:2, 167:7, 167:9, 167:12, 167:14, 167:16, 167:24, 168:1, 168:13, 169:1, 169:4, 169:7, 170:23, 171:1, 171:4, 173:8, 173:20, 174:4, 174:9, 174:12, 174:14, 220:19
**mad** - 133:24, 179:9, 179:10, 179:11, 179:14
**Madrid** - 2:14, 17:9, 23:8, 97:9
**Magee** - 1:22
**maid** - 174:4
**main** - 58:2, 71:2, 98:14
**major** - 62:14, 92:25
**majority** - 66:1
**male** - 22:18, 36:13, 36:15, 48:22, 49:5, 49:21, 51:5, 57:10, 100:16, 101:18, 102:19
**males** - 54:21, 54:24, 54:25, 55:10, 58:4, 99:6, 99:7, 100:8, 101:4, 101:10, 104:8, 105:15, 109:21
**malfeasance** - 21:25
**Mall** - 65:13
**man** - 33:13, 55:23, 91:19, 150:14, 150:15, 150:21, 150:23, 151:3, 151:25, 152:16, 152:20, 153:11, 153:18, 153:20, 156:21, 157:1, 157:4, 157:7, 157:11, 157:19, 158:18, 160:3, 161:8, 161:18, 162:5, 162:18, 163:21, 163:22, 164:10, 164:12, 165:9, 171:16, 171:25, 180:17, 180:19, 181:21, 182:19, 183:17, 184:16, 184:18, 186:25, 187:6, 217:17
**man's** - 152:11
**manner** - 18:9, 27:15
**manpower** - 64:7
**map** - 1:25, 53:13, 53:14, 53:15
**March** - 59:20
**Marilu** - 2:20
**Mario** - 2:14, 17:9, 97:9
**mark** - 140:4
**marked** - 3:24, 53:7, 75:3,

80:25, 81:20, 95:9, 136:24, 139:21, 139:25, 141:25, 142:8, 169:11, 170:21, 200:11
**marriage** - 125:8, 125:10
**married** - 121:6, 122:25, 123:4, 123:9, 127:22, 127:25
**marshy** - 29:23, 91:23
**Mary** - 221:4, 221:20
**mask** - 54:21, 54:24, 55:10, 58:5, 109:9, 118:15, 151:10, 151:11, 151:13, 151:14, 151:18, 156:19, 208:25, 209:2, 209:3, 213:10, 214:21, 214:23
**masked** - 31:8
**masks** - 32:20, 108:22, 109:18, 215:1
**matched** - 36:16, 36:20, 92:21, 119:9
**material** - 19:21
**matter** - 9:18, 14:10, 64:8, 85:3
**mattress** - 74:21
**mean** - 5:8, 5:24, 8:21, 13:6, 38:6, 38:11, 85:24, 93:6, 101:24, 101:25, 102:1, 102:21, 109:3, 111:2, 116:1, 116:19, 118:11, 125:7, 149:20, 150:16, 150:18, 173:23, 177:23, 178:2, 179:3, 180:12, 180:22, 181:22, 189:3, 195:12, 199:1, 199:2, 213:4
**means** - 18:9, 27:15, 28:11, 114:15, 180:21
**meant** - 99:20, 104:15
**medallion** - 111:9
**medical** - 42:18
**meet** - 19:9, 180:2, 197:2
**meeting** - 33:3
**Members** - 69:17
**Memo** - 4:1, 4:3
**memories** - 173:2
**men** - 31:19, 31:23, 36:3, 38:21, 108:22, 138:10, 138:11, 160:6, 182:17, 183:2, 183:10
**men's** - 70:22
**mention** - 56:3
**mentioned** - 51:15, 90:11, 114:8
**mess** - 216:11
**message** - 50:25
**messy** - 81:21
**met** - 37:5, 40:20, 54:9, 98:4, 122:23, 125:6, 125:25, 175:2, 177:24, 180:5, 180:7, 180:8, 180:9, 196:22, 197:1, 197:13, 200:3
**method** - 7:17, 7:19
**Mexican** - 99:2, 108:14
**Mexican-american** - 108:14
**Mexico** - 101:19, 101:21, 116:15, 195:22, 196:19
**mic** - 16:19
**Michael** - 20:8
**microphone** - 45:13, 59:1, 120:16, 194:14
**mics** - 16:18
**middle** - 62:8, 65:24, 111:3
**midnight** - 64:13
**might** - 10:14, 15:5, 15:6, 15:22, 29:11, 34:5, 56:3, 71:21, 80:19, 81:21, 101:22, 190:19
**mile** - 91:25

**military** - 59:25
**mind** - 16:20, 50:5, 52:19, 92:17, 92:19, 101:23, 103:13, 114:24, 116:23
**mine** - 16:23, 99:8, 99:9, 190:23, 211:14
**minor** - 84:11
**minute** - 9:22, 38:4, 69:16, 101:3, 124:17, 162:22, 191:21, 193:23, 194:2
**minutes** - 48:15, 146:24, 148:22, 161:5, 206:19, 220:5
**misleading** - 11:23
**misrepresents** - 44:12
**missing** - 25:21, 25:22, 29:13, 30:5, 32:23, 33:18, 34:15, 34:18, 34:23, 35:5, 49:23, 66:13, 83:10, 84:7, 205:22, 206:11, 216:14, 216:16, 216:19, 216:22
**Missouri** - 91:12, 93:2
**mistakes** - 122:12, 122:16
**mixed** - 129:21
**Mixed** - 65:25
**mode** - 32:6
**modify** - 107:23
**mom** - 86:1
**moment** - 190:14, 206:24, 210:8, 211:25, 212:3, 212:5, 212:9, 214:9, 216:6, 216:8
**Mommy** - 31:18, 155:5
**mommy** - 31:18
**money** - 38:1, 39:21, 89:4, 127:20, 131:7, 143:15, 176:25, 177:2, 177:3, 192:16, 192:21, 192:25, 199:2
**monitoring** - 167:8
**monster** - 158:17
**month** - 30:21, 219:1
**months** - 173:5, 192:2, 192:3, 192:4, 192:5
**morgue** - 92:15, 93:14
**morning** - 18:25, 26:10, 34:14, 34:15, 41:12, 41:14, 45:20, 45:21, 64:2, 90:18, 96:11, 107:22, 188:13, 220:4
**Most** - 27:21
**most** - 3:21, 36:24, 52:22, 69:6, 93:21, 93:24, 144:12, 173:12, 192:4, 195:4
**mostly** - 123:11
**mother** - 32:6, 87:9
**Motion** - 3:14, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 24:4
**motion** - 3:10, 13:4, 14:7, 23:17, 23:23, 24:1, 24:7, 24:19, 24:24
**motions** - 12:17, 12:20, 119:9
**motive** - 32:25
**mouth** - 80:14, 151:12, 158:25, 159:11, 159:13, 159:14, 159:15, 212:3, 214:8
**move** - 76:20, 106:16, 125:15, 131:24, 132:3, 157:14, 157:15, 182:16
**moved** - 11:7, 65:1, 76:22, 125:23, 128:5, 130:4, 173:6, 178:10, 191:20
**Moves** - 161:22, 184:11
**moving** - 65:25, 139:6
**mud** - 91:22
**murder** - 13:7, 13:12, 35:12, 41:3, 41:5, 42:13, 60:12

mute - 16:23
muting - 16:22

**N**

nailing - 117:7
naked - 165:19
name - 17:17, 26:23, 45:23, 49:19, 49:21, 54:8, 94:19, 95:1, 121:3, 121:9, 123:6, 123:17, 129:3, 129:9, 135:2, 138:12, 145:18, 164:19, 175:1, 189:24, 194:24, 195:1, 217:18
named - 36:24, 37:22, 91:19
namely - 18:2, 27:8
names - 123:16
narrative - 106:23, 106:25, 107:1
Natalie - 2:3, 17:10, 40:18, 97:10
naturally - 37:6
nature - 65:6, 85:5, 117:4
near - 30:24
nearby - 32:9, 84:6
neatly - 100:7
necessarily - 116:1, 117:21, 181:22, 182:11
necessary - 23:10, 43:19, 43:25
neck - 186:14, 186:15
necklace - 111:5, 118:25
necklaces - 111:2, 111:8
need - 5:9, 12:12, 15:20, 16:5, 16:23, 17:1, 25:17, 26:4, 41:22, 120:1, 124:15, 135:24, 173:24, 174:6, 193:22, 211:6
needed - 64:20, 117:14, 168:12
Negative - 107:17
neighbor - 32:9, 56:8, 164:21
neighborhood - 38:14, 48:17, 65:22, 87:14
neighbors - 110:19, 110:20, 144:21, 145:2
nervous - 50:6, 121:21
never - 6:14, 6:22, 8:18, 13:11, 19:16, 22:22, 23:1, 35:6, 39:22, 40:8, 52:20, 54:10, 61:1, 98:6, 103:11, 118:16, 126:23, 175:2, 177:20, 178:19, 181:10, 181:17, 182:22, 183:1, 191:9, 198:14
Never - 84:25, 170:24, 171:2
new - 8:23
news - 29:11, 29:15, 29:17, 29:19, 34:17, 34:20, 35:7, 219:3
next - 31:7, 31:17, 32:9, 33:2, 38:2, 39:19, 58:20, 62:3, 103:8, 105:12, 107:22, 120:8, 146:13, 152:17, 163:10, 166:15, 166:23, 188:8, 188:12, 190:9, 193:15, 208:2, 211:23, 215:5
nice - 135:8
nicer - 199:2
nickel - 111:25, 112:2
nickel-plated - 111:25
night - 30:5, 31:2, 35:19, 37:20, 39:17, 47:20, 48:2, 62:3, 62:8, 63:13, 67:5, 71:7, 71:22, 72:9, 77:15, 80:10, 83:5, 87:6, 91:16,

96:11, 96:13, 112:5, 116:24, 117:7, 144:17, 146:9, 146:18, 147:21, 148:20, 149:2, 149:7, 166:14, 182:17, 182:20, 186:5, 186:8, 187:21, 188:1, 188:7, 190:11, 206:13, 216:14, 216:20, 217:2, 217:24, 218:9, 218:11, 219:5, 219:11
nightgown - 31:15
nightmare - 30:20
nights - 61:19, 113:13
nightshift - 47:15, 60:9, 60:14, 60:18, 61:17, 61:18, 63:9, 64:4
Nightshift - 62:4
nightshifts - 64:2
nighttime - 48:11, 208:15
Ninja - 147:25
nobody - 180:1
noise - 162:23, 164:8, 207:21, 207:23
none - 8:16, 20:2, 21:7
None - 41:24, 86:13
nonresponsive - 103:18, 106:2, 106:3, 106:12, 107:3
Nonresponsive - 104:21, 105:18
normal - 30:25, 34:23, 91:19
normally - 73:14, 73:16, 91:21
north - 91:17
North - 6:7, 22:12
northern - 47:21
note - 68:4, 74:3, 77:15, 78:2, 78:4, 78:12
notes - 5:25, 22:13
Nothing - 25:18, 31:1, 74:4, 76:5, 114:4
nothing - 6:25, 8:8, 10:5, 19:25, 60:21, 69:9, 73:5, 87:1, 168:3, 181:13, 192:15, 192:16, 217:14
notice - 13:10, 55:23, 71:1, 126:20
noticed - 110:25
notified - 91:4
noting - 70:23
November - 29:9, 29:17, 30:17, 39:14, 59:23, 91:2, 91:4, 168:19
nowhere - 35:11
nugget - 111:6
Number - 1:22, 102:24
number - 51:1, 68:3, 85:7, 85:8, 85:9, 99:9, 107:9, 107:12, 117:8, 117:9, 117:10
numbered - 1:22, 99:8, 221:11
nuts - 118:1

**O**

o'clock - 65:2
Obel - 1:6, 17:6, 17:7, 17:17, 17:21, 18:4, 26:23, 27:2, 27:10, 28:25, 33:13, 94:19, 97:7, 129:7, 172:9, 172:16
Object - 50:16, 86:6, 103:24, 115:1
object - 9:10, 15:22, 78:8, 78:15, 103:17, 105:20, 105:21, 106:3, 109:5
objected - 106:12
objecting - 11:8, 81:18, 137:19

Objection - 58:6, 86:17, 104:21, 105:18, 108:19, 109:23, 137:13, 140:21, 170:9, 171:8
objection - 15:19, 23:19, 23:20, 43:6, 53:24, 54:1, 67:10, 67:12, 67:16, 81:13, 81:14, 81:15, 81:22, 82:1, 95:21, 95:24, 137:22, 141:13, 169:19, 171:20, 171:23
objections - 14:2, 23:5, 43:8, 105:22, 106:4, 141:10
observations - 51:6, 78:18
observe - 62:14, 65:10, 75:7
observed - 74:10, 79:13, 80:9
observing - 77:5
obtain - 36:13, 36:15
obtained - 13:18, 13:21, 36:20
obvious - 62:1
Obviously - 14:11, 34:19
obviously - 16:7, 56:9, 61:14, 62:7, 75:12, 76:2, 76:18, 77:4, 83:9, 111:16
occasion - 185:24
occupants - 76:22
occurred - 117:16, 119:7, 176:11, 192:1, 221:11
occurrence - 82:21
October - 33:3, 34:16, 60:8, 60:10, 64:1, 95:16, 166:18, 166:21, 166:23, 221:17
offended - 5:5
offense - 13:6
offer - 4:17, 6:9, 7:4, 14:18, 15:1, 15:4, 15:7, 15:14, 15:23, 16:1, 16:21, 20:5, 24:10, 24:11, 24:12, 24:14, 24:16, 43:2, 43:5, 53:21, 67:8, 81:9, 95:18, 137:10, 140:17, 169:17, 170:6, 171:6
offered - 20:24, 24:21, 24:23
Offered - 1:22, 5:17, 23:15, 43:7, 53:23, 67:11, 81:11, 95:19, 137:12, 140:20, 169:18, 170:8, 171:7
offering - 3:9, 4:21, 15:12, 20:4, 20:22, 21:3, 21:16, 21:22, 22:16, 23:11, 24:7, 171:17
Office - 3:20, 3:23
office - 3:4, 61:20, 64:2, 64:24, 64:25, 65:1, 102:14, 117:17
officer - 32:13, 45:10, 46:16, 46:22, 47:1, 47:10, 47:14, 47:24, 51:15, 52:4, 62:10, 63:10, 85:18, 102:10, 104:1, 109:13, 114:12, 115:19
Officer - 45:5, 45:20, 46:1, 46:25, 58:19, 67:25, 89:19, 92:5, 218:21
officer's - 62:13, 62:18
officers - 29:18, 33:12, 35:25, 40:8, 47:3, 61:10, 61:11, 63:5, 64:15, 66:9, 86:14, 92:3, 114:7
Official - 221:4, 221:16, 221:21
official - 92:15
often - 44:1, 148:24
oil - 173:13, 173:15, 196:1
Oil- 173:17

okayed - 14:19
old - 4:18, 6:2, 6:10, 23:7, 24:20, 25:10, 50:1, 65:16, 121:4, 123:2, 123:22, 129:12, 145:10, 145:11
older - 123:23, 124:21
oldest - 125:18
on-call - 58:16, 120:1
on-the-job - 60:22
once - 16:20, 89:23, 100:11, 178:3, 178:9, 179:3
Once- 178:13, 179:5
One - 70:15, 124:14, 143:9, 143:10, 163:20, 213:6
one - 3:11, 3:12, 4:9, 4:10, 4:16, 12:22, 14:16, 19:23, 20:13, 20:14, 20:20, 20:23, 25:11, 25:21, 25:23, 30:12, 31:13, 31:19, 36:2, 42:9, 42:12, 42:15, 42:17, 46:9, 54:10, 54:21, 54:24, 55:3, 55:10, 58:4, 60:16, 60:19, 63:16, 63:21, 64:3, 64:9, 69:18, 70:2, 70:3, 71:11, 73:8, 74:17, 76:10, 79:7, 85:14, 91:14, 96:25, 98:10, 102:24, 103:6, 106:14, 106:22, 109:25, 113:13, 117:8, 117:10, 117:21, 118:13, 118:15, 118:16, 129:23, 131:25, 133:18, 135:6, 135:7, 138:11, 139:6, 142:25, 143:2, 143:20, 144:9, 151:15, 157:5, 157:8, 157:20, 157:21, 162:8, 170:14, 170:16, 170:21, 174:19, 175:5, 180:18, 183:3, 189:10, 190:21, 191:17, 192:8, 192:9, 192:10, 196:14, 196:15, 205:7, 207:1, 210:7, 211:5, 212:10, 212:11, 212:23, 213:5, 213:10
one-line - 106:14
one-page - 20:23
one-third - 4:9, 20:13, 20:14, 20:20
ones - 49:11, 60:16, 60:20
Open - 3:1, 17:4, 26:8, 44:19, 88:14, 97:5, 97:18, 106:17, 147:7, 147:14, 171:21, 193:25, 220:12
open - 68:7, 69:3, 69:7, 69:9, 74:15, 76:11, 104:24, 221:12
Opening - 1:6, 29:8, 41:11
opening - 14:16, 14:17, 14:24, 15:1, 29:5, 41:8, 41:15, 42:4
operations - 37:15
opinion - 20:20, 96:24, 115:2, 119:3, 139:14, 147:2, 194:7, 220:1
opportunity - 44:9, 48:1, 49:18, 57:4, 75:7, 114:19, 153:18
Orchid - 8:4, 8:17, 8:23, 9:15
order - 20:7, 40:24
ordered - 28:11, 220:13
orderly - 71:23, 71:24
ordinary - 31:1
organized - 17:18, 26:24
original - 5:23, 5:24, 6:13, 22:7, 22:8, 22:9, 22:12, 22:13, 94:13, 107:19
originally - 195:21
originals - 22:14
otherwise - 37:23
ounce - 201:8, 201:10

**outcome** - 52:21
**outfit** - 146:21
**outside** - 12:10, 17:15,
48:22, 49:7, 56:8, 61:5,
66:3, 68:8, 72:3, 145:1,
159:3, 163:11, 163:24,
165:19, 187:9, 187:19
**overruled** - 109:7
**own** - 22:25, 31:21, 76:6,
86:18, 86:21
**owned** - 65:21

**P**

**pacing** - 48:23
**package** - 81:16, 81:18
**packaged** - 175:25, 176:2
**packages** - 176:8
**Page** - 1:3, 99:8, 111:2
**page** - 3:10, 3:11, 3:12,
20:23, 107:9, 107:11,
107:12
**pages** - 3:12, 21:2, 54:14
**Paid** - 177:1
**pajamas** - 30:6, 42:5
**pallet** - 31:3, 148:9, 160:21
**panties** - 7:18, 22:18,
31:15
**pants** - 38:23
**papers** - 196:14, 196:15,
196:20
**Pardon** - 176:15
**park** - 92:24, 93:4, 203:21
**Park** - 39:6
**parked** - 64:7, 132:16,
132:18, 132:22
**part** - 12:24, 38:18, 39:21,
66:3, 66:4, 82:23, 84:15,
91:3, 95:15, 103:25, 106:1,
106:14, 108:5, 115:2,
115:19, 136:16, 209:6,
212:20
**participate** - 90:6, 113:3
**particular** - 35:17, 47:16,
98:23
**parties** - 18:25, 221:9,
221:15
**parts** - 10:18, 103:3
**Pasadena** - 93:23
**Pass** - 58:12, 193:5
**pass** - 54:3, 61:24, 90:21,
96:17, 97:22, 112:15,
119:22, 174:15, 219:19
**passage** - 35:13
**passport** - 216:17, 216:21
**past** - 59:19, 72:11,
173:13, 195:25
**patch** - 173:17
**paternity** - 14:5
**Patrol** - 46:17, 47:3, 64:15,
66:7
**patrol** - 46:18, 46:20,
46:22, 47:1, 47:10, 47:15,
47:24, 51:3, 51:15, 52:11,
52:14, 59:21, 61:10, 61:15,
61:16, 62:10, 62:13, 62:17,
63:4, 84:5, 100:8, 100:16,
106:25, 109:11, 113:24
**patrol's** - 62:17
**patrolman** - 75:19
**pause** - 145:7, 174:21,
183:16, 190:17
**Pause** - 17:3
**pay** - 60:1, 124:14, 168:9,
177:19
**paying** - 136:2, 136:3,
136:4
**payments** - 144:1
**Pcr** - 8:25
**Pd** - 84:20, 91:6, 92:6

**peace** - 18:10, 27:16
**penetrating** - 31:20
**Pennsylvania** - 40:3
**People** - 69:3, 82:24,
116:9, 116:10
**people** - 14:2, 14:23, 34:2,
34:3, 37:2, 37:16, 37:17,
41:19, 49:7, 74:9, 77:6,
83:1, 87:13, 93:5, 94:24,
100:9, 100:24, 101:12,
101:13, 108:3, 110:12,
114:19, 115:15, 116:10,
116:18, 118:13, 131:9,
139:3, 139:19, 144:9,
144:12, 144:14, 173:24,
174:5, 176:18, 181:2, 181:9,
181:10, 195:4, 212:10,
214:25
**percent** - 82:23
**performed** - 35:18
**perhaps** - 102:13
**period** - 52:23, 60:19
**permission** - 23:8
**perpetrators** - 80:20
**person** - 33:25, 42:2,
71:21, 94:15, 101:19,
101:21, 114:25, 116:15,
116:19, 117:8, 117:9,
117:10, 117:21, 117:22,
125:3, 126:21, 129:3, 129:7,
139:1, 139:22, 140:2, 140:5,
140:8, 140:10, 141:6,
141:21, 142:3, 155:24,
155:25, 156:4, 156:5,
156:11, 156:13, 156:16,
170:22, 172:8, 182:7,
183:22, 184:12, 191:10,
199:9, 199:11, 199:12,
199:15, 199:16, 199:20,
200:24, 208:9, 208:19,
208:21, 209:9, 209:16,
209:17, 209:19, 209:20,
209:21, 209:23, 209:24,
210:1, 210:7, 210:8, 210:13,
210:15, 210:22, 211:1,
211:7, 211:9, 211:17, 212:5,
212:7, 212:13, 213:5, 213:6,
213:7, 213:16, 214:4,
214:21, 214:22, 215:12,
215:15
**person's** - 209:6, 210:14
**personal** - 20:10, 73:4,
86:18, 86:21
**personally** - 50:2, 82:23
**personnel** - 49:9, 216:13
**persons** - 25:9, 84:7,
163:19, 183:4
**pertain** - 25:7
**pertains** - 24:25
**phasing** - 60:18
**phone** - 32:7, 48:23, 85:2,
85:6, 100:4, 167:6, 212:2
**Phone** - 2:7, 2:13, 2:16
**phones** - 64:21
**photo** - 15:21, 73:8, 78:1,
80:9, 83:25, 84:1, 170:21,
171:17
**photograph** - 190:20
**Photograph** - 2:2, 2:3, 2:4,
2:5, 2:6, 2:7, 2:8, 2:9, 2:10,
2:11, 2:12, 2:13, 2:14, 2:15,
2:16, 2:17, 2:18, 2:19, 2:20,
2:21, 2:22, 2:23, 2:24, 3:2,
3:3, 3:4, 3:5, 3:6, 3:7, 3:8,
3:9, 3:10
**photographed** - 77:23
**photographs** - 5:25,
22:14, 140:13, 140:24,
140:25, 168:23
**photos** - 14:22, 15:12,

16:8, 93:10
**phrased** - 175:9
**Physical** - 106:11
**physical** - 75:9, 83:13,
84:9, 92:16, 105:14, 105:19,
106:7, 106:10, 106:14,
109:20, 119:8
**pick** - 45:2, 133:21,
166:19, 201:14
**picnic** - 144:21, 144:23,
146:1
**picture** - 68:12, 70:23,
83:20, 83:21, 83:22, 88:10,
111:17, 141:17, 141:18,
169:12, 169:13
**pictures** - 14:22, 15:17,
15:25, 66:19, 66:21, 67:4,
69:18, 73:21, 139:18,
140:14, 170:1
**piece** - 30:19, 32:18,
36:21, 40:9, 185:24
**pieces** - 40:15
**piecing** - 40:1
**pile** - 30:4
**piled** - 76:19
**pillow** - 74:25, 75:2, 75:5,
157:24, 159:18, 159:20
**pillowcase** - 158:25,
159:12, 214:6, 214:7, 214:9,
216:7
**pistol** - 75:11, 111:16,
190:21
**pistol-whipped** - 75:11
**place** - 60:21, 79:21,
90:15, 92:1, 106:22, 112:12,
117:16, 129:23, 129:24,
130:1, 130:4, 130:5, 130:6,
130:10, 130:25, 143:10,
159:2, 178:10, 191:20,
191:24, 201:18
**places** - 178:7, 178:8
**plan** - 38:18, 220:4, 220:5
**plane** - 35:6
**planning** - 13:19
**plastic** - 176:1
**plated** - 111:25, 112:7
**play** - 203:22
**playing** - 16:21, 203:15
**plead** - 18:13, 28:25
**pleads** - 29:2
**plus** - 59:17, 60:21, 117:13
**point** - 11:11, 12:7, 15:19,
31:9, 38:9, 38:13, 38:16,
39:7, 52:5, 52:11, 64:11,
64:19, 65:15, 79:25, 85:7,
89:12, 90:23, 98:9, 106:16,
118:8, 124:24, 127:22,
128:4, 133:14, 148:16,
149:7, 150:20, 152:22,
153:11, 153:14, 155:23,
156:25, 158:2, 159:4,
167:10, 172:11, 185:18,
190:5, 196:6, 196:21, 197:4,
197:22, 198:10, 198:15,
198:18, 199:15, 202:13,
203:1, 203:17, 204:16,
204:21, 205:1, 206:5,
207:15, 210:4, 213:24,
216:2
**pointed** - 150:13, 199:20
**pointing** - 208:9, 208:19,
208:22
**points** - 41:20, 98:10
**Polaroids** - 93:12
**Police** - 3:12, 3:16, 11:25,
21:6, 21:21, 29:18, 32:13,
33:3, 46:2, 46:7, 46:14,
59:13, 59:16
**police** - 22:2, 33:19, 35:12,
39:24, 46:3, 46:15, 46:16,

47:5, 47:9, 47:14, 52:3,
59:20, 84:8, 102:6, 102:9,
114:12, 131:14, 133:2,
164:20, 164:22, 164:25,
165:22, 165:25, 166:17,
166:22, 183:8, 184:15,
185:23, 187:21, 188:7,
188:8, 188:9, 188:11,
188:13, 188:17, 188:19,
188:24, 189:6, 189:9,
189:13, 190:9, 192:24,
203:18, 203:25, 217:16,
217:22, 217:25, 218:5,
218:7, 218:14, 218:17
**policeman** - 217:18
**polygraph** - 13:1
**portion** - 47:19, 47:21
**portions** - 221:8
**position** - 12:7, 69:8, 72:5,
160:18
**posse** - 113:17
**Possible** - 54:25
**possible** - 50:20, 50:22
**possibly** - 49:24, 54:20,
55:10, 57:20, 58:4
**post** - 68:15, 68:19, 68:22
**pounds** - 83:18
**Powder** - 175:16, 175:17,
175:18
**Powerpoint** - 14:21, 15:3,
15:4, 15:7, 15:13, 15:14,
15:24, 67:22
**praying** - 29:14
**preceding** - 64:21
**preliminary** - 109:13
**prepare** - 176:6
**presence** - 12:11, 17:15,
89:10
**Present** - 17:9
**present** - 3:1, 17:4, 17:7,
19:1, 26:8, 44:19, 88:14,
93:16, 97:5, 97:8, 97:18,
106:17, 147:7, 147:14,
171:21, 193:25, 220:12
**presentation** - 67:22
**presented** - 1:5, 5:1, 18:3,
27:9, 41:19
**presents** - 17:19, 26:25
**presiding** - 1:23
**pressure** - 87:8, 196:4
**pretty** - 9:23, 10:21, 30:25,
37:13, 71:5, 71:12, 90:23,
94:22, 138:3, 139:1, 143:11,
180:14
**Pretty** - 21:24
**prevents** - 196:2
**primarily** - 65:25
**primary** - 92:3, 94:20
**prints** - 82:12, 82:19,
82:22, 82:24, 83:2
**prison** - 13:20
**privy** - 57:3
**problem** - 8:20, 59:3, 59:5,
179:17
**problems** - 204:16
**procedure** - 8:24, 8:25,
20:19
**procedures** - 4:14
**proceed** - 17:11, 18:20,
26:5, 29:7, 41:10, 44:25,
45:14, 54:5, 59:4, 67:23,
69:21, 82:6, 88:15, 96:7,
97:15, 97:25, 112:19,
120:18, 137:23, 147:16,
147:18, 174:17, 174:22,
194:15
**Proceed** - 124:20
**proceeding** - 67:21, 69:24
**Proceedings** - 1:16, 1:24,
1:2, 220:20

**proceedings** - 1:21, 221:8, 221:14
**process** - 60:17, 62:24, 90:6
**processing** - 90:9
**proffer** - 20:4
**profile** - 4:11, 4:12, 7:16, 7:17, 7:23, 8:1, 8:23, 9:5, 22:17, 23:1, 36:13, 36:15, 36:16
**profiles** - 36:19
**promise** - 40:14
**promoted** - 46:17, 59:23
**proof** - 40:21, 42:3
**proper** - 90:5
**property** - 10:4
**Property** - 3:13, 3:18
**prosecution** - 17:10, 97:11
**protection** - 76:6
**proud** - 33:7, 33:8, 122:6
**prove** - 21:19, 42:16
**proven** - 40:22
**provide** - 11:16, 44:3, 173:25
**provided** - 10:20, 44:21
**Provider** - 173:22
**provider** - 173:24, 174:5
**public** - 66:17
**publish** - 16:6, 43:10, 43:12, 67:17, 67:20, 169:21, 169:24, 172:2
**published** - 45:1
**publishing** - 16:6
**Puerto** - 13:18, 13:20, 13:21, 34:12, 35:2, 35:6, 37:6, 39:21, 117:2, 181:3
**pull** - 38:13, 38:14
**pulled** - 31:15, 38:14, 48:21, 49:6, 71:8, 73:20, 74:16, 192:12
**punishment** - 13:15
**purchased** - 203:12
**purchasing** - 199:8
**pure** - 56:9
**purple** - 183:19
**purpose** - 3:10, 24:22, 89:25
**purposes** - 5:17, 12:12, 20:22, 23:16, 23:20, 23:23, 53:7
**Purposes** - 3:14, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 24:4
**purse** - 72:14, 72:17, 160:12, 160:13, 186:17
**pushed** - 74:22, 91:17
**Put** - 79:25
**put** - 4:4, 6:11, 9:21, 12:11, 13:10, 16:2, 16:8, 18:16, 25:17, 31:3, 50:24, 54:18, 54:22, 69:3, 75:21, 79:13, 79:24, 84:4, 85:1, 85:6, 100:16, 102:6, 102:16, 107:19, 107:20, 107:24, 109:4, 109:17, 110:25, 114:4, 140:23, 146:13, 152:16, 157:16, 157:21, 157:23, 158:9, 162:3, 162:4, 165:15, 165:20, 187:20, 212:2, 214:5, 214:7, 214:9
**putting** - 11:25, 15:13, 51:12, 167:5
**puzzle** - 30:19, 36:21, 40:15

**Q**

**questioned** - 113:5, 189:10

**questioning** - 34:3, 96:5
**questions** - 41:25, 42:8, 42:9, 42:19, 58:14, 96:1, 112:18, 115:9, 115:13, 166:1, 175:6, 175:8, 190:18, 193:8, 210:12
**quick** - 88:5
**quickly** - 31:10, 37:13, 94:22, 102:21, 166:21, 215:19
**Quiet** - 6:16
**quite** - 123:9, 124:8, 127:17, 177:23
**Quite** - 128:7, 177:22
**quote** - 4:7, 20:12, 20:21, 21:12

**R**

**race** - 101:9
**radiator** - 127:15, 197:18, 197:19, 198:5
**radio** - 50:25, 51:3, 74:6, 74:9, 74:10
**rag** - 212:2
**raise** - 26:14, 28:7
**raised** - 86:11, 87:1
**ran** - 52:23, 60:8, 64:25, 165:13
**rank** - 56:16, 59:24
**ransacked** - 71:10, 112:12
**ransacking** - 72:25, 73:12, 74:23, 76:9
**rape** - 22:9, 35:19, 89:18, 113:16, 158:19, 161:21, 165:7
**raped** - 158:6, 160:3, 161:24
**raping** - 158:14, 165:9, 210:9, 212:5, 212:11, 214:10, 214:13, 215:13
**rate** - 60:1
**rather** - 7:19
**react** - 204:4
**reaction** - 34:24
**read** - 3:20, 3:21, 9:18, 11:15, 11:17, 18:23, 19:21, 28:15, 43:23, 103:2, 103:6, 103:22, 104:5, 106:9, 108:5
**reading** - 7:14, 7:22, 10:19, 28:24
**reads** - 102:15
**ready** - 14:14, 17:11, 17:12, 17:13, 25:20, 26:5, 26:13, 97:12, 97:14, 97:20, 121:24, 146:16, 147:9, 147:16
**Ready-** 147:10
**real** - 93:9, 149:10, 204:16
**reality** - 32:5
**realize** - 163:6
**realized** - 52:21
**really** - 14:10, 31:1, 35:10, 38:19, 50:6, 73:5, 74:7, 76:2, 113:7, 116:20, 133:19, 204:25
**reason** - 86:5, 87:14, 88:10, 88:12, 91:15, 110:16, 119:7, 132:13, 179:11, 191:5
**reasonable** - 40:22, 42:3
**reasons** - 64:2
**reassume** - 96:25
**receive** - 57:16
**received** - 50:21, 54:19, 55:9, 57:19, 60:22
**recently** - 22:20
**Recess-** 26:7, 147:6, 194:9
**recess** - 97:4
**recessed** - 220:20

**recognize** - 53:8, 139:22, 140:1, 140:5, 140:8, 140:10, 169:13, 184:9, 184:10, 200:11
**recollection** - 189:18
**record** - 3:3, 3:7, 3:18, 4:4, 4:21, 5:18, 6:11, 6:15, 6:17, 7:14, 9:21, 9:23, 11:5, 12:12, 17:5, 18:16, 18:21, 19:1, 19:4, 19:8, 20:22, 22:15, 23:10, 23:25, 24:7, 24:13, 24:19, 25:17, 26:6, 43:21, 88:7, 97:6, 105:25, 140:23, 171:12, 172:15, 172:18, 193:21, 199:23, 199:25
**Record-** 1:1, 5:19, 221:10, 221:13
**recorded** - 105:11, 105:14, 106:19
**records** - 1:23, 4:11, 6:8, 19:13, 19:15, 22:11, 25:9, 43:3, 92:18
**recover** - 95:3
**recovered** - 30:3, 35:24, 36:2, 81:3
**recovery** - 91:6, 91:8, 91:11, 92:4, 92:6
**red** - 77:25, 78:12, 87:1
**Redirect-** 112:20
**reduced** - 18:23, 30:3
**reenter** - 28:12
**reference** - 3:17, 13:1, 13:2, 13:17, 65:15, 103:24
**referred** - 199:13
**referring** - 114:8
**reflect** - 18:21, 67:5, 172:16, 172:18, 199:24, 199:25
**reflects** - 221:14
**refrigerator** - 72:4
**refused** - 34:25
**regarding** - 18:17
**regards** - 11:20
**Regular-** 96:16
**regular** - 144:15
**regularly** - 86:4
**related** - 57:20, 81:13, 87:10, 115:3, 138:15, 138:16
**relationship** - 86:3, 86:10, 124:25, 128:4, 135:4, 138:19, 179:18, 201:21, 201:22, 201:24
**relay** - 118:7
**relayed** - 160:4
**release** - 52:5
**relevance** - 95:22, 137:13, 137:15, 140:21, 141:10, 170:9, 171:8
**relevancy** - 170:12
**relevant** - 24:22, 25:12, 95:10, 137:17
**relied** - 102:10, 102:13
**religious** - 119:14, 119:16, 119:17
**rely** - 44:23, 102:15
**remain** - 51:24
**remains** - 29:21, 30:13, 30:15
**remember** - 10:17, 48:21, 51:7, 55:2, 55:15, 55:25, 56:13, 57:9, 57:10, 57:11, 63:12, 79:5, 118:23, 122:8, 130:15, 130:20, 131:13, 132:16, 133:15, 133:20, 134:9, 134:15, 136:5, 142:22, 143:3, 145:18, 145:20, 146:17, 148:1, 148:4, 148:16, 149:6,

150:24, 151:3, 155:8, 157:12, 157:16, 164:23, 164:25, 165:4, 165:25, 166:17, 166:25, 167:5, 167:21, 168:19, 183:8, 183:11, 183:15, 183:18, 183:20, 189:24, 190:22, 192:11, 192:17, 198:23, 200:14, 202:7, 202:17, 202:20, 203:17, 205:14, 205:21, 205:24, 207:10, 207:16, 208:14, 208:21, 209:2, 209:18, 210:1, 211:4, 211:23, 214:4, 214:8, 214:15, 214:18, 215:13, 216:13, 216:16, 216:19, 216:23, 217:15, 217:17, 217:19, 218:3, 218:13, 218:14, 218:20, 218:24
**remembered** - 55:4
**remembering** - 44:24
**remembers** - 30:18, 31:7
**remind** - 96:21, 146:25, 194:4
**reminded** - 219:24
**remove** - 90:2, 117:14
**removed** - 76:24, 117:16
**Renee-** 1:22
**renovated** - 65:19
**rent** - 136:2, 136:3, 136:4, 202:14
**repeat** - 55:6, 125:9, 127:1
**Rephrase-** 110:2, 192:7
**rephrase** - 104:25, 175:10
**Report-** 3:11, 3:15
**report** - 3:1, 3:13, 3:20, 10:2, 10:8, 10:18, 20:24, 21:2, 25:5, 25:6, 28:15, 34:17, 51:7, 54:12, 55:2, 55:17, 55:20, 99:4, 99:5, 99:7, 99:9, 99:12, 99:17, 100:23, 102:6, 102:9, 102:15, 103:2, 103:3, 103:23, 103:25, 104:6, 104:13, 104:16, 105:3, 105:8, 105:12, 106:5, 106:19, 107:7, 107:11, 107:17, 107:18, 108:1, 108:6, 109:3, 109:4, 109:8, 109:17, 110:25, 111:12, 113:8, 114:6, 192:23
**reported** - 1:24, 60:9, 131:14, 221:12
**Reporter-** 132:10, 221:4, 221:21
**Reporter's-** 1:1, 1:13, 221:1, 221:10, 221:13
**reports** - 7:4, 20:6
**request** - 35:1
**requested** - 84:10, 221:8
**requesting** - 84:8
**require** - 42:2
**requires** - 60:25
**resident** - 91:19
**residential** - 38:14, 49:1, 49:2
**resolved** - 23:1
**respect** - 19:1, 42:17
**respective** - 221:15
**respects** - 168:9
**respond** - 61:15, 62:4, 115:11
**responded** - 35:1, 35:7
**responder** - 75:20
**responders** - 63:5
**response** - 21:22, 58:7, 115:7, 164:19
**responsibilities** - 46:13, 47:1
**responsible** - 92:3

**responsive** - 61:15, 86:7
**rest** - 103:2
**restrain** - 74:9
**Restrain**- 78:6
**result** - 12:5, 20:16
**results** - 6:18, 6:24, 8:2, 8:18, 24:23
**resume** - 26:3, 97:20
**retaliation** - 87:18, 88:21
**retest** - 8:12
**retested** - 8:17
**return** - 38:7, 220:14
**reverse** - 72:2, 72:5
**reversed** - 11:11
**review** - 40:23, 44:9
**reviewed** - 54:13
**reviewing** - 4:25, 51:7, 55:2, 113:8
**ribs** - 212:25, 217:5
**Rico**- 13:18, 13:20, 13:21, 34:12, 35:2, 35:6, 37:6, 39:21, 117:2, 181:3
**Riesner**- 64:25
**rigs** - 173:14, 173:15
**Rio**- 195:18
**rise** - 97:3, 147:5, 147:13, 220:11
**Road**- 30:24
**roadway** - 93:20
**roadways** - 92:25
**robbed** - 110:12
**robbery** - 32:24, 49:14
**Robbery**- 46:3, 46:11, 46:20
**Rodriguez**- 1:12, 1:20, 34:10, 34:13, 34:14, 49:21, 51:6, 75:7, 121:10, 167:10, 193:18, 194:13, 194:17, 194:22, 195:3, 195:4, 195:8, 195:12, 195:17, 196:6, 197:22, 198:6, 198:23, 199:12, 200:1, 200:10, 200:17, 205:4, 209:5, 210:6, 211:24, 214:12, 215:16, 220:13, 221:4, 221:20
**Rogelio**- 37:22
**Roger**- 37:23, 38:7, 38:24
**Rolando**- 2:20
**role** - 61:12, 62:11, 62:13
**roles** - 61:13
**rolling** - 113:22
**room** - 10:4, 33:12, 70:3, 70:13, 70:15, 70:21, 70:25, 71:5, 71:11, 71:13, 72:8, 72:22, 73:2, 73:23, 79:1, 146:6, 146:10, 149:12, 149:18, 149:22, 150:4, 150:9, 153:12, 153:18, 155:24, 155:25, 159:7, 160:4, 162:9, 163:7, 163:13, 163:16, 164:1, 164:13, 183:5, 207:7, 207:11, 207:12, 208:4, 208:6, 209:24, 213:20, 214:22, 215:12
**Room**- 3:13, 3:18
**rope** - 111:6
**Rosalinda**- 123:17
**Rosenberg**- 123:5
**Rosenthal's**- 19:11
**Rosie**- 123:24, 124:1
**rotation** - 61:17
**roughly** - 48:11
**route** - 93:21, 93:24, 94:2
**Rp**- 2:11
**Rudy**- 36:24, 36:25, 37:24, 38:1, 38:4, 38:12, 38:20, 38:21, 38:25, 39:2, 39:7, 39:15, 39:19, 39:21, 39:22, 39:23, 40:4, 40:10, 40:12,
40:16, 138:12, 138:14, 139:6, 141:7, 142:10, 167:20
**Rudy's**- 40:11
**Rule**- 28:2, 28:3, 28:10
**rule** - 14:1
**rules** - 13:13
**ruling** - 12:13, 21:9, 22:5, 24:1, 24:12, 24:15, 24:19, 24:25
**rulings** - 18:22, 19:3
**run** - 47:7, 89:7
**running** - 216:8
**runs** - 95:15
**rush** - 96:1

# S

**s6** - 59:25
**sake** - 62:6
**salt** - 91:14
**sample** - 8:1, 9:3, 13:17, 13:21, 36:9
**samples** - 34:4
**San**- 173:5
**Santana**- 36:24
**sat** - 29:20, 80:1, 158:23, 161:8, 161:13, 161:14, 161:17
**Saturday**- 112:5
**saw** - 39:22, 55:3, 79:20, 118:16, 119:10, 138:18, 150:6, 150:21, 153:20, 153:21, 156:1, 156:9, 156:11, 156:23, 163:13, 163:17, 163:21, 171:2, 177:25, 178:5, 182:17, 182:24, 183:3, 191:9, 210:8, 212:4, 212:5, 212:9, 214:21
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scar** - 79:19
**scared** - 50:7, 103:15, 204:1, 217:10
**scarring** - 79:20
**scene** - 14:22, 15:12, 15:21, 32:13, 48:10, 48:13, 48:19, 48:20, 48:25, 49:2, 49:4, 49:10, 50:19, 51:10, 51:14, 51:21, 51:23, 51:25, 52:5, 52:17, 53:17, 60:13, 61:11, 61:20, 61:22, 62:5, 62:10, 62:15, 62:24, 63:12, 63:25, 64:9, 64:12, 64:15, 66:8, 66:9, 66:12, 66:16, 66:19, 66:21, 67:5, 68:2, 75:6, 75:18, 75:22, 77:5, 78:19, 81:5, 82:8, 82:20, 87:6, 90:3, 90:9, 91:8, 91:9, 91:11, 91:13, 92:2, 94:14, 107:16, 109:13, 116:23, 117:7, 117:11, 117:14, 118:10, 119:10
**Scene**- 35:23, 82:7
**school** - 96:13, 145:8, 145:13, 145:17, 145:19, 146:15, 203:22
**schools** - 61:4
**science** - 35:14, 36:4
**screamed** - 164:19
**screen** - 15:2, 15:13, 16:2, 69:2, 107:2, 107:6, 107:10, 139:20, 141:16, 141:17
**screens** - 107:24
**screw** - 69:4
**screws** - 69:2, 69:11
**scriptors** - 107:15
**search** - 84:9, 84:18, 88:24
**searched** - 73:23, 74:18, 84:22
**searching** - 71:11
**seat** - 26:18
**seated** - 26:9, 97:19, 147:15
**Second**- 3:11, 166:16
**second** - 3:11, 20:24, 42:12, 74:14, 88:5, 107:10, 123:19, 124:12, 124:15, 129:24, 130:4, 130:5, 130:6, 131:25, 155:24, 155:25, 156:21, 156:23, 157:4, 157:7, 157:11, 157:21, 159:10, 160:3, 162:5, 174:19, 182:19, 192:8, 192:14, 215:12
**seconds** - 20:13
**Seconds**- 215:18
**secure** - 62:15, 64:16, 69:7
**securing** - 66:8
**see** - 4:1, 4:25, 5:1, 5:4, 15:20, 22:16, 25:19, 26:11, 30:8, 30:14, 35:13, 43:18, 67:25, 68:3, 68:7, 68:24, 69:10, 69:18, 70:5, 70:12, 70:21, 70:23, 71:19, 72:3, 72:4, 72:11, 72:23, 73:13, 73:19, 73:21, 74:12, 74:14, 74:15, 74:16, 76:10, 76:15, 76:17, 78:1, 80:11, 82:25, 83:1, 91:24, 93:1, 99:23, 103:7, 106:6, 111:20, 128:25, 134:13, 134:14, 139:8, 139:15, 141:17, 145:2, 150:11, 150:14, 151:5, 151:20, 151:21, 151:23, 153:18, 156:15, 156:16, 156:17, 156:19, 156:21, 158:24, 159:7, 162:13, 163:9, 163:19, 170:11, 172:8, 174:13, 177:21, 178:6, 182:20, 184:16, 184:24, 199:9, 199:12, 204:11, 208:3, 208:9, 209:6, 210:6, 212:7, 214:20, 214:21, 215:24, 215:25, 216:9, 219:6, 219:11
**See** - 220:17
**seeing** - 69:2, 161:14
**seek** - 8:21, 22:24, 24:11, 24:14
**seem** - 32:24
**sees** - 34:17
**selection** - 40:12, 40:19
**Sell** - 126:5
**sell** - 134:2, 144:5, 175:19, 176:18, 177:17, 185:7, 185:15, 201:3, 201:17
**selling** - 33:16, 33:18, 87:25, 127:23, 129:25, 130:3, 130:17, 131:6, 135:16, 143:15, 143:25, 175:11, 175:12, 175:20, 177:13, 185:12, 185:13, 185:14, 191:14, 198:10, 198:17, 198:24, 199:6, 203:1, 204:5, 204:21, 205:18, 205:19, 206:6, 206:8, 218:5, 218:8
**Selling** - 128:14
**semiautomatic** - 190:21
**send** - 47:10, 50:25, 84:9, 89:17, 117:14
**sent** - 6:4, 9:15, 84:22, 89:14, 109:10, 109:11, 109:14
**separate** - 59:24, 65:18
**separation** - 86:3
**September**- 17:22, 18:5,
27:3, 27:11, 30:21, 30:25, 35:19, 35:22, 37:21, 47:23, 52:18, 53:18, 63:13, 63:23, 94:12, 94:16, 95:15, 96:9, 144:18, 191:25, 204:15, 205:5, 205:21, 205:24
**sergeant** - 46:3, 46:11, 46:18, 52:6, 56:18, 60:1, 60:2, 103:6, 103:9
**Sergeant**- 46:5, 47:11, 52:9, 52:10, 52:24, 53:6, 54:8, 56:12, 57:5, 57:7, 58:21, 59:13, 80:24, 87:4, 97:16, 97:21, 98:4, 107:14, 112:22, 168:21
**sergeants** - 56:14, 56:16, 56:20, 56:22, 56:23, 56:24, 60:4, 103:4, 103:10
**Serious**- 42:9
**serious** - 51:17, 61:16
**service** - 47:5, 47:9, 61:1
**set** - 70:6, 70:10, 71:21, 79:1, 79:18, 80:2, 80:15, 148:21, 148:24, 206:18, 206:20, 206:21
**sets** - 95:10
**seven** - 85:9
**seven-digit** - 85:9
**seventeen** - 123:3
**several** - 32:17, 34:2, 34:3, 35:20, 37:1, 37:16, 75:13, 99:5, 168:16, 218:1
**sexual** - 35:18, 36:12, 36:14, 36:17, 49:14, 89:20, 109:11
**sexually** - 108:17, 110:13, 117:12, 214:14
**Sexually** - 31:20
**shaped** - 65:16
**Sharma**- 8:13
**Sharma's**- 6:18
**sharp** - 18:2, 27:8
**Shellist**- 12:21
**ship** - 91:15, 91:24
**shirt** - 30:7, 39:4, 77:25, 78:12, 78:19, 83:19, 147:22, 151:4, 151:7
**shock** - 188:15, 191:8
**shoes** - 73:25
**shoot** - 12:14
**shop** - 127:15, 197:18, 197:19, 198:5
**short** - 31:6, 33:16, 38:7, 38:22, 39:5, 41:15, 197:20, 209:9
**shorthand** - 1:25
**shortly** - 28:20, 37:10, 48:13, 94:17, 100:9, 147:4
**shorts** - 30:7, 30:9, 30:14, 83:19, 92:22, 147:22, 147:23, 147:24
**Shorty** - 195:7
**shot** - 74:25
**shoulders** - 150:18
**show** - 15:2, 21:14, 22:4, 42:18, 67:1, 67:9, 76:13, 80:25, 95:8, 106:18, 136:23, 139:18, 139:19, 139:21, 139:25, 140:7, 141:25, 142:8, 168:25, 169:10, 169:25, 170:20, 200:10
**showed** - 8:5, 168:23, 169:3
**Showing** - 170:13, 170:15
**showing** - 53:6, 73:5, 76:11, 151:6, 151:12
**shy** - 61:2
**side** - 12:19, 27:19, 27:23, 28:3, 33:24, 37:16, 72:8, 106:4, 156:4, 161:22, 181:2,

212:24

**side-by-side** - 37:16
**sides** - 17:11, 147:9
**sideways** - 74:22
**signed** - 27:16, 136:11
**Signed** - 18:10
**significant** - 30:8, 95:25, 119:15
**silver** - 143:2
**simple** - 20:18
**sinks** - 71:20
**sit** - 61:20, 64:5, 64:7, 90:3, 113:18, 118:12, 130:22
**site** - 94:8
**sits** - 29:10
**sitting** - 29:16, 33:11, 34:16, 72:9, 72:14, 79:17, 102:1, 152:18, 153:2, 153:3, 154:23
**situation** - 19:1, 78:20, 87:11, 87:19, 88:22, 90:4
**six** - 59:17
**Sixteen** - 123:3
**Sixth** - 11:9, 11:12
**Sixty** - 121:5
**size** - 92:16, 156:15
**skeletal** - 30:15, 92:8
**ski** - 151:13, 151:14
**skin** - 114:9, 151:5, 151:6, 151:23, 152:11, 153:22, 164:14, 171:18, 172:5, 172:20, 180:12, 180:15, 180:22, 182:20
**skinned** - 100:24, 101:4, 209:21
**Skip** - 14:15, 17:8, 54:8, 97:9, 175:1
**Skip's** - 14:18
**sleep** - 31:5, 146:6, 146:7, 146:9, 146:15, 146:18, 148:20, 206:16, 207:15, 207:18
**Sleeping** - 206:15
**sleeping** - 148:8, 149:8, 207:6, 207:8, 207:10, 207:12
**sleeved** - 151:4
**small** - 30:19, 47:18, 65:12, 65:20, 70:17, 111:8, 141:16, 176:8
**smaller** - 47:19
**smoke** - 35:25, 79:14, 79:15, 80:5
**smoked** - 79:22
**smokers** - 79:7
**smoking** - 61:22
**snaps** - 32:6
**so-called** - 42:16
**social** - 180:6
**socialize** - 135:10
**sofa** - 146:8
**sold** - 33:12, 37:16, 39:20, 87:15, 129:4, 185:10, 202:23
**solve** - 62:6
**solved** - 62:2, 62:6
**someone** - 32:12, 34:24, 41:21, 42:13, 51:22, 64:6, 71:11, 73:23, 74:8, 74:11, 75:12, 76:5, 76:21, 114:23, 116:16, 117:17, 124:25, 138:11, 155:8, 161:21, 179:18, 180:11, 199:8, 214:13, 218:23
**sometime** - 37:8, 191:16
**sometimes** - 99:10, 118:7, 134:24, 138:8, 144:9
**Sometimes** - 135:13
**somewhere** - 35:4, 48:16,

84:6, 95:4

**son** - 49:25, 50:8, 58:2, 123:19, 123:21, 124:6, 145:10, 172:25, 173:3, 186:23, 187:12, 187:18, 188:3, 190:8, 190:11, 191:6, 191:9
**son's** - 57:23
**soon** - 26:3, 32:12, 37:11, 163:8, 218:14
**Sorry** - 124:14
**sorry** - 3:24, 28:23, 38:11, 46:5, 55:20, 66:20, 131:13, 132:10, 146:21, 172:22, 181:12, 181:13, 182:13, 188:14, 189:9, 190:11, 192:9, 196:11
**sort** - 55:21, 70:25, 88:21, 133:2, 179:17, 188:18
**sound** - 149:13, 155:17, 207:16, 207:23, 208:1
**sounds** - 5:8, 31:16, 86:18, 155:14, 214:16
**South** - 65:5
**Southeast** - 46:17
**southeast** - 47:15
**southern** - 116:13
**Southwestern** - 85:4
**Spanish** - 90:10, 99:2, 101:11, 101:21, 108:7, 108:14, 109:12, 116:11, 116:15, 116:21, 152:5, 183:22, 183:25, 184:2, 211:3, 211:5, 211:18
**Spanish-speaking** - 108:14, 109:12
**speaking** - 99:1, 101:11, 105:21, 106:3, 108:14, 109:12, 116:14, 184:2
**special** - 61:3, 112:5
**specific** - 4:17, 21:4, 41:24, 48:20, 102:5, 105:19, 115:14, 119:6, 137:17
**specifically** - 106:10, 115:16, 118:23, 126:6
**Specifically** - 47:23
**speculation** - 115:19
**speech** - 105:6, 107:2, 110:10
**spell** - 113:18
**spent** - 52:14, 59:18, 90:20, 105:11
**Spiderman** - 30:10, 147:25
**spot** - 10:21
**spot-on** - 10:21
**squad** - 60:12
**Sr** - 123:7, 123:8, 125:1, 125:11
**St** - 89:20
**stab** - 22:25
**stabbed** - 39:3
**stabbing** - 18:1, 27:7
**Stadium** - 53:9, 53:12, 65:14, 84:10
**stadium** - 53:10, 84:18, 132:18
**Stafford** - 123:12
**Stainless** - 112:4
**stake** - 132:25
**stakeout** - 133:2
**stand** - 26:14, 52:18
**standing** - 69:25
**standpoint** - 5:1, 19:10, 19:11
**stands** - 24:1
**start** - 11:25, 13:11, 16:6, 16:21, 26:13, 99:19, 107:22, 127:23, 190:1, 197:4, 198:10, 220:5
**started** - 32:18, 33:23,

40:1, 40:7, 128:10, 149:18, 149:19, 149:23, 152:18, 158:5, 158:14, 159:1, 164:9, 186:22, 190:13, 197:7, 198:17, 198:24, 200:23, 220:3
**starting** - 220:14
**starts** - 31:10, 38:12, 38:21, 95:14, 99:9, 99:20
**State** - 1:11, 2:7, 10:20, 11:12, 17:6, 17:12, 17:16, 17:18, 18:10, 21:1, 21:24, 23:19, 24:22, 25:18, 26:19, 26:22, 26:24, 27:16, 29:5, 41:20, 42:4, 42:24, 43:2, 45:5, 58:21, 93:22, 94:6, 97:7, 97:22, 112:17, 120:9, 193:17, 221:2, 221:5
**state** - 48:24, 50:4, 76:20
**State's** - 1:6, 1:7, 12:22, 12:23, 12:24, 14:17, 21:22, 22:24, 23:5, 29:8, 43:2, 43:4, 43:7, 43:11, 43:14, 53:8, 53:13, 53:21, 53:23, 53:25, 54:2, 67:1, 67:9, 67:11, 67:13, 67:18, 67:25, 68:11, 68:23, 69:22, 70:20, 71:15, 71:25, 72:12, 72:19, 73:1, 73:7, 73:11, 73:17, 73:24, 74:5, 74:13, 74:19, 74:24, 75:23, 76:8, 76:15, 76:23, 80:8, 80:25, 81:9, 81:11, 81:16, 81:23, 81:25, 82:4, 83:21, 95:9, 95:18, 95:19, 95:23, 96:2, 96:8, 97:14, 136:24, 137:11, 137:12, 137:22, 137:24, 139:21, 140:1, 140:4, 140:7, 140:17, 140:19, 141:13, 141:14, 141:18, 141:25, 142:8, 142:15, 142:18, 169:11, 169:17, 169:18, 169:20, 169:22, 170:1, 170:7, 170:8, 170:21, 171:5, 171:7, 171:22, 171:24, 171:25, 200:11
**Statement** - 29:8, 4:11
**statement** - 1:6, 12:24, 41:8, 41:16, 42:4, 119:4, 218:10, 218:18, 218:20
**statements** - 3:2, 43:16, 62:18, 90:1, 90:5, 118:18, 119:9
**states** - 37:9
**station** - 11:25, 166:18, 188:10, 188:11, 188:13, 188:17, 189:9, 189:14, 190:10, 217:23, 218:1, 218:17
**stationed** - 173:6
**stations** - 51:3
**stay** - 51:21, 213:14
**stayed** - 8:12, 51:23, 52:2, 60:9, 75:22, 84:15, 123:8, 127:17, 158:22, 162:3, 162:4
**steal** - 119:16
**steel** - 112:4
**step** - 120:6, 120:13, 193:13
**steps** - 19:5
**sticks** - 63:21
**Still** - 25:21
**still** - 24:14, 25:22, 30:14, 39:8, 74:12, 78:14, 78:15, 82:3, 91:12, 121:15, 128:2, 137:18, 148:13, 160:18, 160:23, 205:19, 206:6, 206:8, 216:2
**stolen** - 55:18, 55:22,

111:12, 111:17, 191:3
**stop** - 69:15, 132:9, 132:11, 133:10, 133:16, 133:17, 203:1, 204:5
**stopped** - 33:16, 33:18, 143:25, 191:9, 204:21
**stops** - 31:22, 38:15
**storage** - 9:25, 25:1, 73:25, 74:3
**stored** - 19:14
**stores** - 199:10
**story** - 32:18, 33:25, 34:17, 39:24, 40:1, 65:16, 65:19, 103:8, 103:11, 122:2
**stove** - 72:6
**Str** - 7:20, 22:20
**strand** - 8:8
**strange** - 168:2, 183:24
**streamline** - 4:23
**Street** - 93:2
**street** - 38:15, 53:11, 63:5, 65:14, 84:19, 100:9, 114:3, 128:15, 132:17, 132:21, 164:17
**strewn** - 29:23, 91:23
**strict** - 42:2
**strictly** - 62:4
**Strike** - 182:18
**strong** - 139:1
**struck** - 75:13, 212:16
**studied** - 18:24, 20:14
**studies** - 4:8
**stuff** - 3:4, 3:22, 6:9, 7:15, 8:9, 8:22, 10:6, 10:8, 10:21, 11:9, 13:3, 15:2, 15:6, 15:17, 42:6, 71:11, 71:12, 71:21, 76:10, 76:22, 106:5, 119:14, 119:16, 119:17, 160:8, 192:12
**stumble** - 73:16
**styled** - 17:21, 18:4, 27:2, 27:10, 221:11
**Subject** - 120:2, 193:12
**subject** - 24:15, 28:17, 96:23, 120:3, 120:7, 147:2, 193:10, 193:13, 194:6, 219:25
**submitted** - 35:16, 35:20, 36:6
**sudden** - 198:21
**suit** - 172:13
**Suite** - 2:15
**summary** - 20:23
**sums** - 89:4
**sun** - 181:23
**Superman** - 30:10
**supplement** - 107:18
**supplied** - 129:4
**supplier** - 167:1
**supporting** - 6:7
**supposed** - 25:23
**supposedly** - 108:23
**suppress** - 23:17, 23:23, 24:1, 24:20, 24:25
**Suppress** - 3:14, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:7, 4:9, 4:11, 24:4
**suppressed** - 19:7
**surfaces** - 82:14
**surprise** - 82:17, 124:9
**suspect** - 62:2, 62:21, 78:20, 94:14, 94:20, 107:2, 107:6, 107:24
**Suspect** - 107:10
**suspects** - 32:19, 50:20, 50:22, 54:20, 55:3, 106:21, 107:8, 113:19, 114:2, 114:5, 116:25
**suspicion** - 86:12
**suspicions** - 88:17

**suspicious** - 32:25, 85:21
**sustain** - 170:18
**sustained** - 50:17, 58:8, 78:10, 86:8, 103:19, 104:2, 104:9, 108:20
**swabs** - 22:23
**swear** - 26:4
**sworn** - 1:4, 26:15, 26:16, 27:24, 28:8, 28:9, 45:8, 45:11, 45:17, 46:16, 58:23, 59:8, 120:12, 120:14, 120:21, 194:11, 194:12, 194:18
**Sx** - 1:23, 1:24, 1:25, 2:1, 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10
**system** - 16:15

**T**

**t-shirt** - 30:7, 77:25, 78:12, 78:19, 83:19, 147:22
**table** - 17:8, 76:1, 97:9, 144:22, 144:23, 146:1, 160:12, 186:20
**tagged** - 36:3, 78:21, 81:5
**talks** - 106:9
**tall** - 55:4, 83:18, 150:16, 150:17, 152:20, 156:5, 157:1, 157:19, 158:18, 162:18, 163:21, 163:22, 164:10, 164:12, 171:16, 180:17, 183:17, 209:9, 209:11, 209:14, 210:7, 213:8
**taller** - 209:12
**tan** - 181:24
**tape** - 43:3, 43:5, 43:16, 44:12, 44:22, 44:24
**tapes** - 44:1
**Tarrant** - 11:21
**Tcic/ncic-** 84:7
**tearing** - 71:11, 71:13, 161:25
**technically** - 127:25
**technique** - 8:7
**technology** - 26:5, 35:14
**Telephone**- 30:24, 65:13
**television** - 34:17, 73:7, 79:1
**televisions** - 69:18
**ten** - 85:10, 220:5
**tender** - 81:9
**tendered** - 43:22
**tendering** - 53:21
**tends** - 91:17
**term** - 63:9, 116:7
**terms** - 11:3, 25:1, 75:10
**Terrace**- 2:12
**terrible** - 166:16
**test** - 36:4
**tested** - 6:22, 8:22, 16:15
**testified** - 4:8, 45:17, 59:8, 112:11, 120:21, 194:18
**testify** - 4:5, 20:9, 36:11, 55:5
**testifying** - 40:13
**testimony** - 21:25, 28:14, 28:16, 28:20, 40:24, 42:13, 44:24, 52:14, 97:20, 147:17, 219:22, 220:15
**testing** - 6:1, 10:14, 22:9, 22:14, 35:17, 35:21
**Texas**- 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 17:6, 17:17,

17:18, 17:19, 17:20, 17:21, 18:4, 26:23, 26:24, 26:25, 27:1, 27:2, 27:10, 48:7, 65:4, 94:3, 94:4, 94:7, 97:7, 101:20, 221:2, 221:6, 221:20, 221:23
**Theft**- 60:6
**theft** - 60:6
**theirs** - 37:22
**themselves** – 21:6
**thereof** - 147:3
**thereon** - 96:24, 194:7, 220:2
**They've**- 9:5
**they've** - 9:5
**thinking** - 110:15, 116:24, 132:24, 188:18, 188:19
**thinks** - 39:3, 115:14
**Third-** 3:15
**third** - 3:11, 3:12, 4:9, 20:13, 20:14, 20:20, 21:2, 42:15, 107:11, 123:21
**Thirteen**- 124:10, 124:11
**Thirty-** 46:9, 59:17
**Thirty-one-** 46:9
**Thirty-six-** 59:17
**thoughts** - 13:19, 87:22
**Thousands-** 60:25
**threatened** - 204:18, 210:4
**Three**- 3:12, 21:20, 65:18
**three** - 4:16, 5:14, 21:2, 21:17, 38:21, 48:15, 134:12, 166:20, 189:11, 192:5, 202:25, 212:24, 218:2
**throughout** - 51:2, 84:15
**throw** - 69:10
**thrown** - 71:9, 72:24, 73:13, 73:22
**Thursday-** 96:11
**ticket** - 35:2, 35:6, 39:21
**tickets** - 47:6
**tide** - 91:21
**tidy** - 80:18
**tie** - 74:8, 74:11, 78:7, 92:7, 157:11
**tied** - 31:13, 31:25, 32:2, 78:1, 153:8, 157:5, 157:12, 158:25, 159:21, 159:22, 160:18, 160:23, 162:2, 212:1, 212:18, 212:19, 214:8, 216:2
**tight** - 157:13
**timely** - 14:2
**tip**- 80:11
**tired** - 54:4
**tires** - 39:17
**Tise**- 2:3, 6:3, 6:23, 7:4, 7:25, 8:15, 8:19, 9:2, 11:14, 13:4, 13:8, 13:11, 14:4, 14:7, 14:21, 14:25, 15:10, 15:21, 15:25, 16:7, 16:11, 17:10, 23:20, 25:18, 26:21, 27:18, 27:21, 27:25, 43:1, 43:9, 43:15, 44:1, 44:7, 44:17, 58:21, 59:4, 59:5, 59:10, 66:24, 67:1, 67:8, 67:19, 67:21, 67:24, 69:22, 78:11, 78:23, 80:22, 80:24, 81:8, 81:16, 81:20, 82:3, 82:5, 82:7, 86:9, 86:24, 88:15, 88:16, 88:17, 95:6, 95:8, 95:17, 95:25, 96:3, 96:8, 96:17, 97:10, 97:14, 97:23, 103:24, 105:21, 109:5, 109:23, 112:18, 112:21, 115:5, 115:8, 115:21, 115:22, 115:24, 119:22, 120:5, 120:9, 120:18, 120:19, 120:23, 124:20, 124:21, 132:12,

136:21, 136:23, 137:10, 137:15, 137:16, 137:25, 140:17, 140:25, 141:3, 141:6, 141:16, 147:10, 147:18, 147:19, 150:1, 150:3, 169:8, 169:10, 169:16, 169:23, 169:25, 170:6, 170:13, 170:15, 170:20, 171:5, 171:10, 171:13, 171:16, 171:25, 172:2, 172:4, 172:15, 172:19, 174:15, 174:16, 193:7, 193:8
**Tise's**- 10:7
**tobacco** - 79:16
**Today**- 200:5
**today** - 29:10, 118:12, 124:1, 128:2, 166:12, 183:21, 199:13, 200:7
**together** - 32:18, 40:1, 40:9, 121:15, 127:14, 135:10, 135:14, 195:13, 195:15, 197:5, 197:7, 197:11
**tomorrow** - 220:14, 220:17
**took** - 19:13, 83:25, 87:8, 90:14, 93:10, 155:21, 158:12, 160:9, 160:10, 160:11, 161:3, 165:24, 190:12, 215:23, 216:7
**top** - 31:19, 39:10, 109:1, 160:12, 186:11, 186:13, 186:19
**tortillas** - 144:24, 145:4
**total** - 46:21
**touch** - 21:9
**touched** - 7:6, 21:7, 21:15, 186:18, 186:19
**touching** - 69:1, 157:15, 157:20, 158:5
**tow** - 38:8
**toward** - 164:4, 203:23
**towards** - 38:12, 149:18, 149:21, 150:3, 156:11, 159:7, 211:7
**town** - 47:16, 52:25, 136:16
**track** - 7:12
**traded** - 39:17
**traditional** - 16:1
**traffic** - 47:6
**train** - 4:7, 20:12, 21:12
**trained** - 8:7, 78:18
**training** - 36:19, 60:22, 60:23, 61:1, 61:2, 61:4, 87:5
**transaction** - 144:9, 179:9
**transactions** - 185:18
**transcript** - 43:15, 44:3, 44:5, 44:21
**transcription** - 221:7
**transcription/stenograph** - 1:25
**transcripts** - 45:3
**transfer** - 82:24
**transferred** - 46:20, 59:21, 60:7, 60:10, 60:14, 75:4
**Transitioning-** 66:2
**transparent** - 72:7
**transport** - 75:21, 89:19
**transported** - 51:25, 89:24
**trap** - 85:1, 85:6, 85:7, 167:5
**treat** - 217:11
**treated** - 51:9, 75:21, 217:6
**Tree**- 137:3
**tree** - 70:22
**trial** - 12:19, 15:3, 15:8, 24:12, 25:13, 34:13, 96:23,

96:24, 147:2, 147:3, 171:14, 194:6, 194:8, 220:1, 220:2
**Trial**- 1:3
**trials** - 15:11
**tried** - 49:13, 49:15, 49:16, 68:21, 98:18, 114:17
**trouble** - 127:20, 144:1
**true** - 122:7, 221:7
**truly** - 221:14
**truth** - 98:19, 119:4, 122:14, 166:3, 166:8, 166:11, 190:6
**truthful** - 98:12, 109:14, 119:8, 218:8
**try** - 19:5, 98:21, 104:25, 113:17, 118:10, 161:6, 167:15, 191:6
**trying** - 4:23, 5:11, 19:2, 32:7, 32:11, 32:18, 48:22, 55:5, 96:1, 102:6, 113:16, 113:21, 161:18, 161:20, 180:24, 181:6, 183:13
**turmoil** - 76:12
**turn** - 148:22, 152:19, 152:23, 154:5, 156:9, 156:25, 158:2, 184:5, 206:18, 206:21
**turned** - 11:11, 16:19, 71:8, 71:19, 73:21, 154:11, 156:1, 157:1, 158:6, 158:8, 158:11, 164:6, 173:2, 187:5, 187:8
**Turtles-** 147:25
**Tv-** 31:6, 36:2, 70:6, 70:9, 70:11, 70:24, 73:3, 74:14, 79:17, 79:19, 80:1, 83:1, 111:13, 148:16, 148:19, 148:24, 149:2, 206:18, 206:20
**Tvs-** 73:8
**Twenty-** 85:14
**Twenty-one-** 85:14
**twice** - 65:1, 168:18, 178:3, 178:13, 179:4, 179:5
**two** - 4:16, 7:19, 15:16, 15:17, 20:10, 28:6, 31:8, 32:19, 36:11, 37:17, 50:21, 54:24, 55:10, 57:7, 57:13, 57:23, 58:4, 65:16, 69:17, 70:13, 71:1, 73:8, 91:25, 98:11, 98:24, 99:6, 99:7, 100:18, 100:23, 101:12, 101:13, 102:1, 104:6, 104:8, 105:3, 105:15, 109:21, 111:8, 116:24, 116:25, 117:9, 117:22, 124:21, 125:18, 126:25, 132:22, 166:20, 176:24, 183:2, 183:4, 189:10, 192:5, 195:20, 212:9, 212:24, 218:2
**Two-** 65:19, 99:1, 134:12
**two-room** - 70:13
**two-story** - 65:16
**Two-story-** 65:19
**tying** - 155:8
**type** - 47:8, 87:18, 88:21, 90:20, 90:22, 99:3, 119:20, 208:25
**types** - 47:4
**typing** - 90:20, 105:12, 107:22

**U**

**U-shaped** - 65:16
**ugly** - 91:13, 91:24
**ultimately** - 89:15, 92:13, 113:7, 125:15, 127:5
**unclear** - 14:8

**unconscious** - 158:24, 160:1
**Under** - 105:6, 107:8
**under** - 107:2
**understandable** - 118:11
**understood** - 101:5, 103:14, 118:5, 119:17, 154:5
**underwater** - 91:21
**underwear** - 158:12, 165:15
**undisturbed** - 71:5, 72:15
**unfired** - 76:1
**unfortunately** - 93:6
**unidentified** - 92:8
**uniformed** - 47:10
**unison** - 41:14
**Unit** - 35:23, 82:7
**unit** - 59:23, 61:15, 100:8, 109:11
**units** - 60:18, 65:17, 84:5, 84:9, 84:22, 113:24
**unknown** - 18:9, 27:15, 106:22
**unlawfully** - 17:23, 18:6, 27:4, 27:12
**unless** - 25:11, 28:12, 86:17
**Unless** - 88:12, 185:8
**unlit** - 79:16
**unprofessionalism** - 22:1
**unreliability** - 21:14
**untied** - 158:23, 159:1, 163:1, 163:8, 163:14, 163:17, 186:21, 186:22, 191:8
**untying** - 159:5, 191:8
**unused** - 76:1
**unusual** - 76:5, 111:1
**up** - 11:21, 16:8, 16:14, 16:17, 24:14, 31:13, 31:19, 31:25, 32:2, 35:10, 39:10, 39:17, 40:3, 45:2, 45:12, 48:21, 49:6, 51:21, 59:2, 61:23, 61:24, 62:7, 62:9, 63:9, 64:3, 64:8, 68:12, 68:21, 71:14, 73:12, 74:8, 74:11, 75:3, 76:19, 77:1, 80:13, 84:22, 88:10, 89:15, 90:11, 90:21, 90:24, 95:1, 112:18, 112:23, 113:3, 114:5, 120:16, 129:21, 132:18, 133:21, 136:20, 139:19, 149:15, 149:21, 152:17, 152:25, 153:2, 153:8, 153:20, 154:16, 155:3, 155:8, 155:9, 157:5, 157:11, 157:12, 159:1, 160:18, 161:6, 161:9, 161:15, 161:18, 161:25, 162:21, 162:23, 163:3, 165:14, 166:19, 182:18, 184:11, 194:14, 196:18, 201:14, 204:8, 204:15, 205:1, 205:20, 207:16, 207:20, 208:3, 212:1, 212:18, 212:19, 214:8, 216:1, 216:2, 217:12
**Up** - 189:23
**upfront** - 127:6
**upset** - 83:8, 83:11, 118:9, 185:20, 205:1
**upside** - 71:9, 73:21
**upside-down** - 71:9, 73:21
**upstairs** - 38:5
**upstate** - 116:14
**uses** - 115:25

**V**

**vague** - 50:21
**Valley** - 173:6
**various** - 61:5
**Vcr** - 70:24, 111:13
**vehicle** - 50:22, 54:21, 55:11, 132:16, 132:24, 143:22
**verdict** - 42:21
**Vermont** - 116:14
**Vermonter** - 116:14
**versa** - 4:13
**versus** - 17:17
**Vhs** - 111:13
**vibes** - 119:16
**vice** - 4:12
**victim** - 49:16
**victims** - 101:13, 105:4
**viewed** - 91:7
**violate** - 7:13
**violating** - 28:17
**violation** - 117:12
**violent** - 191:10
**visit** - 201:5, 201:20, 210:10, 212:12
**visited** - 14:15, 40:2
**visiting** - 50:18
**visual** - 100:14
**visually** - 116:10
**voice** - 45:12, 59:2, 120:16, 184:9, 184:10, 194:14, 210:14, 213:19
**voir** - 14:12
**Voir** - 1:8, 1:16
**Vol** - 1:3, 1:8, 1:16, 1:22
**Volume** - 1:2, 1:1, 1:14
**volume** - 221:10
**Volumes** - 1:2
**vs** - 17:6, 26:23, 97:7
**Vs** - 1:9

**W**

**wait** - 38:4, 61:20, 64:3, 64:6, 162:21
**waited** - 38:1
**wake** - 149:15
**waking** - 207:16
**walk** - 93:3
**walked** - 71:13, 72:11, 149:21, 159:8, 163:18, 164:1, 164:8, 187:11, 187:19
**walking** - 38:22, 103:13, 149:18, 149:19, 149:23, 150:3, 159:6, 163:15, 163:17, 164:2, 187:2
**wall** - 70:24, 83:23
**Wallace** - 5:15, 21:17
**wallet** - 55:18, 55:21, 118:25, 160:10, 186:12, 216:19
**warrants** - 60:8
**washed** - 71:20
**waste** - 64:6
**watched** - 33:19
**watching** - 31:5, 34:16, 203:18, 203:25, 206:18
**water** - 30:2, 39:11, 91:14, 91:18, 124:13, 124:18
**water's** - 93:8
**wave** - 48:22
**ways** - 30:13, 143:11
**weapon** - 18:2, 27:8, 76:2
**wear** - 208:25
**wearing** - 30:6, 54:21, 54:24, 55:10, 58:4, 111:1, 117:10, 146:17, 146:20, 147:22, 151:3, 151:4, 151:10, 156:17, 168:24, 169:5, 172:12, 172:13,

186:5, 186:7, 199:16, 199:21, 213:10, 214:23, 215:1
**Wednesday** - 96:11
**week** - 18:22, 178:3, 178:13, 179:4, 179:5, 201:8, 201:10
**weekend** - 26:13
**weeknight** - 96:15, 96:16
**weeks** - 132:22, 134:12, 166:15, 166:20, 168:17, 218:1, 218:2
**weight** - 55:1, 55:12, 109:22
**Weight** - 39:11, 110:7
**whipped** - 75:11
**white** - 66:2, 83:19, 100:10, 100:12, 100:19, 114:14, 182:22
**who-done-it** - 61:24, 90:11
**Whoa** - 38:4
**whole** - 3:20, 116:15, 158:22, 160:8, 177:12
**wide** - 11:19
**wife** - 34:9, 37:4, 134:24, 138:16, 142:4, 167:11, 177:24, 195:11, 202:1, 202:3, 203:9, 210:9, 212:6, 212:11, 214:11, 214:14, 214:20, 215:13, 216:6
**wind** - 91:17, 91:22
**window** - 72:5, 72:6, 72:9
**Winfree** - 129:21, 129:22, 130:14, 130:23, 131:3
**wiretap** - 85:7
**wise** - 116:13
**wish** - 3:19, 18:16, 27:23, 29:5, 33:9, 67:17, 83:3, 169:21
**wishes** - 28:3
**witness** - 4:5, 12:25, 16:19, 20:9, 21:23, 25:12, 28:17, 36:24, 42:25, 45:7, 53:4, 54:3, 58:12, 58:15, 58:23, 96:1, 96:17, 97:16, 97:22, 103:6, 103:8, 111:22, 112:15, 119:22, 120:1, 120:3, 120:11, 172:16, 174:15, 193:5, 193:9, 194:10, 199:24, 219:19
**Witness** - 1:15, 28:21, 59:3, 86:22, 103:21, 120:14, 120:17, 132:11, 193:16, 194:12, 220:16, 221:16
**witnesses** - 10:10, 12:24, 22:3, 22:24, 22:25, 27:19, 27:21, 27:24, 28:6, 28:14, 28:23, 42:11, 49:16, 62:18, 104:6, 108:13
**Witnesses** - 1:7, 28:9
**woke** - 207:20
**woman** - 55:23, 108:14, 196:23
**women's** - 70:22
**Wood** - 2:4, 13:16, 13:24, 14:15, 16:14, 16:24, 17:2, 17:10, 17:12, 17:16, 28:6, 29:6, 29:9, 45:5, 45:9, 45:15, 45:19, 50:18, 53:3, 53:6, 53:20, 54:3, 58:6, 58:14, 58:18, 92:5, 97:10, 193:17, 193:22, 194:15, 194:16, 194:21, 199:23, 200:1, 219:19, 219:20
**wood** - 65:20, 69:5, 69:12
**Word** - 1:14
**word** - 101:25, 115:25, 162:8
**words** - 57:23, 101:22
**wore** - 30:6, 32:19, 108:23,

147:20
**worker** - 174:3
**works** - 61:10, 102:11
**worry** - 6:12
**worth** - 119:1
**wound** - 89:15
**wreck** - 4:7, 20:13, 21:12
**wrestle** - 42:20
**write** - 4:13, 101:7, 102:23, 105:2, 105:7, 191:23
**writing** - 18:23, 47:5, 81:14, 81:17, 81:18, 82:2, 221:9
**written** - 99:5, 100:23, 104:16
**wrote** - 54:15, 101:9, 102:18, 105:8, 107:5, 108:10

**Y**

**Y'all** - 84:18, 185:15
**y'all** - 41:23, 63:2, 75:17, 83:25, 92:2, 121:19, 123:4, 123:11, 127:13, 127:19, 129:4, 129:19, 129:15, 129:25, 130:3, 130:9, 130:13, 130:17, 131:24, 132:3, 132:7, 133:4, 133:6, 133:12, 134:2, 134:13, 135:10, 135:13, 143:8, 143:18, 143:25, 144:5, 148:19, 149:5, 176:23, 185:17, 187:9, 203:18, 220:17
**y'all's** - 146:10
**Yankee** - 116:14
**year** - 61:1, 61:4, 145:12, 176:24, 177:12, 178:1, 179:6, 197:6, 197:8
**year-and-a-half** - 176:24, 177:12, 178:1, 179:6
**years** - 19:20, 35:11, 39:25, 40:5, 46:9, 46:17, 46:19, 46:21, 46:24, 50:1, 52:12, 52:13, 59:17, 59:19, 60:22, 60:23, 61:3, 63:18, 85:13, 87:4, 109:2, 124:10, 124:11, 145:11, 173:12, 173:13, 175:11, 195:20, 196:8, 197:21, 202:25
**yellow** - 142:25
**yielded** - 20:15, 20:16
**you-all** - 13:25, 26:11, 26:12
**yours** - 180:12
**yourself** - 45:22, 57:21, 57:22, 59:11, 90:6, 99:17, 102:10, 121:1, 182:7, 186:21, 194:24
**yourselves** - 96:22, 147:1, 194:5, 219:25

**Z**

**zeroing** - 33:23