REPORTER'S RECORD

**VOLUME 19 OF 35 VOLUMES**

TRIAL COURT CAUSE NO. 1384794

COURT OF CRIMINAL APPEALS NO. AP-77,025


| OBEL CRUZ-GARCIA | ) IN THE DISTRICT COURT |
| | ) |
|     Appellant | ) |
| | ) |
| | ) |
| VS. | ) HARRIS COUNTY, TEXAS |
| | ) |
| | ) |
| THE STATE OF TEXAS | ) |
| | ) |
|     Appellee | ) 337TH JUDICIAL DISTRICT |



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**GUILT-INNOCENCE PROCEEDINGS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



On the 9th day of July, 2013, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Renee Magee,

Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by computer-aided

transcription/stenograph shorthand.

```
 1                    A P P E A R A N C E S

 2


 3
        MS. NATALIE TISE
 4      SBOT NO. 00795683
        MR. JUSTIN WOOD
 5      SBOT NO. 24039247
        Assistant District Attorneys
 6      1201 Franklin
        Houston, Texas  77002
 7      PHONE:  713.755.5800
        ATTORNEYS FOR THE STATE OF TEXAS
 8

 9
             - AND -
10

11
        MR. R.P. 'SKIP' CORNELIUS
12      SBOT NO. 04831500
        2028 Buffalo Terrace
13      Houston, Texas  77019-2408
        PHONE:  713.237.8547
14
        MR. MARIO MADRID
15      SBOT NO. 00797777
        440 Louisiana, Suite 1225
16      Houston, Texas  77002-1659
        PHONE:  713.877.9400
17      ATTORNEYS FOR THE DEFENDANT

18

19
        Rolando Hernandez
20      Marilu Flores,
        Interpreters
21

22

23

24

25
```

**I N D E X**
**VOLUME 19**
**(GUILT-INNOCENCE PROCEEDINGS)**

**JULY 9, 2013**

PAGE   VOL.

**STATE'S WITNESSES**

|  | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Jose Arturo Rodriguez | 4 34 | 5 – | – – | 19 19 |
| Gloria Kologinczok | 35 | 50 | – | 19 |
| W.T. Bredemeyer | 53 | – | – | 19 |
| U.P. Hernandez | 62 | 94 | – | 19 |
| Eric Johnson | – 131 | – – | 107 – | 19 19 |
| Linda Hernandez | 146 | 173 | – | 19 |
| John Swaim | 175 | – | – | 19 |
| Randy Rhodes | 189 | – | – | 19 |

Reporter's Certificate........................ 208  19

Word Glossary.............................End of Volume

**ALPHABETICAL WITNESS INDEX**

|  | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Bredemeyer, W.T. | 53 | – | – | 19 |
| Hernandez, Linda | 146 | 173 | – | 19 |
| Hernandez, U.P. | 62 | 94 | – | 19 |
| Johnson, Eric | – 131 | – – | 107 – | 19 19 |
| Kologinczok, Gloria | 35 | 50 | – | 19 |
| Rhodes, Randy | 189 | – | – | 19 |
| Rodriguez, Jose Arturo | 4 34 | 5 – | – – | 19 19 |

| | | | | |
|---|---|---|---|---|
| Swaim, John | 175 | - | - | 19 |

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| SX - 33 | Sexual assault kit | 47 | - | 19 |
| SX - 33-A | Panties | 47 | - | 19 |
| SX - 33-B | Vaginal swabs and smears | 47 | - | 19 |
| SX - 33-C | Saliva sample | 47 | - | 19 |
| SX - 33-D | Blood sample | 47 | - | 19 |
| SX - 35 | Pasadena Motor Inn receipt | 144 | - | 19 |
| SX - 36 | Bond paperwork | 141 | 141 | 19 |
| SX - 37 | Photograph | 165 | 165 | 19 |
| SX - 38 | Photograph | 165 | 165 | 19 |
| SX - 39 | Photograph | 165 | 165 | 19 |
| SX - 40 | Photograph | 165 | 165 | 19 |
| SX - 41 | Photograph | 165 | 165 | 19 |
| SX - 43 | Map | 195 | 195 | 19 |
| SX - 44 | Photograph | 197 | 198 | 19 |
| SX - 45 | Photograph | 197 | 198 | 19 |
| SX - 46 | Photograph | 197 | 198 | 19 |
| SX - 47 | Photograph | 197 | 198 | 19 |
| SX - 48 | Photograph | 197 | 198 | 19 |
| SX - 49 | Photograph | 197 | 198 | 19 |
| SX - 50 | Photograph | 197 | 198 | 19 |
| SX - 51 | Photograph | 197 | 198 | 19 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | SX - 52 | Photograph | 197 | 198 | 19 |
| 2 | SX - 53 | Photograph | 197 | 198 | 19 |
| 3 | SX - 89 | Photograph | 150 | 150 | 19 |
| 4 | SX - 90 | Photograph | 83 | 83 | 19 |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
 1                    (Open court, defendant present, no jury)

 2                    THE COURT:  Back on the record in Cause

 3      No. 1384794, State of Texas vs. Obel Cruz-Garcia.

 4                    Mr. Cruz-Garcia is seated at counsel table

 5      with his attorneys, Skip Cornelius and Mario Madrid.

 6      Representing the State is Natalie Tise and Justin Wood.

 7      We have the witness, Arturo Rodriguez, on the stand and

 8      we're continuing with his testimony.

 9                    Please bring in the jury.

10                    (Open court, defendant and jury present)

11                    THE COURT:  Please be seated.

12                    Good morning, ladies and gentlemen.  I

13      understand that some of you got caught in some tough

14      elevators this morning.  And I appreciate y'all being on

15      time.  We're getting started a little later.  In the

16      future, if there's elevator problems like that that you

17      encounter, give Deputy Perry a call and he may be able

18      to take you up on like a freight elevator or something

19      in the back to assist so you are here on time.

20                    And so, we're going to proceed right away.

21      We're continuing with the testimony of Arturo Rodriguez.

22                    And, Mr. Wood, were you ready to pass this

23      witness?

24                    MR. WOOD:  Your Honor, I just had a couple

25      of last questions.
```

4

1          THE COURT:  Okay.  Please proceed.

2                **JOSE ARTURO RODRIGUEZ,**

3   having been first duly sworn, testified through the

4   interpreter as follows:

5                **DIRECT EXAMINATION**

6   **CONT'D BY MR. WOOD:**

7       Q.   Good morning, Mr. Rodriguez.

8       A.   Good morning.

9       Q.   You are the same Mr. Rodriguez that was

10  testifying yesterday; is that right?

11      A.   Yes.

12      Q.   I just have a couple last questions for you.

13      A.   Okay.

14      Q.   I want to talk to you back during that time of

15  1992 there we were talking about yesterday.  Were you a

16  person that smoked cigars back then?

17      A.   No.

18      Q.   Did you have cigars in your house?

19      A.   No.

20      Q.   Did Diana or anyone else in your house commonly

21  smoke cigars?

22      A.   No one smoked.

23      Q.   Were you aware that the police found a cigar in

24  your house on that night of September 30th, 1992?

25      A.   Yes.

 1      Q.   And did you know that a cigar was recovered

 2   near your TV in your living room?

 3      A.   Yes.

 4      Q.   Did that surprise you when you found that out?

 5      A.   Yes.

 6            MR. WOOD:   I pass the witness, Your Honor.

 7            THE COURT:   Mr. Cornelius, you may proceed.

 8                    **CROSS-EXAMINATION**

 9   **BY MR. CORNELIUS:**

10      Q.   Mr. Rodriguez, my name is Skip Cornelius.

11      A.   Okay.

12      Q.   We've never met, correct?

13      A.   No.

14      Q.   I'm one of the lawyers in the case, so I get to

15   ask you some questions.

16      A.   Okay.

17      Q.   If I don't state my questions clearly or for

18   any reason you don't understand them, I'm happy to

19   repeat them.

20      A.   Okay.

21      Q.   Back on September 30th, 1992, when these events

22   occurred, that's what I want to focus on first.

23      A.   I didn't understand you.

24      Q.   Okay.  I'm not asking a question.  I'm just

25   letting you know or directing you to September 30th,

1    1992 when these events occurred.

2         A.   Oh, okay.

3         Q.   Did you tell the jury yesterday that you had

4    been selling drugs for Chico for about three years when

5    all of this stuff happened?

6         A.   No.  About two years, more or less.

7         Q.   Okay.  So, you didn't say three years

8    yesterday?

9         A.   No, no.  I don't remember.

10        Q.   Okay.

11        A.   I said that it was about two.

12        Q.   Okay.  Had you sold drugs for somebody else

13   before you were selling drugs for Chico?

14        A.   Yes.

15        Q.   Okay.  For how many years were you selling

16   drugs?

17        A.   About four years, more or less.

18        Q.   How many different people did you sell drugs

19   for?

20        A.   I would purchase it at different places.

21        Q.   Okay.  And did you tell us yesterday that what

22   you -- what you sold was about one ounce per week?

23        A.   That's when I started with the accused.

24        Q.   Okay.  And how much would you have to pay for

25   one ounce?

1      A.   I don't remember.

2      Q.   Well, how much would you sell the cocaine for?

3      A.   For 20.

4      Q.   And how much would $20 buy?

5      A.   What?  I didn't understand you.

6      Q.   Were you selling it by the gram?

7      A.   More or less, yes.

8      Q.   How much was a gram?

9      A.   About 20.

10     Q.   How many grams are in an ounce?  Is it 28?

11     A.   Yes.

12     Q.   Okay.  So, you were making, if you sold it all,

13  $560 per week?

14          THE INTERPRETER:  Could you clarify the --

15  would you repeat the question for the interpreter,

16  please?

17     Q.   (By Mr. Cornelius) If you were selling 1 gram a

18  week, I mean -- strike that.  I'm sorry.

19          One ounce a week, which is roughly is

20  28 grams, and you were selling it by the gram for $20 a

21  gram --

22     A.   Uh-huh

23     Q.   -- that's $560 a week, right?

24     A.   Yes.

25     Q.   And you're telling the jury that's all you were

1   selling?

2       A.   Yes.

3       Q.   Did you tell the police that you had a

4   4,000-dollar bracelet taken?

5       A.   Yes.

6       Q.   Okay.  And did you tell the police that at the

7   time that all of this happened, you were not employed?

8       A.   No.

9       Q.   You didn't tell them that?

10      A.   That I was working in cocaine?

11      Q.   No, no, no.  I'm sorry.  It was my mistake.

12           Did you tell the police that you didn't

13   have a job, any kind of job, when they came to talk to

14   you that night?

15      A.   Yes.

16      Q.   All right.  And you didn't have a job other

17   than selling drugs, did you?

18      A.   When all of this happened, it had been just a

19   few weeks that I had left my job and I was not working.

20      Q.   Do you know if anybody contacted your job and

21   talked to the people that you claimed you had been

22   working with?

23      A.   Did they talk to them?

24      Q.   Yes.

25      A.   I don't know.

1      Q.   All right.  When the police were talking to you

2  the day after all of this happened, did they tell you

3  they thought this was about drugs?

4      A.   I don't remember.

5      Q.   You don't remember being questioned about

6  whether this whole incident was about drugs?

7      A.   No.

8      Q.   All right.  So, your testimony is that the

9  amount of money that you were making was about 560 a

10  week?

11      A.   About 500.

12      Q.   Okay.  The .25 semiautomatic pistol that was in

13  your apartment, was that your gun?

14      A.   No.

15      Q.   Whose gun was that?

16      A.   Maybe it was the person that carried the person

17  that threatened me.  I don't know.

18      Q.   It wasn't Diana's gun?

19      A.   No.

20      Q.   Are you sure about that?

21      A.   Yes.

22      Q.   Because if Diana had her own pistol, you would

23  have known it, right?

24      A.   She had one there in the apartment.

25      Q.   So, she did have a gun?

1      A.   But it wasn't the one that they found.

2      Q.   Oh, was there another gun at the apartment?

3      A.   That's the one that the police picked up.  The

4  police have it.

5           MR. CORNELIUS:  May I approach the witness,

6  Judge?

7           THE COURT:  Yes.

8      Q.   (By Mr. Cornelius) Let me show you what's

9  marked as State's Exhibit 26.  Do you recognize the

10  pistol in that picture (indicating)?

11     A.   The only thing that I know is that the gun that

12  was there at the house was a .25.

13     Q.   Okay.  So, do you recognize this gun or not?

14     A.   No, no.  I don't remember.

15     Q.   Do you remember that the pistol that Diana had

16  had a shiny barrel?

17     A.   I think so.

18     Q.   So, that wasn't your gun, that was Diana's gun?

19     A.   The only thing that I know is that I don't

20  remember what a .25 is.  It's been a very long time

21  since we have had weapons.  And I don't recognize what a

22  .25 is or a .44, because there are guns like that.  It's

23  been a long time since we've had weapons.

24     Q.   Has it been since you got out of the

25  drug-selling business?

1      A.   Never again.

2      Q.   On the day that all of this happened, had you

3  seen Chico earlier in the day?

4      A.   No.

5      Q.   You had not seen him that day?

6      A.   No.

7      Q.   Are you sure about that?

8      A.   Yes.

9      Q.   Did you know -- do you know if Diana had ever

10 been over to Chico's apartment where he lived?

11      A.   I recall that we just went once to his house.

12      Q.   Okay.  Do you know if Diana ever went by

13 herself?

14      A.   No.

15      Q.   How often did Chico come to your apartment?

16      A.   At times once a week, sometimes twice.  I don't

17 remember.

18      Q.   It wasn't unusual for him to come to your

19 apartment, right?

20      A.   I didn't understand you.

21      Q.   It wouldn't be unusual for him to come to your

22 apartment, correct?

23      A.   No, because we knew him.

24      Q.   Okay.  Did you have an argument that day at the

25 store close to your house with a tall black man and a

1  Hispanic man?

2      A.    That same day that everything happened?

3      Q.    Yes.

4      A.    I don't remember.

5      Q.    Do you know who Alice Lemon or Lemone is?

6      A.    I don't remember.  It's been many years.

7      Q.    Did you know what the term "Hispanic" meant

8  back in 1992?

9      A.    Yes.

10     Q.    What does it mean?

11     A.    Hispanics like us that are Mexicans.  The ones

12 that speak Spanish are Hispanics.

13     Q.    Okay.  And did you know what the term "black

14 man" or "black male" meant?

15     A.    I call them colored.

16     Q.    Okay.  Did you know what the term "white man"

17 meant?

18     A.    Yes.

19     Q.    Okay.  And you know there are certain forms or

20 reports that people fill out that have a place to check

21 a box whether you're talking about a white person, a

22 black person, or a Hispanic person?

23           MR. WOOD:  Judge, I'm going to object.

24 Assuming facts not in evidence and relevance.

25           THE COURT:  It's sustained.

1        Q.   (By Mr. Cornelius) When the officer first came

2   to your apartment that night, the first officers that

3   came did not speak Spanish, correct?

4        A.   One of them.

5        Q.   Was that U.P. Hernandez?

6        A.   Yes.

7        Q.   Before Sergeant Hernandez got there, the other

8   officers did not speak Spanish, correct?

9        A.   No.

10       Q.   And when you talked to them, what you said was

11  interpreted to them by Diana, wasn't it?

12       A.   Many words my wife interpreted for me.

13       Q.   Okay.  But when you spoke to U.P. Hernandez,

14  you didn't need an interpreter because y'all spoke in

15  Spanish; is that correct?

16       A.   Exactly.

17       Q.   Did you tell U.P. Hernandez that the man behind

18  the mask was not a Mexican nor a white man because the

19  way the man spoke, he spoke like a black man?

20       A.   Yes.

21            MR. CORNELIUS:  I've got something in my

22  eye, Judge.

23            THE COURT:  Do you need a break or can you

24  do it quickly?

25            MR. CORNELIUS:  Yeah.

1        THE COURT:  Okay.  Let's take just a

2   second.

3        (Brief pause)

4        MR. CORNELIUS:  Okay.  Can we get started

5   again?

6        THE COURT:  Yes, please proceed.

7   Q.   (By Mr. Cornelius) Did you tell U.P. Hernandez

8   or the other officers through Diana's translation that

9   both of the men that came into your house were black

10  men?

11  A.   I just talked about one, the one that came in

12  threatening.  That was the one that I paid more

13  attention to.

14  Q.   And did you actually see the other person?

15  A.   Everything happened very fast.

16  Q.   So, did you actually see the other person?

17  A.   The other person, when I saw the person, was

18  already raping my wife.

19  Q.   I thought you had a pillow over your head while

20  that happened.

21  A.   That was placed on me after I went like this

22  and saw that my wife was being raped (indicating).  At

23  that moment, the pillow was placed on me, but I had like

24  a rag over my mouth.

25  Q.   Okay.  So, you did see the person that was

1  raping your wife?

2      A.   I saw the person, but I did not know who it

3  was.

4      Q.   And, of course, if you knew who it was, you

5  would have told the police because you suspected that

6  person or somebody with that person had taken her son;

7  is that correct?

8      A.   On that occasion, I cannot be sure that the

9  person that was abusing her was that person because they

10  never said anything, never.

11      Q.   Okay.  So, my question is:  If you had known

12  who it was, you would have definitely told the police,

13  right?

14      A.   Well, yes.

15      Q.   So, you were not lying to the police when you

16  told them you didn't know who it was?

17      A.   I didn't understand you.

18      Q.   You were not lying to the police when you told

19  the police you didn't know who it was?

20      A.   At that instant, I did not know who it was; but

21  then later the police interrogated me and I answered or

22  told them what I did.  And then the person that I had

23  worked, that it had been about a month that I was no

24  longer working for him, we thought that it was the

25  accused because that was the person that I was involved

1   in drugs with.

2       Q.   Okay.  This was after you decided to tell the

3   police that this may have had something to do with

4   drugs?

5       A.   Later, the next day when they brought us to

6   investigate us in all of this.

7       Q.   Did the police tell you they thought you were

8   lying to them when you said you weren't involved in

9   drugs?

10              MR. WOOD:  Judge, I'm going to object.

11   Asked and answered.

12              THE COURT:  I'll allow him to ask it one

13   more time.

14              MR. CORNELIUS:  Judge, I don't think I ever

15   asked this witness.

16              THE COURT:  I don't recall that exact

17   question, so I'm going to allow it.

18       Q.   (By Mr. Cornelius) I'll repeat it.

19              On the next day when the police

20   interrogated you, did they tell you they thought you

21   were lying to them about being involved with drugs?

22       A.   I don't remember.

23       Q.   Do you remember describing to the police what

24   the man who had the mask on looked like?

25       A.   Yes.

1      Q.   And yesterday you told us that he had on a mask

2    and it was either black or blue.  I forgot what you

3    said.  Do you remember saying that yesterday?

4      A.   Yes.

5      Q.   Do you remember telling the police, though,

6    that it was a brown or black mask?

7      A.   That night I saw it as blue or black.

8      Q.   So, there would be no reason for you to tell

9    the police that it was brown or black?

10     A.   I don't recall having said that it was brown.

11     Q.   Okay.  Did you tell us yesterday that you

12   received no medical treatment from the fire truck?

13     A.   No.

14     Q.   No, you did not say that, or, no, you didn't

15   have any treatment?

16     A.   They tried to help me, but since I was all

17   frightened and everything, I told them to leave me just

18   the way I was; but, yes, they did want to treat me.

19     Q.   Okay.  And these were firemen rather than

20   ambulance attendants?

21     A.   I recall they were, but what I do not remember

22   is if it was an ambulance or if it was firemen.  I do

23   not remember.

24     Q.   Okay.  I thought you told us yesterday it was

25   not an ambulance, it was a fire truck?

1     A.   Yes, I do recall having said yesterday that

2  they were firemen, but today the question, I do know

3  that they were paramedics, yes.

4     Q.   Okay.

5          MR. CORNELIUS:  May I look for some

6  pictures for a moment, Judge?

7          THE COURT:  Yes.

8          MR. CORNELIUS:  May I approach the witness?

9          THE COURT:  Yes, you may.

10    Q.   (By Mr. Cornelius) I want to show you what's

11  marked as State's 19 through 29.  I'll let you look

12  through those pictures for a moment.  I want you to be

13  able to tell me if those are pictures of y'all's bedroom

14  at that time (indicating).

15    A.   Yes.

16    Q.   And those are the pictures of your bedroom?

17    A.   Yes.

18    Q.   That's the way it looked that night?  This

19  picture on the top, No. 25, is that your blood on the

20  pillow there (indicating)?

21          THE COURT:  Let's put it up on the screen.

22          MR. CORNELIUS:  I will.  I wanted to let

23  him look at it to see it better.

24    A.   I don't remember if it was mine or not.

25    Q.   (By Mr. Cornelius) Okay.  Let me see them.

1          THE COURT:  Mr. Rodriguez, you have a

2     screen right there next to you.

3          Q.   (By Mr. Cornelius) Did you see any other

4     pictures that showed your blood?  And you can look

5     through them again if you want to.  They are right in

6     front of you.

7          A.   Oh, yes, these photographs are of my house.

8          Q.   Did you see any blood in any of the other

9     pictures?

10         A.   I don't remember.  It's been a long time.  It

11    could have been my blood or it could not have been.

12    It's been many years.

13         Q.   Well, whoever's blood that was on the pillow

14    there, what I'm asking is:  Did you find any other

15    pictures of blood anyplace else in that room?

16         A.   Right now as I looked through these?

17         Q.   Yes.

18         A.   No.  Just this one.

19         Q.   And when the paramedics looked at you, you

20    didn't have any stitches, correct?

21         A.   No.

22         Q.   No bandages?

23         A.   No.

24         Q.   No treatment of any kind?

25         A.   I didn't let them do anything to me.

1     Q.   Okay.  When you first met Diana, was she
2  married to somebody else?
3     A.   Yes.
4     Q.   And was that a marriage that was in tact or
5  were they separated and she was dating, or what was the
6  situation?
7              MR. WOOD:  Objection.  Relevance.
8              MR. CORNELIUS:  They went into it, Judge.
9              THE COURT:  I'm going to allow it a little
10 bit.
11             THE INTERPRETER:  Would you repeat the
12 question for the interpreter, please?
13    Q.   (By Mr. Cornelius) Was that a marriage that was
14 in tact at the time that you met her or were they
15 separated and seeing other people, or what was the
16 relationship?
17    A.   My wife and her husband?
18    Q.   Yes.
19    A.   I don't know what problems they had, if they
20 were fine or what.
21    Q.   Well, when you started seeing Diana yourself,
22 when you started dating her, or we'll call it dating,
23 was she still married?
24    A.   Yes.
25    Q.   Were they still living together?

```
 1        A.    No.   More or less a year went by.   A year.

 2        Q.    That they weren't living together?

 3        A.    Her and I?

 4        Q.    You're saying that a year went by before you

 5   and Diana started living together?

 6        A.    Yes.

 7        Q.    Okay.   Was Diana dating other people during

 8   that time other than you?

 9               MR. WOOD:  Objection.  Relevance.

10               THE COURT:  That's sustained.

11               Is there any relevance that I'm aware of,

12   Mr. Cornelius?

13               MR. CORNELIUS:  The next question may

14   establish that.

15               THE COURT:  Okay.

16        Q.    (By Mr. Cornelius) Was she dating this man?

17        A.    That I know of, no.

18        Q.    What is your recollection -- or how long, when

19   you were being interrogated by the police the next day,

20   that you continued to lie to them and tell them you were

21   not involved in dealing drugs?

22        A.    I never told them that I wasn't involved in

23   drugs.

24        Q.    Are You sure about that?

25        A.    I always told them what I did.
```

1      Q.   Okay.  So, you are saying that you told the

2   police from the start --

3      A.   Yes.

4      Q.   -- that you dealt drugs?

5      A.   Yes, that I was involved in drugs.

6      Q.   How long did the police interrogate you that

7   day?  What's your recollection?

8      A.   It was about three to four weeks.  I don't

9   remember very well, but it was a long time.

10      Q.   The day after this happened, you went to the

11   place station, correct?

12      A.   I didn't understand the question.

13      Q.   The day after this happened, you went to the

14   place station, correct?

15      A.   Immediately the next day.

16      Q.   Okay.  How long were you at the police station?

17      A.   I already told you.  I just told you right now,

18   three to four weeks.

19      Q.   You mean you kept going back for three or four

20   weeks?

21      A.   Every day they would go for us.

22      Q.   Okay.  You weren't in custody, though; they

23   didn't throw you in jail, right?

24      A.   Never.

25      Q.   Okay.  Well, on that first day that they were

1   interrogating you, did you say to U.P. Hernandez that

2   you don't know why anyone would enter your apartment and

3   beat you up or assault your wife because y'all are not

4   involved in anything, not even drugs, and have nothing

5   to hide, you have no idea why anyone would attack you?

6       A.   That question is too long.

7       Q.   It is.

8                THE COURT:  Would you rephrase the

9   question, Mr. Cornelius?

10                MR. CORNELIUS:  Well, may we approach?

11                (At the Bench, on the record)

12                MR. CORNELIUS:  To lay the predicate, I

13   have to ask it pretty much verbatim.

14                THE COURT:  Exactly.

15                MR. CORNELIUS:  I can do one part at a

16   time, I guess.

17                THE COURT:  Any suggestion?

18                MR. WOOD:  I think with him you have to

19   break it up.  I don't have any objection.

20                THE COURT:   Okay.  Let's proceed then that

21   way.

22                (Open court, defendant and jury present)

23       Q.   (By Mr. Cornelius) You've just told the jury

24   that you never denied to the police that you were a drug

25   dealer, right?

1     A.   No.

2     Q.   Okay.  Is it your position that you never

3   denied being a drug dealer when you talked to the

4   police?

5     A.   I never denied that.

6     Q.   Okay.  The person that interrogated you was

7   Officer U.P. Hernandez?

8     A.   Yes.

9     Q.   And he talked to you in Spanish?

10    A.   Yes.

11    Q.   And you could understand him?

12    A.   Yes.

13    Q.   And he could understand you?

14    A.   Yes.

15    Q.   Okay.  And it was a long conversation, wasn't

16  it?

17    A.   Every day.

18    Q.   But you never denied that you were involved in

19  drugs, right?

20    A.   No.

21    Q.   Okay.  So, then did you ever say this to him --

22  and I will go slow with the question -- that you didn't

23  know why anyone would enter your apartment and beat you

24  up?

25    A.   Well, yes, because the only person that I was

 1  involved with in drugs was the -- with the accused.

 2      Q.   Okay.  And are you saying you told that to U.P.

 3  Hernandez?

 4      A.   Yes.

 5      Q.   So, then you didn't say to U.P. Hernandez that

 6  you didn't know why anyone would enter your apartment

 7  and beat you up; you didn't say that to him, did you?

 8      A.   I do not remember that.

 9      Q.   Okay.  Now, you remember saying to him that you

10  don't know why anyone would assault your wife or take

11  her son?

12      A.   I didn't understand your question very well.

13      Q.   Did you say to U.P. Hernandez you don't know

14  why anyone would assault your wife and take her son?

15      A.   If I told him, I do not remember.  We didn't

16  have any enemies or anything.

17      Q.   Okay.

18               THE COURT:  Can I see the lawyers at the

19  bench?

20               (At the Bench, on the record)

21               THE COURT:  You were trying to get in that

22  sentence there --

23               MR. CORNELIUS:  Yes, ma'am.

24               THE COURT:  -- I think you've pretty much

25  gotten there from what this witness has said.  Do you

1    agree or disagree?

2              MS. TISE:  I don't think the witness really

3    fully understands any of this.  He is very confused.

4              THE COURT:  I think he is confused, but I

5    think that for you to get up and say that one sentence

6    from a statement that he had gotten, that this witness

7    is completely confused.

8              MS. TISE:  I think the fact that he's

9    confused shows that.

10              THE COURT:  Can you clear that up?

11              MS. TISE:  I think that he hasn't laid the

12    predicate because the witness tends to not understand

13    what he is saying every time you ask him a question.

14              THE COURT:  It is very clear about the fact

15    that he did not ever say he did not -- that he was

16    involved in drugs.

17              MS. TISE:  Well, they asked him different

18    ways.  He was asked initially:  Did you ever lie to the

19    police that you were involved in drugs.  And that was

20    the first question that opened this whole can of worms.

21    And the truth is, is that even at the scene to the first

22    officers he was telling them he was a drug user.  And

23    then Mr. Cornelius changed the question and accused him

24    of denying the drug dealer part and changed the question

25    and came back that way to dealing.  So, it's very

1  confusing.  The timing is very confusing.  This witness

2  had a lot of trouble --

3           THE COURT:  I will let you redirect him.

4  He is not understanding.

5           MS. TISE:  It's important for the jury to

6  see that he is not understanding the question.

7           THE COURT:  We'll continue on for a little

8  while.  We're not going into it too much longer.

9           (Open court, defendant and jury present)

10           THE COURT:  You may proceed, Mr. Cornelius.

11     Q.  (By Mr. Cornelius) Did you make this statement

12  to U.P. Hernandez, that y'all are not involved in

13  anything, not even in drugs?

14     A.  I never lied about that.  I told him that I was

15  involved in drugs.

16     Q.  Okay.  You said y'all had no enemies, right?

17     A.  Yes.

18     Q.  Had y'all had a break-in at your prior

19  apartment about a month before?

20     A.  Like they had robbed me or something like that.

21     Q.  What do you remember?

22     A.  At the other apartment, that they had stole

23  things from me.

24     Q.  What did they steal?

25     A.  A hat that I had bought.

1    Q.   Did you say a hat?

2    A.   When I returned to my apartment, that hat was

3  not there and some people told me that they saw the

4  person coming out wearing the hat.

5    Q.   What about drugs and money?

6    A.   I do not remember.

7    Q.   Okay.  Later in your interview with U.P.

8  Hernandez, do you remember telling Investigator

9  Hernandez that neither you nor your wife were involved

10 in any kind of drug dealing, that you don't know who

11 would do this or why?

12            MR. WOOD:  I object that this has been

13 asked and answered.

14            MR. CORNELIUS:  This is a separate

15 interrogation.

16            THE COURT:  I'm going to allow it.

17            MR. WOOD:  I would ask him to clarify that

18 for the witness.  Because I didn't understand the

19 question either.

20            THE COURT:  Rephrase -- or, actually, just

21 ask it again.

22            MR. CORNELIUS:  Okay.

23    Q.   (By Mr. Cornelius) Later in your interrogation

24 with U.P. Hernandez, did you tell him that neither you

25 or your wife were involved in any drug dealing and you

1   didn't know who would have done this?

2       A.   What happened at the other apartment?

3       Q.   No.   What happened in this case.   Later in your

4   interrogation with Hernandez, did you again deny that

5   neither you nor your wife were involved in drugs?

6       A.   The question that you are asking, I don't know

7   if you are talking about the other apartment or the

8   apartment where the case occurred.

9       Q.   Okay.   How about either one?

10      A.   At both apartments, we were involved in drugs.

11      Q.   And that's what you told U.P. Hernandez?

12      A.   That statement about the other apartment, I

13  don't remember if I stated it in that statement or not.

14  I remember that that night I stated or declared

15  everything that had occurred at the apartment and that

16  was it.   At the other apartment, I don't remember if I

17  said anything about it or not.

18      Q.   So, did you have drugs and money taken at the

19  first break-in, the one at the other apartment?

20      A.   I don't remember.   I just know that they went

21  through everything and took that hat that I had

22  purchased a week before.

23      Q.   So, you remember the hat, but you don't

24  remember if they took your drugs and money?

25      A.   I don't remember that.

1    Q.    Okay.  Did you tell us yesterday that you only

2  bought drugs from Chico?

3    A.    I just purchased drugs from him when I started

4  with him.

5    Q.    Okay.  How were the drugs packaged that you

6  sold?

7    A.    In some plastic bags.

8    Q.    Who put them in plastic bags?

9    A.    Who prepared it?

10    Q.    Yes.

11    A.    Me.

12    Q.    And did you have a scale to weigh it out?

13    A.    Yes.

14    Q.    Where was that scale on the night the burglary

15  occurred?

16    A.    I don't remember.

17    Q.    The cocaine that you were selling yourself at

18  the time that you were dealing with Chico, you bought

19  that from Chico, right?

20    A.    Yes.

21    Q.    Before you were dealing with Chico, you said

22  you bought it from various other people?

23    A.    Yes.

24    Q.    All right.  At the time that the first burglary

25  occurred where you lost your hat, who were you buying

1  your cocaine from then?

2       A.   I think that I had already started with him.

3       Q.   By "him" you mean Chico?

4       A.   The accused.

5       Q.   Okay.  And so, was the -- who cut the cocaine

6  or was it pure cocaine?

7       A.   Of it being pure, pure, I don't know, but it

8  was cocaine.

9       Q.   Well, did you take it yourself?  Did you take

10 it yourself?  Did you use the cocaine yourself?

11      A.   At that time, I did.

12      Q.   Okay.  So, were you selling to people the same

13 cocaine you were taking or were you cutting it?

14      A.   The same.

15      Q.   So, if you had a scale, what were you dividing

16 it out?  What quantity were you dividing out?

17                MR. WOOD:  I object, Your Honor, to

18 relevance.

19                THE COURT:  Okay.  Why don't you approach?

20                (At the Bench, on the record)

21                THE COURT:  What is the relevance?

22                MR. CORNELIUS:  Well, I'm just trying to

23 get to the bottom of this drug dealing.  They are saying

24 this case has to do with the drugs.

25                MR. WOOD:  How it's cut or weighed out has

 1  no relevance to this case.

 2             THE COURT:  Were the materials for that in

 3  this apartment?  Where are you trying to -- why is this

 4  relevant?

 5             MR. CORNELIUS:  Yeah.  I'm trying to figure

 6  out where it is, where all that stuff is.

 7             THE COURT:  Why don't you just ask him

 8  instead of going into all of this stuff about how its

 9  cut?  I don't see the relevance about that, unless you

10  are trying to get to a certain aspect.  I agree it's

11  relevant as to where all the items were, the scale, so

12  just ask him those questions instead of going into how

13  it's cut and everything.  I mean, I think if he --

14             MR. CORNELIUS:  He's also acting like he

15  doesn't know really how much was sold.

16             MR. WOOD:  He has never denied that.  He

17  has said how much he was selling.

18             THE COURT:  Okay.  And I think he said that

19  he didn't cut it.  I believe he said that.  So, how much

20  is really in here.  Let's move on from here.  I don't

21  think this line of questioning is relevant.

22                  (Open court, defendant and jury present)

23             THE COURT:  That objection is sustained.

24             You may proceed, Mr. Cornelius.

25      Q.   (By Mr. Cornelius) Did you say yesterday on

1   direct examination that there was a time where you

2   thought the police were watching you?

3        A.   Yes.

4        Q.   And when was that in relation to the night that

5   all this occurred?

6        A.   I didn't understand.

7        Q.   Can you tell us when it was that you thought

8   the police were watching you?

9        A.   Because it had been about one to two weeks that

10  they were watching me.

11       Q.   When did they stop watching you?

12       A.   Even on the day that everything occurred they

13  were watching me.

14       Q.   Okay.  And so, were you trying to hide your

15  drugs?

16       A.   It had already been about a month to a

17  month-and-a-half that I wasn't selling anything.

18       Q.   Okay.  Did you testify yesterday on direct that

19  you were hit two or three times in the head and you

20  never loss consciousness?

21       A.   Yes.

22            MR. CORNELIUS:  Pass the witness.

23            THE COURT:  Any redirect?

24            MR. WOOD:  Just briefly, Your Honor.

25            THE COURT:  You may proceed.

1                    **REDIRECT EXAMINATION**

2    **BY MR. WOOD:**

3        Q.    Mr. Rodriguez, back when you and Diana --

4    excused me -- were living together, how many vehicles

5    did you guys have?

6        A.    Our own cars?

7        Q.    Yes.

8        A.    I had one car, a Buick Delta 88, and a black

9    pickup, Chevrolet.

10       Q.    And did you and Diana share those vehicles?

11       A.    Yes.

12       Q.    Mr. Rodriguez, you were asked about the mask

13   from that night.  Did the person that was assaulting you

14   with the gun have a mask on?

15       A.    Yes.

16       Q.    Did the person that -- let me back up.

17              Did Diana's attacker that you saw also have

18   a mask on?

19       A.    Yes.

20              MR. WOOD:  Pass the witness, Your Honor.

21              THE COURT:  Anything further,

22   Mr. Cornelius?

23              MR. CORNELIUS:  Nothing further at this

24   time, Judge.

25              THE COURT:  May this witness be excused?

1          MR. WOOD:  No objection.

2          MR. CORNELIUS:  I'd like him on-call.

3          THE COURT:  Okay.  You are excused,

4  Mr. Rodriguez, subject to recall.  You may step down.

5          Please call your next.

6          MR. WOOD:  The State calls Gloria

7  Kologinczok.

8          THE BAILIFF:  Your Honor, the witness has

9  not been sworn.

10          THE COURT:  Okay.

11          (Witness sworn)

12          THE COURT:  Ma'am, please keep your voice

13  up and speak directly into that microphone.

14          You may proceed, Mr. Wood.

15          MR. WOOD:  Thank you, Your Honor.

16                **GLORIA KOLOGINCZOK,**

17  having been first duly sworn, testified as follows:

18                **DIRECT EXAMINATION**

19  **BY MR. WOOD:**

20     Q.   Good morning, Ms. Kologinczok.

21     A.   Good morning.

22     Q.   How are you?

23     A.   I'm good.

24     Q.   Can you introduce yourself with your full name

25  and go ahead and spell your last name for the court

```
 1   reporter?

 2       A.   Gloria Gene Kologinczok.

 3   K-o-l-o-g-i-n-c-z-a-k.

 4       Q.   I bet you have been having to spell that name

 5   so for a long time.

 6       A.   I have.

 7       Q.   Ms. Kologinczok, how are you currently

 8   employed?

 9       A.   I'm a registered nurse at Memorial Hermann

10   Northwest and I'm also an attorney and I have my own

11   practice.

12       Q.   And let's talk a little bit about your nursing

13   background first.  Tell us, what are your

14   responsibilities at Memorial Hermann Northwest?

15       A.   I am in what's called a supplemental float

16   pool.  I work as an operations administrator and Also a

17   charge nurse in the emergency room.

18       Q.   How long have you been working as a registered

19   nurse?

20       A.   Since 1979.

21       Q.   So, at some point you decided to become a

22   lawyer as well?

23       A.   I did.  I finished law school in 1992 and took

24   the bar in '93 and started practicing law, too.

25       Q.   And did you have a law practice for a good
```

1   number of years?

2        A.   I did.

3        Q.   Have you pretty much finished up your law

4   practice and now are just focusing back on nursing

5   again?

6        A.   That's correct.

7        Q.   That's a unique background.  What kind of law

8   did you practice?

9        A.   I had a partner and we practiced -- I practiced

10  primarily medical malpractice, personnel injury.  We

11  have done probate.  We did some of the commercial

12  business.  We had some accounts like that.  And did some

13  criminal law also.

14       Q.   Through your nursing background at some point

15  did you become -- did you become a certified sexual

16  assault nurse examiner?

17       A.   I did.

18       Q.   Tell me, when did that occur.

19       A.   1985 is when I was certified.  There was a

20  course I took prior to that.

21       Q.   And generally can you tell the ladies and

22  gentlemen of the jury what is certified -- I'm sorry --

23  what a certified sexual assault nurse examiner is?

24       A.   It's an RN that gets some special training to

25  be able to take care of patients that come in that have

1   been sexually assaulted and provide them specialized

2   care and perform a sexual assault exam and collect the

3   evidence for them.

4        Q.   You said that you became certified in 1985?

5        A.   That's correct.

6        Q.   Was that early on in the stages of sexual

7   assault nurse examinations?

8        A.   It was.  It was like the second course that had

9   been taught.

10       Q.   Tell me about the training that you went

11  through to become a sexual assault nurse examiner?

12       A.   The City of Houston, Harris County, the

13  hospital districts, all got together and put together a

14  course and decided that would be a better way for a

15  victim that came in for sexual assault to have their

16  evidence collected and preserved.  And so, they put

17  together this class of courses over a series of several

18  weeks.  And so, you went through a process of learning

19  how to do the sexual assault exam, the pelvic exam,

20  collect the evidence.  And part of the course you met

21  with the Harris County Sheriff's Department, the Houston

22  Police Department, and with the court system so that you

23  would go through the whole series of what happens from

24  the time a victim is assaulted all the way through the

25  court proceeding, if it went to court.

1    Q.   So, there was some element of courtroom

2    training as well?

3    A.   That's correct.  You had to come observe some

4    of the sexual assaults that were going on in the court

5    and do a certain amount of court time.

6    Q.   Was there also practical experience and

7    training that was involved?

8    A.   There was.  In order to do the pelvic exams --

9    typically a registered nurse does not perform a pelvic

10   exam on a patient.  So, we were given specialized

11   training with people that were medical students that we

12   would perform the exams on and taught by someone -- I

13   don't remember if it was a doctor or someone -- on how

14   to do a pelvic exam on a female.

15   Q.   Back during that time, well, I guess safe to

16   say that with the passage of time, technology has also

17   changed the way sexual assault exams are performed

18   today.  Is that right?

19   A.   That's correct.

20   Q.   Now are there different instruments and

21   microscope type equipment that's used in the

22   examinations of this nature?

23   A.   There are.

24   Q.   Were those -- was that the same type of

25   equipment being used back when you were trained in the

 1  late 80s?

 2       A.   It was not.

 3       Q.   Where were you working at the time that you

 4  became certified as a sexual assault nurse examiner?

 5       A.   St. Joseph's Hospital.

 6       Q.   And over your career, do you have any

 7  estimation how many of these examinations you have

 8  performed?

 9       A.   I don't have a recorded account of it, but I

10  know there was a lot.  If I had to just guess, it was

11  somewhere around 200 to 400, or something like that,

12  somewhere in that range.

13       Q.   Have you been called upon as an expert to

14  testify in this field previously?

15       A.   I have.

16       Q.   You said that you were working at St. Joseph's

17  Hospital at the time that you were certified.  If a

18  patient presented as a possible sexual assault victim,

19  were they brought to you within the hospital?  How did

20  that work?

21       A.   They either came in by private car, they were

22  instructed to go to a hospital that did sexual assault

23  exams and they came in by private car, they were brought

24  in by the fire department or by the Houston Police

25  Department or Harris County.  Just different ways they

1   came in.

2       Q.   Generally, Ms. Kologinczok, I want to talk to

3   you a little bit about what is involved in a sexual

4   assault examination.  Is there an element of the

5   examination where you gather information from the

6   patient?

7       A.   There is.

8       Q.   And what's the importance of that or what's the

9   significance of that?

10      A.   It's just a recording of the statements that

11  the patient tells you and it's just part of the evidence

12  collection.

13      Q.   And then approximately -- or describe to us

14  generally how the sexual assault exam is performed.

15      A.   You start off with the patient in a room.  And

16  usually there is a designated room because it has a

17  pelvic table that you did the exam in.  And you would

18  get a sexual assault kit that is sealed.  You would take

19  the kit into the room with the patient.  And you had

20  labels, too, that you made before you went in.  And then

21  you'd sit down with the patient and described to them

22  that you had the kit.  If they wanted to do the exam,

23  you would open the kit in front of the patient and let

24  her know you were unsealing the kit.  And then there

25  were packets in there of -- where you collected the

1    evidence as you performed the exam and we would label

2    them.  As you labeled them, you initialed them and dated

3    them and the patient dated them and initialed them.

4              And then when all the evidence was put

5    together and the exam was finished, then you'd put all

6    of the evidence back into the kit and then it's sealed

7    with a tape.  And then it's initialed by you an the

8    patient.

9        Q.   And what's the importance of following the

10   procedure through that process each time?

11       A.   It was a chain of custody so that you knew the

12   evidence that you collected, that it was properly

13   preserved.

14       Q.   How long would a typical sexual assault

15   examination take?

16       A.   It just depended on what was going on with the

17   patient.  I mean, it could be anywhere from, you know, a

18   short time to -- I mean, it could last, you know, a

19   couple of hours.  It just depended on what's going on.

20       Q.   I want to direct your attention to September

21   30th, 1992, October 1st of 1992.  What hospital were you

22   working at at that time?

23       A.   St. Joseph's Hospital.

24       Q.   Did you have an opportunity to perform an

25   examination on a patient by the name of Diana Garcia?

1        A.   I did.

2        Q.   And how was Ms. Garcia presented to, or do you

3   recall how that case came to you?

4        A.   I don't recall.

5        Q.   Okay.  In your examination of Ms. Garcia and

6   any other examination that you performed, do you also

7   record your findings in a report of some nature?

8        A.   It's written in a -- there is a form in the

9   sexual assault kit that has where you record

10  information.

11       Q.   And did you do that also -- did you do that in

12  this case as well?

13       A.   I did.

14       Q.   Do you recall approximately what time -- well,

15  actually, let's go back -- what date it was that you

16  came into contact with Diana Garcia?

17       A.   I don't independently recall, but from looking

18  at the records it was October 1st of 1992.

19       Q.   Do you recall approximately what time it was

20  that the examination on Diana Garcia was performed?

21       A.   3:45 is what the record shows.

22       Q.   Was that -- did you indicate if that was

23  morning or afternoon?

24       A.   In the morning, a.m.

25       Q.   Would you have followed the same steps in the

1  examination of Diana Garcia as you've generally

2  described for us today?

3       A.   I would have.

4       Q.   I believe you stated -- well, I will ask you.

5  Was it a visual examination of Diana Garcia as opposed

6  to using any kind of microscope or colposcope or

7  anything like that?

8       A.   Right.  We didn't have any of that equipment at

9  that time.

10      Q.   And did you collect evidence throughout the

11 examination of Diana Garcia?

12      A.   I did.

13           MR. WOOD:  Your Honor, may I approach the

14 witness?

15           THE COURT:  Yes.

16      Q.   (By Mr. Wood) Ms. Kologinczok, I'm going to

17 show you what's been marked for identification purposes

18 as State's Exhibit 33.  And I'm going to ask if you

19 first recognize State's Exhibit 33, being a box

20 (indicating)?

21      A.   I do.

22      Q.   And how do you recognize that?

23      A.   As a sexual assault kit.

24      Q.   Okay.  And are there identifying marks on that

25 box that belong to you?

1        A.    There is.  My name is on it.

2        Q.    And what other identifying information is on

3   that box that connects it to the case that you are here

4   testifying about?

5        A.    It's got Diana Garcia's name on it, also.

6        Q.    And are there any dates or other markings on

7   there?

8        A.    There is.

9        Q.    What date do you see on that box?

10       A.    10-1 of '92.

11       Q.    And any times that are significant, or is that

12   noted on the box anywhere?

13       A.    There is a time marked 4:25 a.m.  That's when I

14   would have released it.

15       Q.    And we can visit about that in a minute, but

16   within State's Exhibit 33, can you look at the items in

17   State's Exhibit 33 and take a moment and look at those

18   and tell me if you recognize those?

19       A.    Okay.

20       Q.    Do you recognize the items within State's

21   Exhibit 33?

22       A.    I do.

23       Q.    And what do you recognize those items to be

24   generally?

25       A.    Part of the collection of the sexual assault

1    kit.

2        Q.   And are the items within State's Exhibit 33, do

3    they also contain identifying marks on there -- on there

4    that link that to your work on this case?

5        A.   It does.

6        Q.   And what are those identifying marks generally?

7        A.   My initials, the date, and the time and then

8    the initials of Diana Garcia.

9        Q.   And are those contained on each -- are those on

10   each item within State's Exhibit 33?

11       A.   They are on the items of where I collected

12   something from her.

13       Q.   Okay.  And specifically I want to ask you about

14   what's been marked for identification purposes as

15   State's Exhibit 33-A.  Can you tell me what 33-A is

16   (indicating)?

17       A.   It's marked as panties.

18       Q.   And 33-A has the same identifying marks that

19   you have testified about?

20       A.   That's correct.

21       Q.   And 33-B (indicating)?

22       A.   Vaginal swabs and smears.

23       Q.   33-C (indicating)?

24       A.   Known saliva sample.

25       Q.   And then 33-D (indicating)?

```
 1        A.   Known blood sample.
 2        Q.   And do the items, State's Exhibit 33 and the
 3   items contained within State's Exhibit 33, appear to be
 4   in the same or substantially the same condition as they
 5   were or that you would recall from back at that time?
 6        A.   They do.
 7             MR. WOOD:  Your Honor, at this time, I'm
 8   offering State's Exhibit 33 and its contents.
 9             (State's Exhibit No. 33, 33-A, 33-B, 33-C,
10              and 33-D Offered)
11             MR. CORNELIUS:  May we approach the bench?
12             THE COURT:  Yes.
13             (At the Bench, on the record)
14             MR. CORNELIUS:  I will object on relevance
15   at this point.
16             MR. WOOD:  I mean, I can link it up and get
17   it in later.  I didn't know what his position would be
18   on that.
19             THE COURT:  Let's put it in later.
20             MR. WOOD:  Okay.
21             (Open court, defendant and jury present)
22             THE COURT:  That objection is sustained at
23   this time.
24             You may proceed.
25             For clarification, Mr. Wood, did you offer
```

 1   33-D as well?  Was that part of it?

 2              MR. WOOD:  33-A, B, C, D were contents

 3   within 33, yes.

 4              THE COURT:  Very good.  Thank you.

 5              You may proceed.

 6        Q.  (By Mr. Wood) Ms. Kologinczok, during your

 7   examination of Diana Garcia on October 1st, 1992, did

 8   you note any indication of any type of physical injury

 9   to Diana Garcia?

10        A.  I did not.

11        Q.  Or any kind of physical trauma?

12        A.  I did not.

13        Q.  And based on your training and experience, if

14   there is no sign of physical injury or trauma, are you

15   in a position to say whether or not a sexual assault

16   took place?

17        A.  I mean, it doesn't have to be physical injury

18   or bruising or anything to say that there was a sexual

19   assault.  I mean, that doesn't mean that there's not

20   going to be some assault.  I mean, the crime lab will

21   analyze the evidence that I have collected otherwise.

22        Q.  Is that generally what your role is in

23   collecting that evidence?

24        A.  That's correct.

25        Q.  And would it -- is it uncommon in your practice

1   as a sexual assault nurse examiner to not find physical

2   trauma or physical injury?

3        A.   That's correct.

4        Q.   I may have asked a confusing question.  Is it

5   common for you not to find physical injury or trauma in

6   the examinations that you perform?

7        A.   Most of the sexual assault exams that I did

8   perform I didn't find bruising or any other injuries.

9        Q.   And that fact alone was not indicative of

10  whether or not a sexual assault occurred, is that --

11  based on your training and experience; is that correct?

12       A.   That's correct.

13       Q.   What did you do with the evidence that you

14  collected during the examination of Diana Garcia?

15       A.   Once the evidence was collected and Diana and I

16  labeled it, we put it back into the sexual assault kit

17  box and then the box was sealed with the label.  Diana

18  and I initialed and dated it and then it was turned over

19  to the police who came and collected the box.

20       Q.   And do you recall what time -- generally what

21  time of day you turned over that evidence?

22       A.   I think the box was marked 4:25 a.m. in the

23  morning on 10-1 of '92.

24       Q.   Do you have any recollection whether or not

25  that was to an Officer Bredemeyer with the Houston

1  Police Department?

2      A.   I don't recall it independently, no.

3      Q.   Did that pretty much conclude your involvement

4  in this case or with Diana Garcia?

5      A.   It did.

6          MR. WOOD:   I will pass the witness.

7          THE COURT:   Mr. Cornelius.

8                    **CROSS-EXAMINATION**

9  **BY MR. CORNELIUS:**

10     Q.   Ms. Kologinczok -- I hope I got close on

11 that -- my name is Skip Cornelius.   I'm one of the

12 lawyers in the case.   I get to ask you a couple of quick

13 questions.

14          We've never met or discussed this case,

15 right.

16     A.   We have not.

17     Q.   Okay.   Did I understand you to say you don't

18 really remember this incident from your independent

19 recollection, you are testifying from your notes?

20     A.   That's correct.

21     Q.   Okay.   Your job at that time was not really to

22 be the judge or the jury in determining whether someone

23 was sexually assaulted or not, your job was to collect

24 the information; would that be true?

25     A.   That's correct.

1      Q.   It wasn't up to you to decide if they had been

2  sexually assaulted or hadn't been sexually assaulted or

3  what actually happened, your job was to collect the

4  information, make notes if you saw any injuries and

5  where they were, and collect the various things that the

6  kit authorized you or told you to collect, correct?

7      A.   That's correct.

8                MR. CORNELIUS:  All right.  I pass the

9  witness.

10               THE COURT:  Anything further, Mr. Wood?

11               MR. WOOD:  I have no other questions.

12               THE COURT:  May this witness be excused?

13               MR. CORNELIUS:  Yes, Your Honor.

14               MR. WOOD:  Yes.

15               THE COURT:  You may step down.

16               THE WITNESS:  Thank you.

17               THE COURT:  Thank you very much.

18               THE WITNESS:  Uh-huh.

19               THE COURT:  Please call your next.

20               MR. WOOD:  The State calls Officer

21  Bredemeyer.

22               THE COURT:  Has this witness been sworn?

23               MR. WOOD:  I don't believe he was sworn

24  yesterday.

25               THE COURT:  Very good.

1              THE BAILIFF:  Your Honor, the officer has

2    not been sworn.

3              THE COURT:  We'll put him on the stand and

4    we'll take a five-minute break.  I'm not trying to push

5    anything.  Let's take a five-minute break.

6              THE BAILIFF:  All rise.

7              (Open court, defendant present, no jury)

8              THE BAILIFF:  The food is here.

9              THE COURT:   Okay.  The food is here now.

10   We'll take an hour break.  And so, we'll be back at

11   1 o'clock.

12             (Lunch recess)

13             (Open court, defendant present, no jury)

14             THE COURT:  Are both sides ready to

15   proceed?

16             We're back on the record in Cause

17   No. 1384794.  We have the defendant at counsel table,

18   Mr. Obel Cruz-Garcia.  And Mr. Wood is present.

19   Ms. Tise is not.

20             Will we be proceeding without her?

21             MR. WOOD:  That's fine.  She just stepped

22   out.

23             THE COURT:  And we have the witness, W.T.

24   Bredemeyer, on the stand.

25             Please bring in the jury.

1                    (Open court, defendant and jury present)

2                    THE COURT:  Please be seated.

3                    We're ready to proceed with the State's

4    next witness, W.T. Bredemeyer.  And the witness has been

5    sworn for the record.

6                    You may proceed, Mr. Wood.

7                    MR. WOOD:  Thank you, Your Honor.

8                              **W.T. BREDEMEYER,**

9    having been first duly sworn, testified as follows:

10                          **DIRECT EXAMINATION**

11   **BY MR. WOOD:**

12        Q.   Good afternoon, Deputy Bredemeyer.

13        A.   Good afternoon, sir.

14        Q.   How are you doing?

15        A.   Very well.  Thank you.

16        Q.   We almost got you here before lunch.

17        A.   You had me anticipating.  I was ready.

18        Q.   Can you introduce yourself with your full name

19   for the jury, please.

20        A.   My name is Deputy W.T. Bredemeyer.  Bill for

21   short.

22        Q.   Deputy Bredemeyer, can you spell last name for

23   the court reporter?

24        A.   Yes, sir.  B-r-e-d-e-m-e-y-e-r.

25        Q.   Deputy, how are you employed?

1      A.   I'm currently employed with the Precinct 4

2    Constable's Office.

3      Q.   And what are your responsibilities there at

4    Precinct 4?

5      A.   I work the patrol shift from 11:00 at night

6    till 7:00 in the morning.

7      Q.   How long have you been with Precinct 4?

8      A.   Three years.

9      Q.   What did you do before joining Precinct 4?

10     A.   I was a patrol officer for HPD, City of Houston

11    Police Department.

12     Q.   How long were you with the Houston Police

13    Department?

14     A.   Twenty-five years.

15     Q.   So, did you technically retire from --

16     A.   Honorably retired, yes, sir.

17     Q.   And so, you responded to retirement by going

18    back into law enforcement?

19     A.   I question myself sometimes, too.  Yes, sir.

20     Q.   I never really understood that about

21    retirement.

22     A.   The last time.

23     Q.   How long in total did you stay with HPD for?

24     A.   Twenty-five years.

25     Q.   What were your responsibilities there at the

1    Houston Police Department?

2        A.   I worked mainly patrol for most of my career.

3    I did a four-year stint in an undercover -- or the

4    I.A.D. Division, plainclothes, and then worked patrol

5    for the rest.

6        Q.   So, you had somewhere around 20-plus years of

7    patrol experience in your career?

8        A.   Yes, sir.

9        Q.   I guess you've responded to many, many, many

10   different scenes, have you not?

11       A.   Yes, sir.

12       Q.   Are you a certified peace officer in the state?

13       A.   Yes, sir.  I reached the maximum certification

14   of master police officer.

15       Q.   Deputy Bredemeyer, back in September of 1992,

16   were you working at the Houston Police Department at

17   that time?

18       A.   Yes, sir, I was.

19       Q.   And were you working as a patrol officer?

20       A.   Yes, sir.

21       Q.   On September 30th, 1992, did you have an

22   opportunity to respond to a call at 6705 Fairway in

23   Houston, Texas?

24       A.   Yes, sir, I did.

25       Q.   And do you remember what the nature of that

1  call was or why you responded?

2      A.   It went out as a burglary in progress and then

3  turned into a kidnapping call.

4      Q.   Was that area, 6705 Fairway, an area of town

5  that you were familiar with?

6      A.   Yes, sir.

7      Q.   Why were you familiar with that?

8      A.   That was my regular patrol beat.  I worked that

9  beat for several years.

10      Q.   And is that location in Harris County, Texas?

11      A.   Yes, sir, it is.

12      Q.   When you arrived there at the Fairway location,

13  were there other units already there?

14      A.   If I recall, probably one or two other.  I was

15  like the third unit.

16      Q.   How does that happen?  You are dispatched and

17  you just go to that location and then --

18      A.   Because it was my patrol area, I listened for

19  the radio call to go out and I heard it go out and I

20  checked by with the original unit that was responding.

21      Q.   So, what did do you when you first arrived?

22      A.   I tried to find out what was going on, help try

23  to secure the scene as best as I could, looked over the

24  scene and determined what -- find from the main unit

25  what I could do.

1    Q.   Do you recall coming into contact with a female

2 by the name of Diana Garcia?

3    A.   Yes, yes, I did.

4    Q.   And can you describe Ms. Garcia's demeanor when

5 you first encountered here?

6    A.   Upon my initial contact, she was pretty upset,

7 crying and upset, and very hard to get communicating

8 with, but I left her alone and let the primary unit take

9 care of her from there.

10    Q.   Do you recall anyone else that you came into

11 contact with out at the scene other than police

12 officers?

13    A.   A Hispanic male.  At the time, we learned that

14 he was another victim involved in the scene.  And he had

15 been assaulted and we talked it over with the primary

16 unit and they took care of him from there, too.

17    Q.   Do you recall his name being Arturo Rodriguez?

18    A.   Yes, sir.

19    Q.   What was his state when you encountered him or

20 what do you recall about him?

21    A.   He had been assaulted.  He was beat up and he

22 was very hard to work with because of the Spanish

23 interpretation and the language barrier.

24    Q.   So, you do not speak Spanish?

25    A.   No, sir, I don't.

1    Q.   Was there anything else about that location

2  that stands out to you that you observed?

3    A.   The initial scene, we met him outside, they

4  were outside the apartment, but we went back into the

5  apartment and noticed the door had been broken into.

6  And that's basically all I can remember at this time.

7    Q.   Okay.  So, some sign of forced entry?

8    A.   Yes, sir.

9    Q.   When you left the scene, where did you go?

10   A.   I was assigned to transport the female to St.

11 Joseph's Hospital to do a sexual assault kit.

12   Q.   Is that a common responsibility many times when

13 you respond to a call of this nature?

14   A.   Yes, sir, it happens quite often.

15   Q.   And when you transported Ms. Garcia to

16 St. Joseph's, did you remain there at the hospital?

17   A.   Yes, sir, I did.

18   Q.   Was that during the time that the examination

19 was being done on her?

20   A.   Yes, sir.

21   Q.   What did you do at that point or after the

22 examination of Ms. Garcia was complete?

23   A.   After she completed the examination, I took

24 custody of the sexual assault kit and transported her to

25 the Homicide Division for them to talk to her.

1              MR. WOOD:  Your Honor, may I approach the

2   witness?

3              THE COURT:  Yes.

4       Q.   (By Mr. Wood) Deputy Bredemeyer, I'm going to

5   show you what's been marked for identification as

6   State's Exhibit 33.  Generally, do you recognize what

7   State's Exhibit 33 is (indicating)?

8       A.   Yeah.  This is a sexual assault kit and it has

9   on there where I received it from the nurse and then

10  took charge of it.

11      Q.   And was that nurse Gloria Kologinczok?

12      A.   Yes, sir, it was.

13      Q.   And can you tell us by the notations on State's

14  Exhibit 33, the date and the time that it shows you

15  received that evidence?

16      A.   It says 10-1 of '92 at 4:24 a.m.

17      Q.   And that is your handwriting?

18      A.   Yes, sir, it is.

19      Q.   After you took possession of the sexual assault

20  kit from Ms. Kologinczok, what did you do with that

21  evidence?

22      A.   I maintained custody of it till I transported

23  her to the Homicide Division and then was advised to go

24  ahead and take it and tag it into our HPD property room.

25      Q.   So, your first responsibility was getting

1    Ms. Garcia to the Homicide Division?

2         A.   Yes, sir.

3         Q.   And is that typically done for further

4    questioning and things of that nature?

5         A.   Yes, sir.

6         Q.   After you dropped her off at Homicide, what did

7    you do with the evidence?

8         A.   I transported it to the HPD property room and

9    took -- left it in their custody.

10        Q.   Did that conclude your involvement in this

11   case?

12        A.   Yes, sir, it was.

13        Q.   Deputy Bredemeyer, in your 28 years of law

14   enforcement, obviously as a patrol officer for many of

15   those years, you have responded to many scenes; isn't

16   that right?

17        A.   Yes, sir.

18        Q.   Does this scene or this case stand out to you

19   at all?

20        A.   Yes, sir, it does.  It just never went away.

21        Q.   Do you remember this case?

22        A.   Yes, sir, I do.

23        Q.   When we notified you that you would be

24   contacted as a witness?

25        A.   Yes, sir, I do.

```
 1                    MR. WOOD:  I pass the witness.

 2                    THE COURT:  Thank you, Mr. Wood.

 3                    Mr. Cornelius.

 4                    MR. CORNELIUS:  Just a moment, Judge.

 5                    (Pause)

 6                    MR. CORNELIUS:  Judge, we don't have any

 7  questions.

 8                    THE COURT:  Okay.  Very good.  May the

 9  witness be excused?

10                    MR. CORNELIUS:  Yes, Your Honor.

11                    MR. WOOD:  No objection.

12                    THE COURT:  You can step down, Deputy.

13  Thank you very much.

14                    THE WITNESS:  No problem.

15                    THE COURT:  Please call your next.

16                    MS. TISE:  The State will call U.P.

17  Hernandez.

18                    THE COURT:  Has this witness been sworn?

19                    MS. TISE:  No, Your Honor, he hasn't.

20                    THE COURT:  They are unable to find U.P.

21  Hernandez.

22                    MS. TISE:  He was just out there.

23                    (Pause)

24                    THE COURT:  Please raise your right hand.

25                    (Witness sworn)
```

1          THE COURT:  Please have a seat.

2          Is it Officer or Sergeant?

3          THE WITNESS:  Officer.

4          THE COURT:  Officer Hernandez?

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  Please keep your voice up and

7     speak directly into that microphone.

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  You may proceed, Ms. Tise.

10          MS. TISE:  Thank you, Judge.

11                    **U.P. HERNANDEZ,**

12     having been first duly sworn, testified as follows:

13                    **DIRECT EXAMINATION**

14     **BY MS. TISE:**

15     Q.   Good afternoon.

16     A.   How are you?

17     Q.   Officer, would you please introduce yourself to

18     the ladies and gentlemen of the jury?

19     A.   My name is Officer U.P. Hernandez.

20     Q.   And would you tell them how you're employed

21     right now?

22     A.   I'm partially employed by the City of Houston.

23     I retired recently, but I'm still an officer.

24     Q.   Okay.  What do you mean by partially employed?

25     A.   I'm kind of burning down my time, but as I burn

1  down my time, I'm still a peace officer.

2       Q.   Okay.  Tell me how long you've worked for the

3  police department.  And start with which agency you

4  worked for.

5       A.   I have worked for the police department for

6  37-and-a-half years.

7       Q.   That would be the Houston Police Department?

8       A.   The Houston Police Department, yes.

9       Q.   Okay.  Thirty-seven-and-a-half years?

10      A.   Correct.

11      Q.   And tell the jury where you were assigned

12 during your time with HPD?

13      A.   I spent two years in patrol.  I received a

14 special assignment to go to Homicide where I spent 18

15 years.  And then 19 years I spent in Major Offenders

16 working organized crime and investigations of home

17 invasions and police impersonations.

18      Q.   And over the course of your time with HPD, did

19 you receive training?

20      A.   Yes, I did.

21      Q.   Tell the jury about what kind of training you

22 received over the years.

23      A.   I went to a lot of classes.  Interrogation,

24 homicide investigations, how to execute warrants, how to

25 read body language, and many other aspects of

1  investigations.

2       Q.   And you updated your training as was required?

3       A.   I'm sorry?

4       Q.   Did you update your training yearly as required

5  with HPD?

6       A.   Yes.

7       Q.   Okay.  Can you tell us where you were assigned

8  back in September of 1992?

9       A.   Homicide.

10      Q.   And what specifically were your

11  responsibilities with the Homicide Division?

12      A.   Well, my assignment was to investigate

13  homicides.

14      Q.   Okay.

15      A.   Kidnappings, sexual assaults, murders number

16  one.  So, that's basically what I did.

17      Q.   And at that time my understanding is the way it

18  worked is you were either assigned to evenings or days?

19      A.   That's correct.

20      Q.   Okay.  And if a call came in during the evening

21  shift, the evening shift officers would take that call,

22  correct?

23      A.   That's correct.

24      Q.   But then the dayshift officers would come on

25  and take over --

1      A.    That's correct.

2      Q.    -- during the day?

3      A.    Correct.

4      Q.    Okay.  And on the night of September 30th,

5 1992, you weren't one of the initial officers called out

6 to the crime scene during the night, were you?

7      A.    Correct.

8      Q.    Is it fair to say that you were called in to

9 that scene the next day?

10      A.    I was called to the homicide office the

11 following morning, yes.

12      Q.    Okay.  And specifically you were called in for

13 a particular duty, were you not?

14      A.    Correct.

15      Q.    And what was that?

16      A.    To interview two of the complainants in a

17 kidnapping incident.

18      Q.    Okay.  And so, when you got there, were they

19 already there?

20      A.    Yes, they were.

21      Q.    All right.  And after you interviewed them you

22 documented what happened in the interview, did you not?

23      A.    Yes, I did.

24      Q.    You wrote an offense report?

25      A.    I did.

1    Q.   And you also took written statements from those

2  individuals?

3    A.   I did.

4    Q.   Okay.  In your offense report, looking at it

5  recently, we caught a littler error in the dates, didn't

6  we?

7    A.   Yes, I did.

8    Q.   Okay.  And can you tell us about that?

9    A.   Yes.  I put the wrong date.  I put Tuesday

10  instead of Thursday being the date of the offense when I

11  got called in.

12    Q.   Okay.  And the actual date, do you remember you

13  put October 3rd instead of October 1st?

14    A.   October 1st, right.

15    Q.   However, on the written and notarized

16  statements that you took from the individuals you talked

17  to, you wrote the correct date, correct?

18    A.   I did.

19    Q.   In fact, you and the notary both indicated that

20  those statements were taken October 1st, 1992?

21    A.   Correct.

22    Q.   Do you remember who you interviewed that

23  morning?

24    A.   Yes, I do.

25    Q.   Can you tell the jury who you interviewed?

1    A.   I interviewed Arturo Rodriguez, who was one of

2  the complainants.

3    Q.   Okay.

4    A.   And Diana Garcia.  She's a complainant as well.

5    Q.   And who did you interview first?

6    A.   Arturo Rodriguez was the first person I

7  interviewed.

8    Q.   Okay.  And what time of the morning was his

9  statement actually memorialized?

10    A.   I don't know because I don't have a copy of it.

11         MS. TISE:  Can I approach?

12         THE COURT:  Yes.

13    A.   His statement was taken at 4:26 in the morning.

14    Q.   (By Ms. Tise) And what time was Diana's

15  statement taken?

16    A.   6:28 in the morning.

17    Q.   Okay.  Now, when you had the opportunity to

18  interview Diana and Arturo, first of all, did you note

19  that Arturo spoke no English?

20    A.   He is what now?

21    Q.   Spoke no English.

22    A.   Correct.

23    Q.   Okay.  Diana obviously is a native Texan and

24  spoke English?

25    A.   That's correct.

1       Q.   Okay.  Was there anybody assigned to the

2   original case as far as you know out at that crime scene

3   who was able to talk to Arturo in Spanish?

4       A.   No.  I don't know that.

5       Q.   All the officers, Sergeant Elliott, Officer

6   Devereaux, Officer Bredemeyer, those are

7   English-speaking officers, correct?

8       A.   Correct.

9       Q.   So, at that time you were the first officer to

10  be able to really sit down and talk to Arturo and get a

11  statement from his lips?

12      A.   That's correct.

13      Q.   And that would be a statement that wasn't

14  coming through Diana interpreting for him, correct?  It

15  would have been him directly talking to you in his

16  native language?

17      A.   He was talking directly to me.

18      Q.   Okay.  And when you talked to him, did you

19  notice anything about him?  How did he seem?

20      A.   Quiet.

21      Q.   Did you notice injuries or could you see those

22  at that time?

23      A.   No.

24      Q.   Okay.  Had his injuries been cleaned up by that

25  time

1      A.   I guess.  I don't remember the injuries.

2      Q.   Okay.  Did he seem to have been through a

3 pretty traumatic event that evening?

4      A.   He did.

5      Q.   And the same with Diana, did it seem to you

6 that she had been through a very traumatic event?

7      A.   Yes.

8      Q.   And was that reflected in how they talked to

9 you?

10     A.   How they talked, yeah.

11     Q.   When you talked to Arturo, he gave you quite a

12 few details about what happened that night, correct?

13     A.   Correct.

14     Q.   He also described one of the individuals who

15 came in the room, correct?

16     A.   Yes, he did.

17     Q.   And the individual that he described he

18 described as a black man?

19     A.   Yes, he did.

20     Q.   Okay.  And I want to ask you as a Hispanic

21 officer, based on your experience and training, what

22 that meant to you.  Did you believe that that meant he

23 was talking about an African-American person or did you

24 believe that that was something that could involve a lot

25 of different types of individuals?

1      A.    During that time, I wasn't trying to determine

2   whether it was just a black man.

3      Q.    Okay.

4      A.    I was trying to determine who he was trying to

5   describe, what nationality.  Because Hispanic people

6   have a way of describing dark-complected people like me,

7   might make them think he is a black man, and in essence

8   he is not, he could be from another country.

9      Q.    Okay.  And so, is that something that you've

10  encountered commonly; that is, in the Hispanic culture,

11  when a Hispanic individual refers to someone as a black

12  man, they may be referring to a black Colombian or a

13  black Dominican, not necessarily an African-American in

14  this country?

15     A.    That's correct.

16     Q.    And in your experience as a Hispanic officer,

17  would you agree that black Colombians, black Dominicans,

18  or individuals from those countries have a different

19  accent than individuals who speak Spanish from Mexico?

20     A.    Yes.

21     Q.    So, when you were talking to him, were you

22  focused in -- did you think to yourself:  This has to be

23  an African-American man, or was your mind open to a lot

24  of different possibilities?

25     A.    My mind was open to a lot of things.  I'm just

1    listening.

2        Q.    Okay.   In addition, he gave you some idea of

3    the events that happened in that room and he described

4    those in detail, correct?

5        A.    Correct.

6        Q.    And so did Diana, did she not?

7        A.    Yes, she did.

8        Q.    Okay.   And did you find that for the most part

9    they were pretty consistent for individuals that had

10   been through a really traumatic event?

11       A.    Correct.

12       Q.    Obviously, some are going to have a different

13   perspective; that's pretty common at a crime scene,

14   correct?

15       A.    That's correct.

16       Q.    Some might -- one person might see something,

17   the other person might see something else, because

18   different things were going on with them at the same

19   time, correct?

20       A.    Correct.

21       Q.    But you found their statements to be consistent

22   in that regard?

23       A.    Pretty consistent.

24       Q.    Okay.   Is it common for minor details like

25   color of clothing and things like that to be different

1    amongst different individuals at a crime scene?

2        A.    Sure.

3        Q.    Why is that?

4        A.    People see different things, remember different

5    things.  Most people never see the same thing.

6        Q.    Okay.  So, talking to two people a few hours

7    after a traumatic incident occurs, you are going to

8    expect some minor discrepancies, correct?

9        A.    Absolutely.

10       Q.    But in this case, the big picture items were

11   all very consistent between Diana and Arturo?

12       A.    Correct.

13       Q.    What would you expect to happen to a witness

14   who's trying to recall events from 21 years ago?

15       A.    They are going to forget a lot of things.

16       Q.    Would that surprise you at all?

17       A.    No.

18       Q.    Okay.  They might even forget some big things?

19       A.    Yeah.  They will forget quite a few things.

20       Q.    In this particular case when you began talking

21   to Arturo Rodriguez about what happened the night

22   before, did he admit to you that he was dealing drugs?

23       A.    No.

24       Q.    Okay.  And you asked him about it several

25   different ways, didn't you?

```
 1        A.    I did.

 2        Q.    And he told you no, no, no, he wasn't a drug

 3   dealer?

 4        A.    That's correct.

 5        Q.    Okay.  After talking to Arturo and

 6   memorializing his statement, you put down the details

 7   and things that he told you, correct?

 8        A.    That's correct.

 9        Q.    And you left the room and you went and talked

10   to Diana?

11        A.    Correct.

12        Q.    When you talked to Diana, did she tell you

13   about the drug dealing?

14        A.    About the what?

15        Q.    The drug dealing.

16        A.    Yes.

17        Q.    Okay.  And when she -- she didn't tell the very

18   first time you asked her, did she?

19        A.    Right, she denied it.

20        Q.    Okay.  But what did you do to convince her she

21   needed to tell you?

22        A.    I told her that she needed to be pretty open

23   with me and tell me what this is all about.  Because it

24   was pretty obvious to me that this involves drugs,

25   money, or something of that nature.  Because whenever
```

1  they take a child, you're pretty deep into it.

2      Q.  Okay.

3      A.  So, if you don't tell me what's going on now,

4  you are wasting time.  I even told her, you know, it's

5  pretty evident here that if you don't tell us now and be

6  truthful to me, your son, they could kill your boy.

7      Q.  As soon as you told her that, what did she do?

8      A.  As soon as I told her that, she said:  No.  I'm

9  going to quit lying to you and tell you the truth.

10      Q.  And she told you all about the drug dealing?

11      A.  We were dealing in small quantities of drugs.

12      Q.  Okay.  And she told you also the man who was

13  supplying those drugs to her, didn't she?

14      A.  She did.

15      Q.  And what was the man's name?

16      A.  She said:  My supplier is a man named Chico and

17  his wife Angelita.

18      Q.  Okay.  And were you able to determine who Chico

19  was at that point?

20      A.  No.

21      Q.  Okay.  During your follow-up investigation, did

22  y'all determine who Chico was?

23      A.  We did.

24      Q.  Okay.  And did you determine that Chico was the

25  nickname for a man by the name of Obel Cruz-Garcia?

1      A.   Yes, ma'am.

2      Q.   Okay.  After talking to Diana, did you

3    memorialize the things that she told you in a written

4    statement as well?

5      A.   Yes, I did.

6      Q.   Okay.  And one of the things that you said you

7    talked to Diana about was the fact that this screamed

8    drugs to you.  And I want you to tell the jury why you

9    felt that way.

10      A.   Because if they were just going to go in there

11    to her apartment, their apartment to go and just do a

12    kick-in, for example -- let me explain.  A kick-in would

13    be a home invasion, just going to go kick in and take

14    things.  But, obviously, like I told her, these people

15    know you, they knew you had something there.  What it

16    was, I don't know, you are not telling me.  They are

17    coming here for something.  And in order for them to do

18    what they did -- when they tied you up, they beat you

19    up, they assault you, they do whatever they want to, but

20    they mean business.  So, they are being serious.  So,

21    you are more involved in the drugs, even though you are

22    denying it.  It's not going to happen that way.  They

23    would not even target you unless you were really

24    involved somehow.

25      Q.   So, to you, when you hear the facts of this

1  case, you hear that Arturo was beaten badly, you hear

2  that Diana was raped, their son was snatched from the

3  house, it was ransacked, you're thinking a drug-related

4  retaliation type of case?

5      A.   Correct.

6      Q.   As an experienced police officer, you knew that

7  right from the beginning?

8      A.   From the beginning.

9      Q.   A couple of things that were noted in Arturo's

10 statement.  One of the things they talked about was the

11 mask that the person was wearing.  Do you recall that?

12     A.   Yes.

13     Q.   Now --

14          MS. TISE:  May I approach?

15          THE COURT:  Yes.

16     Q.   (By Ms. Tise) And I'm going to show you the

17 statement where he talks about that.  And I want you to

18 read a couple of lines of that to yourself.

19     A.   (Witness complies).

20          Okay.

21     Q.   Okay.  Did Arturo seem very definite when he

22 told you about the color of the mask or did he hedge his

23 bets based on the lighting in the room?

24     A.   I'm figuring he's just telling me what he saw

25 because of the lighting in the room.

1      Q.   Okay.  In fact, didn't he mention that it was
2  dark and he said:  I think the mask was either brown or
3  black, I'm not too sure, the lighting was not too good?
4      A.   Correct.
5      Q.   Okay.  Additionally, did Arturo tell you back
6  then that he passed out?
7      A.   Yes, he did.
8      Q.   Okay.  That they were hitting him and kicking
9  him and he was gasping for air, he could barely hear
10  what was being said or happening and he passed out?
11      A.   Correct.
12      Q.   I guess it wouldn't surprise you if Arturo
13  doesn't remember that 22 years later?
14      A.   Correct.
15      Q.   Okay.  It's been a while?
16      A.   Uh-huh.
17      Q.   After interviewing Arturo and Diana that day,
18  did you have another opportunity to interview them?
19      A.   Yes, I did.
20      Q.   And after October 1st, the drug dealing was
21  pretty much out there?
22      A.   Yes, it was.
23      Q.   And when you went to talk to them or other
24  officers went and talked to them, that was part and
25  parcel of their conversations with them.  Correct?

1       A.   Correct.

2       Q.   It wasn't something that was in the closet

3  anymore, correct?

4       A.   Correct.

5       Q.   In fact, after what, about 6:30 a.m. on October

6  1st, it was out of the closet?

7       A.   We knew now what this was all about.

8       Q.   No reason for Arturo to lie to you about it

9  anymore, everybody knew?

10      A.   Correct.

11      Q.   And your focus was to try to find the

12 individuals who they were working with with the drugs,

13 correct?

14      A.   That's it.

15      Q.   While you were interviewing Diana and Arturo,

16 other officers had a lot of work to do as well, correct?

17      A.   That's correct.

18      Q.   Fair to say that officers were out canvassing

19 the neighborhood?

20      A.   Correct.

21      Q.   Officers were out interviewing neighbors and

22 friends?

23      A.   Uh-huh.

24      Q.   Officers were -- there was a track and trace

25 put on the phone?

1      A.   True.

2      Q.   And you assisted in kind of monitoring some of

3  those calls?

4      A.   I did.

5      Q.   Some family members called, correct?

6      A.   Correct.

7      Q.   Even Angelita called a couple of times?

8      A.   That's right.

9      Q.   And you were aware of that?

10     A.   Uh-huh.

11     Q.   Anything come out of those calls?

12     A.   No, not that I know of.  I don't know.

13     Q.   Okay.  And you would know, wouldn't you?  I

14  mean, was there ever a ransom demand?

15     A.   No.

16     Q.   Okay.  Lots of detectives were working this

17  case, were they not?

18     A.   A bunch.

19     Q.   And there wasn't really a clear lead officer,

20  there were just a bunch of different detectives, a whole

21  bunch of the Homicide Division?

22     A.   Correct.

23     Q.   Would it be fair to say this case was very high

24  publicity?

25     A.   High publicity?  Yes.

1     Q.   All right.  It was big news back in 1992?

2     A.   It was.

3     Q.   And some of the Hispanic television stations

4 were doing shows on it, correct?

5     A.   Uh-huh, that's correct.

6     Q.   The FBI was involved?

7     A.   Correct.

8     Q.   Okay.  A lot of work was going on to try to

9 determine who did this?

10    A.   Yes.

11    Q.   Some of the follow-up, you weren't directly

12 involved in, correct?

13    A.   That's correct.

14    Q.   But do you recall actually being asked to

15 interview another Spanish-speaking individual on the

16 case?

17    A.   Yes.

18    Q.   Can you tell me when this happened?

19    A.   Let me look at my notes.

20         I interviewed an individual by the name of

21 Pedro Ortiz.

22    Q.   Okay.

23    A.   That was an assignment given to me by, I think,

24 Sergeant Stephens.

25    Q.   Okay.  Anything significant come of that

1    interview?

2         A.   No, no.

3         Q.   Who did you interview next?

4         A.   Let's see.  Leonardo German.

5         Q.   Okay.  And were you involved in any of the work

6    that had led to Leonardo German as somebody you wanted

7    to talk to?

8         A.   No.

9         Q.   Does your offense report indicate why you were

10   sent to talk to that person?

11        A.   It does.

12        Q.   Okay.  Can you tell us why?

13        A.   Because Leonardo German and his wife, I believe

14   Linda, or girlfriend named Linda --

15                  MR. CORNELIUS:  Excuse me.  I'll have to

16   object.  I'm feeling hearsay in this.  Maybe there's a

17   way -- I object to hearsay for now.

18                  THE COURT:  Okay.  Is this -- was this

19   something of his own personal knowledge?  Can you

20   develop that, Ms. Tise?

21                  MS. TISE:  Well, I think I can, Judge.

22        Q.   (By Ms. Tise) When you talked to Leonardo

23   German, did you learn what his connection was to Diana

24   and Arturo?

25        A.   They were friends.

1          MR. CORNELIUS:  Well, that's what I'm

2    objecting to.  That's hearsay.  Leonardo is not on the

3    stand, so it's hearsay.

4          THE COURT:  I understand.  I will sustain

5    hearsay at this time, but I think I'll allow him to go,

6    to some extent, into the investigation just for

7    investigation purposes, not anything directly said by

8    Leonardo German, but the circumstances surrounding his

9    relationship.

10          You may proceed.

11    Q.   (By Ms. Tise) Was Leonardo German relaxed

12    during the interview?

13    A.   Yes.

14    Q.   He consented to the interview with you with no

15    problem?

16    A.   Correct.

17    Q.   And after talking to him, did you ask him if

18    you could look at some of his property?

19    A.   Correct.

20    Q.   What did you ask him?

21    A.   If he'd be willing to sign a consent to search

22    to look at his place of business, his vehicle.

23    Q.   And did he willingly sign that and allow you to

24    do it?

25    A.   Yes.

1    Q.   In fact, he gave you his keys and said:  Go

2 ahead, didn't he?

3    A.   That's right.

4         MS. TISE:  May I approach?

5         THE COURT:  Yes.

6    Q.   (By Ms. Tise) I'm going to show you what's been

7 marked as State's Exhibit 90 and ask you if that is

8 Leonardo German (indicating)?

9    A.   It is.

10    Q.   Okay.  And you were interviewing him because he

11 was a friend of Diana and Arturo?

12    A.   Correct.

13         MS. TISE:  Your Honor, I'm going to offer

14 State's Exhibit 90.

15         **(State's Exhibit No. 90 Offered)**

16         MR. CORNELIUS:  No objection.

17         THE COURT:  State's 90 is admitted.

18         **(State's Exhibit No. 90 Admitted)**

19    Q.   (By Ms. Tise) Did you get a -- or ask that a

20 DNA sample be taken from this individual, a blood

21 sample?

22    A.   Yes, I did.

23    Q.   Okay.  And some hair samples?

24    A.   Hair samples as well.

25    Q.   And that was done?

1       A.   Uh-huh.

2       Q.   And did you go out and search after you got his

3  keys, go out and search his business and his car?

4       A.   I didn't go out there.  I think someone else

5  went.  I don't remember going out to the car.

6       Q.   Did you give the information to another officer

7  so that they could follow up?

8       A.   I think I did.  All of that was documented,

9  yes.

10      Q.   Okay.  Did anything else come of that

11 particular interview at that time?

12      A.   No.

13      Q.   At some point in time did you learn from other

14 officers who were conducting other parts of the

15 investigation about a possible lead at a place called

16 Rendon Auto Shop?

17      A.   Yes, I did.

18      Q.   Okay.  And, again, other officers were out

19 doing all kinds of stuff at the same time as you?

20      A.   Correct.

21      Q.   At what point in the investigation are we at

22 when you got the lead on the Rendon Auto Shop?

23      A.   We're at a point where we're just following up

24 on a lot of information that was gathered.

25      Q.   Do you remember how many days past or what day

1    this happened?  Can you refer to your report about that?

2        A.    Yeah.  Monday, October the 5th.

3        Q.    Okay.  And as of October 5th, y'all hadn't

4    gotten Obel Cruz-Garcia, correct?

5        A.    Correct.

6        Q.    He could not be found?

7        A.    That's correct.

8        Q.    And other officers had followed up and gone to

9    his place of residence, right?

10       A.    Correct.

11       Q.    And y'all were looking for any kind of

12   connection or way to track him down?

13       A.    Correct.

14       Q.    When you went out to the Rendon Auto Shop, were

15   you looking to talk to the owner there?

16       A.    Yes.

17       Q.    Okay.  And were you successful?

18       A.    Yes, I did.

19       Q.    Okay.  Who was the owner that you talked to?

20       A.    His name was Mr. Rendon.  I'd have to look at

21   his name real quickly here.

22              Mr. Rogelio Rendon.

23       Q.    Okay.  And this was on October 5th, correct?

24       A.    That's correct.

25       Q.    When you got there, were you looking for

1   Rogelio Rendon to talk to, the owner, and where did you

2   first observe him?

3       A.   He was driving up to his auto shop and he was

4   in a blue Thunderbird, I believe.

5       Q.   A blue Ford Thunderbird?

6       A.   Ford Thunderbird.

7       Q.   Was there another person with him?

8       A.   Yes, there was.

9       Q.   And what was the name of the other person that

10  was with him?

11      A.   Candido Lebron.

12      Q.   I'm going to show you what's been marked as

13  State's Exhibit 84 (indicating).  And is that Candido

14  Lebron?

15      A.   Yes.

16           MS. TISE:  Your Honor, I'm going to offer

17  State's Exhibit 84.

18           MR. CORNELIUS:  We object to relevance.

19           THE COURT:  I'm going to allow it in.

20  State's Exhibit No. 84 -- is that what you said?  84?  I

21  show that 84 is already in.

22           MS. TISE:  I believe it is in.  I actually

23  offered it through another witness.

24           THE COURT:  Very good.  You may proceed.

25      Q.   (By Ms. Tise) And this guy gave you the name

1    Candido Lebron that day on October 5th, correct?

2        A.    Correct.

3        Q.    Did you have an opportunity to talk to

4    Mr. Rendon and Mr. Lebron?

5        A.    Well, I believe I spoke more to Mr. Rendon

6    because he is the owner of the place, the body shop -- I

7    mean the auto shop.

8        Q.    And was there something about that blue Ford

9    Thunderbird that caught your interest?

10       A.    Well, it did because I asked him if he knew --

11               MR. CORNELIUS:  Objection to the hearsay,

12   Judge.

13               THE COURT:  That will be sustained.

14       Q.    (By Ms. Tise) Okay.  Did you talk to him --

15   without saying what he said, did you talk to him about

16   who the owner of that blue Ford Thunderbird was?

17       A.    I did.

18       Q.    Okay.  And you actually ran the registration on

19   that vehicle, didn't you?

20       A.    Correct.

21       Q.    And who was the owner of that blue Ford

22   Thunderbird?

23               MR. CORNELIUS:  Objection to the hearsay.

24               THE COURT:  Develop how he knows that, if

25   he doesn't know of his own personal knowledge.

1    Q.   (By Ms. Tise) You checked the registration,

2  correct?

3    A.   Yes, ma'am, I did.

4    Q.   And you determine the ownership?

5    A.   It came back to a --

6           MR. CORNELIUS:  I object.  It's still

7  hearsay.

8           THE COURT:  I'll allow her to ask that

9  question.  Please complete that question.

10   Q.   (By Ms. Tise) Who did the registration to the

11 blue Ford Thunderbird come back to?

12          THE COURT:   How did he -- I'll sustain at

13 this point unless you can develop how he knows that.

14   Q.   (By Ms. Tise) Shortly after you talked to

15 Mr. Rendon there at the shop, did individuals come to

16 claim that vehicle?

17   A.   Yes, he did.

18   Q.   And who were the individuals who came to claim

19 that vehicle while you were there and saw it?

20   A.   It was Angelita Rodriguez, I believe was her

21 last name, and another male who I later found his name

22 was Carmelo Santana.

23   Q.   All right.  So, while you are there talking to

24 them, you ran the registration and got the ownership of

25 the vehicle and then shortly thereafter two individuals

1    came and claimed that vehicle?

2        A.   Correct.

3        Q.   Okay.  And the owner let them have it, right,

4    the shop owner?

5        A.   He did.

6        Q.   Okay.  And they took the vehicle?

7        A.   They did.

8        Q.   Okay.  And you actually had a conversation with

9    the shop owner about why the vehicle was there, correct?

10       A.   Correct.

11       Q.   And what kind of what work had been done on it?

12       A.   Correct.

13       Q.   Okay.  After Angelita Rodriguez came to pick up

14   that blue Ford Thunderbird, did you ask her if she would

15   talk to you?

16       A.   Yes, I did.

17       Q.   Okay.  Now, you knew who Angelita Rodriguez

18   was, didn't you?

19       A.   Yes, I did.

20       Q.   And how -- what was her relationship to the

21   defendant, Obel Cruz-Garcia?

22       A.   That was his wife.

23       Q.   Okay.  So, obviously, because y'all were

24   looking for him and couldn't find him anywhere, talking

25   to his wife was something pretty important to you?

1  A. Yes, it is.

2  Q. How did she respond to that?

3    MR. CORNELIUS:  Objection to the hearsay,

4 Your Honor.

5    THE COURT:  That will be sustained.

6  Q. (By Ms. Tise) Were you able to interview her at

7 that time?

8  A. Yes, I did.  I talked to her and she agreed to

9 come to the Homicide Division with us.

10  Q. Okay.  Initially, did she express some

11 hesitation?

12    MR. CORNELIUS:  Objection to the hearsay,

13 Your Honor.

14    THE COURT:  That will be sustained.

15  Q. (By Ms. Tise) I'm going to ask you not what she

16 said, but was she hesitant to talk to you --

17    MR. CORNELIUS:  I still object --

18  Q. (By Ms. Tise) -- initially?

19    MR. CORNELIUS:  Objection, hearsay.

20    THE COURT:  I'll allow her to go into her

21 demeanor in response to that question.  Not what she

22 said, sir.

23  A. No.  She agreed to talk to me.

24  Q. (By Ms. Tise) Okay.  And, ultimately, did talk

25 to you?

```
 1        A.    She did.

 2        Q.    Okay.  And how about Carmelo Martinez, did he

 3   also give you an interview?

 4        A.    Yes, he did.

 5        Q.    Okay.  Now, you were calling him Carmelo

 6   Santana?

 7        A.    Santana.

 8        Q.    Okay.  Did you talk to him?

 9        A.    I did.

10        Q.    And did you talk to them there at the scene at

11   the garage?

12        A.    No.

13        Q.    What did you do?

14        A.    I brought them to the Homicide Division.

15        Q.    Okay.  What happened next?

16        A.    We were in the Homicide Division.  I talked to

17   Angelita and she requested her attorney.

18              MR. CORNELIUS:  Objection.  Hearsay, Your

19   Honor.

20              THE COURT:  That will be sustained.

21        Q.    (By Ms. Tise) Did you have to call an

22   individual before you were able to complete your

23   interview with Angelita?

24        A.    I did.

25        Q.    And who did you call?
```

1      A.   Her attorney was Attorney Castillo.

2      Q.   Okay.  And Mr. Castillo, after talking to him,

3  were you able to complete your interview with her?

4      A.   No.  It was terminated.  Once she asked for her

5  attorney, it's over.

6      Q.   Okay.  And so, that ended that and you did not

7  get to talk to her?

8      A.   No, I did not.

9      Q.   Okay.  Later on did you make arrangements for

10  her to come in at another time to interview with you?

11      A.   The following day.

12      Q.   And did she show up?

13      A.   She showed up at 301 San Jacinto.  I went to

14  the district attorney's office to get a Grand Jury

15  subpoena.  And when I came back, she was gone.

16      Q.   Okay.  Again, did this cause you some

17  suspicions and concerns?

18      A.   Right.

19      Q.   Later on what happened next in your attempt to

20  talk to her?

21      A.   Okay.  Well, I had Sergeant Alonzo call

22  Attorney Castillo and let him know that his client was

23  not there and that she had walked away.  And then he

24  made arrangements -- Attorney Castillo made arrangements

25  to go meet with Casey O'Brien with the Grand Jury

1  subpoena, the Grand Jury was in session.  And next thing

2  we know, it was too late and the arrangements were made

3  to meet in Homicide at the homicide office.

4      Q.   So, again, she didn't show up in time to get

5  before the Grand Jury --

6      A.   No.

7      Q.   -- after y'all subpoenaed her?

8      A.   Correct.

9      Q.   Okay.  So, what was your next effort to try to

10 talk to Angelita Rodriguez?

11     A.   We met at Homicide --

12     Q.   Okay.  When was this?

13     A.   We went over and I actually took her, Attorney

14 Castillo, and we drove to the Homicide Division where we

15 sat down and we talked.

16     Q.   Okay.  And did she indicate to you that she

17 knew anything about this case?

18              MR. CORNELIUS:  Objection.  Leading and

19 suggestive and calls for hearsay.

20              THE COURT:   That's sustained.

21     Q.   (By Ms. Tise) Do you recall what the next step

22 in your investigation was or what other involvement you

23 might have had in this case?

24     A.   Did that.  And from that, we -- then the next

25 morning we called Diana and Arturo again and told them

1   we wanted to meet with them at the office.  We talked

2   with them.  We had another interview, another

3   conversation, and...

4       Q.   Y'all met with them frequently --

5       A.   We did.  We really did.

6       Q.   -- between the time of the initial abduction

7   and ultimately the finding of the complaining witness'

8   body, correct?

9       A.   We tried hard, yes.

10      Q.   Okay.  And y'all followed up on every lead you

11  got?

12      A.   Yes, we did.

13      Q.   And talked to a lot of people, correct?

14      A.   Interviewed a lot of people, yes, we did.

15              MS. TISE:  I will pass this witness.

16              THE COURT:   Thank you, Ms. Tise.

17              You may proceed, Mr. Cornelius.

18                      **CROSS-EXAMINATION**

19  **BY MR. CORNELIUS:**

20      Q.   Officer Hernandez --

21      A.   Yes, sir.

22      Q.   -- I'm pretty sure you know my name.

23      A.   Mr. Cornelius.

24      Q.   We have been friends a long time, but we've

25  never talked about this case; is that right?

1      A.   That's fine.  That's fine.

2      Q.   Okay.  I have to admit it's kind of fun to have

3   you under oath.

4           All right.  Now, I want to ask you some

5   questions about the first part of your testimony

6   concerning black or African heritage individuals,

7   Hispanics, and whites.  In 1992, when you were trying to

8   get a description of someone and entering it into the

9   police report there was actually a form that y'all used

10  for suspects, right?

11     A.   There is, but I didn't fill anything -- I

12  didn't fill any kind of form.  The only thing I put was

13  what's in the report.  What they gave me is what I put

14  down.  I didn't fill out a form.

15     Q.   I understand that, but just a general question

16  to you.

17     A.   Okay.

18     Q.   The form, if you were going to fill out a

19  report -- reports are important, right?

20     A.   Uh-huh.

21     Q.   I mean, this report is 21 years old.

22     A.   Correct.

23     Q.   So, it's important for police to fill out

24  reports because other police officers look at them,

25  D.A.s look at them, years and years go by and they're

1   relied on, correct?

2       A.   Correct.

3       Q.   And when you were doing a police report back in

4   1992 -- and I assume that's pretty much the same

5   procedure today -- if you are putting out descriptors,

6   there was a box for -- if someone is white, black, or

7   Hispanic, right?

8       A.   That's correct.

9       Q.   Now, there are some people that are of African

10  heritage that speak Spanish, correct?

11      A.   Yes, there are.

12      Q.   There are Dominicans, people from Dominican

13  Republic that are -- they're not African-Americans

14  because they are from the Dominican Republic, but

15  they're of African heritage who lived or grew up even in

16  the Dominican Republic?

17      A.   Yes.

18      Q.   You agree with me?

19      A.   I'm with you.

20      Q.   You might call one of them a black man or a

21  black woman, but they may speak Spanish?

22      A.   That's true.  Very true.

23      Q.   Okay.  Now, when you were talking to Arturo,

24  for example -- and I'm going to refer to 2.021 of your

25  report.  I think yours is numbered the same way.  2.020,

1    I think, starts your report where it says U.P.

2    Hernandez.  Do we have the same numbers?

3         A.    Uh-huh.

4         Q.    Okay.  Sometimes coming off the computer they

5    number different.

6         A.    Uh-huh.

7         Q.    All right.  Go over to the next page, 2.021.

8         A.    Yes.

9         Q.    When you were talking to him, you tried to

10   write down what he said, right?

11        A.    Correct.

12        Q.    And kind of the middle of that statement, he is

13   telling you that this man was not Mexican --

14        A.    Right.

15        Q.    -- nor a white man because of the way he spoke.

16   He spoke like a black man, right?

17        A.    That's correct.

18        Q.    And that's what he said?

19        A.    That's what he said.

20        Q.    And that's what you wrote down?

21        A.    Correct.

22        Q.    Okay.  And I think you testified on direct that

23   he first -- Arturo first denied being in the drug

24   business, right?

25        A.    That's correct.

1    Q.   For how long did he deny that?

2    A.   He never admitted it, period.

3    Q.   Okay.  Now, I guess, among inconsistencies, you

4  said that Arturo's conversation with you and Diana's

5  conversation with you were largely consistent?

6    A.   Pretty consistent.

7    Q.   But among the inconsistencies would be one

8  admitting they were in the drug business and the other

9  one denying it.  Is that fair to say?

10    A.   That's fair to say.

11    Q.   That's a pretty big inconsistency, isn't it?

12    A.   Not necessarily so.

13    Q.   Okay.  For how long did Diana deny being in the

14  drug business?

15    A.   Up to the point when I talked to her about her

16  son being murder or killed.

17    Q.   Can you recall approximately how long that was,

18  though, in terms of time?

19    A.   I'd be guessing there.  No.

20    Q.   Okay.  Well, I don't want you to guess, but I'm

21  just trying to --

22    A.   You know as well as I do, when you're having

23  that conversation, time flies when you're having fun.

24  So, we're discussing this and it just -- time just

25  flies, so you can't pinpoint time.

1        Q.   Well, you might know what time the conversation

2   started.  Do you know that?  And then there's probably a

3   time on the statement.

4        A.   Well, the time on the statement 628 hours.

5   That's 6 o'clock in the morning, 6:28, almost 6:30 in

6   the morning.

7        Q.   Okay.  And what time did you start talking, if

8   you recall or not?  I'm trying to get you to say

9   something if you don't remember.

10        A.   Well, let's just say that maybe we talked 30

11   minutes, 35 minutes.  I don't know.  I can pinpoint

12   that.

13        Q.   And this was quite a number of hours after

14   whatever happened at their apartment happened?

15        A.   Correct.

16        Q.   And so, even though she was telling you that

17   her child had been abducted, she was still not telling

18   you the truth about the drug business?

19        A.   Up until that point she admitted it, right.

20        Q.   And you were telling her, I suppose, pretty

21   much all along that it didn't -- something was missing

22   and she needed to tell you the truth.  What was your

23   primary concern?  What was the number-one thing you

24   wanted to do?

25        A.   I want to find out from her, number one, if she

1    was selling in drugs; number two, who was she dealing

2    with.  Let me know who they are.

3         Q.   And why did you want to find that out?

4         A.   That's the first person we're looking for.

5         Q.   Okay.  And the reason you want to look for him

6    was to get the child if you possibly could?

7         A.   That's correct.  The child was the number one

8    priority.

9         Q.   That was the number one priority, to get the

10   child?

11        A.   That's correct.

12        Q.   And you told her that pretty much over and

13   over, didn't you?

14        A.   I did.

15        Q.   And finally, you told her that, ma'am, listen,

16   this just looks like a drug thing, this is why -- I

17   think you explained all of that to her, right?

18        A.   Correct.

19        Q.   And she finally admitted it?

20        A.   She did.

21        Q.   But Arturo didn't?

22        A.   No.

23        Q.   Okay.

24        A.   I never asked Arturo.

25        Q.   Okay.  Look on that Page 2.021 down at the

1    bottom.

2        A.   Okay.

3        Q.   Did he say to you, and you wrote in your

4    report, he doesn't know why anyone would enter the

5    apartment and beat him up, assault his wife, and take

6    their son, they are not involved in anything, not even

7    drugs, they have nothing to hide, he doesn't know why

8    they went into his house and attacked them?  Did he make

9    that statement to you?

10       A.   Uh-huh.

11       Q.   You didn't even have to ask him, he just told

12   you:  We're not involved in drugs?

13       A.   That's what he told me.

14       Q.   Okay.  Turn over to Page 2.022.  And this is

15   after you are telling him:  This looks like a drug

16   thing, you need to tell me, this will help us with our

17   investigation.  And he says in that first full

18   paragraph, the second paragraph, the first full one:

19   Arturo advised investigators that neither he nor his

20   wife were involved in any kind of drug dealing and

21   doesn't know who would have done this or why.

22                He told you that, right?

23       A.   Right.

24       Q.   So, if he were to swear to this jury, if he

25   took an oath and swore to this jury that he told y'all

1  all about how he was involved in drug dealing, that

2  wouldn't be a matter of him just forgetting, that just

3  wouldn't be true, would it?

4            MS. TISE:  I'll object to him violating the

5  Rule, talking about what the witness' testimony was.

6            THE COURT:  That will be sustained.

7      Q.  (By Mr. Cornelius) Well, the prosecutor was all

8  of these questions about discrepancies, people forget

9  things over time, they may make mistakes.  Do you think

10  that's something that somebody would forget, whether

11  they were actually trying to help the police find a

12  6-year-old boy by telling them they were a drug dealer

13  or not?

14            MS. TISE:  I object.  That calls for

15  speculation.

16            THE COURT:  Sustained.

17      Q.  (By Mr. Cornelius) Did either Diana or Arturo

18  tell you about the fact -- well, I won't call it fact --

19  tell you a story about being burglarized approximately a

20  month before this happened?

21            MS. TISE:  I'll object.  That calls for a

22  hearsay response.

23            MR. CORNELIUS:  Well, it's just a

24  complete -- I mean, they have gone all through the

25  statement.

1                    MS. TISE:  Actually, we haven't, but we'd

2    be glad to.

3                    THE COURT:  All right.  No sidebar from

4    either side.

5                    The question is regarding Arturo and

6    Diana's statement.  Could you ask the question again,

7    sir?

8                    MR. CORNELIUS:  Yes, I will.

9        Q.   (By Mr. Cornelius) Do you recall -- and refer

10   to your report if you need to -- either Diana or Arturo

11   telling you about their place being burglarized

12   approximately a month before the night of all of this

13   incident?

14                   MS. TISE:  My objection calls for hearsay.

15                   THE COURT:  That will be overruled.

16       A.   No.

17                   MR. CORNELIUS:  Could I have just a moment,

18   Judge?

19                   THE COURT:  Yes.

20                   MR. CORNELIUS:  Can I have a second to look

21   through the notes, Judge?

22                   THE COURT:  Yes.  I'll give you a few

23   seconds.

24                   (Pause)

25       Q.   (By Mr. Cornelius) Okay.  On Page 2.023 with

1    respect to your interview with Diana Garcia, the

2    prosecutor was asking about descriptions of a mask?

3         A.   Correct.

4         Q.   And you were trying to get any kind of

5    description or descriptor you could get, correct?

6         A.   Correct.

7         Q.   And so, did Diana tell you that the mask that

8    this black man had on was blue and brown?  What did she

9    say it was?

10        A.   Diana?

11        Q.   Yeah.

12        A.   That was it white and red.

13        Q.   White and red?  The tall black man?

14        A.   Uh-huh.

15             MR. CORNELIUS:  Pass the witness.

16             THE COURT:  Thank you, Mr. Cornelius.

17             Do you have anything else?

18             MS. TISE:  No further questions, Judge.

19             THE COURT:  Thank you, Ms. Tise.

20             May the witness be excused?

21             MS. TISE:  Yes.

22             MR. CORNELIUS:  Certainly, but we'd like

23    him on-call.

24             THE COURT:  Okay.  You are excused, but

25    subject to recall.

```
 1                    THE WITNESS:  It's okay.  Thank you.
 2                    THE COURT:  You may step down at this time.
 3                    THE WITNESS:  Thank you.
 4                    THE COURT:  Please call -- everyone doing
 5    all right?
 6                    Please call your next witness.
 7                    MR. WOOD:  State calls Agent Eric Johnson.
 8                    Judge, we need to approach briefly before
 9    this witness.
10                    (At the Bench, on the record)
11                    MR. WOOD:  Judge, this witness will talk
12    about his investigation in this case.  One of the
13    elements of his investigation is, obviously, once the
14    defendant becomes a fugitive that triggers -- on October
15    8th of '92, when the defendant fails to appear for a
16    court date and then they learn that he has fled to
17    Puerto Rico.  So, I'm bringing this up now because we
18    would seek to elicit testimony from Agent Johnson about
19    his knowledge of the fact that the defendant fled from a
20    Court date -- or scheduled court date and failed to
21    appear.
22                    THE COURT:  Say that --
23                    MR. WOOD:  For a criminal probation case.
24                    THE COURT:  How do you propose you do that?
25    How are you going to do that?
```

```
 1                    MR. WOOD:  Well --
 2                    MS. TISE:  We have a bond forfeiture that's
 3      certified showing the bond forfeiture.  We're offering
 4      this to show -- so it is an exception.  We're offering
 5      the extraneous offense for certain specific purposes
 6      that are listed, but that's why it is relevant.
 7                    THE COURT:  Let's take the jury out and
 8      discuss it.
 9                    (Open court, defendant and jury present)
10                    THE COURT:  Okay.  Let's take a ten-minute
11      break.  Okay?  So, I'd ask the jury to step out.  And I
12      will remind you that you are not to talk amongst
13      yourselves or with anyone else on any subject connected
14      with this trial or to form any opinion -- or express any
15      opinion or form any opinion until the end of the trial.
16      Ten minutes.
17                    THE BAILIFF:  All rise.
18                    (Open court, defendant present, no jury)
19                    THE COURT:  All right.  Have a seat.
20                    All right.  Let's have a short hearing
21      outside the presence of the jury as to what you propose
22      this witness is going to say and then we'll determine
23      what, if anything, is admissible in regards to the
24      extraneous.  Okay?  Can we go through just that portion
25      real quickly?  Not his entire testimony.
```

1              MR. WOOD:  Do you want me to make a proffer

2   or --

3              THE COURT:  Go ahead and make your proffer

4   because I don't know all of the questions that he should

5   be asked or to hone in on.  So, go ahead and make your

6   proffer as to what you are proposing is an extraneous

7   offense or extraneous conduct that you feel is

8   admissible at this point

9              MR. WOOD:  And, I guess, Judge -- sorry --

10  you want me to do that informally just between you and

11  I, or you want me to do that by asking the witness

12  questions?

13             THE COURT:  Ask the witness questions.

14             MR. WOOD:  Okay.

15                         **ERIC JOHNSON,**

16  having been first duly sworn, testified as follows:

17                    **VOIR DIRE EXAMINATION**

18  **BY MR. WOOD:**

19    Q.   Agent Johnson, for purposes of this hearing, I

20  want to focus on your investigation of the defendant in

21  this case, Obel Cruz-Garcia, and when you became

22  involved in that investigation.

23             Did you become involved on or about October

24  1st of 1992?

25    A.   Yes, I did.

1      Q.   And soon after you became involved in the

2   investigation of this matter, did the defendant, Obel

3   Cruz-Garcia, become a primary suspect in the case?

4      A.   Yes, he did.

5      Q.   And at some point early on in the investigation

6   did you learn that the defendant had possibly left the

7   jurisdiction?

8      A.   That is correct.

9      Q.   And do you recall approximately what point it

10  was that you learned that?

11     A.   Probably within the first couple of weeks after

12  the kidnapping we learned that he had left the country.

13     Q.   In fact, during the first week or so,

14  specifically October 8th, 1992, did you learn that the

15  defendant had a regularly-scheduled court appearance

16  that he was due to be in court for?

17     A.   Yes.  We learned and determined that he had a

18  court appearance on October 8th that he was supposed to

19  attend.

20     Q.   And that was for a court appearance for a

21  Harris County criminal case?

22     A.   Yes, that's correct.

23     Q.   And did the defendant appear for that court

24  date?

25     A.   He did not.

 1      Q.   After that time, did you learn information from

 2  an individual that you spoke to by the name of Angelita

 3  Rodriguez that the defendant had left the jurisdiction?

 4      A.   Yes.  Actually, two days before the 8th,

 5  Angelita Rodriguez had advised us that he had left the

 6  United States.

 7      Q.   And in response to the defendant not appearing

 8  for that court appearance on October 8th, did you --

 9  were actions taken on behalf of your agency in response

10  to that?

11      A.   Yes, that is correct.

12      Q.   What were those actions?

13      A.   I obtained an unlawful flight to avoid

14  prosecution warrant in an effort to locate the

15  defendant.

16      Q.   And at that point did your investigation shift

17  into a fugitive apprehension type investigation?

18      A.   That is correct.

19      Q.   And from that point on -- how early on in the

20  investigation did your investigation shift to that

21  fugitive apprehension aspect?

22      A.   Quickly after the initial abduction, we were

23  looking to try to locate the defendant.  And then once

24  we determined that he was not within the United States,

25  we shifted to the fugitive investigation because that's

1    where the answers would be.

2        Q.   And is that where the bulk of your

3    investigation fell, was on the fugitive side of it?

4        A.   Yes, that's correct.

5                    MR. WOOD:  Judge, I'll pass him for

6    purposes of this hearing.

7                    MR. CORNELIUS:  I don't have any questions.

8                    THE COURT:  Okay.  Let me ask a couple of

9    question.

10                    Okay.  And this is for purposes of the

11   record.  We didn't introduce you.  You are Special Agent

12   Eric Johnson?

13                    THE WITNESS:  Yes, ma'am.

14                    THE COURT:  And you were sworn in; is that

15   correct?

16                    THE WITNESS:  That's correct.

17                    THE COURT:  They kind of skipped those

18   pieces of the process.

19                    All right.  So, the Harris County criminal

20   case, that was a misdemeanor case, did you say?

21                    THE WITNESS:  No.  It was a felony.  It was

22   actually a felon in possession.

23                    THE COURT:  So, it was a felon in

24   possession of a firearm?

25                    THE WITNESS:  No.  Felon in possession of

1    drugs, cocaine.  And that was filed on July 17th of

2    1992.

3                   THE COURT:  Okay.  So, that case was

4    pending at the time this case allegedly occurred,

5    correct?

6                   THE WITNESS:  Yes, ma'am.

7                   THE COURT:  And then he did not appear in

8    court.  And what was the date he did not appear?

9                   THE WITNESS:  October 8th, 1992.

10                  THE COURT:  Okay.  And so, when he did not

11   appear, there was a -- I suppose his bond was forfeited

12   and there was a --

13                  THE WITNESS:  Warrant issued by the State

14   of Texas for his arrest.  Then the Harris County

15   District Attorney's Office on October 15th requested

16   assistant in locating the defendant and I filed the

17   unlawful flight to avoid prosecution warrant on

18   October 16th.

19                  THE COURT:  Now, how does this unlawful

20   flight to avoid prosecution, how did that -- how was

21   that pivotal in you obtaining the information on the

22   fugitive or the further evidence that you obtained on

23   the fugitive?  Did it at all?  In other words, did you

24   need that -- did you need that warrant or --

25                  THE WITNESS:  Yes, absolutely.  I needed

1   that warrant to be able to legally search for the

2   defendant throughout the United States, wherever he may

3   be, for us to open a file and search.

4               THE COURT:  For you to open a file, your

5   processes?

6               THE WITNESS:  Yes, absolutely.

7               THE COURT:  But having found him in Puerto

8   Rico -- and I think that's where we're leading to, is

9   finding him in Puerto Rico -- did you need that -- did

10  you need that warrant to find him in Puerto Rico?

11              THE WITNESS:  Yes.  In order for federal

12  agents to conduct investigations, there has to be a

13  violation of federal law.  The violation of federal law

14  in this instance was the unlawful flight to avoid

15  prosecution case to locate the defendant.  And so, when

16  I sent leads to other field offices, that is what the

17  premise they were working on, was to locate him.

18              THE COURT:  Okay.  And then I suppose you

19  are going to have -- are you here to testify also about

20  obtaining his DNA evidence from Puerto Rico when you

21  found him?

22              THE WITNESS:  No.

23              THE COURT:  Okay.  You are not?

24              THE WITNESS:  No.

25              THE COURT:  Okay.  Mr. Wood, I believe that

1   this witness could testify regarding everything that he

2   did without mentioning the warrant that he had to obtain

3   procedurally for the United States to -- you know, for

4   his inner processes so that he could investigate and go

5   after this defendant wherever he was within the United

6   States or Puerto Rico.  I believe we could proceed with

7   him testifying regarding that without going into the

8   fact that he was charged with the unlawful flight and

9   got that warrant.  I believe we can do that.  Do you see

10  any reason why we could not?

11              MR. WOOD:  Well, if -- so the Court would

12  not be -- not allowing us to go into the defendant's

13  flight from this jurisdiction, being Harris County.  I

14  mean, if they came upon information and learned that

15  they felt that he had left the jurisdiction, his flight

16  from Harris County is something that's permissible.

17              THE COURT:  I'm not talking about not being

18  able to go into it.  I'm talking about calling it

19  criminal behavior by a charge.  Okay?  That's what

20  I'm -- is there a reason why that we need to go into

21  that?

22              MS. TISE:  Let's make a distinction here.

23  We don't necessarily have to go into the fact that they

24  charged him with unlawful flight to avoid prosecution.

25              THE COURT:  Very good.  Okay.

1           MS. TISE:  But what we'd like to go into is

2    the fact that he bond-forfeited on his PCS case.

3           THE COURT:  Okay.  Well, we're getting to

4    that part.  Yeah.

5           MS. TISE:  That's what we want to do.

6    We've got the bond forfeiture paperwork, certified

7    copies.  And we think that's important because that's

8    physical hard evidence of flight.  Otherwise, we have

9    witnesses who can testify to flight.

10          THE COURT:  Exactly.

11          MS. TISE:  That piece of paper showing he

12   fled, we would like to offer into evidence.  The fact

13   that it's a PCS case, as far as your balancing test of

14   probative versus prejudicial, the probative value is

15   going to be very important to show flight in this case,

16   which is a critical part of our case.  And the

17   prejudicial effect of it is going to be minimal because

18   the jury has been hearing all day long about drug

19   dealing.  That's part of -- part and parcel of this

20   case.

21          So, we would like to be able to offer that.

22   I don't think we necessarily have to go into the fact

23   that there was an actual federal charge, but we do have

24   the -- you know, as long as the federal agents can talk

25   about the fact they were participating and looking for

1   him.

2           THE COURT:  Okay.  So, I'm going to rule he

3   cannot go into the fact that there was a federal charge,

4   that he obtained a warrant for unlawful flight, even

5   though you're going to be talking about the flight, but

6   I still have an issue with -- I think we can get into

7   the bond forfeiture -- or him not showing up in court

8   without calling it a bond forfeiture or without talking

9   about why he was in court.  Because at this point still

10  we may have testimony from the complainants that he was

11  involved in drugs.  We don't have any admission from the

12  defendant that he was involved in drugs.  So, it's still

13  an extraneous offense.  I think it is still prejudicial

14  and it was an unproven offense in that it was still only

15  a charged offense.  He was not convicted of it or

16  anything.

17          And so, I think -- and I will take your

18  input on it as well, Mr. Cornelius, but I think at this

19  point I don't see any problem with going into the fact

20  he was supposed to appear in a courtroom and he did not.

21          MS. TISE:  I think it's very important,

22  though, for the jury to know that it's not just that he

23  didn't show up, and, you know, and he got -- he actually

24  had posted a bond that he forfeited.

25          THE COURT:  Okay.

1          MS. TISE:  The severity of what he did is

2    important and relevant to show the nature of his flight.

3    And it was on a felony case.  So, this was no small

4    matter.  I think that that's something they should know.

5    And I think that under the Code, under 404(b), the

6    appropriate analysis, it's an extraneous offense, but as

7    long as we're not offering it for character conformity,

8    we're offering it for another purpose.

9          THE COURT:  What's the purpose?

10         MS. TISE:  Which in this case is flight.

11         THE COURT:  Okay.

12         MS. TISE:  That is totally relevant.  And

13   in addition, the prejudicial value would be minimal

14   because of the fact that they've already been hearing

15   about the drugs.

16         THE COURT:  How about the -- I'll look at

17   what 404(b) says specifically and see if I feel that it

18   fits any of the exceptions that it would be available

19   under.

20         But then let's talk about the hearsay of

21   Angelita telling him that he is in Puerto Rico.  Because

22   that's hearsay.  I see Angelita on your witness list,

23   but at this point it's hearsay.

24         MS. TISE:  I agree with that.

25         MR. WOOD:  Yeah.

1           MS. TISE:  We can wait and get that

2   information in through Angelita and Rudy and some other

3   individuals who have knowledge of that.

4           THE COURT:  So, without going into her

5   telling him that he is in Puerto Rico, you intend to --

6           MR. WOOD:  The only way we would be able to

7   -- I mean, obviously, if we are not able to go into what

8   he had learned from Angelita regarding the defendant's

9   flight, and that being hearsay, then the only basis for

10  which he could testify about the flight would be the

11  October 8th missed court date.

12          THE COURT:  Correct.  I think he'd still be

13  able to say he didn't show up, but how does he know he

14  is in Puerto Rico?  You don't have to tell the jury why

15  he doesn't know -- why he knows he is in Puerto Rico, if

16  he talks about that where he found him.  I don't think

17  we have to make that leap until Angelita testifies, but

18  I don't know how much further you are going to go with

19  his testimony.  I know you've just put on a proffer

20  right now.

21          So, Mr. Cornelius, as per -- so, he's not

22  going to go into the warrant for unlawful flight issued

23  by the federal government and we're not going to go into

24  the hearsay of Angelita at this point.  What do you say

25  as to the evidence of the bond forfeiture and his flight

1  by not showing up at a criminal case here in Harris

2  County?

3          MR. CORNELIUS:  I'm trying to find where I

4  have notice of this.

5          MR. WOOD:  Oh, you have notice of this.

6          MR. CORNELIUS:  I'm sure I do.

7          MR. WOOD:  You have notice of the federal

8  and of the PCS case.

9          MR. CORNELIUS:  Is it the last revised?

10          MR. WOOD:  It was on the initial and the

11  revised and the revised amended 404 notice.

12          MS. TISE:  Both the federal deal and the

13  bond forfeiture.

14          MR. CORNELIUS:  Are you talking about the

15  notice that Angelita is going to testify to this stuff

16  or something else?

17          MR. WOOD:  No.  On the 404(b) notice on the

18  original, there is notice that --

19          MR. CORNELIUS:  Is this the June 20th one?

20          THE COURT:  I have the file here if you

21  need to look at anything that's in the file.

22          MS. TISE:  It's right here on Page 2.  It's

23  the last notation.  Defendant was charged with the

24  offense of felony possession of cocaine and failure to

25  appear in the United States District Court for the

1  Southern District of Texas.  It was connected to the

2  bond forfeiture of the possession of controlled

3  substance charge arising out of the 337th District Court

4  of Harris County, Texas.

5              THE COURT:  It was out of this court?

6              MS. TISE:  Yes, it was.

7              MR. CORNELIUS:  Okay.  I got notice.  That

8  satisfies that.

9              THE COURT:  Okay.  So, having had notice,

10 do you have an argument?  Do you object to it coming in?

11             MR. CORNELIUS:  I do.  I do.  First of all,

12 404(b) doesn't apply to this.  Do you find anything on

13 404(b)?

14             THE COURT:  I'm looking at 404(b) and it

15 says that it could be admissible for purposes of other

16 than to prove the character, which would be proof of

17 motive, opportunity, intent, preparation, plan,

18 knowledge, identity, absence of mistake, or accident,

19 provided that upon timely request, which you've said

20 you've gotten, you received reasonable notice.

21             So, your argument is that the flight, the

22 proof of the flight is preparation, plan, or knowledge

23 of this --

24             MS. TISE:  No, Your Honor.  404(b) has a

25 list on there, but there is ample case law that says

1    it's not an exhaustive list.

2                THE COURT:  Sure.  Do you have any case

3    that applies to flight?

4                MS. TISE:  I actually e-mailed Alan Curry

5    when we started this conversation and he hasn't gotten

6    back to me, but I will be happy to try and get you some;

7    but I do feel like that the statute itself is very

8    clear.  It says any extraneous offense as long as it's

9    not being offered for character conformity, but it's

10   being offered to prove something additional like intent

11   or motive.  This is flight.  Flight has been -- and I

12   know you are aware of this, but it's been held many

13   times it's something that you can show in the guilt

14   phase of trial as consciousness of guilt.  And so, that

15   is something we're offering it for independent of any

16   character conformity.

17               So, I can work on getting cases.  I don't

18   know how quickly I can do that, but I do think this is a

19   pretty clear example of what 404(b) allows.  It's

20   clearly an extraneous offense, which is what 404(b) is

21   for, and it creates exceptions outside of character

22   conformity.

23               THE COURT:  Let's be clear.  If I admit --

24   and I'm thinking about doing that -- I would like to see

25   the case law on it first, but it would be only

1  admission -- only admitting the fact that he did have a

2  case in the 337th District Court that he was on bond for

3  and he gave up that bond, basically forfeited that bond,

4  to leave, did not show up.  He is not going to be able

5  to say where at this point

6              MS. TISE:  Okay.

7              THE COURT:  But I'm not going to let in

8  what he was charged with.

9              MS. TISE:  Okay.  A felony case to show the

10 significance?  It's not like he was charged with a

11 Class C misdemeanor.  I mean, he had a bond on a felony

12 case.  I think that's important to show the flight.

13             THE COURT:   Well, I know you would like to

14 get into it as much as possible, but I think the fact

15 that it is a criminal case where he is risking his

16 liberty is significant.  And I think the further you go,

17 the more likely it is to be more prejudicial than

18 probative for this jury.  I think you are going to get

19 your point across by showing that it was a criminal case

20 where he is risking his liberty to not show up for

21 court.  And whether it's a felony or misdemeanor or what

22 type it is, it just adds to the prejudicial effect, in

23 my opinion.

24             MS. TISE:  Okay.

25             THE COURT:  Do you have any input on that,

1  Mr. Cornelius?

2            MR. CORNELIUS:  No.  I'm satisfied with the

3  way you are analyzing it.  And I'm going to make a 403

4  objection to what you are doing.

5            The other thing I was going to comment on,

6  though, is even if you let this in, I have not made any

7  objections to the hearsay.  I haven't heard the agent

8  say anything that's isn't hearsay.

9            THE COURT:  I understand that.  I was just

10  going to jump in ahead because I didn't want to have to

11  take the jury out again when we got to that part, but I

12  assume -- because what he testified is that the only

13  information he had as to where the defendant was was

14  from Angelita -- is that her name -- Angelita.  And if

15  he testified to that, that would be hearsay.  If you are

16  not going to object to that, then we can go ahead with

17  this witness immediately.

18            MR. CORNELIUS:  Well, I am going to object.

19  I'm going to object to everything he said so far because

20  it's all hearsay.  I mean, I didn't hear that he was in

21  the Court and saw the -- I mean --

22            MS. TISE:  The bond forfeiture paperwork is

23  a certified, it's a public record.  And we'll be

24  offering it that way.  He is going to happen to be on

25  the stand when we offer it, but we don't need him to

1    prove that paperwork up.  We'll have to redact it

2    because it says possession of a controlled substance on

3    it.

4              MR. CORNELIUS:  I'm confused as to what he

5    would be --

6              MS. TISE:  We have a lot of other things.

7              MR. CORNELIUS:  Other things other than

8    this?

9              MS. TISE:  Yes.

10             MR. CORNELIUS:  Well --

11             MS. TISE:  He was really involved in the

12   investigation.  We just were limiting this particular

13   proffer to this position.

14             MR. CORNELIUS:  I appreciate y'all giving

15   me the chance to object to it.  So, his testimony about

16   what he did on this investigation, you know, okay,

17   that's fine.

18             THE COURT:  Okay.  That's what we're going

19   to allow --

20             MR. CORNELIUS:  As far as the proffer is

21   concerned, I have not heard anything that wasn't

22   hearsay.

23             THE COURT:  Okay.  I will allow him to go

24   into -- I will allow the admissibility of the bond

25   forfeiture paperwork on that case as long as it's

1  redacted as to -- I'd have to look at it.  Obviously,

2  the offense.

3                MR. WOOD:  Based on what you've said so far

4  as far as your ruling goes, it's going to have to be

5  redacted as to the offense -- as to the offense and then

6  any mention of the word felony.

7                THE COURT:  Okay.

8                MR. WOOD:  I have looked through there and

9  there is no other mention regarding -- that would

10  indicate felony, misdemeanor, or reference to the

11  offense named.

12                MR. CORNELIUS:  So, you are not just

13  offering the fact that there was a bond forfeiture, you

14  want the whole docket sheet in?

15                MR. WOOD:  That's the only -- I mean, if

16  the objection is going to be hearsay about how he

17  learned about the bond forfeiture, then this would be

18  the vehicle by which to get into the bond forfeiture.

19                MR. CORNELIUS:  Your Honor, I object to all

20  of the court settings and all the notations on all of

21  the court settings and all that stuff as being hearsay.

22                MS. TISE:  It's important because it shows

23  that he was showing up for court until all of this

24  happened and then he bond-forfeited, he fled.

25                MR. CORNELIUS:  It has to be relevant.

1          MS. TISE:  It is relevant.

2          THE COURT:  I don't think going into all of

3    the settings he has had or anything like -- let me see

4    the docket sheet.

5          MR. WOOD:  I will show you the document.

6          (Brief pause)

7          THE COURT:  Back on the record, Mary Ann.

8          Do you have any further argument after

9    looking at those cases?  I know you are not agreeing to

10   it coming in, but is there anything that pops out in

11   those cases that would cause you to argue that they are

12   not on point?

13         MR. CORNELIUS:  Well, the only one I have

14   gotten is the Cantrell case.  It has a lot of the cases

15   cited in it.  It's the closest one.  It's a bond

16   forfeiture case, but it is a bond forfeiture in the case

17   on trial.

18         THE COURT:  Well -- and so, I understand

19   that, but all we're going to allow in is the fact of a

20   bond forfeiture anyway.  We are not going to allow in

21   the details of that case or even what the case is.  And

22   I believe was Cantrell talks about is that forfeiture of

23   the accused's bail bond may be proof as tending to show

24   flight.  And flight in the context of bail jumping may

25   be construed as evidence of guilt.  And I don't think

1  that's necessarily just attached to the case that they

2  are charged with.  In this particular case, it was never

3  charged.  It's the fact that he is bail jumping in

4  general where there is, like we talked about, a risk of

5  his liberty, where there is a risk of losing money

6  because he is on bail.  So, that's the way I'm reading

7  it.

8          MR. CORNELIUS:  Well, I'm not arguing with

9  you, but it just would appear to me that if somebody

10  jumps a bond on their own case, that's going to show

11  flight a lot more than not showing up for some other

12  case.  I mean, jumping bond on their own case is pretty

13  good evidence of flight.

14          THE COURT:  And your point is taken, but

15  I'm going to allow in the docket sheet.  And, in fact,

16  the docket sheet tends to indicate that there was a

17  number of court settings and that he showed up for each

18  court setting.  It doesn't show a lot, other than just

19  that he showed up.  And then all of a sudden, after the

20  occurrence of this crime, the next time he bond

21  forfeits.  So, I believe that -- you know, that's going

22  to be a question for the jury to decide, but I think it

23  certainly is something that's relevant as to whether he

24  fled or not.  And it may be construed as evidence of

25  flight and evidence of guilt because of the bail

1   jumping.  So, I'm going to allow that in, but I will --

2   I do want to note that it will be a redacted portion of

3   that, where any mention of felony is redacted off and

4   any mention of the offense that he is charged with is

5   redacted off.  And you are not to mention that as well,

6   Special Agent.

7               THE WITNESS:  Yes, ma'am.

8               THE COURT:  Any mention that it was felony

9   offense or the type of offense, you are not to mention.

10  Specifically that he was on bond in a case and failed to

11  show.  I think it mentions on there what type of bond it

12  was.  It was a 5,000-dollar bond to start with and then

13  I think it was forfeited and doubled.

14              MR. WOOD:  I'm going to show Skip the --

15              THE COURT:  The redacted portion?

16              THE WITNESS:  Should I use the term

17  fugitive investigation?  Don't use that term.

18              THE COURT:  Well, there's been no objection

19  to that, but I think that your term fugitive

20  investigation is not so offensive because, obviously,

21  it's just your term, but I don't believe that -- in

22  fact, I'm ordering that the evidence that there was an

23  additional federal case filed on him due to flight is

24  inadmissible.  So, don't go into that additional

25  warrant.  And that warrant was based on this information

1    we're talking about.

2                    THE WITNESS:  Yes, ma'am, correct.

3                    MR. CORNELIUS:  Well, I do object to him

4    calling my client a fugitive and that separate

5    extraneous offense.

6                    MR. WOOD:  Well, he was a fugitive at that

7    point.

8                    MR. CORNELIUS:  Well, I object to it.

9                    MS. TISE:  And flight and the fact that he

10   is a fugitive is evidence of guilt, it's conscious --

11                   MR. CORNELIUS:  Well, how is he a fugitive

12   when he wasn't even charged?

13                   MR. WOOD:  He's a fugitive from this case.

14                   MR. CORNELIUS:  But --

15                   THE COURT:  I want to make it clear that

16   he's not charged in this case.  So, let's just stay away

17   from the term fugitive.  You can refer to him in

18   every -- the suspect, the -- not even the accused at

19   that point, but you can refer to him but just don't use

20   the word fugitive.  And I'm not going to allow in the

21   other -- the item that you filed on him, the warrant.

22   And I'm not going to allow any hearsay at this point,

23   but I will allow in the bond forfeiture sheet and --

24   with the redaction that we've made.  Okay?

25                   MR. CORNELIUS:  And so you know, I objected

1  to all these different settings and what happened on

2  these settings as not being relevant for the purpose

3  it's being offered.  And you ruled on that, to allow

4  them in.  Is that my understanding?

5           THE COURT:  I will.  Because after looking

6  at them, it was clear to me that he had chose a pattern

7  that he showed up each and every time until this case

8  happened.

9           MR. CORNELIUS:  Okay.

10          THE COURT:  That's why I believe that's

11 relevant.

12          MR. CORNELIUS:  Okay.  When I'm saying

13 okay, I'm not agreeing.  I'm agreeing that I understand

14 what you are saying.  So, my objections are that this is

15 an extraneous offense --

16          THE COURT:  Correct.

17          MR. CORNELIUS:  -- and that in my opinion,

18 it does not show -- does not comport with my

19 understanding of 404(b) or the case law the State has

20 provided.  And even if the Court does rule that it's

21 admissible, I make a 403 objection that the prejudice to

22 the defendant outweighs the probative value.

23          THE COURT:  Okay.  And specifically I'm

24 going to rule that -- what is that State's exhibit

25 number?

```
 1              MR. WOOD:  36, Your Honor.

 2              THE COURT:  36 is admitted subject to the

 3    redactions that we discussed, which it's not to mention

 4    any felony, it's not to mention the charge that was made

 5    on the docket sheet, a certain charge.  And that's

 6    admissible.  And that's admissible under -- even though

 7    it is an extraneous, a bad act, it's admissible -- it's

 8    admissible and its probative value does not outweigh the

 9    effect of it to show the defendant's flight from this

10    offense and that the bail jumping on that case may be

11    construed as evidence of flight, and, perhaps, evidence

12    of guilt in this case for the jury to determine.

13              Are we all clear?

14              MR. WOOD:  Yes.

15              THE COURT:  In addition, on the record,

16    before we bring the jury out, I want to be sure that the

17    witness is clear not to go into any hearsay, not to

18    mention the warrant obtained federally as fugitive

19    status, and not to call the defendant a fugitive at this

20    point.  Okay?  He was not charged with this offense at

21    this point.

22              THE WITNESS:  Yes, ma'am.

23              THE COURT:  You can make that clear.  He

24    was not charged with this offense at this point.  Okay?

25              THE WITNESS:  Yes, ma'am.
```

 1            THE COURT:  Both sides ready to have the

 2  jury come back out?

 3            MR. CORNELIUS:  Yes, Your Honor.

 4            (Open court, defendant and jury present)

 5            THE COURT:  Please be seated.

 6            I'm sorry for the short delay.  We're ready

 7  to proceed with the State's next witness, who's been

 8  called, Special Agent Eric Johnson.  For the record,

 9  this witness has been sworn.

10            Please proceed, Mr. Wood.

11            MR. WOOD:  Thank you, Your Honor.

12                        **ERIC JOHNSON,**

13  having been first duly sworn, testified as follows:

14                    **DIRECT EXAMINATION**

15  **BY MR. WOOD:**

16      Q.   Agent Johnson, can you introduce yourself, with

17  your full name, to the ladies and gentlemen of the jury?

18      A.   Yes.  My name is Eric Johnson.

19      Q.   And, Agent Johnson, how are you currently

20  employed?

21      A.   I'm employed as a special agent with the

22  Federal Bureau of Investigations.

23      Q.   I want to talk to you a little bit about your

24  background.  Where did you go to school?

25      A.   I went to Western Illinois University in

1    Macomb.

2         Q.   What did you do after finishing there at --

3    with college?

4         A.   After attending college, I graduated and I

5    received a commission in the United States Army as a

6    second lieutenant.

7         Q.   How long did you serve in the Army?

8         A.   I served in the Army for four-and-a-half years

9    and resigned after that to come into the FBI.

10        Q.   When you left the Army, at what rank did you

11   leave?

12        A.   I left at the rank of captain.

13        Q.   From the Army, you then went into the FBI.  Is

14   that what you just said?

15        A.   Yes, sir, that's correct.  In 1989.

16        Q.   And tell me about how you got involved with the

17   FBI.

18        A.   When I was first employed by the FBI, I

19   attended Quantico, the basic academy.  And after

20   attending Quantico, I was assigned to the Houston

21   division of the FBI and assigned to a violent crime

22   squad.

23        Q.   What kind of work did you do within that

24   violent crime squad?

25        A.   On the violent crime squad, we investigated all

1   federal violations involving matters such as bank

2   robberies, kidnappings, extortion, murder-for-hires,

3   anything involving violent crime activity that has to do

4   with federal crimes.

5       Q.  How long did you work in that capacity?

6       A.  I worked in that capacity for approximately 10

7   years and served in different positions while I was on

8   the squad.

9       Q.  Did you also have an opportunity to work in the

10   area of hostage negotiations?

11       A.  Yes, I did.  I was a hostage coordinator for

12   the Houston division and part of the crisis -- the

13   national crisis negotiations team.  I was also the

14   kidnapping coordinator at one point for the Houston

15   division.

16       Q.  From Houston, did you then go on to FBI

17   headquarters?

18       A.  Yes, sir, I did.  I went in 2000 to the FBI

19   headquarters and served as a supervisor on violent

20   crime, violent street gang unit at headquarters.

21       Q.  And where did you go from there?

22       A.  From headquarters, I was assigned to

23   Springfield, Illinois.  And I supervised three of our

24   satellite offices in Illinois.  I supervised Peoria, the

25   Rock Island R.A., and the Bloomington R.A.

 1     Q.   And how long did you serve in that role?

 2     A.   I served in that role for approximately three

 3  years before deciding to take an assignment back in

 4  Houston.

 5     Q.   How long have you been back here in Houston?

 6     A.   Been back in Houston since 2007.

 7     Q.   And what have you been doing since you've been

 8  back here?

 9     A.   Once I returned to Houston, I worked as the

10  counter-terrorism coordinator, I worked on a

11  counter-terrorism squad.  And now I'm a polygraph

12  examiner.

13     Q.   So, other than that busy work, you find some

14  time to deal with some basketball, don't you?

15     A.   Yes, sir.  On the side, I do coach basketball.

16     Q.   You coach?

17     A.   Yes, sir.

18     Q.   Agent Johnson, I want to direct your attention

19  back to 1992.  How were you employed back then?

20     A.   I was employed as a special agent on the

21  violent crime squad in the Houston division.

22     Q.   And was that semi early on in your time in

23  Houston?

24     A.   Yes, it was very early on.  I was assigned to

25  Houston in December of 1989.

1     Q.   Back then during specifically September,

2  October of 1992, what were your responsibilities?

3     A.   I was working on the violent crime squad and we

4  were investigating bank robberies, kidnappings, anything

5  that had to do with violent crime that the federal

6  government investigates.

7     Q.   Were you assigned at some point to become

8  involved in the investigation of the kidnapping of -- or

9  abduction of Angelo Garcia, Jr.?

10     A.   That is correct, I was.

11     Q.   How did you become involved in this case?

12     A.   Our office was notified on I believe -- it was

13  either October 1st or September 30th of the kidnapping

14  of Angelo Garcia.

15     Q.   And tell the ladies and gentlemen of the jury

16  how it is that you, as a federal agent, would become

17  involved in a kidnapping of that nature?  How was it

18  that you were called into that case?

19     A.   For the federal government or the FBI to be

20  involved in a kidnapping investigation, normally it has

21  to involve interstate connection.  That means some sort

22  of connection between states.  When it involves kids of

23  tender years, children under the age of 12, we

24  immediately become involved in those investigations.

25     Q.   So, in those types of investigations, do you

1    work many times hand-in-hand with local police law

2    enforcement?

3        A.   Yes, that's correct.   We work hand-in-hand with

4    the local law enforcement detectives and provide support

5    where we can provide support for them.

6        Q.   Did y'all respond to the scene over off of

7    Fairway in Houston, Texas, back on September 30th, 1992,

8    October 1st, 1992?

9        A.   Yes, we did.

10       Q.   What was your initial involvement in this case

11   or what did you initially do?

12       A.   Well, I have to admit it was a long time ago,

13   but our initial involvement was to go out and assess the

14   scene and coordinate with the investigators assigned the

15   case by the Houston Police Department.   And, again,

16   provide whatever support we can provide to them through

17   our resources.

18       Q.   Did you begin working with the Houston Police

19   Department officers on this case from the beginning?

20       A.   Yes, I did.

21       Q.   And what were some of things that y'all did

22   either alone or jointly in the beginning of your

23   investigation?

24       A.   Some of the investigations we conducted joint

25   interviews or we would be present during their

1   interviews.  We would provide phone records, subscriber

2   information assistance to them.  Later on in the

3   investigation, we provided some surveillance assistance

4   and other things.

5        Q.   Did you have an opportunity to talk to

6   individuals and investigate different individuals in the

7   neighborhood of that location?

8        A.   Yes, I did.

9        Q.   And were you personally involved with that?

10       A.   Yes, sir, I was.

11       Q.   Did you also have an opportunity during your

12  investigation to meet with and interview, I guess so to

13  speak, Diana Garcia and Arturo Rodriguez?

14       A.   Yes, I did meet with both of them.

15       Q.   And with the information that you learned

16  through your investigation, were you putting this

17  information out?  I mean, what was your primary focus at

18  that point?

19       A.   Our primary focus early on in the investigation

20  was to locate a person that we thought may have had

21  something to do with the investigation.

22       Q.   Early on at this point, the whereabouts of

23  Angelo Garcia, Jr. were unknown, you didn't know where

24  he was; is that correct?

25       A.   That is correct.

1    Q.   And so, is it fair to say you were gathering as

2  much information as possible to hopefully locate him?

3    A.   Yes.  That was the number one priority, was to

4  locate Angelo.

5    Q.   Were you gathering information and then putting

6  this information out there for other resources to,

7  hopefully, you know, if they came across something or

8  were able to locate him; is that what you were doing?

9    A.   Yes, absolutely.  And I additionally sent a

10  notice and information to our headquarters and

11  surrounding field offices so if they came across any

12  information to assist us.

13    Q.   At some point in your investigation, did you

14  make contact with local pawn shops in trying to locate

15  information {sic} that might have gone missing from the

16  night of incident?

17    A.   Yes, sir, that's correct.  We were informed

18  that a piece of jewelry was missing from the incident.

19  And I coordinated with the pawn shop detail here in

20  Houston and tried to identify pawn shops out there and

21  get information out to the pawn shops about this jewelry

22  that was missing from the apartment.

23    Q.   At some point early on in your investigation,

24  did your attention focus on one particular individual as

25  a suspect?

1      A.   Yes, sir, it did.

2      Q.   And who was that individual?

3      A.   That would be the defendant.

4      Q.   Obel Cruz-Garcia?

5      A.   Yes, sir, that's correct.

6      Q.   And without going into what witnesses might

7  have told you, why did the defendant, Obel Cruz-Garcia,

8  become the focus of your investigation?

9           MR. CORNELIUS:   Objection if it calls for

10 hearsay, Judge.

11          THE COURT:   Sustained if it calls for

12 hearsay.  You may answer if it does not call for

13 hearsay.

14     A.   It was the totality of the investigation that

15 led us to Obel Cruz-Garcia, that we need to locate him.

16     Q.   (By Mr. Wood) And what were you doing initially

17 to try to locate him?

18     A.   Initially to try to locate him, we used

19 surveillance teams, interviews were conducted, we were

20 sending communication to surrounding field offices for

21 information, checking databases.

22     Q.   And were you successful in the beginning?

23     A.   No, not in locating him.  We were not.

24     Q.   Did you have an opportunity to -- did your

25 investigation lead to Angelita Rodriguez at some point?

1       A.   Yes, sir, it did.

2       Q.   And what was your -- what was Angelita's role

3  in your investigation?

4       A.   It's my understanding that she was the spouse

5  of Obel Cruz-Garcia.  And so, we were attempting to

6  locate her to obtain information about his whereabouts.

7       Q.   At some point during your investigation, did

8  you set up surveillance and follow her in order to

9  obtain that?

10      A.   That's correct.  Yes, sir, we did.

11      Q.   And you and investigators were able to

12  eventually speak with Angelita; is that correct?

13      A.   Early on the Houston Police Department

14  investigators coordinated the interviews with Angelita

15  and we conferred with them about her.

16      Q.   At some point early on in your investigation

17  did you become aware that the defendant, Obel

18  Cruz-Garcia, was set to appear on a criminal case?

19      A.   Yes, sir, we did learn about that.

20      Q.   And was that a criminal case in Harris County,

21  Texas?

22      A.   That's correct, in Harris County.

23      Q.   And do you recall what date it was that you

24  believed he was supposed to appear for this court date?

25      A.   Yes.  October 8th, 1992.

1    Q.   And what was significant about that date?  Did

2  he -- did you learn whether or not he appeared on that

3  date?

4    A.   I did --

5              MR. CORNELIUS:  Calls for hearsay, Judge.

6  I object to it.

7              THE COURT:  That's sustained at this time.

8              MR. WOOD:  Well, Your Honor, at this time

9  the State would offer State's Exhibit 36, a certified

10 copy of public records, court documents, and offer those

11 into evidence.

12             **(State's Exhibit No. 36 Offered)**

13             MR. CORNELIUS:  No additional objection.

14             THE COURT:  Okay.  And what's the number

15 again?

16             MR. WOOD:  State's Exhibit 36.

17             THE COURT:  36 will be admitted.

18             **(State's Exhibit No. 36 Admitted)**

19             MR. WOOD:  Thank you.

20             THE COURT:  You may proceed.

21    Q.   (By Mr. Wood) Agent Johnson, in State's Exhibit

22 36 that's before you, does it appear to be bond

23 paperwork for a court case?

24    A.   Yes, that's correct.

25    Q.   And does that paperwork appear to belong to

1  that of the defendant, Obel Cruz-Garcia?

2      A.   Yes, that's correct.

3      Q.   And on Page 3 of that document, the last page,

4  does it appear to have a notation from the date of

5  October 8th, 1992?

6      A.   Yes.

7      Q.   And does it show that the defendant failed to

8  appear for court that day?

9      A.   That's correct.

10     Q.   And that his bond was subsequently forfeited?

11     A.   Yes, that's correct.

12     Q.   So, October 8th, 1992, that's essentially a

13  week after Angelo Garcia, Jr. had gone missing?

14     A.   Yes, sir.

15     Q.   What else were you as an agent trying to do to

16  get information out to the public and out to the

17  community?

18     A.   We utilized news services to have interviews

19  conducted with Diana and our media representatives to

20  get the information out to the public.

21     Q.   And what outlets were you focusing on?

22     A.   We used Telemundo and we also used local news

23  stations.

24     Q.   Was America's Most Wanted ever involved or

25  contacted in this case?

1      A.   Yes.  We also utilized America's Most Wanted to

2  get the information out regarding to Angelo's

3  kidnapping.

4      Q.   At some point did your investigation also focus

5  on a location known as the Pasadena Motor Inn?

6      A.   It did, that's correct.

7      Q.   And tell me about that.

8      A.   We determined that at some point Pasadena Motor

9  Inn was utilized by Angelita Rodriguez and others to

10  stay there.

11      Q.   And were those on dates that were relevant to

12  this offense, surrounding this offense?

13      A.   Yes.  The dates I determined were October 3rd,

14  1992, to October 10th, 1992.

15      Q.   Did you, in fact, go out to that location and

16  receive some registration paperwork in that matter?

17      A.   Yes, I did.

18            MR. WOOD:  Your Honor, may I approach the

19  witness?

20            THE COURT:  Yes.

21      Q.   (By Mr. Wood) Agent, I'm going to show you

22  what's been marked as State's Exhibit 35.  Do you

23  recognize that (indicating)?

24      A.   Yes, I do.

25      Q.   And what do you recognize that to be?

1      A.   This is the registration slip for the Pasadena

2  Motor Inn obtained by Angelita Rodriguez.

3      Q.   Does it appear to be a fair and accurate copy

4  of that registration?

5      A.   Yes, sir, it does.

6            MR. WOOD:   I will offer State's Exhibit

7  35 -- yeah, 35.

8            **(State's Exhibit No. 35 Offered)**

9            MR. CORNELIUS:   Objection.   Hearsay, Your

10  Honor.

11           THE COURT:   Okay.   Has State's Exhibit 35

12  been on file?

13           MR. WOOD:   It has not been on file, Your

14  Honor, not with a business records affidavit.

15           THE COURT:   That's sustained at this time.

16      Q.   (By Mr. Wood) At some point, Agent Johnson, did

17  the focus of your investigation shift from Houston to

18  some other location?

19      A.   Yes, it did.

20      Q.   And what was that other location?

21      A.   The location was Puerto Rico.

22      Q.   And were you still involved in the

23  investigation at this point when it shifted to Puerto

24  Rico?

25      A.   Yes, absolutely.

1      Q.   Did you personally have to go there or were you

2  involved in that aspect or were you coordinating that

3  from here?

4      A.   I coordinated that from here.  We have an

5  office in San Juan, Puerto Rico.

6      Q.   And was that an easy or a difficult process in

7  coordinating that investigation down there?

8      A.   Back then, it was extremely difficult to

9  coordinate those types of investigations back then.

10      Q.   And why was that?

11      A.   The communication networks weren't set up the

12  way they are today.  We didn't have the computer systems

13  to do certain checks.  It was difficult to check just

14  basic, you know, airline information.  It was a

15  difficult investigation.

16      Q.   Was Puerto Rico a safe place to be then to

17  conduct an investigation?

18      A.   No.  It was an extremely dangerous place to be

19  back then.

20           MR. WOOD:  Your Honor, I will pass the

21  witness at this time.

22           THE COURT:  Thank you.

23           Mr. Cornelius.

24           MR. CORNELIUS:  Can I have just a moment,

25  Judge?

```
 1                   THE COURT:  Yes.
 2                   (Pause)
 3                   MR. CORNELIUS:  No questions at this time,
 4   Judge.
 5                   THE COURT:  Thank you, Mr. Cornelius.
 6                   May this witness be excused?
 7                   MR. WOOD:  No objection.
 8                   THE COURT:  You may be excused, Special
 9   Agent.  Thank you for your time.
10                   Please call your next.
11                   MS. TISE:  The State calls Linda Hernandez.
12                   THE BAILIFF:  Your Honor, this witness has
13   not been sworn.
14                   THE COURT:  Very well.  Deputy Perry, bring
15   her up.
16                   (Witness sworn)
17                   THE COURT:  You may proceed, Mr. Wood or
18   Ms. Tise.  Ms. Tise.
19                         LINDA HERNANDEZ,
20   having been first duly sworn, testified as follows:
21                        DIRECT EXAMINATION
22   BY MS. TISE:
23       Q.   Would you introduce yourself, please, ma'am?
24       A.   My name is Linda Hernandez.
25       Q.   And, Ms. Hernandez, how old are you?
```

```
 1        A.    Forty-six.

 2        Q.    Okay.  And where do you live roughly?

 3        A.    12800 Woodforest Boulevard.

 4        Q.    And what part of Houston is that?

 5        A.    East side of Houston.

 6        Q.    Okay.  Tell us a little bit about yourself.

 7   What do you do?

 8        A.    I'm a cashier.  I work at Wal-Mart.

 9        Q.    Okay.  And do you have children?

10        A.    I've got four.

11        Q.    All right.

12        A.    They're all grown.

13        Q.    Okay.  But you also have some children at home,

14   don't you?

15        A.    Yes.

16        Q.    You're raising your grandchildren as well?

17        A.    Yes, I am.

18        Q.    So, you're doing that and working at Wal-Mart?

19        A.    Yes, ma'am.

20        Q.    And you've got a new grand baby.

21        A.    She'll be born hopefully right now.

22        Q.    Okay.  Well, hopefully --

23        A.    By the time I get out.

24        Q.    Okay.  We appreciate you coming down here

25   today.  I know that's got to be a little bit of a
```

1    distraction for you.

2         A.   Yeah.

3         Q.   Okay.  All right.  I want to take you back a

4    long time, back to 1992.  Okay?

5         A.   Okay.

6         Q.   And back in 1992, do you remember who you were

7    seeing at that time or who you had a relationship with?

8         A.   I was with Bienviendo Melo, but I knew him as

9    Charlie.  And at the time, I didn't know his name was

10   Bienviendo Melo.

11        Q.   Okay.

12        A.   He had another name and I knew him by Fred

13   Ferrer.

14        Q.   So, his -- you knew him as Charlie and you also

15   knew that he went by Fred Ferrer sometimes?

16        A.   Yes, ma'am.

17        Q.   And later you knew that his true name is

18   Bienviendo Melo?

19        A.   Yes, ma'am.

20        Q.   Okay.  And about how old were you back in 1992

21   when you were with him?

22        A.   My early twenties.  Let me see.  Probably about

23   23, 24.

24        Q.   Okay.  Do you remember how you met him, how you

25   got involved with him?

     1        A.    I met him through a friend of mine.   She was

     2   actually meeting with a friend of his at a park.

     3        Q.    Okay.

     4        A.    And she didn't want to go by herself, so I went

     5   with her and met him there.

     6        Q.    Okay.   And, ultimately, y'all developed a

     7   romantic relationship?

     8        A.    Yes, ma'am.

     9        Q.    And were you living together back in 1992?

    10        A.    Yes, ma'am, we were.

    11        Q.    Okay.   And where were you living, what part of

    12   town, back in that time?

    13        A.    It was on Telephone Road, the southeast side.

    14        Q.    Okay.

    15        A.    Some apartments.   I don't remember the address.

    16   I just know it was on Westover.

    17        Q.    Okay.   Okay.   Close to the Telephone Road area?

    18        A.    Yes, it was on Telephone Road.

    19        Q.    Okay.   What did Bienviendo -- or let's call him

    20   Charlie.   Before we talk about him more, let's take a

    21   look at him.

    22              MS. TISE:   May I approach?

    23              THE COURT:   Yes.

    24        Q.    (By Ms. Tise) I'm showing you State's Exhibit

    25   89.   Who's that (indicating)?

```
 1          A.    That's him, Charlie.

 2          Q.    This is the person you knew as Charlie, who you

 3   later learned was Bienviendo Melo?

 4          A.    Bienviendo Melo, yes, ma'am.

 5          Q.    Okay.  And I'll ask you if -- well, this is a

 6   process that's not at all like any human conversation

 7   you will ever have.

 8          A.    Yes, ma'am.

 9          Q.    But this lady here is trying to type down what

10   we're saying, so just wait till I finish before you

11   answer so that we're not talking at the same time.  Fair

12   enough?

13          A.    Uh-huh.

14          Q.    Okay.  All right.  State's Exhibit 89, this is

15   the person you knew as Charlie.

16                    MS. TISE:  I'll offer State's Exhibit 89.

17                    **(State's Exhibit No. 89 Offered)**

18                    MR. CORNELIUS:  Objection to relevance,

19   Your Honor.

20                    THE COURT:  That will be overruled.

21   State's Exhibit 89 is admitted.

22                    You may proceed.

23                    **(State's Exhibit No. 89 Admitted)**

24          Q.    (By Ms. Tise) Is it fair to say that's how he

25   looked back then?
```

```
 1        A.   Yes, ma'am.

 2        Q.   Okay.  Now, you don't know how he looks now

 3   because you haven't seen him in a long time, have you?

 4        A.   Yes, ma'am.

 5        Q.   About how long would you say it's been since

 6   you've had any contact with Bienviendo Melo or Charlie?

 7        A.   I'd say more than 11 years.

 8        Q.   Okay.  You didn't marry him?

 9        A.   No.

10        Q.   And ultimately broke up?

11        A.   Yes, I did.

12        Q.   And you don't hear from him anymore, he doesn't

13   call, doesn't write?

14        A.   He like dropped out of the world.

15        Q.   Okay.  No idea where he's at?

16        A.   No, ma'am.

17        Q.   All right.  So, back in 1992 when you got

18   involved with this man, Bienviendo Melo, did you find

19   out some things about him that he was involved in that

20   weren't really very good?

21        A.   Yes, ma'am.

22        Q.   Okay.  Tell us about that.

23             MR. CORNELIUS:  Objection.  Calls for

24   hearsay and it's not relevant.

25             THE COURT:  I'll allow if it's her own
```

```
 1   personal knowledge.  What's the relevance of where

 2   you're headed?  Is it in relation to this offense?

 3                 MS. TISE:  It is, Judge.  He has a

 4   connection to the defendant that I think this witness

 5   will be able to explain.

 6                 THE COURT:  Okay.  Very good.  You may

 7   proceed then.

 8        Q.  (By Ms. Tise) What, at the time, was Bienviendo

 9   Melo involved in?

10        A.  He was dealing, working for him, Chico.

11        Q.  Okay.  And what was he dealing?

12        A.  Drugs.

13        Q.  What kind of drugs?

14        A.  Cocaine.

15        Q.  All right.  And you said he was working for a

16   person you know as Chico?

17        A.  Yes, ma'am.

18        Q.  Okay.  And is that the same person who's also

19   known as Obel Cruz-Garcia?

20        A.  Obel, yes, ma'am.

21        Q.  Okay.

22                 MS. TISE:  May I approach?

23                 THE WITNESS:  Yes.

24                 THE COURT:  Yes.

25                 THE WITNESS:  Sorry.
```

1    Q.   (By Ms. Tise) Taking a look at State's Exhibit

2    83.  Is that the person you know as Chico or Obel

3    (indicating)?

4    A.   Yes, ma'am.

5    Q.   Okay.  How long after you met Bienviendo Melo

6    did you find out that he was selling drugs for Chico?

7    A.   A few months after we started living together.

8    Q.   Okay.  While this was going on, did you have

9    opportunities to see the defendant engaged with the

10   person you are calling Chico?

11   A.   I mean, he would come over and they would leave

12   together.

13   Q.   Okay.  And you were aware of what was going on,

14   what they were doing?

15   A.   Yes, ma'am.

16   Q.   Okay.  Who, from your observations of the times

17   that you saw Chico and Mr. Melo together, was in charge

18   of the drug operation?

19   A.   Chico.

20   Q.   Okay.  And when you say that he was in charge,

21   what kinds of things did you observe that indicated that

22   to you?

23   A.   It was like whatever he said they did.

24   Q.   Okay.

25   A.   If he wanted them to do something, they would

1  just go out.  If he would call them up to go make

2  deliveries, he would do it.

3      Q.   Okay.  And sometimes that was a problem, wasn't

4  it?

5      A.   Yeah.

6      Q.   You didn't like the fact that when Chico called

7  and said "jump," Melo said "how high," did you?

8      A.   Yes.

9      Q.   Did you get to know any of the other

10 individuals that were selling drugs for Chico back then?

11     A.   Rudy.

12     Q.   Okay.  And I'm going to show you a picture that

13 is State's Exhibit 85 and ask you if you recognize who

14 that is (indicating)?

15     A.   Yes, ma'am.

16     Q.   Okay.  Who is that?

17     A.   Rudy.

18     Q.   Okay.  And were you aware that his true name is

19 Carmelo Martinez Santana?

20     A.   No.

21     Q.   He just basically had you call him Rudy?

22     A.   Yes.

23     Q.   And did you have opportunities to see how the

24 defendant Chico and Rudy interacted with each other?

25     A.   He basically did the same thing like Charlie.

1    Whatever Chico said, he did.

2         Q.   Okay.  When you say Charlie, you're talking

3    about Bienviendo Melo?

4         A.   Bienviendo Melo, yes, ma'am.

5         Q.   Rudy had the same relationship with the

6    defendant as Charlie?

7         A.   Yes, ma'am.

8         Q.   When the defendant told him what to do, he did

9    it?

10        A.   Yes, ma'am.

11        Q.   And he also was selling drugs for the defendant

12   as far as you could tell?

13        A.   As far as I'm concerned, yeah.

14        Q.   Do you know where Bienviendo Melo is originally

15   from?

16        A.   Santo Rue (phonetic).

17        Q.   Okay.  Is that in the Dominican Republic?

18        A.   Yes, ma'am.

19        Q.   And how would you describe his complexion?

20        A.   He was dark.  They would mistake him as being

21   black.

22        Q.   Okay.  And how about the defendant, Chico?

23        A.   Same.

24        Q.   Okay.  As a member of the Hispanic community,

25   are you aware of how people refer to individuals from

1  places like Puerto Rico, the Dominican Republic, or

2  Columbia as being black when they have dark skin?

3       A.   Yes, ma'am.

4       Q.   Is that pretty common in your community?

5       A.   It is pretty common.

6       Q.   I want to take you back to the night of

7  September 30th, 1992, going into the early morning hours

8  of October 1st, 1992.  Okay?

9       A.   Okay.

10       Q.   Do you remember some police officers coming out

11  to your place in 1992 and talking to about some events

12  from that night?

13       A.   Oh, yeah.

14       Q.   And they also talked to Charlie about that

15  night, too?

16       A.   Yes, they did.

17       Q.   And he was taken in, questioned, got a DNA

18  sample and all that from him, right?

19       A.   I don't know about the DNA, but he was taken

20  in.

21       Q.   Okay.  And they asked him about that night?

22       A.   Yes, ma'am.

23       Q.   Do you remember seeing news reports about what

24  happened that night?

25       A.   I remember seeing it on the news, yes, ma'am.

1    Q. Okay.  About the little boy --

2    A. About a little boy, yes.

3    Q. -- and him being kidnapped?

4    A. Yes, ma'am.

5    Q. And, ultimately, the police learned that you

6 and Charlie had information about that case, correct?

7    A. Well, they thought we knew.

8    Q. Okay.

9    A. But we actually didn't.

10    Q. But you had information about something else

11 that happened that night after the kidnapping occurred,

12 correct?

13    A. Yes, ma'am.

14    Q. And they came out and talked to you and Charlie

15 about that?

16    A. Yes, ma'am.

17    Q. All right.  Well, I want to talk to you about

18 what you know about what happened that night.  Where

19 were you?

20    A. At home asleep.

21    Q. And where did you sleep?

22    A. In the front room.

23    Q. Okay.  Was there like a sofa bed or were you on

24 the floor?

25    A. No.  We were sleeping on the floor.  I was

1   living with my mom and my four kids in a two-bedroom.

2       Q.   So, your mom and your four kids and you and

3   Melo weren't in the front room?

4       A.   No.  No.  My kids were in one room, my mom was

5   in the other, and we were in the front room.

6       Q.   You and Charlie?

7       A.   Me and Charlie.

8       Q.   Okay.  And do you remember what time y'all went

9   to bed that night?

10      A.   We probably went to bed about 1:00 something,

11  2:00.

12      Q.   Okay.  What were y'all doing before that?

13      A.   Asleep until we got a call.

14      Q.   Okay.  So, y'all were asleep before 1 o'clock?

15      A.   Yes.

16      Q.   What time do you think y'all went to sleep?

17      A.   Probably maybe 1:30.

18      Q.   Okay.  What were y'all --

19      A.   Give or take.

20      Q.   -- doing before you went to sleep at 1:30?

21      A.   We were looking at TV.

22      Q.   Okay.  And you and Charlie were there together?

23      A.   Yes, ma'am.

24      Q.   Did he leave?

25      A.   No.

1     Q.   Okay.  At some point in the night, you said

2  about 1:30, y'all go to bed?

3     A.   Yes, ma'am.

4     Q.   What happened after you went to bed?

5     A.   Chico called to my house, wanted to -- they

6  kept on calling and we didn't want to answer the phone

7  until like three tries and we finally answered.

8     Q.   Okay.

9     A.   He wanted Charlie to go pick him up.

10     Q.   Okay.  And did you want Charlie to do that?

11     A.   No, I didn't want him to go out.  I told him it

12  was too late in the night and that's not a decent hour

13  to be going and leaving the house.

14     Q.   Okay.  Did Charlie think about it?

15     A.   He thought about it.  So, he listened to me and

16  he didn't do it.

17     Q.   Okay.  That was unusual, wasn't it?

18     A.   Yeah.

19     Q.   Okay.  Do you know where Chico was calling

20  from?

21     A.   I remember them saying something about they

22  were in Baytown.

23             MR. CORNELIUS:  Objection.  Calls for

24  hearsay, Judge.  It sounds like it does.

25             MS. TISE:  It's coming from the defendant.

```
 1                    THE COURT:  Only if it's her personal
 2   knowledge of the defendant, not what somebody else told
 3   her the defendant said.
 4        A.   No.   That's what he said when he called, he was
 5   in Baytown.
 6        Q.   (By Ms. Tise) Okay.   And do you know who was
 7   with him at that point?
 8        A.   Rudy.
 9        Q.   Okay.   And what time of night did you get that
10   call?
11        A.   It was about 2:00, a little after 2:00, I
12   think.
13        Q.   All right.   So, the call comes in around 2:00
14   in the morning, the defendant is in Baytown with Rudy,
15   and they need a ride?
16        A.   Yes, ma'am.
17        Q.   What happened after that phone call came in and
18   you and Charlie decided he wasn't going to go?
19        A.   Well, they wanted to use the vehicle.
20        Q.   Okay.
21        A.   So, we told him they could use it, they just
22   had to come over.
23                    MR. CORNELIUS:  Objection.  This is
24   hearsay, Judge.
25                    THE COURT:  I'm sorry.
```

```
 1              MS. TISE:  I will try to redirect the
 2  question a little better, Judge.
 3              THE COURT:  Yes.
 4              Please don't say what any other person told
 5  you or what you heard someone else say.  Okay?
 6              THE WITNESS:  Okay.
 7              THE COURT:  Thank you.
 8              You can proceed.
 9      Q.  (By Ms. Tise) So, after Charlie wasn't going to
10  go pick them up, did that end it?  In other words, did
11  you hear anything else from Chico and Rudy that night?
12      A.   No.  They just came to pick up the car.
13      Q.   And that's what I'm talking about.  First there
14  was the phone call --
15      A.   Yes, ma'am.
16      Q.   -- where they wanted a ride from Baytown,
17  right?
18      A.   Yes, ma'am.
19      Q.   And Charlie said no?
20      A.   Yes, ma'am.
21      Q.   And then at some point you go back to sleep?
22      A.   No.  We were laying down.  We knew they were
23  going to come and pick up the car.
24      Q.   So, y'all were expecting them to come?
25      A.   Yes, ma'am.
```

1      Q.   All right.  And at some point, they come to

2 your apartment?

3      A.   Yes, ma'am.

4      Q.   About how long after the phone call did it take

5 for them to get there?

6      A.    I think it was about 30 minutes because I think

7 Baytown was quite a bit from where I lived at.

8      Q.   Okay.  So, they arrived at your house somewhere

9 2:30, 3:00, somewhere around there?

10      A.   Yes, ma'am.

11      Q.   Okay.  And when they got there, who all was

12 there?  Who was present?  Who came?

13      A.    Who came?  It was Chico and Rudy.

14      Q.   Okay.  Together?

15      A.    Together.

16      Q.   And do you know if there was another person

17 with them?  Did you look outside or --

18      A.    That I know of, no.

19      Q.   Okay.  And do you know how they got there?

20      A.    In a taxi.

21      Q.   Okay.  After, you know, they arrived in the

22 taxi and -- did they come up and knock on your door or

23 were y'all standing outside waiting for them?

24      A.    No.  They knocked at the door.

25      Q.   Okay.  And did a conversation occur between

1   Chico and Charlie?

2       A.   No.   They just came to pick up the key.   It

3   only lasted a few minutes, I think, and left.

4       Q.   Okay.   So, didn't stay long?

5       A.   No.

6       Q.   Did you notice anything about Rudy?

7       A.   He was just real nervous or something.

8       Q.   Okay.   Did you find that unusual, that wasn't

9   his usual way?

10      A.   I did, but I just blew it off.

11      Q.   Okay.   Obviously, you hadn't heard the news

12  reports and you had no idea what had happened earlier

13  that evening?

14      A.   No.

15      Q.   Okay.   But Rudy was nervous?

16      A.   Yes.

17      Q.   Okay.   Did Chico seem nervous?

18      A.   No.

19      Q.   Did you ever see him nervous?

20      A.   No, I didn't.

21      Q.   How would you describe him?

22      A.   I don't know.   He was like -- let me see.   He

23  had a scary look to him.   I don't know.

24      Q.   Okay.   So, they get the keys and they leave?

25      A.   Yes, ma'am.

1      Q.   Now --

2               MS. TISE:   May I approach?

3               THE COURT:   Yes.

4      Q.   (By Ms. Tise) Let me show you some photographs.

5  These are marked State's Exhibits 37 through 41.   I'll

6  ask you if you recognize that vehicle (indicating)?

7      A.   Yes, ma'am.

8      Q.   Okay.

9      A.   That was our vehicle or Charlie's vehicle.

10     Q.   Okay.   Is this the vehicle that Chico came and

11  got that night?

12     A.   Yeah, it is.

13     Q.   And we will look at all of this.   These are

14  just more pictures of the vehicle (indicating).

15  Correct?

16     A.   Yes, ma'am.

17     Q.   And do they fairly and accurately reflect how

18  that vehicle looked?

19     A.   When they took it, no.

20     Q.   Okay.   What's different?

21     A.   It's very dirty.

22     Q.   Okay.

23     A.   It was all dirty, the inside and the outside.

24     Q.   And when they came and got it from you, it

25  wasn't like that?

1     A.    No.

2     Q.    Okay.

3           MS. TISE:  At this time, I'm going to offer

4     State's Exhibits 37 through 41.

5           **(State's Exhibit No. 37 through 41 Offered)**

6           MR. CORNELIUS:  Objection to relevance.

7           THE COURT:  That will be overruled.

8     State's Exhibits 37, 38, 39, 40, and 41 will be admitted

9     over objection.

10          **(State's Exhibit No. 37 through 41**

11          **Admitted)**

12          MS. TISE:  May I publish them, Judge?

13          THE COURT:  Yes.

14    Q.    (By Ms. Tise) Now, when you were with Charlie

15    or Bienviendo Melo --

16    A.    Yes, ma'am.

17    Q.    --did you believe this was his vehicle?

18    A.    Yes, ma'am.

19    Q.    Okay.  Did you later learn that wasn't his

20    vehicle?

21    A.    Yeah.  He told me it wasn't his.  They gave it

22    to him.

23    Q.    Who gave it to him?

24    A.    Chico gave to him.

25          MR. CORNELIUS:  Objection.  Hearsay.

1          THE COURT:   That will be sustained.

2     Q.   (By Ms. Tise) And is this the back of that same

3  vehicle that Charlie was driving while y'all were

4  together (indicating)?

5     A.   Yes, ma'am.

6     Q.   And State's Exhibit 39, is that the interior of

7  the vehicle we're talking about (indicating)?

8     A.   Yes, ma'am.

9     Q.   State's Exhibit 40, the back seat of vehicle

10  (indicating)?

11     A.   Yes, ma'am.

12     Q.   And State's Exhibit 41, the trunk of the

13  vehicle (indicating)?

14     A.   Yes, ma'am.

15     Q.   Did you ever know of a blue Ford T-Bird that

16  Chico would drive sometimes?

17     A.   I remember he had a blue one and a black one,

18  but I don't remember the make.

19     Q.   Okay.  But he had several cars?

20     A.   Yes, ma'am.

21     Q.   And one was a blue car?

22     A.   Yes, ma'am.

23     Q.   And did you ever see Angelita drive that car?

24     A.   Yes, ma'am.  I don't know if it was the blue

25  one or the black one.  She drove one of them.

1      Q.   Okay.

2      A.   I guess it's been 20 years.

3      Q.   I understand.

4           But you've seen Chico and Angelita in

5   possession of both a blue car and a black car as well as

6   this gold car we were just looking at?

7      A.   Yes, ma'am.

8      Q.   Okay.  Did you have occasion to meet Angelita

9   on times that you would see Chico?

10     A.   We had been to their house once.

11     Q.   Okay.  And do you remember where they lived?

12     A.   I don't remember where they lived.  I just

13  remember it was real far.  It took like an hour drive.

14     Q.   Okay.  Humble sound familiar?

15     A.   I've never been good at areas.

16     Q.   That's okay.

17     A.   Sorry.

18     Q.   How did you -- or did you get that car back,

19  that gold car that was borrowed in the early morning

20  hours of October 1st, 2000 -- I mean 1992?

21     A.   They brought it back within a few days later.

22     Q.   Okay.  Do you know how long later?  Do you

23  remember?

24     A.   I think it was like two or three days later.

25     Q.   It was Rudy who brought it back, wasn't it?

1    A.   Yes, ma'am.

2         MR. CORNELIUS:   Judge, I object to the

3    leading, suggestive nature of the question.

4         THE COURT:   Please don't lead.

5    Q.   (By Ms. Tise) Who brought it back?

6    A.   Rudy.

7    Q.   Okay.  And it was several days later?

8    A.   Yes, ma'am.

9    Q.   Without saying what occurred in the

10   conversation, was there some conversation between Rudy

11   and Charlie about the car?

12   A.   I really don't remember.

13   Q.   Okay.  And did y'all keep possession of that

14   car after that for a while?

15   A.   We did.  The cops came and took it and brought

16   it back to us.

17   Q.   And that's how those pictures got taken,

18   correct?

19   A.   Yes.

20        MR. CORNELIUS:   Objection to the leading

21   nature of the question, Your Honor.

22        THE COURT:   Please don't lead.

23   Q.   (By Ms. Tise) When did those pictures get

24   taken?  Did you take these pictures?

25   A.   No, ma'am.

```
 1        Q.   Okay.  And when you talked about the dirtiness

 2   of the car when it came back, what particularly do you

 3   notice?

 4        A.   Everything.  Because this guy was -- Charlie

 5   was real clean.  He kept everything clean, the inside

 6   and the outside.

 7        Q.   Charlie was?

 8        A.   Yes.

 9        Q.   Before October 1st of 1992, how often would you

10   say you saw Chico coming around?

11        A.   I mean, he would come and -- but I don't know

12   how often.  I don't remember how often.

13        Q.   I mean, once a week, five times a week?

14        A.   Probably I'd see him a couple of times a week.

15        Q.   Okay.  So, pretty frequently he would come by

16   to your apartment?

17        A.   Yes, ma'am.

18        Q.   Okay.  After October 1st, 1992 when Chico came

19   to your house in the middle of the night, did you ever

20   see him again?

21        A.   No.

22        Q.   Okay.  Did you ever talk to Angelita after

23   that?

24        A.   Yeah, I did.

25        Q.   Okay.  And how many times did you talk to
```

 1  Angelita?

 2      A.   I think a couple more times.  She wanted to

 3  come over and stay at my house.

 4      Q.   Okay.  Did that --

 5              MR. CORNELIUS:  Objection to the

 6  conversation as hearsay.

 7              THE COURT:  Hearsay sustained.  Please do

 8  not go into the conversations between you and Angelita.

 9              THE WITNESS:  Okay.

10      Q.   (By Ms. Tise) Did it surprise you -- how did

11  you feel when she asked to come over to your house?

12              MR. CORNELIUS:  Objection to the question

13  because it incorporates the hearsay that I objected to.

14              THE COURT:  That's overruled.

15              Your question was how did she feel?

16              MS. TISE:  Uh-huh.

17              THE COURT:  You may answer that.

18      A.   Awkward.

19      Q.   (By Ms. Tise) Okay.  Did you want her to come

20  and stay at your house?

21      A.   No.

22      Q.   Okay.  Did you let her?

23      A.   No.

24      Q.   You were aware -- or were you that Angelita had

25  her own apartment?

1      A.   I don't remember what the deal was because she

2  ended up staying at a motel.

3      Q.   Okay.  So, she was staying at a motel, not at

4  her apartment?

5      A.   Right.

6      Q.   Did you think that was strange considering the

7  fact that you knew she had an apartment?

8      A.   Yes.  Yeah, I did.

9      Q.   Okay.  Did you wonder why she wasn't staying in

10 her own home?

11     A.   I did ask her, but she never answered.

12     Q.   I'm not asking what your conversation was

13 because I can't, that's hearsay.

14     A.   Right.

15     Q.   Okay?  But I'm just saying, did you think that

16 was strange that she wasn't staying in her own home

17 after October 1st, 1992?

18     A.   I did.

19     Q.   Okay.  But you know for a fact that she wasn't?

20     A.   Right.

21     Q.   She was staying at a hotel, right?

22     A.   Yes, ma'am.

23     Q.   And looking for another place to stay?

24     A.   Yes, she was.

25     Q.   I know it's been a long time since you've seen

```
 1   him but, do you see the person you know as Chico in the
 2   courtroom?
 3        A.   He has just changed a lot.  He doesn't look the
 4   same.
 5        Q.   Do you see him?
 6        A.   Yes.
 7        Q.   Can you point him out?
 8        A.   Right there (indicating).
 9        Q.   Can you tell us what he's wearing?
10        A.   Gray jacket and like -- I don't know -- light
11   brown shirt or something, or even a peach color.  I
12   can't see that far.  Sorry.
13        Q.   Do you see anything on his head?
14        A.   Earphones.
15             MS. TISE:  Your Honor, may the record
16   reflect the witness has identified the defendant?
17             THE COURT:  The record will so reflect.
18        Q.   (By Ms. Tise) Did you ever meet Diana and
19   Arturo, the parents of the little boy?
20        A.   No.
21        Q.   Didn't have any involvement or connection?
22        A.   Never even seen those people.
23             MS. TISE:  I will pass the witness.
24             THE COURT:  Thank you, Ms. Tise.
25             Mr. Cornelius.
```

1                    **CROSS-EXAMINATION**

2     **BY MR. CORNELIUS:**

3         Q.   Ms. Hernandez, my name is Skip Cornelius.

4     We've never met or discussed this case before, have we?

5         A.   No, sir.

6         Q.   I'm one of the lawyers, so I have the right to

7     ask you a couple of questions.

8         A.   Yes, sir.

9         Q.   If my questions don't make sense or you want me

10    to repeat them, I'm happy to do that.

11                    How would you describe Rudy?

12        A.   He was a light-complected person.

13        Q.   Yeah.  What about him?  I mean --

14        A.   The only thing I can tell you is my mom didn't

15    really trust him.

16        Q.   But how about you?

17        A.   I don't know.  He looks -- just something about

18    him.

19        Q.   Did you say something about him?

20        A.   Yeah.  He would always want to take my son to

21    the store with him, but I never let him take him

22    anywhere.

23        Q.   That bothered you?

24        A.   Yeah.

25        Q.   Were you fearful of Rudy?  Fearful?

1    A.   Fearful?  Yeah, because my mom brought it to my

2  attention.

3    Q.   What about drugs, do you know if Rudy used

4  drugs?

5    A.   Bienviendo said he did, but I have never seen

6  him.

7    Q.   Okay.  So, you didn't notice if he was high or

8  appeared to be on drugs or anything?

9    A.   He looked like he was.  His eyes were always

10  red.

11    Q.   He always wanted to take your son where?

12    A.   To go to the store and he would say buy him ice

13  cream or something.

14    Q.   But you never let him do that?

15    A.   No.

16          MR. CORNELIUS:  Could I have a moment,

17  Judge?

18          THE COURT:  Yes.

19          (Brief pause)

20          MR. CORNELIUS:  Pass the witness.

21          THE COURT:  Thank you.

22          May this witness be excused?

23          MS. TISE:  Yes, Your Honor.

24          THE COURT:  Okay.  You may step down,

25  ma'am.

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  Thank you very much.

 3                    Please call your next.

 4                    MS. TISE:  The State calls John Swaim.

 5                    THE BAILIFF:  Your Honor, the witness has

 6     not been sworn.

 7                    THE COURT:  Thank you.

 8                    (Witness sworn)

 9                    THE COURT:  Ms. Tise, you may proceed.

10                    MS. TISE:  Thank you, Judge.

11                            JOHN SWAIM,

12     having been first duly sworn, testified as follows:

13                        DIRECT EXAMINATION

14     BY MS. TISE:

15          Q.   Would you introduce yourself, sir, to the

16     ladies and gentlemen of the jury?

17          A.   I'm Sergeant John Swaim with the Houston Police

18     Homicide, retired.

19          Q.   Okay.  And how long have you been retired?

20          A.   I retired in '06, March of '06.  Seven years.

21          Q.   Are you like some of these other guys who can't

22     get enough of it and keep coming back and working for

23     other agencies?

24          A.   Nope.

25          Q.   Congratulations.
```

1        A.    Thank you.

2        Q.    What are you doing in your retirement?

3        A.    Well, I have a little job at the golf course,

4   Woodlands TPC.  I play golf and marshall and do a little

5   starting, be with my grandkids, and do some volunteer

6   work at my church.

7        Q.    Well, that sounds more like it.

8        A.    Yeah.

9        Q.    So, every now and then, I guess, you get called

10  back to testify about one of your old cases that you

11  worked back in the day?

12       A.    Correct.

13       Q.    Can you tell the jury a little bit your

14  background and training and experience?

15       A.    Well, I graduated from Sam Houston State

16  University in May of 1973 with a degree in -- back then

17  it was called law enforcement, police science.  Today

18  it's called criminal justice.  I joined the Houston

19  Police Department in June of 1973, went through the

20  academy.  I was assigned to, basically, patrol,

21  nightshift patrol for about five years as a police

22  officer where I, you know, made calls for service, all

23  that stuff you see on cop shows, you know, basically

24  just being a real cop.

25                 And in 1978, I promoted to sergeant.  I

1    spent four years as a patrol supervisor on nightshift.

2    In 1982, I was assigned to the Homicide Division as a

3    sergeant and I was assigned to a murder squad and had

4    responsibilities of investigating murders,

5    officer-involved shootings, major kidnapping for ransom,

6    and murders-for-hire.  And I spent 24 years doing that

7    and retired from there in 2006.

8         Q.   Okay.  And you were still a member of the

9    Homicide Division when you retired?

10        A.   I was.

11        Q.   Okay.  I want to take you back to 1992,

12   September, moving into October, and the case involving

13   the abduction and murder of Angelo Garcia, Jr.  Do you

14   remember that case?

15        A.   Sure.

16        Q.   Okay.  And is it a case that sticks out in your

17   mind after all your years of homicide?

18        A.   Of course.

19        Q.   Okay.  And why is that?

20        A.   It's a kidnapped child.

21        Q.   Okay.  And do you remember some of the things

22   that were going on with the investigation surrounding

23   that particular case?

24        A.   Sure.

25        Q.   Would you say there were a lot of HPD officers

1  in the Homicide Division working on it?

2      A.   There were.

3      Q.   And would you say that the case was very high

4  publicity?

5      A.   It was.

6      Q.   And a lot of man hours were put into it back in

7  those days?

8      A.   That's correct.

9      Q.   You weren't the lead homicide investigator on

10  that case by any means, correct?

11      A.   No, ma'am.

12      Q.   But at some point in time you were called in to

13  help with some of the follow-up?

14      A.   I was.

15      Q.   Can you tell the jury how you first became

16  involved with the case?

17      A.   Well, on October 1st, 1992, I was working

18  dayshift.  And when I got to work, I was assigned by my

19  Lieutenant, Ira Franks, back in those days to interview

20  witnesses that were being brought down by the patrol

21  units from the scene of the kidnapping and rape.

22      Q.   Okay.  Did you do that?

23      A.   I did.

24      Q.   Okay.  Can you tell me about some of the

25  individuals that you participated in the interviews

1  with?

2      A.   I spoke to a lady by the name of Alice Lemone

3  or Lemon.

4      Q.   Okay.

5      A.   I spoke to Angelo Garcia, Sr., the father of

6  the kidnapped victim.  I spoke to a gentleman by the

7  last name of Rios, Caesar Rios.

8      Q.   Okay.  And Ms. Lemone was a neighbor, right?

9      A.   Right.

10     Q.   And Mr. Rios was a neighbor?

11     A.   Correct.

12     Q.   And then you said Mr. Angelo Garcia, Sr. was

13 the father of the complainant?

14     A.   Correct.

15     Q.   And when you talked to him, did anything arise

16 out of your conversation with him that led you to any

17 suspicion that he might be involved?

18     A.   No, no suspicion at all.

19     Q.   Were you very comfortable closing that part of

20 the investigation as far as looking into the father?

21     A.   I was, yes.

22     Q.   After interviewing those witnesses, what

23 happened next in your investigation?

24     A.   Well, the next thing I did was on October 5th

25 of 1992.

1      Q.   Okay.

2      A.   And we had information that there was an

3  apartment located out in Humble, the Humble Tree

4  Apartments located at 15100 Golden Eagle, No. 1205.  We

5  had information that the complainants in this case,

6  Ms. Garcia and -- the parents of the victim had rented

7  an apartment at that location for their drug supplier at

8  the time, Angelita Rodriguez and a guy named Chico.  So,

9  myself and Alan Brown, who was an investigator in

10 Homicide, went out to that location to investigate that

11 clue.

12     Q.   Okay.  And what day was this?

13     A.   This was on Monday, October 5th, 1992.

14     Q.   Okay.  And y'all were trying to find Chico --

15     A.   Correct.

16     Q.   -- weren't you?

17          And this was one of the places that he --

18 this was where he was supposed to have lived?

19     A.   That's where he was supposed to have lived,

20 correct.

21     Q.   Out in Humble?

22     A.   Right.

23     Q.   So, as a matter of course, did y'all go out

24 there?

25     A.   We did.

1      Q.   Okay.  Do you know if other investigators had

2   been out there?

3      A.   At this point, I don't think so.

4      Q.   Okay.  What did you find when you got to that

5   apartment?

6      A.   Well, we learned that the people that had been

7   staying at that apartment who were described as two

8   black Hispanic males and a Hispanic female lighter

9   skinned, were staying there; however, they had moved out

10  over the weekend.  So, this was like Monday.  They had

11  moved out that prior weekend.

12     Q.   Okay.  That would have been the weekend that

13  included the 4th -- the 3th and 4th?

14     A.   That's right.

15     Q.   Okay.  At some point over that weekend, that

16  house was moved out of, vacated?

17     A.   They vacated the house.

18     Q.   Okay.

19     A.   And we also learned that one of the people, one

20  of the Hispanic males, dark-skinned Hispanic male that

21  was living there had been seen wearing a work shirt, a

22  dark work shirt with Rendon's -- R-e-n-d-o-n -- Garage

23  and the name Luis on it.

24     Q.   Okay.  And what did you find when you went

25  there?  Did y'all make entry into the residence?

1      A.   No.

2      Q.   Okay.  But you found out that there was this

3  Rendon and the name Luis?

4      A.   Yes, Luis.

5      Q.   So, what did you do to follow up on that

6  information?

7      A.   Well, at that time we decided that we would try

8  to find out where this garage was located, Rendon's

9  Garage was located.

10      Q.   Okay.

11      A.   And we discovered through the research that it

12  was located at 216 Estelle.  So, myself and Officer

13  Brown drove over to that location to see, obviously, if

14  we could find out who this Luis guy was, any information

15  about the case.

16      Q.   But y'all are still trying to find Chico,

17  right?

18      A.   Trying to find Chico.

19      Q.   And thinking this might be a place that he

20  worked or someone else.  You said there were two males

21  that had been living there and a female?

22      A.   Correct.

23      Q.   Okay.

24      A.   When we arrived over there, we talked to -- I

25  believe the lady's name was Juanita Rendon.  She was the

1  wife of the Rogelio Rendon who owned the garage.  He
2  wasn't there at the time.
3       Q.   Okay.
4       A.   So, we weren't able to identify -- you know,
5  talk to him or interview him.
6       Q.   Did you pass that information off to U.P.
7  Hernandez?
8       A.   We did.  U.P. Hernandez and Sergeant Alonzo.
9       Q.   And ultimately U.P. Hernandez went back to that
10 garage and did the follow-up on that information?
11           MR. CORNELIUS:  Objection to the leading
12 and the suggestive nature.
13           MS. TISE:  I'll rephrase it, Judge.
14           THE COURT:  Please don't lead.
15      Q.   (By Ms. Tise) Ultimately, you passed the
16 information on to U.P. for a reason?
17      A.   Correct.
18      Q.   What was the reason?
19      A.   For them to do more follow-up.  They were
20 Hispanic speaking, they speak Spanish, better equipped
21 to speak to the people out there at the garage, who were
22 Hispanic, Spanish-speaking people, than we were.
23      Q.   Okay.  And so, you passed that as a to-do on to
24 U.P. to take care of for you?
25      A.   Right.

1       Q.   Okay.  Do you know if he did that?

2       A.   He did.

3       Q.   What happened next in your investigation?

4       A.   The next day on October 6th, 1992, we received

5    information that there was a Hispanic male or someone

6    living or at the apartment in Humble, the one that we

7    had just went to the day before.

8       Q.   On Golden Eagle?

9       A.   On Golden Eagle.  The same apartment.

10             Armed with that information, we went out to

11   see who it was living in the apartment.  Obviously,

12   we're still looking for Chico.

13      Q.   Okay.

14      A.   So, myself and Sergeant Shirley went to that

15   location.  We arrived there about 2:00 in the afternoon.

16      Q.   Let me ask you this.  Did you have a

17   description of the individual who had been staying

18   there?

19      A.   The individual on the 6th?

20      Q.   Uh-huh.

21      A.   No.

22      Q.   Okay.  And so, you went out to the apartment to

23   see if maybe Chico was there?

24      A.   Correct.

25      Q.   Okay.  What did you find when you got out there

1  on the 6th?

2     A.   Well, we got there about 2:00 in the afternoon

3  and knocked on the door.  The door was answered by a

4  Hispanic male who identified himself as Candido Lebron.

5     Q.   Candido Lebron.  Okay.

6     A.   And he gave us some identifiers.  He gave us a

7  social security card and a birth certificate with that

8  name on it from the Virgin Islands, which we thought was

9  kind of strange because he was speaking with a Spanish

10  accent.  People from the Virgin Islands, that I know of,

11  don't speak with a Spanish accent.

12     Q.   Okay.

13     A.   So, we were a little suspicious about his

14  identification.  So, we asked him if he would come to

15  the Homicide -- accompany us to the Homicide Division so

16  he could be interviewed by Spanish-speaking officers.

17  And he agreed to do so.

18     Q.   Okay.  Was he talking to you the whole time in

19  English?

20     A.   Broken English, yes.

21     Q.   But he had an accent?

22     A.   He had an accent, Spanish accent.

23     Q.   Okay.  And I'm going to show you a photo marked

24  State's Exhibit 84.  Is that the individual that you

25  found at the Golden Eagle apartment on October 6th, 1992

1  (indicating)?

2       A.   That's correct.

3       Q.   And he told you his name was Candido Lebron?

4       A.   That's correct.

5       Q.   Okay.  Did you find out any other information

6  about that detail?

7       A.   Well, we ran, of course, under that name

8  computer checks to see if he -- you know, if that was

9  his name.  There was a person by that name that had a

10  Texas I.D., you know, under that name and he had seven

11  traffic warrants.

12      Q.   Okay.

13      A.   So, we had a reason to hold him.  We also

14  confronted him about the birth certificate that he

15  presented from the Virgin Islands, to-wit, what's your

16  mother's name?

17      Q.   Uh-huh.

18      A.   Couldn't supply that.  What's your father's

19  name?  Couldn't supply that, but he still, you know,

20  insisted that was his name.  So, you know, obviously, we

21  knew he was lying about his identification.  It was not

22  his name.

23      Q.   Okay.  Did you learn his true name?

24      A.   Later in the investigation, yes.

25      Q.   And what is that?

1      A.    Rogelio Aviles.

2      Q.    Okay.  What happened next in your

3  investigation?

4      A.    Well, after that, basically, we were -- several

5  detective investigators were basically trying to locate

6  Chico.

7      Q.    Okay.

8      A.    So, we did -- we had some information that he

9  was here and some information he was there.  So, we were

10  doing surveillance on those locations and trying to find

11  him.

12      Q.    Okay.

13      A.    A motel out in Pasadena, we had information he

14  was out there.

15      Q.    Did y'all find him there?

16      A.    We didn't find him.  We found Angelita

17  Rodriguez there, followed her around a little bit, but

18  never found him.

19      Q.    Okay.  And in the course of following Angelita,

20  did you get any information about where Chico might be?

21      A.    No.

22      Q.    Did you yourself ever interview Angelita?

23      A.    No, ma'am.

24      Q.    Okay.  Did you ever see an individual known as

25  Rudy in her company?

1      A.   Not to my knowledge, no.

2      Q.   Did you do anything further in your

3  investigation other than continue to look for Chico and

4  follow up on leads?

5      A.   That was it.

6             MS. TISE:  I pass the witness.

7             THE COURT:  Thank you, Ms. Tise.

8             Mr. Cornelius.

9             MR. CORNELIUS:  It's good to see you,

10  Sergeant Swaim, but I don't have any questions.

11             THE WITNESS:  It's good to see you as

12  well, sir.

13             THE COURT:  May the witness be excused?

14             MR. CORNELIUS:  Yes, Your Honor.

15             THE COURT:  You may step down, Sergeant.

16  Thank you for coming.

17             Please call your next.

18             MS. TISE:  The State will call Randy

19  Rhodes.

20             Can we approach, Judge?

21             THE COURT:  Yes.

22             (At the Bench, on the record)

23             THE COURT:  Something about this witness?

24             MS. TISE:  Nothing about him.  He is the

25  last witness that we have here right now.  He might take

 1  an hour.  He might not.  I just don't know.  Should we

 2  get another witness here?

 3                  THE COURT:  No.  We'll break.

 4                  MR. WOOD:  That was my fault.  I thought --

 5                  THE COURT:  Are you skipping Bill Stephens?

 6                  MS. TISE:  He's in Washington D.C. right

 7  now and he told us he'd really prefer not to fly back

 8  until Thursday.  And we'll see if we want to put him on

 9  and where we are on Thursday.  We may not call him, in

10  other words.

11                  THE COURT:  I think we have 45 minutes, so

12  one witness should be perfect.  Very good.

13                  MR. WOOD:  Thank you.

14                  (Open court, defendant and jury present)

15                  THE COURT:  Have you been sworn in?

16                  THE WITNESS:  Yes, ma'am.

17                  THE COURT:  You did get sworn in.

18                  Ms. Tise, you may proceed.

19                  MS. TISE:  Thank you, Judge.

20                          **RANDY RHODES,**

21  having been first duly sworn, testified as follows:

22                      **DIRECT EXAMINATION**

23  **BY MS. TISE:**

24      Q.   Good afternoon.

25      A.   Good afternoon.

1    Q.   Would you introduce yourself to the jury,

2  please?

3    A.   My name is Corporal Randy Rhodes.  I'm an

4  administration corporal with the Baytown Police

5  Department.

6    Q.   Okay.  And how long have you been with the

7  Baytown Police Department?

8    A.   Thirty years.

9    Q.   Okay.  And your title is Corporal Rhodes?

10    A.   Yes, ma'am.

11    Q.   Okay.  And you said how long?

12    A.   Thirty.

13    Q.   Thirty years.

14         Okay.  Can you tell the jury a little bit

15  about your background and training?

16    A.   Yes.  I started out as an 18-year-old reserved

17  deputy sheriff in Liberty County before going into the

18  United States Army as a military policeman.  Upon

19  getting out of the Army, I joined the Baytown Police

20  Department where I served in multiple position from

21  patrol to investigations into administration for the

22  last seven years where I'm currently the aid to the

23  chief of police.

24    Q.   Okay.  I want to take you back to a case that

25  you were involved in in 1992.  Okay?

1      A.   Yes, ma'am.

2      Q.   And that's the case that involved a kidnapping

3    and murder of 6-year-old Angelo Garcia, Jr.  Do you

4    remember that case?

5      A.   Yes, ma'am.

6      Q.   Is it a case that stands out in your mind?

7      A.   Yes, ma'am.

8      Q.   And as a member of the Baytown Police

9    Department, tell the jury how your department became

10   involved in the investigation and murder of that child?

11     A.   On November 4th, 1992, at about 5:00 in the

12   afternoon I was told to respond to the scene of a

13   possible body in the water in the waterway.  I was

14   currently, and still am, assigned to the marine unit,

15   which is a police boat.  And I was supposed to respond

16   to the scene to see if a boat would be needed to make

17   any type of recovery.  And that's the reason I responded

18   to the scene.

19     Q.   About what time of day was it?

20     A.   5:00 in the afternoon is when I received the

21   call.

22     Q.   Okay.  And do you know how the body in the

23   waterway was discovered?

24     A.   I believe a local fisherman was walking along

25   the banks.  That's about it.  Where someone was combing

1  the beach.

2       Q.   And thinking back to the way the weather was at

3  that time, can you tell the jury whether something

4  significant had happened with the weather that exposed

5  that body?

6       A.   Yes.  Goose Greek is a freshwater stream that

7  runs from the center west part of Baytown and goes all

8  the way down to where the ship channel is.  It's also

9  affected by the tides.  And at that time in November, we

10 had a strong cold front blow through.  What happened at

11 that time is the water in these small streams get blown

12 out towards the bay, so you have a lot more exposed

13 beach and sand and mud, which you would not normally

14 see.  And this had happened on this account.  We had

15 about 8 to 10 feet of beach, which is not normally

16 visible.

17      Q.   Okay.  And because of that, because the tide

18 going out due to the cold front, this body was exposed?

19      A.   Yes, it was.

20      Q.   Okay.  What did you do after you got your call?

21      A.   Responded to the scene, met with the supervisor

22 there, went and observed that we had skeletal remains of

23 what appeared to be a small child on the sandy part of

24 the beach.  It was determined at that point that the

25 police boat was not needed.  So, I just remained on the

1  scene to assist the investigators as they arrived.

2      Q.   Okay.  And did some officers from the Houston

3  Police Department come?

4      A.   Not at that time.

5      Q.   Okay.  Ultimately, during the time that y'all

6  were out there, do you remember Sergeant Elliott coming

7  from the Houston Police Department to help with the

8  investigation out at the scene?

9      A.   I believe that was not on that night when I was

10  there.  That was maybe a day or so later.

11      Q.   Okay.  The next day?

12      A.   Yes, ma'am.

13      Q.   Okay.  And when you were there that night, was

14  there something that created some urgency in your need

15  to go ahead and get that evidence collected pronto?

16      A.   It was already getting dark.  And one of the

17  concerns was that if we had a weather change, such as a

18  southerly wind coming back, it could blow the water back

19  into its normal banks, at which time it would basically

20  cover and obscure the remains.  So, the concern was that

21  if we left it there too long, we would not be able to

22  probably find everything we needed to find.  And so,

23  under the medical examiner's direction, we recovered the

24  remains.

25      Q.   Was the remains of the small child in tact?

1    A.   They were -- there was parts of the body that

2 was pretty much connected together, but there were also

3 bones scattered.   The skull was separated from the main

4 torso, some rib bones and vertebrae had been scattered

5 by aquatic life, animal life by the way of actions.   I'm

6 not sure what...

7    Q.   And pictures were taken to document the bones

8 that y'all observed and ultimately recovered?

9    A.   That's correct.   Uh-huh.

10    Q.   There wasn't a lot of time to do a lot of

11 detailed documentation, correct?

12    A.   No.

13    Q.   I'm going to show you some photos.

14         MS. TISE:   May I approach?

15         THE COURT:   Yes.

16    Q.   (By Ms. Tise) And the first thing is State's

17 Exhibit 43.   And can you tell the jury what that is

18 (indicating)?

19    A.   It's an aerial shot of the lower waters of the

20 Goose Greek stream off of the Hartman Bridge.

21    Q.   Does that photo show some of the surrounding

22 roadways and the general area there?

23    A.   Yes, it does.

24    Q.   Do you think it would be helpful to the jury to

25 see this to -- in order to understand the scene we're

1  talking about?

2      A.   I do.

3      Q.   Does it fairly and accurately represent how

4  that scene looks from overhead?

5      A.   Yes.

6           MS. TISE:  At this time, I will offer

7  State's Exhibit 43.

8           **(State's Exhibit No. 43 Offered)**

9           MR. CORNELIUS:  No objection, Judge.

10          THE COURT:  State's Exhibit 43 is admitted

11  without objection.

12          **(State's Exhibit No. 43 Admitted)**

13     Q.   (By Ms. Tise) Is this area we're talking about

14  a part of Harris County, Texas?

15     A.   Yes, it is.

16     Q.   All right.

17          MS. TISE:  If I can publish it, Judge?

18          THE COURT:  Yes, you may publish it.

19     Q.   (By Ms. Tise) If you could -- and it might be

20  helpful to step down -- just orient us to what we're

21  seeing here.

22     A.   On your lower left quadrant here is where the

23  Hartman Bridge is (indicating).

24     Q.   Okay.

25     A.   Coming up here, you have a divide which leads

1    to the main current Highway 146.  And down here on south

2    side is Business 146 (indicating).

3         Q.   Okay.

4         A.   This entrance is Goose Creek Stream as it goes

5    up through the center of town.  Currently now, there is

6    boat ramps here.  And this area up here where the body

7    was found is now a park area (indicating).

8         Q.   Okay.

9         A.   But there is a point that sticks out into the

10   stream and it's along that point that we found the

11   remains (indicating).

12        Q.   Okay.  And as you said, this entire area is

13   Harris County, Texas, correct?

14        A.   Yes, ma'am.

15        Q.   And if you got on 146 and headed back to

16   Pasadena, you'd be in Harris County, Texas, that whole

17   route, wouldn't you?

18        A.   Yes, ma'am.

19        Q.   Now, you said the area where the remains were

20   found is now a park?

21        A.   Yes.

22        Q.   Can you describe for the jury that specific

23   area where the point is and the victim was found?  What

24   was it like back then?

25        A.   Back then it was like residual remains of

1   previous oil field construction work.  There was exposed

2   tanks there were still in the area, structures involved

3   with oil production.  It was not normally accessed by

4   most people, although fishermen would walk along the

5   banks and go fish in that area.

6        Q.   Okay.

7             THE COURT:  Corporal, if you don't need to

8   be up for the map, go ahead and have a seat and speak

9   into that microphone.  Thank you.

10       A.   (Witness complies).

11       Q.   (By Ms. Tise) I'm going to show you a few more

12  pictures.  They are marked State's Exhibits 44 through

13  53.  Take a look at those (indicating).

14       A.   The first few shots --

15       Q.   I will ask you specific questions about them,

16  but do these fairly and accurately represent how that

17  scene looked?

18       A.   Yes, ma'am.

19            MS. TISE:  And at this time, I will offer

20  State's Exhibits 44 through 53.

21            **(State's Exhibit No. 44 through 53 Offered)**

22            MR. CORNELIUS:  No objection, Judge.

23            THE COURT:   Thank you, Mr. Cornelius.

24  State's Exhibits 44, 45, 46, 47, 48, 49, 50, 51, 52, and

25  53 are admitted without objection.

1          **(State's Exhibit No. 44 through 53**

2              **Admitted)**

3      Q.   (By Ms. Tise) Taking a look at State's Exhibit

4  44, can you tell the jury what we're looking at here?

5      A.   Okay.  That is a picture taken at the time of

6  the recovery, I think the day after we made the

7  recovery, showing the point -- do you want me to return

8  there?

9      Q.   Would you, please?

10      A.   Yes, ma'am.

11              THE COURT:  Keep your voice up.

12              THE WITNESS:  Yes, ma'am.

13      A.   This is the point that was being discussed.

14  The body was found on this side of that point.  Goose

15  Creek Stream is here and makes a swing around and

16  continues on up.  These are the old production tanks

17  that were still visible at the time, as well as there

18  was some here as well (indicating).

19      Q.   (By Ms. Tise) Okay.  And so, that little

20  peninsula sticking out into the water is the point you

21  are talking about?

22      A.   Yes, ma'am.

23      Q.   And this whole area that we're looking at now

24  is the area that you were saying is now a park?

25      A.   Yes, ma'am.

1    Q.    But at the time, it wasn't at all a park?

2    A.    No.   That's the condition it was in at the

3 time.

4    Q.    Okay.   And can that area be accessed by a

5 little road at that time?

6    A.    Yes, ma'am.   At the end of Arizona Street,

7 which comes from here, off your left side --

8    Q.    Okay.

9    A.    -- that's how access is gained.

10   Q.    Okay.   And is it basically a dirt road that

11 leads on down to the area around that point?

12   A.    Yes, ma'am.   Towards the point itself, there's

13 really not even a road there.   It's just some cleared

14 land.

15   Q.    Okay.   And I will show you State's Exhibit 45.

16 And you may have better luck, since it's kind of high up

17 for you -- the photos are there on the screen right next

18 to you.   And if you touch the screen, it will make a

19 little mark about the area that you're talking about.

20   A.    All right.

21   Q.    Okay.   So, taking a look at State's Exhibit 45,

22 can you tell me what this is a photo of?

23   A.    This is another view, aerial view of the same

24 point we just described.

25   Q.    Okay.

1        A.    This here is the exposed beach, which is

2   visible (indicating).

3        Q.    Okay.

4        A.    The old tank.   That is the other picture.

5        Q.    Okay.   Now, you can see a little bit of them on

6   the back of that picture back there, correct

7   (indicating)?

8        A.    Yes, ma'am, up in here (indicating).

9        Q.    And the dirt area leading down?

10       A.    Correct.

11       Q.    Okay.   And also, I don't know if you can see it

12  on your screen, but can you make out the crime scene

13  tape that's actually there?   It's hard to see.

14       A.    It looks like there's some residual tape along

15  in that area there.   It's hard to tell.

16       Q.    And if you look at the actual picture, you

17  might be able to see it better, depending on how good

18  your reading glasses are.

19       A.    Bifocals.   Yes, ma'am, I can see into the

20  waterway and stuff like that.

21       Q.    Can you find it there on the screen and trace

22  it for the jury?

23       A.    Where I started to draw, that area.   You can

24  see the water's already returning.

25       Q.    Is that area that you have marked there the

1   area where the remains were scattered?

2       A.   Yes, ma'am.

3       Q.   Describe that beach area for me.

4       A.   Silky sand and mud area.  It's fairly compact.

5   The water level normally is right up there to where the

6   vegetation line is.

7       Q.   Okay.  And is it a clean area, dirty?

8       A.   It's dirty.  Old tires, residual clothes that

9   people may have thrown off swimming in that area or

10  fishing in that area or just washed up with wave action,

11  but rocks and debris.

12      Q.   Old tires --

13      A.   Yes.

14      Q.   -- and stuff like that?

15           Taking a look at State's Exhibit 46.

16  Basically, that's just another angle of the same

17  location (indicating)?

18      A.   Yes, ma'am.  Showing the northern side of the

19  point.

20      Q.   And State's Exhibit 47.

21      A.   This is a couple of officers on the scene where

22  the recovery was made.

23      Q.   Okay.  Does that kind of give a good idea of

24  what kind of area we are talking about there with the

25  tires and the trash?

1      A.   Very good.

2      Q.   State's Exhibit 48.   What do we see here

3  (indicating)?

4      A.   I believe this is going to be the exposed

5  skull, the remains that was spotted on the beach.

6      Q.   Can you point that out for us?

7      A.   (Witness complies).

8      Q.   Was that the most obvious part of the remains

9  that you found?

10     A.   From that distance, yes, ma'am.

11     Q.   As you got up closer, did you observed

12  another -- well, I will show you State's Exhibit 49.   Is

13  that another view of the skull closer (indicating)?

14     A.   Yes, ma'am.

15     Q.   Okay.   And in State's Exhibit 50, is it

16  starting to get dark?

17     A.   Yes, ma'am.

18     Q.   And y'all had been out there for a while,

19  right?

20     A.   Yes, ma'am.

21     Q.   You can see something else in the background of

22  that picture, can you not?

23     A.   Yes, ma'am, I can.

24     Q.   What was recovered in that location back there?

25     A.   The main part of the torso was in that general

1  area right there next to this rock, which is visible

2  right there in the picture, just past the skull

3  (indicating).

4      Q.   Okay.  And was the torso smushed down into the

5  mud to some extent?

6      A.   Yes.

7      Q.   Okay.  And did you also find an article of the

8  clothing under that large rock?

9      A.   I did not actually move that particular item,

10 but I did see it and there was a pair of shorts with a

11 Batman logo on it and a t-shirt in that general area

12 right there.

13     Q.   Under that rock?

14     A.   Yes, ma'am.

15     Q.   Okay.  Taking a look at State's Exhibit 51,

16 which is a little bit closer view where you can see some

17 of the clothing right there by that rock, correct

18 (indicating)?

19     A.   Yes, ma'am.

20     Q.   And State's Exhibit 52, a closer view of the

21 skull (indicating)?

22     A.   Yes, ma'am.

23     Q.   And then State's Exhibit 53 (indicating).

24     A.   Yes, ma'am.

25     Q.   What is that?

1      A.   To the best of my memory, I think it was maybe

2  some bones and some other clothing that may have been

3  found in that general area right there.

4      Q.   You and the other officers out there recovered

5  as much as you could?

6      A.   Yes, ma'am.

7      Q.   Didn't get a full skeleton, did you?

8      A.   No, ma'am.

9      Q.   Got some rib bones, some of the torso, the

10 skull.

11     A.   Leg bones, yes.

12     Q.   Parts of the jaw?

13     A.   Correct.

14     Q.   And what did you do with that evidence?

15     A.   That was turned over to the funeral home, which

16 had been sent to recover the remains and transport them

17 to the medical examiner's office.

18     Q.   Okay.  Did you go to the medical examiner's

19 office yourself?

20     A.   No, ma'am, I did not.

21     Q.   Okay.  After those items were recovered and a

22 documentation by pictures was made, did you have any

23 other involvement in the investigation of this case?

24     A.   The following day when I came in, I was advised

25 that additional detectives had returned to the scene for

1  a more thorough search in daylight.  I was tasked with

2  trying to contact the Houston Police Department to see

3  if there was any missing children that they were

4  investigating.  I made contact with the HPD Homicide

5  Division and they told me about a case that they were

6  working on.  And when I mentioned the clothing that was

7  recovered, they thought it appeared to be a case that

8  they were working on.  So, I advised them to contact our

9  investigators who were at the medical examiner's office.

10      Q.   What happened next?

11      A.   The remains were identified as Angelo Garcia,

12  Jr.

13              MS. TISE:  I pass the witness.

14              THE COURT:  Okay.  Thank you, Ms. Tise.

15              Mr. Cornelius.

16              MR. CORNELIUS:  Just a second.

17              (Pause)

18              MR. CORNELIUS:  No questions.

19              THE COURT:  Thank you.

20              May this witness be excused?

21              MR. CORNELIUS:  Yes.

22              MS. TISE:  He may.

23              THE COURT:  You are excused.  Thank you for

24  coming in, sir.

25              THE WITNESS:  Thank you, ma'am.

1          THE COURT:  Ladies and gentlemen of the

2    jury, I believe that's all the witnesses we have for

3    today.  And since we're very close to break time, we're

4    going to go ahead and recess for the evening, give you a

5    little bit of a break.  And I think tomorrow we'll start

6    up at the same time.  I know it may have been a little

7    difficult this morning, but hopefully it won't be so bad

8    tomorrow.  So, if anyone gets stuck in an elevator --

9    usually by 10:00 the crowd has already gotten to the

10   courtrooms.  It was a little bit different this morning,

11   but if you do get stuck in an elevator or something

12   tomorrow morning, please call the deputy and maybe we

13   can take you up in the back elevator so can we get

14   everybody here on time.  So, try to be here about ten

15   minutes till.

16          And if you want -- I see a couple of you

17   have already have.  If you want to bring a bottle of

18   water or something like that in with you, you certainly

19   may.  I know that we're having long days, but we

20   appreciate all of your time.

21          And today before you leave, I'm reminding

22   you, you should not talk amongst yourselves or with

23   anyone else on any subject connected with this trial or

24   to form any expressed -- or express any opinion thereon.

25   You've heard a lot of testimony about locations and

1    stuff now.  Do not go on the Internet looking for

2    anything.  Do not go out to crime scenes.  You need to

3    get all of your information from the witness stand.

4    Okay?

5                    Thank you very much and we'll see you in

6    the morning.

7                    THE BAILIFF:  All rise.

8                    (Open court, defendant present, no jury)

9                    THE COURT:  Okay.  See y'all at 10:00 in

10   the morning.

11                   (Proceedings recessed)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2     THE STATE OF TEXAS   )
      COUNTY OF HARRIS     )

3

4         I, Mary Ann Rodriguez, Official Court Reporter in

5     and for the 337th District Court of Harris County, State

6     of Texas, do hereby certify that the above and foregoing

7     contains a true and correct transcription of all

8     portions of evidence and other proceedings requested in

9     writing by counsel for the parties to be included in

10    this volume of the Reporter's Record, in the

11    above-styled and numbered cause, all of which occurred

12    in open court or in chambers and were reported by me.

13        I further certify that this Reporter's Record of

14    the proceedings truly and correctly reflects the

15    exhibits, if any, admitted by the respective parties.

16        WITNESS MY OFFICIAL HAND this the 3rd day of

17    October, 2013.

18

19

20

21    /s/ Mary Ann Rodriguez
      Mary Ann Rodriguez, Texas CSR 3047
22    Expiration Date:  12/31/2013
      Official Court Reporter
23    337th Court
      1201 Franklin
24    Houston, Texas  77002
      713.755.7746
25

## $

**$20** - 7:4, 7:20
**$560** - 7:13, 7:23

## '

**'06** - 175:20
**'92** - 45:10, 49:23, 59:16, 105:15
**'93** - 36:24
**'skip'** - 2:11

## /

**/s** - 208:21

## 0

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

## 1

**1** - 7:17, 52:11, 158:14
**10** - 133:6, 192:15
**10-1** - 45:10, 49:23, 59:16
**107** - 1:10, 1:20
**10:00** - 206:9, 207:9
**10th** - 143:14
**11** - 151:7
**11:00** - 54:5
**12** - 135:23
**12/31/2013** - 208:22
**1201** - 2:6, 208:23
**1205** - 180:4
**1225** - 2:15
**12800** - 147:3
**131** - 1:10, 1:21
**1384794** - 1:3, 3:3, 52:17
**141** - 2:11
**144** - 2:10
**146** - 1:11, 1:18, 196:1, 196:2, 196:15
**150** - 3:3
**15100** - 180:4
**15th** - 111:15
**165** - 2:12, 2:13, 2:14, 2:15, 2:16
**16th** - 111:18
**173** - 1:11, 1:18
**175** - 1:12, 2:1
**17th** - 111:1
**18** - 63:14
**18-year-old** - 190:16
**189** - 1:13, 1:23
**19** - 1:2, 1:1, 1:5, 1:6, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:17, 1:18, 1:19, 1:20, 1:21, 1:22, 1:23, 1:24, 1:25, 2:1, 2:4, 2:5, 2:6, 2:7, 2:8, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 18:11, 63:15
**195** - 2:17
**197** - 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2
**1973** - 176:16, 176:19
**1978** - 176:25
**1979** - 36:20
**198** - 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2
**1982** - 177:2
**1985** - 37:19, 38:4

## 1989 / continued

**1989** - 132:15, 134:25
**1992** - 4:15, 4:24, 5:21, 6:1, 12:8, 36:23, 42:21, 43:18, 48:7, 55:15, 55:21, 64:8, 65:5, 66:20, 80:1, 95:7, 96:4, 107:24, 108:14, 111:2, 111:9, 134:19, 135:2, 136:7, 136:8, 140:25, 142:5, 142:12, 143:14, 148:4, 148:6, 148:20, 149:9, 151:17, 156:7, 156:8, 156:11, 167:20, 169:9, 169:18, 171:17, 177:11, 178:17, 179:25, 180:13, 184:4, 185:25, 190:25, 191:11
**1:00** - 158:10
**1:30** - 158:17, 158:20, 159:2
**1st** - 42:21, 43:18, 48:7, 66:13, 66:14, 66:20, 77:20, 78:6, 107:24, 135:13, 136:8, 156:8, 167:20, 169:9, 169:18, 171:17, 178:17

## 2

**2** - 118:22
**2.020** - 96:25
**2.021** - 96:24, 97:7, 100:25
**2.022** - 101:14
**2.023** - 103:25
**20** - 7:3, 7:9, 167:2
**20-plus** - 55:6
**200** - 40:11
**2000** - 133:18, 167:20
**2006** - 177:7
**2007** - 134:6
**2013** - 1:20, 1:3, 208:17
**2028** - 2:12
**208** - 1:14
**20th** - 118:19
**21** - 72:14, 95:21
**216** - 182:12
**22** - 77:13
**23** - 148:23
**24** - 148:23, 177:6
**24039247** - 2:5
**25** - 9:12, 10:12, 10:20, 10:22, 18:19
**26** - 10:9
**28** - 7:10, 7:20, 60:13
**29** - 18:11
**2:00** - 158:11, 160:11, 160:13, 184:15, 185:2
**2:30** - 162:9

## 3

**3** - 142:3
**30** - 99:10, 162:6
**301** - 92:13
**3047** - 208:21
**30th** - 4:24, 5:21, 5:25, 42:21, 55:21, 65:4, 135:13, 136:7, 156:7
**33** - 2:3, 44:18, 44:19, 45:16, 45:17, 45:21, 46:2, 46:10, 47:2, 47:3, 47:8, 47:9, 48:3, 59:6, 59:7, 59:14
**33-a** - 2:5, 46:15, 46:18, 47:9, 48:2
**33-b** - 2:6, 46:21, 47:9
**33-c** - 2:7, 46:23, 47:9
**33-d** - 2:8, 46:25, 47:10, 48:1
**337th** - 1:12, 119:3, 121:2, 208:5, 208:23
**34** - 1:5, 1:25
**35** - 1:6, 1:22, 2:9, 99:11,

## 3 / continued

143:22, 144:7, 144:8, 144:11
**36** - 2:11, 130:1, 130:2, 141:9, 141:12, 141:16, 141:17, 141:18, 141:22
**37** - 2:12, 164:5, 165:4, 165:5, 165:8, 165:10
**37-and-a-half** - 63:6
**38** - 2:13, 165:8
**39** - 2:14, 165:8, 166:6
**3:00** - 162:9
**3:45** - 43:21
**3rd** - 66:13, 143:13, 208:16
**3th** - 181:13

## 4

**4** - 1:5, 1:24, 54:1, 54:4, 54:7, 54:9
**4,000-dollar** - 8:4
**40** - 2:15, 165:8, 166:9
**400** - 40:11
**403** - 122:3, 129:21
**404** - 118:11
**404(b** - 116:5, 116:17, 118:17, 119:12, 119:13, 119:14, 119:24, 120:19, 120:20, 129:19
**41** - 2:16, 164:5, 165:4, 165:5, 165:8, 165:10, 166:12
**43** - 2:17, 194:17, 195:7, 195:8, 195:10, 195:12
**44** - 2:18, 10:22, 197:12, 197:20, 197:21, 197:24, 198:1, 198:4
**440** - 2:15
**45** - 2:19, 189:11, 197:24, 199:15, 199:21
**46** - 2:20, 197:24, 201:15
**47** - 2:4, 2:5, 2:6, 2:7, 2:8, 2:21, 197:24, 201:20
**48** - 2:22, 197:24, 202:2
**49** - 2:23, 197:24, 202:12
**4:24** - 59:16
**4:25** - 45:13, 49:22
**4:26** - 67:13
**4th** - 181:13, 191:11

## 5

**5** - 1:5, 1:24
**5,000-dollar** - 127:12
**50** - 1:6, 1:22, 2:24, 197:24, 202:15
**500** - 9:11
**51** - 2:25, 197:24, 203:15
**52** - 3:1, 197:24, 203:20
**53** - 1:8, 1:17, 3:2, 197:13, 197:20, 197:21, 197:25, 198:1, 203:23
**560** - 9:9
**5:00** - 191:11, 191:20
**5th** - 85:2, 85:3, 85:23, 87:1, 179:24, 180:13

## 6

**6** - 99:5
**6-year-old** - 102:12, 191:3
**62** - 1:9, 1:19
**628** - 99:4
**6705** - 55:22, 56:4
**6:28** - 67:16, 99:5
**6:30** - 78:5, 99:5
**6th** - 184:4, 184:19, 185:1, 185:25

## 7

**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 208:24
**713.877.9400** - 2:16
**77002** - 2:6, 208:24
**77002-1659** - 2:16
**77019-2408** - 2:13
**7:00** - 54:6

## 8

**8** - 192:15
**80s** - 40:1
**83** - 3:4, 153:2
**84** - 86:13, 86:17, 86:20, 86:21, 185:24
**85** - 154:13
**88** - 34:8
**89** - 3:3, 149:25, 150:14, 150:16, 150:17, 150:21, 150:23
**8th** - 105:15, 108:14, 108:18, 109:4, 109:8, 111:9, 117:11, 140:25, 142:5, 142:12

## 9

**9** - 1:3
**90** - 3:4, 83:7, 83:14, 83:15, 83:17, 83:18
**94** - 1:9, 1:19
**9th** - 1:20

## A

**abducted** - 99:17
**abduction** - 94:6, 109:22, 135:9, 177:13
**able** - 3:17, 18:13, 37:25, 68:3, 68:10, 74:18, 90:6, 92:22, 92:3, 112:1, 113:18, 114:21, 117:6, 117:7, 117:13, 121:4, 138:8, 140:11, 152:5, 183:4, 193:21, 200:17
**above-entitled** - 1:21
**above-styled** - 208:11
**absence** - 119:18
**absolutely** - 111:25, 112:6, 138:9, 144:25
**Absolutely** - 72:9
**abusing** - 15:9
**academy** - 132:19, 176:20
**accent** - 70:19, 185:10, 185:11, 185:21, 185:22
**access** - 199:9
**accessed** - 197:3, 199:4
**accident** - 119:18
**accompany** - 185:15
**account** - 40:9, 192:14
**accounts** - 37:12
**accurate** - 144:3
**accurately** - 164:17, 195:3, 197:16
**accused** - 6:23, 15:25, 25:1, 26:23, 31:4, 128:18
**accused's** - 125:23
**act** - 130:7
**acting** - 32:14
**action** - 201:10
**actions** - 109:9, 109:12, 194:5
**activity** - 133:3
**actual** - 66:12, 114:23, 200:16
**addition** - 71:2, 116:13,

130:15
**additional** - 120:10,
127:23, 127:24, 141:13,
204:25
**Additionally** - 77:5
**Additionally** - 138:9
**address** - 149:15
**adds** - 121:22
**administration** - 190:4,
190:21
**administrator** - 36:16
**admissibility** - 123:24
**admissible** - 106:23,
107:8, 119:15, 129:21,
130:6, 130:7, 130:8
**admission** - 115:11, 121:1
**admit** - 72:22, 95:2,
120:23, 136:12
**admitted** - 83:17, 98:2,
99:19, 100:19, 130:2,
141:17, 150:21, 165:8,
195:10, 197:25, 208:15
**Admitted** - 2:2, 83:18,
141:18, 150:23, 165:11,
195:12, 198:2
**admitting** - 98:8, 121:1
**advised** - 59:23, 101:19,
109:5, 204:24, 205:8
**aerial** - 194:19, 199:23
**affected** - 192:9
**affidavit** - 144:14
**African** - 69:23, 70:13,
70:23, 95:6, 96:9, 96:13,
96:15
**African-american** - 69:23,
70:13, 70:23
**African-americans** - 96:13
**afternoon** - 43:23, 53:12,
53:13, 62:15, 184:15, 185:2,
189:24, 189:25, 191:12,
191:20
**age** - 135:23
**agencies** - 175:23
**agency** - 63:3, 109:9
**agent** - 122:7, 131:21,
134:20, 135:16, 142:15
**Agent** - 105:7, 105:18,
107:19, 110:11, 127:6,
131:8, 131:16, 131:19,
134:18, 141:21, 143:21,
144:16, 146:9
**agents** - 112:12, 114:24
**ago** - 72:14, 136:12
**agree** - 26:1, 32:10, 70:17,
96:18, 116:24
**agreed** - 90:8, 90:23,
185:17
**agreeing** - 125:9, 129:13
**ahead** - 35:25, 59:24, 83:2,
107:3, 107:5, 122:10,
122:16, 193:15, 197:8,
206:4
**aid** - 190:22
**aided** - 1:24
**air** - 77:9
**airline** - 145:14
**Alan** - 120:4, 180:9
**Alice** - 12:5, 179:2
**allegedly** - 111:4
**allow** - 16:12, 16:17, 20:9,
28:16, 82:5, 82:23, 86:19,
88:8, 90:20, 123:19, 123:23,
123:24, 125:19, 125:20,
126:15, 127:1, 128:20,
128:22, 128:23, 129:3,
151:25
**allowing** - 113:12
**allows** - 120:19
**almost** - 53:16, 99:5
**alone** - 49:9, 57:8, 136:22

**Alonzo** - 92:21, 183:8
**Alphabetical** - 1:16
**ambulance** - 17:20, 17:22,
17:25
**amended** - 118:11
**America's** - 142:24, 143:1
**american** - 69:23, 70:13,
70:23
**americans** - 96:13
**amount** - 9:9, 39:5
**ample** - 119:25
**analysis** - 116:6
**analyze** - 48:21
**analyzing** - 122:3
**Angelita** - 74:17, 79:7,
88:20, 89:13, 89:17, 91:17,
91:23, 93:10, 109:2, 109:5,
116:21, 116:22, 117:2,
117:8, 117:17, 117:24,
118:15, 122:14, 139:25,
140:12, 140:14, 143:9,
144:2, 166:23, 167:4, 167:8,
169:22, 170:1, 170:8,
170:24, 180:8, 187:16,
187:19, 187:22
**Angelita's** - 140:2
**Angelo** - 135:9, 135:14,
137:23, 138:4, 142:13,
177:13, 179:5, 179:12,
191:3, 205:11
**Angelo's** - 143:2
**angle** - 201:16
**animal** - 194:5
**Ann** - 125:7, 208:4, 208:21
**answer** - 139:12, 150:11,
159:6, 170:17
**answered** - 15:21, 16:11,
28:13, 159:7, 171:11, 185:3
**answers** - 110:1
**anticipating** - 53:17
**anyplace** - 19:15
**anyway** - 125:20
**Ap-77,025** - 1:4
**apartment** - 9:13, 9:24,
10:2, 11:10, 11:15, 11:19,
11:22, 13:2, 23:2, 24:23,
25:6, 27:19, 27:22, 28:2,
29:2, 29:7, 29:8, 29:12,
29:15, 29:16, 29:19, 32:3,
58:4, 58:5, 75:11, 99:14,
101:5, 138:22, 162:2,
169:16, 170:25, 171:4,
171:7, 180:3, 180:7, 181:5,
181:7, 184:6, 184:9, 184:11,
184:22, 185:25
**Apartments** - 180:4
**apartments** - 29:10,
149:15
**Appeals** - 1:4
**appear** - 47:3, 105:15,
105:21, 108:23, 111:7,
111:8, 111:11, 115:20,
118:25, 126:9, 140:18,
140:24, 141:22, 141:25,
142:4, 142:8, 144:3
**appearance** - 108:15,
108:18, 108:20, 109:8
**appeared** - 141:2, 174:8,
192:23, 205:7
**appearing** - 109:7
**Appellant** - 1:7
**Appellee** - 1:12
**applies** - 120:3
**apply** - 119:12
**appreciate** - 3:14, 123:14,
147:24, 206:20
**apprehension** - 109:17,
109:21
**approach** - 10:5, 18:8,
23:10, 31:19, 44:13, 47:11,

59:1, 67:11, 76:14, 83:4,
105:8, 143:18, 149:22,
152:22, 164:2, 188:20,
194:14
**appropriate** - 116:6
**aquatic** - 194:5
**area** - 56:4, 56:18, 133:10,
149:17, 194:22, 195:13,
196:6, 196:7, 196:12,
196:19, 196:23, 197:2,
197:5, 198:23, 198:24,
199:4, 199:11, 199:19,
200:9, 200:15, 200:23,
200:25, 201:1, 201:3, 201:4,
201:7, 201:9, 201:10,
201:24, 203:1, 203:11,
204:3
**areas** - 167:15
**argue** - 125:11
**arguing** - 126:8
**argument** - 11:24, 119:10,
119:21, 125:8
**arise** - 179:15
**arising** - 119:3
**Arizona** - 199:6
**Armed** - 184:10
**Army** - 132:5, 132:7,
132:8, 132:10, 132:13,
190:18, 190:19
**arrangements** - 92:9,
92:24, 93:2
**arrest** - 111:14
**arrived** - 56:12, 56:21,
162:8, 162:21, 182:24,
184:15, 193:1
**article** - 203:7
**Arturo** - 1:5, 1:25, 3:7,
3:21, 4:2, 57:17, 67:1, 67:6,
67:18, 67:19, 68:3, 68:10,
69:11, 72:11, 72:21, 73:5,
76:1, 76:21, 77:5, 77:12,
77:17, 78:8, 78:15, 81:24,
83:11, 93:25, 96:23, 97:23,
100:21, 100:24, 101:19,
102:17, 103:5, 103:10,
137:13, 172:19
**Arturo's** - 76:9, 98:4
**asleep** - 157:20, 158:14
**Asleep** - 158:13
**aspect** - 32:10, 109:21,
145:2
**aspects** - 63:25
**assault** - 2:3, 23:3, 25:10,
25:14, 37:16, 37:23, 38:2,
38:7, 38:11, 38:15, 38:19,
39:17, 40:4, 40:18, 40:22,
41:4, 41:14, 41:18, 42:14,
43:9, 44:23, 45:25, 48:15,
48:19, 48:20, 49:1, 49:7,
49:10, 49:16, 58:11, 58:24,
59:8, 59:19, 75:19, 101:5
**assaulted** - 38:1, 38:24,
50:23, 51:2, 57:15, 57:21
**assaulting** - 34:13
**assaults** - 39:4, 64:15
**assess** - 136:13
**assigned** - 58:10, 63:11,
64:7, 64:18, 68:1, 132:20,
132:21, 133:22, 134:24,
135:7, 136:14, 176:20,
177:2, 177:3, 178:18,
191:14
**assignment** - 63:14,
64:12, 80:23, 134:3
**assist** - 3:19, 138:12,
193:1
**assistance** - 137:2, 137:3
**Assistant** - 2:5
**assistant** - 111:16
**assisted** - 79:2

**assume** - 96:4, 122:12
**Assuming** - 12:24
**attached** - 126:1
**attack** - 23:5
**attacked** - 101:8
**attacker** - 34:17
**attempt** - 92:19
**attempting** - 140:5
**attend** - 108:19
**attendants** - 17:20
**attended** - 132:19
**attending** - 132:4, 132:20
**attention** - 14:13, 42:20,
134:18, 138:24, 174:2
**attorney** - 36:10, 91:17,
92:1, 92:5
**Attorney** - 92:1, 92:22,
92:24, 93:13
**Attorney's** - 111:15
**attorney's** - 92:14
**attorneys** - 3:5
**Attorneys** - 2:5, 2:7, 2:17
**authorized** - 51:6
**Auto** - 84:16, 84:22, 85:14
**auto** - 86:3, 87:7
**available** - 116:18
**Aviles** - 187:1
**avoid** - 109:13, 111:17,
111:20, 112:14, 113:24
**aware** - 4:23, 21:11, 79:9,
120:12, 140:17, 153:13,
154:18, 155:25, 170:24
**Awkward** - 170:18

**B**

**baby** - 147:20
**background** - 36:13, 37:7,
37:14, 131:24, 176:14,
190:15, 202:21
**bad** - 130:7, 206:7
**badly** - 76:1
**bags** - 30:7, 30:8
**bail** - 125:23, 125:24,
126:3, 126:6, 126:25,
130:10
**Bailiff** - 35:8, 52:1, 52:6,
52:8, 106:17, 146:12, 175:5,
207:7
**balancing** - 114:13
**bandages** - 19:22
**bank** - 133:1, 135:4
**banks** - 191:25, 193:19,
197:5
**bar** - 36:24
**barely** - 77:9
**barrel** - 10:16
**barrier** - 57:23
**Based** - 124:3
**based** - 48:13, 49:11,
69:21, 76:23, 127:25
**basic** - 132:19, 145:14
**basis** - 117:9
**basketball** - 134:14,
134:15
**Batman** - 203:11
**bay** - 192:12
**Baytown** - 159:22, 160:5,
160:14, 161:16, 162:7,
190:4, 190:7, 190:19, 191:8,
192:7
**beach** - 192:1, 192:13,
192:15, 192:24, 200:1,
201:3, 202:5
**beat** - 23:3, 24:23, 25:7,
56:8, 56:9, 57:21, 75:18,
101:5
**beaten** - 76:1
**became** - 38:4, 40:4,
107:21, 108:1, 178:15,

191:9
**become** - 36:21, 37:15, 38:11, 107:23, 108:3, 135:7, 135:11, 135:16, 135:24, 139:8, 140:17
**becomes** - 105:14
**bed** - 157:23, 158:9, 158:10, 159:2, 159:4
**bedroom** - 18:13, 18:16, 158:1
**began** - 72:20
**begin** - 136:18
**beginning** - 76:7, 76:8, 136:19, 136:22, 139:22
**behalf** - 109:9
**behavior** - 113:19
**behind** - 13:17
**belong** - 44:25, 141:25
**Bench** - 23:11, 25:20, 31:20, 47:13, 105:10, 188:22
**bench** - 25:19, 47:11
**best** - 56:23, 204:1
**bet** - 36:4
**bets** - 76:23
**better** - 18:23, 38:14, 161:2, 183:20, 199:16, 200:17
**between** - 72:11, 94:6, 107:10, 135:22, 162:25, 168:10, 170:8
**Bienviendo** - 148:8, 148:10, 148:18, 149:19, 150:3, 150:4, 151:6, 151:18, 152:8, 153:5, 155:3, 155:4, 155:14, 165:15, 174:5
**Bifocals** - 200:19
**big** - 72:10, 72:18, 80:1, 98:11
**Bill** - 53:20, 189:5
**bird** - 166:15
**birth** - 185:7, 186:14
**bit** - 20:10, 36:12, 41:3, 131:23, 147:6, 147:25, 162:7, 176:13, 187:17, 190:14, 200:5, 203:16, 206:5, 206:10
**black** - 11:25, 12:13, 12:14, 12:22, 13:19, 14:9, 17:2, 17:6, 17:7, 17:9, 34:8, 69:18, 70:2, 70:7, 70:11, 70:12, 70:13, 70:17, 77:3, 95:6, 96:6, 96:20, 96:21, 97:16, 104:8, 104:13, 152:21, 156:2, 166:17, 166:25, 167:5, 181:8
**blew** - 163:10
**blood** - 18:19, 19:4, 19:8, 19:11, 19:13, 19:15, 47:1, 83:20
**Blood** - 2:8
**Bloomington** - 133:25
**blow** - 192:10, 193:18
**blown** - 192:11
**blue** - 17:2, 17:7, 86:4, 86:5, 87:8, 87:16, 87:21, 88:11, 89:14, 104:8, 166:15, 166:17, 166:21, 166:24, 167:5
**boat** - 191:15, 191:16, 192:25, 196:6
**body** - 63:25, 87:6, 94:8, 191:13, 191:22, 192:5, 192:18, 194:1, 196:6, 198:14
**bond** - 106:2, 106:3, 111:11, 114:2, 114:6, 115:7, 115:8, 115:24, 117:25, 118:13, 119:2, 121:2, 121:3, 121:11, 122:22, 123:24,

124:13, 124:17, 124:18, 124:24, 125:15, 125:16, 125:20, 125:23, 126:10, 126:12, 126:20, 127:10, 127:11, 127:12, 128:23, 141:22, 142:10
**Bond** - 2:11
**bond-forfeited** - 114:2, 124:24
**bones** - 194:3, 194:4, 194:7, 204:2, 204:9, 204:11
**born** - 147:21
**borrowed** - 167:19
**bothered** - 173:23
**bottle** - 206:17
**bottom** - 31:23, 101:1
**bought** - 27:25, 30:2, 30:18, 30:22
**Boulevard** - 147:3
**box** - 12:21, 44:19, 44:25, 45:3, 45:9, 45:12, 49:17, 49:19, 49:22, 96:6
**boy** - 74:6, 102:12, 157:1, 157:2, 172:19
**bracelet** - 8:4
**break** - 13:23, 23:19, 27:18, 29:19, 52:4, 52:5, 52:10, 106:11, 189:3, 206:3, 206:5
**break-in** - 27:18, 29:19
**Bredemeyer** - 1:8, 1:17, 49:25, 51:21, 52:24, 53:4, 53:8, 53:12, 53:20, 53:22, 53:24, 55:15, 59:4, 60:13, 68:6
**Bridge** - 194:20, 195:23
**Brief** - 14:3, 125:6, 174:19
**briefly** - 33:24, 105:8
**bring** - 3:9, 52:25, 130:16, 146:14, 206:17
**bringing** - 105:17
**broke** - 151:10
**broken** - 58:5
**Broken** - 185:20
**brought** - 16:5, 40:19, 40:23, 91:14, 167:21, 167:25, 168:5, 168:15, 174:1, 178:20
**Brown** - 180:9, 182:13
**brown** - 17:6, 17:9, 17:10, 77:2, 104:8, 172:11
**bruising** - 48:18, 49:8
**Buffalo** - 2:12
**Buick** - 34:8
**bulk** - 110:2
**bunch** - 79:18, 79:20, 79:21
**Bureau** - 131:22
**burglarized** - 102:19, 103:11
**burglary** - 30:14, 30:24, 56:2
**burn** - 62:25
**burning** - 62:25
**business** - 10:25, 37:12, 75:20, 82:22, 84:3, 97:24, 98:8, 98:14, 99:18, 144:14
**Business** - 196:2
**busy** - 134:13
**buy** - 7:4, 174:12
**buying** - 30:25

---

# C

**Caesar** - 179:7
**Candido** - 86:11, 86:13, 87:1, 185:4, 185:5, 186:3
**cannot** - 15:8, 115:3
**Cantrell** - 125:14, 125:22
**canvassing** - 78:18

**capacity** - 133:5, 133:6
**captain** - 132:12
**car** - 34:8, 40:21, 40:23, 84:3, 84:5, 161:12, 161:23, 166:21, 166:23, 167:5, 167:6, 167:18, 167:19, 168:11, 168:14, 169:2
**card** - 185:7
**care** - 37:25, 38:2, 57:9, 57:16, 183:24
**career** - 40:6, 55:2, 55:7
**Carmelo** - 88:22, 91:2, 91:5, 154:19
**carried** - 9:16
**cars** - 34:6, 166:19
**case** - 5:14, 29:3, 29:8, 31:24, 32:1, 43:3, 43:12, 45:3, 46:4, 50:4, 50:12, 50:14, 60:11, 60:18, 60:21, 68:2, 72:10, 72:20, 76:1, 76:4, 79:17, 79:23, 80:16, 93:17, 93:23, 94:25, 105:12, 105:23, 107:21, 108:3, 108:21, 110:20, 111:3, 111:4, 112:15, 114:2, 114:13, 114:15, 114:16, 114:20, 116:3, 116:10, 118:1, 118:8, 119:25, 120:2, 120:25, 121:2, 121:9, 121:12, 121:15, 121:19, 123:25, 125:14, 125:16, 125:21, 126:1, 126:2, 126:10, 126:12, 127:10, 127:23, 128:13, 128:16, 129:7, 129:19, 130:10, 130:12, 135:11, 135:18, 136:10, 136:15, 136:19, 140:18, 140:20, 141:23, 142:25, 157:6, 173:4, 177:12, 177:14, 177:16, 177:23, 178:3, 178:10, 178:16, 180:5, 182:15, 190:24, 191:2, 191:4, 191:6, 204:23, 205:5, 205:7
**cases** - 120:17, 125:9, 125:11, 125:14, 176:10
**Casey** - 92:25
**cashier** - 147:8
**Castillo** - 92:1, 92:2, 92:22, 92:24, 93:14
**caught** - 3:13, 66:5, 87:9
**center** - 192:7, 196:5
**certain** - 12:19, 32:10, 39:5, 106:5, 130:5, 145:13
**Certainly** - 104:22
**certainly** - 126:23, 206:18
**certificate** - 185:7, 186:14
**Certificate** - 1:14, 208:1
**certification** - 55:13
**certified** - 37:15, 37:19, 37:22, 37:23, 38:4, 40:4, 40:17, 55:12, 106:3, 114:6, 122:23, 141:9
**certify** - 208:6, 208:13
**chain** - 42:11
**chambers** - 208:12
**chance** - 123:15
**change** - 193:17
**changed** - 26:23, 26:24, 39:17, 172:3
**channel** - 192:8
**character** - 116:7, 119:16, 120:9, 120:16, 120:21
**charge** - 36:17, 59:10, 113:19, 114:23, 115:3, 119:3, 130:4, 130:5, 153:17, 153:20
**charged** - 113:8, 113:24, 115:15, 118:23, 121:8, 121:10, 126:2, 126:3, 127:4,

128:12, 128:16, 130:20, 130:24
**Charlie** - 148:9, 148:14, 149:20, 150:1, 150:2, 150:15, 151:6, 154:25, 155:2, 155:6, 156:14, 157:6, 157:14, 158:6, 158:7, 158:22, 159:9, 159:10, 159:14, 160:18, 161:9, 161:19, 163:1, 165:14, 166:3, 168:11, 169:4, 169:7
**Charlie's** - 164:9
**check** - 12:20, 145:13
**checked** - 56:20, 88:1
**checking** - 139:21
**checks** - 145:13, 186:8
**Chevrolet** - 34:8
**Chico** - 6:4, 6:13, 11:3, 11:15, 30:2, 30:18, 30:19, 30:21, 31:3, 74:16, 74:18, 74:22, 74:24, 152:10, 152:16, 153:2, 153:6, 153:10, 153:17, 153:19, 154:6, 154:10, 154:24, 155:1, 155:22, 159:5, 159:19, 161:11, 162:13, 163:1, 163:17, 164:10, 165:24, 166:16, 167:4, 167:9, 169:10, 169:18, 172:1, 180:8, 180:14, 182:16, 182:18, 184:12, 184:23, 187:6, 187:20, 188:3
**Chico's** - 11:10
**chief** - 190:23
**child** - 74:1, 99:17, 100:6, 100:7, 100:10, 177:20, 191:10, 192:23, 193:25
**children** - 135:23, 147:9, 147:13, 205:3
**chose** - 129:6
**church** - 176:6
**cigar** - 4:23, 5:1
**cigars** - 4:16, 4:18, 4:21
**circumstances** - 82:8
**cited** - 125:15
**City** - 38:12, 54:10, 62:22
**claim** - 88:16, 88:18
**claimed** - 8:21, 89:1
**clarification** - 47:25
**clarify** - 7:14, 28:17
**Class** - 121:11
**class** - 38:17
**classes** - 63:23
**clean** - 169:5, 201:7
**cleaned** - 68:24
**clear** - 26:10, 26:14, 79:19, 120:8, 120:19, 120:23, 128:15, 129:6, 130:13, 130:17, 130:23
**cleared** - 199:13
**clearly** - 5:17, 120:20
**client** - 92:22, 128:4
**Close** - 149:17
**close** - 11:25, 50:10, 206:3
**closer** - 202:11, 202:13, 203:16, 203:20
**closest** - 125:15
**closet** - 78:2, 78:6
**closing** - 179:19
**clothes** - 201:8
**clothing** - 71:25, 203:8, 203:17, 204:2, 205:6
**clue** - 180:11
**coach** - 134:15, 134:16
**cocaine** - 7:2, 8:10, 30:17, 31:1, 31:5, 31:6, 31:8, 31:10, 31:13, 111:1, 118:24
**Cocaine** - 152:14
**Code** - 116:5

**cold** - 192:10, 192:18
**collect** - 38:2, 38:20, 44:10, 50:23, 51:3, 51:5, 51:6
**collected** - 38:16, 41:25, 42:12, 46:11, 48:21, 49:14, 49:15, 49:19, 193:15
**collecting** - 48:23
**collection** - 41:12, 45:25
**college** - 132:3, 132:4
**Colombian** - 70:12
**Colombians** - 70:17
**color** - 71:25, 76:22, 172:11
**colored** - 12:15
**colposcope** - 44:6
**Columbia** - 156:2
**combing** - 191:25
**comfortable** - 179:19
**Coming** - 195:25
**coming** - 28:4, 57:1, 68:14, 75:17, 97:4, 119:10, 125:10, 147:24, 156:10, 159:25, 169:10, 175:22, 188:16, 193:6, 193:18, 205:24
**comment** - 122:5
**commercial** - 37:11
**commission** - 132:5
**common** - 49:5, 58:12, 71:13, 71:24, 156:4, 156:5
**commonly** - 4:20, 70:10
**communicating** - 57:7
**communication** - 139:20, 145:11
**community** - 142:17, 155:24, 156:4
**compact** - 201:4
**company** - 187:25
**complainant** - 67:4, 179:13
**complainants** - 65:16, 67:2, 115:10, 180:5
**complaining** - 94:7
**complected** - 70:6, 173:12
**complete** - 58:22, 88:9, 91:22, 92:3, 102:24
**completed** - 58:23
**completely** - 26:7
**complexion** - 155:19
**complies** - 76:19, 197:10, 202:7
**comport** - 129:18
**computer** - 1:24, 97:4, 145:12, 186:8
**computer-aided** - 1:24
**concern** - 99:23, 193:20
**concerned** - 123:21, 155:13
**concerning** - 95:6
**concerns** - 92:17, 193:17
**conclude** - 50:3, 60:10
**condition** - 47:4, 199:2
**conduct** - 107:7, 112:12, 145:17
**conducted** - 136:24, 139:19, 142:19
**conducting** - 84:14
**conferred** - 140:15
**conformity** - 116:7, 120:9, 120:16, 120:22
**confronted** - 186:14
**confused** - 26:3, 26:4, 26:7, 26:9, 123:4
**confusing** - 27:1, 49:4
**Congratulations** - 175:25
**connected** - 106:13, 119:1, 194:2, 206:23
**connection** - 81:23, 85:12, 135:21, 135:22, 152:4,

172:21
**connects** - 45:3
**conscious** - 128:10
**consciousness** - 33:20, 120:14
**consent** - 82:21
**consented** - 82:14
**considering** - 171:6
**consistent** - 71:9, 71:21, 71:23, 72:11, 98:5, 98:6
**Constable's** - 54:2
**construction** - 197:1
**construed** - 125:25, 126:24, 130:11
**Cont'd** - 4:6
**contact** - 43:16, 57:1, 57:6, 57:11, 138:14, 151:6, 205:2, 205:4, 205:8
**contacted** - 8:20, 60:24, 142:25
**contain** - 46:3
**contained** - 46:9, 47:3
**contains** - 208:7
**contents** - 47:8, 48:2
**context** - 125:24
**continue** - 27:7, 188:3
**continued** - 21:20
**continues** - 198:16
**continuing** - 3:8, 3:21
**controlled** - 119:2, 123:2
**conversation** - 24:15, 89:8, 94:3, 98:4, 98:5, 98:23, 99:1, 120:5, 150:6, 162:25, 168:10, 170:6, 171:12, 179:16
**conversations** - 77:25, 170:8
**convicted** - 115:15
**convince** - 73:20
**coordinate** - 136:14, 145:9
**coordinated** - 138:19, 140:14, 145:4
**coordinating** - 145:2, 145:7
**coordinator** - 133:11, 133:14, 134:10
**cop** - 176:23, 176:24
**copies** - 114:7
**cops** - 168:15
**copy** - 67:10, 141:10, 144:3
**Cornelius** - 2:11, 3:5, 5:7, 5:9, 5:10, 7:17, 10:5, 10:8, 13:1, 13:21, 13:25, 14:4, 14:7, 16:14, 16:18, 18:5, 18:8, 18:10, 18:22, 18:25, 19:3, 20:8, 20:13, 21:12, 21:13, 21:16, 23:9, 23:10, 23:12, 23:15, 23:23, 25:23, 26:23, 27:10, 27:11, 28:14, 28:22, 28:23, 31:22, 32:5, 32:14, 32:24, 32:25, 33:22, 34:22, 34:23, 35:2, 47:11, 47:14, 50:7, 50:9, 50:11, 51:8, 51:13, 61:3, 61:4, 61:6, 61:10, 81:15, 82:1, 83:16, 86:18, 87:11, 87:23, 88:6, 90:3, 90:12, 90:17, 90:19, 91:18, 93:18, 94:17, 94:19, 94:23, 102:7, 102:17, 102:23, 103:8, 103:9, 103:17, 103:20, 103:25, 104:15, 104:16, 104:22, 110:7, 115:18, 117:21, 118:3, 118:6, 118:19, 118:14, 118:19, 119:7, 119:11, 122:1, 122:2, 122:18, 123:4, 123:7, 123:10, 123:14, 123:20, 124:12, 124:19, 124:25, 125:13, 126:8,

128:3, 128:8, 128:11, 128:14, 128:25, 129:9, 129:12, 129:17, 131:3, 139:9, 141:5, 141:13, 144:9, 145:23, 145:24, 146:3, 146:5, 150:18, 151:23, 159:23, 160:23, 165:6, 165:25, 168:2, 168:20, 170:5, 170:12, 172:25, 173:2, 173:3, 174:16, 174:20, 183:11, 188:8, 188:9, 188:14, 195:9, 197:22, 197:23, 205:15, 205:16, 205:18, 205:21
**Corporal** - 190:3, 190:9, 197:7
**corporal** - 190:4
**correct** - 5:12, 11:22, 13:3, 13:8, 13:15, 15:7, 19:20, 22:11, 22:14, 37:6, 38:5, 39:3, 39:19, 46:20, 48:24, 49:3, 49:11, 49:12, 50:20, 50:25, 51:6, 51:7, 64:19, 64:22, 64:23, 65:1, 66:17, 67:25, 68:7, 68:12, 68:14, 69:12, 69:15, 70:15, 71:4, 71:14, 71:15, 71:19, 72:8, 73:4, 73:7, 73:8, 78:3, 78:13, 78:16, 78:17, 79:5, 80:4, 80:5, 80:12, 80:13, 85:4, 85:7, 85:23, 85:24, 87:1, 88:2, 89:9, 94:8, 94:13, 96:1, 96:8, 96:10, 97:17, 97:25, 100:7, 100:11, 104:5, 108:8, 108:22, 109:11, 109:18, 110:4, 110:15, 110:16, 111:5, 128:2, 132:15, 135:10, 136:3, 137:24, 137:25, 138:17, 139:5, 140:10, 140:12, 140:22, 141:24, 142:12, 142:9, 142:11, 143:6, 157:6, 157:12, 168:18, 178:8, 178:10, 180:20, 184:6, 194:9, 194:11, 196:13, 200:6, 203:17, 208:7
**Correct** - 63:10, 65:3, 65:7, 65:14, 66:21, 67:22, 68:8, 69:13, 71:5, 71:11, 71:20, 72:12, 73:11, 76:5, 77:4, 77:11, 77:14, 77:25, 78:1, 78:4, 78:10, 78:20, 79:6, 79:22, 80:7, 82:16, 82:19, 83:12, 84:20, 85:5, 85:10, 85:13, 87:2, 87:20, 89:2, 89:10, 89:12, 93:8, 95:22, 96:2, 97:11, 97:21, 99:15, 100:18, 104:3, 104:6, 117:12, 129:16, 164:15, 176:12, 179:11, 179:14, 180:15, 182:22, 183:17, 184:24, 200:10, 204:13
**correctly** - 208:14
**counsel** - 3:4, 52:17, 208:9
**counter** - 134:10, 134:11
**counter-terrorism** - 134:10, 134:11
**countries** - 70:18
**country** - 70:8, 70:14, 108:12
**County** - 1:9, 1:23, 38:12, 38:21, 40:25, 56:10, 108:21, 110:19, 111:14, 113:13, 113:16, 118:2, 119:4, 140:20, 140:22, 190:17, 195:14, 196:13, 196:16, 208:2, 208:5
**couple** - 3:24, 4:12, 42:19,

50:12, 76:9, 76:18, 79:7, 108:11, 110:8, 169:14, 170:2, 173:7, 201:21, 206:16
**course** - 15:4, 37:20, 38:8, 38:14, 38:20, 63:18, 176:3, 177:18, 180:23, 186:7, 187:19
**courses** - 38:17
**court** - 3:1, 3:10, 23:22, 27:9, 32:22, 35:25, 38:22, 38:25, 39:4, 39:5, 47:21, 52:7, 52:13, 53:1, 53:23, 105:16, 105:20, 106:9, 106:18, 108:15, 108:16, 108:18, 108:20, 108:23, 109:8, 111:8, 115:7, 115:9, 117:11, 119:5, 121:21, 124:20, 124:21, 124:23, 126:17, 126:18, 131:4, 140:24, 141:10, 141:23, 142:8, 189:14, 207:8, 208:12
**Court-** 1:3, 1:4, 1:6, 3:2, 3:11, 4:1, 5:7, 10:7, 12:25, 13:23, 14:1, 14:6, 16:12, 16:16, 18:7, 18:9, 18:21, 19:1, 20:9, 21:10, 21:15, 23:8, 23:14, 23:17, 23:20, 25:18, 25:21, 25:24, 26:4, 26:10, 26:14, 27:3, 27:7, 27:10, 28:16, 28:20, 31:19, 31:21, 32:2, 32:7, 32:18, 32:23, 33:23, 33:25, 34:21, 34:25, 35:3, 35:10, 35:12, 44:15, 47:12, 47:19, 47:22, 48:4, 50:7, 51:10, 51:12, 51:15, 51:17, 51:19, 51:22, 51:25, 52:3, 52:9, 52:14, 52:23, 53:2, 59:3, 61:2, 61:8, 61:12, 61:15, 61:18, 61:20, 61:24, 62:1, 62:4, 62:6, 62:9, 67:12, 76:15, 81:18, 82:4, 83:5, 83:17, 86:19, 86:24, 87:13, 87:24, 88:8, 88:12, 90:5, 90:14, 90:20, 91:20, 93:20, 94:16, 102:6, 102:16, 103:3, 103:15, 103:19, 103:22, 104:16, 104:19, 104:24, 105:2, 105:4, 105:20, 105:22, 105:24, 106:7, 106:10, 106:19, 107:3, 107:13, 110:8, 110:14, 110:17, 110:23, 111:3, 111:7, 111:10, 111:19, 112:4, 112:7, 112:18, 112:23, 112:25, 113:11, 113:17, 113:25, 114:3, 114:10, 115:2, 115:25, 116:9, 116:11, 116:16, 117:4, 117:12, 118:20, 118:25, 119:3, 119:5, 119:9, 119:14, 120:2, 120:23, 121:2, 121:7, 121:13, 121:25, 122:9, 122:21, 123:18, 123:23, 124:7, 125:2, 125:7, 125:18, 126:14, 127:8, 127:15, 127:18, 128:15, 129:5, 129:10, 129:16, 129:20, 129:23, 130:2, 130:15, 130:23, 131:1, 131:5, 139:11, 141:7, 141:14, 141:17, 141:20, 143:20, 144:11, 144:15, 145:22, 146:1, 146:5, 146:8, 146:14, 146:17, 149:23, 150:20, 151:25, 152:6, 152:24, 160:1, 160:25, 161:3, 161:7,

164:3, 165:7, 165:13, 166:1,
168:4, 168:22, 170:7,
170:14, 170:17, 172:17,
172:24, 174:18, 174:21,
174:24, 175:2, 175:7, 175:9,
183:14, 188:7, 188:13,
188:15, 188:21, 188:23,
189:3, 189:5, 189:11,
189:15, 189:17, 194:15,
195:10, 195:18, 197:7,
197:23, 198:11, 205:14,
205:19, 205:23, 206:1,
207:9, 208:4, 208:5, 208:22,
208:23
  **courtroom** - 39:1, 115:20,
172:2
  **courtrooms** - 206:10
  **cover** - 193:20
  **cream** - 174:13
  **created** - 193:14
  **creates** - 120:21
  **Creek** - 196:4, 198:15
  **crime** - 48:20, 63:16, 65:6,
68:2, 71:13, 72:1, 126:20,
132:21, 132:24, 132:25,
133:3, 133:20, 134:21,
135:3, 135:5, 200:12, 207:2
  **crimes** - 133:4
  **Criminal** - 1:4
  **criminal** - 37:13, 105:23,
108:21, 110:19, 113:19,
118:1, 121:15, 121:19,
140:18, 140:20, 176:18
  **crisis** - 133:12, 133:13
  **critical** - 114:16
  **Cross** - 1:4, 1:17, 5:8,
50:8, 94:18, 173:1
  **Cross-examination** - 5:8,
50:8, 94:18, 173:1
  **crowd** - 206:9
  **Cruz** - 1:6, 3:3, 3:4, 52:18,
74:25, 85:4, 89:21, 107:21,
108:3, 139:4, 139:7, 139:15,
140:5, 140:18, 142:1,
152:19
  **Cruz-garcia** - 1:6, 3:3, 3:4,
52:18, 74:25, 85:4, 89:21,
107:21, 108:3, 139:4, 139:7,
139:15, 140:5, 140:18,
142:1, 152:19
  **crying** - 57:7
  **Csr** - 208:21
  **culture** - 70:10
  **current** - 196:1
  **Curry** - 120:4
  **custody** - 22:22, 42:11,
58:24, 59:22, 60:9
  **cut** - 31:5, 31:25, 32:9,
32:13, 32:19
  **cutting** - 31:13

# D

  **dangerous** - 145:18
  **dark** - 70:6, 77:2, 155:20,
156:2, 181:20, 181:22,
193:16, 202:16
  **dark-complected** - 70:6
  **dark-skinned** - 181:20
  **Das** - 95:25
  **databases** - 139:21
  **Date** - 208:22
  **date** - 43:15, 45:9, 46:7,
59:14, 66:9, 66:10, 66:12,
66:17, 105:16, 105:20,
108:24, 111:8, 117:11,
140:23, 140:24, 141:1,
141:3, 142:4
  **dated** - 42:2, 42:3, 49:18
  **dates** - 45:6, 66:5, 143:11,

143:13
  **dating** - 20:5, 20:22, 21:7,
21:16
  **daylight** - 205:1
  **days** - 64:18, 84:25, 109:4,
167:21, 167:24, 168:7,
178:7, 178:19, 206:19
  **dayshift** - 64:24, 178:18
  **Dc** - 189:6
  **deal** - 118:12, 134:14,
171:1
  **dealer** - 23:25, 24:3,
26:24, 73:3, 102:12
  **dealing** - 21:21, 26:25,
28:10, 28:25, 30:18, 30:21,
31:23, 72:22, 73:13, 73:15,
74:10, 74:11, 77:20, 100:1,
101:20, 102:1, 114:19,
152:10, 152:11
  **dealt** - 22:4
  **debris** - 201:11
  **December** - 134:25
  **decent** - 159:12
  **decide** - 51:1, 126:22
  **decided** - 16:2, 36:21,
38:14, 160:18, 182:7
  **deciding** - 134:3
  **declared** - 29:14
  **deep** - 74:1
  **Defendant** - 2:17, 118:23
  **defendant** - 3:1, 3:10,
23:22, 27:9, 32:22, 47:21,
52:7, 52:13, 52:17, 53:1,
89:21, 105:14, 105:15,
105:19, 106:9, 106:18,
107:20, 108:2, 108:6,
108:15, 108:23, 109:3,
109:7, 109:15, 109:23,
111:16, 112:2, 112:15,
113:5, 115:12, 122:13,
129:22, 130:19, 131:4,
139:3, 139:7, 140:17, 142:1,
142:7, 152:4, 153:9, 154:24,
155:6, 155:8, 155:11,
155:22, 159:25, 160:2,
160:3, 160:14, 172:16,
189:14, 207:8
  **defendant's** - 113:12,
117:8, 130:9
  **definite** - 76:21
  **definitely** - 15:12
  **degree** - 176:16
  **delay** - 131:6
  **deliveries** - 154:2
  **Delta** - 34:8
  **demand** - 79:14
  **demeanor** - 57:4, 90:21
  **denied** - 23:24, 24:3, 24:5,
24:18, 32:16, 73:19, 97:23
  **deny** - 29:4, 98:1, 98:13
  **denying** - 26:24, 75:22,
98:9
  **Department** - 38:21,
38:22, 40:25, 50:1, 54:11,
54:13, 55:1, 55:16, 63:7,
63:8, 136:15, 136:19,
140:13, 176:19, 190:5,
190:7, 190:20, 191:9, 193:3,
193:7, 205:2
  **department** - 40:24, 63:3,
63:5, 191:9
  **depended** - 42:16, 42:19
  **Deputy** - 3:17, 53:12,
53:20, 53:22, 53:25, 55:15,
59:4, 60:13, 61:12, 146:14
  **deputy** - 190:17, 206:12
  **Describe** - 201:3
  **describe** - 41:13, 57:4,
70:5, 155:19, 163:21,
173:11, 196:22

  **described** - 41:21, 44:2,
69:14, 69:17, 69:18, 71:3,
181:7, 199:24
  **describing** - 16:23, 70:6
  **description** - 95:8, 104:5,
184:17
  **Description** - 2:2
  **descriptions** - 104:2
  **descriptor** - 104:5
  **descriptors** - 96:5
  **designated** - 41:16
  **detail** - 71:4, 138:19, 186:6
  **detailed** - 194:11
  **details** - 69:12, 71:24,
73:6, 125:21
  **detective** - 187:5
  **detectives** - 79:16, 79:20,
136:4, 204:25
  **determine** - 70:1, 70:4,
74:18, 74:22, 74:24, 80:9,
88:4, 106:22, 130:12
  **determined** - 56:24,
108:17, 109:24, 143:8,
143:13, 192:24
  **determining** - 50:22
  **develop** - 81:20, 88:13
  **Develop** - 87:24
  **developed** - 149:6
  **Devereaux** - 68:6
  **Diana** - 4:20, 9:22, 10:15,
11:9, 11:12, 13:11, 20:1,
20:21, 21:5, 21:7, 34:3,
34:10, 42:25, 43:16, 43:20,
44:1, 44:5, 44:11, 45:5,
46:8, 48:7, 48:9, 49:14,
49:15, 49:17, 50:4, 57:2,
67:4, 67:18, 67:23, 68:14,
69:5, 71:6, 72:11, 73:10,
73:12, 75:2, 75:7, 76:2,
77:17, 78:15, 81:23, 83:11,
93:25, 98:13, 102:17,
103:10, 104:1, 104:7,
104:10, 137:13, 142:19,
172:18
  **Diana's** - 9:18, 10:18, 14:8,
34:17, 67:14, 98:4, 103:6
  **different** - 6:18, 6:20,
26:17, 39:20, 40:25, 55:10,
69:25, 70:18, 70:24, 71:12,
71:18, 71:25, 72:1, 72:4,
72:25, 79:20, 97:5, 129:1,
133:7, 137:6, 164:20,
206:10
  **difficult** - 145:6, 145:8,
145:13, 145:15, 206:7
  **Dire** - 1:4, 1:17, 107:17
  **direct** - 33:1, 33:18, 42:20,
97:22, 134:18
  **Direct** - 1:4, 1:17, 4:5,
35:18, 53:10, 62:13, 131:14,
146:21, 175:13, 189:22
  **directing** - 5:25
  **direction** - 193:23
  **directly** - 35:13, 62:7,
68:15, 68:17, 80:11, 82:7
  **dirt** - 199:10, 200:9
  **dirtiness** - 169:1
  **dirty** - 164:21, 164:23,
201:7, 201:8
  **disagree** - 26:1
  **discovered** - 182:11,
191:23
  **discrepancies** - 72:8,
102:8
  **discuss** - 106:8
  **discussed** - 50:14, 130:3,
173:4, 198:13
  **discussing** - 98:24
  **dispatched** - 56:16
  **distance** - 202:10

  **distinction** - 113:22
  **distraction** - 148:1
  **District** - 1:6, 1:12, 2:5,
111:15, 118:25, 119:1,
119:3, 121:2, 208:5
  **district** - 92:14
  **districts** - 38:13
  **divide** - 195:25
  **dividing** - 31:15, 31:16
  **division** - 132:21, 133:12,
133:15, 134:21
  **Division** - 55:4, 58:25,
59:23, 60:1, 64:11, 79:21,
90:9, 91:14, 91:16, 93:14,
177:2, 177:9, 178:1, 185:15,
205:5
  **Dna** - 83:20, 112:20,
156:17, 156:19
  **docket** - 124:14, 125:4,
126:15, 126:16, 130:5
  **doctor** - 39:13
  **document** - 125:5, 142:3,
194:7
  **documentation** - 194:11,
204:22
  **documented** - 65:22, 84:8
  **documents** - 141:10
  **Dominican** - 70:13, 96:12,
96:14, 96:16, 155:17, 156:1
  **Dominicans** - 70:17, 96:12
  **done** - 29:1, 37:11, 58:19,
60:3, 83:25, 89:11, 101:21
  **door** - 58:5, 162:22,
162:24, 185:3
  **doubled** - 127:13
  **down** - 35:4, 41:21, 51:15,
61:12, 62:25, 63:1, 68:10,
73:6, 85:12, 93:15, 95:14,
97:10, 97:20, 100:25, 105:2,
145:7, 147:24, 150:9,
161:22, 174:24, 178:20,
188:15, 192:8, 195:20,
196:1, 199:11, 200:9, 203:4
  **draw** - 200:23
  **drive** - 166:16, 166:23,
167:13
  **driving** - 86:3, 166:3
  **dropped** - 60:6, 151:14
  **drove** - 93:14, 166:25,
182:13
  **drug** - 10:25, 23:24, 24:3,
26:22, 26:24, 28:10, 28:25,
31:23, 73:2, 73:13, 73:15,
74:10, 76:3, 77:20, 97:23,
98:8, 98:14, 99:18, 100:16,
101:15, 101:20, 102:1,
102:12, 114:18, 153:18,
180:7
  **drug-related** - 76:3
  **drug-selling** - 10:25
  **Drugs** - 152:12
  **drugs** - 6:4, 6:12, 6:13,
6:16, 6:18, 8:17, 9:3, 9:6,
16:1, 16:4, 16:9, 16:21,
21:21, 21:23, 22:4, 22:5,
23:4, 24:19, 25:1, 26:16,
26:19, 27:13, 27:15, 28:5,
29:5, 29:10, 29:18, 29:24,
30:2, 30:3, 30:5, 31:24,
33:15, 72:22, 73:24, 74:11,
74:13, 75:8, 75:21, 78:12,
100:1, 101:7, 101:12, 111:1,
115:11, 115:12, 116:15,
152:13, 153:6, 154:10,
155:11, 174:3, 174:4, 174:8
  **due** - 108:16, 127:23,
192:18
  **duly** - 4:3, 35:17, 53:9,
62:12, 107:16, 131:13,
146:20, 175:12, 189:21

**During** - 70:1, 74:21
**during** - 4:14, 21:7, 39:15, 48:6, 49:14, 58:18, 63:12, 64:20, 65:2, 65:6, 82:12, 108:13, 135:1, 136:25, 137:11, 140:7, 193:5
**duty** - 65:13

## E

**e-mailed** - 120:4
**Eagle** - 180:4, 184:8, 184:9, 185:25
**early** - 38:6, 108:5, 109:19, 134:22, 134:24, 137:19, 138:23, 140:16, 148:22, 156:7, 167:19
**Early** - 137:22, 140:13
**Earphones** - 172:14
**East** - 147:5
**easy** - 145:6
**effect** - 114:17, 121:22, 130:9
**effort** - 93:9, 109:14
**either** - 17:2, 28:19, 29:9, 40:21, 64:18, 77:2, 102:17, 103:4, 103:10, 135:13, 136:22
**element** - 39:1, 41:4
**elements** - 105:13
**elevator** - 3:16, 3:18, 206:8, 206:11, 206:13
**elevators** - 3:14
**elicit** - 105:18
**Elliott** - 68:5, 193:6
**emergency** - 36:17
**employed** - 8:7, 36:8, 53:25, 54:1, 62:20, 62:22, 62:24, 131:20, 131:21, 132:18, 134:19, 134:20
**encounter** - 3:17
**encountered** - 57:5, 57:19, 70:10
**end** - 106:15, 161:10, 199:6
**ended** - 92:6, 171:2
**enemies** - 25:16, 27:16
**enforcement** - 54:18, 60:14, 136:2, 136:4, 176:17
**engaged** - 153:9
**English** - 67:19, 67:21, 67:24, 68:7, 185:19, 185:20
**English-speaking** - 68:7
**enter** - 23:2, 24:23, 25:6, 101:4
**entering** - 95:8
**entire** - 106:25, 196:12
**entitled** - 1:21
**entrance** - 196:4
**entry** - 58:7, 181:25
**equipment** - 39:21, 39:25, 44:8
**equipped** - 183:20
**Eric** - 1:10, 1:20, 105:7, 107:15, 110:12, 131:8, 131:12, 131:18
**error** - 66:5
**essence** - 70:7
**essentially** - 142:12
**establish** - 21:14
**Estelle** - 182:12
**estimation** - 40:7
**evening** - 64:20, 64:21, 69:3, 163:13, 206:4
**evenings** - 64:18
**event** - 69:3, 69:6, 71:10
**events** - 5:21, 6:1, 71:3, 72:14, 156:11
**eventually** - 140:12
**evidence** - 12:24, 38:3,

38:16, 38:20, 41:11, 42:1, 42:4, 42:6, 42:12, 44:10, 48:21, 48:23, 49:13, 49:15, 49:21, 59:15, 59:21, 60:7, 111:22, 112:20, 114:8, 114:12, 117:25, 125:25, 126:13, 126:24, 126:25, 127:22, 128:10, 130:11, 141:11, 193:15, 204:14, 208:8
**evident** - 74:5
**exact** - 16:16
**Exactly** - 13:16, 23:14, 114:10
**exam** - 38:2, 38:19, 39:10, 39:14, 41:14, 41:17, 41:22, 42:1, 42:5
**examination** - 5:8, 33:1, 41:4, 41:5, 42:15, 42:25, 43:5, 43:6, 43:20, 44:1, 44:5, 44:11, 48:7, 49:14, 50:8, 58:18, 58:22, 58:23, 94:18, 173:1
**Examination** - 4:5, 34:1, 35:18, 53:10, 62:13, 107:17, 131:14, 146:21, 175:13, 189:22
**examinations** - 38:7, 39:22, 40:7, 49:6
**examiner** - 37:16, 37:23, 38:11, 40:4, 49:1, 134:12
**examiner's** - 193:23, 204:17, 204:18, 205:9
**example** - 75:12, 96:24, 120:19
**exams** - 39:8, 39:12, 39:17, 40:23, 49:7
**exception** - 106:4
**exceptions** - 116:18, 120:21
**Excuse** - 81:15
**excused** - 34:4, 34:25, 35:3, 51:12, 61:9, 104:20, 104:24, 146:6, 146:8, 174:22, 188:13, 205:20, 205:23
**execute** - 63:24
**exhaustive** - 120:1
**Exhibit** - 2:2, 10:9, 44:18, 44:19, 45:16, 45:17, 45:21, 46:2, 46:10, 46:15, 47:2, 47:3, 47:8, 47:9, 59:6, 59:7, 59:14, 83:7, 83:14, 83:15, 83:18, 86:13, 86:17, 86:20, 141:9, 141:12, 141:16, 141:18, 141:21, 143:22, 144:6, 144:8, 144:11, 149:24, 150:14, 150:16, 150:17, 150:21, 150:23, 153:1, 154:13, 165:5, 165:10, 166:6, 166:9, 166:12, 185:24, 194:17, 195:7, 195:8, 195:10, 195:12, 197:21, 198:1, 198:3, 199:15, 199:21, 201:15, 201:20, 202:2, 202:12, 202:15, 203:15, 203:20, 203:23
**exhibit** - 129:24
**exhibits** - 208:15
**Exhibits** - 164:5, 165:4, 165:8, 197:12, 197:20, 197:24
**expect** - 72:8, 72:13
**expecting** - 161:24
**experience** - 39:6, 48:13, 49:11, 55:7, 69:21, 70:16, 176:14
**experienced** - 76:6
**expert** - 40:13

**Expiration** - 208:22
**explain** - 75:12, 152:5
**explained** - 100:17
**exposed** - 192:4, 192:12, 192:18, 197:1, 200:1, 202:4
**express** - 90:10, 106:14, 206:24
**expressed** - 206:24
**extent** - 82:6, 203:5
**extortion** - 133:2
**extraneous** - 106:5, 106:24, 107:6, 107:7, 115:13, 116:6, 120:8, 120:20, 128:5, 129:15, 130:7
**extremely** - 145:8, 145:18
**eye** - 13:22
**eyes** - 174:9

## F

**fact** - 26:8, 26:14, 49:9, 66:19, 75:7, 77:1, 78:5, 83:1, 102:18, 105:19, 108:13, 113:8, 113:23, 114:2, 114:12, 114:22, 114:25, 115:3, 115:19, 116:14, 121:1, 121:14, 124:13, 125:19, 126:3, 126:15, 127:22, 128:9, 143:15, 154:6, 171:7, 171:19
**facts** - 12:24, 75:25
**failed** - 105:20, 127:10, 142:7
**fails** - 105:15
**failure** - 118:24
**Fair** - 78:18, 150:11
**fair** - 65:8, 79:23, 98:9, 98:10, 138:1, 144:3, 150:24
**fairly** - 164:17, 195:3, 197:16, 201:4
**Fairway** - 55:22, 56:4, 56:12, 136:7
**familiar** - 56:5, 56:7, 167:14
**family** - 79:5
**far** - 68:2, 114:13, 122:19, 123:20, 124:3, 124:4, 155:12, 155:13, 167:13, 172:12, 179:20
**fast** - 14:15
**father** - 179:5, 179:13, 179:20
**father's** - 186:18
**fault** - 189:4
**Fbi** - 80:6, 132:9, 132:13, 132:17, 132:18, 132:21, 133:16, 133:18, 135:19
**fearful** - 173:25
**Fearful** - 173:25, 174:1
**Federal** - 131:22
**federal** - 112:11, 112:13, 114:23, 114:24, 115:3, 117:23, 118:7, 118:12, 127:23, 133:1, 133:4, 135:5, 135:16, 135:19
**federally** - 130:18
**feet** - 192:15
**fell** - 110:3
**felon** - 110:22, 110:23
**Felon**- 110:25
**felony** - 110:21, 116:3, 118:24, 121:9, 121:11, 121:21, 124:6, 124:10, 127:3, 127:8, 130:4
**felt** - 75:9, 113:15
**female** - 39:14, 57:1, 58:10, 181:8, 182:21
**Ferrer**- 148:13, 148:15

**few** - 8:19, 69:12, 72:6, 72:19, 103:22, 153:7, 163:3, 167:21, 197:11, 197:14
**field** - 40:14, 112:16, 138:11, 139:20, 197:1
**figure** - 32:5
**figuring** - 76:24
**file** - 112:3, 112:4, 118:20, 118:21, 144:12, 144:13
**filed** - 111:1, 111:16, 127:23, 128:21
**fill** - 12:20, 95:11, 95:12, 95:14, 95:18, 95:23
**finally** - 100:15, 100:19, 159:7
**findings** - 43:7
**fine** - 20:20, 52:21, 95:1, 123:17
**finish** - 150:10
**finished** - 36:23, 37:3, 42:5
**finishing** - 132:2
**fire** - 17:12, 17:25, 40:24
**firearm** - 110:24
**firemen** - 17:19, 17:22, 18:2
**first** - 4:3, 5:22, 13:1, 13:2, 20:1, 22:25, 26:20, 26:21, 29:19, 30:24, 35:17, 36:13, 44:19, 53:9, 56:21, 57:5, 59:25, 62:12, 67:5, 67:6, 67:18, 68:9, 73:18, 86:2, 95:5, 97:23, 100:4, 101:7, 101:18, 107:16, 108:11, 108:13, 120:25, 131:13, 132:18, 146:20, 175:12, 178:15, 189:21, 194:16, 197:14
**First**- 119:11, 161:13
**fish** - 197:5
**fisherman** - 191:24
**fishermen** - 197:4
**fishing** - 201:10
**fits** - 116:18
**five** - 52:4, 52:5, 54:14, 54:24, 169:13, 176:21
**five-minute** - 52:4, 52:5
**fled** - 105:16, 105:19, 114:12, 124:24, 126:24
**flies** - 98:23, 98:25
**Flight**- 120:11
**flight** - 109:13, 111:17, 111:20, 112:14, 113:8, 113:13, 113:15, 113:24, 114:8, 114:9, 114:15, 115:4, 115:5, 116:2, 116:10, 117:9, 117:10, 117:22, 117:25, 119:21, 119:22, 120:3, 120:11, 121:12, 125:24, 126:11, 126:13, 126:25, 127:23, 128:9, 130:9, 130:11
**float** - 36:15
**floor** - 157:24, 157:25
**Flores**- 2:20
**fly** - 189:7
**focus** - 5:22, 78:11, 107:20, 137:17, 137:19, 138:24, 139:8, 143:4, 144:17
**focused** - 70:22
**focusing** - 37:4, 142:21
**follow** - 74:21, 80:11, 84:7, 140:8, 178:13, 182:5, 183:10, 183:19, 188:4
**follow-up** - 74:21, 80:11, 178:13, 183:10, 183:19
**followed** - 43:25, 85:8, 94:10, 187:17
**following** - 1:20, 42:9,

65:11, 84:23, 92:11, 187:19, 204:24
**follows** - 4:4, 35:17, 53:9, 62:12, 107:16, 131:13, 146:20, 175:12, 189:21
**food** - 52:8, 52:9
**forced** - 58:7
**Ford-** 86:5, 86:6, 87:8, 87:16, 87:21, 88:11, 89:14, 166:15
**foregoing** - 208:6
**forfeited** - 111:11, 114:2, 115:24, 121:3, 124:24, 127:13, 142:10
**forfeits** - 126:21
**forfeiture** - 106:2, 106:3, 114:6, 115:7, 115:8, 117:25, 118:13, 119:2, 122:22, 123:25, 124:13, 124:17, 124:18, 125:16, 125:20, 125:22, 128:23
**forget** - 72:15, 72:18, 72:19, 102:8, 102:10
**forgetting** - 102:2
**forgot** - 17:2
**form** - 43:8, 95:9, 95:12, 95:14, 95:18, 106:14, 106:15, 206:24
**forms** - 12:19
**Forty-** 147:1
**Forty-six-** 147:1
**four** - 6:17, 22:8, 22:18, 22:19, 55:3, 132:8, 147:10, 158:1, 158:2, 177:1
**four-and-a-half** - 132:8
**four-year** - 55:3
**Franklin-** 2:6, 208:23
**Franks-** 178:19
**Fred-** 148:12, 148:15
**freight** - 3:18
**frequently** - 94:4, 169:15
**freshwater** - 192:6
**friend** - 83:11, 149:1, 149:2
**friends** - 78:22, 81:25, 94:24
**frightened** - 17:17
**front** - 19:6, 41:23, 157:22, 158:3, 158:5, 192:10, 192:18
**fugitive** - 105:14, 109:17, 109:21, 109:25, 110:3, 111:22, 111:23, 127:17, 127:19, 128:4, 128:6, 128:10, 128:11, 128:13, 128:17, 128:20, 130:18, 130:19
**full** - 35:24, 53:18, 101:17, 101:18, 131:17, 204:7
**fully** - 26:3
**fun** - 95:2, 98:23
**funeral** - 204:15
**future** - 3:16

---

## G

**gained** - 199:9
**gang** - 133:20
**Garage** - 181:22, 182:9
**garage** - 91:11, 182:8, 183:1, 183:10, 183:21
**garcia** - 1:6, 3:3, 3:4, 52:18, 74:25, 85:4, 89:21, 107:21, 108:3, 139:4, 139:7, 139:15, 140:5, 140:18, 142:1, 152:19
**Garcia-** 42:25, 43:2, 43:5, 43:16, 43:20, 44:1, 44:5, 44:11, 46:8, 48:7, 48:9, 49:14, 50:4, 57:2, 58:15,

58:22, 60:1, 67:4, 104:1, 135:9, 135:14, 137:13, 137:23, 142:13, 177:13, 179:5, 179:12, 180:6, 191:3, 205:11
**Garcia's-** 45:5, 57:4
**gasping** - 77:9
**gather** - 41:5
**gathered** - 84:24
**gathering** - 138:1, 138:5
**Gene-** 36:2
**general** - 95:15, 126:4, 194:22, 202:25, 203:11, 204:3
**generally** - 37:21, 41:14, 44:1, 45:24, 46:6, 48:22, 49:20
**Generally-** 41:2, 59:6
**gentleman** - 179:6
**gentlemen** - 3:12, 37:22, 62:18, 131:17, 135:15, 175:16, 206:1
**German-** 81:4, 81:6, 81:13, 81:23, 82:8, 82:11, 83:8
**girlfriend** - 81:14
**given** - 39:10, 80:23
**glad** - 103:2
**glasses** - 200:18
**Gloria-** 1:6, 1:22, 35:6, 35:16, 36:2, 59:11
**Glossary............................**
**.end** - 1:15
**gold** - 167:6, 167:19
**Golden** - 180:4, 184:8, 184:9, 185:25
**golf** - 176:3, 176:4
**Goose** - 192:6, 194:20, 196:4, 198:14
**government** - 117:23, 135:6, 135:19
**graduated** - 132:4, 176:15
**gram** - 7:6, 7:8, 7:17, 7:20, 7:21
**grams** - 7:10, 7:20
**grand** - 147:20
**Grand-** 92:14, 92:25, 93:1, 93:5
**grandchildren** - 147:16
**grandkids** - 176:5
**Gray-** 172:10
**Greek-** 192:6, 194:20
**grew** - 96:15
**grown** - 147:12
**guess** - 23:16, 39:15, 40:10, 55:9, 69:1, 77:12, 98:3, 98:20, 107:9, 137:12, 167:2, 176:9
**guessing** - 98:19
**Guilt-** 1:16, 1:2
**guilt** - 120:13, 120:14, 125:25, 126:25, 128:10, 130:12
**Guilt-innocence** - 1:16, 1:2
**gun** - 9:13, 9:15, 9:18, 9:25, 10:2, 10:11, 10:13, 10:18, 34:14
**guns** - 10:22
**guy** - 86:25, 169:4, 180:8, 182:14
**guys** - 34:5, 175:21

---

## H

**hair** - 83:23
**Hair-** 83:24
**half** - 33:17, 63:9, 132:8
**Hand-** 208:16
**hand** - 61:24, 136:1, 136:3
**hand-in-hand** - 136:1,

136:3
**handwriting** - 59:17
**happy** - 5:18, 120:6, 173:10
**hard** - 57:7, 57:22, 94:9, 114:8, 200:13, 200:15
**Harris-** 1:9, 1:23, 38:12, 38:21, 40:25, 56:10, 108:21, 110:19, 111:14, 113:13, 113:16, 118:1, 119:4, 140:20, 140:22, 195:14, 196:13, 196:16, 208:2, 208:5
**Hartman-** 194:20, 195:23
**hat** - 27:25, 28:1, 28:2, 28:4, 29:21, 29:23, 30:25
**head** - 14:19, 33:19, 172:13
**headed** - 152:2, 196:15
**headquarters** - 133:17, 133:19, 133:20, 133:22, 138:10
**hear** - 75:25, 76:1, 77:9, 122:20, 151:12, 161:11
**heard** - 1:21, 56:19, 122:7, 123:21, 161:5, 163:11, 206:25
**hearing** - 106:20, 107:19, 110:6, 114:18, 116:14
**Hearsay-** 91:18, 144:9, 165:25, 170:7
**hearsay** - 81:16, 81:17, 82:2, 82:3, 82:5, 87:11, 87:23, 88:7, 90:3, 90:12, 90:19, 93:19, 102:22, 103:14, 116:20, 116:22, 116:23, 117:9, 117:24, 122:7, 122:8, 122:15, 122:20, 123:22, 124:16, 124:21, 128:22, 130:17, 139:10, 139:12, 139:13, 141:5, 151:24, 159:24, 160:24, 170:6, 170:13, 171:13
**hedge** - 76:22
**held** - 1:23, 120:12
**help** - 17:16, 56:22, 101:16, 102:11, 178:13, 193:7
**helpful** - 194:24, 195:20
**hereby** - 208:6
**heritage** - 95:6, 96:10, 96:15
**Hermann-** 36:9, 36:14
**Hernandez-** 2:20, 1:9, 1:11, 1:18, 1:19, 13:5, 13:7, 13:13, 13:17, 14:7, 23:1, 24:7, 25:3, 25:5, 25:13, 27:12, 28:8, 28:9, 28:24, 29:4, 29:11, 61:17, 61:21, 62:4, 62:11, 62:19, 94:20, 97:2, 146:11, 146:19, 146:24, 146:25, 173:3, 183:7, 183:8, 183:9
**herself** - 11:13, 149:44
**hesitant** - 90:16
**hesitation** - 90:11
**hide** - 23:5, 33:14, 101:7
**high** - 79:23, 154:7, 174:7, 178:3, 199:16
**High-** 79:25
**Highway-** 196:1
**himself** - 185:4
**hire** - 177:6
**hires** - 133:2
**Hispanic-** 12:1, 12:7, 12:22, 57:13, 69:20, 70:5, 70:10, 70:11, 70:16, 80:3, 96:7, 155:24, 181:8, 181:20, 183:20, 183:22, 184:5,

185:4
**Hispanics** - 12:11, 12:12, 95:7
**hit** - 33:19
**hitting** - 77:8
**hold** - 186:13
**home** - 63:16, 75:13, 147:13, 157:20, 171:10, 171:16, 204:15
**Homicide-** 58:25, 59:23, 60:1, 60:6, 63:14, 64:9, 64:11, 79:21, 90:9, 91:14, 91:16, 93:3, 93:11, 93:14, 175:18, 177:2, 177:9, 178:1, 180:10, 185:15, 205:4
**homicide** - 63:24, 65:10, 93:3, 177:17, 178:9
**homicides** - 64:13
**hone** - 107:5
**Honor-** 3:24, 5:6, 31:17, 33:24, 34:20, 35:8, 35:15, 44:13, 47:7, 51:13, 52:1, 53:7, 59:1, 61:10, 61:19, 83:13, 86:16, 90:4, 90:13, 91:19, 119:24, 124:19, 130:1, 131:3, 131:11, 141:8, 143:18, 144:10, 144:14, 145:20, 146:12, 150:19, 168:21, 172:15, 174:23, 175:5, 188:14
**Honorable** - 1:22
**Honorably** - 54:16
**hope** - 50:10
**hopefully** - 138:2, 138:7, 147:21, 147:22, 206:7
**Hospital-** 40:5, 40:17, 42:23, 58:11
**hospital** - 38:13, 40:19, 40:22, 42:21, 58:16
**hostage** - 133:10, 133:11
**hotel** - 171:21
**hour** - 52:10, 159:12, 167:13, 189:1
**hours** - 42:19, 72:6, 99:4, 99:13, 156:7, 167:20, 178:6
**house** - 4:18, 4:20, 4:24, 10:12, 11:11, 11:25, 14:9, 19:7, 76:3, 101:8, 159:5, 159:13, 162:8, 167:10, 169:19, 170:3, 170:11, 170:20, 181:16, 181:17
**Houston** - 1:23, 2:6, 2:13, 2:16, 38:12, 38:21, 40:24, 49:25, 54:10, 54:12, 55:1, 55:16, 55:23, 62:22, 63:7, 63:8, 132:20, 133:12, 133:14, 133:16, 134:4, 134:5, 134:6, 134:9, 134:21, 134:23, 134:25, 136:7, 136:15, 136:18, 138:20, 140:13, 144:17, 147:4, 147:5, 175:17, 176:15, 176:18, 193:2, 193:7, 205:2, 208:24
**Hpd-** 54:10, 54:23, 59:24, 60:8, 63:12, 63:18, 64:5, 177:25, 205:4
**human** - 150:6
**Humble** - 167:14, 180:3, 180:21, 184:6
**husband** - 20:17

---

## I

**lad** - 55:4
**ice** - 174:12
**Id** - 186:10
**idea** - 23:5, 71:2, 151:15, 163:12, 201:23
**identification** - 44:17,

46:14, 59:5, 185:14, 186:21
**identified** - 172:16, 185:4, 205:11
**identifiers** - 185:6
**identify** - 138:20, 183:4
**identifying** - 44:24, 45:2, 46:3, 46:6, 46:18
**identity** - 119:18
**Illinois** - 131:25, 133:23, 133:24
**immediately** - 122:17, 135:24
**Immediately** - 22:15
**impersonations** - 63:17
**importance** - 41:8, 42:9
**important** - 27:5, 89:25, 95:19, 95:23, 114:7, 114:15, 115:21, 116:2, 121:12, 124:22
**inadmissible** - 127:24
**incident** - 9:6, 50:18, 65:17, 72:7, 103:13, 138:16, 138:18
**included** - 181:13, 208:9
**inconsistencies** - 98:3, 98:7
**inconsistency** - 98:11
**incorporates** - 170:13
**independent** - 50:18, 120:15
**independently** - 43:17, 50:2
**Index** - 1:16, 2:2
**indicate** - 43:22, 81:9, 93:16, 124:10, 126:16
**indicated** - 66:19, 153:21
**indicating** - 10:10, 14:22, 18:14, 18:20, 44:20, 46:16, 46:21, 46:23, 46:25, 59:7, 83:8, 86:13, 143:23, 149:25, 153:3, 154:14, 164:6, 164:14, 166:4, 166:7, 166:10, 166:13, 172:8, 186:1, 194:18, 195:23, 196:2, 196:7, 196:11, 197:13, 198:18, 200:2, 200:7, 200:8, 201:17, 202:3, 202:13, 203:3, 203:18, 203:21, 203:23
**indication** - 48:8
**indicative** - 49:9
**individual** - 69:17, 70:11, 80:15, 80:20, 83:20, 91:22, 109:2, 138:24, 139:2, 184:17, 184:19, 185:24, 187:24
**individuals** - 66:2, 66:16, 69:14, 69:25, 70:18, 70:19, 71:9, 72:1, 78:12, 88:15, 88:18, 88:25, 95:6, 117:3, 137:6, 154:10, 155:25, 178:25
**informally** - 107:10
**information** - 41:5, 43:10, 45:2, 50:24, 51:4, 84:6, 84:24, 109:1, 111:21, 113:14, 117:2, 122:13, 127:25, 137:2, 137:15, 137:17, 138:2, 138:5, 138:6, 138:10, 138:12, 138:15, 138:21, 139:21, 140:6, 142:16, 142:20, 143:2, 145:14, 157:6, 157:10, 180:2, 180:5, 182:6, 182:14, 183:6, 183:10, 183:16, 184:5, 184:10, 186:5, 187:8, 187:9, 187:13, 187:20, 207:3
**informed** - 138:17
**initial** - 57:6, 58:3, 65:5,

94:6, 109:22, 118:10, 136:10, 136:13
**initialed** - 42:2, 42:3, 42:7, 49:18
**initials** - 46:7, 46:8
**injuries** - 49:8, 51:4, 68:21, 68:24, 69:1
**injury** - 37:10, 48:8, 48:14, 48:17, 49:2, 49:5
**Inn** - 2:10, 143:5, 143:9, 144:2
**inner** - 113:4
**innocence** - 1:16, 1:2
**input** - 115:18, 121:25
**inside** - 164:23, 169:5
**insisted** - 186:20
**instance** - 112:14
**instant** - 15:20
**instead** - 32:8, 32:12, 66:10, 66:13
**instructed** - 40:22
**instruments** - 39:20
**intend** - 117:5
**intent** - 119:17, 120:10
**interacted** - 154:24
**interest** - 87:9
**interior** - 166:6
**Internet** - 207:1
**interpretation** - 57:23
**interpreted** - 13:11, 13:12
**Interpreter** - 7:14, 20:11
**interpreter** - 4:4, 7:15, 13:14, 20:12
**Interpreters** - 2:21
**interpreting** - 68:14
**interrogate** - 22:6
**interrogated** - 15:21, 16:20, 21:19, 24:6
**interrogating** - 23:1
**interrogation** - 28:15, 28:23, 29:4
**Interrogation** - 63:23
**interstate** - 135:21
**interview** - 28:7, 65:16, 65:22, 67:5, 67:18, 77:18, 80:15, 81:1, 81:3, 82:12, 82:14, 84:11, 90:6, 91:3, 91:23, 92:3, 92:10, 94:2, 104:1, 137:12, 178:19, 183:5, 187:22
**Interviewed** - 94:14
**interviewed** - 65:21, 66:22, 66:25, 67:1, 67:7, 80:20, 185:16
**interviewing** - 77:17, 78:15, 78:21, 83:10, 179:22
**interviews** - 136:25, 137:1, 139:19, 140:14, 142:18, 178:25
**introduce** - 35:24, 53:18, 62:17, 110:11, 131:16, 146:23, 175:15, 190:1
**invasion** - 75:13
**invasions** - 63:17
**investigate** - 16:6, 64:12, 113:4, 137:6, 180:10
**investigated** - 132:25
**investigates** - 135:6
**investigating** - 135:4, 177:4, 205:4
**investigation** - 74:21, 82:6, 82:7, 84:15, 84:21, 93:22, 101:17, 105:12, 105:13, 107:20, 107:22, 108:2, 108:5, 109:16, 109:17, 109:20, 109:25, 110:3, 123:12, 123:16, 127:17, 127:20, 135:8, 135:20, 136:23, 137:3, 137:12, 137:16, 137:19,

137:21, 138:13, 138:23, 139:8, 139:14, 139:25, 140:3, 140:7, 140:16, 143:4, 144:17, 144:23, 145:7, 145:15, 145:17, 177:22, 179:20, 179:23, 184:3, 186:24, 187:3, 188:3, 191:10, 193:8, 204:23
**investigations** - 63:16, 63:24, 64:1, 112:12, 135:24, 135:25, 136:24, 145:9, 190:21
**Investigations** - 131:22
**Investigator** - 28:8
**investigator** - 178:9, 180:9
**investigators** - 101:19, 136:14, 140:11, 140:14, 181:1, 187:5, 193:1, 205:9
**involve** - 69:24, 135:21
**involved** - 15:25, 16:8, 16:21, 21:21, 21:22, 22:5, 23:4, 24:18, 25:1, 26:16, 26:19, 27:12, 27:15, 28:9, 28:25, 29:5, 29:10, 39:7, 43:15, 57:14, 75:21, 75:24, 80:6, 80:12, 81:5, 101:6, 101:12, 101:20, 102:1, 107:22, 107:23, 108:1, 115:11, 115:12, 123:11, 132:16, 135:8, 135:11, 135:17, 135:20, 135:24, 137:9, 142:24, 144:22, 145:2, 148:25, 151:18, 151:19, 152:9, 177:5, 178:16, 179:17, 190:25, 191:2, 191:10, 197:2
**involvement** - 50:3, 60:10, 93:22, 136:10, 136:13, 172:21, 204:23
**involves** - 73:24, 135:22
**involving** - 133:1, 133:3, 177:12
**Ira** - 178:19
**Island** - 133:25
**Islands** - 185:8, 185:10, 186:15
**issue** - 115:6
**issued** - 111:13, 117:22
**item** - 46:10, 128:21, 203:9
**items** - 32:11, 45:16, 45:20, 45:23, 46:2, 46:11, 47:2, 47:3, 72:10, 204:21
**itself** - 120:7, 199:12

**J**

**Jacinto**- 92:13
**jacket** - 172:10
**jail** - 22:23
**jaw** - 204:12
**jewelry** - 138:18, 138:21
**job** - 8:13, 8:16, 8:19, 8:20, 50:21, 50:23, 51:3, 176:3
**John**- 1:12, 2:1, 175:4, 175:11, 175:17
**Johnson**- 1:10, 1:20, 105:7, 105:18, 107:15, 107:19, 110:12, 131:8, 131:12, 131:16, 131:18, 131:19, 134:18, 141:21, 144:16
**joined** - 176:18, 190:19
**joining** - 54:9
**joint** - 136:24
**jointly** - 136:22
**Jose**- 1:5, 1:24, 4:2
**Joseph's**- 40:5, 40:16, 42:23, 58:11, 58:16
**Jr**- 135:9, 137:23, 142:13, 177:13, 191:3, 205:12

**Juan**- 145:5
**Juanita**- 182:25
**Judge**- 1:23, 10:6, 12:23, 13:22, 16:10, 16:14, 18:6, 20:8, 34:24, 61:4, 61:6, 62:10, 81:21, 87:12, 103:18, 103:21, 104:18, 105:8, 105:11, 107:9, 110:5, 139:10, 141:5, 145:25, 146:4, 152:3, 159:24, 160:24, 161:2, 165:12, 168:2, 174:17, 175:10, 183:13, 188:20, 189:19, 195:9, 195:17, 197:22
**judge** - 50:22
**Judicial** - 1:12
**July**- 1:20, 1:3, 111:1
**jump** - 122:10, 154:7
**jumping** - 125:24, 126:3, 126:12, 127:1, 130:10
**jumps** - 126:10
**June**- 118:19, 176:19
**jurisdiction** - 108:7, 109:3, 113:13, 113:15
**Jury**- 92:14, 92:25, 93:1, 93:5
**jury** - 3:1, 3:9, 3:10, 6:3, 7:25, 23:22, 23:23, 27:5, 27:9, 32:22, 37:22, 47:21, 50:22, 52:7, 52:13, 52:25, 53:1, 53:19, 62:18, 63:11, 63:21, 66:25, 75:8, 101:24, 101:25, 106:7, 106:9, 106:11, 106:18, 106:21, 114:18, 115:22, 117:14, 121:18, 122:11, 126:22, 130:12, 130:16, 131:2, 131:4, 131:17, 135:15, 175:16, 176:13, 178:15, 189:14, 190:1, 190:14, 191:9, 192:3, 194:17, 194:24, 196:22, 198:4, 200:22, 206:2, 207:8
**justice** - 176:18
**Justin**- 2:4, 3:6

**K**

**Keep**- 198:11
**keep** - 35:12, 62:6, 168:13, 175:22
**kept** - 22:19, 159:6, 169:5
**key** - 163:2
**keys** - 83:1, 84:3, 163:24
**kick** - 75:12, 75:13
**kick-in** - 75:12
**kicking** - 77:8
**kidnapped** - 157:3, 177:20, 179:6
**kidnapping** - 56:3, 65:17, 108:12, 133:14, 135:8, 135:13, 135:17, 135:20, 143:3, 157:11, 177:5, 178:21, 191:2
**kidnappings**- 64:15
**kidnappings** - 133:2, 135:4
**kids** - 135:22, 158:1, 158:2, 158:4
**kill** - 74:6
**killed** - 98:16
**kind** - 8:13, 19:24, 28:10, 37:7, 44:6, 48:11, 62:25, 63:21, 79:2, 85:11, 89:11, 95:2, 95:12, 97:12, 101:20, 104:4, 110:17, 132:23, 152:13, 185:9, 199:16, 201:23, 201:24
**kinds** - 84:19, 153:21
**kit** - 2:4, 41:18, 41:19,

41:22, 41:23, 41:24, 42:6, 43:9, 44:23, 46:1, 49:16, 51:6, 58:11, 58:24, 59:8, 59:20
knock - 162:22
knocked - 162:24, 185:3
knowledge - 81:19, 87:25, 105:19, 117:3, 119:18, 119:22, 152:1, 160:2, 188:1
known - 9:23, 15:11, 143:5, 152:19, 187:24
Known - 46:24, 47:1
knows - 87:24, 88:13, 117:15
Kologinczak - 36:3
Kologinczok - 1:7, 1:22, 35:7, 35:16, 35:20, 36:2, 36:7, 41:2, 44:16, 48:6, 50:10, 59:11, 59:20

**L**

lab - 48:20
label - 42:1, 49:17
labeled - 42:2, 49:16
labels - 41:20
ladies - 3:12, 37:21, 62:18, 131:17, 135:15, 175:16
Ladies - 206:1
lady - 150:9, 179:2
lady's - 182:25
laid - 26:11
land - 199:14
language - 57:23, 63:25, 68:16
large - 203:8
largely - 98:5
last - 3:25, 4:12, 35:25, 42:18, 53:22, 54:22, 88:21, 118:9, 118:23, 142:3, 179:7, 188:25, 190:22
lasted - 163:3
late - 40:1, 93:2, 159:12
law - 36:23, 36:24, 36:25, 37:3, 37:7, 37:13, 54:18, 60:13, 112:13, 119:25, 120:25, 129:19, 136:1, 136:4, 176:17
lawyer - 36:22
lawyers - 5:14, 25:18, 50:12, 173:6
lay - 23:12
laying - 161:22
lead - 79:19, 84:15, 84:22, 94:10, 139:25, 168:4, 168:22, 178:9, 183:14
Leading- 93:18
leading - 112:8, 168:3, 168:20, 183:11, 200:9
leads - 112:16, 188:4, 195:25, 199:11
leap - 117:17
learn - 81:23, 84:13, 105:16, 108:6, 108:14, 109:1, 140:19, 141:2, 165:19, 186:23
learned - 57:13, 108:10, 108:12, 108:17, 113:14, 117:8, 124:17, 137:15, 150:3, 157:5, 181:6, 181:19
learning - 38:18
leave - 17:17, 121:4, 132:11, 153:11, 158:24, 163:24, 206:21
leaving - 159:13
Lebron- 86:11, 86:14, 87:1, 87:4, 185:4, 185:5, 186:3
led - 81:6, 139:15, 179:16
left - 8:19, 57:8, 58:9, 60:9,

73:9, 108:6, 108:12, 109:3, 109:5, 113:15, 132:10, 132:12, 163:3, 193:21, 195:22, 199:7
Leg- 204:11
legally - 112:1
Lemon- 12:5, 179:3
Lemone- 12:5, 179:2, 179:8
Leonardo- 81:4, 81:6, 81:13, 81:22, 82:2, 82:8, 82:11, 83:8
less - 6:6, 6:17, 7:7, 21:1
letting - 5:25
level - 201:5
liberty - 121:16, 121:20, 126:5
Liberty- 190:17
lie - 21:20, 26:18, 78:8
lied - 27:14
Lieutenant- 178:19
lieutenant - 132:6
life - 194:5
light - 172:10, 173:12
light-completed - 173:12
lighter - 181:8
lighting - 76:23, 76:25, 77:3
likely - 121:17
limiting - 123:12
Linda- 1:11, 1:18, 81:14, 146:11, 146:19, 146:24
line - 32:21, 201:6
lines - 76:18
link - 46:4, 47:16
lips - 68:11
list - 116:22, 119:25, 120:1
listed - 106:6
listen - 100:15
listened - 56:18, 159:15
listening - 71:1
littler - 66:5
live - 147:2
lived - 11:10, 96:15, 162:7, 167:11, 167:12, 180:18, 180:19
living - 5:2, 20:25, 21:2, 21:5, 34:4, 149:9, 149:11, 153:7, 158:1, 181:21, 182:21, 184:6, 184:11
local - 136:1, 136:4, 138:14, 142:22, 191:24
locate - 109:14, 109:23, 112:15, 112:17, 137:20, 138:2, 138:4, 138:8, 138:14, 139:15, 139:17, 139:18, 140:6, 187:5
located - 180:3, 180:4, 182:8, 182:9, 182:12
locating - 111:16, 139:23
location - 56:10, 56:12, 56:17, 58:1, 137:7, 143:5, 143:15, 144:18, 144:20, 144:21, 180:7, 180:10, 182:13, 184:15, 201:17, 202:24
locations - 187:10, 206:25
logo - 203:11
look - 18:5, 18:11, 18:23, 19:4, 45:16, 45:17, 80:19, 82:18, 82:22, 85:20, 95:24, 95:25, 100:5, 103:20, 116:16, 118:21, 124:1, 149:21, 153:1, 162:17, 163:23, 164:13, 172:3, 188:3, 197:13, 198:3, 199:21, 200:16, 201:15, 203:15
Look- 100:25
looked - 16:24, 18:18,

19:16, 19:19, 56:23, 124:8, 150:25, 164:18, 174:9, 197:17
looking - 43:17, 66:4, 85:11, 85:15, 85:25, 89:24, 100:4, 109:23, 114:25, 119:14, 125:9, 129:5, 158:21, 167:6, 171:23, 179:20, 184:12, 198:4, 198:23, 207:1
looks - 100:16, 101:15, 151:2, 173:17, 195:4, 200:14
losing - 126:5
loss - 33:20
lost - 30:25
Louisiana- 2:15
lower - 194:19, 195:22
luck - 199:16
Luis- 181:23, 182:3, 182:4, 182:14
Lunch- 52:12
lunch - 53:16
lying - 15:15, 15:18, 16:8, 16:21, 74:9, 186:21

**M**

ma'am - 25:23, 62:5, 62:8, 75:1, 88:3, 100:15, 110:13, 111:6, 127:7, 128:2, 130:22, 130:25, 146:23, 147:19, 148:16, 148:19, 149:8, 149:10, 150:4, 150:8, 151:1, 151:4, 151:16, 151:21, 152:17, 152:20, 153:4, 153:15, 154:15, 155:4, 155:7, 155:10, 155:18, 156:3, 156:22, 156:25, 157:4, 157:13, 157:16, 158:23, 159:3, 160:16, 161:15, 161:18, 161:20, 161:25, 162:3, 162:10, 163:25, 164:7, 164:16, 165:16, 165:18, 166:5, 166:8, 166:11, 166:14, 166:20, 166:22, 166:24, 167:7, 168:1, 168:8, 168:25, 169:17, 171:22, 174:25, 178:11, 187:23, 189:16, 190:10, 191:1, 191:5, 191:7, 193:12, 196:14, 196:18, 197:18, 198:10, 198:12, 198:22, 198:25, 199:6, 199:12, 200:8, 200:19, 201:2, 201:18, 202:10, 202:14, 202:17, 202:20, 202:23, 203:14, 203:19, 203:22, 203:24, 204:6, 204:8, 204:20, 205:25
Ma'am - 35:12
Macomb - 132:1
Madrid - 2:14, 3:5
Magee - 1:22
mailed - 120:4
main - 56:24, 194:3, 196:1, 202:25
maintained - 59:22
major - 177:5
Major - 63:15
male - 12:14, 57:13, 88:21, 181:20, 184:5, 185:4
males - 181:8, 181:20, 182:20
malpractice - 37:10
man - 11:25, 12:1, 12:14, 12:16, 13:17, 13:18, 13:19, 16:24, 21:16, 69:18, 70:2, 70:7, 70:12, 70:23, 74:12, 74:16, 74:25, 96:20, 97:13,

97:15, 97:16, 104:8, 104:13, 151:18, 178:6
man's - 74:15
map - 197:8
Map - 2:17
March - 175:20
Marilu - 2:20
marine - 191:14
Mario - 2:14, 3:5
mark - 199:19
marked - 10:9, 18:11, 44:17, 45:13, 46:14, 46:17, 49:22, 59:5, 83:7, 86:12, 143:22, 164:5, 185:23, 197:12, 200:25
markings - 45:6
marks - 44:24, 46:3, 46:6, 46:18
marriage - 20:4, 20:13
married - 20:2, 20:23
marry - 151:8
marshall - 176:4
mart - 147:8, 147:18
Martinez - 91:2, 154:19
Mary - 125:7, 208:4, 208:21
mask - 13:18, 16:24, 17:1, 17:6, 34:12, 34:14, 34:18, 76:11, 76:22, 77:2, 104:2, 104:7
master - 55:14
materials - 32:2
matter - 102:2, 108:2, 116:4, 143:16, 180:23
matters - 133:1
maximum - 55:13
mean - 7:18, 12:10, 22:19, 31:3, 32:13, 42:17, 42:18, 47:16, 48:17, 48:19, 48:20, 62:24, 75:20, 79:14, 87:7, 95:21, 102:24, 113:14, 117:7, 121:11, 122:20, 122:21, 124:15, 126:12, 137:17, 153:11, 167:20, 169:11, 169:13, 173:13
means - 135:21, 178:10
meant - 12:7, 12:14, 12:17, 69:22
media - 142:19
medical - 17:12, 37:10, 39:11, 193:23, 204:17, 204:18, 205:9
meet - 92:25, 93:3, 94:1, 137:12, 137:14, 167:8, 172:18
meeting - 149:2
Melo - 148:8, 148:10, 148:18, 150:3, 150:4, 151:6, 151:18, 152:9, 153:5, 153:17, 154:7, 155:3, 155:4, 155:14, 158:3, 165:15
member - 155:24, 177:8, 191:8
members - 79:5
Memorial - 36:9, 36:14
memorialize - 75:3
memorialized - 67:9
memorializing - 73:6
memory - 204:1
men - 14:9, 14:10
mention - 77:1, 124:6, 124:9, 127:3, 127:4, 127:5, 127:8, 127:9, 130:3, 130:4, 130:18
mentioned - 205:6
mentioning - 113:2
mentions - 127:11
met - 5:12, 20:1, 20:14, 38:20, 50:14, 58:3, 93:11, 94:4, 148:24, 149:1, 149:5,

153:5, 173:4, 192:21
**Mexican** - 13:18, 97:13
**Mexicans** - 12:11
**Mexico** - 70:19
**microphone** - 35:13, 62:7, 197:9
**microscope** - 39:21, 44:6
**middle** - 97:12, 169:19
**might** - 70:7, 71:16, 71:17, 72:18, 93:23, 96:20, 99:1, 138:15, 139:6, 179:17, 182:19, 187:20, 188:25, 189:1, 195:19, 200:17
**military** - 190:18
**mind** - 70:23, 70:25, 177:17, 191:6
**mine** - 18:24, 149:1
**minimal** - 114:17, 116:13
**minor** - 71:24, 72:8
**minute** - 45:15, 52:4, 52:5, 106:10
**minutes** - 99:11, 106:16, 162:6, 163:3, 189:11, 206:15
**misdemeanor** - 110:20, 121:11, 121:21, 124:10
**missed** - 117:11
**missing** - 99:21, 138:15, 138:18, 138:22, 142:13, 205:3
**mistake** - 8:11, 119:18, 155:20
**mistakes** - 102:9
**mom** - 158:1, 158:2, 158:4, 173:14, 174:1
**moment** - 14:23, 18:6, 18:12, 45:17, 61:4, 103:17, 145:24, 174:16
**Monday** - 85:2, 180:13, 181:10
**money** - 9:9, 28:5, 29:18, 29:24, 73:25, 126:5
**monitoring** - 79:2
**month** - 15:23, 27:19, 33:16, 33:17, 102:20, 103:12
**month-and-a-half** - 33:17
**months** - 153:7
**morning** - 3:12, 3:14, 4:7, 4:8, 35:20, 35:21, 43:23, 43:24, 49:23, 54:6, 65:11, 66:23, 67:8, 67:13, 67:16, 93:25, 99:5, 99:6, 156:7, 160:14, 167:19, 206:7, 206:10, 206:12, 207:6, 207:10
**Most** - 49:7, 72:5, 142:24, 143:1
**most** - 55:2, 71:8, 197:4, 202:8
**motel** - 171:2, 171:3, 187:13
**mother's** - 186:16
**motive** - 119:17, 120:11
**Motor** - 2:9, 143:5, 143:8, 144:2
**mouth** - 14:24
**move** - 32:20, 203:9
**moved** - 181:9, 181:11, 181:16
**moving** - 177:12
**mud** - 192:13, 201:4, 203:5
**multiple** - 190:20
**murder** - 98:16, 133:2, 177:3, 177:13, 191:3, 191:10
**murder-for-hires** - 133:2
**murders** - 64:15, 177:4, 177:6

**murders-for-hire** - 177:6

**N**

**name** - 5:10, 35:24, 35:25, 36:4, 42:25, 45:1, 45:5, 50:11, 53:18, 53:20, 53:22, 57:2, 57:17, 62:19, 74:15, 74:25, 80:20, 85:20, 85:21, 86:9, 86:25, 88:21, 94:22, 109:2, 122:14, 131:17, 131:18, 146:24, 148:9, 148:12, 148:17, 154:18, 173:3, 179:2, 179:7, 181:23, 182:3, 182:25, 185:8, 186:3, 186:7, 186:9, 186:10, 186:16, 186:19, 186:20, 186:22, 186:23, 190:3
**named** - 74:16, 81:14, 124:11, 180:8
**Natalie** - 2:3, 3:6
**national** - 133:13
**nationality** - 70:5
**native** - 67:23, 68:16
**nature** - 39:22, 43:7, 55:25, 58:13, 60:4, 73:25, 116:2, 135:17, 168:3, 168:21, 183:12
**near** - 5:2
**necessarily** - 70:13, 98:12, 113:23, 114:22, 126:1
**need** - 13:14, 13:23, 101:16, 103:10, 105:8, 111:24, 112:9, 112:10, 113:20, 118:21, 122:25, 139:15, 160:15, 193:14, 197:7, 207:2
**needed** - 73:21, 73:22, 99:22, 111:25, 191:16, 192:25, 193:22
**negotiations** - 133:10, 133:13
**neighbor** - 179:8, 179:10
**neighborhood** - 78:19, 137:7
**neighbors** - 78:21
**nervous** - 163:7, 163:15, 163:17, 163:19
**networks** - 145:11
**Never** - 11:1, 22:24, 172:22
**never** - 5:12, 15:10, 21:22, 23:24, 24:2, 24:5, 24:18, 27:14, 32:16, 33:20, 50:14, 54:20, 60:20, 72:5, 94:25, 98:2, 100:24, 126:2, 167:15, 171:11, 173:4, 173:21, 174:5, 174:14, 187:18
**new** - 147:20
**news** - 80:1, 142:18, 142:22, 156:23, 156:25, 163:11
**next** - 16:5, 16:19, 19:2, 21:13, 21:19, 22:15, 35:5, 51:19, 53:4, 61:15, 65:9, 81:3, 91:15, 92:19, 93:1, 93:9, 93:21, 93:24, 97:7, 105:6, 126:20, 131:7, 146:10, 175:3, 179:23, 179:24, 184:3, 184:4, 187:2, 188:17, 193:11, 199:17, 203:1, 205:10
**nickname** - 74:25
**night** - 4:24, 8:14, 13:2, 17:7, 18:18, 29:14, 30:14, 33:4, 34:13, 54:5, 65:4, 65:6, 69:12, 72:21, 103:12, 138:16, 156:6, 156:12, 156:15, 156:21, 156:24, 157:11, 157:18, 158:9,

159:1, 159:12, 160:9, 161:11, 164:11, 169:19, 193:9, 193:13
**nightshift** - 176:21, 177:1
**normal** - 193:19
**normally** - 135:20, 192:13, 192:15, 197:3, 201:5
**northern** - 201:18
**Northwest** - 36:10, 36:14
**notarized** - 66:15
**notary** - 66:19
**notation** - 118:23, 142:4
**notations** - 59:13, 124:20
**note** - 48:8, 67:18, 127:2
**noted** - 45:12, 76:9
**notes** - 50:9, 51:4, 80:19, 103:21
**Nothing** - 34:23, 188:24
**nothing** - 23:4, 101:7
**notice** - 68:19, 68:21, 118:4, 118:5, 118:7, 118:11, 118:15, 118:17, 118:18, 119:7, 119:9, 119:20, 138:10, 163:6, 169:3, 174:7
**noticed** - 58:5
**notified** - 60:23, 135:12
**November** - 191:11, 192:9
**Number** - 2:2
**number** - 37:1, 64:15, 97:5, 99:13, 99:23, 99:25, 100:1, 100:7, 100:9, 126:17, 129:25, 138:3, 141:14
**number-one** - 99:23
**numbered** - 1:22, 96:25, 208:11
**numbers** - 97:2
**nurse** - 36:9, 36:17, 36:19, 37:16, 37:23, 38:7, 38:11, 39:9, 40:4, 49:1, 59:9, 59:11
**nursing** - 36:12, 37:4, 37:14

**O**

**O'brien** - 92:25
**o'clock** - 52:11, 99:5, 158:14
**oath** - 95:3, 101:25
**Obel** - 1:6, 3:3, 52:18, 74:25, 85:4, 89:21, 107:21, 108:2, 139:4, 139:7, 139:15, 140:5, 140:17, 142:1, 152:19, 152:20, 153:2
**object** - 12:23, 16:10, 28:12, 31:17, 47:14, 81:16, 81:17, 86:18, 88:6, 90:17, 102:4, 102:14, 102:21, 119:10, 122:16, 122:18, 122:19, 123:15, 124:19, 128:3, 128:8, 141:6, 168:2
**objected** - 128:25, 170:13
**objecting** - 82:2
**Objection** - 20:7, 21:9, 87:11, 87:23, 90:3, 90:12, 90:19, 91:18, 93:18, 139:9, 144:9, 150:18, 151:23, 159:23, 160:23, 165:6, 165:25, 168:20, 170:5, 170:12, 183:11
**objection** - 23:19, 32:23, 35:1, 47:22, 61:11, 83:16, 103:14, 122:4, 124:16, 127:18, 129:21, 141:13, 146:7, 165:9, 195:9, 195:11, 197:22, 197:25
**objections** - 122:7, 129:14
**obscure** - 193:20
**observations** - 153:16
**observe** - 39:3, 86:2, 153:21

**observed** - 58:2, 192:22, 194:8, 202:11
**obtain** - 113:2, 140:6, 140:9
**obtained** - 109:13, 111:22, 115:4, 130:18, 144:2
**obtaining** - 111:21, 112:20
**obvious** - 73:24, 202:8
**obviously** - 60:14, 67:23, 75:14, 89:23, 105:13, 117:7, 127:20, 182:13, 186:20
**Obviously** - 71:12, 124:1, 163:11, 184:11
**occasion** - 15:8, 167:8
**occur** - 37:18, 162:25
**occurred** - 5:22, 6:1, 29:8, 29:15, 30:15, 30:25, 33:5, 33:12, 49:10, 111:4, 157:11, 168:9, 208:11
**occurrence** - 126:20
**occurs** - 72:7
**October** - 42:21, 43:18, 48:7, 66:13, 66:14, 66:20, 77:20, 78:5, 85:2, 85:3, 85:23, 87:1, 105:14, 107:23, 108:14, 108:18, 109:8, 111:9, 111:15, 111:18, 117:11, 135:2, 135:13, 136:8, 140:25, 142:5, 142:12, 143:13, 143:14, 156:8, 167:20, 169:9, 169:18, 171:17, 177:12, 178:17, 179:24, 180:13, 184:4, 185:25, 208:17
**Offenders** - 63:15
**offense** - 65:24, 66:4, 66:10, 81:9, 106:5, 107:7, 115:13, 115:14, 115:15, 116:6, 118:24, 120:8, 120:20, 124:2, 124:5, 124:11, 127:4, 127:9, 128:5, 129:15, 130:10, 130:20, 130:24, 143:12, 152:2
**offensive** - 127:20
**offer** - 47:25, 83:13, 86:16, 114:12, 114:21, 122:25, 141:9, 141:10, 144:6, 150:16, 165:3, 195:6, 197:19
**offered** - 86:23, 120:9, 120:10, 129:3
**Offered** - 2:2, 47:10, 83:15, 141:12, 144:8, 150:17, 165:5, 195:8, 197:21
**offering** - 47:8, 106:3, 106:4, 116:7, 116:8, 120:15, 122:24, 124:13
**Office** - 54:2, 111:15
**office** - 65:10, 92:14, 93:3, 94:1, 135:12, 145:5, 204:17, 204:19, 205:9
**Officer** - 24:7, 49:25, 51:20, 62:2, 62:3, 62:4, 62:17, 62:19, 68:5, 68:6, 94:20, 182:12
**officer** - 13:1, 52:1, 54:10, 55:12, 55:14, 55:19, 60:14, 62:23, 63:1, 68:9, 69:21, 70:16, 76:6, 79:19, 84:6, 176:22, 177:5
**officer-involved** - 177:5
**Officers** - 78:21, 78:24
**officers** - 13:2, 13:8, 14:8, 26:22, 57:12, 64:21, 64:24, 65:5, 68:5, 68:7, 77:24, 78:16, 78:18, 84:14, 84:18, 85:8, 95:24, 136:19, 156:10, 177:25, 185:16, 193:2, 201:21, 204:4
**offices** - 112:16, 133:24,

138:11, 139:20
**Official** - 208:4, 208:16, 208:22
**often** - 11:15, 58:14, 169:9, 169:12
**oil** - 197:1, 197:3
**Old** - 201:8, 201:12
**old** - 95:21, 146:25, 148:20, 176:10, 198:16, 200:4
**on-call** - 35:2, 104:23
**Once** - 49:15, 92:4, 134:9
**once** - 11:11, 11:16, 105:13, 109:23, 167:10, 169:13
**One** - 7:19, 13:4, 76:10, 105:12
**one** - 4:22, 5:14, 6:22, 6:25, 9:24, 10:1, 10:3, 14:11, 14:12, 16:12, 19:18, 23:15, 26:5, 29:9, 29:19, 33:9, 34:8, 50:11, 56:14, 64:16, 65:5, 67:1, 69:14, 71:16, 75:6, 96:20, 98:7, 98:9, 99:23, 99:25, 100:7, 100:9, 101:18, 118:19, 125:13, 125:15, 133:14, 138:3, 138:24, 158:4, 166:17, 166:21, 166:25, 173:6, 176:10, 180:17, 181:19, 184:6, 189:12, 193:16
**ones** - 12:11
**Open** - 3:1, 3:10, 23:22, 27:9, 32:22, 47:21, 52:7, 52:13, 53:1, 106:9, 106:18, 131:4, 189:14, 207:8
**open** - 41:23, 70:23, 70:25, 73:22, 112:3, 112:4, 208:12
**opened** - 26:20
**operation** - 153:18
**operations** - 36:16
**opinion** - 106:14, 106:15, 121:23, 129:17, 206:24
**opportunities** - 153:9, 154:23
**opportunity** - 42:24, 55:22, 67:17, 77:18, 87:3, 119:17, 133:9, 137:5, 137:11, 139:24
**opposed** - 44:5
**order** - 39:8, 75:17, 112:11, 140:8, 194:25
**ordering** - 127:22
**organized** - 63:16
**orient** - 195:20
**original** - 56:20, 68:2, 118:18
**originally** - 155:14
**Ortiz** - 80:21
**otherwise** - 48:21
**Otherwise** - 114:8
**ounce** - 6:22, 6:25, 7:10, 7:19
**outlets** - 142:21
**outside** - 58:3, 58:4, 106:21, 120:21, 162:17, 162:23, 164:23, 169:6
**outweigh** - 130:8
**outweighs** - 129:22
**overhead** - 195:4
**overruled** - 103:15, 150:20, 165:7, 170:14
**own** - 9:22, 34:6, 36:10, 81:19, 87:25, 126:10, 126:12, 151:25, 170:25, 171:10, 171:16
**owned** - 183:1
**owner** - 85:15, 85:19,

86:1, 87:6, 87:16, 87:21, 89:3, 89:4, 89:9
**ownership** - 88:4, 88:24

**P**

**packaged** - 30:5
**packets** - 41:25
**page** - 97:7, 142:3
**Page** - 1:3, 100:25, 101:14, 103:25, 118:22, 142:3
**paid** - 14:12
**pair** - 203:10
**panties** - 46:17
**Panties** - 2:5
**paper** - 114:11
**paperwork** - 2:11, 114:6, 122:22, 123:1, 123:25, 141:23, 141:25, 143:16
**paragraph** - 101:18
**paramedics** - 18:3, 19:19
**parcel** - 77:25, 114:19
**parents** - 172:19, 180:6
**park** - 149:2, 196:7, 196:20, 198:24, 199:1
**part** - 23:15, 26:24, 38:20, 41:11, 48:1, 71:8, 77:24, 95:5, 114:4, 114:16, 114:19, 122:11, 133:12, 147:4, 149:11, 179:19, 192:7, 192:23, 195:14, 202:8, 202:25
**Part** - 45:25
**partially** - 62:22, 62:24
**participated** - 178:25
**participating** - 114:25
**particular** - 65:13, 72:20, 84:11, 123:12, 126:2, 138:24, 177:23, 203:9
**particularly** - 169:2
**parties** - 208:9, 208:15
**partner** - 37:9
**parts** - 84:14, 194:1
**Parts** - 204:12
**Pasadena** - 2:9, 143:5, 143:8, 144:1, 187:13, 196:16
**pass** - 3:22, 5:6, 50:6, 51:8, 61:1, 94:15, 110:5, 145:20, 172:23, 183:6, 188:6, 205:13
**Pass** - 33:22, 34:20, 104:15, 174:20
**passage** - 39:16
**passed** - 77:6, 77:10, 183:15, 183:23
**past** - 84:25, 203:2
**patient** - 39:10, 40:18, 41:6, 41:11, 41:15, 41:19, 41:21, 41:23, 42:3, 42:8, 42:17, 42:25
**patients** - 37:25
**patrol** - 54:5, 54:10, 55:2, 55:4, 55:7, 55:19, 56:8, 56:18, 60:14, 63:13, 176:20, 176:21, 177:1, 178:20, 190:21
**pattern** - 129:6
**pause** - 14:3, 125:6, 174:19
**Pause** - 61:5, 61:23, 103:24, 146:2, 205:17
**pawn** - 138:14, 138:19, 138:20, 138:21
**pay** - 6:24
**Pcs** - 114:2, 114:13, 118:8
**peace** - 55:12, 63:1
**peach** - 172:11
**Pedro** - 80:21
**pelvic** - 38:19, 39:8, 39:9,

39:14, 41:17
**pending** - 111:4
**peninsula** - 198:20
**People** - 72:4, 185:10
**people** - 6:18, 8:21, 12:20, 20:15, 21:7, 28:3, 30:22, 31:12, 39:11, 70:5, 70:6, 72:5, 72:6, 75:14, 94:13, 94:14, 96:9, 96:12, 102:8, 155:25, 172:22, 181:6, 181:19, 183:21, 183:22, 197:4, 201:9
**Peoria** - 133:24
**per** - 6:22, 7:13, 117:21
**perfect** - 189:12
**perform** - 38:2, 39:9, 39:12, 42:24, 49:6, 49:8
**performed** - 39:17, 40:8, 41:14, 42:1, 43:6, 43:20
**perhaps** - 130:11
**period** - 98:2
**permissible** - 113:16
**Perry** - 3:17, 146:14
**person** - 4:16, 9:16, 12:21, 12:22, 14:14, 14:16, 14:17, 14:25, 15:2, 15:6, 15:9, 15:22, 15:25, 24:6, 24:25, 28:4, 34:13, 34:16, 67:6, 69:23, 71:16, 71:17, 76:11, 81:10, 86:7, 86:9, 100:4, 137:20, 150:2, 150:15, 152:16, 152:18, 153:2, 153:10, 161:4, 162:16, 172:1, 173:12, 186:9
**personal** - 81:19, 87:25, 152:1, 160:1
**personally** - 137:9, 145:1
**personnel** - 37:10
**perspective** - 71:13
**phase** - 120:14
**Phone** - 2:7, 2:13, 2:16
**phone** - 78:25, 137:1, 159:6, 160:17, 161:14, 162:4
**phonetic** - 155:16
**photo** - 185:23, 194:21, 199:22
**Photograph** - 2:12, 2:13, 2:14, 2:15, 2:16, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4
**photographs** - 19:7, 164:4
**photos** - 194:13, 199:17
**physical** - 48:8, 48:11, 48:14, 48:17, 49:1, 49:2, 49:5, 114:8
**pick** - 89:13, 159:9, 161:10, 161:12, 161:23, 163:2
**picked** - 10:3
**pickup** - 34:9
**picture** - 10:10, 18:19, 72:10, 154:12, 198:5, 200:4, 200:6, 200:16, 202:22, 203:2
**pictures** - 18:6, 18:12, 18:13, 18:16, 19:4, 19:9, 19:15, 164:14, 168:17, 168:23, 168:24, 194:7, 197:12, 204:22
**piece** - 114:11, 138:18
**pieces** - 110:18
**pillow** - 14:19, 14:23, 18:20, 19:13
**pinpoint** - 98:25, 99:11
**pistol** - 9:12, 9:22, 10:10, 10:15
**pivotal** - 111:21
**place** - 12:20, 22:11, 22:14, 48:16, 82:22, 84:15,

85:9, 87:6, 103:11, 145:16, 145:18, 156:11, 171:23, 182:19
**placed** - 14:21, 14:23
**places** - 6:20, 156:1, 180:17
**plainclothes** - 55:4
**plan** - 119:17, 119:22
**plastic** - 30:7, 30:8
**play** - 176:4
**point** - 36:21, 37:14, 47:15, 58:21, 74:19, 84:13, 84:21, 84:23, 88:13, 98:15, 99:19, 107:8, 108:5, 108:9, 109:16, 109:19, 115:9, 115:19, 116:23, 117:24, 121:5, 121:19, 125:12, 126:14, 128:7, 128:19, 128:22, 130:20, 130:21, 130:24, 133:14, 135:7, 137:18, 137:22, 138:13, 138:23, 139:25, 140:7, 140:16, 143:4, 143:8, 144:16, 144:23, 159:1, 160:7, 161:21, 162:1, 172:7, 178:12, 181:3, 181:15, 192:24, 196:9, 196:10, 196:23, 198:7, 198:13, 198:14, 198:20, 199:11, 199:12, 199:24, 201:19, 202:6
**police** - 4:23, 8:3, 8:6, 8:12, 9:1, 10:3, 10:4, 15:5, 15:12, 15:15, 15:18, 15:19, 15:21, 16:3, 16:7, 16:19, 16:23, 17:5, 17:9, 21:19, 22:2, 22:6, 22:16, 23:24, 24:4, 26:19, 33:2, 33:8, 49:19, 55:14, 57:11, 63:3, 63:5, 63:17, 76:6, 95:9, 95:23, 95:24, 96:3, 102:11, 136:1, 156:10, 157:5, 176:17, 176:21, 190:23, 191:15, 192:25
**Police** - 38:22, 40:24, 50:1, 54:11, 54:12, 55:1, 55:16, 63:7, 63:8, 136:15, 136:18, 140:13, 175:17, 176:19, 190:4, 190:7, 190:19, 191:8, 193:3, 193:7, 205:2
**policeman** - 190:18
**polygraph** - 134:11
**pool** - 36:16
**pops** - 125:10
**portion** - 106:24, 127:2, 127:15
**portions** - 208:8
**position** - 24:2, 47:17, 48:15, 123:13, 190:20
**positions** - 133:7
**possession** - 59:19, 110:22, 110:24, 110:25, 118:24, 119:2, 123:22, 167:5, 168:13
**possibilities** - 70:24
**possible** - 40:18, 84:15, 121:14, 138:2, 191:13
**possibly** - 100:6, 108:6
**posted** - 115:24
**practical** - 39:6
**practice** - 36:11, 36:25, 37:4, 37:8, 48:25
**practiced** - 37:9
**practicing** - 36:24
**Precinct** - 54:1, 54:4, 54:7, 54:9
**predicate** - 23:12, 26:12
**prefer** - 189:7
**prejudice** - 129:21
**prejudicial** - 114:14,

114:17, 115:13, 116:13, 121:17, 121:22
**premise** - 112:17
**preparation** - 119:17, 119:22
**prepared** - 30:9
**presence** - 106:21
**present** - 3:1, 3:10, 23:22, 27:9, 32:22, 47:21, 52:7, 52:13, 52:18, 53:1, 106:9, 106:18, 131:4, 136:25, 162:12, 189:14, 207:8
**presented** - 40:18, 43:2, 186:15
**preserved** - 38:16, 42:13
**presiding** - 1:23
**Pretty** - 71:23, 98:6
**pretty** - 23:13, 25:24, 37:3, 50:3, 57:6, 69:3, 71:9, 71:13, 73:22, 73:24, 74:1, 74:5, 77:21, 89:25, 94:22, 96:4, 98:11, 99:20, 100:12, 120:19, 126:12, 156:4, 156:5, 169:15, 194:2
**previous** - 197:1
**previously** - 40:14
**primarily** - 37:10
**primary** - 57:8, 57:15, 99:23, 108:3, 137:17, 137:19
**priority** - 100:8, 100:9, 138:3
**private** - 40:21, 40:23
**probate** - 37:11
**probation** - 105:23
**probative** - 114:14, 121:18, 129:22, 130:8
**problem** - 61:14, 82:15, 115:19, 154:3
**problems** - 3:16, 20:19
**procedurally** - 113:3
**procedure** - 42:10, 96:5
**proceed** - 3:20, 4:1, 5:7, 14:6, 23:20, 27:10, 32:24, 33:25, 35:14, 47:24, 48:5, 52:15, 53:3, 53:6, 62:9, 82:10, 86:24, 94:17, 113:6, 131:7, 131:10, 141:20, 146:17, 150:22, 152:7, 161:8, 175:9, 189:18
**proceeding** - 38:25, 52:20
**Proceedings** - 1:16, 1:24, 1:2, 207:11
**proceedings** - 1:21, 208:8, 208:14
**process** - 38:18, 42:10, 110:18, 145:6, 150:6
**processes** - 112:5, 113:4
**production** - 197:3, 198:16
**proffer** - 107:1, 107:3, 107:6, 117:19, 123:13, 123:20
**progress** - 56:2
**promoted** - 176:25
**pronto** - 193:15
**proof** - 119:16, 119:22, 125:23
**properly** - 42:12
**property** - 59:24, 60:8, 82:18
**propose** - 105:24, 106:21
**proposing** - 107:6
**prosecution** - 109:14, 111:17, 111:20, 112:15, 113:24
**prosecutor** - 102:7, 104:2
**prove** - 119:16, 120:10, 123:1
**provide** - 38:1, 136:4,

136:5, 136:16, 137:1
**provided** - 119:19, 129:20, 137:3
**public** - 122:23, 141:10, 142:16, 142:20
**publicity** - 79:24, 79:25, 178:4
**publish** - 165:12, 195:17, 195:18
**Puerto** - 105:17, 112:7, 112:9, 112:10, 112:20, 113:6, 116:21, 117:5, 117:14, 117:15, 144:21, 144:23, 145:5, 145:16, 156:1
**purchase** - 6:20
**purchased** - 29:22, 30:3
**pure** - 31:6, 31:7
**purpose** - 116:8, 116:9, 129:2
**purposes** - 44:17, 46:14, 82:7, 106:5, 107:19, 110:6, 110:10, 119:15
**push** - 52:4
**put** - 18:21, 30:8, 38:13, 38:16, 42:4, 42:5, 47:19, 49:16, 52:3, 66:9, 66:13, 73:6, 78:25, 95:12, 95:13, 117:19, 178:6, 189:8
**putting** - 96:5, 137:16, 138:5

## Q

**quadrant** - 195:22
**Quantico** - 132:19, 132:20
**quantities** - 74:11
**quantity** - 31:16
**questioned** - 9:5, 156:17
**questioning** - 32:21, 60:4
**questions** - 3:25, 4:12, 5:15, 5:17, 32:12, 50:13, 51:11, 61:7, 95:5, 102:8, 104:18, 107:4, 107:12, 107:13, 110:7, 146:3, 173:7, 173:9, 188:10, 197:15, 205:18
**quick** - 50:12
**quickly** - 13:24, 85:21, 106:25, 120:18
**Quickly** - 109:22
**Quiet** - 68:20
**quit** - 74:9
**quite** - 58:14, 69:11, 72:19, 99:13, 162:7

## R

**Ra** - 133:25
**radio** - 56:19
**rag** - 14:24
**raise** - 61:24
**raising** - 147:16
**ramps** - 196:6
**ran** - 87:18, 88:24, 186:7
**Randy** - 1:13, 1:23, 188:18, 189:20, 190:3
**range** - 40:12
**rank** - 132:10, 132:12
**ransacked** - 76:3
**ransom** - 79:14, 177:5
**rape** - 178:21
**raped** - 14:22, 76:2
**raping** - 14:18, 15:1
**rather** - 17:19
**reached** - 55:13
**read** - 63:25, 76:18
**reading** - 126:6, 200:18
**ready** - 3:22, 52:14, 53:3, 53:17, 131:1, 131:6

**real** - 85:21, 106:25, 163:7, 167:13, 169:5, 176:24
**really** - 26:2, 32:15, 32:20, 50:18, 50:21, 54:20, 68:10, 71:10, 75:23, 79:19, 94:5, 123:11, 151:20, 168:12, 173:15, 189:7, 199:13
**reason** - 5:18, 17:8, 78:8, 100:5, 113:10, 113:20, 183:16, 183:18, 186:13, 191:17
**reasonable** - 119:20
**receipt** - 2:10
**receive** - 63:19, 143:16
**received** - 17:12, 59:9, 59:15, 63:13, 63:22, 119:20, 132:5, 184:4, 191:20
**recently** - 62:23, 66:5
**recess** - 52:12, 206:4
**recessed** - 207:11
**recognize** - 10:9, 10:13, 10:21, 44:19, 44:22, 45:18, 45:20, 45:23, 59:6, 143:23, 143:25, 154:13, 164:6
**recollection** - 21:18, 22:7, 49:24, 50:19
**record** - 3:2, 23:11, 25:20, 31:20, 43:7, 43:9, 43:21, 47:13, 52:16, 53:5, 105:10, 110:11, 122:23, 125:7, 130:15, 131:8, 172:15, 172:17, 188:22
**Record**- 1:1, 208:10, 208:13
**recorded** - 40:9
**recording** - 41:10
**records** - 43:18, 137:1, 141:10, 144:14
**recover** - 204:16
**recovered** - 5:1, 193:23, 194:8, 202:24, 204:4, 204:21, 205:7
**recovery** - 191:17, 198:6, 198:7, 201:22
**red** - 104:12, 104:13, 174:10
**redact** - 123:1
**redacted** - 124:1, 124:5, 127:2, 127:3, 127:5, 127:15
**redaction** - 128:24
**redactions** - 130:3
**Redirect**- 34:1
**redirect** - 27:3, 33:23, 161:1
**refer** - 85:1, 96:24, 103:9, 128:17, 128:19, 155:25
**reference** - 124:10
**referring** - 70:12
**refers** - 70:11
**reflect** - 164:17, 172:16, 172:17
**reflected** - 69:8
**reflects** - 208:14
**regard** - 71:22
**regarding** - 103:5, 113:1, 113:7, 117:8, 124:9, 143:2
**regards** - 106:23
**registered** - 36:9, 36:18, 39:9
**registration** - 87:18, 88:1, 88:10, 88:24, 143:16, 144:1, 144:4
**regular** - 56:8
**regularly** - 108:15
**regularly-scheduled** - 108:15
**related** - 76:3
**relation** - 33:4, 152:2
**relationship** - 20:16, 82:9, 89:20, 148:7, 149:7, 155:5

**relaxed** - 82:11
**released** - 45:14
**relevance** - 12:24, 21:11, 31:18, 31:21, 32:1, 32:9, 47:14, 86:18, 150:18, 152:1, 165:6
**Relevance**- 20:7, 21:9
**relevant** - 32:4, 32:11, 32:21, 106:6, 116:2, 116:12, 124:25, 125:1, 126:23, 129:2, 129:11, 143:11, 151:24
**relied** - 96:1
**remain** - 58:16
**remained** - 192:25
**remains** - 192:22, 193:20, 193:24, 193:25, 196:11, 196:19, 196:25, 201:1, 202:5, 202:8, 204:16, 205:11
**remember** - 6:9, 7:1, 9:4, 9:5, 10:14, 10:15, 10:20, 11:17, 12:4, 12:6, 16:22, 16:23, 17:3, 17:5, 17:21, 17:23, 18:24, 19:10, 22:9, 25:8, 25:9, 25:15, 27:21, 28:6, 28:8, 29:13, 29:14, 29:16, 29:20, 29:23, 29:24, 29:25, 30:16, 39:13, 50:18, 55:25, 58:6, 60:21, 66:12, 66:22, 69:1, 72:4, 77:13, 84:5, 84:25, 99:9, 148:6, 148:24, 149:15, 156:10, 156:23, 156:25, 158:8, 159:21, 166:17, 166:18, 167:11, 167:12, 167:13, 167:23, 168:12, 169:12, 171:1, 177:14, 177:21, 191:4, 193:6
**remind** - 106:12
**reminding** - 206:21
**Rendon**- 84:16, 84:22, 85:14, 85:20, 85:22, 86:1, 87:4, 87:5, 88:15, 181:22, 182:3, 182:25, 183:1
**Rendon's**- 181:22, 182:8
**Renee**- 1:22
**rented** - 180:6
**repeat** - 5:19, 7:15, 16:18, 20:11, 173:10
**rephrase** - 23:8, 183:13
**Rephrase**- 28:20
**report** - 43:7, 65:24, 66:4, 81:9, 85:1, 95:9, 95:13, 95:19, 95:21, 96:3, 96:25, 97:1, 101:4, 103:10
**reported** - 1:24, 208:12
**reporter** - 36:1, 53:23
**Reporter**- 208:4, 208:22
**Reporter's**- 1:1, 1:14, 208:1, 208:10, 208:13
**reports** - 12:20, 95:19, 95:24, 156:23, 163:12
**represent** - 195:3, 197:16
**representatives** - 142:19
**Representing**- 3:6
**Republic**- 96:13, 96:14, 96:16, 155:17, 156:1
**request** - 119:19
**requested** - 91:17, 111:15, 208:8
**required** - 64:2, 64:4
**research** - 182:11
**reserved** - 190:16
**residence** - 85:9, 181:25
**residual** - 196:25, 200:14, 201:8
**resigned** - 132:9
**resources** - 136:17, 138:6
**respect** - 104:1

**respective** - 208:15
**respond** - 55:22, 58:13, 90:2, 136:6, 191:12, 191:15
**Responded** - 192:21
**responded** - 54:17, 55:9, 56:1, 60:15, 191:17
**responding** - 56:20
**response** - 90:21, 102:22, 109:7, 109:9
**responsibilities** - 36:14, 54:3, 54:25, 64:11, 135:2, 177:4
**responsibility** - 58:12, 59:25
**rest** - 55:5
**retaliation** - 76:4
**retire** - 54:15
**retired** - 54:16, 62:23, 175:18, 175:19, 175:20, 177:7, 177:9
**retirement** - 54:17, 54:21, 176:2
**return** - 198:7
**returned** - 28:2, 134:9, 204:25
**returning** - 200:24
**revised** - 118:9, 118:11
**Rhodes** - 1:13, 1:23, 188:19, 189:20, 190:3, 190:9
**rib** - 194:4, 204:9
**Rico** - 105:17, 112:8, 112:9, 112:10, 112:20, 113:6, 116:21, 117:5, 117:14, 117:15, 144:21, 144:24, 145:5, 145:16, 156:1
**ride** - 160:15, 161:16
**Rios** - 179:7, 179:10
**rise** - 52:6, 106:17, 207:7
**risk** - 126:4, 126:5
**risking** - 121:15, 121:20
**Rn** - 37:24
**Road** - 149:13, 149:17, 149:18
**road** - 199:5, 199:10, 199:13
**roadways** - 194:22
**robbed** - 27:20
**robberies** - 133:2, 135:4
**rock** - 203:1, 203:8, 203:13, 203:17
**Rock** - 133:25
**rocks** - 201:11
**Rodriguez** - 1:5, 1:24, 3:7, 3:21, 4:2, 4:7, 4:9, 5:10, 19:1, 34:3, 34:12, 35:4, 57:17, 67:1, 67:6, 72:21, 88:20, 89:13, 89:17, 93:10, 109:3, 109:5, 137:13, 139:25, 143:9, 144:2, 180:8, 187:17, 208:4, 208:21
**Rogelio** - 85:22, 86:1, 183:1, 187:1
**Rolando** - 2:20
**role** - 48:22, 134:1, 134:2, 140:2
**romantic** - 149:7
**room** - 5:2, 19:15, 36:17, 41:15, 41:16, 41:19, 59:24, 60:8, 69:15, 71:3, 73:9, 76:23, 76:25, 157:22, 158:3, 158:4, 158:5
**roughly** - 7:19, 147:2
**route** - 196:17
**Rp** - 2:11
**Rudy** - 117:2, 154:11, 154:17, 154:21, 154:24, 155:5, 160:8, 160:14, 161:11, 162:13, 163:6,
163:15, 167:25, 168:6, 168:10, 173:11, 173:25, 174:3, 187:25
**Rue** - 155:16
**Rule** - 102:5
**rule** - 115:2, 129:20, 129:24
**ruled** - 129:3
**ruling** - 124:4
**runs** - 192:7

## S

**safe** - 39:15, 145:16
**Saliva** - 2:7
**saliva** - 46:24
**Sam** - 176:15
**sample** - 2:7, 2:8, 46:24, 47:1, 83:20, 83:21, 156:18
**samples** - 83:23, 83:24
**San** - 92:13, 145:5
**sand** - 192:13, 201:4
**sandy** - 192:23
**Santana** - 88:22, 91:6, 91:7, 154:19
**Santo** - 155:16
**sat** - 93:15
**satellite** - 133:24
**satisfied** - 122:2
**satisfies** - 119:8
**saw** - 14:17, 14:22, 15:2, 17:7, 28:3, 34:17, 51:4, 76:24, 88:19, 122:21, 153:17, 169:10
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scale** - 30:12, 30:14, 31:15, 32:11
**scary** - 163:23
**scattered** - 194:3, 194:4, 201:1
**scene** - 26:21, 56:23, 56:24, 57:11, 57:14, 58:3, 58:9, 60:18, 65:6, 65:9, 68:2, 71:13, 72:1, 91:10, 136:6, 136:14, 178:21, 191:12, 191:16, 191:18, 192:21, 193:1, 193:8, 194:25, 195:4, 197:17, 200:12, 201:21, 204:25
**scenes** - 55:10, 60:15, 207:2
**scheduled** - 105:20, 108:15
**school** - 36:23, 131:24
**science** - 176:17
**screamed** - 75:7
**screen** - 18:21, 19:2, 199:17, 199:18, 200:12, 200:21
**sealed** - 41:18, 42:6, 49:17
**search** - 82:21, 84:2, 84:3, 112:1, 112:3, 205:1
**seat** - 62:1, 106:19, 166:9, 197:8
**seated** - 3:4, 3:11, 53:2, 131:5
**second** - 14:2, 38:8, 101:18, 103:20, 132:6, 205:16
**seconds** - 103:23
**secure** - 56:23
**security** - 185:7
**See** - 207:9
**see** - 14:14, 14:16, 14:25, 18:23, 18:25, 19:3, 19:8, 25:18, 27:6, 32:9, 45:9, 68:21, 71:16, 71:17, 72:4, 72:5, 81:4, 113:9, 115:19, 116:17, 116:22, 120:24, 125:3, 148:22, 153:9,
154:23, 163:19, 163:22, 166:23, 167:9, 169:14, 169:20, 172:1, 172:5, 172:12, 172:13, 176:23, 182:13, 184:11, 184:23, 186:8, 187:24, 188:9, 188:11, 189:8, 191:16, 192:14, 194:25, 200:5, 200:11, 200:13, 200:17, 200:19, 200:24, 202:2, 202:21, 203:10, 203:16, 205:2, 206:16, 207:5
**seeing** - 20:15, 20:21, 148:7, 156:23, 156:25, 195:21
**seek** - 105:18
**seem** - 68:19, 69:2, 69:5, 76:21, 163:17
**sell** - 6:18, 7:2
**selling** - 6:4, 6:13, 6:15, 7:6, 7:17, 7:20, 8:1, 8:17, 10:25, 30:17, 31:12, 32:17, 33:17, 100:1, 153:6, 154:10, 155:11
**semi** - 134:22
**semiautomatic** - 9:12
**sending** - 139:20
**sense** - 173:9
**sent** - 81:10, 112:16, 138:9, 204:16
**sentence** - 25:22, 26:5
**separate** - 28:14, 128:4
**separated** - 20:5, 20:15, 194:3
**September** - 4:24, 5:21, 5:25, 42:20, 55:15, 55:21, 64:8, 65:4, 135:1, 135:13, 136:7, 156:7, 177:12
**Sergeant** - 13:7, 62:2, 68:5, 80:24, 92:21, 175:17, 183:8, 184:14, 188:10, 188:15, 193:6
**sergeant** - 176:25, 177:3
**series** - 38:17, 38:23
**serious** - 75:20
**serve** - 132:7, 134:1
**served** - 132:8, 133:7, 133:19, 134:2, 190:20
**service** - 176:22
**services** - 142:18
**session** - 93:1
**set** - 140:8, 140:18, 145:11
**setting** - 126:18
**settings** - 124:20, 124:21, 125:3, 126:17, 129:1, 129:2
**Seven** - 175:20
**seven** - 63:9, 186:10, 190:22
**several** - 38:17, 56:9, 72:24, 166:19, 168:7, 187:4
**severity** - 116:1
**Sexual** - 2:3
**sexual** - 37:15, 37:23, 38:2, 38:6, 38:11, 38:15, 38:19, 39:4, 39:17, 40:4, 40:18, 40:22, 41:3, 41:14, 41:18, 42:14, 43:9, 44:23, 45:25, 48:15, 48:18, 49:1, 49:7, 49:10, 49:16, 58:11, 58:24, 59:8, 59:19, 64:15
**sexually** - 38:1, 50:23, 51:2
**share** - 34:10
**sheet** - 124:14, 125:4, 126:15, 126:16, 128:23, 130:5
**sheriff** - 190:17
**Sheriff's** - 38:21
**shift** - 54:5, 64:21, 109:16, 109:20, 144:17
**shifted** - 109:25, 144:23
**shiny** - 10:16
**ship** - 192:8
**Shirley** - 184:14
**shirt** - 172:11, 181:21, 181:22, 203:11
**shootings** - 177:5
**Shop** - 84:16, 84:22, 85:14
**shop** - 86:3, 87:6, 87:7, 88:15, 89:4, 89:9, 138:19
**shops** - 138:14, 138:20, 138:21
**short** - 42:18, 53:21, 106:20, 131:6
**shorthand** - 1:25
**Shortly** - 88:14
**shortly** - 88:25
**shorts** - 203:10
**shot** - 194:19
**shots** - 197:14
**show** - 10:8, 18:10, 44:17, 59:5, 76:16, 83:6, 86:12, 86:21, 92:12, 93:4, 106:4, 114:15, 115:23, 116:2, 117:13, 120:13, 121:4, 121:9, 121:12, 121:20, 125:5, 125:23, 126:10, 126:18, 127:11, 127:14, 129:18, 130:9, 142:7, 143:21, 154:12, 164:4, 185:23, 194:13, 194:21, 197:11, 199:15, 202:12
**showed** - 19:4, 92:13, 126:17, 126:19, 129:7
**showing** - 106:3, 114:11, 115:7, 118:1, 121:19, 124:23, 126:11, 149:24, 198:7
**Showing** - 201:18
**shows** - 26:9, 43:21, 59:14, 80:4, 124:22, 176:23
**sic** - 138:15
**side** - 103:4, 110:3, 134:15, 147:5, 149:13, 196:2, 198:14, 199:7, 201:18
**sidebar** - 103:3
**sides** - 52:14, 131:11
**sign** - 48:14, 58:7, 82:21, 82:23
**significance** - 41:9, 121:10
**significant** - 45:11, 80:25, 121:16, 141:1, 192:4
**Silky** - 201:4
**sit** - 41:21, 68:10
**situation** - 20:6
**six** - 147:1
**skeletal** - 192:22
**skeleton** - 204:7
**skin** - 156:2
**skinned** - 181:9, 181:20
**Skip** - 3:5, 5:10, 50:11, 127:14, 173:3
**skipped** - 110:17
**skipping** - 189:5
**skull** - 194:3, 202:5, 202:13, 203:2, 203:21, 204:10
**sleep** - 157:21, 158:16, 158:20, 161:21
**sleeping** - 157:25
**slip** - 144:1
**slow** - 24:22
**small** - 74:11, 116:3, 192:11, 192:23, 193:25
**smears** - 2:6, 46:22
**smoke** - 4:21
**smoked** - 4:16, 4:22
**smushed** - 203:4

**snatched** - 76:2
**social** - 185:7
**sofa** - 157:23
**sold** - 6:12, 6:22, 7:12, 30:6, 32:15
**someone** - 39:12, 39:13, 50:22, 70:11, 84:4, 95:8, 96:6, 161:5, 182:20, 184:5, 191:25
**sometimes** - 11:16, 54:19, 148:15, 154:3, 166:16
**Sometimes** - 97:4
**somewhere** - 40:11, 40:12, 55:6, 162:8, 162:9
**son** - 15:6, 25:11, 25:14, 74:6, 76:2, 98:16, 101:6, 173:20, 174:11
**soon** - 74:7, 74:8, 108:1
**Sorry** - 152:25, 167:17, 172:12
**sorry** - 7:18, 8:11, 37:22, 64:3, 107:9, 131:6, 160:25
**sort** - 135:21
**sound** - 167:14
**sounds** - 159:24, 176:7
**south** - 196:1
**southeast** - 149:13
**southerly** - 193:18
**Southern** - 119:1
**Spanish** - 12:12, 13:3, 13:8, 13:15, 24:9, 57:22, 57:24, 68:3, 70:19, 80:15, 96:10, 96:21, 183:20, 183:22, 185:9, 185:11, 185:16, 185:22
**Spanish-speaking** - 80:15, 183:22, 185:16
**speaking** - 68:7, 80:15, 183:20, 183:22, 185:9, 185:16
**special** - 37:24, 63:14, 131:21, 134:20
**Special** - 110:11, 127:6, 131:8, 146:8
**specialized** - 38:1, 39:10
**specific** - 106:5, 196:22, 197:15
**specifically** - 46:13, 64:10, 65:12, 108:14, 116:17, 129:23, 135:1
**Specifically** - 127:10
**speculation** - 102:15
**spell** - 35:25, 36:4, 53:22
**spent** - 63:13, 63:14, 63:15, 177:1, 177:6
**spotted** - 202:5
**spouse** - 140:4
**Springfield** - 133:23
**squad** - 132:22, 132:24, 132:25, 133:8, 134:11, 134:21, 135:3, 177:3
**Sr** - 179:5, 179:12
**St** - 40:5, 40:16, 42:23, 58:10, 58:16
**stages** - 38:6
**stand** - 3:7, 52:3, 52:24, 60:18, 82:3, 122:25, 207:3
**standing** - 162:23
**stands** - 58:2, 191:6
**start** - 22:2, 41:15, 63:3, 99:7, 127:12, 206:5
**started** - 3:15, 6:23, 14:4, 20:21, 20:22, 21:5, 30:3, 31:2, 36:24, 99:2, 120:5, 153:7, 190:16, 200:23
**starting** - 176:5, 202:16
**starts** - 97:1
**State** - 1:11, 2:7, 3:3, 3:6, 35:6, 51:20, 61:16, 105:7, 111:13, 129:19, 141:9,

146:11, 175:4, 176:15, 188:18, 208:2, 208:5
**state** - 5:17, 55:12, 57:19
**State's** - 1:4, 10:9, 18:11, 44:18, 44:19, 45:16, 45:17, 45:20, 46:2, 46:10, 46:15, 47:2, 47:3, 47:8, 47:9, 53:3, 59:6, 59:7, 59:13, 83:7, 83:14, 83:15, 83:17, 83:18, 86:13, 86:17, 86:20, 129:24, 131:7, 141:9, 141:12, 141:16, 141:18, 141:21, 143:22, 144:6, 144:8, 144:11, 149:24, 150:14, 150:16, 150:17, 150:21, 150:23, 153:1, 154:13, 164:5, 165:4, 165:5, 165:8, 165:10, 166:6, 166:9, 166:12, 185:24, 194:16, 195:7, 195:8, 195:10, 195:12, 197:12, 197:20, 197:21, 197:24, 198:1, 198:3, 199:15, 199:21, 201:15, 201:20, 202:2, 202:12, 202:15, 203:15, 203:20, 203:23
**statement** - 26:6, 27:11, 29:12, 29:13, 67:9, 67:13, 67:15, 68:11, 68:13, 73:6, 75:4, 76:10, 76:17, 97:12, 99:3, 99:4, 101:9, 102:25, 103:6
**statements** - 41:10, 66:1, 66:16, 66:20, 71:21
**states** - 135:22
**States** - 109:6, 109:24, 112:2, 113:3, 113:6, 118:25, 132:5, 190:18
**station** - 22:11, 22:14, 22:16
**stations** - 80:3, 142:23
**status** - 130:19
**statute** - 120:7
**stay** - 54:23, 128:16, 143:10, 163:4, 170:3, 170:20, 171:23
**staying** - 171:2, 171:3, 171:9, 171:16, 171:21, 181:7, 181:9, 184:17
**steal** - 27:24
**step** - 35:4, 51:15, 61:12, 93:21, 105:2, 106:11, 174:24, 188:15, 195:20
**Stephens** - 80:24, 189:5
**stepped** - 52:21
**steps** - 43:25
**sticking** - 198:20
**sticks** - 177:16, 196:9
**still** - 20:23, 20:25, 62:23, 63:1, 88:6, 90:17, 99:17, 115:6, 115:9, 115:12, 115:13, 115:14, 117:12, 144:22, 177:8, 182:16, 184:12, 186:19, 191:14, 197:2, 198:17
**stint** - 55:3
**stitches** - 19:20
**stole** - 27:22
**stop** - 33:11
**store** - 11:25, 173:21, 174:12
**story** - 102:19
**strange** - 171:6, 171:16, 185:9
**stream** - 192:6, 194:20, 196:10
**Stream** - 196:4, 198:15
**streams** - 192:11
**Street** - 199:6
**street** - 133:20

**strike** - 7:18
**strong** - 192:10
**structures** - 197:2
**stuck** - 206:8, 206:11
**students** - 39:11
**stuff** - 6:5, 32:6, 32:8, 84:19, 118:15, 124:21, 176:23, 200:20, 201:14, 207:1
**styled** - 208:11
**subject** - 35:4, 104:25, 106:13, 130:2, 206:23
**subpoena** - 92:15, 93:1
**subpoenaed** - 93:7
**subscriber** - 137:1
**subsequently** - 142:10
**substance** - 119:3, 123:2
**substantially** - 47:4
**successful** - 85:17, 139:22
**sudden** - 126:19
**suggestion** - 23:17
**suggestive** - 93:19, 168:3, 183:12
**Suite** - 2:15
**supervised** - 133:23, 133:24
**supervisor** - 133:19, 177:1, 192:21
**supplemental** - 36:15
**supplier** - 74:16, 180:7
**supply** - 186:18, 186:19
**supplying** - 74:13
**support** - 136:4, 136:5, 136:16
**suppose** - 99:20, 111:11, 112:18
**supposed** - 108:18, 115:20, 140:24, 180:18, 180:19, 191:15
**surprise** - 5:4, 72:16, 77:12, 170:10
**surrounding** - 82:8, 138:11, 139:20, 143:12, 177:22, 194:21
**surveillance** - 137:3, 139:19, 140:8, 187:10
**suspect** - 108:3, 128:18, 138:25
**suspected** - 15:5
**suspects** - 95:10
**suspicion** - 179:17, 179:18
**suspicions** - 92:17
**suspicious** - 185:13
**sustain** - 82:4, 88:12
**sustained** - 12:25, 21:10, 32:23, 47:22, 87:13, 90:5, 90:14, 91:20, 93:20, 102:6, 141:7, 144:15, 166:1, 170:7
**Sustained** - 102:16, 139:11
**swabs** - 2:6, 46:22
**Swaim** - 1:12, 2:1, 175:4, 175:11, 175:17, 188:10
**swear** - 101:24
**swimming** - 201:9
**swing** - 198:15
**swore** - 101:25
**sworn** - 4:3, 35:9, 35:11, 35:17, 51:22, 51:23, 52:2, 53:5, 53:9, 61:18, 61:25, 62:12, 107:16, 110:14, 131:9, 131:13, 146:13, 146:16, 146:20, 175:6, 175:8, 175:12, 189:15, 189:17, 189:21
**Sx** - 2:3, 2:5, 2:6, 2:7, 2:8, 2:9, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19,

2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4
**system** - 38:22
**systems** - 145:12

**T**

**T-bird**- 166:15
**t-shirt** - 203:11
**table** - 3:4, 41:17, 52:17
**tact** - 20:4, 20:14, 193:25
**tag** - 59:24
**talks** - 76:17, 117:16, 125:22
**tall** - 11:25, 104:13
**tank** - 200:4
**tanks** - 197:2, 198:16
**tape** - 42:7, 200:13, 200:14
**target** - 75:23
**tasked** - 205:1
**taught** - 38:9, 39:12
**taxi** - 162:20, 162:22
**team** - 133:13
**teams** - 139:19
**technically** - 54:15
**technology** - 39:16
**Telemundo**- 142:22
**Telephone**- 149:13, 149:17, 149:18
**television** - 80:3
**ten** - 106:10, 206:14
**Ten**- 106:16
**ten-minute** - 106:10
**tender** - 135:23
**tending** - 125:23
**tends** - 26:12, 126:16
**term** - 12:7, 12:13, 12:16, 127:16, 127:17, 127:19, 127:21, 128:17
**terminated** - 92:4
**terms** - 98:18
**Terrace**- 2:12
**terrorism** - 134:10, 134:11
**test** - 114:13
**testified** - 4:3, 35:17, 46:19, 53:9, 62:12, 97:22, 107:16, 122:12, 122:15, 131:13, 146:20, 175:12, 189:21
**testifies** - 117:17
**testify** - 33:18, 40:14, 112:19, 113:1, 114:9, 117:10, 118:15, 176:10
**testifying** - 4:10, 45:4, 50:19, 113:7
**testimony** - 3:8, 3:21, 9:8, 95:5, 102:5, 105:18, 106:25, 115:10, 117:19, 123:15, 206:25
**Texan**- 67:23
**Texas**- 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:3, 55:23, 56:10, 111:14, 119:1, 119:4, 136:7, 140:21, 186:10, 195:14, 196:13, 196:16, 208:2, 208:6, 208:21, 208:24
**thereafter** - 88:25
**thereon** - 206:24
**they've** - 116:14
**thinking** - 76:3, 120:24, 182:19, 192:2
**third** - 56:15
**Thirty**- 63:9, 190:8, 190:12, 190:13
**Thirty-seven-and-a-half**- 63:9
**thorough** - 205:1
**threatened** - 9:17
**threatening** - 14:12

**Three**- 54:8
**three** - 6:4, 6:7, 22:8, 22:18, 22:19, 33:19, 133:23, 134:2, 159:7, 167:24
**throughout** - 44:10, 112:2
**throw** - 22:23
**thrown** - 201:9
**Thunderbird**- 86:4, 86:5, 86:6, 87:9, 87:16, 87:22, 88:11, 89:14
**Thursday**- 66:10, 189:8, 189:9
**tide** - 192:17
**tides** - 192:9
**tied** - 75:18
**timely** - 119:19
**timing** - 27:1
**tires** - 201:8, 201:12, 201:25
**Tise**- 2:3, 3:6, 26:2, 26:8, 26:11, 26:17, 27:5, 52:19, 61:16, 61:19, 61:22, 62:9, 62:10, 62:14, 67:11, 67:14, 76:14, 76:16, 81:20, 81:21, 81:22, 82:11, 83:4, 83:6, 83:13, 83:19, 86:16, 86:22, 86:25, 87:14, 88:1, 88:10, 88:14, 90:6, 90:15, 90:18, 90:24, 91:21, 93:21, 94:15, 94:16, 102:4, 102:14, 102:21, 103:1, 103:14, 104:18, 104:19, 104:21, 106:2, 113:22, 114:1, 114:5, 114:11, 115:21, 116:1, 116:10, 116:12, 116:24, 117:1, 118:12, 118:22, 119:6, 119:24, 120:4, 121:6, 121:9, 121:24, 122:22, 123:6, 123:9, 123:11, 124:22, 125:1, 128:9, 146:11, 146:18, 146:22, 149:22, 149:24, 150:16, 150:24, 152:3, 152:8, 152:22, 153:1, 159:25, 160:6, 161:1, 161:9, 164:2, 164:4, 165:3, 165:12, 165:14, 166:2, 168:5, 168:23, 170:10, 170:16, 170:19, 172:15, 172:18, 172:23, 172:24, 174:23, 175:4, 175:9, 175:10, 175:14, 183:13, 183:15, 188:6, 188:7, 188:18, 188:24, 189:6, 189:18, 189:19, 189:23, 194:14, 194:16, 195:6, 195:13, 195:17, 195:19, 197:11, 197:19, 198:3, 198:19, 205:13, 205:14, 205:22
**title** - 190:9
**to-do** - 183:23
**to-wit** - 186:15
**today** - 18:2, 39:18, 44:2, 96:5, 145:12, 147:25, 206:3, 206:21
**Today**- 176:17
**Together**- 162:14, 162:15
**together** - 20:25, 21:2, 21:5, 34:4, 38:13, 38:17, 42:5, 149:9, 153:7, 153:12, 153:17, 158:22, 166:4, 194:2
**tomorrow** - 206:5, 206:8, 206:12
**took** - 29:21, 29:24, 36:23, 37:20, 48:16, 57:16, 58:23, 59:10, 59:19, 60:9, 66:1, 66:16, 89:6, 93:13, 101:25, 164:19, 167:13, 168:15
**top** - 18:19

**torso** - 194:4, 202:25, 203:4, 204:9
**total** - 54:23
**totality** - 139:14
**totally** - 116:12
**touch** - 199:18
**tough** - 3:13
**Towards**- 199:12
**towards** - 192:12
**town** - 56:4, 149:12, 196:5
**Tpc**- 176:4
**trace** - 78:24, 200:21
**track** - 78:24, 85:12
**traffic** - 186:11
**trained** - 39:25
**training** - 37:24, 38:10, 39:2, 39:7, 39:11, 48:13, 49:11, 63:19, 63:21, 64:2, 64:4, 69:21, 176:14, 190:15
**transcription** - 208:7
**transcription/stenograph** - 1:25
**translation** - 14:8
**transport** - 58:10, 204:16
**transported** - 58:15, 58:24, 59:22, 60:8
**trash** - 201:25
**trauma** - 48:11, 48:14, 49:2, 49:5
**traumatic** - 69:3, 69:6, 71:10, 72:7
**treat** - 17:18
**treatment** - 17:12, 17:15, 19:24
**Tree**- 180:3
**trial** - 106:14, 106:15, 120:14, 125:17, 206:23
**Trial**- 1:3
**tried** - 17:16, 56:22, 94:9, 97:9, 138:20
**tries** - 159:7
**triggers** - 105:14
**trouble** - 27:2
**truck** - 17:12, 17:25
**True**- 79:1
**true** - 50:24, 96:22, 102:3, 148:17, 154:18, 186:23, 208:7
**truly** - 208:14
**trunk** - 166:12
**trust** - 173:15
**truth** - 26:21, 74:9, 99:18, 99:22
**truthful** - 74:6
**try** - 56:22, 78:11, 80:8, 93:9, 109:23, 120:6, 139:17, 139:18, 161:1, 182:7, 206:14
**Trying**- 182:18
**trying** - 25:21, 31:22, 32:3, 32:5, 32:10, 33:14, 52:4, 70:1, 70:4, 72:14, 95:7, 98:21, 99:8, 102:11, 104:4, 118:3, 138:14, 142:15, 150:9, 180:14, 182:16, 187:5, 187:10, 205:2
**Tuesday**- 66:9
**Turn**- 101:14
**turned** - 49:18, 49:21, 56:3, 204:15
**Tv**- 5:2, 158:21
**twenties** - 148:22
**Twenty**- 54:14, 54:24
**Twenty-five**- 54:14, 54:24
**twice** - 11:16
**two** - 6:6, 6:11, 33:9, 33:19, 56:14, 63:13, 65:16, 72:6, 88:25, 100:1, 109:4, 158:1, 167:24, 181:7, 182:20

**two-bedroom** - 158:1
**type** - 39:21, 39:24, 48:8, 76:4, 109:17, 121:22, 127:9, 127:11, 150:9, 191:17
**types** - 69:25, 135:25, 145:9
**typical** - 42:14
**typically** - 39:9, 60:3

## U

**Ultimately** - 183:15, 193:5
**ultimately** - 90:24, 94:7, 149:6, 151:10, 157:5, 183:9, 194:8
**unable** - 61:20
**uncommon** - 48:25
**under** - 95:3, 116:5, 116:19, 130:6, 135:23, 186:7, 186:10, 193:23, 203:8
**Under** - 203:13
**undercover** - 55:3
**understood** - 54:20
**unique** - 37:7
**unit** - 56:15, 66:20, 56:24, 57:8, 57:16, 133:20, 191:14
**United** - 109:6, 109:24, 112:2, 113:3, 113:5, 118:25, 132:5, 190:18
**units** - 56:13, 178:21
**University** - 131:25, 176:16
**unknown** - 137:23
**unlawful** - 109:13, 111:17, 111:19, 112:14, 113:8, 113:24, 115:4, 117:22
**unless** - 32:9, 75:23, 88:13
**unproven** - 115:14
**unsealing** - 41:24
**unusual** - 11:18, 11:21, 159:17, 163:8
**Up** - 1:9, 1:19, 13:5, 13:13, 13:17, 14:7, 23:1, 24:7, 25:2, 25:5, 25:23, 27:12, 28:7, 28:24, 29:11, 61:16, 61:20, 62:11, 62:19, 97:1, 98:15, 99:19, 183:6, 183:8, 183:9, 183:16, 183:24
**up** - 3:18, 10:3, 18:21, 23:3, 23:19, 24:24, 25:7, 26:5, 26:10, 34:16, 35:13, 37:3, 47:16, 51:1, 57:21, 62:6, 68:24, 74:5, 75:18, 75:19, 80:11, 84:7, 84:23, 85:8, 86:3, 89:13, 92:12, 92:13, 93:4, 94:10, 96:15, 101:5, 105:17, 115:7, 115:23, 117:13, 118:1, 121:3, 121:4, 121:20, 123:1, 124:23, 126:11, 126:17, 126:19, 129:7, 140:8, 145:11, 146:15, 151:10, 154:1, 159:9, 161:10, 161:12, 161:23, 162:22, 163:2, 171:2, 178:13, 182:5, 183:10, 183:19, 188:4, 195:25, 196:5, 196:6, 197:8, 198:11, 198:16, 199:16, 200:8, 201:5, 201:10, 202:11, 206:6, 206:13
**update** - 64:2
**updated** - 64:4
**upset** - 57:6, 57:7
**urgency** - 193:14
**user** - 26:22
**usual** - 163:9
**utilized** - 142:18, 143:1, 143:9

## V

**vacated** - 181:16, 181:17
**Vaginal** - 2:6, 46:22
**value** - 114:14, 116:13, 129:22, 130:8
**various** - 30:22, 51:5
**vegetation** - 201:6
**vehicle** - 82:22, 87:19, 88:16, 88:19, 88:25, 89:1, 89:6, 89:9, 124:18, 160:19, 164:6, 164:9, 164:10, 164:14, 164:18, 165:17, 165:20, 166:3, 166:7, 166:9, 166:13
**vehicles** - 34:4, 34:10
**verbatim** - 23:13
**versus** - 114:14
**vertebrae** - 194:4
**victim** - 38:15, 38:24, 40:18, 57:14, 179:6, 180:6, 196:23
**view** - 199:23, 202:13, 203:16, 203:20
**violating** - 102:4
**violation** - 112:13
**violations** - 133:1
**violent** - 132:21, 132:24, 132:25, 133:3, 133:19, 133:20, 134:21, 135:3, 135:5
**Virgin** - 185:8, 185:10, 186:15
**visible** - 192:16, 198:17, 200:2, 203:1
**visit** - 45:15
**visual** - 44:5
**voice** - 35:12, 62:6, 198:11
**Voir** - 1:4, 1:17, 107:17
**Vol** - 1:3, 1:4, 1:17, 2:2
**volume** - 208:10
**Volume** - 1:2, 1:1, 1:15
**Volumes** - 1:2
**volunteer** - 176:5
**Vs** - 1:9
**vs** - 3:3

## W

**wait** - 117:1, 150:10
**waiting** - 162:23
**Wal** - 147:8, 147:18
**Wal-mart** - 147:8, 147:18
**walk** - 147:4
**walked** - 92:23
**walking** - 191:24
**warrant** - 109:14, 111:17, 111:24, 112:1, 112:10, 113:2, 113:9, 115:4, 117:22, 127:25, 128:21, 130:18
**Warrant** - 111:13
**warrants** - 63:24, 186:11
**washed** - 201:10
**Washington** - 189:6
**wasting** - 74:4
**watching** - 33:2, 33:8, 33:10, 33:11, 33:13
**water** - 191:13, 192:11, 193:18, 198:20, 201:5, 206:18
**water's** - 200:24
**waters** - 194:19
**waterway** - 191:13, 191:23, 200:20
**wave** - 201:10
**ways** - 26:18, 40:25, 72:25
**weapons** - 10:21, 10:23
**wearing** - 28:4, 76:11, 172:9, 181:21

**weather** - 192:2, 192:4, 193:17

**week** - 6:22, 7:13, 7:18, 7:19, 7:23, 9:10, 11:16, 29:22, 108:13, 142:13, 169:13, 169:14

**weekend** - 181:10, 181:11, 181:12, 181:15

**weeks** - 8:19, 22:8, 22:18, 22:20, 33:9, 38:18, 108:11

**weigh** - 30:12

**weighed** - 31:25

**west** - 192:7

**Western** - 131:25

**Westover** - 149:16

**whereabouts** - 137:22, 140:6

**White** - 104:13

**white** - 12:16, 12:21, 13:18, 96:6, 97:15, 104:12

**whites** - 95:7

**whoever's** - 19:13

**whole** - 9:6, 26:20, 38:23, 79:20, 124:14, 185:18, 196:16, 198:23

**wife** - 13:12, 14:18, 14:22, 15:1, 20:17, 23:3, 25:10, 25:14, 28:9, 28:25, 29:5, 74:17, 81:13, 89:22, 89:25, 101:5, 101:20, 183:1

**willing** - 82:21

**willingly** - 82:23

**wind** - 193:18

**wit** - 186:15

**witness** - 3:7, 3:23, 5:6, 10:5, 16:15, 18:8, 25:25, 26:2, 26:6, 26:12, 27:1, 28:18, 33:22, 34:20, 34:25, 35:8, 44:14, 50:6, 51:9, 51:12, 51:22, 52:23, 53:4, 59:2, 60:24, 61:1, 61:9, 61:18, 72:13, 86:23, 94:15, 104:15, 104:20, 105:6, 105:9, 105:11, 106:22, 107:11, 107:13, 113:1, 116:22, 122:17, 130:17, 131:7, 131:9, 143:19, 145:21, 146:6, 146:12, 152:4, 172:16, 172:23, 174:20, 174:22, 175:5, 188:6, 188:13, 188:23, 188:25, 189:2, 189:12, 205:13, 205:20, 207:3

**Witness** - 1:16, 35:11, 51:16, 51:18, 61:14, 61:25, 62:3, 62:5, 62:8, 76:19, 105:1, 105:3, 110:13, 110:16, 110:21, 110:25, 111:6, 111:9, 111:13, 111:25, 112:6, 112:11, 112:22, 112:24, 127:7, 127:16, 128:2, 130:22, 130:25, 146:16, 152:23, 152:25, 161:6, 170:9, 175:1, 175:8, 188:11, 189:16, 197:10, 198:12, 202:7, 205:25, 208:16

**witness'** - 94:7, 102:5

**Witnesses** - 1:4

**witnesses** - 114:9, 139:6, 178:20, 179:22, 206:2

**woman** - 96:21

**wonder** - 171:9

**Wood** - 2:4, 3:6, 3:22, 3:24, 4:6, 5:6, 12:23, 16:10, 20:7, 21:9, 23:18, 28:12, 28:17, 31:17, 31:25, 32:16, 33:24, 34:2, 34:20, 35:1, 35:6, 35:14, 35:15, 35:19, 44:13, 44:16, 47:7, 47:16, 47:20,

47:25, 48:2, 48:6, 50:6, 51:10, 51:11, 51:14, 51:20, 51:23, 52:18, 52:21, 53:6, 53:7, 53:11, 59:1, 59:4, 61:1, 61:2, 61:11, 105:7, 105:11, 105:23, 106:1, 107:1, 107:9, 107:14, 107:18, 110:5, 112:25, 113:11, 116:25, 117:6, 118:5, 118:7, 118:10, 118:17, 124:3, 124:8, 124:15, 125:5, 127:14, 128:6, 128:13, 130:1, 130:14, 131:10, 131:11, 131:15, 139:16, 141:8, 141:16, 141:19, 141:21, 143:18, 143:21, 144:6, 144:13, 144:16, 145:20, 146:7, 146:17, 189:4, 189:13

**Woodforest** - 147:3

**Woodlands** - 176:4

**Word** - 1:15

**word** - 124:6, 128:20

**words** - 13:12, 111:23, 161:10, 189:10

**world** - 151:14

**worms** - 26:20

**write** - 97:10, 151:13

**writing** - 208:9

**written** - 43:8, 66:1, 66:15, 75:3

**wrote** - 65:24, 66:17, 97:20, 101:3

**Wt** - 1:8, 1:17, 52:23, 53:4, 53:8, 53:20

# Y

**y'all** - 3:14, 13:14, 23:3, 27:12, 27:16, 27:18, 74:22, 85:3, 85:11, 89:23, 93:7, 94:10, 95:9, 101:25, 123:14, 136:6, 136:21, 149:6, 158:8, 158:12, 158:14, 158:16, 158:18, 159:2, 161:24, 162:23, 166:3, 168:13, 180:14, 180:23, 181:25, 182:16, 187:15, 193:5, 194:8, 202:18, 207:9

**Y'all** - 94:4

**y'all's** - 18:13

**year** - 21:1, 21:4, 55:3

**yearly** - 64:4

**years** - 6:4, 6:6, 6:7, 6:15, 6:17, 12:6, 19:12, 37:1, 54:8, 54:14, 54:24, 55:6, 56:9, 60:13, 60:15, 63:6, 63:9, 63:13, 63:15, 63:22, 72:14, 77:13, 95:21, 95:25, 132:8, 133:7, 134:3, 135:23, 151:7, 167:2, 175:20, 176:21, 177:1, 177:6, 177:17, 190:8, 190:13, 190:22

**yesterday** - 4:10, 4:15, 6:3, 6:8, 6:21, 17:1, 17:3, 17:11, 17:24, 18:1, 30:1, 32:25, 33:18, 51:24

**yourself** - 20:21, 30:17, 31:9, 31:10, 35:24, 53:18, 62:17, 70:22, 76:18, 131:16, 146:23, 147:6, 175:15, 187:22, 190:1, 204:19

**yourselves** - 106:13, 206:22