<pre>
 1                   REPORTER'S RECORD

 2             **VOLUME 20 OF 35 VOLUMES**

 3           TRIAL COURT CAUSE NO. 1384794

 4        COURT OF CRIMINAL APPEALS NO. AP-77,025

 5

 6   OBEL CRUZ-GARCIA          )  IN THE DISTRICT COURT
                               )
 7        Appellant            )
                               )
 8                             )
                               )
 9   VS.                       )  HARRIS COUNTY, TEXAS
                               )
10                             )
                               )
11   THE STATE OF TEXAS        )
                               )
12        Appellee             )  337TH JUDICIAL DISTRICT

13

14

15             *******************

16          **GUILT-INNOCENCE PROCEEDINGS**

17             *******************

18

19

20      On the 10th day of July, 2013, the following

21   proceedings came on to be heard in the above-entitled

22   and numbered cause before the Honorable Renee Magee,

23   Judge presiding, held in Houston, Harris County, Texas;

24      Proceedings reported by computer-aided

25   transcription/stenograph shorthand.
</pre>

```
 1                    A P P E A R A N C E S

 2


 3
         MS. NATALIE TISE
 4       SBOT NO. 00795683
         MR. JUSTIN WOOD
 5       SBOT NO. 24039247
         Assistant District Attorneys
 6       1201 Franklin
         Houston, Texas  77002
 7       PHONE:  713.755.5800
         ATTORNEYS FOR THE STATE OF TEXAS
 8

 9
                - AND -
10

11
         MR. R.P. 'SKIP' CORNELIUS
12       SBOT NO. 04831500
         2028 Buffalo Terrace
13       Houston, Texas  77019-2408
         PHONE:  713.237.8547
14
         MR. MARIO MADRID
15       SBOT NO. 00797777
         440 Louisiana, Suite 1225
16       Houston, Texas  77002-1659
         PHONE:  713.877.9400
17       ATTORNEYS FOR THE DEFENDANT

18

19
         Rolando Hernandez
20       Marilu Flores,
21       Interpreters

22

23

24

25
```

**I N D E X**
**VOLUME 20**
**(GUILT-INNOCENCE PROCEEDINGS)**

**JULY 10, 2013**

PAGE  VOL.

STATE'S WITNESSES

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Dr. Dwayne Wolf | 4 | 15 | – | 20 |
| | 23 | 28 | – | 20 |
| Eric Mehl | 33 | – | 59 | 20 |
| | – | 66 | – | 20 |
| | 68 | 68 | – | 20 |
| Griselle Guzman | 70 | – | – | 20 |
| Angelita Rodriguez | 80 | 108 | – | 20 |
| Carmelo Martinez Santana | 116 | – | – | 20 |
| William Ebersole | 175 | – | – | 20 |

Reporter's Certificate........................ 189  20

Word Glossary.............................End of Volume

**ALPHABETICAL WITNESS INDEX**

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Ebersole, William | 175 | – | – | 20 |
| Guzman, Griselle | 70 | – | – | 20 |
| Mehl, Eric | 33 | – | 59 | 20 |
| | – | 66 | – | 20 |
| | 68 | 68 | – | 20 |
| Rodriguez, Angelita | 80 | 108 | – | 20 |
| Santana, Carmelo Martinez | 116 | – | – | 20 |
| Wolf, Dr. Dwayne | 4 | 15 | – | 20 |
| | 23 | 28 | – | 20 |

1

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|--------|-------------|---------|----------|------|
| SX - 34 | Hard copy of PowerPoint presentation | 170 | 172 | 20 |
| SX - 55 | Photograph | 10 | 11 | 20 |
| SX - 64 | Shirt | 13 | 13 | 20 |
| SX - 65 | Buccal swab | 77 | 77 | 20 |
| SX - 66 | Buccal swab | 77 | 77 | 20 |
| SX - 79 | Map | 138 | 139 | 20 |
| DX - 20 | Photograph | 16 | 17 | 20 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Open court, defendant present, no jury)

2                    THE COURT:   We're back on the record in

3    Cause No. 1384794, the State of Texas vs. Obel

4    Cruz-Garcia.   And present at counsel table is Mr.

5    Cruz-Garcia, along with his attorneys, Skip Cornelius

6    and Mario Madrid.   Present for the State is Natalie Tise

7    and Justin Wood.   And we are here to proceed on three

8    witnesses this morning, who are present in the

9    courtroom.   That is Dr. Dwayne Wolf, Sergeant Eric Mel,

10   and Agent Griselle Guzman.   Is that correct?

11                   Okay.   Would you please raise your right

12   hands to be sworn?

13                   (Witnesses sworn)

14                   THE COURT:   And to all of the witnesses,

15   the Rule has been invoked.   And what that means is

16   you're order to leave the courtroom and not re-enter

17   unless instructed to do so by the bailiff or by me.   You

18   are not to discuss this case or your testimony with

19   other witnesses or anyone else, except for the

20   attorneys.

21                   Okay.   So, you are excused at this time.

22   We'll be with you in just a moment.

23                   Is it Dr. Wolf who is first?

24                   MS. TISE:   Yes.

25                   THE COURT:   Very well.   You may stay in the

1  courtroom.

2             And bailiff, you can bring in the jury.

3             THE BAILIFF:  Yes, ma'am.

4             (Open court, defendant and jury present)

5             THE COURT:  Please be seated.

6             Good morning, ladies and gentlemen of the

7  jury.  We're ready to proceed in the State of Texas vs.

8  Obel Cruz-Garcia.

9             State, please call your next witness.

10            MS. TISE:  The State will call Dr. Wolf.

11            THE BAILIFF:  Your Honor, the witness has

12 been sworn.

13            THE COURT:  Dr. Wolf, please keep your

14 voice up and speak right into the microphone.

15            You may proceed, Ms. Tise.

16                    **DR. DWAYNE WOLF,**

17 having been first duly sworn, testified as follows:

18                  **DIRECT EXAMINATION**

19 **BY MS. TISE:**

20    Q.   Good morning.

21    A.   Good morning.

22    Q.   Would you introduce yourself to the jury,

23 please, sir?

24    A.   I'm Dr. Dwayne Wolf.

25    Q.   And will you tell the jury what you do for a

 1    living?

 2         A.    I'm the deputy chief medical examiner for

 3    Harris County.

 4         Q.    Okay.   And what does that mean?   What do you

 5    do?

 6         A.    Our office investigates deaths in Harris

 7    County.   Basically, we investigate deaths that are

 8    either sudden and unexpected or deaths that result from

 9    physical or chemical injury.   By state law, we have the

10    responsibility of determining cause and manner of death

11    in those cases by whatever means, including review of

12    scene findings, medical history, medical records, and

13    complete autopsy, if necessary.

14         Q.    Can you tell the jury a little bit about your

15    background and training?

16         A.    Sure.   I graduated from Lamar University in

17    Beaumont in 1986 with a bachelor's degree in biology.   I

18    then attended the University of Texas Medical Branch in

19    Galveston from 1986 through 1993, where I completed both

20    a PhD in molecular biology as well as an MD degree.   I

21    then began my training in pathology at Brown University

22    in Providence.   I returned to the University of Texas

23    Medical Branch in 1995 and completed my general

24    pathology training in 1998.   My forensic pathology

25    subspecialty training was with the Dade County Medical

 1    Examiner's Office in Miami.  And I completed that

 2    training in 1999.  I'm board certified in anatomic

 3    pathology and forensic pathology.

 4        Q.   Okay.  I wanted to ask you how long have you

 5    been with the medical examiner's office.  Because I

 6    missed that if you said it.

 7        A.   I have been with the office here in Harris

 8    County since September 2001.

 9        Q.   Okay.  And are you familiar with Dr. Vladimir

10    Parungao?

11        A.   Yes.

12        Q.   Okay.  Did you actually work with him?

13        A.   No.  He was no longer employed by the medical

14    examiner by the time I started working there in 2001.

15        Q.   Were you asked to review an autopsy report that

16    was done by Dr. Parungao back in 1992 when he was

17    employed by the Harris County Institute of Forensic

18    Sciences?

19        A.   Yes.

20        Q.   Okay.  And for what purpose?

21        A.   Well, to review the findings in order to reach

22    a conclusion regarding cause and manner of death and in

23    order to present those opinions in court.

24        Q.   Okay.  And is it common for us to ask a current

25    employee of the Harris County Institute of Forensic

1    Sciences to review reports of other doctors who are no

2    longer there or who are on vacation or sick or not

3    present in order to testify?

4        A.   Yes.

5        Q.   Okay.  You have done that many times, have you

6    not?

7        A.   Yes.

8        Q.   Okay.  And in order to prepare to do that, you

9    review some things, do you not?

10       A.   Yes.

11       Q.   What do you review?

12       A.   The autopsy photographs, scene photographs.  Of

13   course, the autopsy report as well, and our

14   investigator's report.  And in this case, that's pretty

15   much the extent of the information that I had.

16       Q.   Okay.  And after doing that, some times are you

17   able to determine the cause of death?

18       A.   Yes.

19       Q.   And the manner of death?

20       A.   Yes.

21       Q.   Can you tell the jury what the difference is

22   between cause of death and manner of death?

23       A.   Sure.  Cause of death is the injury or disease

24   that initiates the sequence of events that culminates in

25   death.  So, for example, a gunshot wound or lung cancer,

1    for example, are causes of death.

2              Manner of death is a classification, for

3    vital statistics purposes, of the way in which the death

4    came about.  Basically, we have a check box on the death

5    certificate of four choice:  Natural, accident, suicide,

6    or homicide.  Of course, there is a fifth choice of

7    undetermined when we can't tell.

8        Q.   Okay.  What kind of things affect your ability

9    to determine the cause of death?

10       A.   Well, obviously, decomposition is one of those

11   things that can influence our ability to determine how

12   somebody died.  A lot of the injuries that we analyze,

13   well, it really depends on our ability to assess the

14   skin surfaces and the organs.  And if those things are

15   no longer there or they are greatly altered by

16   decomposition, then it is much more challenging to

17   determine cause of death.  There are other causes of

18   death that really leave no marks.  Things like asphyxia.

19   There are very often very few, if any, physical signs in

20   an asphyxia death.  So, determination of cause death in

21   those types of cases really relies more on scene

22   investigation, investigation, and the circumstances.

23              Similarly, electrocution, drowning, those

24   sorts of things, also leave no -- or minimal physical

25   marks.  So, again, we have to rely on circumstances and

1  the investigation to determine those causes of death.

2      Q.   Okay.  And in some cases, the cause of death is

3  going to be just undetermined, correct?

4      A.   That's correct.

5      Q.   But that doesn't mean you can't still go

6  forward to determine the manner of death in some cases?

7      A.   That's correct.

8      Q.   Okay.  Because when determining the manner of

9  death, you're looking at the investigation and all the

10  circumstances surrounding what happened to this

11  individual?

12      A.   Right.  Well, for either cause of death or

13  manner of death we're looking at all the information

14  that we can gather from the scene, from the hospital,

15  prior history of known medical records, so forth.  So,

16  for cause or manner, we're looking at the totality of

17  the case.

18      Q.   And you can make that determination by those

19  factors that are external to the body itself?

20      A.   Yes.

21      Q.   Okay.  In this particular case, did you have an

22  opportunity to review some photographs?

23      A.   Yes.

24      Q.   Okay.

25              MS. TISE:  May I approach?

1              THE COURT:  Yes.

2         Q.   (By Ms. Tise) Is it fair to say that you

3    reviewed quite a number of photographs in this case?

4         A.   Yes.

5         Q.   But I'm going to show you one of them, and

6    that's marked as State's Exhibit 55.  I'll ask you if

7    you recognize that photograph to be one of the

8    photographs of the individual we know as Angelo Garcia,

9    Jr. (indicating)?

10        A.   Yes.

11        Q.   Okay.  And there is actually an autopsy report

12   number there in the photo to link it to that particular

13   case, correct?

14        A.   Yes.

15        Q.   And that number links back to the actual

16   autopsy report that you reviewed?

17        A.   That's correct.

18        Q.   Okay.  And, in fact, the fact that the number

19   is a 1992, the first two numbers are 92, does that tell

20   you anything knowing your numbering system?

21        A.   Right.  This autopsy was conducted in 1992.

22        Q.   Okay.

23             MS. TISE:  At this time, I'm going to offer

24   State's Exhibit 55.

25             **(State's Exhibit No. 55 Offered)**

1          MR. CORNELIUS:  No objection.

2          THE COURT:  State's Exhibit No. 55 is

3   admitted without objection.

4          You may proceed.

5          **(State's Exhibit No. 55 Admitted)**

6          MS. TISE:  And, Your Honor, I'm going to

7   ask to publish it.

8          THE COURT:  You may.

9      Q.  (By Ms. Tise) Dr. Wolf, is this basically the

10   remains of Angelo Garcia, Jr. (indicating)?

11      A.  Right.  This is representing photographs.

12   There are a few skeletal elements that are not shown

13   here, but this is by and large the extent of the

14   remains.

15      Q.  Okay.  And when you have just remains like

16   this, especially back in 1992 with the tools that we had

17   back then, are you able to determine a lot from these

18   bones as far as cause of death is concerned?

19      A.  Well, that really depends on the cause of

20   death.  Of course, sometimes we can see injuries on the

21   bones, we can see cut marks, or bullet holes, and that

22   sort of thing.  But in this case, there were none of

23   those things identified.

24      Q.  Okay.

25      A.  So, it's limited, which doesn't mean that

1    cutting or a gunshot wound weren't part of the cause of

2    death, it's just that they didn't involve these skeletal

3    elements.

4         Q.   So, you can't -- if someone was stabbed, it

5    didn't strike the bones that you happened to have to

6    examine that you can see?

7         A.   That's correct.

8         Q.   Or if there was a gunshot wound, it didn't

9    strike the bones that you happened to have as part of

10   this examination?

11        A.   That's correct.

12        Q.   Okay.  However, after evaluating the case as a

13   whole, as you talked about in order to determine manner

14   of death, were you able to come to any conclusions about

15   the death?

16        A.   Yes.

17        Q.   And what was that conclusion?

18        A.   Manner of death was homicide.

19        Q.   Okay.  Looking at these remains, Dr. Wolf,

20   would those remains be consistent with a body being

21   submerged in water for up to five weeks?

22        A.   Yes.

23        Q.   Okay.  In addition, there was some clothing

24   items recovered as part of the autopsy.

25                  MS. TISE:  May I approach?

1                    THE COURT:  Yes.

2          Q.   (By Ms. Tise) And I'm going to show you some

3    clothing, what's already in evidence as State's Exhibit

4    61 and identified as clothing of Angelo Garcia, Jr.  And

5    taking a look at State's Exhibit 64, I'll ask you:  Does

6    this appear to be the shirt that we're looking at in

7    State's Exhibit 61 (indicating)?

8          A.   Yes.

9                    MS. TISE:  At this time, I'm going to offer

10   State's Exhibit 61 into evidence.

11                   MR. CORNELIUS:  No objection, Judge.

12                   THE COURT:  64, is that what you meant?

13                   MS. TISE:  I mean that, Judge.  I'm sorry.

14   61 is already in.  64 is the actual shirt itself.

15                   **(State's Exhibit No. 64 Offered)**

16                   THE COURT:  Mr. Cornelius, do you have any

17   objection to 64?

18                   MR. CORNELIUS:  No objection, Judge.

19                   THE COURT:  State's Exhibit 64 will be

20   admitted without objection.

21                   You may proceed.

22                   **(State's Exhibit No. 64 Admitted)**

23                   MS. TISE:  Judge, may I show this to the

24   jury?

25                   THE COURT:  Yes, you may publish State's

1    Exhibit 64 to the jury.

2        Q.   (By Ms. Tise) Dr. Wolf, if there had been blood

3    on that shirt prior to being submerged in the water --

4             MR. CORNELIUS:  May we approach the bench,

5    Judge, please?

6             THE COURT:  You may.

7             (At the Bench, on the record)

8             MR. CORNELIUS:  I don't want to be

9    insensitive, but there's no excuse for the family being

10   here crying and making sounds and all this stuff in

11   front of the jury.

12            MS. TISE:  We can remove them, Judge.  Our

13   plan was to have them go out, but they wanted to stay.

14   So, I told them --

15            THE COURT:  You're going to tell them.

16            MS. TISE:  I will have our intern tell

17   them.

18            THE COURT:  Because I don't think that's

19   appropriate.  All right.  Very good.  Let's do that.

20            (Open court, defendant and jury present)

21            THE COURT:  You may proceed, Ms. Tise.

22            MS. TISE:  Thank you, Judge.

23       Q.   (By Ms. Tise) Dr. Wolf, if there were blood on

24   the item of clothing that was submerged in water for

25   several weeks, what would you expect to happen to that

1    blood?

2         A.   Blood washes away.  You can't see it on the

3    clothing anymore, even on the body, wounds on the body.

4    Blood washes away and the wound appears bloodless.

5         Q.   And in your experience, I'm sure you have seen

6    a few bodies that have been in the water?

7         A.   Yes.

8         Q.   And you have the experience of seeing wounds

9    where there would have been blood and it's not there and

10   clothing items where blood might have been at one time

11   or should have been based on the wounds that you are

12   seeing that's been washed away?

13        A.   Yes.

14              MS. TISE:  I will pass the witness.

15              THE COURT:  Mr. Cornelius.

16                    **CROSS-EXAMINATION**

17   **BY MR. CORNELIUS:**

18        Q.   Dr. Wolf, how are you?

19        A.   Good.

20        Q.   We have talked about many cases, but not this

21   one yet, right?

22        A.   Right.

23        Q.   Good to see you this morning.

24        A.   Likewise.

25        Q.   I'm going to put another picture up.  Well, let

 1  me show it to you first.

 2                 MR. CORNELIUS:  May I approach the witness?

 3                 THE COURT:  Yes.

 4      Q.  (By Mr. Cornelius) Let me show you what's

 5  marked as Defense 20.  Is that also a picture from the

 6  autopsy (indicating)?

 7      A.   Yes.

 8      Q.   Okay.  Fairly and accurately depicts pretty

 9  much the same thing they had up there?

10      A.   Correct.

11                 MR. CORNELIUS:  May I publish this, Judge?

12                 THE COURT:  Is it already in evidence.

13                 MR. CORNELIUS:  No, ma'am.

14                 THE COURT:  What's the number?

15                 MR. CORNELIUS: 20.

16                 THE COURT:  Defense 20?

17                 MR. CORNELIUS:  Yes.

18                 THE COURT:  Okay.  So, it's not marked by

19  the State as well or not?

20                 MR. CORNELIUS:  No.  It's Defense 20.

21                 **(Defense Exhibit No. 20 Offered)**

22                 THE COURT:  And any objection?

23                 MS. TISE:  No objection, Judge.

24                 THE COURT:  Yes.  Defense No. 20 is

25  admitted.  And you may publish it.

1              **(Defense Exhibit No. 20 Admitted)**

2      Q.   (By Mr. Cornelius) That's a similar picture to

3   the one the State offered, correct?

4      A.   Yes.

5      Q.   I picked this one because I wanted to --

6              MR. CORNELIUS:  May I approach --

7              THE COURT:  Yes.

8              MR. CORNELIUS:  -- the picture up here?

9      Q.   (By Mr. Cornelius) The other one kind of had

10  these bones cut off.  What are these bones right here

11  (indicating)?

12     A.   Ribs.

13     Q.   Do you know how many of the ribs were

14  recovered?

15     A.   Eighteen.

16     Q.   And what -- how many ribs do you have?

17     A.   Twelve on each side.

18     Q.   Twenty-four.

19              So, if someone were stabbed in the chest,

20  for example, you might be able to determine that at

21  autopsy only having the ribs if you could find the

22  wounds in the ribs, correct?

23     A.   Correct.

24     Q.   But you couldn't find any in this case?

25     A.   That's correct.

1        Q.   The other bones, the assorted bones that are

2   there, what are they?

3        A.   There were two bones from the arms, the

4   humerus.  So, from the shoulder to the elbow.  There was

5   the scapula, the clavicle, collar bone.  There were

6   eight vertebrae, part of the spine.  Pelvic, both

7   femurs, the thigh bone.  The bones from the lower part

8   of the leg, the fibula.  There are actually two bones

9   between your knee and your ankle, tibia and fibula.  So,

10  both of the fibulas and the smaller bones were

11  recovered.  Only one tibia was recovered.  Then, of

12  course, the skull was recovered as well, in addition to

13  the mandible or jaw bone.

14       Q.   Okay.  So, I think you already testified that

15  you didn't find any injuries to the bones that would

16  indicate or be able to tell you that this person was

17  stabbed or not stabbed, correct?

18       A.   That's correct.

19       Q.   Okay.  So --

20            MR. CORNELIUS:  Could I stand over there,

21  Judge?

22            THE COURT:  Yes, you can.  Keep your voice

23  up, please.

24       Q.   (By Mr. Cornelius) I'll use myself as a

25  mannequin here.

 1              Would you come over here close to the jury?

 2       A.   (Witness complies).

 3              THE COURT:  Please keep your voice up,

 4    Dr. Wolf.

 5              THE WITNESS:  Sure.

 6       Q.   (By Mr. Cornelius) I want you to show the

 7    jury -- you named the bones, but I'm not sure everybody

 8    knows what they are.  Show the jury what part of this

 9    person's anatomy, the bones, were recovered, where they

10    are.

11       A.   Okay.  Obviously, the skull.  Plus, the jaw

12    bone.  There was one clavicle and scapula.  And I don't

13    know which one it was, but the clavicle is the collar

14    bone, so it extends from about here to about here

15    (indicating).  The scapula, the shoulder blade.

16              There were a number of ribs.  And I don't

17    know which ones those were, but 18 out of 24.  So,

18    that's the chest cavity.  Again, there were vertebra,

19    which is the spine.  There were eight bones there, which

20    is about one-fifth of the length of the spine.

21              Then, of course, the humerus bones, which

22    was this bone from here to here, on both sides

23    (indicating).  The pelvis and then both femurs, the

24    thigh bones.  So, from the pelvis to the knees on both

25    sides.  And then, essentially, three bones from the

1    knees down, two one side and one on the other.

2         Q.   Okay.  Thank you very much.

3                   (Witness resumes stand)

4         Q.   (By Mr. Cornelius) And so, because there were

5    no injuries to any of those bones, marks on them, you

6    couldn't conclude that this person was stabbed or shot

7    or beaten to death, correct?

8         A.   That's correct.

9         Q.   Did you have any prior medical records of this

10   person?

11        A.   No.

12        Q.   So, no way to determine if the child was in

13   good health before the child died or not?

14        A.   Right.  We had no information otherwise, but

15   that's correct.

16        Q.   Okay.  Any way to tell if this person drowned?

17        A.   I'm sorry?

18        Q.   Any way to tell if this person drowned?

19        A.   No.

20        Q.   And to be able to tell that, I guess you'd

21   pretty much have to have the lungs?

22        A.   Even in a non-decomposed body, the signs of

23   drowning are pretty subtle and the findings in the lungs

24   are nonspecific.  So, really a diagnosis of drowning

25   depends more on the circumstances and the history and

1   the investigation than what we see on autopsy.

2        Q.   Okay.  So, just from a medical standpoint, not

3   from what other people told you, but just from a medical

4   standpoint, you being a pathologist, the doctor

5   examining just the medical data that you have, you

6   couldn't say whether the person drowned or not?

7        A.   Yeah.  Based on the examination of the remains,

8   no.

9        Q.   Okay.  So, for example, if -- just as a

10  hypothetical suggestion -- this child was out fishing

11  with someone and accidently fell out of the boat and

12  drowned, you couldn't refute that based on the medical

13  data that you have in this case?

14       A.   Based on the examination of the remains, no.

15       Q.   No injuries on the skull at all?

16       A.   That's correct.

17       Q.   Would there be any chance of getting DNA from

18  the clothing in this case?

19            MS. TISE:  Objection.  That's outside his

20  expertise.

21            THE COURT:  That will be sustained.

22       Q.   (By Mr. Cornelius) Is it outside your

23  expertise?

24       A.   Well, we are involved in collecting evidence

25  that's potentially tested for DNA.  So, I'm familiar

1  with that area.

2     Q.   Okay.  Do you know if any test was done on the

3  clothing to see if any DNA could be recovered?

4          MS. TISE:  Objection.  That calls for

5  speculation on the part of this witness.

6          THE COURT:  Only if he knows from his

7  examination of the report that he's read.

8     Q.   (By Mr. Cornelius) Do you know?

9     A.   I don't know.

10    Q.   Okay.

11         MR. CORNELIUS:  Can I have just a moment,

12  Judge.

13         THE COURT:  Yes.

14         (Brief pause)

15         MR. CORNELIUS:  Could I have a second to

16  read this, just two seconds?

17         THE COURT:  Yes.

18         (Brief pause)

19    Q.   (By Mr. Cornelius) Dr. Wolf, the entire autopsy

20  protocol is the cover sheet and one page and then the

21  investigator's report; is that correct?

22    A.   Right.  There is a toxicology report as well,

23  but...

24    Q.   Okay.  Is that a -- I'm sure that didn't

25  recover anything, did it?

1      A.   That's correct.

2      Q.   Okay.  So, basically, the autopsy itself is

3  Page 2 of the protocol and not even a full page, right?

4      A.   That's correct.

5           MR. CORNELIUS:  All right.  I pass the

6  witness.

7           THE COURT:  Anything further, Ms. Tise?

8           MS. TISE:  Yes, Your Honor.

9           THE COURT:  You may proceed.

10                    **REDIRECT EXAMINATION**

11  **BY MS. TISE:**

12     Q.   One of the points of what you do for a living

13  is determining when a death is accidental or homicide or

14  self-inflicted?

15     A.   That's correct.

16     Q.   That's one of your jobs?

17     A.   That's correct.

18     Q.   And your whole industry is based on training

19  medical doctors to be able to make that determination?

20     A.   Yes.

21     Q.   And the stuff that you are testifying here

22  today is not something unique to you; this is the

23  standard in the field, is it not?

24     A.   Yes.

25     Q.   All over the country doctors do what you do,

1    correct?

2        A.   Yes.

3        Q.   And one of the things that they do is they look

4    at all of the surrounding circumstances about a case to

5    make the determinations that they make, right?

6        A.   That's correct.

7        Q.   There is a lot of things that you can tell from

8    the physical body itself, but there's a lot that you

9    can't and you have to rely on other circumstances

10   sometimes to decide whether something is accidental or

11   homicide?

12       A.   That's correct.

13       Q.   In this case, you decided it was a homicidal

14   act that took the life of 6-year-old Angelo Garcia, Jr.?

15       A.   Yes.

16       Q.   Okay.  And what are some of the factors that

17   factored into that determination for you?

18       A.   Well, again, from the investigator's report we

19   know that the child was taken from his home.  He didn't

20   simply just wander away.  He was recovered in an

21   advanced state of deposition, partial skeletization that

22   was a distance from his residence and weeks later.  And

23   so, there is really not a reason for him to have gotten

24   as far as he got away from his house after he was

25   abducted unless somebody else were involved in that.

1      Q.   And it was a violent abduction, was it not?

2      A.   Yes.

3      Q.   Okay.  And this was an otherwise healthy

4  6-year-old child found many miles from his home?

5      A.   Yes.

6      Q.   Obviously, if he wandered off and drowned,

7  there would have been some indication that someone had

8  reported this accidental drowning of a 6-year-old boy,

9  correct?

10     A.   Well, I mean, if it were seen obviously, but...

11     Q.   To find him in a remote area in the middle of

12  the night miles from his home and knowing the

13  circumstances under which he was taken indicates a

14  homicide to you?

15     A.   Yes.

16     Q.   It sounds to me like, Dr. Wolf, a lot of what

17  you do is really common sense?

18     A.   Don't let anybody know.

19     Q.   And that's really kind of what the jury is

20  going to be asked to do at the end of the day, isn't it,

21  is to use their common sense about the cause of death of

22  this 6-year-old little boy, right?

23     A.   Yes.

24     Q.   Just a couple more questions.

25              Defense counsel made a big issue about the

1    bones and the rib bones.  You don't have a lot of bones

2    there, do you, when you consider what is present in the

3    human body?  There is a lot of bones missing?

4         A.   Yes.

5         Q.   And can you make a determination based on the

6    bones that you have that someone wasn't stabbed

7    somewhere on their body?

8         A.   No.

9         Q.   Okay.  In fact, you can't make a determination

10   from the bones that you have that someone wasn't stabbed

11   in the chest, can you?

12        A.   That's correct.

13        Q.   You can't make a determination that someone

14   didn't have their throat cut?

15        A.   Correct.

16        Q.   Or wasn't stabbed in a vital organ in their

17   abdomen?

18        A.   That's correct.

19        Q.   You just don't have it?

20        A.   That's right.

21        Q.   And even among the bones that you, you have

22   don't have the bones, do you?  You just have pictures of

23   the bones?

24        A.   That's correct.

25        Q.   And there are a lot of pictures.  And I'd be

1    happy to offer them all.  I just didn't want to over do

2    it, but they're all very similar, aren't they?

3        A.   Yes.

4        Q.   And in all the pictures, there is not really a

5    better picture of the bones, is there?

6        A.   No.

7        Q.   Kind of there piled up.

8             There might be, in those rib bones, that

9    you can't see because of the picture?

10             MR. CORNELIUS:  Judge, that calls for

11    speculation.

12             THE COURT:  That's sustained.

13        Q.   (By Ms. Tise) Can you see all the bones very

14    well in the picture?  Can you see every angle of them

15    and every side?

16        A.   The photographs are not optimal.

17        Q.   Okay.  You'd rather have the bones?

18        A.   Yes.

19        Q.   Okay.  And, unfortunately, we don't have those?

20        A.   That's correct.

21        Q.   But we do know all of the facts and

22    circumstances surrounding this case, do we not?

23        A.   Yes.

24        Q.   And we do have our common sense, right?

25        A.   Yes.

1          MS. TISE:  I pass the witness.

2          THE COURT:  Thank you, Ms. Tise.

3          Mr. Cornelius, anything further?

4          MR. CORNELIUS:  Yes, Judge.

5          THE COURT:  You may proceed.

6          MR. CORNELIUS:  A couple things.  A number

7   of things, actually.

8                      **RECROSS-EXAMINATION**

9   **BY MR. CORNELIUS:**

10      Q.   When the doctor who performed the autopsy

11   performed the autopsy and dictated his findings, part of

12   his job would have been to note any injuries to these

13   bones, correct?

14      A.   That's correct.

15      Q.   I mean, if he saw a stab wound or a gunshot

16   wound, he would have dictated that into the record,

17   correct?

18      A.   Yes.

19      Q.   I mean, I guess, people make mistakes, or

20   whatever, but you are here in his stead or commentIng on

21   his autopsy and there is not one word in there

22   indicating that he saw any injury to any bone, correct?

23      A.   That's correct.

24      Q.   Now, these -- you are -- the phrase that you

25   are here to make a finding of whether it's a homicide or

1   suicide or whatever.  You are here basically to offer

2   your opinion, right?

3        A.   That's correct.

4        Q.   This group right here is going to make the

5   finding, correct?

6        A.   Again, our classification of manner of death is

7   for vital statistics purposes.  It's clearly different

8   from...

9        Q.   And you -- to make that, you can base your

10  decision on what people tell you, right?

11       A.   That's correct.

12       Q.   It doesn't have to just be based on the medical

13  data, right?

14       A.   That's correct.  It's the whole circumstances.

15       Q.   It can be, though, right?

16       A.   It depends on the case.

17       Q.   Yeah.  I mean, if you get presented a body that

18  is not decomposed, you might be able to tell very easily

19  that this person was stabbed to death, right?

20       A.   Yes.

21       Q.   You don't need anybody to tell you what

22  happened.  You can tell just by being a medical doctor

23  and pathologist this person died because they were

24  stabbed to death.  I can see it and here it all is.

25  Correct?

 1     A.    That's correct.

 2     Q.    Same thing if a person was shot, correct?

 3     A.    Correct.

 4     Q.    Or strangled, correct?

 5     A.    Yes.

 6     Q.    Maybe not always, but sometimes.

 7           Any indication from these bones that this

 8  person was strangled?

 9     A.    No.

10     Q.    Okay.  Or drowned.  Sometimes you can tell from

11  autopsy that somebody drowned, right?

12     A.    Never from skeletal remains.

13     Q.    Never from skeletal remains, but at autopsy

14  when you are asked to give your opinion as to what the

15  cause and manner of death was, if the body is recovered

16  you might not need people to tell you details about the

17  person being kidnapped or whatever it was, you might be

18  able to tell just strictly from the medical data that

19  you are examining, correct?

20     A.    Cause of death, yeah.  But drowning would not

21  be one of those things we could really diagnose without

22  the circumstances, if that was the question.

23     Q.    Okay.  All right.  So, when you say that part

24  of your decision was that this child was taken from the

25  home, that's because somebody told you that, right?  You

1  are not able to determine that as a doctor?

2      A.   That's correct.

3      Q.   And that he was taken violently.  That's what

4  somebody told you, right?

5      A.   Yes.

6      Q.   You can't tell from these remains that this

7  child was taken from their home, can you?

8      A.   That's correct.

9      Q.   And you can't tell whether it was violent or

10  not, can you?

11      A.   No, sir.

12      Q.   In fact, you can't say anything about it being

13  violent because there doesn't appear to be any violence

14  on the data that you were presented, right?

15      A.   Not from the remains, no.

16      Q.   And when you say the child was otherwise

17  healthy, that's based on, I guess, what somebody told

18  you because you said you didn't have any prior medical

19  records.

20      A.   No prior medical records, but, again, my

21  statement was I have no indication otherwise.

22      Q.   Okay.  Got you.

23           So, your opinion of it being a homicide is

24  based on the facts and circumstances not on the actual

25  remains; is that correct?

1          A.    That's correct.

2          Q.    Which is quite different in many autopsies that

3    you perform because you can make all your conclusions

4    based on the medical data in many of them, can't you?

5          A.    Yes.

6          Q.    And you mentioned that someone -- or I forgot

7    if you mentioned it or she mentioned it, but there was a

8    statement made by someone that you would expect someone

9    to report a drowning.  She said that?

10         A.    Yes.

11         Q.    I didn't remember.

12                I guess that's true, you would expect

13    somebody to do that, but is it possible that that could

14    happen and somebody would be embarrassed or scared of

15    being responsible for that and not report it?  Is that a

16    possibility?

17         A.    I mean, I suppose.

18         Q.    I mean, there's no way from the medical -- from

19    the medical evidence in this case to say that didn't

20    happen, is there?

21         A.    That's correct.

22                MR. CORNELIUS:  Pass the witness, Judge.

23                THE COURT:  Thank you, Mr. Cornelius.

24                Anything further?

25                MS. TISE:  Nothing further, Judge.

```
 1                    THE COURT:  May this witness be excused?
 2                    MS. TISE:  He may.
 3                    THE COURT:  You are excused -- may this
 4   witness be excused?
 5                    MR. CORNELIUS:  Yes, Your Honor.
 6                    THE COURT:  You are excused, Dr. Wolf.
 7   Thank you for your time.
 8                    Please call your next.
 9                    MS. TISE:  The State will call Sergeant
10   Eric Mehl.
11                    THE BAILIFF:  Your Honor, the witness has
12   been sworn.
13                    THE COURT:  Thank you.
14                    Sergeant Mehl, please keep your voice up
15   and speak into that microphone.
16                    You may proceed, Ms. Tise.
17                    MS. TISE:  Thank you, Judge.
18                            ERIC MEHL,
19   having been first duly sworn, testified as follows:
20                        DIRECT EXAMINATION
21   BY MS. TISE:
22       Q.   Would you introduce yourself, please, sir, to
23   these ladies and gentlemen of the jury?
24       A.   My name is Eric Mehl.
25       Q.   And can you tell the jury what you've spent
```

1    your life doing as a career?

2         A.    I joined the Houston Police Department in 1981

3    and retired in February of 2010.

4         Q.    So, what are you doing these days?

5         A.    Taking it easy.

6         Q.    I'm glad to hear that some of y'all are taking

7    it easy.  There are so many of them who are back out

8    working for other agencies.

9               You are also raising a daughter, are you

10   not?

11        A.    Yes.

12        Q.    How old is she?

13        A.    Fourteen.

14        Q.    Okay.  So, you said you started a long time

15   ago.  Can you tell the jury a little bit about the

16   pattern of your career and where you were assigned over

17   the course of that career?

18        A.    After I graduated from the police academy, I

19   was assigned to patrol in the southwest part of the

20   city.  I was a patrol officer until -- well, in 1986 I

21   took the sergeant's exam, got promoted to sergeant in

22   early 1987.  I was a patrol sergeant for about 14

23   months.  I transferred to Homicide in June of 1988.  I

24   served there until June of 1992.  And I was drafted into

25   Internal Affairs.  I did my 18-month tour in Internal

 1    Affairs and returned to Homicide in November of '93 and

 2    spent the rest of my career there.

 3         Q.   And over the course of the years with the

 4    Houston Police Department -- I know you said you went to

 5    the academy, but were you also regularly trained and

 6    updated on how to do things, how to be a police officer,

 7    how to recover evidence, how to evaluate a crime scene?

 8         A.   We had to attend 40 hours of annual in-service

 9    training per year.

10         Q.   And did you always stay up to date on your

11    training?

12         A.   Yes.

13         Q.   At some point in the course of your career, you

14    were asked to start a special -- or have a special focus

15    within the Homicide Division.  And that focus was on

16    cold cases, was it not?

17         A.   It was.

18         Q.   Can you tell the jury how that came about?

19         A.   In November of 2004, HPD decided that they

20    would start a Cold Case Squad within the Homicide

21    Division because of the number of uncleared homicides

22    that existed dating back as far as 1970.  And they asked

23    me to do it.

24         Q.   Okay.  And did you have some help?

25         A.   Initially it was just me and then I was joined

1  by another sergeant.  It's grown now.  They have four

2  people doing it.

3       Q.   Okay.  But at the time, you kind of started the

4  Cold Case Unit at HPD on your own, didn't you?

5       A.   Yes.

6       Q.   Okay.  And did you kind of develop some

7  criteria -- I'm sure there were a lot of cases that had

8  gone cold as you've mentioned?

9       A.   Yes.

10      Q.   And how did you know where to begin, which ones

11 to choose?

12      A.   I had a list of every uncleared homicide dating

13 back to 1970.  And there were roughly 3,000 uncleared

14 homicides between 1970 and 2004.  Back in the day when

15 DNA technology was not available, there was several

16 cases that couldn't be tested for DNA and that weren't

17 done because it wasn't available at the time.  So, I

18 would keep six to eight to ten cases all the time at a

19 private laboratory.  I would pack them, ship them to a

20 private laboratory, and they would do the DNA work.  And

21 as that was going on, I could do the field work on cases

22 that did not involve DNA or cases that had been returned

23 from the lab with positive results.

24      Q.   Did you also kind of keep a lookout for just

25 cases that had the potential for DNA, cases that had a

1    rape reported, or cases that other types of biological

2    evidence that would be a part of the case?

3         A.   I specifically looked for female victims of

4    homicide, yes.

5         Q.   And that was because you knew there might be

6    some DNA?

7         A.   Correct.

8         Q.   And with advancements in DNA technology over

9    the years, did you think that maybe those were cases

10   that we might be able to solve with the technology that

11   existed in 2004 and beyond while you worked in that

12   unit?

13        A.   Yes.

14        Q.   Okay.  And in particular, did you come across a

15   case involving a little 6-year-old by the name of Angelo

16   Garcia, Jr. who was murdered?

17        A.   I did.

18        Q.   Okay.  And did you have some familiarity with

19   that case from back in your days in Homicide?

20        A.   I did not.  I was in Internal Affairs at that

21   time.

22        Q.   Do you remember when the case happened or did

23   you have any memory of it?

24        A.   I did not.

25        Q.   Okay.  So, when you pulled that case, it wasn't

1  because of anything that you remembered from back in the

2  day when it happened, right?

3       A.   Correct.

4       Q.   What specifically drew you to that case?  How

5  did you learn there was a female victim, in other words,

6  in that case?

7       A.   Diana Garcia showed up on my list because she

8  was associated -- she was a crime victim along with her

9  son.

10      Q.   Okay.  And did that trigger to you, because

11 there was a sexual assault, that there might be some DNA

12 that could be tested?

13      A.   Yes.

14      Q.   Okay.  Generally when you are dealing with cold

15 cases, there are special types of issues that develop

16 that you don't always have when -- based on your work in

17 the regular Homicide Division, aren't there?

18      A.   Yes.

19      Q.   Tell the jury a little bit about what kinds of

20 obstacles that you come across from time to when you

21 have a case that's gone cold?

22      A.   Well, any number of things.  Witnesses can die,

23 you cannot find them.  You look for them and you look

24 for them and you can't find the witnesses.  Evidence

25 can't be located.  It's just a whole myriad of

1  frustrating things that can go wrong.

2      Q.   And you had a little bit of that kind of stuff

3  in this case, did you not?  Did you have some witnesses

4  you couldn't locate?

5      A.   Yes.

6      Q.   Had some, you know, evidence that you wish

7  might have been collected or things might have been done

8  differently?

9      A.   I think I got it all.

10     Q.   Okay.  And did you make a determination that

11  this case might be one where you might want to have DNA

12  tested and done to see if you could locate a suspect?

13     A.   Yes.

14     Q.   Okay.  How did you begin?

15     A.   After I reviewed the case, I decided what

16  articles of evidence I would need to send off to the

17  private lab to get tested.

18     Q.   Okay.  And what items did you determine might

19  be worth testing?

20     A.   The sexual assault kit that was performed on

21  Diana Garcia, there was a cigar that had been left at

22  the scene, and there was a cutting from the panties that

23  Diana Garcia had been wearing that night.  And I also

24  sent biological samples on Diana Garcia and Arturo

25  Rodriguez for testing so DNA profiles could be developed

1    on them.

2         Q.   Okay.  And, obviously, the reason for that is

3    when you have a rape kit, it's not uncommon to have DNA,

4    obviously, of the victim that is going to be present on

5    the swabs taken from her vagina, correct?

6         A.   Correct.

7         Q.   And it's not uncommon for the DNA of her

8    husband to also be found on the swabs taken from her

9    vagina?

10        A.   That's correct.

11        Q.   So, as a matter of course, you're going to want

12   to get DNA samples from the two of them?

13        A.   Yes.

14        Q.   And you had those and were able to do that?

15        A.   Yes, I did.

16        Q.   Okay.  Back in 1992 when this case happened, is

17   it fair to say that DNA was pretty much in its infancy

18   as far as using it for law enforcement purposes?

19        A.    It was.  We had never even thought of using DNA

20   technology to solve crimes over at HPD at that time.

21        Q.   Okay.  And so, it was a developing science?

22        A.   Yes.

23        Q.   And is it fair to say that just like a lot of

24   police officers might not even be thinking DNA back in

25   1992, a lot of defendants weren't thinking DNA either,

1    were they?

2          A.   That's correct.

3          Q.   You didn't have all these cold case shows on

4    television showing cases being solved years later based

5    on DNA or defendants to educate themselves on, did you?

6          A.   That's correct.

7          Q.   So, a defendant might be less likely to protect

8    himself from leaving biological evidence behind at a

9    scene because he is not even thinking that this kind of

10   technology is going --

11               MR. CORNELIUS:   I'm going to have to object

12   to the speculation, Judge.

13               THE COURT:   That's sustained.

14         Q.   (By Ms. Tise) Let me ask you this.  As an

15   officer who worked in Homicide back prior to the

16   development of what we now know as science, would you

17   have collected a cigar from a scene and even thought

18   that would be something that you might find DNA on in

19   the early 90s, late 80s?

20         A.   I would have collected a cigar, but not for DNA

21   purposes, no.

22         Q.   Okay.  Were you thinking about things like

23   epithelial cells, skin cells that might be left behind

24   on evidence that ultimately could lead to DNA results as

25   an experienced officer back at that time?

```
 1        A.    No.

 2        Q.    Okay.   If you thought about DNA, what kinds of

 3   evidence were you thinking?

 4        A.    Blood and semen.

 5        Q.    Okay.   But not skin cells left behind on a

 6   cigar?

 7        A.    No.

 8        Q.    Okay.   When you decided to determine if DNA

 9   testing might help solve this case, did you have a DNA

10   sample from the main suspect, Obel Cruz-Garcia?

11        A.    I did not.

12        Q.    Okay.   And why wasn't there a DNA sample from

13   him available?

14        A.    He wasn't available to give one.

15        Q.    Okay.   From reviewing the case, you learned

16   basically that he had -- he was gone --

17        A.    Yes.

18        Q.    -- right?

19              And efforts to locate him by HPD had not

20   been successful?

21        A.    Correct.

22        Q.    Okay.   And so, we didn't have a DNA sample from

23   him?

24        A.    We did not.

25        Q.    When was that you opened this case?   What year?
```

1     A.   It was in September of 2007.

2     Q.   Okay.  And because you didn't have a DNA sample

3  from the main suspect in the case, what was your plan to

4  do -- if you were able to get a DNA profile from the

5  evidence that you had, what was your plan to do with

6  that information?

7     A.   My aim from the beginning was to obtain a

8  CODIS-worthy DNA profile that I could have entered into

9  it.

10     Q.   Okay.  And tell the jury what CODIS is?

11     A.   CODIS is the Combined DNA Index System.  It's a

12  software program that contains the DNA profiles of known

13  offenders.

14     Q.   Okay.  And so, you can take a profile that

15  you've developed from, say, a cold case that you worked

16  and enter into CODIS in hopes that in this national

17  system a match might be able to be found, correct?

18     A.   Yes.

19     Q.   And so, because you didn't have a sample from

20  the primary suspect in the case, you were thinking that

21  you would get a profile and enter it into CODIS and see

22  if you got a hit?

23     A.   Correct.

24     Q.   Did you also have some samples from individuals

25  that HPD had questioned back in the 90s?

1      A.   I did.

2      Q.   A sample from somebody named Bienviendo Melo?

3      A.   Yes.

4      Q.   A sample from somebody named Carmelo Martinez

5   Santana?

6      A.   Yes.

7      Q.   Okay.  Did you have a sample from someone named

8   Rogelio Aviles-Barroso at that time, or Candido Lebron?

9      A.   Well, yeah, I know Candido Lebron.  He has

10  since --

11     Q.   We know his name was Rogelio Aviles-Barroso,

12  but at the time it was Candido Lebron?

13     A.   That's correct, yes.

14     Q.   And did you also consider that you were going

15  to -- oh, and another person named Leonardo German, did

16  you have his sample as well?

17     A.   We did.

18     Q.   And did you also have the intention of having

19  those particular samples compared to what you had?

20     A.   Yes.

21     Q.   Okay.  So, at this point in time you get the

22  evidence together, let's talk about that.  You said

23  there was a cigar?

24     A.   Yes.

25     Q.   There was a rape kit?

1      A.   Yes.

2      Q.   Okay.  Where was the cigar being stored at that

3 time?

4      A.   In the HPD property room.

5      Q.   Okay.  And when you went to locate it, did you

6 observe how it was packaged?

7      A.   Yes.

8      Q.   Okay.  Were you able to link it up from the

9 packaging to the cigar recovered in this case?

10     A.   Yes.

11     Q.   What condition was the package in?

12     A.   Excellent.

13     Q.   Okay.  And how was it stored?  What kind of

14 packaging?  Can you describe that for the jury?

15     A.   It was stored in a plastic bag and then in a

16 large manila-type envelope.

17     Q.   Not this one, but this type of deal, right

18 (indicating)?

19     A.   Similar, but much larger.

20     Q.   Okay.  And the packaging from the external

21 manilla envelope, you said it was in excellent

22 condition?

23     A.   Yes.

24     Q.   And the plastic bag as well?

25     A.   Yes.

```
 1        Q.   Okay.  So, you got the cigar.  What did you do
 2   with it?
 3        A.   We have a -- Cold Case has a small storage area
 4   where we find our evidence at different locations and
 5   we're able to centralize it.  We get it all ready to go
 6   at the same time and ship it out.  So, I put it in the
 7   cold case storage room.
 8        Q.   Okay.  And when you got it -- you said you got
 9   from the HPD property room.  Where is that located?
10        A.   1100 Goliad.
11        Q.   Okay.  You also got together the sexual assault
12   evidence, correct?
13        A.   Yes.
14        Q.   And where was that?
15        A.   That was in the property room annex at 1200
16   Travis.
17        Q.   Okay.  And did you observe the condition that
18   it was being stored in?
19        A.   Yes.
20        Q.   Okay.  Can you tell the jury -- describe the
21   condition that that piece of evidence was being stored
22   in?
23        A.   It, too, was in a box placed in a plastic bag
24   and the plastic bag was sealed.
25                  MS. TISE:  May I approach, Your Honor?
```

```
 1                THE COURT:  Yes.
 2        Q.   (By Ms. Tise) I'm going to show you what's been
 3   marked as State's Exhibit 33, and ask you if you
 4   recognize what that is (indicating)?
 5        A.   Yes.
 6        Q.   Okay.  And you've got the packaging as well as
 7   the actual box here, right?
 8        A.   Correct.
 9        Q.   And do you recognize both items?
10        A.   Yes.  This is the sexual assault kit.
11        Q.   Okay.  And, again, it appeared to be in very
12   good condition?
13        A.   Yes.
14        Q.   All sealed up?
15        A.   Yes.
16        Q.   Okay.  And once you retrieved those items, what
17   did you do with them?
18        A.   I packaged them into a shipping box and secured
19   the box and shipped it to the private lab.
20        Q.   Okay.  And what private lab are you talking
21   about?
22        A.   Orchid Cellmark.
23        Q.   Okay.  Is that an independent laboratory?
24        A.   It is.
25        Q.   It's not connected to HPD?
```

1     A.    No.

2     Q.    Okay.  And you shipped those items to Orchid

3  Cellmark to do what?

4     A.    I asked them to examine the sexual assault kit,

5  the cigar, and the cutting from the panties and attempt

6  to develop a DNA profile from them, as well as develop

7  Diana Garcia and Arturo Rodriguez's DNA profile for

8  comparison.

9     Q.    Okay.  And did that happen?

10    A.    Yes.

11    Q.    At this point in time we can't tell the jury

12 what the results are, but can you tell me when you

13 received the results of that first part of the analysis?

14    A.    December 5th, 2007.

15    Q.    Okay.  And at that point in time there was a

16 DNA profile that had been developed?

17    A.    Yes.

18    Q.    Okay.  So, did you go to an additional testing

19 step, knowing that we now had an unidentified DNA

20 profile?

21    A.    Yes.  That's when I sent the biological samples

22 of the men you mentioned previously to Orchid Cellmark

23 so their DNA profiles could be developed and compared

24 against the unknown DNA profile that we had.

25    Q.    Okay.  And at that point in time, eventually

1   you got results from that testing as well?

2       A.   Yes.

3       Q.   Okay.  When did you get those results?

4       A.   January 16th, 2008.

5       Q.   Okay.  After learning those results, you still

6   had an unidentified male profile, correct?

7       A.   I did.

8       Q.   Okay.  And you're still wanting to know who

9   that was?

10      A.   Yes.

11      Q.   Your intention was to put that into CODIS to

12  see if you got a hit, right?

13      A.   It was put in CODIS, yes.

14      Q.   Okay.  However, in addition to putting it in

15  CODIS, did you receive information about the whereabouts

16  of Obel Cruz-Garcia?

17      A.   I did.

18      Q.   And what geographical location was he found?

19      A.   He was in Puerto Rico.

20      Q.   When did you get that information, do you know?

21      A.   In the time period between January and May of

22  2008.

23      Q.   Okay.  So, after learning of the whereabouts of

24  Obel Cruz-Garcia what did you decide to do?

25      A.   I attempted to get DNA profile -- or a DNA

```
 1   sample from this defendant.

 2        Q.   Okay.  And how did you go about doing that?

 3        A.   Working in conjunction with the FBI and the FBI

 4   was able to obtain that sample for me.

 5        Q.   Obviously, the FBI has agents that work in

 6   Puerto Rico and who are there all the time?

 7        A.   Yes.

 8        Q.   And were you able to get an FBI agent to go see

 9   Obel Cruz-Garcia and get a DNA sample from him?

10        A.   Yes.

11        Q.   What happened with that DNA sample?

12        A.   They sent it by FedEx to me and then I sent it

13   by FedEx to Orchid Cellmark.

14        Q.   I'm sorry.  Could you repeat that?

15        A.   The FBI sent it to me by FedEx and then I sent

16   it to Orchid Cellmark by FedEx.

17        Q.   Okay.  And who were you coordinating with there

18   in Puerto Rico?

19        A.   The agent's name was Mark Miller.

20        Q.   Okay.  And when you ultimately got the sample

21   from the defendant, Obel Cruz-Garcia, what did you do

22   with it?

23        A.   I sent it to Orchid Cellmark.

24        Q.   Okay.  And when -- can you give the date when

25   that sample was received?
```

```
 1        A.    May 23rd, 2008.
 2        Q.    So, May 23rd, 2008, was the very first day that
   DNA from Obel Cruz-Garcia was in possession of HPD for
 3
   the purposes of pursuing a DNA match to the items of
 4
   evidence recovered in this case?
 5
 6        A.    That's correct.
 7        Q.    Okay.  And when you got the defendant's DNA
   sample, did you open it?
 8
 9        A.    No.
10        Q.    Okay.  So, you left it in a sealed packaging as
   it was sent to you from you -- from the Puerto Rican
11
   agent?
12
13        A.    Yes.
14        Q.    And then you sent it off to Orchid Cellmark?
15        A.    Yes.
16        Q.    And what were the instructions that you asked
   of Orchid Cellmark?
17
18        A.    I asked them to develop the DNA profile of Obel
   Cruz-Garcia and compare it against the DNA profile that
19
   was developed in this case.
20
21        Q.    Okay.  And did Orchid Cellmark do that?
22        A.    They did.
23        Q.    And at some point, did you receive the results
   of that comparison?
24
25        A.    I did.
```

1    Q.   Can you tell the jury when you received the

2  results?

3    A.   July 30th, 2008.

4    Q.   After you received the results of Orchid

5  Cellmark's testing, what did you do?

6    A.   I started to search for the people -- the

7  witnesses and complaining witnesses that were involved

8  in this case.

9    Q.   And, I guess, probably one of the first people

10 on your list was Diana Garcia?

11   A.   Yes.

12   Q.   Were you able to locate Diana Garcia?

13   A.   I was.

14   Q.   Where did you find her?

15   A.   In Rio Grande City down in the Valley.

16   Q.   And did you find she was living there with

17 Arturo?

18   A.   I did.

19   Q.   Were you able to arrange a meeting with them?

20   A.   Yes.

21   Q.   And, in fact, when you talked to her, what was

22 her emotional reaction?

23   A.   Quite cooperative.

24   Q.   Okay.  When you sat down and you actually met

25 with her in person, did you tell her the results of the

 1    DNA testing that you had gotten?

 2        A.   Not initially.

 3        Q.   Okay.

 4        A.   Eventually I did.

 5        Q.   Okay.  What did you do first?

 6        A.   I picked up her and Arturo and took them to the

 7    homicide office.  I don't speak Spanish, so Arturo was

 8    interviewed by a Spanish-speaking officer and I

 9    interviewed Diana Garcia in a private office.

10        Q.   Okay.  And did you just basically go over the

11    events of 1992 and get a statement from them about those

12    events?

13        A.   I had eight photographs that I put on the table

14    in front of her and I simply asked her to point to

15    anyone that she knew and tell me her association with

16    that person.

17        Q.   Okay.  How did that go?

18        A.   Well.

19        Q.   Okay.  Tell us what person that you had a

20    photograph of there.

21        A.   The first one she picked up was of Obel

22    Cruz-Garcia, that she knew him --

23              MR. CORNELIUS:  I'm going to object to the

24    hearsay part of that, Judge.

25              THE COURT:  That will be sustained.

1    Q.   (By Ms. Tise) Did Diana identify any other

2    individuals in any other photographs?

3              MR. CORNELIUS:  Objection to hearsay.

4              THE COURT:   That's sustained at this time.

5    Q.   (By Ms. Tise) Did you show her any other

6    photos?

7    A.   Yes.

8    Q.   Okay.  What other photos did you show her?

9    A.   I showed her German Martinez Santana, a man

10   named Jose Hernandez, Bienviendo Melo, Candido Lebron, a

11   man named Umberto Gomez.  I think that's all of them.

12   Q.   Okay.  And after you showed her those photos,

13   what did you do next?

14   A.   I showed her a photograph of the cigar that had

15   been left in the apartment that night.

16   Q.   Then what did you do?

17   A.   I showed her a photograph of the clothing that

18   had been recovered from the body of her son.

19   Q.   Okay.  What was her reaction to that?

20   A.   I think she was able to look at all of the

21   items and she was familiar with the items and...

22   Q.   And able to identify them as well?

23              MR. CORNELIUS:  Objection to the leading

24   nature of the question and it calls for hearsay.

25              THE COURT:  That's sustained.

1       Q.    (By Ms. Tise) What did you do next?

2       A.    I told her that I had the identify of the cigar

3   smoker and rapist.

4       Q.    Did you tell her the identity of that person?

5       A.    I did.

6       Q.    And how did she react?

7       A.    She started to cry.

8       Q.    Did you also interview some other individuals

9   that were connected?

10      A.    I did.

11      Q.    Did you look for Bienviendo Melo?

12      A.    I did.

13      Q.    Were you able to find him?

14      A.    No.  He dropped out of existence in the late

15  1990s and I couldn't pick up a trail from there.

16      Q.    Okay.  Did you talk to Linda Hernandez?

17      A.    I did.

18      Q.    Did you talk to Angelita Rodriguez?

19      A.    I did.

20      Q.    Did you send a Spanish-speaking officer to talk

21  to Rudy?

22      A.    I did.

23      Q.    Okay.  Is there anything else that you did in

24  connection to follow up on this cold case?

25      A.    I filed a charge of capital murder against this

1    defendant.

2        Q.   And when did you do that?

3        A.   September 5th, 2008.

4             MS. TISE:   I will pass the witness.

5             THE COURT:   Thank you, Ms. Tise.

6             MR. CORNELIUS:   Could I have just a second,

7    Judge?

8             THE COURT:   Yes.

9             (Brief pause)

10            MR. CORNELIUS:   Can we approach?

11            THE COURT:   Yes.

12            (At the Bench, on the record)

13            THE COURT:   Yes.

14            MR. CORNELIUS:   He made a statement -- or

15   maybe he just agreed with Natalie -- a statement that

16   DNA was not even thought about at HPD in 1992.  And I

17   know he didn't mean it exactly like that, but I don't

18   know how to go into that without somehow talking about

19   the crime lab.

20            THE COURT:   Okay.

21            MS. TISE:   He was talking about types of

22   evidence that you would submit DNA testing for at that

23   time.  The cigar not being --

24            MR. CORNELIUS:   Well, anyway, I wanted to

25   ask about that.  Not about the closure of the crime lab,

1   just...

2                   THE COURT:  Exactly.

3                   MR. CORNELIUS:  I'd love to go into all of

4   that stuff, but I know you won't let me.

5                   THE COURT:  I will allow you to go into the

6   fact that in certain circumstances DNA analysis was

7   performed and was limited and whatever he knows about

8   that, and that this evidence went to DNA -- to the HPD

9   Crime Lab, but not into the closure.  You understand

10  that?

11                  MR. CORNELIUS:  Yeah, but the DNA crime

12  lab, they didn't do it anyway.

13                  THE COURT:  I know.

14                  MR. CORNELIUS:  It went to a different

15  crime lab.

16                  THE COURT:  Not go into --

17                  MS. TISE:  I object to him going into that

18  because I don't think that's how it played out.

19                  MR. CORNELIUS:  Can I develop it then for

20  the record?

21                  THE COURT:  Yes.  You need to do outside

22  the presence of the jury.

23                  MR. CORNELIUS:  Yes.

24                  (Open court, defendant and jury present)

25                  THE COURT:  Deputy, let's take the jury

1    out.

2                    THE BAILIFF:  Yes, ma'am.

3                    (Open court, defendant present, no jury)

4                    THE COURT:  Okay.  For purposes of the

5    record, the defense has made  note that there was some

6    question regarding DNA -- that DNA testing or evidence

7    wasn't tested back in 1992 on murder cases and they want

8    to develop that with this witness.  And then we'll

9    decide what will be allowed to go into on

10   cross-examination.

11                   MS. TISE:  Can I just say for the record

12   that that wasn't the testimony?  The testimony wasn't

13   that DNA wasn't being tested by HPD in 1992.  It was

14   that certain types of evidence, HPD officers would not

15   have even thought about testing, like a cigar for

16   epithelial cells.

17                   MR. CORNELIUS:  Can we read back?  Maybe

18   I'm wrong.  Let's just --

19                   THE COURT:  Mary Ann, how difficult is that

20   going to be to go back to that area?  Because there were

21   a couple of questions on it.  Can you go back there?

22                   MS. TISE:  I don't think anywhere in there

23   he didn't say that HPD Homicide was not doing DNA

24   testing back then.

25                   THE COURT:  He did not say that

1  specifically.

2          MS. TISE:  He said it was in its infancy.

3          THE COURT:  I agree, he didn't say anything

4  about HPD was not doing testing, but let's just be clear

5  on what exactly was said so then we can make a

6  determination on it.  I'm still not going to allow you

7  to go into the crime lab situation.  I just --

8          MR. CORNELIUS:  I understand.

9          THE COURT:  -- want to get that down so we

10  know exactly how far you're going to be able to go into

11  this cross-examination.  Can you find that?

12          (Discussion off the record)

13          THE COURT:  You may proceed.

14                **VOIR DIRE EXAMINATION**

15  **BY MR. CORNELIUS:**

16     Q.   Okay.  Sergeant Mehl, we just had the court

17  reporter read back the prior testimony.  You read it,

18  right?

19     A.   Yes.

20     Q.   Okay.  What did you mean by that?

21     A.    I meant the technology had not advanced to the

22  degree that it has today.  In working cases in the late

23  1980s, early 1990s, it was mainly witnesses,

24  confessions.  That was at least my thought process in

25  the late 1980s, early 1990s.  It wasn't as focused on

1   DNA as it is today.

2       Q.   Okay.  But with respect to 1992.

3       A.   Yes.

4       Q.   Okay.  And my question is:  In 1992 -- not in

5   the 80s, but in 1992, were you implying to the jury that

6   your crime lab did not do DNA testing in 1992?

7       A.   I don't know if they did.  They sent things to

8   other labs.  I know they used Baylor, I know they used

9   Genetic Design.  Whether they were -- they were trying,

10  but I don't know if they were doing it.

11      Q.   But when I read that question, and when I heard

12  it, it indicated to me -- and I'm going to let you

13  straighten me out -- that you were saying that the crime

14  lab was not involved in using DNA testing to solve

15  crimes.  Are those the words you said?

16      A.   That's not what I meant.  What I meant from my

17  mindset as a homicide detective during that time period,

18  we were still geared towards the witnesses and the

19  confessions and the physical evidence that you can pick

20  up and show as opposed to DNA technology.  And I gave a

21  poor answer.  I'm sorry.

22      Q.   But the -- you know you don't have to apologize

23  to me.

24          But the crime lab was processing evidence,

25  having it DNA tested either themselves or sending it

1  out.  And I don't know either which one it is.  I know

2  in this case they sent it out, but it was being

3  processed for DNA to solve crimes in 1992, wasn't it?

4       A.   Yes.

5       Q.   Okay.  And there was an intent in this very

6  case to do that.  The evidence -- the so-called DNA

7  evidence was sent to Genetic Lab -- Genetic Design -- is

8  that what it's called?

9       A.   Yes.

10      Q.   -- in this very case?

11      A.   Yes.

12           MR. CORNELIUS:  Judge, that's what I want

13  to go into.  I don't know how much of that you are going

14  to let me go into.  I don't think I can go any further

15  with him with happened with Genetic Design.  I would

16  like to prove that up and offer all the records as part

17  of our motion hearing, but I'm not trying to get you to

18  change your ruling or -- I just want to make my record

19  clear.  I would like to go into that.  I can't do it

20  with him, but I'd like to ask what I want to ask of him

21  and then maybe be able to go into that on my case, but

22  I'm not going to do it if you tell me I can't.

23           THE COURT:  Okay.

24           MS. TISE:  I think this is a huge stretch.

25  Basically, Eric Mehl testified to what his mindset was

1    at that time and what he was focused on.  We were not

2    even thinking about DNA technology.  He was talking

3    about his mindset.  He wasn't even in Homicide in 1992.

4    That's when he was in Internal Affairs.  But he was

5    talking about what his mindset was when he was gathering

6    evidence on the cases.  I just don't see how any of that

7    means that all of sudden we need to talk about the crime

8    lab and the evidence.

9              THE COURT:  Okay.  I think it would leave a

10   wrong impression with the jury if we didn't allow him to

11   go -- if the defense is not allowed to go into it to a

12   certain degree.  Because the statement -- for the

13   record, what was the statement, Mary Ann?

14             THE REPORTER:  Well, I'm --

15             THE COURT:  Well, y'all heard exactly what

16   it was, but I will allow you, Mr. Cornelius, to go into

17   and cross-examine on just the fact that the crime lab

18   was actually accepting and processing some evidence.

19   I'm not going to allow you -- for DNA.

20             I'm not going to allow you to go into how

21   they did that or where it was sent or that it was sent

22   to another laboratory or anything like that, but that

23   back in 1992 they were processing some evidence, whether

24   it was in its infancy or not, for DNA.  And that this

25   evidence, specifically the rape kit, not the cigar --

1  you can make that distinction with your questioning --

2  that this evidence did actually go to the HPD Crime Lab

3  and was examined by the HPD Crime Lab.  And that's it.

4        MR. CORNELIUS:  I can't prove they sent it

5  to Genetic Design?

6        MS. TISE:  Judge, I'm going to object to

7  him, on a general statement of the officer saying what

8  DNA was going on at the time, to anything that goes

9  specifically to the evidence in this case.  Because that

10  statement was a general statement.  It's not like the

11  witness got on the stand and said:  We never sent this

12  for DNA testing where this specific evidence would come

13  into play.  Basically, he was talking about general DNA.

14  And if Mr. Cornelius wants to say generally there was

15  some DNA testing -- and he can't even actually say there

16  was testing going on because he doesn't know whether the

17  crime lab was doing at the time, but, generally, was

18  there some evidence at the time being sent to the lab

19  for processing.  Then that's one thing, but for him to

20  get into the specific evidence in this case from a very

21  general statement like that, I think is way far afield

22  and it's going to be very confusing for the jury.

23        THE COURT:  Why would the evidence in this

24  case, why would that not be relevant, that it went there

25  anyway, for issues of --

1              MS. TISE:  Because we're not relying on any

2    of that testing.

3              THE COURT:  The testing isn't coming in.

4    The results of that testing isn't coming in.

5              MS. TISE:  That's going to confuse the jury

6    as to what happened with it.  It's just going to be very

7    confusing.  I think you made a very general statement

8    about the fact that DNA -- and it was probably

9    overbroad, but the fact that DNA testing was not

10   something that homicide officers were even thinking

11   about at that time.  And I think it's okay if he gives a

12   general response that, yes, they were thinking about it

13   to some extent and there was some evidence that was

14   being sent to the crime lab, but to make it specific to

15   this case is going to be very confusing to the jury.

16             THE COURT:  Well, I'm going to allow you

17   to just go into the fact that the evidence in this case

18   back in 1992 did go there and you can talk about the way

19   that you found that it was resealed and packaged, but it

20   did at one point go to the HPD Crime Lab for analysis

21   for DNA.  All right?  And nothing further.

22             MS. TISE:  I don't even know if he can say

23   for DNA because --

24             THE COURT:  Was it submitted for DNA?

25             MS. TISE:  It was submitted for analysis,

1    but they were sending stuff off.  They weren't doing it

2    themselves.

3                    THE COURT:  They performed extraction --

4    and I'm not going to get into that, but you left the

5    impression that DNA was not even thought about in 1992

6    in general, much less this case.  And it was submitted

7    to the HPD Crime Lab for DNA analysis.  Is that correct

8    or is that not correct?

9                    THE WITNESS:  That's correct.

10                   THE COURT:  I don't see how we can get

11   around that, Ms. Tise.

12                   So, that's all I'm going to allow you to

13   do.  Is that clear?  Do you have any questions on how

14   far you can go on that?

15                   MR. CORNELIUS:  No, I have no questions.

16                   THE COURT:  Do you know all of that from

17   your own personal knowledge from your review of this

18   case?

19                   THE WITNESS:  Yes.

20                   THE COURT:  That does not include any

21   hearsay.  I wouldn't allow him to go into any hearsay.

22                   MR. CORNELIUS:  Okay.

23                   THE COURT:  Are you ready to bring the jury

24   back out?

25                   MR. CORNELIUS:  Yes, Your Honor.

```
 1            You know I want to go into all that other
 2  stuff?
 3            THE COURT:  I understand that.
 4            MR. CORNELIUS:  Just so my record is clear,
 5  I'm not withdrawing my attempt to go into it.  I'm
 6  just --
 7            THE COURT:  I'm not allowing you to go into
 8  the other stuff.  Genetic Design, any of the HPD Crime
 9  Lab studies or anything that's contained in that study
10  or anything about its closure.  Okay?
11            MR. CORNELIUS:  Yes, ma'am.
12            THE COURT:  Let bring in the jury.
13            (Open court, defendant and jury present)
14            THE COURT:  You may be seated.
15            We're ready to proceed on the
16  cross-examination of Sergeant Eric Mehl.
17            Mr. Cornelius, you may proceed.
18            MR. CORNELIUS:  Thank you, Judge.
19                     CROSS-EXAMINATION
20  BY MR. CORNELIUS:
21     Q.   Sergeant Mehl, how are you doing?
22     A.   Well.  Thank you.
23     Q.   While the jury was out, we re-read some
24  testimony to make sure we understood it all, correct?
25     A.   Yes.
```

1    Q.   When you said earlier, really early in your

2  testimony, that back in 1992 -- and I think you included

3  the 80s when you were talking about it -- you made the

4  statement that HPD was not even thinking about using DNA

5  analysis to solve crimes, what did you mean by that?

6    A.   What I meant by that is in the late 1980s,

7  early 1990s my thinking was still on witnesses,

8  confessions, physical evidence that you brought into

9  court, and not the scientific DNA process.

10    Q.   Okay.  But in 1992, specifically 1992, which is

11  relevant to this case because that's when this case

12  allegedly occurred, you did have a crime lab that was

13  processing things for DNA analysis, correct?

14    A.   Correct.

15    Q.   You weren't in Homicide at that point?

16    A.   I was in Internal Affairs in 1992.

17    Q.   Okay.  But in your review of this case, you

18  know, don't you, that certain items were submitted to

19  the HPD Crime Lab for processing for DNA?

20    A.   Yes.

21    Q.   In this very case?

22    A.   Yes.

23              MR. CORNELIUS:  That's all we have at this

24  time, Judge.  We'd like him to remain on-call.

25              THE COURT:  Okay.  Very good.

1          Ms. Tise, do you have any redirect?

2          MS. TISE:  I'm sorry.  Just one question.

3          THE COURT:  Yes.

4                    **REDIRECT EXAMINATION**

5    **BY MS. TISE:**

6      Q.  But, again, in 1992, no one in HPD had a sample

7    of Obel Cruz-Garcia's DNA to compare to any of the

8    evidence, correct?

9      A.  That's correct.

10         MS. TISE:  Nothing further.

11         MR. CORNELIUS:  I have a couple more.

12         THE COURT:  Very good.

13                   **RECROSS-EXAMINATION**

14   **BY MR. CORNELIUS:**

15     Q.  That you know of, correct?  You don't know of

16   any?

17     A.  I do not know of any, no.

18     Q.  Okay.  And one thing I might save you time

19   coming back.  When you went to see Diana Garcia, you

20   told her the results of the DNA testing; you told her

21   that?

22     A.  I did.

23         MR. CORNELIUS:  Pass the witness.

24         THE COURT:  Okay.  Nothing further.

25         MS. TISE:  Nothing further.

1                   THE COURT:  May this witness be excused

2      subject to recall?

3                   MR. CORNELIUS:  Yes, Your Honor.

4                   THE COURT:  Sergeant, you are excused

5      subject to recall.  Please step down.

6                   And let's see.  I show your next witness is

7      Griselle Guzman.  Will she be a short witness or a long

8      witness?

9                   MR. WOOD:  I think very brief, Your Honor.

10                  THE COURT:  Let's go ahead and call her.

11                  MR. WOOD:  The State calls Agent Griselle

12     Guzman.

13                  THE BAILIFF:  The witness has been sworn,

14     Your Honor.

15                  THE COURT:  Thank you, Deputy.

16                  Take your seat here and speak into the

17     microphone.  Keep your voice up.

18                  THE WITNESS:  Okay.

19                  THE COURT:  Thank you.

20                  You may proceed, Ms. Tise.

21                  MR. WOOD:  She will be my witness.

22                  THE COURT:  I'm sorry, Mr. Wood.

23                  MR. WOOD:  No problem.

24                       **GRISELLE GUZMAN,**

25     having been first duly sworn, testified as follows:

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | **BY MR. WOOD:** |
| 3 | Q.   Good morning, Agent Guzman. |
| 4 | A.   Good morning. |
| 5 | Q.   How are you? |
| 6 | A.   Good. |
| 7 | Q.   Can you please introduce yourself with your |
| 8 | full name, please? |
| 9 | A.   My name is Griselle Guzman. |
| 10 | Q.   Can you spell your name, first and last name |
| 11 | for the court reporter? |
| 12 | A.   G-r-i-s-e-l-l-e.  G-u-z-m-a-n. |
| 13 | Q.   Can you tell the ladies and gentlemen of the |
| 14 | jury how you are employed? |
| 15 | A.   I'm employed with the Federal Bureau of |
| 16 | Investigations. |
| 17 | Q.   Where do you currently reside? |
| 18 | A.   I'm in the process of locating to Bogota.  I |
| 19 | work there as a legal operation assistant out of the |
| 20 | U.S. Embassy. |
| 21 | Q.   Where have you lived just previous to Bogota? |
| 22 | A.   San Juan, Puerto Rico. |
| 23 | Q.   Is that where you are originally from? |
| 24 | A.   Yes, I am. |
| 25 | Q.   Grew up? |

1      A.   Yes.

2      Q.   How long have you been working with the FBI?

3      A.   Eight years since 2005.

4      Q.   What is your job title with the FBI?

5      A.   Right now, it's legal operations assistant.  I

6  studied as a support service technician with violent gun

7  squads.  And then in 2010, I began the operation as a

8  support technician for the southwest border initiative

9  squad.  And now I'm in the operations.

10     Q.   So, until you were in the process of moving to

11 Bogota, has your work with the FBI been solely in

12 San Juan, Puerto Rico?

13     A.   Yes.

14     Q.   As part of your responsibilities there with the

15 FBI in San Juan, were you also part of the team called

16 the emergency response team?

17     A.   Yes.  Evidence response team, ERT.  That's like

18 a lot of duty.  I've been a full member since 2006.

19     Q.   In Houston we have an emergency response team.

20 That's why I said that.

21              So, the evidence response team.  Is that

22 right?

23     A.   Yes.

24     Q.   Tell us, what are some of the things that you

25 would do as part of the evidence response team?

1      A.   As an evidence collector, you are trained to do
2  various functions within.   Some days you are a
3  photographer, some other days you are the team leader,
4  you are the sketcher, evidence custodian.   You rotate.
5  You're trying to lift fingerprints, collect also the
6  evidence.
7      Q.   And are these -- is this sometimes done at
8  actual crime scenes?
9      A.   Yes.
10      Q.   So, are you familiar with the term here in the
11  states called the Crime Scene Unit?
12      A.   Yes.
13      Q.   Is it similar to what a Crime Scene Unit would
14  perform, their duties here in our law enforcement?
15      A.   Yes, it's an equivalent of what people may
16  think as a C.S.I., but just for the FBI.
17      Q.   Okay.   I want to direct your attention back to
18  May of 2008.   Were you employed with the FBI at that
19  time as well?
20      A.   Yes.
21      Q.   And were you also serving as a member of the
22  evidence response team back in May of 2008?
23      A.   Yes, that's correct.
24      Q.   Did you know an individual by the name of Agent
25  Mark Miller?

1      A.   Yes.  He was our senior team leader in that

2  year.

3      Q.   And in May of 2008, did you get an assignment

4  from Agent Miller that was related to this case?

5      A.   Yes, I did.  I was requested to obtain buccal

6  swabs from Obel Cruz-Garcia.

7      Q.   And for the ladies and gentlemen of the jury,

8  can you explain what a buccal swab is?

9      A.   A buccal swab is just taking a sample of the

10  inside of the mouth, like with something similar to a

11  Q-tip, I call them.  So, you just rub it against the

12  cheek.  And that's it.  You have a DNA sample there.

13      Q.   And it is commonly in law enforcement a way for

14  obtaining a DNA sample from an individual, is it not?

15      A.   Yes, it is.

16      Q.   So, back in May of 2008, Agent Miller asked

17  that you obtain buccal swabs from the defendant in this

18  case, Obel Cruz-Garcia.  Is that correct?

19      A.   That's correct.

20      Q.   Did you have an opportunity to make contact

21  with the defendant at that time?

22      A.   Yes, I did in May of 2008.

23      Q.   And specifically was that date on May 21st of

24  2008?

25      A.   That's correct.

1      Q.   And what geographical location did you make

2   contact with the defendant at?

3      A.   We met him in Bayamon, Puerto Rico.

4      Q.   Is that location close to San Juan, Puerto

5   Rico?

6      A.   About five minutes, yes.

7      Q.   I'm going to tell you that the court reporter

8   is going to ask what the spelling of that town was.  Can

9   you please spell that?

10      A.   B-a-y-a-m-o-n.

11      Q.   Thank you.

12            So, it's nearby, a suburb more or less of

13   San Juan.

14      A.   Yes, it's a metropolitan area near San Juan.

15   It's just five minute away.

16      Q.   Okay.  And you were able to make contact with

17   Obel Cruz-Garcia on May 21st of 2008; is that right?

18      A.   That's correct.

19      Q.   And did you obtain buccal swabs from him at

20   that time?

21      A.   That's correct.

22      Q.   Did you, in fact, obtain two sets of buccal

23   swabs?

24      A.   Yes.

25      Q.   When you obtain buccal swabs, how many Q-tips

1  are included in one buccal swab?

2      A.   Two.

3           MR. WOOD:  Your Honor, may I approach the

4  witness?

5           THE COURT:  Yes.

6      Q.   (By Mr. Wood) Ms. Guzman, I'm going to show you

7  what's been marked for identification purposes as

8  State's Exhibits 65 and 66.  Do you recognize those

9  (indicating)?

10     A.   Yes.

11     Q.   And what do you recognize those to be just

12  generally?

13     A.   Those are the evidence envelopes where you put

14  the collected evidence.  In this case, the buccal swabs.

15     Q.   Okay.  And if you don't mind opening up first

16  State's Exhibit 65 and tell me what's contained within

17  State's Exhibit 65.

18     A.   You have a cardboard box where you put the

19  buccal swabs in there.

20     Q.   And are there, in fact, buccal swabs inside the

21  cardboard box?

22     A.   Yes.

23     Q.   Okay.  And then in -- also in State's Exhibit

24  66, can you tell what's contained in there?

25     A.   Two buccal swabs.

1     Q.   First on State's Exhibit 65, are there

2 identifying marks that indicate that they are the buccal

3 swabs you took in this case?

4     A.   Yes.  The description on the buccal swabs, it

5 has my name, the date I collected it.  It also has the

6 evidence tape with my initials and date on there.

7     Q.   And are those same identifying marks also

8 contained on State's Exhibit 66?

9     A.   Yes.

10     Q.   And with -- also with your initials?

11     A.   My initials, along with the officer who

12 accompanied me that day.

13     Q.   After you obtained the buccal swabs from the

14 defendant in this case, what did you do with this

15 evidence?

16     A.   Once I collected the sample, I have to let it

17 dry.  And then I put it in the box, put it in the

18 envelope, and then I seal it in front of the person I

19 collected it, and I initial it.

20     Q.   I see there is another set of initials on the

21 back.  Do you know who those initials belong to?

22     A.   Yes.  Those belong to Task Force Officer

23 Cristobol Rodriguez.

24     Q.   And is that someone who was there with you at

25 the time of the taking of these swabs?

```
1        A.   Yes.
2               MR. WOOD:  Your Honor, at this time I offer
3    State's Exhibits 65 and 66 into evidence.
4               (State's Exhibit No. 65 and 66 Offered)
5               MR. CORNELIUS:  I have objections already
6    in the record to this.  And I don't have any additional
7    ones.
8               THE COURT:  65 and 66.  What are they --
9    okay.  I see what you are saying.
10              MR. WOOD:  Can we approach briefly?
11              THE COURT:  Yes.
12              (At the Bench, on the record)
13              MR. CORNELIUS:  This was covered by my
14   motion to suppress.
15              THE COURT:  Okay.  Very good.  Other than
16   that, you don't object to them?
17              MR. CORNELIUS:  I don't have any further
18   objections.
19              THE COURT:  All right.
20              (Open court, defendant and jury present)
21              THE COURT:  State's Exhibits 65 and 66 are
22   admitted over objection.
23              You may proceed.
24              (State's Exhibit No. 65 and 66 Admitted)
25        Q.   (By Mr. Wood) Ms. Guzman, do you see the
```

1   individual, Obel Cruz-Garcia, here in the courtroom that

2   you took the buccal swabs from on May 21st of 2008?

3      A.   Yes, I do.

4      Q.   And can you please identify him and point to

5   him and tell us something that he is wearing?

6      A.   He is wearing a blue shirt, gray suit.

7      Q.   And does he have headphones on?

8      A.   Yes.

9             MR. WOOD:  Your Honor, may the record

10  reflect the witness has identified the defendant?

11            THE COURT:  The record will so reflect.

12      Q.  (By Mr. Wood) And, Ms. Guzman, after you --

13  excuse me -- packaged and sealed the buccal swabs, what

14  did you do with them at that point?

15      A.   I wrote my report, put it in a FedEx envelope,

16  sealed it again, and sent it to the detective here in

17  Houston.

18      Q.   And was that Detective Eric Mehl?

19      A.   That's correct.

20      Q.   And did that pretty much conclude your

21  involvement with this case?

22      A.   Yes.

23             MR. WOOD:  Your Honor, I will pass the

24  witness.

25             THE COURT:  Thank you, Mr. Wood.

```
 1                    Mr. Cornelius.

 2                    MR. CORNELIUS:  No questions.

 3                    THE COURT:  Thank you.

 4                    May this witness be excused.

 5                    MR. WOOD:  No objection.

 6                    MR. CORNELIUS:  Yes, Your Honor.

 7                    THE COURT:  Ms. Guzman, you may step down.

 8  You are excused and not subject to recall.  Correct?

 9                    Very good.

10                    And at this time, ladies and gentlemen,

11  we're going to break for lunch.  Is lunch back here?

12                    THE BAILIFF:  I don't believe so.

13                    THE COURT:  Usually it's pretty prompt.  If

14  it's not back there already, it will be back there

15  shortly.

16                    THE BAILIFF:  All rise.

17                    (Lunch recess)

18                    (Open court, defendant and jury present)

19                    THE COURT:  We're ready to proceed in Cause

20  No. 1384794, The State of Texas vs. Obel Cruz-Garcia.

21                    State, please call your next.

22                    MR. WOOD:  The State calls Angelita

23  Rodriguez.

24                    THE BAILIFF:  Your Honor, the witness has

25  not been sworn.
```

```
 1                    (Witness sworn)
 2              THE COURT:  Please keep your voice up and
 3    speak into that microphone.  Okay?
 4              THE WITNESS:  Okay.
 5                    ANGELITA RODRIGUEZ,
 6    having been first duly sworn, testified through the
 7    interpreter as follows:
 8                    DIRECT EXAMINATION
 9    BY MR. WOOD:
10        Q.   Good afternoon, Ms. Rodriguez.
11        A.   Good afternoon.
12        Q.   How are you doing?
13        A.   Well.
14        Q.   Are you a little nervous today?
15        A.   Yes.
16        Q.   Okay.  Well, take your time and take a deep
17    pretty.  Okay?
18        A.   Okay.
19        Q.   Please introduce yourself to the ladies and
20    gentlemen of the jury.
21        A.   Yes.  Please to meet you.  My name is Angelita
22    Rodriguez.
23        Q.   Ms. Rodriguez, tell me how old you are.
24        A.   Forty-eight years old.
25        Q.   Where do you currently live?  What part of
```

```
 1   town?
 2        A.   In Houston, on 45 South in Houston.  You want
 3   the address?
 4        Q.   No.  That's fine.  Just the general area.
 5                  And tell me about your family.  Are you
 6   married?
 7        A.   Yes, I am now.
 8        Q.   And do you have any children?
 9        A.   Yes, sir.
10        Q.   How many children do you have?
11        A.   Two.
12        Q.   And how old are they?
13        A.   Seventeen and eleven years old.
14        Q.   Do they still live there with you at your home?
15        A.   Yes, sir.
16        Q.   And what kind of work do you do?
17        A.   I'm a hairdresser and I work at a beauty
18   parlor.
19        Q.   Do you own that salon or run that salon?
20        A.   I'm the owner of the salon.
21        Q.   And how long have you been in that business?
22        A.   Seventeen years.
23        Q.   Ms. Rodriguez, where are you originally from?
24        A.   From the Dominican Republic.
25        Q.   And how long have you been here in Houston
```

 1    approximately?

 2         A.    Twenty-three years -- no.  Sorry.  Twenty-two

 3    years.

 4         Q.    What originally brought you here to Houston?

 5         A.    My ex-husband.

 6         Q.    And what was his name?

 7         A.    Obel Cruz-Garcia.

 8         Q.    How long has it been since you have seen Obel

 9    Cruz-Garcia?

10         A.    A long time.

11         Q.    Many years?

12         A.    Twenty years, twenty something.  Since 2000 --

13    since 1993, '92.

14         Q.    So, a long time?

15         A.    Yes, that's right.

16         Q.    Ms. Rodriguez, do you see Obel Cruz-Garcia here

17    in the courtroom today?

18         A.    Yes.

19         Q.    And can you please point to him and identify

20    something that he is wearing so we know who you are

21    talking about?

22         A.    It's him (indicating).

23         Q.    And tell me something he is wearing so that we

24    know.

25         A.    A blue shirt.

1     Q.   Does he have some headphones on his head?

2     A.   No.

3          MR. WOOD:  Actually, Your Honor, may the

4   record reflect she has identified the defendant?

5          THE COURT:  Okay.  There are two men with

6   blue shirts sitting right next to each other.

7          MR. WOOD:  I will clarify.

8     Q.   (By Mr. Wood) Ms. Rodriguez, do you know what

9   color of suit that he is wearing?

10    A.   Gray.

11         THE COURT:  The record will so reflect that

12  she's identified the defendant, Obel Cruz-Garcia.

13         MR. WOOD:  Thank you, Your Honor.

14         THE COURT:  Proceed.

15    Q.   (By Mr. Wood) Ms. Rodriguez, when did you first

16  meet your ex-husband?

17    A.   1986 -- '85.  1985.

18    Q.   Where was it that you first met him?

19    A.   In Puerto Rico.

20    Q.   How did you meet?

21    A.   Through work that -- we worked together with a

22  cousin of mine.

23    Q.   And who was that cousin?

24    A.   Isabel Martinez.

25    Q.   Do you know where the defendant -- where the

 1  defendant was originally from?

 2      A.   Dominican.

 3      Q.   Were you guys from the same area in the

 4  Dominican or not?

 5      A.   No.

 6      Q.   Did you always know him as Obel Cruz-Garcia or

 7  by any other name?

 8      A.   By Obel.

 9      Q.   Is that what you called him?

10      A.   I did.

11      Q.   Did you know of any other nicknames he went by?

12      A.   Yes.

13      Q.   What other names did you know him to go by?

14      A.   Chico.

15      Q.   After you and the defendant met, how long was

16  it before you guys got married?

17      A.   About two years.

18      Q.   Did you and the defendant ever have any

19  children together?

20      A.   No.

21      Q.   Describe your relationship with the defendant

22  in the beginning.

23      A.   At the beginning, it was a good relationship.

24      Q.   And how long did you guys stay in Puerto Rico

25  before you came to Houston?

1          A.     Three years.

2          Q.     What brought you here?

3          A.     He told me to come over here.

4          Q.     Do you know an individual by the name of Rudy?

5          A.     Yes, sir.

6          Q.     And do you know that his full name is -- well,

7     let me ask you this.  What did you know his full name to

8     be?

9          A.     Carmelo Martinez.

10          Q.     How do you know -- how do you know Rudy?

11          A.     He is a good kid.  You mean how I do know him?

12          Q.     Let me ask that a different way.  Are you

13     related to Rudy?

14          A.     Yes.  He is my cousin.

15          Q.     And at some point, did you introduce Rudy to

16     Obel, the defendant?

17          A.     Yes.

18          Q.     Was Rudy living over in Puerto Rico near you

19     guys at some point?

20          A.     He came to the house, yes.

21          Q.     But he was living in Puerto Rico at the time?

22          A.     Yes.

23          Q.     Did you and the defendant and Rudy all come

24     over to Houston around the same period of time?

25          A.     Yes.

1      Q.   Did you come together or at separate times?

2      A.   Separate.

3      Q.   Who came first?

4      A.   Rudy.

5      Q.   And then who came after Rudy?

6      A.   Obel.

7      Q.   And then did you join them after the two of

8    them were already here?

9      A.   Yes, later.

10      Q.   Do you recall what year it was that you arrived

11   in Houston?

12      A.   1989.

13      Q.   What kind of work were you doing when you

14   arrived?

15      A.   I was a hairdresser in Puerto Rico.

16      Q.   And so, did you start that same work once you

17   arrived in Houston?

18      A.   I was not working.

19      Q.   Okay.  So, you started doing hair later on

20   again?

21      A.   Yes.

22      Q.   When you arrived in Houston in 1989, what kind

23   of work was your husband doing?

24      A.   He was not working.

25      Q.   When you arrived here, where were you and the

1    defendant living?

2        A.    He lived with a friend.

3        Q.    Do you know who that friend was?

4        A.    Yes.

5        Q.    If you remember, please tell us the name.

6        A.    Ramon Robles.

7        Q.    What about Rudy?  Do you know where Rudy was

8    living when you guys got to Houston?

9        A.    He was with him.

10       Q.    At some point, did you and the defendant get

11   your own place to live?

12       A.    Yes, afterwards.

13       Q.    Was that pretty soon after you arrived in

14   Houston?

15       A.    Months later.  About a month or two months.

16       Q.    Ms. Rodriguez, at some point after you arrived

17   in Houston, did you suspect that the defendant was

18   involved in drugs?

19       A.    Yes.

20       Q.    Why did you suspect that?

21       A.    Because he would come with that.

22       Q.    When you say "he would come with that," what do

23   you mean?

24       A.    Because he was using drugs.

25       Q.    And did you think he was just using drugs or

1    did you know if he was dealing drugs or not?

2         A.   Both, both things.

3         Q.   What did that do to your relationship with the

4    defendant, your marriage?

5         A.   Well, we lived always arguing about that.

6         Q.   Would there be times that he did not come home

7    at night and things like that?

8         A.   Yes.

9         Q.   And how did you feel about that?

10        A.   I felt bad.

11        Q.   Would you speak to him about this?

12        A.   Yes.

13        Q.   Back during that time, do you recall, did the

14   defendant smoke cigarettes?

15        A.   He did and then he quit and then he took it

16   again.

17        Q.   What about cigars, did you ever know him to

18   smoke cigars?

19        A.   Sometimes.

20        Q.   Did you like that?

21        A.   No.

22        Q.   Why not?

23        A.   No.  Because I didn't feel comfortable.

24        Q.   Did it smell bad?

25        A.   Uh-huh.

```
 1        Q.   During that time that the defendant you thought

 2   was using and maybe dealing drugs, was he making a lot

 3   of money or did you know?

 4        A.   Not much money.  Sometimes -- not much money.

 5        Q.   Was money -- was that an issue in your marriage

 6   or no?

 7        A.   Sometimes it was.

 8        Q.   Overall once you arrived to Houston in 1989,

 9   how would you describe your relationship or your

10   marriage with the defendant?

11        A.   Very different.

12        Q.   And how was it very different?

13        A.   It was not the same.

14        Q.   Not the same as it was in Puerto Rico?

15        A.   Huh-uh.

16        Q.   Did you know any of the people that the

17   defendant was working with in the drug business?

18        A.   I don't remember.

19        Q.   Did you know friends of his and associates of

20   his?

21        A.   Not associates.

22        Q.   Okay.  At some point did you meet a couple by

23   the name of Diana Garcia and Arturo Rodriguez?

24        A.   Yes.

25        Q.   And how did you know -- well, I will ask that
```

1    in a minute.

2              Let me ask you this first.  Did you think

3    that Rudy was involved in drugs with your husband?

4         A.   Yes.

5         Q.   And why did you think that?

6         A.   Because they moved together.

7         Q.   Would they spend a lot of time together during

8    that time?

9         A.   Yes.

10             MR. WOOD:  Your Honor, may I approach and

11   get some evidence?

12             THE COURT:  Yes.

13        Q.   (By Mr. Wood) Ms. Rodriguez, I'm going to show

14   you State's Exhibit No. 89.  And you also have a

15   television right next to you, too, that you can look at.

16        A.   Yes, sir.

17        Q.   In State's Exhibit 89, do you remember -- or

18   does that person look familiar to you (indicating)?

19        A.   Yes, sir.

20        Q.   Who is that person?

21        A.   He was called Charlie.

22        Q.   And how did you know Charlie?

23        A.   From a long time ago in Santo Domingo and I

24   came to see him here again.

25        Q.   So, he was somebody you also knew that lived in

1    Houston?

2         A.   Yes.

3         Q.   Did he have any friendship or association with

4    your husband?

5         A.   Yes, sir.

6         Q.   What did you think their relationship was?

7         A.   They were always together.  They were friends.

8         Q.   State's Exhibit 85.  Who is that (indicating)?

9         A.   My cousin, Rudy.

10        Q.   What did you call Rudy?

11        A.   Rudy.

12        Q.   State's Exhibit 90.  Does that person look

13   familiar to you (indicating)?

14        A.   I don't remember.

15        Q.   Okay.  What about State's Exhibit 84, is this

16   someone that looks at all familiar to you (indicating)?

17        A.   No.

18        Q.   And 83, is that what the defendant looked like

19   back then (indicating)?

20        A.   Yes.

21        Q.   At some point, you said that you suspected that

22   your husband -- that the defendant was also dealing

23   drugs, not just using drugs; is that right?

24        A.   Yes.

25        Q.   And where was this taking place, do you know?

1      A.   At the apartments where we first arrived.

2      Q.   So, did you know if people would come over to

3 buy drugs from the defendant at your apartment?

4      A.   No.  He had me living at a hotel.

5      Q.   Okay.  So, was it -- I guess, let me ask you

6 this.  Was it -- was the dealings of drugs taking place

7 in front of you a lot or was it not in front of you?

8      A.   No.

9      Q.   How did you feel about that?

10     A.   No.  Because he had me -- I was not -- I was

11 living somewhere else.

12     Q.   Angelita, were you using drugs at that time?

13     A.   No.

14     Q.   Were you involved in the dealing of drugs at

15 that time?

16     A.   He had me because I was living with him.

17     Q.   And at some point you even caught a case, a

18 drug case, did you not?

19     A.   Yes, sir.

20     Q.   And you ended up being convicted of that drug

21 case, didn't you?

22     A.   Yes, sir.

23     Q.   I want to visit with you a little bit about

24 Diana and Arturo.  Okay?

25     A.   Yes, sir.  Okay.

1      Q.    How did you meet them?

2      A.    Through Obel.

3      Q.    Did you become friends with Diana and Arturo?

4      A.    That's right.

5      Q.    Were you closer with Diana or were you close

6   with both of them?

7      A.    With both, but more with Diana.

8      Q.    Would you and Diana do things to socialize

9   together?

10      A.    Sometimes.

11      Q.    Did you ever get to meet Diana's son Angelo, or

12   Baby Angelo as she called him?

13      A.    Yes.

14      Q.    And how was it -- did you get to know Angelo?

15      A.    That's right.

16      Q.    What kind of kid was Angelo?

17      A.    A very happy boy.

18      Q.    Ms. Rodriguez, what did you think that Diana

19   and Arturo's connection with the defendant was?

20      A.    Well, they met through the drugs.

21      Q.    And that's something you knew?

22      A.    They were always together and Arturo also used

23   drugs.

24      Q.    Back during that time, where were you and the

25   defendant living?

1      A.    In Humble.

2      Q.    Were you living at some point in an apartment

3  called the Humble Tree Apartments?

4      A.    I don't remember the name of the apartments.

5      Q.    But you stated it was up in Humble?

6      A.    Yes, but I don't remember the name of the

7  apartments.

8      Q.    When you stayed in that apartment in Humble,

9  who rented that apartment for you?

10     A.    Diana.

11     Q.    And why was it that Diana rented that apartment

12  for you guys?

13     A.    Because I could not rent an apartment.

14     Q.    Why was that?

15     A.    Because I did not have credit.  I was in

16  trouble.

17     Q.    So --

18              THE INTERPRETER:  I'm sorry.  Interpreter

19  correction.  That was a problem.

20     Q.    (By Mr. Wood) So, you relied on -- you and the

21  defendant relied on your friends to help you rent that

22  apartment?

23     A.    Well, yes, since we were friends and

24  everything.

25     Q.    Back during that time do you remember what cars

1  or vehicles that you and the defendant shared?

2      A.   Yes.

3      Q.   What vehicle do you remember having?

4      A.   A blue Thunderbird, Oldsmobile.

5      Q.   And were there any other vehicles that you

6  remember?

7      A.   No.

8      Q.   Would you drive one vehicle more than the other

9  or what was the arrangement?

10      A.   I drove the Thunderbird.

11      Q.   And did you ever know the defendant to loan out

12  any of his vehicles?

13      A.   I don't remember.

14      Q.   Okay.  I'm going to show you State's Exhibit

15  No. 37.  Does the car in State's Exhibit 37 look

16  familiar to you (indicating)?

17      A.   Yes.

18      Q.   And how do you know that car?

19      A.   That car is -- that's the one that Obel drove.

20  That's the one he had.

21      Q.   And that's the Oldsmobile?

22      A.   Yes.

23      Q.   So, you've told us about the blue Thunderbird,

24  right?

25      A.   Yes.

1    Q.   And the Oldsmobile?

2    A.   Yes, sir.

3    Q.   Do you remember any other vehicles that the

4    defendant or you had during that time?

5    A.   No, sir.

6    Q.   Do you ever remember you or your husband

7    driving a Chevy vehicle?

8    A.   Chevy?  I don't remember.

9    Q.   Ms. Rodriguez, I want to talk to you about a

10   time in September of 1992.  Do you remember the day that

11   you found out about Angelo having been kidnapped?

12   A.   Yes, yes.

13   Q.   Where were you when you found out that news?

14   A.   In the kitchen.

15   Q.   Was that in your apartment or where?

16   A.   At the apartment.

17   Q.   Was this during a time that you were living up

18   in Humble?

19   A.   Yes, yes.

20   Q.   And how did you learn of the news?

21   A.   On the television.

22   Q.   And tell me about that.  How did that happen?

23   A.   I was -- the television was on and I was in the

24   kitchen.  And then I went there to the television to

25   watch a show and then I saw the picture of the little

 1  boy on the television.

 2      Q.   Was this in the morning or afternoon or night?

 3  When was it?

 4      A.   In the afternoon.

 5      Q.   And what did you think when you saw that news

 6  report?

 7      A.   I was very surprised and I went to Obel to tell

 8  him that the little boy had disappeared.

 9      Q.   Was this alarming to you because you were

10  friends with Diana and Arturo?

11      A.   I called Diana from the time I saw the news.

12      Q.   Were you able to reach Diana?

13      A.   Yes.  And I told her that I was coming over.

14      Q.   After you placed that call to Diana, you said

15  that you went to talk to the defendant?

16      A.   Yes.  Yes, sir.

17      Q.   Where was the defendant when you learned of the

18  news of Angelo missing?

19      A.   In the room.

20      Q.   What room?

21      A.   He was laying down sleeping.

22      Q.   Are you talking about the bedroom?

23      A.   Yes.

24      Q.   And that's in the same apartment -- in the same

25  apartment you were in?

1          A.    Yes, sir.

2          Q.    So, you go and wake up the defendant and what

3     do you tell him?

4          A.    I told him what was happening with Angelo.

5          Q.    And how did he respond?

6          A.    He did not respond to me.

7          Q.    Was he awake?

8          A.    He was sleeping and he got up.

9          Q.    Did you tell him that you wanted to go over and

10    see Diana and Arturo?

11         A.    That's right.

12         Q.    And what did he say?

13         A.    That if I wanted to go, that I could go.

14         Q.    And did he agree to go with you?

15         A.    No.

16         Q.    Describe his demeanor.  What -- did he seem

17    concerned about Angelo missing?

18         A.    Calm.  He looked normal.

19         Q.    Did this seem strange to you?

20         A.    Yes.

21         Q.    Why?

22         A.    Because we were friends and he just told me to

23    go.

24         Q.    And where was this conversation taking place?

25         A.    In the kitchen.

1    Q.    What was he doing during this time that you

2  were having this conversation?

3    A.    I don't remember well.

4    Q.    Did he say anything else to you during that

5  conversation in the kitchen?

6    A.    No.

7    Q.    What did he tell you about his plans from

8  there?

9    A.    That he was leaving this place.

10   Q.    And where did he say he was leaving?

11   A.    To Puerto Rico.

12   Q.    Did he say when he was leaving?

13   A.    Yes, that he was leaving at once.

14   Q.    I'm sorry?  I didn't understand.

15   A.    Yes.  Yes, that he was leaving at once.

16   Q.    Did he do anything to start getting ready for

17  that trip?  Was he packing up bags or anything like

18  that?

19   A.    After some time he started.

20   Q.    He started doing what?

21   A.    To prepare his clothes, his luggage.

22   Q.    When he told you that he was planning to go to

23  Puerto Rico, what did you think about that?

24   A.    Well, I told him why was he leaving.

25   Q.    And what did he say?

1          A.   He told me that he had to leave because he

2    would not stay here.  And I told him:  Why?  And he

3    said:  No, no, I have to leave.

4          Q.   This wasn't a planned trip, was it,

5    Ms. Rodriguez?

6          A.   Yes.

7          Q.   You guys weren't planning to go back to Puerto

8    Rico to visit family or anything, were you?

9          A.   No, sir.

10         Q.   So, did you think that this was strange?

11         A.   Yes.

12         Q.   After that conversation, what did you do next?

13         A.   I asked him if he had done something, but he

14   stayed quiet.

15         Q.   And why did you ask him if he had done

16   something?

17         A.   Because he was very -- he told me that if I

18   want to stay here, I could stay, but that he had to

19   leave.  And if I want to stay, I could stay, but that

20   the police would get me.  So, I told him:  Why are the

21   police going to hurt me if I'm not in any trouble?

22         Q.   Did he respond to that?

23         A.   No.

24         Q.   Did you eventually go and see Diana and Arturo?

25         A.   Yes, sir.

1     Q.   Did you go to their apartment or where did you

2  see them?

3     A.   Their apartment.

4     Q.   Did the defendant join you or did he stay

5  behind?

6     A.   No.  I didn't go that day.  I went the next day

7  because Diana told me not to go on that day.

8     Q.   Ms. Rodriguez, I want to talk to you a little

9  bit about what was going on that night before.  Okay?

10    A.   Yes.

11    Q.   And I'm talking about the night before you

12 found out the news about Angelo.  Had you stayed at your

13 apartment there in Humble that night?

14    A.   Yes.

15    Q.   And do you remember anything that you were

16 doing that night out of the ordinary?

17    A.   Not out of the ordinary.  I was watching

18 television earlier and then I went to bed.

19    Q.   And when you went to bed, was the defendant

20 there at the apartment with you?

21    A.   He was, yes.

22    Q.   And do you have any idea of what time it was

23 that you went to bed?

24    A.   I went to my room around 9:00 p.m.

25    Q.   Now, during this time were you and the

1    defendant sleeping in the same bedroom?

2         A.   No.  We were upset, him and I.

3         Q.   Were you guys arguing or fighting?

4         A.   Two months before we had had a fight.

5         Q.   And so, there was still some tension from that?

6         A.   Yes.

7         Q.   So, after you went down to sleep that night, do

8    you know if the defendant stayed at the apartment or he

9    left?

10        A.   No, I was not aware when he left.

11        Q.   Do you know if -- did you know if he came home

12   sometime during that night?

13        A.   No, I don't remember.

14        Q.   And when you woke up that next morning, was

15   there anyone else at your apartment?

16        A.   Oh, yes, he was there.

17        Q.   The defendant was -- Obel was there?

18        A.   Yes.

19        Q.   Okay.  But no one else, just you and him?

20        A.   Yes.

21        Q.   That next day after you had found out about

22   Angelo, what else did the defendant do that day?

23        A.   That's the day that he left.

24        Q.   And when you say "he left," what do you mean?

25        A.   He went to Puerto Rico.

 1        Q.   Did you take him to the airport or do you know

 2    how he got to the airport?

 3        A.   I don't remember well.

 4        Q.   But do you remember -- let me ask.  You didn't

 5    take him to the airport, did you?

 6        A.   No.

 7        Q.   When he left for Puerto Rico, did you think he

 8    was coming back?

 9        A.   He told me that we should leave, but I did not

10    want to leave with him.

11        Q.   But did you think that he was going to be

12    returning to Houston sometime soon?

13        A.   I didn't think about anything at that point.  I

14    don't remember.

15        Q.   Well, did he return to Houston?

16        A.   No.

17        Q.   In fact, were you aware -- did he have an

18    upcoming court date to appear in court that you knew

19    about?

20        A.   Yes.

21        Q.   And do you know if he missed that court date?

22        A.   Yes, sir.

23        Q.   Had you ever known him to miss a court date

24    before?

25        A.   No, sir.

1      Q.   So, when he left, did he leave you with any

2   money or anything like that?

3      A.   He left me money to pay the rent.

4      Q.   And do you recall how much money he left you?

5      A.   I don't remember.

6      Q.   Well, what was the lease; 700, $800?

7      A.   I don't remember well.

8      Q.   Okay.  So, did you end up staying in that

9   Humble apartment from that day on?

10      A.   No, not later.

11      Q.   Where did you go after that?

12      A.   I rented -- because I did not have money to pay

13   for a lease and I ended up going to a hotel.

14      Q.   And who did you go -- did you stay at a hotel

15   by yourself or was anyone with you?

16      A.   Rudy was there.  He was there.

17      Q.   And do you remember at all where that hotel was

18   or what -- anything about that hotel?

19      A.   I don't remember the name of the hotel.

20      Q.   Was it down in Pasadena?

21      A.   Yes.  Yes, sir.

22      Q.   Do you remember how long you stayed there at

23   that motel or hotel down in Pasadena?

24      A.   I don't remember whether it was two or three

25   weeks.  I don't remember.

1    Q.   Ms. Rodriguez, eventually you left -- well, let

2  me ask.   Eventually you saw the defendant again, did you

3  not?

4    A.   Yes, sir.

5    Q.   And where was it the next time that you saw

6  him?

7    A.   In Santo Domingo.

8    Q.   So, somewhere around October 1st or October 2nd

9  of 1992 he left Houston, right?

10    A.   Yes.

11    Q.   And then you thought he was going to Puerto

12  Rico, correct?

13    A.   Yes, sir.

14    Q.   How was it -- actually, how long was it before

15  you saw him in Santo Domingo?

16    A.   I don't remember.   About two months.   I don't

17  remember.

18    Q.   And how was it that you came into contact with

19  him in Santo Domingo?

20    A.   I knew where the family was and we got in

21  contact.

22    Q.   And why were you wanting to get in contact with

23  him?

24    A.   Because I wanted a divorce.

25    Q.   So, was it family members that put you in

1  contact with him?  How did that work?

2       A.   No.  I -- I don't remember.

3       Q.   Did you see him in person or talk to him on the

4  telephone?

5       A.   In person.

6       Q.   And how was that conversation?

7       A.   I don't remember.

8       Q.   Let me ask you this way.  Did you tell him that

9  you wanted a divorce?

10      A.   Yes, that's right, sir.

11      Q.   And how did he respond to that?

12      A.   He said no to me, that he was not going to give

13  me a divorce.

14      Q.   And what did you say?

15      A.   That I did want a divorce.

16      Q.   And how did he respond to that?

17      A.   He told me that he was not going to give me a

18  divorce.

19      Q.   Did he say anything else?

20      A.   Yes.

21      Q.   What did he say?

22      A.   He insulted me and he told me that he was going

23  to harm my family.

24      Q.   Were you worried that he was serious?

25      A.   Yes.

1        Q.   Did he say how he was going to harm your family

2   or what did he mean by that?

3        A.   We were arguing.  And I also asked him about

4   the problem with the boy, with the little boy.

5        Q.   What little boy?

6        A.   About what was happening with Angelo.

7        Q.   Why did you ask him that?

8        A.   Because we knew what had happened and we were

9   friends with Diana.

10       Q.   So, at that point Angelo's body had been found?

11       A.   No.  I don't remember.

12       Q.   Okay.  And so, when you brought up Angelo to

13  him, what did he say?

14       A.   He stayed calm.  And I asked him -- I asked him

15  if he had something to do with that.

16       Q.   Did he answer you?  What did he say?

17       A.   Yes, that he did have to do with that, that he

18  had killed him.

19       Q.   What did you do after he said that?

20       A.   I asked him why he had done that.

21       Q.   Did he say anything?

22       A.   I don't remember what else he said.

23                THE COURT:  Let's take a break.

24                Deputy, can you take the jury out?

25                THE BAILIFF:  All rise.

```
1                    (Open court, defendant present, no jury)
2                    THE COURT:  I realize the testimony in this
3    case is emotional, but if you cannot hold your emotions
4    in and be quiet in the courtroom, then you will have to
5    leave the courtroom.  And that includes the family.  I'm
6    sorry to say that, but we cannot have this jury swayed
7    by emotion and emotional outbursts.  Okay?  So, if you
8    feel that you can't keep from having that happen, you
9    will need to step out.  All right?  Thank you.
10                   Let's take a 10-minute break.
11                   (Recess)
12                   (Open court, defendant and jury present)
13                   THE COURT:  Please be seated.
14                   We're ready to proceed on the State of
15   Texas vs. Obel Cruz-Garcia.  And still on the witness
16   stand is Ms. Angelita Rodriguez.
17                   You may proceed, Mr. Wood.
18        Q.   (By Mr. Wood) Ms. Rodriguez, thank you for your
19   testimony.
20                   MR. WOOD:  Pass the witness.
21                   THE COURT:  Mr. Cornelius.
22                   MR. CORNELIUS:  Yes, ma'am.
23                   THE COURT:  You may proceed.
24                        CROSS-EXAMINATION
25   BY MR. CORNELIUS:
```

1       Q.    Ms. Rodriguez, my name is Skip Cornelius.

2   We've never met, correct?

3       A.    No.  No, sir.

4       Q.    But our investigators did talk to you, correct?

5       A.    No.

6       Q.    Did Cindy Klein or Edna Valdez ever talk to

7   you?

8       A.    Yes, they came to see me.

9       Q.    Okay.  And did you forget to tell them about

10   your ex-husband confessing to this?

11       A.    I didn't talk to her because I told her that I

12   had my lawyer and that I needed to talk to him.

13       Q.    So, you didn't talk to them?

14       A.    No, sir.

15       Q.    Okay.  Didn't talk to them on May 3rd at your

16   beauty salon?

17       A.    She came -- two persons came to the salon.  And

18   when they came over, I told them -- they came to ask

19   questions and I told them that I didn't have to talk to

20   their questions.

21       Q.    So, you didn't talk to them?

22       A.    But she sat down and she introduced herself to

23   me and everything.  And she talked and -- she sat down

24   and talked to me and told me about the name of the case,

25   everything that -- we were talking.

1    Q.   So, did you talk to her?

2    A.   Yes, I did talk to her about those things.

3    Q.   And did she record it?

4    A.   I don't know.

5    Q.   Okay.  So, let me just make sure I'm

6    understanding.  You're saying you did talk to them or

7    you did not talk to them?

8    A.   I did talk to them because I sat down with

9    them.  Yes, sir, I did.

10    Q.   Did you tell them anything about Obel

11    confessing to murdering this little boy?

12    A.   No.  I didn't talk to her about -- I mean, she

13    was asking me questions, but I told her to talk to my

14    attorney, that I had my attorney.

15    Q.   Okay.  When you talked to the police back in

16    2008 do you recall that Sergeant Mehl -- let me see if I

17    can help refresh your memory because I know it's been a

18    long time ago.

19         It was a conversation between you, Sergeant

20    Mehl, Officer Chappell, and an assistant district

21    attorney named Denise Bradley, you and your lawyer, J.C.

22    Castillo.  Do you remember that?

23    A.   Yes.

24    Q.   Okay.  And you knew why they were talking to

25    you, right?

1      A.   Yes, sir.

2      Q.   You knew they were investigating the death of

3  this little boy, didn't you?

4      A.   Yes, sir.

5      Q.   And they were talking to you about Obel

6  Cruz-Garcia, correct?

7      A.   Yes, sir.

8      Q.   And did they appear that they knew what they

9  were doing, they knew how to ask questions and try to

10  find out about Obel Cruz-Garcia's connection to this, if

11  any?

12     A.   I don't understand.

13     Q.   Okay.  Did it appear that these policemen and

14  this assistant D.A. knew what they were doing?

15     A.   Yes, sir.

16     Q.   And you knew what they were asking you about,

17  correct?

18     A.   Yes, sir.

19     Q.   And you told them all the same stuff you've

20  told this jury, about how you and Obel were from the

21  Dominican, correct?

22     A.   Yes, sir.

23     Q.   And about the move to the United States,

24  correct?

25     A.   Yes, sir.

1     Q.   And about how you learned about the alleged

2  kidnapping of Angelo?

3     A.   Through the television.

4     Q.   And about how -- and you told them that, right?

5     A.   Yes, sir.

6     Q.   Just like you've told this jury?

7     A.   Yes, sir.

8     Q.   You told them about asking Obel about it?

9     A.   Yes, sir.

10     Q.   And you told them about Obel leaving?

11     A.   Yes, sir.

12     Q.   And you told them about going back to Puerto

13  Rico -- I mean to the Dominican Republic yourself?

14     A.   Yes, sir.

15     Q.   And asking Obel for a divorce?

16     A.   Yes, sir.

17     Q.   But you must have just totally forgotten to

18  tell them that Obel confessed to you that he is the one

19  who killed this boy?

20     A.   Yes, because I was scared.

21     Q.   You weren't so scared that you could tell them

22  this entire story except for that, right?

23     A.   I was scared.

24     Q.   Okay.  Well, you didn't tell them what you just

25  told this jury, did you?

```
 1              MR. WOOD:  Objection.  That's been asked
 2   and answered.
 3              THE COURT:  That's sustained.
 4       Q.  (By Mr. Cornelius) So, let me see if I'm
 5   understanding this correctly.  You said that Diana
 6   actually rented an apartment for y'all?
 7       A.  Yes, sir.
 8       Q.  And you knew that Diana and Arturo were selling
 9   drugs with Obel?
10       A.  Obel would bring them to Arturo.
11       Q.  Okay.  So, you knew they were involved in
12   selling drugs, correct?
13       A.  Yes, sir.
14       Q.  And you were selling drugs, correct?
15       A.  Because he was in it.
16       Q.  Okay.  Well, I'm asking.  Were you in it?  Were
17   you selling drugs?
18       A.  We were -- because we lived together, yes, I
19   knew that the drugs were there.
20       Q.  Were you spending money that was made off the
21   sell of drugs?
22       A.  Oh, my God.  He received the money.  He paid
23   the rent and everything.
24       Q.  Okay.  And so, when this news report came on
25   the TV, you woke Obel up and told him about it, right?
```

1        A.   Yes, sir.

2        Q.   And did it cross your mind, when you did that,

3    that the police were going to investigate this, correct?

4    Wasn't it on the news that the police were investigating

5    this?

6        A.   No.   On the news I saw the little boy.  I don't

7    understand you.

8        Q.   Well, when you saw the news that this little

9    boy was missing, didn't you think that the police were

10   going to investigate that?

11       A.   Yes.

12       Q.   Okay.  And did it cross your mind that you,

13   Obel, Arturo, and Diana, may all get in a lot of trouble

14   for dealing drugs?

15       A.   At that time, I was peacefully at home.  I did

16   not know what was going on because I had previously had

17   my case and I did not want to get involved with anything

18   else.

19       Q.   Okay.

20            MR. CORNELIUS:  Could I have a moment,

21   Judge?

22            THE COURT:  Yes.

23            (Pause)

24            MR. CORNELIUS:  No further questions at

25   this time, Judge.

```
 1                    THE COURT:  Any further questions,
 2   Mr. Wood?
 3                    MR. WOOD:  No further questions.
 4                    THE COURT:  May the witness be excused?
 5                    MR. CORNELIUS:  I need the witness to be
 6   on-call.
 7                    THE COURT:  You are excused subject to
 8   recall, Ms. Rodriguez.  At this time, you can step down.
 9                    THE WITNESS:  Thank you.
10                    THE COURT:   Please call your next.
11                    MS. TISE:  State calls Carmelo Martinez
12   Santana.
13                    THE COURT:  Ms. Tise, is he a
14   Spanish-speaking witness?
15                    MS. TISE:  He is, Judge.  He does speak
16   quite a bit of English, but I think he's more
17   comfortable in Spanish, so we'll use the interpreter.
18                    THE COURT:  Okay.  This witness has not
19   been sworn?
20                    THE BAILIFF:  No, he's not been sworn.
21                    (Witness sworn)
22                    THE COURT:  Mr. Santana, please keep your
23   voice up and speak into the microphone, sir.  And please
24   wait till the lawyers have asked their full question
25   before you respond.
```

1            You may proceed, Ms. Tise.

2                **CARMELO MARTINEZ SANTANA,**

3    having been first duly sworn, testified through the

4    interpreter as follows:

5                   **DIRECT EXAMINATION**

6    **BY MS. TISE:**

7         Q.   Good afternoon.

8         A.   Good afternoon.

9         Q.   Would you introduce yourself to the jury,

10   please?

11        A.   I'm Carmelo Martinez and come to testify and to

12   tell only the truth.

13        Q.   Okay.  And do you have a nickname that people

14   call you?

15        A.   Yes.

16        Q.   What's that?

17        A.   Rudy.

18        Q.   Okay.  And do you mind if I call you that?

19        A.   No.

20        Q.   Okay.  Rudy, can you tell us how old you are?

21        A.   Forty-four years old.  I'm sorry.

22        Q.   Okay.  And because -- I know you speak a lot of

23   English.  Do you not?

24        A.   I can talk a little, but that's why --

25   sometimes I can't.  So, that's why I prefer Spanish.

1    Q.   Okay.  And so, some words you have trouble

2   with, right?

3    A.   Yes.

4    Q.   And because we have the interpreter here, we're

5   going to use the interpreter on all of the questions and

6   answers.  Okay?

7    A.   That's right.

8    Q.   So, if you will just wait for him to interpret

9   my question.  Even if you believe you understand it,

10  wait for the interpretation before you answer.

11   A.   Right.

12   Q.   And answer in Spanish.

13   A.   Right.

14   Q.   Deal?

15   A.   Yes.

16   Q.   Okay.  Tell me where you're originally from.

17   A.   I'm from the Dominican Republic.

18   Q.   Okay.  And did you spend all your growing-up

19  years there in the Dominican Republic?

20   A.   That's right.

21   Q.   And do you know somebody name Angelita

22  Rodriguez?

23   A.   That's right.

24   Q.   Who is she?

25   A.   She is my cousin and Obel Cruz-Garcia's wife.

1     Q.   Okay.  And did you and Angelita grow up there

2   in the Dominican Republic both of you?

3     A.   That's right.

4     Q.   Okay.  And at some point you came here to the

5   United States, correct?

6     A.   That's right.

7     Q.   Do you remember about how old you were when you

8   came here?

9     A.   I was about 18 years old, or something like

10   that.  I can't remember exactly.

11     Q.   Okay.  Would it have been in the late 1980s?

12     A.   Yes.

13     Q.   Okay.  And why did you come here?

14     A.   I came to sell drugs.

15     Q.   Okay.  And you did do that when you got here,

16   did you not?

17     A.   That's right.

18     Q.   And did you think that that was going to turn

19   out to be a better life for you than what you had back

20   in Santo Domingo?

21     A.   That's right.

22     Q.   Did it turn out that way?

23     A.   No.

24     Q.   And, in fact, you're currently serving time in

25   a federal penitentiary for trafficking drugs, correct?

1      A.   That's right.

2      Q.   How long was your federal sentence?

3      A.   Seventeen years and seven months.

4      Q.   Okay.  And you are pretty much on the tail end

5  of that, aren't you?

6      A.   That's right.

7      Q.   In fact, you are about done with your federal

8  sentence, correct?

9      A.   Yes, in this year.

10      Q.   I want to go back in time to 1992.  You came

11  here to the United States and you were selling drugs

12  here, correct?

13      A.   That's right.

14      Q.   When was the first time you met Obel

15  Cruz-Garcia?

16      A.   It was in Puerto Rico, when I arrived to Puerto

17  Rico.

18      Q.   Okay.  So, you went to Puerto Rico from the

19  Dominican Republic before you came to the United States?

20      A.   That's right.

21      Q.   And did you meet him in Puerto Rico through

22  Angelita?

23      A.   That's right.

24      Q.   And I know you said that you met him in Puerto

25  Rico, but do you know where Obel Cruz-Garcia is from?

1    A.   Yes.

2    Q.   Where is he from?

3    A.   From the Dominican Republic.

4    Q.   But you didn't know him growing up, did you?

5    A.   No.

6    Q.   You met him as an adult through Angelita?

7    A.   That's right.

8    Q.   When you came to the United States, did you

9 find that Obel Cruz-Garcia also came here?

10   A.   Repeat the question, please.

11   Q.   Did Obel Cruz-Garcia also come here to the

12 United States?

13   A.   That's right.

14   Q.   And why did he come here?

15   A.   He came with me, to sell drugs with me.

16   Q.   Okay.  And when y'all got here, did y'all work

17 together in the drug business?

18   A.   That's right.

19   Q.   Did y'all settle here in Houston first?

20   A.   That's right.

21   Q.   Okay.  And did he bring Angelita with him when

22 he came to Houston at first?

23   A.   Yes.  He came first and then Angelita.

24   Q.   Okay.  So, he came before her?

25   A.   Yes.

1    Q.   And how long later did Angelita come?

2    A.   I don't remember the exact time.

3    Q.   Was it --

4    A.   But I think it was shortly after him.

5    Q.   Okay.  And when you and Obel Cruz-Garcia came

6    here, were y'all living together?

7    A.   That's right.

8    Q.   Okay.  Where were y'all living?

9    A.   We lived here by Broadway in a small apartment,

10   back here by Broadway and Easton.

11   Q.   Okay.  Did anybody else live there with you?

12   A.   Yes.

13   Q.   Who?

14   A.   There was another Dominican kid.  His name was

15   Wilson.

16   Q.   Okay.  And did he live with y'all the whole

17   time?

18   A.   He did for a short time, but not after, not

19   later.

20   Q.   Okay.  And during the time that you knew Obel

21   Cruz-Garcia, what name did you call him?  Did he have a

22   nickname?

23   A.   No, not at first.

24   Q.   All right.  At some point did you have a

25   nickname that you called him?

1    A.   Yes.  People called him Chico.

2    Q.   Okay.  Did you call him that?

3    A.   No, not exactly.  I don't remember very well,

4  but I don't think I called him many times by that name.

5    Q.   What did you call him by usually?

6    A.   Obel.

7    Q.   Okay.  While y'all were living together here in

8  Houston, were y'all also using cocaine, you and Obel?

9    A.   That's right.

10   Q.   Okay.  And did you have a problem with cocaine?

11   A.   That's right.

12   Q.   Can you tell us about that?

13   A.   Right.  Well, I started one night.  A Dominican

14  lady came out of prison -- and I didn't use drugs.  I

15  sold them, but I didn't use them.

16   Q.   Okay.

17   A.   And on that night, she convinced me that it was

18  very good and she made me try it.  She convinced me.

19   Q.   Okay.  And did you try it?

20   A.   That's right.

21   Q.   And was that here in the United States or in

22  the Dominican?

23   A.   Here in the United States.

24   Q.   And did you find yourself addicted to cocaine?

25   A.   That's right.

1     Q.   Did that create some problems in your life?

2     A.   Yes, big ones.

3     Q.   Okay.  As you and Chico worked together selling

4 drugs here in Houston, who was the boss of that

5 operation?

6     A.   At first he came here where I was and I told

7 him that we will be partners, half and half; but after

8 that, shortly after that he began to take over.  He took

9 control of the whole business because I continued

10 snorting, snorting, snorting more every day.  And I was

11 going down and he was taking control.  He was taking

12 better control of everything due to his personality.

13     Q.   Okay.  And what about his personality are you

14 talking about?

15     A.   Well, it could be said that he is a violent

16 person.  He does not let anybody mess around with him

17 and he controls everything.

18     Q.   Were you afraid of him?

19     A.   That's right.

20     Q.   And were there specific things that happened

21 between the two of you that reinforced that fear?

22     A.   That's right.

23     Q.   Do you remember something specific that he did

24 to you to show you he was the boss and he was in

25 control?

1      A.   Well, once -- we were practically not partners

2  anymore, but once -- I kept the pager because him and

3  Cesar were going to smoke and I did not want to smoke

4  and I left with my friends.  And about two or three

5  hours he called me very, very angry, asking me where I

6  was and asking me to come over, that he wanted to talk

7  to me.

8           When I arrived there to the hotel, him and

9  Cesar took me into the room and right there he grabbed

10 me by the neck and he tied me up, my hands behind me,

11 and he took me into the bathtub and told me that he was

12 going to kill me because he thought that I was taking

13 his customers away from him.

14     Q.   All right.  In the time that you spent with

15 Chico, did you find that he was very jealous about his

16 customers and the people who sold for him?

17           MR. CORNELIUS:  Objection to the leading

18 nature of the question, Your Honor.

19           THE COURT:  That will be sustained.

20     Q.   (By Ms. Tise) What kind of attitude did Chico

21 have about his customers?

22     A.   I don't understand the question very well.

23 What do you mean by "attitude"?

24     Q.   Did he get angry if people were interfering

25 with his customers?

1      A.   That's right.

2      Q.   Very angry?

3      A.   That's right.

4      Q.   What about when people who worked for him

5  didn't want to work for him anymore and wanted to work

6  for someone else?

7               MR. CORNELIUS:  Can we approach the bench,

8  Judge?

9               THE COURT:  Yes.

10              (At the Bench, on the record)

11              MR. CORNELIUS:  These are extraneous

12  offenses and I object to them.  I mean, she didn't

13  finish her question, but I know exactly where -- I can

14  see that she's going into instances where he's committed

15  other offenses that were extraneous and I object to

16  them.

17              THE COURT:  Where are you going?

18              MS. TISE:  Going to motive.  This is why he

19  went to that apartment that night and retaliated against

20  Diana and Arturo.  I'm not going into -- one of the

21  extraneouses is murder and I'm not going to go into

22  that, but -- and there are similar circumstances on

23  that, but I'm asking generally what his emotional

24  reaction was when he felt like his -- he was losing his

25  dealers to other people.

1              THE COURT:  Yeah, I will let you go into

2    that he observed the defendant's reactions, but I'll not

3    let you go into beating up people.  I don't know what

4    you have to -- I think you've got the motive.  I don't

5    know why --

6              MS. TISE:  I'm going to try to -- I'll

7    attempt to lead him because I'm trying to keep him

8    specific to --

9              MR. CORNELIUS:  That's okay.

10             THE COURT:  Just what he observed about

11   taking customers or his business.  Okay?  Very good.

12   Let's proceed.

13             (Open court, defendant and jury present)

14   Q.  (By Ms. Tise) So, we were talking about how

15   Chico reacted when people who sold drugs for him wanted

16   out and wanted to go to work with somebody else.

17             MR. CORNELIUS:  I object to any answer

18   because that wasn't a question.

19             THE COURT:  I don't think she started her

20   question yet.  That does not require an answer.

21             Proceed with your question.

22   Q.  (By Ms. Tise) And my specific question is:  Did

23   that make him extremely angry?

24   A.  That's right.  He is a very violent person.  He

25   gets angry very quick.

1      Q.   And was he very protective of his drug

2   business?

3      A.   That's right.

4      Q.   Chico didn't think you were a very strong

5   person, did he?

6           MR. CORNELIUS:   Objection to the

7   conclusion.  He can't read Chico's mind.

8           THE COURT:   That's sustained.

9      Q.   (By Ms. Tise) Did Chico ever pick on you

10  because you wouldn't do the things he would do?

11     A.   That's right, the whole time.

12     Q.   Did he call you little names and stuff?

13     A.   That's right.  I can't remember some of them

14  right now, but that's right, he always put me down.

15     Q.   During the time that you knew Chico, where was

16  he living?

17     A.   In Puerto Rico.

18     Q.   Okay.  But back when y'all came to the United

19  States after Puerto Rico, where was he living while he

20  was living here in Houston?

21     A.   Well, at first when he came, first we lived on

22  Broadway and Easton, as I mentioned.

23     Q.   Okay.  And at some point after Angelita came,

24  did they move to another location?

25     A.   That's right.

1    Q.   Do you remember where they moved to?

2    A.   Yes.  We moved here to Broadway.

3    Q.   Okay.  Later do you remember them living in an

4  apartment at another location in Humble?

5    A.   That's right.

6    Q.   And did you stay there yourself sometimes?

7    A.   That's right.

8    Q.   Okay.  Did Angelita live there with him?

9    A.   That's right.

10   Q.   What kind of cars did the defendant have?

11   A.   Well, he had a four-door Chevrolet, blue.

12   Q.   Okay.  And in addition to that, did Angelita

13  have a blue car?

14   A.   Yes.

15   Q.   Okay.  And what kind of car was that?

16   A.   It was a Thunderbird.

17   Q.   Okay.  And did the defendant sometimes loan his

18  cars to people who worked for him?

19   A.   Yes, that's right.

20   Q.   Do you remember a gold-colored Oldsmobile that

21  the defendant owned?

22   A.   That's right.

23   Q.   And is there somebody in particular that he

24  used to lend that car to a lot?

25              There it is on the screen, State's Exhibit

```
 1   37.

 2        A.   Yes.  He lent it for some time to Charlie.  We

 3   called him Charlie.

 4        Q.   Okay.  Did you ever know the defendant to have

 5   any guns?

 6        A.   Yes, that's right.

 7        Q.   What kind of guns did he have?

 8        A.   At the time or the whole time?  Well, he had

 9   guns the whole time.

10        Q.   Okay.  What guns did he have in 1992 that you

11   remember?

12        A.   He had a .45.

13        Q.   Okay.  What else did he have?

14        A.   He had a -- I don't know what you call it.  It

15   was a small one like this and it has a grip like this

16   size and it had a little briefcase that you carry it in,

17   a briefcase (indicating).

18        Q.   Okay.  Did he have any other guns that you

19   remember?

20        A.   In '92?

21        Q.   Uh-huh.

22        A.   Yeah.  He had a .22 rifle and -- a .22 rifle.

23        Q.   Okay.  You worked with him a lot, didn't you?

24        A.   Yes, that's right.

25        Q.   And you spent a lot of time with him, didn't
```

1    you?

2         A.    That's right.

3         Q.    And you got to know, I'm sure, some of the

4    other people who worked for him?

5         A.    Yes, that's right.

6         Q.    I'm going to show you State's Exhibit 89 and

7    ask you if you know that person (indicating)?

8         A.    Yes.  He's called Charlie.

9         Q.    Okay.  And I'm going to show you State's

10   Exhibit 84 and ask you if you know that person

11   (indicating)?

12        A.    Yes, that's right.

13        Q.    And who is that person in State's Exhibit 84?

14        A.    That person, his name is Roger and he's called

15   Bory.

16        Q.    Okay.  What does Bory mean?

17        A.    It's a person who's originally from Puerto

18   Rico.

19        Q.    Okay.  Do you know where he is originally from?

20        A.    Yes, from Puerto Rico.

21        Q.    Okay.  And so, you call him Bory?

22        A.    Yes.  Bory is an abbreviation for Borikae

23   (phonetic), but we call him Bory.

24        Q.    Okay.  Did you also call him Roger sometimes?

25        A.    Yes, that's right.

1      Q.   I'm showing you State's Exhibit 90.  Do you

2   know who that person is (indicating)?

3      A.   (Witness responds in Spanish).

4           THE INTERPRETER:  Your Honor, may the

5   interpreter ask a question for clarification?

6           THE COURT:  Who ask a question?

7           THE INTERPRETER:  The interpreter.  May I

8   ask a question for clarification?

9           THE COURT:  Yes.

10     A.   I had seen that person at a store.  It was

11  there by the Fiesta on Wayside, a store with Chinese

12  people.

13     Q.   (By Ms. Tise) Okay.  Was that person that we're

14  looking at there someone that worked for Chico?

15     A.   Not that I remember.

16     Q.   Okay.  Was that person somebody that had a

17  relationship or close relationship at all with you and

18  Chico?

19     A.   No.

20     Q.   And if you worked for Chico, you would know

21  him, wouldn't you?

22     A.   That's right.

23     Q.   I will show you a picture marked State's

24  Exhibit 87, and ask you if you know that person

25  (indicating)?

1     A.   That's right.

2     Q.   Who's that?

3     A.   That's Diana.

4     Q.   And over time you got to know her pretty well

5  through her working with Chico, correct?

6     A.   That's right.

7     Q.   And State's Exhibit 88, who's that

8  (indicating)?

9     A.   That's Arturo.

10     Q.   Fair to say you knew him pretty well, too?

11     A.   That's right.  That's the husband or the one

12  who lived together with her, with Diana.

13     Q.   Okay.  Did you and Chico go to Arturo's

14  apartment fairly often over time?

15     A.   That's right.

16     Q.   And what was the purpose of those visits?

17     A.   With the purpose of drugs and all.

18     Q.   Okay.  How would that work?  What would y'all

19  do?

20     A.   Well, Ms. Diana sold drugs for Chico, Diana and

21  Arturo as well.

22     Q.   Okay.  And y'all would take drugs there?

23     A.   That's right.

24     Q.   And they would pay you for them?

25     A.   That's right.

1    Q.   And then they would sell them?

2    A.   That's right.

3    Q.   When you would go to their apartment with

4  Chico, would you see little Angelo?

5    A.   That's right.

6    Q.   And would y'all talk to him sometimes?

7    A.   That's right.

8    Q.   And he would recognize Chico if he saw him,

9  wouldn't he?

10   A.   That's right.

11   Q.   And he would recognize you?

12   A.   He sure did, yes.

13   Q.   What kind of relationship did Arturo and Diana

14 have with Chico and Angelita?

15   A.   Well, they were -- they got along well.

16   Q.   They were friends, weren't they?

17   A.   Yes.  Yes, that's right, they were close.  They

18 were friends.

19   Q.   Was there any romantic relationship between

20 Chico and Diana?

21   A.   No.

22   Q.   Okay.  And you know that for certain?

23   A.   Well, to my knowledge.  What I know is that

24 there wasn't.

25   Q.   Okay.  And Chico talked to you about that kind

1    of thing, didn't he?

2         A.   That's right.

3         Q.   Fair to say he was pretty open with you about

4    his women in his life?

5         A.   That's right.

6         Q.   And fair to say he was not faithful to Angelita

7    by any stretch of the imagination?

8         A.   Never.

9         Q.   One of the people that I showed you, Roger or

10   Bory, in State's Exhibit 84, can you tell me how you got

11   to know him?

12        A.   Well, I met him because he came with a friend

13   who was with a friend of mine.

14        Q.   Okay.  Did he start working for Chico?

15        A.   Later, later, yes, we began to -- he came to

16   Chico.

17        Q.   Okay.  He came to Chico for what purpose?

18        A.   Well, he had problems with my friend so he

19   approached Chico and I.

20        Q.   Okay.  And what did he want to do?

21             MR. CORNELIUS:  Objection.  Calls for

22   hearsay.

23             THE COURT:  What was the question again?

24             MS. TISE:  What did he want to do?  He said

25   he approached Chico and I.

1          THE COURT:  That calls for hearsay.  I will

2    sustain it.

3          Q.   (By Ms. Tise) Did he begin -- after he

4    approached you and Chico, did he begin to sell drugs for

5    Chico?

6          A.   Yes, we could say that we were together.

7          Q.   Okay.  When did he come into the picture?  Had

8    he been working with you and Chico for a long time or

9    was that something kind of new in 1992?

10         A.   It was a very short time before that happened.

11   It was for a very short time.

12         Q.   When you say "before that happened," are you

13   talking about the abduction and murder of Angelo?

14         A.   That's right.

15         Q.   I want to talk to you about the night that

16   Angelo was abducted.  Tell me what was going on that

17   night at first.

18         A.   He said:  Let's go to Diana and Arturo's to

19   seek for the drugs -- to seek for my drugs and my money.

20         Q.   Okay.  And you're saying "he."  You're talking

21   about the defendant, Obel Cruz-Garcia?

22         A.   That's right.

23         Q.   Okay.  So, was it just you and Chico when he

24   said:  I want to go to Diana's to get my drugs and

25   money?

1     A.   And Roger.

2     Q.   Okay.  When did y'all first come together that

3 evening, the three of you?

4     A.   Well, I don't remember the exact time, but we

5 were always -- we were together most of the time.

6     Q.   The three of you?

7     A.   Yes, but very few times somebody will be

8 staying in another place and then us at the other one.

9     Q.   So, Roger was kind of new to you and Chico's

10 group, correct?

11     A.   That's right.

12     Q.   But after he joined up with y'all, he was with

13 you all the time?

14     A.   Yes, much time of -- for that short time, we

15 were almost always together.

16     Q.   Okay.  And are we talking just a few weeks?

17     A.   Not exactly.

18     Q.   Okay.  So, you don't remember the exact period,

19 but it was a very short time?

20     A.   Yes.  We're talking about a couple of months

21 or -- months, not weeks.

22     Q.   Okay.  And so, the three of y'all were

23 together.  And what vehicle were y'all in?

24     A.   We were in the blue Chevrolet, the four-door.

25     Q.   Okay.  And who was driving?

1        A.    Obel Cruz-Garcia.

2        Q.    Did he ever let you drive?

3        A.    No.

4        Q.    Where were you sitting?

5        A.    As the passenger in the front.

6        Q.    Okay.  When he said he wanted to go to Diana's,

7   what was the purpose of that?

8        A.    To pick up the money.  His money and his drugs,

9   he said.

10       Q.    Okay.  And so, did you think anything of that?

11       A.    Well, I thought that, well, since we were in

12  that business and we had done stuff like that before,

13  that it was part of the business.

14       Q.    Okay.  So, what did y'all do?

15       A.    Well, we arrived.  We parked on the street

16  behind the apartments.  He said to me:  Sit down at

17  the -- I sat behind the wheel while both of them were

18  going over there to the lady's apartment.

19       Q.    When you say "the lady's apartment," you're

20  talking about Diana and Arturo's apartment?

21       A.    That's right.

22       Q.    And you said you parked on a street behind the

23  apartment?

24       A.    That's right.

25       Q.    Can you tell me a little bit more about that

1    street, where it went to?

2        A.   Yes.   It's a street that is behind the

3    apartments and it leads to the 610 freeway.

4        Q.   Okay.

5             MS. TISE:  May I approach?

6             THE COURT:  Yes.

7        Q.   (By Ms. Tise) I'm going to show you what's been

8    marked as State's Exhibit 79.  Are you familiar with

9    this map picture (indicating)?

10       A.   Yes.

11       Q.   Do you see a red mark on the map indicating

12   where Diana and Arturo's apartment was there on Fairway?

13       A.   That's right.

14       Q.   Okay.  And do you see the street where your

15   vehicle was parked?

16       A.   That's right.

17       Q.   Okay.  Now, do you think it would be helpful

18   for the jury to be able to see that so you can tell them

19   where you were actually at when the offense occurred?

20       A.   That's right.

21            MS. TISE:  Your Honor, at this time, I'd

22   offer State's Exhibit 79.

23            **(State's Exhibit No. 79 Offered)**

24            MR. CORNELIUS:  No objection, Judge.

25            THE COURT:   State's Exhibit No. 79 is

1    admitted without objection.

2                    You may proceed.

3                **(State's Exhibit No. 79 Admitted)**

4        Q.   (By Ms. Tise) And if you look there to the

5    side, can you see the map we were just looking at?

6        A.   That's right.

7        Q.   Okay.  And do you see the little red dot there

8    where Diana and Arturo's apartment is?

9        A.   That's right.

10       Q.   And this would be Fairway, right (indicating)?

11       A.   Yes.

12       Q.   Show us where you were parked.  And you can

13   touch the screen and it will leave a little mark where

14   you touch.

15       A.   Exactly here (indicating).

16       Q.   Okay.  And sitting there, you're kind of a

17   little down the block and around the corner, correct?

18       A.   Yes.

19       Q.   Can you see the door to Diana's apartment from

20   there?

21       A.   No.

22       Q.   Could you see the entrance to her parking lot

23   from there?

24       A.   Yes, it could be seen.  Well, you could see

25   some of it.  Well, right now I don't remember exactly,

 1  but -- but I know that it could because when he was

 2  coming with the little boy I saw him.

 3       Q.   Okay.  And you saw him coming?

 4       A.   That's right.

 5       Q.   Okay.  And we're going to talk about that a

 6  little bit more in a minute.  Okay?

 7       A.   That's right.

 8       Q.   Did you have any way of communicating with him

 9  while he was in that apartment?

10       A.   No.

11       Q.   Nobody had cell phones back then, I guess, did

12  they?

13       A.   Yes.

14       Q.   Well, I guess you're right, a few people did,

15  but did you have any?

16       A.   No.

17       Q.   Okay.  And did Chico have a cell phone?

18       A.   No, he didn't have at that time.

19       Q.   Okay.  In fact, during y'all's drug business

20  y'all used pagers for the most part, correct?

21       A.   Yes, at first we did.

22       Q.   Do you remember when Chico left the car --

23  well, y'all went there and y'all parked, correct?

24       A.   That's right.

25       Q.   Did he say anything to you before he left?

1      A.   No.   Well, I don't remember exactly what he

2   told me, but I do remember that he said for me to wait

3   here behind the steering wheel.

4      Q.   Okay.  So, he made you move over to the

5   driver's side?

6      A.   That's right.

7      Q.   Okay.  Do you remember if he took anything with

8   him when he went to that apartment?

9      A.   What do you mean?  I mean, he always took his

10  weapon.

11     Q.   Okay.  Did he take his weapon to that apartment

12  that night?

13     A.   That's right.

14     Q.   Which weapon did he take?

15     A.   A .45 pistol.

16     Q.   Did anybody go with him?

17     A.   That's right.

18     Q.   Who went with him?

19     A.   Roger, Bory.

20     Q.   Okay.  What does Bory look like, or Roger?

21     A.   What do you mean how does he look like?

22     Q.   We have his picture, but what is his size?

23     A.   He is tall and he is strong build.

24     Q.   A lot bigger than you?

25     A.   That's right.

1      Q.    Bigger than Chico?

2      A.    Yes, that's right.

3      Q.    And he is a dark-complected person, is he not?

4      A.    Yes.

5      Q.    Did Roger have any weapons that you saw?

6      A.    That's right.

7      Q.    What did you see?

8      A.    A small pocketknife from his wallet -- from

9  here on the pants (indicating).

10     Q.    How big was that knife?

11     A.    Like that (indicating).

12     Q.    Okay.  Is it possible that he had other weapons

13 on him that you did not see?

14     A.    I don't think so.

15     Q.    Okay.  What were they wearing?

16     A.    Well, they had masks.

17     Q.    Okay.  What kind of masks?

18     A.    Like those black ones that you put on, like

19 those women's stockings.

20     Q.    Okay.  And could you see part of their face?

21     A.    Not exactly that I remember, but before --

22 before we did the same jobs like that.

23     Q.    Let's talk about this night -- okay -- and what

24 you remember.  Do you remember the masks on this

25 particular night?

 1      A.   Well, to tell the truth, I don't exactly

 2  remember the masks on that night.

 3      Q.   Okay.  So, you know they had masks, but you

 4  don't remember what kind of masks they had?

 5      A.   That's right.  That's right.

 6      Q.   After they left, how long were they gone?

 7      A.   Well, about half an hour, more or less.

 8      Q.   Okay.  And when they came back, what did you

 9  notice about them?  First of all, did they come back at

10  the same time?

11      A.   No.

12      Q.   Okay.  Who came back first?

13      A.   Chico.

14      Q.   How long later did it take for Roger to come

15  back?

16      A.   I don't know exactly.  I don't remember.

17      Q.   Okay.  When Chico came back, did you notice

18  anything about the mask?

19      A.   No.

20      Q.   Okay.  Was he alone?

21      A.   No.  He had the little boy in his arms.

22      Q.   Okay.  Did you see any weapons at that point?

23      A.   Yes.  The .45.

24      Q.   Okay.  What went through your mind when you saw

25  that he had the little boy?

 1      A.   I saw that he was coming, walking with the

 2  little boy in his arms.  I got up from the seat and I

 3  went in front of him and I said to him:  What's going

 4  on?  Why do you have the little boy?

 5      Q.   Okay.  And when we say "the little boy," are we

 6  taking about Angelo Garcia, Jr.?

 7      A.   That's right.

 8      Q.   When you asked him:  What are you doing with

 9  the little boy, what did he say?

10      A.   He saw --

11           THE INTERPRETER:  Interpreter's correction.

12      A.   He said:  He saw me.

13      Q.   (By Ms. Tise) Who said that?

14      A.   Obel Cruz-Garcia.

15      Q.   He said that the little boy saw him?

16      A.   That's right.

17      Q.   And he said that in response to you asking him:

18  Why do you have the little boy?

19      A.   That's right.

20      Q.   What did you do?

21      A.   I said to him:  Well, go tell the baby's

22  mother, go bring her so -- for them to be together so

23  nothing will happen.

24      Q.   Were you worried?

25      A.   Yes.  And very scared at that point.

1        Q.    What did you tell him next?

2        A.    I convinced him to go over for the mother.

3        Q.    Okay.  Did he tell you what had happened

4   upstairs in the apartment?

5        A.    That's right.

6        Q.    What did he tell you happened in the apartment?

7        A.    He said that he had raped Ms. Diana and that he

8   had beaten up Mr. Arturo.

9        Q.    And what did you say about that?  What was your

10  reaction?

11       A.    When he said that to me, I was already very

12  scared.  I was not even -- I couldn't do anything.

13       Q.    And here he is standing there with the little

14  boy.  And so, what did you keep trying to convince him

15  to do?

16       A.    I wanted to convince him to go and get the

17  little boy's mother so nothing will happen to the little

18  boy.

19       Q.    So, what happened next after you tried to

20  convince him of that?

21       A.    He said:  Okay, I will be right back.  And he

22  went right back.

23       Q.    And did you see how far he got?  Did you see

24  where he went?

25       A.    No, not exactly.

1    Q.    How long passed before you saw him again?

2    A.    Not much time.  About -- not more than five

3 minutes, not even five minutes.

4    Q.    Okay.  So, when you saw him again, was he

5 alone?

6    A.    Yes.

7    Q.    Okay.  And did he have the little boy with him?

8    A.    I don't exactly remember if he left the little

9 boy with me or if he took him back.

10    Q.    Okay.  So, when you were trying to convince him

11 to go get Diana, you don't remember if he took the boy

12 with him while he went back or if he went back alone?

13    A.    No, I don't remember exactly, but I believe he

14 left the little boy with me in my arms.

15    Q.    Okay.  And do you know if he went back into the

16 apartment or not?

17    A.    I couldn't tell you, but -- I couldn't see.

18    Q.    But he left for a couple of minutes, right?

19    A.    That's right.

20    Q.    And then what happened when he came back?

21    A.    Well, when he came back alone -- he came back

22 with Bory.  It was -- when they came back, it was one in

23 the front and one was behind.

24    Q.    Okay.  So, Bory was with him?

25    A.    Yes.

1      Q.    And what did he tell you to do?

2      A.    He said:   Move to the back.   And I moved to the

3  back, to the back seat.

4      Q.    Okay.   Did you -- what were you thinking?   The

5  little boy was still there.   What did you say about

6  that?

7      A.    No.   When he came back, I could not say

8  anything else anymore.

9      Q.    Okay.   Did it seem clear to you that he wasn't

10  going to take the little boy back?

11      A.    Yes.   I was already -- inside of me, I was

12  already convinced about that.

13      Q.    Okay.   And Diana didn't come back with him,

14  right, or Arturo?

15      A.    Yes.   When Diana did not come back with him, I

16  was already very scared.   I knew that she was not going

17  to come back.

18      Q.    So, what did you do?

19      A.    I moved to the back where Angelo was here.

20  Angelo was here, I was there, and Bory here

21  (indicating).

22      Q.    So, Angelo was between the two of you in the

23  back seat?

24      A.    That's right.

25      Q.    And did Obel Cruz-Garcia still have his gun?

1    A.   Yes, always in his hand.  He was driving with
2    one hand and the weapon was in the other one.
3    Q.   And what happened at that point?
4    A.   Well, he drove in reverse in the car and then
5    he went to 610.
6    Q.   Okay.  So, he drove up to 610 on that street
7    you were parked on?
8    A.   That's right.
9    Q.   What happened next?
10   A.   Then he took the freeway, 225.
11   Q.   Okay.  And where did he go from there?
12   A.   He headed to Baytown.
13   Q.   Okay.  Did y'all stop on the way?
14   A.   No, never.
15   Q.   Okay.  What happened next?
16   A.   Then next he drove to Baytown and he arrived to
17   Baytown and he came to a place where the street ended --
18   Q.   Okay.
19   A.   -- outside the neighborhood.
20   Q.   Okay.  And was this in Baytown?
21   A.   That's right.
22   Q.   About how far off of 225 was this neighborhood
23   where you stopped?
24   A.   I couldn't tell you exactly, but it was not
25   further deep inside of Baytown.  It was on the outside.

1      Q.   Before you got to Baytown from Pasadena?

2      A.   No, no.   Inside Baytown.

3      Q.   So, it was in Baytown where you stopped?

4      A.   That's right.

5      Q.   Okay.  And what happened when you stopped?

6      A.   We arrived to where the street ended and there

7  was a round space like this (indicating).

8      Q.   A cul-de-sac?  Do you know what a cul-de-sac

9  is?

10     A.   Yes, like a cul-de-sac.  Yes.  And it had like

11 gravel, you know, like little stones.

12     Q.   Okay.  When y'all got to that location, what

13 were you thinking?

14     A.   At that point, I was very -- I was very, very

15 scared.  I knew that by then -- I knew that he was

16 going -- that he was going to kill the little boy.

17     Q.   What happened?  What happened next?

18     A.   Well, he parked.  We arrived.  All three of us

19 opened the doors, we got out.  And he said -- on this

20 side, he told Bory:  You already know what you have to

21 do.

22     Q.   Okay.  So, where were you when you heard that

23 being said?

24     A.   From the time we exited -- when we were exiting

25 the car, he told that to Bory.  And I began walking.  I

1  had taken like one or two steps when he said -- told

2  that to Bory.

3      Q.   And tell me exactly what he said.

4      A.   He said:  You already know what you have to do.

5      Q.   What did you do that point?

6      A.   I continued walking because the car was parked

7  here and I continued walking towards this place because

8  everything got loose in me, I wanted to vomit, I had

9  diarrhea, everything.

10     Q.   And did you actually have to go to the

11 bathroom?

12     A.   Yes.

13     Q.   Were you able to remove your clothes in time?

14     A.   Yes.  I pulled my pants down and I was able to

15 go to the bathroom.

16     Q.   And you defecated?

17     A.   Yes.

18     Q.   Did you hear anything else?

19     A.    I saw when he was walking with the gun in his

20 hand.  He approached me and he said:  Hey, what are you

21 doing?  And I said:  I'm using the restroom.  And he

22 said okay and he just stared.  And I don't know, I think

23 he walked toward the car.

24     Q.   After you heard him tell Bory:  You know what

25 you have to do, did you hear anything?

1    A.   That's right.

2    Q.   What did you hear?

3    A.   The scream from the little boy, the complaint.

4    Q.   What did you do next?

5    A.   Well, that's when I was walking for the

6 restroom.

7    Q.   So, you are on the way and you are about to go

8 to the bathroom on yourself?

9    A.   That's right.

10    Q.   And that's when you heard that?

11    A.   Yes, that's right.

12    Q.   And then after you defecated, Chico walked over

13 to you with a gun?

14    A.   That's right.

15    Q.   And that's when he said:  What are you doing?

16    A.   That's right.

17    Q.   Did he say anything else to you at that point?

18    A.   No.  I just said to him:  I'm using the

19 bathroom.  I just answered the question.

20    Q.   What happened next?

21    A.   Then I finished and I walked to the car.  And

22 when I'm getting to the car, there I found both of them

23 and the little boy, the body of the little boy dead.

24    Q.   And did you see any blood?

25    A.   That's right.  Yes.  The little boy had blood

1   all over here (indicating).

2       Q.   Could you tell where he had been stabbed?

3       A.   No.

4       Q.   What did you do next?

5       A.   He ordered -- he ordered Bory and I to put the

6   body in the back seat.

7       Q.   And did you do that?

8       A.   That's right.

9       Q.   Then what happened?

10      A.   Then he drove again to the neighborhood.  And

11  then about to leave the neighborhood and exit 146 --

12  that's the freeway -- that's the freeway over in

13  Baytown, right?

14      Q.   Well, you tell me.  Do you remember?

15      A.   Right, yes.

16      Q.   Okay.  So --

17      A.   I don't exactly remember if it was 176 or 146.

18      Q.   Okay.  But you exited from 225 to another

19  roadway in Baytown?

20      A.   Yes, but that was to go back already.

21      Q.   Okay.  And what did y'all do with the little

22  boy?

23      A.   Well, we arrived -- he arrived to somewhere

24  next to a river.

25      Q.   Okay.  And was that river that you are talking

1  about in Baytown, the Baytown area?

2       A.   Yes.

3       Q.   And when y'all got there, what did you do with

4  the little boy?

5       A.   He ordered -- we got out of the car and he

6  ordered us to take the body -- I'm sorry.  He ordered us

7  to take the body and to dump it into the river.

8       Q.   And did you do that?

9       A.   That's right.

10      Q.   Did Bory help you?

11      A.   That's right.

12      Q.   When you put the body in the water, what

13 happened?

14      A.   He ordered us to go and get something to put in

15 the body so it would sink under the water so it wouldn't

16 be seen.

17      Q.   Did you do that?

18      A.   That's right.

19      Q.   What did you put on the body?

20      A.   It was Bory and I -- me and I tried to find

21 rocks.

22      Q.   Okay.  And --

23      A.   And I remember putting one or two.  I don't

24 remember exactly how many.

25      Q.   Okay.  Then what did y'all do?

1      A.    Next I remember that the body would not sink

2  very much.    We left it for a little while, but it didn't

3  sink much.    And after that, we came out of the water and

4  we came here to -- again to 45 to where we lived by 225.

5      Q.    Did anyone talk about anything that you

6  remember?

7      A.    No, I don't remember.   Me, I couldn't talk.   He

8  would just order and I would just do.

9      Q.    And did he have the gun still on him and in his

10 hand when y'all were in Baytown putting that body in the

11 water?

12     A.    All the time.   We're there in the water and he

13 is standing right there and the whole time he is

14 standing with the gun like this (indicating).

15     Q.    After y'all left, did y'all head back toward

16 Pasadena?

17     A.    That's right.

18     Q.    And did something happen on the way back?

19     A.    That's right.

20     Q.    What happened?

21     A.    The tires of the car began blowing up.

22     Q.    Okay.   When you say "blowing up," what do you

23 mean?

24     A.    Well, one blue up and then the others did.   All

25 four of them blew up that I remember.

1    Q.    And what did y'all do?

2    A.    Well, right now I can't remember exactly how we

3    were able to take the car to the parking lot of the

4    hotel.

5    Q.    Okay.  What hotel are you talking about?

6    A.    A hotel that is right there on 225.  He would

7    always rent a room there and we did with Angelita.

8    Q.    So, this was a hotel y'all stayed at pretty

9    often?

10    A.    Yes, before.

11    Q.    Do you remember it being called the Pasadena

12    Motor Inn?

13    A.    I'm not sure, but I believe so.

14    Q.    And do you remember anything about the sign at

15    that motel or anything distinctive about it?

16    A.    No, but what I do remember is that here next to

17    it there was like big machinery, like trucks parking

18    next to the hotel.

19    Q.    Okay.  And did y'all sell drugs at that motel

20    sometimes?

21    A.    That's right.

22    Q.    After the tires went flat, y'all somehow

23    managed to get the car to that hotel.  Is that your

24    memory?

25    A.    Yes.

1     Q.   Then what did you do?

2     A.   At the hotel or what?

3     Q.   Did y'all leave the hotel?  Did y'all stay?

4     A.   No.  We were there for a short time.  I don't

5  remember exactly, but -- and there he made us swear --

6  Bory and I swear to him that we'll never say anything

7  about this to anybody.

8     Q.   Okay.  Did y'all try to make arrangements to

9  get another car?

10    A.   Yes.  Charlie was the option.

11    Q.   Okay.  And so, what did y'all do to try to get

12  a car from Charlie?

13    A.   I don't remember -- exactly remember, but it

14  was a -- his own car that he had lent Charlie.

15    Q.   Okay.  Whose own car?

16    A.   Obel Cruz-Garcia's.

17    Q.   Okay.  Are you talking about the gold

18  Oldsmobile that we looked in the picture earlier?

19    A.   That's right.

20    Q.   So, were y'all trying to get that car somehow

21  or another?

22    A.   That's right.

23    Q.   So, what did y'all do to do that?

24    A.   I don't remember exactly, but I believe that we

25  arrived to the place where Charlie lives in a taxi.

1    Q.   So, you went to Charlie's house -- Charlie's

2  apartment in a taxi?

3    A.   It's very possible that's the way it was, but I

4  don't remember exactly.

5    Q.   Okay.  Were y'all able to get the car from

6  Charlie?

7    A.   That's right.

8    Q.   Do you remember going in Charlie's apartment

9  and seeing him there with Linda, his girlfriend?

10    A.   That's right.

11    Q.   And would you say at that point in time you

12  were still pretty upset, pretty nervous?

13    A.   Yes, I was.  Anybody who knew me would see that

14  something big was happening to me.

15    Q.   After y'all got the car, do you remember where

16  you went?

17    A.   I only remember that we went back to the house,

18  but I was very scared.

19    Q.   And when you say "the house," are you talking

20  about Chico's house in Humble?

21    A.   That's right.

22    Q.   Did Bory go back to Chico's house with you?

23    A.   No.

24    Q.   Do you know where he went?  When did y'all

25  separate, in other words?

```
 1        A.   Well, I couldn't exactly tell you if Bory
 2   stayed at the hotel where the car was parked or at
 3   another cheaper hotel, one less expensive.
 4        Q.   It's been a long time, I know, but --
 5        A.   Yes.  I don't remember.
 6        Q.   Do you remember the next day at Chico's house?
 7        A.   That's right.
 8        Q.   What was Chico doing the next day?
 9        A.   We went and picked up Rendon and tires to
10   change them from the car.
11        Q.   Okay.  Did Chico tell you anything about
12   leaving Houston?
13        A.   That's right.
14        Q.   And tell us about that conversation.
15        A.   He said:  I'm leaving.  Aren't you leaving?
16   And I said:  No, no, I'm not going anywhere.
17        Q.   Okay.  And did he tell you where he was going
18   to go?
19        A.   Well, I don't exactly remember, but to me in my
20   mind I believe he went to the Dominican Republic.
21        Q.   Okay.  He told you he was leaving Houston?
22        A.   That's right.
23        Q.   And was this a planned trip that he had or
24   something that he was doing because of what happened to
25   Angelo?
```

1      A.   No.  It was because he knew what he did.

2      Q.   So, that wasn't something that he had been

3  planning to do for a while, he was going to go back

4  home, or anything like that, right?

5      A.   No, never.  He knows -- he knows that was

6  because of what he did, what we did.

7      Q.   Did he have some things he had to do before he

8  left?

9               MR. CORNELIUS:  Judge, could we take a

10  break?

11               THE COURT:  Yes.  Take the jury out.

12               THE BAILIFF:  All rise.

13               (Recess)

14               (Open court, defendant and jury present)

15               THE COURT:  Please be seated.

16               We are ready to proceed with the direct

17  examination of the witness Carmelo Santana, also known

18  as Rudy.

19               However, before we resume, ladies and

20  gentlemen, the interpreter has a correction as to one of

21  the responses made by this witness.  So, he is going to

22  restate the question that was asked by Ms. Tise and the

23  response that he originally gave and then his

24  correction.

25               Please proceed.

1                    THE INTERPRETER:  Thank you, Your Honor.

2                    Well, the question from the prosecutor was:

3    What did you hear?

4                    The answer -- the response of the

5    interpreter was:  The screams from the little boy, the

6    complaint.

7                    And the correction is:  Instead of

8    "complaint," it's "moan."

9                    THE COURT:  Okay.  So, the correction is as

10   to only the one word.  That you said "complaint" and it

11   should have been "moan"?

12                   THE INTERPRETER:  Instead of complaint.

13                   THE COURT:  Very well.

14                   Ms. Tise, you may proceed.

15                   MS. TISE:  Thank you, Judge.

16       Q.   (By Ms. Tise) That next morning or that next

17   day after the little boy was killed, were there some

18   things that Chico needed to do before he left Houston?

19       A.   Yes.

20       Q.   And did he take you with him to do those

21   things?

22       A.   That's right.

23       Q.   Where did y'all go?

24       A.   Well, we changed the -- we went to change the

25   tires of the car.

1    Q.   Okay.  And that's that blue Chevy you were

2    talking about?

3    A.   That's right.

4    Q.   And then what did you do?  Is there a specific

5    garage y'all went to to get some assistance in doing

6    that?

7    A.   No.  It's a man that has a garage behind his

8    apartment, from the place where he lived.

9    Q.   Okay.  And do you know who that man was?

10   A.   That's -- people call him Rendon.

11   Q.   Okay.  And Rendon had a little garage across

12   from his apartments?

13   A.   Yes.  There's a house in the front and then in

14   the back he lives upstairs and he works downstairs.

15   Q.   And was Rendon a friend and associate of yours

16   and Chico's?

17   A.   Yes, he was.  Yes.

18   Q.   What did y'all do after y'all fixed the tires

19   on the blue Chevy?

20   A.   We went to the car wash to wash the car.

21   Q.   Okay.  And why did y'all need to wash the car?

22   A.   Well, it was all dirty with the blood of the

23   little boy and -- the blood of the little boy and I

24   think also with vomit or spit or something.

25   Q.   Was that also from Angelo?

1        A.   Yes, that's right.

2        Q.   After y'all washed the car, what did y'all do

3    with that car?

4        A.   We sold it.

5        Q.   Okay.  And what did Chico do with the money he

6    got from selling the car?

7        A.   He bought the flight ticket.

8        Q.   A plane ticket for Puerto Rico or -- was it

9    Puerto Rico or the Dominican?

10       A.   I don't know.  I don't remember exactly.

11       Q.   And that was all the same day, the day after

12   the little boy, Angelo, was killed?

13       A.   That's right.

14       Q.   When was his flight scheduled to leave?

15       A.   It was -- the flight was in the morning, in the

16   early morning.

17       Q.   Okay.  And how did Chico get to the airport for

18   that flight?

19       A.   I took him.  I took him myself.

20       Q.   That would have been Friday, correct?

21       A.   That's right.

22       Q.   After you took Chico to the airport, did you go

23   back over to the apartment in Humble?

24       A.   That's right.

25       Q.   And was Angelita still there at that time on

1  Friday?

2      A.   That's right.

3      Q.   Did y'all decide to stay in the apartment or do

4  something else?

5      A.   No.  We decided to move.

6      Q.   Okay.  And did you help Angelita move that

7  weekend?

8      A.   Yes.  And Charlie and also his wife or his

9  girlfriend.  I don't know.

10     Q.   Okay.  And where did y'all stay at that point

11  in time?

12     A.   We went to rent a room at the hotel.

13     Q.   And is that the same Pasadena Motor Inn?

14     A.   Yes, that's right.

15     Q.   And how long did you and Angelita stay there in

16  the motel?

17     A.    It was only about -- I can't remember exactly

18  how many days because Angelita had to go to court and

19  then she had to do time for that.

20     Q.   Okay.  After you weren't staying at the motor

21  inn anymore, where did you stay?

22     A.    I don't remember exactly.  Right now, I can't

23  remember exactly, but I was always with my friend

24  when -- I would always go with my friend when I didn't

25  have anywhere to go.

1    Q.   After you took Chico to the airport that

2  morning, did you ever see him again until you were here

3  in Houston for this case?

4    A.   That's right, I never saw him again.

5    Q.   And you are currently being housed in the

6  Harris County Jail?

7    A.   Yes.

8    Q.   And so is the defendant?

9    A.   That's right.

10    Q.   And you have seen him a couple of times in

11  passing in the jail, correct?

12    A.   That's right.

13    Q.   But other than that, before y'all were both

14  here in the jail together, you didn't see him ever again

15  after you dropped him off at the airport?

16    A.   No.

17    Q.   When was the last time you saw Angelita?

18    A.   Well, she came to visit me when I was in

19  prison.

20    Q.   Okay.  How long ago?

21    A.   In 1998.

22    Q.   Is that the last time you have seen her?

23    A.   That's right.

24    Q.   Over the years, police officers have come to

25  talk to you about this case, haven't they?

1     A.   That's right.

2     Q.   And you didn't tell them all the stuff that

3  you've told us today, did you?

4     A.   No, not in the beginning.

5     Q.   Why not?

6     A.   Well, I was very scared.  I didn't want

7  anybody -- anybody to know what happened on that night.

8  I didn't want to die --

9          THE INTERPRETER:  I'm sorry.  Interpreter

10  correction:  I wanted to die.

11     A.   I wanted to die taking that inside of me

12  without anybody knowing it.

13     Q.   (By Ms. Tise) At some point a couple of years

14  ago while you were in prison in Pennsylvania, do you

15  remember an agent with the FBI named Bill Ebersole

16  coming to see you?

17     A.   Yes, I do.

18     Q.   Is he the first person that you told the whole

19  story to?

20     A.   That's right.

21     Q.   Why?

22     A.   Because I couldn't take it anymore.  I couldn't

23  live with that inside of myself.

24     Q.   When Special Agent Ebersole came to talk to

25  you, did he make any promises about your case?

1       A.   No.

2       Q.   Did he offer any special deals or say you were

3   going to get any benefit from this?

4       A.   No, no way.

5       Q.   Was there -- was this something, you know, that

6   you did because anybody offered you something to do it?

7       A.   No, never.

8       Q.   And you know as you sit there that you could be

9   charged with a crime, don't you?

10      A.   That's right.

11      Q.   And you could get in a lot of trouble?

12      A.   That's right.

13      Q.   What happened to the knife?

14      A.   When we were on 59 coming towards -- on 59

15  north, he gave me the knife and he told me to throw it

16  away, throw it away.

17      Q.   Who told you to throw it away?

18      A.   Obel Cruz-Garcia.

19      Q.   Do you think if you had the opportunity to see

20  the person that you called Bory or Roger again you would

21  recognize him?

22      A.   Yes, of course.

23           MS. TISE:  And, Judge, at this time, I'd

24  like to have the person we know as Rogelio Aviles

25  Barroso brought out.  And I'd request permission for the

1    witness to step down.  We can do it when he comes in.

2                    THE COURT:  For what purpose?

3                    MS. TISE:  I want them to stand next to

4    each other, the defendant and Roger and -- Mr. --

5                    THE COURT:  Approach the bench.

6                    MS. TISE:  Okay.

7                    (At the Bench, on the record)

8                    THE COURT:  What is the purpose of that?

9                    MS. TISE:  I told you.  Remember?  I told

10   you I wanted to have them stand next to each other

11   because of the height difference in the individuals.

12                    THE COURT:  He is in jail?

13                    MS. TISE:  He doesn't have to move.  Just

14   stand there at counsel table.

15                    MR. MADRID:  Wouldn't have to stand

16   side-by-side --

17                    THE COURT:  Ten feet apart?

18                    MS. TISE:  That's fine.

19                    THE COURT:  Let's do it one at a time.  Is

20   that good?

21                    MS. TISE:  Uh-huh.

22                    (Open court, defendant and jury present)

23                    THE COURT:  All right.  You may proceed,

24   Ms. Tise.

25                    The witness may step down.

```
 1                    (Witness complies)
 2                    THE COURT:  Did you have a question,
 3    Ms. Tise?
 4                    MS. TISE:  No.  That's all.
 5                    And can the defendant stand up?
 6                    THE COURT:  Please stand, Mr. Obel
 7    Cruz-Garcia.
 8                    (Defendant complies)
 9                    THE COURT:  Okay.  Very good.
10                    Did you want to ask him anything about --
11    the witness on the stand anything about the person
12    that's --
13                    MS. TISE:  I will, but I'll have him return
14    to the witness stand.
15                    THE COURT:  Very good.  Okay.  You may take
16    your seat again, Mr. Santana.
17                    (Witness complies)
18                    THE COURT:  Are we ready to take the
19    prisoner back?
20                    MS. TISE:  Yes.
21                    THE COURT:  You may return.
22        Q.  (By Ms. Tise) Did you recognize that individual
23    that they brought out?
24        A.  Well, not exactly.
25        Q.  If I show you some pictures, do you think it
```

1  will help you?

2       A.   Let's see.

3              MS. TISE:  May I approach?

4              THE COURT:  You may approach.

5       Q.   (By Ms. Tise) Let me show you what's been

6  marked as State's Exhibit 34 and have you take a look at

7  those (indicating).

8       A.   Yes, this is Roger.

9       Q.   These photos are Roger, correct?

10      A.   Yes, yes.

11      Q.   He looks a little different now that he's in

12 the Harris County Jail, doesn't he?

13      A.   I don't know him.  He looks so different.

14      Q.   He looks different.  And he's lost some weight,

15 has he not?

16      A.   Yes, a lot.

17      Q.   I'm going to show you this photo.  Do you

18 recognize the person in this first photo as the person

19 you know as Roger (indicating)?

20      A.   Yes.  Yes, that's right.

21      Q.   And you recognize this person as the person you

22 know as Roger, correct?

23      A.   Okay.

24      Q.   I want to show you some other photos.  Do you

25 recognize this person as the person you know as Chico

1    (indicating)?

2         A.    That's right.

3         Q.    And do you recognize this photo as how Chico

4    looks now (indicating)?

5         A.    Yes, that's right.

6         Q.    And do you recognize this as you (indicating)?

7         A.    That's right.

8         Q.    And this photo is you now (indicating)?

9         A.    That's right.

10        Q.    And do you recognize this person as Angelita

11   Rodriguez (indicating)?

12        A.    Yes.

13        Q.    And do you recognize Diana Garcia (indicating)?

14        A.    That's right.

15        Q.    Arturo Rodriguez (indicating)?

16        A.    That's right.

17        Q.    And Bienviendo Melo (indicating)?

18        A.    That's right.

19        Q.    And Leonardo German (indicating)?

20        A.    That's right.

21               MS. TISE:   At this time, I'm going to offer

22   State's Exhibit 34.   It's a series of photos of the

23   individual involved in this case.

24               **(State's Exhibit No. 34 Offered)**

25               (At the Bench, on the record)

1          MR. CORNELIUS:  Other than the picture of

2    my client, this picture, the one that is supposed to be

3    contemporaneous to when this occurred, I object.  I've

4    already objected to all of these pictures, unless they

5    have not been offered yet.  If they were offered, I have

6    not -- I did object to them not being relevant.  And

7    with respect to Roger, he didn't identify Roger.

8          MS. TISE:  He identified Roger's current

9    picture in here, which is --

10          MR. CORNELIUS:  His current picture?

11          MS. TISE:  Well, you know --

12          MR. CORNELIUS:  He's identifying a picture

13   of him the way he looked then.

14          MS. TISE:  This is a picture of the way he

15   looks, his current driver's license photo.  This is what

16   we arrested him based on.

17          MR. CORNELIUS:  I understand, but he could

18   not identify him --

19          MS. TISE:  I'm not offering that.  I'm

20   offering this picture that he did identify him in.

21          MR. CORNELIUS:  That's not relevant.  It

22   doesn't matter what he looks like now for purposes of

23   this trial.

24          MS. TISE:  It is relevant.  That's how we

25   linked it all up with the investigator.

```
 1                    MR. CORNELIUS:  That will be the basis of
 2      my objection.
 3                    THE COURT:  Let me see.  So, these are both
 4      now back then?
 5                    MS. TISE:  Yes.
 6                    THE COURT:  Same on each page?  He did --
 7      because I couldn't see, but he did identified that.
 8                    MS. TISE:  Yes, he did state -- he's
 9      identified this one.
10                    THE COURT:  This is him.  And all the
11      others he identified.  Okay.  I'm going to let it in
12      over objection.
13                    (Open court, defendant and jury present)
14                    THE COURT:  State's No. 34 is admitted over
15      objection.
16                    You may proceed.
17                    (State's Exhibit No. 34 Admitted)
18                    MS. TISE:  May I publish Page 2 of State's
19      Exhibit 34?
20                    THE COURT:  Yes.
21          Q.   (By Ms. Tise) Can you see the photos we're
22      talking about?
23          A.   That's right.
24          Q.   You can see them there on the screen next to
25      you.
```

1      A.    That's right.

2      Q.    And do you recognize the individual in both of

3   those photos?

4      A.    That's right.

5      Q.    And who is the person in this photo?

6      A.    That's Roger, Bory.

7      Q.    And do you recognize this photo is also Roger?

8      A.    That's right, Bory.

9      Q.    An aged Roger, but Roger?

10     A.    Yes, ma'am, that's right.

11     Q.    We talked about, Rudy, the fact that when the

12  special agent went up to interview you, he didn't make

13  you any promises, correct?

14     A.    No.

15     Q.    And you told this whole story to him, correct?

16     A.    That's right.

17     Q.    And when you told that story to him, you had

18  never met me or Mr. Wood?

19     A.    That's right.

20     Q.    Basically, that all happened up in Pennsylvania

21  when you were in custody and Agent Ebersole came to see

22  you?

23     A.    That's right.

24     Q.    Have Justin or I or any member of the D.A.'s

25  office ever made you any promises about this case?

1       A.   No, never.

2       Q.   Have we ever told you that you are going to get

3  any kind of special deal based on your testimony?

4       A.   No, never.

5            MS. TISE:   Pass the witness.

6            THE COURT:   Thank you, Ms. Tise.

7            Mr. Cornelius, you can proceed.

8            MR. CORNELIUS:   I'm not ready to proceed

9  right now.   And I can reserve until I put my case on,

10 but I'm not ready to proceed right now with cross.   I'll

11 reserve until I put my case on.   I don't mean to slow it

12 down...

13           THE COURT:   Are you passing this witness at

14 this time?

15           MR. CORNELIUS:   Yes.

16           THE COURT:   Are you saying you're ready to

17 finish for the day?

18           MR. CORNELIUS:   No.   I'm ready to go with

19 something else, I'm just not ready to cross him today.

20           THE COURT:   Okay.

21           MS. TISE:   I do have Agent Ebersole here.

22 He's fairly.   If we could do him today, that would

23 probably be good so he can get back to Pennsylvania.

24           THE COURT:   Then let's have this witness

25 step down.   And because I'd like to go to 5:30 if we

1  can, have this witness step down and we'll reserve him

2  for later as well if you need to call him back,

3  Mr. Cornelius.

4                  Please call your next.

5                  MS. TISE:  I will call Agent Ebersole.

6                  THE BAILIFF:  Your Honor, this agent has

7  not been sworn.

8                  THE COURT:  Thank you, Deputy.

9                  (Witness sworn)

10                  THE COURT:  Please keep your voice up and

11  speak into that microphone.

12                  You may proceed, Ms. Tise.

13                          **WILLIAM EBERSOLE,**

14  having been first duly sworn, testified as follows:

15                      **DIRECT EXAMINATION**

16  **BY MS. TISE:**

17      Q.   Would you introduce yourself, please, sir?

18      A.   Ma'am, my name is Special Agent William

19  Ebersole.  My last name is spelled E-b-e-r-s-o-l-e.  I'm

20  employed with the Federal Bureau of Investigations and

21  have been so employed since October 15th, 1995.

22      Q.   Okay.  Can you tell us a little bit about your

23  training and background?

24      A.   My undergraduate degree is in accounting.  I

25  have in excess of 20 credits in Spanish.  I have a law

1   degree.  And I worked briefly as a county prosecutor in

2   Pennsylvania.  I was a state narcotics agent for about a

3   year in Pennsylvania.  And I joined the FBI in 1995.  I

4   completed a 16-week training course in Quantico,

5   Virginia, and was assign to Newark, New Jersey, where I

6   worked drug trafficking, Colombian, Katerina, and South

7   American drug traffickers.  And in June of 1999, I was

8   transferred to Central Pennsylvania where I've worked a

9   variety of drug, white-collar crime, terrorism, a

10  variety of investigations.

11       Q.   Okay.  Were you asked to assist a federal agent

12  named Eric Johnson from here in Houston on a questioning

13  of a defendant who was housed in a facility in

14  Pennsylvania?

15       A.   Yes, I was.

16       Q.   And when did that happen?

17       A.   Approximately two years.  A little bit more.

18       Q.   Okay.  And was the individual that you were

19  asked to interview a person named Carmelo Martinez?

20       A.   Yes, ma'am.

21       Q.   Okay.  Where did you locate him?

22       A.   The Mashan Valley (phonetic) Correctional

23  Institute.

24       Q.   And prior to going and talking to him, did you

25  review some information?

1       A.   Yes.   Special Agent Johnson sent some

2  background reports, investigative reports up to me in my

3  office so I could be familiar with the investigation and

4  be able to question Mr. Martinez.

5       Q.   Okay.   And did you spend some time reviewing

6  those things?

7       A.   Yes, I did.

8       Q.   In addition, did you review some photos?

9       A.   Yes, I did.

10      Q.   Okay.   After reviewing those things, how did

11  you approach Carmelo Martinez when you went to interview

12  him?

13      A.   Well, myself and an agent from the Pittsburgh

14  field office, we went to the correctional facility.

15  Obviously, we had to have their permission.   And we sat

16  down with him and advised him of why we were there,

17  advised him of his right to have an attorney if he so

18  desired, and a general background introduction.   And we

19  let him know that we were interested in discussing this

20  particular case.

21      Q.   Okay.   Then what happened?

22      A.   We had a discussion and interview of him.   We

23  showed him various pictures that were provided to us

24  through Special Agent Johnson.   And it took a while, but

25  gradually he gave a statement that he had firsthand

1  knowledge of some of the events that happened on the

2  night in question.

3      Q.   And when you went to talk to him, you really

4  didn't know that, did you?

5      A.   No.   I went under the belief that, perhaps,

6  because he was a friend or he was close to the

7  defendant, maybe some statements would have been made to

8  him.   And I was to try to elicit those statements.

9      Q.   But you had no idea going in that he was going

10  to ultimately describe to you actually being a witness

11  to the murder of Angelo Garcia, Jr.?

12      A.   I had no idea he would give me the information

13  he gave me, no.

14      Q.   When you talked to him -- are you a Spanish

15  speaker?

16      A.   I'm proficient in Spanish.   I wouldn't say I'm

17  fluent, but I'm proficient and I've used it successfully

18  in a number of investigations.

19      Q.   And when you went in to interview him, you knew

20  that he had been uncooperative with law enforcement in

21  the past?

22      A.   That's correct.

23      Q.   Okay.   And had pretty much denied knowledge?

24      A.   Correct.

25      Q.   After you talked to him for a while, was there

1    sort of a touchstone that seemed to change his

2    willingness to give you information?

3         A.   I believe talking to him about his son or sons

4    and showing him the photographs of the victim, I think

5    was helpful.

6         Q.   And, ultimately, after initially refusing to

7    give you a statement or not giving you a statement, he

8    did give you one, didn't he?

9         A.   That is correct.

10        Q.   And at the end of the statement, he basically

11   made himself -- he was a witness actually to the event

12   and how the little boy was killed?

13        A.   Yes.

14        Q.   When approaching someone to do an interview

15   like this, I'm assuming that you've had extensive

16   training in that regard?

17        A.   We have training at Quantico as new agents.

18   And we get specialized training depending on how our

19   career path takes us.  So, I've had training and

20   experience.

21        Q.   Is it fair to say that when doing this kind of

22   interview, you are going to want to withhold a lot of

23   the details that you know from your review of the

24   reports?

25        A.   Correct.

1          Q.    And why is that?

2          A.    Well, you want to get their assessment of the

3    facts, what knowledge they have.  You don't want them to

4    parrot back information.

5          Q.    And did you implement that technique in this

6    case?

7          A.    Yes.

8          Q.    For instance, when you talked to him, did you

9    withhold things like the body dump site of the child?

10         A.    I don't recall knowing the body dump site.  I

11   didn't know a whole lot about the case, but if I did

12   have that specific knowledge, I would not have given it

13   to him, no.

14         Q.    So, that came from him, correct, the fact that

15   the body was --

16         A.    Yes.  The description of the body being dumped

17   into the water somewhere.  He gave me some various

18   locations.  I don't know the area, but that came from

19   him.

20         Q.    Okay.  And the roadways that he took in order

21   to get to that location, you not being from Houston,

22   those wouldn't have been something you would have known?

23         A.    No.  I just took the notes and worked the

24   report.

25         Q.    The details of what happened up in the

1  apartment as described by the witnesses up there were

2  not things that you disclosed to him prior to him giving

3  you a statement?

4      A.   No.

5      Q.   The details of the evidence and the witnesses

6  that were available to HPD were not things that you gave

7  to him during your interview?

8      A.   No.   During our introduction, we did tell him

9  that there is a case being made and we gave a very

10  general statement to him; but specifics, we did not

11  release that.

12     Q.   And that's because you want to see if he is

13  going to come up with those details?

14     A.   That is correct.

15     Q.   Does the fact that he comes up with those

16  details on his own lend credibility to what he is

17  saying?

18     A.   Yes.

19     Q.   Especially when those details are corroborated

20  by physical evidence at the scene?

21     A.   Yes, if it is corroborated.   I'm not aware of

22  what was recovered from the scene.

23     Q.   At this point in time, you are not one of the

24  investigators on this case?

25     A.   No.   I just did the one interview and then I

1    was out of it.

2         Q.   And your knowledge was then and is now pretty

3    limited?

4         A.   Yes, ma'am.

5         Q.   When you talked to Obel Cruz-Garcia -- I mean,

6    when you talk to Carmelo Martinez Santana, did you

7    explain to him that you could not promise him anything

8    about what would happen to him based on any involvement

9    that he might have had?

10        A.   That is correct.

11        Q.   Did you explain to him that you couldn't offer

12   him any kind of special deal, that you didn't have the

13   authority to do that?

14        A.   That is correct.

15        Q.   Did you ever threaten him or coerce him in any

16   way?

17        A.   No.

18        Q.   Did he ever ask for an attorney while you were

19   talking to him?

20        A.   No.  We did give him an advice of rights form

21   in Spanish, that he requested in Spanish.  And overall,

22   the majority of the interview was in English.  He had

23   been here a number of years.  And at no point did he

24   request an attorney.

25        Q.   So, when you say an advice of rights form, what

1   are you talking about?

2      A.   The Miranda rights.  That you have a right to

3   remain silent; if you want an attorney, one will be

4   provided even if you can't afford one.

5      Q.   Did he actually sign that form and indicate

6   that he understood it?

7      A.   Yes.

8      Q.   Okay.  And, again, did he ever ask for an

9   attorney prior to revealing his statement to you?

10      A.   No.

11            MS. TISE:  I'll pass the witness.

12            THE COURT:  Okay.  Thank you, Ms. Tise.

13            You may proceed.

14            MR. CORNELIUS:  Judge, I can't go forward

15   today.  I got new information about all of this just

16   now.

17            THE COURT:  Okay.  So, you need to break

18   and bring this witness back in the morning?  You'll be

19   prepared to go forward in the morning; is that what

20   you're saying?

21            MR. CORNELIUS:  Yes, ma'am.  Well, can we

22   approach the bench?

23            THE COURT:  Sure.

24            (At the Bench, on the record)

25            THE COURT:  I can give you a few minutes.

1          MR. CORNELIUS:  I can't do it today.  It's

2     sort of the cart before the horse.  Anyway, I have to

3     cross-examine Rudy before to lay any predicate.  If

4     there is anything inconsistent with what he told this

5     FBI agent, I mean -- you see what I'm saying?

6          THE COURT:  I can't recollect, but you

7     passed the opportunity to cross-examine Rudy.

8          MR. CORNELIUS:  Well -- I'm sorry?

9          THE COURT:  We'll have to bring him back

10    tomorrow then.

11         MS. TISE:  You can review his report now.

12         MR. CORNELIUS:  I can and I will go as far

13    as I can go now.  I'll be happy to do that.  I can't

14    guarantee --

15         THE COURT:  I'll look for you to try.

16    Otherwise, he'll be here overnight.

17         MR. CORNELIUS:  Okay.  I will try.

18         THE COURT:  Considering the expense and

19    sick wife, do you think you can get through everything?

20    Let's try.  If you just can't, then we'll have to bring

21    him back.

22         MR. CORNELIUS:  What I'm concerned about --

23    I don't know what Rudy is going to say when I

24    cross-examine him about this conversation.

25         MS. TISE:  You're not cross-examining him

1    tomorrow.  You are not going to know that tomorrow

2    either.

3                    THE COURT:  Yeah.

4                    MS. TISE:  How long will we be leaving him

5    here?

6                    MR. CORNELIUS:  As long as this case takes.

7    I don't know.  I don't know.  I have a right to

8    cross-examine him.

9                    THE COURT:  Let's continue the cross this

10   afternoon and see how far you can get.  And at a later

11   date, if you have to bring him back --

12                   MR. CORNELIUS:  Okay.  Can I have a recess

13   to read this?

14                   THE COURT:  Yes.

15                   (Open court, defendant and jury present)

16                   THE COURT:  Let's recess for about five

17   minutes.  Can you take the jury out?

18                   THE BAILIFF:  All rise.

19                   (Recess)

20                   (Open court, defendant present, no jury)

21                   MR. CORNELIUS:  I want to go on the record

22   about something.

23                   THE COURT:  How long is the report?

24                   MR. CORNELIUS:  Ten or fifteen pages.

25                   THE COURT:  Mr. Cornelius, did you want to

1   put something on the record?

2                   MR. CORNELIUS:  Yeah.  I want to make sure

3   we understand each other.  I don't have a responsibility

4   to go through your file and figure out what's in your

5   file.  I don't have to do that.  If I wasn't given this

6   and you knew you were going to call the witness, then

7   how do I know --

8                   MS. TISE:  I have e-mail after e-mail to

9   you, Skip, that I can print out saying:  Please come by

10  and see my file.  It's opened to you.  In fact, when you

11  stopped by my office last week with Lester Blizzard,

12  I --

13                  THE COURT:  I don't think we need to put

14  this all on the record.

15                  MR. CORNELIUS:  Well --

16                  THE COURT:  If you want to argue, we'll go

17  off the record.

18                  MR. CORNELIUS:  I'm not going to go try to

19  figure out what's in your file.

20                  MS. TISE:  I told you.  I said --

21                  MR. CORNELIUS:  I'm not going to go through

22  20 boxes of DNA records.

23                  MS. TISE:  I told you, Skip, you need to

24  come by and see my file.

25                  THE COURT:  All right.  Let's go off the

1    record, Mary Ann.

2                    (Discussion off the record)

3                    (Open court, defendant present, no jury)

4                    THE COURT:   After discussions with all

5    parties, we're going to break for today and give

6    Mr. Cornelius an opportunity to review the 15-page

7    report that he has not seen on this witness.  And we'll

8    start back up on cross-examination of the witness,

9    Special Agent Bill Ebersole, in the morning at 10:00.

10   Okay?

11                   Bring in the jury.

12                   (Open court, defendant and jury present)

13                   THE COURT:   Please be seated.

14                   After further consideration and speaking

15   with the lawyers and the witness, we're going to break

16   for the day and bring this witness back in the morning

17   for continuation and cross-examination of this witness.

18                   As we break, I want to remind you that you

19   should not talk amongst yourselves or with anyone else

20   on any subject connected with the trial or to form or

21   express any opinion thereon until the end of this trial.

22                   I also want to remind you, as you might

23   have noticed, there are cameras that are recording parts

24   of this.  They're all instructed not to record anything

25   about the jury and you are not going to see yourself on

```
 1   TV.  So, don't go looking there, but things might be
 2   reported on TV that haven't -- that you have not heard.
 3   Because anything that's said in this courtroom, even
 4   when you're taken out, could possibly end up on TV.  So,
 5   I'm going to instruct you not to watch any of the news
 6   channels tonight or any of the nights of the trial.  I
 7   hope that you haven't already.  And I think that was
 8   part of my earlier admonishments, but I wanted to remind
 9   you of that.
10              So, we'll break for today.  I think we're
11   all tired.  We'll be back and resume the trial at 10:00
12   in the morning.
13                   THE BAILIFF:  All rise.
14                   (Open court, defendant present, no jury)
15                   THE COURT:  Okay.  We're in recess till
16   10:00 in the morning.
17                   (Proceedings recessed)
18
19
20
21
22
23
24
25
```

1                        **REPORTER'S CERTIFICATE**

2    THE STATE OF TEXAS   )
     COUNTY OF HARRIS     )

3

4         I, Mary Ann Rodriguez, Official Court Reporter in

5    and for the 337th District Court of Harris County, State

6    of Texas, do hereby certify that the above and foregoing

7    contains a true and correct transcription of all

8    portions of evidence and other proceedings requested in

9    writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13        I further certify that this Reporter's Record of

14   the proceedings truly and correctly reflects the

15   exhibits, if any, admitted by the respective parties.

16        WITNESS MY OFFICIAL HAND this the 3rd day of

17   October, 2013.

18

19

20

21   /s/ Mary Ann Rodriguez
     Mary Ann Rodriguez, Texas CSR 3047
22   Expiration Date:  12/31/2013
     Official Court Reporter
23   337th Court
     1201 Franklin
24   Houston, Texas   77002
     713.755.7746
25

**$**

**$800** - 104:7

**'**

**'85** - 83:18
**'92** - 82:14, 129:21
**'93** - 35:1
**'skip'** - 2:11

**/**

**/s** - 189:21

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**10** - 1:3, 2:4
**10-minute** - 108:11
**108** - 1:9, 1:20
**10:00** - 187:10, 188:12, 188:17
**10th** - 1:20
**11** - 2:4
**1100** - 46:10
**116** - 1:11, 1:22
**12/31/2013** - 189:22
**1200** - 46:15
**1201** - 2:6, 189:23
**1225** - 2:15
**13** - 2:5
**138** - 2:8
**1384794** - 1:3, 3:3, 79:21
**139** - 2:8
**14** - 34:22
**146** - 152:12, 152:18
**15** - 1:5, 1:23
**15-page** - 187:7
**15th** - 175:22
**16** - 2:9
**16-week** - 176:5
**16th** - 49:4
**17** - 2:9
**170** - 2:3
**172** - 2:3
**175** - 1:12, 1:16
**176** - 152:18
**18** - 19:17, 118:10
**18-month** - 34:25
**189** - 1:13
**1970** - 35:22, 36:13, 36:14
**1980s** - 59:24, 60:1, 67:7, 118:12
**1981** - 34:2
**1985** - 83:18
**1986** - 5:17, 5:19, 34:20, 83:18
**1987** - 34:22
**1988** - 34:23
**1989** - 86:13, 86:23, 89:9
**1990s** - 55:15, 59:24, 60:1, 67:8
**1992** - 6:16, 10:19, 10:21, 11:16, 34:24, 40:16, 40:25, 53:11, 56:16, 58:7, 58:13, 60:3, 60:5, 60:6, 60:7, 61:4, 62:4, 62:24, 64:19, 65:6, 67:3, 67:11, 67:17, 68:7, 96:11, 105:10, 119:11, 129:11, 135:10
**1993** - 5:19, 82:14
**1995** - 5:23, 175:22, 176:4
**1998** - 5:24, 164:22

**1999** - 6:2, 176:8
**1st** - 105:9

**2**

**2** - 23:3, 172:19
**20** - 1:2, 1:1, 1:5, 1:6, 1:7, 1:8, 1:9, 1:11, 1:12, 1:13, 1:16, 1:17, 1:18, 1:19, 1:20, 1:22, 1:23, 1:24, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 16:5, 16:15, 16:16, 16:20, 16:21, 16:24, 17:1, 176:1, 186:23
**2000** - 82:13
**2001** - 6:8, 6:14
**2004** - 35:19, 36:14, 37:11
**2005** - 71:4
**2006** - 71:19
**2007** - 43:1, 48:14
**2008** - 49:4, 49:22, 51:1, 51:2, 52:3, 56:3, 72:19, 72:23, 73:4, 73:17, 73:23, 73:25, 74:18, 78:3, 110:17
**2010** - 34:3, 71:8
**2013** - 1:20, 1:3, 189:17
**2028** - 2:12
**21st** - 73:24, 74:18, 78:3
**22** - 129:23
**225** - 148:11, 148:23, 152:19, 154:5, 155:7
**23** - 1:5, 1:24
**23rd** - 51:1, 51:2
**24** - 19:17
**24039247** - 2:5
**28** - 1:5, 1:24
**2nd** - 105:9

**3**

**3,000** - 36:13
**3047** - 189:21
**30th** - 52:3
**33** - 1:6, 1:18, 47:3
**337th** - 1:12, 189:5, 189:23
**34** - 2:22, 169:7, 170:23, 170:25, 172:15, 172:18, 172:20
**37** - 95:16, 129:2
**3rd** - 109:16, 189:16

**4**

**4** - 1:5, 1:23
**40** - 35:8
**440** - 2:15
**45** - 81:3, 129:13, 141:16, 143:24, 154:5

**5**

**55** - 2:4, 10:6, 10:24, 10:25, 11:2, 11:5
**59** - 1:6, 1:18, 166:15
**5:30** - 175:1
**5th** - 48:14, 56:3

**6**

**6-year-old** - 24:14, 25:4, 25:8, 25:22, 37:15
**61** - 13:4, 13:7, 13:10, 13:14
**610** - 138:4, 148:6, 148:7
**64** - 2:5, 13:5, 13:12, 13:14, 13:15, 13:17, 13:19, 13:22, 14:1
**65** - 2:6, 75:9, 75:17, 75:18, 76:2, 77:4, 77:5, 77:9, 77:22, 77:25
**66** - 1:7, 1:19, 2:7, 75:9,

75:25, 76:9, 77:4, 77:5, 77:9, 77:22, 77:25
**68** - 1:7, 1:19

**7**

**70** - 1:8, 1:17
**700** - 104:7
**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 189:24
**713.877.9400** - 2:16
**77** - 2:6, 2:7
**77002** - 2:6, 189:24
**77002-1659** - 2:16
**77019-2408** - 2:13
**79** - 2:8, 138:9, 138:23, 138:24, 139:1, 139:4

**8**

**80** - 1:9, 1:20
**80s** - 41:19, 60:6, 67:4
**83** - 91:19
**84** - 91:16, 130:11, 130:14, 134:11
**85** - 91:9
**87** - 131:25
**88** - 132:8
**89** - 90:15, 90:18, 130:7

**9**

**90** - 91:13, 131:2
**90s** - 41:19, 43:25
**92** - 10:19
**9:00** - 101:25

**A**

**abbreviation** - 130:23
**abdomen** - 26:17
**abducted** - 24:25, 135:17
**abduction** - 25:1, 135:14
**ability** - 8:8, 8:11, 8:13
**able** - 7:17, 11:17, 12:14, 17:20, 18:16, 20:20, 23:19, 29:18, 30:18, 31:1, 37:10, 40:14, 43:4, 43:17, 45:8, 46:5, 50:4, 50:8, 52:12, 52:19, 54:20, 54:22, 55:13, 59:11, 61:22, 74:17, 97:13, 138:19, 150:14, 150:15, 155:4, 157:6, 177:5
**above-entitled** - 1:21
**above-styled** - 189:5
**academy** - 34:18, 35:5
**accepting** - 62:19
**accident** - 8:5
**accidental** - 23:13, 24:10, 25:8
**accidently** - 21:11
**accompanied** - 76:13
**accounting** - 175:25
**accurately** - 16:8
**act** - 24:14
**actual** - 10:15, 13:14, 31:24, 47:7, 72:9
**addicted** - 122:25
**addition** - 12:23, 18:12, 49:14, 128:13, 177:9
**additional** - 48:18, 77:7
**address** - 81:4
**Admitted** - 2:1, 11:5, 13:22, 17:1, 77:25, 139:4, 172:18
**admitted** - 11:3, 13:20, 16:25, 77:23, 139:2, 172:15, 189:15
**admonishments** - 188:9

**adult** - 120:7
**advanced** - 24:21, 59:22
**advancements** - 37:8
**advice** - 182:21, 183:1
**advised** - 177:17, 177:18
**Affairs** - 34:25, 35:1, 37:20, 62:5, 67:17
**affect** - 8:8
**afford** - 183:5
**afield** - 63:22
**afraid** - 123:19
**afternoon** - 80:11, 80:12, 97:3, 97:5, 116:8, 116:9, 185:11
**afterwards** - 87:13
**aged** - 173:10
**agencies** - 34:8
**agent** - 50:8, 51:12, 165:16, 173:13, 175:7, 176:3, 176:12, 177:14, 184:6
**Agent** - 3:10, 69:12, 70:4, 72:25, 73:5, 73:17, 165:25, 173:22, 174:22, 175:6, 175:19, 177:2, 177:25, 187:10
**agent's** - 50:19
**agents** - 50:5, 179:18
**ago** - 34:15, 90:24, 110:19, 164:21, 165:15
**agree** - 59:4, 98:15
**agreed** - 56:15
**ahead** - 69:11
**aided** - 1:24
**aim** - 43:7
**airport** - 103:2, 103:3, 103:6, 162:18, 162:23, 164:2, 164:16
**alarming** - 97:10
**alleged** - 112:2
**allegedly** - 67:13
**allow** - 57:5, 59:7, 62:11, 62:17, 62:20, 62:24, 64:17, 65:13, 65:22
**allowed** - 58:9, 62:12
**allowing** - 66:8
**almost** - 136:16
**alone** - 143:21, 146:6, 146:13, 146:22
**Alphabetical** - 1:15
**altered** - 8:15
**American** - 176:8
**analysis** - 48:13, 57:6, 64:21, 65:1, 65:8, 67:6, 67:14
**analyze** - 8:12
**anatomic** - 6:2
**anatomy** - 19:9
**Angelita** - 1:9, 1:21, 55:18, 79:23, 80:6, 80:22, 92:13, 108:17, 117:22, 118:2, 119:23, 120:7, 120:22, 120:24, 121:2, 127:24, 128:9, 128:13, 133:15, 134:7, 155:8, 163:1, 163:7, 163:16, 163:19, 164:18, 170:11
**Angelo** - 10:8, 11:10, 13:4, 24:14, 37:15, 93:12, 93:13, 93:15, 93:17, 96:12, 97:19, 98:5, 98:18, 101:13, 102:23, 107:7, 107:13, 112:3, 133:5, 135:14, 135:17, 144:7, 147:20, 147:21, 147:23, 159:1, 162:1, 162:13, 178:12
**Angelo's** - 107:11
**angle** - 27:14
**angry** - 124:6, 124:25, 125:3, 126:24, 127:1

**ankle** - 18:9
**Ann** - 58:19, 62:14, 187:2, 189:4, 189:21
**annex** - 46:15
**annual** - 35:8
**answer** - 60:22, 107:17, 117:11, 117:13, 126:18, 126:21, 160:5
**answered** - 113:3, 151:20
**answers** - 117:7
**anyway** - 56:24, 57:12, 64:1
**Anyway** - 184:3
**Ap-77,025** - 1:4
**apart** - 167:18
**apartment** - 54:15, 92:4, 94:3, 94:9, 94:10, 94:12, 94:14, 94:23, 96:16, 96:17, 97:25, 98:1, 101:2, 101:4, 101:14, 101:21, 102:9, 102:16, 104:10, 113:7, 121:10, 125:20, 128:5, 132:15, 133:4, 137:19, 137:20, 137:21, 137:24, 138:13, 139:9, 139:20, 140:10, 141:9, 141:12, 145:5, 145:7, 146:17, 157:3, 157:9, 161:9, 162:24, 163:4, 181:2
**apartments** - 92:2, 94:5, 94:8, 137:17, 138:4, 161:13
**Apartments** - 94:4
**apologize** - 60:23
**Appeals** - 1:4
**appear** - 13:6, 31:13, 103:19, 111:9, 111:14
**appeared** - 47:11
**Appellant** - 1:7
**Appellee** - 1:12
**Approach** - 167:6
**approach** - 9:25, 12:25, 14:4, 16:2, 17:6, 46:25, 56:10, 75:4, 77:11, 90:11, 125:8, 138:6, 169:4, 169:5, 177:12, 183:23
**approached** - 134:20, 135:1, 135:5, 150:21
**approaching** - 179:15
**appropriate** - 14:19
**area** - 22:1, 25:11, 46:3, 58:20, 74:15, 81:5, 84:4, 153:2, 180:19
**argue** - 186:17
**arguing** - 88:6, 102:4, 107:4
**arms** - 18:3, 143:22, 144:3, 146:15
**arrange** - 52:19
**arrangement** - 95:10
**arrangements** - 156:9
**arrested** - 171:17
**arrived** - 86:11, 86:15, 86:18, 86:23, 87:1, 87:14, 87:17, 89:9, 92:2, 119:17, 124:9, 137:16, 148:17, 149:7, 149:19, 152:24, 157:1
**articles** - 39:16
**Arturo** - 39:24, 48:7, 52:17, 53:6, 53:7, 89:24, 92:25, 93:4, 93:23, 97:11, 98:11, 100:25, 113:9, 113:11, 114:14, 125:21, 132:10, 132:22, 133:14, 145:9, 147:15, 170:16
**Arturo's** - 93:20, 132:14, 135:19, 137:21, 138:13, 139:9
**asphyxia** - 8:18, 8:20
**assault** - 38:11, 39:20,

46:11, 47:10, 48:4
**assess** - 8:13
**assessment** - 180:3
**assign** - 176:6
**assigned** - 34:16, 34:19
**assignment** - 73:4
**assist** - 176:12
**assistance** - 161:6
**Assistant** - 2:5
**assistant** - 70:20, 71:6, 110:21, 111:15
**associate** - 161:16
**associated** - 38:8
**associates** - 89:20, 89:22
**association** - 53:15, 91:4
**assorted** - 18:1
**assuming** - 179:16
**attempt** - 48:5, 66:6, 126:8
**attempted** - 49:25
**attend** - 35:8
**attended** - 5:18
**attention** - 72:18
**attitude** - 124:21, 124:24
**attorney** - 110:15, 110:22, 177:18, 182:19, 182:25, 183:4, 183:10
**attorneys** - 3:5, 3:20
**Attorneys** - 2:5, 2:7, 2:17
**authority** - 182:14
**autopsies** - 32:2
**autopsy** - 5:13, 6:15, 7:12, 7:13, 10:11, 10:16, 10:21, 12:24, 16:6, 17:21, 21:1, 22:19, 23:2, 28:10, 28:11, 28:21, 30:11, 30:13
**available** - 36:15, 36:17, 42:13, 42:14, 181:7
**Aviles** - 44:8, 44:11, 166:25
**Aviles-barroso** - 44:8, 44:11
**awake** - 98:8
**aware** - 102:11, 103:18, 181:22

## B

**Baby** - 93:13
**baby's** - 144:22
**bachelor's** - 5:17
**background** - 5:15, 175:24, 177:3, 177:19
**bad** - 88:11, 88:25
**bag** - 45:15, 45:24, 46:23, 46:24
**bags** - 99:18
**bailiff** - 3:17, 4:2
**Bailiff** - 4:3, 4:11, 33:11, 58:2, 69:14, 79:13, 79:17, 79:25, 108:1, 115:21, 159:13, 175:7, 185:19, 188:14
**Barroso** - 167:1
**barroso** - 44:8, 44:11
**base** - 29:9
**Based** - 21:7, 21:14
**based** - 15:11, 21:12, 23:18, 26:5, 29:12, 31:17, 31:24, 32:4, 38:16, 41:4, 171:17, 174:4, 182:9
**basis** - 172:2
**bathroom** - 150:12, 150:16, 151:9, 151:20
**bathtub** - 124:12
**Bayamon** - 74:4, 74:11
**Baylor** - 60:9
**Baytown** - 148:13, 148:17, 148:18, 148:21, 149:1, 149:2, 149:3, 149:4, 152:14, 152:20, 153:2, 154:11

**beaten** - 20:7, 145:9
**beating** - 126:4
**Beaumont** - 5:17
**become** - 93:4
**bed** - 101:19, 101:20, 101:24
**bedroom** - 97:23, 102:2
**began** - 5:21, 71:8, 123:9, 134:16, 150:1, 154:22
**begin** - 36:10, 39:14, 135:4, 135:5
**beginning** - 43:7, 84:23, 84:24, 165:5
**behind** - 41:8, 41:23, 42:5, 101:6, 124:11, 137:17, 137:18, 137:23, 138:3, 141:4, 146:24, 161:8
**belief** - 178:6
**belong** - 76:22, 76:23
**bench** - 14:4, 125:8, 167:6, 183:23
**Bench** - 14:7, 56:12, 77:13, 125:11, 167:8, 171:1, 183:25
**benefit** - 166:4
**better** - 27:5, 118:20, 123:13
**between** - 7:22, 18:9, 36:14, 49:21, 110:20, 123:22, 133:20, 147:23
**beyond** - 37:11
**Bienviendo** - 44:2, 54:10, 55:11, 170:18
**big** - 25:25, 123:3, 142:11, 155:18, 157:15
**bigger** - 141:25
**Bigger** - 142:2
**Bill** - 165:16, 187:10
**biological** - 37:1, 39:24, 41:8, 48:21
**biology** - 5:17, 5:20
**bit** - 5:14, 34:15, 38:19, 39:2, 92:24, 101:10, 115:17, 138:1, 140:7, 175:23, 176:18
**black** - 142:19
**blade** - 19:15
**blew** - 155:1
**Blizzard** - 186:12
**block** - 139:18
**blood** - 14:2, 14:23, 15:1, 15:9, 15:10, 151:25, 152:1, 161:23, 161:24
**Blood** - 15:2, 15:4, 42:4
**bloodless** - 15:4
**blowing** - 154:22, 154:23
**blue** - 78:7, 83:1, 83:7, 95:5, 95:24, 128:12, 128:14, 136:25, 154:25, 161:2, 161:20
**board** - 6:2
**boat** - 21:11
**bodies** - 15:6
**body** - 9:19, 12:20, 15:3, 20:22, 24:8, 26:3, 26:7, 29:17, 30:15, 54:18, 107:11, 151:24, 152:7, 153:7, 153:8, 153:13, 153:16, 153:20, 154:2, 154:11, 180:10, 180:11, 180:16, 180:17
**Bogota** - 70:19, 70:22, 71:12
**bone** - 18:5, 18:7, 18:13, 19:12, 19:14, 19:22, 28:22
**bones** - 11:18, 11:21, 12:5, 12:19, 17:13, 18:1, 18:3, 18:7, 18:8, 18:10, 18:15, 19:7, 19:9, 19:19, 19:21, 19:24, 19:25, 20:5,

26:1, 26:3, 26:6, 26:10, 26:21, 26:22, 26:23, 27:5, 27:8, 27:13, 27:17, 28:13, 30:7
**border** - 71:9
**Borikae** - 130:23
**Bory** - 130:16, 130:17, 130:22, 130:23, 130:24, 134:11, 141:20, 141:21, 146:23, 146:25, 147:21, 149:21, 150:1, 150:3, 150:25, 152:6, 153:11, 153:21, 156:7, 157:23, 158:2, 166:21, 173:7, 173:9
**boss** - 123:5, 123:25
**bought** - 162:8
**box** - 8:4, 46:23, 47:7, 47:18, 47:19, 75:19, 75:22, 76:18
**boxes** - 186:23
**boy** - 25:8, 25:22, 93:18, 97:2, 97:9, 107:5, 107:6, 110:12, 111:4, 112:20, 114:7, 114:10, 140:3, 143:22, 144:1, 144:3, 144:5, 144:6, 144:10, 144:16, 144:19, 145:15, 145:19, 146:8, 146:10, 146:12, 146:15, 147:6, 147:11, 149:17, 151:4, 151:24, 152:1, 152:23, 153:5, 160:6, 160:18, 161:24, 162:13, 179:13
**boy's** - 145:18
**Bradley** - 110:22
**Branch** - 5:18, 5:23
**break** - 79:12, 107:24, 108:11, 159:11, 183:18, 187:6, 187:16, 187:19, 188:11
**Brief** - 22:14, 22:18, 56:9
**brief** - 69:10
**briefcase** - 129:17, 129:18
**briefly** - 77:11, 176:2
**bring** - 4:2, 65:24, 66:13, 113:11, 120:22, 144:23, 183:19, 184:10, 184:21, 185:12, 187:17
**Bring** - 187:12
**Broadway** - 121:10, 121:11, 127:23, 128:3
**brought** - 67:9, 82:5, 85:3, 107:13, 167:1, 168:24
**Brown** - 5:21
**buccal** - 73:6, 73:9, 73:10, 73:18, 74:20, 74:23, 75:1, 75:2, 75:15, 75:20, 75:21, 76:1, 76:3, 76:5, 76:14, 78:3, 78:14
**Buccal** - 2:6, 2:7
**Buffalo** - 2:12
**build** - 141:24
**bullet** - 11:21
**Bureau** - 70:16, 175:21
**business** - 81:22, 89:18, 120:18, 123:10, 126:12, 127:3, 137:13, 137:14, 140:20
**buy** - 92:4

## C

**Calm** - 98:19
**calm** - 107:15
**cameras** - 187:24
**cancer** - 7:25
**Candido** - 44:8, 44:9, 44:12, 54:10
**cannot** - 38:23, 108:4, 108:7

**capital** - 55:25
**car** - 95:16, 95:19, 95:20, 128:14, 128:16, 128:25, 140:23, 148:5, 150:1, 150:7, 150:24, 151:22, 153:23, 153:6, 154:22, 155:4, 155:24, 156:10, 156:13, 156:15, 156:16, 156:21, 157:6, 157:16, 158:3, 158:11, 161:1, 161:21, 161:22, 162:3, 162:4, 162:7
**cardboard** - 75:19, 75:22
**career** - 34:1, 34:16, 34:17, 35:2, 35:13, 179:20
**Carmelo** - 1:11, 1:22, 44:4, 85:10, 115:12, 116:3, 116:12, 159:18, 176:20, 177:12, 182:7
**carry** - 129:17
**cars** - 95:1, 128:11, 128:19
**cart** - 184:3
**Case** - 35:20, 36:4, 46:3
**case** - 3:18, 7:14, 9:17, 9:21, 10:3, 10:13, 11:22, 12:12, 17:24, 21:13, 21:18, 24:4, 24:13, 27:22, 29:16, 32:19, 37:2, 37:15, 37:19, 37:22, 37:25, 38:4, 38:6, 38:21, 39:3, 39:11, 39:15, 40:16, 41:3, 42:9, 42:15, 42:25, 43:3, 43:15, 43:20, 45:9, 46:7, 51:5, 51:20, 52:8, 55:24, 61:3, 61:7, 61:11, 61:22, 63:10, 63:21, 63:25, 64:16, 64:18, 65:7, 65:19, 67:12, 67:18, 67:22, 73:5, 73:19, 75:15, 76:4, 76:15, 78:22, 92:18, 92:19, 92:22, 108:4, 109:25, 114:18, 164:4, 165:1, 166:1, 170:24, 174:1, 174:10, 174:12, 177:21, 180:7, 180:12, 181:10, 181:25, 185:7
**cases** - 5:11, 8:21, 9:2, 9:6, 15:20, 35:16, 36:7, 36:16, 36:18, 36:21, 36:22, 36:25, 37:1, 37:9, 38:15, 41:4, 58:7, 59:23, 62:7
**Castillo** - 110:23
**caught** - 92:18
**causes** - 8:1, 8:17, 9:1
**cavity** - 19:18
**cell** - 140:12, 140:18
**Cellmark** - 47:22, 48:3, 48:22, 50:13, 50:16, 50:23, 51:14, 51:17, 51:21
**Cellmark's** - 52:5
**cells** - 41:23, 42:5, 58:16
**Central** - 176:9
**centralize** - 46:5
**certain** - 57:6, 58:14, 62:13, 67:19, 133:23
**Certificate** - 1:13, 189:1
**certificate** - 8:5
**certified** - 6:2
**certify** - 189:6, 189:13
**Cesar** - 124:4, 124:10
**challenging** - 8:16
**chambers** - 189:12
**chance** - 21:17
**change** - 61:19, 158:11, 160:25, 179:2
**changed** - 160:25
**channels** - 188:7
**Chappell** - 110:21
**charge** - 55:25
**charged** - 166:10
**Charlie** - 90:22, 90:23, 129:3, 129:4, 130:9, 156:11,

156:13, 156:15, 157:1, 157:7, 163:9
**Charlie's** - 157:2, 157:9
**cheaper** - 158:4
**check** - 8:4
**cheek** - 73:13
**chemical** - 5:9
**chest** - 17:19, 19:18, 26:11
**Chevrolet** - 128:12, 136:25
**Chevy** - 96:8, 96:9, 161:2, 161:20
**Chico** - 84:15, 122:2, 123:4, 124:16, 124:21, 126:16, 127:5, 127:10, 127:16, 131:15, 131:19, 131:21, 132:6, 132:14, 132:21, 133:5, 133:9, 133:15, 133:21, 134:1, 134:15, 134:17, 134:18, 134:20, 135:1, 135:5, 135:6, 135:9, 135:24, 140:18, 140:23, 142:2, 143:14, 143:18, 151:13, 158:9, 158:12, 160:19, 162:6, 162:18, 162:23, 164:2, 170:1, 170:4
**Chico's** - 127:8, 136:10, 157:21, 157:23, 158:7, 161:17
**chief** - 5:2
**child** - 20:12, 20:13, 21:10, 24:19, 25:4, 30:24, 31:7, 31:16, 180:10
**children** - 81:9, 81:11, 84:20
**Chinese** - 131:12
**choice** - 8:5, 8:6
**choose** - 36:11
**cigar** - 39:21, 41:17, 41:20, 42:6, 44:23, 45:2, 45:9, 46:1, 48:5, 54:14, 55:2, 56:23, 58:15, 63:1
**cigarettes** - 88:15
**cigars** - 88:18, 88:19
**Cindy** - 109:7
**circumstances** - 8:22, 8:25, 9:10, 20:25, 24:4, 24:9, 25:13, 27:22, 29:14, 30:22, 31:24, 57:6, 125:23
**City** - 52:15
**city** - 34:20
**clarification** - 131:6, 131:9
**clarify** - 83:8
**classification** - 8:2, 29:6
**clavicle** - 18:5, 19:12, 19:13
**clear** - 59:5, 61:20, 65:14, 66:5, 147:10
**clearly** - 29:7
**client** - 171:3
**close** - 19:1, 74:5, 93:6, 131:18, 133:18, 178:7
**closer** - 93:6
**closure** - 56:25, 57:9, 66:11
**clothes** - 99:22, 150:14
**clothing** - 12:23, 13:3, 13:4, 14:24, 15:3, 15:10, 21:18, 22:3, 54:17
**cocaine** - 122:9, 122:11, 122:25
**Codis** - 43:8, 43:10, 43:11, 43:16, 43:21, 49:11, 49:13, 49:15
**Codis-worthy** - 43:8
**coerce** - 182:16
**cold** - 35:16, 36:8, 38:14, 38:21, 41:3, 43:15, 46:7, 55:24
**Cold** - 35:20, 36:4, 46:3

**collar** - 18:5, 19:13, 176:10
**collect** - 72:6
**collected** - 39:7, 41:17, 41:20, 75:15, 76:6, 76:17, 76:20
**collecting** - 21:24
**collector** - 72:2
**Colombian** - 176:7
**color** - 83:10
**colored** - 128:21
**Combined** - 43:11
**comfortable** - 88:24, 115:18
**coming** - 64:4, 64:5, 68:20, 97:14, 103:9, 140:3, 140:4, 144:2, 165:17, 166:15
**commenting** - 28:20
**committed** - 125:15
**common** - 6:24, 25:17, 25:21, 27:24
**commonly** - 73:14
**communicating** - 140:9
**compare** - 51:19, 88:8
**compared** - 44:19, 48:23
**comparison** - 48:8, 51:24
**complaining** - 52:7
**complaint** - 151:4, 160:7, 160:9, 160:11, 160:13
**complected** - 142:4
**complete** - 5:13
**completed** - 5:19, 5:23, 6:1, 176:5
**complies** - 19:2, 168:2, 168:9, 168:18
**computer** - 1:24
**computer-aided** - 1:24
**concerned** - 11:18, 98:18, 184:23
**conclude** - 20:6, 78:21
**conclusion** - 6:22, 12:17, 127:8
**conclusions** - 12:14, 32:3
**condition** - 45:11, 45:22, 46:17, 46:21, 47:12
**conducted** - 10:21
**confessed** - 112:19
**confessing** - 109:11, 110:12
**confessions** - 59:25, 60:20, 67:9
**confuse** - 64:6
**confusing** - 63:23, 64:8, 64:16
**conjunction** - 50:3
**connected** - 47:25, 55:9, 187:21
**connection** - 55:24, 93:20, 111:11
**consider** - 26:2, 44:14
**consideration** - 187:15
**Considering** - 184:19
**consistent** - 12:20
**contact** - 73:21, 74:3, 74:17, 105:19, 105:22, 105:23, 106:2
**contained** - 66:10, 75:17, 75:25, 76:9
**contains** - 43:12, 189:7
**contemporaneous** - 171:4
**continuation** - 187:18
**continue** - 185:10
**continued** - 123:10, 150:7, 150:8
**control** - 123:10, 123:12, 123:13, 124:1
**controls** - 123:18
**conversation** - 98:25, 99:3, 99:6, 100:13, 106:7,

110:20, 158:15, 184:25
**convicted** - 92:21
**convince** - 145:15, 145:17, 145:21, 146:11
**convinced** - 122:18, 122:19, 145:3, 147:13
**cooperative** - 52:23
**coordinating** - 50:17
**copy** - 2:2
**Cornelius** - 2:11, 3:5, 11:1, 13:11, 13:16, 13:18, 14:4, 14:8, 15:15, 15:17, 16:2, 16:4, 16:11, 16:13, 16:15, 16:17, 16:20, 17:2, 17:6, 17:9, 17:9, 18:20, 18:24, 19:6, 20:4, 21:22, 22:8, 22:11, 22:15, 22:19, 23:5, 27:10, 28:3, 28:4, 28:6, 28:9, 32:22, 32:23, 33:5, 41:11, 53:23, 54:3, 54:23, 56:6, 56:10, 56:14, 56:24, 57:3, 57:11, 57:14, 57:19, 57:23, 58:17, 59:9, 59:16, 61:13, 62:17, 63:5, 63:15, 65:10, 65:23, 66:1, 66:5, 66:12, 66:18, 66:19, 66:21, 67:24, 68:12, 68:15, 68:24, 69:4, 77:6, 77:14, 77:18, 79:2, 79:3, 79:7, 108:22, 108:23, 109:1, 109:2, 113:5, 114:21, 114:25, 115:6, 124:18, 125:8, 125:12, 126:10, 126:18, 127:7, 134:22, 138:25, 159:10, 171:2, 171:11, 171:13, 171:18, 171:22, 172:2, 174:8, 174:9, 174:16, 174:19, 175:4, 183:15, 183:22, 184:2, 184:9, 184:13, 184:18, 184:23, 185:7, 185:13, 185:22, 185:25, 186:1, 186:3, 186:16, 186:19, 186:22, 187:7
**corner** - 139:18
**Correct** - 16:10, 17:23, 26:15, 29:25, 30:3, 37:7, 38:3, 40:6, 42:21, 43:23, 47:8, 67:15, 79:9, 178:25, 180:1
**correct** - 3:10, 9:3, 9:4, 9:7, 10:13, 10:17, 12:7, 12:11, 17:3, 17:22, 17:25, 18:18, 20:7, 20:8, 20:15, 21:16, 22:21, 23:1, 23:4, 23:15, 23:17, 24:1, 24:6, 24:12, 25:9, 26:12, 26:18, 26:24, 27:20, 28:13, 28:14, 28:17, 28:22, 28:23, 29:3, 29:5, 29:11, 29:14, 30:1, 30:2, 30:4, 30:19, 31:2, 31:8, 31:25, 32:1, 32:21, 40:5, 40:10, 41:2, 41:6, 43:17, 44:13, 46:12, 49:6, 51:6, 65:8, 65:9, 65:10, 66:25, 67:14, 68:9, 68:10, 68:16, 72:24, 73:19, 73:20, 74:1, 74:19, 74:22, 78:20, 105:13, 109:3, 109:5, 111:7, 111:18, 111:22, 111:25, 113:13, 113:15, 114:4, 118:6, 119:1, 119:9, 119:13, 132:6, 136:11, 139:18, 140:21, 140:24, 162:21, 164:12, 169:10, 169:23, 173:14, 173:16, 178:23, 179:10, 180:15, 181:15, 182:11, 182:15, 189:7
**correction** - 94:20,

144:12, 159:21, 159:25,
160:8, 160:10, 165:11
**Correctional** - 176:23
**correctional** - 177:15
**correctly** - 113:6, 189:14
**corroborated** - 181:20,
181:22
**counsel** - 3:4, 25:25,
167:15, 189:9
**country** - 23:25
**County** - 1:9, 1:23, 5:3,
5:7, 5:25, 6:8, 6:17, 6:25,
164:7, 169:13, 189:2, 189:5
**county** - 176:2
**couple** - 25:24, 28:6,
58:21, 68:12, 89:23, 136:21,
146:19, 164:11, 165:14
**course** - 7:13, 8:6, 11:20,
18:12, 19:21, 34:17, 35:3,
35:13, 40:11, 166:23, 176:5
**court** - 3:1, 4:4, 6:23,
14:20, 57:24, 58:3, 59:17,
66:14, 67:10, 70:12, 74:8,
77:21, 79:19, 103:19,
103:22, 103:24, 108:2,
108:13, 126:14, 159:15,
163:19, 167:23, 172:14,
185:16, 185:21, 187:4,
187:13, 188:15, 189:12
**Court** - 1:3, 1:4, 1:6, 3:2,
3:14, 3:25, 4:5, 4:13, 10:1,
11:2, 11:8, 13:1, 13:12,
13:16, 13:19, 13:25, 14:6,
14:15, 14:18, 14:21, 15:15,
16:3, 16:12, 16:14, 16:16,
16:18, 16:22, 16:24, 17:7,
18:22, 19:3, 21:21, 22:6,
22:13, 22:17, 23:7, 23:9,
27:12, 28:2, 28:5, 32:23,
33:1, 33:3, 33:6, 33:13,
41:13, 47:1, 53:25, 54:4,
54:25, 56:5, 56:8, 56:11,
56:13, 56:20, 57:2, 57:5,
57:13, 57:16, 57:21, 57:25,
58:4, 58:19, 59:1, 59:4,
59:10, 59:14, 61:24, 62:10,
62:16, 63:24, 64:4, 64:17,
64:25, 65:4, 65:11, 65:17,
65:21, 65:24, 66:4, 66:8,
66:13, 66:15, 68:1, 68:4,
68:13, 68:25, 69:2, 69:5,
69:11, 69:16, 69:20, 69:23,
75:6, 77:9, 77:12, 77:16,
77:20, 77:22, 78:12, 79:1,
79:4, 79:8, 79:14, 79:20,
80:3, 83:6, 83:12, 83:15,
90:13, 107:24, 108:3,
108:14, 108:22, 108:24,
113:4, 114:23, 115:2, 115:5,
115:8, 115:11, 115:14,
115:19, 115:23, 124:20,
125:10, 125:18, 126:2,
126:11, 126:20, 127:9,
131:7, 131:10, 134:24,
135:2, 138:7, 139:1, 159:12,
159:16, 160:10, 160:14,
167:3, 167:6, 167:9, 167:13,
167:18, 167:20, 167:24,
168:3, 168:7, 168:10,
168:16, 168:19, 168:22,
169:5, 172:4, 172:7, 172:11,
172:15, 172:21, 174:7,
174:14, 174:17, 174:21,
174:25, 175:9, 175:11,
183:13, 183:18, 183:24,
184:1, 184:7, 184:10,
184:16, 184:19, 185:4,
185:10, 185:15, 185:17,
185:24, 186:1, 186:14,
186:17, 187:1, 187:5,

187:14, 188:16, 189:4,
189:5, 189:22, 189:23
**courtroom** - 3:9, 3:16, 4:1,
78:2, 82:18, 108:5, 108:6,
188:4
**cousin** - 83:23, 83:24,
85:15, 91:10, 118:1
**cover** - 22:20
**covered** - 77:14
**create** - 123:2
**credibility** - 181:17
**credit** - 94:16
**credits** - 176:1
**Crime** - 57:9, 63:3, 63:4,
64:21, 65:8, 66:9, 67:20,
72:12, 72:14
**crime** - 35:7, 38:8, 56:19,
56:25, 57:11, 57:15, 59:8,
60:7, 60:14, 60:25, 62:8,
62:18, 63:18, 64:15, 67:13,
72:9, 166:10, 176:10
**crimes** - 40:20, 60:16,
61:4, 67:6
**Criminal** - 1:4
**Cristobol** - 76:24
**criteria** - 36:7
**Cross** - 1:14, 1:16, 15:16,
66:20, 108:25
**cross** - 58:10, 59:12,
62:18, 66:17, 114:3, 114:13,
174:11, 174:20, 184:4,
184:8, 184:25, 185:1, 185:9,
185:10, 187:9, 187:18
**Cross-examination** -
15:16, 66:20, 108:25
**cross-examination** -
58:10, 59:12, 66:17, 187:9,
187:18
**cross-examine** - 62:18,
184:4, 184:8, 184:25, 185:9
**cross-examining** - 185:1
**Cruz** - 1:6, 3:4, 3:5, 4:8,
42:10, 49:16, 49:24, 50:9,
50:21, 51:3, 51:19, 53:22,
68:8, 73:7, 73:19, 74:18,
78:2, 79:21, 82:8, 82:10,
82:17, 83:13, 84:7, 108:16,
111:7, 111:11, 118:1,
119:16, 120:1, 120:10,
120:12, 121:6, 121:22,
135:22, 137:2, 144:15,
148:1, 156:17, 166:19,
168:8, 182:6
**Cruz-garcia** - 1:6, 3:4, 3:5,
4:8, 42:10, 49:16, 49:24,
50:9, 50:21, 51:3, 51:19,
53:22, 73:7, 73:19, 74:18,
78:2, 79:21, 82:8, 82:10,
82:17, 83:13, 84:7, 108:16,
111:7, 119:16, 120:1,
120:10, 120:12, 121:6,
121:22, 135:22, 137:2,
144:15, 148:1, 166:19,
168:8, 182:6
**Cruz-garcia's** - 68:8,
111:11, 118:1, 156:17
**cry** - 55:7
**crying** - 14:10
**Csi** - 72:17
**Csr** - 189:21
**cul** - 149:9, 149:11
**cul-de-sac** - 149:9, 149:11
**culminates** - 7:24
**current** - 6:24, 171:9,
171:11, 171:16
**custodian** - 72:5
**custody** - 173:22
**customers** - 124:14,
124:17, 124:22, 125:1,
126:12

**cut** - 11:21, 17:10, 26:14
**cutting** - 12:1, 39:22, 48:5

# D

**D.a.'s** - 173:25
**Dade** - 5:25
**dark** - 142:4
**dark-complected** - 142:4
**data** - 21:5, 21:13, 29:13,
30:18, 31:14, 32:4
**Date** - 189:22
**date** - 35:10, 50:24, 73:24,
76:6, 76:7, 103:19, 103:22,
103:24, 185:12
**dating** - 35:22, 36:12
**daughter** - 34:9
**days** - 34:4, 37:19, 72:3,
72:4, 163:19
**de** - 149:9, 149:11
**dead** - 151:24
**deal** - 45:17, 174:4, 182:13
**Deal** - 117:15
**dealers** - 126:1
**dealing** - 34:14, 88:2,
89:3, 91:23, 92:15, 114:15
**dealings** - 92:7
**deals** - 166:3
**death** - 5:10, 6:22, 7:17,
7:19, 7:22, 7:23, 7:25, 8:1,
8:2, 8:3, 8:4, 8:9, 8:17, 8:18,
8:20, 9:1, 9:2, 9:6, 9:9, 9:12,
9:13, 11:18, 11:20, 12:2,
12:14, 12:15, 12:18, 20:7,
23:13, 25:21, 29:6, 29:19,
29:24, 30:15, 30:20, 111:3
**deaths** - 5:6, 5:7, 5:8
**December** - 48:14
**decide** - 24:10, 49:24,
58:9, 163:4
**decided** - 24:13, 35:19,
39:15, 42:8, 163:6
**decision** - 29:10, 30:24
**decomposed** - 20:22,
29:18
**decomposition** - 8:10,
8:16
**deep** - 80:17, 149:1
**defecated** - 150:17,
151:13
**Defendant** - 2:17, 168:9
**defendant** - 3:1, 4:4,
14:20, 41:7, 50:1, 50:21,
56:1, 57:24, 58:3, 66:14,
73:18, 73:22, 74:3, 76:15,
77:21, 78:11, 79:19, 83:5,
83:13, 84:1, 84:2, 84:16,
84:19, 84:22, 85:17, 85:24,
87:2, 87:11, 87:18, 88:5,
88:15, 89:2, 89:11, 89:18,
91:19, 91:23, 92:4, 93:20,
94:1, 94:22, 95:2, 95:12,
96:5, 97:16, 97:18, 98:3,
101:5, 101:20, 102:2, 102:9,
102:18, 102:23, 105:3,
108:2, 108:13, 126:14,
128:11, 128:18, 128:22,
129:5, 135:22, 159:15,
164:9, 167:5, 167:23, 168:6,
172:14, 176:14, 178:8,
185:16, 185:21, 187:4,
187:13, 188:15
**defendant's** - 51:7, 126:3
**defendants** - 40:25, 41:5
**defense** - 58:5, 62:12
**Defense** - 16:5, 16:16,
16:20, 16:21, 16:24, 17:1,
25:25
**degree** - 5:17, 5:20, 59:23,
62:13, 175:25, 176:2

**demeanor** - 98:17
**denied** - 178:24
**Denise** - 110:22
**Department** - 34:2, 35:4
**depicts** - 16:8
**deposition** - 24:21
**deputy** - 5:2
**Deputy** - 57:25, 69:16,
107:25, 175:9
**Describe** - 84:22, 98:17
**describe** - 45:14, 46:20,
89:10, 178:11
**described** - 181:2
**description** - 76:5, 180:17
**Description** - 2:1
**Design** - 60:10, 61:8,
61:16, 63:6, 66:9
**desired** - 177:19
**details** - 30:16, 179:24,
181:1, 181:6, 181:14,
181:17, 181:20
**Detective** - 78:19
**detective** - 60:18, 78:17
**determination** - 8:20,
9:18, 23:19, 24:17, 26:5,
26:9, 26:13, 39:10, 59:7
**determinations** - 24:5
**determine** - 7:17, 8:9,
8:11, 8:17, 9:1, 9:6, 11:17,
12:13, 17:20, 20:12, 31:1,
39:18, 42:8
**determining** - 5:10, 9:8,
23:13
**develop** - 36:6, 38:15,
48:6, 51:18, 57:19, 58:8
**developed** - 39:25, 43:15,
48:16, 48:23, 51:20
**developing** - 40:21
**development** - 41:16
**diagnose** - 30:21
**diagnosis** - 20:24
**Diana** - 38:7, 39:21, 39:23,
39:24, 48:7, 52:10, 52:12,
53:9, 54:1, 68:20, 89:24,
92:25, 93:4, 93:6, 93:8,
93:9, 93:19, 94:11, 94:12,
97:11, 97:12, 97:13, 97:15,
98:11, 100:25, 101:8,
107:10, 113:6, 113:9,
114:14, 125:21, 132:4,
132:13, 132:21, 133:14,
133:21, 135:19, 137:21,
138:13, 139:9, 145:8,
146:12, 147:14, 147:16,
170:14
**Diana's** - 93:12, 135:25,
137:7, 139:20
**diarrhea** - 150:10
**dictated** - 28:11, 28:16
**die** - 38:22, 165:9, 165:11,
165:12
**died** - 8:12, 20:13, 29:23
**difference** - 7:21, 167:12
**different** - 29:7, 32:2, 46:4,
57:14, 85:13, 89:12, 89:13,
169:12, 169:14, 169:15
**differently** - 39:8
**difficulty** - 58:19
**Dire** - 1:4, 1:16, 59:15
**direct** - 72:18, 159:17
**Direct** - 1:4, 1:16, 4:18,
33:20, 70:2, 80:9, 116:6,
175:16
**dirty** - 161:23
**disappeared** - 97:9
**disclosed** - 18:13
**discuss** - 3:18
**discussing** - 177:20
**Discussion** - 59:13, 187:3
**discussion** - 177:23

**discussions** - 187:5
**disease** - 7:23
**distance** - 24:22
**distinction** - 63:2
**distinctive** - 155:16
**district** - 110:21
**District** - 1:6, 1:12, 2:5, 189:5
**Division** - 35:15, 35:21, 38:17
**divorce** - 105:25, 106:10, 106:14, 106:16, 106:19, 112:16
**Dna** - 21:17, 21:25, 22:3, 36:15, 36:16, 36:20, 36:22, 36:25, 37:6, 37:8, 38:11, 39:11, 39:25, 40:3, 40:7, 40:12, 40:17, 40:19, 40:24, 40:25, 41:5, 41:18, 41:20, 41:24, 42:2, 42:8, 42:9, 42:12, 42:22, 43:2, 43:4, 43:8, 43:11, 43:12, 48:6, 48:7, 48:16, 48:19, 48:23, 48:24, 49:25, 50:9, 50:11, 51:3, 51:4, 51:7, 51:18, 51:19, 53:1, 56:16, 56:22, 57:6, 57:8, 57:11, 58:6, 58:13, 58:24, 60:2, 60:7, 60:15, 60:21, 61:1, 61:4, 61:7, 62:3, 62:20, 62:25, 63:9, 63:13, 63:14, 63:16, 64:9, 64:10, 64:22, 64:24, 64:25, 65:6, 65:8, 67:5, 67:10, 67:14, 67:20, 68:8, 68:21, 73:13, 73:15, 186:23
**doctor** - 21:4, 28:10, 29:22, 31:1
**doctors** - 7:1, 23:19, 23:25
**Domingo** - 90:24, 105:8, 105:16, 105:20, 118:21
**Dominican** - 81:25, 84:3, 84:5, 111:22, 112:14, 117:18, 117:20, 118:3, 119:20, 120:4, 121:15, 122:14, 122:23, 158:21, 162:10
**done** - 6:16, 7:5, 22:2, 36:17, 39:7, 39:12, 72:8, 100:14, 100:16, 107:21, 119:8, 137:13
**door** - 128:12, 136:25, 139:20
**doors** - 149:20
**dot** - 139:8
**down** - 20:1, 52:15, 52:24, 59:10, 69:6, 79:8, 97:22, 102:8, 104:21, 104:24, 109:23, 109:24, 110:9, 115:9, 123:12, 127:15, 137:17, 139:18, 150:15, 167:2, 168:1, 174:13, 175:1, 175:2, 177:17
**downstairs** - 161:15
**Dr** - 1:5, 1:23, 3:9, 3:23, 4:10, 4:13, 4:16, 4:24, 6:9, 6:16, 11:9, 12:19, 14:2, 14:23, 15:18, 19:4, 22:19, 25:16, 33:6
**drafted** - 34:24
**drew** - 38:4
**drive** - 95:9, 137:3
**driver's** - 141:6, 171:16
**driving** - 96:8, 137:1, 148:2
**dropped** - 55:14, 164:16
**drove** - 95:11, 95:20, 148:5, 148:7, 148:17, 152:11
**drowned** - 20:16, 20:18, 21:6, 21:12, 25:6, 30:10,

30:11
**drowning** - 8:23, 20:23, 20:24, 25:8, 30:20, 32:9
**drug** - 89:18, 92:19, 92:21, 120:18, 127:2, 140:20, 176:7, 176:8, 176:10
**drugs** - 87:19, 87:25, 88:1, 88:2, 89:3, 90:4, 91:24, 92:4, 92:7, 92:13, 92:15, 93:21, 93:24, 113:10, 113:13, 113:15, 113:18, 113:20, 113:22, 114:15, 118:15, 119:1, 119:12, 120:16, 122:15, 123:5, 126:16, 132:18, 132:21, 132:23, 135:5, 135:20, 135:25, 137:9, 155:20
**dry** - 76:18
**due** - 123:13
**duly** - 4:17, 33:19, 70:1, 80:7, 116:4, 175:15
**dump** - 153:8, 180:10, 180:11
**dumped** - 180:17
**during** - 60:18, 88:14, 90:8, 93:25, 95:1, 96:5, 96:18, 99:2, 99:5, 102:1, 102:13, 121:21, 140:20, 181:8
**During** - 89:2, 127:16, 181:9
**duties** - 72:15
**duty** - 71:19
**Dwayne** - 1:5, 1:23, 3:9, 4:16, 4:24
**Dx** - 2:9

# E

**e-mail** - 186:9
**early** - 34:22, 41:19, 59:24, 60:1, 67:2, 67:8, 162:17
**easily** - 29:18
**Easton** - 121:11, 127:23
**easy** - 34:5, 34:7
**Ebersole** - 1:12, 1:16, 165:16, 165:25, 173:22, 174:22, 175:6, 175:14, 175:20, 187:10
**Edna** - 109:7
**educate** - 41:5
**efforts** - 42:19
**eight** - 18:6, 19:19, 36:18, 53:13, 80:25
**Eight** - 71:4
**Eighteen** - 17:15
**either** - 5:8, 9:12, 40:25, 61:1, 61:2, 185:3
**elbow** - 18:4
**electrocution** - 8:23
**elements** - 11:12, 12:3
**eleven** - 81:14
**elicit** - 178:9
**embarrassed** - 32:14
**Embassy** - 70:21
**emergency** - 71:17, 71:20
**emotion** - 108:8
**emotional** - 52:22, 108:4, 108:8, 125:24
**emotions** - 108:4
**employed** - 6:13, 6:17, 70:15, 70:16, 72:19, 175:21, 175:22
**employee** - 6:25
**end** - 25:20, 104:9, 119:5, 179:11, 187:22, 188:5
**ended** - 92:21, 104:14, 148:18, 149:7
**enforcement** - 40:18, 72:15, 73:14, 178:21

**English** - 115:17, 116:24, 182:23
**enter** - 3:16, 43:16, 43:21
**entered** - 43:8
**entire** - 22:19, 112:23
**entitled** - 1:21
**entrance** - 139:23
**envelope** - 45:16, 45:21, 76:19, 78:16
**envelopes** - 75:14
**epithelial** - 41:23, 58:16
**equivalent** - 72:16
**Eric** - 1:6, 1:18, 3:9, 33:10, 33:18, 33:24, 62:1, 66:17, 78:19, 176:13
**Ert** - 71:18
**Especially** - 181:20
**especially** - 11:16
**essentially** - 19:25
**evaluate** - 35:7
**evaluating** - 12:12
**evening** - 136:4
**event** - 179:12
**events** - 7:24, 53:11, 53:12, 178:2
**Eventually** - 53:4, 105:3
**eventually** - 48:25, 100:25, 105:2
**Evidence** - 38:24, 71:18
**evidence** - 13:3, 13:10, 16:12, 21:24, 32:19, 35:7, 37:2, 39:6, 39:16, 41:8, 41:24, 42:3, 43:5, 44:22, 46:4, 46:12, 46:21, 51:5, 56:22, 57:8, 58:6, 58:14, 60:20, 60:25, 61:7, 61:8, 62:7, 62:9, 62:19, 62:24, 63:1, 63:3, 63:10, 63:13, 63:19, 63:21, 63:24, 64:14, 64:18, 67:9, 68:9, 71:22, 72:1, 72:2, 72:5, 72:7, 72:23, 75:14, 75:15, 76:7, 76:16, 77:4, 90:12, 181:6, 181:21, 189:8
**ex** - 82:6, 83:17, 109:11
**ex-husband** - 82:6, 83:17, 109:11
**exact** - 121:3, 136:5, 136:19
**exactly** - 56:17, 59:6, 59:11, 62:16, 118:11, 122:4, 125:14, 136:18, 140:1, 141:2, 142:22, 143:2, 143:17, 146:1, 146:9, 146:14, 148:25, 150:4, 152:18, 153:25, 155:3, 156:6, 156:14, 156:25, 157:5, 158:2, 158:20, 162:11, 163:18, 163:23, 163:24, 168:25
**Exactly** - 57:2, 139:16
**exam** - 34:21
**examination** - 12:10, 15:16, 21:7, 21:14, 22:7, 28:8, 58:10, 59:12, 66:17, 66:20, 68:14, 108:25, 159:18, 187:9, 187:18
**Examination** - 4:18, 23:10, 33:20, 59:15, 68:5, 70:2, 80:9, 116:6, 175:16
**examine** - 12:6, 48:4, 62:18, 184:4, 184:8, 184:25, 185:9
**examined** - 63:4
**examiner** - 5:2, 6:14
**Examiner's** - 6:1
**examiner's** - 6:5
**examining** - 21:5, 30:19, 185:1
**example** - 7:25, 8:1, 17:20,

21:9
**excellent** - 45:21
**Excellent** - 45:12
**except** - 3:19, 112:23
**excess** - 22:19, 112:23
**excuse** - 14:9, 78:14
**excused** - 3:21, 33:1, 33:3, 33:4, 33:6, 69:2, 69:5, 79:5, 79:9, 115:5, 115:8
**Exhibit** - 2:1, 10:6, 10:24, 10:25, 11:2, 11:5, 13:3, 13:5, 13:7, 13:10, 13:15, 13:19, 13:22, 14:1, 16:21, 17:1, 47:3, 75:17, 75:18, 75:24, 76:2, 76:9, 77:5, 77:25, 90:15, 90:18, 91:9, 91:13, 91:16, 95:15, 95:16, 129:1, 130:7, 130:11, 130:14, 131:2, 131:25, 132:8, 134:11, 138:9, 138:23, 138:24, 139:1, 139:4, 169:7, 170:23, 170:25, 172:18, 172:20
**Exhibits** - 75:9, 77:4, 77:22
**exhibits** - 189:15
**existed** - 35:22, 37:11
**existence** - 55:14
**exit** - 152:12
**exited** - 149:25, 152:19
**exiting** - 149:25
**expect** - 14:25, 32:8, 32:12
**expense** - 184:19
**expensive** - 158:4
**experience** - 15:5, 15:8, 179:21
**experienced** - 41:25
**expertise** - 21:20, 21:23
**Expiration** - 189:22
**explain** - 73:9, 182:8, 182:12
**express** - 187:22
**extends** - 19:14
**extensive** - 179:16
**extent** - 7:15, 11:13, 64:14
**external** - 9:19, 45:20
**extraction** - 65:4
**extraneous** - 125:12, 125:16
**extraneouses** - 125:22
**extremely** - 126:24

# F

**face** - 142:21
**facility** - 176:14, 177:15
**fact** - 10:18, 26:9, 31:12, 52:21, 57:6, 62:18, 64:9, 64:10, 64:18, 74:23, 75:21, 103:18, 118:25, 119:8, 140:20, 173:12, 180:15, 181:16, 186:11
**factored** - 24:17
**factors** - 9:19, 24:16
**facts** - 27:21, 31:24, 180:4
**Fair** - 132:11, 134:4
**fair** - 10:2, 40:17, 40:23, 134:7, 179:22
**Fairly** - 16:8
**fairly** - 132:15, 174:23
**Fairway** - 138:13, 139:11
**faithful** - 134:7
**familiar** - 6:9, 21:25, 54:21, 72:11, 90:19, 91:14, 91:17, 95:17, 138:9, 177:4
**familiarity** - 37:18
**family** - 14:9, 81:6, 100:9, 105:21, 106:1, 106:24, 107:2, 108:6
**far** - 11:18, 24:24, 35:22,

40:18, 59:11, 63:22, 65:15,
145:24, 148:23, 184:13,
185:11
**Fbi-** 50:3, 50:5, 50:8,
50:15, 71:3, 71:5, 71:12,
71:16, 72:17, 72:19, 165:16,
176:4, 184:6
**fear** - 123:22
**February**- 34:3
**Federal-** 70:16, 175:21
**federal** - 119:1, 119:3,
119:8, 176:12
**Fedex-** 50:12, 50:13,
50:15, 50:16, 78:16
**feet** - 167:18
**fell** - 21:11
**felt** - 88:11, 125:25
**female** - 37:3, 38:5
**femurs** - 18:7, 19:23
**few** - 8:19, 11:12, 15:6,
136:8, 136:17, 140:15,
184:1
**fibula** - 18:8, 18:9
**fibulas** - 18:10
**field** - 23:23, 36:21, 177:15
**Fiesta-** 131:12
**fifteen** - 185:25
**fifth** - 8:6, 19:20
**fight** - 102:5
**fighting** - 102:4
**figure** - 186:5, 186:20
**file** - 186:5, 186:6, 186:11,
186:20, 186:25
**filed** - 55:25
**findings** - 5:12, 6:21,
20:23, 28:11
**fine** - 81:5, 167:19
**fingerprints** - 72:6
**finish** - 125:14, 174:18
**finished** - 151:22
**First-** 76:2, 143:10
**first** - 3:23, 4:17, 10:19,
16:1, 33:19, 48:13, 51:2,
52:9, 53:5, 53:21, 70:1,
70:11, 75:16, 80:7, 83:16,
83:19, 86:4, 90:3, 92:2,
116:4, 119:15, 120:20,
120:23, 120:24, 121:24,
123:7, 127:22, 135:18,
136:3, 140:22, 143:13,
165:19, 169:19, 175:15
**firsthand** - 178:1
**fishing** - 21:10
**five** - 12:21, 74:7, 74:16,
146:3, 146:4, 185:17
**fixed** - 155:23
**flat** - 155:23
**flight** - 162:8, 162:15,
162:16, 162:19
**Flores-** 2:20
**fluent** - 178:18
**focus** - 35:14, 35:15
**focused** - 60:1, 62:2
**follow** - 55:24
**following** - 1:20
**follows** - 4:17, 33:19, 70:1,
80:8, 116:5, 175:15
**Force-** 76:23
**foregoing** - 189:6
**forensic** - 5:24, 6:3
**Forensic-** 6:17, 6:25
**forget** - 109:10
**forgot** - 32:6
**forgotten** - 112:18
**form** - 182:21, 183:1,
183:6, 187:21
**forth** - 9:15
**Forty-** 80:25, 116:22
**Forty-eight-** 80:25
**Forty-four-** 116:22

**forward** - 9:6, 183:15,
183:20
**four** - 8:5, 17:18, 36:1,
116:22, 128:12, 136:25,
155:1
**four-door** - 128:12, 136:25
**Fourteen-** 34:13
**Franklin-** 2:6, 189:23
**freeway** - 138:4, 148:11,
152:13
**Friday-** 162:21, 163:2
**friend** - 87:3, 87:4, 134:13,
134:14, 134:19, 161:16,
163:24, 163:25, 178:7
**friends** - 89:20, 91:8, 93:4,
94:22, 94:24, 97:11, 98:23,
107:10, 124:5, 133:17,
133:19
**friendship** - 91:4
**front** - 14:11, 53:14, 76:19,
92:8, 137:6, 144:4, 146:24,
161:14
**frustrating** - 39:1
**full** - 23:3, 70:9, 71:19,
85:7, 85:8, 115:25
**functions** - 72:3

## G

**Galveston-** 5:19
**garage** - 161:6, 161:8,
161:12
**garcia** - 1:6, 3:4, 3:5, 4:8,
42:10, 49:16, 49:24, 50:9,
50:21, 51:3, 51:19, 53:22,
73:7, 73:19, 74:18, 78:2,
79:21, 82:8, 82:10, 82:17,
83:13, 84:7, 108:16, 111:7,
119:16, 120:1, 120:10,
120:12, 121:6, 121:22,
135:22, 137:2, 144:15,
148:1, 166:19, 168:8, 182:6
**Garcia-** 10:8, 11:10, 13:4,
24:14, 37:16, 38:7, 39:21,
39:23, 39:24, 48:7, 52:10,
52:12, 53:9, 68:20, 89:24,
144:7, 170:14, 178:12
**garcia's-** 68:8, 111:11,
118:1, 156:17
**gather** - 9:14
**gathering** - 62:6
**geared** - 60:19
**general** - 5:23, 63:8,
63:11, 63:14, 63:22, 64:8,
64:13, 65:7, 81:5, 177:19,
181:11
**Generally-** 38:14
**generally** - 63:15, 63:18,
75:13, 125:24
**Genetic-** 60:10, 61:8,
61:16, 63:6, 66:9
**gentlemen** - 4:6, 33:23,
70:14, 73:8, 79:11, 80:21,
159:21
**geographical** - 49:18, 74:2
**German-** 44:15, 54:9,
170:20
**girlfriend** - 157:10, 163:10
**given** - 180:13, 186:6
**glad** - 34:6
**Glossary.............................
.end** - 1:14
**God** - 113:23
**gold** - 128:21, 156:18
**gold-colored** - 128:21
**Goliad-** 46:10
**Gomez** - 54:11
**grabbed** - 124:10
**gradually** - 178:1
**graduated** - 5:16, 34:18

**Grande** - 52:15
**gravel** - 149:12
**Gray-** 83:11
**gray** - 78:7
**greatly** - 8:15
**Grew** - 71:1
**grip** - 129:16
**Griselle** - 1:8, 1:17, 3:10,
69:8, 69:12, 69:25, 70:10,
70:13
**group** - 29:4, 136:11
**grow** - 118:2
**growing** - 117:19, 120:5
**growing-up** - 117:19
**grown** - 36:1
**guarantee** - 184:15
**guess** - 20:20, 28:19,
31:17, 32:12, 52:9, 92:6,
140:12, 140:15
**Guilt-** 1:16, 1:2
**Guilt-innocence-** 1:16, 1:2
**gun** - 71:7, 148:1, 150:20,
151:14, 154:10, 154:15
**guns** - 129:6, 129:8,
129:10, 129:11, 129:19
**gunshot** - 7:25, 12:1, 12:8,
28:15
**guys** - 84:4, 84:17, 84:25,
85:20, 87:9, 94:13, 100:8,
102:4
**Guzman** - 1:8, 1:17, 3:10,
69:8, 69:13, 69:25, 70:4,
70:10, 70:13, 75:7, 78:1,
78:13, 79:8

## H

**hair** - 86:20
**hairdresser** - 81:18, 86:16
**half** - 123:8, 143:8
**hand** - 148:2, 148:3,
150:21, 154:11
**Hand-** 189:16
**hands** - 3:12, 124:11
**happy** - 27:1, 93:18,
184:14
**Hard-** 2:2
**harm** - 106:24, 107:2
**Harris-** 1:9, 1:23, 5:3, 5:6,
6:7, 6:17, 6:25, 164:7,
169:13, 189:2, 189:5
**head** - 83:12, 154:10
**headed** - 148:13
**headphones** - 78:8, 83:2
**health** - 20:13
**healthy** - 25:3, 31:17
**hear** - 34:6, 150:19, 151:1,
151:3, 160:4
**heard** - 1:21, 60:12, 62:16,
149:23, 150:25, 151:11,
188:3
**hearing** - 61:18
**hearsay** - 53:24, 54:3,
54:24, 65:22, 134:23, 135:2
**height** - 167:12
**held** - 1:23
**help** - 35:24, 42:9, 94:22,
110:18, 153:11, 163:7,
169:2
**helpful** - 138:18, 179:6
**hereby** - 189:6
**Hernandez-** 2:20, 54:10,
55:16
**herself** - 109:23
**himself** - 41:8, 179:12
**history** - 5:12, 9:15, 20:25
**hit** - 43:22, 49:12
**hold** - 108:4
**holes** - 11:21
**home** - 24:19, 25:4, 25:12,

30:25, 31:7, 81:15, 88:7,
102:12, 114:16, 159:5
**homicidal** - 24:13
**Homicide-** 34:23, 35:1,
35:15, 35:20, 37:19, 38:17,
41:15, 58:24, 62:4, 67:16
**homicide** - 8:6, 12:18,
23:13, 24:11, 25:14, 28:25,
31:23, 36:12, 37:4, 53:7,
60:18, 64:11
**homicides** - 35:21, 36:14
**Honor-** 4:11, 11:6, 23:8,
33:5, 33:11, 46:25, 66:1,
69:4, 69:10, 69:15, 75:4,
77:3, 78:10, 78:24, 79:7,
79:25, 83:4, 83:14, 90:11,
124:19, 131:5, 138:22,
160:2, 175:7
**Honorable** - 1:22
**hope** - 188:8
**hopes** - 43:16
**horse** - 184:3
**hospital** - 9:14
**hotel** - 92:5, 104:14,
104:15, 104:18, 104:19,
104:20, 104:24, 124:9,
155:5, 155:6, 155:7, 155:9,
155:19, 155:24, 156:3,
156:4, 158:3, 158:4, 163:13
**hour** - 143:8
**hours** - 35:8, 124:6
**house** - 24:24, 85:21,
157:2, 157:18, 157:20,
157:21, 157:23, 158:7,
161:14
**housed** - 164:6, 176:14
**Houston** - 1:23, 2:6, 2:13,
2:16, 34:2, 35:4, 71:20,
78:18, 81:3, 82:1, 82:5,
85:1, 85:25, 86:12, 86:18,
86:23, 87:9, 87:15, 87:18,
89:9, 91:2, 103:13, 103:16,
105:10, 120:20, 120:23,
122:9, 123:5, 127:21,
158:13, 158:22, 160:19,
164:4, 176:13, 180:22,
189:24
**Hpd-** 35:19, 36:4, 40:20,
42:19, 43:25, 45:4, 46:9,
47:25, 51:3, 56:16, 57:8,
58:13, 58:14, 58:24, 59:5,
63:3, 63:4, 64:21, 65:8,
66:9, 67:5, 67:20, 68:7,
181:7
**huge** - 61:25
**human** - 26:3
**Humble** - 94:2, 94:4, 94:6,
94:9, 96:19, 101:14, 104:10,
128:5, 157:21, 162:24
**humerus** - 18:4, 19:21
**hurt** - 100:22
**husband** - 40:8, 82:6,
83:17, 86:24, 90:4, 91:5,
91:23, 96:7, 109:11, 132:12
**hypothetical** - 21:10

## I

**idea** - 101:23, 178:10,
178:13
**identification** - 75:8
**identified** - 11:23, 13:4,
78:11, 83:5, 83:13, 171:9,
172:8, 172:10, 172:12
**identify** - 54:1, 54:22,
55:2, 78:5, 82:20, 171:8,
171:19, 171:21
**identifying** - 76:3, 76:8,
171:13
**identity** - 55:4

**imagination** - 134:8
**implement** - 180:6
**implying** - 60:6
**impression** - 62:11, 65:6
**in-service** - 35:8
**include** - 65:21
**included** - 67:3, 75:2, 189:9
**includes** - 108:6
**including** - 5:11
**inconsistent** - 184:5
**independent** - 47:23
**Index** - 1:15, 2:1, 43:11
**indicate** - 18:16, 76:3, 183:6
**indicated** - 60:13
**indicates** - 25:13
**indicating** - 10:9, 11:10, 13:7, 16:6, 17:11, 19:15, 19:23, 28:22, 45:18, 47:4, 75:10, 82:23, 90:19, 91:9, 91:14, 91:17, 91:20, 95:17, 129:18, 130:8, 130:12, 131:3, 132:1, 132:9, 138:10, 138:12, 139:11, 139:16, 142:10, 142:12, 147:22, 149:8, 152:2, 154:15, 169:8, 169:20, 170:2, 170:5, 170:7, 170:9, 170:12, 170:14, 170:16, 170:18, 170:20
**indication** - 25:7, 30:7, 31:21
**individual** - 9:11, 10:8, 72:25, 73:15, 78:2, 85:5, 168:23, 170:24, 173:3, 176:19
**individuals** - 43:24, 54:2, 55:8, 167:12
**industry** - 23:18
**infancy** - 40:17, 59:3, 62:25
**inflicted** - 23:14
**influence** - 8:11
**information** - 7:15, 9:13, 20:14, 43:6, 49:15, 49:20, 177:1, 178:13, 179:3, 180:5, 183:16
**initial** - 76:20
**initials** - 76:7, 76:11, 76:12, 76:21, 76:22
**initiates** - 7:24
**initiative** - 71:9
**injuries** - 8:12, 11:20, 18:15, 20:5, 21:15, 28:12
**injury** - 5:9, 7:23, 28:22
**Inn** - 155:13, 163:14
**inn** - 163:22
**innocence** - 1:16, 1:2
**insensitive** - 14:9
**inside** - 73:11, 75:21, 147:12, 149:1, 165:12, 165:24
**Inside** - 149:3
**instance** - 180:9
**instances** - 125:15
**Instead** - 160:8, 160:13
**Institute** - 6:17, 6:25, 176:24
**instruct** - 188:6
**instructed** - 3:17, 187:25
**instructions** - 51:16
**insulted** - 106:23
**intent** - 61:6
**intention** - 44:18, 49:11
**interested** - 177:20
**interfering** - 124:25
**intern** - 14:16
**Internal** - 34:25, 37:20, 62:5, 67:17
**interpret** - 117:9

**interpretation** - 117:11
**Interpreter** - 94:19, 131:5, 131:8, 144:12, 160:2, 160:13, 165:10
**interpreter** - 80:8, 115:18, 116:5, 117:5, 117:6, 131:6, 131:8, 159:21, 160:6
**Interpreter's** - 144:12
**Interpreters** - 2:21
**interview** - 55:8, 173:13, 176:20, 177:12, 177:23, 178:20, 179:15, 179:23, 181:8, 182:1, 182:23
**interviewed** - 53:8, 53:9
**introduce** - 4:22, 33:22, 70:8, 80:20, 85:16, 116:10, 175:18
**introduced** - 109:23
**introduction** - 177:19, 181:9
**investigate** - 5:7, 114:4, 114:11
**investigates** - 5:6
**investigating** - 111:3, 114:5
**investigation** - 8:22, 9:1, 9:9, 21:1, 177:4
**Investigations** - 70:17, 175:21
**investigations** - 176:11, 178:19
**investigative** - 177:3
**investigator** - 172:1
**investigator's** - 7:14, 22:21, 24:18
**investigators** - 109:5, 181:25
**invoked** - 3:15
**involve** - 12:2, 36:22
**involved** - 21:24, 24:25, 52:7, 60:15, 87:19, 90:4, 92:15, 113:12, 114:18, 170:24
**involvement** - 78:22, 182:9
**involving** - 37:15
**Isabel** - 83:25
**issue** - 25:25, 89:6
**issues** - 38:15, 64:1
**item** - 14:24
**items** - 12:24, 15:10, 39:18, 47:9, 47:16, 48:2, 51:4, 54:21, 67:19
**itself** - 9:19, 13:14, 23:2, 24:8

**J**

**Jail** - 164:7, 169:13
**jail** - 164:12, 164:15, 167:13
**January** - 49:4, 49:21
**jaw** - 18:13, 19:11
**Jc** - 110:22
**jealous** - 124:16
**Jersey** - 176:6
**job** - 28:12, 71:5
**jobs** - 23:16, 142:23
**Johnson** - 176:13, 177:2, 177:25
**join** - 86:8, 101:5
**joined** - 34:2, 35:25, 136:13, 176:4
**Jose** - 54:10
**Jr** - 10:9, 11:10, 13:4, 24:14, 37:16, 144:7, 178:12
**Juan** - 70:23, 71:13, 71:16, 74:5, 74:14, 74:15
**Judge** - 1:23, 13:11, 13:13, 13:18, 13:23, 14:5, 14:12,

14:22, 16:11, 16:23, 18:21, 22:12, 27:10, 28:4, 32:22, 32:25, 33:17, 41:12, 53:24, 56:7, 61:13, 63:7, 66:19, 67:25, 114:22, 115:1, 115:16, 125:9, 138:25, 159:10, 160:16, 166:24, 183:15
**Judicial** - 1:12
**July** - 1:20, 1:3, 52:3
**June** - 34:23, 34:24, 176:8
**jury** - 3:1, 4:2, 4:4, 4:7, 4:22, 4:25, 5:14, 7:21, 13:24, 14:1, 14:11, 14:20, 19:1, 19:7, 19:8, 25:19, 33:23, 33:25, 34:15, 35:18, 38:19, 43:10, 45:14, 46:20, 48:11, 52:1, 57:22, 57:24, 57:25, 58:3, 60:6, 62:11, 63:23, 64:6, 64:16, 65:24, 66:13, 66:14, 66:24, 70:15, 73:8, 77:21, 79:19, 80:21, 107:25, 108:2, 108:7, 108:13, 111:21, 112:7, 138:19, 159:12, 159:15, 167:23, 172:14, 185:16, 185:18, 185:21, 187:4, 187:12, 187:13, 188:1, 188:15
**Justin** - 2:4, 3:7, 173:25

**K**

**Katerina** - 176:7
**Keep** - 18:22, 69:18
**keep** - 4:13, 19:3, 33:14, 36:18, 36:24, 80:3, 108:9, 115:23, 126:8, 145:15, 175:11
**kept** - 124:3
**kid** - 85:12, 93:17, 121:15
**kidnapped** - 30:17, 96:12
**kidnapping** - 112:3
**kill** - 124:13, 149:17
**killed** - 107:19, 112:20, 160:18, 162:13, 179:13
**kind** - 8:8, 17:9, 25:19, 36:3, 36:6, 36:24, 39:2, 41:9, 45:13, 81:17, 86:14, 86:23, 93:17, 124:21, 128:11, 128:16, 129:8, 133:14, 134:1, 135:10, 136:10, 139:17, 142:18, 143:5, 174:4, 179:22, 182:13
**Kind** - 27:7
**kinds** - 38:19, 42:2
**kit** - 39:20, 40:3, 44:25, 47:10, 48:4, 63:1
**kitchen** - 96:15, 96:25, 99:1, 99:6
**Klein** - 109:7
**knee** - 18:9
**knees** - 19:24, 20:1
**knife** - 142:11, 166:14, 166:16
**knowing** - 10:20, 25:12, 48:19, 165:13, 180:11
**knowledge** - 65:18, 133:24, 178:2, 178:24, 180:4, 180:13, 182:3
**known** - 9:15, 43:12, 103:24, 159:18, 180:23
**knows** - 19:8, 22:6, 57:7, 159:6

**L**

**lab** - 36:23, 39:17, 47:19,

47:20, 56:19, 56:25, 57:12, 57:15, 59:8, 60:7, 60:15, 60:25, 62:9, 62:18, 63:18, 63:19, 64:15, 67:13
**Lab** - 57:9, 61:8, 63:3, 63:4, 64:21, 65:8, 66:10, 67:20
**laboratory** - 36:19, 36:20, 47:23, 62:23
**labs** - 60:9
**ladies** - 4:6, 33:23, 70:14, 73:8, 79:11, 80:20, 159:20
**lady** - 122:15
**lady's** - 137:19, 137:20
**Lamar** - 5:16
**large** - 11:13, 45:16
**larger** - 45:19
**last** - 70:11, 164:18, 164:23, 175:20, 186:12
**late** - 41:19, 55:14, 59:23, 60:1, 67:7, 118:12
**law** - 5:9, 40:18, 72:15, 73:14, 176:1, 178:21
**lawyer** - 109:13, 110:22
**lawyers** - 115:25, 187:16
**lay** - 184:4
**laying** - 97:22
**lead** - 41:24, 126:8
**leader** - 72:4, 73:2
**leading** - 54:23, 124:18
**leads** - 138:4
**learn** - 38:5, 96:21
**learned** - 42:15, 97:18, 112:2
**learning** - 49:5, 49:23
**lease** - 104:7, 104:14
**least** - 59:25
**leave** - 3:16, 8:18, 8:24, 62:10, 100:2, 100:4, 100:20, 103:10, 103:11, 104:2, 108:6, 139:14, 152:12, 156:4, 162:15
**leaving** - 41:8, 99:10, 99:11, 99:13, 99:14, 99:16, 99:25, 112:11, 158:13, 158:16, 158:22, 185:5
**Lebron** - 44:8, 44:9, 44:12, 54:10
**left** - 39:21, 41:23, 42:5, 51:10, 54:15, 65:5, 102:10, 102:11, 102:24, 102:25, 103:8, 104:2, 104:4, 104:5, 105:2, 105:10, 124:5, 140:23, 141:1, 143:7, 146:9, 146:15, 146:19, 154:3, 154:16, 159:9, 160:19
**leg** - 18:8
**legal** - 70:20, 71:6
**lend** - 128:25, 181:17
**length** - 19:20
**lent** - 129:3, 156:15
**Leonardo** - 44:15, 170:20
**less** - 41:7, 65:7, 74:13, 143:8, 158:4
**Lester** - 186:12
**license** - 171:16
**life** - 24:14, 34:1, 118:20, 123:2, 134:5
**lift** - 72:6
**likely** - 41:7
**Likewise** - 15:24
**limited** - 11:25, 57:7, 182:4
**Linda** - 55:16, 157:10
**link** - 10:12, 45:8
**linked** - 172:1
**links** - 10:15
**list** - 36:13, 52:10
**live** - 81:1, 81:15, 87:12, 121:12, 121:17, 128:9, 165:24

**lived** - 70:22, 87:3, 88:6, 91:1, 113:19, 121:10, 127:22, 132:13, 154:5, 161:9
**lives** - 157:1, 161:15
**living** - 5:1, 23:12, 52:16, 85:19, 85:22, 87:2, 87:9, 92:5, 92:12, 92:17, 94:1, 94:3, 96:18, 121:7, 121:9, 122:8, 127:17, 127:20, 127:21, 128:4
**loan** - 95:12, 128:18
**locate** - 39:4, 39:12, 42:19, 45:5, 52:12, 176:22
**located** - 38:25, 46:9
**locating** - 70:19
**location** - 49:18, 74:2, 74:5, 127:25, 128:5, 149:13, 180:22
**locations** - 46:4, 180:19
**look** - 13:5, 24:3, 38:23, 54:20, 55:11, 90:16, 90:19, 91:13, 95:16, 139:5, 141:21, 141:22, 169:7, 184:16
**looked** - 37:3, 91:19, 98:19, 156:19, 171:14
**looking** - 9:9, 9:13, 9:16, 13:6, 131:15, 139:6, 188:2
**Looking**- 12:19
**lookout** - 36:24
**looks** - 91:17, 169:12, 169:14, 169:15, 170:5, 171:16, 171:23
**loose** - 150:9
**losing** - 125:25
**lost** - 169:15
**Louisiana**- 2:15
**love** - 57:3
**lower** - 18:7
**luggage** - 99:22
**lunch** - 79:12
**Lunch**- 79:18
**lung** - 7:25
**lungs** - 20:21, 20:23

## M

**ma'am** - 4:3, 16:13, 58:2, 66:12, 108:23, 173:11, 176:21, 182:5, 183:22
**Ma'am** - 175:19
**machinery** - 155:18
**Madrid** - 2:14, 3:6, 167:16
**Magee** - 1:22
**mail** - 186:9
**main** - 42:10, 43:3
**majority** - 182:23
**male** - 49:6
**man** - 54:9, 54:11, 161:8, 161:10
**managed** - 155:24
**mandible** - 18:13
**manila** - 45:16
**manila-type** - 45:16
**manilla** - 45:21
**mannequin** - 18:25
**Manner** - 8:2, 12:18
**manner** - 5:10, 6:22, 7:19, 7:22, 9:6, 9:8, 9:13, 9:16, 12:13, 29:6, 30:15
**Map** - 2:8
**map** - 138:10, 138:12, 139:6
**Marilu** - 2:20
**Mario** - 2:14, 3:6
**mark** - 138:12, 139:14
**Mark** - 50:19, 73:1
**marked** - 10:6, 16:5, 16:18, 47:3, 75:8, 131:24, 138:9, 169:7

**marks** - 8:18, 8:25, 11:21, 20:5, 76:3, 76:8
**marriage** - 88:5, 89:6, 89:11
**married** - 81:7, 84:17
**Martinez** - 1:11, 1:22, 44:4, 54:9, 83:25, 85:10, 115:12, 116:3, 116:12, 176:20, 177:5, 177:12, 182:7
**Mary** - 58:19, 62:14, 187:2, 189:4, 189:21
**Mashan** - 176:23
**mask** - 143:19
**masks** - 142:17, 142:18, 142:25, 143:3, 143:4, 143:5
**match** - 43:17, 51:4
**matter** - 40:11, 171:23
**Md** - 5:20
**mean** - 5:4, 9:5, 11:25, 13:13, 25:10, 28:15, 28:19, 29:17, 32:17, 32:18, 56:17, 59:21, 67:6, 85:12, 87:24, 102:25, 107:3, 110:13, 112:14, 124:24, 125:13, 130:17, 141:10, 141:22, 154:24, 174:12, 182:6, 184:6
**means** - 3:15, 5:11, 62:8
**meant** - 13:12, 59:22, 60:17, 67:7
**Medical** - 5:18, 5:23, 5:25
**medical** - 5:2, 5:12, 6:5, 6:13, 9:15, 20:9, 21:2, 21:3, 21:5, 21:12, 23:19, 29:12, 29:22, 30:18, 31:18, 31:20, 32:4, 32:18, 32:19
**meet** - 80:22, 83:17, 83:21, 89:23, 93:2, 93:12, 119:22
**meeting** - 52:19
**Mehl** - 1:6, 1:18, 33:10, 33:14, 33:18, 33:24, 59:17, 62:1, 66:17, 66:22, 78:19, 110:17, 110:21
**Mel** - 3:9
**Melo** - 44:2, 54:10, 55:11, 170:18
**member** - 71:19, 72:22, 173:25
**members** - 106:1
**memory** - 37:23, 110:18, 155:25
**men** - 48:22, 83:6
**mentioned** - 32:6, 32:7, 36:8, 48:22, 127:23
**mess** - 123:17
**met** - 52:24, 74:4, 83:19, 84:16, 93:21, 109:3, 119:15, 119:25, 120:7, 134:13, 173:19
**metropolitan** - 74:15
**Miami** - 6:1
**microphone** - 4:14, 33:15, 69:18, 80:4, 115:24, 175:12
**middle** - 25:11
**might** - 15:10, 17:20, 27:8, 29:18, 30:16, 30:17, 37:5, 37:10, 38:11, 39:7, 39:11, 39:18, 40:24, 41:7, 41:18, 41:23, 42:9, 43:17, 68:19, 182:10, 187:23, 188:2
**miles** - 25:4, 25:12
**Miller** - 50:19, 73:1, 73:5, 73:17
**mind** - 75:16, 114:3, 114:13, 116:19, 127:8, 143:25, 158:21
**mindset** - 60:18, 62:1, 62:4, 62:6
**mine** - 83:23, 134:14

**minimal** - 8:24
**minute** - 74:16, 90:2, 140:7
**minutes** - 74:7, 146:4, 146:19, 184:1, 185:18
**Miranda** - 183:3
**miss** - 103:24
**missed** - 6:6, 103:22
**missing** - 26:3, 97:19, 98:18, 114:10
**mistakes** - 28:19
**moan** - 160:9, 160:12
**molecular** - 5:20
**moment** - 3:22, 22:11, 114:21
**money** - 89:4, 89:5, 89:6, 104:3, 104:4, 104:5, 104:13, 113:21, 113:23, 135:20, 136:1, 137:9, 162:6
**month** - 87:16
**months** - 34:23, 87:16, 102:5, 105:17, 119:4, 136:21, 136:22
**Months** - 87:16
**morning** - 3:8, 4:6, 4:20, 4:21, 15:23, 70:4, 70:5, 97:3, 102:15, 160:17, 162:16, 162:17, 164:3, 183:19, 183:20, 187:10, 187:17, 188:13, 188:17
**most** - 136:6, 140:21
**motel** - 104:24, 155:16, 155:20, 163:17
**mother** - 144:23, 145:3, 145:18
**motion** - 61:18, 77:15
**motive** - 125:19, 126:5
**motor** - 163:21
**Motor** - 155:13, 163:14
**mouth** - 73:11
**move** - 111:24, 127:25, 141:5, 163:6, 163:7, 167:14
**Move** - 147:3
**moved** - 90:7, 128:2, 128:3, 147:3, 147:20
**moving** - 71:11
**murder** - 55:25, 58:7, 125:22, 135:14, 178:12
**murdered** - 37:16
**murdering** - 110:12
**must** - 112:18
**myriad** - 38:25

## N

**name** - 33:24, 37:15, 44:11, 50:19, 70:9, 70:10, 70:11, 72:25, 76:6, 80:22, 82:7, 84:8, 85:5, 85:7, 85:8, 87:6, 89:24, 94:5, 94:7, 104:20, 109:2, 109:25, 117:22, 121:15, 121:22, 122:5, 130:15, 175:19, 175:20
**named** - 19:7, 44:2, 44:4, 44:7, 44:15, 54:10, 54:11, 110:22, 165:16, 176:13, 176:20
**names** - 84:14, 127:13
**narcotics** - 176:3
**Natalie** - 2:3, 3:6, 56:15
**national** - 43:16
**Natural** - 8:5
**nature** - 54:24, 124:19
**near** - 74:15, 85:19
**nearby** - 74:13
**necessary** - 5:13
**neck** - 124:11
**need** - 29:21, 30:16, 39:16, 57:21, 62:8, 108:10, 115:6,

161:22, 175:3, 183:18, 186:14, 186:24
**needed** - 109:13, 160:19
**neighborhood** - 148:20, 148:23, 152:11, 152:12
**nervous** - 80:15, 157:13
**never** - 40:19, 63:12, 109:3, 148:15, 156:7, 159:6, 164:5, 166:8, 173:19, 174:2, 174:5
**Never** - 30:12, 30:13, 134:9
**New** - 176:6
**new** - 135:10, 136:10, 179:18, 183:16
**Newark** - 176:6
**news** - 96:14, 96:21, 97:6, 97:12, 97:19, 101:13, 113:25, 114:5, 114:7, 114:9, 188:6
**next** - 4:9, 33:8, 54:13, 55:1, 69:7, 79:22, 83:7, 90:16, 100:13, 101:7, 102:15, 102:22, 105:6, 115:11, 145:2, 145:20, 140:10, 148:16, 148:17, 149:18, 151:5, 151:21, 152:5, 152:25, 155:17, 155:19, 158:7, 158:9, 160:17, 167:4, 167:11, 172:25, 175:5
**Next** - 154:2
**nickname** - 116:14, 121:23, 122:1
**nicknames** - 84:12
**night** - 25:12, 39:23, 54:15, 88:8, 97:3, 101:10, 101:12, 101:14, 101:17, 102:8, 102:13, 122:14, 122:18, 125:20, 135:16, 135:18, 141:13, 142:24, 143:1, 143:3, 165:8, 178:3
**nights** - 188:7
**Nobody** - 140:12
**non** - 20:22
**non-decomposed** - 20:22
**none** - 11:22
**nonspecific** - 20:24
**normal** - 98:19
**north** - 166:16
**note** - 28:12, 58:5
**notes** - 180:24
**Nothing** - 32:25, 68:11, 68:25, 69:1
**nothing** - 64:22, 144:24, 145:18
**notice** - 143:10, 143:18
**noticed** - 187:24
**November** - 35:1, 35:19
**number** - 10:3, 10:12, 10:15, 10:18, 16:14, 19:16, 28:6, 35:21, 38:22, 178:19, 182:24
**Number** - 2:1
**numbered** - 1:22, 189:11
**numbering** - 10:20
**numbers** - 10:19

## O

**Obel** - 1:6, 3:3, 4:8, 42:10, 49:16, 49:24, 50:9, 50:21, 51:3, 51:18, 53:21, 68:8, 73:7, 73:19, 74:18, 78:2, 79:21, 82:8, 82:9, 82:17, 83:13, 84:7, 84:9, 85:17, 86:7, 93:3, 95:20, 97:8, 102:18, 108:16, 110:11, 111:6, 111:11, 111:21, 112:9, 112:11, 112:16, 112:19, 113:10, 113:11,

114:1, 114:14, 118:1,
119:15, 120:1, 120:10,
120:12, 121:6, 121:21,
122:7, 122:9, 135:22, 137:2,
144:15, 148:1, 156:17,
166:19, 168:7, 182:6
**object** - 41:11, 53:23,
57:17, 63:7, 77:17, 125:13,
125:16, 126:18, 171:4,
171:7
  **objected** - 171:5
  **Objection** - 21:19, 22:4,
54:3, 54:23, 113:2, 124:18,
127:7, 134:22
  **objection** - 11:1, 11:3,
13:11, 13:17, 13:18, 13:20,
16:22, 16:23, 77:23, 79:6,
138:25, 139:2, 172:3,
172:13, 172:16
  **objections** - 77:6, 77:19
  **observe** - 45:6, 46:17
  **observed** - 126:3, 126:11
  **obstacles** - 38:20
  **obtain** - 43:7, 50:4, 73:6,
73:18, 74:20, 74:23, 75:1
  **obtained** - 76:14
  **obtaining** - 73:15
  **obviously** - 8:10, 25:10,
40:2, 40:4
  **Obviously** - 19:11, 25:6,
50:5, 177:16
  **occurred** - 67:13, 138:20,
171:4, 189:11
  **October** - 105:9, 175:22,
189:17
  **offenders** - 43:13
  **offense** - 138:20
  **offenses** - 125:13, 125:16
  **offer** - 10:23, 13:9, 27:1,
29:1, 61:17, 77:3, 138:23,
166:3, 170:22, 182:12
  **Offered** - 2:1, 10:25, 13:15,
16:21, 77:5, 138:24, 170:25
  **offered** - 17:3, 166:7,
171:6
  **offering** - 171:20, 171:21
  **office** - 5:6, 6:5, 6:7, 53:7,
53:9, 174:1, 177:4, 177:15,
186:12
  **Office** - 6:1
  **officer** - 34:20, 35:6,
41:15, 41:25, 53:8, 55:20,
63:8, 76:12
  **Officer** - 76:23, 110:21
  **officers** - 40:24, 58:14,
64:11, 164:25
  **Official** - 189:4, 189:16,
189:22
  **often** - 8:19, 132:15,
155:10
  **old** - 34:12, 80:24, 80:25,
81:13, 81:14, 116:21,
116:22, 118:8, 118:10
  **Oldsmobile** - 95:5, 95:22,
96:2, 128:21, 156:19
  **on-call** - 67:25, 115:7
  **Once** - 76:17
  **once** - 47:16, 86:17, 89:9,
99:14, 99:16, 124:2, 124:3
  **One** - 23:12, 134:10
  **one** - 8:10, 10:5, 10:7,
15:10, 15:21, 17:3, 17:5,
17:9, 18:11, 19:12, 19:13,
19:20, 20:1, 22:20, 23:16,
24:3, 28:21, 30:21, 39:11,
42:14, 45:17, 52:9, 53:21,
61:2, 63:20, 64:21, 68:3,
68:7, 68:19, 75:2, 95:9,
95:20, 95:21, 102:20,
112:19, 122:14, 125:21,

129:16, 132:12, 136:9,
146:23, 146:24, 148:3,
150:2, 153:24, 154:25,
158:4, 159:21, 160:11,
167:20, 171:3, 172:10,
179:9, 181:24, 182:1, 183:4,
183:5
  **one-fifth** - 19:20
  **ones** - 19:17, 36:10, 77:8,
123:3, 142:19
  **Open** - 3:1, 4:4, 14:20,
57:24, 58:3, 66:14, 77:21,
79:19, 108:2, 108:13,
126:14, 159:15, 167:23,
172:14, 185:16, 185:21,
187:4, 187:13, 188:15
  **open** - 51:8, 134:4, 189:12
  **opened** - 42:25, 149:20,
186:11
  **opening** - 75:16
  **operation** - 70:20, 71:8,
123:6
  **operations** - 71:6, 71:10
  **opinion** - 29:2, 30:14,
31:23, 187:22
  **opinions** - 6:23
  **opportunity** - 9:22, 73:21,
166:20, 184:8, 187:7
  **opposed** - 60:21
  **optimal** - 27:16
  **option** - 156:11
  **Orchid** - 47:22, 48:2,
48:22, 50:13, 50:16, 50:23,
51:14, 51:17, 51:21, 52:4
  **order** - 3:16, 6:21, 6:23,
7:3, 7:8, 12:13, 154:9,
180:21
  **ordered** - 152:6, 153:6,
153:7, 153:15
  **ordinary** - 101:17, 101:18
  **organ** - 26:16
  **organs** - 8:14
  **originally** - 70:24, 81:24,
82:5, 84:2, 117:17, 130:18,
130:20, 159:24
  **Otherwise** - 184:17
  **otherwise** - 20:14, 25:3,
31:16, 31:21
  **outbursts** - 108:8
  **outside** - 21:19, 21:22,
57:21, 148:20, 149:1
  **overall** - 182:22
  **Overall** - 89:9
  **overbroad** - 64:10
  **overnight** - 184:17
  **own** - 36:4, 65:18, 81:20,
87:12, 156:15, 156:16,
181:17
  **owned** - 128:22
  **owner** - 81:21

# P

  **pack** - 36:19
  **package** - 45:11
  **packaged** - 45:6, 47:18,
64:20, 78:14
  **packaging** - 45:9, 45:14,
45:20, 47:6, 51:10
  **packing** - 99:18
  **Page** - 1:3, 23:3, 172:19
  **page** - 22:20, 23:3, 172:7
  **pager** - 124:3
  **pagers** - 140:21
  **pages** - 185:25
  **paid** - 113:23
  **panties** - 39:22, 48:5
  **pants** - 142:10, 150:15
  **parked** - 137:16, 137:23,
138:16, 139:13, 140:24,

148:8, 149:19, 150:7, 158:3
  **parking** - 139:23, 155:4,
155:18
  **parlor** - 81:19
  **parrot** - 180:5
  **part** - 12:1, 12:9, 12:24,
18:6, 18:7, 19:8, 22:5,
28:11, 30:23, 34:19, 37:2,
48:13, 53:24, 61:17, 71:15,
71:16, 72:1, 81:1, 137:14,
140:21, 142:21, 188:9
  **partial** - 24:21
  **particular** - 9:21, 10:12,
37:14, 44:19, 128:24, 143:1,
177:21
  **parties** - 187:6, 189:9,
189:15
  **partners** - 123:8, 124:2
  **parts** - 187:24
  **Parungao** - 6:10, 6:16
  **Pasadena** - 104:21,
104:24, 149:2, 154:17,
155:12, 163:14
  **pass** - 15:14, 23:5, 28:1,
56:4, 78:24, 183:12
  **Pass** - 32:22, 68:24,
108:21, 174:6
  **passed** - 146:2, 184:8
  **passenger** - 137:6
  **passing** - 164:12, 174:14
  **past** - 178:22
  **path** - 179:20
  **pathologist** - 21:4, 29:23
  **pathology** - 5:21, 5:24, 6:3
  **patrol** - 34:19, 34:20,
34:22
  **pattern** - 34:16
  **Pause** - 114:24
  **pause** - 22:14, 22:18, 56:9
  **pay** - 104:4, 104:13,
132:25
  **peacefully** - 114:16
  **Pelvic** - 18:6
  **pelvis** - 19:23, 19:24
  **penitentiary** - 119:1
  **Pennsylvania** - 165:15,
173:21, 174:24, 176:3,
176:4, 176:9, 176:15
  **people** - 21:3, 28:19,
29:10, 30:16, 36:2, 52:6,
52:9, 72:16, 89:17, 92:3,
116:14, 124:17, 124:25,
125:5, 126:1, 126:4, 126:16,
128:19, 130:5, 131:13,
134:10, 140:15, 161:11
  **People** - 122:2
  **per** - 35:9
  **perform** - 32:3, 72:15
  **performed** - 28:10, 28:11,
39:20, 57:7, 65:4
  **perhaps** - 178:6
  **period** - 49:21, 60:18,
85:25, 136:19
  **permission** - 167:1,
177:16
  **person** - 18:16, 20:6,
20:10, 20:16, 20:18, 21:6,
29:19, 29:23, 30:2, 30:8,
30:17, 44:15, 52:25, 53:16,
53:19, 55:4, 76:19, 90:19,
90:21, 91:13, 106:4, 106:6,
123:17, 126:25, 127:6,
130:8, 130:11, 130:14,
130:15, 130:18, 131:3,
131:11, 131:14, 131:17,
131:25, 142:4, 165:19,
166:21, 166:25, 168:12,
169:19, 169:22, 170:1,
170:11, 173:6, 176:20
  **person's** - 19:9

  **personal** - 65:18
  **personality** - 123:13,
123:14
  **persons** - 109:18
  **Phd** - 5:20
  **phone** - 140:18
  **Phone** - 2:7, 2:13, 2:16
  **phones** - 140:12
  **phonetic** - 130:24, 176:23
  **photo** - 10:12, 169:18,
169:19, 170:4, 170:9,
171:16, 173:6, 173:8
  **Photograph** - 2:4, 2:9
  **photograph** - 10:7, 53:20,
54:14, 54:17
  **photographer** - 72:4
  **photographs** - 7:12, 9:22,
10:3, 10:8, 11:11, 27:16,
53:13, 54:2, 179:5
  **photos** - 54:6, 54:8, 54:12,
169:10, 169:25, 170:23,
172:22, 173:4, 177:9
  **phrase** - 28:24
  **physical** - 5:9, 8:19, 8:24,
24:8, 60:20, 67:9, 181:21
  **pick** - 55:15, 60:20,
127:10, 137:9
  **picked** - 17:5, 53:6, 53:21,
158:10
  **picture** - 15:25, 16:5, 17:2,
17:8, 27:5, 27:9, 27:14,
97:1, 131:24, 135:8, 138:10,
141:23, 156:19, 171:2,
171:3, 171:10, 171:11,
171:13, 171:15, 171:21
  **pictures** - 26:22, 26:25,
27:4, 169:1, 171:5, 177:24
  **piece** - 46:21
  **piled** - 27:7
  **pistol** - 141:16
  **Pittsburgh** - 177:14
  **place** - 87:12, 92:1, 92:7,
98:25, 99:10, 136:9, 148:18,
150:8, 157:1, 161:9
  **placed** - 46:23, 97:15
  **plan** - 14:13, 43:3, 43:5
  **plane** - 162:9
  **planned** - 100:5, 158:24
  **planning** - 99:23, 100:8,
159:4
  **plans** - 99:8
  **plastic** - 45:15, 45:24,
46:23, 46:24
  **play** - 63:14
  **played** - 57:18
  **Plus** - 19:11
  **Pm** - 101:25
  **pocketknife** - 142:9
  **point** - 35:13, 44:21,
48:11, 48:15, 48:25, 51:23,
53:14, 64:21, 67:16, 78:5,
78:15, 82:20, 85:16, 85:20,
87:11, 87:17, 89:23, 91:22,
92:18, 94:3, 103:14, 107:11,
118:5, 121:25, 127:24,
143:23, 145:1, 148:4,
149:15, 150:6, 151:18,
157:12, 163:11, 165:14,
181:24, 182:24
  **points** - 23:12
  **Police** - 34:2, 35:4
  **police** - 34:18, 35:6, 40:24,
100:21, 100:22, 110:16,
114:4, 114:5, 114:10,
164:25
  **policemen** - 111:14
  **poor** - 60:22
  **portions** - 189:8
  **positive** - 36:23
  **possession** - 51:3

**possibility** - 32:16
**possible** - 32:13, 142:13, 157:4
**possibly** - 188:5
**potential** - 36:25
**potentially** - 21:25
**Powerpoint** - 2:3
**practically** - 124:2
**predicate** - 184:4
**prefer** - 117:1
**prepare** - 7:8, 99:22
**prepared** - 183:20
**presence** - 57:22
**present** - 3:1, 3:4, 3:8, 4:4, 6:23, 7:3, 14:20, 26:2, 40:4, 57:24, 58:3, 66:14, 77:21, 79:19, 108:2, 108:13, 126:14, 159:15, 167:23, 172:14, 185:16, 185:21, 187:4, 187:13, 188:15
**Present** - 3:6
**presentation** - 2:3
**presented** - 29:17, 31:14
**presiding** - 1:23
**pretty** - 7:14, 16:8, 20:21, 20:23, 40:17, 78:21, 79:14, 80:18, 87:14, 119:5, 132:5, 132:11, 134:4, 155:9, 157:13, 178:24, 182:3
**previous** - 70:22
**previously** - 48:22, 114:17
**primary** - 43:20
**print** - 186:10
**prison** - 122:15, 164:20, 165:15
**prisoner** - 168:20
**private** - 36:19, 36:20, 39:17, 47:19, 47:20, 53:9
**problem** - 69:24, 94:20, 107:5, 122:11
**problems** - 123:2, 134:19
**Proceed** - 83:15, 126:22
**proceed** - 3:7, 4:7, 4:15, 11:4, 13:21, 14:21, 23:9, 28:5, 33:16, 59:14, 66:16, 66:18, 69:21, 77:24, 79:20, 108:15, 108:18, 108:24, 116:2, 126:13, 139:3, 159:17, 160:1, 160:15, 167:24, 172:17, 174:8, 174:9, 174:11, 175:13, 183:14
**Proceedings** - 1:16, 1:24, 1:2, 188:18
**proceedings** - 1:21, 189:8, 189:14
**process** - 59:25, 67:10, 70:19, 71:11
**processed** - 61:4
**processing** - 60:25, 62:19, 62:24, 63:20, 67:14, 67:20
**proficient** - 178:17, 178:18
**profile** - 43:4, 43:8, 43:14, 43:21, 48:6, 48:7, 48:16, 48:20, 48:24, 49:6, 49:25, 51:18, 51:19
**profiles** - 39:25, 43:12, 48:23
**program** - 43:12
**promise** - 182:8
**promises** - 166:1, 173:14, 174:1
**promoted** - 34:21
**prompt** - 79:14
**property** - 45:4, 46:9, 46:15
**prosecutor** - 160:3, 176:2
**protect** - 41:7
**protective** - 127:2
**protocol** - 22:20, 23:3

**prove** - 61:17, 63:5
**provided** - 177:24, 183:5
**Providence** - 5:22
**publish** - 11:7, 13:25, 16:11, 16:25, 172:19
**Puerto** - 49:19, 50:6, 50:18, 51:11, 70:23, 71:13, 74:4, 74:5, 83:20, 84:25, 85:19, 85:22, 86:16, 89:15, 99:12, 99:24, 100:8, 103:1, 103:8, 105:12, 112:13, 119:17, 119:19, 119:22, 119:25, 127:18, 127:20, 130:18, 130:21, 162:9, 162:10
**pulled** - 37:25, 150:15
**purpose** - 6:20, 132:17, 132:18, 134:18, 137:8, 167:3, 167:9
**purposes** - 8:3, 29:7, 40:18, 41:21, 51:4, 58:4, 75:8, 171:23
**pursuing** - 51:4
**put** - 15:25, 46:6, 49:11, 49:13, 53:13, 75:14, 75:19, 76:18, 78:16, 106:1, 127:15, 142:19, 152:6, 153:13, 153:15, 153:20, 174:10, 174:12, 186:2, 186:14
**putting** - 49:14, 153:24, 154:11

# Q

**Q-tip** - 73:12
**Q-tips** - 75:1
**Quantico** - 176:5, 179:18
**questioned** - 43:25
**questioning** - 63:2, 176:13
**questions** - 25:24, 58:21, 65:14, 65:16, 79:3, 109:20, 109:21, 110:14, 111:10, 114:25, 115:2, 115:4, 117:6
**quick** - 127:1
**quiet** - 100:15, 108:5
**quit** - 88:16
**Quite** - 52:23
**quite** - 10:3, 32:2, 115:17

# R

**raise** - 3:11
**raising** - 34:9
**Ramon** - 87:7
**rape** - 37:1, 40:3, 44:25, 63:1
**raped** - 145:8
**rapist** - 55:3
**rather** - 27:17
**re** - 3:16, 66:24
**re-enter** - 3:16
**re-read** - 66:24
**reach** - 6:21, 97:13
**react** - 55:6
**reacted** - 126:16
**reaction** - 52:22, 54:19, 125:25, 145:11
**reactions** - 126:3
**read** - 22:7, 22:16, 58:17, 59:18, 60:12, 66:24, 127:8, 185:14
**ready** - 4:7, 46:5, 65:24, 66:16, 79:20, 99:17, 108:15, 159:17, 168:19, 174:9, 174:11, 174:17, 174:19, 174:20
**realize** - 108:3
**really** - 8:13, 8:18, 8:21, 11:19, 20:24, 24:23, 25:17, 25:19, 27:4, 30:21, 67:2,

178:4
**reason** - 24:23, 40:2
**receive** - 49:15, 51:23
**received** - 48:13, 50:25, 52:1, 52:4, 13:23
**recess** - 79:18, 185:13, 185:17, 188:16
**Recess-** 108:12, 159:14, 185:20
**recessed** - 188:18
**recognize** - 10:7, 47:4, 47:9, 75:9, 75:12, 133:9, 133:12, 166:22, 168:23, 169:19, 169:22, 170:1, 170:4, 170:7, 170:11, 170:14, 173:3, 173:8
**recollect** - 184:7
**Record-** 1:1, 189:10, 189:13
**record** - 3:2, 14:7, 28:16, 56:12, 57:20, 58:5, 58:11, 59:13, 61:19, 62:14, 66:5, 77:7, 77:13, 78:10, 78:12, 83:5, 83:12, 110:4, 125:11, 167:8, 171:1, 183:25, 185:22, 186:2, 186:15, 186:18, 187:2, 187:3, 187:25
**recording** - 187:24
**records** - 5:12, 9:15, 20:9, 31:19, 31:20, 61:17, 186:23
**recover** - 22:25, 35:7
**recovered** - 12:24, 17:14, 18:11, 18:12, 19:9, 22:3, 24:20, 30:15, 45:9, 51:5, 54:18, 181:23
**Recross-** 28:8, 68:14
**Recross-examination-** 28:8, 68:14
**red** - 138:12, 139:8
**redirect** - 68:2
**Redirect-** 23:10, 68:5
**reflect** - 78:11, 78:12, 83:5, 83:12
**reflects** - 189:14
**refresh** - 110:18
**refusing** - 179:7
**refute** - 21:12
**regard** - 179:17
**regarding** - 6:22, 58:6
**regular** - 38:17
**regularly** - 35:5
**reinforced** - 123:22
**related** - 73:5, 85:14
**relationship** - 84:22, 84:24, 88:4, 89:10, 91:7, 131:18, 133:14, 133:20
**release** - 181:12
**relevant** - 63:25, 67:12, 171:7, 171:22, 171:25
**relied** - 94:21, 94:22
**relies** - 8:21
**rely** - 8:25, 24:9
**relying** - 64:2
**remain** - 11:10, 11:14, 11:15, 12:19, 12:20, 21:7, 21:14, 30:12, 30:13, 31:6, 31:15, 31:25
**Remember-** 167:10
**remember** - 32:11, 37:22, 87:6, 89:19, 90:18, 91:15, 94:5, 94:7, 95:1, 95:4, 95:7, 95:14, 96:4, 96:7, 96:9, 96:11, 99:4, 101:16, 102:14, 103:4, 103:5, 103:15, 104:6, 104:8, 104:18, 104:20, 104:23, 104:25, 105:1, 105:17, 105:18, 106:3, 106:8, 107:12, 107:23,

110:23, 118:8, 118:11, 121:3, 122:4, 123:24, 127:14, 128:2, 128:4, 128:21, 129:12, 129:20, 136:16, 136:5, 136:19, 140:1, 140:23, 141:2, 141:3, 141:8, 142:22, 142:25, 143:3, 143:5, 143:17, 146:9, 146:12, 146:14, 152:15, 152:18, 153:24, 153:25, 154:2, 154:7, 154:8, 155:1, 155:3, 155:12, 155:15, 155:17, 156:6, 156:14, 156:25, 157:5, 157:9, 157:16, 157:18, 158:6, 158:7, 158:20, 162:11, 163:18, 163:23, 163:24, 165:16
**remembered** - 38:1
**remind** - 187:19, 187:23, 188:9
**remote** - 25:11
**remove** - 14:12, 150:14
**Rendon-** 158:10, 161:11, 161:12, 161:16
**Renee-** 1:22
**rent** - 94:14, 94:22, 104:4, 113:24, 155:8, 163:13
**rented** - 94:10, 94:12, 104:13, 113:7
**repeat** - 50:14
**Repeat-** 120:11
**report** - 6:15, 7:13, 7:14, 10:11, 10:16, 22:7, 22:21, 22:22, 24:18, 32:9, 32:15, 78:16, 97:7, 113:25, 180:25, 184:12, 185:24, 187:8
**reported** - 1:24, 25:8, 37:1, 188:3, 189:12
**reporter** - 59:18, 70:12, 74:8
**Reporter-** 62:15, 189:4, 189:22
**Reporter's-** 1:1, 1:13, 189:1, 189:10, 189:13
**reports** - 7:1, 177:3, 179:25
**representing** - 11:11
**Republic-** 81:25, 112:14, 117:18, 117:20, 118:3, 119:20, 120:4, 158:21
**request** - 167:1, 182:25
**requested** - 73:6, 182:22, 189:8
**require** - 126:21
**resealed** - 64:20
**reserve** - 174:10, 174:12, 175:2
**reside** - 70:18
**residence** - 24:22
**respect** - 60:3, 171:8
**respective** - 189:15
**respond** - 98:6, 98:7, 100:23, 106:12, 106:17, 116:1
**responds** - 131:4
**response** - 64:13, 71:17, 71:18, 71:20, 71:22, 72:1, 72:23, 144:18, 159:24, 160:5
**responses** - 159:22
**responsibilities** - 71:15
**responsibility** - 5:10, 186:4
**responsible** - 32:15
**rest** - 35:2
**restate** - 159:23
**restroom** - 150:22, 151:7
**result** - 5:8
**results** - 36:23, 41:24,

48:12, 48:13, 49:1, 49:3, 49:5, 51:23, 52:2, 52:4, 52:25, 64:5, 68:21
  **resume** - 159:20, 188:12
  **resumes** - 20:3
  **retaliated** - 125:20
  **retired** - 34:3
  **retrieved** - 47:16
  **return** - 103:16, 168:14, 168:22
  **returned** - 5:22, 35:1, 36:22
  **returning** - 103:13
  **revealing** - 183:10
  **reverse** - 148:5
  **review** - 5:11, 6:15, 6:21, 7:1, 7:9, 7:11, 9:22, 65:18, 67:18, 177:1, 177:9, 179:24, 184:12, 187:7
  **reviewed** - 10:3, 10:16, 39:15
  **reviewing** - 42:15, 177:6, 177:11
  **rib** - 26:1, 27:8
  **Ribs**- 17:12
  **ribs** - 17:13, 17:16, 17:21, 17:22, 19:16
  **Rican**- 51:11
  **Rico**- 49:19, 50:6, 50:18, 70:23, 71:13, 74:4, 74:6, 83:20, 84:25, 85:19, 85:22, 86:16, 89:15, 99:12, 99:24, 100:9, 103:1, 103:8, 105:13, 112:14, 119:17, 119:18, 119:19, 119:22, 120:1, 127:18, 127:20, 130:19, 130:21, 162:9, 162:10
  **rifle** - 129:23
  **rights** - 182:21, 183:1, 183:3
  **Rio**- 52:15
  **rise** - 79:17, 108:1, 159:13, 185:19, 188:14
  **river** - 152:25, 153:1, 153:8
  **roadway** - 152:20
  **roadways** - 180:21
  **Robles**- 87:7
  **rocks** - 153:22
  **Rodriguez**- 1:10, 1:20, 39:25, 55:18, 76:24, 79:24, 80:6, 80:11, 80:23, 80:24, 81:24, 82:17, 83:9, 83:16, 87:17, 89:24, 90:14, 93:19, 96:10, 100:6, 101:9, 105:2, 108:17, 108:19, 109:2, 115:9, 117:23, 170:12, 170:16, 189:4, 189:21
  **Rodriguez's**- 48:7
  **Rogelio**- 44:8, 44:11, 166:25
  **Roger**- 130:15, 130:25, 134:10, 136:2, 136:10, 141:20, 141:21, 142:6, 143:15, 166:21, 167:5, 169:9, 169:10, 169:20, 169:23, 171:8, 173:7, 173:8, 173:10
  **Roger's**- 171:9
  **Rolando**- 2:20
  **romantic** - 133:20
  **room** - 45:4, 46:7, 46:9, 46:15, 97:20, 97:21, 101:25, 124:10, 155:8, 163:13
  **rotate** - 72:5
  **roughly** - 36:13
  **round** - 149:8
  **Rp**- 2:11
  **rub** - 73:12
  **Rudy**- 55:21, 85:5, 85:11,

85:14, 85:16, 85:19, 85:24, 86:5, 86:6, 87:8, 90:4, 91:10, 91:11, 91:12, 104:17, 116:18, 116:21, 159:19, 173:12, 184:4, 184:8, 184:24
  **Rule**- 3:15
  **ruling** - 61:19
  **run** - 81:20

# S

  **sac** - 149:9, 149:11
  **salon** - 81:20, 81:21, 109:17, 109:18
  **sample** - 42:10, 42:12, 42:22, 43:2, 43:19, 44:2, 44:4, 44:7, 44:16, 50:1, 50:4, 50:9, 50:11, 50:20, 50:25, 51:8, 68:7, 73:10, 73:13, 73:15, 76:17
  **samples** - 39:24, 40:12, 43:24, 44:19, 48:21
  **San**- 70:23, 71:13, 71:16, 74:5, 74:14, 74:15
  **Santana**- 1:11, 1:22, 44:5, 54:9, 115:13, 115:23, 116:3, 159:18, 168:17, 182:7
  **Santo**- 90:24, 105:8, 105:16, 105:20, 118:21
  **sat** - 52:24, 109:23, 109:24, 110:9, 137:18, 177:16
  **save** - 68:19
  **saw** - 28:15, 28:22, 97:1, 97:6, 97:12, 105:3, 105:6, 105:16, 114:7, 114:9, 133:9, 140:3, 140:4, 142:6, 143:25, 144:2, 144:11, 144:13, 144:16, 146:2, 146:5, 150:20, 164:5, 164:18
  **Sbot** - 2:4, 2:5, 2:12, 2:15
  **scapula** - 18:5, 19:12, 19:15
  **scared** - 32:14, 112:21, 112:22, 112:24, 145:1, 145:13, 147:17, 149:16, 157:19, 165:7
  **Scene** - 72:12, 72:14
  **scene** - 5:12, 7:12, 8:21, 9:14, 35:7, 39:22, 41:9, 41:17, 181:21, 181:23
  **scenes** - 72:9
  **scheduled** - 162:15
  **science** - 40:21, 41:16
  **Sciences**- 6:18, 7:1
  **scientific** - 67:10
  **scream** - 151:4
  **screams** - 161:6
  **screen** - 129:1, 139:14, 172:25
  **seal** - 76:19
  **sealed** - 46:24, 47:14, 51:10, 78:14, 78:17
  **search** - 52:6
  **seat** - 69:17, 144:3, 147:4, 147:24, 152:7, 168:17
  **seated** - 4:5, 66:15, 108:14, 159:16, 187:14
  **second** - 22:15, 56:6
  **seconds** - 22:16
  **secured** - 47:18
  **see** - 11:20, 11:21, 12:6, 15:2, 15:23, 21:1, 22:3, 27:9, 27:13, 27:14, 29:24, 39:12, 43:21, 49:12, 50:8, 62:7, 65:11, 68:20, 69:7, 76:21, 77:10, 78:1, 82:17, 90:25, 98:11, 100:25, 101:3, 106:4, 109:9, 110:17, 113:5,

125:15, 133:5, 138:12, 138:15, 138:19, 139:6, 139:8, 139:20, 139:23, 139:25, 142:8, 142:14, 142:21, 143:23, 145:24, 146:18, 151:25, 157:14, 164:3, 164:15, 165:17, 166:20, 169:3, 172:4, 172:8, 172:22, 172:25, 173:22, 181:13, 184:6, 185:11, 186:11, 186:25, 188:1
  **seeing** - 15:8, 15:12, 157:10
  **seek** - 135:20
  **seem** - 98:17, 98:20, 147:10
  **self** - 23:14
  **self-inflicted** - 23:14
  **sell** - 113:22, 118:15, 120:16, 133:2, 135:5, 155:20
  **selling** - 113:9, 113:13, 113:15, 113:18, 119:12, 123:4, 162:7
  **semen** - 42:4
  **send** - 39:16, 55:20
  **sending** - 61:1, 65:2
  **senior** - 73:2
  **sense** - 25:17, 25:21, 27:24
  **sent** - 39:24, 48:21, 50:12, 50:15, 50:23, 51:11, 51:14, 60:8, 61:3, 61:8, 62:22, 63:5, 63:12, 63:19, 64:15, 78:17, 177:2
  **sentence** - 119:3, 119:9
  **separate** - 86:2, 158:1
  **Separate** - 86:3
  **September** - 6:8, 43:1, 56:3, 96:11
  **sequence** - 7:24
  **Sergeant** - 3:9, 33:9, 33:14, 59:17, 66:17, 66:22, 69:5, 110:17, 110:20
  **sergeant** - 34:21, 34:22, 36:1
  **sergeant's** - 34:21
  **series** - 170:23
  **serious** - 106:25
  **served** - 34:24
  **service** - 35:8, 71:7
  **serving** - 72:22, 118:25
  **set** - 76:21
  **sets** - 74:23
  **settle** - 120:20
  **seven** - 119:4
  **Seventeen** - 81:14, 81:23, 119:4
  **several** - 14:25, 36:15
  **sexual** - 38:11, 39:20, 46:11, 47:10, 48:4
  **shared** - 95:2
  **sheet** - 22:20
  **ship** - 36:19, 46:6
  **shipped** - 47:19, 48:2
  **shipping** - 47:18
  **shirt** - 13:6, 13:14, 14:3, 78:7, 83:1
  **Shirt** - 2:5
  **shirts** - 83:7
  **short** - 69:8, 121:19, 135:11, 135:12, 136:15, 136:20, 156:5
  **shorthand** - 1:25
  **shortly** - 79:16, 121:5, 123:9
  **shot** - 20:6, 30:2
  **shoulder** - 18:4, 19:15
  **show** - 10:5, 13:2, 13:23, 16:1, 16:4, 19:6, 47:2, 54:5,

54:8, 60:21, 69:7, 75:7, 90:14, 95:15, 97:1, 123:25, 130:7, 130:10, 131:24, 138:8, 169:1, 169:6, 169:18, 169:25
  **Show** - 19:8, 139:13
  **showed** - 38:7, 54:9, 54:12, 54:14, 54:17, 134:10, 177:24
  **showing** - 41:4, 131:2, 179:5
  **shown** - 11:12
  **shows** - 41:3
  **sick** - 7:2, 184:20
  **side** - 17:17, 20:1, 27:15, 139:6, 141:6, 149:21, 167:17
  **side-by-side** - 167:17
  **sides** - 19:22, 19:25
  **sign** - 155:15, 183:6
  **signs** - 8:19, 20:22
  **silent** - 183:4
  **similar** - 17:2, 27:2, 72:14, 73:11, 125:23
  **Similar** - 45:19
  **Similarly** - 8:23
  **simply** - 24:20, 53:14
  **sink** - 153:16, 154:2, 154:4
  **Sit** - 137:17
  **sit** - 166:9
  **site** - 180:10, 180:11
  **sitting** - 83:7, 137:5, 139:17
  **situation** - 59:8
  **six** - 36:18
  **size** - 129:17, 141:23
  **skeletal** - 11:12, 12:2, 30:12, 30:13
  **skeletonization** - 24:21
  **sketcher** - 72:5
  **skin** - 8:14, 41:23, 42:5
  **Skip** - 3:5, 109:2, 186:10, 186:24
  **skull** - 18:12, 19:11, 21:15
  **sleep** - 102:8
  **sleeping** - 97:22, 98:9, 102:2
  **slow** - 174:12
  **small** - 46:3, 121:10, 129:16, 142:9
  **smaller** - 18:10
  **smell** - 88:25
  **smoke** - 88:15, 88:19, 124:4
  **smoker** - 55:3
  **snorting** - 123:11
  **so-called** - 61:7
  **socialize** - 93:9
  **software** - 43:12
  **sold** - 122:16, 124:17, 126:16, 132:21, 162:5
  **solely** - 71:12
  **solve** - 37:10, 40:20, 42:9, 60:15, 61:4, 67:6
  **solved** - 41:4
  **someone** - 12:4, 17:19, 21:11, 25:7, 26:6, 26:10, 26:13, 32:6, 32:8, 44:7, 76:25, 91:17, 125:7, 131:15, 179:15
  **sometime** - 102:13, 103:13
  **sometimes** - 11:20, 24:10, 30:6, 72:8, 117:1, 128:7, 128:18, 130:25, 133:7, 155:21
  **Sometimes** - 30:10, 88:20, 89:5, 89:8, 93:11
  **somewhere** - 26:7, 92:12, 105:9, 152:24, 180:18

**son** - 38:9, 54:18, 93:12, 179:4
**sons** - 179:4
**soon** - 87:14, 103:13
**sorry** - 13:13, 20:17, 50:14, 60:22, 68:3, 69:23, 94:19, 99:15, 108:7, 116:22, 153:7, 165:10, 184:9
**Sorry** - 82:3
**sort** - 11:22, 179:2, 184:3
**sorts** - 8:24
**sounds** - 14:10, 25:16
**South** - 81:3, 176:7
**southwest** - 34:19, 71:9
**space** - 149:8
**Spanish** - 53:7, 53:8, 55:20, 115:15, 115:18, 117:1, 117:13, 131:4, 176:1, 178:15, 178:17, 182:22
**Spanish-speaking** - 53:8, 55:20, 115:15
**speaker** - 178:16
**speaking** - 53:8, 55:20, 115:15, 187:15
**special** - 35:14, 38:15, 166:3, 173:13, 174:4, 182:13
**Special** - 165:25, 175:19, 177:2, 177:25, 187:10
**specialized** - 179:19
**specific** - 63:13, 63:21, 64:15, 123:21, 123:24, 126:9, 126:23, 161:5, 180:13
**specifically** - 37:3, 38:4, 59:2, 63:1, 63:10, 67:11, 73:24
**specifics** - 181:11
**speculation** - 22:5, 27:11, 41:12
**spell** - 70:11, 74:10
**spelled** - 175:20
**spelling** - 74:9
**spend** - 90:8, 117:19, 177:6
**spending** - 113:21
**spent** - 33:25, 35:2, 124:15, 130:1
**spine** - 18:6, 19:19, 19:20
**spit** - 161:25
**squad** - 71:10
**Squad** - 35:20
**squads** - 71:8
**stab** - 28:15
**stabbed** - 12:4, 17:19, 18:17, 20:6, 26:6, 26:10, 26:16, 29:19, 29:24, 152:3
**stand** - 18:20, 20:3, 63:12, 108:17, 167:4, 167:11, 167:15, 167:16, 168:6, 168:7, 168:12, 168:15
**standard** - 23:23
**standing** - 145:14, 154:14, 154:15
**standpoint** - 21:2, 21:4
**start** - 150:23
**started** - 35:14, 35:20, 86:17, 99:17, 134:15, 187:9
**started** - 6:14, 34:14, 36:3, 52:6, 55:7, 86:20, 99:20, 99:21, 122:14, 126:20
**State** - 1:11, 2:7, 3:3, 3:6, 4:7, 4:9, 4:10, 16:19, 17:3, 33:9, 69:12, 79:21, 79:22, 79:23, 108:15, 115:12, 189:2, 189:5
**state** - 5:9, 24:21, 172:9, 176:3
**State's** - 1:4, 10:6, 10:24, 10:25, 11:2, 11:5, 13:3,

13:5, 13:7, 13:10, 13:15, 13:19, 13:22, 13:25, 47:3, 75:9, 75:17, 75:18, 75:24, 76:2, 76:9, 77:4, 77:5, 77:22, 77:25, 90:15, 90:18, 91:9, 91:13, 91:16, 95:15, 95:16, 129:1, 130:7, 130:10, 130:14, 131:2, 131:24, 132:8, 134:11, 138:9, 138:23, 138:24, 139:1, 139:4, 169:7, 170:23, 170:25, 172:15, 172:18, 172:19
**statement** - 31:21, 32:8, 53:11, 56:14, 56:15, 62:13, 62:14, 63:8, 63:11, 63:22, 64:8, 67:5, 178:1, 179:8, 179:11, 181:4, 181:11, 183:10
**statements** - 178:8, 178:9
**states** - 72:12
**States** - 111:24, 118:6, 119:12, 119:20, 120:9, 120:13, 122:22, 122:24, 127:20
**statistics** - 8:3, 29:7
**stay** - 3:25, 14:13, 35:10, 84:25, 100:3, 100:19, 100:20, 101:5, 104:15, 128:7, 156:4, 163:4, 163:11, 163:16, 163:22
**stayed** - 94:9, 100:15, 101:13, 102:9, 104:23, 107:15, 155:9, 158:3
**staying** - 104:9, 136:9, 163:21
**stead** - 28:20
**steering** - 141:4
**step** - 48:19, 69:6, 79:8, 108:10, 115:9, 167:2, 168:1, 175:1, 175:2
**steps** - 150:2
**still** - 9:5, 49:5, 49:8, 59:7, 60:19, 67:8, 81:15, 102:6, 108:16, 147:6, 148:1, 154:10, 157:13, 163:1
**stockings** - 142:20
**stones** - 149:12
**stop** - 148:14
**stopped** - 148:24, 149:4, 149:6, 186:12
**storage** - 46:3, 46:7
**store** - 131:11, 131:12
**stored** - 45:2, 45:13, 45:15, 46:18, 46:21
**story** - 112:23, 165:20, 173:16, 173:18
**straighten** - 60:14
**strange** - 98:20, 100:11
**strangled** - 30:4, 30:8
**street** - 137:16, 137:23, 138:2, 138:3, 138:15, 148:7, 148:18, 149:7
**stretch** - 61:25, 134:8
**strictly** - 30:18
**strike** - 12:5, 12:9
**strong** - 127:5, 141:24
**studied** - 71:7
**studies** - 66:10
**study** - 66:10
**stuff** - 14:10, 23:21, 39:2, 57:4, 65:2, 66:3, 66:9, 111:20, 127:13, 137:13, 165:3
**styled** - 189:11
**subject** - 69:3, 69:6, 79:9, 115:8, 187:21
**submerged** - 12:21, 14:3, 14:24
**submit** - 56:22

**submitted** - 64:25, 65:1, 65:7, 67:19
**subspecialty** - 5:25
**subtle** - 20:23
**suburb** - 74:13
**successful** - 42:20
**successfully** - 178:18
**sudden** - 5:8, 62:8
**suggestion** - 21:10
**suicide** - 8:5, 29:1
**suit** - 78:7, 83:10
**Suite** - 2:15
**support** - 71:7, 71:9
**suppose** - 32:17
**supposed** - 171:3
**suppress** - 77:15
**surfaces** - 8:14
**surprised** - 97:8
**surrounding** - 9:10, 24:4, 27:22
**suspect** - 39:12, 42:10, 43:3, 43:20, 87:18, 87:21
**suspected** - 91:22
**sustain** - 135:3
**sustained** - 21:21, 27:12, 41:13, 53:25, 54:4, 54:25, 113:4, 124:20, 127:9
**swab** - 2:6, 2:7, 73:9, 73:10, 75:2
**swabs** - 40:5, 40:8, 73:7, 73:18, 74:20, 74:24, 75:1, 75:15, 75:20, 75:21, 76:1, 76:4, 76:5, 76:14, 77:1, 78:3, 78:14
**swayed** - 108:7
**swear** - 156:6, 156:7
**sworn** - 3:12, 3:13, 4:12, 4:17, 33:12, 33:19, 69:14, 70:1, 80:1, 80:2, 80:7, 115:20, 115:21, 115:22, 116:4, 175:8, 175:10, 175:15
**Sx** - 2:2, 2:4, 2:5, 2:6, 2:7, 2:8
**System** - 43:11
**system** - 10:20, 43:17

## T

**table** - 4:3, 53:13, 167:15
**tail** - 119:5
**tall** - 141:24
**tape** - 76:7
**Task** - 76:23
**taxi** - 157:1, 157:3
**team** - 71:16, 71:17, 71:18, 71:20, 71:22, 72:1, 72:4, 72:23, 73:2
**technician** - 71:7, 71:9
**technique** - 180:6
**technology** - 36:15, 37:8, 37:10, 40:20, 41:10, 59:22, 60:21, 62:3
**telephone** - 106:5
**television** - 41:4, 90:16, 96:22, 96:24, 96:25, 97:2, 101:19, 112:4
**Ten** - 167:18, 185:25
**ten** - 36:18
**tension** - 102:6
**term** - 72:11
**Terrace** - 2:12
**terrorism** - 176:10
**test** - 22:2
**tested** - 21:25, 36:16, 38:12, 39:12, 39:17, 58:7, 58:13, 61:11
**testified** - 4:17, 18:14, 33:19, 62:1, 70:1, 80:7, 116:4, 175:15

**testify** - 7:3, 116:12
**testifying** - 23:21
**testimony** - 3:18, 58:12, 59:18, 66:25, 67:3, 108:3, 108:20, 174:4
**testing** - 39:19, 39:25, 42:9, 48:18, 49:1, 52:5, 53:1, 56:22, 58:6, 58:15, 58:25, 59:5, 60:7, 60:15, 63:13, 63:16, 63:17, 64:3, 64:4, 64:5, 64:10, 68:21
**Texas** - 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:3, 4:7, 5:18, 5:22, 79:21, 108:16, 189:2, 189:6, 189:21, 189:24
**themselves** - 41:5, 61:1, 65:3
**thereon** - 187:22
**thigh** - 18:7, 19:24
**thinking** - 40:24, 40:25, 41:9, 41:22, 42:3, 43:20, 62:3, 64:11, 64:13, 67:5, 67:8, 147:5, 149:14
**threaten** - 182:16
**three** - 3:7, 19:25, 82:3, 104:25, 124:5, 136:4, 136:7, 136:23, 149:19
**Three** - 85:2
**throat** - 26:14
**throw** - 166:16, 166:17, 166:18
**Thunderbird** - 95:5, 95:11, 95:24, 128:17
**tibia** - 18:9, 18:11
**ticket** - 162:8, 162:9
**tied** - 124:11
**tip** - 73:12
**tips** - 75:1
**tired** - 188:12
**tires** - 154:22, 155:23, 158:10, 161:1, 161:19
**Tise** - 2:3, 3:6, 3:24, 4:10, 4:15, 4:19, 9:25, 10:2, 10:23, 11:6, 11:9, 12:25, 13:2, 13:9, 13:13, 13:23, 14:2, 14:12, 14:16, 14:21, 14:22, 14:23, 15:14, 16:23, 21:19, 22:4, 23:7, 23:8, 23:11, 27:13, 28:1, 28:2, 32:25, 33:2, 33:9, 33:16, 33:17, 33:21, 41:14, 46:25, 47:2, 54:1, 54:5, 55:1, 56:4, 56:5, 56:21, 57:17, 58:11, 58:23, 59:3, 61:25, 63:7, 64:2, 64:6, 64:23, 65:1, 65:12, 68:2, 68:3, 68:6, 68:11, 69:1, 69:21, 115:12, 115:14, 115:16, 116:2, 116:7, 124:21, 125:19, 126:7, 126:15, 126:23, 127:10, 131:14, 134:25, 135:4, 138:6, 138:8, 138:22, 139:5, 144:14, 159:23, 160:15, 160:16, 160:17, 165:14, 166:24, 167:4, 167:7, 167:10, 167:14, 167:19, 167:22, 167:25, 168:4, 168:5, 168:14, 168:21, 168:23, 169:4, 169:6, 170:22, 171:9, 171:12, 171:15, 171:20, 171:25, 172:6, 172:9, 172:19, 172:22, 174:6, 174:7, 174:22, 175:6, 175:13, 175:17, 183:12, 183:13, 184:12, 185:1, 185:5, 186:9, 186:21, 186:24
**title** - 71:5

**today** - 23:22, 59:23, 60:2, 80:15, 82:18, 165:4, 174:20, 174:23, 183:16, 184:2, 187:6, 188:11
**together** - 44:22, 46:11, 83:22, 84:20, 86:2, 90:7, 90:8, 91:8, 93:10, 93:23, 113:19, 120:18, 121:7, 122:8, 123:4, 132:13, 135:7, 136:3, 136:6, 136:16, 136:24, 144:23, 164:15
**tomorrow** - 184:11, 185:2
**tonight** - 188:7
**took** - 24:14, 34:21, 53:6, 76:4, 78:3, 88:16, 123:9, 124:10, 124:12, 141:8, 141:10, 146:10, 146:12, 148:11, 162:20, 162:23, 164:2, 177:25, 180:21, 180:24
**tools** - 11:16
**totality** - 9:16
**totally** - 112:18
**touch** - 139:14, 139:15
**touchstone** - 179:2
**tour** - 34:25
**toward** - 150:24, 154:16
**towards** - 60:19, 150:8, 166:15
**town** - 74:9, 81:2
**toxicology** - 22:22
**traffickers** - 176:8
**trafficking** - 119:1, 176:7
**trail** - 55:15
**trained** - 35:5, 72:2
**training** - 5:15, 5:21, 5:24, 5:25, 6:2, 23:18, 35:9, 35:11, 175:24, 176:5, 179:17, 179:18, 179:19, 179:20
**transcription** - 189:7
**transcription/stenograph** - 1:25
**transferred** - 34:23, 176:9
**Travis** - 46:16
**Tree**- 94:4
**Trial**- 1:3
**trial** - 171:24, 187:21, 187:22, 188:7, 188:12
**tried** - 145:20, 153:21
**trigger** - 38:10
**trip** - 99:18, 100:5, 158:24
**trouble** - 94:17, 100:22, 114:14, 117:2, 166:12
**trucks** - 155:18
**true** - 32:12, 189:7
**truly** - 189:14
**truth** - 116:13, 143:2
**try** - 111:10, 122:19, 122:20, 126:7, 156:9, 156:12, 178:9, 184:16, 184:18, 184:21, 186:19
**trying** - 60:10, 61:18, 72:6, 126:8, 145:15, 146:11, 156:21
**turn** - 118:19, 118:23
**Tv-** 114:1, 188:2, 188:3, 188:5
**Twelve**- 17:17
**twenty** - 82:13
**Twenty-** 17:18, 82:3, 82:13
**Twenty-four**- 17:18
**Twenty-three**- 82:3
**Twenty-two**- 82:3
**two** - 10:19, 18:3, 18:8, 20:1, 22:16, 40:12, 74:23, 82:3, 83:6, 84:18, 86:8, 87:16, 104:25, 105:17, 109:18, 123:22, 124:5, 147:23, 150:2, 153:24, 176:18
**Two**- 75:3, 76:1, 81:12, 102:5
**type** - 45:16, 45:17
**types** - 8:21, 37:1, 38:15, 56:21, 58:14

## U

**ultimately** - 41:24, 50:20, 178:11, 179:7
**Umberto**- 54:11
**uncleared** - 35:21, 36:12, 36:13
**uncommon** - 40:3, 40:7
**uncooperative** - 178:21
**under** - 25:13, 153:16, 178:6
**undergraduate** - 175:25
**understood** - 66:25, 183:7
**undetermined** - 8:7, 9:3
**unexpected** - 5:8
**unfortunately** - 27:19
**unidentified** - 48:19, 49:6
**unique** - 23:22
**Unit** - 36:4, 72:12, 72:14
**unit** - 37:12
**United** - 111:24, 118:6, 119:12, 119:20, 120:9, 120:13, 122:22, 122:24, 127:19
**University** - 5:16, 5:18, 5:21, 5:22
**unknown** - 48:24
**unless** - 3:17, 24:25, 171:5
**up** - 4:14, 12:21, 15:25, 16:9, 17:8, 18:23, 19:3, 27:7, 33:14, 35:10, 38:7, 45:8, 47:14, 53:6, 53:21, 55:15, 55:24, 60:21, 61:17, 69:18, 71:1, 75:16, 80:3, 92:21, 94:6, 96:18, 98:3, 98:9, 99:18, 102:15, 104:9, 104:14, 107:13, 114:1, 115:24, 117:19, 118:2, 120:5, 124:11, 126:4, 136:13, 137:9, 144:3, 145:9, 148:7, 154:22, 154:23, 154:25, 155:1, 158:10, 168:6, 172:1, 173:13, 173:21, 175:11, 177:3, 181:1, 181:2, 181:14, 181:16, 187:9, 188:5
**upcoming** - 103:19
**updated** - 35:6
**upset** - 102:3, 157:13
**upstairs** - 145:5, 161:15

## V

**vacation** - 7:2
**vagina** - 40:5, 40:9
**Valdez**- 109:7
**Valley** - 52:15, 176:23
**variety** - 176:10, 176:11
**various** - 72:3, 177:24, 180:18
**vehicle** - 95:4, 95:9, 96:8, 136:24, 138:16
**vehicles** - 95:2, 95:6, 95:13, 96:4
**vertebra** - 19:18
**vertebrae** - 18:6
**victim** - 38:5, 38:8, 40:4, 179:5
**victims** - 37:3
**violence** - 31:3
**violent** - 25:1, 31:9, 31:13, 71:7, 123:16, 126:25
**violently** - 31:3

**Virginia** - 176:6
**visit** - 92:24, 100:9, 164:19
**visits** - 132:17
**vital** - 8:3, 26:16, 29:7
**Vladimir**- 6:9
**voice** - 4:14, 18:22, 19:3, 33:14, 69:18, 80:3, 115:24, 175:11
**Voir** - 1:4, 1:16, 59:15
**Vol-** 1:3, 1:4, 1:16, 2:1
**volume** - 189:10
**Volume** - 1:2, 1:1, 1:14
**Volumes** - 1:2
**vomit** - 150:9, 161:25
**Vs-** 1:9
**vs** - 3:3, 4:7, 79:21, 108:16

## W

**wait** - 115:25, 117:9, 117:11, 141:3
**wake** - 98:3
**walked** - 150:24, 151:13, 151:22
**walking** - 144:2, 150:1, 150:7, 150:8, 150:20, 151:6
**wallet** - 142:9
**wander** - 24:20
**wandered** - 25:6
**wants** - 63:15
**wash** - 161:21, 161:22
**washed** - 15:12, 162:3
**washes** - 15:2, 15:4
**watch** - 97:1, 188:6
**watching** - 101:18
**water** - 12:21, 14:3, 14:24, 15:6, 153:13, 153:16, 154:4, 154:12, 154:13, 180:18
**Wayside** - 131:12
**weapon** - 141:11, 141:12, 141:15, 148:3
**weapons** - 142:6, 142:13, 143:23
**wearing** - 39:23, 78:6, 78:7, 82:21, 82:24, 83:10, 142:16
**week** - 186:12
**weekend** - 163:8
**weeks** - 12:21, 14:25, 24:22, 105:1, 136:17, 136:22
**weight** - 169:15
**wheel** - 137:18, 141:4
**whereabouts** - 49:15, 49:23
**white** - 176:10
**white-collar** - 176:10
**whole** - 12:13, 23:18, 29:14, 38:25, 121:17, 123:10, 127:12, 129:9, 129:10, 154:14, 165:19, 173:16, 180:12
**wife** - 118:1, 163:9, 184:20
**William** - 1:12, 1:16, 175:14, 175:19
**willingness** - 179:3
**Wilson**- 121:16
**wish** - 39:6
**withdrawing** - 66:6
**withhold** - 179:23, 180:10
**witness** - 4:9, 4:11, 15:14, 16:2, 22:5, 23:6, 28:1, 32:22, 33:1, 33:4, 33:11, 56:4, 58:8, 63:12, 68:24, 69:2, 69:7, 69:8, 69:9, 69:14, 69:22, 75:5, 78:11, 78:25, 79:5, 79:25, 108:16, 108:21, 115:5, 115:6, 115:15, 115:19, 159:18, 159:22, 167:2, 168:1,

168:12, 168:15, 174:6, 174:14, 174:25, 175:2, 178:11, 179:12, 183:12, 183:19, 186:7, 187:8, 187:9, 187:16, 187:17, 187:18
**Witness** - 1:15, 19:2, 19:5, 20:3, 65:10, 65:20, 69:19, 80:2, 80:5, 115:10, 115:22, 131:4, 168:2, 168:18, 175:10, 189:16
**Witnesses** - 1:4, 3:13, 38:22
**witnesses** - 3:8, 3:14, 3:19, 38:24, 39:3, 52:7, 59:24, 60:19, 67:8, 181:2, 181:6
**woke** - 102:15, 114:1
**Wolf** - 1:5, 1:23, 3:9, 3:23, 4:10, 4:13, 4:16, 4:24, 11:9, 12:19, 14:2, 14:23, 15:18, 19:4, 22:19, 25:16, 33:6
**women** - 134:5
**women's** - 142:20
**Wood** - 2:4, 3:7, 69:10, 69:12, 69:22, 69:23, 69:24, 70:3, 75:4, 75:7, 77:3, 77:11, 78:1, 78:10, 78:13, 78:24, 79:1, 79:6, 79:23, 80:10, 83:4, 83:8, 83:9, 83:14, 83:16, 90:11, 90:14, 94:21, 108:18, 108:19, 108:21, 113:2, 115:3, 115:4, 173:19
**word** - 28:21, 160:11
**Word** - 1:14
**words** - 38:5, 60:16, 117:2, 158:1
**works** - 161:15
**worried** - 106:25, 144:25
**worth** - 39:19
**worthy** - 43:8
**wound** - 7:25, 12:1, 12:8, 15:4, 28:15, 28:16
**wounds** - 15:3, 15:8, 15:11, 17:22
**writing** - 189:9
**wrote** - 78:16

## Y

**y'all** - 34:6, 62:16, 113:7, 120:17, 120:20, 121:7, 121:9, 121:17, 122:8, 122:9, 127:19, 132:19, 132:23, 133:7, 136:3, 136:13, 136:23, 136:24, 137:15, 140:21, 140:24, 148:14, 149:13, 152:22, 153:4, 154:1, 154:11, 154:16, 155:2, 155:9, 155:20, 155:23, 156:4, 156:9, 156:12, 156:21, 156:24, 157:6, 157:16, 157:25, 160:24, 161:6, 161:19, 161:22, 162:3, 163:4, 163:11, 164:14
**y'all's** - 140:20
**year** - 35:9, 42:25, 73:3, 86:11, 119:10, 176:4
**years** - 35:3, 37:9, 41:4, 71:4, 80:25, 81:14, 81:23, 82:3, 82:4, 82:12, 82:13, 84:18, 85:2, 116:22, 117:20, 118:10, 119:4, 164:25, 165:14, 176:18, 182:24
**yourself** - 4:22, 33:22, 70:8, 80:20, 104:16, 112:14, 116:10, 122:25, 128:7, 151:9, 175:18, 188:1
**yourselves** - 187:20