REPORTER'S RECORD

**VOLUME 21 OF 35 VOLUMES**

TRIAL COURT CAUSE NO. 1384794

COURT OF CRIMINAL APPEALS NO. AP-77,025

| | |
|---|---|
| OBEL CRUZ-GARCIA ) | IN THE DISTRICT COURT |
| Appellant ) | |
| ) | |
| VS. ) | HARRIS COUNTY, TEXAS |
| ) | |
| THE STATE OF TEXAS ) | |
| Appellee ) | 337TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**GUILT-INNOCENCE PROCEEDINGS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 11th day of July, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Renee Magee, Judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by computer-aided transcription/stenograph shorthand.

1                    **A P P E A R A N C E S**

2


3

        MS. NATALIE TISE
4       SBOT NO. 00795683
        MR. JUSTIN WOOD
5       SBOT NO. 24039247
        Assistant District Attorneys
6       1201 Franklin
        Houston, Texas  77002
7       PHONE:  713.755.5800
        **ATTORNEYS FOR THE STATE OF TEXAS**
8


9
                **- AND -**
10


11

        MR. R.P. 'SKIP' CORNELIUS
12      SBOT NO. 04831500
        2028 Buffalo Terrace
13      Houston, Texas  77019-2408
        PHONE:  713.237.8547
14
        MR. MARIO MADRID
15      SBOT NO. 00797777
        440 Louisiana, Suite 1225
16      Houston, Texas  77002-1659
        PHONE:  713.877.9400
17      **ATTORNEYS FOR THE DEFENDANT**

18


19


20      Rolando Hernandez
        Marilu Flores,
21      **Interpreters**

22


23


24


25

**I N D E X**
**VOLUME 21**
**(GUILT-INNOCENCE PROCEEDINGS)**

**JULY 11, 2013**

PAGE  VOL.

**STATE'S WITNESSES**

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Carmelo Martinez | 5 | 15 | 18 | 21 |
| Santana | – | 29 | – | 21 |
| William Ebersole | – | 64 | – | 21 |
| | 77 | 82 | – | 21 |
| Micah Webb | 84 | 101 | – | 21 |
| Matt Quartaro | 103 | 127 | – | 21 |
| | 136 | 140 | – | 21 |
| | 141 | – | – | 21 |
| Courtney Head | 142 | 171 | – | 21 |

State rests...................................... 174   21

Defendant rests................................. 175   21

Both sides close............................... 176   21

Reporter's Certificate......................... 178   21

Word Glossary...............................End of Volume

**ALPHABETICAL WITNESS INDEX**

| | Direct | Cross | Voir Dire | VOL. |
|---|---|---|---|---|
| Ebersole, William | – | 64 | – | 21 |
| | 77 | 82 | – | 21 |
| Head, Courtney | 142 | 171 | – | 21 |
| Quartaro, Matt | 103 | 127 | – | 21 |
| | 136 | 140 | – | 21 |
| | 141 | – | – | 21 |
| Santana, Carmelo | 5 | 15 | 18 | 21 |
| Martinez | – | 29 | – | 21 |
| Webb, Micah | 84 | 101 | – | 21 |

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| SX - 33-A | Panties | 121 | 124 | 21 |
| SX - 33-B | Vaginal swabs and smears | 121 | 124 | 21 |
| SX - 33-C | Saliva sample | 121 | 124 | 21 |
| SX - 33-D | Blood sample | 121 | 124 | 21 |
| SX - 68 | Consent form | 92 | 93 | 21 |
| SX - 70 | HPD DNA lab report | 152 | 152 | 21 |
| SX - 71 | Photograph | 99 | 100 | 21 |
| SX - 72 | Photograph | 99 | 100 | 21 |
| SX - 73 | Photograph | 99 | 100 | 21 |
| SX - 74 | Photograph | 99 | 100 | 21 |
| SX - 76 | Buccal swab | 157 | 157 | 21 |
| SX - 77 | Buccal swab | 157 | 157 | 21 |
| SX - 78 | Map | 98 | 98 | 21 |
| SX - 91 | Photograph | 7 | 7 | 21 |
| SX - 92 | DNA statistics | 167 | 167 | 21 |
| SX - 95 | Cuttings of panties | 121 | 124 | 21 |
| SX - 96 | DNA summary (Cigar) | 167 | 167 | 21 |
| SX - 97 | DNA summary (Vaginal swabs) | 167 | 167 | 21 |
| SX - 94 | Map | 95 | 95 | 21 |
| SX - 99 | Cigar packaging (Admitted For Record Purposes Only) | 174 | 175 | 21 |

index - 3

1   SX - 100  Cigar packaging   174       175          21
              (Admitted For Record Purposes Only)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Open court, defendant present, no jury)
 2               THE COURT:   We're back on the record in
 3    the State of Texas vs. Obel Cruz-Garcia.   Mr. Garcia is
 4    present at counsel table with his lawyers, Mr. Cornelius
 5    and Mr. Madrid.   And present for the State is Ms. Tise
 6    and Mr. Wood.   And the bailiff is presently bringing out
 7    the jury.
 8               And we'll proceed with witness Special
 9    Agent Bill Ebersole.   Is he present?   Is that correct?
10               MS. TISE:   Bill Ebersole was on the stand,
11    Judge.
12               MR. CORNELIUS:   Judge, when --
13                    (Open court, defendant and jury present)
14                    (At the Bench, on the record)
15               MR. CORNELIUS:   I really can't
16    cross-examine him now because my purpose would be if
17    there is any inconsistent statement from Rudy's
18    statement that he made to him, but I haven't laid those
19    predicates yet to do that, but the State is going to
20    recall Rudy.
21               THE COURT:   You are going to recall
22    Mr. Santana?
23               MS. TISE:   Yes, Your Honor.   I told him I
24    was going to be recalling him this morning, but I just
25    found out he's not crossing Ebersole.   I was going to
```

1  call him after Ebersole, but I'm prepared to do it now

2  if the bailiffs can make it happen.

3                    THE COURT:  Let's do it.

4                    (Open court, defendant and jury present)

5                    THE COURT:  Good morning, ladies and

6  gentlemen.

7                    We are ready to proceed in the case of the

8  State of Texas vs. Obel Cruz-Garcia.

9                    And at this time, the State has requested,

10 and I'm going to grant it, for them to recall Carmelo

11 Santana, also known as Rudy, for a few additional

12 questions.  And then we'll allow Mr. Cornelius to go

13 into his cross-examination, which he waived yesterday.

14                    Please bring out Carmelo Santana.

15                    THE BAILIFF:  Your Honor, the witness has

16 previously testified and was previously sworn.

17                    THE COURT:  Thank you, Deputy Perry.

18                    Mr. Santana, please speak into the

19 microphone.  Keep your voice up.  Have a seat.

20                    THE WITNESS:  Yes.

21                    THE COURT:  You may proceed, Ms. Tise.

22                    MS. TISE:  Thank you, Judge.

23                    **CARMELO MARTINEZ SANTANA,**

24 having been first duly sworn, testified through the

25 interpreter through the interpreter as follows:

1              **DIRECT EXAMINATION**

2  **CONT'D BY MS. TISE:**

3       Q.   Good morning.

4       A.   Good morning.

5       Q.   Give us your name again one more time for the

6  record.   Remind us of who you are.

7       A.   My name is Carmelo Martinez.

8       Q.   Okay.   And you are the person that we call

9  Rudy, correct?

10      A.   That's right.

11      Q.   Okay.   And yesterday you told us a lot about

12  the events that happened on the night of September 30th,

13  1992, and in the early morning hours of October 1st,

14  1992.   Remember that?

15      A.   That's right.

16      Q.   Okay.   And we were talking that whole time

17  about an individual that you know as Obel Cruz-Garcia,

18  correct?

19      A.   That's right.

20      Q.   And he was sometimes called Chico by a lot of

21  people, right?

22      A.   That's right.

23      Q.   Do you see the individual that you know as Obel

24  Cruz-Garcia in the courtroom today?

25      A.   That's right.

1    Q.   And can you point him out for the jury?

2    A.   That's right.  He is the man over sitting

3 between those two persons sitting (indicating).

4    Q.   Okay.  And can you tell us what color of shirt

5 he has on and what color of suit he has on?

6    A.   Well, he has a blue shirt and -- but I couldn't

7 tell you exactly the color of the suit, but it looks

8 like a gray color.

9         MS. TISE:  Your Honor, may the record

10 reflect the witness has identified the defendant?

11         THE COURT:  The record will so reflect.

12    Q.   (By Ms. Tise) We also talked about an

13 individual by the name of Roger quite a bit in your

14 testimony yesterday.

15    A.   That's right.

16    Q.   And you were noting that he had changed quite a

17 bit since you last saw him.

18    A.   That's right.

19    Q.   And you were looking at him from across the

20 room, were you not?

21    A.   That's right.

22    Q.   Do you think looking at a closer-up picture of

23 Roger might help you?

24    A.   Well, yes, I believe so.

25         MS. TISE:  May I approach?

1              THE COURT:  Yes.

2       Q.   (By Ms. Tise) Let me show you State's Exhibit

3  91, and ask if you recognize the individual in that

4  close-up photo (indicating)?

5       A.   Yes.

6       Q.   Okay.  And in State's Exhibit 91, who is that a

7  picture of?

8       A.   That's Roger, Bory.

9       Q.   And he is the same person that we see in this

10  1992 photo right here on Page 2 of State's Exhibit 34 in

11  the striped shirt, correct (indicating)?

12      A.   That's right.

13      Q.   And it's the same person in this much later

14  photo on the left of Page 2 of State's Exhibit 34; it's

15  also the person that you know to be Roger or Bory?

16      A.   That's right.

17              MS. TISE:  At this time, I will offer

18  State's Exhibit 91, tendering to defense counsel for any

19  objection.

20              **(State's Exhibit No. 91 Offered)**

21              MR. CORNELIUS:  No objection.

22              THE COURT:  State's Exhibit No. 91 is

23  admitted without objection.

24              You may proceed.

25              **(State's Exhibit No. 91 Admitted)**

1       Q.   (By Ms. Tise) Is it fair to say, Rudy, that he

2   is a whole lot skinnier than the Roger you knew back in

3   1992?

4       A.   That's right.

5       Q.   Okay.  You knew Roger back in '92 as a big man,

6   did you not?

7       A.   That is right.

8       Q.   Tall with a bulky build?

9       A.   Yes, yes.

10      Q.   I want to ask you a couple of other questions

11  about the things that you told us yesterday.  You talked

12  about the location where y'all went, the little

13  neighborhood where the actual stabbing of Angelo Garcia,

14  Jr. happened.

15      A.   That's right.

16      Q.   Can you describe -- I'm sorry.  I need to wait

17  for your answer.  That's my fault.

18           Can you describe that area a little bit

19  better?

20      A.   Well, it's an area where the main street, there

21  is a park in the front and then that's the same street

22  that leads -- it ends at a street.  I don't know exactly

23  the name of that street right now.  There are stores and

24  washaterias and stop-and-goes.  That's on that side.

25  And on the other side, that's where we used to live

 1  before.   Ms. Diana and I, we were neighbors.

 2       Q.   Okay.  Diana Garcia?

 3       A.   Yes, the little boy's mother.

 4       Q.   And it was in that same area?

 5       A.   Yes, pretty close.

 6       Q.   So, the little cul-de-sac where you described

 7  where y'all pulled over and stopped, were there houses

 8  over there?

 9       A.   Are you saying where we stopped where the death

10  of the little boy happened?

11       Q.   Yes.

12       A.   No.  It was a dark place.

13       Q.   And were there woods in that area?

14       A.   Well, it ends there at the cul-de-sac and

15  what's over there was woods.

16       Q.   Okay.  You also described for the jury that you

17  didn't actually see when Angelo was actually killed

18  because you were -- you had to go to the bathroom, did

19  you not?

20       A.   That's right.

21       Q.   I think you described it as your insides went

22  loose; is that correct?

23       A.   Yes, that's right.

24       Q.   But you heard what was said and you heard what

25  happened, right?

```
 1        A.    That's right.

 2        Q.    And when you walked back over, you saw Baby

 3   Angelo on the ground, did you not?

 4        A.    That's right.

 5        Q.    And could you see where his wounds were?

 6        A.    No, not the wounds.  I didn't see the wounds.

 7        Q.    Did you want to look at the wounds?

 8        A.    No.

 9        Q.    Did you see where the blood was?

10        A.    Yes.

11        Q.    And can you describe where the blood was on

12   Baby Angelo's body?

13        A.    It was all over here from -- starting from his

14   chest and all over here (indicating).

15        Q.    And I'm looking at you, but the record can't

16   see that.  But I see your hand starting in the collar

17   area; is that correct?

18        A.    Yes.  From here all over down here

19   (indicating).

20        Q.    Going down?

21        A.    Yes.

22        Q.    Now, back when you talked to Agent Ebersole --

23   let me stop just a second.

24                  MS. TISE:  May I approach?

25                  THE COURT:  Yes.
```

 1      Q.   (By Ms. Tise) I'm going to show you State's
 2  Exhibit 31 and ask you if you recognize who that person
 3  is (indicating)?
 4      A.   That's the little boy, Michael Angelo,
 5  Angelito.
 6      Q.   Angelito?
 7      A.   Right.
 8      Q.   Is this the little boy that was killed that
 9  night?
10      A.   Yes, that's right.
11      Q.   Back when you talked to Agent Ebersole, you
12  knew you could have gotten an attorney in there before
13  you talked to him, didn't you?
14      A.   Yes.
15      Q.   But you opted not to do that, didn't you?
16      A.   That's right.
17      Q.   And later on when you were brought back to
18  Houston, you were appointed an attorney to represent
19  you, were you not?
20      A.   That's right.
21      Q.   And Mr. Castro has been present with you
22  throughout our interviews with you and in court
23  frequently, has he not?
24      A.   That's right.
25      Q.   And he has explained to you that you don't have

1    any kind of deal for your testimony?

2              MR. CORNELIUS:  Objection to the hearsay,

3    Your Honor, talking about what Mr. Castro --

4              THE COURT:  That will be sustained.

5    Q.   (By Ms. Tise) You know and your attorney has

6    worked with you and explained things to you, hasn't he?

7    A.   That's right.

8    Q.   Okay.  And you continue to be willing to

9    testify to all of these things?

10   A.   The whole time.

11   Q.   And have never even asked for a deal, have you?

12   A.   No, never.

13   Q.   You've never asked for one single thing from

14   Agent Ebersole or us, have you?

15   A.   No, no, no.  I don't want to.

16   Q.   And you knew -- you knew that there was going

17   to be some inconvenience, some risk to you because

18   you're testifying, did you not?

19   A.   Well, yes, but I don't care.

20   Q.   Okay.  You've been in prison a long time and

21   you recognize things can happen, don't you?

22   A.   That's right.

23   Q.   And when you talked to Agent Ebersole, at first

24   you weren't going to tell him any of this; is that

25   correct?

1       A.   No.

2       Q.   And you told him some of your concerns, didn't

3   you?

4       A.   Like what do you mean?   I don't understand.

5       Q.   Do you remember talking to him about not

6   wanting to move out of the federal penitentiary that you

7   were in in Pennsylvania?

8       A.   I don't remember, no.

9       Q.   You don't remember.

10           Okay.   And about your concerns about

11  testifying, do you remember being concerned about that?

12      A.   I don't understand the question.

13      Q.   Okay.   Initially you were concerned about

14  having to come to court and testify against Chico,

15  weren't you?

16      A.   That's right.

17      Q.   And there were times when you were concerned

18  about being secure, having some security; is that

19  correct?

20      A.   That's right.

21      Q.   And you told Agent Ebersole all of those things

22  up in Pennsylvania, didn't you?

23      A.   No, I don't remember.

24      Q.   I think Agent Ebersole will.

25           MR. CORNELIUS:   Judge, I have to object to

1    the statement by counsel.

2              THE COURT:  That will be sustained.  No

3    sidebar.

4              MR. CORNELIUS:  I'd ask for the jury

5    instruction.

6              THE COURT:  You are instructed to disregard

7    that and not consider it for any reason.

8              MR. CORNELIUS:  Move for a mistrial.

9              THE COURT:  That will be denied.

10             You may proceed.

11        Q.   (By Ms. Tise) And you didn't really want to be

12   the only witness against Chico, did you?  Do you

13   remember that?

14        A.   No.

15        Q.   Is it fair to say, Rudy, that there were a lot

16   of things on your mind before you finally decided to

17   tell Agent Ebersole the truth about what happened?

18        A.   That's right, a lot.

19        Q.   Concerns about your own safety?

20        A.   Yes.

21        Q.   So, why did you decide to do it?

22        A.   Because I wanted first with God and also with

23   Ms. Diana and with the American justice, that everything

24   to be known and to ask forgiveness for the mistakes I've

25   made and the person that I have harmed.

1          MS. TISE:  I will pass the witness.

2          THE COURT:  Thank you, Ms. Tise.

3          Mr. Cornelius, you may proceed.

4          MR. CORNELIUS:  Thank you, Judge.

5                   **CROSS-EXAMINATION**

6  **BY MR. CORNELIUS:**

7      Q.   Mr. Martinez, my name is Skip Cornelius.  We've

8  never met; is that correct?

9      A.   That's right.

10     Q.   You've never even been charged in this case,

11 have you?

12     A.   Well, I don't know.  I'm here to tell the

13 truth.

14     Q.   Okay.  But have you ever been charged with

15 capital murder, a murder, kidnapping, robbery, burglary,

16 or any crimes out of this particular incident?

17     A.   Well, I don't care.  I'm here to tell the

18 truth.

19     Q.   I understand that.  I'm still trying to ask my

20 question and I need an answer to my question, please.

21          Have you received any indictment or formal

22 charges for anything concerning this incident?

23     A.   No, but in the computer it say, when I check

24 it, on ICT to come here, the computer says that I have a

25 charge of a killing.

1    Q.   Have you ever been indicted in this case or

2  anything?

3    A.   Well, I also say that the computer said so.  I

4  don't care, but the computer says so.  I'm here to tell

5  the truth.

6    Q.   All right.  Let me see if I can get to the

7  bottom of this.  Are you sure the computer is not

8  attaching you to this case because you are a witness in

9  this case?

10    A.   No, never.

11    Q.   Have you ever been before this Judge and been

12  presented an indictment or been before this Judge where

13  you are accused of something and had your warnings or

14  any proceeding other than the trial?

15    A.   No.

16    Q.   Have you ever had to enter a plea of either

17  guilty or not guilty to any charge relating to this?

18    A.   No.

19    Q.   Has anybody ever come to your jail cell and

20  served you with a document or any charge relating to

21  this?

22    A.   No.

23    Q.   Okay.

24        MR. CORNELIUS:  Can we approach the bench

25  for a moment?

```
 1                    THE COURT:  Yes.

 2                    (At the Bench, on the record)

 3                    MR. CORNELIUS:  I'm not sure what

 4   impeachment offenses that I can go into with him.

 5   Honestly, I'm not sure.  In fairness, I've got an

 6   investigator's report, but I don't have that much

 7   confidence in it.

 8                    THE COURT:  Okay.  Are you saying you need

 9   to take the jury out?

10                    MR. CORNELIUS:  I think we should.

11                    (Open court, defendant and jury present)

12                    THE COURT:  Let's take the jury out.

13                    THE BAILIFF:  All rise.

14                    (Open court, defendant present, no jury)

15                    THE COURT:  Okay.  Mr. Cornelius, you are

16   wanting to impeach this witness with extraneous conduct

17   of his own?

18                    MR. CORNELIUS:  No, no, no.  Prior

19   convictions.

20                    THE COURT:  With prior convictions.

21                    MR. CORNELIUS:  Prior convictions.

22                    THE COURT:  Okay.

23                    MR. CORNELIUS:  And there is the -- you

24   know, there are rules on what you can go into and what

25   you can't go into on prior convictions and time
```

 1   restraints and all this kind of stuff.  And I've got

 2   some conflicting information from my own investigators

 3   and so, I'm going to accept pretty much whatever the

 4   State tells me or what he tells me, but...

 5                    THE COURT:  Okay.  Would you like to take

 6   this witness on voir dire then?

 7                    MR. CORNELIUS:  Yes.

 8                    THE COURT:  Okay.  You may proceed.

 9                    MR. CORNELIUS:  May the record reflect we

10   are proceeding outside the presence of the jury.

11                        **VOIR DIRE EXAMINATION**

12   **BY MR. CORNELIUS:**

13        Q.   Mr. Martinez, as I understood your testimony

14   from yesterday, you are in federal custody serving

15   prison time.  For what, though?

16        A.   For drugs.

17        Q.   And what was your sentence?

18        A.   Seventeen years, seven months.

19        Q.   Okay.  And you've served how much of that?

20        A.   I went in in December of 1997.  I have been

21   there almost 17 years -- 16 years, 16 years.

22        Q.   Now, was this a conviction for one case or more

23   than one case?

24        A.   For two cases.

25        Q.   What was -- okay.  Are they both drugs cases?

1    A.    No.

2    Q.    What was the other case?

3    A.    A revolver that I had with drugs.

4    Q.    Having a pistol?

5    A.    Yes.  A revolver, pistol.

6    Q.    And is that did -- you get the same sentence on

7  that case or did you get two sentences that are stacked

8  or how does that work?

9    A.    Well, I received two sentences.

10    Q.    Are they running at the same time or are they

11  stacked?

12    A.    Seventeen years and seven months for the drugs

13  and five years for the revolver.

14    Q.    Is the five-year sentence running at the same

15  time that the revolver is running -- let me rephrase

16  that.

17         Is the 17-year sentence running at the same

18  time that the 5-year sentence is running?

19    A.    No.  Because it's two charges, two cases, the

20  drugs and the revolver.  For the drugs, twelve years and

21  seven months.  And five years for the weapon.  So, both

22  sentences are seventeen years and seven months.  That's

23  what I'm serving.

24    Q.    All right.  So, the sentences are stacked on

25  top of each other?

1      A.   Well, I don't know how that counts, but I

2  imagine so.

3      Q.   Okay.  Added together, they come up to 17 years

4  and 7 months?

5      A.   Yes.

6      Q.   Okay.  Now, I'm just going to ask this

7  question.  I don't know if it's true.  Did you also get

8  convicted of illegal entry after deportation and got a

9  45-month sentence back in 2009?  Is that you or somebody

10  else?

11      A.   No.

12      Q.   Okay.

13           MR. CORNELIUS:  I have no confidence that's

14  him, unless the State tells me it is.

15           MS. TISE:  It's not him.

16      Q.   (By Mr. Cornelius) So, you were in prison in

17  2009?

18      A.   I sure did -- I sure was.

19      Q.   All right.  Back in 1992, did you have a

20  conviction for a misdemeanor charge of assault here in

21  Harris County that you got six months for?

22      A.   Well, I don't remember the year, but I do know

23  that I served six months --

24      Q.   Okay.

25      A.   -- for that charge.

1    Q.   The person that you were accused of assaulting,

2   was that person a male or a female?

3    A.   No.

4    Q.   Well, was the person you were accused of

5   assaulting a male or a female?

6    A.   No.

7    Q.   It wasn't a boy or a girl?

8    A.   It was a boy.

9    Q.   Okay.

10         MR. CORNELIUS:  Judge, can I have just a

11   second?

12         THE COURT:  Yes.

13         (Pause)

14    Q.   (By Mr. Cornelius) Was that case where you got

15   the six months for assault, did it -- was that --

16   initially were you charged with -- let me rephrase that.

17         Were you initially charged with injury to a

18   child?

19    A.   That's right.

20    Q.   And what was the age of the child that you were

21   alleged to have assaulted?

22    A.   I have no idea.  Because I have not assaulted

23   any child.

24    Q.   So, even though you pled guilty to it, you are

25   saying you were actually innocent?

1      A.   That's right.

2           MS. TISE:   Just for the record, Judge, he

3  pled guilty to assault, not injury to a child.

4           MR. CORNELIUS:   Let me just tell you what

5  my -- can we stop for a second and --

6           THE COURT:   Off the record?

7           MR. CORNELIUS:   No.  It's on the record.

8           THE COURT:   Okay.

9           MR. CORNELIUS:   -- what my thinking is on

10  this.  Ordinarily that wouldn't be admissible because

11  it's not a woman, but the Court has great discretion in

12  allowing into evidence prior convictions.  I mean, it's

13  always within the discretion of the Court in a situation

14  like that.  Because we have, in this case, the murder of

15  a child in 1992, I'm going to ask the Court to allow us

16  to at least ask the question that I just asked of this

17  witness because of the similarities between the two and

18  because of the accusation in this case.

19           THE COURT:   So, you are saying the

20  accusation -- I'm unclear.  Was there an accusation --

21  it was originally charged as an injury to a child?  Is

22  that what you are saying?  And then it was reduced to

23  assault.  I'm unclear.

24           MR. CORNELIUS:   Well, I would like to be

25  able to get that in.

```
1              THE COURT:  Is that what happened?  That's
2    what I'm saying.
3              MR. CORNELIUS:  That is what happened.
4    Well, according to the records.  I wasn't there, but
5    according to the records, he was charged or indicted, I
6    guess, for injury to a child, but it ended up being
7    reduced to a misdemeanor assault and he pled out for six
8    months.
9              MS. TISE:  And he says that's because it
10   wasn't a child.  That would be completely --
11             MR. CORNELIUS:  I thought he just didn't do
12   it.
13             MS. TISE:  He said he never assaulted a
14   child.  He called it a male.
15             THE COURT:  Instead of going back and forth
16   here, put on the record what you are asking and then
17   I'll let the State respond.
18             MR. CORNELIUS:  Can I just ask him to see
19   if that's what he is saying?
20             THE COURT:  You may ask him.  You've got
21   him on voir dire.  Yes.
22        Q.  (By Mr. Cornelius) Mr. Martinez, are you saying
23   you did assault someone, but it wasn't a child?
24        A.  No, I have not assaulted anybody.
25             MR. CORNELIUS:  That's what I thought he
```

1    said.

2                    So, yes, I am seeking to go into that

3    because of the similarities to this case.  At least I'm

4    seeking to go into the fact that he has the conviction

5    for assault back in 1992.

6                    THE COURT:  Okay. State, go ahead.  What's

7    your response?

8                    MS. TISE:  That flies in the face of

9    everything that the impeachment rules allow.

10                    First of all, Rule 609 only allows evidence

11   of a conviction.  You cannot go into the underlying

12   facts of that conviction in any way.  And there is a

13   conviction here and the conviction is for assault.

14   That's it.  Assault.  For you to allow him to talk about

15   the fact that that involved injury to a child would be

16   to completely ignore Rule 609 that says no specific

17   instances of conduct, no going underneath the conviction

18   with the facts.  The only thing that's admissible is the

19   conviction.  And in this case, even the conviction is

20   not admissible because it's -- first of all, it happened

21   in 1992.  It's very old, but, more importantly, the

22   reason the conviction is not admissible is because it's

23   not a crime of moral turpitude and it's not a felony.

24                    So, we would object vigorously to him being

25   able to go into that.  There is nothing in the rules of

1  impeachment, which is what he's trying to do, to allow

2  him to do that.  And his specific reason for wanting to

3  do it is expressly prohibited under the rules of

4  evidence.  The specific reason for wanting to do is to

5  go into the fact that it was an injury to a child and

6  make some comparison to the fact that a child was hurt

7  in this case.  And that is specifically going into the

8  specific instances of conduct to impeach a witness,

9  which the rules do not allow.

10            THE COURT:  My ruling is that you will not

11  be able to go into the conviction for misdemeanor

12  assault back in 1992 of a male.  And you will not be

13  able to go into the fact that it was originally charged

14  as injury to a child.  And the only reason I can see

15  that you would want to go into that is to try and make a

16  connection that he would be acting in conformity

17  therewith and somehow impeaching his testimony here,

18  even though he's not the charged individual.

19            So, I'm not going to allow it.  And I don't

20  believe the rules allow it.

21            So, do you want to continue with the voir

22  dire of this witness?

23            MR. CORNELIUS:  Yes.  Just a couple more

24  questions, if I might, Judge.

25            THE COURT:  Okay.

1    Q.   (By Mr. Cornelius) Do you have any other

2  convictions that I haven't asked you about?

3    A.   Yes, I have.

4    Q.   What are they?

5    A.   Well, I had problems with the mother of my

6  child.

7    Q.   And when was that?  What year approximately

8  would that be?

9    A.   I don't remember.

10    Q.   Did you actually -- just having problems with

11  her is not what I'm asking.  Did you actually get

12  convicted for something concerning that?

13    A.   I don't remember exactly how much time I

14  served, but I did go to jail.

15    Q.   For assaulting who, the mother?

16    A.   Sure, of course.

17    Q.   How many times did that happen?

18    A.   Well, that I -- only once that I remember.  I

19  don't remember more than that time.

20    Q.   The conviction you had for assaulting your

21  wife, I guess it was -- was that about the same time

22  that you were charged with this other stuff?

23    A.   I don't remember, but -- I don't know exactly

24  the times, what the times were.

25    Q.   Okay.

1            MR. CORNELIUS:  The records that I have

2    show that he was charged on two cases.  He's only

3    admitted to being convicted of one.  One is in '91 and

4    one is in '92.  And so, from that -- if he does admit

5    that conviction of a woman, that is certainly admissible

6    as a crime involving moral turpitude.  And it's not

7    remote because under attacking part of that, it would go

8    back 10 years.  And so, it wouldn't be remote.  So, we

9    also seek to go into that.

10            THE COURT:  Okay.  Ms. Tise.

11            MS. TISE:  I agree with him.  I think that

12    it is remote, but I do think that attacking would allow

13    him to go into and it is assault of a female.  I have

14    actually provided -- and I think Mr. Cornelius is

15    looking there -- the date of that and the cause number

16    and all of that.  That's the 1992 case out of County

17    Court 14.

18            THE COURT:  Okay.  So, is that the same

19    county court case that you were referring to that was

20    reduced from an injury to a child?

21            MS. TISE:  Oh, no Your Honor.  That's a

22    different case.

23            THE COURT:  So, there was two convictions

24    for assault.  One was in 1991, assault of a female, out

25    of County Court 14?

1                    MS. TISE:  Yes.

2                    THE COURT:  And one was filed in some

3    felony court as injury to a child but was reduced to a

4    misdemeanor and he did six months in 1992?

5                    MS. TISE:  Correct.

6                    THE COURT:  Okay.  Then, I will allow the

7    1991 conviction assault of a female in from County Court

8    14 as a crime of moral turpitude.  Okay?  I will allow

9    you to go into that conviction.

10                    MR. CORNELIUS:  Okay.  I don't want to do

11   that in any way that's unacceptable.  Having interpreted

12   all of this stuff, I'm not exactly sure how to ask the

13   questions.  I'm open for suggestion.

14                    MS. TISE:  I think it would probably be

15   best to go off the record and instruct the witness.

16                    MR. CORNELIUS:  Can you do that, or Justin

17   do it or --

18                    MS. TISE:  Can we do that, Judge?

19                    THE COURT:  Let's go off the record for a

20   moment.

21                    (Pause)

22                    MR. CORNELIUS:  I'm planning on going into

23   the bare bones of the two federal convictions and the

24   one assault.  And that's it.  And I would like to go

25   into all of them, but I understand your ruling and

 1   accept your ruling.

 2              THE COURT:  Do we have anything further on

 3   the record outside the presence of the jury?

 4              MR. CORNELIUS:  No, ma'am.

 5              MS. TISE:  No, Your Honor.

 6              THE COURT:  Let's bring the jury in.

 7              (Open court, defendant and jury present)

 8              THE COURT:  Please be seated.

 9              We are ready to proceed with the

10   cross-examination of Carmelo Santana by Mr. Cornelius.

11              You may proceed.

12                        **CROSS-EXAMINATION**

13   **CONT'D BY MR. CORNELIUS:**

14       Q.   Have we been calling you Martinez or Santana?

15       A.   Well, Her Honor called me by Santana.  And I am

16   called Rudy, but I sign as Carmelo Martinez.  And

17   Santana is my second surname.

18       Q.   Okay.  All right.  Well, if I refer to you as

19   Mr. Martinez, you'll understand that, right?

20       A.   I sure do.

21       Q.   Okay.  Yesterday when you were testifying you

22   told the jury that you were serving some time in federal

23   court, right?

24       A.   Yes, that's right.

25       Q.   What were you actually convicted of?

1       A.   For drugs and for a weapon.

2       Q.   Is that two different convictions?

3       A.   That's right.

4       Q.   And your sentences on those convictions were

5   what?

6       A.   Well, when I was arrested, I was caught with

7   the drugs and the revolver and the sentence was five

8   years for the revolver and twelve years and seven months

9   for the drugs.

10      Q.   So, a total of seventeen years and seven

11  months?

12      A.   That's right.

13      Q.   And how much of that have you served?

14      A.   Well, I have been in jail since December of

15  1997.

16      Q.   So, you've almost served it all?

17      A.   That's right.  I was told that on this year,

18  the 13th, I was going to finish my sentence.

19      Q.   And you have no other criminal cases pending

20  against you, correct?

21      A.   Well, I didn't at the time of my sentence over

22  there.

23      Q.   Okay.  Did you have a conviction for

24  misdemeanor assault back in 1991 or '92 here in Harris

25  County, Texas?

1        A.    Yes.

2        Q.    How long was it after that that you actually

3   went to prison on these federal cases?

4        A.    Repeat the question again.

5        Q.    From the time you were convicted of a

6   misdemeanor assault case here in Harris County until you

7   were incarcerated on this drug and pistol case, how much

8   time transpired?

9        A.    Well, I couldn't tell you exactly the time.

10       Q.    Well, it's about five years, isn't it?  Didn't

11   you say you went to prison in '97?

12       A.    That's right.

13       Q.    Yesterday, when you were testifying about how

14   you got involved in the drug business, you said it was

15   when you met some -- did you call her a Dominican woman,

16   girl?  How did you refer to this woman?

17       A.    It was a Dominican lady.

18       Q.    Okay.  She's the one that got you started using

19   drugs?

20       A.    That's right.

21       Q.    And also selling drugs?

22       A.    No.  I sold drugs.

23       Q.    Okay.  Well, I thought you were kind of saying

24   that it was her fault that you got involved in the drug

25   life.

1        A.    No, but using cocaine.

2        Q.    So, just her fault that you started using

3    cocaine?

4        A.    That's right.

5        Q.    You decided to sell drugs yourself?

6        A.    That's right.

7        Q.    And when you started to sell drugs, was that

8    here in Harris County?

9        A.    That's right.

10        Q.    And when was it that you met my client whom you

11    call -- well, I guess you don't call him Chico, but some

12    people call Chico.

13        A.    Well, I met him in Puerto Rico.

14        Q.    Where was he when you started using drugs here,

15    though?

16        A.    Well, in Puerto Rico.  I imagine so.

17        Q.    Okay.  So, he wasn't here then when you first

18    started using drugs?

19        A.    No.

20        Q.    And was he here when you first started selling

21    drugs?

22        A.    No.

23        Q.    You also told the jury yesterday that Mr. Obel

24    Cruz-Garcia was mean to you and called you names.  Is

25    that true?

1    A.   Yes.   He began to -- he always -- he began

2  taking control of the whole business and to control me

3  because I was always -- I was always weak to him.

4    Q.   Okay.   So, basically, your troubles were his

5  fault?

6    A.   When you say "trouble," what kind of trouble do

7  you mean?

8    Q.   Being in the drug business.

9    A.   Well, the problem is that he was putting me

10  down.   Yes.   Sure.

11    Q.   So, he was putting you down.   Is that what you

12  said?

13    A.   The whole time.

14    Q.   Okay.   And is that the reason you were taking

15  drugs and selling drugs?

16    A.   No.

17    Q.   All right.   Well, I thought the point you were

18  trying to make to the jury is it was his fault that you

19  got involved in all of this drug stuff.

20    A.   No.

21    Q.   It seems like you are saying on the one hand

22  you want to be his right-hand man, his main ally to work

23  with, and on the other hand he was terrible to you.

24    A.   No.   I arrived here first.   And the business --

25  I made the business with the people that I met here.   He

1    asked me to come here where I was.  When he got here, we

2    got together, the guys, him and I, in the business.

3              So, he had problems because he has a strong

4    character with the other guys.  So, since I had brought

5    him here and he is the husband of my cousin, then I went

6    with him.  We separated from the others.

7    Q.   Well, don't you think it's a little consistent,

8    though -- sorry -- a little inconsistent for you to say

9    that he's such a bad person, he put you down all the

10   time, and he's the reason you are in trouble, and yet

11   you stayed with him through thick and thin?  Don't you

12   think that's a little inconsistent?

13             MS. TISE:  I'm going to object that that

14   mischaracterizes his testimony.

15             THE COURT:  I'm going to allow him to ask

16   that.  He can clear it up, if he likes.

17   A.   Well, sure, of course.  Because he came to me

18   and he was the husband of my cousin and we were

19   partners, we would run half and half.  And then he went

20   taking over all the power and staying as the boss and

21   putting me down all the time.

22   Q.   (By Mr. Cornelius) Don't you think it's a

23   little convenient for you, since you are not charged in

24   this case, to put all the blame on Obel?

25   A.   No, not at all.  I am only telling the truth.

1      Q.   Okay.  Did you testify today that the area

2  where you claim this little boy was killed was an area

3  where y'all used to live?

4      A.   No.  Excuse me.  What was the question?  Can

5  you repeat the question?

6      Q.   Didn't you tell the jury earlier this morning

7  that the area where the little boy was killed was an

8  area close to where you used to live?

9      A.   No, I haven't said that.

10     Q.   Okay.  I thought it was near a place where

11  Diana used to live and you lived there, too.

12     A.   You mean about the death of the boy?

13     Q.   Yeah.  Where you are claiming this boy was

14  killed.

15     A.   The little boy was murdered in Baytown.

16     Q.   Yeah, I understand that.

17     A.   But we lived here on 45.  But -- at that time

18  we lived in Humble, but I'm saying 45 because we always

19  lived around 45.

20     Q.   Okay.  Well, maybe I misunderstood it.  So, you

21  correct me if I'm wrong, but I thought you were telling

22  the jury and were describing the place where the little

23  boy was killed earlier today.  Do you remember that?

24     A.   Can you repeat the question?

25     Q.   Do you remember earlier this morning when you

1   were testifying describing to the jury the place where

2   the little boy was killed?

3        A.   Yes.

4        Q.   You talked about the buildings and stuff and

5   where the woods were or forest, or whatever you said.

6   Do you remember talking about all of that?

7        A.   I remember the cul-de-sac where we arrived and

8   I remember it was a place with gravel.  It ended in a

9   circle and the street ran like this (indicating).

10       Q.   Okay.  That's what I'm talking about.

11       A.   That's right.

12       Q.   Did you tell the jury it was near where Diana

13  used to live and where you used to live?

14       A.   No, I didn't say that.

15       Q.   Why would it be that you know that area so

16  well?

17       A.   No, I don't know that area.

18       Q.   So, are you telling the jury that you can

19  remember where the buildings were and all this stuff

20  from going out there one time at night 21 years ago?

21       A.   Well, I can tell the jury how the place --

22  where we arrived was, but I can -- well, it was a place

23  that was away from houses.

24       Q.   You knew that area around there because you

25  used to sell drugs there, didn't you?

1    A.   No.

2    Q.   When the FBI agent came to see you in 2011 --

3  do you remember that?

4    A.   Yes, I remember that two agents came to visit

5  me.

6    Q.   And do you remember telling them that you were

7  familiar with the Baytown area because you used to sell

8  drugs in that area?

9    A.   No.

10    Q.   You didn't tell them that?

11    A.   No.

12    Q.   So, all of your recollection of how to get to

13  Baytown and whether to use 225 or 146 or -- you may call

14  it 176, but I think we know what you mean -- is all

15  based on one trip there 21 years ago at night; is that

16  what you're telling us?

17    A.   Yes, that's what I'm saying.

18    Q.   Okay.  Now, you didn't tell the FBI agent when

19  they met with you in 2011 that you had been to Baytown

20  many times and had friends there for purposes of dealing

21  drugs?

22    A.   Well, of course, the guys -- the friends that I

23  had over here, they would go to Baytown.

24    Q.   But did you make that statement to the FBI

25  agents?

1       A.   Not that I remember.

2       Q.   All right.  Did you not draw them maps of the

3   area?

4       A.   No, not that I remember.  The only thing that I

5   remember is what I'm always saying.

6       Q.   Okay.  So, what you're saying to the jury today

7   is you did not know the area of Baytown because you had

8   not sold drugs there?

9            MS. TISE:  Objection.  That's a compound

10   question.

11           THE COURT:  That's sustained.

12           Can you rephrase that?

13           MR. CORNELIUS:  I sure can, Judge.  I sure

14   will.

15       Q.   (By Mr. Cornelius) So, what you're telling the

16   jury today is you did not know your way around Baytown?

17       A.   No, I didn't know and I don't know it well.

18       Q.   Okay.  And you had not sold people drugs in

19   Baytown?

20       A.   That's right.

21       Q.   And you didn't have friends in Baytown?

22       A.   That's right.

23       Q.   And you never told this jury this morning that

24   where this boy was killed was near where you and Diana

25   had used to live?

1       A.   No, no way.

2       Q.   Okay.  Have you had an opportunity to read the

3  16-page, single-spaced document that reflects the

4  conversation that you had with the FBI agents in 2011?

5       A.   No.

6       Q.   Okay.  How often would you and Obel Cruz-Garcia

7  go to Diana's apartment?

8       A.   We would go frequently.

9       Q.   And by "frequently," is that once a day, once a

10  week, once a month?  What do you mean by that?

11       A.   No.  We would go almost every day, once or

12  twice, I imagine.  It was for family -- we were like

13  family, like we were related.

14       Q.   Well, were you also selling them drugs?

15       A.   No, I never sold drugs to her.  He did.

16       Q.   Okay.

17       A.   Because -- well, I can't say it.

18       Q.   Were you present when you claim Obel

19  Cruz-Garcia sold them drugs?

20       A.   Yes, of course.

21       Q.   And what was the quantity that was being sold

22  to them?

23       A.   Well, I can't exactly tell you, but sometimes 1

24  ounce, most of the times; but sometimes I was not with

25  him.  I didn't live with him anymore.  I don't know what

1   amounts he was selling.

2        Q.   When you say you didn't live with him anymore,

3   are you talking about who?  Didn't live with who

4   anymore?

5        A.   With Obel Cruz-Garcia.

6        Q.   Well, I thought you testified to the jury

7   yesterday you stayed with him the very night that you

8   claim all this stuff happened.

9        A.   Of course, during that time when that happened

10  I was staying with him.

11       Q.   He went in and slept with Angelita and you

12  slept somewhere else in the apartment, correct?

13       A.   The apartment in Humble is two-bedroom.  There

14  is room for -- you know, for the couple and the other

15  room where I stayed that night.

16       Q.   But you remember that Obel slept with his wife?

17       A.   No.  Well, he stayed the rest of the night --

18  the remainder of the night using drugs.

19       Q.   You didn't tell the jury yesterday that Obel

20  went and slept with Angelita?

21       A.   No.  We went to the apartment, but he didn't go

22  to bed.  He spent the rest of the night using drugs.  I

23  wanted to use drugs, too, but he didn't give me.  He

24  said to me to go to bed in the other room where he had

25  that Buddha shrine.

1      Q.   Do you think you told us that yesterday when

2  you described this same thing?

3      A.   I have never lied.

4      Q.   Well, do you think you told that same story

5  though yesterday?

6      A.   Yes, of course.

7      Q.   You did?  You told the jury yesterday that Obel

8  stayed up all night using drugs and you wanted to, but

9  he wouldn't give you --

10              MS. TISE:  Objection, Your Honor.  He

11  wasn't asked that question.  This is totally

12  mischaracterizing his testimony.

13              THE COURT:  Hang on just a minute.

14              MR. CORNELIUS:  Judge --

15              THE COURT:  No.  Wait.  I'm going to rule

16  first before anybody else talks.  We can't all be

17  talking at the same time.

18              So, your objection is sustained.

19              And ask your next question, Counselor.

20              MR. CORNELIUS:  I object to speaking

21  objections.

22              THE COURT:   Okay.  No speaking objections.

23              Proceed.

24              MS. TISE:  Yes, Your Honor.

25      Q.   (By Mr. Cornelius) Did you testify yesterday

1  that when y'all got to Angelita and Chico's apartment

2  that he went and slept with Angelita?

3       A.   Well, I can say "go to sleep" because we went

4  to the apartment.

5       Q.   My question is:  Isn't that what you said

6  yesterday?

7       A.   Yes, I said -- well, because to me -- I'm

8  telling the truth -- to go to sleep is like to go home,

9  but he didn't go to sleep with Angelita.  He spent the

10 night using drugs.

11      Q.   Okay.  So, what was the quantity that Diana was

12 getting from y'all?

13              MS. TISE:  Objection.  Asked and answered.

14              THE COURT:  That's sustained.

15      Q.   (By Mr. Cornelius) Well, I know you said

16 sometimes an ounce.  What about the other times?

17              MS. TISE:  Asked and answered.

18              THE COURT:  That's sustained.

19      Q.   (By Mr. Cornelius) What did an ounce go for in

20 those days?

21      A.   Well, it depended on the customer.  From 500 to

22 700, like that.

23      Q.   Is that the bulk price buying the ounce or is

24 that after the ounce is put in little baggies, like

25 1-gram baggies?

1          MS. TISE:  I object to the relevance of

2     this.

3          THE COURT:  I will allow him to go into it

4     a little bit, but let's move on.

5          A.   No, those are whole ounces.

6          Q.   (By Mr. Cornelius) Okay.  You said that you had

7     not been to -- or at least yesterday -- you had not been

8     to that apartment the day that you claim that the little

9     boy was taken?

10          A.   Repeat the question.

11          Q.   Did you testify yesterday you had not been to

12     Diana's apartment on the day the little boy was taken

13     until y'all went there that night?

14          A.   I don't remember if we went during the day.

15          Q.   Is it possible you did go during the day?

16          A.   Well, maybe so.

17          Q.   Okay.  So, is it possible that Obel went there

18     earlier that day?

19          A.   Of course it's possible.

20          Q.   Is it possible he went there without you?

21          A.   Well, yes, of course.

22          Q.   Yesterday, when the prosecutor was asking you

23     about whether there was a cell phone or not, did you say

24     that y'all did not have a cell phone?

25          A.   Not that night.

1    Q.    Did you normally have one and just didn't have

2    it that night?

3    A.    No.  At that time, we didn't have one.

4    Q.    Did Obel make any calls that night?

5    A.    Yes.  He made a phone call from a pay phone.

6    Q.    And when was that?

7    A.    On that same night before going -- before

8    arriving to Ms. Diana's apartment.

9    Q.    Did he make any other phone calls?

10   A.    No, not that I remember.

11   Q.    He didn't call for a tow truck or call for a

12   taxi or call Charlie or call anybody else?

13   A.    Yes, but that was after the death of the little

14   boy.

15   Q.    Okay.  But did he make all of those phone

16   calls?

17   A.    He -- well, excuse me.  He made the phone call

18   for a taxi, I think I seem to remember because we

19   arrived to Charlie's on a taxi.  That's what I think

20   that I can remember.

21   Q.    Did he call Charlie?

22   A.    I cannot tell you exactly one hundred percent,

23   but it's very probable that he did.

24   Q.    But you are saying he didn't have a cell phone?

25   A.    No.

1    Q.   Okay.  Did you tell us yesterday that all four

2  tires blew out on the car?

3    A.   Yes.

4    Q.   When you were having your conversation with the

5  FBI back in 2011, did you tell them that two tires blew

6  out of the car?

7    A.   I don't remember how many I said, but they

8  began to blow up.  One of them blew up first.  And

9  later, shortly later -- he continued driving -- and

10  another one blew up.  And then he continued, he went on

11  driving, and the others continued blowing up.

12    Q.   So, you are telling us that all four tires blew

13  up?

14    A.   Yes, to my recollection.  Because they were --

15  they were like this, they were like in the rims

16  (indicating).

17    Q.   Okay.  Now, that's what you remember today?

18    A.   That's what I remember happening with the tires

19  on that night.

20    Q.   Okay.  When you talked to the FBI agent back in

21  2011, they were very detailed, weren't they?

22    A.   No.  Well, it was me explaining what happened.

23    Q.   Okay.  All right.  Do you recall only

24  explaining to them that two tires blew up?

25    A.   Well, maybe I did, but me -- after that, I was

1  thinking the whole time about what happened on that

2  night.  Because this is -- because I want to tell all of

3  the details about the truth.  And this is something very

4  big and everything needs to be said.  And what I

5  remember is that they were blowing up.  And I have been

6  thinking and remembering.  And we arrived with the -- on

7  the rims.  I mean, you could see the sparks.

8      Q.  Okay.  So, what you're saying is you may have

9  told FBI agents that only two tires blew up, but what

10  you remember today is four tires blew up?

11          MS. TISE:  Objection.  That has been asked

12  and answered.

13          MR. CORNELIUS:  Well --

14          THE COURT:  One last time.  Make it clear.

15  And that's a yes-or-no answer.

16      A.  Yes.

17      Q.  (By Mr. Cornelius) What I'm trying to do is

18  make it clear.  Are you saying that you may have told

19  the FBI agent that it was only two tires, but today you

20  remember it was four?  Is that what you are saying?

21          MS. TISE:  Your Honor --

22          THE COURT:  I think this has been -- I

23  sustained that objection.  I think you're saying it's

24  been asked and answered.

25          MS. TISE:  Yes, Your Honor.

1        THE COURT:  Yes.

2    Q.   (By Mr. Cornelius) Do you remember when you

3  were talking to the FBI agents saying that Chico went in

4  to sleep with Angelita?  Do you remember telling them

5  that?

6    A.   Well, from the way I see things, to go to sleep

7  means to go to the apartment.  And he goes inside his

8  bedroom, his apartment, and he comes out whenever he

9  wants.  But I remember like right now, when -- that he

10  went inside the room and I was laying down on the carpet

11  and he was looking at me with the gun in his hand and I

12  was pretending to be asleep.

13        THE COURT:  Okay.  Mr. Santana Martinez,

14  you need to just answer the question that's asked.  So,

15  I'm going to instruct the defense attorney to ask the

16  next question.

17        You may proceed, Mr. Cornelius.

18    Q.   (By Mr. Cornelius) I'm trying to give you a

19  chance to tell us if you remember what you actually told

20  the FBI agent two years ago.

21        THE COURT:  We're going to do this question

22  and answer, not narrative.

23        MR. CORNELIUS:  Okay.

24        THE COURT:  So, proceed.

25    Q.   (By Mr. Cornelius) Did you tell him that when

1    you got to the apartment Chico went in to sleep with

2    Angelita?

3         A.   Well, I don't remember saying it exactly like

4    that.

5         Q.   Okay.  During all the time that you talked to

6    the FBI agents and did whatever they did to make their

7    notes, did you ever tell them anything about defecating

8    either in your pants or on the ground out there when you

9    claim the child was killed?

10        A.   On the ground.  But I cannot say -- well, I

11   don't think that I said on my pants.

12        Q.   Did you ever tell them anything about

13   defecating at all?

14        A.   Of course, I defecated, but that I can

15   remember, I was able to get to the ground.

16        Q.   The question is:  Did you tell the FBI that?

17        A.   Not that I remember.  Well, if I told them that

18   I defecated it's because that's the truth.

19        Q.   It would be really hard to forget that,

20   wouldn't it?

21        A.   I have never forgotten everything.  I always

22   have that in my mind.

23        Q.   Did you tell us yesterday -- "us" being

24   everybody in the courtroom -- that the masks that were

25   used on the night that that happened were like ladies'

1  stockings?

2      A.   Yes.

3      Q.   Okay.  And what is that you've said as to how

4  long the people were in -- out of the car that you were

5  in and into Diana's apartment, if that's where they

6  went, how long that took?

7      A.   What do you mean exactly?  Repeat the question.

8      Q.   You were asked yesterday how long they were

9  gone.  You said that they got out of the car, went to

10  where Diana's apartment was.  I'm not sure if you could

11  see the door or not.  How long were they gone?

12      A.   Well, from what I can remember, it was

13  something between 30 -- 30, 40 minutes.

14      Q.   Thirty to forty minutes, right?

15      A.   Well, average, more or less.

16      Q.   Okay.  When you talked to the FBI and they

17  interviewed you about this, did you tell them it was

18  five to ten minutes?

19      A.   I don't -- I don't believe that I said that

20  because that's not how it was.

21      Q.   Okay.  What did you tell us about whether they

22  came back together or separate, they came back to the

23  car?

24      A.   Chico came with the little boy walking.  When I

25  saw him walking, I got up and I got in front of him and

1    I asked him why he was bringing him.

2         Q.   Okay.  When Chico came back, did he come back

3    with Roger or was it sometime later before Roger came

4    back?

5         A.   No.  Chico -- that I remember, they came back

6    one in front of the other one, like together.

7         Q.   Together?

8         A.   I don't remember exactly, but to me, my view

9    that I can remember, he came shortly first.

10        Q.   Okay.  And you said Chico had the boy?

11        A.   Yes.  The first time, sure, he brought the

12   little boy.

13        Q.   And do you remember the FBI asking if the boy

14   was crying?

15        A.   I don't remember.

16        Q.   Do you remember him asking a number of times if

17   the boy was crying?

18        A.   Well, I don't remember, but the little boy was

19   not crying, but I don't remember.

20        Q.   Okay.  So, he wasn't crying?

21        A.   No.  The little boy was very calm.  We're

22   family.

23        Q.   The boy was very calm because y'all were

24   family.  Is that what you said?

25        A.   Yes.  Yes.  The little boy was in his arms and

1  he was very calm, as if he was -- as if he were his

2  father.

3        Q.   Did Chico have on a mask?

4        A.   When he had brought the little boy, he did not

5  have a mask.

6        Q.   Okay.  But the little boy was calm and not

7  crying?

8        A.   Very calm.

9        Q.   So, what was then done with the little boy when

10  Chico came back with the little boy?

11        A.   Well, I have always said that I can't remember

12  exactly if he left the little boy with me.  I think that

13  he left him with me because that's how I feel it.  And

14  he went back, supposedly, looking for the mother because

15  I told him about that.

16        Q.   Okay.  So, you think either the boy was with

17  Chico or with you?

18        A.   I believe that he left him with me.  I'm almost

19  sure all the time.

20        Q.   And he wasn't crying because you and Chico are

21  like family to him?

22        A.   That's right.

23        Q.   Do you remember telling the FBI agent, when you

24  talked to him, that Chico gave the boy to Rogelio?

25        A.   No.

1    Q.    Rogelio wasn't family, was he?

2    A.    No.

3    Q.    If I understood you correctly, you said

4  yesterday that on this particular occasion Obel had a

5  gun and Rogelio or Roger had a knife.  Is that true?

6    A.    Obel had a firearm and Rogelio had the knife,

7  the pocketknife here outside (indicating).

8    Q.    When you are saying "here" and making a

9  gesture, was it attached to his belt or to his pants

10 somehow?  What do you mean?

11   A.    It's like a pocketknife like this and it was

12 here.  Well, I don't know where it was hooked or what.

13   Q.    So, one gun, one knife; is that correct?

14   A.    That's right.

15   Q.    Did you tell us yesterday that the body of the

16 little boy would not sink?

17   A.    No, it didn't sink.

18   Q.    Is that the way you remember it this morning?

19   A.    Sure, of course.

20   Q.    When you talked to the FBI back in 2011, did

21 you tell them that the boy's body eventually went under

22 the water due to the weight of the rocks?

23   A.    Well, I couldn't tell you what he understood

24 from what I said or what depth he understood, but the

25 body of the little boy was not -- did not sink very

1   much.

2       Q.   Okay.  So, you did not tell them that the boy's

3   body eventually went underwater due to the weight of

4   rocks?

5       A.   Of course it sank, but not that much.

6       Q.   Okay.  Were you having any trouble talking to

7   them, the FBI agents?

8       A.   What do you mean?

9       Q.   You made a comment that you don't know what

10  they understood.  Are you thinking they misunderstood

11  you?

12      A.   Well, I don't know if they misunderstood me or

13  not, but it was the first interview -- it was the first

14  time I talked about that.

15      Q.   Were you having trouble understanding their

16  questions?

17      A.   Well.  Maybe I don't remember, but it's

18  possible.

19      Q.   Okay.  Where were you when you claim this boy

20  was actually killed.  Where were you standing or sitting

21  or where were you in relation to everybody else?

22      A.   I always have said that we arrived, all three

23  of us opened the doors.  Rogelio was behind him.  I was

24  in the back seat with Rogelio, but on the other side.

25  And we were -- when we were standing outside, he told

1   Rogelio:  You know what you have to do.  That's what --

2   I heard that

3                    MR. CORNELIUS:  I'll make an objection to

4   not being responsive.  I don't know what's faster.

5                    THE COURT:  I understand.

6                    Mr. Santana Martinez, you need to answer

7   the question that's asked you and only that question,

8   not anything else.

9                    So, you can rephrase your question or

10  re-ask that question.

11                   THE WITNESS:  Okay.

12       Q.   (By Mr. Cornelius) I will try to do better with

13  my questions.  Where were you standing or sitting at the

14  time you say the little boy was killed?

15       A.   No.  I was walking.

16       Q.   Okay.  Where?

17       A.   At the place where the little boy was killed.

18       Q.   Okay.  Where was Rogelio?

19       A.   He's here in the front directing Obel.

20       Q.   One moment.  Hold on.

21                   In relation to the car -- front, back side,

22  wherever -- where was Rogelio standing when you heard

23  the gasping or whatever it was that you described

24  hearing?

25       A.   The gasp?  Do you mean the scream from the

1    little boy?

2         Q.   Yes.

3         A.   I was walking to -- I was walking to vomit, to

4    use the bathroom.

5         Q.   Walking to vomit?

6         A.   To use the bathroom.  I was -- inside of me, I

7    was -- I felt very much like vomiting and going to the

8    bathroom.

9         Q.   Okay.

10                  MR. CORNELIUS:  Can I use that up there,

11   Judge?

12                  THE COURT:  Yes, you may.

13                  MR. CORNELIUS:  Can I get a Sharpie from

14   the briefcase?

15                  THE COURT:  I think I have one here.

16        Q.   (By Mr. Cornelius) Can you see that

17   (indicating)?

18        A.   Yes.

19        Q.   That is a crude drawing of a car going that

20   way.

21                  In relation to this car, as well as you

22   recall, where was Roger or Rogelio and the little boy at

23   the time you heard the scream or the gasp or whatever

24   you've described?

25        A.   I cannot tell you where he was because I was

1    already walking.  My back was facing them.

2         Q.   Then where was the last place you saw Rogelio

3    and the boy before you walked away?

4         A.   When we stood up.

5         Q.   Where was Rogelio the last place you saw him?

6         A.   Standing on the side by his door.

7         Q.   So, that would be towards the rear of the car?

8         A.   That's right.

9         Q.   On the driver's side?

10        A.   That's right.

11        Q.   Okay.  So, that would be somewhere in this area

12   over here (indicating)?

13        A.   Yes.

14        Q.   Was the boy with him?

15        A.   No.  When we all stood up, the little boy

16   remained sitting on the seat.

17        Q.   When you talked to the FBI two years ago, do

18   you remember talking about this?

19        A.   Well, I think so because -- of course, I talked

20   about this because I'm talking about the story, how this

21   happened.

22        Q.   Okay.  Do you remember telling them that

23   Rogelio exited the vehicle and took Angelo to the

24   driver's side rear of the vehicle?

25        A.   Well, maybe I told him that because I have

1    always believed that Rogelio is the one who killed him

2    because he ordered it.   He is the one who told him:   You

3    know what you have to do.

4        Q.   Okay.   Did you make that statement to the FBI

5    or do you not remember?

6        A.   Of course.   I'm always stating what happened on

7    that night.

8        Q.   So, you did say to the FBI that Rogelio exited

9    the vehicle and took Angelo to the driver's side rear of

10   the car?

11       A.   Well, maybe I did tell him that.

12       Q.   Okay.   Where was Obel?

13       A.   Standing -- the last time I saw him, he was

14   standing with his door open by the -- on the side of the

15   driver.

16       Q.   Do you remember telling the FBI that Chico was

17   at the front of the car looking around?

18       A.   I don't remember telling him that.

19       Q.   Okay.   Where were you in relations to the car?

20       A.   I was in the back seat.

21       Q.   Still in the car?

22       A.   No.   What time are you talking about?

23       Q.   When you heard the boy gasp.

24       A.   No, I didn't see that.   I was walking to go use

25   the bathroom.

1      Q.    Where were you in relation to the car?

2      A.    I arrived -- I was on that side, Rogelio on

3   this side, and the little boy on the back seat.   And he

4   was at the driver's seat, behind the driving wheel.

5      Q.    Okay.  Did you get out of the car?

6      A.    All three of us arrived and we got out of the

7   car.

8      Q.    Okay.  Did you get out of the car?

9      A.    Yes.

10      Q.    Did you get out of the back seat passenger

11   side?

12      A.    That's right.

13      Q.    Where did you go?

14      A.    I walked to the front.

15      Q.    To the front.

16            So, you came out here and went that way

17   (indicating)?

18      A.    Yes.

19      Q.    Where were you when you heard the child gasp,

20   if you remember?

21      A.    Of course I remember.   I was walking a short

22   distance when I heard the little boy scream, when he

23   moaned.

24      Q.    Had you cleared the car or what is your

25   recollection on that?

1     A.   I don't remember exactly, but I think I already

2  had passed the car because it happened shortly, almost

3  immediately.

4     Q.   Okay.  At that point, do you see Chico in front

5  of the car?

6     A.   Where I was using the bathroom, he could be

7  seen that he was at the front.

8     Q.   Was that at the time the child moaned?

9     A.   No.

10    Q.   Before or after you heard from the child?

11    A.   After.

12    Q.   Okay.

13         MR. CORNELIUS:  I don't think I need this

14  anymore.  Can I just move it so --

15         THE COURT:  Yes.

16    Q.   (By Mr. Cornelius) So, Mr. Martinez, from being

17  there and observing what you observed and having thought

18  about it, you think that Rogelio stabbed this little

19  boy, right?

20    A.   No.  From what I heard.

21    Q.   You think Rogelio stabbed the boy or you don't

22  think Rogelio stabbed the boy?

23    A.   Actually, I'm not sure who stabbed the little

24  boy, but I have always thought that Rogelio did because

25  he ordered it.

```
 1              MS. TISE:  Judge, can I, for the record,
 2   have him clarify what he means when he says "he ordered
 3   it"?
 4              THE COURT:  Clarify it.  I will let you
 5   clear that up on redirect.
 6              You can continue on your cross.
 7       Q.  (By Mr. Cornelius) Well, all right.  So, I'm
 8   confused.  Do you think Rogelio stabbed the boy or you
 9   don't think Rogelio stabbed the boy?
10       A.   I always believed in my mind from what I heard
11   and from the order that he gave that Rogelio killed him,
12   but I actually did not see who killed him.
13       Q.   Okay.  Would it be helpful for you to say one
14   more time that you believe Obel gave the order for the
15   child to be killed?  Would you like to say that again?
16       A.   Yes, of course.  He said:  You know what you
17   have to do.
18       Q.   Okay.  You want to say that again?  Do you
19   think there's any question about that, that that's what
20   you're saying?
21       A.   No, not completely.
22       Q.   You sure?
23       A.   One hundred percent.
24       Q.   Okay.  Did you tell us yesterday that when
25   y'all got back to the -- I don't remember if it was the
```

1   apartment or the hotel, I think it was the hotel -- that

2   there was some statement made by Obel or by somebody

3   about keeping this to yourselves?  Do you remember

4   saying that about that yesterday?

5        A.   That's right.

6        Q.   What did you say?  What did you say happened?

7        A.   He made us promise to him, both of us to

8   promise to him that we were never going to tell anybody

9   about this.

10       Q.   Are you making that sound like a threat, that

11  Mr. Obel Cruz-Garcia threatened y'all not to say

12  anything?

13       A.   I have always -- I have always felt his

14  threats.

15       Q.   Okay.  So, that's the point you're trying to

16  make by that, correct?

17       A.   Yes, of course.

18       Q.   When you were talking to the FBI, do you recall

19  telling them that while at the hotel, Chico, Rogelio,

20  and Martinez made a pact never to tell what had happened

21  that night?

22       A.   That's right.

23       Q.   Nothing about being threatened by my client not

24  to tell then, just that y'all made a pact?

25       A.   Of course not, but he is the boss.  He

1   always -- I was always threatened by him.  And I was in

2   this trouble because of him.  And he ended Ms. Diana's

3   life and mine as well.

4        Q.   It's all his fault?

5        A.   And he has also harmed many other people.

6        Q.   I see.

7             You, on the other hand, have never harmed

8   anyone, have you?

9             MS. TISE:  I will object.

10            THE COURT:  That's sustained.

11            Mr. Santana -- I believe that's right --

12  Santana Martinez -- excuse me -- please just answer the

13  question.  Don't add any additional details.  The

14  lawyers will ask you the questions that they're

15  intending to get answers from you.

16            THE WITNESS:  I'm sorry.

17            THE COURT:  Don't elaborate on that any

18  further.

19            Please proceed with cross-examination.

20            THE WITNESS:  I'm sorry.

21            MR. CORNELIUS:  Judge, I'm almost done.

22  Can I review my notes for a minute, though?

23            THE COURT:  Yes.

24            (Pause)

25            MR. CORNELIUS:  Judge, I pass the witness.

1        THE COURT:  Thank you.

2        Ms. Tise, do you have any redirect?

3        MS. TISE:  I do not.

4        THE COURT:  All right.  We're going to

5   break for lunch at this time.

6        I'm going to remind you not to talk amongst

7   yourselves or with anyone else on any subject connected

8   with the trial or to form or express any opinion thereon

9   until the end of the trial.  You're going to be going

10  out to lunch today, so it will be an hour-and-a-half

11  before we see you again.

12        You may go with the bailiff.

13        THE BAILIFF:  All rise.

14        (Open court, defendant present, no jury)

15        THE COURT:  May the witness be excused?

16        MS. TISE:  Yes, Your Honor.

17        MR. CORNELIUS:  Yes, Your Honor.

18        THE COURT:  Take him on back.

19        (Lunch recess)

20        (Open court, defendant and jury present)

21        THE COURT:  Please be seated.

22        We're back on the record in Cause

23  No. 1384794 before the jury.  And the defendant is at

24  counsel table with his two lawyers, Mr. Cornelius and

25  Mr. Madrid.  Present for the State is Natalie Tise and

1  Justin Wood.  And we are ready to proceed with the

2  cross-examination of the witness, Special Agent Bill

3  Ebersole, who has already been sworn.

4             You may proceed, Mr. Cornelius.

5             MR. CORNELIUS:  Thank you, Judge.

6                    **WILLIAM EBERSOLE,**

7  having been first duly sworn, testified as follows:

8                    **CROSS-EXAMINATION**

9  **BY MR. CORNELIUS:**

10      Q.  Special Agent Ebersole, my name is Skip

11  Cornelius.  We've never met or discussed this case, have

12  we?

13      A.  No, sir.

14      Q.  Okay.  Obviously, I've heard your testimony

15  from yesterday, so I'll pick right up into it.

16      A.  Yes, sir.

17      Q.  You went to Pennsylvania to interview

18  Mr. Martinez, correct?

19      A.  I worked in Pennsylvania, so I was there and I

20  responded to a lead from the Houston office.

21      Q.  Okay.  Then you went to the Pennsylvania --

22  which prison unit was it?

23      A.  It's Mashan Valley, which is -- I believe it's

24  a private type prison.  Sometimes prisoners are

25  contracted out to private institutions.  It's not in my

1  area.  It's in the Pittsburgh office area.

2      Q.   Okay.  So, you went over there, though, to talk

3  to Mr. Martinez?

4      A.   Yes, sir.

5      Q.   And you went over there because you were

6  helping some special agents from Houston?

7      A.   Yes.

8      Q.   All right.  And you had a partner?

9      A.   Yes.  The other agent that went was Special

10 Agent Mike Hawthorne from the Pittsburgh division.  So,

11 it was actually his area that he worked.

12     Q.   Correct.

13          And so, y'all sat down and talked to this

14 gentleman, correct?

15     A.   Yes, sir.

16     Q.   Now, did you record any of the conversation?

17     A.   No, sir.

18     Q.   So, it's all an oral conversation?

19     A.   Yes, sir.

20     Q.   Unrecorded?

21     A.   That is correct, sir.

22     Q.   Do you know if your partner, the one from the

23 Pittsburgh office, made his own 302?

24     A.   He did not make a 302.  Both of us made that

25 one with the interview.  He made a 302 with regard to

1    taking buccal swabs, I believe.

2         Q.    Okay.  And 302 is just the form number that the

3    FBI uses for official reports?

4         A.    Yes, sir.

5         Q.    Okay.  How much time did you spend reviewing

6    the documents and/or photographs that you received from

7    Houston before you conducted this interview?

8         A.    I don't recall specifically, sir.

9         Q.    Can you give me a ballpark?

10        A.    It would been more than an hour.

11        Q.    Okay.  All right.  So, you go in there to talk

12   to this suspect, I guess we'll call him, although he

13   hadn't been charged with this offense, right?

14        A.    To my knowledge, he has not been charged.

15        Q.    Okay.  But you went in to talk to him, correct?

16        A.    Correct.

17        Q.    And to see if he would talk to you?

18        A.    Correct.

19        Q.    When he started talking to you, how did you

20   record either in your mind or in writing what it was he

21   was saying to you?

22        A.    Well, I took notes.

23        Q.    Okay.  Is that standard procedure in the FBI,

24   at least at that time?

25        A.    Yes, sir.

1      Q.   It wasn't standard procedure at that time to

2  actually record these types of interviews, was it?

3      A.   You are correct.

4      Q.   So, when would it have been that you would have

5  converted your notes to a typewritten 302?

6      A.   It would have been within the next day I would

7  have started typing it.  It was a rather lengthy report,

8  so I don't know if I finished it in a day.  Then I have

9  to run it by Agent Hawthorne as well to make sure he was

10  okay with it.

11      Q.   Okay.  Because y'all obviously did your very

12  best to record what was said in the conversation?

13      A.   Yes, sir.

14      Q.   And the report is 16 pages, basically,

15  single-spaced?

16      A.   Correct, sir.

17      Q.   And typed?

18      A.   Yes, sir.

19      Q.   So, it's a pretty long report?

20      A.   Yes, sir.

21      Q.   Do you have a copy of it?

22      A.   I may, sir.  If I may.

23      Q.   Why don't you get it out because I'm going to

24  ask you some specific questions about it and I want to

25  be able to refer to it to refresh your memory.

1       A.   Okay, sir.

2       Q.   Before I get into a few specific questions, did

3   you have any problem communicating with Mr. Martinez?

4       A.   No, sir.

5       Q.   Was there any Spanish to English

6   miscommunications that you detected?

7       A.   Well, I had -- there were a couple of phrases

8   that he used, which I put in my report, for emphasis I

9   put in there in Spanish.  There may have been times, for

10  example, where I had to repeat myself or he had to

11  repeat himself.  We're in a prison where it's a

12  relatively small room, we're huddled together trying to

13  talk.  So, it wouldn't be as easy to converse, for

14  example, like it would be in here.

15      Q.   Okay.  Do you stand by the report that you

16  wrote as being the most accurate version of what was

17  said and being put together?

18      A.   Well, I typed up what I believed to be the

19  substance of the interview.  And FBI 302 is a summary,

20  and large, of an interview.  It's not a transcript like

21  we would get in court proceedings.

22      Q.   Right.

23      A.   I stand by my report.

24      Q.   Okay.  For example, if Mr. Martinez had told

25  you at the time of the alleged killing he defecated in

1    his pants or defecated on the ground, you wouldn't have

2    trouble understanding that, if he said those words?

3         A.   Yes, sir, you are correct.

4         Q.   Okay.  Now, I'm not saying the word "defecate,"

5    he might have said it in Spanish, but you know how to

6    say that in Spanish, I take it?

7         A.   Well, the majority of the interview was

8    English.  So, one way or the other, I would have

9    understood it, yes.

10        Q.   That's not something that would have escaped

11   your attention that this was such a traumatic event that

12   he defecated in his pants or on the ground?

13        A.   Correct, sir.

14        Q.   He never told you that, did he?

15        A.   I don't recall that being said, sir.

16        Q.   Well, is there any doubt about it?  Do you need

17   to read your report?

18        A.   I don't recall that at all being put in my

19   report.  No, sir.

20        Q.   Okay.  I want to turn to Page 9 of the report

21   so you can refresh your memory.  And in the second

22   paragraph, the second third sentence, did Mr. Martinez

23   tell you that he was familiar with the Baytown area

24   having sold drugs in that area?

25        A.   Yes, sir.

1      Q.   Now, that's not a miscommunication that you

2  would have just made up.   I mean, are you confident he

3  told you that?

4      A.   I believe so, yes, sir.

5      Q.   Because part of the -- what you testified to

6  yesterday was how on earth could he have known how to

7  describe how to get over to Baytown -- do you remember

8  being asked that -- or giving the roads and the names

9  and all that stuff.   Remember those questions on direct?

10      A.   Somewhat.   I remember being asked and not being

11  familiar with the roads.

12      Q.   And you not being familiar?

13      A.   Correct.

14      Q.   And the next paragraph, did Martinez advise you

15  that he had been to Baytown many times and had friends

16  there for the purpose of dealing drugs?

17      A.   Yes, sir.

18      Q.   Okay.   And, again, that's not something that

19  was miscommunicated or you have any question in your

20  mind about; he actually told you he was very familiar

21  with Baytown, right?

22      A.   I don't think there is a miscommunication, sir.

23      Q.   All right.   Now, turn to Page 7, the second

24  full paragraph on Page 7.

25      A.   Okay.

1        Q.   Let me orient you, if I can, with my question.

2   This is after he claims Rogelio and Chico had left to go

3   to, perhaps, the lady's apartment.  I don't know that he

4   ever said he saw them go in there, but at the apartment.

5   Did he tell you that Rogelio and Chico returned

6   approximately five to ten minutes later?

7        A.   Yes, sir.

8        Q.   And Chico was holding Angelo?

9        A.   Yes, sir.

10        Q.   Okay.  And, again, that's -- you think that's a

11   miscommunication?

12        A.   I'm not aware of it, sir.

13        Q.   On Page 8, the next page, the third paragraph

14   talking about Chico and Roger returning from Diana's

15   apartment.  Did Mr. Martinez tell you he believed Chico

16   handed Angelo to Rogelio?  Do you see the second

17   sentence on that third paragraph?

18        A.   Yes.  Martinez believed that Chico handed

19   Angelo to Rogelio.

20        Q.   Now, again, are you backing off that in any

21   way?  Do you think that's a miscommunication, you didn't

22   have the names right, or --

23        A.   I'm not aware of it, no.

24        Q.   Okay.  Let's go to Page 10 at the top.  Was

25   there a part of the conversation -- or time in the

```
 1   conversation when Martinez was telling you about what
 2   happened where he alleges the boy was actually killed?
 3        A.   Yes, sir.
 4        Q.   And, of course, you were, I'm sure, vitally
 5   interested in hearing what he had to say about that,
 6   correct?
 7        A.   Yes, sir.
 8        Q.   And trying to determine what role people
 9   played?
10        A.   Yes.
11        Q.   And one of the ways to determine what role they
12   played would be to sort of figure out where they were at
13   the time that the killing allegedly took place.
14        A.   Yes, sir.
15        Q.   So, did Mr. Martinez -- let me back up for a
16   quick second.
17             Since there is not a recording of it --
18   obviously, I haven't heard any recording of it -- I
19   don't know exactly how it was going, but were you kind
20   of trying to give him the lead?  Since he was talking to
21   you, were you trying to get him to tell the story?
22        A.   I wanted him to tell the story in his own
23   words, yes, sir.
24        Q.   Okay.  So, was it more of him just telling you
25   the story or him answering specific questions that you
```

1  were asking?

2      A.    There was a mixture.  There were parts where he

3  would just narrate and I would pay attention and then

4  maybe, for example, have to ask a little more detail.

5      Q.    Okay.  If you thought it was something

6  important that you needed to get some detail on, you

7  would ask him that, right?

8      A.    Yes, sir.

9      Q.    That's not exactly reflected in here, your

10 questions, but where people were standing at the time

11 the child was killed was probably pretty important to

12 you, wasn't it?

13     A.    Yes, sir.

14     Q.    So, at the top of that did he tell you that

15 Rogelio exited the vehicle and took Angelo to the

16 driver's side rear area of the vehicle?

17     A.    Yes.

18     Q.    Now, I bet you made -- took great attention in

19 getting that down as close to exact as you possibly

20 could, right?

21     A.    Uh-huh, yes, sir.

22     Q.    And when you typed this out, referred to your

23 note and talking to your compadre there, your partner

24 there, this is pretty important and y'all would be very

25 certain that's what he told you?

1      A.   Yes, sir.

2      Q.   A little bit down from that, did Martinez say

3  to you that he did not see Rogelio stab or slash Angelo,

4  but did hear Angelo cry out one time, he heard Angelo

5  say "uh" and then he heard him hit the ground.  Remember

6  that?

7      A.   Yes, sir.

8      Q.   Then he said, very next thing, at least you

9  have recorded:  At this time Chico was at the front of

10  the car looking around.

11      A.   Yes, sir.

12      Q.   Back to the sixth page -- I'm sorry.  Not the

13  sixth page, the twelfth page.  Now, in the interview

14  we're at the point where Mr. Martinez -- or you're

15  getting him to tell you about what was done with the

16  body.

17      A.   Yes, sir.

18      Q.   All right.  And did he tell you they were

19  trying to get the body to go underwater, put it in the

20  water and make it submerge and they had to put rocks on

21  it?  Is that generally what the conversation was?

22      A.   Yes, sir.

23      Q.   At the end of that -- well, I don't if it's at

24  the end of it, but on the -- one, two, three, four,

25  five -- fifth full paragraph down there, did you record:

1    Martinez noted that Angelo's body eventually went down

2    underwater due to the weight of the rocks?

3         A.   That is correct, sir.

4         Q.   So, do you stand by that statement?

5         A.   Yes, sir.

6         Q.   Again, on Page 12, the last paragraph on Page

7    12, he was talking about the tires blowing out on the

8    way back.

9         A.   Okay.

10        Q.   And you devoted quite a lot of space to that.

11   And this is a pretty long paragraph, right?

12        A.   Yes, sir.

13        Q.   And you record that he told you about one tire

14   and then a second tire blowing out, correct?

15        A.   Yes, sir.

16        Q.   Nothing about a third tire or fourth tire

17   blowing out?

18        A.   No, sir.

19        Q.   Pages 14 and 15; 14 at the top he is telling

20   you how he had gotten the car back to a hotel?

21        A.   Yes, sir.

22        Q.   Did he say to you that while at the -- you said

23   he mentioned a hotel.

24        A.   Correct.

25        Q.   At he mentioned the hotel, Chico, Rogelio, and

1    Martinez made a pact to never tell what happened that

2    night.

3         A.   Correct.

4         Q.   Now, when you use the words "made a pact," I

5    don't know if he used those exact words, but was he

6    saying to you that Chico threatened him or made him

7    swear not to tell anybody or did all this at gunpoint or

8    the three of them just made a pact not to tell anybody?

9         A.   In that section, the sentence you are referring

10   to, sounds to me like an agreement amongst three

11   parties.

12        Q.   Let's turn over to the next page, Page 15, the

13   first full paragraph.  Did he reiterate that where you

14   wrote:  Martinez further noted that at the hotel the

15   night of the murder all three agreed not to tell anyone

16   regarding the murder of Angelo.

17        A.   Yes, sir.

18        Q.   That's the way you remember hearing it?

19        A.   Yes, sir.

20        Q.   Skip back to Page 13, the second paragraph.

21   And this is where he's telling you about them getting

22   back to -- you wrote or he called it the apartment used

23   by Angelita.  Are you with me?

24        A.   Yes, sir.

25        Q.   He said he did not speak with Angelita, Chico

1  went in to sleep with Angelita.  Do you remember that?

2      A.   Yes, sir.

3      Q.   Now, is there any way that could be confused

4  with Chico staying up all night doing drugs?

5              MS. TISE:  Your Honor, I will object.  That

6  calls for speculation and conclusion on the part of this

7  witness.

8              THE COURT:  That's sustained.

9      Q.   (By Mr. Cornelius) Well, I mean, if he had said

10  that Chico did not go in to sleep with Angelita, but

11  stayed up all night doing drugs, you wouldn't have

12  written in there Chico -- that he said Chico went in to

13  sleep with Angelita, would you?

14      A.   If there was mention of drug use, I would have

15  typed it.

16      Q.   All right.

17              MR. CORNELIUS:  Pass the witness, Judge.

18              THE COURT:  Any redirect, Ms. Tise?

19              MS. TISE:  A couple of questions, Judge.

20              THE COURT:  You may proceed.

21                    **REDIRECT EXAMINATION**

22  **BY MS. TISE:**

23      Q.   First of all, all of those things that you were

24  just asked about --

25      A.   Yes, ma'am.

1    Q.    -- and all of the page numbers you were just

2  given --

3    A.    Yes, ma'am.

4    Q.    -- are things that are in your report --

5    A.    That is correct.

6    Q.    -- right?

7          And your report is basically your

8  documentation at some later time from your handwritten

9  notes during your interview of what was said?

10    A.    Yes, ma'am.

11    Q.    Have you ever played the game telephone -- Do

12  you know what that game is -- when were you a little

13  kid?

14    A.    No.

15    Q.    Was there also a written statement taken from

16  Carmelo Martinez Santana?

17    A.    Yes.  Towards the end of our time with him, we

18  asked him to write in his own words what happened.  I

19  didn't want him to give law enforcement officer words.

20  We gave him the opportunity to write out what he thought

21  happened and at no direction from us.

22              MS. TISE:  May I approach?

23              THE COURT:  Yes.

24              MS. TISE:  And I realize I can't offer

25  this, Judge, but I just wanted to identify it.  I've

 1  marked it as State's Exhibit 93.

 2      A.   The third page would have my name on it and the

 3  date May 23rd, 2011.

 4      Q.   (By Ms. Tise) Okay.  And did he also sign it?

 5      A.   Yes.  Carmelo Martinez.

 6      Q.   And you conducted this interview with him in

 7  English, right?

 8      A.   Yes, ma'am.

 9      Q.   But you had him write his statement in Spanish?

10      A.   Yes, ma'am.

11      Q.   Why?

12      A.   I believe he felt more comfortable reading and

13  writing in Spanish.

14      Q.   Okay.  And is it fair to say that what came out

15  of his mouth in his own words in his own native language

16  would be the more accurate version of his story?

17      A.   That handwritten statement is his story without

18  any questions, without any elicitation.

19      Q.   We have seen throughout this trial the

20  difficulties of -- even with a Spanish speaker

21  communicating with a witness who speaks in Spanish --

22              MR. CORNELIUS:  Objection to the form of

23  this.  There is not a question.  She's putting things in

24  evidence that he couldn't possibly know.

25              THE COURT:  Let her finish her question.

1    And then wait until I rule on the objection.

2        Q.    (By Ms. Tise) You've translated things for

3    people who are Spanish speakers before, have you not?

4        A.    Yes.

5        Q.    Things get lost in translation, do they not?

6        A.    Sometimes, yes.

7        Q.    And different words are used to convey

8    different things in certain languages that mean

9    something different in other languages?

10       A.    Yes.  Even English.  You talk to someone from

11   Texas, you talk to someone from Louisiana, and you

12   talking to someone from Pennsylvania, it's a lit bit of

13   a difference.

14       Q.    A couple of other things came up in the

15   statement.  We talked about the fact that initially he

16   was not going to tell you the story.

17       A.    That is correct.

18       Q.    And you talked to him for a little while about

19   telling his story and he expressed some concerns to you,

20   did he not?

21       A.    Yes.

22       Q.    Okay.  Can you tell the jury some of the things

23   that he was concerned about before he gave his

24   statement?

25                   MR. CORNELIUS:  Objection to hearsay, Your

1    Honor.

2                    THE COURT:  That's sustained.

3        Q.   (By Ms. Tise) Would you say that there were

4    three or four things that he talked to you about that he

5    was concerned about before he gave his statement?

6        A.   He did have some concerns.  For example, about

7    testifying --

8                    MR. CORNELIUS:  Objection --

9                    THE COURT:  That's going to be sustained as

10   to hearsay.

11       Q.   (By Ms. Tise) I'm not going to ask you what his

12   specific concerns were, but there were a number of them,

13   weren't there?

14       A.   There were concerns, yes.

15       Q.   And did those concerns seem like legitimate,

16   real concerns?

17       A.   Yes.  And if I could further expound, the

18   Williamsport office, my primary office of the FBI, one

19   of its main missions is the bureau prison.  We have

20   several prison facilities out there.  So, when we do

21   custodial interviews, we are very sensitive towards what

22   would be concerns by another inmate.

23       Q.   Okay.  And mainly I'm just trying to get

24   across the point that he did express those to you and he

25   did seem legitimately afraid or concerned about certain

 1  types of things?

 2       A.   Yes, ma'am.

 3            MS. TISE:  I pass the witness.

 4            MR. CORNELIUS:  A couple of more questions,

 5  if I might.

 6            THE COURT:  Yes.

 7                    **RECROSS-EXAMINATION**

 8  **BY MR. CORNELIUS:**

 9       Q.   On this handwritten statement that he wrote,

10  does it also contain some diagrams that he drew?

11       A.   There were diagrams, yes, sir.

12       Q.   Okay.  And the diagrams were drawn to help you

13  understand what he was saying?

14       A.   There was a diagram to show positions of

15  people, for example.  And that in a sense, yes, it did

16  help me understand.

17       Q.   Okay.  And also in terms of deciding what is

18  the more accurate -- and you don't have any personal

19  knowledge about this case, do you?

20       A.   I've reviewed reports, I have talked to

21  different investigators.  I'm probably the least

22  knowledgeable person in this courtroom about the case.

23       Q.   So, you wouldn't be in a position to tell us

24  what's accurate and what is inaccurate with respect to

25  him or any other witness in this case, would you?

1          A.   I have very limited knowledge about this case.

2                    MR. CORNELIUS:  All right.  Pass the

3     witness.

4                    THE COURT:  Anything further, Ms. Tise?

5                    MS. TISE:  No, Your Honor.

6                    THE COURT:  May this witness be excused?

7                    MR. CORNELIUS:  Yes, Your Honor.

8                    MS. TISE:  Yes.

9                    THE WITNESS:  Thank you.

10                   THE COURT:  Not to be recalled.  Is that

11    correct?

12                   MR. CORNELIUS:  Correct.

13                   MS. TISE:  That's correct.  We'd like him

14    to be able to go home.

15                   THE WITNESS:  Thank you.

16                   THE COURT:  You are excused, sir.  Thank

17    you.

18                   THE WITNESS:  Thank you.

19                   THE COURT:  Call your next, Ms. Tise.

20                   MS. TISE:  The State calls Micah Webb.

21                   THE BAILIFF:  Your Honor, he has not been

22    sworn.

23                   (Witness sworn)

24                   THE COURT:  All right.  Speak right into

25    the microphone and keep your voice up, please.

1          You may proceed, Ms. Tise.

2                    **MICAH WEBB,**

3    having been first duly sworn, testified as follows:

4                 **DIRECT EXAMINATION**

5    **BY MS. TISE:**

6          Q.    Would you introduce yourself, please, sir, to

7    the jury?

8          A.    My name is Micah Webb.

9          Q.    And, Mr. Webb, can you tell the jury what you

10   do for a living?

11         A.    I'm an investigator with the Harris County

12   District Attorney's Office.

13         Q.    And how long have you been an investigator at

14   our office?

15         A.    Six years.

16         Q.    Okay.  What did you do before that?

17         A.    Immediately prior to, I was a healthcare fraud

18   investigator with the attorney general's office.   And

19   prior to that, I was a Houston police officer.

20         Q.    Okay.  What are your duties at the D.A.'s

21   office?

22         A.    Generally speaking, we assist the prosecution

23   in preparing a case for prosecution.

24         Q.    Did you actually get asked to assist us in our

25   preparation of this case against Obel Cruz-Garcia for

1   trial?

2        A.   Yes, ma'am, I did.

3        Q.   Okay.  And you were involved pretty much not

4   too long after the case got filed, correct?

5        A.   Yes, ma'am.

6        Q.   And there were certain things that you were

7   asked to do in order to help get the case ready for

8   trial, correct?

9        A.   Yes, ma'am.

10       Q.   At some point in time, were you asked to try to

11  locate some of the witnesses in the case?

12       A.   I was.

13       Q.   And did you find that some of the witnesses

14  have passed away?

15       A.   Yes, ma'am.

16       Q.   Specifically, tell the jury who David Kerr is.

17       A.   David Kerr was a gentleman that was crabbing

18  along the --

19            MR. CORNELIUS:  Objection.  I mean,

20  that's -- may we approach the bench?

21            (At the Bench, on the record)

22            MR. CORNELIUS:  I'm not sure I'd object to

23  everything that -- but I don't have any control of what

24  he is going to say.  And for him to sort of go off what

25  a witness' testimony would be, but not -- it's hearsay.

1                      THE COURT:  Just a general investigation as

2    to what role he played and --

3                      MS. TISE:  He was a crabber who found the

4    body.  That is all he was going to say.

5                      THE COURT:  He was concerned about --

6                      MS. TISE:  The other stuff I want to

7    establish -- and we will confine him to --

8                      MR. CORNELIUS:  Okay.  That's fine.

9                      (Open court, defendant and jury present)

10                      THE COURT:  Proceed, Ms. Tise.

11        Q.   (By Ms. Tise) So, briefly, who was David Kerr?

12        A.   David Kerr was the gentleman who had happened

13    upon the remains of the victim.

14        Q.   Okay.  And were you able to find that

15    individual?

16        A.   No, ma'am.

17        Q.   Why?

18        A.   He was deceased.

19        Q.   Also, when this case was filed, did you try to

20    locate Angelo, Sr.

21        A.   Yes, ma'am, I did.

22        Q.   And what did you learn?

23        A.   He was also deceased.

24        Q.   Did you also try to locate Bienviendo Melo or

25    Charlie?

1    A.   Yes, ma'am.

2    Q.   Were you able to find him?

3    A.   My databases were a little -- well, not

4  confusing, but he was either in the Dominican or in

5  Wisconsin.  I was never able to find him.

6    Q.   Okay.  Or pinpoint an exact location?

7    A.   Yes, ma'am.

8    Q.   Some people, obviously, you did find?

9    A.   Yes, ma'am.

10    Q.   We found and talked to Linda Hernandez, for

11  example.  We talked to the complainants in the case, the

12  parents?

13    A.   Yes, ma'am.

14    Q.   Talked to Rudy eventually?

15    A.   Yes, ma'am.

16    Q.   Okay.  And as you were working and trying to

17  keep track of all of these names and all of these

18  nicknames and what people looked like back then and what

19  they look like now, did you create some tools to kind of

20  help us do that?

21    A.   Yes, ma'am, I did.

22              MS. TISE:  May I approach?

23              THE COURT:  Yes.

24    Q.   (By Ms. Tise) I'll show what's been marked as

25  State's Exhibit 34, and ask if you recognize this packet

1    (indicating)?

2          A.   Yes, ma'am.

3          Q.   And does this packet kind of summarize some of

4    the key players in this case and what they looked like

5    back then and what they look like now and some of their

6    nicknames?

7          A.   Yes, ma'am.

8                    MS. TISE:   Okay.  And if I can just go

9    through it quickly with the jury by publishing --

10                    THE COURT:   On the screen?

11                    MS. TISE:   Because it's -- I can do it this

12   way.

13                    THE COURT:   Let's do it on the screen.

14                    Yes, you may publish it.

15         Q.   (By Ms. Tise) The jury has seen sections of

16   this, but on Page 1 of State's Exhibit 34, who is that

17   (indicating)?

18         A.   That's Obel Cruz-Garcia, the charged defendant.

19         Q.   And you were able to track down an old picture

20   of him, correct?

21         A.   Yes, ma'am.

22         Q.   And a more recent photo of him as well?

23         A.   Yes, ma'am.

24         Q.   Page 2, who is that (indicating)?

25         A.   That's a gentleman that went by the name of

1   Roger, now known to be Rogelio Aviles.

2       Q.   Okay.  And he also went by another name, did he

3   not?

4       A.   Yes, ma'am.

5       Q.   What was that?

6       A.   Candido Lebron.

7       Q.   Okay.  Page 3 of State's Exhibit 34, what do we

8   have here (indicating)?

9       A.   Mr. Carlos Santana, also known as Rudy.

10      Q.   Okay.  Carmelo Martinez Santana?

11      A.   Yes, ma'am.

12      Q.   I know that's confusing at times, but we all

13  have met Rudy.

14           And this is an old picture of who

15  (indicating)?

16      A.   That's Angelita Rodriguez.

17      Q.   And is this also an old picture of who?

18      A.   That's Diana Garcia.

19      Q.   And on the next page, obviously --

20      A.   Arturo Rodriguez.

21      Q.   And the next page, who is this (indicating)?

22      A.   Bienviendo Melo, also known as Charlie.

23      Q.   Okay.  He also went by Fred Ferrer sometimes,

24  too, didn't he?

25      A.   I believe so, yes, ma'am.

1      Q.    And finally, Leonardo German (indicating).

2      A.    Yes, ma'am.

3      Q.    Let's go back to Page 2 and this Rogelio Aviles

4  person.  You were asked to try to locate that

5  individual?

6      A.    Yes, ma'am.

7      Q.    Okay.  And that request became much more

8  significant after Rudy was interviewed by the federal

9  agents, correct?

10     A.    Yes, ma'am.

11     Q.    And were you able to track his whereabouts?

12     A.    I was.

13     Q.    And where was he living?

14     A.    We located him in Georgia.

15     Q.    Okay.  And were you also able, through your

16  investigation, to determine and confirm by AFIS that

17  this individual that was going by the name of Candido

18  Lebron and living in Houston back in the early 90s was,

19  according to AFIS, the same individual that was living

20  in Georgia at the time?

21     A.    That is correct.

22     Q.    Okay.  And what is AFIS?

23     A.    AFIS is an acronym for Automated Fingerprint

24  Identification System.  It's an automated database that

25  collects fingerprints.

1    Q.   So, basically, based on prints, we know that

2   the person that we went to talk to in Georgia is the

3   same person who was living here in Houston in the 90s

4   and used the name Candido Lebron?

5    A.   Yes, ma'am.

6    Q.   Or Roger?

7    A.   Yes.

8    Q.   And once we located him, did an investigator go

9   out to talk to him and interview him?

10    A.   Yes, ma'am.

11    Q.   Okay.  And after that interview, did you assist

12   in preparing capital murder charges against Rogelio

13   Aviles Barroso?

14    A.   Yes, ma'am, I did.

15    Q.   And that happened after the interview in

16   Georgia?

17    A.   That's correct.

18    Q.   Additionally, was there a point in time in the

19   history of this case that you were asked to meet with

20   the defendant and obtain a buccal swab from him?

21    A.   Yes, ma'am.

22    Q.   And did you do that?

23    A.   I did.

24          MS. TISE:  May I approach?

25          THE COURT:  Yes.

1    Q.   (By Ms. Tise) I'll show you what's been marked

2   as State's Exhibit 68, and ask you if recognize that

3   document (indicating)?

4    A.   Yes, ma'am.

5    Q.   What is that?

6    A.   It's a consent to take a blood, saliva, or hair

7   sample.

8    Q.   And did Obel Cruz-Garcia -- was he presented

9   with that form?

10    A.   Yes, ma'am.  It was interpreted to him, he

11   understood, and he voluntarily provided his sample and

12   signed the form.

13    Q.   Okay.  So, you actually had an interpreter come

14   and explain the form to him?

15    A.   Yes, ma'am.

16    Q.   In Spanish?

17    A.   Yes, ma'am.

18    Q.   And he signed it?

19    A.   Yes, ma'am.

20    Q.   Okay.  And when did that happen?

21    A.   That was on February 16th of 2010.

22         MS. TISE:  At this time, I offer State's

23   Exhibit 68.

24              **(State's Exhibit No. 68 Offered)**

25         MR. CORNELIUS:  No objection.

1            THE COURT:   State's No. 68 is admitted

2    without objection.

3            You may proceed.

4            **(State's Exhibit No. 68 Admitted)**

5        Q.   (By Ms. Tise) I'm going to show you State's

6    Exhibits 76 and 77, and ask you if you recognize what

7    those items are (indicating)?

8        A.   It's a swab container box that has my

9    handwriting dated February 16th of 2010 at 11:20 a.m.

10   with the defendant's name, my name, and evidence tape.

11       Q.   Okay.  And looking at the next exhibit, which

12   is State's Exhibit 77 (indicating).

13       A.   It's identical.  It's a second sample.  They

14   both contain a singular cotton swab that was used to

15   collect the cheek material to contain DNA.

16       Q.   Okay.  And is it standard procedure to collect

17   two swabs?

18       A.   Yes, ma'am.

19       Q.   Okay.  And you did that?

20       A.   Yes, ma'am.

21       Q.   And both of these swabs were collected from the

22   cheek of Obel Cruz-Garcia, correct?

23       A.   Yes, ma'am.

24       Q.   Can you point him out for us and identify him

25   for the record?

1      A.   The gentleman in the gray suit with the
2  headphones (indicating).
3      Q.   That's the person you collected these samples
4  from?
5      A.   Yes, ma'am.
6           MS. TISE:   At this time, I will offer
7  State's Exhibits 76 and 77 -- actually, I will withhold
8  my offer at this point in time.   I'll get back to that
9  in a minute.
10      Q.   (By Ms. Tise) Were you also asked to map out
11  some of the locations that came up during the
12  investigation of this case?
13      A.   Yes, ma'am.
14      Q.   And asked to document those locations in a way
15  that we could present it to the jury and show them those
16  locations?
17      A.   Yes, ma'am.
18           MS. TISE:   Can you help me with the exhibit
19  number, Justin?
20           MR. WOOD:   It will be 93, Natalie.
21      Q.   (By Ms. Tise) I'm going to show you State's
22  Exhibit 93.
23           THE COURT:   93 is Rudy's written statement.
24           MR. WOOD:   94.
25      Q.   (By Ms. Tise) All right.   I'm showing you

1    State's Exhibit No. 94.  Does this exhibit fairly and

2    accurately show a number of the locations that were

3    important during the investigation of this case?

4         A.   Yes, ma'am.

5         Q.   And do you think that it would be helpful for

6    the jury to be able to see this and kind of get their

7    bearings on these individual places?

8         A.   Yes, ma'am.

9              MS. TISE:  At this time, I will offer

10   State's Exhibit 94.

11             **(State's Exhibit No. 94 Offered)**

12             MR. CORNELIUS:  I just want to look at the

13   stuff that's written on it.

14             No objection.

15             THE COURT:  State's Exhibit No. 94 will be

16   admitted without objection.

17             You may proceed.

18             **(State's Exhibit No. 94 Admitted)**

19             MS. TISE:  I would ask the witness to step

20   down.

21             THE COURT:  Yes.  Just keep your voice up.

22             THE WITNESS:  Yes, ma'am.

23             MR. CORNELIUS:  Can I stand over there,

24   Judge, so I can see?

25             THE COURT:  Yes, you may.

1    Q.   (By Ms. Tise) I'll try to do this where

2  everyone can still see.

3              Okay.  Take a look at that diagram.  You

4  have color coded and indicated what those individual

5  locations are?

6    A.   Yes, ma'am.

7    Q.   Let's start at where it began at Diana and

8  Arturo's apartment over on Fairway.

9    A.   What's indicated, I guess, navy blue or close

10  to it, dark blue, is the 6705 Fairway address.

11    Q.   Okay.  And let's go next to where Linda

12  Hernandez and Bienviendo Melo were living at the time

13  over on Westover.

14    A.   That's indicated in red as 7523 Westover.

15    Q.   And did you also locate what at one time was

16  the Pasadena Motor Inn?

17    A.   Yes, ma'am.  Indicated in the green.

18    Q.   Okay.  And what freeway is that (indicating)?

19    A.   This is 225.

20    Q.   Okay.

21    A.   Also known as the Pasadena Freeway, the LaPorte

22  Freeway.

23    Q.   Okay.  And did you also locate the place where

24  Angelo Garcia, Jr.'s body was discovered on Goose Greek?

25    A.   Yes, ma'am.  That's in teal.

1    Q.   Okay.  And did you also locate where Angelita

2    and Obel Cruz-Garcia were living in an apartment rented

3    for them by Diana?

4    A.   Yes, ma'am.  Up here in the yellow

5    (indicating).

6    Q.   Up in the Humble area?

7    A.   Yes, ma'am.

8    Q.   That apartment was on Golden Eagle up there,

9    correct?

10   A.   Correct.

11   Q.   Is this location in Harris County?  In fact, is

12   all of Baytown in Harris County?

13   A.   Yes, ma'am.

14   Q.   Okay.  And if you were going to Baytown and

15   went down 225 to get to this location where the body was

16   found, where would you -- what would be the next street

17   you would go on after you got off of 225?

18   A.   The most logical to that location is off of

19   Highway 146, which goes over the Fred Hartman Bridge.

20   Q.   You can take your seat.

21   A.   (Witness complies).

22   Q.   Additionally, did I ask you to estimate the

23   time that it would take, if you went a straight shot,

24   from Diana and Arturo's apartment on Fairway to the

25   location where the body was dumped in Goose Greek?

1          A.   Yes, ma'am.

2          Q.   And did you prepare an exhibit that illustrates

3    that?

4          A.   Yes, ma'am, I did.

5          Q.   I'm going to show you what's been marked as

6    State's Exhibit 78 (indicating).

7          A.   Yes, ma'am.  That's the map that I put

8    together.

9          Q.   And did you indicate the miles that it takes --

10   the number of miles between those two locations?

11         A.   This particular exhibit, I used Google Maps.

12   So, that's the estimate according to Google.

13         Q.   And what's that estimate?

14         A.   20.7 miles.

15         Q.   And what's the estimated time to get there?

16         A.   Twenty-three minute.

17              MS. TISE:  I will offer State's Exhibit 78.

18              **(State's Exhibit No. 78 Offered)**

19              MR. CORNELIUS:  No objection.

20              THE COURT:  State's Exhibit 79 is admitted

21   without objection.

22              Please proceed.

23              **(State's Exhibit No. 78 Admitted)**

24              MS. TISE:  May I publish?

25              THE COURT:  Yes.

1    Q.   (By Ms. Tise) And is that basically the map

2   we're talking about that documented that route?

3    A.   Yes, ma'am.

4    Q.   And, finally, were you asked to go out to that

5   Fairway location and get some photographs documenting

6   some things that we didn't have from the original scene

7   photos?

8    A.   Yes, ma'am.

9    Q.   Okay.  And did you drive by that location and

10   confirm the accuracy of these photos?

11    A.   Yes, ma'am.

12    Q.   I'm going to show you State's Exhibits 71

13   through 74 and ask you if those are photos of the

14   Fairway apartments now (indicating)?

15    A.   With the exception of 73, which is a shot taken

16   across the street from the address, yes, ma'am.

17    Q.   Okay.

18         MS. TISE:  At this time, I'm going to offer

19   State's Exhibits 71 through 74.

20         **(State's Exhibit No. 71 through 74 Offered)**

21         MR. CORNELIUS:  No objection.

22         THE COURT:  State's Exhibits 71, 72, 73,

23   and 74 are admitted without objection.

24         You may proceed.

25         **(State's Exhibit No. 71 through 74**

1          **Admitted)**

2          Q.   (By Ms. Tise) Looking at State's Exhibit 71, is

3     that the front view looking at those apartments from

4     Fairway (indicating)?

5          A.   Yes, ma'am, it is.

6          Q.   And State's Exhibit 72, can we see where we

7     would be looking back from the street towards the

8     apartment that at one time Diana and Arturo lived in?

9          A.   Yes, ma'am.

10         Q.   And can you point out where Apartment No. 3 is

11    on your screen there to the left?

12         A.   It's the second apartment at the -- the first

13    floor from the corner (indicating).

14         Q.   And right across the street from that apartment

15    complex, there was now and there still is what?

16         A.   Barnett Stadium.

17         Q.   And if you look down Fairway, would this be

18    your view (indicating)?

19         A.   Yes, ma'am.

20         Q.   Okay.  And it's going to be really hard to see,

21    but right down there you can see the street sign where a

22    little street intersects with Fairway down there

23    (indicating)?  And it would be kind of behind Diana and

24    Arturo's apartment.

25         A.   Yes, ma'am.

1    Q.   Okay.  And can you circle for the jury where

2  that street sign is?

3    A.   Just above my mark -- apparently there's

4  something -- well, you see it (indicating).

5    Q.   Okay.

6    A.   It's between those lines.

7            MS. TISE:  Can I have just a moment, Judge?

8            THE COURT:  Yes.

9            (Pause)

10            MS. TISE:  I'll pass the witness.

11            MR. CORNELIUS:  Could I have just a second,

12  Judge?

13            THE COURT:  Yes.

14            (Pause)

15            MR. CORNELIUS:  May I proceed, Judge?

16            THE COURT:  Yes, you may.

17                    **CROSS-EXAMINATION**

18  **BY MR. CORNELIUS:**

19    Q.   Mr. Webb, I'm Skip Cornelius.  We've met

20  before, but we've not really talked about this case,

21  right?

22    A.   Yes, sir.

23    Q.   I've just got a couple of questions for you.

24            Do you know Baytown?  Have you been to

25  Baytown?

1        A.   I have been to Baytown.

2        Q.   If you were anybody in the southern part, I

3   guess, of Harris County or Houston and was asking for

4   directions to Baytown, would you tell them 225 to 146?

5        A.   Yes, sir.

6        Q.   That's the way he may have gone?

7        A.   Generally, yes.

8                 MR. CORNELIUS:  All right.  Pass the

9   witness?

10                THE COURT:  Anything further?

11                MS. TISE:  No, Your Honor.

12                THE COURT:  May this witness be excused?

13                MS. TISE:  Yes.

14                MR. CORNELIUS:  Yes.

15                THE COURT:  You may step down, sir.

16                THE WITNESS:  Thank you, ma'am.

17                THE COURT:  Please call your next.

18                MS. TISE:  The State calls Matt Quartaro.

19                (Witness sworn)

20                THE COURT:  Sir, keep your voice up and

21   speak right into that microphone.

22                THE WITNESS:  Certainly.

23                THE COURT:  You may proceed, Ms. Tise.

24                      **MATT QUARTARO,**

25   having been first duly sworn, testified as follows:

1                        **DIRECT EXAMINATION**

2     **BY MS. TISE:**

3         Q.   Would you introduce yourself please, sir?

4         A.   Yes.  My name is Matt Quartaro.

5         Q.   And can you tell the jury what you do for a

6     living?

7         A.   Yes.  I'm a supervisor of forensics at Orchid

8     Cellmark in Dallas, Texas.

9         Q.   Okay.  And Orchid Cellmark, is that an

10    independent lab?

11        A.   Yes.  We're an independent lab who performs DNA

12    testings on specimens from criminal cases around the

13    country.

14        Q.   And as an independent lab, you are not

15    connected with or controlled by any police agency,

16    correct?

17        A.   That's correct.

18        Q.   Okay.  Can you tell the jury what your

19    background and training is that qualifies you to do what

20    you do?

21        A.   Sure.  I have a bachelor's degree in molecular

22    biology from Texas A&M University and a master's degree

23    in molecular biology from the University of Texas at

24    Dallas.  And I have approximately twelve years

25    experience performing forensic DNA testing.  We have a

1  vigorous training program at our laboratory that helped

2  me to become qualified to become a DNA analyst.  And

3  then we have to perform continuing education every year

4  to maintain that status.

5       Q.   And have you testified as an expert in court

6  before?

7       A.   Yes, I have.

8       Q.   And has that been on few or many occasions?

9       A.   Approximately 60 times.

10      Q.   Okay.  And have you testified and been

11 recognized as an expert in the courts here in Harris

12 County, Texas?

13      A.   I have.

14      Q.   Okay.  Tell the jury what DNA is.

15      A.   Sure.  DNA is a chemical that's found in every

16 cell in your body, except for red blood cells.  The long

17 name for it is deoxyribonucleic acid.  And it's

18 basically the blueprints, the genetic information that

19 makes you who you are.  The majority of DNA is the same

20 from person to person, but what we concentrate on in

21 doing forensic DNA testing is those small differences

22 that make each person unique.

23      Q.   And the testing that you do, how is it used in

24 a forensic setting?

25      A.   Basically, we obtain a specimen from the crime

1    scene samples.  So, it may be a blood or semen or

2    another biological fluid.  And we'll try to see if we

3    can obtain a DNA profile from that sample.  We'll then

4    compare it to a DNA profile that we'll get from

5    potential parties that were associated with a crime

6    scene, whether it be a victim or a potential suspect,

7    and see if those two profiles, you know, match or if we

8    can exclude some of those people from being a

9    contributor.

10        Q.   Okay.  And were you asked to do just that in

11   the case involving Obel Cruz-Garcia that we're here on

12   today?

13        A.   Yes.

14        Q.   When did Orchid Cellmark first become involved

15   in assisting with the case against Obel Cruz-Garcia?

16        A.   It was -- may I refer to my notes?

17        Q.   Yes.

18        A.   Thank you.

19             We first received evidence in this case on

20   October 3rd of 2007.

21        Q.   Okay.  And who did you receive that evidence

22   from?

23        A.   I believe Sergeant Eric Mehl from the Houston

24   Police Department sent this evidence to us for testing.

25        Q.   And can you tell the jury what evidence you

1  received in 2007?

2      A.   Yes, ma'am.  We received a cigar, a sexual

3  assault kit, and reference samples from Diana Garcia and

4  Arturo Rodriguez.

5      Q.   At that point in time, had you received any

6  sample from anyone named Obel Cruz-Garcia?

7      A.   No.

8      Q.   Okay.

9           MS. TISE:  May I approach?

10          THE COURT:  Yes.

11     Q.   (By Ms. Tise) I'm going to show you some items

12  and ask you to identify them.  First, State's Exhibit 32

13  (indicating).

14     A.   Yes.  This is the cigar that we received in

15  this case.

16     Q.   Okay.  In 2007?

17     A.   Correct.

18     Q.   And I'm showing you State's Exhibit 33

19  (indicating).

20     A.   Yes.  This is the sexual assault kit that we

21  received in this case.

22     Q.   And I'm showing you State's Exhibit 95

23  (indicating).

24     A.   Yes.  This is a cutting from a pair of panties

25  that we tested.

1    Q.   Okay.  And what were you asked to do with those

2  items when you first received them in 2007?

3    A.   We were asked to first see if we could identify

4  any semen that was present on the sexual assault kit or

5  the panties.  And if we could, to see if we could

6  develop a DNA profile that may be suitable for

7  comparison.

8    Q.   Okay.  And did you do that?

9    A.   Yes.

10    Q.   Okay.  And were you also asked to do something

11  with the cigar?

12    A.   Yes.  We were also asked to see if we could

13  obtain a DNA profile from someone who would have smoked

14  the cigar as well.

15    Q.   Okay.  And did you also have instructions to do

16  something with the panties?

17    A.   With the panties, yes.  As I said, to look for

18  any potential semen there and see if we could generate a

19  DNA profile from that as well.

20    Q.   Okay.  Now, let's start with -- well, where do

21  you want to start; the cigar, the panties, or the rape

22  kit?

23    A.   For me -- the cigar is Sample No. 1, so that's

24  the easiest for me.

25    Q.   Can you tell the jury when dealing with a cigar

1  specifically, that's an item that you are not looking

2  necessarily for DNA in the form of semen, obviously,

3  correct?

4      A.   That's correct.  Basically, what we're looking

5  for on a cigar is the DNA from the person who would put

6  the cigar in their mouth as they're smoking it or

7  chewing on it.  It may even be from their fingers as

8  they're holding it while they're smoke it.  So, really,

9  it's DNA close to the mouth and the end of that cigar

10  that we're trying to identify.

11      Q.   And those cells are a different type of cells,

12  are they not --

13      A.   That's correct.

14      Q.   -- than semen, correct?

15      A.   Yes.  You would expect to find what's called

16  epithelial or skin cells on that type of item.  It

17  wouldn't be sperm cells that you would find in the

18  sexual assault portion of it, yes.

19      Q.   And your science allows you to actually

20  differentiate between those two kinds of cells in your

21  analysis, correct?

22      A.   Yes.  And we're looking for -- we can visually

23  look at cells and determine if there are sperm cells

24  present.  And if there are sperm cells present, then we

25  do slightly different testing than if we're just looking

1   for epithelial cells.

2       Q.   Okay.  So, let's talk about the cigar.  You

3   were asked to see if you could develop a profile.  And

4   that was the limit of what you were asked to do at that

5   point, correct?

6       A.   That's correct.

7       Q.   And were you able to do that?

8       A.   Yes.  We were able to obtain a complete DNA

9   profile from an unknown male from the cigar.

10      Q.   Okay.  And the only samples that you had at

11  that point to compare, were you asked to compare those

12  samples at that point?

13      A.   Yes.  We had reference samples from Diana

14  Garcia and from Arturo Rodriguez.  So, we did compare

15  the DNA profile that we obtained from the cigar to those

16  two reference samples.  Neither one of them matched.

17  So, we said it originated from an unknown male.

18      Q.   And, of course, you documented and prepared a

19  report that included that profile that you developed

20  from the cigar?

21      A.   That's correct.

22      Q.   What did you do next in 2007?

23      A.   Well, sort of at the same time we also tested

24  the vaginal swabs, the vaginal swabs from the sexual

25  assault kit.  We screened those for the presence of

1  semen.  And sperm were identified on the vaginal swabs.

2      Q.  And I will ask you to take a look inside that

3  sexual assault kit because I believe the vaginal swabs

4  in there are individually marked.

5      A.  Yes.  This is the vaginal swabs envelope.

6      Q.  Okay.

7      A.  Inside there --

8      Q.  And it's marked as?

9      A.  State's Exhibit 33-B.

10     Q.  Okay.  And do you recognize that as the vaginal

11 swabs that you were asked to test?

12     A.  Yes.  They're labeled vaginal swabs and smear

13 on the envelope.  And this is our purple evidence tape

14 in here, as well as our sample stickers as well.  Inside

15 there are two boxes, which would contain the vaginal

16 swabs as well as some smears that were -- we didn't --

17 these came with the kit.

18     Q.  Okay.  And when you analyzed the vaginal swabs,

19 what result did you get?

20     A.  Like I said, we identified semen.  And when you

21 identify semen on an item of evidence, you can perform

22 what's called the differential extraction.  And as we

23 were speaking about earlier, if there are epithelial

24 cells that you would expect to find from the female

25 victim or from --

1    Q.   Okay.  Let's take this slowly.  You've got

2 vaginal swabs?

3    A.   Correct.

4    Q.   You are going to expect the female that you got

5 those vaginal swabs skin cells to be present, correct?

6    A.   Correct.

7    Q.   Okay.  Go on.

8    A.   Sure.  And so, the skin cells are basically --

9 or then we also found semen here.  So, the sperm cells

10 are a much hardier type of cell.  They came from a male,

11 obviously.  So, we can separate those cells out during

12 our testing so that we have two separate fractions.

13 One of them which contains the epithelial cells or skin

14 cells and one that would contain the sperm cells.  So,

15 we have an epithelial fraction and a sperm fraction.

16           The epithelial fraction was consistent with

17 Diana Garcia.  And the sperm cell fraction was a

18 mixture, meaning there was more than one individual

19 present who contributed the DNA to the sample.

20    Q.   Did you take the known sample that you were

21 given of Arturo Rodriguez and compare it to that mixture

22 of semen cells that you found in Diana's vaginal swabs?

23    A.   Yes, we did.

24    Q.   And what did you find?

25    A.   That he could not be excluded as a possible

1  contributor to this vaginal swab.

2      Q.   Okay.  Did you also find that there was some

3  male DNA there that was not consistent with Arturo

4  Rodriguez?

5      A.   Yes.

6      Q.   Okay.  And did you learn anything about that

7  profile in particular?

8      A.   That it was consistent with the -- basically,

9  what we said is that Arturo Rodriguez and the unknown

10  male donor from the cigar could not be excluded as

11  potential contributors to this sample.

12      Q.   Okay.  So, in summary, you got Diana's DNA on

13  epithelial cells from her vagina?

14      A.   Correct.

15      Q.   You also have Arturo Rodriguez's sperm, the

16  sample is consistent with Arturo Rodriguez's DNA?

17      A.   Yeah.  He could not be excluded as the

18  contributor.

19      Q.   But you also know that there is another

20  individual based on the DNA that you found?

21      A.   Correct.

22      Q.   Okay.  And that other individual is a male

23  because we're still talking about sperm fractions,

24  correct?

25      A.   Correct.

1    Q.   And that male cannot be excluded as being the

2  same male as the person that you found on the cigar?

3    A.   Correct.   That profile from the cigar could

4  also not be excluded as a contributor to that vaginal

5  swab.

6    Q.   All right.   What did you do next?

7    A.   We also tested a cutting from a pair of

8  panties --

9    Q.   Okay.

10   A.   -- as well.

11        And, again, the first thing that we did was

12  screen it and look for the presence of semen, which we

13  did find.   And, again, we performed the same

14  differential extraction, which separated out the skin or

15  epithelial cells from the sperm cells.   The epithelial

16  fraction from the sample matched the DNA profile from

17  Diana Garcia.   So, again, it was her panties and her DNA

18  profile was obtained in the epithelial fraction.

19        The sperm cell fraction, again, was a

20  mixture, meaning there was more than one person's DNA

21  present.   There was a major profile.   And what a major

22  profile is, is the person who contributed the most DNA

23  to this sample.   So, you can tell relatively who

24  contributed the most DNA to the sample.   So, that is a

25  major profile, which was consistent with the DNA profile

1    that we obtained from the cigar.  And then Diana Garcia

2    and Arturo Rodriguez could not be excluded as the minor

3    contributors to this sample.

4        Q.   Okay.  So, when you tested the panties or the

5    crotch of the panties, you had, again, a mixture of DNA?

6        A.   Correct.

7        Q.   And the epithelial cells on the crotch of the

8    panties were Diana Garcia's?

9        A.   Correct.

10       Q.   And the sperm was separated out?

11       A.   Correct.

12       Q.   And Arturo Rodriguez contributed to that

13   mixture?

14       A.   Correct.  He could not be excluded, yes.

15       Q.   But the major profile, the person who

16   contributed the most DNA to that sample, was an unknown

17   individual whose DNA was also on that cigar?

18       A.   Correct.

19       Q.   And was also on the swabs from the vagina or

20   could not be excluded from those swabs?

21       A.   That's correct.

22       Q.   Okay.  Did you document those results?

23       A.   Yes.

24       Q.   Okay.  And did you send those results to

25   Sergeant Mehl?

```
 1        A.   Yes, I did.

 2        Q.   At some point later, did you hear from Sergeant

 3   Mehl again?

 4        A.   Yes.  We received some more evidence December

 5   7th of 2007.

 6        Q.   Okay.  And what evidence did you receive from

 7   Sergeant Mehl in December?

 8        A.   We received samples from four different

 9   potential suspects.

10        Q.   Okay.  And tell the jury who those people are.

11        A.   The first sample was from Candido Lebron.

12        Q.   Okay.

13        A.   The second sample was from Bienviendo Melo.

14        Q.   Uh-huh.

15        A.   The third sample was from Leonardo German or

16   German.  And the last sample was from Carmelo Martinez.

17        Q.   Okay.  Let's talk about the last one first.

18        A.   Sure.

19        Q.   Did you have enough DNA on the sample you

20   received from Carmelo Martinez at that time to make a

21   comparison to the results that you had gotten on the

22   cigar and the items from the rape kit?

23        A.   No, we didn't.  You know, basically when you

24   receive a reference sample, you expect to get a complete

25   DNA profile that you can compare to any of the evidence
```

1  samples that we tested.  For Carmelo Martinez, we

2  obtained a very partial profile from his reference

3  samples.  So, weren't able to make any comparisons to

4  those evidence samples that we had already tested.

5      Q.   At that time?

6      A.   Correct.

7      Q.   Okay.  Let's talk about the other three

8  individuals that you received reference samples on.

9      A.   Sure.  The other three individuals were

10  excluded as possible contributors to any of the samples

11  tested.

12     Q.   Okay.  So, they weren't on the cigar, they

13  weren't on any of the items from the rape kit that you

14  tested?

15     A.   That's correct.

16     Q.   Did you prepare a report about that?

17     A.   Yes.

18     Q.   And did you send that off to Sergeant Mehl?

19     A.   Yes.

20     Q.   At some point later on -- and let's just skip

21  ahead a little bit to deal with Carmelo all at once.

22     A.   Sure.

23     Q.   -- did you receive a more full sample from

24  Carmelo Martinez?

25     A.   Yes, we did.  On June 2nd of 2001, we had

 1   obtained a new profile from Carmelo Martinez.  And at

 2   this point, we were able to generate a complete DNA

 3   profile and he was excluded as a potential contributor

 4   to all of the samples that were tested as well.

 5        Q.    Okay.  Now, let's go back into our time order.

 6   When did you -- that's right.  When did you get the

 7   sample from -- the sample of Carmelo Martinez?

 8        A.    It was June 2nd, 2011.

 9        Q.    Okay.  Now let's go back to after you notified

10   Sergeant Mehl of the results of the testing from Candido

11   Lebron and Bienviendo Melo and Leonardo German that was

12   sent to you in December of 2007.  Did Sergeant Mehl come

13   calling again?

14        A.    Yes.

15        Q.    About when was that?

16        A.    May 28th, 2008, we received a reference sample

17   from Obel Cruz-Garcia.

18        Q.    Okay.

19             MS. TISE:  May I approach?

20        Q.    (By Ms. Tise) I'm going to show you two items

21   that are already in evidence, State's Exhibits 65 and 66

22   (indicating).

23        A.    Okay.  This is the reference sample that we

24   obtained from Obel Cruz-Garcia.  We actually received

25   both of these envelopes.  We actually tested the sample

1    from this envelope.  This is our purple evidence tape

2    here, along with our evidence sticker as well.

3         Q.   Okay.  And did you test what's in State's

4    Exhibit 66, the second reference sample?

5         A.   No, ma'am.  No, we did not.

6         Q.   And why is that?

7         A.   Well, we received, basically, two different

8    swabs and that's more than enough DNA to perform our DNA

9    testing.  So, we just tested one of the swabs that was

10   sent to us.

11        Q.   And is that common practice, to use what you

12   have and reserve a sample in case further testing is

13   ever requested by either the State or the defense?

14        A.   Absolutely.  We never want to consume evidence

15   when we have the opportunity.  That way, if there is any

16   retesting that needs to be done, we can do that.

17        Q.   So, you tested the buccal swab in State's

18   Exhibit 65, correct?

19        A.   Correct.

20        Q.   And were you able to obtain a DNA profile from

21   State's Exhibit 65?

22        A.   Yes, we did.

23        Q.   And does your envelope here indicate who sent

24   you that swab?  Where did it come from?

25        A.   As far as the remarks on it?

1      Q.   What individual sent you that?

2      A.   Griselle Guzman from the FBI.

3      Q.   Okay.  And does it indicate whose swab that is?

4      A.   Yes.  Obel Julian Cruz-Garcia.

5      Q.   Okay.  And when you tested this buccal swab in

6   State's Exhibit 65, what result did you get?

7      A.   We obtained, obviously, his profile.  And we

8   compared that to the samples that we had already tested.

9      Q.   Okay.  And what result did you get from that

10  comparison?

11     A.   Sure.  We'll just go through the samples again

12  as we have before.

13     Q.   Okay.

14     A.   So, the DNA profile that we obtained from the

15  cigar, it matched the DNA profile that we obtained --

16  that we had from Obel Cruz-Garcia.

17     Q.   It was an absolute match?

18     A.   Yes.

19     Q.   Okay.  And the DNA profile that you obtained

20  from the sexual assault kit vaginal swabs?

21     A.   Yes.  He could not be excluded as a possible

22  donor to the sperm fraction of the vaginal swabs.

23     Q.   Okay.  And the DNA that you obtained from the

24  cutting of the panties?

25     A.   Yes.  We talked about there was a major profile

1  or major contributor.  And the major profile we obtained

2  from the cutting of the red panties matched the DNA

3  profile from Obel Cruz-Garcia.

4       Q.   So, he was the major contributor?

5       A.   That's correct.

6       Q.   There is more of his DNA there than Diana's

7  husband's?

8       A.   That's correct.

9       Q.   There is more of his DNA there on the panties

10 than Diana's?

11      A.   In the sperm fraction, yes.  I can't really say

12 as a whole.

13      Q.   All right.  And so, you were able to determine

14 that the DNA, the sperm in her panties, belonged to Obel

15 Cruz-Garcia?

16      A.   The major profile from the sperm, yes.

17      Q.   Okay.

18           MS. TISE:  Your Honor, at this time, I'm

19 going to offer State's Exhibit 95, the cutting from the

20 panties, the crotch of the panties.  I'm going to offer

21 State's Exhibit 33 and the individual swabs inside.

22           THE COURT:  Is that 33-B?

23           MS. TISE:  33-B.  I'm going to go ahead and

24 call it 33 and its contents, which are 33-A through D,

25 the contents of the rape kit.

1          **(State's Exhibit No. 33, 33-A, 33-B, 33-C,**

2           **33-D, and 95 Offered)**

3          MR. CORNELIUS:  Is that it?  I need to put

4    something on the record to effect my motion.

5          THE COURT:  We'll take the jury out.

6          THE BAILIFF:  All rise.

7          (Open court, defendant present, no jury)

8          THE COURT:  You may proceed, Mr. Cornelius.

9          MR. CORNELIUS:  Judge, I know you've

10   already ruled on this.  I don't want to beat a dead

11   horse, but I think so the record is clear and it doesn't

12   look like I waived my motion that I tried pretty hard to

13   preserve and demonstrate for the record.  All of the

14   arguments that I've made before in writing and orally, I

15   re-urge.  We're in the position I'd thought we'd be in

16   when this time came.  So, my specific objection really

17   is kind of a reiteration.

18          But what we don't have in the chain of

19   custody and in this case, starting with the cigar I

20   guess, is the -- at least before the jury, the storage,

21   HPD Crime Lab's work in preserving or not preserving the

22   cigar, what was done with it.  We have Mehl obtaining it

23   from a location, but nothing as to really how it got

24   there and what was done with it.

25          With respect to the panties, we have the

1   nurse that provided the HPD Crime Lab with the panties

2   from which they made a cutting and from, I guess, this

3   cutting -- let me ask one question of the witness so I

4   don't misstate something.

5                    THE COURT:  Okay.  You can ask one

6   question, but you're kind of mixing argument with

7   testimony here, so...

8                    MR. CORNELIUS:  I don't want to make a

9   mistake.

10                    Did y'all make your own cutting from the

11  panties or you used the cutting that HPD provided you?

12                    THE WITNESS:  We talked about this in the

13  hearing.  The HPD had cut out the entire crotch of the

14  panties.  We took a cutting from that crotch cutting.

15                    MR. CORNELIUS:  All right.  But the overall

16  cutting is what you got from HPD?

17                    THE WITNESS:  We received -- well, the

18  entire crotch was cut.  So, yes, we received the cutting

19  of the crotch and then we took our own cutting from that

20  crotch.

21                    THE COURT:  Which was all contained within

22  the sexual assault kit; is that correct?

23                    THE WITNESS:  It was packaged separate.

24  It was packaged as a cutting, but initially, I believe,

25  it all was.

1                THE COURT:  Okay.

2                MR. CORNELIUS:  So, we don't have the

3      person or the procedures or the quality control or any

4      testimony as to how those panties were preserved and cut

5      and kept.  And that's the part that we wanted to go

6      into.  And I understand you're not going to let us, so

7      we're not going to.  But I think that maybe I haven't

8      said in my motion that we have a breach in the chain of

9      custody.  We have completely jumped a whole step in

10     what's being offered here because we don't have any

11     input from the HPD Crime Lab.  And that's what we're

12     trying to get into and that's the basis of why we're

13     objecting to the admissibility of this stuff.

14                I don't think that's too different from

15     what I said before, but I won't have to say it anymore.

16                THE COURT:  Right, it's not.  And so, I'm

17     going to rule on your objection right now, which I'm

18     going to allow in State's Exhibit No. 95, which is the

19     cutting from the panties.  And it's my understanding --

20     although, it seems like you are saying something

21     different now -- that the cutting from the panties was

22     delivered to you by Sergeant Eric Mehl when he delivered

23     the sexual assault kit that he picked up from the HPD

24     Crime Lab.  Is that correct?  Am I remembering correct?

25                MS. TISE:  Yes.

1          THE COURT:  So, that was delivered to the

2  laboratory by Sergeant Eric Mehl.  Correct?

3          THE WITNESS:  That's correct.

4          THE COURT:  So, I'll allow that in over

5  objection.

6          And I'm going to allow State's Exhibits 33

7  and 33-A, B, C, and D, which was the panties from the

8  sexual assault kit, the vaginal swabs and smears from

9  the sexual assault kit, the saliva sample of Diana

10  Garcia in the sexual assault kit, and the blood sample

11  of Diana Garcia from the sexual assault kit.  Okay?  And

12  that's all in over objection.  And your objection is

13  noted.

14          **(State's Exhibit No. 33, 33-A, 33-B, 33-C,**

15          **33-D, and 95 Admitted)**

16          MR. CORNELIUS:  Thank you, Judge.

17          MS. TISE:  Can we just say 33 and its

18  contents and then specifically labeled items A, B, C,

19  and D?  Because there are some other items in 33 --

20          THE COURT:  Which are not admitted.

21          MS. TISE:  Okay.  I will do that.

22          THE COURT:  They're not marked, they're not

23  admitted, or anything.  So, I'm not going to let all

24  that in unless you want to go through and say what those

25  items are.  I have no idea what's written on them or

1  anything else.  We haven't reviewed them.

2              MS. TISE:  Okay.

3              THE COURT:  So, I don't want to put those

4  in.

5              Specifically, in regards to your objection,

6  I will let you cross-examine this witness on any

7  perceived contamination or whether the items that he

8  received and examine were degraded in any way or whether

9  he could determine if they had been contaminated in any

10  way.  I will allow that in cross-examination.  I believe

11  you've already gotten into, in your prior cross, that

12  some of this evidence at one point did go to HPD Crime

13  Lab.  And you can ask him if he can tell if anything

14  happened to it there.  But I will not allow in the

15  results of the Houston Crime Lab or any testing that was

16  done by the HPD Crime Lab.

17              So, is that clear?

18              MR. CORNELIUS:  I can ask if he can tell it

19  came from the HPD Crime Lab?

20              THE COURT:  I think we went there.  If

21  you --

22              MR. CORNELIUS:  I'm afraid to use the

23  words --

24              THE COURT:  Let's ask him right now so we

25  don't go into a lot of stuff that -- can you tell that

1  it went to the HPD Crime Lab from your evaluation?

2              THE WITNESS:  I can tell there was some

3  testing done and we received it from the Houston Police

4  Department, from Sergeant Mehl.  So, I couldn't tell you

5  who tested it or who touched it at the crime lab.

6              THE COURT:  Then he can answer those

7  questions right there.  Okay?

8              MS. TISE:  Well, he can tell that somebody

9  tested it is going to open the door to the test.  I

10  mean...

11              THE COURT:  Not if they're inadmissible.

12              MS. TISE:  If he says somebody tested it, I

13  thought that was the whole thing that we weren't going

14  to get into, was the testing.

15              THE COURT:  We're not getting into the

16  results of the testing.  This goes only to any

17  contamination issues or any storage issues as to whether

18  it was degraded or anything.

19              MS. TISE:  And I understand that, but I

20  think if he gets into the fact that it was tested, that

21  opens up the whole thing that you ruled wasn't going to

22  come in.

23              THE COURT:  He can't open his own door.

24  Okay?  I'm not going to allow him to go into that.  If

25  he wants to ask that question in regards to

1  contamination and degradation of the evidence, he may.

2  And he can argue whatever he wants to, which is a

3  reasonable conclusion from the evidence if he wants to,

4  but he's not going to be able to go into the testing.

5  He can, by asking that question, open his own door to

6  the testing of the HPD laboratory.  Okay?

7              All right.  Let's bring in the jury.

8              (Open court, defendant and jury present)

9              THE COURT:  Please be seated.

10             We're ready to proceed with the

11  cross-examination of the witness, Matt Quartaro.

12             You may proceed, Mr. Cornelius.

13             MS. TISE:  I hadn't passed him, but I will,

14  Judge.

15             THE COURT:  Sorry.

16             MS. TISE:  That's okay.

17             THE COURT:  You may proceed, Mr. Cornelius.

18             MR. CORNELIUS:  All right.

19                    **CROSS-EXAMINATION**

20  **BY MR. CORNELIUS:**

21      Q.   Mr. Quartaro, we met briefly before this trial

22  started, correct?

23      A.   That's correct.

24      Q.   But before that, we had never met or talked

25  about this case, right?

```
 1        A.   No, sir.

 2        Q.   Does Orchid Cellmark have quality control

 3  procedures?

 4        A.   Yes, sir, we have many quality control

 5  procedures.

 6        Q.   And why would you have that?

 7        A.   We're always concerned about the quality of our

 8  results.   It's very sensitive technology, so we want to

 9  make sure we're getting the best and most accurate

10  results that we can to all of our clients.

11        Q.   Do lawyers sometime scream about contamination

12  or -- I mean, that's a common claim, right?

13        A.   Yes, sir, it is.  And it's a concern that we

14  take very seriously.  Sometimes -- like in this case,

15  it's a very old case, there is a limited amount of

16  evidence, and we want to make sure we get things right

17  the first time.

18        Q.   And so, you have quality control to try to

19  prevent there from being any contamination, right?

20        A.   Both to prevent contamination and to identify

21  it if it does happen.

22        Q.   Because if evidence is contaminated, if it is

23  contaminated, doesn't necessarily mean it's done

24  intentionally, right?

25        A.   No, sir.
```

1      Q.   I mean, contamination can just be an accident?

2      A.   It could, yes.

3      Q.   And it's kind of hard to see because you

4  actually can't see contamination?

5      A.   I wouldn't say that.  You can tell from the

6  testing results or from the condition of the evidence.

7  There are many different ways that things can be

8  contaminated.  So, I'm not sure exactly what you're

9  speaking to, but...

10      Q.   Well, some of them you can't see, though, can

11  you, with the naked eye at least?

12      A.   Well, I mean, you wouldn't be able to -- I

13  mean, basically what you are looking for is

14  contamination in the results themselves, which you

15  really can't see with a naked eye.  We're talking about

16  DNA, it's very small amounts.  But, I mean, that's why

17  we have quality control steps, like I said, to identify

18  them.  We have computer software programs that search

19  all of the DNA profiles that we obtain from each case to

20  the DNA profiles that have been tested in our lab in the

21  past two months to all of our employees to make sure

22  there isn't any contamination from sample to sample in

23  our laboratory.  We have checks, when samples are moved

24  from one tube to another, to make sure we're moving them

25  from the correctly labeled tubes.  We wear gloves and

1    masks and lab coats and hair nets to prevent ourselves

2    from contaminating the evidence.  We bleach all of our

3    instruments in between each use.  We only have one

4    sample open at a time.  So, there is a long list of

5    quality control steps that we have in the laboratory to

6    prevent contamination.

7        Q.   Now, can Orchid Cellmark control how some other

8    lab attempts to control or have quality control?

9        A.   No, sir.

10       Q.   Okay.  The evidence that you received in this

11   case came from where?

12       A.   It came from the Houston Police Department.

13       Q.   Okay.  And can you tell if it came from --

14   specifically where in the Houston Police Department?

15       A.   Sergeant Eric Mehl sent the evidence to me.

16       Q.   And can you tell from your study where he got

17   the evidence?

18       A.   No, sir, I don't know.

19       Q.   Okay.  But can you tell that this evidence was

20   handled by the HPD Crime Lab?

21       A.   I can tell it was somewhere before it was sent

22   to me, but I don't know who before.

23       Q.   All right.  When you said that you received a

24   sample from Obel Cruz-Garcia -- you really don't know

25   Obel Cruz-Garcia, do you?

1       A.   No, I do not.

2       Q.   And you really received a sample that was

3  labelled Obel Cruz-Garcia, correct?

4       A.   That's correct, yes.

5       Q.   Because you didn't get the sample from Obel

6  Cruz-Garcia, did you?

7       A.   No, I didn't.  It was in this envelope, like I

8  said, right here.  It was just labeled with his name on

9  it.

10       Q.   All right.  So, somebody else provided you with

11  something that is labeled Obel Cruz-Garcia, right?

12       A.   That's correct, yes.

13       Q.   And you don't exactly know where that came

14  from?

15       A.   Just from the labeling on the evidence itself,

16  yes.

17       Q.   Okay.  Or what measures were kept to keep it;

18  you don't know that, do you?

19       A.   I don't know.  We received this evidence in a

20  sealed condition with this label on it.

21       Q.   All right.  And that applies to all of the

22  stuff that you've looked at today, right?  You received

23  it all from the same person?

24       A.   I believe so, yes.

25       Q.   Okay.  DNA -- can you actually see DNA?

1     A.   With the naked eye, no, sir.

2     Q.   The epithelial cells that we're talking about,

3 which are the skin cells, can you actually see those

4 with the naked eye?

5     A.   You can see them with a microscope, but not

6 with the naked eye.

7     Q.   What about the sperm fractions?

8     A.   Sperm cells, again, they're microscopic.  You

9 couldn't see them with the naked eye.

10     Q.   Did you examine any of the sperm fractions in

11 this case yourself?

12     A.   Yes, I did.

13     Q.   Under a microscope?

14     A.   Yes, I did.

15     Q.   And when you look at the spermatozoa -- did you

16 see spermatozoa?

17     A.   Yes, sir.

18     Q.   Heads and tails?

19     A.   I saw heads.  The tails are the first thing to

20 degrade, so it's not really common to see the tails.

21     Q.   So, no intact spermatozoa?

22     A.   The sperm heads were in tact.  The sperm is

23 basically a cell and there is tail on the end of it, a

24 propelled cell.  And, again, it's not common to see

25 tails on the sperm, especially in a case that's worked,

1    you know, many years after the sample was collected.

2        Q.   It's not common to see them or not to see them?

3        A.   It's not common to see them.

4        Q.   Okay.  So, did you find any spermatozoa with

5    heads and tails?

6        A.   I don't have it in my notes.  I found many

7    heads, but I don't recall seeing any tails.  I made no

8    notes of seeing tails.

9        Q.   And this would have been -- when you first

10   looked at it under the microscope, what year was that?

11       A.   In 2007.

12       Q.   2007.

13             So, if that spermatozoa was first

14   discovered in 1992, we're talking about 15 years?

15       A.   That's correct.

16       Q.   So, the spermatozoa can last 15 years?

17       A.   They can.  They can last a long time, yes.

18       Q.   In your part of this case, your work on this

19   case, other than what's labeled on various things, can

20   you tell from looking at them where -- we'll start with

21   the spermatozoa -- it was actually found?  Can you tell

22   by looking at them where they were found?

23       A.   No, sir.  I mean, the swabs were all labeled

24   coming from different locations, but looking at an

25   actual sperm cell it testify, no, there is no way to

1  tell where that came from.

2     Q.   So, you've got to rely on the labeling that

3  somebody gives you, correct?

4     A.   Correct.

5     Q.   I mean, I guess it doesn't matter for your

6  testing, it doesn't matter to you where it was found;

7  you're trying to see if it's semen, right, to see if

8  there is sperm cells there?

9     A.   That's correct.

10    Q.   So, I'm not trying to make you the detective,

11 Inspector Clouseau on this or whatever; but my point is,

12 you don't know how it was placed, where it was placed,

13 when it was placed, where it was placed, how it was

14 collected, and how it was stored before you got it, do

15 you?

16    A.   No.  My job was to basically figure out is

17 there DNA there, can I get a DNA profile from it, and

18 whose DNA profile it is.

19    Q.   And so, in the case of spermatozoa, you can't

20 tell from anything that you look at or study whether

21 this was the result of consensual sex or a sexual

22 assault, can you?

23    A.   No, sir, I can't.

24    Q.   Now, the epithelial cells, the skin cells,

25 pretty much the same thing, you can't tell how they got

1   there or under what circumstances they got there, how

2   long they had been there, can you?

3        A.   No, sir.

4        Q.   And, again, with epithelial cells, if that

5   evidence was collected in 1992 and you didn't examine it

6   till 2007, it had been there for 15 years?

7        A.   Apparently, yes.

8             MR. CORNELIUS:   Could I have just a second,

9   Judge?

10            THE COURT:   Yes.

11            (Pause)

12       Q.   (By Mr. Cornelius) I want to get back to the

13  cuttings from the panties for a moment.   There was a

14  cutting from the crotch of the panties, correct?

15       A.   Yes.

16       Q.   You don't know who did that cutting?

17       A.   No, I don't.

18       Q.   But it's from that cutting that you made your

19  own cutting?

20       A.   Yes, that's correct.   We received -- basically,

21  the crotch of the pair of underwear was cut out from the

22  original pair of panties and we took a cutting from the

23  crotch area for our testing.

24       Q.   Now, was that cutting that was done by somebody

25  else packaged in its own package?

1      A.   Yes, it was.

2      Q.   For example, you didn't take the panties

3  themselves that were left and try to make your own

4  cutting from that, you took a cutting out of whoever

5  else had already taken a cutting from the panties.  Does

6  that make sense?

7      A.   Yes.  And it was a large sample.  Again, if it

8  would have been a very small sample, we would have gone

9  back to the panties; but it was the crotch of the

10  underwear, which we'd expect to find semen there, if

11  there is semen there.  So, we took a cutting, we did our

12  own testing, looked for semen, and then performed the

13  DNA test on that.

14               MR. CORNELIUS:  Okay.  I pass the witness.

15               THE COURT:  Anything further, Ms. Tise?

16               MS. TISE:  Yes, Your Honor.

17                    **REDIRECT EXAMINATION**

18  **BY MS. TISE:**

19      Q.   When you received the evidence in this case,

20  you told us some -- scratch that.

21               When you received the evidence in this

22  case, did you see anything that indicated any kind of

23  contamination or mishandling that you could see?

24      A.   There was no notations made of any sort of

25  potential tampering with any of this evidence.

1    Q.    Everything seemed to be in good condition?

2    A.    Yes.

3    Q.    And packaged the way you would ordinarily

4  expect it to be?

5    A.    All evidence is packaged a little bit

6  different, but, yes, there was nothing that stood out

7  about this evidence.

8    Q.    Separate items were packaged in their own

9  plastic bags to keep them from being -- touching other

10  items?

11    A.    Correct.  Whether it be plastic or envelopes,

12  yes.

13    Q.    And the items in the rape kit were in a bag and

14  in that box, correct?

15    A.    That's correct.

16    Q.    The panties were in the little bag that we see

17  here, correct (indicating)?

18    A.    Yes.  The cutting from the panties, yes.

19    Q.    Cutting from the panties sealed up.

20         And you didn't get a cutting from the

21  crotch, you got the whole crotch of the panties,

22  correct, it had been cut out.

23    A.    We got that cutting, yes, which was a large

24  cutting from the crotch.

25    Q.    And you cut out your own cutting from it --

1       A.    Correct.

2       Q.    -- to test it?

3             Nothing unusual about that, right?

4       A.    No.

5       Q.    And the cigar came to you in its own package,

6   correct?

7       A.    That's correct.

8       Q.    All sealed up, right?

9       A.    Yes.

10      Q.    If you were just a bad person and you wanted to

11  contaminate some DNA from a crime scene, would you be

12  able to contaminate evidence to create a DNA sample with

13  someone's DNA that you did not have?

14      A.    I would not be able to, no.

15      Q.    All right.  So, hypothetically, let's say

16  someone was mishandling evidence.  Okay?  But they

17  didn't have Obel Cruz-Garcia's DNA.  Is there any way

18  they could put Obel Cruz-Garcia's DNA on evidence that

19  didn't already have it?

20      A.    No.  You would have to have a sample of his DNA

21  to contaminate the evidence with.

22      Q.    Okay.  Because it's there, right?

23      A.    Those profiles match, yes.

24      Q.    And if you don't have his DNA, you can't put it

25  on there if you are an evil person and have bad

1   intentions, right?

2       A.   Correct.

3       Q.   And let's just talk about cross-contamination.

4   Let's say you have one item of evidence that has his DNA

5   on it, like the cigar, and another item of evidence like

6   the panties.  If you were just an evil person and you

7   wanted to just deliberately mess things up and

8   contaminate those panties with the cigar, what about the

9   evidence tells you that that didn't happen?

10      A.   Well, basically there is -- we obtain a DNA

11  profile from the cigar, which would be epithelial cells.

12  From the panties and from the vaginal swabs, we obtained

13  his DNA profile -- or a profile that matches DNA profile

14  from sperm cells.  So, you'd have to have a semen sample

15  in order to contaminate those samples with sperm cells.

16      Q.   So, it's not only the fact that they didn't

17  have his DNA -- they would have had to have his semen,

18  correct, to contaminate the items from the rape kit and

19  the panties?

20      A.   Correct.

21      Q.   Okay.  Because that's semen we're talking

22  about, right?

23      A.   That's correct.

24      Q.   So, you wouldn't be able to take the cigar with

25  epithelial cells on it and turn that into the

1  defendant's semen to put it in the rape kit and the

2  panties?

3       A.   No.  And if there was -- if the cigar -- if

4  there was epithelial cells that would have came in

5  contact with the vaginal swabs or the panties, you would

6  expect to find that in the epithelial fractions of those

7  samples, but we found his DNA profile in the sperm

8  fractions.

9       Q.   Okay.  Anything in this case that indicates any

10  kind of contamination or mishandling to you?

11      A.   Nothing that I can see.

12               MS. TISE:  I will pass the witness.

13               MR. CORNELIUS:  A couple more questions, if

14  I may.

15                    **RECROSS-EXAMINATION**

16  **BY MR. CORNELIUS:**

17      Q.   All of these quality control procedures and

18  assurances, are they in place just to detect evil people

19  or mistakes?

20      A.   They're just to detect contamination regardless

21  of how it happens.

22      Q.   I mean, contamination happens, right?

23      A.   It does.

24      Q.   It doesn't necessarily mean that people are

25  evil that do it, does it?

1     A.   No, it doesn't.

2     Q.   Okay.  In you looking at this evidence and

3  being asked whether there is anything indicated, any

4  kind of contamination, did you receive from HPD any

5  notations of quality control procedures or assurances?

6     A.   No, I did not.

7          MR. CORNELIUS:  Pass the witness.

8                **REDIRECT EXAMINATION**

9  **BY MS. TISE:**

10     Q.   Did you see any mistaken contamination as well

11  as evil contamination?

12     A.   I didn't see anything that -- you know, there

13  was nothing to me to indicate there was contamination.

14          MS. TISE:  Nothing further.

15          MR. CORNELIUS:  Nothing further.

16          THE COURT:  Okay.  Very good.  May this

17  witness be excused?

18          MS. TISE:  Yes, Your Honor.

19          MR. CORNELIUS:  Yes, Your Honor.

20          THE COURT:  You may step down.  Thank you,

21  Mr. Quartaro.

22          Call your next, please.

23          MR. WOOD:  The State calls Courtney Head.

24          THE BAILIFF:  Your Honor, this witness has

25  not been sworn in.

 1                    THE COURT:  Thank you.

 2                    Please raise your right hand.

 3                    (Witness sworn)

 4                    THE COURT:  Take the stand.  Speak directly

 5   into the microphone and you keep your voice up.

 6                    We'll start in just a moment.  One of the

 7   attorneys just stepped out.

 8                    THE WITNESS:  Okay.

 9                    (Pause)

10                    THE COURT:  Are you ready to proceed?

11                    MR. CORNELIUS:  Yes, Your Honor.

12                    THE COURT:  Ms. Tise, you may proceed.

13                    MR. WOOD:  Actually, Judge, it's my

14   witness.

15                    THE COURT:  I'm sorry.  Mr. Wood, you may

16   proceed.

17                         **COURTNEY HEAD,**

18   having been first duly sworn, testified as follows:

19                      **DIRECT EXAMINATION**

20   **BY MR. WOOD:**

21        Q.   Good afternoon, Ms. Head.

22        A.   Good afternoon.

23        Q.   Can you tell the ladies and gentlemen of the

24   jury how you're employed?

25        A.   I'm employed as a criminalist specialist with

1  the Houston Police Department Crime Laboratory.

2      Q.   How long have you been with the Houston Police

3  Department Crime Lab?

4      A.   I've been at HPD for three-and-a-half years.

5      Q.   What is a criminalist specialist?

6      A.   My role there is a first-line supervisor.  So,

7  I supervise a small group of about eight individuals.

8  I'm also responsible for some of the training programs

9  in the section.  I'm also a qualified DNA analyst as

10  well as a screener.

11      Q.   So, you supervise and you do actual work, DNA

12  analysis?

13      A.   Yes.

14      Q.   Tell me a little bit about your education

15  leading up to this point.

16      A.   I have a bachelor's degree in biology from

17  Ouachita Baptist University.  I also have a master's

18  degree in forensic science with a concentration in

19  forensic molecular biology from the George Washington

20  University.

21      Q.   And through that education, have you had

22  training in the area of DNA analysis?

23      A.   Yes, I have.

24      Q.   And when did you start working in that field?

25      A.   I started working in the field of forensics in

1   2001.

2       Q.   What did you do in between finishing up your

3   education and coming to HPD three years ago?

4       A.   Actually, while I was still in graduate school

5   I got an internship at a lab in Virginia.  And so, I

6   started working there.  And I got hired on full-time as

7   a DNA analyst at that laboratory.  I worked there for

8   about four years.  And I moved back to Texas and worked

9   in Dallas for a while at the medical examiner's office,

10  also as a DNA analyst.  I worked for Dallas Police

11  Department for about a year before I moved to Houston as

12  the director of the Crime Scene Unit.

13      Q.   Ms. Head, have you been called upon in the past

14  to testify as an expert in the area of DNA analysis?

15      A.   Yes, I have.

16      Q.   And would you say that's few or many times?

17      A.   I would say many times.

18      Q.   Okay.  Ms. Head, I want to take about two

19  minutes and teach the jury everything you know about

20  DNA.  Okay?

21      A.   Okay.

22      Q.   Just a quick rundown about general concepts of

23  DNA.  Tell the ladies and gentlemen of the jury

24  generally what is DNA?

25      A.   DNA is really what makes the person that you

1  are.  You get half your DNA from your mom, half your DNA

2  from your dad.  DNA is kind of what makes us all look

3  similar.  Our legs are in the same spot, arms in the

4  same spot, but DNA is also what makes us look different

5  from each other and act different from each other.  We

6  have to have different DNA, obviously, inside our body

7  to that makes that happen.

8       Q.   Is DNA unique to specific individual?

9       A.   DNA is unique to all individuals unless you

10  have an identical twin, in which the identical twins

11  would have the same identical DNA.

12       Q.   So, it varies from person to person excluding

13  identical twins?

14       A.   That's correct.

15       Q.   Does your DNA change over time?

16       A.   Not really, no.  Only if you were to have a

17  blood transfusion or something major like that.

18       Q.   In the area of forensics, are there particular

19  sources of DNA that you usually -- that are common?

20       A.   Yes.

21       Q.   And tell us about that.

22       A.   It's common to receive evidence that may

23  contain blood or semen or something like contact DNA, in

24  addition to buccal swabs.  These are normal pieces of

25  evidence that would possibly contain DNA.

 1     Q.   And how does that -- how is that applicable in

 2   a forensic setting regarding what you do?

 3     A.   Usually, we try to examine evidence items and

 4   get a DNA profile from that piece of evidence that might

 5   have been left at a crime scene and compare that to a

 6   reference sample or a known sample of DNA that is

 7   collected from a certain individual.

 8     Q.   What happens -- well, let's go back.

 9          What is a known sample or reference sample?

10     A.   A known sample or a reference sample is a

11   sample of DNA that's collected from an individual.  For

12   example, a buccal swab would be collected by placing

13   some -- what looks like a bigger Q-tip inside of your

14   mouth, rubbing it around a little bit, and collecting

15   those cells that are inside of your mouth, which are

16   called buccal cells.  And so, that would be a known

17   sample of DNA from a person.

18     Q.   And what about evidence samples?  How is it

19   that you commonly encounter evidence samples in your

20   work?

21     A.   At HPD, the Crime Scene Unit usually goes to

22   the scene or maybe a hospital some SANE nurses,

23   depending on the type of evidence that's collected, but

24   usually it's from a crime scene.  And evidence is

25   collected by HPD personnel and is taken to the property

1  room.

2      Q.   What happens generally when you receive an item

3  of evidence, whether it be a known reference sample or

4  an item of evidence, for you to do DNA analysis on?

5      A.   Usually we'll get a request from an

6  investigator asking us to work this case, along with

7  some information on whether we need to test for blood or

8  test for semen or these are the references that we need

9  to compare them to.  And then we'll just get started

10  based on what type of testing is requested.

11      Q.   Is there some type of screen or extraction

12  process involved?

13      A.   There is a screening step that would first kind

14  of try to identify what kind of biological fluid we are

15  dealing with.  So, we have certain tests that we can use

16  to identify blood or semen.  And then once a certain

17  biological fluid is identified, we can do a step further

18  and start DNA testing, which would require extraction of

19  that DNA and some other steps as well.

20      Q.   And when you go to extract DNA from an item,

21  generally what does that mean?

22      A.   That means that the DNA is contained in cells

23  and we need to bust open those cells in order to get DNA

24  out of them.  There is also a bunch of other stuff.  I

25  don't know if you can flashback to your biology classes

1  in high school.  Liquids and fats and other things that

2  are inside of that cell, that we just need to clean them

3  out as well as we can so we can get the most pure form

4  of DNA that we can get.

5      Q.   After you have extracted an item for DNA, what

6  happens next?

7      A.   After we've extracted DNA, we know exactly how

8  much exact DNA we have.  So, we have a process, which we

9  call quantification, in which we can determine exactly

10  how much DNA we have collected from a sample.

11      Q.   And then at some point, do you perform analysis

12  on that extraction?

13      A.   Yes.  Yes.  After the extraction, the

14  quantification happens, we do a couple of other

15  processes.  And, ultimately, we can get a profile that

16  we can analyze.

17      Q.   And when you say "a profile," what is a DNA

18  profile?

19      A.   A DNA profile is a set of markers that is

20  contained within the chromosomes in your DNA.  And we

21  look at certain locations which ultimately make up an

22  entire DNA profile.

23      Q.   Can you obtain DNA profiles from both known

24  reference samples and also evidence samples?

25      A.   Yes.

1      Q.   And if you are able to obtain those known --

2  I'm sorry -- a DNA profile from each of those, a

3  reference sample and an evidence sample, are you able to

4  then compare those --

5      A.   Yes.

6      Q.   -- DNA profiles?

7      A.   Yes.

8      Q.   And what would the comparison tell us?

9      A.   The comparison?  So, if we had a sample from a

10  crime scene or a piece of evidence and a sample from

11  known individual to compare it to, we would try to

12  determine whether the profile from the known sample

13  could be included, so that person could be a possible

14  contributor to whatever evidence was left at the crime

15  scene, or that person would be excluded and could not be

16  included as someone who might have left that DNA at the

17  crime scene.

18      Q.   Are there different methods of DNA analysis

19  that are used?

20      A.   There are different extractions and different

21  kits and some different locations that are looked at.

22      Q.   And when you say "locations," what do you mean?

23      A.   I mean different location on the actual

24  chromosome.

25      Q.   Ms. Head, I want to visit with you about your

1  work on this case.  Would you consider this case to have

2  been what we call in our industry a cold case?

3      A.   Yes.

4      Q.   And have you done work on cases similar to this

5  in the past?

6      A.   Yes.

7      Q.   Because it was considered a cold case, was your

8  work a little bit different than it is on maybe a fresh

9  case?

10      A.   Yes, it was a little bit different.

11      Q.   When was it that you were first assigned to do

12  some work on this particular case?

13      A.   In 2010.

14      Q.   And at that time in order to, I guess, get up

15  to speed, were you -- did you review some reports and

16  documents in order to get up to speed on the case?

17      A.   Yes, I did.

18      Q.   Did you learn that at that point in 2010 that a

19  lab called Orchid Cellmark had done some work on this

20  case?

21      A.   Yes, I did.

22      Q.   Are you familiar with that lab?

23      A.   Yes.

24      Q.   Is that a lab that HPD Crime Lab worked with in

25  conjunction or has in the past?

1      A.   Yes, it is.

2      Q.   Was this case assigned or had it been assigned

3   a uniquely identifying case number for y'all's record

4   purposes?

5      A.   Yes.

6      Q.   And can you tell us what that lab number was?

7      A.   Sure.   The lab number was L92-10367.

8      Q.   Did you ultimately generate a report of your

9   findings and your work in this case?

10     A.   Yes, I did.

11     Q.   And are you a custodian of those records?

12     A.   I am.

13     Q.   Are those records kept in the normal course of

14   business at the Houston Police Department Crime Lab?

15     A.   Yes, they are.

16     Q.   And were those records actually made by you?

17     A.   Yes.

18     Q.   And you had personal knowledge of what went

19   into those records?

20     A.   Some of the reports, yes.

21     Q.   And they were made at or near the time that you

22   were doing your work on this case?

23     A.   Yes.

24          MR. WOOD:   Your Honor, may I approach the

25   witness?

1           THE COURT:  Yes, you may.

2      Q.   (By Mr. Wood) Ms. Head, I'm going to show you

3  what's been marked as No. 70.  Can you take a second and

4  tell me if you recognize that (indicating)?

5      A.   Yes.  It appears to be a copy in which I have

6  the original of the report I generated on this case.

7      Q.   And is it a fair and accurate copy to the best

8  of your knowledge?

9      A.   Yes.

10      Q.   And it summarizes the work that you did in this

11  case?

12      A.   Yes.

13      Q.   Do you think it would assist the jury in

14  understanding your work and analysis in this case?

15      A.   Yes.

16           MR. WOOD:  I will offer State's Exhibit 70

17  after tendering.

18           **(State's Exhibit No. 70 Offered)**

19           MR. CORNELIUS:  I have a copy of this.  No

20  objections other than ones I have already made, Judge.

21           THE COURT:  Okay.  Very good.  State's

22  Exhibit 70 will be admitted over objections.

23           You may proceed.

24           **(State's Exhibit No. 70 Admitted)**

25      Q.   (By Mr. Wood) Ms. Head, going back a little

1  bit.  In your training, is it possible to test whether

2  an item -- whether there is the presence of blood on a

3  particular item?

4       A.   Yes, it is.

5       Q.   And that happens when certain items are

6  submitted to your lab and you're asked to test for that,

7  right?

8       A.   Yes.

9       Q.   Generally how is that done when -- where you

10  test for the presence of blood on an item?

11       A.   For example, if it was a t-shirt or an item of

12  clothing, we would look for certain stains.  A red-brown

13  stain would be a pretty good indication that blood might

14  be on this item.  However, if there are no stains or

15  we've since talked to an investigator and they have told

16  us to continue with the blood work testing, then we

17  would basically take what is a larger Q-tip and swab

18  across the area or maybe even take a filter paper, wet

19  it with a little bit of water to try and collect some

20  samples from the t-shirt and transfer that onto the

21  filter paper.

22            We would then apply some chemical testing

23  and look for a color change.  And if we see a color

24  change, then that would indicate to us that blood would

25  be present on that item.  However, if we do not see a

1  color change, that would be indicative that blood is not

2  present on this item.

3       Q.   At some point, Ms. Head, was your lab asked to

4  test a t-shirt that was related to this case?

5       A.   Yes, it was.

6       Q.   And was that to test for the presence of blood,

7  whether or not there was any?

8       A.   Yes.

9       Q.   And were you able to -- well, I'm going to show

10 you first -- I'm going to show you what's been

11 previously admitted as State's Exhibit 64.  This is

12 what's been previously admitted as State's Exhibit 64.

13 Does this look familiar to you as it relates to any of

14 the records that you have of any testing that was done

15 by your lab in this case (indicating)?

16      A.   Yes.  I have a record of testing that was done,

17 some photographs that were also provided in which I can

18 tell that those look to be the same t-shirt.  In

19 addition to I could see there was a tag on that t-shirt

20 that would indicate the analyst tested.

21      Q.   And was -- according to your records, was that

22 t-shirt tested by your lab for the presence of that --

23 whether or not there was blood?

24      A.   Yes.

25      Q.   And what were the results of that test?

1        A.    Blood was not detected on that item.

2        Q.    I'm going to give a hypothetical situation,

3   Ms. Head.  If you were told that blood was on an item of

4   clothing, potentially on an item of clothing and that

5   that item had been submerged in water and/or exposed to

6   the elements, weather and whatnot, for a period of time,

7   say, for example, 30 plus days, would you necessarily

8   except for there to be blood on that item given those

9   circumstances?

10       A.    No.  Given the fact that it was in water, or,

11   perhaps, exposed to the elements for that amount of

12   time, I would not expect there to be blood on the item.

13       Q.    I want to go back to the other testing in this

14   case, Ms. Head.  Did you learn -- you stated that you

15   were familiar with the lab of Orchid Cellmark?

16       A.    Yes.

17       Q.    And you had learned that they had previously

18   done some analysis or work on this case; is that right?

19       A.    That's correct.

20       Q.    Did you review reports and information from

21   Orchid Cellmark at the time that you were assigned this

22   case?

23       A.    Yes, I did.

24       Q.    Did you independently receive a known reference

25   sample from an individual in this case?

1       A.   Yes, I did.

2       Q.   Would you say that that's unrelated to anything

3  that Orchid Cellmark did in this case?

4       A.   Yes.  To my knowledge, Orchid has never seen or

5  touched that sample.

6       Q.   And based on your records, who was the known

7  reference sample from that you received in your lab?

8       A.   The known sample was from Obel Cruz-Garcia.

9       Q.   And do you know when that reference sample was

10  submitted to y'all?

11       A.   I believe it was submitted on February 8th of

12  2010.

13       Q.   And what kind of reference sample was that?

14  Were those buccal swabs like you've discussed?

15       A.   They were buccal swabs.

16       Q.   What did you then do with those buccal swabs?

17       A.   Once I took them into my custody, I started the

18  DNA extraction process on those samples.

19            MR. WOOD:  Your Honor, may I approach?

20            THE COURT:  Yes.

21       Q.   (By Mr. Wood) Ms. Head, I'm going to show you

22  what's been marked as State's Exhibits 76 and 77.  Can

23  you identify what those are for the jury (indicating)?

24       A.   Yes.  These are the buccal swabs that I tested.

25  I can tell that because my initials, the date, and all

1   the appropriate lab identifiers are on that item.

2       Q.   Also contained on State's Exhibits 76 and 77,

3   is there an individual's name who is the source of the

4   those buccal swabs?

5       A.   Yes.

6       Q.   What is the name?

7       A.   Obel Cruz-Garcia.

8       Q.   And does it show who those were collected by?

9       A.   Yes, it does.

10      Q.   Who is that name?

11      A.   It says M.K. Webb.

12      Q.   And does it show a date and time at which time

13  those samples were collected?

14      A.   Yes.  February 16th, 2010 at 11:20 a.m.

15           MR. WOOD:  Your Honor, at this time, I will

16  offer State's Exhibits 76 and 77.

17           **(State's Exhibit No. 76 and 77 Offered)**

18           MR. CORNELIUS:  No additional objections,

19  Judge.

20           THE COURT:  Okay.  State's Exhibits 76 and

21  77 will be admitted over objections.

22           You may proceed.

23           **(State's Exhibit No. 76 and 77 Admitted)**

24      Q.   (By Mr. Wood) Ms. Head, when you say that you

25  started doing the extractions on those items, 76 and 77,

1    what do you mean by that?

2         A.   It means that I cut a portion of that sample

3    and put it into a tube and applied certain chemicals

4    that will aid me in extracting that DNA from the cells

5    that they're currently in.

6         Q.   Was your goal in doing that in attempting to

7    see if you could obtain a DNA profile from that item?

8         A.   Yes.

9         Q.   And were you able to do that?

10        A.   Yes, I was.

11             MR. WOOD:   Your Honor, I'm going to ask

12   permission to publish parts of State's Exhibit 70 that

13   was admitted, the report.

14             THE COURT:   State's Exhibit 70?   Okay.

15   Yes, you are allowed to.

16        Q.   (By Mr. Wood) Ms. Head, as contained in your

17   report in State's Exhibit 70, I'm going to show you, if

18   I can, if it shows up on here -- is this the final page

19   of your report in State's Exhibit 70?

20        A.   Yes, it is.

21        Q.   And we're not going to go into specifics, but,

22   basically, tell us what this first column is that I'm

23   pointing at in the upper left-hand corner (indicating).

24        A.   That is the locations on the chromosome that

25   we're looking for when we do DNA testing to get a

1   certain DNA profile.

2        Q.   And the second column just to the right of

3   that, is that the DNA -- essentially the DNA profile

4   that you obtained from that item?

5        A.   Yes.

6        Q.   And that would be the DNA profile of Obel

7   Cruz-Garcia; is that right?

8        A.   Yes, it is.

9        Q.   You've talked about evidentiary samples.  What

10  did you rely upon regarding evidentiary samples in this

11  case?

12       A.   Do you mean what did I compare this reference

13  to?

14       Q.   Yes.  That's probably a better question.

15       A.   I compared this to a cigar, the sperm fraction

16  vaginal swabs, and also the sperm fraction of panties,

17  the crotch and -- from Diana Garcia.

18       Q.   And when you say you compared that, are you

19  saying you compared that to DNA profiles obtained from

20  those items?

21       A.   Yes.  I compared the known profile, which is

22  what you can see on the screen there, to the profiles

23  that Orchid Cellmark generated on the samples.

24       Q.   So, in this case -- well, let me ask you this.

25  Was this case a little bit different in that you had

1  evidence samples that DNA profiles had been already

2  obtained from to work with?

3       A.   Yes.  Typically, in our laboratory we do the

4  testing on the evidence and then compare the references,

5  but in this case, since another laboratory had

6  previously done the testing, we could rely on their

7  results and compare it with the reference sample.

8       Q.   And the DNA profiles that you compared the

9  known samples to regarding the panties, the cutting from

10 the panties, the crotch of the panties, and the vaginal

11 swabs, was that sperm fraction DNA?

12      A.   Yes, it was.

13      Q.   As opposed to -- what about the cigar?

14      A.   The cigar was just a straight extraction.  So,

15 in some situations, we extract DNA and we can make two

16 fractions, what we call an epithelial fraction and a

17 sperm cell fraction, and those would be in

18 semen-containing samples only.  If we do DNA extraction

19 on other types of samples, we would just get one DNA

20 profile.  We wouldn't separate that into two different

21 types.

22      Q.   Were you able to ultimately make comparisons

23 between the known reference sample, the DNA profile of

24 Obel Cruz-Garcia, and those three items of evidence, the

25 DNA profiles from those three items of evidence?

1       A.   Yes.

2       Q.   Let's talk about those one-by-one.   With

3   regards to your findings about the cigar or the

4   comparison with the cigar to the known DNA profile of

5   Obel Cruz-Garcia, what were your findings?

6       A.   I found that I -- or that Orchid Cellmark

7   obtained a full single-source male DNA profile.   And

8   when I compared it to the buccal swabs, I determined

9   that Obel Cruz-Garcia cannot be excluded as a

10  contributor to the DNA profile obtained from this item.

11      Q.   And, you know, I guess, I'm probably used to

12  this wording, but we hear "cannot be excluded" and all

13  of those words.   What does that mean if you break that

14  down?

15      A.   We, as a crime lab, do not say that a certain

16  individual matches the profile.   So, we usually say the

17  person is excluded or the person cannot be excluded.

18  So, therefore, if they can be excluded, then that

19  person's DNA is not found on that item.   If the

20  sample -- if the person cannot be excluded, then

21  potentially that person is on that sample.

22      Q.   Okay.   So, I want to make sure I'm clear on

23  that.   So, if you say that a person cannot be excluded,

24  what does that mean?

25      A.   That means that the profile obtained from the

1  buccal swab contains all of the same alleles as the

2  evidence sample.

3      Q.   Okay.  What were your findings regarding the

4  vaginal swabs, the sperm fractions from the vaginal

5  swabs of Diana Garcia?

6      A.   The vaginal swabs sperm fraction was a mixture

7  of DNA from at least three individuals and Obel

8  Cruz-Garcia cannot be excluded as a possible contributor

9  to this DNA mixture.

10     Q.   What about your results regarding the sperm

11  fraction DNA from the panties of Diana Garcia?

12     A.   The panties was a mixture of DNA from at least

13  two individuals and Obel Cruz-Garcia could not be

14  excluded as the contributor to the major component of

15  that profile.

16     Q.   Let's go back.  As far as a mixture of DNA from

17  two individuals, does that appear to be -- was there any

18  differentiation between male and female contributors to

19  that mixture?

20     A.   Well, the way the DNA works is if you get an X

21  and Y, that would indicate that a male profile -- or a

22  male would be contributing to this DNA sample.  However,

23  females only contain an X.  And so, we can't necessarily

24  differentiate to know that the female and the male is

25  contributing to this sample because there would always

 1  be an X and a Y, or at least in this DNA mixture there

 2  is.

 3       Q.   Okay.  Are we talking about -- regarding the

 4  vaginal -- I'm sorry -- the panties, sperm fraction from

 5  the panties, are we talking specifically about sperm

 6  fraction DNA?

 7       A.   For the panties?

 8       Q.   Yes.

 9       A.   I'm sorry.  Could you rephrase the question?

10       Q.   I've probably asked a confusing question.

11            Regarding the panties, let me ask you this:

12  It was a mixture of DNA from at least two individuals,

13  right.

14       A.   Yes.

15       Q.   Are we talking about sperm fraction DNA?

16       A.   Yes.

17       Q.   Okay.  And how does that factor into your

18  analysis of that?

19       A.   Well, if we get a DNA profile with sperm

20  fraction, then typically that sample would contain sperm

21  and could only come from a male because females do not

22  have sperm.  Sometimes, however -- in this case, the

23  sample was collected from a pair of panties that a

24  female is wearing.  So, at times we get a mixture that

25  contains mostly male DNA, which is from that semen

1  sample, but it could contain some carryover DNA from the

2  female.  That would be epithelial DNA.

3      Q.  And with regards to you identifying Obel

4  Cruz-Garcia being -- cannot be excluded as a major

5  contributor to that DNA mixture, what does that mean,

6  "major contributor"?

7      A.  That means that when we're looking at the DNA

8  profile, we can tell based on the intensity of the

9  profile that one person is contributing much more DNA

10  than another person.

11      Q.  And when you said that it was a mixture of at

12  least two individuals, did you have any other known

13  reference samples by which to compare that -- those

14  results to?

15      A.  I did not.

16      Q.  So, for example, if there -- Diana Garcia's

17  husband, Arturo Rodriguez, you didn't have a known

18  reference sample from Arturo Rodriguez to compare to see

19  if he was the other contributor or if he was at all in

20  play in that DNA mixture, did you?

21      A.  No, I did not.

22      Q.  You were just looking at the known reference

23  sample of Obel Cruz-Garcia, correct?

24      A.  Yes.

25      Q.  Once you obtain results, Ms. Head, are you able

1    to apply statistics to those results?

2         A.   Yes.

3         Q.   And explain that for the ladies and gentlemen

4    of the jury.

5         A.   We try to use statistics to kind of give a

6    weight to how common or uncommon that DNA profile may

7    be.

8         Q.   And when you say statistics, are we talking

9    about particular population groups or what do you mean?

10        A.   Yes.  We use population groups and the

11   frequencies that we typically see certain DNA profiles

12   in those population groups.

13        Q.   And are those split up into -- do you have

14   specific population groups that you look at in each and

15   every case or how does that work?

16        A.   Well, we use a database to assist us in

17   calculating the statistics.  So, there are some

18   population groups within that database.

19        Q.   What are those population groups?

20        A.   They are the Caucasian, the African-American,

21   the Southeast Hispanic, and the Southwest Hispanic.

22        Q.   Now, I guess it's probably a dumb question, but

23   does every individual necessarily fit nice and neat into

24   one of those categories?

25        A.   No.  And in order to develop these databases, a

1    certain subpopulation of each of the population groups

2    were sampled in order to get enough to create this

3    database.  And so, some people may think they are

4    Caucasian and so they say that they are Caucasian when

5    they were giving their samples in order to go into this

6    database.  However, they may not know their complete

7    lineage.  And so, it may not be completely accurate.

8         Q.   So, when you report on these statistics, do you

9    report on each of those subpopulation groups?

10        A.   Yes.

11        Q.   And do you think often it's helpful to compare

12   those statistics, your results on those statistics to

13   what the world's population is?

14        A.   To give a reference as to how great or small

15   the statistic may be?

16        Q.   Yes.

17        A.   Yes.

18        Q.   Generally or approximately do you know what the

19   world's population is?

20        A.   Yes.  It's about 7 billion.

21             MR. WOOD:  Your Honor, may I approach the

22   witness?

23             THE COURT:  Yes.

24        Q.   (By Mr. Wood) Ms. Head, I'm going to show you

25   what's been marked as State's Exhibits 96, 97, and

1    actually 92.  Generally, 96, 97, and 92, would you say

2    that these are summaries of your results in this case

3    regarding 96 and 97?

4        A.  Yes.  They appear to be the paragraph taken

5    right out of my actual report.

6        Q.  And with regards to 92, are those some

7    statistics or figures that you think would be helpful in

8    aiding jury in understanding your findings and results

9    in this case?

10       A.  Yes.  It contains the approximate world

11   population and then some examples of what a quadrillion

12   and what a quintillion looks like as far as how large

13   that number is.

14             MR. WOOD:  Your Honor, at this time, I will

15   offer 92, 96, and 97.

16             **(State's Exhibit No. 92, 96, and 97**

17              **Offered)**

18             MR. CORNELIUS:  No additional objections,

19   Judge.

20             THE COURT:  Okay.  State's Exhibits 92, 96,

21   and 97 are admitted.

22             **(State's Exhibit No. 92, 96, and 97**

23              **Admitted)**

24             MR. WOOD:  Permission to publish?

25             THE COURT:  Yes, you may publish.

1    Q.   (By Mr. Wood) Ms. Head, I want to visit with

2    you about State's Exhibit 96.  And I know the words are

3    small, but in State's Exhibit No. 96, is this just a

4    section from your report (indicating)?

5    A.   Yes.

6    Q.   And what we're looking at in State's Exhibit

7    No. 96, is that your results regarding the testing you

8    did on the cigar or the comparison you did on the cigar?

9    A.   Yes.

10   Q.   I just want to focus a little bit on the

11   statistics.  Can you read for the jury what the

12   statistics are regarding the cigar?

13   A.   The statistics would be 1 in 6.2 quintillion

14   for Caucasians; 1 in 700 quintillion for

15   African-Americans; 1 in 140 quadrillion for Southeast

16   Hispanics; and 1 in 100 quintillion for Southwest

17   Hispanics.

18   Q.   And in pink, can you tell the ladies and

19   gentlemen of the jury what your results read?

20   A.   It says:  To a reasonable degree scientific

21   certainty, Obel Cruz-Garcia is the source of this DNA

22   profile, excluding identical twins.

23   Q.   And in State's 97, this is, is it not, your

24   results regarding the comparison of Obel Cruz-Garcia's

25   known DNA profile with the cutting from the crotch of

1   the panties?

2        A.   Yes.

3        Q.   And can you read the statistics as it relates

4   to that item of evidence?

5        A.   The statistics are 1 in 6.2 quintillion for

6   Caucasians; 1 in 700 quintillion for African-Americans;

7   1 in 140 quadrillion for Southeast Hispanics; and 1 in

8   100 quintillion for Southwest Hispanics.

9        Q.   And, again, can you read for us what is written

10  in pink on that sheet?

11       A.   To a reasonable degree of scientific certainty,

12  Obel Cruz-Garcia is the source of the major component of

13  this DNA mixture, excluding identical twins.

14       Q.   Okay.  So, put some of those numbers in

15  context.  I think you said before that the world's

16  population is approximately 7 billion.  Is that right?

17       A.   Yes.

18       Q.   And that's what's on that first line in State's

19  92?

20       A.   Yes.

21       Q.   Many of the statistics that you just read off

22  dealt with numbers like quintillion and quadrillion, did

23  they not?

24       A.   Yes, they did.

25       Q.   As it relates to -- compares to 7 billion, what

```
 1  is a quadrillion?
 2       A.    Quadrillion is much larger than a billion.
 3       Q.    And, in fact, a billion has nine zeros, does it
 4  not?
 5       A.    Yes.
 6       Q.    And a quadrillion has -- is that 15?
 7       A.    Fifteen, yes.
 8       Q.    And a quadrillion then is many times over what
 9  the world population is, is it not?
10       A.    Yes, it is.
11       Q.    And what about a quintillion, is it that 18
12  zeros?
13       A.    It is 18 zeros.
14       Q.    And that is even a larger number than the
15  quadrillion, is it not?
16       A.    Yes, it is.
17       Q.    Many times over what the world's population is?
18       A.    Yes.
19       Q.    Is that partially what contribute to your
20  findings that you state to a reasonable degree of
21  scientific certainty Obel Cruz-Garcia is the source of
22  this DNA profile or mixture on both of those items?
23       A.    Yes.
24       Q.    Was there a technical review of your work in
25  this case, Ms. Head?
```

1       A.   Yes.

2       Q.   And what is a technical review?

3       A.   A technical review is when I hand my work, all

4   of the work that I have done and the report, the allele

5   chart, to another analysts that will independently look

6   at everything to determine if they agree with the

7   ultimate conclusions that I have drawn.

8       Q.   Is that an element of quality control within

9   your lab?

10      A.   Yes, it is.

11      Q.   And that was done in this case?

12      A.   Yes.

13           MR. WOOD:  I pass the witness, Your Honor.

14           THE COURT:  Thank you, Mr. Wood.

15           Mr. Cornelius, you may proceed.

16           (Pause)

17           MR. CORNELIUS:  May I proceed?

18           THE COURT:  Yes, you may.

19                    **CROSS-EXAMINATION**

20   **BY MR. CORNELIUS:**

21      Q.   Ms. Head, we've met before and actually on this

22   case, but not during this trial, right?

23      A.   That's correct.

24      Q.   Okay.  If I'm understanding what you said, you

25   did not perform any testing on the cigar, correct?

1     A.   No.   That's correct.

2     Q.   Or on the vaginal swabs?

3     A.   Also correct.

4     Q.   Or on the cutting from the panties?

5     A.   Yes.

6     Q.   So, there is no quality control or technical

7   review on your work on those because you didn't do any

8   work on those, correct?

9     A.   I simply reviewed their work.

10     Q.   Okay.   You developed a profile from the buccal

11   swab or buccal swabs that you were provided by the

12   D.A.'s office?

13     A.   That's correct.

14     Q.   And that would have been what, in 2010?

15     A.   Yes.

16     Q.   And is that about when you went to work for the

17   Houston Crime Lab?

18     A.   Yes.

19     Q.   So, the only quality control about your work

20   would be on the buccal swabs that the D.A.'s office

21   provided you from Obel Cruz-Garcia, correct?

22     A.   They would also be -- when I do my comparisons

23   and I calculate the statistics, they would make sure

24   that I included everything correctly.

25     Q.   Just that the math is right?

1      A.   Right.

2      Q.   Okay.  Well --

3                MR. CORNELIUS:  Can I approach the bench,

4    Judge?

5                THE COURT:  Yes.

6                (At the Bench, on the record)

7                MR. CORNELIUS:  I'm thinking, if you'll

8    allow me to go into the quality control that existed on

9    other things when they were ran by the crime lab because

10   of what -- she didn't work there, number one.  And,

11   number two, the old crime lab -- I want to do that, but

12   I don't want to do it if you've told me not to.

13               THE COURT:  Do not go into that.

14               MR. CORNELIUS:  Okay.

15               (Open court, defendant and jury present)

16               MR. CORNELIUS:  I'm going to pass the

17   witness, Judge.

18               THE COURT:  Anything further?

19               MR. WOOD:  No, Your Honor.

20               THE COURT:  Okay.  May this witness be

21   excused?

22               MR. WOOD:  No, Judge.

23               MR. CORNELIUS:  Yes, Judge.

24               THE COURT:  You may step down.  Thank you.

25               THE WITNESS:  Thank you.

```
 1                    THE COURT:  Please call your next.
 2                    MS. TISE:  Your Honor, at this time, the
 3  State rests.
 4                    THE COURT:  What says the defense?
 5                    MR. CORNELIUS:  May we have a five-minute
 6  recess?
 7                    THE COURT:  Yes.  Let's take jury out.
 8                    THE BAILIFF:  All rise.
 9                    (Open court, defendant present, no jury)
10                    THE COURT:  Okay.  So, the State is
11  offering State's Exhibits 99 and 100 for purposes of the
12  record only, not to go back to the jury.  And I'm going
13  to allow that.
14                    (State's Exhibit No. 99 and 100 Offered)
15                    MR. CORNELIUS:  All right.
16                    (State's Exhibit No. 99 and 100 Admitted
17                     For Record Purposes Only)
18                    THE COURT:  So, you will keep them, but
19  they have to stay separate.  They're offering them, but
20  put them as Court exhibits.  And there is no objection
21  to that, correct?
22                    MR. CORNELIUS:  No, ma'am.
23                    THE COURT:  Let's talk about tomorrow.
24  We're going to bring them back at 10:00, if that's good
25  with everybody.  And we can meet at 9:00 and go over the
```

1   charge.  We'll talk a little bit about it after we

2   release them and see what you think about the charge

3   right now and see if there is anything you want to add.

4   And then we can work on that more between 9:00 and 10:00

5   in the morning.

6            Does that sound good to everybody?

7            MR. CORNELIUS:  Whatever you want to do,

8   Judge.

9            THE COURT:  All right.  Have you had a

10  chance to look at it?

11           MR. CORNELIUS:  I've had a chance to look

12  at it.  I know what I'm going to request.  And you've

13  probably already considered it, so you may be able to

14  make your -- there is a mistake on the accomplice

15  charge.

16           THE COURT:  So, we'll stick with that

17  schedule.  Bring them back now and release the jury.

18           (Open court, defendant and jury present)

19           THE BAILIFF:  All rise.

20           THE COURT:   You may be seated.

21           We're back on the record in Cause

22  No. 1384794.

23           The State has rested.  What's says the

24  defense?

25           MR. CORNELIUS:  We're going to rest, Judge.

1          THE COURT:  Okay.  And so, you also.

2          State, you rest and close?

3          MS. TISE:  State rests and closes.

4          THE COURT:  Defense rests and closes.

5          MR. CORNELIUS:  Yes, Your Honor.

6          THE COURT:  Okay.  What that means, ladies

7   and gentlemen of the jury, is that all of the evidence

8   in this case is before you.  However, you have not been

9   given the Court's charge, which will be the law that you

10   should apply to this case.  And you have not heard the

11   closing arguments of counsel.

12          So, we're going to take a recess at this

13   time.  We need to prepare that charge and I want to give

14   the attorneys an opportunity to review it before reading

15   that charge to you.  We'll do that at 10:00 in the

16   morning.  We'll read the charge to you and then the

17   lawyers from both sides will have an opportunity to

18   argue their case to you.  Okay?

19          In recessing tonight, I want to continue to

20   admonish you that all of the same instructions are

21   applicable tonight.  It is most important that you, of

22   course, don't do any investigation on this case.  Don't

23   watch any media reports on the case.  And, please, you

24   are reminded, you should not talk amongst yourselves or

25   with anyone else on any subject connected with the trial

1   or to form or express any opinion thereon until the end

2   of the trial.

3            So, we stand in recess until 10:00 a.m.

4   tomorrow when you will be read that charge and hear

5   arguments from counsel.  Okay?

6            You may go with the bailiff at this time.

7            THE BAILIFF:  All rise.

8            (Open court, defendant present, no jury)

9            THE COURT:  Let's go over the charge and

10  make some notations.  Let me see if I've got my copy

11  here.

12           (Discussion off the record)

13           (Proceedings recessed)

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS   )
   COUNTY OF HARRIS     )

3

4       I, Mary Ann Rodriguez, Official Court Reporter in

5  and for the 337th District Court of Harris County, State

6  of Texas, do hereby certify that the above and foregoing

7  contains a true and correct transcription of all

8  portions of evidence and other proceedings requested in

9  writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND this the 3rd day of

17  October, 2013.

18

19

20  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
21  Expiration Date:  12/31/2013
    Official Court Reporter
22  337th Court
    1201 Franklin
23  Houston, Texas   77002
    713.755.7746

24

25

**'**

**'91** - 27:3
**'92** - 8:5, 27:4, 30:24
**'97** - 31:11
**'skip'** - 2:11

**/**

**/s** - 178:20

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**1** - 39:23, 88:16, 107:23, 168:13, 168:14, 168:15, 168:16, 169:5, 169:6, 169:7
**1-gram** - 42:25
**10** - 27:8, 71:24
**100** - 2:9, 2:10, 2:11, 2:12, 3:1, 168:16, 169:8, 174:11, 174:14, 174:16
**101** - 1:8, 1:24
**103** - 1:9, 1:20
**10:00** - 174:24, 175:4, 176:15, 177:3
**11** - 1:3
**11:20** - 93:9, 157:14
**11th** - 1:20
**12** - 75:6, 75:7
**12/31/2013** - 178:21
**1201** - 2:6, 178:22
**121** - 2:2, 2:4, 2:5, 2:6, 2:19
**1225** - 2:15
**124** - 2:2, 2:4, 2:5, 2:6, 2:19
**127** - 1:9, 1:20
**13** - 76:20
**136** - 1:9, 1:21
**1384794** - 1:3, 63:23, 175:22
**13th** - 30:18
**14** - 27:17, 27:25, 28:8, 75:19
**140** - 1:9, 1:21, 168:15, 169:7
**141** - 1:10, 1:21
**142** - 1:11, 1:19
**146** - 37:13, 97:19, 102:4
**15** - 1:5, 1:22, 75:19, 76:12, 133:14, 133:16, 135:6, 170:6
**152** - 2:8
**157** - 2:13, 2:14
**16** - 18:21, 67:14
**16-page** - 39:3
**167** - 2:17, 2:20, 2:22
**16th** - 92:21, 93:9, 157:14
**17** - 18:21, 20:3
**17-year** - 19:17
**171** - 1:11, 1:19
**174** - 1:12, 2:24, 3:1
**175** - 1:13, 2:24, 3:1
**176** - 1:14, 37:14
**178** - 1:15
**18** - 1:5, 1:22, 170:11, 170:13
**1991** - 27:24, 28:7, 30:24
**1992** - 5:13, 5:14, 7:10, 8:3, 20:19, 22:15, 24:5, 24:21, 25:12, 27:16, 28:4, 133:14, 135:5
**1997** - 18:20, 30:15

**1st** - 5:13

**2**

**2** - 7:10, 7:14, 88:24, 90:3
**20.7** - 98:14
**2001** - 116:25, 144:1
**2007** - 105:20, 106:1, 106:16, 107:2, 109:22, 115:5, 117:12, 133:11, 133:12, 135:6
**2008** - 117:16
**2009** - 20:9, 20:17
**2010** - 92:21, 93:9, 150:13, 150:18, 156:12, 157:14, 172:14
**2011** - 37:2, 37:19, 39:4, 45:5, 45:21, 52:20, 79:3, 117:8
**2013** - 1:20, 1:3, 178:17
**2028** - 2:12
**21** - 1:2, 1:1, 1:5, 1:6, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:15, 1:18, 1:19, 1:20, 1:21, 1:22, 1:23, 1:24, 2:2, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:19, 2:20, 2:22, 2:23, 2:24, 3:1, 36:20, 37:15
**225** - 37:13, 96:19, 97:15, 97:17, 102:4
**23rd** - 79:3
**24039247** - 2:5
**28th** - 117:16
**29** - 1:5, 1:23
**2nd** - 116:25, 117:8

**3**

**3** - 89:7, 100:10
**30** - 49:13, 155:7
**302** - 65:23, 65:24, 65:25, 66:2, 67:5, 68:19
**3047** - 178:20
**30th** - 5:12
**31** - 11:2
**32** - 106:12
**33** - 106:18, 120:21, 120:24, 121:1, 124:6, 124:14, 124:17, 124:19
**33-a** - 2:2, 120:24, 121:1, 124:7, 124:14
**33-b** - 2:3, 110:9, 120:22, 120:23, 121:1, 124:14
**33-c** - 2:5, 121:1, 124:14
**33-d** - 2:6, 121:2, 124:15
**337th** - 1:12, 178:5, 178:22
**34** - 7:10, 7:14, 87:25, 88:16, 89:7
**3rd** - 105:20, 178:16

**4**

**40** - 49:13
**440** - 2:15
**45** - 35:17, 35:18, 35:19
**45-month** - 20:9

**5**

**5** - 1:5, 1:22
**5-year** - 19:18
**500** - 42:21

**6**

**6.2** - 168:13, 169:5
**60** - 104:9
**609** - 24:10, 24:16

**64** - 1:6, 1:18, 154:11, 154:12
**65** - 117:21, 118:18, 118:21, 119:6
**66** - 117:21, 118:4
**6705** - 96:10
**68** - 2:7, 92:2, 92:23, 92:24, 93:1, 93:4

**7**

**7** - 2:16, 20:4, 70:23, 70:24, 166:20, 169:16, 169:25
**70** - 2:8, 152:3, 152:16, 152:18, 152:22, 152:24, 158:12, 158:14, 158:17, 158:19
**700** - 42:22, 168:14, 169:6
**71** - 2:9, 99:12, 99:19, 99:20, 99:22, 99:25, 100:2
**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 178:23
**713.877.9400** - 2:16
**72** - 2:10, 99:22, 100:6
**73** - 2:11, 99:15, 99:22
**74** - 2:12, 99:13, 99:19, 99:20, 99:23, 99:25
**7523** - 96:14
**76** - 2:13, 93:6, 94:7, 156:22, 157:2, 157:16, 157:17, 157:20, 157:23, 157:25
**77** - 1:7, 1:18, 2:14, 93:6, 93:12, 94:7, 156:22, 157:2, 157:16, 157:17, 157:21, 157:23, 157:25
**77002** - 2:6, 178:23
**77002-1659** - 2:16
**77019-2408** - 2:13
**78** - 2:15, 98:6, 98:17, 98:18, 98:23
**79** - 98:20
**7th** - 115:5

**8**

**8** - 71:13
**82** - 1:7, 1:18
**84** - 1:8, 1:24
**8th** - 156:11

**9**

**9** - 69:20
**90s** - 90:18, 91:3
**91** - 2:16, 7:3, 7:6, 7:18, 7:20, 7:22, 7:25
**92** - 2:7, 2:17, 167:1, 167:6, 167:15, 167:16, 167:20, 167:22, 169:19
**93** - 2:7, 79:1, 94:20, 94:22, 94:23
**94** - 2:23, 94:24, 95:1, 95:10, 95:11, 95:15, 95:18
**95** - 2:18, 2:23, 106:22, 120:19, 121:2, 123:18, 124:15
**96** - 2:20, 166:25, 167:1, 167:3, 167:15, 167:16, 167:20, 167:22, 168:2, 168:3, 168:7
**97** - 2:21, 166:25, 167:1, 167:3, 167:15, 167:16, 167:21, 167:22, 168:23
**98** - 2:15, 169:8
**99** - 2:9, 2:10, 2:11, 2:12, 2:24, 174:11, 174:14, 174:16

**9:00** - 174:25, 175:4

**A**

**A&m** - 103:22
**able** - 22:25, 24:25, 25:11, 25:13, 48:15, 67:25, 83:14, 86:14, 87:2, 87:5, 88:19, 90:11, 90:15, 95:6, 109:7, 109:8, 116:3, 117:2, 118:20, 120:13, 127:4, 129:12, 138:12, 138:14, 139:24, 149:1, 149:3, 154:9, 158:9, 160:22, 164:25, 175:13
**above-entitled** - 1:21
**above-styled** - 178:11
**absolute** - 119:17
**Absolutely** - 118:14
**accept** - 18:3, 29:1
**accident** - 129:1
**accomplice** - 175:14
**according** - 23:4, 23:5, 90:19, 98:12, 154:21
**accuracy** - 99:10
**accurate** - 68:16, 79:16, 82:18, 82:24, 128:9, 152:7, 166:7
**accurately** - 95:2
**accusation** - 22:18, 22:20
**accused** - 16:13, 21:1, 21:4
**acid** - 104:17
**acronym** - 90:23
**act** - 145:5
**acting** - 25:16
**actual** - 8:13, 133:25, 143:11, 149:23, 167:5
**add** - 62:13, 175:3
**Added** - 20:3
**addition** - 145:24, 154:19
**additional** - 4:11, 62:13, 157:18, 167:18
**Additionally** - 91:18, 97:22
**address** - 96:10, 99:16
**admissibility** - 123:13
**admissible** - 22:10, 24:18, 24:20, 24:22, 27:5
**admit** - 27:4
**admitted** - 7:23, 27:3, 93:1, 95:16, 98:20, 99:23, 124:20, 124:23, 152:22, 154:11, 154:12, 157:21, 158:13, 167:21, 178:15
**Admitted** - 2:1, 2:24, 3:1, 7:25, 93:4, 95:18, 98:23, 100:1, 124:15, 152:24, 157:23, 167:23, 174:16
**admonish** - 176:20
**advise** - 70:14
**Afis** - 90:16, 90:19, 90:22, 90:23
**afraid** - 81:25, 125:22
**African** - 165:20, 168:15, 169:6
**African-american** - 165:20
**African-americans** - 168:15, 169:6
**afternoon** - 142:21, 142:22
**age** - 21:20
**agency** - 103:15
**agent** - 37:2, 37:18, 45:20, 46:19, 47:20, 51:23, 65:9
**Agent** - 3:9, 10:22, 11:11, 12:14, 12:23, 13:21, 13:24, 14:17, 64:2, 64:10, 65:10, 67:9
**agents** - 37:4, 37:25, 39:4, 46:9, 47:3, 48:6, 53:7, 65:6, 90:9

**ago** - 36:20, 37:15, 47:20, 56:17, 144:3
**agree** - 27:11, 171:6
**agreed** - 76:15
**agreement** - 76:10
**ahead** - 24:6, 116:21, 120:23
**aid** - 158:4
**aided** - 1:24
**aiding** - 167:8
**alleged** - 21:21, 68:25
**allegedly** - 72:13
**alleges** - 72:2
**allele** - 171:4
**alleles** - 162:1
**allow** - 4:12, 22:15, 24:9, 24:14, 25:1, 25:9, 25:19, 25:20, 27:12, 28:6, 28:8, 34:15, 43:3, 123:18, 124:4, 124:6, 125:10, 125:14, 126:24, 173:8, 174:13
**allowed** - 158:15
**allowing** - 22:12
**allows** - 24:10, 108:19
**ally** - 33:22
**almost** - 18:21, 30:16, 39:11, 51:18, 59:2, 62:21
**Alphabetical** - 1:17
**American** - 14:23
**american** - 165:20
**americans** - 168:15, 169:6
**amount** - 128:15, 155:11
**amounts** - 40:1, 129:16
**analysis** - 108:21, 143:12, 143:22, 144:14, 147:4, 148:11, 149:18, 152:14, 155:18, 163:18
**analyst** - 104:2, 143:9, 144:7, 144:10, 154:20
**analysts** - 171:5
**analyze** - 148:16
**analyzed** - 110:18
**Angelita** - 40:11, 40:20, 42:1, 42:2, 42:9, 47:4, 48:2, 76:23, 76:25, 77:1, 77:10, 77:13, 89:16, 97:1
**Angelito** - 11:5, 11:6
**Angelo** - 8:13, 9:17, 10:3, 11:4, 56:23, 57:9, 71:8, 71:16, 71:19, 73:15, 74:3, 74:4, 76:16, 86:20, 96:24
**Angelo's** - 10:12, 75:1
**Ann** - 178:4, 178:20
**answer** - 8:17, 15:20, 46:15, 47:14, 47:22, 54:6, 62:12, 126:6
**answered** - 42:13, 42:17, 46:12, 46:24
**answering** - 72:25
**answers** - 62:15
**Ap-77,025** - 1:4
**Apartment** - 100:10
**apartment** - 39:7, 40:12, 40:13, 40:21, 42:1, 42:4, 43:12, 43:12, 44:8, 47:7, 47:8, 48:1, 49:5, 49:10, 61:1, 71:3, 71:4, 71:15, 76:22, 96:8, 97:2, 97:8, 97:24, 100:8, 100:12, 100:14, 100:24
**apartments** - 99:14, 100:3
**Appeals** - 1:4
**appear** - 162:17, 167:4
**Appellant** - 1:7
**Appellee** - 1:12
**applicable** - 146:1, 176:21
**applied** - 158:3
**applies** - 131:21
**apply** - 153:22, 165:1, 176:10

**appointed** - 11:18
**approach** - 6:25, 10:24, 16:24, 78:22, 85:20, 87:22, 91:24, 106:9, 117:19, 151:24, 156:19, 166:21, 173:3
**appropriate** - 157:1
**approximate** - 167:10
**area** - 8:18, 8:20, 9:4, 9:13, 10:17, 35:1, 35:2, 35:7, 35:8, 36:15, 36:17, 36:24, 37:7, 37:8, 38:3, 38:7, 56:11, 65:1, 65:11, 69:23, 69:24, 73:16, 97:6, 135:23, 143:22, 144:14, 145:18, 153:18
**argue** - 127:2, 176:18
**argument** - 122:6
**arguments** - 121:14, 176:11, 177:5
**arms** - 50:25, 145:3
**arrested** - 30:6
**arrived** - 33:24, 36:7, 36:22, 44:19, 46:6, 53:22, 58:2, 58:6
**arriving** - 44:8
**Arturo** - 89:20, 100:8, 106:4, 109:14, 111:21, 112:3, 112:9, 112:15, 112:16, 114:2, 114:12, 164:17, 164:18
**Arturo's** - 96:8, 97:24, 100:24
**asleep** - 47:12
**assault** - 20:20, 21:15, 22:3, 22:23, 23:7, 23:23, 24:5, 24:13, 25:12, 27:13, 27:24, 28:7, 28:24, 30:24, 31:6, 106:3, 106:20, 107:4, 108:18, 109:25, 110:3, 119:20, 122:22, 123:23, 124:8, 124:9, 124:10, 124:11, 134:22
**Assault** - 24:14
**assaulted** - 21:21, 21:22, 23:13, 23:24
**assaulting** - 21:1, 21:5, 26:15, 26:20
**assigned** - 150:11, 151:2, 155:21
**assist** - 84:22, 84:24, 91:11, 152:13, 165:16
**Assistant** - 2:5
**assisting** - 105:15
**associated** - 105:5
**assurances** - 140:18, 141:5
**attached** - 52:9
**attaching** - 16:8
**attacking** - 27:7, 27:12
**attempting** - 158:6
**attempts** - 130:8
**attention** - 69:11, 73:3, 73:18
**attorney** - 11:12, 11:18, 12:5, 47:15, 84:18
**Attorney's** - 84:12
**Attorneys** - 2:5, 2:7, 2:17
**attorneys** - 142:7, 176:14
**Automated** - 90:23
**automated** - 90:24
**average** - 49:15
**Aviles** - 89:1, 90:3, 91:13
**aware** - 71:12, 71:23

**B**

**Baby** - 10:2, 10:12
**bachelor's** - 103:21, 143:16

**background** - 103:19
**backing** - 71:20
**bad** - 34:9, 138:10, 138:25
**bag** - 137:13, 137:16
**baggies** - 42:24, 42:25
**bags** - 137:9
**bailiff** - 3:6, 63:12, 177:6
**Bailiff** - 4:15, 17:13, 63:13, 83:21, 121:6, 141:24, 174:8, 175:19, 177:7
**bailiffs** - 4:2
**ballpark** - 66:9
**Baptist** - 143:17
**bare** - 28:23
**Barnett** - 100:16
**Barroso** - 91:13
**based** - 37:15, 91:1, 112:20, 147:10, 156:6, 164:8
**basis** - 123:12
**bathroom** - 9:18, 55:4, 55:6, 55:8, 57:25, 59:6
**Baytown** - 35:15, 37:7, 37:13, 37:19, 37:23, 38:7, 38:16, 38:19, 38:21, 69:23, 70:7, 70:15, 70:21, 97:12, 97:14, 101:24, 101:25, 102:1, 102:4
**bearings** - 95:7
**beat** - 121:10
**became** - 90:7
**become** - 104:2, 105:14
**bed** - 40:22, 40:24
**bedroom** - 40:13, 47:8
**began** - 33:1, 45:8, 96:7
**behind** - 53:23, 58:4, 100:23
**belonged** - 120:14
**belt** - 52:9
**bench** - 16:24, 85:20, 173:3
**Bench** - 3:14, 17:2, 85:21, 173:6
**best** - 28:15, 67:12, 128:9, 152:7
**bet** - 73:18
**better** - 8:19, 54:12, 159:14
**between** - 6:3, 22:17, 49:13, 98:10, 101:6, 108:20, 130:3, 144:2, 160:23, 162:18, 175:4
**Bienviendo** - 86:24, 89:22, 96:12, 115:13, 117:11
**big** - 8:5, 46:4
**bigger** - 146:13
**Bill** - 3:9, 3:10, 64:2
**billion** - 166:20, 169:16, 169:25, 170:2, 170:3
**biological** - 105:2, 147:14, 147:17
**biology** - 103:22, 103:23, 143:16, 143:19, 147:25
**bit** - 6:13, 6:17, 8:18, 43:4, 74:2, 80:12, 116:21, 137:5, 143:14, 146:14, 150:8, 150:10, 153:1, 153:19, 159:25, 168:10, 175:1
**blame** - 34:24
**bleach** - 130:2
**blew** - 45:2, 45:5, 45:8, 45:10, 45:12, 45:24, 46:9, 46:10
**Blood** - 2:6, 155:1
**blood** - 10:9, 10:11, 92:6, 104:16, 105:1, 124:10, 145:17, 145:23, 147:7, 147:16, 153:2, 153:10, 153:13, 153:16, 153:24, 154:1, 154:6, 154:23, 155:3,

155:8, 155:12
**blow** - 45:8
**blowing** - 45:11, 46:5, 75:7, 75:14, 75:17
**blue** - 6:16, 96:9, 96:10
**blueprints** - 104:18
**body** - 10:12, 52:15, 52:21, 52:25, 53:3, 74:16, 74:19, 75:1, 86:4, 96:24, 97:15, 97:25, 104:16, 145:6
**bones** - 28:23
**Bory** - 7:8, 7:15
**boss** - 34:20, 61:25
**bottom** - 16:7
**box** - 93:8, 137:14
**boxes** - 110:15
**boy** - 9:10, 11:4, 11:8, 21:7, 21:8, 35:2, 35:7, 35:12, 35:13, 35:15, 35:23, 36:2, 38:24, 43:9, 43:12, 44:14, 49:24, 50:10, 50:12, 50:13, 50:17, 50:18, 50:21, 50:23, 50:25, 51:4, 51:6, 51:9, 51:10, 51:12, 51:16, 51:24, 52:16, 52:25, 53:19, 54:14, 54:17, 55:1, 55:22, 56:3, 56:14, 56:15, 57:23, 58:3, 58:22, 59:19, 59:21, 59:22, 59:24, 60:8, 60:9, 72:2
**boy's** - 9:3, 52:21, 53:2
**breach** - 123:8
**break** - 63:5, 161:13
**Bridge** - 97:19
**briefcase** - 55:14
**briefly** - 86:11, 127:21
**bring** - 4:14, 29:6, 127:7, 174:24
**Bring** - 175:17
**bringing** - 3:6, 50:1
**brought** - 11:17, 34:4, 50:11, 51:4
**brown** - 153:12
**Buccal** - 2:13, 2:14
**buccal** - 66:1, 91:20, 118:17, 119:5, 145:24, 146:12, 146:16, 156:14, 156:15, 156:16, 156:24, 157:4, 161:8, 162:1, 172:10, 172:11, 172:20
**Buddha** - 40:25
**Buffalo** - 2:12
**build** - 8:8
**buildings** - 36:4, 36:19
**bulk** - 42:23
**bully** - 8:8
**bunch** - 147:24
**bureau** - 81:19
**burglary** - 15:15
**business** - 31:14, 33:2, 33:8, 33:24, 33:25, 34:2, 151:14
**bust** - 147:23
**buying** - 42:23

**C**

**calculate** - 172:23
**calculating** - 165:17
**calm** - 50:21, 50:23, 51:1, 51:6, 51:8
**Candido** - 89:6, 90:17, 91:4, 115:11, 117:10
**cannot** - 24:11, 44:22, 48:10, 55:25, 113:1, 161:9, 161:12, 161:17, 161:20, 161:23, 162:8, 164:4
**capital** - 15:15, 91:12
**car** - 45:2, 45:6, 49:4, 49:9, 49:23, 54:21, 55:19, 55:21,

56:7, 57:10, 57:17, 57:19,
57:21, 58:1, 58:5, 58:7,
58:8, 58:24, 59:2, 59:5,
74:10, 75:20
  care - 12:19, 15:17, 16:4
  Carlos - 89:9
  Carmelo - 1:5, 1:22, 4:10,
4:14, 4:23, 5:7, 29:10,
29:16, 78:16, 79:5, 89:10,
115:16, 115:20, 116:1,
116:21, 116:24, 117:1,
117:7
  carpet - 47:10
  carryover - 164:1
  case - 4:7, 15:10, 16:1,
16:8, 16:9, 18:22, 18:23,
19:2, 19:7, 21:14, 22:14,
22:18, 24:3, 24:19, 25:7,
27:16, 27:19, 27:22, 31:6,
31:7, 34:24, 64:11, 82:19,
82:22, 82:25, 83:1, 84:23,
84:25, 85:4, 85:7, 85:11,
86:19, 87:11, 88:4, 91:19,
94:12, 95:3, 101:20, 105:11,
105:15, 105:19, 106:15,
106:21, 118:12, 121:19,
127:25, 128:14, 128:15,
129:19, 130:11, 132:11,
132:25, 133:18, 133:19,
134:19, 136:19, 136:22,
140:9, 147:6, 150:1, 150:2,
150:7, 150:9, 150:12,
150:16, 150:20, 151:2,
151:3, 151:9, 151:22, 152:6,
152:11, 152:14, 154:4,
154:15, 155:14, 155:18,
155:22, 155:25, 156:3,
159:11, 159:24, 159:25,
160:5, 163:22, 165:15,
167:2, 167:9, 170:25,
171:11, 171:22, 176:8,
176:10, 176:18, 176:22,
176:23
  cases - 18:24, 18:25,
19:19, 27:2, 30:19, 31:3,
103:12, 150:4
  Castro - 11:21, 12:3
  categories - 165:24
  Caucasian - 165:20, 166:4
  Caucasians - 168:14,
169:6
  caught - 30:6
  cell - 16:19, 43:23, 43:24,
44:24, 104:16, 111:10,
111:17, 113:19, 132:23,
132:24, 133:25, 148:2,
160:17
  Cellmark - 103:8, 103:9,
105:14, 128:2, 130:7,
150:19, 155:15, 155:21,
156:3, 159:23, 161:6
  cells - 104:16, 108:11,
108:16, 108:17, 108:20,
108:23, 108:24, 109:1,
110:24, 111:5, 111:8, 111:9,
111:11, 111:13, 111:14,
111:22, 112:13, 113:15,
114:7, 132:2, 132:3, 132:8,
134:8, 134:24, 135:4,
139:11, 139:14, 139:15,
139:25, 140:4, 146:15,
146:16, 147:22, 147:23,
158:4
  certain - 73:25, 80:8,
81:25, 85:6, 146:7, 147:15,
147:16, 148:21, 153:5,
153:12, 158:3, 159:1,
161:15, 165:11, 166:1
  Certainly - 102:22
  certainly - 27:5

  certainty - 168:21, 169:11,
170:21
  Certificate - 1:15, 178:1
  certify - 178:6, 178:13
  chain - 121:18, 123:8
  chambers - 178:12
  chance - 47:19, 175:10,
175:11
  change - 145:15, 153:23,
153:24, 154:1
  changed - 6:16
  character - 34:4
  charge - 15:25, 16:17,
16:20, 20:20, 20:25, 175:1,
175:2, 175:15, 176:9,
176:13, 176:15, 176:16,
177:4, 177:9
  charged - 15:10, 15:14,
21:16, 21:17, 22:21, 23:5,
25:13, 25:18, 26:22, 27:2,
34:23, 66:13, 66:14, 88:18
  charges - 15:22, 19:19,
91:12
  Charlie - 44:12, 44:21,
86:25, 89:22
  Charlie's - 44:19
  chart - 171:5
  check - 15:23
  checks - 129:23
  cheek - 93:15, 93:22
  chemical - 104:15, 153:22
  chemicals - 158:3
  chest - 10:14
  chewing - 108:7
  Chico - 5:20, 13:14, 14:12,
32:11, 32:12, 47:3, 48:1,
49:24, 50:2, 50:5, 50:10,
51:3, 51:10, 51:17, 51:20,
51:24, 57:16, 59:4, 61:19,
71:2, 71:5, 71:8, 71:14,
71:15, 71:18, 74:9, 75:25,
76:6, 76:25, 77:4, 77:10,
77:12
  Chico's - 42:1
  child - 21:18, 21:20, 21:23,
22:3, 22:15, 22:21, 23:6,
23:10, 23:14, 23:23, 24:15,
25:5, 25:6, 25:14, 26:6,
27:20, 28:3, 48:9, 58:19,
59:8, 59:10, 60:15, 73:11
  chromosome - 149:24,
158:24
  chromosomes - 148:20
  cigar - 106:2, 106:14,
107:11, 107:14, 107:21,
107:23, 107:25, 108:5,
108:6, 108:9, 109:2, 109:9,
109:15, 109:20, 112:10,
113:2, 113:3, 114:1, 114:17,
115:22, 116:12, 119:15,
121:19, 121:22, 138:5,
139:5, 139:8, 139:11,
139:24, 140:3, 159:15,
160:13, 160:14, 161:3,
161:4, 168:8, 168:12,
171:25
  Cigar - 2:20, 2:24, 3:1
  circle - 36:9, 101:1
  circumstances - 135:1,
155:9
  claim - 35:2, 39:18, 40:8,
43:8, 48:9, 53:19, 128:12
  claiming - 35:13
  claims - 71:2
  clarify - 60:2
  Clarify - 60:4
  classes - 147:25
  clean - 148:2
  clear - 34:16, 46:14, 46:18,
60:5, 121:11, 125:17,

161:22
  cleared - 58:24
  client - 32:10, 61:23
  clients - 128:10
  close - 1:14, 7:4, 9:5, 35:8,
73:19, 96:9, 108:9, 176:2
  close-up - 7:4
  closer - 6:22
  closer-up - 6:22
  closes - 176:3, 176:4
  closing - 176:11
  clothing - 153:12, 155:4
  Clouseau - 134:11
  coats - 130:1
  cocaine - 32:1, 32:3
  coded - 96:4
  cold - 150:2, 150:7
  collar - 10:16
  collect - 93:15, 93:16,
153:19
  collected - 93:21, 94:3,
133:1, 134:14, 135:5, 146:7,
146:11, 146:12, 146:23,
146:25, 148:10, 157:8,
157:13, 163:23
  collecting - 146:14
  collects - 90:25
  color - 6:4, 6:5, 6:7, 6:8,
96:4, 153:23, 154:1
  column - 158:22, 159:2
  comfortable - 79:12
  coming - 133:24, 144:3
  comment - 53:9
  common - 118:11, 128:12,
132:20, 132:24, 133:2,
133:3, 145:19, 145:22,
165:6
  commonly - 146:19
  communicating - 68:3,
79:21
  compadre - 73:23
  compare - 105:4, 109:11,
109:14, 111:21, 115:25,
146:5, 147:9, 149:4, 149:11,
159:12, 160:4, 160:7,
164:13, 164:18, 166:11
  compared - 119:8, 159:15,
159:18, 159:19, 159:21,
160:8, 161:8
  compares - 169:25
  comparison - 25:6, 107:7,
115:21, 119:10, 149:8,
149:9, 161:4, 168:8, 168:24
  comparisons - 116:3,
160:22, 172:22
  complainants - 87:11
  complete - 109:8, 115:24,
117:2, 166:6
  completely - 23:10, 24:16,
60:21, 123:9, 166:7
  complex - 100:15
  complies - 97:21
  component - 162:14,
169:12
  compound - 38:9
  computer - 1:24, 15:23,
15:24, 16:3, 16:4, 16:7,
129:18
  computer-aided - 1:24
  concentrate - 104:20
  concentration - 143:18
  concepts - 144:22
  concern - 128:13
  concerned - 13:11, 13:13,
13:17, 80:23, 81:5, 81:25,
86:5, 128:7
  concerning - 15:22, 26:12
  concerns - 13:2, 13:10,
80:19, 81:6, 81:12, 81:14,
81:15, 81:16, 81:22

  Concerns - 14:19
  conclusion - 77:6, 127:3
  conclusions - 171:7
  condition - 129:6, 131:20,
137:1
  conduct - 17:16, 24:17,
25:8
  conducted - 66:7, 79:6
  confidence - 17:7, 20:13
  confident - 70:2
  confine - 86:7
  confirm - 90:16, 99:10
  conflicting - 18:2
  conformity - 25:16
  confused - 60:8, 77:3
  confusing - 87:4, 89:12,
163:10
  conjunction - 150:25
  connected - 63:7, 103:15,
176:25
  connection - 25:16
  consensual - 134:21
  Consent - 2:7
  consent - 92:6
  consider - 14:7, 150:1
  considered - 150:7,
175:13
  consistent - 34:7, 111:16,
112:3, 112:8, 112:16,
113:25
  consume - 118:14
  Cont'd - 5:2, 29:13
  contact - 140:5, 145:23
  contain - 82:10, 93:14,
93:15, 110:15, 111:14,
145:23, 145:25, 162:23,
163:20, 164:1
  contained - 122:21,
147:22, 148:20, 157:2,
158:16
  container - 93:8
  containing - 160:18
  contains - 111:13, 162:1,
163:25, 167:10, 178:7
  contaminate - 138:11,
138:12, 138:21, 139:8,
139:15, 139:18
  contaminated - 125:9,
128:22, 128:23, 129:8
  contaminating - 130:2
  contamination - 125:7,
126:17, 127:1, 128:11,
128:19, 128:20, 129:1,
129:4, 129:14, 129:22,
130:6, 136:23, 139:3,
140:10, 140:20, 140:22,
141:4, 141:10, 141:11,
141:13
  contents - 120:24, 120:25,
124:18
  context - 169:15
  continue - 12:8, 25:21,
60:6, 153:16, 176:19
  continued - 45:9, 45:10,
45:11
  continuing - 104:3
  contracted - 64:25
  contribute - 170:19
  contributed - 111:19,
113:22, 113:24, 114:12,
114:16
  contributing - 162:22,
162:25, 164:9
  contributor - 105:9, 112:1,
112:18, 113:4, 117:3, 120:1,
120:4, 149:14, 161:10,
162:8, 162:14, 164:5, 164:6,
164:19
  contributors - 112:11,
114:3, 116:10, 162:18

**control** - 33:2, 85:23, 123:3, 128:2, 128:4, 128:18, 129:17, 130:5, 130:7, 130:8, 140:17, 141:5, 171:8, 172:6, 172:19, 173:8
**controlled** - 103:15
**convenient** - 34:23
**conversation** - 39:4, 45:4, 65:16, 65:18, 67:12, 71:25, 72:1, 74:21
**converse** - 68:13
**converted** - 67:5
**convey** - 80:7
**convicted** - 20:8, 26:12, 27:3, 29:25, 31:5
**conviction** - 18:22, 20:20, 24:4, 24:11, 24:12, 24:13, 24:17, 24:19, 24:22, 25:11, 26:20, 27:5, 28:7, 28:9, 30:23
**convictions** - 17:19, 17:20, 17:21, 17:25, 22:12, 26:2, 27:23, 28:23, 30:2, 30:4
**copy** - 67:21, 152:5, 152:7, 152:19, 177:10
**Cornelius** - 2:11, 3:4, 3:12, 3:15, 4:12, 7:21, 12:2, 13:25, 14:4, 14:8, 15:3, 15:4, 15:6, 15:7, 16:24, 17:3, 17:10, 17:15, 17:18, 17:21, 17:23, 18:7, 18:9, 18:12, 20:13, 20:16, 21:10, 21:14, 22:4, 22:7, 22:9, 22:24, 23:3, 23:11, 23:18, 23:22, 23:25, 25:23, 26:1, 27:1, 27:14, 28:10, 28:16, 28:22, 29:4, 29:10, 29:13, 34:22, 38:13, 38:15, 41:14, 41:20, 41:25, 42:15, 42:19, 43:6, 46:13, 46:17, 47:2, 47:17, 47:18, 47:23, 47:25, 54:3, 54:12, 55:10, 55:13, 55:16, 59:13, 59:16, 60:7, 62:21, 62:25, 63:17, 63:24, 64:4, 64:5, 64:9, 64:11, 77:9, 77:17, 79:22, 80:25, 81:8, 82:4, 82:8, 83:2, 83:7, 83:12, 85:19, 85:22, 86:8, 92:25, 95:12, 95:23, 98:19, 99:21, 101:11, 101:15, 101:18, 101:19, 102:8, 102:14, 121:3, 121:8, 121:9, 122:8, 122:15, 123:2, 124:16, 125:18, 125:22, 127:12, 127:17, 127:18, 127:20, 135:8, 135:12, 136:14, 140:13, 140:16, 141:7, 141:15, 141:19, 142:11, 152:19, 157:18, 167:18, 171:15, 171:17, 171:20, 173:3, 173:7, 173:14, 173:16, 173:23, 174:5, 174:15, 174:22, 175:7, 175:11, 175:25, 176:5
**corner** - 100:13, 158:23
**correct** - 3:9, 5:9, 5:18, 7:11, 9:22, 10:17, 12:25, 13:19, 15:8, 30:20, 35:21, 40:12, 52:13, 61:16, 64:18, 65:14, 65:21, 66:15, 67:3, 69:3, 72:6, 75:3, 75:14, 78:5, 80:17, 83:11, 83:13, 85:4, 85:8, 88:20, 90:9, 90:21, 91:17, 93:22, 97:9, 103:16, 103:17, 108:3, 108:4, 108:13, 108:14, 108:21, 109:5, 109:6, 109:21, 111:5, 112:24,

114:21, 116:15, 118:18, 120:5, 120:8, 122:22, 123:24, 124:3, 127:22, 127:23, 131:3, 131:4, 131:12, 133:15, 134:3, 134:9, 135:14, 135:20, 137:14, 137:15, 137:17, 137:22, 138:6, 138:7, 139:18, 139:23, 145:14, 155:19, 164:23, 171:23, 171:25, 172:1, 172:3, 172:8, 172:13, 172:21, 174:21, 178:7
**Correct** - 28:5, 65:12, 66:16, 66:18, 67:16, 69:13, 70:13, 75:24, 76:3, 83:12, 97:10, 106:17, 111:3, 111:6, 112:14, 112:21, 112:25, 113:3, 114:6, 114:9, 114:11, 114:14, 114:18, 116:6, 118:19, 124:2, 134:4, 137:11, 138:1, 139:2, 139:20
**correctly** - 52:3, 129:25, 172:24, 178:14
**cotton** - 93:14
**counsel** - 3:4, 7:18, 14:1, 63:24, 176:11, 177:5, 178:9
**Counselor** - 41:19
**country** - 103:13
**counts** - 20:1
**County** - 1:9, 1:23, 20:21, 27:16, 27:25, 28:7, 30:25, 31:6, 32:8, 84:11, 97:11, 97:12, 102:3, 104:12, 178:2, 178:5
**county** - 27:19
**couple** - 8:10, 25:23, 40:14, 68:7, 77:19, 80:14, 82:4, 101:23, 140:13, 148:14
**course** - 26:16, 34:17, 37:22, 39:20, 40:9, 41:6, 43:19, 43:21, 48:14, 52:19, 53:5, 56:19, 57:6, 58:21, 60:16, 61:17, 61:25, 72:4, 109:18, 151:13, 176:22
**court** - 3:1, 3:14, 4:4, 11:22, 13:14, 17:11, 17:14, 27:19, 28:3, 29:7, 29:23, 63:14, 63:20, 68:21, 86:9, 104:5, 121:7, 127:8, 173:15, 174:9, 175:18, 177:8, 178:12
**Court:** - 1:3, 1:4, 1:6, 3:2, 3:21, 4:3, 4:5, 4:17, 4:21, 6:11, 7:1, 7:22, 10:25, 12:4, 14:2, 14:6, 14:9, 15:2, 17:1, 17:8, 17:12, 17:15, 17:20, 17:22, 18:5, 18:8, 21:12, 22:6, 22:8, 22:11, 22:13, 22:15, 22:19, 23:1, 23:15, 23:20, 24:6, 25:10, 25:25, 27:10, 27:17, 27:18, 27:23, 27:25, 28:2, 28:6, 28:7, 28:19, 29:2, 29:6, 29:8, 34:15, 38:11, 41:13, 41:15, 41:22, 42:14, 42:18, 43:3, 46:14, 46:22, 47:1, 47:13, 47:21, 47:24, 54:5, 55:12, 55:15, 59:15, 60:4, 62:10, 62:17, 62:23, 63:1, 63:4, 63:15, 63:18, 63:21, 77:8, 77:18, 77:20, 78:23, 79:25, 81:2, 81:9, 82:6, 83:4, 83:6, 83:10, 83:16, 83:19, 83:24, 86:1, 86:5, 86:10, 87:23, 88:10, 88:13, 91:25, 93:1, 94:23, 95:15, 95:21, 95:25, 98:20, 98:25, 99:22, 101:8,

101:13, 101:16, 102:10, 102:12, 102:15, 102:17, 102:20, 102:23, 106:10, 120:22, 121:5, 121:8, 122:5, 122:21, 123:1, 123:16, 124:1, 124:4, 124:20, 124:22, 125:3, 125:20, 125:24, 126:6, 126:11, 126:15, 126:23, 127:9, 127:15, 127:17, 135:10, 136:15, 141:16, 141:20, 142:1, 142:4, 142:10, 142:12, 142:15, 152:1, 152:21, 156:20, 157:20, 158:14, 166:23, 167:20, 167:25, 171:14, 171:18, 173:5, 173:13, 173:18, 173:20, 173:24, 174:1, 174:4, 174:7, 174:10, 174:18, 174:20, 174:23, 175:9, 175:16, 175:20, 176:1, 176:4, 176:6, 176:9, 177:9, 178:4, 178:5, 178:21, 178:22
**Court's** - 176:9
**Courtney** - 1:11, 1:19, 141:23, 142:17
**courtroom** - 5:24, 48:24, 82:22
**courts** - 104:11
**cousin** - 34:5, 34:18
**crabber** - 86:3
**crabbing** - 85:17
**create** - 87:19, 138:12, 166:2
**crime** - 24:23, 27:6, 28:8, 104:25, 105:5, 126:5, 138:11, 146:5, 146:24, 149:10, 149:14, 149:17, 161:15, 173:9, 173:11
**Crime** - 121:21, 122:1, 123:11, 123:24, 125:12, 125:15, 125:16, 125:19, 126:1, 130:20, 143:1, 143:3, 144:12, 146:21, 150:24, 151:14, 172:17
**crimes** - 15:16
**Criminal** - 1:4
**criminal** - 30:19, 103:12
**criminalist** - 142:25, 143:5
**Cross** - 1:4, 1:17, 15:5, 29:12, 64:8, 101:17, 127:19, 171:19
**cross** - 3:16, 4:13, 29:10, 60:6, 62:19, 64:2, 125:6, 125:10, 125:11, 127:11, 139:3
**cross-contamination** - 139:3
**Cross-examination** - 15:5, 29:12, 64:8, 101:17, 127:19, 171:19
**cross-examination** - 4:13, 29:10, 62:19, 64:2, 125:10, 127:11
**cross-examine** - 3:16, 125:6
**crossing** - 3:25
**crotch** - 114:5, 114:7, 120:20, 122:13, 122:14, 122:18, 122:19, 122:20, 135:14, 135:21, 135:23, 136:9, 137:21, 137:24, 159:17, 160:10, 168:25
**Cruz** - 1:6, 3:3, 4:8, 5:17, 5:24, 32:24, 39:6, 39:19, 40:5, 61:11, 84:25, 88:18, 92:8, 93:22, 97:2, 105:11, 105:15, 106:6, 117:17,

117:24, 119:4, 119:16, 120:3, 120:15, 130:24, 130:25, 131:3, 131:6, 131:11, 138:17, 138:18, 156:8, 157:7, 159:7, 160:24, 161:5, 161:9, 162:8, 162:13, 164:4, 164:23, 168:21, 168:24, 169:12, 170:21, 172:21
**Cruz-garcia** - 1:6, 3:3, 4:8, 5:17, 5:24, 32:24, 39:6, 39:19, 40:5, 61:11, 84:25, 88:18, 92:8, 93:22, 97:2, 105:11, 105:15, 106:6, 117:17, 117:24, 119:4, 119:16, 120:3, 120:15, 130:24, 130:25, 131:3, 131:6, 131:11, 156:8, 157:7, 159:7, 160:24, 161:5, 161:9, 162:8, 162:13, 164:4, 164:23, 168:21, 169:12, 170:21, 172:21
**Cruz-garcia's** - 138:17, 138:18, 168:24
**cry** - 74:4
**crying** - 50:14, 50:17, 50:19, 50:20, 51:7, 51:20
**Csr** - 178:20
**cul** - 9:6, 9:14, 36:7
**cul-de-sac** - 9:6, 9:14, 36:7
**custodial** - 81:21
**custodian** - 151:11
**custody** - 114:19, 121:19, 123:9, 156:17
**customer** - 42:21
**cut** - 122:13, 122:18, 123:4, 135:21, 137:22, 137:25, 158:2
**cutting** - 106:24, 113:7, 119:24, 120:2, 120:19, 122:2, 122:3, 122:10, 122:11, 122:14, 122:16, 122:18, 122:19, 122:24, 122:19, 123:21, 135:14, 135:16, 135:18, 135:19, 135:22, 135:24, 136:4, 136:5, 136:11, 137:18, 137:20, 137:23, 137:24, 137:25, 160:9, 168:25, 172:4
**Cutting** - 137:19
**Cuttings** - 2:18
**cuttings** - 135:13

**D**

**D.a.'s** - 84:20, 172:12, 172:20
**dad** - 145:2
**Dallas** - 103:8, 103:24, 144:9, 144:10
**dark** - 9:12, 96:10
**database** - 90:24, 165:16, 165:18, 166:3, 166:6
**databases** - 87:3, 165:25
**Date** - 178:21
**date** - 27:15, 79:3, 156:25, 157:12
**dated** - 93:9
**David** - 85:16, 85:17, 86:11, 86:12
**days** - 42:20, 155:7
**de** - 9:6, 9:14, 36:7
**dead** - 121:10
**deal** - 12:1, 12:11, 116:21
**dealing** - 37:20, 70:16, 107:25, 147:15
**dealt** - 169:22
**death** - 9:9, 35:12, 44:13

**deceased** - 86:18, 86:23
**December** - 18:20, 30:14, 115:4, 115:7, 117:12
**decide** - 14:21
**decided** - 14:16, 32:5
**deciding** - 82:17
**defecate** - 69:4
**defecated** - 48:14, 48:18, 68:25, 69:1, 69:12
**defecating** - 48:7, 48:13
**defendant** - 3:1, 3:13, 4:4, 6:10, 17:11, 17:14, 29:7, 63:14, 63:20, 63:23, 86:9, 88:18, 91:20, 121:7, 127:8, 173:15, 174:9, 175:18, 177:8
**Defendant** - 2:17, 1:13
**defendant's** - 93:10, 140:1
**defense** - 7:18, 47:15, 118:13, 174:4, 175:24
**Defense** - 176:4
**degradation** - 127:1
**degrade** - 132:20
**degraded** - 125:8, 126:18
**degree** - 103:21, 103:22, 143:16, 143:18, 168:20, 169:11, 170:20
**deliberately** - 139:7
**delivered** - 123:22, 124:1
**demonstrate** - 121:13
**denied** - 14:9
**deoxyribonucleic** - 104:17
**Department** - 105:24, 126:4, 130:12, 130:14, 143:1, 143:3, 144:11, 151:14
**depended** - 42:21
**deportation** - 20:8
**depth** - 52:24
**Deputy** - 4:17
**describe** - 8:16, 8:18, 10:11, 70:7
**described** - 9:6, 9:16, 9:21, 41:2, 54:23, 55:24
**describing** - 35:22, 36:1
**Description** - 2:1
**detail** - 73:4, 73:6
**detailed** - 45:21
**details** - 46:3, 62:13
**detect** - 140:18, 140:20
**detected** - 68:6, 155:1
**detective** - 134:10
**determine** - 72:8, 72:11, 90:16, 108:23, 120:13, 125:9, 148:9, 149:12, 171:6
**determined** - 161:8
**develop** - 107:6, 109:3, 165:25
**developed** - 109:19, 172:10
**devoted** - 75:10
**diagram** - 82:14, 96:3
**diagrams** - 82:10, 82:11, 82:12
**Diana** - 9:1, 9:2, 14:23, 35:11, 36:12, 38:24, 42:11, 89:18, 96:7, 97:3, 97:24, 100:8, 100:23, 106:3, 109:13, 111:17, 113:17, 114:1, 114:8, 124:9, 124:11, 159:17, 162:5, 162:11, 164:16
**Diana's** - 39:7, 43:12, 44:8, 49:5, 49:10, 62:2, 71:14, 111:22, 112:12, 120:6, 120:10
**difference** - 80:13
**differences** - 104:21
**different** - 27:22, 30:2, 80:7, 80:8, 80:9, 82:21,

108:11, 108:25, 115:8, 118:7, 123:14, 123:21, 129:7, 133:24, 137:6, 145:4, 145:5, 145:6, 149:18, 149:20, 149:21, 149:23, 150:8, 150:10, 159:25, 160:20
**differential** - 110:22, 113:14
**differentiate** - 108:20, 162:24
**differentiation** - 162:18
**difficulties** - 79:20
**dire** - 18:6, 23:21, 25:22
**Dire** - 1:4, 1:17, 18:11
**direct** - 70:9
**Direct** - 1:4, 1:17, 5:1, 84:4, 103:1, 142:19
**directing** - 54:19
**direction** - 78:21
**directions** - 102:4
**directly** - 142:4
**director** - 144:12
**discovered** - 96:24, 133:14
**discretion** - 22:11, 22:13
**discussed** - 64:11, 156:14
**Discussion** - 177:12
**disregard** - 14:6
**distance** - 58:22
**District** - 1:6, 1:12, 2:5, 84:12, 178:5
**division** - 65:10
**Dna** - 2:8, 2:17, 2:20, 2:21, 93:15, 103:11, 103:25, 104:2, 104:14, 104:15, 104:19, 104:21, 105:3, 105:4, 107:6, 107:13, 107:19, 108:2, 108:5, 108:9, 109:8, 109:15, 111:19, 112:3, 112:12, 112:16, 112:20, 113:16, 113:17, 113:20, 113:22, 113:24, 113:25, 114:5, 114:16, 114:17, 115:19, 115:25, 117:2, 118:8, 118:20, 119:14, 119:15, 119:19, 119:23, 120:2, 120:6, 120:9, 120:14, 129:16, 129:19, 129:20, 131:25, 134:17, 134:18, 136:13, 138:11, 138:12, 138:13, 138:17, 138:18, 138:20, 138:24, 139:4, 139:10, 139:13, 139:17, 140:7, 143:9, 143:11, 143:22, 144:7, 144:10, 144:14, 144:20, 144:23, 144:24, 144:25, 145:1, 145:2, 145:4, 145:6, 145:8, 145:9, 145:11, 145:15, 145:19, 145:23, 145:25, 146:4, 146:6, 146:11, 146:17, 147:4, 147:18, 147:19, 147:20, 147:22, 147:23, 148:4, 148:5, 148:7, 148:8, 148:10, 148:17, 148:19, 148:20, 148:22, 148:23, 149:2, 149:6, 149:16, 149:18, 156:18, 158:4, 158:7, 158:25, 159:1, 159:3, 159:6, 159:19, 160:1, 160:8, 160:11, 160:15, 160:18, 160:19, 160:23, 160:25, 161:4, 161:7, 161:10, 161:19, 162:7, 162:9, 162:11, 162:12, 162:16, 162:20, 162:22, 163:1, 163:6, 163:12, 163:15, 163:19, 163:25, 164:1,

164:2, 164:5, 164:7, 164:9, 164:20, 165:6, 165:11, 168:21, 168:25, 169:13, 170:22
**document** - 16:20, 39:3, 92:3, 94:14, 114:22
**documentation** - 78:8
**documented** - 99:2, 109:18
**documenting** - 99:5
**documents** - 66:6, 150:16
**Dominican** - 31:15, 31:17, 87:4
**done** - 51:9, 62:21, 74:15, 118:16, 121:22, 121:24, 125:16, 126:3, 128:23, 135:24, 150:4, 150:19, 153:9, 154:14, 154:16, 155:18, 160:6, 171:4, 171:11
**donor** - 112:10, 119:22
**door** - 49:11, 56:6, 57:14, 126:9, 126:23, 127:5
**doors** - 53:23
**doubt** - 69:16
**down** - 10:18, 10:20, 33:10, 33:11, 34:9, 34:21, 47:10, 65:13, 73:19, 74:2, 74:25, 75:1, 88:19, 95:20, 97:15, 100:17, 100:21, 100:22, 102:15, 141:20, 161:14, 173:24
**draw** - 38:2
**drawing** - 55:19
**drawn** - 82:12, 171:7
**drew** - 82:10
**drive** - 99:9
**driver** - 57:15
**driver's** - 56:9, 56:24, 57:9, 58:4, 73:16
**driving** - 45:9, 45:11, 58:4
**drug** - 31:7, 31:14, 31:24, 33:8, 33:19, 77:14
**drugs** - 18:16, 18:25, 19:3, 19:12, 19:20, 30:1, 30:7, 30:9, 31:19, 31:21, 31:22, 32:5, 32:7, 32:14, 32:18, 32:21, 33:15, 36:25, 37:8, 37:21, 38:8, 38:18, 39:14, 39:15, 39:19, 40:18, 40:22, 40:23, 41:8, 42:10, 69:24, 70:16, 77:4, 77:11
**due** - 52:22, 53:3, 75:2
**duly** - 4:24, 64:7, 84:3, 102:25, 142:18
**dumb** - 165:22
**dumped** - 97:25
**during** - 40:9, 43:14, 43:15, 78:9, 94:11, 95:3, 111:11, 171:22
**During** - 48:5
**duties** - 84:20

**E**

**Eagle** - 97:8
**early** - 5:13, 90:18
**earth** - 70:6
**easiest** - 107:24
**easy** - 68:13
**Ebersole** - 1:6, 1:18, 3:9, 3:10, 3:25, 4:1, 10:22, 11:11, 12:14, 12:23, 13:21, 13:24, 14:17, 64:3, 64:6, 64:10
**education** - 104:3, 143:14, 143:21, 144:3
**effect** - 121:4
**eight** - 143:7
**either** - 16:16, 48:8, 51:16,

66:20, 87:4, 118:13
**elaborate** - 62:17
**element** - 171:8
**elements** - 155:6, 155:11
**elicitation** - 79:18
**emphasis** - 68:8
**employed** - 142:24, 142:25
**employees** - 129:21
**encounter** - 146:19
**end** - 63:9, 74:23, 74:24, 78:17, 108:9, 132:23, 177:1
**ended** - 23:6, 36:8, 62:2
**ends** - 8:22, 9:14
**enforcement** - 78:19
**English** - 68:5, 69:8, 79:7, 80:10
**enter** - 16:16
**entire** - 122:13, 122:18, 148:22
**entitled** - 1:21
**entry** - 20:8
**envelope** - 110:5, 110:13, 118:1, 118:23, 131:7
**envelopes** - 117:25, 137:11
**epithelial** - 108:16, 109:1, 110:23, 111:13, 111:15, 111:16, 112:13, 113:15, 113:18, 114:7, 132:2, 134:24, 135:4, 139:11, 139:25, 140:4, 140:6, 160:16, 164:2
**Eric** - 105:23, 123:22, 124:2, 130:15
**escaped** - 69:10
**especially** - 132:25
**essentially** - 159:3
**establish** - 86:7
**estimate** - 97:22, 98:12, 98:13
**estimated** - 98:15
**evaluation** - 126:1
**event** - 69:11
**events** - 5:12
**eventually** - 52:21, 53:3, 75:1, 87:14
**evidence** - 22:12, 24:10, 25:4, 79:24, 93:10, 105:19, 105:21, 105:24, 105:25, 110:13, 110:21, 115:4, 115:6, 115:25, 116:4, 117:21, 118:1, 118:2, 118:14, 125:12, 127:1, 127:3, 128:16, 128:22, 129:6, 130:2, 130:10, 130:15, 130:17, 130:19, 131:15, 131:19, 135:5, 136:19, 136:21, 136:25, 137:5, 137:7, 138:12, 138:16, 138:18, 138:21, 139:4, 139:5, 139:9, 141:2, 145:22, 145:25, 146:3, 146:4, 146:18, 146:19, 146:23, 146:24, 147:3, 147:4, 148:24, 149:3, 149:10, 149:14, 160:1, 160:4, 160:24, 160:25, 162:2, 169:4, 176:7, 178:8
**evidentiary** - 159:9, 159:10
**evil** - 138:25, 139:6, 140:18, 140:25, 141:11
**exact** - 73:19, 76:5, 87:6, 148:8
**exactly** - 6:7, 8:22, 26:13, 26:23, 28:12, 31:9, 39:23, 44:22, 48:3, 49:7, 50:8, 51:12, 59:1, 72:19, 73:9, 129:8, 131:13, 148:7, 148:9

**examination** - 4:13, 15:5, 29:10, 29:12, 62:19, 64:2, 64:8, 82:7, 101:17, 125:10, 127:11, 127:19, 140:15, 171:19
**Examination** - 5:1, 18:11, 77:21, 84:4, 103:1, 136:17, 141:8, 142:19
**examine** - 3:16, 125:6, 125:8, 132:10, 135:5, 146:3
**examiner's** - 144:9
**example** - 68:10, 68:14, 68:24, 73:4, 81:6, 82:15, 87:11, 136:2, 146:12, 153:11, 155:7, 164:16
**examples** - 167:11
**except** - 104:16, 155:8
**exception** - 99:15
**exclude** - 105:8
**excluded** - 111:25, 112:10, 112:17, 113:1, 113:4, 114:2, 114:14, 114:20, 116:10, 117:3, 119:21, 149:15, 161:9, 161:12, 161:17, 161:18, 161:20, 161:23, 162:8, 162:14, 164:4
**excluding** - 145:12, 168:22, 169:13
**Excuse** - 35:4
**excuse** - 44:17, 62:12
**excused** - 63:15, 83:6, 83:16, 102:12, 141:17, 173:21
**exhibit** - 93:11, 94:18, 95:1, 98:2, 98:11
**Exhibit** - 2:1, 7:2, 7:6, 7:10, 7:14, 7:18, 7:20, 7:22, 7:25, 11:2, 79:1, 87:25, 88:16, 89:7, 92:2, 92:23, 92:24, 93:4, 93:12, 94:22, 95:1, 95:10, 95:11, 95:15, 95:18, 98:6, 98:17, 98:18, 98:20, 98:23, 99:20, 99:25, 100:2, 100:6, 106:12, 106:18, 106:22, 110:9, 118:4, 118:18, 118:21, 119:6, 120:19, 120:21, 121:1, 123:18, 124:14, 152:16, 152:18, 152:22, 152:24, 154:11, 154:12, 157:17, 157:23, 158:12, 158:14, 158:17, 158:19, 167:16, 167:22, 168:2, 168:3, 168:6, 174:14, 174:16
**Exhibits** - 93:6, 94:7, 99:12, 99:19, 99:22, 117:21, 124:6, 156:22, 157:2, 157:16, 157:20, 166:25, 167:20, 174:11
**exhibits** - 174:20, 178:15
**existed** - 173:8
**exited** - 56:23, 57:8, 73:15
**expect** - 108:15, 110:24, 111:4, 115:24, 136:10, 137:4, 140:6, 155:12
**experience** - 103:25
**expert** - 104:5, 104:11, 144:14
**Expiration** - 178:21
**explain** - 92:14, 165:3
**explained** - 11:25, 12:6
**explaining** - 45:22, 45:24
**exposed** - 155:5, 155:11
**expound** - 81:17
**express** - 63:8, 81:24, 177:1
**expressed** - 80:19
**expressly** - 25:3
**extract** - 147:20, 160:15

**extracted** - 148:5, 148:7
**extracting** - 158:4
**extraction** - 110:22, 113:14, 147:11, 147:18, 148:12, 148:13, 156:18, 160:14, 160:18
**extractions** - 149:20, 157:25
**extraneous** - 17:16
**eye** - 129:11, 129:15, 132:1, 132:4, 132:6, 132:9

---

## F

**face** - 24:8
**facilities** - 81:20
**facing** - 56:1
**fact** - 24:4, 24:15, 25:5, 25:6, 25:13, 80:15, 97:11, 126:20, 139:16, 155:10, 170:3
**factor** - 163:17
**facts** - 24:12, 24:18
**fair** - 8:1, 14:15, 79:14, 152:7
**fairly** - 95:1
**fairness** - 17:5
**Fairway** - 96:8, 96:10, 97:24, 99:5, 99:14, 100:4, 100:17, 100:22
**familiar** - 37:7, 69:23, 70:11, 70:12, 70:20, 150:22, 154:13, 155:15
**family** - 39:12, 39:13, 50:22, 50:24, 51:21, 52:1
**far** - 118:25, 162:16, 167:12
**faster** - 54:4
**father** - 51:2
**fats** - 148:1
**fault** - 8:17, 31:24, 32:2, 33:5, 33:18, 62:4
**Fbi** - 37:2, 37:18, 37:24, 39:4, 45:5, 45:20, 46:9, 46:19, 47:3, 47:20, 48:6, 48:16, 49:16, 50:13, 51:23, 52:20, 53:7, 56:17, 57:4, 57:8, 57:16, 61:18, 66:3, 66:23, 68:19, 81:18, 119:2
**February** - 92:21, 93:9, 156:11, 157:14
**federal** - 13:6, 18:14, 28:23, 29:22, 31:3, 90:8
**felony** - 24:23, 28:3
**felt** - 55:7, 61:13, 79:12
**female** - 21:2, 21:5, 27:13, 27:24, 28:7, 110:24, 111:4, 162:18, 162:24, 163:24, 164:2
**females** - 162:23, 163:21
**Ferrer-** 89:23
**few** - 4:11, 68:2, 104:8, 144:16
**field** - 143:24, 143:25
**Fifteen** - 170:7
**fifth** - 74:25
**figure** - 72:12, 134:16
**figures** - 167:7
**filed** - 28:2, 85:4, 86:19
**filter** - 153:18, 153:21
**final** - 158:18
**finally** - 14:16, 90:1, 99:4
**findings** - 151:9, 161:3, 161:5, 162:3, 167:8, 170:20
**fine** - 86:8
**Fingerprint** - 90:23
**fingerprint** - 90:25
**fingers** - 108:7
**finish** - 30:18, 79:25
**finished** - 67:8

**finishing** - 144:2
**firearm** - 52:6
**First** - 24:10, 77:23, 106:12
**first** - 4:24, 12:23, 14:22, 24:20, 32:17, 32:20, 33:24, 41:16, 45:8, 50:9, 50:11, 53:13, 64:7, 76:13, 84:3, 100:12, 102:25, 105:14, 105:19, 107:2, 107:3, 113:11, 115:11, 115:17, 128:17, 132:19, 133:9, 133:13, 142:18, 143:6, 147:13, 150:11, 154:10, 158:22, 169:18
**first-line** - 143:6
**fit** - 165:23
**five** - 19:13, 19:14, 19:21, 30:7, 31:10, 49:18, 71:6, 74:25, 174:5
**five-minute** - 174:5
**five-year** - 19:14
**flashback** - 147:25
**flies** - 24:8
**floor** - 100:13
**Flores-** 2:20
**fluid** - 105:2, 147:14, 147:17
**focus** - 168:10
**following** - 1:20
**follows** - 4:25, 64:7, 84:3, 102:25, 142:18
**foregoing** - 178:6
**forensic** - 103:25, 104:21, 104:24, 143:18, 143:19, 146:2
**forensics** - 103:7, 143:25, 145:18
**forest** - 36:5
**forget** - 48:19
**forgiveness** - 14:24
**forgotten** - 48:21
**form** - 2:7, 63:8, 66:2, 79:22, 92:9, 92:12, 92:14, 108:2, 148:3, 177:1
**formal** - 15:21
**forth** - 23:15
**forty** - 49:14
**four** - 45:1, 45:12, 46:10, 46:20, 74:24, 81:4, 115:8, 144:8
**fourth** - 75:16
**fraction** - 111:15, 111:16, 111:17, 113:16, 113:18, 113:19, 119:22, 120:11, 159:15, 159:16, 160:11, 160:16, 160:17, 162:6, 162:11, 163:4, 163:6, 163:15, 163:20
**fractions** - 111:12, 112:23, 132:7, 132:10, 140:6, 140:8, 160:16, 162:4
**Franklin-** 2:6, 178:22
**fraud** - 84:17
**Fred-** 89:23, 97:19
**freeway** - 96:18
**Freeway-** 96:21, 96:22
**frequencies** - 165:11
**frequently** - 11:23, 39:8, 39:9
**fresh** - 150:8
**friends** - 37:20, 37:22, 38:21, 70:15
**front** - 8:21, 49:25, 50:6, 54:19, 54:21, 57:17, 58:14, 58:15, 59:4, 59:7, 74:9, 100:3
**full** - 70:24, 74:25, 76:13, 116:23, 144:6, 161:7
**full-time** - 144:6

---

## G

**game** - 78:11, 78:12
**Garcia** - 3:3, 8:13, 9:2, 89:18, 96:24, 106:3, 109:14, 111:17, 113:17, 114:1, 124:10, 124:11, 159:17, 162:5, 162:11
**garcia** - 1:6, 3:3, 4:8, 5:17, 5:24, 32:24, 39:6, 39:19, 40:5, 61:11, 84:25, 88:18, 92:8, 93:22, 97:2, 105:11, 105:15, 106:6, 117:17, 117:24, 119:4, 119:16, 120:3, 120:15, 130:24, 130:25, 131:3, 131:6, 131:11, 156:8, 157:7, 159:7, 160:24, 161:5, 161:9, 162:8, 162:13, 164:4, 164:23, 168:21, 169:12, 170:21, 172:21
**garcia's** - 138:17, 138:18, 168:24
**Garcia's** - 114:8, 164:16
**gasp** - 54:25, 55:23, 57:23, 58:19
**gasping** - 54:23
**general** - 86:1, 144:22
**general's** - 84:18
**generally** - 74:21, 144:24, 147:2, 147:21
**Generally** - 84:22, 102:7, 153:9, 166:18, 167:1
**generate** - 107:18, 117:2, 151:8
**generated** - 152:6, 159:23
**genetic** - 104:18
**gentleman** - 65:14, 85:17, 86:12, 88:25, 94:1
**gentlemen** - 4:6, 142:23, 144:23, 165:3, 168:19, 176:7
**George** - 143:19
**Georgia** - 90:14, 90:20, 91:2, 91:16
**German** - 90:1, 115:15, 115:16, 117:11
**gesture** - 52:9
**girl** - 21:7, 31:16
**given** - 78:2, 111:21, 155:8, 176:9
**Given** - 155:10
**Glossary............................**
**.end** - 1:16
**gloves** - 129:25
**goal** - 158:6
**God** - 14:22
**Golden** - 97:8
**Google** - 98:11, 98:12
**Goose** - 96:24, 97:25
**graduate** - 144:4
**grant** - 4:10
**gravel** - 36:8
**gray** - 6:8, 94:1
**great** - 22:11, 73:18, 166:14
**Greek** - 96:24, 97:25
**green** - 96:17
**Griselle-** 119:2
**ground** - 10:3, 48:8, 48:10, 48:15, 69:1, 69:12, 74:5
**group** - 143:7
**groups** - 165:9, 165:10, 165:12, 165:14, 165:18, 165:19, 166:1, 166:9
**guess** - 23:6, 26:21, 32:11, 66:12, 96:9, 102:3, 121:20, 122:2, 134:5, 150:14, 161:11, 165:22

**Guilt** - 1:16, 1:2
**Guilt-innocence** - 1:16, 1:2
**guilty** - 16:17, 21:24, 22:3
**gun** - 47:11, 52:5, 52:13
**gunpoint** - 76:7
**guys** - 34:2, 34:4, 37:22
**Guzman** - 119:2

## H

**hair** - 92:6, 130:1
**half** - 34:19, 63:10, 143:4, 145:1
**Hand** - 178:16
**hand** - 10:16, 33:21, 33:22, 33:23, 47:11, 62:7, 142:2, 158:23, 171:3
**handed** - 71:16, 71:18
**handled** - 130:20
**handwriting** - 93:9
**handwritten** - 78:8, 79:17, 82:9
**Hang** - 41:13
**hard** - 48:19, 100:20, 121:12, 129:3
**hardier** - 111:10
**harmed** - 14:25, 62:5, 62:7
**Harris** - 1:9, 1:23, 20:21, 30:24, 31:6, 32:8, 84:11, 97:11, 97:12, 102:3, 104:11, 178:2, 178:5
**Hartman** - 97:19
**Hawthorne** - 65:10, 67:9
**Head** - 1:11, 1:19, 141:23, 142:17, 142:21, 144:13, 144:18, 149:25, 152:2, 152:25, 154:3, 155:3, 155:14, 156:21, 157:24, 158:16, 164:25, 166:24, 168:1, 170:25, 171:21
**headphones** - 94:2
**Heads** - 132:18
**heads** - 132:19, 132:22, 133:5, 133:7
**healthcare** - 84:17
**hear** - 74:4, 115:2, 161:12, 177:4
**heard** - 1:21, 9:24, 54:2, 54:22, 55:23, 57:23, 58:19, 58:22, 59:10, 59:20, 60:10, 64:14, 72:18, 74:4, 74:5, 176:10
**hearing** - 54:24, 72:5, 76:18, 122:13
**hearsay** - 12:2, 80:25, 81:10, 85:25
**held** - 1:23
**help** - 6:23, 82:12, 82:16, 85:7, 87:20, 94:18
**helped** - 104:1
**helpful** - 60:13, 95:5, 166:11, 167:7
**helping** - 65:6
**hereby** - 178:6
**Hernandez** - 2:20, 87:10, 96:12
**high** - 148:1
**Highway** - 97:19
**himself** - 68:11
**hired** - 144:6
**Hispanic** - 165:21
**Hispanics** - 168:16, 168:17, 169:7, 169:8
**history** - 91:19
**hit** - 74:5
**Hold** - 54:20
**holding** - 71:8, 108:8
**home** - 42:8, 83:14
**Honestly** - 17:5
**Honor** - 3:23, 4:15, 6:9,

12:3, 27:21, 29:5, 29:15, 41:10, 41:24, 46:21, 46:25, 63:16, 63:17, 77:5, 81:1, 83:5, 83:7, 83:21, 102:11, 120:18, 136:16, 141:18, 141:19, 141:24, 142:11, 151:24, 156:19, 157:15, 158:11, 166:21, 167:14, 171:13, 173:19, 174:2, 176:5
**Honorable** - 1:22
**hooked** - 52:12
**horse** - 121:11
**hospital** - 146:22
**hotel** - 61:1, 61:19, 75:20, 75:23, 75:25, 76:14
**hour** - 63:10, 66:10
**hour-and-a-half** - 63:10
**hours** - 5:13
**houses** - 9:7, 36:23
**Houston** - 1:23, 2:6, 2:13, 2:16, 11:18, 64:20, 65:6, 66:7, 84:19, 90:18, 91:3, 102:3, 105:23, 125:15, 126:3, 130:12, 130:14, 143:1, 143:2, 144:11, 151:14, 172:17, 178:23
**Hpd** - 2:8, 121:21, 122:1, 122:11, 122:13, 122:16, 123:11, 123:23, 125:12, 125:16, 125:19, 126:1, 127:6, 130:20, 141:4, 143:4, 144:3, 146:21, 146:25, 150:24
**huddled** - 68:12
**Humble** - 35:18, 40:13, 97:6
**hundred** - 44:22, 60:23
**hurt** - 25:6
**husband** - 34:5, 34:18, 164:17
**husband's** - 120:7
**hypothetical** - 155:2
**hypothetically** - 138:15

## I

**Ict** - 15:24
**idea** - 21:22, 124:25
**identical** - 93:13, 145:10, 145:11, 145:13, 168:22, 169:13
**Identification** - 90:24
**identified** - 6:10, 110:1, 110:20, 147:17
**identifies** - 157:1
**identify** - 78:25, 93:24, 106:12, 107:3, 108:10, 110:21, 128:20, 129:17, 147:14, 147:16, 156:23
**identifying** - 151:3, 164:3
**ignore** - 24:16
**illegal** - 20:8
**illustrates** - 98:2
**imagine** - 20:2, 32:16, 39:12
**Immediately** - 84:17
**immediately** - 59:3
**impeach** - 17:16, 25:8
**impeaching** - 25:17
**impeachment** - 17:4, 24:9, 25:1
**important** - 73:6, 73:11, 73:24, 95:3, 176:21
**importantly** - 24:21
**inaccurate** - 82:24
**inadmissible** - 126:11
**incarcerated** - 31:7
**incident** - 15:16, 15:22
**included** - 109:19, 149:13,

149:16, 172:24, 178:9
**inconsistent** - 3:17, 34:8, 34:12
**inconvenience** - 12:17
**independent** - 103:10, 103:11, 103:14
**independently** - 155:24, 171:5
**Index** - 1:17, 2:1
**indicate** - 98:9, 118:23, 119:3, 141:13, 153:24, 154:20, 162:21
**indicated** - 96:4, 96:9, 96:14, 136:22, 141:3
**Indicated** - 96:17
**indicates** - 140:9
**indicating** - 6:3, 7:4, 7:11, 10:14, 10:19, 11:3, 36:9, 45:16, 52:7, 55:17, 56:12, 58:17, 88:1, 88:17, 88:24, 89:8, 89:15, 89:21, 90:1, 92:3, 93:7, 93:12, 94:2, 96:18, 97:5, 98:6, 99:14, 100:4, 100:13, 100:18, 100:23, 101:4, 106:13, 106:19, 106:23, 117:22, 137:17, 152:4, 154:15, 156:23, 158:23, 168:4
**indication** - 153:13
**indicative** - 154:1
**indicted** - 16:1, 23:5
**indictment** - 15:21, 16:12
**individual** - 5:17, 5:23, 6:13, 7:3, 25:18, 86:15, 90:5, 90:17, 90:19, 95:7, 96:4, 111:18, 112:20, 112:22, 114:17, 119:1, 120:21, 145:8, 146:7, 146:11, 149:11, 155:25, 161:16, 165:23
**individual's** - 157:3
**individually** - 110:4
**individuals** - 116:8, 116:9, 143:7, 145:9, 162:7, 162:13, 162:17, 163:12, 164:12
**industry** - 150:2
**information** - 18:2, 104:18, 147:7, 155:20
**initials** - 156:25
**injury** - 21:17, 22:3, 22:21, 23:6, 24:15, 25:5, 25:14, 27:20, 28:3
**inmate** - 81:22
**Inn** - 96:16
**innocence** - 1:16, 1:2
**innocent** - 21:25
**input** - 123:11
**inside** - 47:7, 47:10, 55:6, 110:2, 120:21, 145:6, 146:13, 146:15, 148:2
**Inside** - 110:7, 110:14
**insides** - 9:21
**Inspector** - 134:11
**instances** - 24:17, 25:8
**Instead** - 23:15
**institutions** - 64:25
**instruct** - 28:15, 47:15
**instructed** - 14:6
**instruction** - 14:5
**instructions** - 107:15, 176:20
**instruments** - 130:3
**intact** - 132:21
**intending** - 62:15
**intensity** - 164:8
**intentionally** - 128:24
**intentions** - 139:1
**interested** - 72:5
**internship** - 144:5
**interpreted** - 28:11, 92:10

**interpreter** - 4:25, 92:13
**Interpreters** - 2:21
**intersects** - 100:22
**interview** - 53:13, 64:17, 65:25, 66:7, 68:19, 68:20, 69:7, 74:13, 78:9, 79:6, 91:9, 91:11, 91:15
**interviewed** - 49:17, 90:8
**interviews** - 11:22, 67:2, 81:21
**introduce** - 84:6, 103:3
**investigation** - 86:1, 90:16, 94:12, 95:3, 176:22
**investigator** - 84:11, 84:13, 84:18, 91:8, 147:6, 153:15
**investigator's** - 17:6
**investigators** - 18:2, 82:21
**involved** - 24:15, 31:14, 31:24, 33:19, 85:3, 105:14, 147:12
**involving** - 27:6, 105:11
**issues** - 126:17
**item** - 108:1, 108:16, 110:21, 139:4, 139:5, 147:2, 147:4, 147:20, 148:5, 153:2, 153:3, 153:10, 153:11, 153:14, 153:25, 154:2, 155:1, 155:3, 155:4, 155:5, 155:8, 155:12, 157:1, 158:7, 159:4, 161:10, 161:19, 169:4
**items** - 93:7, 106:11, 107:2, 115:22, 116:13, 117:20, 124:18, 124:19, 124:25, 125:7, 137:8, 137:10, 137:13, 139:18, 146:3, 153:5, 157:25, 159:20, 160:24, 160:25, 170:22
**itself** - 131:15

## J

**jail** - 16:19, 26:14, 30:14
**job** - 134:16
**Jr** - 8:14
**Jr.'s** - 96:24
**Judge** - 1:23, 3:11, 3:12, 4:22, 13:25, 15:4, 16:11, 16:12, 21:10, 22:2, 25:24, 28:18, 38:13, 41:14, 55:11, 60:1, 62:21, 62:25, 64:5, 77:17, 77:19, 78:25, 95:24, 101:7, 101:12, 101:15, 121:9, 124:16, 127:14, 135:9, 142:13, 152:20, 157:19, 167:19, 173:4, 173:17, 173:22, 173:23, 175:8, 175:25
**Judicial-** 1:12
**Julian-** 119:4
**July-** 1:20, 1:3
**jumped** - 123:9
**June-** 116:25, 117:8
**jury** - 3:1, 3:7, 3:13, 4:4, 6:1, 9:16, 14:4, 17:9, 17:11, 17:12, 17:14, 18:10, 29:3, 29:6, 29:7, 29:22, 32:23, 33:18, 35:6, 35:22, 36:1, 36:12, 36:18, 36:21, 38:6, 38:16, 38:23, 40:6, 40:19, 41:7, 63:14, 63:20, 63:23, 80:22, 84:7, 84:9, 85:16, 86:9, 88:9, 88:15, 94:15, 95:6, 101:1, 103:5, 103:18, 104:14, 105:25, 107:25, 115:10, 121:5, 121:7, 121:20, 127:7, 127:8, 142:24, 144:19, 144:23,

152:13, 156:23, 165:4,
167:8, 168:11, 168:19,
173:15, 174:7, 174:9,
174:12, 175:17, 175:18,
176:7, 177:8
  **justice** - 14:23
  **Justin**- 2:4, 28:16, 64:1,
94:19

**K**

  **Keep**- 4:19
  **keep** - 83:25, 87:17, 95:21,
102:20, 131:17, 137:9,
142:5, 174:18
  **keeping** - 61:3
  **kept** - 123:5, 131:17,
151:13
  **Kerr**- 85:16, 85:17, 86:11,
86:12
  **key** - 88:4
  **kid** - 78:13
  **kidnapping** - 15:15
  **killed** - 9:17, 11:8, 35:2,
35:7, 35:14, 35:23, 36:2,
38:24, 48:9, 53:20, 54:14,
54:17, 57:1, 60:11, 60:12,
60:15, 72:2, 73:11
  **killing** - 15:25, 68:25,
72:13
  **kind** - 12:1, 18:1, 31:23,
33:6, 72:19, 87:19, 88:3,
95:6, 100:23, 121:17, 122:6,
129:3, 136:22, 140:10,
141:4, 145:2, 147:13,
147:14, 156:13, 165:5
  **kinds** - 108:20
  **kit** - 106:3, 106:20, 107:4,
107:22, 109:25, 110:3,
110:17, 115:22, 116:13,
119:20, 120:25, 122:22,
123:23, 124:8, 124:9,
124:10, 124:11, 137:13,
139:18, 140:1
  **kits** - 149:21
  **knife** - 52:5, 52:6, 52:13
  **knowledge** - 66:14, 82:19,
83:1, 151:18, 152:8, 156:4
  **knowledgeable** - 82:22
  **known** - 4:11, 14:24, 70:6,
89:1, 89:9, 89:22, 96:21,
111:20, 146:6, 146:9,
146:10, 146:16, 147:3,
148:23, 149:1, 149:11,
149:12, 155:24, 156:6,
156:8, 159:21, 160:9,
160:23, 161:4, 164:12,
164:17, 164:22, 168:25

**L**

  **L92-10367**- 151:7
  **Lab**- 122:1, 123:11,
123:24, 125:13, 125:15,
125:16, 125:19, 126:1,
130:20, 143:3, 150:24,
151:14, 172:17
  **lab** - 2:8, 103:10, 103:11,
103:14, 126:5, 129:20,
130:1, 130:8, 144:5, 150:19,
150:22, 150:24, 151:6,
151:7, 153:6, 154:3, 154:15,
154:22, 155:15, 156:7,
157:1, 161:15, 171:9, 173:9,
173:11
  **Lab's**- 121:21
  **label** - 131:20
  **labeled** - 110:12, 124:18,
129:25, 131:8, 131:11,
133:19, 133:23

  **labeling** - 131:15, 134:2
  **labelled** - 131:3
  **Laboratory**- 143:1
  **laboratory** - 104:1, 124:2,
127:6, 129:23, 130:5, 144:7,
160:3, 160:5
  **ladies** - 4:5, 142:23,
144:23, 165:3, 168:18,
176:6
  **ladies'** - 48:25
  **lady** - 31:17
  **lady's** - 71:3
  **laid** - 3:18
  **language** - 79:15
  **languages** - 80:8, 80:9
  **Laporte**- 96:21
  **large** - 68:20, 136:7,
137:23, 167:12
  **larger** - 153:17, 170:2,
170:14
  **last** - 6:17, 46:14, 56:2,
56:5, 57:13, 75:6, 115:16,
115:17, 133:16, 133:17
  **law** - 78:19, 176:9
  **lawyers** - 3:4, 62:14,
63:24, 128:11, 176:17
  **laying** - 47:10
  **lead** - 64:20, 72:20
  **leading** - 143:15
  **leads** - 8:22
  **learn** - 86:22, 112:6,
150:18, 155:14
  **learned** - 155:17
  **least** - 22:16, 24:3, 43:7,
66:24, 74:8, 82:21, 121:20,
129:11, 162:7, 162:12,
163:1, 163:12, 164:12
  **Lebron**- 89:6, 90:18, 91:4,
115:11, 117:11
  **left** - 7:14, 51:12, 51:13,
51:18, 71:2, 100:11, 136:3,
146:5, 149:14, 149:16,
158:23
  **left-hand** - 158:23
  **legitimate** - 81:15
  **legitimately** - 81:25
  **legs** - 145:3
  **lengthy** - 67:7
  **Leonardo**- 90:1, 115:15,
117:11
  **less** - 49:15
  **lied** - 41:3
  **life** - 31:25, 62:3
  **limit** - 109:4
  **limited** - 83:1, 128:15
  **Linda**- 87:10, 96:11
  **line** - 143:6, 169:18
  **lineage** - 166:7
  **lines** - 101:6
  **Liquids**- 148:1
  **list** - 130:4
  **lit** - 80:12
  **live** - 8:25, 35:3, 35:8,
35:11, 36:13, 38:25, 39:25,
40:2, 40:3
  **lived** - 35:11, 35:17, 35:18,
35:19, 100:8
  **living** - 84:10, 90:13,
90:18, 90:19, 91:3, 96:12,
97:2, 103:6
  **locate** - 85:11, 86:20,
86:24, 90:4, 96:15, 96:23,
97:1
  **located** - 90:14, 91:8
  **location** - 8:12, 87:6,
97:11, 97:15, 97:18, 97:25,
99:5, 99:9, 121:23, 149:23
  **locations** - 94:11, 94:14,
94:16, 95:2, 96:5, 98:10,
133:24, 148:21, 149:21,

149:22, 158:24
  **logical** - 97:18
  **look** - 10:7, 87:19, 88:5,
95:12, 96:3, 100:17, 107:17,
108:23, 110:2, 113:12,
121:12, 132:15, 134:20,
145:2, 145:4, 148:21,
153:12, 153:23, 154:13,
154:18, 165:14, 171:5,
175:10, 175:11
  **looked** - 87:18, 88:4,
131:22, 133:10, 136:12,
149:21
  **looking** - 6:19, 6:22,
10:15, 27:15, 47:11, 51:14,
57:17, 74:10, 93:11, 100:3,
100:7, 108:1, 108:4, 108:22,
108:25, 129:13, 133:20,
133:22, 133:24, 141:2,
158:25, 164:7, 164:22,
168:6
  **Looking**- 100:2
  **looks** - 6:7, 146:13, 167:12
  **loose** - 9:22
  **lost** - 80:5
  **Louisiana**- 2:15, 80:11
  **lunch** - 63:5, 63:10
  **Lunch**- 63:19

**M**

  **ma'am** - 29:4, 77:25, 78:3,
78:10, 79:8, 79:10, 82:2,
85:2, 85:5, 85:9, 85:15,
86:16, 86:21, 87:1, 87:7,
87:9, 87:13, 87:15, 87:21,
88:2, 88:7, 88:21, 88:23,
89:4, 89:11, 89:25, 90:2,
90:6, 90:10, 91:5, 91:10,
91:14, 91:21, 92:4, 92:10,
92:15, 92:17, 92:19, 93:18,
93:20, 93:23, 94:5, 94:13,
94:17, 95:4, 95:8, 95:22,
96:6, 96:17, 96:25, 97:4,
97:7, 97:13, 98:1, 98:4,
98:7, 99:3, 99:8, 99:11,
99:16, 100:5, 100:9, 100:19,
100:25, 102:16, 106:2,
118:5, 174:22
  **Madrid** - 2:14, 3:5, 63:25
  **Magee** - 1:22
  **main** - 8:20, 33:22, 81:19
  **major** - 113:21, 113:25,
114:15, 119:25, 120:1,
120:4, 120:16, 145:17,
162:14, 164:4, 164:6,
169:12
  **majority** - 69:7, 104:19
  **male** - 21:2, 21:5, 23:14,
25:12, 109:9, 109:17,
111:10, 112:3, 112:10,
112:22, 113:1, 113:2, 161:7,
162:18, 162:21, 162:22,
162:24, 163:21, 163:25
  **man** - 6:23, 8:5, 33:22
  **map** - 94:10, 98:7, 99:1
  **Map** - 2:15, 2:23
  **Maps** - 98:11
  **maps** - 38:2
  **Marilu** - 2:20
  **Mario** - 2:14
  **mark** - 101:3
  **marked** - 79:1, 87:24,
92:1, 98:5, 110:4, 110:8,
124:22, 152:3, 156:22,
166:25
  **markers** - 148:19
  **Martinez** - 1:5, 1:23, 4:23,
5:7, 15:7, 18:13, 23:22,

29:14, 29:16, 29:19, 47:13,
54:6, 59:16, 61:20, 62:12,
64:18, 65:3, 68:3, 68:24,
69:22, 70:14, 71:15, 71:18,
72:1, 72:15, 74:2, 74:14,
75:1, 76:1, 76:14, 78:16,
79:5, 89:10, 115:16, 115:20,
116:1, 116:24, 117:1, 117:7
  **Mary** - 178:4, 178:20
  **Mashan** - 64:23
  **mask** - 51:3, 51:5
  **masks** - 48:24, 130:1
  **master's** - 103:22, 143:17
  **match** - 105:7, 119:17,
138:23
  **matched** - 109:16, 113:16,
119:15, 120:2
  **matches** - 139:13, 161:16
  **material** - 93:15
  **math** - 172:25
  **Matt** - 1:9, 1:20, 102:18,
102:24, 103:4, 127:11
  **matter** - 134:5, 134:6
  **mean** - 13:4, 22:12, 32:24,
33:7, 35:12, 37:14, 39:10,
46:7, 49:7, 52:10, 53:8,
54:25, 70:2, 77:9, 80:8,
85:19, 126:10, 128:12,
128:23, 129:1, 129:12,
129:13, 129:16, 133:23,
134:5, 140:22, 140:24,
147:21, 149:22, 149:23,
158:1, 159:12, 161:13,
161:24, 164:5, 165:9
  **meaning** - 111:18, 113:20
  **means** - 47:7, 60:2,
147:22, 158:2, 161:25,
164:7, 176:6
  **measures** - 131:17
  **media** - 176:23
  **medical** - 144:9
  **meet** - 91:19, 174:25
  **Mehl** - 105:23, 114:25,
115:3, 115:7, 116:18,
117:10, 117:12, 121:22,
123:22, 124:2, 126:4,
130:15
  **Melo** - 86:24, 89:22, 96:12,
115:13, 117:11
  **memory** - 67:25, 69:21
  **mention** - 77:14
  **mentioned** - 75:23, 75:25
  **mess** - 139:7
  **met** - 15:8, 31:15, 32:10,
32:13, 33:25, 37:19, 64:11,
89:13, 101:19, 127:21,
127:24, 171:21
  **methods** - 149:18
  **Micah** - 1:8, 1:24, 83:20,
84:2, 84:8
  **Michael** - 11:4
  **microphone** - 4:19, 83:25,
102:21, 142:5
  **microscope** - 132:5,
132:13, 133:10
  **microscopic** - 132:8
  **might** - 6:23, 25:24, 69:5,
82:5, 146:4, 149:16, 153:13
  **Mike** - 65:10
  **miles** - 98:9, 98:10, 98:14
  **mind** - 14:16, 48:22,
60:10, 66:20, 70:20
  **mine** - 62:3
  **minor** - 114:2
  **minute** - 41:13, 62:22,
94:9, 98:16, 174:5
  **minutes** - 49:13, 49:14,
49:18, 71:6, 144:19
  **mischaracterizes** - 34:14
  **mischaracterizing** - 41:12

miscommunicated - 70:19
miscommunication - 70:1, 70:22, 71:11, 71:21
miscommunications - 68:6
misdemeanor - 20:20, 23:7, 25:11, 28:4, 30:24, 31:6
mishandling - 136:23, 138:16, 140:10
missions - 81:19
misstate - 122:4
mistake - 122:9, 175:14
mistaken - 141:10
mistakes - 14:24, 140:19
mistrial - 14:8
misunderstood - 35:20, 53:10, 53:12
mixing - 122:6
mixture - 73:2, 111:18, 111:21, 113:20, 114:5, 114:13, 162:6, 162:9, 162:12, 162:16, 162:19, 163:1, 163:12, 163:24, 164:5, 164:11, 164:20, 169:13, 170:22
Mk - 157:11
moaned - 58:23, 59:8
molecular - 103:21, 103:23, 143:19
mom - 145:1
moment - 16:25, 28:20, 54:20, 101:7, 135:13, 142:6
month - 39:10
months - 18:18, 19:12, 19:21, 19:22, 20:4, 20:21, 20:23, 21:15, 23:8, 28:4, 30:8, 30:11, 129:21
moral - 24:23, 27:6, 28:8
morning - 3:24, 4:5, 5:3, 5:4, 5:13, 35:6, 35:25, 38:23, 52:18, 175:5, 176:16
most - 39:24, 68:16, 97:18, 113:22, 113:24, 114:16, 128:9, 148:3, 176:21
mostly - 163:25
mother - 9:3, 26:5, 26:15, 51:14
motion - 121:4, 121:12, 123:8
Motor - 96:16
mouth - 79:15, 108:6, 108:9, 146:14, 146:15
move - 13:6, 43:4, 59:14
Move - 14:8
moved - 129:23, 144:8, 144:11
moving - 129:24
murder - 15:15, 22:14, 76:15, 76:16, 91:12
murdered - 35:15

N

naked - 129:11, 129:15, 132:1, 132:4, 132:6, 132:9
name - 5:5, 5:7, 6:13, 8:23, 15:7, 64:10, 79:2, 84:8, 88:25, 89:2, 90:17, 91:4, 93:10, 103:4, 104:17, 131:8, 157:3, 157:6, 157:10
named - 106:6
names - 32:24, 70:8, 71:22, 87:17
narrate - 73:3
narrative - 47:22
Natalie - 2:3, 63:25, 94:20
native - 79:15

navy - 96:9
near - 35:10, 36:12, 38:24, 151:21
neat - 165:23
necessarily - 108:2, 128:23, 140:24, 155:7, 162:23, 165:23
need - 8:16, 15:20, 17:8, 47:14, 54:6, 59:13, 69:16, 121:3, 147:7, 147:8, 147:23, 148:2, 176:13
needed - 73:6
needs - 46:4, 118:16
neighborhood - 8:13
neighbors - 9:1
nets - 130:1
never - 12:11, 12:12, 12:13, 15:8, 15:10, 16:10, 23:13, 38:23, 39:15, 41:3, 48:21, 61:8, 61:20, 62:7, 64:11, 69:14, 76:1, 87:5, 118:14, 127:24, 156:4
new - 117:1
next - 41:19, 47:16, 67:6, 70:14, 71:13, 74:8, 76:12, 83:19, 89:19, 89:21, 93:11, 96:11, 97:16, 102:17, 109:22, 113:6, 141:22, 148:6, 174:1
nice - 165:23
nicknames - 87:18, 88:6
night - 5:12, 11:9, 36:20, 37:15, 40:7, 40:15, 40:17, 40:18, 40:22, 41:8, 42:10, 43:11, 43:25, 44:2, 44:4, 44:7, 45:19, 46:2, 48:25, 57:7, 61:21, 76:2, 76:15, 77:4, 77:11
nine - 170:3
normal - 145:24, 151:13
normally - 44:1
notations - 136:24, 141:5, 177:10
note - 73:23
noted - 75:1, 76:14, 124:13
notes - 48:7, 62:22, 66:22, 67:5, 78:9, 105:16, 133:6, 133:8
Nothing - 61:23, 75:16, 138:3, 140:11, 141:14, 141:15
nothing - 24:25, 121:23, 137:6, 141:13
notified - 117:9
noting - 6:16
Number - 2:1
number - 27:15, 50:16, 66:2, 81:12, 94:19, 95:2, 98:10, 151:3, 151:6, 151:7, 167:13, 170:14, 173:10, 173:11
numbered - 1:22, 178:11
numbers - 78:1, 169:14, 169:22
nurse - 122:1
nurses - 146:22

O

Obel - 1:6, 3:3, 4:8, 5:17, 5:23, 32:23, 34:24, 39:6, 39:18, 40:5, 40:16, 40:19, 41:7, 43:17, 44:4, 52:4, 52:6, 54:19, 57:12, 60:14, 61:2, 61:11, 84:25, 88:18, 92:8, 93:22, 95:7, 105:11, 105:15, 106:6, 117:17, 117:24, 119:4, 119:16, 120:3, 120:14, 130:24,

130:25, 131:3, 131:5, 131:11, 138:17, 138:18, 156:8, 157:7, 159:6, 160:24, 161:5, 161:9, 162:7, 162:13, 164:3, 164:23, 168:21, 168:24, 169:12, 170:21, 172:21
object - 13:25, 24:24, 34:13, 41:20, 43:1, 62:9, 77:5, 85:22
objecting - 123:13
objection - 7:19, 7:21, 7:23, 41:18, 46:23, 54:3, 80:1, 92:25, 93:2, 95:14, 95:16, 98:19, 98:21, 99:21, 99:23, 121:16, 123:17, 124:5, 124:12, 125:5, 174:20
Objection - 12:2, 38:9, 41:10, 42:13, 46:11, 79:22, 80:25, 81:8, 85:19
objections - 41:21, 41:22, 152:20, 152:22, 157:18, 157:21, 167:18
observed - 59:17
observing - 59:17
obtain - 91:20, 104:25, 105:3, 107:13, 109:8, 118:20, 129:19, 139:10, 148:23, 149:1, 158:7, 164:25
obtained - 109:15, 113:18, 114:1, 116:2, 117:1, 117:24, 119:7, 119:14, 119:15, 119:19, 119:23, 120:1, 139:12, 159:4, 159:19, 160:2, 161:7, 161:10, 161:25
obtaining - 121:22
obviously - 67:11, 72:18, 87:8, 89:19, 108:2, 111:11, 119:7, 145:6
Obviously - 64:14
occasion - 52:4
occasions - 104:8
occurred - 178:11
October - 5:13, 105:20, 178:17
offense - 66:13
offenses - 17:4
offer - 7:17, 78:24, 92:22, 94:6, 94:8, 95:9, 98:17, 99:18, 120:19, 120:20, 152:16, 157:16, 167:15
offered - 123:10
Offered - 2:1, 7:20, 92:24, 95:11, 98:18, 99:20, 121:2, 152:18, 157:17, 167:17, 174:14
offering - 174:11, 174:19
Office- 84:12
office - 64:20, 65:1, 65:23, 81:18, 84:14, 84:18, 84:21, 144:9, 172:12, 172:20
officer - 78:19, 84:19
Official - 178:4, 178:16, 178:21
official - 66:3
often - 39:6, 166:11
old - 24:21, 88:19, 89:14, 89:17, 128:15, 173:11
once - 26:18, 39:9, 39:10, 39:11, 91:8, 116:21, 147:16
Once- 156:17, 164:25
one - 5:5, 12:13, 18:22, 18:23, 27:3, 27:4, 28:2, 28:24, 31:18, 33:21, 36:20, 37:15, 44:1, 44:3, 44:22, 45:10, 50:6, 52:13, 55:15, 57:1, 57:2, 60:13, 65:22,

65:25, 69:8, 72:11, 74:4, 74:24, 75:13, 81:18, 96:15, 100:8, 109:16, 111:14, 111:18, 113:20, 115:17, 118:9, 122:3, 122:5, 125:12, 129:24, 130:3, 139:4, 160:19, 161:2, 164:9, 165:24, 173:10
One- 27:3, 27:24, 45:8, 46:14, 54:20, 60:23, 111:13, 142:6
one-by-one - 161:2
ones - 152:20
Open- 3:1, 3:13, 4:4, 17:11, 17:14, 29:7, 63:14, 63:20, 86:9, 121:7, 127:8, 173:15, 174:9, 175:18, 177:8
open - 28:13, 57:14, 126:9, 126:23, 127:5, 130:4, 147:23, 178:12
opened - 53:23
opens - 126:21
opinion - 63:8, 177:1
opportunity - 39:2, 78:20, 118:15, 176:14, 176:17
opposed - 160:13
opted - 11:15
oral - 65:18
orally - 121:14
Orchid - 103:7, 103:9, 105:14, 128:2, 130:7, 150:19, 155:15, 155:21, 156:3, 156:4, 159:23, 161:6
order - 60:11, 60:14, 85:7, 117:5, 139:15, 147:23, 150:14, 150:16, 165:25, 166:2, 166:5
ordered - 57:2, 59:25, 60:2
Ordinarily - 22:10
ordinarily - 137:3
orient - 71:1
original - 99:6, 135:22, 152:6
originally - 22:21, 25:13
originated - 109:17
Ouachita - 143:17
ounce - 39:24, 42:16, 42:19, 42:23, 42:24
ounces - 43:5
ourselves - 130:1
outside - 18:10, 29:3, 52:7, 53:25
overall - 122:15
own - 14:19, 17:17, 18:2, 65:23, 72:22, 78:18, 79:15, 122:10, 122:19, 126:23, 127:5, 135:19, 135:25, 136:3, 136:12, 137:8, 137:25, 138:5

P

package - 135:25, 138:5
packaged - 122:23, 122:24, 135:25, 137:3, 137:5, 137:8
packaging - 2:24, 3:1
packet - 87:25, 88:3
pact - 61:20, 61:24, 76:1, 76:4, 76:8
Page - 1:3, 7:10, 7:14, 69:20, 70:23, 70:24, 71:13, 71:24, 75:6, 76:12, 76:20, 88:16, 88:24, 89:7, 90:3
page - 71:13, 74:12, 74:13, 76:12, 78:1, 79:2, 89:19, 89:21, 158:18
Pages - 75:19
pages - 67:14

**pair** - 106:24, 113:7, 135:21, 135:22, 163:23
**Panties** - 2:2
**panties** - 2:19, 106:24, 107:5, 107:16, 107:17, 107:21, 113:8, 113:17, 114:4, 114:5, 114:8, 119:24, 120:2, 120:9, 120:14, 120:20, 121:25, 122:1, 122:11, 122:14, 123:4, 123:19, 123:21, 124:7, 135:13, 135:14, 135:22, 136:2, 136:5, 136:9, 137:16, 137:18, 137:19, 137:21, 138:9, 139:8, 139:12, 139:19, 140:2, 140:5, 159:16, 160:9, 160:10, 162:11, 162:12, 163:4, 163:5, 163:7, 163:11, 163:23, 169:1, 172:4
**pants** - 48:8, 48:11, 52:9, 69:1, 69:12
**paper** - 153:18, 153:21
**paragraph** - 69:22, 70:14, 70:24, 71:13, 71:17, 74:25, 75:6, 75:11, 76:13, 76:20, 167:4
**parents** - 87:12
**park** - 8:21
**part** - 27:7, 70:5, 71:25, 77:6, 102:2, 123:5, 133:18
**partial** - 116:2
**partially** - 170:19
**particular** - 15:16, 52:4, 98:11, 112:7, 145:18, 150:12, 153:3, 165:9
**parties** - 76:11, 105:5, 178:9, 178:15
**partner** - 65:8, 65:22, 73:23
**partners** - 34:19
**parts** - 73:2, 158:12
**Pasadena** - 96:16, 96:21
**pass** - 15:1, 62:25, 82:3, 101:10, 136:14, 140:12, 171:13, 173:16
**Pass** - 77:17, 83:2, 102:8, 141:7
**passed** - 59:2, 85:14, 127:13
**passenger** - 58:10
**past** - 129:21, 144:13, 150:5, 150:25
**Pause** - 21:13, 28:21, 62:2, 100:19, 101:14, 135:11, 142:9, 171:16
**pay** - 44:5, 73:3
**pending** - 30:19
**penitentiary** - 13:6
**Pennsylvania** - 13:7, 13:22, 64:17, 64:19, 64:21, 80:12
**people** - 5:21, 32:12, 33:25, 38:18, 49:4, 62:5, 72:8, 73:10, 80:3, 82:15, 87:8, 87:18, 105:8, 115:10, 140:18, 140:24, 166:3
**perceived** - 125:7
**percent** - 44:22, 60:23
**perform** - 104:3, 110:21, 118:8, 148:11, 171:25
**performed** - 113:13, 136:12
**performing** - 103:25
**performs** - 103:11
**perhaps** - 71:3, 155:11
**period** - 155:6
**Permission** - 167:24
**permission** - 158:12
**Perry** - 4:17

**person** - 5:8, 7:9, 7:13, 7:15, 11:2, 14:25, 21:1, 21:2, 21:4, 34:9, 82:22, 90:4, 91:2, 91:3, 94:3, 104:20, 104:22, 108:5, 113:2, 113:22, 114:15, 123:3, 131:23, 138:10, 138:25, 139:6, 144:25, 145:12, 146:17, 149:13, 149:15, 161:17, 161:20, 161:21, 161:23, 164:9, 164:10
**person's** - 113:20, 161:19
**personal** - 82:18, 151:18
**personnel** - 146:25
**persons** - 6:3
**phone** - 43:23, 43:24, 44:5, 44:9, 44:15, 44:17, 44:24
**Phone** - 2:7, 2:13, 2:16
**photo** - 7:4, 7:10, 7:14, 88:22
**Photograph** - 2:9, 2:10, 2:11, 2:12, 2:16
**photographs** - 66:6, 99:5, 154:17
**photos** - 99:7, 99:10, 99:13
**phrases** - 68:7
**pick** - 64:15
**picked** - 123:23
**picture** - 6:22, 7:7, 88:19, 89:14, 89:17
**piece** - 146:4, 149:10
**pieces** - 145:24
**pink** - 168:18, 169:10
**pinpoint** - 81:6
**pistol** - 19:4, 19:5, 31:7
**Pittsburgh** - 65:1, 65:10, 65:23
**place** - 9:12, 35:10, 35:22, 36:1, 36:8, 36:21, 36:22, 54:17, 56:2, 56:5, 72:13, 96:23, 140:18
**placed** - 134:12, 134:13
**places** - 95:7
**placing** - 146:12
**planning** - 28:22
**plastic** - 137:9, 137:11
**play** - 164:20
**played** - 72:9, 72:12, 78:11, 86:2
**players** - 88:4
**plea** - 16:16
**pled** - 21:24, 22:3, 23:7
**plus** - 155:7
**pocketknife** - 52:7, 52:11
**point** - 6:1, 33:17, 59:4, 61:15, 74:14, 81:24, 85:10, 91:18, 93:24, 94:8, 100:10, 106:5, 109:5, 109:11, 109:12, 115:2, 116:20, 117:2, 125:12, 134:11, 143:15, 148:11, 150:18, 154:3
**pointing** - 158:23
**Police** - 105:24, 126:3, 130:12, 130:14, 143:1, 143:2, 144:10, 151:14
**police** - 84:19, 103:15
**population** - 165:9, 165:10, 165:12, 165:14, 165:18, 165:19, 166:1, 166:13, 166:19, 167:11, 169:16, 170:9, 170:17
**portion** - 108:18, 158:2
**portions** - 178:8
**position** - 82:23, 121:15
**positions** - 82:14
**possible** - 43:15, 43:17,

43:19, 43:20, 53:18, 111:25, 116:10, 119:21, 149:13, 153:1, 162:8
**possibly** - 73:19, 79:24, 145:25
**potential** - 105:5, 105:6, 107:18, 112:11, 115:9, 117:3, 136:25
**potentially** - 155:4, 161:21
**power** - 34:20
**practice** - 118:11
**predicates** - 3:19
**preparation** - 84:25
**prepare** - 98:2, 116:16, 176:13
**prepared** - 4:1, 109:18
**preparing** - 84:23, 91:12
**presence** - 18:10, 29:3, 109:25, 113:12, 153:2, 153:10, 154:6, 154:22
**Present** - 63:25
**present** - 3:1, 3:4, 3:5, 3:9, 3:13, 4:4, 11:21, 17:11, 17:14, 29:7, 39:18, 63:14, 63:20, 86:9, 94:15, 107:4, 108:24, 111:5, 111:19, 113:21, 121:7, 127:8, 153:25, 154:2, 173:15, 174:9, 175:18, 177:8
**presented** - 16:12, 92:8
**presently** - 3:6
**preserve** - 121:13
**preserved** - 123:4
**preserving** - 121:21
**presiding** - 1:23
**pretending** - 47:12
**pretty** - 9:5, 18:3, 67:19, 73:11, 73:24, 75:11, 85:3, 121:12, 134:25, 153:13
**prevent** - 128:19, 128:20, 130:1, 130:6
**previously** - 4:16, 154:11, 154:12, 155:17, 160:6
**price** - 42:23
**primary** - 81:18
**prints** - 91:1
**prison** - 12:20, 18:15, 20:16, 31:3, 31:11, 64:22, 64:24, 68:11, 81:19, 81:20
**prisoners** - 64:24
**private** - 64:24, 64:25
**probable** - 44:23
**problem** - 33:9, 68:3
**problems** - 26:5, 26:10, 34:3
**procedure** - 66:23, 67:1, 93:16
**procedures** - 123:3, 128:3, 128:5, 140:17, 141:5
**proceed** - 3:8, 4:7, 4:21, 7:24, 14:10, 15:3, 18:8, 29:9, 29:11, 47:17, 47:24, 62:19, 64:1, 64:4, 77:20, 84:1, 93:3, 95:17, 98:22, 99:24, 101:15, 102:23, 121:8, 127:10, 127:12, 127:17, 142:10, 142:12, 142:16, 152:23, 157:22, 171:15, 171:17
**Proceed** - 41:23, 86:10
**proceeding** - 16:14, 18:10
**Proceedings** - 1:16, 1:24, 1:2, 177:13
**proceedings** - 1:21, 68:21, 178:8, 178:14
**process** - 147:12, 148:8, 156:18
**processes** - 148:15
**profile** - 105:3, 105:4, 107:6, 107:13, 107:19,

109:3, 109:9, 109:15, 109:19, 112:7, 113:3, 113:16, 113:18, 113:21, 113:22, 113:25, 114:15, 115:25, 116:2, 117:1, 117:3, 118:20, 119:7, 119:14, 119:15, 119:19, 119:25, 120:1, 120:3, 120:16, 134:17, 134:18, 139:11, 139:13, 140:7, 146:4, 148:15, 148:17, 148:18, 148:19, 148:22, 149:2, 149:12, 158:7, 159:1, 159:3, 159:6, 159:21, 160:20, 160:23, 161:4, 161:7, 161:10, 161:16, 161:25, 162:15, 162:21, 163:19, 164:8, 164:9, 165:6, 168:22, 168:25, 170:22, 172:10
**profiles** - 105:7, 129:19, 129:20, 138:23, 148:23, 149:6, 159:19, 159:22, 160:1, 160:8, 160:25, 165:11
**program** - 104:1
**programs** - 129:18, 143:8
**prohibited** - 25:3
**promise** - 61:7, 61:8
**propelled** - 132:24
**property** - 146:25
**prosecution** - 84:22, 84:23
**prosecutor** - 43:22
**provided** - 27:14, 92:11, 122:1, 122:11, 131:10, 154:17, 172:11, 172:21
**publish** - 88:14, 98:24, 158:12, 167:24, 167:25
**publishing** - 88:9
**Puerto** - 32:13, 32:16
**pulled** - 9:7
**pure** - 148:3
**purple** - 110:13, 118:1
**purpose** - 3:16, 70:16
**purposes** - 37:20, 151:4, 174:11
**Purposes** - 2:24, 3:1, 174:17
**put** - 23:16, 34:9, 34:24, 42:24, 68:8, 68:9, 68:17, 69:18, 74:19, 74:20, 98:7, 108:5, 121:3, 125:3, 138:18, 138:24, 140:1, 158:3, 169:14, 174:20
**putting** - 33:9, 33:11, 34:21, 79:23

## Q

**Q-tip** - 146:13, 153:17
**quadrillion** - 167:11, 168:15, 169:7, 169:22, 170:1, 170:6, 170:8, 170:15
**Quadrillion** - 170:2
**qualified** - 104:2, 143:9
**qualifies** - 103:19
**quality** - 123:3, 128:2, 128:4, 128:7, 128:18, 129:17, 130:5, 130:8, 140:17, 141:5, 171:8, 172:6, 172:19, 173:8
**quantification** - 148:9, 148:14
**quantity** - 39:21, 42:11
**Quartaro** - 1:9, 1:20, 102:18, 102:24, 103:4, 127:11, 127:21, 141:21
**questions** - 4:12, 8:10, 25:24, 28:13, 53:16, 54:13, 62:14, 67:24, 68:2, 70:9,

72:25, 73:10, 77:19, 79:18,
82:4, 101:23, 126:7, 140:13
**quick** - 72:16, 144:22
**quickly** - 88:9
**quintillion** - 167:12,
168:13, 168:14, 168:16,
169:5, 169:6, 169:8, 169:22,
170:11
**quite** - 6:13, 6:16, 75:10

# R

**raise** - 142:2
**ran** - 36:9, 173:9
**rape** - 107:21, 115:22,
116:13, 120:25, 137:13,
139:18, 140:1
**rather** - 67:7
**re** - 54:10, 121:15
**re-ask** - 54:10
**re-urge** - 121:15
**read** - 39:2, 69:17, 168:11,
168:19, 169:3, 169:9,
169:21, 176:16, 177:4
**reading** - 79:12, 176:14
**ready** - 4:7, 29:9, 64:1,
85:7, 127:10, 142:10
**real** - 81:16
**realize** - 78:24
**really** - 3:15, 14:11, 48:19,
100:20, 101:20, 108:8,
120:11, 121:16, 121:23,
129:15, 130:24, 131:2,
132:20, 144:25, 145:16
**rear** - 56:7, 56:24, 57:9,
73:16
**reason** - 14:7, 24:22, 25:2,
25:4, 25:14, 33:14, 34:10
**reasonable** - 127:3,
168:20, 169:11, 170:20
**recalled** - 83:10
**recalling** - 3:24
**receive** - 105:21, 115:6,
115:24, 116:23, 141:4,
145:22, 147:2, 155:24
**received** - 15:21, 19:9,
66:6, 105:19, 106:1, 106:2,
106:5, 106:14, 106:21,
107:2, 115:4, 115:8, 115:20,
116:8, 117:16, 117:24,
118:7, 122:17, 122:18,
125:8, 126:3, 130:10,
130:23, 131:2, 131:19,
131:22, 135:20, 136:19,
136:21, 156:7
**recent** - 88:22
**recess** - 63:19, 174:6,
176:12, 177:3
**recessed** - 177:13
**recessing** - 176:19
**recognize** - 7:3, 11:2,
12:21, 87:25, 92:2, 93:6,
110:10, 152:4
**recognized** - 104:11
**recollection** - 37:12,
45:14, 58:25
**Record** - 1:1, 2:24, 3:1,
174:17, 178:10, 178:13
**record** - 3:2, 3:14, 5:6, 6:9,
6:11, 10:15, 17:2, 18:9,
22:2, 22:6, 22:7, 23:16,
28:15, 28:19, 29:3, 60:1,
63:22, 65:16, 66:20, 67:2,
67:12, 74:25, 75:13, 85:21,
93:25, 121:4, 121:11,
121:13, 151:3, 154:16,
173:6, 174:12, 175:21,
177:12
**recorded** - 74:9
**recording** - 72:17, 72:18

**records** - 23:4, 23:5, 27:1,
151:11, 151:13, 151:16,
151:19, 154:14, 154:21,
156:6
**Recross-** 82:7, 140:15
**Recross-examination-**
82:7, 140:15
**red** - 96:14, 104:16, 120:2,
153:12
**red-brown** - 153:12
**redirect** - 60:5, 63:2, 77:18
**Redirect-** 77:21, 136:17,
141:8
**reduced** - 22:22, 23:7,
27:20, 28:3
**refer** - 29:18, 31:16, 67:25,
105:16
**reference** - 106:3, 109:13,
109:16, 115:24, 116:2,
116:8, 117:16, 117:23,
118:4, 146:6, 146:9, 146:10,
147:3, 148:24, 149:3,
155:24, 156:7, 156:9,
156:13, 159:12, 160:7,
160:23, 164:13, 164:18,
164:22, 166:14
**references** - 147:8, 160:4
**referred** - 73:22
**referring** - 27:19, 76:9
**reflect** - 6:10, 6:11, 18:9
**reflected** - 73:9
**reflects** - 39:3, 178:14
**refresh** - 67:25, 69:21
**regard** - 65:25
**regarding** - 76:16, 146:2,
159:10, 160:9, 162:3,
162:10, 163:3, 167:3, 168:7,
168:12, 168:24
**Regarding-** 163:11
**regardless** - 140:20
**regards** - 125:5, 126:25,
161:3, 164:3, 167:6
**reiterate** - 76:13
**reiteration** - 121:17
**related** - 39:13, 154:4
**relates** - 154:13, 169:3,
169:25
**relating** - 16:17, 16:20
**relation** - 53:21, 54:21,
55:21, 58:1
**relations** - 57:19
**relatively** - 68:12, 113:23
**release** - 175:2, 175:17
**relevance** - 43:1
**rely** - 134:2, 159:10, 160:6
**remainder** - 40:18
**remained** - 56:16
**remains** - 86:13
**remarks** - 118:25
**Remember-** 5:14, 70:9,
74:5
**remember** - 13:5, 13:8,
13:9, 13:11, 13:23, 14:13,
20:22, 26:9, 26:13, 26:18,
26:19, 26:23, 35:23, 35:25,
36:6, 36:7, 36:8, 36:19,
37:3, 37:4, 37:6, 38:1, 38:4,
38:5, 40:16, 43:14, 44:10,
44:18, 44:20, 45:7, 45:17,
45:18, 46:5, 46:10, 46:20,
47:2, 47:4, 47:9, 47:19,
48:3, 48:15, 48:17, 49:12,
50:5, 50:8, 50:9, 50:13,
50:15, 50:16, 50:18, 50:19,
51:11, 51:23, 52:18, 53:17,
56:18, 56:22, 57:5, 57:16,
57:18, 58:20, 58:21, 59:1,
60:25, 61:3, 70:7, 70:10,
76:18, 77:1
**remembering** - 46:6,

123:24
**remind** - 63:6
**Remind-** 5:6
**reminded** - 176:24
**remote** - 27:7, 27:8, 27:12
**Renee-** 1:22
**rented** - 97:2
**Repeat-** 31:4, 43:10, 49:7
**repeat** - 35:5, 35:24,
68:10, 68:11
**rephrase** - 19:15, 21:16,
38:12, 54:9, 163:9
**report** - 2:8, 17:6, 67:7,
67:14, 67:19, 68:8, 68:15,
68:23, 69:17, 69:19, 69:20,
78:4, 78:7, 109:19, 116:16,
151:8, 152:6, 158:13,
158:17, 158:19, 166:8,
166:9, 167:5, 168:4, 171:4
**reported** - 1:24, 178:12
**Reporter-** 178:4, 178:21
**Reporter's-** 1:1, 1:15,
178:1, 178:10, 178:13
**reports** - 66:3, 82:20,
150:15, 151:20, 155:20,
176:23
**represent** - 11:18
**request** - 90:7, 147:5,
175:12
**requested** - 4:9, 118:13,
147:10, 178:8
**require** - 147:18
**reserve** - 118:12
**respect** - 82:24, 121:25
**respective** - 178:15
**respond** - 23:17
**responded** - 64:20
**response** - 24:7
**responsible** - 143:8
**responsive** - 54:4
**rest** - 40:17, 40:22,
175:25, 176:2
**rested** - 175:23
**restraints** - 18:1
**rests** - 1:12, 1:13, 174:3,
176:3, 176:4
**result** - 110:19, 119:6,
119:9, 134:21
**results** - 114:22, 114:24,
115:21, 117:10, 125:15,
126:16, 128:8, 128:10,
129:6, 129:14, 154:25,
160:7, 162:10, 164:14,
164:25, 165:1, 166:12,
167:2, 167:8, 168:7, 168:19,
168:24
**retesting** - 118:16
**returned** - 71:5
**returning** - 71:14
**review** - 62:22, 150:15,
155:20, 170:24, 171:2,
171:3, 172:7, 176:14
**reviewed** - 82:20, 125:1,
172:9
**reviewing** - 66:5
**revolver** - 19:3, 19:5,
19:13, 19:15, 19:20, 30:7,
30:8
**Rico-** 32:13, 32:16
**right-hand** - 33:22
**rims** - 45:15, 46:7
**rise** - 17:13, 63:13, 121:6,
174:8, 175:19, 177:7
**risk** - 12:17
**roads** - 70:8, 70:11
**robbery** - 15:15
**rocks** - 52:22, 53:4, 74:20,
75:2
**Rodriguez-** 89:16, 89:20,
106:4, 109:14, 111:21,

112:4, 112:9, 114:2, 114:12,
164:17, 164:18, 178:4,
178:20
**Rodriguez's-** 112:15,
112:16
**Rogelio-** 51:24, 52:1, 52:5,
52:6, 53:23, 53:24, 54:1,
54:18, 54:22, 55:22, 56:2,
56:5, 56:23, 57:1, 57:8,
58:2, 59:18, 59:21, 59:22,
59:24, 60:8, 60:9, 60:11,
61:19, 71:2, 71:5, 71:16,
71:19, 73:15, 74:3, 75:25,
89:1, 90:3, 91:12
**Roger-** 6:13, 6:23, 7:8,
7:15, 8:2, 8:5, 50:3, 52:5,
55:22, 71:14, 89:1, 91:6
**Rolando-** 2:20
**role** - 72:8, 72:11, 86:2,
143:6
**room** - 6:20, 40:14, 40:15,
40:24, 47:10, 68:12, 147:1
**route** - 99:2
**Rp-** 2:11
**rubbing** - 146:14
**Rudy-** 3:20, 4:11, 5:9, 8:1,
14:15, 29:16, 87:14, 89:9,
89:13, 90:8
**Rudy's** - 3:17, 94:23
**Rule-** 24:10, 24:16
**rule** - 41:15, 80:1, 123:17
**ruled** - 121:10, 126:21
**rules** - 17:24, 24:9, 24:25,
25:3, 25:9, 25:20
**ruling** - 25:10, 28:25, 29:1
**run** - 34:19, 67:9
**rundown** - 144:22
**running** - 19:10, 19:14,
19:15, 19:17, 19:18

# S

**sac** - 9:6, 9:14, 36:7
**safety** - 14:19
**Saliva-** 2:5
**saliva** - 92:6, 124:9
**Sample-** 107:23
**sample** - 2:5, 2:6, 92:7,
92:11, 93:13, 105:3, 106:6,
110:14, 111:19, 111:20,
112:11, 112:16, 113:16,
113:23, 113:24, 114:3,
114:16, 115:11, 115:13,
115:15, 115:16, 115:19,
115:24, 116:23, 117:7,
117:16, 117:23, 117:25,
118:4, 118:12, 124:9,
124:10, 129:22, 130:4,
130:24, 131:2, 131:5, 133:1,
136:7, 136:8, 138:12,
138:20, 139:14, 146:6,
146:9, 146:10, 146:11,
146:17, 147:3, 148:10,
149:3, 149:9, 149:10,
149:12, 155:25, 156:5,
156:7, 156:8, 156:9, 156:13,
158:2, 160:7, 160:23,
161:20, 161:21, 162:2,
162:22, 162:25, 163:20,
163:23, 164:1, 164:18,
164:23
**sampled** - 166:2
**samples** - 94:3, 105:1,
106:3, 109:10, 109:12,
109:13, 109:16, 115:8,
116:1, 116:3, 116:4, 116:8,
116:10, 117:4, 119:8,
119:11, 129:23, 139:15,
140:7, 146:18, 146:19,
148:24, 153:20, 156:18,

157:13, 159:9, 159:10, 159:23, 160:1, 160:9, 160:18, 160:19, 164:13, 166:5
**Sane** - 146:22
**sank** - 53:5
**Santana** - 1:5, 1:22, 3:22, 4:11, 4:14, 4:18, 4:23, 29:10, 29:14, 29:15, 29:17, 47:13, 54:6, 62:11, 62:12, 78:16, 89:9, 89:10
**sat** - 65:13
**saw** - 6:17, 10:2, 49:25, 56:2, 56:5, 57:13, 71:4, 132:19
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scene** - 99:6, 105:1, 105:6, 138:11, 146:5, 146:22, 146:24, 149:10, 149:15, 149:17
**Scene** - 144:12, 146:21
**schedule** - 175:17
**school** - 144:4, 148:1
**science** - 108:19, 143:18
**scientific** - 168:20, 169:11, 170:21
**scratch** - 136:20
**scream** - 54:25, 55:23, 58:22, 128:11
**screen** - 88:10, 88:13, 100:11, 113:12, 147:11, 159:22
**screened** - 109:25
**screener** - 143:10
**screening** - 147:13
**sealed** - 131:20, 137:19, 138:8
**search** - 129:18
**seat** - 4:19, 53:24, 56:16, 57:20, 58:3, 58:4, 58:10, 97:20
**seated** - 29:8, 63:21, 127:9, 175:20
**second** - 10:23, 21:11, 22:5, 29:17, 69:21, 69:22, 70:23, 71:16, 72:16, 75:14, 76:20, 93:13, 100:12, 101:11, 115:13, 118:4, 135:8, 152:3, 159:2
**section** - 76:9, 143:9, 168:4
**sections** - 88:15
**secure** - 13:18
**security** - 13:18
**see** - 5:23, 7:9, 9:17, 10:5, 10:6, 10:9, 10:16, 16:6, 23:18, 25:14, 37:2, 46:7, 47:6, 49:11, 55:16, 57:24, 59:4, 60:12, 62:6, 63:11, 66:17, 71:16, 74:3, 95:6, 95:24, 96:2, 100:6, 100:20, 100:21, 101:4, 105:2, 105:7, 107:3, 107:5, 107:12, 107:18, 109:3, 129:3, 129:4, 129:10, 129:15, 131:25, 132:3, 132:5, 132:9, 132:16, 132:20, 132:24, 133:2, 133:3, 134:7, 136:22, 136:23, 137:16, 140:11, 141:10, 141:12, 153:23, 153:25, 154:19, 158:7, 159:22, 164:18, 165:11, 175:2, 175:3, 177:10
**seeing** - 133:7, 133:8
**seek** - 27:9
**seeking** - 24:2, 24:4
**seem** - 44:18, 81:15, 81:25
**sell** - 32:5, 32:7, 36:25, 37:7
**selling** - 31:21, 32:20,

33:15, 39:14, 40:1
**semen** - 105:1, 107:4, 107:18, 108:2, 108:14, 110:1, 110:20, 110:21, 111:9, 111:22, 113:12, 134:7, 136:10, 136:11, 136:12, 139:14, 139:17, 139:21, 140:1, 145:23, 147:8, 147:16, 160:18, 163:25
**semen-containing** - 160:18
**send** - 114:24, 116:18
**sense** - 82:15, 136:6
**sensitive** - 81:21, 128:8
**sent** - 105:24, 117:12, 118:10, 118:23, 119:1, 130:15, 130:21
**sentence** - 18:17, 19:6, 19:14, 19:17, 19:18, 20:9, 30:7, 30:18, 30:21, 69:22, 71:17, 76:9
**sentences** - 19:7, 19:9, 19:22, 19:24, 30:4
**separate** - 49:22, 111:11, 111:12, 122:23, 160:20, 174:19
**Separate** - 137:8
**separated** - 34:6, 113:14, 114:10
**September** - 5:12
**Sergeant** - 105:23, 114:25, 115:2, 115:7, 116:18, 117:10, 117:12, 123:22, 124:2, 126:4, 130:15
**seriously** - 128:14
**served** - 16:20, 18:19, 20:23, 26:14, 30:13, 30:16
**serving** - 18:14, 19:23, 29:22
**set** - 148:19
**setting** - 104:24, 146:2
**seven** - 18:18, 19:12, 19:21, 19:22, 30:8, 30:10
**Seventeen** - 18:18, 19:12
**seventeen** - 19:22, 30:10
**several** - 81:20
**sex** - 134:21
**sexual** - 106:2, 106:20, 107:4, 108:18, 109:24, 110:3, 119:20, 122:22, 123:23, 124:8, 124:9, 124:10, 124:11, 134:21
**Sharpie** - 55:13
**sheet** - 169:10
**shirt** - 6:4, 6:6, 7:11, 153:11, 153:20, 154:4, 154:18, 154:19, 154:22
**short** - 58:21
**shorthand** - 1:25
**shortly** - 45:9, 50:9, 59:2
**shot** - 97:23, 99:15
**show** - 7:2, 11:1, 27:2, 82:14, 87:24, 92:1, 93:5, 94:15, 94:21, 95:2, 98:5, 99:12, 106:11, 117:20, 152:2, 154:9, 154:10, 156:21, 157:8, 157:12, 158:17, 166:24
**showing** - 94:25, 106:18, 106:22
**shows** - 158:18
**shrine** - 40:25
**side** - 8:24, 8:25, 53:24, 54:21, 56:6, 56:9, 56:24, 57:9, 57:14, 58:2, 58:3, 58:11, 73:16
**sidebar** - 14:3
**sides** - 1:14, 176:17
**sign** - 29:16, 79:4, 100:21,

101:2
**signed** - 92:12, 92:18
**significant** - 90:8
**similar** - 145:3, 150:4
**similarities** - 22:17, 24:3
**simply** - 172:9
**single** - 12:13, 39:3, 67:15, 161:7
**single-source** - 161:7
**single-spaced** - 39:3, 67:15
**singular** - 93:14
**sink** - 52:16, 52:17, 52:25
**sitting** - 6:2, 6:3, 53:20, 54:13, 56:16
**situation** - 22:13, 155:2
**situations** - 160:15
**Six** - 84:15
**six** - 20:21, 20:23, 21:15, 23:7, 28:4
**sixth** - 74:12, 74:13
**skin** - 108:16, 111:5, 111:8, 111:13, 113:14, 132:3, 134:24
**skinnier** - 8:2
**Skip** - 15:7, 64:10, 76:20, 101:19
**skip** - 116:20
**slash** - 74:3
**sleep** - 42:3, 42:8, 42:9, 47:4, 47:6, 48:1, 77:1, 77:10, 77:13
**slept** - 40:11, 40:12, 40:16, 40:20, 42:2
**slightly** - 108:25
**slowly** - 111:1
**small** - 68:12, 104:21, 129:16, 136:8, 143:7, 166:14, 168:3
**smear** - 110:12
**smears** - 2:4, 110:16, 124:8
**smoke** - 108:8
**smoked** - 107:13
**smoking** - 108:6
**software** - 129:18
**sold** - 31:22, 38:8, 38:18, 39:15, 39:19, 39:21, 69:24
**someone** - 23:23, 80:10, 80:11, 80:12, 107:13, 138:16, 149:16
**sometime** - 50:3, 128:11
**sometimes** - 5:20, 39:23, 39:24, 42:16, 89:23
**Sometimes** - 64:24, 80:6, 128:14, 163:22
**Somewhat** - 70:10
**somewhere** - 40:12, 56:11, 130:21
**sorry** - 8:16, 34:8, 62:16, 62:20, 74:12, 142:15, 149:2, 163:4, 163:9
**Sorry** - 127:15
**sort** - 72:12, 85:24, 109:23, 136:24
**sound** - 61:10, 175:6
**sounds** - 76:10
**source** - 157:3, 161:7, 168:21, 169:12, 170:21
**sources** - 145:19
**Southeast** - 165:21, 168:15, 169:7
**southern** - 102:2
**Southwest** - 165:21, 168:16, 169:8
**space** - 75:10
**spaced** - 39:3, 67:15
**Spanish** - 68:5, 68:9, 69:5, 69:6, 79:9, 79:13, 79:20, 79:21, 80:3, 92:16

**sparks** - 46:7
**speaker** - 79:20
**speakers** - 80:3
**speaking** - 41:20, 41:22, 84:22, 110:23, 129:9
**speaks** - 79:21
**special** - 65:6
**Special** - 3:8, 64:2, 64:10, 65:9
**specialist** - 142:25, 143:5
**specific** - 24:16, 25:2, 25:4, 25:8, 67:24, 68:2, 72:25, 81:12, 121:16, 145:8, 165:14
**specifically** - 25:7, 66:8, 108:1, 124:18, 130:14, 163:5
**Specifically** - 85:16, 125:5
**specifics** - 158:21
**specimen** - 104:25
**specimens** - 103:12
**speculation** - 77:6
**speed** - 150:15, 150:16
**spend** - 66:5
**spent** - 40:22, 42:9
**Sperm** - 132:8
**sperm** - 108:17, 108:23, 108:24, 110:1, 111:9, 111:14, 111:15, 111:17, 112:15, 112:23, 113:15, 113:19, 114:10, 119:22, 120:11, 120:14, 120:16, 132:7, 132:10, 132:22, 132:25, 133:25, 134:8, 139:14, 139:15, 140:7, 159:15, 159:16, 160:11, 160:17, 162:4, 162:6, 162:10, 163:4, 163:5, 163:15, 163:19, 163:20, 163:22
**spermatozoa** - 132:15, 132:16, 132:21, 133:4, 133:13, 133:16, 133:21, 134:19
**split** - 165:13
**spot** - 145:3, 145:4
**Sr** - 86:20
**stab** - 74:3
**stabbed** - 59:18, 59:21, 59:22, 59:23, 60:8, 60:9
**stabbing** - 8:13
**stacked** - 19:7, 19:11, 19:24
**Stadium** - 100:16
**stain** - 153:13
**stains** - 153:12, 153:14
**stand** - 3:10, 68:15, 68:23, 75:4, 95:23, 142:4, 177:3
**standard** - 66:23, 67:1, 93:16
**standing** - 53:20, 53:25, 54:13, 54:22, 57:14, 73:10
**Standing** - 56:6, 57:13
**start** - 96:7, 107:20, 107:21, 133:20, 142:6, 143:24, 147:18
**started** - 31:18, 32:2, 32:7, 32:14, 32:18, 32:20, 66:19, 67:7, 127:22, 143:25, 144:6, 147:9, 156:17, 157:25
**starting** - 10:13, 10:16, 121:19
**state** - 170:20
**State** - 1:11, 2:7, 1:12, 3:3, 3:5, 3:19, 4:8, 4:9, 18:4, 20:14, 23:17, 24:6, 63:25, 83:20, 102:18, 118:13, 141:23, 174:3, 174:10, 175:23, 176:2, 176:3, 178:2, 178:5

**State's** - 1:4, 7:2, 7:6, 7:10, 7:14, 7:18, 7:20, 7:22, 7:25, 11:1, 79:1, 87:25, 88:16, 89:7, 92:2, 92:22, 92:24, 93:1, 93:4, 93:5, 93:12, 94:7, 94:21, 95:1, 95:10, 95:11, 95:15, 95:18, 98:6, 98:17, 98:18, 98:20, 98:23, 99:12, 99:19, 99:20, 99:22, 99:25, 100:2, 100:6, 106:12, 106:18, 106:22, 110:9, 117:21, 118:3, 118:17, 118:21, 119:6, 120:19, 120:21, 121:1, 123:18, 124:6, 124:14, 152:16, 152:18, 152:21, 152:24, 154:11, 154:12, 156:22, 157:2, 157:16, 157:17, 157:20, 157:23, 158:12, 158:14, 158:17, 158:19, 166:25, 167:16, 167:20, 167:22, 168:2, 168:3, 168:6, 168:23, 169:18, 174:11, 174:14, 174:16
**statement** - 3:17, 3:18, 14:1, 37:24, 57:4, 61:2, 75:4, 78:15, 79:9, 79:17, 80:15, 80:24, 81:5, 82:9, 94:23
**stating** - 57:6
**statistic** - 166:15
**statistics** - 2:17, 165:1, 165:5, 165:8, 165:17, 166:8, 166:12, 167:7, 168:11, 168:12, 168:13, 169:3, 169:5, 169:21, 172:23
**status** - 104:4
**stay** - 174:19
**stayed** - 34:11, 40:7, 40:15, 40:17, 41:8, 77:11
**staying** - 34:20, 40:10, 77:4
**step** - 95:19, 102:15, 123:9, 141:20, 147:13, 147:17, 173:24
**stepped** - 142:7
**steps** - 129:17, 130:5, 147:19
**stick** - 175:16
**sticker** - 118:2
**stickers** - 110:14
**Still** - 57:21
**still** - 15:19, 96:2, 100:15, 112:23, 144:4
**stockings** - 49:1
**stood** - 56:4, 56:15, 137:6
**stop** - 8:24, 10:23, 22:5
**stop-and-goes** - 8:24
**stopped** - 9:7, 9:9
**storage** - 121:20, 126:17
**stored** - 134:14
**stores** - 8:23
**story** - 41:4, 56:20, 72:21, 72:22, 72:25, 79:16, 79:17, 80:16, 80:19
**straight** - 97:23, 160:14
**street** - 8:20, 8:21, 8:22, 8:23, 36:9, 97:16, 99:16, 100:7, 100:14, 100:21, 100:22, 101:2
**striped** - 7:11
**strong** - 34:3
**study** - 130:16, 134:20
**stuff** - 18:1, 26:22, 28:12, 33:19, 36:4, 36:19, 40:8, 70:9, 86:6, 95:13, 123:13, 125:25, 131:22, 147:24
**styled** - 178:11
**subject** - 63:7, 176:25
**submerge** - 74:20

**submerged** - 155:5
**submitted** - 153:6, 156:10, 156:11
**subpopulation** - 166:1, 166:9
**substance** - 68:19
**suggestion** - 28:13
**suit** - 6:5, 6:7, 94:1
**suitable** - 107:6
**Suite** - 2:15
**summaries** - 167:2
**summarize** - 88:3
**summarizes** - 152:10
**summary** - 2:20, 2:21, 68:19, 112:12
**supervise** - 143:7, 143:11
**supervisor** - 103:7, 143:6
**supposedly** - 51:14
**surname** - 29:17
**suspect** - 66:12, 105:6
**suspects** - 115:9
**sustained** - 12:4, 14:2, 38:11, 41:18, 42:14, 42:18, 46:23, 62:10, 77:8, 81:2, 81:9
**swab** - 2:13, 2:14, 91:20, 93:8, 93:14, 112:1, 113:5, 118:17, 118:24, 119:3, 119:5, 146:12, 153:17, 162:1, 172:11
**swabs** - 2:3, 2:22, 66:1, 93:17, 93:21, 109:24, 110:1, 110:3, 110:5, 110:11, 110:12, 110:16, 110:18, 111:2, 111:5, 111:22, 114:19, 114:20, 118:8, 118:9, 119:20, 119:22, 120:21, 124:8, 133:23, 139:12, 140:5, 145:24, 156:14, 156:15, 156:16, 156:24, 157:4, 159:16, 160:11, 161:8, 162:4, 162:5, 162:6, 172:2, 172:11, 172:20
**swear** - 76:7
**sworn** - 4:16, 4:24, 64:3, 64:7, 83:22, 83:23, 84:3, 102:19, 102:25, 141:25, 142:3, 142:18
**Sx** - 2:2, 2:3, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:20, 2:21, 2:23, 2:24, 3:1
**System** - 90:24

# T

**t-shirt** - 153:11, 153:20, 154:4, 154:18, 154:19, 154:22
**table** - 3:4, 63:24
**tact** - 132:22
**tag** - 154:19
**tail** - 132:23
**tails** - 132:18, 132:19, 132:20, 132:25, 133:5, 133:7, 133:8
**talks** - 41:16
**Tall** - 8:8
**tampering** - 136:25
**tape** - 93:10, 110:13, 118:1
**taxi** - 44:12, 44:18, 44:19
**teach** - 144:19
**teal** - 96:25
**technical** - 170:24, 171:2, 171:3, 172:6
**technology** - 128:8
**telephone** - 78:11
**ten** - 49:18, 71:6

**tendering** - 7:18, 152:17
**terms** - 82:17
**Terrace** - 2:12
**terrible** - 33:23
**test** - 110:11, 118:3, 126:9, 136:13, 138:2, 147:7, 147:8, 153:1, 153:6, 153:10, 154:4, 154:6, 154:25
**tested** - 106:25, 109:23, 113:7, 114:4, 116:1, 116:4, 116:11, 116:14, 117:4, 117:25, 118:9, 118:17, 119:5, 119:8, 126:5, 126:9, 126:12, 126:20, 129:20, 154:20, 154:22, 156:24
**testified** - 4:16, 4:24, 40:6, 64:7, 70:5, 84:3, 102:25, 104:5, 104:10, 142:18
**testify** - 12:9, 13:14, 35:1, 41:25, 43:11, 133:25, 144:14
**testifying** - 12:18, 13:11, 29:21, 31:13, 36:1, 81:7
**testimony** - 6:14, 12:1, 18:13, 25:17, 34:14, 41:12, 64:14, 85:25, 122:7, 123:4
**testing** - 103:25, 104:21, 104:23, 105:24, 108:25, 111:12, 117:10, 118:9, 118:12, 125:15, 126:3, 126:14, 126:16, 127:4, 127:6, 129:6, 134:6, 135:23, 136:12, 147:10, 147:18, 153:16, 153:22, 154:14, 154:16, 155:13, 158:25, 160:4, 160:6, 168:7, 171:25
**testings** - 103:12
**tests** - 147:15
**Texas** - 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:3, 4:8, 30:25, 80:11, 103:8, 103:22, 103:23, 104:12, 144:8, 178:2, 178:6, 178:20, 178:23
**themselves** - 129:14, 136:3
**therefore** - 161:18
**thereon** - 63:8, 177:1
**therewith** - 25:17
**thick** - 34:11
**thin** - 34:11
**thinking** - 22:9, 46:1, 46:6, 53:10, 173:7
**third** - 69:22, 71:13, 71:17, 75:16, 79:2, 115:15
**Thirty** - 49:14
**threat** - 61:10
**threatened** - 61:11, 61:23, 62:1, 76:6
**threats** - 61:14
**three** - 53:22, 58:6, 74:24, 76:8, 76:10, 76:15, 81:4, 98:16, 116:7, 116:9, 143:4, 144:3, 160:24, 160:25, 162:7
**three-and-a-half** - 143:4
**throughout** - 11:22, 79:19
**tip** - 146:13, 153:17
**tire** - 75:13, 75:14, 75:16
**tires** - 45:2, 45:5, 45:12, 45:18, 45:24, 46:9, 46:10, 46:19, 75:7
**Tise** - 2:3, 3:5, 3:10, 3:23, 4:21, 4:22, 5:2, 6:9, 6:12, 6:25, 7:2, 7:17, 8:1, 10:24, 11:1, 12:5, 14:11, 15:1, 15:2, 20:15, 22:2, 23:9, 23:13, 24:8, 27:10, 27:11, 27:21, 28:1, 28:5, 28:14, 28:18, 29:5, 34:13, 38:9,

41:10, 41:24, 42:13, 42:17, 43:1, 46:11, 46:21, 46:25, 60:1, 62:9, 63:2, 63:3, 63:16, 63:25, 77:5, 77:18, 77:19, 77:22, 78:22, 78:24, 79:4, 80:2, 81:3, 81:11, 82:3, 83:4, 83:5, 83:8, 83:13, 83:19, 83:20, 84:1, 84:5, 86:3, 86:6, 86:10, 86:11, 87:22, 87:24, 88:8, 88:11, 88:15, 91:24, 92:1, 92:22, 93:5, 94:6, 94:10, 94:18, 94:21, 94:25, 95:9, 95:19, 96:1, 98:17, 98:24, 99:1, 99:18, 100:2, 101:7, 101:10, 102:11, 102:13, 102:18, 102:23, 103:2, 106:9, 106:11, 117:19, 117:20, 120:18, 120:23, 123:25, 124:17, 124:21, 125:2, 126:8, 126:12, 126:19, 127:13, 127:16, 136:15, 136:16, 136:18, 140:12, 141:9, 141:14, 141:17, 141:22, 174:2, 176:3
**today** - 5:24, 35:1, 35:23, 38:6, 38:16, 45:17, 46:10, 46:19, 63:10, 105:12, 131:22
**together** - 20:3, 34:2, 49:22, 50:6, 68:12, 68:17, 98:8
**Together** - 50:7
**tomorrow** - 174:23, 177:4
**tonight** - 176:19, 176:21
**took** - 49:6, 56:23, 57:9, 66:22, 72:13, 73:15, 73:18, 122:14, 122:19, 135:22, 136:4, 136:11, 156:17
**tools** - 87:19
**top** - 19:25, 71:24, 73:14, 75:19
**total** - 30:10
**totally** - 41:11
**touched** - 126:5, 156:5
**touching** - 137:9
**tow** - 44:11
**towards** - 56:7, 81:21, 100:7
**Towards** - 78:17
**track** - 87:17, 88:19, 90:11
**training** - 103:19, 104:1, 143:8, 143:22, 153:1
**transcript** - 68:20
**transcription** - 178:7
**transcription/stenograph** - 1:25
**transfer** - 153:20
**transfusion** - 145:17
**translated** - 80:2
**translation** - 80:5
**transpired** - 31:8
**traumatic** - 69:11
**Trial** - 1:3
**trial** - 16:14, 63:8, 63:9, 79:19, 85:1, 85:8, 127:21, 171:22, 176:25, 177:2
**tried** - 121:12
**trip** - 37:15
**trouble** - 33:6, 34:10, 53:6, 53:15, 62:2, 69:22
**troubles** - 33:4
**truck** - 44:11
**true** - 20:7, 32:25, 52:5, 178:7
**truly** - 178:14
**truth** - 14:17, 15:13, 15:18, 16:5, 34:25, 42:8, 46:3, 48:18

**try** - 25:15, 54:12, 85:10, 86:19, 86:24, 90:4, 96:1, 105:2, 128:18, 136:3, 146:3, 147:14, 149:11, 153:19, 165:5
**trying** - 15:19, 25:1, 33:18, 46:17, 47:18, 61:15, 68:12, 72:8, 72:20, 72:21, 74:19, 81:23, 87:16, 108:10, 123:12, 134:7, 134:10
**tube** - 129:24, 158:3
**tubes** - 129:25
**turn** - 69:20, 70:23, 76:12, 139:25
**turpitude** - 24:23, 27:6, 28:8
**twelfth** - 74:13
**twelve** - 19:20, 30:8, 103:24
**Twenty** - 98:16
**Twenty-three-** 98:16
**twice** - 39:12
**twin** - 145:10
**twins** - 145:10, 145:13, 168:22, 169:13
**two** - 6:3, 18:24, 19:7, 19:9, 19:19, 22:17, 27:2, 27:23, 28:23, 30:2, 37:4, 40:13, 45:5, 45:24, 46:9, 46:19, 47:20, 56:17, 63:24, 74:24, 93:17, 98:10, 105:7, 108:20, 109:16, 110:15, 111:12, 117:20, 118:7, 129:21, 144:18, 160:15, 160:20, 162:13, 162:17, 163:12, 164:12, 173:11
**two-bedroom** - 40:13
**type** - 64:24, 108:11, 108:16, 111:10, 146:23, 147:10, 147:11
**typed** - 67:17, 68:18, 73:22, 77:15
**types** - 67:2, 82:1, 160:19, 160:21
**typewritten** - 67:5
**Typically-** 160:3
**typically** - 163:20, 165:11
**typing** - 67:7

**U**

**ultimate** - 171:7
**ultimately** - 148:15, 148:21, 151:8, 160:22
**unacceptable** - 28:11
**unclear** - 22:20, 22:23
**uncommon** - 165:6
**Under** - 132:13
**under** - 25:3, 27:7, 52:21, 133:10, 135:1
**underlying** - 24:11
**underneath** - 24:17
**understood** - 18:13, 52:3, 52:23, 52:24, 53:10, 69:9, 92:11
**underwater** - 53:3, 74:19, 75:2
**underwear** - 135:21, 136:10
**unique** - 104:22, 145:8, 145:9
**uniquely** - 151:3
**Unit** - 144:12, 146:21
**unit** - 64:22
**University** - 103:22, 103:23, 143:17, 143:20
**unknown** - 109:9, 109:17, 112:9, 114:16
**unless** - 20:14, 124:24, 145:9

**Unrecorded** - 65:20
**unrelated** - 156:2
**unusual** - 138:3
**up** - 4:19, 6:22, 7:4, 13:22, 20:3, 23:6, 34:16, 41:8, 45:8, 45:10, 45:11, 45:13, 45:24, 46:5, 46:9, 46:10, 49:25, 55:10, 56:4, 56:15, 60:5, 64:15, 68:18, 70:2, 72:15, 77:4, 77:11, 80:14, 83:25, 94:11, 95:21, 97:8, 102:20, 123:23, 126:21, 137:19, 138:8, 139:7, 142:5, 143:15, 144:2, 148:21, 150:14, 150:16, 158:18, 165:13
**Up** - 97:4, 97:6
**upper** - 158:23
**urge** - 121:15
**uses** - 66:3

**V**

**vagina** - 112:13, 114:19
**Vaginal** - 2:3, 2:22
**vaginal** - 109:24, 110:1, 110:3, 110:5, 110:10, 110:12, 110:15, 110:18, 111:2, 111:5, 111:22, 112:1, 113:4, 119:20, 119:22, 124:8, 139:12, 140:5, 159:16, 160:10, 162:4, 162:6, 163:4, 172:2
**Valley** - 64:23
**varies** - 145:12
**various** - 133:19
**vehicle** - 56:23, 56:24, 57:9, 73:15, 73:16
**version** - 68:16, 79:16
**victim** - 86:13, 105:6, 110:25
**view** - 50:8, 100:3, 100:18
**vigorous** - 104:1
**vigorously** - 24:24
**Virginia** - 144:5
**visit** - 37:4, 149:25, 168:1
**visually** - 108:22
**vitally** - 72:4
**voice** - 4:19, 83:25, 95:21, 102:20, 142:5
**voir** - 18:6, 23:21, 25:21
**Voir** - 1:4, 1:17, 18:11
**Vol-** 1:3, 1:4, 1:17, 2:1
**volume** - 178:10
**Volume** - 1:2, 1:1, 1:16
**Volumes** - 1:2
**voluntarily** - 92:11
**vomit** - 55:3, 55:5
**vomiting** - 55:7
**vs** - 3:3, 4:8
**Vs-** 1:9

**W**

**wait** - 8:16, 80:1
**Wait** - 41:15
**waived** - 4:13, 121:12
**walked** - 10:2, 56:3, 58:14
**Walking** - 55:5
**walking** - 49:24, 49:25, 54:15, 55:3, 56:1, 57:24, 58:21
**wants** - 47:9, 126:25, 127:2, 127:3
**warnings** - 16:13
**washaterias** - 8:24
**Washington** - 143:19
**watch** - 176:23
**water** - 52:22, 74:20, 153:19, 155:5, 155:10

**ways** - 72:11, 129:7
**weak** - 33:3
**weapon** - 19:21, 30:1
**wear** - 129:25
**wearing** - 163:24
**weather** - 155:6
**Webb-** 1:8, 1:24, 83:20, 84:2, 84:8, 84:9, 101:19, 157:11
**week** - 39:10
**weight** - 52:22, 53:3, 75:2, 165:6
**Westover** - 96:13, 96:14
**wet** - 153:18
**whatnot** - 155:6
**whereabouts** - 90:11
**whole** - 5:16, 8:2, 12:10, 33:2, 33:13, 43:5, 46:1, 120:12, 123:9, 126:13, 126:21, 137:21
**wife** - 26:21, 40:16
**William** - 1:6, 1:18, 64:6
**Williamsport** - 81:18
**willing** - 12:8
**Wisconsin** - 87:5
**withhold** - 94:7
**witness** - 3:8, 4:15, 6:10, 14:12, 15:1, 16:8, 17:16, 18:6, 22:17, 25:8, 25:22, 28:15, 62:25, 63:15, 64:2, 77:7, 77:17, 79:21, 82:3, 82:25, 83:3, 83:6, 95:19, 101:10, 102:9, 102:12, 122:3, 125:6, 127:11, 136:14, 140:12, 141:7, 141:17, 141:24, 142:14, 151:25, 166:22, 171:13, 173:17, 173:20
**Witness** - 1:17, 4:20, 54:11, 62:16, 62:20, 83:9, 83:15, 83:18, 83:23, 95:22, 97:21, 102:16, 102:19, 102:22, 122:12, 122:17, 122:23, 124:3, 126:2, 142:3, 142:8, 173:25, 178:16
**witness'** - 85:25
**Witnesses** - 1:4
**witnesses** - 85:11, 85:13
**woman** - 22:11, 27:5, 31:15, 31:16
**Wood** - 2:4, 3:6, 64:1, 94:20, 94:24, 141:23, 142:13, 142:15, 142:20, 151:24, 152:2, 152:16, 152:25, 156:19, 156:21, 157:15, 157:24, 158:11, 158:16, 166:21, 166:24, 167:14, 167:24, 168:1, 171:13, 171:14, 173:19, 173:22
**woods** - 9:13, 9:15, 36:5
**word** - 69:4
**Word** - 1:16
**wording** - 161:12
**words** - 69:2, 72:23, 76:4, 76:5, 78:18, 78:19, 79:15, 80:7, 125:23, 161:13, 168:2
**works** - 162:20
**world** - 167:10, 170:9
**world's** - 166:13, 166:19, 169:15, 170:17
**wounds** - 10:5, 10:6, 10:7
**write** - 78:18, 78:20, 79:9
**writing** - 66:20, 79:13, 121:14, 178:9
**written** - 77:12, 78:15, 94:23, 95:13, 124:25, 169:9
**wrote** - 68:16, 76:14, 76:22, 82:9

**Y**

**y'all** - 8:12, 9:7, 35:3, 42:1, 42:12, 43:13, 43:24, 50:23, 60:25, 61:11, 61:24, 65:13, 67:11, 73:24, 122:10, 156:10
**y'all's** - 151:3
**year** - 19:14, 20:22, 26:7, 30:17, 104:3, 133:10, 144:11
**years** - 18:18, 18:21, 19:12, 19:13, 19:20, 19:21, 19:22, 20:3, 27:8, 30:8, 30:10, 31:10, 36:20, 37:15, 47:20, 56:17, 84:15, 103:24, 133:1, 133:14, 133:16, 135:6, 143:4, 144:3, 144:8
**yellow** - 97:4
**yes-or-no** - 46:15
**Yesterday** - 29:21, 31:13, 43:22
**yesterday** - 4:13, 5:11, 6:14, 8:11, 18:14, 32:23, 40:7, 40:19, 41:1, 41:5, 41:7, 41:25, 42:6, 43:7, 43:11, 45:1, 48:23, 49:8, 52:4, 52:15, 60:24, 61:4, 64:15, 70:6
**yourself** - 32:5, 84:6, 103:3, 132:11
**yourselves** - 61:3, 63:7, 176:24

**Z**

**zeros** - 170:3, 170:12, 170:13