REPORTER'S RECORD

**VOLUME 25 OF 35 VOLUMES**

TRIAL COURT CAUSE NO. 1384794

COURT OF CRIMINAL APPEALS NO. AP-77,025


OBEL CRUZ-GARCIA              )  IN THE DISTRICT COURT
                             )
     Appellant               )
                             )
                             )
                             )
VS.                          )  HARRIS COUNTY, TEXAS
                             )
                             )
                             )
THE STATE OF TEXAS           )
                             )
     Appellee                )  337TH JUDICIAL DISTRICT



        * * * * * * * * * * * * * * * * * *

        **PUNISHMENT PROCEEDINGS**

        * * * * * * * * * * * * * * * * * *



     On the 17th day of July, 2013, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Renee Magee,

Judge presiding, held in Houston, Harris County, Texas;

     Proceedings reported by computer-aided

transcription/stenograph shorthand.

**A P P E A R A N C E S**

MS. NATALIE TISE
SBOT NO. 00795683
MR. JUSTIN WOOD
SBOT NO. 24039247
Assistant District Attorneys
1201 Franklin
Houston, Texas  77002
PHONE:  713.755.5800
**ATTORNEYS FOR THE STATE OF TEXAS**


**- AND -**


MR. R.P. 'SKIP' CORNELIUS
SBOT NO. 04831500
2028 Buffalo Terrace
Houston, Texas  77019-2408
PHONE:  713.237.8547

MR. MARIO MADRID
SBOT NO. 00797777
440 Louisiana, Suite 1225
Houston, Texas  77002-1659
PHONE:  713.877.9400
**ATTORNEYS FOR THE DEFENDANT**



Rolando Hernandez
Marilu Flores,
**Interpreters**

**I N D E X**
**VOLUME 25**
**(PUNISHMENT PROCEEDINGS)**

**JULY 17, 2013**

|  |  |  |  | PAGE | VOL. |
|---|---|---|---|---|---|
| **STATE'S WITNESSES** | **Direct** | **Cross** | **Voir Dire** |  | **VOL.** |
| James Kennedy | 4 | – | – |  | 25 |
| Tina Longoria | 20 | 36 | – |  | 25 |
| Perez | 40 | – | – |  | 25 |
| Johnny Lopez | 41 | 51 | – |  | 25 |
| Carmelo Martinez | 59 | 87 | – |  | 25 |
| Santana | 95 | – | – |  | 25 |
| Dr. Dwayne Wolf | 97 | 112 | – |  | 25 |
| Micah Webb | 116 | 121 | – |  | 25 |
| Darryl Novak | 123 | 136 | – |  | 25 |
|  | 139 | 140 | – |  | 25 |
| David Alan Davis, Jr. | 142 | – | – |  | 25 |
| Bonnie Fiveash | 148 | 178 | – |  | 25 |
| Diana Garcia | 191 | – | – |  | 25 |

State rests.................................. 202   25

Reporter's Certificate....................... 204   25

Word Glossary............................End of Volume

**ALPHABETICAL WITNESS INDEX**

|  | **Direct** | **Cross** | **Voir Dire** | **VOL.** |
|---|---|---|---|---|
| Davis, David Alan, Jr. | 142 | – | – | 25 |
| Fiveash, Bonnie | 148 | 178 | – | 25 |
| Garcia, Diana | 191 | – | – | 25 |
| Kennedy, James | 4 | – | – | 25 |
| Lopez, Johnny | 41 | 51 | – | 25 |

| | | | | |
|---|---|---|---|---|
| Novak, Darryl | 123 | 136 | - | 25 |
| | 139 | 140 | - | 25 |
| Perez, Tina | 20 | 36 | - | 25 |
| Longoria | 40 | - | - | 25 |
| Santana, Carmelo | 59 | 87 | - | 25 |
| Martinez | 95 | - | - | 25 |
| Webb, Micah | 116 | 121 | - | 25 |
| Wolf, Dr. Dwayne | 97 | 111 | - | 25 |

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| SX - 80 | Photograph | 197 | 197 | 25 |
| SX - 81 | Photograph | 197 | 197 | 25 |
| SX - 105 | Photograph | 10 | 10 | 25 |
| SX - 106 | Photograph | 10 | 10 | 25 |
| SX - 107 | Photograph | 10 | 10 | 25 |
| SX - 108 | Photograph | 10 | 10 | 25 |
| SX - 109 | Photograph | 10 | 10 | 25 |
| SX - 110 | Photograph | 10 | 10 | 25 |
| SX - 111 | Photograph | 10 | 10 | 25 |
| SX - 112 | Photograph | 10 | 10 | 25 |
| SX - 113 | Photograph | 10 | 10 | 25 |
| SX - 114 | Photograph | 15 | 16 | 25 |
| SX - 115 | Photograph | 15 | 16 | 25 |
| SX - 116 | Photograph | 15 | 16 | 25 |
| SX - 117 | Photograph | 15 | 16 | 25 |
| SX - 118 | Photograph | 15 | 16 | 25 |
| SX - 119 | Photograph | 15 | 16 | 25 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | SX - 120 | Photograph | 15 | 16 | 25 |
| 2 | SX - 122 | Photograph | 102 | 103 | 25 |
| 3 | SX - 126 | Photograph | 68 | 68 | 25 |
| 4 | SX - 127 | Photograph | 68 | 68 | 25 |
| 5 | SX - 128 | Photograph | 102 | 103 | 25 |
| 6 | SX - 130 | Bag with contents | 198 | 199 | 25 |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
 1                    (Open court, defendant present, no jury)
 2                    THE COURT:   Back on the record in Cause
 3   No. 1384794, the State of Texas vs. Obel Cruz-Garcia.
 4                    Mr. Cruz-Garcia is present at counsel table
 5   with his lawyers, Skip Cornelius and Mario Madrid.
 6   Present for the State is Natalie Tise and Justin Wood.
 7   And we have a number of witnesses to be sworn in this
 8   morning.
 9                    Please come in.  You can stand right there.
10   Raise your right hand, please.
11                    (Witnesses sworn)
12                    THE COURT:  Very good.
13                    The Rule has been invoked in this case.
14   And that's the rule of exclusion of witnesses.  What
15   that means -- you can put your hands down.  What that
16   means is all witnesses, except the parties, are
17   instructed to remain outside the courtroom.  Do not
18   discuss the case with anyone, except the attorneys.  And
19   do not read or listen to any report of the testimony in
20   the case until you are released as witnesses.
21                    Okay.  At this time, who will be your first
22   witness?
23                    MR. WOOD:  Officer Kennedy.
24                    THE COURT:  Officer Kennedy.
25                    And the other two may go out.
```

```
 1                    (Open court, defendant and jury present)

 2                    THE BAILIFF:  All rise.

 3                    THE COURT:  Please be seated.

 4                    Back on the record in Cause No. 1384794.

 5     The jury is present in the courtroom.

 6                    Are both sides ready to proceed?

 7                    MR. WOOD:  Yes, the State is ready.

 8                    MR. CORNELIUS:  The defense is ready.

 9                    THE COURT:  Please call your next witness.

10                    MR. WOOD:  The State calls Officer James

11     Kennedy.

12                    THE BAILIFF:  The witness was sworn, Your

13     Honor.

14                    THE COURT:  Officer, please speak directly

15     into the mic.

16                            JAMES KENNEDY,

17     having been first duly sworn, testified as follows:

18                          DIRECT EXAMINATION

19     BY MR. WOOD:

20         Q.   Good morning, Officer Kennedy.  How are you

21     doing?

22         A.   Good.

23         Q.   Can you introduce yourself to the ladies and

24     gentlemen of the jury, please?

25         A.   I'm Officer James Kennedy of the Houston Police
```

1  Department.

2       Q.   And, Officer Kennedy, how long have you been

3  employed by the Houston Police Department?

4       A.   Thirty-five years.

5       Q.   Thirty-five years.

6            Does that pretty much span your career in

7  law enforcement?

8       A.   Yes, sir.

9       Q.   Before joining HPD, tell me about your

10 education.

11      A.   I went to high school in Memphis, Tennessee.

12 And then I went to the University of Alabama.  I got a

13 degree in criminal justice.  And then I moved to

14 Houston.

15      Q.   So, as an Aggie, can you get past the Alabama

16 Aggie conflict?

17      A.   No.  You are going to lose the game.

18      Q.   What year was it that you joined HPD?

19      A.   1979.

20      Q.   And did you go through the academy and the

21 regular training to become a police officer?

22      A.   Yes, sir.

23      Q.   After you went through the academy, what was

24 your first assignment at HPD?

25      A.   I worked in patrol in northeast, in northeast

1   Houston.

2       Q.   When did you start working as a patrol officer,

3   approximately?

4       A.   June of '79.

5       Q.   How long did you work in patrol?

6       A.   About three years.

7       Q.   And after patrol, what did you do?

8       A.   I went to the Crime Scene Unit section.

9       Q.   How long did you serve in the Crime Scene Unit?

10      A.   Fifteen years.

11      Q.   And after that?

12      A.   I went to family violence for eight years.

13      Q.   And where do you currently work out of?

14      A.   I work at Intercontinental Airport.

15      Q.   Officer Kennedy, back in 1989, were you working

16  at the Houston Police Department?

17      A.   Yes, sir.

18      Q.   And in what capacity -- in what capacity were

19  you working back in '89?

20      A.   I was in the Homicide Division in the Crime

21  Scene Unit.

22      Q.   And when you say Crime Scene Unit, can you just

23  educate us a little bit about what the Crime Scene Unit

24  did back then when you worked with them?

25      A.   We went to crime scenes and we would take

1    pictures, lift fingerprints, recover the evidence, tag

2    all that evidence.  We made videos of the crime scenes.

3         Q.   And when you were asked to -- how was it that

4    you were called out to a scene generally?

5         A.   The dispatcher would call us.  A patrol unit

6    would get a call to a scene and they would determine if

7    they needed a Crime Scene Unit.

8         Q.   And would you work hand-in-hand with either

9    officers there on the scene or homicide or whoever it

10   was that was out there already working the case?

11        A.   Yes, sir.

12        Q.   I want to take you back to July 1st of 1989.

13   Was that a time that you were working as part of the

14   Crime Scene Unit?

15        A.   Yes, sir.

16        Q.   Specifically, were you required or requested at

17   that time to go out to a scene of 123 Winkler here in

18   Houston, Texas?

19        A.   Yes, sir.

20        Q.   And is that location, 123 Winkler, is that a

21   location in Harris County, Texas?

22        A.   Yes, sir.

23        Q.   What was the nature of the call that you were

24   dispatched to out at that --

25        A.   A dead body had been found in a dumpster at the

1  apartment complex at that location.

2      Q.   And a Crime Scene Unit had been requested in

3  response to that?

4      A.   Yes, sir.

5      Q.   Do you recall approximately what time it was

6  that you arrived on July 1st of '89?

7      A.   It was about 7:38, 7:39 in the morning.

8      Q.   What did you do -- well, first describe

9  generally the location there at 123 Winkler.  What kind

10  of location is that?

11      A.   It's in southeast Houston.  It's an older

12  neighborhood.  The complex is an older complex.

13      Q.   And when you say "complex," is that the

14  location of an apartment complex?

15      A.   Yes, sir.

16      Q.   What did you do when you first arrived at the

17  scene, Officer Kennedy?

18      A.   I met with the officer that was there to just

19  get some basic information and then I would have started

20  photographing the scene.

21      Q.   Was your attention directed towards the

22  dumpster there on the complex?

23      A.   Yes, sir.

24      Q.   When you went to that -- or when you went to

25  that dumpster, what did you -- generally, what did you

1  find?

2      A.   The body of a Hispanic male had been placed in

3  the dumpster.

4      Q.   And at that point, you said that you would have

5  began photographing that scene?

6      A.   Yes, sir.

7              MR. WOOD:  Your Honor, may I approach the

8  witness?

9              THE COURT:  Yes.

10     Q.   (By Mr. Wood) Officer Kennedy, I'm going to

11  show you what's been marked for identification purposes

12  as State's Exhibit 105, 106, 107, 108, 109, 110, 111,

13  112, and 113.  If you can take a minute and look at

14  those and tell me if you recognize those (indicating).

15     A.   Yes, sir, I do.

16     Q.   What do you recognize those to be?

17     A.   Those are the prints of the photographs I took

18  at the scene that day.

19     Q.   And do these photographs fairly and accurately

20  depict the scene that you responded to back on July 1st

21  of '89 at 123 Winkler?

22     A.   Yes, sir, they do.

23              MR. WOOD:  Your Honor, at this time I will

24  offer State's 105 through 113 consecutively after

25  tendering to defense counsel.

```
 1              (State's Exhibit No. 105 through 113

 2               Offered)

 3              MR. CORNELIUS:  We have a relevance

 4    objection at this point, Judge.

 5              THE COURT:  That will be overruled.

 6              State's 105, 106, 107, 108, 109, 110, 111,

 7    112, and 113 will be admitted over objection.

 8              You may proceed.

 9              (State's Exhibit No. 105 through 113

10               Admitted)

11              MR. WOOD:  Your Honor, permission to

12    publish these?

13              THE COURT:  Yes.

14        Q.  (By Mr. Wood) Officer Kennedy, when you first

15    arrived out there, you said you found the body of a

16    Hispanic male in that dumpster; is that correct?

17        A.  Yes, sir.

18        Q.  Did you do anything or did any other officer

19    out at the scene do anything to remove the body or move

20    the body in any way at first?

21        A.  No, sir.

22        Q.  Did you photograph that dumpster and the body

23    as you found it?

24        A.  Yes, sir.

25        Q.  I want to show you State's Exhibit 106.  Let me
```

1    enlarge that for you.

2                Tell the ladies and gentlemen of the jury

3    what State's 106 shows.

4        A.   This is a photograph of the dumpster.   There is

5    a parking lot behind it and there is a car in the front

6    on the left side.   It's at the end of the covered

7    parking area.

8        Q.   And that dumpster would be contained within

9    that apartment complex, I guess?

10       A.   Yes, sir.

11       Q.   State's Exhibit 107.   What does 107 show us

12   (indicating)?

13       A.   This is a picture of the complainants' body in

14   the dumpster.

15       Q.   Is that depicting where the head area is?

16       A.   Yes, sir.   And that blue thing is his shirt.

17       Q.   Right here in the middle of the photo

18   (indicating).

19       A.   Yes, sir.   And the large plastic thing on the

20   right and the left are trash bags with, I presume,

21   garbage.

22       Q.   Okay.   And 108 (indicating).

23       A.   This is also the picture of the complainant

24   showing his legs, his pants, and his lower back.   There

25   is a towel tied around his ankles in the lower

1  right-hand corner.

2      Q.   Okay.  And State's Exhibit 109 (indicating).

3      A.   That's a photograph of the interior of the

4  dumpster showing the entire body of the complaint.

5      Q.   Officer, at some point while you were out there

6  at the scene, was the body of the complainant removed

7  from that dumpster?

8      A.   Yes, sir.  We would have removed it when the

9  body car got there.

10     Q.   When you say "the body car," what do you mean

11 by that?

12     A.   A funeral home that would have been dispatched

13 by the medical examiner's office to take the body to the

14 medical examiner.

15     Q.   After the body of the complainant was removed,

16 in State's Exhibit 110, is that a picture depicting that

17 same dumpster (indicating)?

18     A.   Yes, sir.

19     Q.   And, I guess, obviously what would be found in

20 a dumpster is trash and other items of garbage, but of

21 note was there anything depicted in 110 that you, in

22 fact, ended up tagging as possibly relevant in this

23 case?

24     A.   Some gloves, rubber gloves, plastic gloves.

25     Q.   Are these depicted here in the top portion of

1   State's Exhibit 110 (indicating)?

2        A.   Yes, sir.

3        Q.   And did you tag those because you thought they

4   might have some relevance down the road?

5        A.   Yes, sir.

6        Q.   After the body of the complainant was removed

7   from the dumpster, was it immediately taken to the

8   medical examiner's office or the morgue or did you have

9   an opportunity to photograph after it was removed?

10       A.   I may have photographed it while it was on the

11   stretcher before they put -- after it left, it went

12   straight to the medical examiner's office.

13       Q.   I'm going to show you State's Exhibit 111.

14   What does that show us (indicating)?

15       A.   That's the body of the complainant laying on a

16   sheet outside the dumpster.

17       Q.   And State's Exhibit 112, specifically what is

18   that (indicating)?

19       A.   The right side of the complainants' body, his

20   lower abdomen and upper thigh, his right arm.  And there

21   is a towel and a rope wrapped around it.

22       Q.   And here on the complainant's -- right side of

23   his body, is there a large abrasion, does it appear

24   (indicating)?

25       A.   Yes, sir.

1      Q.   And finally, State's Exhibit 113.  What does
2  113 show us (indicating)?
3      A.   That's the complainant's body, specifically the
4  area of his feet.  And his feet are tied up with a
5  towel.
6      Q.   After the body was photographed there as
7  depicted in those State's exhibits, what else did you do
8  out there at the scene?
9      A.   I would have gone and taken notes to make a
10  scene diagram, checked around the area to make sure we
11  didn't miss anything, and then I would have gone to the
12  medical examiner's office.
13      Q.   And did you, in fact, do that in this case?
14      A.   Yes, sir.
15      Q.   When you leave a scene like this and you go to
16  the medical examiner's office, what was your purpose in
17  doing so?
18      A.   We would take more pictures of any injuries,
19  get fingerprints of the deceased, make a wound chart.
20  And if there were any other examinations that we would
21  be allowed to do, we would do those.
22      Q.   So, oftentimes you were called out as part of
23  your duties as a crime scene officer to also follow up
24  in this regard as well?
25      A.   Yes, sir.

```
 1              MR. WOOD:  Your Honor, may I approach the
 2   witness again?
 3              THE COURT:  Yes.
 4       Q.  (By Mr. Wood) Officer Kennedy, I'm going to now
 5   show you State's Exhibits 113, 114, 115, 116, 117, 118,
 6   119, and 120.  Can you take a look at those and tell me
 7   if you recognize those (indicating)?
 8       A.  Yes, sir, I do.
 9       Q.  What do you recognize those exhibits to be?
10       A.  Those are photographs I took of the deceased in
11   the medical examiner's office.
12       Q.  And do they more specifically depict some of
13   the specific areas of the injury to the complainant?
14       A.  Yes, sir.
15       Q.  And do they fairly and accurately represent
16   what you remember the complainant being like there when
17   you photographed him at the medical examiner's office?
18       A.  Yes, sir.
19              MR. WOOD:  At this time, Your Honor, I will
20   offer State's Exhibits 114 through 120 consecutively
21   after tendering to defense counsel.
22              **(State's Exhibit No. 114 through 120**
23               **Offered)**
24              MR. CORNELIUS:  Relevance objection, Judge.
25              THE COURT:  Okay.  That will be overruled.
```

1    State's Exhibits 114, 115, 116, 117, 118, 119, and 120

2    are admitted over objection.

3                    **(State's Exhibit No. 114 through 120**

4                    **Admitted)**

5                    MR. WOOD:  Thank you, Your Honor.

6                    Permission to publish?

7                    THE COURT:  Yes.

8         Q.  (By Mr. Wood) Officer Kennedy, I'm going to

9    show you State's 114.  What does State's 114 show us

10   (indicating)?

11        A.  That's the toe tag that was placed on the

12   deceased's toe.

13        Q.  Are you aware what any of these numbers mean on

14   this in State's Exhibit 114?

15        A.  The 68 represents his height, the 137 is his

16   weight, and the 89-4198 is the medical-legal number.  In

17   other words, he was the 4,198th deceased person to go to

18   the medical examiner's office in 1989.

19        Q.  And when you say the 68 and the 137, when you

20   say 68 indicates his height, what does that mean?

21        A.  His height in inches.

22        Q.  Okay.  And the 137 would be in pounds?

23        A.  Yes, sir.

24        Q.  State's Exhibit 116.  What does 116 show us

25   (indicating)?

1      A.   This is a photograph of the deceased laying on

2  a morgue tray.  It's from the waist up.  It shows his

3  face, his right arm.  There is a tattoo of an "S."

4      Q.   Is that right here in the middle of State's

5  Exhibit 116 (indicating)?

6      A.   Yes, sir.  And then under it is like a face

7  wearing a hat.  And also his right arm has got some rope

8  and a towel wrapped around it.

9      Q.   State's Exhibit 118.  What does 118 show us

10 (indicating)?

11     A.   118 is a photograph of the deceased's neck on

12 the left side.  It shows three ligature strangulation

13 marks.

14     Q.   And is that indicated here in the middle of his

15 neck (indicating)?

16     A.   Yes, sir.

17     Q.   State's Exhibit 119.  What is that picture

18 (indicating)?

19     A.   That's a picture of his right hand and the

20 towel and rope wrapped arm it.

21     Q.   Is there also an abrasion on his right hand

22 depicted in 119?

23     A.   Yes, sir.

24     Q.   And then finally, State's Exhibit 120.  What is

25 shown in 120 (indicating)?

1      A.   That's the deceased's feet with a toe tag,

2   socks, a towel wrapped around his feet, and it looks

3   like some black wire.

4      Q.   Are you indicating what is in the bottom half

5   of the picture?

6      A.   Yes, sir.

7      Q.   Would you characterize that as wire or some

8   kind of electrical cord possibly?

9      A.   Yes, sir.

10     Q.   Other than photographing the complainant's body

11  at the morgue that day on July 1st, what else did you do

12  while you were there?

13     A.   Took his fingerprints, took pictures.  That

14  would be it.

15     Q.   What was the purpose in taking fingerprints at

16  that point in the investigation?

17     A.   Well, so if we had recovered fingerprints from

18  the scene, we would have his fingerprints to compare

19  them by.  And also, so the Identification Division, they

20  can go through the fingerprint records.  And if he has a

21  criminal history, they can identify him.

22     Q.   And so, one goal in this is trying to help

23  identify who that person is; is that right?

24     A.   Yes, sir.

25     Q.   After you left the medical examiner's office

1    that day, what did you then do involving this case?

2         A.   I would have gone back to the office, did the

3    report, and tagged all of the evidence.

4         Q.   And would that pretty much conclude your

5    involvement in this investigation?

6         A.   Yes, sir.

7                   MR. WOOD:  Your Honor, at this time, I will

8    pass the witness.

9                   THE COURT:  Thank you, Mr. Wood.

10                  Mr. Cornelius, do you have any questions?

11                  MR. CORNELIUS:  May I have a moment, Judge?

12                  THE COURT:  Okay.

13                  (Pause)

14                  MR. CORNELIUS:  We pass the witness, Judge.

15                  THE COURT:  Thank you.

16                  May this witness be excused?

17                  MR. WOOD:  No objection.

18                  MR. CORNELIUS:  No objection.

19                  THE COURT:  You may be excused.

20                  THE WITNESS:  Thank you.

21                  THE COURT:  State, call your next.

22                  MR. WOOD:  The State calls Tina Longoria

23    Perez.

24                  THE BAILIFF:  The witness has been sworn,

25    Your Honor.

```
 1                    THE COURT:  Thank you.
 2                    Ma'am, please keep your voice up and speak
 3    directly into the microphone.
 4                    You may proceed, Mr. Wood.
 5                    MR. WOOD:  Thank you, Your Honor.
 6                       TINA LONGORIA PEREZ,
 7    having been first duly sworn, testified as follows:
 8                       DIRECT EXAMINATION
 9    BY MR. WOOD:
10        Q.   Good morning, Ms. Perez.
11        A.   Good morning.
12        Q.   How are you doing?
13        A.   Great.
14        Q.   Are you a little nervous?
15        A.   Yes.
16        Q.   Well, just like I told you, just take your time
17    and take a deep breath.
18                    Can you introduce yourself for the ladies
19    and gentlemen of the jury, please?
20        A.   Hi.  My name is Tina Perez.
21        Q.   And, Ms. Perez, what -- do you live here in
22    Houston?
23        A.   Yes.
24        Q.   And do you have family here?
25        A.   Yes.
```

1      Q.   Tell me generally about your family.  How big

2    is your family?

3      A.   I have four children and six grandchildren.

4      Q.   So, do they keep you busy?

5      A.   Yes.

6      Q.   Are you married?

7      A.   Yes.

8      Q.   And what -- are you currently working?

9      A.   No, not at this time.

10     Q.   Are you taking care of kids and grandkids a lot

11   of the day?

12     A.   Yes.

13     Q.   How long have you lived here in the Houston

14   area?

15     A.   All my life.

16     Q.   If you don't mind me asking -- it's one of

17   those questions I'm not supposed to ask, but how old are

18   you?

19     A.   Forty.

20     Q.   Okay.  Did you go to school -- did you grow up

21   and go to school here in the area as well?

22     A.   Yes.

23     Q.   Where did you go to school?

24     A.   I went to Briscoe Elementary, Deady Middle

25   School, and Milby.

1        Q.    Milby High School?

2        A.    Yes.

3        Q.    Ms. Longoria -- Ms. Perez, I want -- you were

4   Ms. Longoria before.  Is that your maiden name?

5        A.    That is my maiden name.

6        Q.    Ms. Perez, I want to take you back a long time,

7   back to some time around 1989.  Would you been around

8   16, thereabouts?

9        A.    Yes.

10        Q.    Where were you -- what was your situation then?

11   Where were you living?

12        A.    I lived -- at that time, I was living with my

13   parents.  I lived behind the Barnett Stadium in, I

14   guess, the southeast side of town.

15        Q.    Is that over there kind of Telephone and the

16   610 area?

17        A.    Yes, Telephone and 610 area.

18        Q.    And were you in school at that time?

19        A.    No.

20        Q.    Tell me what was going on in your life back

21   then when you were 16.  Was it a good time or a bad

22   time?

23        A.    A bad time.

24        Q.    Describe that for the ladies and gentlemen of

25   the jury.  What do you mean?

1      A.   I had separated from my husband at that time.

2   And I met up with an old friend and I got mixed up with

3   the wrong people.

4      Q.   Who was that old friend?

5      A.   Her name was Elizabeth Ramos.

6      Q.   And at that point, you said you had separated

7   from your husband.  Are you talking about the husband

8   that you are still with today?

9      A.   Yes.

10     Q.   Did you guys have any -- had you had any of

11  your kids together at that point?

12     A.   Yes.  We had two.

13     Q.   And those would, I guess, be your two oldest

14  kids.

15     A.   Right.

16     Q.   How old were they around that time?

17     A.   One was two.  The oldest was two.  And the

18  second one was like about a year old.

19     Q.   Was that area -- that period of time,

20  Ms. Perez, and an area of time that you are proud of?

21     A.   No, not proud at all.

22     Q.   And why was that?  When you said you met up

23  with Elizabeth and you guys got involved in some stuff,

24  what kind of stuff?

25     A.   Drugs.

```
 1        Q.   How did that happen?  How did that start?

 2        A.   Being with friends, hanging out with people

 3   they knew, partying, whatnot.

 4        Q.   Was that something that was an area of conflict

 5   for you and your parents?

 6        A.   Yes.

 7        Q.   Who was this Elizabeth Ramos?

 8        A.   She was a girlfriend of Obel's.

 9        Q.   And how did you -- do you remember how you

10   first met Elizabeth or how your friendship started with

11   her?

12        A.   I had met her in school.  She was someone I

13   went to school with in elementary.

14        Q.   And then you guys kind of reconnected?

15        A.   Yes.

16        Q.   Where would you and Elizabeth get your drugs?

17        A.   She would get them from him.

18        Q.   And "she" being Elizabeth?

19        A.   Yes.  Elizabeth would get them from Obel.

20        Q.   When you say Obel, do you know that person as

21   Obel Cruz-Garcia?

22        A.   Yes.  Back then, I knew him as Obel.

23        Q.   Because of that connection, would you sometimes

24   have an occasion to hang out or be in the same -- or be

25   in contact with the person you've described as Obel?
```

1      A.   Yes.

2      Q.   And would you say that that -- the main purpose

3  that you would have contact with him would be for the

4  drug connection?

5      A.   Not him in particular, but the person that he

6  had doing his business, yes.

7      Q.   Well, Ms. Perez, I know it's probably been a

8  long time since you have had to talk or deal with this.

9  Is that right?

10     A.   Yes.

11     Q.   And fair to say has it been a long time since

12 you have seen any of those people that you had contact

13 with back in that life?

14     A.   Yes.  Because when I walked away, I walked away

15 not to turn back to it.  Just walked away from it.

16     Q.   Ms. Perez, do you see the person that you have

17 described as Obel here in the courtroom today?

18     A.   Yes.

19     Q.   And can you please point to him and identify

20 something that he's wearing so we know who you are

21 talking about?

22     A.   The guy in the gray suit with the ear phones on

23 his head.

24          MR. WOOD:  Your Honor, may the record

25 reflect that she has identified the defendant?

1            THE COURT:  The record will so reflect.

2       Q.   (By Mr. Wood) So, back when you had contact

3  with the defendant -- this is around the time of 1989

4  timeframe -- how often would you say that you and

5  Elizabeth would see him?

6       A.   I would say maybe on a weekend basis, maybe.

7       Q.   On weekends or a weekly basis?

8       A.   On a weekend basis, I would say.

9       Q.   You said Elizabeth was a girlfriend of his?

10      A.   Yes.

11      Q.   What do you mean by that?

12      A.   She was his -- I guess you could say his fling.

13  That was his little sidekick.

14      Q.   And through the defendant and Elizabeth, did

15  you also have an opportunity to get to know other

16  associates of the defendant?

17      A.   Yes.

18      Q.   Do you remember any of those names or any of

19  those individuals you would also have contact with?

20      A.   Yes.

21      Q.   What were those names, if any, that you can

22  remember?

23      A.   Back then, Shorty.  There was one by the name

24  of Shorty.  There was Rudy, Saul, and a guy named

25  Robert, but his real name was Leo.

1           MR. WOOD:  Your Honor, may I approach and

2    get some evidence?

3           THE COURT:  Yes.

4      Q.  (By Mr. Wood) Ms. Perez, I'm going to show you

5    State's Exhibit 83.  State's Exhibit 83, is that how you

6    remember the defendant back in that time (indicating)?

7      A.  Yes.

8      Q.  And what about State's Exhibit 85, who is that

9    person (indicating)?

10     A.  That's his cousin.  I believe it was his

11   cousin.  That was like his right-hand man.

12     Q.  And what was his name?

13     A.  Rudy.

14     Q.  Did you ever know the person shown in State's

15   Exhibit 84?  Is that anyone that you recognize?

16     A.  No.  I've never seen him before.

17     Q.  Not during that time?

18     A.  No.

19     Q.  When you said that -- you described Rudy as

20   kind of his right-hand man.  What do you mean by that?

21   Describe what you meant by that.

22     A.  Everywhere he was, he was.  They were

23   inseparable.

24     Q.  Did those individuals you identified, Rudy and

25   the person named Shorty and Saul, did they -- were they

```
 1   friends of the defendant or how -- what would you

 2   characterized their relationship with the defendant?

 3        A.   I would say they were like his dealers, I

 4   guess.

 5        Q.   So, they dealt drugs for him?

 6        A.   Uh-huh.

 7        Q.   Do you know what kind of -- was it cocaine or

 8   anything --

 9        A.   Cocaine.

10        Q.   Is that what you and Elizabeth would buy from

11   him?

12        A.   Yes.

13        Q.   Who would y'all deal with directly in getting

14   your drugs typically?

15        A.   I dealt with Shorty.

16        Q.   In that whole group of individuals, was there

17   anybody you felt was kind of in charge or the boss?

18        A.   Obel.

19        Q.   Why do you say that?

20        A.   Because he would be the one to call the shots.

21   Just the way he would speak and how he carried himself,

22   it was like he was the person in control.

23        Q.   And you said that you dealt with Shorty some as

24   someone that you bought from.  Who was this person that

25   you called Saul?
```

1      A.   He was a young kid.  He was one -- I guess a

2  new person they had recruited.  He was a young guy and

3  he also helped.

4      Q.   At some point in time, Ms. Perez, did you learn

5  something happened to Saul?

6      A.   Yes.

7      Q.   And how did that come about?  How did you learn

8  of that?

9      A.   I learned about it because I had went to his

10 apartment to look for Shorty to go grab some drugs.  And

11 the door was open to that apartment.  I happened to walk

12 in there and I asked for him.  I shouted out his name.

13 Shorty never came out.  So, when I glanced towards the

14 bedroom, I glanced towards the restroom, I seen a body

15 in the tub.  So, when I seen the body, I kind of froze,

16 I freaked out, and I ran out of there, never to turn

17 back to say anything.  Later I ran into the defendant

18 here --

19     Q.   Let me stop you because I have to ask the next

20 question.  And we'll get to that.

21          I want to take you back a little bit about

22 what you said.  You said that you had gone to an

23 apartment.  What -- describe that apartment or what you

24 mean by that.

25     A.   I went to -- they were called the Winkler

1    Apartments, I believe.  I went to Apartment 94.  I went

2    there to get some drugs from Shorty.  And I happened to

3    walk in there.  The door was open.  I walked in that

4    apartment, calling out his name.  He never answered.  I

5    walked a little bit towards the hallway and I glanced

6    towards the bedroom.  I didn't see anything.  I glanced

7    towards the bathroom and I seen a body in the tub.

8         Q.  Was that an apartment that you were familiar

9    with?

10        A.  I would just go there to get drugs.

11        Q.  Okay.  And did you think that -- had it been an

12   apartment that you had been to prior to that day that

13   you saw the body?

14        A.  Yes, I had been there prior to that.

15        Q.  And had you been there several times or a few

16   times or can you remember?

17        A.  No, I can't remember, but I remember going

18   there prior to that time walking in there and seeing

19   what I had seen.

20        Q.  Was that apartment an apartment that you

21   thought someone actually lived in or do you know?

22        A.  There was -- I knew that guy was there, that

23   Shorty was there, but, I mean, there was no furniture or

24   anything in that apartment, so...

25        Q.  Was it kind of an apartment that they may have

1  just dealt out of?

2       A.   Yes, I believe so.

3       Q.   And your purpose in typically going there was

4  not to really hang out, it was to buy drugs?

5       A.   Right.

6       Q.   And this apartment was a place where you had

7  previously met up with Shorty at?

8       A.   Yes.

9       Q.   On that day that you went in, you said the door

10 was open?

11      A.   Right.

12      Q.   And did you just knock and go ahead --

13      A.   I knocked and I yelled for his name.  And he

14 never answered, so I took it upon myself to walk in.

15 And as I walked towards the little hallway there, I was

16 still yelling out his name.  I look towards the bedroom,

17 I didn't see anything.  I just seen stuff scattered

18 everywhere.  And I glanced towards the bathroom and I

19 seen a body in the tub.

20      Q.   When you say that you noticed some stuff

21 scattered, what do you mean by that?

22      A.   Like clothes, you know, just things were

23 scattered, like just -- I mean, I don't know how to

24 describe it to you.  It's been such a long time.  It was

25 just like -- basically, like if you ransacked something

 1  or like there is stuff scattered everywhere.  That's how

 2  that looked.

 3       Q.   So, a little out of place?

 4       A.   Right.

 5       Q.   Other than that, before you saw the body in the

 6  tub, was there anything out of the ordinary about that

 7  day and when you went in that apartment?

 8       A.   No.

 9       Q.   Tell me, when you first saw that body in the

10  tub, what did you do?

11       A.   I kind of froze for a minute.  Then I froze and

12  I panicked and I got out of there because I knew

13  basically if I got caught there, I probably would end up

14  the same way.

15       Q.   What do you remember about that body?

16       A.   He was upside down in the tub and he was bound,

17  like he was tied.  His hands were tied to the back of

18  his head -- I mean to the back of his -- to the back, to

19  his back.  And his feet, he was like bounded, like

20  face-down.

21       Q.   Could you tell anything about that body?  Did

22  you recognize anything about who that person was?

23       A.   I kind of -- when I froze, I kind of glanced at

24  it and I recognized like who it was.  And I just -- I

25  left from there.  I left.

1      Q.   Who was that?

2      A.   Saul.

3      Q.   And is that the same person as you've described

4  in your testimony as being someone that you knew dealt

5  drugs for the defendant?

6      A.   Yes.

7      Q.   When you ran from there, what did you do?

8      A.   I got back in the car with my friend and left

9  from there.  And just not to say nothing or anything.  I

10  just left from there.  I was just puzzled.  I didn't

11  know what to do or say.  I just -- I freaked out,

12  basically.  I was 16 years old.

13      Q.   Was that friend Elizabeth?

14      A.   No.  It was another person I was with at that

15  time.

16      Q.   Okay.  At some point after that, did the police

17  come and talk to you?

18      A.   Yes.

19      Q.   And did you tell them what you -- what had

20  happened --

21      A.   What I had seen.  I told them what I had seen.

22  I don't know how many months later after I had seen the

23  dead person in the tub, the detectives came out and

24  spoke with me.  And I explained to them what I had seen.

25  Like I said, it's been so long, 24 years ago.  We spoke

1  briefly, but I remember what I had seen.  That hadn't

2  gone anywhere.

3      Q.   Ms. Perez, after that day that you saw Saul's

4  body there in the tub, I mean, did you maintain this

5  life-style that you were leading then for a long time or

6  did you change?

7      A.   No.  I changed.  I changed.  I changed my life.

8  I started going back to school.  I started, you know,

9  trying to get myself back to where I needed to be.

10 After that, I pulled away from all these people.  I

11 pulled away completely.  I cut everybody off.  And I

12 ended up leaving to Florida with my children to get away

13 from everything.  And then I came back in '90,

14 February of '90, I believe.  I came back to Houston.

15 And just -- I never communicated with these people

16 anymore, I never dealt with them anymore, and I just

17 left it at that.

18     Q.   After that day that you saw what you saw in

19 that apartment, did you have -- did you ever see the

20 defendant or Shorty or Rudy ever again?

21     A.   No -- yes, I did.  I take that back.  Yes, I

22 did.  I did see them again.

23     Q.   Tell me, who did you see after that?

24     A.   I ended up seeing them three.  I was asked if

25 I -- he had heard that I had spoken with the police.

1  Obel had told me that -- for me not to say anything --

2  that I didn't see anything and not to say anything.  And

3  I just left it at that.

4      Q.  Where was it that you had contact with him that

5  he said this?

6      A.  I want to say it was at -- I can't remember if

7  it was at their location where they were at down the

8  street from where I lived or a corner store where I had

9  seen them, but I remember seeing -- speaking with them

10  and I was asked that question and...

11      Q.  You were asked if you had talked to the police?

12      A.  Yes.  They had heard that I had spoken with the

13  police.  And he said to me to be quiet, not to say

14  anything, that I didn't see anything, and that's how I

15  left it (indicating).

16      Q.  And describing that, Ms. Perez, you just put

17  your finger up to your lips.  Was that a gesture that

18  the defendant himself made?

19      A.  Yes.

20      Q.  And was that while he was telling you what he

21  told you?

22      A.  Yes.

23      Q.  What did you take from that, all of that, or

24  what did you think?

25      A.  I feared for my life after that.

1    Q.   Did you say anything else after that?

2    A.   No.

3    Q.   Was it many, many years until -- later that you

4    had to finally talk to somebody about that?

5    A.   Yes.

6    Q.   And when was that approximately?

7    A.   When I finally said something, when I spoke

8    with y'all, it was back in July.

9    Q.   And that was July of last year?

10   A.   Yes.

11   Q.   Did it kind of come as a shock to you when we

12   showed up on your doorstep to talk to you?

13   A.   Yes.

14   Q.   Thank you, Ms. Perez.

15           MR. WOOD:  Judge, I will pass the witness.

16           THE COURT:  Thank you, Mr. Wood.

17           Mr. Cornelius, you may proceed.

18           MR. CORNELIUS:  May I have a moment, Judge?

19           THE COURT:  Yes.

20           (Pause)

21           MR. CORNELIUS:  May I proceed?

22           THE COURT:  Yes.

23                    **CROSS-EXAMINATION**

24   **BY MR. CORNELIUS:**

25   Q.   Ms. Perez, my name is Skip Cornelius.  You and

1    I have never met or talked about this case, or anything

2    else, have we?

3         A.   No.

4         Q.   You did meet with the defense investigators,

5    though, correct?

6         A.   Yes.

7         Q.   Tell me about Shorty.  Who was Shorty?

8         A.   Shorty was someone that worked for Obel or that

9    would drug deal for him.

10        Q.   Okay.  And do you remember his name?

11        A.   Faustino.  Faustino was his name.  Cervantes,

12   or something like that, I believe.

13        Q.   The best you can recall, Cervantes?

14        A.   I believe so.  I didn't know his real name back

15   then.  I only knew them by their nicknames.

16        Q.   You knew his nickname was Shorty?

17        A.   Right.  I only knew him by Shorty.  And he went

18   by Harvey, or something like that.

19        Q.   All right.  And you knew him because you bought

20   drugs from him?

21        A.   Yes.

22        Q.   Okay.  And those drugs, did you sometimes sell

23   those drugs yourself?

24        A.   No.

25        Q.   You just took the drugs?

1      A.   Yes.  Well, yes, I would buy some from him.

2      Q.   Okay.  Now, what was Shorty like?

3      A.   He was an older person.  He was older than

4  Obel.  He was -- I would say he was older than all of

5  them in the circle there.

6      Q.   Did you say to the investigators that you --

7  that he was a scary person and looked mean?

8      A.   He did look scary.  He looked scary.  Maybe

9  just because of his appearance, the way he carried

10 himself, but he did look scary.

11     Q.   He was older, a little scary in appearance?

12     A.   Right.

13     Q.   What about weapons?  Did he have weapons?

14     A.   At times they had -- you would see them every

15 now and then with a gun or something like that.

16     Q.   What about in that apartment?

17     A.   I don't remember seeing any weapons in that

18 apartment.  I went there to that apartment to go buy

19 drugs and that person wasn't there.  So, I happened to

20 go there at the wrong -- I mean, be there at the wrong

21 time, I guess you could say, because I happened to see

22 what I seen.

23     Q.   Did you say to the investigators, when they

24 came to talk to you, that every time you walked into

25 Shorty's apartment guns were laying around and you were

 1  afraid of Shorty?  Did you say that?

 2      A.  No, I don't recall saying that.

 3      Q.  Okay.  When you say you don't recall, is it

 4  possible you said it and you just don't remember, or are

 5  you saying that --

 6      A.  It could be.  I mean, it was 24 years ago.  I

 7  was 16 years old.  So, I couldn't really tell you if

 8  that was something that was said back then or -- I know

 9  it wasn't said recently.

10      Q.  Okay.  The conversation that I'm talking about

11  was with Investigator J. Areola on June 21st, 2013 at

12  2:41 p.m. at 8600 Fagan Street.  Do you remember having

13  that conversation?

14      A.  Yes.

15      Q.  Okay.  In that conversation -- and I know you

16  are being asked to remember things that happened 25

17  years before.

18      A.  Right.

19      Q.  But did you not say to that investigator that

20  when you went to the apartment there were guns there and

21  you were afraid?

22      A.  They had -- yes, they did have -- I just said

23  they had weapons.  Yes, they did.

24              MR. CORNELIUS:  All right.  I will pass the

25  witness at this time, Judge.

1              THE COURT:  Anything further?

2              MR. WOOD:  Just briefly, Your Honor.

3                    **REDIRECT EXAMINATION**

4    **BY MR. WOOD:**

5        Q.   Ms. Perez, did you personally ever observe or

6    know of any conflicts between Shorty and Saul?

7        A.   No.

8        Q.   Any argument or disagreements?

9        A.   No.

10       Q.   Did you personally observe or did you know,

11   based on what you know, of any disagreements or

12   arguments between Saul and the defendant, Obel

13   Cruz-Garcia?

14       A.   No.

15       Q.   Do you know of any conflicts?

16       A.   No.

17       Q.   Okay.  And back during that time, Elizabeth,

18   your friend that you testified about, she was kind of

19   seeing Obel Cruz-Garcia on the side, you said?

20       A.   Right.

21       Q.   Was there any issue between Saul and Elizabeth

22   and the defendant that you knew of?

23       A.   No, no.

24              MR. WOOD:  I have no further questions,

25   Your Honor.  I pass the witness.

1            MR. CORNELIUS:  Nothing further at this

2    time.

3            THE COURT:  May the witness be excused?

4            MR. WOOD:  No objection.

5            MR. CORNELIUS:  As long as she's on-call

6    and we can get her if we need her.

7            THE COURT:  All right.  Ma'am, you are

8    excuse subject to recall.  You may step down.

9            THE WITNESS:  Okay.  Thank you.

10           THE COURT:   Thank you.

11           Please call your next.

12           MR. WOOD:  The State calls Johnny Lopez.

13           THE COURT:  You may proceed, Mr. Wood.

14           MR. WOOD:  Thank you, Your Honor.

15                     **JOHNNY LOPEZ,**

16   having been first duly sworn, testified as follows:

17                  **DIRECT EXAMINATION**

18   **BY MR. WOOD:**

19       Q.   Good morning, Mr. Lopez.

20       A.   Good morning.

21       Q.   How are you?

22       A.   Fine.

23       Q.   Good.

24            Can you introduce yourself with your full

25   name for the jury, please?

1      A.   Johnny Lopez.

2      Q.   And, Mr. Lopez, do you live here in Houston?

3      A.   Yes, sir.

4      Q.   Are you pretty much a Houston native?

5      A.   Yes, born here.

6      Q.   How old are you?

7      A.   I'm 52.

8      Q.   And have you lived in Houston your whole life,

9 pretty much?

10     A.   Yes, sir.

11     Q.   Are you currently working?

12     A.   Yeah.  Construction.

13     Q.   And tell me about -- are you married or --

14     A.   No.  I live with my common-law wife.

15     Q.   And what's her name?

16     A.   Lupita Marie Martinez.

17     Q.   And you guys have been together for a while?

18     A.   About five years.

19     Q.   Tell me a little bit about your background.

20 Did you go to school here in Houston?

21     A.   Yes.  I went to DeZavala Elementary.  And then

22 from there, I went it Edison Junior High.  And from

23 there, I went to Austin High.

24     Q.   And after you finished -- after Austin High,

25 what did you then do?

```
 1        A.   I went to the service for four years.

 2        Q.   And how long were you -- you said you served

 3   for four years?

 4        A.   Yes, sir.

 5        Q.   In what branch?

 6        A.   The Army.

 7        Q.   Where all were you stationed?

 8        A.   I was stationed in Georgia.  And in Georgia, I

 9   did two-and-a-half years in Germany.  And then I came

10   back to Fort Hood, Texas, and then I got out.

11             THE COURT:  Let me stop you.

12             Sir, do you have gum in your mouth?

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  Can you spit that out, please?

15             THE WITNESS:  Sorry about that.

16             THE COURT:  Thank you.

17             You may proceed.

18        Q.   (By Mr. Wood) Do you remember what year it was

19   that you got out of the Army?

20        A.   '83, 1983.

21        Q.   And were you honorably discharged?

22        A.   Other than honorable.

23        Q.   Say that again.

24        A.   Other than honorable.

25        Q.   Okay.  And what did you do after you got out,
```

1  after you were discharged?

2       A.   Well, I went to work.  I got in trouble.  I'm

3  sorry.  I went to work and then I got in trouble.  And

4  then I was out on the streets for a little while.

5       Q.   What path did your life take, Mr. Lopez, after

6  you got out of the Army?  Did --

7       A.   Well, what happened, my dad had passed away and

8  I had just -- you know, just forgot about everybody,

9  just wanted to be left alone and went a little on the

10 wild side.

11      Q.   Did it lead to some drugs?

12      A.   Yes.  I was on some drugs for a little while.

13      Q.   And did that life-style lead to kind of a life

14 of you being in and out of jail during that time?

15      A.   Yes.  Being in jail, incarcerated a few times.

16      Q.   That was both the county jail and also prison,

17 was it not?

18      A.   Yes, sir.

19      Q.   Did you receive multiple convictions over that

20 period of time for theft and possession of a controlled

21 substance and offenses such as that?

22      A.   Yes, sir.

23      Q.   And were you in and out of the county jail and

24 incarcerated; is that right?

25      A.   Yes, sir.

1     Q.   Is that a period of your life that you are

2   proud of, Mr. Lopez?

3     A.   Oh, no.

4     Q.   Has Lupita kind of helped put you on the right

5   path?

6     A.   Oh, yeah, a whole lot.  I have been away from

7   all of that for quite a while already.

8     Q.   Does she keep you pretty close in check?

9     A.   Oh, yeah.  Yeah.

10     Q.   Back during that time, did you have periods of

11   time where you were in and out of having a stable home?

12     A.   At what time?

13     Q.   Back during say -- specifically, 1989, what was

14   going on in your life during that time?

15     A.   I was like in the streets off and on, lived

16   here and there.

17     Q.   Did you ever have an opportunity to get to know

18   a person name Saul Flores?

19     A.   Yes, sir.  I knew him for a little while.

20     Q.   How did you know Saul?

21     A.   From the streets.

22     Q.   Would you have considered Saul a friend?

23     A.   Yeah.  He was a nice little friend of mine.

24     Q.   And was he -- how old was Saul generally?

25     A.   When I met him, he was about 17 or 18 years

 1  old.  He was very young.

 2      Q.  Would you say that -- I mean, was your

 3  friendship or your relationship with him always just a

 4  friendship?

 5      A.  It was a friendship.  We talked a lot about,

 6  you know, personal stuff, you know.  Yeah.  We were

 7  pretty good friends.

 8      Q.  So, you came to know him over a period of time.

 9  Is that fair?

10      A.  Yeah, for a little while.

11      Q.  How long would you say that you knew Saul as a

12  friend?

13      A.  I don't know.  I would say probably maybe close

14  to a year, maybe.

15      Q.  And at some point, Mr. Lopez, did you learn of

16  Saul's passing?

17      A.  I learned about that when I was in jail.

18      Q.  And how did you learn about that?

19      A.  Some detective came and talked to me about it.

20      Q.  And that was while you were incarcerated in the

21  Harris County Jail?

22      A.  Yes, sir.

23      Q.  And is that the first that you learned that

24  your friend Saul had died?

25      A.  That was the first that I learned, yes.

1      Q.   Did the investigator that came and talked to

2  you, did they come and -- were they just wanting to know

3  if you had any information or if you knew of anything?

4      A.   Yeah.  They asked some questions about him, how

5  long I knew him, some stuff, other things like that.

6  They showed me some pictures of him and some other

7  people.

8      Q.   Were they also hoping to try to locate Saul's

9  family?

10      A.   Well, they asked me if I knew any family and I

11  didn't know of his family here in Houston or -- I just

12  know he was from Mexico.

13      Q.   After they talked to you and came and visited

14  with you there in the jail, did you have any other

15  involvement in his case or the investigation of his

16  death?

17      A.   No kind.  No kind.

18      Q.   Was it many, many years until you talked about

19  that situation again?

20      A.   It was a long time, a long time.

21      Q.   Was that when we showed up and visited with you

22  about it?

23      A.   I heard about it again from yourself.

24            MR. WOOD:  Your Honor, may I approach the

25  witness?

1          THE COURT:  Yes.

2     Q.   (By Mr. Wood) Mr. Lopez, I'm going to show you

3  what's been marked for identification purposes as

4  State's Exhibit 22 -- I'm sorry -- 122.  You know, I

5  visited with you and told you there would be a point in

6  trial that I would have to show you a picture of Saul;

7  is that right?

8     A.   Right.

9     Q.   And -- or show you a picture and ask you if you

10 recognize that.

11    A.   Yes, sir.

12    Q.   And I just want you to take a minute and just

13 turn that picture over and let me know if you recognize

14 that individual in State's Exhibit 122.

15    A.   Yes, sir.

16    Q.   And who is that individual?

17    A.   That's Saul, my little friend.

18    Q.   Back during that time when you -- when you were

19 hanging with -- hanging out with Saul and you guys were

20 friends, did you know a lot of his other friends or

21 associates from the streets?

22    A.   Not really.  Just that person he -- he was

23 talking to me about some things that happened before I

24 got locked up.

25    Q.   Did you ever have an opportunity to meet or

 1  come into contact with Obel Cruz-Garcia?

 2      A.   Yeah.  I seen him around.

 3      Q.   And when you say "him," do you see that person

 4  here in the courtroom?

 5      A.   Yes, sir.

 6      Q.   And do you recognize him?

 7      A.   Yes, sir.

 8      Q.   Can you identify who you are talking about by

 9  identifying something they're wearing?

10      A.   He is sitting right there in the blue shirt

11  with the headphones on.

12              MR. WOOD:  Your Honor, if the record would

13  reflect he also has identified the defendant.

14              THE COURT:  The record will so reflect.

15      Q.   (By Mr. Wood) Mr. Lopez, did you have any

16  personal dealings with the defendant?

17      A.   No.

18      Q.   Did you visit -- was there occasions where you

19  would visit with Saul about his connection to the

20  defendant?

21      A.   He used to tell me to go over there and work

22  for --

23              MR. CORNELIUS:  Objection.  Hearsay, Your

24  Honor.

25              THE COURT:  Please don't say what other

1  persons have told you.  Okay, sir?

2          That's sustained.

3      Q.   (By Mr. Wood) And, Mr. Lopez, without going

4  into what Saul might have told you about the defendant,

5  did you guys have occasions to talk about the defendant?

6      A.   Oh, yeah.

7      Q.   Mr. Lopez, again, you can't go into anything

8  that was said to you --

9      A.   Right.

10     Q.   -- but based on -- were you aware of any

11 problems that Saul was having with the defendant?

12     A.   Yeah, he was having problems.

13          MR. CORNELIUS:  Objection.  Unless he

14 somehow demonstrates that it's not hearsay.  I don't

15 know how else he can know it, unless he observed it.

16          THE COURT:  Do you have any personal

17 knowledge?  Did you personally observe --

18          THE WITNESS:  Yes, I did.

19          THE COURT:  You may proceed then.

20     Q.   (By Mr. Wood) And what was the nature of that?

21     A.   Well, Saul would be outside talking on the

22 street on the sidewalk and he was always looking around.

23 When they would come around in the car, he started

24 running.

25     Q.   So, based on what you observed -- when you say

1    "he would start running," who are you talking about?

2        A.   Saul, my little friend.

3        Q.   So, based on your perceptions, did you -- what

4    did you take from that?

5        A.   He was running from someone.

6        Q.   And was that -- in that situation, would the

7    defendant -- would that be a person that would be coming

8    that you thought Saul was running from?

9        A.   Yeah.

10               MR. WOOD:  I will pass the witness, Your

11   Honor.

12               THE COURT:  Mr. Cornelius.

13               MR. CORNELIUS:  Just a moment, if I might,

14   Judge.

15               (Pause)

16                   **CROSS-EXAMINATION**

17   **BY MR. CORNELIUS:**

18       Q.   Mr. Lopez, my name is Skip Cornelius.  We've

19   never met or discussed this case or anything else

20   before, have we?

21       A.   Never.

22       Q.   Do you remember talking to the police about

23   this back in 1989?

24       A.   Yes.

25       Q.   Did you tell the police back in 1989 that your

1    friend was actually running from Shorty?

2         A.    Never said nothing like that.

3         Q.    You never said that?

4         A.    No.

5         Q.    Okay.

6         A.    Or that I can remember.  I don't even know -- I

7    ain't going to say nothing, whatever you asked me.

8         Q.    Okay.  Now, you remember talking to the police,

9    though?

10        A.    Yeah, somewhat.

11        Q.    Do you remember that it was an officer named

12   R.E. Gonzalez --

13        A.    I don't remember the officer's name.  It's been

14   a long time.

15             THE COURT:  Okay.  Sir, let me stop you.

16   When the lawyers are asking questions, you need to wait

17   till they finish.

18             THE WITNESS:  Yes, ma'am.

19             THE COURT:  Because Ms. Rodriguez is taking

20   everything down and can't write it down if you are

21   talking at the same time.

22             THE WITNESS:  Yes, Your Honor.  I'll take

23   my time.

24             THE COURT:  You may proceed.

25        Q.    (By Mr. Cornelius) You correctly figured out

1   what I was going to ask, but I have to get my question

2   in the record.

3        A.   It's okay.

4        Q.   You don't remember the name of the officer?

5        A.   No.

6        Q.   Just to see if it might refresh your memory --

7   and if it doesn't, it doesn't -- does the name R.E.

8   Gonzalez, a Houston police officer named R.E. Gonzalez

9   refresh your memory?

10       A.   No, sir.

11       Q.   Do you remember talking to the police in 1989?

12       A.   It wasn't the police.  It was like detectives.

13  I was in the county jail.

14       Q.   What was the last name you said?

15       A.   It was like a detective in like regular

16  clothes.  They were police -- like police officers --

17  they weren't dressed like police officers.

18       Q.   Like Homicide detectives?

19       A.   Yes.

20       Q.   Okay.  And do you remember saying, though,

21  whoever it was you were talking to, that Flores -- who

22  was Flores?  Saul?

23       A.   Saul.

24       Q.   Was a dealer for Shorty until they had a

25  falling out.  Do you remember making that statement?

54

```
 1        A.    No, sir.

 2        Q.    Okay.  Do you remember telling the police the

 3   details of this falling-out that they had?

 4        A.    No, sir.

 5        Q.    Shorty and Saul?

 6        A.    No, sir.  You just asked me that.

 7        Q.    Did you know Shorty?

 8        A.    No, sir.

 9        Q.    Never met him?

10        A.    No.

11        Q.    When did you first start to talk to these

12   assistant D.A.s?

13        A.    They have all of that information.  I don't

14   know what day it was.

15        Q.    What is your best recollection as to when you

16   first talked to them?

17        A.    I don't know.  I think it was about October or

18   something.  I'm not sure.

19        Q.    Okay.

20        A.    It was a while back, a few months ago.  I could

21   say that.

22        Q.    And where was it that y'all first talked?

23        A.    On the phone.

24        Q.    And then did you have any face-to-face

25   meetings?
```

1    A.   Yes.

2    Q.   How many times?

3    A.   A couple of times.

4    Q.   When was the last one?

5    A.   It was last week, around there.  Sometime

6  before this, something like that.  About a week -- more

7  than that, a little bit more than that.

8    Q.   Okay.  And you never told them anything about

9  Shorty being --

10    A.   I --

11    Q.   Let me finish.

12    A.   I'm sorry.

13    Q.   -- that Shorty being the person that your

14  friend was afraid of, you never told them that?

15    A.   No.

16    Q.   When you talked to the police back in 1989 do

17  you remember mentioning Obel Cruz-Garcia at all?

18    A.   They talked about it.

19    Q.   They did?

20    A.   Yes, sir.

21    Q.   And what did you tell them?

22    A.   What did I tell them?  They showed me a picture

23  and I told them:  That's the one he was running from.

24    Q.   Okay.

25    A.   That was it.

1      Q.   The prosecutor asked you if you had a couple of

2   convictions for theft or drugs or -- I've forgotten

3   exactly how he phrased it.  Do you remember that?

4      A.   What detectives?

5      Q.   No.  The prosecutor.

6      A.   What about them?

7      Q.   Didn't he just asked you some questions about

8   your convictions?

9      A.   Sure did.  Yes, sir.

10     Q.   You said you had a couple of convictions?

11     A.   Yes, sir.

12     Q.   That was a long time ago?

13     A.   Yes, sir.  My last conviction, yes.  A lot of

14  them.

15     Q.   The last time you got sent to the state jail --

16  what is the state jail?

17     A.   What is the state jail?

18     Q.   Do you know what it is?

19     A.   It's a state jail.

20     Q.   A prison, right?

21     A.   Something like -- I wouldn't call it a prison.

22     Q.   Well, then the last time you went there was

23  2008?

24     A.   Yes, sir.

25     Q.   And --

1        A.    Around there.

2        Q.    The last theft conviction you had was in 2009,

3   correct?

4        A.    No.  It was '7 or '8.  That was the last time I

5   went to state jail.

6        Q.    Well --

7        A.    No.  I didn't go to state jail.  It was the

8   state jail crime, but I did the time here in the county

9   because I was fighting the case.  I never went to state

10  jail.

11       Q.    Okay.  In 2008, you never went?

12       A.    No.  It was a state jail conviction.

13       Q.    Did you go to state jail in 2002 and 2005?

14       A.    Yes, sir, back then I did.

15       Q.    Let me finish my question.  2002 and 2005?

16       A.    I know it was 2002.  It might have been 2005.

17  I can't remember all the convictions, but they're there.

18  I did a few state jails.

19       Q.    Okay.  How many times have you been to prison,

20  to TDC?

21       A.    TDC?  I was convicted to TDC twice.

22       Q.    What for?

23       A.    One for -- the first one was burglary of a

24  vehicle and then the next one was -- three times.  I'm

25  sorry.  And the last two were for drugs.

1     Q.   How many theft convictions do you say you have?

2     A.   If I told you, it would be a lie because I

3  couldn't even remember.  I think it might have been

4  eleven.  That's just a guess.

5     Q.   What was the number that you told us?

6     A.   Huh, sir?

7     Q.   What's the number you told us?

8     A.   Maybe eleven.  Maybe.  I don't know.  Maybe.

9     Q.   So, to kind of sum that up, you are telling the

10  jury you have been to TDC three times, correct?

11     A.   That's what I said.

12     Q.   You've got three state jail convictions,

13  although one of them you served in the county jail?

14     A.   Yes, sir.

15     Q.   And you think you have about eleven total

16  theft --

17     A.   Around there, maybe.  I'm just guessing.

18          MR. CORNELIUS:  I pass the witness.

19          THE COURT:  Anything further, Mr. Wood?

20          MR. WOOD:  I have nothing further.

21          THE COURT:  May he be excused?

22          MR. WOOD:  He may.

23          THE COURT:  You may step down, sir.

24          THE WITNESS:  I don't know what he's

25  laughing about.  He is the one in trouble.

```
 1                    THE COURT:  Please call your next.
 2                    THE WITNESS:  I wouldn't be laughing.
 3                    MR. WOOD:  The State calls Carmelo Martinez
 4   Santana.
 5                    THE WITNESS:  I wouldn't be --
 6                    MR. CORNELIUS:  Pardon me?
 7                    THE WITNESS:  I wouldn't be laughing.  He
 8   is the one in trouble.
 9                    THE COURT:  All right.  Please call your
10   next.
11                    MR. WOOD:  The State calls Carmelo Martinez
12   Santana.
13                    THE COURT:  You may proceed, Mr. Wood.
14                    MR. WOOD:  Thank you, Your Honor.
15                    THE COURT:  Let's make sure this witness on
16   record is sworn.  I know he was sworn before, but that's
17   for the record.
18                    MR. WOOD:  Yes, Your Honor.
19                    CARMELO MARTINEZ SANTANA,
20   having been first duly sworn, testified through the
21   interpreter as follows:
22                    DIRECT EXAMINATION
23   BY MR. WOOD:
24       Q.   Good morning, Mr. Martinez.
25       A.   Good morning.
```

1      Q.    How are you doing?

2      A.    Fine, fine.

3      Q.    I have to ask you:  Are you the same Carmelo

4  Martinez Santana that testified last week in this trial?

5      A.    That's correct.

6      Q.    And that we have been calling Rudy?

7      A.    That's right.

8      Q.    And you remember last week when you testified

9  and you took the stand and you swore to tell the truth;

10  you remember that?

11      A.    That's right.

12      Q.    And those same rules apply today.  Okay?

13      A.    Fine.

14      Q.    Rudy, I want to take you back to the time that

15  you were living here in Houston, back in the late --

16  when you moved to Houston in the late 80s.

17      A.    Okay.

18      Q.    And I want to speak to you about some of the

19  other things going on during that period of time.

20      A.    That's fine.

21      Q.    Rudy, last week in your testimony you mentioned

22  something that I want to visit with you more about.

23      A.    That's fine.

24      Q.    And you mentioned something in your testimony

25  about one occasion where the defendant Obel Cruz-Garcia

1  tied you up.

2      A.   That's right.

3      Q.   And since this is a different day, I'm going to

4  have you identify him.  Do you see Obel Cruz-Garcia in

5  the courtroom again today?

6      A.   That's right.

7      Q.   And can you again identify who you are talking

8  about by pointing to where he is and identifying

9  something he is wearing?

10      A.   That's right.  He is the one sitting over there

11  with a gray coat and a gray tie.

12              MR. WOOD:  Again, Your Honor, may the

13  record reflect the witness has identified the defendant?

14              THE COURT:  The record will so reflect.

15      Q.   (By Mr. Wood) Rudy, the incident --

16              THE INTERPRETER:  Interpreter correction:

17  Blue shirt.

18      Q.   (By Mr. Wood) Rudy, when you are talking about

19  the incident where you were tied up, tell us who was

20  involved in that?

21      A.   Well, him and Cesar.

22      Q.   And who was Cesar?

23      A.   He was a young kid from the Barrio (phonetic)

24  in Chicago.

25      Q.   And what was his relationship to you and to the

1  defendant?

2      A.   Well, in the beginning I met him because we

3  lived in the same apartment and we would use drugs

4  together.

5      Q.   You and Cesar?

6      A.   Yes, that's right.

7      Q.   And how long was Cesar a person that you guys

8  hung out with?

9      A.   Well, like I'm telling you, at the beginning he

10  lived in my apartment and then he met him through me.

11  And then he gave him work and they worked together.

12      Q.   Okay.  What was the argument about or what was

13  the deal going on leading up to you being tied up?

14      A.    Well, one day Angelita had gone to Santo

15  Domingo and Cesar wanted to smoke drugs and I didn't

16  want to smoke drugs.  I went to my friends' and they

17  stayed there in a room, at a hotel room, and I went to

18  my friends'.  And then later, about two hours or three

19  hours, something like that, he called me and asked me

20  where I was.  And I told him I was with my friends.  And

21  then he asked me what was I doing, if I could come over.

22  And then when I arrived at the hotel, he and Cesar

23  grabbed me, took me into the hotel room, he tied me up,

24  and he put me in the bathtub, also with Cesar's help

25  (indicating).

1    Q.   When you say "he," I know you're pointing with

2    your finger, but who are you talking about?

3        A.   Obel Cruz-Garcia.   He is over there

4    (indicating).

5        Q.   Rudy, can you help me understand what the

6    problem was, you know, why the defendant was upset with

7    you?

8        A.   Yes, of course.   Because he thought that I was

9    taking his customers away.

10       Q.   Was there a beeper involved or some argument

11   over that?

12       A.   Yes, that's right.   I had his beeper, the

13   business beeper.

14       Q.   And was he upset about that?

15       A.   Yes.

16       Q.   And when you got to this hotel, he and Ceasar

17   were already there?

18       A.   That's right.   They had stayed there and I went

19   with my friends.

20       Q.   And then tell me about how you were tied up.

21       A.   Well, he put my hands in the back.   They had me

22   here.   I was held here by the throat.   And then with

23   Cesar's help, Cesar tied me like this to the back.   I

24   was put into the bathtub and he said that he was going

25   to kill me (indicating).

1    Q.   When you say "he" said that, who are you

2  talking about?

3    A.   Obel.

4    Q.   Were you locked in the bathroom?  Did they

5  leave you in the bathroom?

6    A.   No.  They were there with me.

7    Q.   In the bathroom?

8    A.   Yes.

9    Q.   How long did you stay there in the bathroom?

10    A.   A few minutes.  Not a lot.

11    Q.   Were you scared during that time?

12    A.   I was very scared.

13    Q.   And how did you get released or what led up to

14  that?

15    A.   Before I was tied up and before I was gagged --

16  because I was also gagged -- I told him that I was not

17  taking his clients away, that I had the drug money.

18  Then he removed this.  I told him, I said:  I will never

19  betray, the money is here in my pocket.

20    Q.   And did you produce the money?

21    A.   He took the money out of my pocket.

22    Q.   And did that end the argument?

23    A.   Yes.

24    Q.   Rudy, last week in your testimony do you

25  remember being asked about the masks that were worn

1    during Angelo's kidnapping?

2        A.   That's right.

3        Q.   And you said something about the mask that I

4    wanted to ask you about.

5        A.   Okay.

6        Q.   You indicated that there were other occasions

7    where masks had been used.  Is that correct?

8        A.   That's right.

9        Q.   Are you saying that -- are you aware of other

10   robberies or burglaries that were committed that

11   involved masks?

12       A.   That's right.

13       Q.   I want to ask you about an individual by the

14   name of Patiko (phonetic).  Do you know a person by that

15   name?

16       A.   Patiko.

17       Q.   And who was Patiko?

18       A.   He is a Dominican man that he was also involved

19   in the drug business.

20       Q.   Was he someone that worked with you and Obel?

21       A.   No.

22       Q.   Is he someone that bought from you and Obel?

23       A.   No.

24       Q.   Would you say he was someone who was a

25   competitor with you and Obel?

1     A.   No.  He had his business apart from ours.

2     Q.   Okay.  But you were aware that he also sold

3  drugs?

4     A.   That's right.

5     Q.   Was there an occasion that you and the

6  defendant went over to his apartment?

7     A.   Yes.

8     Q.   And tell me about that.  Who was with you?

9     A.   We went to the apartment to break in.

10    Q.   And how did you-all come up with this plan?

11    A.   We found out where he lived and we decided to

12  break in.

13    Q.   Who was with you?

14    A.   It was he and me and there were other people,

15  but right now I cannot remember who.

16    Q.   So, there were -- when you say -- I'm sorry.

17  When you say "he," are you talking about Obel

18  Cruz-Garcia?

19    A.   That's right.  That's right.

20    Q.   So, it was you, the defendant, and one or more

21  other people?

22    A.   Right now, I can't remember, but it was one

23  more.

24    Q.   Okay.  Now, you just don't remember who it was

25  that was with you?

1      A.   No.

2      Q.   And do you remember generally where the

3  apartment or the house of Patiko was?

4      A.   Yes, of course.

5      Q.   Where was that generally?

6      A.   It was right there next to 610 at some

7  apartments right there on the side of the freeway.

8      Q.   And you said it was an apartment complex?

9      A.   That's right.

10          MR. WOOD:  Your Honor, may I approach the

11  witness?

12          THE COURT:  Yes, you may.

13     Q.   (By Mr. Wood) Rudy, I'm going to show you

14  what's been marked for identification purposes as

15  State's Exhibits 126 and 127.  Do you recollect -- I may

16  have said this, but take a minute and look at State's

17  Exhibits 126 and 127 (indicating).

18     A.   Uh-huh.

19     Q.   Do you recognize what's shown in State's 126

20  and 127?

21     A.   That's right.

22     Q.   Does that look -- does that fairly and

23  accurately depict -- well, let me back up.

24          What does State's 126 and 127 look like?

25     A.   They're the apartments.

1       Q.   And are those the apartments that you described

2  regarding Patiko's apartment?

3       A.   That's right.

4       Q.   And do they fairly and accurately depict what

5  you remember Patiko's apartment looking like back then?

6       A.   That's right.

7            MR. WOOD:  Your Honor, at this time, I'll

8  offer State's 126 and 127 after tendering to defense

9  counsel.

10           **(State's Exhibit No. 126 and 127 Offered)**

11           MR. CORNELIUS:  Objection to relevance.

12           THE COURT:  That's overruled.  State's

13  Exhibit No. 126 and 127 are admitted over objection.

14           You may proceed.

15           **(State's Exhibit No. 126 and 127 Admitted)**

16           MR. WOOD:  Permission to publish, Your

17  Honor?

18           THE COURT:  Yes.

19       Q.   (By Mr. Wood) State's Exhibit 126, Rudy, is

20  that generally the area or the apartment complex that

21  you've described?

22       A.   That's the front part of the complex.

23       Q.   Okay.  And State's Exhibit 127, is this the

24  area near 610 that you were describing over here on the

25  right side of the picture (indicating)?

1    A.   That's right.

2    Q.   When you and the defendant and this other

3  person went over to Patiko's apartment was it night or

4  day?

5    A.   Night.

6    Q.   And when you arrived at the apartment, what did

7  the three of you-all do?

8    A.   Well, they both went into the apartment and I

9  stayed -- I stayed at the driver's seat.

10    Q.   And did you park at the front of the complex or

11  at the back?

12    A.   No.  In the back.

13    Q.   So, you stayed parked down in the vehicle.  And

14  were you in the driver's seat, right?

15    A.   That's right.

16    Q.   And you thought that the plan was for them to

17  go up and either burglarize or rob Patiko's apartment?

18    A.   That's right.

19    Q.   And how long would you say they were up there

20  in Patiko's apartment, do you know?

21    A.   About 20 minutes.

22    Q.   And who returned there to your vehicle?

23    A.   Obel.  And I think it was Borikae, Bory.  I

24  believe that he went there with us.  I'm not sure one

25  hundred percent, but I think so.

1      Q.   Okay.  When you say Bory, are you talking about

2   the person we've heard talked about as Roger?

3      A.   That's right, that's right.

4      Q.   So, you think it might have been Roger, but you

5   are not sure?

6      A.   No.  Because there were other people that went

7   once with us and I'm not sure if it was him or Bory.

8      Q.   Okay.  So, on this occasion at Patiko's

9   apartment, the defendant comes back down and maybe

10  Roger, maybe another person came back down?

11     A.   Yes.

12     Q.   And what happened when they came back down to

13  the car?

14     A.   They came back with the drugs and the money.  I

15  don't remember how much.

16     Q.   So, you don't remember if it was a lot or not

17  very much?

18     A.   It was not that much.

19     Q.   And did the defendant, Obel Cruz-Garcia, say

20  anything to you at that time?

21     A.   That's right.

22     Q.   What did he say?

23     A.   He said that he had raped Patiko's woman and he

24  had beaten him.

25     Q.   Did he say anything about tying him up or do

1  you remember?

2      A.   I think I can remember that he said that he had

3  tied up Patiko.

4      Q.   And when he gave you -- when he told you that,

5  what did you do?

6      A.   Well, nothing.

7      Q.   Did that seem -- was that because it was

8  normal, or I mean --

9      A.   Well, for me, it wasn't normal, but one doesn't

10  have any other alternative but to accept.

11      Q.   Well, so you guys took the money and the drugs

12  and then you left that location?

13      A.   That's right.  That's right.

14      Q.   Would you say that this was a single occurrence

15  or did that happen on other occasions as well?

16      A.   It occurred at other times.

17      Q.   So, going over to an apartment and robbing or

18  burglarizing someone was not that out of the ordinary?

19      A.   No.

20      Q.   Would the targets of these burglaries or

21  robberies oftentimes be someone that you had known

22  through your drug connections?

23      A.   That's right, they were people that were

24  dedicated to drugs.

25      Q.   Rudy, I want to talk to you about a person that

1   you knew as Saul Flores.

2        A.   Okay.

3        Q.   Who was Saul to you?

4        A.   He was a Mexican guy that worked with both of

5   us.

6        Q.   And did he work for you guys for a long time or

7   a short time?

8        A.   Not for a long time.

9        Q.   Do you know how old Saul was or generally how

10  old of a person he was?

11       A.   He was a young man, about 22 or -- from 20 to

12  22 years.  I can't tell you exactly how old.

13       Q.   So, a young guy?

14       A.   That's right.

15       Q.   And did he eventually sell drugs for -- or sell

16  cocaine for you and Obel?

17       A.   That's right.

18       Q.   How did you and the defendant meet Saul?

19       A.   Through another Mexican that worked for us.

20       Q.   Who was that person?

21       A.   They would call him Shorty.

22       Q.   Who was Shorty?  Do you know -- well, first let

23  me ask:  Do you know Shorty's full name?

24       A.   No.

25       Q.   And who was Shorty?

1    A.   He was a Mexican man that he and I met at

2  Broadway at Easton, at the first apartments when we

3  first began.

4    Q.   And from there, you began a friendship with

5  Shorty?

6    A.   That's right.

7    Q.   And how long did Shorty work for you and the

8  defendant?

9    A.   Well, he was the one that was with us the

10  longest.

11    Q.   Okay.  Shorty was?

12    A.   Yes.

13    Q.   And through Shorty is how you met Saul; is that

14  right?

15    A.   That's right.

16    Q.   Was Saul a big-time dealer for you guys or more

17  small-time?

18    A.   He would sell small amounts.  He was just in

19  charge of taking care of the business.

20    Q.   Would you say that the time period that Saul

21  sold drugs for you was early on in the time that you

22  lived -- after you moved here to Houston?

23    A.   Not a lot of time -- not a lot of time passed

24  when he was selling drugs for us.

25    Q.   I think I may have asked a confusing question.

1      A.   Okay.

2      Q.   Did you and the defendant meet Saul shortly

3  after moving to Houston?

4      A.   Yes, after Shorty had worked for us.

5      Q.   And was that sometime around 1989, would you

6  say?

7      A.   That's right.

8      Q.   At some -- excuse me.  At some point in time,

9  did -- were you aware of a conflict with the defendant

10 and Saul?

11     A.   That's right.

12     Q.   What was the source of that conflict?

13     A.   It was a girlfriend that he had.

14     Q.   And when you say "he," who are you talking

15 about?

16     A.   Obel.

17     Q.   And who was that girlfriend?

18     A.   Her name was Isabel -- Correction.  Elizabeth.

19     Q.   So, the girlfriend of Obel was Elizabeth?

20     A.   Yes.

21     Q.   And what was the conflict between the defendant

22 and Elizabeth and Saul?

23     A.   It's that Saul had taken some drugs, he had

24 gone to Elizabeth's apartment, and he wanted to have

25 some type of love relationship with her.  And then she

1  called him and told him that Saul was courting her, he

2  was courting her, and at that same moment, he was there

3  at the apartment with her.

4       Q.   And when you say that "she called him," are you

5  saying that Elizabeth called the defendant?

6       A.   That's right.

7       Q.   And were you there -- I will withdraw that.

8            Did you observe the defendant's reaction to

9  this news?

10      A.   He was furious.

11      Q.   So, what happened next?

12      A.   He said immediately:  Let's go for him.

13      Q.   So, at that point would you say that the

14  business relationship between the defendant and Saul had

15  ended?

16      A.   That's right.

17      Q.   And did the defendant start looking for Saul?

18      A.   We went directly to Elizabeth's apartment.

19      Q.   And did you find Saul?

20      A.   That's right.

21      Q.   Do you remember at that time who was with you

22  besides you and the defendant?

23      A.   Roberto, a Chicano.

24      Q.   Robert?

25      A.   Robert, yes.

1  Q. So, you, Robert, and the defendant go over to

2 Elizabeth's apartment?

3  A. That's right.

4  Q. And do you encounter Saul at that point?

5  A. That's right.

6  Q. And then what happens?

7  A. He put him in the car -- we put him in the car.

8  Q. Are you saying you put Saul in the car?

9  A. No.  I don't want you to think that I'm trying

10 to take any blame from myself.  I said that we put him

11 in there.  Because in one way or another, I'm involved

12 in the case.

13  Q. Okay.  So, I guess my question is:  Was it Saul

14 that you put in the car?

15  A. That's right.

16  Q. And it was you, Robert, and the defendant?

17  A. That's right.

18  Q. Okay.  So, once Saul was in the car, where did

19 you drive to?

20  A. We went to the apartment on Winkler that we had

21 rented.

22  Q. So, y'all -- you guys had an apartment there

23 off of Winkler?

24  A. That's right.

25  Q. Did anybody live in that apartment at Winkler?

1     A.   No.

2     Q.   What was the purpose of that apartment?

3     A.   To sell drugs.

4     Q.   And is that one of the locations you guys kind

5 of operated out of?

6     A.   That's right.  Sometimes Shorty stayed there

7 and at other times we would just go there for a short

8 time.

9     Q.   Okay.  So, this period of time is still a

10 period of time that Shorty is selling drugs for you

11 guys?

12     A.   That's right.

13     Q.   So, once you arrived at the apartment, what

14 happens next?

15     A.   We went upstairs.  But right now, I don't

16 remember exactly how we went up, who took him up, but we

17 all went upstairs.

18     Q.   So, it was an upstairs apartment?

19     A.   That's right.

20     Q.   And did the four of you go inside?

21     A.   That's right.

22     Q.   And once you got inside, what did you do?

23     A.   Correction.  When we were on our way over

24 there, there are five of us because Richard also came

25 with us because Richard and Elizabeth are family,

1    relatives.

2         Q.   Okay.  Let me just clarify that real quick.

3              So, when you left the apartment -- when you

4    left Elizabeth's apartment with Saul -- or after you

5    left, rather, on the way to the Winkler apartment you

6    picked up a person named Richard?

7         A.   He went with us.  He accompanied us from

8    Elizabeth's apartment.

9         Q.   Okay.  And who was this Richard person?

10        A.   Richard is a Chicano that we met through

11   Elizabeth and through the drugs.  And they lived at the

12   same apartments where he and Angelita lived and me.

13        Q.   So, Richard and Elizabeth were family?

14        A.   That's right.

15        Q.   During that period of time, did you ever know

16   anyone by the name of Tina?

17        A.   That's right.

18        Q.   Who was Tina?

19        A.   She is a Chicano.

20        Q.   And how was it she knew anybody in that group?

21        A.   She was the girlfriend of another guy named

22   Roberto, but it's not the same Robert.

23        Q.   Did Elizabeth know Tina?

24        A.   I think so.  I don't remember exactly right

25   now.

1     Q.   Okay.  There is a lot of Roberts and Richards.

2  I'll move on.

3            When you arrived at the apartment, it was

4  you, the defendant, Saul, Robert, and Richard?

5     A.   That's right.

6     Q.   What did you do when you guys got up to the

7  apartment?

8     A.   We got there and he started, all at once from

9  the beginning, beating him up badly.  He told me:  Go to

10  the room because you can't see what's going to happen

11  here.

12     Q.   Now, when you say he started beating him, you

13  have to tell me who you are talking about.

14     A.   Obel.

15     Q.   Started beating who?

16     A.   Saul.

17     Q.   Was Saul free at this point?  I mean, was he

18  bound in any way?

19     A.   He threw him and tied him up.

20     Q.   Now, when you say that Obel told you to go to

21  the room, what do you mean by that?

22     A.   Because he always thought that I was very weak

23  and that I couldn't look at things like that.

24     Q.   So, what room did he direct you to?

25     A.   Okay.  Here is -- he had Saul.  Here is the

1  kitchen, over here is the living room.  That was where

2  Saul was laying.  And the room where he sent me was over

3  here (indicating).

4       Q.   So, you are pointing somewhere behind you.

5  Behind where the kitchen was as you've described it?

6       A.   No.   The body is here, Saul is here, the

7  kitchen is here, and the room is back here (indicating).

8       Q.   Okay.  Was it a bedroom?

9       A.   That's right.

10      Q.   And did you go directly back to that bedroom?

11      A.   That's right.

12      Q.   And could you see the kitchen area where Saul's

13  body was from where you were standing?

14      A.   That's right, perfectly.

15      Q.   And what did you -- could you tell what Saul

16  was being beaten with?

17      A.   Yes.  They were beating him with something very

18  heavy, but at this moment I don't remember if it was a

19  hammer.  He would say:  Lift up your hand.  And he would

20  swing very hard and his hand got really ugly.  Raise the

21  other one.  And he was hitting him hard.  And I was

22  standing behind the door.  I was looking at everything.

23      Q.   So, when you say "he," are you talking about

24  the defendant?

25      A.   That's right.

1    Q.   So, you could see Saul's hands being hit with

2  something; is that right?

3    A.   That's right.

4    Q.   What else did you see?

5    A.   They were injecting him with drugs.

6    Q.   Who is "they"?

7    A.   Him and Richard.

8    Q.   The defendant and Richard?

9    A.   That's right.

10   Q.   And could you see that from where you were

11 standing?

12   A.   That's right.

13   Q.   And what happened next?

14   A.   Then later he was sweating a lot.  Before that

15 he was asking for help, he was saying:  Rudy, help me.

16 But I couldn't help him.

17   Q.   And what else did you observe?

18   A.   After that -- excuse me.  I don't know exactly

19 if it was -- I'm here, I'm not lying, because this is

20 something that did happen, but what happened happened a

21 long time ago.  And sometimes I get confused in the

22 sequence of how it happened.  After he had -- was

23 sweating profusely and his hands were completely

24 destroyed and they had injected a lot of drugs into him,

25 then he got on top of him like this and he broke his

1 neck like this (indicating).

2     Q.   So, from where you were standing it looked like

3 he was doing something to his neck area?

4     A.   Yes.  Of course, I saw it perfectly when he

5 broke his neck.

6     Q.   And do you -- are you talking about the

7 defendant, Obel Cruz-Garcia?

8     A.   That's right, that's right.

9     Q.   Did you see anything else happen to Saul as he

10 was laying there?

11     A.   After that -- there after he killed him, he

12 tied him up, him and Richard, they called me to help

13 them take the body to the bathtub.

14     Q.   What was Robert doing during this time?

15     A.   Right now, I cannot remember.  It doesn't come

16 to my mind.  Because I can't get it out of my mind how

17 he and Richard, that Richard was injecting drugs into

18 him over here and he completely destroyed his hands.

19     Q.   Now, when you say that he was tied up or bound,

20 where was he tied up or how was he tied?

21     A.   They tied him with his hands to the back.  The

22 body was face-down.

23     Q.   Did you take him into the bathtub?

24     A.   No.  I helped to take him to the bathtub.

25     Q.   Okay.  I'm sorry.  I asked that the wrong way.

1              You helped take the body to the bathtub?

2        A.   That's right.

3        Q.   Where did you place him when you got to the

4   bathtub or where did the group of you place him when you

5   got him to the bathtub?

6        A.   We put the body inside the bathtub.

7        Q.   And then what happened?

8        A.   We left.

9        Q.   Where did you -- did you leave anyone behind at

10  the apartment other than Saul or did you-all leave?

11       A.   I don't remember exactly, but I believe that we

12  all left.

13       Q.   Okay.  And do you remember what you did after

14  that?

15       A.   We went to drink, to continue drinking.

16       Q.   Did you eventually come back to that apartment?

17       A.   Yes, we came back later.

18       Q.   Do you know how long it was that you stayed

19  gone from that apartment?

20       A.   Not exactly.

21       Q.   Was Saul's body still there in the bathtub when

22  you arrived back at the apartment?

23       A.   That's right.

24       Q.   And then what did -- what happened next?

25       A.   We came back and after a while we left.

1      Q.   Let me -- when you returned to the apartment,

2  did you do anything with Saul's body?

3      A.   Not that same night.

4      Q.   Okay.  At some point, at a later time?

5      A.   No, not that same night.

6      Q.   Okay.  What about the next day?

7      A.   The following day, Shorty called us and asked

8  what had happened, why had his friend Saul been killed.

9      Q.   And did y'all respond to him?  "Yes" or "no"?

10     A.   I don't remember exactly what he said to him.

11     Q.   Okay.  And after Shorty contacted you, what

12  happened next?

13     A.   We lived over there on 10 going towards

14  Wallisville and we would come go over there to sell

15  drugs.

16     Q.   Okay.

17     A.   And then from there, we came back to here and

18  then the following night we decided to bring down the

19  body.

20     Q.   And when you say "we," who are you talking

21  about?

22     A.   Him, me, Roberto.  And I don't remember exactly

23  if it was Shorty or Richard.  There were four of us.

24  There were two of us on each side and we brought the

25  body down.

1    Q.   And what did you do with the body?

2    A.   We put him over in the dumpster that was

3  outside.

4    Q.   And that's where you left him?

5    A.   That's right.

6    Q.   Rudy, back in 1989 when this happened, were

7  any -- or any time after that, did the police ever come

8  and talk to you about Saul's death?

9    A.   No.

10    Q.   You were never brought in to answer questions

11  about that?

12    A.   No.

13    Q.   No one ever mentioned it to you, did they?

14    A.   No.

15    Q.   When was the first time you told about Saul's

16  death?

17    A.   I told my attorney.

18    Q.   And that's Mr. Castro?

19    A.   That's right.

20    Q.   And then did you -- after you told Mr. Castro,

21  did you tell anyone else?

22    A.   That's right.

23    Q.   And who else did you tell?

24    A.   You-all.

25    Q.   And was that over in the jail when we came to

1  visit you?

2      A.   That's right.

3              MR. WOOD:  Your Honor, may I have just a

4  second?

5              THE COURT:  Yes.

6              (Pause)

7              MR. WOOD:  Your Honor, at this time I will

8  pass the witness.

9              THE COURT:  Thank you, Mr. Wood.

10             At this time, ladies and gentlemen, we're

11  going to break for lunch.  Your lunch has arrived.

12  We'll come back at 1:30.

13             I want to remind you that you should not

14  talk amongst yourselves or with anyone else on any

15  subject connected with the trial or to form or express

16  any opinion thereon.  You may go with the bailiff.

17             (Open court, defendant present, no jury)

18             THE COURT:  We'll be in recess till 1:30.

19             (Lunch recess)

20             (Open court, defendant and jury present)

21             THE COURT:  Please be seated.

22             Back on the record in Cause 1384794.  The

23  jury is in the courtroom.  The defendant is at counsel

24  table with his counsel and the prosecution is

25  represented by Ms. Tise and Mr. Wood.

1              I believe we were on the witness, Carmelo

2   Martinez Santana, also known as Rudy, and the State and

3   had just passed this witness.  Is that correct?

4              MR. WOOD:  That's right, Your Honor.

5              THE COURT:  Okay.  Mr. Cornelius, you may

6   proceed.

7                    **CROSS-EXAMINATION**

8   **BY MR. CORNELIUS:**

9      Q.   Mr. Martinez, how are you this afternoon?

10     A.   Fine.

11     Q.   Back in 2011 when the FBI came to talk to you,

12  was that because you contacted them and asked them to

13  come talk to you?

14     A.   No.

15     Q.   They just showed up unannounced, correct?

16     A.   Yes.

17     Q.   So, you had not contacted them or anybody else

18  and told anybody in law enforcement that you wanted to

19  talk to them about a case or cases in Houston, Texas,

20  correct?

21     A.   No.

22     Q.   It wasn't your idea to talk to them, it was

23  their idea to talk to you?

24     A.   Yes.

25     Q.   And this other murder case that you've told the

1  jury about today, have you been charged in that case?

2       A.   I really don't know.  I don't know anything.

3  I'm just here to tell the truth.

4       Q.   Okay.  Did you talk to your lawyer today?

5       A.   Just a few minutes ago during the recess.

6       Q.   Okay.  And is he here in the courtroom?

7       A.   That's right.

8       Q.   So, do you have any murder cases, capital

9  murder cases, robberies, burglaries, any cases pending

10 on you here in Harris County, Texas?

11      A.   That really depends on the law.  I'm just here

12 to tell the truth and they are the law.  They are the

13 ones that know.

14      Q.   Okay.  But don't you know if you were charged

15 in any of these cases your lawyer would tell you that?

16      A.   Well, they are the ones that know that.  I

17 always -- when I put the -- the man in Puerto Rico said:

18 You have two cases, murder charges.  I don't care.  I'm

19 here to say -- to tell the truth in front of God and

20 justice.

21      Q.   I thought you told the jury earlier in your

22 testimony that you had not been served with any kind of

23 indictment or formal charges in the case you told the

24 jury about before.

25      A.   That I can recall, I didn't say that.  I have

1  always said that.

2       Q.   Since that time, have you received any

3  indictments or any formal charges, since you previously

4  told the jury you didn't have any?

5       A.   That I know of, no.  I don't know.

6       Q.   All right.  Thank you.

7            The incidents you told the jury about where

8  you were put in a bathtub, when did that occur?

9       A.   I can't tell you exactly what year that

10 occurred.

11      Q.   Did it occur -- strike that question.

12           If the murder case that you told the jury

13 about today occurred in 1989, did the case that you told

14 the jury about where you were put in a bathtub occur

15 before that murder occurred or after?

16      A.   After.

17      Q.   Okay.  If the case you told the jury about last

18 week, the case that this trial is about occurred in

19 1992, the incident in the bathtub occurred before that

20 or after that?

21      A.   Before.

22      Q.   Okay.  And the Patiko case, when did that

23 occur?

24      A.   That occurred -- that occurred a little before

25 the murder case of this child.

1      Q.   All right.  And in that Patiko case, you were

2   left in the car behind the wheel.  Is that what you

3   testified to?

4      A.   That's right.  That's right.

5      Q.   And what is your understanding of what you were

6   supposed to do in that car behind the wheel while the

7   other people got out?

8      A.   Wait for them to come back.

9      Q.   Okay.  Well, you could wait for them in the

10  passenger seat or the back seat, but you were waiting

11  for them behind the wheel, correct?

12     A.   Yes, because that's what he ordered.

13     Q.   Okay.  And if they needed you to come pick them

14  up, were you going to come pick them up?

15     A.   Well, of course.

16     Q.   And if they needed to get away fast, were you

17  going to get them away fast?

18     A.   That's right.

19     Q.   Were you also there looking out to see if the

20  police came or some other people came that might cause a

21  problem for them?

22     A.   It could be.

23     Q.   Okay.  That's the same thing you did on the

24  night that Baby Angelo was taken?

25     A.   That's right.

1      Q.   You told the jury today that these events that

2  occurred you had no choice in them and had to accept

3  them.  Is that what you said?

4      A.   Yes, of course.

5      Q.   Well, even after you claim whatever you claim

6  about the Baby Angelo case, you say that you stayed with

7  Obel Cruz-Garcia?

8      A.   Afterwards?

9      Q.   Yes.

10     A.   Yes.

11     Q.   You helped clean up the car that was used to

12  transport the body?

13     A.   That's right.

14     Q.   You helped him sell that car?

15     A.   I was with him.  I didn't help.

16     Q.   Okay.  Well, did y'all go in two cars so you

17  would have another car to drive when you sold it?

18     A.   I don't remember exactly how it occurred.

19     Q.   All right.  You drove him to the airport so he

20  could get away, correct?

21     A.   That's right.

22     Q.   And then you continued in your own drug dealing

23  practice after he left, right?

24     A.   That's right.  Not immediately.  Because before

25  that, I was in jail here in the county.  And then after

1  that, I went to a church on 59, the Light of the World,

2  and doing legal work.  And then I went with my son to

3  church to ask God for forgiveness.  I had to go every

4  day to ask for his forgiveness with my son kneeling

5  there so that God won't punish him.

6      Q.   Okay.  And then it was after that that you

7  resumed the drug business?

8      A.   Yes.  I went back again using drugs and

9  drinking and then I started selling drugs again.

10     Q.   And carrying weapons?

11     A.   The day that I was caught, yes.

12     Q.   Okay.  Now, the day that Saul was killed, you

13  said that he had injuries to his hands.  His hands were

14  beaten with something?

15     A.   Yes, of course.

16     Q.   Explain that again, please.

17     A.   Saul was laying like this.  This is the

18  kitchen.  Here is the entrance to the kitchen.  Over

19  here, over here Saul was lying face-up -- he was lying

20  face-down.  At that moment Saul was not tied up.  He was

21  hitting him with something.  He would tell him:  Raise

22  your hand.  And he would hit him very hard, but it

23  doesn't come to mind or to my sight with what he was

24  hitting him with (indicating).

25     Q.   Let me stop you for a moment and ask questions.

1  How many times did he hit the hands?

2       A.   Several times, many times.

3       Q.   Okay.  Give me an estimate, whatever your best

4  estimate would be.

5       A.   I couldn't tell you, but he had them like this

6  (indicating).

7       Q.   And you said something like he destroyed his

8  hands.  I forgot the words that you used earlier.

9       A.   Yes.  His hands were this big (indicating).

10      Q.   Uh-huh.

11      A.   He tore them.

12      Q.   All right.

13      A.   And then he was also burning him with

14  cigarettes.  And Richard and him were injecting drugs

15  into him.

16      Q.   Okay.  I'm going to get to that.  Stick with

17  the hands for a minute.  Did he hit both hands at the

18  same time or one at a time?

19      A.   First one hand and then the other.

20      Q.   One time on each hand or multiple on each hand?

21      A.   I can't tell you exactly, but what I can

22  remember is he would hit him a lot on one and then he

23  would also hit him on the other hand.

24      Q.   So, a lot on both hands, is what you're saying?

25      A.   That's right.

1      Q.   Okay.  And then he was being burned by

2  cigarettes?

3      A.   That's right.  He burned him.  He would burn

4  him.

5      Q.   Okay.  About how many times?

6      A.   I can't tell you how many times.

7      Q.   Is it more than one?

8      A.   Yes, of course.

9      Q.   More than five?

10      A.   Right now, I don't know exactly, but it could

11  be.

12      Q.   All right.  And I forgot the guy's name, but

13  someone was injecting him with drugs?

14      A.   Him and Richard.

15      Q.   Okay.  And you were pointing to your neck when

16  you were talking to the jury.  Is that where they were

17  injecting him?

18      A.   Yes.  They were injecting him here and also

19  injecting him over here, his hands (indicating).

20      Q.   In the hands?

21      A.   In the veins of the hands or over here

22  (indicating).

23      Q.   So, they were injecting him in the neck?

24      A.   That's right, they injected him in the neck.

25      Q.   And in the hands or arms?

1     A.   Right now, I don't exactly know where it was,

2  but they injected him in the arms.  I don't know if it

3  was here or if it was over here, but that occurred

4  (indicating).

5     Q.   Okay.

6          MR. CORNELIUS:  May I check my notes for a

7  second, Judge?

8          THE COURT:  Yes.

9          (Pause)

10          MR. CORNELIUS:  Pass the witness.

11          THE COURT:   Thank you, Mr. Cornelius.

12          Anything further, Mr. Wood?

13          MR. WOOD:  Just briefly, Your Honor.

14                    **REDIRECT EXAMINATION**

15  **BY MR. WOOD:**

16     Q.   Rudy, in talking about Saul's case -- or rather

17  Saul's murder, at any time when you have talked to

18  myself or Ms. Tise or any investigators that might be

19  working with us, have we promised you anything regarding

20  the murder of Saul?

21     A.   No.

22     Q.   And did we tell you necessarily that you would

23  get any kind of deal or benefit from coming into court

24  and testifying about Saul's murder?

25     A.   None.  None.

1     Q.   And in speaking with your lawyer, Mr. Castro,

2   he hasn't promised you anything about Saul's murder case

3   either, has he?

4     A.   No.   First, I decided to tell him about it.

5     Q.   And you were the first person that told

6   Mr. Castro about that, right?

7     A.   That's right.

8     Q.   And then you volunteered the information about

9   Saul when we first spoke to you; is that right?

10     A.   That's right.   Because I'm very, very sorry for

11   this.   I want to cleanse myself.   I want to be another

12   person.

13     Q.   And, Rudy, when we first visited with you over

14   in the jail, we first came to speak to you about

15   Angelo's kidnapping and murder; is that right?

16     A.   That's right.

17     Q.   And when we asked you if you had any other

18   information you wanted to share, that's when you told us

19   about Saul's murder; is that right?

20     A.   That's right.

21           MR. WOOD:   I will pass the witness.

22           THE COURT:   Anything further,

23   Mr. Cornelius?

24           MR. CORNELIUS:   No, Your Honor.

25           THE COURT:   May this witness be excused?

1          MR. CORNELIUS:  Yes, Your Honor.

2          THE COURT:  You may step down, Mr. Martinez

3    Santana.

4          Please call your next.

5          MR. WOOD:  The State calls Dr. Dwayne Wolf.

6          THE BAILIFF:  Your Honor, the witness has

7    been sworn and testified previously.

8          THE COURT:  Thank you, Deputy Perry.

9          You may proceed.

10          MR. WOOD:  Thank you, Your Honor.

11                    **DR. DWAYNE WOLF,**

12    having been first duly sworn, testified as follows:

13                    **DIRECT EXAMINATION**

14    **BY MR. WOOD:**

15      Q.   Good afternoon, Dr. Wolf.  Welcome back.

16      A.   Thanks.

17      Q.   I won't ask if you are excited to be here.

18          Can you please reintroduce yourself for the

19    ladies and gentlemen of the jury?

20      A.   I'm Dr. Dwayne Wolf.

21      Q.   And are you the same Dwayne Wolf that testified

22    earlier in this same trial?

23      A.   Yes.

24      Q.   And, Dr. Wolf, generally can you go over

25    quickly with us your -- well, first tell us how you are

1  employed again.

2      A.   Deputy chief medical examiner for Harris

3  County.

4      Q.   And just briefly your background and

5  qualifications in being a medical examiner.

6      A.   I have bachelor's degree in biology, a Ph.D. in

7  molecular biology, and an M.D. degree.  Training in

8  pathology, subspecialty training in forensic pathology.

9  And I'm board certified by the American Board of

10  Pathology in both anatomic pathology and forensic

11  pathology.

12     Q.   And how long have you been employed again with

13  the Harris County Institute of Forensic Sciences?

14     A.   Since September of 2001.

15     Q.   During the course of that, you have had the

16  occasion to perform many autopsies, have you not?

17     A.   Yes.

18     Q.   And you've also been called upon to testify as

19  an expert in this court and other courts?

20     A.   Yes.

21     Q.   And that would be on many occasions; is that

22  right?

23     A.   Yes.

24     Q.   The case that you testified before in this --

25  I'm sorry.  Yeah.  In your earlier testimony you were

1    testifying about a 1992 case; isn't that right?

2        A.   Correct.

3        Q.   During discussions with our office, were you

4    asked to look into a 1989 case that your office

5    performed an autopsy on?

6        A.   Yes.

7        Q.   And was that a case involving an autopsy of

8    Saul Flores?

9        A.   Yes.

10       Q.   Dr. Wolf, I know you testified last week about

11   this, but back during that time, suffice to say you were

12   not employed with the Harris County Institute of

13   Forensic Sciences or the medical examiner's office as it

14   was then known?

15       A.   That's correct.

16       Q.   Were you asked to review the documentation and

17   findings in that autopsy of Saul Flores just like you

18   were in the case of Angelo Garcia, Jr.?

19       A.   Yes.

20       Q.   Going back to that case, the case involving

21   Saul Flores, was that case, like other cases, assigned a

22   uniquely identifying number by your office?

23       A.   Yes.

24       Q.   And do you have recollection what that number

25   was?

1  A. That was ML-89-4198.

2  Q. And how are those numbers assigned within your

3 office?

4  A. The first two digits are the year and the last

5 digits are a sequential number for bodies that were

6 examined.

7  Q. And in that case of 89-4198, was an autopsy

8 performed?

9  A. Yes.

10  Q. And when was that autopsy performed?

11  A. It was July 1st, '89.

12  Q. And was that autopsy performed by?

13  A. Dr. Narula.

14  Q. Is Dr. Narula, is he employed by your office

15 any longer?

16  A. No.

17  Q. At the time that the autopsy was performed on

18 an individual known as Saul Flores, was a report

19 generated for that?

20  A. Yes.

21  Q. And that report generally just noted findings

22 of Dr. Narula?

23  A. That's correct.

24  Q. And you were you able to review Dr. Narula's

25 original report?

1      A.   Yes.

2      Q.   What other documents or items have you been

3  able to review in this particular case?

4      A.   Our investigator's report, which is basically

5  preliminary information gathered before the autopsy is

6  conducted.  I also reviewed all the photographs in our

7  case file for this case, which included both photographs

8  that were taken at the scene as well as photographs

9  taken during the course of the examination.

10      Q.   And in your review of that, would you say that

11  there were many photos that you reviewed?

12      A.   Yes.

13           MR. WOOD:  Your Honor, may I approach the

14  witness?

15           THE COURT:  Yes.

16      Q.   (By Mr. Wood) Dr. Wolf, I'm going to show you

17  what's been marked for identification purposes as

18  State's Exhibit 121 and 122.  Can you look at those and

19  tell me if you recognize those (indicating)?

20      A.   Yes.

21      Q.   And what do you recognize those to be?

22      A.   These are photographs taken during the autopsy

23  that we're discussing.

24      Q.   And is there a uniquely identifying number on

25  each of those?

1      A.   Yes.

2      Q.   What is that number?

3      A.   Again, 89-4198.

4      Q.   And are these -- you reference that you

5  reviewed many photos in this case.  Are these just two

6  of the many photos that you reviewed?

7      A.   Yes.

8           MR. WOOD:  Your Honor, at this time, I will

9  offer the State's Exhibit 121 and 122.

10           THE COURT:  I have 121 already marked as a

11  certified copy of a Puerto Rican J & A, so you'll have

12  to mark it as something else.  122 is the photo of Saul?

13           MR. WOOD:  That's correct, Your Honor.  I

14  have miss-marked that.  The other will be one 128.

15           THE COURT:  So, 122 and 128?

16           MR. WOOD:  Yes, Your Honor.  I will have

17  Dr. Wolf just clarify.

18      Q.   (By Mr. Wood) Now those are marked 122 and 128.

19  Does that seem accurate (indicating)?

20      A.   Yes.

21           MR. WOOD:  Sorry about that.

22           **(State's Exhibit No. 122 and 128 Offered)**

23           MR. CORNELIUS:  No objection.

24           THE COURT:  State's Exhibits No. 122 and

25  128 are admitted without objection.

1          **(State's Exhibit No. 122 and 128 Admitted)**

2              MR. WOOD:  Permission to publish, Your

3    Honor?

4        Q.  (By Mr. Wood) Dr. Wolf, State's Exhibit 128

5    first, can you tell us what's depicted in 128

6    (indicating)?

7        A.  This is an overall photograph of the body of

8    Mr. Flores.

9        Q.  And it's kind of hard to read upside down, so

10   I'll turn that.

11             And that's the M.E. number that you've

12   referenced up here in the upper right-hand corner?

13       A.  That's correct.

14       Q.  And State's Exhibit 122, what is 122?

15       A.  This is a photograph taken of the face of

16   Mr. Flores.

17       Q.  Can you tell the ladies and gentlemen in your

18   practice what we commonly know as an identification

19   photo or I.D. photo?

20       A.  All right.  The identification photograph

21   typically is a photograph taken directly straight at the

22   face with the face cleaned up and generally with the

23   case number and field of view.

24       Q.  And would you say over the years the

25   identification photo has evolved to where it in many

1  cases today might be even a little cleaner than it

2  appears in 122?

3      A.   Yes.

4      Q.   Did you also have an opportunity to review some

5  photos taken by the Crime Scene Unit back on July 1st of

6  '89 that are related to this case?

7      A.   Yes.

8      Q.   In your review of the photos, both from your

9  office, the documents from your office and from the

10 Houston Police Department, were you able to make any

11 determination or findings based on your training and

12 experience regarding the death of Saul Flores?

13     A.   Yes.

14     Q.   And what generally were your findings or your

15 conclusions?

16     A.   He had injuries that were consistent with

17 ligature strangulation.

18     Q.   And when we hear the term "ligature," what do

19 you mean by that?

20     A.   By strangulation, we mean that there was a neck

21 compression.  Typically, the mechanism of that has to do

22 with compression of the blood vessels in the neck.  Not

23 the airway, but the blood vessels.  When we refer to

24 manual strangulation, that means that somebody was

25 strangled with another person's hand.  Ligature

1  strangulation means that there was some object that was

2  used to strangle the person with, be it a rope, a cord,

3  extension cord, any of those sorts of things.  So, there

4  was some object used in addition to or instead of just a

5  hand.

6      Q.   And when strangulation occurs, you said that it

7  creates some popping of the blood vessels?

8      A.   Well, it's compression of the blood vessels in

9  the neck, which cuts off blood flow to the brain.

10     Q.   Is that ultimately what leads to one's death if

11 the cause of death is strangulation?

12     A.   Usually.  Again, you can get some compression

13 of the airways, too, but it takes a lot more force to

14 compress the airways than it does to compress the

15 vessels.  So, it's usually more of a vascular

16 compression.

17     Q.   Dr. Wolf, I'm going to take you through a few

18 photos, if you don't mind.  State's Exhibit 118, I will

19 enlarge that.  What is shown in State's Exhibit 118 from

20 this picture (indicating)?

21     A.   We're looking at left side of Mr. Flores' neck

22 and there are two ligature marks across the neck,

23 horizontal ligature marks.  And, in fact, it's a pattern

24 mark, a ligature mark.  Particularly, the one

25 superior -- the one closest to the top of the neck

1  consists of two rows of outer outline by red marks.

2  Consistent with what you would see with an extension

3  cord, two side-by-side components.  The other mark is

4  just a linear line, which would be consistent, again,

5  with something like an extension cord, but just on its

6  side so that you didn't see the two components.  Again,

7  with manual strangulation, we frequently see injuries of

8  the neck, but they're not well defined like this.  There

9  will be scattered and contusions, but not linear marks

10  like this.

11      Q.   And these ligature marks depicted in 118 are

12  consistent with the same ligature marks that in your

13  opinion led to the strangulation of Saul Flores?

14      A.   Right.

15      Q.   State's Exhibit 117.  What, if anything, can

16  you tell us about 117 that stands out to you

17  (indicating)?

18      A.   Again, you are looking at pretty much the same

19  view here, but from the other side of the body.  So, now

20  we're looking at Mr. Flores' face.  There is some bloody

21  fluid on the face emanating from the nose and the mouth.

22  When a person is strangled, the lungs will become

23  congested.  In other words, fluid fills up inside the

24  air spaces.  And, you know, once a person dies, that

25  fluid can just leak back out.  So, we get, essentially,

 1  purged fluid, which is what this is, coming out of the

 2  nose and mouth.  It is nonspecific.  So, we see in any

 3  condition where we have pulmonary congestion, edema, or

 4  fluid in the lungs, but it's consistent with

 5  strangulation.  In many of the photographs we were able

 6  to see petechial hemorrhages on the face, which are just

 7  little pinpoint hemorrhages in the skin.  And I don't

 8  know if they are visible on this photograph or not.  I

 9  certainly can't tell on the projected view here, but

10  when you compress the vessels in the neck, the first

11  thing that becomes compressed are the veins.  It only

12  takes about 4 pounds of pressure to compress the jugular

13  veins and it takes about 11 pounds of pressure on the

14  carotid arteries.

15            So, between about 4 pounds and 11 pounds,

16  blood is still going into the head, but it's not coming

17  back out.  So, the blood pressure in your head goes up

18  and up and you start popping small blood vessels.

19  That's when we start to say these little pinpoint

20  hemorrhage or petechial hemorrhages in various places.

21  They will show up on the skin of the face, sometimes in

22  the inside of the eyes, the whites of the eyes, and that

23  sort of thing, but, again, it is just another indicator

24  of strangulation.

25            He has also got some blunt force injuries.

1    There are some contusions there around the eyes.  And

2    you will see that the right eye is swollen and

3    discolored purple.  Basically a black eye.

4         Q.   And you said that's consistent with blunt force

5    trauma?

6         A.   Yeah, the result of blunt force trauma.

7         Q.   And also noted on the face up here near the

8    hairline, would you say that that could be characterized

9    as contusions up here near the hairline (indicating)?

10        A.   He actually has a couple of different types of

11   blunt force trauma.  A contusion is simply a bruise

12   bleeding into the subcutaneous tissue, which shows up

13   with swelling, purple, blue, or red discoloration.  And

14   an abrasion is a scrape in the skin where the tops of

15   the skin is actually scraped off.  And the injuries up

16   on his forehead, I think, were more abrasions than

17   contusions.

18        Q.   And were there any abrasions, lacerations,

19   contusions anywhere else on the head of Saul Flores in

20   your review in this case?

21        A.   He had several injuries around the face and the

22   forehead.  He also had a laceration inside the lip on

23   the right side.  It's a little hard to see in that

24   photograph, but the right side of the lip was swollen.

25   It was more on the inside of the lip.

1    Q.   State's Exhibit 119.  What does that show us

2  (indicating)?

3    A.   This Mr. Flores' right hand.  His hands were

4  actually bound.  There was a ligature around the wrist.

5  Well, at least around the right wrist at this point.

6  This was a flannel cloth.  There was also a rope as

7  well.  There was indentations of the skin corresponding

8  to the rope and there was actually hemorrhage in the

9  subcutaneous tissues under that.

10           There is also an abrasion a little further

11  down the back of the hand.  There was contusions around

12  that.  In other words, the skin is scraped off, but

13  right around that you will see that the skin is

14  discolored purple.  So, it's an abraded contusion.

15    Q.   So, the purple coloring, is that consistent

16  with some type of bruising in layman's terms?

17    A.   That's correct.

18    Q.   The red mark here indicated in the middle of

19  this hand in State's Exhibit 119, explain -- can you

20  tell us -- is that -- did you say that would be

21  characterized as an abrasion?

22    A.   That's correct.  So, again, it's a little hard

23  to see on the projected photograph, but there is an

24  abrasion and then surrounding that is a purple

25  contusion.  Again, an indicator of blunt force trauma.

1   So, there was impact against some object.  And there is

2   no pattern to that.  So, we can't tell what that object

3   was, other than some blunt force instrument.

4        Q.   And we use that word a lot in our line of work,

5   blunt force trauma, but what does that essentially mean?

6        A.   It's an impact against some object without a

7   sharp edge.  So, you know, like this chair handle, your

8   fist, a hammer, anything like that.

9        Q.   Consistent with being struck with something

10  like you've just described?

11       A.   Correct.

12       Q.   And then finally I will show you State's

13  Exhibit 120.  Anything about 120 that stands out to you?

14       A.   Yeah.  His ankles were tied together with some

15  kind of terrycloth ligature.  And so, his ankles are

16  still tied in this photograph.  Wrapped within that

17  ligature is an extension cord of the type that I

18  referred to earlier.  Like, you know, two wires

19  side-by-side.  So, it's that type of cord that would

20  produce the same type of mark we see on Mr. Flores'

21  neck.

22       Q.   Dr. Wolf, I know that you testifying in the

23  nature you have both last week and this week is a little

24  unique; isn't that right?  Unique in the sense that you

25  weren't personally involved with either of the actual

1    autopsies?

2         A.   Right.  It's not that infrequent that we're

3    called to testify on somebody's else work.

4         Q.   Right.  And to do that, you've testified you

5    reviewed all of the documents and what you had as

6    resources in this case, correct?

7         A.   Correct.

8         Q.   As part of that, you said that you looked at

9    the original autopsy report of Dr. Narula?

10        A.   Yes.

11        Q.   And is it common in the performance of

12   autopsies to do any kind of testing, toxicology wise or

13   otherwise, on the complainants -- or the deceaseds when

14   you perform autopsies?

15        A.   We usually do.

16        Q.   And was toxicology testing performed in this

17   case?

18        A.   Yes.

19        Q.   Was there any indication or presence of drugs

20   or otherwise in Saul Flores' body?

21        A.   Yes.  He had cocaine in his blood.

22              MR. WOOD:  I will pass the witness, Your

23   Honor.

24              THE COURT:  Okay.  Mr. Cornelius, you may

25   proceed.

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | **BY MR. CORNELIUS:** |
| 3 | Q.   Okay.  Dr. Wolf, how are you this afternoon? |
| 4 | A.   Good. |
| 5 | Q.   Turning -- do you have a copy of the protocol |
| 6 | up there? |
| 7 | A.   Yes. |
| 8 | Q.   Turning to Page 4, I want to talk to you about |
| 9 | the hands for a minute.  The very top paragraph, not |
| 10 | even the full paragraph, it talks about the right hand. |
| 11 | Do you find it there? |
| 12 | A.   Yes. |
| 13 | Q.   It says that -- well, the only injury -- you |
| 14 | tell me if this is correct -- concerning the right hand, |
| 15 | it says:  The right hand dorsally along the thumb showed |
| 16 | an abrasion measuring one-half inch and three-quarters |
| 17 | of inch with hemorrhage in the underlying soft tissues. |
| 18 | Correct? |
| 19 | A.   Yeah.  Well, three-eighths, but, yes. |
| 20 | Q.   Okay.  Did you see any evidence of any other |
| 21 | injuries to that hand? |
| 22 | A.   Not the hand itself.  As I mentioned, there's |
| 23 | injuries at the wrist. |
| 24 | Q.   At the wrist. |
| 25 | A.   But, no. |

1    Q.   So, an abrasion on his right thumb, correct?

2    A.   Well, that was the injury we looked at.

3    Q.   All right.  That's the on the jury saw?

4    A.   That's correct.

5    Q.   Okay.  That was it on the right hand?

6    A.   That's correct.

7    Q.   And in addition to the photographs in the case

8    and the protocol which was typed, are there also

9    radiographs or x-rays?

10   A.   If they were already taken, they were not

11   available for my review.

12   Q.   Would that be a typical part of the autopsy

13   process to see if there were any broken bones?

14   A.   No, not in this type of the case.  We can

15   generally tell if there is a broken bone.

16   Q.   Okay.  Particularly, in the hands?

17   A.   Yes.

18   Q.   There didn't appear to be any broken bones in

19   the right hand, correct?

20   A.   That's correct.

21   Q.   The only injury is the one the jury saw?

22   A.   That's correct.

23   Q.   On the left hand, again, it says there was an

24   abrasion on left hand on the little finger, right?

25   A.   That's correct.

1      Q.    On the knuckle of the little finger?

2      A.    Right.   Just distal to means down on the

3  finger.

4      Q.    Three-eights of an inch by three-sixteenths of

5  an inch, correct?

6      A.    Yes, that's correct.

7      Q.    No other injuries described in the autopsy

8  protocol to the left hand and no reason to think any

9  bones were broken in the left hand, correct?

10      A.    That's correct.

11      Q.    Is there anything in here indicating that the

12  doctor who did the autopsy found any cigarette burns

13  anywhere on the body?

14      A.    No.   There was nothing described as a burn.

15      Q.    And if there were, that would certainly be

16  described in an autopsy protocol, correct?

17      A.    Sometimes it's difficult to tell an abrasion

18  from a burn, but there was nothing described

19  specifically as a burn.

20      Q.    Okay.   So, I mean, as you studied this case,

21  would you be able to tell the jury that this person had

22  some fresh cigarette burns on his body or not?

23      A.    There was nothing that looked like a cigarette

24  burn to me.

25      Q.    Okay.   Now, y'all also look for needle tracks,

1    right, when you do an autopsy?

2        A.   Yes.

3        Q.   There were some needle track scars found on one

4    of the arms, correct?  That's on Page 4 at the top.

5        A.   Yes.

6        Q.   No fresh needle marks, correct?

7        A.   That's correct.

8        Q.   None in the neck, none in the arms, none

9    anywhere -- recorded anywhere, correct?

10       A.   That's correct.

11       Q.   The only ones were old because they were

12   already scarred, right?

13       A.   Yes.

14       Q.   And did he have a broken neck?

15       A.   No.

16               MR. CORNELIUS:  All right.  I will pass the

17   witness.

18               THE COURT:  Anything further, Mr. Wood?

19               MR. WOOD:  I have nothing further for this

20   witness.

21               THE COURT:  Okay.  He may be excused then,

22   correct?

23               MR. WOOD:  No objection.

24               THE COURT:  You may step down, Dr. Wolf.

25   Thank you very much.

1                    THE WITNESS:  Thank you.

2                    THE COURT:  Please call your next.

3                    MR. WOOD:  The State calls Micah Webb.

4                    THE BAILIFF:  Your Honor, the officer

5     previously testified and was previously sworn.

6                    THE COURT:  Thank you.

7                    You may proceed.

8                    MR. WOOD:  Thank you, Your Honor.

9                         **MICAH WEBB,**

10    having been first duly sworn, testified as follows:

11                    **DIRECT EXAMINATION**

12    **BY MR. WOOD:**

13        Q.   Good afternoon, Mr. Webb.

14        A.   Hello, sir.

15        Q.   Can you reintroduce yourself for the jury?

16        A.   Micah Webb.  District attorney's office

17    investigator.

18        Q.   And, Mr. Webb, you are the same Micah Webb that

19    testified last week in this trial; is that right?

20        A.   Yes, sir.

21        Q.   And I believe last week you told us that you

22    work in the capacity as an investigator here in the

23    D.A.'s office, right?

24        A.   That's correct.

25        Q.   And at some point during your assignment here,

1  you were asked to help with the investigation of this

2  case against Obel Cruz-Garcia?

3       A.   Yes.

4       Q.   And specifically I want to direct your

5  attention as it relates to today regarding a time in the

6  late -- late 2011, around that timeframe.  Was that a

7  time that you were already working on this case?

8       A.   Yes, sir.

9       Q.   And during that time, did you have an occasion

10 to go to the jail and meet with a potential witness by

11 the name of Carmelo Martinez Santana?

12      A.   Yes, sir.

13      Q.   And is that person also the person we know as

14 Rudy?

15      A.   Yes, sir, it is.

16      Q.   And was that after a time that Rudy had been

17 brought to Harris County from Pennsylvania?

18      A.   Yes, sir.

19      Q.   And were you there and part of that initial

20 conversation that the Harris County District Attorney's

21 Office had with Rudy once he was brought here?

22      A.   Yes, sir.

23      Q.   And was the original purpose in meeting with

24 Rudy to find out what information he had regarding the

25 kidnapping and murder of Angelo Garcia, Jr.?

1        A.   Yes, sir, it is.

2        Q.   And was that conversation with Rudy -- well, I

3   assume that was a lengthy conversation?

4        A.   Yes, sir.

5        Q.   Was there an opportunity during that

6   conversation with Rudy where he was asked if he had any

7   additional information that he wanted to provide?

8        A.   Yes, sir.

9        Q.   And at that time, did Rudy give some additional

10  information?

11       A.   Yes, sir.

12       Q.   Without going into those details, did some of

13  that information involved the murder of another

14  individual unrelated to Angelo Garcia, Jr.?

15       A.   Yes, sir, it did.

16       Q.   When you learned of that information, was that

17  information a surprise to you?

18       A.   Yes.

19       Q.   Was that new information, regarding the

20  different murder, anything that you had come across in

21  your investigation up to that point?

22       A.   Yes, sir, it was new.

23       Q.   After learning of that information, did Rudy go

24  on to provide more information about that murder?

25       A.   Yes, sir.

1    Q.   And was that involving a murder -- well, I will

2    withdraw that.

3              At the time that Rudy shared that

4    information, did you or anyone else in that room offer

5    Rudy anything in exchange for telling that information?

6    A.   No, sir.

7    Q.   Did you promise him anything related to that

8    new information he had provided?

9    A.   No, sir.

10   Q.   To your knowledge, at any point in time has

11   Rudy ever been offered or promised anything related to

12   that information?

13   A.   Not that I'm aware of.

14   Q.   After you obtained that information, what did

15   you then do with that information?

16   A.   I queried our various law enforcement

17   databases, including the HPD system, which is called

18   OLO, and basically researched the details that Rudy had

19   provided and was able to identify what I thought to be

20   the incident that he was referring to.

21   Q.   Did you have pretty basic information at that

22   point?

23   A.   Yes, sir.

24   Q.   Without going into details, just generally what

25   pieces of information did you have?

1       A.   If memory serves me, he identified the --

2              MR. CORNELIUS:  Objection to the hearsay.

3              THE COURT:  That's sustained.

4       Q.   (By Mr. Wood) What key points did you have to

5  continue your investigation at that point?

6       A.   I had a rough location, the details of the

7  dumpster, and a rough estimate of what time period that

8  it happened.

9       Q.   Anything regarding the deceased in that case?

10      A.   I don't recall, but I think he might have had a

11  nickname or first name, but I don't remember

12  specifically.

13      Q.   And you took that information and then started

14  using some of the resources you have?

15      A.   Yes, sir.

16      Q.   And what were your results of that?

17      A.   I was able to identify an unsolved murder.  I

18  can't remember what date, but it was the apartment

19  complex that fit his description.  It involved some of

20  the other details that he had provided in that

21  interview.  And I was also able to -- I think I already

22  said this, but it was identified as an unsolved murder.

23      Q.   And was that a case that the Houston Police

24  Department had originally worked?

25      A.   Yes, sir, it is.

1      Q.   And if -- does the date of July of 1989 sound

2 about accurate?

3      A.   That sounds about right.

4      Q.   And after you kind of put those pieces together

5 and thought that you had the offense for what had been

6 described to you, what did you do then?

7      A.   I contacted HPD's Homicide Division.  And I

8 believe I contacted specifically their Cold Case Unit

9 and just told them what I had in hopes that they would

10 run with it.

11      Q.   And is it fair to say from that point, the

12 piecing together of that case started happening?

13      A.   Yes, sir.

14      Q.   To your knowledge, at that point in time the

15 information that you were provided in that initial

16 meeting with Rudy, had there been any other activity on

17 this case since the time it was investigated?

18      A.   I don't believe so.

19                MR. WOOD:  I will pass the witness.

20                THE COURT:  Thank you, Mr. Wood.

21                Mr. Cornelius.

22                      **CROSS-EXAMINATION**

23 **BY MR. CORNELIUS:**

24      Q.   Mr. Webb, has Rudy ever been charged with

25 either this capital murder case this jury's tried or

```
 1   this murder case that you researched?

 2       A.   No, sir.

 3                 MR. CORNELIUS:  May I have just a moment,

 4   Judge?

 5                 THE COURT:  Yes.

 6                 (Pause)

 7                 MR. CORNELIUS:  Pass the witness.

 8                 THE COURT:  Thank you.

 9                 May this witness be excused?

10                 MR. WOOD:  No objection, Your Honor.

11                 MR. CORNELIUS:  No objection.

12                 THE COURT:  You may step down, sir.

13                 THE WITNESS:  Thank you.

14                 THE COURT:  Please call your next.

15                 MR. WOOD:  Your Honor, if I may have one

16   minute.

17                 (Pause)

18                 MR. WOOD:  Your Honor, the State calls

19   Darryl Novak.

20                 THE COURT:  Has this witness been sworn?

21                 MR. WOOD:  I don't believe he was sworn

22   yesterday, Your Honor.

23                 THE BAILIFF:  He has not been sworn, Your

24   Honor.

25                 THE COURT:  Please raise your right hand.
```

```
 1                      (Witness sworn)
 2                THE COURT:  Please speak into the
 3    microphone and keep your voice up.
 4                MR. WOOD:  Thank you, Your Honor.
 5                      DARRYL NOVAK,
 6    having been first duly sworn, testified as follows:
 7                    DIRECT EXAMINATION
 8    BY MR. WOOD:
 9        Q.   Good afternoon, Mr. Novak.
10        A.   Good afternoon.
11        Q.   Can you introduce yourself?
12        A.   I'm Detention Officer Darryl Novak.
13        Q.   And Mr. Novak -- can I call you Officer Novak?
14        A.   Sure.
15        Q.   Officer, how are you employed?
16        A.   At the Harris County Sheriff's Department.
17        Q.   And you said you're a detention officer, right?
18        A.   Yes, sir.
19        Q.   How long have you been with the Harris County
20    Sheriff's Department?
21        A.   April of 2007.
22        Q.   And have you been employed as a detention
23    officer that entire time?
24        A.   Yes, sir.
25        Q.   Are you assigned over at the Harris County
```

1  Jail?

2      A.   Yes, sir.

3      Q.   Tell me what - well, tell me first what some of

4  your current responsibilities are.

5      A.   As of right now, we have an annual bid on the

6  charge of recreation.

7      Q.   And what does that involve?

8      A.   Every inmate or every cell block has three

9  hours of recreation allowed to them per stay a week.

10     Q.   And what other responsibilities have you had as

11  a detention officer?

12     A.   Working a pod, care, custody, and control,

13  basically, of the inmates' wellbeing.  Making sure

14  they're at the right housing location and then

15  controlling their movement.

16     Q.   And when you say a pod, just generally describe

17  to the ladies and gentlemen what that means.

18     A.   Every floor has roughly seven pods.  The upper

19  floors, it's high risk, you've got twelve pods, you've

20  got two tanks.  The lower floors, you have four cell

21  blocks.  Within those cell blocks, you have up to 29

22  inmates.  So, you're roughly in charge of 116 inmates.

23     Q.   So, there are four pods --

24     A.   Four cell blocks.

25     Q.   Four cell blocks within a pod?

1     A.   Within a pod.

2     Q.   And up to 29 inmates per cell block?

3     A.   Correct.

4     Q.   Okay.  And when you worked -- in working as

5  maintaining a pod, what do you have to do?  What are

6  some of the things you have to do?

7     A.   Get them out for court, change their laundry,

8  afford them recreation, visitation, attorney visits,

9  church.

10    Q.   So, generally, you supervise kind of the flow

11  of what happens within those cell blocks?

12    A.   Normal operations, yes, sir.

13    Q.   And back in September of 2012, what were your

14  responsibilities -- first, were you employed as a

15  detention officer?

16    A.   Yes, sir.

17    Q.   And what were your responsibilities back in

18  September of -- this past September?

19    A.   Are you talking about a specific date.

20    Q.   Well, generally, were you maintaining a cell

21  block at that time?

22    A.   Yes, sir.

23    Q.   And was there a particular area of the jail you

24  were assigned to?

25    A.   I was assigned to 2-G pod.  I was assigned

1   there for roughly a year.

2        Q.   And 2-G pod, is that -- does that signify a

3   specific location or what does that mean?

4        A.   It's a specific location within that pod.  Like

5   I said, there is four cell blocks, you've got one side

6   2-G-1, 2-G-2, 2-G-3, 2-G4.

7        Q.   Were you working with any individual at that

8   point or working alone?

9        A.   I was working with my partner, Deputy Bonner.

10       Q.   I want to direct your attention to September

11  23rd of 2012.  Do you remember that date?

12       A.   Yes, sir.

13       Q.   And was there a particular incident involving

14  Obel Cruz-Garcia that stands out in your mind on that

15  date?

16       A.   Yes, sir.

17       Q.   And was Obel Cruz-Garcia assigned to 2-G pod at

18  that time?

19       A.   He was assigned to 2-G-4.

20       Q.   2-G-4?

21       A.   Yes, sir.

22       Q.   And you stated that that was a pod that -- if

23  I'm using the wrong words, I apologize, but that was an

24  area that you had been assigned for some time?

25       A.   Yes, sir.

1      Q.   And was Obel Cruz-Garcia an individual that you

2  were familiar with or you just knew from being assigned

3  to that area?

4      A.   Just being assigned to that area until, like I

5  said, his infraction.

6      Q.   And do you see that individual here in the

7  courtroom today?

8      A.   Yes, sir.

9      Q.   Can you identify something that person is

10  wearing and point that person out?

11      A.   He is wearing a blue shirt and a tie.

12              MR. WOOD:   Your Honor, if the record would

13  reflect he has also identified the defendant?

14              THE COURT:   The record will so reflect.

15      Q.   (By Mr. Wood) On September 23rd of 2012, what

16  was happening in that 2-G-4 pod that was any different?

17      A.   On every Sunday, the inmates are issued a

18  razor.  They have a two-hour window to shave and shave

19  only.  At recreation they are allowed, Mondays and

20  Tuesdays, to cut hair with clippers.  All inmates were

21  advised mishandling a county razor would result in

22  disciplinary action.

23      Q.   Let me stop you there.  So, Sundays are the

24  razor day, basically?

25      A.   Razors are -- that's the only day that they get

 1   and receive razors.

 2        Q.   So, if an inmate wants to shave, it's got to be

 3   on a Sunday?

 4        A.   Yes, sir.

 5        Q.   Are those razors handed out at -- were those

 6   razors handed out a specific time?

 7        A.   Yes, sir.  Every Sunday, it was the same

 8   routine, between 7 and 9 o'clock.  They are supposed to

 9   be passed out before 7:00 and picked up no later than 9

10   o'clock before the trays gets there.

11        Q.   So, there has to be a two-hour window to work

12   from?

13        A.   Yes, sir.

14        Q.   Okay.  And is there a process of signing razors

15   in and signing razors out for inmates?

16        A.   Yes, sir.

17        Q.   How does that work?

18        A.   Every shift conducts an armband T-card count.

19   Lights come no later than 7:00 in the morning.  When we

20   go in and do count, they are issued a log if it's a

21   haircut or a log sheet for a razor.  Inmates sign the

22   full name, their SPN number.  And then when we go in and

23   conduct count, we collect the paper when the rovers

24   bring us the razors for the assigned count we have for

25   that day.  As we are doing count, we go down the list

1   and check off their name.  There's like three different

2   spots:  Was an inmate afforded the opportunity to get a

3   razor, was it collected, and was it altered.

4       Q.  So, you first go through and kind of tally up

5   who is asking for a razor that day.  Is that fair?

6       A.  Correct.

7       Q.  And then once that number is obtained, then

8   eventually when those razors are handed out, they are

9   actually signed out to those individuals?

10      A.  It's assigned to that individual.  And we also

11  tell them, when we collect them -- and it was translated

12  via one of the rovers -- that they're responsible for

13  that razor, any disassemblement of that razor they would

14  be charged with it if they turned it back in.

15      Q.  And are those instructions that you give

16  personally every time you -- on a Sunday when you hand

17  out those razors?

18      A.  Every Sunday, yes, sir.

19      Q.  And were those same instructions given on

20  September 23rd of 2012?

21      A.  Yes, sir.

22      Q.  And tell the ladies and gentlemen of the jury

23  exactly what is that instruction?

24      A.  Same thing during count.  Always announce count

25  time, get up, make up your rack, sheets around your

1   mattress, get it tucked in, remove the knots from your

2   sheets and blankets.  Anything under your mattress is

3   considered contraband.  Place it inside your commissary

4   bag.  Inmates are not allowed to wash any clothing or

5   linen.  They hang it on the back of their racks, the day

6   room tables.  It's unsanitary.  They're not to -- like I

7   said, remove all wet laundry and linens from all of the

8   racks and day room tables, have a seat at the table for

9   count.  Once we do count, like I said we collect the

10  razor sheets, start going down the list, pass out the

11  razors, check them off individually.  Each person gets a

12  razor.

13      Q.   And what specific instructions regarding the

14  razors were given on that day?

15      A.   Any disassemblement of razor would result in

16  disciplinary action.

17      Q.   And after the razors were handed out on

18  September 23rd, 2012 -- well, rather, was a razor signed

19  out to Obel Cruz-Garcia on that day?

20      A.   Yes, sir.

21      Q.   And after razors were handed out in that cell

22  block, what happened next?

23      A.   When we collect the razors, there is --

24  depending on who is the vendor is that day, there is two

25  types of plastic razors.  One has a double blade, one

1  has a single blade.

2            Now, once you've been collecting razors and

3  you notice the razors, one of the razors has two divots

4  on the left side and the right side.  One of the other

5  razors has a single divot.  Well, these guys will pop

6  the top off, they use the blades, they'll put them in

7  plugs, cut wires, take two rigs out of it.  When I

8  picked up Mr. Cruz's razor, it had been altered.  The

9  plastic top had been popped off and the original razor

10 wasn't in there.  It had an old razor from a previous

11 time that he was issued a razor.

12    Q.  So, when you discovered that altered razor,

13 what did you do?

14    A.   I informed him that he was being written up for

15 destroying county property, altering county property,

16 refusing to obey an order.

17    Q.  Did you give him an opportunity to -- I'm

18 sorry.

19            Did you request that he go retrieve the

20 razor that was missing?

21    A.  Yes.

22    Q.  Or the razor blade.

23    A.  The razor blade.

24    Q.  Okay.  And did he do that?

25    A.  Yes.

1    Q.   And did he return to you with that razor blade?

2    A.   He returned, basically, an extra razor blade as

3  well.

4    Q.   Okay.  And what do you mean by an extra razor

5  blade?

6    A.   Like I said, that one consisted of two blades.

7  What they usually do, most inmates, they use it to cut

8  hair.  Like I said, they'll cut wires, make tattoo rigs,

9  cut sheets up.  Usually when that blade gets dull, they

10  try to swap it out much.  Now, they get commissary.  On

11  commissary they get the Ramon noodle soups.  Within that

12  Ramon noodle soup, they have an open package with the

13  seasoning in it.  Some of these guys will take out a

14  razor blade and switch it with that aluminum to make it

15  look like a razor.

16    Q.   So, in Mr. Cruz-Garcia's case, you stated to

17  him to go and retrieve the razor blade?

18    A.   Yes.

19    Q.   And he brought back a razor blade to you?

20    A.   He brought back the initial razor blade that

21  was in that one; and like I said, the one that was in

22  there was one of the older ones.

23    Q.   Okay.  So, basically, in your estimation he had

24  switched out the razor blade, one of the razor blades in

25  that razor with an old razor blade?

1       A.   Correct.

2       Q.   So, the fresh razor blade was something he went

3  and retrieved?

4       A.   Correct.

5       Q.   From where you were, were you able to tell

6  where he retrieved that from?

7       A.   There was three inmates with the same deal.

8  So, it -- they went back to their beds and probably

9  retrieved it underneath their mattress, somewhere around

10  their bunk areas.

11       Q.   Okay.  So, that's not something you saw with

12  your own eyes.  You just knew that he brought it back to

13  you?

14       A.   Correct.

15       Q.   After he returned the razor blade to you, what

16  happened at that point?

17       A.   I had Detention Officer Flores -- like I said,

18  he's bilingual.  He translated and asked him -- like I

19  said, all inmates are afforded the opportunity to make a

20  statement.  All three of the inmates refused to submit a

21  written statement at that time.  I think he went to

22  disciplinary court on September 27th and he was charged

23  13 cents for disassembling the county razor.

24       Q.   And then a report is generated on -- from you

25  detailing what your findings and your -- what happened

1    in that incident?

2         A.   Correct.

3         Q.   It seems to be a very thorough process in

4    handing out these razors and retrieving the razors.   Is

5    that fair?

6         A.   Correct.

7         Q.   And then also in collecting and noting the

8    state of those razors when you get them back.   Is that

9    right?

10        A.   Correct.

11        Q.   Are there any safety concerns from your

12   standpoint in the handing out and using of these razors?

13        A.   When I work overtime, you will catch guys --

14   like I said, they are allowed that two-hour window.

15   I've worked in the pods where I've seen inmates cut

16   themselves.

17             MR. CORNELIUS:   Judge, I object to this as

18   being speculation and not relevant to this particular

19   case and this particular defendant.

20             THE COURT:   Is there any relevance?

21             MR. WOOD:   Well, Your Honor, I would say

22   that it's relevant to the -- obviously, the nature of

23   what we're talking about and the safety of those

24   individuals in the jail.

25             THE COURT:   Okay.   You can ask that

1   specific question, but do not go into any other details

2   of what other inmates have done.  It will be sustained.

3               MR. WOOD:  Okay.

4        Q.  (By Mr. Wood) Officer Novak, is there a safety

5   concern in the distribution of these razors in your job?

6        A.  Yes, sir.

7        Q.  Is that regarding your safety as well as

8   others' safety inside the jail?

9        A.  Yes, sir.

10       Q.  Including workers, yourself, inmate, other

11  individuals?

12       A.  Yes, sir.  Every shift conducts a cell search

13  once a month --

14               MR. CORNELIUS:  Objection.  Nonresponsive.

15  It does not include my client's extraneous matter, which

16  I object to.

17               THE COURT:  And your first objection was

18  what?

19               MR. CORNELIUS:  Nonresponsive.

20               THE COURT:  That's sustained.

21       Q.  (By Mr. Cornelius) Mr. Novak, you didn't have

22  anything to do with the actual assessing of punishment

23  or discipline of Obel Cruz-Garcia related to this

24  incident, did you?

25       A.  No, sir.  That's part of disciplinary.

1          MR. WOOD:  I pass the witness.

2          THE COURT:  Mr. Cornelius.

3          MR. CORNELIUS:  May I have a moment, Judge?

4          THE COURT:  Yes.

5          (Pause)

6                    **CROSS-EXAMINATION**

7  **BY MR. CORNELIUS:**

8     Q.  Officer Novak, my name is Skip Cornelius.  I

9  don't think we've ever met.  We've certainly never

10  discussed this case before, correct?

11    A.  No, sir.

12    Q.  You work in the jail, obviously.

13    A.  Yes, sir.

14    Q.  So, the jail keeps pretty meticulous records of

15  any kind of jail infractions that the inmates may do,

16  correct?

17    A.  Correct.

18    Q.  And they're permanent records, right?

19    A.  I'm not part of classification, so I couldn't

20  say.

21    Q.  So, if somebody's been in the jail, let's say,

22  five years or one year or one year, five months, or

23  whatever the case might be, it's pretty easy to

24  determine what their jail infractions, if they have any,

25  would be, correct?

1     A.    Are you talking about like prior write-ups?

2     Q.    Yeah.

3     A.    No, sir.  We can only pull up the write-ups

4  that we do.

5     Q.    But I'm talking about the State, the D.A.'s

6  office, or even a defense lawyer, if they want to, could

7  subpoena the records that are kept --

8     A.    Yes, sir.

9     Q.    -- written records that detail these incidents,

10  if they are any, correct?

11     A.    Yes, sir.

12     Q.    And you wrote up an offense report for this?

13     A.    Yes, sir.

14     Q.    And in your offense report, you said on that

15  particular day that you told the inmates if they

16  disassemble the count-issued razors to cut hair, they

17  were going to have disciplinary action.

18     A.    Correct.

19     Q.    That's what you put in your report?

20     A.    Correct.

21     Q.    Because they do that, right?

22     A.    They do it, but they're not supposed to.  Yes,

23  sir.

24     Q.    I know they are not supposed to, but they do

25  that.  And three guys, you wrote in your report,

1   including my client, you said each turned in a

2   disassembled county razor.

3        A.   Yes, sir.

4        Q.   I don't find anything in your report about

5   going back and getting some other razor, but you said

6   that happened?

7        A.   Yes, sir.  I didn't write him up for possession

8   of a weapon because he voluntarily turned it in when I

9   asked him to go get it.

10       Q.   Okay.  And then you note that he had to pay the

11  county back 13 cents for the razor, correct?

12       A.   That would be disciplinary, yes, sir.

13       Q.   Well, do you know if he even had any discipline

14  in this?

15       A.   I'm not disciplinary.  I generate the report

16  and they -- disciplinary calls them down to sanction

17  their actions.  Like I said, there's a price list for

18  like mattresses, sheets, blankets.  They have the price

19  list.

20       Q.   So, you don't know if he had any discipline?

21       A.   Well, apparently he's had it.  Like I said, the

22  report has been generated.  I believe he was found

23  guilty.

24       Q.   Okay.  That's what I'm getting at.  He got

25  seven days loss of visitation and commissary, right?

1    Did you read that?

2         A.   I think it was probated for seven days.

3         Q.   Well, actually, seven days, but it was probated

4    for 15 days.  Right?

5         A.   Correct.

6         Q.   So, this incident resulted in him being

7    essentially fined -- well, maybe not fined.  Getting

8    seven days loss of privileges probated for 15 days, and

9    he had to, as a condition I guess of the probation, pay

10   the county back the 13 cents?

11        A.   Correct.

12                  MR. CORNELIUS:  Pass the witness.

13                  THE COURT:  Do you have anything further,

14   Mr. Wood.

15                  MR. WOOD:  Briefly.

16                  **REDIRECT EXAMINATION**

17   **BY MR. WOOD:**

18        Q.   Mr. Novak, obviously razor blades can be used

19   to cut hair, right?

20        A.   Right.

21        Q.   A razor blade can be used for many other

22   things, can it not?

23        A.   Yes.

24        Q.   A razor blade can be used to cut or harm

25   another individual, can it not?

1    A.   Correct.

2    Q.   And this is a particular concern inside a penal

3  institution, wouldn't you agree?

4    A.   Yes, sir.

5    Q.   For both -- for the safety of everyone

6  involved?

7    A.   Yes, sir.

8         MR. CORNELIUS:  Objection, Judge.  It's

9  been asked and answered, all these questions have.

10         THE COURT:  That's overruled, but let's

11  move along.

12    Q.   (By Mr. Wood) And you have seen in your

13  experience working as a detention officer all of these

14  years razor blades are cutting instruments used for many

15  different things?

16    A.   Correct.

17    Q.   So, your concern on September 23rd, 2012 was

18  not just using a razor blade to cut hair, it was also

19  for the safety of you and others?

20    A.   Correct.

21         MR. WOOD:  I will pass the witness.

22         THE COURT:  Mr. Cornelius, anything?

23                **RECROSS-EXAMINATION**

24  **BY MR. CORNELIUS:**

25    Q.   But you didn't write him up for anything else,

 1  did you?

 2       A.   No, sir.  I just got him for destroying county

 3  property, altering county property, and failing to obey

 4  an order.

 5       Q.   And he didn't use that razor blade for any

 6  purpose at all that you know of, right?

 7       A.   No, sir.

 8                 MR. CORNELIUS:  Pass the witness.

 9                 MR. WOOD:  Nothing further.

10                 THE COURT:  Very good.  May this witness be

11  excused?

12                 MR. CORNELIUS:  Yes, Your Honor.

13                 MR. WOOD:  Yes, Your Honor.

14                 THE COURT:  You may step down, sir.

15                 Please call your next.

16                 MS. TISE:  The State calls Bonnie Fiveash.

17                 THE COURT:  Let's take a five-minute break.

18  The jury might need a little bit of a break before the

19  next witness comes in.

20                 THE BAILIFF:  All rise.

21                 (Recess)

22                 (Open court, defendant and jury present)

23                 THE COURT:  Please be seated.

24                 We're ready to proceed in Cause

25  No. 1384794.  The jury is present.  Mr. Cruz-Garcia is

1   present at counsel table with his attorneys.

2                   Are you ready to proceed with the next

3   witness?

4                   MS. TISE:  I am, Judge.

5                   And before the break, I had called Bonnie

6   Fiveash.  She's here and available, but there is another

7   witness who I think will be a little more brief that I

8   would like to call next.  His name is Sergeant David

9   Davis.

10                  THE COURT:  Okay.  Please bring him in.

11                  THE BAILIFF:  The witness has not been

12  sworn, Your Honor.

13                   THE COURT:  Please raise your right hand,

14  sir.

15                  (Witness sworn)

16                  THE COURT:  Very good.  Take your seat.

17  Please keep your voice up.  Speak directly into the

18  microphone.

19                  THE WITNESS:  Yes, ma'am.

20                  THE COURT:  Thank you.

21                  You may proceed.

22                  **DAVID ALAN DAVIS, JR.**

23  having been first duly sworn, testified as follows:

24                  **DIRECT EXAMINATION**

25  **BY MS. TISE:**

1     Q.   Good afternoon.

2     A.   Good afternoon.

3     Q.   Would you introduce yourself to the jury,

4  please?

5     A.   My name is David Alan Davis, Jr.  I'm a

6  sergeant with the Harris County Sheriff's Office.

7     Q.   Okay.  And, Sergeant Davis, can you tell the

8  jury specifically where you've been assigned in the

9  Harris County Sheriff's Office over your career and what

10  kind of training you've had?

11     A.   Throughout the years, I was assigned to the

12  floors for the first two years of the sheriff's office.

13  For the majority of my career, I was in classification

14  which handles all the inmate records.  And in June of

15  this year, I was transferred to patrol.

16     Q.   Okay.  And when you say floors with the

17  sheriff's department, you're talking over at the jail?

18     A.   Yes.  The old jail, 1301.

19     Q.   And then you said classification?

20     A.   That's correct.

21     Q.   And now you are on patrol?

22     A.   Correct.

23     Q.   What kind of training have you had?

24     A.   I've had in excess of 2300 hours of TCLEOSE

25  training, approximately 800 hours in gangs, terrorists,

1    and all the regular training that we have to have each

2    year as a police officer.

3        Q.    How many years have you been with the sheriff's

4    office?

5        A.    I have been with the sheriff's office since

6    1985.

7        Q.    It's fair to say since 1985, all of that time

8    until recently had been in the jail?

9        A.    That is correct.

10       Q.    Okay.  So, you are very experienced with what

11   goes on over there and what the rules are?

12       A.    That is correct.

13       Q.    Okay.  And you said that you were specifically

14   assigned for many, many years to classification?

15       A.    Correct.  As a deputy and as a supervisor.

16       Q.    Tell the jury what classification is?

17       A.    Classification is each inmate that's booked

18   into the jail has to be classified according to what is

19   called the objective classification plan.  The objective

20   classification plan simply is inmates who are charged

21   with lesser offenses -- say DWI -- are not classified

22   with inmates who are charged with capital murder.

23       Q.    Okay.  And when you say "classified," is that

24   basically the way y'all call it when you are determining

25   where they are going to be housed and who they are going

1  to be housed with during their stay with you in the

2  Harris County Jail?

3       A.   That's correct.

4       Q.   Okay.  And are you familiar with the case of an

5  individual by the name of Obel Cruz-Garcia?

6       A.   Yes, ma'am.

7       Q.   And can you tell us when Obel Cruz-Garcia

8  arrived into the Harris County Jail on this capital

9  murder case that we're here on today?

10       A.   He was booked in the Harris County Jail on

11  February 12th, 2010.

12       Q.   Okay.  And when he was booked into the Harris

13  County Jail, how did classification assign him?

14       A.   He was classified as a high-risk inmate and

15  placed into administrative separation.

16       Q.   And how long did he stay in administrative

17  separation?

18       A.   He was in the administrative separation from

19  February 12th, 2010, through July 22nd, 2012.

20       Q.   So, by my count approximately two-and-a-half

21  years of his time in the Harris County Jail was in

22  administrative separation?

23       A.   That would be correct.

24       Q.   The vast majority of his time?

25       A.   Correct.

1     Q.   And can you tell the jury what administrative

2  separation means?

3     A.   Administrative separation is a cell block that

4  is 24 single cells.  They have a restriction in that

5  cell block 23 hours a day and they are let out to go to

6  the restroom, take a shower one hour a day.

7     Q.   Okay.  And so, basically, their access to other

8  inmates and their ability to get into trouble is

9  limited?

10     A.   Extremely limited.

11     Q.   Okay.  Twenty-three hours a day locked down by

12  yourself?

13     A.   Correct.

14     Q.   Okay.  Since moving out of administrative

15  separation, is it fair to say that Obel Cruz-Garcia

16  began to pick up a few minor violations in the jail?

17     A.   That is correct.

18     Q.   Okay.  Are you familiar with situations where

19  inmates have razors in jail from time to time?

20     A.   Yes, ma'am.

21     Q.   And is that something that is very stringently

22  monitored and prohibited?

23     A.   It is extremely prohibited because of the

24  issuance.  They have to be issued and picked up on a

25  daily basis when they get an opportunity to shave.

1      Q.   Okay.  So, would you term that a minor

2    violation?

3      A.   It's a prohibited weapon in the penal

4    institution once it is not picked up.

5      Q.   And if a detention officer who was dealing with

6    Obel Cruz-Garcia chose to charge him with something

7    lesser, that would have been basically a kindness on his

8    part?

9      A.   That would be correct.

10     Q.   Because by taking a razor and concealing it and

11   holding it, you basically have a prohibited weapon in a

12   penal institute?

13     A.   That is correct.

14     Q.   What kind of danger does that present?

15     A.   It could be used as a slicing weapon.  It could

16   be used as a stabbing weapon, depending on how it's

17   affixed to a pen or some other device.

18     Q.   Okay.  And those kinds of things happen all the

19   time over there, don't they?

20     A.   That's correct.

21          MS. TISE:  Pass the witness.

22          THE COURT:  Mr. Cornelius.

23          MR. CORNELIUS:  Could I have a moment,

24   Judge?

25          THE COURT:  Yes.

```
 1                    (Pause)
 2              MR. CORNELIUS:  Judge, we don't have any
 3   questions.
 4              THE COURT:  Very good.
 5              May this witness be excused?
 6              MS. TISE:  Yes, Your Honor.
 7              THE COURT:  Thank you, Sergeant Davis.  You
 8   may step down.
 9              Please call your next.
10              MS. TISE:  Now I will call Bonnie Fiveash.
11              THE BAILIFF:  Your Honor, the witness has
12   not been sworn.
13              THE COURT:  Okay. Please raise your right
14   hand, ma'am.
15                    (Witness sworn)
16              THE COURT:  Very good.  Please take the
17   witness stand.  Please keep your voice up and speak
18   directly into that microphone.
19              You may proceed, Ms. Tise.
20                    BONNIE FIVEASH,
21   having been first duly sworn, testified as follows:
22                    DIRECT EXAMINATION
23   BY MS. TISE:
24      Q.  Can you introduce yourself to the jury, please,
25   ma'am?
```

1      A.   Yes, ma'am.  I'm Bonnie Fiveash.

2      Q.   And can you tell the jury what you do for a

3  living?

4      A.   I classify offenders.

5      Q.   Okay.  And what does that mean?

6      A.   That means I have 21 years experience of

7  classifying offenders as far as criminal sophistication,

8  placement in appropriate jobs and the appropriate

9  facility for their security needs.

10     Q.   Okay.  And do you have an institution that you

11  specifically do that for?

12     A.   At this time, I'm statewide.  I'm over all the

13  facilities in the state, which is approximately 120

14  facilities that I oversee placing offenders at.

15     Q.   And we're talking specifically about the Texas

16  prison system, are we not?

17     A.   Yes, ma'am.

18     Q.   And what is your -- what is your exact title?

19     A.   Programs supervisor III.

20     Q.   Okay.  What does that mean?

21     A.   It's a state classification member which

22  classifies offenders.

23     Q.   Okay.  And can you tell the jury a little bit

24  about your background and training that enables you to

25  do your job?

1      A.   I have 21 years experience with the Texas

2  Department of Criminal Justice, all of which is under

3  classifying offenders.  I have worked as far as in the

4  room that houses and gives the offenders their job.

5  I've been in the medical department, which makes sure

6  all their medical needs are met and are updated on the

7  computer.  Then went to classification, which is seeing

8  the offenders on a personal level and making sure they

9  are placed in the appropriate security level as far as

10 their custody and their job according to their medical

11 restrictions.

12     Q.   Okay.  So, as a member of classification, is it

13 fair to say that when an individual is going to be

14 coming to the Texas Department of Corrections, they have

15 been sentenced on their case and they will be housed in

16 the Texas Department of Corrections, you and the members

17 of your committee determine as to each and every inmate

18 that's going to come into the Texas Department of

19 Corrections how they're going to be classified, housed,

20 and treated while they are there?

21     A.   Yes, ma'am.

22     Q.   Okay.  And in addition to that, do you and your

23 fellow committee members also determine when the

24 classification that they initially receive when they

25 came in might change over the course of their prison

1  stay?

2      A.   Once we assign them to a facility, it's up to

3  that unit's classification department to determine which

4  custody level that he needs according to his

5  disciplinary, as far as his actions once he is received

6  at that facility.

7      Q.   Okay.  So, your statewide committee is

8  basically determining how they are going to be treated

9  and housed initially when they come in?

10     A.   Initial assignment and their custody level.

11 Once they reach that that facility, it depends on his

12 behavior where he goes from there.

13     Q.   Right.  And then the facility itself has their

14 own classification employees who determine whether their

15 classification might change during the time that they

16 are in TDC?

17     A.   Yes.

18     Q.   Okay.  What kinds of things are evaluated to

19 determine how a person is going to be classified when

20 they come to TDC?

21     A.   It depends on their length of sentence, if they

22 have a prior incarceration what their behavior was on

23 their incarceration, their age, what facility they're

24 going to be able to go to, because each facility is

25 based on a certain age criteria, whether he has any

1    medical restrictions that we need to look at to make

2    sure all his medical needs are set and we can take care

3    of him in that respect.

4        Q.   And those kinds of things are part of the

5    protocol that you look into?

6        A.   Yes, ma'am.

7        Q.   And you mentioned one of the things that you

8    looked into is prior incarcerations and their behavior

9    during that time.  But isn't it fair to say that you are

10   limited as to what prior incarcerations you have access

11   to and that would be taken into account?

12       A.   Yes.  If we have a jail prior history, we'll

13   take that into consideration.

14       Q.   Okay.  And if he has any other TDC

15   incarcerations, you will take that into consideration?

16       A.   Yes.

17       Q.   But would you have any consideration at all

18   given to prison time spent in, say, for instance, Puerto

19   Rico?

20       A.   Unless he verbalizes that in his interview with

21   sociology, no, ma'am, we don't have access to that.

22       Q.   So, you don't have access to those records and

23   they would not be used or taken into account in his

24   classification unless he just happened to volunteer

25   something from that?

1     A.   Yes, ma'am.

2     Q.   Okay.  So, if I understand you, when the inmate

3  comes in -- or is going to be coming into your prison

4  institution somewhere here in Texas, you are going to

5  look at a social history that is basically an interview

6  with him, right?

7     A.   Sociology, on intake, they'll interview him.  I

8  won't interview him personally.  All I have is what they

9  put on the computer as far as that.

10     Q.   Right.  And that's going to be him reporting to

11  a sociologist any details that might be relevant?

12     A.   Yes, ma'am.

13     Q.   And then in addition to that, you might have

14  some history from the jail where he had been housed

15  before?

16     A.   Yes.

17     Q.   Or if he were housed in another Texas prison

18  institution?

19     A.   Yes.

20     Q.   And that would be it?

21     A.   Yes, ma'am.

22     Q.   And taking that data, you and your other

23  committee members decide to put him in a certain

24  classification system?

25     A.   Yes.

1       Q.   Okay.  And what -- can you tell us if that

2   classification includes things like G-1, G-2, G-3, G-4,

3   and G-5?

4       A.   Yes.

5       Q.   What does that "G" stand for?

6       A.   "G" stands for general populations.

7       Q.   Okay.  And in addition, does the classification

8   include a category called administrative segregation?

9       A.   Yes.

10      Q.   And in addition, is there a whole separate

11  category for inmates who have been sentenced to the

12  death penalty?

13      A.   Yes.

14      Q.   And they're housed on death row?

15      A.   Yes, ma'am.

16      Q.   So, obviously, they are going to death row?

17      A.   Straight to death row, yes, ma'am.

18      Q.   There's no classification involved.

19           I want to talk to you about those

20  categories G-1 through G-5 that you talked about

21  regarding general populations.  Tell the jury what a G-1

22  or G-2 inmate is.

23      A.   The G-1 or G-2 is basically your better

24  inmates.  They are -- you have seen the outside trustees

25  that work outside the building.  Those are G-1s, they're

1  otherwise known as outside trustees.  They can work in

2  maintenance, they can work outside the building, you can

3  see them working in the farm.  They have very little

4  supervision.  They are checked on once an hour.

5            You've got your G-2 offenders that are

6  always under direct armed supervision.  So, no matter

7  what job they have, they are under supervision and they

8  are usually in the building.  Then you have -- do you

9  want me to go on to G-3?

10     Q.   Yes.

11     A.   Okay.  G-2s and G-3s are basically the same

12  thing with the difference of their job.  G-3 offenders

13  are serving a sentence that is over 50 years.  So,

14  therefore, they have to do ten years flat before they

15  can be considered for G-2.  The difference in their job

16  is they have to have direct supervision at all times.

17  They can't have multiple access to areas of the

18  facility.  So, in other words, they work in the kitchen,

19  which is under direct supervision, or an industry job

20  that has a supervisor right there, or they can work in

21  the field, which is under armed supervision outside the

22  parameter.

23            Then you go into your G-4s and G-5s.  These

24  are offenders that are having problems with their

25  disciplinary history.  They are getting in trouble.  So,

1  they have a more restrictive custody and they don't have

2  access to facility jobs like the kitchen or the garment

3  factory.  They can only work in the field squad.  G-5

4  offenders are your more assaultive offenders.  They have

5  to have a more restrictive custody.  And, again, they

6  can only work in the field.  If they can't make it in

7  G-5, what she mentioned, the administrative segregation,

8  that's where they end up after that.

9       Q.  Okay.  And you've given us a lot of

10 information, so I want to break some of that down; but,

11 basically, first of all, just because you have been

12 charged with capital murder and convicted by a jury, if

13 you are not sentenced to the death penalty, you are not

14 necessarily started out in administrative segregation,

15 are you?

16      A.  No, ma'am.

17      Q.  In fact, you are usually not sent to

18 administrative segregation, correct?

19      A.  Correct.  Correct, yes.

20      Q.  In fact, you are not even started out at G-4 or

21 G-5?

22      A.  No, ma'am.

23      Q.  Most individuals convicted of capital murder

24 who are not sentenced to death row are treated as G-3

25 inmates, correct?

 1     A.   Yes.

 2     Q.   And in this particular case, the information

 3 that you have available to you about Obel Cruz-Garcia,

 4 is that your opinion that he would be treated as a G-3

 5 inmate on admission to TDC?

 6     A.   Yes.

 7     Q.   Okay.  When you talked about inmates that have

 8 assaultive conduct being at the G-4 or G-5 level, is it

 9 fair to say that you are talking about conduct that has

10 occurred after they are admitted into the prison?

11     A.   Yes.

12     Q.   It makes no difference as far as whether

13 they're G-3 or G-4 or G-5 the severity of the offense

14 that they initially come in on?

15     A.   Correct, yes.

16     Q.   And so, Obel Cruz-Garcia, based on the

17 information you are aware of, would be a G-3 offender?

18     A.   Yes, ma'am.

19     Q.   Okay.  And that classification status is going

20 to determine a lot of things, isn't it?

21     A.   Yes.

22     Q.   You talked about his job.

23     A.   Yes.

24     Q.   But it's also going to determine how he's

25 housed, right?

```
1        A.    Yes, ma'am.

2        Q.    Who he is housed with?

3        A.    Yes.

4        Q.    What kind of visitation he is allowed?

5        A.    Yes.

6        Q.    How he's allowed to move about in the prison?

7        A.    Yes.

8        Q.    Lots of things?

9        A.    Yes.

10       Q.    Okay.  So, a G-3 offense -- and before I go on

11  to that, let me ask you this.  Just because someone

12  comes in as a G-3 offender, does that mean they stay a

13  G-3 offender?

14       A.    No.

15       Q.    Okay.  Usually capital murderers who will be

16  sentenced to life without parole will stay at least a

17  G-3 their entire time in prison?

18       A.    Yes.

19       Q.    However, in a case where the defendant is not

20  subject to life without parole law, he would be able to

21  be reconsidered for a G-2 status after ten years of

22  service in prison.

23       A.    Yes.

24       Q.    Correct?

25       A.    Yes.
```

1      Q.   So, ten years from now, he could be moved down

2   all the way to a G-2 level?

3      A.   Yes.

4      Q.   I want to talk to you about the housing in TDC

5   for an inmate who is considered a G-3 inmate.  Okay?

6   How is a G-3 inmate housed?

7      A.   Most facilities have cell block and dorm

8   housing for G-3 offenders.  If he is living in a dorm

9   type setting, he could be housed with other G-2

10  offenders.  If he is housed on a cell block with other

11  G-2 offenders, he will be in the same with a G-3

12  offender, but he could be on the same cell block as G-2

13  offenders.

14     Q.   So, regardless either way, whether he is in an

15  individual cell or dormitory, he is going to be with

16  other inmates?

17     A.   Yes.

18     Q.   And at the most restrictive level, he is going

19  to have an inmate in a cell with him?

20     A.   Yes.

21     Q.   Okay.  And in a dormitory setting, he could

22  have inmates in his cell who have -- who are at a G-2

23  status?

24     A.   Yes.  It's an open dormitory.  So, it's not a

25  cell, yes.

```
 1      Q.   Okay.  And he could be housed with individuals
 2  with no violent history, correct?
 3      A.   Yes.
 4      Q.   He could be housed with somebody there on a DWI
 5  third?
 6      A.   Yes.
 7      Q.   He could be housed with somebody with a
 8  white-collar theft case?
 9      A.   Yes.
10      Q.   He could be housed with a low-level drug
11  offender?
12      A.   Yes.
13      Q.   How does his G-3 status interpret to the jobs
14  that he is able to take?
15      A.   Like I said before, he can't have multiple
16  access to areas of the facility like janitor jobs or
17  maintenance jobs.  He can only be assigned to one area
18  of the facility, like a kitchen or an industry or work
19  in the fields.
20      Q.   Okay.  So, because a janitor can go all over
21  the prison --
22      A.   He's not under direct supervision.  He can --
23      Q.   And I want to talk to you about that direct
24  supervision in a minute, but let's talk about the job
25  assignments first.
```

1       A.   Okay.

2       Q.   What sorts of job assignments might he be able

3   to take?

4       A.   Kitchen, laundry, garment factory, mattress

5   factory.

6       Q.   Okay.  And when assigned to those types of

7   jobs, he has access to things like kitchen utensils,

8   correct?

9       A.   Yes.

10      Q.   Tools that might be used by someone who works

11  in a mattress factory?

12      A.   Yes.

13      Q.   Tools that might be used by somebody who works

14  in the laundry?

15      A.   Yes.

16      Q.   Opportunity to confiscate and conceal weapons?

17      A.   Yes.

18      Q.   In addition to that -- and let me ask you this.

19  Is it fair to say that that happens?

20      A.   Yes.

21      Q.   In fact, possession of a weapon happens very

22  frequently in TDC, does it not?

23      A.   Yes.

24      Q.   And when individuals don't have access to a

25  weapon, per se, like a knife or a gun, they make

1  weapons, don't they?

2      A.   Oh, yes.

3      Q.   What kinds of things do they make weapons out

4  of?

5      A.   They can get fans from the commissary and

6  sometimes they put the fan motors in socks and use that

7  as a weapon.  They can fashion metal from the fencing.

8  They can use the food carts, they can get metal from the

9  food carts.  They can find metal objects anywhere and

10 sharpen them.

11     Q.   And they can sharpen plastic objects, can they

12 not?

13     A.   Yes.

14     Q.   They can take a chicken bone and sharpen it

15 into a weapon --

16     A.   Yes.

17     Q.   -- can't they?

18     A.   Yes.

19     Q.   And they're pretty creative, aren't they?

20     A.   Very, yes.

21     Q.   And although TDC makes a lot of effort to, you

22 know, try to prohibit these things from happening, it is

23 pretty common for them to be able to smuggle something

24 in and out of, say, the kitchen area or a workplace or a

25 rec yard and be caught with a weapon?

1     A.   Yes.

2     Q.   When they move from one place to another in the

3 prison, you talked about the -- what were you calling

4 it, the supervision that they receive?

5     A.   The supervision, yes.

6     Q.   Okay.  Let's talk about what that actually

7 means.  Okay?

8     A.   Okay.

9     Q.   There are obviously guards that are employed by

10 the prison.

11    A.   Yes.

12    Q.   And when individuals are moved from place to

13 place or when they decide to go from place to place in

14 the prison, the rules say that they have to be under

15 supervision?

16    A.   Yes.

17    Q.   Okay.  And, in fact, the way that works in

18 reality is you may have 25 inmates proceeding from a

19 cell block to the chow hall to have a meal with one

20 unarmed guard with them?

21    A.   Yes.

22    Q.   Okay.  And is it fair to say that there is a

23 lot of movement that goes on without actual direct

24 supervision?

25    A.   Yes.  When they are released from their cell

1    block, possibly 20 of them could go down the hallway for

2    each checkpoint to the chow hall without someone right

3    there with them, yes.

4         Q.   Okay.  And they also can go to the day room

5    without supervision?

6         A.   Yes.

7         Q.   They can go to the rec yard without

8    supervision?

9         A.   Yes.

10         Q.   They can go to medical, if they claim that they

11    have a medical condition, correct?

12         A.   Yes.

13         Q.   And they can do that without supervision?

14         A.   Yes.

15         Q.   They can go to educational training without

16    supervision?

17         A.   Yes.

18         Q.   And they can go to eat without supervision?

19         A.   Yes.

20         Q.   And that happens routinely?

21         A.   Yes.

22         Q.   Let's talk about their time in the day room.

23    Is it fair to say that in most units they can go to the

24    day room and watch TV any time from 10:00 a.m. to 10:30

25    p.m. in the evening?

1       A.   Each facility has their own time allotment,

2  but, yes, that's safe to say.

3       Q.   In fact, on the weekends may be able to stay

4  till midnight?

5       A.   It depends on the unit, but, yes.

6       Q.   And in the rec yard or the rec room, is it fair

7  to say that generally something like four hours a day is

8  permissible for G-3 inmates?

9       A.   Yes.

10      Q.   And on up to seven hours is permissible in the

11 rec yard for a G-3 inmate on the weekends?

12      A.   Yes.

13      Q.   Okay.  And in that situation when they are out

14 in the rec yard, there are armed guards up in the

15 picket, correct?

16      A.   Yes.

17      Q.   Tell the jury what the pickets are.

18      A.   The pickets are stationed in areas on the

19 outside perimeters to prevent offenders from trying to

20 escape.  They are there to fire upon them if they try to

21 go over the fence or if there is danger that they need

22 to alleviate inside the rec yard.  They are armed

23 because the security inside cannot be armed, of course.

24      Q.   Right.  And so, the pickets are fairly remote

25 to what's actually going on down in the rec yard,

1   correct?

2        A.   Yes.

3        Q.   And there are no armed guards in the rec yard?

4        A.   No.

5        Q.   And, in fact, there are no arm guards inside

6   the prison itself?

7        A.   No.

8        Q.   Okay.  Because that would be a security

9   concern?

10       A.   Yes.

11       Q.   So, these guards that are walking around with

12   20 G-3 inmates, many of whom may be capital murderers,

13   basically have no way to defend themselves?

14       A.   All they have is gas, yes.

15       Q.   Okay.  When inmates of a G-3 status go from

16   place to place in the prison like the day room or the

17   rec yard, are they shackled and cuffed?

18       A.   No.

19       Q.   Okay.  And once they arrive at that location,

20   they can move about in the day room or the rec yard

21   freely?

22       A.   Yes.

23       Q.   Interact with other inmates?

24       A.   Yes.

25       Q.   And is there anything about the clothing of an

1  individual who has been convicted of capital murder

2  that's different --

3       A.   No.

4       Q.   -- from, say, a guy in there for possession of

5  a less than a gram of cocaine?

6       A.   No.

7       Q.   They all are going to be wearing the same

8  prison whites?

9       A.   Yes.

10       Q.   And so, a guard who is dealing with them really

11  has no way of knowing that the person he is dealing with

12  has been convicted of capital murder, does he?

13       A.   No.

14       Q.   Unless the inmate volunteers that information?

15       A.   Correct.

16       Q.   And is it fair to say that other inmates really

17  have no way of knowing that the person they are dealing

18  with has been convicted of capital murder?

19       A.   No.

20       Q.   Unless the inmate tells them?

21       A.   Correct.

22       Q.   What kind of privileges does a G-3 inmate have?

23       A.   The same as G-2, other than the job difference.

24       Q.   Okay.  Can they have visitation?

25       A.   Yes.

1      Q.   And, in fact, can they have contact visitation?

2      A.   Yes.

3      Q.   And that means that they can be loose,

4  unshackled, and uncuffed, correct?

5      A.   Yes.

6      Q.   In a room with other civilians?

7      A.   Yes.

8      Q.   These contact visitations, they basically

9  happen in a big room, do they not?

10      A.   Yes.

11      Q.   And there are other inmates there with their

12  families?

13      A.   Yes.

14      Q.   Their children?

15      A.   Yes.

16      Q.   Their wives?

17      A.   Yes.

18      Q.   And our capital murder defendant is there

19  visiting his family?

20      A.   Yes.

21      Q.   All of them in one big room with no shackles or

22  cuffs?

23      A.   Yes.

24      Q.   With all of those civilians?

25      A.   Yes.

1    Q.   Does a G-3 inmate have access to commissary?

2    A.   Yes.

3    Q.   What's commissary?

4    A.   Commissary is where they can go buy, basically,

5    free-world that we don't give him -- free-world

6    commissary that we don't give them already.  Like

7    hygiene items, fans, radios, food items, like Bluebell.

8    Q.   You mentioned Bluebell.  They can get Bluebell

9    ice cream in prison, can't they?

10   A.   Yeah.  It's very good.  Any kind of ice cream

11   that you can think of, they have.  Any other food items

12   that they don't want to eat in the ODR or the dining

13   hall, they have access to.

14   Q.   So, they've got like a little convenience

15   store?

16   A.   It's a little convenience store, yes.

17   Q.   And they can buy stuff like Bluebell ice cream?

18   A.   Yes.

19   Q.   And that applies to the G-3 inmates like

20   anybody else?

21   A.   Yes.

22   Q.   And if they have some medical incident that

23   happens that can't be treated in the jail, it's fair to

24   say they'll be transported out of the facility to  a

25   medical facility?

1        A.    Yes.  We meet their medical needs, yes.

2        Q.    Okay.  And escapes could occur during events

3   like that, could they not?

4        A.    Yes.

5        Q.    Let's talk about other than the visitation in

6   that big visitation room with lots of civilians in

7   there.  What kind of other exposure do they have to

8   civilians that aren't prison guards?

9        A.    Well, you have your medical personnel.  You've

10  got your education personnel, your teachers, your

11  principals.  You have got volunteers that come in for

12  the chaplaincy, the chaplain.  And, of course,

13  classification is free-world.  So, there are free-world

14  officers as well as the security officers.

15       Q.    Church volunteers, substance abuse volunteers,

16  those kinds of folks?

17       A.    Yes.

18       Q.    And, in fact, if I go up to the prison to meet

19  with say you, if I walk up into the main hallway of the

20  prison, I will find myself surrounded by unshackled,

21  unhandcuffed G-3 prisoners, won't I?

22       A.    Yes.

23       Q.    They're just walking around just like you and

24  I, right?

25       A.    Yes.

1      Q.   Many of them are capital murderers?

2      A.   Yes.

3      Q.   What kind of ways do inmates have to gain

4   access to contraband during their stay at TDC?

5      A.   Well, as much as I hate to say, the staff is

6   one way that they can get it.  They manipulate the staff

7   to bring in cell phones and numerous other contraband

8   that they shouldn't have.  During the contact

9   visitation, they can -- the visitors can slip them

10  money, cell phones.  Outside trustees that come through

11  the building to do maintenance, they can bring things

12  in.  They can have multiple access to contraband, yes.

13     Q.   And guards, personnel, as you mentioned,

14  employees, they get bribed?

15     A.   Yes.

16     Q.   That happens --

17     A.   Yes.

18     Q.   -- with embarrassing frequency, doesn't it?

19     A.   We have security measures in place, but it

20  happens, yes.

21     Q.   And you mentioned trustees, G-1 level inmates.

22     A.   Yes.

23     Q.   Those G-1 level inmates, when they work, they

24  are pretty unfettered, aren't they?

25     A.   Yes.  They are checked hourly, but they're not

1    under direct supervision, though.

2        Q.   So, they're out, roaming around, driving trucks

3    and doing jobs and things like that without anybody

4    watching them?

5        A.   Yes.

6        Q.   And so, if a G-1 inmate wants to go buy drugs

7    off the street corner and bring it into prison with

8    them --

9        A.   Well, they can't make it to the street corner,

10   but, yes, they can have people drop it off and they find

11   it, yes.

12       Q.   And that's stuff happens --

13       A.   Yes.

14       Q.   -- with alarming frequency?

15       A.   Yes.

16       Q.   What kind of contraband are we talking about?

17   What kinds of things do they have people bring to them?

18       A.   Marijuana, cell phones, money.

19       Q.   And you mentioned cell phones.  Tell the jury

20   why those are a concern?

21       A.   It's pretty much a security concern because

22   with the gang affiliation, they can call out and make

23   hits or they could facilitate an escape to get someone

24   to meet them somewhere.  They can have access to the

25   Internet with the smart phones, which is a breach of

 1  security.

 2       Q.   They can harass people on the outside?

 3       A.   Yes, ma'am.

 4       Q.   And that happens?

 5       A.   Yes, ma'am, that's happened.

 6       Q.   They can set up hits on people on the outside?

 7       A.   Yes.

 8       Q.   There is a lot of things they can do with a

 9  cell phone?

10       A.   Yes.

11       Q.   Okay.  And that is a common occurrence for them

12  to be caught with cell phones, correct?

13       A.   Yes.

14       Q.   You talked about them having -- G-3 inmates

15  having jobs in the field.  Correct?

16       A.   Yes.

17       Q.   And when they have a job in the field they are,

18  again, a large number of inmates under the supervision

19  of a guard possibly on horseback with a gun?

20       A.   Yes.

21       Q.   Okay.  And in that particular situation, even

22  though they are being monitored by a guard with a gun,

23  escapes have happened --

24       A.   Yes.

25       Q.   -- correct?

1                     And even guards have been killed?

2        A.   Yes.

3        Q.   Are you familiar with the case of Susan

4   Canfield?

5        A.   Yes.

6        Q.   And who was Susan Canfield?

7        A.   She was a security officer at the Wynn Unit

8   that was working in the field.  Yes.

9        Q.   And she was an armed guard on horseback?

10       A.   Yes.

11       Q.   Okay.  And what happened to her?

12       A.   During an escape at the Wynn Unit, her horse

13   was struck by a vehicle of offenders that were trying to

14   escape.  She was a high rider, the one carrying the gun,

15   yes.

16       Q.   And she was killed?

17       A.   Yes.

18       Q.   In fact, are there statistics done on a monthly

19   basis about the incidents that occur in TDC?

20       A.   Yes.

21       Q.   And those statistics are compiled in a document

22   called the Emergency Actions Statistics?

23       A.   Yes.

24       Q.   And those statistics document the number of

25   assaults that occur on a monthly basis in TDC?

1      A.   Yes.

2      Q.   And there are a lot of them, are there not?

3      A.   Yes.

4      Q.   And most of them or a large number of them are

5 categorized as serious assaults?

6      A.   Yes.

7      Q.   What is a serious assault?

8      A.   A serious assault is when injuries are

9 involved.

10      Q.   And injuries, are you -- is it fair to say that

11 we're talking about something that's going to require

12 more than first-aid?

13      A.   Yes.

14      Q.   Something that's going to require more

15 extensive medical attention?

16      A.   Yes.

17      Q.   Okay.  And certainly in an assault with a

18 weapon would also be a serious assault?

19      A.   Yes.

20      Q.   Is it fair to say that guards get assaulted?

21      A.   Yes.

22      Q.   And there are instances where guards have been

23 killed?

24      A.   Yes.

25      Q.   Is it fair to say that civilians have been

1    assaulted in the prison?

2        A.   Yes.

3        Q.   Visitors?

4        A.   Yes.

5        Q.   And sometimes killed?

6        A.   Yes.

7        Q.   Are you familiar with something that inmates do

8    called chunking?

9        A.   Yes.

10       Q.   Can you tell the jury what that is?

11       A.   It's where an offender holds up his urine or

12   his feces and chunks it on an officer or an offender

13   going by, or any unknown substance or hot fluid on

14   offenders going by.  It's a staff assault, yes.

15       Q.   Okay.  And do those happen with pretty good

16   frequency in particular?

17       A.   Yes.

18       Q.   Is it fair to say that even when you have an

19   offender in administrative segregation, serious events

20   and escapes have occurred?

21       A.   Yes.

22       Q.   And, in fact, even inmates on death row have

23   been able to escape from prison?

24       A.   Yes.

25       Q.   Are you familiar with someone named Juan

1    Quintero?

2         A.   Yes.

3         Q.   Tell the jury who Juan Quintero was.

4         A.   He was in administrative segregation at the

5    Stiles Unit, I believe, and he facilitated and

6    established a relationship with a female on a cell

7    phone.

8         Q.   Okay.

9         A.   He ended up escaping, cutting through the

10   fence, jumping over the fence, finding an unlocked

11   vehicle, going to a hospital and trying to get

12   treatment, but he did not want to fill out the

13   paperwork.  So, he left the hospital.  He called the

14   girlfriend that he had facilitated this established

15   relationship with and caught up with her, but he was

16   eventually captured five days later.

17        Q.   Okay.  And are you familiar with David Puckett?

18        A.   Yes.  He was at the Polunsky Unit.  Him and

19   five other -- well, it was five G-3 offenders went to a

20   church service.  And on their way back from the church

21   service they attempted to jump the fence.  They made it

22   all the way to the outer perimeter fence and the picket

23   officer fired upon them and they were captured, but they

24   did make it to the outer perimeter fence.

25        Q.   And the other inmate that we talked about from

1    Stiles actually made it all the way to Nebraska, didn't

2    he?

3        A.   He was gone five days.  I didn't know where he

4    went, but I knew he was gone five days, yes.

5        Q.   Would you agree with me, Ms. Fiveash, that

6    despite the precautions that you take there at TDC, if

7    an individual is an individual who has a violent nature

8    they can find a way?

9        A.   Yes.

10            MS. TISE:  I will pass the witness.

11            THE COURT:  Mr. Cornelius.

12                    **CROSS-EXAMINATION**

13   **BY MR. CORNELIUS:**

14       Q.   Would you spell Fiveash for the record, please?

15       A.   F-i-v-e-a-s-h.

16       Q.   Okay.  Ms. Fiveash, my name is Skip Cornelius.

17   I'm one of the defense lawyers in the case.  We've never

18   met or discussed this case before, have we?

19       A.   No, sir.

20       Q.   Okay.  A few questions for you.  Have we left

21   out any nightmare scenarios in this conversation?

22       A.   No, sir.

23       Q.   In general, what is your opinion as to the

24   competency of whether TDC is competent or not in

25   handling of inmates?

A.   Competent of handling inmates?

Q.   Yes.

A.   I feel that we do a very good job.  We try to provide safety and security for both our staff and the outside world, yes.

Q.   Are there also statistics as to different states and their prison units?

A.   Yes, sir, but I'm not a keeper of the statistics.

Q.   All right.  Well, do you have any reason to think that there is anything lacking -- not that it's perfect, because nothing is perfect, but anything lacking at TDC in terms of their ability to deal with the inmates?

A.   No, sir.

Q.   You have to answer all these questions that you are asked.

A.   Yes, sir.

Q.   Have you given up on your job?

A.   No, sir.

Q.   Do you have a vote of confidence or no confidence to other people that work at TDC?

A.   No, sir.

Q.   Confidence?

A.   Yes, sir, I have confidence.

1     Q.   All right.  Over the years just about

2  everything imaginable has happened at TDC, I guess?

3     A.   Yes, sir.

4     Q.   Including crimes that guards have committed on

5  inmates?

6     A.   Yes, sir.

7     Q.   This G-3 prediction for Obel Cruz-Garcia, where

8  did that come from?

9     A.   If he has over a 50-year sentence, that's why I

10  told her G-3.  That's what custody they go to if their

11  sentence is over 50 years.  As I explained to her, I

12  can't say that's what he's going to do until he is

13  convicted and I see the paperwork.

14     Q.   Okay.  If you thought there was any reason at

15  all to give him a G-4 or G-5, would you do it?

16     A.   I would have to look at his jail history.  If

17  he has an extensive assaultive jail history, then I

18  would recommend G-4; but if he has no history

19  whatsoever, he would be G-3.

20     Q.   Okay.  All right.  Now, if somebody gets to

21  prison in any of these categories, G-1 through 5, and

22  they start having problems in prison, then what happens

23  to them?

24     A.   If they receive disciplinary action and are

25  proven guilty that they have been assaultive, then we

1  review them for a more restrictive custody.

2      Q.   And by that do you mean on the G-1 through 5

3  level or administrative seg.

4      A.   Administrative segregation or G-4 and G-5, yes.

5      Q.   Okay.  So, are you -- is administrative

6  segregation above G-5?

7      A.   No, sir.  That's progressive.  If he gets a

8  disciplinary, it depends on the extensiveness of his

9  assault whether he is going to go G-4 or G-5 or

10  administrative segregation.

11      Q.   How about somebody in G-3?

12      A.   G-3?  He would -- progressive disciplinary.  It

13  depends on the level of his assault whether he would go

14  G-4, G-5, or administrative segregation.

15      Q.   Okay.  So, somebody that gets placed in

16  administrative seg, I guess, they can get placed on any

17  of those levels, right?

18      A.   Yes.

19      Q.   Depending on what their violation is?

20      A.   Yes, sir.  If they have proven to be a security

21  risk or an escape risk, then they could be placed in

22  administrative segregation.

23      Q.   I mean, let's say that you place them wherever

24  you place them, G-1 through 5, and they do well for a

25  while but then they get in trouble.  If they get in

1    enough trouble, they can go straight from G-1 through 5

2    into administrative seg, right?

3         A.   Yes.

4         Q.   What is administrative seg?

5         A.   Administrative segregation is a place that we

6    put offenders that pose a security threat to either

7    offenders or staff or an escape risk.

8         Q.   Okay.  And what does it mean?  What's the place

9    like?

10        A.   What is the place like?  They are in a cell all

11   by themself.  Everywhere they go they're shackled and

12   they're escorted by an officer.  Their rec is in an

13   individual caged area where they can play basketball.

14        Q.   By themselves?

15        A.   By themselves.  They do not get contact visits.

16        Q.   So, no matter where they are in the prison

17   system, if they -- if their conduct is really bad, they

18   can be sent to administrative seg and not be around

19   anybody other than other guards, right?

20        A.   Yes, sir.

21        Q.   And y'all don't hesitate to do that if it's

22   called for, correct?

23        A.   No, sir.  We are not going to risk the safety

24   of other offenders or staff.

25        Q.   All right.  And so, even though there are

1  clearly bad people at TDC that violate these rules, the

2  commitment to the people that work at TDC is to prevent

3  the violation of these rules, correct?

4       A.   Yes, sir.  Staff and offenders alike, yes, sir.

5       Q.   Are you trained to indicate to the jury that

6  this is hopeless and they ought to just -- if they ever

7  have an opportunity to be on a capital murder jury kill

8  everybody that they can kill because y'all can't handle

9  them?

10      A.   No, sir.

11      Q.   You are not saying that at all, are you?

12      A.   No, sir.

13      Q.   Okay.  These men in the pickets, if they see an

14  inmate trying to get over the walls, they just shoot

15  them, don't they?

16      A.   They give them orders to stop first.  And if

17  they fail to stop and they start to make it over the

18  outer perimeter fence, yes, they have access to shoot

19  the offender, yes.

20      Q.   And the guards with the rifles out on the

21  horses out in the fields, the reason they have the rifle

22  is to shoot an inmate if they have to?

23      A.   If they have to, yes.

24      Q.   And all of that has happened, too, hasn't it?

25      A.   Yes.

1      Q.   All right.   The privileges that these inmates

2  have -- well, I call them privileges.   Are they

3  privileges, like commissary and visitation and stuff

4  like that?

5      A.   Yes.

6      Q.   I mean, they have to earn those, right?

7      A.   No, sir.   He has the privileges, but he loses

8  them through his actions, yes.

9      Q.   Okay.   Are they valuable to the inmates?

10     A.   I would say so, yes.

11     Q.   An inmate that has commissary, I mean, as part

12 of your research, education, and on-the-job training and

13 all, has it -- is it your opinion that the inmates don't

14 want to lose that?

15     A.   I would say so, yes.

16     Q.   And just taking away the commissary can be a

17 really serious punishment for an inmate, right?

18     A.   Yes.

19     Q.   And the same with their visitation privileges?

20     A.   Yes.

21     Q.   And with respect to contact visitation, do all

22 of the inmates get contact visitation immediately as

23 soon as they get to prison?

24     A.   Yes.

25     Q.   And on every level, I guess, except

 1  administrative seg?

 2       A.   Except G-4 and G-5.

 3       Q.   G-4, G-5, and administrative seg?

 4       A.   Yes.

 5       Q.   Okay.  So, if they have violations, they are

 6  going to lose that, too, right?

 7       A.   Yes.

 8       Q.   And it's your training and experience that

 9  that's important to the inmates also?

10       A.   Yes.

11       Q.   Is there a -- do you have some criticism that

12  you can offer today of TDC or how it can get better or

13  what more they can do for the inmates for their

14  protection and the other people?

15       A.   No, sir.

16       Q.   I mean, are you satisfied that y'all are doing

17  the best you can?

18       A.   Yes, sir.

19       Q.   How many times have you testified in trials

20  like this?

21       A.   Like this?  This is my first one.

22       Q.   Okay.  And did you know most of the questions

23  that the prosecutor was going to ask you?  Did she tell

24  what she --

25       A.   Prior to this?  No, sir.

1        Q.   So, I want to give you -- kind of give you a

2   chance to explain.  Did you feel like you were making

3   any kind of admission to this jury that TDC just can't

4   handle its business or can't handle the inmates?

5        A.   I wouldn't do that, sir.  I love my job.

6        Q.   Well, is it true?

7        A.   I want them to understand the differences

8   between the custody so that they understand that, but as

9   far as sway them either way, I don't intend to do that

10  at all.

11       Q.   Okay.  I guess the fear from our standpoint

12  might be that through your testimony the jury is getting

13  the impression that it's just too dangerous to send

14  anybody to TDC.

15       A.   No, sir.

16       Q.   These situations that -- these catastrophic

17  situations that occur at TDC, even though they have

18  occurred there these are not the normal things that

19  happen at TDC, are they?

20       A.   No.

21       Q.   Has there ever been another guard that's been

22  hit by a car and killed on a horse?

23       A.   Accidents happen.

24       Q.   Has that ever happened before?

25       A.   No.

1      Q.   How many units are there at TDC?

2      A.   Approximately 115.  We've had some closures

3 recently, so approximately 115.

4      Q.   115 or 150?

5      A.   115.  Sorry.

6      Q.   So, 115 units.  You don't have to apologize

7 because I can't hear.

8              And how many inmates?

9      A.   I couldn't give you that right now off the top

10 of my head.  I'm not real good at statistics.  I'm

11 sorry.

12      Q.   Let's -- maybe we can sort of predict it a

13 little bit.

14      A.   Okay.

15      Q.   Give me the sizes -- not every one, but --

16      A.   Maximum security is anywhere from 2400

17 offenders.  And 1,000 bed facilities also.  So, you are

18 looking at approximately 130,000 offenders, maybe.

19      Q.   Okay.  130,000 offenders?

20      A.   Doesn't quote me on that, but...

21      Q.   Okay.  That's an estimate?

22      A.   Estimate, yes, sir.

23      Q.   So, 115 units, approximately 130,000 inmates?

24      A.   Growing every day.

25      Q.   Big job?

 1       A.   Yes, sir.

 2             MR. CORNELIUS:  Let me have just a moment,

 3  if I might, Judge.

 4             THE COURT:  Yes.

 5             (Pause)

 6       Q.   (By Mr. Cornelius) When was the Juan Quintero

 7  incident?

 8       A.   I don't know, sir.

 9       Q.   How long have you worked there?

10       A.   How long have I been with TDC?  Twenty-one

11  years, but I can't give you an exact date.

12       Q.   Was it since you've worked there?

13       A.   Yes.

14       Q.   He made it out five full days?

15       A.   Yes, sir.

16       Q.   Is there more than one level of administrative

17  segregation?

18       A.   Yes, sir.  There is three.

19       Q.   Okay.  Explain those.  Somebody goes to

20  whatever the first level is, what is that?

21       A.   So, 3 is when they've got a disciplinary within

22  the last 90 days, 3-A, and they progress to 2-A.  And

23  then 1-A is the best in administrative segregation where

24  they don't have any disciplinary.

25       Q.   Okay.  But are they in the same -- is it the

1  same lockdown?

2      A.   Yes.  They have different levels.  You have

3  different cell blocks.  You have cell blocks for 3-A and

4  then you have cell blocks for 2-A and then the rest are

5  1-A.  Yes, sir.

6      Q.   Okay.  That's what I was thinking.  But other

7  than different cell blocks, that means they're in a

8  different location?

9      A.   Yes, sir.

10     Q.   But is the lockdown procedure the same?

11     A.   Yes, sir.

12     Q.   Twenty-three hours a day, no contact except

13  with guards?

14     A.   Correct.

15     Q.   And the length of time for administrative seg,

16  is it set, how they make these various levels?

17     A.   That's another one of our job duties.  We go

18  and see them every six months to review their possible

19  released from administrative segregation back to general

20  population depending on their behavior if they are in

21  there for disciplinary infractions, yes.

22     Q.   Okay.  All right.

23          MR. CORNELIUS:  I'm going to pass the

24  witness, Judge.

25          THE COURT:  Anything further, Ms. Tise?

```
 1              MS. TISE:  No, Your Honor.
 2              THE COURT:  May this witness be excused?
 3              MS. TISE:  Yes.
 4              THE COURT:  You may step down, ma'am.
 5  Thank you very much.
 6              THE WITNESS:  Thank you.
 7              THE COURT:  Please call your next.
 8              MS. TISE:  Judge, we need to approach.
 9              THE COURT:  Okay.
10              (At the bench, on the record)
11              MS. TISE:  We have the print guy here ready
12  to go, so I'd like to go ahead and do that.
13              (Open court, defendant and jury present)
14              THE COURT:  Let's take a 10-minute break.
15              THE BAILIFF:  All rise.
16              (Recess)
17              (Open court, defendant and jury present)
18              THE COURT:  Please be seated.
19              We're ready to proceed in Cause
20  No. 1384794.  And Mr. Obel Cruz-Garcia is present at
21  counsel table with his lawyers.  The prosecution is
22  present.  And the jury is present in the courtroom.
23              You may call your next witness.
24              MS. TISE:  The State calls Diana Garcia.
25              THE BAILIFF:  Your Honor, the witness has
```

1    been sworn and testified previously in this trial.

2                    THE COURT:  Thank you, Deputy Perry.

3                    You may proceed, Ms. Tise.

4                    MS. TISE:  Thank you, Judge.

5                            **DIANA GARCIA,**

6    having been first duly sworn, testified as follows:

7                        **DIRECT EXAMINATION**

8    **BY MS. TISE:**

9        Q.  Ma'am, are you the same Diana Garcia that

10   testified in the trial last week?

11       A.  Yes, ma'am.

12       Q.  And I want to talk to you this afternoon about

13   some different things than we were able to talk about in

14   the guilt phase of the trial.  Okay?

15       A.  Okay.

16       Q.  First of all, tell the jury where you are

17   living now.

18       A.  I live in Rio Grande City.

19       Q.  And how long have you lived there?

20       A.  Ever since '94.

21       Q.  Okay.  And do you have some family members here

22   in Houston?

23       A.  Yes, ma'am.

24       Q.  Is it fair to say that almost all of your

25   family still lives here in Houston?

1      A.   Yes, ma'am.

2      Q.   And a lot of those family members have been

3 here throughout the trial, right?

4      A.   Yes, ma'am.

5      Q.   And can you tell us who some of the ones who

6 are here now are?

7      A.   My daughter, Rosalinda.

8      Q.   Okay.

9      A.   My son, James.  And my common-law husband,

10 Arturo.

11      Q.   And Rosalinda and James are Angelo's brother

12 and sister, are they not?

13      A.   Yes, ma'am.

14      Q.   Okay.  You've also had some other family

15 members here throughout the trial who can't be here

16 right now.

17      A.   My sisters.  One of them got sick.  The other

18 one is taking care of her.

19      Q.   Okay.  What are their names?

20      A.   Benny is the Godmother, the one that got sick.

21 Dora is my other sister.  Stella, my youngest sister.

22 And they were here.

23      Q.   They have all been here at various times

24 throughout the trial?

25      A.   Yes, ma'am.

1    Q.   And some of their extended family, children,

2  have been here as well, right?

3    A.   Yes, ma'am.

4    Q.   When Angelo was born, about how old were you?

5    A.   About 30, 33.

6    Q.   Okay.  And how was that different from when

7  Rosalinda and James were born?

8    A.   I grew up with Rosalinda and James.  I was a

9  little girl myself.

10    Q.   When you had them?

11    A.   I was very -- I was the seventeenth, eighteenth

12  years.  Rosie and James are like three years apart.

13    Q.   Okay.  And when you had Angelo, you were a

14  little older?

15    A.   Yes.

16    Q.   You've had been kind of through some of that

17  child-raising stuff?

18    A.   Yes.

19    Q.   Was he a surprise?

20    A.   Yes.

21    Q.   Okay.  And what kind of relationship did you

22  have with Angelo, Sr.?

23    A.   A very good one.

24    Q.   And after you and Angelo, Sr. separated -- and

25  I understand you were pretty much a child when you

 1  married him.

 2      A.   Yes.

 3      Q.   After y'all separated, did Angelo and Angelo,

 4  Sr. continue to have a very close relationship?

 5      A.   Yes, ma'am.

 6      Q.   How often would he see his father?

 7      A.   On weekends.

 8      Q.   Was that pretty regularly?

 9      A.   Very regular.

10      Q.   And did he enjoy going to see his dad?

11      A.   Yes, ma'am.

12      Q.   What happened to Angelo, Sr.?

13      A.   He passed away.

14      Q.   Okay.  Was he ever able to see the person who

15  killed his son be brought to justice?

16      A.   No, ma'am.

17      Q.   When he died, did he know that someone had been

18  charged?

19      A.   No, ma'am.

20      Q.   That all happened after he died?

21      A.   Yes, ma'am.

22      Q.   And what do you think about that?

23           MR. CORNELIUS:  Judge, I'm sorry, but I'm

24  going to have to object.  I don't see the relevance in

25  this.

1          THE COURT:  That's sustained.

2     Q.   (By Ms. Tise) Over the years in your contact

3  with Angelo, Sr., was what happened to Angelo, Jr.

4  something that appeared to create a lot of emotional

5  problems for him?

6     A.   Yes.  He was drinking a lot.

7     Q.   Okay.  And that was a problem?

8     A.   Very much so.

9     Q.   And do you believe that stemmed from what

10  happened to Angelo?

11     A.   Yes, ma'am.

12     Q.   Is it fair to say it's something that he never

13  really got over?

14     A.   No, he never got over it.

15     Q.   Tell us a little bit about what kind of little

16  boy Angelo was.

17     A.   Very friendly, very loveable, outspoken.  He

18  had lots of friends.  People that I didn't even know

19  were his friends.  He played a lot.  He liked to bike

20  ride.

21     Q.   Some people say there are certain types of

22  people that never met a stranger.  Would you say Angelo

23  was that kind of little boy?

24     A.   Angelo -- he would talk to anybody and

25  everybody, even the cops.  He got ran over.

1      Q.   And tell us about that.

2      A.   There was a guy that he was out of jail and my

3  son was bike-riding and he ran over him.  Baby Angelo

4  was in the hospital.

5      Q.   When was this?

6      A.   I can't remember.  It was like two years before

7  this happened.

8      Q.   Okay.

9      A.   He stopped an officer at the store and he told

10 him that he had been in the Life Flight.

11     Q.   The helicopter?

12     A.   And I told Angelo:  What are you doing?  I'm

13 talking to my new friend.  He just met the policeman and

14 he was his friend.  And I said:  Daddy, you can't talk

15 to everybody.  He said:  Yes, I can.

16     Q.   Did Angelo -- was he a generous little boy?

17     A.   Yes, ma'am.

18     Q.   And do you remember some examples of that?

19     A.   A lot of things.  He was very nice.  He wanted

20 to be loved.  He played a lot.  He got along with

21 everybody.  He would come and tell me:  Mommy, make

22 tortillas for my friends.  Mommy, do this for them.

23 Mommy, do this for this other person.  I would say:

24 Baby Angelo, please.  He would just hug me on the back

25 and cuddle himself all over me in the back.  You can do

1    it; for me, you can do it.

2              MS. TISE:  May I approach?

3              THE COURT:  Yes.

4        Q.  (By Ms. Tise) I'm going to show you some items.

5    First of all, State's Exhibit 80.  I'll ask you if you

6    recognize that picture (indicating)?

7        A.  Yes, ma'am.  This was his last picture right

8    after my birthday.

9        Q.  Okay.  And State's Exhibit 81, who is that with

10   Angelo in that picture?

11       A.  This is me with him.

12       Q.  And do you know when that was taken?

13       A.  He was about three years old.

14       Q.  Okay.

15             MS. TISE:  At this time, I'm going to offer

16   State's Exhibits 80 and 81.

17             **(State's Exhibit No. 80 and 81 Offered)**

18             MR. CORNELIUS:  No objection.

19             THE COURT:  State 80 and 81 will be

20   admitted without objection.

21             **(State's Exhibit No. 80 and 81 Admitted)**

22       Q.  (By Ms. Tise) And this is the one that you said

23   was his last picture taken after your birthday

24   (indicating)?

25       A.  Yes, ma'am.

1    Q.   And State's Exhibit 81.  He did have some

2  really blue eyes, didn't he?

3    A.   Very.

4    Q.   I'm going to show you what's been marked as

5  State's Exhibit 131, and ask you what this is

6  (indicating)?

7    A.   I know what that is.  Those are Baby Angelo's

8  school things.  His tennies.

9    Q.   And have you pretty much kept it in tact all of

10  this time?

11    A.   I gave it to my sister, Doris, to save for me.

12    Q.   And, basically, left it like he left it?

13    A.   Yes.

14    Q.   And you said he's got his tennies in here.  Are

15  these his little tennies (indicating)?

16    A.   Yes, ma'am.

17    Q.   Did he also have some of his pictures that he

18  drew and his little Batman coloring book?

19    A.   Yes, ma'am.

20          MS. TISE:  At this time, I'll offer State's

21  130 and its contents.

22          **(State's Exhibit No. 130 Offered)**

23          MR. CORNELIUS:  No objection.

24          THE COURT:  State's 130 is admitted without

25  objection.  It's 130; is that correct?

1        **(State's Exhibit No. 130 Admitted)**

2        Q.   (By Ms. Tise) Diana, what kind of relationship

3    did you have with Angelo as his mother?

4        A.   He was adorable.  He was my whole world.  I

5    loved him.  I loved him a lot.  I still do.  I still

6    miss him.  I still dream of missing him.  It's as if he

7    is still alive.  I can still feel him.

8        Q.   And when you picture Angelo, how do you picture

9    him?

10       A.   Very loving.

11       Q.   Can you see him as an adult?

12       A.   No, I can't.  I still see him as my baby.

13       Q.   How has your life changed since you lost

14   Angelo?

15       A.   A lot.  Nothing was the same afterwards.  It

16   was a big, big piece out of me taken.

17       Q.   Did your relationship with your family change?

18       A.   Not with my daughter and son, but with my other

19   family, I distanced because I was so afraid they would

20   come back and do the same to my other two kids.

21       Q.   Why did y'all end up moving so far away from

22   all of your family?

23       A.   I figured the further away the better.  It was

24   because every little thing that's here in Houston, there

25   are memories.  I lived in Stafford, I lived in Houston.

1    He used to love to go to the pony rides on Main Street.

2    He wanted to go here, there.  He wanted to go to the

3    zoo.  He wanted to do a lot of things, things that I

4    can't see anymore.

5         Q.   What kind of affect did it have on Arturo?

6         A.   He's had almost the same affects as me.  He

7    still can't get over it.

8         Q.   Has he changed?

9         A.   Yes.

10        Q.   How --

11        A.   Very much.

12        Q.   How has he changed?

13        A.   Arturo is very a loving, loveable man,

14   friendly.  Now he sees people the way they are, not

15   friendly like me.  He reads the way people are.  I

16   don't.  I see everybody friendly like my baby Angelo, no

17   wrongdoing.

18        Q.   But Arturo is skeptical about people?

19        A.   Now he is.

20        Q.   Diana, is it fair to say you've had to deal

21   with a lot of regrets and a lot of guilt?

22        A.   Yes.

23        Q.   Tell the jury about that.

24        A.   I regret ever meeting this man.  I didn't think

25   he would ever, ever do something like that.  We trusted

1    him.  We thought he was our friend, him and his wife.

2    We treated them like friends, especially me more than

3    Arturo.  I didn't think he ever would do something that

4    bad to me because this is all on me.  He raped me.  He

5    took my son away from me.  He hurt me very much.  And I

6    didn't hurt him.  I didn't do anything to him.

7         Q.   As you go through your day-to-day life, are you

8    ever able to put what happened that night behind you?

9         A.   No, ma'am.

10         Q.   Tell the jury about that.

11         A.   I can't put it behind me.  I wish I could, but,

12    no.  He is present day-by-day in my heart, in my

13    feelings, my memories.  Everything, it's about my baby.

14    I grew up with my other two, but I knew what I had with

15    Angelo.  I knew I loved babies and I had him in my hands

16    and I raised him.  Ever since I came out pregnant, I was

17    a small woman and my baby weighed 10 pounds, almost 10

18    pounds.

19         Q.   He was a big baby, huh?

20         A.   And my other two babies were 5 pounds.  This

21    one was double.  I wanted to have a baby so bad.  I did

22    have one for six-and-a-half years.  That's all I had him

23    for.

24         Q.   Thank you, Diana.

25              MS. TISE:  I will pass with the witness.

1          THE COURT:  Thank you, Ms. Tise.

2          Mr. Cornelius.

3          MR. CORNELIUS:  No questions, Judge.

4          THE COURT:  May this witness be excused?

5          MR. CORNELIUS:  Yes, Your Honor.

6          MS. TISE:  Yes, Your Honor.

7          THE COURT:  Ms. Garcia, you may step down.

8  Thank you very much.

9          THE WITNESS:  Thank you.

10          THE COURT:  State, call your next.

11          MS. TISE:  The State rests.

12          THE COURT:  Folks, at this time, I believe

13  we're going to break for the day.  I told you we'd work

14  till 6:00, but I think this is a good time to break.

15  The State is resting their case.  And we have had a long

16  day.  So, let's step out and we'll return at 10:00 in

17  the morning and we'll proceed with the case for the

18  defense.

19          THE BAILIFF:  All rise.

20          THE COURT:  I'm sorry, Deputy.

21          Before you leave, let me make sure I remind

22  you that you should not talk amongst yourselves or with

23  anyone else on any subject connected with the trial or

24  to form or express any opinion thereon until the end of

25  the trial.

1          Once again, thank you.

2          (Proceedings recessed)

1                    **REPORTER'S CERTIFICATE**

2   THE STATE OF TEXAS  )
    COUNTY OF HARRIS    )
3

4        I, Mary Ann Rodriguez, Official Court Reporter in

5   and for the 337th District Court of Harris County, State

6   of Texas, do hereby certify that the above and foregoing

7   contains a true and correct transcription of all

8   portions of evidence and other proceedings requested in

9   writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND this the 16th day of

17  October, 2013.

18

19

20

21  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
22  Expiration Date:  12/31/2013
    Official Court Reporter
23  337th Court
    1201 Franklin
24  Houston, Texas  77002
    713.755.7746
25

**'**

**'79** - 6:4
**'83** - 43:20
**'89** - 6:19, 8:6, 9:21, 100:11, 104:6
**'90** - 34:13, 34:14
**'94** - 191:20
**'skip'** - 2:11

**/**

**/s** - 204:21

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**1,000** - 187:17
**1-a** - 188:23, 189:5
**10** - 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 84:13, 201:17
**10-minute** - 190:14
**102** - 3:2, 3:5
**103** - 3:2, 3:5
**105** - 2:11, 9:12, 9:24, 10:1, 10:6, 10:9
**106** - 2:12, 9:12, 10:6, 10:25, 11:3
**107** - 2:13, 9:12, 10:6, 11:11
**108** - 2:14, 9:12, 10:6, 11:22
**109** - 2:15, 9:12, 10:6, 12:2
**10:00** - 164:24, 202:16
**10:30** - 164:24
**11** - 107:13, 107:15
**110** - 2:16, 9:12, 10:6, 12:16, 12:21, 13:1
**111** - 2:7, 2:17, 9:12, 10:6, 13:13
**112** - 1:10, 2:18, 9:13, 10:7, 13:17
**113** - 2:19, 9:13, 9:24, 10:1, 10:7, 10:9, 14:1, 14:2, 15:5
**114** - 2:20, 15:5, 15:20, 15:22, 16:1, 16:3, 16:9, 16:14
**115** - 2:21, 15:5, 16:1, 187:2, 187:3, 187:4, 187:5, 187:6, 187:23
**116** - 1:11, 2:6, 2:22, 15:5, 16:1, 16:24, 17:5, 124:22
**117** - 2:23, 15:5, 16:1, 106:15, 106:16
**118** - 2:24, 15:5, 16:1, 17:9, 17:11, 105:18, 105:19, 106:11
**119** - 2:25, 15:6, 16:1, 17:17, 17:22, 109:1, 109:19
**12/31/2013** - 204:22
**120** - 3:1, 15:6, 15:20, 15:22, 16:1, 16:3, 17:24, 17:25, 110:13, 149:13
**1201** - 2:6, 204:23
**121** - 1:11, 2:6, 101:18, 102:9, 102:10
**122** - 3:2, 48:4, 48:14, 101:18, 102:9, 102:12, 102:15, 102:18, 102:22, 102:24, 103:1, 103:14, 104:2
**1225** - 2:15

**123** - 1:12, 2:1, 7:17, 7:20, 8:9, 9:21
**126** - 3:3, 67:15, 67:17, 67:19, 67:24, 68:8, 68:10, 68:13, 68:15, 68:19
**127** - 3:4, 67:15, 67:17, 67:20, 67:24, 68:8, 68:10, 68:13, 68:15, 68:23
**128** - 3:5, 102:14, 102:15, 102:18, 102:22, 102:25, 103:1, 103:4, 103:5
**12th** - 145:11, 145:19
**13** - 133:23, 138:11, 139:10
**130** - 3:6, 198:21, 198:22, 198:24, 198:25, 199:1
**130,000** - 187:18, 187:19, 187:23
**1301** - 143:18
**131** - 198:5
**136** - 1:12, 2:1
**137** - 16:15, 16:19, 16:22
**1384794** - 1:3, 3:3, 4:4, 86:22, 141:25, 190:20
**139** - 1:12, 2:2
**140** - 1:12, 2:2
**142** - 1:13, 1:21
**148** - 1:15, 1:22
**15** - 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 139:4, 139:8
**150** - 187:4
**16** - 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 22:8, 22:21, 33:12, 39:7
**16th** - 204:16
**17** - 1:3, 45:25
**178** - 1:15, 1:22
**17th** - 1:20
**18** - 45:25
**191** - 1:16, 1:23
**197** - 2:9, 2:10
**1979** - 5:19
**198** - 3:6
**1983** - 43:20
**1985** - 144:6, 144:7
**1989** - 6:15, 7:12, 16:18, 22:7, 26:3, 45:13, 51:23, 51:25, 53:11, 55:16, 74:5, 85:6, 89:13, 99:4, 121:1
**199** - 3:6
**1992** - 89:19, 99:1
**1:30** - 86:12, 86:18
**1st** - 7:12, 8:6, 9:20, 18:11, 100:11, 104:5

**2**

**2-a** - 188:22, 189:4
**2-g** - 125:25, 126:2, 126:17
**2-g-1** - 126:6
**2-g-2** - 126:6
**2-g-3** - 126:6
**2-g-4** - 126:19, 126:20, 127:16
**2-g4** - 126:6
**20** - 1:6, 2:3, 69:21, 72:11, 164:1, 166:12
**2001** - 98:14
**2002** - 57:13, 57:15, 57:16
**2005** - 57:13, 57:15, 57:16
**2007** - 123:21
**2008** - 56:23, 57:11
**2009** - 57:2
**2010** - 145:11, 145:19
**2011** - 87:11, 117:6
**2012** - 125:13, 126:11, 127:15, 129:20, 130:18, 140:17, 145:19
**2013** - 1:20, 1:3, 39:11, 204:17

**202** - 1:17
**2028** - 2:12
**204** - 1:18
**21** - 149:6, 150:1
**21st** - 39:11
**22** - 48:4, 72:11, 72:12
**22nd** - 145:19
**23** - 146:5
**2300** - 143:24
**23rd** - 126:11, 127:15, 129:20, 130:18, 140:17
**24** - 33:25, 39:6, 146:4
**2400** - 187:16
**24039247** - 2:5
**25** - 1:2, 1:1, 1:5, 1:6, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:15, 1:16, 1:17, 1:18, 1:21, 1:22, 1:23, 1:24, 1:25, 2:1, 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 39:16, 163:18
**27th** - 133:22
**29** - 124:21, 125:2
**2:41** - 39:12

**3**

**3** - 188:21
**3-a** - 188:22, 189:3
**30** - 193:5
**3047** - 204:21
**33** - 193:5
**337th** - 1:12, 204:5, 204:23
**35** - 1:2
**36** - 1:6, 2:3

**4**

**4** - 1:5, 1:24, 107:12, 107:15, 112:8, 115:4
**4,198th** - 16:17
**40** - 1:6, 2:3
**41** - 1:7, 1:25
**440** - 2:15

**5**

**5** - 180:21, 181:2, 181:24, 182:1, 201:20
**50** - 155:13, 180:11
**50-year** - 180:9
**51** - 1:7, 1:25
**52** - 42:7
**59** - 1:8, 2:4, 92:1

**6**

**610** - 22:16, 22:17, 67:6, 68:24
**68** - 3:3, 3:4, 16:15, 16:19, 16:20
**6:00** - 202:14

**7**

**7** - 57:4, 128:8
**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 204:24
**713.877.9400** - 2:16
**77002** - 2:6, 204:24
**77002-1659** - 2:16
**77019-2408** - 2:13
**7:00** - 128:9, 128:19
**7:38** - 8:7
**7:39** - 8:7

**8**

**8** - 57:4
**80** - 2:9, 197:5, 197:16, 197:17, 197:19, 197:21
**800** - 143:25
**80s** - 60:16
**81** - 2:10, 197:9, 197:16, 197:17, 197:19, 197:21, 198:1
**83** - 27:5
**84** - 27:15
**85** - 27:8
**8600** - 39:12
**87** - 1:8, 2:4
**89-4198** - 16:16, 100:7, 102:3

**9**

**9** - 128:8, 128:9
**90** - 188:22
**94** - 30:1
**95** - 1:9, 2:5
**97** - 1:10, 2:7

**A**

**abdomen** - 13:20
**ability** - 146:8, 179:13
**able** - 100:24, 101:3, 104:10, 107:5, 114:21, 119:19, 120:17, 120:21, 133:5, 151:24, 158:20, 160:14, 161:2, 162:23, 165:3, 176:23, 191:13, 194:14, 201:8
**above-entitled** - 1:21
**above-styled** - 204:11
**abraded** - 109:14
**abrasion** - 13:23, 17:21, 108:14, 109:10, 109:21, 109:24, 112:16, 113:1, 113:24, 114:17
**abrasions** - 108:16, 108:18
**abuse** - 170:15
**academy** - 5:20, 5:23
**accept** - 71:10, 91:2
**access** - 146:7, 152:10, 152:21, 152:22, 155:17, 156:2, 160:16, 161:7, 161:24, 169:1, 169:13, 171:4, 171:12, 172:24, 183:18
**Accidents** - 186:23
**accompanied** - 78:7
**according** - 144:18, 150:10, 151:4
**account** - 152:11, 152:23
**accurate** - 102:19, 121:2
**accurately** - 9:19, 15:15, 67:23, 68:4
**action** - 127:22, 130:16, 137:17, 180:24
**Actions** - 174:22
**actions** - 138:17, 151:5, 184:8
**activity** - 121:16
**actual** - 110:25, 135:22, 163:23
**addition** - 105:4, 113:7, 150:22, 153:13, 154:7, 154:10, 161:18
**additional** - 118:7, 118:9
**administrative** - 145:15, 145:16, 145:18, 145:22, 146:1, 146:14, 154:8, 156:7, 156:14, 156:18, 176:19,

177:4, 181:3, 181:5, 181:10, 181:14, 181:16, 181:22, 182:2, 182:4, 182:18, 185:1, 185:3, 188:16, 188:23, 189:15, 189:19
**Administrative** - 146:3, 181:4, 182:5
**admission** - 157:5, 186:3
**Admitted** - 2:8, 10:10, 16:4, 68:15, 103:1, 197:21, 199:1
**admitted** - 10:7, 16:2, 68:13, 102:25, 157:10, 197:20, 198:24, 204:15
**adorable** - 199:4
**adult** - 199:11
**advised** - 127:21
**affect** - 200:5
**affects** - 200:6
**affiliation** - 172:22
**affixed** - 147:17
**afford** - 125:8
**afforded** - 129:2, 133:19
**afraid** - 39:1, 39:21, 55:14, 199:19
**afternoon** - 87:9, 97:15, 112:3, 116:13, 123:9, 123:10, 143:1, 143:2, 191:12
**afterwards** - 199:15
**Afterwards** - 91:8
**age** - 151:23, 151:25
**Aggie** - 5:15, 5:16
**ago** - 33:25, 39:6, 54:20, 56:12, 81:21, 88:5
**agree** - 140:3, 178:5
**ahead** - 31:12, 190:12
**aid** - 175:12
**aided** - 1:24
**ain't** - 52:7
**air** - 106:24
**airport** - 91:19
**Airport** - 6:14
**airway** - 104:23
**airways** - 105:13, 105:14
**Alabama** - 5:12, 5:15
**Alan** - 1:13, 1:21, 142:22, 143:5
**alarming** - 172:14
**alike** - 183:4
**alive** - 199:7
**alleviate** - 165:22
**allotment** - 165:1
**allowed** - 14:21, 124:9, 127:19, 130:4, 134:14, 158:4, 158:6
**almost** - 191:24, 200:6, 201:17
**alone** - 44:9, 126:8
**Alphabetical** - 1:20
**altered** - 129:3, 131:8, 131:12
**altering** - 131:15, 141:3
**alternative** - 71:10
**aluminum** - 132:14
**American** - 98:9
**amounts** - 73:18
**anatomic** - 98:10
**Angelita** - 62:14, 78:12
**Angelo** - 90:24, 91:6, 99:18, 117:25, 118:14, 193:4, 193:13, 193:22, 193:24, 194:3, 194:12, 195:3, 195:10, 195:16, 195:22, 195:24, 196:3, 196:12, 196:16, 196:24, 197:10, 199:3, 199:8, 199:14, 200:16, 201:15
**Angelo's** - 65:1, 96:15, 192:11, 198:7

**ankles** - 11:25, 110:14, 110:15
**Ann** - 204:4, 204:21
**announce** - 129:24
**annual** - 124:5
**answer** - 85:10, 179:16
**answered** - 30:4, 31:14, 140:9
**Ap-77,025** - 1:4
**apart** - 66:1, 193:12
**apartment** - 8:1, 8:14, 11:9, 29:10, 29:11, 29:23, 30:4, 30:8, 30:12, 30:20, 30:24, 30:25, 31:6, 32:7, 34:19, 38:16, 38:18, 38:25, 39:20, 62:3, 62:10, 66:6, 66:9, 67:3, 67:8, 68:2, 68:5, 68:20, 69:3, 69:6, 69:8, 69:17, 69:20, 70:9, 71:17, 74:24, 75:3, 75:18, 76:2, 76:20, 76:22, 76:25, 77:2, 77:13, 77:18, 78:3, 78:4, 78:5, 78:8, 79:3, 79:7, 83:10, 83:16, 83:19, 83:22, 84:1, 120:18
**Apartment** - 30:1
**apartments** - 67:7, 67:25, 68:1, 73:2, 78:12
**Apartments** - 30:1
**apologize** - 126:23, 187:6
**Appeals** - 1:4
**appear** - 13:23, 113:18
**appearance** - 38:9, 38:11
**appeared** - 195:4
**Appellant** - 1:7
**Appellee** - 1:12
**applies** - 169:19
**apply** - 60:12
**approach** - 9:7, 15:1, 27:1, 47:24, 67:10, 101:13, 190:8, 197:2
**appropriate** - 149:8, 150:9
**April** - 123:21
**area** - 11:7, 11:15, 14:4, 14:10, 21:14, 21:21, 22:16, 22:17, 23:19, 23:20, 24:4, 68:20, 68:24, 80:12, 82:3, 125:23, 126:24, 127:3, 127:4, 160:17, 162:24, 182:13
**areas** - 15:13, 133:10, 155:17, 160:16, 165:18
**Areola** - 39:11
**argument** - 40:8, 62:12, 63:10, 64:22
**arguments** - 40:12
**arm** - 13:20, 17:3, 17:7, 17:20, 166:5
**armband** - 128:18
**armed** - 155:6, 155:21, 165:14, 165:22, 165:23, 166:3, 174:9
**arms** - 94:25, 95:2, 115:4, 115:8
**Army** - 43:6, 43:19, 44:6
**arrive** - 166:19
**arrived** - 8:6, 8:16, 10:15, 62:22, 69:6, 77:13, 79:3, 83:22, 86:11, 145:8
**arteries** - 107:14
**Arturo** - 192:10, 200:5, 200:13, 200:18, 201:3
**assault** - 175:7, 175:8, 175:17, 175:18, 176:14, 181:9, 181:13
**assaulted** - 175:20, 176:1
**assaultive** - 156:4, 157:8, 180:17, 180:25
**assaults** - 174:25, 175:5
**assessing** - 135:22

**assign** - 145:13, 151:2
**assigned** - 99:21, 100:2, 123:25, 125:24, 125:25, 126:17, 126:19, 126:24, 127:2, 127:4, 128:24, 129:10, 143:8, 143:11, 144:14, 160:17, 161:6
**assignment** - 5:24, 116:25, 151:10
**assignments** - 160:25, 161:2
**Assistant** - 2:5
**assistant** - 54:12
**associates** - 26:16, 48:21
**assume** - 118:3
**attempted** - 177:21
**attention** - 8:21, 117:5, 126:10, 175:15
**attorney** - 85:17, 125:8
**attorney's** - 116:16
**Attorney's** - 117:20
**attorneys** - 3:18, 142:1
**Attorneys** - 2:5, 2:7, 2:17
**Austin** - 42:23, 42:24
**autopsies** - 98:16, 111:1, 111:12, 111:14
**autopsy** - 99:5, 99:7, 99:17, 100:7, 100:10, 100:12, 100:17, 101:5, 101:22, 111:9, 113:12, 114:7, 114:12, 114:16, 115:1
**available** - 113:11, 142:6, 157:3
**aware** - 16:13, 50:10, 65:9, 66:2, 74:9, 119:13, 157:17

**B**

**babies** - 201:15, 201:20
**Baby** - 90:24, 91:6, 196:3, 196:24, 198:7
**baby** - 199:12, 200:16, 201:13, 201:17, 201:19, 201:21
**bachelor's** - 98:6
**background** - 42:19, 98:4, 149:24
**bad** - 22:21, 22:23, 182:17, 183:1, 201:4, 201:21
**badly** - 79:9
**bag** - 130:4
**Bag** - 3:6
**bags** - 11:20
**bailiff** - 86:16
**Bailiff** - 4:2, 4:12, 19:24, 97:6, 116:4, 122:23, 141:20, 142:11, 148:11, 190:15, 190:25, 202:19
**Barnett** - 22:13
**Barrio** - 61:23
**based** - 40:11, 50:10, 50:25, 51:3, 104:11, 151:25, 157:16
**basic** - 8:19, 119:21
**basis** - 26:6, 26:7, 26:8, 146:25, 174:19, 174:25
**basketball** - 182:13
**bathroom** - 30:7, 31:18, 64:4, 64:5, 64:7, 64:9
**bathtub** - 62:24, 63:24, 82:13, 82:23, 82:24, 83:1, 83:4, 83:5, 83:6, 83:21, 89:8, 89:14, 89:19
**Batman** - 198:18
**beaten** - 70:24, 80:16, 92:14
**beating** - 79:9, 79:12, 79:15, 80:17
**become** - 5:21, 106:22

**becomes** - 107:11
**bed** - 187:17
**bedroom** - 29:14, 30:6, 31:16, 80:8, 80:10
**beds** - 133:8
**beeper** - 63:10, 63:12, 63:13
**began** - 9:5, 73:3, 73:4, 146:16
**beginning** - 62:2, 62:9, 79:9
**behavior** - 151:12, 151:22, 152:8, 189:20
**Behind** - 80:5
**behind** - 11:5, 22:13, 80:4, 80:22, 83:9, 90:2, 90:6, 90:11, 201:8, 201:11
**bench** - 190:10
**benefit** - 95:23
**Benny** - 192:20
**best** - 37:13, 54:15, 93:3, 185:17, 188:23
**betray** - 64:19
**better** - 154:23, 185:12, 199:23
**between** - 40:6, 40:12, 40:21, 74:21, 75:14, 107:15, 128:8, 186:8
**bid** - 124:5
**big** - 21:1, 73:16, 93:9, 168:9, 168:21, 170:6, 199:16, 201:19
**Big** - 187:25
**big-time** - 73:16
**bike** - 195:19, 196:3
**bike-riding** - 196:3
**bilingual** - 133:18
**biology** - 98:6, 98:7
**birthday** - 197:8, 197:23
**bit** - 6:23, 29:21, 30:5, 42:19, 55:7, 141:18, 149:23, 187:13, 195:15
**black** - 18:3, 108:3
**blade** - 130:25, 131:1, 131:22, 131:23, 132:1, 132:2, 132:5, 132:9, 132:14, 132:17, 132:19, 132:20, 132:24, 132:25, 133:2, 133:15, 139:21, 139:24, 140:18, 141:5
**blades** - 131:6, 132:6, 132:24, 139:18, 140:14
**blame** - 76:10
**blankets** - 130:2, 138:18
**bleeding** - 108:12
**block** - 124:8, 125:2, 125:21, 130:22, 146:3, 146:5, 159:7, 159:10, 159:12, 163:19, 164:1
**blocks** - 124:21, 124:24, 124:25, 125:11, 126:5, 189:3, 189:4, 189:7
**blood** - 104:22, 104:23, 105:7, 105:8, 105:9, 107:16, 107:17, 107:18, 111:21
**bloody** - 106:20
**blue** - 11:16, 49:10, 108:13, 127:11, 198:2
**Blue** - 61:17
**Bluebell** - 169:7, 169:8, 169:17
**blunt** - 107:25, 108:4, 108:6, 108:11, 109:25, 110:3, 110:5
**board** - 98:9
**Board** - 98:9
**bodies** - 100:5
**body** - 7:25, 9:2, 10:15, 10:19, 10:20, 10:22, 11:13, 12:4, 12:6, 12:9, 12:10,

12:13, 12:15, 13:6, 13:15, 13:19, 13:23, 14:3, 14:6, 18:10, 29:14, 29:15, 30:7, 30:13, 31:19, 32:5, 32:9, 32:15, 32:21, 34:4, 80:6, 80:13, 82:13, 82:22, 83:1, 83:6, 83:21, 84:2, 84:19, 84:25, 85:1, 91:12, 103:7, 106:19, 111:20, 114:13, 114:22

**bone** - 113:15, 162:14

**bones** - 113:13, 113:18, 114:9

**Bonner** - 126:9

**Bonnie** - 1:15, 1:22, 141:16, 142:5, 148:10, 148:20, 149:1

**book** - 198:18

**booked** - 144:17, 145:10, 145:12

**Borikae** - 69:23

**born** - 42:5, 193:4, 193:7

**Bory** - 69:23, 70:1, 70:7

**boss** - 28:17

**bottom** - 18:4

**bought** - 28:24, 37:19, 65:22

**bound** - 32:16, 79:18, 82:19, 109:4

**bounded** - 32:19

**boy** - 195:16, 195:23, 196:16

**brain** - 105:9

**branch** - 43:5

**breach** - 172:25

**break** - 66:9, 66:12, 86:11, 141:17, 141:18, 142:5, 156:10, 190:14, 202:13, 202:14

**breath** - 20:17

**bribed** - 171:14

**brief** - 142:7

**Briefly** - 139:15

**briefly** - 34:1, 40:2, 95:13, 98:4

**bring** - 84:18, 128:24, 142:10, 171:7, 171:11, 172:7, 172:17

**Briscoe** - 21:24

**Broadway** - 73:2

**broke** - 81:25, 82:5

**broken** - 113:13, 113:15, 113:18, 114:9, 115:14

**brother** - 192:11

**brought** - 84:24, 85:10, 117:17, 117:21, 132:19, 132:20, 133:12, 194:15

**bruise** - 108:11

**bruising** - 109:16

**Buffalo** - 2:12

**building** - 154:25, 155:2, 155:8, 171:11

**bunk** - 133:10

**burglaries** - 65:10, 71:20, 88:9

**burglarize** - 69:17

**burglarizing** - 71:18

**burglary** - 57:23

**burn** - 94:3, 114:14, 114:18, 114:19, 114:24

**burned** - 94:1, 94:3

**burning** - 93:13

**burns** - 114:12, 114:22

**business** - 25:6, 63:13, 65:19, 66:1, 73:19, 75:14, 92:7, 186:4

**busy** - 21:4

**buy** - 28:10, 31:4, 38:1, 38:18, 169:4, 169:17, 172:6

## C

**caged** - 182:13

**Canfield** - 174:4, 174:6

**cannot** - 66:15, 82:15, 165:23

**capacity** - 6:18, 116:22

**capital** - 88:8, 121:25, 144:22, 145:8, 156:12, 156:23, 158:15, 166:12, 167:1, 167:12, 167:18, 168:18, 171:1, 183:7

**captured** - 177:16, 177:23

**car** - 11:5, 12:9, 12:10, 33:8, 50:23, 70:13, 76:7, 76:8, 76:14, 76:18, 90:2, 90:6, 91:11, 91:14, 91:17, 186:22

**card** - 128:18

**care** - 21:10, 73:19, 88:18, 124:12, 152:2, 192:18

**career** - 5:6, 143:9, 143:13

**Carmelo** - 1:8, 2:4, 59:3, 59:11, 59:19, 60:3, 87:1, 117:11

**carotid** - 107:14

**carried** - 28:21, 38:9

**carrying** - 92:10, 174:14

**cars** - 91:16

**carts** - 162:8, 162:9

**Case** - 121:8

**case** - 3:13, 3:18, 3:20, 7:10, 12:23, 14:13, 19:1, 37:1, 47:15, 51:19, 57:9, 76:12, 87:19, 87:25, 88:1, 88:23, 89:12, 89:13, 89:17, 89:18, 89:22, 89:25, 90:1, 91:6, 95:16, 96:2, 98:24, 99:1, 99:4, 99:7, 99:18, 99:20, 99:21, 100:7, 101:3, 101:7, 102:5, 103:23, 104:6, 108:20, 111:6, 111:17, 113:7, 113:14, 114:20, 117:2, 117:7, 120:9, 120:23, 121:12, 121:17, 121:25, 122:1, 132:16, 134:19, 136:10, 136:23, 145:4, 145:9, 150:15, 157:2, 158:19, 160:8, 174:3, 178:17, 178:18, 202:15, 202:17

**cases** - 87:19, 88:8, 88:9, 88:15, 88:18, 99:21, 104:1

**Castro** - 85:18, 85:20, 96:1, 96:6

**catastrophic** - 186:16

**catch** - 134:13

**categories** - 154:20, 180:21

**categorized** - 175:5

**category** - 154:8, 154:11

**caught** - 32:13, 92:11, 162:25, 173:12, 177:15

**Ceasar** - 63:16

**cell** - 124:8, 124:20, 124:21, 124:24, 124:25, 125:2, 125:11, 125:20, 126:5, 130:21, 135:12, 146:3, 146:5, 159:7, 159:10, 159:12, 159:15, 159:19, 159:22, 159:25, 163:19, 163:25, 171:7, 171:10, 172:18, 172:19, 173:9, 173:12, 177:6, 182:10, 189:3, 189:4, 189:7

**cells** - 146:4

**cents** - 133:23, 138:11, 139:10

**certain** - 151:25, 153:23,

195:21

**certainly** - 107:9, 114:15, 136:9, 175:17

**Certificate** - 1:18, 204:1

**certified** - 98:9, 102:11

**certify** - 204:6, 204:13

**Cervantes** - 37:11, 37:13

**Cesar** - 61:21, 61:22, 62:5, 62:7, 62:15, 62:22, 63:23

**Cesar's** - 62:24, 63:23

**chair** - 110:7

**chambers** - 204:12

**chance** - 186:2

**change** - 34:6, 125:7, 150:25, 151:15, 199:17

**changed** - 34:7, 199:13, 200:8, 200:12

**chaplain** - 170:12

**chaplaincy** - 170:12

**characterize** - 18:7

**characterized** - 28:2, 108:8, 109:21

**charge** - 28:17, 73:19, 124:6, 124:22, 147:6

**charged** - 88:1, 88:14, 121:24, 129:14, 133:22, 144:20, 144:22, 156:12, 194:18

**charges** - 88:18, 88:23, 89:3

**chart** - 14:19

**check** - 45:8, 95:6, 129:1, 130:11

**checked** - 14:10, 155:4, 171:25

**checkpoint** - 164:2

**Chicago** - 61:24

**Chicano** - 75:23, 78:10, 78:19

**chicken** - 162:14

**chief** - 98:2

**child** - 89:25, 193:17, 193:25

**child-raising** - 193:17

**children** - 2:13, 34:12, 168:14, 193:1

**choice** - 91:2

**chose** - 147:6

**chow** - 163:19, 164:2

**chunking** - 176:8

**chunks** - 176:12

**church** - 92:1, 92:3, 125:9, 177:20

**Church-** 170:15

**cigarette** - 114:12, 114:22, 114:23

**cigarettes** - 93:14, 94:2

**circle** - 38:5

**City-** 191:18

**civilians** - 168:6, 168:24, 170:6, 170:8, 175:25

**claim** - 91:5, 164:10

**clarify** - 78:2, 102:17

**classification** - 136:19, 143:13, 143:19, 144:14, 144:16, 144:19, 144:20, 145:13, 149:21, 150:7, 150:12, 150:24, 151:3, 151:14, 151:15, 152:24, 153:24, 154:2, 154:7, 154:18, 157:19, 170:13

**Classification** - 144:17

**classified** - 144:18, 144:21, 144:23, 145:14, 150:19, 151:19

**classifies** - 149:22

**classify** - 149:4

**classifying** - 149:7, 150:3

**clean** - 91:11

**cleaned** - 103:22

**cleaner** - 104:1

**cleanse** - 96:11

**clearly** - 183:1

**client** - 138:1

**client's** - 135:15

**clients** - 64:17

**clippers** - 127:20

**close** - 45:8, 46:13, 194:4

**closest** - 105:25

**closures** - 187:2

**cloth** - 109:6

**clothes** - 31:22, 53:16

**clothing** - 130:4, 166:25

**coat** - 61:11

**cocaine** - 28:7, 72:16, 111:21, 167:5

**Cocaine** - 28:9

**Cold** - 121:8

**collar** - 160:8

**collect** - 128:23, 129:11, 130:9, 130:23

**collected** - 129:3

**collecting** - 131:2, 134:7

**coloring** - 109:15, 198:18

**coming** - 51:7, 95:23, 107:1, 107:16, 150:14, 153:3

**Commissary** - 169:4

**commissary** - 130:3, 132:10, 132:11, 138:25, 162:5, 169:1, 169:3, 169:6, 184:3, 184:11, 184:16

**commitment** - 183:2

**committed** - 65:10, 180:4

**committee** - 150:17, 150:23, 151:7, 153:23

**common** - 42:14, 111:11, 162:23, 173:11, 192:9

**common-law** - 42:14, 192:9

**commonly** - 103:18

**communicated** - 34:15

**compare** - 18:18

**competency** - 178:24

**competent** - 178:24

**Competent** - 179:1

**competitor** - 65:25

**compiled** - 174:21

**complainant** - 11:23, 12:6, 12:15, 13:6, 13:15, 15:13, 15:16

**complainant's** - 13:22, 14:3, 18:10

**complainants** - 111:13

**complainants'** - 11:13, 13:19

**complaint** - 12:4

**completely** - 34:11, 81:23, 82:18

**complex** - 8:1, 8:12, 8:13, 8:14, 8:22, 11:9, 67:8, 68:20, 68:22, 69:10, 120:19

**components** - 106:3, 106:6

**compress** - 105:14, 107:10, 107:12

**compressed** - 107:11

**compression** - 104:21, 104:22, 105:8, 105:12, 105:16

**computer** - 1:24, 150:7, 153:9

**computer-aided** - 1:24

**conceal** - 161:16

**concealing** - 147:10

**concern** - 135:5, 140:2, 140:17, 166:9, 172:20, 172:21

**concerning** - 112:14

**concerns** - 134:11

**conclude** - 19:4
**conclusions** - 104:15
**condition** - 107:3, 139:9, 164:11
**conduct** - 128:23, 157:8, 157:9, 182:17
**conducted** - 101:6
**conducts** - 128:18, 135:12
**confidence** - 179:21, 179:22, 179:25
**Confidence** - 179:24
**confiscate** - 161:16
**conflict** - 5:16, 24:4, 74:9, 74:12, 74:21
**conflicts** - 40:6, 40:15
**confused** - 81:21
**confusing** - 73:25
**congested** - 106:23
**congestion** - 107:3
**connected** - 86:15, 202:23
**connection** - 24:23, 25:4, 49:19
**connections** - 71:22
**consecutively** - 9:24, 15:20
**consideration** - 152:13, 152:15, 152:17
**considered** - 45:22, 130:3, 155:15, 159:5
**consisted** - 132:6
**consistent** - 104:16, 106:4, 106:12, 107:4, 108:4, 109:15
**Consistent** - 106:2, 110:9
**consists** - 106:1
**Construction** - 42:12
**contact** - 24:25, 25:3, 25:12, 26:2, 26:19, 35:4, 49:1, 168:1, 168:8, 171:8, 182:15, 184:21, 184:22, 189:12, 195:2
**contacted** - 84:11, 87:12, 87:17, 121:7, 121:8
**contained** - 11:8
**contains** - 204:7
**contents** - 3:6, 198:21
**continue** - 83:15, 120:5, 194:4
**continued** - 91:22
**contraband** - 130:3, 171:4, 171:7, 171:12, 172:16
**control** - 28:22, 124:12
**controlled** - 44:20
**controlling** - 124:15
**contusion** - 108:11, 109:14, 109:25
**contusions** - 106:9, 108:1, 108:9, 108:17, 108:19, 109:11
**convenience** - 169:14, 169:16
**conversation** - 39:10, 39:13, 39:15, 117:20, 118:2, 118:3, 118:6, 178:21
**convicted** - 57:21, 156:12, 156:23, 167:1, 167:12, 167:18, 180:13
**conviction** - 56:13, 57:2, 57:12
**convictions** - 44:19, 56:2, 56:8, 56:10, 57:17, 58:1, 58:12
**cops** - 195:25
**copy** - 102:11, 112:5
**cord** - 18:8, 105:2, 105:3, 106:3, 106:5, 110:17, 110:19
**Cornelius** - 2:11, 3:5, 4:8, 10:3, 15:24, 19:10, 19:11,

19:14, 19:18, 36:17, 36:18, 36:21, 36:24, 36:25, 39:24, 41:1, 41:5, 49:23, 50:13, 51:12, 51:13, 51:17, 51:18, 52:25, 58:18, 59:6, 68:11, 87:5, 87:8, 95:6, 95:10, 95:11, 96:23, 96:24, 97:1, 102:23, 111:24, 112:2, 115:16, 120:2, 121:21, 121:23, 122:3, 122:7, 122:11, 134:17, 135:14, 135:19, 135:21, 136:2, 136:3, 136:7, 136:8, 139:12, 140:8, 140:22, 140:24, 141:8, 147:12, 147:22, 147:23, 148:2, 178:11, 178:13, 178:16, 188:2, 188:6, 189:23, 194:23, 197:18, 198:23, 202:2, 202:3, 202:5
**corner** - 12:1, 35:8, 103:12, 172:7, 172:9
**Correct** - 99:2, 110:11, 111:7, 112:18, 125:3, 129:6, 133:1, 133:4, 133:14, 134:2, 134:6, 134:10, 136:17, 137:18, 137:20, 139:5, 139:11, 140:1, 140:16, 140:20, 143:22, 144:15, 145:25, 146:13, 156:19, 157:15, 158:24, 167:15, 167:21, 173:15, 189:14
**correct** - 10:16, 37:5, 57:3, 58:10, 60:5, 65:7, 87:3, 87:15, 87:20, 90:11, 91:20, 99:15, 100:23, 102:13, 103:13, 109:17, 109:22, 111:6, 112:14, 113:1, 113:4, 113:6, 113:19, 113:20, 113:22, 113:25, 114:5, 114:6, 114:9, 114:10, 114:16, 115:4, 115:6, 115:7, 115:9, 115:10, 115:22, 116:24, 136:10, 136:16, 136:25, 137:10, 138:11, 143:20, 144:9, 144:12, 145:3, 145:23, 146:17, 147:9, 147:13, 147:20, 156:18, 156:25, 160:2, 161:8, 164:11, 165:15, 166:1, 168:4, 173:12, 173:25, 182:22, 183:3, 198:25, 204:7
**correction** - 61:16
**Correction** - 74:18, 77:23
**Corrections** - 150:14, 150:16, 150:19
**correctly** - 52:25, 204:14
**corresponding** - 109:7
**counsel** - 3:4, 9:25, 15:21, 68:9, 86:23, 86:24, 142:1, 190:21, 204:9
**count** - 128:18, 128:20, 128:23, 128:24, 128:25, 129:24, 130:9, 137:16, 145:20
**count-issued** - 137:16
**county** - 44:16, 44:23, 53:13, 57:8, 58:13, 91:25, 127:21, 131:15, 133:23, 138:2, 138:11, 139:10, 141:2, 141:3
**County** - 1:9, 1:23, 7:21, 46:21, 88:10, 98:3, 98:13, 99:12, 117:17, 117:20, 123:16, 123:19, 123:25, 143:6, 143:9, 145:2, 145:8, 145:10, 145:13, 145:21, 204:2, 204:5
**couple** - 55:3, 56:1, 56:10,

108:10
**course** - 63:8, 67:4, 82:4, 90:15, 91:4, 92:15, 94:8, 98:15, 101:9, 150:25, 165:23, 170:12
**Court** - 1:3, 1:4, 1:6, 3:2, 3:12, 3:24, 4:3, 4:9, 4:14, 9:9, 10:5, 10:13, 15:3, 15:25, 16:7, 19:9, 19:12, 19:15, 19:19, 19:21, 20:1, 26:1, 27:3, 36:16, 36:19, 36:22, 40:1, 41:3, 41:7, 41:10, 41:13, 43:11, 43:14, 43:16, 48:1, 49:14, 49:25, 50:16, 50:19, 51:12, 52:15, 52:19, 52:24, 58:19, 58:21, 58:23, 59:1, 59:9, 59:13, 59:15, 61:14, 67:12, 68:12, 68:18, 86:5, 86:9, 86:18, 86:21, 87:5, 95:8, 95:11, 96:22, 96:25, 97:2, 97:8, 101:15, 102:10, 102:15, 102:24, 111:24, 115:18, 115:21, 115:24, 116:2, 116:6, 120:3, 121:20, 122:5, 122:8, 122:12, 122:14, 122:20, 122:25, 123:2, 127:14, 134:20, 134:25, 135:17, 135:20, 136:2, 136:4, 139:13, 140:10, 140:22, 141:10, 141:14, 141:17, 141:23, 142:10, 142:13, 142:16, 142:20, 147:22, 147:25, 148:4, 148:7, 148:13, 148:16, 178:11, 188:4, 189:25, 190:2, 190:4, 190:7, 190:9, 190:14, 190:18, 191:2, 195:1, 197:3, 197:19, 198:24, 202:1, 202:4, 202:7, 202:10, 202:12, 202:20, 204:4, 204:5, 204:22, 204:23
**court** - 3:1, 4:1, 86:17, 86:20, 95:23, 98:19, 125:7, 133:22, 141:22, 190:13, 190:17, 204:12
**courting** - 75:1, 75:2
**courtroom** - 3:17, 4:5, 25:17, 49:4, 61:5, 86:23, 88:6, 127:7, 190:22
**courts** - 98:19
**cousin** - 27:10, 27:11
**covered** - 11:6
**cream** - 169:9, 169:10, 169:17
**create** - 195:4
**creates** - 105:7
**creative** - 162:19
**Crime** - 6:8, 6:9, 6:20, 6:22, 6:23, 7:7, 7:14, 8:2, 104:5
**crime** - 6:25, 7:2, 14:23, 57:8
**crimes** - 180:4
**criminal** - 5:13, 18:21, 149:7
**Criminal** - 1:4, 150:2
**criteria** - 151:25
**criticism** - 185:11
**Cross** - 1:4, 1:20, 36:23, 51:16, 87:7, 112:1, 121:22, 136:6, 178:12
**Cross-examination** - 36:23, 51:16, 87:7, 112:1, 121:22, 136:6, 178:12
**Cruz** - 1:6, 1:13, 3:4, 24:21, 40:13, 40:19, 49:1, 55:17, 60:25, 61:4, 63:3, 66:18, 70:19, 82:7, 91:7, 117:2, 126:14, 126:17, 127:1, 130:19, 135:23, 141:25, 145:5, 145:7, 146:15, 147:6, 157:3, 157:16, 180:7, 190:20

126:14, 126:17, 127:1, 130:19, 132:16, 135:23, 141:25, 145:5, 145:7, 146:15, 147:6, 157:3, 157:16, 180:7, 190:20
**Cruz's** - 131:8
**Cruz-garcia** - 1:6, 3:3, 3:4, 24:21, 40:13, 40:19, 49:1, 55:17, 60:25, 61:4, 63:3, 66:18, 70:19, 82:7, 91:7, 117:2, 126:14, 126:17, 127:1, 130:19, 135:23, 141:25, 145:5, 145:7, 146:15, 147:6, 157:3, 157:16, 180:7, 190:20
**Cruz-garcia's** - 132:16
**Csr** - 204:21
**cuddle** - 196:25
**cuffed** - 166:17
**cuffs** - 168:22
**current** - 124:4
**custody** - 124:12, 150:10, 151:4, 151:10, 156:1, 156:5, 180:10, 181:1, 186:8
**customers** - 63:9
**cut** - 34:11, 127:20, 131:7, 132:7, 132:8, 132:9, 134:15, 137:16, 139:19, 139:24, 140:18
**cuts** - 105:9
**cutting** - 140:14, 177:9

## D

**D.a.'s** - 116:23, 137:5
**dad** - 44:7, 194:10
**Daddy** - 196:14
**daily** - 146:25
**danger** - 147:14, 165:21
**dangerous** - 186:13
**Darryl** - 1:12, 2:1, 122:19, 123:5, 123:12
**Das** - 54:12
**data** - 153:22
**databases** - 119:17
**Date** - 204:22
**date** - 120:18, 121:1, 125:19, 126:11, 126:15, 188:11
**daughter** - 192:7, 199:18
**David** - 1:13, 1:21, 142:8, 142:22, 143:5, 177:17
**Davis** - 1:13, 1:21, 142:9, 142:22, 143:5, 143:7, 148:7
**day-by-day** - 201:12
**day-to-day** - 201:7
**days** - 138:25, 139:2, 139:3, 139:4, 139:8, 177:16, 178:3, 178:4, 188:14, 188:22
**dead** - 7:25, 33:23
**Deady** - 21:24
**deal** - 25:8, 28:13, 37:9, 62:13, 95:23, 133:7, 179:13, 200:20
**dealer** - 53:24, 73:16
**dealers** - 28:3
**dealing** - 91:22, 147:5, 167:10, 167:11, 167:17
**dealings** - 49:16
**dealt** - 28:5, 28:15, 28:23, 31:1, 33:4, 34:16
**death** - 47:16, 85:8, 85:16, 104:12, 105:10, 105:11, 154:12, 154:14, 154:16, 154:17, 156:13, 156:24, 176:22
**deceased** - 14:19, 15:10, 16:17, 17:1, 120:9
**deceased's** - 16:12, 17:11,

18:1
 **deceaseds** - 111:13
 **decide** - 153:23, 163:13
 **decided** - 66:11, 84:18,
96:4
 **dedicated** - 71:24
 **deep** - 20:17
 **defend** - 166:13
 **defendant** - 3:1, 4:1,
25:25, 26:3, 26:14, 26:16,
27:6, 28:1, 28:2, 29:17,
33:5, 34:20, 35:18, 40:12,
40:22, 49:13, 49:16, 49:20,
50:4, 50:5, 50:11, 51:7,
60:25, 61:13, 62:1, 63:6,
66:6, 66:20, 69:2, 70:9,
70:19, 72:18, 73:8, 74:2,
74:9, 74:21, 75:5, 75:14,
75:17, 75:22, 76:1, 76:16,
79:4, 80:24, 81:8, 82:7,
86:17, 86:20, 86:23, 127:13,
134:19, 141:22, 158:19,
168:18, 190:13, 190:17
 **Defendant** - 2:17
 **defendant's** - 75:8
 **defense** - 4:8, 9:25, 15:21,
37:4, 68:8, 137:6, 178:17,
202:18
 **defined** - 106:8
 **degree** - 5:13, 98:6, 98:7
 **demonstrates** - 50:14
 **department** - 143:17,
150:5, 151:3
 **Department** - 5:1, 5:3,
6:16, 104:10, 120:24,
123:16, 123:20, 150:2,
150:14, 150:16, 150:18
 **depict** - 9:20, 15:12,
67:23, 68:4
 **depicted** - 12:21, 12:25,
14:7, 17:22, 103:5, 106:11
 **depicting** - 11:15, 12:16
 **Deputy** - 97:8, 98:2, 126:9,
191:2, 202:20
 **deputy** - 144:15
 **describe** - 8:8, 29:23,
31:24, 124:16
 **Describe** - 22:24, 27:21
 **described** - 24:25, 25:17,
27:19, 33:3, 68:1, 68:21,
80:5, 110:10, 114:7, 114:14,
114:16, 114:18, 121:6
 **describing** - 35:16, 68:24
 **Description** - 2:8
 **description** - 120:19
 **despite** - 178:6
 **destroyed** - 81:24, 82:18,
93:7
 **destroying** - 131:15, 141:2
 **detail** - 137:9
 **detailing** - 133:25
 **details** - 54:3, 118:12,
119:18, 119:24, 120:6,
120:20, 135:1, 153:11
 **detective** - 46:19, 53:15
 **detectives** - 33:23, 53:12,
53:18, 56:4
 **Detention** - 123:12, 133:17
 **detention** - 123:17,
123:22, 124:11, 125:15,
140:13, 147:5
 **determination** - 104:11
 **determine** - 7:6, 136:24,
150:17, 150:23, 151:3,
151:14, 151:19, 157:20,
157:24
 **determining** - 144:24,
151:8
 **device** - 147:17
 **Dezavala** - 42:21

 **diagram** - 14:10
 **Diana** - 1:16, 1:23, 190:24,
191:5, 191:9, 191:2, 200:20,
201:24
 **died** - 46:24, 194:17,
194:20
 **dies** - 106:24
 **difference** - 155:12,
155:15, 157:12, 167:23
 **differences** - 186:7
 **different** - 61:3, 108:10,
118:20, 127:16, 129:1,
140:15, 167:2, 179:6, 189:2,
189:3, 189:7, 189:8, 191:13,
193:6
 **difficult** - 114:17
 **digits** - 100:4, 100:5
 **dining** - 169:12
 **Dire** - 1:4, 1:20
 **direct** - 79:24, 117:4,
126:10, 155:6, 155:16,
155:19, 160:22, 160:23,
163:23, 172:1
 **Direct** - 1:4, 1:20, 4:18,
20:8, 41:17, 59:22, 97:13,
116:11, 123:7, 142:24,
148:22, 191:7
 **directed** - 8:21
 **directly** - 4:14, 20:3,
28:13, 75:18, 80:10, 103:21,
142:17, 148:18
 **disagreements** - 40:8,
40:11
 **disassemble** - 137:16
 **disassembled** - 138:2
 **disassemblement** -
129:13, 130:15
 **disassembling** - 133:23
 **discharged** - 43:21, 44:1
 **disciplinary** - 127:22,
130:16, 133:22, 135:25,
137:17, 138:12, 138:15,
138:16, 151:5, 155:25,
180:24, 181:8, 181:12,
188:21, 188:24, 189:21
 **discipline** - 135:23,
138:13, 138:20
 **discoloration** - 108:13
 **discolored** - 108:3, 109:14
 **discovered** - 131:12
 **discuss** - 3:18
 **discussed** - 51:19,
136:10, 178:18
 **discussing** - 101:23
 **discussions** - 99:3
 **dispatched** - 7:24, 12:12
 **dispatcher** - 7:5
 **distal** - 114:2
 **distanced** - 199:19
 **distribution** - 135:5
 **District** - 1:6, 1:12, 2:5,
116:16, 117:20, 204:5
 **Division** - 6:20, 18:19,
121:7
 **divot** - 131:5
 **divots** - 131:3
 **doctor** - 114:12
 **document** - 174:21,
174:24
 **documentation** - 99:16
 **documents** - 101:2, 104:9,
111:5
 **Domingo** - 62:15
 **Dominican** - 65:18
 **done** - 135:2, 174:18
 **door** - 29:11, 30:3, 31:9,
80:22
 **doorstep** - 36:12
 **Dora** - 192:21
 **Doris** - 198:11

 **dorm** - 159:7, 159:8
 **dormitory** - 159:15,
159:21, 159:24
 **dorsally** - 112:15
 **double** - 130:25, 201:21
 **down** - 3:15, 13:4, 32:16,
32:20, 35:7, 41:8, 52:20,
58:23, 69:13, 70:9, 70:10,
70:12, 82:22, 84:18, 84:25,
92:20, 97:2, 103:9, 109:11,
114:2, 115:24, 122:12,
128:25, 130:10, 138:16,
141:14, 146:11, 148:8,
156:10, 159:1, 164:1,
165:25, 190:4, 202:7
 **Dr** - 1:10, 2:7, 97:5, 97:11,
97:15, 97:20, 97:24, 99:10,
100:13, 100:14, 100:22,
100:24, 101:16, 102:17,
103:4, 105:17, 110:22,
111:9, 112:3, 115:24
 **dream** - 199:6
 **dressed** - 53:17
 **drew** - 198:18
 **drink** - 83:15
 **drinking** - 83:15, 92:9,
195:6
 **drive** - 76:19, 91:17
 **driver's** - 69:9, 69:14
 **driving** - 172:2
 **drop** - 172:10
 **drove** - 91:19
 **drug** - 25:4, 37:9, 64:17,
65:19, 71:22, 91:22, 92:7,
160:10
 **Drugs** - 23:25
 **drugs** - 24:16, 28:5, 28:14,
29:10, 30:2, 30:10, 31:4,
33:5, 37:20, 37:22, 37:23,
37:25, 38:19, 44:11, 44:12,
56:2, 57:25, 62:3, 62:15,
62:16, 66:3, 70:14, 71:11,
71:24, 72:15, 73:21, 73:24,
74:23, 77:3, 77:10, 78:11,
81:5, 81:24, 82:17, 84:15,
92:8, 92:9, 93:14, 94:13,
111:19, 172:6
 **dull** - 132:9
 **duly** - 4:17, 20:7, 41:16,
59:20, 97:12, 116:10, 123:6,
142:23, 148:21, 191:6
 **dumpster** - 7:25, 8:22,
8:25, 9:3, 10:16, 10:22,
11:4, 11:8, 11:14, 12:4,
12:7, 12:17, 12:20, 13:7,
13:16, 85:2, 120:7
 **During** - 78:15, 98:15,
99:3, 171:8, 174:12
 **during** - 27:17, 40:17,
44:14, 45:10, 45:13, 45:14,
48:18, 60:19, 64:11, 65:1,
82:14, 88:5, 99:11, 101:9,
101:22, 116:25, 117:9,
118:5, 129:24, 145:1,
151:15, 152:9, 170:2, 171:4
 **duties** - 14:23, 189:17
 **Dwayne** - 1:10, 2:7, 97:5,
97:11, 97:20, 97:21
 **Dwi** - 144:21, 160:4

# E

 **ear** - 25:22
 **early** - 73:21
 **earn** - 184:6
 **Easton** - 73:2
 **easy** - 136:23
 **eat** - 164:18, 169:12
 **edema** - 107:3
 **edge** - 110:7

 **Edison** - 42:22
 **educate** - 6:23
 **education** - 5:10, 170:10,
184:12
 **educational** - 164:15
 **effort** - 162:21
 **eight** - 6:12
 **eighteenth** - 193:11
 **eighths** - 112:19
 **eights** - 114:4
 **either** - 7:8, 69:17, 96:3,
110:25, 121:25, 159:14,
182:6, 186:9
 **electrical** - 18:8
 **Elementary** - 21:24, 42:21
 **elementary** - 24:13
 **eleven** - 58:4, 58:8, 58:15
 **Elizabeth** - 23:5, 23:23,
24:7, 24:10, 24:16, 24:18,
24:19, 26:5, 26:9, 26:14,
28:10, 33:13, 40:17, 40:21,
74:18, 74:19, 74:22, 75:5,
77:25, 78:11, 78:13, 78:23
 **Elizabeth's** - 74:24, 75:18,
76:2, 78:14, 78:18
 **emanating** - 106:21
 **embarrassing** - 171:18
 **Emergency** - 174:22
 **emotional** - 195:4
 **employed** - 5:3, 98:1,
98:12, 99:12, 100:14,
123:15, 123:22, 125:14,
163:9
 **employees** - 151:14,
171:14
 **enables** - 149:24
 **encounter** - 76:4
 **end** - 11:6, 32:13, 64:22,
156:8, 199:21, 202:24
 **ended** - 12:22, 34:12,
34:24, 75:15, 177:9
 **enforcement** - 5:7, 87:18,
119:16
 **enjoy** - 194:10
 **enlarge** - 11:1, 105:19
 **entire** - 12:4, 123:23,
158:17
 **entitled** - 1:21
 **entrance** - 92:18
 **escape** - 165:20, 172:23,
174:12, 174:14, 176:23,
181:21, 182:7
 **escapes** - 170:2, 173:23,
176:20
 **escaping** - 177:9
 **escorted** - 182:12
 **especially** - 201:2
 **essentially** - 106:25,
110:5, 139:7
 **established** - 177:6,
177:14
 **Estimate** - 187:22
 **estimate** - 93:3, 93:4,
120:7, 187:21
 **estimation** - 132:23
 **evaluated** - 151:14
 **evening** - 164:25
 **events** - 91:1, 170:2,
176:19
 **eventually** - 72:15, 83:16,
129:8, 177:16
 **Everywhere** - 27:22,
182:11
 **everywhere** - 31:18, 32:1
 **evidence** - 7:1, 7:2, 19:3,
27:2, 112:20, 204:8
 **evolved** - 103:25
 **exact** - 149:18, 188:11
 **exactly** - 56:3, 72:12,
77:16, 78:24, 81:18, 83:11,

83:20, 84:10, 84:22, 89:9,
91:18, 93:21, 94:10, 95:1,
129:23
  examination - 36:23,
51:16, 87:7, 101:9, 112:1,
121:22, 136:6, 140:23,
178:12
  Examination - 4:18, 20:8,
40:3, 41:17, 59:22, 95:14,
97:13, 116:11, 123:7,
139:16, 142:24, 148:22,
191:7
  examinations - 14:20
  examined - 100:6
  examiner - 12:14, 98:2,
98:5
  examiner's - 12:13, 13:8,
13:12, 14:12, 14:16, 15:11,
15:17, 16:18, 18:25, 99:13
  examples - 196:18
  except - 3:16, 3:18,
184:25, 189:12
  Except - 185:2
  excess - 143:24
  exchange - 119:5
  excited - 97:17
  exclusion - 3:14
  excuse - 41:8, 74:8, 81:18
  excused - 19:16, 19:19,
41:3, 58:21, 96:25, 115:21,
122:9, 141:11, 148:5, 190:2,
202:4
  Exhibit - 2:8, 9:12, 10:1,
10:9, 10:25, 11:11, 12:2,
12:16, 13:1, 13:13, 13:17,
14:1, 15:22, 16:3, 16:14,
16:24, 17:5, 17:9, 17:17,
17:24, 27:5, 27:8, 27:15,
48:4, 48:14, 68:10, 68:13,
68:15, 68:19, 68:23, 101:18,
102:9, 102:22, 103:1, 103:4,
103:14, 105:18, 105:19,
106:15, 109:1, 109:19,
110:13, 197:5, 197:9,
197:17, 197:21, 198:1,
198:5, 198:22, 199:1
  exhibits - 14:7, 15:9,
204:15
  Exhibits - 15:5, 15:20,
16:1, 67:15, 67:17, 102:24,
197:16
  experience - 104:12,
140:13, 149:6, 150:1, 185:8
  experienced - 144:10
  expert - 98:19
  Expiration - 204:22
  explain - 109:19, 186:2
  Explain - 92:16, 188:19
  explained - 33:24, 180:11
  exposure - 170:7
  express - 86:15, 202:24
  extended - 193:1
  extension - 105:3, 106:2,
106:5, 110:17
  extensive - 175:15, 180:17
  extensiveness - 181:8
  extra - 132:2, 132:4
  extraneous - 135:15
  Extremely - 146:10
  extremely - 146:23
  eye - 108:2, 108:3
  eyes - 107:22, 108:1,
133:12, 198:2

F

  face - 17:3, 17:6, 32:20,
54:24, 82:22, 92:19, 92:20,
103:15, 103:22, 106:20,
106:21, 107:6, 107:21,

108:7, 108:21
  face-down - 32:20, 82:22,
92:20
  face-up - 92:19
  facilitate - 172:23
  facilitated - 177:5, 177:14
  facilities - 149:13, 149:14,
159:7, 187:17
  facility - 149:9, 151:2,
151:6, 151:11, 151:13,
151:23, 151:24, 155:18,
156:2, 160:16, 160:18,
165:1, 169:24, 169:25
  fact - 12:22, 14:13, 105:23,
156:17, 156:20, 161:21,
163:17, 165:3, 166:5, 168:1,
170:18, 174:18, 176:22
  factory - 156:3, 161:4,
161:5, 161:11
  Fagan - 39:12
  fail - 183:17
  failing - 141:3
  fair - 25:11, 46:9, 121:11,
129:5, 134:5, 144:7, 146:15,
150:13, 152:9, 157:9,
161:19, 163:22, 164:23,
165:6, 167:16, 169:23,
175:10, 175:20, 175:25,
176:18, 191:24, 195:12,
200:20
  fairly - 9:19, 15:15, 67:22,
68:4, 165:24
  falling - 53:25, 54:3
  falling-out - 54:3
  familiar - 30:8, 127:2,
145:4, 146:18, 174:3, 176:7,
176:25, 177:17
  families - 168:12
  family - 6:12, 20:24, 21:1,
21:2, 47:9, 47:10, 47:11,
77:25, 78:13, 168:19,
191:21, 191:25, 192:2,
192:14, 193:1, 199:17,
199:19, 199:22
  fan - 162:6
  fans - 162:5, 169:7
  far - 149:7, 150:3, 150:9,
151:5, 153:9, 157:12, 186:9,
199:21
  farm - 155:3
  fashion - 162:7
  fast - 90:16, 90:17
  father - 194:6
  Faustino - 37:11
  Fbi - 87:11
  fear - 186:11
  feared - 35:25
  February- 34:14, 145:11,
145:19
  feces - 176:12
  feelings - 201:13
  feet - 14:4, 18:1, 18:2,
32:19
  fellow - 150:23
  felt - 28:17
  female - 177:6
  fence - 165:21, 177:10,
177:21, 177:22, 177:24,
183:18
  fencing - 162:7
  few - 30:15, 44:15, 54:20,
57:18, 64:10, 88:5, 105:17,
146:16, 178:20
  field - 103:23, 155:21,
156:3, 156:6, 173:15,
173:17, 174:8
  fields - 160:19, 183:21
  Fifteen- 6:10
  fighting - 57:9

  figured - 52:25, 199:23
  file - 101:7
  fill - 177:12
  fills - 106:23
  finally - 14:1, 17:24, 36:4,
36:7, 110:12
  findings - 99:17, 100:21,
104:11, 104:14, 133:25
  Fine- 41:22, 60:2, 60:13,
87:10
  fine - 60:2, 60:20, 60:23
  fined - 139:7
  finger - 35:17, 63:2,
113:24, 114:1, 114:3
  fingerprint - 18:20
  fingerprints - 7:1, 14:19,
18:13, 18:15, 18:17, 18:18
  finish - 52:17, 55:11,
57:15
  finished - 42:24
  fire - 165:20
  fired - 177:23
  first - 3:21, 4:17, 5:24, 8:8,
8:16, 10:14, 10:20, 20:7,
24:10, 32:9, 41:16, 46:23,
46:25, 54:11, 54:16, 54:22,
57:23, 59:20, 72:22, 73:2,
73:3, 85:15, 96:5, 96:9,
96:13, 96:14, 97:12, 97:25,
100:4, 103:5, 107:10,
116:10, 120:11, 123:6,
124:3, 125:14, 129:4,
135:17, 142:23, 143:12,
148:21, 156:11, 160:25,
175:12, 183:16, 185:21,
188:20, 191:6
  First- 93:19, 96:4, 191:16,
197:5
  first-aid - 175:12
  fist - 110:8
  fit - 120:19
  five - 5:4, 5:5, 42:18,
77:24, 94:9, 136:22, 141:17,
177:16, 177:19, 178:3,
178:4, 188:14
  five-minute - 141:17
  Fiveash- 1:15, 1:22,
141:16, 142:6, 148:10,
148:20, 149:1, 178:5,
178:14, 178:15, 178:16
  flannel - 109:6
  flat - 155:14
  Flight- 196:10
  fling - 26:12
  floor - 124:18
  floors - 124:19, 124:20,
143:12, 143:16
  Flores- 2:20, 45:18, 53:21,
53:22, 72:1, 99:8, 99:17,
99:21, 100:18, 103:8,
103:16, 104:12, 106:13,
108:19, 133:17
  Flores'- 105:21, 106:20,
109:3, 110:20, 111:20
  Florida- 34:12
  flow - 105:9, 125:10
  fluid - 106:21, 106:23,
106:25, 107:1, 107:4,
176:13
  Folks- 202:12
  folks - 170:16
  follow - 14:23
  following - 1:20, 84:7,
84:18
  follows - 4:17, 20:7, 41:16,
59:21, 97:12, 116:10, 123:6,
142:23, 148:21, 191:6
  food - 162:8, 162:9, 169:7,
169:11
  force - 105:13, 107:25,

108:4, 108:6, 108:11,
109:25, 110:3, 110:5
  foregoing - 204:6
  forehead - 108:16, 108:22
  forensic - 98:8, 98:10
  Forensic- 98:13, 99:13
  forgiveness - 92:3, 92:4
  forgot - 44:8, 93:8, 94:12
  forgotten - 56:2
  form - 86:15, 202:24
  formal - 88:23, 89:3
  Fort- 43:10
  Forty- 21:19
  Four- 124:24, 124:25
  four - 21:3, 43:1, 43:3,
77:20, 84:23, 124:20,
124:23, 126:5, 165:7
  Franklin- 2:6, 204:23
  freaked - 29:16, 33:11
  free - 79:17, 169:5, 170:13
  free-world - 169:5, 170:13
  freely - 166:21
  freeway - 67:7
  frequency - 171:18,
172:14, 176:16
  frequently - 106:7, 161:22
  fresh - 114:22, 115:6,
133:2
  friend - 23:2, 23:4, 33:8,
33:13, 40:18, 45:22, 45:23,
46:12, 46:24, 48:17, 51:2,
52:1, 55:14, 84:8, 196:13,
196:14, 201:1
  friendly - 195:17, 200:14,
200:15, 200:16
  friends - 24:2, 28:1, 46:7,
48:20, 62:20, 63:19, 195:18,
195:19, 196:22, 201:2
  friends' - 62:16, 62:18
  friendship - 24:10, 46:3,
46:4, 46:5, 73:4
  front - 11:5, 68:22, 69:10,
88:19
  froze - 29:15, 32:11, 32:23
  full - 41:24, 72:23, 112:10,
128:22, 188:14
  funeral - 12:12
  furious - 75:10
  furniture - 30:23

G

  G-1 - 154:2, 154:20,
154:21, 154:23, 171:21,
171:23, 172:6, 180:21,
181:2, 181:24, 182:1
  G-1s- 154:25
  G-2 - 154:2, 154:22,
154:23, 155:5, 155:15,
158:21, 159:2, 159:9,
159:11, 159:12, 159:22,
167:23
  G-2s- 155:11
  G-3 - 154:2, 155:9, 155:12,
156:24, 157:4, 157:13,
157:17, 158:10, 158:12,
158:13, 158:17, 159:5,
159:6, 159:8, 159:11,
160:13, 165:8, 165:11,
166:12, 166:15, 167:22,
169:1, 169:19, 170:21,
173:14, 177:19, 180:7,
180:10, 180:19, 181:11,
181:12
  G-3s- 155:11
  G-4 - 154:2, 156:20, 157:8,
157:13, 180:15, 180:18,
181:4, 181:9, 181:14, 185:2,
185:3
  G-4s- 155:23

**G-5**- 154:3, 154:20, 156:3, 156:7, 156:21, 157:8, 157:13, 180:15, 181:4, 181:6, 181:9, 181:14, 185:2, 185:3
**G-5s**- 155:23
**gagged** - 64:15, 64:16
**gain** - 171:3
**game** - 5:17
**gang** - 172:22
**gangs** - 143:25
**garbage** - 11:21, 12:20
**garcia** - 1:6, 3:3, 3:4, 24:21, 40:13, 40:19, 49:1, 55:17, 60:25, 61:4, 63:3, 66:18, 70:19, 82:7, 91:7, 117:2, 126:14, 126:17, 127:1, 130:19, 135:23, 141:25, 145:5, 145:7, 146:15, 147:6, 157:3, 157:16, 180:7, 190:20
**Garcia** - 1:16, 1:23, 99:18, 117:25, 118:14, 190:24, 191:5, 191:9, 202:7
**garcia's** - 132:16
**garment** - 156:2, 161:4
**gas** - 166:14
**gathered** - 101:5
**general** - 154:6, 154:21, 178:23, 189:19
**generally** - 7:4, 8:9, 8:25, 21:1, 45:24, 67:2, 67:5, 68:20, 72:9, 97:24, 100:21, 103:22, 104:14, 113:15, 119:24, 124:16, 125:10, 125:20, 165:7
**generate** - 138:15
**generated** - 100:19, 133:24, 138:22
**generous** - 196:16
**gentlemen** - 4:24, 11:2, 20:19, 22:24, 86:10, 97:19, 103:17, 124:17, 129:22
**Georgia**- 43:8
**Germany** - 43:9
**gesture** - 35:17
**girl** - 193:9
**girlfriend** - 24:8, 26:9, 74:13, 74:17, 74:19, 78:21, 177:14
**given** - 129:19, 130:14, 152:18, 156:9, 179:19
**glanced** - 29:13, 29:14, 30:5, 30:6, 31:18, 32:23
**Glossary**...........................
.end - 1:19
**gloves** - 12:24
**goal** - 18:22
**God**- 88:19, 92:3, 92:5
**Godmother**- 192:20
**Gonzalez**- 52:12, 53:8
**grab** - 29:10
**grabbed** - 62:23
**gram** - 167:5
**grandchildren** - 21:3
**Grande**- 191:18
**grandkids** - 21:10
**gray** - 25:22, 61:11
**Great**- 20:13
**grew** - 193:8, 201:14
**group** - 28:16, 78:20, 83:4
**grow** - 21:20
**Growing**- 187:24
**guard** - 163:20, 167:10, 173:19, 173:22, 174:9, 186:21
**guards** - 163:9, 165:14, 166:3, 166:5, 166:11, 170:8, 171:13, 174:1, 175:20, 175:22, 180:4, 182:19,

183:20, 189:13
**guess** - 11:9, 12:19, 22:14, 23:13, 26:12, 28:4, 29:1, 38:21, 58:4, 76:13, 139:9, 180:2, 181:14, 184:25, 186:11
**guessing** - 58:17
**guilt** - 191:14, 200:21
**guilty** - 138:23, 180:25
**gum** - 43:12
**gun** - 38:15, 161:25, 173:19, 173:22, 174:14
**guns** - 38:25, 39:20
**guy** - 25:22, 26:24, 29:2, 30:22, 72:4, 72:13, 78:21, 157:4, 190:11, 196:2
**guys** - 23:10, 23:23, 24:14, 42:17, 48:19, 50:5, 62:7, 71:11, 72:6, 73:16, 76:22, 77:4, 77:11, 79:6, 131:5, 132:13, 134:13, 137:25

## H

**hair** - 127:20, 132:8, 137:16, 139:19, 140:18
**haircut** - 128:21
**hairline** - 108:8, 108:9
**half** - 18:4, 43:9, 112:16, 145:20, 201:22
**hall** - 163:19, 164:2, 169:13
**hallway** - 30:5, 31:15, 164:1, 170:19
**hammer** - 80:19, 110:8
**hand** - 3:10, 7:8, 12:1, 17:19, 17:21, 27:11, 27:20, 80:19, 80:20, 92:22, 93:19, 93:20, 93:23, 103:12, 104:25, 105:5, 109:3, 109:11, 109:19, 112:10, 112:14, 112:15, 112:21, 112:22, 113:5, 113:19, 113:23, 113:24, 114:8, 114:9, 122:25, 129:16, 142:13, 148:14
**Hand** - 204:16
**hand-in-hand** - 7:8
**handed** - 128:5, 128:6, 129:8, 130:17, 130:21
**handing** - 134:4, 134:12
**handle** - 110:7, 183:8, 186:4
**handles** - 143:14
**handling** - 178:25, 179:1
**hands** - 3:15, 32:17, 63:21, 81:1, 81:23, 82:18, 82:21, 92:13, 93:1, 93:8, 93:9, 93:17, 93:24, 94:19, 94:20, 94:21, 94:25, 109:3, 112:9, 113:16, 201:15
**hang** - 24:24, 31:4, 130:5
**hanging** - 24:2, 48:19
**harass** - 173:2
**hard** - 80:20, 80:21, 92:22, 103:9, 108:23, 109:22
**harm** - 139:24
**Harris** - 1:9, 1:23, 7:21, 46:21, 88:10, 98:2, 98:13, 99:12, 117:17, 117:20, 123:16, 123:19, 123:25, 143:6, 143:9, 145:2, 145:8, 145:10, 145:12, 145:21, 204:2, 204:5
**Harvey** - 37:18
**hat** - 17:7
**hate** - 171:5
**head** - 11:15, 25:23, 32:18, 107:16, 107:17, 108:19, 187:10

**headphones** - 49:11
**hear** - 104:18, 187:7
**heard** - 1:21, 34:25, 35:12, 47:23, 70:2
**Hearsay**- 49:23
**hearsay** - 50:14, 120:2
**heart** - 201:12
**heavy** - 80:18
**height** - 16:15, 16:20, 16:21
**held** - 1:23, 63:22
**helicopter** - 196:11
**Hello** - 116:14
**help** - 18:22, 62:24, 63:5, 63:23, 81:15, 81:16, 82:12, 91:15, 117:1
**helped** - 29:3, 45:4, 82:24, 83:1, 91:11, 91:14
**hemorrhage** - 107:20, 109:8, 112:17
**hemorrhages** - 107:6, 107:7, 107:20
**hereby** - 204:6
**Hernandez**- 2:20
**hesitate** - 182:21
**Hi**- 20:20
**high** - 5:11, 124:19, 145:14, 174:14
**High** - 22:1, 42:22, 42:23, 42:24
**high-risk** - 145:14
**himself** - 28:21, 35:18, 38:10, 196:25
**Hispanic**- 9:2, 10:16
**history** - 18:21, 152:12, 153:5, 153:14, 155:25, 160:2, 180:16, 180:17, 180:18
**hit** - 81:1, 92:22, 93:1, 93:17, 93:22, 93:23, 186:22
**hits** - 172:23, 173:6
**hitting** - 80:21, 92:21, 92:24
**holding** - 147:11
**holds** - 176:11
**home** - 12:12, 45:11
**Homicide**- 6:20, 53:18, 121:7
**homicide** - 7:9
**Honor**- 4:13, 9:7, 9:23, 10:11, 15:1, 15:19, 16:5, 19:7, 19:25, 20:5, 25:24, 27:1, 40:2, 40:25, 41:14, 47:24, 49:12, 49:24, 51:11, 52:22, 59:14, 59:18, 61:12, 67:10, 68:7, 68:17, 86:3, 86:7, 87:4, 95:13, 96:24, 97:1, 97:6, 97:10, 101:13, 102:8, 102:13, 102:16, 103:3, 111:23, 116:4, 116:8, 122:10, 122:15, 122:18, 122:22, 122:24, 123:4, 127:12, 134:21, 141:12, 141:13, 142:12, 148:6, 148:11, 190:1, 190:25, 202:5, 202:6
**Honorable**- 1:22
**honorable** - 43:22, 43:24
**honorably** - 43:21
**Hood**- 43:10
**hopeless** - 183:6
**hopes** - 121:9
**hoping** - 47:8
**horizontal** - 105:23
**horse** - 174:12, 186:22
**horseback** - 173:19, 174:9
**horses** - 183:21
**hospital** - 177:11, 177:13, 196:4
**hot** - 176:13

**hotel** - 62:17, 62:22, 62:23, 63:16
**hour** - 127:18, 128:11, 134:14, 146:6, 155:4
**hourly** - 171:25
**hours** - 62:18, 62:19, 124:9, 143:24, 143:25, 146:5, 146:11, 165:7, 165:10, 189:12
**house** - 67:3
**housed** - 144:25, 145:1, 150:15, 150:19, 151:9, 153:14, 153:17, 154:14, 157:25, 158:2, 159:6, 159:9, 159:10, 160:1, 160:4, 160:7, 160:10
**houses** - 150:4
**housing** - 124:14, 159:4, 159:8
**Houston** - 1:23, 2:6, 2:13, 2:16, 4:25, 5:3, 5:14, 6:1, 6:16, 7:18, 8:11, 20:22, 21:13, 34:14, 42:2, 42:4, 42:8, 42:20, 47:11, 53:8, 60:15, 60:16, 73:22, 74:3, 87:19, 104:10, 120:23, 191:22, 191:25, 199:24, 199:25, 204:24
**Hpd**- 5:9, 5:18, 5:24, 119:17
**Hpd's**- 121:7
**hug** - 196:24
**hundred** - 69:25
**hung** - 62:8
**hurt** - 201:5, 201:6
**husband** - 23:1, 23:7, 192:9
**hygiene** - 169:7

## I

**ice** - 169:9, 169:10, 169:17
**Id** - 103:19
**idea** - 87:22, 87:23
**Identification**- 18:19
**identification** - 9:11, 48:3, 67:14, 101:17, 103:18, 103:20, 103:25
**identified** - 25:25, 27:24, 49:13, 61:13, 120:1, 120:22, 127:13
**identify** - 18:21, 18:23, 25:19, 49:8, 61:4, 61:7, 119:19, 120:17, 127:9
**identifying** - 49:9, 61:8, 99:22, 101:24
**Iii** - 149:19
**imaginable** - 180:2
**immediately** - 13:7, 75:12, 91:24, 184:22
**impact** - 110:1, 110:6
**important** - 185:9
**impression** - 186:13
**incarcerated** - 44:15, 44:24, 46:20
**incarceration** - 151:22, 151:23
**incarcerations** - 152:8, 152:10, 152:15
**inch** - 112:16, 112:17, 114:4, 114:5
**inches** - 16:21
**incident** - 61:15, 61:19, 89:19, 119:20, 126:13, 134:1, 135:24, 139:6, 169:22, 188:7
**incidents** - 89:7, 137:9, 174:19
**include** - 135:15, 154:8
**included** - 101:7, 204:9

**includes** - 154:2
**including** - 119:17, 138:1
**Including** - 135:10, 180:4
**indentations** - 109:7
**Index** - 1:20, 2:8
**indicate** - 183:5
**indicated** - 17:14, 65:6, 109:18
**indicates** - 16:20
**indicating** - 9:14, 11:12, 11:18, 11:22, 12:2, 12:17, 13:1, 13:14, 13:18, 13:24, 14:2, 15:7, 16:10, 16:25, 17:5, 17:10, 17:15, 17:18, 17:25, 18:4, 27:6, 27:9, 35:15, 62:25, 63:4, 63:25, 67:17, 68:25, 80:3, 80:7, 82:1, 92:24, 93:6, 93:9, 94:19, 94:22, 95:4, 101:19, 102:19, 103:6, 105:20, 106:17, 108:9, 109:2, 114:11, 197:6, 197:24, 198:6, 198:15
**indication** - 111:19
**indicator** - 107:23, 109:25
**indictment** - 88:23
**indictments** - 89:3
**individual** - 48:14, 48:16, 65:13, 100:18, 118:14, 126:7, 127:1, 127:6, 129:10, 139:25, 145:5, 150:13, 159:15, 167:1, 178:7, 182:13
**individually** - 130:11
**individuals** - 26:19, 27:24, 28:16, 129:9, 134:24, 135:11, 156:23, 160:1, 161:24, 163:12
**industry** - 155:19, 160:18
**information** - 8:19, 47:3, 54:13, 96:8, 96:18, 101:5, 117:24, 118:7, 118:10, 118:13, 118:16, 118:17, 118:19, 118:23, 118:24, 119:4, 119:5, 119:8, 119:12, 119:14, 119:15, 119:21, 119:25, 120:13, 121:15, 156:10, 157:2, 157:17, 167:14
**informed** - 131:14
**infraction** - 127:5
**infractions** - 136:15, 136:24, 189:21
**infrequent** - 111:2
**initial** - 151:10
**initial** - 117:19, 121:15, 132:20
**injected** - 81:24, 94:24, 95:2
**injecting** - 81:5, 82:17, 93:14, 94:13, 94:17, 94:18, 94:19, 94:23
**injuries** - 14:18, 92:13, 104:16, 106:7, 107:25, 108:15, 108:21, 112:21, 112:23, 114:7, 175:8, 175:10
**injury** - 15:13, 112:13, 113:2, 113:21
**inmate** - 124:8, 128:2, 129:2, 135:10, 143:14, 144:17, 145:14, 150:17, 153:2, 154:22, 157:5, 159:5, 159:6, 159:19, 165:11, 167:14, 167:20, 167:22, 169:1, 172:6, 177:25, 183:14, 183:22, 184:11, 184:17
**Inmates** - 128:21, 130:4
**inmates** - 124:22, 125:2,

127:17, 127:20, 128:15, 132:7, 133:7, 133:19, 133:20, 134:15, 135:2, 136:15, 137:15, 144:20, 144:22, 146:8, 146:19, 154:11, 154:24, 156:25, 157:7, 159:16, 159:22, 163:18, 165:8, 166:12, 166:15, 166:23, 167:16, 168:11, 169:19, 171:3, 171:21, 171:23, 173:14, 173:18, 176:7, 176:22, 178:25, 179:1, 179:14, 180:5, 184:1, 184:9, 184:13, 184:22, 185:9, 185:13, 186:4, 187:8, 187:23
**inmates'** - 124:13
**inseparable** - 27:23
**inside** - 77:20, 77:22, 83:6, 106:23, 107:22, 108:22, 108:25, 130:3, 135:8, 140:2, 165:22, 165:23, 166:5
**instance** - 152:18
**instances** - 175:22
**instead** - 105:4
**Institute** - 98:13, 99:12
**institute** - 147:12
**institution** - 140:3, 147:4, 149:10, 153:4, 153:18
**instructed** - 3:17
**instruction** - 129:23
**instructions** - 129:15, 129:19, 130:13
**instrument** - 110:3
**instruments** - 140:14
**intake** - 153:7
**intend** - 186:9
**Interact** - 166:23
**Intercontinental** - 6:14
**interior** - 12:3
**Internet** - 172:15
**interpret** - 160:13
**interpreter** - 59:21
**Interpreter** - 61:16
**Interpreters** - 2:21
**interview** - 120:21, 152:20, 153:5, 153:7, 153:8
**introduce** - 4:23, 20:18, 41:24, 123:11, 143:3, 148:24
**investigated** - 121:17
**investigation** - 18:16, 19:5, 47:15, 117:1, 118:21, 120:5
**Investigator** - 39:11
**investigator** - 39:19, 47:1, 116:17, 116:22
**investigator's** - 101:4
**investigators** - 37:4, 38:6, 38:23, 95:18
**invoked** - 3:13
**involve** - 124:7
**involved** - 23:23, 61:20, 63:10, 65:11, 65:18, 76:11, 110:25, 118:13, 120:19, 140:6, 154:18, 175:9
**involvement** - 19:5, 47:15
**involving** - 19:1, 99:7, 99:20, 119:1, 126:13
**Isabel** - 74:18
**issuance** - 146:24
**issue** - 40:21
**issued** - 127:17, 128:20, 131:11, 137:16, 146:24
**items** - 12:20, 101:2, 169:7, 169:11, 197:4
**itself** - 112:22, 151:13, 166:6

## J

**jail** - 44:14, 44:15, 44:16, 44:23, 46:17, 47:14, 53:13, 56:15, 56:16, 56:17, 56:19, 57:5, 57:7, 57:8, 57:10, 57:12, 57:13, 58:12, 58:13, 85:25, 91:25, 96:14, 117:10, 125:23, 134:24, 135:8, 136:12, 136:14, 136:15, 136:21, 136:24, 143:17, 143:18, 144:8, 144:18, 146:16, 146:19, 152:12, 153:14, 169:23, 180:16, 180:17, 196:2
**Jail**- 46:21, 124:1, 145:2, 145:8, 145:10, 145:13, 145:21
**jails** - 57:18
**James** - 1:5, 1:24, 4:10, 4:16, 4:25, 192:9, 192:11, 193:7, 193:8, 193:12
**janitor** - 160:16, 160:20
**job** - 135:5, 149:25, 150:4, 150:10, 155:7, 155:12, 155:15, 155:19, 157:22, 160:24, 161:2, 167:23, 173:17, 179:3, 179:19, 184:12, 186:5, 187:25, 189:17
**jobs** - 149:8, 156:2, 160:13, 160:16, 160:17, 161:7, 172:3, 173:15
**Johnny**- 1:7, 1:25, 41:12, 41:15, 42:1
**joined** - 5:18
**joining** - 5:9
**Jr**- 1:14, 1:21, 99:18, 117:25, 118:14, 142:22, 143:5, 195:3
**Juan**- 176:25, 177:3, 188:6
**Judge**- 3:23, 10:4, 15:24, 19:11, 19:14, 36:15, 36:18, 39:25, 51:14, 95:7, 122:4, 134:17, 136:3, 140:8, 142:4, 147:24, 148:2, 188:3, 189:24, 190:8, 191:4, 194:23, 202:3
**Judicial**- 1:12
**jugular** - 107:12
**July**- 1:20, 1:3, 7:12, 8:6, 9:20, 18:11, 36:8, 36:9, 100:11, 104:5, 121:1, 145:19
**jump** - 177:21
**jumping** - 177:10
**June**- 6:4, 39:11, 143:14
**Junior**- 42:17
**jury** - 3:1, 4:1, 4:5, 4:24, 11:2, 20:19, 22:25, 41:25, 58:10, 86:17, 86:20, 86:23, 88:1, 88:21, 88:24, 89:4, 89:7, 89:12, 89:14, 89:17, 91:1, 94:16, 97:19, 113:3, 113:21, 114:21, 118:15, 129:22, 141:18, 141:22, 141:25, 143:3, 143:8, 144:16, 146:1, 148:24, 149:2, 149:23, 154:21, 156:12, 165:17, 172:19, 176:10, 177:3, 183:5, 183:7, 186:3, 186:12, 190:13, 190:17, 190:22, 191:16, 200:23, 201:10
**jury's** - 121:25
**justice** - 5:13, 88:20, 194:15
**Justice**- 150:2
**Justin**- 2:4, 3:6

## K

**keep** - 20:2, 21:4, 45:8, 123:3, 142:17, 148:17
**keeper** - 179:8
**keeps** - 136:14
**Kennedy** - 1:5, 1:24, 3:23, 3:24, 4:11, 4:16, 4:20, 4:25, 5:2, 6:15, 8:17, 9:10, 10:14, 15:4, 16:8
**kept** - 137:7, 198:9
**key** - 120:4
**kid** - 29:1, 61:23
**kidnapping** - 65:1, 96:15, 117:25
**kids** - 21:10, 23:11, 23:14, 199:20
**kill** - 63:25, 183:7, 183:8
**killed** - 82:11, 84:8, 92:12, 174:1, 174:16, 175:23, 176:5, 186:22, 194:15
**kind** - 8:9, 18:8, 22:15, 23:24, 24:14, 27:20, 28:7, 28:17, 29:15, 30:25, 32:11, 32:23, 36:11, 40:18, 44:13, 45:4, 47:17, 58:9, 77:4, 88:22, 95:23, 103:9, 110:15, 111:12, 121:4, 125:10, 129:4, 136:15, 143:10, 143:23, 147:14, 158:4, 167:22, 169:10, 170:7, 171:3, 172:16, 186:1, 186:3, 193:16, 193:21, 195:15, 195:23, 199:2, 200:5
**kindness** - 147:7
**kinds** - 147:18, 151:18, 152:4, 162:3, 170:16, 172:17
**Kitchen** - 161:4
**kitchen** - 80:1, 80:5, 80:7, 80:12, 92:18, 155:18, 156:2, 160:18, 161:7, 162:24
**kneeling** - 92:4
**knife** - 161:25
**knock** - 31:12
**knocked** - 31:13
**knots** - 130:1
**knowing** - 167:11, 167:17
**knowledge** - 50:17, 119:10, 121:14
**known** - 71:21, 87:2, 99:14, 100:18, 155:1
**knuckle** - 114:1

## L

**laceration** - 108:22
**lacerations** - 108:18
**lacking** - 179:11, 179:13
**ladies** - 4:23, 11:2, 20:18, 22:24, 86:10, 97:19, 103:17, 124:17, 129:22
**large** - 11:19, 13:23, 173:18, 175:4
**last** - 36:9, 53:14, 55:4, 55:5, 56:13, 56:15, 56:22, 57:2, 57:4, 57:25, 60:4, 60:8, 60:21, 64:24, 89:17, 99:10, 100:4, 110:23, 116:19, 116:21, 188:22, 191:10, 197:7, 197:23
**late** - 60:15, 60:16, 117:6
**laughing** - 58:25, 59:2, 59:7
**laundry** - 125:7, 130:7, 161:4, 161:14
**law** - 5:7, 42:14, 87:18, 88:11, 88:12, 119:16, 158:20, 192:9

**lawyer** - 88:4, 88:15, 96:1, 137:6

**lawyers** - 3:5, 52:16, 178:17, 190:21

**laying** - 13:15, 17:1, 38:25, 80:2, 82:10, 92:17

**layman's** - 109:16

**lead** - 44:11, 44:13

**leading** - 34:5, 62:13

**leads** - 105:10

**leak** - 106:25

**learn** - 29:4, 29:7, 46:15, 46:18

**learned** - 29:9, 46:17, 46:23, 46:25, 118:16

**learning** - 118:23

**least** - 109:5, 158:16

**leave** - 14:15, 64:5, 83:9, 83:10, 202:21

**leaving** - 34:12

**led** - 64:13, 106:13

**left** - 11:6, 11:20, 13:11, 17:12, 18:25, 32:25, 33:8, 33:10, 34:17, 35:3, 35:15, 44:9, 71:12, 78:3, 78:4, 78:5, 83:8, 83:12, 83:25, 85:4, 90:2, 91:23, 105:21, 113:23, 113:24, 114:8, 114:9, 131:4, 177:13, 178:20, 198:12

**legal** - 16:16, 92:2

**legs** - 11:24

**length** - 151:21, 189:15

**lengthy** - 118:3

**Leo**- 26:25

**less** - 167:5

**lesser** - 144:21, 147:7

**level** - 150:8, 150:9, 151:4, 151:10, 157:8, 159:2, 159:18, 160:10, 171:21, 171:23, 181:3, 181:13, 184:25, 188:16, 188:20

**levels** - 181:17, 189:2, 189:16

**lie** - 58:2

**Life**- 196:10

**life** - 21:15, 22:20, 25:13, 34:5, 34:7, 35:25, 42:8, 44:5, 44:13, 45:1, 45:14, 158:16, 158:20, 199:13, 201:7

**life-style** - 34:5, 44:13

**lift** - 7:1

**Lift**- 80:19

**ligature** - 17:12, 104:17, 104:18, 105:22, 105:23, 105:24, 106:11, 106:12, 109:4, 110:15, 110:17

**Ligature**- 104:25

**Light**- 92:1

**Lights**- 128:19

**limited** - 146:9, 146:10, 152:10

**line** - 106:4, 110:4

**linear** - 106:4, 106:9

**linen** - 130:5

**linens** - 130:7

**lip** - 108:22, 108:24, 108:25

**lips** - 35:17

**list** - 128:25, 130:10, 138:17, 138:19

**listen** - 3:19

**live** - 20:21, 42:2, 42:14, 76:25, 191:18

**lived** - 21:13, 22:12, 22:13, 30:21, 35:8, 42:8, 45:15, 62:3, 62:10, 66:11, 73:22, 78:11, 78:12, 84:13, 191:19, 199:25

**lives** - 191:25

**living** - 22:11, 22:12, 60:15, 80:1, 149:3, 159:8, 191:17

**locate** - 47:8

**location** - 7:20, 7:21, 8:1, 8:9, 8:10, 8:14, 35:7, 71:12, 120:6, 124:14, 126:3, 126:4, 166:19, 189:8

**locations** - 77:4

**lockdown** - 189:1, 189:10

**locked** - 48:24, 64:4, 146:11

**log** - 128:20, 128:21

**longest** - 73:10

**Longoria**- 1:6, 2:3, 19:22, 20:6, 22:3, 22:4

**look** - 9:13, 15:6, 29:10, 31:16, 38:8, 38:10, 67:16, 67:22, 67:24, 79:23, 99:4, 101:18, 114:25, 132:15, 152:1, 152:5, 153:5, 180:16

**looked** - 32:2, 38:7, 38:8, 82:2, 111:8, 113:2, 114:23, 152:8

**looking** - 50:22, 68:5, 75:17, 80:22, 90:19, 105:21, 106:18, 106:20, 187:18

**looks** - 18:2

**loose** - 168:3

**Lopez**- 1:7, 1:25, 41:12, 41:15, 41:19, 42:1, 42:2, 44:5, 45:2, 46:15, 48:2, 49:15, 50:3, 50:7, 51:18

**lose** - 5:17, 184:14, 185:6

**loses** - 184:7

**loss** - 138:25, 139:8

**lost** - 199:13

**Louisiana**- 2:15

**love** - 74:25, 186:5, 200:1

**loveable** - 195:17, 200:13

**loved** - 196:20, 199:5, 201:15

**loving** - 199:10, 200:13

**low** - 160:10

**low-level** - 160:10

**lower** - 11:24, 11:25, 13:20, 124:20

**lunch** - 86:11

**Lunch**- 86:19

**lungs** - 106:22, 107:4

**Lupita**- 42:16, 45:4

**lying** - 81:19, 92:19

---

## M

**Ma'am** - 20:2, 41:7, 191:9

**ma'am** - 43:13, 52:18, 142:19, 145:6, 146:20, 148:14, 148:25, 149:1, 149:17, 150:21, 152:6, 152:21, 153:1, 153:12, 153:21, 154:15, 154:17, 156:16, 156:22, 157:18, 158:1, 173:3, 173:5, 190:4, 191:11, 191:23, 192:1, 192:4, 192:13, 192:25, 193:3, 194:5, 194:11, 194:16, 194:19, 194:21, 195:11, 196:17, 197:7, 197:25, 198:16, 198:19, 201:9

**Madrid** - 2:14, 3:5

**Magee** - 1:22

**maiden** - 22:4, 22:5

**Main** - 200:1

**main** - 25:2, 170:19

**maintain** - 34:4

**maintaining** - 125:5, 125:20

**maintenance** - 155:2, 160:17, 171:11

**majority** - 143:13, 145:24

**male** - 9:2, 10:16

**man** - 17:11, 27:20, 65:18, 72:11, 73:1, 88:17, 200:13, 200:24

**manipulate** - 171:6

**manual** - 104:24, 106:7

**Marie** - 42:16

**Marijuana** - 172:18

**Marilu** - 2:20

**Mario** - 2:14, 3:5

**mark** - 102:12, 105:24, 106:3, 109:18, 110:20

**marked** - 9:11, 48:3, 67:14, 101:17, 102:10, 102:14, 102:18, 198:4

**marks** - 17:13, 105:22, 105:23, 106:1, 106:9, 106:11, 106:12, 115:6

**married** - 21:6, 42:13, 194:1

**Martinez** - 1:8, 2:5, 42:16, 59:3, 59:11, 59:19, 59:24, 60:4, 87:2, 87:9, 97:2, 117:11

**Mary** - 204:4, 204:21

**mask** - 65:3

**masks** - 64:25, 65:7, 65:11, 182:16

**mattress** - 130:1, 130:2, 133:9, 161:4, 161:11

**mattresses** - 138:18

**Maximum** - 187:16

**Md** - 98:7

**meal** - 163:19

**mean** - 12:10, 16:13, 16:20, 22:25, 26:11, 27:20, 29:24, 30:23, 31:21, 31:23, 32:18, 34:4, 38:7, 38:20, 39:6, 46:2, 71:8, 79:17, 79:21, 104:19, 104:20, 110:5, 114:20, 126:3, 132:4, 149:5, 149:20, 158:12, 181:2, 181:23, 182:8, 184:6, 184:11, 185:16

**means** - 3:15, 3:16, 104:24, 105:1, 114:2, 124:17, 146:2, 149:6, 163:7, 168:3, 189:7

**meant** - 27:21

**measures** - 171:19

**measuring** - 112:16

**mechanism** - 104:21

**medical** - 12:13, 12:14, 13:8, 13:12, 14:12, 14:16, 15:11, 15:17, 16:16, 16:18, 18:25, 98:2, 98:5, 99:13, 150:5, 150:6, 150:10, 152:1, 152:2, 164:10, 164:11, 169:22, 169:25, 170:1, 170:9, 175:15

**medical-legal** - 16:16

**meet** - 37:4, 48:25, 72:18, 74:2, 117:10, 170:1, 170:18, 172:24

**meeting** - 117:23, 121:16, 200:24

**meetings** - 54:25

**member** - 149:21, 150:12

**members** - 150:16, 150:23, 153:23, 191:21, 192:2, 192:15

**memories** - 199:25, 201:13

**memory** - 53:6, 53:9, 120:1

**Memphis** - 5:11

**men** - 183:13

**mentioned** - 60:21, 60:24, 85:13, 112:22, 152:7, 156:7, 169:8, 171:13, 171:21, 172:19

**mentioning** - 55:17

**met** - 8:18, 23:2, 23:22, 24:10, 24:12, 31:7, 37:1, 45:25, 51:19, 54:9, 62:2, 62:10, 73:1, 73:13, 78:10, 136:9, 150:6, 178:18, 195:22, 196:13

**metal** - 162:7, 162:8, 162:9

**meticulous** - 136:14

**Mexican** - 72:4, 72:19, 73:1

**Mexico** - 47:12

**mic** - 4:15

**Micah** - 1:11, 2:6, 116:3, 116:9, 116:16, 116:18

**microphone** - 20:3, 123:3, 142:18, 148:18

**middle** - 11:17, 17:4, 17:14, 109:18

**Middle** - 21:24

**midnight** - 146:3

**might** - 13:4, 50:4, 51:13, 53:6, 57:16, 58:3, 70:4, 90:20, 95:18, 104:1, 120:10, 136:23, 141:18, 150:25, 151:15, 153:11, 153:13, 161:2, 161:10, 161:13, 186:12, 188:3

**Milby** - 21:25, 22:1

**mind** - 21:16, 82:16, 92:23, 105:18, 126:14

**nine** - 45:23

**minor** - 146:16, 147:1

**minute** - 9:13, 32:11, 48:12, 67:16, 93:17, 112:9, 122:16, 141:17, 160:24

**minutes** - 64:10, 69:21, 88:5

**mishandling** - 127:21

**miss** - 14:11, 102:14, 199:6

**miss-marked** - 102:14

**missing** - 131:20, 199:6

**mixed** - 23:2

**MI-89-4198** - 100:1

**molecular** - 98:7

**moment** - 19:11, 36:18, 51:13, 75:2, 80:18, 92:20, 92:25, 122:3, 136:3, 147:23, 188:2

**Mommy** - 196:21, 196:22, 196:23

**Mondays** - 127:19

**money** - 64:17, 64:19, 64:20, 64:21, 70:14, 71:11, 171:10, 172:18

**monitored** - 146:22, 173:22

**month** - 135:13

**monthly** - 174:18, 174:25

**months** - 33:22, 54:20, 136:22, 189:18

**morgue** - 13:8, 17:2, 18:11

**morning** - 3:8, 4:20, 8:7, 20:10, 20:11, 41:19, 41:20, 59:24, 59:25, 128:19, 202:17

**most** - 132:7, 159:18, 164:23, 175:4, 185:22

**Most** - 156:23, 159:7

**mother** - 199:3

**motors** - 162:6

**mouth** - 43:12, 106:21, 107:2

**move** - 10:19, 79:2,

140:11, 158:6, 163:2, 166:20
 **moved** - 5:13, 60:16, 73:22, 159:1, 163:12
 **movement** - 124:15, 163:23
 **moving** - 74:3, 146:14, 199:21
 **multiple** - 44:19, 93:20, 155:17, 160:15, 171:12
 **murder** - 87:25, 88:8, 88:9, 88:18, 89:12, 89:15, 89:25, 95:17, 95:20, 95:24, 96:2, 96:15, 96:19, 117:25, 118:13, 118:20, 118:24, 119:1, 120:17, 120:22, 121:25, 122:1, 144:22, 145:9, 156:12, 156:23, 167:1, 167:12, 167:18, 168:18, 183:7
 **murderers** - 158:15, 166:12, 171:1

## N

 **name** - 20:20, 22:4, 22:5, 23:5, 26:23, 26:25, 27:12, 29:12, 30:4, 31:13, 31:16, 36:25, 37:10, 37:11, 37:14, 41:25, 42:15, 45:18, 51:18, 52:13, 53:4, 53:7, 53:14, 65:14, 65:15, 72:23, 74:18, 78:16, 94:12, 117:11, 120:11, 128:22, 129:1, 136:8, 142:8, 143:5, 145:5, 178:16
 **named** - 26:24, 27:25, 52:11, 53:8, 78:6, 78:21, 176:25
 **names** - 26:18, 26:21, 192:19
 **Narula** - 100:13, 100:14, 100:22, 111:9
 **Narula's** - 100:24
 **Natalie** - 2:3, 3:6
 **native** - 42:4
 **nature** - 7:23, 50:20, 110:23, 134:22, 178:7
 **near** - 68:24, 108:7, 108:9
 **Nebraska** - 178:1
 **necessarily** - 95:22, 156:14
 **neck** - 17:11, 17:15, 82:1, 82:3, 82:5, 94:15, 94:23, 94:24, 104:20, 104:22, 105:9, 105:21, 105:22, 105:25, 106:8, 107:10, 110:21, 115:8, 115:14
 **need** - 41:6, 52:16, 141:18, 152:1, 165:21, 190:8
 **needed** - 7:7, 34:9, 90:13, 90:16
 **needle** - 114:25, 115:3, 115:6
 **needs** - 149:9, 150:6, 151:4, 152:2, 170:1
 **neighborhood** - 8:12
 **nervous** - 20:14
 **Never** - 51:21, 52:2, 54:9
 **never** - 27:16, 29:13, 29:16, 30:4, 31:14, 34:15, 34:16, 37:1, 51:19, 52:3, 55:8, 55:14, 57:9, 57:11, 64:18, 85:10, 136:9, 178:17, 195:12, 195:14, 195:22
 **new** - 29:2, 118:19, 118:22, 119:8, 196:13
 **news** - 75:9
 **next** - 4:9, 19:21, 29:19, 41:11, 57:24, 59:1, 59:10,

67:6, 75:11, 77:14, 81:13, 83:24, 84:6, 84:12, 97:4, 116:2, 122:14, 130:22, 141:15, 141:19, 142:2, 142:8, 148:9, 190:7, 190:23, 202:10
 **nice** - 45:23, 196:19
 **nickname** - 37:16, 120:11
 **nicknames** - 37:15
 **night** - 69:3, 84:3, 84:5, 84:18, 90:24, 201:8
 **Night** - 69:5
 **nightmare** - 178:21
 **None** - 95:25, 115:8
 **none** - 115:8
 **Nonresponsive** - 135:14, 135:19
 **nonspecific** - 107:2
 **noodle** - 132:11, 132:12
 **Normal** - 125:12
 **normal** - 71:8, 71:9, 186:18
 **northeast** - 5:25
 **nose** - 106:21, 107:2
 **note** - 12:21, 138:10
 **noted** - 100:21, 108:7
 **notes** - 14:9, 95:6
 **nothing** - 33:9, 52:2, 52:7, 58:20, 71:6, 114:14, 114:18, 114:23, 115:19, 179:12
 **Nothing** - 41:1, 141:9, 199:15
 **notice** - 131:3
 **noticed** - 31:20
 **noting** - 134:7
 **Novak** - 1:12, 2:1, 122:19, 123:5, 123:9, 123:12, 123:13, 135:4, 135:21, 136:8, 139:18
 **number** - 3:7, 16:16, 58:5, 58:7, 99:22, 99:24, 100:5, 101:24, 102:2, 103:11, 103:23, 128:22, 129:7, 173:18, 174:24, 175:4
 **Number** - 2:8
 **numbered** - 1:22, 204:11
 **numbers** - 16:13, 100:2
 **numerous** - 171:7

## O

 **o'clock** - 128:8, 128:10
 **Obel** - 1:6, 3:3, 24:19, 24:20, 24:21, 24:22, 24:25, 25:17, 28:18, 35:1, 37:8, 38:4, 40:12, 40:19, 49:1, 55:17, 60:25, 61:4, 63:3, 64:3, 65:20, 65:22, 65:25, 66:17, 69:23, 70:19, 72:16, 74:16, 74:19, 79:14, 79:20, 82:7, 91:7, 117:2, 126:14, 126:17, 127:1, 130:19, 135:23, 145:5, 145:7, 146:15, 147:6, 157:3, 157:16, 160:7, 190:20
 **Obel's** - 24:8
 **obey** - 131:16, 141:3
 **object** - 105:1, 105:4, 110:1, 110:2, 110:6, 134:17, 135:16, 194:24
 **objection** - 10:4, 10:7, 15:24, 16:2, 19:17, 19:18, 41:4, 68:13, 102:23, 102:25, 115:23, 122:10, 122:11, 135:17, 197:18, 197:20, 198:23, 198:25
 **Objection** - 49:23, 50:13, 68:11, 120:2, 135:14, 140:8
 **objective** - 144:19
 **objects** - 162:9, 162:11

 **observe** - 40:5, 40:10, 50:17, 75:8, 81:17
 **observed** - 50:15, 50:25
 **obtained** - 119:14, 129:7
 **obviously** - 12:19, 134:22, 136:12, 139:18, 154:16, 163:9
 **occasion** - 24:24, 60:25, 66:5, 70:8, 98:16, 117:9
 **occasions** - 49:18, 50:5, 65:6, 71:15, 98:21
 **occur** - 89:8, 89:11, 89:14, 89:23, 170:2, 174:19, 174:25, 186:17
 **occurred** - 71:16, 89:10, 89:13, 89:15, 89:18, 89:19, 89:24, 91:2, 91:18, 95:3, 157:10, 176:20, 186:18, 204:11
 **occurrence** - 71:14, 173:11
 **occurs** - 105:6
 **October** - 54:17, 204:17
 **Odr** - 169:12
 **offender** - 157:17, 158:12, 158:13, 159:12, 160:11, 176:11, 176:12, 176:19, 183:19
 **offenders** - 149:4, 149:7, 149:14, 149:22, 150:3, 150:4, 150:8, 155:5, 155:12, 155:24, 156:4, 159:8, 159:10, 159:11, 159:13, 165:19, 174:13, 176:14, 177:19, 182:6, 182:7, 182:24, 183:4, 187:17, 187:18, 187:19
 **offense** - 121:5, 137:12, 137:14, 157:13, 158:10
 **offenses** - 44:21, 144:21
 **offer** - 9:24, 15:20, 68:8, 102:9, 119:4, 185:12, 197:15, 198:20
 **Offered** - 2:8, 10:2, 15:23, 68:10, 102:22, 197:17, 198:22
 **offered** - 119:11
 **office** - 12:13, 13:8, 13:12, 14:12, 14:16, 15:11, 15:17, 16:18, 18:25, 19:2, 99:3, 99:4, 99:13, 99:22, 100:3, 100:14, 104:9, 116:16, 116:23, 137:6, 143:12, 144:4, 144:5
 **Office** - 117:21, 143:6, 143:9
 **officer** - 5:21, 6:2, 8:18, 10:18, 14:23, 52:11, 53:4, 53:8, 116:4, 123:17, 123:23, 124:11, 125:15, 140:13, 144:2, 147:5, 174:7, 176:12, 177:23, 182:12, 196:9
 **Officer** - 3:23, 3:24, 4:10, 4:14, 4:20, 4:25, 5:2, 6:15, 8:17, 9:10, 10:14, 12:5, 15:4, 16:8, 123:12, 123:13, 123:15, 133:17, 135:4, 136:8
 **officer's** - 52:13
 **officers** - 7:9, 53:16, 53:17, 170:14
 **Official** - 204:4, 204:16, 204:22
 **often** - 26:4, 194:6
 **oftentimes** - 14:22, 71:21
 **old** - 2:17, 23:2, 23:4, 23:16, 23:18, 33:12, 39:7, 42:6, 45:24, 46:1, 72:9, 72:10, 72:12, 115:11, 131:10, 132:25, 143:18,

193:4, 197:13
 **older** - 8:11, 8:12, 38:3, 38:4, 38:11, 132:22, 193:14
 **oldest** - 23:13, 23:17
 **Olo** - 119:18
 **on-call** - 41:5
 **on-the-job** - 184:12
 **Once** - 130:9, 151:2, 151:11, 203:1
 **once** - 70:7, 76:18, 77:13, 77:22, 79:8, 106:24, 117:21, 129:7, 131:2, 135:13, 147:4, 151:5, 155:4, 166:19
 **one** - 18:22, 21:16, 23:18, 26:23, 28:20, 29:1, 55:4, 55:23, 57:23, 57:24, 58:13, 58:25, 59:8, 60:25, 61:10, 62:14, 66:20, 66:22, 69:24, 71:9, 73:9, 76:11, 77:4, 80:21, 85:13, 93:18, 93:19, 93:22, 94:7, 102:14, 105:24, 105:25, 112:16, 113:21, 115:3, 122:15, 126:5, 129:12, 130:25, 131:3, 132:6, 132:21, 132:22, 132:24, 136:22, 146:6, 152:7, 160:17, 163:2, 163:19, 168:21, 171:6, 174:14, 178:17, 185:21, 187:15, 188:10, 188:16, 189:17, 192:18, 192:20, 193:23, 197:22, 201:21, 201:22
 **One** - 23:17, 57:23, 93:20, 130:25, 131:4, 192:17
 **one's** - 105:10
 **one-half** - 112:16
 **ones** - 88:13, 88:16, 115:11, 132:22, 192:5
 **open** - 29:11, 30:3, 31:10, 132:12, 159:24, 204:12
 **Open** - 3:1, 4:1, 86:17, 86:20, 141:22, 190:13, 190:17
 **operated** - 77:5
 **operations** - 125:12
 **opinion** - 86:16, 106:13, 157:4, 178:23, 184:13, 202:24
 **Opportunity** - 161:16
 **opportunity** - 13:9, 26:15, 45:17, 48:25, 104:4, 118:5, 129:2, 131:17, 133:19, 146:25, 183:7
 **order** - 131:16, 141:4
 **ordered** - 90:12
 **orders** - 183:16
 **ordinary** - 32:6, 71:18
 **original** - 100:25, 111:9, 117:23, 131:9
 **originally** - 120:24
 **others'** - 135:8
 **otherwise** - 111:13, 111:20, 155:1
 **ought** - 183:6
 **outer** - 106:1, 177:22, 177:24, 183:18
 **outline** - 106:1
 **outside** - 3:17, 13:16, 50:21, 85:3, 154:24, 154:25, 155:1, 155:2, 155:21, 165:19, 173:2, 173:6, 179:5
 **Outside** - 171:10
 **outspoken** - 195:17
 **overall** - 103:7
 **overruled** - 10:5, 15:25, 68:12, 140:10
 **oversee** - 149:14
 **overtime** - 134:13
 **own** - 91:22, 133:12,

151:14, 165:1

# P

**package** - 132:12
**Page** - 1:3, 112:8, 115:4
**panicked** - 32:12
**pants** - 11:24
**paper** - 128:23
**paperwork** - 177:13, 180:13
**paragraph** - 112:9, 112:10
**parameter** - 155:22
**Pardon** - 59:6
**parents** - 22:13, 24:5
**park** - 69:10
**parked** - 69:13
**parking** - 11:5, 11:7
**parole** - 158:16, 158:20
**part** - 7:13, 14:22, 68:22, 111:8, 113:12, 117:19, 135:25, 136:19, 147:8, 152:4, 184:11
**particular** - 25:5, 101:3, 125:23, 126:13, 134:18, 134:19, 137:15, 140:2, 157:2, 173:21, 176:16
**Particularly** - 105:24, 113:16
**parties** - 3:16, 204:9, 204:15
**partner** - 126:9
**partying** - 24:3
**Pass** - 95:10, 122:7, 139:12, 141:8, 147:21
**pass** - 19:8, 19:14, 36:15, 39:24, 40:25, 51:10, 58:18, 86:8, 96:21, 111:22, 115:16, 121:19, 130:10, 136:1, 140:21, 178:10, 189:23, 201:25
**passed** - 44:7, 73:23, 87:3, 128:9, 194:13
**passenger** - 90:10
**passing** - 46:16
**past** - 5:15, 125:18
**path** - 44:5, 45:5
**pathology** - 98:8, 98:10, 98:11
**Pathology** - 98:10
**Patiko** - 65:14, 65:16, 65:17, 67:3, 71:3, 89:22, 90:1
**Patiko's** - 68:2, 68:5, 69:3, 69:17, 69:20, 70:8, 70:23
**patrol** - 5:25, 6:2, 6:5, 6:7, 7:5, 143:15, 143:21
**pattern** - 105:23, 110:2
**Pause** - 19:13, 36:20, 51:15, 86:6, 95:9, 122:6, 122:17, 136:5, 148:1, 188:5
**pay** - 138:10, 139:9
**pen** - 147:17
**penal** - 140:2, 147:3, 147:12
**penalty** - 154:12, 156:13
**pending** - 88:9
**Pennsylvania** - 117:17
**people** - 23:3, 24:2, 25:12, 34:10, 34:15, 47:7, 66:14, 66:21, 70:6, 71:23, 90:7, 90:20, 172:10, 172:17, 173:2, 173:6, 179:22, 183:1, 183:2, 185:14, 195:21, 195:22, 200:14, 200:15, 200:18
**People** - 195:18
**per** - 124:9, 125:2, 161:25
**percent** - 69:25
**perceptions** - 51:3

**Perez** - 1:6, 2:3, 19:23, 20:6, 20:10, 20:20, 20:21, 22:3, 22:6, 23:20, 25:7, 25:16, 27:4, 29:4, 34:3, 35:16, 36:14, 36:25, 40:5
**perfect** - 179:12
**perfectly** - 80:14, 82:4
**perform** - 98:16, 111:14
**performance** - 111:11
**performed** - 99:5, 100:8, 100:10, 100:12, 100:17, 111:16
**perimeter** - 177:22, 177:24, 183:18
**perimeters** - 165:19
**period** - 23:19, 44:20, 45:1, 46:8, 60:19, 73:20, 77:9, 77:10, 78:15, 120:7
**periods** - 45:10
**permanent** - 136:18
**permissible** - 165:8, 165:10
**Permission** - 16:6, 68:16, 103:2
**permission** - 10:11
**Perry** - 97:8, 191:2
**person** - 16:17, 18:23, 24:20, 24:25, 25:5, 25:16, 27:9, 27:14, 27:25, 28:22, 28:24, 29:2, 32:22, 33:3, 33:14, 33:23, 38:3, 38:7, 38:19, 45:18, 48:22, 49:3, 51:7, 55:13, 62:7, 65:14, 69:3, 70:2, 70:10, 71:25, 72:10, 72:20, 78:6, 78:9, 98:5, 96:12, 105:2, 106:22, 106:24, 114:21, 117:13, 127:9, 127:10, 130:11, 151:19, 167:11, 167:17, 194:14, 196:23
**person's** - 104:25
**personal** - 46:6, 49:16, 50:16, 150:8
**personally** - 40:5, 40:10, 50:17, 110:25, 129:16, 153:8
**personnel** - 170:9, 170:10, 171:13
**persons** - 50:1
**petechial** - 107:6, 107:20
**Ph.d** - 98:6
**phase** - 191:14
**Phone** - 2:7, 2:13, 2:16
**phone** - 54:23, 173:9, 177:7
**phones** - 25:22, 171:7, 171:10, 172:18, 172:19, 172:25, 173:12
**phonetic** - 61:23, 65:14
**photo** - 11:17, 102:12, 103:19, 103:25
**Photograph** - 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5
**photograph** - 10:22, 11:4, 12:3, 13:9, 17:1, 17:11, 103:7, 103:15, 103:20, 103:21, 107:8, 108:24, 109:23, 110:16
**photographed** - 13:10, 14:6, 15:17
**photographing** - 8:20, 9:5, 18:10
**photographs** - 9:17, 9:19, 15:10, 101:6, 101:7, 101:8, 101:22, 107:5, 113:7
**photos** - 101:11, 102:5, 102:6, 104:5, 104:8, 105:18

**phrased** - 56:3
**pick** - 90:13, 90:14, 146:16
**picked** - 78:6, 128:9, 131:8, 146:24, 147:4
**picket** - 165:15, 177:22
**pickets** - 165:17, 165:18, 165:24, 183:13
**picture** - 11:13, 11:23, 12:16, 17:17, 17:19, 18:5, 48:6, 48:9, 48:13, 55:22, 68:25, 105:20, 197:6, 197:7, 197:10, 197:23, 199:8
**pictures** - 7:1, 14:18, 18:13, 47:6, 198:17
**piece** - 199:16
**pieces** - 119:25, 121:4
**piecing** - 121:12
**pinpoint** - 107:7, 107:19
**place** - 31:6, 32:3, 83:3, 83:4, 163:2, 163:12, 163:13, 166:16, 171:19, 181:23, 181:24, 182:5, 182:8, 182:10
**Place** - 130:3
**placed** - 9:2, 16:11, 145:15, 150:9, 181:15, 181:16, 181:21
**placement** - 149:8
**places** - 107:20
**placing** - 149:14
**plan** - 66:10, 69:16, 144:19, 144:20
**plastic** - 11:19, 12:24, 130:25, 131:9, 162:11
**play** - 182:13
**played** - 195:19, 196:20
**plugs** - 131:7
**Pm** - 39:12, 164:25
**pocket** - 64:19, 64:21
**pod** - 124:12, 124:16, 124:25, 125:1, 125:5, 125:25, 126:2, 126:4, 126:17, 126:22, 127:16
**pods** - 124:18, 124:19, 124:23, 134:15
**point** - 9:4, 10:4, 12:5, 18:16, 23:6, 23:11, 25:19, 29:4, 33:16, 46:15, 48:5, 74:8, 75:13, 76:4, 79:17, 84:4, 109:5, 116:25, 118:21, 119:10, 119:22, 120:5, 121:11, 121:14, 126:8, 127:10, 133:16
**pointing** - 61:8, 63:1, 80:4, 94:15
**points** - 120:4
**Police** - 4:25, 5:3, 6:16, 104:10, 120:23
**police** - 5:21, 33:16, 34:25, 35:11, 35:13, 51:22, 51:25, 52:8, 53:8, 53:11, 53:12, 53:16, 53:17, 54:2, 55:16, 85:7, 90:20, 144:2
**policeman** - 196:13
**Polunsky** - 177:18
**pony** - 200:1
**pop** - 131:5
**popped** - 131:9
**popping** - 105:7, 107:18
**population** - 189:20
**populations** - 154:6, 154:21
**portion** - 12:25
**portions** - 204:8
**pose** - 182:6
**possession** - 44:20, 138:7, 161:21, 167:4
**possible** - 39:4, 189:18
**possibly** - 12:22, 18:8, 164:1, 173:19

**potential** - 117:10
**pounds** - 16:22, 107:12, 107:13, 107:15, 201:17, 201:18, 201:20
**practice** - 91:23, 103:18
**precautions** - 178:6
**predict** - 187:12
**prediction** - 180:7
**pregnant** - 201:16
**preliminary** - 101:5
**presence** - 111:19
**present** - 3:1, 3:4, 4:1, 4:5, 86:17, 86:20, 141:22, 141:25, 142:1, 147:14, 190:13, 190:17, 190:20, 190:22, 201:12
**Present** - 3:6
**presiding** - 1:23
**pressure** - 107:12, 107:13, 107:17
**presume** - 11:20
**pretty** - 5:6, 19:4, 42:4, 42:9, 45:8, 46:7, 106:18, 119:21, 136:14, 136:23, 162:9, 162:23, 171:24, 172:21, 176:15, 193:25, 194:8, 198:9
**prevent** - 165:19, 183:2
**previous** - 131:10
**previously** - 31:7, 89:3, 97:7, 116:5, 191:1
**price** - 138:17, 138:18
**principals** - 170:11
**print** - 190:11
**prints** - 9:17
**prison** - 44:16, 56:20, 56:21, 57:19, 149:16, 150:25, 152:18, 153:3, 153:17, 157:10, 158:6, 158:17, 158:22, 160:21, 163:3, 163:10, 163:14, 166:6, 166:16, 167:8, 169:9, 170:8, 170:18, 170:20, 172:7, 176:1, 176:23, 179:7, 180:21, 180:22, 182:16, 184:23
**prisoners** - 170:21
**privileges** - 139:8, 167:22, 184:1, 184:2, 184:3, 184:7, 184:19
**probated** - 139:2, 139:3, 139:8
**probation** - 139:9
**problem** - 63:6, 90:21, 195:7
**problems** - 50:11, 50:12, 155:24, 180:22, 195:5
**procedure** - 189:10
**proceed** - 4:6, 10:8, 20:4, 36:17, 36:21, 41:13, 43:17, 50:19, 52:24, 59:13, 68:14, 87:6, 97:9, 111:25, 116:7, 141:24, 142:2, 142:21, 148:19, 190:19, 191:3, 202:17
**proceeding** - 163:18
**Proceedings** - 1:16, 1:24, 1:2, 203:2
**proceedings** - 1:21, 204:8, 204:14
**process** - 113:13, 128:14, 134:3
**produce** - 64:20, 110:20
**profusely** - 81:23
**Programs** - 149:19
**progress** - 188:22
**progressive** - 181:7, 181:12
**prohibit** - 162:22
**prohibited** - 146:22,

146:23, 147:3, 147:11
**projected** - 107:9, 109:23
**promise** - 119:7
**promised** - 95:19, 96:2, 119:11
**property** - 131:15, 141:3
**prosecution** - 86:24, 190:21
**prosecutor** - 56:1, 56:5, 185:23
**protection** - 185:14
**protocol** - 112:5, 113:8, 114:8, 114:16, 152:5
**proud** - 23:20, 23:21, 45:2
**proven** - 180:25, 181:20
**provide** - 118:7, 118:24, 179:4
**provided** - 119:8, 119:19, 120:20, 121:15
**publish** - 10:12, 16:6, 68:16, 103:2
**Puckett** - 177:17
**Puerto** - 88:17, 102:11, 152:18
**pull** - 137:3
**pulled** - 34:10, 34:11
**pulmonary** - 107:3
**punish** - 92:5
**Punishment** - 1:16, 1:2
**punishment** - 135:22, 184:17
**purged** - 107:1
**purple** - 108:3, 108:13, 109:14, 109:15, 109:24
**purpose** - 14:16, 18:15, 25:2, 31:3, 77:2, 117:23, 141:6
**purposes** - 9:11, 48:3, 67:14, 101:17
**put** - 3:15, 13:11, 35:16, 45:4, 62:24, 63:21, 63:24, 76:7, 76:8, 76:10, 76:14, 83:6, 85:2, 88:17, 89:8, 89:14, 121:4, 131:6, 137:19, 153:9, 153:23, 162:6, 182:6, 201:8, 201:11
**puzzled** - 33:10

## Q

**qualifications** - 98:5
**quarters** - 112:16
**queried** - 119:16
**questions** - 19:10, 21:17, 40:24, 47:4, 52:16, 56:7, 85:10, 92:25, 140:9, 148:3, 178:20, 179:16, 185:22, 202:3
**quick** - 78:2
**quickly** - 97:25
**quiet** - 35:13
**Quintero** - 177:1, 177:3, 188:6
**quite** - 45:7
**quote** - 187:20

## R

**rack** - 129:25
**racks** - 130:5, 130:8
**radiographs** - 113:9
**radios** - 169:7
**Raise** - 3:10, 80:20, 92:21
**raise** - 122:25, 142:13, 148:13
**raised** - 201:16
**raising** - 193:17
**Ramon** - 132:11, 132:12
**Ramos** - 23:5, 24:7
**ran** - 29:16, 29:17, 33:7,

195:25, 196:3
**ransacked** - 31:25
**raped** - 70:23, 201:4
**rather** - 78:5, 95:16, 130:18
**rays** - 113:9
**razor** - 127:18, 127:21, 127:24, 128:21, 129:3, 129:5, 129:13, 130:10, 130:12, 130:15, 130:18, 131:8, 131:9, 131:10, 131:11, 131:12, 131:20, 131:22, 131:23, 132:1, 132:2, 132:4, 132:14, 132:15, 132:17, 132:19, 132:20, 132:24, 132:25, 133:2, 133:15, 133:23, 138:2, 138:5, 138:11, 139:18, 139:21, 139:24, 140:14, 140:18, 141:5, 147:10
**Razors** - 127:25
**razors** - 128:1, 128:5, 128:6, 128:14, 128:15, 128:24, 129:8, 129:17, 130:11, 130:14, 130:17, 130:21, 130:23, 130:25, 131:2, 131:3, 131:5, 134:4, 134:8, 134:12, 135:5, 137:16, 146:19
**Re**- 52:12, 53:7, 53:8
**reach** - 151:11
**reaction** - 75:8
**read** - 3:19, 103:9, 139:1
**reads** - 200:15
**ready** - 4:6, 4:7, 4:8, 141:24, 142:2, 190:11, 190:19
**real** - 26:25, 37:14, 78:2, 187:10
**reality** - 163:18
**really** - 31:4, 39:7, 48:22, 80:20, 88:2, 88:11, 167:10, 167:16, 182:17, 184:17, 195:13, 198:2
**reason** - 114:8, 179:10, 180:14, 183:21
**rec** - 162:25, 164:7, 165:6, 165:11, 165:14, 165:22, 165:25, 166:3, 166:17, 166:20, 182:12
**receive** - 44:19, 128:1, 150:24, 163:4, 180:24
**received** - 89:2, 151:5
**recently** - 39:9, 144:8, 187:3
**Recess**- 142:11, 190:16
**recess** - 86:18, 86:19, 88:5
**recessed** - 203:2
**recognize** - 9:14, 9:16, 15:7, 15:9, 27:15, 32:22, 48:10, 48:13, 49:6, 67:19, 101:19, 101:21, 197:6
**recognized** - 32:24
**recollect** - 67:15
**recollection** - 54:15, 99:24
**recommend** - 180:18
**reconnected** - 24:14
**reconsidered** - 158:21
**record** - 3:2, 4:4, 25:24, 26:1, 49:12, 49:14, 53:2, 59:16, 59:17, 61:13, 61:14, 86:22, 127:12, 127:14, 178:14, 190:10
**Record**- 1:1, 204:10, 204:13
**recorded** - 115:9
**records** - 18:20, 136:14, 136:18, 137:7, 137:9, 143:14, 152:22

**recover** - 7:1
**recovered** - 18:17
**recreation** - 124:6, 124:9, 125:8, 127:19
**Recross**- 140:23
**Recross-examination**- 140:23
**recruited** - 29:2
**red** - 106:1, 108:13, 109:18
**Redirect**- 40:3, 95:14, 139:16
**refer** - 104:23
**reference** - 102:4
**referenced** - 103:12
**referred** - 110:18
**referring** - 119:20
**reflect** - 25:25, 26:1, 49:13, 49:14, 61:13, 61:14, 127:13, 127:14
**reflects** - 204:14
**refresh** - 53:6, 53:9
**refused** - 133:20
**refusing** - 131:16
**regard** - 14:24
**regarding** - 68:2, 95:19, 104:12, 117:5, 117:24, 118:19, 120:9, 130:13, 135:7, 154:21
**regardless** - 159:14
**regret** - 200:24
**regrets** - 200:21
**regular** - 5:21, 53:15, 144:1, 194:9
**regularly** - 194:8
**reintroduce** - 97:18, 116:15
**related** - 104:6, 119:7, 119:11, 135:23
**relates** - 117:5
**relationship** - 28:2, 46:3, 61:25, 74:25, 75:14, 177:6, 177:15, 193:21, 194:4, 199:2, 199:17
**relatives** - 78:1
**released** - 3:20, 64:13, 163:25, 189:19
**Relevance**- 15:24
**relevance** - 10:3, 13:4, 68:11, 134:20, 194:24
**relevant** - 12:22, 134:18, 134:22, 153:11
**remain** - 3:17
**remember** - 15:16, 24:9, 26:18, 26:22, 27:6, 30:16, 30:17, 32:15, 34:1, 35:6, 35:9, 37:10, 38:17, 39:4, 39:12, 39:16, 43:18, 51:22, 52:6, 52:8, 52:11, 52:13, 53:4, 53:11, 53:20, 53:25, 54:2, 55:17, 56:3, 57:17, 58:3, 60:8, 60:10, 64:25, 66:15, 66:22, 66:24, 67:2, 68:5, 70:15, 70:16, 71:1, 71:2, 75:21, 77:16, 78:24, 80:18, 82:15, 83:11, 83:13, 84:10, 84:22, 91:18, 93:22, 120:11, 120:18, 126:11, 196:6, 196:18
**remind** - 86:13, 202:21
**remote** - 165:24
**remove** - 10:19, 130:1, 130:7
**removed** - 12:6, 12:8, 12:15, 13:6, 13:9, 64:18
**Renee**- 1:22
**rented** - 76:21
**report** - 3:19, 19:3, 100:18, 100:21, 100:25, 101:4, 111:9, 133:24, 137:12,

137:14, 137:19, 137:25, 138:4, 138:15, 138:22
**reported** - 1:24, 204:12
**Reporter**- 204:4, 204:22
**Reporter's**- 1:1, 1:18, 204:1, 204:10, 204:13
**reporting** - 153:10
**represent** - 15:15
**represented** - 86:25
**represents** - 16:15
**request** - 131:19
**requested** - 7:16, 8:2, 204:8
**require** - 175:11, 175:14
**required** - 7:16
**research** - 184:12
**researched** - 119:18, 122:1
**resources** - 111:6, 120:14
**respect** - 152:3, 184:21
**respective** - 204:15
**respond** - 84:9
**responded** - 9:20
**response** - 8:3
**responsibilities** - 124:4, 124:10, 125:14, 125:17
**responsible** - 129:12
**rest** - 189:4
**resting** - 202:15
**restriction** - 146:4
**restrictions** - 150:11, 152:1
**restrictive** - 156:1, 156:5, 159:18, 181:1
**restroom** - 29:14, 146:6
**rests** - 1:17, 202:11
**result** - 108:6, 127:21, 130:15
**resulted** - 139:6
**results** - 120:16
**resumed** - 92:7
**retrieve** - 131:19, 132:17
**retrieved** - 133:3, 133:6, 133:9
**retrieving** - 134:4
**return** - 132:1, 202:16
**returned** - 69:22, 84:1, 132:2, 133:15
**review** - 99:16, 100:24, 101:3, 101:10, 104:4, 104:8, 108:20, 113:11, 181:1, 189:18
**reviewed** - 101:6, 101:11, 102:5, 102:6, 111:5
**Rican**- 102:11
**Richard**- 77:24, 77:25, 78:6, 78:9, 78:10, 78:13, 79:4, 81:7, 81:8, 82:12, 82:17, 84:23, 93:14, 94:14
**Richards**- 79:1
**Rico**- 88:17, 152:19
**ride** - 195:20
**rider** - 174:14
**rides** - 200:1
**riding** - 196:3
**rifle** - 183:21
**rifles** - 183:20
**right-hand** - 12:1, 27:11, 27:20, 103:12
**rigs** - 131:7, 132:8
**Río**- 191:18
**rise** - 4:2, 141:20, 190:15, 202:19
**risk** - 124:19, 145:14, 181:21, 182:7, 182:23
**road** - 13:4
**roaming** - 172:2
**rob** - 69:17
**robberies** - 65:10, 71:21, 88:9

**robbing** - 71:17
**Robert**- 26:25, 75:24, 75:25, 76:1, 76:16, 78:22, 79:4, 82:14
**Roberto**- 75:23, 78:22, 84:22
**Roberts**- 79:1
**Rodriguez**- 52:19, 204:4, 204:21
**Roger**- 70:2, 70:4, 70:10
**Rolando**- 2:20
**room** - 62:17, 62:23, 79:10, 79:21, 79:24, 80:1, 80:2, 80:7, 119:4, 130:6, 130:8, 150:4, 164:4, 164:22, 164:24, 165:6, 166:16, 166:20, 168:6, 168:9, 168:21, 170:6
**rope** - 13:21, 17:7, 17:20, 105:2, 109:6, 109:8
**Rosalinda**- 192:7, 192:11, 193:7, 193:8
**Rosie**- 193:12
**rough** - 120:6, 120:7
**roughly** - 124:18, 124:22, 126:1
**routine** - 128:8
**routinely** - 164:20
**rovers** - 128:23, 129:12
**row** - 154:14, 154:16, 154:17, 156:24, 176:22
**rows** - 106:1
**Rp**- 2:11
**rubber** - 12:24
**Rudy**- 26:24, 27:13, 27:19, 27:24, 34:20, 60:6, 60:14, 60:21, 61:15, 61:18, 63:5, 64:24, 67:13, 68:19, 71:25, 81:15, 85:6, 87:2, 95:16, 96:13, 117:14, 117:16, 117:21, 117:24, 118:2, 118:6, 118:9, 118:23, 119:3, 119:5, 119:11, 119:18, 121:16, 121:24
**Rule**- 3:13
**rule** - 3:14
**rules** - 60:12, 144:11, 163:14, 183:1, 183:3
**run** - 121:10
**running** - 50:24, 51:1, 51:5, 51:8, 52:1, 55:23

## S

**safe** - 165:2
**safety** - 134:11, 134:23, 135:4, 135:7, 135:8, 140:5, 140:19, 179:4, 182:23
**sanction** - 138:16
**Santana** - 1:9, 2:4, 59:4, 59:12, 59:19, 60:4, 87:2, 97:3, 117:11
**Santo** - 62:14
**satisfied** - 185:16
**Saul** - 26:24, 27:25, 28:25, 29:5, 33:2, 40:6, 40:12, 40:21, 45:18, 45:20, 45:22, 45:24, 46:11, 46:24, 48:6, 48:17, 48:19, 49:19, 50:4, 50:11, 50:21, 51:2, 51:8, 53:22, 53:23, 54:5, 72:1, 72:3, 72:9, 72:18, 73:13, 73:16, 73:20, 74:2, 74:10, 74:22, 74:23, 75:1, 75:14, 75:17, 75:19, 76:4, 76:8, 76:13, 76:18, 78:4, 79:4, 79:16, 79:17, 79:25, 80:2, 80:6, 80:15, 82:9, 83:10, 84:8, 92:12, 92:17, 92:19, 92:20, 95:20, 96:9, 99:8,

99:17, 99:21, 100:18, 102:12, 104:12, 106:13, 108:19, 111:20
**Saul's**- 34:3, 46:16, 47:8, 80:12, 81:1, 83:21, 84:2, 85:8, 85:15, 95:16, 95:17, 95:24, 96:2, 96:19
**save** - 198:11
**saw** - 30:13, 32:5, 32:9, 34:3, 34:18, 82:4, 113:3, 113:21, 133:11
**Sbot** - 2:4, 2:5, 2:12, 2:15
**scared** - 64:11, 64:12
**scarred** - 115:12
**scars** - 115:3
**scary** - 38:7, 38:8, 38:10, 38:11
**scattered** - 31:17, 31:21, 31:23, 32:1, 106:9
**scenarios** - 178:21
**scene** - 7:4, 7:6, 7:9, 7:17, 8:17, 8:20, 9:5, 9:18, 9:20, 10:19, 12:6, 14:8, 14:10, 14:15, 14:23, 18:18, 101:8
**Scene** - 6:8, 6:9, 6:21, 6:22, 6:23, 7:7, 7:14, 8:2, 104:5
**scenes** - 6:25, 7:2
**School** - 21:25, 22:1
**school** - 5:11, 21:20, 21:21, 21:23, 22:18, 24:12, 24:13, 34:8, 42:20, 198:8
**Sciences** - 98:13, 99:13
**scrape** - 108:14
**scraped** - 108:15, 109:12
**se** - 161:25
**search** - 135:12
**seasoning** - 132:13
**seat** - 69:9, 69:14, 90:10, 130:8, 142:16
**seated** - 4:3, 86:21, 141:23, 190:18
**second** - 23:18, 86:4, 95:7
**section** - 6:8
**security** - 149:9, 150:9, 165:23, 166:8, 170:14, 171:19, 172:21, 173:1, 174:7, 179:4, 181:20, 182:6, 187:16
**see** - 25:16, 26:5, 30:6, 31:17, 34:19, 34:22, 34:23, 35:2, 35:14, 38:14, 38:21, 49:3, 53:6, 61:4, 79:10, 80:12, 81:1, 81:4, 81:10, 82:9, 90:19, 106:2, 106:6, 106:7, 107:2, 107:6, 108:2, 108:23, 109:13, 109:23, 110:20, 112:20, 113:13, 127:6, 155:3, 180:13, 183:13, 189:18, 194:6, 194:10, 194:14, 194:24, 199:11, 199:12, 200:4, 200:16
**seeing** - 30:18, 34:24, 35:9, 38:17, 40:19, 150:7
**seem** - 71:7, 102:19
**sees** - 200:14
**seg** - 181:3, 181:16, 182:2, 182:4, 182:18, 185:1, 185:3, 189:15
**segregation** - 154:8, 156:7, 156:14, 156:18, 176:19, 177:4, 181:4, 181:6, 181:10, 181:14, 181:22, 182:5, 188:17, 188:23, 189:19
**sell** - 37:22, 72:15, 73:18, 77:3, 84:14, 91:14
**selling** - 73:24, 77:10, 92:9
**send** - 186:13

**sense** - 110:24
**sent** - 56:15, 80:2, 156:17, 182:18
**sentence** - 151:21, 155:13, 180:9, 180:11
**sentenced** - 150:15, 154:11, 156:13, 156:24, 158:16
**separate** - 154:10
**separated** - 23:1, 23:6, 193:24, 194:3
**separation** - 145:15, 145:17, 145:18, 145:22, 146:2, 146:3, 146:15
**September** - 98:14, 125:13, 125:18, 126:10, 127:15, 129:20, 130:18, 133:22, 140:17
**sequence** - 81:22
**sequential** - 100:5
**Sergeant** - 142:8, 143:7, 148:7
**sergeant** - 143:6
**serious** - 175:5, 175:7, 175:8, 175:18, 176:19, 184:17
**serve** - 6:9
**served** - 43:2, 58:13, 88:22
**serves** - 120:1
**service** - 43:1, 158:22, 177:20, 177:21
**serving** - 155:13
**set** - 152:2, 173:6, 189:16
**setting** - 59:9, 159:21
**seven** - 124:18, 138:25, 139:2, 139:3, 139:8, 165:10
**seventeenth** - 193:11
**Several** - 93:2
**several** - 30:15, 108:21
**severity** - 157:13
**shackled** - 166:17, 182:11
**shackles** - 168:21
**share** - 96:18
**shared** - 119:3
**sharp** - 110:7
**sharpen** - 162:10, 162:11, 162:14
**shave** - 127:18, 128:2, 146:25
**sheet** - 13:16, 128:21
**sheets** - 129:25, 130:2, 130:10, 132:9, 138:18
**sheriff's** - 143:12, 143:17, 144:3, 144:5
**Sheriff's** - 123:16, 123:20, 143:6, 143:9
**shift** - 128:18, 135:12
**shirt** - 11:16, 49:10, 61:17, 127:11
**shock** - 36:11
**shoot** - 183:14, 183:18, 183:22
**short** - 72:7, 77:7
**shorthand** - 1:25
**shortly** - 74:2
**Shorty** - 26:23, 26:24, 27:25, 28:15, 28:23, 29:10, 29:13, 30:2, 30:23, 31:7, 34:20, 37:7, 37:8, 37:16, 37:17, 38:2, 39:1, 40:6, 52:1, 53:24, 54:5, 54:7, 55:9, 55:13, 72:21, 72:22, 72:25, 73:5, 73:7, 73:11, 73:13, 74:4, 77:6, 77:10, 84:7, 84:11, 84:23
**Shorty's**- 38:25, 72:23
**shots** - 28:20
**shouted** - 29:12
**show** - 9:11, 10:25, 11:11, 13:13, 13:14, 14:2, 15:5,

16:9, 16:24, 17:9, 27:4, 48:2, 48:6, 48:9, 67:13, 101:16, 107:21, 109:1, 110:12, 197:4, 198:4
**showed** - 36:12, 47:6, 47:21, 55:22, 87:15, 112:15
**shower** - 146:6
**showing** - 11:24, 12:4
**shown** - 17:25, 27:14, 67:19, 105:19
**shows** - 11:3, 17:2, 17:12, 108:12
**sick** - 192:17, 192:20
**side** - 11:6, 13:19, 13:22, 17:12, 22:14, 40:19, 44:10, 67:7, 68:25, 84:24, 105:21, 106:3, 106:6, 106:19, 108:23, 108:24, 110:19, 126:5, 131:4
**side-by-side** - 106:3, 110:19
**sidekick** - 26:13
**sides** - 4:6
**sidewalk** - 50:22
**sight** - 92:23
**sign** - 128:21
**signed** - 129:9, 130:18
**signify** - 126:2
**signing** - 128:14, 128:15
**simply** - 108:11, 144:20
**single** - 71:14, 131:1, 131:5, 146:4
**sister** - 192:12, 192:21, 198:11
**sisters** - 192:17
**sitting** - 49:10, 61:10
**situation** - 22:10, 47:19, 51:6, 165:13, 173:21
**situations** - 146:18, 186:16, 186:17
**six** - 21:3, 189:18, 201:22
**six-and-a-half** - 201:22
**sixteenths** - 114:4
**sizes** - 187:15
**skeptical** - 200:18
**skin** - 107:7, 107:21, 108:14, 108:15, 109:7, 109:12, 109:13
**Skip** - 3:5, 36:25, 51:18, 136:8, 178:16
**slicing** - 147:15
**slip** - 171:9
**small** - 73:17, 73:18, 107:18, 201:17
**small-time** - 73:17
**smart** - 172:25
**smoke** - 62:15, 62:16
**smuggle** - 162:23
**social** - 153:5
**sociologist** - 153:11
**sociology** - 152:21
**Sociology** - 153:7
**socks** - 18:2, 162:6
**soft** - 112:17
**sold** - 66:2, 73:21, 91:17
**someone** - 24:12, 28:24, 30:21, 33:4, 37:8, 51:5, 65:20, 65:22, 65:24, 71:18, 71:21, 94:13, 158:11, 161:10, 164:2, 172:23, 176:25, 194:17
**Sometime** - 55:5
**sometime** - 74:5
**Sometimes** - 77:6, 114:17
**sometimes** - 24:23, 37:22, 81:21, 107:21, 162:6, 176:5
**somewhat** - 52:10
**somewhere** - 80:4, 133:9, 153:4, 172:24
**son** - 92:2, 92:4, 192:9,

194:15, 196:3, 199:18, 201:5
**soon** - 184:23
**sophistication** - 149:7
**sorry** - 44:3, 48:4, 55:12, 57:25, 66:16, 82:25, 96:10, 98:25, 131:18, 187:11, 194:23, 202:20
**Sorry** - 43:15, 102:21, 187:5
**sort** - 107:23, 187:12
**sorts** - 105:3, 161:2
**sound** - 121:1
**sounds** - 121:3
**soup** - 132:12
**soups** - 132:11
**source** - 74:12
**southeast** - 8:11, 22:14
**spaces** - 106:24
**span** - 5:6
**speaking** - 35:9, 96:1
**specific** - 15:13, 125:19, 126:3, 126:4, 128:6, 130:13, 135:1
**Specifically** - 7:16
**specifically** - 13:17, 14:3, 15:12, 45:13, 114:19, 117:4, 120:12, 121:8, 143:8, 144:13, 149:11, 149:15
**speculation** - 134:18
**spell** - 178:14
**spent** - 152:18
**spit** - 43:14
**Spn** - 128:22
**spoken** - 34:25, 35:12
**spots** - 129:2
**squad** - 156:3
**Sr** - 193:22, 193:24, 194:4, 194:12, 195:3
**stabbing** - 147:16
**stable** - 45:11
**Stadium** - 22:13
**Staff** - 183:4
**staff** - 171:5, 171:6, 176:14, 179:4, 182:7, 182:24
**Stafford** - 199:25
**stand** - 3:9, 60:9, 148:17, 154:5
**standing** - 80:13, 80:22, 81:11, 82:2
**standpoint** - 134:12, 186:11
**stands** - 106:16, 110:13, 126:14, 154:6
**start** - 6:2, 24:1, 51:1, 54:11, 75:17, 107:18, 107:19, 130:10, 180:22, 183:17
**Started** - 79:15
**started** - 8:19, 24:10, 34:8, 50:23, 79:8, 79:12, 92:9, 120:13, 121:12, 156:14, 156:20
**State** - 1:11, 2:7, 1:17, 3:3, 3:6, 4:7, 4:10, 19:21, 19:22, 41:12, 59:3, 59:11, 87:2, 97:5, 116:3, 122:18, 137:5, 141:16, 190:24, 197:19, 202:10, 202:11, 202:15, 204:2, 204:5
**state** - 56:15, 56:16, 56:17, 56:19, 57:5, 57:7, 57:8, 57:9, 57:12, 57:13, 57:18, 58:12, 134:8, 149:13, 149:21
**State's** - 1:4, 9:12, 9:24, 10:1, 10:6, 10:9, 10:25, 11:3, 11:11, 12:2, 12:16, 13:1, 13:13, 13:17, 14:1,

14:7, 15:5, 15:20, 15:22, 16:1, 16:3, 16:9, 16:14, 16:24, 17:4, 17:9, 17:17, 17:24, 27:5, 27:8, 27:14, 48:4, 48:14, 67:15, 67:16, 67:19, 67:24, 68:8, 68:10, 68:12, 68:15, 68:19, 68:23, 101:18, 102:9, 102:22, 102:24, 103:1, 103:4, 103:14, 105:18, 105:19, 106:15, 109:1, 109:19, 110:12, 197:5, 197:9, 197:16, 197:17, 197:21, 198:1, 198:5, 198:20, 198:22, 198:24, 199:1
**statement** - 53:25, 133:20, 133:21
**states** - 179:7
**statewide** - 149:12, 151:7
**stationed** - 43:7, 43:8, 165:18
**statistics** - 174:18, 174:21, 174:24, 179:6, 179:9, 187:10
**Statistics** - 174:22
**status** - 157:19, 158:21, 159:23, 160:13, 166:15
**stay** - 64:9, 124:9, 145:1, 145:16, 151:1, 158:12, 158:16, 165:3, 171:4
**stayed** - 62:17, 63:18, 69:9, 69:13, 77:6, 83:18, 91:6
**Stella** - 192:21
**stemmed** - 195:9
**step** - 41:8, 58:23, 97:2, 115:24, 122:12, 141:14, 148:8, 190:4, 202:7, 202:16
**Stick** - 93:16
**Stiles** - 177:5, 178:1
**still** - 23:8, 31:16, 77:9, 83:21, 107:16, 110:16, 191:25, 199:5, 199:6, 199:7, 199:12, 200:7
**stop** - 29:19, 43:11, 52:15, 92:25, 127:23, 183:16, 183:17
**stopped** - 196:9
**store** - 35:8, 169:15, 169:16, 196:9
**straight** - 13:12, 103:21, 182:1
**Straight** - 154:17
**stranger** - 195:22
**strangle** - 105:2
**strangled** - 104:25, 106:22
**strangulation** - 17:12, 104:17, 104:20, 104:24, 105:1, 105:6, 105:11, 106:7, 106:13, 107:5, 107:24, 172:9
**Street** - 39:12, 200:1
**streets** - 44:4, 45:15, 45:21, 48:21
**stretcher** - 13:11
**strike** - 89:11
**stringently** - 146:21
**struck** - 110:9, 174:13
**studied** - 114:20
**stuff** - 23:23, 23:24, 31:17, 31:20, 32:1, 46:6, 47:5, 169:17, 172:12, 184:3, 193:17
**style** - 34:5, 44:13
**styled** - 204:11
**subcutaneous** - 108:12, 109:9
**subject** - 41:8, 86:15, 158:20, 202:23

**submit** - 133:20
**subpoena** - 137:7
**subspecialty** - 98:8
**substance** - 44:21, 170:15, 176:13
**suffice** - 99:11
**suit** - 25:22
**Suite** - 2:15
**sum** - 58:9
**Sunday** - 127:17, 128:3, 128:7, 129:16, 129:18
**Sundays** - 127:23
**superior** - 105:25
**supervise** - 125:10
**supervision** - 155:4, 155:6, 155:7, 155:16, 155:19, 155:21, 160:22, 160:24, 163:4, 163:5, 163:15, 163:24, 164:5, 164:8, 164:13, 164:16, 164:18, 172:1, 173:18
**supervisor** - 144:15, 149:19, 155:20
**supposed** - 21:17, 90:6, 128:8, 137:22, 137:24
**surprise** - 118:17, 193:19
**surrounded** - 170:20
**surrounding** - 109:24
**Susan** - 174:3, 174:6
**sustained** - 50:2, 120:3, 135:2, 135:20, 195:1
**swap** - 132:10
**sway** - 186:9
**sweating** - 81:14, 81:23
**swelling** - 108:13
**swing** - 80:20
**switch** - 132:14
**switched** - 132:24
**swollen** - 108:2, 108:24
**swore** - 60:9
**sworn** - 3:7, 3:11, 4:12, 4:17, 19:24, 20:7, 41:16, 59:16, 59:20, 97:7, 97:12, 116:5, 116:10, 122:20, 122:21, 122:23, 123:1, 123:6, 142:12, 142:15, 142:23, 148:12, 148:15, 148:21, 191:1, 191:6
**Sx** - 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6
**system** - 119:17, 149:16, 153:24, 182:17

# T

**T-card**- 128:18
**table** - 3:4, 86:24, 130:8, 142:1, 190:21
**tables** - 130:6, 130:8
**tact** - 198:9
**tag** - 7:1, 13:3, 16:11, 18:1
**tagged** - 19:3
**tagging** - 12:22
**talks** - 112:10
**tally** - 129:4
**tanks** - 124:20
**targets** - 71:20
**tattoo** - 17:3, 132:8
**Tcleose**- 143:24
**Tdc**- 57:20, 57:21, 58:10, 151:16, 151:20, 152:14, 157:5, 159:4, 161:22, 162:21, 171:4, 174:19, 174:25, 178:6, 178:24, 179:13, 179:22, 180:2, 183:1, 183:2, 185:12, 186:3, 186:14, 186:17, 186:19,

187:1, 188:10
**teachers** - 170:10
**Telephone** - 22:15, 22:17
**ten** - 155:14, 158:21, 159:1
**tendering** - 9:25, 15:21, 68:8
**Tennessee** - 5:11
**tennies** - 198:8, 198:14, 198:15
**term** - 104:18, 147:1
**terms** - 109:16, 179:13
**Terrace** - 2:12
**terrorists** - 143:25
**testified** - 4:17, 20:7, 40:18, 41:16, 59:20, 60:4, 60:8, 90:3, 97:7, 97:12, 97:21, 98:24, 99:10, 111:4, 116:5, 116:10, 116:19, 123:6, 142:23, 148:21, 185:19, 191:1, 191:6, 191:10
**testify** - 98:18, 111:3, 110:22
**testimony** - 3:19, 33:4, 60:21, 60:24, 64:24, 88:22, 98:25, 186:12
**testing** - 111:12, 111:16
**Texas** - 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:3, 7:18, 7:21, 43:10, 87:19, 88:10, 149:15, 150:1, 150:14, 150:16, 150:18, 153:4, 153:17, 204:2, 204:6, 204:21, 204:24
**theft** - 44:20, 56:2, 57:2, 58:1, 58:16, 160:8
**themself** - 182:11
**themselves** - 134:16, 166:13, 182:14, 182:15
**thereabouts** - 22:8
**therefore** - 155:14
**thereon** - 86:16, 202:24
**they've** - 169:14, 188:21
**thigh** - 13:20
**thinking** - 189:6
**third** - 160:5
**Thirty**- 5:4, 5:5
**Thirty-five**- 5:4, 5:5
**thorough** - 134:3
**threat** - 182:6
**three** - 6:6, 17:12, 34:24, 57:24, 58:10, 58:12, 62:18, 69:7, 112:16, 112:19, 114:4, 124:8, 129:1, 133:7, 133:20, 137:25, 146:11, 188:18, 189:12, 193:12, 197:13
**Three**- 114:4
**three-eighths** - 112:19
**Three-eights**- 114:4
**three-quarters** - 112:16
**three-sixteenths** - 114:4
**threw** - 79:19
**throat** - 63:22
**Throughout**- 143:11
**throughout** - 192:3, 192:15, 192:24
**thumb** - 112:15, 113:1
**tie** - 61:11, 127:11
**tied** - 11:25, 14:4, 32:17, 61:1, 61:19, 62:13, 62:23, 63:20, 63:23, 64:15, 71:3, 79:19, 82:12, 82:19, 82:20, 82:21, 92:20, 110:14, 110:16
**timeframe** - 26:4, 117:6
**Tina**- 1:6, 2:3, 19:22, 20:6, 20:20, 78:16, 78:18, 78:23
**Tise**- 2:3, 3:6, 86:25,

95:18, 141:16, 142:4, 142:25, 147:21, 148:6, 148:10, 148:19, 148:23, 178:10, 189:25, 190:1, 190:3, 190:8, 190:11, 190:24, 191:3, 191:4, 191:8, 195:2, 197:2, 197:4, 197:15, 197:22, 198:20, 199:2, 201:25, 202:1, 202:6, 202:11
**tissue** - 108:12
**tissues** - 109:9, 112:17
**title** - 149:18
**today** - 23:8, 25:17, 60:12, 61:5, 88:1, 88:4, 89:13, 91:1, 104:1, 117:5, 127:7, 145:9, 185:12
**toe** - 16:11, 16:12, 18:1
**together** - 23:11, 42:17, 62:4, 62:11, 110:14, 121:4, 121:12
**took** - 9:17, 15:10, 18:13, 31:14, 37:25, 60:9, 62:23, 64:21, 71:11, 77:16, 120:13, 201:5
**Took**- 18:13
**Tools**- 161:10, 161:13
**top** - 12:25, 81:25, 105:25, 112:9, 115:4, 131:6, 131:9, 187:9
**tops** - 108:14
**tore** - 93:11
**tortillas** - 196:22
**total** - 58:15
**towards** - 8:21, 29:13, 29:14, 30:5, 30:6, 30:7, 31:15, 31:16, 31:18, 84:13
**towel** - 11:25, 13:21, 14:5, 17:8, 17:20, 18:2
**town** - 22:14
**toxicology** - 111:12, 111:16
**track** - 115:3
**tracks** - 114:25
**trained** - 183:5
**training** - 5:21, 98:8, 104:11, 143:10, 143:23, 143:25, 144:1, 149:24, 164:15, 184:12, 185:8
**Training**- 98:7
**transcription** - 204:7
**transcription/stenograph** - 1:25
**transferred** - 143:15
**translated** - 129:11, 133:18
**transport** - 91:12
**transported** - 169:24
**trash** - 11:20, 12:20
**trauma** - 108:5, 108:6, 108:11, 109:25, 110:5
**tray** - 17:2
**trays** - 128:10
**treated** - 150:20, 151:8, 156:24, 157:4, 169:23, 201:2
**treatment** - 177:12
**trial** - 48:6, 60:4, 86:15, 89:18, 97:22, 116:19, 191:1, 191:10, 191:14, 192:3, 192:15, 192:24, 202:23, 202:25
**Trial**- 1:3
**trials** - 185:19
**tried** - 121:25
**trouble** - 44:2, 44:3, 58:25, 59:8, 146:8, 155:25, 181:25, 182:1
**trucks** - 172:2
**true** - 186:6, 204:7

**truly** - 204:14
**trusted** - 200:25
**trustees** - 154:24, 155:1, 171:10, 171:21
**truth** - 60:9, 88:3, 88:12, 88:19
**try** - 47:8, 132:10, 162:22, 165:20, 179:3
**trying** - 18:22, 34:9, 76:9, 165:19, 174:13, 177:11, 183:14
**tub** - 29:15, 30:7, 31:19, 32:6, 32:10, 32:16, 33:23, 34:4
**tucked** - 130:1
**Tuesdays**- 127:20
**turn** - 25:15, 29:16, 48:13, 103:10
**turned** - 129:14, 138:1, 138:8
**Turning**- 112:5, 112:8
**Tv**- 164:24
**twelve** - 124:19
**Twenty**- 146:11, 188:10, 189:12
**Twenty-one**- 188:10
**Twenty-three**- 146:11, 189:12
**twice** - 57:21
**two** - 3:25, 23:12, 23:13, 23:17, 43:9, 57:25, 62:18, 84:24, 88:18, 91:16, 100:4, 102:5, 105:22, 106:1, 106:3, 106:6, 110:18, 124:20, 127:18, 128:11, 130:24, 131:3, 131:7, 132:6, 134:14, 143:12, 145:20, 196:6, 199:20, 201:14, 201:20
**two-and-a-half** - 43:9, 145:20
**two-hour** - 127:18, 128:11, 134:14
**tying** - 70:25
**type** - 74:25, 109:16, 110:17, 110:19, 110:20, 113:14, 159:9
**typed** - 113:8
**types** - 108:10, 130:25, 161:6, 195:21
**typical** - 113:12
**Typically**- 104:21
**typically** - 28:14, 31:3, 103:21

**U**

**ugly** - 80:20
**ultimately** - 105:10
**unannounced** - 87:15
**unarmed** - 163:20
**uncuffed** - 168:4
**under** - 17:6, 109:9, 130:2, 150:2, 155:6, 155:7, 155:19, 155:21, 160:22, 163:14, 172:1, 173:18
**underlying** - 112:17
**underneath** - 133:9
**unfettered** - 171:24
**unhandcuffed** - 170:21
**unique** - 110:24
**Unique** - 110:24
**uniquely** - 99:22, 101:24
**unit** - 7:5, 165:5
**Unit** - 6:8, 6:9, 6:21, 6:22, 6:23, 7:7, 7:14, 8:2, 104:5, 121:8, 174:7, 174:12, 177:5, 177:18
**unit's** - 151:3
**units** - 164:23, 179:7, 187:1, 187:6, 187:23

**University** - 5:12
**unknown** - 176:13
**Unless** - 50:13, 152:20, 167:14, 167:20
**unless** - 50:15, 152:24
**unlocked** - 177:10
**unrelated** - 118:14
**unsanitary** - 130:6
**unshackled** - 168:4, 170:20
**unsolved** - 120:17, 120:22
**up** - 12:22, 14:4, 14:23, 17:2, 20:2, 21:20, 23:2, 23:22, 31:7, 32:13, 34:12, 45:24, 35:17, 36:12, 47:21, 48:24, 58:9, 61:1, 61:19, 62:13, 62:23, 63:20, 64:13, 64:15, 66:10, 67:23, 69:17, 69:19, 70:25, 71:3, 77:16, 78:6, 79:6, 79:9, 79:19, 80:19, 82:12, 82:19, 82:20, 87:15, 90:14, 91:11, 92:19, 92:20, 103:12, 103:22, 106:23, 107:17, 107:18, 107:21, 108:7, 108:9, 108:12, 108:15, 112:6, 118:21, 123:3, 124:21, 125:2, 128:9, 129:4, 129:25, 131:8, 131:14, 132:9, 137:3, 137:12, 138:7, 140:25, 142:17, 146:16, 146:24, 147:4, 148:17, 151:2, 156:8, 165:10, 165:14, 170:18, 170:19, 173:6, 176:11, 177:9, 177:15, 179:19, 193:8, 199:21, 201:14
**updated** - 150:6
**upper** - 13:20, 103:12, 124:18
**ups** - 137:1, 137:3
**upset** - 63:6, 63:14
**upside** - 32:16, 103:9
**upstairs** - 77:15, 77:17, 77:18
**urine** - 176:11
**utensils** - 161:7

**V**

**valuable** - 184:9
**various** - 107:20, 119:16, 189:16, 192:23
**vascular** - 105:15
**vast** - 145:24
**vehicle** - 57:24, 69:13, 69:22, 174:13, 177:11, 107:13
**veins** - 94:21, 107:11, 107:13
**vendor** - 130:24
**verbalizes** - 152:20
**vessels** - 104:22, 104:23, 105:7, 105:8, 105:15, 107:10, 107:18
**via** - 129:12
**videos** - 7:12
**view** - 103:23, 106:19, 107:9
**violate** - 183:1
**violation** - 147:2, 181:19, 183:3
**violations** - 146:16, 185:5
**violence** - 6:12
**violent** - 160:2, 178:7
**visible** - 107:8
**visit** - 49:18, 49:19, 60:22, 86:1
**visitation** - 125:8, 138:25, 158:4, 167:24, 168:1, 170:5, 170:6, 171:9, 184:3, 184:19, 184:21, 184:22

**visitations** - 168:8
**visited** - 47:13, 47:21, 48:5, 96:13
**visiting** - 168:19
**Visitors** - 176:3
**visitors** - 171:9
**visits** - 125:8, 182:15
**voice** - 20:2, 123:3, 142:17, 148:17
**Voir** - 1:4, 1:20
**Vol** - 1:3, 1:4, 1:20, 2:8
**volume** - 204:10
**Volume** - 1:2, 1:1, 1:19
**Volumes** - 1:2
**voluntarily** - 138:8
**volunteer** - 152:24
**volunteered** - 96:8
**volunteers** - 167:14, 170:11, 170:15
**vote** - 179:21
**vs** - 3:3
**Vs** - 1:9

**W**

**waist** - 17:2
**wait** - 52:16, 90:9
**Wait**- 90:8
**waiting** - 90:10
**walk** - 29:11, 30:3, 31:14, 170:19
**walked** - 25:14, 25:15, 30:3, 30:5, 31:15, 38:24
**walking** - 30:18, 166:11, 170:23
**Wallisville** - 84:14
**walls** - 183:14
**wants** - 128:2, 172:6
**wash** - 130:4
**watch** - 164:24
**watching** - 172:4
**ways** - 171:3
**weak** - 79:22
**weapon** - 138:8, 147:3, 147:11, 147:15, 147:16, 161:21, 161:25, 162:7, 162:15, 162:25, 175:18
**weapons** - 38:13, 38:17, 39:23, 92:10, 161:16, 162:1, 162:3
**wearing** - 17:7, 25:20, 49:9, 61:9, 127:10, 127:11, 167:7
**Webb** - 1:11, 2:6, 116:3, 116:9, 116:13, 116:16, 116:18, 121:24
**week** - 55:5, 55:6, 60:4, 60:8, 60:21, 64:24, 89:18, 99:10, 110:23, 116:19, 116:21, 124:9, 191:10
**weekend** - 26:6, 26:8
**weekends** - 26:7, 165:3, 165:11, 194:7
**weekly** - 26:7
**weighed** - 201:17
**weight** - 16:16
**Welcome**- 97:15
**wellbeing** - 124:13
**wet** - 130:7
**whatnot** - 24:3
**whatsoever** - 180:19
**wheel** - 90:2, 90:6, 90:11
**white** - 160:8
**white-collar** - 160:8
**whites** - 107:22, 167:8
**whole** - 28:16, 42:8, 45:6, 154:10, 199:14
**wife** - 42:14, 201:1
**wild** - 44:10
**window** - 127:18, 128:11,

134:14

**Winkler** - 7:17, 7:20, 8:9, 9:21, 29:25, 76:20, 76:23, 76:25, 78:5

**wire** - 18:3, 18:7

**wires** - 110:18, 131:7, 132:8

**wise** - 111:12

**wish** - 201:11

**withdraw** - 75:7, 119:2

**witness** - 3:22, 4:9, 4:12, 9:8, 15:2, 19:8, 19:14, 19:16, 19:24, 36:15, 39:25, 40:25, 41:3, 47:25, 51:10, 58:18, 59:15, 61:13, 67:11, 86:8, 87:1, 87:3, 95:10, 96:21, 96:25, 97:6, 101:14, 111:22, 115:17, 115:20, 117:10, 121:19, 122:7, 122:9, 122:20, 136:1, 139:12, 140:21, 141:8, 141:10, 141:19, 142:3, 142:7, 142:11, 147:21, 148:5, 148:11, 148:17, 178:10, 189:24, 190:2, 190:23, 190:25, 201:25, 202:4

**Witness** - 1:20, 19:20, 41:9, 43:13, 43:15, 50:18, 52:18, 52:22, 58:24, 59:2, 59:5, 59:7, 116:1, 122:13, 123:1, 142:15, 142:19, 148:15, 190:6, 202:9, 204:16

**Witnesses** - 1:4, 3:11

**witnesses** - 3:7, 3:14, 3:16, 3:20

**wives** - 168:16

**Wolf** - 1:10, 2:7, 97:5, 97:11, 97:15, 97:20, 97:21, 97:24, 99:10, 101:16, 102:17, 103:4, 105:17, 110:22, 112:3, 115:24

**woman** - 70:23, 201:17

**Wood** - 2:4, 3:6, 3:23, 4:7, 4:10, 4:19, 9:7, 9:10, 9:23, 10:11, 10:14, 15:1, 15:4, 15:19, 16:5, 16:8, 19:7, 19:9, 19:17, 19:22, 20:4, 20:5, 20:9, 25:24, 26:2, 27:1, 27:4, 36:15, 36:16, 40:2, 40:4, 40:24, 41:4, 41:12, 41:13, 41:14, 41:18, 43:18, 47:24, 48:2, 49:12, 49:15, 50:3, 50:20, 51:10, 58:19, 58:20, 58:22, 59:3, 59:11, 59:13, 59:14, 59:18, 59:23, 61:12, 61:15, 61:18, 67:10, 67:13, 68:7, 68:16, 68:19, 86:3, 86:7, 86:9, 86:25, 87:4, 95:12, 95:13, 95:15, 96:21, 97:5, 97:10, 97:14, 101:13, 101:16, 102:8, 102:13, 102:16, 102:18, 102:21, 103:2, 103:4, 111:22, 115:18, 115:19, 115:23, 116:3, 116:8, 116:12, 120:4, 121:19, 121:20, 122:10, 122:15, 122:18, 122:21, 123:4, 123:8, 127:12, 127:15, 134:21, 135:3, 135:4, 136:1, 139:14, 139:15, 139:17, 140:12, 140:21, 141:9, 141:13

**Word** - 1:19

**word** - 110:4

**words** - 16:17, 93:8, 106:23, 109:12, 126:23, 155:18

**workers** - 135:10

**workplace** - 162:24

**works** - 161:10, 161:13, 163:17

**World** - 92:1

**world** - 169:5, 170:13, 179:5, 199:4

**worn** - 64:25

**wound** - 14:19

**Wrapped** - 110:16

**wrapped** - 13:21, 17:8, 17:20, 18:2

**wrist** - 109:4, 109:5, 112:23, 112:24

**write** - 52:20, 137:1, 137:3, 138:7, 140:25

**write-ups** - 137:1, 137:3

**writing** - 204:9

**written** - 131:14, 133:21, 137:9

**wrongdoing** - 200:17

**wrote** - 137:12, 137:25

**Wynn** - 174:7, 174:12

## X

**x-rays** - 113:9

## Y

**y'all** - 28:13, 36:8, 54:22, 76:22, 84:9, 91:16, 114:25, 144:24, 182:21, 183:8, 185:16, 194:3, 199:21

**yard** - 162:25, 164:7, 165:6, 165:11, 165:14, 165:22, 165:25, 166:3, 166:17, 166:20

**year** - 5:18, 23:18, 36:9, 43:18, 46:14, 89:9, 100:4, 126:1, 136:22, 143:15, 144:2

**years** - 5:4, 5:5, 6:6, 6:10, 6:12, 33:12, 33:25, 36:3, 39:6, 39:7, 39:17, 42:18, 43:1, 43:3, 43:9, 45:25, 47:18, 72:12, 103:24, 136:22, 140:14, 143:11, 143:12, 144:3, 144:14, 145:21, 149:6, 150:1, 155:13, 155:14, 158:21, 159:1, 180:1, 180:11, 188:11, 193:12, 195:2, 196:6, 197:13, 201:22

**yelled** - 31:13

**yelling** - 31:16

**yesterday** - 122:22

**you-all** - 66:10, 69:7, 83:10

**You-all** - 85:24

**young** - 29:1, 29:2, 46:1, 61:23, 72:11, 72:13

**youngest** - 192:21

**yourself** - 4:23, 20:18, 37:23, 41:24, 47:23, 97:18, 116:15, 123:11, 135:10, 143:3, 146:12, 148:24

**yourselves** - 86:14, 202:22

## Z

**zoo** - 200:3