1                    REPORTER'S RECORD

2                **VOLUME 26 OF 35 VOLUMES**

3             TRIAL COURT CAUSE NO. 1384794

4          COURT OF CRIMINAL APPEALS NO. AP-77,025

5

6   OBEL CRUZ-GARCIA              )  IN THE DISTRICT COURT
                                  )
7        Appellant               )
                                  )
8                                 )
                                  )
9   VS.                          )  HARRIS COUNTY, TEXAS
                                  )
10                                )
                                  )
11  THE STATE OF TEXAS            )
                                  )
12       Appellee               )  337TH JUDICIAL DISTRICT

13

14

15              *******************

16              **PUNISHMENT PHASE**

17              *******************

18

19

20       On the 18th day of July, 2013, the following

21  proceedings came on to be heard in the above-entitled

22  and numbered cause before the Honorable Renee Magee,

23  Judge presiding, held in Houston, Harris County, Texas;

24       Proceedings reported by computer-aided

25  transcription/stenograph shorthand.

1                          **A P P E A R A N C E S**

2

3

4        MS. NATALIE TISE
         SBOT NO. 00795683
         MR. JUSTIN WOOD
5        SBOT NO. 24039247
         Assistant District Attorneys
6        1201 Franklin
         Houston, Texas  77002
7        PHONE:  713.755.5800
         **ATTORNEYS FOR THE STATE OF TEXAS**
8

9
              - AND -
10

11
         MR. R.P. 'SKIP' CORNELIUS
12       SBOT NO. 04831500
         2028 Buffalo Terrace
13       Houston, Texas  77019-2408
         PHONE:  713.237.8547
14
         MR. MARIO MADRID
15       SBOT NO. 00797777
         440 Louisiana, Suite 1225
16       Houston, Texas  77002-1659
         PHONE:  713.877.9400
17       **ATTORNEYS FOR THE DEFENDANT**

18

19

20       Rolando Hernandez
         Marilu Flores,
21       **Interpreters**

22

23

24

25

```
 1                          I N D E X
                          VOLUME 26
 2                  (PUNISHMENT PROCEEDINGS)

 3   JULY 18, 2013
                                              PAGE  VOL.
 4   DEFENSE WITNESSES
                       Direct    Cross    Voir Dire      VOL.
 5   Mireya              8         22         -           26
     Perez-Garcia
 6
     Joel Cruz-Garcia    32        43         -           26
 7                       54        -          -           26

 8   Abel Cruz-Perez     67        79         -           26

 9   Angel Meza          80        86         -           26
                         91        -          -           26
10
     Defendant rests................................ 93   26
11
     Both sides close.............................. 93    26
12
     Objections to Court's Charge.................. 61     26
13
     Court's charge read........................... 93    26
14
     Closing Argument by Defense Attorney.......... 105    26
15   Closing Argument by State's Attorney.......... 141    26

16   Jury retired for deliberations............... 176     26

17   Reporter's Certificate....................... 179     26

18   Word Glossary...............................End of Volume

19              ALPHABETICAL WITNESS INDEX
                      Direct    Cross    Voir Dire       VOL.
20   Cruz-Garcia, Joel   32        43         -           26
                         54        -          -           26
21
     Cruz-Perez, Abel    67        79         -           26
22
     Meza, Angel         80        86         -           26
23                       91        -          -           26

24   Perez-Garcia,        8         22        -           26
     Mireya
25
```

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| DX - 21 | Photograph | 42 | 43 | 26 |
| DX - 22 | Photograph | 42 | 43 | 26 |
| DX - 23 | Photograph | 42 | 43 | 26 |
| DX - 24 | Photograph | 42 | 43 | 26 |
| DX - 25 | Photograph | 42 | 43 | 26 |
| DX - 26 | Photograph | 42 | 43 | 26 |
| DX - 27 | Photograph | 42 | 43 | 26 |
| DX - 28 | Photograph | 42 | 43 | 26 |
| DX - 29 | Photograph | 42 | 43 | 26 |
| DX - 30 | Photograph | 42 | 43 | 26 |
| DX - 31 | Photograph | 42 | 43 | 26 |
| DX - 32 | Photograph | 42 | 43 | 26 |
| DX - 33 | Photograph | 42 | 43 | 26 |
| DX - 34 | Photograph | 42 | 43 | 26 |
| DX - 35 | Photograph | 42 | 43 | 26 |
| DX - 36 | Photograph | 42 | 43 | 26 |
| DX - 37 | Photograph | 42 | 43 | 26 |
| DX - 38 | Photograph | 42 | 43 | 26 |
| DX - 39 | Photograph | 42 | 43 | 26 |
| DX - 40 | Photograph | 42 | 43 | 26 |
| DX - 41 | Photograph | 42 | 43 | 26 |
| DX - 42 | Photograph | 42 | 43 | 26 |
| DX - 43 | Photograph | 42 | 43 | 26 |
| DX - 44 | Photograph | 42 | 43 | 26 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | DX - 45 | Photograph | 42 | 43 | 26 |
| 2 | DX - 46 | Photograph | 42 | 43 | 26 |
| 3 | DX - 47 | Photograph | 42 | 43 | 26 |
| 4 | DX - 48 | Certificate | 57 | - | 26 |
| 5 | DX - 49 | Certificate | 57 | - | 26 |
| 6 | DX - 50 | Certificate | 57 | - | 26 |
| 7 | DX - 51 | Certificate | 57 | - | 26 |
| 8 | DX - 52 | Certificate | 57 | - | 26 |
| 9 | DX - 53 | Certificate | 57 | - | 26 |
| 10 | DX - 54 | Certificate | 57 | - | 26 |
| 11 | DX - 55 | Certificate | 57 | - | 26 |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

1                    (Open court, defendant present, no jury)

2            THE COURT:  We're back on the record in

3     Cause No. 1384794, State of Texas versus Obel

4     Cruz-Garcia.  Mr. Garcia Cruz-Garcia is present at

5     counsel table with his lawyers, Skip Cornelius and Mario

6     Madrid.  Natalie Tise and Justin Wood are present for

7     the prosecution.

8            The jury is not present at this time.  We

9     are ready to proceed with the defense case on the

10    punishment phase of the trial.  And, Mr. Cornelius,

11    would you like to put something on the record before the

12    jury comes back in?

13           MR. CORNELIUS:  Yes, Your Honor.  I have a

14    quick motion in limine.  We intend to offer a series of

15    photographs into evidence.  We've provided the State a

16    copy.  They've looked at the photographs and have told

17    us of the desire to be able to prove up that the

18    defendant's -- one of the defendant's sons is in prison

19    at the present time.  And our position would be that the

20    fact that the defendant's son or any relative of the

21    defendant is in prison would not be admissible for any

22    purpose in this trial.

23           THE COURT:  Okay.  Is this person

24    testifying?

25           MR. CORNELIUS:  No.

1              THE COURT:  Go ahead, Ms. Tise.

2              MS. TISE:  I've been talking to appellate

3    about it.  And the defense has given me this stack of a

4    lot of photos, some of which, I guess, the relevance of

5    these would be established, but there are a lot of

6    photos depicting happy family pictures with these

7    individuals in them, as if this is the way his life is.

8    And I have talked to appellate about the fact that if

9    he's going to present these pictures, I can ask

10   questions about where these people are now.  They are

11   not living this life.  A lot of his relatives are in

12   prison.  And I know his oldest son, who is pictured in

13   these photos, is in prison with his own capital murder

14   charge in Puerto Rico.

15              So, what I'm proposing is to be able to ask

16   where-are-they-now questions about the people that he is

17   putting pictures of into evidence.

18              THE COURT:  So, you are not asking to go

19   into any charges specifically.

20              MS. TISE:  I'd be fine with them saying

21   that they are in prison.  Because this is not a true

22   picture of what his life back home is.

23              THE COURT:  Okay.

24              MS. TISE:  And I think I should be able to

25   inquire into that.

1          THE COURT:  All right.  And so, these

2    pictures are coming in through which witness?

3          MR. CORNELIUS:  I think we'll do them --

4    it's just so complicated with this lady that we're going

5    to call already.  I think I'll put them in through his

6    brother, Joel, who is in the hall.

7          THE COURT:  So, he would have personal

8    knowledge?

9          MR. CORNELIUS:  He knows everybody in the

10   pictures, yes.

11          THE COURT:  Okay.  And show me the pictures

12   again.  It depends on which pictures come in.

13          MR. CORNELIUS:  Well, if the Court rules

14   that you are going to allow that questioning, I'm just

15   going to offer the pictures that contain those people

16   for the record and not before the jury.

17          THE COURT:  I think -- depending on what

18   pictures come in, but I think if you paint a picture to

19   the jury that this is a happy family that's awaiting his

20   return down in another country and through the

21   photographs appear to be altogether and the State has --

22   I think the State can go into where they are now.  And

23   if the witness knows, they can answer of their own

24   personal knowledge.  Not as to what kind of conviction

25   they were or what they are being held for.

1          MS. TISE:  Understood.

2          MR. CORNELIUS:  Okay.  Well, give me a

3   second and I will pull out the ones that I'm going to

4   offer in for the record.

5          (Pause)

6          THE COURT:  Okay.  For purposes of the

7   record -- we're back on the record, Mary Ann -- the

8   first witness that the defense intends to call will be

9   called and her testimony heard through Skype, which is a

10  direct line through the computer with the witness who

11  is -- who will be in a foreign country, which will be

12  established by the testimony.  There will be a slight

13  delay from her statements to the arrival of her

14  statements at the court, but it will be a matter of five

15  seconds.  Skype is a commonly-used and

16  internationally-used device for communication.  And the

17  witness is a Spanish-speaking witness.  Is that correct,

18  Mr. Cornelius?

19          MR. CORNELIUS:  Yes, Your Honor.

20          THE COURT:  As she delivers her response to

21  the question, I'm instructing the lawyers to wait till

22  the interpreter interprets her response for the jury and

23  then the lawyers shall continue with the next question,

24  which will be interpreted by the interpreter and then

25  related to the witness.  If we could all just wait for

1   the delay and not speak over one another, I believe this

2   will go much smoother.

3                   Is everybody ready to bring the jury  in?

4   Any other thing we need to address on the record?  No?

5                   MS. TISE:  No.

6                   MR. CORNELIUS:  I think we're ready, Judge.

7                   (Witness sworn)

8                   THE COURT:  Okay.  Very good.

9                   Bring in the jury.

10                  (Open court, defendant and jury present)

11                  THE COURT:  Are we ready to proceed in

12  Cause No. 1384794 --

13                  MR. CORNELIUS:  We were ready one minute

14  ago.  I think give us a second.

15                  THE COURT:  Okay.  Let's go ahead on the

16  record.  We're ready to proceed in Cause No. 1384794.

17  And the jury is present in the courtroom.

18  Mr. Cruz-Garcia is present at counsel table with his

19  lawyers, Skip Cornelius and Mario Madrid.  And present

20  for the State is Natalie Tise and Justin Wood.

21                  Both sides ready to proceed?

22                  MS. TISE:  State's ready.

23                  MR. CORNELIUS:  The defense is ready.

24                  THE COURT:  Mr. Cornelius, would you like

25  to make an opening at this time?

1          MR. CORNELIUS:  No, Judge.  I would like to

2    go straight in the testimony if we can get this lined up

3    again.  And Mr. Madrid is going to question the witness.

4          THE COURT:  For purposes of the record, are

5    you calling a witness out of this country, the person is

6    located outside of this country?

7          MR. CORNELIUS:  Yes.

8          THE COURT:  Who is that witness?

9          MR. MADRID:  Mireya Perez-Garcia.

10          THE COURT:  Okay.  And for purposes of the

11   record, this witness will be called via Skype, which

12   will be available for your viewing on the television

13   screens and be real-time with a short delay.  This

14   witness has been sworn.

15          You may proceed, Mr. Madrid.

16          MR. MADRID:  Thank you, Your Honor.

17                **MIREYA PEREZ-GARCIA,**

18   having been first duly sworn, testified via Skype

19   through the interpreter as follows:

20                **DIRECT EXAMINATION**

21   **BY MR. MADRID:**

22        Q.   Mireya, can you hear me?

23        A.   Yes.

24        Q.   We're in a courtroom with a judge, the State's

25   attorneys, and the jury.  Can you please introduce

```
 1  yourself to the jury?

 2       A.   Yes.  My name is Mireya Perez-Garcia.

 3       Q.   And where are you presently, Ms. Garcia?

 4       A.   A place that's called Unawa (phonetic).

 5       Q.   Is that in the Dominican Republic?

 6       A.   Yes, ma'am.

 7       Q.   And you had -- did you have plans to come to

 8  Houston for this trial?

 9       A.   Yes, ma'am.

10       Q.   And why were you unable to come?

11       A.   Because when you send me the papers, I had to

12  go to the consulate there and they told me I had to do

13  some special thing and get a visa.

14                THE COURT:  Let's stop for just a moment.

15                MR. CORNELIUS:  If it cuts in and out like

16  this, do you want us to keep going or stop until -- to

17  make sure they can see her.  We have been having sound

18  consistently, but not image.

19                THE COURT:  Okay.  How often do we

20  anticipate it may cut in and out like this?

21                MR. MADRID:  It was working for a good 15

22  minutes straight earlier.

23                THE COURT:  As long as the picture of her

24  is just coming in and out and it will come back, let's

25  proceed with her testimony, as long as we can hear her.
```

```
 1            MR. MADRID:  Your Honor, we can hear on the
 2  speaker phone.  Would you like us to continue or wait
 3  till we see her?
 4            THE COURT:  You can continue with her voice
 5  and the interpretation so that the jury can hear.  I'm
 6  not just going to have it on the speaker phone.  It has
 7  to be --
 8            MR. MADRID:  That's what I mean.
 9            THE COURT:  As long as we can hear her
10  voice.
11            You may proceed.
12       Q.   (By Mr. Madrid) Ms. Perez, you were saying that
13  you had a problem getting your visa or passport?
14       A.   Yes, sir -- yes, ma'am.  Excuse me.
15       Q.   And do you know Obel Cruz-Garcia?
16       A.   Yes, ma'am.
17       Q.   And we're here in his trial.  Do you understand
18  that?
19       A.   Yes, ma'am.
20       Q.   And you understand that the jury has found him
21  guilty of capital murder?
22       A.   No, not for me.  He is not guilty for me.
23       Q.   But you understand that the jury has made their
24  ruling?
25       A.   Okay.  Could you please repeat the question?
```

1      Q.   You understand that the jury has found Obel

2  Cruz-Garcia guilty?

3               THE INTERPRETER:  Do you hear me?

4      A.   Would you please repeat the question again?

5  I'm having problems with the phone.

6      Q.   (By Mr. Madrid) Please talk directly through

7  the telephone, please.

8      A.   Oh, okay.  Yes, yes.

9               THE COURT:  Please repeat the question.

10     Q.   (By Mr. Madrid) Can you hear me?

11     A.   Yes, I can hear you.

12     Q.   So, you understand that the jury has found him

13  guilty?

14     A.   Well, how can I tell you?  For me, he is not

15  guilty.

16     Q.   That wasn't my question.  I'm asking if you

17  understand that he has been found guilty?

18     A.   Well, I understand because you told me about

19  the case, but even though the jury has found him guilty,

20  for me he is not.

21     Q.   And that's not what we're going to discuss.

22     A.   Okay.  Okay.

23     Q.   Now, could you tell me a little bit about

24  yourself?  How old are you?

25     A.   I'm 40 years old.

1     Q.   And could you tell me where you were born and

2  raised?

3     A.   Yes.  Santo Domingo, Unawa, Boga.

4     Q.   And where did you -- how do you know Obel

5  Cruz-Garcia?  Where did you first meet him?

6     A.   At a place called Viavista de Boga.

7     Q.   Is that a city or a town?

8     A.   It's like a field in Unawa.

9     Q.   How old were you?

10    A.   I was 15 about to turn 16.

11    Q.   And what kind of relationship did you have with

12  Obel Cruz-Garcia?

13    A.   Well, at that time we were boyfriend and

14  girlfriend.  We went out for about three weeks and then

15  about two weeks later I married him.

16    Q.   And did y'all live together?

17    A.   Yes, we were together for some time.  We were

18  living together in Santo Domingo for about three months.

19             THE INTERPRETER:  Interpreter's correction:

20  Six months.  Six months.

21    Q.   (By Mr. Madrid) And what year was this

22  approximately?

23    A.   '87, '89, somewhere around there.

24    Q.   And about how old was Obel at that time?

25    A.   He was around 20 or 21, more or less.

1    Q.   What kind of work did he do at the time?

2    A.   He would fish with his father.  He would fish

3  in the sea.

4    Q.   And did y'all continue to live in Santo Domingo

5  or did Obel moved a way?

6    A.   We were together.  From Santo Domingo, we went

7  back to Unawa.

8    Q.   How long did y'all remain together?

9    A.   At that time, six month more or less.

10   Q.   What happened after six months?

11   A.   He went to Puerto Rico.

12   Q.   What did he go to do there?

13   A.   He told me that he was going there for a better

14  life.

15   Q.   When was the next time that you saw Obel?

16   A.   I saw after -- we saw each other again in '94.

17   Q.   Where at?

18   A.   In Puerto Rico.

19   Q.   Did you continue your relationship with him?

20   A.   Yes.  When we saw each other again, at that

21  instance we were together again.

22   Q.   Could you describe your relationship?

23   A.   At that time, right?

24   Q.   Yes.

25   A.   Well, at that time we moved together.  We went

```
 1   to live together.
 2        Q.   Did you have a family together?
 3        A.   Yes, we had a son.
 4        Q.   Did you have any other children with him?
 5        A.   Yes, one more.
 6        Q.   And what year was that?
 7        A.   We had him in '94, '95, a son.
 8        Q.   And where did y'all live?
 9        A.   In Rio Pedra.
10        Q.   Is that in Puerto Rico?
11        A.   Yes, ma'am.
12        Q.   And how long did y'all live together?
13        A.   At that time, we were in Puerto Rico for about
14   two years and then we went back to Santo Domingo.
15        Q.   Did you live together with your two sons and
16   Obel?
17        A.   Yes, ma'am.
18        Q.   And was Obel working?
19        A.   Yes, ma'am.
20        Q.   What kind of work did he do?
21        A.   It was like real estate where you buy houses
22   and then you sell them and we would receive commission.
23   We had like a small office.
24        Q.   Was it your own company?
25        A.   Yes, it was our own company, but the houses
```

1  were not our own.

2      Q.   Y'all were real estate agents?

3      A.   Yes, exactly.  Yes.  We would get houses to

4  sell them and then we would make a commission.

5      Q.   And what kind of worker was Obel?

6      A.   He was like the boss.  They would give him all

7  of the houses to sell and he was the administrator.  He

8  was like the boss, the manager.

9      Q.   Did he do a good job managing?

10     A.   Yes.  Because he's a hard worker.  That's why

11 they would give him houses because he would do it well.

12     Q.   Was he involved in the community there where

13 you lived?

14     A.   Yes, we have a lot of friends.

15     Q.   Could you explain how he was involved in your

16 neighborhood?

17     A.   He would interact with all of the friends that

18 we would have, the friends from church.  He was a

19 sincere and noble person.  He was an impeccable person.

20     Q.   What church did y'all attend?

21     A.   He likes the evangelic churches.  I like the

22 Catholic church because my mother was Catholic.

23     Q.   Did y'all attend the evangelical church?

24     A.   Yes.  Yes, ma'am.

25     Q.   Was he involved in helping build that church?

1    A.   Yes, ma'am.

2    Q.   Can you explain that, please?

3    A.   Are you trying to ask me what part he played in

4    the church?

5    Q.   Yes.

6    A.   He was like a member of the church.  They would

7    say:  Well, you have to do this on this mission, and he

8    would do his part when they would tell us this is what

9    you have to do.

10   Q.   Can you explain what kind of missions that he

11   did?

12   A.   When we would go to church on Sundays or on

13   Saturdays sometimes they would tell him:  Okay.  You

14   have to accompany us.  And it would be to go and give

15   gifts to the children, the poor children that didn't

16   have anything.  And he liked to do that and also liked

17   to give games and stuff.

18   Q.   Did he help to build that church?

19   A.   Yes, ma'am.

20   Q.   How did he do that?

21   A.   Well, we were given several apartments and then

22   he made a promise to God that if he was able to sell

23   those apartments that he would give some -- he would

24   give the money to the church.  And so, then he gave that

25   to the person that was in charge, to the administrator.

```
 1        Q.    And with that money, did they build a church?
 2        A.    Part of it.  Not all of it.  And it was not all
 3   of it or part of it and then we had to take up a
 4   collection amongst the servers.
 5        Q.    Did y'all have a house?
 6        A.    Yes, we did have a house.
 7        Q.    Did you build the house or buy the house?
 8        A.    No.  Obel purchased it when he was working.
 9        Q.    And on y'all's property, did y'all have any
10   other houses?
11        A.    Are you asking if on that same property we had
12   another house?
13        Q.    Yes.
14        A.    No, we didn't have more houses.  It was within
15   the same house.  We had like two small houses, but like
16   to put things away.
17        Q.    Where did his father live?
18        A.    Next to our house.
19        Q.    And how did his father get that house?
20        A.    Well, the wife of the father, she is a teacher.
21   She's a teacher.
22        Q.    Was Obel close to his father?
23        A.    Yes, ma'am.  That was his love.
24        Q.    Could you tell me the names of your children?
25        A.    Abel Cruz-Perez and Obelito Cruz-Perez.
```

```
 1        Q.   How old are they?

 2        A.   The children?

 3        Q.   Yes.

 4        A.   One is 17 and the other one is 23.

 5        Q.   And when they were growing up there in the mid

 6   to late 90s was Obel a part of their life?

 7        A.   Yes, all the time.

 8        Q.   Could you explain to the jury what kind of

 9   father he was?

10        A.   As a father, he was excellent because he wanted

11   to be the best for his children --

12        Q.   What kinds of --

13        A.   -- and educate them.

14        Q.   And what kinds of things did he do for his

15   sons?

16        A.   Could you please repeat the questions?

17        Q.   What kinds of things did he do for his sons?

18        A.   He was an excellent father.  He always

19   wanted -- he participated with them in school.  When

20   they would get home from school, he would do their

21   homework with them.  He liked to check their homework.

22   He liked to take them to the park and to the church.  He

23   liked to cook.  He liked to see them eat the food that

24   he would cook.  He would always like to make sure that

25   their nails were trimmed and that they were always
```

1    nicely dressed.  He also liked to make sure about the

2    pet, that he would be bathed and well groomed.

3         Q.   Did he interact with any other kids in the

4    neighborhood?

5         A.   Yes.  With his brothers that were younger that

6    lived next door.

7         Q.   And how did he treat them?

8         A.   He treated them as if they were his own

9    children.  There was no difference for him with the

10   children, between his children and the others.

11        Q.   Was he a loving father?

12        A.   Yes, very loving.

13        Q.   Could you tell me about his spiritual life?

14        A.   He always liked to read his Bible.  He would

15   like to read Psalms.  At times, I felt that he would

16   even forget about me, but since he was an evangelical.

17   Okay.  At times I felt like he would forget about me

18   because he was more involved in the church than he was

19   with me.

20        Q.   So, he was a very spiritual Christian?

21        A.   Yes, ma'am.

22        Q.   Now, an investigator for us went to meet you in

23   the Dominican Republic, right?

24        A.   Yes, ma'am.

25        Q.   And in speaking with the investigator you

1   provided -- or did you provide photos of the house?

2        A.   Yes, ma'am.  Yes, he took them.

3        Q.   And of your family life?

4        A.   We're a very loving family, very humble.

5        Q.   What I'm asking is if you provided photos of

6   your family.

7        A.   Yes, ma'am.  Yes.

8        Q.   I want to thank you for testifying.  Under this

9   process, the attorney for the State is now going to ask

10  you questions.

11       A.   Okay.

12            MR. MADRID:  Pass the witness.

13            MR. CORNELIUS:  May we approach the bench

14  before we start cross?

15            THE COURT:  Yes.

16            (At the bench, on the record)

17            MR. CORNELIUS:  I make a motion in limine

18  that the State not be allowed to go into the evidence

19  and what he is talking --

20            THE COURT:  Okay.  What's your --

21            MR. WOOD:  Well, Judge, first the witness

22  was asked if they have children and she stated that they

23  have two sons.  And they have now painted a picture that

24  the defendant was a loving father and have also left the

25  wrong impression that he's been a member of this family

1  unit, I guess, continuous through these years.  So, I

2  think I should be able to go into actually what the true

3  family dynamics are and how long the defendant has been

4  apart of from the family and where, in fact, the sons

5  reside, are they in the Dominican or where are they.

6          MS. TISE:  They were a happy family and --

7  she said they are a happy family and I think they are

8  misleading --

9          THE COURT:  I'm not going to let you go

10 into the dynamics of the family.  I'm going to let you

11 go into the fact of where they are located, with no

12 convictions or anything like that.  And I don't know

13 which child it was, but primarily because of the example

14 that they had a question asked whether he set a good

15 example, I will let you go into the fact that one son is

16 in jail, but no convictions or anything.

17         MR. WOOD:  What conviction the prison

18 sentence was for?

19         THE COURT:  Exactly.

20         MR. WOOD:  Okay.

21         (Open court, defendant and jury present)

22         THE COURT:  You may proceed.

23         Mr. Wood, you are taking cross?

24         MR. WOOD:  Yes, Your Honor

25         THE COURT:  You may proceed.

**CROSS-EXAMINATION**

**BY MR. WOOD:**

    Q.   Hello, ma'am.

    A.   Hi.

    Q.   My name is Justin Wood.  I'm one of the attorneys for the State in this case.

    A.   Okay.

    Q.   And I want to visit with you about a few of the things that you just spoke about.

    A.   Okay.

    Q.   I want to be clear, when was it that you met Obel Cruz-Garcia?  What year approximately?

    A.   '87, '88.

    Q.   And that was during the time that you were 15 or 16 years old; is that right?

    A.   Yes, 15 to 16 years old, more or less.

    Q.   And that was in Santo Domingo?

    A.   Yes.  Unawa, Boga.

    Q.   And when was it that you and Obel Cruz-Garcia went to -- I'm sorry.  I will withdraw that.

           How long were you and Obel Cruz-Garcia together before he went to Puerto Rico the first time?

    A.   Six months, approximately six months.

    Q.   And the next time you saw him was approximately 1994; isn't that correct?

1        A.   Yes, uh-huh.  '93, '94 in Puerto Rico.

2        Q.   And you are aware that during that time Obel

3   Cruz-Garcia moved to Houston for a period of time?

4        A.   No, no.  I didn't know anything about his life.

5        Q.   So, in 1994 or 1993 when you reconnected with

6   him, did you then find out that he had been living in

7   Houston for a period of time?

8        A.   We would talk, but he never told me anything

9   about that.

10       Q.   Okay.  Do you know a lady by the name of

11  Angelita Rodriguez?

12       A.   No, ma'am.

13       Q.   So, you're not aware that Obel Cruz-Garcia --

14       A.   Did you say person or a name?  I made a

15  mistake.

16       Q.   Yes.  I will ask it again.  Do you know --

17       A.   Okay.

18       Q.   Do you know a person by the name of Angelita

19  Rodriguez?

20       A.   No, ma'am.  No, I don't know her.

21       Q.   So, you are not aware that Obel Cruz-Garcia

22  married Angelita Rodriguez around 1999 -- 1989?  I'm

23  sorry.

24       A.   Yes, I did know about that because they would

25  tell me, yes, that he was married.  We were separated

1  and I did become aware that he was married to her, but

2  we were already separated.

3      Q.  And you are aware that they married very

4  shortly after he went to Puerto Rico in 1989?

5      A.  Yes, I was aware of that.  I didn't have

6  communication with him, but I became aware of that

7  through other people and that's why we stopped the

8  communication.

9      Q.  So, Obel Cruz-Garcia never told you that he

10  married Angelita, did he?

11      A.  Yes, I did find out and became aware that he

12  had married that woman, yes, ma'am.

13      Q.  That was not my question.  My question is:  Did

14  Obel Cruz-Garcia ever tell you that he married Angelita

15  Rodriguez?

16      A.  Yes, ma'am.  Yes, he did tell me, but we never

17  talked about that subject.

18      Q.  So, you reconnected with Obel Cruz-Garcia

19  sometime around 1993 or '94; isn't that right?

20      A.  No.  In '94, we did not reconnect.  From '93 to

21  '94 when we got back together, we always had

22  communication.

23      Q.  Okay.  So, the next time you saw Obel

24  Cruz-Garcia was in Puerto Rico, right?

25      A.  In Puerto Rico, yes, ma'am.

1          Q.   And that was sometime around 1993 or 1994?

2          A.   Exactly.

3          Q.   When you saw the defendant again for the first

4    time, did he tell you why he moved back from Houston?

5          A.   No.  No, ma'am.  We didn't talk about that.

6          Q.   And were you aware that Obel Cruz-Garcia had

7    become involved in drugs at that point?

8          A.   No, no, no.

9          Q.   So, you weren't aware that is how he made his

10   living here in Houston when he lived here?

11         A.   No, no, no.

12         Q.   Okay.  Ma'am, you said that you had your first

13   son with Obel Cruz-Garcia in 1994; is that right?

14         A.   No, it wasn't in '94.  It was in '98 when he

15   left me and I was pregnant.  My first child was in '94

16   in Santo Domingo.

17         Q.   You said that your first child was born in

18   1994?

19         A.   No.  My first child, which is Obel, was '96,

20   '97.

21         Q.   And then when was Obelito born?

22         A.   '96, '97.  He is the oldest.

23         Q.   Well, I'm confused, ma'am.

24         A.   Uh-huh.

25         Q.   What is the birth date of your oldest child,

1  Obel?

2      A.   Excuse me.   '87 because he left in that same

3  year.

4      Q.   The question is:  What is the birth date of

5  your first child?

6      A.   November of '86 -- the 23rd of November of '83.

7            THE INTERPRETER:  Interpreter correction:

8  Of '86.

9      Q.   (By Mr. Wood) So, your first child was born in

10 1986 named Obel, correct?

11     A.   Yes, ma'am.  Obelito.

12     Q.   I thought you said your sons were 23 years old

13 and 17 years old.  Is that right?

14     A.   Yes, ma'am.

15     Q.   Well, you've confused me, ma'am.  I don't know

16 when your sons were born.  Tell me when Obelito was

17 born.

18     A.   I'm confused in age.  I'm confused with '86.

19     Q.   Scratch the '86.

20     A.   November.

21     Q.   Is she answering?  Let me ask another question.

22            Are you comfortable with saying that your

23 two boys are 23 years old and 17 years old today?

24     A.   Yes.

25     Q.   And their names are Obel and Obelito; is that

1  right?

2       A.   No.  Obelito and Abel.

3       Q.   Abel.  Thank you.  Sorry.  I was confused about

4  that, ma'am.

5            Okay.  So, Obel Cruz-Garcia that is here in

6  the courtroom is the father of both of those children,

7  correct?

8       A.   No.  He was not present with the first one.  He

9  wasn't present.

10      Q.   That was not my question.  Is he the father of

11  both of your sons?

12      A.   Yes, sir.  Yes, ma'am.

13      Q.   So, when you and Obel Cruz-Garcia got back

14  together in 1993 or '94, how long did you stay together

15  at that time?

16      A.   On that occasion, '93, '94, '94.  And then when

17  the baby was born, we came over here.

18      Q.   And when you say you came over here, you came

19  back to -- you went back to Santo Domingo?

20      A.   Yes, ma'am.

21      Q.   And that was in 1995?

22      A.   Yes.  '95 to '96, in December and January we

23  came back here.

24      Q.   When did Obel Cruz-Garcia return to Puerto

25  Rico?

1      A.   I know that my son was 4 to 5 years old.

2  Excuse me.   He would continue traveling.   He was just

3  traveling.

4      Q.   So, you are aware that your husband, Obel

5  Cruz-Garcia, went to prison in Puerto Rico in 2001,

6  aren't you?

7      A.   Yes.   I found that out because I hear the

8  comment about it, that he was in prison and that he was

9  calling.

10     Q.   And during that time, your son, Obelito, would

11 have been about 5 years old, wouldn't he?

12     A.   Yes, the youngest.

13     Q.   And Obel Cruz-Garcia has been in jail or prison

14 since that time, hasn't he?

15     A.   Yes.

16     Q.   So, since 2001 how many times would you say

17 Obel Cruz-Garcia has seen his son, Obelito?

18     A.   In 2000 we were together here in Santo Domingo.

19     Q.   Since Obel Cruz-Garcia has been in prison, how

20 many times has your son, Obelito, seen his dad?

21     A.   The younger one?

22     Q.   Yes.

23     A.   I would send him -- I would take him.   It was

24 about three times.

25     Q.   So, you would take him to the prison to see his

 1  dad?

 2      A.   No.  I was in Santo Domingo.  I did not travel.

 3      Q.   Where is your oldest son today?

 4           MR. CORNELIUS:  Judge, we renew our motion.

 5           THE COURT:  That will be noted and

 6  overruled.

 7      A.   Here in Santo Domingo.

 8      Q.   (By Mr. Wood) Where does he live?

 9      A.   He lives out in the countryside.  Cocatre

10  (phonetic) or -- I don't know exactly because it's been

11  several months since I've heard anything from him.

12      Q.   Are you aware if he is in prison or not?

13      A.   No, no, no.

14      Q.   Are you saying you don't know if your son is in

15  prison or not, or, no, he is not in prison?

16      A.   No, no.  That, I don't know.  No, I don't know.

17  I don't know about his life right now.

18      Q.   Ma'am, are you aware or do you know a person by

19  the name of Dorka?

20      A.   I have heard about her because I know that she

21  has a daughter with my husband.

22      Q.   And are you aware that Obel Cruz-Garcia has

23  been married to Dorka?

24      A.   Well, I know that they had some type of

25  relationship and I became aware of it when the child was

1   born.

2       Q.   Well, ma'am, are you aware that Dorka believes

3   that they have been married since 1995?

4               MR. CORNELIUS:  Objection to the question,

5   Judge.  It calls for hearsay.

6               THE COURT:  That's sustained.

7       Q.   (By Mr. Wood) Are you aware whether or not the

8   defendant has been married to Dorka since 1995?

9       A.   Well, I became aware of it after the child was

10  born, but I did not know that he had a relationship.

11              MR. WOOD:  I pass the witness.

12              THE COURT:  Do we have anything further?

13              MR. CORNELIUS:  He's passing the witness.

14  I'd ask for a jury instruction on the question about

15  what Dorka knows or believes.

16              THE COURT:  As to the question that was

17  solicited where the objection was sustained as to

18  hearsay, you are to disregard that question and not

19  consider it for any reason.

20              MR. CORNELIUS:  Move for a mistrial.

21              THE COURT:  That will be denied.

22              Do we need this witness any further?  I'm

23  talking about trying to get her picture back on the

24  screen?

25              MR. MADRID:  No, we don't need her.

1          THE COURT:  The State has passed the

2   witness on cross-examination.  Is there any redirect,

3   Mr. Madrid?

4          MR. MADRID:  No redirect, Your Honor.

5          THE COURT:  All right.  This witness is

6   excused then.

7          THE WITNESS:  Thank you all very much.

8          THE COURT:  Defense, call your next.

9          MR. MADRID:  The defense calls Joel

10  Cruz-Garcia.

11         THE BAILIFF:  The witness has not been

12  sworn, Your Honor, and needs an interpreter.

13         THE COURT:  Please raise your right hand,

14  sir.

15         (Witness sworn)

16         THE BAILIFF:  Your Honor, we have to switch

17  on the witnesses.  This is an incorrect witness.

18         MR. MADRID:  Your Honor, we called Joel.

19  This is Abel.  He is going to step right in.

20         THE COURT:  Do we have the next witness

21  available?

22         MR. MADRID:  Yes, we do, Your Honor.

23         THE COURT:  Let's bring in that witness.

24         Please raise your right hand, sir.

25         (Witness sworn)

1          THE COURT:  Very good.  You may take the

2    witness stand.

3          Please keep your voice up and speak into

4    the microphone.

5          You may proceed.

6                **JOEL CRUZ-GARCIA,**

7    having been first duly sworn, testified as follows:

8                **DIRECT EXAMINATION**

9    **BY MR. MADRID:**

10        Q.   Good morning.  Can you please introduce

11   yourself to the jury?

12        A.   Joel Cruz-Garcia.

13        Q.   And, Mr. Cruz-Garcia, can you lift the

14   microphone a little bit and talk into it, please?

15        A.   Okay.

16        Q.   Where do you live, Mr. Cruz-Garcia?

17        A.   Puerto Rico.

18        Q.   And how old are you?

19        A.   Forty.

20        Q.   What do you do in Puerto Rico?

21        A.   I have a small landscaping company and a small

22   company, a cheese factory.

23        Q.   Are you married?

24        A.   Yeah.

25        Q.   How long have you been married?

```
 1        A.    Fifteen.

 2        Q.    Do you have any children?

 3        A.    Yes.

 4        Q.    How many?

 5        A.    Two.

 6        Q.    How old are they?

 7        A.    Thirteen and the other one is eleven.

 8        Q.    And do you know the man sitting to my right

 9  here?

10        A.    Yes.

11        Q.    And who is he, in the gray suit?

12        A.    My brother.

13        Q.    Obel Cruz-Garcia?

14        A.    Yes.

15        Q.    I'm going to ask you some questions about kind

16  of where you were born and raised.

17        A.    Okay.

18        Q.    Where were you born?

19        A.    In Santo Domingo.

20        Q.    Is that in the Dominican Republic?

21        A.    Yes.

22        Q.    Did you have any brothers or sisters?

23        A.    Yes.

24        Q.    Could you tell me how many?

25        A.    Four.
```

1      Q.   Brothers or sisters or could you describe that?

2      A.   Two sisters and two males.

3      Q.   And what were they -- who was born first and

4   last?

5      A.   The oldest one is Naomi, Obel, Natalia is the

6   third one, and I'm the little one.

7      Q.   And you are about five years younger than your

8   brother?

9      A.   Yes.

10     Q.   And could you tell me a little bit about your

11  childhood where y'all lived?

12     A.   Yes.  We lived in the capital city for about

13  seven years.  And after that, we were taken to the City

14  of Unawa.  It's a field there.

15     Q.   And did you have two parents?

16     A.   Yeah, yes.

17     Q.   What kinds of work did your father do?

18     A.   He was in the army over there, a marine, and

19  then he did fishing.

20     Q.   How did he end up changing to being a

21  fisherman?

22     A.   He suffered an automobile accident so he was

23  suspended, yeah.

24     Q.   He retired?  Did he get some kind of

25  retirement?

1        A.   Yeah, he was retired.  Yes.

2        Q.   And your mother, how long were your parents

3   together?

4        A.   For about 17 years.  And that's when she moved.

5   She went to Venezuela.

6        Q.   How old were you when she moved to Venezuela?

7        A.   Seven.  I was seven.

8        Q.   So, Obel was about twelve?

9        A.   Yeah.

10        Q.   And did y'all attend school?  What kind of

11   childhood did y'all have?

12        A.   Yes, we attended school.  Yes.

13        Q.   And did Obel attend school?

14        A.   Yeah, yes.

15        Q.   When he was a teenager, did he work or help his

16   father in the fishing business?

17        A.   Yeah, yes.

18        Q.   What did he do?  Can you describe that?

19        A.   He would help with the nets to put out in the

20   sea and then to bring it back.

21        Q.   And at some point did he leave the Dominican

22   Republic?

23        A.   Yes.

24        Q.   When was that?

25        A.   '85, 1985.

```
 1      Q.   Before I get into that, can you give me a
 2  little bit about your family history.  Where is your
 3  father living right now?
 4      A.   Over there in Unawa, Santo Domingo.
 5      Q.   Does he live with anyone else?
 6      A.   Yes.  He has another wife.
 7      Q.   And how about your mother?
 8      A.   In Venezuela.  She lives in Venezuela.
 9      Q.   And how is she doing?
10      A.   Right now she's ill.  Heart disease.
11      Q.   And how about your sisters?
12      A.   They live over there and they have their
13  children, they have their steady lives.
14      Q.   In Venezuela?
15      A.   Yeah.
16      Q.   Do you have any step brother or sisters?
17      A.   Yeah.  Two.
18      Q.   Where do they live?
19      A.   In Santo Domingo.
20      Q.   Could you tell me a little bit about when you
21  were growing up what kind of brother Obel was?
22      A.   He was good and he was always caring for me.
23  We had a good relationship.
24      Q.   Were you close with him?
25      A.   Yes, yes.
```

1       Q.    He looked after you and took care of you?

2       A.    Yes, yes.

3       Q.    You said in 1985 or '96, he moved to Puerto

4   Rico?

5       A.    Yes, more or less.

6       Q.    What did he go to do in Puerto Rico?

7       A.    To work.

8       Q.    What kind of work did he do there?

9       A.    I remember he was working out in the field.

10      Q.    And was he working -- what was he doing out in

11  the field?

12      A.    Picking coffee.

13      Q.    And at some point did you -- do you know if he

14  stayed in Puerto Rico or moved somewhere else?

15      A.    I believe that after some time -- I don't know

16  when -- he came over here.

17      Q.    And do you know anything about his life over

18  here?

19      A.    From -- how do you say it?  From just what I

20  have heard.

21      Q.    What do you know?  What do you know about his

22  life over here?

23      A.    That he came to live here with a wife.

24      Q.    And he was involved in the drug business?

25      A.    I couldn't tell you -- how do you say it?

1    Well, I was in Puerto Rico, I couldn't say that.

2        Q.    Were you ever involved in the drug business?

3        A.    No, no, never.

4        Q.    That part of his life, if he was involved in

5    the drug business or any kind of crime, wasn't part of

6    your life, was it?

7        A.    No.

8        Q.    You work and you have a family, right?

9        A.    Yeah.

10       Q.    Did you -- after he went to Houston, when did

11   you see him next?

12       A.    When he was here in prison.

13       Q.    And what I'm saying, did you see him in Puerto

14   Rico or the Dominican Republic after the late 80s?

15       A.    In Puerto Rico.  In Puerto Rico.

16       Q.    About what year did you see him in Puerto Rico?

17       A.    About '92 or '93 or so.

18       Q.    And at that time, did you continue having

19   contact and a relationship with him?

20       A.    Very little, but, yes, we saw each other.

21       Q.    When would you -- say, from 1992 till the year

22   2000, when did you have contact with him?

23       A.    We may have seen each other maybe more than ten

24   times.

25       Q.    When would you see each other?

```
 1        A.   Whenever -- before going to church, whenever I
 2   got out of work.
 3        Q.   And I'm talking about -- when he was in Puerto
 4   Rico or the Dominican Republic?
 5        A.   No.  Puerto Rico.  When he was in Puerto Rico.
 6        Q.   And when did he move back to the Dominican
 7   Republic?
 8        A.   '98, '97, or so.
 9        Q.   Did you get a chance to see him in those years?
10        A.   Yes, yes.
11        Q.   And did you have communication with him?
12        A.   Yes.  He will always call me and we were in
13   contact as brothers.
14        Q.   Would he ever visit you in Puerto Rico?
15        A.   Yes.  Yes, he did.
16        Q.   And what did you know was going on in his life
17   at that time?
18        A.   As brothers -- well, we wouldn't talk -- I
19   mean, he has his life and I had mine.
20        Q.   But did he have a family, is what I'm asking?
21        A.   Yes.  Yeah.  He did in Santo Domingo, yes.
22        Q.   Did you ever get a chance to see him interact
23   with his sons?
24        A.   Yes.
25        Q.   And what is your opinion, was he a good father?
```

1      A.   Yes.

2      Q.   And was he working at that time?

3      A.   Yes, yes.

4      Q.   Did he have some kind of a real estate

5 business?

6      A.   Yes, yes.  In Santo Domingo.

7      Q.   Now, he went to prison in Puerto Rico, correct?

8      A.   Yes.

9      Q.   About when was that?

10      A.   2001, I think.

11      Q.   And what do you know about that?

12      A.   Only what I have heard.

13      Q.   You've heard that he had a kidnapping case

14 there?

15      A.   Yes.

16      Q.   Did you continue to have a relationship and

17 talk to him?

18      A.   Yes, we talked.  Yes.

19      Q.   Do you know anything about his spiritual life?

20           MS. TISE:  I'll object.  Calls for hearsay.

21           THE COURT:  Only if he knows of his own

22 personal knowledge, not through someone else.

23      A.   Sorry?

24      Q.   (By Mr. Madrid) Did you ever -- and what is

25 that, what is his spiritual life?

```
 1                    MS. TISE:  I'll object.  It calls for
 2   hearsay.
 3                    THE COURT:  Can you clear it up on the
 4   record, Mr. Madrid, whether he knows of his own personal
 5   knowledge or he was told by someone else?
 6                    MS. TISE:  And that someone else would
 7   include the defendant himself.
 8                    THE COURT:  No sidebar, Ms. Tise.
 9        Q.   (By Mr. Madrid) Did you ever attend any kind of
10   church services with him?
11        A.   I think once.  Once.
12        Q.   When was that?
13        A.   2002.
14        Q.   Where was that?
15        A.   In prison.
16        Q.   Was he -- would he attend church services in
17   prison?
18                    MS. TISE:  I'll object.  Calls for hearsay.
19                    THE COURT:  That's sustained.
20        Q.   (By Mr. Madrid) Did you attend a church service
21   with him in prison?
22                    MS. TISE:  Asked and answered.
23                    THE COURT:  Let him answer that one more to
24   clarify.
25        A.   When I visited him, yes.
```

1      Q.   (By Mr. Madrid) Are you aware -- if you are,

2  you can answer -- that he was taking Bible classes?

3            MS. TISE:  I will object.  Calls for

4  hearsay.

5            THE COURT:  That's sustained.

6            MR. MADRID:  May I approach the witness,

7  Your Honor?

8            THE COURT:  Yes.

9      Q.   (By Mr. Madrid) I'm going to show you these

10  photos and ask you to look through them.  Just if you

11  could look through each one of them.  The pictures that

12  I have shown you, Defendant's Exhibits 21 through 47, do

13  you recognize them (indicating)?

14      A.   Yes.

15      Q.   And do they depict what they purport to depict?

16      A.   Yes.

17            MR. MADRID:  At this time, I tender Defense

18  21 through 47 and ask they be admitted.

19            **(Defense Exhibit No. 21 through 47 Offered)**

20            (Pause)

21            MS. TISE:  No objection.

22            THE COURT:  State's Exhibits 21, 22, 23,

23  24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37,

24  38, 39, 40, 41, 42, 43, 44, 45, 46, and 47 are admitted

25  without objection.

```
 1              You may proceed.

 2              MS. TISE:  Judge, for clarification

 3  purposes, those are Defense exhibits.

 4              THE COURT:  I'm sorry.  I said State.  Yes,

 5  those are Defense exhibits.

 6              (Defense Exhibit No. 21 through 47

 7               Admitted)

 8     Q.   (By Mr. Madrid) And without -- I'm not going to

 9  go through each individual photo at this time, but could

10  you generally describe what's in the exhibits that --

11  the pictures that you just looked at?

12     A.   Family, my -- the family of my brother.

13              MR. MADRID:  Pass the witness, Your Honor.

14              THE COURT:  Thank you, Mr. Madrid.

15              Ms. Tise.

16              MS. TISE:  Yes, Judge.

17              THE COURT:  You may proceed.

18                   CROSS-EXAMINATION

19  BY MS. TISE:

20     Q.   Good morning, Mr. Cruz-Garcia.  My name is

21  Natalie Tise and I am the prosecutor in this case along

22  with Justin Wood.  I'm hoping you can help me clear up

23  some of the family history.

24              First of all, how old is your brother, Obel

25  Cruz-Garcia?
```

```
 1        A.    Forty-five.   Forty-five.

 2        Q.    Okay.   And do you remember back in -- I guess

 3   it was the late 80s when he met Mireya who testified

 4   earlier today?

 5        A.    Yes.

 6        Q.    Okay.   And is it fair to say that he married

 7   her in 1988?

 8        A.    Yes.

 9        Q.    Okay.   When she was 15 and he was, my math

10   shows, 20.

11        A.    Yes.

12        Q.    And would you agree with me that they stayed

13   together about six months?

14        A.    More, a longer time.

15        Q.    Not long, right?

16        A.    Uh-huh.   Exactly.

17        Q.    And after six months with her, he left her for

18   a better life in Puerto Rico, correct?

19        A.    Yes.

20        Q.    And he left her pregnant with their first

21   child, Obelito.   Correct?

22        A.    Yes.

23        Q.    And do you know how old Obelito is now?

24        A.    Twenty-two, twenty-three, something like that.

25        Q.    Born in 1988, '89.   Does that sound right?
```

1     A.   Yes, one of those two years.

2     Q.   Okay.  And after your brother left for a better

3  life in Puerto Rico and left his 15-year-old pregnant

4  bride behind, do you remember if he married someone else

5  pretty much right away?

6     A.   I don't remember the marriage as such, no.

7     Q.   Okay.  Did he ever introduce you to his wife,

8  Angelita Rodriguez, that he married in Puerto Rico?

9     A.   Angelita, she was in -- in Puerto Rico, yeah.

10  In Puerto Rico.

11     Q.   And you met her in Puerto Rico?

12     A.   Yes.

13     Q.   And you knew he married her in 1989, didn't

14  you?

15     A.   No, I didn't know he had married.

16     Q.   Okay.  Did you know that he had a relationship

17  with her?

18     A.   A relationship I knew, yes.

19     Q.   And that relationship began before he left for

20  the United States?

21     A.   From Puerto Rico?

22     Q.   Yes.

23     A.   In Puerto Rico.

24     Q.   Is that correct, that you knew that he had a

25  relationship with her in Puerto Rico before he left for

1   the United States in 1989?

2        A.   Yes, yes.   That's right.

3        Q.   And you know that ultimately he took her with

4   him, correct?

5        A.   Over here?

6        Q.   Yes.

7        A.   Yes.

8        Q.   And they lived here in the United States as man

9   and wife for several years, did they not?

10        A.   That's my understanding.

11        Q.   Okay.   And what was your understanding of what

12   he did here in the United States to support himself?

13        A.   He worked.

14        Q.   And how do you know that?

15        A.   When he called me, he would tell me that he

16   worked.

17        Q.   And so, you know that from him, right?

18        A.   Yeah.

19        Q.   And I'm sure during those phone calls he didn't

20   tell you that he was over here selling drugs?

21        A.   No.

22        Q.   And I'm sure he also didn't tell you that

23   during those years over here he built up quite a nice

24   little business for himself, did he?

25        A.   No, no.

1      Q.   And he probably also didn't tell you that he

2  had a number of people who were working under him

3  selling drugs for him, a little network?

4      A.   No.

5      Q.   And I bet he also didn't tell you why he left

6  the United States and came back to the Dominican

7  Republic, did he?

8      A.   Not either.

9      Q.   Were you surprised when he came back?

10      A.   No, no.

11      Q.   Okay.  When he came back, did he go back

12  immediately to Mireya?

13      A.   Yeah.  Yes, yes.

14      Q.   Okay.  And did she take him back?

15      A.   Yes.

16      Q.   And, ultimately, they had a second child

17  together, didn't they?

18      A.   Yeah, yes.

19      Q.   And what is his name?

20      A.   Abel Cruz-Perez.

21      Q.   During that time, where did you live in

22  relation to your brother Obel and Mireya?

23      A.   In Puerto Rico.

24      Q.   So, were you in Puerto Rico and they were

25  living in the Dominican Republic during those years?

 1     A.   No.   They lived in Puerto Rico.   Yes, Puerto

 2  Rico.

 3     Q.   I'm sorry.   I misunderstood.   So, when he came

 4  back, did he go initially to the Dominican or initially

 5  to Puerto Rico?

 6     A.   Puerto Rico.   Puerto Rico.

 7     Q.   Okay.   And during that time period, how often

 8  would you see your brother?

 9     A.   Very seldom, very seldom.

10     Q.   Very seldom.

11          So, basically, what you know what he was

12  doing for a living and how his life was during that time

13  is from what he told you, correct?

14     A.   Exactly.

15     Q.   So, if he wasn't telling you all the truth

16  about everything, you wouldn't necessarily know about

17  that, would you?

18     A.   That's true.

19     Q.   And if you weren't seeing him very often, how

20  could you say that he was a good father?

21     A.   For the children, for the child.

22     Q.   How can you say that if you didn't see him very

23  often?

24     A.   From his testimony whenever he called me and

25  told me about his son.

1    Q.   So, basically, from things that he would share

2  with you?

3    A.   Yes, yes.

4    Q.   At some point after he was in Puerto Rico

5  living with Mireya, he left her and married another

6  individual, didn't he?

7    A.   How do you say that?  Living together.  Not

8  married, but living together.

9    Q.   Okay.  Well, you know an individual name Dorka,

10 do you not?

11   A.   Dorka, yes.

12   Q.   And you have communications with her from time

13 to time, do you not?

14   A.   Yeah.

15   Q.   And she considers herself married to your

16 brother, doesn't she?

17   A.   That's up to her.  That's her.  Exactly.

18   Q.   I'm asking what your experience has been.

19   A.   She has a child with him.  They had a child.

20 Exactly.

21   Q.   And he lived with her, didn't he?

22   A.   Yes, yes, yes.

23   Q.   So, he left Mireya, once again, and this time

24 established a relationship with Dorka?

25   A.   Yes.

```
 1      Q.   And she's very devoted to him, is she not?

 2      A.   Yes.

 3      Q.   Writes him all the time?

 4      A.   Yes, yes.

 5      Q.   Calls him?

 6      A.   Yeah.

 7      Q.   Puts money on his commissary?

 8      A.   Yes.

 9      Q.   And so do you, right?

10      A.   Yes.

11      Q.   So does Mireya, right?

12      A.   Mireya?  Not from there, no.

13      Q.   Are you aware that Mireya describes herself as

14   his ex-wife?

15      A.   Yeah, yes.

16      Q.   How many children does he have?

17      A.   It's Obelito, Abel, Obel, Obelina.  Four.

18      Q.   And Obelito and Abel are his children with

19   Mireya, right?

20      A.   Yeah, yes.

21      Q.   And Obelise is his daughter --

22      A.   Dorka.

23      Q.   -- with Dorka?

24              THE INTERPRETER:  I'm sorry.  Can you

25   repeat the question for the interpreter?
```

1    Q.   (By Ms. Tise) Obelise is his daughter with

2  Dorka?

3    A.   Yeah.

4    Q.   And who is Obelina?

5    A.   She lives in Miami, yeah.

6    Q.   Whose daughter is she?

7    A.   Obel's.

8    Q.   How old is she?

9    A.   I believe she's 12, 12 years old.

10    Q.   Who is her mother?

11    A.   I don't remember the name.  I don't remember

12  the name.

13    Q.   And in those pictures that Mr. Madrid showed

14  you, are there any pictures of Obelise or Obelina in

15  there?

16    A.   Not from Obelina, no.

17    Q.   Okay.  Are there pictures of Obelise in there?

18    A.   No, not either.  Not Obelise.

19    Q.   Are there any pictures of Dorka, his current

20  wife, in there?

21    A.   No, no.

22    Q.   And do you know why Dorka is not here today?

23    A.   Because of her documentation, she cannot

24  travel.

25    Q.   Well, she could have Skyped, couldn't she?

```
 1        A.   Correct.  Yes, that's my understanding.
 2        Q.   You said that your brother, Obel Cruz-Garcia,
 3   was a good father from what you could see from a
 4   distance and what he told you?
 5        A.   Yeah.
 6        Q.   Some of these children, I don't know that he
 7   would have ever seen.  Has he?
 8        A.   Yes.
 9        Q.   He's been in prison since 2001, right?
10        A.   Yes.
11        Q.   But he's a good father to those children?
12        A.   Obelise, the one he has with Dorka, yes, he
13   will see her in jail, visiting in jail.
14        Q.   Okay.  Does she live here in the United States?
15        A.   In Puerto Rico, yeah.
16        Q.   Has she traveled here to see him he knows he
17   has been here?
18        A.   No.
19        Q.   Okay.  And how old is Obelise?
20        A.   Twelve, twelve.
21        Q.   So, she's also twelve?
22        A.   Yes.
23        Q.   Okay.  Where is Obelito now?
24        A.   In jail.
25        Q.   Okay.  In jail in Puerto Rico?
```

1      A.   Yes.

2                MR. CORNELIUS:  We renew our motion.  I

3    think you've already ruled on it, but --

4                THE COURT:  That's overruled.

5                MR. CORNELIUS:  -- for the record, it's

6    renewed.

7      Q.   (By Ms. Tise) And you know about the case that

8    he's here charged on today, do you not?

9                THE COURT:  Please clarify who you're

10   talking about.  He is charged.

11               MS. TISE:  I'm sorry.

12     Q.   (By Ms. Tise) Your brother.  You know about the

13   case that your brother is here charged on today,

14   correct?

15     A.   Yes, yes.

16     Q.   You are aware that he is charged with killing a

17   6-year-old boy?

18     A.   Yeah.

19     Q.   And you are aware that this jury heard the

20   evidence and found him guilty?

21     A.   Yes.

22     Q.   Do you also know the facts about the kidnapping

23   case that he went to prison on in Puerto Rico?

24     A.   Part of it, yes.

25     Q.   What's your understanding of what happened in

```
 1   that case?
 2        A.   It was said on the TV that he did that, on TV.
 3        Q.   And you know that he pled guilty to that case,
 4   do you not?
 5        A.   Well, yes.
 6        Q.   And since he was sentenced to prison, you've
 7   visited him once and went to church with him once,
 8   right?
 9        A.   Several times.
10        Q.   Several times.
11             Isn't it true that earlier you said you
12   went once?
13        A.   Once before, yes.
14             MS. TISE:  I will pass with the witness.
15             THE COURT:  Anything further, Mr. Madrid?
16             MR. MADRID:  Briefly.  Just briefly.
17             THE COURT:  Proceed.
18                    REDIRECT EXAMINATION
19   BY MR. MADRID:
20        Q.   From 2001 till whenever Obel left prison in
21   Puerto Rico and came here, how many times did you visit
22   him?
23        A.   One -- three times counting this time.
24        Q.   But only once did you have an opportunity to go
25   to church with him there?
```

```
 1        A.   Yes, yeah.
 2                  MR. MADRID:  Pass the witness, Your Honor.
 3                  THE COURT:  Thank you, Mr. Madrid.
 4                  Ms. Tise, anything?
 5                  MS. TISE:  No, Your Honor.
 6                  THE COURT:  May this witness be excused?
 7                  MS. TISE:  Yes, Your Honor.
 8                  MR. CORNELIUS:  I need to put something on
 9   the record after the jury is out or whenever you want me
10   to with this witness.
11                  THE COURT:  Okay.  Let's excuse him at this
12   time.  Is it subject to recalling this witness,
13   Mr. Cornelius, or possibly?
14                  MR. CORNELIUS:  I just need to put
15   something on the record.
16                  THE COURT:  Then the witness is excused.
17   You may step down, sir.
18                  And we're going to break for lunch at this
19   time.  So, jurors, you are reminded you should not talk
20   amongst yourselves or anyone else on any subject
21   connected with the trial or to form or express any
22   opinion thereon.
23                  We'll resume in approximately an
24   hour-and-a-half when you're finished with lunch.
25                  THE BAILIFF:  All rise.
```

1                    (Open court, defendant present, no jury)

2                    THE COURT:  Do we have something for the

3    defendant?  Just while he makes something -- a comment

4    on the record.  Very good.  All right.  Sit down.

5                    MR. CORNELIUS:  You want me to go forward

6    now?

7                    THE COURT:  Yes, you may go forward on the

8    record.

9                    MR. CORNELIUS:  Judge, this is just a

10   proffer because from the State's objections, I know

11   they're going to object to this.  Not sure how the Court

12   is going to rule, but I'll give them a chance to object

13   outside the presence jury.  And if the Court doesn't

14   allow these exhibits into evidence, they will be part of

15   the record.  But through Joel, the witness, the

16   defendant's brother who just testified, Mr. Madrid, if

17   he were allowed, would ask him to identify these

18   exhibits State's 48 through 55, which are certificates

19   that the defendant earned while in prison in Puerto Rico

20   concerning Bible studies.

21                   The basis of our offering this is that the

22   witness has talked to him about these things.  Not that

23   the witness took the courses with him, but he's talked

24   to him about it.  All of the evidence shows Obel

25   Cruz-Garcia as the recipient.  Some are not dated, but

1   the ones are dated, the dates are within the timeframe

2   that he has been in prison.

3            We think -- we anticipate the State

4   objecting that our proffer is based upon hearsay.  And

5   it is based upon hearsay, but this being a capital

6   murder case, I'm thinking that the Court could rule that

7   that goes to the weight to be given the evidence and not

8   the admissibility.  We gave them copies of this.  The

9   State has copies of all these documents.

10            So, anyway, I just thought it would be

11   easier to do that right now.  I didn't want to do it in

12   front of the jury in case the State --

13            THE COURT:  So, make your proffer on the

14   record.  What are the exhibit numbers?

15            MR. CORNELIUS:  Exhibits 48 through 55.

16            MR. WOOD:  You said State's exhibits.

17            MR. CORNELIUS:  Oh, I'm sorry.  Defense

18   exhibits.

19            **(Defense Exhibit No. 48 through 55 Offered)**

20            THE COURT:  Okay.  So, defense is offering

21   Defense Exhibits 48 through 55.  And they would offer

22   them through this witness, Joel --

23            MR. CORNELIUS:  Yes.

24            THE COURT:  -- Cruz-Garcia?

25            And so, what says the State?

```
 1              MS. TISE:  We'll object as hearsay.
 2              THE COURT:  Okay.  May I see the exhibits?
 3              Okay.  The Court finds that Defense
 4   Exhibits 48 through 55 are relevant, so I'm not going to
 5   sustain them on that ground, but on the grounds of
 6   hearsay through this witness, I will sustain the State's
 7   objection as to hearsay.
 8              And it looks like one of them, State's
 9   Exhibit -- I mean Defense Exhibit 55 contains a bunch of
10   other items.  There are number of different things in
11   here, but they would still all be hearsay.
12              You don't have any type of documentation as
13   to business records or anything on any of these?
14              MR. CORNELIUS:  I don't, Judge.  And my
15   option would be to call the defendant and I'm inclined
16   not to call him just to get that into evidence, or to
17   call the people from Puerto Rico where they taught these
18   classes.  And I'm not prepared to do that.
19              THE COURT:  Well, you have that option.  I
20   think they would be admissible through the defendant if
21   he chose to testify, but through this witness, they are
22   hearsay.  So, I sustain that objection.
23              MR. CORNELIUS:  So, I will offer them for
24   purposes of the record only.  I'll just leave the same
25   numbers on them.
```

```
 1                    THE COURT:  Okay.

 2                    MR. CORNELIUS:  That's all we have.

 3                    THE COURT:  So, you will not be calling

 4   another witness or you will?

 5                    MR. CORNELIUS:  We have another witness.

 6                    THE COURT:  Okay.  Very well.

 7                    Let's break for lunch.  And the jury is

 8   going out today.  I anticipate that they will be at

 9   least an hour-and-a-half.  So, let's be back at 2:00 or

10   a little earlier.  Okay?

11                    (Lunch recess)

12                    (Open court, defendant not present, no

13                     jury)

14                    THE COURT:  Let's go back on the record in

15   Cause No. 1384794.  We're outside the presence of the

16   jury.

17                    Go ahead, Ms. Tise.

18                    MR. CORNELIUS:  I don't know that he needs

19   to be here for this.

20                    THE COURT:  I don't think he does.

21                    You want to start?

22                    MS. TISE:  Defense counsel let me know that

23   a witness came today, unbeknownst to him, someone who

24   knows the defendant from jail.  I was talking to him and

25   he told me that he has been listening to the punishment
```

1   phase of the trial.  So, I would object to his testimony

2   as being a violation of the Rule.

3                  MR. CORNELIUS:  Can I respond?

4                  THE COURT:  Yes, go ahead and respond.

5                  MR. CORNELIUS:  He's never been under the

6   Rule.  He hasn't been subpoenaed.  He wasn't under the

7   Rule.  He doesn't even know what the Rule is.  I have

8   him outside now, but to complete the conversation,

9   apparently he came down here today in support of Obel

10  Cruz-Garcia.  Okay?  When we broke for lunch, my

11  investigator said:  You ought to talk to this kid.

12  Apparently the kid went over and talked to Joel.  And

13  so, I went over there and got him and sat with him over

14  there and he told me that he hasn't been asked to be

15  down here, he hasn't been subpoenaed by the State.  The

16  investigators for either side have never talked to him

17  before, but he was in jail with Obel and used to pray

18  with him and Obel was helpful to him.

19                  MS. TISE:  Most of that is going to be

20  hearsay.  And my conversation with him --

21                  THE COURT:  I'll let you lodge the hearsay

22  objection.

23                  I'm going to allow him to testify in

24  regards to his observations while he was in custody.  Do

25  you know -- were you made aware of what he was in

 1    custody for or --

 2                    MS. TISE:  Yes.

 3                    THE COURT:  Okay.  So, y'all know all of

 4    that.  I'm going to allow him to put that witness on.  I

 5    understand that he listened to some of the other

 6    witness, but there wasn't a whole lot of testimony about

 7    what went on, except for that one.  You know, it's not

 8    like he's heard a bunch of information and would try to

 9    confirm that.  He's going to give his own individual

10    information about Obel.

11                    MR. CORNELIUS:  I doubt he knows anything

12    that was talked about by the family, but I'm not going

13    to go into that anyway.  I mean, I didn't even ask him

14    about it.  I assume that he didn't know it, but that

15    might be a problem.  I wasn't calling him to rebut what

16    they said on cross-examination.  I'm not planning to do

17    that.

18                    THE COURT:  All right.  Very good.

19                    I would like, before we start out again --

20    he has two witnesses and then I would like to go

21    directly into the charge and reading the charge and then

22    argument.

23                    So, have you looked over the amended

24    charge?

25                    MS. TISE:  I have.

```
 1                    THE COURT:  Do you have any objections?
 2                    MS. TISE:  No.  And I'm ready to go right
 3   into it.
 4                    THE COURT:  So, Mr. Cornelius, do you want
 5   to look over that charge before we get going?  I am not
 6   going to allow the extraneous instruction jury to the
 7   jury in the charge.  And I also want to put on the
 8   record that you asked for the parole law.
 9                    So, other than that, do you have any
10   objection to it?  You can put that on now.
11                    MR. CORNELIUS:  No.  Those two -- I had the
12   request that you granted and the objection that you
13   denied.
14                    MS. TISE:  So, is the extraneous
15   instruction still in the charge?
16                    THE COURT:  I keep meaning accomplice.
17                    MS. TISE:  Okay.  I was going to say, I
18   thought I saw it in there.
19                    THE COURT:  The extraneous did go in there.
20   And that was -- yes.
21                    MS. TISE:  That's correct.
22                    THE COURT:  But the accomplice witness
23   instruction, I'm not putting in this one.
24                    MS. TISE:  Okay.
25                    THE COURT:  Okay.  Very good.
```

```
 1              MS. TISE:  Judge, in addition, we made

 2   copies of the little blue bag of the complainant's and

 3   the contents and we'll be offering the photos in place

 4   of that.  Mr. Cornelius indicated he has no objection to

 5   doing that, but I wanted to put that on the record.

 6              THE COURT:  Let's put that on the record

 7   and talk about the charge in just a second.  Okay?

 8              MS. TISE:  Okay.

 9              (Pause)

10              (Open court, defendant present, no jury)

11              THE COURT:  Back on the record in Cause

12   No. 1384794, the State of Texas vs. Obel Cruz-Garcia.

13   Mr. Cruz-Garcia is present at counsel table with his

14   attorneys, Mr. Cornelius and Mr. Madrid.  Present for

15   the State is Mr. Wood and Ms. Tise.  And the jury is not

16   present at this time.

17              Before bringing out the members of the

18   jury, the Court has delivered to each of the attorneys a

19   proposed charge.  Have you had an opportunity to -- have

20   both sides had an opportunity to review the proposed

21   punishment charge?

22              MS. TISE:  We have reviewed it, Judge.

23              MR. CORNELIUS:  We reviewed it, Judge.

24              THE COURT:  Does the State have any

25   objections to the charge?
```

1          MS. TISE:  We don't have any objection,

2   Judge, but we wanted to note for the record that there

3   was an addition made to the charge about the parole law

4   and the 35-year eligibility for parole.

5          THE COURT:  Okay.

6          MS. TISE:  We just want it to be clear for

7   the record that that was done at the request of

8   Mr. Cornelius.

9          THE COURT:  Okay.  So, is that correct,

10  defense, Mr. Cornelius, that you requested --

11  specifically requested that the parole law instruction

12  instructing the jury that the defendant would be

13  eligible for parole at 35 -- after 35 calendar years but

14  they still should not consider that in assessing -- they

15  may consider the existence of this parole law; however,

16  that they are not to consider the manner in which the

17  parole law may be applied to this particular defendant?

18  Did you request that parole instruction?

19          MR. CORNELIUS:  I did, Judge.

20          THE COURT:  Okay.  Very good.

21          Did you have an opportunity, other than

22  that portion of the charge, to review the entirety of

23  the charge, Mr. Cornelius?

24          MR. CORNELIUS:  I did, Judge.

25          THE COURT:  Do you have any objections?

1           MR. CORNELIUS:  Well, the only objection I

2    had -- or it was actually not an objection, but a

3    request to put in the accomplice witness rule as a

4    matter of law.  And I understand the Court denied that.

5    The record should reflect that I requested the

6    accomplice witness rule instruction.

7           THE COURT:  Okay.  And so the record is

8    clear, you are requesting an instruction to the jury

9    similar to the instruction given in the guilt-innocence

10   phase, wherein if they hear an accomplice witness there

11   to corroborate that evidence before they can consider

12   the testimony of that accomplice.  In other words, they

13   have to tie the defendant in some way, connect the

14   defendant to the crime with corroborating evidence

15   before they can consider the testimony of the

16   accomplice.  That's the instructions that you are

17   wanting?

18           MR. CORNELIUS:  Yes.  The same exact

19   instruction that we had on the guilt or innocence

20   charge.

21           THE COURT:  As to the accomplice.  Okay.

22   And that will be denied.

23           Other than that, do you have any objections

24   to the charge?

25           MR. CORNELIUS:  No, ma'am.

 1                    THE COURT:  Okay.  Very good.

 2                    So, at this time, we're going to bring out

 3   the jury.  After the witnesses, I intend to ask both

 4   sides if they are resting and closing, and then we'll

 5   proceed directly into reading the charge and argument.

 6   I will give each side one hour.

 7                    All right.  You can bring out the jury.

 8                    (Open court, defendant and jury present)

 9                    THE COURT:  Please be seated.

10                    We're back on the record in Cause

11   No. 1384794, the State of Texas vs. Obel Cruz-Garcia.

12   Mr. Cruz-Garcia is present at counsel table with his

13   attorneys.  The State is represented by their attorneys.

14   The jury is present in the courtroom.

15                    Are you ready to proceed, defense?

16                    MR. MADRID:  Yes, we are, Your Honor.

17                    THE COURT:  You may call your next witness.

18                    MR. MADRID:  The defense calls Abel

19   Cruz-Perez.

20                    THE COURT:  And this witness has been

21   sworn?

22                    MR. MADRID:  Yes, he has.

23                    THE BAILIFF:  Your Honor, the witness has

24   been sworn.

25                    THE COURT:  Thank you, Deputy.

1          Sir, please speak into that microphone and

2    keep your voice up.

3          You may proceed, Mr. Madrid.

4          MR. MADRID:  Thank you, Your Honor.

5                    **ABEL CRUZ-PEREZ,**

6    having been first duly sworn, testified through the

7    interpreter as follows:

8                  **DIRECT EXAMINATION**

9    **BY MR. MADRID:**

10       Q.   Good afternoon.

11       A.   Good afternoon.

12       Q.   Can you please, for the record, state your name

13   and introduce yourself to the jury, please?

14       A.   Abel Cruz-Perez.  Good afternoon.

15       Q.   And Abel, how old are you?

16       A.   Seventeen years old.

17       Q.   Where do you live?

18       A.   In Unawa, Dominican Republic.

19       Q.   Where were you born?

20       A.   In Puerto Rico.

21       Q.   So, you are a U.S. citizen?

22       A.   Yes.

23       Q.   But you live in Puerto Rico?

24       A.   No.  Dominican Republic.

25       Q.   Who do you live with in the Dominican Republic?

```
 1        A.    With my mother.

 2        Q.    What is her name?

 3        A.    Mireya Perez.

 4        Q.    And do you know the man seated to my right here

 5   in the gray coat?

 6        A.    My father.

 7        Q.    Obel Cruz-Garcia is your father?

 8        A.    He's my father.

 9        Q.    What do you do there in the Dominican Republic?

10   Are you in school?

11        A.    I study.  I go to school.

12        Q.    Do you have two years left in high school?

13        A.    Two years to finish it.

14        Q.    Do you have a girlfriend or wife or anything?

15        A.    Yes.

16        Q.    Which one?

17        A.    A wife.

18        Q.    Do y'all have any kids together?

19        A.    Yes.

20        Q.    How many?

21        A.    One.

22        Q.    You have a little girl?

23        A.    A girl.

24        Q.    What is her name?

25        A.    Avelian (phonetic).
```

1     Q.   How old is she?

2     A.   Seven months.

3     Q.   And that would be your father's granddaughter?

4     A.   Yes.

5     Q.   Now, when you were a little boy, did you live

6 with your father?

7     A.   Yes.

8     Q.   When were you born?

9     A.   '95.

10     Q.   And you understand your father went to prison

11 in 2001, right?

12     A.   Yes.

13     Q.   Before he went to prison, tell me -- I want to

14 ask you a little about your family life -- who lived

15 with you?

16     A.   My mother and my father.

17     Q.   Does your brother live with you, too?  Did you

18 have a brother?

19     A.   Yes.

20     Q.   And during those years before your father went

21 to prison, was it an on-and-off thing or did he live

22 with you the whole time?

23     A.   He lived with us permanently.

24     Q.   And if you remember, do you remember if your

25 father worked?

```
 1        A.    Yes.

 2        Q.    What did he do?

 3        A.    Real estate.

 4        Q.    Do you remember if your father was a good

 5  worker or a hard worker?

 6        A.    Good father.  He is a good father.

 7        Q.    And I'm asking about, is he a good worker?

 8        A.    Yes, a hard worker.

 9        Q.    Did he go to work every day?

10        A.    Yes, he did go to work every day.

11        Q.    Did he spend time with you every day?

12        A.    Yes.

13        Q.    What kind of things would he do with you?

14        A.    He would help me to study for school and all of

15  that.  And he was always playing with me.

16        Q.    Did you attend church with your father?

17        A.    I did go to church, yes.

18        Q.    Would your father take you there?

19        A.    Yes, he did.

20        Q.    And, Abel, there is some tissue in front of

21  you, if you need it.  Right there to your left.

22              Did he guide you like in the ways of the

23  church in whatever church you went to?

24        A.    Yes.

25        Q.    How did he do that?
```

1    A.   So I could learn the word of God and all of

2  that.

3    Q.   After he went to prison, it was harder to see

4  him, wasn't it?

5    A.   Yes, it was harder.

6    Q.   But did you have an opportunity to see him

7  while he was in prison?

8    A.   Yes.

9    Q.   Did you have any communication with him while

10 he was in prison those years in Puerto Rico?

11   A.   Yes.  Through mail, sending letters.

12   Q.   Would he send you a lot of letters?

13   A.   Yes.

14   Q.   Is it more difficult now that he's come to the

15 United States to communicate with him?

16   A.   Yes, it's more difficult.

17        MR. MADRID:  Your Honor, permission to

18 publish the exhibits?

19        THE COURT:   You may.

20   Q.   (By Mr. Madrid) I'm going to show you some

21 photos, Abel.  I'm going to start with State's -- I'm

22 sorry -- Defense No. 21.  Could you tell me what that is

23 (indicating)?

24   A.   That's me and my little girl.

25   Q.   Is this her as well?

1      A.   That's her as well.

2      Q.   Did an investigator go to visit you from --

3  that was working with us there in the Dominican

4  Republic?

5      A.   Yes.

6      Q.   And did they take some photos of where you

7  live?

8      A.   Yes.

9      Q.   I'm showing you State's 40.  Can you tell me

10 what that is?  I'm sorry.  Defense 40 (indicating).

11     A.   My house.  That's my mother with the

12 investigator.

13     Q.   Who's the man in the door there (indicating)?

14     A.   The driver.  It was her driver and my mother

15 sought after him.

16     Q.   And are these -- is this the house that you

17 lived in when you were with your father when you were a

18 little boy?

19     A.   No.  Because back then, I lived in the capital

20 city.

21     Q.   Did you ever live in this house with your

22 father?

23     A.   Maybe when we were little, but I can't

24 remember.

25     Q.   And is this your living room in Defense 38

 1   (indicating)?

 2       A.   Yes.

 3       Q.   And then Defense 39, tell me what that is

 4   (indicating).

 5       A.   The back part of the house.

 6       Q.   And what is in Defense 41 (indicating)?

 7       A.   The kitchen.

 8       Q.   Defense 44, is that you there (indicating)?

 9       A.   Yes.  And she was investigating.

10       Q.   She was the investigator that was helping out

11   in your father's case?

12       A.   Yes, she was the investigator.

13       Q.   Can you tell me what Defense 46 is

14   (indicating)?

15       A.   That's a church.

16            MR. CORNELIUS:  Speak up.

17       A.   Church.

18       Q.   (By Mr. Madrid) Did your father help build the

19   church?

20       A.   He did.

21       Q.   Is that the church?

22       A.   Yes, it is.

23       Q.   Is that looking out from the front of your

24   house across the street?

25       A.   Yes, in front of my house.

1              THE COURT:  Rolando, instruct the witness

2    to take his hand away from his mouth and speak into the

3    microphone.  Thank you.

4              (Interpreter complies)

5       Q.  (By Mr. Madrid) Abel, when you're speaking,

6    just move the microphone down because you are looking

7    down at the pictures.

8              Let me show you Defense 42. Is that a

9    picture that's hanging in your house (indicating)?

10      A.   Yes.  Yes, at my house.

11      Q.   And who are these people right here that I'm

12   pointing to (indicating)?

13      A.   That's my mother and that's me.  My mom.

14      Q.   Who is this lady here (indicating)?

15      A.   A friend of my mother.

16      Q.   And the baby?

17      A.   My father.

18      Q.   That's your dad when he was a baby?

19      A.   When he was a baby.

20      Q.   Who are these two people in Defense 36

21   (indicating)?

22      A.   My father.  My father.

23      Q.   I'll show you State's 35 {sic}.  Who is there

24   on the top there (indicating)?

25      A.   My grandmother and me.

1        Q.   And how about on the picture on the bottom, who

2   is sitting on the couch (indicating)?

3        A.   My grandmother, my father, my mother, my

4   brother, and I.

5        Q.   Could you describe who this is in State's --

6   Defense 34 (indicating)?

7        A.   My father and my mother.

8        Q.   State's 33 {sic}.  Is this a birthday party

9   (indicating)?

10       A.   Uh-huh.

11       Q.   Whose birthday party was this?

12       A.   Mine.

13       Q.   Is that you there, the little boy in the purple

14   pants?

15       A.   Uh-huh.

16       Q.   Is this your dad here at the party

17   (indicating)?

18       A.   Uh-huh.

19       Q.   Is this family and friends?

20            THE COURT:  Let me stop you.

21            Please instruct him he needs to answer

22   "yes" or "no," not "uh-huh."

23            (Interpreter complies)

24            THE COURT:  Thank you.

25       Q.   (By Mr. Madrid) Defense 32, is this your father

```
 1   (indicating)?

 2        A.   My father.

 3        Q.   Who is he with there?

 4        A.   My father, my brother, uncle, grandfather, and

 5   me.

 6        Q.   That's you celebrating your birthday with

 7   family?

 8        A.   Yes.

 9        Q.   And who is there with -- is that your father

10   and you?

11        A.   Yes.

12        Q.   How old were you?

13        A.   I don't remember very well.  I don't remember.

14   I don't remember that photograph.  Two or three years,

15   but I don't remember.

16        Q.   Defense Exhibit 30.  Can you tell me what this

17   is (indicating)?

18        A.   My mom and my brother, my dad and me.

19        Q.   What are y'all doing there?

20        A.   I don't remember.

21        Q.   I'm showing you Defense Exhibit 29.  Could you

22   describe the people in that picture and what you are

23   doing (indicating)?

24        A.   My mom, my dad, and me.

25        Q.   Do you know where you are at?
```

1      A.    I know where we are because I'm riding the

2  little horses, but, no, I don't know.

3      Q.    I'm showing you Defense Exhibit 28.  Who is in

4  this photo (indicating)?

5      A.    My dad and me.

6      Q.    And that photo also on Defense 28 (indicating)?

7      A.    My dad and me.

8      Q.    Is that at your house?

9      A.    Yes, at my house.

10     Q.    And Defense 27.  Could you tell me what that is

11 (indicating)?

12     A.    My brother, my dad, mom, and me.

13     Q.    Is that another birthday party?

14     A.    It's a birthday party.

15     Q.    You are celebrating together as a family?

16     A.    Yes, we are.

17     Q.    Defense 23.  Is that another picture of the

18 birthday party (indicating)?

19     A.    The same party.  My dad, my brother, and me.

20     Q.    I'm showing you Defense 24.  Do you recognize

21 the people in that photo (indicating)?

22     A.    Yes.  My dad, my mom, and me.

23     Q.    That's when you were a little boy?

24     A.    A baby.  I don't remember.

25     Q.    I'll show you Defense Exhibit 26.  Look at

1    these photo.  Who are these people (indicating)?

2        A.   My dad and me.  My dad and me.

3        Q.   And the photo attached to that also on Defense

4    Exhibit 26, who is that (indicating)?

5        A.   My dad and me.

6        Q.   Defense Exhibit 25, in that photo who is that

7    (indicating)?

8        A.   My dad and me.

9        Q.   And what does it look like he is doing there?

10   Playing with you?

11       A.   Playing.

12       Q.   But also on Defense Exhibit 25, who is that

13   baby (indicating)?

14       A.   My dad and me.

15       Q.   Does it look like he was washing you or

16   changing you?

17       A.   Yes, changing me.

18       Q.   This is Defense Exhibit 22.  Is that a family

19   photo (indicating)?

20       A.   Uh-huh, yes.

21       Q.   Who's in the photo?

22       A.   My dad, my mom, my brother, and me.

23                MR. MADRID:  Pass the witness, Your Honor.

24                THE COURT:  Thank you, Mr. Madrid.

25                Ms. Tise, are you going to do this?

1    Mr. Wood?

2                    MR. WOOD:  Just a few questions, Your

3    Honor.

4                    THE COURT:   You may proceed.

5                        **CROSS-EXAMINATION**

6    **BY MR. WOOD:**

7         Q.   Good afternoon, sir.

8         A.   Good afternoon.

9         Q.   You don't have a lot of memories with your

10   father after you were about 5 years old, do you?

11        A.   No.  I do have memories, but not much.

12        Q.   And you were about 5 years old when your daddy

13   went to prison; is that right?

14        A.   Uh-huh.  When I stopped seeing him.

15        Q.   So, the only time you've gotten to see your dad

16   since you were about 5 years old is either going to

17   prison to see him or getting mail from him in prison;

18   isn't that right?

19        A.   Going to the prison to see him and through

20   mail.

21                    MR. WOOD:  I pass the witness.

22                    THE COURT:  Anything further?

23                    MR. MADRID:  Nothing further.

24                    THE COURT:  May this witness be excused?

25                    MR. MADRID:  Yes, Your Honor.

1          THE COURT:  You may step down, sir.

2          Please call your next.

3          MR. CORNELIUS:  Did you say next witness?

4          THE COURT:  Yes.

5          MR. CORNELIUS:  Angel Meza.

6          THE BAILIFF:  The witness has not been

7   sworn, Your Honor.

8          THE COURT:  Does he need an interpreter?

9          MR. CORNELIUS:  No, ma'am.

10         (Witness sworn)

11         THE COURT:  Please take the witness stand.

12  Please speak into the microphone and keep your voice up.

13         You may proceed, Mr. Cornelius.

14         MR. CORNELIUS:  Thank you, Your Honor.

15                        **ANGEL MEZA,**

16  having been first duly sworn, testified as follows:

17                   **DIRECT EXAMINATION**

18  **BY MR. CORNELIUS:**

19     Q.   State your name to the ladies and gentlemen of

20  the jury, please.

21     A.   Angel Meza.

22     Q.   Angel, where are you from?

23     A.   Mexico.  Born in Mexico.

24     Q.   And where do you live now?

25     A.   Pasadena.

1      Q.   How long have you lived in the Houston area?

2      A.   For 13 years.

3      Q.   How old are you?

4      A.   Eighteen.

5      Q.   What do you do?

6      A.   Right now I'm trying to enroll in college.

7      Q.   All right.  Angel, when is the first time that

8  you and I ever met?

9      A.   A couple of hours ago in the hallway.

10      Q.   Okay.  And you have been subpoenaed to come

11  down here?  Did the State subpoena or did we subpoena

12  you?

13      A.   No.  I came here by myself, my own will.

14      Q.   And why did you come down here?

15      A.   Because Mr. Cruz is a very close friend of

16  mine.

17      Q.   Okay.  And how would you know Mr. Cruz?

18      A.   I met him in jail.

19      Q.   Why were you in jail?

20      A.   For burglary of a habitation.

21      Q.   And what happened on that case?  Is it

22  resolved?

23      A.   Yes, sir.  I got five years probation and I

24  went to YMAC.

25      Q.   What's is YMAC?

1      A.   It's Young Men Accepting Change.

2      Q.   Young Men About Change?

3      A.   Young Men About Change, correct.

4      Q.   Is that a condition of probation?

5      A.   Yes, sir.

6      Q.   Okay.  While you were in the jail, the man that

7   you are calling Mr. Cruz, is that Obel Cruz-Garcia?

8      A.   Yes, sir.

9      Q.   And do you see him in the courtroom?

10      A.   Yes, sir.

11      Q.   Where is he in relation to me?  Is he right

12   next to me?

13      A.   Right behind you.

14      Q.   On my left?

15      A.   Yes.

16      Q.   Okay.  So, when you say you met him in jail,

17   how did you meet him in jail?

18      A.   I was a trustee and I would go feed him when he

19   was on lockdown.

20      Q.   When he was on lockdown --

21      A.   Yes, sir.

22      Q.   -- you would go and feed him?

23      A.   Yes, sir.

24      Q.   And did you have -- you can't tell me what the

25   conversations were, but did you have conversations with

 1   him?

 2        A.   Yes, sir.

 3        Q.   Over what period of time?

 4        A.   How long were our conversations?

 5        Q.   Yes.  We can start with that.

 6        A.   About 30 to 45 minutes, an hour.

 7        Q.   Okay.  And without saying what he said, what

 8   was the topic that you discussed?

 9        A.   Spiritual.

10        Q.   What does that mean?

11        A.   About the Bible.

12        Q.   Okay.  And whose idea was that?

13        A.   His idea.

14        Q.   And what affect, if any, did that have on you?

15        A.   On me?

16        Q.   Yes.

17        A.   Helped me out a lot.

18        Q.   And how so?

19        A.   Changed my choices.  Because I came -- when I

20   went -- when I first went inside the jail, I was real

21   hard-headed.

22        Q.   Okay.  So, how many -- over what period of

23   time -- not the length of the conversation, but what

24   period of time, days, weeks, or months, did you have

25   these conversations with my client?

1    A.   Daily.

2    Q.   Daily for how long?

3    A.   Okay.  For two months.  About two months, yeah.

4    Q.   About two months?

5    A.   Yes, sir.  Well, I got transferred.  That's why

6  it was for a period of two months, two-and-a-half

7  months.

8    Q.   So, your exposure to him face-to-face was about

9  two months?

10   A.   Yes, sir.

11   Q.   And how often in say a week would you actually

12  get to see him or talk to him?

13   A.   Every day because every day I would have to go

14  and feed him.

15   Q.   Okay.  You know what we're here for, correct?

16   A.   Yes, sir.

17   Q.   You knew what he was charged with?

18   A.   Yes, sir.

19   Q.   We're not here for your opinion on that, so I'm

20  not trying to ask your opinion, but the side of him that

21  you met, the person that you met there in the jail, the

22  Obel Cruz-Garcia you met in the jail, what kind of

23  person was that?

24   A.   A real homie guy.  He was a man of God.  He's a

25  man of God.  In my opinion, he's a man of God.  Always

1  tried to help me in every possible way he could.

2       Q.   Now, are you related to him?

3       A.   No, sir.

4       Q.   And what -- when you got out of jail -- when

5  did you get out?

6       A.   March 18th.

7       Q.   And after getting out of jail on March 18th,

8  where did you go?

9       A.   Home.

10       Q.   Okay.  So, the Young Men About Change, YMAC, is

11  actually in the jail?

12       A.   Yes -- no.  It's over there in Humble.

13       Q.   You mean Atascocita?

14       A.   Yes.

15       Q.   So, when you got out of that, was that in

16  March?

17       A.   Yes, sir.

18       Q.   And so, have you had any contact with Obel

19  Cruz-Garcia since then?

20       A.   Yes.  Yeah.  He writes me, but I actually

21  haven't wrote him in about a month.

22       Q.   So, y'all kept up some contact?

23       A.   Yeah.  He will write my house and I'll write

24  him back and everything.

25       Q.   Okay.  And have you detected any change in him

1    or do you think he's still trying to help you or --

2         A.   Yes, sir.  I wish I could have brought a

3    letter, but, you know, he always tried to help me, even

4    when I was outside.  He always spoke real good to me.

5         Q.   All right.  But none of the investigators or

6    either Mr. Madrid or myself had ever talked to you

7    before today?

8         A.   No, sir.

9         Q.   All right.

10             MR. CORNELIUS:  Pass the witness.

11             THE COURT:  Ms. Tise.

12             MS. TISE:  Yes, Judge.

13             THE COURT:  You may proceed.

14                   **CROSS-EXAMINATION**

15   **BY MS. TISE:**

16        Q.   Good afternoon.  Mr. Meza, is it?

17        A.   Yes, ma'am.

18        Q.   And, Mr. Meza, you said that you felt like the

19   defendant, Obel Cruz-Garcia, was a man of God --

20        A.   Yes, ma'am.

21        Q.   -- correct?

22             And you base this on some conversations

23   that you had with him while he was in jail --

24        A.   Yes, ma'am.

25        Q.   -- correct?

1          And have you followed up on that in your
2    life and done some reading and things like that.
3          A.   Yes, ma'am, I actually attend a church.
4          Q.   And when you go to church and when you do your
5    reading and get into the Bible, do you see a lot of
6    things about how being a man of God is not just about
7    talk?
8          A.   Yes, ma'am.
9          Q.   That it's actually about the way you live your
10   life and things that you do?
11         A.   Yes, ma'am.
12         Q.   And have you seen actually examples in the
13   Bible of people who talk one way and profess to be a man
14   of God, but actually in the way they live their life
15   they are not like that?  There are actual examples of
16   that in the Bible, aren't there?
17         A.   Yes, ma'am.
18         Q.   And that's not good, is it?
19         A.   It's not.
20         Q.   Do you understand the difference between
21   someone talking a good game versus how they live and
22   choices they make?
23         A.   Yes, ma'am.
24         Q.   And that's a pretty important distinction,
25   isn't it?

1      A.   Yes, ma'am.

2      Q.   And I hope you have learned that and I hope you

3  do carry that forward in your life, but I want to ask

4  you:  When you came here today, did you know what Obel

5  Cruz-Garcia was charged with?

6      A.   Yes, ma'am.

7      Q.   So, you know that he has been charged with

8  killing a 6-year-old boy?

9      A.   Yes, ma'am.

10     Q.   Did you also know or have you heard that he

11 basically lived an entire life of crime?

12     A.   Yes, ma'am.

13     Q.   Prior to going to prison, he was involved in a

14 very brutal kidnapping in Puerto Rico.  Did you know

15 about that?

16     A.   No, ma'am.

17     Q.   Did you know that he has killed at least two

18 people?

19     A.   No, ma'am.

20     Q.   Did you know that he raped women?

21     A.   No, ma'am.

22     Q.   Broke not just into one house, but lots of

23 houses and brutalized the people inside.

24     A.   No, ma'am.

25     Q.   And did you know that at that point in his life

1  he was going around professing to be a good Christian

2  person then, too; did you know that?

3      A.  Yes, ma'am.  No, I didn't know that.

4      Q.  Telling his family that he was a Christian and

5  going to church, but at the same time he was living a

6  life of crime, hurting people, and selling drugs.

7              MR. CORNELIUS:  Objection to the form of

8  the question.

9      Q.  (By Ms. Tise) Did you know any of that?

10             MR. CORNELIUS:  She's not asking a

11  question.  She's making a statement, not questioning.

12             THE COURT:  That's sustained.

13             You need to stop while they make their

14  objection.

15             MR. CORNELIUS:  Ask for a jury instruction.

16             THE COURT:  First let me rule on it.  The

17  objection is sustained.

18             MS. TISE:  I will --

19             MR. CORNELIUS:  Ask for a jury instruction.

20             THE COURT:  On what, Mr. Cornelius?

21             MR. CORNELIUS:  On the statement that she

22  was making, that the jury should disregard it.

23             THE COURT:  I don't think that -- everyone

24  was talking over one another.  I don't think anything

25  needs to be instructed to disregard.

```
 1              MR. CORNELIUS:  All right.
 2              THE COURT:  If you did hear that question,
 3   which about three people were talking, ladies and
 4   gentlemen, you should disregard it, but I don't think
 5   that went on the record, so...
 6              MR. CORNELIUS:  Move for a mistrial.
 7              THE COURT:  That will be denied.
 8              Rephrased your question.
 9        Q.   (By Ms. Tise) Did you know that back in the
10   early 90s while he was still leading a life of crime, he
11   was professing to be a good Christian then, too; did you
12   know that?
13        A.   No.
14        Q.   How old are you?
15        A.   Eighteen.
16        Q.   And you are young, but do you recognize that
17   there are a lot of people who aren't what they pretend
18   to be?
19        A.   I understand that.
20        Q.   And that difference, I hope you know, is an
21   important one.  Do you understand that?
22        A.   Yes, ma'am.
23        Q.   It's not about what you say.  It's about what
24   you do, isn't it?
25        A.   Yes, ma'am.
```

1          MS. TISE:  I will pass the witness.

2          THE COURT:  Anything further,

3   Mr. Cornelius?

4          MR. CORNELIUS:  Yes, Your Honor.

5          THE COURT:  You may proceed.

6                **REDIRECT EXAMINATION**

7   **BY MR. CORNELIUS:**

8      Q.   Were you born in the early 90s?

9      A.   '95.

10     Q.   Okay.  So, it's pretty hard for you to know

11  what happened in the early 90s when you weren't even

12  born, right?

13     A.   Yes, sir.

14     Q.   Now, is the person that you met in jail, that

15  you talked to in jail, is that person, in your opinion,

16  the same person that the prosecutor is describing to

17  you?

18          MS. TISE:  I'll object.  Calls for

19  speculation.

20          THE COURT:  That's overruled.

21          Continue asking your question.

22     Q.   (By Mr. Cornelius) The character that you saw

23  in the jail -- okay -- you don't know what happened in

24  the 90s, but the character of the person in jail, is

25  that in line with the questions that the prosecutor was

1  asking you?

2       A.   No, sir.

3       Q.   You don't know what happened in the 90s, do

4  you?

5       A.   I read the case, but I'm not...

6       Q.   Okay.  Can't get into your opinion on how you

7  feel about it, but can get into your opinion on the time

8  that you were with Obel Cruz-Garcia in the jail and what

9  you thought about his character at that time.  What did

10 you think about it?

11      A.   Can you repeat that question again?

12      Q.   Just based on the time you spent with Obel

13 Cruz-Garcia in the jail, the person you talked to there,

14 you've already told us about that, what did you think

15 about his character?  What did you think about it?

16      A.   He was a great guy, a guy that I made friends

17 with because you don't have friends in jail.  And I made

18 him a friend because I could see his honesty.

19      Q.   Okay.

20           MR. CORNELIUS:  Pass the witness.

21           THE COURT:  Anything further, Ms. Tise?

22           MS. TISE:  No, Your Honor.

23           THE COURT:  May this witness be excused?

24           MR. CORNELIUS:  Yes, Your Honor.

25           THE COURT:  You may step down, sir.  Thank

1  you.

2              Please call your next.

3              MR. CORNELIUS:  We rest.

4              THE COURT:  Very good.  What says the

5  State?

6              MS. TISE:  State rests and closes, Your

7  Honor.

8              THE COURT:  And defense rests and closes?

9              MR. CORNELIUS:  Yes, Your Honor.

10             THE COURT:  Very good.  Ladies and

11  gentlemen of the jury, the State and the defense have

12  rested their case on the punishment phase of this trial.

13  All of the evidence is now before you.

14             At this time, ladies and gentlemen, I will

15  read to you the charge of the Court containing the law

16  applicable to the case in punishment.  Please listen

17  carefully as I read the charge to you.  The original

18  will be placed on the table in the jury room when you

19  are retired to begin your deliberations.

20             Cause No. 1384794, the State of Texas vs.

21  Obel Cruz-Garcia, in the 337th District Court of Harris

22  County, Texas, January Term, AD, 2013.

23             Members of the jury:  By your verdict

24  returned in this case you have found the defendant, Obel

25  Cruz-Garcia, guilty of the offense of capital murder,

which was alleged to have been committed on or about the

30th day of September, 1992, in Harris County, Texas.

In order for the Court to assess the proper punishment,

it is necessary now for you to determine, from all the

evidence in the case, the answers to certain questions,

called Special Issues, in this charge.  The Court

instructs you in answering these Special Issues as

follows:

The mandatory punishment for capital murder

is death or confinement in the Texas Department of

Criminal Justice, Institutional Division, for life.

In determining your answers to the questions, or special

issues, submitted to you, you shall consider all the

evidence submitted to you in this trial.  You shall

consider all evidence submitted to you during the trial

as to the defendant's background or character or the

circumstances of the offense that militates for or

mitigates against the imposition of the death penalty.

You are instructed that when you deliberate

on the questions posed in the special issues, you are to

consider all relevant mitigating circumstances, if any,

supported by the evidence, whether presented by the

State or the defendant.

The State must prove Special Issue No. 1

submitted to you beyond a reasonable doubt, and you

1  shall return a Special Verdict of "yes" or "no" on

2  Special Issue No. 1.

3          In deliberating on Special Issue No. 1 you

4  shall consider all the evidence admitted at the trial,

5  including but not limited to evidence of the defendant's

6  background, character, or the circumstances of the

7  offense that militates for or mitigates against the

8  imposition of the death penalty.

9          You may not answer Special Issue No. 1

10  "yes" unless you agree unanimously.

11          You may not answer Special Issue No. 1 "no"

12  unless ten or more jurors agree.

13          Members of the jury need not agree on what

14  particular evidence supports a negative or affirmative

15  answer to Special Issue No. 1.

16          You are further instructed that you are not

17  to be swayed by mere sentiment, conjecture, sympathy,

18  passion, prejudice, public opinion or public feeling in

19  considering all of the evidence before you and in

20  answering the Special Issue No. 1.

21          It is not required that the State prove

22  Special Issue No. 1 beyond all possible doubt; it is

23  required that the State's proof excludes all reasonable

24  doubt concerning the defendant.

25          You are instructed that if you return an

1  affirmative finding, that is a "yes" answer, to Special

2  Issue No. 1, and only then, are you to answer Special

3  Issue No. 2.

4         The State must prove Special Issue No. 2

5  submitted to you beyond a reasonable doubt, and you

6  shall return a Special Verdict of "yes" or "no" on

7  Special Issue No. 2.

8         In deliberating on Special Issue No. 2 you

9  shall consider all the evidence admitted at the trial,

10  including but not limited to evidence of the defendant's

11  background, character, or the circumstances of the

12  offense that militates for or mitigates against the

13  imposition of the death penalty.

14         You may not answer Special Issue No. 2

15  "yes" unless you agree unanimously.

16         You may not answer Special Issue No. 2 "no"

17  unless ten or more jurors agree.

18         You need not agree on what particular

19  evidence supports a negative or affirmative answer to

20  Special Issue No. 2.

21         You are further instructed that you are not

22  to be swayed by mere sentiment, conjecture, sympathy,

23  passion, prejudice, public opinion or public feeling in

24  considering all of the evidence before you and in

25  answering the Special Issue No. 2.

1            It is not required that the State prove

2    Special Issue No. 2 beyond all possible doubt; it is

3    required that the State's proof excludes all reasonable

4    doubt concerning the defendant.

5            You are instructed that if you return an

6    affirmative finding, that is a "yes" answer, to Special

7    Issue No. 2, and only then, are you to answer Special

8    Issue No. 3.

9            In deliberating on Special Issue No. 3 you

10   shall consider all the evidence admitted at the trial,

11   including but not limited to evidence of the defendant's

12   background, character, or the circumstances of the

13   offense that militates for or mitigates against the

14   imposition of the death penalty.

15           You shall consider mitigating evidence to

16   be evidence that you might regard as reducing the

17   defendant's moral blameworthiness.

18           You may not answer Special Issue No. 3 "no"

19   unless you agree unanimously.

20           You may not answer Special Issue No. 3

21   "yes" unless ten or more jurors agree.

22           You need not agree on what particular

23   evidence supports a negative or affirmative answer to

24   Special Issue No. 3.

25           You are further instructed that you are not

1  to be swayed by mere sentiment, conjecture, sympathy,

2  passion, prejudice, public opinion or public feeling in

3  considering all of the evidence before you and in

4  answering the Special Issue No. 3.

5          You are instructed that if you answer

6  Special Issue No. 1, and Special Issue No. 2 "yes," and

7  you answer Special Issue No. 3 "no," the court shall

8  sentence the Defendant to death.  You are further

9  instructed that if you answer Special Issue No. 1 or

10  Special Issue No. 2 "no," or you answer Special Issue

11  No. 3 "yes," the court shall sentence the Defendant to

12  the Texas Department of Criminal Justice Institutional

13  Division for life.

14          You may consider evidence of an extraneous

15  crime or bad act in assessing punishment even if the

16  defendant has not yet been charged with or finally

17  convicted of the crime or act.  However, you may

18  consider such evidence only if the extraneous crime or

19  bad act has been shown by the State beyond a reasonable

20  doubt to have been committed by the defendant or is one

21  for which the defendant could be held criminally

22  responsible.

23          The prosecution does not have to prove an

24  extraneous crime or bad act beyond all possible doubt.

25  The prosecution's proof must exclude all reasonable

1  doubt concerning the extraneous crime or bad act.

2  Therefore, if you find and believe beyond a reasonable

3  doubt that the defendant committed an extraneous crime

4  or bad act or could be held criminally responsible for

5  an extraneous crime or bad act, then you may consider

6  such evidence in assessing the defendant's punishment.

7  However, if you have a reasonable doubt that the

8  defendant committed an extraneous crime or bad act or

9  could be held criminally responsible for an extraneous

10 crime or bad act, then you may not consider such

11 evidence in assessing punishment.

12         You are further instructed that any

13 evidence that any witness has been convicted in any case

14 or cases was admitted before you for the purpose of

15 aiding you, if it does aid you, in passing upon the

16 credibility of the witness and the weight to be given

17 his or her testimony, and you will not consider the same

18 for any other purpose.

19         Under the law applicable in this case, if

20 the defendant is sentenced to imprisonment in the

21 institutional division of the Texas Department of

22 Criminal Justice for life, the defendant will become

23 eligible for release on parole, but not until the actual

24 time served by the defendant equals thirty-five calendar

25 years.  It cannot accurately be predicted how the parole

1   laws might be applied to this defendant if the defendant

2   is sentenced to a term of imprisonment for life because

3   the application of those laws will depend on decisions

4   made by prison and parole authorities, but eligibility

5   for parole does not guarantee that parole will be

6   granted.

7              You may consider the existence of the

8   parole law.  However, you are not to consider the manner

9   in which the parole law may be applied to this

10  particular defendant.

11             You are instructed that the defendant may

12  testify in his own behalf if he chooses to do so, but if

13  he elects not to do so, that fact cannot be taken by you

14  as a circumstance against him nor prejudice him in any

15  way.  The defendant has elected not to testify in this

16  punishment phase of trial, and you are instructed that

17  you cannot and must not refer to or allude to that fact

18  throughout your deliberations or take it into

19  consideration for any purpose whatsoever.

20             During your deliberations upon the Special

21  Issues, you must not consider, discuss, nor relate any

22  matters not in evidence before you.  You should not

23  consider nor mention any personal knowledge or

24  information you may have about any fact or person

25  connected with this case which is not shown by the

1   evidence.

2               In arriving at the answers to the Special

3   Issues submitted, it will not be proper for you to fix

4   the same by lot, chance, or any other method than by a

5   full, fair and free exchange of the opinion of each

6   individual juror.

7               After the reading of this charge, you shall

8   not be permitted to separate from each other, nor shall

9   you talk with anyone not of your jury.  After argument

10  of counsel, you will retire and consider your answers to

11  the Special Issues submitted to you.  It is the duty of

12  your foreman to preside in the jury room and vote with

13  you on the answers to the Special Issues submitted.

14              You are the exclusive judges of the facts

15  proved and the credibility of the witnesses and the

16  weight to be given to their testimony, but you are bound

17  to receive the law from the Court which has been given

18  you and you are bound thereby.

19              I'm going to sign this at the bottom of the

20  charge.

21              And then there are the verdict pages.  The

22  verdict pages read:  Cause No. 1384794, State of Texas

23  vs. Obel Cruz-Garcia.

24              The Special Issues, with forms for your

25  answers, are as follows:  Special Issue No. 1.

1  Do you find from the evidence beyond a reasonable doubt

2  there is a probability that the defendant, Obel

3  Cruz-Garcia, would commit criminal acts of violence that

4  would constitute a continuing threat to society?

5              Your answers are:  We, the jury,

6  unanimously find and determine beyond a reasonable doubt

7  that the answer to the Special Issue is "yes."  Or:  We,

8  the jury, because at least ten jurors have a reasonable

9  doubt as to the matter inquired about in this Special

10  Issue, find and determine that the answer to this

11  Special Issue is "no."

12              As to Special Issue No. 2:  Do you find

13  from the evidence beyond a reasonable doubt that Obel

14  Cruz-Garcia, the defendant himself, actually caused the

15  death of Angelo Garcia, Jr., on the occasion in

16  question, or if he did not actually cause the death of

17  Angelo Garcia, Jr., that he intended to kill Angelo

18  Garcia, Jr., or that he anticipated that a human life

19  would be taken?

20              Answers:  We, the jury, unanimously find

21  and determine beyond a reasonable doubt that the answer

22  to this Special Issue is "yes."  Or:  We, the jury,

23  because at least ten jurors have a reasonable doubt that

24  Obel Cruz-Garcia, the defendant himself, actually caused

25  the death of Angelo Garcia, Jr., on the occasion in

1  question, or that he intended to kill Angelo Garcia,

2  Jr., or that he anticipated that a human life would be

3  taken, determine that the answer to this Special Issue

4  is "no."

5           Special Issue No. 3:  In the event that the

6  jury has answered Special Issues No. 1 and No. 2 in the

7  affirmative, and only then, shall the jury answer

8  Special Issue No. 3.

9           Special Issue No. 3:  Do you find from the

10 evidence, taking into consideration all of the evidence,

11 including the circumstances of the offense, the

12 defendant's character and background, and the personal

13 moral culpability of the defendant, that there is a

14 sufficient mitigating circumstance or circumstances to

15 warrant that a sentence of life imprisonment rather than

16 a death sentence be imposed?

17           You are instructed that in answering this

18 Special Issue that you shall answer the issue "yes" or

19 "no."

20           You may not answer this issue "no" unless

21 you agree unanimously, and you may not answer this issue

22 "yes" unless ten or more of you agree to do so.

23           And the answers are:  We, the jury, find

24 and determine that the answer to this special issue is

25 "no," or:  We, the jury, because at least ten jurors

1    agree that there is sufficient mitigating circumstance

2    or circumstances to warrant that a sentence of life

3    imprisonment rather than a death sentence be imposed,

4    find that the answer to this Special Issue is "yes."

5                    And the last page is:  After the jury has

6    answered each of the Special Issues under the conditions

7    and instructions outlined above, the Foreman should sign

8    the verdict form below.

9                    And there is a place for the Foreman to

10   sign with a statement:  We, the jury, return in open

11   court the above answers to the Special Issues submitted

12   to us and the same is our verdict in this case.

13                   Ms. Tise, does the State want to --

14                   MS. TISE:  The State will waive the right

15   to open and reserve the right to close.

16                   MR. CORNELIUS:  Could we approach quickly?

17                   (At the bench, on the record)

18                   MR. CORNELIUS:  He needs to go to the

19   bathroom.  I mean, two hours...

20                   MS. TISE:  Sorry.

21                   THE COURT:  We'll take a five-minute

22   break and then start opening.

23                   (Open court, defendant and jury present)

24                   THE COURT:  Folks, we're going to take just

25   a five-minute break.  Does anybody on the jury -- it

 1   will  be approximately two hours in argument.  Does

 2   anyone need to take a bathroom break?  You do.  Let's do

 3   so at this time.  Please take the jury out.

 4                    (Recess)

 5                    (Open court, defendant and jury present)

 6                    THE COURT:  Please be seated.

 7                    Back on the record in the State of Texas

 8   vs. Obel Cruz-Garcia, Cause No. 1384794.

 9                    The jury is present in the courtroom.

10   Mr. Cruz-Garcia is present at counsel table with his two

11   attorneys and the State is present.

12                    Are both sides ready to proceed?

13                    MS. TISE:  Ready.

14                    THE COURT:  Defense?

15                    MR. MADRID:  Defense is ready.

16                    THE COURT:  Thank you.

17                    Would you like to make a closing argument,

18   Ms. Tise?

19                    MS. TISE:  We'll waive the right to open

20   and reserve the right to close.

21                    THE COURT:  Mr. Cornelius or Mr. Madrid.

22                    MR. MADRID:  Thank you, Your Honor.

23                    THE COURT:  You may proceed.

24                 **DEFENSE CLOSING STATEMENT**

25                    MR. MADRID:  Thank you.

1              Good afternoon.

2              JURORS:  Good afternoon (in unison).

3              MR. MADRID:  I want to start by thanking

4   y'all because y'all have worked for two weeks and y'all

5   have worked really hard.  And y'all have heard a lot of

6   difficult evidence.  And y'all came to the

7   guilt-innocence verdict.  And we respect that verdict.

8              But when we began picking this jury last

9   month and y'all came in and we talked to you

10  individually, we asked a lot of questions about this

11  issue, the death penalty.  And what I'm going to ask

12  y'all to do is a couple of things.  The first thing is,

13  I sensed that after y'all deliberated -- that y'all

14  deliberated and looked at all of the evidence, but it

15  was a hard decision.  And there were some of y'all that

16  maybe had more doubts than others.

17             And in the situation with twelve people, I

18  know sometimes it's difficult when you get back there in

19  the room and one person has a difference of opinion than

20  you and some people, whether it's you or you or you, or

21  whoever, might hold out on hold missions or say:  Hey,

22  help me, help me to make this decision or help me to

23  convince this person.  And if that happens, that's fine

24  because that's how debate happens and it's expected.

25             But if you have a differing opinion and if

1   there are ten people or eleven people and they have you

2   in that situation and you feel pressured, don't.

3   Because this is one of the most important decisions you

4   are going to make in your life.  This isn't something

5   that's going away after you leave today or tomorrow or

6   whenever you leave.  This is something that you are

7   going to be thinking about.  It might be in five years

8   or ten years or twenty years.

9            And you will remember this.  You will

10  remember all the sadness that you heard of Baby Angelo.

11  You will remember this man, depending on the decision

12  you make.  And I don't want you to feel that way.  I

13  don't want anybody to come in here upset or crying

14  because they feel like they didn't make their decision,

15  because it's each one of your verdicts.  Okay?  And I'm

16  not going to make an emotional argument.  And there's

17  been a lot of emotional arguments made.  I suspect the

18  State will.  I suspect they will go through Baby

19  Angelo's shoes and clothes and things that he took to

20  school.

21            And, you know, when those things are

22  presented, I know that there is not one person in here

23  who is not fighting back tears.  I know some of you

24  aren't even fighting them back because you can't.  But

25  that is not what the -- what the Judge is asking you to

1     do.

2                    Remember we went through those questions.

3     And one of the instructions you are going to get is that

4     you not be swayed by mere sentiment, conjecture,

5     sympathy, passion, prejudice, and on and on.  But that's

6     not what this is about.  When the State decides they are

7     going to charge somebody, they're asking you to go

8     through these questions.  But what they are essentially

9     asking you is to make the decision to kill somebody.

10    Just blunt, plain and simple.  They are going to stand

11    up and ask each of one of you to make the decision to

12    have the State kill this man.

13                    MR. WOOD:  I'm going to object.  That's a

14    misstatement of the law.

15                    THE COURT:  That's sustained.

16                    MR. MADRID:  So, you are going to go

17    through these questions.  And there is going to be

18    certain sympathy for what's happened, but it has to be

19    based on the facts, the facts that were presented.

20                    Now, I'm just going to briefly go through

21    the facts.  You have the case-in-chief.  And you've

22    heard that already.  Okay?  And as part of that, if you

23    remember in that charge, you had a law of parties

24    charge.  And I want you to take that into consideration.

25    I know way back when we talked to you individually,

1  there were statements made about people ordering -- like
2  Hitler and people like that -- to kill other people.
3  And I don't want you to be swayed by that because this
4  isn't that kind of case.  There wasn't the ordering of
5  killing, you know, of millions of people.
6         As to the law of parties, the reason it's
7  important is because there wasn't any evidence presented
8  that this man, Obel Cruz-Garcia, killed that little boy.
9  If you think back in the evidence, Rudy didn't say he
10 did it.  There wasn't any evidence that he had a knife.
11 You may have come to that conclusion based on the law of
12 parties, but I want you to take that into consideration.
13        Now, as to these charges, the State
14 presented -- and one of these last witnesses was
15 discussing -- Angel, the young man from jail that seemed
16 to turn a corner with the advice of Obel -- to paint
17 this picture that he has done multiple rapes, multi home
18 invasions, he killed two people.  The charge is asking
19 you to base it on the evidence.  And one of the things
20 the State has to do -- it says:  You may consider such
21 evidence -- we're talking about other crimes -- only if
22 the extraneous crime or bad act has been shown by the
23 State beyond a reasonable doubt to have been committed
24 by the defendant.  It's not enough that Ms. Tise listed
25 a litany of crimes to a witness.  That doesn't mean she

1  proved it.

2           A lot of this testimony came from a guy

3  named Rudy.  And I don't want you to forget Rudy.  Okay?

4  Because I think you -- the evidence showed that Rudy

5  could be guilty of every single one of the crimes he

6  talked about if you go back to the law of parties.  And

7  Rudy lied and lied and lied.  Almost to the last

8  question that he was asked.  Were you ever charged with

9  these?  And he said something to the effect that they

10 tell me in the jail that it's on the computer screen.

11 He said that over and over.

12           The truth is, Rudy hasn't been charged with

13 it.  The State's own investigator from the district

14 attorney's office told you:  No, he hasn't been charged

15 with anything.  And I want you to consider that.

16 Because all his lies is what the State using to present

17 you these extraneouses.  And they make the argument --

18 or they presented evidence and inferred that that murder

19 that -- you know, during when Ms. Tise asked:  Well, you

20 know he killed two people.  There is no proof that Obel

21 Cruz killed two people.

22           And they asked the witnesses during direct

23 thing like:  You never -- we never asked you, you came

24 to us with this, you came -- you know, when the FBI came

25 and talked to you up in Pennsylvania, you never -- we

1  didn't ask you about it.  You came to us.  And, of

2  course, Rudy came to them.  Because this is the cherry

3  on top, that murder.  This is what they want to use for

4  you to answer these questions to lead to the death

5  penalty.  And Rudy knows that he would never be charged

6  with this if he gave the State enough.

7          And he gave them enough for that case.  And

8  when he got here -- and remember Rogelio, the guy that

9  came out and they told you:  Yeah, in preparation of

10  this trial he was charged this year.  He had never been

11  charged before.  But the State said:  After we talked to

12  him, we charged him.  That's fine.  But didn't they talk

13  to Rudy and didn't Rudy admit to being part of a murder

14  and a murder and sexual assault and aggravated robbery?

15  But he was never charged.

16          And I want you to consider that because all

17  of his evidence is the only evidence that the State

18  wants to present to you to prove beyond a reasonable

19  doubt that Obel Cruz-Garcia committed all of these other

20  crimes.

21          MR. WOOD:  Your Honor, I object.  That's a

22  misrepresentation of the facts.

23          THE COURT:  Okay.  The jury will recall the

24  evidence from the witness stand.  They will recall and

25  rely on that in their deliberations.  Arguments of

1   counsel is not evidence.

2            You may proceed.

3            MR. MADRID:   Thank you, Your Honor.

4            And the first case is some sexual assault.

5   I don't remember the guy's name.   Vetico or Vutico

6   {sic}.   You remember that?   Rudy came and testified

7   something to the affect there was some kind of -- I

8   don't know if he was a rival drug dealer or what was

9   trying to be implied.   So, Obel went in and beat him up

10  and raped his wife.   Great story because it matches

11  this.   And that's what the State wants to present.

12           Now, this -- there was absolutely no

13  evidence other than the testimony of him.   This wife of

14  this man, did she come and testify?   No.   Did the

15  husband testify?   No.   Was a report ever made?   No.

16  Were charges filed?   No.   And I'm asking you not to

17  consider that because it doesn't exist.

18           The next case they presented to you was a

19  murder from 1989.   Now, the State wants you to -- want

20  to accuse Obel of murder.   They can't even prove

21  probable cause on that case, that he committed that

22  crime.   He's never even been charged.   They never

23  charged him.

24           MR. WOOD:   Your Honor, I'm going to object.

25  That's a misstatement of the law and of the facts.

1            THE COURT:  Once again, arguments of

2     counsel is not evidence.  You will recall what the

3     evidence is from the witness stand and rely thereon.

4            MR. MADRID:  May I proceed, Your Honor?

5            THE COURT:  Yes.

6            MR. MADRID:  And you heard the evidence.

7     And if the State had a witness that could come in and

8     say:  Yes, we charged that man or we found DNA from that

9     body -- you remember they talked about the DNA, the

10    epithelial cells, and the kinds of things they collect.

11    I know they said there were some gloves there.  I'm sure

12    they could get cells off that.  There was plenty of ways

13    that they could have actually proven he did that, but

14    the evidence they brought, Elizabeth -- if you remember,

15    she was the young lady that was 16 at the time -- she

16    told you that she used to buy her drugs from Shorty.

17    And that day she went into that apartment, because

18    that's where she bought her drugs from Shorty, and in

19    Shorty's apartment where he sold drugs, a body was

20    found.  That was the evidence.  That's the State's

21    evidence.  That's part of their evidence.

22            Now, Rudy says it was Obel that went into

23    Shorty's apartment and did this, but it doesn't really

24    make sense because it was Shorty's apartment.  They also

25    brought you Johnny Lopez.  He was the guy with the

1  eleven thefts and the five prison trips that they tried

2  to infer he is now 52 and he got his life together, but

3  he had like -- I think in 2010, as late as 2010 or 2011

4  he had charges.  Completely uncredible {sic}.

5              And so, that goes to that murder.  And the

6  reason I'm speaking to you about this, because what the

7  State wants to present to you is this man murdered two

8  people and raped multiple people and they don't have any

9  evidence of it.

10             When this young man came in, Angel, who had

11 the burglary of a habitation, and came to speak on

12 Obel's behalf, the State talked about, you know, this is

13 a timeframe.  We have the late 80s in Puerto Rico, a

14 brief period here in Houston when this case occurred,

15 and then a case in 2001.  And the evidence that was

16 presented to you was this case-in-chief and a kidnapping

17 case in 2001.  The State wants to paint this picture to

18 you that Obel talks a good game, but he doesn't live his

19 life like that.

20             And you saw the photos and you saw his

21 family.  And you know that there is another side to him.

22 And it isn't this whatever -- 25-year reign of terror or

23 whatever that the State wants to prove to you.  They

24 have proven you a case regarding this young boy Angelo

25 and regarding the kidnapping in 2001.

1            And I want to speak to you about that

2   because there were some pretty horrific details, no

3   doubt.  And I'm sure you were moved by that.  The hammer

4   and the testimony that Obel took out a knife and

5   threatened to cut the 16-year-old's penis off and those

6   type of things.  And they were horrific, no doubt.  But

7   something in that case -- there is something in that

8   case that I think kind of ties all these things

9   together.  One thing is that case happened in about a

10   span of 25 to 26 hours.  And I think the agents down in

11   Puerto Rico did a terrific job because this happened

12   in -- within what, 25 or 26 hours they captured the

13   parties, the suspects, right?

14            I don't think -- and certainly not

15   criticizing them because they were investigating a

16   kidnapping, but the evidence shows that they didn't

17   investigate any kind of drug dealing.  I don't think

18   there is any reason to.

19            MR. WOOD:  Objection, Your Honor.  That's a

20   misstatement of the facts.

21            THE COURT:  Once again, the jury will

22   remember the facts from the witness stand.  Arguments of

23   counsel are not evidence.

24            MR. MADRID:  If you remember the agent said

25   that he investigated it and he didn't find any, right,

1   any evidence of drug dealing.  And I believe that he is

2   telling the truth or he believe she's telling the truth.

3   But I honestly believe that that time when that man,

4   Manuel, walked into his office --

5                    MR. WOOD:  Objection.  Improper argument.

6   His opinion is not relevant.

7                    THE COURT:  That's sustained.

8                    MR. MADRID:  May I proceed, Your Honor?

9                    THE COURT:  Yes.

10                    MR. MADRID:  The evidence shows that Manuel

11   walked into the office of the police and received a call

12   about 11:00 that night and the case proceeded to try to

13   get the kidnappers.  There wasn't time -- and the

14   evidence is clear on that -- to go around and look to

15   see if these people sell drugs.  The agent in that case

16   said what usually happens, yes, in Puerto Rico people

17   ask for drugs or money.  And under cross-examination, he

18   said they ask for drugs or money if the people have it.

19   Because it was asked for some outrageous amount, a

20   hundred kilos and $150,000.  Okay?

21                    No doubt this man sold drugs, knew people

22   that sold drugs, participated in the drug world.  He is

23   not going to go ask somebody for a hundred kilos if they

24   don't have a hundred kilos.  It doesn't make sense.  And

25   there is no -- all these cases -- and that is not to

1  minimize what happened to these people, but I want to

2  put this in context.

3          Capital murder is certainly capital murder

4  and kidnapping is kidnapping, but all of these crimes

5  that the State has presented -- and it's important to

6  know what context they were presented in -- they were

7  presented in the drug world.  Not that it's right or

8  wrong.  Certainly you --

9          MR. WOOD:  Your Honor, I'm going to object.

10 That's a misstatement of the facts.

11         THE COURT:  That's sustained.

12         MR. MADRID:  You know the evidence and you

13 heard the evidence presented.  And I'm happy to say if

14 we want to say that Obel Cruz-Garcia wasn't selling

15 drugs or involved in drugs, but that was the evidence

16 that was presented and the crimes that he was involved

17 in.  And I want you to understand that those cases

18 happen in a context.  I'm certainly not saying anybody

19 deserved what they got or anything like that.  I don't

20 think either Baby Angelo, that would be a certainty for

21 me to say that, or the two victims in Puerto Rico; but

22 they happen in a certain context.

23         Now, the first question you are going to be

24 asked is whether Obel Cruz-Garcia is a future danger.

25 And there was evidence presented from an official from

1   TDC that works in classification.  And I think the
2   picture was trying to be painted that it's some kind of
3   Baskin-Robbins up in TDC.  You remember they said:  You
4   even get your Bluebell and it's really good, isn't it?
5   Things are running amuck down there.
6                   But, again, she told you on
7   cross-examination that's not how it is.  People in TDC,
8   the workers there, the guards there, they do their job.
9   And you can bring up whatever anecdotal evidence and any
10  kind of situation in society and you can know always
11  find something, but she told you that things are kept in
12  line there.  And there are classifications and people
13  can be held for up to 23 hours with only one day out.
14  And if people try to climb that fence, they get shot.
15  That's what she told you.  Don't let -- don't believe
16  that's some kind of country club.  It's a hell hole.
17  It's prison.
18                  Society would be protected if Obel
19  Cruz-Garcia went to prison for the rest of his life.  He
20  is not a future danger.  And the two pieces of evidence
21  they brought you -- and you have -- you have a slice
22  here of twelve years to look at.  The whole argument
23  that he is going to get out and he's going to do
24  something or he's going to be a future danger, you've
25  got twelve years to look at.  He got arrested in 2001.

1    And so, the evidence they brought you from Puerto

2    Rico -- I think he was in prison there about eight years

3    or ten years before he was brought over here.

4              The evidence they brought you was a

5    detention officer from there.  And he said that Obel

6    Cruz-Garcia was in a room.  At first it was presented as

7    some kind of window.  And in my mind, you think of a

8    glass pane window and you break it out and on the other

9    side is freedom.  But, again, during cross-examination,

10   you were told that it's a complex with five different

11   prison facilities in the complex.  You were told that

12   that window is actually a number of window panes and

13   that one was moved over.  You were told that he had a

14   cell mate.  Nobody told us how long he was in there with

15   the cell mate.  He said there were some sheets also.

16   Nobody said whether it was him or it was his cell mate.

17   No charges of escape or attempted escape or any kind of

18   segregation.

19             There wasn't any evidence presented because

20   if he tried to escape, the State would have charged him.

21   The officials in Puerto Rico would have charged him.  In

22   this case, the prosecution wants you to use that against

23   him as future danger as an example.  And the evidence

24   just doesn't break out.  The last question asked of that

25   detention officer was:  Who can open those windows?  Who

1  has the power over them?  And they said -- he said the

2  inmate.  So, they can open and close their own windows

3  for ventilation.  A window that can be opened and closed

4  for their own ventilation that had one out of four or

5  one of six panes -- that was the testimony -- the State

6  is going to tell you that's an escape attempt, although

7  he was never charged.

8              They also brought somebody from the Harris

9  County Jail here.  They told you about a razor.  The

10  inmates get to shave once a week on Sundays.  And there

11  was a razor taken out and the detention officer is doing

12  a good job and he saw that was an old razor.  And he

13  explained to you that inmates use those razors to do

14  things like cook.  They get Ramon noodles, if you

15  remember, and they cook and they make things or cut

16  their hair.  That's what he said.  He didn't say that

17  Obel Cruz-Garcia in the few years here in the jail, that

18  he stabbed anybody.  In fact, in that incident he went

19  back to his jail cell and gave him the other one.  And

20  his punishment was 13 cents and no visitation for seven

21  days.  That's what the jail -- the jail, who wants to

22  keep it safe for their guards and their personnel, they

23  deemed that act not to be a violent act, not that he was

24  using it, they deemed it worth 13 cents.  And the State

25  is going to use those two examples in twelve years as a

1   future danger.

2            Now, as to mitigation.  The second question

3   that you are going to discuss is regarding whether

4   Mr. Obel Cruz-Garcia either caused the death or was a

5   party to the death.  And I think y'all answered that,

6   but you can go over it and decide.  One of those

7   questions, I think, is going to be -- you might discuss

8   who actually did the killing or didn't do the killing,

9   but you pretty much answered that in the first phase of

10  the trial.

11           So, on the third phase of the trial, you

12  are going to ask:  Is there any mitigation that would

13  have you turn away from the death penalty?  And I think

14  there's been plenty of mitigation that's been presented

15  to you.  And I think you should look at the years.  I'm

16  asking you to look at the years.  The State will have

17  you believe that this time, from '92 to 2001 -- there

18  was no evidence proved that Obel Cruz-Garcia was

19  committing any kind of offenses.  In fact, the evidence

20  that was presented says that he was a family man, he was

21  running a reality business, he saw his son.  You heard

22  his brother.  You know he has a family.  You know he

23  raised his boys as best he could.  Obviously, he went to

24  prison, so he can't continue to do that.  But he has

25  kept in contact with them.  He helped to build a church.

1   They will make the argument that those are just words,

2   but I think the evidence that was presented was that he

3   was involved in the church from 1992 to 2001, that he

4   was a churchgoing man.  His brother went to visit him in

5   prison and he was still going to church.

6                And Angel who came to testify -- and he's

7   not somebody that we found.  Out of the -- what he felt

8   in his heart of this man, he came on his own.  He just

9   showed up today.  And he told you he had a burglary of a

10  habitation case, but he's trying to do the right things

11  in his life.  And he got that example ironically from

12  somebody charged with capital murder.  And the part of

13  the person that he found that from is Obel Cruz-Garcia.

14  He has been in prison these years and you heard from

15  more than one person that he is a Christian and a person

16  that has strong faith.

17                That doesn't discount the loss of Baby

18  Angelo at all, but it's mitigation evidence.  And when

19  you look -- when you -- when y'all discuss these and

20  deliberate these things, I'm asking that you consider

21  all of those things.  There is nothing that could change

22  the pain of Diana Garcia and everything she went

23  through.  There is nothing that could bring her son

24  back.  And the death penalty is not going to do it and

25  it's not going to make anybody feel better.  The pain is

1  always going to be there, but the decision that you have

2  to make is one, is society going to be protected; and is

3  there any mitigation to turn away from that?

4            This man over here, Obel Cruz-Garcia, you

5  can see him, and you've seen him throughout the trial,

6  he is a living, breathing human being.  And you have to

7  decide with those questions is the State going to give

8  him the death penalty?  That's the decision you have to

9  make.  So, I want you to think long and hard.  Certainly

10  about Diana Garcia and the pain and the pain of that

11  family.  We all feel that.  We don't feel like she does,

12  but we know what it's like.  We all have family and many

13  of us have children.

14            And in knowing that, we're all brothers and

15  sisters in this world.  We're all human beings.  And we

16  have to decide in our society.  We have laws and we have

17  rules, but we have to decide, you have to make the

18  decision.  And those rules, are we going to answer those

19  questions and take the life of one of our brothers and

20  sisters, or are we going to be protected with him being

21  in prison for the rest of his life?  And I will submit

22  to you the evidence shows that he is not a future

23  danger.  He has been in jail for twelve years.  He

24  already changed one man's life, one young man's life in

25  there.

1                    And I'm asking when you go back to come

2    back with the questions answered in a way that turns

3    away from the death penalty and give Obel Cruz-Garcia a

4    life sentence.  Thank you for your time.

5                    I'll turn it over to Mr. Skip Cornelius.

6                    THE COURT:  Thank you, Mr. Madrid.

7                    Mr. Cornelius, you may proceed.

8                    MR. CORNELIUS:  Thank you, Your Honor.

9                    A couple of quick things to start off with.

10   First of all, I don't know how you can't say that the

11   bad part of Obel Cruz-Garcia's life is associated with

12   the drug world.  I don't know why that's outside the

13   record.  I mean, that seems pretty obvious to me, which

14   was what Mr. Madrid was saying.

15                   But I want to start with the kidnapping.

16   This is the conviction, the actual conviction that the

17   State has and was offered you.  And I want to make sure

18   that we understand what he's actually convicted of.

19   These are just hard, cold facts.  He is convicted of two

20   counts of kidnapping and three counts of possession and

21   use of a deadly weapon without a license.  Okay?

22                   Now, I want you to spend a second with me.

23   Maybe you won't even ask for the evidence and you might

24   not read this.  And because I'm afraid of that, I want

25   to read it to you to make sure you see this.  In this

1  transcribed part of the judgment, it says that on the --

2  he is convicted of possession of these weapons without a

3  license.  With respect to the kidnapping conviction of

4  the minor, it says:  The weapons in question were not

5  used.  And on the judgment of the other kidnapping, the

6  brother that was kidnapped, it also says -- there is a

7  finding by the Court -- the weapons in question were not

8  used.

9           So, I think that sets to rest whether the

10  weapons were actually fired or not during that offense.

11  There was some confusion by the witnesses as to they

12  thought they were fired.  There may be an interpretation

13  problem with that, but I think the actual conviction is

14  for kidnapping and possession of weapons, not for

15  aggravated assault or attempted murder or something

16  else.  Not that that's good.  And I'm not touting him

17  for being convicted of those things, but I want you to

18  have whatever the correct facts are that we have in

19  evidence in this case.

20           Now, on Thursday -- or, actually, on Friday

21  when I had to sit there and listen to the State's

22  argument, I anticipated the fact that I would love to

23  have gotten up and responded to it and I would be able

24  to if the law allowed me, but the law didn't allow me,

25  but I can respond to it now.

1           This is where we were attacked for only

2   giving you half the story.  The two things to their

3   argument was:  The defense lawyers only gave you half

4   the story.  And the other thing was emotion, emotion,

5   emotion.  I want to talk to you and respond about half

6   the story for a moment.  I know that when you are a

7   prosecutor and you are trying a death penalty case and

8   you're on attack mode, you are going to attacking,

9   including opposing counsel.  And I'm used to that.

10  That's fine, but I'm going to defend myself for a

11  moment.

12          Half the story.  We were only telling half

13  the story.  This was repeated over and over.  First of

14  all, as they well know, we don't have to tell any story.

15  Because we're not telling a story.  They are telling the

16  story.  They are supposed to bring you hard, concrete

17  facts of their story that convinces you beyond a

18  reasonable doubt.  We don't have to convince you that

19  our client is innocent or convince you not to give the

20  death penalty.  There is a presumption that the client

21  is innocent.

22          Now, you've convicted him and the law

23  doesn't allow me to argue with your verdict, and I'm not

24  trying to argue with your verdict.  I'm going to respect

25  it and ask you to respect yourselves.  I'm going to

1  respect you, too.  But the burden is on the State in

2  criminal cases, not on the defense.  And they know that

3  very well.  We don't have to tell you the story, but I

4  made what I thought was really a pretty simple argument.

5  It was a reiteration of my opening statement, frankly.

6  Argued four things.

7           I said that I thought that the credibility

8  of Arturo and Diana was in question because they were

9  drug dealers and they lied to the police.  And I wanted

10  you to consider that.  And I'm sure that you did.  I

11  said that Rudy's credibility is affected by the law.

12  The law says you can take into consideration his

13  criminal record in deciding if you believe him at all.

14  And he is -- you are instructed by the Court that he was

15  an accomplice witness as a matter of law.  And the law

16  said, and still says, and said before I was born, and,

17  therefore, before any of you were born, that no

18  conviction can be had on the unsupported testimony of an

19  accomplice witness.  There has to be an independent

20  witness to support --

21           MS. TISE:  Objection.  That's a

22  misstatement of the law.  There only has to be evidence

23  that tends to corroborate.  Not an independent witness.

24           THE COURT:  Okay.  That's sustained.

25           MR. CORNELIUS:  I'm not sure what's wrong

1   with that, Judge.  I respect your ruling, but --

2                   MS. TISE:  I'll object to the sidebar.

3                   THE COURT:  That's sustained.

4                   MR. CORNELIUS:  I think the charge told you

5   that you cannot convict on the uncorroborated testimony

6   of an accomplice witness.  I think that's what the Judge

7   said in the charge.

8                   THE COURT:  We're in punishment now,

9   Mr. Cornelius.  And they have their charge and they'll

10  rely upon this charge to --

11                  MR. CORNELIUS:  I know.  We have an

12  accomplice witness in this case, too, that I'm arguing.

13                  THE COURT:  Mr. Cornelius, the law will be

14  given by the Court and it's in this charge.  So, stay

15  inside that charge.

16                  MS. TISE:  There's no accomplice witness

17  rule in the charge that we have.  So, this argument goes

18  outside --

19                  THE COURT:  The jury will read the charge

20  and rely on the law that's in this charge as provided to

21  them.

22                  MR. CORNELIUS: Okay.  Well, I argued that

23  Friday.

24                  Three things.  Criminal record, accomplice

25  witness.  And then the third thing was the

1  inconsistencies between Rudy's testimony and the long

2  interview with the FBI agent.  Now, I brought y'all that

3  stuff because I thought it was important for you to

4  know.  Not because it was half the story.  They left out

5  that part.  I didn't.  You wouldn't have known it.

6           Let me step back for a second.  You

7  wouldn't have known any of those inconsistencies if I

8  hadn't brought it out.  So, I'm bringing the other side

9  of the story, not half the story.  They left you with

10  half the story.  I brought out the inconsistencies.  The

11  DNA, I argued -- and this is from their witnesses, their

12  evidence.  The DNA does not prove and it never can prove

13  when it occurred, when it was placed there, or under

14  what circumstances it was placed there.  That's what I

15  argued.

16           The medical examiner testified that he

17  could not cite a single medical fact to determine the

18  cause of death.  He decided it on the circumstances

19  which to him were hearsay, what he was told.  And he can

20  do that, but on cross-examination I wanted you to know

21  that there is not a single medical fact to support the

22  cause of death.

23           What we have and the significance of that

24  is we have Rudy.  We have Rudy.  On each of these

25  alleged murder cases, we have Rudy.  That's it.  We have

1  got Rudy to establish cause of death.  Without Rudy, we

2  have nothing.  And Rudy is not someone, I would think,

3  that a jury would base a death sentence on.  And he is

4  it in this case on these two murder cases.

5            MS. TISE:  Objection.  That

6  mischaracterizes the evidence in front of the jury.

7            THE COURT:  The jury will remember the

8  testimony.  Arguments of counsel is not evidence.

9            MR. CORNELIUS:  On that second question

10 specifically as to who caused the death, what other

11 evidence is there other than Rudy?  None.  None.  On

12 this murder case that they have presented here that no

13 charges been filed on anybody, what evidence do you

14 have?  Rudy.  Rudy is the only one saying my client

15 killed anybody or assisted in killing anybody.  It's

16 based on his testimony.

17            So, to answer to the extent that his

18 testimony affects Question No. 1 and Question No. 2 --

19 very important for me to be able to argue that and talk

20 to you about that -- he has no credibility.  And so, I'm

21 saying to base a death sentence on his testimony, I

22 think, is --

23            MS. TISE:  Objection.  Counsel opinion is

24 not relevant.

25            THE COURT:  That's sustained.

1              MR. CORNELIUS:  Now, but let me just follow

2    up.  Rudy said he saw Obel Cruz-Garcia break his neck.

3    He said he saw him put cigarette burns in him, inject

4    him in the neck and other places with drugs, and smash

5    his hands.  What was the medical testimony from the

6    autopsy?  No broken neck.  No broken bones, period.  No

7    fresh needle marks in the neck or anyplace else.  He had

8    an abrasion on his pinky finger on one hand.  Not that

9    that's good and he was dead.  And I'm not making fun of

10   any cause of death, but I'm talking about Rudy.  He had

11   one mark on the top of the other hand.  That's it.  His

12   fingers weren't smashed, they weren't broken.  There is

13   nothing.  No cigarette burns on the body.  Nothing to

14   corroborate him from the medical examiner's report and

15   testimony.

16              Okay.  Who's telling half the story?

17   Ms. Tise got up here in her opening statement and said

18   that in the 80s and 90s the defendant was breaking into

19   houses, she was going to bring you evidence of that.

20   She brought you one case by Rudy who didn't even go in

21   there, according to him, because he always says that.

22              MS. TISE:  Objection.  Mischaracterizes the

23   testimony.

24              THE COURT:  The jury will remember the

25   testimony from the witness stand.  Arguments of counsel

1  are not evidence.

2          MR. CORNELIUS:  I'm very satisfied you will

3  remember the evidence.  And if you come up with some

4  other burglary other than the one that they offered,

5  then I want you to consider it, but there has only been

6  testimony about one burglary other than the primary case

7  here in the punishment hearing.  One.  Her opening

8  statement said she was going to bring you testimony that

9  he was out doing other burglaries.

10          MS. TISE:  And Rudy specifically testified

11  to that.

12          THE COURT:  Okay.  Let's not have any

13  sidebars.

14          MR. CORNELIUS:  Well, there you go.  Rudy

15  testified to it.  There you go.

16          THE COURT:  Ms. Tise, you will have your

17  opportunity to argue.

18          Mr. Cornelius, no sidebar either.

19          Please proceed.

20          MR. CORNELIUS:  Well -- yes, ma'am.

21          Rudy says.  Okay?  Rudy.  Not a victim, not

22  somebody who said they were burglarized or sexually

23  assaulted or injured, but Rudy.  Rudy saying it.  And

24  only evidence of one, but only Rudy bringing you that

25  evidence.

1                    She said that first on this other case

2     of -- this other case involving Saul, Saul, that

3     first -- it's her opening statement -- first Obel caught

4     him, tied him up, then he escaped.  And then he caught

5     him again and that's when he killed him.  We didn't have

6     any evidence of that.  We didn't have any evidence of

7     him being caught, tied up, escaping, and then finding

8     him.  That wasn't what Rudy said.  Now, I know she

9     didn't make that up.  She wouldn't do that.  So,

10    somebody probably told her that.  And it's probably Rudy

11    since he is the only one testifying about it.  And he

12    just didn't remember it, I guess, or couldn't keep his

13    story straight.  And what does that tell you?  That was

14    her opening statement.  She said the victims were held

15    for three days.  They weren't held for three days.  Who

16    is telling you half the story?

17                    Now, we have this Johnny Lopez.  And who is

18    telling you half the story about Rudy when they say to

19    you that Rudy's got a drug conviction, you know, you got

20    in the drug world, all this, and you had a drug

21    conviction, right, and you got some time on it, right?

22    If I hadn't cross-examined Rudy, that's what you'd

23    think, right?  It was a heck of a drug conviction,

24    wasn't it?  It was a heck of a drug conviction.  It was

25    a lot more than a drug conviction.

```
1              Johnny Lopez.  Now, Johnny, you've had a
2   rough time in life and you committed a couple of crimes,
3   a couple of thefts and drug cases, right?  If I hadn't
4   cross-examined him, what would you think about that?
5   Not much.  But after cross, what did you find out?
6   Three times to TDC, three times to the state jail.  He
7   says eleven theft convictions.  A little more than just
8   a couple of little thefts or drug cases.  Pretty
9   extensive record.  And then he was a certified nut
10  anyway.
11             Now, leaving the impression with the jury
12  by this HPD officer that Obel had multiple infractions
13  in the Harris County Jail.  There are not multiple
14  infractions.  He's got one infraction.
15             MS. TISE:  Objection.  The testimony was
16  from an officer who would know that he had multiple.
17             MR. CORNELIUS:  Well, is that --
18             THE COURT:  The jury will remember the
19  evidence from the witness stand.  And you are reminded
20  that arguments of counsel are not evidence.
21             MR. CORNELIUS:  It was actually her
22  question that he agreed to, but there is no evidence of
23  it.  And what is the evidence that we brought out?  They
24  have records of all this stuff.  They keep records of
25  all this stuff.
```

1      You know, it's just not fair to make an
2  accusation that we have multiple infractions but no
3  evidence of them.  But that's been consistent in this
4  prosecution.  A whole lot of accusations and no evidence
5  to prove it.  Multiple infrac -- the infraction we got
6  was a -- he didn't even lose those seven days.  He got
7  seven days loss of privileges probated for 15 days, but
8  he had to pay the 13 cents with the razor blade.  That's
9  it.  That's his sole infraction in the jail that you
10  know of.  That's it.  That's what the evidence is in
11  this case.  I don't know what's in people's minds, but I
12  do know what's in the evidence.  That's it.

13      Not one hint of a suggestion, of the
14  possibility in the twelve years he's been incarcerated
15  that he ever assaulted anyone, attempted to assault
16  anyone, tried to get somebody else to assault someone,
17  harmed anybody, attempted to harm anybody, conspired to
18  harm anybody.  Not a shred of evidence that he did that
19  for the twelve years he's been in prison.  That's pretty
20  important in answering those questions, I think.

21      Rudy.  Rudy apparently skates.  I think
22  it's highly mitigating that the colossal unfairness of a
23  death sentence for him and Rudy goes free, it's just
24  simply not fair.

25      Questions 1 and 2 are based on Rudy.  They

1   are based on Rudy.  I hope you answer them, either one

2   of them, "no" because you can't take Rudy's testimony --

3                  MS. TISE:  Objection, Your Honor.  That

4   totally mischaracterizes the testimony and leaves out a

5   whole day of testimony on a kidnapping case that the

6   defendant pled guilty to.

7                  THE COURT:  Okay.  The jury will remember

8   the testimony.  And arguments of counsel are not

9   evidence.

10                  MR. CORNELIUS:  Back to the mitigation for

11  a second here.  I want to talk to you about mitigation

12  and I will be done.

13                  The law doesn't define what mitigation is.

14  It leaves it up to you.  Mitigation can be anything you

15  think mitigation is.  That's the law.  But Mr. Madrid

16  argued that you are deciding on the death penalty.

17  That's not -- maybe that's not an artful way to put

18  that, but I think you know what the situation is.  If

19  you answer Question No. 1 "yes," that he's a future

20  danger, and you answer Question No. 2 "yes," that he is

21  either caused the murder himself or participated in it,

22  then you get to this mitigation question.  And based on

23  how you answer it, you know he gets -- and the charge

24  tells you -- he gets the death penalty.

25                  So, I don't know how to sugarcoat it.  I

1    mean, if you get to that point, hypothetically, you are

2    going to know what the impact of your answer is.  And

3    the law says that we have this mitigation question that

4    the Judge has to give you with instructions telling you

5    that you have to consider it because it's a grave

6    situation that this jury has to decide.  And the law

7    says you are supposed to consider everything in the case

8    and see -- everything in the case and see if you find

9    mitigation sufficient to turn away from a death sentence

10   and give a life sentence.  It's hard to put it any other

11   way other than that's going to be your job to do and you

12   know what the outcome is.  I'm not trying to put some

13   heavy guilt trip on you.  You knew that when we were

14   talking to you in jury selection.  You knew that it

15   could get down to that.  They asked you that very

16   question in jury selection, every one of you.

17                So, at some point in time, regardless which

18   way you decide a capital case, you are going to know

19   that you made that decision and you are not going to be

20   able to say that somebody -- that the other eleven

21   overpowered me or forced me to answer it, or that they

22   convinced me but it really wasn't my opinion.  It's

23   going to be your opinion.  You are going to have to

24   decide it.  You are going to have to decide whether in

25   this case, under these facts, with this defendant you

1  find that there is mitigation or you don't find that

2  there is mitigation.

3           Now, there is a lot of other little

4  technical things that I'd like to argue, but as I said

5  on Friday, I know you would catch all of those technical

6  things.  I know you did.  Somebody does out of the

7  twelve.  But the bottom line to this is:  What is

8  mitigation?  It might be one thing to one of you and not

9  to somebody else, but something else might be mitigation

10  to another person.  Same as with reasonable doubt.  I

11  talked about that at length on Friday.  It doesn't have

12  to be the same, but if you find, any of you, if you find

13  yourself in the position of answering Questions 1 and 2

14  "yes" and you're down to mitigation, you find any reason

15  that you think is sufficient to mitigate the case away

16  from the death sentence, if that's your opinion, you are

17  entitled to it.  That's your opinion.  Everybody's

18  opinion is just as important as anybody else's.

19  Everybody's verdict is just as important as everybody

20  else's.  No one has any more authority.

21           I hope -- I know the State is going to open

22  up this and bring out this stuff and they are going to

23  appeal to every heartstring they can appeal to, probably

24  make some of you cry during argument.  And that's okay.

25  I'm just going to have to sit there and endure that.

1               But I want you to think about when they are

2    going into these things if that is actually proof from

3    which you can answer the questions or if it's just an

4    appeal to your heartstrings.  If it's an appeal to just

5    pure sentiment, first of all, the law says you are not

6    supposed to do it that way.  And I'm going to suggest to

7    you as heartfelt as I can if you make your decision

8    objectively and dispassionately, you will feel better

9    about it.  Regardless which way it is, you will feel

10   better about it.  If you decide it on emotion, you won't

11   feel good about it.  Maybe not -- maybe it won't be a

12   problem today or tomorrow, but years from now -- and I

13   don't know how many years from now; maybe one year from

14   now, maybe 30 years from now -- it's not going to feel

15   good.  Objectively and dispassionately is what the law

16   says and that's what I recommend to you.

17               The mitigation.  Sometimes the State will

18   argue that the mitigation has to be sufficient enough to

19   overcome the crime.  That's not what the law says.  The

20   law doesn't say anything about the mitigation being

21   sufficient to overcome the crime.

22               MS. TISE:  Objection.  That's

23   mischaracterizes the law.  It says:  Sufficiency in

24   light of the circumstances of the crime.

25               THE COURT:  The law will be given to you in

1  the Court charge and you'll be governed thereby.

2          MR. CORNELIUS:  The law does not say

3  mitigation has to overcome the crime.  That's not what

4  this charge says.  And she can object a hundred times,

5  but that's not what this charge says.  Okay?  It doesn't

6  say that.  It doesn't say that.  There is never going to

7  be any mitigation that can overcome the crime in any

8  capital murder case.  If you've convicted somebody, you

9  can't justify the crime, you can't overcome it with any

10 kind of mitigation.  It is for you to decide:  Is it

11 sufficient for whatever reason to save this man's life.

12 It's never going to be sufficient to overcome this crime

13 or to make it okay, but is there some reason or reasons

14 for you to consider it and not take his life, if you get

15 that far in the case.

16          It's hard to sit down.  I'm trying a death

17 penalty case and I feel like I have done everything I

18 can do to try to save my client.  It's hard to do that,

19 but I'm going to have to sit down.  I'm going to have to

20 sit down and I'm going to have to listen to another

21 argument.  Probably I will be attacked again personally.

22 If I am, that's the way it goes.  I will not be able to

23 respond.  The trial will be over when they are through

24 with their argument.  It will be up to you to

25 deliberate, but the trial part will be over.

1              You can respond, though.  If you go back in

2    the jury room and everybody is crying and everybody is

3    so sad because of little Angelo's death -- and I know

4    everybody is sad about it -- at some point, though, when

5    you start looking at the evidence in the case and making

6    decisions, if you will just say to yourself:  Let's take

7    the emotion part of it away and decide what the facts

8    are, everybody will do better if you do that.  Everyone

9    will do better.

10              It's going to be emotional.  They are going

11   to make it emotional.  Decide if they are appealing to

12   your heartstrings or applying to your brain when they

13   are making their arguments.  Okay?  And you will be

14   fine.

15              Thank you very much.

16              THE COURT:  Thank you, Mr. Cornelius.

17              State, you ready to proceed, Mr. Wood?  You

18   have one hour.

19                    **STATE'S CLOSING STATEMENT**

20              MR. WOOD:  Ladies and gentlemen, Mr. Madrid

21   was right.  There are rules that we all live by.  We're

22   a society governed by rules.  Rules that your kids have

23   to abide by when they go off to school, rules at your

24   work when you go into work every day, rules in your own

25   household that you implement.  That's just a fact of

1  life, the rules that we live by.

2              And with anything at home, at school, at

3  your work, if you break the rules, there are

4  consequences.  That's just something that we learn to

5  live by from the time that we are small children.  And

6  we have to get comfortable with those consequences.  And

7  we have an overriding set of rules that we live by.  And

8  these are the laws that you and I have to follow every

9  single day.  And with the consequence in life when we

10 break the rules, there are also consequences when we

11 break the law.

12             And we live in the United States of

13 America, the best country in the entire world.  And

14 thank God for that.  We get to live with freedoms that

15 so many people do not get to live with.  We get to,

16 hopefully, walk around in our streets and feel safe.  We

17 get to live out our dreams because this is America.

18 Right?

19             But in order for our society to function

20 like we are used to functioning, like we get to take the

21 benefit of every single day, then we have to rely on

22 that system of consequences as well.  And when someone

23 breaks the law, you, me, or anyone else, there is a

24 consequence.  And our laws are set up for certain people

25 and for certain offenses, there is the ultimate

1    circumstance.

2                Very early on when as a prosecutor, I got

3    advice or was visiting with a much more senior, wiser

4    prosecutor, seasoned prosecutor.  And in talking about

5    how you decide or assess someone's punishment or what's

6    fair in a case, I was told, you know, you obviously have

7    to look at the offense.  And for many offenses, the

8    punishment -- we hear this all the time -- the

9    punishment must fit the crime.  Right?  We've all heard

10   that.  But I was also told that you have to also

11   consider the person.  Many times the punishment has to

12   fit the person that you are talking about.

13               And there are some people, ladies and

14   gentlemen, that because of the type of person they are

15   and the way they live their life, they can't live in the

16   society that we benefit from every day.  They can't

17   follow the rules that we live by.  They can't have the

18   benefit of walking out on the streets of Harris County

19   and enjoying the same things we do because they cannot

20   follow the rules.  And, therefore, there has to be a

21   consequence.  And if you are a person that cannot live

22   within our society, you have to be removed from society.

23   And in some situations, that has to be extreme and you

24   have to permanently remove that person from society.

25               And I submit to you -- and thankfully so --

1  there aren't a lot of people that have to be permanently

2  remove from our society.  Because we like to think some

3  people learn from mistakes and are able to change, but

4  there are those rare circumstances.  And when you have

5  one of those individuals that has warranted suffering

6  those -- the most extreme consequences, then our law

7  allows for you to take that person out of society.

8              And for now what has been almost ten solid

9  days, you have heard about the life of Obel Cruz-Garcia.

10 And in deciding in what is appropriate for Obel

11 Cruz-Garcia, you get to consider everything you know

12 about him.  And you now have to apply everything you

13 know about him to those three special issue questions.

14 And we want you to apply the facts and the evidence to

15 those special issue questions.

16             I was really curious to know what

17 Mr. Madrid and Mr. Cornelius would get up here and say

18 to you in response to what you now know about the

19 defendant.  Because last week, our focus was on Baby

20 Angelo's case and what happened in his case.  And while

21 you cannot put those horrific facts out of your mind --

22 and we ask that you not put those facts out of your

23 mind, that was a small look into the person that Obel

24 Cruz-Garcia is.  And now you know the true person of who

25 we're talking about.

 1          And I was a little perplexed by

 2   Mr. Cornelius' argument about guilt and responding to

 3   Natalie's argument from Monday.  And they can get up

 4   here and tell you that they respect your verdict and

 5   then turn around and try to reargue, I guess, how he was

 6   not guilty of capital murder.  The twelve of you have

 7   found the defendant guilty of capital murder.  And

 8   Natalie and I know that was not an easy process.  We

 9   never claimed that to be easy, but that decision came

10   from the 12 of you and I know that you stand by that,

11   but I will also ask you that you remember those

12   conversations that we had with each of you individually

13   over the last month or so back in jury selection.  And

14   when we talked to you about those special issues, we

15   asked each and every one of you that if the facts and

16   the evidence leads you in that direction, that at the

17   end of the case Natalie and I would be asking you to

18   answer those questions in a way that would ultimately

19   lead to the death penalty being assessed against Obel

20   Cruz-Garcia.

21          And, ladies and gentlemen, every single one

22   of you twelve jurors assured Natalie and I that you

23   could do that.  And that you would wait and hear the

24   facts and listen to the testimony and weigh the evidence

25   that's before you.  And that after you did that, in

1    looking at each individual question, that you could

2    answer those questions.  And that if the evidence and

3    facts led you in that direction, that each and every one

4    of you could do that.  And I ask that you remember that

5    when you go back in that deliberation room.

6                   And if it takes some urging of fellow jury

7    members, do that.  Because we know that this process

8    will not be easy.  It will not be any easier than

9    possibly Monday.  And it may even be harder.  The twelve

10   of you have to resolve that in your mind.  But in

11   looking at those special issues, I ask that you focus in

12   on the facts.  And like I said, I was curious how they

13   would get up and respond to some of the evidence and the

14   testimony that you've learned over the course of the

15   last two or three days.  And I would characterize how

16   they portrayed it to you in the last 45 minutes to the

17   last hour was a big case of minimization.  There were

18   major gaps that they seem to have missed over the last

19   three or four days.  And I want to talk to you about the

20   first couple of special issues.

21                  In considering the first special issue you,

22   as a jury, have to determine if you believe the

23   defendant -- if there is a probability that the

24   defendant will commit criminal acts of violence and be a

25   continuing threat to society.  That's that first

1    question that you must answer.  And you get to weigh

2    everything that you know about the defendant.  You are

3    told in that jury instruction you get to consider his

4    background, his character, the circumstances of the

5    case.

6            And, ladies and gentlemen, do not forget

7    the underlying case.  Because with many of you in jury

8    selection, we talked about that there are certain cases

9    where the underlying facts of the case alone may show

10   you that the defendant is a continuing threat to society

11   and will continue to be a continuing threat to society.

12   This, ladies and gentlemen, is one of those cases.  In

13   your deliberations, do not forget these are facts.  If

14   they are combined with emotions, so be it, but these are

15   facts.

16           Do not forget the night of September 30th,

17   1992.  Do not forget the night that 6-year-old Angelo

18   Garcia, Jr. was taken from his home, taken from his

19   mother in the middle of the night, taken down to a car

20   and put in that car.  Do not forget Angelo Garcia, Jr.'s

21   last 20 minutes of his life as he sat in the back of

22   that car, likely frightened to death.  Don't forget that

23   moment when Angelo Garcia, Jr. is taken out of that car

24   out in Baytown and killed.  Don't forget the fact that

25   his body was put in that water.  You were told his

 1   little body wouldn't sink, so he had to be weighted down

 2   with a rock.  And don't forget the fact that that's

 3   where that 6-year-old little boy laid for 36 days until

 4   his little bones and his Batman shorts were found.

 5                Ladies and gentlemen, whether that invokes

 6   emotion or not, those are the facts.  And any person

 7   that can do that to a 6-year-old little boy will always

 8   be a continuing threat to our society.  You can believe

 9   by a probability that this man will always pose a threat

10   to our society if he can be responsible for that.  You

11   can answer that Special Issue No. 1 "yes" and move on

12   just based on the facts of Baby Angelo's case, period.

13                But guess what?  You have a lot more to

14   consider.  You have a kidnapping that occurs after that

15   that the defendant pled guilty to.  I don't know if

16   going through that judgment, like Mr. Cornelius did, and

17   trying to break down or pick out things in some attempt

18   to minimize what the defendant pled guilty to is

19   supposed to negate the fact that he first shot at --

20   whether the shots fired out of the gun or not.  You

21   heard evidence from multiple people that the defendant

22   shot at another individual twice and then kidnapped two

23   other people.

24                Now, ladies and gentlemen, I don't know

25   where Mr. Madrid was pulling his inferences from, but

 1  the facts and the evidence and testimony that's before

 2  you is these people were -- these victims were strangers

 3  to Obel Cruz-Garcia.  These aren't people that he had

 4  dealt drugs with or been involved in drugs with.  That

 5  was investigated and they were not involved in any kind

 6  of drug activity.  These were strangers.  These were --

 7  this was somebody who the defendant saw an opportunity

 8  and he went after.

 9              And do not forget the details of what

10  Andres Buten and William Garay told you took place

11  inside of that home after they had been captured.  Do

12  not forget those details of being beaten with hands,

13  with fists, with his feet, being bitten.  He bit William

14  Garay.  Being beaten with a shower curtain rod.  Being

15  urinated on after he has beaten them and the sting of

16  that urine hitting his body after he has been hit and

17  beaten with a shower curtain rod.  Do not forget those

18  details.

19              Do not forget the fact that the defendant

20  had William Garay pull out his penis and he threatened

21  to chop his penis off and nicked at his penis.  Don't

22  forget the fact that William Garay was cut on his face

23  with a knife.  Don't forget the fact that the defendant

24  let his girlfriend, who -- and I'm not sure who that

25  might have been.  Maybe it was Dorka, maybe it wasn't.

1    Let her into that house, into that bathroom, had sex

2    with her, sticks his finger in her vagina, and then

3    makes Andres Buten smell and lick his fingers.  Those

4    are the facts that the defense kind of wants you to

5    forget.

6              Those are more facts and more evidence that

7    shows you that this defendant is and has been and will

8    continue to be a continuing threat to society.

9              And then you have Saul Flores.  The

10   18-year-old old Hispanic boy who was killed in 1989 and

11   how was he laid to rest?  In a dumpster filled with

12   garbage.  The defense wants to shift focus of Saul's

13   death back to Rudy.  And he's right.  Without Rudy, we

14   would have never been able to piece that case together.

15   Saul Flores would have been another nameless victim on

16   another cold case on that list that Eric Mehl talked

17   about that never went solved.  And you can like the fact

18   that Rudy was there, you can dislike the fact that Rudy

19   was there, but you can also evaluate Rudy's testimony on

20   that.

21             Does it line up with what we know about the

22   defendant?  Absolutely.  Does it line up with what Tina

23   Perez told you?  Absolutely.  And then they attack

24   Johnny Lopez.  Johnny Lopez, ladies and gentlemen, was

25   brought in here because he was a friend of Saul Flores.

1    Somebody that knew and was friends or family with Saul

2    Flores has to come in and say:  Yeah, I knew that

3    person.  He was a friend of mine or he was a family

4    member of mine.  It's kind of sad when that's who Saul

5    Flores has left 20 plus years later.  That's what Johnny

6    Lopez came in to tell you.  And he is attacked.  I don't

7    remember what names Skip called him.

8                     But you know what the defendant's

9    involvement was in that, ladies and gentlemen.  You know

10   based on the evidence and what the testimony was on

11   that.  Just another example of the way and the life that

12   this defendant lived.

13                    The little incident in prison in Puerto

14   Rico, that was interesting the way that was -- the spin

15   that was placed on that.  You have somebody that is in

16   prison, mind you, for two really awful kidnapping cases

17   spending a sentence of 16 years and he's caught in a

18   cell with a cell mate, the window of his cell had been

19   cut in a way where an entire human body could fit

20   through the window if not discovered by the guard,

21   Esmurria.  He told you a human body could have fit out

22   of that hole cut in the cell of that prison wall -- or

23   the prison window, rather.

24                    What else was found in that cell?

25   Mr. Madrid said:  I think some sheets.  No.  There were

1    some sheets.  They were sheets that had been designed in

2    a way to form a rope that you could get down from the

3    second floor of that prison cell.  And what else did

4    they find?  A map of Puerto Rico and a cell phone on the

5    defendant's person.

6              Ladies and gentlemen, this is not a man who

7    just has been sitting in prison leading Bible study and

8    finding God.  This was a man, back in 2001, that was

9    trying to find a way to get out of there.  And they want

10   you to think that that's not a factor in considering

11   whether Obel Cruz-Garcia will be a continuing threat to

12   society.  Well, you will remember, ladies and gentlemen,

13   that when we talked about that special issue, society

14   can mean many things.  It can mean the world that -- the

15   streets that you and I walk in on -- around on every

16   day.  It can be the inside of that prison wall.

17             Ladies and gentlemen, the evidence, the

18   hard evidence and facts and testimony that you have

19   before you prove to you, I would submit to you, well

20   beyond a reasonable doubt that this man would be a

21   continuing threat to society.  He has been, he is, and

22   he will continue to be.

23             I submit to you in considering Special

24   Issue No. 1, please ask yourself this question:  Can you

25   imagine anyone being more of a continuing threat to

1   society than Obel Cruz-Garcia based on what you know

2   about him?  I think the answer to that is "no."  And

3   because of that, you have to answer that first question

4   "yes."

5              And in considering Special Issue No. 2 --

6   Mr. Madrid discussed a little bit -- you have to decide

7   beyond a reasonable doubt if you believe Obel

8   Cruz-Garcia actually caused the death of Angelo Garcia,

9   Jr., or if he didn't actually cause the death that he

10  intended to cause the death.  And you go back and you

11  review everything that you learned last week in the

12  trial.  You can answer based on what you know in the

13  facts and evidence that Obel Cruz-Garcia is responsible

14  for Angelo's death.  But for Obel Cruz-Garcia, don't you

15  know that Angelo Garcia, Jr. would be alive.  Baby

16  Angelo would be here but for Obel Cruz-Garcia.  You can

17  answer Special Issue No. 2 "yes" based on what you know.

18              Ladies and gentlemen, I'm going to sit down

19  and Natalie is going to talk to you about Special Issue

20  No. 3, the mitigation.  But I want to leave you with the

21  fact that, you know, I think before many of you have

22  probably been thrown into this situation of being a

23  juror on this kind of the case, many of us and many of

24  you probably would like to think that there aren't

25  people in the world that can do the kind of things that

1    you have heard about over the last two weeks.  Surely

2    there aren't those type of people.  Those type of people

3    can't exist because you and I as human beings can't

4    really fathom that.  Because most human beings that get

5    the benefit of living in our society and living under

6    our laws have -- even if you have a tendency have a

7    trigger that would stop you and say:  I can't do that to

8    another human being.  I can't do those things.

9                   But I submit to you there are those

10   individuals that do not have that trigger, that internal

11   trigger.  They act on impulses.  And they do the things

12   that we have heard about over the last two weeks.  And

13   like it or not, ladies and gentlemen, that is the sad

14   reality.  And today is the day that Obel Cruz-Garcia

15   answers for the terror that he has inflicted on many,

16   many people over the course of his life.

17                   Today is the day that Angelo Garcia, Jr.,

18   Baby Angelo, gets justice.  Today is the day that,

19   hopefully, Diana Garcia just starts getting some closure

20   in her life over this.  Today is the day that he, Obel

21   Cruz-Garcia, is held responsible for what he's done.

22   And I ask that you hold him responsible.  You tell him

23   that, yes, you have been, you are, and you will continue

24   to be a continuing threat to society.  And, yes, you are

25   responsible for Angelo Garcia, Jr.'s death.  And I ask

1   that you answer those special issue questions in that

2   way and hold him accountable.

3                THE Thank you, ladies and gentlemen.  I will

4   turn it over to Natalie.

5                THE COURT:  Thank you, Mr. Wood.

6                Ms. Tise, you may proceed.

7                MS. TISE:  Thank you, Judge.

8                Ladies and gentlemen, this case is not

9   about Rudy, but I can't say that I blame the defense for

10  trying to make it that way.  And I should have done this

11  in the guilt phase of the trial.  And I blame myself for

12  not doing it, but I'm going to do it now because I'm

13  going to put the issue of Rudy to rest.  Because that's

14  not what this is about.  And I know that's what they

15  want you to think it's about, but it's not.

16                I'm going to tell you a little story.  Back

17  in 2009, Obel Cruz-Garcia was charged -- I'm sorry --

18  2008 with capital murder.  Already charged.  Three years

19  before we talked to Rudy.  Why was he charged with

20  capital murder?  Because we got his DNA.  We got his DNA

21  and we know based on that DNA that he is the man who

22  came in that apartment that night and raped Diana.

23                And you see, we, at the district attorney's

24  office, we kind of operate on common sense and we put

25  people on juries who we think have common sense.

1  Because that's the way the law works.  You make your

2  decisions based on reason and common sense.  And reason

3  and common sense tells you that if a woman is woken up

4  in the middle of the night and raped and then when she's

5  able to free herself and get up and find her child

6  missing, it stands to reason that the person who raped

7  her took that child.

8            Now, under the law -- and it's a

9  complicated law and you saw in the instructions you were

10  given -- if you commit a felony offense, along with some

11  other individuals, like rape or burglary or robbery,

12  something that those individuals who went in that

13  apartment that night we know did -- and you know one of

14  them is him because he left his DNA behind -- if you do

15  that and then you leave and another felony is committed

16  as part of the conspiracy, in furtherance of the

17  conspiracy -- it might be something you totally didn't

18  even think was going to happen, but let's say you rape

19  someone and the child sees you and you have to get rid

20  of the child.  So, in furtherance of your conspiracy,

21  you take that child and you go kill him, you are guilty

22  of capital murder, right?

23            MR. CORNELIUS:  Objection.  That leaves out

24  a whole --

25            MS. TISE:  And that's what we're operating

1   on in 2008 when he is charged.

2            MR. CORNELIUS:  That is reasonably

3   anticipated.  She left that out.

4            THE COURT:  What is your objection,

5   Mr. Cornelius?

6            MR. CORNELIUS:  She leaves out a whole

7   element.

8            MS. TISE:  You know, he is exactly right.

9   Reasonably anticipates.

10            THE COURT:  Ms. Tise, may I rule on the

11   objection?

12            MS. TISE:  I'm sorry, Judge.

13            THE COURT:  Just a moment.

14            Your objection is it leaves out an element?

15            MR. CORNELIUS:  Yes.

16            THE COURT:  That's not a proper objection.

17   What is your objection?

18            MR. CORNELIUS:  It's a false statement of

19   the law, Judge.

20            THE COURT:  That's overruled.

21            You may proceed.

22            MS. TISE:  Okay.  So, back to what I was

23   talking about.  Those things make a person guilty of

24   capital murder.  In 2008, we did not know what happened

25   to Baby Angelo.  We did not know -- we knew he died, but

1   we did not know how he died.  We did not know where he

2   died.  We did not when he died.  But we knew that under

3   the law, the person who raped Diana was guilty of

4   capital murder under the law of parties.  And that's why

5   the defendant was charged and that's why the case was

6   proceeding through the system.

7              One day in 2011, while working on the case,

8   I called an FBI agent named Billy Ebersole.  And I said:

9   I understand that Rudy, Carmelo Martinez Santana --

10             MR. CORNELIUS:  This is outside the record.

11  We object to it.

12             THE COURT:  Please stay within the record.

13             MS. TISE:  Responding to counsel's argument

14  about the charging decision in the case.

15             THE COURT:  Okay.  Stay within the record,

16  Ms. Tise.

17             MS. TISE:  Agent Ebersole was asked to go

18  talk to Rudy.  He knew Rudy had been at Linda

19  Hernandez's apartment at 2:00 in the morning, sometime

20  between 2:00 and 3:00 that night.  So, we wanted to know

21  if Rudy could tell us the rest of the story.  Without

22  Rudy, would the defendant still have been charged with

23  capital murder?  Yes.  He already was.  He had been

24  charged with capital murder for two years and we were

25  proceeding to trial.  Absolutely.  But we wanted to know

1   the rest of the story.  And we also wanted to know who

2   the third guy was.  Because we know that Rudy wasn't the

3   man up in that apartment with the rapist that night.  He

4   doesn't match the description.  He is someone Diana

5   knows.  She would have recognized his voice.  We wanted

6   to know who that tall man was with the dark skin and the

7   weird accent.  So, that's why we talked to Rudy.

8              And you know what?  I cannot tell you how

9   that day was when the agent called me and said:  He told

10  me the whole story.  For the first time, he told us the

11  whole story.  Is Rudy why the defendant is charged with

12  capital murder?  No.  Does Rudy tell us a whole lot more

13  information than we had before about the capital murder?

14  Absolutely.  And you know what?  I'm grateful to him for

15  doing that.

16             But a very important detail that the

17  defense doesn't want you to recognize is the fact that

18  when he told us that story, we had no idea what he was

19  going to tell us.  We didn't think he'd tell us anything

20  at all.  There was no -- there was no:  Hey, and by the

21  way, if you tell us that you are a party to capital

22  murder, Rudy, we won't charge you.  No.  He was already

23  on paper committed to that story based on his

24  conversation with William Ebersole.  I had a signed

25  statement from him as to his involvement before I ever

1    had any communication with him, before I knew anything.

2              Ladies and gentlemen, Rudy was a big help

3    to us, but what's so stunning about Rudy is I could

4    charge him with capital murder tomorrow.  There is no

5    guarantee.  And the other thing that's stunning about

6    Rudy is he is not being evasive with you when he tells

7    you he doesn't know whether he's charged.  He really

8    doesn't know.  He doesn't get it.  He sees in the

9    computer that his name has capital murder attached to it

10   and he really doesn't know.  I mean, basically, the

11   amazing thing about Rudy is he's just kind of letting

12   the chips fall where they may.  He didn't have an

13   attorney.  There was no nobody negotiating with anyone.

14   When he gave us that statement, it was a gift, is what

15   it was.  And he was locked in on it.  And he couldn't

16   come in here and tell you something different if he

17   wanted to because I've got his statement and he's locked

18   in.  But he came in and did it anyway.

19              I'm sorry, I'm sorry that Rudy has had to

20   spend the last ten days being trashed in this courtroom.

21   I'm not here to tell you he's a perfect individual.  He

22   did some bad things with the defendant, but what Rudy

23   has done now is maybe the first good thing he's ever

24   done in his life.  And I'm sorry -- I'm proud of him for

25   doing it.  I'm proud of him for coming in here and

1  telling you the details that we would have never known

2  for absolutely no benefit at all.

3              And I'm not going to charge him with

4  capital murder.  And that's because when he was there,

5  when that child was killed, he was defecating in the

6  woods.  And that's the only evidence we have.  And I'm

7  certainly not going to stand in front of the jury -- you

8  see how hard it is to make a decision when you have a

9  witness who is saying:  You told somebody to stab the

10  child with a knife.  What's going to be my evidence in

11  Rudy's case if I try him for capital murder?  His

12  statement.  That's it.  His statement.  Nobody can put

13  him up in that room.  There's no DNA there.  There is no

14  witness who can put him up there.  He can put himself

15  down in the car below sitting there.  And as far at the

16  scene of the actual murder, we have his statement and

17  his statement is he is defecating in the woods at the

18  time the murder happens.

19              Do you want to be on that jury?  No, I'm

20  not going to charge Rudy.  But there are a lot of good

21  reasons why I'm not charging Rudy.  I don't have

22  anything other than his statement and his statement is

23  he was going to the bathroom in the woods, literally

24  losing his stool, when that murder happened.  I'm tired

25  of this case being about Rudy.

1           Ladies and gentlemen, the other thing that
2  you know about Rudy is that Rudy is corroborated time
3  and time again.  One of the really cool things about
4  Rudy's statement when we got it is we were like, wow,
5  now we know why there was a rock on top of that little
6  boy's body as it was buried in the mud.  Wow, now we
7  know who was up there in the apartment with Rudy.  And,
8  by golly, Rudy doesn't know what our crime scene
9  descriptions are.  The person he says was up there
10 matches the description.  By golly, without even knowing
11 a single thing about Linda Hernandez and the fact that
12 she talked to the police, he explained to us about that.
13 He told us the whole story all on his own.
14          It was chilling to get Rudy's statement and
15 see all of those indications of his reliability in
16 there, all the things that proved he was telling the
17 truth.  I'm tired of this case being about Rudy.  I hope
18 you-all thank God that you got to hear from Rudy.
19 Because he told you a whole lot.  And because of Rudy,
20 we know who put that knife in that little boy and we now
21 how it happened.  And we know it happened that night.
22 And we know that man ordered it.
23          Something else that Rudy was repeatedly
24 corroborated on, ladies and gentlemen, is the fact that
25 Obel Cruz-Garcia was the absolutely, unquestioned boss

1   of his little network of followers.  And guess what?

2   Every other civilian witness who took the stand who knew

3   Obel Cruz-Garcia told you the exact same thing.  So, you

4   don't have to take Rudy's word for that.  You have about

5   ten people who told you that.  You have Rudy, Diana, and

6   Arturo.  You have Linda Hernandez, whose boyfriend,

7   Charlie, worked for the defendant.  And remember I said:

8   When the defendant said jump, Charlie said how high.

9   Remember that?

10          Doesn't this seem like sort of a little

11  repeating thing here when I asked the victims of the

12  kidnapping, both of them, individually:  Who was running

13  the show?  Who was telling everybody what to do?  Obel

14  Cruz-Garcia was.  Clearly, the boss.  And when he told

15  somebody to do something, they did it.  Who else said

16  that?  Johnny said that.  Who else said that?  Tina

17  Perez said that.  Who is orchestrating this deal?  Who

18  is orchestrating all the criminal conduct that he's

19  involved in from all of the evidence that you've heard?

20  Him.  He is the boss.  And that's why when he told Roger

21  to stab that little boy, he did.  And Roger will pay the

22  price for that when his turn comes, but don't take the

23  blame off of the man who told him to do it.  Don't

24  excuse him.

25          Because I will tell you right now, if it

1   were up to Roger alone, Angelo would still be alive.

2                   MR. CORNELIUS:  Judge, we have to object.

3   That's way outside the record.  There's no evidence of

4   that.

5                   THE COURT:  I'm sorry.  I'm going to

6   instruct the jury that the evidence will speak for

7   itself.  You will remember the testimony from the

8   witness stand.  These are just arguments.  They are not

9   evidence.

10                  You may proceed.

11                  MR. CORNELIUS:  I would request a ruling on

12  my objection.  I object that that's outside record,

13  damaging the --

14                  THE COURT:  Which specific part is outside

15  the record?

16                  MR. CORNELIUS:  Well, I don't want to

17  repeat it in front of the jury, but --

18                  THE COURT:  Well, I need to be able to rule

19  since she said a long statement.  Can you approach the

20  bench?

21                  MR. CORNELIUS:  Yes.

22                  (At the bench, on the record)

23                  THE COURT:  Which portion are you objecting

24  to?

25                  MR. CORNELIUS:  She said:  If it were up to

1    Roger, the little boy would still be alive.

2              MS. TISE:  Which is a reasonable deduction

3    from the evidence because the defendant ordered him to.

4    My whole argument is about the defendant being the boss.

5    He is the one who dictated it.

6              THE COURT:  Okay.  And your objection is

7    that's outside the evidence?

8              MR. CORNELIUS:  Outside the record, yes.

9              MS. TISE:  It's a reasonable deduction.

10             THE COURT:  I will make -- please clear it

11   up.

12             MS. TISE:  Yes.

13             MR. CORNELIUS:  So, the Court is overruling

14   my objection?

15             (Open court, defendant and jury present)

16             THE COURT:  I'll overrule your objection,

17   but request that the State clear up their statement.

18             MS. TISE:  What I'm saying to you is, is

19   that the defendant was the boss.  The defendant told

20   Roger to kill the little boy.  Do any of you have any

21   doubt that Roger was going to take that little boy and

22   go kill him on his own?  Why did Angelo get killed?  He

23   got killed because the defendant grabbed him out of his

24   bed as he laid there sleeping, took him down to the car

25   in his arms, put him in the back of the car, and ordered

1  Rudy and Roger to sit on either side of him.  And 20

2  minutes with the cold deliberation of the cold-blooded

3  killer that he is, drove out to Baytown knowing exactly

4  what he was going to do.  And without hesitation, he got

5  out of the car and opened the door and he told Roger in

6  Spanish:  You know what you have to do.  And guess what?

7  Roger did it.

8              And like I said, nobody says Roger is not

9  to blame and nobody says Roger won't be asked to be

10 accountable for his actions, but make no mistake, the

11 defendant gave the order.  He is the reason Angelo is

12 dead.  Make no mistake.  This all happened because of

13 him.  And if any of you have any further remaining

14 doubts about people's credibility, namely Rudy, I want

15 you to think about the facts of the punishment evidence

16 that you received.  And I told you in my opening

17 statements to listen to certain things because they're

18 like a signature, they're like a calling card.  Do you

19 remember that?  And did you hear those things?

20              William and Andres, all the way down in

21 Puerto Rico, they don't know Rudy.  Rudy is in prison in

22 Pennsylvania.  They don't know anything about all of

23 that, but William and Andres talking about the defendant

24 taking a hammer to Andres' feet, tying him up with their

25 hands behind their back with wire, tossing Andres into

1   the bathtub.  There are a lot of assaults in Houston

2   that don't have anything to do with people striking

3   people's extremities with hammers.

4                It's just a coincidence that a big portion

5   of the cases that the defendant has been accuse of

6   that's exactly what happened?  Or is it that's something

7   he likes to do?  Ladies and gentlemen, that's just

8   something he likes to do.  Those aren't coincidences

9   that people just randomly talk about, their hands

10  getting hit with hammers.  And the defense wants to make

11  points about his injuries.  What did Dr. Wolf say were

12  his injuries on his hands?  Blunt force trauma.  Oh,

13  just a little laceration.  Just a little laceration.  We

14  saw that laceration.  And you heard --

15                MR. CORNELIUS:  Objection.  He said

16  abrasions, Judge.  Not laceration.  That's not the same

17  thing.

18                THE COURT:  The jury will remember the

19  testimony.

20                MS. TISE:  You heard the medical expert

21  tell you that that was caused by blunt force trauma and

22  there was bruising underneath it and it was caused by

23  striking with a blunt instrument like a hammer.

24                Ladies and gentlemen, those aren't

25  coincidences.  Those are the things that you know and

1    those are the defendant's calling card.  The defense

2    wants to make this case about everybody else and it's

3    not about everybody else.  It's about him.  It's about

4    the things that he likes to do.  They even went so far

5    as to try to impugn the character of those three

6    witnesses that you had from Puerto Rico, who were

7    basically unimpeachable.  They weren't even

8    cross-examined.  They are trying to, oh, they must be

9    drug dealers.  And everything that he was accused of in

10   the punishment phase of the trial had to do with drugs.

11            But you heard from Sergeant DeJesus -- or

12   Agent DeJesus who told you:  What he did to them, he may

13   have thought they had drugs, but they didn't have any

14   drugs.  They were good, decent, law-abiding business

15   owners, just like you and me, who were trying to make a

16   living.  And he kidnapped those two young men and

17   tortured them.  And I'm sorry, but it just gives you a

18   little insight into their strategy for you to sit here

19   and listen to their characters being impugned.

20            Why are they doing it?  Because they have

21   to.  Because those facts are not facts that sound like

22   somebody who is not a danger to society.  And those

23   facts don't really lend themselves to any argument that

24   he's a good Christian and there is all this mitigation

25   out there, do they?

1              I have a lot of things that I wanted to say

2    to you about mitigation.  And I'm going to turn to that

3    now, but I want you to think about the fact that it's

4    been 21 years for this woman and her husband to wait for

5    justice.  Twenty-one years.  Twenty-one years for them

6    to come to court and have a jury say what they have been

7    waiting to hear.  And you gave it to them on Monday with

8    your guilty verdict.  And now they want to know what you

9    think about the man and his crime and what you think is

10   fair for what he did.

11             And Justin is absolutely right, this case

12   alone is all that you need.  It's all that you need.

13   It's horrible.  It's sad.  And I'm sorry if I get

14   emotional sometimes, but I want to apologize for you.  I

15   know you get emotional sometimes because those are the

16   facts that we have.  And we can't pretend that those

17   aren't the facts, but I'm not going to ask you to make

18   your decision based on emotion.  I'm going to ask you to

19   make your decision based on a pretty cold, pretty

20   step-by-step look at the facts.

21             Mr. Cornelius -- I'm sorry I have to differ

22   with him -- is incorrect when he says mitigation is not

23   defined.  It says right here in the charge:  Mitigation

24   is anything that removes -- I'm sorry -- the moral

25   blameworthiness of the defendant.  Removes or alleviates

1   his moral blameworthiness.  For what?  For murdering

2   Angelo Garcia.  That's what mitigation is.  And I'm not

3   just making it up.  It's in your charge.

4             What have you heard that takes away or

5   mitigates his moral blameworthiness for what happened to

6   Angelo Garcia?  Nothing.  And that's why they are not

7   talking about it.  Nothing.  This case is really about

8   you going back there and dispassionately looking at the

9   evidence you were presented.  And you can do that and

10  dispassionately come to the conclusion that there is no

11  mitigation.

12            You heard from his wife or former wife who

13  gave you a bunch of stuff about -- basically, I think

14  she gave you aggravation.  She told you that he left her

15  pregnant at 15 years old after a six-month relationship

16  and moved to Puerto Rico to make a better life for

17  himself.  He took up with another woman when he got

18  there, married her.  You know her.  Her name is

19  Angelita.  And you know what kind of grief he left her

20  with, don't you?

21            Then when she left him after he killed

22  Angelo Garcia, he runs away to his homeland and goes

23  back to the first wife for a while.  Fathers another

24  child with her and then commits -- then takes off from

25  her and takes up with another woman and fathers a couple

1  of more children with all of those people.  And then

2  later on in 2001, he goes to prison leaving the youngest

3  at the age of five.  And I guess they have some happy

4  birthday pictures, but that's not mitigation.  Happy

5  birthday pictures do not take away his moral

6  blameworthiness for killing Angelo Garcia, do they?

7          And you have his family members telling you

8  he helped build a church and some people who say they

9  like to pray with him.  All this is going on in the

10  early 90s.  Does that timeframe sound familiar to you?

11  That's when he is out dealing drugs.  That's when he is

12  this big drug lord with all of these people working

13  under him.  That's when he kills Angelo Garcia.  That's

14  when he is running around on the east side of Houston

15  breaking into apartments and raping people.  That's when

16  that was happening.  So, you can evaluate what you think

17  about his Christian conversion.  Do you think that's

18  sincere?  Do you think that that reduces his moral

19  blameworthiness for what happened to Angelo?

20          What else?  They want to minimize the

21  escape attempt.  Justin talked to you about that.  What

22  do you think happened after he attempted to escape?  You

23  think he might have wound up in administrative

24  segregation.  I bet he did.

25          MR. CORNELIUS:  Judge, we're outside the

1   record.  Objection.

2                    MS. TISE:  Invited argument.

3                    MR. CORNELIUS:  That's her opinion on that.

4                    THE COURT:  That's sustained.  Stay within

5   the argument, Ms. Tise.

6                    MR. CORNELIUS:  Ask for --

7                    THE COURT:  Stay within the record,

8   Ms. Tise.

9                    MR. CORNELIUS:  Ask for a jury instruction.

10                    THE COURT:  You are instructed to disregard

11   the last comment by Ms. Tise and not consider it for any

12   reason.

13                    MR. CORNELIUS:  Move for a mistrial.

14                    THE COURT:  That's overruled.

15                    MS. TISE:  Ladies and gentlemen, do you

16   remember Bonnie Fiveash coming in here and telling you

17   the types of things prison officials evaluate when they

18   decide whether to put somebody in administrative

19   segregation?  One of them is escape attempts.  Pretty

20   hard to get into trouble when you are in a single cell

21   lockdown 23 hours a day.  And, unfortunately, Bonnie

22   won't be able to consider his Puerto Rican escape

23   attempt when she decides how to house him in TDC because

24   they don't have access to those records.  He will be in

25   G-3, general population, walking around in a white

1    jumpsuit with everybody else.

2              You know all about Obel Cruz-Garcia's

3    history.  Knowing him, knowing that he is the kind of

4    man who will kill you for the smallest thing, like

5    flirting with his girlfriend.  Why do you think he was

6    hoarding razor blades?  You can make your own

7    conclusion.  Do you think it was because Obel

8    Cruz-Garcia wanted to cut some of his friends' hair?

9    You can decide.

10             But I submit to you that you have before

11   you an extremely violent human being.  You have before

12   you a man who is capable of abducting a 16-year-old boy

13   from his father's business for drugs and money.  And

14   during that abduction, he does things like spit on his

15   face, put a knife to his penis, beat him while he's down

16   on the grounds listening to the screams of his friends,

17   who the defendant is beating whenever he leaves him.

18   And then whenever the defendant comes back, he jumps on

19   his back with both feet.  And you don't have to have

20   Rudy for any of that.  That's who he is.

21             Don't put blinders on.  Don't miss it.

22   It's too important.  Look at this case with your eyes

23   wide open and use your common sense.  This is a man who

24   killed Saul, a friend of his.  And I'm sorry, but when

25   he had his hands in that extension cord, around Saul's

1    neck, I don't know if Rudy thought he broke his neck or

2    strangled him.  He is not a medical examiner, but he

3    died because something was done to his neck.  Pulling

4    back extremely hard with an extension cord.  His hands

5    showed the blunt force trauma injuries corroborating

6    what Rudy said about the hammer.  And he killed that

7    18-year-old guy for nothing more than he hit on his

8    girlfriend.  And you saw the condition he left him in

9    and you saw where he left him.  Don't put your blinders

10   on.  See him for who he is.  He's a dangerous

11   individual.

12               There are a lot of people, ladies and

13   gentlemen, who have nightmares about what Obel

14   Cruz-Garcia did to them.  When you saw Andres sit on the

15   stand, did you see how he sat here on this chair with

16   his back turned?  He didn't even look at him, not until

17   he had to.  Did you hear the catch in Rudy's {sic} voice

18   when he sat up here and told you what happened to him?

19   Did you hear how his father talked about the long-term

20   repercussions of this?  Did you hear his father cry?

21               Ladies and gentlemen, there is no

22   mitigation in this case.  None.  They couldn't -- what

23   did they point to you?  There isn't any.  There is

24   evidence upon evidence upon evidence of the fact that he

25   is a future danger to society.  And you know and you

1  already resolved for yourself the fact that he either

2  intended Angelo to die or foresaw it.  The answer to the

3  special issues are clear, but when you go back there

4  don't forget about Angelo.  He is a fact of this case, a

5  fact that they don't want to talk about.  He was a

6  6-year-old boy who was only laying in bed at night in

7  his pajamas going to sleep.  He's a little boy who once

8  wore these shoes --

9            THE COURT:  You have three minutes,

10  Ms. Tise.

11            MS. TISE:  Thank you, Judge.

12            -- to run and play and ride his bike and go

13  to school in.  And he will never wear those again.  He's

14  a little boy who colored this picture and who will never

15  have the chance to learn that when he spell his name,

16  the "R" does not come before the "J," a little boy who

17  was a beautiful, precious little child.  And this is

18  what he looked like (indicating).  And when the

19  defendant got through with him, this is what he looked

20  like (indicating).

21            Those are just the facts.  Those are just

22  the facts.  And they are the facts that you need to base

23  your decision on.  Obel Cruz-Garcia is a monster.  He is

24  an evil person who likes to torture and taunt his

25  victims.  He is a person who is capable of taking a

1   6-year-old child and reducing him to this (indicating).

2   He's a person who is capable of seeing a 6-year-old

3   child as a means to an end.

4   And a human being like that is always going

5   to be a danger in our society.  And a human being like

6   that needs to pay the ultimate price.  Don't do it for

7   Diana.  Don't do for Arturo.  Don't do it for Rosie and

8   James.  And don't do it for me and Justin.  Do it for

9   Angelo.  Angelo is enough.  Thank you.

10   THE COURT:  Thank you, Ms. Tise.

11   Ladies and gentlemen of the jury, all of

12   the evidence, the Court's charge, and closing arguments

13   on punishment of counsel are before you.  I'm handing

14   the bailiff the charge and the verdict forms.  And it

15   will be left with you in the jury room, the jury

16   deliberation room.  Once all of the members are in there

17   together and assemble, it is formally submitted to you

18   and you may begin your deliberations.

19   We stand in recess until you reach a

20   verdict.

21   THE BAILIFF:  All rise.

22   (Jury deliberating)

23   (Open court, defendant present, no jury)

24   THE COURT:  Court is in recess.

25   (Recess)

1           (Open court, defendant and jury present)

2           THE COURT:  Please be seated.

3           We're back on the record in Cause

4   No. 1384794, the State of Texas vs. Obel Cruz-Garcia.

5   And Mr. Cruz-Garcia is present at counsel table with his

6   two lawyers.  And the State is represented by her two

7   lawyers.

8           Ladies and gentlemen of the jury, we are

9   going to recess for the evening.  As you have already

10  read and heard in the charge, after the charge is read

11  to you and delivered to you and you've begun your

12  deliberations, we cannot separate you.  So, the county

13  will be putting you up tonight in a local hotel.  And

14  I'm going to go ahead and break today at this time

15  because it's been a long day and I'm sure you're all

16  tired.

17          You are not to talk amongst yourselves

18  about the evidence or any subject connected with the

19  trial, or to form or express any opinion thereon

20  throughout the time you're outside that jury room.  So,

21  make sure you don't do that tonight.  Relax.  You'll

22  have a nice dinner.  You'll get a good night's sleep.

23  We'll get you up early tomorrow and get you a good

24  breakfast and bring you back about 8:30 to start your

25  deliberations again.  Okay?

1          So, at this time, you are going with Deputy

2    Solis for the next few moments.  All of the arrangements

3    have been made for you.

4               We're in recess.

5               THE BAILIFF:  All rise, please.

6               (Proceedings recessed)

1                    **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS   )
   COUNTY OF HARRIS     )

3

4      I, Mary Ann Rodriguez, Official Court Reporter in

5  and for the 337th District Court of Harris County, State

6  of Texas, do hereby certify that the above and foregoing

7  contains a true and correct transcription of all

8  portions of evidence and other proceedings requested in

9  writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13      I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, admitted by the respective parties.

16      WITNESS MY OFFICIAL HAND this the 16th day of

17  October, 2013.

18

19  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
20  Expiration Date:  12/31/2013
    Official Court Reporter
21  337th Court
    1201 Franklin
22  Houston, Texas  77002
    713.755.7746

23

24

25

**$**

**$150,000** - 116:20

**'**

**'83** - 26:6
**'85** - 35:25
**'86** - 26:6, 26:8, 26:18, 26:19
**'87** - 12:23, 22:13, 26:2
**'88** - 22:13
**'89** - 12:23, 44:25
**'92** - 38:17, 121:17
**'93** - 23:1, 24:20, 27:16, 38:17
**'94** - 13:16, 14:7, 23:1, 24:19, 24:20, 24:21, 25:14, 25:15, 27:14, 27:16
**'95** - 14:7, 27:22, 69:9, 91:9
**'96** - 25:19, 25:22, 27:22, 37:3
**'97** - 25:20, 25:22, 39:8
**'98** - 25:14, 39:8
**'skip'** - 2:11

**/**

**/s** - 179:19

**0**

**00795683** - 2:4
**00797777** - 2:15
**04831500** - 2:12

**1**

**1** - 94:24, 95:2, 95:3, 95:9, 95:11, 95:15, 95:20, 95:22, 96:2, 98:6, 98:9, 101:25, 103:6, 130:18, 135:25, 136:19, 138:13, 148:11, 152:24
**105** - 1:14
**11:00** - 116:12
**12** - 51:9, 145:10
**12/31/2013** - 179:20
**1201** - 2:6, 179:21
**1225** - 2:15
**13** - 81:2, 120:20, 120:24, 135:8
**1384794** - 1:3, 3:3, 7:12, 7:16, 59:15, 63:12, 66:11, 93:20, 101:22, 105:8, 177:4
**141** - 1:15
**15** - 9:21, 12:10, 22:14, 22:16, 44:9, 135:7, 170:15
**15-year-old** - 45:3
**16** - 12:10, 22:15, 22:16, 113:15, 151:17
**16-year-old** - 173:12
**16-year-old's** - 115:5
**16th** - 179:16
**17** - 18:4, 26:13, 26:23, 35:4
**176** - 1:16
**179** - 1:17
**18** - 1:3
**18-year-old** - 150:10, 174:7
**18th** - 1:20, 85:6, 85:7
**1985** - 35:25, 37:3
**1986** - 26:10
**1988** - 44:7, 44:25
**1989** - 23:22, 24:4, 45:13, 46:1, 112:19, 150:10
**1992** - 38:21, 94:2, 122:3,

147:17
**1993** - 23:5, 24:19, 25:1, 27:14
**1994** - 22:25, 23:5, 25:1, 25:13, 25:18
**1995** - 27:21, 30:3, 30:8
**1999** - 23:22

**2**

**2** - 96:3, 96:4, 96:7, 96:8, 96:14, 96:16, 96:20, 96:25, 97:2, 97:7, 98:6, 98:10, 102:12, 103:6, 130:18, 135:25, 136:20, 138:13, 153:5, 153:17
**20** - 12:25, 44:10, 147:21, 151:5, 166:1
**2000** - 28:18, 38:22
**2001** - 28:5, 28:16, 40:10, 52:9, 54:20, 69:11, 114:15, 114:17, 114:25, 118:25, 121:17, 122:3, 152:8, 171:2
**2002** - 41:13
**2008** - 155:18, 157:1, 157:24
**2009** - 155:17
**2010** - 114:3
**2011** - 114:3, 158:7
**2013** - 1:20, 1:3, 93:22, 179:17
**2028** - 2:12
**21** - 2:2, 12:25, 42:12, 42:18, 42:19, 42:22, 43:6, 71:22, 169:4
**22** - 1:5, 1:24, 2:3, 42:22, 78:18
**23** - 2:4, 18:4, 26:12, 26:23, 42:22, 77:17, 118:13, 172:21
**23rd** - 26:6
**24** - 2:5, 42:23, 77:20
**24039247** - 2:5
**25** - 2:6, 42:23, 78:6, 78:12, 115:10, 115:12
**25-year** - 114:22
**26** - 1:2, 1:1, 1:5, 1:6, 1:7, 1:8, 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:15, 1:16, 1:17, 1:20, 1:21, 1:22, 1:23, 1:24, 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11, 42:23, 77:25, 78:4, 115:10, 115:12
**27** - 2:8, 42:23, 77:10
**28** - 2:9, 42:23, 77:3, 77:6
**29** - 2:10, 42:23, 76:21
**2:00** - 59:9, 158:19, 158:20

**3**

**3** - 97:8, 97:9, 97:18, 97:20, 97:24, 98:4, 98:7, 98:11, 103:5, 103:8, 103:9, 153:20
**30** - 2:11, 42:23, 76:16, 83:6, 139:14
**3047** - 179:19
**30th** - 94:2, 147:16
**31** - 2:12, 42:23
**32** - 1:6, 1:20, 2:13, 42:23, 75:25
**33** - 2:14, 42:23, 75:8
**337th** - 1:12, 93:21, 179:5, 179:21
**34** - 2:15, 42:23, 75:6

**35** - 1:2, 2:16, 42:23, 64:13, 74:23
**35-year** - 64:4
**36** - 2:17, 42:23, 74:20, 148:3
**37** - 2:18, 42:23
**38** - 2:19, 42:24, 72:25
**39** - 2:20, 42:24, 73:3
**3:00** - 158:20

**4**

**4** - 28:1
**40** - 2:21, 11:25, 42:24, 72:9, 72:10
**41** - 2:22, 42:24, 73:6
**42** - 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 42:24, 74:8
**43** - 1:6, 1:20, 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 42:24
**44** - 2:25, 42:24, 73:8
**440** - 2:15
**45** - 3:1, 42:24, 83:6, 146:16
**46** - 3:2, 42:24, 73:13
**47** - 3:3, 42:12, 42:18, 42:19, 42:24, 43:6
**48** - 3:4, 56:18, 57:15, 57:19, 57:21, 58:4
**49** - 3:5

**5**

**5** - 28:1, 28:11, 79:10, 79:12, 79:16
**50** - 3:6
**51** - 3:7
**52** - 3:8, 114:2
**53** - 3:9
**54** - 1:7, 1:20, 3:10
**55** - 3:11, 56:18, 57:15, 57:19, 57:21, 58:4, 58:9
**57** - 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11

**6**

**6-year-old** - 53:17, 88:8, 147:17, 148:3, 148:7, 175:6, 176:1, 176:2
**61** - 1:12
**67** - 1:8, 1:21

**7**

**713.237.8547** - 2:13
**713.755.5800** - 2:7
**713.755.7746** - 179:22
**713.877.9400** - 2:16
**77002** - 2:6, 179:22
**77002-1659** - 2:16
**77019-2408** - 2:13
**79** - 1:8, 1:21

**8**

**8** - 1:5, 1:24
**80** - 1:9, 1:22
**80s** - 38:14, 44:3, 114:13, 131:18
**86** - 1:9, 1:22
**8:30** - 177:24

**9**

**90s** - 18:6, 90:10, 91:8, 91:11, 91:24, 92:3, 131:18, 171:10
**91** - 1:9, 1:23
**93** - 1:10, 1:11, 1:13

**A**

**abducting** - 173:12
**abduction** - 173:14
**Abel** - 1:8, 1:21, 17:25, 27:2, 27:3, 31:19, 47:20, 50:17, 50:18, 66:18, 67:5, 67:14, 67:15, 70:20, 71:21, 74:5
**abide** - 141:23
**abiding** - 168:14
**able** - 3:17, 4:15, 4:24, 16:22, 21:2, 125:23, 130:19, 137:20, 140:22, 144:3, 150:14, 156:5, 164:18, 172:22
**above-entitled** - 1:21
**above-styled** - 179:11
**abrasion** - 131:8
**abrasions** - 167:16
**Absolutely** - 150:22, 150:23, 158:25, 159:14
**absolutely** - 112:12, 161:2, 162:25, 169:11
**accent** - 159:7
**Accepting** - 82:1
**access** - 172:24
**accident** - 34:22
**accompany** - 16:14
**accomplice** - 62:16, 62:22, 65:3, 65:6, 65:10, 65:12, 65:16, 65:21, 127:15, 127:19, 128:6, 128:12, 128:16, 128:24
**according** - 131:21
**accountable** - 155:2, 166:10
**accurately** - 99:25
**accusation** - 135:2
**accusations** - 135:4
**accuse** - 112:20, 167:5
**accused** - 168:9
**act** - 98:15, 98:17, 98:19, 98:24, 99:1, 99:4, 99:5, 99:8, 99:10, 109:22, 120:23, 154:11
**actions** - 166:10
**activity** - 149:6
**acts** - 102:3, 146:24
**actual** - 87:15, 99:23, 124:16, 125:13, 161:16
**Ad** - 93:22
**addition** - 63:1, 64:3
**address** - 7:4
**administrative** - 171:23, 172:18
**administrator** - 15:7, 16:25
**admissibility** - 57:8
**admissible** - 3:21, 58:20
**admit** - 111:13
**admitted** - 42:18, 42:24, 95:4, 96:9, 97:10, 99:14, 179:15
**Admitted** - 2:1, 43:7
**advice** - 109:16, 143:3
**affect** - 83:14, 112:7
**affected** - 127:11
**affects** - 130:18
**afraid** - 124:24
**afternoon** - 67:10, 67:11,

67:14, 79:7, 79:8, 86:16, 106:1, 106:2
**age** - 26:18, 171:3
**agent** - 115:24, 116:15, 129:2, 158:8, 159:9
**Agent** - 158:17, 168:12
**agents** - 15:2, 115:10
**aggravated** - 111:14, 125:15
**aggravation** - 170:14
**ago** - 7:14, 81:9
**agree** - 44:12, 95:10, 95:12, 95:13, 96:15, 96:17, 96:18, 97:19, 97:21, 97:22, 103:21, 103:22, 104:1
**agreed** - 134:22
**ahead** - 4:1, 7:15, 59:17, 60:4, 177:14
**aid** - 99:15
**aided** - 1:24
**aiding** - 99:15
**alive** - 153:15, 164:1, 165:1
**alleged** - 94:1, 129:25
**alleviates** - 169:25
**allow** - 5:14, 56:14, 60:23, 61:4, 62:6, 125:24, 126:23
**allowed** - 20:18, 56:17, 125:24
**allows** - 144:7
**allude** - 100:17
**almost** - 144:8
**Almost** - 110:7
**alone** - 147:9, 164:1, 169:12
**Alphabetical** - 1:19
**altogether** - 5:21
**amazing** - 160:11
**amended** - 61:23
**America** - 142:13, 142:17
**amount** - 116:19
**amuck** - 118:5
**Andres** - 149:10, 150:3, 166:20, 166:23, 166:25, 174:14
**Andres'** - 166:24
**anecdotal** - 118:9
**Angel** - 1:9, 1:22, 80:5, 80:15, 80:21, 80:22, 81:7, 109:15, 114:10, 122:6
**Angelita** - 23:11, 23:18, 23:22, 24:10, 24:14, 45:8, 45:9, 170:19
**Angelo** - 102:15, 102:17, 102:25, 103:1, 107:10, 114:24, 117:20, 122:18, 147:17, 147:20, 147:23, 153:8, 153:15, 153:16, 154:17, 154:18, 154:25, 157:25, 164:1, 165:22, 166:11, 170:2, 170:6, 170:22, 171:6, 171:13, 171:19, 175:2, 175:4, 176:9
**Angelo's** - 107:19, 141:3, 144:20, 148:12, 153:14
**Ann** - 6:7, 179:4, 179:19
**answer** - 5:23, 41:23, 42:2, 75:21, 95:9, 95:11, 95:15, 96:1, 96:2, 96:14, 96:16, 96:19, 97:6, 97:7, 97:18, 97:20, 97:23, 98:5, 98:7, 98:9, 98:10, 102:7, 102:10, 102:21, 103:3, 103:7, 103:18, 103:20, 103:21, 103:24, 104:4, 111:4, 123:18, 130:17, 136:1, 136:19, 136:20, 136:23, 137:2, 137:21, 139:3, 145:18, 146:2, 147:1, 148:11, 153:2, 153:3,

153:12, 153:17, 155:1, 175:2
**answered** - 41:22, 103:6, 104:6, 121:5, 121:9, 124:2
**answering** - 26:21, 94:7, 95:20, 96:25, 98:4, 103:17, 135:20, 138:13
**Answers** - 102:20
**answers** - 94:5, 94:12, 101:2, 101:10, 101:13, 101:25, 102:5, 103:23, 104:11, 154:15
**anticipate** - 9:20, 57:3, 59:8
**anticipated** - 102:18, 103:2, 125:22, 157:3
**anticipates** - 157:9
**anyplace** - 131:7
**anyway** - 57:10, 61:13, 134:10, 160:18
**Ap-77,025** - 1:4
**apart** - 21:4
**apartment** - 113:17, 113:19, 113:23, 113:24, 155:22, 156:13, 158:19, 159:3, 162:7
**apartments** - 16:21, 16:23, 171:15
**apologize** - 169:14
**appeal** - 138:23, 139:4
**appealing** - 141:11
**Appeals** - 1:4
**appear** - 5:21
**Appellant** - 1:7
**appellate** - 4:2, 4:8
**Appellee** - 1:12
**applicable** - 93:16, 99:19
**application** - 100:3
**applied** - 64:17, 100:1, 100:9
**apply** - 144:12, 144:14
**applying** - 141:12
**approach** - 20:13, 42:6, 104:16, 164:19
**appropriate** - 144:10
**area** - 81:1
**argue** - 126:23, 126:24, 130:19, 132:17, 138:4, 139:18
**argued** - 128:22, 129:11, 129:15, 136:16
**Argued** - 127:6
**arguing** - 128:12
**argument** - 61:22, 66:5, 101:9, 105:1, 105:17, 107:16, 110:17, 116:5, 118:22, 122:1, 125:22, 126:3, 127:4, 128:17, 138:24, 140:21, 140:24, 145:2, 145:3, 158:13, 165:4, 168:23, 172:2, 172:5
**Argument** - 1:14, 1:15
**Arguments** - 111:25, 115:22, 130:8, 131:25
**arguments** - 107:17, 113:1, 134:20, 136:8, 141:13, 164:8, 176:12
**arms** - 165:25
**army** - 34:18
**arrangements** - 178:2
**arrested** - 118:25
**arrival** - 6:13
**arriving** - 101:2
**artful** - 136:17
**Arturo** - 127:8, 163:6, 176:7
**assault** - 111:14, 112:4, 125:15, 135:15, 135:16
**assaulted** - 132:23, 135:15

**assaults** - 167:1
**assemble** - 176:17
**assess** - 94:3, 143:5
**assessed** - 145:19
**assessing** - 64:14, 98:15, 99:6, 99:11
**Assistant** - 2:5
**assisted** - 130:15
**associated** - 124:11
**assume** - 61:14
**assured** - 145:22
**Atascocita** - 85:13
**attached** - 78:3, 160:9
**attack** - 126:8, 150:23
**attacked** - 126:1, 140:21, 151:6
**attacking** - 126:8
**attempt** - 120:6, 148:17, 171:21, 172:23
**attempted** - 119:17, 125:15, 135:15, 135:17, 171:22
**attempts** - 172:19
**attend** - 15:20, 15:23, 35:10, 35:13, 41:9, 41:16, 41:20, 70:16, 87:3
**attended** - 35:12
**attorney** - 20:9, 160:13
**Attorney** - 1:14, 1:15
**attorney's** - 110:14, 155:23
**Attorneys** - 2:5, 2:7, 2:17
**attorneys** - 8:25, 22:6, 63:14, 63:18, 66:13, 105:11
**authorities** - 100:4
**authority** - 138:20
**automobile** - 34:22
**autopsy** - 131:6
**available** - 8:12, 31:21
**Avelian** - 68:25
**awaiting** - 5:19
**aware** - 23:2, 23:13, 23:21, 24:1, 24:3, 24:5, 24:6, 24:11, 25:6, 25:9, 28:4, 29:12, 29:19, 29:22, 29:25, 30:2, 30:7, 30:9, 42:1, 50:13, 53:16, 53:19, 60:25
**awful** - 151:16

---

**B**

**baby** - 27:17, 74:16, 74:18, 74:19, 77:24, 78:13
**Baby** - 100:17, 108:18, 117:20, 122:17, 144:19, 148:12, 153:15, 154:18, 157:25
**background** - 94:16, 95:6, 96:11, 97:12, 103:12, 147:4
**bad** - 98:15, 98:19, 98:24, 99:1, 99:4, 99:5, 99:8, 99:10, 109:22, 124:11, 160:22
**bag** - 63:2
**Bailiff** - 31:11, 31:16, 55:25, 66:23, 80:6, 176:21, 178:5
**bailiff** - 176:14
**base** - 86:22, 109:19, 130:3, 130:21, 176:16
**based** - 57:4, 57:5, 92:12, 108:19, 109:11, 130:16, 135:25, 136:1, 136:22, 148:12, 151:10, 153:1, 153:2, 153:17, 155:21, 156:2, 159:23, 169:18, 169:19
**basis** - 56:21
**Baskin** - 118:3
**Baskin-robbins** - 118:3

**bathed** - 19:2
**bathroom** - 104:19, 105:2, 150:1, 161:23
**bathtub** - 167:1
**Batman** - 148:4
**Baytown** - 147:24, 166:3
**beat** - 112:9, 173:15
**beaten** - 149:12, 149:14, 149:15, 149:17
**beating** - 173:17
**beautiful** - 175:17
**became** - 24:6, 24:11, 29:25, 30:9
**become** - 24:1, 25:7, 99:22
**bed** - 165:24, 175:6
**began** - 45:19, 106:8
**begin** - 93:19, 176:18
**begun** - 177:11
**behalf** - 100:12, 114:12
**behind** - 45:4, 82:13, 156:14, 166:25
**beings** - 123:15, 154:3, 154:4
**believes** - 30:2, 30:15
**below** - 104:8, 161:15
**bench** - 20:13, 20:16, 104:17, 164:20, 164:22
**benefit** - 142:21, 143:16, 143:18, 154:5, 161:2
**best** - 18:11, 121:23, 142:13
**bet** - 47:5, 171:24
**better** - 13:13, 44:18, 45:2, 122:25, 139:8, 139:10, 141:8, 141:9, 170:16
**between** - 19:10, 87:20, 129:1, 158:20
**beyond** - 94:25, 95:22, 96:5, 97:2, 98:19, 98:24, 99:2, 102:1, 102:6, 102:13, 102:21, 109:23, 111:18, 126:17, 152:20, 153:7
**Bible** - 19:14, 42:2, 56:20, 83:11, 87:5, 87:13, 87:16, 152:7
**big** - 146:17, 160:2, 167:4, 171:12
**bike** - 175:12
**Billy** - 158:8
**birth** - 25:25, 26:4
**birthday** - 75:8, 75:11, 76:6, 77:13, 77:14, 77:18, 171:4, 171:5
**bit** - 1:23, 32:14, 34:10, 36:2, 36:20, 149:13, 153:6
**bitten** - 149:13
**blade** - 135:8
**blades** - 173:6
**blame** - 155:9, 155:11, 163:23, 166:9
**blameworthiness** - 97:17, 169:25, 170:1, 170:5, 171:6, 171:19
**blinders** - 173:21, 174:9
**blooded** - 166:2
**blue** - 63:2
**Bluebell** - 118:4
**Blunt** - 167:12
**blunt** - 108:10, 167:21, 167:23, 174:5
**body** - 113:9, 113:19, 131:13, 147:25, 148:1, 149:16, 151:19, 151:21, 162:6
**Boga** - 12:3, 12:6, 22:18
**bones** - 131:6, 148:4
**Bonnie** - 172:16, 172:21
**Born** - 44:25, 80:23
**born** - 12:1, 25:17, 25:21,

26:9, 26:16, 26:17, 27:17, 30:1, 30:10, 33:16, 33:18, 34:3, 67:19, 69:8, 91:8, 91:12, 127:16, 127:17
**boss** - 15:6, 15:8, 162:25, 163:14, 163:20, 165:4, 165:19
**bottom** - 75:1, 101:19, 138:7
**bought** - 113:18
**bound** - 101:16, 101:18
**boy** - 53:17, 69:5, 72:18, 75:13, 77:23, 88:8, 109:8, 114:24, 148:3, 148:7, 150:10, 162:20, 163:21, 165:1, 165:20, 165:21, 173:12, 175:6, 175:7, 175:14, 175:16
**boy's** - 162:6
**boyfriend** - 12:13, 163:6
**boys** - 26:23, 121:23
**brain** - 141:12
**break** - 55:18, 59:7, 104:22, 104:25, 105:2, 119:8, 119:24, 131:2, 142:3, 142:10, 142:11, 148:17, 177:14
**breakfast** - 177:24
**breaking** - 131:18, 171:15
**breaks** - 142:23
**breathing** - 123:6
**bride** - 45:4
**brief** - 114:14
**Briefly** - 54:16
**briefly** - 54:16, 108:20
**bring** - 7:3, 31:23, 35:20, 66:2, 66:7, 118:9, 122:23, 126:16, 131:19, 132:8, 138:22, 177:24
**Bring** - 7:9
**bringing** - 63:17, 129:8, 132:24
**Broke** - 88:22
**broke** - 60:10, 174:1
**broken** - 131:6, 131:12
**brother** - 5:6, 33:12, 34:8, 36:16, 36:21, 43:12, 43:24, 45:2, 47:22, 48:8, 49:16, 52:2, 53:12, 53:13, 56:16, 69:17, 69:18, 75:4, 76:4, 76:18, 77:12, 77:19, 78:22, 121:22, 122:4, 125:6
**brothers** - 19:5, 33:22, 39:13, 39:18, 123:14, 123:19
**Brothers** - 34:1
**brought** - 86:2, 113:14, 113:25, 118:21, 119:1, 119:3, 119:4, 120:8, 129:2, 129:8, 129:10, 131:20, 134:23, 150:25
**bruising** - 167:22
**brutal** - 88:14
**brutalized** - 88:23
**Buffalo** - 2:12
**build** - 15:25, 16:18, 17:1, 17:7, 73:18, 121:25, 171:8
**built** - 46:23
**bunch** - 58:9, 61:8, 170:13
**burden** - 127:1
**burglaries** - 132:9
**burglarized** - 132:22
**burglary** - 81:20, 114:11, 122:9, 132:4, 132:6, 156:11
**buried** - 162:6
**burns** - 131:3, 131:13
**business** - 35:16, 37:24, 38:2, 38:5, 40:5, 46:24, 58:13, 121:21, 168:14, 173:13

**Buten** - 149:10, 150:3
**buy** - 14:21, 17:7, 113:16

## C

**calendar** - 64:13, 99:24
**cannot** - 51:23, 99:25, 100:13, 100:17, 128:5, 143:19, 143:21, 144:21, 159:8, 177:12
**capable** - 173:12, 175:25, 176:2
**capital** - 4:13, 10:21, 34:12, 57:5, 72:19, 93:25, 94:9, 117:3, 122:12, 137:18, 140:8, 145:6, 145:7, 155:18, 155:20, 156:22, 157:24, 158:4, 158:23, 158:24, 159:12, 159:13, 159:21, 160:4, 160:9, 161:4, 161:11
**Capital** - 117:3
**captured** - 115:12, 149:11
**car** - 147:19, 147:20, 147:22, 147:23, 161:15, 165:24, 166:25, 166:5
**card** - 166:18, 168:1
**care** - 37:1
**carefully** - 93:17
**caring** - 36:22
**Carmelo** - 158:9
**carry** - 88:3
**case** - 3:9, 11:19, 22:6, 40:13, 43:21, 53:7, 53:13, 53:23, 54:1, 54:3, 57:6, 57:12, 73:11, 81:21, 92:5, 93:12, 93:16, 93:24, 94:5, 99:13, 99:19, 100:25, 104:12, 108:21, 109:4, 111:7, 112:4, 112:18, 112:21, 114:14, 114:15, 114:16, 114:17, 114:24, 115:7, 115:8, 115:9, 116:12, 116:15, 119:22, 122:10, 125:19, 126:7, 128:12, 130:4, 130:12, 131:22, 132:6, 133:1, 133:2, 135:11, 136:5, 137:7, 137:8, 137:18, 137:25, 138:15, 140:8, 140:15, 140:17, 141:5, 143:6, 144:20, 145:17, 146:17, 147:5, 147:7, 147:9, 148:12, 150:14, 150:16, 153:23, 155:8, 158:5, 158:7, 158:14, 161:11, 161:25, 162:17, 168:2, 169:11, 170:7, 173:22, 174:22, 175:4
**case-in-chief** - 108:21, 114:16
**cases** - 99:14, 116:25, 117:17, 127:2, 129:25, 130:4, 134:3, 134:8, 147:8, 147:12, 151:16, 167:5
**catch** - 138:5, 174:17
**Catholic** - 15:22
**caught** - 133:3, 133:4, 133:7, 151:17
**caused** - 102:14, 102:24, 121:4, 130:10, 136:21, 153:8, 167:21, 167:22
**celebrating** - 76:6, 77:15
**cell** - 119:14, 119:15, 119:16, 120:19, 151:18, 151:22, 151:24, 152:3, 152:4, 172:20
**cells** - 113:10, 113:12
**cents** - 120:20, 120:24, 135:8
**certain** - 94:5, 108:18, 117:22, 142:24, 142:25,

147:8, 166:17
**certainly** - 115:14, 117:3, 117:18, 161:7
**Certainly** - 117:8, 123:9
**certainly** - 117:20
**Certificate** - 1:17, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11, 179:1
**certificates** - 56:18
**certified** - 134:9
**certify** - 179:6, 179:13
**chair** - 174:15
**chambers** - 179:12
**chance** - 39:9, 39:22, 56:12, 101:4, 175:15
**change** - 85:25, 122:21, 144:3
**Change** - 82:1, 82:2, 82:3, 85:10
**changed** - 123:24
**Changed** - 83:19
**changing** - 34:20, 78:16, 78:17
**character** - 91:22, 91:24, 92:9, 92:15, 94:16, 95:6, 96:11, 97:12, 103:12, 147:4, 168:5
**characterize** - 146:15
**characters** - 168:19
**Charge** - 1:12
**charge** - 1:13, 4:14, 16:25, 61:21, 61:24, 62:5, 62:7, 62:15, 63:7, 63:19, 63:21, 63:25, 64:3, 64:22, 64:23, 65:20, 65:24, 66:5, 93:15, 93:17, 94:6, 101:7, 101:20, 108:7, 108:23, 108:24, 109:18, 128:4, 128:7, 128:9, 128:10, 128:14, 128:15, 128:17, 128:19, 128:20, 136:23, 140:1, 140:4, 140:5, 159:22, 160:4, 161:3, 161:20, 169:23, 170:3, 176:12, 176:14, 177:10
**charged** - 53:8, 53:10, 53:13, 53:16, 84:17, 88:5, 88:7, 98:16, 110:8, 110:12, 110:14, 111:5, 111:10, 111:11, 111:12, 111:15, 112:22, 112:23, 113:8, 119:20, 119:21, 120:7, 122:12, 155:17, 155:18, 155:19, 157:1, 158:5, 158:22, 158:24, 159:11, 160:7
**charges** - 4:19, 109:13, 112:16, 114:4, 119:17, 130:13
**charging** - 158:14, 161:21
**Charlie** - 163:7, 163:8
**check** - 18:21
**cheese** - 32:22
**cherry** - 111:2
**chief** - 108:21, 114:16
**child** - 21:13, 25:15, 25:17, 25:19, 25:25, 26:5, 26:9, 29:25, 30:9, 44:21, 47:16, 48:21, 49:19, 156:5, 156:7, 156:19, 156:20, 156:21, 161:5, 161:10, 170:24, 175:17, 176:1, 176:3
**childhood** - 34:11, 35:11
**children** - 14:4, 16:15, 17:24, 18:2, 18:11, 19:9, 19:10, 20:22, 27:6, 33:2, 36:13, 48:21, 50:16, 50:18, 52:6, 52:11, 123:13, 142:5, 171:1
**chilling** - 162:14
**chips** - 160:12

**choices** - 83:19, 87:22
**chooses** - 100:12
**chop** - 149:21
**chose** - 58:21
**Christian** - 19:20, 89:1, 89:4, 90:11, 122:15, 168:24, 171:17
**Church** - 73:17
**church** - 15:18, 15:20, 15:22, 15:23, 15:25, 16:4, 16:6, 16:12, 16:18, 16:24, 17:1, 18:22, 19:18, 39:1, 41:10, 41:16, 41:20, 54:7, 54:25, 70:16, 70:17, 70:23, 73:15, 73:19, 73:21, 87:3, 87:4, 89:5, 121:25, 122:3, 122:5, 171:8
**churches** - 15:21
**churchgoing** - 122:4
**cigarette** - 131:3, 131:13
**circumstance** - 100:14, 103:14, 104:1, 143:1
**circumstances** - 94:17, 94:21, 95:6, 96:11, 97:12, 103:11, 103:14, 104:2, 129:14, 129:18, 139:24, 144:4, 147:4
**cite** - 129:17
**citizen** - 67:21
**City** - 34:13
**city** - 12:7, 34:12, 72:20
**civilian** - 163:2
**claimed** - 145:9
**clarification** - 43:2
**clarify** - 41:24, 53:9
**classes** - 42:2, 58:18
**classification** - 118:1
**classifications** - 118:12
**clear** - 22:11, 41:3, 43:22, 64:6, 65:8, 116:14, 165:10, 165:17, 175:3
**Clearly** - 163:14
**client** - 83:25, 126:19, 126:20, 130:14, 140:18
**climb** - 54:17
**close** - 1:11, 17:22, 36:24, 81:15, 104:15, 105:20, 120:2
**closed** - 120:3
**closes** - 93:6, 93:8
**Closing** - 1:14, 1:15, 105:24, 141:19
**closing** - 66:4, 105:17, 176:12
**closure** - 154:19
**clothes** - 107:19
**club** - 118:16
**coat** - 68:5
**Cocatre** - 29:9
**coffee** - 37:12
**coincidence** - 167:4
**coincidences** - 167:8, 167:25
**cold** - 124:19, 150:16, 166:2, 169:19
**cold-blooded** - 166:2
**collect** - 113:10
**collection** - 17:4
**college** - 81:6
**colored** - 175:14
**colossal** - 135:22
**combined** - 147:14
**comfortable** - 26:22, 142:6
**coming** - 5:2, 9:24, 160:25, 172:16
**comment** - 28:8, 56:3, 172:11
**commissary** - 50:7
**commission** - 14:22, 15:4

**commit** - 102:3, 146:24, 156:10
**commits** - 170:24
**committed** - 94:1, 98:20, 99:3, 99:8, 109:23, 111:19, 112:21, 134:2, 156:15, 159:23
**committing** - 121:19
**common** - 155:24, 155:25, 156:2, 156:3, 173:23
**commonly** - 6:15
**commonly-used** - 6:15
**communicate** - 71:15
**communication** - 6:16, 24:6, 24:8, 24:22, 39:11, 71:9, 160:1
**communications** - 49:12
**community** - 15:12
**company** - 14:24, 14:25, 32:21, 32:22
**complainant's** - 63:2
**complete** - 60:8
**Completely** - 114:4
**complex** - 119:10, 119:11
**complicated** - 5:4, 156:9
**complies** - 74:4, 75:23
**computer** - 1:24, 6:10, 110:10, 160:9
**computer-aided** - 1:24
**concerning** - 56:20, 95:24, 97:4, 99:1
**conclusion** - 109:11, 170:10, 173:7
**concrete** - 126:16
**condition** - 82:4, 174:8
**conditions** - 104:6
**conduct** - 163:18
**confinement** - 94:10
**confirm** - 61:9
**confused** - 25:23, 26:15, 26:18, 27:3
**confusion** - 125:11
**conjecture** - 95:17, 96:22, 98:1, 108:4
**connect** - 65:13
**connected** - 55:21, 100:25, 177:18
**consequence** - 142:9, 142:24, 143:21
**consequences** - 142:4, 142:6, 142:10, 142:22, 144:6
**consider** - 30:19, 64:14, 64:15, 64:16, 65:11, 65:15, 94:13, 94:15, 94:21, 95:4, 96:9, 97:10, 97:15, 98:14, 98:18, 99:5, 99:10, 99:17, 100:7, 100:8, 100:21, 100:23, 101:10, 109:20, 110:15, 111:16, 112:17, 122:20, 127:10, 132:5, 137:5, 137:7, 140:14, 143:11, 144:11, 147:3, 148:14, 172:11, 172:22
**consideration** - 100:19, 103:10, 108:24, 109:12, 127:12
**considering** - 95:19, 96:24, 98:3, 146:21, 152:10, 152:23, 153:5
**considers** - 49:15
**consistent** - 135:3
**consistently** - 9:18
**conspiracy** - 156:16, 156:17, 156:20
**conspired** - 135:17
**constitute** - 102:4
**consulate** - 9:12
**contact** - 38:19, 38:22, 39:13, 85:18, 85:22, 121:25

**contain** - 5:15
**containing** - 93:15
**contains** - 58:9, 179:7
**contents** - 63:3
**context** - 117:2, 117:6, 117:18, 117:22
**continue** - 6:23, 10:2, 10:4, 13:4, 13:19, 28:2, 38:18, 40:16, 121:24, 147:11, 150:8, 152:22, 154:23
**Continue** - 91:21
**continuing** - 102:4, 146:25, 147:10, 147:11, 148:8, 150:8, 152:11, 152:21, 152:25, 154:24
**continuous** - 21:1
**conversation** - 60:8, 60:20, 83:23, 159:24
**conversations** - 82:25, 83:4, 83:25, 86:22, 145:12
**conversion** - 171:17
**convict** - 128:5
**convicted** - 98:17, 99:13, 124:18, 124:19, 125:2, 125:17, 126:22, 140:8
**conviction** - 5:24, 21:17, 124:16, 125:3, 125:13, 127:18, 133:19, 133:21, 133:23, 133:24, 133:25
**convictions** - 21:12, 21:16, 134:7
**convince** - 106:23, 126:18, 126:19
**convinced** - 137:22
**convinces** - 126:17
**cook** - 18:23, 18:24, 120:14, 120:15
**cool** - 162:3
**copies** - 57:8, 57:9, 63:2
**copy** - 3:16
**cord** - 173:25, 174:4
**Cornelius** - 2:11, 3:5, 3:10, 3:13, 3:25, 5:3, 5:9, 5:13, 6:2, 6:18, 6:19, 7:6, 7:13, 7:19, 7:23, 7:24, 8:1, 8:7, 9:15, 20:13, 20:17, 29:4, 30:4, 30:13, 30:20, 53:2, 53:5, 55:8, 55:13, 55:14, 56:5, 56:9, 57:15, 57:17, 57:23, 58:14, 58:23, 59:2, 59:5, 59:18, 60:3, 60:5, 61:11, 62:4, 62:11, 63:4, 63:14, 63:23, 64:8, 64:10, 64:19, 64:23, 64:24, 65:1, 65:18, 65:25, 73:16, 80:3, 80:5, 80:9, 80:13, 80:14, 80:18, 86:10, 89:7, 89:10, 89:15, 89:19, 89:20, 89:21, 90:1, 90:6, 91:3, 91:4, 91:7, 91:22, 92:20, 92:24, 93:3, 93:9, 104:16, 104:18, 105:21, 124:5, 124:7, 124:8, 127:25, 128:4, 128:9, 128:11, 128:13, 128:22, 130:9, 131:1, 132:2, 132:14, 132:18, 132:20, 134:17, 134:21, 136:10, 140:2, 141:16, 144:17, 148:16, 156:23, 157:2, 157:5, 157:6, 157:15, 157:18, 158:10, 164:2, 164:11, 164:16, 164:21, 164:25, 165:8, 165:13, 167:15, 169:21, 171:25, 172:3, 172:6, 172:9, 172:13
**Cornelius'** - 145:2
**corner** - 109:16
**Correct** - 44:21, 52:1
**correct** - 6:17, 22:25,

26:10, 27:7, 40:7, 44:18, 45:24, 46:4, 48:13, 53:14, 62:21, 64:9, 82:3, 84:15, 86:21, 86:25, 125:18, 179:7
**correction** - 12:19, 26:7
**correctly** - 179:14
**corroborate** - 65:11, 127:23, 131:14
**corroborated** - 162:2, 162:24
**corroborating** - 65:14, 174:5
**couch** - 75:2
**counsel** - 3:5, 7:18, 59:22, 63:13, 66:12, 101:10, 105:10, 112:1, 113:2, 115:23, 126:9, 130:8, 131:25, 134:20, 136:8, 176:13, 177:5, 179:9
**Counsel** - 130:23
**counsel's** - 158:13
**counting** - 54:23
**country** - 5:20, 6:11, 8:5, 8:6, 118:16, 142:13
**countryside** - 29:9
**counts** - 124:20
**county** - 177:12
**County** - 1:9, 1:23, 93:22, 94:2, 120:9, 134:13, 143:18, 179:2, 179:5
**couple** - 81:9, 106:12, 124:9, 134:2, 134:3, 134:8, 146:20, 170:25
**course** - 111:2, 146:14, 154:16
**courses** - 56:23
**court** - 3:1, 6:14, 7:10, 21:21, 56:1, 59:12, 63:10, 66:8, 98:7, 98:11, 104:11, 104:23, 105:5, 165:15, 169:6, 176:23, 177:1, 179:12
**Court** - 1:3, 1:4, 1:6, 3:2, 3:23, 4:1, 4:18, 4:23, 5:1, 5:7, 5:11, 5:13, 5:17, 6:6, 6:20, 7:8, 7:11, 7:15, 7:24, 8:4, 8:8, 8:10, 9:14, 9:19, 9:23, 10:4, 10:9, 11:9, 20:15, 20:20, 21:9, 21:19, 21:22, 21:25, 29:5, 30:6, 30:12, 30:16, 30:21, 31:1, 31:5, 31:8, 31:13, 31:20, 31:23, 32:1, 40:21, 41:3, 41:8, 41:19, 41:23, 42:5, 42:8, 42:22, 43:4, 43:14, 43:17, 53:4, 53:9, 54:15, 54:17, 55:3, 55:6, 55:11, 55:16, 56:2, 56:7, 56:11, 56:13, 57:6, 57:13, 57:20, 57:24, 58:2, 58:3, 58:19, 59:1, 59:3, 59:6, 59:14, 59:20, 60:4, 60:21, 61:3, 61:18, 62:1, 62:4, 62:16, 62:19, 62:22, 62:25, 63:6, 63:11, 63:18, 63:24, 64:5, 64:9, 64:20, 64:25, 65:4, 65:7, 65:21, 66:1, 66:9, 66:17, 66:20, 66:25, 71:19, 74:1, 75:20, 75:24, 78:24, 79:4, 79:22, 79:24, 80:1, 80:4, 80:8, 80:11, 86:11, 86:13, 89:12, 89:16, 89:20, 89:23, 90:2, 90:7, 91:2, 91:5, 91:20, 92:21, 92:23, 92:25, 93:4, 93:8, 93:10, 93:15, 93:21, 94:3, 94:6, 101:17, 104:21, 104:24, 105:6, 105:14, 105:16, 105:21, 105:23, 108:15, 111:23, 113:1, 113:5,

115:21, 116:7, 116:9, 117:11, 124:6, 125:7, 127:14, 127:24, 128:3, 128:8, 128:13, 128:14, 128:19, 130:7, 130:25, 131:24, 132:12, 132:16, 134:18, 136:7, 139:25, 140:1, 141:16, 155:5, 157:4, 157:10, 157:13, 157:16, 157:20, 158:12, 158:15, 164:5, 164:14, 164:18, 164:23, 165:6, 165:10, 165:13, 165:16, 167:18, 172:4, 172:7, 172:10, 172:14, 175:9, 176:10, 176:24, 177:2, 179:4, 179:5, 179:20, 179:21
**Court's** - 1:12, 1:13, 176:12
**courtroom** - 7:17, 8:24, 27:6, 66:14, 82:9, 105:9, 160:20
**credibility** - 99:16, 101:15, 127:7, 127:11, 130:20, 166:14
**crime** - 38:5, 65:14, 88:11, 89:6, 90:10, 98:15, 98:17, 98:18, 98:24, 99:1, 99:3, 99:5, 99:8, 99:10, 109:22, 112:22, 139:19, 139:21, 139:24, 140:3, 140:7, 140:9, 140:12, 143:9, 162:8, 169:9
**crimes** - 109:21, 109:25, 110:5, 111:20, 117:4, 117:16, 134:2
**Criminal** - 1:4, 94:11, 98:12, 99:22, 128:24
**criminal** - 102:3, 127:2, 127:13, 146:24, 163:18
**criminally** - 98:21, 99:4, 99:9
**criticizing** - 115:15
**cross** - 20:14, 21:23, 31:2, 61:16, 116:17, 118:7, 119:9, 129:20, 133:22, 134:4, 134:5, 168:8
**Cross** - 1:4, 1:19, 22:1, 43:18, 79:5, 86:14
**cross-examination** - 31:2, 61:16, 116:17, 118:7, 119:9, 129:20
**Cross-examination** - 22:1, 43:18, 79:5, 86:14
**cross-examined** - 133:22, 134:4, 168:8
**Cruz** - 1:6, 1:6, 1:8, 1:20, 1:21, 3:4, 7:18, 10:15, 11:2, 12:5, 12:12, 17:25, 22:12, 22:19, 22:21, 23:3, 23:13, 23:21, 24:9, 24:14, 24:18, 24:24, 25:6, 25:13, 27:5, 27:13, 27:24, 28:5, 28:13, 28:17, 28:19, 29:22, 31:10, 32:6, 32:12, 32:13, 32:16, 33:13, 43:20, 43:25, 47:20, 52:2, 56:25, 57:24, 60:10, 63:12, 63:13, 66:11, 66:12, 66:19, 67:5, 67:14, 68:7, 81:15, 81:17, 82:7, 84:22, 85:19, 86:19, 88:5, 92:8, 92:13, 93:21, 93:25, 101:23, 102:3, 102:14, 102:24, 105:8, 105:10, 109:8, 110:21, 111:19, 117:14, 117:24, 118:19, 119:6, 120:17, 121:4, 121:18, 122:13, 123:4, 124:3, 124:11, 131:2, 144:9, 144:11, 144:24, 145:20, 149:3, 152:11, 153:1, 153:8,

153:13, 153:14, 153:16,
154:14, 154:21, 155:17,
162:25, 163:3, 163:14,
173:2, 173:8, 174:14,
175:23, 177:4, 177:5
**Cruz-garcia** - 1:6, 1:6,
1:20, 3:4, 7:18, 10:15, 11:2,
12:5, 12:12, 22:12, 22:19,
22:21, 23:3, 23:13, 23:21,
24:9, 24:14, 24:18, 24:24,
25:6, 25:13, 27:5, 27:13,
27:24, 28:5, 28:13, 28:17,
28:19, 29:22, 31:10, 32:6,
32:12, 32:13, 32:16, 33:13,
43:20, 43:25, 52:2, 56:25,
57:24, 60:10, 63:12, 63:13,
66:11, 66:12, 68:7, 82:7,
84:22, 85:19, 86:19, 88:5,
92:8, 92:13, 93:21, 93:25,
101:23, 102:3, 102:14,
102:24, 105:8, 105:10,
109:8, 111:19, 117:14,
117:24, 118:19, 119:6,
120:17, 121:4, 121:18,
122:13, 123:4, 124:3, 131:2,
144:9, 144:11, 144:24,
145:20, 149:3, 152:11,
153:1, 153:8, 153:13,
153:14, 153:16, 154:14,
154:21, 155:17, 162:25,
163:3, 163:14, 173:8,
174:14, 175:23, 177:4,
177:5
**Cruz-garcia's** - 124:11,
173:2
**Cruz-perez** - 1:8, 1:21,
17:25, 47:20, 66:19, 67:5,
67:14
**cry** - 138:24, 174:20
**crying** - 107:13, 141:2
**Csr** - 179:19
**culpability** - 103:13
**curious** - 144:16, 146:12
**curtain** - 149:14, 149:17
**custody** - 60:24, 61:1
**cut** - 9:20, 115:5, 120:15,
149:22, 151:19, 151:22,
173:8
**cuts** - 9:15

# D

**dad** - 28:20, 29:1, 74:18,
75:16, 76:18, 76:24, 77:5,
77:7, 77:12, 77:19, 77:22,
78:2, 78:5, 78:8, 78:14,
78:22, 79:15
**daddy** - 79:12
**Daily** - 84:1, 84:2
**damaging** - 164:13
**danger** - 117:24, 118:20,
118:24, 119:23, 121:1,
123:23, 136:20, 168:22,
174:25, 176:5
**dangerous** - 174:10
**dark** - 159:6
**date** - 25:25, 26:4
**Date** - 179:20
**dated** - 56:25, 57:1
**dates** - 57:1
**daughter** - 29:21, 50:21,
51:1, 51:6
**days** - 83:24, 120:21,
133:15, 135:6, 135:7, 144:9,
146:15, 146:19, 148:3,
160:20
**de** - 12:6
**dead** - 131:9, 166:12
**deadly** - 124:21

**deal** - 163:17
**dealer** - 112:8
**dealers** - 127:9, 168:9
**dealing** - 115:17, 116:1,
171:11
**dealt** - 149:4
**death** - 94:10, 94:18, 95:8,
96:13, 97:14, 98:8, 102:15,
102:16, 102:25, 103:16,
104:3, 106:11, 111:4, 121:4,
121:5, 121:13, 122:24,
123:8, 124:3, 126:7, 126:20,
129:18, 129:22, 130:1,
130:3, 130:10, 130:21,
131:10, 135:23, 136:16,
136:24, 137:9, 138:16,
140:16, 141:3, 145:19,
147:22, 150:13, 153:8,
153:9, 153:10, 153:14,
154:25
**debate** - 106:24
**December** - 27:22
**decent** - 168:14
**decide** - 121:6, 123:7,
123:16, 123:17, 137:6,
137:18, 137:24, 139:10,
140:10, 141:7, 143:5, 153:6,
172:18, 173:9
**Decide** - 141:11
**decided** - 129:18
**decides** - 108:6, 172:23
**deciding** - 127:13, 136:16,
144:10
**decision** - 106:15, 106:22,
107:11, 107:14, 108:9,
108:11, 123:1, 123:8,
123:18, 137:19, 139:7,
145:9, 158:14, 161:8,
169:18, 169:19, 175:23
**decisions** - 100:3, 107:3,
141:6, 156:2
**deduction** - 165:2, 165:9
**deemed** - 120:23, 120:24
**defecating** - 161:5, 161:17
**defend** - 126:10
**defendant** - 3:1, 3:21,
7:10, 20:24, 21:3, 21:21,
25:3, 30:8, 41:7, 56:1, 56:3,
56:19, 58:15, 58:20, 59:12,
59:24, 63:10, 64:12, 64:17,
65:13, 65:14, 66:8, 86:19,
93:24, 94:23, 95:24, 97:4,
98:16, 98:20, 98:21, 99:3,
99:8, 99:20, 99:22, 99:24,
100:1, 100:10, 100:11,
100:15, 102:2, 102:14,
102:24, 103:13, 104:23,
105:5, 109:24, 131:18,
136:6, 137:25, 144:19,
145:7, 146:23, 146:24,
147:2, 147:10, 148:15,
148:18, 148:21, 149:7,
149:19, 149:23, 150:7,
150:22, 151:12, 158:5,
158:22, 159:11, 160:22,
163:7, 163:8, 165:3, 165:4,
165:15, 165:19, 165:23,
166:11, 166:23, 167:5,
169:25, 173:17, 173:18,
175:19, 176:23, 177:1
**Defendant** - 2:17, 1:10,
98:8, 98:11
**defendant's** - 3:18, 3:20,
56:16, 94:16, 95:5, 96:10,
97:11, 97:17, 99:6, 103:12,
151:8, 152:5, 168:1
**Defendant's** - 42:12
**Defense** - 1:4, 1:14, 31:8,
42:17, 42:19, 43:3, 43:5,
43:6, 57:17, 57:19, 57:21,

58:3, 58:9, 59:22, 71:22,
72:10, 72:25, 73:3, 73:6,
73:8, 73:13, 74:8, 74:20,
75:6, 75:25, 76:16, 76:21,
77:3, 77:6, 77:10, 77:17,
77:20, 77:25, 78:3, 78:6,
78:12, 78:18, 105:14,
105:15, 105:24
**defense** - 3:9, 4:3, 6:8,
7:23, 31:9, 57:20, 64:10,
66:15, 66:18, 93:8, 93:11,
126:3, 127:2, 150:4, 150:12,
155:9, 159:17, 167:10,
168:1
**define** - 136:13
**defined** - 169:23
**Dejesus** - 168:11, 168:12
**delay** - 6:13, 7:1, 8:13
**deliberate** - 94:19, 122:20,
140:25
**deliberated** - 106:13,
106:14
**deliberating** - 95:3, 96:8,
97:9, 176:22
**deliberation** - 146:5,
166:2, 176:16
**deliberations** - 1:16,
93:19, 100:18, 100:20,
111:25, 147:13, 176:18,
177:12, 177:25
**delivered** - 63:18, 177:11
**delivers** - 6:20
**denied** - 30:21, 62:13,
65:4, 65:22, 90:7
**Department** - 94:10,
98:12, 99:21
**depict** - 42:15
**depicting** - 4:6
**Deputy** - 66:25, 178:1
**describe** - 13:22, 34:1,
35:18, 43:10, 75:5, 76:22
**describes** - 50:13
**describing** - 91:16
**Description** - 2:1
**description** - 159:4,
162:10
**descriptions** - 162:9
**deserved** - 117:19
**designed** - 152:1
**desire** - 3:17
**detail** - 159:16
**details** - 115:2, 149:9,
149:12, 149:18, 161:1
**detected** - 85:25
**detention** - 119:5, 119:25,
120:11
**determine** - 94:4, 102:6,
102:10, 102:21, 103:3,
103:24, 129:17, 146:22
**determining** - 94:12
**device** - 6:16
**devoted** - 50:1
**Diana** - 122:22, 123:10,
127:8, 154:19, 155:22,
158:3, 159:4, 163:5, 176:7
**dictated** - 165:5
**die** - 175:2
**died** - 157:25, 158:1,
158:2, 174:3
**differ** - 169:21
**difference** - 19:9, 87:20,
90:20, 106:19
**different** - 58:10, 119:10,
160:16
**differing** - 106:25
**difficult** - 71:14, 71:16,
106:6, 106:18
**dinner** - 177:22
**Dire** - 1:9, 1:19
**direct** - 6:10, 110:22

**Direct** - 1:4, 1:19, 8:20,
32:8, 67:8, 80:17
**direction** - 145:16, 146:3
**directly** - 11:6, 61:21, 66:5
**discount** - 122:17
**discovered** - 151:20
**discuss** - 11:21, 100:21,
121:3, 121:7, 122:19
**discussed** - 83:8, 153:6
**discussing** - 109:15
**disease** - 36:10
**dislike** - 150:18
**dispassionately** - 139:8,
139:15, 170:8, 170:10
**disregard** - 30:18, 89:22,
89:25, 90:4, 172:10
**distance** - 52:4
**distinction** - 87:24
**District** - 1:6, 1:12, 2:5,
93:21, 179:5
**district** - 110:13, 155:23
**division** - 99:21
**Division** - 94:11, 98:13
**Dna** - 113:8, 113:9, 129:11,
129:12, 155:20, 155:21,
156:14, 161:13
**documentation** - 51:23,
58:12
**documents** - 57:9
**Domingo** - 12:3, 12:18,
13:4, 13:6, 14:14, 22:17,
25:16, 27:19, 28:18, 29:2,
29:7, 33:19, 36:4, 36:19,
39:21, 40:6
**Dominican** - 9:5, 19:23,
21:5, 33:20, 35:21, 38:14,
39:4, 39:6, 47:6, 47:25,
48:4, 67:18, 67:24, 67:25,
68:9, 72:3
**done** - 64:7, 87:2, 109:17,
136:12, 140:17, 154:21,
155:10, 160:23, 160:24,
174:3
**door** - 19:6, 72:13, 166:5
**Dorka** - 29:19, 29:23, 30:2,
30:8, 30:15, 49:9, 49:11,
49:24, 50:22, 50:23, 51:2,
51:19, 51:22, 52:12, 149:25
**doubt** - 61:11, 94:25,
95:22, 95:24, 96:5, 97:2,
97:4, 98:20, 98:24, 99:1,
99:3, 99:7, 102:1, 102:6,
102:9, 102:13, 102:21,
102:23, 109:23, 111:19,
115:3, 115:6, 116:21,
126:18, 138:10, 152:20,
153:7, 165:21
**doubts** - 106:16, 166:14
**down** - 5:20, 55:17, 56:4,
60:9, 60:15, 74:6, 74:7,
80:1, 81:11, 81:14, 92:25,
115:10, 118:5, 137:15,
138:14, 140:16, 140:19,
140:20, 147:19, 148:1,
148:17, 152:2, 153:18,
161:15, 165:24, 166:20,
173:15
**Dr** - 167:11
**dreams** - 142:17
**dressed** - 19:1
**driver** - 72:14
**drove** - 166:3
**drug** - 37:24, 38:2, 38:5,
112:8, 115:17, 116:1,
116:22, 117:7, 124:12,
127:9, 133:19, 133:20,
133:23, 133:24, 133:25,
134:3, 134:8, 149:6, 168:9,
171:12
**drugs** - 25:7, 46:20, 47:3,

89:6, 113:16, 113:18, 113:19, 116:15, 116:17, 116:18, 116:21, 116:22, 117:15, 131:4, 149:4, 168:10, 168:13, 168:14, 171:11, 173:13
**duly** - 8:18, 32:7, 67:6, 80:16
**dumpster** - 150:11
**during** - 22:14, 23:2, 28:10, 46:19, 46:23, 47:25, 48:7, 48:12, 69:20, 94:15, 110:19, 110:22, 119:9, 125:10, 138:24, 173:14
**During** - 47:21, 100:20
**duty** - 101:11
**Dx** - 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 3:7, 3:8, 3:9, 3:10, 3:11
**dynamics** - 21:3, 21:10

## E

**early** - 90:10, 91:8, 91:11, 143:2, 171:10, 177:23
**earned** - 56:19
**easier** - 57:11, 146:8
**east** - 171:14
**easy** - 145:8, 145:9, 146:8
**eat** - 18:23
**Ebersole** - 158:8, 158:17, 159:24
**educate** - 18:13
**effect** - 110:9
**eight** - 119:2
**Eighteen** - 81:4, 90:15
**either** - 47:8, 51:18, 60:16, 79:16, 86:6, 117:20, 121:4, 132:18, 136:1, 136:21, 166:1, 175:1
**elected** - 100:15
**elects** - 100:13
**element** - 157:7, 157:14
**eleven** - 33:7, 107:1, 114:1, 134:7, 137:20
**eligibility** - 64:4, 100:4
**eligible** - 64:13, 99:23
**Elizabeth** - 113:14
**emotion** - 126:4, 126:5, 139:10, 141:7, 148:6, 169:18
**emotional** - 107:16, 107:17, 141:10, 141:11, 169:14, 169:15
**emotions** - 147:14
**end** - 34:20, 145:17, 176:3
**endure** - 138:25
**enjoying** - 143:19
**enroll** - 81:6
**entire** - 88:11, 142:13, 151:19
**entirety** - 64:22
**entitled** - 1:21, 138:17
**epithelial** - 113:10
**equals** - 99:24
**Eric** - 150:16
**escape** - 119:17, 119:20, 120:6, 171:21, 171:22, 172:19, 172:22
**escaped** - 133:4
**escaping** - 133:7
**Esmurria** - 151:21
**essentially** - 108:8
**establish** - 130:1
**established** - 4:5, 6:12, 49:24

**estate** - 14:21, 15:2, 40:4, 70:3
**evaluate** - 150:19, 171:16, 172:17
**evangelic** - 15:21
**evangelical** - 15:23, 19:16
**evasive** - 160:6
**evening** - 177:9
**event** - 103:5
**evidence** - 3:15, 4:17, 20:18, 53:20, 56:14, 56:24, 57:7, 58:16, 65:11, 65:14, 93:13, 94:5, 94:14, 94:15, 94:22, 95:4, 95:5, 95:14, 95:19, 96:9, 96:10, 96:19, 96:24, 97:10, 97:11, 97:15, 97:16, 97:23, 98:3, 98:14, 98:18, 99:6, 99:11, 99:13, 100:22, 101:1, 102:1, 102:13, 103:10, 106:6, 106:14, 109:7, 109:9, 109:10, 109:19, 109:21, 110:4, 110:18, 111:17, 111:24, 112:1, 112:13, 113:2, 113:3, 113:6, 113:14, 113:20, 113:21, 114:9, 114:15, 115:16, 115:23, 116:1, 116:10, 116:14, 117:12, 117:13, 117:15, 117:25, 118:9, 118:20, 119:1, 119:4, 119:19, 119:23, 121:18, 121:19, 122:2, 122:18, 123:22, 124:23, 125:19, 127:22, 129:12, 130:6, 130:8, 130:11, 130:13, 131:19, 132:1, 132:3, 132:24, 132:25, 133:6, 134:19, 134:20, 134:22, 134:23, 135:3, 135:4, 135:10, 135:12, 135:18, 136:9, 141:5, 144:14, 145:16, 145:24, 146:2, 146:13, 148:21, 149:1, 150:6, 151:10, 152:17, 152:18, 153:13, 161:6, 161:10, 163:19, 164:3, 164:6, 164:9, 165:3, 165:7, 166:15, 170:9, 174:24, 176:12, 177:18, 179:8
**evil** - 175:24
**ex** - 50:14
**ex-wife** - 50:14
**exact** - 65:18, 163:3
**Exactly** - 21:19, 25:2, 44:16, 48:14, 49:17, 49:20
**exactly** - 15:3, 29:10, 157:8, 166:3, 167:6
**examination** - 22:1, 31:2, 43:18, 61:16, 79:5, 86:14, 116:17, 118:7, 119:9, 129:20
**Examination** - 8:20, 32:8, 54:18, 67:8, 80:17, 91:6
**examined** - 133:22, 134:4, 168:8
**examiner** - 129:16, 174:2
**examiner's** - 131:14
**example** - 21:13, 21:15, 119:23, 122:11, 151:11
**examples** - 87:12, 87:15, 120:25
**excellent** - 18:10, 18:18
**except** - 61:7
**exchange** - 101:5
**exclude** - 98:25
**excludes** - 95:23, 97:3
**exclusive** - 101:14
**Excuse** - 10:14, 26:2, 28:2
**excuse** - 55:11, 163:24

**excused** - 31:6, 55:6, 55:16, 79:24, 92:23
**Exhibit** - 2:1, 42:19, 43:6, 57:19, 58:9, 76:16, 76:21, 77:3, 77:25, 78:4, 78:6, 78:12, 78:18
**exhibit** - 57:14
**Exhibits** - 42:12, 42:22, 57:15, 57:21, 58:4
**exhibits** - 43:3, 43:5, 43:10, 56:14, 56:18, 57:16, 57:18, 58:2, 71:18, 179:15
**exist** - 112:17, 154:3
**existence** - 64:15, 100:7
**expected** - 106:24
**experience** - 49:18
**expert** - 167:20
**Expiration** - 179:20
**explain** - 15:15, 16:2, 16:10, 18:8
**explained** - 120:13, 162:12
**exposure** - 84:8
**express** - 55:21, 177:19
**extension** - 173:25, 174:4
**extensive** - 134:9
**extent** - 130:17
**extraneous** - 62:6, 62:14, 62:19, 98:14, 98:18, 98:24, 99:1, 99:3, 99:5, 99:8, 99:9, 109:22
**extraneouses** - 110:17
**extreme** - 143:23, 144:6
**extremely** - 173:11, 174:4
**extremities** - 167:3
**eyes** - 173:22

## F

**face** - 84:8, 149:22, 173:15
**face-to-face** - 84:8
**facilities** - 119:11
**fact** - 3:20, 4:8, 21:4, 21:11, 21:15, 100:13, 100:17, 100:24, 120:18, 121:19, 125:22, 129:17, 129:21, 141:25, 147:24, 148:2, 148:19, 149:19, 149:22, 149:23, 150:17, 150:18, 153:21, 159:17, 162:11, 162:24, 169:3, 174:24, 175:1, 175:4, 175:5
**factor** - 152:10
**factory** - 32:22
**facts** - 53:22, 101:14, 108:19, 108:21, 111:22, 112:25, 115:20, 115:22, 117:10, 124:19, 125:18, 126:17, 137:25, 141:7, 144:14, 144:21, 144:22, 145:15, 145:24, 146:3, 146:12, 147:9, 147:13, 147:15, 148:6, 148:12, 149:1, 150:4, 150:6, 152:18, 153:13, 166:15, 168:21, 168:23, 169:16, 169:17, 169:20, 175:21, 175:22
**fair** - 44:6, 101:5, 135:1, 135:24, 143:6, 169:10
**faith** - 22:18
**fall** - 160:12
**false** - 157:18
**familiar** - 171:10
**family** - 4:6, 5:19, 14:2, 20:3, 20:4, 20:6, 20:25, 21:3, 21:4, 21:6, 21:7, 21:10, 36:2, 38:8, 39:20, 43:12, 43:23, 61:12, 69:14, 75:19, 76:7, 77:15, 78:18, 89:4, 114:21, 121:20,

121:22, 123:11, 123:12, 151:1, 151:3, 171:7
**Family** - 43:12
**far** - 140:15, 161:15, 168:4
**father** - 13:2, 17:17, 17:19, 17:20, 17:22, 18:9, 18:10, 18:18, 19:11, 20:24, 27:6, 27:10, 34:17, 35:16, 36:3, 39:25, 48:20, 52:3, 52:11, 68:6, 68:7, 68:8, 69:6, 69:10, 69:16, 69:20, 69:25, 70:4, 70:6, 70:16, 70:18, 72:17, 72:22, 73:18, 74:17, 74:22, 75:3, 75:7, 75:25, 76:2, 76:4, 76:9, 79:10, 174:19, 174:20
**father's** - 69:3, 73:11, 173:13
**Fathers** - 170:23
**fathers** - 170:25
**fathom** - 154:4
**Fbi** - 110:24, 129:2, 158:8
**feed** - 82:18, 82:22, 84:14
**feet** - 149:13, 166:24, 173:19
**fellow** - 146:6
**felony** - 156:10, 156:15
**felt** - 19:15, 19:17, 86:18, 122:7
**fence** - 118:14
**few** - 22:8, 79:2, 120:17, 178:2
**field** - 12:8, 34:14, 37:9, 37:11
**Fifteen** - 33:1
**fighting** - 107:23, 107:24
**filed** - 112:16, 130:13
**filled** - 150:11
**finally** - 98:16
**fine** - 4:20, 106:23, 111:12, 126:10, 141:14
**finger** - 131:8, 150:2
**fingers** - 131:12, 150:3
**finish** - 68:13
**finished** - 55:24
**fired** - 125:10, 125:12, 148:20
**First** - 43:24, 89:16, 124:10, 126:13
**first** - 6:8, 8:18, 12:5, 20:21, 22:22, 25:3, 25:12, 25:15, 25:17, 25:19, 26:5, 26:9, 27:8, 32:7, 34:3, 44:20, 67:6, 80:16, 81:7, 83:20, 106:12, 112:4, 117:23, 119:6, 121:9, 133:1, 133:3, 139:5, 146:20, 146:21, 146:25, 148:19, 153:3, 159:10, 160:23, 170:23
**fish** - 13:2
**fisherman** - 34:21
**fishing** - 34:19, 35:16
**fists** - 149:13
**fit** - 143:9, 143:12, 151:19, 151:21
**five** - 6:14, 34:7, 44:1, 81:23, 99:24, 104:21, 104:25, 107:7, 114:1, 119:10, 171:3
**five-minute** - 104:21, 104:25
**Fiveash** - 172:16
**fix** - 101:3
**flirting** - 173:5
**floor** - 152:3
**Flores** - 2:20, 150:9, 150:15, 150:25, 151:2, 151:5
**focus** - 144:19, 146:11,

150:12
**Folks**- 104:24
**follow** - 131:1, 142:8, 143:17, 143:20
**followed** - 87:1
**followers** - 163:1
**following** - 1:20
**follows** - 8:19, 32:7, 67:7, 80:16, 94:8, 101:25
**food** - 18:23
**force** - 167:12, 167:21, 174:5
**forced** - 137:21
**foregoing** - 179:6
**foreign** - 6:11
**foreman** - 101:12
**Foreman**- 104:7, 104:9
**foresaw** - 175:2
**forget** - 19:16, 19:17, 110:3, 147:6, 147:13, 147:16, 147:17, 147:20, 147:22, 147:24, 148:2, 149:9, 149:12, 149:17, 149:19, 149:22, 149:23, 150:5, 175:4
**form** - 55:21, 89:7, 104:8, 152:2, 177:19
**formally** - 176:17
**former** - 170:12
**forms** - 101:24, 176:14
**Forty**- 32:19, 44:1
**Forty-five**- 44:1
**forward** - 56:5, 56:7, 88:3
**four** - 120:4, 127:6, 146:19
**Four**- 33:25, 50:17
**Franklin**- 2:6, 179:21
**frankly** - 127:5
**free** - 101:5, 135:23, 156:5
**freedom** - 119:9
**freedoms** - 142:14
**fresh** - 131:7
**Friday**- 125:20, 128:23, 138:5, 138:11
**friend** - 74:15, 81:15, 92:18, 150:25, 151:3, 173:24
**friends** - 15:14, 15:17, 15:18, 75:19, 92:16, 92:17, 151:1, 173:16
**friends'** - 173:8
**frightened** - 147:22
**front** - 57:12, 70:20, 73:23, 73:25, 130:6, 161:7, 164:17
**full** - 101:5
**fun** - 131:9
**function** - 142:19
**functioning** - 142:20
**furtherance** - 156:16, 156:20
**future** - 117:24, 118:20, 118:24, 119:23, 121:1, 123:22, 136:19, 174:25

**G**

**G-3**- 172:25
**game** - 87:21, 114:18
**games** - 16:17
**gaps** - 146:18
**Garay** - 149:10, 149:14, 149:20, 149:22
**garbage** - 150:12
**garcia** - 1:6, 1:5, 1:6, 1:20, 1:24, 3:4, 7:18, 8:9, 8:17, 9:2, 10:15, 11:2, 12:5, 12:12, 22:12, 22:19, 22:21, 23:3, 23:13, 23:21, 24:9, 24:14, 24:18, 24:24, 25:6, 25:13, 27:5, 27:13, 27:24, 28:5, 28:13, 28:17, 28:19,

29:22, 31:10, 32:6, 32:12, 32:13, 32:16, 33:13, 43:20, 43:25, 52:2, 56:25, 57:24, 60:10, 63:12, 63:13, 66:11, 66:12, 68:7, 82:7, 84:22, 85:19, 86:19, 88:5, 92:8, 92:13, 93:21, 93:25, 101:23, 102:3, 102:14, 102:24, 105:8, 105:10, 109:8, 111:19, 117:14, 117:24, 118:19, 119:6, 120:17, 121:4, 121:18, 122:13, 123:4, 124:3, 131:2, 144:9, 144:11, 144:24, 145:20, 149:3, 152:11, 153:1, 153:8, 153:13, 153:14, 153:16, 154:14, 154:21, 155:17, 162:25, 163:3, 163:14, 173:8, 174:14, 175:23, 177:4, 177:5
**Garcia**- 3:4, 9:3, 102:15, 102:17, 102:18, 102:25, 103:1, 122:22, 123:10, 147:18, 147:20, 147:23, 153:8, 153:15, 154:17, 154:19, 154:25, 170:2, 170:6, 170:22, 171:6, 171:13
**garcia's** - 124:11, 173:2
**general** - 172:25
**generally** - 43:10
**gentlemen** - 80:19, 90:4, 93:11, 93:14, 141:20, 143:14, 145:21, 147:6, 147:12, 148:5, 148:24, 150:24, 151:9, 152:6, 152:12, 152:17, 153:18, 154:13, 155:3, 155:8, 160:2, 162:1, 162:24, 167:7, 167:24, 172:15, 174:13, 174:21, 176:11, 177:8
**gift** - 160:14
**gifts** - 16:15
**girl** - 68:22, 68:23, 71:24
**girlfriend** - 12:14, 68:14, 149:24, 173:5, 174:8
**given** - 4:3, 16:21, 57:7, 65:9, 99:16, 101:16, 101:17, 128:14, 139:25, 156:10
**glass** - 119:8
**Glossary.............................**
**.end** - 1:18
**gloves** - 113:11
**God**- 16:22, 71:1, 84:24, 84:25, 86:19, 87:6, 87:14, 142:14, 152:8, 162:18
**golly** - 162:8, 162:10
**governed** - 140:1, 141:22
**grabbed** - 165:23
**granddaughter** - 69:3
**grandfather** - 76:4
**grandmother** - 74:25, 75:3
**granted** - 62:12, 100:6
**grateful** - 159:14
**grave** - 137:5
**gray** - 33:11, 68:5
**great** - 92:16
**Great**- 112:10
**grief** - 170:19
**groomed** - 19:2
**ground** - 58:5
**grounds** - 58:5, 173:16
**growing** - 18:5, 36:21
**guarantee** - 100:5, 160:5
**guard** - 151:20
**guards** - 118:8, 120:22
**guess** - 4:4, 21:1, 44:2, 133:12, 145:5, 148:13, 163:1, 166:6, 171:3
**guide** - 70:22

**guilt** - 65:9, 65:19, 106:7, 137:13, 145:2, 155:11
**guilt-innocence** - 65:9, 106:7
**guilty** - 10:21, 10:22, 11:2, 11:13, 11:15, 11:17, 11:19, 53:20, 54:3, 93:25, 110:5, 136:6, 145:6, 145:7, 148:15, 148:18, 156:21, 157:23, 158:3, 169:8
**gun** - 148:20
**guy** - 84:24, 92:16, 110:2, 111:8, 113:25, 159:2, 174:7

**H**

**habitation** - 81:20, 114:11, 122:10
**hair** - 120:16, 173:8
**Half**- 126:12
**half** - 55:24, 59:9, 84:6, 126:2, 126:3, 126:5, 126:12, 129:4, 129:9, 129:10, 131:16, 133:16, 133:18
**hall** - 5:6
**hallway** - 81:9
**hammer** - 115:3, 166:24, 167:23, 174:6
**hammers** - 167:3, 167:10
**hand** - 31:13, 31:24, 74:2, 131:8, 131:11
**Hand**- 179:16
**handing** - 176:13
**hands** - 131:5, 149:12, 166:25, 167:9, 167:12, 173:25, 174:4
**hanging** - 74:9
**Happy**- 171:4
**happy** - 4:6, 5:19, 21:6, 21:7, 117:13, 171:3
**hard** - 15:10, 70:5, 70:8, 83:21, 91:10, 106:5, 106:15, 123:9, 124:19, 126:16, 137:10, 140:16, 140:18, 152:18, 161:8, 172:20, 174:4
**hard-headed** - 83:21
**harder** - 71:3, 71:5, 146:9
**harm** - 135:17, 135:18
**harmed** - 135:17
**Harris** - 1:9, 1:23, 93:21, 94:2, 120:8, 134:13, 143:18, 179:2, 179:5
**headed** - 83:21
**hear** - 8:22, 9:25, 10:1, 10:5, 10:9, 11:3, 11:10, 11:11, 28:7, 65:10, 90:2, 143:8, 145:23, 162:18, 166:19, 169:7, 174:17, 174:19, 174:20
**heard** - 1:21, 6:9, 29:11, 29:20, 37:20, 40:12, 40:13, 53:19, 61:8, 88:10, 106:5, 107:10, 108:22, 113:6, 117:13, 121:21, 122:14, 143:9, 144:9, 148:21, 154:1, 154:12, 163:19, 167:14, 167:20, 168:11, 170:4, 170:12, 177:10
**hearing** - 132:7
**hearsay** - 30:5, 30:18, 40:20, 41:2, 41:18, 42:4, 57:4, 57:5, 58:1, 58:6, 58:7, 58:11, 58:22, 60:20, 60:21, 129:19
**Heart**- 36:10
**heart** - 122:8
**heartfelt** - 139:7
**heartstring** - 138:23
**heartstrings** - 139:4,

141:12
**heavy** - 137:13
**heck** - 133:23, 133:24
**held** - 1:23, 5:25, 98:21, 99:4, 99:9, 118:13, 133:14, 133:15, 154:21
**hell** - 118:16
**Hello**- 22:3
**help** - 16:18, 35:15, 35:19, 43:22, 70:14, 73:18, 85:1, 86:1, 86:3, 106:22, 160:2
**Helped**- 83:17
**helped** - 121:25, 171:8
**helpful** - 60:18
**helping** - 15:25, 73:10
**hereby** - 179:6
**Hernandez** - 2:20, 162:11, 163:6
**Hernandez's** - 158:19
**herself** - 49:15, 50:13, 156:5
**hesitation** - 166:4
**Hi**- 22:4
**high** - 68:12, 163:8
**highly** - 135:22
**himself** - 41:7, 46:12, 46:24, 102:14, 102:24, 136:21, 161:14, 170:17
**hint** - 135:13
**Hispanic**- 150:10
**history** - 36:2, 43:23, 173:3
**hit** - 149:16, 167:10, 174:7
**Hitler**- 109:2
**hitting** - 149:16
**hoarding** - 173:6
**hold** - 106:21, 154:22, 155:2
**hole** - 118:16, 151:22
**home** - 4:22, 18:20, 109:17, 142:2, 147:18, 149:11
**Home**- 85:9
**homeland** - 170:22
**homework** - 18:21
**homie** - 84:24
**honestly** - 116:3
**honesty** - 92:18
**Honor** - 3:13, 6:19, 8:16, 10:1, 21:24, 31:4, 31:12, 31:16, 31:18, 31:22, 42:7, 43:13, 55:2, 55:5, 55:7, 66:16, 66:23, 67:4, 71:17, 78:23, 79:3, 79:25, 80:7, 80:14, 91:4, 92:22, 92:24, 93:7, 93:9, 105:22, 111:21, 112:3, 112:24, 113:4, 115:19, 116:8, 117:9, 124:8, 136:3
**Honorable**- 1:22
**hope** - 88:2, 90:20, 136:1, 138:21, 162:17
**hopefully** - 142:16, 154:19
**hoping** - 43:22
**horrible** - 169:13
**horrific** - 115:2, 115:6, 144:21
**horses** - 177:2
**hotel** - 177:13
**hour** - 55:24, 59:9, 66:6, 83:6, 141:18, 146:17
**hour-and-a-half** - 55:24, 59:9
**hours** - 81:9, 104:19, 105:1, 115:10, 115:12, 118:13, 172:21
**house** - 17:5, 17:6, 17:7, 17:12, 17:15, 17:18, 17:19, 20:1, 72:11, 72:16, 72:21, 73:5, 73:24, 73:25, 74:9,

74:10, 77:8, 77:9, 85:23, 88:22, 150:1, 172:23
  **household** - 141:25
  **houses** - 14:21, 14:25, 15:3, 15:7, 15:11, 17:10, 17:14, 17:15, 88:23, 131:19
  **Houston** - 1:23, 2:6, 2:13, 2:16, 9:8, 23:3, 23:7, 25:4, 25:10, 38:10, 81:1, 114:14, 167:1, 171:14, 179:22
  **Hpd** - 134:12
  **human** - 102:18, 103:2, 123:6, 123:15, 151:19, 151:21, 154:3, 154:4, 154:8, 173:11, 176:4, 176:5
  **humble** - 20:4
  **Humble** - 85:12
  **hundred** - 116:20, 116:23, 116:24, 140:4
  **hurting** - 89:6
  **husband** - 28:4, 29:21, 112:15, 169:4
  **hypothetically** - 137:1

**I**

  **idea** - 83:12, 83:13, 159:18
  **identify** - 56:17
  **ill** - 36:10
  **image** - 9:18
  **imagine** - 152:25
  **immediately** - 47:12
  **impact** - 137:2
  **impeccable** - 15:19
  **implement** - 141:25
  **implied** - 112:9
  **important** - 87:24, 90:21, 107:3, 109:7, 117:5, 129:3, 130:19, 135:20, 138:18, 138:19, 159:16, 173:22
  **imposed** - 103:16, 104:3
  **imposition** - 94:18, 95:8, 96:13, 97:14
  **impression** - 20:25, 134:11
  **imprisonment** - 99:20, 100:2, 103:15, 104:3
  **Improper** - 116:5
  **impugn** - 168:5
  **impugned** - 168:19
  **impulses** - 154:11
  **incarcerated** - 135:14
  **incident** - 120:18, 151:13
  **inclined** - 58:15
  **include** - 41:7
  **included** - 179:9
  **including** - 95:5, 96:10, 97:11, 103:11, 126:9
  **inconsistencies** - 129:1, 129:7, 129:10
  **incorrect** - 31:17, 169:22
  **independent** - 127:19, 127:23
  **Index** - 1:19, 2:1
  **indicated** - 63:4
  **indicating** - 42:13, 71:23, 72:10, 72:13, 73:1, 73:4, 73:6, 73:8, 73:14, 74:9, 74:12, 74:14, 74:21, 74:24, 75:2, 75:6, 75:9, 75:17, 76:1, 76:17, 76:23, 77:4, 77:6, 77:11, 77:18, 77:21, 78:1, 78:4, 78:7, 78:13, 78:19, 175:18, 175:20, 176:1
  **indications** - 162:15
  **individual** - 43:9, 49:6, 49:9, 61:9, 101:6, 146:1, 148:22, 160:21, 174:11
  **individually** - 106:10,

108:25, 145:12, 163:12
  **individuals** - 4:7, 144:5, 154:10, 156:11, 156:12
  **infer** - 114:2
  **inferences** - 148:25
  **inferred** - 110:18
  **inflicted** - 154:15
  **information** - 61:8, 61:10, 100:24, 159:13
  **infrac** - 135:5
  **infraction** - 134:14, 135:5, 135:9
  **infractions** - 134:12, 134:14, 135:2
  **inject** - 131:3
  **injured** - 132:23
  **injuries** - 167:11, 167:12, 174:5
  **inmate** - 120:2
  **inmates** - 120:10, 120:13
  **innocence** - 65:9, 65:19, 106:7
  **innocent** - 126:19, 126:21
  **inquire** - 4:25
  **inquired** - 102:9
  **inside** - 83:20, 88:23, 128:15, 149:11, 152:16
  **insight** - 168:18
  **instance** - 13:21
  **Institutional** - 94:11, 98:12
  **institutional** - 99:21
  **instruct** - 74:1, 75:21, 164:6
  **instructed** - 89:25, 94:19, 95:16, 95:25, 96:21, 97:5, 97:25, 98:5, 98:9, 99:12, 100:11, 100:16, 103:17, 127:14, 172:10
  **instructing** - 6:21, 64:12
  **instruction** - 30:14, 62:6, 62:15, 62:23, 64:11, 64:18, 65:6, 65:8, 65:9, 65:19, 89:15, 89:19, 147:3, 172:9
  **instructions** - 65:16, 104:7, 108:3, 137:4, 156:9
  **instructs** - 94:7
  **instrument** - 167:23
  **intend** - 3:6, 84:6
  **intended** - 102:17, 103:1, 153:10, 175:2
  **intends** - 6:8
  **interact** - 15:17, 19:3, 39:22
  **interesting** - 151:14
  **internal** - 154:10
  **internationally** - 6:16
  **internationally-used** - 6:16
  **interpretation** - 10:5, 125:12
  **interpreted** - 6:24
  **Interpreter** - 11:3, 12:19, 26:7, 50:24, 74:4, 75:23
  **interpreter** - 6:22, 6:24, 8:19, 31:12, 50:25, 67:7, 80:8
  **Interpreter's** - 12:19
  **Interpreters** - 2:21
  **interprets** - 6:22
  **interview** - 129:2
  **introduce** - 8:25, 32:10, 45:7, 67:13
  **invasions** - 109:18
  **investigate** - 115:17
  **investigated** - 115:25, 149:5
  **investigating** - 73:9, 115:15
  **investigator** - 19:22, 19:25, 60:11, 72:2, 72:12,

73:10, 73:12, 110:13
  **investigators** - 60:16, 86:5
  **Invited** - 172:2
  **invokes** - 148:5
  **involved** - 15:12, 15:15, 15:25, 19:18, 25:7, 37:24, 38:2, 38:4, 88:13, 117:15, 117:16, 122:3, 149:4, 149:5, 163:19
  **involvement** - 151:9, 159:25
  **involving** - 133:2
  **ironically** - 122:11
  **Issue** - 94:24, 95:2, 95:3, 95:9, 95:11, 95:15, 95:20, 95:22, 96:2, 96:3, 96:4, 96:7, 96:8, 96:14, 96:16, 96:20, 96:25, 97:2, 97:7, 97:8, 97:9, 97:18, 97:20, 97:24, 98:4, 98:6, 98:7, 98:9, 98:10, 101:25, 102:7, 102:10, 102:11, 102:12, 102:22, 103:3, 103:5, 103:8, 103:9, 103:18, 104:4, 148:11, 152:24, 153:5, 153:17, 153:19
  **issue** - 103:18, 103:20, 103:21, 103:24, 106:11, 144:13, 144:15, 146:21, 152:13, 155:1, 155:13
  **Issues** - 94:6, 94:7, 100:21, 101:3, 101:11, 101:13, 101:24, 103:6, 104:6, 104:11
  **issues** - 94:13, 94:20, 145:14, 146:11, 146:20, 175:3
  **items** - 58:10
  **itself** - 164:7

**J**

  **Jail** - 120:9, 134:13
  **jail** - 21:16, 28:13, 52:13, 52:24, 52:25, 59:24, 60:17, 81:18, 81:19, 82:6, 82:16, 82:17, 83:20, 84:21, 84:22, 85:4, 85:7, 85:11, 86:23, 91:14, 91:15, 91:23, 91:24, 92:8, 92:13, 92:17, 109:15, 110:10, 120:17, 120:19, 120:21, 123:23, 134:6, 135:9
  **James** - 176:8
  **January** - 27:22, 93:22
  **job** - 15:9, 115:11, 118:8, 120:12, 137:11
  **Joel** - 1:6, 1:20, 5:6, 31:9, 31:18, 32:6, 32:12, 56:15, 57:22, 60:12
  **Johnny** - 113:25, 133:17, 134:1, 150:24, 151:5, 163:16
  **Jr** - 102:15, 102:17, 102:18, 102:25, 103:2, 147:18, 147:23, 153:9, 153:15, 154:17
  **Jr.'s** - 147:20, 154:25
  **Judge** - 1:23, 7:6, 8:1, 20:21, 29:4, 30:5, 43:2, 43:16, 56:9, 58:14, 63:1, 63:22, 63:23, 64:2, 64:19, 64:24, 86:12, 107:25, 128:1, 128:6, 137:4, 155:7, 157:12, 157:19, 164:2, 167:16, 171:25, 175:11
  **judge** - 8:24
  **judges** - 101:14
  **judgment** - 125:1, 125:5, 148:16

**Judicial** - 1:12
  **July** - 1:20, 1:3
  **jump** - 163:8
  **jumps** - 173:18
  **jumpsuit** - 173:1
  **juries** - 155:25
  **juror** - 101:6, 153:23
  **Jurors** - 106:2
  **jurors** - 55:19, 95:12, 96:17, 97:21, 102:8, 102:23, 103:25, 145:22
  **Jury** - 1:16, 176:22
  **jury** - 3:1, 3:8, 3:12, 5:16, 5:19, 6:22, 7:3, 7:9, 7:10, 7:17, 8:25, 9:1, 10:5, 10:20, 10:23, 11:1, 11:12, 11:19, 18:8, 21:21, 30:14, 32:11, 53:19, 55:9, 56:1, 56:13, 57:12, 59:7, 59:13, 59:16, 62:6, 62:7, 63:10, 63:15, 63:18, 64:12, 65:8, 66:3, 66:7, 66:8, 66:14, 67:13, 80:20, 89:15, 89:19, 89:22, 93:11, 93:18, 93:23, 95:13, 101:9, 101:12, 102:5, 102:8, 102:20, 102:22, 103:6, 103:7, 103:23, 103:25, 104:5, 104:10, 104:23, 104:25, 105:3, 105:5, 105:9, 106:8, 111:23, 115:21, 128:19, 130:3, 130:6, 130:7, 131:24, 134:11, 134:18, 136:7, 137:6, 137:14, 137:16, 141:2, 145:13, 146:6, 146:22, 147:3, 147:7, 161:7, 161:19, 164:6, 164:17, 165:15, 167:18, 169:6, 172:9, 176:11, 176:15, 176:23, 177:1, 177:8, 177:20
  **Justice** - 94:11, 98:12, 99:22
  **justice** - 154:18, 169:5
  **justify** - 140:9
  **Justin** - 2:4, 3:6, 7:20, 22:5, 43:22, 169:11, 171:21, 176:8

**K**

  **keep** - 9:16, 32:3, 62:16, 67:2, 80:12, 120:22, 133:12, 134:24
  **kept** - 85:22, 118:11, 121:25
  **kid** - 60:11, 60:12
  **kidnapped** - 125:6, 148:22, 168:16
  **kidnappers** - 116:13
  **kidnapping** - 40:13, 53:22, 88:14, 114:16, 114:25, 115:16, 117:4, 124:15, 124:20, 125:3, 125:5, 125:14, 136:5, 148:14, 151:16, 163:12
  **kids** - 19:3, 68:18, 141:22
  **kill** - 102:17, 103:1, 108:9, 108:12, 109:2, 156:21, 165:20, 165:22, 173:4
  **killed** - 88:17, 109:8, 109:18, 110:20, 110:21, 130:15, 133:5, 147:24, 150:10, 161:5, 165:22, 165:23, 170:21, 173:24, 174:6
  **killer** - 166:3
  **killing** - 53:16, 88:8, 109:5, 121:8, 130:15, 171:6
  **kills** - 171:13
  **kilos** - 116:20, 116:23,

116:24
**kind** - 5:24, 12:11, 13:1, 14:20, 15:5, 16:10, 18:8, 33:15, 34:24, 35:10, 36:21, 37:8, 38:5, 40:4, 41:9, 70:13, 84:22, 109:4, 112:7, 115:8, 115:17, 118:2, 118:10, 118:16, 119:7, 119:17, 121:19, 140:10, 149:5, 150:4, 151:4, 153:23, 153:25, 155:24, 160:11, 170:19, 173:3
**kinds** - 18:12, 18:14, 18:17, 34:17, 113:10
**kitchen** - 73:7
**knife** - 109:10, 115:4, 149:23, 161:10, 162:20, 173:15
**Knowing** - 173:3
**knowing** - 123:14, 162:10, 166:3, 173:3
**knowledge** - 5:8, 5:24, 40:22, 41:5, 100:23
**known** - 129:5, 129:7, 161:1
**knows** - 5:9, 5:23, 30:15, 40:21, 41:4, 52:16, 59:24, 61:11, 111:5, 159:5

**L**

**laceration** - 167:13, 167:14, 167:16
**Ladies**- 93:10, 141:20, 148:5, 152:6, 152:17, 153:18, 155:8, 160:2, 162:1, 167:7, 167:24, 172:15, 174:21, 176:11, 177:8
**ladies** - 80:19, 90:3, 93:14, 143:13, 145:21, 147:6, 147:12, 148:24, 150:24, 151:9, 152:12, 154:13, 155:3, 162:24, 174:12
**lady** - 5:4, 23:10, 74:14, 113:15
**laid** - 148:3, 150:11, 165:24
**landscaping** - 32:21
**last** - 34:4, 104:5, 106:8, 109:14, 110:7, 119:24, 144:19, 145:13, 146:15, 146:16, 146:17, 146:18, 147:21, 153:11, 154:1, 154:12, 160:20, 172:11
**late** - 18:6, 38:14, 44:3, 114:3, 114:13
**law** - 62:8, 64:3, 64:11, 64:15, 64:17, 65:4, 93:15, 99:19, 100:8, 100:9, 101:17, 108:14, 108:23, 109:6, 109:11, 110:6, 112:25, 125:24, 126:22, 127:11, 127:12, 127:15, 127:22, 128:13, 128:20, 136:13, 136:15, 137:3, 137:6, 139:5, 139:15, 139:19, 139:20, 139:23, 139:25, 140:2, 142:11, 142:23, 144:6, 156:1, 156:8, 156:9, 157:19, 158:3, 158:4, 168:14
**law-abiding** - 168:14
**laws** - 100:1, 100:3, 123:16, 142:8, 142:24, 154:6
**lawyers** - 3:5, 6:21, 6:23, 7:19, 126:3, 177:6, 177:7
**laying** - 175:6
**lead** - 111:4, 145:19
**leading** - 90:10, 152:7
**leads** - 145:16

**learn** - 71:1, 142:4, 144:3, 175:15
**learned** - 88:2, 146:14, 153:11
**least** - 59:9, 88:17, 102:8, 102:23, 103:25
**leave** - 35:21, 58:24, 107:5, 107:6, 153:20, 156:15
**leaves** - 136:4, 136:14, 156:23, 157:6, 157:14, 173:17
**leaving** - 134:11, 171:2
**led** - 146:3
**left** - 20:24, 25:15, 26:2, 44:17, 44:20, 45:2, 45:3, 45:19, 45:25, 47:5, 49:5, 49:23, 54:20, 68:12, 70:21, 82:14, 129:4, 129:9, 151:5, 156:14, 157:3, 170:14, 170:19, 170:21, 174:8, 174:9, 176:15
**lend** - 168:23
**length** - 83:23, 138:11
**less** - 12:25, 13:9, 22:16, 37:5
**letter** - 86:3
**letters** - 71:11, 71:12
**letting** - 160:11
**license** - 124:21, 125:3
**lick** - 150:3
**lied** - 110:7, 127:9
**lies** - 110:16
**life** - 4:7, 4:11, 4:22, 13:14, 18:6, 19:13, 20:3, 23:4, 29:17, 37:17, 37:22, 38:4, 38:6, 39:16, 39:19, 40:19, 40:25, 44:18, 45:3, 48:12, 69:14, 87:2, 87:10, 87:14, 88:3, 88:11, 88:25, 89:6, 90:10, 94:11, 98:13, 99:22, 100:2, 102:18, 103:2, 103:15, 104:2, 107:4, 114:2, 114:19, 118:19, 122:11, 123:19, 123:21, 123:24, 124:4, 124:11, 134:2, 137:10, 140:11, 140:14, 142:1, 142:9, 143:15, 144:9, 147:21, 151:11, 154:16, 154:20, 160:24, 170:16
**lift** - 32:13
**light** - 139:24
**likely** - 147:22
**limine** - 3:14, 20:17
**limited** - 95:5, 96:10, 97:11
**Linda**- 158:18, 162:11, 163:6
**line** - 6:10, 91:25, 118:12, 138:7, 150:21, 150:22
**lined** - 8:2
**list** - 150:16
**listed** - 109:24
**listen** - 93:16, 125:21, 140:20, 145:24, 166:17, 168:19
**listened** - 61:5
**listening** - 59:25, 173:16
**litany** - 109:25
**literally** - 161:23
**live** - 12:16, 13:4, 14:1, 14:8, 14:12, 14:15, 17:17, 29:8, 32:16, 36:5, 36:12, 36:18, 37:23, 47:21, 52:14, 67:17, 67:23, 67:25, 69:5, 69:17, 69:21, 72:7, 72:21, 80:24, 87:9, 87:14, 87:21, 114:18, 141:21, 142:1, 142:5, 142:7, 142:12, 142:14, 142:15, 142:17,

143:15, 143:17, 143:21
**lived** - 15:13, 19:6, 25:10, 34:11, 34:12, 46:8, 48:1, 49:21, 69:14, 69:23, 72:17, 72:19, 81:1, 88:11, 151:12
**lives** - 29:9, 36:8, 36:13, 51:5
**living** - 4:11, 12:18, 23:6, 25:10, 36:3, 47:25, 48:12, 49:5, 49:8, 72:25, 89:5, 123:6, 154:5, 168:16
**Living**- 49:7
**local** - 177:13
**located** - 8:6, 21:11
**lockdown** - 82:19, 82:20, 172:21
**locked** - 160:15, 160:17
**lodge** - 60:21
**long-term** - 174:19
**look** - 42:10, 42:11, 62:5, 78:9, 78:15, 116:14, 118:22, 118:25, 121:15, 121:16, 122:19, 143:7, 144:23, 169:20, 174:16
**Look**- 77:25, 173:22
**looked** - 3:16, 37:1, 43:11, 61:23, 106:14, 175:18, 175:19
**looking** - 73:23, 74:6, 141:5, 146:1, 146:11, 170:8
**looks** - 58:8
**Lopez**- 113:25, 133:17, 134:1, 150:24, 151:6
**lord** - 171:12
**lose** - 135:6
**losing** - 161:24
**loss** - 122:17, 135:7
**Louisiana**- 2:15
**love** - 17:23, 125:22
**loving** - 19:11, 19:12, 20:4, 20:24
**Lunch**- 59:11
**lunch** - 55:18, 55:24, 59:7, 60:10

**M**

**ma'am** - 9:6, 9:9, 10:14, 10:16, 10:19, 14:11, 14:17, 14:19, 15:24, 16:1, 16:19, 17:23, 19:21, 19:24, 20:2, 20:7, 22:3, 23:12, 23:20, 24:12, 24:16, 24:25, 25:5, 25:23, 26:11, 26:14, 26:15, 27:4, 27:12, 27:20, 30:2, 65:25, 80:9, 86:17, 86:20, 86:24, 87:3, 87:8, 87:11, 87:17, 87:23, 88:1, 88:6, 88:9, 88:12, 88:16, 88:19, 88:21, 88:24, 89:3, 90:22, 90:25, 132:20
**Ma'am** - 25:12, 29:18
**Madrid** - 2:14, 3:6, 7:19, 8:3, 8:9, 8:15, 8:16, 8:21, 9:21, 10:1, 10:8, 10:12, 11:6, 11:10, 12:21, 20:12, 30:25, 31:3, 31:4, 31:9, 31:18, 31:22, 32:9, 40:24, 41:4, 41:9, 41:20, 42:1, 42:6, 42:9, 42:17, 43:8, 43:13, 43:14, 51:13, 54:15, 54:16, 54:19, 55:2, 55:3, 56:16, 63:14, 66:16, 66:18, 66:22, 67:3, 67:4, 67:9, 71:17, 71:20, 73:18, 74:5, 75:25, 78:23, 78:24, 79:23, 79:25, 86:6, 105:15, 105:21, 105:22, 105:25, 106:3, 108:16, 112:3, 113:4, 113:6, 115:24, 116:8, 116:10,

117:12, 124:6, 124:14, 136:15, 141:20, 144:17, 148:25, 151:25, 153:6
**Magee** - 1:22
**mail** - 71:11, 79:17, 79:20
**major** - 146:18
**males** - 34:2
**man** - 33:8, 46:8, 68:4, 72:13, 82:6, 84:24, 84:25, 86:19, 87:6, 87:13, 107:11, 108:12, 109:8, 109:15, 112:14, 113:8, 114:7, 114:10, 116:3, 116:21, 121:20, 122:4, 122:8, 123:4, 148:9, 152:6, 152:8, 152:20, 155:21, 159:3, 159:6, 162:22, 163:23, 169:9, 173:4, 173:12, 173:23
**man's** - 123:24, 140:11
**manager** - 15:8
**managing** - 15:9
**mandatory** - 94:9
**manner** - 64:16, 100:8
**Manuel** - 116:4, 116:10
**map** - 152:4
**March** - 85:6, 85:7, 85:16
**Marilu** - 2:20
**marine** - 34:18
**Mario** - 2:14, 3:5, 7:19
**mark** - 131:11
**marks** - 131:7
**marriage** - 45:6
**married** - 12:15, 23:22, 23:25, 24:1, 24:3, 24:10, 24:12, 24:14, 29:23, 30:3, 30:8, 32:23, 32:25, 44:6, 45:4, 45:8, 45:13, 45:15, 49:5, 49:8, 49:15, 170:18
**Martinez** - 158:9
**Mary** - 6:7, 179:4, 179:19
**match** - 159:4
**matches** - 112:10, 162:10
**mate** - 119:14, 119:15, 119:16, 151:18
**math** - 44:9
**matter** - 6:14, 65:4, 102:9, 127:15
**matters** - 100:22
**mean** - 10:8, 39:19, 58:9, 61:13, 83:10, 85:13, 104:19, 109:25, 124:13, 137:1, 152:14, 160:10
**meaning** - 62:16
**means** - 176:3
**medical** - 129:16, 129:17, 129:21, 131:5, 131:14, 167:20, 174:2
**meet** - 12:5, 19:22, 82:17
**Mehl** - 150:16
**member** - 16:6, 20:25, 151:4
**members** - 63:17, 146:7, 171:7, 176:16
**Members** - 93:23, 95:13
**memories** - 79:9, 79:11
**men** - 168:16
**Men** - 82:1, 82:2, 82:3, 85:10
**mention** - 100:23
**mere** - 95:17, 96:22, 98:1, 108:4
**met** - 22:11, 44:3, 45:11, 81:8, 81:18, 82:16, 84:21, 84:22, 91:14
**method** - 101:4
**Mexico** - 80:23
**Meza** - 1:9, 1:22, 80:5, 80:15, 80:21, 86:16, 86:18
**Miami** - 51:5
**microphone** - 32:4, 32:14,

67:1, 74:3, 74:6, 80:12
**mid** - 18:5
**middle** - 147:19, 156:4
**might** - 61:15, 97:16,
100:1, 106:21, 107:7, 121:7,
124:23, 138:8, 138:9,
149:25, 156:17, 171:23
**militates** - 94:17, 95:7,
96:12, 97:13
**millions** - 109:5
**mind** - 119:7, 144:21,
144:23, 146:10, 151:16
**minds** - 135:11
**mine** - 39:19, 81:16, 151:3,
151:4
**Mine** - 75:12
**minimization** - 146:17
**minimize** - 117:1, 148:18,
171:20
**minor** - 125:4
**minute** - 7:13, 104:21,
104:25
**minutes** - 9:22, 83:6,
146:16, 147:21, 166:2,
175:9
**Mireya** - 1:5, 1:24, 8:9,
8:17, 8:22, 9:2, 44:3, 47:12,
47:22, 49:5, 49:23, 50:11,
50:12, 50:13, 50:19, 68:3
**mischaracterizes** - 130:6,
136:4, 139:23
**Mischaracterizes** - 131:22
**misleading** - 21:8
**misrepresentation** -
11:22
**miss** - 173:21
**missed** - 146:18
**missing** - 156:6
**mission** - 16:7
**missions** - 16:10, 106:21
**misstatement** - 108:14,
112:25, 115:20, 117:10,
127:22
**mistake** - 23:15, 166:10,
166:12
**mistakes** - 14:2
**mistrial** - 30:20, 90:6,
172:13
**misunderstood** - 48:3
**mitigate** - 138:15
**mitigates** - 94:18, 95:7,
96:12, 97:13, 170:5
**mitigating** - 94:21, 97:15,
103:14, 104:1, 135:22
**Mitigation** - 136:14,
169:23
**mitigation** - 121:2, 121:12,
121:14, 122:18, 123:3,
136:10, 136:11, 136:13,
136:15, 136:22, 137:3,
137:9, 138:1, 138:2, 138:8,
138:9, 138:14, 139:17,
139:18, 139:20, 140:3,
140:7, 140:10, 153:20,
168:24, 169:2, 169:22,
170:2, 170:11, 171:4,
174:22
**mode** - 126:8
**mom** - 74:13, 76:18,
76:24, 77:12, 77:22, 78:22
**moment** - 9:14, 126:6,
126:11, 147:23, 157:13
**moments** - 178:2
**Monday** - 145:3, 146:9,
169:7
**money** - 16:24, 17:1, 50:7,
116:17, 116:18, 173:13
**monster** - 175:23
**month** - 13:9, 85:21,
106:9, 145:13, 170:15

**months** - 12:18, 12:20,
13:10, 22:23, 29:11, 44:13,
44:17, 69:2, 83:24, 84:3,
84:4, 84:6, 84:7, 84:9
**moral** - 97:17, 103:13,
169:24, 170:1, 170:5, 171:5,
171:18
**morning** - 32:10, 43:20,
158:19
**Most** - 60:19
**most** - 107:3, 144:6, 154:4
**mother** - 15:22, 35:2, 36:7,
51:10, 68:1, 69:16, 72:11,
72:14, 74:13, 74:15, 75:3,
75:7, 147:19
**motion** - 3:14, 20:17, 29:4,
53:2
**mouth** - 74:2
**move** - 39:6, 74:6, 148:11
**Move** - 30:20, 90:6, 172:13
**moved** - 13:5, 13:25, 23:3,
25:4, 35:4, 35:6, 37:3,
37:14, 115:3, 119:13,
170:16
**mud** - 162:6
**multi** - 109:17
**Multiple** - 135:5
**multiple** - 109:17, 114:8,
134:12, 134:13, 134:16,
135:2, 148:21
**murder** - 4:13, 10:21, 57:6,
93:25, 94:9, 110:18, 111:3,
111:13, 111:14, 112:19,
112:20, 114:5, 117:3,
122:12, 125:15, 129:25,
130:4, 130:12, 136:21,
140:8, 145:6, 145:7, 155:18,
155:20, 156:22, 157:24,
158:4, 158:23, 158:24,
159:12, 159:13, 159:22,
160:4, 160:9, 161:4, 161:11,
161:16, 161:18, 161:24
**murdered** - 114:7
**murdering** - 170:1
**must** - 34:24, 96:4, 98:25,
100:17, 100:21, 143:9,
147:1, 168:8

# N

**nails** - 18:25
**name** - 9:2, 22:5, 23:10,
23:14, 23:18, 29:19, 43:20,
47:19, 49:9, 51:11, 51:12,
67:12, 68:2, 68:24, 80:19,
112:5, 160:9, 170:18,
175:15
**named** - 26:10, 110:3,
158:8
**nameless** - 150:15
**namely** - 166:14
**names** - 17:24, 26:25,
151:7
**Naomi** - 34:5
**Natalia** - 34:5
**Natalie** - 2:3, 3:6, 7:20,
43:21, 145:8, 145:17,
145:22, 153:19, 155:4
**Natalie's** - 145:3
**necessarily** - 48:16
**necessary** - 94:4
**neck** - 131:2, 131:4, 131:6,
131:7, 174:1, 174:3
**need** - 7:4, 30:22, 30:25,
55:8, 55:14, 70:21, 80:8,
89:13, 95:13, 96:18, 97:22,
105:2, 164:18, 169:12,
175:22
**needle** - 131:7
**needs** - 31:12, 59:18,

75:21, 89:25, 104:18, 176:6
**negate** - 148:19
**negative** - 95:14, 96:19,
97:23
**negotiating** - 160:13
**neighborhood** - 15:16,
19:4
**nets** - 35:19
**network** - 47:3, 163:1
**never** - 23:8, 24:9, 24:16,
38:3, 60:5, 60:16, 110:23,
110:25, 111:5, 111:10,
111:15, 112:22, 120:7,
129:12, 140:6, 144:12,
145:9, 150:14, 150:17,
161:1, 175:13, 175:14
**Next** - 17:18
**next** - 6:23, 13:15, 19:6,
22:24, 24:23, 31:8, 31:20,
38:11, 66:17, 80:2, 80:3,
82:12, 93:2, 112:18, 178:2
**nice** - 46:23, 177:22
**nicely** - 19:1
**nicked** - 149:21
**night** - 116:12, 147:16,
147:17, 147:19, 155:22,
156:4, 156:13, 158:20,
159:3, 162:21, 175:6
**night's** - 177:22
**nightmares** - 174:13
**noble** - 15:19
**nobody** - 160:13, 166:8,
166:9
**Nobody** - 119:14, 119:16,
161:12
**none** - 86:5
**None** - 130:11, 174:22
**noodles** - 120:14
**note** - 64:2
**noted** - 29:5
**Nothing** - 79:23, 131:13,
170:6, 170:7
**nothing** - 122:21, 122:23,
130:2, 131:13, 174:7
**November** - 26:6, 26:20
**Number** - 2:1
**number** - 47:2, 58:10,
119:12
**numbered** - 1:22, 179:11
**numbers** - 57:14, 58:25
**nut** - 134:9

# O

**Obel** - 1:6, 3:3, 10:15, 11:1,
12:4, 12:12, 12:24, 13:5,
13:15, 14:16, 14:18, 15:5,
17:8, 17:22, 18:6, 22:12,
22:19, 22:21, 23:2, 23:13,
23:21, 24:9, 24:14, 24:18,
24:23, 25:6, 25:13, 25:19,
26:1, 26:10, 26:25, 27:5,
27:13, 27:24, 28:4, 28:13,
28:17, 28:19, 29:22, 33:13,
34:5, 35:8, 35:13, 36:21,
43:24, 47:22, 50:17, 52:2,
54:20, 56:24, 60:9, 60:17,
60:18, 61:10, 63:12, 66:11,
68:7, 82:7, 84:22, 85:18,
86:19, 88:4, 92:8, 92:12,
93:21, 93:24, 101:23, 102:2,
102:13, 102:24, 105:8,
109:8, 109:16, 110:20,
111:19, 112:9, 112:20,
113:22, 114:18, 115:4,
117:14, 117:24, 118:18,
119:5, 120:17, 121:4,
121:18, 122:13, 123:4,
124:3, 124:11, 131:2, 133:3,
134:12, 144:9, 144:10,

144:23, 145:19, 149:3,
152:11, 153:1, 153:7,
153:13, 153:14, 153:16,
154:14, 154:20, 155:17,
162:25, 163:3, 163:13,
173:2, 173:7, 174:13,
175:23, 177:4
**Obel's** - 51:7, 114:12
**Obelina** - 50:17, 51:4,
51:14, 51:16
**Obelise** - 50:21, 51:1,
51:14, 51:17, 51:18, 52:12,
52:19
**Obelito** - 17:25, 25:21,
26:11, 26:16, 26:25, 27:2,
28:10, 28:17, 28:20, 44:21,
44:23, 50:17, 50:18, 52:23
**object** - 40:20, 41:1,
41:18, 42:3, 56:11, 56:12,
58:1, 60:1, 91:18, 108:13,
111:21, 112:24, 117:9,
128:2, 140:4, 158:11, 164:2,
164:12
**objecting** - 57:4, 164:23
**Objection** - 30:4, 89:7,
115:19, 116:5, 127:21,
130:5, 130:23, 131:22,
134:15, 136:3, 139:22,
156:23, 167:15, 172:1
**objection** - 30:17, 42:21,
42:25, 58:7, 58:22, 60:22,
62:10, 62:12, 63:4, 64:1,
65:1, 65:2, 89:14, 89:17,
157:4, 157:11, 157:14,
157:16, 157:17, 164:12,
165:6, 165:14, 165:16
**Objections** - 1:12
**objections** - 56:10, 62:1,
63:25, 64:25, 65:23
**objectively** - 139:8
**Objectively** - 139:15
**observations** - 60:24
**obvious** - 124:13
**Obviously** - 121:23
**obviously** - 143:6
**occasion** - 27:16, 102:15,
102:25
**occurred** - 114:14, 129:13,
179:11
**occurs** - 148:14
**October** - 179:17
**offense** - 93:25, 94:17,
95:7, 96:12, 97:13, 103:11,
125:10, 143:7, 156:10
**offenses** - 121:19, 142:25,
143:7
**offer** - 3:14, 5:15, 6:4,
57:21, 58:23
**offered** - 124:17, 132:4
**Offered** - 2:1, 42:19, 57:19
**offering** - 56:21, 57:20,
63:3
**office** - 14:23, 110:14,
116:4, 116:11, 155:24
**officer** - 119:5, 119:25,
120:11, 134:12, 134:16
**official** - 117:25
**Official** - 179:4, 179:16,
179:20
**officials** - 119:21, 172:17
**often** - 9:19, 48:7, 48:19,
48:23, 84:11
**old** - 11:24, 11:25, 12:9,
12:24, 18:1, 22:15, 22:16,
26:12, 26:13, 26:23, 28:1,
28:11, 32:18, 33:6, 35:6,
43:24, 44:23, 51:8, 51:9,
52:19, 67:15, 67:16, 69:1,
76:12, 79:10, 79:12, 79:16,
81:3, 90:14, 120:12, 150:10,

170:15
**oldest** - 4:12, 25:22, 25:25, 29:3, 34:5
**on-and-off** - 69:21
**once** - 41:11, 49:23, 54:7, 54:12, 54:24, 120:10, 175:7
**Once** - 41:11, 54:13, 113:1, 115:21, 176:16
**One** - 18:4, 54:23, 68:21, 115:9, 121:6, 132:7, 158:7, 162:3, 172:19
**one** - 3:18, 7:1, 7:13, 14:5, 18:4, 21:15, 22:5, 27:8, 28:21, 33:7, 34:5, 34:6, 41:23, 42:11, 45:1, 52:12, 58:8, 61:7, 62:23, 66:6, 68:16, 87:13, 88:22, 89:24, 90:21, 98:20, 106:19, 107:3, 107:15, 107:22, 108:3, 108:11, 109:14, 109:19, 110:5, 118:13, 119:13, 120:4, 120:5, 120:19, 122:15, 123:2, 123:19, 123:24, 130:14, 131:8, 131:11, 131:20, 132:4, 132:6, 132:24, 133:11, 134:14, 135:13, 136:1, 137:16, 138:8, 138:20, 139:13, 141:18, 144:5, 145:15, 145:21, 146:3, 147:12, 156:13, 165:5, 169:5
**ones** - 6:3, 57:1
**open** - 104:10, 104:15, 105:19, 119:25, 120:2, 138:21, 173:23, 179:12
**Open** - 3:1, 7:10, 21:21, 56:1, 59:12, 63:10, 66:8, 104:23, 105:5, 165:15, 176:23, 177:1
**opened** - 120:3, 166:5
**opening** - 7:25, 104:22, 127:5, 131:17, 132:7, 133:3, 133:14, 166:16
**operate** - 155:24
**operating** - 156:25
**opinion** - 39:25, 55:22, 84:19, 84:20, 84:25, 91:15, 92:6, 92:7, 95:18, 96:23, 98:2, 101:5, 106:19, 106:25, 116:6, 130:23, 137:22, 137:23, 138:16, 138:17, 138:18, 172:3, 177:19
**opportunity** - 54:24, 63:19, 63:20, 64:21, 71:6, 132:17, 149:7
**opposing** - 126:9
**option** - 58:15, 58:19
**orchestrating** - 163:17, 163:18
**order** - 94:3, 142:19, 166:11
**ordered** - 162:22, 165:3, 165:25
**ordering** - 109:1, 109:4
**original** - 93:17
**ought** - 60:11
**outcome** - 137:12
**outlined** - 104:7
**outrageous** - 116:19
**Outside** - 165:8
**outside** - 8:6, 56:13, 59:15, 60:8, 86:4, 124:12, 128:18, 158:10, 164:3, 164:12, 164:14, 165:7, 171:25, 177:20
**overcome** - 139:19, 139:21, 140:3, 140:7, 140:9, 140:12
**overpowered** - 137:21

**overriding** - 142:7
**overrule** - 165:16
**overruled** - 29:6, 53:4, 91:20, 157:20, 172:14
**overruling** - 115:13
**own** - 4:13, 5:23, 14:24, 14:25, 15:1, 19:8, 40:21, 41:4, 61:9, 81:13, 100:12, 110:13, 120:2, 120:4, 122:8, 141:24, 162:13, 165:22, 173:6
**owners** - 168:15

# P

**page** - 104:5
**Page** - 1:3
**pages** - 101:21, 101:22
**pain** - 122:22, 122:25, 123:10
**paint** - 5:18, 109:16, 114:17
**painted** - 20:23, 118:2
**pajamas** - 175:7
**pane** - 119:8
**panes** - 119:12, 120:5
**pants** - 75:14
**paper** - 159:23
**papers** - 9:11
**parents** - 34:15, 35:2
**park** - 18:22
**parole** - 62:8, 64:3, 64:4, 64:11, 64:13, 64:15, 64:17, 64:18, 99:23, 99:25, 100:4, 100:5, 100:8, 100:9
**part** - 16:3, 16:8, 17:3, 19:6, 38:4, 38:5, 56:14, 73:5, 108:22, 111:13, 113:21, 122:12, 124:11, 125:1, 129:5, 140:25, 141:7, 156:16, 164:14
**Part** - 17:2, 53:24
**participated** - 18:19, 116:22, 136:21
**particular** - 64:17, 95:14, 96:18, 97:22, 100:10
**parties** - 108:23, 109:6, 109:12, 110:6, 115:13, 158:4, 179:9, 179:15
**party** - 75:8, 75:11, 75:16, 77:13, 77:14, 77:18, 77:19, 121:5, 159:21
**Pasadena** - 80:25
**Pass** - 20:12, 43:13, 55:2, 78:23, 86:10, 92:20
**pass** - 30:11, 54:14, 79:21, 91:1
**passed** - 31:1
**passing** - 30:13, 99:15
**passion** - 95:18, 96:23, 98:2, 108:5
**passport** - 10:13
**Pause** - 6:5, 42:20, 63:9
**pay** - 135:8, 163:21, 176:6
**Pedra** - 14:9
**penalty** - 94:18, 95:8, 96:13, 97:14, 106:11, 111:5, 121:13, 122:24, 123:8, 124:3, 126:7, 126:20, 136:16, 136:24, 140:17, 145:19
**penis** - 115:5, 149:20, 149:21, 173:15
**Pennsylvania** - 110:25, 166:22
**people** - 4:10, 4:16, 5:15, 24:7, 47:2, 58:17, 74:11, 74:20, 76:22, 77:21, 78:1, 87:13, 88:18, 88:23, 89:6, 90:3, 90:17, 106:17, 106:20,

107:1, 109:1, 109:2, 109:5, 109:18, 110:20, 110:21, 114:8, 116:15, 116:16, 116:18, 116:21, 117:1, 118:12, 118:14, 142:15, 142:24, 143:13, 144:1, 144:3, 148:21, 148:23, 149:2, 149:3, 153:25, 154:2, 154:16, 155:25, 163:5, 167:2, 167:9, 171:1, 171:8, 171:12, 171:15, 174:12
**People** - 118:7
**people's** - 135:11, 166:14, 167:3
**Perez** - 1:5, 1:24, 8:9, 8:17, 9:2, 10:12, 68:3, 150:23, 163:17
**perez** - 1:8, 1:21, 17:25, 47:20, 66:19, 67:5, 67:14
**Perez-garcia** - 1:5, 1:24, 8:9, 8:17, 9:2
**perfect** - 160:21
**period** - 23:3, 23:7, 48:7, 83:3, 83:22, 83:24, 84:6, 114:14, 131:6, 148:12
**permanently** - 69:23, 143:24, 144:1
**permission** - 71:17
**permitted** - 101:8
**perplexed** - 145:1
**person** - 3:23, 8:5, 15:19, 16:25, 23:14, 23:18, 29:18, 84:21, 84:23, 89:2, 91:14, 91:15, 91:16, 91:24, 92:13, 100:24, 106:19, 106:23, 107:22, 122:13, 122:15, 138:10, 143:11, 143:12, 143:14, 143:21, 143:24, 144:7, 144:23, 144:24, 148:6, 151:3, 152:5, 156:6, 157:23, 158:3, 162:9, 175:24, 175:25, 176:2
**personal** - 5:7, 5:24, 40:22, 41:4, 100:23, 103:12
**personally** - 140:21
**personnel** - 120:22
**pet** - 19:2
**Phase** - 1:16
**phase** - 3:10, 60:1, 65:10, 93:12, 100:16, 121:9, 121:11, 155:11, 168:10
**phone** - 10:2, 10:6, 11:5, 46:19, 152:4
**Phone** - 2:7, 2:13, 2:16
**phonetic** - 9:4, 29:10, 68:25
**photo** - 43:9, 77:4, 77:6, 77:21, 78:1, 78:3, 78:6, 78:19, 78:21
**photograph** - 76:14
**Photograph** - 2:2, 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11, 2:12, 2:13, 2:14, 2:15, 2:16, 2:17, 2:18, 2:19, 2:20, 2:21, 2:22, 2:23, 2:24, 2:25, 3:1, 3:2, 3:3
**photographs** - 3:15, 3:16, 5:21
**photos** - 4:4, 4:6, 4:13, 20:1, 20:5, 42:10, 63:3, 71:21, 72:6, 114:20
**pick** - 148:17
**Picking** - 37:12
**picking** - 106:8
**picture** - 4:22, 5:18, 9:23, 20:23, 30:23, 74:9, 75:1, 76:22, 77:17, 109:17, 114:17, 118:2, 175:14
**pictured** - 4:12
**pictures** - 4:6, 4:9, 4:17,

5:2, 5:10, 5:11, 5:12, 5:15, 5:18, 42:11, 43:11, 51:13, 51:14, 51:17, 51:19, 74:7, 171:4, 171:5
**piece** - 150:14
**pieces** - 118:20
**pinky** - 131:8
**place** - 9:4, 12:6, 63:3, 104:9, 149:10
**placed** - 93:18, 129:13, 129:14, 151:15
**places** - 131:4
**plain** - 108:10
**planning** - 61:16
**plans** - 9:7
**play** - 175:12
**played** - 16:3
**Playing** - 78:10, 78:11
**playing** - 70:15
**pled** - 54:3, 136:6, 148:15, 148:18
**plenty** - 113:12, 121:14
**plus** - 151:5
**point** - 25:7, 35:21, 37:13, 49:4, 88:25, 137:1, 137:17, 141:4, 174:23
**pointing** - 74:12
**points** - 167:11
**police** - 116:11, 127:9, 162:12
**poor** - 16:15
**population** - 172:25
**portion** - 64:22, 164:23, 167:4
**portions** - 179:8
**portrayed** - 146:16
**pose** - 148:9
**posed** - 94:20
**position** - 3:19, 138:13
**possession** - 124:20, 125:2, 125:14
**possibility** - 135:14
**possible** - 85:1, 95:22, 97:2, 98:24
**possibly** - 55:13, 146:9
**power** - 120:1
**pray** - 60:17, 171:9
**precious** - 175:17
**predicted** - 99:25
**pregnant** - 25:15, 44:20, 45:3, 170:15
**prejudice** - 95:18, 96:23, 98:2, 100:14, 108:5
**preparation** - 111:9
**prepared** - 58:18
**presence** - 56:13, 59:15
**present** - 3:1, 3:4, 3:6, 3:8, 3:19, 4:9, 7:10, 7:17, 7:18, 7:19, 21:21, 27:8, 27:9, 56:1, 59:12, 63:10, 63:13, 63:16, 66:8, 66:12, 66:14, 104:23, 105:5, 105:9, 105:10, 105:11, 110:16, 111:18, 112:11, 114:7, 165:15, 176:23, 177:1, 177:5
**Present** - 63:14
**presented** - 94:22, 107:22, 108:19, 109:7, 109:14, 110:18, 112:18, 114:16, 117:5, 117:6, 117:7, 117:13, 117:16, 117:25, 119:6, 119:19, 121:14, 121:20, 122:2, 130:12, 170:9
**presently** - 9:3
**preside** - 101:12
**presiding** - 1:23
**pressured** - 107:2
**presumption** - 126:20
**pretend** - 90:17, 169:16

**pretty** - 45:5, 87:24, 91:10, 115:2, 121:9, 124:13, 127:4, 135:19, 169:19
**Pretty** - 134:8, 172:19
**price** - 163:22, 176:6
**primarily** - 21:13
**primary** - 132:6
**prison** - 3:18, 3:21, 4:12, 4:13, 4:21, 21:17, 28:5, 28:8, 28:13, 28:19, 28:25, 29:12, 29:15, 38:12, 40:7, 41:15, 41:17, 41:21, 52:9, 53:23, 54:6, 54:20, 56:19, 57:2, 69:10, 69:13, 69:21, 71:3, 71:7, 71:10, 79:13, 79:17, 79:19, 88:13, 100:4, 114:1, 118:17, 118:19, 119:2, 119:11, 121:24, 122:5, 122:14, 123:21, 135:19, 151:13, 151:16, 151:22, 151:23, 152:3, 152:7, 152:16, 166:21, 171:2, 172:17
**privileges** - 135:7
**probability** - 102:2, 146:23, 148:9
**probable** - 112:21
**probated** - 135:7
**probation** - 81:23, 82:4
**problem** - 10:13, 61:15, 125:13, 139:12
**problems** - 11:5
**Proceed** - 54:17
**proceed** - 3:9, 7:11, 7:16, 7:21, 8:15, 9:25, 10:11, 21:22, 21:25, 32:5, 43:1, 43:17, 66:5, 66:15, 67:3, 79:4, 80:13, 86:13, 91:5, 105:12, 105:23, 112:2, 113:4, 116:8, 124:7, 132:19, 141:17, 155:6, 157:21, 164:10
**proceeded** - 116:12
**proceeding** - 158:6, 158:25
**proceedings** - 1:21, 179:8, 179:14
**Proceedings** - 1:24, 1:2, 178:6
**process** - 20:9, 145:8, 146:7
**profess** - 87:13
**professing** - 89:1, 90:11
**proffer** - 56:10, 57:4, 57:13
**promise** - 16:22
**proof** - 95:23, 97:3, 98:25, 110:20, 139:2
**proper** - 94:3, 101:3, 157:16
**property** - 17:9, 17:11
**proposed** - 63:19, 63:20
**proposing** - 4:15
**prosecution** - 3:7, 98:23, 119:22, 135:4
**prosecution's** - 98:25
**prosecutor** - 43:21, 91:16, 91:25, 126:7, 143:2, 143:4
**protected** - 118:18, 123:2, 123:20
**proud** - 160:24, 160:25
**prove** - 3:17, 94:24, 95:21, 96:4, 97:1, 98:23, 111:18, 112:20, 114:23, 129:12, 135:5, 152:19
**proved** - 101:15, 110:1, 121:18, 162:16
**proven** - 113:13, 114:24
**provide** - 20:1
**provided** - 3:15, 20:1,

20:5, 128:20
**Psalms** - 19:15
**public** - 95:18, 96:23, 98:2
**publish** - 71:18
**Puerto** - 4:14, 13:11, 13:18, 14:10, 14:13, 22:22, 23:1, 24:4, 24:24, 24:25, 27:24, 28:5, 32:17, 32:20, 37:3, 37:6, 37:14, 38:1, 38:13, 38:15, 38:16, 39:3, 39:5, 39:14, 40:7, 44:18, 45:3, 45:8, 45:9, 45:10, 45:11, 45:21, 45:23, 45:25, 47:23, 47:24, 48:1, 48:5, 48:6, 49:4, 52:15, 52:25, 53:23, 54:21, 56:19, 58:17, 67:20, 67:23, 71:10, 88:14, 114:13, 115:11, 116:16, 117:21, 119:1, 119:21, 151:13, 152:4, 166:21, 168:6, 170:16, 172:22
**pull** - 6:3, 149:20
**pulling** - 148:25
**Pulling** - 174:3
**Punishment** - 1:16, 1:2
**punishment** - 3:10, 59:25, 63:21, 93:12, 93:16, 94:3, 94:9, 98:15, 99:6, 99:11, 100:16, 120:20, 128:8, 132:7, 143:5, 143:8, 143:9, 143:11, 166:15, 168:10, 176:13
**purchased** - 17:8
**pure** - 139:5
**purple** - 75:13
**purport** - 42:15
**purpose** - 3:22, 99:14, 99:18, 100:19
**purposes** - 6:6, 8:4, 8:10, 43:3, 58:24
**put** - 3:11, 5:5, 17:16, 35:19, 55:8, 55:14, 61:4, 62:7, 62:10, 63:5, 63:6, 65:3, 117:2, 131:3, 136:17, 137:10, 137:12, 144:21, 144:22, 147:20, 147:25, 155:13, 155:24, 161:12, 161:14, 162:20, 165:25, 172:18, 173:15, 173:21, 174:9
**Puts** - 50:7
**putting** - 4:17, 62:23, 177:13

**Q**

**questioning** - 5:14, 89:11
**Questions** - 135:25, 138:13
**questions** - 4:10, 4:16, 18:16, 20:10, 33:15, 79:2, 91:25, 94:5, 94:12, 94:20, 106:10, 108:2, 108:8, 108:17, 111:4, 121:7, 123:7, 123:19, 124:2, 135:20, 139:3, 144:13, 144:15, 145:18, 146:2, 155:1
**quick** - 3:14, 124:9
**quickly** - 104:16
**quite** - 46:23

**R**

**raise** - 31:13, 31:24
**raised** - 12:2, 33:16, 121:23
**Ramon** - 120:14
**randomly** - 167:9
**rape** - 156:11, 156:18
**raped** - 88:20, 112:10,

114:8, 155:22, 156:4, 156:6, 158:3
**rapes** - 109:17
**raping** - 171:15
**rapist** - 159:3
**rare** - 144:4
**rather** - 103:15, 104:3, 151:23
**razor** - 120:9, 120:11, 120:12, 135:8, 173:6
**razors** - 120:13
**reach** - 176:19
**read** - 1:13, 19:14, 19:15, 92:5, 93:15, 93:17, 101:22, 124:24, 124:25, 128:19, 177:10
**reading** - 61:21, 66:5, 87:2, 87:5, 101:7
**ready** - 3:9, 7:3, 7:6, 7:11, 7:13, 7:16, 7:21, 7:22, 7:23, 62:2, 66:15, 105:12, 105:15, 141:17
**Ready** - 105:13
**real** - 8:13, 14:21, 15:2, 40:4, 83:20, 84:24, 86:4
**real-time** - 8:13
**reality** - 121:21, 154:14
**really** - 106:5, 113:23, 118:4, 127:4, 137:22, 144:16, 151:16, 154:4, 160:7, 160:10, 162:3, 168:23, 170:7
**reargue** - 145:5
**reason** - 30:19, 109:6, 114:6, 115:18, 138:14, 140:11, 140:13, 156:2, 156:6, 166:11, 172:12
**reasonable** - 94:25, 95:23, 96:5, 97:3, 98:19, 98:25, 99:2, 99:7, 102:1, 102:6, 102:8, 102:13, 102:21, 102:23, 109:23, 111:18, 126:18, 138:10, 152:20, 153:7, 165:2, 165:9
**reasonably** - 157:2
**Reasonably**- 157:9
**reasons** - 140:13, 161:21
**rebut** - 61:15
**recalling** - 55:12
**receive** - 14:22, 101:17
**received** - 116:11, 166:16
**Recess**- 105:4, 176:25
**recess** - 59:11, 176:19, 176:24, 177:9, 178:4
**recessed** - 178:6
**recipient** - 56:25
**recognize** - 42:13, 77:20, 90:16, 159:17
**recognized** - 159:5
**recommend** - 139:16
**reconnect** - 24:20
**reconnected** - 23:5, 24:18
**record** - 3:2, 3:11, 5:16, 6:4, 6:7, 7:4, 7:16, 8:4, 8:11, 20:16, 41:4, 53:5, 55:9, 55:15, 56:4, 56:8, 56:15, 57:14, 58:24, 59:14, 62:8, 63:5, 63:6, 63:11, 64:2, 64:7, 65:5, 65:7, 66:10, 67:12, 90:5, 104:17, 105:7, 124:13, 127:13, 128:24, 134:9, 158:10, 158:12, 158:15, 164:3, 164:12, 164:15, 164:19, 167:18, 172:1, 172:7, 177:3
**Record**- 1:1, 179:10, 179:13
**records** - 58:13, 134:24, 172:24

**redirect** - 31:2, 31:4
**Redirect**- 54:18, 91:6
**reduces** - 171:18
**reducing** - 97:16, 176:1
**refer** - 100:17
**reflect** - 65:2
**reflects** - 179:14
**regard** - 97:16
**regarding** - 114:24, 114:25, 121:3
**Regardless**- 139:9
**regardless** - 137:17
**regards** - 60:24
**reign** - 114:22
**reiteration** - 127:5
**relate** - 100:21
**related** - 6:25, 85:2
**relation** - 47:22, 82:11
**relationship** - 12:11, 13:19, 13:22, 29:25, 30:10, 36:23, 38:19, 40:16, 45:16, 45:18, 45:19, 45:25, 49:24, 170:15
**relative** - 3:20
**relatives** - 4:11
**Relax**- 177:21
**release** - 99:23
**relevance** - 4:4
**relevant** - 58:4, 94:21, 116:6, 130:24
**reliability** - 162:15
**rely** - 111:25, 113:3, 128:10, 128:20, 142:21
**remain** - 13:8
**remaining** - 166:5
**remember** - 37:9, 44:2, 45:4, 45:6, 51:11, 69:24, 70:4, 72:24, 76:13, 76:14, 76:15, 76:20, 77:24, 107:9, 107:10, 107:11, 108:23, 111:8, 112:5, 112:6, 113:9, 113:14, 115:22, 115:24, 118:3, 120:15, 130:7, 131:24, 132:3, 133:12, 134:18, 136:7, 145:11, 146:4, 151:7, 152:12, 163:7, 164:7, 166:19, 167:18, 172:16
**Remember**- 108:2, 163:9
**reminded** - 55:19, 134:19
**remove** - 143:24, 144:2
**removed** - 143:22
**removes** - 169:24
**Removes**- 169:25
**Renee**- 1:22
**renew** - 29:4, 53:2
**renewed** - 53:6
**repeat** - 10:25, 11:4, 11:9, 18:16, 50:25, 92:11, 164:17
**repeated** - 126:13
**repeatedly** - 162:23
**repeating** - 163:11
**repercussions** - 174:20
**Rephrased**- 90:8
**report** - 112:15, 131:14
**reported** - 1:24, 179:12
**Reporter**- 179:4, 179:20
**Reporter's**- 1:1, 1:17, 179:1, 179:10, 179:13
**represented** - 66:13, 177:6
**Republic**- 9:5, 19:23, 33:20, 35:22, 38:14, 39:4, 39:7, 47:7, 47:25, 67:18, 67:24, 67:25, 68:9, 72:4
**request** - 62:12, 64:7, 64:18, 65:3, 164:11, 165:17
**requested** - 64:10, 64:11, 65:5, 179:8
**requesting** - 65:8

**required** - 95:21, 95:23, 97:1, 97:3
**reserve** - 104:15, 105:20
**reside** - 21:5
**resolve** - 146:10
**resolved** - 81:22, 175:1
**respect** - 106:7, 125:3, 126:24, 126:25, 127:1, 128:1, 145:4
**respective** - 179:15
**respond** - 60:3, 60:4, 125:25, 126:5, 140:23, 141:1, 146:13
**responded** - 125:23
**Responding** - 158:13
**responding** - 145:2
**response** - 6:20, 6:22, 144:18
**responsible** - 98:22, 99:4, 99:9, 148:10, 153:13, 154:21, 154:22, 154:25
**rest** - 93:3, 118:19, 123:21, 125:9, 150:11, 155:13, 158:21, 159:1
**rested** - 93:12
**resting** - 66:4
**rests** - 1:10, 93:6, 93:8
**resume** - 55:23
**retire** - 101:10
**retired** - 1:16, 34:24, 35:1, 93:19
**retirement** - 34:25
**return** - 5:20, 27:24, 95:1, 95:25, 96:6, 97:5, 104:10
**returned** - 93:24
**review** - 63:20, 64:22, 153:11
**reviewed** - 63:22, 63:23
**Rican**- 172:22
**Rico**- 4:14, 13:11, 13:18, 14:10, 14:13, 22:22, 23:1, 24:4, 24:24, 24:25, 27:25, 28:5, 32:17, 32:20, 37:4, 37:6, 37:14, 38:1, 38:14, 38:15, 38:16, 39:4, 39:5, 39:14, 40:7, 44:18, 45:3, 45:8, 45:9, 45:10, 45:11, 45:21, 45:23, 45:25, 47:23, 47:24, 48:1, 48:2, 48:5, 48:6, 49:4, 52:15, 52:25, 53:23, 54:21, 56:19, 58:17, 67:20, 67:23, 71:10, 88:14, 114:13, 115:11, 116:16, 117:21, 119:2, 119:21, 151:14, 152:4, 166:21, 168:6, 170:16
**rid** - 156:19
**ride** - 175:12
**riding** - 77:1
**Rio**- 14:9
**rise** - 55:25, 176:21, 178:5
**rival** - 112:8
**robbery** - 111:14, 156:11
**robbins** - 118:3
**rock** - 148:2, 162:5
**rod** - 149:14, 149:17
**Rodriguez**- 23:11, 23:19, 23:22, 24:15, 45:8, 179:4, 179:19
**Rogelio**- 111:8
**Roger**- 163:20, 163:21, 164:1, 165:1, 165:20, 165:21, 166:1, 166:5, 166:7, 166:8, 166:9
**Rolando**- 2:20, 74:1
**room** - 72:25, 93:18, 101:12, 106:19, 119:6, 141:2, 146:5, 161:13, 176:15, 176:16, 177:20
**rope** - 152:2

**Rosie**- 176:7
**rough** - 134:2
**Rp**- 2:11
**Rudy**- 109:9, 110:3, 110:4, 110:7, 110:12, 111:2, 111:5, 111:13, 112:6, 113:22, 129:24, 129:25, 130:1, 130:2, 130:11, 130:14, 131:2, 131:10, 131:20, 132:10, 132:14, 132:21, 132:23, 132:24, 133:8, 133:10, 133:18, 133:22, 135:21, 135:23, 135:25, 136:1, 150:13, 150:18, 155:9, 155:13, 155:19, 158:9, 158:18, 158:21, 158:22, 159:2, 159:7, 159:11, 159:12, 159:22, 160:2, 160:3, 160:6, 160:11, 160:19, 160:22, 161:20, 161:21, 161:25, 162:2, 162:7, 162:8, 162:17, 162:18, 162:19, 162:23, 163:5, 166:1, 166:14, 166:21, 173:20, 174:1, 174:6
**Rudy's**- 127:11, 129:1, 133:19, 136:2, 150:19, 161:11, 162:4, 162:14, 163:4, 174:17
**rule** - 56:12, 57:6, 65:3, 65:6, 89:16, 128:17, 157:10, 164:18
**Rule**- 60:2, 60:6, 60:7
**ruled** - 53:3
**rules** - 5:13, 123:17, 123:18, 141:21, 141:22, 141:23, 141:24, 142:1, 142:3, 142:7, 142:10, 143:17, 143:20
**Rules**- 141:22
**ruling** - 10:24, 128:1, 164:11
**run** - 175:12
**running** - 118:5, 121:21, 163:12, 171:14
**runs** - 170:22

## S

**sad** - 141:3, 141:4, 151:4, 154:13, 169:13
**sadness** - 107:10
**safe** - 120:22, 142:16
**Santana** - 158:9
**Santo** - 12:3, 12:18, 13:4, 13:6, 14:14, 22:17, 25:16, 27:19, 28:18, 29:2, 29:7, 33:19, 36:4, 36:19, 39:21, 40:6
**sat** - 60:13, 147:21, 174:15, 174:18
**satisfied** - 132:2
**Saturdays**- 16:13
**Saul** - 133:2, 150:9, 150:15, 150:25, 151:1, 151:4, 173:24
**Saul's** - 150:12, 173:25
**save** - 140:11, 140:18
**saw** - 13:15, 13:16, 13:20, 22:24, 24:23, 25:3, 38:20, 62:18, 91:22, 114:20, 120:12, 121:21, 131:2, 131:3, 149:7, 156:9, 167:14, 174:8, 174:9, 174:14
**Sbot**- 2:4, 2:5, 2:12, 2:15
**scene** - 161:16, 162:8
**school** - 18:19, 18:20, 35:10, 35:12, 35:13, 68:10, 68:11, 68:12, 70:14, 107:20,

141:23, 142:2, 175:13
**Scratch** - 26:19
**screams** - 173:16
**screen** - 30:24, 110:10
**screens** - 6:13
**sea** - 13:3, 35:20
**seasoned** - 143:4
**seated** - 66:9, 68:4, 105:6, 177:2
**second** - 6:3, 7:14, 47:16, 63:7, 121:2, 124:22, 129:6, 130:9, 136:11, 152:3
**seconds** - 6:15
**See** - 174:10
**see** - 9:17, 10:3, 18:23, 28:25, 38:11, 38:13, 38:16, 38:25, 39:9, 39:22, 48:8, 48:22, 52:3, 52:13, 52:16, 58:2, 71:3, 71:6, 79:15, 79:17, 79:19, 82:9, 84:12, 87:5, 92:18, 116:15, 123:5, 124:25, 137:8, 155:23, 161:8, 162:15, 174:15
**seeing** - 48:19, 79:14, 176:2
**seem** - 146:18, 163:10
**sees** - 156:19, 160:8
**segregation** - 119:18, 171:24, 172:19
**seldom** - 48:9, 48:10
**selection** - 137:14, 137:16, 145:13, 147:8
**sell** - 14:22, 15:4, 15:7, 16:22, 116:15
**selling** - 46:20, 47:3, 89:6, 117:14
**send** - 9:11, 28:23, 71:12
**sending** - 71:11
**senior** - 143:3
**sense** - 113:24, 116:24, 155:24, 155:25, 156:2, 156:3, 173:23
**sensed** - 106:13
**sentence** - 21:18, 98:8, 99:11, 103:15, 103:16, 104:2, 104:3, 124:4, 130:3, 130:21, 135:23, 137:9, 137:10, 138:16, 151:17
**sentenced** - 54:6, 99:20, 100:2
**sentiment** - 95:17, 96:22, 98:1, 108:4, 139:5
**separate** - 101:8, 177:12
**separated** - 23:25, 24:2
**September**- 94:2, 147:16
**Sergeant**- 168:11
**series** - 3:14
**served** - 99:24
**servers** - 17:4
**service** - 41:20
**services** - 41:10, 41:16
**set** - 21:14, 142:7, 142:24
**sets** - 125:9
**seven** - 34:13, 35:7, 120:20, 135:6, 135:7
**Seven**- 35:7, 69:2
**Seventeen**- 67:16
**several** - 16:21, 29:11, 46:9
**Several**- 54:9, 54:10
**sex** - 150:1
**sexual** - 111:14, 112:4
**sexually** - 132:22
**shall** - 6:23, 94:13, 94:14, 95:1, 95:4, 96:6, 96:9, 97:10, 97:15, 98:7, 98:11, 101:7, 101:8, 103:7, 103:18
**share** - 49:1
**shave** - 120:10
**sheets** - 119:15, 151:25,

152:1
**shift** - 150:12
**shoes** - 107:19, 175:8
**short** - 8:13
**shorthand** - 1:25
**shortly** - 24:4
**shorts** - 148:4
**Shorty** - 113:16, 113:18
**Shorty's** - 113:19, 113:23, 113:24
**shot** - 118:14, 148:19, 148:22
**shots** - 148:20
**show** - 5:11, 42:9, 71:20, 74:8, 74:23, 77:25, 147:9, 163:13
**showed** - 51:13, 110:4, 122:9, 174:5
**shower** - 149:14, 149:17
**showing** - 72:9, 76:21, 77:3, 77:20
**shown** - 42:12, 98:19, 100:25, 109:22
**shows** - 44:10, 56:24, 115:16, 116:10, 123:22, 150:7
**shred** - 135:18
**sic** - 74:23, 75:8, 112:6, 114:4, 174:17
**side** - 60:16, 66:6, 84:20, 114:21, 119:9, 129:8, 166:1, 171:14
**sidebar** - 41:8, 128:2, 132:18
**sidebars** - 132:13
**sides** - 1:11, 7:21, 63:20, 66:4, 105:12
**sign** - 101:19, 104:7, 104:10
**signature** - 166:18
**signed** - 159:24
**significance** - 129:23
**similar** - 65:9
**simple** - 108:10, 127:4
**simply** - 135:24
**sincere** - 15:19, 171:18
**single** - 110:5, 129:17, 129:21, 142:9, 142:21, 145:21, 162:11, 172:20
**sink** - 148:1
**sisters** - 33:22, 34:1, 34:2, 36:11, 36:16, 123:15, 123:20
**sit** - 125:21, 138:25, 140:16, 140:19, 140:20, 153:18, 166:1, 168:18, 174:14
**Sit**- 56:4
**sitting** - 33:8, 75:2, 152:7, 161:15
**situation** - 106:17, 107:2, 118:10, 136:18, 137:6, 153:22
**situations** - 143:23
**six** - 13:10, 22:23, 44:13, 44:17, 120:5, 170:15
**Six**- 12:20, 22:23
**six-month** - 170:15
**skates** - 135:21
**skin** - 159:6
**Skip** - 3:5, 7:19, 124:5, 151:7
**Skype** - 6:9, 6:15, 8:11, 8:18
**Skyped** - 51:25
**sleep** - 175:7, 177:22
**sleeping** - 165:24
**slice** - 118:21
**slight** - 6:12
**small** - 14:23, 17:15,

32:21, 142:5, 144:23
**smallest** - 173:4
**smash** - 131:4
**smashed** - 131:12
**smell** - 150:3
**smoother** - 7:2
**Society** - 118:18
**society** - 102:4, 118:10, 123:2, 123:16, 141:22, 142:19, 143:16, 143:22, 143:24, 144:2, 144:7, 146:25, 147:10, 147:11, 148:8, 148:10, 150:8, 152:12, 152:13, 152:21, 153:1, 154:5, 154:24, 168:22, 174:25, 176:5
**sold** - 113:19, 116:21, 116:22
**sole** - 135:9
**solicited** - 30:17
**solid** - 144:8
**Solis** - 178:2
**solved** - 150:17
**someone** - 40:22, 41:5, 41:6, 45:4, 59:23, 87:21, 130:2, 135:16, 142:22, 156:19, 159:4
**sometime** - 24:19, 25:1, 158:19
**Sometimes** - 139:17
**sometimes** - 16:13, 106:18, 169:14, 169:15
**somewhere** - 12:23, 37:14
**son** - 3:20, 4:12, 14:3, 14:7, 21:15, 25:13, 28:1, 28:10, 28:17, 28:20, 29:3, 29:14, 48:25, 121:21, 122:23
**sons** - 3:18, 14:15, 18:15, 18:17, 20:23, 21:4, 26:12, 26:16, 27:11, 39:23
**Sorry** - 27:3, 40:23, 104:20
**sorry** - 22:20, 23:23, 43:4, 48:3, 50:24, 53:11, 57:17, 71:22, 72:10, 155:17, 157:12, 160:19, 160:24, 164:5, 168:17, 169:13, 169:21, 169:24, 173:24
**sort** - 163:10
**sought** - 72:15
**sound** - 9:17, 44:25, 168:21, 171:10
**span** - 115:10
**Spanish** - 6:17, 166:6
**Spanish-speaking** - 6:17
**speaker** - 10:2, 10:6
**speaking** - 6:17, 19:25, 74:5, 114:6
**Special** - 94:6, 94:7, 94:24, 95:1, 95:2, 95:3, 95:9, 95:11, 95:15, 95:20, 95:22, 96:1, 96:2, 96:4, 96:6, 96:7, 96:8, 96:14, 96:16, 96:20, 96:25, 97:2, 97:6, 97:7, 97:9, 97:18, 97:20, 97:24, 98:4, 98:6, 98:7, 98:9, 98:10, 100:20, 101:2, 101:11, 101:13, 101:24, 101:25, 102:7, 102:9, 102:11, 102:12, 102:22, 103:3, 103:5, 103:6, 103:8, 103:9, 103:18, 104:4, 104:6, 104:11, 148:11, 152:23, 153:5, 153:17, 153:19
**special** - 9:13, 94:12, 94:20, 103:24, 144:13, 144:15, 145:14, 146:11, 146:20, 146:21, 152:13, 155:1, 175:3
**specific** - 164:14

**specifically** - 4:19, 64:11, 130:10, 132:10
**speculation** - 91:19
**spell** - 175:15
**spend** - 70:11, 124:22, 160:20
**spending** - 151:17
**spent** - 92:12
**spin** - 151:14
**Spiritual** - 83:9
**spiritual** - 19:13, 19:20, 40:19, 40:25
**spit** - 173:14
**stab** - 161:9, 163:21
**stabbed** - 120:18
**stack** - 4:3
**stand** - 32:2, 80:11, 108:10, 111:24, 113:3, 115:22, 131:25, 134:19, 145:10, 161:7, 163:2, 164:8, 174:15, 176:19
**stands** - 156:6
**start** - 20:14, 59:21, 61:19, 71:21, 83:5, 104:22, 106:3, 124:9, 124:15, 141:5, 177:24
**starts** - 154:19
**State** - 1:11, 2:7, 3:3, 3:15, 5:21, 5:22, 7:20, 20:9, 20:18, 22:6, 31:1, 43:4, 57:3, 57:9, 57:12, 57:25, 60:15, 63:12, 63:15, 63:24, 66:11, 66:13, 80:19, 81:11, 93:5, 93:6, 93:11, 93:20, 94:23, 94:24, 95:21, 96:4, 97:1, 98:19, 101:22, 104:13, 104:14, 105:7, 105:11, 107:18, 108:6, 108:12, 109:13, 109:20, 109:23, 110:16, 111:6, 111:11, 111:17, 112:11, 112:19, 113:7, 114:7, 114:12, 114:17, 114:23, 117:5, 119:20, 120:5, 120:24, 121:16, 123:7, 124:17, 127:1, 138:21, 139:17, 141:17, 165:17, 177:4, 177:6, 179:2, 179:5
**state** - 67:12, 134:6
**State's** - 1:15, 7:22, 8:24, 42:22, 56:10, 56:18, 57:16, 58:6, 58:8, 71:21, 72:9, 74:23, 75:5, 75:8, 95:23, 97:3, 110:13, 113:20, 125:21, 141:19
**Statement** - 105:24, 141:19
**statement** - 89:11, 89:21, 104:10, 127:5, 131:17, 132:8, 133:3, 133:14, 157:18, 159:25, 160:14, 160:17, 161:12, 161:16, 161:17, 161:22, 162:4, 162:14, 164:19, 165:17
**statements** - 6:13, 6:14, 109:1, 166:17
**States** - 45:20, 46:1, 46:8, 46:12, 47:6, 52:14, 71:15, 142:12
**stay** - 27:14, 128:14, 158:12
**Stay** - 158:15, 172:4, 172:7
**stayed** - 37:14, 44:12
**steady** - 36:13
**step** - 31:19, 36:16, 55:17, 80:1, 92:25, 129:6, 169:20
**step-by-step** - 169:20
**sticks** - 150:2
**still** - 58:11, 62:15, 64:14, 86:1, 90:10, 122:5, 127:16,

158:22, 164:1, 165:1
**sting** - 149:15
**stool** - 161:24
**stop** - 9:14, 9:16, 75:20, 89:13, 154:7
**stopped** - 24:7, 79:14
**story** - 112:10, 126:2, 126:4, 126:6, 126:12, 126:13, 126:14, 126:15, 126:16, 126:17, 127:3, 129:4, 129:9, 129:10, 131:16, 133:13, 133:16, 133:18, 155:16, 158:21, 159:1, 159:10, 159:11, 159:18, 159:23, 162:13
**straight** - 8:2, 9:22, 133:13
**strangers** - 149:2, 149:6
**strangled** - 174:2
**strategy** - 168:18
**street** - 73:24
**streets** - 142:16, 143:18, 152:15
**striking** - 167:2, 167:23
**strong** - 122:16
**studies** - 56:20
**study** - 68:11, 70:14, 152:7
**stuff** - 16:17, 129:3, 134:24, 134:25, 138:22, 170:13
**stunning** - 160:3, 160:5
**styled** - 179:11
**subject** - 24:17, 55:12, 55:20, 177:18
**submit** - 123:21, 143:25, 152:19, 152:23, 154:9, 173:10
**submitted** - 94:13, 94:14, 94:15, 94:25, 96:5, 101:3, 101:11, 101:13, 104:11, 176:17
**subpoena** - 81:11
**subpoenaed** - 60:6, 60:15, 81:10
**suffered** - 34:22
**suffering** - 144:5
**Sufficiency** - 139:23
**sufficient** - 103:14, 104:1, 137:9, 138:15, 139:18, 139:21, 140:11, 140:12
**sugarcoat** - 136:25
**suggest** - 139:6
**suggestion** - 135:13
**suit** - 33:11
**Suite** - 2:15
**Sundays** - 16:12, 120:10
**support** - 46:12, 60:9, 127:20, 129:21
**supported** - 94:22
**supports** - 95:14, 96:19, 97:23
**supposed** - 126:16, 137:7, 139:6, 148:19
**Surely** - 154:1
**surprised** - 47:9
**suspect** - 107:17, 107:18
**suspects** - 115:13
**suspended** - 34:23
**sustain** - 58:5, 58:6, 58:22
**sustained** - 30:6, 30:17, 41:19, 42:5, 89:12, 89:17, 108:15, 116:7, 117:11, 127:24, 128:3, 130:25, 172:4
**swayed** - 95:17, 96:22, 98:1, 108:4, 109:3
**switch** - 31:16
**sworn** - 7:7, 8:14, 8:18, 31:12, 31:15, 31:25, 32:7, 66:21, 66:24, 67:6, 80:7, 80:10, 80:16

**sympathy** - 95:17, 96:22, 98:1, 108:5, 108:18
**system** - 142:22, 158:6

**T**

**table** - 3:5, 7:18, 63:13, 66:12, 93:18, 105:10, 177:5
**talks** - 114:18
**tall** - 159:6
**taught** - 58:17
**taunt** - 175:24
**Tdc-** 118:1, 118:3, 118:7, 134:6, 172:23
**teacher** - 17:20, 17:21
**tears** - 107:23
**technical** - 138:4, 138:5
**teenager** - 35:15
**telephone** - 11:7
**television** - 8:12
**ten** - 38:23, 95:12, 96:17, 97:21, 102:8, 102:23, 103:22, 103:25, 107:1, 107:8, 119:3, 144:8, 160:20, 163:5
**tendency** - 154:6
**tender** - 42:17
**tends** - 127:23
**term** - 100:2, 174:19
**Term**- 93:22
**Terrace** - 2:12
**terrific** - 115:11
**terror** - 114:22, 154:15
**testified** - 8:18, 32:7, 44:3, 56:16, 67:6, 80:16, 112:6, 129:16, 132:10, 132:15
**testify** - 58:21, 60:23, 100:12, 100:15, 112:14, 112:15, 122:6
**testifying** - 3:24, 20:8, 133:11
**testimony** - 6:9, 6:12, 8:2, 9:25, 48:24, 60:1, 61:6, 65:12, 65:15, 99:17, 101:16, 110:2, 112:13, 115:4, 120:5, 127:18, 128:5, 129:1, 130:8, 130:16, 130:18, 130:21, 131:5, 131:15, 131:23, 131:25, 132:6, 132:8, 134:15, 136:2, 136:4, 136:5, 136:8, 145:24, 146:14, 149:1, 150:19, 151:10, 152:18, 164:7, 167:19
**Texas**- 1:11, 1:9, 1:23, 2:6, 2:7, 2:13, 2:16, 3:3, 63:12, 66:11, 93:20, 93:22, 94:2, 94:10, 98:12, 99:21, 101:22, 105:7, 177:4, 179:2, 179:6, 179:19, 179:22
**thankfully** - 143:25
**thanking** - 106:3
**theft** - 134:7
**thefts** - 114:1, 134:3, 134:8
**themselves** - 168:23
**thereby** - 101:18, 140:1
**therefore** - 127:17, 143:20
**Therefore**- 99:2
**thereon** - 55:22, 113:3, 177:19
**They've**- 3:16
**thinking** - 57:6, 107:7
**third** - 34:6, 121:11, 128:25, 159:2
**Thirteen**- 33:7
**thirty** - 99:24
**thirty-five** - 99:24
**threat** - 102:4, 146:25, 147:10, 147:11, 148:8, 148:9, 150:8, 152:11,

152:21, 152:25, 154:24
**threatened** - 115:5, 149:20
**three** - 12:14, 12:18, 28:24, 44:24, 54:23, 76:14, 90:3, 124:20, 133:15, 134:6, 144:13, 146:15, 146:19, 168:5, 175:9
**Three**- 128:24, 134:6, 155:18
**throughout** - 100:18, 123:5, 177:20
**thrown** - 153:22
**Thursday**- 125:20
**tie** - 65:13
**tied** - 133:4, 133:7
**ties** - 115:8
**timeframe** - 57:1, 114:13, 171:10
**Tina**- 150:22, 163:16
**tired** - 161:24, 162:17, 177:16
**Tise**- 2:3, 3:6, 4:1, 4:2, 4:20, 4:24, 6:1, 7:5, 7:20, 7:22, 21:6, 40:20, 41:1, 41:6, 41:8, 41:18, 41:22, 42:3, 42:21, 43:2, 43:15, 43:16, 43:19, 43:21, 51:1, 53:7, 53:11, 53:12, 54:14, 55:4, 55:5, 55:7, 58:1, 59:17, 59:22, 60:19, 61:2, 61:25, 62:2, 62:14, 62:17, 62:21, 62:24, 63:1, 63:8, 63:15, 63:22, 64:1, 64:6, 78:25, 86:11, 86:12, 86:15, 89:9, 89:18, 90:9, 91:1, 91:18, 92:21, 92:22, 93:6, 104:13, 104:14, 104:20, 105:13, 105:18, 105:19, 109:24, 110:19, 127:21, 128:2, 128:16, 130:5, 130:23, 131:17, 131:22, 132:10, 132:16, 134:15, 136:3, 139:22, 155:6, 155:7, 156:25, 157:8, 157:10, 157:12, 157:22, 158:13, 158:16, 158:17, 165:2, 165:9, 165:12, 165:18, 167:20, 172:2, 172:5, 172:8, 172:11, 172:15, 175:10, 175:11, 176:10
**tissue** - 70:20
**today** - 26:23, 29:3, 44:4, 51:22, 53:8, 53:13, 59:8, 59:23, 60:9, 86:7, 88:4, 107:5, 122:9, 139:12, 154:14, 177:14
**Today**- 154:17, 154:18, 154:20
**together** - 12:16, 12:17, 12:18, 13:6, 13:8, 13:21, 13:25, 14:1, 14:2, 14:12, 14:15, 22:22, 24:21, 27:14, 28:18, 35:3, 44:13, 47:17, 49:7, 49:8, 68:18, 77:15, 114:2, 115:9, 150:14, 176:17
**tomorrow** - 107:5, 139:12, 160:4, 177:23
**tonight** - 177:13, 177:21
**took** - 20:2, 37:1, 46:3, 56:23, 107:19, 115:4, 149:10, 156:7, 163:2, 165:24, 170:17
**top** - 74:24, 111:3, 131:11, 162:5
**topic** - 83:8
**torture** - 175:24
**tortured** - 168:17
**tossing** - 166:25
**totally** - 136:4, 156:17

**touting** - 125:16
**town** - 12:7
**transcribed** - 125:1
**transcription** - 179:7
**transcription/stenograph** - 1:25
**transferred** - 84:5
**trashed** - 160:20
**trauma** - 167:12, 167:21, 174:5
**travel** - 29:2, 51:24
**traveled** - 52:16
**traveling** - 28:2, 28:3
**treat** - 19:7
**treated** - 19:8
**trial** - 3:10, 3:22, 9:8, 10:17, 55:21, 60:1, 93:12, 94:14, 94:15, 95:4, 96:9, 97:10, 100:16, 111:10, 121:10, 121:11, 123:5, 140:23, 140:25, 153:12, 155:11, 158:25, 168:10, 177:19
**Trial**- 1:3
**tried** - 85:1, 86:3, 114:1, 119:20, 135:16
**trigger** - 154:7, 154:10, 154:11
**trimmed** - 18:25
**trip** - 137:13
**trips** - 114:1
**trouble** - 172:20
**true** - 4:21, 21:2, 48:18, 54:11, 144:24, 179:7
**truly** - 179:14
**trustee** - 82:18
**truth** - 48:15, 110:12, 116:2, 162:17
**try** - 61:8, 116:12, 118:14, 140:18, 145:5, 161:11, 168:5
**trying** - 16:3, 30:23, 81:6, 84:20, 86:1, 112:9, 118:2, 122:10, 126:7, 126:24, 137:12, 140:16, 148:17, 152:9, 155:10, 168:8, 168:15
**turn** - 12:10, 109:16, 121:13, 123:3, 124:5, 137:9, 145:5, 155:4, 163:22, 169:2
**turned** - 174:16
**turns** - 124:2
**Tv**- 54:2
**twelve** - 35:8, 52:20, 52:21, 106:17, 118:22, 118:25, 120:25, 123:23, 135:14, 135:19, 138:7, 145:6, 145:22, 146:9
**Twelve**- 52:20
**Twenty**- 44:24, 169:5
**twenty** - 44:24, 107:8
**Twenty-one**- 169:5
**twenty-three** - 44:24
**Twenty-two**- 44:24
**twice** - 148:22
**Two**- 33:5, 34:2, 36:17, 68:13, 76:14
**two** - 12:14, 14:14, 14:15, 17:15, 20:23, 26:23, 34:2, 34:15, 44:24, 45:1, 61:20, 62:11, 68:12, 74:20, 84:3, 84:4, 84:6, 84:9, 88:17, 104:19, 105:1, 105:10, 106:4, 109:18, 110:20, 110:21, 114:7, 117:21, 118:20, 120:25, 124:19, 126:2, 130:4, 146:15, 148:22, 151:16, 154:1, 154:12, 158:24, 168:16, 177:6

**two-and-a-half** - 84:6
**tying** - 166:24
**type** - 29:24, 58:12, 115:6, 143:14, 154:2
**types** - 172:17

## U

**ultimate** - 142:25, 176:6
**ultimately** - 46:3, 47:16, 145:18
**unable** - 9:10
**unanimously** - 95:10, 96:15, 97:19, 102:6, 102:20, 103:21
**Unawa**- 9:4, 12:3, 12:8, 13:7, 22:18, 34:14, 36:4, 67:18
**unbeknownst** - 59:23
**uncle** - 76:4
**uncorroborated** - 128:5
**uncredible** - 114:4
**Under**- 20:8, 99:19
**under** - 47:2, 60:5, 60:6, 104:6, 116:17, 129:13, 137:25, 154:5, 156:8, 158:2, 158:4, 171:13
**underlying** - 147:7, 147:9
**underneath** - 167:22
**Understood**- 6:1
**unfairness** - 135:22
**unfortunately** - 172:21
**unimpeachable** - 168:7
**unison** - 106:2
**unit** - 21:1
**United**- 45:20, 46:1, 46:8, 46:12, 47:6, 52:14, 71:15, 142:12
**unless** - 95:10, 95:12, 96:15, 96:17, 97:19, 97:21, 103:20, 103:22
**unquestioned** - 162:25
**unsupported** - 127:18
**up** - 3:17, 8:2, 17:3, 18:5, 32:3, 34:20, 36:21, 41:3, 43:22, 46:23, 49:17, 67:2, 73:16, 80:12, 85:22, 87:1, 108:11, 110:25, 112:9, 118:3, 118:9, 118:13, 122:9, 125:23, 131:2, 131:17, 132:3, 133:4, 133:7, 133:9, 136:14, 138:22, 140:24, 142:24, 144:17, 145:3, 146:13, 150:21, 150:22, 156:3, 156:5, 159:3, 161:13, 161:14, 162:7, 162:9, 164:1, 164:25, 165:11, 165:17, 166:24, 170:3, 170:17, 170:25, 171:23, 174:18, 177:13, 177:23
**upset** - 107:13
**urging** - 146:6
**urinated** - 149:15
**urine** - 149:16

## V

**vagina** - 150:2
**Venezuela**- 35:5, 35:6, 36:8, 36:14
**ventilation** - 120:3, 120:4
**verdict**- 93:23, 101:21, 101:22, 104:8, 104:12, 106:7, 126:23, 126:24, 138:19, 145:4, 169:8, 176:14, 176:20
**Verdict**- 95:1, 96:6
**verdicts** - 107:15
**versus** - 3:3, 87:21
**Vetico**- 112:5

**via** - 8:11, 8:18
**Viavista**- 12:6
**victim** - 132:21, 150:15
**victims** - 117:21, 133:14, 149:2, 163:11, 175:25
**viewing**- 8:12
**violation** - 60:2
**violence** - 102:3, 146:24
**violent** - 120:23, 173:11
**visa** - 9:13, 10:13
**visit** - 22:8, 39:14, 54:21, 72:2, 122:4
**visitation** - 120:20
**visited** - 41:25, 54:7
**visiting** - 52:13, 143:3
**voice** - 10:4, 10:10, 32:3, 67:2, 80:12, 159:5, 174:17
**Voir**- 1:4, 1:19
**Vol**- 1:3, 1:4, 1:19, 2:1
**volume** - 179:10
**Volume**- 1:2, 1:1, 1:18
**Volumes**- 1:2
**vote** - 101:12
**vs**- 63:12, 66:11, 93:20, 101:23, 105:8, 177:4
**Vs**- 1:9
**Vutico**- 112:5

## W

**wait** - 6:21, 6:25, 10:2, 145:23, 169:4
**waiting** - 169:7
**waive** - 104:14, 105:19
**walk** - 142:16, 152:15
**walked** - 116:4, 116:11
**walking** - 143:18, 172:25
**wall** - 151:22, 152:16
**wants** - 111:18, 112:11, 112:19, 114:7, 114:17, 114:23, 119:22, 120:21, 150:4, 150:12, 167:10, 168:2
**warrant** - 103:15, 104:2
**warranted** - 144:5
**washing** - 78:15
**water** - 147:25
**ways** - 70:22, 113:12
**weapon** - 124:21
**weapons** - 125:2, 125:4, 125:7, 125:10, 125:14
**wear** - 175:13
**week** - 84:11, 120:10, 144:19, 153:11
**weeks** - 12:14, 12:15, 83:24, 106:4, 154:1, 154:12
**weigh** - 145:24, 147:1
**weight** - 57:7, 99:16, 101:16
**weighted** - 148:1
**weird** - 159:7
**whatsoever** - 100:19
**where-are-they-now** - 4:16
**wherein** - 65:10
**white** - 172:25
**whole** - 61:6, 69:22, 118:22, 135:4, 136:5, 156:24, 157:6, 159:10, 159:11, 159:12, 162:13, 162:19, 165:4
**wide** - 173:23
**wife** - 17:20, 36:6, 37:23, 45:7, 46:9, 50:14, 51:20, 68:14, 68:17, 112:10, 112:13, 170:12, 170:23
**William**- 149:10, 149:13, 149:20, 149:22, 159:24, 166:20, 166:23
**window** - 119:7, 119:8,

119:12, 120:3, 151:18,
151:20, 151:23
  **windows** - 119:25, 120:2
  **wire** - 166:25
  **wiser** - 143:3
  **wish** - 86:2
  **withdraw** - 22:20
  **witness** - 5:2, 5:23, 6:8,
6:10, 6:17, 6:25, 8:3, 8:5,
8:8, 8:11, 8:14, 20:12,
20:21, 30:11, 30:13, 30:22,
31:2, 31:5, 31:11, 31:17,
31:20, 31:23, 32:2, 42:6,
43:13, 54:14, 55:2, 55:6,
55:10, 55:12, 55:16, 56:15,
56:22, 56:23, 57:22, 58:6,
58:21, 59:4, 59:5, 59:23,
61:4, 61:6, 62:22, 65:3,
65:6, 65:10, 66:17, 66:20,
66:23, 74:1, 78:23, 79:21,
79:24, 80:3, 80:6, 80:11,
86:10, 91:1, 92:20, 92:23,
99:13, 99:16, 109:25,
111:24, 113:3, 113:7,
115:22, 127:15, 127:19,
127:20, 127:23, 128:6,
128:12, 128:16, 128:25,
131:25, 134:19, 161:9,
161:14, 163:2, 164:8
  **Witness** - 1:19, 7:7, 31:7,
31:15, 31:25, 80:10, 179:16
  **Witnesses** - 1:4
  **witnesses** - 31:17, 61:20,
66:3, 101:15, 109:14,
110:22, 125:11, 129:11,
168:6
  **woken** - 156:3
  **Wolf** - 167:11
  **woman** - 24:12, 156:3,
169:4, 170:17, 170:25
  **women** - 88:20
  **Wood** - 2:4, 3:6, 7:20,
20:21, 21:17, 21:20, 21:23,
21:24, 22:2, 22:5, 26:9,
29:8, 30:7, 30:11, 43:22,
57:16, 63:15, 79:1, 79:2,
79:6, 79:21, 108:13, 111:21,
112:24, 115:19, 116:5,
117:9, 141:17, 141:20,
155:5
  **woods** - 161:6, 161:17,
161:23
  **word** - 71:1, 163:4
  **Word** - 1:18
  **words** - 65:12, 122:1
  **wore** - 175:8
  **worker** - 15:5, 15:10, 70:5,
70:7, 70:8
  **workers** - 118:8
  **works** - 118:1, 156:1
  **world** - 116:22, 117:7,
123:15, 124:12, 133:20,
142:13, 152:14, 153:25
  **worth** - 120:24
  **wound** - 171:23
  **wow** - 162:4
  **Wow** - 162:6
  **write** - 85:23
  **Writes** - 50:3
  **writes** - 85:20
  **writing** - 179:9
  **wrote** - 85:21

## Y

  **Y'all** - 15:2
  **y'all** - 12:16, 13:4, 13:8,
14:8, 14:12, 15:20, 15:23,
17:5, 17:9, 34:11, 35:10,
35:11, 61:3, 68:18, 76:19,

85:22, 106:4, 106:5, 106:6,
106:9, 106:12, 106:13,
106:15, 121:5, 122:19,
129:2
  **y'all's** - 17:9
  **year** - 12:21, 14:6, 22:12,
26:3, 38:16, 38:21, 111:10,
139:13
  **years** - 11:25, 14:14, 21:1,
22:15, 22:16, 26:12, 26:13,
26:23, 28:1, 28:11, 34:7,
34:13, 35:4, 39:9, 45:1,
46:9, 46:23, 47:25, 51:9,
64:13, 67:16, 68:12, 68:13,
69:20, 71:10, 76:14, 79:10,
79:12, 79:16, 81:2, 81:23,
99:25, 107:7, 107:8, 118:22,
118:25, 119:2, 119:3,
120:17, 120:25, 121:15,
121:16, 122:14, 123:23,
135:14, 135:19, 139:12,
139:13, 139:14, 151:5,
151:17, 155:18, 158:24,
169:4, 169:5, 170:15
  **Ymac** - 81:24, 81:25, 85:10
  **you-all** - 162:18
  **young** - 90:16, 109:15,
113:15, 114:10, 114:24,
123:24, 168:16
  **Young** - 82:1, 82:2, 82:3,
85:10
  **younger** - 19:5, 28:21,
34:7
  **youngest** - 28:12, 171:2
  **yourself** - 9:1, 11:24,
32:11, 67:13, 138:13, 141:6,
152:24, 175:1
  **yourselves** - 55:20,
126:25, 177:17