1              REPORTER'S RECORD

2          **VOLUME 35 OF 35 VOLUMES**

3        TRIAL COURT CAUSE NO. 1384794

4      COURT OF CRIMINAL APPEALS NO. AP-77,025

5

6  OBEL CRUZ-GARCIA              ) IN THE DISTRICT COURT
                                 )
7      Appellant                 )
                                 )
8                                )
                                 )
9  VS.                           ) HARRIS COUNTY, TEXAS
                                 )
10                               )
                                 )
11  THE STATE OF TEXAS           )
                                 )
12     Appellee                  ) 337TH JUDICIAL DISTRICT

13

14

15          *******************

16          **EXHIBIT VOLUME**

17     **(MOTION FOR NEW TRIAL EXHIBITS)**

18          *******************

19

20     The following proceedings came on to be heard in

21  the above-entitled and numbered cause before the

22  Honorable Renee Magee, Judge presiding, held in Houston,

23  Harris County, Texas;

24     Proceedings reported by computer-aided

25  transcription/stenograph shorthand.

1                      **A P P E A R A N C E S**

2


3

        MS. NATALIE TISE
4       SBOT NO. 00795683
        MR. JUSTIN WOOD
5       SBOT NO. 24039247
        Assistant District Attorneys
6       1201 Franklin
        Houston, Texas  77002
7       PHONE:  713.755.5800
        **ATTORNEYS FOR THE STATE OF TEXAS**
8


9
            **- AND -**
10


11

        MR. R.P. 'SKIP' CORNELIUS
12      SBOT NO. 04831500
        2028 Buffalo Terrace
13      Houston, Texas  77019-2408
        PHONE:  713.237.8547
14
        MR. MARIO MADRID
15      SBOT NO. 00797777
        440 Louisiana, Suite 1225
16      Houston, Texas  77002-1659
        PHONE:  713.877.9400
17      **ATTORNEYS FOR THE DEFENDANT**

18


19


20      Rolando Hernandez
        Marilu Flores,
21      **Interpreters**

22


23


24


25

| | NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | SX - 1 | Affidavit | 28 | 28 | 29 |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

## AFFIDAVIT OF CASEY LYNN GUILLOTTE

FILED
Chris Daniel
District Clerk
SEP 19 2013
Time:
By
Harris County, Texas
Deputy

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared, Casey Lynn Guillotte, who being by me duly sworn, stated as follows:

My name is Casey Lynn Guillotte and I am 28 years of age and was born on March 22, 1985. I currently reside in Harris County, Texas, at 1508 Rutland Street. I am the same Casey Lynn Guillotte who previously served as a juror in the capital murder trial of *The State of Texas vs. Obel Cruz-Garcia*. My jury service concluded on Friday, July 19, 2013, when my fellow jurors and I answered the three special issue questions in a manner that led to the death penalty being assessed against Obel Cruz-Garcia.

Testimony in the trial concluded on Thursday, July 18, 2013, and we began our deliberations on that same day. After being sequestered for the night, we returned to continue our deliberations on Friday, July 19, 2013. We addressed each of the three special issue questions separately. We first discussed special issue no. 1 and then addressed special issue no. 2. After discussion on these special issues, we unanimously answered both questions affirmatively. We then turned to special issue no. 3 – whether there was sufficient mitigating evidence to warrant life in prison rather than the death penalty. There was lengthy debate concerning this third special issue and in coming to our decision we went around the room and each contributed our thoughts. Ultimately we unanimously decided there was nothing sufficiently mitigating to warrant something less than the death penalty and answered the third question "no".

After we had come to a unanimous decision on all three special issue questions and before the jury foreman, Matt Clinger, signed the verdict form, I asked the jury a general question about how they were going to come to terms with the verdict from an emotional standpoint. Essentially, I was wondering how they were going to find peace of mind with the verdict we had reached, knowing the defendant would ultimately be sentenced to death. In response to my question, Matt retrieved a bible from his personal belongings and appeared to read a passage of the bible to himself. He then stated he had personally found comfort with his decision because of a bible verse in the book of Romans. At no time did Matt read the bible verse to the jury or



STATE'S
EXHIBIT
PENGAD 800-631-6989

refer directly to a specific verse or passage from the bible. Matt's retrieval of the bible and his referral to the bible verse did not in any way influence my decision in answering the three special issue questions. My response to the three special issue questions was based solely on the facts and the evidence presented throughout the trial of Obel Cruz-Garcia.


Casey Lynn Guillotte

SUBSCRIBED AND SWORN BEFORE ME, the undersigned authority, on this the 18TH day of September, 2013.

Notary Public in and for the State of Texas

KERRY ROGER GILLIE
Notary Public, State of Texas
My Commission Expires
October 12, 2016

| | NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|--------|-------------|---------|----------|------|
| 1 | | | | | |
| 2 | SX - 2 | Affidavit | 28 | 28 | 29 |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

# AFFIDAVIT OF MATTHEW CLINGER

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this the _18_ day of September, 2013, appeared Matthew Clinger, who being by me duly sworn stated the following:

My name is Matthew Clinger and I am 32 years old, having been born on 9/10/1981. I currently reside at 1101 W Melwood St. in Harris County, Texas. I am the same Matthew Clinger who served on the jury in the capital murder trial of The State of Texas vs. Obel Cruz-Garcia. I was elected by my fellow jurors to serve as the foreman.

Deliberations in the punishment phase of the trial began late in the day on Thursday July 18, 2013, and only lasted a short time on that first day. We were sequestered over night and returned to deliberate on the morning of Friday, July 19, 2013. We all agreed to focus our discussions on the facts and not on emotions. For this reason, we tried to avoid talking about where the results of our answers would lead and instead tried to just answer the Special Issues in our jury charge based on the evidence we had heard. We discussed the Special Issues one by one in the order they were presented in our jury charge and I did not move on to the next Special Issue and sign the jury form as to that issue until we had arrived at a consensus. Ultimately, we all agreed that based on the evidence the answers to the Special Issues were "Yes," "Yes," and "No."

At one point during the discussion Friday morning my fellow juror, Casey Guilliotte, noted that although she knew what the answers to the special issues were based on the evidence, she was concerned about how she would deal emotionally with the fact that by answering the questions in the way the evidence pointed, we were sentencing a person to die. She asked the group for some words

STATE'S
EXHIBIT
2

PENGAD 800-631-6989

of encouragement to help her through this emotional struggle. At this time numerous jurors spoke up about how they had personally dealt and continued to deal with the emotions surrounding the decision. When it was my turn, I told Casey that I had found some comfort in the Bible. I opened up my personal Bible to a chapter in Romans and laid it on the table. At no point did I read directly from the Bible. I did not see Casey or any other juror read from it. After I laid the Bible on the table Casey acknowledged it, but did not read it. I do not believe Casey or any other juror changed their answers to the Special Issues based on this brief exchange. At the end of the discussion Casey thanked us all for our insights and we went back to discussing the facts of the case and deliberating the answers to the Special Issues presented to us. We were merely discussing how to cope with the emotional ramifications of our decision during this short exchange at Casey's request to help her look past her emotions and focus on the facts of the case as they pertained to answering the Special Issues.

The last juror to come to terms with the decision to answer the Special Issues "Yes," "Yes," and "No" was Angela Bowman. Based on Angela's comments during deliberations, it appeared to me that although she agreed with the rest of the jurors on how the evidence directed us to answer those questions, Angela was still struggling with the emotional consequences of those answers. Several times she said "I agree," and told me to "sign the verdict form," but because I could tell she was not convinced of the verdict I did not do that. We continued talking about the evidence and gave her opportunities to discuss the issues and any facts or evidence that she felt should lead us to a different result. I was very conscientious about making sure Angela was not rushed into a decision.

I seem to recall Angela making an offhand remark about her daughter being sick one time early on during the course of our deliberations. She did not seem overly concerned about that and never mentioned that she needed to hurry up and reach a verdict so she could attend to her daughter's illness. She did, however, mention several times that she was planning to take her daughter to South Padre

for her birthday the following day, Saturday, July 20, 2013. I remember her asking other jurors how long it would take to get to South Padre. I did not notice any undue pressure being put on Angela by other jurors and believed that throughout the process we remained respectful of each other's opinions.

_____
Matthew Clinger

SUB SCRIBED AND SWORN BEFORE ME, the undersigned authority, on this the _18_ day of September 2013.

_____

KERRY ROGER GILLIE
Notary Public, State of Texas
My Commission Expires
October 12, 2016

Notary Public In and for the State of Texas

| | NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | SX - 3 | Reporter's record 28 | | 28 | 29 |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

1   **REPORTER'S RECORD**

2   TRIAL COURT CAUSE NO. 1384794

3

4

5   THE STATE OF TEXAS          )  IN THE DISTRICT COURT

6                              )
                               )
7   VS.                        )  HARRIS COUNTY, TEXAS

8                              )
                               )
9   OBEL CRUZ-GARCIA           )  337TH JUDICIAL DISTRICT

10

11

12

13   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

14   PUNISHMENT PROCEEDINGS

15   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

16

17

18

19        On the 19th day of July, 2013, the following

20   proceedings came on to be heard in the above-entitled

21   and numbered cause before the Honorable Renee Magee,

22   Judge presiding, held in Houston, Harris County, Texas;

23        Proceedings reported by computer-aided

24   transcription/stenograph shorthand.

25



STATE'S
EXHIBIT
3

1                      A P P E A R A N C E S

2

3          MS. NATALIE TISE
           SBOT NO. 00795683
4          MR. JUSTIN WOOD
           SBOT NO. 24039247
5          Assistant District Attorneys
           1201 Franklin
6          Houston, Texas  77002
           PHONE:  713.755.5800
7          **ATTORNEYS FOR THE STATE OF TEXAS**

8

9              - **AND** -

10

11         MR. R.P. 'SKIP' CORNELIUS
           SBOT NO. 04831500
12         2028 Buffalo Terrace
           Houston, Texas  77019-2408
13         PHONE:  713.237.8547

14         MR. MARIO MADRID
           SBOT NO. 00797777
15         440 Louisiana, Suite 1225
           Houston, Texas  77002-1659
16         PHONE:  713.877.9400
           **ATTORNEYS FOR THE DEFENDANT**

17

18

19         Rolando Hernandez
           Marilu Flores,
20         **Interpreters**

21

22

23

24

25

1       I N D E X
        (PUNISHMENT PROCEEDINGS)

2   **JULY 19, 2013**

3                                           **PAGE**

Jury continues deliberations.................. 3

4   Proceedings in chambers....................... 4

5   Verdict Received............................. 9

6   Polling of the jury.......................... 11

7   Reporter's Certificate....................... 15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Jury continues deliberating)

2                    (Open court, defendant present, no jury)

3                    THE COURT: Mr. Cornelius, have you read

4    the note? It says, "May I speak to the Judge? Angela

5    Bowman," and then it's signed by the foreman.

6                    MR. CORNELIUS: Yes, ma'am.

7                    THE COURT: Do you have any objection to

8    the Court speaking to the juror in private, in chambers

9    with the reporter present?

10                   MR. CORNELIUS: No, ma'am.

11                   THE COURT: Does the State have any

12   objection to that?

13                   MR. WOOD: Judge, I don't have any

14   objection to that. I don't believe Ms. Tise would

15   either. I don't really know any other way to resolve

16   that other than that means.

17                   THE COURT: Because I have no idea what's

18   going on back there and I don't know what she wants to

19   ask me, so -- okay. Then I'm going to return this to

20   the bailiff. And make sure I've got the cause number on

21   here.

22                   MR. CORNELIUS: She may just have a

23   conflict.

24                   THE COURT: You mean a conflict with

25   staying the next night or so?

1          MR. CORNELIUS: Yeah. I mean, I don't

2 know.

3          THE COURT: She may.

4          MR. CORNELIUS: We won't know unless you

5 talk to her.

6          THE COURT: Exactly.

7          MR. WOOD: She does have a small child.

8          THE COURT: I'm going to have the clerk

9 stamp this.

10          And then, JJ, please bring Ms. Angela

11 Bowman from the jury room. Tell them they need to cease

12 deliberations while I speak to her. And bring her to my

13 chambers, please.

14          (The following proceedings were held in

15          chambers)

16          THE COURT: We're putting it on the record,

17 Ms. Bowman.

18          So, we're in chambers outside the presence

19 of the jury, outside the presence of the defense

20 attorneys and the prosecutors, with one of the jurors in

21 this case who requested to speak with the Judge,

22 Ms. Angela Bowman.

23          And, Ms. Bowman, what is that you needed to

24 relay to the Court?

25          JUROR BOWMAN: I'm sorry. I don't mean to

1 | waste your time. You are important, Judge, and
2 | everything like that. I just -- I am the only juror
3 | that's completely -- I can't agree. I can't agree with
4 | the questions. I can't answer the same questions with
5 | everyone else and I feel pressured. And I don't want to
6 | hold them up. So, I feel like maybe they can exchange
7 | me out with one of the alternates.

8 | THE COURT: Well, there is a manner that we
9 | have to proceed with. And just because you can't
10 | deliberate with them or -- you are not saying you can't
11 | deliberate, but because your answers to the questions
12 | are different from them does not qualify that you can
13 | just sub out with an alternate. That's not what the
14 | alternate is for. There is a long list of things that I
15 | would have to go through. And I don't want to go
16 | through those with you because I don't want to try to
17 | figure out what you need to do to get off the jury. You
18 | shouldn't have to figure out what you want to do. Those
19 | things, unfortunately, that would have to happen to you,
20 | and I don't want it to happen to you, like falling
21 | gravely ill, or something like that. And that's the
22 | only way that the alternate would replace you, is for
23 | you to become completely disabled.

24 | Just having a different opinion than the
25 | other jurors at this point, that doesn't exclude you

1  from being a juror. So, you are going to have to

2  continue to deliberate with them.

3      JUROR BOWMAN: Here's my thing. I don't

4  think I'll ever come to an agreement. We're never going

5  to come to an agreement. They all have the same

6  answers. The only question -- the only answer I'm in

7  agreement with them is No. 2. No. 1 and 3, they're

8  all -- you know, they are all different. I am the only

9  one with the different opinion. And I am not changing

10 my stance on that. I'm not. And they are not.

11      So, I mean, if we keep on going to

12 deliberations, it could be years, I mean, because I'm

13 not the type of person --

14      THE COURT: Well, all I can tell you is

15 there are rules associated with that, too. And I'll

16 instruct you on that, but you do need to continue to

17 deliberate until, you know, the Court tells you to stop.

18 And, generally, that can be a pretty long period of

19 time, but it's not going to be for years, I can tell you

20 that.

21      And so, what I am going to instruct you to

22 do now is to go back. If you don't reach a verdict by

23 this afternoon, we have made arrangements for y'all to

24 stay again tonight. And we did the next night, too.

25 The county picks up the expenses. So, I anticipated

1　that the trial would be over on Friday, and that's what

2　we told y'all, but I believe that we also told you that

3　might be how long y'all would be deliberating.

4　　　　　　JUROR BOWMAN: I know it shouldn't be an

5　easy thing. It shouldn't be an easy thing, but it's

6　harder --

7　　　　　　THE COURT: It shouldn't be an easy thing.

8　This is what we talked about on voir dire. It should

9　take -- some serious consideration should go into it,

10　but I do want you to recall the voir dire and my

11　instructions at voir dire, as well as you should answer

12　the questions according to what the evidence is.

13　　　　　　JUROR BOWMAN: Right.

14　　　　　　THE COURT: Not what you know the result

15　would be in terms of what that is. Right?

16　　　　　　JUROR BOWMAN: Right.

17　　　　　　THE COURT: If the evidence leads you to a

18　certain way, that's the way you should answer it, even

19　though it might result in something that bothers you.

20　That's why we don't ask you to vote to give the death

21　penalty or to not give the death penalty.

22　　　　　　So, I'd like you to go back and continue

23　your deliberations with the jury and continue trying to

24　reach an agreement with the jury, if you can. Do not

25　violate your conscious. And answer those questions

1  according to where the evidence leads you.

2             JUROR BOWMAN:  Okay.

3             THE COURT:  All right.

4             JUROR BOWMAN:  Judge, I don't want to have

5  to stay another night.  I really don't know.

6             THE COURT:  That's completely in the hands

7  of the entire jury.  You have to deliberate back there

8  and try to find out whether you can reach a verdict or

9  not.  Okay?

10             JUROR BOWMAN:  Thank you.

11             (Jury continues deliberating)

12             (Recess)

13             (Open court, defendant present, no jury)

14             THE COURT:  Before the jury comes into the

15  courtroom, I want to remind the audience:  Please don't

16  have an emotional response.  I know it's an emotional

17  time for you, but this is a court of law.  So, I'm going

18  to ask if you could please refrain from any emotional

19  response.  I would appreciate it.  Thank you.

20             Both sides ready for the jury to come in?

21             MR. CORNELIUS:  Yes, Your Honor.

22             MS. TISE:  Yes, Your Honor.

23             THE BAILIFF:  All rise.

24             (Open court, defendant and jury present)

25             THE COURT:  Please be seated.

1    We're back on the record in Cause

2 No. 1384794, the State of Texas vs. Obel Cruz-Garcia.

3 The jury is present in the courtroom.  Mr. Cruz-Garcia

4 is standing at counsel table with his lawyers, Skip

5 Cornelius and Mario Madrid.  Present for the prosecution

6 is Justin Wood and Natalie Tise.

7    Mr. Foreman, has the jury reached a

8 verdict?

9    FOREPERSON:  We have, Your Honor.

10    THE COURT:  Please pass your verdict form

11 to the deputy.

12    (Foreperson complies)

13    THE COURT:  Mr. Cruz-Garcia, please stand.

14 You are standing.

15        **JURY'S VERDICT**

16    THE COURT:  Cause No. 1384794, the State of

17 Texas vs. Obel Cruz-Garcia.

18    The special issues with forms for your

19 answers are here and are as follows.  Special Issue

20 No. 1:  Do you find from the evidence beyond a

21 reasonable doubt there is a probability that the

22 defendant, Obel Cruz-Garcia, would commit criminal acts

23 of violence that would constitute a continuing threat to

24 society?

25    Answer:  We, the jury, unanimously find and

1　determine beyond a reasonable doubt that the answer to
2　this special issue is "yes."  Signed, Foreman of the
3　jury.

4　　　　　Special Issue No. 2:  Do you find from the
5　evidence beyond a reasonable doubt that Obel
6　Cruz-Garcia, the defendant himself, actually caused the
7　death of Angelo Garcia, Jr. on the occasion in question,
8　or if he did not actually cause the death of Angelo
9　Garcia, Jr., that he intended to kill Angelo Garcia,
10　Jr., or that he anticipated that a human life would be
11　taken?

12　　　　　Answer:  We, the jury, unanimously find and
13　determine beyond a reasonable doubt that the answer to
14　this special issue is "yes."  Signed, Foreman of the
15　jury.

16　　　　　Special issue No. 3:  Do you find from the
17　evidence, taking into consideration all of the evidence,
18　including the circumstances of the offense, the
19　defendant's character and background and the personal
20　moral culpability of the defendant, that there is a
21　sufficient mitigating circumstance or circumstances to
22　warrant that a sentence of life imprisonment rather than
23　a death sentence be imposed?  You are instructed that in
24　answering the special issue, that you shall answer the
25　issue "yes" or "no."  You may not answer this issue "no"

1  unless you agree unanimously and you may not answer this

2  issue "yes" unless ten or more of you agree to do so.

3          And the answer to that:  We, the jury,

4  unanimously find and determine that the answer to this

5  special issue is "no."  Signed, Foreman of the Grand

6  Jury {sic}.

7          And the final page:  We, the jury, return

8  in open court the above answers to the special issues

9  submitted to us and the same is our verdict in this

10  case.  Signed, Foreman of the Grand Jury.

11          Is that the unanimous verdict of all

12  members of the jury -- I'm sorry -- of the jury.

13          Is that the unanimous verdict of all

14  members of the jury?

15          FOREPERSON:  It is, Your Honor.

16          THE COURT:  Okay.  Very good.

17          Would either side wish the jury to be

18  polled?

19          MR. CORNELIUS:  Yes, Your Honor.

20          THE COURT:  Okay.  At this time, I am going

21  to call your name individually.  If this is your

22  verdict, please answer "yes."

23          Joshua Caluag.

24          JUROR:  Yes.

25          THE COURT:  Larry Jordan.

1          JUROR: Yes.

2          THE COURT: Olga Sanchez.

3          JUROR: Yes.

4          THE COURT: Wayne Montgomery.

5          JUROR: Yes.

6          THE COURT: Nancee Pyper.

7          JUROR: Yes.

8          THE COURT: Angela Bowman.

9          JUROR: Yes.

10         THE COURT: Casey Guillotte.

11         JUROR: Yes.

12         THE COURT: Jennifer Sims.

13         JUROR: Yes.

14         THE COURT: Virginia Allman.

15         JUROR: Yes.

16         THE COURT: Matthew Clinger.

17         JUROR: Yes.

18         THE COURT: Leonard Torres.

19         JUROR: Yes.

20         THE COURT: Karen Sue Bridges.

21         JUROR: Yes.

22         THE COURT: Very good.

23         The verdict of the jury is received by the

24 Court.

25         Members of the jury, this now concludes

1 your service as jurors in this case. I want to

2 recognize the inconvenience that this has been to you,

3 the amount of time and effort that you have taken out of

4 your own lives. And I want to tell you that we all

5 appreciate your time and service. Now it's probably

6 more clear than ever how necessary your service is to

7 the proper administration of justice. I understand that

8 the job we asked you to do was very difficult and I

9 appreciate the thoughtfulness and attention that you

10 made to your decision.

11       At this time, I am going to release you

12 from your admonitions. Everything that I've admonished

13 you to, you may discuss it with whomever you like, your

14 service, the evidence, whatever you would like. And all

15 the admonitions, you are released from.

16       The lawyers may want to discuss the case

17 with you. And you are free to discuss the case with the

18 lawyers, if you would like, and actually this afternoon

19 if you would like; but if you choose not to, that is

20 your right as well.

21       So, at this time, I would like you to

22 return to the jury room, place your badges on the table.

23 And I'll be back in just a few moments to discharge you

24 from the jury room.

25       THE BAILIFF: All rise.

1          (Open court, defendant present, no jury)

2          THE COURT: You may all have a seat.

3          At this time, the Court is going to defer

4  sentencing until Monday morning, which will be the 22nd

5  of July. And at that time, the Court will sentence

6  Mr. Obel Cruz-Garcia having been convicted of the

7  offense of capital murder.

8          At this time, the Court is in recess.

9          (Proceedings recessed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS    )
   COUNTY OF HARRIS      )

3

4        I, Mary Ann Rodriguez, Official Court Reporter in

5  and for the 337th District Court of Harris County, State

6  of Texas, do hereby certify that the above and foregoing

7  contains a true and correct transcription of all

8  portions of evidence and other proceedings requested in

9  writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13       I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, admitted by the respective parties.

16       WITNESS MY OFFICIAL HAND this the 9th day of

17  September, 2013.

18

19

20

21  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
22  Expiration Date:  12/31/2013
    Official Court Reporter
23  337th Court
    1201 Franklin
24  Houston, Texas   77002
    713.755.7746

25

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| DX - 1 | Affidavit | 26 | 27 | 29 |

# AFFIDAVIT OF MARIO MADRID

BEFORE ME THE UNDERSIGNED AUTHORITY, on this day personally appeared, Mario Madrid, a person known to me, who after being duly sworn, upon his oath did state:

My name is Mario Madrid. I am an attorney licensed to practice in the State of Texas. I was appointed to represent Obel Cruz-Garcia who was charged by indictment with the offense of capital murder in cause number 1384794 in the 337th District Court of Harris County, Texas.

At the conclusion of the guilt/innocence phase of the trial, the jury found Mr. Cruz-Garcia guilty of capital murder. During the punishment phase deliberations, a juror named Angela Bowman met privately with Judge Magee. Judge Magee stated that Ms. Bowman questioned how long deliberations would last. At the conclusion of the punishment phase of the trial, the jury returned a verdict which resulted in the trial court sentencing Mr. Cruz-Garcia to death.

On the evening of the jury's punishment verdict, I received a telephone call from a juror named Angela Bowman. Ms. Bowman was distraught over her decision to capitulate during the punishment phase deliberations and change her vote from life in prison to the death penalty. Ms. Bowman explained to me that she was pressured into changing her position on the life vs. death decision. She explained that her decision was especially complicated by virtue of the fact that her daughter was suffering from a fever and she (Bowman) was unable to attend to her daughter because of being sequestered. Ms. Bowman also explained that the jury foreman informed the jury that he had been praying about making the right decision and he took out his Bible and started quoting from the Bible during the decision-making process. The introduction of the Bible seemed to sway other jurors toward death rather than life in prison. Ms. Bowman's decision so disturbed her that she told me she had to bring these events to my attention in an effort to correct the injustice that she had participated in.

△ Exhibit 1

Based on the foregoing information provided to me by Angela Bowman, it is my opinion that the defendant must be granted a new trial, or a new trial on punishment because the death verdict returned in this matter was decided in a manner other than the fair expression of the jurors' opinion. Furthermore, after retiring to deliberate, the jury received other evidence in the form of Biblical passages (not evidence admitted at trial). Based on the jury misconduct outlined above, I do not believe that the defendant received a fair and impartial trial.



Mario Madrid

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the _19_ day of August, 2013.

Notary Public in and for the State of Texas

DONNA M. RAMOS
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
MARCH 17, 2014

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Motion for New Trial has been mailed to: The Harris County District Attorney's Office, Appellate Division, 1201 Franklin, 6th Floor, Houston, Texas 77002.

SIGNED THIS _19_ day of August, 2013.

Wayne T. Hill

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|--------|-------------|---------|----------|------|
| DX - 2 | Affidavit | 26 | 27 | 29 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# AFFIDAVIT OF J.J. GRADONI

BEFORE ME THE UNDERSIGNED AUTHORITY, on this day personally appeared, J.J. Gradoni, a person known to me, who after being duly sworn, upon his oath did state:

My name is J.J. Gradoni. I am a licensed investigator in the State of Texas. My Texas License Number is: A05741. I conducted post-trial jury interviews in the case styled: State of Texas v. Obel Cruz-Garcia in cause number 1384794 in the 337th District Court of Harris County, Texas. Mr. Cruz-Garcia was sentenced to death by lethal injection. I am setting out some of the juror interviews below:

I conducted an interview with juror Angela Bowman. Ms. Bowman stated that the verdict she announced in open court when polled by the Judge was not her true and honest punishment verdict. Ms. Bowman explained that she had learned that her daughter was sick with a fever over 101 degrees. Because she had been sequestered during the punishment deliberations, Bowman was unable to attend to her child's medical needs. She was unaware of her daughter's medical status and punishment deliberations continued. Ms. Bowman's inability to tend to her daughter caused her to be distracted and ultimately the subject of undue pressure from other members of the jury to change her vote to favor the death penalty. Ms. Bowman stated that the other jurors told her they were not changing their minds and that she was holding them up and taking the process too personally. She said that other jurors told her she was wasting their time. Ms. Bowman ultimately voted in a way that a death verdict was returned in order to get home and take her child to the hospital. Ms. Bowman also noted that the jury deliberations involved the jury foreman injecting Biblical passages into the deliberations. Ms. Bowman believed that the Biblical references affected other members of the jury and caused them to vote in favor of the death penalty. Ms. Bowman further stated that a juror named Casey Guillotte commented during deliberations that she needed "spiritual guidance" to make her

A    **Exhibit  2**

decision. Bowman related that at this point in the deliberations, jury foreman Matthew Clinger took out his Bible and stated that he had prayed on this the night before. After this "religious experience", Ms. Guillotte changed her vote to death.  Ms. Bowman was of the opinion that other jurors changed their positions to vote for death after Mr. Clinger read scriptures from the Bible.

I interviewed jury foreman Matthew Clinger who confirmed that he produced his Bible during punishment deliberations. Mr. Clinger stated that he read Romans 13, Genesis 9 and from Deuteronomy while other jurors were present. He stated that he had researched the Bible the night before deliberating on life or death for Obel Cruz-Garcia. Clinger noted that one-third of the jurors favored death, one-third favored life and one-third were undecided. Mr. Clinger indicated to me that juror Casey Guillotte stated that she needed spiritual guidance. Mr. Clinger went on to state that he and Guillotte learned that they attended the same church. When I asked Clinger if his quotes from the Bible caused Guillotte to change her vote, he responded by saying that he thought the Bible verses were "contributing factors".

_____
J.J. Gradoni

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this 20th day of August, 2013.

_____
Notary Public in and for the State of Texas

KAYLA KOENIG
My Commission Expires
September 13, 2016
NOTARY PUBLIC STATE OF TEXAS

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|--------|-------------|---------|----------|------|
| DX - 3 | Affidavit | 26 | 27 | 29 |

# AFFIDAVIT OF ANGELA BOWMAN

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared Angela Bowman, a person known to me, who after being duly sworn, upon her oath did state:

My name is Angela Bowman. I am over the age of eighteen and fully competent to make this Affidavit. I served as a juror in the capital murder case styled: State of Texas v. Obel Cruz-Garcia in cause number 1384794 in the 337th District Court of Harris County, Texas.

I am making this Affidavit of my own free will. I have not been provided anything of value, nor have I been promised anything of value, to get me to make this Affidavit. I am the one who initiated the chain of events which resulted in the filing of this document because I contacted Mario Madrid (trial counsel for Obel Cruz-Garcia) after the jury returned a death penalty verdict in the above-referenced matter. I contacted Mr. Madrid to let him know that I was pressured into voting in favor of the death penalty - this was not my true and honest verdict at the punishment stage of the trial.

On Thursday, July 18, 2013 at 4:17 p.m., I received a voice mail from my ten year old daughter's camp counselor, informing me that my daughter was running a 101.8 fever. This concerned me greatly because I knew the jury was going to be sequestered and I would not be able to care for my sick child. I spoke with Judge Magee and asked that I be removed as a juror and an alternate put in my place. This request was denied. While at dinner, the bailiff allowed me to call home to check on my daughter. I learned that my daughter still had a fever and was sick with a cough. I was very concerned that my daughter may have had pneumonia. I was not free to leave to take care of my child due to being sequestered. During our deliberation during the punishment phase of the trial one of the female jurors (I believe her name was Casey Guillotte) stated that she needed spiritual guidance to make her decision. At that point, our jury foreman (Matthew Clinger) told the jury that he had prayed about the decision the night before.

△ Exhibit 3

Matthew then pulled out his Bible. After this "religious experience", Ms. Guillotte changed her mind to vote for the death penalty. I believe other jurors changed their position from life to death after Matthew read scriptures from the Bible. I felt a great deal of pressure from the other jurors because it appeared that I was the last holdout for a life sentence. My situation worsened as I became increasingly concerned about my daughter's condition as I had no communication or information updating me on her condition. If it had not been for my concern over my daughter's health condition, I would have remained committed to voting for life in prison. I was told by other members of the jury that I was holding up the process and taking it too personally. Finally, at the end of the day, I was told by the other eleven jurors that they weren't changing their minds and that I was holding them up. I was told that I was wasting the other juror's time. I changed my verdict so I could go home and take care of my child. When I left the courthouse, I took my daughter straight to the emergency room. The verdict I returned was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty.

In my opinion, the jury misconduct deprived Obel Cruz-Garcia of a fair and impartial jury and a fair trial in this matter. I believe that Mr. Cruz-Garcia is entitled to a new punishment trial or the Court's imposition of a life sentence.

Angela Bowman

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the

_____ day of August, 2013.

My Commission Expires
2/2/2014

Notary Public in and for the State of Texas

| NUMBER | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|--------|-------------|---------|----------|------|
| DX - 4 | Affidavit with Exhibit A, transcript and B, CD of interview) | 26 | 32 | 29 |
| | (Admitted For Bill of Exceptions) | | | |

(Exhibit B, converted media filed as part of record;      See file:
HARRIS-1384794-RR-PART001-DMNTEXHIBIT4(B).mp3)

# AFFIDAVIT OF J.J. GRADONI

BEFORE ME. THE UNDERSIGNED AUTHORITY, on this day personally appeared, J.J. Gradoni, who after being duly sworn by me, upon his oath did state:

My name is J.J. Gradoni. I am a licensed private investigator in the State of Texas. My license number is: AO5741. I worked as the trial court investigator in the capital murder case styled: State of Texas v. Obel Cruz-Garcia, Cause No: 1384794 which was heard in the 337th District Court of Harris County, Texas. After the jury returned the death penalty against Mr. Cruz-Garcia, I was asked conduct juror interviews by the appellate attorney for Mr. Cruz-Garcia.

On August 12, 2013, I conducted a juror interview with Mr. Matthew Clinger who served as the jury foreperson (foreman). The attached Exhibit "A" is a complete and accurate transcript of the interview I conducted with Mr. Clinger. The attached Exhibit "B" is a compact disk [CD] of the interview. No changes, alterations or deletions were made to the CD. The CD is a complete and accurate representation of the interview conducted on August 12, 2013 with Matthew Clinger.  My associate, Cindy Klein, was also present and participated in the interview of Mr. Clinger. The parties to the interview are designated by the following initials appearing in the transcript: "JJ" is J.J. Gradoni / "CK" is Cindy Klein and "MC" is Matthew Clinger.

Mr. Clinger was agreeable to signing an Affidavit about what we had discussed. I contacted Matthew Clinger again after the August 12, 2013 interview to arrange a time for him to sign an Affidavit of what we had discussed. Mr. Clinger informed me that his corporate counsel at his workplace had advised him not to sign the Affidavit, advising him instead to give live testimony before this Court. The undersigned asked Mr. Clinger why he would refuse to sign an Affidavit before even seeing its content. Mr. Clinger did not otherwise offer a reason for not signing the Affidavit.

Exhibit 4

Exhibits "A" and "B" which are attached hereto, are incorporated herein for all purposes

to be considered by this Honorable Court in passing upon the allegations raised in Defendant's

Motion for New Trial and the Supplement thereto.

J. J. Gradoni
License No: A05741

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public in and

for the State of Texas, on this ___19th___ day of September, 2013.

Notary Public in and for the State of Texas

NOTARY PUBLIC
STATE OF TEXAS
KAYLA KOENIG
My Commission Expires
September 13, 2016

| | |
|---|---|
| **CLIENT:** | **Wayne Hill** |
| **CASE DESCRIPTION:** | **Obel Cruz-Garcia Appeal** |
| **OUR FILE #:** | **13-08-0329** |
| **REPORT DATE:** | **September 15, 2013** |
| **REPORT TOPIC:** | **Matthew Clinger - Transcript** |
| **REPORT #:** | **3** |
| **RELATIONSHIP TO CASE:** | **Jury Foreman** |

## INVESTIGATIVE ACTIVITY

### I.   Preliminary Information

The following transcript is from the recording of the interview with Matthew Clinger by Investigators JJ Gradoni & Cindy Klein on Monday, August 12, 2013.

### II.   Transcript

JJ:   7:44 PM. Monday, August 12, 2013. Cindy and I will be at the residence of Matthew Clinger, the jury foreman in the Obel case, in an attempt to interview him regarding jury deliberations, at 1101 Millwood, in the Heights.

CK:   Wait a minute, the uh...

JJ:   (unintelligible)

CK:   Yeah.

JJ:   Is it any good?

MC:   It's very good!

JJ:   JJ Gradoni, I'm a Private Investigator.

MC:   Hi.



Exhibit _A_

JJ: The court has started the appeals process on Obel's case.

MC: Yes. Ok.

JJ: And, so, one of the... part of the appeals process is we talk to the jurors.

MC: Ok.

JJ: If that's ok with you.

MC: Yeah, yeah. Do you mind if uh... come on in. Do you mind if I finish my steak real quick?

JJ: No.

CK: Oh, sorry to hit you at that time.

JJ: We'll just...

MC: No, come in, have a seat. I've only got a couple bites left.

JJ: Wow, what a great house!

MC: Thank you!

CK: Oh it's beautiful.

MC: Uh, I've been here a little over a year. When I bought it it hadn't been touched in about four years. I started (unintelligible) and uh, moved a bunch of walls. (Unintelligible)

JJ: Did you do that by yourself?

MC: Uh, this time... so, my first house I did it all by myself. This time I hired a buddy to do a lot of it, so. It took me five years to do my first house myself, and I didn't feel like taking that kind of time again. So, I um, I saved some projects. I've been re-trimming all the windows outside. Um, I've got a build out (unintelligible). I've got a lot of stuff I'm still working on. I didn't want to take five years, so... (laughing)

JJ: I can imagine that. I could never, I'm not very handy.

CK: It's just so open. You know, just...

MC: There used to be a wall up here, with just a little door. And then this room was segregated a bit as well. So, yeah, that was one of the things I wanted to do, is to open it up.

CK: Nice job.

MC: Thank you. Go ahead, you can...

JJ: So, anyway. The toughest, probably, thing in the world, is to be a juror in a Capital Murder case with a death penalty.

MC: Yeah.

JJ: And so, um, now that he's been found Guilty there's years of appeals, and different layers of appeals. So, um, Wayne Hill, who is a Capital Murder Appellate Attorney, was appointed to do the original appeal.

MC: Ok.

JJ: And part of that is to talk to the jurors. Um, I know that the Defense Attorney said that they didn't talk to you guys after.

MC: That's correct.

JJ: Which is their choice. Actually, the one lead attorney, Skip, said, you know, he said that's just a little too early to talk I think, right now. You know, go (unintelligible)

MC: Right, right.

JJ: Anyway. There's, I guess, two phases. One is the Guilt or Innocence and I know that the State put on a lot of evidence, um, regarding that case.

MC: Mhmm.

JJ: Um, was there anything there in the Guilt or Innocence that really stuck out?

MC: Um. Just, the DNA, um, was huge for me. Uh, all of the different witnesses. The, the, the big pieces of the story all collaborated really well across all the witnesses. There were certain things in, um, in Rudy's testimony. Little details that, you know, Skip kind of keyed in on. You know, when he gave his statement, the tires blown out on the car is a good example. He said in the statement, I think, two tires blew out and then his testimony said all four. There were little things here and there that Skip kind of keyed in on that Rudy remembered one way in his statement and he remembered another way testifying.

But across the, all the big pieces of the testimony, all the collaborations as well...

JJ: And that's what an intelligent juror, really should do. See if it, kind of fits.

MC: Yeah. Um. There were, um...I really thought that, uh, if I can get her name correct. His, his wife...

JJ: Angelita

MC: Angelita. I really felt like...her testimony was impactful for me, personally. Uh, I really felt like she was telling the truth. Um, there were some other jurors that weren't quite so convinced, but for me, her testimony was, was pretty impactful and meaningful. Um, and, I mean it was all important. I'm an Engineer by degree and training, I guess, so I'm kind of a detail guy and I like to gather data and take in a lot of data and put it together into a, kind of a logical explanation or conclusion I guess. So, you know, I didn't take any of it...

The only thing I, well, that was not in the Guilty...the only thing I kind of had to just brush aside was, there was a gentleman's testimony in the sentencing phase. He was the friend of the young man that was murdered and found in the dumpster, and I mean he had like 8 convictions and he was just. He was kind of all over the map and went off the, not went off the deep end. (Unintelligible) Anyway, that was kind of the only guy that at the end of the day I just, I kind of have to just ignore what he said cuz I just can't (unintelligible) him as credible.

JJ: But in the Guilt or Innocence, I guess, for the jury that went pretty smooth? I mean...

MC: It did. There was uh… it did. There were a couple of things that um, we talked for a while about uh, Rudy's testimony and the small details that didn't quite match up between his statement and his verbal testimony. Uh, and then Skip kind of threw out there a couple, uh, what were later called "straw men" by the Prosecution, in their closing argument.

Uh, you know, basically, uh, I think the straw man that we talked the most about was whether or not the, you know… The DNA clearly, clearly proved that Obel was the one that had sex with, with Angelita, or no, I forgot her name.

JJ: The boy's mother.

MC: The boy's mother. Yes. But Skip's point that he was trying to make was that it didn't prove that it wasn't consensual at some earlier point in time.

JJ: Mhmm.

MC: And, uh, and he's right. It didn't prove that. Uh, and we talked about that at length, but where we ended up coming down as a jury was, correct it did not prove that, but all the other pieces of evidence, if you put the whole picture together it really points towards Obel.

Everything really falls into place and that's really a lot harder to swallow or a lot harder to conclude than somehow they had consensual sex earlier in the day, unbeknownst to anyone else. Rather than all the other pieces of evidence that come together showing that he was the one that was there that night that raped her. Um, anyway, I don't know if that's …

JJ: And of course, the State's mission was to prove he didn't kill the boy, he ordered it. Right?

MC: Correct.

JJ: That was the scenario.

MC: Correct.

JJ: The other, I don't know what his name was …

MC: Robert I think. I think they were calling him, yeah.

JJ: The other guy is the one who actually stabbed the little boy.

MC: Correct.

JJ: Um, ok. So, uh, getting to 12 on that wasn't too difficult?

MC: That was not overly difficult, no.

JJ: Then of course, then you have the real work, at least from my standpoint. Where now you found this person guilty and, uh. They explained... see that happened back in, what, '92? Or...

MC: '93. Yeah.

JJ: And back then there wasn't Life without Parole. Back then, there was Life. But Life wasn't Life because, I think, after 40 years or something they would be eligible for parole.

MC: You were eligible, right.

JJ: So, under those guidelines is what you had to deliberate on, right?

MC: Right.

JJ: And they actually explained that to you.

MC: Correct. They did.

JJ: See, in the old days they didn't explain that. They would just say Life and when the jury went back to deliberate, they weren't told that Life wasn't Life. They just thought it was Life. Back in the days when, um, they could get out.

MC: I see, I see.

JJ: And for some constitutional reason, whatever, they never told them that. And I was wondering, so you knew that ...

MC: Yes. It was clear. Yeah, yeah. It was clear. They explained it to us and it was also very clear in our charge that was the case. So, not

only did they verbally explain that, they also, uh, that was clear in the charge.

JJ: And, what was it? That he could get out after possibly(unintelligible).

MC: Yeah, I believe it was 40 years.

JJ: Of course, Obel was what, 40 something...

MC: He's 45.

JJ: (unintelligible)

MC: He was going to be around, he might've been 35. I wanna say he was going to be around (unintelligible). He was going to be a pretty elderly man.

JJ: Yeah. But you guys knew that.

MC: Yes.

JJ: So you knew that if you gave him Life it was that window, he could possible leave prison and then of course, obviously, the other option was the Death Penalty.

MC: Yeah.

JJ: So, how hard was that?

MC: That was extremely difficult. That was extremely difficult. Uh, not only for me, but for the... I mean, there seemed to be a few members of the jury that it was less difficult for than others. It was very difficult for me. Um, and there were a few members that (unintelligible) so...

Really what it boiled down to, for me, um...Through the remaining testimony, particularly of the gentleman from Puerto Rico, that he kidnapped.

JJ: They actually brought him.

MC: Yeah. There were three of them. One guy that just... there was an older brother and... he was an older brother of one guy and a step-

father of the other guy. And, um, he had actually founded his own taco truck company and was doing really well, and he had just bought a new truck and was kind of starting to have the appearances of having money.

And Obel and his little gang came and held him up and, uh, when he got away they kidnapped his 16 year old step-son and younger brother, who was like 22 at the time. And um, I mean, just beat him up badly. I won't go into all the details but it was brutal. Brutal. They told him he was going to be killed (unintelligible). He took his mask off so they could both see him and said, you know, I don't care if you blank blank blank see me cuz I'm just going to kill you, and beat him up badly and then left him for a while.

The Puerto Rican cops did an amazing job and tricked him and caught him, uh, while he was trying to embezzle some drugs and some money. But, uh, hearing the testimony from those guys about the whole experience. These three guys were all very, very… I mean they were just, very honest guys trying to make a living and just, were victims. And, um, and this guy… I mean, they were still, to this day, this was …'01 that that happened? And they're still, to this day, I mean, sitting on the stand and wouldn't look at Obel, just because they're still so afraid of him, and just, seeing the, kind of the fear that he could impart, even after so long, on some individuals…on those individuals' lives.

JJ:     Wow.

MC:     Um, you know. They weren't the only ones. The other, a number of the other witnesses testifying, I mean. Something that was really impactful for me too is, particularly, they flew in the Puerto Rican Detective who came up with the plan to catch him. While he was up there during one of the, while they were taking us out for a little break, Obel was kind of talking from the Defense, I mean, from his (unintelligible). I mean I wasn't there, there were a couple of us that saw it and, um, we talked about that in our deliberation.

He was, I mean, with some pretty angry facial expressions, just mouthing some…you know, I don't know Spanish.

JJ:     Right.

MC: I couldn't tell what he was saying, but it wasn't like "Hi. How are you?" I mean, it was pretty clear, um, he was (unintelligible). So, where I was heading with all that, one of the witnesses that the Prosecution brought in kind of explained that if we were to give him Life, what that would mean and where he would _____ in the system. The type of people... the type of freedoms he would have and the type of people he would regularly come into contact with.

After hearing all of the testimony in the sentencing phase, in addition to the Guilt phase, and just hearing how, just the manipulator of people that he was and, and how many people he has hurt over a period of time... Emotionally it would have been a whole lot easier to give him Life, but I really felt strongly that he was dangerous enough that if I gave him Life he would just slide as a Level 3 or whatever the term was and able to just walk freely about with, you know, DWI offenders or you know, maybe some white collar criminals. People that have done something wrong but definitely not cut from the same cloth.

I really felt pretty strongly the odds were good that he would, you know hurt or harm, if not kill, someone else between now and when he eventually did pass naturally. So, um, to me it really came down to it would almost be a selfish decision on my part. If you're just going by the algorithm they gave us, and if I was honest, by just going by that algorithm and answering those questions truthfully in my heart, emotionally, it would have been easier for me to give him Life, but my, in my head I knew that the thing that this was leading me to... I really felt strongly that he was a real danger to society. And, uh, and the other two questions we kind of already answered.

That's kind of the one it really boiled down to.

JJ: Yeah, I don't know much about death (unintelligible).

MC: Ok.

JJ: I thought the guys that got Life for Murder were all put in the hardcore prison. I thought...

CK: Yeah, I don't know. Where did you get that?

JJ: I thought they were all in with the bad guys.

MC: No, they brought in the girl that does the classifications and she talked about an hour and a half. She kind of explained that if he was just given a Life Sentence, I mean, he'd be in there with a lot of other people at this, you know, they could just have a DWI or white collar crime, so...

JJ: Ok. So, initially when you started out the Life/Death how many wanted Death and how many wanted Life?

MC: Uh, so the morning. So we broke...

JJ: Thursday.

MC: Thursday afternoon. We talked just for a short period and then they sequestered us. And then Friday morning we started off by having everyone go around and just kind of speak their mind of what they had been thinking about. I mean I thought about it all night and I'm sure others did too. And, I would say after everyone went around, it took probably about five minutes talking through everything, and I asked them to kind of give a leaning. I would say it was probably a third that were leaning for Life, a third that were leaning for the Death Penalty and a third that were undecided. I think it was pretty evenly split.

Um, we didn't really take a poll the first, Thursday afternoon. Friday morning that was, it was pretty evenly split.

JJ: And I've never been on a jury, so.

MC: Ok.

JJ: I've been on, you know, cases but I've never been in a jury room where you have to deliberate that.

MC: I hope you're never on one like this.

(laughter)

JJ: I don't know if I'd want to be but, but at some point, I mean, you have to move everybody to one place, or it's a mistrial. So, how do you get, and I would say, _____ common. You know, you have, everybody listens to the testimony, but you've got individuals that are not sure. How do you, you were the foreman.

MC:     Mhmm.

JJ:     Not that it's your job. Your job is to, I guess, be the organizer, but how do you get all these people in one spot?

MC:     Right.

JJ:     How do you do that?

MC:     Um, we really just started by going... the first question was the hardest question. Which was basically do you feel like he's a continuing threat to society. And we spent most of the morning talking over that. Um, so we started, you know, I kind of started by just defining what that meant, and we spent some time kind of talking that over and getting everyone on the same page as to what the definition of society was. The definition of _____, we talked about all those things. Um, and really we just had a lot of round table discussion. We were, we had a really good jury and everyone was very, very respectful of each other. So we really, I would just kind of take turns and let people talk back and forth.

JJ:     Mhmm.

MC:     I mean, there were obviously people on both sides of the fence. (unintelligible) And the second one was pretty...

JJ:     So by lunch time everybody was kind of on board for "he's a continuing threat."

MC:     Yeah. A continuing threat and I think I also signed off on, the second one was basically, "Do you feel like he, himself, was personally responsible for killing the boy or responsible for having him killed?" We basically had agreed to that already, from the Guilt/Innocence phase. So those, that one, once we decided the first one that one was, you know, five minutes. That was pretty easy.

JJ:     If you don't mind me asking, what third were you in?

MC:     I was undecided that morning. I definitely was. If I had to choose a lean I was probably leaning towards... man, I really don't know. I don't know where I was leaning. I was definitely undecided.

JJ: Well, don't you think the decision actually, I mean once you assimilate all the testimony, the decision, actually, I think actually comes from the jury discussing it.

MC: Yeah. Oh absolutely.

JJ: It's kind of like, you know, the pros and cons and discussing it.

MC: Yeah, yeah. And that's the way of the system, I mean...

JJ: That's the way it's supposed to work.

MC: That's the way it's supposed to work and that's the way, it only works well if that's the case.

JJ: Correct.

MC: Um, the thing that I had the hardest time with was this, uh, I don't know how many of the details of the case you know, but as the Defense was finishing up there was an 18 year old kid that came in that knew Obel in prison for a period of time. He was basically, he was the one who brought him his food while he was in solitary.

And, um, this kid read about the case in the paper. He'd been out for a couple months. He read about the case in the paper and felt compelled enough to find his way downtown and just show up and talk to Skip during one of the breaks and volunteer that he wanted to testify on Obel's behalf. And he testified that during that time Obel had been really kind to him and really tried to talk a lot of truth into his life. They talked about a lot of, he called it, you know, "spiritual stuff", trying to kind of give him advice. And then he said Obel had even continued to write him a couple of letters when he got out. And, um, to me that was, that was incredibly touching.

I was... if it hadn't have been for that kid, it would have been a much easier decision for me. I think I would have probably fallen on the third favoring the Death Penalty if it hadn't been for that kid. I definitely, I don't think I would have...I would not have made up my mind, but I would have, that would have been my leaning going in if it hadn't been for that kid.

But, as we talked through that kid's testimony, as a jury, um, and I readily admitted to everyone even before we started deliberating, my

nature is to always try and look for any inkling of hope or any inkling of good in someone and just give them the benefit and go with it. That's just kind of my nature, and some of the, the other juror members, that had a little more life experience than me, all pointed out that Obel's consistent, or his entire life all the testimony we heard was to find, kind of, weaker individuals around him and just kind of use them and mold them for his purposes.

And, uh, you saw that when he was here in Houston dealing drugs. Well, you saw that, you know, when he was 20 years old in the Dominican, and in Puerto Rico and here in Houston. We heard about it again when he was back in Puerto Rico and back in the Dominican.

And, you know, the point was this was just another example. This kid was just looking for a father-figure. He just, he's 18, in prison, and, uh, he's come from a rough past. He's just looking for any... he's just reaching out for anyone. And Obel was just looking for someone, he's in Solitary Confinement. He's looking for someone he can, uh, kind of exploit (unintelligible). The more I thought about it, that made a lot of sense and I ended up agreeing with them. It actually made me feel even better after the trial was over. The judge came in, the Prosecution; they both agreed that's what they thought he was doing too. But uh, after everything was said and done. That was one of the biggest things

JJ:     So the judge (unintelligible)

MC:     Yeah. After everything was said and done. Actually I think it was the prosecutor. The prosecutor said that's what the judge thought. So, the judge didn't actually say that herself. She just came in and thanked us for our time and all that.

CK:     Exploited for what?

MC:     What's that?

CK:     Exploited for what?

MC:     Well so, he had been, you know. In Puerto Rico he had been in all kinds of, he had a number of things smuggled into him. He had cell phones smuggled in, uh, that was basically what, you know, he was angling to get something. Whether it was something smuggled to him or it was just trying to get (unintelligible).

JJ: The other jurors thought that this kid, although he was genuine…

MC: Exactly. No one disagreed at all that the kid was 100% genuine.

JJ: But Obel's motive was not to help the kid, but more to…

MC: Yeah.

JJ: Manipulate the kid.

MC: Correct.

CK: Oh.

JJ: Well you know, it's kind of like, you could talk to five witnesses of an accident, who all are…

MC: Oh yeah.

JJ: Watching it and everyone's got kind of a different take.

MC: Everyone's going to have a different perspective.

JJ: So, how long did it take to get to twelve?

MC: Oh man, uh…

JJ: Well I mean, you did that day, right?

MC: We did that day, but it was the end of the day. I mean it was 4:00 PM or 4:30 PM that afternoon.

JJ: Would you guys… You weren't sequestered for the Guilt/Innocence? You went home right?

MC: No, that is correct.

JJ: So…

MC: We found that… we were given, we were handed the charge, I think it was Friday morning.

JJ: Let's say Friday you guys had not come up with the agreement.

MC: Yes.

JJ: Would you have to spend all weekend sequestered?

MC: Yeah. Yeah.

JJ: I mean, that was explained to you?

MC: It was.

JJ: But during that, if you had come to a decision on Saturday morning then you could go, it's not like you'd have to wait til Monday. You could go in, right?

MC: Yeah.

JJ: Yeah, I mean...

MC: No, she... yeah, that was explained.

JJ: Do you think anybody rushed your decision, so you didn't have to spend the weekend?

MC: Umm

JJ: Or did anybody say that?

MC: No one s... I, I don't remember anyone saying as much. There was one girl that, I, I don't know... she was pretty emotional.

JJ: Like... upset? What do you mean emotional?

MC: She was just upset about the whole thing. She basically went and, uh, she just didn't want to be there anymore. It was kind of a, she kind of thought this was going to be, kind of an adventure. And then when it came down to, uh, it just wasn't fun anymore. (Unintelligible) have to make decisions.

In fact, she even asked...she went to see the judge to see if she could (unintelligible)

JJ: Do you know what...? I mean, I guess this conversation... do you know what... she actually went to the judge and (unintelligible) home?

MC: Yeah. I saw... Yeah. I had to write a note. But that's what she said, she wanted to go. She told us. She basically... she did not understand the process. She thought the alternates were there so basically, that, she thought she wasn't enjoying this anymore so she could just go home and one of the alternates would come in.

She asked me that multiple times. No, no. That's not how this works.

JJ & MC: (unintelligible)

MC: Exactly! And that's what I said, (unintelligible) in my truck on the way to lunch or something like that. So, but finally, I mean she was adamant enough, she had to write a note and she went to talk to the judge about it. So, no, I wasn't sitting there for the conversation.

JJ: But I guess the judge sent her back and said...

MC: The judge sent her back and yeah, what she told us the judge said no, you're here until y'all reach a verdict.

CK: I've never heard of that, when they only partially sequester.

MC: I'm sure we would've been sequestered for the guilt/innocence if we hadn't reached a verdict in the same day.

CK: I see.

MC: But they handed us the charge, I think it was a Friday morning and we had reached a verdict in the late afternoon. It was the same day they handed us the charge. (Unintelligible) we talked about earlier. That one went fairly quickly.

JJ: Yeah, they probably would've ... anyway. I guess, I don't know. I mean, I can understand, on the Death Penalty issue having to sequester the jury. I mean that kind of makes sense. That's serious deliberation, so...

CK: But you actually went home the first night?

JJ:    No.

CK:    Oh, no?

JJ:    That was on Thursday.

MC:    No. No, no, no, no, no. They sequestered, they gave us the charge Thursday afternoon at about 3:30 PM or 4:00 PM and the sequestered us that night.

CK:    I see.

JJ:    And you deliberated for a short period of time...

MC:    Yeah, an hour and a half to two hours.

JJ:    ...and they went to sequester, which, I guess you were prepared for?

MC:    Yes

(Unintelligible)

JJ:    They didn't just say "Hey, look. By the way..."

MC:    Wednesday night...

JJ:    Oh you got toothpaste...

MC:    Yeah, Wednesday night the Bailiff called us. I got a call about 8:00 PM that said "The judge would like you to bring some clothes, just in case."

(Unintelligible)

MC:    Right.

CK:    So, they let you bring a change of clothes and...?

MC:    A change of clothes and overnight things. You know, whatever you need for staying overnight.

JJ:    Did they take the phones?

MC: Oh yeah. Took the phones, turned the TVs and the phones off in the room. Yeah, uh, when we went to dinner they turned the music off in the restaurant.

JJ: I mean, that's pretty sequestered. Yeah when you can't talk…

CK: You can't talk.

JJ: Can't see TV, which, I guess it could be on the TV. Um, can't call anybody to discuss the case.

MC: Yeah.

JJ: Can't use the phone in your hotel room.

MC: Right.

JJ: Don't have your cell phone.

MC: They let us make one, right before, they let us make one quick call just to give out the Bailiff's number, before they allowed us to start deliberating. Then they kind of took our phones and iPads and whatever else…

JJ: Did the Bailiff (unintelligible)

MC: Yes. Two Bailiffs. We had, the male Bailiff was our primary Bailiff and then they brought in a female from another court who stayed with the ladies. So he stayed with us. The guys and JJ stayed on one floor and the ladies, I don't know…

JJ: It wasn't John, was the Bailiff John M_____?

MC: No, it was JJ, uh, I'll think of it here in a minute. No it was not (unintelligible)

JJ: Anything else?

MC: Um, I mean, not really. I'm happy to answer any questions…

JJ: No, I mean, you kind of…you've kind of given me the process…I mean, honestly, our job is to talk to the jurors. It's not like we're trying to find something wrong, it's just, what was the process?

MC: Right.

JJ: I mean, cuz it is possible that the jurors were fighting and screaming and yelling and...

MC: Yeah. We didn't have any of that.

JJ: I guess that happens.

MC: Yeah, I'm sure it does.

JJ: You know. Um...

MC: We spent the afternoon basically, the third question basically asks "Are there any mitigating circumstances..." or... any circumstances that would sufficiently mitigate the crime to basically allow the Life Sentence to be given rather than the Death Penalty.

So we basically spent the afternoon... I got, I got the dry erase board and we just started listing any mitigating circumstances we could think of. And, uh, we came up with about, I think 10 or so, and, uh, it was all pretty, pretty weak stuff.

JJ: But, do you consider the crime or do you also consider the stuff they brought up in the punishment, like the Puerto Rican people that got kidnapped...

MC: Oh absolutely. You consider all, yeah, yeah. Yeah you bring in everything.

CK: That'd be awful tough for me. I just don't know that I could do that.

MC: It was, yeah it was extremely difficult. It was a lot. I mean I actually, I have to admit, I mentioned there was a girl that said "I just wanna go home now." You know, and, I think we all felt that way. It's just, heavy. It's heavy to sit through and listen to all this stuff. It just gets really heavy there and (unintelligible). If I was sincere, I don't wish it on anyone.

JJ: Well, that's why they have, how many? 120? I think they start out with 120 people.

MC: We had 150 something. They called, they started with 75 and then I was part of the second group of 75. I mean, yeah.

JJ: It's, it's a long process. I think to some degree it has to be that way, based on what the end could be for the Defendant, who we presume innocent until proven guilty.

MC: Right.

JJ: And then, then you get into the second phase. So, at what point during the deliberation did you bring out your Bible?

MC: Uh, it was about 10:00 AM Friday morning. One of the, one of the girls was um, she actually goes to my church and, uh, she was in tears.

JJ: A girl on the jury goes to your church?

MC: Uh huh. I never met her before but...

JJ: Wow.

MC: We just found... small talk

JJ: Now, you figured this out after you were on the jury?

MC: Yeah, I mean we were...

JJ: You go to the same church?

MC: It was Thursday or Friday, of the first week. Yeah.

JJ: Wow.

MC: So we had just, kinda, come on that in small talk. So I kinda, we had talked a little bit more just about, you know, upbringing and church backgrounds and stuff just during breaks and,uh... Friday morning she had, um, she broke down Friday morning and basically admitted in her, her head she knew, she knew one thing to be true but in her she, she basically said, how do I live with myself knowing that I sentenced somebody to die?

I had, I'd spent a lot of time researching that beforehand, throughout the voir dire process. The Death Penalty is always something I had an opinion on, but it wasn't ever something that I... It was an opinion, but, you know, rubber meets the road type of thing.

CK:     Mhmm.

MC:     It was never something I had to, you know, stand up and live by. So, during the voir dire process I did a lot of research on it. You know, that's, the Bible is, it's hearsay and a lot of people say this, but the Bible really is what I strive to live my life through. That's, that's kind of my guidebook so I spent a lot of time researching what I felt scripture said about it, and I came down to basically the Lord has instilled government to, you know, to enact justice for citizens and, uh, Romans 13 is the passage I spoke about Friday morning. That Friday morning

You know, I ... al's writing and saying th... uh, you know, the Lord has given th... ..... to govern and, .. e sword's really, it's not used for a sl... on the hand, so. You kn... I, that was, that was kind of the key pa... ...... I used. You know, ... sis 9 and a lot of places in Deuteronomy ... you know, I just ... e knowing her, kind of, background a ... where she stood.

Everyone else talked for probably 10 minutes and I, I just kind of closed with that briefly, and said...I started by saying I'm not trying to, not trying to preach here and I hope not to be offensive to anyone, but I know Casey's background and I know where she goes to church and I know what, that scripture, you know, scripture is important to her so, I just shared (unintelligible) about that.

JJ:     Well, ok, when you say... ok. Cuz normally when someone says "I researched", the first thing I go, "Oh, you got it on the internet?" You researched in the Bible?

MC:     Yeah.

JJ:     Ok. So, when you, I mean, I couldn't quote (unintelligible)

MC:     Yeah, no.

JJ:     So, when you impart this information, is it something you read or is it all in your head? I mean, you know this inside out.

MC: Yeah, but I had my Bible there too. I had it in my overnight bag. So...

JJ: So did you read from the Bible or did you quote it from memory?

MC: No, I read.

JJ: Read it from the Bible.

MC: Yeah.

JJ: Did that offend anybody?

MC: Uh, no one said that, no.

JJ: No.

MC: And as I ... I kind of qualified it by saying, you know, I'm not trying ... as I said, I'm not trying to be offensive. I just, I think this will be helpful to Casey and so, I just want to share it.

JJ: So, after you read that was Casey able to say Death?

MC: Uh, after I read that she was able to move, that was, we were finishing up talking about the first question and she was able to move on from the first question. Uh, we still talked about a lot more stuff throughout the course of the day, but she was able to move on...

JJ: No, no, that helped her move on to question number two.

MC: Correct.

JJ: Which is....?

MC: That was "Do you feel like he was responsible for the child's death?" So, that, everyone was in agreement on that one. That was, as I said...

JJ: Well, frankly if he ordered the death, I mean, that's kind of a no-brainer.

MC: Exactly. Yeah. Yeah.

JJ:    I guess. If you believe the testimony that he ordered the child to be killed.

MC:    Yeah. And it really was, like I said, we …. (unintelligible)

JJ:    …He's certainly responsible…

MC:    We spent about five minutes on that one. That one went quick.

CK:    So did you spend longer on the first one then, than the last one?

MC:    Pretty even I would say, between the first… We probably spent, it was probably a little bit longer on the first one, but the third one was … we spent three plus hours on _____, so.

CK:    Well, did you go back to the Bible then?

MC:    No.

CK:    Not after…?

MC:    No.

CK:    And the people were listening, I guess, when you were saying this, and did it help them understand? You think it made a difference to them?

MC:    It made a difference with Casey. I don't know if it made a difference with anyone else.

CK:    Yeah. Yeah.

JJ:    Cuz nobodoy said…

MC:    Yeah, she was, she was sitting right next to me and I, I really, like, I read it but I slid it over where she could see it and I was kind of just talking to her and she smiled and thanked me afterwards.

CK:    Did it make a difference to you?

MC:    Uh, it felt good to be able to kind of share what I had, you know, what I had researched and spent time processing. I, I had already, that was a path I'd been down a number of times already.

It made a lot of... it made a lot of difference to me, kind of earlier in the process. Um, I don't really remember if it was helpful again that morning or not.

JJ: Is this girl married, single?

MC: She's married. Yeah.

CK: Now this kid that, that came in the courtroom that said that Obel made an impact on his life.

MC: Mhmm.

CK: Uh, that was a spiritual impact?

MC: Uh that's what he said, yeah. He didn't really elaborate on it, but that's what he said, yeah.

CK: Yet people didn't think that that was genuine?

MC: Well, uh, I don't think anyone, I don't think anyone disagreed. We all agreed that we hoped it was genuine. It was just the motives behind it is kind of, that's where we ended up.

CK: But the Bible gives hope right? So you'd think people can be redeemed, or...

MC: Oh absolutely! Yeah. No, no doubt about that.

CK: You didn't bring any of that stuff out as well, or?

MC: Yeah we talked about that.

CK: Really?

MC: Yeah. Actually, one of the guys, one of the other jurors talked about that at length. Yeah we talked about that for a while, so.

CK: At the mitigation part, or? That's tough.

MC: Yeah.

CK: Very tough. Glad it wasn't me.

JJ: So in reality, you knew that the kid was genuine and you knew that Obel had had the conversations with him, but overall you thought maybe Obel's motives were not going to help the kid turn around (unintelligible)

MC: (Unintelligible) I mean there's countless examples of individuals (unintelligible) you know, in scripture (unintelligible)...

JJ: Oh yeah.

MC: You know, to manipulate. Even if what they're speaking is truth, I mean, it can really change, it can still make genuine impacts on hearts and lives, but you know, the motive behind it. So, that's what it really came down to on that.

JJ: Do you have any questions or anything?

CK: Yeah, I just, I... You know it's a shame when somebody's, and it was coming from you. I mean, that somebody's so cynical that they can't think that somebody might ... (unintelligible)

JJ: Can, I didn't have your phone number. Could I get it in case there's...

MC: Absolutely. (713) 449-3987. That's my cell phone.

CK: Is there anything else that stands out to you that may be important for us to know? That we didn't ask you.

MC: Um, the girl that was, um, the girl that was real emotional that I mentioned, that just wanted to go home, um, she was the, uh, it really did... At the end of the day, when we all approached kind of the questions from the facts, she would answer... The reason, the way, she was getting hung up on her emotions.

We all asked questions from different angles. She would answer them, she would end up answering the fact, the questions based on the facts but then she would just basically break down and, uh, and say, you know, her emotions were just (unintelligible). And that was really hard. We spent a lot of time just trying to talk her through it.

That was, that was really, really difficult. Um...

CK:     You think she didn't want the Death Penalty?

MC:     She didn't want the Death, she was one of the most adamantly opposed. I mean, that morning she was, you know I said there was a third, a third, a third. I think, she was, she was pretty adamant. She was probably the only one in the third that was against the Death Penalty that was pretty adamantly against it that morning. Um, and just, that was just, that was very difficult.

I really, I felt fortunate to be on the jury with ... it was just really a great group of individuals. Everyone really was, was very understanding and caring. A lot of the women especially, I mean, I kinda got to a point where, you know, I was trying to direct in conversation and really just trying to come at it from all these different angles of logic, and, uh, now it's just kinda done (laughing) (unintelligible) I mean, I just, I don't know what to do now.

They really, I mean, I don't, I don't deal well with emotions, so they were able to kind of talk through probably some different angles, kind of emotional. That was helpful, so. That's probably the only other thing I guess I would say. That, that was probably the, I would say eleven of the twelve were at a consensus probably by about _____, and it took us a while to talk it through with Angela.

CK:     What time was it when you _____?

MC:     I want to say it was 4:30 PM or so.

JJ:     Do you think... Angela didn't really want to be there.

MC:     Correct.

JJ:     And she didn't want the Death Penalty, but she didn't really stay the course and say ok. You know, you see movies about this, when...

MC:     Right, the whole....

(Unintelligible)

JJ:     She didn't stay the course and be the hold out, so, she obviously changed her mind, and uh, I guess, why did she change her mind? Did she want to leave? Cuz she thought it was the right thing to do? Do you even have a guess?

MC:    I don't know.

JJ:    You probably haven't thought it through.

MC:    I haven't thought it through.

JJ:    So, but in your opinion, Cas, it is Casey

MC:    Casey.

JJ:    Casey was able to come to peace with the first question after the scriptures.

MC:    Not just that, I mean, there were probably nine of the twelve that shared something during that time. And she, it was not just the scriptures.

JJ:    Ok.

MC:    It was kind of a collaboration of everything that everyone said. Uh, it definitely (unintelligible)

JJ:    Oh, ok.

MC:    Everyone was contributing something and that was just kind of my little, I didn't, you know, they covered a lot and said some really nice things. I knew that that was something that was important to her as well and just said here's one other thing that I researched coming into this that might be helpful for you.

       So, but, no I, after that she, she went around and thanked everyone for their, their words and …

JJ:    Now we'll let you have your dessert.

(Unintelligible)

CK:    I'm sorry we came…

MC:    No, you're fine. Thanks for letting me eat my last couple bites of steak.

CK:    Yeah, I was really jealous.

JJ: Why do you think they picked you as the foreman?

MC: Um, so there were, there were kind of two older gentlemen on the jury. One was kind of a quieter, he was more of an introvert, and the other guy was pretty strong, was kind of my impression. So, I think I was, I don't know. I was just friendly to everyone and …

CK: You're very personable

JJ: I think they made a good choice. I think they made a good choice. Again, it's 12 people from 12 different backgrounds.

MC: It was really neat. I mean we had every, we had a guy that drove a truck, a lady that, you know, sits as a Security Guard, we had a retired, like, COO of a pretty big insurance company, another guy was a COO of a big Human Resources firm, I mean it's, a school teacher.

JJ: Wow.

MC: I mean it really was, we had one kid just graduated from college. It really was neat. All different, you know, ethnicities. It was really neat. And everyone, I mean, from the first day we really hit it off. Enjoyed it as much as, I mean…

JJ: Yeah, yeah. Listening to all that. Cuz I would assume that, from the juror perspective, all the stuff that you heard, that stuff that has to do with what goes on on the streets and dope dealing. Whatever. Which is, probably not everybody in the jury had dealings with that.

MC: No.

JJ: So you had to listen to this stuff that really happens in the real world out there, um…

MC: Yeah. My comments to people when they've asked about the case, I don't really like to talk about it much, but one of the things I say is it was just kind of a sad glimpse into a side of society you'd rather not hear about.

JJ: Yeah. If you notice, the courthouse is not sparse of people.

MC: No, it was a busy place. (Unintelligble)

JJ:   Are you kidding me? It's got the worst engineering. It's horrible!

MC:   No I, (unintelligible) every morning when I got there.

JJ:   I asked an attorney once, I said ok, let's say your client's here on time, but he can't get up in the elevator, and he gets to the courtroom at 9:30 cuz he can't get up on the elevator. Does the judge revoke his bond? And he said get here at 7:30. I said, even knowing that he had this nightmare. He said the judge's answer to that is get here at 7:30. I said wow.

MC:   The second day of trial we were supposed to, court was set to begin at 10:00 AM. I got there at 9:00. I was standing at the elevator shaft at 9:25. I made the mistake of going up to 10 and trying to go over...

JJ:   Oh yeah, yeah.

MC:   And catch it the rest of the way. I stood there for 30 minutes. I called the _____. Ended up, I went back down to one and I'd been watching, you know there's six elevators on the _____ that go up between 15 and 20. I'm watching and I figured out which three were working and which three weren't, so I went back down to one and I went and stood by the door of one of the three that was working that I kind of figured was the last one to cycle. It hit like a minute after I got over there. We got there 10 minutes late but... the Bailiff was down looking for us, I mean, it was terrible. I was there 35 minutes early.

JJ:   Yeah I know, it's an absolute... I hate it. I mean, if you go at 10:00 you're ok, but if you try to go when all these people...

MC:   And the judge commented, it was after the holiday weekend. She said it was just kind of an abnormal day, but yeah.

JJ:   It's like that every day!

MC:   Ok.

JJ:   I mean it's just crazy. So. I thought the jurors had a, like...

CK:   Freight elevator?

JJ:   No, I thought they had the ability to (unintelligible)

MC: Well we did. We had a special elevator, but that particular morning I went to that elevator but the Bailiffs kind of had seized it, because they had a line of jurors all the way from that elevator in the basement almost back to the little hallway to the jury building, or whatever. I mean it was 100 yards long. So I went there and they said no, you can't use it today. So I had to use that other one on the other side.

JJ: Now, you go up to the new civil building...

MC: Yeah they said they figured it out and that one's 100 times better.

JJ: Yeah you go through you get on the elevator.

MC: Yeah. That's what JJ was telling us.

JJ: But, that civil building does not have traffic in the morning like the criminal building has. And everybody says the civil building, they figured it out. Well I just want to know what would happen if all of those people that descend on the criminal building at 9:00 in the morning descend on the civil building.

MC: Descend on the civil building.

JJ: Cuz there's not that...

MC: I got ya.

JJ: K. I wonder what would happen. It might be the same. Who knows. Thank you for your time.

MC: My pleasure. Give me a call if anything else comes up.

JJ: I will. I got your number.

CK: Thank you.

MC: Yup.

CK: Sorry about the food and all

MC: Are y'all with, how does it work? Are y'all with one side or the other? How does it...

JJ:  Well, the court, the court appoints an attorney…

MC:  Ok.

JJ:  …to do the Appellate process after the punishment phase. Then the attorney doesn't go out and talk to everybody, he appoints the Investigators (unintelligible)

MC:  To do that.

JJ:  To go out and do it. So then we talk to the jurors, we write reports that say "Ok, this is what Matt told us," and then he may say "Hey look can we put this together? Maybe I can throw an Affidavit up on what Matt told you and then you'd have to see if he'd want to sign that…" Whatever his purpose is.

MC:  Yeah, ok.

JJ:  So that's how it works. The attorneys don't ever go out and do anything. (unintelligible) But he has to do a filing within 30 days of sentencing. That's the first thing.

MC:  I see.

JJ:  And then it gets real complicated. There's all kind of different appeal processes. Somebody looks at all the trial testimony and is there an error…

MC:  I see.

JJ:  Is there lawyer incompetence, is there, what'd you think of the Defense lawyers?

MC:  Skip was really good. I was thoroughly impressed. The young guy, I remember his name. He didn't talk very much. I mean he gave kind of, he gave closing statements both times. He seemed to be good as well, but Skip was very, very impressive. We all commented on that. Um, even though, I mean, there just didn't seem to be, he didn't have a lot of ammunition to draw from, but he still did an excellent job with what he had, so.

JJ:  He's certainly a trial veteran.

MC:  I really, um, after the trial was over I was a little disappointed that he didn't come talk to us. I understand why he didn't, but I did want to shake his hand and just thank him, because you know, I felt like he did an outstanding job. I would have felt, and other jurors commented, that they also would've felt just not right about the process had there just been a lay down Defense attorney, if that makes sense.

Skip really did everything he could and really did a bang up job.

JJ:  Yeah and I asked him, he said you know, he said you guys, he said after a week or two, that's the time to talk to the jurors, not right at that moment.

MC:  Yeah.

JJ:  Now, he said had they found him not guilty or, he said I (unintelligible). He said you know, that's a very stressful thing and you're right, you're limited to what you had to work with. But he's a very seasoned, I don't know how many trials he's done, but...

MC:  Yeah and you can, I mean, the Prosecution did a good job as well, but it was clear who had the experience and (unintelligible). I mean Skip, Skip definitely had been down that road a lot more times. The Prosecutors were just younger.

JJ:  I think so. I think the lady prosecutor has done a bunch of cases.

MC:  Ok.

JJ:  I think. I think she's... Janelle...

MC:  Justin. Yeah.

JJ:  I never saw ....

MC:  They both, they did a good job. But Skip definitely, I mean you could just tell he'd been doing it longer.

JJ:  Thanks again.

MC: Alright, thank y'all. Pleasure to meet you. Just curious if, I mean was the, you asked about the scripture thing (unintelligible) Was that a problem at all or just kind of a... ?

JJ: No, that's of interest. I mean, I don't know what the, um, how would you say? I don't know what a lawyer would look at and say "Oh ok." I don't know. The Appellate process is, we're more fact finders. Now, if we were talking about the Guilt or Innocence part, where we have tons of experience interviewing witnesses, putting together these criminal cases, I could answer that. But, in the ...

MC: And that's fine. I was just curious.

JJ: Well see, in the Appellate process, which we've done on Death Penalty cases where, let's say the guy's already on Death Row...

MC: Mhmm

JJ: ...and you're working with the attorney and say, well why don't we find this out? And they say you can't do that. Why can't we do that? Cuz it's not allowed in this portion of the appeal. So if we get this information and it's helpful, we can't use it. It's very structured and I don't understand it.

MC: Yeah.

JJ: I do understand on this one it's basically trial procedures, um you know, let's say the attorney says you know I think the Defense attorneys did a really poor job. They're unprepared, etc.

MC: Yeah.

JJ: So, and as a result of that I think Mr. Obel should have a new trial, or whatever, ok?

MC: I see

JJ: I don't have a clue. So all we do is, we're like sponges. We talked to Matt and this is what he told us.

MC: Yup.

JJ: We talk to this person and that's what they told us. We talked to this person and they said no we're not gonna talk to you. Now here you go Mr. Hill. Do whatever the heck you gotta do.

MC: Yeah. And will we get feedback, as to the findings of the appeals process or how does that...not generally?

JJ: I can let you know on this, but the rest of it... it goes to different courts and then it goes to the Federal courts. It's a long process. Somebody gets on Death Row, we had a case where the guy was on Death Row for 30 years.

MC: Wow.

JJ: How many times did they send it back? Three? He had three Guilt or Innocence trials then they sent it, and he'd been there 30 years, then they sent it back for punishment. Ok he's guilty, but now we have to re-do the punishment phase. Does he get Life or does he get Death? Now, he went to Death Row when he was 19 and he's now 50.

MC: 50

JJ: Finally the State said you know what? We'll just, let's just forget about this and we'll give him life.

MC: Ok.

JJ: So, they actually got off the Death Penalty, finally, after that.

MC: Wow. And was it just they found some error somewhere along the way?

JJ: In the Guilt or Innocence trial they kept sending it back for whatever reasons. I'm sure some of it had to do with attorneys and competence. I'm only guessing. But you know, this guy was like, on Death Row for 30 years. Went there when he was 19.

MC: Wow.

JJ: And he was, uh, he actually killed a guy on Death Row. Back when Death Row wasn't like it is now. They actually had two guys to a cell and this guy attacked him and he killed him with a wishbone. Stabbed him in his chest when he was 20. So, he had that against

him, you know. But they finally just said you know what? We'll give him life. So, he'll probably be eligible for parole when he's about 75. You know, but he spent his entire life, since he was 19, in prison, over a Church's Fried Chicken robbery.

You know, it's amazing, the process. In reality they spend, they could've given him Life to start with. I don't know.

MC:    Thank y'all for explaining that to me. I appreciate it.

JJ:    We'll let you know. I'll give you a call.

MC:    Take care.

JJ:    K, Matt. Thanks.

MC:    Yup.

_____

**President/Manager, Texas License A05741**
G:\Cases\2013 Case Files\08\0329\Reports\ .doc

9/15/2013
Date



The Truth Makes a Difference

Matthew Clinger
Interview
8/12/13

13-08-0329
Wayne Hill
Obel Cruz-Garcia
Appeal

## Gradoni & Associates

Professional Investigative Services
State License A5741

2611 FM 1960 West
Suite C100
Houston, TX 77068
(281)440-0800
jj@gradoni.com

Exhibit __B__

1                    TRIAL COURT CAUSE NO. 1384794
THE STATE OF TEXAS        )   IN THE DISTRICT COURT
2                             )
VS.                          )   HARRIS COUNTY, TEXAS
3                             )
OBEL CRUZ-GARCIA             )   337TH JUDICIAL DISTRICT
4

5        I, Mary Ann Rodriguez, Official Court Reporter in

6   and for the 337th District Court of Harris County, State

7   of Texas, do hereby certify that the following exhibits

8   constitute true and complete duplicates of the original

9   exhibits, excluding physical evidence, offered into

10  evidence during the jury trial in the above-entitled and

11  numbered cause as set out herein before the Honorable

12  Renee Magee, Judge of the 337th of Harris County, Texas,

13  and a hearing on the 20th day of September, 2013.

14       I further certify that the total cost for the

15  preparation of this Reporter's Record is $_____

16  and was paid/will be paid by Harris County, Texas.

17       WITNESS MY OFFICIAL HAND this the 16th day of

18  October, 2013.

19

20

21

22  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
23  Expiration Date:  12/31/2013
    Official Court Reporter
24  337th Court
    1201 Franklin
25  Houston, Texas  77002
    713.755.7746