This document contains some
pages that are of poor quality
at the time of Imaging.

# CAUSE #1384794-A

## P O S T   C O N V I C T I O N

FROM:                    337TH DISTRICT COURT

OF

HARRIS COUNTY, TEXAS

OBEL CRUZ-GARCIA

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 02 2017

Abel Acosta, Clerk

### APPLICANT

VS.

THE STATE OF TEXAS

### RESPONDENT

# VOLUME V OF V

NO. 1384794-A

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **337th JUDICIAL DISTRICT** |
| | § | |
| **OBEL CRUZ GARCIA,** | § | **HARRIS COUNTY, TEXAS** |
| **Applicant** | | |

## AFFIDAVIT OF DEFENSE COUNSEL

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

On this date, November 25, 2016 was placed under oath and stated the following after being duly sworn:

"My name is Mario Madrid. I am over the age of eighteen, and I am competent to make this affidavit. I am an attorney licensed to practice in the State of Texas since 1996. My bar card number is 00797777. My office address is 440 Louisiana, Suite 1225, Houston, Texas 77002, and my office telephone number is 713-877-9400.

"I have been ordered by the Court to provide an affidavit responding to ten questions. I did represent Obel Cruz Garcia in the capacity as Second Chair. R.P. Cornelius was lead counsel. I am answering these questions to the best of my recollection without the benefit of my file or the file of R.P. Cornelius as we both loaned our files to the writ lawyers with the understanding that the files would be returned. However, at the time of the writing of this affidavit, the files have not been returned.

**FILED**
Chris Daniel
District Clerk

NOV 28 2016 *11:20*

Time:
Harris County, Texas
By
Deputy

27|992

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

: 00951

**State whether counsel considered hiring a DNA expert to assist before and/or during trial, and counsel's reasoning for his ultimate decision not to retain such an expert.**

"Lead counsel R.P. Cornelius made the decision regarding whether or not to hire a DNA expert. Neither of us believed that we would win that issue with the jury. I agree with him that the best trial strategy and the strategy we discussed, was to create a reasonable doubt to show how Cruz Garcia's DNA could be present without him being involved in the murder. We attempted to do this by arguing a consensual sexual relationship. We were hampered in our defense because our client would not discuss any facts of the case. He insisted that God would set him free but refused to discuss the case.

**State whether counsel investigated the allegation that the applicant and Diana Garcia had a consensual sexual relationship, whether counsel was aware or should have been aware that the defendant had a sexual relationship with Diana Garcia.**

"We attempted to development the theory of a consensual relationship through cross examination and argument. As I stated previously, Mr. Cruz Garcia would not discuss any facts of the case with defense counsel or our investigator. We could not offer direct proof a consensual relationship without the defendant's testimony or any witnesses to support the possible relationship. Our investigator, J.J. Gradoni made efforts to speak with all witnesses. However, there were no witnesses who could provide testimony of a consensual sexual relationship between Obel Cruz Garcia and Diana Garcia.

**State whether any source provided the names of potential witnesses Cesar Rios, Jose Valdez and Hector Saavedra, whether counsel was aware of these witnesses, and whether counsel interviewed these witnesses in preparation for trial.**

"Mr. Cruz Garcia never mentioned any of these witnesses. As I mentioned previously, I do not have the benefit of my file or Mr. Cornelius' file, but per the affidavit of investigator Gradoni, Cesar Rios was listed in the offense report. Mr. Gradoni made efforts to locate Cesar Rios but was unsuccessful.

**State whether counsel reviewed the State's file in preparation for trial.**

"Yes.

**State whether counsel investigated the issue of the applicant's future dangerousness and whether counsel made contact with any potential witnesses in Puerto Rico or Dominican Republic.**

"We did make contact with witnesses located in Puerto Rico and the Dominican Republic. As I recall we presented evidence of courses or bible classes that Mr. Cruz Garcia attended while in prison. We also presented a witness that testified to Mr. Cruz Garcia's positive influence on him while he was an inmate at the Harris County Jail.

**Explain counsel's decision not to personally travel to Puerto Rico or the Dominican Republic to investigate the applicant's background.**

"I, along with lead counsel R.P. Cornelius were confident that the investigators would do a professional and competent job and nothing has convinced me otherwise.

**State whether counsel considered using a mitigation specialist, anthropologist, or sociologist to assist at trial and explain counsel's decision regarding hiring such an expert.**

"Lead Counsel Cornelius made the decision on the hiring of a psychologist and an investigator that worked on the mitigation, apart from another investigator working on investigating criminal case. I was in court when Mr. Cornelius spoke with the Judge regarding the difficulty of hiring a "Mitigation Expert" after the Harris County Commissioners Court cut indigent defense spending. Mr. Cornelius could not find a mitigation expert willing to accept the case under the County's new pay rate. The Judge agreed to pay for psychologist to consult with any of matter of mitigation and an investigator devoted to mitigation evidence.

**Defendant's Consulate**

"The defendant expressed no interest at all in receiving any help of any kind from his consulate. He was given his warnings about this and it was reiterated by us. He had no interest in having us contact the consulate.

**Explain counsel's reasoning in choosing not to object to or specifically request the trial court to report its conversation with juror Angela Bowman on the record.**

"My recollection is that the Judge informed us of the situation and that we were told that the Judge would speak with the juror in chambers with the court reporter present to make a record for appellate purposes.

**Explain counsel's reasoning for not personally calling attorney Michael Casaretto to investigate the conversation he claimed to have overheard between two jurors on the elevator.**

"My recollection is that the Judge informed us of the event and gave us a thorough description as related by Mr. Casaretto. I recall that speaking with Mr. Cornelius about it and forming the opinion that it is was insignificant.

_____
Mario Madrid, Affiant

Sworn to and subscribed before me on this the 25th day of November, 2016.

_____
NOTARY PUBLIC



JACQUELINE VANESSA KAMAIE
Notary Public, State of Texas
My Commission Expires
March 31, 2018



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 29, 2016

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed

☒ Affidavit November 28, 2016

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – AFFIDAVIT OF MARIO MADRID



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

November 29, 2016

JOANNE HEISEY
ATTORNEY FOR APPLICANT
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 N. CONGRESS AVENUE, SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed                    ,

☒ Affidavit November 28, 2016

☐ Court Order Dated                    ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – AFFIDAVIT OF MARIO MADRID

1384794-A
337th District Court

p5

**SWORN AFFIDAVIT**

| STATE OF TEXAS | § | KNOW ALL MEN BY |
|---|---|---|
| | § | |
| | § | |
| COUNTY OF HARRIS | § | THESE PRESENTS |

My name is JJ Gradoni. I am the owner of Gradoni & Associates and have operated a State of Texas licensed investigative firm since 1988 (28 years). Prior to entering the private sector I worked as a police officer for 12 years. I have a great deal of experience in investigating criminal cases and have worked with Mr. R.P. Skip Cornelius on a great number of cases over the last 20 years, with emphasis on capital murder cases. We have had great success on many of our cases.

In 2011, I was the lead investigator on the Obel Cruz Garcia capital murder case. It was at a time when Harris County was cutting back on paying mitigation experts and investigators. In the Cruz Garcia case I had an agreement with Mr. Cornelius to do both the criminal investigation and the mitigation investigation. I assigned Edna Velez, a native of Puerto Rico, as the lead on the mitigation aspect because of her background; specifically her experience as a Customs agent, her Spanish speaking skills, and her knowledge of Puerto Rico and the Dominican Republic. Edna reported directly to me and Mr. Cornelius and had Dr. Susana Rosin, Ph.D. to confer with if she chose to. I, myself and virtually all of my staff, worked on the facts and legal defenses of the case.

Edna and I went to the Dominican Republic and located and interviewed witnesses, took photographs and obtained very useful and important information for the lawyers to use in mitigation. We attempted to locate any known relatives or friends of the defendant.

Cruz Garcia was visited 7 times at the Harris County Jail by Edna Velez. I was present during two of the interviews, and Attorney R.P. Skip Cornelius was present on two of the interviews. We gave Cruz Garcia every opportunity to tell us about any person that could possibly say anything good about him, which produced negative results. Cruz Garcia was not very forthcoming about much of anything with respect to the case because, as he informed me, God and Jesus were going to deliver him and he was not really concerned about being convicted. Cruz Garcia told me, amongst other things, that God would change the witnesses' tongues into snakes and they would not testify against him. Cruz Garcia was not

**FILED**
Chris Daniel
District Clerk

Time: **NOV 28 2016** 11:20
By: Harris County, Texas
Deputy

27/991

IMAGED

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

000957

interested in contacting his consulate in the Dominican Republic or anyone else, to my knowledge.

Cruz Garcia never told myself or Edna Velez anything about Jose Valdez or Hector Saavedra.

Cesar Mala Rios was identified in the offense report as an associate of Diana Garcia. As a result of this documentation we conducted database searches to identify current addresses and phone numbers for Cesar Mala Rios, along with establishing his criminal history and rap photograph. Efforts to make contact with Cesar Mala Rios at addresses we developed were not successful. Attempts to make contact with Cesar Mala Rios by the phone numbers we developed were not successful. Cruz Garcia never asked us to locate and contact Cesar Mala Rios.

Because Cruz Garcia's DNA was found in the rape kit of Diana Garcia, the woman whose son was killed (she said he raped her that night), we asked Cruz Garcia if he could explain how his semen was found in the rape kit on more than one occasion. On May 2, 2013 Cruz Garcia responded by saying "the day of the alleged incident there was a lot of people in her apartment (referring to Diana's) and a lot of things happened. The truth will come out during trial." The second time Cruz Garcia was asked about the DNA, on May 20, 2013, Cruz Garcia was asked if he had had consensual sex with Garcia. He responded by saying "there was always lots of people at Diana's apartment and everyone entered every room without asking permission." When Cruz Garcia was told that his response was not acceptable he continued to avoid answering the question. Cruz Garcia then stated that when Diana testifies it will be noted that it was him that took care of the little boy when she did her thing. Everything will be revealed in the trial because God will convert their tongues into snakes and they will only be able to tell the truth.

On June 3, 2013 when asked about the DNA, Cruz Garcia answered again that the truth was going to come out during trial and Diana had to tell the truth. Cruz Garcia also questioned the reason the DNA was such a "big deal," because the rape was not one of his charges.

Each and every time members of the defense team spoke to Cruz Garcia it was with the assistance of Edna Velez, who was a certified interpreter with the Customs Service. I have no reason to believe that our questions to Cruz Garcia were not clear and concise nor were his responses to our questions not translated properly into the English language.

I can read and write the English language. I have read the foregoing Affidavit, which I have made and the statements are true and correct to the best of my knowledge and belief.

FURTHER THE AFFIANT SAYETH NOT:

James Gladoni

_____

James Gladoni
Printed Name

Subscribed and sworn to before me, a Notary Public, in and for the State of Texas, County of Harris, on this the 16th day of November 2016

**KAYLA KOENIG**
Notary ID # 126626427
My Commission Expires
September 13, 2020

Notary Public

Harris _____        TX _____
County                           State

: 00959



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 29, 2016

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed

☒ Affidavit November 28, 2016

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – AFFIDAVIT OF JJ GRADONI

1201 FRANKLIN • P.O. BOX 4651 • HOUSTON, TEXAS 77210-4651 • (888) 545-5577



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

November 29, 2016

JOANNE HEISEY
ATTORNEY FOR APPLICANT
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 N. CONGRESS AVENUE, SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed

☒ Affidavit November 28, 2016

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – AFFIDAVIT OF JJ GRADONI

P 5

Cause No. 1384794-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 337TH DISTRICT COURT |
| | § | OF |
| OBEL CRUZ-GARCIA, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## STATE'S MOTION REQUESTING THE TRIAL COURT TO SET DATE FOR FILING OF PROPSED FINDINGS OF FACT

COMES THE State of Texas by and through its undersigned Assistant District Attorney and respectfully request that the Court order the parties to submit proposed findings of fact in cause no. 1384794-A to the Court on or before December 22, 2016:

### I.

On August 8, 2016, the Court designated issues of alleged ineffective assistance of counsel that the Court ordered be addressed by affidavits of trial counsel R. P. (Skip) Cornelius and trial counsel Mario Madrid in cause no. 1384794-A. On November 28, 2016, trial counsel Cornelius and trial counsel Madrid filed the ordered affidavits responding to the allegations of ineffective assistance of trial counsel.

Therefore, the State respectfully requests that the Court order both parties to submit proposed findings of fact in cause no. 1384794-A on or before December 22, 2016.

Respectfully submitted,

LORI DEANGELO
deangelo_lori@dao.hctx.net

RECEIVED IN
POST TRIAL
DISTRICT CLERK OFFICE
NOV 29 2016
Time:_____
Harris County, Texas
By_____
Deputy

**FILED**
Chris Daniel
District Clerk
NOV 29 2016
Time:_____
Harris County, Texas
By_____
Deputy

IMAGED

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1

: 00962

## II. CERTIFICATE OF SERVICE

A copy of this instrument was sent via email on November 29, 2016 to applicant's

counsel: Joanne Heisey; 1700 North Congress Ave., Suite 460; Austin, Texas  78701.

LORI DEANGELO
deangelo_lori@dao.hctx.net

2

Cause No. 1384794-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 337TH DISTRICT COURT |
| | § | OF |
| OBEL CRUZ-GARCIA, Applicant | § | HARRIS COUNTY, TEXAS |

## <u>ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT</u>

The Court **ORDERS** that the applicant and the State submit to the Court proposed findings of fact in cause no. 1384794-A on or before December 22, 2016.

SIGNED the _30_ day of November, 2016.

RENEE MAGEE
Presiding Judge
337TH District Court
Harris County, Texas

3



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 30, 2016

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed　　　　　　,

☐ Affidavit　　　,

☐ Court Order Dated　　　　　　,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order　　　　　　,

☒ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S MOTION / ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

November 30, 2016

JOANNE HEISEY
ATTORNEY FOR APPLICANT
1700 NORTH CONGRESS AVE., SUITE 460
AUSTIN, TEXAS 78701

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed ,

☐ Affidavit ,

☐ Court Order Dated ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order ,

☒ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S MOTION / ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT

# IN THE 337TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

**FILED**
Chris Daniel
District Clerk

DEC - 1 2016

Time: _____ 11:20
Harris County, Texas
By _____
Deputy

| | ) | |
|---|---|---|
| | ) | Trial Cause No. |
| EX PARTE | ) | 1384794 *-A* |
| Obel Cruz-Garcia, | ) | |
| APPLICANT | ) | |
| | ) | |
| | ) | |

## APPLICANT'S OPPOSITION TO STATE'S MOTION REQUESTING THE TRIAL COURT TO SET DATE FOR FILING OF PROPSED [SIC] FINDINGS OF FACT

Obel Cruz-Garcia, by and through his attorneys of record the Office of Capital and Forensic Writs (OCFW), respectfully requests that this Court deny the State's *Motion Requesting the Trial Court Set Date for Filing Propsed [sic] Findings of Fact.* The State's Motion is both premature and based on incorrect presumptions. The motion should be denied.

### RELEVANT BACKGROUND

At a hearing held on August 8, 2016, this Court signed an order requiring Mr. Cruz-Garcia's trial counsel to submit affidavits responding to the allegations of ineffective assistance of counsel raised in Mr. Cruz-Garcia's Initial Application. At that same hearing, Mr. Cruz-Garcia urged a motion asking the Court to designate controverted issues of material fact to be resolved pursuant to Article 11.071 of the Texas Code of Criminal Procedure *before* proceeding with findings of fact based

: 00967

solely on pleadings that included plainly contradictory assertions of material fact. *See* Tex. Code Crim. Proc. Art. 11.071 § 8(a) ("[A]fter the last date the state answers the application, the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of applicant's confinement exist and shall issue a written order of the determination."). At that time, the Court indicated that the necessity of designating issues not resolved by the affidavits from trial counsel would be addressed only after trial counsel's affidavits had been submitted.[1] Thus, Mr. Cruz-Garcia's motion for an order designating disputed issues of fact, filed on August 5, 2016, remains pending before this court.

**ARGUMENT**

The State's request is premature. The State's current motion indicates that trial counsel have now filed the affidavits responding to the allegations of ineffective assistance of counsel raised in Mr. Cruz-Garcia's Initial Application as ordered. Undersigned counsel have not, however, yet been served with said affidavits and, therefore, cannot know what factual disputes remain.

The State's request is also based on a misapprehension of the affidavits' scope. Again, Mr. Cruz-Garcia, unlike counsel for the State, has not yet been served with copies of the trial counsel affidavits in question. But the affidavits from trial

---

[1] Undersigned counsel has left several messages with the court reporter over the past several months since the hearing requesting a transcript of the hearing but has not yet received a response.

: 00968

counsel cannot be sufficient to address all disputed claims raised in Mr. Cruz-Garcia's Initial Application.  Several claims do not implicate trial counsel's conduct; thus trial counsel's personal knowledge could not reach those claims.  For instance, the affidavits from trial counsel will be insufficient to resolve the issue of whether jurors discussed the evidence in the case outside of deliberations because, presumably, trial counsel were not in the jury room.  Thus, the designation of remaining disputed factual issues will be required—even in the unlikely event that this Court were to find that the trial counsel affidavits are entirely credible in every aspect, address all ineffectiveness issues raised in the Initial Application on their face, and thus somehow warrant depriving Mr. Cruz-Garcia of his due process right to cross-examine, via hearing or deposition, and otherwise test the veracity of the affiants.[2]

Moreover, at the August 8 hearing, the Court indicated that Mr. Cruz-Garcia would be afforded an opportunity to submit evidence in support of the claims raised in his Initial Application, as due process requires.  Mr. Cruz-Garcia has not yet had this opportunity.

Even without having been afforded at this juncture the opportunity to review the affidavits of trial counsel, however, it merits noting as a general matter that

---

[2] *See* Motion for Order Designating Factual Issues Pursuant to Texas Code of Criminal Procedure, Article 11.071 Sections 8(A) And 9(A), filed August 5, 2016.

affidavits are an improper method of taking evidence where a district court judge must resolve disputed factual issues involving credibility determinations. *See, e.g., Manzi v. State*, 88 S.W.3d 240, 255 (Tex. Crim. App. 2002) (Cochran, J., concurring) ("Trial judges who are confronted with contradictory affidavits, each reciting a plausible version of the events, ought to convene an evidentiary hearing to see and hear the witnesses and then make a factual decision based on an evaluation of their credibility."); *see also id.* at 250 (Womack, J., concurring) ("That the statute authorizes a court to make decisions on affidavits does not mean it can make decisions of every kind on affidavit. The statute can be construed to allow some issues to be decided by written evidence when credibility determinations are not involved."); *Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *4-*5 (Tex. Crim. App. Nov. 18, 2015) (recognizing that where the record is comprised solely of evidence offered through affidavits, the record does not contain enough information on which to base credibility determinations to resolve controverted issues of fact, and remanding for specific findings of fact regarding credibility).

In the post-conviction context where a claim of ineffective assistance of trial counsel is alleged, trial counsel occupy a position that is adverse to their former client. This reality implicates additional concerns. *Cf. Christeson v. Roper*, 135 S. Ct. 891, 894-95 (2015) (recognizing the importance of policing conflicts of interest that can arise in capital post-conviction representation). As adverse witnesses,

defense counsel become interested parties,[3] and affidavits from interested witnesses are an inadequate fact-finding mechanism. As the Court of Criminal Appeals observed in *Charles v. State*:

> Affidavits... are widely and appropriately used in criminal and civil proceedings to determine if there are material disputed facts and to define exactly which facts are disputed. They are not always well-suited for resolving disputed facts.

*Charles v. State*, 146 S.W.3d 204, 210 (Tex. Crim. App. 2004), citing *Manzi v. State*, 88 S.W. 3d 240, 250 (Tex. Crim. App. 2002) (Cochran, J., concurring). The statements in affidavits of interested witnesses concerning their own state of mind are incontestable, because "the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting." *Id.* For that reason, rather than blindly crediting the incontestable affidavits of interested witnesses, such as trial counsel, the Court of Criminal Appeals has held that a trial judge has the discretion to *discount* any factual allegations offered by these witnesses in affidavit form. *See id.*; *see also Manzi*, 88 S.W.3d at 250-51 (Cochran, J., concurring) ("When... one affiant says, 'the light was green,' while another affiant says, 'the light was red,' a hearing at which the

---

[3] If a court were to find either trial counsel to have rendered ineffective assistance of counsel, trial counsel would be ineligible for appointment in future cases. *See* TEX. GOV'T CODE § 78.056(a)(2). Thus, each trial counsel had an irremediable conflict of interest with respect to Mr. Cruz-Garcia's allegations, since a finding for Mr. Cruz-Garcia would adversely impact their reputational and pecuniary interests.

witnesses testify, are cross-examined, and have their credibility assessed by the fact finder is usually required.").

Finally, even were it appropriate to set a deadline to file proposed findings of fact and conclusions of law at this stage—which it is not—undersigned counsel would be unable to comply with the December 22, 2016, deadline the State has proposed. Undersigned counsel has a week-long evidentiary capital post-conviction hearing set to commence on December 12, 2016, in Fort Bend County. At the close of the evidentiary hearing, undersigned counsel, Joanne Heisey, will travel to Indianapolis to attend a memorial service for her deceased uncle on December 18. The earliest date when counsel are available for a hearing on the State's motion is December 22, 2016.

## CONCLUSION

For the foregoing reasons, Mr. Cruz-Garcia respectfully requests that the Court deny the State's Motion.

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED: November 30, 2016

Joanne Heisey
Texas Bar No. 24087704
Gretchen S. Sween
Texas Bar No. 24041996
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8502
Facsimile: (512) 463-8590
joanne.heisey@ocfw.texas.gov
gretchen.sween@ocfw.texas.gov

**Post-Conviction Attorneys for Mr. Cruz-Garcia**

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002
(One courtesy copy, via email)

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002
(One copy, via email)

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy)

Joanne Heisey

# IN THE 337TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| _____ | ) | Trial Cause No. |
| EX PARTE | ) | 1384794 - 4 |
| Obel Cruz-Garcia, | ) | |
| APPLICANT | ) | |
|  | ) | |
| _____ | ) | |

## APPLICANT'S MOTION TO RECONSIDER IMPROPER ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
GRETCHEN SWEEN (No. 24041996)
(E-Mail: Gretchen.Sween@ocfw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocfw.texas.gov)
Post-Conviction Attorneys
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Applicant*



**FILED**
Chris Daniel
District Clerk

DEC 2 2 2016
Time: _____ 8:35
Harris County, Texas
By _____
Den.

1

: 00975

## IN THE 337TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

| | |
|---|---|
| EX PARTE<br>Obel Cruz-Garcia,<br>APPLICANT | Trial Cause No.<br>1384794 |

## APPLICANT'S MOTION TO RECONSIDER IMPROPER ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT

Obel Cruz-Garcia, by and through his attorneys of record, the Office of Capital and Forensic Writs (OCFW), respectfully requests that this Court reconsider its improper Order, directing the parties to file proposed findings of fact and conclusions of law (FFCL) as the State had prematurely requested. The timing and circumstances of the Order reflect a failure to comply with the governing statutory directives. The Order should be rescinded.

### INTRODUCTION

The sequence of events that culminated in the Court's issuing the Order in question suggest an alarming assertion of power and even collusion with counsel for the State at the expense of due process and proper statutory construction. The rule of law does not countenance these developments. Thus, the Order should be reconsidered and rescinded.

1

The Order in question was signed on November 30, 2016. *See* Exhibit A. However, the Order was not received by Mr. Cruz-Garcia's counsel until December 6, 2016—a week later. The Order demands that the parties submit proposed FFCL by a specific date (December 22, 2016) although Mr. Cruz-Garcia had opposed the State's premature request for such an Order and has not yet been given an opportunity to be heard with respect to this matter.

Although Mr. Cruz-Garcia's opposition was made in a written motion, duly filed on December 1, the Court seemingly overlooked (and implicitly denied) that opposition and instead ordered the parties to appear on December 22, 2016, with proposed FFCL in hand. These developments seem to have more to do with gamesmanship in the wake of an election lost—actions particularly untoward in a post-conviction habeas proceeding challenging the constitutionality of a conviction and death sentence in a capital case.

The specific events that have culminated in the current impropriety are outlined below.

## RELEVANT BACKGROUND

At a hearing held on August 8, 2016, this Court signed an order requiring Mr. Cruz-Garcia's trial counsel to submit affidavits responding to the allegations of ineffective assistance of counsel raised in Mr. Cruz-Garcia's Initial Application. At that same hearing, Mr. Cruz-Garcia asked the Court to designate controverted issues

2

of material fact to be resolved pursuant to Article 11.071 of the Texas Code of Criminal Procedure *before* proceeding with findings of fact based solely on pleadings that included plainly contradictory assertions of material fact, as state law requires. *See* TEX. CODE CRIM. PROC. art. 11.071 § 8(a) ("[A]fter the last date the state answers the application, the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of applicant's confinement exist and shall issue a written order of the determination."). At that time, the Court indicated that it would determine the necessity of designating issues after trial counsel's affidavits were submitted.[1] Thus, Mr. Cruz-Garcia's motion for an order designating disputed issues of fact, filed on August 5, 2016, remained pending.

Meanwhile, on November 8, 2016, Judge Renee McGee, the current judge presiding over this Court, narrowly lost her bid for reelection. In addition, current Harris County District Attorney Devon Anderson was defeated by Kim Ogg, who ran on a reform platform.

Soon thereafter, on November 18, 2016, counsel for the State emailed counsel for Mr. Cruz-Garcia, asking about setting a hearing on proposed FFCL on November

---

[1] Mr. Cruz-Garcia's counsel has left several messages with the court reporter over the past several months since that hearing, requesting a transcript of the hearing, but has not yet received a response.

3

: 00978

28 or 29. Exhibit B. At that point, trial counsel affidavits had not yet been filed and Mr. Cruz-Garcia's pending motion had not yet been revisited.

A few days later, on November 21, counsel for Mr. Cruz-Garcia responded that counsel was unavailable on those dates and noted that it was premature to be talking about FFCL since the parties had not yet received the trial counsel affidavits. Exhibit C.

A week later, on November 28, the State's counsel again emailed counsel for Mr. Cruz-Garcia stating that the trial counsel had filed their affidavits that day, and State's counsel again pushed for an immediate hearing on proposed FFCL. Exhibit D. Without waiting for an answer from Mr. Cruz-Garcia, the State's counsel filed the State's boilerplate motion for proposed FFCL the next day, on November 29.

Counsel for Mr. Cruz-Garcia responded to these developments promptly, restating that counsel was not available until December 20. Exhibit E.

The next day, Mr. Cruz-Garcia served his opposition to the State's motion regarding proposed FFCL on counsel for the State and Judge Magee and sent the original to the clerk's office via express mail. Exhibit F.

Later that same day, November 30, counsel for the State conveyed copies of the trial counsel affidavits to Mr. Cruz-Garcia's counsel that the State, seemingly, had previously had in its possession.

4

On December 1, Judge McGee's court coordinator then emailed Mr. Cruz-Garcia's counsel stating that the Judge wanted to set the State's motion for a hearing on December 7th or 9th. Exhibit G. Again, presumably, the objective was to require Mr. Cruz-Garcia to prematurely file proposed FFCL even though: (1) disputed issues of material fact were (and remain) evident from the face of the pleadings; (2) most material facts are not resolved by the trial counsel affidavits; and (3) an order either finding no issues under Section 8(a) of Article 11.071 or an order designating issues under Section 9(a) is a prerequisite for an order requiring the parties to submit proposed FFCL. Mr. Cruz-Garcia's counsel responded to the Court's directive, restating that counsel was not available either of those dates but was available on December 22 at the earliest. Exhibit H.

Counsel for the State then chimed in, suggesting that the director of the OCFW or another attorney could cover the hearing. OCFW's director, Benjamin Wolff, then addressed this unnecessary push to set an immediate hearing, explaining that he was not available and that counsel on this case would not be available until December 21 at the earliest. Exhibit I.

On December 5, a hearing was then set—but not on the contested motion. Instead, the Court set a hearing for December 22 at which time the Court expected to be presented with proposed FFCL from both sides. The Order at issue here followed the next day. Exhibit A.

5

On December 16, 2016, incoming District Attorney-elect Kim Ogg announced that she intended to take the office in a "new direction" and that "change is coming" to the Office of the District Attorney, and dismissed 37 prosecutors, over ten percent of the prosecutors in the office. *See, e.g.,* Brian Rogers, "Shake-ups begin at DA's office as Ogg moves toward taking office," HOUSTON CHRONICLE, December 16, 2016, *available at* http://www.chron.com/news/houston-texas/article/Shake-ups-begin-at-DA-s-office-as-Ogg-moves-10801298.php. In announcing the staffing changes, District Attorney-elect Ogg stated that her administration will "not have a win-at-all-costs mentality, that we would prize fairness and transparency and equality" and that "the leadership decisions that I made are directed to that view." Meagan Flynn, *Incoming DA Kim Ogg Prepares to Fire Dozens of Prosecutors*, HOUSTON PRESS, December 16, 2016, *available at:* http://www.houstonpress.com/news/incoming-da-kim-ogg-prepares-to-fire-dozens-of-prosecutors-9034289.

### ARGUMENT

The push to set a hearing for the presentation of premature proposed FFCL seems to be animated more by the recent election results and less by the interests of justice or the governing law.

**I.    The Texas Code of Criminal Procedure Outlines the Process That Must Proceed Any Order Seeking Proposed FFCL.**

6

: 00981

This proceeding is governed by Article 11.071 of the Texas Code of Criminal Procedure. Article 11.071 provides just two distinct pathways through which a court may order FFCL: section 8 and section 9.

Section 8 applies when the claims raised by the application, and answered by the state, fail to raise any disputed issues of fact material to the constitutionality of confinement. These are claims that are either purely matters of law—such as a challenge to Texas's Special Issues as unconstitutionally vague—or claims based on facts that are entirely uncontested. With such claims, no fact-finding is required before the convicting court can proceed to resolve the claims and make recommendations. To the extent that the court finds that Section 8 applies, and only *after* the convicting court has found there to be no material issues of fact and issued a written order of that determination, it may then order the parties to submit proposed FFCL.

Section 9, by contrast, applies when there are disputed factual issues material to claims of the allegedly unconstitutional confinement. In this situation, the statue requires the convicting court to designate the specific factual issues that need to be resolved *and* announce the manner of fact-finding. Additionally, the Constitution requires that both sides be permitted to present and test evidence. *Panetti v. Quarterman,* 551 U.S. 930, 949 (2007) (same); *see also* TEX. CODE CRIM. PROC. art. 11.071 § 10 (applying the Texas Rules of Criminal Evidence to a hearing under

7

Article 11.071). To the extent that the convicting court finds that Section 9 applies, the convicting court must first issue an order designating factual issues and then allow the parties to present evidence through the specified methods in support of, or in opposition to, the claims raised, that a court may order that the parties to submit proposed FFCL.

At the invitation of the outgoing District Attorney in the last few days of her tenure before a new District Attorney will take office and before that District Attorney has the opportunity to take the Office in a new direction, the Court has engaged in an entirely extra-statutory, illegal procedure. A court may not order FFCL without first designating factual issues, or the lack thereof, pursuant to either Section 8 or 9. There has been no Order, per the statute, that serves as a predicate for any FFCL. Because no such order was issued in this case, Mr. Cruz-Garcia has not proposed FFCL.

## II. The Court's Chosen Process Disregards the Specific Claims at Issue and How Article 11.071 Directs Courts to Resolve Such Claims.

The specific allegations and circumstances of this case preclude the application of Section 8 because the Initial Application and the Answer contain disputed factual issues. The State conceded as much in seeking the production of trial counsel's affidavits. Had Section 8 been applicable, which it is not, the court would not be able to consider the trial counsel affidavits or any other post-filing evidentiary development at all because, by definition, the court would have

8

concluded that the claims could all be adjudicated based on the face of the pleadings: the Initial Application and the Answer. Because, however, most claims at issue here fall under the rubric of Section 9, notice of the disputed factual issues is required, as is the opportunity to present evidence and to test any evidence offered by the State. The attempt to truncate the process is improper.

Seemingly, the State's goal from the outset has been to deprive Mr. Cruz-Garcia of the process described in Section 9. The State sought to set a hearing on proposed FFCL even before trial counsel had filed affidavits responding to the allegations of ineffective assistance of counsel raised in Mr. Cruz-Garcia's Initial Application. More critically, the State's motion and the Court's Order granting that motion ignore the affidavits' scope. The affidavits from trial counsel are insufficient to address all disputed claims raised in Mr. Cruz-Garcia's Initial Application. Several claims do not implicate trial counsel's conduct; thus trial counsel's personal knowledge cannot and does not reach those claims. For instance, the affidavits from trial counsel cannot resolve the issue of whether jurors discussed the evidence outside of deliberations because, presumably, trial counsel were not in the jury room during the deliberations or otherwise privy to the jurors' discussions.

The affidavits do not even permit resolution of all disputed issues of material fact relevant to the ineffective assistance of counsel claim. That is, even if the trial counsel affidavits were deemed credible in every aspect, on their face, these

9

affidavits do not address all issues of deficit performance raised in the Initial Application.

Thus, the Court still needs to designate the disputed factual issues to be resolved and the manner whereby those issues would be resolved. The Court's Order reflects an intent to jump precipitously toward a resolution before issues have even been identified. The short-circuiting of the process is designed—intentionally or otherwise—to deprive Mr. Cruz-Garcia of his due process right to cross-examine, via hearing or deposition, and to otherwise test the veracity of the affiants.[2]

Moreover, at the August 8 hearing, the Court indicated that Mr. Cruz-Garcia *would* be afforded an opportunity to submit evidence in support of the claims raised in his Initial Application, as due process requires. Mr. Cruz-Garcia has not yet had this opportunity. No intervening events, other than the recent election, suggest a reason for the Court's change in course. Moreover, it is improper for the outgoing regime of the District Attorney's office to tie the hands of the incoming District Attorney, and encourage this Court to make hasty and unwise decisions, contrary to the statutory scheme, all designed to deprive Mr. Cruz-Garcia of the opportunity to prove his allegations of unconstitutional confinement.

---

[2] *See* Motion for Order Designating Factual Issues Pursuant to Texas Code of Criminal Procedure, Article 11.071 Sections 8(A) And 9(A), filed August 5, 2016.

: 00985

Further, as a general matter, one-sided, incomplete affidavits, such as those procured by the State in this case from trial counsel, are an improper method of taking evidence where a district court judge must resolve disputed factual issues involving credibility determinations. *See, e.g., Manzi v. State*, 88 S.W.3d 240, 255 (Tex. Crim. App. 2002) (Cochran, J., concurring) ("Trial judges who are confronted with contradictory affidavits, each reciting a plausible version of the events, ought to convene an evidentiary hearing to see and hear the witnesses and then make a factual decision based on an evaluation of their credibility."); *see also id.* at 250 (Womack, J., concurring) ("That the statute authorizes a court to make decisions on affidavits does not mean it can make decisions of every kind on affidavit. The statute can be construed to allow some issues to be decided by written evidence when credibility determinations are not involved."); *Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *4-*5 (Tex. Crim. App. Nov. 18, 2015) (recognizing that where the record is comprised solely of evidence offered through affidavits, the record does not contain enough information on which to base credibility determinations to resolve controverted issues of fact, and remanding for specific findings of fact regarding credibility).

In the post-conviction context, where a claim of ineffective assistance of trial counsel is alleged, trial counsel occupy a position that is adverse to their former client. This reality implicates additional concerns. *Cf. Christeson v. Roper*, 135 S.

11

: 00985

Ct. 891, 894-95 (2015) (recognizing the importance of policing conflicts of interest that can arise in capital post-conviction representation). As adverse witnesses, defense counsel become interested parties,[3] and affidavits from interested witnesses are an inadequate fact-finding mechanism. As the Court of Criminal Appeals observed in *Charles* v. *State*:

> Affidavits... are widely and appropriately used in criminal and civil proceedings to determine if there are material disputed facts and to define exactly which facts are disputed. They are not always well-suited for resolving disputed facts.

*Charles v. State*, 146 S.W.3d 204, 210 (Tex. Crim. App. 2004) (citing *Manzi v. State*, 88 S.W. 3d 240, 250 (Tex. Crim. App. 2002) (Cochran, J., concurring)). The statements in affidavits of interested witnesses concerning their own state of mind are incontestable, because "the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting." *Id.* For that reason, rather than blindly crediting the incontestable affidavits of interested witnesses, such as trial counsel, the Court of Criminal Appeals has held that a trial judge has the discretion to *discount* any factual allegations offered by these witnesses in affidavit form. *See id.*; *see also Manzi*, 88

---

[3] If a court were to find either trial counsel to have rendered ineffective assistance of counsel, trial counsel would be ineligible for appointment in future cases. *See* TEX. GOV'T CODE § 78.056(a)(2). Thus, each trial counsel had an irremediable conflict of interest with respect to Mr. Cruz-Garcia's allegations, since a finding for Mr. Cruz-Garcia would adversely impact their reputational and pecuniary interests.

: 000987

S.W.3d at 250-51 (Cochran, J., concurring) ("When... one affiant says, 'the light was green,' while another affiant says, 'the light was red,' a hearing at which the witnesses testify, are cross-examined, and have their credibility assessed by the fact finder is usually required.").

Even if it were appropriate to order production of proposed FFCL at this stage—which it is not—undersigned counsel expressly conveyed to the Court and to counsel for the State specific details as to why counsel for Mr. Cruz-Garcia were not even available to attend a hearing on the State's contested motion until December 21. To then hastily enter an Order requiring the production of FFCL by that date would seem to further no legitimate purpose. Moreover, less than three weeks to prepare proposed findings of fact and conclusions of law is an uncommonly short period of time in which to prepare proposed findings of fact and conclusions of law. In all other cases the OCFW has handled in Harris County, the district courts have allowed counsel at least 50 and often 100 or more days. *See, e.g., Ex parte Carl Buntion*, cause no. 588227 (178th District Court) (allowing 127 days to file proposed findings of fact and conclusions of law); *Ex parte Jaime Cole*, cause no. 1250754 (230th District Court) (allowing 100 days to file proposed findings of fact and conclusions of law); *Ex parte Joseph Jean*, cause no. 1302120 (230th District Court) (allowing 100 days to file proposed findings of fact and conclusions of law); *Ex parte Garland Harper*, cause no. 1272085 (182nd District Court) (allowing 57 days

13

to file proposed findings of fact and conclusions of law); *Ex parte Brian Davis*, cause no. 616522 (230th District Court) (allowing 56 days to file proposed findings of fact and conclusions of law). Respectfully, the only purpose the Order accomplishes is a race to a predetermined finish line before a new judge and a new district attorney take office office—absent any regard to the substance of Mr. Cruz-Garcia's claims and their merit. It also does not comport with the articulated policy of District Attorney-elect Ogg, who has indicated that her office would replace a "win-at-all-costs mentality" with one that "prize[s] fairness and transparency and equality." Fairness, transparency and equality demand that Mr. Cruz-Garcia be given the opportunity to prove his claims in a proceeding that accords with the clear statutory language of Article 11.071.

As the Court must understand, the tenure of any particular district attorney or judge is not the correct parameter for assessing what process is warranted. The requisite process that precedes the submission of proposed FFCL is described in plain statutory text. *See* TEX. CODE OF CRIM. PROC. art. 11.071, §§ 8 & 9, described above. Circumventing that process is arbitrary and capricious as well as a clear violation of Mr. Cruz-Garcia's right to due process under the U.S. Constitution and state law.

## CONCLUSION

: 00989

For the foregoing reasons, Mr. Cruz-Garcia respectfully requests that the Court rescind its Order for Parties to File Proposed Findings of Fact, and rule on the pending motion to designate issues, as it indicated it would at the August 8 hearing, or, in the alternative, withhold ruling on the pending motions until the Court can address them in January.

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED: December 21, 2016

Joanne Heisey
Texas Bar No. 24087704
Gretchen S. Sween
Texas Bar No. 24041996
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8502
Facsimile: (512) 463-8590
joanne.heisey@ocfw.texas.gov
gretchen.sween@ocfw.texas.gov

**Post-Conviction Attorneys for Mr. Cruz-Garcia**

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002
(One courtesy copy, via email)

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002
(One copy, via email)

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy)

Joanne Heisey

16

: 00991

# Exhibit A

: 00992

Cause No. 1384794-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 337TH DISTRICT COURT |
| | § | OF |
| OBEL CRUZ-GARCIA, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT

The Court **ORDERS** that the applicant and the State submit to the Court proposed

findings of fact in cause no. 1384794-A on or before December 22, 2016.

SIGNED the _30_ day of November, 2016.

RENEE MAGEE
Presiding Judge
337TH District Court
Harris County, Texas

3

: 00993

# Exhibit B

00994

## Joanne Heisey

| | |
|---|---|
| **From:** | DeAngelo, Lori <DEANGELO_LORI@dao.hctx.net> |
| **Sent:** | Friday, November 18, 2016 2:37 PM |
| **To:** | Joanne Heisey |
| **Subject:** | Obel Cruz-Garica |

Hey there. I would like to get this case on the docket to discuss findings with Judge Magee. I haven't checked with the court yet, but are you available Nov. 29th or 30th? Please let me know asap and I'll contact the court coordinator. Thanks!

1

: 00995

# Exhibit C

: 00996

**Joanne Heisey**

| | |
|---|---|
| **From:** | Joanne Heisey <Joanne.Heisey@ocfw.texas.gov> |
| **Sent:** | Monday, November 21, 2016 9:31 AM |
| **To:** | DeAngelo, Lori |
| **Subject:** | RE: Obel Cruz-Garica |

Hi Lori. I am not available either of those dates. I've got a hearing in Williamson County on the 29th and will be traveling with an expert interviewing witnesses the rest of the week. It seems premature to be talking about findings since we don't yet have the affidavits from trial counsel as far as I know.

**From:** DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
**Sent:** Friday, November 18, 2016 2:37 PM
**To:** Joanne Heisey
**Subject:** Obel Cruz-Garica

Hey there. I would like to get this case on the docket to discuss findings with Judge Magee. I haven't checked with the court yet, but are you available Nov. 29th or 30th? Please let me know asap and I'll contact the court coordinator. Thanks!

1

# Exhibit D

: 00998

**Joanne Heisey**

| | |
|---|---|
| **From:** | DeAngelo, Lori <DEANGELO_LORI@dao.hctx.net> |
| **Sent:** | Monday, November 28, 2016 11:51 AM |
| **To:** | Joanne Heisey |
| **Subject:** | RE: Obel Cruz-Garica |

Good morning. Both attorneys filed their affidavits with the clerk's office today. Are you still booked all of this week? If so, how about Monday, Dec. 5th?

---

**From:** Joanne Heisey [mailto:Joanne.Heisey@ocfw.texas.gov]
**Sent:** Monday, November 21, 2016 9:31 AM
**To:** DeAngelo, Lori
**Subject:** RE: Obel Cruz-Garica

Hi Lori. I am not available either of those dates. I've got a hearing in Williamson County on the 29th and will be traveling with an expert interviewing witnesses the rest of the week. It seems premature to be talking about findings since we don't yet have the affidavits from trial counsel as far as I know.

**From:** DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
**Sent:** Friday, November 18, 2016 2:37 PM
**To:** Joanne Heisey
**Subject:** Obel Cruz-Garica

Hey there. I would like to get this case on the docket to discuss findings with Judge Magee. I haven't checked with the court yet, but are you available Nov. 29th or 30th? Please let me know asap and I'll contact the court coordinator. Thanks!

: 00999

# Exhibit E

: 01000

## Joanne Heisey

| | |
|---|---|
| **From:** | Joanne Heisey |
| **Sent:** | Tuesday, November 29, 2016 3:25 PM |
| **To:** | 'DeAngelo, Lori' |
| **Subject:** | RE: Obel Cruz-Garica |

Hi Lori,

I am out of pocket the next couple weeks because I have a week-long evidentiary hearing starting December 12. I will be attending a memorial service for my uncle in Indianapolis on December 18 and flying back to Austin on the 19th, so the earliest I could do would be the 20th. I'll also be traveling December 23 and 26 for Christmas. Let me know what date will work for you.

Thanks,
Joanne

**From:** DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
**Sent:** Monday, November 28, 2016 11:51 AM
**To:** Joanne Heisey
**Subject:** RE: Obel Cruz-Garica

Good morning. Both attorneys filed their affidavits with the clerk's office today. Are you still booked all of this week? If so, how about Monday, Dec. 5th?

**From:** Joanne Heisey [mailto:Joanne.Heisey@ocfw.texas.gov]
**Sent:** Monday, November 21, 2016 9:31 AM
**To:** DeAngelo, Lori
**Subject:** RE: Obel Cruz-Garica

Hi Lori. I am not available either of those dates. I've got a hearing in Williamson County on the 29th and will be traveling with an expert interviewing witnesses the rest of the week. It seems premature to be talking about findings since we don't yet have the affidavits from trial counsel as far as I know.

**From:** DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
**Sent:** Friday, November 18, 2016 2:37 PM
**To:** Joanne Heisey
**Subject:** Obel Cruz-Garica

Hey there. I would like to get this case on the docket to discuss findings with Judge Magee. I haven't checked with the court yet, but are you available Nov. 29th or 30th? Please let me know asap and I'll contact the court coordinator. Thanks!

1

: 001001

# Exhibit F

: 01002

**Joanne Heisey**

| | |
|---|---|
| **From:** | Joanne Heisey |
| **Sent:** | Wednesday, November 30, 2016 2:13 PM |
| **To:** | 'DeAngelo, Lori' |
| **Cc:** | Magee, Judge Renee (DCA) |
| **Subject:** | RE: |
| **Attachments:** | 33 - Opposition to State's Motion for Findings of Fact.pdf |

Dear Lori and Judge Magee,

Please find attached our opposition to the State's motion for findings of fact, which I FedExed to the clerk today.

Best regards,

Joanne Heisey
Post-Conviction Attorney
Office of Capital and Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8509
joanne.heisey@ocfw.texas.gov


-----Original Message-----
From: DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
Sent: Tuesday, November 29, 2016 9:38 AM
To: Joanne Heisey
Cc: Magee, Judge Renee (DCA)
Subject: FW:

Please see attached motion filed today in the Obel Cruz-Garcia case.

Lori DeAngelo
Assistant District Attorney
Post-Conviction Writs Division
713-274-5990

-----Original Message-----
From: xx@dao.hctx.net [mailto:xx@dao.hctx.net]
Sent: Tuesday, November 29, 2016 9:34 AM
To: DeAngelo, Lori
Subject:

Please open the attached document. This document was digitally sent to you using an HP Digital Sending device.

1

: 01003

# Exhibit G

: 01004

## Joanne Heisey

| | |
|---|---|
| **From:** | Callis, Leah (DCA) <Leah_Callis@Justex.net> |
| **Sent:** | Thursday, December 01, 2016 3:57 PM |
| **To:** | Joanne Heisey |
| **Cc:** | DeAngelo, Lori (HCDA) |
| **Subject:** | OBEL CRUZ GARCIA COURT DATE |

**Importance:** High

Good afternoon to you both.

The Judge has requested for the matter to be placed on the docket for mid-week of next week. The best dates I have are Wednesday, 12/7/16 or Friday, 12/9/16.

Please let me know which date works for you.

Thank you, Leah Callis

-----Original Message-----
From: Joanne Heisey [mailto:Joanne.Heisey@ocfw.texas.gov]
Sent: Wednesday, November 30, 2016 2:16 PM
To: Callis, Leah (DCA) <Leah_Callis@Justex.net>
Subject: FW:

Hi Ms. Callis,

I meant to cc you on the below email--just sending a courtesy copy to Judge Magee of a motion I filed today in Obel Cruz-Garcia's case.

Many thanks,
Joanne

-----Original Message-----
From: Joanne Heisey
Sent: Wednesday, November 30, 2016 2:13 PM
To: 'DeAngelo, Lori'
Cc: Magee, Judge Renee (DCA)
Subject: RE:

Dear Lori and Judge Magee,

Please find attached our opposition to the State's motion for findings of fact, which I FedExed to the clerk today.

Best regards,

Joanne Heisey
Post-Conviction Attorney
Office of Capital and Forensic Writs
1700 Congress Avenue, Suite 460

1

Austin, Texas 78701
512.463.8509
joanne.heisey@ocfw.texas.gov

-----Original Message-----
From: DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
Sent: Tuesday, November 29, 2016 9:38 AM
To: Joanne Heisey
Cc: Magee, Judge Renee (DCA)
Subject: FW:

Please see attached motion filed today in the Obel Cruz-Garcia case.

Lori DeAngelo
Assistant District Attorney
Post-Conviction Writs Division
713-274-5990

-----Original Message-----
From: xx@dao.hctx.net [mailto:xx@dao.hctx.net]
Sent: Tuesday, November 29, 2016 9:34 AM
To: DeAngelo, Lori
Subject:

Please open the attached document. This document was digitally sent to you using an HP Digital Sending device.

2

# Exhibit H

**Joanne Heisey**

| | |
|---|---|
| **From:** | Joanne Heisey |
| **Sent:** | Friday, December 02, 2016 6:36 AM |
| **To:** | 'Callis, Leah (DCA)' |
| **Cc:** | DeAngelo, Lori (HCDA) |
| **Subject:** | RE: OBEL CRUZ GARCIA COURT DATE |

Hi Ms. Callis,

I am not available either of those dates, as I have a week-long evidentiary hearing in another capital case set to commence on Dec. 12. Following the hearing, I am traveling to Indianapolis for my uncle's funeral. The earliest I'm available would be Dec. 22.

Thanks,
Joanne

-----Original Message-----
From: Callis, Leah (DCA) [mailto:Leah_Callis@Justex.net]
Sent: Thursday, December 01, 2016 3:57 PM
To: Joanne Heisey
Cc: DeAngelo, Lori (HCDA)
Subject: OBEL CRUZ GARCIA COURT DATE
Importance: High

Good afternoon to you both.

The Judge has requested for the matter to be placed on the docket for mid-week of next week. The best dates I have are Wednesday, 12/7/16 or Friday, 12/9/16.

Please let me know which date works for you.

Thank you, Leah Callis

-----Original Message-----
From: Joanne Heisey [mailto:Joanne.Heisey@ocfw.texas.gov]
Sent: Wednesday, November 30, 2016 2:16 PM
To: Callis, Leah (DCA) <Leah_Callis@Justex.net>
Subject: FW:

Hi Ms. Callis,

I meant to cc you on the below email--just sending a courtesy copy to Judge Magee of a motion I filed today in Obel Cruz-Garcia's case.

Many thanks,
Joanne

-----Original Message-----
From: Joanne Heisey

1

Sent: Wednesday, November 30, 2016 2:13 PM
To: 'DeAngelo, Lori'
Cc: Magee, Judge Renee (DCA)
Subject: RE:

Dear Lori and Judge Magee,

Please find attached our opposition to the State's motion for findings of fact, which I FedExed to the clerk today.

Best regards,

Joanne Heisey
Post-Conviction Attorney
Office of Capital and Forensic Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512.463.8509
joanne.heisey@ocfw.texas.gov


-----Original Message-----
From: DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
Sent: Tuesday, November 29, 2016 9:38 AM
To: Joanne Heisey
Cc: Magee, Judge Renee (DCA)
Subject: FW:

Please see attached motion filed today in the Obel Cruz-Garcia case.

Lori DeAngelo
Assistant District Attorney
Post-Conviction Writs Division
713-274-5990

-----Original Message-----
From: xx@dao.hctx.net [mailto:xx@dao.hctx.net]
Sent: Tuesday, November 29, 2016 9:34 AM
To: DeAngelo, Lori
Subject:

Please open the attached document. This document was digitally sent to you using an HP Digital Sending device.

2

# Exhibit I

: 01010

**Joanne Heisey**

| | |
|---|---|
| **From:** | Benjamin Wolff |
| **Sent:** | Friday, December 02, 2016 10:26 AM |
| **To:** | 'DeAngelo, Lori'; 'Leah_Callis@Justex.net' |
| **Cc:** | Gretchen Sween; Joanne Heisey |
| **Subject:** | Obel Cruz-Garcia court setting |

Ms. Callis,

I am writing in reference to the scheduling of a motions argument and conference in Ex parte Obel Cruz-Garcia. This case is handled by Joanne Heisey and Gretchen Sween from our office. Because of a capital post-conviction hearing in another county, Ms. Heisey and Ms. Sween are unavailable until after December 20. In addition, Ms. Heisey will be out of the state for her uncle's memorial service following this hearing, so the earliest she could appear would be December 22. So, the earliest Ms. Sween could appear would be December 21, and the earliest Ms. Heisey could appear would be December 22. And, contrary to Ms. DeAngelo's suggestion, I cannot appear in their place. My name appears on the pleadings in this case, as well as the case of every client represented by our office, because I am the Director of our office. This does not mean, however, that I am a lawyer directly involved in the litigation of every case, or available to argue contested motions on every case, much like how Devon Anderson's name appears on pleadings filed by the Office of the District Attorney, but is not available to conduct the trial of every case prosecuted by the Harris County District Attorney.

We are a small state agency in Austin. We currently have six staff attorneys working in our office, and represent the vast majority of death-sentenced persons in Texas initial state habeas proceedings and have cases pending throughout the state. In addition to the aforementioned evidentiary hearing, we have three initial state habeas application due over the next six weeks. Unfortunately, we simply do not have the staffing that would allow another lawyer to take over the representation of Mr. Cruz-Garcia at this juncture, even for a limited purpose.

Please let us know if there is a date convenient for the court on or after December 21. Alternatively, please let us know whether there is a date after the holidays that would work for the court. Thanks so much.

Best,

Benjamin B. Wolff
Director, Office of Capital and Forensic Writs
1700 Congress, Suite 460
Austin, TX 78701
(512) 463-8502
Benjamin.Wolff@ocfw.texas.gov



 Office of Capital and Forensic Writs

1

Filed 16 December 27 P4:09
Chris Daniel - District Clerk
Harris County
FAX16559060

# IN THE 337TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Obel Cruz-Garcia, | ) | 1384794 |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## APPLICANT'S RENEWED OBJECTION TO ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
GRETCHEN SWEEN (No. 24041996)
(E-Mail: Gretchen.Sween@ocfw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocfw.texas.gov)
Post-Conviction Attorneys
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Applicant*

: 01012

**IN THE 337TH JUDICIAL DISTRICT COURT**
**HARRIS COUNTY, TEXAS**

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Obel Cruz-Garcia, | ) | 1384794 |
|  APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## APPLICANT'S RENEWED OBJECTION TO ORDER FOR PARTIES TO FILE PROPOSED FINDINGS OF FACT

Obel Cruz-Garcia, by and through his attorneys of record, the Office of Capital and Forensic Writs (OCFW), renews his objection to the Order directing the parties to file proposed findings of fact (FFCL) by December 27, 2016. The Order should be rescinded because it deprives Mr. Cruz-Garcia of due process. In support of his objection, Mr. Cruz-Garcia respectfully shows the following:

1.    This proceeding arises in a capital case in which Mr. Cruz-Garcia has asserted numerous cognizable claims challenging the constitutionality of his conviction and death sentence under Article 11.071 of the Texas Code of Criminal Procedure and in which he seeks relief through issuance of a writ of habeas corpus.

2.    This Court has yet to make a determination as to whether each of the various claims at issue in this Article 11.071 proceeding are governed by Section 8 or by Section 9 of the governing statute. In August, the Court signed the State's Proposed Order for Filing Affidavits, which designated ten factual issues relevant to

1

Mr. Cruz-Garcia's ineffective assistance of counsel claim that the State believed needed to be resolved and believed could be resolved via affidavits from trial counsel. At that time, the Court tabled the question of what additional disputed factual issues also needed to be resolved.[1]

3.     At a hearing held in this Court on December 22, 2016, the Court notified Mr. Cruz-Garcia for the first time that the Court considered the August 8 Order for Filing Affidavits to be an Order Designating Issues for all purposes and all claims, notwithstanding the presence of other disputed factual issues based on the face of the parties' pleadings. For instance, Mr. Cruz-Garcia has alleged that members of the jury discussed the evidence in the case outside of deliberations. *See* Claim Nine of the Initial Application. The State has denied this allegation. *See* State's Answer at 66. The Order for Filing Affidavits does not address this controverted fact issue, nor could affidavits from trial counsel constitute competent evidence to resolve this controverted fact issue, as trial counsel, presumably, were not present with each juror at all times throughout the course of the trial. Moreover, the affidavits from trial counsel are inadequate to address all of the allegations supporting the ineffective assistance of counsel claim. While the affidavits purport

---

[1] Undersigned counsel has left several messages with the court reporter over the past several months since the hearing requesting a transcript of that hearing but has not yet received a response.

: 01014

to explain counsel's reasons for not pursuing certain avenues of investigation, they are incapable of addressing what evidence was available had counsel pursued these avenues of investigation—an issue that is crucial to resolving the question of prejudice that constitutes step two of the two-prong *Strickland* analysis. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

4. Trial counsel filed the ordered affidavits on November 28, 2016, but did not serve Mr. Cruz-Garcia's current counsel. But a subsequent review of those affidavits demonstrates that, even if deemed credible in all respects, those affidavits do not resolve all issues of fact material to the ineffective assistance of counsel claim, let alone the other fact-based claims in the Initial Application.

5. Rather than addressing what controverted issues of fact remain, as the Court had indicated at the August 8 hearing that it eventually would, the Court instead signed an Order two days later, on November 30, 2016, directing the parties to submit proposed FFCL by December 22, 2016. Mr. Cruz-Garcia did not receive the Order until December 6, 2016.

6. The same day that the Court entered the Order, November 30, Mr. Cruz-Garcia had filed a written opposition to the State's request for such an order. The Order granting the State's request was entered before any hearing on the State's

3

motion that Mr. Cruz-Garcia opposed.[23] Therefore, he filed a motion seeking reconsideration of the Order, explaining how it was at odds with the requisite statutory mandates and asking for an opportunity to be heard. That motion was heard on December 22, 2016.

7.      On December 22, 2016, the Court denied Mr. Cruz-Garcia's motion seeking reconsideration and again ordered the parties to submit proposed FFCL—this time by December 27, 2016.

8.      December 22 was a Thursday. During the four intervening days between that date and December 27, the OCFW was closed for the Christmas holidays. Moreover, it would be impossible for counsel for Mr. Cruz-Garcia to prepare proposed FFCL under this unnecessarily and unreasonably compressed time frame. Drafting proposed FFCL is a painstaking process that involves, in this case, the review of 35 volumes of the Reporter's Record, which consists of over 5,500 pages of text, plus three volumes of the Clerk's Record, to substantiate factual

---

[2] Only after that opposition was filed, in which Mr. Cruz-Garcia noted that he had not yet been served with the affidavits from trial counsel, counsel for the State served copies of those affidavits on the OCFW.

[3] It has been consistently represented to the OCFW by both members of the Harris County District Attorney's Office and various Harris County court staff that it is the regular practice in Harris County that judges will not rule on a motion unless it is presented in person by the attorney sponsoring the motion. Counsel for Mr. Cruz-Garcia were not present when the Court signed the State's proposed Order, which suggests that either the State approached the Court with its motion ex parte or the Court broke with established protocol in order to grant the State's premature motion.

4

assertions. It should also be noted that the process of drafting FFCL is, or at least should be, a painstaking, time-consuming process for the Court as well, which must read not only hundreds of pages of proposed submissions, but compare them to the record.

9.     Mr. Cruz-Garcia's counsel, the OCFW, has represented numerous other applicants in Article 11.071 proceedings in Harris County. Routinely, the OCFW is given 50-150 days to prepare proposed FFCL. Five days, which include a holiday weekend, is facially unreasonable to undertake this important task in a capital case.

10.    Additionally, the problem with ordering proposed FFCL has not been remedied in the interim, as myriad controverted issues of fact have yet to be designated for resolution by this Court, and as the evidence currently before the Court is inadequate to address either the factual issues that have been designated or those that remain.

11.    Even assuming that the Court's Order for Filing Affidavits constitutes a proper Order Designating Issues covering all of the claims raised in Mr. Cruz-Garcia's Initial Application, the only evidence currently submitted to the Court for consideration—and the only evidence that the Court has permitted to be submitted— are the self-serving affidavits from trial counsel. As a general matter, one-sided, incomplete affidavits, such as those procured by the State in this case from trial counsel, are an improper method of taking evidence where a district court judge must

: 01017

resolve disputed factual issues involving credibility determinations. *See, e.g., Manzi v. State*, 88 S.W.3d 240, 255 (Tex. Crim. App. 2002) (Cochran, J., concurring) ("Trial judges who are confronted with contradictory affidavits, each reciting a plausible version of the events, ought to convene an evidentiary hearing to see and hear the witnesses and then make a factual decision based on an evaluation of their credibility."); *see also id.* at 250 (Womack, J., concurring) ("That the statute authorizes a court to make decisions on affidavits does not mean it can make decisions of every kind on affidavit. The statute can be construed to allow some issues to be decided by written evidence when credibility determinations are not involved."); *Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *4-*5 (Tex. Crim. App. Nov. 18, 2015) (recognizing that where the record is comprised solely of evidence offered through affidavits, the record does not contain enough information on which to base credibility determinations to resolve controverted issues of fact, and remanding for specific findings of fact regarding credibility). And here, the affidavits from trial counsel are notable for their bald assertions of strategy, as well as their inadequacy. For instance, the affidavits from trial counsel do not address what efforts were made to contact Cesar Rios, who knew of Mr. Cruz-Garcia's ongoing sexual relationship with Diana Garcia, only that their "efforts to find him were unsuccessful," *see* Affidavit of Skip Cornelius at 4; thus, the affidavits are inadequate for the Court to determine whether trial counsel's investigation in this

6

respect was reasonable. Nor do the affidavits from trial counsel address what awareness trial counsel had that Ms. Garcia and Arturo Rodriguez were still selling drugs for Mr. Cruz-Garcia at the time of the offense, in contradiction to their trial testimony, nor what steps they took to investigate this fact. Nor do the affidavits from trial counsel address what reasons, if any, counsel had for not conducting any investigation in Puerto Rico, where Mr. Cruz-Garcia spent most of his adult life.[4] As noted above, the affidavits from trial counsel are also inadequate to address claims that do not implicate trial counsel's conduct, for example, allegations of juror misconduct.

12.    In sum, the affidavits recently submitted by Mr. Cruz-Garcia's trial counsel do not resolve all disputed issues of material fact raised by the face of the pleadings (Mr. Cruz-Garcia's Initial Application and the State's Answer). Those affidavits do not even resolve all disputed issues of material fact relevant to resolving the ineffective assistance of counsel claim. Therefore, the Court has not yet engaged in a process that would permit it to resolve all disputed issues of material fact, a

---

[4] It is also worth noting that the affidavits contain facially incorrect representations. For instance, Mr. Cornelius states in his affidavit that counsel for Mr. Cruz-Garcia "have refused to return" Mr. Cruz-Garcia's file to him. Mr. Cornelius has never asked counsel to return Mr. Cruz-Garcia's file to him. This misrepresentation underscores the unreliability of the trial counsel affidavits and the necessity of being afforded the right to confront these adverse witnesses.

7

precursor to adopting any FFCL as part of making recommendations to the Court of Criminal Appeals as to the disposition of Mr. Cruz-Garcia's Initial Application under Article 11.071.

13.    While it is the burden of a habeas applicant—and his right—to plead and prove his case, Mr. Cruz-Garcia has to this point been denied any opportunity to prove his claims of unconstitutional confinement.

14.    For the foregoing reasons, as well as those articulated in his Motion for Order Designating Factual Issues Pursuant to Texas Code of Criminal Procedure, Article 11.071 Sections 8(A) And 9(A), filed August 5, 2016; his opposition to the State's motion seeking proposed FFCL, filed on December 1, 2016; his motion seeking reconsideration of the Court's Order to submit proposed FFCL, filed on December 22, 2016; and arguments made during the hearing before this Court on December 22, 2016, Mr. Cruz-Garcia objects to the Order requiring the submission of proposed FFCL by December 27, 2016.

## CONCLUSION

For the foregoing reasons, Mr. Cruz-Garcia respectfully objects to the order requiring the parties to submit FFCL by December 27, 2016, and requests that the Court rescind its Order for Parties to File Proposed Findings of Fact.

8

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED: December 27, 2016

Joanne Heisey
Texas Bar No. 24087704
Gretchen S. Sween
Texas Bar No. 24041996
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8502
Facsimile: (512) 463-8590
joanne.heisey@ocfw.texas.gov
gretchen.sween@ocfw.texas.gov

**Post-Conviction Attorneys for Mr. Cruz-Garcia**

9

: 01021

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002
(One courtesy copy, via email)

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002
(One copy, via email)

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy)

Joanne Heisey

10

: 01022

Filed 16 December 27 P4:09
Chris Daniel - District Clerk
Harris County
FAX16559060

## IN THE 337TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Obel Cruz-Garcia, | ) | 1384794 |
| APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## APPLICANT'S MOTION TO PRESENT EVIDENCE IN SUPPORT OF CLAIMS RAISED UNDER ARTICLE 11.071 AND OBJECTIONS TO EVIDENCE PRESENTED BY THE STATE

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
GRETCHEN SWEEN (No. 24041996)
(E-Mail: Gretchen.Sween@ocfw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocfw.texas.gov)
Post-Conviction Attorneys
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Applicant*

1

# IN THE 337TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |  |
|---|---|---|
| EX PARTE | ) | Trial Cause No. |
| Obel Cruz-Garcia, | ) | 1384794 |
|     APPLICANT | ) |  |
|  | ) |  |
|  | ) |  |

## APPLICANT'S MOTION TO PRESENT EVIDENCE IN SUPPORT OF CLAIMS RAISED UNDER ARTICLE 11.071 AND OBJECTIONS TO EVIDENCE PRESENTED BY THE STATE

Obel Cruz-Garcia, by and through his attorneys of record, the Office of Capital and Forensic Writs (OCFW), moves to present evidence in support of his claims raised under Article 11.071 of the Texas Code of Criminal Procedure, and raises the following objections to evidence presented by the State in opposition to his claims.

### RELEVANT BACKGROUND

Mr. Cruz-Garcia's Initial Application for Writ of Habeas is currently pending before this Court. Following the State's Answer to Mr. Cruz-Garcia's Initial Application, Mr. Cruz-Garcia moved this Court to enter an order designating controverted issues of fact to be resolved in this case, pursuant to Article 11.071, Sections 8 and 9(a). This Court denied the motion and instead signed the State's Proposed Order for Filing Affidavits, which ordered trial counsel Skip Cornelius and

1

: 01024

Mario Madrid to file affidavits responding to ten of numerous factual allegations pertaining to the claim of ineffective assistance of counsel raised in the Initial Application. At that time, the Court indicated that it would address the necessity of designating issues not resolved by the affidavits from trial counsel after trial counsel's affidavits had been submitted.[1] Instead, two days after trial counsel filed the ordered affidavits, and on the same day that counsel for Mr. Cruz-Garcia was served with the affidavits, this Court entered an order for the parties to file proposed findings of fact.[2]

Mr. Cruz-Garcia has not yet been afforded an opportunity to present evidence in support of the claims raised in his Initial Application or to make objections to the evidence submitted by the State in the form of the affidavits from trial counsel. Accordingly, Mr. Cruz-Garcia hereby moves this Court to admit evidence in support of the claims raised in his Initial Application and makes the following objections to evidence presented by the State in opposition to his claims.

---

[1] Undersigned counsel has left several messages with the court reporter over the past several months since the hearing requesting a transcript of the hearing but has not yet received a response.

[2] Mr. Cruz-Garcia objected to the State's Motion Requesting the Trial Court to Set Date for Filing of Propsed [sic] Findings of Fact. His objection was denied without a hearing.

2

: 01025

## ARGUMENT

### I. Mr. Cruz-Garcia Must Be Afforded an Opportunity to Present Evidence in Support of His Claims for Relief

While the convicting court enjoys considerable discretion to determine the manner of fact-finding through which it wishes to resolve issues of fact determined under §8(a), this discretion is not unlimited. Due process requires that a habeas applicant be afforded the opportunity to present evidence, confront adverse witnesses, and object to and challenge the substance of evidence offered by the State. *See, e.g., Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled on other ground by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992); *Ford v. Wainwright*, 477 U.S. 399 (1986) (explaining that due process requires that a capital defendant be allowed to substantiate a claim with her own evidence and be given the opportunity to challenge and respond to the State's evidence against them before such a claim is rejected); *Panetti v. Quarterman* 551 U.S. 930, 949 (2007) (same); *see also* TEX. CODE CRIM. PROC. art. 11.071 § 10 (applying the Texas Rules of Criminal Evidence to a hearing under art. 11.071).

The Due Process Clause requires, at a minimum, that "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965); *see also Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard" (quoting *Grannis v.*

3

: 01026

*Ordean*, 234 U.S. 385, 394 (1914)). In the context presented here—an application for habeas corpus review—due process requires, indeed, "presupposes," "the opportunity to be heard, to argue and present evidence." *Townsend*, 372 U.S. at 312.

Mr. Cruz-Garcia's only burden at the pleading stage was to allege specific facts, which, if true, entitle him to relief. *See, e.g., Ex parte Medina*, 361 S.W.3d 633, 637 (Tex. Crim. App. 2011) ("Texas law has long required all post-conviction applicants for writs of habeas corpus to plead specific facts which, if proven to be true, might call for relief."); *Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at \*2 (Tex. Crim. App. Nov. 18, 2015) (noting that the Applicant had "alleged facts that, if true, might entitle him to relief"). *Cf.* Rules Governing § 2254 Cases in the United States District Courts, Rule 2 (A petitioner must "specify all the grounds for relief available" and "state the facts supporting each ground."); Fed. R. Civ. Proc. 12(b)(6). There is no requirement that habeas applicants plead "evidence." *See Medina*, 361 S.W.3d at 639.

When applicants do attach affidavits and other documentary evidence to pleadings, it is not for the purposes of seeking to have such "evidence" considered under Article 11.071 §9; rather, it is to meet the factually specific pleading burden. *See id.* at 637-38 ("The application may, and frequently does, also contain affidavits, associated exhibits, and a memorandum of law to establish specific facts that might entitle the applicant to relief."); *see also Rouse v. State*, 300 S.W.3d 754, 762 (Tex.

4

: 01627

Crim. App. 2009) ("[P]ost trial motions . . . are not self-proving and any allegations made in support of them by way of affidavit or otherwise must be offered into evidence at a hearing.").[3] In this case, Mr. Cruz-Garcia attached various affidavits and documentary evidence to his Initial Application as evidentiary proffers to satisfy the specific factual pleading burden recognized by the Court of Criminal Appeals in *Medina*. That these evidentiary proffers were in the form of affidavits does not mean that Mr. Cruz-Garcia has been provided the opportunity to present evidence in support of his allegations pursuant to § 9.[4]

Accordingly, Mr. Cruz-Garcia hereby moves for the introduction of all affidavits attached as evidentiary proffers to his Initial Application, Exhibits 1-24, 36, as well as Exhibit 37, which was submitted post-filing in support of Claim Three. Mr. Cruz-Garcia also moves this Court to find that Exhibits 25-35 are properly

---

[3] Notwithstanding the pleading requirement, post-conviction counsel have a prudential duty to attach all available proof to an Application. *See State Bar of Texas Guidelines and Standards for Texas Capital Counsel*, Guideline 12.1(B)(7)(d) (Duties of Post–Trial Counsel) (2006) ("Habeas counsel should attach all available proof to the application (affidavits, documentary evidence, etc.) even though doing so is not technically required by state law. Failing to attach proof in state court will likely waive the client's ability to present it in federal court. When proof is unavailable, habeas counsel should plead all factual allegations with the greatest possible specificity.").

[4] Indeed, were it otherwise, a habeas applicant, by mere virtue of the appendices to his or her application, would inevitably arrogate the Court's authority under §9 (a) to determine the manner in which evidence would be received to resolve controverted factual issues.

: 01028

authenticated under Rule 901 of the Texas Rules of Evidence, and admissible as evidence, and moves for admission of those exhibits as well. Mr. Cruz-Garcia further moves to depose trial counsel, submit interrogatories, and/or hold an evidentiary hearing where trial counsel may be cross-examined.

## II.   This Proceeding is Governed by the Texas Rules of Evidence, and Mr. Cruz-Garcia Accordingly Makes the Following Objections to the State's Evidentiary Proffers

This proceeding is governed by the Texas Rules of Evidence. *See* TEX. CODE CRIM. PROC. Art. 11.071 §10. Accordingly, Mr. Cruz-Garcia raises the following objections to evidence submitted by the State in the form of affidavits from trial counsel.

Mr. Cruz-Garcia specifically objects to all statements in the affidavits from trial counsel pertaining to statements made to counsel or other members of the defense team by Mr. Cruz-Garcia and to what Mr. Cruz-Garcia did or did not communicate to counsel or other members of the defense team, as these statements constitute a breach of the attorney-client privilege as to matters not relevant to claims raised in the Initial Application and are outside of the scope of matters to be addressed in the order for trial counsel affidavits.

When the State moved this Court for an order for affidavits from trial counsel, Mr. Cruz-Garcia objected to language in the State's proposed order that would have required counsel to state what Mr. Cruz-Garcia had communicated to them regarding

6

his consensual sexual relationship with Diana Garcia and regarding the names of specific witnesses. Mr. Cruz-Garcia raised this objection on the grounds that communications made by Mr. Cruz-Garcia were irrelevant to the claim of ineffective assistance of counsel because "[t]he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). The Court sustained this objection and modified the proposed order for trial counsel affidavits accordingly. Nevertheless, trial counsel violated their ongoing duties of loyalty and confidentiality to Mr. Cruz-Garcia by disclosing privileged communications made to them by Mr. Cruz-Garcia.[5] Because these statements are irrelevant to the determination of ineffective assistance of counsel, violate the attorney-client privilege, and are outside the scope of the court's order, Mr. Cruz-Garcia objects to their admissibility as substantive evidence.

---

[5] Trial counsel and all members of the defense team owe a continuing duty of loyalty to their clients, even after the representation ends. *See, e.g.*, Guideline 11.8, State Bar of Texas, GUIDELINES AND STANDARDS FOR TEXAS CAPITAL COUNSEL (2006) ("all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client and should cooperate fully with successor counsel"). Related to the duty of loyalty is the duty to guard client confidences. *See, e.g.*, TEX. DISCIPLINARY R. PROF'L COND. 1.05; ABA MODEL RULE 1.6(a). The confidentiality rule likewise continues to apply even after the representation ends.

: 01030

Mr. Cruz-Garcia further objects to the statement contained in Section 4 of Mr. Cornelius's affidavit, stating that he is "certain that the State provided me with every piece of discovery we were entitled to." This statement calls for speculation, in that Mr. Cornelius cannot possibly know whether the State has complied with its *Brady* obligations; by definition, if he was not provided with a discovery item to which he was entitled, he would not know about it. Moreover, Mr. Cornelius's opinion as to whether the State complied with its *Brady* obligations is irrelevant to the determination of ineffective assistance of counsel and outside the scope of the issues outlined in the Court's order for affidavits.

Mr. Cruz-Garcia also objects to the statement contained in Section 9(c) of Mr. Cornelius's affidavit, stating that he "do[es] not now think the Judge did anything improper" with respect to her ex parte conversation with Juror Bowman. Mr. Cornelius's opinion as to whether the Court committed misconduct is irrelevant to the determination of ineffective assistance of counsel and outside the scope of the issues outlined in the Court's order for affidavits.

Finally, Mr. Cruz-Garcia objects to the entirety of the affidavit submitted by JJ Gradoni, the investigator retained by Mr. Cruz-Garcia's trial counsel. As noted above, all members of the defense team owe a continuing duty of loyalty and confidentiality to their former client. Accordingly, the American Bar Association has held that in the context of a claim of ineffective assistance of counsel, "the

8

lawyer may disclose … [confidential information] only if the court requires the lawyer to do so after adjudicating any claims of privilege or other objections raised by the client or former client." ABA Formal Opinion 10-456. This principle applies to all members of the defense team. Mr. Gradoni was not ordered to submit an affidavit regarding his work in Mr. Cruz-Garcia's case and thus has violated his duties of loyalty and confidentiality to Mr. Cruz-Garcia by disclosing confidential information about the representation outside of a court order. Mr. Cruz-Garcia therefore moves that his entire affidavit be stricken.

CONCLUSION

For the foregoing reasons, Mr. Cruz-Garcia respectfully asks that this Court afford him an opportunity to submit evidence in support of his Initial Application and sustain the foregoing evidentiary objections made to the evidence submitted by the State in the form of trial counsel affidavits.

: 01032

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED: December 27, 2016

Joanne Heisey
Texas Bar No. 24087704
Gretchen S. Sween
Texas Bar No. 24041996
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8502
Facsimile: (512) 463-8590
joanne.heisey@ocfw.texas.gov
gretchen.sween@ocfw.texas.gov

**Post-Conviction Attorneys for Mr. Cruz-Garcia**

: 01033

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002
(One courtesy copy, via email)

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002
(One copy, via email)

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy)

Joanne Heisey

11

: 01034

District Clerk

DEC 2 1 2016 4:00

Time:

Harris County, Texas

By_____
            Deputy

Cause No. 1384794-A

EX PARTE                          §        IN THE 337TH DISTRICT COURT

                                  §        OF

OBEL CRUZ-GARCIA,                 §        HARRIS COUNTY, TEXAS
APPLICANT

## STATE'S PROPOSED FINDINGS OF FACT,
## CONCLUSIONS OF LAW AND ORDER

The Court, having considered the applicant's application for writ of habeas corpus, the

State's original answer, the evidence elicited at the applicant's capital murder trial in cause no.

1384794, the affidavits and exhibits filed in cause no. 1384794-A, and official court documents

and records, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      The applicant, Obel Cruz-Garcia, was indicted and convicted of the felony offense of

capital murder of six-year-old Angelo Garcia, Jr., cause no. 1384794, in the 337th District Court

of Harris County, Texas (III C.R. at 484-506).[1]  On July 19, 2013, pursuant to the jury's answers

to the special issues, the trial court assessed punishment at death by lethal injection (XXVII R.R.

at 9-10).  On July 22, 2013, the applicant was formally sentenced (III C.R. at 513-530)(XXVIII

R.R. at 4).

2.      On February 4, 2014, the applicant's co-defendant, Rogelio Aviles-Barroso, was

convicted of capital murder, cause no. 1364839, and sentenced to life imprisonment.

---

[1] The indictment alleged that the applicant intentionally killed Angelo Garcia, Jr., while in the course of committing
kidnapping on September 30, 1992 (I C.R. at 2-3).

1

: 01035

3.      On October 28, 2015, the Court of Criminal Appeals affirmed the applicant's conviction in an unpublished opinion. *See Cruz-Garcia v. State,* No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015)(not designated for publication).

4.      On April 11, 2016, the Supreme Court of the United States denied certiorari. *See Cruz-Garcia v. Texas,* __U.S.__, 136 S.Ct. 1518 (2016).

**FACTS OF THE OFFENSE**

5.      On September 30, 1992, the applicant and a second man, Rogelio Aviles-Barroso, kicked in the door to Diana Garcia's apartment, where she lived with her common-law husband, Arturo Rodriguez, and her six-year-old son, Angelo Garcia, Jr. (XVIII R.R. at 47-48, 69, 149, 206-07; XIX R.R. at 58).

6.      Shortly before midnight, the couple was awakened by a loud noise; Arturo got out of bed and encountered a tall masked man holding a gun (XVIII R.R. at 149-51, 208-09; XIX R.R. 34). This man forced Diana onto the bed, tied up Arturo with the alarm clock cord, and repeatedly kicked Arturo and hit him over the head with the handgun until he was unconscious (XVIII R.R. at 74, 77, 152-53, 158-60, 210-13; XIX R.R. at 77).

7.      A second gunman entered the room, tied up Diana, and sexually assaulted her (XVIII R.R. at 78, 157-58, 210, 212, 214). Diana knew the assailant ejaculated because she felt something running down her legs (XVIII R.R. at 165). Angelo was lying on a pallet on the floor, and Diana heard him crying while she was raped and Arturo was assaulted (XVIII R.R. at 146, 155, 158).

8.      After the sexual assault, the two men ransacked the bedroom and left the apartment (XVIII R.R. at 160-62). Soon afterwards, Diana realized that Angelo was no longer in the

: 001035

apartment and ran outside while her neighbor called the police to report the sexual assault and kidnapping (XVIII R.R. at 163-64).

9.      The couple needed immediate medical attention: Arturo suffered injuries to the back of his head and Diana went to the hospital for a sexual assault exam (XVIII R.R. at 51-52, 89, 163, 165, 217; XIX R.R. at 57). The sexual assault exam kit was collected as evidence (XIX R.R. at 49-50, 58-59).

10.      A cigar found in the apartment, which did not belong to Diana or Arturo, was also collected as evidence (XVIII R.R. at 79-82; XIX R.R. at 4-5).

11.      Diana was unable to give a description of the second man who raped her, as she did not see his face or hear his voice (XVIII R.R. at 162). However, she was able to describe the first man, the tall one who assaulted Arturo (XVIII R.R. at 98-99, 101-02). Diana recalled that he had a dark complexion and spoke in the Spanish language, but with a foreign accent—not a Hispanic accent that one would hear in Mexico (XVIII R.R. at 99, 152). Arturo described it as a Central American accent (XVIII R.R. at 211).

12.      Police learned from neighbors that Diana and Arturo had recently been selling drugs out of their apartment (XVIII R.R. at 56). Believing this was crucial to the investigation of Angelo's kidnapping, U. P. Hernandez, HPD Homicide Division, interviewed both Diana and Arturo (XIX R.R. 65-67). They initially denied being involved with drugs, but later admitted their involvement and told authorities that the applicant was their drug supplier (XVIII R.R. at 166-67, 199, 218; XIX R.R. at 65-75).

13.      Diana and Arturo knew the applicant as "Chico" (XVIII R.R. at 128-29, 141, 167, 172, 177, 199-201; XX R.R. at 84, 93). They also knew one of his associates, Carmelo Martinez

3

: 01037

Santana, who went by the name "Rudy" (XVIII R.R. at 138, 142; XX R.R. at 85; XXI R.R. at 39).

14.     Two to three weeks prior to the offense, Diana and Arturo decided to stop selling drugs for the applicant, and he was not happy about it (XVIII R.R. at 133-34, 203-04).

15.     The Federal Bureau of Investigation (FBI) immediately became involved in the case because it involved a child under twelve (XIX R.R. at 135). FBI Special Agent Eric Johnson initially suspected the applicant in Angelo's abduction, and learned that he fled the country soon after the offense (XIX R.R. at 139, 144-45; XX R.R. 98-100).

16.     When the applicant's wife Angelita learned about Angelo's abduction on the news, she was shocked and immediately called Diana to tell her that she was coming over (XX R.R. at 96-97). Angelita testified that, before she left for Diana's apartment, Angelita told the applicant what had happened. The applicant seemed very calm, started packing, and told Angelita that he had to leave (XX R.R. at 98-100). When Angelita asked the applicant if he had done something, he did not respond (XX R.R. at 100). The applicant left for Puerto Rico that day and did not return to Houston (XX R.R. at 103).

17.     John Swaim, HPD Homicide Division, went to the applicant's apartment on October 6, 1992, where he encountered a Hispanic man who identified himself as Candido Lebron (XIX R.R. at 184-86). Swaim interviewed him but doubted his identity because the man could not provide the names of his parents which were listed on the Virgin Islands birth certificate he produced (XIX R.R. at 185). Swaim later learned the man was Rogelio Aviles-Barroso, the applicant's co-defendant in this case (XIX R.R. at 186-87; XX R.R. at 130-31; XXI R.R. at 88-89).

: 001038

18.     More than a month after Angelo's abduction, on November 5, 1992, the body of a young boy was found washed up along the shore of a water basin in Baytown (XVIII R.R. at 91-92, 218-19; XIX R.R. at 191-92; XXI R.R. at 86). Dental records confirmed the child was Angelo, and the medical examiner's office ruled that the death was a homicide (XVIII R.R. at 92; XIX R.R. at 205; XX R.R. at 4-15, 24-25). Although his remains were skeletal by the time he was found, Angelo was still wearing the Batman pajamas he had worn to bed on September 30, 1992 (XVIII R.R. at 92, 168-69; XIX R.R. at 193-94, 202-04).

19.     Approximately one month after Angelo's body was found, Angelita Rodriguez traveled to Puerto Rico. While there she met with the applicant and told him she wanted a divorce (XX R.R. at 105-06). The applicant refused Angelita's request for a divorce and threatened to harm her family (XX R.R. at 106-07). Angelita asked the applicant if he had anything to do with Angelo's disappearance, and the applicant admitted that he killed Angelo (XX R.R. at 107).

20.     In 2007, as part of a cold-case investigation, Eric Mehl, HPD Homicide Division, reviewed the case file, learned that there was a potential for DNA evidence in the case, and located the applicant in Puerto Rico (XX R.R. at 37-43, 49). A sample of the applicant's DNA was obtained and compared to the sexual assault kit and cigar left at the crime scene; analysis revealed that the applicant was the man who raped Diana in 1992 (XX R.R. at 44-52, 55, 72-78; XXI R.R. at 92-93, 105-07, 109, 117-20, 156-57, 160-62, 168).

21.     Courtney Head, Criminalist, HPD crime lab, testified that the sperm fraction from the crotch of Diana's panties was a mixture of DNA from at least two individuals and the applicant could not be excluded as the contributor to the major component of that DNA profile (XXI R.R. at 162). The likelihood of an unrelated individual sharing that profile was 1 in 6.2 quintillion for Caucasians; 1 in 700 quintillion for African-Americans; 1 in 140 quadrillion for Southeast

5

Hispanics; and 1 in 100 quintillion for Southwest Hispanics (XXI R.R. at 169). According to Head, the applicant was—to a reasonable degree of scientific certainty—the source of the major component of this DNA mixture (XXI R.R. at 169).[2]

22. When the case was re-opened, Johnson, the FBI agent who originally suspected the applicant, located Carmelo Martinez Santana in a Pennsylvania prison where he was serving time on two federal convictions for drug trafficking and weapons possession (XX R.R. at 118-19, 165-66, 176-78; XXI R.R. at 18-19, 29-30). When FBI Special Agent William Ebersole interviewed Santana, he gathered significantly more information than was previously known about Angelo's abduction and murder (XX R.R. 175-83; XXI R.R.11-14, 65-77).

23. Santana, who is Angelita's cousin and known as "Rudy," recalled that on September 30, 1992, the applicant wanted to go to Diana's apartment to look for drugs and money, so he and Aviles-Barroso accompanied the applicant (XX R.R. at 116-20, 135-37). Santana remained in the car while the applicant and Aviles-Barroso went inside the apartment (XX R.R. at 137-38). Both the applicant and Aviles-Barroso wore ski masks and had weapons. Santana recalled that the applicant had a gun and Aviles-Barroso had a knife (XX R.R. at 137-42; XXI R.R. at 52).

24. Santana estimated that the applicant and Aviles-Barroso were in the apartment for approximately thirty minutes (XX R.R. at 143). When they returned, Santana was surprised to see the applicant holding a little boy in his arms (XX R.R. at 143-44). Santana immediately asked the applicant why he had taken Angelo, and the applicant replied that the child had seen his face and recognized him (XX R.R. at 144). Santana was unsuccessful in trying to convince the applicant to take Angelo back inside to his mother (XX R.R. at 145-47).

25. The applicant admitted to Santana that he raped Diana (XX R.R. at 145).

---

[2] Houston Forensic Science Center issued an amended laboratory report on November 3, 2015, consisting of updated statistical analyses of DNA testing results. *See State's Original Answer, State's writ ex. A, HFSC Lab Report.*

: 01040

26.    The applicant put Angelo in the backseat of the vehicle and, with a gun in one hand, drove the group to Baytown (XX R.R. at 147-49). He stopped in a secluded area and they all got out of the vehicle; the applicant stated to Aviles-Barroso, "You already know what you have to do" (XX R.R. at 149-50; XXI R.R. at 60). Santana immediately felt nauseous and became ill; he walked away from them and defecated in the woods (XX R.R. at 150; XXI R.R. at 9). During this time, the applicant followed Santana to see what he was doing, and Santana heard Angelo scream and moan (XX R.R. at 150-51, 160). When Santana returned to the vehicle, he saw that Angelo was dead and covered in blood (XX R.R. at 151-52; XXI R.R. at 10).

27.    Santana and Aviles-Barroso complied with the applicant's command to put Angelo's body back into the vehicle (XX R.R. at 152). The applicant then drove to a rural area and instructed them to throw the body in a nearby river (XX R.R. at 152-53). He further instructed them to sink the child, so Santana and Aviles-Barroso gathered some rocks and placed them on top of the body (XX R.R. at 153-54).

28.    The applicant instructed Santana to get rid of the knife and told Santana he was leaving town because of what he did that night (XX R.R. at 158-59, 166).

29.    The following day, the applicant sold his vehicle and used the money he got from the car sale to buy a plane ticket out of the country (XX R.R. at 160-62). Santana took the applicant to the airport and never saw him again (XX R.R. at 162, 164).

**DEFENSE EVIDENCE AT GUILT-INNOCENCE**

30.    The applicant presented no evidence at guilt-innocence.

**STATE'S PUNISHMENT EVIDENCE**

31.    Santana explained that prior to the instant capital murder, the applicant believed Santana was stealing his money and his drug customers, so the applicant tied Santana up, threw him in

7

: 001041

the bathtub, and gagged him and threatened to kill him until Santana gave him money and promised never to betray him (XXV R.R. at 61-64).

32.     Santana related another incident in which the applicant sought retribution against a drug competitor, a Dominican man named Patiko (XXV R.R. at 65-71). The applicant and another man broke into Patiko's apartment while Santana waited in the car (XXV R.R. at 66-69). When they returned twenty minutes later, they were carrying drugs and money (XXV R.R. at 69-70). The applicant told Santana that he tied up and beat Patiko and then raped his girlfriend (XXV R.R. at 70-71). Santana recalled that when he spent time with the applicant, they frequently burglarized other drug dealers (XXV R.R. at 71).

33.     Santana testified that in July of 1989, the applicant kidnapped and killed a drug associate named Saul Flores (XXV R.R. at 22-33, 72-85, 99, 121). The applicant learned that Saul was interested in the applicant's girlfriend, Elizabeth Ramos, and became infuriated (XXV R.R. at 49-50, 74-75). The applicant, Santana, and a man named Robert went over to Elizabeth's apartment where they found Saul (XXV R.R. at 75-76). They grabbed Saul, put him in their car, and transported him to an apartment where they sold drugs (XXV R.R. at 76-77).

34.     The applicant tied up Saul and began beating him (XXV R.R. at 79). The applicant repeatedly hit Saul with a hammer and injected him with drugs (XXV R.R. at 80-81, 93-94). Santana saw the applicant get on top of Saul and apply pressure to his neck until he died (XXV R.R. at 81-82). The applicant ordered Santana to help him put Saul's body in the bathtub and they left the apartment (XXV R.R. at 82-83).

35.     Tina Perez discovered Saul's body when she went to his apartment to buy drugs (XXV R.R. at 24-30). When the applicant learned that the police wanted to question Tina about Saul, he told her to keep quiet, and tell the police she had not seen anything (XXV R.R. at 32-35).

8

36.     In October of 2001, while in Puerto Rico, the applicant kidnapped two other men and attempted to kill a restaurant business owner (XXIV R.R. at 14-42). The applicant pointed a revolver at Manuel Buten and twice attempted to shoot him; however, the gun did not fire and Buten ran away (XXIV R.R. at 23-25, 82-83, 102).

37.     Buten testified that he learned that the applicant kidnapped two family members who worked at the restaurant: his brother Andres Buten, and his sixteen year old stepson William Martinez (XXIV R.R. at 18, 20, 26, 83-97, 99, 102-6). The applicant called Buten and demanded seventy-five kilos of cocaine and $100,000 in exchange for the safe release of the two men (XXIV R.R. at 29-32, 47). The applicant threatened to kill them if Buten called the police or failed to comply with his demands (XXIV R.R. at 31, 37). With the assistance of law enforcement, Buten negotiated with the applicant, and the applicant was apprehended (XXIV R.R. at 41, 48-58).

38.     Andres Buten described how the applicant treated him while he was confined (XXIV R.R. 84-94). Andres was bound with wire from a coat hanger while the applicant repeatedly punched him, kicked him, hit him over the head with a shower curtain, hit his feet with a mallet, and urinated on him (XXIV R.R. at 86-90, 93-94). The applicant told Andres he was going to kill him (XXIV R.R. at 87).

39.     William Martinez testified that the applicant physically beat him, threw him to the floor, stomped on his back, and spit on him (XXIV R.R. at 105-08). The applicant also hit William with a revolver, tied him up with the wire from a coat hanger, and held a knife to his throat, toes and penis, threatening to cut him (XXIV R.R. at 109-10).

40.     The applicant pled guilty to kidnapping and possession of weapons and was sentenced to imprisonment for sixteen years in Puerto Rico (XXIV R.R. at 65-67).

: 001043

41.     While incarcerated in Puerto Rico, an inspection of the applicant's cell revealed his plans to escape; the window pane was loose and open to the outside, and he had hidden a rope of bed sheets and a map of Puerto Rico (XXIV R.R. at 120-127). When authorities strip-searched the applicant, they found a cell phone, which is a prohibited item in a correctional facility (XXIV R.R. at 128).

42.     On February 12, 2010, the applicant was booked into the Harris County Jail where he was classified as a high-risk inmate and placed into administrative separation (XXV R.R. at 145). Two months after being moved from separation, on September 23, 2012, the applicant was found to possess a prohibited weapon; he had disassembled a razor that had been checked out to him and hid the blade inside his bed (XXV R.R. at 126-33, 137-38, 145, 147).

43.     Diana Garcia testified that she regretted ever meeting the applicant and believing he was their friend (XXV R.R. at 200-01). Diana described her son as friendly, lovable, and very outspoken (XXV R.R. at 195). She said that Angelo was her whole world and that she could not put his murder behind her (XXV R.R. at 199, 201).

**DEFENSE EVIDENCE AT PUNISHMENT**

44.     The applicant's wife, Mireya Perez-Garcia, testified via Skype about how she met the applicant when she was fifteen years old, and went out with him for about three weeks before getting married (XXVI R.R. at 8-12). The couple lived with each other on and off and had two sons (XXVI R.R. at 12-14). Perez-Garcia testified that the applicant was a "sincere and noble person"; that he participated in missions and gave money to help build a church; that he was a very spiritual Christian; and, that he was a loving father who helped his children with their homework, cooked for them, took them to church, and made sure that they were well-groomed and well-dressed. She testified that he had been in prison since his youngest son was about five

: 001044

years old; that she knew the applicant was also married to Angelita; and, that she knew he has a daughter with a woman named Dorka (XXVI R.R. at 15-30).

45.     Joel Cruz-Garcia, the applicant's younger brother, and Abel Cruz-Perez, the applicant's seventeen year old son, testified that each had a positive relationship with the applicant and believed he was a good brother and father, respectively (XXVI R.R. at 33-36, 67-70). Joel also testified that the applicant had four children with three different women (XXVI R.R. at 50-51).

46.     Angel Meza, a fellow inmate at the Harris County Jail, testified that he met the applicant while Meza was a trustee, and he brought the applicant food while he was in lockdown (XXVI R.R. at 82). Meza and the applicant had long conversations about the Bible, and Meza believed that it helped him make better choices (XXVI R.R. at 83). Meza considered the applicant a man of God and a great friend (XXVI R.R. at 84, 92).

**FIRST GROUND: REPRESENTATION AT TRIAL – DNA EVIDENCE**

*-GENERAL REPRESENTATION*

47.     The applicant was represented at trial by first chair counsel R.P. Cornelius and Mario Madrid as second chair counsel. *See State's Ex. B and C, affidavits of Cornelius and Madrid, respectively.*

48.     The Court finds, based on personal recollection, the trial record, and the affidavits submitted by trial counsel and their investigator, that the totality of the representation afforded the applicant at trial was competent under prevailing professional norms; that the applicant fails to demonstrate that trial counsel was deficient in the representation of the applicant at either phase of trial; and, that the applicant fails to establish that the applicant was harmed on the basis of any alleged deficiency in trial counsel's representation. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(for ineffective assistance of counsel claims, a defendant must meet the standard

: 01045

established in *Strickland* by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense").

49.     Particularly, based on the court's personal knowledge and the credible habeas affidavit of trial counsel Cornelius, the Court finds that Cornelius is very well-qualified to represent defendants, such as the applicant, facing a charge of capital murder in which the State seeks the death penalty; that Cornelius has been trying death penalty cases as a prosecutor and then as a defense attorney since 1976; that Cornelius is a former Harris County Assistant District Attorney and Assistant United States Attorney for the Southern District of Texas; that Cornelius is board certified in criminal law; and, that Cornelius has never been found ineffective, denied admission to a court, or disciplined. *State's Ex. B, affidavit of Cornelius.*

*-DEFENSE PRESENTATION OF DNA EVIDENCE*

50.     The Court finds, based on the trial and habeas proceedings, that the applicant fails to demonstrate deficient performance, much less harm, based on the allegation that trial counsel was ineffective for failing to present expert testimony to challenge the State's DNA evidence presented at trial. *Applicant's writ at 17.*

*-suppression hearing*

51.     Trial counsel filed a pre-trial motion to suppress the results of all DNA testing which focused on problems with the old HPD crime lab and alleged that the physical evidence in the applicant's case was contaminated and the DNA analysis was unreliable (III C.R. at 454-56)(XVI R.R. at 3-121).

52.     The trial court conducted a hearing on the applicant's suppression motion during which trial counsel argued that the investigation of the "old" Houston Police Department (HPD) crime lab resulted in such scathing reports that the lab had to be closed, and the court should have no

12

confidence in any evidence that was transferred from the old HPD crime lab to anywhere else for fear of contamination, and that employees of the old HPD crime lab who handled evidence in the applicant's case were found to have committed misconduct in their work at the lab (XVI R.R. at 16-18).

53.    In support of the applicant's motion to suppress, trial counsel presented several reports from the independent investigator for the old HPD crime lab: the Bromwich, report, the HPD internal affairs investigation summary, and internal complaint reports regarding various HPD crime lab employees (XVI R.R. at 18-21).

54.    During the suppression hearing, the State proffered the testimony of SANE nurse Gloria Kologinczok who performed a sexual assault examination of Diana Garcia at 3:45 a.m., on October 1, 1992, and then turned over the sexual assault evidence collection kit to HPD Officer W.T. Bredemeyer who deposited the evidence at the HPD property room (XVI R.R. at 23-5)(XIX R.R. at 59-60).

55.    The State also presented the testimony of Eric Mehl, HPD sergeant, who testified that police were unsuccessful in making contact with the applicant during the initial investigation of the primary offense in 1992; that the primary case was reopened in 2007 after HPD created a cold case squad; that Mehl located evidence from the primary case at the HPD property room and subsequently sent some blood samples and three pieces of evidence - a cigar, a sexual assault examination kit, and a cutting from a pair of women's panties - to Orchid Cellmark for analysis on October 2, 2007; that HPD did not possess a DNA sample from the applicant when the evidence was originally sent to Orchid Cellmark for analysis; that, in 2008, the applicant was located in a Puerto Rican prison and a sample of his DNA which Mehl received on May 23, 2008, and then shipped to Orchid Cellmark for analysis; and, that Mehl filed capital murder

13

charges on the applicant after he received Orchid Cellmark's DNA testing report (XVI R.R. at 28-39).

56.     Matt Quartaro, an Orchid Cellmark supervisor, testified that Orchid Cellmark performed their own DNA extractions from the evidence and did not rely on those previously obtained by HPD; that Orchid Cellmark compared the applicant's DNA against the cigar, the sexual assault examination kit, and a cutting from the panties; that testing established that the DNA profile on the cigar left at the crime scene was a match for the applicant; that the sperm fraction from the cutting of the panties was a mixture of DNA with the major DNA profile belonging to the applicant; that the applicant could not be ruled out as the contributor to the DNA mixture from the vaginal swab; and, that the probability of that DNA profile repeating in the North American population was one in 71.5 quadrillion unrelated individuals (XVI R.R. at 39, 51-60).

57.     Courtney Head, HPD crime lab, testified that, in October, 2012, she developed a DNA profile from a swab collected from the applicant and compared that profile to the DNA profiles obtained from evidentiary samples taken by Orchid Cellmark, and Head concluded that the applicant could not be excluded as a contributor to the DNA from the cigar, the DNA mixture from the vaginal swab or as a major contributor to the DNA from the panties (XVI R.R. at 89-92).

58.     The trial court denied the applicant's motion to suppress the DNA evidence, making numerous findings of fact on the record, including specific findings that the evidence and test results were relevant and reliable; that testing results from the old HPD crime lab and Genetic Design Lab were not offered and admitted into evidence; that Orchid Cellmark did not use any extractions from evidence made by the old HPD crime lab; that the old HPD crime lab had not handled any evidence in the instant case since 1994; and, that there was no indication that any of

14

the State's DNA evidence had been contaminated or mishandled when it was stored by the old HPD crime lab (XVII R.R. at 3-17).

59.     During the guilt/innocence phase of trial, the State presented much of the same testimony from Mehl, Quartaro, and Head that was presented during the suppression hearing.

60.     The Court of Criminal Appeals on direct appeal of the applicant's conviction overruled the applicant's claim that the trial court's denial of his motion to suppress the DNA testing results constituted a due process violation and the applicant's challenge to the sufficiency of the evidence of the chain of custody of the State's forensic evidence. *See Cruz-Garcia*, 2015 WL 6528727, *8-13.

61.     The Court of Criminal Appeals held that the record supported the trial court's conclusion that the DNA evidence was reliable, citing testimony that the evidence appeared to have been stored appropriately; that the evidence was separated and sealed in individual containers; and, that the locations where the evidence was stored were not the locations described as deficient in reports criticizing the old HPD crime lab. *See Cruz-Garcia*, 2015 WL 6528727, *13.

62.     Additionally, the Court of Criminal Appeals noted the following concerning the State's DNA evidence: that the cigar and the sexual assault kit were stored in different HPD buildings and sealed in separate bags when Mehl retrieved them for shipment to Orchid Cellmark; that Mehl considered the cigar and sexual assault kit in good condition and not damaged when he retrieved them; that, after Mehl shipped the cigar and sexual assault kit to Orchid Cellmark, he obtained the cutting of Diana's panties as well as Diana's and Arturo's biological samples that were stored in the HPD crime lab in separate sealed plastic bags; that Mehl received the applicant's DNA sample from a colleague who collected it from the applicant in Puerto Rico in 2008; that Mehl did not open the package with the applicant's DNA sample before sending it to

15

: 001049

Orchid Cellmark – Mehl just repackaged it; that the evidence was packaged separately and did not appear to have been tampered with or contaminated when Quartaro received it; and, that Orchid Cellmark performed its own extractions and analyses on the panties, the cigar and the vaginal swabs rather than rely on the old HPD crime lab extractions. *See Cruz-Garcia*, 2015 WL 6528727, \*11-12.

63.    The Court of Criminal Appeals, on the issue of the alleged contamination of the State's evidence, cited Quartaro's testimony that without a sample of the applicant's DNA in the crime lab where the evidence was stored, it would be difficult to contaminate the evidence with the applicant's DNA; that the cells containing the applicant's DNA on the cigar were saliva and skin cells while the cells on the panties and vaginal swabs were sperm cells; that Quartaro observed no signs of tampering or contamination when he received the State's evidence; and, that contamination from excess moisture, heat or other environmental factors would result in a degraded biological sample on a particular item of evidence and not the manifestation of an otherwise-absent DNA profile. *See Cruz-Garcia*, 2015 WL 6528727, \*12.

64.    The Court finds, based on the credible habeas affidavits of trial counsel Cornelius and Madrid, that counsel made a reasonable trial strategy decision regarding whether to retain a DNA expert; that Cornelius knows a lot about DNA and has been involved in DNA evidence with his criminal trials since its inception; that Cornelius thoroughly reviewed the DNA evidence in the applicant's case and made the best record and argument that he could to suppress it; and, that the State's evidence at the suppression hearing demonstrated that the evidence at issue was sufficiently preserved. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

16

65.    The Court finds that trial counsel were effective in their efforts to challenge the State's DNA evidence, and that the applicant's hindsight examination of the applicant's representation in this area, including the applicant's proffered affidavits of former counsel Steve Shellist and DNA experts Daniel Hellwig and Elizabeth Johnson do not establish trial counsel's alleged ineffectiveness. *See Applicant's Ex. 2, 4, and 32, affidavits of Hellwig, Shellist and Johnson, respectively.*

### SECOND GROUND: REPRESENTATION AT TRIAL - GUILT/INNOCENCE

66.    The applicant fails to demonstrate deficient performance, much less harm, based on the habeas claim that trial counsel were ineffective for failing to investigate and present reasonable doubt at the guilt/innocence phase of trial. *Applicant's writ at 35.*

### *-consensual sexual relationship*

67.    The Court finds, based on the credible habeas affidavits of trial counsel, that trial counsel elected as a matter of reasonable trial strategy to develop through cross-examination and argument that there was a consensual sexual relationship between the applicant and Diana Garcia; that counsel was hampered in their efforts to develop and present evidence of a consensual sexual relationship because there was no direct evidence of a consensual relationship between the applicant and Diana Garcia; that the defense investigator made efforts to speak to all potential witnesses, but there were no witnesses to support the defense's theory of a consensual relationship between the applicant and Diana Garcia; that trial counsel explained to the applicant numerous times that evidence of consensual sexual relationship with Diana Garcia would have been the best attempt to naturalize the State's DNA evidence; that the applicant refused to discuss the facts of the primary case with counsel, merely making statements to the effect that God would deliver him and would turn the witnesses tongues into snakes; and, that the applicant

17

had no intention to testify. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

68. The Court finds, based on the credible affidvits of trial counsel, that the applicant never told counsel about alleged witnesses Cesar Rios, Jose Valdez or Hector Saavedra. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

69. The Court finds, based on the affidavit of defense investigator J.J. Gradoni, that the defense gave the applicant every opportunity to inform them of anyone who could say something good about the applicant; that the applicant was not very forthcoming about much of anything regarding the primary case, saying that he was not concerned about being convicted, God or Jesus would deliver him and the witnesses would not testify against him; that, when asked directly about an alleged consensual sexual relationship with Diana Garcia, the applicant avoided answering the defense team's questions; that, whenever any member of the defense team spoke to the applicant, a certified interpreter was present to assist with communication. *See State's Ex. D, affidavit of defense investigator Gradoni.*

70. The Court finds, based on the affidavit of defense investigator Gradoni, that Cesar Mala Rios was identified as an associate of Diana Garcia in the police offense report; that the defense's efforts to contact Cesar Mala Rios were not successful; and, that the applicant never asked to defense to locate/contact Cesar Mala Rios. *See State's Ex. D, affidavit of defense investigator Gradoni.*

71. Because the applicant did not supply trial counsel with the names of Cesar Rios or Cesar Mala Rios, Jose Valdez or Hector Saavedra as potentially beneficial defense witnesses and the defense was unable to locate Cesar Mala Rios, the applicant fails to demonstrate trial counsels' alleged ineffectiveness for not presenting them as witnesses. *King v. State*, 649 S.W.2d 42, 44

18

(Tex. Crim. App. 1983)("counsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony"); *see also Pape v. Thaler*, 645 F.3d 281, 289 (5th Cir. 2011)(defense counsel not ineffective for failure to call witnesses to testify regarding the defendant's good character or alleged credibility because defendant failed to supply counsel with witnesses' names).

72.  The Court finds that the applicant fails to demonstrate that Cesar Amado Rios, Hector Saavedra or Jose Valdez could have provided the defense with admissible evidence of an alleged consensual sexual relationship between the applicant and Diana Garcia. *See Applicant's Ex. 20, 21, and 24, affidavits of Cesar Amado Rios, Hector Saavedra, and Jose Valdez, respectively.*

*-drug dealing*

73.  On cross-examination of Diana Garcia and Arturo, trial counsel obtained admissions from both witnesses that they initially lied to police about their involvement in drug dealing (XVIII R.R. at 189-90, 218).

**THIRD GROUND & FOURTH GROUNDS: TRIAL REPRESENTATION - PUNISHMENT**

74.  The Court finds, based on the trial and habeas record, that the applicant fails to demonstrate deficient performance, much less harm, based on the habeas claim that trial counsel were ineffective in their presentation of evidence at punishment.

75.  The Court finds that the applicant presents the unrelated e-mails between the prosecutor, Natalie Tise, and Christian Capitaine, an attorney who represented the applicant before the State chose to seek the death penalty, in which Tise and Capitaine went back and forth about whether the offense report was complete and whether Capitaine received all supplemental and DNA reports.

19

76.   The Court finds that the email exchanges between prosecutor Tise and former trial counsel Capitaine have no bearing on the issue of whether trial counsel Cornelius and trial counsel Madrid reviewed the State's files before trial.

77.   During punishment, there was an exchange between prosecutor Tise and trial counsel Cornelius after Tise questioned FBI Special Agent Ebersole in which Cornelius requested more time to look at a report (XX R.R. at 183-7).

78.   The Court finds unsupported the applicant's habeas assertion that trial counsel failed to review the State's file in preparation for the applicant's trial.

79.   The Court finds, according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid, that trial counsel reviewed the State's files "many times," and that when Cornelius needed additional time to read over a particular report from FBI Special Agent Ebersole, it was because Cornelius could not find the documents in his files at that moment, but did later locate the documents at issue. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

80.   The Court finds that trial counsel filed a dozen pre-trial motions, hired an investigator, hired a clinical psychologist, questioned potential jurors for eleven days, cross-examined thirty-two witnesses, and presented the testimony of four defense witnesses.

81.   The Court finds, according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid, that based on their review of the State's files, trial counsel hired an investigator, James Gradoni, to interview witnesses, talk to experts, and interview the applicant's family members in the Dominican Republic and Puerto Rico.  Trial counsel also obtained funds from the court to send Gradoni to the Dominican Republic in order to follow up with witnesses. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

20

82.     The Court finds, according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid, that trial counsel did make contact with witnesses in Puerto Rico and the Dominican Republic but did not feel they needed to personally travel to those locations because they were confident that investigator Gradoni would do a professional and competent job handling that portion of the investigation. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

83.     The Court finds, according to the credible affidavit of investigator Gradoni, that he and Edna Velez, a native of Puerto Rico who assisted Gradoni in the investigation, travelled to the Dominican Republic, where they located and interviewed witnesses, took photographs, and obtained useful and important information for trial counsel Cornelius and trial counsel Madrid to use for mitigation purposes. *State's Ex. D, affidavit of defense investigator Gradoni.*

84.     The Court finds, according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid, that trial counsel did not hire a person who was recognized as a "mitigation expert," but instead hired a psychologist and a private investigator who were devoted to developing mitigation evidence with the guidance of trial counsel. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

85.     The Court finds, according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid that trial counsel could not find a "mitigation expert" in Harris County, Dallas, or Fort Worth that would look at the applicant's case for the amount of money that the Harris County Commissioner's Court was willing to pay. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

86.     The Court finds, according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid, that trial counsel did not believe that they needed an anthropologist or

21

sociologist to present evidence of the applicant's life history and chose to use testimony from lay witnesses to present such evidence. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

87.     The Court finds that trial counsel presented evidence of the applicant's life history through the applicant's wife, Mireya Perez-Garcia, the applicant's younger brother, Joel Cruz-Garcia, the applicant's younger brother, the applicant's seventeen year old son, Abel Cruz-Perez (XXVI R.R. at 8-79).

88.     The Court finds that the applicant's life history also came out through fellow drug dealer, Carmelo Martinez Santana, and the applicant's ex-wife, Angelita Rodriguez (XX R.R. at 83-123).

89.     The Court finds unpersuasive the habeas affidavit of Dr. Gina Perez, anthropology professor, in which she explains the applicant's ultimate involvement in the drug trade in the context of the broader experience of men and women emigrating from the Dominican Republic to Puerto Rico from the 1970's to the 1990's. *See Applicant's Ex. 3, affidavit of Dr. Gina Perez.*

90.     The Court finds, based on the trial and habeas record, that the applicant fails to demonstrate deficient performance, much less harm, based on trial counsels' strategy decisions regarding the presentation of punishment evidence.

**FIFTH & SIXTH GROUNDS: VIENNA CONVENTION**

91.     The Court finds, based on the record, that the applicant did not object either pre-trial or during trial to any alleged violation of the Vienna Convention on Consular Relations; accordingly, the instant ground for relief is procedurally barred.

93.     On February 12, 2010, the applicant was given his probable cause warnings by a magistrate for the instant capital murder case. The form that the hearing officer signed reflects

22

that an interpreter was present for the proceedings; that the applicant was advised of his consular rights, but the country of the applicant's citizenship was not designated on the form; and, that the form indicates that the consulate for Dominica was to be notified (I C.R. at 7).

94.     According to an exhibit included with the applicant's habeas application, a fax sheet indicates that notice was sent to the Dominica Embassy, and there is a hand written notation indicating "wrong embassy." *See Applicant's writ exhibit no. 26, "Probable Cause for Further Detention & Statutory Warnings by Magistrate."*

95.     On February 16, 2010, the applicant was again given his statutory warnings by a magistrate on February 16, 2010, and the applicant was advised of his consular rights (I C.R. at 9).

96.     On February 16, 2010 and within days of the applicant's arrest, Mike Fosher was appointed to represent the applicant; that, on February 24, 2010, the applicant's case was reset in order that a Spanish speaking attorney could be appointed for the applicant; that Mario Madrid was appointed to represent the applicant on March 3, 2010; that the applicant subsequently retained Steve Shellist and Christian Capitaine whose motion to substitute in as counsel was granted on April 16, 2010; and, that the trial court subsequently appointed experienced trial counsel R.P. Cornelius and Mario Madrid to represent the applicant when the State announced its intent to seek the death penalty (I C.R. at 8, 11, 19, 57-9)(II R.R. at 4-8).

97.     Based on the record, the Court finds that the applicant was already familiar with the local criminal justice system as the result of his arrest and being on bond in a Harris County felony drug case when he committed the instant capital murder (XIX R.R. at 140-2)(XX R.R. at 103).

98.     The Court finds, based on the trial record and habeas affidavits of trial counsel Cornelius and Madrid, that the applicant was advised of his consular rights which were reiterated to him by

23

: 01057

trial counsel; that the applicant did not want trial counsel to contact the applicant's consulate; and, that the applicant had no interest in receiving help of any kind from his consulate. *See State's Ex. B & C, affidavits of trial counsel Cornelius and Madrid, respectively.*

99.     The Court finds, based on the habeas proceedings, that the applicant fails to demonstrate prejudice on the basis of any alleged treaty violation; that the applicant does not demonstrate prejudice, that such violation caused the applicant to do something he would not have done otherwise, or that an alleged violation affected the fairness of the applicant's capital murder trial.

100.    Given the heinous nature of the primary offense and the applicant's criminal history, the Court finds the letter from the Consul General for the Dominican Republic and the habeas affidavit of Cornell University law professor Sandra Babcock speculative and unpersuasive for the proposition that consular officials could have interceded in the applicant's case and persuaded prosecutors not to seek the death penalty or provided assistance that would have made a difference in the outcome of the primary case. *See Applicant's Ex. 1, Babcock affidavit; Applicant's Ex. 25, letter from Consul General for the Dominican Republic.*

101.    Moreover, Article 36 of the Vienna Convention on Consular Relations does not guarantee consular assistance or consular intervention. *Sanchez-Llamas v. Oregon*, 548 U.S. at 349, 126 S.Ct. 2669, 2681 (2006); *see also Medellin v. Texas*, 552 U.S. 491, 499 (2008).

102.    The Court finds, based on personal recollection, the trial record and habeas proceedings, that the applicant's claims of trial counsels' ineffectiveness for failing to recognize the significance of the applicant's foreign nationality, seek the assistance of the Dominican consulate in defending the applicant's case, and preserve the applicant's Vienna Convention complaints for appeal are grounded purely in speculation; that the applicant was represented by skilled counsel who were far more qualified to explain the Texas criminal justice system to the applicant than a

24

representative of the applicant's consulate; and, that the applicant fails to demonstrate deficient performance, much less harm on the basis urged. *Applicant's writ at 109.*

### SEVENTH GROUNDS: TRIAL JUDGE'S DISCUSSION WITH JUROR BOWMAN

103.    The Court finds, based on the trial and habeas records, that the applicant fails to demonstrate error based on the trial judge's ex parte conversation with juror Angela Bowman.

104.    The Court finds, based on the record, that the applicant did not object at the trial level to the trial judge's conversation in chambers with juror Angela Bowman; accordingly, the instant ground for relief is procedurally barred.

105.    Additionally, the Court finds that the applicant did not urge the instant claim during his motion for new trial or on direct appeal; rather, the applicant argued in his motion for new trial that juror Bowman was subject to undue pressure or an outside influence, and the trial court denied the motion for new trial (XIX R.R. at 30).

106.    The Court finds, based on the record, that the trial judge presided over nine days of testimony and heard from thirty-five witnesses; that, when the jury retired to deliberate on punishment, they only deliberated for fifty minutes before the court adjourned; that, the following day on July 19, 2013, the jury began deliberating at 9:20 a.m., broke for a seventy-five minute lunch; and, that juror Bowman then sent out a note at 3:20 p.m., asking to speak to the trial judge (III C.R. at 512, 587).

107.    The Court finds, based on the trial record and personal recollection, that the parties agreed that the trial judge could speak to juror Bowman privately in chambers, and Bowman met with the trial judge in chambers with only the court reporter present (XXVII R.R. at 3).

108.    During their brief meeting, juror Bowman told the trial judge that she could not agree with the other jurors on the special issues and felt pressured; Bowman asked the judge to allow

: 001059

an alternate juror take her place; when the judge explained the law to Bowman regarding alternates replacing jurors, Bowman responded that the jury was never going to reach an agreement and that she did not want to stay another night; the judge instructed Bowman to resume deliberations with the jury until the court directed otherwise; and, the trial judge then explained the following to Bowman:

> If the evidence leads you to a certain way, that's the way you should answer it, even though it might result in something that bothers you. That's why we don't ask you to vote to give the death penalty or to not give the death penalty. So, I'd like you to go back and continue your deliberations with the jury and continue trying to reach an agreement with the jury, if you can. Do not violate your conscience. And answer those questions according to where the evidence leads you.

(XXVII R.R. at 4-8).

109.    Bowman returned to the jury room and the jury returned a verdict on punishment later that same day (XXVII R.R. at 9-12).

110.    After confirming that the verdict was unanimous, the trial judge asked whether either side wanted the jury to be polled; trial counsel indicated that he wanted the jury polled; the trial judge called out each juror's name individually; and, when the judge called the name "Angela Bowman," Bowman replied "Yes" confirming that the verdict rendered was her true and correct verdict (XXXVII R.R. at 11-2).

111.    The applicant urged a motion for new trial and supplement for motion for new trial alleging jury misconduct during the punishment phase of trial, during which the parties presented affidavits by trial counsel Mario Madrid, defense investigator J.J. Gradoni, juror Angela Bowman, juror Casey Guillotte, and jury foreman Matthew Clinger (III C.R. at 538-649).

111.    According to trial counsel Madrid's August 19, 2013 affidavit filed in support of the applicant's motion for new trial, Madrid received a phone call from juror Bowman the evening

26

that the jury returned its verdict in the primary case; during the conversation, Bowman stated that she was distraught over the punishment deliberations and claimed that she was pressured into changing her decision; Bowman stated that her decision was complicated because her daughter was ill and Bowman was unable to attend to her daughter because the jury was sequestered; and, the jury foreman quoted from his Bible during deliberations which Bowman felt influenced other jurors towards death rather than a life sentence (III C.R. at 541-2, 551-2, 561-2, 572-3).

112. According to the August 20, 2013 affidavit of juror Bowman filed in support of the applicant's motion for new trial, Bowman received a phone call from her daughter's camp counselor on the first day of deliberations, July 18, 2013, and learned that her daughter had a fever; Bowman spoke with the trial judge and asked to be removed so that an alternate could take her place, and the judge denied Bowman's request; Bowman would have "remained committed to voting for life in prison" if she had not been concerned about her daughter's health; the jury foreman took out his Bible when juror Guillotte sought spiritual guidance to make her decision; Guillotte then changed her mind and voted for death; Bowman felt pressure because it appeared that she was the last holdout for the applicant to receive a life sentence; Bowman became increasingly concerned about her daughter when she had no communication regarding her condition; Bowman would have remained committed to voting for life if she had not been concerned about her daughter; other jurors told Bowman that she was holding them up and wasting their time; Bowman changed her verdict so that she could return home to take care of her child; and, Bowman's verdict was not a true and honest expression of her belief in the evidence regarding the special issues (III C.R. at 555-6, 576-7).

27

113.   During the motion for new trial, the trial court found that certain portions of juror Bowman's August 20, 2013 affidavit were not correct as to her recollection of events relating to deliberations and her conversation with the trial judge (XIX R.R. at 29-30).

114.   According to the August 20 and September 19, 2013 affidavits of defense investigator J.J. Gradoni offered in support of the applicant's motion for new trial, Gradoni conducted a post-trial interview with juror Bowman during which Bowman stated that the verdict she announced in open court when the jury was polled was not her "true and honest punishment verdict"; that Bowman learned that her daughter was ill and her inability to care for her daughter caused her to be distracted and made her the subject of undue pressure from other jurors to change her vote in favor of a death sentence; that Bowman voted so that a death verdict would be returned because she wanted to get home to take her child to the hospital; that jury foreman Matthew Clinger injected Biblical passages into deliberations which Bowman believed caused other jurors to vote in favor of death; that juror Guillotte commented in deliberations that she needed spiritual guidance to decide, and foreman Clinger brought out his Bible and stated that he had prayed on the issue the night before; that juror Guillotte then changed her vote in favor of death; that Gradoni interviewed foreman Clinger who confirmed that he had read Biblical passages during deliberations; that Clinger researched the Bible the night before the jury deliberated on the applicant's punishment; that one-third of the jurors favored death, a third favored life, and another third were undecided; and, that Clinger thought that the Bible verses were "contributing factors" in Guillote changing her vote (III C.R. at 553-4, 574-5, 612-648).

115.   According to the September 18, 2013 affidavit of juror Casey Guillotte, after the jury reached a unanimous decision on the special issues and foreman Clinger signed the verdict form, Guillotte asked a general question about how the jury was going to emotionally come to terms

28

: 01062

with their verdict; that, in response, foreman Clinger got a Bible from his personal belongings, appeared to read a Bible passage to himself, and then stated that he had found comfort with his decision because of a verse in the book of Romans; that foreman Clinger did not read the Bible verse to the jury or refer directly to a particular Bible verse; and, that Clinger's retrieval of his Bible and reference to a verse did not influence Guillotte's decision in answering the special issues (III.C.R. at 597-8).

116. According to the September 18, 2013 affidavit of jury foreman Matthew Clinger, juror Guillotte noted during the Friday deliberations that even though she knew the answers to the special issues were based on the evidence, she was concerned about the emotional impact of her answers; that Guillotte asked the group for help with the emotional struggle; that numerous jurors then talked about how they personally handled their emotions about the decision; that Clinger then stated that he found comfort in the Bible and he laid his personal Bible on the table, opening it to a chapter in Romans; that Clinger never read directly from his Bible and did not see the other jurors read from it; that Clinger did not believe that Guillotte or the other jurors changed their answers to the special issues based on this exchange about the Bible; that juror Bowman was the last juror to come to terms with the special issue answers; that juror Bowman appeared to agree with the rest of the jurors on how the evidence directed the jurors' to answer the special issues but she struggled with the emotional consequences; that juror Bowman said "I agree" and told Clinger to sign the verdict form several times but Clinger did not do that because he could tell that she was not convinced of the verdict; that they continued to talk about the evidence and gave Bowman the opportunity to discuss the issues and evidence; that Clinger was conscientious about insuring that Bowman was not rushed into a decision; that Bowman made an offhand remark about her daughter's illness early in deliberations but did not seem overly

29

concerned and never mentioned that she needed to rush to a verdict; that Bowman did mention that she planned to take her daughter to South Padre on the following day, Saturday, July 20, 2013; that Bowman asked other jurors how long it would take to reach South Padre; that Clinger did not notice that other jurors put undue pressure on Bowman; and, that Clinger believed that the jurors were respectful of others' opinions throughout the process (III C.R. at 599-601).

117.    The Court finds, based on the trial and habeas records, that the applicant fails to demonstrate that trial counsel were not aware of the substance of the trial judge's conversation with juror Bowman after their meeting in chambers.

118.    The Court finds, based on the habeas record, that the applicant offers nothing to support his allegations that trial counsel, during the applicant's habeas investigation, asserted that they were not told by the court that Bowman was a holdout vote and wanted to stop deliberating; that there was an informal conversation with the judge outside the courtroom during which counsel were informed that Bowman was having a hard time; and, that both counsel would have asked the court to end deliberations and enter a life sentence if they had known that Bowman was a holdout juror who desired to stop deliberations. *Applicant's writ at 124.*

119.    The Court finds, based on the habeas record, that neither of trial counsels' habeas affidavits contain the statements alleged by the applicant in *Finding of Fact 118.*

120.    The applicant fails to demonstrate deficient performance, much less harm on the basis now alleged regarding trial counsel; that, based on what trial counsel knew at the time of the complained-of incident, the conversation between the trial judge and juror Bowman was recorded and a part of the record for review on appeal if necessary; that trial counsel trusted the trial judge to do what she thought was appropriate in the situation; and, that trial counsel does not

30

now consider the trial judge's actions improper. *See State's Ex. B and C, affidavits of trial counsel Cornelius and Madrid, respectively.*

121.   The Court finds, pursuant to TEX. R. EVID. 606(b), that a juror can only testify about whether any outside influence was improperly brought to bear upon any juror or to rebut a claim that a juror was not qualified to serve.

122.   The Court finds that the August 13, 2015 habeas affidavit statements of juror Angela Bowman that she was the only juror voting for life without parole; that it was clear that she was not going to change anyone's mind; and, that she changed her mind to vote for death because of the pressure from the other jurors and her daughter's illness consists of Bowman's emotional or mental processes during deliberations which are processes that are inadmissible pursuant to Rule 606(b). *Applicant's Ex. 14, 2015 affidavit of juror Bowman.*

123.   Notwithstanding the inadmissibility of juror Bowman's 2015 habeas affidavit, the Court finds that the assertions of Bowman concerning her deliberations are suspect and unpersuasive in light of the September 18, 2013 affidavit of jury foreman Matthew Clinger which was presented during the hearing on the applicant's motion for new trial (III C.R. at 599-601).

124.   The Court finds, based on personal recollection and the trial record concerning the circumstances and contents of the Court's conversation with Bowman, that the Court's instructions to Bowman did not constitute an impermissible or coercive *Allen* charge; that the trial judge did not pressure Bowman into reaching a particular verdict or somehow convey the judge's opinion of the primary case; and, that the applicant was not prejudiced as a result of juror Bowman's ex parte conversation with the trial judge.

125.   The Court finds, based on the trial record and the habeas proceedings, that the applicant fails to demonstrate a violation of his constitutional rights, much less the deficient performance

31

of trial/appellate counsel and prejudice based on the Court's objected-to ex parte conversation with juror Bowman.

126. The Court finds, based on the trial and habeas records, that the instant case is factually distinguishable from that contemplated by the United States Supreme Court in *United States v. United States Gypsum Co.*, 438 U.S. 460-1 (1978) in that the trial judge in the primary case did not seek out juror Bowman and there is no evidence that Bowman was the trial judge's mouthpiece for the jury; accordingly, the applicant's reliance on such case is unpersuasive and not dispositive of the instant habeas claim.

### EIGHTH GROUND – TRIAL REPRESENTATION – FAILURE TO INVESTIGATE ALLEGED JUROR MISCONDUCT

127. The Court finds, based on the trial and habeas records, that the applicant fails to demonstrate deficient performance, much less harm, based on the allegation that trial counsel were ineffective for failing to investigate alleged juror misconduct relating to information that defense attorney Michael Lazaretto gave to the trial judge during the punishment phase of trial; that the trial judge gave the parties a thorough description of the event as related to her by Lazaretto, and counsel considered the event insignificant while noting that the event was memorialized in the record for appellate counsel to consider on appeal. *Applicant's writ at 133. See State's Ex. B and C, affidavits of trial counsel Cornelius and Madrid, respectively.*

128. On the morning of July 16, 2013, before the State began presenting evidence in the punishment phase of the trial, the trial judge related to the parties what defense attorney Casaretto had told her that morning: that Casaretto was waiting for an elevator when he heard two men—both wearing badges indicating they were jurors in the 337th District Court—having what was "possibly an innocuous conversation;" that it was hard for Casaretto to hear the jurors, but they seemed to be speaking about the case and struggling with the issues; that the younger

32

juror thanked the older juror for his words of encouragement the day before; that the jurors discussed nothing specific about the issues; that Casaretto could not tell if the jurors were actually talking about evidence in the case; and, that the conversation ceased once the jurors got on the elevator (XXIV R.R. at 3-4).

129.    The trial judge then told the parties that she intended to, once again, strongly admonish the jury not to discuss the evidence, or any deliberations, or any aspect of the deliberations, outside the presence of the jury where they were all seated together and are supposed to be deliberating (XXIV R.R. at 4).

130.    In response to trial counsel's question asking whether the judge had spoken to Casaretto herself and whether she was satisfied that was all of Casaretto's information, the trial judge confirmed to the parties that she talked to Casaretto in chambers, took notes as to what Casaretto told her, and read her notes back to Casaretto; and, that Casaretto told the trial judge, "Yes, that's it, that is exactly what I observed today" (XXIV R.R. at 5).

131.    The trial judge told the parties that she was not going to make her actual notes part of the record because she read everything in her notes to the parties verbatim as to what she wrote down, and she gave the parties Casaretto's phone number (XXIV R.R. at 5).

132.    Casaretto's subsequently submitted an affidavit to habeas counsel on August 27, 2015, recounting his observations of the two jurors from the 337th District Court in the Harris County Criminal Courthouse on July 16, 2013, and stating that it was clear from the jurors' comments that they were taking about the case itself; that the jurors continued their conversation in the elevator; that it seemed that the jurors were discussing the content and their feelings about the testimony of a witness that they heard; that Casaretto was troubled by the "possibility" that two jurors were publicly discussing an ongoing case; that Casaretto made note of the court listed on

33

the jurors' badges, and Casaretto went to that courtroom to speak to the trial judge in the primary case; that Casaretto reported what he observed to the trial judge because he believed that he had witnessed an "obvious violation of the jurors' obligations during trial;" and, that Casaretto was never contacted by the judge, the State or the defense attorneys about the matter. *See Applicant's Ex. 36, affidavit of Michael R. Casaretto.*

133.   The Court finds, based on the trial and the habeas proceedings, that there are significant differences between Casaretto's 2015 affidavit and the information that he originally related to the trial judge in 2013; that, given the two year lapse in time between the event and the affidavit that Casaretto provided for the applicant, the Court finds that Casaretto's 2015 habeas affidavit is suspect and unpersuasive; that the information that Casaretto related to the trial judge in 2013 and the judge's notes from the conversation represent a more reliable representation of what Casaretto actually observed on the morning of July 16, 2013.

134.   The Court further finds, based on the trial and habeas proceedings, that Casaretto's 2015 opinions concerning the action that trial counsel should have taken regarding the information that Casaretto related to the trial judge in 2013 are unpersuasive and not dispositive of the merits of the applicant's habeas claim.

**NINTH GROUND - JUROR'S REFERENCE TO BIBLE DURING DELIBERATIONS**

135.   The Court finds, based on the record, that the applicant fails to demonstrate that his right to a fair trial was violated based on alleged juror misconduct.

136.   The Court finds that the Court of Criminal Appeals rejected the applicant's point of error on direct appeal complaining that the trial court erred when it denied the applicant's motion for new trial based on the alleged juror misconduct of the jury foreman reading passages from the Bible during jury deliberations, holding that the reference to the Bible during jury deliberations

34

did not constitute an outside influence; accordingly, this Court need not reexamine the applicant's instant ground for relief. *See Cruz-Garcia*, 2015 WL 6528727, at *28.

144. Moreover, according to the September 18, 2013 affidavit of juror Casey Guillotte, after the jury reached a unanimous decision on the special issues and foreman Clinger signed the verdict form, Guillotte asked a general question about how the jury was going to come to emotionally come to terms with their verdict; that, in response, foreman Clinger got a Bible from his personal belongings, appeared to read a Bible passage to himself, and then stated that he had found comfort with his decision because of a verse in the book of Romans; that foreman Clinger did not read the Bible verse to the jury or refer directly to a particular Bible verse; and, that Clinger's retrieval of his Bible and reference to a verse did not influence Guillotte's decision in answering the special issues (III C.R. at 597-8).

145. Additionally, according to the September 18, 2013 affidavit of jury foreman Matthew Clinger, juror Guillotte noted during the Friday deliberations that even though she knew the answers to the special issues were based on the evidence, she was concerned about the emotional impact of her answers; that Guillotte asked the group for help with the emotional struggle; that numerous jurors then talked about how they personally handled their emotions about the decision; that Clinger then stated that he found comfort in the Bible and he laid his personal Bible on the table, opening it to a chapter in Romans; that Clinger never read directly from his Bible and did not see the other jurors read from it; that Clinger did not believe that Guillotte or the other jurors changed their answers to the special issues based on this exchange about the Bible; that juror Bowman was the last juror to come to terms with the special issue answers; that juror Bowman appeared to agree with the rest of the jurors on how the evidence directed the jurors' to answer the special issues but she struggled with the emotional consequences; that juror

35

Bowman said "I agree" and told Clinger to sign the verdict form several times but Clinger did not do that because he could tell that she was not convinced of the verdict; that they continued to talk about the evidence and gave Bowman the opportunity to discuss the issues and evidence; that Clinger was conscientious about insuring that Bowman was not rushed into a decision; that Bowman made an offhand remark about her daughter's illness early in deliberations but did not seem overly concerned and never mentioned that she needed to rush to a verdict; that Bowman did mention that she planned to take her daughter to South Padre on the following day, Saturday, July 20, 2013; that Bowman asked other jurors how long it would take to reach South Padre; that Clinger did not notice that other jurors put undue pressure on Bowman; and, that Clinger believed that the jurors were respectful of others' opinions throughout the process (III C.R. at 599-601).

**TENTH GROUND: TRIAL COUNSELS' ALLEGED CUMULATIVE DEFICIENT PERFORMANCE**

146. The Court finds, based on a review of the trial and habeas proceedings, that the totality of the representation afforded the applicant at trial was competent under prevailing professional norms; that the applicant fails to demonstrate that trial counsel was deficient in the representation of the applicant at either phase of trial; and, that the applicant fails to establish that the applicant was harmed on the basis of any alleged deficiency in trial counsel's representation. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(for ineffective assistance of counsel claims, a defendant must meet the standard established in *Strickland* by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense").

147. Based on the applicant's failure to demonstrate trial counsel's alleged ineffectiveness, the applicant fails to show cumulative deficient performance by trial counsel, much less prejudicial effect.

36

: 01070

**ELEVENTH GROUND: JURY'S CONSIDERATION OF MITIGATING EVIDENCE**

148.    The Court finds, based on the record, that the applicant did not object to the punishment

charge or the Texas death penalty scheme on the basis that it allegedly unconstitutionally

restricted the evidence that the jury could determine was mitigating to evidence that reduced the

applicant's moral blameworthiness.

149.    Additionally, the Court finds that the applicant did not present such claim on direct

appeal.

150.    At the conclusion of the punishment phase, the trial court instructed the jury:

> In determining your answers to the questions, or special issues,
> submitted to you, you shall consider all the evidence submitted to
> you in this trial.  You shall consider all evidence submitted to you
> during the trial as to the defendant's background or character or the
> circumstances of the offense that militates for or mitigates against
> the imposition of the death penalty.
>
> You are instructed that when you deliberate on the questions posed
> in the special issues, you are to consider all relevant mitigating
> circumstances, if any, supported by the evidence, whether
> presented by the State or the defendant.

(III C.R. at 513-14; XXVI R.R. at 94).

151.    The trial court also instructed the jury that it need not agree on what particular evidence

supports an affirmative finding to the mitigation special issue, and that,

> In deliberating on Special Issue No. 3 you shall consider all the
> evidence admitted at the trial, including but not limited to evidence
> of the defendant's background, character, or the circumstances of
> the offense that militates for or mitigates against the imposition of
> the death penalty.
>
> You shall consider mitigating evidence to be evidence that you
> might regard as reducing the defendant's moral blameworthiness.

(III C.R. at 516-17; XXVI R.R. at 97).

152.    The mitigation instruction asked the jury,

37

: 01071

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a sentence of death be imposed?

(III C.R. at 525; XXVI R.R. at 103).

153.   The Court finds that the Court of Criminal Appeals has previously rejected the argument that TEX. CODE CRIM. PROC. art. 37.071 unconstitutionally narrows a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness. *See Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).

154.   The applicant fails to show that the Texas death penalty scheme unconstitutionally prevents his jury from considering as mitigating only evidence that reduces moral blameworthiness; the applicant also fails to show that the Texas death penalty scheme is unconstitutional as applied to him.

**TWELFTH GROUND: 10-12 RULE**

155.   The Court finds, based on the record, that the applicant did not object at the trial level to the jury charge on the basis that the 10-12 Rule violated his constitutional rights; that the applicant did not request that the jury be told the effect of a single "no" vote or object to the lack of such instruction in the jury charge; therefore, the applicant's habeas claim is procedurally barred.

156.   Additionally, the Court finds that the applicant did not urge such claim on direct appeal.

157.   The following three special issues were submitted to the jury at the close of the instant trial:

1.   Do you find from the evidence beyond a reasonable doubt there is a probability that the defendant, Obel Cruz-Garcia, would commit criminal acts of violence that would constitute a continuing threat to society?

38

2.    Do you find from the evidence beyond a reasonable doubt that Obel Cruz-Garcia, the defendant himself, actually caused the death of Angelo Garcia, Jr., on the occasion in question, or if he did not actually cause the death of Angelo Garcia, Jr., that he intended to kill Angelo Garcia, Jr., or that he anticipated that a human life would be taken?

3.    Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(III C.R. at 523-5); Tex. Code Crim. Proc. art. 37.0711 § 3.

158.    In compliance with Article 37.0711, the jury was properly instructed that it could not answer the first and second special issues "yes" without unanimous agreement; that it could not answer the first and second issues "no" unless 10 or more jurors agreed; that it could not answer the third special issue "no" unless it agreed unanimously; and, that the agreement of ten jurors was required to answer the third special issue "yes" (III C.R. at 513-7).

159.    The trial court also instructed the jury to consider all the evidence submitted during the trial when answering the special issues, and the jury "shall consider all the evidence admitted at the trial, including but not limited to evidence of the defendant's background, character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty" (III C.R. at 515).

160.    The Court finds that the Court of Criminal Appeals has repeatedly rejected a capital defendant's challenge to the constitutionality of art. 37.071, § (2)(a), based on the allegation that it misled the jury as to the effect of a single "no" vote.

001073

161.　The Court finds that the Court of Criminal Appeals has also rejected the contention that the decisions in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), support the applicant's argument concerning the 10-12 rule.

162.　The Court finds, based on the habeas pleadings, that the applicant fails to demonstrate that the 10-12 Rule constituted an impermissible outside influence on jury deliberations; that the applicant's assertions regarding the 10-12 Rule and jurors' alleged reluctance to cause a mistrial are speculative and unpersuasive; and, that the applicant's assertions regarding the 10-12 Rule and the jury do not constitute an outside influence.　TEX. R. EVID. 606(b); *see also White v. State*, 225 S.W.3d 571, 574 (Tex. Crim. App. 2007)("an outside influence is something outside of both the jury room and the juror"); *Golden Eagle Archery Inc. v. Jackson*, 24 S.W.3d 362, 366-75 (Tex. 2000)(rules contemplate that an "outside influence" originates from sources other than the jurors themselves).

163.　The Court finds that the habeas affidavit statements of jurors Bowman, Alexander, Sanchez and Torres are inadmissible pursuant to TEX. R. EVID. 606(b). *See Applicant's Ex. 13, 14, 22, 23 2015s affidavit of jurors Bowman, Sanchez, and Torres.*

**THIRTEENTH GROUND: PUNISHMENT CHARGE**

163.　The Court finds, based on the record, that the applicant did not object to the Texas death penalty scheme, specifically the first special issue concerning future dangerousness, on the basis that his death sentence was arbitrarily and capriciously assigned, that key terms, such as "probability" and "criminal acts of violence" were not defined, and that the special issue is unconstitutionally vague because it fails to narrow the class of death eligible defendants; therefore, the applicant's habeas claim is procedurally barred.

: 001074

164.    Further, the Court finds that the applicant did not present on direct appeal his claim that his death sentence was arbitrary and capricious based on the first special issue allegedly being unconstitutionally vague because of the absence of definition of key terms in the issue or that the first special issue allegedly fails to narrow the class of death-eligible defendants.

165.    The Court finds that the Court of Criminal Appeals has consistently and repeatedly held that "probability" and "criminal acts of violence" require no special definitions and that Tex. Code Crim. Proc. art. 37.071 is not unconstitutional for lack of such definitions.

166.    The Court finds that the Texas death penalty scheme properly narrows the class of death eligible defendants at guilt due to the narrow statutory descriptions of capital murder in Texas, rather than through the special issues at punishment.

**FOURTEENTH GROUND:  TEXAS' SYSTEM OF ADMINISTERING DEATH PENALTIES**

167.    The Court finds, based on the record, that the applicant did not object at the trial level on the basis that his death sentence was unconstitutional based on Texas' alleged arbitrary system of administering the death penalty in various counties; accordingly, the applicant's ground for relief is procedurally barred.

168.    Additionally, the Court finds, that the applicant did not urge such claim on direct appeal of the instant conviction.

169.    The Court finds unsupported and speculative the applicant's claim that his sentence was unconstitutional based on being administered in Harris County rather than any other Texas county and based on an alleged arbitrary system of administering death penalties in various Texas counties.

: 01075

## CONCLUSIONS OF LAW

**FIRST GROUND: REPRESENTATION AT TRIAL – DNA EVIDENCE**

1.     The applicant fails to show that trial counsel are ineffective based on not presenting expert testimony to challenge the State's DNA evidence; trial counsel thoroughly reviewed the DNA evidence in the case and made the strategic choice to challenge the State's DNA testing through a pre-trial motion and hearing. *See Solis v. State,* 792 S.W.2d 95, 100 (Tex. Crim. App. 1990)(reviewing court will not "second-guess through hindsight" strategy of counsel, nor will fact that another attorney might have pursued different course support finding of ineffectiveness); *see also Cruz-Garcia,* 2015 WL 6528727, *8-13 (holding that trial court did not err in denying motion to suppress DNA testing and holding that record supported finding that DNA evidence was reliable).

**SECOND GROUND: REPRESENTATION AT TRIAL – GUILT/INNOCENCE**

2.     Trial counsel are not ineffective for making the plausible decision to develop through cross-examination and argument the fact that there was was consensual sexual relationship between the applicant and Diana Garcia, regardless of the difficulties of developing and presenting such evidence. *See Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)(holding that reviewing court "commonly will assume a strategic motivation if any can possibly be imagined," and will not find challenged conduct constitute deficient performance "unless conduct was so outrageous that no competent attorney would have engaged in it.").

3.     The applicant fails to show ineffective assistance of counsel based on the applicant not informing trial counsel about alleged, cited witnesses, the applicant's not being forthcoming when questioned about potential witnesses, and the unsuccessful effort to locate certain potential witnesses. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)("counsel's failure to

42

: 01075

call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony"); *see also Pape v. Thaler*, 645 F.3d 281, 289 (5th Cir. 2011)(defense counsel not ineffective for failure to call witnesses to testify regarding the defendant's good character or alleged credibility because defendant failed to supply counsel with witnesses' names).

**THIRD & FOURTH GROUNDS: TRIAL REPRESENTATION - PUNISHMENT**

4.    The applicant fails to show ineffective assistance of counsel at punishment; trial counsel filed a dozen pre-trial motions, hired an investigator, obtained funds to send the investigator to the Dominican Republic to follow up with witnesses, hired a clinical psychologist, questioned potential jurors for eleven days, cross-examined thirty-two witnesses, presented evidence of the applicant's life history, and presented the testimony of four defense witnesses. *See Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000)(citing *Strickland*, 466 U.S. at 689)(holding that review of counsel's representation is highly deferential; counsel is afforded strong presumption that actions falls within wide range of reasonably effective assistance); *see also Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)(holding that if evidence of future dangerousness overwhelming in death penalty case, it is "virtually impossible" to establish prejudice prong of *Strickland*).

43

: 01077

FIFTH & SIXTH GROUNDS: VIENNA CONVENTION

5.     Based on the lack of objection concerning an alleged violation of the Vienna Convention

on Consular Relations, the applicant's habeas claim concerning such issue is procedurally barred.

*See* Tex. R. App. P. 33.1(a); *Hodge v. State*, 631 S.W.2d 754, 757 (Tex. Crim. App. 1978); *see*

*also Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999)(holding that defendant's failure to

comply with Texas contemporaneous objection rule constituted adequate and independent state-

law procedural ground sufficient to bar federal habeas).

6.     In the alternative, the applicant fails to demonstrate prejudice on the basis of an alleged

treaty violation; the applicant fails to show that his right to due process was violated or that he

was denied a fair trial. *See Sanchez-Llamas v. Oregon*, 548 U.S. at 349, 126 S.Ct. 2669, 2681

(2006)(holding art. 36 of Vienna Convention does not guarantee consular assistance or consular

intervention); *see also Medellin v. Texas*, 552 U.S. 491, 499 (2008).

7.     The applicant fails to show that trial counsel are ineffective for failing to preserve the

applicant's alleged Vienna Convention complaints or for failing to recognize the alleged

significance of the applicant's foreign nationality. *See and cf. Kinnamon v. State*, 791 S.W.2d

84, 97 (Tex. Crim. App. 1990)(counsel not ineffective for failing to request jury charge on

lesser-included of murder when the evidence did not support such charge).

EIGHT GROUND: TRIAL REPRESENTATION – FAILURE TO INVESTIGATE ALLEGED JUROR
MISCONDUCT

8.     The applicant fails to show ineffective assistance of trial counsel based on not

investigating alleged juror misconduct in light of the event being memorialized in the record for

possible appellate review and in light of trial counsel considering the event insignificant. *See*

*Solis*, 792 S.W.2d at 100 (holding reviewing court will not "second-guess through hindsight"

44

: 01078

strategy of counsel, nor will fact that another attorney might have pursued different course support finding of ineffectiveness).

### NINTH GROUND - JUROR'S REFERENCE TO BIBLE DURING DELIBERATIONS

9.     Because the applicant's claim of alleged juror misconduct was raised and rejected on direct appeal, such claim need not be considered in the instant writ proceeding or any subsequent writ proceedings. *See Ex parte Acosta,* 672 S.W.2d 470, 472 (Tex. Crim. App. 1984)(holding that reviewing court need not address previously raised and rejected issues).

10.     In the alternative, as held by the Court of Criminal Appeal on direct appeal, the reference to the Bible during jury deliberations did not constitute an outside influence. *See Cruz-Garcia*, 2015 WL 6528727, at \*28.  The applicant fails to show that he was denied a fair trial or that his right to due process was violated.

### TENTH GROUND: TRIAL COUNSELS' ALLEGED CUMULATIVE DEFICIENT PERFORMANCE

11.     Because the applicant fails to demonstrate that he was denied effective assistance of counsel at trial, the instant allegation of cumulative deficient performance and prejudice is without merit and should be denied. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(for ineffective assistance of counsel claims, a defendant must meet the standard established in *Strickland* by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense").

### ELEVENTH GROUND: JURY'S CONSIDERATION OF MITIGATING EVIDENCE

12.     The applicant fails to show that the punishment instruction, given pursuant to TEX. CODE CRIM. PROC. art. 37.701, prevented the jury from considering and giving effect to all mitigating evidence; art. 37.071 does not unconstitutionally narrow a jury's discretion to consider as mitigating only those factors concerning moral blameworthiness. *See Williams v. State,* 301

45

S.W.3d 675, 694 (Tex. Crim. App. 2009)(rejecting claim that Texas death penalty scheme unconstitutional based on its definition of mitigating evidence allegedly limiting Eighth Amendment concept of "mitigation" to factors that render defendant less morally blameworthy for commission of capital murder); *Shannon v. State,* 942 S.W.2d 591 (Tex. Crim. App. 1996)(holding that because consideration of mitigation evidence is open-ended subjective determination by each individual juror, art. 37.071 does not unconstitutionally narrow jury's discretion to factors concerning only moral blameworthiness).

**TWELFTH GROUND: 10-12 RULE**

13.    Because the applicant neither requested that the jury be told the effect of a single "no" vote, nor did the applicant object to the lack of such instruction in the jury charge, the applicant is procedurally barred from advancing such habeas claim. *See* Tex. R. App. P. 33.1(a); *Hodge,* 631 S.W.2d at 757; *see also Hughes,* 191 F.3d at 614 (holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas).

14.    Alternatively, the jury was properly instructed that it could not answer the first and second special issues "yes" without unanimous agreement; that it could not answer the first and second issues "no" unless 10 or more jurors agreed; that it could not answer the third special issue "no" unless it agreed unanimously; that the agreement of ten jurors was required to answer the third special issue "yes"; that the jury was to consider all the evidence submitted during the trial when answering the special issues; and, that the jury "shall consider all the evidence admitted at the trial, including but not limited to evidence of the defendant's background, character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty" (III C.R. at 513-517). *See Leza v. State,* 351 S.W.3d 344, 361-2

46

(Tex. Crim. App. 2011)(holding "10-12 rule" in art. 37.071 does not violate Eighth Amendment); *Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).

15.  The applicant fails to show that the 10-12 jury instruction violates the United States and Texas Constitutions and the "Supreme Court precedent" of *Mills v. Maryland,* 486 U.S. 367 (1988) and *McKoy v North Carolina,* 494 U.S. 433 (1990). *See Hughes v. State,* 897 S.W.2d 285, 300, 301 (Tex. Crim. App. 1994)(citing *Rousseau v. State,* 855 S.W.2d 666, 687 (Tex. Crim. App. 1993)(rejecting contention that 37.071 violates decisions in *McKoy* and *Mills)).*

### THIRTEENTH GROUND: PUNISHMENT CHARGE

16.  Because the applicant did not urge an objection at the trial level based on the lack of definitions of terms in the special issues and because the special issue fails to narrow the class of death eligible defendants, the applicant is procedurally barred from advancing such habeas claims. *See* Tex. R. App. P. 33.1(a); *Hodge,* 631 S.W.2d at 757; *see also Hughes,* 191 F.3d at 614 (holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas).

17.  In the alternative, the terms "probability" and "criminal acts of violence" need not be defined and the absence of such definitions does not render the special issues vague or the Texas death scheme unconstitutional. *See Blue v. State,* 125 S.W.3d 491, 503 (Tex. Crim. App. 2003)(re-affirming holdings where lack of following definitions not error: "continuing threat to society," "criminal acts of violence," "probability," "society,"; "personal moral culpability," and "moral blameworthiness").

47

18.   The Texas death penalty scheme properly narrows the class of death-eligible defendants during the guilt-innocence phase. *See Fearance v. State,* 771 S.W.2d 486, 494 (Tex. Crim. App. 1988)(holding the Texas death penalty scheme properly narrows class of death-eligible defendants).

**FOURTEENTH GROUND: TEXAS' SYSTEM OF ADMINISTERING DEATH PENALTIES**

19.   Because the applicant did not object to the constitutionality of the Texas death penalty scheme or the punishment charge or attempt to quash his indictment on the basis of alleged racial bias or alleged arbitrariness in administering the death penalty in Texas counties, the applicant is procedurally barred from advancing such habeas claims. *See* Tex. R. App. P. 33.1(a); *Hodge,* 631 S.W.2d at 757; *Hughes,* 191 F.3d at 614 (holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas).

20.   In the alternative, the applicant fails to show that his death sentence was unconstitutional, under U.S. CONST. amends. VI, VIII and XIV, based on an alleged arbitrary system of administering death penalties in various Texas counties - specifically in Harris County rather than other counties. *See Cantu v. State,* 842 S.W.2d 667, 691-92 (Tex. Crim. App. 1992), *cert. denied,* 509 U.S. 926 (1993)(holding prosecutorial discretion does not render death penalty unconstitutional); *Allen v. State,* 108 S.W.3d 281, 286 (Tex. Crim. App. 2003)(citing *Bell v. State,* 938 S.W.2d 35, 55 (Tex. Crim. App. 1996); *King v. State,* 953 S.W.2d 266, 274 (Tex. Crim. App. 1997)(declining to reach merits of claim of disparate treatment based on cases being held in different counties; noting there was no empirical data, case law, or other factual basis to support claim)); *see and cf. Morris v. State,* 940 S.W.2d 610, 613-4 (Tex. Crim. App.

48

: 01082

1996)(noting possibility of two defendants, who have committed identical murder, receiving different sentences based on differing degrees of mitigating character and background evidence).

21. The applicant fails to show that his death sentence was unconstitutionally based on alleged racial bias; the applicant fails to show that the Texas death penalty scheme is unconstitutional, as applied to him. *Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996)(rejecting defendant's claim that certain statistical studies allegedly establish that Texas death penalty disproportionately imposed in racially discriminatory manner and holding that defendant has to show scheme unconstitutional as applied to him to gain relief from death sentence).

22. The applicant fails to show that the Texas death penalty scheme was enacted or maintained because of any anticipated discriminatory effect in violation of equal protection, and that the sentencing scheme, as applied to the applicant, was racially discriminatory in violation of equal protection. *See and cf. McCleskey v. Kemp,* 482 U.S. 920 (1987)(holding a state's legitimate reasons for adopting and maintaining capital punishment precluded inference of discriminatory purpose on part of the state in adopting death penalty sentencing scheme and allowing it to remain in force despite allegedly discriminatory impact and statistical study showing death penalty imposed more often on black defendants and killers of white victims than on white defendants and killers of black victims).

23. The applicant fails to demonstrate that his conviction was unlawfully obtained. Accordingly, it is recommended to the Texas Court of Criminal Appeals that relief be denied.

: 001083

Cause No. 1384794-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 337TH DISTRICT COURT |
| | § | OF |
| OBEL CRUZ-GARCIA,<br>APPLICANT | § | HARRIS COUNTY, TEXAS |

## ORDER

THE CLERK IS HEREBY **ORDERED** to prepare a transcript of all papers in cause no. 1384794-A and transmit same to the Court of Criminal Appeals, as provided by Article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. all of the applicant's pleadings filed in cause number 1384794-A, including his application for writ of habeas corpus;

2. all of the State's pleadings filed in cause number 1384794-A, including the State's Original Answer;

3. this court's findings of fact, conclusions of law and order denying relief in cause no. 1384794-A;

4. any Proposed Findings of Fact and Conclusions of Law submitted by either the applicant or State in cause no. 1384794-A;

5. any affidavits and exhibits filed in cause no. 1384794-A; and,

6. the indictment, judgment, sentence, docket sheet, and appellate record in cause no. 1384794, unless they have been previously forwarded to the Court of Criminal Appeals.

THE CLERK IS FURTHER **ORDERED** to send a copy of the court's findings of fact and conclusions of law, including its order, to the applicant's counsel: Benjamin Wolff and Joanne

50

: 01084

Heisy: Office of Capital and Forensic Writs; 1700 N. Congress Ave., Suite 460; Austin, Texas 78711, and to the State: Lori DeAngelo; Harris County District Attorney's Office; 1201 Franklin; Houston, Texas 77002-1901.

BY THE FOLLOWING SIGNATURE, THE COURT ADOPTS THE STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CAUSE NO. 1384794-A.

SIGNED this 29 day of _____Dec_____, 2016.

_Renee Magee_
RENEE MAGEE
Presiding Judge
337th District Court
Harris County, Texas

51

# State's Writ Exhibit B

# Affidavit of trial counsel Cornelius

: 01086

1384794 - A

| | | |
|---|---|---|
| STATE OF TEXAS | : | _AFFIDAVIT_ |
| COUNTY OF HARRIS | : | |

My name is **R. P. CORNELIUS**. I am an attorney licensed to practice law in the State of Texas since 1972. My bar card number is 04831500. My office address is 2028 Buffalo Terrace, Houston, Texas, 77019, and my telephone number is (713) 237-8547.

I am also admitted to the bar in good standing in the United States District Court For The Southern District Of Texas and the Fourth, Fifth, and Eleventh Circuit Courts Of Appeals, as well as, the United States Supreme Court. I am Board Certified in the field of criminal law by the Texas Board of Legal Specialization. I am a former Assistant District Attorney for Harris County, Texas, and a former Assistant United States Attorney for the Southern District of Texas. My Notice Of Appearance And Motion To Appear Pro Hac Vice has been approved in State or Federal court in the following states: California, Connecticut, Florida, Illinois, Louisiana, Michigan, New Hampshire, North Carolina, and Virginia. I have never been found ineffective, denied admission, or disciplined by any court.

I have been ordered by the Court to provide an affidavit answering several issues which have been presented to me as potential grounds for an allegation of ineffective assistance of counsel.

I did represent OBEL CRUZ GARCIA in the capital murder case for which a post conviction writ of habeas corpus has been filed and I will provide my answers to the questions I have been asked to respond to, but only because I am ordered to do so. It puts me at cross-purposes and requires me to say things that are not in the best interest of my client whom I gave a part of my life to defend and with whom I sat next to day after day in jury selection and in the trial and with whom I made decisions with and suffered with.

I am well aware that the procedure that must be followed in these cases requires the writ lawyers to essentially play devil's advocate and challenge every decision made by the trial lawyers whose responsibility and commitment to the client and the law is immense. I don't know the writ lawyers in this case, or what their actual experience is, and particularly if they have ever defended

FILED
Chris Daniel
District Clerk

NOV 28 2016

Time: _____ 11:20

Harris County, Texas

By_____
Deputy

: 01087

a single case like this one or not, but I do know their responsibility and I accept it as a part of the system.

In an effort to get this affidavit before the trial Judge who actually tried this case, before she leaves the bench, I must also add that I am filing this affidavit without the benefit of my own file which I loaned to the writ lawyers with the complete understanding that I was not making a copy and they would return the file to me, but they have refused to return it.

Before I attempt to answer the specific questions my experience might be helpful. I have been trying death penalty cases since 1976 and have tried quite a few and have tried them from both sides of the table. There have been psychological issues; witness issues and decisions; expert witness issues and decisions; DNA issues; mitigation issues and decisions; and juror issues in every one of them and in virtually all of the non-death capital cases I have tried, as well as, these same issues in many of the other criminal cases I have tried since 1972 when I first began my practice. All of my practice has been in criminal law. Suffice it to say, even though I am only a lawyer and not a psychologist, or DNA analyst, and certainly not a mind reader I have a lot of experience in trying criminal cases and making decisions in real time with a lot on the line and without the benefit of years of analysis after the fact. The truth is I trust my instincts in trial.

I do hope this is of some assistance to the Court and to counsel.

**I would like to make a general statement which will apply to a number of the allegations in the writ:**

*To make certain that I remember this correctly I conferred with Mario Madrid, JJ Gradoni, and Edna Velez; my co-counsel, our lead investigator, and our mitigation investigator, (those who had the most contact with the client), to see if their respective recollections were the same as mine and they are. Mr. Cruz Garcia would not discuss the facts of this case with us. At all. He refused to discuss it with us. His statement was that God would deliver him. God would send angels to protect him. God would turn the witnesses tongues into snakes. And other things like this. He would talk with us but not about the case. He had no intention of testifying and did not want his consulate contacted, at least with respect to helping defend the case.*

*I have included the affidavit of JJ Gradoni for further specific information on some of these allegations.*

**Here are my answers to the specific questions:**

1. **Why not hire a DNA expert.**

I do not hold myself out to be a DNA expert but I must stress that I have been involved with DNA evidence in my trials since it arrived. I do know a lot about DNA evidence. I do not find the arguments advanced in applicant's First Ground For Relief compelling. I poured over the DNA evidence in this case and made the best record and argument I could to suppress it but at the end of the day the State's evidence at the hearing clearly showed that, even though the crime lab had been in shambles, this evidence, which was tested and re-tested, had been sufficiently preserved. Other than the arguments I made and the evidence I presented I do not see what other attack I could have made. It is not hard to find an expert to give an affidavit that, in his or her opinion, the DNA testing was flawed but it is not that easy in trial with experienced Assistant District Attorneys trained in DNA evidence waiting to cross examine them. I did not think and do not now think we were going to win that issue with the jury. What we needed to do, in my opinion, was to create a reasonable argument to show how his DNA could be there without him being involved in the murder, which we attempted to do by arguing a consensual sexual relationship.

2-3. **Did the defendant have consensual sex with Linda Garcia.**

**Did the defense team know of Cesar Rios, Jose Valdez, and Hector Saavedra.**

We attempted to develop through cross examination and argument a consensual sexual relationship with Diana Garcia, however without the defendant's testimony, or any witnesses to support it, we could not actually offer direct proof of this. If we had evidence of a consensual sexual relationship this would have been our best attempt to naturalize the DNA evidence. We explained this to him numerous times. He never told us about the alleged witnesses Cesar Rios, Jose Valdez, or Hector Saavedra. The defendant consistently and emphatically told us that Jesus would deliver him. That Jesus would turn the State's witnesses tongues into snakes. He was not interested in testifying or calling witnesses, or contacting his consulate.

I have contacted the investigative team to see if any of them ever heard one word about these three alleged witnesses, or any other witnesses that could help on this or any other issue, and no one has ever heard of them, except as shown in the affidavit of JJ Gradoni, where he explains that the investigators developed a "Cesar Mala Rios" from the offense reports but all efforts to find him were unsuccessful; and further, Cesar Mala Rios was never mentioned by the defendant.

**4.      Did we see the State's file.**

Yes, many times, the files where brought to court by a number of prosecutors who worked, at various times, on the case. I am also certain that the State provided me with every piece of discovery we were entitled to. Let me address what I feel is the reason this question is being asked. During the trial I couldn't find in my files two documents that I needed to use for cross examination and each time I asked the State for another copy. Both times the State thought I was trying to imply that they had not followed the rules of discovery and commented that I should have come to their office with my file and compared every document to make certain that I had every piece of paper that I was entitled to. I thought that was a ridiculous statement and said so on the record. The State has the duty to give the defense what the defense is entitled to. The defense does not have to go to their office and figure it out. In both instances, however, I later found the documents in my files and told them so. I also expressed, sincerely, that I was not implying that they had not followed the rules of discovery I just didn't wish to delay the trial while I looked through literally a thousand pages of discovery to find the one or two pages I was having difficulty finding.

**5.      Did we investigate the issue of future dangerousness. Did we make contact with witnesses from Puerto Rico or the Dominican Republic.**

Permit me to delve into the future dangerousness issue for a moment. Even though no juror has ever been seated by me in a death penalty case where that juror has admitted that if they, in fact, convicted someone of capital murder they would automatically find that there is at least a "probability" that person will be a continuing threat, I know better. I certainly see why that question is a part of death penalty scheme and it is very helpful in eliminating intellectually honest jurors. But, *and this is a huge "but"*, a great majority of potential jurors absolutely can not get past their

belief that they are fair minded people who want to do the right thing. *But*, in the serenity of the court room, and before they have seen the victims family cry and the crime scene photos and the autopsy photos and the bloody clothing, and the murder weapon, and on and on, they truly believe they are not hard wired to automatically find that in a case where a defendant who commits a grisly capital murder, it is, at least, automatically probable that he or she will be a continuing threat. By the way what does probability mean? [One per cent is a probability, as is 99 percent]. I have not won a case on the future dangerousness question, or seen it done. I have had a few cases where the capital murder was the defendant's only crime and I felt it was a compelling argument to challenge the State on future dangerousness but, as I said, to no avail. Another reason for this is the State does not seek the death penalty on cases where the crime is an aberration or where the defendant does not have a history. Not even in Harris County. Unless, of course, the crime itself is so horrific that no other conclusion could be drawn.

Another factor I always consider is credibility. I have found, and have spoken on this subject at CLE presentations, that a defense lawyer's personal credibility with a jury is the single most important factor in a successful outcome at trial. I did not feel we had much of a chance on the issue of future dangerousness in this trial. I felt our best shot at punishment was on mitigation and I thought we had some good mitigation evidence and I banked on that. I have found that people know inherently or from some exposure to psychology that the greatest raw factor in deciding what a person will do in the future is what they have done in the past. It is hard to find an expert who will dispute this. Experts will say that this is not always the case but, let me say again, I have had no success in the past with experts on future danger. I haven't used one in some time now. This is not to say I would never use one and I imagine there could be a case where future danger is the best shot for a particular defendant but not the defendant in this case. We were not going to win on future danger in this case, in my opinion, and I was quite clearly afraid of losing my credibility with the jury by an impassioned plea that he would not be a future danger. I felt, and still feel, that if this was what the jury would deliberate on we would lose for sure. I am spending time on this issue to make it clear that this was not a rash decision, but a well thought out decision based largely on experience.

We did make contact with witnesses located in Puerto Rico or the Dominican Republic.

**6.     Why the lawyers did not go to Puerto Rico and the Dominican Republic.**

I was confident that the investigators would do a very professional and competent job and nothing has convinced me otherwise.

**7.     Did we have a mitigation expert.**

We did not have a person who was recognized as a quote "Mitigation Expert"; however we had my experience, which predates mitigation experts, at least in Harris County; we had a psychologist, with whom I consulted on mitigation; and a private investigator devoted to developing mitigation evidence, with my guidance and that of the psychologist.

Let me give some background on this. This case came to me at a time when the Harris County Commissioners Court cut indigent defense spending across the board. To my knowledge all of the "Mitigation Experts" in Harris County, of which there were not many at that time, refused to take cases for the money the County was willing to pay and I was forced to look out of county, which I did but to no avail. I contacted "Mitigation Experts" in Dallas and Fort Worth and none would even consider the case. I then got Judge Magee to agree to order the County Auditor to pay the original amount, which had been reduced as I said by the County Commissioners, but no one would take the case because they feared, and said they had heard, the County Auditor would not pay it even if we had an Court Order directing them and, in essence, they said life is too short to have to file a law suit to require Harris County to honor their debts. So I asked Judge Magee if she would agree to allow me to hire a psychologist to consult with on any matter of mitigation and she agreed. So instead of a "Mitigation Expert", who would be paid $75.00 an hour, the County got to pay my psychologist $250.00 an hour. As it turned out there really were no psychological issues to be developed.

I did not see, and do not now see, what could have been developed by an anthropologist or a sociologist.

**8.     Defendant's consulate.**

The defendant expressed no interest at all in receiving help of any kind from his consulate.

He was given his warnings about this and it was reiterated by us and his response to almost everything was that Jesus would deliver him.

**9.     Trial court's report of the conversation with juror.**

There is a huge difference between what we knew at the time and what has been said after the verdict was rendered.  Based on what I knew at the time:

>   A. I thought it was recorded and a part of the record and could be reviewed on appeal if necessary.

>   B.  I trusted the Judge to do what she thought to be the appropriate action in the situation.

>   C.  I do not now think the Judge did anything improper.

**10.     Not calling attorney Michael Casaretto.**

Honestly, after the Judge's thorough description of the event, as related to her by Mr. Casaretto, and particularly her notes of the event, I felt that it was insignificant but noted to myself that it was recorded in the record for appellate counsel to consider on appeal.

R. P. Cornelius

SWORN TO AND SUBSCRIBED BEFORE me on this the 28th day of
November, 2016.

Julia C. Patterson

JULIA C PATTERSON
1556480
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 25, 2020

# State's Writ Exhibit C

# Affidavit of trial counsel Madrid

NO. 1384794-A

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | 337th JUDICIAL DISTRICT |
| | § | |
| OBEL CRUZ GARCIA, | § | HARRIS COUNTY, TEXAS |
| **Applicant** | | |

## <u>AFFIDAVIT OF DEFENSE COUNSEL</u>

| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

On this date, November 25, 2016 was placed under oath and stated the following after

being duly sworn:

"My name is Mario Madrid. I am over the age of eighteen, and I am competent to make

this affidavit. I am an attorney licensed to practice in the State of Texas since 1996. My bar card

number is 00797777. My office address is 440 Louisiana, Suite 1225, Houston, Texas 77002,

and my office telephone number is 713-877-9400.

"I have been ordered by the Court to provide an affidavit responding to ten questions. I

did represent Obel Cruz Garcia in the capacity as Second Chair. R.P. Cornelius was lead counsel.

I am answering these questions to the best of my recollection without the benefit of my file or the

file of R.P. Cornelius as we both loaned our files to the writ lawyers with the understanding that

the files would be returned. However, at the time of the writing of this affidavit, the files have

not been returned.



FILED
Chris Daniel
District Clerk
NOV 28 2016 11:20
Time: _____
Harris County, Texas
By _____
Deputy

: 01095

**State whether counsel considered hiring a DNA expert to assist before and/or during trial, and counsel's reasoning for his ultimate decision not to retain such an expert.**

"Lead counsel R.P. Cornelius made the decision regarding whether or not to hire a DNA expert. Neither of us believed that we would win that issue with the jury. I agree with him that the best trial strategy and the strategy we discussed, was to create a reasonable doubt to show how Cruz Garcia's DNA could be present without him being involved in the murder. We attempted to do this by arguing a consensual sexual relationship. We were hampered in our defense because our client would not discuss any facts of the case. He insisted that God would set him free but refused to discuss the case.

**State whether counsel investigated the allegation that the applicant and Diana Garcia had a consensual sexual relationship, whether counsel was aware or should have been aware that the defendant had a sexual relationship with Diana Garcia.**

"We attempted to development the theory of a consensual relationship through cross examination and argument. As I stated previously, Mr. Cruz Garcia would not discuss any facts of the case with defense counsel or our investigator. We could not offer direct proof a consensual relationship without the defendant's testimony or any witnesses to support the possible relationship. Our investigator, J.J. Gradoni made efforts to speak with all witnesses. However, there were no witnesses who could provide testimony of a consensual sexual relationship between Obel Cruz Garcia and Diana Garcia.

**State whether any source provided the names of potential witnesses Cesar Rios, Jose Valdez and Hector Saavedra, whether counsel was aware of these witnesses, and whether counsel interviewed these witnesses in preparation for trial.**

"Mr. Cruz Garcia never mentioned any of these witnesses. As I mentioned previously, I do not have the benefit of my file or Mr. Cornelius' file, but per the affidavit of investigator Gradoni, Cesar Rios was listed in the offense report. Mr. Gradoni made efforts to locate Cesar Rios but was unsuccessful.

: 01096

**State whether counsel reviewed the State's file in preparation for trial.**

"Yes.

**State whether counsel investigated the issue of the applicant's future dangerousness and whether counsel made contact with any potential witnesses in Puerto Rico or Dominican Republic.**

"We did make contact with witnesses located in Puerto Rico and the Dominican

Republic. As I recall we presented evidence of courses or bible classes that Mr. Cruz Garcia

attended while in prison. We also presented a witness that testified to Mr. Cruz Garcia's positive

influence on him while he was an inmate at the Harris County Jail.

**Explain counsel's decision not to personally travel to Puerto Rico or the Dominican Republic to investigate the applicant's background.**

"I, along with lead counsel R.P. Cornelius were confident that the investigators would do

a professional and competent job and nothing has convinced me otherwise.

**State whether counsel considered using a mitigation specialist, anthropologist, or sociologist to assist at trial and explain counsel's decision regarding hiring such an expert.**

"Lead Counsel Cornelius made the decision on the hiring of a psychologist and an

investigator that worked on the mitigation, apart from another investigator working on

investigating criminal case. I was in court when Mr. Cornelius spoke with the Judge regarding

the difficulty of hiring a "Mitigation Expert" after the Harris County Commissioners Court cut

indigent defense spending. Mr. Cornelius could not find a mitigation expert willing to accept the

case under the County's new pay rate. The Judge agreed to pay for psychologist to consult with

any of matter of mitigation and an investigator devoted to mitigation evidence.

**Defendant's Consulate**

"The defendant expressed no interest at all in receiving any help of any kind from his consulate. He was given his warnings about this and it was reiterated by us. He had no interest in having us contact the consulate.

**Explain counsel's reasoning in choosing not to object to or specifically request the trial court to report its conversation with juror Angela Bowman on the record.**

"My recollection is that the Judge informed us of the situation and that we were told that the Judge would speak with the juror in chambers with the court reporter present to make a record for appellate purposes.

**Explain counsel's reasoning for not personally calling attorney Michael Casaretto to investigate the conversation he claimed to have overheard between two jurors on the elevator.**

"My recollection is that the Judge informed us of the event and gave us a thorough description as related by Mr. Casaretto. I recall that speaking with Mr. Cornelius about it and forming the opinion that it is was insignificant.

Mario Madrid, Affiant

Sworn to and subscribed before me on this the 25th day of November, 2016.

NOTARY PUBLIC



JACQUELINE VANESSA KAMAIE
Notary Public, State of Texas
My Commission Expires
March 31, 2018

# State's Writ Exhibit D

# Affidavit of defense investigator Gradoni

: 01099

1384794 - A
337th District Court

## SWORN AFFIDAVIT

| STATE OF TEXAS | § | KNOW ALL MEN BY |
| | § | |
| | § | |
| COUNTY OF HARRIS | § | THESE PRESENTS |

My name is JJ Gradoni.  I am the owner of Gradoni & Associates and have operated a State of Texas licensed investigative firm since 1988 (28 years). Prior to entering the private sector I worked as a police officer for 12 years. I have a great deal of experience in investigating criminal cases and have worked with Mr. R.P. Skip Cornelius on a great number of cases over the last 20 years, with emphasis on capital murder cases. We have had great success on many of our cases.

In 2011, I was the lead investigator on the Obel Cruz Garcia capital murder case. It was at a time when Harris County was cutting back on paying mitigation experts and investigators. In the Cruz Garcia case I had an agreement with Mr. Cornelius to do both the criminal investigation and the mitigation investigation. I assigned Edna Velez, a native of Puerto Rico, as the lead on the mitigation aspect because of her background; specifically her experience as a Customs agent, her Spanish speaking skills, and her knowledge of Puerto Rico and the Dominican Republic. Edna reported directly to me and Mr. Cornelius and had Dr. Susana Rosin, Ph.D. to confer with if she chose to. I, myself and virtually all of my staff, worked on the facts and legal defenses of the case.

Edna and I went to the Dominican Republic and located and interviewed witnesses, took photographs and obtained very useful and important information for the lawyers to use in mitigation. We attempted to locate any known relatives or friends of the defendant.

Cruz Garcia was visited 7 times at the Harris County Jail by Edna Velez. I was present during two of the interviews, and Attorney R.P. Skip Cornelius was present on two of the interviews. We gave Cruz Garcia every opportunity to tell us about any person that could possibly say anything good about him, which produced negative results. Cruz Garcia was not very forthcoming about much of anything with respect to the case because, as he informed me, God and Jesus were going to deliver him and he was not really concerned about being convicted. Cruz Garcia told me, amongst other things, that God would change the witnesses' tongues into snakes and they would not testify against him. Cruz Garcia was not

**FILED**

Chris Daniel
District Clerk

Time: NOV 28 2016  11:20

By_____
Harris County, Texas
Deputy

: 01100

interested in contacting his consulate in the Dominican Republic or anyone else, to my knowledge.

Cruz Garcia never told myself or Edna Velez anything about Jose Valdez or Hector Saavedra.

Cesar Mala Rios was identified in the offense report as an associate of Diana Garcia. As a result of this documentation we conducted database searches to identify current addresses and phone numbers for Cesar Mala Rios, along with establishing his criminal history and rap photograph. Efforts to make contact with Cesar Mala Rios at addresses we developed were not successful. Attempts to make contact with Cesar Mala Rios by the phone numbers we developed were not successful. Cruz Garcia never asked us to locate and contact Cesar Mala Rios.

Because Cruz Garcia's DNA was found in the rape kit of Diana Garcia, the woman whose son was killed (she said he raped her that night), we asked Cruz Garcia if he could explain how his semen was found in the rape kit on more than one occasion. On May 2, 2013 Cruz Garcia responded by saying "the day of the alleged incident there was a lot of people in her apartment (referring to Diana's) and a lot of things happened. The truth will come out during trial." The second time Cruz Garcia was asked about the DNA, on May 20, 2013, Cruz Garcia was asked if he had had consensual sex with Garcia. He responded by saying "there was always lots of people at Diana's apartment and everyone entered every room without asking permission." When Cruz Garcia was told that his response was not acceptable he continued to avoid answering the question. Cruz Garcia then stated that when Diana testifies it will be noted that it was him that took care of the little boy when she did her thing. Everything will be revealed in the trial because God will convert their tongues into snakes and they will only be able to tell the truth.

On June 3, 2013 when asked about the DNA, Cruz Garcia answered again that the truth was going to come out during trial and Diana had to tell the truth. Cruz Garcia also questioned the reason the DNA was such a "big deal," because the rape was not one of his charges.

Each and every time members of the defense team spoke to Cruz Garcia it was with the assistance of Edna Velez, who was a certified interpreter with the Customs Service. I have no reason to believe that our questions to Cruz Garcia were not clear and concise nor were his responses to our questions not translated properly into the English language.

I can read and write the English language. I have read the foregoing Affidavit, which I have made and the statements are true and correct to the best of my knowledge and belief.

FURTHER THE AFFIANT SAYETH NOT:

_James Gradoni_

_James Gradoni_
Printed Name

Subscribed and sworn to before me, a Notary Public, in and for the State of Texas, County of Harris, on this the _16th_ day of _November_ 20_16_.

_[signature]_
Notary Public

_Harris_                    _TX_
County                      State

KAYLA KOENIG
Notary ID # 126626427
My Commission Expires
September 13, 2020



# CHRIS DANIEL
## HARRIS COUNTY DISTRICT CLERK

December 29, 2016

DEVON ANDERSON
DISTRICT ATTORNEY
HARRIS COUNTY, TEXAS

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed          ,

☐ Affidavit          ,

☐ Court Order Dated          ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☒ Respondent's Proposed Findings of Fact and Order December 29, 2016

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S PROPOSED FINDINGS OF FACT AND ORDER



# CHRIS DANIEL
### HARRIS COUNTY DISTRICT CLERK

December 29, 2016

JOANNE HEISY
OFFICE OF CAPITAL AND FORENSIC WRITS
1700 N. CONGRESS AVE., SUITE 460
AUSTIN, TEXAS 78711

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 1384794-A in the 337th District Court.

☐ State's Original Answer Filed                    ,

☐ Affidavit                    ,

☐ Court Order Dated                    ,

☐ Respondent's Proposed Order Designating Issues and Order For Filing Affidavit.

☒ Respondent's Proposed Findings of Fact and Order December 29, 2016

☐ Other

Sincerely,

Leslie Hernandez, Deputy
Criminal Post Trial

Enclosure(s) – STATE'S PROPOSED FINDINGS OF FACT AND ORDER

# IN THE 337TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

EX PARTE )  Trial Cause No.
Obel Cruz-Garcia, )  1384794 - A *per Rwolff by phone ph*
    APPLICANT )
   )
   )
   )

## MOTION TO RECONSIDER ORDER ADOPTING THE
## STATE'S PROPOSED FINDINGS WHOLESALE AND
## TRANSMITTING SAME TO CCA

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov)
GRETCHEN SWEEN (No. 24041996)
(E-Mail: Gretchen.Sween@ocfw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocfw.texas.gov)
Post-Conviction Attorneys
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Applicant*



FILED
Chris Daniel
District Clerk
JAN 11 2017
Time: 10:30 AM
Harris County, Texas
By_____
Deputy

: 01106

## IN THE 337TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

|                              |     |                       |
| ---------------------------- | --- | --------------------- |
|                              | )   | Trial Cause No.       |
| EX PARTE                     | )   | 1384794               |
| Obel Cruz-Garcia,            | )   |                       |
|            APPLICANT         | )   |                       |
|                              | )   |                       |
|                              | )   |                       |

## MOTION TO RECONSIDER ORDER ADOPTING THE STATE'S PROPOSED FINDINGS WHOLESALE AND TRANSMITTING SAME TO CCA

Obel Cruz-Garcia, by and through his attorneys of record the Office of Capital and Forensic Writs (OCFW), respectfully requests that this Court reconsider its order, entered December 29, 2016, adopting wholesale the State's proposed findings of fact and conclusions of law and transmitting the case to the Court of Criminal Appeals. The Court's Order violates the procedure outlined in Article 11.071 of the Code of Criminal Procedure and deprives Mr. Cruz-Garcia of due process.

### RELEVANT BACKGROUND

Mr. Cruz-Garcia is confined under a sentence of death pursuant to the judgment of the 337th District Court, Harris County, Texas, which was rendered on July 19, 2013, 3 CR at 104,[1] and entered on July 22, 2013.  28 RR at 3-6.

---

[1] "CR" refers to the Clerk's Record in Mr. Cruz-Garcia's trial.  "RR" refers to the Reporter's Record in Mr. Cruz-Garcia's trial.

: 01107

Mr. Cruz-Garcia filed his Initial Application for Writ of Habeas Corpus (Initial Application), pursuant to Article 11.071 of the Texas Code of Criminal Procedure, in this Court on August 28, 2015. The State filed its Answer to Mr. Cruz-Garcia's Initial Application on February 23, 2016.

At a hearing held on August 8, 2016, this Court signed an order requiring Mr. Cruz-Garcia's trial counsel to submit affidavits responding to the allegations of ineffective assistance of counsel raised in Mr. Cruz-Garcia's Initial Application. At that same hearing, Mr. Cruz-Garcia urged a motion asking the Court to designate controverted issues of material fact to be resolved pursuant to Article 11.071 of the Texas Code of Criminal Procedure *before* proceeding with findings of fact based solely on pleadings that included plainly contradictory assertions of material fact. *See* Tex. Code Crim. Proc. Art. 11.071 § 8(a) ("[A]fter the last date the state answers the application, the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of applicant's confinement exist and shall issue a written order of the determination."). At that time, the Court indicated that the necessity of designating issues not resolved by the affidavits from trial counsel would be addressed only after trial counsel's affidavits had been submitted.[2]

---

[2] Undersigned counsel has left several messages with the court reporter over the past several months since the hearing requesting a transcript of the hearing but has not yet received a response.

2

On November 8, 2016, Judge Renee Magee, the judge formerly presiding over this Court, lost her bid for reelection. In addition, current Harris County District Attorney Devon Anderson was defeated by Kim Ogg, who ran on a reform platform.

On November 28, trial counsel filed the ordered affidavits. The next day, the State filed a motion for proposed findings of fact and conclusions of law (FFCL). On November 30, Mr. Cruz-Garcia served on counsel for the State and Judge Magee his opposition to the State's motion for proposed FFCL, noting that the Court had yet to make a determination as to whether each of the various claims raised in Mr. Cruz-Garcia's Initial Application presented controverted issues of fact and, thus, whether those claims would be governed by Section 8 or by Section 9 of the governing statute. Mr. Cruz-Garcia further noted that his counsel had not yet been served with the affidavits from trial counsel and that, in any event, counsel would be unable to prepare proposed FFCL by the State's proposed deadline—December 22, 2016—as they were currently engaged in an evidentiary hearing in another capital case. Nevertheless, on November 30, Judge Magee signed an order for the parties to submit proposed FFCL by December 22.[3] Mr. Cruz-Garcia did not receive the order until December 6, less than three weeks before the deadline.

---

[3] It has been consistently represented to the OCFW by both members of the Harris County District Attorney's Office and various Harris County court staff that it is the regular practice in Harris County that judges will not rule on a motion unless it is presented in person by the attorney sponsoring the motion. Counsel for Mr. Cruz-Garcia were not present when the Court signed the State's proposed Order, which

3

On December 16, 2016, incoming District Attorney-elect Kim Ogg announced that she intended to take the office in a "new direction" and that "change is coming" to the Office of the District Attorney, and dismissed 37 prosecutors, over ten percent of the prosecutors in the office. *See, e.g.,* Brian Rogers, "Shake-ups begin at DA's office as Ogg moves toward taking office," HOUSTON CHRONICLE, December 16, 2016, *available at* http://www.chron.com/news/houston-texas/article/Shake-ups-begin-at-DA-s-office-as-Ogg-moves-10801298.php.    In announcing the staffing changes, District Attorney-elect Ogg stated that her administration will "not have a win-at-all-costs mentality, that we would prize fairness and transparency and equality" and that "the leadership decisions that I made are directed to that view." Meagan Flynn, *Incoming DA Kim Ogg Prepares to Fire Dozens of Prosecutors*, HOUSTON PRESS, December 16, 2016, *available at:* http://www.houstonpress.com/news/incoming-da-kim-ogg-prepares-to-fire-dozens-of-prosecutors-9034289.

At a hearing held in this Court on December 22, Mr. Cruz-Garcia renewed his objection to the Court's order for proposed FFCL in violation of the statute and without affording him an opportunity to present evidence in support of his claims

---

suggests that either the State approached the Court with its motion ex parte or the Court broke with established protocol in order to grant the State's premature motion.

for relief. The Court denied Mr. Cruz-Garcia's motion to reconsider the order and stated that counsel would be given until December 27 to submit proposed FFCL and that the she intended to sign FFCL before leaving the bench. At that same hearing, the Court notified Mr. Cruz-Garcia for the first time that the Court considered the August 8 Order for Filing Affidavits to be an Order Designating Issues for all purposes and all claims, notwithstanding the presence of other disputed factual issues based on the face of the parties' pleadings.

On December 27, Mr. Cruz-Garcia filed a renewed objection to the Court's order for proposed FFCL in violation of the statute. Nevertheless, on December 29, 2016, the Court signed the State's proposed FFCL wholesale, without altering a single word.[4] Mr. Cruz-Garcia now files the instant motion to reconsider the Court's December 29 order as well as the November 30 order for proposed FFCL and to instead enter an order announcing whether the remaining controverted issues of fact will be resolved under Section 8 or Section 9, as required by Article 11.071, and afford Mr. Cruz-Garcia an opportunity to present evidence in support of his claims, as procedural due process requires.

---

[4] In its haste to deny relief before leaving the bench, the Court did not even bother changing the style of the State's proposed FFCL; the Court's order is filed as "State's Proposed Findings of Fact, Conclusions of Law and Order."

5

## ARGUMENT

The Court's December 29 order is improper in several respects. First, this Court has yet to make the requisite determination as to whether each of the various claims at issue in this Article 11.071 proceeding are governed by Section 8 or by Section 9 of the governing statute. *See* Tex. Code Crim. Proc. Art. 11.071 § 8(a) ("[A]fter the last date the state answers the application, the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of applicant's confinement exist and shall issue a written order of the determination."). Numerous controverted issues of fact remain that are not, and could not be, resolved by the affidavits from trial counsel. For instance, Mr. Cruz-Garcia has alleged that members of the jury discussed the evidence in the case outside of deliberations. *See* Claim Nine of the Initial Application. The State has denied this allegation. *See* State's Answer at 66. The Order for Filing Affidavits does not address this controverted fact issue, nor could affidavits from trial counsel constitute competent evidence to resolve this controverted fact issue, as trial counsel, presumably, were not present with each juror at all times throughout the course of the trial. Moreover, the affidavits from trial counsel are inadequate to address all of the allegations supporting the ineffective assistance of counsel claim. While the affidavits purport to explain counsel's reasons for not pursuing certain avenues of investigation, they are incapable of addressing what evidence was available had

6

counsel pursued these avenues of investigation—an issue that is crucial to resolving the question of prejudice that constitutes step two of the two-prong Strickland analysis. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).[5]

Additionally, at the August 8 hearing, the Court indicated that Mr. Cruz-Garcia would be afforded an opportunity to submit evidence in support of the claims raised in his Initial Application, as due process requires. Instead, two days after trial counsel filed the ordered affidavits, and on the same day that counsel for Mr. Cruz-Garcia was served with the affidavits, this Court entered an order for the parties to file proposed findings of fact. Thus, the Court's December 29 findings and order

---

[5] Beyond the fact that the Court's order for proposed FFCL was entered in contravention of the statute, it also did not afford counsel a reasonable amount of time to prepare proposed FFCL. Drafting proposed FFCL is a painstaking process that involves, in this case, the review of 35 volumes of the Reporter's Record, which consists of over 5,500 pages of text, plus three volumes of the Clerk's Record, to substantiate factual assertions. In all other cases the OCFW has handled in Harris County, the district courts have allowed counsel at least 50 and often 100 or more days. *See, e.g., Ex parte Carl Buntion*, cause no. 588227 (178th District Court) (allowing 127 days to file proposed findings of fact and conclusions of law); *Ex parte Jaime Cole*, cause no. 1250754 (230th District Court) (allowing 100 days to file proposed findings of fact and conclusions of law); *Ex parte Joseph Jean*, cause no. 1302120 (230th District Court) (allowing 100 days to file proposed findings of fact and conclusions of law); *Ex parte Garland Harper*, cause no. 1272085 (182nd District Court) (allowing 57 days to file proposed findings of fact and conclusions of law); *Ex parte Brian Davis*, cause no. 616522 (230th District Court) (allowing 56 days to file proposed findings of fact and conclusions of law). Mr. Cruz-Garcia was granted less than three weeks, during which time his counsel were engaged in an evidentiary hearing in another capital case. At the December 22 hearing, counsel were granted an additional five days to draft proposed FFCL, during four of which the OCFW office was closed for the Christmas holiday.

: 01113

were entered before Mr. Cruz-Garcia had been afforded opportunity to submit evidence in support of his claims for relief.

Moreover, the substance of the Court's findings reveals the unreasonableness of the Court's fact-finding process. For instance, the Court finds that the affidavits submitted by trial counsel are "credible." Findings at ¶ 64. Yet the Court of Criminal Appeals has recognized that where the record is comprised solely of evidence offered through affidavits, the record does not contain enough information on which to base credibility determinations to resolve controverted issues of fact. *See Ex parte Armstrong*, No. WR-78,106-01, 2015 WL 7354084, at *4-*5 (Tex. Crim. App. Nov. 18, 2015). Indeed, the CCA has noted that as a general matter, affidavits are an improper method of taking evidence where a district court judge must resolve disputed factual issues involving credibility determinations. *See, e.g., Manzi v. State*, 88 S.W.3d 240, 255 (Tex. Crim. App. 2002) (Cochran, J., concurring) ("Trial judges who are confronted with contradictory affidavits, each reciting a plausible version of the events, ought to convene an evidentiary hearing to see and hear the witnesses and then make a factual decision based on an evaluation of their credibility."); *see also id.* at 250 (Womack, J., concurring) ("That the statute authorizes a court to make decisions on affidavits does not mean it can make decisions of every kind on affidavit. The statute can be construed to allow some

8

issues to be decided by written evidence when credibility determinations are not involved.").

In its findings, the Court expressly relies on statements from the trial counsel affidavits that the Court itself deemed irrelevant to the determination of the ineffective assistance of counsel claim and which the Court expressly excluded from the Order for Filing Affidavits upon Mr. Cruz-Garcia's objection. When the State moved this Court for an order for affidavits from trial counsel, Mr. Cruz-Garcia objected to language in the State's proposed order that would have required counsel to state what Mr. Cruz-Garcia had communicated to them regarding his consensual sexual relationship with Diana Garcia and regarding the names of specific witnesses. Mr. Cruz-Garcia raised this objection on the grounds that communications made by Mr. Cruz-Garcia were irrelevant to the claim of ineffective assistance of counsel because "[t]he duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). The Court sustained this objection and modified the proposed order for trial counsel affidavits accordingly. Nevertheless, in apparent contravention of counsel's duty under Texas Disciplinary Rule of Professional Conduct 1.05 and notwithstanding the prior Court order deeming disclosure irrelevant to the IAC claims at issue, trial counsel disclosed privileged communications made to them by Mr. Cruz-Garcia, and the Court relied

9

upon these statements in its findings. *See* Findings at ¶ 68 ("The Court finds...that the applicant never told counsel about alleged witnesses Cesar Rios, Jose Valdez, or Hector Saavedra.").

Equally unreasonable is the Court's finding regarding Mr. Cruz-Garcia's allegation of the Court's improper ex parte communication with a lone holdout juror. The Court finds

> that the applicant offers nothing to support his allegations that trial counsel, during the applicant's habeas investigation, asserted that they were not told by the court that Bowman was a holdout vote and wanted to stop deliberating; that there was an informal conversation with the judge outside the courtroom during which counsel were informed that Bowman was having a hard time; and, that both counsel would have asked the court to end deliberations and enter a life sentence if they had known that Bowman was a holdout juror who desired to stop deliberations.

Findings at ¶ 118. Yet Mr. Cruz-Garcia was never afforded an opportunity to present evidence or to elicit this information from trial counsel via cross-examination, deposition, or interrogatories. Likewise, the Court finds "that neither of trial counsels' [sic] habeas affidavits contain the statements alleged by the applicant in *Finding of Fact 118*." Findings at ¶ 119. Yet the Court's Order for Affidavits did not ask counsel to state what the Court told them about her conversation with Juror Bowman or what they would have done had they known she was a holdout juror who desired to stop deliberations. And, more importantly, this Court never afforded

10

Mr. Cruz-Garcia the opportunity to present any evidence in support of the allegations he pleaded in his application.

As with the affidavits from trial counsel, the Court also makes credibility determinations with respect to affidavits submitted by the jurors. The Court finds that "the assertions of Bowman concerning her deliberations are suspect and unpersuasive in light of the September 18, 2013 affidavit of jury foreman Matthew Clinger which was presented during the hearing on the applicant's motion for new trial." Findings at ¶ 123. This finding is facially unreasonable in light of the fact that Juror Clinger's affidavit directly contradicts statements he made to the defense investigators, which were audio recorded. (*Compare* 3 CR at 635 ("JJ: So did you read from the Bible or did you quote it from memory? MC: No, I read. JJ: Read it from the Bible. MC: Yeah....After I read that...she was able to move on from the first question.") with *id.* at 600 ("At no point did I read directly from the Bible.") and *id.* at 635-36 ("JJ: So, after you read that was [Juror Guillote] able to say Death? MC: Uh, after I read that she was able to move, that was, we were finishing up talking about the first question and she was able to move on from the first question. Uh, we still talked about a lot more stuff throughout the course of the day, but she was able to move on... JJ: No, no, that helped her move on to question number two. MC: Correct....CK: And the people were listening, I guess, when you were saying this, and did it help them understand? You think it made a difference to them? MC:

11

: 01117

It made a difference with [Juror Guillote]. I don't know if it made a difference with anyone else.") with *id.* at 600 ("I do not believe [Juror Guillote] or any other juror changed their answers to the Special Issues based on this brief exchange.").)

The Court's reliance on the untested affidavits from trial counsel is made even more unreasonable by the fact that the affidavits contain facially incorrect representations. For instance, Mr. Cornelius states in his affidavit that counsel for Mr. Cruz-Garcia "have refused to return" Mr. Cruz-Garcia's file to him. Mr. Cornelius has never asked counsel to "return" Mr. Cruz-Garcia's file to him.[6] This misrepresentation underscores the unreliability of the trial counsel affidavits and the necessity of being afforded the right to confront these adverse witnesses.

## CONCLUSION

For the foregoing reasons, Mr. Cruz-Garcia respectfully requests that the Court reconsider its order, entered December 29, 2016, adopting wholesale the State's proposed findings of fact and conclusions of law and transmitting the case to the Court of Criminal Appeals, designate remaining disputed factual issues for resolution, offer Mr. Cruz-Garcia the opportunity to prove his claims of

---

[6] Moreover, were any request to be made to "return" the trial file for Mr. Cruz-Garcia to Mr. Cornelius, it would be up to Mr. Cruz-Garcia to decide whether to comply with the request. *See In re McCann*, 422 S.W.3d 701, 704 (Tex.Crim.App. 2013) (clarifying that a client's file belongs to the client).

12

unconstitutional confinement, and grant Mr. Cruz-Garcia any other relief to which he may be entitled.

Respectfully submitted,

OFFICE OF CAPITAL AND FORENSIC WRITS

DATED: January 9, 2017

_____

Joanne Heisey
Texas Bar No. 24087704
Gretchen S. Sween
Texas Bar No. 24041996
1700 Congress, Suite 460
Austin, TX 78701
Telephone: (512) 463-8502
Facsimile: (512) 463-8590
joanne.heisey@ocfw.texas.gov
gretchen.sween@ocfw.texas.gov

**Post-Conviction Attorneys for Mr. Cruz-Garcia**

: 01120

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Herb Ritchie
337th District Court
Harris County Criminal Justice Center
1201 Franklin, 15th Floor
Houston, Texas 77002

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002
(One copy, via email)

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy)

_____
Joanne Heisey

15

: 01121



FILE COPY

**FILED**
Chris Daniel
District Clerk

MAY 0 4 2016

Time:
By
Harris County, Texas
Deputy



# TEXAS COURT OF CRIMINAL APPEALS

### Austin, Texas

### M A N D A T E

**THE STATE OF TEXAS,**

**TO THE 337TH DISTRICT COURT OF HARRIS COUNTY — GREETINGS:**

Before our **COURT OF CRIMINAL APPEALS**, on the **OCTOBER 28, 2015**, the cause upon appeal to revise or reverse your Judgment between:

### OBEL CRUZ-GARCIA

### VS.

### THE STATE OF TEXAS

**CCRA NO. AP-77,025**

**TRIAL COURT NO. 1384794**

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the record of the Court below, and the same being considered, because it is the Opinion of this Court that there was no error in the judgment, it is **ORDERED, ADJUDGED AND DECREED** by the Court that the judgment be **AFFIRMED**, in accordance with the Opinion of this Court, and that this Decision be certified below for observance."

**WHEREFORE,** We command you to observe the Order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER,**

Presiding Judge of our said **COURT OF CRIMINAL APPEALS,**

with the Seal thereof annexed, at the City of Austin,

on this day **Monday, November 23, 2015.**

**ABEL ACOSTA,** Clerk
By: Deana Williamson, Deputy Clerk

22/973

: 01122

**FILED**
Chris Daniel
District Clerk
MAY 04 2016
Time:_____
By_____
Harris County, Texas
Deputy



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,025

### OBEL CRUZ-GARCIA, Appellant

v.

### THE STATE OF TEXAS

## ON DIRECT APPEAL
## FROM CAUSE NO. 1384794 IN THE 337th DISTRICT COURT
## HARRIS COUNTY

**KELLER, P.J.**, delivered the opinion of the Court in which **MEYERS, JOHNSON, KEASLER, ALCALA, RICHARDSON** and **YEARY, JJ.,** joined. **HERVEY** and **NEWELL, JJ.,** concurred.

In June 2013, appellant was convicted of capital murder and sentenced to death.[1]  Direct

---

[1] TEX. PENAL CODE § 19.03(a)(2); TEX. CODE CRIM. PROC. art. 37.071.  Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

CRUZ-GARCIA–2

appeal to this Court is automatic.[2] Appellant raises twelve points of error. Finding no reversible error, we affirm the conviction and sentence.

## I. Background

On September 30, 1992, two masked intruders broke into an apartment shared by Arturo Rodriguez, Diana Garcia, and Diana Garcia's six-year-old son, Angelo Garcia, Jr. Diana was awakened by a loud sound coming from her living room. Her husband, Arturo, walked toward the sound but was quickly met by a large male wearing a mask and pointing a gun at him. Both Diana and Arturo testified that this man spoke to them, but neither could understand him because he spoke in an unknown accent. Additionally, they both described the man as "black" or dark-complexioned. When the initial responding officer made his report about this case, he described Diana's and Arturo's assailants as "black" but testified at trial that he meant "black Hispanics."

The masked man instructed Diana to turn face down on her bed and then began beating Arturo. After Diana complied with the instruction to lie face down, a second man entered the room holding a gun, and one of the intruders tied up Diana. Arturo was tied up with the cord from his alarm clock, a rag was put in his mouth, and he was beaten on his head with a gun while he knelt by his bed. At this point, Angelo, who had been sleeping on a pallet by the bed, began crying out for Diana.

The second intruder then started touching Diana on her buttocks, turned her over so that she was lying on her back, and put a blanket over her face. The second intruder removed Diana's panties and sexually assaulted her. Diana testified that the assailant ejaculated during the sexual assault. Arturo testified that he saw an unknown male sexually assaulting his wife before the other assailant

---

[2] Art. 37.071, § 2(h).

CRUZ-GARCIA–3

placed a pillowcase over his head. All the while, Angelo was present in the room and crying.

Once the sexual assault ended, the two men ransacked the bedroom and then left. Arturo testified that his passport and a bracelet were missing after the incident. After the men left, Diana got up and untied Arturo's hands. Diana and Arturo then noticed that Angelo was missing and walked into their living room to look for him. Upon entering their living room, they saw the first, tall, masked intruder returning to the apartment. When Diana and Arturo saw this man, they turned and walked back into their bedroom, and the masked man turned and left the apartment.

After both intruders left, Diana and Arturo left their apartment and began looking for Angelo. They called out his name at their own apartment complex and across the street but received no response. At some point, Diana's neighbor called 911. Houston Police Department ("HPD") responded to a 911 call claiming that a child had been kidnapped from Diana and Arturo's apartment. Upon arriving, officers found Arturo injured and Diana distraught. An inspection of the apartment revealed the bedroom to be in disarray, with drawers pulled out of dressers and items of clothing strewn about. Officers found a cigar in the living room, although at trial both Diana and Arturo testified that neither one of them smoked.

Police officers interviewed Diana and Arturo on-scene and asked them whether they sold drugs. Both were untruthful. Diana was transported to a hospital for a sexual assault examination. A Sexual Assault Nurse Examiner (SANE), Gloria Kologinczok, testified that she performed a sexual assault examination on Diana Garcia during the early morning hours of October 1 and produced a sexual assault kit containing evidence from Diana.

On October 1, 1992, police interviewed Diana at the police station, and she came clean about her and Arturo's drug dealing. She also told police that appellant was her drug supplier until

01125

CRUZ-GARCIA—4

recently, when she and Arturo had told appellant that they no longer wanted to sell drugs for him. Officer U.P. Hernandez interviewed both Diana and Arturo. Arturo testified that, when he spoke to police, he never lied about his drug dealing, but Officer Hernandez testified to the contrary.

During their investigation, officers also met with or interviewed Leonardo German (friend of Diana and Arturo), Rogelio Rendon, Carmelo Martinez Santana[3] (also known as "Rudy;" friend of appellant), and Angelita Rodriguez (appellant's wife).

At trial, Diana and Arturo both testified about their relationship with appellant. Arturo and Diana sold cocaine for appellant for several years when all three lived in Houston. They also associated socially with appellant and his wife, Angelita, on several occasions. Arturo testified that he considered his relationship with appellant to be a friendly one, and Diana testified that Angelita was her friend. A few months prior to Angelo's kidnapping, Arturo and Diana told appellant they no longer wanted to sell drugs for him, and Arturo testified that this upset appellant.

Angelita also testified about her relationship with appellant. Her cousin, Rudy, was good friends with appellant, and the three of them moved to Houston from Puerto Rico around the same time in 1989. Angelita and appellant shared an apartment in Humble, a suburb of Houston. Angelita testified that appellant smoked both cigarettes and cigars and that he owned a gold Oldsmobile and a blue Thunderbird. Angelita met Diana and Arturo through appellant because of appellant's drug dealing.

Angelita learned of Angelo's disappearance on the news on the afternoon of October 1. Upon hearing of his disappearance, she immediately approached appellant in their apartment and told

---

[3] Several witnesses are referred to throughout the record by their nicknames. We will do the same.

CRUZ-GARCIA—5

him that Angelo had gone missing. Angelita told appellant she wanted to go see Diana and Arturo, but he refused to go with her. Angelita testified that appellant seemed calm and "normal" upon hearing the news that Angelo had disappeared, despite the fact that Diana and Arturo were their friends and their child had gone missing. Appellant then told Angelita that he was leaving Houston for Puerto Rico immediately and began to pack his bags.

Angelita testified that, due to his sudden departure from Houston, appellant missed a scheduled court date. He had never missed one prior to that. After appellant left for Puerto Rico, Angelita could not afford to continue paying rent in their Humble apartment, so she moved to a hotel in Pasadena. Some time later, Angelita went to the Dominican Republic, where appellant was then living, to ask him for a divorce. Appellant refused. Angelita then asked him about Angelo, and appellant confessed to her that he had killed him.

Rudy, Angelita's cousin, testified that he met appellant when they were both living in Puerto Rico, prior to their initial move to Houston. Both are originally from the Dominican Republic. Rudy and appellant moved to Houston to sell drugs in the late 1980s, and Angelita followed them shortly thereafter. Rudy and appellant worked together selling drugs until Rudy's drug addiction became too severe for him to continue dealing. At that point, appellant took over the operation. Rudy testified that appellant was a violent, angry, and controlling person. Once when appellant thought Rudy was stealing drug customers from him, he assaulted Rudy and threatened to kill him.

Rudy testified that appellant owned three cars: a blue Chevrolet, a blue Thunderbird, and a gold Oldsmobile. Appellant routinely lent the Oldsmobile to Bienviendo Melo (also known as "Charlie"). On September 30, appellant drove his blue Chevrolet to Diana and Arturo's apartment to collect his drugs and money. Rudy and Rogelio Aviles (also known as "Roger") went with him.

Rudy described Roger as tall, strongly built, and dark-complexioned. Appellant parked his car

behind Diana and Arturo's apartment complex and instructed Rudy to sit in the passenger seat while

he and Roger went inside. Appellant took a .45 caliber pistol with him, Roger carried a knife, and

both appellant and Roger wore black stocking masks.

Approximately thirty minutes after appellant and Roger left the car, appellant came back with

a child in his arms. Rudy recognized the child as Angelo Garcia, Jr. When Rudy asked why

appellant was carrying Angelo, appellant responded, "He saw me."

Rudy tried to persuade appellant to retrieve Diana to care for Angelo. Appellant left the car

for the apartment again, leaving Angelo with Rudy, but returned with Roger instead of Diana. When

appellant returned, he told Rudy to sit in the back seat with Angelo. Appellant maintained a grip on

his gun while he drove Rudy, Angelo, and Roger to Baytown. Appellant stopped the car not far into

Baytown, and all three men exited the car. Rudy testified that by this time he was very scared and

had grown convinced appellant was going to kill Angelo.

Appellant told Roger, "You already know what you have to do." Rudy testified that he

walked away from the two other men and then became ill, defecating nearby. As Rudy was walking

away, he heard Angelo scream. Rudy returned to the car where he saw Angelo with blood on his

chest. Appellant ordered Rudy and Roger to put Angelo's body in the backseat, and they complied.

Appellant drove them to another location in Baytown near a waterway and ordered Rudy and

Roger to put Angelo's body in the water. The two men once again complied. Rudy and Roger piled

rocks on top of Angelo's body to make it sink. Rudy testified that appellant had his gun with him

the entire time. The three men then left Baytown and drove to Pasadena. On their way there, several

of their tires blew out.

They managed to make it to a hotel where appellant made Rudy and Roger swear they would never tell what had happened to Angelo. At the hotel, the men attempted to make other transportation arrangements by calling Charlie. Appellant, Rudy, and Roger eventually went to Charlie's apartment in a taxi, where they retrieved appellant's car. There, Rudy saw Charlie and his girlfriend, Linda.

Linda also testified about appellant's phone call to Charlie. In the early morning hours of October 1, 1992, Linda and Charlie were staying together at Linda's mother's house when they received several phone calls from appellant. Linda and Charlie were both familiar with appellant because Charlie sold drugs for appellant. Linda described appellant as controlling.

When Charlie finally answered the phone around 2:00 a.m., appellant asked Charlie to pick him up. Charlie declined. Approximately thirty minutes later, appellant and Rudy appeared at Charlie's house to borrow a car. Linda testified that, while Rudy appeared nervous, appellant did not. After October 1, 1992, Linda never saw appellant again. Prior to that date, appellant visited Linda and Charlie's residence several times a week.

Later in the day on October 1, Rudy and appellant took appellant's blue Chevrolet to Rendon's Garage to have the tires changed. At this time, appellant told Rudy that appellant was leaving Houston. Rudy helped appellant wash Angelo's blood and vomit from the interior of the car. Appellant then sold the car and used the money to buy a plane ticket to Puerto Rico. Rudy drove appellant to the airport the following day, October 2, 1992, and he did not see appellant again until they both returned to Houston for appellant's capital murder trial.

Agent William Ebersole testified that he interviewed Rudy while Rudy was in a federal prison in Pennsylvania. Agent Ebersole obtained a statement from Rudy about what happened the

night of September 30, 1992, and about appellant's involvement in Angelo's murder.

On cross-examination of both Rudy and Agent Ebersole, defense counsel highlighted inconsistencies between Rudy's trial testimony and the statement he gave to Agent Ebersole while imprisoned. Rudy omitted from his story to Agent Ebersole any reference to him defecating while Angelo was being killed. Rudy told Agent Ebersole that he was familiar with the Baytown area because he had sold drugs there prior to September 30, 1992, but Rudy denied this at trial. Rudy told Agent Ebersole that Roger took Angelo to the rear of the driver's side of the car and that is where he killed him while appellant stood near the front of the car, but this did not exactly comport with Rudy's trial testimony.

While Rudy testified at trial that appellant threatened him and ordered him not to tell anyone what the three of them did to Angelo, Agent Ebersole's notes reflected that the three merely made a pact to keep their secret. Additionally, Rudy's recollection of how long appellant and Roger were in Diana and Arturo's apartment and how many tires blew out on their car once they left Baytown was inconsistent with the recollection given to Agent Ebersole.

During their investigation into Angelo's kidnapping, local police officials learned that Diana and Arturo had rented an apartment in Humble for appellant and his wife. When HPD officers went to that apartment to look for appellant on October 5, 1992, they found it vacated. Additionally, officers learned that, prior to it being vacated, the apartment had been occupied by two "black-Hispanic males" and one light-skinned Hispanic female.

One of the men who had occupied the Humble apartment had been seen wearing a shirt from Rendon's Garage with the name Luis on it. Upon learning this, officers went to Rendon's Garage where they met with Juanita Rendon, the wife of the owner, Rogelio Rendon. Rogelio was initially

unavailable to speak with officers. Officer Hernandez returned to the garage and observed Rogelio

driving up in a blue Thunderbird. Rogelio was accompanied by a man who identified himself as

Candido Lebron. While Officer Hernandez was speaking with Rogelio, Angelita and Rudy came

to the garage to claim the blue Thunderbird.

The next day, on October 6, HPD received a tip that a Hispanic male was seen at the Humble

apartment. HPD officers returned to the apartment, knocked on the door, and were met by an

individual who again identified himself as Candido Lebron. They later learned his true name was

Rogelio Aviles (also known as "Roger," the third adult male with appellant and Rudy on the night

of September 30, 1992). HPD officers continued to look for appellant in Houston and surrounding

cities but were unable to locate him.

FBI Agent Eric Johnson testified that he became involved in the current case in 1992 because

it involved the kidnapping of a child under the age of twelve. The FBI worked in conjunction with

local authorities in an attempt to locate Angelo. Appellant was a suspect early on in the FBI's

investigation. During his investigation, Agent Johnson learned that on October 8, 1992, appellant

was set to appear in a Harris County district court on an unrelated felony drug case.

Agent Johnson testified from court documents that reflected that appellant was scheduled to

appear in court on October 8, 1992, that appellant failed to appear in court on that date, and that his

bond was subsequently forfeited for this failure to appear.

On the afternoon of November 4, 1992, a fisherman walking the banks of Goose Creek in

Baytown discovered Angelo's body. Because of a cold front that had blown through the area, eight

to ten feet of beach that was normally submerged was exposed; this is where Angelo's body was

found. Baytown Police Corporal Randy Rhodes was dispatched to the waterway.

Upon arriving, he observed the skeletal remains of a small child on the sandy part of the beach. The skeleton was mostly intact, but the skull had disconnected from the torso, and some rib bones and vertebrae had been disturbed. From the same area, officers also recovered a pair of shorts with a Batman logo and a t-shirt. Diana testified that Angelo had been wearing Batman pajamas on the night he was kidnapped.

An autopsy was performed on Angelo's remains in 1992 by Dr. Vladimir Parungao. Dr. Parungao was no longer employed by the Harris County Institute of Forensic Sciences at the time of trial, so Harris County Deputy Chief Medical Examiner, Dr. Dwayne Wolf, testified at trial. After reviewing photographs and Angelo's autopsy report, Dr. Wolf testified that Angelo's manner of death was homicide and that his body appeared in a state that was consistent with it having been submerged for several weeks. The fact that Angelo was abducted, that his body was found in an advanced state of decomposition, and that his body was found many miles from his home all contributed to Dr. Wolf's opinion that Angelo was murdered.

Dr. Wolf also examined the clothing found near Angelo's body and testified that any blood that may have been on the clothing would have washed away after the clothing was submerged in water. On cross-examination, Dr. Wolf confirmed that he did not find any injuries to any of Angelo's bones and that he could not rule out drowning as a cause of death.

DNA evidence was also presented at trial. Sergeant Eric Mehl worked in the cold case division of HPD in 2007 when this case was reopened. As part of his investigation, Sergeant Mehl submitted several pieces of evidence to a private forensics lab called Orchid Cellmark[4] for DNA testing. Sergeant Mehl sent the cigar that was collected from the crime scene, Diana's sexual assault

---

[4] Orchid Cellmark was called "Cellmark Forensics" at the time of trial.

kit, and a cutting from the pair of panties Diana was wearing the night of her sexual assault. The cutting from Diana's panties was a cutting from the crotch area. From that cutting, Orchid Cellmark cut away a small piece on which they performed their testing. Orchid Cellmark developed an unidentified male DNA profile from these pieces of evidence.

Matt Quartaro, a supervisor of forensics at Orchid Cellmark, testified about the DNA testing his lab performed after it received evidence from Sergeant Mehl. After testing the cigar, Orchid Cellmark was able to generate a full DNA profile of an unknown male. This profile was compared to the profiles of Diana and Arturo, but it did not match either of them.

Orchid Cellmark also tested vaginal swabs from the sexual assault kit. The vaginal swabs contained a mixture of epithelial cells and sperm cells. The epithelial cells belonged to Diana, and the sperm cells belonged to more than one male individual. Arturo could not be excluded as a contributor to the sperm-cell fraction from the vaginal swab. Additionally, the unknown male whose DNA was found on the cigar could not be excluded as a contributor to the sperm-cell fraction from the vaginal swab.

When Orchid Cellmark tested the portion of the panties they had received, they once again found Diana's epithelial cells and a sperm-cell fraction with more than one contributor. The unknown male from the cigar DNA sample could not be excluded as a major contributor to the sperm sample in the panties. Additionally, Arturo could not be excluded as a contributor to that sperm sample.

Later, in December 2007, Orchid Cellmark received DNA samples from Roger, Charlie, Leonardo German, and Rudy to compare to the DNA profiles they had obtained from the cigar, sexual assault kit, and panties. Roger, Charlie, and Leonardo were all excluded as contributors to

any of the DNA evidence found on the cigar, sexual assault kit, and panties.

The first sample received from Rudy was not sufficient to compare to the DNA profiles Orchid Cellmark had obtained. In June of 2011, Orchid Cellmark received a second DNA sample from Rudy and at that time was able to exclude him as a contributor to any of the DNA on the evidence that Orchid Cellmark tested.

In early 2008, Sergeant Mehl learned that appellant was in Puerto Rico. Sergeant Mehl, working in conjunction with the FBI in Puerto Rico, obtained a DNA sample from appellant on May 23, 2008. He then sent that DNA sample to Orchid Cellmark. On May 28, 2008, Orchid Cellmark received a sample of appellant's DNA. The sample arrived in a sealed envelope with appellant's name written on it.

Appellant's DNA matched the profile that had been obtained from the cigar found in Diana and Arturo's apartment in September of 1992. Additionally, appellant's DNA could not be excluded as a contributor to the unknown male profile found on the vaginal swabs from Diana's sexual assault kit. Lastly, appellant's DNA matched the unknown male profile that was the major contributor to the DNA in the sperm-cell fraction from Diana's panties.

Quartaro also discussed the quality-control procedures in place at Orchid Cellmark to prevent contamination of the evidence they receive and the profiles they obtain. Quartaro acknowledged that Orchid Cellmark cannot implement or monitor quality-control procedures at other labs. But on redirect, Quartaro testified that none of the evidence that he received appeared to be contaminated. All the evidence appeared to be in good condition; it was packaged separately to prevent cross-contamination, and all containers were sealed. Quartaro also testified that it would be impossible to contaminate a sample in such a way that appellant's DNA would appear on that sample unless the

CRUZ-GARCIA–13

contaminator had some of appellant's DNA.

Moreover, Quartaro testified that cross-contamination between the cigar and the sexual assault kit or panties was not possible because appellant's epithelial cells were found on the cigar, while appellant's sperm cells were found on the swabs from the sexual assault kit and the panties. Additionally, no epithelial cells belonging to appellant were found in the samples from the sexual assault kit or panties.

The Houston Police Department Crime Lab was also involved in DNA analysis in the instant case. Courtney Head, an analyst from the crime lab, testified that in February 2010 she received a known DNA sample from appellant. This sample was collected separately from the sample collected and sent to Orchid Cellmark in 2008. From this sample, Head performed her own DNA extraction to create a DNA profile. She then compared that profile to the profiles obtained by Orchid Cellmark from the cigar, the sexual assault kit, and the panties.

Appellant could not be excluded as a contributor to the male DNA profile found on the cigar and the vaginal swabs from the sexual assault kit. Additionally, appellant could not be excluded as the major contributor to a male DNA profile in the sperm-cell fraction obtained from Diana's panties. Head testified that, to a reasonable degree of scientific certainty, appellant was the source of the DNA profile on the cigar and the panties.

Pursuant to his cold case investigation, Sergeant Mehl interviewed Diana, Arturo, Linda Hernandez, and Angelita Rodriguez. A Spanish-speaking officer interviewed Rudy. Sergeant Mehl attempted to locate Charlie for an interview but was unable to find him. At the conclusion of his investigation, Sergeant Mehl filed charges against appellant. Appellant was later tried and convicted of capital murder and sentenced to death.

CRUZ-GARCIA–14

## II. Guilt

*A. Sufficiency of the Evidence*

In his third point of error, appellant challenges the sufficiency of the evidence to support his conviction for capital murder. Appellant highlights the following areas in which he claims the evidence is insufficient: Rudy's credibility and motive to testify, Diana's and Arturo's descriptions of their intruders, Diana's and Arturo's dishonesty about their drug dealing, Angelita's potential ulterior motive to testify against appellant, whether a sexual assault or consensual sexual encounter occurred, the chain of custody for the forensic evidence, and Angelo's cause of death. We review these complaints specifically, in addition to reviewing the totality of the evidence supporting appellant's conviction.

This Court does not engage in a factual-sufficiency review. Instead, we engage only in the legal-sufficiency review enunciated in *Jackson v. Virginia*.[5] In so doing, we review the entire record in the light most favorable to the verdict to determine whether any rational fact-finder could have found the elements of the offense beyond a reasonable doubt.[6] If a rational fact-finder could have so found, the verdict will not be disturbed on appeal.[7]

Here, appellant was convicted of capital murder, having intentionally or knowingly caused

---

[5] *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). *See also Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (holding that the relevant inquiry for appellate courts reviewing the sufficiency of the evidence to support a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original)).

[6] *Jackson*, 443 U.S. at 319.

[7] *See id.* at 319 (upholding conviction where evidence was legally sufficient). *See Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013) (affirming judgment because evidence was legally sufficient to support a conviction).

the death of another during the course of committing a kidnapping.[8] Circumstantial evidence is just as probative as direct evidence in establishing guilt.[9] Every piece of circumstantial evidence need not point directly to appellant's guilt.[10] Instead, we examine the cumulative effect of all the evidence when determining whether such evidence is sufficient to sustain a conviction.[11]

Further, we permit juries to draw reasonable inferences from the facts they are presented, so long as their inferences are supported by the evidence adduced at trial.[12] After a thorough review of the record, we conclude that the evidence is sufficient to support appellant's conviction.

*1. Appellant's Specific Sufficiency Complaints*

The jury heard testimony from twenty witnesses, including Diana Garcia, Arturo Rodriguez, and Rudy. Although appellant attacks the credibility of these three witnesses in particular, all credibility determinations are solely within the province of the jury.[13] The jury is the sole judge of credibility and of the weight to be attached to the testimony of witnesses.[14]

The jury was free to believe Rudy's account of September 30, 1992, at trial and disregard any inconsistencies with previously-made statements. Rudy's testimony presented compelling evidence of appellant's direct involvement in the kidnapping and killing of Angelo. Rudy's testimony about

---

[8] *See* TEX. PENAL CODE § 19.03(a)(2).

[9] *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[10] *Hooper*, 214 S.W.3d at 13.

[11] *Id.*

[12] *Temple*, 390 S.W.3d at 360; *Hooper*, 214 S.W.3d at 15.

[13] *Temple*, 390 S.W.3d at 363.

[14] *Id.* at 360.

01137

CRUZ-GARCIA–16

the events of September 30, 1992, was corroborated by Diana's and Arturo's accounts that two masked men entered their apartment and left with their child and by the location where Angelo's body was discovered. Appellant also highlights the fact that Rudy was in federal prison when he was first approached by law enforcement officers during their cold case investigation into Angelo's death. This fact goes to Rudy's credibility, a determination left to the jury.

Additionally, the jury was free to find credible Diana's and Arturo's testimony, despite evidence of previous dishonesty or inconsistent testimony about the disclosure of their drug dealing. Diana testified that two masked men broke into her apartment, that one sexually assaulted her, and that when they left, her child was gone. Diana's testimony was corroborated by Rudy's testimony that appellant and Roger, while wearing masks, went to Diana and Arturo's apartment to retrieve their drugs and money and left that apartment with Angelo.

Further, Diana's claim that she was sexually assaulted on the night in question is corroborated by the DNA results from the evidence in her sexual assault kit. Diana testified that she and appellant had never had a consensual sexual relationship, yet appellant's DNA was found in sperm from vaginal swabs obtained the night that Diana claims she was sexually assaulted.

Appellant also complains that the evidence is insufficient to support his conviction because of the descriptions Diana and Arturo gave the police of their intruders. Diana, Arturo, and various police officers testified that Diana and Arturo both described their intruders as "black." Appellant is not African-American and therefore contests the applicability of this description to him.

At trial, however, numerous witnesses testified that Mexican Hispanics routinely use the descriptor "black" to describe dark-complexioned Hispanics who are not from Mexico. The jury was free to believe this explanation and could reasonably infer from the testimony they heard that Diana

and Arturo were describing dark-complexioned Hispanic males, not African-American males.

Appellant also contests Angelita's motive to testify and claims her testimony was untrustworthy. But Angelita's credibility was for the jury alone to decide. Angelita testified that appellant was a drug dealer who sold drugs to Diana and Arturo. On October 1, 1992, the night after Angelo was abducted, appellant abruptly told Angelita he was moving back to Puerto Rico and expressed no concern over Angelo's abduction, despite appellant's friendship with Diana and Arturo. Angelita's testimony as to appellant's flight presented circumstantial evidence of appellant's guilt, and the jury was free to believe that testimony and draw reasonable inferences regarding appellant's guilt therefrom.

Appellant complains that there was insufficient evidence of the chain of custody of the forensic evidence admitted by the State. Absent a showing of tampering, discrepancies in the chain of custody go to the weight to be given a piece of evidence, not its admissibility.[15] The jury is the sole decider of the weight to be given a piece of evidence.

Here, the jury heard testimony that the forensic evidence at issue was stored in sealed plastic bags. Quartaro testified that, when he received the evidence for testing, he observed no signs of tampering or contamination. The jury was free to lend credence to Quartaro's examination of the evidence and the state it was in based on his training and experience and disregard implications from defense counsel that the evidence had been compromised.

Lastly, appellant complains of insufficient evidence to support a determination that Angelo was murdered. But the jury heard evidence from Dr. Wolf, the Deputy Chief Medical Examiner in Harris County, that, based on all the circumstances surrounding the case, he believed Angelo's death

---

[15] *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

to be a homicide. Dr. Wolf's testimony, combined with the circumstances surrounding Angelo's kidnapping and the discovery of his body, was sufficient for a rational juror to determine that Angelo had been murdered. The jury was free to believe Dr. Wolf's testimony and disregard evidence to the contrary.

Appellant also alludes to an argument that there was insufficient evidence for a fact-finder to determine Angelo came to his death "as alleged in the indictment." But here, the State alleged two separate manner and means for how Angelo died: first, that Angelo was stabbed to death, and second, that Angelo died by unknown means. Rudy's testimony provided sufficient evidence, if believed, that Angelo was stabbed to death. Dr. Wolf's testimony provided sufficient evidence, if believed, that at the very least, Angelo was murdered, even if the particular manner and means were unknown.

It was within the purview of the jury to lend credence to the testimony of Rudy and Dr. Wolf about how Angelo died. Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence to support the jury's verdict that Angelo died at the behest of appellant, in a manner alleged in the indictment.

2. Other Evidence Supporting Appellant's Conviction

Beyond appellant's specific sufficiency complaints, we hold that there is sufficient evidence in the record for a rational trier of fact to find every element of capital murder beyond a reasonable doubt. Appellant knew Diana and Arturo through his drug business. When Diana and Arturo withdrew from appellant's drug business, appellant became upset with them. Shortly thereafter, two dark-complexioned males broke into Diana and Arturo's apartment on the night of September 30, 1992, and assaulted Arturo and sexually assaulted Diana. A sexual assault examination was

CRUZ-GARCIA–19

performed on Diana that very night and a sexual assault kit was created with the biological material collected. Subsequent DNA testing revealed that that evidence contained sperm from appellant.

Rudy testified that he saw appellant carry Angelo from Diana and Arturo's apartment to their car on the night of September 30, 1992. Appellant then drove to a remote area of Baytown where he ordered Roger to kill Angelo. Rudy saw Angelo's body lifeless and covered in blood immediately after this order and helped Roger dispose of the body in a nearby waterway while appellant looked on.

One day later, on October 1, 1992, appellant told his wife, Angelita, that he was leaving Houston to return to Puerto Rico. Angelita testified that this trip was sudden and unplanned. Appellant cleaned out the interior of the car he had been driving on September 30, sold the car, and used the proceeds to purchase a plane ticket to Puerto Rico. The next time Angelita saw appellant was in the Dominican Republic, when he confessed to her that he had killed Angelo.

Appellant was scheduled to appear in a Harris County district court on October 8, 1992, on a pending drug case. Appellant failed to appear on that date and subsequently forfeited his bond. Appellant had been present at every court setting prior to the October 8 setting. In November 1992, Angelo's body was found in a waterway in Baytown, and Rudy testified that he and Roger had left Angelo's body in a Baytown waterway a month prior. We conclude that the evidence is sufficient to support appellant's conviction for capital murder. Appellant's third point of error is overruled.

*B. Motion to Suppress*

In his first point of error, appellant contends that the trial court denied him due process when it denied his motion to suppress DNA and other forensic evidence that had been stored by the "old" Houston Police Department Crime Lab ("old HPD crime lab"). We review a trial court's ruling on

CRUZ-GARCIA–20

a motion to suppress under a bifurcated standard of review.[16] We afford almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that turn on the evaluation of credibility and demeanor.[17] Questions of law and mixed questions of law and fact not turning on credibility are reviewed de novo.[18] We will not disturb the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case.[19]

At the hearing on appellant's motion to suppress, appellant argued against the admission of forensic evidence that had been stored by the old HPD crime lab. Specifically, the pieces of evidence to which appellant objected were (1) a cigar found at the crime scene, (2) a sexual assault kit performed on Diana Garcia on the morning after Angelo was kidnapped, and (3) a cutting from the pair of panties Diana wore the night of the instant offense.

Appellant also argued against the admission of results from DNA testing performed on the cigar, sexual assault kit, and panties, despite the fact that the proffered test results were not generated by the old HPD crime lab. In support of his motion, appellant argued that the mere fact that the forensic evidence at issue had been stored by HPD, and subsequent to that storage the old HPD crime lab was shut down because of quality-control problems, provided sufficient indicia that the evidence had been contaminated and was therefore untrustworthy to put before a jury.

The State countered with testimony from three witnesses. First, Eric Mehl, a retired police sergeant, testified that he had worked on appellant's case as a member of the cold case squad in the

---

[16] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[17] *Id.*

[18] *Id.*

[19] *State v. Ross*, 32 S.W.3d 853, 855-56. (Tex. Crim. App. 2000).

homicide division of the Houston Police Department. Pursuant to that role, in October 2007, Sergeant Mehl obtained the cigar and sexual assault kit that had been collected as evidence in 1992. At the time it was retrieved, the cigar was being stored in the HPD property room on Goliad Street. The sexual assault kit was being stored in the property room annex on the 24th floor on Travis Street. Both the cigar and the sexual assault kit were sealed in separate plastic bags. Sergeant Mehl testified that both pieces of evidence appeared to be in good condition and neither appeared to have been damaged.

On October 2, 2007, Sergeant Mehl shipped the cigar and sexual assault kit to Orchid Cellmark, a private forensics lab that contracted with HPD, for testing. Subsequently, Sergeant Mehl obtained the cutting of the crotch from the panties that had belonged to Diana, a biological sample from Diana, and a biological sample from Arturo, that had all been stored in the crime lab. Each piece of evidence was stored separately in its own sealed plastic bag. Additionally, Sergeant Mehl obtained stored blood samples of various known associates of appellant.

On May 23, 2008, Sergeant Mehl received a sample of appellant's DNA after Mehl's colleague, Sergeant Stephens, informed Mehl that appellant was in custody in Puerto Rico. An FBI agent in Puerto Rico obtained appellant's DNA sample and sent that sample to Sergeant Mehl. Sergeant Mehl did not open the package containing appellant's DNA sample but instead repackaged it and shipped it to Orchid Cellmark for comparison with the evidence already in its possession.[20]

At the time Sergeant Mehl sent appellant's DNA sample to Orchid Cellmark, Orchid

---

[20] While the record is clear that Sergeant Mehl sent the cigar and sexual assault kit to Orchid Cellmark on October 2, 2007, the record is unclear as to when Sergeant Mehl sent the panties and the known DNA samples from Diana, Arturo, and appellant's associates. Sergeant Mehl testified only that, by the time he obtained appellant's DNA sample from Puerto Rico (May 23, 2008), he had already sent "all of the original evidence that might contain biological material" to Orchid Cellmark.

CRUZ-GARCIA–22

Cellmark already had all the original evidence that potentially contained biological material. Later, Sergeant Mehl received the results of Orchid Cellmark's testing and comparison. After learning of Orchid Cellmark's results, Sergeant Mehl arrested appellant for capital murder.

Second, the State called Matt Quartaro, a supervisor at Orchid Cellmark. Quartaro testified to his qualifications and to the procedures he employs when he analyzes DNA evidence. Orchid Cellmark received evidence connected to appellant's case on October 3, 2007. The evidence arrived in a sealed box. Within the box were several manilla envelopes and within those envelopes were sealed plastic bags, each containing an individual piece of evidence. Quartaro testified that nothing appeared to have been tampered with or contaminated.

Ultimately, Orchid Cellmark took possession of the cigar, the sexual assault kit, Diana's panties, DNA extractions that had already been performed on several pieces of evidence, and the known DNA samples from Angelo's family and appellant's associates. Instead of relying on the existing DNA extractions it received, that were generated by the old HPD crime lab, Orchid Cellmark performed its own DNA extractions and analyses on the panties, the cigar, and the vaginal swabs from the sexual assault kit.

An unknown male DNA profile was found on the cigar. That DNA profile could not be excluded as a contributor to an unknown male DNA profile from sperm found on a vaginal swab in the sexual assault kit. Additionally, an unknown male DNA profile was discovered on the panties that was consistent with the unknown male DNA profile found on the cigar and the vaginal swab.

The DNA on the cigar was single-source; only one individual's DNA was present. The vaginal swab contained Diana's epithelial cells, Arturo's DNA in the form of sperm cells, and an unknown male contributor's DNA, also in the form of sperm cells. This unknown male profile

matched the profile obtained from the cigar. Diana's epithelial cells were also found on her panties along with sperm from two contributors. The major contributor to the sperm-cell fraction in the panties matched the unknown male DNA profile found on the cigar. Arturo, Diana's husband, could not be excluded as the minor contributor to the sperm-cell fraction in the panties.

On May 28, 2008, Orchid Cellmark received a sample of appellant's DNA. From that sample, it obtained a full DNA profile for appellant, which matched the DNA profile found on the cigar and the major contributor profile obtained from the sperm-cell fraction of the panties. Appellant could not be excluded as a contributor to the sperm-cell fraction from the vaginal swabs in the sexual assault kit. Orchid Cellmark eliminated as contributors all of appellant's associates for whom they had known DNA samples.

On the topic of contamination, Quartaro testified that without a sample of appellant's DNA in the crime lab where the evidence at issue was stored, it would be difficult to contaminate the evidence with appellant's DNA. Put another way, it is highly unlikely under existing circumstances that appellant's DNA would appear on the evidence at issue if he did not put it there himself. Quartaro also quelled fears regarding cross-contamination between the cigar and the panties or sexual assault kit because the cells containing appellant's DNA on the cigar were saliva and skin cells, while the cells on the panties and vaginal swabs were sperm cells.

Finally, Quartaro noted that contamination from excess moisture, heat, or other environmental factors would manifest itself as a degradation of the biological sample found on a particular piece of evidence. Such contamination would not result in the manifestation of an otherwise-absent DNA profile.

Third, the State called Courtney Head, a criminalist specialist with the "new" Houston Police

Department crime lab ("new HPD crime lab").[21]  Head testified to her qualifications as a DNA

analyst and then testified about the involvement of Genetic Design Lab in the instant case.  Genetic

Design Lab is an independent, California-based lab that received DNA extractions from evidence

in appellant's case in the 1990s.  Head testified that her notes indicated that in 1992 the old HPD

crime lab extracted DNA from evidentiary samples and sent those extractions to Genetic Design Lab

for testing.  There is no indication that any pieces of actual evidence, as opposed to mere extractions,

were sent to Genetic Design Lab.

Head also testified to analyses she performed at the new HPD crime lab.  After receiving a

buccal swab from appellant, Head extracted appellant's DNA and obtained his DNA profile.  Head

then compared that profile to the profiles that had been generated by Orchid Cellmark from the cigar,

the panties, and the vaginal swab.  According to Head's tests, appellant could not be excluded as the

contributor to the DNA on the cigar, appellant could not be excluded as the contributor to the major

DNA profile on the panties, and appellant could not be excluded as a contributor to the DNA found

on the vaginal swab in the sexual assault kit.

Appellant cross-examined all three of the State's witnesses, focusing on the time each piece

of evidence spent at the old HPD crime lab.  Appellant also emphasized the fact that some of the

evidence at issue had even been tested by the old HPD crime lab when it first reached the lab in

1992, including one of the vaginal swabs from the sexual assault kit.  Appellant argued to the trial

court that the evidence was contaminated as a result of the time it spent at the old HPD crime lab.

Absent evidence of tampering, allegations or questions regarding the care and custody of a

---

[21]  Some years after the closure of the old HPD Crime Lab, HPD opened a new crime lab.

CRUZ-GARCIA–25

piece of evidence go to the weight to be given that evidence, not its admissibility.[22] Here, the only evidence appellant put forth regarding contamination of the evidence is the fact that it was stored by the old HPD crime lab. Although appellant offered evidence challenging the reliability of the old HPD crime lab as a whole, he offered no evidence that the particular evidence at issue in the instant case had been tampered with or contaminated. In response to appellant's claims, the State introduced testimony to support the reliability of the evidence at issue.

The trial court made oral findings of fact on the record.[23] The court found Mehl, Quartaro, and Head to be credible witnesses, qualified to testify in their areas of expertise. The trial court then recited findings of fact adopting the testimony of the State's witnesses as it is summarized above. The court explicitly found that there was no indication that any of the evidence at issue in appellant's case had been contaminated or mishandled during the time it was stored by the old HPD crime lab.

Ultimately, the court ruled the cigar, sexual assault kit, and panties admissible as reliable and relevant evidence. The court determined that the results of the DNA tests performed by Orchid Cellmark on the cigar, sexual assault kit, and panties were also admissible as reliable and relevant evidence. Lastly, the court ruled that the DNA comparison performed by Head at the new HPD crime lab was admissible.

The record supports the trial court's conclusion that the DNA evidence was reliable. The trial court heard evidence about how and where each piece of evidence at issue was stored. Quartaro and Sergeant Mehl both testified that the evidence appeared to have been stored appropriately,

---

[22] *Lagrone*, 942 S.W.2d at 617.

[23] *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (stating that findings of fact rendered after a ruling on a motion to suppress can be in written form or stated orally on the record).

CRUZ-GARCIA–26

separated and sealed in individual containers. Additionally, the trial court found that the locations

where the evidence in this case was stored were not the locations described as being deficient in any

of the reports critical of the old HPD crime lab.

The record also supports the trial court's conclusion that the DNA evidence was relevant.

Evidence is relevant if it makes any fact of consequence more or less probable than it would be

without the evidence.[24] Here, the DNA evidence makes appellant's presence at Diana and Arturo's

apartment the night Angelo was kidnapped more probable.

Because we defer to the trial court's factual determinations so long as those determinations

are supported by the record, we will not disturb the trial court's findings on appeal. The trial court

did not abuse its discretion in admitting the forensic evidence, and appellant's due process rights

have not been violated. Appellant's first point of error is overruled.

In his second point of error, appellant contends that the trial court erred when it limited his

ability to present a defense by excluding evidence critical of the old HPD crime lab and limiting his

cross-examination of witnesses with respect to testimony critical of the old HPD crime lab. We will

address each complaint in turn.

Although defense exhibits 2-9 were offered into evidence at the motion-to-suppress hearing,

they were not the subject of the defense's motion to suppress. Instead, they were offered in support

~~of the defense's motion to suppress, and the trial court included a ruling on their admissibility at trial~~

in its findings of fact. Because the trial court's ruling on defense exhibits 2-9 was an evidentiary

ruling, separate from its ruling on the defense's motion to suppress the State's evidence, we review

---

[24] TEX. R. EVID. 401 (West 2014). We cite to the version of the Rules of Evidence that was in effect at the time of appellant's trial. Although the Rules of Evidence have been amended, effective April 1, 2015, we note no substantive changes to the rules pertinent to this case.

the denial of exhibits 2-9 for an abuse of discretion only.[25]

First, appellant complains of the trial court's exclusion of defense exhibits 2-9 as a violation of his right to compel the attendance of witnesses in his favor and a limitation on his ability to present a defense. Absent an abuse of discretion, a trial court's evidentiary ruling will not be disturbed on appeal.[26] A trial court abuses its discretion only if its ruling lies outside the zone of reasonable disagreement.[27]

Defense exhibits 2-9 were offered at the hearing on the motion to suppress the State's DNA evidence. At that hearing, the trial court ruled that defense exhibits 2-9 were inadmissible at trial. Defense exhibits 2-7 consisted of a report termed the "Bromwich Report." The Bromwich Report was initiated in response to the closure of the old HPD crime lab in 2003 and heavily criticized the lab in the areas of quality assurance, internal auditing, training, and standard operating procedure.

The trial court determined that nothing in the Bromwich Report related to the specific evidence being offered by the State and, as such, was irrelevant under Rule 401 and inadmissible under Rule 402. Alternatively, the court held that, even if some portions were relevant, the probative value substantially outweighed the danger of unfair prejudice, confusion of the issues, and the misleading of the jury under Rule 403.

Defense exhibits 8 and 9 consisted of misconduct reports and criminal histories for three former HPD crime lab employees, J. Chu, B. Sharma, and D. Wallace, who dealt with the forensic

---

[25] *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) ("An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse-of-discretion standard of review."); *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999).

[26] *Weatherred*, 15 S.W.3d at 542.

[27] *Id.*

evidence offered by the State when it was first collected and sent to HPD in 1992. None of these employees were called to testify in appellant's trial. Additionally, none of the results of tests performed by any old HPD crime lab employees were offered into evidence. That being true, the trial court determined that evidence concerning any misconduct on the part of Chu, Sharma, or Wallace was irrelevant under Rule 401 and inadmissible under Rules 402, 403, 404, 608, and 609.

Evidence is relevant only if it tends to make a fact of consequence more or less probable than it would be without the evidence.[28] Based on the fact that none of the old HPD crime lab employees were called to testify for the State, coupled with the fact that results from the tests each performed were not offered into evidence, it was not outside the zone of reasonable disagreement to determine that evidence regarding these witnesses was irrelevant. Additionally, because these exhibits did not comprise the entire substance of appellant's defense, we cannot say that their exclusion prevented him from presenting a defense.[29] Finding support in the record for the trial court's ruling, we hold that the trial court did not abuse its discretion in refusing to admit defense exhibits 2-9.

Appellant also complains in his second point of error that the trial court erred when it limited his cross-examination as it related to the State's DNA evidence and the old HPD crime lab. Specifically, appellant complains that his cross-examination of Sergeant Mehl, FBI Agent Griselle Guzman, Matt Quartaro, and Courtney Head was impermissibly limited. Appellant's claim in this Court is grounded in the Confrontation Clause of the Sixth Amendment. As a threshold matter, the State asserts that appellant has not preserved a confrontation objection for review. A party must object in the trial court, and obtain a ruling on his objection, before he can present his complaint for

---

[28] TEX. R. EVID. 401 (West 2014).

[29] *See infra* Part III.A.

CRUZ-GARCIA–29

appellate review.[30]  Because appellant did not object in the trial court on Confrontation Clause grounds, he has not preserved that claim for review in this Court.

At the hearing on the motion to suppress, the trial court ruled that appellant would not be permitted to go into the Bromwich Report, the closure of the old HPD crime lab, the reasons for that closure, or the misconduct of former HPD crime lab employees who were not going to testify.  The trial court explicitly stated it would allow cross-examination on the issues of where the evidence was stored, whether those locations were proper, to whom the evidence was taken, and whether the storage conditions were proper for reducing or preventing contamination.

At trial, on direct examination, Sergeant Mehl testified that law enforcement officers did not consider the presence of DNA as evidence when they investigated crimes in 1992, the year of the instant offense.  In order to correct the impression that DNA evidence and analysis was not utilized by law enforcement in 1992, the trial court permitted appellant to cross-examine Sergeant Mehl on the fact that the existence of DNA testing was known by police agencies in 1992 and that some of the evidence relevant to the case at bar had been submitted to the old HPD crime lab for DNA analysis.

Prior to beginning his cross-examination, defense counsel attempted to re-urge his objection to the trial court's ruling at the hearing on his motion to suppress limiting his cross-examination on the topics of the Bromwich Report and the old HPD crime lab's closure.  Specifically, defense counsel stated:

[Defense counsel]: Yes, Your Honor. You know I want to go into all that other stuff?

[The court]: I understand that.

---

[30]  TEX. R. APP. P. 33.1.

CRUZ-GARCIA–30

[Defense counsel]: Just so my record is clear, I'm not withdrawing my attempt to go into it. I'm just–

[The court]: I'm not allowing you to go into the other stuff. Genetic Design, any of the HPD crime lab studies or anything that's contained in that study or anything about its closure. Okay?

[Defense counsel]: Yes ma'am.

Appellant's objection does not in fact make his record clear. "[T]o preserve an issue for appeal, a timely objection must be made that states the specific ground for the objection, if the specific ground is not apparent from the context."[31] An objection must be sufficiently specific to tell the trial court what a party wants and why he feels himself entitled to it. The trial colloquy excerpted above does not specifically indicate the legal basis for appellant's objection to the trial court's limitation on his cross-examination. Indeed, appellant specifies no grounds for his objection.

Even without a specific objection, error may be preserved if the grounds for the objection are apparent from its context, such that context can save an otherwise ambiguous objection.[32] But even when the above exchange is read in the context of the motion to suppress, we cannot discern a Confrontation Clause objection. In his written motion to suppress, appellant contests the admission of the State's forensic evidence and related testimony on Fourth Amendment grounds. Then, at the hearing on the motion to suppress, where the trial court first ruled on the extent of appellant's cross-examination, the focus was on the relevance of the testimony sought to be elicited, not on the Confrontation Clause. Because appellant did not specifically state he was objecting on

_____

[31] *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

[32] *Id. See Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (holding that the circumstances surrounding the defendant's objection and the trial court's ruling made it clear that the trial court was aware of the basis of the defendant's objection).

CRUZ-GARCIA–31

Confrontation Clause grounds at the hearing on the motion to suppress or at trial, an objection on that basis with regard to Sergeant Mehl's cross-examination is not preserved for our review.[33]

Second, appellant complains that his cross-examination of FBI Agent Griselle Guzman was erroneously limited. During the State's direct examination of Agent Guzman, the State introduced two buccal swabs taken from appellant. In response to the State's offer, appellant informed the court that the swabs were covered by his motion to suppress and indicated that he had no "further objections." When given the opportunity to cross-examine Agent Guzman, appellant declined, and Guzman was released. Appellant lodged no Confrontation Clause objection to the trial court's limitation on his cross-examination at trial or during the hearing on his motion to suppress, so his Confrontation Clause claim as it relates to the cross-examination of Agent Guzman is not preserved for our review.

Third, appellant complains that his cross-examination of Matt Quartaro was limited. During the State's direct examination of Quartaro, it offered the cigar, sexual assault kit, and panties into evidence. Appellant objected to the admission of this evidence on chain of custody grounds. The trial court overruled appellant's objection and at the same time reiterated its limitation on appellant's cross-examination to questions about apparent contamination or degradation. At no point did appellant object on the basis of the Confrontation Clause. Appellant made no Confrontation Clause objection during the hearing on his motion to suppress either. Again, because appellant did not specifically state an objection based on the Confrontation Clause, this claim is not preserved for our review.

---

[33] *Cf. Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (holding that a hearsay objection does not preserve a Confrontation Clause objection for appellate review).

CRUZ-GARCIA–32

Lastly, appellant complains of the limitations placed on his cross-examination of Courtney Head. During Head's direct examination the State offered several items into evidence. Each time appellant said, "No additional objections," and the State's evidence was admitted. During his cross-examination, defense counsel approached the trial court and asked to expand the scope of his cross-examination to include quality-control issues at the old HPD crime lab. The following colloquy ensued:

> [Defense counsel]: I'm thinking, if you'll allow me to go into the quality control that existed on other things when they were ran by the crime lab because of what–she didn't work there, number one. And, number two, the old crime lab–I want to do that, but I don't want to do it if you've told me not to.
>
> [The court]: Do not go into that.
>
> [Defense counsel]: Okay.

Nothing further was said on the subject, and Head was released. Appellant lodged no Confrontation Clause objection to the trial court's limitation of his cross-examination of Head at trial or at the hearing on his motion to suppress. Accordingly, his Confrontation Clause claim has not been preserved for our review.

An appellant forfeits his confrontation complaint if he fails to object at trial.[34] In this case, appellant never objected on the basis of the Confrontation Clause at trial or during his pretrial motion-to-suppress hearing. We have previously emphasized the importance of specifying

---

[34] *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) ("We hold that in failing to object at trial, appellant waived any claim that admission of the videotape violated his rights to confrontation and due process/due course of law."); *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("[A]lmost all error–even constitutional error–may be forfeited if the appellant failed to object. We have consistently held that the failure to object in a timely manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant.").

CRUZ-GARCIA–33

constitutional bases for objections because of the stricter harm analysis performed on appeal.[35] Because appellant failed to lodge a Confrontation Clause objection in the trial court, this claim has not been preserved and we do not reach the merits of appellant's Confrontation Clause complaint as it relates to the limitations placed on his cross-examination. Appellant's second point of error is overruled.

*C. Extraneous Offense Evidence*

In his fourth and fifth points of error, appellant complains that the trial court erred when it admitted evidence of an extraneous offense. Appellant's objection is two-fold: the actual extraneous offense appellant complains of is a drug charge, unrelated to the capital murder, but his objection encompasses the admission of the fact of the drug charge along with the admission of the fact of his subsequent bond forfeiture on that charge when he failed to appear at a scheduled court date.

We note at the outset that the trial court did not admit any evidence as to the character of the underlying offense for which appellant was on bond. Instead, the trial court limited the evidence to the mere fact that appellant forfeited a bond by failing to appear on an unrelated criminal offense. Therefore, our analysis will address only the admission of evidence of appellant's bond forfeiture and flight as shown by appellant's failure to appear in an unrelated, unnamed criminal case.

In his fourth point of error, appellant contends this evidence was inadmissible under Rule 404(b). In his fifth point of error, appellant contends the evidence was inadmissible under Rule 403. Because our analysis is the same for both complaints, we will address them together.[36] We review

---

[35] *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012).

[36] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

a trial court's evidentiary ruling for an abuse of discretion.[37] We will affirm an evidentiary ruling unless it lies outside the zone of reasonable disagreement.[38]

During trial, the State sought to introduce evidence that appellant failed to appear at a scheduled court date on an unrelated drug charge approximately one week after the instant offense occurred. Through FBI Agent Eric Johnson, the State attempted to introduce testimony that, at the time of Angelo's kidnapping, appellant had a pending felony drug case in Harris County for which he had posted a bond, that appellant forfeited that bond when he failed to appear for a scheduled court date, and that, subsequent to his failure to appear, a federal warrant for unlawful flight to avoid prosecution was issued.

Appellant objected to the admission of Agent Johnson's testimony on Rule 404(b), Rule 403, and hearsay grounds. Ultimately, the trial court allowed Agent Johnson to testify to the fact that appellant had a pending criminal case in Harris County at the time of the commission of the instant offense and that, approximately one week after the instant offense took place, appellant failed to show up at a scheduled appearance for his pending case. Agent Johnson also testified that, at the time of his flight, appellant was a suspect in Angelo's kidnapping. The trial court specifically excluded evidence about the federal flight warrant and about the type of case for which appellant failed to appear.

~~Additionally, the court admitted a docket sheet that indicated appellant had been present at~~ all of his previous court appearances in his pending drug case–approximately twelve settings over

---

[37] *Id; Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

[38] *Montgomery*, 810 S.W.2d at 391; *Cantrell v. State*, 731 S.W.2d 84, 90 (Tex. Crim. App. 1987) ("[T]he trial judge's discretion in admitting an extraneous offense is to be given due deference.").

CRUZ-GARCIA–35

fifteen months. The trial court found consciousness of guilt as indicated by flight to be a permissible use for the extraneous offense evidence under Rule 404(b) and found that the probative value of the evidence was not outweighed by its prejudicial effect.

"Extraneous-offense evidence is admissible under both Rules 403 and 404(b) if that evidence satisfies a two-pronged test: (1) whether the extraneous-offense evidence is relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character; and (2) whether the probative value of the evidence is not substantially outweighed by unfair prejudice."[39] The first prong of this test requires us to determine (a) whether the evidence is relevant at all and (b) whether the evidence is relevant to something other than a showing of character conformity.

Rule 401 governs relevance and provides, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[40] Generally, evidence of flight is a relevant circumstance from which a jury can infer guilt.[41] This is true specifically in the context of bail-jumping.[42] Indeed, flight is admissible "even though it may show the commission

---

[39] *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *Johnston v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004).

[40] TEX. R. EVID. 401 (West 2014).

[41] *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn."); *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994) (same); *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989) (same).

[42] *Cantrell*, 731 S.W.2d at 93 ("The forfeiture of an accused's bail bond may be proved as tending to show flight....And flight, in the context of bail-jumping, may be construed as evidence of guilt."). *See Wockenfuss v. State*, 521 S.W.2d 630, 632 (Tex. Crim. App. 1975) (holding that evidence of defendant's bond forfeiture was admissible absent the defendant showing the bond
(continued...)

of other crimes.["43] But before evidence of flight can be admitted, it must appear the flight has some legal relevance to the case being prosecuted.[44]

Here, the timing of appellant's flight from prosecution on his drug case is a relevant circumstance of guilt in the instant case. Appellant fled the jurisdiction only one week after Angelo was kidnapped and killed. The docket sheet for appellant's drug offense indicated appellant had never missed a court date until the court date immediately following the date of the instant offense and that appellant forfeited his bond when he fled. The trial court did not abuse its discretion in finding that appellant's flight one week after Angelo was kidnapped and killed was relevant.

After relevance has been established, the burden shifts to appellant to make an affirmative showing that the flight is not connected with the offense on trial and is instead connected to some other transaction.[45]

Appellant argues that any evidence of flight from the drug prosecution was unrelated to the capital murder prosecution and showed only consciousness of guilt as to the drug charge. Further, appellant argues that, because he was not yet charged in the instant case at the time he forfeited his bond on the drug case, such forfeiture cannot be construed as an act designed to avoid prosecution

---

(...continued)
forfeiture was related to another offense).

[43] *Cantrell*, 731 S.W.2d at 92; *McWherter v. State*, 607 S.W.2d 531, 534-35 (Tex. Crim. App. 1980) ("The fact that circumstances of flight incidentally show the commission of another crime does not render the evidence inadmissible.").

[44] *Hodge v. State*, 506 S.W.2d 870, 873 (Tex. Crim. App. 1974) (op. on reh'g). *See Wockenfuss*, 521 S.W.2d at 632.

[45] *Burks*, 876 S.W.2d at 904; *Hodge*, 506 S.W.2d at 873. *See Wockenfuss*, 521 S.W.2d at 632.

CRUZ-GARCIA–37

in the instant case. We disagree.

While appellant's failure to appear for his drug case could have been motivated by his desire to avoid prosecution in that case alone, there is evidence to support the trial court's conclusion that appellant's failure to appear related to the instant capital murder prosecution. The timing of appellant's absence, combined with his status as a suspect in Angelo's kidnapping and the fact that he had been present at all prior court dates, supports the finding that appellant's failure was, at least in part, motivated by a desire to avoid arrest and prosecution for Angelo's murder.[46]

Evidence of appellant's absence from court one week after the commission of the capital murder meets the low threshold for relevance imposed by Rule 401, but this is not the end of our inquiry, because Rule 401 is limited by Rule 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.[47]

Therefore, Rule 404(b) tempers what would otherwise be admissible under Rule 401 by distinguishing between acceptable and unacceptable uses of relevant extraneous-offense evidence. Rule 404(b) prohibits the use of extraneous-offense evidence to show character conformity. And while the latter half of Rule 404(b) provides a list of potential permissible uses of extraneous-offense evidence, it does not contain an exhaustive list of the "other purposes" for which extraneous-offense

---

[46] In *Burks*, we stated, "Since appellant was already identified as a suspect in the case, his flight when confronted by the police was relevant to the issue of whether or not he committed the instant crime." *Burks*, 876 S.W.2d at 903-04.

[47] TEX. R. EVID. 404(b) (West 2014).

01159

CRUZ-GARCIA–38

evidence can be used.[48]

It follows, then, that once extraneous-offense evidence meets Rule 401's test, it will be admitted if it serves any relevant purpose–whether listed in 404(b) or not–other than showing character conformity.

"[C]riminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing 'consciousness of guilt.'"[49] Here, appellant failed to appear in court on an unrelated drug charge. Failure to appear at a scheduled court date is a criminal act.[50] Based on the timing of appellant's bond forfeiture, there is evidence to support the trial court's conclusion that such forfeiture was motivated by a desire to reduce the likelihood of arrest and prosecution for Angelo's murder, making evidence of the forfeiture admissible under Rule 404(b).

Furthermore, evidence of appellant's flight was not used to show conformity with a general criminal disposition. Instead, the evidence of appellant's failure to appear was used to show a disruption in appellant's normal course of attending his scheduled court dates after the commission of the offense in this case. The trial court did not abuse its discretion in finding that evidence of appellant's bond forfeiture was admissible under Rule 404(b).

Next, we determine whether the extraneous-offense evidence was barred by Rule 403. Rule

---

[48] *Banda v. State*, 768 S.W.2d 294, 296 (Tex. Crim. App. 1989) ("Whether or not it neatly fits one of [the 404(b)] categories, an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable."); *Johnston*, 145 S.W.3d at 220 ("This list is illustrative, not exhaustive.").

[49] *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g).

[50] TEX. PENAL CODE § 38.10(a).

: 01160

403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[51]

Rule 403's prohibition against the admission of evidence whose probative value is substantially outweighed by the danger of unfair prejudice is not intended to keep out all evidence that tends to prejudice the opponent's case.[52] Instead, it aims to prevent only the admission of evidence that promotes a jury decision on an improper basis.[53]

Here, the court determined that the probative value of the extraneous-offense evidence was that it made a showing of flight and potentially provided evidence of guilt. Additionally, the court took steps to ameliorate the prejudicial effect of the extraneous-offense evidence by redacting the name of the offense. We cannot say that the prejudicial effect of the extraneous-offense evidence substantially outweighed its probative value. The trial court did not err in finding that this evidence was admissible under Rule 403.

The trial court's decision to admit Agent Johnson's testimony concerning appellant's bond forfeiture does not lie outside the zone of reasonable disagreement as to its admissibility, so the trial court did not abuse its discretion in admitting the evidence under Rule 404(b) or Rule 403. Appellant's fourth and fifth points of error are overruled.

---

[51] TEX. R. EVID. 403 (West 2014).

[52] *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) ("All testimony and physical evidence are likely to be prejudicial to one party or the other. It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable.") (internal citations omitted).

[53] *Montgomery*, 810 S.W.2d at 389. *See Davis*, 329 S.W.3d at 806.

## D. Improper Jury Argument

In points of error eight and nine appellant contends that the State engaged in improper jury argument during the guilt phase of trial. In his eighth point of error, appellant complains of the following statements made by the prosecutor as being outside the record:

> [The State]: Let me give you another example, another example of half the story. The SANE nurse. She came here and she said: Well there were no injuries. Wow, that must mean Obel Cruz-Garcia is guilty–is not guilty of capital murder according to the defense attorneys. No. Let's talk about what else the SANE nurse said. And I want to say she said 95%–it is a very high percentage–of rape cases that she does SANE nurse examinations on–
>
> [Defense counsel]: Objection. Outside the record.
>
> [The State]: –do not have any injuries.

The trial court overruled appellant's objection and stated, "But I will remind the jury that you recall the testimony from the witness stand and that is–that will be your guide in your deliberations. Arguments of counsel is not evidence."

The State concedes that the prosecutor mischaracterized the SANE nurse's testimony. At trial Gloria Kologinczok, the SANE nurse who examined Diana, testified that she does not see physical injuries resulting from sexual assaults in most of the sexual assault exams she performs. Kologinczok did not further quantify how often she sees physical injuries during sexual assault exams, as the prosecutor did during her closing argument.

Jury argument generally serves at least four permissible purposes: summation of the evidence, reasonable deductions from the evidence, answers to arguments of opposing counsel, and pleas for law enforcement.[54] It is error to insert facts into closing argument that are not supported

---

[54] *Davis*, 329 S.W.3d at 821.

by the record.[55]   Because her statement was not supported by the record, the prosecutor's

quantification of Kologinczok's testimony was improper, and the trial court erred when it overruled

appellant's objection.

"However, every inappropriate remark made during closing arguments does not require the

reversal of a conviction."[56]   A reversal will be required only if the improper argument is harmful.[57]

To determine whether the argument was harmful, we must engage in a harm analysis.[58]   The Rules

of Appellate Procedure provide two avenues for harm analysis, depending upon the type of error

committed: constitutional or nonconstitutional.[59]

We have held that jury argument that injects facts outside the record is nonconstitutional

error.[60]   As such, it is governed by Texas Rule of Appellate Procedure 44.2(b).[61]   Rule 44.2(b)

provides, "Any other error, defect, irregularity, or variance that does not affect substantial rights must

---

[55] *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999) ("Error exists when facts not supported by the record are injected in the argument...."); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011).

[56] *Lagrone*, 942 S.W.2d at 619 (citing *Hernandez v. State*, 819 S.W.2d 806, 820 (Tex. Crim. App. 1991)).

[57] *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

[58] *Id.*

[59] *Compare* Tex. R. App. P. 44.2(a) and Tex. R. App. P. 44.2(b).

[60] *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000) ("Comments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status. We shall therefore apply the standard of harm for nonconstitutional error."). *See Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) (stating improper-argument error that arose when prosecutor "delved into matters that were well outside the record" was nonconstitutional in nature).

[61] *Martinez*, 17 S.W.3d at 692.

CRUZ-GARCIA-42

be disregarded."[62] Therefore, unless the State's improper jury argument error affected appellant's substantial rights, it will not call for a reversal of appellant's conviction.[63]

To determine whether the error affected a substantial right, and was therefore harmful, this Court looks at three factors: (1) the severity of the misconduct, (2) any curative measures employed to correct the misconduct, and (3) the certainty of conviction without the misconduct.[64]

First, we examine the severity of the misconduct. The error arose during the State's final closing argument in the guilt phase of trial. After objection, the prosecutor immediately moved on from the topic of the SANE nurse. The error did not relate directly to the act of kidnapping or killing Angelo, but instead related only to the sexual assault alleged to have taken place prior to the kidnapping. The SANE nurse did indeed testify that, in most of the sexual assault exams that she performs, she does not see injuries, so the prosecutor erred only in assigning a numerical value to the nurse's testimony.

Additionally, viewing the misconduct in light of the entire record of jury arguments, the statement was not extreme or manifestly improper. The statement was made in the middle of a closing argument that spans twenty-one pages of the record, and the prosecutor never emphasized the statement or returned to the topic of the sexual assault after appellant's objection. We find the severity of the misconduct to be slight.

With respect to curative measures, the trial court immediately reminded the jury that statements made in closing arguments are not evidence, decreasing the likelihood that jurors would

---

[62] TEX. R. APP. P. 44.2(b).

[63] Id.; Martinez, 17 S.W.3d at 692.

[64] Mosley, 983 S.W.2d at 259; Martinez, 17 S.W.3d at 692-93.

attach significance to the improper statement. Although this does not amount to a curative instruction, it weighs in favor of the error being harmless.[65]

Lastly, appellant's conviction was relatively certain, even without the misconduct. As discussed extensively above, there was direct and circumstantial evidence connecting appellant to Angelo's kidnapping and murder. Based upon the evidence before the jury, it is highly unlikely that the prosecutor's misstatement impacted appellant's conviction. Appellant's eighth point of error is overruled.

In his ninth point of error, appellant complains that the prosecutor injected her personal beliefs into her closing argument. Appellant contends that the following argument was improper:

[The State]: We ask you to find him guilty as a party because what we believed happened is the defendant directed and encouraged–

[Defense counsel]: Objection to putting beliefs into argument, Your Honor. It's improper.

[The court]: That will be overruled.

It is improper for a prosecutor to inject her opinion into statements made before the jury.[66] However, it is proper for a prosecutor to argue her opinion where that opinion is based upon evidence in the record.[67]

As stated above, permissible jury argument generally falls into one of four categories: summation of the evidence, reasonable deductions from the evidence, answers to arguments of

---

[65] *Freeman*, 340 S.W.3d at 728-29.

[66] *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985).

[67] *Wolfe v. State*, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996) (quoting *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985)).

CRUZ-GARCIA–44

opposing counsel, and pleas for law enforcement.[68]

    We conclude that the prosecutor's discussion of what the State believed happened was a summation of the evidence presented at trial. Rudy testified that appellant kidnapped Angelo, drove him to Baytown, and then ordered Roger to kill to him. After Angelo's death, appellant ordered Rudy and Roger to submerge Angelo's body. Even if the prosecutor's statement injected her opinion into her argument, her opinion was sufficiently supported by the evidence presented at trial.

    Even assuming *arguendo* that the prosecutor's argument was improper, it was harmless. Jury argument error is analyzed for harm under Texas Rule of Appellate Procedure 44.2(b).[69] Under the 44.2(b) standard, error will not require reversal unless it affects a substantial right.[70] To determine whether error affects a substantial right in the improper-jury-argument realm, we weigh the three factors discussed above: the severity of the misconduct, any curative measures taken, and the likelihood of conviction absent the misconduct.[71]

    Here, any possible misconduct was not severe. After reading the prosecutor's statement in the context of the entire record of jury arguments, we conclude the prosecutor was merely summarizing the State's theory of the case and not suggesting to the jury that she had outside knowledge about contested facts.

    Further, while the trial court did not take any steps to cure the error, the prosecutor immediately rephrased her statement and said, "What the evidence supports is that the defendant

---

[68] *Davis*, 329 S.W.3d at 821.

[69] *Martinez*, 17 S.W.3d at 692.

[70] Tex. R. App. P. 44.2(b).

[71] *Mosley*, 983 S.W.2d at 259.

directed and encouraged Roger to kill the little boy." This quasi-curative measure works in favor of the error being harmless.[72]

Additionally, appellant's conviction was relatively certain, even absent the prosecutor's statement. Appellant's ninth point of error is overruled.

### III. Punishment

*A. Mitigating Evidence in Punishment*

In his sixth and seventh points of error, appellant complains that the trial court erred when it sustained the State's hearsay objections to two items of evidence he offered during the punishment phase of trial. The first piece of evidence, complained of in point of error six, was a series of Bible study certificates that appellant earned while incarcerated in Puerto Rico. The second piece of evidence, complained of in point of error seven, was testimony that appellant worked as an informant for several American federal agencies. Appellant now complains that the trial court's exclusion of these pieces of evidence violated his right to put forth a complete defense. Assuming without deciding that appellant preserved this complaint, we overrule appellant's sixth and seventh points of error.

We review a trial court's evidentiary ruling for an abuse of discretion.[73] So, if the trial court's determination falls within the zone of reasonable disagreement, we will not disturb it on

---

[72] *Hawkins v. State*, 135 S.W.3d 72, 85 (Tex. Crim. App. 2004) ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless."). *See Canales v. State*, 98 S.W.3d 690, 695-96 (Tex. Crim. App. 2003) (holding that a prosecutor's misstatement of the law was harmless when, immediately following the misstatement, the prosecutor corrected his mistake).

[73] *Weatherred*, 15 S.W.3d at 542.

CRUZ-GARCIA–46

appeal.[74] We begin with appellant's sixth point of error. Appellant attempted to offer his own Bible study certificates through his brother, Joel Cruz-Garcia. The State objected that the certificates were hearsay, and the trial court sustained the objection. Appellant now complains that the trial court's ruling excluding the certificates from evidence violated his right to put forth a complete defense.

A criminal defendant's right to present relevant evidence is not absolute.[75] Instead, it is subject to reasonable restrictions that accommodate other legitimate interests in the criminal trial process.[76] Where mitigating evidence comes in an objectionable form, neither the Texas nor the United States Constitutions require its admission.[77] The Constitution is implicated only if the evidentiary rule being employed to exclude evidence is applied arbitrarily or unjustly and its application effectively precludes a defendant from putting forth a defense.[78]

Here, appellant's proffered evidence was limited by the application of the hearsay rule. The rule against hearsay prohibits the admission of out-of-court statements offered to prove their truth.[79]

---

[74] *Id.*

[75] *United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) ("Although the Eighth Amendment to the United States Constitution assures that no person shall be put to death without the opportunity to bring before the sentencing authority all evidence of mitigating circumstances, the Constitution does not assure that the evidence be received in a form which is otherwise objectionable.").

[76] *Scheffer*, 523 U.S. at 308.

[77] *Id.*; *See Renteria v. State*, 206 S.W.3d 689, 697 (Tex. Crim. App. 2006) (concluding that admission of constitutionally relevant evidence is not required if it is otherwise objectionable under state law).

[78] *Potier v. State*, 68 S.W.3d 657, 662 (Tex. Crim. App. 2002).

[79] TEX. R. EVID. 801(d) (West 2014).

CRUZ-GARCIA–47

Appellant's certificates were indeed hearsay because they each contained out-of-court statements that appellant was offering for their truth. As hearsay, the evidence was inadmissible unless it fit within an exception or exclusion.[80]  Appellant, as the proponent of the evidence, bore the burden of articulating an exception or exclusion under which the Bible study certificates would be properly admissible.[81]  Appellant offered no such exceptions.

Appellant now asserts that the Bible study certificates were admissible under Texas Rules of Evidence 803(11), 803(13), 803(19), and 804(3).  Without deciding whether appellant has forfeited his error by failing to allege his hearsay exceptions in the trial court, we hold that none have merit.

First, appellant's certificates do not qualify as Records of a Religious Organization under Rule 803(11) because they are not statements of birth, marriage, divorce, death, legitimacy, ancestry, relationship, or other fact of personal history.  Second, appellant's certificates do not qualify as Family Records under Rule 803(13) because they are not statements of fact concerning personal or family history, nor are they contained in any of the documents listed in Rule 803(13).  Third, appellant's certificates do not meet the requirements in Rule 803(19) because they do not concern a person's birth, adoption, marriage, divorce, death, legitimacy, relationship, ancestry, or other fact of personal or family history.  Lastly, appellant's certificates do not qualify under Rule 804(b)(3) because appellant has failed to establish the unavailability of the certificates' declarant.  Further, the certificates do not contain any statements about the declarant's own birth, adoption, marriage,

---

[80]  *Valle v. State*, 109 S.W.3d 500, 505 (Tex. Crim. App. 2003).

[81]  *Martinez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005) ("The State, as the proponent of the evidence, had the burden of demonstrating the applicability of that exemption or exception.").

01169

ancestry, or fact of personal or family history, nor do they contain statements about any of the foregoing with respect to a person related to or intimately associated with the declarant. Additionally, appellant's Bible study certificates do not bear "persuasive assurances of trustworthiness," which weighs in favor of the trial court's exclusion.[82]

The rule excluding hearsay that does not fit within an exception or exclusion is not an arbitrary rule, nor was it arbitrarily or unjustly applied to appellant.[83] Instead, the rule represents a reasonable restriction on the admission of evidence that accommodates other legitimate criminal-trial interests, namely, ensuring the reliability of evidence.[84]

While appellant contends that the hearsay rule should give way in favor of his right to put on a defense, "[t]he fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his

---

[82] *See Valle*, 109 S.W.3d at 506 (affirming the exclusion of hearsay evidence because it did not meet an exception to the hearsay rule and did not bear persuasive assurances of trustworthiness).

[83] *Potier*, 68 S.W.3d at 662 ("These cases show that the exclusion of relevant, material, important evidence by the application of particular rules that are arbitrary or disproportionate to their purposes may offend the Constitution. They also show that courts are free to apply evidentiary rules that are not arbitrary and unjustified.").

[84] *Id.* at 666 (holding that the hearsay rule, when properly applied, is a valid limitation on a defendant's evidence). *See Renteria*, 206 S.W.3d at 697. ("[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary only where it has infringed upon a weighty interest of the accused."). *See Valle*, 109 S.W.3d at 506 (holding that defendant's hearsay evidence that was not within an exception and that did not bear "persuasive assurances of trustworthiness" was properly excluded).

CRUZ-GARCIA–49

defense to the jury."[85]  Because appellant was not prevented from presenting the substance of his

defense, the trial court did not abuse its discretion when it sustained the State's hearsay objection and

excluded appellant's Bible study certificates.  Appellant's sixth point of error is overruled.

Turning now to appellant's seventh point of error, appellant once again contends that the trial

court violated his right to put forth a meaningful defense when it sustained the State's hearsay

objection to testimony about whether appellant worked as an informant for various federal law

enforcement agencies in the United States.  But again, appellant's right to the admission of evidence

in his defense is not absolute.[86]  If defense evidence is presented in a form that violates the rules of

evidence, and those rules are not being arbitrarily applied, it is not properly admissible.[87]

The testimony appellant attempted to elicit through Puerto Rican police officer, Agent Juan

DeJesus Rodriguez, about appellant's work as a federal informant was hearsay because Agent

Rodriguez had no personal knowledge of appellant's work and had learned about this alleged work

only through conversations with other agents.  Because the testimony about what other agents told

Agent Rodriguez was an out-of-court statement being offered for its truth, the State's hearsay

objection was proper.[88]

In response to the State's objection, appellant offered no applicable exceptions or exclusions

---

[85] *Valle*, 109 S.W.3d at 507; *See Potier*, 68 S.W.3d at 665 ("We hold that the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.").

[86] *Scheffer*, 523 U.S. at 308; *Lewis*, 815 S.W.2d at 568.

[87] *See Potier*, 68 S.W.3d at 666 (holding that the hearsay rule is a valid limitation on a defendant's evidence when it is correctly applied).

[88] Tex. R. Evid. 801 (West 2014).

CRUZ-GARCIA–50

to the hearsay rule. Appellant now asserts that Agent Rodriguez's testimony was admissible under Texas Rule of Evidence 803(21). Again, without deciding whether appellant has forfeited this claim, we hold that it lacks merit. Agent Rodriguez's testimony did not concern appellant's *character* among appellant's associates or within his community, so it does not meet the requirements of Rule 803(21).

The exclusion of Agent Rodriguez's testimony as hearsay did not effectively preclude appellant from putting on a defense, and the application of the hearsay rule was not arbitrary or unjust. Consequently, the trial court did not abuse its discretion when it sustained the State's objection and excluded appellant's evidence. Appellant's seventh point of error is overruled.

*B. Improper Jury Argument*

In his tenth and eleventh points of error, appellant complains of improper jury argument during the punishment phase of trial. In point of error ten, appellant complains that the trial court erred when it overruled his objection to part of the State's argument, which he contends went outside the record. During her punishment summation, the prosecutor stated:

> Who is orchestrating this deal? Who is orchestrating all the criminal conduct that he's involved in from all the evidence that you've heard? Him. He is the boss. And that's why when he told Roger to stab that little boy, he did. And Roger will pay the price for that when his turn comes, but don't take the blame off of the man who told him to do it. Don't excuse him. Because I will tell you right now, if it were up to Roger alone, Angelo would still be alive.

Appellant objected that the last sentence was outside the record. The trial court overruled the objection and instructed the jury that the arguments of counsel are not evidence. Appellant now complains of this ruling on appeal. In response, the State contends appellant forfeited his error with respect to this argument, or alternatively, that the statement was a proper deduction from the

CRUZ-GARCIA–51

evidence.

Assuming without deciding that error was preserved, we agree with the State's contention that the statement was a proper deduction from the evidence. Throughout trial, the jury heard ample evidence of appellant's role as the ringleader of the violence that unfolded on the night Angelo died. Rudy testified that appellant was in charge and ordered Angelo's death because Angelo saw appellant sexually assaulting Diana. The prosecutor's statement that, if it were up to Roger, Angelo would still be alive, was merely a restatement of what was already before the jury as the State's theory of its case and was a proper deduction from the evidence presented at trial. Appellant's tenth point of error is overruled.

In his eleventh point of error, appellant complains that the trial court erred when it denied his motion for a mistrial after improper jury argument from the State during closing arguments in the punishment phase of trial. Appellant complains that the State went outside the record when it argued, "What else? They want to minimize the escape attempt. Justin talked to you about that. What do you think happened after he attempted to escape? You think he might have wound up in administrative segregation? I bet he did."

Appellant objected, and the trial court sustained his objection. The trial court instructed the jury to "disregard the last comment by [the prosecutor] and not consider it for any reason." Appellant then moved for a mistrial, which was denied. Appellant now complains of this denial. We review a trial court's refusal to grant a mistrial for an abuse of discretion.[89] Unless the trial

---

[89] *Hawkins*, 135 S.W.3d at 77.

: 01173

-GARCIA–52

court's ruling was outside the zone of reasonable disagreement, it will not be disturbed on appeal.[90]

A mistrial will be required only in extreme circumstances where the improper conduct is so harmful that continuing with the trial would be wasteful and futile.[91] We apply the same three-factor test articulated in *Mosley*[92] and extended in *Martinez*[93] to evaluate "whether the trial court abused its discretion in denying a mistrial for improper argument."[94]

The first factor examines the severity of the misconduct. When determining the severity of the misconduct, we look at the magnitude of the prejudicial effect and whether the misconduct was extreme or manifestly improper.[95] The misconduct here was slight, and its prejudicial effect was minimal. The State's reference to administrative segregation was brief and was perhaps the most benign evidence offered against appellant during the punishment phase.

Second, we examine curative measures taken by the trial court. Here, the trial court sustained appellant's objection and instructed the jury to disregard the prosecutor's statement. Ordinarily, an instruction to disregard will sufficiently relieve harm, except with respect to the most inflammatory

---

[90] *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

[91] *Hawkins*, 135 S.W.3d at 77.

[92] *Mosley*, 983 S.W.2d at 259 (establishing the three-factor test for determining when improper jury argument during the guilt phase is harmful).

[93] *Martinez*, 17 S.W.3d at 693 (extending the *Mosley* three-factor test to apply to improper jury argument during the punishment phase of trial).

[94] *Hawkins*, 135 S.W.3d at 77.

[95] *Mosley*, 983 S.W.2d at 259; *Brown*, 270 S.W.3d at 573.

CRUZ-GARCIA–53

statements.[96] The statement at issue was not so inflammatory,[97] and the trial court's actions "sufficiently ameliorated any potential harm."[98]

Lastly, we examine the certainty of the punishment assessed, absent the improper argument. During the punishment phase of trial, the jury heard evidence that appellant murdered another individual for flirting with appellant's girlfriend, and that appellant kidnapped, tortured, and held for ransom two teenagers in Puerto Rico. Given the severity of the punishment evidence, we cannot say that, absent the State's reference to administrative segregation, appellant would have received a different sentence. The trial court did not abuse its discretion when it denied appellant's motion for a mistrial. Appellant's eleventh point of error is overruled.

*C. Motion for New Trial*

In his twelfth and final point of error, appellant asserts that the trial court erred when it denied his motion for a new trial based on alleged jury misconduct during the punishment phase. Appellant also contends that the trial court erred when it refused his request for an evidentiary hearing on his motion. Although the trial court heard argument on appellant's motion for new trial, testimony at the hearing was restricted to affidavits. We review a trial court's decision to hold a live hearing on a motion for new trial, as well as the ruling on such motion, for an abuse of discretion.[99] A trial court

---

[96] *Long v. State*, 823 S.W.2d 259, 269 (Tex. Crim. App. 1991).

[97] *See Martinez*, 17 S.W.3d at 691 (holding that the prosecutor's statement about facts outside the record was not so extreme that it could not be cured by an instruction to disregard).

[98] *Archie*, 221 S.W.3d at 700 (holding that sustaining an objection to the prosecutor's comment on the defendant's failure to testify combined with an instruction to disregard was sufficiently ameliorative of any potential harm such that the error did not require reversal).

[99] *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *State v. Zalman*, 400
(continued...)

CRUZ-GARCIA–54

abuses its discretion in denying a motion for new trial only if no reasonable view of the record could support the trial court's ruling.[100]

The jury began its punishment deliberations on the afternoon of Thursday, July 18, 2013. The following morning, Friday, July 19, the jurors resumed their punishment deliberations. At some point during their discussion, juror Casey Guillotte asked her fellow jurors how they were going to emotionally cope with their verdict. Ms. Guillotte testified by way of affidavit that her inquiry came after the jury had already agreed on each of the special issues. The other affidavits received by the trial court are ambiguous as to when her question was posed.

In response to this inquiry, several jurors offered words of encouragement. Then, jury foreman Matthew Clinger pulled his Bible from his overnight bag and directed Ms. Guillotte to several passages. Mr. Clinger told Ms. Guillotte that he felt comforted by passages in the book of Romans. Both Mr. Clinger and Ms. Guillotte testified through their affidavits that Mr. Clinger never read aloud from his Bible. Juror Angela Bowman's affidavit indicates that Mr. Clinger "read scriptures from the Bible," but she does not indicate those scriptures were read aloud to the entire jury.

At approximately 3:20 p.m., Ms. Bowman sent a note to the judge asking to speak with her privately. After discussing the request with the attorneys for the State and defense, the judge spoke with Ms. Bowman on the record in her chambers. During this conversation, Ms. Bowman expressed her desire to be replaced with an alternate juror because she could not come to an agreement with

---

(...continued)
S.W.3d 590, 593 (Tex. Crim. App. 2013).

[100] *Holden*, 201 S.W.3d at 763.

the remaining eleven jurors. Ms. Bowman also expressed hesitancy at the idea of having to be sequestered over the weekend. The trial judge told Ms. Bowman that she was unable to replace her with an alternate simply because she was disagreeing with the other jurors and urged Ms. Bowman to continue deliberating.

Approximately one hour later, the jury returned its punishment verdict in such a way that the trial court would sentence appellant to death. The trial court polled the jury, and each juror confirmed that the verdict rendered was his or her true and correct verdict.

Later that evening, Mario Madrid, one of appellant's trial attorneys, received a phone call from Ms. Bowman in which she told him that she had been pressured by the other jurors to return a verdict that would result in a death sentence and that the verdict actually rendered was not her personal verdict. Mr. Madrid brought this to the attention of the trial court by way of an affidavit attached to appellant's motion for new trial.

Appellant complains that alleged jury misconduct tainted the verdict on punishment because of the foreman's Bible reading during deliberations. Appellant asserts that this reading was an outside influence that inappropriately impacted the verdicts of jurors Angela Bowman and Casey Guillotte, so affidavits to that effect were admissible under Rule 606(b). At the hearing on the motion for new trial, the State objected to the admission of any affidavits regarding jury deliberations, but prepared affidavits from Mr. Clinger and Ms. Guillotte should the trial court choose to admit affidavits.

Inquiring into the deliberative processes of a jury to ferret out misconduct has been prohibited

CRUZ-GARCIA–56

in this country, save for a few, narrow exceptions.[101]   This state currently recognizes only two exceptions to this general rule.[102]   First, jurors may testify about their deliberations to rebut an accusation that a juror was unqualified to serve, and second, jurors may testify about whether an outside influence was improperly brought to bear upon their deliberations.[103]

This Court has never determined whether reference to the Bible during jury deliberations is an outside influence.  Today we hold that it is not.

This Court first explained in *McQuarrie v. State* that an outside influence is one that originates "from a source outside of the jury room and other than from the jurors themselves."[104]   But, as we later explained in *Colyer v. State*, this does not necessarily encompass every influence originating from outside the physical jury deliberation room.[105]   "The 'outside influence' exception to Rule 606(b) does not include influences or information that are unrelated to trial issues."[106]

Here, the alleged "outside influence" that appellant complains of is a scripture from the Bible

---

[101]   FED. R. EVID. 606(b)(2) ("A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict form."); TEX. R. EVID. 606(b)(2) ("A juror may testify: (A) about whether an outside influence was improperly brought to bear on any juror; or (B) to rebut a claim that a juror was not qualified to serve.").

[102]   TEX. R. EVID. 606(b)(2).

[103]   *Id.*

[104]   *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012).

[105]   *Colyer v. State*, 428 S.W.3d 117, 127 (Tex. Crim. App. 2014) (holding that a telephone call from a juror's physician that the juror's daughter was sick did not qualify as an "outside influence" for the purposes of Rule 606(b) despite the fact that it did indeed originate from a source outside the jury room).

[106]   *Id.*

CRUZ-GARCIA–57

that the jury foreman recommended to another juror in an effort to comfort her. While this scripture did literally come from outside the jury room, as neither the Bible nor any of its contents were ever offered into evidence, we cannot say that it meets the definition of "outside influence" this Court established in *McQuarrie*.

When a jury has before it evidence that was not offered at trial, or subject to cross-examination, a defendant's right to a fair and impartial jury may be compromised. This compromise occurs, however, only when the outside evidence or influence relates directly to a question of fact left to the jury's determination and improperly influences their verdict.

Referring to the Bible did not directly relate to a fact at issue before the jury in appellant's case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it. Had the foreman merely recited a Bible verse from memory, we could not consider it an outside influence. Indeed, evidence of such a recitation would not have even been admissible per the constraints of Rule 606(b).[107]

The fact that the foreman in this instance referred a juror to the Bible verse instead of quoting it from memory is a distinction without a difference. Either way, there is no evidence that the biblical reference related to the facts at issue in this case, and it was therefore not an outside influence under Rule 606(b) and as interpreted by this Court in *McQuarrie* and *Colyer*.[108]

---

[107] Our analysis is guided by the 4th Circuit's analysis in *Robinson v. Polk*, where the court was presented with a factually analogous situation and determined that, because the Bible reading did not go to a fact at issue in the case, and because a juror merely quoting the Bible from memory "assuredly would not be considered an improper influence," there was no improper outside influence in violation of Rule 606(b). *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006).

[108] We are mindful of the fact that the 5th Circuit has held that the Bible can be an external influence on the jury, but the facts of that case distinguish it from this one.

CRUZ-GARCIA–58

Because the Bible was not an outside influence, the trial court erred when it admitted State and defense affidavits describing jury deliberations. Additionally, because the affidavits describing the inner goings-on of the jury's deliberations were improperly admitted, any live testimony to that effect would have been inadmissible under Rule 606(b) as well. Even had the affidavits been admissible, it was within the trial court's discretion to rule on a motion for new trial on affidavits without oral testimony.[109] Either way, the trial court did not abuse its discretion when it denied appellant's request for an evidentiary hearing on his motion for new trial.

When citizens are selected for jury service, the law does not ask them to set aside every personal or moral directive to which they adhere, nor will this Court do the same by holding that reference to such a directive during jury deliberations is improper. If trial attorneys are troubled by jurors who call upon such beliefs during their deliberations, this trouble is better addressed in voir dire than it is in by way of a motion for new trial.

The jury foreman's reference to his Bible in an attempt to comfort his fellow juror was not an outside influence improperly brought to bear on the jury's deliberations, and affidavits to that effect were not properly admissible under Rule 606(b). Regardless, although the trial court erred in admitting the affidavits, the trial court did not abuse its discretion when it overruled appellant's motion for new trial. Appellant's twelfth point of error is overruled.

We affirm the judgment of the trial court.

Delivered: October 28, 2015
Do Not Publish

---

[109] *Holden*, 201 S.W.3d at 763.

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| **THE STATE OF TEXAS VS. CRUZ-GARCIA, OBEL** | **Bond:** $0 |
| **Cause No.:** 138479401010-3 **Court:** 337th | **Next Setting:** |
| **Offense:** CAPITAL MURDER        **Level:** C Level Felony | **Case Disposition:** Disposed |
| **Charging Instrument:** On Appeal CCA | **Case Status:** Appeal |
| | **Defendant Status:** JAIL |
| **GENERAL ORDERS OF THE COURT** | |

| Docket Sheet Entries | |
|---|---|
| **Date** | **Comment** |
| 4/19/2013 | GRAND JURY ACTION: Reindictment GJ COURT: 338<br>OFFENSE: CAPITAL MURDER      C Level Felony<br>BOND AMOUNT: $0<br>Previous Case Number: 1289188 |
| 4/19/2013 | CAPIAS ISSUED—INDICTMENT<br>BOND AMOUNT: $0 |
| 4/19/2013 | Precept issued to serve copy of indictment |
| 4/23/2013 | The defendant filed a sworn pauper's oath, and JUDGE MAGEE, HOLLY RENEE<br>ordered CORNELIUS, R. P.        appointed as Appointed Defense Attorney |
| 4/23/2013 | The defendant filed a sworn pauper's oath, and JUDGE MAGEE, HOLLY RENEE<br>ordered MADRID, MARIO appointed as Appointed Defense Attorney |
| 4/23/2013 | MOTION FILED: TRANSFER PRIOR MTS |
| 4/23/2013 | MOTION FILED: NTC OF REINDICTMENT |
| 4/23/2013 | ORDER: GRNT TRANSFER PRIOR MOTIONS |
| 5/2/2013 | BENCH WARRANT ISSUED<br>ISSUED FOR SPN: 01206555 MARTINEZ, CAMELO, Bench Warrant Material Witness For Prosecution |
| 5/3/2013 | MOTION FILED: DISCLOSE EXPRT |
| 5/6/2013 | ORDER: GRANTED DISCLOSE EXPERTS |
| 5/20/2013 | Precept issued to serve copy of veniremen |
| 5/23/2013 | MOTION FILED: STS:NTC OF TRANSLTR |
| 6/3/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 6/3/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, R. P..<br>Interpreter FLORES, MARILU & DE LA TORRE, MAURICO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter: RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:45 AM THE COURT CAME TO ORDER, ALL PARTIES WERE PRESENT AND ANNOUNCED READY.<br><br>10:00 AM THE COURT EXCUSED JUROR #9 AND #59 BY AGREEMENT.<br><br>10:10 AM 85 GOOD MEN AND WOMEN WERE SEATED AS PROSPECTIVE JURORS. THE COURT INSTRUCTED THE JURORS AS TO THE LAW.<br><br>10:15 AM THE COURT BEGAN VOIR DIRE.<br>12:00 NOON THE JURORS WERE EXCUSD FOR LUNCH BREAK.<br>THE FOLLOWING JURORS WERE STRUCK BY AGREEMENT: NOS. 1, 3, 6, 8, 9, 10, 12, 16, 18, 20,23, 26, 27, 29, 30, 36, 39, 47, 48, 49, 50, 51, 55, 59, 61, 63, 65, 66, 67, 71, 73, 75, 77, 79, 80, 81, 82, 85.<br><br>1:00 PM THE COURT CAME TO ORDER AND 83 JURORS WERE SEATED.<br><br>1:10 PM THE FOLLOWING JURORS WERE STRUCK BY FOR STATE CAUSE: NOS. 21, 32, 33, 42.<br><br>1:50 PM THE COURT RECESSED FOR A SHORT BREAK.<br><br>2:05 PM THE COURT CAME TO ORDER. NO. 2 JUROR WAS SWORN AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>3:15 PM JUROR #2 CALUAG, JOSHUA WAS SELECTED AS THE 1ST JUROR. JUROR #4 BOLLOM TOOK THE STAND.<br><br>4:25 PM JUROR #4 WAS EXCUSED FROM THE COURT ROOM AND MATTERS WERE DISCUSSED OUTSIDE HIS PRESENCE.<br><br>4:35 PM JUROR #4 WAS STRUCK BY THE DEFENSE (1ST PEREMPTORY). JUROR #5 JORDAN TOOK THE STAND.<br><br>5:40 PM JUROR #5 WAS SELECTED AS THE 2ND JUROR. JUROR #7 TOOK THE STAND.<br><br>6:10 PM JUROR #7 GONZALEZ WAS STRUCK FOR STATE'S CAUSE.<br><br>COURT STAFF WAS INSTRUCTED TO RETURN @ 8:30 AM. COURT STANDS IN RECESS UNTIL 06-04-13 |
| 6/3/2013 | MOTION FILED: LIMINE |
| 6/3/2013 | ORDER: GRANT LIMINE |
| 6/3/2013 | Continued 6/04/2013 09:00 AM Jury Trial |
| 6/4/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 6/4/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, R. P.. <br> Interpreter HERNANDEZ, ROLANDO <br> TISE, NATALIE & WOOD, JUSTIN appeared for the State. <br> Court Reporter: RODRIGUEZ, MARY ANN <br> Judge Presiding: MAGEE, HOLLY-RENEE <br><br> 9:05 AM THE COURT CAME TO ORDER, ALL PARTIES WERE PRESENT AND ANNOUNCED READY. <br><br> 9:10 AM THE STATE AND DEFENSE AGREED TO STRIKE JUROR #11, WILLIS, RACHEL. JUROR #14 TOOK THE STAND. <br><br> 10:15 AM THE STATE AND DEFENSE AGREED TO STRIKE JUROR #14 KIRKPATRICK. JUROR #13 TOOK THE STAND. <br><br> 11:15 AM THE STATE MOTIONED TO STRIKE JUROR #13, MCPHERSON FOR CAUSE / MOTION DENIED. STATE MADE 1ST PEREMPTIVE STRIKE. <br><br> 11:25 AM JUROR #15 TOOK THE STAND. THE STATE AND DEFENSE AGREED TO STRIKE. <br><br> 11:30 AM THE STATE AND DEFENSE AGREED TO STRIKE JUROR #17. <br><br> THE COURT RECESSED FOR LUNCH BREAK UNTIL 1PM <br><br> 1:05 PM THE COURT CAME TO ORDER, AND JUROR #2, RODRIGUEZ, ADELA TOOK THE STAND. <br><br> 2:00 PM THE DEFENSE MADE THE 3RD PEREMPTIVE STRIKE ON JUROR #22, RODRIGUEZ. JUROR #19 TOOK THE STAND. <br><br> 2:25 PM THE STATE AND DEFENSE AGREED TO STRIKE JUROR #19, MASEMENE, TSEPISO. JUROR #24 TOOK THE STAND. <br><br> 2:30 PM BOTH SIDES AGREED TO STRIKE, JUROR #24, PARAGAS, EDWIN. LEGAL MATTERS WERE DISCUSSED AND JUROR #31, MALONE, RANDI AND JUROR #37,TOWSE-PAULK, DANA WERE STRUCK BY AGREEMENT. <br><br> 2:45 PM THE COURT STAND ADJOURNED UNTIL 06-05-13 @ 8:30 AM. |
| 6/4/2013 | Continued 6/05/2013 09:00 AM Jury Trial |
| 6/5/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

01183

## Harris County Criminal District Docket Sheet

| 6/5/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, R. P. / MADRID, MARIO<br>Interpreter HERNANDEZ, ROLANDO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter: RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:00 AM THE COURT CAME TO ORDER, ALL PARTIES WERE PRESENT AND ANNOUNCED READY.<br>LEGAL MATTERS WERE DISCUSSED.<br><br>9:10 AM JUROR #25, GENAW, LINDA TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>10:00 AM THE STATE STRUCK JUROR #25. JUROR #28, SANCHEZ, OLA TOOK THE STAND.<br><br>10:40 AM THE STATE AND DEFENSE ACCEPTED JUROR #28, SANCHEZ, OLGA.<br><br>10:45 AM JUROR #34, EMERT, ALLYN TOOK THE STAND.<br><br>11:30 AM THE STATE MADE A MOTION AND USED 3RD PEREMPTORY TO STRIKE JUROR #34, EMER,<br>ALLYN<br><br>11:45 AM THE COURT RECESSED FOR LUNCH UNTIL 1PM.<br><br>1:00 PM THE COURT CAME TO ORDER AND LEGAL MATTERS WERE DISCUSSED.<br><br>1:05 PM JUROR #35, JOHNSON, MARCELLA TOOK THE STAND.<br><br>1:55 PM THE DEFENSE MADE A MOTION AND USED 4TH PEREMPTORY TO STRIKE JUROR<br>#35,JOHNSON MARCELLA. JUROR #38, BROWN, SCOTT TOOK THE STAND<br><br>2:30 PM THE STATE EXERCISED 4TH PEREMPTORY STRIKE. JUROR #40, MONTGOMERY, WAYNE<br>TOOK THE STAND<br><br>3:35 PM THE STATE AND DEFENSE ACCEPTED MONTGOMERY, WAYNE AS JUROR #4<br><br>MATTERS WERE DISCUSSED. THE STATE AND DEFENSE AGREED TO STRIKE JUROR #52 LOWRANCE,<br>MICHAEL AND #54 QUINTANILLA, ELSY .<br><br>3:55 PM THE COURT STAFF WAS INSTRUCTED BY THE COURT TO RETURN 06-06-13 @ 8:30AM. |
| 6/5/2013 | Continued 6/06/2013 09:00 AM Jury Trial |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 6/6/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, R. P. & MADRID, MARIO Interpreter:HERNANDEZ, ROLANDO & FLORES, MARILU TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE<br><br>AT 9:03AM COURT CAME TO ORDER, ALL PARTIES PRESENT AND READY, AT THIS TIME JUROR #41 MCDONALD WAS SEATED FOR INDIVIDUAL VOIR DIRE.<br><br>AT 9:41AM ST MADE A MOTION TO EXCUSE JUROR#41 FOR CAUSE WHICH WAS DENIED BY THE COURT. AT 9:43AM STATE EXERCISED 5TH PEREMPTORY STRIKE AND EXCUSED JUROR# 41 MCDONALD.<br><br>AT 9:48AM JUROR #44 CLARK WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 9:50AM BOTH SIDES AGREED TO STRIKE JUROR #44 CLARK.<br><br>AT 9:52AM JUROR #45 CHAMBERS WAS SEATED AND VOIR DIRE BEGAN. AT 10:10AM ST MADE A MOTION TO STRIKE JUROR FOR CAUSE. AT 10:23AM JUROR #45 WAS EXCUSED AND MATTERS WERE ADDRESSED OUTSIDE OF HER PRESENCE. AT 10:30AM JUROR #45 RETURNED TO OPEN COURT AND QUESTIONNING CONTINUED; AT THIS TIME THE COURT GRANTED ST'S MOTION AND EXCUSED JUROR #45 CHAMBERS.<br><br>AT 10:33AM JUROR #46 BROWN TOOK THE STAND AND VOIR DIRE BEGAN. AT 11:22AM JUROR #46 BROWN WAS EXCUSED BY DEFENSE 5TH PEREMPTORY STRIKE.<br><br>AT 11:26AM THE COURT RECCESSED FOR LUNCH.<br><br>AT 1:01PM ALL PARTIES PRESENT AND JUROR #53 ZINK WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 1:57PM JUROR#53 ZINK WAS EXCUSED FOR A MOMENT. AT 2:00PM JUROR #53 ZINK RETURNED TO OPEN COURT, AT THIS TIME DEFENSE USED 6TH PEREMPTORY STRIKE TO EXCUSE HIM.<br><br>AT 2:03PM JUROR #57 PEREZ TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN. AT 2:06PM STATE MADE A MOTION TO STRIKE JUROR #57 PEREZ FOR CAUSE, AT THIS TIME THE COURT GRANTED STATE'S MOTION.<br><br>AT 2:17PM BOTH JUROR #58 BALL AND JUROR #60 MIXON WERE EXCUSED BY AGREEMENT.<br><br>AT 2:22PM COURT INSTRUCTED EVERYONE TO RETURN 6/7/13 BY 9AM, AT THIS TIME COURT ADJOURNED. |
| 6/6/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 6/6/2013 | Reset By Court, 6/07/2013 09:00 AM Jury Trial |
| 6/7/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

01185

## Harris County Criminal District Docket Sheet

| 6/7/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, R. P..<br>Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>AT 9:08AM ALL PARTIES PRESENT AND READY. AT THIS TIME JUROR #58 CHAYKOSKY TOOK THE STAND FOR INDIVIDUAL VOIR DIRE. AT 9:26AM BOTH SIDES AGREED AND STRUCK JUROR #58.<br><br>AT 9:29AM JUROR #62 DENMAN WAS SEATED AND VOIR DIRE BEGAN. AT 10:13AM JUROR #62 WAS EXCUSED SO MATTERS COULD BE DISCUSSED. AT 10:15AM JUROR #62 DENMAN RETURNED TO OPEN COURT, AT THIS TIME THE STATE USED THEIR 6TH PEREMPTORY STRIKE.<br><br>AT 10:16AM THE COURT TOOK A BREAK.<br><br>AT 10:19AM JUROR #70 ANDERSON WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 11:13 JUROR WAS EXCUSED AND MATTERS WERE DISCUSSED. AT 11:14AM JUROR #70 ANDERSON RETURNED TO OPEN COURT, AT THIS TIME THE DEFENSE USED THEIR 7TH PEREMPTORY STRIKE.<br><br>AT 11:17AM JUROR #69 RIVERA TOOK THE STAND FOR INDIVIDUAL VOIR DIRE.  AT 11:40AM JUROR WAS EXCUSED AND MATTERS WERE DISCUSSED. AT 11:42AM VOIR DIRE WITH JUROR #69 RIVERA CONTINUED. At 12:06PM JUROR WAS EXCUSED AND MATTERS WERE DISCUSSED OUTSIDE HER PRESENCE. AT 12:12PM JUROR #69 RIVERA RETURNED TO OPEN COURT, AT THIS TIME THE COURT GRANTED STATE'S CHALLENGE FOR CAUSE.<br><br>AT 12:14PM THE COURT TOOK A BREAK.<br><br>AT 12:17PM JUROR #64 PYPER WAS SEATED FOR INDIVIDUAL VOIR DIRE. AT 1:18PM JUROR WAS EXCUSED AND MATTERS WERE ADDRESSED. AT 1:21PM JUROR #64 PYPER RETURNED TO OPEN COURT, AT THIS TIME BOTH SIDES ACCEPTED HER AND THE COURT ADMONISHED HER AS TO THE LAW.<br><br>AT 1:24PM THE COURT TOOK A SHORT BREAK.<br><br>AT 1:26PM JUROR #72 BOWERS WAS SEATED AND VOIR DIRE BEGAN. AT 2:06PM JUROR WAS EXCUSED FOR A MOMENT. AT 2:07PM JUROR #72 BOWERS RETURNED TO OPEN COURT AND AT THIS TIME STATE USED THIER 7TH PEREMPTORY STRIKE TO EXCUSE HIM.<br><br>AT 2:10PM COURT GAVE INSTRUCTIONS TO BOTH PARTIES TO RETURN 6/10/13 AT 9AM AND THEN ADJOURNED. |
| 6/7/2013 | Reset By Court, 6/10/2013 09:00 AM Jury Trial |

## Harris County Criminal District Docket Sheet

| 6/10/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE |
|---|---|

9:05 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.

9:10 AM JUROR #43 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

10:10 AM THE DEFENSE USED 8TH PEREMPTORY TO STRIKE JUROR #43. LEGAL MATTERS WERE DISCUSSED.A

10:30 AM JUROR #76 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

11:15 AM THE STATE AND DEFENSE ACCEPTED JUROR #76.

JUROR 1122 IN THE NEXT PANEL IS EXCUSED BY THE STATE AND DEFENSE.

11:25 AM JUROR #78 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

11:30 AM THE STATE AND DEFENSE AGREED TO STRIKE FOR CAUSE. THE COURT RECESSED FOR LUNCH.

1:00 PM THE COURT CAME TO ORDER. THE STATE AND DEFENSE AGREED TO STRIKE FOR CAUSE JUROR #102 & JUROR #88.

1:05 PM JUROR #83 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

2:05 PM THE STATE AND DEFENSE AGREED TO STRIKE FOR CAUSE.

2:10 PM JUROR #84 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

3:10 PM THE STATE AND THE DEFENSE AGREED TO ACCEPT JUROR #84.

COURT ADJOURNED UNTIL 06-11-13 9:00 AM

| 6/10/2013 | Continued 6/11/2013 09:00 AM Jury Trial |
|---|---|

## Harris County Criminal District Docket Sheet

| 6/11/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE

10:00 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  LEGAL MATTERS WERE DISCUSSED.

10:10 AM THE STATE AND DEFENSE AGREED TO EXCUSE JUROR #86 UNTIL 06-12-2013 @ 9AM

10:25 AM 65 GOOD MEN AND WOMEN WERE SEATED AS PROSPECTIVE JURORS.  THE COURT BEGAN ADMONISHED THE PANEL AS TO THE LAW.

12:10 PM THE JURY PANEL RECESSED FOR LUNCH UNTIL 1:00 PM.  THE STATE AND DEFENSE MADE CAUSE/AGREEMENTS.

1:15 PM THE COURT CAME TO ORDER AND THE JURY PANEL WAS SEATED.  INDIVIDUAL JURORS WERE CALLED TO THE BENCH FOR QUESTIONING BY BOTH SIDES.

1:50 PM THE STATE AND DEFENSE AGREED TO EXCUSE THE FOLLOWING JURORS FOR CAUSE, NOS: 86,87, 88, 90, 94, 100, 102, 103, 104, 105, 106, 108, 114, 116, 118, 119, 120, 121, 122, 123, 124, 125, 126, 131, 133, 134, 135, 138, 142, 144, 145, 146, 147.  THE STATE MADE MOTIONS AND THE COURT GRANTED 8TH PEREMPTORY STRIKE FOR JUROR #94 AND 9TH PEREMPTORY STRIKE FOR JUROR #120.

2:00 PM JUROR #89 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

2:55 PM THE COURT GRANTED THE STATE'S 10TH PEREMPTORY FOR JUROR #89.

3:00 PM JUROR #91 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

3:45 PM THE DEFENSE MOTIONED AND COURT GRANTED 9TH PEREMPTORY STRIKE FOR JUROR #91.

3:55 PM JUROR #92 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.

4:35 PM THE DEFENSE STRUCK JUROR #92 - 11TH PEREMPTORY.

4:45 PM STAND ADJOURNED UNTIL 06-12-13 @ 9AM |
| 6/11/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 6/11/2013 | Reset By Court, 6/12/2013 09:00 AM Jury Trial |

**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 6/12/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO<br>Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>8:50 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY. LEGAL MATTERS WERE DISCUSSED.<br><br>8:55 AM JUROR #86 CAME BEFORE THE BENCH AND THE COURT ADMONISHED HIM AS TO THE LAW REGARDING HIS ABSENCE FROM THE COURT 06-11-2013 @ 9:30 AM<br><br>9:10 AM JUROR #93 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>10:20 AM THE STATE AND DEFENSE ACCEPTED JUROR #93.<br><br>10:30 AM JUROR #95 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.  10:35 AM JUROR #95 RETIRED TO THE HALL AND LEGAL MATTERS WERE DISCUSSED.<br><br>10:40 AM JUROR #95 RETURNED TO THE STAND AND VOIR DIRE RESUMED.<br><br>11:00 AM DEFENSE MOTION FOR CAUSE WAS GRANTED BY THE COURT ON JUROR #95.<br><br>11:00 AM JUROR #96 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>12:00 NOON THE DEFENSE MOTIONED AND THE COURT GRANTED STRIKE FOR CAUSE OF JUROR #96.<br><br>12:05 PM JUROR #97 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>1:00 PM THE STATE AND DEFENSE ACCEPTED JUROR #97 AS THE 9TH JUROR.<br><br>1:05 PM THE COURT RECESSED FOR 30 MINUTE LUNCH.<br><br>1:35 PM JUROR #98 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>2:15 PM THE STATE USED 10TH PEREMPTORY CHALLENGE FOR JUROR #98.<br><br>2:20 PM JUROR #99 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>2:30 PM JUROR #99 WAS STRUCK FOR CAUSE BY THE COURT.<br><br>2:35 PM JUROR #101 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>2:40 PM THE COURT GRANTED MOTION TO STRIKE JUROR #101.<br><br>2:45 PM JUROR #107 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>3:30 PM THE STATE ACCEPTED JUROR #107 AND THE DEFENSE EXERCISED 10TH PEREMPTORY. |
| 6/12/2013 | Reset By Court, 6/13/2013 09:00 AM Jury Trial |
| 6/13/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

01189

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 6/13/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:00 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY. MATTERS WERE DISCUSSED.<br><br>9:05 AM JUROR #109 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>10:05 AM THE DEFENSE MOTIONED TO STRIKE JUROR #109 AND THE COURT GRANTED MOTION.<br><br>10:10 AM JUROR #110 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>10:45 AM THE STATE AND DEFENSE ACCEPTED JUROR #110 AS JUROR #10.<br><br>10:50 AM JUROR #111 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>11:05 AM THE STATE MOTIONED FOR CAUSE AND THE COURT GRANTED THE MOTION FOR CAUSE.<br><br>11:15 AM JUROR #112 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN<br><br>11:35 AM STATE MOTIONED TO STRIKE JUROR #112 FOR CAUSE. THE COURT GRANTED MOTION.<br><br>THE COURT RECESSED FOR LUNCH.<br><br>1:10 PM THE COURT CAME TO ORDER. JUROR #113 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>1:25 PM THE STATE AND THE DEFENSE AGREED TO STRIKE JUROR #113<br><br>1:30 PM JUROR #115 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>2:00 PM THE STATE EXCERCISED #11TH PEREMPTORY STRIKE ON JUROR #115<br><br>2:05 PM JUROR #117 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>2:20 PM THE DEFENSE MOTIONED TO STRIKE JUROR #117 FOR CAUSE. THE COURT GRANTED THE MOTION.<br><br>2:25 PM JUROR #127 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>3:25 PM THE DEFENSE MOTIONED TO STRIKE JUROR #127 FOR CAUSE AND THE COURT GRANTED THE MOTION.<br><br>3:30 PM THE COURT ADJOURNED UNTIL FRIDAY, 06-14-13 @ 8:30 AM |
| 6/13/2013 | Continued 6/14/2013 09:00 AM Jury Trial |
| 6/14/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

01190

**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 6/14/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:00 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  MATTERS WERE DISCUSSED.<br><br>9:10 AM JUROR #128 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>9:55 AM THE STATE ACCEPTED JUROR #128 AND THE DEFENSE MOTIONED TO EXERCISE PEREMPTROY STRIKE.  THE COURT GRANTED MOTION.<br><br>10:00 AM JUROR #129 TO THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>10:45 AM THE DEFENSE MOTIONED TO STRIKE JUROR #129 FOR CAUSE.  THE COURT GRANTED THE MOTION.<br><br>10:50 AM JUROR #130 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>11:10 AM THE STATE MOTIONED TO STRIKE JUROR #130 FOR CAUSE AND THE COURT GRANTED THE MOTION.<br><br>11:15 AM JUROR #132 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>11:20 AM THE STATE MOTIONED TO STRIKE JUROR #132 FOR CAUSE.  THE COURT GRANTED THE MOTION.<br><br>11:40 THE COURT RECESSED FOR LUNCH.<br><br>12:20 PM THE COURT CAME TO ORDER, ALL PARTIES WERE PRESENT AND ANNOUNCED READY.<br><br>12:25 PM JUROR #136 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>1:20 PM STATE MOTION FOR 12TH PEREMPTORY STRIKE ON JUROR #136.  THE COURT GRANTED THE STRIKE.<br><br>1:25 PM JUROR #137 TORRES, LEONARD TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>2:20 PM THE STATE AND DEFENSE ACCEPTED JUROR #137.<br><br>THE COURT RECESSED FOR SHORT BREAK.<br><br>2:45 PM JUROR #139 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>3:35 PM THE DEFENSE EXCERCISED 13TH PEREMPTORY STRIKE.  THE COURT GRANTED STRIKE.<br><br>3:40 PM JUROR #140 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>4:35 PM THE DEFENSE EXERCISED 14TH PEREMPTORY STRIKE FOR JUROR #140.<br><br>THE COURT ADJOURNED UNTIL MONDAY @ 9AM. |
| 6/14/2013 | MOTION FILED: FUND OUT-ST WITNESS |
| 6/14/2013 | MOTION FILED: FUND OUT-ST WITNESS |
| 6/14/2013 | ORDER: GRNT OUT-ST WITNESS $2,374 |
| 6/14/2013 | ORDER: GRNT OUT-ST WITNESS $2,215 |
| 6/14/2013 | Continued 6/17/2013 09:00 AM Jury Trial |
| 6/17/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

: 01191

**Harris County Criminal District Docket Sheet**

| | |
|---|---|
| 6/17/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:00 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY. MATTERS WERE DISCUSSED.<br><br>9:10 AM JUROR #141 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>9:35 AM THE COURT RECESSED FOR A SHORT BREAK.<br><br>9:55 AM THE COURT CAME TO ORDER AND JUROR #141 TOOK THE STAND AND INDIVIDUAL VOIR CONTINUED.<br><br>10:25 PM THE STATE AND THE DEFENSE ACCEPTED JUROR #141 AS JUROR #12.<br><br>THE COURT RECESSED FOR A SHORT BREAK.<br><br>11:45 AM THE COURT CAME TO ORDER. JUROR #143 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>11:30 AM THE STATE AND THE DEFENSE ACCEPTED JUROR #143 AS THE 1ST ALTERNATE JUROR.<br><br>11:40 AM JUROR #148 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>12:25 PM THE STATE ACCEPTED JUROR #148 AND THE DEFENSE USED 15TH PEREMPTORY STRIKE<br><br>12:30 PM JUROR #149 TOOK THE STAND AND INDIVIDUAL VOIR DIRE BEGAN.<br><br>1:20 PM THE STATE AND THE DEFENSE ACCEPTED JUROR #149 AS THE 2ND ALTERNATE JUROR.<br><br>1:30 PM THE COURT STAND ADJOURNED UNTIL WEDNESDAY, 06-19-13 @ 9AM |
| 6/17/2013 | Continued 6/18/2013 09:00 AM Jury Trial |
| 6/18/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 6/18/2013 | Continued 6/19/2013 09:00 AM Jury Trial |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 6/19/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO<br>Interpreter:HERNANDEZ, ROLANDO & MARILU FLORES<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:15 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY FOR THE MOTIONS HEARING.  LEGAL MATTERS WERE DISCUSSED.<br><br>9:45 AM THE STATE BEGAN OPENING STATEMENT.<br><br>9:50 AM THE STATE BEGAN TESTIMONY.<br><br>10:35 AM THE COURT RECESSED FOR A SHORT BREAK.<br><br>10:50 AM THE STATE'S TESTIMONY CONTINUED.<br><br>11:40 AM THE STATE BEGAN CLOSING.<br><br>11:45 AM THE DEFENSE BEGAN CLOSING. |
| 6/19/2013 | MOTION FILED: NTC INT USE PRIORS |
| 6/19/2013 | Reset By Agreement Of Both Parties, 7/03/2013 09:00 AM Jury Trial |
| 6/20/2013 | MOTION FILED: PYMT OUT-ST WITNESS |
| 6/20/2013 | ORDER: GRANT PYMT OUT-ST WITNESS |
| 7/3/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel MADRID, MARIO<br>Interpreter:MARILU FLORES<br>TISE, NATALIE appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>1:00 PM ALL PARTIES WERE PRESENT AND ANNOUNCED READY FOR THE MOTIONS HEARING.<br><br>RULINGS WERE MADE BY THE COURT.<br><br>1:30 PM ALL PARTIES WERE INSTRUCTED TO RETURN MONDAY, 07-08-13 @ 10AM.<br><br>LEGAL MATTERS WERE DISCUSSED. |
| 7/3/2013 | Reset By Operation Of Law, 7/08/2013 09:00 AM Jury Trial |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 7/8/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO<br>Interpreter:MARILU FLOREs & HERNANDEZ,ROLANDO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>10:15 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  LEGAL MATTERS WERE DISCUSSED.<br><br>10:25 AM THE INDICTMENT WAS READ AND THE DEFENDANT WAS ARRAIGNED OUTSIDE THE PRESENCE OF THE JURY.<br><br>10:30 AM LEGAL MATTERS WERE DISCUSSED.<br><br>10:45 AM  THE JURY WAS SWORN AND SEATED.  THE STATE READ THE INDICTMENT.  THE WITNESSES WERE SWORN AND THE RULE WAS INVOKED.  THE DEFENDANT PLED "NOT GUILTY".  THE STATE BEGAN OPENING STATEMENT.<br><br>11:05 AM THE DEFENSE BEGAN OPENING STATEMENT.<br><br>11:15 AM THE STATE BEGAN TESTIMONY.<br><br>12:15 PM THE JURY RETIRED AND THE COURT RECESSED FOR SHORT LUNCH BREAK.<br><br>1:40 PM THE STATE RESUMED TESTIMONY.<br><br>2:45 PM THE COURT RECESSED FOR A BREAK.<br><br>3:10 PM THE COURT CAME TO ORDER THE JURY WAS SEATED AND THE STATE CONTINUED TESTIMONY<br><br>5:25 PM THE COURT STAND ADJOURNED UNTIL TUESDAY, 07-09-13 @ 10AM |
| 7/8/2013 | Reset By Operation Of Law, 7/09/2013 09:00 AM Jury Trial |
| 7/9/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 7/9/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO<br>Interpreter:MARILU FLOREs & HERNANDEZ,ROLANDO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>10:15 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.<br><br>10:20 AM THE JURY WAS SEATED AND THE STATE RESUMED TESTIMONY.<br><br>11:55 AM THE JURY RETIRED AND THE COURT RECESSED FOR LUNCH.<br><br>1:20 PM THE COURT CAME TO ORDER, THE JURY WAS SEATED AND THE STATE CONTINUED TESTIMONY.<br><br>2:30 PM THE JURY RETIRED TO THE JURY ROOM.  LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY. |
| | 3:05 PM THE JURY WAS SEATED AND THE STATE CONTINUED TESTIMONY.<br><br>4:30 PM THE COURT STAND ADJOURNED UNTIL WEDNESDAY, 07-10-13 @ 10AM. |
| 7/9/2013 | Reset By Operation Of Law, 7/10/2013 09:00 AM Jury Trial |

9/1/2015 3:05:52 PM

01194

## Harris County Criminal District Docket Sheet

| 7/10/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
|---|---|
| 7/10/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO Interpreter:MARILU FLOREs & HERNANDEZ,ROLANDO TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE |
| | 10:15 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  THE JURY WAS SEATED AND THE STATE BEGAN TESTIMONY. |
| | 11:30 AM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED OUTSIDE THEIR PRESENCE. |
| | 11:50 AM THE JURY WAS SEATED AND THE STATE RESUMED TESTIMONY. |
| | 12:10 PM THE COURT RECESSED FOR LUNCH |
| | 1:35 PM THE COURT CAME TO ORDER, THE JURY WAS SEATED AND THE STATE CONTINUED TESTIMONY. |
| | 2:30 PM THE JURY RETIRED AND THE COURT RECESSED FOR A SHORT BREAK. |
| | 2:50 PM THE JURY WAS SEATED.  THE STATE RESTED AND THE DEFENSE BEGAN CROSS-EXAMINATION. |
| | 4:30 PM THE COURT RECESSED FOR A SHORT BREAK. |
| | 4:45 PM THE COURT CAME TO ORDER, THE JURY WAS SEATED AND THE STATE CONTINUED TESTIMONY. |
| | 5:30 PM THE JURY RETIRED AND MATTERS WERE DISCUSSED. |
| | 5:35 PM THE COURT STAND ADJOURNED UNTIL THURSDAY, 07-10-13 @ 9AM |
| 7/10/2013 | Reset By Operation Of Law, 7/11/2013 09:00 AM Jury Trial |
| 7/11/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 7/11/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE |
| | 10:10 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  THE JURY WAS SEATED AND THE STATE BEGAN TESTIMONY. |
| | 10:35 AM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED OUTSIDE THEIR PRESENCE. |
| | 10:50 AM THE JURY WAS SEATED AND THE STATE RESUMED TESTIMONY. |
| | 12:20 PM THE COURT RECESSED FOR LUNCH UNTIL 2:00 PM |
| | 2:15 PM THE COURT CAME TO ORDER, THE JURY WAS SEATED AND THE STATE CONTINUED TESTIMONY. |
| | 3:30 PM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED. |
| | 3:40 PM THE JURY WAS SEATED AND TESTIMONY CONTINUED. |
| | 4:40 PM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED. |
| | 4:50 PM THE JURY WAS SEATED AND INSTRUCTED To RETURN FRIDAY, 07-12-13 @ 10AM.  LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY. |
| 7/11/2013 | Reset By Operation Of Law, 7/12/2013 09:00 AM Jury Trial |

01195

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 7/12/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 7/12/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE <br><br> 10:50 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY <br><br> 12:35 PM THE JURY RECESSED FOR LUNCH. <br><br> 2:00 PM THE JURY RETURNED TO THE JURY ROOM. <br><br> 2:30 PM THE JURY WAS SEATED AND INSTRUCTED TO RETURN MONDAY, 07-15-13 @9 AM.  LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY. <br><br><br><br><br> 10:35 AM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED OUTSIDE THEIR PRESENCE. |
| 7/12/2013 | Reset By Operation Of Law, 7/15/2013 09:00 AM Jury Trial |
| 7/15/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 7/15/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:10 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY.<br><br>9:15 AM THE JURY WAS SEATED AND THE COURT READ THE CHARGE.<br><br>9:45 AM THE STATE BEGAN CLOSING STATEMENTS.<br><br>10:05 AM THE DEFENSE BEGAN CLOSING STATEMENTS.<br><br>11:00 AM THE STATE BEGAN FINAL CLOSING STATEMENTS.<br><br>11:30 AM THE JURY RETIRED TO DELIBERATE GUILT OR INNOCENCE.<br><br>12:15 PM THE JURY RECESSED FOR LUNCH.<br><br>12:45 PM THE JURY RESUMED DELIBERATION.<br><br>1:55 PM THE JURY WAS SEATED AND THE COURT REPORTER READ BACK TRANSCRIPT.<br><br>2:00 PM THE JURY RETIRED AND CONTINUED TO DELIBERATE.<br><br>4:20 PM THE JURY WAS SEATED.  THE JURY FOUND THE DEFENDANT GUILTY.  THE JURY WAS POLLED AND THE VOTE WAS UNANIMIOUS.<br><br>4:25 PM THE JURY AND STAFF WERE INSTRUCTED TO RETURN @ 10AM, TUESDAY, 07/16/13 |
| 7/15/2013 | Reset By Operation Of Law, 7/16/2013 09:00 AM Jury Trial |
| 7/16/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 7/16/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE

9:45 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY. LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY.

10:30 AM THE JURY WAS SEATED AND THE STATE BEGAN PUNISHMENT OPENING STATEMENT.

10:35 AM THE DEFENSE WAIVED PUNISHMENT OPENING STATEMENT. THE WITNESSES WERE SWORN AND THE STATE BEGAN PUNISHMENT TESTIMONY.

11:30 AM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED OUTSIDE THEIR PRESENCE.

11:40 AM THE JURY WAS SEATE AND THE STATE RESUMED TESTIMONY.

12:30 PM THE JURY RETIRED AND THE COURT RECESSED FOR LUNCH.

2:00 PM THE COURT CAME TO ORDER AND THE JURY WAS SEATED. THE STATE RESUMED PUNISHMENT TESTIMONY.

2:20 PM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED.

4:15 PM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED OUTSIDE THEIR PRESENCE.

4:20 PM THE COURT RECESSED FOR A SHORT BREAK.

4:35 PM THE COURT CAME TO ORDER, THE JURY WAS SEATED AND THE DEFENSE BEGAN CROSS-EXAM.

4:40 PM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED. THE COURT RECESSED FOR A SHORT BREAK.

5:00 PM THE JURY WAS SEATED AND THE DEFENSE CONTINUED CROSS-EXAM.

5:05 pm THE JURY AND THE COURT WERE INSTRUCTED TO RETURN 07-17-13 @ 10 AM. |
| 7/16/2013 | Reset By Operation Of Law, 7/17/2013 09:00 AM Jury Trial |
| 7/17/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

**Harris County Criminal District Docket Sheet**

| 7/17/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO<br>Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>10:00 AM ALL PARTIES WERE PRESENT AND ANNOUNCED READY.  LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY.  THE WITNESSES WERE SWORN AND THE RULE WAS INVOKED.<br><br>10:15 AM THE JURY WAS SEATED AND THE STATE CONTINUED PUNISHMENT TESTIMONY.<br><br>10:30 AM THE JURY WAS SEATED AND THE STATE BEGAN PUNISHMENT OPENING STATEMENT.<br><br>12:20 PM THE JURY RETIRED AND THE COURT RECESSED FOR LUNCH.<br><br>1:50 PM THE COURT CAME TO ORDER AND THE JURY WAS SEATED AND THE DEFENSE RESUMED CROSS-EXAM PUNISHMENT TESTIMONY.<br><br>3:05 PM THE JURY RETIRED AND THE COURT RECESSED FOR A SHORT BREAK.<br><br>3:20 PM THE JURY WAS SEATED AND THE STATE RESUMED PUNISHMENT TESTIMONY.<br><br>4:15 PM THE JURY RETIRED AND LEGAL MATTERS WERE DISCUSSED.<br><br>4:20 PM THE COURT RECESSED FOR A BREAK.<br><br>4:50 PM THE JURY WAS SEATED AND TESTIMONY CONTINUED.<br><br>5:05 PM THE JURY WAS INSTRUCTED TO RETURN 10 AM, THURSDAY, 07-18-13.  THE JURY RETIRED. LEGAL MATTERS WERE DISCUSSED.  THE COURT WAS INSTRUCTED TO RETURN @ 9:30 AM.<br><br>5:10 PM THE COURT STAND ADJOURNED. |
| --- | --- |
| 7/17/2013 | Reset By Operation Of Law, 7/18/2013 09:00 AM Jury Trial |
| 7/18/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 7/18/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO<br>Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>10:40 AM THE COURT CAME TO ORDER AND ALL PARTIES WERE PRESENT AND ANNOUNCED READY.<br>LEGAL MATTERS WERE DISCUSSED OUTSIDE THE PRESENCE OF THE JURY.<br><br>10:55 AM THE JURY WAS SEATED AND THE DEFENSE BEGAN PUNISHMENT TESTIMONY.<br><br>12:45 PM THE JURY RETIRED AND THE COURT RECESSED FOR LUNCH<br><br>2:15 PM THE COURT CAME TO ORDER AND LEGAL MATTERS WERE DISCUSSED OUTSIDE THE<br>PRESENCE OF THE JURY.<br><br>2:30 PM THE JURY WAS SEATED AND DEFENSE PUNISHMENT CONTINUED.<br><br>3:05 PM THE DEFENSE REST AND THE COURT READ THE CHARGE.<br><br>3:15 PM THE JURY RETIRED AND COURT RECESSED FOR A BREAK.<br><br>3:30 PM THE JURY WAS SEATED AND THE STATE WAIVED THE RIGHT TO OPEN WITH CLOSING<br>STATEMENTS. THE DEFENSE BEGAN CLOSING.<br><br>4:20 PM THE STATE BEGAN FINAL CLOSING.<br><br>5:20 PM THE JURY RETIRED TO DELIBERATE PUNISHMENT.<br><br>6:10 PM THE JURY WAS SEATED. THE COURT INSTRUCTED THE JURY REGARDING THE SEQUESTER.<br>THE COURT STANDS ADJOURNED UNTIL FRIDAY, 07-18-13 @ 8:30AM |
| 7/18/2013 | Reset By Operation Of Law 7/19/2013 09:00 AM Jury Trial |
| 7/19/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel CORNELIUS, R. P.. |
| 7/19/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNELIUS, SKIP & MADRID, MARIO<br>Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO<br>TISE, NATALIE & WOOD, JUSTIN appeared for the State.<br>Court Reporter:RODRIGUEZ, MARY ANN<br>Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:20 AM THE JURY RETIRED TO THE JURY ROOM TO BEGAN DELIBERATING.<br><br>12:45 PM THE JURY RECESSED FOR LUNCH.<br><br>2:00 PM THE JURY RETIRED TO RESUME DELIBERATIONS.<br><br>4:30 PM THE JURY WAS SEATED AND THE VERDICT WAS READ: SPECIAL ISSUES: #1=YES, #2=YES,<br>#3=NO.<br><br>4:33 PM THE JURY WAS THANKED AND EXCUSED FROM FURTHER SERVICE.<br><br>4:35 PM THE COURT WILL ASSESS PUNISHMENT MONDAY, 07-22-13. |
| 7/19/2013 | Continued 7/22/2013 09:00 AM Sentencing |
| 7/22/2013 | The defendant filed a sworn pauper's oath, and JUDGE MAGEE, HOLLY RENEE<br>ordered HILL, WAYNE T. appointed as Appointed Atty On Appeal |
| 7/22/2013 | Appeal BOND SET AT $0<br>BAIL OPTIONS ORDERED: $0 APPEAL BOND PER JGE MAGEE |
| 7/22/2013 | ORDER: APPT COUNSEL ART 11.071 |
| 7/22/2013 | ORDER: PREP STMT FACT APPEAL GRNTD |
| 7/22/2013 | ORDER: DEF REMAIN ON ORIGINAL BOND |
| 7/22/2013 | Delivery Order Issued<br>Location: Texas Department of Criminal Justice awaiting mandate |
| 7/22/2013 | Notice of Appeal Filed |

01200

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 7/22/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel CORNEILUS, SKIP & MADRID, MARIO Interpreter:MARILU FLORES & HERNANDEZ,ROLANDO TISE, NATALIE & WOOD, JUSTIN appeared for the State. Court Reporter:RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE<br><br>9:05 AM THE COURT CAME TO ORDER ALL PARTIES WERE PRESENT AND ANNOUNCED READY.<br><br>THE COURT SENTENCED THE DEFENDANT TO DEATH.<br><br>9:09 AM THE COURT THANKED AND EXCUSED THE STATE AND DEFENSE. |
| 7/22/2013 | Continued 9/20/2013 09:00 AM Motion for New Trial Hearing |
| 7/26/2013 | ORDER: ATTORNEY FEE VOUCHER FEE AMOUNT: $60,000 |
| 7/29/2013 | ORDER: ATTORNEY FEE VOUCHER FEE AMOUNT: $88,266 |
| 7/30/2013 | Assigned to Court of Criminal Appeals |
| 8/7/2013 | ORDER: CCA #AP-77,025 |
| 8/19/2013 | MOTION FILED: NEW TRIAL |
| 8/21/2013 | MOTION FILED: SUPPLEMENT NEW TRIAL |
| 9/9/2013 | ORDER: ATTORNEY FEE VOUCHER FEE AMOUNT: $1,682 |
| 9/12/2013 | MOTION FILED: LIVE WITNS EVID HRNG |
| 9/12/2013 | Researched, 5/27/2015 09:00 AM Other |
| 9/16/2013 | ORDER: DENIED LIVE WIT EVID HEARIN |
| 9/19/2013 | MOTION FILED: FOR NEW TRIAL |
| 9/20/2013 | Defendant CRUZ-GARCIA, OBEL appeared with counsel HILL, WAYNE T.. |
| 9/20/2013 | Defendant CRUZ-GARCIA, OBEL appeared in person with Counsel HILL, WAYNE TISE, NATALIE appeared for the State. Court Reporter: RODRIGUEZ, MARY ANN Judge Presiding: MAGEE, HOLLY RENEE<br><br>10:30 AM THE COURT CAME TO ORDER, ALL PARTIES WERE PRESENT AND ANNOUNCED READY. THE DEFENDANT BEGAN MOTION FOR NEW TRIAL HEARING.<br><br>11:30 AM MOTION OF NEW TRIAL WAS DENIED. |
| 9/20/2013 | Continued 9/12/2013 09:00 AM Other |
| 1/29/2014 | MOTION FILED: EX PARTE FOR FUNDS |
| 1/29/2014 | ORDER: GRNT EXPARTE FOR FUNDS |
| 1/29/2014 | ORDER: GRNT JUROR QUESTIONAIRE |
| 1/29/2014 | ORDER: GRNT COPY OF SEALED 172-173 |
| 2/6/2014 | BENCH WARRANT RETURN ISSUED FOR SPN: 01206555 MARTINEZ, CAMELO, Bench Warrant Material Witness For Defendant |
| 4/29/2014 | ORDER: EX PARTE TRL TRNSCRPT GRNTD |
| 5/21/2014 | ORDER: ATTORNEY FEE VOUCHER FEE AMOUNT: $1,306 |

## Harris County Criminal District Docket Sheet

| | |
|---|---|
| 5/21/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $1,750 |
| 6/24/2014 | ORDER: GRNT EXPARTE TRANS SPA |
| 9/22/2014 | MOTION FILED: PAY INVESTI MAX |
| 9/22/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $20,173 |
| 9/22/2014 | ORDER: 0PAY INVESTI MAX 20173 |
| 9/23/2014 | ORDER: SEAL DEF.EXHIBIT 1 GRANTED |
| 10/9/2014 | MOTION FILED: PAY INVESTI MAX |
| 10/9/2014 | ORDER: GRNT PAY INVEST 1,025.00 |
| 10/9/2014 | ORDER: ATTORNEY FEE VOUCHER<br>FEE AMOUNT: $1,025 |
| 4/20/2015 | MOTION FILED: UNOP 90EXT ST WRTAPP |
| 4/28/2015 | MOTION FILED: UN OPOSSED 90DYS EXT |
| 4/28/2015 | MOTION FILED: INTIAL 90DYS EXT |
| 4/28/2015 | MOTION FILED: BRADY V MARYLAND |
| 4/28/2015 | ORDER: GRNT DISCLOSURE BRADY V MAR |
| 4/28/2015 | ORDER: GRNT 90 DAYS EXT HAB APP |
| 4/30/2015 | MOTION FILED: DISCL BRDY V MARYLAN |
| 5/11/2015 | MOTION FILED: REQ FOR DISCLOSURE |
| 5/27/2015 | Reset By Operation Of Law 6/10/2015 09:00 AM Other |
| 6/10/2015 | Defendant CRUZ-GARCIA, OBEL appeared with counsel HILL, WAYNE T.. |

THE STATE OF TEXAS
VS.
**OBEL CRUZ-GARCIA**

SPN: 01134368
DOB: WM 07/08/1967
DATE PREPARED: 4/18/2013

D.A. LOG NUMBER:1950720
CJIS TRACKING NO.: 9165103092-D001
BY: **KS** DA NO: 050795683 AGENCY:**HPD**
O/R NO: 105758592
ARREST DATE:

NCIC CODE: 0907 10          RELATED CASES: **REFILE**

FELONY CHARGE: CAPITAL MURDER
CAUSE NO:   ~~I8~~  1384199
HARRIS COUNTY DISTRICT COURT NO: 337
FIRST SETTING DATE:

BAIL: $NO BOND
PRIOR CAUSE NO: 1289188

---

**IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:**

The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, **OBEL CRUZ-GARCIA**, hereafter styled the Defendant, heretofore on or about **SEPTEMBER 30, 1992**, did then and there unlawfully, while in the course of committing and attempting to commit the KIDNAPPING of ANGELO GARCIA, JR., intentionally cause the death of ANGELO GARCIA, JR., by STABBING ANGELO GARCIA JR. WITH A DEADLY WEAPON, NAMELY A SHARP INSTRUMENT.

It is further presented that in Harris County, Texas, OBEL CRUZ-GARCIA, hereafter styled the Defendant, heretofore on or about SEPTEMBER 30, 1992, did then and there unlawfully while in the course of committing and attempting to commit the KIDNAPPING of ANGELO GARCIA JR., intentionally cause the death of ANGELO GARCIA JR. BY AN UNKNOWN MANNER AND MEANS.

It is further presented that in Harris County, Texas, OBEL CRUZ-GARCIA, hereafter styled the Defendant, heretofore on or about SEPTEMBER 30, 1992, did then and there unlawfully while in the course of committing and attempting to commit the BURGLARY OF A BUILDING owned by DIANA GARCIA, intentionally cause the death of ANGELO GARCIA JR. by STABBING ANGELO GARCIA JR. WITH A DEADLY WEAPON, NAMELY A SHARP INSTRUMENT.

It is further presented that in Harris County, Texas, OBEL CRUZ-GARCIA, hereafter styled the Defendant, heretofore on or about SEPTEMBER 30, 1992, did then and there unlawfully while in the course of committing and attempting to commit the BURGLARY OF A BUILDING owned by DIANA GARCIA, intentionally cause the death of ANGELO GARCIA JR. by AN UNKNOWN MANNER AND MEANS.

It is further presented that in Harris County, Texas, OBEL CRUZ-GARCIA, hereafter styled the Defendant, heretofore on or about SEPTEMBER 30, 1992, did then and there unlawfully while in the course of committing and attempting to commit the AGGRAVATED SEXUAL ASSAULT of DIANA GARCIA, intentionally cause the death of ANGELO GARCIA JR. by STABBING ANGELO GARCIA JR. WITH A DEADLY WEAPON, NAMELY A SHARP INSTRUMENT.

It is further presented that in Harris County, Texas, OBEL CRUZ-GARCIA, hereafter styled the Defendant, heretofore on or about SEPTEMBER 30, 1992, did then and there unlawfully while in the course of committing and attempting to commit the AGGRAVATED SEXUAL ASSAULT of DIANA GARCIA, intentionally cause the death of ANGELO GARCIA JR. by AN UNKNOWN MANNER AND MEANS.

*State moves # 3, 4, 5 &6 (new)*
*to abandon 6-3-2013*
*granted*

**FILED**
~~Chris Daniel~~
**District Clerk**

APR 19 2013

Time: _____
By _____

**IMAGED**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.
IMAGED

**AGAINST THE PEACE AND DIGNITY OF THE STATE.**

**Foreman**          338th

*DanEWils*
_____
FOREMAN OF THE GRAND JURY

**INDICTMENT**

: 01203

  

P2

CASE NO. 138479401010
INCIDENT NO./TRN: 9165103092D001

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 337TH DISTRICT |
| | § | |
| vs. | § | COURT |
| | § | |
| CRUZ-GARCIA, OBEL | § | HARRIS COUNTY, TEXAS |
| | § | |
| SID: TX04421988 | § | |

## JUDGMENT OF CONVICTION BY JURY – CAPITAL MURDER

| Judge Presiding: | HON. RENEE MAGEE | Date Judgment Entered: | 07/22/13 | |
|---|---|---|---|---|
| Attorney for State: | TISE, NATALIE WOOD, JUSTIN | Attorney for Defendant: | CORNELIUS, R. P. MADRID MARIO | |

Offense for Which Defendant Convicted:
**CAPITAL MURDER**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | N/A |

Date of Offense:
**9/30/1992**

| Degree of Offense: | Plea to Offense: |
|---|---|
| **CAPITAL MURDER** | **NOT GUILTY** |

| Verdict of Jury: | Findings on Deadly Weapon: |
|---|---|
| **GUILTY** | **YES-NOT A FIREARM** |

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| Punished Assessed by: | Date Sentence Imposed: | Date Sentence to Commence: |
|---|---|---|
| JURY | 07/22/13 | 07/22/13 |

Punishment and Place of Confinement:

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ N/A | $ | $ N/A | N/A |

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

| Time Credited: | From 2/12/2010 to 7/15/2013 | From to | From to |
|---|---|---|---|
| | From to | From to | From to |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

N/A DAYS    NOTES: N/A

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in _____ County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel  (select one)**

☒ Defendant appeared in person with Counsel.

☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

It appeared to the Court that defendant was mentally competent and had pleaded as shown above to the charging instrument. Both parties announced ready for trial. A jury of twelve individuals was selected, impaneled, and sworn. The INDICTMENT was read to the jury, and defendant entered a plea to the charged offense. The Court received the plea and entered it of record.

The jury heard the evidence submitted and argument of counsel. The Court charged the jury as to its duty to determine the guilt or innocence of defendant, and the jury retired to consider the evidence. Upon returning to open court, the jury delivered its verdict in the presence of Defendant and defense counsel.

The Court received the verdict and ORDERED it entered upon the minutes of the Court.

The jury heard evidence relative to the question of punishment. The Court charged the jury and it retired to consider the special issues set out in the jury charge. After due deliberation, the jury was brought into Court, and, in open court, it returned its answers to the special issues as indicated below.

: 01204

CRUZ-GARCIA, OBEL Judgment of Conviction by Jury--Capital Murder (State seeks Death)_138479401010_3.docx

Page 1 of 3

RECORDER'S MEMORANDUM
This instrument is of poor quality at the time of imaging

The jury found beyond a REASONABLE DOUBT that there is a probability that defendant would commit criminal acts of violen that would constitute a continuing threat to society.

☒ Yes (unanimous)

☐ No (by at least 10 jurors)

The jury found beyond a REASONABLE DOUBT that considering all the evidence, including the circumstances of the offense, tl defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigatir circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence l imposed?

☐ Yes (by at least 10 jurors)

☒ No (unanimous)

Special Issues to be included if necessary:

**(If defendant is found GUILTY as a party under TEX. PEN. CODE §§ 7.01, 7.02)**
☒ The jury found beyond a REASONABLE DOUBT that the defendant actually caused the death of the deceased or did not actually cau: the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

☒ Yes (unanimous)

☐ No (by at least 10 jurors)

**(If defendant has a mental impairment or defect)**
The jury found from a PREPONDERANCE OF THE EVIDENCE that defendant is a person with:

☐ Mental illness

☐ Mental retardation

The Court FINDS Defendant committed the above offense and ORDERS, ADJUDGES AND DECREES that Defendant is **GUILTY** of the above offense.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS that the State of Texas shall recover all costs of the prosecution from the Defendant and that execution will issue.

**Punishment Options**

☐ **Confinement in Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS TDCJ to make withdrawals from the Defendant's inmate account as such funds become available. The Court ORDERS TDCJ to pay such funds to the individual / agency cited above until the ordered restitution, court fees, costs, and fines are paid in full. TEX. GOV'T CODE § 501.014. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence.

☒ **Death.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the Director, Institutional Division, TDCJ. Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas. The Court Orders Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence.

**Execution**

☒ The Court ORDERS Defendant's sentence EXECUTED.

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

The Court further ORDERS Defendant to pay restitution to the person(s) named above in the amount specified.

**Furthermore, the following special findings or orders apply:**

**Deadly Weapon.**
The Court FINDS Defendant used or exhibited a deadly weapon, namely, **A SHARP INSTRUMENT**, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited. TEX. CODE CRIM. PROC. art. 42.12 §3g.

Signed and entered on July 16, 2013
22

x _Renee Magee_
**RENEE MAGEE**
JUDGE PRESIDING

Ntc Appeal Filed: **JUL 2 2 2013** Mandate Rec'd:_____

After Mandate Received, Sentence to Begin Date is:_____

Received on _____ at _____ AM / PM

By:_____, Deputy Sheriff of Harris County

001205

CRUZ-GARCIA, OBEL Judgment of Conviction by Jury--Capital Murder (State seeks Death)_138479401010_3.docx

CERTIFICATE OF THE CLERK

APPLICANT IN CUSTODY

THE STATE OF TEXAS       {   IN THE 337th DISTRICT COURT

COUNTY OF HARRIS       {   OF HARRIS COUNTY, TEXAS

I, CHRIS DANIEL, District Clerk of Harris County, Texas, do hereby certify that the

foregoing *1206* pages contain true and correct copies of original records now in my

lawful custody and possession relating to cause number 1384794-A including the

petition, all answers filed by the State, the Order of the Court (entered on the 29TH day

of DECEMBER,A.D., 2016 ) and each document, the inclusion of which was thereby

ordered.

I further certify the Applicant OBEL CRUZ-GARCIA is in the custody of the Texas

Department of Criminal Justice Institutional Division.

Witness my hand and seal of said Court at Houston, Texas, on this the *31st* day of

JANUARY, 2017.

CHRIS DANIEL, District Clerk
Harris County, Texas

By: _____
Leslie Hernandez, Deputy

REV. 01-02-04

: 01206