## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **OBEL CRUZ-GARCIA,**<br><br>　　　　Petitioner,<br><br><br>　　*v.*<br><br><br>**LORIE DAVIS, Director,**<br>Texas Department of<br>Criminal Justice,<br>Correctional Institutions Division,<br><br><br>　　　　Respondent. | Case No. 4:17-CV-03621<br><br><br>District Judge Vanessa D. Gilmore |

## MEMORANDUM OF LAW IN SUPPORT OF THE FIRST AMENDED PETITION

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS (TX 24084578)
Supervisor, Capital Habeas Unit

David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Defenders
Office of Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
David_currie@fd.org

## THIS IS A CAPITAL CASE

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES ...................................................................................vii

I.   INTRODUCTION ............................................................................................1

II.  PROCEDURAL HISTORY ..............................................................................5

III. APPLICABLE PROCEDURAL RULES ..........................................................6

    A.   The exhaustion requirement.........................................................................6

    B.   Federal court review of claims that received merits review in state court. ................6

        1.   The 28 U.S.C. § 2254(d)(1) exception to the relitigation bar is satisfied if either the state court's reasoning or its ultimate decision is unreasonable. ...........................7

        2.   The § 2254(d) inquiry is separate from, and subject to different restrictions than, the § 2254(a) analysis. .....................................................................8

        3.   28 U.S.C. § 2254(d) applies to claims that were properly presented in state court only if those claims were adjudicated on the merits in accordance with due process; otherwise, the claims should be reviewed *de novo*. .....................................10

    C.   Federal court review of claims that are procedurally defaulted. ...........................12

    D.   Discovery in federal habeas. .......................................................................14

IV.  LEGAL ARGUMENTS APPLICABLE TO MULTIPLE CLAIMS IN THE PETITION ...................................................................................................15

    A.   The Court should not apply 28 U.S.C. § 2254(d) to any of Mr. Cruz-Garcia's claims because the state habeas proceedings did not comport with due process.....................15

        1.   Despite his best efforts, Mr. Cruz-Garcia's state habeas proceeding did not proceed according to state-law requirements or provide him fundamental fairness and due process...16

        2.   Because Mr. Cruz-Garcia's state habeas proceeding did not comport with state law or due process, 28 U.S.C. § 2254(d)'s relitigation bar does not apply and this Court should consider his claims *de novo*. .....................................................21

    B.   Cumulative error. .....................................................................................24

    C.   Mr. Cruz-Garcia's actual innocence mandates consideration of his procedurally defaulted claims on the merits to avoid a fundamental miscarriage of justice. ...........25

V.   STATEMENT REGARDING PROCEDURAL DEFENSES ...........................26

VI.  LEGAL BRIEFING OF INDIVIDUAL CLAIMS ...........................................26

CLAIM ONE: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL............................26

    A.   Legal Standard. .......................................................................................26

        1.   Deficient performance at the guilt/innocence phase. .........................................27

2. Deficient performance at the punishment phase....................................................28

3. Prejudice. ..............................................................................................................29

B. Trial counsel's representation was deficient. ............................................................30

1. Trial counsel refused to review the State's file, asserting on the record that it was not their responsibility. .......................................................................................................31

2. Trial Counsel conducted almost no investigations until the eve of trial, and 30 percent of their investigations took place during trial. ..................................................32

3. Trial counsel failed to secure the expert assistance needed to effectively present a defense. ...........................................................................................................................33

4. Trial counsel performed deficiently at voir dire. ....................................................34

C. Counsel's deficient performance prejudiced Mr. Cruz-Garcia at both the guilt/innocence and penalty phases of the trial. ...............................................................34

1. Mr. Cruz-Garcia was prejudiced at the guilt/innocence phase by his counsel's abnegation of their duties because faulty DNA testing procedures and inaccurate test results were presented to the jury unchallenged. ...............................................................35

a. Relevant background to the DNA evidence ......................................................35

b. Trial counsel's failure to review the State's file, conduct investigations into Mr. Cruz-Garcia's relationship with Ms. Garcia, and retain a DNA expert prejudiced Mr. Cruz-Garcia. ............................................................................................................40

2. Mr. Cruz-Garcia was prejudiced at the guilt/innocence and penalty phases by his counsel's abnegation of their duty to review the State's file and investigate State's witness Rudy Santana. ...................................................................................................................42

3. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Diana Garcia and Arturo Rodriguez. ........................................................................................44

4. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Angelita Rodriguez. .....................................................................................................................45

5. Mr. Cruz-Garcia was prejudiced in additional ways by trial counsel's failure to familiarize themselves with the State's file and conduct guilt/innocence investigations. ........45

6. Mr. Cruz-Garcia was prejudiced at the penalty phase by trial counsel's failure to conduct minimally adequate investigations into mitigation and in rebuttal of the State's case in aggravation. ................................................................................................................46

a. Had trial counsel conducted an adequate investigation, the jury would have heard a vastly different case in mitigation of a death sentence. ...........................................48

b. Had trial counsel conducted an adequate investigation, there is a reasonable probability that at least one juror would have answered the future dangerousness special issue in the negative, resulting in a life sentence. ..........................................................51

7.    Mr. Cruz-Garcia was prejudiced by trial counsel's deficient performance during jury deliberations.....................................................................................................53

8.    Mr. Cruz-Garcia was prejudiced by his trial counsel's failure to contact consular officials from the Dominican Republic............................................................................53

D.    The Claim is unexhausted. .........................................................................53

E.    Mr. Cruz-Garcia will seek discovery concerning this claim. .....................................54

CLAIM TWO: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL .................54

A.    Legal standard.........................................................................................54

B.    Appellate counsel was ineffective for failing to challenge the trial court's improper, coercive, and *ex parte* instruction to Juror Bowman during punishment phase deliberations. ....55

1.    The trial court improperly coerced Juror Bowman to change her vote during punishment phase deliberations.......................................................................................55

2.    Appellate counsel ineffectively failed to raise the trial court's coercive instruction to Juror Bowman..................................................................................................57

C.    28 U.S.C. § 2254(d) does not preclude the relitigation of this claim. ....................58

CLAIM THREE: FALSE TESTIMONY...........................................................................59

A.    Legal standard.........................................................................................59

B.    False testimony regarding DNA evidence.................................................................61

1.    Testimony identifying Mr. Cruz-Garcia as the source of the DNA evidence was false.............................................................................................................61

2.    Testimony about the DNA source and cross-contamination was false. ..............62

C.    False testimony concerning Mr. Santana....................................................................63

1.    The State and Mr. Santana lied about his criminal record. ...............................63

2.    The State and Mr. Santana lied about his exposure to criminal liability..............64

D.    False testimony regarding Ms. Garcia and Mr. Rodriguez.......................................65

1.    Ms. Garcia and Mr. Rodriguez lied about Mr. Cruz-Garcia's supposed motive for the murder...................................................................................................65

2.    Ms. Garcia lied about her relationship with Mr. Rodriguez...............................66

E.    False testimony from law enforcement......................................................................66

1.    Law enforcement officers lied about Ms. Garcia and Mr. Rodriguez. ................66

2.    Law enforcement officers lied about other theories of the murder. ...................67

F.    False testimony from Angelita Rodriguez.................................................................68

G.    False testimony at the punishment phase..................................................................68

H.    The claim is unexhausted.........................................................................................68

iii

CLAIM FOUR: FALSE AND UNRELIABLE DNA EVIDENCE. ....................................69

    A.    The trial court admitted false and unreliable DNA evidence.................................69

    B.    The admission of false and unreliable evidence violated Mr. Cruz-Garcia's right to due process and a fair trial. ...............................................................................71

    C.    This claim is exhausted and should be reviewed *de novo*. .........................................72

CLAIM FIVE: RIGHT TO PRESENT A DEFENSE AND CROSS-EXAMINE WITNESSES ............................................................................................................................72

    A.    The trial court prohibited Mr. Cruz-Garcia from presenting evidence going to the unreliability of the DNA evidence...................................................................72

    B.    The trial court violated Mr. Cruz-Garcia's right to present a defense. ...................74

        1.    The Due Process Clause guarantees defendants the opportunity to present a defense........................................................................................................74

        2.    The trial court's rulings deprived Mr. Cruz-Garcia of his constitutionally-protected right to present a defense...................................................................75

    C.    The trial court violated Mr. Cruz-Garcia's right to confront the witnesses against him. ...............................................................................................................76

        1.    The Confrontation Clause guarantees defendants an opportunity for effective cross-examination. ...................................................................................76

        2.    The trial court's rulings violated Mr. Cruz-Garcia's constitutional right to challenge the State's DNA evidence through cross-examination. ...............................77

    D.    The trial court can review this claim *de novo*. .........................................................78

        1.    Mr. Cruz-Garcia fairly presented this claim on direct appeal. ............................78

        2.    The trial court failed to adjudicate the merits of Mr. Cruz-Garcia's allegation that the trial court violated his right to present a defense. ...............................78

        3.    This court should review the allegation that Mr. Cruz-Garcia's right to cross-examine witnesses was violated to avoid a fundamental miscarriage of justice. .......................79

CLAIM SIX: FALSE AND UNRELIABLE EVIDENCE ............................................79

    A.    Mr. Cruz-Garcia's conviction and death sentence violate the Eighth Amendment because they were obtained on the basis of unreliable evidence....................................79

    B.    The claim is unexhausted..................................................80

CLAIM SEVEN: JUROR MISCONDUCT..................................................80

    A.    Legal standard.........................................................80

    B.    The jury foreman brought a Bible to the deliberations and read passages to the jury that were intended to, and did, influence them to answer the special issues in a way that resulted in a death verdict.....................................................................81

iv

C.    Two of the jurors discussed the case outside of deliberations. ..................................82

D.    The external influences were harmful. ....................................................................83

E.    The court should review this claim *de novo* because the state court failed to rule on the federal claim or, alternatively, because 28 U.S.C. § 2254(d) is satisfied. ...............84

CLAIM EIGHT: COERCIVE SUPPLEMENTAL JURY INSTRUCTIONS ...................86

A.    The trial court violated Mr. Cruz-Garcia's right to an uncoerced jury verdict.........86

B.    The state court's default of this claim does not preclude merits review. .................87

CLAIM NINE: CONFRONTATION CLAUSE ....................................................................87

CLAIM TEN: VCCR VIOLATION......................................................................................88

CLAIM ELEVEN: BRADY V. MARYLAND ......................................................................89

A.    Legal standard.............................................................................................................89

B.    The State withheld evidence concerning Mr. Santana and Ms. Rodriguez's testimony. ..................................................................................................................90

C.    The State failed to disclose investigative materials relating to a "second theory" of the offense..........................................................................................................................91

D.    The State withheld information and documents concerning the punishment phase. ....................................................................................................................................92

E.    This claim is unexhausted. .........................................................................................92

CLAIMS TWELVE THROUGH SEVENTEEN ....................................................................93

CLAIM EIGHTEEN: PORTIONS OF RECORD ABSENT.................................................95

CLAIM NINETEEN: EXCLUSION FROM CRITICAL STAGES OF TRIAL ................96

A.    Mr. Cruz-Garcia was absent from two critical stages of his trial............................96

B.    Mr. Cruz-Garcia's absence violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and a fair trial. ....................................................97

C.    This claim is unexhausted. Alternatively, the procedural default of this claim should be excused to avoid a fundamental miscarriage of justice. ..........................................99

CLAIM TWENTY: INCONSISTENT THEORIES.........................................................100

CLAIM TWENTY-ONE: JUDICIAL BIAS .....................................................................100

A.    There are several indications that Judge Magee was biased against Mr. Cruz-Garcia. .....................................................................................................................100

B.    Mr. Cruz-Garcia was denied due process and a fair trial by Judge Magee's bias....102

C.    The claim is unexhausted.........................................................................................103

CLAIM TWENTY-TWO: REPEATED EMOTIONAL OUTBURSTS............................104

CLAIM TWENTY-THREE: INACCURATE INTERPRETATION.................................104

A.   Mr. Cruz-Garcia's trial proceedings were not accurately interpreted. ...................104

B.   Because Mr. Cruz-Garcia's trial was infected with inaccurate interpretations of the evidence and arguments, and because the jurors deliberated over different testimony based on their comprehension or not of the Spanish language, Mr. Cruz-Garcia's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated. ...............................................................105

C.   The claim is unexhausted. ...............................................................109

CLAIM TWENTY-FOUR: EXCLUSION OF MITIGATION EVIDENCE ..................109

CLAIM TWENTY-FIVE: THE STATE'S INFLAMMATORY STATEMENTS .............110

CLAIM TWENTY SIX: ABUSE OF THE SUBPOENA POWER ...................................111

CLAIM TWENTY SEVEN: ACTUAL INNOCENCE ......................................................111

CLAIM TWENTY EIGHT: UNCONSTITUTIONAL PENALTY-PHASE INSTRUCTIONS ..................................................................................................................112

CLAIM TWENTY NINE: THE TEN-TWELVE RULE ....................................................113

CLAIM THIRTY: UNCONSTITUTIONALLY VAGUE SPECIAL ISSUE ...................113

CLAIM THIRTY ONE: ARBITRARY AND DISCRIMINATORY CAPITAL PUNISHMENT SCHEME ....................................................................................................114

CERTIFICATE OF SERVICE ...........................................................................................116

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ex parte Adams,*
   768 S.W.2d 281 (Tex. Crim. App. 1989) ................................................................... 89

*Alcorta v. Texas,*
   355 U.S. 28 (1957) ................................................................................................ 59, 60

*Allen v. United States,*
   164 U.S. 492 (1896) ..................................................................................................... 57

*Andrus v. Texas,*
   140 S. Ct. 1875 (2020) ................................................................................ 29, 30, 46, 47

*Aparicio v. Artuz,*
   269 F.3d 78 (2d Cir. 2001) .......................................................................................... 11

*Apprendi v. New Jersey,*
   530 U.S. 466 (2000) ................................................................................................... 106

*Arizona v. Fulminante,*
   499 U.S. 279 (1991) ................................................................................................... 107

*Baldwin v. Reese,*
   541 U.S. 27 (2004) ...................................................................................................... 84

*Banks v. Dretke,*
   540 U.S. 668 (2004) .................................................................................................... 90

*Batson v. Kentucky,*
   476 U.S. 79 (1986) ............................................................................................ 9, 34, 94

*Blackmon v. Scott,*
   22 F.3d 560 (5th Cir. 1994) ........................................................................................ 89

*Blue v. Thaler,*
   665 F.3d 647 (5th Cir. 2011) ..................................................................................... 112

*Brady v. Maryland,*
   373 U.S. 83 (1963) ........................................................................................ 43, 60, 89, 90

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993)................................................................................. 81, 83, 84

*Bryant v. Scott,*
    28 F.3d 1411 (5th Cir. 1994) ...................................................................... 27

*Callins v. Collins,*
    510 U.S. 1141 (1994)..................................................................................114

*Campbell v. Bradshaw,*
    674 F.3d 578 (6th Cir. 2012) ...................................................................... 11

*Campbell v. Louisiana,*
    523 U.S. 392 (1998)..................................................................................... 93

*Canales v. Stephens,*
    765 F.3d 551 (5th Cir. 2014) ...................................................................... 13

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009)....................................................................................102

*Cargle v. Mullin,*
    317 F.3d 1196 (10th Cir. 2003) .................................................................. 25

*Castaneda v. Partida,*
    430 U.S. 482 (1977)..................................................................................... 93

*Ex parte Chabot,*
    300 S.W.3d 768 (Tex. Crim. App. 2009)................................................... 72

*Chambers v. Mississippi,*
    410 U.S. 284 (1973)......................................................................... 24, 74, 75

*Chapman v. California,*
    386 U.S. 18 (1967)....................................................................................... 60

*Charles v. Stephens,*
    736 F.3d 380 (5th Cir. 2013) ...................................................................... 28

*Coleman v. Thompson,*
    501 U.S. 722 (1991)......................................................................... 12, 13, 99

*Crane v. Kentucky,*
    467 U.S. 683 (1986)..................................................................................... 74

*Crawford v. Washington*,
   541 U.S. 36 (2004)............................................................................................88, 106

*Crosby v. United States*,
   506 U.S. 255 (1993)......................................................................................................97

*Cruz-Garcia v. Texas.*,
   2015 WL 6528727 (Tex. Crim. App., Oct. 28, 2015)...................................*passim*

*Ex parte Cruz-Garcia*,
   2017 WL 4947132 (Tex. Crim. App. Nov. 1, 2017)....................................85, 87

*Cullen v. Pinholster*,
   563 U.S. 170 (2011)..................................................................................................8, 9

*Curry v. State*,
   541 S.W.3d 751 (Tex. Crim. App. 2017).............................................................113

*Darden v. Wainwright*,
   477 U.S. 168 (1986).....................................................................................................110

*Davis v. Alaska*,
   415 U.S. 308 (1974).......................................................................................................76

*Delaware v. Fensterer*,
   474 U.S. 15 (1985).........................................................................................................76

*Delaware v. Van Arsdall*,
   475 U.S. 673 (1986).......................................................................................................76

*Diaz v. United States*,
   223 U. S. 442 (1912)....................................................................................................97

*Donnelly v. DeChristoforo*,
   416 U.S. 637 (1974).......................................................................................................95

*Drake v. Portuondo*,
   321 F.3d 338 (2d Cir. 2003)........................................................................................12

*Drope v. Missouri*,
   420 U.S. 162 (1975).....................................................................................................106

*Early v. Packer*,
   537 U.S. 3 (2002)..............................................................................................................7

ix

*Engle v. Issac,*
    456 U.S. 107 (1982) ..................................................................................14, 99

*Escamilla v. Stephens,*
    749 F.3d 380 (5th Cir. 2014) ...........................................................................29

*Evitts v. Lucey,*
    469 U.S. 387 (1985) ........................................................................................54

*Fairey v. Tucker,*
    567 U.S. 337 (1970) ........................................................................................97

*Ferrell v. Estelle,*
    568 F.2d 1128 (5th Cir. 1978) .......................................................................106

*Gentry v. Sinclair,*
    576 F. Supp. 2d 1130 (W.D. Wash. 2008) .......................................................25

*Gibbs v. Johnson,*
    154 F.3d 253 (5th Cir. 1998) ...........................................................................15

*Giglio v. United States,*
    405 U.S. 150 (1972) ........................................................................... 59, 60, 89, 90

*Gilmore v. Taylor,*
    508 U.S. 333 (1993) ......................................................................................107

*Godfrey v. Georgia,*
    446 U.S. 420 (1980) ............................................................................. 113, 114

*Gordon v. Baxton,*
    780 F.3d 196 (4th Cir. 2015) ...........................................................................11

*Graves v. Dretke,*
    442 F.3d 334 (5th Cir. 2006) ...........................................................................90

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ..................................................................................80, 113

*Hall v. State,*
    283 S.W.3d 137 (Tex. App. 2009) .................................................................100

*Hardman v. State,*
    868 S.W.2d 404 (Tex. App. 1993) ...................................................................63

*Harrington v. Richter,*
  562 U.S. 86 (2011) ............................................................................8, 12

*Henderson v. Cockrell,*
  333 F.3d 392 (5th Cir. 2003) ................................................................10

*Herrera v. Collins,*
  506 U.S. 390 (1993).........................................................25, 26, 111, 112

*Holmes v. South Carolina,*
  547 U.S. 319 (2006).............................................................................74

*House v. Bell,*
  547 U.S. 518 (2006).............................................................................111

*Illinois v. Allen,*
  397 U.S. 337 (1970).............................................................................97

*J.E.B. v. Alabama ex rel. T.B.,*
  511 U.S. 127 (1994).............................................................................94

*James v. Collins,*
  987 F.2d 1116 (5th Cir. 1993) ..............................................................113

*James v. Kentucky,*
  466 U.S. 341 (1984).............................................................................13

*Jenkins v. United States,*
  380 U.S. 445 (1965).........................................................................57, 58

*Johnson v. Williams,*
  568 U.S. 289 (2013)........................................................................*passim*

*Ex parte Kerr,*
  64 S.W.3d 414 (Tex. Crim. App. 2002)................................................15

*Kittelson v. Dretke,*
  426 F.3d 306 (5th Cir. 2005) ................................................................75

*Kyles v. Whitley,*
  514 U.S. 419 (1995).........................................................................89, 90

*Lee v. Kemna,*
  534 U.S. 362 (2002).............................................................................13

*Lockett v. Ohio,*
   438 U.S. 586 (1978) ..................................................................... 112

*Lowenfield v. Phelps,*
   484 U.S. 231 (1988) ........................................................... 57, 58, 86

*Martinez v. Ryan,*
   566 U.S. 1 (2012) .............................................................. 13, 54, 100

*Mattox v. United States,*
   146 U.S. 140 (1892) ................................................................. 80, 83

*Melendez-Diaz v. Massachusetts,*
   557 U.S. 305 (2009) ..................................................................... 88

*Miller-El v. Cockrell,*
   537 U.S. 322 (2003) ........................................................ 7, 58, 86, 89

*Montana v. Egelhoff,*
   518 U.S. 37 (1996) ....................................................................... 75

*Mooney v. Holohan,*
   294 U.S. 103 (1935) ..................................................................... 59

*Moore v. Johnson,*
   194 F.3d 586 (5th Cir. 1999) ........................................................ 27

*Morgan v. Illinois,*
   504 U.S. 719 (1992) ..................................................................... 86

*Morris v. Dretke,*
   413 F.3d 484 (5th Cir. 2005) .......................................................... 6

*In re Murchison,*
   349 U.S. 133 (1955) ................................................................... 102

*Murphy v. Johnson,*
   205 F.3d 809 (5th Cir. 2000) ........................................................ 15

*Murray v. Carrier,*
   477 U.S. 478 (1986) ........................................................... 13, 26, 99

*Napue v. Illinois,*
   360 U.S. 264 (1959) ........................................................... 59, 60, 71

*Nealy v. Cabana,*
    764 F.2d 1173 (5th Cir. 1985) ................................................................28

*United State ex rel. Negron v. New York,*
    434 F.2d 386 (2nd Cir. 1970) ............................................................106

*Oliver v. Quarterman,*
    541 F.3d 329 (5th Cir. 2008) .......................................................*passim*

*Panetti v. Quarterman,*
    551 U.S. 930 (2007) ....................................................................*passim*

*Parker v. Gladden,*
    385 U.S. 363 (1966) ....................................................................*passim*

*Patton v. State of Mississippi,*
    332 U.S. 463 (1947) ................................................................................94

*Perry v. New Hampshire,*
    565 U.S. 228 (2012) ................................................................................71

*Phillips v. Woodford,*
    267 F.3d 966 (9th Cir. 2001) ................................................................25

*Porter v. McCollum,*
    558 U.S. 30 (2009) ..........................................................................28, 30

*Ramey v. Davis,*
    942 F.3d 241 (5th Cir. 2019) ................................................................28

*Remmer v. United States,*
    347 U.S. 227 (1954) ....................................................................*passim*

*Rhines v. Weber,*
    544 U.S. 269 (2005) ............................................................................111

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) ..........................................................27, 29

*Rodriguez v. City of Houston,*
    2011 WL 13202989 (S.D. Tex. Oct. 20, 2011) ....................................37

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ..........................................................................28, 29

Rose v. Clark,
478 U.S. 570 (1986)........................................................................................107

Sawyer v. Whitley,
505 U.S. 333 (1992)..........................................................................................14

Schlup v. Delo,
513 U.S. 298 (1995)...........................................................14, 25, 26, 111

Sears v. Upton,
561 U.S. 945 (2010)..........................................................................................30

Sheppard v. Maxwell,
384 U.S. 33 (1966)...........................................................................................104

Smith v. Cain,
708 F.3d 628 (5th Cir. 2013) .............................................................................9

Smith v. Groose,
205 F.3d 1045 (8th Cir. 2000)........................................................................100

Smith v. Phillips,
455 U.S. 209 (1982)........................................................................................100

Smith v. Robbins,
528 U.S. 259 (2000).................................................................................54, 58

Snyder v. Massachusetts,
291 U.S. 97 (1934)............................................................................................97

Strickland v. Washington,
466 U.S. 668 (1984)......................................................................................passim

Swarthout v. Cooke,
562 U.S. 216 (2011)..........................................................................................22

Taylor v. Kentucky,
436 U.S. 478 (1978)..........................................................................................24

Taylor v. Louisiana,
419 U.S. 522 (1975)..........................................................................................93

Taylor v. Maddox,
366 F.3d 992 (9th Cir. 2004) ...........................................................................12

*Townsend v. Burke*,
   334 U.S. 736 (1948) ...................................................................................... 72

*Trevino v. Thaler*,
   569 U.S. 413 (2013) ................................................................................ 13, 54

*Tumey v. Ohio*,
   273 U.S. 510 (1927) .................................................................................... 102

*Turner v. Louisiana*,
   379 U.S. 466 (1965) ............................................................................... *passim*

*Turner v. Quarterman*,
   481 F.3d 292 (5th Cir. 2000) ..................................................................... 113

*U.S. v. Skelton*,
   514 F.3d 433 (5th Cir. 2008) ....................................................................... 77

*United States v. Bagley*,
   473 U.S. 667 (1985) ................................................................................ 60, 89

*United States v. Barham*,
   595 F.2d 231 (5th Cir. 1979) ....................................................................... 60

*United States v. Carrion*,
   488 F.2d 12 (1st Cir. 1973) ........................................................................ 107

*United States v. Collins*,
   799 F.3d 554 (6th Cir. 2015) ..................................................................... 100

*United States v. Delgado*,
   631 F.3d 685 (5th Cir. 2011) ....................................................................... 24

*United States v. Diharce-Estrada*,
   526 F.3d 637 (5th Cir. 1976) ....................................................................... 25

*United States v. Dvorin*,
   817 F.3d 438 (5th Cir. 2016) ....................................................................... 60

*United States v. Gonzalez-Lopez*,
   548 U.S. 140 (2006) ..................................................................................... 24

*United States v. Higgs*,
   353 F.3d 281 (4th Cir. 2003) ..................................................................... 100

xv

*United States v. Jones,*
   172 F.3d 381 (5th Cir. 1999) ...............................................................................10, 15

*United States v. Labarbera,*
   581 F.3d 107 (5th Cir. 1978) ......................................................................................24

*United States v. Riddle,*
   103 F.3d 423 (5th Cir. 1997) ......................................................................................24

*United States v. United States Gypsum Co.,*
   438 U.S. 422 (1978) ...............................................................................................57, 58

*United States v. Williamson,*
   183 F.3d 458 (5th Cir. 1999) ......................................................................................54

*Walbey v. Quarterman,*
   309 F. App'x 795 (5th Cir. 2009) ...............................................................................30

*Warren v. Baenen,*
   712 F.3d 1090 (7th Cir. 2013) ....................................................................................11

*Washington v. Davis,*
   715 F. App'x. 380 (5th Cir. 2018) .........................................................................14, 15

*Washington v. Texas,*
   388 U.S. 14 (1967) ....................................................................................................106

*Wearry v. Cain,*
   136 S. Ct. 1002 (2016) ................................................................................................61

*Weeks v. Angelone,*
   176 F.3d 249 (4th Cir. 1999) ......................................................................................11

*Wiggins v. Smith,*
   539 U.S. 510 (2003) .........................................................................................29, 30, 42

*Wilkerson v. Goodwin,*
   774 F.3d 845 (5th Cir. 2014) ......................................................................................23

*Williams v. Pennsylvania,*
   136 S. Ct. 1899 (2016) ......................................................................................102, 103

*Williams v. Taylor,*
   529 U.S. 362 (2000) ............................................................................................ *passim*

xvi

*Willingham v. Mullin,*
296 F.3d 917 (10th Cir. 2002) ................................................................25

*Wilson v. Sellers,*
138 S. Ct. 1188 (2018) ...................................................................... 7, 8

*Wilson v. Workman,*
577 F.3d 1284 (10th Cir. 2009) .............................................................12

*Witherspoon v. Illinois,*
391 U.S. 510 (1968) ...................................................................... 94, 95

*Withrow v. Larkin,*
421 U.S. 35 (1975) ..........................................................................102

*Woodson v. North Carolina,*
428 U.S. 280 (1976) ..........................................................................80

**Statutes**

28 U.S.C. § 2254 ................................................................ 14, 15, 26

28 U.S.C. § 2254(a) ..................................................................8, 15

28 U.S.C. § 2254(b)(1)(A) ...............................................................6

28 U.S.C. § 2254(b)(1)(B) ...............................................................6

28 U.S.C. § 2254(c) ......................................................................6

28 U.S.C. § 2254(d) ...............................................................*passim*

28 U.S.C. § 2254(d)(1) ...............................................................7, 9

28 U.S.C. § 2254(d)(2) ...........................................................7, 9, 12

28 U.S.C. § 2254(e)(1) ..............................................................81, 85

28 U.S.C. § 2254(e)(2) ...............................................................9, 10

TEX. CODE CRIM. PRO. ANN. ART. 37.071 § 2(b)(1) ...............................113

TEX. CODE CRIM. PRO. ART. 37.071 .............................................112

TEX. CODE CRIM. PRO. ART. 38.30(a) ...........................................105

Tex. Code of Crim. Pro. Art. 11.071 ..............................................................15, 17

**Other Authorities**

31 Hofstra L. Rev. 913 (2003) ............................................................................27

Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131, 131-32 (2012) ...................................114

Tex. R. Civ. P. 18a(g)........................................................................................16

U. S. Const. amend. V............................................................................. *passim*

U. S. Const. amend. VI ........................................................................... *passim*

U. S. Const. amend. VIII ......................................................................... *passim*

U. S. Const. amend. XIV.......................................................................... *passim*

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U. S. T. 77 ..................88

## I. INTRODUCTION

Obel Cruz-Garcia sits on Texas death row based on state court proceedings that were so clearly flawed, one-sided, and biased against him that they shock the conscience. He was convicted in 2013 of a murder that occurred over twenty years earlier based largely on DNA evidence gathered, analyzed, and stored by the now-defunct Houston Police Department crime lab (the "old HPD crime lab"), which was closed after it came to light that the lab routinely falsified results, contaminated evidence, and generally failed to adhere to basic forensic standards. Not only was the DNA evidence admitted at trial, but the court forbade Mr. Cruz-Garcia from presenting any evidence concerning the impugned credibility of the lab, or the incompetence of the disgraced employees who handled the evidence in his case (one of whom was criminally prosecuted). Mr. Cruz-Garcia's appointed trial counsel—who worked under an ethically dubious flat fee arrangement with the court—never even consulted a DNA expert. Had they done so, the outcome of the trial would have been different: less than a week after Mr. Cruz-Garcia's conviction became final on appeal, the State recanted the DNA analysis presented at trial and conceded that much of the DNA evidence used to convict Mr. Cruz-Garcia was false.

The State's other main piece of evidence against Mr. Cruz-Garcia was the testimony of his supposed accomplice, Carmelo "Rudy" Santana, who admitted to participating in the kidnapping and murder of the victim but testified that Mr. Cruz-Garcia was the ringleader. The prosecution repeatedly emphasized to the jury that it had no deal with Mr. Santana and that he was putting himself in grave legal jeopardy by admitting his role in the murder. As the State now concedes, however, Mr. Santana was never in any legal jeopardy; though, rather than crafting a formal deal

with Mr. Santana that would destroy his credibility at trial, the State asserted a legal fiction—that Mr. Santana, despite his admissions, never committed a crime—to justify their decision not to charge him for his acts. Had the jury known the truth about the State's understanding with Mr. Santana, he would have lost all credibility with the jury.

Not that Mr. Santana should have had any credibility to begin with. He had committed at least one crime of moral turpitude involving a young girl around the time of the murder and, shortly before implicating Mr. Cruz-Garcia, had tried to convince a federal court that he suffered from debilitating mental illness necessitating his early release from prison. Mr. Cruz-Garcia's counsel was unaware of this evidence, because they did not perform a sufficient investigation. Indeed, they conceded in open court during the trial that they had not even reviewed the State's open file, believing the State had a duty to identify and inform them of all documents in the file that would benefit their case.

Trial counsel's failure to investigate became even more apparent at the punishment phase. Again, Mr. Santana was the State's star witness, this time detailing a 1989 kidnapping and murder he participated in and again alleging that Mr. Cruz-Garcia was the ringleader. The physical evidence and available witness accounts contradicted Mr. Santana's testimony, but because trial counsel failed to investigate the extraneous offense, the implausibility of Mr. Santana's testimony was never exposed. Trial counsel's failure to investigate also meant that the jury did not hear evidence of Mr. Cruz-Garcia's exemplary behavior when he was incarcerated in Puerto Rico, where he was such a trusted inmate that he was literally given the keys to parts of the prison. Trial counsel also failed in their duty to tell Mr. Cruz-Garcia's life story, which included his mother's abandonment and enduring a childhood of crushing poverty in a remote Dominican fishing village. And in the few

2

instances when trial counsel did try to introduce mitigating evidence of Bible study certificates and the testimony of a Puerto Rican police officer that Mr. Cruz-Garcia provided substantial assistance to the FBI, DEA, and INS, the trial court excluded the evidence on hearsay grounds.

The jury deliberations were a fiasco. The problems began when jurors were overheard discussing the case mid-trial in a courthouse elevator. A witness brought the juror misconduct to the court's attention. The judge spoke to the witness *in camera*, but misrepresented his report to counsel. Defense counsel compounded the error by failing to interview the witness themselves. The trial judge conducted yet another *in camera* meeting during the punishment phase deliberations, this time with Juror Angela Bowman, who was a holdout juror for a life sentence. Shortly after the meeting, Bowman changed her vote and the jury returned a death verdict. The court did not report the content of the *ex parte* meeting on the record, but informally told defense counsel that Bowman merely asked how long deliberations would last.

Within hours of the verdict, Bowman contacted defense counsel and, distraught over the verdict, explained what had happened in the jury room. Initially, several jurors favored life. On the second day of deliberations, the foreman (who favored death) brought his Bible to the jury room and read several passages, including Genesis 9, which states: "Whoever sheds human blood by humans shall their blood be shed." The Bible passages convinced the remaining jurors to vote for death, except Juror Bowman. What ultimately convinced her was that her daughter, away at camp, had become seriously ill. Because the jury was sequestered, Juror Bowman could not get to her daughter until the deliberations ceased. That was why she asked to speak with the trial judge.

Juror Bowman told the trial judge that she could not in good conscience vote for death, but that she did not want to stay another night and that she was getting incredible pressure from the

other jurors to stop holding up the deliberations. The trial judge gave Juror Bowman a coercive instruction and told her that the length of the deliberations was "completely in the hands of the jury." Juror Bowman returned to the deliberation room, changed her vote to death, rushed to take her daughter to the emergency room, and then immediately contacted trial counsel.

At a post-trial hearing, the trial judge decided that portions of Juror Bowman's affidavit were not credible, refused to consider a recorded interview with the jury foreman at which he admitted he had read from the Bible to convince the other jurors to vote for death, and credited the State's affidavits suggesting that the Bible reading occurred *after* everyone agreed on death. The court refused to hear from any live witnesses.

If there were any doubts that the trial judge was determined to salvage Mr. Cruz-Garcia's flawed conviction, those doubts were laid to rest during the post-conviction proceedings. First, her *ex parte* conference with Juror Bowman was a major issue in the state habeas application, but she refused to recuse herself upon Mr. Cruz-Garcia's motion.

The Judge was also running for re-election during the post-conviction proceedings. Her campaign website prominently featured Mr. Cruz-Garcia's trial (and did not mention any other cases over which she had presided). Shortly after the case was briefed, the Judge lost her bid for re-election. Defense counsel rushed to get their affidavits filed and explicitly stated they did so because they wanted the Judge—not her successor—to decide whether they had performed deficiently. The State argued that the Judge should compress the post-conviction proceedings into the few weeks remaining before she stepped down. The Judge obliged and ordered the parties to submit proposed findings of fact and conclusions of law ("FFCL") on an impossibly tight schedule, skipping over critical phases of the process required by the Texas Rules of Criminal Procedure. She then adopted the State's

4

proposed FFCL verbatim, two days before leaving office. In 2018, the Judge ran for a different judgeship; her website again featured Mr. Cruz-Garcia.

The above summary covers just a few of the constitutional infirmities in Mr. Cruz-Garcia's conviction. In truth, there are almost too many to name. The State presented false testimony from several witnesses, particularly concerning the victim's mother and her boyfriend and the supposed motive for the crime. Others besides Mr. Santana received deals. Trial counsel failed to locate and talk to significant people from Mr. Cruz-Garcia's life and other witnesses. They presented no expert testimony. The interpreters routinely misinterpreted testimony, leaving some of the jurors to do their own interpretation. Large portions of the State's case were admitted in violation of the Confrontation Clause. Mr. Cruz-Garcia's consular rights were violated. And so on.

Mr. Cruz-Garcia's state court proceedings did not meet minimum constitutional standards. Nor did they meet the moral standards of our society. The State's misconduct, trial counsels' deficient performance, the misconduct of the jurors, and the one-sided and indefensible rulings of the court are each sufficient to warrant relief; there can be no doubt that their combined effect was to deprive Mr. Cruz-Garcia of a fair trial.

## II.  PROCEDURAL HISTORY

Mr. Cruz-Garcia timely filed his Amended Petition on July 1, 2019. ECF No. 18. On September 30, 2019, the Director moved for summary judgment. ECF No. 20. The Court denied the Director's motion on April 30, 2020. ECF No. 33. The Court ordered legal briefing from the parties, with Mr. Cruz-Garcia's brief due within 60 days. *Id.* On June 18, 2020, the Court granted Mr. Cruz-Garcia's unopposed request to extend the deadline by 14 days. ECF No. 37.

### III.  APPLICABLE PROCEDURAL RULES

#### A.    The exhaustion requirement.

Before a federal court may grant relief on a claim in habeas corpus, the petitioner must show that he has exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "The exhaustion requirement is satisfied when the substance of the federal claim has been fairly presented to the highest state court," either on direct appeal or in state habeas. *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (internal quotations and citations omitted). Federal habeas petitioners may supplement an exhausted claim with new evidence in federal court, but if the new evidence fundamentally alters the claim, it loses its exhausted status. *Id.* In addition to presentation to the highest state court, a claim may also be exhausted if there is no available state court corrective process, or if any such process is ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1)(B). A claim is *not* exhausted if, at the time the federal petition is filed, state law provides a viable procedure for presenting the claim for consideration. 28 U.S.C. § 2254(c).

Many of Mr. Cruz-Garcia's claims for relief have been exhausted, either because they were properly presented to the Texas Court of Criminal Appeals ("CCA") or because there is now no viable procedure to secure review in state court. Several claims are unexhausted, and if the State raises a procedural defense on this ground, Mr. Cruz-Garcia will file a motion to stay and abey this proceeding to allow exhaustion of those claims.

#### B.    Federal court review of claims that received merits review in state court.

Habeas claims that were adjudicated on the merits in state court are generally subject to the 28 U.S.C. § 2254(d) relitigation bar. Pursuant to § 2254(d), federal courts may not grant relief on a

claim, regardless of the claim's merit, unless the petitioner demonstrates that the state court adjudication resulted in a decision that:

(a) was contrary to clearly established federal law as determined by the U.S. Supreme Court, § 2254(d)(1);

(b) was an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court, § 2254(d)(1); or

(c) was based on an unreasonable determination of the facts in light of the evidence presented to the state court, § 2254(d)(2).

A state court ruling is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision has unreasonably applied clearly established federal law if it "identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. Section 2254(d)(2)'s "unreasonable determination of the facts" exception is satisfied if the state-court fact-finding was "objectively unreasonable in light of the evidence presented []." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

1.    **The 28 U.S.C. § 2254(d)(1) exception to the relitigation bar is satisfied if either the state court's reasoning or its ultimate decision is unreasonable.**

For a claim that was adjudicated on the merits in state court to be subjected to the § 2254(d) relitigation bar, "neither the reasoning nor the result of the state-court decision [may] contradict [the Supreme Court's cases]." *Early v. Packer*, 537 U.S. 3, 8 (2002). In *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), the Court elaborated that the § 2254(d)(1) inquiry "requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state

7

prisoner's federal claims []." *Id.* at 1191-92 (internal citations and quotations omitted). The Court also addressed the proper procedure when the decision of the highest state court is unreasoned but a lower state court made detailed findings—a situation that arises in nearly every Texas capital state habeas case. In such a case, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Id.* at 1192.[1] The Supreme Court distinguished this procedure from one in which the federal court "imagine[s] what might have been the [highest] state court's supportive reasoning" and asks whether any reasonable basis could support the ultimate decision *Id.* at 1194-95.

2.    **The § 2254(d) inquiry is separate from, and subject to different restrictions than, the § 2254(a) analysis.**

Whereas § 2254(a)[2] addresses the showing required to demonstrate a habeas claimant's entitlement to relief on the merits, § 2254(d) is designed to aid the separate goals of comity, finality and federalism: "Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 185 (2011). Thus, the § 2254(d) inquiry should proceed separately from the Court's inquiry into the merits of Mr. Cruz-Garcia's claims of constitutional violation. *See, e.g., Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent

---

[1] This presumption is subject to rebuttal by either party through presentation of evidence tending to show that the highest state court's decision was based on different grounds than the lower state court's decision. *Id.*

[2] Under 28 U.S.C. § 2254(a), the petitioner must demonstrate he is being held in state custody in violation of the Constitution, laws or treaties of the United States to be entitled to relief on the merits of his claim.

unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

The need for distinct procedures for determining whether § 2254(a) and (d) are satisfied is significant because of the limitations that § 2254(d) places on the taking of new evidence. Whereas the § 2254(d)(1) and (d)(2) inquiries must be made only on the basis of the record that was before the state court, *Pinholster*, 563 U.S. at 184-85, no similar limitation is placed on the Court's taking of evidence to determine the merits of federal habeas claims. So, for instance, in *Smith v. Cain*, 708 F.3d 628 (5th Cir. 2013), the federal district court found that the petitioner had satisfied § 2254(d)(1) on his *Batson* claim and thereafter held an evidentiary hearing on the merits. The Respondent appealed, but the Fifth Circuit held the district court did not abuse its discretion: "[W]e think that the district court did what section 2254(d)(1) allows, and what *Pinholster* does not forbid. . . . Because the district court appropriately and correctly concluded that the state court had unreasonably applied *Batson* under section 2254(d)(1) based solely on the state court record, *Pinholster* is inapplicable." *Id*. at 634-35. Accordingly, a district court has discretion, subject to 28 U.S.C. § 2254(e)(2), to hold an evidentiary hearing on the merits of habeas claims notwithstanding that any new evidence adduced at that hearing cannot be considered as part of the § 2254(d) analysis. *See*, *e.g.*, *Pinholster*, 563 U.S. at 185 (holding that "evidence introduced in federal court has no bearing on § 2254(d)(1) review").

Furthermore, evidentiary hearings and the taking of new evidence are not absolutely prohibited as an aid to the Court's § 2254(d) analysis. Although the reasonableness inquiry in § 2254(d)(1) has been held to contemplate only the evidence presented in state court, *Pinholster*, 563 U.S. at 185, and § 2254(d)(2) review is by its terms also limited to the evidence presented in state

court, § 2254(e)(2)'s limitation on the availability of evidentiary hearings applies only to hearings on the *merits* of claims. Procedural questions—such as whether § 2254(d) applies to bar relief on an otherwise meritorious claim and whether cause and prejudice have been established to overcome a procedure default—may be decided with the assistance of new evidence and a hearing. *See, e.g.*, *United States v. Jones*, 172 F.3d 381, 385 (5th Cir. 1999) (remanding for evidentiary hearing on petitioner's ability to overcome procedural bar).

> **3.** **28 U.S.C. § 2254(d) applies to claims that were properly presented in state court only if those claims were adjudicated on the merits in accordance with due process; otherwise, the claims should be reviewed *de novo*.**

The Supreme Court has defined an adjudication "on the merits" for purposes of determining whether to apply the § 2254(d) relitigation bar:

> A judgment is normally said to have been rendered "on the merits" only if it was "delivered after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments." Black's Law Dictionary 1199 (9th ed. 2009) (emphasis added). And as used in [the § 2254(d)] context, the word "merits" is defined as "*[t]he intrinsic rights and wrongs of a case* as determined by *matters of substance*, in distinction from matters of form." Webster's New International Dictionary 1540 (2d ed. 1954) (emphasis added) [].

*Johnson v. Williams*, 568 U.S. 289, 302 (2013) (emphasis in original). If the state court's treatment of a claim that was raised in a procedurally appropriate manner did not result in such an adjudication "on the merits," then § 2254(d) does not apply.

Thus, the Supreme Court has held that a claim that was properly presented to the state court, but which was "rejected as a result of sheer inadvertence," was not adjudicated on the merits and should be reviewed in federal court *de novo*. *Id.* at 293, 302-03. Similarly, a state-court decision that misconstrued the claim presented to it, and that therefore adjudicated the wrong issues, is not an adjudication on the merits for § 2254(d) purposes. *See Henderson v. Cockrell*, 333 F.3d 392, 398 (5th

10

Cir. 2003); *see also Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001); *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir. 1999); *Warren v. Baenen*, 712 F.3d 1090, 1098 (7th Cir. 2013); *Campbell v. Bradshaw*, 674 F.3d 578, 596 (6th Cir. 2012).

Finally, the Supreme Court has held that a federal habeas claim should be reviewed *de novo* when "the factfinding *procedures* upon which the [state] court relied were not adequate for reaching reasonably correct results or, at a minimum, resulted in a process that appeared to be seriously inadequate for the ascertainment of the truth." *Panetti*, 551 U.S. at 954 (internal citations and quotations omitted) (emphasis added). In *Panetti*, the Supreme Court found that the state court's denial of the petitioner's *Ford* claim "rest[ed] on an implicit finding: that the procedures it provided were adequate to resolve the [] claim." *Id.* at 952-53. The Court held that this implicit finding was not supported by the record, specifically that "[t]he state court failed to provide the petitioner with a constitutionally adequate opportunity to be heard." *Id.* at 952. Accordingly, the claim was subject to *de novo* review in federal court. *Id.*

*Panetti* stands for the basic principle that state court adjudications of constitutional challenges must comport with the Due Process Clause before § 2254(d) can be applied to bar relief in federal court. *Id.* at 953. This is in line with the Supreme Court's later opinion in *Johnson* that, in order for an adjudication to have been "on the merits," the state court must have "heard and *evaluated* the evidence and the parties' substantive arguments." *Johnson*, 568 U.S. at 302 (internal citation and quotation omitted) (emphasis in original). For these reasons, the federal courts have held that a state court adjudication is not "on the merits" when the decision was made on the basis of a materially incomplete record, *Gordon v. Baxton*, 780 F.3d 196, 202 (4th Cir. 2015); when the

11

court has refused to consider material evidence presented by the defense, *Wilson v. Workman*, 577 F.3d 1284, 1292 (10th Cir. 2009); and when the state court prohibited factual development of the claim and relied on an incomplete record in rendering its decision, *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003).[3]

In Section IV, *infra*, Mr. Cruz-Garcia will show that § 2254(d) should not apply to any of the claims that he properly exhausted in state habeas because of the inadequacy of the state court's habeas process. He will address all other § 2254(d) arguments within his analyses of the individual claims in Section VI, *infra*.

### C.  Federal court review of claims that are procedurally defaulted.

Several of Mr. Cruz-Garcia's claims were presented to the CCA on direct appeal or in state habeas, but were found to be procedurally barred. Claims in this posture are exhausted but procedurally defaulted in federal court, unless the petitioner can show that the state procedural bar was either not independent of the federal question or inadequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Federal courts should employ a rebuttable presumption that state adjudications of federal claims are *not* independent of the federal question. *Richter*, 562 U.S. at 99. That presumption may be overcome only by showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100. Even a procedural bar that was purportedly based solely on state law will not bar federal review if the court's application of the state procedural bar was intertwined with an assessment of the constitutional question.

--------

[3] Other courts have held that a claim adjudicated pursuant to a deficient state court fact-finding process, though subject to § 2254(d), satisfies the § 2254(d)(2) exception to the relitigation bar, resulting in *de novo* review. *E.g.*, *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

Furthermore, to bar federal habeas review, the state procedural bar must be adequate to support the judgment. *Coleman*, 501 U.S. at 734. To be adequate, the state rule must be "firmly established and regularly followed." *See James v. Kentucky*, 466 U.S. 341, 348 (1984). In "exceptional cases," a state rule may be applied so exorbitantly in a particular case that it becomes inadequate to stop federal consideration of the federal question, even if the rule is otherwise firmly established and regularly followed. *Lee v. Kemna*, 534 U.S. 362, 376 (2002).

Should the Court find that the state procedural bars in this case were independent and adequate, Mr. Cruz-Garcia may still overcome procedural default by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To establish cause, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Commonly, cause may be demonstrated by showing that the factual or legal basis of the claim was previously unavailable to the petitioner, or that interference by State officials—such as withholding of evidence or other misconduct—made compliance with the State's procedural rule impracticable. *Id.* The showing required to establish actual prejudice is that the alleged constitutional error worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (internal quotation and citation omitted). Additionally, defaulted claims of ineffective assistance of trial counsel ("IATC") can be considered in federal court if the petitioner demonstrates that his state habeas counsel was ineffective and that the claims are substantial, or have "some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

13

"The terms 'cause' and 'prejudice' are not rigid concepts; they take their meaning from the principles of comity and finality []. In appropriate cases, those principles must yield to the imperative of correcting a fundamentally unjust incarceration." *Engle v. Issac*, 456 U.S. 107, 135 (1982). "It is this centrality of 'fundamental fairness' that has led the Court to hold that habeas review of a defaulted, successive, or abusive claim is available, even absent a showing of cause, if failure to consider the claim would result in a fundamental miscarriage of justice." *Sawyer v. Whitley*, 505 U.S. 333, 360 (1992) (Stevens, J., concurring). The Supreme Court has found that the fundamental miscarriage of justice exception to procedural default is satisfied by showing that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent," or that it is more likely than not that, in light of new evidence, no reasonable juror would have convicted him. *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). In capital cases, petitioners may also overcome default by demonstrating actual innocence of the death penalty. *Sawyer*, 505 U.S. at 347. Because this inquiry is focused on actual innocence, the federal courts deciding this issue are not bound by the rules of evidence that would govern at trial. *Schlup*, 513 U.S. at 327-28.

This Court can consider each of Mr. Cruz-Garcia's procedurally defaulted claims on one or more of the grounds discussed above. The application of the independent and adequate state law requirement and the cause-and-prejudice exceptions to procedural default will be addressed in the analyses of his individual claims in Section VI, *infra*.

### D.      Discovery in federal habeas.

Rule 6 of the Rules Governing § 2254 Cases permits discovery if the petitioner demonstrates "good cause." Although the Fifth Circuit has never defined "good cause," it is clearly satisfied upon a *prima facie* showing of the petitioner's entitlement to relief. *Washington v. Davis*, 715 F. App'x. 380,

385 (5th Cir. 2018). The Court has also held that, where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for adequate inquiry." *Gibbs v. Johnson*, 154 F.3d 253, 258 (5th Cir. 1998).

In order to obtain discovery, "a petitioner's factual allegations must be specific, as opposed to merely speculative or conclusory[.]" *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). Discovery may be granted to establish a claim's merit under § 2254(a) or to establish a procedural issue such as cause and prejudice to overcome procedural default. *See Jones*, 172 F.3d at 385 (remanding for evidentiary hearing on petitioner's ability to overcome procedural bar); *Washington*, 715 F. App'x. at 385-86 (remanding for discovery and a hearing on cause to excuse procedural default). Mr. Cruz-Garcia will seek discovery as to Claims 1 through 8, 11, 21, 23, and 27.

## IV.  LEGAL ARGUMENTS APPLICABLE TO MULTIPLE CLAIMS IN THE PETITION

**A.    The Court should not apply 28 U.S.C. § 2254(d) to any of Mr. Cruz-Garcia's claims because the state habeas proceedings did not comport with due process.**

The CCA has stated that Texas Code of Criminal Procedure ("TCCP") Article 11.071, which governs capital state habeas proceedings, ensures "that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002) (emphasis in original). 28 U.S.C. § 2254, in turn, assumes that the CCA honors that responsibility and follows procedures that comport with due process, so that petitioners receive full and fair review of their claims before litigating in federal court. *Panetti*, 551 U.S. at 952. When states fail to do so, state

15

prisoners must seek their "one bite at the apple" in federal court, and the limitations that § 2254(d) places on the granting of federal habeas relief do not apply. *Id.* at 954; *Williams*, 568 U.S. at 301-02.

1. **Despite his best efforts, Mr. Cruz-Garcia's state habeas proceeding did not proceed according to state-law requirements or provide him fundamental fairness and due process.**

Mr. Cruz-Garcia diligently sought a full and fair opportunity to litigate his habeas cause in state court. Through no fault of his own, the trial court nonetheless deprived him of the process to which he was due.

Mr. Cruz-Garcia filed a timely 11.071 application on August 28, 2015, raising several constitutional challenges. Five months later, he filed a motion to recuse Judge Renee Magee because one of his claims alleged that she held an improper *ex parte* conversation with a lone holdout juror during the trial's penalty phase deliberations, which coerced the juror into changing her vote to death. ECF No. 23-40 at 18-66. The motion argued that Judge Magee's adjudication of her own misconduct would create the appearance of partiality and that she had personal knowledge of disputed facts material to the claim, causing a conflict of interest. *Id.* at 19-33. Judge Magee denied the motion without a hearing and referred it to the regional presiding judge, who also denied the motion without a hearing. *Id.* at 67, 105. Mr. Cruz-Garcia filed a motion to reconsider, which was also denied. *Id.* at 68-104. He then filed a motion for leave to file a writ of mandamus in the CCA, challenging the denial of his recusal motion without holding a hearing, which violated Texas Rule of Civil Procedure 18a(g). ECF No. 23-30, 23-31. The CCA denied the motion for leave without written order. ECF No. 23-33. Mr. Cruz-Garcia was forced to proceed on his claims in front of the judge he had accused of misconduct.

After the State answered his application, Mr. Cruz-Garcia filed a motion for an order designating controverted issues of material fact in accordance with TCCP Article 11.071 § 8(a). ECF No. 23-41 at 122-153.[4] The motion argued that state law mandated designation of issues, after which either Section 8 or Section 9[5] would govern the development and resolution of the claims. *Id.* The motion asserted that "due process requires that this court follow the statutory procedure." *Id.* at 134. Mr. Cruz-Garcia advised the court of controverted fact issues with regard to his juror misconduct, judicial misconduct, Vienna Convention violation, and IATC claims. *Id.* at 145-51. The State, in turn, asked that the court only order affidavits from trial counsel, answering ten questions posed *exclusively* by the State regarding allegations of their deficient performance. *Id.* at 186-88.

At a hearing on August 8, 2016, Mr. Cruz-Garcia again pressed the importance of following the statute, designating controverted fact issues, and following the required procedures. ECF No. 24-9 at 6 ("And as the Court know[s], this is a death penalty case. I think it's important that we follow the law and the proper procedure."). The Court did not address Mr. Cruz-Garcia's motion, but immediately agreed to sign the State's proposed order that drastically limited fact development. *Id.* at 8. Mr. Cruz-Garcia's counsel objected on the ground that the 11.071 application raised contested issues of fact beyond the question of trial counsel's deficient performance, and directed the Court's attention to his own proposed order designating issues. *Id.* at 13-14, 17. At the State's suggestion, the court confirmed it would only order trial counsel's affidavits, but also clearly

---

[4] Tex. Code Crim. Proc. art. 11.071 § 8(a) states: "Not later than the 20th day after the last date the State answers the application, the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist and shall issue a written order of the determination."

[5] Tex. Code Crim. Proc. art. 11.071 § 8 governs state habeas procedure on claims for which the trial court determines there are no controverted, unresolved fact issues. Tex. Code Crim. Proc. art. 11.071 § 9 governs state habeas procedure on claims for which the trial court determines there are controverted, unresolved fact issues.

indicated it would address whether to designate additional issues and order further fact development after the affidavits were filed. *Id.* at 18-19.

On November 8, 2016, Judge Magee lost her bid for reelection. ECF No. 24-1 at 160-61. Lead trial counsel Skip Cornelius filed his affidavit on November 28, asserting that he filed the affidavit before even receiving the trial file to reacquaint himself with the case because he wanted Judge Magee to review his performance before she left the bench. ECF No. 23-41 at 197. The State, rather than the court, notified state habeas counsel that the affidavits had been filed, and served them on counsel days later. ECF No. 24-1 at 50, 67 n.3. The following day, November 29 (before the affidavits had been served), the State moved for an order directing the parties to submit proposed FFCL by December 22, 2016, without any further fact development and without designating the controverted issues as required by statute. *Id.* at 13-14.

Mr. Cruz-Garcia responded to the State's motion the next day, November 30, arguing that the submission of proposed FFCL was premature in light of the lack of evidentiary development and the court's failure to identify which claims presented controverted fact issues, and thus which rule would apply to the resolution of each claim. ECF No. 24-1 at 18-24. In the alternative, he asked for a later deadline than December 22 because his attorney was engaged in a week-long evidentiary hearing beginning December 12 and was attending a memorial service outside the state for a close family member on December 18.[6] *Id.* at 23. The same day Mr. Cruz-Garcia filed his opposition, the

---

[6] In response, the State took the extraordinary step of attempting to force the director of Office of Capital and Forensic Writs, located in Austin, Texas, to personally appear at the hearing, requiring the Director to explain in writing why he could not do so. ECF No. 24-1 at 62.

trial court signed the State's order making the proposed FFCL due December 22. *Id.* at 15.[7] The court, however, failed to serve the order on the parties until December 6, a mere six days before counsel's week-long evidentiary hearing, twelve days before she left the state for a family funeral, and sixteen days before the filing deadline. ECF No. 24-1 at 28.[8]

Mr. Cruz-Garcia filed a motion to reconsider and rescind the court's order, arguing it violated state law and prohibited him from presenting evidence in support of controverted claims, in violation of due process. ECF No. 24-1 at 27-41. At a hearing on December 22, the court denied the motion, indicating it would file the FFCL by the following week, before Judge Magee's tenure terminated on December 31, 2016. ECF No. 24-10 at 10. The court gave Mr. Cruz-Garcia five days— until December 27—to submit "anything that you would like me to consider," but stated she would decide within the week whether to sign the State's proposed FFCL "in total" or "draft my own." *Id.*

On December 27, Mr. Cruz-Garcia filed renewed objections, ECF No. at 64-72, and a motion to present evidence both in support of his claims and in rebuttal to the State's evidence, attaching 37 evidentiary proffers. *Id.* at 75-85. Two days later, the State sent an *ex parte* message to Judge Magee's chambers requesting an update on the status of the FFCL. Exh. A.[9] Without

---

[7] State habeas counsel for Mr. Cruz-Garcia was repeatedly told by the Harris County D.A.'s office and members of the Harris County court staff that motions would not be ruled on unless the sponsoring attorney presented it in person. Counsel for Mr. Cruz-Garcia was not present when the trial court granted the State's motion, suggesting either that the State approached the court *ex parte* or that the court broke with established protocol. Doc. 24-6 at 12 n.1.

[8] In all other capital state habeas cases that the Office of Capital and Forensic Writs ("OCFW") had handled in Harris County, they were given at least 50, and often more than 100 days to prepare their FFCL. *See, e.g., Ex parte Carl Buntion*, No. 588227 (178th Dist. Ct.) (allowing 127 days to file proposed FFCL); *Ex parte Jaime Cole*, No. 1250754 (230th Dist. Ct.) (allowing 100 days); *Ex parte Joseph Jean*, No. 1302120 (230th Dist. Ct.) (allowing 100 days); *Ex parte Garland Harper*, No. 1272085 (182nd Dist. Ct.) (allowing 57 days); *Ex parte Brian Davis*, No. 616522 (230th Dist. Ct.) (allowing 56 days). Doc. 14-6 at 13 n.2.

[9] Exhibits A and B were provided to Petitioner's counsel on August 12, 2019 in response to a Public Information Act request.

responding to the pending motions, the trial court signed the State's proposed FFCL that same day—two days before her tenure terminated—without altering a single word, including the heading "State's Proposed Findings of Fact, Conclusions of Law and Order." *Id.* at 86-136. The signed order even failed to excise the three evidentiary attachments the State had appended to it. *Id.* at 137-54.

On January 9, 2017, Mr. Cruz-Garcia filed a motion to reconsider the order adopting the State's proposed FFCL verbatim. *Id.* at 157-72. He also requested reconsideration of the November 30, 2016 order establishing the proposed FFCL filing deadline, and asked again for an order announcing whether his claims would be resolved under Rule 8 or Rule 9. *Id.* He again requested an opportunity to present his evidence. *Id.* The trial court, then presided over by Judge Herb Ritchie, held a hearing on the motion on February 1, 2017. ECF No. 24-7. Mr. Cruz-Garcia made it plain that he was not challenging the *content* of the FFCL, but rather the court's failure to provide him *adequate process* for a reliable resolution of his claims: "As I stated, Your Honor may reach the exact same outcome [as Judge Magee]. It's a matter of following the proper procedure, being afforded due process, and being afforded an opportunity to present evidence." *Id.* at 20; *see also id.* at 12.

In response to Mr. Cruz-Garcia's arguments, the State repeatedly instructed the court that the FFCL had already been transmitted to the CCA, thus depriving the trial court of jurisdiction over the motion to reconsider. *Id.* at 11-13, 17.[10] The trial court expressed sympathy with Mr. Cruz-Garcia's arguments, but based solely on the State's assertions that the case had already been transferred to the CCA, held it had no jurisdiction to take corrective action:

---

[10] The State claimed to have called the district court clerk's office the day prior to the hearing and confirmed the case's transmission. Doc. 24-7 at 12.

I understand exactly where you're coming from on some of the points that you've raised. We seem to present evidence on certain points, and affidavits wouldn't be sufficient on maybe some issues of credibility and other areas you weren't allowed to go into. . . . However, I'm in a position where the State is telling me that the record is now in the hand of the [CCA]. So at this point, I find I have no jurisdiction to do anything [].

*Id.* at 21-22. In fact, the FFCL were not transferred to the CCA until February 23, 2017, more than three weeks *after* the hearing. ECF No. 24-6 at 15.

After the FFCL were transmitted to the CCA, Mr. Cruz-Garcia filed detailed objections to the trial court's procedures as well as its fact-findings and legal analysis. ECF No. 24-6. Six months later, without addressing Mr. Cruz-Garcia's due process objections, the CCA ruled that, based on the trial court's FFCL and the Court's own review, Mr. Cruz-Garcia was not entitled to relief. ECF No. 24-13 at 3-5.

> **2.    Because Mr. Cruz-Garcia's state habeas proceeding did not comport with state law or due process, 28 U.S.C. § 2254(d)'s relitigation bar does not apply and this Court should consider his claims *de novo*.**

28 U.S.C. § 2254(d)'s language, which makes the federal habeas relitigation bar dependent on a state-court "adjudication on the merits," requires more than a mere state-court decision. Instead, the Supreme Court has consistently interpreted the provision as applying only when both substantive and procedural due process standards were met. In *Panetti*, the Supreme Court found that the CCA "failed to provide the petitioner with a constitutionally adequate opportunity to be heard." 551 U.S. at 948, 952. There, the petitioner had made a *prima facie* showing of his incompetency to be executed. The state court appointed experts to conduct evaluations, but did not allow the petitioner to present his own expert evidence in rebuttal, and failed to hold a hearing on the claim. *Id.* at 950-51. Moreover, the state court's process "in fact, constitute[d] a violation of the

21

procedural framework Texas has mandated for the adjudication of competency claims," which undermined any argument by the State that its procedures were reasonable in light of states' "substantial leeway to determine what process best balances the various interests at stake." *Id.* (citation omitted).

Based on the above observations, the Supreme Court found that the CCA's procedures for adjudicating the Eighth Amendment claim were "not adequate for reaching reasonably correct results or, at a minimum, resulted in a process that appeared to be seriously inadequate for the ascertainment of the truth." *Id.* at 954 (internal citations and quotations omitted). "As a result of this error, [federal] review of petitioner's underlying [] claim [wa]s unencumbered by the deference AEDPA normally requires." *Id.* at 948. The Court emphasized that even broadly-stated due process standards do not require a finding that state court processes reasonably applied those standards for purposes of a § 2254(d) analysis. *Id.* at 953. "The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Id.*

Like the procedural safeguards the Fifth and Fourteenth Amendments guarantee to petitioners that raise colorable incompetency-to-be-executed claims, the procedural due process to which state habeas applicants are entitled is broadly defined. Nonetheless, due process requires that, at a minimum, when the State establishes a corrective process by which convicted persons may challenge the constitutionality of the judgments against them, that process must ensure the person seeking relief an adequate opportunity to be heard. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) ("When[] a state creates a liberty interest, the Due Process Clause requires fair procedures for its vindication–and federal courts will review the application of those constitutionally required procedures.").

22

There are several hallmarks of unfairness present in Mr. Cruz-Garcia's state habeas proceeding. First, Judge Magee presided over allegations of her own misconduct, despite a motion asking her to recuse herself. Second, the court thwarted state law by refusing to follow the statutory requirement that it identify contested, previously unresolved issues of material fact, establish which procedures would govern each of Mr. Cruz-Garcia's claims, allow Mr. Cruz-Garcia an opportunity to present evidence to establish the merits of his factually contested claims, and allow Mr. Cruz-Garcia a fair opportunity to file proposed FFCL. Third, during the state habeas proceedings, Judge Magee used the fact that she presided over Mr. Cruz-Garcia's case to campaign for her judicial reelection. ECF No. 18 at 220. Fourth, the trial court undermined the fairness and impartiality of the state habeas process when Judge Magee accelerated and compressed the proceedings after losing reelection solely so that she, rather than her duly elected successor, could rule on Mr. Cruz-Garcia's claims—particularly given that she immediately sought judicial election a second time, once again using Mr. Cruz-Garcia's case in her campaign materials. *Id.* Fifth, Judge Magee signed the State's proposed FFCL verbatim, without sufficient time to review them and despite the presence of several fact-findings based on her personal observations and recollections from the trial. And finally, when a new judge presiding over the case indicated an interest in curing some of the due process violations that occurred under Judge Magee, the State provided false information to the judge that his court no longer had jurisdiction over the case.

The procedures in Mr. Cruz-Garcia's case were clearly inadequate to ascertain the truth and reach reasonably correct results. *Panetti*, 551 U.S. at 954; *see also Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014) (courts reviewing due process claims related to expectations or interests created by state laws or policies should focus on nature of deprivation rather than language of a particular

regulation). On that basis, § 2254(d) should not apply as a bar to the relitigation, *de novo*, of any of the claims that Mr. Cruz-Garcia raised in state habeas.

    **B.**    **Cumulative error.**

"The Constitution guarantees a fair trial through the Due Process Clauses . . . ." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (internal citation and quotations omitted). This guarantee "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). In service of the fundamental right to a fair trial, the Constitution provides for specific safeguards such as the criminal defendant's Sixth Amendment right to be effectively represented and the Fifth and Fourteenth Amendment prohibitions against the State's withholding of evidence favorable to the accused and presentation of false or misleading testimony to secure a conviction and favorable sentence.

The Supreme Court has twice addressed the assessment of prejudice under the Due Process Clause where there are multiple violations of a criminal defendant's constitutional rights in a single proceeding. *Taylor v. Kentucky*, 436 U.S. 478 (1978); *Chambers v. Mississippi*, 410 U.S. 284 (1973). Both times, the Court considered the combined prejudicial impact from the various errors to determine whether their "cumulative effect . . . violated the due process guarantee of fundamental fairness." *Taylor*, 436 U.S. at 487 n.15; *see also Chambers*, 410 U.S. at 302–03.

The Fifth Circuit has explained that "the cumulative error doctrine recognizes that 'an aggregate of non-reversible errors' can result in 'a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 631 F.3d 685, 710–11 (5th Cir. 2011) (reversing conviction based on a finding of cumulative error resulting from several harmless constitutional violations); *see also United States v. Riddle*, 103 F.3d 423, 435 (5th Cir. 1997); *United States v. Labarbera*,

581 F.3d 107, 110 (5th Cir. 1978); *United States v. Diharce-Estrada*, 526 F.3d 637, 642 (5th Cir. 1976).

Other circuit courts have likewise applied the cumulative error doctrine to assess claims of

prosecutorial misconduct and *Strickland* error. *See Cargle v. Mullin*, 317 F.3d 1196, 1220–22 (10th

Cir. 2003); *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001); *Gentry v. Sinclair*, 576 F.Supp.2d 1130,

1171 (W.D. Wash. 2008). As the Tenth Circuit explained in *Cargle*:

> [C]laims should be included in the cumulative-error calculus if they have been
> individually denied for insufficient prejudice. Indeed, to deny cumulative-error
> consideration of claims unless they have first satisfied their individual substantive
> standards for actionable prejudice "would render the cumulative error inquiry
> meaningless, since it [would] . . . be predicated only upon individual error already
> requiring reversal."

317 F.3d at 1207 (*quoting Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002)).

Each of the alleged trial errors in Mr. Cruz-Garcia's case, standing alone, was sufficiently

prejudicial to warrant habeas relief. When considered together, the cumulative impact of the

egregious errors set forth in the petition undermined all reasonable confidence in the outcome of

the trial and sentencing.

### C.   Mr. Cruz-Garcia's actual innocence mandates consideration of his procedurally defaulted claims on the merits to avoid a fundamental miscarriage of justice.

In Claim 27, Mr. Cruz-Garcia asserts that new evidence shows he is actually innocent of

capital murder and that his execution would therefore violate the Eighth Amendment under *Herrera*

*v. Collins*, 506 U.S. 390, 400 (1993). In addition to establishing a constitutional violation, evidence

of Mr. Cruz-Garcia's actual innocence can serve as a gateway through which his procedurally

defaulted claims for relief may be considered on the merits. *Schlup*, 513 U.S. at 298, 315-16. Under

the *Schlup* standard, Mr. Cruz-Garcia must demonstrate that a constitutional violation "'probably

resulted in the conviction of one who is actually innocent.'" *Id.* at 326-27 (quoting *Murray v. Carrier*, 477 U.S. 478 (1986)). Thus, the *Schlup* standard is easier to satisfy than the *Herrera* standard.

Mr. Cruz-Garcia incorporates by express reference the allegations and arguments in support of Claim 27, both within this brief, *infra*, and in his first amended petition, ECF No. 18 at 230. Because it is more likely than not that no reasonable juror would have convicted him in light of the new evidence of his innocence, each of his procedurally defaulted claims should be considered on the merits, under a *de novo* standard of review. *Schlup*, 513 U.S. at 327.

## V.  STATEMENT REGARDING PROCEDURAL DEFENSES

In federal habeas proceedings, the respondent must plead procedural defenses under Rule 5(b) of the Rules Governing § 2254 Cases in the United States District Courts. Under Rule 5(b), the respondent, by way of answer, "must address the allegations in the petition. In addition, [the answer] must state whether any claim in the petition is barred by a failure to exhaust remedies, a procedural bar, non-retroactivity, or a state of limitations." Mr. Cruz-Garcia explicitly reserves the right to reply to any potential affirmative defenses raised by the Director in her Answer.

## VI.  LEGAL BRIEFING OF INDIVIDUAL CLAIMS

### CLAIM ONE: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Mr. Cruz-Garcia was denied the effective assistance of counsel at trial, in violation of the Sixth, Eighth and Fourteenth Amendments.

### A.  Legal Standard.

To establish ineffective assistance of counsel, Mr. Cruz-Garcia must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is representation that falls below "an

objective standard of reasonableness." *Id.* at 688. Prejudice is established if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

### 1.   Deficient performance at the guilt/innocence phase.

In assessing counsel's performance, courts look to the "[p]revailing norms of practice as reflected in [the] American Bar Association standards and the like." *See Strickland*, 466 U.S. at 688-89. *See also* American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) ("ABA Guidelines"), 31 Hofstra L. Rev. 913 (2003), Guideline 1.1 at cmt. ("With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client."); *id.* at Guideline 10.7(A) ("[C]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (1984). While counsel may make strategic decisions about what evidence to present at trial, "courts are 'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'" *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999)).

Professional norms in a criminal case mandate that defense counsel at least attempt interviews with all significant state's witnesses. This is the most basic trial preparation. *See Bryant v.*

27

*Scott*, 28 F.3d 1411, 1417-18 (5th Cit. 1994); *Nealy v. Cabana*, 764 F.2d 1173, 11778 (5th Cir. 1985) ("[A]t a minimum," counsel must "interview potential witnesses and [] make an independent investigation of the facts and circumstances of the case."). Counsel also has a duty to investigate the state's witnesses and develop evidence with which to cross-examine and impeach them. *See Ramey v. Davis*, 942 F.3d 241, 256 (5th Cir. 2019) (finding substantial showing that trial counsel was ineffective for lack of preparation to impeach and cross-examine witnesses); ABA Guidelines at Guideline 10.7 cmt ("Counsel should investigate all sources of possible impeachment of defense and prosecution witnesses."); *Guidelines and Standards for Texas Capital Counsel*, State Bar of Texas (2006), Guideline 11.1(A)(2)(h) ("The investigation for the guilt-innocence phase of the trial should generally encompass . . . trial strategy, including . . . cross examination techniques of State witnesses[.]").

### 2.     Deficient performance at the punishment phase.

Under clearly established Supreme Court precedent, "[i]t is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams*, 529 U.S. at 396). "[T]rial counsel must not ignore pertinent avenues of investigation or even a single, particularly promising lead." *Charles v. Stephens*, 736 F.3d 380, 390 (5th Cir. 2013) (internal citations and quotation omitted); ABA Guidelines at Guideline 10.7(A) ,10.11(A). Moreover, trial counsel may not "ignore [] pertinent avenues for investigation of which he *should have been* aware," *Porter*, 558 U.S. at 40 (emphasis added), even when the defendant or his family tells counsel that no mitigating evidence exists, *Rompilla v. Beard*, 545 U.S. 374, 377 (2005).

Trial counsel's duty to investigate covers both evidence in mitigation of a death sentence and evidence to rebut the State's case in aggravation. *Rompilla*, 545 U.S. at 385. The Supreme Court recently explained the unique significance of the failure to investigate rebuttals to the State's case in aggravation in Texas:

> In Texas, a jury cannot recommend a death sentence without unanimously finding that a defendant presents a future danger to society (*i.e.*, that the State has made a sufficient showing of aggravation). Tex. Code Crim. Proc. Ann. Art. 37.071 § 2(b)(1). Only after a jury makes a finding of future dangerousness can it consider any mitigating evidence. *Ibid*. Thus, by failing to conduct even a marginally adequate investigation, counsel not only "seriously compromise[ed his] opportunity to respond to a case for aggravation," *Rompilla*, 545 U.S. at 385, but also relinquished the first of only two procedural pathways for opposing the State's pursuit of the death penalty. There is no squaring that conduct, certainly when examined alongside counsel's other shortfalls, with objectively reasonable judgment.

*Andrus v. Texas*, 140 S. Ct. 1875, 1885 (2020).

Trial counsel performs deficiently when they acquire "only rudimentary knowledge of [the defendant's history] from a narrow set of sources," or when they fail to make reasonable investigative decisions in light of available information. *Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003). The "failure to uncover and present voluminous mitigating evidence" cannot be passed off as trial strategy where trial counsel have not first discharged their duty to conduct a thorough background investigation. *Id*. at 522; *Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014) ("[I]f a purportedly tactical decision is not preceded by a reasonable investigation, then it is not sufficiently informed and not entitled to the deference typically afforded counsel's choices."); *Richards*, 566 F.3d at 564.

### 3.    Prejudice.

Trial counsel's deficient performance violates the Sixth Amendment when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

29

would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When assessing prejudice, this Court must consider the totality of the circumstances. *Williams*, 529 U.S. at 397–98.

Regarding the punishment phase, a finding of prejudice should never be foreclosed based on "counsel's effort to present some mitigation evidence." *Sears v. Upton*, 561 U.S. 945, 955 (2010); *see also Walbey v. Quarterman*, 309 F. App'x 795, 802 (5th Cir. 2009) ("This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.") (emphasis in original). Rather, the prejudice inquiry looks to "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding[s]," *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397–98), and evaluates whether the "available mitigating evidence taken as a whole might have sufficiently influenced the jury's appraisal of [the petitioner's] moral culpability," *Andrus*, 140 S. Ct. at 1887. (internal citations and quotation omitted). Because Mr. Cruz-Garcia's death sentence required a unanimous jury recommendation, prejudice "requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [Mr. Cruz-Garcia's] moral culpability [.]" *Id.* at 1886 (quoting *Wiggins*, 539 U.S. at 537-38).

## B.   Trial counsel's representation was deficient.

On February 16, 2010, the Court appointed Mike Fosher as first chair counsel for Mr. Cruz-Garcia. ECF No. 22-8 at 22. Mario Madrid was appointed as co-counsel on March 3, 2010. *Id.* at 25. Members of Mr. Cruz-Garcia's family, however, raised sufficient funds to retain private counsel. ECF No. 18-85 at 9. They hired Steven Shellist and Christian Capitaine to represent Mr. Cruz-Garcia in April of 2010. ECF No. 22-8 at 33-35; ECF No. 18-85 at 9.

30

Mr. Shellist and Mr. Capitaine worked on Mr. Cruz-Garcia's case until August of 2011. However, when the State decided to seek the death penalty, they withdrew from the case. ECF No. 22-9 at 108; ECF No. 22-30 at 6-7; ECF No. 18-6 at 1. On August 31, 2011, the court appointed R.P. "Skip" Cornelius as lead counsel and Mario Madrid as second chair. ECF No. 22-8 at 71-72.

Beyond the clerk's and reporter's records, there is virtually no record of what investigations and other preparations trial counsel undertook in Mr. Cruz-Garcia's case because, contrary to the ABA Guidelines, Mr. Cornelius and Mr. Madrid represented Mr. Cruz-Garcia on a fixed-fee basis: $65,000 for Mr. Cornelius and $60,000 for Mr. Madrid. ECF 18-7 at 1; ECF No. 22-9 at 158.[11] Fixed fees are prohibited by the Guidelines for obvious reasons: "When assigned counsel is paid a predetermined fee for the case regardless of the number of hours of work actually demanded by the representation, there is an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee." ABA Guidelines at Guideline 9.1, cmt. Under this arrangement, neither attorney kept contemporaneous time entries. Besides looking to the pleadings and transcripts, the only other contemporaneous source of information on trial counsel's work are the time entries kept by their investigator, who was paid by the hour.

### 1. Trial counsel refused to review the State's file, asserting on the record that it was not their responsibility.

Even with the limited documentation available, it is apparent that trial counsel endeavored to do the absolute minimum. First, trial counsel did not review the district attorneys' file. Under the mistaken impression that the State was required to essentially curate a limited set of relevant files

---

[11] The absence of a record is also attributable to the trial court's denial of Mr. Cruz-Garcia's repeated requests for evidentiary development in state habeas.

for them to review, trial counsel repeatedly rebuked the State's open file policy. ECF No. 23-6 at 188-89; *see also* ECF No. 23-2 at 7-8, ECF No. 18-3 at 58.

During the guilt/innocence phase, frustrated that he had to cross-examine the State's expert without having read his report, Mr. Cornelius asked to make a record of his complaints:

| | |
|---|---|
| Mr. Cornelius: | Yeah. I want to make sure we understand each other. *I don't have a responsibility to go through your file and figure out what's in your file. I don't have to do that.* . . . |
| Ms. Tise: | I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's opened to you. . . . |
| The Court: | I don't think we need to put this all on the record. . . . If you want to argue, we'll go off the record. |
| Mr. Cornelius: | I'm not going to go try to figure out what's in your file. . . . I'm not going to go through 20 boxes of DNA records. |
| Ms. Tise: | I told you, Skip, you need to come by and see my file. |
| The Court: | All right. Let's go off the record, Mary Ann. |

ECF No. 23-6 at 188-89 (emphasis added). As a result of counsels' misunderstanding of their duties, they went to trial without any firsthand knowledge of the State's case.

### 2. Trial Counsel conducted almost no investigations until the eve of trial, and 30 percent of their investigations took place during trial.

After their appointment in August of 2011, trial counsel waited almost nine months, until May of 2012, to begin investigating the case at all. ECF No. 18-7 at 6-7. Over the course of 2012, their investigators billed less than 70 hours. *Id.* Perhaps most troublingly, the vast majority of the investigators' work occurred during or just before trial. Jury selection began on June 3, 2012, but less than 20% of the investigative work was completed by April 7, 2012. *Id.* at 6-7, 10-11, 26, 46-49. Nearly 30% of the investigation took place *during the trial itself. Id.*

Because trial counsel waited until just before trial to investigate in earnest, there was no margin for error and no time for follow-up investigations. Thus, although their investigator did make a short visit to the Dominican Republic (43% of the time billed for the trip was for travel to and from Houston), little was accomplished beyond a few interviews, and no follow-up investigation was possible because sufficient time had not been allocated. ECF No. 18-7 at 26. Likewise, although trial counsel asserted in court filings that investigations in Puerto Rico would be *necessary* for the defense, ECF No. 22-9 at 166-67, they never travelled there.

3.    **Trial counsel failed to secure the expert assistance needed to effectively present a defense.**

Trial counsel's work also fell well below the minimum requirements when it came to experts. Although they sought and obtained funds for "mental health and mitigation," they never retained a mitigation specialist, never put together a social history of Mr. Cruz-Garcia's life, and had their mental health expert limit herself to *seven hours* of work—despite informing the court that she would need to bill sixty to seventy hours to fulfill her role in the case. ECF No. 22-9 at 169-72; ECF No. 18-7 at 21. Trial counsel also did not consult with an appropriate mental health expert who could have explained the complex trauma Mr. Cruz-Garcia suffered in his youth and early adulthood, his remarkably positive reputation as an inmate while incarcerated in Puerto Rico, and the social, historical, and economic context in which his life unfolded in the Dominican Republic, Puerto Rico, and the United States. *See, e.g.*, ECF No. 18 at 18-40, 41, 110.

Trial counsel also failed to continue working with the DNA expert that Mr. Cruz-Garcia's original representatives had already retained for him. At the time of their appointment, Dr. Elizabeth Johnson, a private forensic expert and DNA analyst, had already been retained to review the State's

33

DNA evidence. ECF No. 18-6 at 1-2. However, Messrs. Cornelius and Madrid declined to consult with Dr. Johnson, and therefore went to trial with no DNA evidence of their own.

**4.    Trial counsel performed deficiently at voir dire.**

Trial counsel performed deficiently throughout the voir dire by, inter alia, (1) stipulating to the removal, without questioning, of jurors with strongly held views about the death penalty; (2) agreeing to strike jurors without making a full record of the strikes; (3) agreeing not to mention that the victim was a child and failing to question potential jurors on their attitude toward a case with both a child victim and a sexual assault; (4) failing to investigate and raise a fair-cross section claim; and (5) failing to make *Batson* challenges. ECF No. 18 at 116-25.

**C.    Counsel's deficient performance prejudiced Mr. Cruz-Garcia at both the guilt/innocence and penalty phases of the trial.**

The background of the offense was as follows: On the evening of September 30, 1992, two masked intruders broke into the apartment shared by Diana Garcia, her boyfriend Arturo Rodriguez, and Ms. Garcia's six-year-old son, Angelo Garcia, Jr. One of the intruders beat and restrained Mr. Rodriguez, while the other sexually assaulted Ms. Garcia. The intruders then kidnapped Angelo. On the afternoon of November 4, 1992, Angelo's body was found by a fisherman in Goose Creek near Baytown, Texas.

At trial, the State's case rested primarily on four evidentiary sources:

(1) evidence that Mr. Cruz-Garcia's DNA was present in the vaginal swab taken from Diana Garcia, on a sample taken from her underwear, and on a cigar that was found in her apartment, which the State alleged was left by one of the assailants;

(2) the testimony of Rudy Santana, who admitted that he participated in Angelo's abduction with Mr. Cruz-Garcia and another man named Rogelio Aviles-Barroso, but alleged that Mr. Cruz-Garcia and Mr. Aviles-Barroso had been the masked me who broke into the apartment while Mr. Santana waited in the car,

34

that Mr. Cruz-Garcia had sexually assaulted Ms. Garcia, and that Mr. Cruz-Garcia subsequently ordered Mr. Aviles-Barroso to kill Angelo;

(3) the testimony of Diana Garcia and Arturo Rodriguez that Mr. Cruz-Garcia had a motive to commit the offense because they had stopped selling cocaine for him; and

(4) the testimony of Mr. Cruz-Garcia's ex-wife, Angelita Rodriguez, who claimed that Mr. Cruz-Garcia had abruptly left Houston after the offense occurred and later confessed to her.

Each of these four sources of evidence had substantial flaws and questionable credibility, which could have been, but were not, brought out at trial. Had trial counsel represented Mr. Cruz-Garcia in accordance with prevailing norms of practice in 2012, there is a reasonable probability that the result of the trial would have been different.

1. **Mr. Cruz-Garcia was prejudiced at the guilt/innocence phase by his counsel's abnegation of their duties because faulty DNA testing procedures and inaccurate test results were presented to the jury unchallenged.**

a. **Relevant background to the DNA evidence**

Potential DNA evidence was collected at the crime scene. The evidence included a vaginal swab taken from Ms. Garcia, a cutting taken from Ms. Garcia's underwear, and a cigar found in the apartment. ECF No. 23-2 at 33. In 1992, the old HPD crime lab performed DNA extractions on the evidence. *Id.* at 87. An HPD crime lab employee named Deetrice Wallace received the sexual assault kit and did initial screening to detect blood and semen. *Id.* at 91. Another employee of the old HPD crime lab, Baldev Sharma, was the primary DNA analyst on the extractions taken from the sexual assault kit in 1992. *Id.* at 89-90. A criminalist named Joseph Chu also obtained a hair sample from a suspect in 1992. *Id.* at 88-89.

The DNA extractions were sent by James Bolding, an HPD crime lab supervisor, to Genetic Design Lab in California for testing, together with samples from a number of male individuals. *Id.* at 87; ECF No. 23-24 at 137. Genetic Design Lab reported its results in a letter to Mr. Bolding dated February 4, 1993. ECF No. 23-24. at 123. The lab found that "DNA types obtained from the male fraction of panties are not consistent with any of the individuals tested in the analysis." *Id.* Notably, one of the individuals who was excluded was Arturo Rodriguez, who lived with Ms. Garcia and Angelo as Ms. Garcia's supposed common-law husband. *Id.* The letter did not elaborate on its conclusions with respect to the DNA from the vaginal swab, although it did report numerical test results. A note from the lab's files, however, makes clear that there was one individual who their analysis found was "not excluded." *Id.* at 131. That individual's name was Bienvenido Melo. *Id.*

The DNA results did not lead to any indictments and the case was effectively closed. The DNA evidence remained at the old HPD crime lab.

On November 11, 2002, KHOU Channel 11, a local Houston television station, began airing a series investigative news reports that revealed shocking information regarding the old HPD crime lab. ECF No. 23-22 at 65. The report led to an investigation led by Michael Bromwich, a former Inspector General of the U.S. Department of Justice, and the eventual closure of the lab. The Bromwich investigation revealed numerous instances of misconduct, mismanagement, and general ineptitude in the lab's DNA section, including by employees who handled the evidence taken from the 1992 crime scene. In addition to its employees outright falsifying results, the lab had

serious issues with DNA contamination.[12] The crime lab was eventually rebuilt from scratch and reopened in 2007 (the "new crime lab"). ECF No. 23-3 at 6.

Also in 2007, the HPD cold case squad reopened investigations in this case. The HPD collected the vaginal swab, the cutting of the panties, and the cigar, which had been stored in the shuttered HPD crime lab, and sent them to Orchid Cellmark for DNA analysis. ECF No. 23-2 at 32-38, 41-42. The State claimed that the evidence had been stored in sealed plastic bags, although this later turned out to be false. *Id.* Orchid Cellmark performed DNA analyses on the samples. *Id.* In 2010, the new crime lab obtained a buccal swab from Mr. Cruz-Garcia. *Id.* at 92-94. They then compared Orchid Cellmark's results to their own analysis of Mr. Cruz-Garcia's swab. *Id.*

The new crime lab concluded that Mr. Cruz-Garcia could not be excluded as a contributor to the cigar sample and the vaginal swab, and found the sperm cell fraction from the panties came from two men. *Id.* at 94-95. Mr. Cruz-Garcia could not be excluded as one of the contributors. *Id.* Orchid determined that Arturo Rodriguez could not be excluded as the other contributor to the sperm cell fraction from the panties, reversing the result of the 1992 testing. *Id.* at 57, 59. Bienvenido Melo, who originally could not be excluded as a contributor, was now excluded. *Id.* at 60-61.

Despite having refused to work with DNA expert Dr. Johnson, trial counsel moved to have all of the DNA evidence suppressed. ECF No. 22-10 at 5-7. In support of their motion, they cited the findings of the Bromwich investigation. ECF No. 23-2 at 19-21. They also introduced evidence of repeated reprimands of the employees of the HPD crime lab who handled the 1992 evidence. *Id.*

---

[12] Several individuals convicted of sexual assault based on the lab's DNA work were exonerated. *E.g., Rodriguez v. City of Houston*, 2011 WL 13202989 (S.D. Tex. 2011).

at 20, 111. Baldev Sharma had received numerous allegations of misconduct, and had been cited for violations of competence and truthfulness. The lab's DNA/Serology Section was found to be a "total disaster" under his management. ECF No. 23-3 at 16-17; ECF No. 23-18 at 18; ECF No. 23-24 at 44, 62. The Bromwich Report concluded that James Bolding "was not a competent leader for DNA analysis" and that at the time he supervised the DNA lab its analysts "were never adequately trained," "were not receiving competent technical guidance," and "continued processing and reporting cases while using and perpetuating flawed practices that . . . permeated virtually the entire body of the Crime Lab's DNA work." ECF No. 23-22 at 110. Deetrice Wallace was convicted of three counts of tampering with a governmental record. ECF No. 23-3 at 17; ECF No. 23-24 at 85. Joseph Chu received numerous complaints of misconduct and on several occasions failed to report DNA statistics properly. ECF No. 23-3 at 15-16; ECF No. 23-24 at 42, 43, 50, 53, 55, 61.

Trial counsel's motion was not successful. Not only did the trial court not suppress the DNA evidence, it also prohibited trial counsel from presenting any of their own evidence concerning the problems at the shuttered HPD crime lab or mentioning the scandal. ECF No.23-3 at 5-25; ECF No. 23-4 at 7-18. Nor was trial counsel permitted to offer evidence concerning the reprimands and criminal convictions of the lab employees who handled and tested the evidence in this case. ECF No. 23-4 at 7-10. Trial counsel was also prohibited from offering evidence of the 1992 test results, which were inconsistent with the results of the State's recent testing. ECF No. 23-24. at 123, 131.

At trial, several State's witnesses testified regarding the results of the DNA testing. Many testified regarding issues of which they had no firsthand knowledge, and thus their testimony violated the Confrontation Clause, but trial counsel inexplicably failed to object. *See* ECF 18 at 179-181. Had they objected, either the DNA evidence would have been inadmissible or the witnesses

38

who originally handled the evidence would have had to testify, which would have provided trial counsel an opportunity to question them regarding problems at the old HPD crime lab. Additionally, when trial counsel did object to being prohibited from cross-examining the State's witnesses concerning the problems at the old HPD crime lab and the misconduct of the employees who handled the DNA evidence in 1992, they failed to federalize the issue.

Moreover, having failed to consult with or retain a DNA expert, trial counsel was unable to rebut the State's evidence by challenging the procedures used or the results reported. Although it was readily available, trial counsel also failed to offer any evidence that would explain the State's DNA results, such as evidence that Mr. Cruz-Garcia had a consensual sexual relationship with Ms. Garcia and that the cigar found in the apartment was not left by the assailants.

Mr. Cruz-Garcia's state post-conviction counsel retained an outside DNA expert to review the State's trial evidence. The report identified numerous deficiencies in the analyses. ECF No. 18-10. It also identified significant problems with the chain of custody. *Id.* at 2-3. Contrary to the testimony of the State's witnesses, the evidence bag containing the vaginal swabs was *unsealed* when it arrived at Orchid Cellmark. *Id.* Likewise, the cutting from the panties was stored in the same *unsealed* envelope as the blood sample from Arturo Rodriguez. *Id.*

On November 3, 2015, over two years after Mr. Cruz-Garcia was convicted, the new crime lab revealed that they had, in fact, botched the DNA analysis in this case. ECF No. 18-11. Contrary to the evidence presented at trial, the new HPD crime lab admitted that it could not link Mr. Cruz-Garcia to the vaginal swab. *Id.* at 2. While the lab continued to assert that Mr. Cruz-Garcia could not be excluded as a *possible* contributor to the sperm cell fraction in the panties, it conceded that it had wrongly linked Arturo Rodriguez to the minor component. *Id.* That is, the second contributor

39

to the sperm cell fraction in the panties was completely unknown and could be the perpetrator. Post-conviction investigation also uncovered numerous witnesses who would testify to the fact that Mr. Cruz-Garcia and Ms. Garcia had an ongoing, consensual sexual relationship. ECF 18-21 at 1; -22 at 1, -23 at 2. Moreover, recordings that were available at the time of trial reveal that HPD abandoned the theory that the cigar had belonged to one of the assailants during its 1992 investigation. ECF No. 18-64 at 7.

> **b.** **Trial counsel's failure to review the State's file, conduct investigations into Mr. Cruz-Garcia's relationship with Ms. Garcia, and retain a DNA expert prejudiced Mr. Cruz-Garcia.**

Had trial counsel retained a DNA expert, Mr. Cruz-Garcia would have uncovered evidence that incompetent evidence storage by the old HPD crime lab and flaws in the chain of custody rendered the State's DNA evidence wholly unreliable. A DNA expert would have instructed trial counsel that:

(1) The sexual assault kit stored by the old HPD crime lab was unsealed when received by Orchid Cellmark, exposing it to contamination and cross-contamination;

(2) The cutting from the panties was stored in the same envelope as Arturo Rodriguez's blood sample, which was also unsealed, and identification of Rodriguez as the minor contributor to that sample was unreliable (and later shown to be false), leaving open the possibility of an unknown contributor who could have been the perpetrator;

(3) Orchid Cellmark did not follow prevailing scientific norms in testing DNA and interpreting results. Already briefed in detail in Mr. Cruz-Garcia's Amended Petition, a DNA expert would have explained that, under prevailing scientific norms, the comparison between the DNA obtained from the panties and Arturo Rodriguez's blood sample should have been deemed inconclusive;

(4) No conclusion should have been drawn from the DNA analysis of the sperm cell fraction taken from the vaginal swab.

The State has since conceded the latter two errors in a 2015 amended DNA report. ECF No. 18-11.

Moreover, a DNA expert would have enabled Mr. Cruz-Garcia to cross-examine State witnesses to expose other infirmities in the State's evidence. For instance, contrary to HPD criminalist Courtney Head's testimony that she could opine as to the identification of Mr. Cruz-Garcia by comparing his DNA profile with profiles obtained by Orchid Cellmark, without performing any analysis of the DNA itself, reanalysis of the work of another forensic laboratory runs counter to best scientific practice. ECF No. 18-10 at 5-8. Further, contrary to Orchid Cellmark analyst Matt Quartaro's testimony, it is not scientifically possible to determine that the DNA extracted from a sperm fraction is itself from sperm. *See* ECF No. 23-7 at 123; ECF No. 18 at 143-45. It is possible for epithelial cell DNA to appear in sperm fraction, and vice versa. *Id.* Nor would Mr. Cruz-Garcia's sperm have been necessary to contaminate the items from the sexual assault kit. ECF No. 23-2 at 65; ECF No. 23-7 at 142; ECF No. 18 at 143-45.

As conceded by the State in its 2015 amended DNA report, the DNA evidence in fact painted a very different picture than that presented to the jury. Mr. Cruz-Garcia could not be linked to the vaginal swab, nor could an unknown contributor be excluded from the swabs taken from Ms. Garcia's underwear. While the amended report noted that Mr. Cruz-Garcia could not be excluded as a possible contributor to the DNA found on Ms. Garcia's underwear, trial counsel could have rendered that possibility irrelevant had they conducted adequate investigations and uncovered readily available evidence, attested to by several witnesses, that Mr. Cruz-Garcia and Ms. Garcia were having a consensual sexual relationship at the time of the offense. And had counsel reviewed the State's file—an elementary responsibility in any criminal defense—they could have cross-examined investigating officers about their assessment in 1992 that the cigar did not belong to one of the assailants. ECF No. 18-64 at 7. Finally, they also would have uncovered the results of Ms. Garcia's

41

Sexual Assault Nurse Examiner (SANE) exam, which were atypical for victims of sexual assault, and they could have investigated Ms. Garcia's sexual assault allegations further. ECF No. 18-109.

Had counsel familiarized themselves with the State's file and conducted a follow-up investigation, aided by a DNA expert, they could have undermined the jury's confidence in the State's experts and established reasonable doubt as to Mr. Cruz-Garcia's guilt. They could have also shown that, regardless of its accuracy, the DNA evidence was hardly probative of any fact other than Mr. Cruz-Garcia's relationship with the victims, including an ongoing sexual relationship with Ms. Garcia. Instead, the State argued to the jury in closing that, "[p]robably the most damning corroboration for the defendant in this case is the DNA evidence." ECF No. 23-9 at 37. Trial counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Because the DNA evidence was unreliable, and the State has since conceded that much of it was inaccurate, counsel's failure prejudiced Mr. Cruz-Garcia.

2.   **Mr. Cruz-Garcia was prejudiced at the guilt/innocence and penalty phases by his counsel's abnegation of their duty to review the State's file and investigate State's witness Rudy Santana.**

Rudy Santana testified for the State at both the guilt/innocence and punishment phases of trial. He told the jury that Mr. Cruz-Garcia had been frustrated with Ms. Garcia and Arturo Rodriguez because they had stopped selling cocaine for him, providing a motive for the offense. ECF No. 18 at 8. Though Mr. Santana had previously repeatedly denied participating in the offense, he also testified at trial that Mr. Cruz-Garcia recruited him and another associate, Rogelio Aviles-Barroso, to break into the victims' home to look for drugs and money. *Id.* He claimed that he was outside, acting as the getaway driver while the other two went inside, that Mr. Cruz-Garcia assaulted Ms. Garcia, and that Mr. Cruz-Garcia and Mr. Aviles-Barroso kidnapped Angelo. *Id.* According to

42

Mr. Santana, Mr. Cruz-Garcia then ordered Mr. Aviles-Barroso to execute Angelo, and ordered both Mr. Santana and Mr. Aviles-Barroso to dump the body in the bayou, which they did. *Id.*

Mr. Santana's story changed with each telling, and he was not charged with anything for his participation. A plethora of evidence impeaches Mr. Santana's credibility and renders his testimony practically useless; however, because trial counsel failed to review the State's file or conduct any of their own investigations, that evidence was not uncovered or presented to the jury.

First, had trial counsel reviewed the State's file, they would have found multiple prior inconsistent statements. During two interrogations in 1992 and one in 2009, Mr. Santana denied any knowledge of or involvement in the offense. *Id.* at 148. His testimony also materially contradicted several of the statements he gave HPD after agreeing to cooperate as a witness. *Id.* at 148-50. These inconsistencies include how long Mr. Cruz-Garcia was inside the home, whether Angelo was walking when he was kidnapped, Mr. Cruz-Garcia's drug use that evening, and whether he was offered a deal to testify. *Id.* Because counsel did not review the file, including the State's supplemental *Brady* notice, they were unable to impeach any of Mr. Santana's statements.

Next, trial counsel failed to investigate Mr. Santana's mental health history. Just before Mr. Santana implicated Mr. Cruz-Garcia, he asserted in his own unrelated case that he was suffering from such serious mental health issues that his federal sentence should be set aside. ECF No. 18-12, -13, -14. This was not the first time Mr. Santana had alleged that he was mentally ill. His attorney had moved for a psychiatric evaluation and the court ordered a competency evaluation in connection with his original sentencing. ECF No. 18 at 50-51. This evidence would have further impeached Mr. Santana's credibility, showing either that he was seriously mentally ill or that he had lied to a federal

court about being seriously mentally ill, and either way that he had a strong incentive to assist the prosecution because he was actively seeking early release.

Finally, counsel failed to investigate Mr. Santana's criminal history, which included crimes of moral turpitude. *Id.* at 51-52. Indeed, trial counsel stipulated during Mr. Santana's testimony that they had not sufficiently investigated his criminal history to identify whether he had committed any crimes of moral turpitude. ECF No. 23-7 at 21-28. They agreed to accept the State's word on whether one of his offenses was a crime of moral turpitude. *Id.* The State provided false information and counsel therefore failed to use it to impeach Mr. Santana. *Id.*; ECF No. 18-79.

Mr. Santana was an unindicted co-conspirator, purportedly suffering from serious mental illness, and with a long criminal history that included crimes of moral turpitude against children. His testimony could have been, and should have been, aggressively impeached. The evidence was available, but because trial counsel failed to familiarize themselves with the State's file and conduct follow-up investigations, the jury never heard it.

### 3. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Diana Garcia and Arturo Rodriguez.

The State's theory of motive was that Mr. Cruz-Garcia was upset that Ms. Garcia and Mr. Rodriguez had stopped selling cocaine for him. Both Ms. Garcia and Mr. Rodriguez testified that they had stopped dealing drugs well before the murder occurred. ECF No. 23-4 at 137-38; 23-5 at 36. They also suggested that the cigar taken from the crime scene was left by the assailants. *See, e.g.,* ECF No. 23-5 at 7-8. Law enforcement witnesses testified that they found Ms. Garcia and Mr. Rodriguez to be forthcoming and truthful. ECF No. 23-4 at 123; ECF No. 23-5 at 77.

44

Had trial counsel reviewed the D.A.'s file or otherwise conducted a competent investigation, they would have learned that, according to police reports, Ms. Garcia and Mr. Rodriguez were dealing drugs *on the day of the incident.* ECF No. 18-24 at 1-2. Likewise, materials from the HPD reflect that law enforcement (1) disregarded the possibility that the cigar had been left by the assailants and (2) never believed that Ms. Garcia and Mr. Rodriguez were forthcoming or truthful. ECF No. 18-64 at 7; ECF No. 18-19; ECF No. 18-64 at 4-8; ECF No. 18-66.

### 4. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Angelita Rodriguez.

Ms. Rodriguez, Mr. Cruz-Garcia's ex-wife, testified that Mr. Cruz-Garcia left Houston abruptly after Angelo's kidnapping, that their marriage ended when he left, and that he later confessed to her. ECF No. 101-09. Had trial counsel conducted an adequate investigation, they would have learned that Mr. Cruz-Garcia had been planning to return to the Dominican Republic for some time before the offense and that, according to the FBI, he and Ms. Rodriguez continued to live as husband and wife there. ECF Nos. 18-15, -81, -91. Trial counsel also failed to investigate and question Ms. Rodriguez on any assistance she expected to receive from the State in return for her testimony. In fact, the State did provide immigration assistance to Ms. Rodriguez in return for her testimony. Exh. B. Had counsel conducted an adequate investigation, Ms. Rodriguez would have lost credibility with the jury.

### 5. Mr. Cruz-Garcia was prejudiced in additional ways by trial counsel's failure to familiarize themselves with the State's file and conduct guilt/innocence investigations.

Trial counsel failed to introduce evidence, available in the State's file, that the HPD developed other suspects during the course of their investigations, that the FBI received a ransom

demand, that another individual called HPD and offered to tell them Angelo's whereabouts in exchange for $10,000, and that a confidential informant told HPD that the person who kidnapped Angelo was in New York. ECF No. 18-16, -17, -18, -19 & -20. This evidence could have created a reasonable doubt that Mr. Cruz-Garcia was involved in the offense. No tactical decision could have informed counsel's decision not to pursue this evidence.

Trial counsel also neither requested nor received documents that the State subpoenaed from the Puerto Rican branch of the FBI. ECF No. 18-36. The subpoenaed documents included the file from Mr. Cruz-Garcia's incarceration, during which he exhibited exemplary behavior. *Id.* at 2. And for no strategic reason, counsel declined the State's offer to provide them the grand jury testimony of their trial witnesses.

**6.    Mr. Cruz-Garcia was prejudiced at the penalty phase by trial counsel's failure to conduct minimally adequate investigations into mitigation and in rebuttal of the State's case in aggravation.**

Trial counsel did not retain a mitigation specialist or consult with appropriate experts. The defense's entire penalty case, presented through four witnesses, took only 70 pages of the transcript. ECF No. 18 at 68. In light of the results of post-conviction investigations, it is clear that "effective counsel would have painted a vividly different tableau of aggravating and mitigating evidence than that presented at trial." *Andrus,*140 S. Ct. at 1886.

Trial counsel called only four lay witnesses at the punishment phase. Mr. Cruz-Garcia's younger brother Joel had to pay his own way from the Dominican Republic to Houston, and trial counsel showed little to no interest in preparing him to testify. ECF No. 18-85 at 1-2. Joel's direct examination lasted only 12 pages of transcript, which included lengthy objections from the State. ECF No. 23-12 at 32-43. Because trial counsel were unprepared and had not investigated Mr. Cruz-

46

Garcia's life history, they failed to elicit helpful testimony. Instead, Joel provided only the briefest chronology of Mr. Cruz-Garcia's childhood and inadvertently made it appear that he had experienced a pleasant childhood in the Dominican Republic. *Id.* Not only was the testimony not particularly mitigating, the false impression it gave was actually aggravating. *Andrus*, 140 S. Ct. at 1883 ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment.").

The second witness, Mr. Cruz-Garcia's wife Mireya, testified via a shoddy video link from the Dominican Republic. Her testimony lasted less than 10 pages and, due to the poor connection and problems with interpretation, her testimony was extremely difficult to discern. ECF No. 23-12 at 11-20. She could not testify to Mr. Cruz-Garcia's childhood or his life leading up to the offense, and instead generally described their life in the Dominican Republic. *Id.* Mr. Cruz-Garcia's then 17-year old son also testified, but because Mr. Cruz-Garcia went to prison when he was five years old, there was little he could offer. ECF No. 23-12 at 70-83.

The defense's final witness was Angel Mesa, a teenager who had known Mr. Cruz-Garcia while he was in pretrial detention, and who Mr. Cruz-Garcia had positively influenced. ECF No. 23-12 at 81-89. He literally walked in off the street, into the courtroom, and asked to testify. *Id.* at 81. The jury foreman later stated that he was by far the most persuasive defense witness. ECF No. 23-26 at 71 ("[I]f it hadn't been for that kid, it would have been a much easier decision for me."). Had defense counsel presented evidence that Mr. Cruz-Garcia had been a similarly positive force on the lives of scores of other inmates in Puerto Rico, there is a reasonable probability the jury would have reached a different result.

Trial counsel also attempted to introduce evidence of Mr. Cruz-Garcia's religiosity through Bible study certificates and his assistance to federal law enforcement agencies such as the FBI, DEA, and INS through a Puerto Rican police officer, who was a state's witness. ECF No. 23-12 at 58-61, 72. However, the evidence was excluded by the trial court. *Id.* at 60, 74-77. While the trial court's decision violated Mr. Cruz-Garcia's right to present a defense, trial counsel was also ineffective for failing to do the legwork necessary to introduce the evidence in a form that would not have drawn a sustained objection from the State.

Although they retained Dr. Rosin, she only met Mr. Cruz-Garcia one time and spent seven hours on the case before testifying to her opinion of his mental health. ECF No. 18-7 at 7, 21. Her work was practically useless.

### a.   Had trial counsel conducted an adequate investigation, the jury would have heard a vastly different case in mitigation of a death sentence.

Many witnesses present in the Houston area, but who were not interviewed by trial counsel, were available and willing to provide relevant mitigation testimony at the penalty phase. The witnesses would have testified that Mr. Cruz-Garcia had a traumatic childhood, defined by neglect and rejection by all of his adult caregivers, but nevertheless was a compassionate and generous adult, often providing clothes and food to families and paying for medical treatment for those in need. ECF No. 18-21 at 2, -22 at 2, -23.

Mr. Cruz-Garcia experienced substantial hardship and as a child. ECF No. 18-39, -40, -41, -42, -43, -44, -45, -46, -81, -82, -83, -84, -85, -86, -87, -88, -89, -90, -91, -92, -93, -94, -110. As a consequence of his early-life adversities Mr. Cruz-Garcia suffers from complex post-traumatic stress disorder ("PTSD"), a psychological disorder that can develop in response to prolonged, repeated

experiences of interpersonal trauma in a context in which the individual has little or no chance of escape, such as when the individual is a child and dependent on parental caregivers for survival. *See, e.g.*, ECF No. 18-110 at 4-15.

Among other things, early in Mr. Cruz-Garcia's life, his father suffered a debilitating injury from a violent car crash that led to his departure from the Dominican Navy, one of the country's most prestigious institutions, and devastating economic disadvantages for the family. ECF No. 18-85 at 11; 18-89 at 3. Mr. Cruz-Garcia's mother, with whom Mr. Cruz-Garcia had a strong, dependent emotional attachment, abandoned the family and left for Venezuela. ECF No. 18-85 at 11; 18-89 at 3; 18-90 at 6-7. Mr. Cruz-Garcia, his father, and his three siblings moved from Santo Domingo, the capital of the Dominican Republic, to a remote village that practiced subsistence fishing and adhered to a native, evangelical version of Christianity that was nothing like the Catholicism Mr. Cruz-Garcia's had grown up with. ECF No. 18-85 at 11-12; 18-90 at 7-8. Mr. Cruz-Garcia could no longer maintain regular school attendance because he had to go fishing with the village men to feed his family. ECF No. 18-85 at 11-12. The work was often perilous: in at least one instance, his boat capsized in a storm in the middle of the sea. ECF No. 18-44 at 8; 18-82 at 3.

His mother eventually sent for Mr. Cruz-Garcia's sisters to join her in Venezuela, but she made clear she had no interest in reuniting with him. ECF No. 18-85 at 11; 18-89 at 3; 18-90 at 8-9. Mr. Cruz-Garcia's father eventually remarried to a woman who was disdainful of Mr. Cruz-Garcia and encouraged his father to focus his attention exclusively on the children he had with her. ECF No. 18-85 at 12-13; ECF No. 18-94 at 2. His father, who had always been a regular drinker, developed full-blown alcoholism and became distant and withdrawn. ECF No. 18-85 at 12-13; ECF No. 18-94

49

at 2. Because his step-mother worked in a far-away village, Mr. Cruz-Garcia had to care for his siblings and new half-siblings while he himself was still a child. ECF No. 18-85 at 12-13; 18-94 at 2.

At the age of 18, Mr. Cruz-Garcia was forced to marry a local girl in the village because they were found alone in a room together. ECF No. 18-85 at 13-14. A year later, with a child on the way and the Dominican Republic's economy chronically depressed, Mr. Cruz-Garcia emigrated to Puerto Rico, where he worked as a laborer on coffee and banana plantations, saving money to send home to his wife and family. ECF No. 18-85 at 13-14. While there, he learned that his wife, although pregnant with his child, had abandoned him and taken up with another man. ECF No. 18-85 at 13-14. Mr. Cruz-Garcia subsequently met his future wife Angelita and Mr. Santana in Puerto Rico. ECF No. 18-85 at 14. The three moved to Houston, where Mr. Santana introduced Mr. Cruz-Garcia to the cocaine trade. ECF No. 18-85 at 14.

After Mr. Cruz-Garcia left the United States, he provided invaluable assistance to federal law enforcement agencies, including the INS, DEA and the FBI. ECF No. 18-46; ECF No. 18-85 at 15. His operations as a confidential informant led to the arrest and prosecution of numerous individuals. *Id.* The federal government so trusted and valued Mr. Cruz-Garcia that he was frequently permitted to enter U.S. territory for the purpose of providing "significant public benefit," despite having previously lived in the United States as an undocumented immigrant. ECF No. 18-111. Due to the poor performance of trial counsel, the jury heard nothing about the substantial assistance Mr. Cruz-Garcia provided to law enforcement, often at great personal risk to himself.

Moreover, at the time of his trial in 2013, Mr. Cruz-Garcia had been incarcerated in Puerto Rico for almost a decade. His prison records, which were included in the D.A.'s files that trial counsel refused to review, show that Mr. Cruz-Garcia was an exemplary inmate. Witnesses who

50

worked in the prison stated that he became a deeply religious man while incarcerated. ECF No. 18-45, -105, -106, -107, -108. In light of his good behavior and positive contributions to prison life, he was given extraordinary privileges. Indeed, he was literally given the keys to parts of the prison. ECF No. 18-105 at 7. Yet, because trial counsel performed no investigation of Mr. Cruz-Garcia's time in prison, none of this was brought to the jury's attention.

Had trial counsel reviewed the documents in the State's file, retained a mitigation investigator, contracted for a full mental health evaluation, and learned the true story of the man they were representing, the jury would have sat in judgment of a different man than they were confronted with through the brief, incomplete, and convoluted testimony of the four witnesses that counsel did call. There is a reasonable probability that, learning of Mr. Cruz-Garcia's childhood of loss and neglect, his regular and reliable assistance to law enforcement, and his rehabilitation and good conduct in prison, at least one juror would have answered the mitigation special issue in the affirmative, resulting in a life sentence.

> **b. Had trial counsel conducted an adequate investigation, there is a reasonable probability that at least one juror would have answered the future dangerousness special issue in the negative, resulting in a life sentence.**

Trial counsel also failed to investigate the State's case in aggravation. Had they done so, they would have uncovered substantial evidence casting doubt on the truthfulness of the testimony implicating Mr. Cruz-Garcia in several extraneous, uncharged offenses.

> **i. The Saul Flores murder.**

Trial counsel failed to request the D.A.'s materials concerning the Saul Flores murder, including the DNA evidence. As a result, they failed to uncover and present evidence that Johnny

Lopez had previously given statements regarding this murder that were inconsistent with his testimony. They also failed to present evidence that Mr. Santana's dramatic testimony regarding the murder was completely inconsistent with the autopsy reports, photographs, and witness affidavits. ECF No. 18 at 95-97.

### ii.   The kidnapping in Puerto Rico.

Trial counsel could have learned that Mr. Cruz-Garcia was working on behalf of U.S. law enforcement agencies when the kidnapping occurred, having recently entered Puerto Rico on a special visa given to those who provide a "significant public benefit." ECF No. 18 at 97-98; ECF No. 18-111. Mr. Cruz-Garcia requires discovery to ascertain the full extent of the information that would have been available to trial counsel concerning the kidnapping and whether it exculpates him from any participation in this offense.

### iii.   The assault on "Betico" and rape of an unknown woman.

Trial counsel should have sought to exclude evidence of this assault and rape and had they done so, it would have been excluded. The only evidence of the alleged offense was the testimony of Mr. Santana, who admitted he had no first-hand knowledge of the events. ECF No. 18 at 98-99.

Had the jury learned that the evidence of Mr. Cruz-Garcia's participation in these aggravated, but uncharged offenses was unreliable, in combination with the unpresented evidence that Mr. Cruz-Garcia had been a model inmate in Puerto Rico, there is a reasonable probability that at least one juror would have found that the State failed to prove it was more likely than not that Mr. Cruz-Garcia would commit criminal acts of violence that would constitute a continuing threat to society. Accordingly, there is a reasonable probability that Mr. Cruz-Garcia would have been sentenced to life instead of death.

7.     **Mr. Cruz-Garcia was prejudiced by trial counsel's deficient performance during jury deliberations.**

As detailed in Claim 7 and incorporated herein by express reference, a local attorney alerted the trial judge that he had witnessed juror misconduct in the courthouse elevator. Trial counsel failed to interview the attorney, question the individual jurors involved, or move for a mistrial. As detailed in Claim 8, trial counsel also failed to object to the trial judge's *ex parte* meeting with a holdout juror, failed to question the holdout juror, failed to request a transcript of the *ex parte* meeting, and failed to move for a mistrial. Had trial counsel followed up on these instances of juror and judicial misconduct that were brought to their attention, there is a reasonable probability that a motion for mistrial would have been granted, or that Mr. Cruz-Garcia's conviction and death sentence would have been reversed on direct appeal.

8.     **Mr. Cruz-Garcia was prejudiced by his trial counsel's failure to contact consular officials from the Dominican Republic.**

As soon as a foreign national is detained in the U.S., he has a right to consult with and receive assistance from the consulate of his home country. Despite knowing that Mr. Cruz-Garcia was a Dominican citizen, and despite the fact that both the ABA and Texas Guidelines instruct that counsel representing a foreign national should take steps to liaise with the relevant consulate, trial counsel failed to do so. As a consequence, Mr. Cruz-Garcia did not receive any support from his home government. Foreign consulates regularly provide assistance to their nationals facing the death penalty, including by assisting with investigations in the home country and assisting in the process of securing the physical presence of witnesses from their home country to testify at trial. There is no tactical reason for trial counsel to have failed to take advantage of this significant assistance.

D.     **The Claim is unexhausted.**

53

The foregoing claim was not presented in Mr. Cruz-Garcia's state post-conviction application. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

**E.      Mr. Cruz-Garcia will seek discovery concerning this claim.**

As set forth in Mr. Cruz-Garcia's forthcoming Motion for Discovery, he will seek significant discovery in support of this claim. This Court has broad discretion to grant discovery, and will be authorized to consider the new evidence to establish the claim's merit and, if relevant, to establish cause and prejudice to overcome procedural default pursuant to *Martinez*, 566 U.S. 1, and *Trevino*, 569 U.S. 413.

### CLAIM TWO: INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Mr. Cruz-Garcia was denied the effective assistance of appellate counsel, in violation of the Sixth, Eighth, and Fourteenth Amendments.

**A.      Legal standard.**

Under clearly established Supreme Court precedent, ineffective assistance of appellate counsel claims are governed by the two-prong *Strickland* standard, which requires a showing of deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see also Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985) (holding the Fourteenth Amendment requires the assistance of counsel on the first appeal as of right). Appellate counsel has an obligation to raise "solid, meritorious arguments" based on controlling precedent. *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999). Here, appellate counsel's performance was prejudicially deficient because he failed to challenge the trial court's improper, coercive instruction given during an *ex parte* meeting

54

with a holdout juror. ECF No. 18 at 123–25. Because his constitutional rights were violated, Mr.

Cruz-Garcia is entitled to a new trial.[13]

### B. Appellate counsel was ineffective for failing to challenge the trial court's improper, coercive, and *ex parte* instruction to Juror Bowman during punishment phase deliberations.

#### 1. The trial court improperly coerced Juror Bowman to change her vote during punishment phase deliberations.

The factual basis for this claim is extensively laid out in Mr. Cruz-Garcia's amended petition.

ECF No. 18 at 171–78. During the penalty phase deliberations, Juror Bowman learned that her ten-

year-old daughter was seriously ill, possibly with pneumonia. ECF No. 22-10 at 161-62; ECF No. 23-

39 at 69. Juror Bowman "was one of the most adamantly opposed" jurors to returning a death

sentence, and after the jury was sequestered overnight during punishment phase deliberations, "felt

a great deal of pressure" to change her vote on the special issues. *Id.* at 162, 190. On the second day

of deliberations, Juror Bowman sent a note asking to speak to the trial court without explaining the

reason why, and the trial court decided to meet with juror Bowman one-on-one in chambers. ECF

No. 23-13 at 4-5. Trial counsel did not object to this meeting based on their clearly-stated assumption

that the meeting was to discuss a scheduling conflict. *Id.*

During the *ex parte* meeting, Juror Bowman explained that she was the only juror who

answered special issues 1 and 3 such that Mr. Cruz-Garcia would be sentenced to life instead of

death, and suggested that she be replaced with an alternate juror because she did not think the jury

---

[13] Based on additional factual development, Mr. Cruz-Garcia withdraws his assertion from the Amended Petition that appellate counsel failed to ensure that the record on appeal was complete. *See* ECF No. 18 at 124. Mr. Cruz-Garcia also withdraws his claim that appellate counsel was ineffective for failing to challenge the constitutionality of Mr. Cruz-Garcia's conviction and sentence based on the violation of his rights under the Vienna Convention on Consular Relations ("VCCR"). *See* ECF No. 18 at 125.

would ever come to an agreement. *Id.* at 7. She explained that she felt pressured to change her vote, but that she would not change her opinion. *Id.* At the meeting, she also expressed serious concern about having to be sequestered another night. *Id.* at 9.

Juror Bowman told the trial court that, "I am not changing my stance on [the special issues]. I'm not." *Id.* at 6-7. The trial court instructed her to continue to deliberate, and that it could be for "a pretty long period of time," but that it would not "be for years." *Id.* The trial court told juror Bowman to "continue trying to reach an agreement with the jury, if you can." *Id.* at 8. She indicated that how long Juror Bowman had to deliberate was "completely in the hands of the entire jury." *Id.* at 9. The court also instructed that,

> I do want you to recall the voir dire and my instructions at voir dire, as well as you should answer the questions according to what the evidence is. . . . Not what you know the result would be in terms of what that is. Right? . . . If the evidence leads you to a certain way, that's the way you should answer it, even though it might result in something that bothers you.

*Id.* at 8. An hour after their *ex parte* meeting, Juror Bowman, who had plainly just asserted, "I am not changing my stance on [life]. I am not," *id.* at 7, joined a unanimous jury verdict sentencing Mr. Cruz-Garcia to death. The court did not communicate anything about this discussion, or its supplemental instructions, on the record to counsel or Mr. Cruz-Garcia. Instead, the court only told counsel that Juror Bowman asked how long the deliberations would last. ECF No. 22-10 at 157.

The process was so disturbing to Juror Bowman that she reached out to trial counsel the same day that the verdict was read and signed a sworn affidavit averring that, "[t]he verdict I returned was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty." ECF No. 22-10 at 162. Juror Bowman was "distraught over her decision to capitulate during the punishment phase deliberations and change her vote" and felt "pressured"

to do so. *Id.* at 157-162. Additionally, she explained that her daughter was suffering from a fever and she wanted to take care of her, rather than be sequestered another night. *Id.* at 157, 162.

### 2. Appellate counsel ineffectively failed to raise the trial court's coercive instruction to Juror Bowman.

Appellate counsel's performance was prejudicially deficient because he did not seek relief based on the trial court's coercive, *ex parte* instructions to Juror Bowman. ECF No. 18 at 124. Had the trial court's impropriety been raised as a point of error, Mr. Cruz-Garcia would have prevailed and the death sentence would have been vacated.

Supplemental jury instructions can be given to a deadlocked jury. *Allen v. United States*, 164 U.S. 492 (1896). However, if those instructions are impermissibly coercive, a defendant's constitutional rights are violated. *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Deciding whether a supplemental instruction is improperly coercive requires a court to consider the instruction "in its context and under all the circumstances." *Jenkins v. United States*, 380 U.S. 445, 446 (1965). A jury verdict returned shortly after the instruction was given weighs in favor of a finding that the instruction was coercive. *United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978). Giving the instruction during an *ex parte* meeting—even if trial counsel acquiesced to such a meeting—also weighs in favor of a finding of coercion. *Id.* at 460–62. And an instruction that targets holdout-jurors specifically is more likely to be coercive. *Lowenfield*, 484 U.S. at 237–38. This instruction meets all three of those standards.

Because trial counsel was not present when the coercive instruction was given, and the trial court did not inform trial counsel of the content of its instructions to Juror Bowman, direct appeal was Mr. Cruz-Garcia's first opportunity to raise this claim in the CCA. The failure to do so

constituted ineffective assistance in violation of Mr. Cruz-Garcia's constitutional rights. *See Robbins*, 528 U.S. at 285.

### C.   28 U.S.C. § 2254(d) does not preclude the relitigation of this claim.

This claim is exhausted. Mr. Cruz-Garcia presented it as Claim 7 in his initial state habeas application. ECF No. 23-38 at 148–50. The state court purported to resolve this claim on the merits; however, the trial court's FFCL hardly mentions appellate counsel. Virtually the only finding referring to appellate counsel was that Mr. Cruz-Garcia failed "to demonstrate a violation of his constitutional rights, much less the deficient performance of trial/appellate counsel and prejudice based on the Court's objected-to ex parte conversation with juror Bowman." ECF No. 24-1 at 116–17. Subsequently, the CCA issued a blanket denial of all ineffectiveness claims by stating that Mr. Cruz-Garcia had not met his burden under *Strickland*. ECF No. 24-13 at 4. Accordingly, this Court should conduct *de novo* review of this claim.

If this Court determines that the state court adjudicated this claim on the merits, an exception to the 28 U.S.C. § 2254(d) relitigation bar exists. The state-court decision rejecting this claim involved an unreasonable application of the *Robbins/Strickland* ineffectiveness standard and the Supreme Court's opinions in *United States Gypsum Co.*, 438 U.S. 422, *Jenkins*, 380 U.S. 445, and *Lowenfield*, 484 U.S. 231. The opinion also contains multiple unreasonable determinations of the facts. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000). Among other things, the state court's holding that appellate counsel was not ineffective for failing to raise this meritorious claim was unreasonable in light of the clearly coercive nature of the *ex parte* conversation, which violated Mr. Cruz-Garcia's constitutional rights.

58

Additionally, the trial court apparently determined that trial counsel had been fully informed of the substance of the court's *ex parte* meeting with Juror Bowman. ECF No. 24-1 at 115. Yet, there is nothing in the record suggesting that trial counsel were ever informed and affidavits of trial counsel strongly suggest otherwise. ECF No. 23-26 at 28 (affidavit of Mauro Madrid stating only that "Judge Magee stated that Ms. Bowman questioned how long deliberations would last"); 23-41 at 202 (affidavit of Skip Cornelius stating "[t]here is a huge difference between what we knew at the time and what has been said after the verdict was rendered"); 24-1 at 5 (affidavit of Mauro Madrid stating nothing about learning of the substance of Judge Magee's *ex parte* meeting with Juror Bowman and only that "Judge Magee informed us of the situation" prior to the *ex parte* meeting and that the *ex parte* meeting would be transcribed").

## CLAIM THREE: FALSE TESTIMONY

The State repeatedly elicited and failed to correct false testimony, in violation of the Fifth, Eighth and Fourteenth Amendments.

### A.    Legal standard.

Under clearly established federal law, the State may not elicit or fail to correct testimony that it knows or should know to be false. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Alcorta v. Texas*, 355 U.S. 28, 78 (1957)). Presentation of false testimony violates due process and is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). To establish a due process violation, a petitioner must show that false testimony was presented to the jury, that the prosecution knew or should have known of its falsity, and that the false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (internal citation and quotation omitted); *see also*

59

*Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (finding the defendant's due process rights were violated where State's witness "gave the jury [a] false impression"). Moreover, "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269.

In the Fifth Circuit, a false testimony claimant must prove three elements: (1) the falsity of a witness statement; (2) the State's culpable elicitation or failure to correct it; and (3) materiality. *See United States v. Dvorin*, 817 F.3d 438, 451−52 (5th Cir. 2016). The second prong has been read broadly and is satisfied when *anyone* on the government's team knew, or the prosecution *should have known*, the testimony was false. *Giglio*, 405 U.S. at 154.

The standard for determining whether false testimony was material under *Napue*'s third prong is more lenient than the *Brady* materiality standard, because "the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves a corruption of the truth-seeking function of the trial process." *United States v. Bagley*, 473 U.S. 667, 680 (1985) (internal quotation omitted). Even if sufficient evidence exists to support the guilty verdict without the perjured testimony, "the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979). Accordingly, the *Napue* standard is equivalent to the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967), which requires the State to "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Bagley*, 473 U.S. at 679 n.9; *Barham*, 595 F.2d at 242.

Finally, as the Supreme Court has recently reminded us, false and misleading testimony must be evaluated for materiality *cumulatively*, rather than individually. *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (overturning a conviction because "the state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively").

**B.      False testimony regarding DNA evidence.**

**1.      Testimony identifying Mr. Cruz-Garcia as the source of the DNA evidence was false.**

The case against Mr. Cruz-Garcia was a cold case that was ostensibly solved in reliance on DNA evidence that has since been shown to be false. As conceded by the State in a 2015 amended report, and contrary to testimony by the State's witnesses at trial, Mr. Cruz-Garcia cannot be linked to the vaginal swabs taken from the rape kit, nor can a second unknown contributor be excluded from the swabs of the cuttings taken from the panties. ECF No. 18-11.

At trial, the State introduced the false testimony of Orchid Cellmark Analyst Matt Quartaro. Mr. Quartaro testified that Mr. Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction obtained from the vaginal swabs was a mixture of multiple individuals, from which neither Mr. Cruz-Garcia nor Mr. Rodriguez could be excluded as contributors; and that the sperm cell fraction obtained from the cutting of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia was a major contributor and Mr. Rodriguez could not be excluded as a minor contributor. ECF No.23-7 at 119–20. The State's amended DNA report now establishes that this testimony, with the exception of the cigar, is false. ECF No. 18-11.

The amended lab report reveals serious issues with the two seemingly inculpatory pieces of DNA evidence upon which the State's case depends. The amended lab report notes that, with respect

to the vaginal swabs taken from Ms. Garcia, "*No conclusions will be made given the excessive number of contributors to this DNA mixture*." ECF No. 18-11 at 2 (emphasis added). As for the sperm cell fraction of the DNA mixture taken from the panties, the amended lab report notes that, while Mr. Cruz-Garcia cannot be excluded as a possible contributor to the major component of the DNA mixture, "*[n]o conclusions will be made regarding the minor component of this DNA mixture due to insufficient data.*" *Id.* (emphasis added).

> ### 2.    Testimony about the DNA source and cross-contamination was false.

Eric Mehl and Mr. Quartaro falsely testified that the evidence was sent to Orchid in sealed bags. ECF No. 23-6 at 48-49; ECF No. 23-7 at 140. In fact, the sexual assault kit and the cutting from the panties were not sealed. ECF No. 18-10 at 2-3. Mr. Quartaro also provided false testimony about the source of DNA in the sperm fraction. ECF No. 23-7 at 139–40. Even if it were possible to reliably determine that Mr. Cruz-Garcia's DNA was present in the sperm fraction, the mere presence of DNA in the sperm fraction does not mean the DNA came from sperm. DNA from epithelial (skin) cells may also be present in sperm fractions. Mr. Quartaro also gave false testimony that it was Mr. Cruz-Garcia's sperm on the vaginal swabs and the panties, and that cross-contamination between the cigar and these samples was not possible. ECF No. 23-2 at 65. DNA testing of these items yielded a mixture of DNA from multiple contributors. This mixture could have resulted from a combination of sperm cells and epithelial cells. That means that, contrary to the State's argument at trial, it cannot be said that Mr. Cruz-Garcia's sperm was present. ECF No. 18 at 143-45.

The State knew, or should have known, that this testimony was false. The false DNA evidence was developed and presented by members of the prosecution team. Moreover, the

erroneous mixture interpretation standards were utilized and implemented by State actors to create false DNA interpretations.

### C.    False testimony concerning Mr. Santana.

### 1.    The State and Mr. Santana lied about his criminal record.

In 1992, shortly before Angelo was kidnapped, Mr. Santana assaulted a young girl.  ECF No. 18-79 at 1, 7. According to records in the State's possession, Mr. Santana was "hallucinating and became violent." *Id.* at 6-8. After attacking the girl, Mr. Santana broke windows in the apartment where she lived. *Id.* The victim's mother told the Harris County District Attorney's Office ("HCDAO") that she was concerned about "the possibility of serious injury to her child or any other child," and that "she fear[ed] for the safety of her child" if Mr. Santana were released from jail. *Id.* at 13. He was initially charged with injury to a child, but later pled to misdemeanor assault.

In Texas, assaulting a female is a crime of moral turpitude. *Hardman v. State*, 868 S.W.2d 404, 405 (Tex. App. 1993). Accordingly, Mr. Santana's conviction for assaulting a child around the time of Angelo's disappearance should have been fair game for cross-examination. During a hearing outside the presence of the jury, however, Mr. Santana lied about his conviction. ECF No. 23-7 at 24. He testified that the child he had assaulted had been a boy, not a girl. *Id.* The State did not correct this testimony. As set forth above in Claim 1, Mr. Cruz-Garcia's counsel admitted that he failed to investigate the offense and stated that he would accept whatever the State told him about the offense. ECF No. 23-7 at 17-18. Although the documents in their own files clearly identified the victim as a girl, the State falsely represented to the trial court that crime had not been one of moral turpitude. *Id.* at 27. The trial court accepted the State's characterization of the crime and precluded defense counsel from asking questions relating to Mr. Santana's 1992 conviction. *Id.* at 28.

Had the State not sponsored Mr. Santana's false testimony, and had the State not falsely represented to the trial court that the victim of Mr. Santana's assault was a male, defense counsel could have cross-examined Mr. Santana regarding the crime, impugning his credibility with a second crime against a child. Of course, a conviction for any crime of moral turpitude will heavily damage a witness's credibility, and the fact that Mr. Santana assaulted a child around the time of Angelo's kidnapping would have additionally caused the jury to question Mr. Santana's testimony that he was a reluctant participant in Angelo's murder and became physically ill at the thought of harming a child. Accordingly, the State's false testimony and representations regarding Mr. Santana's criminal history prevented the defense from undermining a core aspect of Mr. Santana's story.

**2.    The State and Mr. Santana lied about his exposure to criminal liability.**

One issue that both sides recognized was critical to Mr. Santana's credibility was whether he was in any danger of prosecution for his role in Angelo's murder. The State now asserts that, according to Mr. Santana's version of the events, he did not commit a crime, but that legal analysis does not pass the smell test. Texas has sent men to the execution chamber for less culpable conduct than what Mr. Santana admitted to.[14] In fact, the assertion that Mr. Santana was criminally blameless was a post-hoc rationalization for an informal understanding with Mr. Santana that so long as he implicated Mr. Cruz-Garcia, he would be spared prosecution.[15]

---

[14] Steven Michael Woods, Jr. (https://www.reuters.com/article/us-execution-texas/texas-executes-man-for-dallas-area-slayings-idUSTRE78D00H20110914); Jeffrey Lee Wood (https://abcnews.go.com/TheLaw/story?id=5532710&page=1); Kenneth Foster (https://www.austinchronicle.com/news/2005-02-11/wrong-place-wrong-time/).

[15] Mr. Cruz-Garcia will seek the discovery he was improperly denied in state court concerning Mr. Santana's false testimony that he and the prosecution had not discussed a deal. The State's implausible legal reasoning for failing to charge Mr. Santana provides sufficient good cause for the requested discovery.

Even if the Court were to credit the State's outlandish assertion that Mr. Santana's version of the events absolved him of any criminal liability, the State took extraordinary steps at trial to paint a misleading, and ultimately false, picture of Mr. Santana's cooperation. First, Mr. Santana testified that he had actually been charged in connection with Angelo's murder and the State let this testimony stand uncorrected, giving the jury the false impression that Mr. Santana would be prosecuted for Angelo's murder. ECF No. 23-7 at 18-19.

Second, despite having purportedly concluded that Mr. Santana did not commit any crimes in connection with Angelo's killing, the State deliberately elicited testimony from Mr. Santana to suggest that, by testifying against Mr. Cruz-Garcia, he was placing himself in serious legal jeopardy. ECF No. 23-6 at 168 ("Q. And you know that as you sit there that you could be charged with a crime, don't you? A. That's right."). This testimony was elicited to create a false impression that Mr. Santana agreed to cooperate at great risk to himself. Discovery will show that both the State and Mr. Santana knew, based on their agreement, that this was false.

### D.     False testimony regarding Ms. Garcia and Mr. Rodriguez.

### 1.     Ms. Garcia and Mr. Rodriguez lied about Mr. Cruz-Garcia's supposed motive for the murder.

A key aspect of the State's case was assigning a motive to Mr. Cruz-Garcia. The theory the State presented was that Mr. Cruz-Garcia was angry at Ms. Garcia and Mr. Rodriguez because they had stopped selling cocaine for him. Both Ms. Garcia and Mr. Rodriguez testified that they had stopped dealing drugs before Angelo was kidnapped. ECF No. 23-4 at 137, ECF No. 23-5 at 206. According to the State's own files, that testimony was false. In fact, multiple reports from the HPD show that Ms. Garcia and Mr. Rodriguez were selling cocaine out of their apartment the very day

that Angelo was taken. ECF No. 18-24 at 1-4. Had the State not elicited Ms. Garcia and Mr. Rodriguez's false testimony, its theory of Mr. Cruz-Garcia's motive would have fallen apart.

**2.    Ms. Garcia lied about her relationship with Mr. Rodriguez.**

Ms. Garcia also testified falsely about her relationship with Mr. Rodriguez. She claimed that she and Mr. Rodriguez had a "common-law" marriage. Ms. Garcia, however, remained legally married to Angelo Garcia, Sr. Moreover, Ms. Garcia maintained a romantic relationship with another man, a Mr. Valdez, whose love letters were found in Ms. Garcia's purse. ECF No. 18-99, 18-22. Ms. Garcia also testified falsely that Angelo Garcia, Sr., her husband, was Angelo's father. ECF No. 23-11 at 194. In fact, police records indicate that Angelo's father was a man named Pedro Ortiz. ECF No. 18-97.

**E.    False testimony from law enforcement.**

**1.    Law enforcement officers lied about Ms. Garcia and Mr. Rodriguez.**

In addition to soliciting false testimony from Ms. Garcia and Mr. Rodriguez, the State also solicited false testimony from law enforcement about the couple and about the kidnapping. During the investigation of the kidnapping, the police found Ms. Garcia and Mr. Rodriguez to be uncooperative and dishonest. In a recorded phone call several weeks after the kidnapping, Officer U.P. Hernandez said to Ms. Garcia: "We are trying to help you, and you are still lying to us. . . . Everyone else tells us things that you all are not even telling us that are important. Why do you all lie so much?" ECF No. 18-64 at 4. He further stated: "[Y]ou haven't told me everything that happened that night, and neither has Arturo," and "I find out more things from other people than I do from you all, you know, and that's pathetic. It is really pitiful." *Id.* at 6-8. Officer Hernandez added, "[W]e look at what you said, and it doesn't make sense. It doesn't make sense." *Id.*

66

On November 9, 1992, over a month after the kidnapping, Officer W.I. Stevens wrote in his report: "It is still our belief that [Ms. Garcia] is not being completely truthful with us concerning her drug activity and her knowledge of a possible motive for the events that occurred on September 30, 1992." ECF No. 18-66. Several months later, on January 6, 1993, Officer Stevens wrote: "Diana [Garcia] and Arturo [Rodriguez] have been untruthful throughout the investigation with regard to the events inside the apartment and the identity of the suspects." ECF No. 18-19.

When it came time for trial, the law enforcement witnesses, including Officer Hernandez, told a completely different story. These witnesses told the jury that Ms. Garcia and Mr. Rodriguez, although initially reluctant to speak to the police, were fully cooperative and forthcoming within a day of Angelo's kidnapping. ECF No. 23-4 at 123; ECF No. 23-5 at 77. This false testimony gave the jury the inaccurate impression that the police had found Ms. Garcia and Mr. Rodriguez to be credible witnesses (and that by extension the jury should as well), when in fact the police had never believed that Ms. Garcia and Mr. Rodriguez were reliable.

## 2. Law enforcement officers lied about other theories of the murder.

The false testimony from law enforcement personnel was not limited to the credibility of Ms. Garcia and Mr. Rodriguez. When asked whether there had been any ransom demands after Angelo was kidnapped, Officer Hernandez testified that there had not. ECF No. 23-5 at 82. In fact, according to police records, several demands for ransom were made. ECF No. 18-17; ECF No. 18-18. Officer Hernandez gave misleading testimony concerning Pedro Ortiz. When asked about his interview with Mr. Ortiz, Officer Hernandez testified that there was nothing "significant" about the interview and failed to inform the jury that, contrary to Ms. Garcia's testimony, Mr. Ortiz was, in fact, Angelo's biological father. ECF No. 23-5 at 80-81. Due to Officer Hernandez's false testimony,

67

the jury was left with the inaccurate impression that there were no other theories as to Angelo's

disappearance, such as a kidnapping for ransom or being taken by his biological father.

###### F.     False testimony from Angelita Rodriguez.

Angelita Rodriguez also testified falsely. The story she told at trial was that Mr. Cruz-Garcia

abruptly left Houston, without having made any plans, just after Angelo disappeared. ECF No. 23-

6 at 101-02. She further testified that, after Mr. Cruz-Garcia left Houston, their marriage effectively

ended and they never lived together as husband and wife. *Id.* at 107-09. In fact, Mr. Cruz-Garcia had

been planning to leave Houston for some time. Before he did so, his father had been building a

house for Mr. Cruz-Garcia and Ms. Rodriguez to live in together. ECF No. 18-81, -91. Moreover,

shortly after Mr. Cruz-Garcia left Houston, he was joined by Ms. Rodriguez who lived with Mr. Cruz-

Garcia in her mother's house in the Dominican Republic. ECF No. 18-15.

###### G.     False testimony at the punishment phase.

The State solicited false testimony from both Johnny Lopez and Mr. Santana concerning the

murder of Saul Flores. Mr. Lopez's testimony was directly contradicted by the statements he gave to

the police in 1989. ECF No. 18 at 133-34. Mr. Santana's testimony was directly at odds with the

physical evidence, the testimony of the State's own medical expert, and the testimony of Elizabeth

Ramos, the woman who was allegedly the victim of a rape that precipitated the murder. ECF No. 18

at 144-46. Mr. Santana also testified falsely when, without any personal knowledge and without any

corroborating evidence, he told the jury that Mr. Cruz-Garcia broke into "Betico's" house, stole

drugs and money, and beat Betico and raped his wife. ECF No. 18 at 146-47.

###### H.     The claim is unexhausted.

68

The foregoing claim was not presented in Mr. Cruz-Garcia's state post-conviction application. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

### CLAIM FOUR: FALSE AND UNRELIABLE DNA EVIDENCE.

The trial court admitted false and unreliable DNA evidence, in violation of the Sixth, Eighth and Fourteenth Amendments.

#### A.    The trial court admitted false and unreliable DNA evidence.

DNA evidence is the only physical evidence purportedly linking Mr. Cruz-Garcia to the offense. In closing, the State described the DNA evidence as "the most damning corroboration for the defendant in this case[.]" ECF No. 23-9 at 37. Yet, as extensively described in Mr. Cruz-Garcia's Amended Petition and Claims I(C)(1) and 3(B), *supra*, the deficient storage, processing, and interpretation of the DNA samples renders that evidence entirely unreliable. ECF No. 18 at Claims 1(B)(1), 3(A), 4, 5 & 6.

Trial counsel filed a pre-trial motion to suppress any DNA evidence "stored and/or processed by the former now defunct HPD crime lab" based on documented and generalized mishandling of forensic evidence. ECF No. 22-10 at 5-7. In support thereof, counsel appended, and moved for the admission of, eight investigative and disciplinary reports documenting false testing results, mishandling of evidence, misconduct, criminal activity, and incompetence by the HPD crime lab. ECF Nos. 23-18, -19, -20, -21, -22, -23 and -24 at 1-142. These reports established that the misconduct occurred over the period that the old HPD crime lab processed, stored, and transferred forensic evidence in the case against Mr. Cruz-Garcia, and further established misconduct by at least three HPD crime lab analysts who came in contact with the DNA evidence in this case. ECF No. 23-18

through 23-25 (Defendant's Exhibits 2-9); ECF No. 23-3 at 8. Key findings in these reports are described at length in Mr. Cruz-Garcia's Amended Petition and Claim 1(C)(1). ECF No. 18 at 156-57.

The trial court held a suppression hearing, in the course of which trial counsel outlined the significant issues identified by the various investigations into the old HPD crime lab. ECF No. 23-2 at 19-21. Counsel further flagged the involvement of the HPD crime lab analysts in the handling of the DNA evidence in this case, and identified by name in the investigations leading to the old HPD crime lab's closure. *Id.* at 20. The trial court admitted the eight reports for the limited purpose of the suppression hearing. *Id.* at 24.

In rebuttal, the State called a number of witnesses, none of which had personal knowledge of the old HPD crime lab's handling of the DNA evidence in this case. Former HPD Sergeant Mehl testified that he did not have any training in the handling of DNA evidence but did not observe damage to the brown bags containing the cigar and the rape kit retrieved from storage, nor to the brown bag containing the underwear cutting retrieved from the HPD crime lab directly. *Id.* at 30, 34, 36. Courtney Head testified that the lab had performed DNA extractions in the case and sent those extractions to a California lab for testing. *Id.* at 87. Ms. Head confirmed that the old HPD crime lab analysts identified in the disciplinary reports had come into contact with the DNA evidence in the case. *Id.* at 88-90, 100-101. Finally, Ms. Head testified that she did not herself analyze the relevant items for DNA but that, based on her comparison of Mr. Cruz-Garcia's DNA profile and the results obtained by Orchid Cellmark, she had reached the same conclusions as Orchid Cellmark. *Id.* at 94-95.

With regard to the DNA results, Matt Quartaro, a DNA analyst at Orchid Cellmark, testified that analysis of the DNA evidence provided by Sergeant Mehl led to a finding that Mr. Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction from the vaginal swab was a mixture of multiple individuals, from which neither Mr. Cruz Garcia nor Arturo Rodriguez could be excluded; and that the sperm cell fraction from the underwear cutting was a mixture of at least two individuals, to which Mr. Cruz-Garcia was a major contributor and from which Arturo Rodriguez could not be excluded. *Id.* a 57-63.

However, as extensively briefed in Mr. Cruz-Garcia's Amended Petition, in 2015 the new HPD crime lab released an amended DNA report that much of the State's DNA evidence at trial was false.

**B.     The admission of false and unreliable evidence violated Mr. Cruz-Garcia's right to due process and a fair trial.**

The State denies a defendant due process of law and a fair trial when it obtains a conviction on the basis of false evidence. *Napue*, 360 U.S. at 269. Mr. Cruz-Garcia acknowledges that the Supreme Court has been hesitant to find a violation of due process based on the introduction of unreliable evidence alone, "without the taint of improper state conduct." *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012). This limitation rests on the assumption that, in accordance with other constitutional safeguards designed to prevent a conviction on the basis of false evidence, the defendant will benefit from an opportunity to challenge the strength of that evidence. *Id.* at 245-46 (explaining the Court's "unwillingness to enlarge the domain of due process" because the jury determines the credibility of evidence and, for example, the Sixth Amendment right to confront evidence ensures the defendant is able to put issue of credibility before the jury). However, as argued

in Claim 5, *infra*, Mr. Cruz-Garcia's confrontation rights were also violated in this case. Hence, in the context of this case, the introduction of the State's DNA evidence, shown to be false, violated Mr. Cruz-Garcia's right to due process of law and a fair trial. *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (finding due process violation when the defendant was sentenced on the basis of assumptions which were materially untrue and defendant did not benefit from services of counsel to correct those misapprehensions).

### C.    This claim is exhausted and should be reviewed *de novo*.

In his subsequent state habeas application, this claim was pled as a federal claim under the standard applied by Texas courts. *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009). Texas law has done away with the knowledge requirement of this claim entirely. *Id.* at 772. Because there is no avenue for Mr. Cruz-Garcia to secure review of this claim in state court, there was no previous opportunity to develop or prove the knowledge element of the claim, and it is exhausted and should be considered by this Court *de novo*.

## CLAIM FIVE: RIGHT TO PRESENT A DEFENSE AND CROSS-EXAMINE WITNESSES

The trial court erroneously deprived Mr. Cruz-Garcia of his rights to present a defense and cross-examine the State's witnesses, in violation of the Sixth, Eighth and Fourteenth Amendments.

### A.    The trial court prohibited Mr. Cruz-Garcia from presenting evidence going to the unreliability of the DNA evidence.

Mr. Cruz-Garcia sought to have admitted into evidence the reports of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room; the HPD Internal Affairs Investigation summary; employee complaint histories for Joseph Chu and Baldev Sharma; and judgments of conviction against Deetrice Wallace. ECF No. 18 at 174. Trial counsel

asked that this evidence be admitted to enable the jury to assess the reliability and credibility of the DNA evidence proffered by the State. In addition, the defense sought to call Michael Bromwich to testify to his findings that the old HPD crime lab was a "train wreck" and that over a third of cases passing through the lab were "contaminated," among other matters. ECF No. 23-4 at 24. Trial counsel also asked to present evidence that three HPD crime lab employees, identified as having engaged in misconduct and criminal behavior, came in contact with the DNA evidence in this case. *Id.* at 27-28; ECF No. 23-3 at 17 RR 16-18.

The trial court found that the evidence proffered by the defense raised "a question of fact as to whether the jury believes the [DNA] evidence to be credible." Nonetheless, the court denied all requests to introduce evidence or elicit testimony going to the reliability of the DNA evidence. ECF No. 23-2 at 116. It found that the Bromwich Report was "irrelevant" and cautioned trial counsel that it was "not to be mentioned or alluded to or discussed." ECF No. 23-3 at 15. After finding that Joseph Chu came into contact with forensic evidence linked to the offense, the trial court ruled that disciplinary records of misconduct by Chu were "not admissible [. . .] irrelevant and prejudicial[.]" *Id.* at 16. Similarly, after finding that Baldev Sharma "did perform DNA analysis on the extractions in this case," it ruled that records of misconduct by Sharma were "irrelevant [and] inadmissible." *Id.* at 17. Finally, after finding that Deetrice Wallace "received the sexual assault kit in 1992 and screened a portion," the trial court ruled that her felony conviction for tampering with a government document was "irrelevant." *Id.* at 18. Trial counsel was also prohibited from presenting the results of the State's own 1992 DNA analysis, which differed from the results the State presented at trial. ECF No. 23-24 at 123, 131.

Having been prevented from introducing any defense going to the reliability of the DNA evidence, Mr. Cruz-Garcia nevertheless sought to bring the issue before the jury through cross-examination. However, in a single breath, the trial court ruled that while it would "allow cross-examination on contamination issues[,]" it would "not allow the defense to go into the Bromwich Report or the closure of the lab or the reasons for the closure of the lab or the impeachment of the witnesses at the laboratory that do not testify." ECF No. 23-3 at 18-19. The trial court agreed that as a result of the latter limitation, cross-examination by the defense on the issue of contamination would likely be barred as "assuming facts not in evidence." *Id.* at 20.

**B.      The trial court violated Mr. Cruz-Garcia's right to present a defense.**

**1.      The Due Process Clause guarantees defendants the opportunity to present a defense.**

"[T]he Constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation omitted). Whether through the presentation of a witness or admission of evidence, it is a "fundamental" right of the defendant that he have the opportunity to present evidence in his defense. *Chambers*, 410 U.S. at 302. However, such an opportunity is "an empty one" where the trial court excludes evidence bearing on the credibility of that proffered by the State. *Crane v. Kentucky*, 467 U.S. 683, 690 (1986) (finding that the exclusion of evidence about the manner in which a confession was obtained violated defendant's right to a fair opportunity to present a defense).

Even well-established evidentiary rules must sometimes yield to the defendant's right to present a defense. *Chambers*, 410 U.S. at 289-90 (defendant's right to present a defense violated when hearsay rule precluded introduction of testimony tending to show another person had committed

74

offense); *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (describing *Chambers* as holding that "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation"); *Kittelson v. Dretke*, 426 F.3d 306, 320-21 (5th Cir. 2005) (finding a violation of the right to present a defense, and granting habeas relief under AEDPA, where exclusion of evidence left defendant unable to fully cross-examine prosecution witnesses).

### 2.      The trial court's rulings deprived Mr. Cruz-Garcia of his constitutionally-protected right to present a defense.

The DNA evidence was the only physical evidence implicating Mr. Cruz-Garcia. The State described the DNA evidence as "the most damning" evidence of Mr. Cruz-Garcia's guilt. ECF No. 23-9 at 37. Absent such evidence, the State's case rested entirely on unreliable testimony by alleged co-conspirator Rudy Santana and Mr. Cruz-Garcia's ex-wife Angelita Rodriguez. The trial court acknowledged that the DNA evidence raised "a question of fact as to whether the jury believes [it] to be credible." ECF No. 23-2 at 116. Yet Mr. Cruz-Garcia was denied any opportunity to challenge the integrity of the lab and the lab employees that generated the evidence used against him, effectively muzzling the defense.

The trial court's determination that the exhibits offered by the defense were irrelevant cannot withstand constitutional scrutiny. The trial court itself accepted that contamination of the DNA evidence by the old HPD crime lab and, therefore, the credibility of such evidence, was at issue. Still, it reasoned that because the HPD crime lab had ultimately followed the  Bromwich Report recommendations—namely that it be shuttered *after* the relevant time period in this case— evidence showing that one-third of cases passing through the crime lab were contaminated was precluded. ECF No. 23-3 at 14.

Because the DNA evidence was critical to the State's case against Mr. Cruz-Garcia, its reliability was a major issue at trial. Absent the DNA evidence, the State's case rested entirely on contradictory and unreliable witness accounts. The exclusion of any exhibits about the old HPD crime lab "effectively disabled" Mr. Cruz-Garcia's defense and he is entitled to a new trial.

### C.  The trial court violated Mr. Cruz-Garcia's right to confront the witnesses against him.

### 1.  The Confrontation Clause guarantees defendants an opportunity for effective cross-examination.

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315 (974) (internal citation and quotation omitted); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) ("[T[he Confrontation Clause guarantees an *opportunity* for effective cross-examination[.]"). A defendant's rights under the Confrontation Clause are satisfied where he is "permitted to expose to the jury the fact from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability" of the evidence presented. *Davis*, 415 U.S. at 318. A trial court's ability to impede the right of cross-examination is circumscribed: the court may only place "reasonable limitations on [] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

To prevail on a Confrontation Clause claim, a defendant need only show that "he was prohibited from engaging in otherwise appropriate cross-examination" designed to test the reliability of the witness's testimony. *Delaware*, 475 U.S. at 680 (finding the defendant was not required to

show "outcome determinative prejudice" to prevail on Confrontation Clause claim predicated on cross-examination); *U.S. v. Skelton*, 514 F.3d 433, 439-40 (5th Cir. 2008).

> **2.**      **The trial court's rulings violated Mr. Cruz-Garcia's constitutional right to challenge the State's DNA evidence through cross-examination.**

The trial court denied Mr. Cruz-Garcia his right to cross-examine witnesses about the reliability of the DNA evidence. In a single breath, the trial court acknowledged that contamination of the DNA evidence by the old HPD crime lab was a relevant and critical line of cross-examination, but cautioned that its decision to preclude any defense evidence on the issue effectively prevented such cross-examination. ECF No. 23-3 at 20-22. The impossibility of Mr. Cruz-Garcia's situation was realized during the defense's cross-examinations of Sergeant Mehl, Matt Quartaro, and Courtney Head. The trial court admitted "it would leave a wrong impression with the jury" should the defense not be permitted to go into the DNA testing conducted and ordered by the old HPD crime lab. ECF No. 23-6 at 64. Still, the trial court ruled that it was "not going to allow you to go into how they did that or where it was sent or that was sent to another laboratory or anything like that[.]" *Id.* The defense was thereafter permitted only to establish through cross-examination that the forensic evidence did in fact go to, and was examined by, the HPD crime lab. *Id.* at 65, 66 ("Well, I'm going to allow you to just go into the fact that the evidence in this case back in 1992 did go there and you can talk about the way that you found that it was resealed and packaged [. . .] And nothing further."). By the trial court's own admission, this absolute bar on any cross-examination designed to test the reliability of the DNA evidence confused the jury.

Because Mr. Cruz-Garcia was prohibited from cross-examining the State's witnesses on the issue of contamination at the old HPD crime lab, his Sixth Amendment confrontation rights were violated.

**D.     The trial court can review this claim *de novo*.**

**1.     Mr. Cruz-Garcia fairly presented this claim on direct appeal.**

Mr. Cruz-Garcia raised this claim as point of error 2 on direct appeal. *Cruz-Garcia v. Texas.*, 2015 WL 6528727, *26 (Tex. Crim. App., Oct. 28, 2015). Citing to the U.S. Constitution and to corresponding Supreme Court case law, Mr. Cruz-Garcia alleged that the trial court erred when it precluded cross-examination and the presentation of defense evidence on the reliability of the State's DNA evidence. ECF No. 12-1 at 85-87. He asked that the CCA find that he was denied the right to cross-examine witnesses and to present a full defense, in violation of the Sixth and Fourteenth Amendments. *Id.*

**2.     The trial court failed to adjudicate the merits of Mr. Cruz-Garcia's allegation that the trial court violated his right to present a defense.**

Irrespective of Mr. Cruz-Garcia's reliance on the Constitution and corresponding Supreme Court and Texas case law, the CCA adjudicated this claim on state-law grounds alone. *Cruz-Garcia v. Texas*, 2015 WL 6528727, *27 & n.25-27 (Tex. Crim. App., Oct. 28, 2015). Citing the state-law standard of review, the CCA enquired only whether the trial court had abused its discretion under the Texas Rules of Evidence, and found that it did not. *Id.* at *27-28 & n.28.

The CCA's discussion of this claim omits any reference to the Constitution or relevant case law. *Johnson v. Williams*, 568 U.S. 289, 301 (2013) (presumption that state court adjudicated federal claim on the merits may be rebutted where state court adjudication "made no reference to federal

law"). The state-law standard applied by the CCA is also "quite different" to the federal constitutional standard relied upon by Mr. Cruz-Garcia. *Id.*

Buried amidst several paragraphs discussing state evidentiary rules, the CCA's observation that "we cannot say that [the defense exhibits'] exclusion prevented him from presenting a defense" is not supported by any citation. *Cruz-Garcia v. Texas*, 2015 WL 6528727, *28 (Tex. Crim. App., Oct. 28, 2015). The footnote to a separate section of its decision, pertaining to a separate claim, is insufficient to constitute an adjudication on the merits of the federal constitutional question. *Johnson*, 568 U.S. at 301 (presumption that state court adjudicated federal claim on the merits may be rebutted where "provision of the Federal Constitution or a federal precedent was simply mentioned in passing in a footnote or was buried in a string cite").

> **3.     This court should review the allegation that Mr. Cruz-Garcia's right to cross-examine witnesses was violated to avoid a fundamental miscarriage of justice.**

On direct appeal, the state court ruled that the allegation that the trial court's rulings impermissibly limited Mr. Cruz-Garcia's right to cross-examine witnesses was not preserved. *Cruz-Garcia v. Texas*, 2015 WL 6528727, *32-33 (Tex. Crim. App., Oct. 28, 2015). The procedural default of this claim may nevertheless be excused because refusal to consider it will result in a fundamental miscarriage of justice.

## CLAIM SIX: FALSE AND UNRELIABLE EVIDENCE

Mr. Cruz-Garcia was convicted and sentenced to death on the basis of false and unreliable evidence, in violation of the Eighth and Fourteenth Amendments.

> **A.     Mr. Cruz-Garcia's conviction and death sentence violate the Eighth Amendment because they were obtained on the basis of unreliable evidence.**

The Eighth Amendment requires heightened reliability in death penalty cases. *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). As described in points of error 4 and 5, the DNA evidence introduced against Mr. Cruz-Garcia was unreliable and has since been shown to be false. Mr. Cruz-Garcia's death sentence should be reversed because it, too, is unreliable.

### B.     The claim is unexhausted.

The foregoing claim was not presented in Mr. Cruz-Garcia's state post-conviction application. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

## CLAIM SEVEN: JUROR MISCONDUCT

Mr. Cruz-Garcia's rights to a fair trial, impartial jury, and due process of law were violated when the jury foreman read Bible passages that influenced the verdict and the jury discussed the case outside of deliberations, in violation of the Sixth, Eighth and Fourteenth Amendments.

### A.     Legal standard.

Under clearly established Supreme Court precedent, "a jury's verdict must be based upon the evidence developed at the trial," and that protection "goes to the fundamental integrity of all that is embraced in the constitutional concept of a trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation omitted); *Parker v. Gladden*, 385 U.S. 363, 365 (1966); *Turner*, 379 U.S. at 472; *Remmer v. United States*, 347 U.S. 227, 229 (1954); *Mattox v. United States*, 146 U.S. 140, 149 (1892); *see also Oliver v. Quarterman*, 541 F.3d 329, 336, 339 (5th Cir. 2008) (holding that "the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence" and that a juror reading Bible passages during deliberations constituted an

external influence). A jury's exposure to external influences results in a presumption of "extreme prejudice." *Turner*, 379 U.S. at 472–73; *Parker*, 385 U.S. at 365; *see also Remmer*, 347 U.S. at 229 (holding that "private communication, contact, or tampering" with the jury is presumptively prejudicial).

Whether something is an external influence is a fact-specific question. *Oliver*, 541 F.3d at 336. While an external influence is presumptively prejudicial, in the habeas context, a petitioner may still be required to show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 341 (*citing Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

In *Oliver*, jurors brought a Bible in during punishment phase deliberations and read passages that stated that death was the appropriate punishment for someone who committed murder. *Id.* at 331–33. The Fifth Circuit held that the jury had "crossed an important line" because the Bible was not part of the law and evidence, and the specific passages they referenced advocated for a death sentence under similar facts to the defendant's case. *Id.* at 339. The Court found that the jury's use of the Bible was an outside influence under the "egregious" facts of the case. *Id.* at 340. The Court held, however, that the petitioner was not entitled to federal habeas relief because he was unable to rebut the presumption of correctness that the state court's fact findings receive under 28 U.S.C. § 2254(e)(1). *Id.* at 342–44.

> **B.    The jury foreman brought a Bible to the deliberations and read passages to the jury that were intended to, and did, influence them to answer the special issues in a way that resulted in a death verdict.**

Shortly after the jury sentenced Mr. Cruz-Garcia to death, juror Angela Bowman contacted trial counsel Mario Madrid and informed him that the jury foreman, Matthew Clinger, brought a Bible into the deliberations room and read passages from it, which swayed other jurors to sentence

81

Mr. Cruz-Garcia to death. ECF No. 18 at 168–71. When interviewed by a defense investigator shortly after trial, juror Clinger confirmed that he brought his Bible to the deliberations room and read passages to fellow juror Casey Lynn Guillotte, who was struggling to reach a decision on the special issues. ECF No. 22-10 at 184-87. Juror Clinger stated that he believed his reading of the Bible passages "made a difference with [juror Guillotte.]" *Id.* at 187. The State would later secure affidavits from jurors Clinger and Guillotte with conflicting factual information to juror Clinger's initial statement, and those affidavits were also inconsistent with each other on important facts including the timing of when the Bible was read. ECF No. 18 at 170.

The passages juror Clinger read included Genesis 9, "a lot of places in Deuteronomy," and Romans 13. ECF No. 22-10 at 185. Parts of Genesis 9 directly call for the death penalty: "I will demand an accounting for the life of another human being. *Whoever sheds human blood, by humans shall their blood be shed*; for in the image of God has God made mankind." *Genesis* 9:5-6 (New International Version) (emphasis added). The Book of Deuteronomy likewise calls for the death penalty on numerous occasions. *See Deuteronomy* 13:5 (for inciting rebellion against the Lord), 17:12 (for refusing to obey the decision of a judge or priest), 18:20 (for false prophecy), 19:16–19 (for perjury), 21:18-21 (for disobedience to one's parents), 22:13–21 (for falsely claiming virginity at the time of marriage), 22:22–24 (for committing adultery). Romans 13 indicates that because God created the governing authorities, God has implicitly endorsed the law of the governing authorities. *See Romans* 13 (New International Version).

### C.   Two of the jurors discussed the case outside of deliberations.

Additionally, jurors discussed Mr. Cruz-Garcia's case outside of deliberations. ECF No. 18 at 166–68. On the first day of the punishment phase, Michael Casaretto, a local attorney, overhead

a conversation on the elevator in the courthouse between two jurors. It was clear to him that the two individuals were discussing the merits of the case in which they were serving as jurors, including their feelings on the evidence. ECF No. 23-39 at 257. Mr. Casaretto was "immediately troubled by the possibility that the two jurors were discussing an ongoing case publicly and outside the presence of other jurors." *Id.* at 258. He took down the court information from the jurors' badges and alerted Judge Magee to what he had witnessed, because he "felt it necessary to report to her conduct that appeared to . . . reach the level of juror misconduct." *Id.*; *see also id.* at 258–59 (Mr. Casaretto describing the conversation as "blatant" misconduct and "extremely important"). Judge Magee's later summary of this conversation is not consistent with Mr. Casaretto's description of it. ECF No. 23-10 at 5–8.

Moreover, alternate juror Sharon Alexander recalls that the jury repeatedly discussed the evidence during breaks in the trial. ECF No. 23-39 at 66. She also learned "from the other jurors that one of the jurors in particular was having a hard time voting for the death penalty." *Id.* As an alternate, juror Alexander also appears to be an outside influence.

### D.    The external influences were harmful.

Similar to *Oliver*, the juror's use of the Bible was an external influence. The specific passages at issue advocated for a death sentence, placing an improper and impermissible weight on the scale for death. *See Parker*, 385 U.S. at 365; *Turner*, 379 U.S. at 472; *Remmer*, 347 U.S. at 229; *Mattox*, 146 U.S. at 149. This error is presumptively prejudicial. *Turner*, 379 U.S. at 472–73; *Parker*, 385 U.S. at 365; *Remmer*, 347 U.S. at 229. Unlike the petitioner in *Oliver*, Mr. Cruz-Garcia can establish that the Bible had a "substantial and injurious effect" on the verdict. *See Brecht*, 507 U.S. at 637. In his initial recounting of what occurred during deliberations, Juror Clinger stated that he believed his

reading of the Bible passages "made a difference with [Juror Guillotte.]" *Id.* at 636. Thus, Mr. Cruz-Garcia is entitled to a new punishment phase.

### E.   The court should review this claim *de novo* because the state court failed to rule on the federal claim or, alternatively, because 28 U.S.C. § 2254(d) is satisfied.

This claim is exhausted. Mr. Cruz-Garcia presented the portion of the claim pertaining to the jurors relying on Bible passages to sentence him to death as Claim 12 on direct appeal. ECF No. 22-7 at 118–28. He also presented it as Claim 9 in his initial state habeas application. ECF No. 23-38 at 158–69. However, despite being presented with a fair opportunity to do so, the state court did not adjudicate this claim. Thus, this Court conducts *de novo* review. *Johnson v. Williams*, 568 U.S. 289, 301–02 (2013).

Mr. Cruz-Garcia appropriately alerted the CCA to the federal nature of this claim. *Baldwin*, 541 U.S. at 29 (2004). Appellate counsel filed a Motion for New Trial on the basis of jury misconduct. ECF No. 22-10 at 89-91. Counsel requested a live evidentiary hearing, which the trial court denied despite the conflicting evidence that was presented. *Id.* at 135; ECF No. 23-15 at 27-33. On direct appeal, Mr. Cruz-Garcia raised this issue as Claim 12, on both state law and federal constitutional grounds. ECF No. 22-7 at 118–29. With respect to the federal claim, Mr. Cruz-Garcia argued that the Bible operated as an outside influence on the jury, and specifically referenced the 6th Amendment and his right to due process, and cited *Turner*, *Parker*, *Remmer*, and *Oliver*. *Id.* at 126–28. Yet, in ruling on the claim, the CCA only resolved the state-law questions and failed to rule on the federal constitutional question presented. The CCA cited state-law evidentiary rules and its own precedent to hold that the jurors relying on the Bible during deliberations is not an outside influence. *Cruz-Garcia*, 2015 WL 6528727 at *28–29. Because the court found the Bible reading was

84

not an outside influence, the CCA also held that the affidavits and evidence containing conflicting versions of what occurred during deliberations were inadmissible under state evidentiary rules. *Id.* at * 29.[16] It made no ruling on the federal aspect of this claim.

When a petitioner has presented a claim for relief to the state court, a rebuttable presumption exists that the state court adjudicated the claim on the merits, even if the state court did not expressly rule on the claim. *Johnson*, 568 U.S. at 301. Here, Mr. Cruz-Garcia can rebut that presumption because (1) the state court overlooked or declined to rule the federal claim and (2) the state standard is less protective than the federal standard. *See id.* at 301–03. The direct appeal brief placed the CCA squarely on notice of the federal nature of this claim, yet the Court relied on state evidentiary rules to deny it without engaging in the federal question. Further, by holding that reading Bible passages during deliberations is not an outside influence, the CCA took a position that is squarely at odds with, and less protective than, the federal standard. *See Oliver*, 541 F.3d at 339 (holding that "the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence" and that a juror reading Bible passages during deliberations constituted an external influence).

The CCA was presented with a second opportunity to adjudicate the merits of this claim in state habeas, but it again failed to do so. There, the Court found that the claim was procedurally barred on the grounds that "it was raised and rejected on direct appeal." *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1 (Tex. Crim. App. Nov. 1, 2017). However, the CCA was incorrect. Mr. Cruz-

---

[16] Here, because the state court refused to hold an evidentiary hearing on this claim and because the CCA determined that the affidavits were inadmissible, there are no factual findings to defer to under 28 U.S.C. § 2254(e)(1).

Garcia did not raise the issue of jurors discussing the case outside of deliberations on direct appeal, which, of course, means it was not ruled on during direct appeal. And, as previously noted, the CCA did not rule on the federal claim raised on direct appeal regarding the jury's reliance on the Bible to render a death sentence. Thus, the CCA again passed on its opportunity to adjudicate this claim during state habeas.

Without a state-court adjudication to defer to, this court must conduct *de novo* review of this claim. *Johnson*, 568 U.S. at 301–02. However, even if this Court were to determine that the state court did adjudicate this claim on the merits, Mr. Cruz-Garcia meets the relitigation bar of 28 U.S.C. § 2254(d). The state court decision rejecting this claim both involved an unreasonable application of *Turner*, *Parker*, *Remmer* and other Supreme Court precedent, and was based on an unreasonable determination of the facts. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000). Specifically, the CCA held that jurors reading from the Bible during deliberations is not an external influence, which is contrary to, and an unreasonable application of, those Supreme Court cases. *Compare Cruz-Garcia*, 2015 WL 6528727 at *28–29, *with Oliver*, 541 F.3d at 339.

### CLAIM EIGHT: COERCIVE SUPPLEMENTAL JURY INSTRUCTIONS

The trial court gave coercive, *ex parte* supplemental jury instruction to holdout juror Angela Bowman, in violation of the Sixth, Eighth and Fourteenth Amendments.

**A.     The trial court violated Mr. Cruz-Garcia's right to an uncoerced jury verdict.**

Under clearly established Supreme Court precedent, "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that

body." *Lowenfiels*, 484 U.S. at 241; *see also Morgan v. Illinois*, 504 U.S. 719 (1992) (holding that due process requires an impartial jury). The facts and law presented in support of Claim 2 discuss both the relevant factual allegations and the law applicable to this claim. Claim 2 is therefore incorporated herein by express reference.

Here, Mr. Cruz-Garcia's constitutional rights were violated when the trial court met with holdout juror, Angela Bowman without Mr. Cruz-Garcia or his counsel being present, and gave coercive instructions to her. ECF No. 18 at 171–78. Because his constitutional rights were violated, Mr. Cruz-Garcia is entitled to a new punishment phase.

### B.    The state court's default of this claim does not preclude merits review.

This claim is exhausted because it was presented as Claim 7 in the initial state habeas application. ECF No. 23-38 at 148–50. The state court did not adjudicate the merits of the claim, instead finding that it was procedurally barred because it should have been raised on direct appeal. *Ex parte Cruz-Garcia*, 2017 WL 4947132, *1 (Tex. Crim. App. Nov. 1, 2017). However, to the extent that any default is asserted in these proceedings, this court can reach the merits of the claim because cause and prejudice exists to excuse the default, as the trial judge's *ex parte* instruction was an external factor to the defense that prevented the issue from being raised, and the underlying claim is meritorious. Furthermore, the procedural default should be excused to avoid a fundamental miscarriage of justice.

### CLAIM NINE: CONFRONTATION CLAUSE

The State's witnesses repeatedly testified to the out-of-court statements of other individuals, in violation of the Sixth, Eighth and Fourteenth Amendments.

Under clearly established Supreme Court precedent, testimonial witness statements are not admissible unless both the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine that witness. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Results of forensic analysis are testimonial statements for purposes of the Sixth Amendment. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009).

At trial, Matt Quartaro, a DNA analyst at Orchid Cellmark, repeatedly testified regarding lab work that was performed by others who did not testify at trial. *See* ECF No. 18 at 179-181. He also sponsored exhibits that others collected and/or analyzed. *Id.* Likewise, Dr. Dwayne Wolf testified regarding autopsy work that others performed, concerning both Angelo Garcia (at the guilt phase) and Saul Flores (at the punishment phase). *Id.* at 181-83. Because the DNA and autopsy evidence significantly contributed to Mr. Cruz-Garcia's conviction, and because the murder of Saul Flores was a critical aspect of the punishment phase, the Confrontation Clause violation was not harmless.

The foregoing claim was not presented in Mr. Cruz-Garcia's state post-conviction application. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

## CLAIM TEN: VCCR VIOLATION

Mr. Cruz-Garcia's rights to equal protection, due process, and the effective assistance of counsel were violated when the State failed to inform him of his right to seek the assistance of the Dominican Consulate as required by Article 36(1)(b) of the Vienna Convention on Consular Relations. This claim is exhausted. Mr. Cruz-Garcia presented it as Claim 5 in his initial state habeas application. ECF No. 12 at 113. If this Court determines that the state court adjudicated this claim

88

on the merits, this Court may grant relief because the state-court decision involved an unreasonable application of Supreme Court precedent and was based on an unreasonable determination of facts. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000).

## CLAIM ELEVEN: BRADY V. MARYLAND

The State withheld material exculpatory evidence from Mr. Cruz-Garcia, in violation of the Sixth, Eighth, and Fourteenth Amendments.

### A.    Legal standard.

Under clearly established Supreme Court precedent, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Subsequent decisions have eliminated the prerequisite of a defense request to trigger the State's duty to disclose exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Moreover, the Supreme Court has rejected any distinction between impeachment and exculpatory evidence for *Brady* purposes. *Id.* at 677; *Giglio*, 405 U.S. at 154. Thus, under the clearly established law of *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution suppressed favorable evidence, and (2) the evidence was material to either guilt or punishment. *Brady*, 373 U.S. 83, 87; *see also Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *Bagley*, 473 U.S. at 683; *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994), *cert. denied*, 513 U.S. 1060 (1994); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal

quotation omitted); *Bagley*, 473 U.S. at 682; *Blackmon*, 22 F.3d at 564. The Supreme Court has found *Brady* violations where the State failed to disclose impeachment evidence that could have been used to impugn the credibility of the State's "key witness," *Giglio*, 405 U.S. at 154–55, or that could have significantly weakened key eyewitness testimony. *Kyles*, 514 U.S. at 441, 453; *see also Banks*, 540 U.S. at 701–02 (holding *Brady* violation was material where the State suppressed impeachment evidence that police and prosecutors had coached two "essential" prosecution witnesses before they testified); *Graves v. Dretke*, 442 F.3d 334, 344 (5th Cir. 2006).

As the Court is no doubt aware, Harris County is notorious for ongoing, systematic problems concerning the disclosure of exculpatory evidence. *See* ECF No. 18 at 193-94. In Mr. Cruz-Garcia's case, as in so many others, the State withheld material, exculpatory evidence.

**B.     The State withheld evidence concerning Mr. Santana and Ms. Rodriguez's testimony.**

As discussed in Claim 3, the State asserted that Mr. Santana was not charged with an offense for his role in Angelo's kidnapping and murder for the facially pretextual reason that, under the version of events set forth in his testimony, he did not commit a crime. The reason given by the State for not charging Mr. Santana is not plausible and evidences an undisclosed deal between Mr. Santana and the State. Even if the State's rationale for not charging Mr. Santana could be credited (which it cannot), the State nonetheless created the false impression at trial that Mr. Santana was putting himself in grave legal jeopardy by testifying against Mr. Cruz-Garcia. The State failed to disclose that it had no intention of charging Mr. Santana.

Likewise, Angelita Rodriguez was rewarded by the State for her testimony with a letter to the immigration authorities. Exh. B. The State failed to disclose that it would be assisting Ms. Rodriguez

in her effort to normalize her immigration status. In light of the State's repeated failures to disclose the benefits it would be conferring on cooperating witnesses, it is likely that other State's witnesses, such as Johnny Lopez, also received deals for their testimony, and Mr. Cruz-Garcia expects that discovery will reveal additional, undisclosed deals.

Other critical information concerning Mr. Santana and Ms. Rodriguez was not disclosed. Shortly before Mr. Santana admitted to his role in Angelo's death and implicated Mr. Cruz-Garcia, Mr. Santana asserted in federal court pleadings that he was suffering from severe mental illness. ECF No. 18-12, -13, -14. The State did not disclose this information, nor did it disclose Mr. Santana's mental health records. Mr. Cruz-Garcia anticipates that discovery of those records will reveal that Mr. Santana did have serious mental health problems.

As to Ms. Rodriguez, the State failed to disclose a report from law enforcement that as of late 1992, she was living with Mr. Cruz-Garcia in the Dominican Republic, contrary to her testimony that their marriage ended when Mr. Cruz-Garcia left Houston. ECF No. 18-15. The State also failed to disclose that on October 6, 1992, Ms. Rodriguez denied having any knowledge of Angelo's disappearance, "other than what Diana and other people had told her." ECF No. 18-72. Ms. Rodriguez also had numerous criminal issues that were not disclosed, including that criminal charges were filed against her in 1993 for evading prosecution and fleeing the jurisdiction, and that at the time of Mr. Cruz-Garcia's trial, Ms. Rodriguez had an open case in Harris County wherein she forfeited a $25,000 bond and had a default judgment entered against her. ECF No. 18-73, -75; *Texas v. Angelita Rodriguez*, Cause No. 06142570101A (Harris Cnty., Tex.).

**C.    The State failed to disclose investigative materials relating to a "second theory" of the offense.**

91

The State also concealed investigative materials from Mr. Cruz-Garcia. Indeed, several of the police reports provided to Mr. Cruz-Garcia's counsel contain extensive redactions. ECF No. 18-16, -17, -18. To make matters worse, the redactions appear to concern an undisclosed "second theory" as to who kidnapped and murdered Angelo. ECF No. 18-16 at 1.[17]

### D.     The State withheld information and documents concerning the punishment phase.

The State also concealed important information relating to the punishment phase, withholding nearly all information concerning Mr. Cruz-Garcia's numerous efforts to assist United States law enforcement agencies. ECF No. 18-46. The State also withheld prior inconsistent statements by Johnny Lopez, one of the key punishment phase witnesses. ECF No. 18-29. Likewise, the State failed to disclose the documents it received in response to a subpoena to the FBI's Puerto Rico field office. ECF No. 18-35, -36. The contents of those documents will be revealed in discovery. Mr. Cruz-Garcia anticipates that the documents will support his arguments that he was a model prisoner while in Puerto Rico.

### E.     This claim is unexhausted.

The foregoing claim was not presented during Mr. Cruz-Garcia's state post-conviction proceedings. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will request that the Court stay and abey this proceeding so that he may exhaust this and several other meritorious claims.

---

[17] Mr. Cruz-Garcia will seek the unredacted reports in discovery.

92

## CLAIMS TWELVE THROUGH SEVENTEEN

Petitioner recognizes that procedural constraints may prevent the Court from reaching the merits of claims 12 through 17. Petitioner addresses them briefly here to preserve the claims for later review in the event that a change in law removes the procedural obstacles to merits review.

**Claim 12: Grand Jury.** Mr. Cruz-Garcia's right to right to a grand jury selected from a fair cross-section of the community was violated when his grand jury was selected according to the since-abolished "key man" system, in violation of the Sixth, Eighth and Fourteenth Amendments. ECF No. 18 at 207-08. Under clearly established federal law, "the accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination." *Campbell v. Louisiana*, 523 U.S. 392, 398 (1998). Here, Mr. Cruz-Garcia's right to have a grand jury selected from a fair-cross section of the community was violated when the grand jury was selected applying a system that has been recognized by the Supreme Court as "susceptible of abuse as applied." *Castaneda v. Partida*, 430 U.S. 482, 497 (1977). ECF No. 18 at 207-08.

**Claim 13: Petit Jury.** Mr. Cruz-Garcia's right to a petit jury selected from a fair cross-section of the community was violated when his petit jury was selected from a venire on which Hispanics were underrepresented, in violation of the Sixth, Eighth and Fourteenth Amendments. ECF No. 18 at 208-11. Under clearly established federal law, "venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). At the time of Mr. Cruz-

Garcia's trial and over a significant number of years, Hispanics were systematically underrepresented in venires in Harris County. ECF No. 18 at 208-11.

**Claim 14: Discriminatory Jury System.** The jury system that produced the petit venire from which Mr. Cruz-Garcia's jury was selected discriminated in the selection of jurors, in violation of the Equal Protection Clause of the Fourteenth Amendment. ECF No. 18 at 211-12. Under clearly established federal law, "a jury selection plan, whatever it is, [that] operates in such a way as always to result in the complete and long-continued exclusion of any representative at all from [. . .] any other racial group" violates the Equal Protection Clause. *Patton v. State of Mississippi*, 332 U.S. 463, 469 (1947). The jury system employed by Harris County resulted in the significant underrepresentation of Hispanics in jury venires and, as alleged in Claim 13, including the venire from which the jury in Mr. Cruz-Garcia's case was selected. ECF No. 18 at 211-12.

**Claim 15: *Batson v. Kentucky*.** The State improperly exercised peremptory challenges to systematically exclude African-Americans and Hispanics, women, poor people or the unemployed, and other cognizable groups from serving on the jury, in violation of the Sixth, Eighth, and Fourteenth Amendments. ECF No. 18 at 212-16. Under clearly established federal law, the "State may not exercise its challenges in contravention of the Equal Protection Clause." *Batson v. Kentucky*, 476 U.S. 79, 91 (1986); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994) ("[T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender[.]"). Here, Mr. Cruz-Garcia's rights were violated when the State exercised peremptory challenges against African-American women and Hispanic men whose answers on their questionnaires and in the course of *voir dire* were comparable to that of similarly situated jurors the State did not seek to strike. ECF No. 18 at 212-16.

94

**Claim 16:** *Witherspoon v. Illinois.* Mr. Cruz-Garcia's right to be tried by a jury representative of a fair cross-section of the community was violated by the exclusion of potential jurors who voiced only general objections to the death penalty, in violation of the Sixth, Eighth and Fourteenth Amendments. ECF No. 18 at 216-18. Under clearly established federal law, a capital jury "chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious scruples against its infliction" violates the fair cross-section requirement. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). Here, Mr. Cruz-Garcia's right to a fair and impartial jury was violated when the State struck for cause a number of jurors who expressed ambivalence towards the death penalty but did not indicate that they could not impose the death penalty. ECF No. 18 at 216-18.

**Claim 17: Inflammatory and Unduly Prejudicial Voir Dire.** Mr. Cruz-Garcia's right to an impartial jury was violated when the prosecution made improper, inflammatory, and prejudicial comments throughout voir dire, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. ECF No. 18 at 218-24. Under clearly established federal law, prosecutorial conduct may not infringe upon a defendant's constitutionally protected rights at trial. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Here, the prosecution violated Mr. Cruz-Garcia's right to a fair trial by comparing Mr. Cruz-Garcia to Charles Manson and Adolf Hitler, using the Boston Marathon bombing and the case of Andrea Yates as examples, asking prospective jurors to agree that Mr. Cruz-Garcia was in control of the scene of the offense, suggesting that Mr. Cruz-Garcia had a criminal history that would be revealed at punishment, and asking discriminatory questions to potential female jurors. ECF No. 18 at 218-24.

## CLAIM EIGHTEEN: PORTIONS OF RECORD ABSENT

95

Based on additional factual development, Mr. Cruz-Garcia withdraws Claim 18.

### CLAIM NINETEEN: EXCLUSION FROM CRITICAL STAGES OF TRIAL

Mr. Cruz-Garcia was excluded from critical stages of his trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**A.      Mr. Cruz-Garcia was absent from two critical stages of his trial.**

The first critical stage of his trial from which Mr. Cruz-Garcia was excluded was the *ex parte* meeting with Juror Bowman, at which the trial court gave unconstitutionally coercive supplemental instructions. The factual allegations set forth in Claim 8 are incorporated herein by express reference. Mr. Cruz-Garcia was also absent when the trial court conferred with defense counsel and the prosecution regarding a conversation that a third-party attorney overheard between two jurors outside the courtroom. ECF No. 23-10 at 5-8. During the discussion with counsel, Judge Magee related the following notes from her conversation with the reporting attorney:

> He stated that the two individuals were speaking about people on the jury with struggles. It was hard to hear them. He seemed – they seemed to be speaking about the case. The younger individual thanked the older individual for words of encouragement yesterday, which yesterday would have been July 15th, 2013.[18] He said they seemed to be speaking about struggling with the issues. There was nothing specific about the issues discussed and they did not seem to be conspiring. He said he could not tell if they were actually talking about evidence. He said the conversation went on for approximately five minutes and that was while they were waiting on the elevator because the elevator took a long time. Once they got on the elevator, the conversation did not continue.

*Id.* at 5-6.

---

[18] June 15, 2013 was the day of guilt-phase jury deliberations that resulted in the capital murder conviction.

Judge Magee did not make her notes from the conversation a part of the record on the ground that she had read them "verbatim" in open court (but outside Mr. Cruz-Garcia's presence). *Id.* at 7. Counsel took the attorney's name and phone number for a follow-up conversation and the parties agreed to the court's proposal to admonish the jury "strongly" not to discuss the case outside deliberations "and leave it at that." *Id.* at 6. Shortly after this discussion, Mr. Cruz-Garcia and the jury were brought into the courtroom. *Id.* at 8. Other than reiterating the admonishments, the court warned the jurors that a violation "could have serious ramifications to the outcome of this case." *Id.* at 8-9. Nothing about the inappropriate conversation was discussed in Mr. Cruz-Garcia's presence.

### B.   Mr. Cruz-Garcia's absence violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and a fair trial.

"It is a basic premise of our justice system that 'in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Fairey v. Tucker*, 567 U.S. 337, 343 (1970) (Sotomayor, J., dissenting from denial of *certiorari*) (quoting *Snyder v. Massachusetts*, 291 U. S. 97 (1934)).[19] The Supreme Court has long recognized that the right to be present is "scarcely less important to the accused than the right of trial itself." *Diaz v. United States*, 223 U. S. 442, 455 (1912).

---

[19] The Supreme Court has recognized only two exceptions to this fundamental rule: a defendant may waive his right to be present after the trial has commenced in his presence, *Crosby v. United States*, 506 U.S. 255, 260 (1993); and a defendant may be removed from the courtroom if, after being warned of his possible removal, "he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom," *Illinois v. Allen*, 397 U.S. 337, 343 (1970). Neither applies to the facts here, and the exceptions do not necessarily apply in capital trials.

Both of Mr. Cruz-Garcia's absences occurred during critical phases of his trial. Both discussions took place during the jury's deliberations and both exposed jurors' struggles to arrive at a unanimous verdict. Furthermore, the conversation between the court and the attorneys during the guilt-phase deliberations also addressed potential juror misconduct that, as the court itself acknowledged, "could have serious ramifications to the outcome of this case." ECF No. 23-10 at 8. This discussion should have led to questioning of both of the jurors involved and the reporting attorney in open court. Without Mr. Cruz-Garcia's input, that did not occur, to his own prejudice.

The court's *ex parte* discussion with Juror Bowman was even more critical to the outcome of the trial. Juror Bowman adamantly insisted that she would not change her answers to special issues 1 and 3, that the other jurors were frustrated with her for being a holdout, and that she did not want to continue deliberations because "it could be years" before they agreed on a verdict. ECF No. 23-13 at 6-9. The Court did not relate any of the conversation it had with Juror Bowman to counsel or directly to Mr. Cruz-Garcia, though counsel had clearly agreed to the *ex parte* meeting on the assumption that the Judge would simply determine whether the juror had a scheduling conflict. ECF No. 23-13 at 4-5. Immediately after Juror Bowman spoke with the trial court outside the presence of Mr. Cruz-Garcia and his counsel, she changed her verdict and agreed to a death sentence. She immediately contacted trial counsel expressing how much the conversation with the court and her verdict disturbed her. She even signed sworn affidavit averring that, "[t]he verdict I returned was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty." ECF No. 22-10 at 162.

Had Mr. Cruz-Garcia and his counsel been present during the meeting with Juror Bowman, the coercive nature of Judge Magee's questions and responses would have been challenged, counsel

98

themselves would have questioned Juror Bowman, and a motion to poll the jury to determine whether they were hopelessly deadlocked—necessitating a mistrial—would have been filed. Mr. Cruz-Garcia was clearly prejudiced by his and his attorneys' absence during this colloquy.

### C. This claim is unexhausted. Alternatively, the procedural default of this claim should be excused to avoid a fundamental miscarriage of justice.

This claim is unexhausted because it was not presented to the state courts and a viable procedural vehicle exists to secure review in a subsequent 11.071 application. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will request that the Court stay and abey this proceeding so that he may exhaust this and several other meritorious claims. Alternatively, the procedural default of the claim may be excused because refusal to consider the claim will result in a fundamental miscarriage of justice, both because Mr. Cruz-Garcia is probably actually innocent and because the verdicts upon which he was convicted and sentenced to death were not truly unanimous. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The Supreme Court has explained that "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (quoting *Engle v. Issac*, 456 U.S. 107, 135 (1982)). Though the Court has not provided a precise definition of the term "miscarriage of justice," it should certainly apply when the petitioner demonstrates both a violation of a fundamental trial right, such as the right to be present at critical stages of his trial, and a resulting conviction and death sentence that were produced under duress, and were therefore not truly unanimous judgments of the case. Both showings have been made here. If the Court finds this claim is procedurally defaulted, it should therefore proceed to consider Claim 23 *de novo*.

## CLAIM TWENTY: INCONSISTENT THEORIES

The State presented a version of the offense at Mr. Cruz-Garcia's trial that was inconsistent with the version presented at the trial of Mr. Cruz-Garcia's co-defendant, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. ECF No. 18 at 215-217. Under clearly established Supreme Court precedent, prosecutorial misconduct must not render a trial fundamentally unfair. *Smith v. Phillips*, 455 U.S. 209, 219 (1982). As a consequence, "the Due Process Clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offense arising out of the same event." *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000); *see also United States v. Collins*, 799 F.3d 554, 582 (6th Cir. 2015); *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003); *Hall v. State*, 283 S.W.3d 137, 156 (Tex. App.—Austin 2009, pet. denied). Because the trial of Mr. Cruz-Garcia's co-defendant occurred before Mr. Cruz-Garcia's state habeas counsel submitted his application for post-conviction relief, state habeas counsel was ineffective for failing to raise this claim and it may be reviewed *de novo* by this Court. *See Martinez v. Ryan*, 566 U.S. 1 (2012).

## CLAIM TWENTY-ONE: JUDICIAL BIAS

Mr. Cruz-Garcia's Fifth, Eighth and Fourteenth Amendment rights were violated because there is a serious risk that Judge Magee was biased against him.

### A.     There are several indications that Judge Magee was biased against Mr. Cruz-Garcia.

Judge Magee, who presided over Mr. Cruz-Garcia's trial, was an assistant district attorney ("ADA") with the Harris County District Attorney's Office ("HCDAO") from 1992 to 2012. ECF No. 18 at 218. The HCDAO secured an indictment against Mr. Cruz-Garcia for capital murder on

November 20, 2008, four years before Judge Magee left their office. The trial of Mr. Cruz-Garcia began only six months after she left the HCDAO to assume her judgeship. Moreover, during twelve of her twenty-one years at the HCDAO, Judge Magee served as a felony district court chief, supervising other ADA's in four district courts. *Id*. She also personally tried ten capital murder cases to jury. *Id*. Thus, Judge Magee would have had unfettered access to, and potentially direct personal involvement in, the investigative and prosecutorial materials against Mr. Cruz-Garcia.[20]

In Claims 8 and 19, Mr. Cruz-Garcia challenges the constitutionality of Judge Magee's *ex parte* communication with Juror Bowman regarding her position as the lone holdout juror refusing to sentence Mr. Cruz-Garcia to death. Those claims allege both that Judge Magee violated Mr. Cruz-Garcia's right to be present at all critical stages of his trial and that she unconstitutionally coerced Juror Bowman into rendering an untrue verdict. Claims 8 and 19 are incorporated herein by express reference because they, too, show Judge Magee's bias.

In Claim 5, Mr. Cruz-Garcia also challenges Judge Magee's highly unusual and improper ruling disallowing him from cross-examining State's witnesses and presenting his own evidence concerning a history of misconduct at the HPD crime lab that handled the DNA evidence in his case. For instance, Mr. Cruz-Garcia sought to introduce evidence that three of the HPD crime lab employees involved in the handling of evidence in this case were incompetent and engaged in misconduct and criminal behavior. Mr. Cruz-Garcia incorporates Claim 5 by express reference for its tendency to show Judge Magee's bias.

---

[20] Without discovery, it is impossible to ascertain whether Judge Magee had any direct involvement in the decision-making and other aspects of the prosecution of Mr. Cruz-Garcia. It is notable, however, that Judge Magee presided over cases she had indicted as a prosecutor on numerous occasions. ECF No. 18 at 231-32; 18-54, -55, -56, -57. Clearly, the court lacked any kind of conflict prevention system.

Finally, evidence from Judge Magee's handling of Mr. Cruz-Garcia's state habeas proceeding also tends to establish her bias during the trial. First, while running for re-election during Mr. Cruz-Garcia's state habeas proceedings, Mr. Cruz-Garcia's case was the *only* case cited in support of her candidacy. Judge Magee's campaign website even linked to a *Houston Chronicle* article about the trial. ECF No. 18 at 220.[21] Judge Magee also refused to recuse herself upon Mr. Cruz-Garcia's motion alleging that his claim that she violated his constitutional rights by holding an *ex parte* meeting with Juror Bowman created a conflict of interest. Upon losing her reelection campaign, Judge Magee rushed Mr. Cruz-Garcia's state habeas, preventing him from meaningfully participating in order to ensure that she would decide the fate of his conviction and death sentence, which she did two days before her tenure as judge concluded by signing the State's proposed FFCL verbatim. *See* Section III, *supra*.

### B.   Mr. Cruz-Garcia was denied due process and a fair trial by Judge Magee's bias.

Due process guarantees that an accused will be tried before a judge who harbors no actual bias against the accused. *See, e.g., In re Murchison*, 349 U.S. 133, 136 (1955). A judge free of actual bias is one capable of "hold[ing] the balance nice, clear and true between the state and the accused []." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Because of the impracticability of proving actual bias, the Supreme Court has set forth an objective test for adjudicating judicial bias challenges. *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016). Under this test, relief should be granted when "the

---

[21] Since Mr. Cruz-Garcia filed his amended petition on July 1, 2019, Judge Magee has removed her campaign website from the internet. Her Facebook page, however, still contains the link. https://www.facebook.com/reneemageeforjudge/, last visited on June 9, 2020.

probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Thus, the courts ask "whether, as an objective matter, the average judge in [the challenged judge's] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams*, 136 S. Ct. at 1905; *accord Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). Judicial bias is a structural trial error not subject to harmless error analysis. *Williams*, 136 S. Ct. at 1909. Upon a showing of a constitutionally intolerable risk of bias, relief is automatic.

The Supreme Court has found a Fourteenth Amendment violation when the judge "earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Williams*, 136 S. Ct. at 1905. Mr. Cruz-Garcia will be filing a discovery motion requesting leave to conduct depositions of relevant witnesses to establish that Judge Magee was personally and significantly involved in prosecutorial decision-making in his case. But even without this evidence, Judge Magee's status as a felony supervisor creates a constitutionally intolerable likelihood that she was aware of and involved in prosecutorial decision-making before taking the bench and presiding over the trial. Certainly, the average judge presiding over a capital murder trial being prosecuted by the same office the judge worked for as a supervisor during the first four years of the case would not sit as a neutral arbitrator. Moreover, Judge Magee's conduct throughout the trial, and continuing into the state habeas proceedings, which was decidedly biased in favor of the prosecution, casts additional doubt on Judge Magee's neutrality.

**C. The claim is unexhausted.**

The foregoing claim was not presented during Mr. Cruz-Garcia's state post-conviction proceedings. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

## CLAIM TWENTY-TWO: REPEATED EMOTIONAL OUTBURSTS

Mr. Cruz-Garcia's conviction was unconstitutionally obtained due to repeated, emotional outbursts from the gallery during his trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. *See* ECF No. 23-6 at 16, 109-110. Under clearly established Supreme Court precedent, a defendant is entitled to be "fairly tried in a public tribunal free of prejudices, passion, [and] excitement." *Sheppard v. Maxwell*, 384 U.S. 33, 350 (1966). This claim is unexhausted. The foregoing claim was not presented during Mr. Cruz-Garcia's state post-conviction proceedings. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

## CLAIM TWENTY-THREE: INACCURATE INTERPRETATION

Mr. Cruz-Garcia's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the trial court's failure to provide accurate interpretations of the testimony.

### A.      Mr. Cruz-Garcia's trial proceedings were not accurately interpreted.

Eleven witnesses at Mr. Cruz-Garcia's trial testified in Spanish because they did not adequately speak or understand English. *See* ECF No. 23-4 at 198; ECF No. 23-6 at 82, 118; ECF No. 23-7 at 7;ECF No. 23-10 at 16, 45, 80, 100, 120; ECF No. 23-11 at 62; ECF No. 23-12 at 11.[22]

---

[22] The State presented Spanish-language testimony from three guilt-phase witnesses and six penalty-phase witnesses. Mr. Cruz-Garcia presented Spanish-language testimony from two penalty-phase witnesses.

The record contains several instances of the interpreters self-correcting their interpretations of these witnesses' testimony, raising doubts as to both the interpreters' qualifications and the accuracy of the testimony that was related to the jury. *See, e.g.*, ECF No. 23-6 at 96 (correcting original interpretation stating "I was in trouble" to "that was a problem"); ECF No. 23-6 at 167 (correcting original interpretation stating "I didn't want to die" to "I wanted to die"); ECF No. 23-11 at 68 (correcting original interpretation stating the defendant was wearing "a grey coat and a grey tie" to a "blue shirt").

Solidifying the concerns raised by the record, the jury sent a note to the trial court during their guilt-phase deliberations in which they asked: "Are we only allowed to consider the interpreter's response of the witness in English and not the Spanish response as heard by the Spanish-speaking jury members[?]" ECF No. 23-9 at 101. After conferring with counsel, and without objection, the court instructed the jury that "[t]he interpreter's response is the official record and evidence in the case." *Id.*

Finally, Ronaldo Hernandez, one of the interpreters for the jury, also interpreted the English-language testimony and argument into Spanish for Mr. Cruz-Garcia, a foreign national who does not speak or understand English. ECF No. 22-30 at 5. Based on the record evidence that he and fellow interpreter Marilu Flores struggled to accurately interpret the Spanish testimony into English, it is more likely than not that Mr. Hernandez also failed to adequately interpret the English testimony into Spanish for Mr. Cruz-Garcia.

**B.      Because Mr. Cruz-Garcia's trial was infected with inaccurate interpretations of the evidence and arguments, and because the jurors deliberated over different testimony based on their comprehension or not of the Spanish language, Mr. Cruz-Garcia's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated.**

105

The trial court's failure to provide accurate interpretations of the evidence and arguments, and the failure of the parties to identify and request amelioration of this error under TCCP Art. 38.30(a), resulted in a violation of Mr. Cruz-Garcia's constitutional rights to due process and a fair trial, right to a jury trial, right to a unanimous verdict, right to be present and confront the witnesses against him, and right to present a defense.

The Supreme Court has not specifically addressed whether provision of an interpreter is a fundamental trial right. Nonetheless, in the context of competency challenges, the Court has long held that a criminal defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial" because, "though physically present in the courtroom, [he] is in reality afforded no opportunity to defend himself." *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *see also Ferrell v. Estelle*, 568 F.2d 1128, 1132-33 (5th Cir. 1978) ("The Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense. Ensuring that the defendant has that minimum understanding is primarily the task of the trial judge."). Because of the practical similarities between incompetency and language barriers, the Second Circuit has explicitly extended the Supreme Court's competency jurisprudence to situations in which interpreters are needed, but not provided. *United State ex rel. Negron v. New York*, 434 F.2d 386, 390 (2nd Cir. 1970) (holding defendant's obvious "language disability . . . was as debilitating to his ability participate in the trial as a mental disease or defect," but more readily curable).

Moreover, as a criminal defendant, Mr. Cruz-Garcia enjoyed the "bedrock procedural guarantee" of confrontation of the witnesses against him, *Crawford v. Washington*, 541 U.S. 36, 42

(2004) (citation omitted); "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies," *Washington v. Texas*, 388 U.S. 14, 19 (1967); and the right to have a jury determine every element of the crime of which he was charged, *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000). Criminal defendants are deprived of these and other "constitutional protections of surpassing importance," *id.* at 476, when the evidence at their trials is inaccurately conveyed to both themselves and their juries. The injustice resulting from such a "Kafkaesque spectre of an incomprehensible ritual," *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973), is amplified when not only the defendant's liberty, but his life, is at stake in a capital trial. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (capital defendants entitled to "a greater degree of accuracy . . . than would be true in a noncapital case").

The Fifth Circuit has tentatively scheduled oral argument on August 3, 2020, to address the question "whether the failure to provide Petitioner with an interpreter without a valid waiver constituted a structural error that 'affect[ed] the framework within which the trial proceeds' and therefore Petitioner need not demonstrate prejudice in order for his petition to be granted." *Garcia v. Davis*, Case No. 7:16-cv-00632, Opinion at Order at 4-5 (S.D. Tex. Nov. 9, 2018) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).[23] Although the McAllen Division of the Southern District denied relief to the petitioner in that case after finding he failed to demonstrate prejudice, the Court granted a certificate of appealability after concluding that "reasonable jurists could determine the error here is structural error and reversal required." *Id.* at 32-33.[24] Inaccurate interpretation, as much

---

[23] The Fifth Circuit case number is 18-41150.

[24] Structural errors require automatic reversal because they "affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot

as the failure to provide interpretation, thwarts both the defendant's ability to understand and participate in his own trial and the jury's ability to understand and deliberate on the evidence that was presented, resulting in structural error.

Moreover, it is nearly impossible to demonstrate harm resulting from unreliable interpretation. The trial court did not make a record of the Spanish-language testimony or the Spanish interpretations of the English-language testimony. The only official record of the trial proceedings is the English-language testimony and the English interpretation of the Spanish-language testimony. There is no record by which to compare what the jury and Mr. Cruz-Garcia heard with what the witnesses actually testified to. The only records we do have are several self-corrections by the interpreters, a note sent by the jury during guilt-phase deliberations, and the court's response to that note. Together, the evidence establishes four facts:

(1) the jurors who understood both English and Spanish heard different testimony from the jurors that understood only English,

(2) those differences were material enough to the deliberation process that the jurors found it necessary to seek guidance from the court on which testimony they could consider,

(3) the trial court instructed the jury to consider only the English interpretation of the testimony, and thus the jury deliberated over evidence that was not presented, and

(4) The inaccurate testimony referred to in the jury's note came from the State's guilt-phase witnesses.

---

reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment can be regarded as fundamentally fair.'" *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (quoting *Clark*, 478 U.S. 570, 577-78). As the McAllen Division of this Court acknowledged, "it is a reasonable contention that the [deprivation of a qualified interpreter] undermined 'basic protections' in the trial process without which a trial cannot be 'fundamentally fair.'" *Garcia*, Opinion and Order at 32 (quoting *Clark*, 478 U.S. at 577-78).

It would place an impossible burden on Mr. Cruz-Garcia to require a showing of harm under these circumstances, providing further support for treating the denial of accurate interpretations as structural error that requires reversal.[25]

Finally, in addition to the above constitutional rights, the interpretation errors violated Mr. Cruz-Garcia's right to a unanimous verdict. The court's instruction to the jury to consider only the English interpretations of the testimony resulted in a trial at which the jurors who spoke only English not only heard inaccurate testimony, but heard testimony that was different from that which the Spanish-speaking jurors heard. They did not deliberate on the same evidence. The differences in the evidence were certainly material to the verdict, as demonstrated by the fact that the jury sent a note seeking guidance during its guilt-phase deliberations.

C.      **The claim is unexhausted.**

The foregoing claim was not presented during Mr. Cruz-Garcia's state post-conviction proceedings. If the Director raises lack of exhaustion as a procedural defense, Mr. Cruz-Garcia will file a motion requesting stay and abeyance to exhaust this and several other meritorious claims.

## CLAIM TWENTY-FOUR: EXCLUSION OF MITIGATION EVIDENCE

In violation of the Eighth and Fourteenth Amendments, the trial court precluded Mr. Cruz-Garcia from presenting powerful mitigating evidence at the punishment phase. Mr. Cruz-Garcia sought to introduce certificates establishing that he had completed multiple Bible study courses while in prison in Puerto Rico. ECF No. 23-12 at 58-61. The evidence would have, among other

---

[25] Alternatively, if the Court requires Mr. Cruz-Garcia to show that he was harmed by the inaccurate interpretations at his trial, he requires discovery and an evidentiary hearing to complete the record.

things, supported the testimony of Angel Meza, a trustee at the Harris County jail where Mr. Cruz-Garcia was held while awaiting trial, that Mr. Cruz-Garcia was a genuine "Man of God." *Id.* at 84-88. Mr. Cruz-Garcia also sought to introduce evidence through a Puerto Rican police officer named Juan DeJesus Rodriguez, a witness for the State, that Mr. Cruz-Garcia worked as a confidential informant for the INS, DEA, and FBI. *Id.* at 72.

The trial court excluded the evidence on hearsay grounds and rejected Mr. Cruz-Garcia's argument that exclusion of the evidence implicated Mr. Cruz-Garcia's right to present a defense. *Id.* at 60, 74-77. The CCA affirmed. ECF No. 18-2 at 45-53. The clearly established law with respect to the right to present a defense is set forth in the discussion of Claim 5. The CCA's decision holding that the trial court's exclusion of the mitigation evidence did not violate Mr. Cruz-Garcia's right to present a defense was an unreasonable application of this clearly established federal law. Specifically, to the extent the court finds that Mr. Cruz-Garcia's counsel were not deficient in failing to present evidence of Mr. Cruz-Garcia's genuine religiosity and his assistance to federal law enforcement in an admissible form, then the CCA erred in holding that the exclusion of the evidence merely prevented Mr. Cruz-Garcia from presenting the evidence in "the form he desired." *Id.* at 48. Rather, the exclusion of the evidence prevented Mr. Cruz-Garcia from presenting his mitigation defense on those points entirely.

## CLAIM TWENTY-FIVE: THE STATE'S INFLAMMATORY STATEMENTS

The State made numerous inappropriate, inflammatory and prejudicial statements throughout trial, in violation of Fifth, Eighth and Fourteenth Amendments. ECF No. 18 at 226-28. Among other things, the State recited Biblical passages, attempted to elicit religious fury from the jurors, compared Mr. Cruz-Garcia to Adolf Hitler and infamous serial killers, and suggested to the

jury that Mr. Cruz-Garcia was subhuman. *Id.* Under clearly established federal law, prosecutorial misconduct, such as the State's inflammatory rhetoric in this case, warrants habeas relief when the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Given how far beyond the pale the State's comments went, there can be no question that they seriously prejudiced the jury's ability to judge Mr. Cruz-Garcia fairly. This claim was not presented during Mr. Cruz-Garcia's state court proceedings, but Mr. Cruz-Garcia intends to present to the state court during any stay of the proceedings pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005).

## CLAIM TWENTY SIX: ABUSE OF THE SUBPOENA POWER

Mr. Cruz-Garcia's rights to a fair trial and due process of law were violated when the State issued abusive, extra-judicial subpoenas, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. ECF No. 18 at 242. Here, the State abused its power to obtain evidence through means forbidden by Texas pretrial discovery rules, relied upon the extra-judicially obtained evidence at punishment, and upon information and belief, did not disclose this evidence to Mr. Cruz-Garcia.

## CLAIM TWENTY SEVEN: ACTUAL INNOCENCE

Mr. Cruz-Garcia is actually innocent of the offense and his execution would therefore constitute cruel and unusual punishment and violate due process. In *Herrera v. Collins*, the Supreme Court assumed, without deciding, that the execution of an innocent person would violate the Constitution. *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *accord House v. Bell*, 547 U.S. 518, 554-55 (2006); *see also Schlup*, 513 U.S. at n.28.

State postconviction and federal habeas counsel have gathered persuasive evidence that Mr. Cruz-Garcia is actually innocent of the offense. Evidence mustered against Mr. Cruz-Garcia by the State is unreliable and offends the Constitution for the reasons set forth *supra* and in the First Amended Petition.

By the State's own admission, the DNA evidence presented at trial against Mr. Cruz-Garcia was false. ECF No. 18-11. The supposed "most damning corroboration" for his guilt in fact established nothing other than the presence of an unknown party. ECF No. 23-9 at 37. The rest of the State's case rested entirely on the testimony of Rudy Santana and Angelita Rodriguez. As briefed *supra* and in the First Amended Petition, their testimony was false, unreliable, and, upon information and belief, obtained in exchange for deals that were never disclosed to the defense.

The State's revised DNA evidence, combined with postconviction investigation revealing that Mr. Cruz-Garcia had a personal relationship with Arturo and Diana, a consensual sexual relationship with Diana, and that Mr. Cruz-Garcia had visited the apartment earlier on an entirely unrelated matter, only establishes the presence of an unknown party. Mr. Cruz-Garcia is factually and legally innocent of the offense and his execution would therefore violate the Eighth and Fourteenth Amendments. *Herrera*, 506 U.S. at 417, 419, 431.

**CLAIM TWENTY EIGHT: UNCONSTITUTIONAL PENALTY-PHASE INSTRUCTIONS**

The jury instructions at punishment prevented the jury from considering "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense[,]" in violation of the Eighth and Fourteenth Amendments. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original). Pursuant to TCCP art. 37.071, penalty-phase jury instructions in Texas impermissibly limit the jury's inquiry on mitigation to evidence going to the

112

defendant's "moral blameworthiness." This argument is foreclosed by this Circuit's precedent. *Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

## CLAIM TWENTY NINE: THE TEN-TWELVE RULE

The jury was not instructed that Mr. Cruz-Garcia would be sentenced to life without parole if any single juror did not answer the special issues such as to return a sentence of death, in violation of the Eighth and Fourteenth Amendments. Here, a lone holdout juror, Angela Bowman, explained to the trial court that she felt "pressured" to change her vote on the special issues so as to return a unanimous verdict of death. ECF No. 22-10 at 157-62; *see* ECF No. at 171-78. This argument is foreclosed by this Circuit's precedent. *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2000). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

## CLAIM THIRTY: UNCONSTITUTIONALLY VAGUE SPECIAL ISSUE

Mr. Cruz-Garcia was sentenced to death according to "standards so vague that they [. . .] fail adequately to channel the sentencing decision patterns of juries[,]" in violation of the Eighth and Fourteenth Amendments, *Gregg v. Georgia*, 428 U.S. 153, n.46 (1976). Texas law requires that the jury determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). These terms are not defined and the CCA has declined to provide any further guidance on the future dangerousness inquiry. *Curry v. State*, 541 S.W.3d 751, 751-52 (Tex. Crim. App. 2017) (Alcala J., dissenting) (not error for trial court to fail to define "society" in future dangerousness context so as to preclude jury from engaging in "fictional inquiry into [defendant's] future dangerousness in the free society into which he would never re-enter as a matter of law"). Under

113

clearly established federal law, the State "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (internal quotations and citations omitted). This argument is foreclosed by this Circuit's precedent. *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

## CLAIM THIRTY ONE: ARBITRARY AND DISCRIMINATORY CAPITAL PUNISHMENT SCHEME

Mr. Cruz-Garcia was sentenced to death based on an arbitrary and discriminatory system for the administration of the death penalty, in violation of the Eighth and Fourteenth Amendments. At the time of Mr. Cruz-Garcia's trial, a statistical study on the administration of the death penalty by the office of the Harris County District Attorney demonstrated that, while there was a 20% likelihood that the district attorney would advance a capital murder charge to a capital trial against a white defendant, that likelihood escalated to 80% against a Hispanic defendant. *See* Raymond Peternoster, *Racial Disparity in the Case of Duane Edward Buck*, at (Dec. 29, 2012) [Amended Petition, Ex. 47]; *see also*, Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131, 131-32 (2012) (showing that "death sentences were imposed on behalf of white victims at 2.5 times [. . .] and death sentences were imposed on behalf of white female victims at 5 times the rate one would expect if the system were blind to race and gender."). Excluding retrials, Harris County has not sentenced a white capital defendant to death since 2004.

The State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420,

428 (1980). Here, "if any discernible basis could be identified for the selection of those few who were chosen to die, it was the constitutionally impermissible basis of race." *Callins v. Collins*, 510 U.S. 1141, 1147 (Blackmun J., dissenting) (internal quotations omitted). Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.


Respectfully submitted,


DATE: July 13, 2020

Jason D. Hawkins
Federal Public Defender

**/s/ David C. Currie**
Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

David C. Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defenders

Office of Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629 Dallas,
TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org
david_currie@fd.org
naomi_fenwick@fd.org

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum of Law in Support of the First Amended Petition has been served by CM/ECF upon counsel for Respondent on July 13, 2020:

Postconviction Litigation Division
Office of the Attorney General
P.O. Box 12548
Capitol Station
Austin, TX 78711

/s/ **David C. Currie**
David C. Currie (TX 24084240)
Assistant Federal Defender