# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**OBEL CRUZ-GARCIA,**
     Petitioner,

  v.

**BOBBY LUMPKIN, Director,**
Texas Department of
Criminal Justice,
Correctional Institutions Division,
     Respondent.

Case No. 4:17-CV-03621

U.S. District Judge Lee H. Rosenthal

---

## SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

---

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
david_currie@fd.org

## THIS IS A CAPITAL CASE

## PETITION FOR WRIT OF HABEAS CORPUS
### PURSUANT TO 28 U.S.C. § 2254

Petitioner Obel Cruz-Garcia, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

# TABLE OF CONTENTS

PETITION FOR WRIT OF HABEAS CORPUS ............................................................... i

PURSUANT TO 28 U.S.C. § 2254 ............................................................................... i

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................... xiii

JURISDICTION AND VENUE .................................................................................... 1

PARTIES ..................................................................................................................... 1

INTRODUCTION ........................................................................................................ 1

PROCEDURAL HISTORY .......................................................................................... 9

STATEMENT OF FACTS ........................................................................................... 11

LEGAL ARGUMENTS APPLICABLE TO MULTIPLE CLAIMS ............................ 12

    A.  The Court should not apply 28 U.S.C. § 2254(d) to any of Mr. Cruz-Garcia's claims because the state habeas proceedings did not comport with due process. ........................... 12

        1.  Despite his best efforts, Mr. Cruz-Garcia's state habeas proceedings did not comport with state-law requirements or provide him fundamental fairness and due process. ... 12

        2.  Because Mr. Cruz-Garcia's state habeas proceeding did not comport with state law or due process, 28 U.S.C. § 2254(d)'s relitigation bar does not apply and this Court should consider his claims *de novo* ............................................................................ 18

    B.  Cumulative Prejudice. ............................................................................................ 20

    C.  Request for discovery and a hearing. ..................................................................... 22

CLAIMS FOR RELIEF ............................................................................................... 22

**Claim One: Juror misconduct denied Mr. Cruz-Garcia a fair and impartial trial, in violation of the Sixth, Eighth, and Fourteenth Amendments. ................................................. 22**

    A.  The jury foreman read Bible passages to the jury during their penalty phase deliberations and the jury was influenced by these Bible passages to answer the special issues in a way that resulted in a death sentence. ........................................................................... 23

        1.  The jury was exposed to an external influence when the jury foreperson brought a Bible into the deliberations room and read from it to the jury during their deliberations on punishment. ....................................................................................... 24

        2.  This external influence had a substantial and injurious effect on the jury's verdict. ... 25

    B.  Jurors discussed the evidence and sentence outside of punishment deliberations. ............... 28

C. This Court can review this claim *de novo* because the state court failed to adjudicate the federal claim on the merits or, in the alternative, this Court can review the merits of this claim because 28 U.S.C. § 2254(d) is satisfied........................................................................29

**Claim Two: Mr. Cruz-Garcia's right to present a defense and to cross-examine witnesses was violated when the trial court refused to allow him to present evidence relating to the unreliability of the DNA evidence. ................................................. 32**

A. The trial court prohibited Mr. Cruz-Garcia from presenting documentary and testimonial evidence relating to the unreliability of the State's DNA evidence........................................32

   1. The prohibited evidence reflected that the HPD Crime Lab, where the DNA evidence against Mr. Cruz-Garcia was received and stored, was shuttered following revelations of gross negligence........................................................................33

   2. At a pre-trial hearing, the trial court made extensive findings of fact about the defunct HPD Crime Lab's involvement in the processing and storage of the State's DNA evidence against Mr. Cruz-Garcia. ................................................ 36

   3. The trial court prohibited Mr. Cruz-Garcia from introducing any evidence going to the credibility of the State's DNA evidence based on the defunct HPD Crime Lab's involvement. ........................................................................40

B. The trial court's exclusion of this evidence violated Mr. Cruz-Garcia's right to present a complete defense. ........................................................................40

C. The trial court's exclusion of this evidence violated Mr. Cruz-Garcia's right to confront witnesses against him........................................................................43

D. This Court can review this claim *de novo*........................................................................44

   1. This Court can review Mr. Cruz-Garcia's complete defense claim *de novo* because the state court failed to adjudicate the federal claims on the merits.................................44

   2. This court can review the claim that Mr. Cruz-Garcia's right to cross- examine witnesses was violated *de novo* to avoid a fundamental miscarriage of justice..............46

**Claim Three: Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated when his conviction was secured based on inaccurate and unreliable DNA evidence. ..................................................... 51**

A. The DNA evidence relied on by the State to secure Mr. Cruz-Garcia's conviction was unreliable. ........................................................................51

B. The DNA evidence relied on by the State was inaccurate. ........................................52

C. The State's reliance on unreliable and inaccurate DNA evidence violated the Eighth Amendment's heightened reliability requirement and the Due Process Clause of the Fourteenth Amendment. ........................................................................53

iii

D.  This court can review this claim *de novo* to avoid a fundamental miscarriage of justice........53

**Claim Four: Mr. Cruz-Garcia's Sixth Amendment right to effective assistance of counsel was violated. ................................................................................. 54**

A.  The Sixth Amendment guarantees the right to effective representation. ...........................54

B.  Caseload and fee guidelines for Texas death penalty cases...........................................56

    1.  Texas and ABA Guidelines require counsel to limit their caseload. ...........................56

    2.  The Texas Indigent Defense Commission has concluded that five is the maximum number of death penalty cases a fulltime capital practitioner can handle...................57

    3.  TIDC has also closely studied felony caseloads. ................................................58

    4.  Both the ABA and the Texas Guidelines prohibit fixed-fee arrangements in death penalty cases. ...............................................................................................59

C.  Background regarding Mr. Cruz-Garcia's trial counsel...............................................60

    1.  Mr. Cruz-Garcia's family raised money to retain counsel for him. ...........................60

    2.  When the State decided to seek the death penalty, Mr. Cruz-Garcia's retained counsel were forced to withdraw and Mr. Cornelius and Mr. Madrid were appointed to represent Mr. Cruz-Garcia. ...............................................................................61

    3.  Trial counsel sought and received compensation for their representation of Mr. Cruz-Garcia on a flat-fee basis, in contravention of Texas Guideline 8.1.B.1 and ABA Guideline 9.1.B.1..............................................................................................61

    4.  Mr. Cornelius's crushing caseload far exceeded reasonable standards. .......................62

    5.  From jury selection through the punishment phase of Mr. Cruz-Garcia's trial, Mr. Cornelius spent extraordinary amounts of time working on other cases. ...................85

        a.  Jury Selection.....................................................................................87

        b.  The week of the evidentiary hearing.........................................................88

        c.  Two weeks before trial.........................................................................89

        d.  The week before trial...........................................................................89

        e.  The guilt phase. ................................................................................90

        f.  The punishment phase..........................................................................91

    6.  The billing records of trial counsel's investigator show that Mr. Cruz-Garcia's case was not ready to be tried by the beginning of jury selection. ...........................................101

    7.  Trial counsel failed to review the State's file..........................................................102

D.  Trial counsel performed deficiently by failing to adequately communicate with Mr. Cruz-Garcia................................................................................................................104

iv

E.  Trial counsel performed deficiently by failing to seek a continuance. .................................106

F.  Trial counsel's investigation, preparation, and performance during the guilt/innocence phase were ineffective..................................................................................................107

    1.  Trial counsel performed deficiently by not challenging the State's DNA evidence. ...107

        a.  Trial counsel performed deficiently by not retaining a DNA expert and by failing to adequately investigate the State's DNA evidence....................................................107

        b.  Trial counsel's failure to retain a DNA expert and to adequately investigate the State's DNA evidence prejudiced Mr. Cruz-Garcia................................................110

            i.  A DNA expert could have identified serious, and now conceded, flaws with the State's DNA analysis..............................................................................................111

            ii.  A DNA expert could have identified serious problems with the storage of the DNA evidence...............................................................................................113

    2.  Trial counsel failed to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab..................115

        a.  Trial counsel performed deficiently by failing to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab. ...............................................................................................115

        b.  Mr. Cruz-Garcia was prejudiced by trial counsel's failure to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination concerning the old HPD Crime Lab..................................................116

    3.  Trial counsel failed to investigate the State's star witness, Mr. Santana. ..................117

        a.  Trial counsel failed to investigate Mr. Santana's mental health issues..................117

        b.  Trial counsel failed to investigate Mr. Santana's crime of moral turpitude..........118

        c.  Trial counsel failed to make use of the State's *Brady* notice regarding the lack of blood on Angel Garcia's clothing, in contradiction of Mr. Santana's testimony. .120

        d.  Mr. Cruz-Garcia was prejudiced by trial counsel's failures to investigate Mr. Santana. ....................................................................................................121

    4.  Trial counsel failed to investigate Angelita Rodriguez.................................................121

        a.  Trial counsel performed deficiently by failing to investigate the testimony of Angelita Rodriguez. ...............................................................................................121

        b.  Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Angelita Rodriguez. ..........................................................................................................123

    5.  Trial counsel failed to investigate Diana Garcia and Arturo Rodriguez.....................124

        a.  Trial counsel failed to develop evidence of Diana Garcia's consensual relationship with Mr. Cruz-Garcia. ............................................................................................124

b. Trial counsel failed to develop evidence that Ms. Garcia and Mr. Rodriguez were still selling drugs on the night of the offense. ....................................................126

c. Trial counsel failued to develop evidence that Ms. Garcia was an unreliable witness..........................................................................................................127

d. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Diana Garcia and Arturo Rodriguez. ..............................................................127

6. Trial counsel failed to investigate law enforcement's theory of the case at trial.........128

a. Trial counsel performed deficiently by failing to present evidence that the cigar was not linked to the crime. ..........................................................128

b. Trial counsel performed deficiently by failing to present evidence that the police never believed Ms. Garcia and Mr. Rodriguez. ......................................129

c. Trial counsel performed deficiently by not investigating law enforcement's other theories of the offense. ..........................................................130

d. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate law enforcement's theory of the case..........................................................130

G. Trial counsel's investigation, preparation, and performance during the punishment phase was ineffective. ..........................................................................................................131

1. Trial counsel performed deficiently in their investigation and presentation of mitigation evidence. ..........................................................................................................131

a. Trial counsel's mitigation presentation was anemic at best.....................................133

b. Trial counsel performed deficiently by failing to retain a mitigation specialist. ....134

c. Trial counsel botched the minimal effort they made to introduce mitigating evidence. ..........................................................................................................135

d. Trial counsel failed to consult with any experts, except for a psychologist who did just seven hours of work..........................................................................136

e. Trial counsel failed to investigate in Puerto Rico. ..................................................137

2. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to conduct an adequate mitigation investigation. ..........................................................................................................138

a. An adequate mitigation investigation by a mitigation specialist would have allowed trial counsel to present compelling mitigation evidence of Mr. Cruz-Garcia's life history. ..........................................................................................................138

i. Mr. Cruz-Garcia's father, the family's sole provider, was the victim of a life-threatening accident and the family was pushed into subsistence fishing. .......139

ii. Mr. Cruz-Garcia was abandoned by his mother. ................................................141

iii. Mr. Cruz-Garcia became his siblings' caregiver. ................................................142

iv. Mr. Cruz-Garcia was forced into child labor. ....................................................143

v. After his father remarried, Mr. Cruz-Garcia was expected to care for his siblings and half-siblings. ...........................................................144

vi. After their father remarried, Mr. Cruz-Garcia and his siblings were increasingly beaten and punished. ....................................................144

vii. At age 19, Mr. Cruz-Garcia emigrated to Puerto Rico and then to Houston to provide for his young family and ageing father. ...............................145

viii. Back in Puerto Rico, Mr. Cruz-Garcia assisted U.S. law enforcement............148

ix. Mr. Cruz-Garcia was heavily involved in his children's lives and provided financial support to the community in Boba. ...............................148

x. Mr. Cruz-Garcia was a model inmate................................................150

b. Had trial counsel retained a trauma expert and an expert with knowledge about Dominican culture and history, trial counsel could have presented evidence of trauma and relevant cultural context........................................151

c. Had trial counsel not waited until the last minute, they could have presented evidence of Mr. Cruz-Garcia's assistance to United States law enforcement agencies.. ....................................................................153

3. Trial counsel performed deficiently by failing to investigate, and presenting no rebuttal case to, the State's case on future dangerousness. .........................154

a. Trial counsel performed deficiently by failing to investigate extraneous offenses. 154

b. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate extraneous offenses. ...............................................................155

i. Saul Flores Murder. .........................................................155

ii. Kidnapping Puerto Rico.....................................................157

iii. Beating of "Betico." ........................................................158

c. Trial counsel performed deficiently by failing to investigate Mr. Cruz-Garcia's exemplary prison record..........................................................159

d. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Mr. Cruz-Garcia's exemplary prison record. ...............................................160

i. Puerto Rican prison records from the State's own file show that Mr. Cruz-Garcia was a well-behaved inmate.................................................160

ii. Prison chaplains who knew Mr. Cruz-Garcia well could have testified to his outstanding conduct and sincere religious conversion in prison. ....................161

iii. A classifications supervisor could have testified that Mr. Cruz-Garcia did not present any security risk as an inmate............................................164

iv. A psychologist who counseled Mr. Cruz-Garcia could have testified to his genuine religious faith and personal growth while in Puerto Rican prison. .....165

v. An expert on the Puerto Rican Department of Corrections could have testified to the remarkable nature of Mr. Cruz-Garcia's exemplary prison record..........165

vi. Mr. Cruz-Garcia's common-law wife Dorca could also have provided valuable testimony concerning Mr. Cruz-Garcia's time in Puerto Rican prison. ............166

vii. Evidence of Mr. Cruz-Garcia's life and conduct in Puerto Rican prison could have persuaded at least one juror that Mr. Cruz-Garcia was not a future danger................................................................................................................167

H.  Trial counsel was ineffective for failing to object to error and failing to preserve error for appellate review. ................................................................................................................167

1.  Trial counsel failed to object to, and preserve for appellate review, violations of Mr. Cruz-Garcia's rights under the Confrontation Clause. ...............................168

2.  Trial counsel failed to object to, and preserve for appellate review, the trial court's ruling impermissibly limiting Mr. Cruz-Garcia's right to cross-examine witnesses about the reliability of the DNA evidence...............................................................169

3.  Trial counsel failed to object to, and preserve for appellate review, the improper admission of victim impact testimony. ..........................................................169

4.  Trial counsel failed to preserve for appellate review error arising from the State's inflammatory comments. ...........................................................................170

5.  Trial counsel failed to preserve for appellate review error arising from emotional outbursts from the gallery. ........................................................................170

6.  Trial counsel failed to preserve for appellate review error arising from incorrect translation of testimony. ...........................................................................171

7.  Trial counsel failed to object to, and preserve for appellate review, Mr. Cruz-Garcia's absence from critical stages of his trial. ...........................................................171

I.  Trial counsel was ineffective during jury deliberations..........................................172

1.  Trial counsel failed to investigate jury misconduct.........................................172

2.  Trial counsel failed to object to the trial court's *ex parte* meeting with a holdout juror.......................................................................................................172

3.  Mr. Cruz-Garcia was prejudiced by trial counsel's ineffectiveness during the jury's deliberations..................................................................................................173

J.  Trial counsel was ineffective during jury selection..............................................174

1. Trial counsel failed to raise and preserve as error that Mr. Cruz-Garcia's jury was selected from a venire that was not representative of a fair cross section of the community, in violation of the Sixth and Fourteenth Amendments. ........................174

2. Trial counsel failed to make a full and accurate record of jury selection, and to require the State to exercise its cause for challenges on the record. .......................................176

3. Trial counsel failed to raise a *Batson* challenge. ...........................................177

4. Trial counsel failed to raise *Witherspoon* challenges. ....................................178

5. Trial counsel failed to identify potential jurors' biases based on the alleged facts of the offense.....................................................................................................179

6. Trial counsel failed to object to the State's inflammatory *voir dire* questioning. ........180

K.   Trial counsel rendered ineffective assistance by failing to recognize significance of Mr. Cruz-Garcia's foreign nationality. ...............................................................................182

    1. Trial counsel performed deficiently by failing to contact the Dominican consulate. 182

    2. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to contact the Dominican consulate.................................................................................................185

L.   The Court can review this claim *de novo* because state habeas counsel performed deficiently in failing to raise this substantial claim. ...............................................................186

**Claim Five:  The State relied on false testimony, in violation of the Fourteenth Amendment.................................................................................................190**

A.   The State relied on the false testimony of Mr. Santana. ........................................191

    1. The State relied on false testimony to establish Mr. Cruz-Garcia's guilt as a party to capital murder. .......................................................................................193

    2. The State relied on false testimony to bolster Mr. Santana's credibility to the jury...196

    3. The State relied on false testimony to prevent the defense from impeaching Mr. Santana. ..................................................................................................199

B.   The State relied on false testimony about the DNA evidence.............................199

    1. The State relied on false testimony regarding DNA evidence to link Mr. Cruz-Garcia to the offense and corroborate Mr. Santana's testimony. ...........................................200

    2. The State relied on false testimony to bolster the reliability of the DNA evidence. ...201

C.   The State relied on the false testimony of Angelita Rodriguez..............................203

D.   The State also relied on false testimony from Diana Garcia and Arturo Rodriguez. ..........204

E.   The State relied on the false testimony of law enforcement.................................205

ix

F.   The State relied on the false testimony of Johnny Lopez and Mr. Santana at punishment.............................................................................................206

G.   The State solicited false testimony about a kidnapping in Puerto Rico..............208

H.   The State knew, or should have known, of the false testimony. ..........................209

I.   There is a reasonable likelihood that this false testimony impacted the outcome of the proceedings. ...........................................................................................209

J.   This Court can review the merits of this claim because 28 U.S.C. § 2254(d) is satisfied. ..212

**Claim Six: The State withheld exculpatory evidence, in violation of the Sixth, Eighth, and Fourteenth Amendments and *Brady v. Maryland*. .......................................... 214**

A.   The State withheld impeachment evidence against Santana...............................215

1.   The State failed to disclose that Mr. Santana received a benefit for his testimony against Mr. Cruz-Garcia. ...........................................................215

2.   The State failed to disclose further evidence going to Mr. Santana's credibility........218

3.   The State failed to disclose that Santana was convicted of a crime involving moral turpitude.............................................................................................219

B.   The State withheld mitigation evidence. ...........................................................219

C.   The State withheld exculpatory evidence and impeachment in connection with several witnesses....................................................................................................220

D.   The evidence withheld by the State was material.................................................222

E.   This Court can review this claim *de novo* because Mr. Cruz-Garcia can show cause and prejudice to overcome procedural default..........................................................224

**Claim Seven: The trial court met *ex parte* and gave coercive instructions to a holdout juror, in violation of the Sixth, Eighth, and Fourteenth Amendments. .......................... 225**

A.   The trial court held an *ex parte* meeting with a holdout juror and gave that juror coercive instructions. ...................................................................................226

B.   Mr. Cruz-Garcia's constitutional rights were violated by the *ex parte* coercive instruction..227

C.   This Court can review this claim *de novo* because Mr. Cruz-Garcia can show cause and prejudice to overcome procedural default..........................................................228

**Claim Eight: Direct appeal counsel was ineffective, in violation of Mr. Cruz-Garcia's Sixth Amendment right to effective counsel. .......................................................... 229**

A.   Direct appeal counsel was ineffective for failing to challenge the trial court's ex parte meeting with, and coercive instructions to, a holdout juror. ...............................230

B.   This Court can review this claim because 28 U.S.C. § 2254(d) is satisfied. .......................231

**Claim Nine: Mr. Cruz-Garcia was not present during portions of his trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.** ......................................... 232

   A. Mr. Cruz-Garcia was absent from two critical stages of his trial. ...........................................233

   B. Mr. Cruz-Garcia's absence violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and a fair trial. ......................................................................233

   C. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice ......235

**Claim Ten:   Mr. Cruz-Garcia was denied the right to confront witnesses against him, in violation of the Confrontation Clause.** ........................................... 235

   A. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice ......237

**Claim Eleven: Testimony was translated incorrectly to the jury, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.** ........................................... 237

   A. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice ......241

**Claim Twelve: The trial court judge had a conflict of interest and was biased against Mr. Cruz-Garcia, in violation of the Fourteenth Amendment.** ......................................... 241

   A. There are several indications that Judge Magee was biased against Mr. Cruz-Garcia. .........241

   B. Mr. Cruz-Garcia was denied due process and a fair trial by Judge Magee's bias. .................243

   C. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice ......244

**Claim Thirteen: The trial court prohibited Mr. Cruz-Garcia from presenting mitigation evidence, in violation of the Eighth and Fourteenth Amendments.** ................. 244

   A. This Court can review the merits of this claim because 28 U.S.C. § 2254(d) is satisfied. ...245

**Claim Fourteen: Repeated emotional outbursts from the gallery rendered Mr. Cruz-Garcia's conviction and death sentence fundamentally unfair.** ...................................... 246

   A. This court can review this claim de novo to avoid a fundamental miscarriage of justice ....247

**Claim Fifteen: The State made numerous inflammatory comments throughout trial, in violation of Mr. Cruz-Garcia's due process rights and right to a fair trial under the Fourteenth Amendment.** ................................................................. 247

   A. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice ......249

**Claim Sixteen: Violation of the Vienna Convention on Consular Relations.** ........................ 249

**Claim Seventeen: Mr. Cruz-Garcia is actually innocent.** ....................................................... 250

**Claim Eighteen: The punishment phase jury instructions restricted the evidence that the jury could consider as mitigating, in violation of Mr. Cruz-Garcia's rights.** ............... 250

**Claim Nineteen: The trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence, in violation of Mr. Cruz-Garcia's rights.** ... 251

**Claim Twenty: Mr. Cruz-Garcia's death sentence was based on Texas's unconstitutionally vague first special issue, in violation of Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments.**............................................................................. 252

**Claim Twenty-One: Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated based on Texas's arbitrary and discriminatory system of administering the death penalty.**...................................................... 252

PRAYER FOR RELIEF.......................................................................................255

EXHIBIT LIST ..................................................................................................257

VERIFICATION BY ATTORNEY.......................................................................264

CERTIFICATE OF SERVICE ............................................................................265

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Allen v. United States,*
    164 U.S. 492 (1896) ........................................................................... 227

*Andrus v. Texas,*
    140 S. Ct. 1875 (2020) ..................................................................... *passim*

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000) ........................................................................... 238

*Baldez v. State,*
    386 SW.3d 324 (Tex. App.—San Antonio 2012, no pet.) ..................... 116

*Banks v. Dretke,*
    540 U.S. 668 (2004) ........................................................................... 225

*Barnes v. Joyner,*
    751 F.3d 229 (4th Cir. 2014) ................................................................ 23

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ............................................................................. 177

*Beazley v. Johnson,*
    242 F.3d 249 (5th Cir. 2001) ............................................................. 251

*Bobby v. Van Hook,*
    558 U.S. 4 (2009) ................................................................................ 55

*Brady v. Maryland,*
    373 U.S. 83 (1963) ........................................................... 120, 214, 220

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ....................................................................... 25, 43

*Ex parte Brian Davis,*
    No. 616522 (230th Dist. Ct.) ............................................................... 16

*Busby v. Davis,*
    925 F.3d 699 (5th Cir. 2019) ............................................................. 212

*Callins v. Collins,*
    510 U.S. 1141 ................................................................................... 253

*Canales v. Stephens,*
    765 F.3d 551 (5th Cir. 2014) ............................................................. 212

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) ........................................................................ 243

*Cargle v. Mullin,*
    317 F.3d 1196 (10th Cir. 2003) .................................................... 21, 22

*Ex parte Carl Buntion,*
    No. 588227 (178th Dist. Ct.) ........................................................... 16

*Chambers v. Mississippi,*
    410 U.S. 284 (1973) ............................................................. 21, 41, 245

*Coleman v. Thompson,*
    501 U.S. 722 (1991) ........................................................................ 213

*Cossel v. Miller,*
    229 F.3d 649 (7th Cir. 2000) .......................................................... 168

*Crane v. Kentucky,*
    476 U.S. 683 (1986) ............................................................... 32, 41, 42

*Crawford v. Washington,*
    541 U.S. 36 (2004) ................................................................. 236, 238

*Crenshaw v. State,*
    125 S.W.3d 651 (Tex. App.–Houston [1st Dist.] 2003, pet. ref'd) ............ 116

*Crosby v. United States,*
    506 U.S. 255 (1993) ........................................................................ 233

*Cruz-Garcia v. Texas,*
    No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015) ........... *passim*

*Ex parte Cruz-Garcia,*
    No. WR–85,051–04, 2021 WL 4571730 (Tex. Crim. App. Oct. 6, 2021) ......... *passim*

*Ex parte Cruz-Garcia,*
    Nos. WR–85,051–02 and WR–85,051–03, 2017 WL 4947132 (Tex. Crim.
    App. Nov. 1, 2017) ....................................................................... *passim*

*Cullen v. Pinholster,*
    563 U.S. 170 (2011) .......................................................................... 54

*Curry v. State,*
    541 S.W.3d 751 (Tex. Crim. App. 2017)....................................................................252

*Curtis v. State,*
    205 S.W.3d 656 (Tex. App.–Fort Worth 2006, pet. ref'd) ......................................116

*Darden v. Wainwright,*
    477 U.S. 168 (1986) ........................................................................246, 247, 248

*Davis v. Alaska,*
    415 U.S. 308 (1974)..............................................................................................43

*Delaware v. Fensterer,*
    474 U.S. 15 (1985) (per curiam)........................................................................43

*Delaware v. Van Arsdall,*
    475 U.S. 673 (1986)......................................................................................43, 44

*Dendel v. Washington,*
    647 F. App'x 612 (6th Cir. 2016).................................................................108, 114

*Diaz v. United States,*
    223 U. S. 442 (1912)..........................................................................................233

*Drope v. Missouri,*
    420 U.S. 162 (1975)............................................................................................237

*Druery v. State,*
    225 S.W.3d 491 (Tex. Crim. App. 2007).............................................................217

*Duren v. Missouri,*
    439 U.S. 357 (1979)...................................................................................175, 176

*Elmore v. Ozmint,*
    661 F.3d 783 (4th Cir. 2011) .....................................................................108, 114

*Evitts v. Lucey,*
    469 U.S. 387 (1985)............................................................................................230

*Fairey v. Tucker,*
    567 U.S. 924 (1970) ...........................................................................................232

*Ferrell v. Estelle,*
    568 F.2d 1128 (5th Cir. 1978) ...........................................................................238

*Fratta v. Qaurterman*,
    536 F.3d 485 (5th Cir. 2008) ................................................... 44

*Freeman v. Class*,
    95 F.3d 639 (8th Cir. 1996) ........................................... 170, 180

*Fry v. Pliler*,
    551 U.S. 112 (2007) ........................................................... 42

*Gabaree v. Steele*,
    792 F.3d 991 (8th Cir. 2015) ................................................ 168

*Garcia v. Davis*,
    2018 WL 5921018 (S.D. Tex. 2018) ...................................... 240

*Garcia v. Lumpkin*,
    824 F. App'x 252 (5th Cir. 2020) ......................................... 240

*Ex parte Garland Harper*,
    No. 1272085 (182nd Dist. Ct.) ............................................. 16

*Giglio v. United States*,
    405 U.S. 150 (1971) ..................................... 209, 210, 218

*Gilmore v. Taylor*,
    508 U.S. 333 (1993) ........................................................ 238

*Godfrey v. Georgia*,
    446 U.S. 420 (1980) ................................................. 252, 253

*Grant v. Lockett*,
    709 F.3d 224 (3d Cir. 2013) ......................................... 117, 121

*Gray v. Epps*,
    616 F.3d 436 (5th Cir. 2010) .............................................. 213

*Gregg v. Georgia*,
    428 U.S. 153 (1976) ........................................................ 252

*Griffin v. Harrington*,
    727 F.3d 940 (9th Cir. 2013) .............................................. 168

*Hardeman v. Texas*,
    868 S.W.2d 404 (Tex. App.–Austin 1993), *pet. dism'd*, 891 S.W.2d 960 (Tex.
    Crim. App. 1995) .................................... 119, 120, 199, 219

*Harrington v. Richter*,
    562 U.S. 86 (2011) ............................................................................................... 55

*Henry v. Scully*,
    78 F.3d 51 (2d Cir. 1996) ................................................................................. 168

*Herrera v. Collins*,
    506 U.S. 390 (1993) .......................................................................................... 250

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ..................................................................................... 32, 41

*House v. Bell*,
    547 U.S. 518 (2006) ................................................................................... 47, 250

*Illinois v. Allen*,
    397 U.S. 337 (1970) .......................................................................................... 233

*Ex parte Jaime Cole*,
    No. 1250754 (230th Dist. Ct.) ........................................................................ 16

*James v. Collins*,
    987 F.2d 1116 (5th Cir. 1993) ........................................................................ 252

*Janecka v. Cockrell*,
    301 F.3d 316 (5th Cir. 2002) ............................................................................ 42

*Jenkins v. United States*,
    380 U.S. 445 (1965) .................................................................................. 228, 231

*Johnson v. Mississippi*,
    486 U.S. 578 (1988) ............................................................................................ 53

*Johnson v. Williams*,
    568 U.S. 289 (2013) .................................................................................. *passim*

*Ex parte Joseph Jean*,
    No. 1302120 (230th Dist. Ct.) ........................................................................ 16

*Jurek v. Texas*,
    428 U.S. 262 (1976) .......................................................................................... 253

*Kelly v. Lynaugh*,
    862 F.2d 1126 (5th Cir. 1988) ........................................................................ 253

*Ex parte Kerr*,
    64 S.W.3d 414 (Tex. Crim. App. 2002) ................................................................ 12

*Kittelson v. Dretke*,
    426 F.3d 306 (5th Cir. 2005) ................................................................. 41, 42

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ................................................................................. 218

*Leonard v. Michigan*,
    256 F. Supp. 2d 723 (W.D. Mich. 2003) ................................................ 108, 114

*Lockett v. Ohio*,
    438 U.S. 586 (1978) ......................................................................... 245, 251

*Lowenfield v. Phelps*,
    484 U.S. 231 (1988) ................................................................. 225, 228, 231

*Lucas v. Johnson*,
    132 F.3d 1069 (5th Cir. 1998) ............................................................... 250

*Martin v. Grosshans*,
    424 F.3d 588 (7th Cir. 2005) ................................................................. 168

*Martinez v. Ryan*,
    566 U.S. 1 (2012) .......................................................................... 186, 189

*Mathis v. Dretke*,
    124 F. App'x 865 (5th Cir. 2005) ........................................................... 219

*Mattox v. United States*,
    146 U.S. 140 (1892) ......................................................................... 23, 25

*Medellin v. Dretke*,
    371 F.3d 270 (5 th Cir. 2004) ................................................................ 250

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009) ............................................................................. 236

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) ....................................................................... 31, 213

*Montana v. Egelhoff*,
    518 U.S. 37 (1996) .............................................................................. 41

*Moore v. Johnson,*
    194 F.3d 586 (5th Cir. 1999) ................................................................ 159, 160, 167

*Morgan v. Illinois,*
    504 U.S. 719 (1992) ........................................................................................ 225

*In re Murchison,*
    349 U.S. 133 (1955) ........................................................................................ 243

*Murray v. Carrier,*
    477 U.S. 478 (1986) ........................................................... 224, 225, 229, 235

*Napue v. Illinois,*
    360 U.S. 264 (1959) ........................................................... 190, 198, 210

*United States ex rel. Negron v. New York,*
    434 F.2d 386 (2d Cir. 1970) ........................................................................ 237

*Oliver v. Quarterman,*
    *541 F.3d 329 (5th Circ. 2008)* ........................................................... *passim*

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) .......................................................................................... 54

*Panetti v. Quarterman,*
    551 U.S. 930 (2007) ........................................................... 12, 18, 19, 20

*Parker v. Gladden,*
    385 U.S. 363 (1966) .................................................................................. 23, 25

*Payne v. Tennessee,*
    501 U.S. 808 (1991) ...................................................................................... 169

*Phillips v. Woodford,*
    267 F.3d 966 (9th Cir. 2001) ........................................................................ 21

*Pope v. State,*
    161 S.W.3d 114 (Tex. App. Fort Worth 2004, pet. granted on other grounds) .................... 116

*Porter v. McCollum,*
    558 U.S. 30 (2009) ................................................................................ 131, 132

*Pyles v. Johnson,*
    136 F.3d 986 (5th Cir. 1998) ...................................................................... 190

*Remmer v. United States,*
    347 U.S. 227 (1954) ................................................................................... 23, 25, 28

*Rhines v. Weber,*
    544 U.S. 269 (2005) ................................................................................................ 10

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) ...................................................................... 110, 132

*Rocha v. Thaler,*
    626 F.3d 815 (5th Cir. 2010) ................................................................................ 212

*Rompilla v. Beard,*
    545 U.S. 374 (2005) (O'Connor, J., concurring) ............................................... 55, 132

*Ruiz v. Quarterman,*
    504 F.3d 523 (2007) ............................................................................................... 212

*Schlup v. Delo,*
    513 U.S. 298 (1995) ....................................................................................... *passim*

*Schriro v. Landrigan,*
    550 U.S. 465 (2007) ............................................................................................... 28

*Sheppard v. Maxwell,*
    384 U.S. 33 (1966) ...................................................................................... 246, 247

*Smith v. Robbins,*
    528 U.S. 259 (2000) ............................................................................................. 230

*Snyder v. Massachusetts,*
    291 U. S. 97 (1934), ............................................................................................ 232

*Sparks v. Davis,*
    756 F. App'x 397 (5th Cir. 2018) ...................................................................... 213

*Strickland v. Washington,*
    466 U.S. 668 (1984) ....................................................................................... *passim*

*Strickler v. Greene,*
    525 U.S. 263 (1999) ............................................................................................. 225

*Strickler v. Greene,*
    527 U.S.668 (2004) .............................................................................................. 214

*Swarthout v. Cooke,*
    562 U.S. 216 (2011) ................................................................................................ 19

*Taylor v. Kentucky,*
    436 U.S. 478 (1978) ................................................................................................ 21

*Texas v. Obel Cruz-Garcia,*
    No. 1384794 (Tex. 337th Dist. Ct.—Harris County) ...................................... 1

*Thomas v. Varner,*
    428 F.3d 491 (3d Cir. 2005) ............................................................................... 168

*Townsend v. Burke,*
    334 U.S. 736 (1948) ................................................................................................ 53

*Trevino v. Thaler,*
    569 U.S. 413 (2013) ....................................................................................... *passim*

*Tumey v. Ohio,*
    273 U.S. 510 (1927) .............................................................................................. 243

*Turner v. Louisiana,*
    379 U.S. 466 (1965) .......................................................................................... 23, 25

*Turner v. Quarterman,*
    481 F.3d 292 (5th Cir. 2000) ............................................................................. 251

*U.S. v. Gagnon,*
    470 U.S. 522 (1985) ............................................................................. 232, 233, 234

*United States v. Agurs,*
    427 U.S. 97 (1976) ...................................................................................... 222, 223

*United States v. Anderson,*
    574 F.2d 1347 (5th Cir. 1978) ........................................................................... 198

*United States v. Bagley,*
    473 U.S. 667 (1985) ......................................................................... 214, 219, 222, 223

*United States v. Carmelo Martinez,*
    4:98-cr-00012 (S.D. Tex. Dec. 17, 1998) ......................................................... 117

*United States v. Carrion,*
    488 F.2d 12 (1st Cir. 1973) ............................................................... 238, 239, 240

*United States v. Chiantese,*
    582 F.2d 974 (5th Cir. 1978) ................................................................29

*United States v. Cirincione,*
    780 F.2d 620 (7th Cir. 1985) ..............................................................238

*United States v. Diharce-Estrada,*
    526 F.2d 637 (5th Cir. 1976) ................................................................21

*United States v. Gonzalez-Lopez,*
    548 U.S. 140 (2006)..............................................................................20

*United States v. Henry,*
    888 F.3d 589 (2d Cir. 2018)................................................................239

*United States v. Jimenez-Nava,*
    243 F.3d 192 (5th Cir. 2011) ..............................................................250

*United States v. Labarbera,*
    581 F.2d 107 (5th Cir. 1978) ................................................................21

*United States v. Laureys,*
    866 F.3d 432 (D.C. Cir. 2017) ................................................... 108, 114

*United States v. Riddle,*
    103 F.3d 423 (5th Cir. 1997) ................................................................21

*United States v. Scheffer,*
    523 U.S. 303 (1998)........................................................................41, 42

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978)................................................................... 228, 231

*United States v. Williamson,*
    183 F.3d 458 (5th Cir. 1999) ..............................................................230

*Washington v. Davis,*
    715 F. App'x 380 (5th Cir. 2017) .............................................. 186, 189

*Washington v. Texas,*
    388 U.S. 14 (1967)..............................................................................238

*Wearry v. Cain,*
    136 S. Ct. 1002 (2016)........................................................................209

*Wiggins v. Smith,*
  539 U.S. 510 (2003) ............................................................ 54, 107, 131

*Wilkerson v. Goodwin,*
  774 F.3d 845 (5th Cir. 2014) ................................................................. 20

*Williams v. Pennsylvania,*
  136 S. Ct. 1899 (2016) ............................................................... 243, 244

*Williams v. Taylor,*
  529 U.S. 362 (2000) ....................................................................... 31, 213

*Winebrenner v. United States,*
  147 F.2d 322 (8th Cir. 1945) ................................................................. 29

*Witherspoon v. Illinois,*
  391 U.S. 510 (1968) .............................................................................. 178

*Withrow v. Larkin,*
  421 U.S. 35 (1975) .............................................................................. 243

## Constitutional Provisions

U.S. Const. amend. V ............................................................... *passim*

U.S. Const. amend. VI .............................................................. *passim*

U.S. Const. amend. VIII ........................................................... *passim*

U.S. Const. amend. XIV ........................................................... *passim*

## Statutes

8 C.F.R. § 212.5(b)(4) ............................................................... 158

28 U.S.C. § 1331 .......................................................................... 1

28 U.S.C. § 2241(d) ....................................................................... 1

28 U.S.C. § 2254 ................................................................... *passim*

Tex. Code Crim. Proc. Art. 11.071 ...................................... *passim*

Tex. Code Crim. Proc. Art. 37.071 ....................................... 251, 252

## Other Authorities

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 06-441, at 9 (2006) ....................... 56

ABA Guideline for Aappointment and Performance of Defense Counsel in Death
  Penalty Cases, 31 HOFSTRA L. REV. 913 (2005) ................................................. 55, 132, 134, 135

DIANA GARCIA, *there was a need to complete the picture of what happened to the little
  boy ANGELO* .................................................................................................... 196

James D. Bethke and Morgan Shell, *Public Defense Innovation in Texas*, 51 IND. L.
  REV. 111, 112 (2018) ........................................................................................... 57

Lawrence J. Fox, *Capital Guidelines and Ethical Duties: Mutually Reinforcing
  Responsibilities*, 36 HOFSTRA L. REV. 775, 783 (2008) ...................................... 56, 57

*Raymond Peternoster, Racial Disparity in the Case of Duane Edward Buck, at (Dec. 29,
  2012)* ................................................................................................................. 253

*Scott Phillips, Continued Racial Disparities in the Capital of Capital Punishment: The
  Rosenthal Era*, 50 Hous. L. Rev. 131, 131-32 (2012) ....................................... 253

State Bar of Texas Guidelines and Standards for Texas Capital Counsel, 69 Tex.
  B.J. 966 (2006) .................................................................................................. 55

Tex H.B. 1318, 83rd Leg., R.S. (2013) .................................................................. 59

*Texas Department of State Health Services, Texas Population, 2013 (Estimate)*,
  http://dshs.texas.gov/chs/popdat/ST2013.shtm ............................................. 175

*Vienna Convention on Consular Relations Art. 36(1)(b)*, April 24, 1963, 21 U.S.T. 77,
  TIAS 6820 ............................................................................................ 182, 249, 250

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Cruz-Garcia was convicted and sentenced.

## PARTIES

Petitioner Obel Cruz-Garcia is an inmate of the Texas Department of Criminal Justice ("TDCJ"). Mr. Cruz-Garcia's TDCJ number is 999584 and he is housed at the Polunsky Unit, Livingston, Texas.

Respondent Bobby Lumpkin is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Cruz-Garcia. He has custody pursuant to the judgment and sentence of death entered against Mr. Cruz-Garcia on July 22, 2013, in *Texas v. Obel Cruz-Garcia*, No. 1384794 (Tex. 337th Dist. Ct.—Harris County).

## INTRODUCTION

In 2013, Obel Cruz-Garcia was convicted and sentenced to death as a party to the 1992 capital murder of Angelo Garcia, a young child. According to the State's version of the offense, Mr. Cruz-Garcia and two associates, Carmelo Rudy Martinez Santana and Roger Aviles Barroso, kidnapped Angelo and drove to a remote location by a bayou. After Mr. Cruz-Garcia purportedly told Mr. Barroso that he knew what needed to be done, Mr. Barroso murdered Angelo, and Mr. Barroso and Mr. Santana weighed Angelo's body down so that it would sink into the bayou. In 2008, DNA evidence collected in 1992 was matched to Mr. Cruz-Garcia, who was subsequently convicted and sentenced to death as a party to the capital murder of Angelo. Mr. Barroso was convicted and sentenced to life (the death penalty was never sought). Mr. Santana, who testified extensively to his

participation in the murder at both Mr. Cruz-Garcia and Mr. Barroso's trials, was never charged with *any* offense in connection with Angelo's kidnapping and murder.

Mr. Cruz-Garcia awaits execution (while his purported co-conspirator remains uncharged and unpunished) for a simple reason: he did not receive a fair trial. This was apparent a few hours after Mr. Cruz-Garcia was sentenced to death, when his trial counsel received a frantic phone call from one of the jurors, Angela Bowman. Juror Bowman told trial counsel she did not believe the State had proven its case at the punishment phase, but she had felt compelled to vote on the special issues in such as a way as to result in a death sentence after the trial judge gave a coercive instruction to her—and only to her—during an *ex parte* meeting. Juror Bowman also revealed that she was not the only juror who was unpersuaded by the State's punishment phase evidence. At least one other juror had not agreed on the special issues until the jury foreman read from the Bible to the jury during their deliberations on punishment. The jury foreman confirmed these events in a recorded interview with the defense investigator, before later contradicting his own prior statements in an affidavit provided to the State. Yet, the trial court refused to hear live testimony on these serious allegations of jury misconduct and denied Mr. Cruz-Garcia's motion for new trial.

In short, the jury's deliberations in Mr. Cruz-Garcia's case were controversial, deeply flawed, and permeated by constitutional violations. In this respect, the jury deliberations were like the rest of Mr. Cruz-Garcia's trial. Due to serious errors, deficiencies, and, in some instances, misconduct, Mr. Cruz-Garcia sits on Texas death row based on proceedings that were flawed, one-sided, and biased against him.

There are no hourly billing records from trial counsel's representation of Mr. Cruz-Garcia because trial counsel was compensated on an ethically dubious flat-fee basis that did not require

them to keep time entries. First chair counsel Skip Cornelius did, however, keep detailed time entries for the hundreds of other felony cases, including capital murders, that he was appointed to during the time he represented Mr. Cruz-Garcia. According to those records, Mr. Cornelius frequently billed over six hours—and up to seven or eight hours—to other cases on the days when Mr. Cruz-Garcia's case was in jury selection. The pattern continued throughout the guilt and punishmnet phases. On each day the jury heard evidence during the guilt phase of Mr. Cruz-Garcia's trial, Mr. Cornelius billed at least four hours to other cases. During the punishment phase, Mr. Cornelius billed an average of nearly five hours each day to other cases.

In addition to billing his time hourly, Mr. Cornelius also charged the county for individual court appearances on a flat-fee basis. Over the 11 days of jury selection in Mr. Cruz-Garcia's case, Mr. Cornelius claimed $3,450.00 in flat fees for 19 court appearances in other cases. Over the four days of evidence in the guilt phase, Mr. Cornelius claimed six court appearance fees. He claimed another four during the three days of evidence in the punishment phase. In total, over the course of Mr. Cruz-Garcia's trial, Mr. Cornelius billed the county nearly $35,000.00. That sum corresponds to the default flat fee in Harris County for a death penalty case, including all pre-trial litigation and investigation, jury selection, and trial to verdict. In other words, during Mr. Cruz-Garcia's trial, Mr. Cornelius worked the equivalent of an entire other death penalty case.

Having adequate counsel who were not consumed by work on other cases would have led to a different result in Mr. Cruz-Garcia's case. Neither Mr. Cruz-Garcia's conviction nor his death sentence were a forgone conclusion. Yet, trial counsel failed to perform even the most basic tasks, such as reviewing the State's file. Despite repeated requests from the State for trial counsel to "[p]lease come by and see my file," trial counsel refused, stating "I don't have a responsibility to go

3

through your file" and "I'm not going to go through 20 boxes of DNA records." 20 RR 186–87. Mr. Cornelius later wrote that he does not participate in open file systems because "I don't play that game." 3 SHCR 607.

Trial counsel's refusal to "go through 20 boxes of DNA records" was inexplicable given that the State's case against Mr. Cruz-Garcia turned largely on DNA evidence. Trial counsel did not even consult with a DNA expert. Had they done so, the outcome of the trial would have been different: less than a week after Mr. Cruz-Garcia's conviction became final on appeal, the State recanted the DNA analysis presented at trial and conceded that much of the DNA evidence used to convict Mr. Cruz-Garcia was false.

The trial court also hampered Mr. Cruz-Garcia's ability to defend himself against the State's DNA evidence. The evidence was originally processed and stored by the now-defunct HPD Crime Lab, which was closed after it came to light that the lab routinely falsified results, contaminated evidence, and generally failed to adhere to basic forensic standards. During that time, the DNA evidence was handled and analyzed by disgraced employees who were later cited for incompetence and misconduct, and in one case, criminally prosecuted. Judge Magee, however, forbade Mr. Cruz-Garcia from presenting any evidence concerning the impugned credibility of the lab, the incompetence of the disgraced employees who handled the evidence in his case, or the fact that earlier testing had yielded results different from those presented at trial.

In addition to failing to investigate the DNA evidence, trial counsel also failed to investigate the State's star witness, Mr. Santana. His criminal record reflected that Mr. Santana had committed at least one crime of moral turpitude involving the assault of a child around the time of the murder, an impeachable offense. Trial counsel, however, failed to impeach Mr. Santana with that conviction

because they did not investigate Mr. Santana's criminal record. As trial counsel stated, moments before cross-examining the State's star witness: "I've got some conflicting information from my own investigators" about the circumstances of the offense, "and so, *I'm going to accept pretty much whatever the State tells me or what he [Mr. Santana] tells me.*" 21 RR 18. Mr. Santana then lied about the facts of the offense and trial counsel were therefore unable to rely on his prior conviction to impeach his testimony. Due to trial counsel's failure to reasonably investigate the State's star witness, the jury never learned of Mr. Santana's lies or his crime of moral turpitude that—like the crime of which he accused Mr. Cruz-Garcia and claimed to have only reluctantly participated in—involved violence to a child.

Trial counsel failed to investigate other issues about Mr. Santana's credibility. Mr. Santana had a documented history of mental illness and had even been evaluated for competency before he plead guilty to a prior federal drug trafficking and gun offenses. Shortly before implicating Mr. Cruz-Garcia, Mr. Santana tried to convince a federal court that he suffered from such debilitating mental illness that he should be released early from federal prison because "I [Mr. Santana] have a plethora of medical records that illustrate my undeniable incompetence to accept a guilty plea." ECF No. 18–12. Because of trial counsel's failure to investigate, the jury never learned that the State's star witness had declared himself "undeniabl[y] incompeten[t]" just before he implicated Mr. Cruz-Garcia.

Trial counsel's lack of investigation led to other failings. Mr. Cruz-Garcia's ex-wife, Angelita Rodriguez, testified that he had confessed to her—after denying for decades that she knew anything about the case. Her description of the circumstances surrounding the confession were contradicted by other evidence, including an FBI report. But that was never brought to the jury's attention. Nor

was the fact that Ms. Rodriguez would be receiving assistance from the State with her immigration issues, which was later provided by way of a letter from the lead prosecutor.

Trial counsel's failure to investigate also meant that the State's law enforcement witnesses could reimagine the original 1992 investigation to make it fit the State's 2013 theory of the case. Angelo was kidnapped from the home of his mother, Diana Garcia, and her boyfriend, Arturo Rodriguez. A cigar was found in the apartment with Mr. Cruz-Garcia's DNA, the presence of which could be explained by the fact that he was a close acquaintance of Ms. Garcia and Mr. Rodriguez and had visited their apartment earlier in the day. Indeed, in 1992, the police told Ms. Garcia that they thought the cigar was completely unconnected with the crime. In 2013, law enforcement testified that it must have belonged to one of the assailants. In 1992, the police concluded that Ms. Garcia and Mr. Rodriguez were actively dealing cocaine on the day of the offense and were not being truthful with them. In 2013, they became *former* drug dealers who had abandoned crime and who the police believed were forthright and cooperative. And ransom demands for the victim recorded in contemporaneous police reports and pointing to other suspects somehow never happened. Because of trial counsel's failure to investigate, these inconsistencies between the original investigation and State's case were never brought to the jury's attention.

Trial counsel did not present any evidence at the guilt phase and presented hardly any evidence at the punishment phase. Trial counsel did not retain a mitigation specialist, despite the Texas and national guidelines requiring one. Instead, as Mr. Cornelius later put it, "we had my experience, which predates mitigation experts, at least in Harris County." 4 SHCR 947.

Mr. Cornelius's experience led to a punishment phase case that accounted for less than 75 pages of the transcript. It consisted of just three family members, who were obviously unprepared,

6

and an 18-year-old who had been held in pre-trial confinement with Mr. Cruz-Garcia and approached trial counsel unsolicited to ask if he could say something on Mr. Cruz-Garcia's behalf. Only one of the family members testified live. The other two participated via a shoddy video connection because trial counsel had not arranged for them travel to the United States. No experts testified. No life history was prepared. And, Mr. Cruz-Garcia's life story—which included being abandoned by his mother, enduring a childhood of crushing poverty in a remote Dominican fishing village, working while still a child to feed his family, and being forced into a hastily arranged marriage while still a teenager—went untold.

On the future dangerousness special issue, trial counsel did not present any evidence contesting the State's case. Rather, without performing an investigation, trial counsel decided that "[w]e were not going to win on future danger" because "the State does not seek the death penalty on cases where the crime is an aberration or where the defendant does not have a history." 4 SHCR 946.

Had trial counsel not in effect conceded the future dangerousness special issue, trial counsel could have rebutted the State's main extraneous offense: the 1989 kidnapping and murder of Saul Flores. As during the guilt phase, the State's star witness was Mr. Santana, who purported to describe a brutal killing that he himself participated in, yet never faced any charges for. Mr. Santana's testimony was gruesome and graphic—and also completely inconsistent with the forensic evidence and autopsy. His explanation for why Mr. Cruz-Garcia would want to kill Mr. Flores was Mr. Flores' involvement with Mr. Cruz-Garcia's then-girlfriend, Elizabeth Ramos. Trial counsel never attempted to contact Ms. Ramos. Had they done so, she would have testified that she had never heard of, much less had anything to do with, Mr. Flores. Because trial counsel decided from the get-go that the future

dangerousness issue was a forgone conclusion, the jury never learned that Mr. Santana's supposed motive for Mr. Flores's murder was invented by Mr. Santana.

The State also presented evidence that Mr. Cruz-Garcia had been sentenced to a 16-year prison sentence in Puerto Rico in 2002. However, because trial counsel conducted no investigation of Mr. Cruz-Garcia's prior incarceration, the jury never heard that Mr. Cruz-Garcia was a model inmate who experienced a profound religious conversion while in prison. Despite justifying their funding requests by telling the trial court that "investigators will in all likelihood be required to go to Puerto Rico to properly investigate this case," trial counsel conducted no investigation *at all* in Puerto Rico. 2 CR 384–85. Had trial counsel conducted an investigation there, numerous witnesses from the Puerto Rican prison where Mr. Cruz-Garcia was housed—including four chaplains, a psychologist, and the classification supervisor—could have testified that Mr. Cruz-Garcia was among the most well-behaved inmates they had ever encountered, that he took on a mentorship role with other inmates, and that he was so trusted by prison staff that he was given the keys to parts of the facility as a trustee. Mr. Cruz-Garcia had no disciplinary infractions during his incarceration in Puerto Rico.

These witnesses, including several prison chaplains, also could have testified to the renewal of religious faith Mr. Cruz-Garcia experienced and his genuine repentance for the actions that had led to his incarceration. Here, where the jury—improperly—used the Bible during deliberations, this would have been powerful evidence on both the future dangerousness and mitigation special issues. As a consequence of trial counsel's failure to investigate Mr. Cruz-Garcia's prison record, the only information the jury learned about his conduct in Puerto Rican prison was a single disciplinary infraction the State presented in its case in aggravation.

State habeas was Mr. Cruz-Garcia's first opportunity to raise trial counsel's ineffectiveness. Mr. Cruz-Garcia, however, was deprived of a fair opportunity to litigate this and other claims. At the time of Mr. Cruz-Garcia's state post-conviction proceedings, Judge Magee was seeking re-election. Her campaign website prominently featured Mr. Cruz-Garcia's trial. No other case was mentioned anywhere on the website.

Judge Magee lost her bid for re-election in November 2016. At that point in the state habeas proceedings, the parties were still waiting on affidavits from trial counsel and there had been no further fact development in the convicting court on any of the issues alleged by Mr. Cruz-Garcia. The State quite transparently urged Judge Magee to "get[] this wrapped up before you leave the bench, Your Honor" lest her successor be permitted to rule on the case. 3 SHRR 6. Judge Magee obliged and signed the State's proposed Findings of Fact and Conclusions of Law, *verbatim*, on December 29, 2016—two days before leaving office and barely a week after receiving them from the State. When Judge Magee ran for a different judgeship in 2018, her website again featured Mr. Cruz-Garcia's case.

Mr. Cruz-Garcia's trial did not meet minimum constitutional standards. Trial counsel's deficient performance at both the guilt and punishment phases, the State's reliance on false and unreliable evidence, the misconduct of the jurors, and the actions and decisions of the trial judge were each sufficiently prejudicial to warrant relief. Their combined effect deprived Mr. Cruz-Garcia of a fair trial.

## PROCEDURAL HISTORY

Mr. Cruz-Garcia was convicted and sentenced to death as party to capital murder in the 337th District Court, Harris County, on July 22, 2013. 3 CR 530. The Texas Court of Criminal Appeals ("CCA") affirmed Mr. Cruz-Garcia's conviction and sentence of death on direct appeal on

October 28, 2015. *Cruz-Garcia v. Texas*, No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015). Mr. Cruz-Garcia timely filed an Initial Application for A Writ of Habeas Corpus in the convicting court on August 28, 2015. 1 SHCR 2.[1] Mr. Cruz-Garcia filed a Subsequent Application for Writ of Habeas Corpus in the CCA on May 2, 2016. 4 SHCR 762. The convicting court recommended that relief be denied on the claims raised in Mr. Cruz-Garcia's Initial Application on December 29, 2016. 5 CR 1084–85. The CCA adopted the convicting court's recommendation that relief be denied on the Initial Application and dismissed the Subsequent Application on November 1, 2017. *Ex parte Cruz-Garcia*, Nos. WR–85,051–02 and WR–85,051–03, 2017 WL 4947132 (Tex. Crim. App. Nov. 1, 2017).

Mr. Cruz-Garcia timely filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Texas, Houston Division, on October 31, 2018. ECF No. 12. Mr. Cruz-Garcia then filed a First Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 on July 1, 2019. ECF No. 18. The Director moved for summary judgement on September 30, 2019, and this Court denied that motion on April 30, 2020. ECF Nos. 20; 30. The Court ordered legal briefing from the parties. ECF No. 30. Mr. Cruz-Garcia timely filed a Memorandum of Law in Support of Amended Petition on July 13, 2020. ECF No. 38. Mr. Cruz-Garcia filed a Motion for Stay and Abeyance of Federal Proceedings under *Rhines v. Weber*, 544 U.S. 269 (2005) on November 30, 2020. ECF No. 46. This Court granted Mr. Cruz-Garcia's stay and abeyance motion on January 29, 2021, and ordered Mr. Cruz-Garcia to file a subsequent state habeas application within 60 days of its order. ECF No. 59.

---

[1] Mr. Cruz-Garcia will cite to the trial Reporter's Record as "RR" and trial Clerk's Record as "CR." Mr. Cruz-Garcia will cite to the state habeas Reporter's Record as "SHRR" and to the state habeas Clerk's Record as "SHCR."

Mr. Cruz-Garcia timely filed a Subsequent Application for Post-Conviction Writ of Habeas Corpus in the CCA on April 9, 2021. Ex. 149. The CCA dismissed Mr. Cruz-Garcia's Application as an abuse of the writ on October 6, 2021. *See Ex parte Cruz-Garcia*, No. WR–85,051–04, 2021 WL 4571730 (Tex. Crim. App. Oct. 6, 2021). This Court ordered Mr. Cruz-Garcia to file a Second Amended Petition for Writ of Habeas Corpus by May 4, 2022. ECF No. 72.

## STATEMENT OF FACTS

During the night of September 30 to October 1, 1992, Angelo Garcia was taken from the apartment of his mother, Diana Garcia, and her boyfriend, Arturo Rodriguez. Ms. Garcia reported to the Houston Police Department ("HPD") that two masked intruders had broken into the apartment, physically and sexually assaulted her, and taken her son. Mr. Rodriguez also reported that he had been physically assaulted. HPD officers took into evidence several items from the apartment, including a cigar, and a Sexual Assault Nurse Examiner performed a rape kit on Ms. Garcia, from which vaginal swabs and her underwear were taken into evidence. That evidence was processed, and then stored, by the HPD Crime Lab. The body of Angelo Garcia was discovered in a bayou about a month later. The case eventually went cold.

In September 2007, the case was reopened and the cigar, vaginal swabs, and underwear were submitted to a third-party DNA lab, Orchid Cellmark. Law enforcement obtained a DNA sample from Mr. Cruz-Garcia and he was matched to the single-source DNA profile on the cigar and identified as a contributor to the DNA mixture on the vaginal swabs and the major DNA component to the mixture on the underwear.  In 2011, law enforcement interviewed a known associate of Mr. Cruz-Garcia, Carmelo Rudy Martinez Santana, and Mr. Santana told law enforcement that Mr. Cruz-Garcia had ordered a third associate, Roger Aviles-Barroso, to murder Angelo Garcia. In 2013, Mr. Cruz-Garcia was convicted and sentenced to death as a party to the capital murder of Angelo Garcia.

## LEGAL ARGUMENTS APPLICABLE TO MULTIPLE CLAIMS

**A. The Court should not apply 28 U.S.C. § 2254(d) to any of Mr. Cruz-Garcia's claims because the state habeas proceedings did not comport with due process.**

The CCA has stated that Texas Code of Criminal Procedure ("TCCP") Article 11.071, which governs capital state habeas proceedings, ensures "that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002) (emphasis in original). 28 U.S.C. § 2254, in turn, assumes that the CCA honors that responsibility and follows procedures that comport with due process, so that petitioners receive full and fair review of their claims before litigating in federal court. *Panetti v. Quarterman*, 551 U.S. 930, 952 (2007). When states fail to do so, state prisoners must seek their "one bite at the apple" in federal court, and federal courts are not required to defer to the state court's resolution of the petitioner's claims. *Id.* at 954; *see also Johnson v. Williams*, 568 U.S. 289, 301–02 (2013) (identifying other scenarios where AEDPA deference may not apply to claims presented to the state courts); *Trevino v. Thaler*, 569 U.S. 413 (2013) (finding that, in Texas, state habeas is effectively a petitioner's first and only opportunity to raise an ineffective assistance of counsel challenge to his conviction or death sentence).

### 1. Despite his best efforts, Mr. Cruz-Garcia's state habeas proceedings did not comport with state-law requirements or provide him fundamental fairness and due process.

Mr. Cruz-Garcia diligently sought a full and fair opportunity to litigate his habeas cause in state court. Through no fault of his own, the trial court nonetheless deprived him of due process and a fundamentally fair proceeding.

Mr. Cruz-Garcia filed an 11.071 application on August 28, 2015, raising several constitutional challenges. 1 SHCR 2. Five months later, he filed a motion to recuse Judge Renee

Magee because one of his claims alleged that she had held an improper *ex parte* conversation with a lone holdout juror during the trial's penalty phase deliberations, which coerced the juror into changing her vote to death. 3 SHCR 565–81. The motion argued that if Judge Magee adjudicated her own misconduct, it would create the appearance of partiality and, because she had personal knowledge of disputed facts material to the claim, it would create a conflict of interest. *Id.* Judge Magee denied the motion without a hearing and referred it to the regional presiding judge, who also denied the motion without a hearing. *Id.* at 614, 652. Mr. Cruz-Garcia filed a motion to reconsider, which was also denied. *Id.* at 615–50. He then filed a motion for leave to file a writ of mandamus in the CCA, challenging the denial of his recusal motion without holding a hearing in violation of Texas Rule of Civil Procedure 18a(g). 4 SHCR 808, 811. The CCA denied the motion for leave without a written order. ECF No. 23-33. Mr. Cruz-Garcia was forced to proceed on his claims in front of the judge he had accused of misconduct.

After the State answered his application, Mr. Cruz-Garcia filed a motion for an order designating controverted issues of material fact in accordance with Texas Code of Criminal Procedure Article 11.071 § 8(a). 4 SHCR 868–99.[2] The motion argued that state law mandated designation of issues, after which either Section 8 or Section 9[3] would govern the development

---

[2] Tex. Code Crim. Proc. art. 11.071 § 8(a) states: "Not later than the 20th day after the last date the State answers the application, the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist and shall issue a written order of the determination."

[3] Tex. Code Crim. Proc. art. 11.071 § 8 governs state habeas procedure on claims for which the trial court determines there are no controverted, unresolved issues of fact. Tex. Code Crim. Proc. art. 11.071 § 9 governs state habeas procedure on claims for which the trial court determines there are controverted, unresolved issues of fact.

13

and resolution of the claims. *Id.* The motion asserted that "due process requires that this court follow the statutory procedure." *Id.* at 880. Mr. Cruz-Garcia advised the court of controverted fact issues with regard to his juror misconduct, judicial misconduct, Vienna Convention violation, and ineffective assistance of trial counsel ("IATC") claims. *Id.* at 891–97. The State, in turn, asked that the court only order affidavits from trial counsel, answering ten questions posed *exclusively* by the State regarding allegations of their deficient performance. *Id.* at 932–34.

At a hearing on August 8, 2016, Mr. Cruz-Garcia again pressed the importance of following the statute, designating controverted fact issues, and following the required procedures. 2 SHRR 5 ("And as the Court know[s], this is a death penalty case. I think it's important that we follow the law and the proper procedure."). The convicting court did not address Mr. Cruz-Garcia's motion, but immediately agreed to sign the State's proposed order that drastically limited fact development. *Id.* at 7. Mr. Cruz-Garcia's counsel objected on the ground that the 11.071 application raised contested issues of fact beyond the question of trial counsel's deficient performance, and directed the convicting court's attention to his own proposed order designating issues. *Id.* at 12–13, 16. At the State's suggestion, the convicting court confirmed it would only order trial counsel's affidavits, but also clearly indicated it would address whether to designate additional issues and order further fact development after the affidavits were filed. *Id.* at 17–18.

During the pendency of Mr. Cruz-Garcia's state habeas proceedings, Judge Magee was running for reelection to the 337th district court, Harris County. On her campaign website, Judge Magee prominently feature a Houston Chronicle article about Mr. Cruz-Garcia's trial. She did not feature any other cases.

On November 8, 2016, Judge Magee lost her bid for reelection. 5 SHCR 1109–10. Lead

trial counsel Skip Cornelius filed his affidavit on November 28, asserting that he was filing the affidavit before even receiving the trial file[4] to reacquaint himself with the case because he wanted Judge Magee to review his performance before she left the bench. 4 SHCR 943. The State, rather than the court, notified state habeas counsel that the affidavits had been filed, and served them on counsel days later. 5 SHCR 999, 1016 n. 2. The following day, November 29 (before the affidavits had been served), the State moved for an order directing the parties to submit proposed Findings of Fact and Conclusions of Law ("FFCL") by December 22, 2016, without any further fact development or hearing and without designating the controverted issues as required by statute. *Id.* at 962–963.

Mr. Cruz-Garcia responded to the State's motion the next day, November 30, arguing that the submission of proposed FFCL was premature in light of the lack of evidentiary development and the court's failure to identify which claims presented controverted fact issues, and thus which rule would apply to the resolution of each claim. 5 SHCR 967–73. In the alternative, he asked for a later deadline than December 22 because counsel was engaged in a week-long evidentiary hearing beginning December 12 and was attending a memorial service outside the state for a close family member on December 18.[5] *Id.* at 972. The same day Mr. Cruz-Garcia filed his opposition, the convicting court signed the State's order making the proposed FFCL due December 22. *Id.* at

---

[4] Mr. Cornelius maintained that the OCFW had yet to return his file at the time he submitted his affidavit to the trial court. 4 SHCR 943. The OCFW, however, made clear to the convicting court that Mr. Cornelius had never asked that his file be returned to him. 5 SHCR 1019.

[5] In response, the State took the extraordinary step of attempting to force the director of Office of Capital and Forensic Writs, located in Austin, Texas, to personally appear at the hearing, requiring the Director to explain in writing why he could not do so. 5 SHCR 1011.

964.[6] The convicting court, however, failed to serve the order on the parties until December 6, a mere six days before counsel's week-long evidentiary hearing, twelve days before she left the state for a family funeral, and sixteen days before the filing deadline. *Id.* at 977.[7]

Mr. Cruz-Garcia filed a motion to reconsider and rescind the convicting court's order, arguing  it violated state law and prohibited him from presenting evidence in support of controverted claims in violation of due process. 5 SHCR 976–90. At a hearing on December 22, the convicting court denied the motion, and indicated it would sign the FFCL by the following week, days before Judge Magee's tenure ended on December 31, 2016. 3 SHRR 9. The convicting court gave Mr. Cruz-Garcia five days– until December 27–to submit "anything that you would like me to consider," but stated she would decide within the week whether to sign the State's proposed FFCL "in total" or "draft my own." *Id.* On December 27, Mr. Cruz-Garcia filed renewed objections, 5 SHCR 1021–21, and a motion to present evidence both in support of his claims and in rebuttal to the State's evidence, attaching 37 evidentiary proffers. *Id.* at 1024–34 Two days later, the State sent an *ex parte* message to Judge Magee's chambers requesting an update on the status of the FFCL. Ex. 112. Without responding to the pending motions, the convicting

---

[6] State habeas counsel for Mr. Cruz-Garcia was repeatedly told by the Harris County D.A.'s office and members of the Harris County court staff that motions would not be ruled on unless the sponsoring attorney presented it in person. Counsel for Mr. Cruz-Garcia was not present when the trial court granted the State's motion, suggesting either that the State approached the court *ex parte* or that the court broke with established protocol. ECF No. 24-6 at 12 n. 1.

[7] In all other capital state habeas cases that the Office of Capital and Forensic Writs ("OCFW") had handled in Harris County, they were given at least 50, and often more than 100 days to prepare their FFCL. *See, e.g., Ex parte Carl Buntion*, No. 588227 (178th Dist. Ct.) (allowing 127 days to file proposed FFCL); *Ex parte Jaime Cole*, No. 1250754 (230th Dist. Ct.) (allowing 100 days); *Ex parte Joseph Jean*, No. 1302120 (230th Dist. Ct.) (allowing 100 days); *Ex parte Garland Harper*, No. 1272085 (182nd Dist. Ct.) (allowing 57 days); *Ex parte Brian Davis*, No. 616522 (230th Dist. Ct.) (allowing 56 days). ECF No. 24-6 at 13 n. 2.

court signed the State's proposed FFCL that same day— two days before her tenure terminated— without altering a single word, including the heading "State's Proposed Findings of Fact, Conclusions of Law and Order." 5 SHCR 1035–85.

On January 9, 2017, Mr. Cruz-Garcia filed a motion to reconsider the order adopting the State's proposed FFCL *verbatim*. 5 SHCR 1106–121. He also requested reconsideration of the November 30, 2016, order setting the proposed FFCL filing deadline, and asked again for an order announcing whether his claims would be resolved under § 8 or § 9. *Id.* He again requested an opportunity to present his evidence. *Id.* The convicting court, then presided over by Judge Herb Ritchie, held a hearing on the motion on February 1, 2017. ECF No. 24-7. Mr. Cruz-Garcia made it plain that he was challenging the convicting court's failure to provide him *adequate process* for a reliable resolution of his claims: "As I stated, Your Honor may reach the exact same outcome [as Judge Magee]. It's a matter of following the proper procedure, being afforded due process, and being afforded an opportunity to present evidence." *Id.* at 20; *see also id.* at 12.

In response to Mr. Cruz-Garcia's arguments, the State repeatedly claimed to the court that the FFCL had already been transmitted to the CCA, thus depriving the trial court of jurisdiction over the motion to reconsider. ECF No. 24-7 at 11–13, 17.[8] The convicting court expressed sympathy with Mr. Cruz-Garcia's arguments but, based solely on the State's assertions that the case had already been transferred to the CCA, held it had no jurisdiction to take corrective action:

> I understand exactly where you're coming from on some of the points that you've raised. We seem to present evidence on certain points, and affidavits wouldn't be sufficient on maybe some issues of credibility and other areas you weren't allowed to go into. However, I'm in a position where the State is telling me that the record is now in the hand of the [CCA]. So at this point, I find I have no jurisdiction to

---

[8] The State claimed to have called the district court clerk's office the day prior to the hearing and confirmed the case's transmission. ECF No. 24-7 at 12.

do anything [].

*Id.* at 21–22. In fact, the FFCL were not transferred to the CCA until February 23, 2017, more than three weeks *after* the hearing. ECF No. 24-6 at 15.

After the FFCL were transmitted to the CCA, Mr. Cruz-Garcia filed detailed objections to the trial court's procedures as well as its fact-findings and legal analysis. ECF No. 24-6. Six months later, without addressing Mr. Cruz-Garcia's due process objections, the CCA ruled that, based on the trial court's FFCL and the its own review, Mr. Cruz-Garcia was not entitled to relief. *Ex parte Cruz-Garcia*, No. WR–85,051–04, 2021 WL 4571730 (Tex. Crim. App. Oct. 6, 2021).

### 2. Because Mr. Cruz-Garcia's state habeas proceeding did not comport with state law or due process, 28 U.S.C. § 2254(d)'s relitigation bar does not apply and this Court should consider his claims *de novo*.

28 U.S.C. § 2254(d)'s language, which makes the federal habeas relitigation bar dependent on a state-court "adjudication on the merits," requires more than a mere state-court decision. Instead, the Supreme Court has consistently interpreted the provision as applying only when both substantive and procedural due process standards were met. In *Panetti*, the Supreme Court found that the CCA "failed to provide the petitioner with a constitutionally adequate opportunity to be heard." 551 U.S. at 948, 952. There, the petitioner had made a *prima facie* showing of his incompetency to be executed. The state court appointed experts to conduct evaluations, but did not allow the petitioner to present his own expert evidence in rebuttal, and failed to hold a hearing on the claim. *Id.* at 950–51. Moreover, the state court's process "in fact, constitute[d] a violation of the procedural framework Texas has mandated for the adjudication of competency claims," which also undermined any argument by the State that its procedures were reasonable in light of states' "substantial leeway to determine what process best balances the various interests at stake." *Id.* (citation omitted).

Based on the above observations, the Supreme Court found that the CCA's procedures for adjudicating the Eighth Amendment claim at issue were "not adequate for reaching reasonably correct results or, at a minimum, resulted in a process that appeared to be seriously inadequate for the ascertainment of the truth." *Panetti*, 551 U.S. at 954 (internal citations and quotations omitted). "As a result of this error, [federal] review of petitioner's underlying [] claim [wa]s unencumbered by the deference AEDPA normally requires." *Id.* at 948. The Court emphasized that even broadly-stated due process standards do not require a finding that state court processes reasonably applied those standards for purposes of a § 2254(d) analysis. *Id.* at 953. "The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Id.*

Like the procedural safeguards the Fifth and Fourteenth Amendments guarantee to petitioners that raise colorable incompetency-to-be-executed claims, the procedural due process to which state habeas applicants are entitled is broadly defined. Nonetheless, due process requires that, at a minimum, when the State establishes a corrective process by which convicted persons may challenge the constitutionality of the judgments against them, that process must ensure the person seeking relief an adequate opportunity to be heard. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) ("When[] a state creates a liberty interest, the Due Process Clause requires fair procedures for its vindication—and federal courts will review the application of those constitutionally required procedures.").

There are several hallmarks of unfairness present in Mr. Cruz-Garcia's state habeas proceeding. First, Judge Magee presided over allegations of her own misconduct, despite a motion asking her to recuse herself. Second, the court thwarted state law by refusing to follow the

statutory requirement that it identify contested, previously unresolved issues of material fact, establish which procedures would govern each of Mr. Cruz-Garcia's claims, allow Mr. Cruz-Garcia an opportunity to present evidence to establish the merits of his factually contested claims, and allow Mr. Cruz- Garcia a fair opportunity to file proposed FFCL. Third, during the state habeas proceedings, Judge Magee used the fact that she presided over Mr. Cruz-Garcia's case to campaign for her judicial reelection. ECF Nos. 18–58; 18–60. Fourth, the convicting court undermined the fairness and impartiality of the state habeas process when Judge Magee accelerated and compressed the proceedings after losing reelection so that she, rather than her duly elected successor, could rule on Mr. Cruz-Garcia's claims—particularly given that she immediately sought judicial election a second time, once again using Mr. Cruz-Garcia's case in her campaign materials. *Id.* And finally, when a new judge presiding over the case indicated an interest in curing some of the due process violations that occurred under Judge Magee, the State provided false information to the judge that his court no longer had jurisdiction over the case.

The procedures in Mr. Cruz-Garcia's case were clearly inadequate to ascertain the truth and reach reasonably correct results. *Panetti*, 551 U.S. at 954; *see also Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014) (courts reviewing due process claims related to expectations or interests created by state laws or policies should focus on nature of deprivation rather than language of a particular regulation). On that basis, § 2254(d) should not apply as a bar to the relitigation, *de novo*, of any of the claims that Mr. Cruz-Garcia raised in state habeas.

## B. Cumulative Prejudice.

"The Constitution guarantees a fair trial through the Due Process Clauses . . . ." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (internal citation and quotations omitted). This guarantee "is, in essence, the right to a fair opportunity to defend against the State's accusations."

*Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). In service of the fundamental right to a fair trial, the Constitution provides for specific safeguards such as the criminal defendant's Sixth Amendment right to be effectively represented by counsel and the Fifth and Fourteenth Amendment prohibitions against the State's withholding of evidence favorable to the accused and presentation of false or misleading testimony to secure a conviction and favorable sentence.

The Supreme Court has twice addressed the assessment of prejudice under the Due Process Clause where there are multiple violations of a criminal defendant's constitutional rights in a single proceeding. *Taylor v. Kentucky*, 436 U.S. 478 (1978); *Chambers*, 410 U.S. 284. Both times, the Court considered the combined prejudicial impact from the various errors to determine whether their "cumulative effect . . . violated the due process guarantee of fundamental fairness." *Taylor*, 436 U.S. at 487 n.15; *see also Chambers*, 410 U.S. at 302–03.

The Fifth Circuit has likewise explained that "the cumulative and interactive effect" of separate errors can require vacating a conviction and remanding for a new trial. *United States v. Riddle*, 103 F.3d 423, 425, 435 (5th Cir. 1997) (holding that "cumulative effect of the errors" were "not harmless and require a new trial," while "express[ing] no view as to whether any one of the errors standing alone would be sufficient to justify reversal"); *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978) (holding that although "[i]individual instances such as these have sometimes escaped reversal under the harmless error rule," the "cumulative effect of the errors" at trial meant "that the defendant did not receive the fair trial that he is entitled to"); *United States v. Diharce-Estrada*, 526 F.2d 637, 642 (5th Cir. 1976). Other circuit courts have likewise applied the cumulative error doctrine to assess claims of prosecutorial misconduct and *Strickland* error. *See Cargle v. Mullin*, 317 F.3d 1196, 1220–22 (10th Cir. 2003); *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) (holding that cumulative prejudice of false testimony and trial counsel's

deficient performance required vacating conviction). As the Tenth Circuit explained in *Cargle*:

> [C]laims should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice. Indeed, to deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice "would render the cumulative error inquiry meaningless, since it [would] . . . be predicated only upon individual error already requiring reversal."

317 F.3d at 1207 (*quoting Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002)).

Each of the trial errors in Mr. Cruz-Garcia's case, standing alone, is sufficiently prejudicial to warrant habeas relief. When considered together, the cumulative impact of the egregious errors set forth in this petition undermine all reasonable confidence in the outcome of the trial and sentence.

**C.  Request for discovery and a hearing.**

Mr. Cruz-Garcia previously filed in this Court a Motion for Discovery. ECF No. 43. This Court denied that motion without prejudice, based on its finding that "discovery is not appropriate until the parties have litigated the question of whether a *Rhines* stay is available in this case." ECF No. 45 at 4. Mr. Cruz-Garcia will file a motion for discovery and a motion for an evidentiary hearing separately from this Petition.

## CLAIMS FOR RELIEF

**Claim One:   Juror misconduct denied Mr. Cruz-Garcia a fair and impartial trial, in violation of the Sixth, Eighth, and Fourteenth Amendments.**

Mr. Cruz-Garcia's right to a fair trial, impartial jury, and due process of law were violated when the jury foreman read Bible passages that influenced the verdict and when the jury discussed the case outside of deliberations, in violation of the Sixth, Eighth and Fourteenth Amendments.

**A. The jury foreman read Bible passages to the jury during their penalty phase deliberations and the jury was influenced by these Bible passages to answer the special issues in a way that resulted in a death sentence.**

Under clearly established Supreme Court precedent, "a jury's verdict must be based upon the evidence developed at the trial," and that protection "goes to the fundamental integrity of all that is embraced in the constitutional concept of a trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotations omitted); *see Parker v. Gladden*, 385 U.S. 363, 365 (1966); *Remmer v. United States*, 347 U.S. 227, 229 (1954); *Mattox v. United States*, 146 U.S. 140, 149 (1892). In *Oliver v. Quarterman*, this Circuit held that that "the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to external influence" and that the Bible was an external influence. 541 F.3d 329, 336, 339 (5th Cir. 2008).

Whether something is an external influence is a fact-specific question. *Oliver*, 541 F.3d at 336. Where a trial court is confronted with allegations that an external influence was brought to bear on the jury's deliberations, a trial court *must* afford the defendant an opportunity to test the impact of that influence on the jury. *Remmer*, 347 U.S. at 230 (the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate"); *Barnes v. Joyner*, 751 F.3d 229, 242 (4th Cir. 2014) ("*Remmer* clearly established . . . a defendant's entitlement to an evidentiary hearing when the defendant presents a credible allegation" of an external influence on the jury.).

An external influence is presumptively prejudicial. *Remmer*, 347 U.S. at 229. In the habeas context, however, a petitioner is required to show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Oliver*, 541 F.3d at 341 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This violation entitles Mr. Cruz-Garcia to a new

punishment phase.

> **1.  The jury was exposed to an external influence when the jury foreperson brought a Bible into the deliberations room and read from it to the jury during their deliberations on punishment.**

Shortly after Mr. Cruz-Garcia was sentenced to death, juror Angela Bowman contacted trial counsel Mario Madrid to inform him that the jury foreman, Matthew Clinger, had brought a Bible into the deliberation room and read passages from it to the jury. 3 CR 606–07, 610–11. Juror Bowman further recalled that another juror, Casey Guillotte, had changed her vote after juror Clinger read from the Bible. *Id.* at 610–11. When interviewed by a defense investigator soon after, juror Clinger confirmed that he had brought a Bible into the deliberations room, that he had read from it to the jury, and that his reading from the Bible had "made a difference with Casey [Guillotte]." *Id.* at 633–40.

Juror Clinger recalled that he had read to the jury from Genesis 9, "a lot of places in Deuteronomy," and Romans 13. 3 CR 634. Parts of Genesis 9 directly call for the death penalty: "I will demand an accounting for the life of another human being. *Whoever sheds human blood, by humans shall their blood be shed*; for in the image of God has God made mankind." *Genesis* 9:5-6 (New International Version) (emphasis added). The Book of Deuteronomy likewise calls for the death penalty on numerous occasions. *See Deuteronomy* 13:5 (for inciting rebellion against the Lord), 17:12 (for refusing to obey the decision of a judge or priest), 18:20 (for false prophecy), 19:16–19 (for perjury), 21:18–21 (for disobedience to one's parents), 22:13–21 (for falsely claiming virginity at the time of marriage), 22:22–24 (for committing adultery). Romans 13 indicates that because God created the governing authorities, God has implicitly endorsed the law of the governing authorities. *See Romans* 13 (New International Version).

In his interview with the defense investigator, juror Clinger made clear that he *had read* from the Bible out loud and to the jurors *during* their deliberations. 3 CR 635 ("[Defense investigator]: So did you read from the Bible or did you quote it from memory? [Juror Clinger]: No, I read."); *id.* at 633 ("[Defense investigator]: So, at what point during the deliberations did you bring out your Bible? [Juror Clinger]: Uh, it was about 10:00 AM Friday morning."). Juror Clinger further made clear that "after [he] read that. . . [juror Guillotte] was able to move on from the first question."[9] *Id.* at 635–36.

As in *Oliver*, the juror's reliance on the Bible to answer the special issues determinative of Mr. Cruz-Garcia's sentence constituted an external influence. The specific passages at issue advocate for a death sentence, including in circumstances close to that of the offense and extraneous conduct introduced by the State at the punishment phase. *See Oliver*, 541 F.3d at 340 ("The Bible served as an external influence precisely because it may have influenced the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry[.]"). The reading of these Bible passages by the jury foreman thus placed an impermissible weight on the scale for death. *See Parker*, 385 U.S. at 365; *Turner*, 379 U.S. at 472; *Remmer*, 347 U.S. at 229; *Mattox*, 146 U.S. at 149.

### 2. This external influence had a substantial and injurious effect on the jury's verdict.

A jury's exposure to external influences results in a presumption of "extreme prejudice." *Turner*, 379 U.S. at 472–73; *Parker*, 385 U.S. at 365. In the habeas context, Mr. Cruz-Garcia is required to show that the Bible had a "substantial and injurious effect" on the verdict. *See Brecht*,

---

[9] The "first question" here refers to the Texas future dangerousness special issue.

507 U.S. at 637; *Oliver*, 541 F.3d at 341 (citing *Brecht*, 507 U.S. at 637). In his recorded interview

shortly after deliberations, juror Clinger was clear that his reading of the Bible passages "made a

difference with [juror Guillotte]" and that "after I read that. . . she was able to move on[.]" 3 CR

635–36. Likewise, juror Bowman recalled that juror Guillotte changed her vote after juror Clinger

read from the Bible and that other jurors may also have been influenced by the scriptures read to

them. 3 CR 556. Moreover, juror Clinger read from the Bible to the jury at a critical point in

their deliberations on punishment. Indeed, juror Clinger was clear that he read from the Bible to

the jury at "about 10:10 AM Friday morning," at which point "a third [of the jury] . . . were leaning

for life, a third . . . were leaning for the death penalty and a third . . . were undecided." 3 CR 633,

623. Because the Bible reading had a substantial and injurious effect on the jury's verdict, Mr.

Cruz-Garcia is entitled to a new punishment phase.

Mr. Cruz-Garcia also acknowledges that the state court record is contradictory on several

facts, including when juror Clinger read from the Bible and whether juror Clinger's reading of

scripture did influence juror Guillotte (and others) to answer the sentencing issues in such a way

as to result in a death sentence.

Based on jurors Clinger and Bowman's recollection that juror Clinger had read from the

Bible and at least one juror was influenced, Mr. Cruz-Garcia moved for a new trial. 3 CR 538–

43; 544–46. Mr. Cruz-Garcia further asked that the trial court hear live witness testimony to

resolve these allegations of jury misconduct. *Id.* at 580–82. In support of his motion, Mr. Cruz-

Garcia submitted juror Clinger's recorded interview in which he stated that he had read out loud

from the Bible and at least one juror was influenced, juror Bowman's affidavit reflecting the same,

and an affidavit from the defense investigator memorializing that juror Clinger had declined to

sign an affidavit based on the advice of counsel at his workplace but was willing to testify at a live hearing. *Id.* at 605–49.

Although juror Clinger had refused to sign an affidavit reflecting his statements to the defense investigator, he then provided an affidavit to the State, after Mr. Cruz-Garcia had filed a motion for new trial. 3 CR 599–601. In that affidavit, juror Clinger contradicted his prior recorded statements and claimed that he had only opened his Bible and laid it on the table *while* the jury was deliberating. He also claimed that he *had not read* from the Bible and that no jurors had changed their vote based on his having taken his Bible out. 3 CR 599–601. Juror Guillotte also provided an affidavit to the State, in which she represented that juror Clinger *had read* from the Bible, but only to himself and only *after* the jury had agreed on the special issues and ceased their deliberations. 3 CR 597–98. Hence, juror Clinger and juror Guillotte's affidavits offered conflicting versions of events, including whether juror Clinger had read from the Bible and at what point in the jury's deliberations this occurred.

Mr. Cruz-Garcia then requested that the trial court hear live testimony to resolve the issue. 3 CR 580–82. Notwithstanding the contradictions between juror Clinger's recorded interview with a defense investigator and his later affidavit to the State, as well as the discrepancies between the State's own evidence from jurors Clinger and Guillotte about whether juror Clinger read from the Bible and at what point in the jury's deliberations the Bible was used, the trial court denied Mr. Cruz-Garcia's motion for live testimony and denied Mr. Cruz-Garcia's motion for new trial.[10]

---

[10] Because the CCA determined under state law that the trial court erred in admitting the affidavits submitted by the State and the defense, there are no fact findings for this Court to defer to. *Cruz-Garcia*, 2015 WL 6528727, at *29.

29 RR 3, 28; *see also* 3 CR 580–82.

This Court should therefore hold a hearing on this claim. *See Remmer*, 347 U.S. at 229–30 (remanding the case "with directions to hold a hearing to determine whether the incident complained of was harmful to the petitioner[.]"). Because Mr. Cruz-Garcia has pled facts that would entitle him to relief if proven, and in light of the conflicting nature of the factual record and state court's failure to conduct a hearing, an evidentiary hearing is warranted on this claim.[11] *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

**B.  Jurors discussed the evidence and sentence outside of punishment deliberations.**

On the morning of the first day of the punishment phase, an attorney unconnected to the case, Michael Casaretto, reported to the trial court that he had overheard two jurors on Mr. Cruz-Garcia's jury discussing the evidence in the courthouse elevator. 24 RR 3; 2 SHCR 543–44. It was clear to Mr. Casaretto that the jurors were discussing the merits of the case, including their impressions of the evidence and witness testimony. 2 SHCR 544. Based on the jurors' badges, Mr. Casaretto was able to identify the court room and judge, and alerted Judge Magee shortly thereafter because he "felt it necessary to report to her conduct that appeared to . . . reach the level of juror misconduct." *Id.*; *see also id.* at 544–45 (Mr. Casaretto describing the conversation as "blatant" misconduct, an "obvious violation of the jurors' obligations during trial," and "extremely important"). *Id.* at 258. Judge Magee, however, told the State and defense counsel that Mr. Casaretto had reported overhearing "possibly an innocuous conversation[.]" 24 RR 3.

Alternate juror Sharon Alexander also recalled that the jury repeatedly discussed the evidence during breaks in the trial. 2 SHCR 352. ("[W]e would talk as a jury about the case and

---

[11] *See supra* Legal Arguments Applicable to Multiple Claims § C.

what was going on . . . during breaks, when we were in the jury room waiting."). In addition to discussing the evidence, she also recalled that the jurors discussed voting to sentence Mr. Cruz-Garcia to death during their breaks. *Id.* ("I remember learning from the other jurors that one of the jurors in particular was having a hard time voting for the death penalty. That was one of the things we talked about during the trial when we were together.").

The jurors' discussion of the sentence and evidence outside of deliberations and before the close of evidence violated Mr. Cruz-Garcia's right to a fair trial by an impartial jury. *Winebrenner v. United States*, 147 F.2d 322, 329 (8th Cir. 1945) (describing "generally accepted principle that it is improper for jurors to discuss a case prior to its submission to them"); *United States v. Chiantese*, 582 F.2d 974, 979 (5th Cir. 1978) (describing "impropriety of jurors discussing a case among themselves before they retire to arrive at a verdict"). By contrast with the remarks at issue in *Chiantese*, both Mr. Casaretto and alternate juror Alexander recalled that the jurors discussed the sentence, witness testimony, and impressions of the evidence. *Id.* (declining to extend prohibition on jurors' discussion outside of deliberations where "juror . . . did not commit herself to any outcome in the case or demonstrate a prejudgment of the evidence"). Because the jury discussed the evidence and sentence outside of deliberations and prior to the close of evidence at punishment, this violation entitles Mr. Cruz-Garcia to a new punishment phase.

### C. This Court can review this claim *de novo* because the state court failed to adjudicate the federal claim on the merits or, in the alternative, this Court can review the merits of this claim because 28 U.S.C. § 2254(d) is satisfied.

Mr. Cruz-Garcia raised the portion of the claim pertaining to the jurors relying on the Bible to sentence him to death as Claim 12 on direct appeal and as Claim 9 in state habeas. *See* ECF No. 22-7 at 118–28; 1 SHCR 153. This claim is therefore exhausted. The state court,

however, failed to adjudicate Mr. Cruz-Garcia's federal claim on the merits. This Court can therefore conduct *de novo* review. *Johnson*, 568 U.S. at 301–02.

On direct appeal, Mr. Cruz-Garcia argued that the Bible operated as an external influence on the jury, in violation to his rights to a fair trial and due process. ECF No. 22-7 at 118–28. In support thereof, Mr. Cruz-Garcia expressly referenced the Sixth Amendment and right to due process, and cited to the Supreme Court's decisions in *Turner* and *Parker*, as well as this Circuit's precedent in *Oliver*. *Id.* The CCA, however, resolved this claim on the basis of state law only, including state law evidentiary rules and its own precedent, and held that jurors' reliance on the Bible to reach a verdict does not constitute an external influence. *Cruz-Garcia*, 2015 WL 6528727, at *29. It made no ruling on the federal aspect of this claim.

The CCA was presented with a second opportunity to adjudicate the merits of this claim in state habeas, but it again failed to do so. In state habeas, Mr. Cruz-Garcia argued that juror misconduct, including the jurors' reliance on the Bible and the jurors' discussion of the case outside of deliberations, violated his federal constitutional right to a fair trial. 1 SHCR 153–64. The Court found that the claim was procedurally barred on the ground that "it was raised and rejected on direct appeal." *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1. Mr. Cruz-Garcia, however, did not raise the issue of jurors discussing the case outside of deliberations on direct appeal, which, of course, means it was not ruled on during direct appeal. And, as previously noted, the CCA did not rule on the federal claim raised on direct appeal regarding the jury's reliance on the Bible to render a death sentence. Thus, the CCA again passed on its opportunity to adjudicate this claim during state habeas.

"When a state court rejects a federal claim without expressly addressing that claim, a

federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Johnson*, 568 U.S. at 301. Here, Mr. Cruz-Garcia can rebut that presumption because (1) the state court overlooked or declined to rule on the federal claim and (2) the state standard is less protective than the federal standard. *See id.* at 301–03. The direct appeal brief placed the CCA on notice of the federal nature of this claim, yet the CCA relied on state evidentiary rules to deny it without engaging in the federal question. Further, by holding that reading Bible passages during deliberations is not an external influence, the CCA took a position that is squarely at odds with, and less protective than, the federal standard. *See Oliver*, 541 F.3d at 339 (holding that "the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence" and that a juror reading Bible passages during deliberations constituted an external influence). Because the state court did not adjudicate Mr. Cruz-Garcia's claim—both as it pertains to the Bible reading being an external influence and as to the jurors' discussion of the evidence and sentence outside of deliberations—review by this Court should therefore be *de novo*. *Johnson*, 568 U.S. at 301–02.

In the alternative, if this Court determines that the state court did adjudicate on the merits the allegations pertaining to the Bible reading being an external influence, Mr. Cruz-Garcia can meet the relitigation bar under 28 U.S.C. § 2254(d). The state court's adjudication both involved an unreasonable application of *Turner*, *Parker*, *Remmer*, and other Supreme Court precedent, and was based on an unreasonable determination of the facts. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000). The CCA held that jurors reading the Bible during deliberations is not an external influence, which is contrary to, and an unreasonable application of, that Supreme Court precedent. *Compare Cruz-Garcia*, 2015 WL

6528727, at *28–29, *with Oliver*, 541 F.3d at 339.

Hence, whether this Court finds that the state court did not adjudicate this claim on the merits or finds that § 2254(d) is satisfied, this Court can review the merits of this claim.

**Claim Two:** **Mr. Cruz-Garcia's right to present a defense and to cross-examine witnesses was violated when the trial court refused to allow him to present evidence relating to the unreliability of the DNA evidence.**

Under clearly established Supreme Court precedent, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotations omitted); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (same). The State's case rested on DNA evidence that purportedly tied Mr. Cruz-Garcia to the sexual assault of Diana Garcia and corroborated the accomplice testimony of the State's star witness, Mr. Santana. *See* 23 RR 96. Mr. Cruz-Garcia, however, was prohibited by the trial court from presenting a complete defense against that DNA evidence. Because Mr. Cruz-Garcia's right to present a complete defense was violated, he is entitled to a new trial.

**A. The trial court prohibited Mr. Cruz-Garcia from presenting documentary and testimonial evidence relating to the unreliability of the State's DNA evidence.**

At trial, the State introduced evidence that Mr. Cruz-Garcia's DNA matched (1) the DNA profile identified on the cigar; (2) the major DNA profile of the DNA mixture on the underwear cutting; and (3) the DNA mixture identified on the vaginal swabs. 21 RR 119–20; *Id.* at 161–62. The State also introduced evidence that Diana Garcia's husband, Arturo Rodriguez, could not be excluded as a contributor to the minor profile obtained from the DNA mixtures identified on the underwear cutting and to the DNA mixture identified on the vaginal swabs. *Id.* at 111–12, 114.

32

The DNA evidence relied upon by the State to tie Mr. Cruz-Garcia to the facts of the offense and corroborate Mr. Santana's accomplice testimony was received, processed, and stored by the DNA Section of the old HPD Crime Lab, including DNA analysts Dr. Baldev Sharma, Deetrice Wallace, and Joseph Chu. At trial, defense counsel sought to admit the following:

- The Bromwich Reports, detailing the risk of miscarriage of justice arising from the processing and storage of forensic evidence, and in particular rape kits, by the HPD Crime Lab;

- Employee complaint histories for Joseph Chu and Dr. Baldev Sharma, reflecting disciplinary action against them for employee misconduct;

- HPD Internal Affairs Investigation summary reflecting that Dr. Sharma was demoted "for violations of Competence and Truthfulness"; and

- Judgment of conviction against Deetrice Wallace for tampering with a government record.

16 RR 20–21; *see* 31–34 RR Def. Exs. 2–18. The defense further sought to call Mr. Bromwich to testify to his findings that the HPD Crime Lab was a "train wreck" and that over a third of cases that passed through the DNA section suffered from contamination and other issues. 18 RR 20. Finally, trial counsel sought to introduce evidence that the State had conducted DNA testing in 1993 through a third-party lab, Genetic Design, and that the 1993 testing yielded results different from those presented by the State at trial in 2014. *See* 34 RR Def. Ex. 19. Trial counsel argued that these materials and testimony should be admitted to enable Mr. Cruz-Garcia to defend himself against the State's DNA evidence. 16 RR 109–10. The trial court, however, prohibited Mr. Cruz-Garcia from introducing *any* of this evidence, whether in exhibit form, through testimony, or through cross-examination, in violation of his right to present a complete defense.

       1. **The prohibited evidence reflected that the HPD Crime Lab, where the DNA evidence against Mr. Cruz-Garcia was received and stored, was shuttered following revelations of gross negligence.**

The DNA evidence relied upon by the State to tie Mr. Cruz-Garcia to the offense and corroborate Mr. Santana's testimony was first processed by analyst Deetrice Wallace at the HPD Crime Lab in October 1992. 16 RR 98. The HPD Crime Lab had only just begun performing DNA casework the year prior, in 1991, under the management of James Bolding and the supervision of Dr. Baldev Sharma. 31 RR Def. Ex. 3 at 16–17.[12] Prior to supervising the small team of five DNA analysts, Dr. Sharma had "no experience in forensic science." *Id.* at 17. Despite having a supervisory role, Dr. Sharma's skills as a DNA analyst were acknowledged to be "weak[]." *Id.* at 18. At the time of the HPD Crime Lab's receipt of the forensic evidence in Mr. Cruz-Garcia's case in 1992, Dr. Sharma acted as the main DNA analyst in connection with that evidence. 16 RR 97. Specifically, on October 25, 1992, Dr. Sharma performed DNA extractions and analysis on the rape kit, including by cutting a section from Diana Garcia's underwear. 16 RR 83, 86–87; 21 RR 13; Ex. 132.

At that time, the DNA extractions were sent to Genetic Design Lab, together with DNA samples from several male individuals. 34 RR Def. Ex. 19. On February 4, 1993, Genetic Design reported its findings to the HPD Crime Lab, including that an individual named Bienvenido Melo could not be excluded as a potential contributor to the DNA extracted from the evidence. *Id.* Genetic Design also reported that Diana Garcia's boyfriend, Arturo Rodriguez, could be excluded from the DNA mixture on the panties. *Id.*

Dr. Sharma was eventually demoted on the ground of employee misconduct. 31 RR Def. Ex. 3; 34 RR Def. Ex. 9; Ex. 132. Dr. Sharma's employee complaint history further reflects that, during his tenure as supervisor of the DNA Section, he had four sustained allegations of employee misconduct, including for "incompetency," "misconduct," and "improper police procedure." 34 RR

---

[12] Pin cites to the trial Defense Exhibits are to the pages within the corresponding document itself.

Def. Ex. 9. Ms. Wallace was later convicted of tampering with a government record based on her actions in other cases. *Id.* at Def. Exs. 17; 18.

On November 11, 2002, KHOU Channel 11, a local Houston television station, began airing a series of investigative news reports that revealed shocking information regarding the HPD Crime Lab. The report led to an investigation by Michael Bromwich, who was tasked by the City of Houston to investigate allegations of gross misconduct and negligence by the HPD Crime Lab. *See* 32 RR Def. Ex. 6. Mr. Bromwich's final report, published in 2007, concluded that "the risk that casework performed by the Crime Lab, *particularly the DNA Section*, would lead to miscarriage of justice was unacceptably high." *Id.* at 28 (emphasis added).

The DNA Section of the lab had been shuttered as early as 2002, after it was found to be operating "under conditions that made the risk of an injustice intolerably high." 32 RR Def. Ex. 6 at 5, 151. That 2002 closure resulted from an audit by an outside agency, which uncovered that the DNA Section was "in shambles[.]" 31 RR Def. Ex. 3 at 4, 5, 50–51. Of particular concern, the 2002 audit revealed that "serious deficiencies . . . had become so egregious that analysts in the Lab simply had no perspective on how bad their practices were." 31 RR Def. Ex. 4 at 2. Among the "major problems" identified, the analysis of DNA mixtures was specifically flagged as a particularly problematic area. *Id.* at Def. Ex. 3 at 5. Likewise, in 2005, Mr. Bromwich also reported that, "in several cases involving mixtures, the DNA analysts performed the statistical calculations incorrectly." *Id.*

In addition to detailing the mishandling of forensic evidence and the misreporting of results by the DNA Section, Mr. Bromwich identified significant issues with the storage of forensic evidence by the HPD Crime Lab. 32 RR Def. Ex. 6 at 25. The report highlighted that the "[s]torage of

biological evidence" had been "an ongoing problem for the Property Room." *Id.* The report further noted that practices surrounding the long-term storage of biological evidence, including sexual assault kits, made such evidence "much more likely to degrade[.]" *Id.*; 31 RR Def. Ex. 3 at 58–59.

Mr. Bromwich also found that in May 2001, "a significant volume of evidence related to homicides and sexual assaults was water damaged" when Tropical Storm Allison caused extensive damage to the property room located at 1200 Travis St. 31 RR Def. Ex. 3 at 45. Mr. Bromwich reported that "the Crime Lab employees had no information about which cases were specifically affected." *Id.* at 46 n. 51. Although the HPD Crime Lab expanded its storage capacities by relocating the Property Room to a separate building on Goliad Street, Mr. Bromwich found that this facility too suffered from "major deficiencies[.]" *Id.* at 56. The report concluded that, "[e]ven if repairs are made to the present facility, it may not be adequate for the proper storage and handling of evidence[.]" *Id.*

The concerns reflected in the 2002 audit and Mr. Bromwich's findings were realized in Mr. Cruz-Garcia's case. The DNA evidence relied upon by the State was stored at both the Travis Street and Goliad Street locations. 16 RR 30, 32. A postconviction review of that evidence revealed "concerns about the integrity" of the DNA evidence based on storage conditions. 1 SHCR 221–22. And, in 2015, the State itself recanted much of the DNA evidence purportedly establishing Mr. Cruz-Garcia's identity as Ms. Garcia's assailant and corroborative of Mr. Santana's accomplice testimony. ECF No. 18–11.

      **2.   At a pre-trial hearing, the trial court made extensive findings of fact about the defunct HPD Crime Lab's involvement in the processing and storage of the State's DNA evidence against Mr. Cruz-Garcia.**

At a pre-trial hearing on defense counsel's Motion to Suppress Results of All DNA Testing, 3 CR 455, HPD Sergeant Mehl testified for the State that, in 2007, he retrieved the cigar from the HPD Crime Lab Property Room on Goliad Street and the rape kit from the HPD Crime Lab storage rooms on Travis Street. 16 RR 30, 32. Sergeant Mehl testified that he did not observe any damage to the plastic bags and envelopes in which the evidence was stored. *Id.* at 31. Sergeant Mehl also testified that he had no training in the collection and storage of biological evidence, including DNA evidence. *Id.* at 27. The cigar and rape kit were then sent to Orchid Cellmark by Sergeant Mehl. *Id.* at 33.

Orchid Cellmark DNA analyst Matt Quartaro testified, "[t]here was nothing initially just looking at the evidence that would indicate that any tampering or contamination may have occurred." 16 RR 50. However, he also explained that he did not receive the evidence; an Orchid Cellmark evidence custodian did. *Id.* That custodian was not identified at trial, nor called to testify. Before the jury, Mr. Quartaro explained that he would not have been able to observe contamination to the DNA evidence with the naked eye. 21 RR 129. Mr. Quartaro also testified that although Orchid Cellmark performed separate DNA extractions, he relied on the cutting of the underwear made by HPD Crime Lab employee Dr. Sharma in 1992. *Id.* at 135.

Finally, Amber Head, a criminalist specialist with the HPD Crime Lab, testified that she had obtained a DNA profile from a buccal swab submitted by Mr. Cruz-Garcia. 16 RR 89–90. Ms. Head explained that she then compared that DNA profile to those obtained by Orchid Cellmark and confirmed that Mr. Cruz-Garcia could not be excluded as a contributor to the cigar, the vaginal swabs, and the cutting from the underwear. *Id.* Ms. Head testified that she had not herself obtained DNA profiles from the forensic evidence at issue and had relied entirely on the analysis performed

by Orchid Cellmark, which in turn was based on evidence processed by and stored at the defunct HPD Crime Lab. *Id.* at 91. Nor had Ms. Head compared any other profiles from known individuals connected to law enforcement's investigation with the DNA profiles identified by Orchid Cellmark. 21 RR 164. Ms. Head confirmed that Dr. Sharma had acted as the main DNA analyst at the time of the original analysis in 1992, and that HPD Crime Lab employee Deetrice Wallace had initially received and processed the sexual assault evidence. *Id.* at 86–98.

In ruling on Mr. Cruz-Garcia's Motion to Suppress, with regards to the findings of independent investigator Mr. Bromwich, the trial court found that:

> The [Bromwich] report sets out facts and discussions of employees at the HPD – old HPD Crime Laboratory and discusses disputes, allegations of misconduct, and potential criminal activity. The report sets out certain issues with the old HPD DNA serology section of the crime lab. Those issues include deficiency in documentation of procedures, mistakes in performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standards of operating procedures.

17 RR 13. As to Dr. Sharma, the trial court found that he "did perform DNA analysis on the extractions in this case" and "had five instances of alleged employee misconduct . . . [f]our of [which] were sustained." *Id.* at 15–16. The trial court likewise found that Joseph Chu had "nine employee misconduct allegations . . . two [of which] were sustained." *Id.* at 14–15. As to Deetrice Wallace, the trial court found that "Deetrice Wallace received the sexual assault kit in 1992" and "subsequently obtained a felony allegation or conviction . . . for tampering with a government document while working at a . . . different laboratory[.]" *Id.* at 16.

The trial court also made findings of fact as to each DNA item offered by the State:

I find that the cigar evidence was stored at the HPD property room on Goliad Street on October 1st, 1992, and was retrieved from that location by Sergeant Mehl in October 2007. I find that the cigar evidence was inside a larger container of evidence, was taken to the old HPD Crime Lab sometime in 1992, but was returned to the HPD property room and appeared to be unopened by the HPD Crime Lab at the time it was retrieved by Sergeant Mehl and mailed to Orchid Cellmark Laboratory for DNA testing on October 2nd, 2007.

. . .

The sexual assault kit was sealed and stored in the Houston Police Department property room annex on the 24th floor of 1200 Travis. And that was in 1992. I find that sometime in 1992, that sexual assault kit was taken to the old HPD Crime Lab and tested by Dr. B. Sharma. I find that Dr. Sharma took cuttings from the panties in that sexual assault kit and extracted DNA from the cutting that he retrieved from those panties.

. . .

The sexual kit evidence was retrieved from the Houston Police Department's property room annex on the 24th floor of 1200 Travis in October 2007 by Sergeant Eric Mehl, who retrieved it and observed that it appeared to be sealed and it was sent to Orchid Cellmark Laboratories on October 2nd, 2007.

17 RR 6–7. As to what it dubbed the "new" HPD Crime Lab, the trial court found that the lab "did not independently obtain DNA profiles from the evidentiary samples, but rather relied on the DNA profiles already obtained by Orchid Cellmark."[13] *Id.* at 11.

The trial court denied Mr. Cruz-Garcia's Motion to Suppress based on its finding that, despite having been stored, handled, and analyzed by the old HPD Crime Lab, the DNA evidence was nonetheless "sufficiently reliable and relevant" that it could be presented to the jury. 17 RR 5.

---

[13] The trial court found that Orchid Cellmark "performed their own extractions from a cutting of the underwear of Diana Garcia that they obtained, which was a different cutting than that used by the old HPD Crime Lab." 17 RR 8. Mr. Quartaro testified that Orchid Cellmark "received . . . the crotch of the pair of underwear [which] was cut out from the original pair of underwear and we took a cutting from the crotch area for our testing." 21 RR 135.

3.  **The trial court prohibited Mr. Cruz-Garcia from introducing any evidence going to the credibility of the State's DNA evidence based on the defunct HPD Crime Lab's involvement.**

Defense counsel sought to admit the Bromwich Reports; employee complaint histories for Joseph Chu and Dr. Baldev Sharma; the HPD Internal Affairs Investigation summary reflecting that Dr. Sharma was demoted "for violations of Competence and Truthfulness"; and a judgment of conviction against Deetrice Wallace for tampering with a government record. 16 RR 20–21; *see* 31–34 RR Def. Exs. 2–18. The defense further sought to call independent investigator Michael Bromwich to testify to his findings. 18 RR 20. The defense also sought to introduce evidence that the DNA evidence had been tested by another third-party lab, Genetic Design, in 1993 which yielded different results. 34 RR Def. Ex. 19.

The trial court prohibited Mr. Cruz-Garcia from introducing *any* of the above-described evidence to challenge the reliability of the State's DNA evidence. It acknowledged that "whether the jury believes the DNA evidence" was likely a critical issue. 16 RR 113. Regardless, it found the evidence urged by the defense to be irrelevant and instructed defense counsel that they "can't go into the Bromwich Report, [] can't go into the closure of the laboratory, and [] can't go into the impeachment of those witnesses," whether through documentary evidence or cross-examination. 17 RR 18–20. Whereas the trial court conceded that defense counsel should be permitted to establish that the DNA evidence was first received by the HPD Crime Lab, it agreed with the State that the preclusion of the Bromwich Report and Mr. Bromwich's testimony would bar any cross-examination into the closure of the Lab and employee misconduct. 17 RR 19–21.

B.  **The trial court's exclusion of this evidence violated Mr. Cruz-Garcia's right to present a complete defense.**

"[T]he Constitution guarantees a criminal defendant a meaningful opportunity to present a

complete defense." *Holmes*, 547 U.S. at 324 (internal quotation omitted). That opportunity, however, is "an empty one" where a trial court excludes "competent, reliable evidence bearing on the credibility" of evidence that is key to a defendant's defense. *Crane*, 476 U.S. at 690. Hence, even an evidentiary rule "which has long been recognized and respected by virtually every State" must sometimes yield to a defendant's right to present a defense. *Chambers*, 410 U.S. at 298 (finding that defendant's right to present a defense was violated by application of hearsay rule to preclude evidence going to the credibility of a defendant's confession); *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (describing *Chambers* as holding that "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation").

A trial court's application of evidentiary rules may violate a defendant's right to present a complete defense where "[t]he exclusion of evidence. . . significantly undermined fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)); *Kittelson v. Dretke*, 426 F.3d 306, 320–21 (5th Cir. 2005) (finding a violation of the right to present a defense, and granting relief under AEDPA, where discretionary evidentiary ruling left defendant unable to fully cross-examine prosecution witnesses).

The State's case against Mr. Cruz-Garcia turned on DNA evidence. *See* 23 RR 37 (the State arguing to the jury that the DNA evidence was "the most damning evidence" against Mr. Cruz-Garcia). The State's theory of the case was that the DNA evidence tied Mr. Cruz-Garcia to the sexual assault that preceded the kidnapping of Angelo Garcia *and* corroborated the accomplice testimony of its star witness, Mr. Santana. 23 RR 81; 26 RR 36. Challenging the reliability and credibility of that DNA evidence was therefore "fundamental" to Mr. Cruz-Garcia's defense. *Scheffer*, 523 U.S. at 315

The trial court, however, ruled that evidence of miscarriages of justice, misconduct, and mishandling of the DNA evidence by the lab and lab employees who first received, processed, and stored that DNA evidence in Mr. Cruz-Garcia's case was irrelevant. 17 RR 14–18. That ruling is plainly not supported by the trial court's own extensive findings of fact, including that the Bromwich Report and other evidence urged by the defense reflected significant concerns about the HPD Crime Lab and particular DNA analysts. *See supra* Claim Two § A.1. By instructing defense counsel that the Bromwich Reports and other evidence about the lab and employees who handled the evidence against Mr. Cruz-Garcia were "not to be mentioned or alluded or discussed," 17 RR 14, the trial court "effectively disabled" Mr. Cruz-Garcia's defense. *Crane*, 476 U.S. at 689; *see Kittelson*, 426 F.3d at 318 ("Whether the exclusion of evidence is of a constitutional dimension depends on the trial court's reason for the exclusion and the effect of the exclusion."). In other words, the trial court's ruling was "disproportionate." *Scheffer*, 523 U.S. at 308.

"*Chambers* error is by nature prejudicial." *Fry v. Pliler*, 551 U.S. 112, 124 (2007) (Stevens J., concurring in part and dissenting in part). In other words, because such error goes to a defendant's very ability to defend himself, "it is well nigh impossible for reviewing courts to conclude that such error did not influence the jury, or had but a very slight effect on its verdict." *Id.* (internal quotations omitted). In the habeas context, however, a petitioner is required to show that the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Janecka v. Cockrell*, 301 F.3d 316, 327 (5th Cir. 2002) (quoting and applying *Brecht* harm standard to collateral review of alleged violation of the right to present a complete defense). As the State's closing argument makes clear, the DNA evidence was critical to its case against Mr. Cruz-Garcia. Because that evidence was so fundamental to the State's case, Mr. Cruz-Garcia can show that the violation of his right to present

a complete defense against that evidence "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Mr. Cruz-Garcia is therefore entitled to a new trial.

   **C.   The trial court's exclusion of this evidence violated Mr. Cruz-Garcia's right to confront witnesses against him.**

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (internal citation and quotation omitted); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) ("[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination[.]"). A defendant's rights under the Confrontation Clause are satisfied where he is "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability" of the evidence presented. *Davis*, 415 U.S. at 318. A trial court's ability to impede the right of cross-examination is not unfettered. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (Courts may only place "reasonable limitations on [] cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."). To prevail on a Confrontation Clause claim, a defendant need only show that "he was prohibited from engaging in otherwise appropriate cross-examination" designed to test the reliability of the witness's testimony. *Delaware*, 475 U.S. at 680.

By refusing to permit Mr. Cruz-Garcia to cross-examine witnesses about the reliability of the DNA evidence based on the HPD Crime Lab's involvement, the trial court violated his right to cross-examine witnesses. The trial court acknowledged that contamination of the DNA evidence by the HPD crime lab was likely a relevant and critical line of cross-examination. 17 RR 19–21. The trial

court, however, also agreed that its prohibition on any of Mr. Cruz-Garcia's evidence about the HPD Crime Lab and DNA analysts' history of misconduct and mishandling of DNA evidence likely precluded any cross-examination on contamination and conditions of storage of the DNA evidence in Mr. Cruz-Garcia's case. *Id.*

The impossibility of Mr. Cruz-Garcia's situation was realized during the defense's cross-examinations of Sergeant Mehl, Matt Quartaro, and Courtney Head. The trial court admitted "it would leave a wrong impression with the jury" should the defense not be permitted to go into the DNA testing conducted by the third-party lab, Genetic Design, and ordered by the HPD Crime Lab. 20 RR 62. Still, the trial court ruled that it was "not going to allow you to go into how they did that or where it was sent or what was sent to another laboratory or anything like that[.]" *Id.* The defense was thereafter permitted only to establish through cross-examination that the forensic evidence did in fact go to, and was examined by, the HPD Crime Lab. *Id.* at 63–64 ("Well, I'm going to allow you to just go into the fact that the evidence in this case back in 1992 did go there and you can talk about the way that you found that it was resealed and packaged . . . And nothing further.").

The trial court's prohibition on cross-examination going to the reliability of the State's DNA evidence violated Mr. Cruz-Garcia's rights under the Confrontation Clause. Moreover, because Mr. Cruz-Garcia can satisfy the *Brecht* harm standard, he is entitled to a new trial. *Fratta v. Qaurterman*, 536 F.3d 485, 508 (5th Cir. 2008) (applying *Brecht* harm standard to collateral review of Confrontation Clause violation).

### D. This Court can review this claim *de novo*.

#### 1. This Court can review Mr. Cruz-Garcia's complete defense claim *de novo* because the state court failed to adjudicate the federal claims on the merits.

Mr. Cruz-Garcia raised this claim as Claim 2 on direct appeal. *See* ECF No. 22–7 at 4, 81–

44

87. The complete defense claim is therefore exhausted. The state court, however, failed to adjudicate Mr. Cruz-Garcia's federal claim on the merits. *Cruz-Garcia*, 2015 WL 6528727, at *26. Moreover, because the CCA overlooked or declined to rule on the federal claim, Mr. Cruz-Garcia can rebut the presumption that the state court ruled on it. *Johnson*, 568 U.S. at 301–02. This Court's review should therefore be *de novo*. *Id.*

On direct appeal, Mr. Cruz-Garcia alerted the state court to the federal nature of his claim that the trial court violated his right to present a complete defense when it prohibited the presentation of defense evidence and cross-examination on the reliability of the State's DNA evidence. Mr. Cruz-Garcia expressly referenced the Sixth and Fourteenth Amendments, cited to the Supreme Court's precedent in *Holmes*, and cited to further case law interpreting the right to present a complete defense under the Federal Constitution. ECF No. 22–7 at 4, 85–87. Mr. Cruz-Garcia asked that the CCA find that he was denied the right to cross-examine witnesses and to present a full defense, in violation of the Sixth and Fourteenth Amendments. *Id.*

Irrespective of Mr. Cruz-Garcia's reliance on the Constitution and corresponding Supreme Court and Texas case law interpreting the federal constitutional right, the CCA adjudicated this claim on state-law grounds alone. *Cruz-Garcia*, 2015 WL 6528727, at *13–14. Citing the state-law standard of review applicable to a trial court evidentiary ruling (abuse of discretion) and to the Texas Rules of Evidence, the CCA enquired only whether the trial court had abused its discretion under the Texas Rules of Evidence and found that it had not. *Id.* at *13–14 & n. 28.

The CCA's discussion of this claim omits any reference to the Constitution or relevant case law discussing the federal constitutional claim. *Johnson*, 568 U.S. at 301 (presumption that

state court adjudicated federal claim on the merits may be rebutted where state court adjudication "made no reference to federal law"). The CCA's observation that "we cannot say that [the defense exhibits'] exclusion prevented him from presenting a defense" is not supported by any citation to the Federal Constitution or corresponding case-law. *Cruz-Garcia*, 2015 WL 6528727, at *14. The CCA's footnote to a separate section of its decision, pertaining to a separate claim arising from the exclusion of mitigating evidence at the penalty phase of trial, and resting upon a different provision of the federal Constitution, is insufficient to constitute an adjudication on the merits of the federal constitutional claim that the trial court violated Mr. Cruz-Garcia's right to present a complete defense. In *Johnson*, the Supreme Court specifically noted that, where "a provision of the Federal Constitution or a federal precedent was simply mentioned in passing in a footnote or was buried in a string cite. . . [i]n such circumstances, the presumption that the federal claim was adjudicated on the merits may be rebutted[] by the habeas petitioner (for the purpose of showing that the claim should be considered by the federal court *de novo*)." *Johnson*, 586 U.S. at 301 (emphasis added).

Because the state court did not adjudicate Mr. Cruz-Garcia's federal constitutional claim on the merits, this Court's review should be *de novo*.

**2.    This court can review the claim that Mr. Cruz-Garcia's right to cross- examine witnesses was violated *de novo* to avoid a fundamental miscarriage of justice.**

On direct appeal, the CCA treated Mr. Cruz-Garcia's allegations that the trial court erred in prohibiting him from cross-examining witnesses about the HPD Crime Lab as a separate claim arising under the Confrontation Clause. *Cruz-Garcia*, 2015 WL 6528727, at *15–16. The CCA ruled that Mr. Cruz-Garcia's Confrontation Clause arguments were not preserved at trial and the court would therefore not rule on the merits. *Id.* This court can, however, excuse the procedural default

so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 316 (1995) (holding that when a petitioner establishes actual innocence, "the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims").

To establish actual innocence to overcome the procedural default of a constitutional claim, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of [] new evidence." *Schlup*, 513 U.S. at 327. However, a petitioner is not required to show that the new evidence upon which he now relies "unquestionably establishes [his] innocence." *Id.* at 317. Moreover, that there is some evidence tending to support a guilty verdict is not dispositive of a reviewing court's actual innocence inquiry. *Id.* at 327 ("[P]etitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict."). Hence, in conducting this actual innocence inquiry, a reviewing court should consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation omitted).

Since trial, critical evidence has come to light that undermines every aspect of the State's case against Mr. Cruz-Garcia. During the guilt phase, the State's case rested on 3 key elements: the DNA evidence purportedly tying him to the offense; the accomplice testimony of Mr. Santana placing Mr. Cruz-Garcia at the scene of A.'s murder; and the testimony of Angelita Rodriguez, to whom Mr. Cruz-Garcia allegedly confessed. *See* 23 RR 93–96. New evidence "establish[es] significant doubt" as to all 3 pillars of the State's case. *Schlup*, 513 U.S. at 316.

First, since trial, the State has recanted significant aspects of the DNA evidence introduced against Mr. Cruz-Garcia. *See* ECF No. 18–11. At trial, the State argued that the DNA evidence established Mr. Cruz-Garcia's identity as Diana Garcia's assailant because his DNA was on the panties and vaginal swabs, and the remaining DNA was that of her husband. 23 RR 83 (arguing to the jury, "if Obel Cruz-Garcia was not the one . . . where is the DNA of the guy who raped Diana?"). The State further relied on the DNA evidence to corroborate Mr. Santana's accomplice testimony because his DNA was excluded from the vaginal swab. *Id.* at 82. In short, the State told the jury that "on the DNA alone, you could convict [Mr. Cruz-Garcia]." *Id.* at 91. The Amended DNA Report issued during state habeas proceedings, however, concluded that no conclusions could be drawn as to the identity of any of the contributors to the DNA mixture on the vaginal swabs, and no conclusion could be drawn as to the identity of the contributor to the minor DNA mixture on the underwear cutting. ECF No. 18–11. As corrected, the DNA evidence therefore does not conclusively establish Mr. Cruz-Garcia's identity as the assailant, does not corroborates Mr. Santana's testimony that he was never in the apartment with Ms. Garcia, and leaves open the possibility of an unknown assailant. Instead, no conclusion can be drawn as to the identity of *any* of the contributors to the DNA recovered from the vaginal swabs, nor as to the identity of the contributors recovered from the underwear cutting.

Moreover, evidence discovered since trial undercuts the strength of the remaining DNA evidence supposed to prove Mr. Cruz-Garcia's identity as Ms. Garcia's assailant. The Amended DNA Report produced by the State confirmed Mr. Cruz-Garcia's DNA on the underwear cutting and the cigar found at Ms. Garcia's apartment. However, in state post-conviction, several witnesses revealed

that Mr. Cruz-Garcia and Ms. Garcia had an ongoing sexual relationship at the time of the offense.[14]

ECF Nos. 18–21; 18–22. As to the cigar, Ms. Garcia and Mr. Rodriguez testified that Mr. Cruz-Garcia had visited their apartment earlier on the day of the assault. 18 RR 145. Indeed, HPD records establish that law enforcement themselves thought the cigar was entirely unconnected to the facts of the offense. ECF No. 18–64. Hence, even the remaining DNA evidence does not establish Mr. Cruz-Garcia's identity as Ms. Garcia's assailant.

Second, the State's star witness, Mr. Santana, testified falsely and/or received a deal in connection with his testimony against Mr. Cruz-Garcia.  *See infra* Claim Five **§** A. In his testimony, Mr. Santana implicated himself in both the 1992 capital murder of Angelo Garcia and the 1989 murder of Saul Flores (introduced at punishment). *See* 20 RR 142–64; 21 RR 15–28; 25 RR 71–89. Indeed, the trial court found that Mr. Santana was "an accomplice witness as a matter of law" based on "his own testimony[.]" 22 RR 3. The State elicited testimony from Mr. Santana that he did not receive a deal in exchange for his testimony and was testifying at the risk of being prosecuted. *See* 20 RR 165–66, 173–74; 21 R 12. Since trial, however, Mr. Santana has never been charged by the State with *any* offense in connection with either murder. The absence of any charges reveals that the jury was laboring under a false impression as to the credibility of the State's star witness at the guilt phase of trial.

Furthermore, Mr. Santana was never a credible witness. He has a long history of mental illness. In 1998, a federal court ordered Mr. Santana to submit to a competency evaluation and, in 2011, Mr. Santana moved a federal court to set aside his plea based on "a plethora of records"

---

[14] At trial, the State argued that Mr. Cruz-Garcia and Ms. Garcia could not have had a consensual sexual relationship because Mr. Cruz-Garcia was "her drug supplier and 15 years her junior." 23 RR 91.

reflecting serious concerns regarding his mental health and competency. *See infra* Claims Four § F.3 & Six.A.2; ECF No. 18–12. Mr. Santana also has a history of committing physical assault, including against children. ECF No. 18–86. Mr. Santana was convicted of assaulting a young girl around the time Angelo was abducted, a crime of moral turpitude, which he lied about on the stand. *See infra* Claim Five § A. Mr. Santana's testimony at trial is therefore neither credible, nor reliable.

Third, newly uncovered evidence has also undercut the testimony of Angelita Rodriguez. After she testified for the State that Mr. Cruz-Garcia had confessed to her some months after Angelo's disappearance, Angelita Rodriguez was able to adjust her immigration status despite having been convicted of several deportable offense. Indeed, one of the prosecutors who tried the case against Mr. Cruz-Garcia personally wrote and signed a letter in support of her bid to adjust her immigration status. Ex. 113. And, as with Mr. Santana, there is significant evidence that Ms. Rodriguez testified falsely. *See infra* Claim Five § C. Contrary to her testimony that Mr. Cruz-Garcia's departure from Houston was unexpected and that she had not seen him for months prior to his supposed confession, law enforcement records reflect that Ms. Rodriguez was living with Mr. Cruz-Garcia in the Dominican Republic. ECF No. 18–15. And evidence further establishes that Mr. Cruz-Garcia had been preparing to return to the Dominican Republic for a long while by building a house there. ECF Nos. 18–81; 18–91.

In short, the only forensic evidence tying Mr. Cruz-Garcia to the facts of the offense, described by the State as "the most damning" evidence against Mr. Cruz-Garcia, has since been almost entirely recanted by the State. *See* ECF No. 18–11. Contrary to the State's closing argument, the DNA evidence as corrected does not establish Mr. Cruz-Garcia's identity as Ms. Garcia's assailant, does not exclude Mr. Santana as a potential assailant, and leaves open the possibility of an

unknown assailant. Moreover, records and witness recollection since trial undercut the strength of the remaining DNA evidence. Finally, neither Mr. Santana nor Ms. Rodriguez can be credited as credible witnesses in the light of the State's post-trial conduct in their favor, as well as other new uncovered evidence undermining their credibility. Mr. Cruz-Garcia further incorporates by reference all facts alleged in support of Claims Four and Five. Based on the corrected DNA evidence, in combination with the lack of credibility of the State's key witnesses against Mr. Cruz-Garcia, "no reasonable juror would have found [Mr. Cruz-Garcia] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 326. Because Mr. Cruz-Garcia can establish that he is actually innocent, this Court should consider his constitutional claim so as to avoid a miscarriage of justice.

**Claim Three:   Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated when his conviction was secured based on inaccurate and unreliable DNA evidence.**

The Eighth Amendment's heightened reliability requirement and the Due Process Clause under the Fourteenth Amendment were violated when the State obtained Mr. Cruz-Garcia's conviction based on inaccurate and unreliable DNA evidence.

### A.   The DNA evidence relied on by the State to secure Mr. Cruz-Garcia's conviction was unreliable.

The DNA evidence relied on by the State was unreliable and neither established that Mr. Cruz-Garcia was the assailant who sexually assaulted Ms. Garcia nor confirmed Mr. Santana's account of the night of the offense. By the time of Mr. Cruz-Garcia's trial, the HPD Crime Lab, and the DNA Section in particular, had been linked by an independent investigation to several miscarriages of justice. *See* ECF No. 18–61; 31 RR Def. Exs. 1–4; 32 RR Def. Exs. 5–7; *supra* Claim Two § A. That investigation specifically identified a significant number of issues directly relevant to the DNA evidence relied on by the State to secure Mr. Cruz-Garcia's conviction. Namely, the

investigation flagged as problem areas the storage of rape kits such as that stored by the HPD Crime Lab and relied on by Orchid Cellmark in this case, the work of Dr. Sharma (who was the lead DNA analyst in connection with the forensic evidence relied on by the State), and the analysis of DNA mixtures of the type at issue in Mr. Cruz-Garcia's case. *Id.*

Indeed, the independent investigation identified two of the locations at which forensic evidence relied on in the case against Cruz-Garcia was stored, 1200 Travis St. and Goliad St., as suffering from serious problems and likely to result in the contamination and degradation of forensic evidence. 31 RR Def. Ex. 3. Finally, employee complaint histories and criminal records implicated at least three HPD Crime Lab employees (Dr. Baldev Sharma, Joseph Chu, and Deetrice Wallace) who were directly involved in receiving, processing, and storing the DNA evidence that was then relied on by the State to secure Mr. Cruz-Garcia's conviction. 34 RR Def Exs. 12–18; Ex. 132. The unreliability of the DNA evidence relied on by the State is best summed up by the State's closing argument with respect to the DNA evidence: "I don't care about quality control." 23 RR 90.

**B. The DNA evidence relied on by the State was inaccurate.**

In 2015, after Mr. Cruz-Garcia had filed his initial application for habeas corpus relief in the state court, the State published an amended DNA report that established that the DNA results introduced at trial to tie Mr. Cruz-Garcia to the facts of offense were inaccurate. ECF No. 18–11. At trial, the State's expert witnesses testified that Mr. Cruz-Garcia could not be excluded as a contributor to the DNA on the vaginal swabs and as contributor to the major DNA sample on the underwear. 21 RR 112. He also testified that Mr. Rodriguez could not be excluded as a contributor to the DNA on the vaginal swabs and as a contributor to the minor DNA sample on the underwear cutting. *Id.* Contrary to that testimony, the amended DNA report stated that no conclusions could

be drawn as to the identity of any contributors to the DNA on the vaginal swabs, nor as to the identity of the minor contributor to the DNA on the underwear cutting. ECF No. 18–11.

In short, Mr. Cruz-Garcia should never have been linked to the DNA from the vaginal swabs. And there is no evidence that Mr. Rodriguez must have been the other DNA profile, whether on the underwear or vaginal swabs, such that only Mr. Cruz-Garcia could have been the perpetrator of the assault. Hence, contrary to the State's characterization of the DNA evidence in closing argument, the DNA evidence did not establish that Mr. Cruz-Garcia must have sexually assaulted Ms. Garcia to the extent that the only other DNA profile was that of her husband's; and the DNA evidence did not establish that Mr. Santana was truthful in recounting that he had remained in the car during the offense to the extent his DNA profile was not identified on the sexual assault kit. 23 RR 82, 93.

**C.  The State's reliance on unreliable and inaccurate DNA evidence violated the Eighth Amendment's heightened reliability requirement and the Due Process Clause of the Fourteenth Amendment.**

Reliance upon unreliable evidence to secure a conviction and death sentence violates the Eighth Amendment heightened reliability requirement and the Due Process clause of the Fourteenth Amendment. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (holding that Eighth Amendment violated where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"); *Townsend v. Burke*, 334 U.S. 736, 740–41 (1948) (holding that due process violated when court relies on "extensively and material false" evidence to impose sentence). Because the State relied on evidence that neither satisfied the heightened reliability requirement under the Eighth Amendment or the Due Process Clause under the Fourteenth Amendment, Mr. Cruz-Garcia is entitled to a new trial.

**D.  This court can review this claim *de novo* to avoid a fundamental miscarriage of justice.**

Mr. Cruz-Garcia raised this claim as Claim 3 in his second subsequent application for state

habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 at *1. This claim is therefore exhausted and procedurally defaulted. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

**Claim Four:   Mr. Cruz-Garcia's Sixth Amendment right to effective assistance of counsel was violated.**

   **A.  The Sixth Amendment guarantees the right to effective representation.**

The Sixth Amendment guarantees every criminal defendant the right to effective representation at trial. To prove ineffective assistance of counsel, an applicant must show that his counsel performed deficiently and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

An applicant establishes deficient performance by showing that trial counsel's performance fell below an objective standard of reasonableness. *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020). In death penalty cases, trial counsel's performance is deficient when it was "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). The American Bar Association (ABA) standards, which the Supreme Court "has long referred to as 'guides to determining what is reasonable,'" play an important role in assessing counsel's performance. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688). Because the ABA standards reflect the "[p]revailing norms of practice," *Strickland*, 466 U.S. at 688, they are "valuable measures of the prevailing professional norms of effective representation," *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).

In assessing trial counsel's performance, courts look to the guidelines that were in effect at the time of trial. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009). Where the "prevailing professional norms" as expressed in the ABA standards are different from the "most common customs" of defense attorneys in a particular locale, the prevailing professional norms nonetheless govern trial counsel's performance. *Harrington v. Richter,* 562 U.S. 86, 88 (2011). That is, a culture of deficiency does not shelter trial counsel's performance from constitutional accountability. The guidelines applicable to Mr. Cruz-Garcia's case include the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2005) (the "ABA Guidelines") and the ABA Standards for Criminal Justice (3d ed. 1993) (the "ABA Standards"), as well as the State Bar of Texas Guidelines and Standards for Texas Capital Counsel, 69 Tex. B.J. 966 (2006) (the "Texas Guidelines"). See *Trevino v. Thaler*, 569 U.S. 413, 426 (2013) (citing the Texas Guidelines).

Courts apply a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under Strickland." *Rompilla v. Beard*, 545 U.S. 374, 393–94 (2005) (O'Connor, J., concurring). An applicant establishes prejudice when he shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94. An applicant does not need to show that trial counsel's deficient performance "more likely than not altered the outcome" in his case. *Id.* at 693. Rather, the applicant need only show that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112. Because Texas requires a unanimous jury verdict, prejudice "requires only 'a reasonable probability that at least one juror would have struck a

different balance'" in answering Texas's special issues. *Andrus*, 140 S. Ct. 1886 (quoting *Wiggins*, 539 U.S. at 537). Because Mr. Cruz-Garcia can show deficient performance and prejudice, he is entitled to a new trial.

## B.  Caseload and fee guidelines for Texas death penalty cases.

### 1.  Texas and ABA Guidelines require counsel to limit their caseload.

One of the most important obligations of capital counsel is to maintain a manageable caseload. All lawyers "have an ethical obligation to control their workloads so that every matter they undertake will be handled diligently and competently." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 06-441, at 9 (2006). ABA Guideline 10.3 provides that "[c]ounsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines." ABA Guideline 10.3. Texas Guideline 9.3(B) provides additional detail. It requires counsel to "give priority to death penalty clients over their other caseload." It also requires that if counsel finds themself "overextended" "such that reasonable time is not available to properly complete the tasks necessary for providing quality representation," they are required to "notify the court." Texas Guideline 9.3(C). If counsel find themselves overextended, they are also required to request legal assistance, withdraw from the case, or "take steps to reduce other case load matters." *Id.*

The reasons for limits to capital counsel's caseload are obvious. "A sleep-deprived member of a capital defense team, no matter how talented or dedicated, cannot provide competent representation if his or her workload does not provide the time necessary to handle these extraordinarily taxing engagements." Lawrence J. Fox, *Capital Guidelines and Ethical Duties: Mutually Reinforcing Responsibilities*, 36 HOFSTRA L. REV. 775, 783 (2008). Because death penalty cases "are

intense emotionally and demanding of one's time," even the "best of intentions cannot overcome an excessive workload." *Id.* at 784.

> **2. The Texas Indigent Defense Commission has concluded that five is the maximum number of death penalty cases a fulltime capital practitioner can handle.**

Facing a "statewide crisis in the criminal defense system," the Texas legislature passed the Fair Defense Act ("FDA") in 2001. James D. Bethke and Morgan Shell, *Public Defense Innovation in Texas*, 51 IND. L. REV. 111, 112 (2018). "A key component of the Act was the creation of the Task Force on Indigent Defense," which was subsequently renamed the Texas Indigent Defense Commission ("TIDC"). *Id.* TIDC "distributes funds to counties, monitors their compliance with state and constitutional requirements, provides counties technical support, and develops Texas indigent defense policies." *Id.*

The TIDC studied the issue of appointed counsel caseloads for both death penalty and non-death penalty cases. In 2013, the TIDC ordered an assessment of the Regional Public Defender for Capital Cases Office ("RPDO") from the Public Policy Research Institute of Texas A&M University. Ex. 142. The RPDO was created by TIDC in 2008 "to make high-quality capital defense representation more accessible in small and mid-sized jurisdictions," whose budgets could otherwise become overwhelmed by the costs of a capital case. Bethke & Shell, *Public Defense Innovation in Texas*, 51 IND. L. REV. at 115. The RPDO does so by employing salaried attorneys who "specialize exclusively in capital defense services." Ex. 142 at 24, 29. RPDO staffs each case with two attorneys, an investigator, and a mitigation specialist. *Id.* at vii.

When it funded the creation of the RPDO, TIDC mandated that each attorney's caseload not exceed five active cases to ensure effective representation. *Id.* at 2. The 2013 assessment found

that RPDO respected the five-case maximum, with each attorney averaging four cases. *Id.* at 24. The assessment concluded that the five-cases-per-attorney cap was important to RPDO's ability to provide capital representation consistent with the Texas Guidelines. *Id.* at 2.

Three years later, however, TIDC commissioned another report on RPDO. The assessment, which RPDO joined TIDC in requesting, was conducted by the National Association of Public Defense ("NAPD"). The NAPD found that caseloads had increased, with the cap being raised to six cases per attorney. Ex. 145. The report criticized this development, noting that "[t]here are other places in the country where the caps are significantly lower than that maintained by RPDO, including some with a cap of one or two open cases at a time." *Id.* The report concluded that "six capital cases appears to be too high to comply with the ABA Guidelines." *Id.* at 12.

The lessons from the TIDC reports are clear: An attorney who works exclusively on death penalty cases—as part of a team with at least one other attorney, an investigator, and a mitigation specialist—can handle up to, but no more than, five capital cases to remain compliant with the prevailing professional guidelines.

### 3. TIDC has also closely studied felony caseloads.

TIDC has also looked at the issue of appointed counsel caseloads for non-capital cases. For many years, the default standard for a non-capital caseload was that developed by the National Advisory Commission on Criminal Justice Standards and Goals in 1973. Ex. 144. The "NAC standards," as they became known, provided that caseloads should not exceed 150 felony cases a year. *Id.* According to a September 2013 Report from the Council of State Governments Justice Center, the Harris County Public Defender's Office adhered to the NAC standards, with a caseload cap of 150 felony cases per year and a goal of 30–35 cases open at any given time. Ex. 147.

In 2013, the Texas Legislature instructed TIDC to "conduct and publish a study for the purpose of determining guidelines for establishing a maximum allowable caseload for a criminal defense attorney that, when the attorney's total caseload . . . is considered, allows the attorney to give each indigent defendant the time and effort necessary to ensure effective representation." Tex. H.B. 1318, 83rd Leg., R.S. (2013). The legislature further directed that "[t]he study must be based on relevant policies, performance guidelines, and best practices." *Id.*

TIDC's 2015 report strongly criticized the NAC standards as outdated and lacking an empirical foundation. Ex. 144. Based on an exhaustive analysis of Texas criminal defense practice, the report concluded that caseloads should be capped according to the degree of offense. The report concluded that:

> for the delivery of reasonably effective representation attorneys should carry an annual full-time equivalent caseload of no more than the following:
> - 236 Class B Misdemeanors;
> - 216 Class A Misdemeanors;
> - 174 State Jail Felonies;
> - 144 Third Degree Felonies;
> - 105 Second Degree Felonies; or
> - 77 First Degree Felonies.

*Id.* at 34. The TIDC has criticized Harris County for failing to adhere to the caseload guidelines for appointed counsel. Ex. 146 at 15; Ex. 143 at 11. Indeed, in 2016, TIDC found that Harris County's appointment system was so badly flawed and led to such high caseloads that it failed TIDC's standard for being a "fair, neutral, and nondiscriminatory system." Ex 146.

**4. Both the ABA and the Texas Guidelines prohibit fixed-fee arrangements in death penalty cases.**

Like workload, fee structure is critical to ensure that counsel provide adequate representation in capital cases. Fox, *Capital Guidelines and Ethical Duties*, 36 HOFSTRA L. REV. at 777–78 ("Given the fact that the prosecution in capital cases will likely be represented by well-funded and skilled specialists, issues of fees and workload have become central to the defense team's duty of competent performance imposed by Rule 1.1.").

Both the Texas and ABA Guidelines prohibit the use of flat fees in death penalty cases. Texas Guideline 8.1.B.1 ("Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases."); ABA Guideline 9.1.B.1 (same). Fixed fees are prohibited by the Guidelines for obvious reasons: "When assigned counsel is paid a predetermined fee for the case regardless of the number of hours of work actually demanded by the representation, there is an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee." ABA Guideline 9.1, Cmt. "The possible effect of such rates is to discourage lawyers from doing more than what is minimally necessary to qualify for the flat payment." *Id.* (quoting commentary to Standard 5-2.4 of the ABA Standards for Criminal Justice: Providing Defense Services).

### C. Background regarding Mr. Cruz-Garcia's trial counsel.

#### 1. Mr. Cruz-Garcia's family raised money to retain counsel for him.

On February 16, 2010, the Court appointed Mike Fosher as first chair counsel for Mr. Cruz-Garcia. 1 CR 8. Mario Madrid was appointed as co-counsel on March 3, 2010. 1 CR 11. Members of Mr. Cruz-Garcia's family, however, raised sufficient funds through their church to retain private counsel. ECF No. 18-85 at 9. They hired Steven Shellist and Christian Capitaine to represent Mr. Cruz-Garcia in April of 2010. *Id.*

    **2.  When the State decided to seek the death penalty, Mr. Cruz-Garcia's retained counsel were forced to withdraw and Mr. Cornelius and Mr. Madrid were appointed to represent Mr. Cruz-Garcia.**

Mr. Shellist and Mr. Capitaine worked on Mr. Cruz-Garcia's case until August 2011. When the State decided to seek the death penalty, however, they withdrew from the case. 2 CR 326; 4 RR 4–10; ECF No. 18- 6. On August 31, 2011, the court appointed Mr. Cornelius as lead counsel and Mr. Madrid as second chair. 1 CR 57–58.

    **3.  Trial counsel sought and received compensation for their representation of Mr. Cruz-Garcia on a flat-fee basis, in contravention of Texas Guideline 8.1.B.1 and ABA Guideline 9.1.B.1.**

The Texas and ABA Guidelines are clear: flat fees "are improper in death penalty cases." Texas Guideline 8.1.B.1; ABA Guideline 9.1.B.1. Mr. Cornelius nonetheless sought and received a $65,000 flat fee for his representation of Mr. Cruz-Garcia. ECF No. 18-7. Mr. Cornelius's second chair counsel, Mr. Madrid, likewise sought and received a $60,000 flat fee. 2 CR 375–76. Although flat fees are prohibited by both the ABA and Texas Guidelines, they have long been permitted as part of the Harris County appointment system that TIDC concluded failed the "fair, neutral, and nondiscriminatory" test. Ex. 146. In 2013, the presumptive flat fee was $35,000.00 for first-chair counsel and $30,000.00 for second chair. ECF No. 18-7 at 1. Mr. Cornelius justified his being paid a near-doubling of the presumptive flat fee on the grounds that the case was "more than 19 years old" and was "very complex." 2 CR 372. Mr. Cornelius also told the court that "[i]n all likelihood there will be a multitude of expert witnesses on many different elements of the various cases."[15] 2 CR 373. He also emphasized Mr. Cruz-Garcia's ties to Puerto Rico, telling the court that the case

---

[15] It is unclear what Mr. Cornelius meant by the "various cases."

"involves numerous extraneous offenses, both in Texas and in Puerto Rico" and that "[d]efendant's family lives in Puerto Rico, as well as in Texas and other cities." 2 CR 372.

As discussed above, the problem with flat fees in death penalty cases is that they create "an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee." ABA Guideline 9.1, Cmt. Flat fees also impede accountability for appointed counsel. Indeed, because they were working on a flat fee, neither Mr. Cornelius nor Mr. Madrid kept contemporaneous time entries of their representation of Mr. Cruz-Garcia. Yet, as described below, an analysis of Mr. Cornelius's billing records in other cases shows that the exact situation the prohibition of flat fees was meant to prevent occurred in Mr. Cruz-Garcia's case: Mr. Cornelius did not "give priority" to Mr. Cruz-Garcia's case. Instead, he worked relentlessly on other, hourly-billed cases from the beginning of jury selection in Mr. Cruz-Garcia's case on June 3, 2013, until sentencing on July 22, 2013. *See* Ex. 138.

### 4. Mr. Cornelius's crushing caseload far exceeded reasonable standards.

Throughout his representation of Mr. Cruz-Garcia, Mr. Cornelius carried a caseload far in excess of TIDC standards. Harris County did not track counsel caseloads during the 2011 to 2013 time period, which corresponds to Mr. Cornelius's appointment to Mr. Cruz-Garcia's case. Accordingly, the only way to determine Mr. Cornelius' caseload is to identify and count each of his individual appointments. The appointments Mr. Cruz-Garcia has been able to identify paint an extremely troubling picture of Mr. Cornelius's caseload.[16]

---

[16] Mr. Cruz-Garcia used the docket searching feature of the Harris County District Clerk's website to attempt to identify the capital cases to which Mr. Cornelius was appointed during his representation of Mr. Cruz-Garcia. Because there is no centralized repository for appointments, though, he cannot be certain that he has identified all of Mr. Cornelius's appointments.

The chart below summarizes Mr. Cornelius's capital murder appointments while he served as Mr. Cruz-Garcia's lead counsel. The documents underlying Figure 1 are included in Exhibit 138 and Exhibit 148, showing when Mr. Cornelius was appointed and when representation concluded, and billing in corresponding cases.[17]

**Figure 1:** Mr. Cornelius's capital appointments during his representation of Mr. Cruz-Garcia.[18]

| Case | Type | Appt. | End |
|------|------|-------|-----|
| Andre Sloan | Non-Death | 09/21/10 | 05/25/12 |
| Herbert Nash | Non-Death | 03/10/10 | 09/30/11 |
| **Lucky Ward** | **Death** | **03/02/11** | **09/17/13** |
| Kevin Owens | Non-Death | 04/12/11 | 01/27/14 |
| Judy Hambrick | Non-Death | 04/18/11 | 12/20/12 |
| Bobby Jones | Non-Death | 04/19/11 | 06/08/12 |
| Charles Grabow | Non-Death | 04/24/11 | 01/22/13 |
| **Jeffery Prevost** | **Death** | **05/24/11** | **04/05/14** |
| Daryl Reed | Non-Death | 11/14/11 | 08/23/13 |
| Astin Johnson | Non-Death | 01/30/12 | 01/31/13 |
| Shawn Mayreis | Non-Death | 03/29/12 | 08/08/13 |
| Justin McGee | Non-Death | 05/07/12 | 12/12/13 |
| **Neil Mukherjee** | **Death** | **12/04/12** | **11/14/15** |
| **Juan Reyes** | **Death** | **12/13/12** | **04/04/14** |
| Anthony Alegria | Non-Death | 01/11/13 | 10/01/14 |
| **Curtis Adams** | **Death** | **01/13/13** | **07/15/15** |
| Neva Jane Gonzalez | Non-Death | 02/06/13 | 02/13/14 |
| Johntay Gibson | Non-Death | 02/25/13 | 07/14/14 |
| Randy Segura | Non-Death | 04/24/13 | 11/17/14 |

[17] Billing records from Mr. Cornelius's capital cases are included with his non-capital billing records. The fact that some of the cases were death penalty cases is only apparent from the billing records. Mr. Cornelius's billing records in the Juan Reyes case include a notation that it was a death case until January 2014, six months after Mr. Cruz-Garcia's trial ended. Likewise, Mr. Cornelius's billing records in the Neil Mukherjee case state that the State was seeking the death penalty against Mr. Mukherjee at the time Mr. Cornelius withdrew from the representation in November 2015. Mr. Cornelius's billing records in the Curtis Adams, Lucky Ward, and Jeffery Prevost cases also indicate that those cases were death penalty cases.

[18] The documents underlying **Figure 1** are collected in Exhibits 138 and 148. Exhibit 148 contains appointment orders and documents indicating when Mr. Cornelius's representation ended. In some instances, to see that the case was a death case, it is necessary to look to Exhibit 138. The duration of Mr. Cornelius's involvement is also evidenced in the billing records in Exhibit 138.

| Case | Type | Appt. | End |
|------|------|-------|-----|
| Tyran Riley | Non-Death | 05/13/13 | 01/08/15 |
| Osman Irias | Non-Death | 06/21/13 | 04/07/14 |

The documents in Exhibits 138 and 148 show that between August 2011, when he was appointed to Mr. Cruz-Garcia's case, and June 2013, when jury selection began in Mr. Cruz-Garcia's case, Mr. Cornelius worked six non-death capital murder cases to conclusion. These records also show that at the time of Mr. Cruz-Garcia's trial, Mr. Cornelius had six active death penalty cases, including Mr. Cruz-Garcia's. As the 2016 TIDC report on RPDO found, "six capital cases appears to be too high to comply with the ABA Guidelines." Ex. 145 at 12. That figure of six cases further assumes that the attorney works on no other cases and is part of a team comprised of co-counsel, a mitigation specialist, and an investigator. As discussed *infra* in Section G, trial counsel did not retain a mitigation specialist in Mr. Cruz-Garcia's case.

Moreover, in addition to the six death penalty cases Mr. Cornelius was appointed to, he was appointed to at least ten non-death capital cases, two of which[19] he tried to verdict within a month of concluding Mr. Cruz-Garcia's trial. In the time period between when Mr. Cornelius was appointed to represent Mr. Cruz-Garcia and the trial, Mr. Cornelius saw another six non-death capital cases to conclusion. In total, Mr. Cornelius worked on six death cases and at least sixteen non-death capital murder cases while representing Mr. Cruz-Garcia.

Mr. Cornelius's capital murder docket alone put his caseload far above the TIDC limit of five death cases per full-time capital attorney. Yet, Mr. Cornelius also carried hundreds of non-capital felony cases. Again, although there is no central repository of case appointments in Harris County for the relevant time period, Mr. Cruz-Garcia has identified as many of Mr. Cornelius's

---

[19] Shawn Mayreis and Daryl Reed.

appointments as he could during the time period from September of 2010 to the date of Mr. Cruz-Garcia's trial in 2013. A list of Mr. Cornelius's non-capital appointments from one year before he was appointed to represent Mr. Cruz-Garcia until the end of Mr. Cruz-Garcia's trial is included below in **Figure 2**. The documents underlying Figure 2, including appointment orders and indictments, are collected in Exhibit 139.

As indicated by Figure 2, Mr. Cornelius was appointed to over 500 felony cases in the less-than-three-year period from September 2010 to July 2013.[20] In 2012 alone, Mr. Cornelius was appointed to over 250 felony cases. During his less-than-two-year representation of Mr. Cruz-Garcia, Mr. Cornelius was appointed to over 400 felony cases.

The TIDC guidelines provide that attorneys should not handle more than 144 cases per year, assuming all the cases are third degree felonies. Yet, much of Mr. Cornelius's caseload consisted of first degree felonies such as non-capital murder, aggravated robbery, aggravated assault, aggravated kidnapping, and aggravated sexual assault. The TIDC guidelines dictate that attorneys should not take on more than 77 first-degree felonies in one year, assuming the attorney has no other cases.

**Figure 2:** Mr. Cornelius's felony appointments from September 2010 to July 2013.[21]

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1276750 | Sept. 7, 2010 | Robert Edwin Lewis | Burglary of a habitation |
| 1276472 | Sept. 7, 2010 | Anthana Denmon | Aggravated Assault with a deadly weapon |
| 1276473 | Sept. 7, 2010 | Anthana Denmon | Aggravated Assault |
| 1276862 | Sept. 7, 2010 | Truett Lane Finch | Burglary of a habitation |
| 1276580 | Sept. 7, 2010 | Angela Michelle Palmer | Prostitution |
| 1276950 | Sept. 8, 2010 | Johnny Dawon Hall | Aggravated Robbery – Deadly Weapon |

---

[20] The time period from September 2010 to July 2013 encompasses the period when Mr. Cornelius represented Mr. Cruz-Garcia as well as the year prior. The number of case Mr. Cornelius accepted in the year prior to appointment to Mr. Cruz-Garcia's case is relevant because many of those cases likely remained ongoing during Mr. Cornelius appointment to Mr. Cruz-Garcia's case.

[21] The documents underlying Figure 2 are collected in Exhibit 139.

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1277012 | Sept. 8, 2010 | Lawrence Price | Aggravated Assault – Family Member |
| 1277059 | Sept. 8, 2010 | Rafael Ochoa Flores | Aggravated Assault |
| 1277381 | Sept. 13, 2010 | Johnny Oneal Rosborough | Delivery of a Controlled Substance |
| 1277262 | Sept. 13, 2010 | Zeke Jermaine Rayford | Burglary of a habitation |
| 1277574 | Sept. 13, 2010 | Sheneka Henderson | Aggravated Assault |
| 1277739 | Sept. 14, 2010 | Elmer Yobany Martinez | Possession of a Controlled Substance |
| 1277801 | Sept. 14, 2010 | Eulalio Alejandro Garcia | Evading Arrest or Detention |
| 1277903 | Sept. 15, 2010 | Charles Stevens Woods | Endangering Child |
| 1277810 | Sept. 15, 2010 | Donald Wayne Lewis | Possession of a Controlled Substance |
| 1278042 | Sept. 16, 2010 | Steven Anthony Scanlon | Burglary of a habitation |
| 1278015 | Sept. 16, 2010 | Darla Jean Westerfield | Prostitution |
| 1278092 | Sept. 17, 2010 | Mary K. Beltran | Possession of a Controlled Substance |
| 1277782 | Sept. 17, 2010 | Louis Thomas | Assault – Family Violence – 2nd Offender |
| 1278835 | Sept. 24, 2010 | Deangelis Marshall | Robbery |
| 1281238 | Oct. 13, 2010 | Raymond Richardson | Sexual Assault |
| 1281569 | Oct. 18, 2010 | Clyde Eugene Bradford | Murder |
| 1282123 | Oct. 21, 2010 | Tredric Culclager | Murder |
| 1281298 | Oct. 25, 2010 | Henry Price | Aggravated Sexual Assault |
| 1281146 | Oct. 26, 2011 | Matthew Young | Aggravated sexual assault child under 14 |
| 1282084 | Oct. 29, 2010 | Leonard Keith Campbell | Burglary of a habitation |
| 1285192 | Nov. 15, 2010 | Charles Ellium Dees | Possession of a Controlled Substance |
| 1285814 | Nov. 19, 2010 | Ashley Trimont | Possession of a Controlled Substance |
| 1287718 | Dec. 7, 2010 | Floyd Edward Coleman | Aggravated Assault – Family Member |
| 1280414 | Dec. 8, 2010 | Brian Lynn Fairchild | Possession of a Controlled Substance |
| 1288400 | Dec. 13, 2010 | Tevlon John Campbell | Possession of a Controlled Substance |
| 1288718 | Dec. 16, 2010 | Christopher Cash Wilkins | Aggravated Robbery – Deadly Weapon |
| 1288977 | Dec. 17, 2010 | Gregory Scott Jelks | Possession with Intent to Deliver a Controlled Substance |
| 1289316 | Dec. 20, 2010 | Marvin Earl Rumley, II | Criminal Mischief |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1289228 | Dec. 20, 2010 | Paul Anthony Archer | Theft |
| 1289199 | Dec. 20, 2010 | Troy Bennings | Burglary of a habitation |
| 1289045 | Dec. 20, 2010 | Tyler Frank | Burglary of a habitation |
| 1289088 | Dec. 20, 2010 | Tyler Frank | Assault |
| 1287026 | Dec. 20, 2010 | Le-Charles Bryant | Aggravated Robbery – Deadly Weapon |
| 1294397 | Feb. 7, 2011 | Lorenzo Rogers | Possession with Intent to Deliver a Controlled Substance |
| 1292242 | Feb. 7, 2011 | Lorenzo Vonzell Rogers | Assault of a family member 2nd offender & impending breathing |
| 1290357 | Feb. 14, 2011 | Michael Walker | Burglary of a habitation |
| 1295252 | Feb. 14, 2011 | Ione Lashay Allen | Theft – Third Offender |
| 1290358 | Feb. 14, 2011 | Michael Walker | Burglary of a habitation |
| 1298168 | March 10, 2011 | Teddrick Batiste | Aggravated Robbery – Deadly Weapon |
| 1298422 | March 14, 2011 | Wilson Ennis Barker III | Delivery of a Controlled Substance |
| 1298423 | March 14, 2011 | Wilson Ennis Barker III | Possession of a Controlled Substance |
| 1298424 | March 14, 2011 | Wilson Ennis Barker III | Delivery of a Controlled Substance |
| 1298482 | March 14, 2011 | Frank G Garcia | Possession with Intent to Deliver a Controlled Substance |
| 1291793 | March 15, 2011 | Steven Hanks | Aggravated sexual assault child under 14 |
| 1300376 | March 28, 2011 | Desarian Oneal Cartwright | Burglary – Habitation |
| 1300296 | March 29, 2011 | Jesus Fedibiagini | Aggravated Kidnapping |
| 1300619 | March 30, 2011 | Leland Dazey | Possession of a Controlled Substance |
| 1296660 | April 1, 2011 | James Benton Thomas | Aggravated Assault – Family Member |
| 1287853 | April 4, 2011 | Kyle Bryant | Delivery of Marihuana |
| 1301372 | April 4, 2011 | Miguel Angel Mata | Assault of Family Member – Impeding Breathing |
| 1284004 | April 5, 2011 | Chalyn Stewart | Robbery |
| 1288687 | April 5, 2011 | Esmai Kyet | Aggravated sexual assault of a child 14-17 years of age |
| 1297534 | April 5, 2011 | Amanda Michelle Thornton | Possession with Intent to Deliver a Controlled Substance |
| 1301461 | April 5, 2011 | Jason Ryan Lafeur | Possession of a Controlled Substance |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1301618 | April 6, 2011 | Rafael Horazeo Gonzales | Possession of a Controlled Substance |
| 1301482 | April 6, 2011 | Percy Lee Freeman | Aggravated Assault – Family Member |
| 1301483 | April 6, 2011 | Percy Lee Freeman | Felon in Possession of Firearm |
| 1301484 | April 6, 2011 | Percy Lee Freeman | Possession of a Controlled Substance |
| 1301394 | April 6, 2011 | Justin Lott | Assault |
| 1301396 | April 6, 2011 | Justin Lott | Assault |
| 1299908 | April 6, 2011 | Leonardo Buentello | Theft |
| 1301661 | April 7, 2011 | Morris Banks | Theft |
| 1297594 | April 7, 2011 | Michael Anthony Reescano | Theft |
| 1301545 | April 7, 2011 | Michael Reescano | Theft – Third Offender |
| 1302237 | April 11, 2011 | Ricky Lee Vallejo | Aggravated Assault |
| 1302079 | April 11, 2011 | Vernis Elbert Boyd | Harassment of Public Servant |
| 1302038 | April 11, 2011 | Janice Renne Johnson | Possession of a Controlled Substance |
| 1302122 | April 11, 2011 | Jarvis Eugene Faultry | Aggravated Assault |
| 1302124 | April 11, 2011 | Jarvis Eugene Faultry | Possession of a Controlled Substance |
| 1301900 | April 11, 2011 | Vern Hayward McKinney | Controlled Substance Fraud – Prescription |
| 1302501 | April 13, 2011 | Brandon Lee West | Possession with Intent to Deliver a Controlled Substance |
| 1301953 | April 13, 2011 | Brandon West | Felon in Possession of Firearm |
| 1301954 | April 13, 2011 | Brandon West | Possession of Marihuana |
| 1302509 | April 13, 2011 | Christopher James Franks | Aggravated Robbery – Deadly Weapon |
| 1302510 | April 13, 2011 | Christopher James Franks | Aggravated Assault |
| 1297373 | April 19, 2011 | Bobby Jones | Aggravated Assault |
| 1302731 | April 18, 2011 | Judy Lucille Hambrick | Theft of Firearm |
| 1302700 | April 18, 2011 | John Henry Addison | Aggravated Assault – Family Member |
| 1298312 | April 17, 2011 | Ethel Ibarra | Possession with Intent to Deliver a Controlled Substance |
| 1303461 | April 25, 2011 | Mattheaus Reed | Possession of a Controlled Substance |
| 1292299 | April 26, 2011 | Vito Mario Murrugo | Aggravated Assault – Family Member |
| 1301177 | May 4, 2011 | Justin Abels | Bail Jumping and Failure to Appear |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1296922 | May 9, 2011 | Broderick Keon Ansley | Possession of Marihuana |
| 1296921 | May 9, 2011 | Broderick Keon Ansley | Possession with Intent to Deliver a Controlled Substance |
| 1305352 | May 9, 2011 | Broderick Keon Ansley | Tampering/Fabricating Physical Evidence |
| 1305885 | May 12, 2011 | Jimmy Calvin Parker | Aggravated Assault – Family Member |
| 1306894 | May 23, 2011 | Patrick Bernard Jackson | Aggravated Robbery – Deadly Weapon |
| 1307048 | May 23, 2011 | Calvin Lavergne | Aggravated Robbery – Deadly Weapon |
| 1307176 | May 23, 2011 | Manuel L. Luna | Assault of Family Member – Impeding Breathing |
| 1307028 | May 24, 2011 | Kenneth Robert Welters | Aggravated Assault – Family Member |
| 1307152 | May 24, 2011 | Torrance Keith Coleman | Possession of a Controlled Substance |
| 1307404 | May 25, 2011 | Tramella A. Waller | Possession of a Controlled Substance |
| 1307363 | May 25, 2011 | Julius Murray | Assault of Family Member Second Offender and Impeding Breathing |
| 1307331 | May 25, 2011 | Laura Kim Taylor | Deadly Conduct |
| 1281626 | May 26, 2011 | John Joe Valencia | Possession of a Controlled Substance |
| 1280866 | May 26, 2011 | Deshon Chantez Gilkey | Aggravated Assault |
| 1302296 | May 27, 2011 | Charles Douglas Grabow Jr. | Aggravated Assault |
| 1294356 | May 27, 2011 | Seaver Kardell Gordon | Aggravated Robbery – Deadly Weapon |
| 1307784 | June 17, 2011 | John Joe Valencia | Bail Jumping and Failure to Appear |
| 1295162 | June 21, 2011 | William Hernandez | Aggravated Robbery – Deadly Weapon |
| 1312658 | July 12, 2011 | Esmai Kyet | Robbery |
| 1310708 | July 13, 2011 | Kerri Lashun Livings | Aggravated Robbery – Deadly Weapon |
| 1313253 | July 18, 2011 | Orlando Salinas | Injury to Elderly Individual |
| 1312972 | July 18, 2011 | Tremayne Givens | Violation of Protective Order – Family Violence |
| 1315016 | Aug. 1, 2011 | Damian Orion Smith | Theft – Third Offender |
| 1314871 | Aug. 1, 2011 | James Byron McCauley | Burglary with Intent to Commit Theft |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1311512 | Aug. 4, 2011 | Donovan Charles Anderson | Credit/Debit Card Abuse |
| 1309645 | Aug. 4, 2011 | Donovan Charles Anderson | Assault – Family Member – 2nd Offender |
| 1315349 | Aug. 4, 2011 | Paul Curtis Rideaux | Assault of Family Member – Impeding Breathing |
| 1310753 | Aug. 5, 2011 | Steven Anthony Scanlon | Possession of Marihuana |
| 1315417 | Aug. 5, 2011 | Augustine M. Peralez | Credit/Debit Card Abuse |
| 1315123 | Aug. 5, 2011 | Claudia Elizabeth Munoz | Assault of Family Member – Impeding Breathing |
| 1315938 | Aug. 10, 2011 | Freddy Sanchez | Possession of a Controlled Substance |
| 1316066 | Aug. 11, 2011 | Janice Rena Johnson | Possession of a Controlled Substance |
| 1316076 | Aug. 11, 2011 | Jyamos Edward Maxie-Mouton | Assault of Family Member – Impeding Breathing |
| 1316088 | Aug. 11, 2011 | James Edward Lewis | Possession with Intent to Deliver a Controlled Substance |
| 1316171 | Aug. 12, 2011 | Kevin Antonio Owens | Aggravated Assault |
| 1316317 | Aug. 15, 2011 | Lissandro Pacheco | Burglary of a habitation |
| 1316230 | Aug. 15, 2011 | Nathan Edward Williams | Possession of a Controlled Substance |
| 1316432 | Aug. 15, 2011 | Sergio Luis Gil | Indecency with a Child |
| 1316522 | Aug. 16, 2011 | Juan Manuel Lucio-Lopez | Retaliation |
| 1316624 | Aug. 16, 2011 | Juan Manuel Lucio-Lopez | Aggregate Criminal Mischief |
| 1309846 | Aug. 16, 2011 | Johnathan Matthew Adams | Possession of a Controlled Substance |
| 1313015 | Aug. 17, 2011 | Alejandro Castillo | Possession of a Controlled Substance |
| 1316371 | Aug. 17, 2011 | Nija A. Brown | Assault – Family Violence – 2nd Offender |
| 1316714 | Aug. 17, 2011 | Christopher Bernard Hamlett | Theft – Third Offender |
| 1316737 | Aug. 17, 2011 | Jordan Lee Lane | Theft – Third Offender |
| 1298312 | Aug. 17, 2011 | Ethel Ibarra | Possession with Intent to Deliver a Controlled Substance |
| 1312234 | Aug. 18, 2011 | Zackery Lee Hayes | Aggravated Robbery – Deadly Weapon |
| 1316787 | Aug. 18, 2011 | Daniel Martinez | Assault of Family Member Second Offender and Impeding Breathing |
| 1316848 | Aug. 18, 2011 | William Griffin | Assault of Family Member – Impeding Breathing |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1316826 | Aug. 18, 2011 | Jeremy Michael Gonzalez | Possession of Marihuana |
| 1316603 | Aug. 18, 2011 | Kayla Michelle Matthews | Harassments of Public Servant |
| 1309558 | Aug. 18, 2011 | Gloria Torres | Aggregated Assault |
| 1283183 | Aug. 19, 2011 | Charles Chilcutt | Theft |
| 1316985 | Aug. 19, 2011 | Tamisha Renee Jones | Delivery of Marihuana |
| 1316953 | Aug. 19, 2011 | Christopher R. Rhodes | Assault – Family Violence – 2nd Offender |
| 1317205 | Aug. 22, 2011 | Kim Anthony Williams | Possession with Intent to Deliver a Controlled Substance |
| 1315485 | Aug. 25, 2011 | Dominic Rendon | Aggravated Robbery – Over 65 or Disable |
| 1304788 | Aug. 25, 2011 | Curtis Pugh | Aggravated Assault – Family Member |
| 1308710 | Sept. 1, 2011 | Colton Lavoire Harris | Burglary of habitation |
| 1318466 | Sept. 1, 2011 | Zacorrieon Tjontrae Nauling | Aggravated Robbery – Deadly Weapon |
| 1318985 | Sept. 6, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1313906 | Sept. 6, 2011 | Pete Ramos | Aggravated Robbery – Deadly Weapon |
| 1319096 | Sept. 7, 2011 | Stacy Demon Williams | Assault of Family Member Second Offender and Impeding Breathing |
| 1319138 | Sept. 8, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1305537 | Sept. 9, 2011 | Adolfo Martinez | Burglary with Intent to Commit Theft |
| 1319282 | Sept. 9, 2011 | Desmon Wayne Preston | Aggravated Robbery – Deadly Weapon |
| 1304487 | Sept. 9, 2011 | Adolfo Martinez | Theft |
| 1319301 | Sept. 9, 2011 | Adolfo Martinez | Theft – Third Offender |
| 1319241 | Sept. 9, 2011 | Alexander Scott | Aggravated Assault |
| 1318986 | Sept. 9, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1319441 | Sept. 12, 2011 | Valentina Rebecca Gonzales | Possession of a Controlled Substance |
| 1319596 | Sept. 12, 2011 | James Price Fagan | Driving While Intoxicated |
| 1319827 | Sept. 14, 2011 | Adrian Uriostigue | Burglary of habitation |
| 1319804 | Sept. 14, 2011 | Aaron Davon Kossie | Violation of Protective Order – Family Violence |
| 1320647 | Sept. 21, 2011 | Patrice Annette Breeler | Theft – Third Offender |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1320627 | Sept. 21, 2011 | Manuel S. Garcia | Assault – Family Violence – 2nd Offender |
| 1320744 | Sept. 22, 2011 | Roy Charles Findley | Burglary of habitation |
| 1319149 | Sept. 30, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1318694 | Sept. 30, 2011 | Zacorrien Jhontrae Nauling | Aggravated Robbery – Deadly Weapon |
| 1320838 | Oct. 3, 2011 | Kenneth Gradnigo | Aggravated Robbery – Deadly Weapon |
| 1321919 | Oct. 3, 2011 | Kyle Yamcey McWhorter | Injury to Elderly Individual |
| 1322105 | Oct. 3, 2011 | Kenneth Davonne Grandnigo | Evading Arrest or Detention – Second Offender |
| 1322034 | Oct. 3, 2011 | Robert Edward Byrd | Theft – Third Offender |
| 1317118 | Oct. 4, 2011 | Walter J. Gamble | Unauthorized use of a vehicle |
| 1320820 | Oct. 4, 2011 | Adam Wade Buchanan | Prohibited Weapons |
| 1322239 | Oct. 4, 2011 | Kyle Yamcey McWhorter | Burglary with Intent to Commit Theft |
| 1322236 | Oct. 4, 2011 | Alaniz Arturo Espinoza | Possession of a Controlled Substance |
| 1322212 | Oct. 5, 2011 | Jvarro Young | Assault – Family Violence – 2nd Offender |
| 1322415 | Oct. 6, 2011 | Terell D. Jones | Possession of a Controlled Substance |
| 1322453 | Oct. 6, 2011 | Jose Mendoza | Possession of a Controlled Substance |
| 1316148 | Oct. 7, 2011 | Nicholas Ray Bosley | Forgery |
| 1321806 | Oct. 7, 2011 | Ketrick Demonta White | Burglary of a habitation |
| 1322502 | Oct. 7, 2011 | Stefen Kennedy | Theft of Firearm |
| 1322501 | Oct. 7, 2011 | Stefen Kennedy | Aggravated Robbery – Deadly Weapon |
| 1322586 | Oct. 7, 2011 | Elbridge Brown | Delivery of a Controlled Substance |
| 1322568 | Oct. 7, 2011 | Mammie Lakeysha Nelson | Prostitution |
| 1297587 | Oct. 11, 2011 | Desmond Wayne Preston | Robbery |
| 1322591 | Oct. 14, 2011 | Anita Diamond Washington | Injury to Child – Omission |
| 1315900 | Oct. 24, 2011 | Stephanie Ann Kaiser | Theft by Check |
| 1325912 | Nov. 7, 2011 | Jamal Molizone | Aggravated Assault – Family Member |
| 1326108 | Nov. 7, 2011 | Clifford Jones | Aggravated Assault |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1316831 | Nov. 8, 2011 | John V. Danna | Assault – Family Violence – 2nd Offender |
| 1326363 | Nov. 10, 2011 | Thanh Kim Hoang | Aggravated Robbery – Deadly Weapon |
| 1327392 | Nov. 18, 2011 | Frank Kenneth Burnett | Possession of a Controlled Substance |
| 1327299 | Nov. 18, 2011 | Pete Ramos | Burglary of a habitation |
| 1327734 | Nov. 21, 2011 | Angelica Lee Serrano | Murder |
| 1324880 | Nov. 21, 2011 | Charles Douglas Garbow Jr. | Aggravated Robbery – Deadly Weapon |
| 1324881 | Nov. 21, 2011 | Charles Douglas Garbow Jr. | Tampering/Fabricating Physical Evidence |
| 1329482 | Dec. 9, 2011 | Selina Ruby Dominguez | Burglary of a habitation |
| 1329698 | Dec. 12, 2011 | Chezare Rivers | Possession with Intent to Deliver a Controlled Substance |
| 1329463 | Dec. 19, 2011 | Casey Albert Smith | Aggravated Assault |
| 1330357 | Dec. 19, 2011 | Viola Robles | Burglary of a habitation |
| 1330238 | Dec. 19, 2011 | Desmon Wayne Preston | Aggravated Robbery – Deadly Weapon |
| 1330156 | Jan. 9, 2012 | Selina Ruby Dominguez | Burglary of a habitation |
| 1333822 | Jan. 23, 2012 | Ashley Lanerica Jackson | Burglary of a habitation |
| 1334082 | Jan. 23, 2012 | Jose Sorto | Driving While Intoxicated |
| 1334143 | Jan. 23, 2012 | Nathan Lee Shelton | Aggravated Assault |
| 1333840 | Jan. 23, 2012 | Brian Anthony Pendarvis | Burglary of a habitation |
| 1333885 | Jan. 23, 2012 | Joshua William Anderson | Controlled Substance Fraud – Prescription |
| 1332389 | Jan. 23, 2012 | Joshua William Anderson | Possession with Intent to Deliver a Controlled Substance |
| 1326314 | Jan. 24, 2012 | Melvin Glens Black | Possession of a Controlled Substance |
| 1329804 | Jan. 24, 2012 | Glinda Gail Bustaman | Injury to Child |
| 1334238 | Jan. 24, 2012 | Ronnie Antonio Jordan | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1334208 | Jan. 24, 2012 | Mark Johnson | Possession of a Controlled Substance |
| 1310478 | Jan. 24, 2012 | Brandon Bridges | Aggravated Robbery – Deadly Weapon |
| 1310225 | Jan. 24, 2012 | Brandon Joseph Bridges | Aggravated Robbery – Deadly Weapon |
| 1308369 | Jan. 24, 2012 | Brandon Joseph Bridges | Unauthorized Use of a Vehicle |
| 1334334 | Jan. 25, 2012 | Priscilla Lee Gonzalez | Theft – Third Offender |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1334435 | Jan. 26, 2012 | Adrian R. Jameson | Criminal Mischief |
| 1334354 | Jan. 26, 2012 | Ivory S. Delaney | Robbery |
| 1334370 | Jan. 26, 2012 | Christopher Laderrick Amos | Engaging in Organized Criminal Activity |
| 1334416 | Jan. 26, 2012 | Torrey Taylor | Aggravated Robbery – Deadly Weapon |
| 1293300 | Jan. 27, 2012 | Angela Geething | Robbery |
| 1334611 | Jan. 27, 2012 | Bruce Kevin Curry | Theft – Third Offender |
| 1334592 | Jan. 27, 2012 | Chatham Hayes Summers | Theft of Metal |
| 1318215 | Jan. 27, 2012 | David Michael Cain | Driving While Intoxicated |
| 1299894 | Jan. 27, 2012 | Latosha Crawford | Theft $1,500-$20,000 (Food Stamps/Snap) |
| 1309773 | Feb. 1, 2012 | Jeremy Wayne Williams | Criminal Mischief |
| 1314000 | Feb. 1, 2012 | Jeremy Wayne Williams | Burglary of Habitation |
| 1318992 | Feb. 1, 2012 | Jeremy Williams | Evading Arrest or Detention – Second Offender |
| 1322789 | Feb. 6, 2012 | Christopher Barillas | Felon in Possession of Firearm |
| 1328640 | Feb. 6, 2012 | Walid Pervez | Driving While Intoxicated with Child Passenger |
| 1335869 | Feb. 6, 2012 | Xin Gu | Forgery – Government Instrument |
| 1335870 | Feb. 6, 2012 | Xin Gu | Theft – Aggregate |
| 1336016 | Feb. 6. 2012 | Yalobeth Levorn Jarra | Possession of a Controlled Substance |
| 1331220 | Feb. 6, 2012 | David Anthony Torreence | Possession of a Controlled Substance |
| 1336036 | Feb. 7, 2012 | Adam Daniel Martinez | Driving While Intoxicated |
| 1335983 | Feb. 7, 2012 | Christian Blair Pillow | Possession of a Controlled Substance |
| 1331011 | Feb. 8, 2012 | Oscar Perez | Injury to Child |
| 1336160 | Feb. 8, 2012 | Richard Allen Powell | Burglary of a motor vehicle |
| 1336271 | Feb. 9, 2012 | Muntaser Hazem Judeh | Possession with Intent to Deliver a Controlled Substance |
| 1336273 | Feb. 9, 2012 | Muntaser Hazem Judeh | Harassment of Public Servant |
| 1326527 | Feb. 9, 2012 | Muntaser Hazem Judeh | Aggravated Assault |
| 1296263 | Feb. 9, 2012 | Reginald Tyrone Hollins | Aggravated Robbery – Deadly Weapon |
| 1311807 | Feb. 9, 2012 | Carrington Taylor | Burglary with Intent to Commit Theft |
| 1335652 | Feb. 10, 2012 | Roy Alejos | Theft – Third Offender |
| 1336425 | Feb. 10, 2012 | Jason Andrew Burrow | Driving While Intoxicated |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1336461 | Feb. 10, 2012 | Cedric Brown | Aggravated Robbery – Deadly Weapon |
| 1336485 | Feb. 10, 2012 | Matthew Wade Brown | Driving While Intoxicated |
| 1298272 | Feb. 13, 2012 | Leroy D. Taylor | Possession of a Controlled Substance |
| 1336575 | Feb. 13, 2012 | Leroy Devonte Taylor | Burglary of a habitation and theft |
| 1308624 | Feb. 16, 2012 | Pete Fulgencio Ramos | Aggravated Robbery – Deadly Weapon |
| 1337289 | Feb. 17, 2012 | Ronald Glen Simon | Theft – Third Offender |
| 1324169 | Feb. 28, 2012 | Biance Chintel Lewis | Theft – Third Offender |
| 1339165 | March 5, 2012 | Robert Lee Busby | Retaliation |
| 1339164 | March 5, 2012 | Robert Lee Busby | Arson |
| 1339134 | March 5, 2012 | Mandy Lea Melder | Possession of a Controlled Substance |
| 1339699 | March 9, 2012 | Don Morris Washington | Possession of a Controlled Substance |
| 1338227 | March 14, 2012 | Cedric Brown | Burglary of a habitation |
| 1340642 | March 19, 2012 | Muntaser Hazem Judeh | Assault |
| 1341053 | March 26, 2012 | James Benton Thomas | Aggravated Assault – Family Member |
| 1341866 | March 30, 2012 | James Thomas | Violation of Protective Order – Family Violence |
| 1340574 | March 30, 2012 | William Hernandez | Engaging in Organized Criminal Activity |
| 1342143 | April 2, 2012 | Chesare Denontrae Rivers | Aggravated Assault |
| 1343079 | April 10, 2012 | Amy Lynn Catlett | Robbery |
| 1343774 | April 16, 2012 | Antonio Arturo Herdandez | Possession with Intent to Deliver a Controlled Substance |
| 1344007 | April 16, 2012 | William Chambers | Possession of a Controlled Substance |
| 1343898 | April 17, 2012 | Joshua Cole | Possession of a Controlled Substance |
| 1344184 | April 18, 2012 | Cuong Khanh Nguyen | Theft – Third Offender |
| 1344216 | April 18, 2012 | Vicente Aguilar, Jr | Engaging in Organized Criminal Activity – Participate in Combination |
| 1344379 | April 19, 2012 | Gernette Toran | Prostitution |
| 1344471 | April 20, 2012 | Travone Desean Harris | Evading Arrest or Detention – Second Offender |
| 1342022 | April 20, 2012 | Reginald Hollins | Aggravated Robbery – Deadly Weapon |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1346763 | May 9, 2012 | Carlos Garcia | Aggravated Robbery – Deadly Weapon |
| 1347592 | May 16, 2012 | Ashton Vincent Craven | Murder |
| 1343569 | May 21, 2012 | Justin Joseph Morris | Failure To Comply With Sex Registration Requirements |
| 1348020 | May 21, 2012 | Clinton Blount | Delivery of a Controlled Substance |
| 1348240 | May 22, 2012 | Brannon Kirk Chappel | Robbery |
| 1348285 | May 22, 2012 | Erick Charles Erminger | Murder |
| 1348948 | May 29, 2012 | Roman Nathan Lazo | Assault of Family Member Second Offender and Impeding Breathing |
| 1348949 | May 29, 2012 | Roman Nathan Lazo | Violation of Protective Order – Family Violence |
| 1348606 | May 29, 2012 | Daniel Velasco | Burglary of a habitation |
| 1347677 | May 29, 2012 | Jeremy Wayne Williams | Assault of a Family Member |
| 1349326 | May 31, 2012 | Ozzie Walker | Theft – Third Offender |
| 1347104 | May 31, 2012 | Laura Eileen Holloway | Theft – Third Offender |
| 1349385 | June 1, 2012 | Jairo Umanzor | Murder |
| 1349399 | June 1, 2012 | Robert Earl Garner | Burglary of a habitation |
| 1322060 | June 4, 2012 | Amber Rae Silver | Possession with Intent to Deliver a Controlled Substance |
| 1349735 | June 4, 2012 | Amber R. Silver | Robbery |
| 1349736 | June 4, 2012 | Amber R. Silver | Possession of a Controlled Substance |
| 1349502 | June 4, 2012 | Rhiannon Michelle Hendon | Attempted Arson |
| 1832776 | June 11, 2012 | Michael William Resnick | Possession of a Controlled Substance (M) |
| 1321171 | June 11, 2012 | Justin McGee | Aggravated Robbery – Deadly Weapon |
| 1321172 | June 11, 2012 | Justin McGee | Aggravated Kidnapping |
| 1350329 | June 18, 2012 | Clifford Jones | Aggravated Assault with Deadly Weapon |
| 1351322 | June 18, 2012 | Edward Montemayor | Possession with Intent to Deliver a Controlled Substance |
| 1351306 | June 18, 2012 | Edward Montemayor | Murder |
| 1351510 | June 20, 2012 | Joseph Earl Marshall | Murder |
| 1352143 | June 25, 2012 | Juan Jucro Penaluer | Aggravated Robbery – Deadly Weapon |
| 1345586 | June 25, 2012 | Jose Fierros | Unauthorized use of a vehicle |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1352328 | June 28, 2012 | Johntrell Anderson Gable | Attempted Burglary of a Habitation |
| 1352329 | June 28, 2012 | Johntrell Anderson Gable | Felon in Possession of Firearm |
| 1353062 | July 5, 2012 | Toni Tavarez | Injury to Child |
| 1353471 | July 9, 2012 | Rory Darnell Jones | Felon in Possession of Firearm |
| 1353155 | July 9, 2012 | Rory Darnell Jones | Aggravated Assault |
| 1353392 | July 9, 2012 | Daniel Ward | Aggravated Robbery – Deadly Weapon |
| 1355800 | July 30, 2012 | Clinton Christopher Graham | Aggravated Robbery – Deadly Weapon |
| 1355874 | July 30, 2012 | Lalo Erick Garza | Robbery |
| 1355648 | July 30, 2012 | Kevin J. Carr | Delivery of a Controlled Substance |
| 1355649 | July 30, 2012 | Kevin J. Carr | Delivery of a Controlled Substance |
| 1355928 | July 31, 2012 | Paula Mendez | Prostitution |
| 1355818 | July 31, 2012 | Ronald Dean Jacksich | Impersonating a Public Servant |
| 1350774 | July 31, 2012 | Jerry Wayne Adaway | Failure to Comply with Sex Registration Requirements |
| 1329885 | July 31, 2012 | Saul Melesio, Jr. | Assault – Family Violence – 2nd Offender |
| 1356046 | Aug. 1, 2012 | John Earl Jackson | Possession of a Controlled Substance |
| 1356023 | Aug. 1, 2012 | Jerrell Bell | Felon in Possession of Firearm |
| 1354901 | Aug. 1, 2012 | Rickey Stewart | Assault of Family Member Second Offender and Impeding Breathing |
| 1356193 | Aug. 2, 2012 | Russell Ray Delaune | Theft of Metal |
| 1356136 | Aug. 2, 2012 | Ramon Lopez Elizarraraz Jr | Possession of a Controlled Substance |
| 1355976 | Aug. 2, 2012 | Jose Ruben Perez | Reckless Injury to Child |
| 1355977 | Aug. 2, 2012 | Jose Ruben Perez | Injury Child under 15/B Injury |
| 1355358 | Aug. 2, 2012 | Nestor Dizan Wong | Forgery – Commercial Instrument |
| 1324977 | Aug. 3, 2012 | Jerome Lige | Assault of Family Member – Impeding Breathing |
| 1356244 | Aug. 3, 2012 | Vicki Lynn Kintz | Possession of a Controlled Substance |
| 1356062 | Aug. 3, 2012 | Carl Alexander Turner | Failure to Comply with Sex Offender Registration |
| 1357324 | Aug. 13, 2012 | Andrew Lee Ratcliff | Felon in Possession of Firearm |
| 1358058 | Aug. 20, 2012 | Cesar Martinez | Felon in Possession of Firearm |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1358059 | Aug. 20, 2012 | Cesar Martinez | Burglary of a habitation |
| 1358060 | Aug. 20, 2012 | Cesar Martinez | Burglary of a habitation |
| 1357992 | Aug. 20, 2012 | Arthur Collins | Possession of a Controlled Substance |
| 1358372 | Aug. 22, 2012 | Velma Wiley | Driving While Intoxicated |
| 1358247 | Aug. 22, 2012 | John Gates | Possession with Intent to Deliver a Controlled Substance |
| 1358604 | Aug. 27, 2012 | Delvin Lamar Williams | Aggravated Robbery – Deadly Weapon |
| 1358766 | Aug. 27, 2012 | Ashley Dawn Robinson | Aggravated Assault |
| 1358854 | Aug. 27, 2012 | Jason Lee Road | Aggravated Assault |
| 1358987 | Aug. 28, 2012 | Matthew Ward Albritton | Injury to Child |
| 1358904 | Aug. 28, 2012 | Shadarick Bruce Joseph | Theft – Third Offender |
| 1358936 | Aug. 28, 2012 | Bobby Ray Short | Possession of a Controlled Substance |
| 1358937 | Aug. 28, 2012 | Bobby Ray Short | Tampering/Fabricating Physical Evidence |
| 1352456 | Aug. 28, 2012 | Emily Nichole Medina | Burglary of a building |
| 1351678 | Aug. 28, 2012 | Emily Nichole Medina | Theft of Firearm |
| 1352466 | Aug. 28, 2012 | Victor Manuel Fuentes | Aggravated Robbery – Deadly Weapon |
| 1352467 | Aug. 28, 2012 | Victor Manuel Fuentes | Aggravated Robbery – Deadly Weapon |
| 1359029 | Aug. 29, 2012 | Rolando Tomas Mendez | Injury to Child |
| 1359137 | Aug. 29, 2012 | Elizabeth Ann Esparza | Delivery Simulated Controlled Substance |
| 1359102 | Aug. 29, 2012 | Donald Ray Johnson | Possession of a Controlled Substance |
| 1359224 | Aug. 30, 2012 | Diane Johnson | Theft – Third Offender |
| 1359257 | Aug. 31, 2012 | Franklin Jamile Randle | Forgery – Commercial Instrument |
| 1359303 | Aug. 31, 2012 | Darius Yohaunce Moore | Assault |
| 1359304 | Aug. 31, 2012 | Darius Yohaunce Moore | Possession with Intent to Deliver a Controlled Substance |
| 1359305 | Aug. 31, 2012 | Darius Yohaunce Moore | Evading Arrest or Detention – Second Offender |
| 1359451 | Sept. 4, 2012 | Jose Fraga | Theft – Third Offender |
| 1354008 | Sept. 4, 2012 | Jose Fraga Jr | Aggravated Robbery – Deadly Weapon |
| 1359806 | Sept. 4, 2012 | Alfonso Bosquez | Assault – Family Violence – 2nd Offender |
| 1360026 | Sept. 6, 2012 | Otis Lee Thompson | Aggravated Assault |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1359693 | Sept. 6, 2012 | Harold Dewayne Bradley | Aggravated Assault – Family Member |
| 1360704 | Sept. 14, 2012 | William Joseph Bernard | Theft |
| 1336674 | Sept. 14, 2012 | Kenneth Arthur | Felon in Possession of Firearm |
| 1333489 | Sept. 14, 2012 | Kenneth Junior Arthur | Tampering/Fabricating Physical Evidence |
| 1354559 | Sept. 15, 2012 | James Thomas | Violation of Protective Order |
| 1360537 | Sept. 17, 2012 | Jorden Marquis Thompson | Assault of Family Member – Impeding Breathing |
| 1360903 | Sept. 17, 2012 | Joshua Deandre Jones | Theft |
| 1360904 | Sept. 17, 2012 | Joshua Deandre Jones | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1353410 | Sept. 17, 2012 | Tryone Lee Brown | Aggravated Robbery |
| 1281978 | Sept. 19, 2012 | Ramiro Ruiz | Theft |
| 1361521 | Sept. 19, 2012 | Rory Keith Chenier | Delivery of a Controlled Substance |
| 1361522 | Sept. 19, 2012 | Rory Keith Chenier | Possession with Intent to Deliver a Controlled Substance |
| 1361249 | Sept. 19, 2012 | Matthew Wadsworth | Burglary with Intent to Commit Theft |
| 1361250 | Sept. 19, 2012 | Matthew Wadsworth | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1361251 | Sept. 19, 2012 | Matthew Wadsworth | Theft |
| 1361675 | Sept. 20, 2012 | Leonard Flowers | Theft of Metal |
| 1361588 | Sept. 20, 2012 | Joseph Norman Payne | Possession of Dangerous Drug |
| 1359426 | Sept. 20, 2012 | Dave Vu Mai, II | Burglary of a habitation |
| 1343978 | Sept. 21, 2012 | Stephen Lucas | Theft – Third Offender |
| 1291817 | Sept. 21, 2012 | Pedro Ernesto Umana | Aggravated Robbery – Deadly Weapon |
| 1361414 | Sept. 21, 2012 | Joe Villarreal | Assault – Family Violence – 2nd Offender |
| 1361437 | Sept. 21, 2012 | Harold Bruise Lackey | Controlled Substance – Fraud – Fraudulent Acquisition of Controlled Substance – Section 481.129(a-1), Health and Safety Code |
| 1362480 | Sept. 27, 2012 | Cesar Alejandro Martinez | Burglary of a habitation |
| 1362630 | Oct. 1, 2012 | Joseph Wayne General | Possession of a Controlled Substance |
| 1362631 | Oct. 1, 2012 | Joseph Wayne General | Possession of a Controlled Substance |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1362799 | Oct. 1, 2012 | Rachael Channelle Scott | Prostitution |
| 1362945 | Oct. 1, 2012 | Marvis Dominick Collins | Evading Arrest or Detention – Second Offender |
| 1335545 | Oct. 2, 2012 | Christopher J Simpson | Aggravated Assault |
| 1335546 | Oct. 2, 2012 | Christopher J Simpson | Possession of a Controlled Substance |
| 1362557 | Oct. 2, 2012 | Michael Dejean Simmons | Aggravated Assault |
| 1363054 | Oct. 2, 2012 | Ruben Dioniso Stergiou | Possession of a Controlled Substance |
| 1363127 | Oct. 3, 2012 | Carl William Woolery | Aggravated Assault |
| 1357004 | Oct. 3, 2012 | Marvin E Robinson | Aggravated Assault – Family Member |
| 1356608 | Oct. 3, 2012 | Brodrick Lichris Green | Robbery |
| 1363149 | Oct. 4, 2012 | Jason Andrew Furrer | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1363183 | Oct. 4, 2012 | Kale Traylor Forks | Possession of a Controlled Substance |
| 1356588 | Oct. 4, 2012 | Michael James Baker | Theft |
| 1363199 | Oct. 5, 2012 | Samuel Placencia | Aggravated Robbery – Deadly Weapon |
| 1363312 | Oct. 5, 2012 | Steven Davila | Aggravated Assault – Family Member |
| 1363313 | Oct. 5, 2012 | Steven Davila | Violation of Protective Order – Family Member |
| 1354485 | Oct. 5, 2012 | Steven Davila | Aggravated Assault – Family Member |
| 1363399 | Oct. 7, 2012 | Fred Michael Anderson | Possession of a Controlled Substance |
| 1363854 | Oct. 7, 2012 | James Ronald Coleman | Possession of a Controlled Substance |
| 1363776 | Oct. 8, 2012 | Lloyd Dewayne Gilbert | Robbery |
| 1363548 | Oct. 8, 2012 | Kelby Swinney | Aggravated Assault |
| 1293965 | Oct. 9, 2012 | Daniel Palacios | Cruelty to livestock animals |
| 1362093 | Oct. 9, 2012 | Markus Dwayne Butler | Possession with Intent to Deliver a Controlled Substance |
| 1364009 | Oct. 11, 2012 | Terry Lee Bagley | Aggravated Assault |
| 1364147 | Oct. 11, 2012 | Christopher Pyse | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1363898 | Oct. 12, 2012 | Jesus Arturo Ventura | Assault – Family Member – 2nd Offender |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1364277 | Oct. 12, 2012 | Brandon Lamont Fisher | Possession with Intent to Deliver a Controlled Substance |
| 1365885 | Oct. 31, 2012 | Kelby Swinney | Criminal Mischief |
| 1368826 | Nov. 26, 2012 | Leonel Morillo | Aggravated Assault |
| 1368810 | Nov. 26, 2012 | Dennis Leon Sharp | Robbery |
| 1368690 | Dec. 4, 2012 | Neil Jay Mukherjee | Aggravated Robbery – Deadly Weapon |
| 1367889 | Dec. 6, 2012 | Charles Dixon Moore | Possession with Intent to Deliver a Controlled Substance |
| 1323357 | Dec. 10, 2012 | Edwin James Brooks Jr. | Burglary of a habitation |
| 1370354 | Dec. 10, 2012 | Rodney L. Smith | Aggravated Assault – Family Member |
| 1370355 | Dec. 10, 2012 | Rodney L. Smith | Burglary – Habitation |
| 1370428 | Dec. 10, 2012 | Jameisha Elainne Kennon | Theft |
| 1370530 | Dec. 10, 2012 | David Yates | Assault – Family Violence – 2nd Offender |
| 1370446 | Dec. 10, 2012 | Anthony John Kaczmarek | Possession of a Controlled Substance |
| 1370070 | Dec. 10, 2012 | Willie Walker | Possession of a Controlled Substance |
| 1370164 | Dec. 10, 2012 | Leonard Gregory | Possession of a Controlled Substance |
| 1366319 | Dec. 10, 2012 | Matthew Vincent Woodard | Aggravated Assault |
| 1311799 | Dec. 10, 2012 | Edwin James Brooks | Theft |
| 1311351 | Dec. 10, 2012 | Edwin Brooks | Burglary of a habitation |
| 1300048 | Dec. 10, 2012 | Edwin Brooks | Burglary of a habitation |
| 1366366 | Dec. 11, 2012 | Rashawn Demond Ross | Theft |
| 1370550 | Dec. 11, 2012 | Kendrick Tamara Mable | Robbery |
| 1370569 | Dec. 11, 2012 | Patricia Martinez | Theft – Third Offender |
| 1369735 | Dec. 11, 2012 | Tyler Kent Wright | Unauthorized use of a vehicle |
| 1370109 | Dec. 12, 2012 | Ricky Pittman | Burglary of a habitation |
| 1370032 | Dec. 12, 2012 | Willie Darries | Possession of a Controlled Substance |
| 1369719 | Dec. 12, 2012 | Antonio Manuel Flores | Assault – Family Violence – 2nd Offender |
| 1367796 | Dec. 12, 2012 | Lindsey Rene Lindquist | Theft – Third Offender |
| 1356096 | Dec. 12, 2012 | Mikesha Matthews | Unauthorized use of a vehicle |
| 1370760 | Dec. 13, 2012 | Christina McCardell | Assault |
| 1357349 | Dec. 14, 2012 | Barron Keith Williams | Assault of Family Member – Impeding Breathing |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1370972 | Dec. 14, 2012 | Jose Tereso Salazar | Assault of Family Member – Impeding Breathing |
| 1370940 | Dec. 14, 2012 | Antonio Bermudez | Aggravated Assault – Family Member |
| 1370896 | Dec. 15, 2012 | Miguel Angel Rios | Possession with Intent to Deliver a Controlled Substance |
| 1368157 | Dec. 15, 2012 | Binh Lam | Possession of a Controlled Substance |
| 1317189 | Dec. 15, 2012 | Laverne M. Brown | Stalking |
| 1370642 | Dec. 17, 2012 | Nathan Patrick Carlisle | Aggravated Assault – Family Member |
| 1371052 | Dec. 17, 2012 | Clarence Alvin Hill | Felon in Possession of Firearm |
| 1371051 | Dec. 17, 2012 | Clarence Alvin Hill | Possession of a Controlled Substance |
| 1371291 | Dec. 17, 2012 | Grady Clyde Nelson | Robbery |
| 1370925 | Dec. 17, 2012 | Jerrell Bell | Aggravated Robbery – Deadly Weapon |
| 1367505 | Dec. 18, 2012 | Korey Donnell Anderson | Aggravated Assault – Family Member |
| 1371354 | Dec. 18, 2012 | Vance Edward Vanhowten | Theft – Third Offender |
| 1371312 | Dec. 18, 2012 | Katrina Rashawn Ben | Aggravated Assault – Family Member |
| 1359876 | Dec. 18, 2012 | Michael Anthony Davila | Aggravated Assault – Family Member |
| 1335856 | Dec. 19, 2012 | Keith Leonard Townsend | Injury to an Elderly Individual |
| 1371404 | Dec. 19, 2012 | Byron White | Assault Family Member Impeding Breathing |
| 1298678 | Dec. 19, 2012 | Gil Moises Escoto | Robbery |
| 1371561 | Dec. 20, 2012 | Vance Edward Vanhowten | Theft – Third Offender |
| 1371537 | Dec. 20, 2012 | Brandon Garcia | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1369162 | Dec. 21, 2012 | John Mora III | Illegal Dumping |
| 1371686 | Dec. 21, 2012 | Gregory Oneal Jenkins | Possession of a Controlled Substance |
| 1371264 | Dec. 21, 2012 | John Anderson | Theft – Third Offender |
| 1371628 | Dec. 21, 2012 | Judy Lucille Hambrick | Theft of Firearm |
| 1369814 | Dec. 21, 2012 | Carla Denise Jackson | Theft |
| 1374729 | Jan. 24, 2013 | Jonathan Jerome Brooks | Unauthorized Use of a Vehicle |
| 1341148 | Feb. 12, 2013 | Kevin Jamon Johnson | Aggravated Robbery – Deadly Weapon |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1377762 | Feb. 19, 2013 | Erric Bernard Bailey | Possession with Intent to Deliver a Controlled Substance |
| 1380193 | March 11, 2013 | Marco Ivan Perez-De Los | Arson |
| 1380147 | March 11, 2013 | Rickie James Bradley | Attempted Aggravated Sexual Assault |
| 1379542 | March 13, 2013 | Marquiet A. Davis | Aggravated Robbery – Deadly Weapon |
| 1380441 | March 18, 2013 | Cindy Bogado | Assault – Family Violence – 2nd Offender |
| 1380810 | March 18, 2013 | Vicente Raul Lopez | Theft of Firearm |
| 1380877 | March 18, 2013 | Randy Dewayne Masters | Aggravated Robbery – Deadly Weapon |
| 1380858 | March 18, 2013 | Cindy Bogado | Assault – Family Violence – 2nd Offender |
| 1381025 | March 19, 2013 | Keenan Shawn Houston | Possession of a Controlled Substance |
| 1369694 | March 19, 2013 | Antonio Gonzales | Possession of a Controlled Substance |
| 1381003 | March 20, 2013 | Brian E. Crouch | Evading Arrest or Detention – Second Offender |
| 1381092 | March 20, 2013 | Frederick Addison | Possession with Intent to Deliver a Controlled Substance |
| 1381171 | March 21, 2013 | Erik Lee Sharp | Burglary of habitation |
| 1381250 | March 21, 2013 | Joe Anthony Fisher | Aggravated Assault – Family Member |
| 1369498 | March 21, 2013 | Erik Lee Sharp | Burglary of habitation |
| 1310116 | March 21, 2013 | Debbie Rae Sherman | Possession of a Controlled Substance |
| 1381376 | March 22, 2013 | Derek Wayne Hemingway | Forgery – Commercial Instrument |
| 1381377 | March 22, 2013 | Derek Wayne Hemingway | Theft |
| 1381335 | March 22, 2013 | Susan Marie Perdomo | Fraudulent use of identifying information |
| 1380485 | March 22, 2013 | William Kaiser | Possession of a Controlled Substance |
| 1383003 | April 8, 2013 | Joseph Wyatt | Assault of Family Member – Impeding Breathing |
| 1382963 | April 8, 2013 | Gunter Nicola | Assault of Family Member – Impeding Breathing |
| 1356874 | April 11, 2013 | Javed Stephen Tafarroji | Burglary of a habitation |
| 1361294 | April 11, 2013 | Javed Stephen Tafarroji | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1361295 | April 11, 2013 | Javed Stephen Tafarroji | Unauthorized use of a vehicle |
| 1350164 | April 11, 2013 | Rhonda Denise Sparks | Aggravated Assault |
| 1384132 | April 15, 2013 | Matthew James Hurlock | Harassment to Public Servant |
| 1338908 | April 17, 2013 | Marquiet Antonio Davis | Possession of a Controlled Substance |
| 1376715 | April 19, 2013 | Keith Winston | Burglary of a habitation |
| 1339892 | April 19, 2013 | Michael Slaughter | Kidnapping |
| 1381191 | April 24, 2013 | Randy Allen Segura | Aggravated Assault |
| 1385115 | April 25, 2013 | Derrick Jones | Aggravated Robbery – Deadly Weapon |
| 1385755 | April 29, 2013 | Tristin Terril Williams | Felon in Possession of Firearm |
| 1385712 | April 29, 2013 | Erick Dewayne Lee | Theft |
| 1385713 | April 29, 2013 | Erick Dewayne Lee | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1385612 | April 29, 2013 | Bernard J. Serrano | Retaliation |
| 1385474 | April 29, 2013 | Ronald Wayne Degrate Jr. | Aggravated Assault – Family Member |
| 1385493 | April 29, 2013 | Hector Mario Gonzalez | Possession with Intent to Deliver a Controlled Substance |
| 1385494 | April 29, 2013 | Nichole Lynn Walko | Possession with Intent to Deliver a Controlled Substance |
| 1385567 | April 29, 2013 | Bernardo Alvarez Serrano | Burglary of a habitation |
| 1385412 | April 29, 2013 | Carl Anthony Bowman | Controlled Substance Fraud – Prescription |
| 1325973 | April 30, 2013 | Mister Eliakim Thomas | Burglary of a habitation |
| 1370501 | April 30, 2013 | Adam Valentine Castro | Burglary of a habitation |
| 1352665 | April 30, 2013 | Kristin Louise Bunch | Possession of a Controlled Substance |
| 1385785 | May 1, 2013 | Kevin Mark Arvay | Driving While Intoxicated |
| 1385786 | May 1, 2013 | Kevin Mark Arvay | Possession of a Controlled Substance |
| 1288489 | May 1, 2013 | Oscar Daniel Ponce | Evading Arrest |
| 1385820 | May 1, 2013 | Gregory Stevenson | Burglary with Intent to Commit Theft |
| 1336563 | May 1, 2013 | Tuan Anh Nguyen | Possession of Marihuana |
| 1339977 | May 2, 2013 | Jesus Angel Chavira | Aggravated Assault |
| 1386001 | May 2, 2013 | Treon Rashard Pruitt | Evading Arrest or Detention – Motor Vehicle |
| 1386002 | May 2, 2013 | Treon Rashard Pruitt | Tampering/Fabricating Physical Evidence |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1386003 | May 2, 2013 | Treon Rashard Pruitt | Possession of a Controlled Substance |
| 1385960 | May 2, 2013 | Randy Deshun Lindsey | Aggravated Assault – Family Member |
| 1386924 | May 10, 2013 | Michael Gregory Ceaser, Sr | Engaging in Organized Criminal Activities – Participation in Combination |
| 1386930 | May 10, 2013 | Michael Gregory Ceaser, Sr | Engaging in Organized Criminal Activities – Participation in Combination |
| 1386049 | May 22, 2013 | Gregory Lynn Stevenson | Aggravated Robbery – Deadly Weapon |
| 1387502 | May 23, 2013 | Randy Allen Segura | Assault |
| 1389758 | June 25, 2013 | Keith Aundre Wright | Robbery |
| 1390561 | June 26, 2013 | Cindy Nahir Bogado | Assault – Contract Jail or Detention Facility Employee |
| 1394065 | July 11, 2013 | Muntaser Hazem Jedeh | Aggravated Assault – Family Member |
| 1387261 | July 11, 2013 | Muntaser Hazem Jedeh | Possession with Intent to Deliver a Controlled Substance |
| 1336272 | July 11, 2013 | Muntaser Hazem Jedeh | Possession with Intent to Deliver a Controlled Substance |
| 1395226 | July 22, 2013 | Adrian Roshard Jones | Possession of a Controlled Substance |
| 1395476 | July 26, 2013 | Susan Morris | Aggravated Assault |

**5. From jury selection through the punishment phase of Mr. Cruz-Garcia's trial, Mr. Cornelius spent extraordinary amounts of time working on other cases.**

As set forth above in Section B, an attorney's excessive workload can have devastating consequences for a client. For Mr. Cruz-Garcia, Mr. Cornelius's overwhelming caseload meant not only that Mr. Cornelius could not effectively prepare for Mr. Cruz-Garcia's trial, but also that Mr. Cornelius dedicated much of his time *during* Mr. Cruz-Garcia's death penalty trial to working on other cases.

Using the docket search function of Harris County District Clerk's website, Mr. Cruz-Garcia has obtained as many of Mr. Cornelius's billing records as he can for the time period from the start

of jury selection in Mr. Cruz-Garcia's case (June 3, 2013) to sentencing (July 22, 2013). There is no central repository of billing records from this time period, nor was billing done electronically. Rather, Mr. Cornelius filled out handwritten time sheets and submitted them to the individual court in each case. Using the same handwritten form that Mr. Cornelius submitted, the courts would then approve or disapprove his fee request.

These records can paint only a partial picture of Mr. Cornelius's workload around the time of Mr. Cruz-Garcia's trial. Time sheets are missing for many of Mr. Cornelius's cases. For example, the fee request for Johntay Gibson's capital murder case was filed under seal. And Mr. Cruz-Garcia's case was not the only one Mr. Cornelius handled on a flat-fee basis. He also sought and received $75,000.00 flat fees in the Jeffery Prevost and Curtis Adams cases. Ex. 128. As in Mr. Cruz-Garcia's case, Mr. Cornelius did not submit time sheets in either case. Because the below analysis can only reflect cases that Mr. Cruz-Garcia was able to identify and in which Mr. Cornelius submitted time sheets, it likely understates the amount of work Mr. Cornelius performed on other cases around and during the time of Mr. Cruz-Garcia's trial.

In Harris County, attorneys can either bill by the hour, by court appearance, or both. *See* Ex. 140. As indicated in Mr. Cornelius's billing records, the hourly rate for capital cases was $100.00/hr.[22] ECF No. 18-7; Ex. 138. For felony cases, the hourly rates are $85.00/hr. for a first-degree felony, $60.00/hr. for a second-degree felony, and $40.00/hr. for a third-degree felony. Ex. 140.

---

[22] By the time Mr. Cornelius sought payment in Neil Mukherjee's case, the rate appears to have increased to $150.00/hr. *Id.*

When an attorney appears in court, he can claim a flat fee for that day in addition to his hourly billing. The court day fee for capital cases is $400.00. Ex. 140. For felony cases, the court day fees are $225.00 for a first-degree felony, $175.00 for a second-degree felony, and $125.00 for a third-degree felony. *Id.* Thus, the system roughly equates a court appearance with between 2.5 and 4 hours of work. Since 2010, attorneys may claim a maximum of four court day fees per day. *Id.* When a client has multiple charges arising from different offense reports, the attorney may claim a separate court day fee for court appearances on behalf of the same client but for different charges. *Id.*

Even with limited accessibility to Mr. Cornelius's billing records, the records Mr. Cruz-Garcia was able to locate paint a disturbing picture. Jury selection in Mr. Cruz-Garcia's case started on June 3, 2013, and sentencing occurred on July 22, 2013. As described below and as set forth in **Figure 3**, Mr. Cornelius billed time to other cases *every day* Monday through Saturday, between June 3 and July 22, 2013. Indeed, other than one day of jury deliberations when he billed half an hour and claimed a court day fee in another case, Mr. Cornelius billed at least **2.5 hours** to other cases *on each of those days during Mr. Cruz-Garcia's trial*. Mr. Cornelius did not "give priority" to Mr. Cruz-Garcia's case as required by Texas Guideline 9.3.B. Rather, he did exactly what the Texas and ABA Guidelines prohibition on flat fees is designed to prevent: he prioritized his hourly-billed cases to the detriment of Mr. Cruz-Garcia.

### a.  Jury Selection.

Jury selection in Mr. Cruz-Garcia's case began on June 3, 2013, and lasted eleven days. As described below and as shown in **Figure 3**, Mr. Cornelius regularly worked substantial amounts of time on other cases throughout jury selection.

- On the first day of jury selection, for which the transcript runs **333 pages,**[23] Mr. Cornelius billed **7 hours** to other cases and claimed **a $225.00 court day fee** in another case.

- On the seventh day of jury selection, for which the transcript runs **262 pages**, Mr. Cornelius billed **7.75 hours** to other cases and claimed a **$125.00 court day fee** in another case.

- On the ninth day of jury selection, for which the transcript runs **237 pages**, Mr. Cornelius billed **8 hours** to other cases and claimed a **$225.00 court day fee** and a **$125.00 court day fee** for appearances in other cases.

- On the tenth day of jury selection, for which the transcript runs **292 pages**, Mr. Cornelius billed **6.5 hours** to other cases.

- On the Saturday after the second week of jury selection, Mr. Cornelius billed **5 hours** to other cases.[24]

- On the final day of jury selection, for which the transcript runs **201 pages**, Mr. Cornelius billed **6 hours** to other cases.

- In sum, over the **11 days of jury selection**, Mr. Cornelius:

  - billed at least **2.5 hours** to other cases on 10 of those days;

  - billed at least **3.25 hours** to other cases on 8 of those days;

  - billed at least **6 hours** to other cases on 5 of those five days; and

  - claimed **19 court day fees** in other cases, for a total of **$3,450.00** just in flat fee court appearances.

**b. The week of the evidentiary hearing.**

Jury selection ended on Monday, June 17, 2013. On Wednesday June 19, the court held an evidentiary hearing on the defense's motion to exclude DNA evidence, a critically important pretrial motion. 16 RR; 17 RR. Yet, leading up to the evidentiary hearing and throughout the rest of that week, Mr. Cornelius spent substantial amounts of time working on other cases.

- On the day before the evidentiary hearing, Mr. Cornelius billed **10 hours** to other cases.

---

[23] Transcript page counts do not include the index. Additionally, because Cruz-Garcia does not speak English, all the proceedings were translated into Spanish—except for the witnesses who testified in Spanish, whose testimony was translated into English.

[24] Mr. Cornelius also claimed a $125.00 court day fee, though he likely misdated the entry as it fell on a Saturday.

- On the day of the evidentiary hearing, for which the transcript runs **122 pages**, Mr. Cornelius billed **5.5 hours** to other cases. He also claimed a **$400.00 court day fee** for an appearance in a different capital murder case and **two $125.00 court day fees** in other cases.

- The day following the hearing, Mr. Cornelius billed **5.25 hours** to other cases, claimed another **$400.00 court day fee** for an appearance in yet another capital murder case, and claimed a **$225.00 court day fee** and a **$125.00 court day fee** in other cases.

- On Friday, June 21, Mr. Cornelius billed **7 hours** in other cases, claimed a **$400.00 court day fee** for an appearance in still yet another capital murder case, and claimed a **$225.00 court day fee** for an appearance in a different case.

The following Saturday, Mr. Cornelius billed **8.5 hours** to other cases.

### c.  Two weeks before trial.

In the penultimate week before trial, Mr. Cornelius continued to spend significant amounts of time on his other cases.

- On Monday, June 24, exactly two weeks before trial began, Mr. Cornelius billed **7 hours** to other cases and claimed a **$125.00 court day fee**.

- The next day, he billed **8 hours** to other cases and claimed one **$175.00 court day fee** for one case, and **three $125.00 court day fees** in other cases.

- On Wednesday, June 26, he billed **5 hours** to other cases and claimed **three $125.00 court day fees**.

- On Thursday, June 27, Mr. Cornelius billed **6.5 hours** to other cases and claimed a **$400.00 court day fee** for an appearance day in still yet another capital murder case.

- On Friday, June 28, he billed **7 hours** and claimed **two** $175.00 court day fees.

- On Saturday, June 29, Mr. Cornelius billed **5.5 hours** to other cases.

### d.  The week before trial.

The same pattern continued the week before opening arguments in Mr. Cruz-Garcia's case. Mr. Cornelius continued to dedicate significant amounts of time to other cases, even on the eve of Mr. Cruz-Garcia's trial.

- Trial began on Monday, July 8, 2013.

- The Saturday before trial (July 6), Mr. Cornelius billed **8.5 hours** to other cases.[25]

- The Friday before trial (July 5), Mr. Cornelius billed **8.75 hours** other cases.

- The Thursday before trial was the Fourth of July holiday. Mr. Cornelius nonetheless billed **8 hours** to other cases.

- The Wednesday before trial (July 3), there was a second hearing on the Motion to Suppress DNA evidence in Mr. Cruz-Garcia's case. Mr. Cornelius billed **7.75 hours** to other cases.

- The Tuesday before trial (July 2), Mr. Cornelius billed **7.25 hours** to other cases, and claimed **three $225.00 court day fees** in other cases, plus a **$175.00 court day fee** for another case.

- On Monday (July 1), exactly one week before trial, Mr. Cornelius billed **9.55 hours** to other cases.

### e. The guilt phase.

Trial began on July 8, 2013**.** The jury heard evidence from Monday, July 8, until Thursday, July 11. Closing arguments were to have occurred on July 12, but the parties disagreed about whether an accomplice charge should be included. The parties' submissions to the court on this point were not transcribed and do not appear in the clerk's record, although Mr. Cornelius emphasized that the parties had been "work[ing] on this charge since about 10:00 this morning" and "ha[d] not broken for lunch." 22 RR 17. Judge Magee issued a decision from the bench at around 4:45 p.m. on July 12. 22 RR 18. Closing arguments were pushed to the following Monday, July 15.

On each day that the jury heard evidence during the guilt phase, Cornelius billed at least **4 hours** to other cases. He also claimed **three $175.00 court day fees** in other cases, and a **$125.00 court day fee** in another case. Specifically:

- On Monday, July 8, Mr. Cornelius billed **4 hours** to other cases.

- On Tuesday, July 9, Mr. Cornelius billed **5.5 hours** to other cases, and claimed **two $175.00 court day fees**.

- On Wednesday, July 10, Mr. Cornelius billed **4 hours** to other cases, claimed a **$225.00 court day fee,** and claimed **two $125.00 court day fees in other cases**.

---

[25] Mr. Cornelius also claimed a **$175.00 court day fee** the Sunday before trial, but that seems like it must be an error.

- On Thursday, July 11, Mr. Cornelius billed **4 hours** to other cases and claimed a **$175.00 court day fee.**

- On Friday, July 12, the day of the disputed charge conference, Mr. Cornelius billed **4 hours** to other cases.

- On the Saturday before closing arguments in the guilt phase, which were scheduled for the following Monday (and the beginning of the punishment phase that Tuesday), Mr. Cornelius billed **6.5 hours** to other cases.

- On Monday, July 15, the day of closing arguments and jury deliberations in the guilt phase, Mr. Cornelius billed **2.25 hours** to other cases.

### f.   The punishment phase.

The evidence presentation in the punishment phase lasted three days. The state presented evidence on Tuesday, July 16, and Wednesday, July 17. The defense presented its evidence on Thursday, July 18. The jury reached its verdict late in the day on Friday, July 19. Mr. Cruz-Garcia was sentenced to death on Monday, July 22. In the three days that the jury heard evidence in the punishment phase, Mr. Cornelius claimed **four court day fees**, including **two $400.00 fees** in two different capital cases. Over those same three days, Mr. Cornelius billed an average of **4.83 hours per day** in other cases. Specifically:

- On Tuesday, July 16, Mr. Cornelius billed **6.25 hours** to other cases and claimed a **$175.00 court day fee**.

- On Wednesday, July 17, 2013—the day before the defense presented its case— Mr. Cornelius billed **3.25** hours to other cases, claimed a **$400.00 court day fee** in another capital case, and claimed a **$225.00** court day fee in a different case.

- On Thursday, July 18, 2013—the day the defense presented its case— Mr. Cornelius billed **5.5 hours** to other cases and claimed a **$400.00 court day fee** in yet another capital case.

- On the day of jury deliberations, when a serious issue emerged with a holdout juror,[26] Mr. Cornelius billed **8 hours** to other cases.

- On the following Saturday, Mr. Cornelius billed **5.5 hours** to other cases.

- On the day that Mr. Cruz-Garcia was sentenced to death, Mr. Cornelius billed **8.5 hours** to other cases, and claimed a **$175.00 court day fee** and a **$125.00 court day fee.**

---

[26] *See infra* Claim Seven.

To summarize, according to these billing records, Mr. Cornelius performed $33,430.75 worth of work in other cases *over the course of Mr. Cruz-Garcia's trial*. Based on the $35,000 flat fee permitted by Harris County for first chair in a death penalty case, Mr. Cornelius performed the equivalent of an entire other death-sought capital murder trial. In other words, Mr. Cornelius performed so much work on other cases over the course of Mr. Cruz-Garcia's trial, it was as if he had investigated, selected a jury for, and tried to verdict an entire other death penalty case between the time of jury selection and sentencing in Mr. Cruz-Garcia's case.

**Figure 3** below sets forth the details of Mr. Cornelius's billings between June 3 and July 22, 2013. The billing records underlying Figure 3 are collected at Exhibit 138.

**Figure 3:** Mr. Cornelius's billings in other cases from June 3, 2013 to July 22, 2013.[27]

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|--------------------|-------|
| Mon., June 3, 2013 | Jury Selection | **Ward:** 3 hrs. trial prep<br>**Gonzalez:** 1 hr. legal research<br>**Serrano:** 0.5 hrs. witness interview<br>**Taverez:** 2.5 hrs. legal research<br><u>Court Day:</u> **Jones D** ($225.00) | **7 hours**<br>**1 Court Day** |
| Tues., June 4, 2013 | Jury Selection | **Degrate:** 1 hr. legal research<br>**Mendez:** 1.75 hr. jail visit<br><u>Court Day:</u> **Gonzalez** ($225.00) | **2.75 hours**<br>**1 Court Day** |

---

[27] The documents supporting **Figure 3** are collected in Exhibit 138. In some instances, Mr. Cornelius represented a client in multiple charges and billed separately for each charge. For clients with multiple charges, the different cases are indicated by the last 3 digits of the case number.

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Wed., June 5, 2013 | Jury Selection | **Serrano:** 0.50 hrs. witness interview<br>**Jones, D:** 0.50 hrs. misc. matters<br>**Bogado:** 0.50 hrs. witness interview (-858)<br>**Alegria:** 1.25 hrs. legal research<br><u>Court Day:</u> **Degrate** ($175.00)<br><u>Court Day:</u> **Alegria** ($400.00) | **2.75 hours**<br>**2 Court Days** |
| Thur., June 6, 2013 | Jury Selection | **Lindsey:** 1 hr. legal research<br>**Serrano:** 0.75 hrs. legal research<br>**Jones D:** 0.50 hrs. witness interview<br>**Bogado:** 0.50 hrs. witness interview (-858)<br>**Mendez:** 0.50 hrs. records research<br><u>Court Day:</u> **Bogado** ($125.00)   (-858)<br><u>Court Day:</u> **Bogado** ($125.00)   (-441)<br><u>Court Day:</u> **Serrano** ($175.00)<br><u>Court Day:</u> **Chavira** ($125.00) | **3.25 hours**<br>**4 Court Days** |
| Fri., June 7, 2013 | Jury Selection | **Davis:** 1.5 hrs. misc. matters      (-542)<br>**Winston:** 1.25 hrs. legal research (-716)<br>**Judeh:** 0.75 hr. jail visit (-273)<br><u>Court Day:</u> **Lindsey** ($175.00)<br><u>Court Day:</u> **Winston** ($175.00)   (-715)<br><u>Court Day:</u> **Winston** ($175.00)   (-716)<br><u>Court Day:</u> **Judeh** ($225.00)     (-272) | **3.5 hours**<br>**4 Court Days** |
| Sat. June 8, 2013 | No court | **Lindsey:** 0.75 witness interview<br>**Winston:** 1.25 hrs. legal research (-715)<br>**Mukherjee:** 2 hrs. records research<br>**Batiste:** 1.25 hrs. records research | **5.25 hours** |
| Sun. June 9, 2013 | No court | **Ward:** 4 hrs. trial prep | **4 hours** |

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Mon., June 10, 2013 | Jury Selection | **Mukherjee:** 2.5 hrs. records research<br>**Court Day:** Davis ($225.00)   (-542)<br>**Court Day:** Davis ($125.00)   (-908) | **2.5 hours**<br>**2 Court Days** |
| Tues., June 11, 2013 | Jury Selection | **Ward:** 3 hrs. trial prep<br>**Bradley:** 0.75 hrs. misc. matters<br>**Gonzales N:** 1.5 hrs. records research<br>**Mukherjee:** 1.5 hrs. court appearance<br>**Ceaser:** 1 hr. records research<br>**Court Day:** Pruitt ($125.00) | **7.75 hours**<br>**1 Court Day** |
| Wed., June 12, 2013 | Jury Selection | **Bradley:** 0.50 hrs. records research<br>**Court Day:** Bradley ($175.00) | **0.50 hours.**<br>**1 Court Day** |
| Thur., June 13, 2013 | Jury Selection | **Ward:** 3 hrs. trial prep<br>**Riley:** 1.25 hrs. legal research<br>**Gonzales N:** 1 hr. records research<br>**Woodard:** 2 hrs. legal research<br>**Ceaser:** 0.75 hrs. records research<br>**Court Day:** Perdomo ($125.00)<br>**Court Day:** Ceaser ($225.00) | **8 hours**<br>**2 Court Days** |
| Fri., June 14, 2013 | Jury Selection | **Reed:** 1.5 hrs. legal research<br>**Ward:** 3 hrs. trial prep<br>**Taverez:** 2 hrs. misc. matters | **6.5 hours** |
| Sat., June 15, 2013 | No court | **Reed:** 3 hrs. of trial prep<br>**Taverez:** 2 hrs. misc. matters<br>**Court Day:** Bowman ($125.00)[28] | **5 hours**<br>**1 Court Day** |
| Mon., June 17, 2013 | Jury Selection | **Mayreis:** 5 hrs. legal research<br>**McGee:** 1 hr. legal research    (-317) | **6 hours** |

---

[28] This court date appears to have been misdated by Mr. Cornelius.

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Tues., June 18, 2013 | No court | **Riley:** 0.5 hrs. witness interview; 1.25 hrs. records research<br><br>**McGee:** 2 hrs. legal research      (-317)<br><br>**Gonzales N:** 1.25 hrs. misc. matters<br><br>**Jones R:** 2 hrs. misc. matters<br><br>**Serrano A:** 3 hrs. misc. matters | **10 hours** |
| Wed., June 19, 2013 | Motion to Suppress Evidentiary Hearing | **Stevenson:** 1 hr. legal research (-049)<br><br>**Segura:** 1.75 hrs. legal research<br><br>**Gonzales N:** 1 hr. records research<br><br>**Serrano A:** 1.75 hrs. misc. matters<br><br><u>Court Day</u>**: Gonzalez N** ($400.00)<br><br><u>Court Day</u>**: Lee** ($125.00) (-713)<br><br><u>Court Day</u>**: Lee** ($125.00) (-712) | **5.5 hours**<br>**3 Court Days** |
| Thur., June 20, 2013 | No court | **Riley:** 0.5 hrs. witness interview<br><br>**Lee:** 0.25 hrs. written correspondence (-713)<br><br>**Davis:** 1.5 hrs. misc. matters      (-542)<br><br>**Stergiou:** legal research (hrs. not listed)<br><br>**Serrano A:** 1 hr. legal research<br><br>**Ward D:** 0.50 hrs. written correspondence<br><br>**Sparks:** 1.5 hrs. jail visit<br><br><u>Court Day</u>**: Stevenson** ($225.00) (-049)<br><br><u>Court Day</u>**: Stevenson** ($125.00) (-820)<br><br><u>Court Day</u>**: Riley** ($400.00) | **5.25 hours**<br>**3 Court Days** |
| Fri., June 21, 2013 | No court | **Riley:** 3 hrs. document review and conferences.<br><br>**Jones, D:** 2 hrs. legal research<br><br>**Davis:** 1.25 hrs. misc. matters      (-542)<br><br>**Irais:** 0.75 hrs. records research<br><br><u>Court Day</u>**: Irias** ($400.00)<br><br><u>Court Day</u>**: Jones D** ($225.00) | **7.00 hours**<br>**2 Court Days** |

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Sat., June 22, 2013 | No court | **Irias:** 2.5 hrs. legal research<br><br>**Lee:** 0.75 hrs. written correspondence (-713); 0.25 hrs. written correspondence (-713)<br><br>**Perdomo:** 0.50 hrs. written correspondence<br><br>**Darries:** 1.5 hrs. legal research<br><br>**Stergiou:** 2 hrs. legal research | 8.5 hours |
| Mon., June 24, 2013 | No court | **Mayreis:** 1.5 hrs. records research; 0.5 hrs. meeting with DA<br><br>**McGee:** 2.5 hrs. trial notebook   (-317)<br><br>**Alegria:** 2 hrs. records research<br><br><u>Court Day</u>: **Stergiou** ($125.00) | 6.50 hours<br>1 Court Day |
| Tues., June 25, 2013 | No court | **Irias:** 1 hr. written correspondence; 1.5 hrs. legal research<br><br>**Wright:** 1 hr. misc. matters<br><br>**Winston:** 1 hr. legal research    (-716)<br><br>**Mukherjee:** 3.5 hrs. records research<br><br><u>Court Day</u>: **Williams** ($125.00)<br><br><u>Court Day</u>: **Wright** ($175.00)<br><br><u>Court Day</u>: **Arvay** ($125.00)      (-785)<br><br><u>Court Day</u>: **Arvay** ($125.00)      (-786) | 8 hours<br>4 Court Days |
| Wed. June 26, 2013 | No court | **Riley:** 1 hr. legal research<br><br>**McGee:** 2 hrs. records research (-317)<br><br>**Williams:** 1 hr. records research<br><br>**Gonzalez:** 1 hr. legal research<br><br><u>Court Day</u>: **Bogado** ($125.00)   (-858)<br><br><u>Court Day</u>: **Bogado** ($125.00)   (-441)<br><br><u>Court Day</u>: **Perdomo** ($125.00) | 5 Hours<br>3 Court Days |

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Thur. June 27, 2013 | No court | **McGee:** 2.5 hrs. misc. matters (-317)<br>**Degrate:** 0.75 hrs. witness interview<br>**Gonzalez:** 1.25 hrs. legal research<br>**Brown:** 1 hr. legal research<br>**Ceaser:** 1 hr. legal research<br>Court Day: McGee ($400.00)    (-993) | **6.5 hours**<br>**1 Court Day** |
| Fri. June 28, 2013 | No court | **Wright:** 1.5 hrs. records research<br>**Jones, D:** 1.75 hrs. records research<br>**Gonzales N:** 1.75 hrs. legal research<br>**Hernandez:** 2 hrs. legal research<br>Court Day: Winston ($175.00) (-715)<br>Court Day: Winston ($175.00) (-716) | **7 hours**<br>**2 Court Days** |
| Sat. June 29, 2013 | No court | **McGee:** 3 hr. witness interview (-317)<br>**Hernandez:** 2.5 hrs. legal research | **5.5 hours** |
| Mon. July 1, 2013 | No court | **Lindsey:** 1 hr. records research<br>**Winston:** 1.75 hrs. records research (-715)<br>**Mukherjee:** 5.8 hrs. records research<br>**Mendez:** 1 hr. records research | **9.55 hours** |
| Tues., July 2, 2013 | No court | **Mayreis:** 1 hr. Meeting with judge/DA<br>**Wright:** 0.75 hrs. written correspondence; 0.75 hrs. legal research; 1.75 hrs. misc. matters; 0.75 misc. matters<br>**Jones, D:** 0.75 hrs. witness interview; 1.50 hrs. legal research<br>Court Day: Davis ($225.00) (-542)<br>Court Day: Gonzalez ($225.00)<br>Court Day: Jones D ($225.00)<br>Court Day: Lindsey ($175.00) | **7.25 hours**<br>**4 Court Days** |

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Wed., July 3, 2013 | Motion to Suppress Hearing | **Wright:** 0.75 misc. matters<br>**Gonzalez:** 1.5 hrs. legal research<br>**Jones, D:** 0.75 hrs. witness interview<br>**Sparks:** 1 hr. legal research<br>**Ceaser:** 0.75 hrs. written correspondence<br>**Serrano A:** 1.5 hrs. misc. matters<br>**Hernandez:** 1.5 hrs. written correspondence | **7.75 hours** |
| Thur. July 4, 2013 | No court | **Mayreis:** 3 hrs. legal research<br>**Ward D:** 2 hrs. written correspondence<br>**Hernandez:** 3 hrs. legal search | **8 hours** |
| Fri. July 5, 2013 | No court | **Stevenson:** 1 hr. misc. matters  (-049); 0.25 misc. matters (-049)<br>**Gonzalez:** 1 hr. records research<br>**Jones, D:** 1.50 hrs. records research<br>**Davila:** 3 hrs. misc. matters<br>**Williams D:** 2 hrs. legal research | **8.75 hours** |
| Sat. July 6, 2013 | No court | **Davis:** 4 hrs. misc. matters (-542)<br>**Alegria:** 3 hrs. trial notebook<br>**Williams D:** 1.5 hrs. legal research | **8.5 hours** |
| Sun. July 7, 2013 | No court | <u>**Court Day:** Serrano ($175.00)</u>[29] | **1 Court Day** |
| Mon., July 8, 2013 | Guilt Phase | **Wright:** 0.75 misc. matters<br>**Davila:** 2.5 hrs. misc. matters<br>**Batiste:** 0.75 hr. witness interview | **4 Hours** |

---

[29] This court date appears to have been misdated by Mr. Cornelius.

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|--------------------|-------|
| Tues., July 9, 2013 | Guilt Phase | **Mayreis:** 2 hrs. witness interview; 0.5 hrs. conference with client and DA<br>**Ward:** 2 hrs. DNA evidence<br>**Mendez:** 1 hr. legal research<br><u>**Court Day:**</u> Degrate ($175.00)<br><u>**Court Day**</u>: Bowman ($175.00) | **5.5 Hours**<br>**2 Court Days** |
| Wed., July 10, 2013 | Guilt Phase | **Ward:** 2.5 hrs. DNA evidence<br>**Mendez:** 0.5 hr. jail visit<br>**Batiste:** 1 hr. legal research<br><u>**Court Day:**</u> Judeh ($225.00)    (-272)<br><u>**Court Day:**</u> Judeh ($125.00)    (-642)<br><u>**Court Day:**</u> Judeh ($125.00)    (-273) | **4 Hours**<br>**3 Court Days** |
| Thur., July 11, 2013 | Guilt Phase | **Judeh:** 0.75 hrs. witness interview (-065)<br>**Judeh:** 1 hr. witness interview (-273)<br>**Mukherjee:** 1 hr. court appearance<br>**Mendez:** 1.25 hrs. misc. matters<br><u>**Court Day:**</u> **Judeh** ($175.00) | **4 Hours**<br>**1 Court Day** |
| Fri., July 12, 2013 | Guilt Phase Charge Conference | **Mukherjee:** 2 hrs. records research<br>**Sparks:** 0.75 hrs. records research<br>**Serrano A:** 1.25 hrs. records research | **4 Hours** |
| Sat., July 13, 2013 | No court | **Mayreis:** 3 hrs. trial prep<br>**Lee:** 2 hrs. records research (-713)<br>**Sparks:** 1.5 hrs. legal research | **6.5 Hours** |
| Mon., July 15, 2013 | Guilt Phase Closing Arguments and Deliberation | **Mayreis:** 1 hr. witness interview<br>**Sparks:** 1.25 hrs. records research | **2.25 Hours** |

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Tue., July 16, 2013 | Punishment Phase | **Ward:** 3 hrs. of legal research<br>**Wright:** 1.5 hrs. of legal research<br>**Bradley:** 1 hr. witness interview<br>**Brown:** 0.75 hrs. misc. matters<br><u>Court Day</u>: **Bradley** ($175.00) | **6.25 Hours**<br>**1 Court Day** |
| Wed., July 17, 2013 | Punishment Phase | **Mayreis:** 2 hrs. trial prep<br>**Owens:** 0.75 hrs. misc. matters<br>**Ceaser:** 0.50 hrs. witness interview<br><u>Court Day</u>: **Alegria** ($400.00)<br><u>Court Day</u>: **Ceaser** ($225.00) | **3.25 Hours**<br>**2 Court Days** |
| Thur., July 18, 2013 | Punishment Phase | **Mayreis:** 1 hr. Conference with DA/Review Notes<br>**Irias:** 1.5 hrs. misc. matters<br>**Gonzales N:** 1.5 hrs. records research<br>**Alegria:** 1 hr. witness interview<br>**Batiste:** 0.50 hr. witness interview<br><u>Court Day</u>: **Gonzales N** ($400.00) | **5.5 Hours**<br>**1 Court Day** |
| Fri., July 19, 2013 | Punishment Phase Jury Deliberation and Verdict | **Mayreis:** 3 hrs. trial prep<br>**Gonzales N:** 1 hr. records research<br>**Alegria:** 2 hrs. records research<br>**Batiste:** 2 hrs. misc. matters | **8 hours** |
| Sat., July 20, 2013 | No court | **Mayreis:** 2 hrs. trial prep<br>**Judeh:** 3.5 hrs. legal research   (-065) | **5.5 hours** |

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|--------------------|-------|
| Mon. July 22, 2013 | Sentencing | **Mayreis:** 2.5 hrs. jail visit; 0.75 hrs. meeting with DA; 1.5 hrs. witness interview.<br><br>**Owens:** 1 hr. trial prep<br><br>**Irias:** 1 hr. witness interview<br><br>**Sharp:** 1 hr. legal research<br><br>**Fraga:** 0.75 hrs. legal research<br><br><u>Court Day:</u> **Jones A** ($125.00)<br><br><u>Court Day:</u> **Carrizales** ($175.00) | **8.5 Hours**<br><br>**2 Court Days** |

**6.  The billing records of trial counsel's investigator show that Mr. Cruz-Garcia's case was not ready to be tried by the beginning of jury selection.**

While Mr. Cornelius and Mr. Madrid did not keep time entries, their investigator, J.J. Gradoni, did. It is apparent from those time entries that, after their appointment in August 2011, trial counsel waited almost nine months—until May 2012—to begin investigating the case at all. ECF No. 18- 7 at 6–7. Over the course of 2012, the investigator billed fewer than 70 hours. *Id.* Perhaps most troublingly, the vast majority of the investigator's work occurred during or just before trial. Indeed, jury selection began on June 3, 2013, but less than 20% of the total time billed by the investigator was billed before April 7, 2013. *Id.* at 6–7, 10–11, 26, 46–49. A substantial portion of the investigative activity occurred after June 3, 2013, the first day of jury selection. *Id.* The investigator's time entries reflect that the defense team was attempting to locate witnesses, conduct interviews, research state's witnesses, do other field work, and set investigative assignments throughout June 2013. *Id.* at 46–49. By that time, however, trial counsel were occupied by the lengthy *voir dire* proceedings—in addition to the scores of hours and court appearances Mr. Cornelius logged in other cases—making it unlikely that they could do anything productive with the investigative teams' last minute scramble for information.

Moreover, because trial counsel waited until just before trial to investigate in earnest, there was no time for follow-up investigations. Thus, although their investigator did make a short visit to the Dominican Republic (43% of the time billed for the trip was for travel to and from Houston), little was accomplished beyond a few interviews, and no follow-up investigation was possible. ECF No. 18-7 at 26. Likewise, although trial counsel asserted in court filings that investigations in Puerto Rico would be *necessary* for the defense, 2 CR 384–85, they never travelled there.

### 7.  Trial counsel failed to review the State's file.

Trial counsel failed to perform basic tasks necessary for a competent representation. Mr. Cornelius did not even review the district attorney's file. Trial counsel repeatedly refused to take advantage of the district attorney's open file policy. *See* 20 RR 185–86; 16 RR 4–5.

During the guilt phase, frustrated that he had to cross-examine the State's expert without having read his report, Mr. Cornelius asked to make a record of his complaints:

| Mr. Cornelius: | Yeah. I want to make sure we understand each other. *I don't have a responsibility to go through your file and figure out what's in your file. I don't have to do that.* . . . |
| Ms. Tise: | I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's opened to you. . . . |
| The Court: | I don't think we need to put this all on the record. . . . If you want to argue, we'll go off the record. |
| Mr. Cornelius: | I'm not going to go try to figure out what's in your file. . . . I'm not going to go through 20 boxes of DNA records. |
| Ms. Tise: | I told you, Skip, you need to come by and see my file. |

20 RR 186–87 (emphasis added).  Mr. Cornelius subsequently confirmed to post-conviction counsel in an email that he, as a matter of policy, did not participate in "open file" systems like that used by the Harris County District Attorney's Office, stating "I don't play that game." 3 SHCR 607.

In his affidavit to the convicting court, Mr. Cornelius attempted to walk back the admission he made during trial concerning his failure to review the State's file. He claimed that "the files where [sic] brought to court by a number of prosecutors" and that he reviewed the State's file then and there. 4 SHCR 942–48. Mr. Cornelius's billing records, together with other factors, strongly suggest that trial counsel did not actually review the State's file.

First, Mr. Cornelius's billing records show that from jury selection to sentencing (i.e., the time when Mr. Cruz-Garcia's case was in court), Mr. Cornelius was routinely working a substantial number of hours on other cases in addition to his full court days for Mr. Cruz-Garcia's case. In addition, Mr. Cornelius was appearing in court for other clients, often several times a day. It is not plausible that, with the amount of time Mr. Cornelius was working and billing on other cases, he could have reviewed the State's entire file in the courtroom.

Second, when post-conviction counsel examined the State's file, they found numerous documents that were not in trial counsel's files. 1 SHCR 61. Many of the documents were in Spanish, a language Mr. Cornelius does not read. Id. at 61–62. Mr. Cornelius could not have read through these Spanish-language documents. Indeed, none of that evidence was introduced at Mr. Cruz-Garcia's trial.

Third, the State made clear both during the guilt phase and in writing that its file was located in the District Attorney's office, not in the courtroom. 20 RR 186 ("I told you, Skip, you need to come by and see my file."); 2 CR 491 ("My file . . . remained open to defense counsel up to and during trial. Photos witness statements, evidentiary items, lab reports, and other items were all stored together in my office and were available for review before and during trial."). There is no indication on the record that the files were ever located or brought to the courtroom.

In combination, Mr. Cornelius's affidavit, billing records, and other evidence shows that trial counsel failed to perform even the most basic of defense tasks: to review the State's file.

**D. Trial counsel performed deficiently by failing to adequately communicate with Mr. Cruz-Garcia.**

Trial counsel violated the Texas Guidelines and rendered constitutionally deficient representation by failing to adequately communicate with Mr. Cruz-Garcia. The Texas Guidelines provide that "[c]ounsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client." Texas Guideline 10.2.A. "Barring exceptional circumstances, the client should be contacted within 24 hours of initial counsel's entry to the case, with full and complete interviews of the client to be conducted as soon as practically possible." Texas Guideline 10.2.A.1. Counsel must thereafter "engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case." Texas Guideline 10.2.C.

The Texas Guidelines contain additional provisions concerning non-English speaking clients, such as Mr. Cruz-Garcia. Neither Mr. Cornelius nor his investigator Mr. Gradoni spoke Spanish. Having a single attorney who speaks the client's native language and relying on an interpreter for communication with lead counsel is strongly discouraged. Rather, "[i]t is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel." Texas Guideline 13.3.B.2. "If there are language conflicts," which there were here, "counsel may request permission to withdraw due to language problems." *Id.*

Trial counsel compounded this issue by barely meeting with Mr. Cruz-Garcia at all. Mr. Cornelius was appointed to Mr. Cruz-Garcia's case in August 2011. Yet, according to Mr. Gradoni's

billing records, no one visited Mr. Cruz-Garcia until May 2012. ECF No. 18-7 at 6. Throughout his

entire representation, Mr. Cornelius met with Mr. Cruz-Garcia only twice.[30] 5 SHCR 957. Mr.

Gradoni, the lead investigator, also met with Mr. Cruz-Garcia only twice. *Id.* Mr. Madrid apparently

never visited Mr. Cruz-Garcia.[31]  *Id.*

Given their limited interactions with Mr. Cruz-Garcia, complaints from the defense team

attempting to blame Mr. Cruz-Garcia for their failures ring hollow. In their post-conviction

affidavits, the trial defense team describe a completely dysfunctional relationship with their client.

*See* 5 SHCR 952 ("We were hampered in our defense because our client would not discuss any facts

of the case. He insisted that God would set him free but refused to discuss the case."); 5 SHCR 957

("Cruz-Garcia was not very forthcoming about much of anything with respect to the case because, as

he informed me, God and Jesus were going to deliver him and he was not really concerned about

being convicted."); 4 SHCR 943 ("Cruz-Garcia would not discuss the facts of the case with us. At

all. He refused to discuss it with us. His statement was that God would deliver him."). Indeed, in

---

[30] This is apparent from Mr. Gradoni's affidavit. He states that due to the fact that Mr. Cruz-Garcia does not speak English, "[e]ach and every time members of the defense team spoke to Mr. Cruz-Garcia it was with the assistance of Edna Velez, who was a certified interpreter with the Customs Service." 5 SHCR 958. Mr. Gradoni says that Ms. Velez, who was also assigned some investigative tasks, visited Mr. Cruz-Garcia a total of seven times. 5 SHCR at 957. He then states: "I was present for two of the interviews, and Attorney R.P. Cornelius was present on two of the interviews." *Id.* Given that Mr. Cornelius, certainly a "member of the defense team," only spoke with Mr. Cruz-Garcia with Ms. Velez and he only accompanied Ms. Velez to visit Mr. Cruz-Garcia twice, it follows that Mr. Cornelius only visited Mr. Cruz-Garcia on two occasions.

[31] Again, Mr. Gradoni's affidavit states that "each and every time" anyone from the defense team spoke to Mr. Cruz-Garcia, it was with Ms. Velez. 5 SHCR 958. Mr. Gradoni identifies two instances when he and Mr. Cornelius met with Mr. Cruz-Garcia. 5 SHCR 957. He does not mention any visits by Mr. Madrid. Nor does Mr. Madrid identify any visits with Mr. Cruz-Garcia in his affidavit. 5 SHCR 951–54.

response to nearly every issue they were asked about, counsel pointed to their difficulty communicating with their client, which they contend was exclusively Mr. Cruz-Garcia's fault.

However, the Texas Guidelines do not contemplate a one-way street where counsel parachutes in for a couple of visits with their client before trial and the client immediately provides counsel everything needed to win the case. Rather, the Texas Guidelines speak of "establish[ing] a relationship of trust with the client" and "maintain[ing] close contact with the client" as essential to effective representation. Texas Guideline 10.2.A. Trial counsel failed to establish any relationship or communicate with Mr. Cruz-Garcia in accordance with the Guidelines. Trial counsel's deficient performance on this front contributed to the deficient performance and resulting prejudice detailed below with respect to both the guilt and punishment phases.

### E.  Trial counsel performed deficiently by failing to seek a continuance.

As trial approached, trial counsel were nowhere near completing their investigation. This is evidenced not only by Mr. Gradoni's billing records, *see supra* § C.6, but by trial counsel's own statements and actions at trial, *see*, e.g., *infra* § F.3 (trial counsel admitting that they had not completed their investigation of Mr. Santana's criminal background). Mr. Cornelius maintained a crushing caseload with more death penalty cases than TIDC recommends for full-time capital practitioners and more felony cases than TIDC recommends for non-capital practitioners. *See supra* § C. Additionally, trial counsel rarely met with their client. *See supra* § D. Under the Texas Guidelines, either of these issues would have been sufficient to justify withdrawing from the case or, at the very least, seeking a continuance. *See* Texas Guideline 9.3.C (counsel should notify the court and may seek to withdraw if "counsel's caseload becomes overextended"); Texas Guideline 10.3.B.2 ("[C]ounsel may request permission to withdraw due to language problems."). Yet, trial counsel did

not even attempt to obtain a continuance. Trial counsel's decision to proceed to trial without at least attempting to obtain a continuance simply does not square with the defense team's attempts to blame their failings at trial on Mr. Cruz-Garcia's purported lack of cooperation. As detailed below, had trial sought a continuance and conducted a thorough investigation, they could have presented evidence that would have undercut the State's case at both the guilt and punishment phases.

**F. Trial counsel's investigation, preparation, and performance during the guilt/innocence phase were ineffective.**

One of trial counsel's most critical duties is to thoroughly investigate the State's case. To the extent trial counsel does not investigate a particular thread or item of evidence, that assessment must be based on a reasonable decision that supports trial counsel thus limiting the investigation. *Wiggins*, 539 U.S. at 521; *see Strickland*, 466 U.S. at 690–91. Trial counsel presented no rebuttal witnesses *at all* and did not investigate evidence from the State's file, including the now-recanted DNA evidence and numerous prior inconsistent statements by the State's witnesses.

**1. Trial counsel performed deficiently by not challenging the State's DNA evidence.**

**a. Trial counsel performed deficiently by not retaining a DNA expert and by failing to adequately investigate the State's DNA evidence.**

"[I]nvestigating a homicide is uniquely complex and often involves evidence of many different types." ABA Guideline 4.1 cmmt. "Analyzing and interpreting such evidence is *impossible without consulting experts*—whether pathologists, serologists, *DNA analysts*, ballistics, specialists, translators, or others." *Id.* (emphasis added). Pursuant to ABA Guideline 10.7.A, trial counsel "have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *See also* Texas Guideline 11.1. Trial counsel cannot simply take the State's evidence at face value. Rather, "[c]ounsel should make a prompt request to the relevant government

107

agencies for any physical evidence or expert reports relevant to the offense or sentencing, as well as the underlying materials." ABA Guideline 10.7 cmmt. "*With the assistance of appropriate experts*, counsel should then *aggressively re-examine all of the government's forensic evidence* and conduct appropriate analyses of all other available forensic evidence." *Id.* (emphasis added).

Trial counsel failed to adhere to the Guidelines. DNA evidence was a crucial prong of the State's case against Mr. Cruz-Garcia. Trial counsel, however, did not retain a DNA expert, and therefore did not employ "the assistance of appropriate experts." ABA Guideline 10.7 cmmt. Trial counsel also did not "aggressively re-examine" the DNA evidence. *Id.* Instead, trial counsel simply accepted the DNA results reported by the State. In doing so, trial counsel performed deficiently. *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) (trial counsel performed deficiently by failing to investigate forensic evidence); *United States v. Laureys*, 866 F.3d 432, 440 (D.C. Cir. 2017) (trial counsel performed deficiently by failing to retain appropriate expert); *Leonard v. Michigan*, 256 F. Supp. 2d 723, 731 (W.D. Mich. 2003) (trial counsel performed deficiently by failing to retain DNA expert where DNA was a central issue in case); *see also Dendel v. Washington*, 647 F. App'x 612, 615 (6th Cir. 2016) (trial counsel performed deficiently by failing to obtain expert).

Mr. Cruz-Garcia's initial, retained counsel recognized that DNA evidence would be a key aspect of the prosecution's case. As attorney Steven Shellist wrote in his affidavit, "DNA evidence was the only physical evidence linking Cruz-Garcia to the crime." ECF No. 18-6. It thus "became apparent immediately that DNA was the State's key piece of evidence in this case." *Id.* Both Mr. Shellist and Mr. Capitaine "knew that evaluating the integrity of the DNA evidence would be crucial in determining whether or not Cruz-Garcia could be connected to the sexual assault of Diana Garcia and the kidnapping and subsequent death of her son." *Id.* Particularly given that the DNA evidence

had been initially handled by an HPD Crime Lab employee who was subsequently convicted of tampering with evidence, Mr. Shellist and Mr. Capitaine "believed that a review of the State's handling and processing of the DNA evidence by an independent DNA expert was necessary to render effective assistance of counsel and to guarantee Cruz-Garcia a fair trial." *Id.*

To that end, Mr. Shellist and Mr. Capitaine "reached out to Dr. Elizabeth Johnson, a forensic scientist and DNA analyst, to consult with us about the DNA evidence in the case." ECF No. 18–6. They intended "to have Dr. Johnson perform a review of the DNA testing already done and, if necessary, have the DNA retested." *Id.* Mr. Shellist and Mr. Capitaine withdrew from the case before Dr. Johnson could assess the DNA evidence. *Id.* Had they not withdrawn, Mr. Shellist and Mr. Capitaine would have "continued to consult with her for her assistance in [their] cross-examination of the State's witnesses pertaining to DNA," in addition to possibly presenting her as an expert witness at trial or at a suppression hearing. *Id.* After withdrawing from the case, Mr. Shellist and Mr. Capitaine "told Cruz-Garcia's new counsel, Skip Cornelius, that we would be happy to consult with him about the case and share our thoughts and ideas for Cruz-Garcia's defense." *Id.* Mr. Cornelius, however, "only wanted our files and declined to consult with us about the case." *Id.*

Not only did trial counsel decline to consult with Mr. Shellist and Mr. Capitaine, they also declined to contact Dr. Johnson—the DNA expert previously retained. In fact, despite the obvious importance of the DNA evidence in Mr. Cruz-Garcia's case, trial counsel did not consult with *any* DNA expert. Instead, trial counsel simply accepted the State's DNA analysis, which even the State now agrees was deeply flawed. *See* Claim Three; ECF No. 18–11. Likewise, although there were obvious red flags concerning the handling and storage of the DNA evidence by the HPD Crime Lab, trial failed to use publicly available sources to link the scandal directly to the DNA evidence in Mr.

Cruz-Garcia's case. Instead, trial counsel's only engagement with the DNA evidence was to attempt to have it suppressed based on the overall conclusions of the Final Bromwich Report.

In his affidavit, Mr. Cornelius attempted to explain his failure to retain an expert by stating that he "know[s] a lot about DNA evidence," and in his opinion the DNA evidence "had been sufficiently preserved." 4 SHCR 944. Mr. Cornelius was wrong on both counts. As discussed below, however, a DNA expert would have assessed that the State's DNA analysis had yielded unsupportable results, as the State later conceded. A DNA expert would also have identified serious problems with how the DNA evidence was stored.

Mr. Cornelius also stated that a DNA expert was not retained because this expert would have been cross-examined by the State. 4 SHCR 944. Of course, that in no way explains Mr. Cornelius's failure to even *consult* with a DNA expert. Indeed, the decision of whether to present expert testimony can only be made once the expert has examined the State's evidence. Here, as discussed below, a DNA expert would have uncovered serious problems with the State's DNA analysis—which the State has now conceded—as well as significant storage issues. Having not consulted with a DNA expert *at all*, Mr. Cornelius cannot have made an informed decision about whether to present expert testimony. *Richards v. Quarterman,* 566 F.3d 553, 564 (5th Cir. 2009) ("[C]ourts are 'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'" (quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999)).

> **b. Trial counsel's failure to retain a DNA expert and to adequately investigate the State's DNA evidence prejudiced Mr. Cruz-Garcia.**

Trial counsel's failure to retain an expert and adequately investigate the DNA evidence prejudiced Mr. Cruz-Garcia. The DNA evidence was crucial to the State's case. *See* 23 RR 37 (arguing

to the jury that the DNA evidence was "the most damning evidence" against Mr. Cruz-Garcia). Had Mr. Cornelius retained a DNA expert, he would have known about—and could have informed the jury of—serious inaccuracies in the State's DNA evidence. A DNA expert also would have identified substantial storage irregularities in how the DNA evidence was stored, including that key pieces of forensic evidence were co-mingled and stored in unsealed containers.

### i. A DNA expert could have identified serious, and now conceded, flaws with the State's DNA analysis.

During state post-conviction proceedings, Mr. Cruz-Garcia retained a DNA expert to assess the State's DNA evidence. The expert concluded that there were serious problems with the interpretation of the DNA results. ECF No. 18-10. Notably, the expert reached these conclusions before the State recanted its DNA analysis.

A DNA expert could have identified the State's erroneous inclusion of Arturo Rodriguez, Diana Garcia's boyfriend, as a contributor to the DNA mixture from Ms. Garcia's panties. In 2010, the Scientific Working Group on DNA Analysis Methods (SWGDAM) promulgated guidelines requiring that "any inclusion (or non-exclusion) [of an individual] must be reported along with a statistical weight to aid the trier of fact" in assessing "the strength of this inclusion." *Id.* at 3. Yet, when Orchid Cellmark included Mr. Rodriguez as a possible contributor to the mixture DNA profile obtained from the cutting of the red panties, it did so without reporting a statistical evaluation. *Id.* Indeed, it appears that "[t]he laboratory did not do a statistical calculation on this DNA mixture." *Id.* Accordingly, pursuant to the SWGDAM guidelines, Orchid Cellmark "should not have included Arturo Rodriguez as a possible contributor." *Id.*

Orchid Cellmark's failure to conduct a statistical calculation is further confirmed by the fact that "the DNA mixture from the cutting of the red panties is only detected in four of fifteen DNA

loci and at a very low level." *Id.* at 4. "It is very unlikely that any of these could be deemed suitable for statistical analysis," making it impossible to obtain a statistical weight. *Id.* To put it simply, there was "insufficient information for a laboratory to conclude that Arturo Rodriguez may have been the second contributor." *Id.* Orchid Cellmark should have reported the comparison between the panties and Mr. Rodriguez as "inconclusive," rather that reporting that he was included as a possible contributor. *Id.*

It is now undisputed, of course, that Mr. Cruz-Garcia's post-conviction DNA expert was correct and Orchid Cellmark was wrong. *See* ECF No. 18–11. Mr. Rodriguez never should have been identified as a possible contributor to the mixture sample from the panties, as the State conceded after its own post-trial DNA analysis. *Id.*

Orchid Cellmark's analysis of the vaginal swab also suffered from numerous deficiencies that a DNA expert could have uncovered. DNA at several loci—that is, the "tested locations on the DNA"—appeared at such a low level "that the laboratory should have precluded them from statistical analysis." ECF No. 18-10 at 4. In at least one instance, there was a missing allele, yet "the laboratory still improperly utilized this DNA locus for statistical analysis." *Id.* Orchid Cellmark violated SWGDAM guidelines when it used these loci in its statistical analysis that did not meet the threshold required for inclusion. *Id.* Again, this conclusion of Mr. Cruz-Garcia's post-conviction DNA expert was ultimately confirmed by the State when its post-trial reanalysis conceded that Mr. Cruz-Garcia should not have been linked to the vaginal swab. ECF No. 18-11.

There were multiple, additional problems with the State's DNA testing that an expert could have brought to trial counsel's attention. Orchid Cellmark used two separate statistical analyses of the contributors to the vaginal swab, one for Mr. Cruz-Garcia and another for Mr. Rodriguez. ECF

No. 18-10 at 5. That is, after including Mr. Rodriguez as a possible contributor, "the statistics were changed for the subsequent inclusion of Obel Cruz-Garcia." Unsurprisingly, "[t]his is a violation of SWGDAM guidelines." *Id.*

Likewise, although Orchid Cellmark generated the DNA profiles and identified possible contributors (with multiple, substantial errors, as discussed above), the HPD analyst subsequently reinterpreted those DNA profiles before reaching its (now retracted) conclusions regarding who could be included as possible contributors. *Id.* at 5–6. In doing so, the HPD analyst excluded a DNA marker that had been included by Orchid Cellmark and included additional DNA loci. *Id.* This violated "scientific best practice" and "accreditation standards," and led to an inappropriate "adjustment to the statistical interpretation." *Id.* at 5–7.

### ii. A DNA expert could have identified serious problems with the storage of the DNA evidence.

The DNA expert retained by Mr. Cruz-Garcia's post-conviction counsel also identified serious issues concerning "the integrity of the probative pieces of evidence in this case." ECF No. 18–10 at 2. Specifically, "it appears the evidence bag containing the sexual assault kit that housed the vaginal swabs tested in this case was unsealed prior to laboratory testing." *Id.* "Given the extended timeframe between the original HPD/Genetic Design testing and the submission of this evidence to Orchid Cellmark—roughly fifteen years—the unsealed sexual assault kit raises serious concerns as to the integrity of this evidence." *Id.* at 3.

The sexual assault kit was not the only item of the DNA evidence that was improperly stored. Mr. Cruz-Garcia's post-conviction expert also noted that "although the manila envelope containing the cutting from the crotch of the red panties was identified [by Orchid Cellmark] as a sealed container, two integral pieces within that sealed package were noted as unsealed." *Id.* The unsealed

envelopes "housed the cutting from the crotch of the red panties and the liquid blood known sample from Arturo Rodriguez." *Id.* Allowing an "unsealed known sample" to be housed with "an unknown evidence sample" is not only a cause for concern, but also "calls into question the integrity of this evidence." *Id.*

As discussed in Claims Two and Three, the publicly-available Bromwich reports also called into question the storage of the DNA evidence. Had trial counsel retained a DNA expert and adequately investigated the DNA evidence, trial counsel could have shown that the State's DNA analysis was flawed and reached unsupportable conclusions—something the State now concedes. *See* ECF No. 18-11. Trial counsel could have brought the DNA storage problems to the jury's attention during trial and thus significantly undercut the reliability of the DNA evidence. The storage issues would have also significantly strengthened the defense's motion to suppress the DNA evidence, and at the very least would have assisted the defense's argument that the trial court should not preclude evidence of the problems at the HPD Crime Lab and the malfeasance and incompetence of the analysts who originally handed the DNA evidence. In denying the defense's motion to suppress and prohibiting any evidence about the old HPD Crime Lab, Judge Magee relied on the apparent lack of a connection between the DNA in Mr. Cruz-Garcia's case and handling and storage problems within the old HPD Crime Lab. 17 RR 13, 17. However, the issues identified by Mr. Cruz-Garcia's DNA expert and reflected im the Bromwich reports could have provided that link between the evidence at issue in Mr. Cruz-Garcia's case and the HPD Crime Lab. Mr. Cruz-Garcia was therefore prejudiced by his trial counsel's deficient performance and his Sixth Amendment right to effective assistance of counsel was violated. *Elmore*, 661 F.3d at 866–71; *Laureys*, 866 F.3d at 440–41; *Leonard*, 256 F. Supp. 2d at 733–34; *see also Dendel*, 647 F. App'x at 615–16.

> **2. Trial counsel failed to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab.**
>
> > **a. Trial counsel performed deficiently by failing to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab.**

Trial counsel has a duty to consider all potentially available legal claims and assert them "as forcefully as possible." ABA Guideline 10.8; Texas Guideline 11.2. "'One of the most fundamental duties of an attorney defending a capital case is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.'" ABA Guideline 10.8 cmmt. (quoting Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42–43). "[T]rial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, but also of the heightened need to fully preserve all potential issues for later review." *Id.* "[C]ounsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other cases." *Id.* Thus, when there are multiple bases for asserting a legal claim, it is not sufficient for counsel raise only one of them. Rather, "counsel should be sure to litigate all of the possible legal and factual bases for the request." *Id.* Because—as occurred in this case—"[a] reviewing court may refuse to consider a legal theory different from that put forward originally," trial counsel "should *always* cite any arguably applicable provision of *the United States Constitution*, the state constitution, and state law as bases for granting a claim." *Id.* n. 230 (emphasis added).

Here, trial counsel violated the Guidelines by failing to raise a Sixth Amendment objection to the trial court's erroneous decision to prohibit the defense from cross-examining the State's witnesses about the problems at the old HPD Crime Lab. 17 RR 18–21. Trial counsel objected to the trial court's ruling solely on the basis of state law. As a consequence, the CCA refused to assess

whether the ruling violated Mr. Cruz-Garcia's rights under the Confrontation Clause. *Cruz-Garcia*, 2015 WL 6528727, at *16.

The Sixth Amendment implications of the trial court's ruling were obvious. Indeed, the case law provided by the State to the trial court on the issue of whether trial counsel should be permitted to cross witnesses about the old HPD Crime Lab focused on the Sixth Amendment implications of restricting cross-examination.[32] It should therefore have been clear to trial counsel that the trial court's decision to limit the defense's cross-examination raised a substantial Confrontation Clause issue. By failing to raise that issue, trial counsel did not "litigate all of the possible legal and factual bases" for challenging the trial court's decision, nor did they cite an "applicable provision of the United States Constitution," as the Guidelines require. ABA Guideline 10.8 cmmt. & n. 230; *see also* Texas Guideline 11.2. Trial counsel therefore performed deficiently.

> **b.  Mr. Cruz-Garcia was prejudiced by trial counsel's failure to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination concerning the old HPD Crime Lab.**

Had trial counsel preserved the issue, Mr. Cruz-Garcia's appeal would have likely succeeded for all the reasons stated in Claim Two § C.

---

[32] *Baldez v. State*, 386 SW.3d 324, 327–29 (Tex. App.–San Antonio 2012, no pet.); *Curtis v. State*, 205 S.W.3d 656, 665–66 (Tex. App.–Fort Worth 2006, pet. ref'd); *Pope v. State*, 161 S.W.3d 114, 124–25 (Tex. App. Fort Worth 2004, pet. granted on other grounds); *see also Crenshaw v. State*, 125 S.W.3d 651, 653–55 (Tex. App.–Houston [1st Dist.] 2003, pet. ref'd) (cited in *Curtis*). *Baldez*, *Curtis*, and *Pope* were each cited in a bench memo provided by the State to Judge Magee. Although the bench memo is not part of the clerk's record, Judge Magee read the case names into the record. 17 RR 4. Defense counsel did not provide any written filing or bench memo to Judge Magee regarding the decision to preclude the defense from cross-examining State witnesses regarding the problems at the old HPD Crime Lab. Nor did trial counsel cite any case law to Judge Magee.

### 3.   Trial counsel failed to investigate the State's star witness, Mr. Santana.

The testimony of Mr. Santana was a key aspect of the State's case against Mr. Cruz-Garcia. Mr. Santana purported to have witnessed—and participated in—the abduction and murder of Angelo Garcia. He was the only eyewitness to implicate Mr. Cruz-Garcia.

Trial counsel has a duty to conduct a thorough investigation to prepare for trial. *Strickland*, 466 U.S. at 690–91; ABA Guideline 10.7; Texas Guideline 11.1. To discharge that duty, trial counsel "should investigate all sources of possible impeachment of defense **and prosecution witnesses**." ABA Guideline 10.7 cmmt. (emphasis added). "A key prosecution witness's prior criminal history and resultant parole status clearly constitute important impeachment evidence." *Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013), *abrogated on other grounds*, *Dennis v. Sec., Penn. Dep't of Corrs.*, 834 F.3d 263 (3d Cir. 2016). "It is beyond the range of professionally reasonable judgment to forgo investigation of, and impeachment based upon, such evidence absent some apparent strategic reason that might explain or excuse counsel's failure." *Grant*, 709 F.3d at 234. Here, trial counsel performed deficiently by failing to investigate the prosecution's star witness, Mr. Santana.

### a.   Trial counsel failed to investigate Mr. Santana's mental health issues.

When, after decades of denying he knew anything about Angelo Garcia's murder, Mr. Santana implicated Mr. Cruz-Garcia in his 2011 statement to the FBI, Mr. Santana was serving a lengthy sentence on federal drug-related charges. *United States v. Carmelo Martinez*, 4:98-cr-00012 (S.D. Tex. Dec. 17, 1998). Leading up to that conviction, Mr. Santana's counsel requested a psychiatric examination due to concerns about Mr. Santana's competence to stand trial. ECF No. 18-13. The government did not oppose the motion and the court ordered that Mr. Santana be

examined by a psychiatrist. ECF No. 18-14. Ultimately, the federal proceeding was resolved through a guilty plea. ECF No. 18-12.

Mr. Santana's mental health problems persisted, however, and in April 2011, Mr. Santana addressed a letter to the convicting court seeking to have his guilty plea set aside based on his "continued incompetence." ECF No. 18–12. In that letter, Mr. Santana stated: "I have a plethora of medical records that illustrate my undeniable incompetence to accept a guilty plea." *Id.* He also explained that "an inmate assistant" would file the motion to set aside his guilty plea because "in light of my illness, I would have never been able to file such a motion." *Id.* Mr. Santana's letter, which evidences not only a well-documented history of mental illness but also Mr. Santana's desperation to be released from federal confinement, was sent just two months before Mr. Santana's meeting with the FBI, in which he implicated Mr. Cruz-Garcia in Angelo Garcia's murder after denying any knowledge of the matter for two decades. This information[33] was readily available through public records, including the electronic docket entries in connection with Mr. Santana's federal prosecution, and could have been discovered by trial counsel had they exercised reasonable diligence. Trial counsel, however, failed to investigate Mr. Santana's documented mental health issues and, as a result, the jury did not learn about it.

### b. Trial counsel failed to investigate Mr. Santana's crime of moral turpitude.

Around the time of Angelo Garcia's kidnapping, Mr. Santana was convicted in Harris County of assaulting a young girl. ECF No. 18-79 at 7. Because the victim was female, the assault constituted a crime of moral turpitude and was admissible for impeachment purposes under Texas

---

[33] The records concerning Mr. Santana's mental health problems should have been disclosed to trial counsel pursuant to the State's *Brady* obligation to disclose impeachment evidence. *See* Claim Six § A.

law. *See* Tex. R. Evid. 609; *Hardeman v. Texas*, 868 S.W.2d 404, 407 (Tex. App.—Austin 1993), *pet. dism'd*, 891 S.W.2d 960 (Tex. Crim. App. 1995) (holding that misdemeanor assault conviction, when the crime is committed by a man against a woman, is a crime of moral turpitude). Due to trial counsel's lack of investigation, however, the jury never heard about Mr. Santana's child-assault conviction.

Trial counsel, however, had not investigated the conviction and therefore did not know the gender of the victim. As Mr. Cornelius stated during the trial: "Honestly, I'm not sure. In fairness, I've got an investigator's report, but I don't have that much confidence in it." 21 RR 17. Indeed, the billing records of trial counsel's investigator show that, on June 20, 2013, when Mr. Cruz-Garcia's trial was already well under way, he attempted to "Obtain Offense Report Regarding State Witness Prior Conviction." ECF No. 18-7 at 47. However, it appears that there was no follow-up to determine the specifics of Mr. Santana's conviction. Because trial counsel did not investigate Mr. Santana's prior conviction, Mr. Cornelius stated that he would simply rely on whatever the State or Mr. Santana told him: "I've got some conflicting information from my own investigators and so, I'm going to accept pretty much whatever the State tells me or what he [Mr. Santana] tells me." 21 RR 18.

Mr. Santana lied on the stand about the gender of the victim. He asserted that he had committed an assault against a boy, not a girl, which meant that the conviction was inadmissible for impeachment purposes. 21 RR 21. Because trial counsel had not conducted an adequate investigation, they did not know that Mr. Santana had not only committed a crime of moral turpitude that was admissible for impeachment purposes, but that he had also just perjured himself by falsely testifying that the victim had been a boy. Besides being a ground for impeachment, *see* Tex.

R. Evid. 609, the fact of Mr. Santana's child-assault conviction around the time of Angelo Garcia's disappearance would have also cast doubt as to his claims to the jury that he reluctantly followed along in kidnapping and killing Angelo, a child. 21 RR 18.

As evidenced by trial counsel's own statements on the record that he would "accept pretty much whatever" was said by the very witness that he sought to impeach, counsel's failure to investigate Mr. Santana's prior conviction was not based on any strategy. Instead, trial counsel's belated investigation combined with an excessive case-load prevented any more than what was by trial counsel's own admission an incomplete investigation. *Id.*

> **c. Trial counsel failed to make use of the State's *Brady* notice regarding the lack of blood on Angel Garcia's clothing, in contradiction of Mr. Santana's testimony.**

Mr. Santana testified that Mr. Aviles-Barroso used a knife to murder Angelo Garcia and that Angelo's chest had been covered in blood. 20 RR 151–52. Mr. Santana further described how he himself later threw that knife out of the car. *Id.* at 166.

Shortly before trial, however, the State provided a supplemental *Brady* notice stating that a presumptive test for blood on Angelo Garcia's clothing was negative. 3 CR 482. This absence of blood contradicted Mr. Santana's recounting of how the murder supposedly occurred. Nor was there any other forensic evidence suggesting that Angelo Garcia had been stabbed to death.

Trial counsel, however, did not introduce any evidence of the blood testing that contradicted Mr. Santana's testimony and the jury did not hear that Mr. Santana's version of events was contradicted by the forensic evidence.

### d. Mr. Cruz-Garcia was prejudiced by trial counsel's failures to investigate Mr. Santana.

Trial counsel's failure to adequately investigate Mr. Santana's mental health and criminal history substantially impacted Mr. Cruz-Garcia's trial. In closing, the State made clear that the testimony of Mr. Santana, its only eyewitness, was key to establishing Mr. Cruz-Garcia's guilt. 23 RR 98. Had trial counsel performed an adequate investigation, they could have seriously undermined the credibility of the State's star witness. The jury could have heard that the State's only eyewitness had a documented history of mental illness, which that witness himself alleged was so significant as to make him incompetent. The jury could also have heard that, just before implicating Mr. Cruz-Garcia, Mr. Santana had sought to have his federal drug trafficking conviction set aside based on his mental illness. The jury also could have heard that Mr. Santana was convicted of assaulting a child around the time of Angelo Garcia's murder and that it could consider that conviction in assessing Mr. Santana's credibility. Finally, the jury could have heard that Mr. Santana's recounting of Angelo Garcia's murder was inconsistent with the forensic evidence, further casting doubt on his credibility.

Given how crucial Mr. Santana's testimony was to establishing Mr. Cruz-Garcia's guilt, there is a reasonable probability that at least one juror would have voted not to convict Mr. Cruz-Garcia had trial counsel not performed deficiently. *See Grant*, 709 F.3d at 234 (failure to discover star witness was on parole and use conviction to impeach him was ineffective assistance of counsel).

### 4. Trial counsel failed to investigate Angelita Rodriguez.

### a. Trial counsel performed deficiently by failing to investigate the testimony of Angelita Rodriguez.

To corroborate Mr. Santana's testimony and the DNA evidence, the State relied heavily on the testimony of Angelita Rodriguez, Mr. Cruz-Garcia's ex-wife, who claimed that Mr. Cruz-Garcia had "told her he did it." 23 RR 37. Her testimony, however, was demonstrably false based on her

prior inconsistent statements to law enforcement. *See* Claim Five § C. Indeed, Ms. Rodriguez's trial testimony contradicted her numerous prior statements to law enforcement, from her first interview in October 1992 and continuing until October 2008. ECF Nos. 18- 73; 18–37; 18–74. Ms. Rodriguez had always maintained to law enforcement that she had no knowledge about the disappearance and murder of Angelo. *Id.*

Trial counsel, however, failed to bring any of these prior inconsistent statements to the jury's attention. Instead, Mr. Cornelius sought to impeach her by pointing to a 2008 interview in which she stated that Mr. Cruz-Garcia had not answered her when she asked him whether he was involved in Angelo Garcia's death. 20 RR 111–12. In doing so, however, Mr. Cornelius indicated to the jury that Ms. Rodriguez had told the police "this entire story except for that," suggesting that Ms. Rodriguez was being untruthful only about Mr. Cruz-Garcia's purported confession. *Id.* at 112. Ms. Rodriguez explained her misstatement at the 2008 interview by saying: "I was scared." *Id.*

There was significant evidence, however, that Ms. Rodriguez testified falsely about more than the purported confession. Trial counsel performed deficiently by not investigating this information and presenting it to the jury. As discussed below, witnesses from the Dominican Republic could have testified that Mr. Cruz-Garcia had been preparing to leave Houston prior to Angelo Garcia's disappearance. Because trial counsel failed to interview these witnesses, including Mr. Cruz-Garcia's father, they did not present this information to the jury. An FBI memorandum also cast serious doubt on the circumstances of Mr. Cruz-Garcia's purported confession. It described Ms. Rodriguez as living together with Mr. Cruz-Garcia in the Dominican Republic at Ms. Rodriguez's mother's house, contrary to Ms. Rodriguez's trial testimony that the only time she saw Mr. Cruz-Garcia again was to ask for a divorce and that is when he purportedly confessed. Because trial counsel did not

adequately review the law enforcement records, however, this information was also not presented to the jury.

Finally, trial counsel failed to investigate and question Ms. Rodriguez concerning any assistance she expected to receive from the State in return for her testimony. In fact, the State did provide immigration assistance to Ms. Rodriguez in return for her testimony. *See* Ex. 113.

### b. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Angelita Rodriguez.

Had trial counsel conducted an adequate investigation into Ms. Rodriguez, they could have raised serious doubts among the jurors as to her credibility. Ms. Rodriguez's testimony that Mr. Cruz-Garcia purportedly confessed to her was a key part of the prosecution's case. There were many reasons, however, for the jury to be skeptical of her testimony. Trial counsel could have shown that, contrary to Ms. Rodriguez's testimony, Mr. Cruz-Garcia had been preparing to return to the Dominican Republic for some time. He had been sending money to his father to build a house for Mr. Cruz-Garcia and his family to inhabit in Bella Vista de Boba. ECF Nos. 18-81, 18-91. Indeed, he and his father completed the house after his return and Mr. Cruz-Garcia opened a fish store on the first floor. ECF No. 18-81. Trial counsel could have also shown that Ms. Rodriguez testified falsely concerning her relationship with Mr. Cruz-Garcia after he left Houston. Contrary to her testimony that she had not seen Mr. Cruz-Garcia again until asking for a divorce, Ms. Rodriguez was living with Mr. Cruz-Garcia in the Dominican Republic in Ms. Rodriguez's mother's house. ECF No. 18-15. Trial counsel did not even need to travel to the Dominican Republic to learn that Ms. Rodriguez had testified falsely on this point; the fact that Ms. Rodriguez and Mr. Cruz-Garcia continued to live together in the Dominican Republic was memorialized in an FBI memorandum. *Id.* Finally, after she testified against Mr. Cruz-Garcia, the prosecution provided assistance to Ms.

Rodriguez in her efforts to resolve her immigration status. Ex. 113. Additionally, not just in 2008 but from the time of the offense in 1992, Ms. Rodriguez had repeatedly told law enforcement she had no idea who had abducted Angelo Garcia.

In short, her testimony concerning the circumstances of the purported confession was demonstrably false. Mr. Cruz-Garcia's departure from Houston had not been completely unplanned. She had not simply returned to the Dominican Republic to ask Mr. Cruz-Garcia for a divorce (the time when the purported confession occurred), but had lived together with Mr. Cruz-Garcia at her mother's house. Finally, Ms. Rodriguez had an obvious incentive for changing her story to implicate Mr. Cruz-Garcia—assistance from the State to resolve her immigration problems. Ms. Rodriguez should not have been a witness the jury found credible, and she would not have been had trial counsel conducted an adequate investigation.

### 5. Trial counsel failed to investigate Diana Garcia and Arturo Rodriguez.

#### a. Trial counsel failed to develop evidence of Diana Garcia's consensual relationship with Mr. Cruz-Garcia.

The key piece of evidence against Mr. Cruz-Garcia was the presence of his DNA in the extractions taken from Ms. Garcia's vaginal swab and underwear. 23 RR 93. Based on Ms. Garcia's statement that one of the assailants sexually assaulted her, the DNA appeared to link Mr. Cruz-Garcia to the time and place of Angelo Garcia's disappearance. Trial counsel, however, failed to investigate and present substantial evidence that Mr. Cruz-Garcia and Ms. Garcia had a consensual sexual relationship. Specifically, several friends of Ms. Garcia and Mr. Cruz-Garcia could and would have testified that it was well known that they maintained a consensual sexual relationship. ECF Nos. 18-21 at 1; 18-22 at 1; 18-23 at 2. Cesar Rios, and his brothers Hector Saavedra and Jose Valdez, knew Ms. Garcia and Mr. Cruz-Garcia well and could have testified that they had a consensual sexual

relationship. *Id.* All three of the brothers were available to testify at Mr. Cruz-Garcia's trial, had the defense team asked them to. *Id.*

In their affidavits, trial counsel squarely placed the blame on Mr. Cruz-Garcia for their failure to contact and follow-up with witnesses who could have testified to Ms. Garcia and Mr. Cruz-Garcia's relationship. These claims, however, do not withstand scrutiny. According to the investigator billing records, the bulk of trial counsel's efforts to locate witnesses occurred in June 2013, *during jury selection* and while Mr. Cornelius continued to bill several hours each day to other cases. ECF No. 18 –7 at 46–49; Ex. 138.

Mr. Rios, who was identified in the offense report from 1992 as an associate of Ms. Garcia, remembers speaking briefly with someone from the defense team. ECF No. 18-21 at 2. After that brief conversation, however, he was never contacted again. *Id.* In his affidavit, Mr. Gradoni acknowledges that Mr. Rios was identified as a possible witness based on the 1992 offense report, 5 CR 958, but Mr. Cornelius and Mr. Gradoni both claimed that they could not locate or interview Mr. Rios. 4 CR 944–45; 5 CR 958. These claims, however, are contradicted by Mr. Rios's own recollection of having briefly been contacted by the defense team. ECF No. 18-21.

In his affidavit, Mr. Cornelius further attempts to place the blame on Mr. Cruz-Garcia for trial counsel's failure to locate Mr. Rios, asserting that (in his two meetings with Mr. Cruz-Garcia), "[h]e never told us about the alleged witnesses Cesar Rios [or his brothers] Jose Valdez, or Hector Saavedra." 4 SHCR 944. Yet, by his investigator's own admission, Mr. Cornelius did not need Mr. Cruz-Garcia to tell him that Mr. Rios was a potentially important witness: he was listed as an associate of Ms. Garcia in the 1992 offense reports. 5 SHCR 958. The background check Mr. Gradoni claims to have run on Mr. Rios could have also turned up his family members. *Id.* Indeed, it is difficult to

imagine how Mr. Cruz-Garcia could have assisted trial counsel in locating Mr. Rios and his brothers, given that Mr. Cruz-Garcia had not lived in the United States in over 20 years aside from in pre-trial detention.

Trial counsel's failure to locate and/or follow-up with witnesses who could have testified to Mr. Cruz-Garcia and Ms. Garcia's relationship is attributable to trial counsel's failure to begin their investigations sufficiently in advance of jury selection or by seeking a continuance. Trial counsel's affidavits and Mr. Cornelius's billing records make clear that trial counsel did not dedicate sufficient time to investigation ahead of Mr. Cruz-Garcia's trial. That jury selection had already begun by the time trial counsel attempted to locate and reach out to witnesses, combined with Mr. Cornelius's extensive billing to other cases, lend support to Mr. Rios's recollection that the defense team simply never followed-up. The defense was thus prevented from presenting evidence of a consensual relationship between Mr. Cruz-Garcia and Ms. Garcia.

> ### b. Trial counsel failed to develop evidence that Ms. Garcia and Mr. Rodriguez were still selling drugs on the night of the offense.

The State's theory of Mr. Cruz-Garcia's motive for assaulting Ms. Garcia and Mr. Rodriguez was retaliation because they had stopped selling drugs for him. 18 RR 33, 204. Ms. Garcia and Mr. Rodriguez both testified that they had stopped selling drugs a month before Angelo Garcia was kidnapped. 18 RR 133–34, 204; 19 RR 33. The State presented their testimony not only as evidence of Mr. Cruz-Garcia's motive, but also to portray Ms. Garcia and Mr. Rodriguez as a hardworking couple who had recently left their criminal past behind to raise her young son. 18 RR 33.

Evidence from police reports, however, establish that Ms. Garcia and Mr. Rodriguez lied to law enforcement. ECF No. 18-24 at 1–2. Not only had the couple not stopped dealing drugs; they were dealing drugs on the night of Angelo Garcia's disappearance and from the apartment from

which he was taken. *Id.* These police reports were easily discoverable to trial counsel, had trial counsel reviewed the State's file.

### c. Trial counsel failed to develop evidence that Ms. Garcia was an unreliable witness.

Trial counsel failed to investigate and present evidence that Ms. Garcia testified falsely to a number of material facts, including her relationship with Mr. Rodriguez, her son's paternity, and living arrangements. Ms. Garcia lied to the jury about her relationship with Mr. Rodriguez. Ms. Garcia described Mr. Rodriguez as her common-law husband and testified that Angelo Garcia lived with the couple full-time. 18 RR 121, 125; 25 RR 194. However, at the time of the offense and of the trial, Ms. Garcia remained legally married to Angelo Garcia Sr. and Mr. Rodriguez was therefore not her common-law husband. Ms. Garcia and Mr. Rodriguez had become a couple when Ms. Garcia still lived with, and remained married to, Mr. Garcia Sr.[34] ECF No. 18-100; 18–97. Additionally, Angelo Garcia did not live with the couple until much later than Ms. Garcia's representation at trial. 19 RR 197. This information was uncovered by law enforcement and available to trial counsel had they reviewed the State's file. *See, e.g.*, ECF No. 18-24.

### d. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Diana Garcia and Arturo Rodriguez.

Had trial counsel adequately investigated the relationship between Ms. Garcia and Mr. Cruz-Garcia, they could have undermined the State's only forensic evidence linking Mr. Cruz-Garcia to Angelo Garcia's abduction. The State argued to the jury that Mr. Cruz-Garcia must have sexually assaulted Ms. Garcia because his DNA was identified in the vaginal swab and the cutting from Ms.

---

[34] Ms. Garcia had also previously had an affair with a man named Pedro Ortiz, who she told police was the biological father of Angelo Garcia. ECF No. 18-97. At trial, Ms. Garcia referred to Mr. Garcia Sr. as Angelo Garcia's father. 25 RR 194.

Garcia's panties and there was no evidence of any consensual relationship between the two of them. 23 90–91. Presenting evidence that Ms. Garcia and Mr. Cruz-Garcia had a consensual sexual relationship would have explained the presence of Mr. Cruz-Garcia's DNA and thus prevented the State from arguing to the jury that Mr. Cruz-Garcia must have been one of the assailants on the night of Angelo Garcia's disappearance. The State described the DNA evidence as "the most damning corroboration for the defendant in this case[.]" 23 RR 36. But for trial counsel's deficient performance, that "most damning" evidence would not have tied Mr. Cruz-Garcia to the crime.

Showing that Ms. Garcia and Mr. Rodriguez continued selling drugs up until the day of the abduction would have also undermined the State's case. Had trial counsel presented evidence that Ms. Garcia and Mr. Rodriguez were dealing drugs on the night when, and from the apartment from which, Angelo Garcia was taken, the State would have had no theory as to motive for Mr. Cruz-Garcia's involvement. Instead, the jury could readily have tied the assault and Angelo Garcia's disappearance to Ms. Garcia and Mr. Rodriguez's continued involvement in a dangerous criminal activity. It would also—together with other false statements by Ms. Garcia—have seriously damaged the credibility of Ms. Garcia and Mr. Rodriguez as witnesses, particularly given the State's emphasis on their having ceased dealing drugs. 18 RR 33.

### 6. Trial counsel failed to investigate law enforcement's theory of the case at trial.

#### a. Trial counsel performed deficiently by failing to present evidence that the cigar was not linked to the crime.

The cigar found in Ms. Garcia's apartment was one of the State's key pieces of evidence. The State contended to the jury that the cigar was left by one of the assailants and, because Mr. Cruz-Garcia's DNA was on it, it therefore inculpated Mr. Cruz-Garcia. 18 RR 35–36, 80; 21 RR 119. Trial counsel performed deficiently by failing to present evidence that, during the original

128

Case 4:17-cv-03621   Document 73   Filed on 05/04/22 in TXSD   Page 154 of 290

investigation, law enforcement reached the opposite conclusion: that the cigar was not linked to Angelo Garcia's abduction. The evidence was readily available. In a recorded statement during the original investigation, an HPD officer stated that the investigators did not believe that the cigar was tied to the assault and assailants. ECF No. 18-64 at 7 ("Somebody was there at your house that evening, left the cigar there and it wasn't the guys that came in. It was somebody else that was with you all. He left it there."); 18-65. Had trial counsel conducted a sufficient investigation, including by reviewing the State's file, trial counsel could have located this recording.

> **b. Trial counsel performed deficiently by failing to present evidence that the police never believed Ms. Garcia and Mr. Rodriguez.**

Trial counsel also performed deficiently by failing to present evidence that, contrary to the testimony of the State's law enforcement witnesses, the police concluded during the original investigation that Ms. Garcia and Mr. Rodriguez had never been truthful with them.

Law enforcement witnesses testified that very soon after Angelo's disappearance, Ms. Garcia and Mr. Rodriguez cooperated fully and were truthful with law enforcement. 18 RR 119; 19 RR 66, 67, 74. In fact, according to numerous police reports, Ms. Garcia and Mr. Rodriguez were uncooperative throughout the investigation and law enforcement did not trust their account of the circumstances of Angelo's disappearance. ECF Nos. 18-19; 18-64; 18-66. In 1993, months after Angelo Garcia's disappearance and the discovery of his body, one investigating officer even summarized: "Diana [Garcia] and Arturo [Rodriguez] have been *untruthful throughout the investigation* with regards to the events inside the apartment and the identity of the suspects." ECF No. 18-19 (emphasis added). These reports were available to trial counsel as part of the State's file, but because the trial counsel failed to review the State's file, law enforcement's false testimony was unchallenged.

### c. Trial counsel performed deficiently by not investigating law enforcement's other theories of the offense.

Trial counsel also failed to present evidence that the testimony of the State's law enforcement witnesses was inaccurate on other important points. Law enforcement witnesses testified that the investigation had never considered other theories of Angelo Garcia's disappearance. 19 RR 79. According to police records, however, several demands for ransom were made. ECF Nos. 18-17, 18-18. Law enforcement also documented uncovering a "family secret" regarding Angelo Garcia's paternity. ECF No. 18-97. Because trial counsel failed to adequately investigate law enforcement's theories of the case from the original investigation, however, law enforcement witnesses' testimony went unrebutted and the jury was left with the inaccurate impression that there were no other theories as to Angelo Garcia's disappearance, such as a kidnapping for ransom or being taken by his biological father.

### d. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate law enforcement's theory of the case.

Had trial counsel conducted an adequate investigation of law enforcement's theory of the case, they could have presented evidence that—contrary to their testimony at trial—law enforcement concluded during the original investigation that the cigar was not linked to Angelo Garcia's kidnappers. In combination with the information from Mr. Rios and his brothers about Mr. Cruz-Garcia and Ms. Garcia's consensual relationship, this would have meant that the State's DNA evidence did not tie Mr. Cruz-Garcia to Angelo Garcia's disappearance and death. The presence of Mr. Cruz-Garcia's DNA in the vaginal swab and panties cutting would be explained by his consensual relationship with Ms. Garcia and his DNA on the cigar would be explained by the fact that he was a frequent visitor to Ms. Garcia and Mr. Rodriguez's residence, as Ms. Garcia and Mr. Rodriguez themselves testified to at trial. 18 RR 133-134; 18 RR 178–179; 18 RR 201. Indeed, Mr. Cruz-Garcia

has visited Ms. Garcia and Mr. Rodriguez's apartment earlier on the day Angelo was kidnapped. 18 RR 184.

Had trial counsel presented evidence that—contrary to their testimony at trial—law enforcement witnesses concluded during the original investigation that Ms. Garcia and Mr. Rodriguez had never been truthful with them, it would have undermined the credibility of not just Ms. Garcia and Mr. Rodriguez, but of the law enforcement witnesses as well. And, had trial counsel presented evidence that—contrary to the testimony of the State's law enforcement witnesses—law enforcement had considered other theories of the case, including a kidnapping for ransom, it would have further diminished the credibility of those witnesses, while also giving credence to the possibility that someone besides Mr. Cruz-Garcia had taken Angelo Garcia.

**G. Trial counsel's investigation, preparation, and performance during the punishment phase was ineffective.**

**1. Trial counsel performed deficiently in their investigation and presentation of mitigation evidence.**

As detailed in prior sections, trial counsel failed to allocate and devote adequate time to investigate and prepare for Mr. Cruz-Garcia's trial. Under clearly established Supreme Court precedent, "[i]t is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). Trial counsel's failure to make reasonable investigative decisions in light of available information constitutes deficient performance. *See Wiggins*, 539 U.S. at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *id.* at 523 (explaining that the focus of a deficiency inquiry is on "whether the investigation supporting counsel's decisions . . . itself was reasonable").

131

Trial counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40 . Trial counsel's duty to investigate exists even if the defendant or his family tells counsel that no mitigation evidence exists. *Rompilla*, 545 U.S. at 377. Courts cannot "condone unreasonable decisions parading under the umbrella of strategy," or "fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Richards*, 566 F.3d at 564 ((internal quotation omitted).

Professional norms prevailing at the time of Mr. Cruz-Garcia's trial likewise underscore defense counsel's paramount duty to investigate and prepare for the punishment phase. *See* ABA Guidelines, Guideline 10.7(A) ("[C]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); *id.* at 10.11(A) ("[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.").

Trial counsel performed deficiently by failing to conduct an adequate punishment phase investigation. Trial counsel did not retain a mitigation specialist, 4 SHCR 947. The defense's entire penalty case relied on just four lay witnesses, lasted less than one day, and accounted for less than 75 pages of the transcript. 26 RR 8–55, 67–92. Furthermore, by trial counsel's own admission, trial counsel did not even seek to investigate or rebut the State's case on future dangerousness. *See infra* § G.3. A wealth of mitigation evidence uncovered in post-conviction makes clear that "effective counsel would have painted a vividly different tableau of aggravating and mitigating evidence than that presented at trial." *Andrus*, 140 S. Ct. at 1886.

### a. Trial counsel's mitigation presentation was anemic at best.

Trial counsel called only four lay witnesses at the punishment phase and only two of whom testified in person. The first witness, Mr. Cruz-Garcia's younger brother Joel, had to pay his own way from Puerto Rico to Houston, and trial counsel showed little to no interest in him and barely prepared him to testify. ECF No. 18-85 at 10–11. Joel's direct examination lasted only twelve pages of the transcript, including lengthy objections from the State. 26 RR 32–43. Because trial counsel were unprepared and had not adequately investigated Mr. Cruz-Garcia's life history, they failed to elicit helpful testimony. Instead, Joel provided only the briefest chronology of Mr. Cruz-Garcia's childhood and inadvertently made it appear that he had experienced a pleasant childhood in the Dominican Republic. *Id.* Not only was the testimony not particularly mitigating, the false impression it gave was actually aggravating. *See Andrus*, 140 S. Ct. at 1883 ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment.").

The second witness, Mr. Cruz-Garcia's wife Mireya Perez, testified via a shoddy video link from the Dominican Republic. Her testimony lasted fewer than ten pages and, due to the poor connection and problems with interpretation, her testimony was extremely difficult to understand. 26 RR 11–20. Moreover, Ms. Perez could not testify to Mr. Cruz-Garcia's childhood or his life leading up to the offense, and instead generally described their life in the Dominican Republic. *Id.* The third witness, Mr. Cruz-Garcia's then 17-year-old son Abel, also testified via video link, but because Mr. Cruz-Garcia went to prison when Abel was five years old, there was little he could offer. 26 RR 67–79.

The defense's final witness was Angel Meza, a teenager who had known Mr. Cruz-Garcia while he was in pre-trial detention, and whom Mr. Cruz-Garcia had positively influenced. 26 RR

80–86. Mr. Mesa was not identified or contacted by trial counsel; instead, he came to the courtroom and asked to testify after hearing about the trial. *Id.* at 81. The jury foreman later stated that he was by far the most persuasive defense witness. 35 RR Def. Ex. 4; 3 CR 625 ("[I]f it hadn't been for that kid, it would have been a much easier decision for me.").

### b. Trial counsel performed deficiently by failing to retain a mitigation specialist.

Texas Guideline 3.1.A.1 provides: "The defense team should consist of no fewer than two attorneys qualified in accordance with GUIDELINE 4.1, an investigator, and a mitigation specialist." ABA Guideline 4.1.A.1 contains substantially identical language. The commentary to the ABA Guidelines emphasizes the importance of a mitigation specialist. "A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings" because they "possess clinical and information-gathering skills and training that most lawyers simply do not have." ABA Guideline 4.1.A.1 Cmt., 31 HOFSTRA L. REV. at 960 (internal citations and quotation marks omitted). Among other things, "[t]he mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation." *Id.* A mitigation specialist also "plays an important role as well in maintaining close contact with the client and his family while the case is pending," something that was clearly lacking in Mr. Cruz-Garcia's case. *Id.* "Perhaps most critically," a mitigation specialist "insures that the presentation to be made at the penalty phase is

integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel," precisely what occurred in this case. *Id.*

Contrary to the Texas and ABA Guidelines, trial counsel did not retain a mitigation specialist. In his affidavit, Mr. Cornelius claimed that although it was true that he did not have a mitigation specialist, the defense team "had my experience, which predates mitigation experts, at least in Harris County." 4 SHCR 947. He also noted that he had an investigator on the case. *Id.* The Texas Guidelines are clear, however, that an investigator is not enough; rather, "[t]he defense team should consist of no fewer than two attorneys . . . , an investigator, *and a mitigation specialist.*" Texas Guideline 3.1.A.1 (emphasis added). The Texas Guidelines do not support Mr. Cornelius's suggestion that either he or his investigators could have somehow worn two hats, and also taken on the role of mitigation specialist.

Mr. Cornelius also claimed that "all of the 'Mitigation Experts' in Harris, County, of which there were not many at that time, refused to take cases for the money the County was willing to pay," which was $75.00/hr. 4 SHCR 947. Mr. Cornelius's billing records, however, reveal otherwise. In the Jeffrey Prevost death penalty case, he employed a mitigation specialist beginning in September 2012, nine months before Mr. Cruz-Garcia's trial, who was based in Houston, and worked for the $75.00/hr. rate. Ex. 140.

### c. Trial counsel botched the minimal effort they made to introduce mitigating evidence.

Trial counsel attempted to introduce evidence of Mr. Cruz-Garcia's strong religious faith through Bible study certificates and his assistance to federal law enforcement agencies such as the FBI, DEA, and INS through a Puerto Rican police officer, who was a State's witness. 26 RR 56–58; 24 RR 68–75. This evidence, however, was excluded by the trial court on hearsay grounds. *Id.* Trial

counsel was ineffective for failing to do the legwork necessary to introduce the evidence in a form that would not have drawn a sustained objection from the State.

### d. Trial counsel failed to consult with any experts, except for a psychologist who did just seven hours of work.

When Mr. Cornelius sought approval for his $65,000.00 flat fee, he told the court that "[i]n all likelihood there will be a multitude of expert witnesses on many different elements of the various cases."[35] ECF No. 18-7 at 14. The only expert trial counsel sought funding for, however, was a psychologist, Dr. Susana Rosin. According to trial counsel's funding motion, Dr. Rosin was needed for "testing, review of documents, consultation, and possible testimony" relating to "issues of mental health and mitigation." 2 CR 387. In support of that motion, trial counsel attached a letter from Dr. Rosin in which she stated that, based on her understanding of her role on the case and its complexity, her role would involve approximately sixty to seventy hours of work. *Id.* at 390. The trial court approved funds up to $17,400 for this purpose. *Id.* at 389.

Yet, trial counsel barely used Dr. Rosin. After receiving funding for Dr. Rosin in July 2012, trial counsel did not have her perform any work on the case *for nearly a year*, until May 2013, just before trial. ECF No. 18-7 at 21. Other than a phone call with the investigators on January 6, 2013 (for which Dr. Rosin did not bill time), Dr. Rosin reviewed records for two hours on May 9, 2013, and evaluated Mr. Cruz-Garcia for three hours on May 15, 2013. *Id.* She then spoke with counsel for an hour on June 27, 2013, and prepared a report in an hour on July 1, 2013, a week before opening statements in Mr. Cruz-Garcia's trial. *Id.* Thus, in total, Dr. Rosin performed only seven

---

[35] It is unclear what Mr. Cornelius meant by the "various cases."

hours of work on Mr. Cruz-Garcia's case, all shortly before trial. Dr. Rosin did not testify and her work appears to have been unused by trial counsel.

### e.   Trial counsel failed to investigate in Puerto Rico.

In his motion requesting approval for his $65,000.00 flat fee, Mr. Cornelius emphasized Mr. Cruz-Garcia's ties to Puerto Rico, telling the court that the case "involves numerous extraneous offenses, both in Texas and in Puerto Rico," and that "[d]efendant's family lives in Puerto Rico, as well as in Texas and other cities." ECF No. 18-7 at 13. When he sought funding for his investigator, trial counsel reiterated to the court that "investigations will in all likelihood be required to go to Puerto Rico to properly investigate this case," as "Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case." 2 CR 384–85.

Yet, no one from the defense team ever travelled to Puerto Rico, nor were any records requested by trial counsel from Puerto Rico. Trial counsel even failed to uncover records that were within the State's possession and accessible as part of the State's open file policy. *See infra* § G.3.

Addressing why no one from the defense team travelled to Puerto Rico, where Mr. Cruz-Garcia was previously incarcerated and where he spent much of his life, Mr. Cornelius stated in his affidavit that he "was confident that the investigators would do a very professional and competent job and nothing has convinced me otherwise." 4 SHCR 947. As with so much else in that affidavit, Mr. Cornelius seeks to the shift blame for the problems at Mr. Cruz-Garcia's trial on to others, in this case his investigator. This argument, however, is unavailing under the Guidelines. *See* ABA Guideline 10.4.B ("Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards."). Mr. Gradoni did not address the question in his affidavit. In a subsequent

letter, Mr. Gradoni said only: "I have no recollection of suggesting we travel to Puerto Rico." ECF No. 18-8 at 1.

### 2. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to conduct an adequate mitigation investigation.

#### a. An adequate mitigation investigation by a mitigation specialist would have allowed trial counsel to present compelling mitigation evidence of Mr. Cruz-Garcia's life history.

Had trial counsel retained a mitigation specialist and conducted an objectively reasonable mitigation investigation, trial counsel would have uncovered a wealth of mitigation evidence. Numerous witnesses were available and willing to testify at the penalty phase. These witnesses would have told the jury that Mr. Cruz-Garcia grew up in the Dominican Republic in extreme poverty and was abandoned by his mother. These witnesses would have also told the jury that Mr. Cruz-Garcia emigrated to Puerto Rico, and then on to Houston, as a young adult to escape from poverty and provide for better opportunities for his young family. Witnesses would have told the jury that, when Mr. Cruz-Garcia returned to Puerto Rico and the Dominican Republic, he provided financial support to his family.

In addition, prison officials and chaplains who knew Mr. Cruz-Garcia from his incarceration in Puerto Rico were available and willing to testify that Mr. Cruz-Garcia was not a threat to security, was not known to have any disciplinary issues, and was even granted the keys to various offices and unsupervised movement around the prison. These witnesses would have also told the jury that he was a model prisoner who "had the overall trust and confidence of the prison staff." ECF No. 18–105. This testimony would thus have provided not only powerful mitigation evidence, but also squarely rebutted the State's case on future dangerousness. *See infra* § G.3.c. Almost *none* of the

information below regarding Mr. Cruz-Garcia's childhood, early adulthood, and incarceration in Puerto Rico was presented to the jury.

> ### i. Mr. Cruz-Garcia's father, the family's sole provider, was the victim of a life-threatening accident and the family was pushed into subsistence fishing.

"[Mr. Cruz-Garcia's] traumatic life experiences began with a childhood characterized by neglect, parentification at a young age, exposure to alcohol at a very young age, abandonment, and other traumatic and stressful events." ECF No. 18–110.   Mr. Cruz-Garcia was born in Santo Domingo, the capital of the Dominican Republic, the oldest son and second child of Valerio "Hungría" Cruz Santos and Dalia Margarita Garcia Martinez. ECF No. 18–44. During Mr. Cruz-Garcia's early childhood in Santo Domingo, his father was in the Dominican Republic Navy where he trained as a paramedic. *Id.* His father was the sole provider of the family. *Id.*

When Mr. Cruz-Garcia was still a young child, his father suffered life-threatening injuries in a car accident. Mr. Cruz-Garcia's father had been standing on the side of a road when he was violently struck by a passing vehicle. ECF No. 18–44. He was hospitalized for two months, suffered multiple breaks to his legs and ribs, and lost part of his liver. ECF Nos. 18–44; 18–90. His injuries were so severe that he was initially declared dead and taken to a morgue before being transported to a hospital. ECF No. 18–110. As a result of this accident, Mr. Cruz-Garcia's father was permanently disabled and was eventually discharged from the Navy. ECF Nos. 18–85; 18–90.

Unable to provide for his family, Mr. Cruz-Garcia's father moved his young family back to Boba, a small fishing village where he was from. ECF No. 18–44. Unlike their home in Santo Domingo, there was no electricity, no plumbing, and no telephone in their new home. ECF No. 18–90. The houses in Boba were made of wooden planks, genipap tress, and zinc. ECF Nos. 18–84; 18–87. They were flimsy and easily destroyed by the weather. *Id.* The village depended on well water

as its only source of fresh water and latrines as its only form of sanitation. ECF Nos. 18–91; 18–93. Rain frequently caused the latrines to overflow into the well water, contaminating the village's drinking water. *Id.* Boba was not connected to running water until the early 2010s, around the time of Mr. Cruz-Garcia's trial in Houston. ECF No. 18–93.

When they arrived in Boba, Mr. Cruz-Garcia and his siblings moved into a two-room wooden home with their paternal grandparents. ECF Nos. 18–80; 18–85; 18–90. Mr. Cruz-Garcia was expected to repair the frequent weather damage to the family's shelter. When he was around 9 years old, Mr. Cruz-Garcia fell from the roof while repairing damage to the roof from a storm. ECF Nos. 18–84; 18–92. He suffered a head injury so severe that he had to be transported via truck to the closest town with a hospital, Nagua. *Id.* For some time afterwards, Mr. Cruz-Garcia suffered headaches, loss of vision, and was not able to read and write at school. *Id.*

In the years that followed Mr. Cruz-Garcia and his siblings' move from Santo Domingo, the family's main source of food and income was subsistence fishing. In Boba, Mr. Cruz-Garcia's father relied on subsistence fishing to provide for his family and Mr. Cruz-Garcia worked alongside his father. ECF Nos. 18–44; 18–85; 18–92; 18–94. This was an extraordinarily dangerous trade because the waters were rough and shark infested. ECF Nos. 18–42; 18–44; 18–110. On several occasions, the small yawl used by Mr. Cruz-Garcia and his father capsized and Mr. Cruz-Garcia rescued his father. ECF No. 18–42. Mr. Cruz-Garcia's uncle, Jose de la Cruz, remembered at least two separate times during which Mr. Cruz-Garcia saved his father from drowning. *Id.* Mr. Cruz-Garcia's father remembered becoming trapped under the overturned hull of their yawl and Mr. Cruz-Garcia saving him. ECF No. 18–44.

### ii.    Mr. Cruz-Garcia was abandoned by his mother.

In the wake of her husband's disability and after discovering that he engaged in extra-marital affairs, Mr. Cruz-Garcia's mother emigrated to Venezuela alone when Mr. Cruz-Garcia was around 8 years old. ECF Nos. 18-44; 18-85; 18-89; 18-90. She left behind Mr. Cruz-Garcia, along with his older sister, younger sister, and brother. Mr. Cruz-Garcia's older sister, Noemi Margarita Cruz-Garcia, remembered that her brother had been particularly close to their mother. ECF No. 18-90. Their mother's departure to Venezuela was profoundly shocking to Mr. Cruz-Garcia and his siblings. *Id.* After she left, the children had no direct contact with their mother. ECF No. 18-90. Instead, they left messages with their maternal grandparents to be passed on to their mother. *Id.* Mr. Cruz-Garcia wrote to his mother, but his sister could not recall if their mother ever replied to her eldest son's letters. *Id.*

Within a year of leaving, Mr. Cruz-Garcia's mother petitioned for her eldest daughter, Noemi, to emigrate and join her in Venezuela. ECF No. 18-90. Mr. Cruz-Garcia was told that he too would be joining his mother in Venezuela alongside his eldest sister. *Id.* Noemi left first and remembered Mr. Cruz-Garcia being excited and telling her that he would be joining her and their mother soon. *Id.* This, however, "was a lie." *Id.* Noemi discovered that their mother had pretended to misplace Mr. Cruz-Garcia's vital documents that she needed to apply for a visa for her son. *Id.* Eventually, Mr. Cruz-Garcia's mother admitted that she had no intention of applying for a visa for her son. *Id.* Some years later, Mr. Cruz-Garcia's mother obtained a visa for her youngest daughter, Natalia. *Id.* However, she never reunited with Mr. Cruz-Garcia nor his brother. *Id.* Mr. Cruz-Garcia and his young brother "felt abandoned by [their] mother." ECF No. 18-85; *see also* ECF No. 18-110.

In the span of just months, Mr. Cruz-Garcia was forced to confront and adapt to extreme poverty and his mother's abandonment. ECF No. 18–110. Mr. Cruz-Garcia was a child when his mother left for Venezuela, abandoning him and his siblings in the Dominican Republic.

### iii.   Mr. Cruz-Garcia became his siblings' caregiver.

Abandoned by his mother, Mr. Cruz-Garcia was forced to step into the roles of caregiver and provider at a young age. ECF Nos. 18–85; 18–110. Mr. Cruz-Garcia "kept all of the sadness inside him" and "stayed focused in working hard to provide for the family." ECF No. 18–85. He became "a second father for his younger siblings." ECF No. 18–92.

Mr. Cruz-Garcia was forced to become his siblings', and at times his father's, caregiver. ECF No. 18–110. In the immediate aftermath of his father's accident, at around age 8, Mr. Cruz-Garcia took care of him, including his personal hygiene because his father would not trust anyone else to help. ECF Nos. 88; 18–110. Mr. Cruz-Garcia would then return home from the hospital to care for his siblings, including his toddler brother whose diapers he changed and washed, and cooked and cleaned. ECF Nos. 18–85; 18–110. In Boba, even after his father's convalescence, Mr. Cruz-Garcia continued to be responsible for his siblings' wellbeing and safety. ECF Nos. 18–85; 18–110. As the oldest (after his sister left for Venezuela), Mr. Cruz-Garcia had the most responsibilities. ECF Nos. 18–39; 18–85.

Mr. Cruz-Garcia's father, Mr. Cruz Santos, was a strict parent and "demanded respect from his children." ECF No. 18–91. As the eldest son, Mr. Cruz-Garcia was expected to work alongside his father and was subjected to harsher punishments than his younger siblings. ECF No. 18–94. Mr. Cruz Santos also drank heavily, leaving him unable to care for his children. ECF No. 18–85. He exposed Mr. Cruz-Garcia and his brother to his alcohol abuse from a very young age. ECF No. 18–

110. On more than one occasion, Mr. Cruz Santos crashed a car in a ditch because he was driving drunk. ECF No. 18–85.

### iv.    Mr. Cruz-Garcia was forced into child labor.

In addition to household chores, like cooking and cleaning, "[t]he most important thing for [Mr. Cruz-Garcia] was to make sure his family had enough to eat." ECF No. 18–88. At about the age of 8, Mr. Cruz-Garcia was forced into child labor: he fished every day to provide the family's main source of food and income. ECF Nos. 18–42; 18–44; 18–88; 18–91; 18–92; 18–94; 18–110. "Returning with enough fish made the difference as to whether or not [the family] had food to eat, or whether [they] would be without food." ECF No. 18–82. And "[w]hen [Mr.] Cruz-Garcia was not fishing, he was at home cooking, changing his siblings' diapers, and taking care of them." ECF No. 18–94.

After Mr. Cruz-Garcia's father opened a small medical clinic, the community's only access to healthcare, Mr. Cruz-Garcia was expected to assist with his father's medical work. ECF No. 18–85. Mr. Cruz-Garcia helped his father give injections, clean, and suture wounds. ECF Nos. 18–85; 18–110. As a result, Mr. Cruz-Garcia was exposed from a very young age to serious illness, injuries, and deformities. ECF No. 18–110. Later on, as a young teenager, Mr. Cruz-Garcia also worked in construction and agricultural fieldwork. ECF No. 18–110. There, Mr. Cruz-Garcia was exposed to pesticides and herbicides that caused headaches and nausea. *Id.* In short, from the age of 8, Mr. Cruz-Garcia was no longer treated as a child with time to play and attend school, but as an adult who was expected to work. ECF No. 18–94.

Because Mr. Cruz-Garcia had to fish to provide his family's food and income, he was unable to continue with his education full-time as he had done in Santo Domingo. ECF Nos. 18–90; 18–92. In Boba, Mr. Cruz-Garcia fished in the morning, attended school for a few hours in the

afternoon, and returned to the sea soon after. ECF Nos. 18–42; 18–85; 18–92. Books at the severely impoverished school were shared and pencils snapped in two to be shared amongst students. ECF No. 18–92. The Dominican Republic government also provided for wheat and rice to ensure students "had at least one good meal per day." *Id.* As his siblings' caregiver, Mr. Cruz-Garcia also missed school whenever they were sick. *Id.*

> ### v. After his father remarried, Mr. Cruz-Garcia was expected to care for his siblings and half-siblings.

Mr. Cruz-Garcia's father, Mr. Cruz-Santos, eventually remarried to Dorca Cruz Faña and they had two children together (Menagen Cruz-Santos and Jelissa Yelietza Cruz). ECF No. 18–39. After Ms. Cruz Faña had her first child, Mr. Cruz-Garcia and his siblings joined the new family but they were never accepted nor loved by their stepmother. Ms. Cruz Faña was profoundly jealous of her husband's relationship with his children from his previous marriage. ECF No. 18–110. Their stepmother's dislike for Mr. Cruz-Garcia and his siblings was "obvious." ECF No. 18–85.

Mr. Cruz-Garcia was also made responsible for the care of his half-siblings. ECF No. 18–85. Now, he cooked, cleaned, washed, and changed diapers not just for his younger full siblings, but for his new half-siblings as well. ECF Nos. 18–39; 18–85. This was in addition to continuing to work as a fisherman and in his father's medical practice. Around this time, Mr. Cruz-Garcia also worked in construction and planting and gathering crops. ECF No. 18–110.

> ### vi. After their father remarried, Mr. Cruz-Garcia and his siblings were increasingly beaten and punished.

Although Mr. Cruz-Garcia cooked, cleaned, and cared for the whole household, "it was never enough for [his] stepmother and . . . [Mr. Cruz-Garcia] received more of the punishment" as the eldest. ECF Nos. 18–85; 18–94. Because Mr. Cruz-Santos wanted to please his new wife, he distanced himself from Mr. Cruz-Garcia and took to beating him and his siblings if their stepmother

said they had been disobedient or disrespectful to her. ECF Nos. 18–85; 18–94; 18–110. On at least

one occasion, Mr. Cruz-Garcia's father grabbed the bucket used to wash dirty diapers and dumped

the feces and water over his children's heads. ECF No. 18–85. Even if the children had not done

anything wrong, they would still be disciplined based on what their stepmother told their father.

ECF No. 18–85. Ms. Cruz Faña made it clear to Mr. Cruz Santos that the children from his prior

marriage were separate from their children together. ECF No. 18–85.

> ### vii.   At age 19, Mr. Cruz-Garcia emigrated to Puerto Rico and then to Houston to provide for his young family and ageing father.

When he was 18, Mr. Cruz-Garcia met Mireya Perez, who was visiting Boba with her family.

ECF No. 18–87. After Mr. Cruz-Garcia and Ms. Perez were found alone together in a room, and

although nothing inappropriate had happened between them, they were forced to common-law

marry. *Id.*; ECF No. 18–85. Neither Mr. Cruz-Garcia's father nor stepmother, however, approved of

the union and Mr. Cruz-Garcia was quickly forced to move out of his father's home with his new

wife. ECF No. 18–87.

Subsistence fishing remained their main source of food and income. ECF No. 18–87. The

catch was often small, however, and food was scarce. ECF No. 18–110. Nevertheless, Mr. Cruz-

Garcia shared his catch amongst the small community. ECF Nos. 18–110; 18–82. At the time, in

the 1980s, many young people from the Dominican Republic emigrated to neighboring Puerto Rico

to find work. ECF No. 18–84; 18–85. Mr. Cruz-Garcia and his wife agreed that he would leave for

Puerto Rico and, at age 19 Mr. Cruz-Garcia left Boba for Puerto Rico. ECF Nos. 18–87; 18–110.

Mr. Cruz-Garcia crossed from the Dominican Republic to Puerto Rico in a yawl made out

of wood and without a motor, across "the sea of the dead," so-named because of the frequent deaths

caused by the severe storms and currents. ECF Nos. 18–87; 18–110. As planned, Mr. Cruz-Garcia

sought work in Puerto Rico so he could send money back to the Dominican Republic to purchase his own fishing boat and equipment. ECF No. 18–110. To find work, Mr. Cruz-Garcia was forced into dangerous, low-paying jobs. *Id.* He worked on a coffee plantation, seven-days a week, earning $50-60 a week. *Id.* Mr. Cruz-Garcia lived with 15 other workers in the plantation warehouse, was charged for all food and coffee, and had to purchase his work equipment from the plantation. *Id.* What little money was left over, Mr. Cruz-Garcia sent back to his father to be passed along to Ms. Perez. ECF Nos. 18–87; 18–110.

Soon after arriving in Puerto Rico, Mr. Cruz-Garcia's father told him that Ms. Perez was with another man. ECF No. 18–110. This, however, was a lie designed to ensure that the money went to Mr. Cruz-Garcia's father only. ECF No. 18–87. Mr. Cruz-Garcia believed his father and, believing himself to have been abandoned again, he sank into alcohol. ECF No. 18–110.

After leaving the plantation, Mr. Cruz-Garcia remained in Puerto Rico and worked in whatever employment he could find, including as a cook, gardener, loading and unloading cargo, in construction, and selling aluminum cans to be recycled. ECF No. 18–110. Mr. Cruz-Garcia eventually reunited with a friend from Boba who had also emigrated to Puerto Rico and obtained employment as a restaurant cook. ECF No. 18–110.  While working in Puerto Rico, Mr. Cruz-Garcia suffered life-threatening injuries, including in a car accident, but he was not able to obtain medical care. *Id.*

While working as a cook, Mr. Cruz-Garcia met Angelita Rodriguez, who would become his wife and later testified against him. Ms. Rodriguez was also a Dominican immigrant, but she had family in Puerto Rico. ECF No. 18–110. Mr. Cruz-Garcia and Ms. Rodriguez were legally married in 1987 and Mr. Cruz-Garcia worked for her father in construction. *Id.* Ms. Rodriguez would also

go on to introduce Mr. Cruz-Garcia to Carmelo "Rudy" Martinez Santana. *See infra* Claim Five § A. Mr. Santana had been living in Houston, Texas, but had been deported back to the Dominican Republic and had recently come to Puerto Rico. ECF No. 18–86. At the time, Ms. Rodriguez and Mr. Santana were likely already involved in dealing drugs. ECF Nos. 18–85; 18–87. In 1989, Mr. Cruz-Garcia, Mr. Santana, and Ms. Rodriguez emigrated to Houston, Texas. ECF No. 18–86.

While in Houston, Mr. Cruz-Garcia continued to send money to his father in Boba. ECF Nos. 18–81; 18–84; 18–91. Eventually, his father was able to build one of the community's few cinder-block houses, with enough room for a fishing stall, for Mr. Cruz-Garcia to return to and live in. *Id.* In Houston, Mr. Cruz-Garcia protected Mr. Santana's wife, Margarita Martinez Zorrilla, from her then-husband's violence. ECF No. 18–86. Ms. Zorrilla spoke no English, had no family in Houston, and was too afraid to report her husband's violence because of her undocumented status. *Id.* The violence, however, escalated such that neighbors were forced to call law enforcement on at least one occasion after Mr. Santana beat and bit Ms. Zorrilla. *Id.* In addition to intervening to protect Ms. Zorrilla from Mr. Santana's violence, Mr. Cruz-Garcia also provided her with food and diapers for her baby son. *Id.*

As well as his ageing father in the Dominican Republic and his family and Mr. Santana's family in Houston, Mr. Cruz-Garcia provided financial and material support to other immigrant families in Houston. *See* ECF Nos. 18–86; 18–21; 18–23. Among other forms of financial support, Mr. Cruz-Garcia paid for a friend's hospitalization and medical care when his friend sustained limb-threatening injuries. ECF Nos. 18–21; 18–23. When his friend Cesar Amado Rios was shot and told that his arm would need to be amputated, Mr. Cruz-Garcia took it upon himself to take Mr. Rios to another hospital for a second opinion. *Id.* The second hospital was able to save Mr. Rios'

arm and Mr. Cruz-Garcia paid for the treatment. ECF Nos. 18–21;18–23. Mr. Cruz-Garcia also bough milk and food for neighboring families and encouraged the children to attend school. ECF No. 18–23.

### viii.    Back in Puerto Rico, Mr. Cruz-Garcia assisted U.S. law enforcement.

After returning to the Dominican Republic with Angelita Rodriguez in 1992 and their eventual divorce sometime later, Mr. Cruz-Garcia turned again to working whatever jobs were available to continue to support his father and, after reuniting with Mireya Perez, his wife and children.  ECF Nos. 18–81; 18–87; 18–89; 18–91; 18–110. After a brief period in Puerto Rico, Mr. Cruz-Garcia returned to Boba to live with Mireya Perez, their children, and Mr. Cruz-Garcia's father in the house built with money sent by Mr. Cruz-Garcia. ECF Nos. 18–44; 18–81; 18–87. Mr. Cruz-Garcia went back to fishing as his family's source of income and food, as well as shouldering childcare and household chores. ECF No. 18–82; 18–87. His ageing father was no longer able to fish. ECF No. 18–82. In addition, Mr. Cruz-Garcia also sold fish from a small stand and drove a bus. ECF No. 18–87. Eventually, the family moved to Santo Domingo so that Mr. Cruz-Garcia's sons could access better education. *Id.*

While in Puerto Rico, Cruz-Garcia was recruited by an agent with the Immigration and Naturalization Service ("INS"), to help U.S. law enforcement uncover criminal activity in Puerto Rico. ECF Nos. 18–85; 18–46; 24 RR 71–75. After Mr. Cruz-Garcia moved back to the Dominican Republic, he was regularly sent into Puerto Rico as part of this work. ECF Nos. 18–85; 18–111.

### ix.    Mr. Cruz-Garcia was heavily involved in his children's lives and provided financial support to the community in Boba.

Mr. Cruz-Garcia's work enabled him to continue his financial support to the community in and around Boba. Mr. Cruz-Garcia provided direct financial support to several community

members, ensured they had access to medical care, and helped fund the construction of a church in Boba. ECF Nos. 18–43; 18–93. For example, one day, as Mr. Cruz-Garcia returned from fishing in his pickup truck, he saw a crowd of people surrounding a badly injured child who had been struck by a car. ECF Nos. 18–43; 18–93. Mr. Cruz-Garcia ran to help the 6-year-old boy and drove him to the nearest hospital. *Id.* The boy's mother and neighbors credit Mr. Cruz-Garcia with saving the boy's life. *Id.* On another occasion, as he drove from Santo Domingo to Bella Vista de Boba, Mr. Cruz-Garcia spotted a child begging on the side of the road. ECF No. 18–87. He pulled over and, when the child explained that his parents were very poor and that he needed help, Mr. Cruz-Garcia bought the child meal and clothes and then took him home. *Id.* Mr. Cruz-Garcia talked to the parents about the importance of educating their son and he stayed in touch with the child. He sent money to help the child and his family for some time thereafter. *Id.*

Despite his separation from Mireya Perez for several years, Mr. Cruz-Garcia was a "loving and attentive father." ECF No. 18–87; *see also* ECF No. 18–88. When Mr. Cruz-Garcia and Ms. Perez rekindled their romance, Mr. Cruz-Garcia worked "hard to regain [his son] Obelito's love." ECF No. 18–87. Mr. Cruz-Garcia would often buy Ms. Perez and their children gifts in addition to taking them out on family outings to the beach or horseback riding. *Id.* Mr. Cruz-Garcia did not shy away from helping Ms. Perez with house chores like cooking, cleaning, and doing laundry. *Id.* Maria Altagracia Cappellan, with whom Mr. Cruz-Garcia had a son, said Cruz-Garcia "treated her so well" and she knew he was a "good provider for his family." ECF No. 18–88. Mr. Cruz-Garcia likewise paid for Ms. Capellan's surgery when she fell ill with an ovarian cyst and cared for her throughout her convalescence. *Id.* When she was away, Mr. Cruz-Garcia cooked, cleaned, and took care of Ms. Capellan's home business selling phone cards, as well as looking after their daughter. *Id.*

### x.   Mr. Cruz-Garcia was a model inmate.

Mr. Cruz- Garcia was arrested in 2001 in Puerto Rico. 24 RR 71–75. He was sentenced to 16 years in prison, during which he was incarcerated in several prisons on the island. ECF No. 18–105.08. During that time, Mr. Cruz-Garcia was a model inmate who was reputed by prison officials and chaplains to be trustworthy and devoted to his Christian faith. ECF No. 18–105; 18–108; *see also infra* § G.3.

Mr. Cruz-Garcia was housed in general population, was "never considered . . . to be a dangerous or violent inmate," and was not known to have any disciplinary problems. ECF No. 18–108; *see also* ECF Nos. 18–107; 18–105; 18–45; 18–83. Based on his exemplary conduct, Mr. Cruz-Garcia was granted "tremendous privileges." ECF No. 18–107. These privileges included having the keys to and access to various offices and the prison chapel, being permitted to move around the prison unsupervised, and being employed in furniture-making and access to tools. ECF Nos. 18–83; 18–105; 18–107; 18–108. The supervisor at Bayamón, where Mr. Cruz-Garcia was incarcerated for several years, concluded that Mr. Cruz-Garcia "did not present any security risk." ECF No. 18–83.

In addition to these privileges, Mr. Cruz-Garcia took an active role in religious and counseling services. ECF Nos. 18–105; 18–107; 18–108. At Bayamón, Mr. Cruz-Garcia served as the assistant to the chaplain and "assisted in all matters dealing with the facility's religious services." ECF No. 18–105. Mr. Cruz-Garcia "supervised other inmates" and "took a very active role in helping with other inmates, serving as a type of counselor for them." *Id.* He also "would pray and preach with other inmates" and led religious services. *Id.* Likewise, at the Oso Blanco prison where Mr. Cruz-Garcia spent several years, Mr. Cruz-Garcia "counseled other inmates and encouraged and supported them to become better people." ECF No. 18–107.

To the prison officials and chaplains, "it was obvious that [Mr. Cruz-Garcia] was repentant, and that he had the intention of making his life better." ECF No. 18–83. Mr. Cruz-Garcia "was in the process of changing to better himself." *Id.* While incarcerated at the Ria Piedra jail, Mr. Cruz-Garcia voluntarily sought out counseling and therapy services. ECF No. 18–45. Based on these sessions, Dr. Lebrón, who counseled Mr. Cruz-Garcia, "did not have the impression that [Mr. Cruz-Garcia] was a danger to others in the jail or that he would be a danger to society after being released from prison." *Id.*

> **b.  Had trial counsel retained a trauma expert and an expert with knowledge about Dominican culture and history, trial counsel could have presented evidence of trauma and relevant cultural context.**

As described *supra* § G.2.a, Mr. Cruz-Garcia was born in the Dominican Republic, emigrated to Puerto Rico and then Houston, and experienced significant trauma throughout his childhood and adulthood. Trial counsel, however, did not retain any experts with relevant expertise in trauma and Dominican culture and history, leaving the jury with little by which to understand Mr. Cruz-Garcia's life experiences. These experts would have told the jury that Mr. Cruz Garcia "suffered chronic, repeated, trauma with its long-lasting consequences and effects[.]" ECF No. 18–110.

A trauma expert would have explained to the jury that Mr. Cruz-Garcia experienced "chronic and repeated exposure to traumatic and stressful events during his developmental period" and that "years of repeated and prolonged adverse experiences profoundly affected Cruz-Garcia." ECF No. 18–110. Indeed, a trauma expert would have identified to the jury that Mr. Cruz-Garcia experienced multiple forms of trauma, including maternal abandonment, extreme poverty and related deprivation, substance abuse exposure, child labor, and parentification. *Id.* And, a trauma expert would have further explained to the jury how these multiple and sustained forms of trauma "shaped

and substantially impaired his cognitive, psychological, and social functioning and behaviors." *Id.* Indeed, a trauma expert would have determined that Mr. Cruz-Garcia "exhibited a number of symptoms associated with a traumatic response," most notably "memory and attention deficits." *Id.* A trauma expert would have further explained to the jury how "religion became not only a source of comfort and hope for him, but . . . a lifeline." *Id.*

An expert with relevant cultural expertise would have likewise provided further evidence and context about Mr. Cruz-Garcia's life experiences as a Dominican native and immigrant to Puerto Rico and Houston. Indeed, an expert with knowledge of the Dominican Republic would have explained to the jury that Mr. Cruz-Garcia's childhood and early adulthood coincided with "deteriorating economic and social conditions" in the Dominican Republic, a time when "economic hardship increasingly defined life in the Dominican Republic." ECF No. 18-41. This expert would have further placed Mr. Cruz-Garcia's emigration to Puerto Rico, and eventually to Houston, within a broader economic context which saw thousands of young men leave the Dominican Republic "as a way to . . . search for a better life." *Id.* Indeed, despite low wages and abusive labor conditions, Mr. Cruz-Garcia was able to send money back to his family in the Dominican Republic. ECF Nos. 18-41; 18-101. *See supra* Claim § G.2.a.

Had trial counsel retained experts with relevant expertise in trauma and Dominican culture and history, the jury would have heard how Mr. Cruz-Garcia's social history "reflect[s] the strategies people turn to in order to meet their obligation as a father, son, brother, uncle, and community member in severely constrained circumstances." ECF No. 18-41. A trauma expert would further have told the jury how Mr. Cruz-Garcia has found in religion a "way of coping with the sequelae of

the chronic, severe and repeated traumatic life experiences he has had to live through since childhood." ECF No. 18–110.

          **c.   Had trial counsel not waited until the last minute, they could have presented evidence of Mr. Cruz-Garcia's assistance to United States law enforcement agencies.**

Had counsel timely requested records from government agencies, they would have been able to show that Cruz-Garcia assisted United States law enforcement agencies. ECF No. 18-46. Because trial counsel did not dedicate sufficient time to pre-trial investigation, the only evidence they obtained regarding Mr. Cruz-Garcia's assistance to U.S. law enforcement was a heavily redacted document from the Department of Justice. *Id.* It begins with "As per your request I am submitting a list with case number of aliens prosecuted as a result of the assistance rendered by confidential informant Obel Julian CRUZ-Garcia" and then continues onto the next page. *Id.* As a result of his activities—often at risk to himself—federal agencies were able to make numerous arrests. *Id.* Because trial counsel waited until just before trial to begin their investigation in earnest, however, they were left with an almost fully redacted and practically useless list of matters in which Mr. Cruz-Garcia had assisted the United States. Had trial counsel acted more diligently, they could have taken the steps required to obtain additional information.

These records would have also shown that the U.S. Government repeatedly trusted Mr. Cruz-Garcia to enter the country legally for the purpose of providing "significant public benefit." ECF No. 18-111. In fact, even obtaining a copy of Cruz-Garcia's passport—which his family had and would have gladly provided, had trial counsel asked—would have shown that he was repeatedly issued permission to enter the country for "significant public benefit." *Id.* These admissions into the country were for the purpose of providing assistance to United States federal agencies in the apprehension of serious drug traffickers.

Either Mr. Cruz-Garcia's passport or immigration records would have also shown that Mr. Cruz-Garcia entered the country legally and was in Puerto Rico for one of these assignments when he was arrested for kidnapping. ECF No. 18–111. Thus, records of federal agencies—which trial counsel failed to request——would have provided information relevant to both future dangerousness and mitigation special issues.

### 3. Trial counsel performed deficiently by failing to investigate, and presenting no rebuttal case to, the State's case on future dangerousness.

#### a. Trial counsel performed deficiently by failing to investigate extraneous offenses.

Trial counsel failed to conduct *any* investigation into the extraneous offenses offered by the State and into the issue of future dangerousness generally. Instead, trial counsel simply conceded the future dangerousness special issue. Mr. Cornelius's affidavit alone makes that clear: "We were not going to win on future danger, in my opinion," he wrote. 4 SHCR 946. Yet, Mr. Cornelius did not describe any investigative effort explaining this determination. Instead, trial counsel appears to have based this conclusion on their failure to succeed on the future dangerousness special issue in prior cases, and trial counsel's apparent belief that HCDAO would not seek the death penalty unless there were an insurmountable case for future dangerousness. *Id.* ("[T]he State does not seek the death penalty on cases where the crime is an aberration or where the defendant does not have a history.").

As discussed *infra* § G, there was significant evidence available to combat the State's future dangerousness case. Much of the testimony concerning extraneous offenses was contradicted by forensic evidence and prior witness statements. There was also substantial record-based evidence that Mr. Cruz-Garcia had been a model prisoner in Puerto Rico, so much so that he was given the keys to parts of the prison he was incarcerated in. *See supra* G.2.b & *infra* § G.3.c. Trial counsel not

only failed to present evidence showing that Mr. Cruz-Garcia was not a future danger, trial counsel never even attempted to uncover any such evidence.  As the Supreme Court held in *Andrus*, it is "hardly the work of reasonable counsel" to "relinquish[] the first of only two procedural pathways for opposing the State's pursuit of the death penalty" by failing to investigate future dangerousness. 140 S. Ct. at 1885.

### b. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate extraneous offenses.

Trial counsel failed to conduct a thorough and independent investigation into extraneous offenses. Much of the testimony that the State presented about extraneous offenses was false and could have been rebutted had trial counsel conducted an adequate investigation.

### i.   Saul Flores Murder.

One of the offenses introduced by the defense at the punishment phase was the 1989 murder of Saul Flores in Houston. Trial counsel, however, failed to investigate Saul Flores's murder despite being put on notice that the State intended to introduce testimony and evidence about it. The State presented five lay witnesses and an expert, along with dozens of exhibits related to this extraneous offense. Trial counsel did not present a single rebuttal witness and failed to follow basic procedure for impeaching the State's witnesses.

One of the State's main witnesses concerning the Flores murder was Johnny Lopez. Mr. Lopez testified that Mr. Flores had been a friend and that he had learned of his death when an HPD investigator visited with him in the Harris County Jail in 1989 in connection with HPD's investigation into Mr. Flores's murder. 25 RR 46–47. Mr. Lopez testified that he had told law enforcement that Mr. Lopez was on the run from Mr. Cruz-Garcia. 25 RR 54–55. Law enforcement records, however, showed that Mr. Lopez identified a different individual by name and from a

picture line up as being implicated in Mr. Flores's murder. ECF No. 18-29. In fact, Mr. Lopez never even mentioned Mr. Cruz-Garcia in his 1989 statement to HPD.

Trial counsel, however, completely failed to impeach Mr. Lopez with his prior statement, and instead simply let his false testimony stand. *See infra* Claim Five § F. Trial counsel also failed to present rebuttal witnesses who could have testified that Mr. Lopez gave a completely different statement in 1989. Mr. Lopez was interviewed by two officers, R.E. Gonzales and A.C. Alonzo, who was also involved in investigating Cruz-Garcia's case. ECF No. 18-29; *see also* ECF No. 18-67. Because they interviewed Mr. Lopez in 1989, they could have testified about what Mr. Lopez told them for purposes of impeachment. Due to trial counsel's failure to properly impeach Mr. Lopez, the jury was left with the impression that Mr. Lopez had in fact identified Mr. Cruz-Garcia as a possible assailant, when in fact he had not.

Mr. Santana, the State's star witness at the guilt phase, also gave dramatic testimony about Saul Flores's murder. As discussed in Claim Five § F, Mr. Santana purported to have witnessed, and participated in, the killing of Mr. Flores by Mr. Cruz-Garcia, which he described in gruesome and graphic detail. His testimony, however, was completely inconsistent with the results of Mr. Flores's autopsy. *See* Claim Five § F.

Mr. Santana also testified that Mr. Cruz-Garcia's then-girlfriend, Elizabeth Ramos, was the source of the conflict between Mr. Cruz-Garcia and Mr. Flores. 25 RR 74. According to Mr. Santana, Mr. Cruz-Garcia killed Mr. Flores after Mr. Flores confessed his feelings to Mr. Cruz-Garcia's then-girlfriend, Elizabeth Ramos. 25 RR 74. He testified that "Saul had taken some drugs, he had gone to Elizabeth's apartment, and he wanted to have some type of love relationship with her." *Id.* Ms. Ramos called Mr. Cruz-Garcia and told him about it; Mr. Cruz-Garcia was furious, and immediately

went to her apartment. *Id.* According to Mr. Santana, Mr. Cruz-Garcia then killed Mr. Flores elsewhere. The State used this testimony to argue in closing that Mr. Cruz-Garcia "killed that 18-year-old guy for nothing more than he hit on his girlfriend." 26 RR 174.

Had trial counsel conducted an adequate investigation, they would have been able to locate and interview Elizabeth Ramos and she would have testified that she did not even know Saul Flores ECF No. 18-30. Moreover, Ms. Ramos would have told the jury she was never "courted" by Mr. Flores and Mr. Cruz-Garcia never picked up Mr. Flores—or any other man—from her apartment under the circumstances described in the testimony. At that time, she was living with her mother, in her mother's apartment. Ms. Ramos is certain she would have remembered if several men arrived to remove another man interested in "some type of love relationship." *Id.*

The Saul Flores murder was a key part of the State's punishment phase case. Indeed, according to the prosecutor, it was the reason the State chose to seek the death penalty against Mr. Cruz-Garcia. Ex. 125; *infra* n.36. Had trial counsel adequately investigated the extraneous offense—instead of simply assuming that the future dangerousness issue was a lost cause—they could have shown that the witnesses who implicated Mr. Cruz-Garcia simply were not credible. Particularly when considered together with the evidence trial counsel should have presented concerning Mr. Cruz-Garcia's exemplary prison record, there is a reasonable probability that at least one juror would not have voted "yes" on the special dangerousness special issue if trial counsel had adequately investigated the Saul Flores murder.

### ii.   Kidnapping Puerto Rico.

Trial counsel failed to investigate the extraneous offense for which Mr. Cruz-Garcia was incarcerated in Puerto Rico. Trial counsel failed to uncover records that would have substantiated the testimony the defense was unable to introduce at trial: that Mr. Cruz-Garcia was working on

behalf of law enforcement agencies at the time of the offense, October 11, 2001. Specifically, Cruz-Garcia was admitted to Puerto Rico a couple of weeks prior, on September 21, 2001, for 90 days for "significant public benefit." ECF No. 18-111. This type of benefit is typically used to allow noncitizens to appear for and participate in a civil or criminal legal proceeding in the United States. 8 C.F.R. § 212.5(b)(4). Significant public benefit parole might be granted, for example, to allow a key witness with no legal means of entering the United States to be paroled into the country long enough to testify in a criminal prosecution for drug trafficking.

Again, trial counsel failed to obtain those records, investigate the testifying witnesses, and present any rebuttal witnesses or experts. Here, counsel could have introduced testimony of an agent familiar with Mr. Cruz-Garcia who could have put his action that day in context of a multi-agency operation gone sideways and their informant being caught in the middle of it. Trial counsel did none of that.

### iii.    Beating of "Betico."

Finally, during the punishment phase, Mr. Santana also testified that Mr. Cruz-Garcia, along with others, broke into "Betico's"[36] house. 25 RR 66. According to Mr. Santana, Mr. Cruz-Garcia stole drugs and money from Betico, beat him, and raped his wife. *Id.* at 70.

Trial counsel failed to conduct any investigation, locate any information about Betico and the alleged rape, and present any rebuttal testimony. Trial counsel failed to make any objection to the introduction of such highly prejudicial, inflammatory testimony that had no indicia of reliability. Aside from issues with Mr. Santana's credibility in general, Mr. Santana did not witness this offense

---

[36] Spelled phonetically in the transcript as "Patiko" but spelled as "Betico" on the State's notice of intent to use prior bad acts. The notice does not provide the name of Betico's wife, the date the alleged assault occurred, or location. 2 CR 414.

himself, could not say when this incident allegedly occurred, did not know the names of the people who were present, and did not even know the names of the alleged victims.

### c. Trial counsel performed deficiently by failing to investigate Mr. Cruz-Garcia's exemplary prison record.

Extraneous offenses are not the only kind of evidence that bears on a defendant's future dangerousness. If the defendant has been incarcerated prior to trial, his "prison record [i]s clearly relevant on the issue of future dangerousness." *Moore v. Johnson*, 194 F.3d 586, 621 (5th Cir. 1999). Here, Mr. Cruz-Garcia was serving a prison sentence in Puerto Rico for the 2001 kidnapping offense described in Section G.3.b., when he was indicted for capital murder. In response to the State's subpoena, the FBI produced the entire file of Mr. Cruz-Garcia's incarceration in Puerto Rico. ECF No. 18-35; ECF No. 18-56 at 2; *see also* 1 CR 39. As described below, the records reflect that Mr. Cruz-Garcia had an exemplary prison record. Witnesses from the Puerto Rican prison were also available to testify concerning Mr. Cruz-Garcia's conduct in prison, which was universally praised among the correctional personnel who knew him.

Trial counsel failed to present any evidence concerning Mr. Cruz-Garcia's incarceration in Puerto Rico. Although Mr. Cruz-Garcia's prison records were part of the District Attorney's file, trial counsel did not review the State's file, as discussed in Section C.7, and therefore did not introduce any of that record-based evidence. Likewise, as discussed in Section G, trial counsel failed to conduct any investigation in Puerto Rico—despite (correctly) telling the court it would be necessary to prepare Mr. Cruz-Garcia's defense.

Moreover, it was not as if both sides in the case chose to ignore Mr. Cruz-Garcia's imprisonment in Puerto Rico. One of the State's witnesses was a Puerto Rican correctional official. He testified that, early in his period of incarceration, Mr. Cruz-Garcia was found to have a cell

phone, map and rope made from bedsheets in his cell, suggesting a possible escape attempt. 24 RR 118–29. But because trial counsel neither investigated, nor presented any rebuttal evidence on future dangerousness, this infraction was the *only* information the jury heard concerning Mr. Cruz-Garcia's time in Puerto Rican prison. Trial counsel could have meaningfully undermined this evidence by showing the jury that Mr. Cruz-Garcia was a model prisoner for the vast majority of his incarceration, to the point that Mr. Cruz-Garcia became one of the most *trusted* inmates in the prison.

Despite being on notice that the State's case would include information concerning Mr. Cruz-Garcia's time in Puerto Rican prison, trial counsel failed to undertake any investigation of that issue. By failing to do so, trial counsel performed deficiently. *Moore*, 194 F.3d at 621 (trial counsel performed deficiently by failing to present evidence of defendant's good behavior in prison in response to prosecution's use of prison record at punishment phase); ABA Guideline 10.7(A).

### d. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to investigate Mr. Cruz-Garcia's exemplary prison record.

Had trial counsel conducted an adequate investigation, Mr. Cruz-Garcia's time in Puerto Rican prison could have been leveraged to undermine the State's case on future dangerousness and provide strong evidence that Mr. Cruz-Garcia did *not* constitute a future danger.

### i. Puerto Rican prison records from the State's own file show that Mr. Cruz-Garcia was a well-behaved inmate.

Records from Mr. Cruz-Garcia's time in prison, many of which were in the State's file that trial counsel did not review, indicate Mr. Cruz-Garcia had no disciplinary history or grievances from his time in Puerto Rican prisons. ECF No. 18-38 at 8 (no disciplinary complaints from October 31, 2005 to November, 3, 2008); *id.* at 9 (no grievances from 2005 to 2010); *id.* at 10 (no disciplinary complaints); *id.* at 11 (same). Indeed, the records reflect that rather than being a disciplinary problem, Mr. Cruz-Garcia was the opposite. Mr. Cruz-Garcia earned numerous recommendations

for good time credit based on his behavior and hard work. *Id.* at 1, 4, 6, 7, 12, 14, 16, 18, 20, 21. From October 2005 to July 2009, Mr. Cruz-Garcia received frequent commendations for his hard work at the prison. *Id.* In total, Mr. Cruz-Garcia received 204 days of credit for his behavior. One notation specifically observed that:

> This prisoner performs risky jobs and for this reason we are asking for this good conduct time to compensate him for the effort that he makes and by this means help create an example so that other prisoners will give their best.

*Id.* at 6.

> ii. **Prison chaplains who knew Mr. Cruz-Garcia well could have testified to his outstanding conduct and sincere religious conversion in prison.**

Chaplains at the facilities where Mr. Cruz-Garcia was housed were available to testify regarding his positive behavior in prison and the resulting trust and freedoms that were bestowed upon him. Chaplain Irma Iglesias Cruz has worked in the Puerto Rico Department of Correction for roughly forty years. ECF No. 18-105. She supervises about sixty other prison workers, including chaplains in other facilities, and oversees the orientation of new chaplains coming in to work in an institutional setting for the first time. *Id.* Ivan Negron Vera has worked as a chaplain for the Department of Correction for seventeen years. ECF No. 18-106. From 2000 to 2012, he supervised roughly two thousand chaplains serving the various facilities run by the Department. *Id.* He regularly counsels both inmates and correctional staff and guards. *Id.* Jimmy Osorio has been a pastor for thirty years and has volunteered as a chaplain with the Department of Correction for about twenty-two years. ECF No. 18-107. And Luis Gonzales Martinez has volunteered as a chaplain at multiple facilities in San Juan for about twenty-eight years. ECF No. 18-108.

These four chaplains each got to know Mr. Cruz-Garcia as a volunteer helping with religious services and taking care of the chapel. ECF Nos.18–105; 18–106; 18–107; 18–108. Each agrees that in the many years they have worked in the criminal justice system, Mr. Cruz-Garcia stood out to them as one of the best behaved, most trusted, and most well-respected inmates. ECF Nos. 18–105; 18–106; 18–107; 18–108.

As an experienced chaplain, Ms. Cruz had witnessed other inmates trying to con their way into positions of trust or pretend to be religious, but Mr. Cruz-Garcia was not one of them. ECF No. 18–105.  Each of the chaplains believed through their experiences with Mr. Cruz-Garcia that he was a genuine and honest person. ECF Nos. 18–105; 18–106; 18–107; 18–108. To them, Cruz-Garcia's faith is real, as was the encouragement and support he gave to other inmates. Exs. 105 at 6-7, 106 at 9, 107 at 6, 108 at 5-6. At the time, the chaplains noted how he worked hard to help others become better people and productive inmates. ECF Nos. 18–105; 18–106; 18–107; 18–108. He got along well with other inmates and staff. ECF Nos. 18–105; 18–106; 18–107; 18–108.

Because of Mr. Cruz-Garcia's good behavior, he earned the respect of guards, staff, and other inmates. ECF Nos. 18–105; 18–106; 18–107; 18–108. He was given a significant role in the church services of the prison. ECF Nos. 18–105; 18–106; 18–107. They described Mr. Cruz-Garcia as one of the most trusted inmates in the chapel and that Mr. Cruz-Garcia would assist in all matters dealing with the prison's religious services. ECF Nos. 18–105; 18–106; 18–107; 18–108. For example, Mr. Cruz-Garcia would help get the chapel ready for worship services and clean up after, moving about freely. ECF Nos. 18–105; 18–106; 18–107. Mr. Cruz-Garcia also took part in music services and led Bible studies. ECF Nos. 18–105; 18–107.

None of the chaplains remember Mr. Cruz-Garcia being written up for discipline problems or being considered dangerous. ECF Nos. 18–105; 18–106; 18–107; 18–108. None ever witnessed nor heard of him committing any violence. ECF Nos. 18–105; 18–106; 18–107; 18–108. And this was not due to the lack of opportunity—while in prison in Puerto Rico, Mr. Cruz-Garcia was housed in general population and he was frequently left alone outside his cell. ECF Nos. 18–105; 18–106; 18–107; 18–108.

Mr. Cruz-Garcia was given tremendous privileges and trust in the prison not conferred on most other inmates. For example, multiple chaplains at various times gave Mr. Cruz-Garcia the keys to the chapel or their offices and allowed him to move around unsupervised. ECF Nos. 18–105; 18–106; 18–107; 18–108.

Mr. Cruz-Garcia was also allowed to work in the "corporation" area, which allowed inmates access to power tools and other potentially dangerous objects that were used for making furniture. ECF Nos. 18-106; 18-107; 18-108. Only inmates who were well-behaved, hard-working, and had earned trust were permitted to work there. *See, e.g.*, ECF Nos. 18-106; 18-107; 18-108.

In fact, if anything, Mr. Cruz-Garcia was seen as a calming influence who helped to maintain order. ECF Nos. 18-105; 18-106; 18-107; 18-108. He would convince other inmates to pay attention to correctional staff and to follow the rules. ECF Nos. 18-106; 18-107. Correctional staff felt Mr. Cruz-Garcia made their jobs easier through his influence on other inmates. ECF No. 18-106. When Mr. Cruz-Garcia was moved into segregation because he was being extradited to Texas, he maintained this attitude.[37] ECF Nos. 18-105.

---

[37] Copies of the letters found in the DA file support the chaplains' view that Mr. Cruz-Garcia maintained his faith even as he was incarcerated in Houston: he continued to take Bible courses by

Overall, these chaplains would have testified that Mr. Cruz-Garcia had a tremendous, positive impact on the lives of other inmates and of correctional staff while in prison in Puerto Rico. ECF Nos. 18-105; 18-106; 18-107; 18-108. In addition to being a trustworthy and hard worker, Mr. Cruz-Garcia acted as a counselor to help other inmates obey prison rules. ECF Nos. 18-105; 18-106; 18-107; 18-108.

### iii.   A classifications supervisor could have testified that Mr. Cruz-Garcia did not present any security risk as an inmate.

Daisy Melendez, a classifications supervisor at one of the prisons where Mr. Cruz-Garcia was incarcerated, was also available to testify. ECF No. 18-83 at 2. It was obvious to her that Mr. Cruz-Garcia "was repentant, and that he had the intention of making his life better." *Id.* She had seen how some inmates with long sentences "close themselves up" and "los[e] the opportunity to change." *Id.* "[O]thers change and start being different, better persons." *Id.* Ms. Melendez "can tell the difference" and she noticed that Mr. Cruz-Garcia "seemed to be one of the ones that was in the process of changing to better himself." *Id.* It was apparent that Mr. Cruz-Garcia "had a very strong faith" and he "used to talk about God a lot." *Id.* Ms. Melendez "never heard any complaints about [Mr. Cruz-Garcia], neither from the guards, nor from the other inmates." *Id.* Ms. Melendez could have told the jury that, based on her years of experience as a prison classifications official, Mr. Cruz-Garcia "did not present any security risk." *Id.*

---

correspondence and engage in nearly daily religious exchanges via post with friends and family. Had trial counsel reviewed the DA file, these letters could have been presented to the jury.

iv. **A psychologist who counseled Mr. Cruz-Garcia could have testified to his genuine religious faith and personal growth while in Puerto Rican prison.**

Dr. Alejandro Lebron, a clinical psychologist who counseled Mr. Cruz-Garcia while he was in prison there, was also available to testify. ECF No. 18–45. Dr. Lebron has worked in the field for roughly forty years and, at the time he knew Mr. Cruz-Garcia, was providing mental health support and assistance to inmates. *Id.* at 6. Mr. Cruz-Garcia began seeing Dr. Lebron by choice. *Id.* That is, he was not ordered to receive counseling, but instead sought out therapy on his own. *Id.*

Like the chaplains, Dr. Lebron observed that Mr. Cruz-Garcia's faith was genuine and thoughtful. ECF No. 18–45 He also felt that his dealings with Mr. Cruz-Garcia gave him a new perspective on the Bible. *Id.* Dr. Lebron's experience in dealing with Mr. Cruz-Garcia was that he was open and honest and was not a troublemaker. *Id.* Dr. Lebron could have told the jury that, based on his observations of Mr. Cruz-Garcia's interactions with other prison staff and civilians, he never felt like Mr. Cruz-Garcia posed a danger to anyone. *Id.* Indeed, he never knew of Mr. Cruz-Garcia to cause any trouble. *Id.* Dr. Lebron would have described Mr. Cruz-Garcia to the jury as "a deeply spiritual man, who believed that doing good work and living a good Christian life was the most important thing he could do." ECF No. 18–45. Having worked with prison populations, and knowing Cruz-Garcia in the years after the crime occurred, Dr. Lebron would have communicated that he had witnessed inmates change and that, even if guilty, he believed Mr. Cruz-Garcia was no longer the same individual. *Id.*

v. **An expert on the Puerto Rican Department of Corrections could have testified to the remarkable nature of Mr. Cruz-Garcia's exemplary prison record.**

Trial counsel did not retain, nor present the testimony of any expert who could have reviewed, and testified to, Mr. Cruz-Garcia's exemplary prison record. Had such an expert reviewed

Mr. Cruz-Garcia's records, that expert could have told the jury that Mr. Cruz-Garcia's records reflected his exemplary conduct during the nearly eight years he was incarcerated in Puerto Rico. ECF No. 18-40. There was nothing in the records to indicate that Mr. Cruz-Garcia was a dangerous or violent inmate; in fact, just the opposite—Mr. Cruz-Garcia was a model inmate who was trusted and highly regarded by prison staff. *Id.* Indeed, when an expert retained in post-conviction proceedings did review these records, he concluded that the trial testimony concerning Mr. Cruz-Garcia's purported escape attempt was likely overblown, if not downright misleading. *Id.* at 4. Among other things, Mr. Cruz-Garcia was never under "arrest" due to the incident, as the State's witness testified. 24 RR 125. He was never even criminally charged with attempting to escape and his sentence was not increased. ECF No. 18-40. Mr. Cruz-Garcia was reclassified back to minimum custody in significantly less time than would be typical. *Id.* Moreover, the cell where the items were found was shared with another inmate and there was no indication that it was not the other inmate who had acquired the contraband. *Id.*

> ### vi.   Mr. Cruz-Garcia's common-law wife Dorca could also have provided valuable testimony concerning Mr. Cruz-Garcia's time in Puerto Rican prison.

Finally, Mr. Cruz-Garcia's common-law wife Dorca, who trial counsel briefly interviewed by telephone, could have provided helpful information in this regard had she been interviewed earlier and more thoroughly. Dorca had been with Mr. Cruz-Garcia during the time he was in prison and had visited him there frequently with their daughter. ECF No. 18-88. She recalls the jail guards were friendly with Mr. Cruz-Garcia and told Dorca how much they liked him. *Id.* She still sees some of the guards occasionally and they are dismayed to hear that he remains incarcerated in the United States. *Id.* During his time in prison, Mr. Cruz-Garcia worked hard to continue to provide for his

family by making hammocks, key chains, and other items, which he would sell for money that he would give to his daughter. ECF No. 18-107.

>### vii.   Evidence of Mr. Cruz-Garcia's life and conduct in Puerto Rican prison could have persuaded at least one juror that Mr. Cruz-Garcia was not a future danger.

None of this information about Cruz-Garcia's conduct and life in prison in Puerto Rico was presented to the jury. Instead, the jury heard only of Mr. Cruz-Garcia's purported escape preparations. Trial counsel's failure to investigate and present evidence concerning Mr. Cruz-Garcia's incarceration was doubly harmful. Evidence of Mr. Cruz-Garcia's exceptional prison record would have blunted the impact of the State's evidence concerning his purported escape attempt, showing the jury that nothing similar—nor any other infractions—occurred during the remainder of his prison term. It would also have shown the jury that, far from being a potential escapist, Mr. Cruz-Garcia would be a well-behaved inmate and a positive influence on his fellow inmates if he were sentenced to life. Particularly given the hesitation of several of the jurors to impose a death sentence (and in one case, a juror's complete and immediate disavowal of the sentence) there is a reasonable probability that at least one juror would have reached a different result if the jury heard the full story concerning Mr. Cruz-Garcia conduct and life in Puerto Rican prison. *Moore*, 194 F.3d at 621 (holding that trial counsel's failure to present evidence concerning defendant's good behavior in prison prejudiced defendant as to both future dangerousness and mitigation special issues).

### H.  Trial counsel was ineffective for failing to object to error and failing to preserve error for appellate review.

"[T]rial counsel in a death penalty case must be especially aware . . . of the heightened need to fully preserve all potential issues for later review." A.B.A. Guideline 10.8, Cmt. "Counsel must therefore know and follow the procedural requirements for issue preservation and act with the

understanding that the failure to raise an issue . . . may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings." *Id.* Trial counsel has a duty to preserve constitutional error for appellate review, as well as a duty to object and move to exclude inadmissible evidence. *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) (failure to object to inadmissible evidence amounted to deficient performance); *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000) (failure to object to in-court identification); *Gabaree v. Steele*, 792 F.3d 991, 999 (8th Cir. 2015) (failure to object to inadmissible testimony); *Griffin v. Harrington*, 727 F.3d 940, 947–48 (9th Cir. 2013) (failure to object to unsworn testimony); *Thomas v. Varner*, 428 F.3d 491, 501–02 (3d Cir. 2005) (failure to object to in-court identification); *Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (failure to object to inadmissible testimony). Throughout Mr. Cruz-Garcia's trial, however, trial counsel failed to object to the admission of highly prejudicial evidence and failed to object to violations of Mr. Cruz-Garcia's constitutional rights.

### 1. Trial counsel failed to object to, and preserve for appellate review, violations of Mr. Cruz-Garcia's rights under the Confrontation Clause.

As detailed, *infra*, in Claims Two and Ten, Mr. Cruz-Garcia's right to confront witnesses against him was repeatedly violated when one of the State's DNA experts, Matt Quartaro, was permitted to testify to forensic work that he himself did not perform. *See* 16 RR 48–79; 21 RR 103–42. Likewise, the State's medical examiner, Dr. Dwayne Wolf, testified at length to autopsies that he himself did not perform. *See* 20 RR 4–33; 25 RR 97–115. Trial counsel, however, did not object to their testimony on Confrontation Clause grounds. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to this testimony because, had trial counsel objected, that testimony would have been excluded; or error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial on direct appeal. *See* Claim Ten.

168

2. **Trial counsel failed to object to, and preserve for appellate review, the trial court's ruling impermissibly limiting Mr. Cruz-Garcia's right to cross-examine witnesses about the reliability of the DNA evidence.**

As detailed, *infra*, in Claim Two § C, the trial court prohibited Mr. Cruz-Garcia from cross-examining witnesses about the reliability and accuracy of the DNA evidence based on the disgraced HPD Crime Lab's processing and storage of that DNA evidence. As detailed, *infra*, in Claim Four § 2, trial counsel did not object to that ruling on Confrontation Clause grounds. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to this testimony because, had trial counsel objected, Mr. Cruz-Garcia would have cross-examined witnesses about the unreliability of the DNA evidence; or error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial on direct appeal. *See* Claim Two § C; Claim Four § F.2.

3. **Trial counsel failed to object to, and preserve for appellate review, the improper admission of victim impact testimony.**

At the penalty phase, the State may introduce evidence "about the victim and about the impact of the murder on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). That evidence, however, must be limited to the "the human cost of crime of *which the defendant stands convicted.*" *Id.* at 827 (emphasis added); *see also id.* at 825 (victim impact testimony permitted as "another form or method if informing the sentencing authority about the specific harm caused *by the crime in question*") (emphasis added).

At the penalty phase of Mr. Cruz-Garcia's trial, the State elicited victim impact testimony from witnesses to extraneous offense, in violation of the Eighth Amendment and *Payne*. For example, Manuel Buten, a witness to an extraneous offense, testified about his family members' ongoing mobility issues and continuing emotional issues, such as nervousness, feelings of insecurity, inability to continue working, etc. RR 24 at 42. Likewise, Andres Castillo Buten also offered

improper extraneous victim impact evidence, testifying that he still has problems to this day. 24 RR 95–96, 97. Trial counsel, however, did not object to this testimony in violation of the Eighth Amendment. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to this testimony because, had trial counsel objected, that testimony would have been excluded; or error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial on direct appeal.

### 4. Trial counsel failed to preserve for appellate review error arising from the State's inflammatory comments.

Counsel has a duty to object to improper argument by the State. *Freeman v. Class*, 95 F.3d 639, 644 (8th Cir. 1996) (holding *Strickland* violated based on trial counsel's failure to object to improper argument from prosecutor). As detailed, *infra*, in Claim Fifteen, the State made numerous inflammatory comments in violation of Mr. Cruz-Garcia's right to a fair trial by an impartial jury and due process rights. The State repeatedly relied on comparisons with Hitler and Charles Manson, relied on highly publicized murder and terrorist cases such the Boston Marathon bombings, and invoked jurors' sense of nationalism in adjudicating the sentence of Mr. Cruz-Garcia, a foreign defendant. Regardless, trial counsel did not object to the State's inflammatory comments, nor requested an instruction to disregard. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to these comments because, had trial counsel objected, error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial or punishment phase on direct appeal.

### 5. Trial counsel failed to preserve for appellate review error arising from emotional outbursts from the gallery.

As detailed, *infra*, in Claim Fifteen, repeated emotional outbursts from the gallery tainted Mr. Cruz-Garcia's trial, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. Indeed, the trial court itself felt compelled to remove the jury at times to caution the gallery to refrain from emotional outbursts. 20 RR 108. Trial counsel did bring these outbursts to

the trial court's attention but neither moved for a mistrial, nor preserved any error arising under the Fifth, Sixth, and Fourteenth Amendments. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to these comments because, had trial counsel objected, error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial on direct appeal.

### 6. Trial counsel failed to preserve for appellate review error arising from incorrect translation of testimony.

As detailed, *infra*, in Claim Eleven, numerous witnesses at Mr. Cruz-Garcia's trial testified in Spanish and their testimony was translated incorrectly to the jury. Indeed, the jury itself sent a note asking whether it should deliberate based on the original or translated testimony. 23 RR 100. This incorrect translation of testimony violated Mr. Cruz-Garcia's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Trial counsel, however, did not object after the court interpreter flagged their own incorrect interpretation, nor after the jury sent out a note inquiring about the issue. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to these comments because, had trial counsel objected, error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial on direct appeal.

### 7. Trial counsel failed to object to, and preserve for appellate review, Mr. Cruz-Garcia's absence from critical stages of his trial.

As detailed, *infra*, in Claim Nine, Mr. Cruz-Garcia was absent from critical stages of his trial, including when the trial court discussed its *ex parte* meeting with a holdout juror, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendment. Trial counsel, however, did not object to Mr. Cruz-Garcia's absence. 24 RR 3. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to object to his absence because, had trial counsel objected, he would have been present to participate in his own defense; or error would have been preserved and Mr. Cruz-Garcia would have been granted a new trial on direct appeal.

## I.   Trial counsel was ineffective during jury deliberations.

### 1.   Trial counsel failed to investigate jury misconduct.

As detailed above in Claim One, the jury discussed the evidence and sentence outside of deliberations. Mr. Cruz-Garcia incorporates here by reference all facts alleged above in Claim One § B in support of his claim that trial counsel failed to investigate jury misconduct. After attorney Michael Casaretto alerted the trial court to misconduct by jurors in Mr. Cruz-Garcia's case, the trial court gave Mr. Casaretto's contact information to trial counsel and trial counsel represented that they would contact Mr. Casaretto. 24 RR 4–5. Trial counsel, however, never contacted Mr. Casaretto, nor took any other steps to investigate jury misconduct. ECF No. 18–31. That investigation would have confirmed Mr. Casaretto's report of jury misconduct. *See supra* Claim One § B.

In state post-conviction, trial counsel Skip Cornelius described the report of jury misconduct as "insignificant." 4 SHCR 948. By his own admission, however, that assessment was based on the trial court's summary of Mr. Casaretto's report and trial counsel themselves never even sought to contact Mr. Casaretto or take any other steps to investigate the jury misconduct. Instead, as is made clear by Mr. Cornelius's billing records described above, Mr. Cornelius was simply too busy with his workload on other cases.

### 2.   Trial counsel failed to object to the trial court's *ex parte* meeting with a holdout juror.

As detailed *below in* Claim Seven, the trial court held an *ex parte* meeting with a holdout juror who wanted to answer the special issues in such a way as to result in a life verdict, and gave that juror coercive instructions. Mr. Cruz-Garcia incorporates here by reference all facts alleged below in Claim Seven in support of his claim that trial counsel was ineffective for failing to object to the trial court's

*ex parte* meeting. Trial counsel did not object to the trial court's *ex parte* meeting with juror Bowman and, instead, acquiesced to the trial court meeting with juror Bowman outside the presence of counsel and Mr. Cruz-Garcia. 27 RR 3–4. Trial counsel further did not request an accounting of the trial court's *ex parte* meeting.

In state post-conviction, trial counsel was ordered to "[e]xplain [their] reasoning in choosing not to object to or specifically request the trial court to report its conversation with juror Angela Bowman on the record." 4 SHCR 933. Mr. Cornelius responded that: "There is a huge difference between what we knew at the time and what has been said after the verdict was rendered." 4 SHCR 948. That, however, is exactly the point. By failing to object to the *ex parte* meeting and failing to request that the trial court inform trial counsel of the content of that meeting, trial counsel deprived Mr. Cruz-Garcia of any opportunity to challenge the trial court's coercive instructions to a lone holdout juror who clearly stated that she believed that the answers to the sentencing special issues were such that Mr. Cruz-Garcia would have been sentenced to life.

### 3. Mr. Cruz-Garcia was prejudiced by trial counsel's ineffectiveness during the jury's deliberations.

As established in Claims One and Seven, the jury in Mr. Cruz-Garcia's case committed misconduct by discussing the evidence and sentence outside of deliberations and the trial court gave coercive instructions to the sole holdout juror. Under Texas law, a capital defendant cannot be sentenced to death absent a unanimous jury verdict on the special issues. Here, however, the jury was not unanimous and juror Bowman differed from the rest of the jury on how to answer the Texas sentencing special issues. Shortly after the trial court's coercive instruction, which juror Bowman understood to require that the jury continue to deliberate and remain sequestered until a verdict was reached, the jury returned an apparently unanimous verdict. 3 CR 629. Had trial counsel

objected to the *ex parte* meeting, trial counsel could have objected to the coercive instruction and there is a strong possibility that juror Bowman would not have capitulated to the immense pressure she felt to agree with the other jurors, meaning Mr. Cruz-Garcia would have received a life verdict. Although appellate counsel could and should have raised the *ex parte* meeting with juror Bowman on appeal, *see infra* Claim Eight, to extent the Court concludes that appellate counsel could not have raised the issue because trial counsel failed to preserve it, then Mr. Cruz-Garcia was prejudiced by trial counsel's deficient performance because the issue would have prevailed on appeal. Finally, had trial counsel investigated Mr. Casaretto's report, trial counsel would have been able to ask for a mistrial based on juror misconduct, or at least preserve the issue for review such that Mr. Cruz-Garcia would have obtained a new punishment trial.

## J. Trial counsel was ineffective during jury selection.

Jury selection in a capital case is "critical" and trial counsel should accordingly "devote substantial time" to preparing and conducting jury selection. ABA Guideline 10.10.2, Cmt. Trial counsel should further "listen closely to the prosecutor's voir dire . . . make appropriate objections, and ensure that all the information critical to a discrimination claim is preserved on the record." *Id.* Trial counsel did not dedicate the time, nor attention required to select the jury and ensure that any error was identified and preserved for appellate review in Mr. Cruz-Garcia's case. Indeed, Mr. Cornelius's billing records reflect that he billed *at least* 2.5 hours and *up to* 8 hours to *other* cases on nearly every day that Mr. Cruz-Garcia's case was in jury selection. *See supra* § A.5.a. Mr. Cornelius further claimed 19 court day fees in *other* cases over that same time period. *Id.*

### 1. Trial counsel failed to raise and preserve as error that Mr. Cruz-Garcia's jury was selected from a venire that was not representative of a fair cross section of the community, in violation of the Sixth and Fourteenth Amendments.

"Counsel should consider . . . whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge." A.B.A. Guideline 10.10.2. Widely available information at the time and even prior to Mr. Cruz-Garcia's trial made clear that Harris County systematically excluded Hispanics from the jury pool: whereas Hispanics at the time accounted for 40% of the Harris County population, they represented less than 25% of veniremembers. *See infra* n.38. This systematic exclusion of Hispanics in jury venires was present in Mr. Cruz-Garcia's case. At the time of Mr. Cruz-Garcia's trial in 2013, Harris County's population was 42.81%, Hispanic.[38] By contrast, the petit jury venire from which Mr. Cruz-Garcia's jury was selected was made up of 150 people, of which only 28 people or 18.67%, were Hispanic. This practice of systemic exclusion, resulting in jury venires that are not representative of a fair cross section of the community, violates a criminal defendants rights under the Sixth and Fourteenth Amendments. *See Duren v. Missouri*, 439 U.S. 357, 358–59 (1979).

Trial counsel, however, failed to raise and preserve this fair cross-section claim. Mr. Cruz-Garcia was prejudiced by this failure because, had trial counsel objected and thus preserved this error, Mr. Cruz-Garcia would have been successful on direct appeal. Indeed, Mr. Cruz-Garcia would have been able to show that (1) Hispanics are "a distinctive group in the community;" (2) that the representation of Hispanics in venires from which juries are selected "is not fair and reasonable" based on the fact that Hispanics represented just 25% in venires generally despite representing 40% of the population; and (3) that this underrepresentation was "due to systematic exclusion" based on statistical evidence in Mr. Cruz-Garcia's case and numerous other cases across Harris County. *Duren*,

---

[38] Texas Department of State Health Services, Texas Population, 2013 (Estimates), *available at* http://dshs.texas.gov/chs/popdat/ST2013.shtm (last accessed Oct. 27, 2018).

439 U.S. at 668–70 (describing three-part test a criminal defendant must satisfy to establish *prima facie* violation of fair cross-section requirement). Finally, the State would have been unable to rebut Mr. Cruz-Garcia's *prima facie* case. *Id.* at 671 (holding that to rebut *prima facie* violation of fair-cross section requirement, "the State that bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest").

2. **Trial counsel failed to make a full and accurate record of jury selection, and to require the State to exercise its cause for challenges on the record.**

Over the course of jury selection, trial counsel stipulated to the removal of approximately 80 prospective jurors. *See, e.g.*, 5 RR 104–05; 6 RR 4,118, 186–87, 192; 7 RR 251; 8 RR 35, 180; 9 RR 17; 10 RR 123, 124; 11 RR 4, 105; 13 RR 149. In many instances, trial counsel agreed to the removal of prospective jurors, including for cause, without conducting any individual *voir dire* of those veniremembers. *See e.g.* 5 RR 104–05 (defense counsel and the State agreeing to excuse thirty-eight people); 11 RR 105 (defense counsel and the State agreeing to excuse thirty-one people). Many of the discussions about these prospective jurors, including the reason for their removal either by agreement or for cause, were held off the record. *See, e.g.*, 5 RR 99–100 ("Have both sides had an opportunity to review the questionnaires in this case and make agreements as to those questionnaires?"). Moreover, even where the prospective jurors were challenged and removed for cause, the trial court recorded their removal as by agreement. 5 RR 100. Trial counsel thus failed to make a full and accurate record of *voir dire*, including by extensively discussing *and* agreeing to for-cause challenges off the record, and not requiring the trial court to accurately record why prospective jurors were removed. Trial counsel thus further failed to hold the State to its burden to prove those for-cause challenges.

Trial counsel's failure to make a record of for-cause challenges and to hold the State to its burden to prove for-cause challenges persisted throughout *voir dire* and impacted the removal of minority veniremembers.   For example, trial counsel stipulated to the removal of venireperson 11 (Rachel Willis), even after the State withdrew its strike for cause. 5 RR 105–06; 6 RR 4. Trial counsel also agreed to excuse venireperson No. 54 (Elsy Quinanilla), a Hispanic woman, even after the trial court denied the State's strike for cause. 5 RR 117–18; 7 RR 251.

Trial counsel's failure to make a full and accurate record of *voir dire*, including agreements and for cause challenges, prejudiced Mr. Cruz-Garcia because the trial court would not have sustained the State's for cause challenges. Among the prospective jurors who were dismissed without any record being made of the reason, were potential jurors like venireperson No. 18 (Anita Payne). 5 RR 104. Nothing in her questionnaire or the few questions she asked during general *voir dire* suggested a basis in support of a for cause challenge. *See* 5 RR 34–35, 90–91. It was the same with, with venireperson No. 20 (Meghan Mehl) and Monica Lara, venireperson No. 8, *see* 5 RR 49–50, 104, and several others. *See* 5 RR 82, 104. *see generally* 5 RR 8–105. Some expressed hesitancy about the death penalty that did not rise to the level of "cause" sufficient to grant a strike. *See, e.g.*, Venireperson No. 8 statement, 5 RR 83 ("I'm not for the death penalty, so I might possibly be swayed. I don't want to go 100 percent, but I'm not for it. So, it would be a little difficult for me.").

### 3.   Trial counsel failed to raise a *Batson* challenge.

The State unconstitutionally used peremptory challenges to systematically exclude Black and Hispanic prospective jurors from serving on the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). These peremptory strikes include the discriminatory strikes of venirepersons Latoya Johnson (No. 89), Melinda Dixon (No. 98), Johnny Bermudez (No. 92), and Gilberto Vazquez (No. 115).

These jurors had similar answers on their questionnaires and responses during *voir dire* as compared to seated white jurors. Yet trial counsel failed to raise a *Batson* objection to the State's peremptory challenge of these four jurors. 11 RR 180, 261; 12 RR 219; 13 RR 181. Mr. Cruz-Garcia was prejudiced by trial counsel's failure to raise a *Batson* challenge because he would have been successful in proving a *Batson* objection.

The State also targeted women, as reflected by their biased questions unrelated to their qualifications as jurors, such as "Do you know how your husband feels about the death penalty?" 9 RR 120 (voir dire of Patricia Lopez, venireperson No. 69, by the State); *see also* Donna Chambers, venireperson 45, 8 RR 45; Nancee Pyper, venireperson 64, 9 RR 169; Casey Guillotte, venireperson 84, 10 RR 184; Sharon Alexander, venireperson 149, 15 RR 157. None of the married men in the venire were asked about how their wives felt about the death penalty.

### 4.  Trial counsel failed to raise *Witherspoon* challenges.

The Supreme Court in *Witherspoon v. Illinois* recognized that to allow the State to remove from the panel any member who has moral qualms about the death penalty would unfairly cause the jury to be "uncommonly willing to condemn a man to die." 391 U.S. 510, 521 (1968). Nevertheless, numerous veniremembers were excluded from Mr. Cruz-Garcia's jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Trial counsel, however, failed to object to the removal of these veniremembers and failed to attempt to rehabilitate them. *See* A.B.A. Guidelines 10.10.2, Cmt. ("Counsel should also develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty.").

For example, the State moved to strike for cause veniremember No. 8 (Monica Lara), after she stated "I'm not for the death penalty, so I might possibly be swayed. I don't want to go 100 percent, but I'm not for it. So, it would be a little difficult for me." 5 RR 83. 5 RR 100. Likewise, veniremember No. 20 (Megan Mehl) was struck after she stated: "I feel the same way. I put that I'm opposed, but in a few cases I'm for it, but not if I have to make the decision. I would be swayed to go against the death penalty." 5 RR 82. Both were struck/excused without any attempt by the trial counsel to rehabilitate them. Indeed, trial counsel did not object to the exclusion of dozens of such jurors, nor did trial counsel make any attempt to rehabilitate such jurors. These failures by trial counsel prejudiced Mr. Cruz-Garcia because, had trial counsel objected to their removal or rehabilitated them, the court would not have sustained the State's for cause challenges and these jurors would have been seated on the jury.

### 5. Trial counsel failed to identify potential jurors' biases based on the alleged facts of the offense.

"Counsel should conduct a voir dire that is broad enough to expose those prospective jurors who are unable or unwilling to follow the applicable sentencing law, whether because they will automatically vote for death in certain circumstances or because they are unwilling to consider mitigating evidence." A.B.A. Guideline 10.10.2, Cmt. Trial counsel, however, agreed to the State's request that either party be prohibited from discussing during *voir dire* that the offense was committed against a child and included allegations of sexual assault. 5 RR 5. Trial counsel was thus deficient by failing to conduct a "broad" *voir dire* to explore and determine whether prospective jurors could nevertheless render impartial judgment.

Furthermore, while agreeing with the State not to examine jurors' potential biases towards crimes involving children and sexual violence, trial counsel did not object to the State's repeated

reliance on sensational crimes against children. For example, the State repeatedly invoked the Boston marathon bombing, the Candy Man case, and the Andrea Yates case. 5 RR 174, 223, 289; 7 RR 27, 73, 104, 144, 151, 220; 8 RR 138; 9 RR 83, 180, 185; 10 RR 13, 139; 11 RR 189, 145; 12 RR 115, 157, 251; 13 RR 209. Trial counsel thus forewent any chance to identify potential jurors' biases, while also permitting the State to rely on examples of crimes committed against children to build up what it suggested seated jurors could expect to hear.

### 6. Trial counsel failed to object to the State's inflammatory *voir dire* questioning.

Trial counsel failed to object to the State's unconstitutionally inflammatory comments and questions during *voir dire*. *See Freeman*, 95 F.3d 639 (holding *Strickland* violated due to trial counsel's failure to object to improper argument from prosecutor).

The State repeatedly used examples such as Adolf Hitler and Charles Manson to explain the applicable law to prospective jurors. *See* 6 RR 26–27; 8 RR 95; 11 RR 202; 12 RR 261; 13 RR 217; 14 RR 222–23, 262–63. For example, the State explained the law of parties, which governed Mr. Cruz-Garcia's case, by referencing Charles Manson and Adolf Hitler: "Charles Manson got people to do his work for him, but he was clearly the worst actor of the bunch. You know, Hitler. . .  So, that's one of the reasons this law exists." 6 RR 26–27. These were not isolated remarks; the State repeatedly made use of these analogies throughout *voir dire*, including with two jurors who were seated. 12 RR 22, 163–64. These comments and comparisons drew no objection from trial counsel.

Trial counsel likewise failed to object to the State repeatedly invoking the then-recent Boston marathon bombing, as well as other highly publicized crimes, with prospective jurors as well as jurors who were eventually seated. 7 RR 27, 104; 8 RR 138; 10 RR 13, 139; 11 RR 189, 145; 12 RR 157, 251; 13 RR 209. Likewise, the State repeatedly invoked "the Candy Man case" during *voir dire*— including with those seated as jurors—as an example of a case with facts so egregious that "anyone

who can do that, is always going to be a threat to society." 5 RR 174, 223, 289; 7 RR 144; 9 RR 180. The prosecutor also repeatedly brought up Andrea Yates, a woman who drowned her five children, in *voir dire*—including with seated jurors. 7 RR 73, 151, 220; 9 RR 83, 185; 12 RR 115.

Trial counsel also failed object to the State's suggestions to veniremembers that Mr. Cruz-Garcia had a long criminal history. For example, the State told prospective jurors: : "So, can you see how that other evidence—a lot of jurors are like: Well, we didn't hear anything about criminal history, so he must not have any, during the guilt phase. But that's not true because usually you won't hear about that until the punishment phase, if there is any." 6 RR 16. With the venireperson who ended up being seated on the jury, the State both suggested that criminal history existed and questioned the existence of mitigation: "And in the guilt phase, certain things like the defendant's criminal history, good things about the defendant, if there are any of those, those kinds of things are not going to come into play usually until the punishment phase of the trial." 12 RR 14 (voir dire of Jennifer Sims, seated juror).  By strongly suggesting to potential jurors that Mr. Cruz-Garcia had a "criminal history" that would only be revealed at the punishment phase, the State effectively evaded the rules of evidence prohibiting, with limited exceptions, a defendant's criminal history from being used by the State to prove guilt. Trial counsel should have objected.

The State's reliance on and comparisons with examples such as Hitler, Charles Manson, the Boston marathon bombing, Andrea Yates, and the Candy Man case violated Mr. Cruz-Garcia's rights to a trial by a fair and impartial jury. *See infra* Claim Fifteen. Trial counsel, however, never objected to this inflammatory *voir dire* by the State. Mr. Cruz-Garcia was prejudiced by this failure. Building on the foundation laid in *voir dire*, the State subsequently invoked these same comparisons and imagery during closing argument: "I will also ask you that you remember those conversations that

we had with each of you individually over the last month or so back in jury selection." 26 RR 145.

Echoing the voir dire—"Charles Manson or Hitler . . . they have been evil inside," 8 RR 95—the State

went on to argue that "Cruz-Garcia is a monster. He is an evil person who likes to torture and taunt

his victims." 26 RR 175.

### K. Trial counsel rendered ineffective assistance by failing to recognize the significance of Mr. Cruz-Garcia's foreign nationality.

As a citizen of the Dominican Republic, Mr. Cruz-Garcia is entitled to certain protections

under the Vienna Convention on Consular Relations (VCCR).[39] Here, Mr. Cruz-Garcia was denied

effective assistance of counsel when his trial attorneys failed to recognize and act on his rights under

the VCCR by contacting the Dominican Republic consulate concerning his prosecution, thereby

depriving him of all the benefits that consular involvement would have provided.

#### 1. Trial counsel performed deficiently by failing to contact the Dominican consulate.

Sandra Babcock, a clinical professor of law at Cornell University and a licensed Texas

attorney with over twenty years of capital experience, stated that it was standard practice within the

capital defense community in 2013 to enlist the help of a foreign consulate to assist a foreign client.

ECF No. 18-26. This is reflected in the ABA Guidelines, which state require trial counsel

representing a foreign national to "immediately advise the client of his or her right to communicate

with the relevant consular office," "obtain the consent of the client to contact the consular office,"

and immediately thereafter "contact the client's consular office and inform it of the client's

---

[39] Specifically, Mr. Cruz-Garcia was entitled to be apprised of his right to contact authorities from his home country if he has been arrested, detained, or indicted. Vienna Convention on Consular Relations Art. 36(1)(b), April 24, 1963, 21 U.S.T. 77, TIAS 6820. Ensuring that this right is properly enforced is crucial in ensuring that foreigners of any nationality, including United States citizens, receive fair treatment when detained outside of their home countries.

detention or arrest." ABA Guideline 10.6. The Texas Guidelines go even further and require trial counsel to potentially contact the client's consular office even if trial counsel cannot obtain the client's consent to do so. Texas Guideline 10.3.B.4. ("Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.").

In addition to the information available to trial counsel through Mr. Cruz-Garcia himself—who speaks no English and has a foreign passport—trial counsel had objective information in their possession confirming that Mr. Cruz-Garcia is a foreign national. In particular, counsel had a copy of Mr. Cruz-Garcia's 2010 Probable Cause Order, which states that he is not a United States citizen.[40] ECF No. 18-25.

Through discovery, trial counsel also had access to numerous police and other state-issued reports indicating that Mr. Cruz-Garcia is a citizen of the Dominican Republic. A supplemental police report provided to trial counsel identifies Mr. Cruz-Garcia as a national of the Dominican Republic. ECF No. 18-26. Moreover, on June 19, 2013, the prosecution filed a Notice to Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction stating that "[t]he defendant is a citizen of the Dominican Republic who entered the United States as well as the Commonwealth of Puerto Rico on multiple occasions since the late 1980s illegally and remained in both locations for periods of time as an undocumented alien." *Id.*

---

[40] This Order incorrectly identified Mr. Cruz-Garcia as being from Dominica rather than the Dominican Republic. Nevertheless, this Order provides evidence of Mr. Cruz-Garcia's foreign nationality. Furthermore, given trial counsel's later efforts to locate and speak with family members of Mr. Cruz-Garcia's in the Dominican Republic, it is clear that counsel knew where their client was from.

This information would have been sufficient to place counsel on notice that they were defending a non-United States citizen. Consequently, prevailing norms of professional practice dictated that trial counsel take certain steps in their representation of Mr. Cruz-Garcia.

Trial counsel did not inform Mr. Cruz-Garcia of his right to communicate with the Dominican Republic Consulate, even though "Guideline 10.6 unequivocally states that counsel should advise a foreign national client of her right to communicate with consular officials." ECF No. 18-26. Despite myriad professional guidelines clearly outlining counsel's obligations in representing a foreign national, trial counsel never made an attempt to contact the Dominican Republic Consulate on Mr. Cruz-Garcia's behalf.

In his affidavit, Mr. Cornelius asserts: "The defendant expressed no interest at all in receiving help of any kinds from his consulate. He was given warnings about this and it was reiterated by us and his response to almost everything was that Jesus would deliver him." 4 SHCR 944. The Texas Guidelines on the importance of seeking consular assistance are clear. Counsel must not merely "reiterate[]" the trial court's statements about consular assistance. Counsel is required to "[o]btain the consent of the client to contact the consular office." Texas Guideline 10.3.B.4. Nothing in Mr. Cornelius's affidavit suggests that he affirmatively attempted to gain Mr. Cruz-Garcia's consent.

Moreover, even if counsel is "unable to obtain consent," that does not mean counsel should not attempt to obtain consular assistance. Rather, the Texas Guidelines direct counsel to "exercise his or her best professional judgment." *Id.* Nowhere in his affidavit does Mr. Cornelius explain or even suggest why his "best professional judgment" was not to contact the consulate. Nor does Mr. Cornelius explain why, given the extreme importance the Texas Guidelines place on obtaining

consular assistance, neither he nor his investigator made a written record of having discussed the issue with Mr. Cruz-Garcia.

###### 2.   Mr. Cruz-Garcia was prejudiced by trial counsel's failure to contact the Dominican consulate.

At the time of Cruz-Garcia's trial, the Dominican Republic consulate was unaware of Mr. Cruz-Garcia's arrest and that he faced the death penalty. Had the consulate been informed by reasonably diligent trial counsel, multiple services would have been made available to Mr. Cruz-Garcia's defense team, including assistance contacting family members, locating witnesses or records in the Dominican Republic, sending out documents and letters to the court, being present in court, and otherwise supporting Mr. Cruz-Garcia. ECF No. 18-27. Had it been contacted by the defense team, the Dominican Republic consulate would have sought to assist trial counsel in its representation of Mr. Cruz-Garcia, including by facilitating trial counsel's investigation. In addition, had the consulate been involved in this case from the start, they could have sought to use their political influence to negotiate with the State to seek a life sentence for Mr. Cruz-Garcia. Consular officials are often successful in persuading prosecutors to waive the death penalty in exchange for a guilty plea. ECF No. 18-26. Officers of the Dominican Republic Consulate were available to assist but trial counsel never contacted the consulate, in clear contravention of the Guidelines.

Trial counsel wholly failed to fulfill their obligations under prevailing norms of both national and state professional practice in failing to advise Mr. Cruz-Garcia of his right to consular access, seek out consular assistance in the defense of his case, and communicate to the court that the State failed to properly warn Mr. Cruz-Garcia of his rights under the VCCR. Given the significant ways consular assistance can positively impact a defendant's capital case, there is no doubt that failure to

seek such assistance—especially when the obligation to do so is codified by various professional

guidelines—is prejudicial.

> **L. The Court can review this claim _de novo_ because state habeas counsel performed deficiently in failing to raise this substantial claim.**

Mr. Cruz-Garcia raised this claim as Claim 6 in his second subsequent state habeas

application. Ex. 149. The CCA dismissed the claim as procedurally defaulted. _See Ex parte Cruz-_

_Garcia_, 2021 WL 4571730, at *1. The claim is therefore exhausted and procedurally defaulted. Mr.

Cruz-Garcia can overcome the procedural default because this claim is substantial and his state

habeas counsel performed deficiently by failing to raise it.

Under _Martinez v. Ryan_, 566 U.S. 1, 17 (2012) and _Trevino v. Thaler_, 569 U.S. 413, 417 (2013)

a Texas habeas petitioner can overcome the procedural default of an ineffective assistance of trial

counsel claim by showing that the claim is "substantial" and that state habeas counsel performed

deficiently in failing to raise it. A claim is "substantial" for _Martinez/Trevino_ purposes if it "has some

merit." _Washington v. Davis_, 715 F. App'x 380, 384 (5th Cir. 2017) (quoting _Segundo v. Davis_, 831

F.3d 345, 350 (5th Cir. 2016)). Here, Mr. Cruz-Garcia has pled a detailed and multifarious _Strickland_

claim that undoubtedly has "some merit." _Id._ Moreover, although state habeas counsel pled some

_Strickland_-related claims, the ineffectiveness claim that Mr. Cruz-Garcia alleges here substantially

alters what State habeas counsel pled, and goes far beyond it from a factual and legal standpoint.

Where state habeas counsel pled a significantly reduced version of a federal-court _Strickland_ claim,

_Martinez_ can permit the federal court to review _de novo_ the entirety of the fundamentally altered

federal-court claim. _Id._ at 381–82.

Mr. Cruz-Garcia was represented in his initial state post-conviction proceedings by the Office

of Capital and Forensic Writs ("OCFW"). The responsibilities of state habeas counsel are set forth

in the Texas Guidelines, as well as Article 11.071 of the Texas Code of Criminal Procedure. Both the Texas Guidelines and Article 11.071 make clear that extra-record factual development has a critical role in state post-conviction representation. Article 11.071 expressly provides that state habeas counsel "*shall*" investigate and develop extra-record facts "*before and after* the appellate record is filed in the court of criminal appeals[.]" Tex. Code Crim. Proc. art. 11.071 § 3(a) (emphasis added). The Texas Guidelines similarly affirm that a thorough investigation is the core duty of state habeas counsel, by cautioning that "[c]ounsel should not accept an appointment if he or she is not prepared to undertake *the comprehensive extra-record investigation that habeas corpus demands.*" Texas Guideline 12.2.B(1)(a) (emphasis added). Hence, the Guidelines mandate that state habeas counsel "must promptly obtain . . . the assistance of a fact investigator *and* a mitigation specialist[.]" *Id.* at 12.2.B(3)(a) (emphasis added).

Here, state habeas counsel failed to conduct an adequate extra-record investigation. State habeas counsel did not obtain trial counsel's publicly available appointment and billing records. Ex. 137. Those records lend significant support to Mr. Cruz-Garcia's allegations of ineffective assistance of counsel. *See supra* § C. Those records are readily accessible via the Harris County District Clerk's Office. State habeas counsel's failure to obtain those records was not based on any strategic consideration.  In fact, state habeas counsel did obtain records reflecting Mr. Cornelius's excessive caseload in a later case that state habeas counsel litigated less than a year later. *Id.* In that later filing, state habeas counsel also included briefing on the applicable caseload caps that Mr. Cornelius violated. *Id.* When representing Mr. Cruz-Garcia, state habeas counsel simply did not realize that they could leverage publicly available information to show the excessive number of appointments Mr. Cornelius took on. *Id.*

As discussed above, the mitigation presentation at Mr. Cruz-Garcia's trial was limited to the ineffective examination of three family members and a fourth witness who had only recently met Mr. Cruz-Garcia. It should therefore have been clear that an extensive and thorough mitigation investigation would be required. State habeas counsel, however, did not seek *any* investigation-related funding from the trial court. Ex. 120. Instead, a single investigator, Mr. de la Rosa, was assigned to Mr. Cruz-Garcia's case, with no distinction between fact and mitigation investigation. *Id.* Mr. de la Rosa was assigned to conduct the totality of all investigation in connection with both phases of Mr. Cruz-Garcia's trial, had very limited prior investigation experience, and was discouraged from seeking support. Ex. 121. Even though state habeas counsel determined that investigation would require travel to Houston, the Dominican Republic, and Puerto Rico, Mr. de la Rosa was given just one week to locate and interview witnesses, and draft, translate, and obtain signed declarations from witnesses in the Dominican Republic *and* Puerto Rico. Exs. 120; 121. Due to a family emergency, Mr. de la Rosa had to cut his trip short. *Id.*

Furthermore, Article 11.071 clearly mandates that investigation should begin "on appointment" and continue throughout the pendency of the direct appeal. Tex. Code Crim. Proc. art. 11.071 § 3. However, it was not until the spring of 2015, nearly two years into appellate and post-conviction proceedings and weeks shy of the initial deadline for filing an initial writ application in state court, that *any* investigation in the Dominican Republic and Puerto Rico was conducted. Ex. 120. Similarly, there is no indication that state habeas counsel sought the assistance of "a fact investigator with specialized training," as required by Texas Guidelines at 12.2.B.4(d) ("The assistance of a fact investigator with specialized training is indispensable to discovery and developing the facts that must be unearthed in habeas corpus proceedings."). Yet, as discussed above, there were

numerous fact issues concerning not just the State's guilt-phase case, but the extraneous offenses the State used to secure the death penalty. Yet, state habeas counsel failed to raise any claims concerning the extraneous offenses.

The Texas Guidelines also provide that state habeas counsel must "reinvestigate . . . most, if not all, of the critical witnesses for the prosecution and investigate their background[,]" including "whether motives for fabrication or bias were left uncovered at the time of trial." Texas Guidelines at 12.2.B.4(e). Here, state habeas counsel did not investigate the background of Mr. Santana, the State's sole eyewitness. The documents evidencing Mr. Santana's longstanding mental illness were publicly available and should have been obtained as part of a basic criminal history search.

The Texas Guidelines also make clear that state habeas counsel "has a duty to keep the capital client informed" and to "fully discuss[]" case strategy. Texas Guidelines at 12.2.B.2(b). Pursuant to Texas Guideline 12.2.B.2(e), state habeas counsel must take additional steps where the client is a national of a foreign country. State habeas counsel, however, did not seek to have the trial record translated into Spanish until July 2014, or six months after appointment. 4 SHCR 855–62. Mr. Cruz-Garcia, who does not speak English, was therefore prevented from participating fully in his own case for at least the first six months and the time during which the record was being translated.

Perhaps most critically, as the Fifth Circuit has noted, the "mere fact that state habeas counsel failed to raise [a] potentially meritorious IATC claim[]" evidences counsel's ineffectiveness and the resulting prejudice to the petitioner. *Washington*, 715 F. App'x at 385. Here, state habeas counsel did not meet the Texas Guidelines and statutory requirements for post-conviction representation. As a consequence, Mr. Cruz-Garcia's procedural default of this claim is excused. *Martinez*, 566 U.S. at 17; *Trevino*, 569 U.S. at 417.

In the alternative, this court can excuse the procedural default of this claim so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

**Claim Five:     The State relied on false testimony, in violation of the Fourteenth Amendment.**

The State relied extensively on false testimony to obtain a conviction and sentence of death against Mr. Cruz-Garcia, in violation of his due process rights under the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). Under clearly established Supreme Court precedent a violation of Due Process based on the State's false evidence is established where (1) false testimony was given; (2) the State knew or should have known that the testimony was false; and (3) the false testimony was material. *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998). Because Mr. Cruz-Garcia satisfies all three elements, he is entitled to a new trial.

At trial, the State's case against Cruz-Garcia turned on the testimony of Mr. Santana implicating Mr. Cruz-Garcia as a party to the offense, DNA evidence linking Mr. Cruz-Garcia to the offense, and the testimony of Angelita Rodriguez alleging that Mr. Cruz-Garcia had confessed to her. False testimony, however, impacted all three critical elements of the State's case and beyond. Despite eliciting testimony designed to convey to the jury the impression that Mr. Santana did not have a deal with the State and was testifying at the risk of being prosecuted, the State never brought *any* charges against him. Then, after Mr. Cruz-Garcia was convicted, the State published an amended DNA report in which it recanted much of the DNA evidence it relied on to tie him to the offense and to corroborate Mr. Santana's accomplice testimony. ECF No. 18–11. Finally, after Ms. Rodriguez testified against Mr. Cruz-Garcia, the State supported her bid to adjust her immigration

status. Ex. 113. Based on the information available to the State at the time of trial, the State knew or should have known that this testimony was false.

In combination, this false testimony infected all critical aspects of the State's case against Mr. Cruz-Garcia. Absent the false testimony, the jury would have been presented with little evidence supporting the State's theory of the case, whether at the guilt phase or punishment phase.

### A. The State relied on the false testimony of Mr. Santana.

At the guilt phase of trial, the testimony of Mr. Santana was critical to the State's case against Mr. Cruz-Garcia. In closing, the State argued that his testimony needed only "the tiniest little bit of corroboration" to prove that Mr. Cruz-Garcia was guilty of capital murder as a party. 23 RR 36. Mr. Santana, who had recruited Mr. Cruz-Garcia from Puerto Rico to Houston to join him in the drug trade, claimed that he, Rogelio Aviles-Barroso,[41] and Mr. Cruz-Garcia drove to the apartment of Diana Garcia and Arturo Rodriguez on the night of the offense. 20 RR 135. He alleged that Mr. Cruz-Garcia sexually assaulted Diana Garcia, took Angelo, and ordered Mr. Aviles-Barroso to murder him. *Id.* at 149–50. Mr. Santana described his own participation in the kidnapping and murder of Angelo Garcia and, at the State's prompting, told the jury that his testimony placed him at risk of prosecution. *Id.* at 153–54, 166. The State did not call Mr. Aviles-Barroso to testify.[42]

According to Mr. Santana, the three men drove to Ms. Garcia and Mr. Rodriguez's apartment because Mr. Cruz-Garcia wanted to get drugs and money from the couple. 20 RR 135.

---

[41] At the time of Mr. Cruz-Garcia's trial, Mr. Aviles-Barroso had been arrested in connection with the offense and was housed at the Harris County Jail. 20 RR 166–67. He was convicted of capital murder on January 29, 2014, in trial Cause No. 1346839, in the 337th District Court in Harris County, Texas. The State did not seek the death penalty against Mr. Aviles-Barroso and he was sentenced to life.

[42] Mr. Santana also testified for the State against Mr. Aviles-Barroso in a subsequent trial.

He described the vehicle used that night as a four-door, blue Chevrolet driven by Mr. Cruz-Garcia. *Id.* at 136. Mr. Santana alleged that Mr. Cruz-Garcia instructed him to remain in the car while he and Mr. Aviles-Barroso went up to the apartment. *Id.* at 137. Mr. Santana insisted to the jury that he remained in the car, from which he observed Mr. Cruz-Garcia returning from the apartment with Angelo in his arms. *Id.* at 144. According to Mr. Santana, Mr. Cruz-Garcia volunteered to him that he had raped Ms. Garcia and beaten Mr. Rodriguez. *Id.* at 145. Mr. Santana was adamant to the jury that he pled with Mr. Cruz-Garcia to find Ms. Garcia so as to protect the child, at which point Mr. Cruz-Garcia walked away while Mr. Santana remained in the car with Angelo. *Id.* at 145–46. Mr. Santana testified that, sitting alone with Angelo in the car and with Mr. Cruz-Garcia and Mr. Aviles-Barroso nowhere in sight, he was "already convinced" that Mr. Cruz-Garcia was not going to return Angelo to Ms. Garcia. *Id.* at 147.

Mr. Santana then recounted sitting in the backseat of the car alongside Angelo as the group drove towards Baytown. 20 RR 147. He described to the jury how, upon stopping the car, Mr. Cruz-Garcia told Mr. Aviles-Barroso that he knew what needed to be done. *Id.* at 149. It was at this point that, in Mr. Santana's version of the offense, Mr. Santana stepped away to defecate and discovered Angelo dead only upon walking back towards the group. *Id.* at 150–52. Mr. Santana then described to the jury how he tied rocks to Angelo to weigh the body down and that he and Mr. Aviles-Barroso submerged Angelo's body in a bayou. *Id.* at 153–54. Mr. Santana testified that he threw the knife used by Mr. Aviles-Barroso out of the car window as they drove away. *Id.* at 166.

Mr. Santana testified that the group then drove to a motel in Pasadena and called a friend after all four tires on their car blew out. 20 RR 154. He alleged that Mr. Cruz-Garcia then swore him and Mr. Aviles-Barroso to secrecy. *Id.* at 156. Mr. Santana described driving back to Mr. Cruz-

Garcia's apartment, while Mr. Aviles-Barroso left. *Id.* at 158. After spending the night there, Mr. Santana testified that Mr. Cruz-Garcia explained to him that he intended to leave Houston immediately and suggested Mr. Santana accompany him throughout the day as he prepared to travel back to the Dominican Republic. 20 RR 160–61. Mr. Santana drove Mr. Cruz-Garcia to the airport the following morning. *Id.* at 162. He never saw Mr. Cruz-Garcia again. *Id.* at 164.

Mr. Santana's account of the night of the offense to the jury squarely contradicted his prior statements to law enforcement spanning from 1992 to 2011. Moreover, despite his repeated pleas to the jury that he risked grave legal consequences by testifying to his participation in capital murder, the State never charged Mr. Santana in connection with the offense and indeed never intended to. Finally, Mr. Santana misrepresented his criminal record and thus avoided being impeached.

### 1.  The State relied on false testimony to establish Mr. Cruz-Garcia's guilt as a party to capital murder.

Mr. Santana's testimony to the jury was riddled with falsities that were known to the State as contradicted by his prior statements to law enforcement,[43] other witnesses' accounts, and law enforcement's investigation of the offense. Mr. Santana was interviewed by law enforcement in connection with the offense as early as October 5, 1992. ECF No. 18–67. In an interview with HPD officers U.P. Hernandez and A.C. Alonzo, Mr. Santana "denied knowledge of who kidnapped and murdered the complainant in this case . . . and told officers that [Mr. Cruz-Garcia] had left for Puerto Rico on a 'planned trip.'" *Id.* Mr. Santana was interviewed again on November 5, 1992, and again denied any knowledge of the offense. ECF No. 18–68. In February 2009, HPD interviewed Mr.

---

[43] The State did not disclose to the defense a number of prior statements by Mr. Santana (as well as other witnesses) made to law enforcement. *See infra* Claim Six.

Santana after reopening the case but he remained adamant that he did not remember anything about the circumstances of Angelo's disappearance and death. Ex. 69.

It was not until Mr. Santana was interviewed by FBI Agent Ebersole in 2011, and was told that "any cooperation he gave would be made known to the prosecutor and the presiding judge," that he connected Mr. Cruz-Garcia to the capital murder of Angelo. 20 RR 165; ECF No. 18-101. Despite the State's suggestion to Mr. Santana before the jury that he had told Agent Ebersole that he had not previously implicated Mr. Cruz-Garcia because he had been too scared, Mr. Santana replied that he could not recall making such statements to the FBI.[44] 21 RR 13.[45]

In his account of the night of Angelo's disappearance to the jury, Mr. Santana further contradicted his prior statement to the FBI concerning key elements of the offense. In his 2011 statement to the FBI, he stated that Mr. Cruz-Garcia and Mr. Aviles-Barroso had returned to the waiting car together and that Mr. Cruz-Garcia was holding Angelo Garcia in his arms. ECF No. 18-101. According to this same statement, the two men then returned to Ms. Garcia's apartment and Mr. Aviles-Barroso carried Angelo Garcia back with them. *Id.* But by the time of his testimony, Mr. Santana described Mr. Cruz-Garcia returning alone, telling Mr. Santana that he had assaulted Ms. Garcia and Mr. Rodriguez, and Angelo walking alongside Cruz-Garcia because he was familiar to him. 21 RR 49-50.

---

[44] In response to Mr. Santana replying that he did not remember ever telling Agent Ebersole that he had not previously implicated Mr. Cruz-Garcia because he was concerned about testifying against Mr. Cruz-Garcia, the State commented on the record and before the jury, "I think Agent Ebersole will." 21 RR 13. The court sustained the defense's objection to the State's sidebar. *Id.* at 13–14.

[45] FBI Agent Ebersole's report of Mr. Santana's statement reflects that: "MARTINEZ [Santana] *again interjected in his responses that he did not want to go to trial. MARTINEZ was advised that his cooperation would be made known to the prosecutor and the presiding judge.*" ECF No. 18–101 (emphasis added).

In another example of the falsity of Mr. Santana's account to the jury, Mr. Santana testified that the three men had driven to Ms. Garcia's apartment in Mr. Cruz-Garcia's car, which he described as a blue four-door Chevrolet. 20 RR 128, 136, 161. Mr. Santana specifically distinguished this blue Chevrolet from the blue Thunderbird owned and driven by Mr. Cruz-Garcia's wife. *Id.* at 128. Yet, Mr. Cruz-Garcia's wife testified that the couple never owned a blue Chevrolet and that, in 1992, Mr. Cruz-Garcia owned and drove an Oldsmobile. *Id.* at 95. The State's own pictures of the cars owned by Mr. Cruz-Garcia and his wife at the time of the offense further established that both cars were two-door vehicles. *See* 30 RR State's Ex. 37; 38.

Mr. Santana's explanation to the jury for why Mr. Cruz-Garcia would have taken Angelo Garcia was contradicted by the testimony of Angelo's own mother and step-father, Ms. Garcia and Mr. Rodriguez. According to Mr. Santana, Mr. Cruz-Garcia took Angelo Garcia because Angelo Garcia had recognized him. 20 RR 144. Yet, both Ms. Garcia and Mr. Rodriguez testified that the alleged assailants had been wearing masks. 19 RR 215; 18 RR 214–15. According to Mr. Rodriguez, Angelo Garcia was asleep and "didn't even know what was going on." 18 RR 215. No explanation was offered as to why Ms. Garcia and Mr. Rodriguez, who described themselves as close friends with Mr. Cruz-Garcia, did not recognize Mr. Cruz-Garcia but Angelo Garcia did.

Finally, Mr. Santana testified that Mr. Aviles-Barroso had used a knife to cause the death of Angelo Garcia and that Angelo's chest had been covered in blood. 20 RR 151–52. Santana further described how he himself later threw that knife out of the car. *Id.* at 166. But the State provided a supplemental *Brady* notice on the eve of trial stating that a presumptive test for blood on Angelo's clothing was negative. 3 CR 482. Mr. Santana's testimony to the jury was contrary to his own prior

statements, eyewitness testimony provided by two other State witnesses, and law enforcement's own investigation, all of which were known to the State.

> ### 2. The State relied on false testimony to bolster Mr. Santana's credibility to the jury.

With no forensic evidence tying Mr. Cruz-Garcia to events occurring *after* the alleged assault in Ms. Garcia's apartment, Mr. Santana's testimony was key to establishing Mr. Cruz-Garcia's participation in the murder of Angelo.[46] In closing, the State argued that Mr. Santana's testimony "filled in all the gaps for you." 23 RR 98. Mr. Santana had been interviewed by law enforcement in connection with Angelo's death as early as October 5, 1992. ECF No. 18–67. He was also interviewed again in 2009, after the HPD interpreted the DNA evidence. ECF No. 18–69. Yet, Mr. Santana testified that it was not until he was approached by the FBI in 2011 that he felt compelled to reveal Mr. Cruz-Garcia's participation as a party to the capital murder of Angelo. 20 RR 165. By then, it was clear to HCDAO that Mr. Santana was involved. Ex. 127.

At trial, the State prompted Mr. Santana to tell the jury that he was testifying at grave, personal risk of being prosecuted in connection with the capital murder of Angelo:

> Q.   When Special Agent Ebersole came to talk to you, did he make any promises about your case?
>
> A.   No.
>
> Q.   Did he offer any deals or say you were going to get any benefits from this?
>
> A.   No, no way.

---

[46] *See* Ex. 101 ("MARTINEZ [Santana] was advised that the interviewing agent wanted his assistance; and although there was scientific evidence to prove [Cruz-Garcia's] involvement in the invasion of the GARCIA's home as well as the rape of DIANA GARCIA, *there was a need to complete the picture of what happened to the little boy ANGELO*") (emphasis added).

> Q.    Was there - - was this something, you know, that you did because anybody offered you something to do it?
>
> A.    No, never.
>
> Q.    And you know as you sit there that you could be charged with a crime, don't you?
>
> A.    That's right.
>
> Q.    And you could get in a lot of trouble?
>
> A.    That's right.

20 RR 165–66. The State also elicited testimony that neither the FBI nor the HCDAO had made promises to Mr. Santana or offered him a deal in connection with his testimony against Mr. Cruz-Garcia:

> Q.    We talked about, Rudy [Santana], the fact that when the special agent went up to interview you, he didn't make you any promises, correct?
>
> A.    No.
>
> . . .
>
> Q.    Have Justin [Wood] or I [Natalie Tise] or any member of the D.A.'s office ever made you any promises about this case?
>
> A.    No, never.
>
> Q.    Have we ever told you that you are going to get any kind of special deal based on your testimony?
>
> A.    No, never.

*Id.* at 173–74. The State further asked Mr. Santana to testify that he had also "never even asked for a deal," to which he replied, "No, never."[47] 21 RR 12.

---

[47] At punishment, the State similarly elicited testimony from Mr. Santana that he had neither asked for nor been offered a deal or benefit. 25 RR 95–96.

In his statement to the FBI and in his testimony as a witness for the State, Mr. Santana described in detail his participation in the kidnapping and death of Angelo, including how he weighed down Angelo's body and disposed of the murder weapon.[48] 20 RR 153–54, 66. Yet, contrary to Mr. Santana's representations at trial that he risked being prosecuted by testifying, the State never charged him with *any* offense in connection with the capital murder of Angelo.[49] The State thus elicited false testimony designed to convey to the jury the false impression that Mr. Santana could and would be charged based on his sworn testimony that he participated in the capital murder of Angelo Garcia. *Napue*, 360 U.S. at 269 (due process violated where State elicited false testimony going to credibility of the witness); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) (due process violated where the prosecution "allows the jury to be presented with a materially false impression"). Furthermore, the State's objection to the trial court's charge that Mr. Santana's testimony be characterized as accomplice testimony indicates that the State knew that it would not bring charges against Mr. Santana. 22 RR 16 (objecting to the jury being instructed on Mr. Santana being considered an accomplice as a matter of law).

In the alternative, the State elicited false testimony by prompting Mr. Santana to represent to the jury that he did not receive, nor request, a deal in connection with his testimony against Mr. Cruz-Garcia. The FBI's report of Mr. Santana's 2011 statement belies his trial testimony that he was entirely unconcerned about obtaining a deal in exchange for his testimony. Agent Ebersole's report

---

[48] At punishment, Mr. Santana also implicated himself in the murder of Saul Flores. *See infra* Claim Five § F.

[49] The State also never charged Mr. Santana in connection with the murder of Saul Flores, after Mr. Santana testified that he took Mr. Flores by force, watched as he was beaten, dumped Mr. Flores's body in a bathtub, and then left it in a dumpster. *See infra* Claims Five § F and Six § A.

establishes that, from the outset and throughout the interview, he was "advised [by the FBI officer] that his cooperation would be made known to the prosecutor and the presiding judge." ECF No. 18–101. His report also states that "MARTINEZ [Santana] *again* interjected in his responses that he did not want to go to trial. MARTINEZ was advised that his cooperation would be made known to the prosecutor and the presiding judge." *Id.* (emphasis added). *See* Claim Six **§** A.

3. **The State relied on false testimony to prevent the defense from impeaching Mr. Santana.**

On *voir dire* by the defense, Mr. Santana testified that he was convicted in 1992 in Harris County of misdemeanor assault on a child. 21 RR 28. The victim of that offense was a girl, a fact known to HCDAO. ECF No. 18–79. Mr. Santana, however, falsely testified on *voir dire* that the victim had been a boy. 21 RR 28. The State then argued, and the trial court agreed, that the defense should be prohibited from introducing this prior conviction as impeachment because it was not a crime involving moral turpitude. 21 RR 24. Hence, Mr. Santana's false testimony and the State's false characterization of the offense prevented Mr. Santana from being impeached with a crime of moral turpitude. *See* Tex. R. Evid. 609; *Hardman*, 868 S.W.2d at 407 (finding that assault by a man against a woman constitutes a crime involving moral turpitude that is admissible for impeachment pursuant to Texas Rule of Evidence 609). In addition, this conviction would have further cast doubt on Mr. Santana's testimony, according to which he could not stomach even the thought of an offense being committed against a child.

B. **The State relied on false testimony about the DNA evidence.**

The case against Mr. Cruz-Garcia was ostensibly solved in 2008 on the basis of DNA evidence linking Cruz-Garcia to the assault on Diana Garcia on the night of Angelo's disappearance. 23 RR 89. At trial, the State asserted that the DNA evidence established Mr. Cruz-Garcia's identity as the

masked assailant who assaulted Ms. Garcia, thus tying him to the place and time of Aneglo's disappearance, and that it also corroborated Mr. Santana's account of the offense. *Id.* at 82–83, 90–91.

The State introduced the testimony of Orchid Cellmark analyst Matt Quartaro, who testified that Mr. Cruz-Garcia's DNA matched (1) the DNA profile identified on the cigar; (2) the major DNA profile of the DNA mixture on the underwear cutting; and (3) that Mr. Cruz-Garcia could not be excluded as a possible contributor to the DNA mixture identified on the vaginal swabs. 21 RR 119–20. Mr. Quartaro also testified that Diana Garcia's husband, Arturo Rodriguez, could not be excluded as a contributor to the minor profile obtained from the DNA mixtures identified on the underwear cutting. *Id.* at 111–12, 114. The State also introduced the testimony of HPD Crime Lab analyst Amber Head, who similarly testified that Mr. Cruz-Garcia could not be excluded as a contributor to the DNA profile on the cigar and the major DNA profile from the mixture on the underwear cutting, nor from the DNA profile from the mixture on the vaginal swabs.[50] *Id.* at 161–62.

### 1. The State relied on false testimony regarding DNA evidence to link Mr. Cruz-Garcia to the offense and corroborate Mr. Santana's testimony.

In closing, the State described this DNA testimony as "the most damning" evidence against Mr. Cruz-Garcia. 23 RR 36. The State argued to the jury that the DNA established Mr. Cruz-Garcia's identity as Ms. Garcia's assailant on the night of Angelo's disappearance. *Id.* at 82–83. The State further contended that, by excluding Mr. Santana as a possible contributor to the DNA identified

---

[50] Ms. Head testified that she compared only Mr. Cruz-Garcia's DNA sample to the DNA profiles obtained from Orchid Cellmark testing. She did not compare the DNA profiles obtained by Orchid Cellmark against any other DNA sample. 21 RR 164.

on the rape kit, the DNA corroborated Mr. Santana's account according to which he was never in Ms. Garcia's apartment. *Id.* at 82. The State reasoned to the jury that, based on the DNA evidence excluding Mr. Santana as Ms. Garcia's assailant and Ms. Garcia's husband being the other contributor to the DNA mixtures, Mr. Cruz-Garcia must have been Ms. Garcia's assailant and was thus connected to Angelo's disappearance and death. *Id.* at 82–83, 93. In closing argument at the guilt phase of trial, the State affirmed to the jury that, "you could literally stop with the DNA" and that, "on the DNA alone, you could convict the defendant." *Id.* at 91.

That testimony, however, was false because it was based on unreliable and incorrect analysis of the DNA evidence. *See* ECF No. 18–11. Indeed, according to Mr. Cruz-Garcia's post-conviction DNA expert, "no conclusion should have been drawn, or could have been drawn" about the minor sample from the underwear cutting and Orchid Cellmark's statistical analysis of the DNA on the vaginal swabs was "against best scientific practices." *Id.* The State has now conceded that the results testified to by its DNA analysts were incorrect. In November 2015, after Mr. Cruz-Garcia was convicted and after he filed an initial writ of habeas corpus in state court, the State produced an amended DNA report in which the State recanted much of this DNA testimony. *Id.* Contrary to the version of the DNA evidence presented at trial, the amended report agreed with Mr. Cruz-Garcia's expert and concluded that no conclusions should have been drawn as to the identity of the contributors to the DNA mixture on the vaginal swabs, nor as to the identity of the contributors to the minor component of the DNA mixture on the underwear cutting. *Id.*

### 2. The State relied on false testimony to bolster the reliability of the DNA evidence.

The State itself described the DNA evidence as the linchpin to its case against Cruz-Garcia. 23 RR 91. However, emails dating back to the months leading up to Cruz-Garcia's trial to and from

various State actors establish that the State knew that the reliability of the DNA evidence was at issue. Ex. 124; *see also* Exs. 132; 136. The HPD Crime Lab had been shuttered in 2007 after an independent investigator tasked by the City of Houston with reviewing HPD Crime Lab procedures uncovered "rampant false test results, mishandling of evidence, improper police procedure, criminal activity, and incompetence." 3 CR 455. Among the significant failings identified, the independent investigator cautioned that the storage conditions of biological evidence, and rape kits specifically, were likely to cause the contamination and degradation of evidence. *See* ECF No. 18–61; 31 RR Def. Ex. 3. For example, the independent investigator documented the fact that evidence stored at 1200 Travis St., from where Sergeant Mehl retrieved the sexual assault kit in 2007, had been exposed to water. 31 RR Def. Ex. 3 at 45. Hence, to bolster the reliability of the DNA evidence, the State relied on the false testimony of law enforcement and lab technicians to give the jury the false impression that the only forensic evidence tying Cruz-Garcia to the offense was "in pristine condition." 23 RR 90.

HPD Sergeant Eric Mehl and Orchid Cellmark supervisor Matt Quartaro both testified that the rape kit had been sent to, and received by, Orchid Cellmark in sealed bags. 20 RR 47; 21 RR 137. Sergeant Mehl agreed with the State that the rape kit was "[a]ll sealed up." 20 RR 47. However, a review of the chain of custody of the sexual assault kit revealed that the evidence bag in which it was stored was unsealed prior to being processed by Orchid Cellmark. ECF No. 18–10 at 2–3. Contrary to Mr. Quartaro's testimony as an Orchid Cellmark supervisor, notes made by Orchid Cellmark reflect that the FedEx packaging was sealed but the sexual assault kit itself was unsealed.[51]

---

[51] In his review of HPD Crime Lab storage facilities and procedures, the independent investigator found that storage conditions often required evidence to be unsealed so as to determine the contents of the paper bags, boxes, and containers in which evidence was stored. ECF No. 18–61 at 31.

*Id.* at 2–3. Likewise, the envelope containing the cutting from Ms. Garcia's underwear and from which Orchid Cellmark made its own cutting was marked as unsealed. *Id.* at 3.

### C.  The State relied on the false testimony of Angelita Rodriguez.

To further corroborate Mr. Santana's testimony and the DNA evidence, the State relied heavily in closing argument on the testimony of Angelita Rodriguez, Mr. Cruz-Garcia's wife, who claimed that Mr. Cruz-Garcia had confessed to being involved in Angelo's death. 20 RR 107. Ms. Rodriguez testified that on the night of the offense, she and Mr. Cruz-Garcia were watching television in their apartment until she went to bed around 9 p.m. 20 RR 101. Rodriguez did not remember Mr. Cruz-Garcia leaving the apartment on that night, nor him returning to the apartment in the night. *Id.* at 102. She was clear, however, that the next morning, it was just her and Mr. Cruz-Garcia at the apartment. *Id.*

Ms. Rodriguez testified that she learned about Aneglo's disappearance on the news that same morning, and that Mr. Cruz-Garcia did not react when she told him about it. 20 RR 89. According to Ms. Rodriguez, Mr. Cruz-Garcia later told her that he was leaving Houston immediately, did not explain why, and that this was not a planned trip. *Id.* at 99–100. Ms. Rodriguez testified that she did not see Mr. Cruz-Garcia again until two months later, in Santo Domingo, when she visited to ask him for a divorce. *Id.* at 105. Ms. Rodriguez told the jury that it is then that she asked Cruz-Garcia again about Aneglo's disappearance and that he told her he had killed Angelo Garcia *Id.* at 107.

Ms. Rodriguez's trial testimony contradicted her numerous prior statements to law enforcement, from her first interview in October 1992 and continuing until October 2008. ECF Nos. 18–73; 18–37; 18–74. Rodriguez never previously alleged that Mr. Cruz-Garcia had confessed to killing Angelo, let alone to killing Angelo himself. Moreover, contrary to her testimony that she

had not seen Mr. Cruz-Garcia again until she travelled to Santo Domingo to ask for a divorce, law enforcement documented in February 8, 1993, that Ms. Rodriguez was living with Mr. Cruz-Garcia in the Dominican Republic. ECF. No. 118–15. Ms. Rodriguez and Mr. Cruz-Garcia's relationship was not over, nor was Ms. Rodriguez unaware of her husband's location in the months that followed the offense. Multiple witnesses further confirmed that, contrary to Ms. Rodriguez's testimony that he had left Houston suddenly, Mr. Cruz-Garcia had been preparing to leave Houston for some time. ECF. Nos. 18–81; 18–91.

### D.  The State also relied on false testimony from Diana Garcia and Arturo Rodriguez.

The State's case also relied on Diana Garcia and Arturo Rodriguez's testimony about a supposed motive for Cruz-Garcia's involvement in the offense. Ms. Garcia and Mr. Rodriguez testified that Mr. Cruz-Garcia had taken Angelo in retaliation for their decision to stop dealing drugs. 18 RR 133, 204. However, law enforcement's investigation revealed that Ms. Garcia and Mr. Rodriguez were dealing drugs on the night of Angelo's disappearance, as confirmed by two separate witnesses known to the State. ECF No. 18–24. In addition to testifying falsely about a supposed motive, critical aspects of Ms. Garcia's and Mr. Rodriguez's account of the events inside the apartment on the night of the offense were contradicted by forensic evidence known to the State. For example, Mr. Rodriguez testified that that his head was stuffed in a pillowcase by the assailants. Yet, no pillowcase was found at the scene nor taken into evidence. ECF No. 18–95 (listing items identified by law enforcement at Garcia's and Rodriguez's apartment).

In addition to testifying falsely about the night of the offense, Ms. Garcia lied to the jury about her relationship with Mr. Rodriguez. Ms. Garcia described Rodriguez as her common-law husband and testified that Angelo Garcia lived with the couple full-time. 18 RR 121, 125; 25 RR 194. However, at the time of the offense and of the trial, Ms. Garcia remained legally married to

Angelo Garcia Sr. and Rodriguez was therefore not her common-law husband. Ms. Garcia and Mr. Rodriguez had become a couple when Ms. Garcia still lived with, and remained married to, Mr. Garcia Sr. ECF No. 18–100; 18–97. Additionally, Angelo Garcia did not live with the couple until much later than Ms. Garcia's representation at trial. 19 RR 197.

### E.  The State relied on the false testimony of law enforcement.

The State relied on the false testimony of law enforcement to bolster the credibility of Diana Garcia and Arturo Rodriguez, whom investigators repeatedly accused of being dishonest during their investigation. Although HPD Officers C.E. Elliott and U.P. Hernandez acknowledged that Ms. Garcia and Mr. Rodriguez were not truthful in their initial statements, they testified that Ms. Garcia and Mr. Rodriguez had cooperated and assisted early in the investigation. 18 RR 119; 19 RR 74. Officer Elliott testified that "they were truthful about everything." *Id.* Similarly, Officer Hernandez told the jury that Garcia had told him, "I'm going to quit lying to you and tell you the truth." 19 RR 74. This testimony is squarely contradicted by law enforcement's reports for months after the disappearance and death of Angelo, documenting law enforcement's distrust in Ms. Garcia and Mr. Rodriguez. For example, in a November 9, 1992 supplement, investigating officers reported, "[i]t is still our belief that [Garcia] is not being completely truthful with us[.]" Ex. 66. Similarly, on January 6, 1993, law enforcement concluded that "Diana and Arturo have been untruthful *throughout the investigation*[.]" Ex. 19 (emphasis added); *see* ECF Nos. 18–24; 18–64; 18–65; 18–97.

In addition to misrepresenting Ms. Garcia and Mr. Rodriguez as reliable witnesses, law enforcement testified falsely to facts connected with the offense. The State elicited false testimony that no ransom was ever demanded after Angelo Garcia disappeared. 19 R 79. However, there were at least two ransom calls made and known to law enforcement. ECF Nos. 18–17; 18–18. This

evidence further contradicted law enforcement witnesses' testimony that the investigation had never considered other theories of events surrounding Angelo's disappearance. 19 RR 79.

### F. The State relied on the false testimony of Johnny Lopez and Mr. Santana at punishment.

The State relied on the false testimony of Johnny Lopez[52] and Mr. Santana to tie Mr. Cruz-Garcia to the 1989 murder of Saul Flores in Houston, introduced at punishment as an extraneous offense in support of a sentence of death. Mr. Lopez testified that Mr. Flores had been a friend of his and that he had learned of his death when an HPD investigator visited with him in the Harris County Jail in 1989 in connection with Mr. Flores's murder. 25 RR 46–47. In response to the State's leading question about whether Mr. Flores had been running from Mr. Cruz-Garcia, Mr. Lopez alleged that Mr. Flores had been on the run from Mr. Cruz-Garcia. *Id.* at 50–51. Mr. Lopez further testified that he had also identified Mr. Cruz-Garcia in 1989 as a potential suspect in connection with Mr. Flores's murder. 25 RR 54–55.

Mr. Lopez's testimony contradicted his 1989 statement to HPD. ECF No. 18–29. In 1989, Mr. Lopez formally identified a suspect known as "Shorty" and explained to HPD that Mr. Flores had been a dealer for Shorty until the pair fell out. *Id.* According to this same statement, Shorty had made it known that he was looking for Mr. Flores after discovering that Mr. Flores had stolen cocaine from him. *Id.* According to Mr. Lopez's statement, Mr. Flores had been on the run from Shorty until Mr. Flores was murdered. *Id.* In addition to Mr. Lopez's 1989 statement naming Shorty as the likely suspect in the murder of Mr. Flores, HPD identified Shorty as Alfonso Faustino Cervantes from a

---

[52] Mr. Lopez died in 2015.

photo lineup during the same 1989 interview with Mr. Lopez.[53] *Id.* Mr. Lopez never mentioned Cruz-Garcia in his 1989 statement to HPD, nor was his statement given to the defense at trial.[54]

The State relied again on Mr. Santana, this time at the penalty phase, to bolster Mr. Lopez's testimony that Mr. Cruz-Garcia was responsible for Mr. Flores's death. According to Mr. Santana, Mr. Cruz-Garcia had killed Mr. Flores after Mr. Flores confessed his feelings to Mr. Cruz-Garcia's then-girlfriend, Elizabeth Ramos.[55] 25 RR 74. At the State's prompting, Mr. Santana graphically described Mr. Cruz-Garcia allegedly assaulting Mr. Flores before breaking his neck.[56] *Id.* at 81–82. Mr. Santana described how Mr. Flores was injected with drugs, his hands were "completely destroyed," he was hit "several times, many times," and burned with cigarettes "I can't tell you how

---

[53] In all of its reports, law enforcement associated Mr. Cruz-Garcia with the alias "Chico." *See, e.g.,* ECF No. 18–101.

[54] This statement, as well as other prior statements by witnesses for the State, was not included in the State's initial and supplemental *Brady* notices. 3 CR 447–50, 482–83.

[55] At punishment, Mr. Santana was also called to testify by the State to the alleged rape by Mr. Cruz-Garcia of a woman only identified as "Betico's wife." 25 RR 66–70. The State's notice of intent to use prior bad acts provides no further identifying information, either concerning "Betico" or the victim of the alleged rape. 3 CR 414. Upon information and belief, this testimony is false.

[56] The State indicted Mr. Cruz-Garcia on a charge of capital murder in 2008, 1 CR 6, but did not give notice of its intention to seek the death penalty against him until August 31, 2011, 4 RR 9. In an email dated August 1, 2011, Assistant District Attorney Natalie Tise reports, "due to a newly discovered witness, we are now looking at seeking the death penalty against this defendant . . . Our new witness has told us about an extraneous murder that he saw this defendant commit. We have found a 1989 unsolved case that matches the details provided by this witness." Ex. 125. Upon information and belief, the witness is Mr. Santana and the cold case is the 1989 unsolved murder of Saul Flores, and the State sought the death penalty against Mr. Cruz-Garcia on the basis of false evidence. In response to an open records request by counsel for Mr. Cruz-Garcia to HPD for records in connection with the 1989 murder of Saul Flores, HPD indicated that it believed those records to be excepted from disclosure. Exs. 116; 117.

many times." *Id.* at 81, 93. Mr. Santana further insisted to the jury, "I saw it perfectly when [Cruz-Garcia] broke [Flores's] neck." *Id.* at 82.

However, this testimony was contrary to the autopsy of Flores, which showed no evidence of a broken neck, no evidence of injuries to the hands, no evidence of cigarette burns, and no needle marks. 25 RR 113–15. Elizabeth Ramos, who was supposed to have provoked the dispute between Mr. Flores and Mr. Cruz-Garcia, has now provided a sworn declaration that she had never met or even known any individual known as Saul Flores. ECF No. 18–30.

**G.  The State solicited false testimony about a kidnapping in Puerto Rico.**

In support of its case on future dangerousness, the State introduced testimony that Mr. Cruz-Garcia was tied to the 2001 kidnapping of several individuals in Puerto Rico. 24 RR 14–43, 78–117. Federal agent Juan DeJesus Rodriguez testified for the State that he arrested Mr. Cruz-Garcia in 2001 in Puerto Rico in connection with the kidnapping and release of two individuals. *Id.* at 54. On cross, trial counsel was prevented from questioning Agent Rodriguez about the circumstances of the kidnapping, including Mr. Cruz-Garcia's role as an informant for federal law enforcement. The trial court sustained the State's objection, even after Agent Rodriguez testified on *voir dire* that he had verified that Mr. Cruz-Garcia cooperated as an informant in connection with federal law enforcement operations. *Id.* at 72–73. Upon information and belief,[57] testimony regarding Mr. Cruz-Garcia's role in the 2001 kidnapping was misleading.

---

[57] In addition to Agent Rodriguez's testimony confirming Mr. Cruz-Garcia's cooperation, Mr. Cruz-Garcia was granted by INS a three-month visa on September 21, 2001. Ex. 111. Under the "purpose" section, a handwritten note states: "significant public benefit." *Id.*

**H.  The State knew, or should have known, of the false testimony.**

Mr. Cruz-Garcia is not required to prove actual knowledge by the State of the falsity of the testimony it elicited, only that the State should have known. *See Giglio v. United States*, 405 U.S. 150, 154–55 (1971) (holding that State violated due process by relying on false testimony despite absence of showing that the prosecutor who elicited the testimony knew of its falsity). Here, the discrete allegations of false testimony are based on information located in emails to and from State actors leading up to Mr. Cruz-Garcia's trial; law enforcement and investigative reports on the basis of which the State built its case; and, in the case of Mr. Santana's false testimony that he risked being prosecuted, the State's own representations to the trial court outside the presence of the jury that Mr. Santana would not face prosecution. Mr. Cruz-Garcia can therefore establish that the State knew, or should have known based on information available to State actors involved in Mr. Cruz-Garcia's case, that the testimony was false.

**I.  There is a reasonable likelihood that this false testimony impacted the outcome of the proceedings.**

The false testimony relied on by the State to secure Cruz-Garcia's conviction and sentence was material because that false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 153–54 (internal citation and quotation omitted). False testimony must be evaluated for materiality *cumulatively*. *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016) (overturning a conviction because "the state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively"). Here, false testimony infected every critical aspect of the State's case against Mr. Cruz-Garcia, including the only eyewitness account, the only forensic evidence, and the only purported confession introduced by the State. The

cumulative impact of the false evidence relied upon by the State therefore entitles Mr. Cruz-Garcia to a new trial.

Mr. Santana's testimony—according to which Mr. Cruz-Garcia sexually assaulted Ms. Garcia, took Angelo, and directed Mr. Aviles-Barroso to kill Angelo—enabled the jury to find Mr. Cruz-Garcia guilty as a party to capital murder. Mr. Santana's description of Angelo's body further provided a cause of death where the medical examiner had been unable to establish one. 20 RR 151-52. In addition to testifying falsely to critical aspects of how the offense was purportedly committed, Mr. Santana's false testimony concerning the victim's gender in his 1992 child-assault conviction deprived the jury of an opportunity to assess his credibility. The State likewise deprived the jury of crucial information concerning Mr. Santana's credibility when, despite representing to the trial court that Mr. Santana could not face prosecution in connection with the offense, it itself elicited contrary testimony from Mr. Santana. Because Mr. Santana was a critical witness, false testimony bolstering his credibility is material. *Napue*, 360 U.S. at 269 ("[T]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]"); *Giglio*, 405 U.S. at 154–55 (false testimony impacting credibility of prosecution's key witness was material).

There can likewise be little doubt as to the materiality of the false DNA testimony in light of the State's closing argument, which told the jury that "on the DNA alone, you could convict the defendant." 23 RR 91. According to the State, the DNA evidence was critical to its case against Mr. Cruz-Garcia because it tied him to the alleged sexual assault of Diana Garcia *and* corroborated its star witness's version of the offense. *Id.* at 36, 93. Absent the false testimony that reliable DNA evidence tied Mr. Cruz-Garcia to the vaginal swabs and tied both Mr. Cruz-Garcia and Ms. Garcia's

boyfriend to the underwear cutting, the State could not have argued in closing that Mr. Cruz-Garcia *must* have been the assailant who sexually assaulted Ms. Garcia before taking Angelo Garcia 23 RR 82–83, 93. Nor could the State have argued to the jury that the DNA evidence corroborated Mr. Santana's account, according to which he was never inside Garcia's apartment on the night of the offense. *Id.* at 82.

Moreover, the jury would have been left with little to corroborate Mr. Santana's account of the offense, which the jury could then not have relied on because Mr. Santana's testimony was accomplice testimony and therefore required corroboration. 3 CR 484. Although the 2015 amended DNA report confirmed the presence of Mr. Cruz-Garcia's DNA profile on a cigar found at Ms. Garcia's apartment, law enforcement accepted that "it wasn't the guys that came in" that had left the cigar. ECF No. 18–64. Moreover, trial testimony established that Mr. Cruz-Garcia, who along with his then-wife Angelita Rodriguez were friends of Ms. Garcia and Mr. Rodriguez, had visited Ms. Garcia's apartment earlier on the day of the offense. [58] 18 RR 133–34, 145, 178–79, 184, 201.

Finally, Angelita Rodriguez's false testimony was similarly material. At the time of Angelo's disappearance, law enforcement did not doubt her or Mr. Santana's statements, according to which Mr. Cruz-Garcia's departure had been planned. *See* ECF No. 18–67. By the time of trial, Ms. Rodriguez's testimony served to further cast guilt on Mr. Cruz-Garcia by linking his departure to the timing of Angelo's disappearance. By alleging that she had contacted Mr. Cruz-Garcia to ask him for a divorce, Ms. Rodriguez also set the scene for Mr. Cruz-Garcia's supposed confession. Likewise, Diana Garcia's and Arturo Rodriguez's false testimony concerning the supposed motive was essential

---

[58] Neither Diana Garcia nor Arturo Rodriguez identified Cruz-Garcia as one of the assailants who allegedly assaulted them on the night that Angelo Garcia was kidnapped from their apartment, even though they described Cruz-Garcia as a close friend. 18 RR 138.

to explaining why Mr. Cruz-Garcia, who was widely known to be a close friend of the couple, would sexually assault Ms. Garcia, physically assault Mr. Rodriguez, and kidnap and order the murder of Angelo Garcia

Because this false testimony was material to Mr. Cruz-Garcia's conviction and sentence, Mr. Cruz-Garcia is entitled to a new trial. However, should this Court determine that a new trial is not warranted, there is a reasonable likelihood that this false evidence impacted the jury's verdict at punishment and Mr. Cruz-Garcia should therefore receive a new punishment phase.

**J.   This Court can review the merits of this claim because 28 U.S.C. § 2254(d) is satisfied.**

Mr. Cruz-Garcia raised this claim as Claim 1 in his second subsequent application for state habeas relief. Ex. 149. This claim is therefore exhausted. The CCA purported to dismiss this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-García*, 2021 WL 4571730, at *1. This disposition, however, does not automatically trigger a procedural default. *See Ruiz v. Quarterman*, 504 F.3d 523, 527 (2007); *Rocha v. Thaler*, 626 F.3d 815, 835 (5th Cir. 2010).

Mr. Cruz-Garcia argued that the CCA should authorize this claim because it met Texas Code of Criminal Procedure, Article 11.071 § (5)(a)(2). Unlike § (5)(a)(1), a dismissal under § (5)(a)(2) necessarily requires the CCA to assess the merits of the claim, therefore this dismissal involved a merits assessment of the federal claim. *See Canales v. Stephens*, 765 F.3d 551, 565 (5th Cir. 2014) ("If the CCA dismisses the petition under § 5(a)(2) or § 5(a)(3), this Court can also review it under the standard in § 2254(d)."); *see also Busby v. Davis*, 925 F.3d 699, 710 (5th Cir. 2019) (holding that the dismissal of an *Atkins* claim under § 5(a)(3) "necessarily considers the merits of a federal constitution claim"). Indeed, the plain language of § (5)(a)(2) requires the CCA to conduct a merits assessment of the asserted claim. Tex. Code Crim. Proc. art. § (5)(a)(2) ("[B]y a preponderance of the evidence,

but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt."). Because the CCA's disposition of this claim was not independent of the federal question, no default is triggered. *See Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991) (discussing the operation of the adequate and independent state ground doctrine in the habeas context).

Furthermore, Mr. Cruz-Garcia can meet the relitigation bar under 28 U.S.C. § 2254(d) because the state court's adjudication was either "(1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting 28 U.S.C. § 2254(d)). In light of the evidence presented in the state proceedings, the state court decision rejecting this claim necessarily either involved an unreasonable application of the *Napue* standard and its progeny regarding the presentation of false testimony, or was based on an unreasonable determination of facts. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000). Hence, because 28 U.S.C. 2254(d) is satisfied, this Court can review the merits of this claim.

In the alternative, if this Court finds that the CCA did not adjudicate this claim on the merits, Mr. Cruz-Garcia can establish cause and prejudice to overcome the procedural default of this claim. As established *supra*, the State introduced false testimony that it knew or should have known to be false, thus establishing cause and prejudice to overcome procedural default. *Sparks v. Davis*, 756 F. App'x 397, 401 (5th Cir. 2018) (cause and prejudice analysis to overcome procedural default of false testimony claim "largely parallels" false testimony inquiry). This court can also excuse the

procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually

innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

**Claim Six:**   **The State withheld exculpatory evidence, in violation of the Sixth, Eighth, and Fourteenth Amendments and *Brady v. Maryland*.**

The State withheld exculpatory, impeachment, and mitigating evidence impacting critical

aspects of its case against Mr. Cruz-Garcia in violation of its constitutional duty and of Mr. Cruz-

Garcia's due process rights. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the

prosecution of evidence favorable to an accused . . . violates due process where the evidence is

material either to guilt or punishment[.]"). The State has a duty to disclose such evidence, regardless

of whether a defendant requests the withheld evidence and irrespective of the State's intention in

withholding it. *Id.* (due process violation arises from withholding of exculpatory information by the

State "irrespective of the good faith or bad faith of the prosecution"); *United States v. Bagley*, 473 U.S.

667, 682 (1985) (withholding of material, exculpatory evidence violates due process irrespective of

defense request for evidence). Accordingly, the State violates a defendant's due process rights when:

(1) a prosecutor fails to disclose evidence; (2) which is favorable to the accused; and (3) the

undisclosed evidence was material. *Strickler v. Greene*, 527 U.S.668, 281–82 (2004) ("There are three

components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either

because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by

the State, either willfully or inadvertently; and prejudice must have ensued."). Evidence meets the

materiality standard when "there is a reasonable probability that, had the evidence been disclosed

to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

Because Mr. Cruz-Garcia satisfies all elements, he is entitled to a new trial.

### A.  The State withheld impeachment evidence against Santana.

As outlined *supra* Claim Five §§ A and F, the State called Mr. Santana to testify against Mr. Cruz-Garcia at both the guilt and punishment phase of trial. Mr. Santana's testimony was critical to the State's case against Mr. Cruz-Garcia as the only *direct* evidence placing Mr. Cruz-Garcia at the scene of Angelo's death. Moreover, Mr. Santana's recounting of Mr. Cruz-Garcia's supposed role in the unsolved 1989 murder of Flores apparently motivated the State to seek the death penalty against Mr. Cruz-Garcia and underpinned its case on future dangerousness. *See* Ex. 125; *supra* n.36. The State, however, failed to disclose significant impeachment evidence, including evidence going to Mr. Santana's bias, evidence demonstrating that Mr. Santana was an unreliable witness, and evidence that he was convicted of a crime involving moral turpitude.

### 1.  The State failed to disclose that Mr. Santana received a benefit for his testimony against Mr. Cruz-Garcia.

In his statements to federal and local law enforcement and in his testimony at Mr. Cruz-Garcia's trial, Mr. Santana implicated himself in the capital murder of Angelo and the 1989 murder of Saul Flores. Specifically, in his 2011 statement to the FBI and at trial, Mr. Santana described waiting alone with Angelo Garcia after realizing that Angelo Garcia would not be returned to Ms. Garcia, witnessing Mr. Aviles-Barroso murder Angelo, tying rocks to Angelo's body to submerge it in a bayou, and disposing of the murder weapon on the way back to Houston. 20 RR 145–46, 149, 153–54, 156; ECF No. 18–101. Similarly, in statements to local law enforcement and at trial, Mr. Santana described taking Mr. Flores by force to an apartment he rented to deal drugs from; watching and listening as Mr. Flores was beaten, injected with drugs, and strangled; helping carry Mr. Flores's body to the bathtub; and eventually returning to move his body to a dumpster. 25 RR 76–85.

During his testimony, both at guilt and punishment, the State elicited testimony from Mr. Santana that he had neither been offered nor requested a deal. *See supra* Claim Five § A.2.  In closing argument at the guilt phase, the State further argued to the jury that it could not have offered him a deal because it had "nothing" on Mr. Santana in connection with the capital murder of Angelo. 23 RR 96. Thereafter, the State similarly represented to initial state habeas counsel that Mr. Santana's conduct did not rise to the level of criminal liability. *See* ECF No. 18–80.[59]

The State's assertion that Mr. Santana did not, nor could have, received a deal—whether because the State had no evidence to support *any* criminal charges against him, or because he did not commit *any* crime in connection with the capital murder of Angelo or the murder of Mr. Flores—is not plausible. First, Mr. Santana's own statements to federal and local law enforcement, as well as his sworn testimony, implicate him in kidnapping Angelo, hiding Angelo's body, disposing of the murder weapon, kidnapping Mr. Flores, and dumping Mr. Flores's body. Second, FBI Agent Ebersole's report establishes that already in 2011 Mr. Santana made clear to law enforcement that he "did not want to go to trial" for the murder of Angelo Garcia and was repeatedly "advised that his cooperation would be made known to the prosecutor and the presiding judge." ECF No. 18–101. Third, contrary to the State's argument that it could not have offered Mr. Santana a deal at the time of his 2011 statement because it did not know of his involvement in the disappearance and

---

[59] Among the materials turned over by the State in response to the convicting court's order that the State comply with its *Brady* obligations, the State included typed "Meeting Notes from Jail Meeting with Rudy [Santana] on 05.16.12." Ex. 135. Whereas the meeting notes are entirely typed, the document includes undated and unsigned handwritten additions at the bottom of several pages, including the handwritten annotation "No deals, no limits on what we could ask." *Id.*

death of Angelo, 23 RR 96–97, ADA Natalie Tise wrote in an email dated prior to Mr. Santana's statement: "I know that Rudy [Santana] was likely with the defendant that night."[60] Ex. 127.

Finally, the trial court itself found that Mr. Santana was an accomplice *as a matter of law*. 22 RR 3–5. Under Texas law, "[a]n accomplice is someone who participates with the defendant before, during, or after the commission of the crime and acts with the required culpable mental state." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). "To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged." *Id.* "If the evidence presented by the parties is conflicting and it remains unclear whether the witness is an accomplice, the trial judge should allow the jury to decide whether the inculpatory witness is an accomplice [.]" *Id.* At 498–99. If, however, "there is no doubt that the witness is an accomplice," then the trial court should instruct the jury that the witness is an accomplice as a matter of law. *Id.* at 499. A "matter of law" accomplice instruction is appropriate "when the evidence clearly shows that the witness could have been . . . charged" with the same offense as the defendant or with a lesser-included offense. *Id.* The trial court's holding therefore makes clear that the State's representation that it could not have charged Mr. Santana with a crime is not plausible.

---

[60] This email, dated May 19, 2011, also casts doubt on FBI Agent Ebersole's testimony to the jury that, going into the interview with Mr. Santana on May 28, 2011, he "had no idea" that Mr. Santana may have firsthand knowledge of the offense. 20 RR 178. Agent Ebersole testified that he had previously reviewed "background reports, investigative reports" sent by Agent Johnson. *Id.* at 177. Agent Johnson had been part of the investigation since 1992, and Mr. Santana was interviewed in connection with the death and disappearance of Angelo Garcia as early as October 5, 1992. ECF No. 18–67.

Based on these factors, and upon information and belief, Mr. Santana had a deal (wither explicit or implicit) with the prosecution, and the State failed to disclose that deal, in violation of the State's *Brady* obligations and in violation of Mr. Cruz-Garcia's due process rights.[61] *Giglio*, 405 U.S. at 154–55 (due process violated where prosecution failed to disclose "evidence of any understanding or agreement as to future prosecution" of prosecution witness); *Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (prosecution failed in its *Brady* obligation and defendant's due process rights violated where prosecution failed to disclose statements going to credibility of eyewitness testimony).

**2.   The State failed to disclose further evidence going to Mr. Santana's credibility.**

At the time of his 2011 statement to the FBI, Mr. Santana was serving a 17-year sentence on federal drug-related charges. In 1998, leading up to Santana's conviction, a federal court granted his defense counsel's motion for a psychiatric evaluation, citing competency concerns. ECF Nos. 18–13; 18–14. In April 2011, just one month prior to his statement to the FBI implicating Mr. Cruz-Garcia, Mr. Santana addressed a letter to the convicting court seeking to have his sentence set aside based on incompetence. ECF No. 18–12.

Notwithstanding the relevance of these records going to Mr. Santana's credibility, the State failed to disclose to defense counsel that a court had previously found sufficient grounds to order a psychiatric evaluation of Mr. Santana. Likewise, the State did not disclose that weeks prior to implicating Mr. Cruz-Garcia, Mr. Santana sought to have his sentence set aside based on his psychiatric history. The State thus violated its *Brady* obligations to disclose Santana's competency

---

[61] In the alternative, if the State's representation that it could not charge Mr. Santana with any offense in connection with the capital murder of Angelo Garcia is an accurate statement, then the State deliberately elicited false testimony by asking Mr. Santana to state to the jury that he "could be charged with a crime." 20 RR 166; ECF No. 18–80; *see supra* Claim Five § A.2.

evaluation. *Mathis v. Dretke*, 124 F. App'x 865, 877 (5th Cir. 2005) (State failed in its *Brady* obligations when it did not disclose to defense publicly available record of prosecution witness's competency evaluation).

### 3. The State failed to disclose that Santana was convicted of a crime involving moral turpitude.

Mr. Cruz-Garcia incorporates here by reference all facts under *supra* Claim Five § A.3. The State failed to disclose that Santana was charged with injury to a child and eventually convicted in Harris County in 1992 of misdemeanor assault on a girl, which is a crime involving moral turpitude.[62] ECF No. 18–79. As a crime involving moral turpitude, this conviction was grounds for impeachment. *See* Tex. R. Evid. 609. Additionally, this conviction undermined Mr. Santana's allegations that, although present at the scene, he did not witness Angelo's murder because he could not withstand harm to a child. 21 RR 9. The State violated its *Brady* obligations when it failed to disclose an accurate version of Santana's criminal history. *Bagley*, 473 U.S. at 676 (*Brady* obligations extends to impeachment evidence).

### B. The State withheld mitigation evidence.

As well as failing to disclose impeachment evidence, the State withheld mitigating evidence that Mr. Cruz-Garcia assisted federal law enforcement. On *voir dire* by the defense, State witness and federal agent Juan DeJesus Rodriguez testified that he had verified with federal law enforcement that Mr. Cruz-Garcia assisted federal law enforcement. 24 RR 72–73. The State objected to Agent Rodriguez testifying to Mr. Cruz-Garcia's cooperation with federal law enforcement before the jury on hearsay grounds. *Id.* at 74. While sustaining the State's hearsay objection, the trial court ruled

---

[62] *Hardman*, 868 S.W.2d at 407.

that the information may nevertheless be relevant to mitigation. *Id.* Notwithstanding the trial court's

cautioning as to the mitigating value of this information, the State did not disclose evidence of Mr.

Cruz-Garcia's assistance to federal law enforcement.

**C. The State withheld exculpatory evidence and impeachment in connection with several witnesses.**

In response to Mr. Cruz-Garcia's multiple pre-trial motions for disclosure of *Brady* materials

and the trial court's corresponding orders, the State responded with a *Brady* notice dated June 3,

2013, and a supplemental *Brady* notice dated June 27, 2013.[63] 2 CR 447–50, 3 CR 482–83.

---

[63] As well as expressly requesting pre-trial disclosure of evidence that was then withheld by the State, 1 CR 184, Mr. Cruz-Garcia again moved for disclosure by the State of any exculpatory, impeachment, and mitigating evidence in initial state postconviction proceedings. Ex. 122. Mr. Cruz-Garcia specifically requested:

> 1. Any information tending to show a witness's bias in favor of the government or against Cruz-Garcia or which otherwise impeaches a witness's testimony. . . .
> . . .
> 3. All deals or "consideration" or promises of "consideration" given to or on behalf of all State witnesses or expected or hoped for by said State witnesses. . . .
> . . .
> 3. Emails between the State and the FBI regarding Carmelo Martinez Santana ("Rudy"), specifically discussing:
> a. his willingness to testify;
> b. the anticipated content of his testimony;
> c. any representations made to him regarding the potential consequences of his testimony; and
> d. his transfer from federal custody in Pennsylvania to Houston to testify.
> . . .
> 6. Emails between the State and the FBI or other law enforcement entities regarding Cruz-Garcia's use as a Confidential Informant by FBI agents in Puerto Rico.

*Id.* Despite acknowledging "its ongoing obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material, exculpatory and impeachment evidence to the defense[,]" the State nevertheless requested that the convicting court "vacate its order granting the defendant's motion for disclosure." Ex. 123. After the State's motion was denied, it turned over a small number of emails and reports, including an email in response to the convicting court's order in which the State represented that "[t]here were no offers of promises made to any witness to testify[.]" ECF No. 18–80. In that same

Notwithstanding the trial court's order for the disclosure of *Brady* materials generally, including prior statements and criminal records concerning specific witnesses for the State, the State failed to disclose to the defense the following: [64]

- That Angelita Rodriguez would receive a benefit from the State in connection with her testimony against Mr. Cruz-Garcia. Ex. 113.

- Criminal records and immigration records establishing that Angelita Rodriguez was facing state and federal charges, was convicted of a deportable offense. ECF Nos. 18–73; 18–75.

- Prior inconsistent statement made by Johnny Lopez to HPD in 1989 concerning the murder of Saul Flores. ECF No. 18–29.

- A Memo by FBI Agent Eric Johnson documenting that Angelita Rodriguez and Mr. Cruz-Garcia were living together in the Dominican Republic with her mother a few months after leaving the country in 1992. ECF No. 18–15.

- Reports from law enforcement establishing that law enforcement questioned the credibility and truthfulness of Diana Garcia and Arturo Rodriguez. *See, e.g.*, ECF Nos. 18–19; 18–64; 18–65; 18–66.

- Reports from various law enforcement and federal agencies, significant portions of which are redacted, including portions that appear to contain exculpatory evidence. *See, e.g.*, ECF Nos. 18–16; 18–17; 18–18.

---

email, the State further represented that it was unable to verify that Cruz-Garcia had worked as a confidential informant on behalf of law enforcement in Puerto Rico. *Id.*

[64] To the extent that this Court finds that these materials were provided to trial counsel, Mr. Cruz-Garcia alleges that trial counsel was ineffective for failing utilize them. *See infra* Claim Four **§** F.

- Law enforcement records showing that law enforcement was developing a second theory of the case and that other, unnamed individuals claimed knowledge of the offense. ECF No. 18–16.

- Documents received in response to a subpoena issued by the Harris County District Attorney's Office to Agent Juan DeJesus Rodriguez – FBI Puerto Rico Field Office. ECF No. 18–35.

- Immigration records showing that Mr. Santana's legal permanent residence status was revoked. ECF No. 18–76.

**D.  The evidence withheld by the State was material.**

Withheld evidence is deemed material if it "might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104 (1976); *Bagley*, 473 U.S. at 682 (materiality standard met where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). This standard parallels the prejudice requirement from *Strickland* for prevailing on an ineffective assistance of counsel claim. *Bagley*, 473 U.S. at 682.

Here, the withheld evidence of Mr. Santana's bias, as well as withheld evidence of his psychiatric history and crime of moral turpitude, would have undermined the credibility and reliability of the State's only eyewitness tying Mr. Cruz-Garcia to the scene of Angelo's murder. The significance of the impeachment evidence withheld by the State is strengthened by the State's deliberate misrepresentations to the jury that no such evidence existed.[65] Finally, defense counsel expressly requested, and the trial court ordered, the State to disclose:

---

[65] *See supra* Claim Five **§** A.3.

4. All promises of benefit or leniency afforded to any accomplice or prospective witness in connection with his/her proposed testimony or other cooperation with regard to the alleged offense.

5. All known convictions which are admissible for impeachment concerning any of the State's proposed witnesses.

6. All known convictions, pending charges or suspected criminal offense concerning any accomplice proposed to be used as a witness by the State.

1 CR 184. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106; *see also Bagley*, 473 U.S. at 682–83 ("The more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.").

Similarly, at punishment, the State failed to disclose evidence that would have critically undermined its case on future dangerousness. In closing at punishment, the State recounted in vivid detail the alleged murder by Mr. Cruz-Garcia of Saul Flores. 26 RR 150. The State argued that the murder "line[d] up with what we know about the defendant[.]" *Id.* at 151. However, the State withheld exculpatory and impeachment evidence implicating the only two witnesses, Mr. Santana and Mr. Lopez, to tie Mr. Cruz-Garcia to the 1989 unsolved murder of Flores. Significantly, the State did not identify in its *Brady* notices Mr. Lopez's statement to HPD at the time of the offense, in which he identified by name and in a photo lineup an entirely different individual as Mr. Flores's murderer. ECF No. 18–29. This statement was thus not only entirely exculpatory of Mr. Cruz-Garcia; it should have permitted the defense to impeach Mr. Lopez with his entirely contradictory statements given at the time of the offense, in 1989.

Mr. Santana also testified in gruesome detail about how Mr. Cruz-Garcia tortured and broke the neck of Mr. Flores. 25 RR 76–85. Undisclosed evidence would have undermined his credibility and further undermined the State's case on future dangerousness. With seemingly no evidence tying

Mr. Cruz-Garcia to Mr. Flores's murder and Mr. Lopez's prior identification of another individual, Mr. Santana's credibility was crucial to the State's case on future dangerousness. Similarly, withheld evidence of Mr. Cruz-Garcia's cooperation as an informant for federal law enforcement would have weighed heavily in favor of a verdict of life.[66]

In light of the totality of the State's case on guilt and punishment, there is a reasonable probability that the withheld evidence affected the outcome of Cruz-Garcia's conviction and sentence of death. Hence, the State's withholding of exculpatory, impeachment, and mitigating evidence violated Cruz-Garcia's due process rights.

### E.  This Court can review this claim *de novo* because Mr. Cruz-Garcia can show cause and prejudice to overcome procedural default.

Mr. Cruz-Garcia raised this claim as Claim 2 in his second subsequent state habeas application for state habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1. This claim is therefore exhausted and procedurally defaulted. Mr. Cruz-Garcia can, however, show cause and prejudice to excuse the procedural default of this claim. To demonstrate cause, Mr. Cruz-Garcia must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Cause may include "a showing that the factual or legal basis for a claim was not reasonably available" or that interference by state officials made compliance impracticable. *Id.* Prejudice may include showing that the misconduct "infect[ed] his entire trial with error of constitutional dimensions." *Carrier*, 477 U.S.

---

[66] Significantly, there was a lone holdout juror in favor of a verdict of life, which further suggests the overall weakness of the State's case for a sentence of death and the heightened relevance of evidence going both to Cruz-Garcia's future dangerousness and of mitigating circumstances. 3 CR 636; 27 RR 3–8.

at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Thus, prejudice is shown when the petitioner demonstrates he was denied fundamental fairness at trial. *Id.*

Here, Mr. Cruz-Garcia can establish cause based on the State's suppression of exculpatory, impeachment, and mitigating evidence. *Strickler v. Greene*, 525 U.S. 263, 289 (1999) (finding that petitioner could establish cause to excuse procedural default based on, amongst other factors, State suppression of *Brady* evidence). As established *supra*, the State suppressed exculpatory, mitigating, and impeachment evidence, and that evidence was material. Mr. Cruz-Garcia has therefore established cause and prejudice to overcome procedural default of his *Brady* claim. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes."). Therefore, because Mr. Cruz-Garcia can show cause and prejudice, this Court can review this claim *de novo*.

**Claim Seven:   The trial court met *ex parte* and gave coercive instructions to a holdout juror, in violation of the Sixth, Eighth, and Fourteenth Amendments.**

During penalty phase deliberations, the trial court conducted an *ex parte* meeting with, and gave coercive instructions to, a holdout juror in violation of Mr. Cruz-Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments. Under clearly established Supreme Court precedent, "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988); *see also Morgan v. Illinois*, 504 U.S. 719 (1992) (holding that due process requires an impartial jury). Here, the trial court's *ex parte* meeting and coercive instructions were especially harmful because the coercive

instructions were given to a juror who wanted to answer the Texas special issues in a way that would have resulted in a life sentence being imposed. Because the trial court gave coercive instructions to the sole holdout juror, Mr. Cruz-Garcia is entitled to a new punishment trial.

**A. The trial court held an *ex parte* meeting with a holdout juror and gave that juror coercive instructions.**

During the penalty phase deliberations, juror Bowman asked to speak to the trial court because she did not believe that the jury could reach a unanimous verdict on the Texas sentencing special issues. 27 RR 3–8. Juror Bowman "was one of the most adamantly opposed" jurors to returning a death sentence, and, after the jury was sequestered overnight during punishment phase deliberations, "felt a great deal of pressure" to change her vote on the special issues. 3 CR 611, 636. On the second day of deliberations, juror Bowman sent a note asking to speak to the trial court without explaining the reason why, and the trial court decided to meet with juror Bowman one-on-one in chambers. 27 RR 3–4. Trial counsel did not object to this meeting based on their clearly stated assumption that the meeting was to discuss a scheduling conflict. *Id.*

During the *ex parte* meeting with the trial court, juror Bowman explained that she was the only juror who disagreed on special issues 1 and 3, and suggested that she be replaced with an alternate juror because she did not think the jury would ever be unanimous on those special issues. 27 RR 5. She explained that she felt pressured to change her vote, but that she would not change her opinion. *Id.* At 5–6. Indeed, juror Bowman told the trial court that, "I am not changing my stance on [the special issues]. I'm not." 27 RR 6. At the meeting, juror Bowman also expressed serious concern about having to be sequestered another night.[67] *Id.* at 8.

---

[67] Juror Bowman had recently learned that her ten-year-old daughter was seriously ill while at camp, possibly with pneumonia. 3 CR 610–11.

The trial court, however, was adamant that juror Bowman was "going to have to continue to deliberate with [the jury]" and that deliberations could go on for "a pretty long period of time," but that it would not "be for years." *Id.* The trial court told juror Bowman to "continue trying to reach an agreement with the jury, if you can." *Id.* at 7–8. She indicated that how long juror Bowman had to deliberate was "completely in the hands of the entire jury." *Id.* at 8.

An hour after their *ex parte* meeting, juror Bowman, who had plainly just asserted, "I am not changing my stance on [life]. I am not," *id.* at 7, joined a unanimous jury verdict sentencing Mr. Cruz-Garcia to death. The court did not communicate anything about this discussion, or its supplemental instructions, on the record to counsel or Mr. Cruz-Garcia. Instead, the court only told counsel that Juror Bowman asked how long the deliberations would last. 3 CR 606.

The same day of the verdict, juror Bowman reached out to trial counsel and signed a sworn affidavit averring that, "[t]he verdict I returned was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty." 3 CR 611. Juror Bowman was "distraught over her decision to capitulate during the punishment phase deliberations and change her vote" and felt "pressured" to do so. *Id.* at 606–11. Additionally, she explained that her daughter was suffering from a fever and she wanted to take care of her, rather than be sequestered another night. *Id.* at 606; 611.

### B. Mr. Cruz-Garcia's constitutional rights were violated by the *ex parte* coercive instruction.

Supplemental jury instructions may be given to a deadlocked jury. *Allen v. United States*, 164 U.S. 492 (1896). However, if those instructions are impermissibly coercive, a defendant's

constitutional rights are violated. *Lowenfield*, 484 U.S. at 241. In determining whether a supplemental jury instruction is coercive, a reviewing court must look to the instruction "in its context and under all the circumstances." *Jenkins v. United States*, 380 U.S. 445, 446 (1965). Here, the trial court's instructions to Juror Bowman that she was required to attempt to reach an agreement until told to stop by the court bears several hallmarks of an unconstitutionally coercive instruction.

First, notwithstanding that Juror Bowman made clear she could not agree on several of the sentencing special issues, the jury returned a verdict of death just one hour after the trial court's *ex parte* instructions to Juror Bowman. *United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978) ("swift resolution of the issues in the face of positive prior indications of hopeless deadlock" weighed in favor of finding that supplemental jury instruction was improper). Second, the trial court gave its instruction to Juror Bowman during an *ex parte* meeting. *Id.* at 460–62 (absence of counsel when supplemental jury instruction given weighed in favor of finding that supplemental jury instruction was improper). Finally, the trial court gave its instruction to *only* Juror Bowman, the lone holdout juror. *Lowenfield*, 484 U.S. at 238 (constitutionality of supplemental jury instruction "beyond dispute" where instruction "does not speak specifically to the minority jurors"). The Supreme Court has further cautioned against giving supplemental jury instructions to a single juror. *United States Gypsum Co.*, 438 U.S. at 461 ("[A]ny occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants.").

### C.  This Court can review this claim *de novo* because Mr. Cruz-Garcia can show cause and prejudice to overcome procedural default.

Mr. Cruz-Garcia raised this claim as Claim 7 in his initial state habeas application. 1 SHCR–43. The state court did not adjudicate the merits of the claim, instead finding that it was procedurally

barred because it should have been raised on direct appeal. *Ex parte Cruz-Garcia*, 2017 at *1. This claim is therefore exhausted and procedurally defaulted. Mr. Cruz-Garcia can, however, show cause and prejudice to overcome the procedural default of this claim. *Carrier*, 477 U.S. at 488, 494; *see supra* Claim Six § E.

Here, Mr. Cruz-Garcia can show cause based on the fact that the trial court's coercive instructions were given *ex parte*, as well as the fact that the trial court also failed to give an accurate accounting of that *ex parte* meeting to trial counsel. Mr. Cruz-Garcia was therefore unable to preserve this claim for review on direct appeal by timely objecting to the trial court's coercive instructions. The trial court's actions thus amounted to an external factor that prohibited Mr. Cruz-Garcia from preserving and raising this error for appellate review. [68] *Carrier*, 477 U.S. at 488. The CCA then penalized Mr. Cruz-Garcia by also barring this claim from review in state habeas proceedings, notwithstanding the fact that Mr. Cruz-Garcia could not have raised it on direct appeal.

Mr. Cruz-Garcia can further show prejudice because, as described above with respect to the merits of this claim, the trial court's coercive instruction influenced a juror to change her vote and resulting in a death sentence, thereby denying Mr. Cruz-Garcia fundamental fairness. *Carrier*, 477 U.S. at 494. Therefore, because Mr. Cruz-Garcia can show cause and prejudice, this Court can review this claim *de novo*.

**Claim Eight:   Direct appeal counsel was ineffective, in violation of Mr. Cruz-Garcia's Sixth Amendment right to effective counsel.**

Under clearly established Supreme Court precedent, a claim of ineffective assistance of appellate counsel is governed by the two-prong *Strickland* standard, which requires a showing of

---

[68] To the extent that this Court determines this claim was available on direct appeal, Mr. Cruz-Garcia asserts that appellate counsel was ineffective for failing to raise it. *See infra* Claim Eight.

deficient performance and prejudice. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *see also Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985) (holding that the Fourteenth Amendment requires the assistance of counsel on the first appeal as of right). Appellate counsel has an obligation to raise "solid, meritorious arguments" based on controlling precedent. *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999). Here, appellate counsel's performance was prejudicially deficient because appellate counsel failed to challenge the trial court's coercive instructions given during an *ex parte* meeting with a holdout juror. Because Mr. Cruz-Garcia's constitutional right to effective assistance of appellate counsel was violated, he is entitled to a new punishment phase trial.[69]

### A. Direct appeal counsel was ineffective for failing to challenge the trial court's ex parte meeting with, and coercive instructions to, a holdout juror.

As established, *supra*, in Claim Seven, the trial court held an *ex parte* meeting with the sole holdout juror and gave that juror coercive instructions. The factual allegations set forth in Claim Seven are incorporated herein by express reference. Because those coercive instructions were given *ex parte* and the trial court did not inform trial counsel of the content of its instructions to the holdout juror, direct appeal was Mr. Cruz-Garcia's first opportunity to challenge those instructions. To the extent that this Court finds that this claim was available to Mr. Cruz-Garcia on direct appeal, appellate counsel's failure to raise this claim constitutes deficient performance. *See Robbins*, 528 U.S. at 285. Appellate counsel failed to raise, and seek relief based on, "solid, meritorious arguments" that the trial court's coercive instructions violated Mr. Cruz-Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments. *See supra* Claim Seven. Furthermore, trial counsel's deficient performance prejudiced Mr. Cruz-Garcia because, had this

---

[69] To the extent that this Court determines this claim was not available on direct appeal, Mr. Cruz-Garcia asserts that trial counsel was ineffective for failing to raise it. *See supra* Claim Four.

point of error been raised on direct appeal, Mr. Cruz-Garcia would have obtained a new punishment trial. *See id.*

**B.  This Court can review this claim because 28 U.S.C. § 2254(d) is satisfied.**

Mr. Cruz-Garcia raised this as Claim 7 in his initial state habeas application. 1 SHCR 143–45. This claim is therefore exhausted. The state court purported to resolve this claim on the merits; however, the trial court's Findings of Fact and Conclusions of Law ("FFCL") hardly mention appellate counsel. *See* 5 SHCR 1035. Virtually the only finding referring to appellate counsel was that Mr. Cruz-Garcia failed "to demonstrate a violation of his constitutional rights, much less the deficient performance of trial/appellate counsel and prejudice based on the Court's objected-to ex parte conversation with juror Bowman." *Id.* at 1065. Subsequently, the CCA issued a blanket denial of all ineffectiveness claims by stating that Mr. Cruz-Garcia had not met his burden under *Strickland. Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2.

Mr. Cruz-Garcia can meet the relitigation bar under 28 U.S.C. § 2254(d). The state court's adjudication involved an unreasonable application of the *Robbins/Strickland* standard and the Supreme Court's opinions in *United States Gypsum Co.*, 438 U.S. 422, *Jenkins*, 380 U.S. 445, and *Lowenfield*, 484 U.S. 231. The CCA's holding that appellate counsel was not ineffective for failing to raise this meritorious claim was unreasonable in light of the clearly coercive nature of the *ex parte* conversation, which violated Mr. Cruz-Garcia's constitutional rights. Therefore, the CCA's decision was legally unreasonable under § 2254(d)(1).

The state court's adjudication was also based on an unreasonable determination of the facts. For example, the convicting court apparently determined that trial counsel had been fully informed of the substance of the court's *ex parte* meeting with Juror Bowman. 5 SHCR 1064. Yet, this finding is unsupported by the trial record and trial counsel's affidavits strongly suggest otherwise.  CR

606–07 (affidavit of Mario Madrid stating only that "Judge Magee stated that Ms. Bowman questioned how long deliberations would last"); 4 SHCR 948 (affidavit of Skip Cornelius stating "[t]here is a huge difference between what we knew at the time and what has been said after the verdict was rendered"); 5 SHCR 954 (affidavit of trial counsel Mario Madrid stating nothing about learning of the substance of Judge Magee's *ex parte* meeting with Juror Bowman and only that "Judge Magee informed us of the situation" prior to the *ex parte* meeting and that the *ex parte* meeting "would be transcribed"). Therefore, the CCA's decision was factually unreasonable under § 2254(d)(2).

Hence, whether because the state court's adjudication involved an unreasonable application of clearly established federal law or because it was based on an unreasonable determination of the facts, this Court can review the merits of this claim.

**Claim Nine:   Mr. Cruz-Garcia was not present during portions of his trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Mr. Cruz-Garcia was excluded from critical stages of his trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. Under clearly established Supreme Court precedent, "in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U. S. 97, 105–106 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964) ; *U.S. v. Gagnon*, 470 U.S. 522, 526 (1985) ("The constitutional right to presence is [also] rooted to a large extent in the Confrontation Clause of the Sixth Amendment but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."); *see also Fairey v. Tucker*, 567 U.S. 924 (2012)

(Sotomayor, J., dissenting from denial of *certiorari*) (describing rule announced in *Snyder* as "a basic premise of our justice system"). [70] The Supreme Court has long recognized that the right to be present is "scarcely less important to the accused than the right of trial itself." *Diaz v. United States*, 223 U. S. 442, 455 (1912). "[T]he exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *Gagnon*, 470 U.S. at 526–27. Because Mr. Cruz-Garcia was not present at critical stages of his trial, he is entitled to a new trial.

### A.  Mr. Cruz-Garcia was absent from two critical stages of his trial.

The first critical stage of his trial from which Mr. Cruz-Garcia was excluded was the *ex parte* meeting with Juror Bowman, at which the trial court gave unconstitutionally coercive supplemental instructions. The factual allegations set forth in Claim Seven are incorporated herein by express reference. The second stage of his trial from which Mr. Cruz-Garcia was excluded was the trial court's conference with defense counsel and the State regarding a conversation that a third-party attorney overheard between two jurors outside the courtroom. The factual allegations set forth in Claim One are incorporated herein by express reference.

### B.  Mr. Cruz-Garcia's absence violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process and a fair trial.

Both of Mr. Cruz-Garcia's absences occurred during critical phases of his trial. Indeed, both occurred during discussions involving the jury's deliberations on sentencing and both conversations

---

[70] Indeed, a defendant's right to be present is so fundamental, that the Supreme Court has recognized only two exceptions to this fundamental rule. *Crosby v. United States*, 506 U.S. 255, 260 (1993) (a defendant may waive his right to be present after the trial has commenced in his presence); *Illinois v. Allen*, 397 U.S. 337, 343 (1970) (defendant may be removed, if after being warned, defendant "nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom"). Here, neither exception is present.

reflected that the jury was struggling to reach a unanimous verdict. In both instances, Mr. Cruz-Garcia was clearly prejudiced by his absence. With regards to Mr. Cruz-Garcia's first absence, that conversation was about potential jury misconduct, which the trial court itself cautioned "could have serious ramifications to the outcome of this case." 24 RR 7. Based on the allegations of jury misconduct brought to light, the jurors should have been questioned as well as the reporting attorney. That investigation would have made clear that jury misconduct did occur. *See supra* Claim One.

With regards to Mr. Cruz-Garcia's second absence, the trial court's *ex parte* discussion with juror Bowman was even more critical to the outcome of the trial. Juror Bowman explained that she was the lone holdout juror on special issues 1 and 3 (future dangerousness and mitigation), that she felt a great deal of pressure from the other jurors, but that she could not change her stance on those special issues. 27 RR 5–6 (telling the trial court, "I am not changing my stance on [the special issues]. I'm not."). In response, the trial court instructed juror Bowman that she was required to continue deliberating and that how long those deliberations lasted was entirely in the jury's hands. *Id.* at 7. The trial court did not relay any of this exchange, nor its instructions, to trial counsel and Mr. Cruz-Garcia. Soon after the trial court's instructions to juror Bowman, the jury returned a unanimous verdict on the special issues, such that Mr. Cruz-Garcia was sentenced to death. Juror Bowman's verdict, however, "was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty." 3 CR 610–11. Had Mr. Cruz-Garcia (and trial counsel) been present during that *ex parte* meeting, Mr. Cruz-Garcia could have challenged the trial court's coercive instructions, questioned juror Bowman, and a motion to poll the jury to determine whether they were deadlocked would have been filed. *Contrast with Gagnon*, 470 U.S. at 527

(respondents' absence from trial court's conference did not violate his right to be present where respondents "could have done nothing had they been at the conference, nor would they have gained anything by attending").

### C.   This court can review this claim *de novo* to avoid a fundamental miscarriage of justice.

Mr. Cruz-Garcia raised this claim as Claim 8 in his second subsequent application for state habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1. This claim is therefore exhausted and procedurally defaulted. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2. In addition, the Supreme Court has explained that "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (quoting *Engle v. Issac*, 456 U.S. 107, 135 (1982)). Here, the miscarriage of justice exception is particularly salient because Mr. Cruz-Garcia has demonstrated both a violation of a fundamental trial right, such as the right to be present at critical stages of his trial, and a resulting conviction and death sentence that were produced under duress, and were therefore not truly unanimous judgments of the case.

**Claim Ten:**   **Mr. Cruz-Garcia was denied the right to confront witnesses against him, in violation of the Confrontation Clause.**

The State's witnesses repeatedly testified to the out-of-court statements of other individuals, in violation of the Sixth, Eighth, and Fourteenth Amendments. Under clearly established Supreme Court precedent, testimonial witness statements are not admissible unless both the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine

that witness. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Results of forensic analysis are testimonial statements for purposes of the Sixth Amendment. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009).

Mr. Cruz-Garcia's right to confront witnesses was repeatedly violated when Orchid Cellmark DNA analyst Matt Quartaro was permitted to testify at the suppression hearing and at the guilt phase to forensic work he did not perform himself. 16 RR 48–79; 21 RR 103–42. His testimony included information about the condition in which the DNA evidence was received by Orchid Cellmark, the DNA testing process, and the analysis of the results obtained. *Id.* However, Quartaro did not himself receive the DNA evidence, nor perform all of the DNA lab work. During the suppression hearing, he explained that Orchid Cellmark "work[ed] as a team format, so [he] didn't perform every step along the way." 16 RR 52–53. Through Mr. Quartaro, the State also admitted a number of exhibits that were collected and/or analyzed by others. *See, e.g.*, 17 RR 120, 124.

Similarly, Dr. Dwayne Wolf testified during the guilt phase and punishment phases of trial about autopsies that he did not himself perform. 21 RR 4–34. The 1992 autopsy of Angelo Garcia was conducted by Dr. Vladimir Parungao, who did not testify. *Id.* at 6. Dr. Wolf was not involved in creating, nor had personal knowledge of the autopsy report, photographs, and related records. *Id.* at 7. This was "pretty much the extent of the information" Dr. Wolf had. *Id.* Through Dr. Wolf, the State also admitted a number of exhibits that were collected by others. *See, e.g.*, *id.* at 10–13. Dr. Wolf further testified about the autopsy of Saul Flores, which was conducted by Dr. Narula. 25 RR 97–115. Despite having no personal knowledge of either case, Dr. Wolf opined as to the cause of death of both Angelo Garcia and Flores. *Id.* at 104–10.

**A. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice.**

Mr. Cruz-Garcia raised this claim as Claim 8 in his second subsequent application for state habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1. This claim is therefore exhausted and procedurally defaulted. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

**Claim Eleven: Testimony was translated incorrectly to the jury, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

The trial court's failure to provide accurate and correct interpretation of witnesses' testimony violated Mr. Cruz-Garcia's constitutional rights to due process and a fair trial, right to a jury trial, right to be present, right to confront witnesses against him, right to present a defense, and right to a unanimous verdict.

The Supreme Court has not squarely addressed whether the provision of an interpreter is a fundamental trial right. Nonetheless, in the context of competency challenges, the Court has long held that a criminal defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial" because "though physically present in the courtroom, [he] is in reality afforded no opportunity to defend himself." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Because of the practical similarities between incompetency and language barriers, the Second Circuit has explicitly extended the Supreme Court's competency jurisprudence to situations in which interpreters are needed, but not provided. *United States ex rel. Negron v. New York*, 434 F.2d 386, 390 (2d Cir. 1970).

Moreover, as a criminal defendant, Mr. Cruz-Garcia enjoyed the "bedrock procedural guarantee" of confrontation of the witnesses against him, *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citation omitted); "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies," *Washington v. Texas*, 388 U.S. 14, 19 (1967); and the right to have a jury determine every element of the crime of which he was charged, *Apprendi v. New Jersey*, 530 U.S. 466, 476–77 (2000). Criminal defendants are deprived of these and other "constitutional protections of surpassing importance," *id.* at 476, when the evidence at their trials is inaccurately conveyed to both themselves and their juries. The injustice resulting from such a "Kafkaesque spectre of an incomprehensible ritual," *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973), is amplified when not only the defendant's liberty, but his life, is at stake in a capital trial. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (capital defendants entitled to "a greater degree of accuracy . . . than would be true in a noncapital case").

Courts have recognized that translation of proceedings against a criminal defendant implicates these "bedrock" rights. *Ferrell v. Estelle*, 568 F.2d 1128, 1132–33 (5th Cir. 1978) ("The Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense."), *opinion withdrawn on other grounds*, 573 F.2d 867 (5th Cir. 1978) (withdrawing opinion because petitioner had died before issuance of the mandate); *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973) ("Clearly, the right to confront witnesses would be meaningless if the accused could not understand their testimony, and the effectiveness of cross-examination would be severely hampered."); *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985) (holding that defendant in a criminal proceeding is denied due process when, amongst other circumstances, "the accuracy and scope of a translation at a hearing or trial is subject to grave

doubt"); *United States v. Henry*, 888 F.3d 589, 604 (2d Cir. 2018) (use of an interpreter "ensures the accuracy and completeness of the trial record, and helps to preserve a defendant's rights in the event that he chooses to appeal").

Twelve witnesses at Mr. Cruz-Garcia's trial testified in Spanish because they did not speak or understand English. 18 RR 194; 19 RR 4; 20 RR 80, 116; 21 RR 4; 24 RR 14, 43, 78, 98, 118; 25 RR 59; 26 RR 8. These witnesses included both guilt and penalty phase witnesses. The trial court provided for the translation of Spanish testimony into English and the translation of English testimony into Spanish. The interpreters, however, repeatedly corrected their translation of witnesses' testimony. *See* 20 RR 94 (correcting translation from "I was in trouble" to "that was a problem"); *Id.* at 165 (correcting translation from "I didn't want to die" to "I wanted to die"); 24 RR 49–50 (correcting translation from "several confidential vehicles were found" to "several unmarked vehicles", and correcting again to "several points in that route were found"); *Id.* at 60 (correcting translation from "which was passing some patrol cars" to "when some patrol cars were passing by"); 25 RR 61 (correcting translation from "gray coat and a gray tie" to "blue shirt"); 26 RR 12 (correcting translation from "three months" to "six months") ; *Id.* at 26 (correcting translation from "83" to "86").

Outside of these corrections, the jury also brought to the court's attention the fact that portions of witnesses' testimony had been translated inaccurately. During the guilt phase deliberations, the jury sent a note to the trial court asking: "Are we only allowed to consider the interpreter's response of the witness in English and not the Spanish response as heard by Spanish-speaking jury members?" 23 RR 100. After conferring with the State and with defense counsel, the

trial court responded to the jury note that "[t]he interpreter's response is the official record and evidence in the case." *Id.*

It is nearly impossible to demonstrate harm resulting from unreliable interpretation.[71] The trial court did not make a record of the Spanish-language testimony or the Spanish interpretations of the English-language testimony to Mr. Cruz-Garcia. The only official record of the trial proceedings is the English-language testimony and the English interpretation of the Spanish language testimony. There is no record by which to compare what the jury and Mr. Cruz-Garcia heard with what the witnesses actually testified to. The only records we do have are several self-corrections by the interpreters, a note sent by the jury during guilt-phase deliberations, and the court's response to that note. Together, the evidence establishes four facts:

> (1) the jurors who understood both English and Spanish heard different testimony from the jurors that understood only English,
>
> (2) those differences were material enough to the deliberation process that the jurors found it necessary to seek guidance from the court on which testimony they could consider,
>
> (3) the trial court instructed the jury to consider only the English interpretation of the testimony, and thus the jury deliberated over evidence that was not presented, and
>
> (4) the inaccurate testimony referred to in the jury's note came from the State's guilt-phase witnesses.

It would place an impossible burden on Mr. Cruz-Garcia to require a showing of harm under these circumstances, providing further support for treating the denial of accurate interpretations as structural error that requires reversal.

---

[71] In *Garcia v. Davis*, the Fifth Circuit granted oral argument on "whether the failure to provide Petitioner with an interpreter without a valid waiver constituted a structural error that 'affect[ed] the framework within which the trial proceeds' and therefore Petitioner need not demonstrate prejudice in order for his petition to be granted." *Garcia v. Davis*, 2018 WL 5921018, at *3 (S.D. Tex. 2018). Ultimately, the Fifth Circuit did not reach this issue. *Garcia v. Lumpkin*, 824 F. App'x 252 (5th Cir. 2020).

### A. This court can review this claim *de novo* to avoid a fundamental miscarriage of justice.

Mr. Cruz-Garcia raised this claim as Claim 10 in his second subsequent application for state habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 at *1. This claim is therefore exhausted and procedurally defaulted. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

## Claim Twelve: The trial court judge had a conflict of interest and was biased against Mr. Cruz-Garcia, in violation of the Fourteenth Amendment.

Mr. Cruz-Garcia's Fifth, Eighth, and Fourteenth Amendment rights were violated because there is a serious risk that Judge Magee was biased against him.

### A. There are several indications that Judge Magee was biased against Mr. Cruz-Garcia.

Judge Magee, who presided over Mr. Cruz-Garcia's trial, was an assistant district attorney ("ADA") with the HCDAO from 1992 to 2012. Ex. 150. The HCDAO secured an indictment against Mr. Cruz-Garcia for capital murder on November 20, 2008. 1 CR 6. At that time, Judge Magee was still a member of the Harris County District Attorney's Office, and would be for approximately four more years. Ex.150. The trial of Mr. Cruz-Garcia began in June of 2013, only six months after she left the HCDAO to assume her judgeship. Moreover, during twelve of her twenty-one years at the HCDAO, Judge Magee served as a felony district court chief, supervising other ADA's in four district courts. *Id*. She also personally tried ten capital murder cases to jury. *Id*. Thus, Judge Magee would have had unfettered access to, and potentially direct personal involvement in, the investigative and prosecutorial materials against Mr. Cruz-Garcia.

Moreover, at the time of Mr. Cruz-Garcia's trial, Harris County appears to have lacked a conflict check system to prevent judges from presiding over cases they had previously prosecuted as an attorney. Judge Magee presided over at least two cases in which she had signed complaints when she was a prosecutor. *See* ECF Nos. 18-54, 18-55, 18-56, 18-57. The process that resulted in the recusal of Judge Denise Bradley early on in Mr. Cruz-Garcia's case also suggests the absence of a conflict-check system. Judge Bradley had been a senior prosecutor HCDAO. Shortly after the assumed the bench, Mr. Capitaine and Mr. Shellish (the retained counsel who were then representing Mr. Cruz-Garcia) filed a motion to recuse Judge Bradley. 1 CR 152-62. In support of the motion, they attached police reports stating that Bradley met with HPD personnel regarding the case and with Angelita Rodriguez. *Id.* Also attached was the indictment against Mr. Cruz-Garcia, which was signed by Judge Bradley. *Id.* Even though Judge Bradley immediately granted the recusal motion, the fact that it was necessary for the defense to bring a motion documenting Judge Bradley's involvement with Mr. Cruz-Garcia's case suggests that—besides relying of defense counsel—the Harris County courts lacked a conflict-management system.

Evidence from Judge Magee's handling of Mr. Cruz-Garcia's state habeas proceeding also tends to establish her bias during the trial. First, while running for re-election during Mr. Cruz-Garcia's state habeas proceedings, Mr. Cruz-Garcia's case was the *only* case cited in support of her candidacy. Judge Magee's campaign website even linked to a *Houston Chronicle* article about the trial. ECF No. 18-58, 18-59, 18-60.[72] Judge Magee also refused to recuse herself during the state habeas

---

[72] Since Mr. Cruz-Garcia filed his Amended Petition on July 1, 2019 (ECF No. 18), Judge Magee's campaign website (www.judgereneemagee.com) is no longer online. Judge Magee's Facebook page, however, still links to the campaign website: https://www.facebook.com/reneemageeforjudge/ (last visited Apr. 27, 2022).

proceedings upon Mr. Cruz-Garcia's motion alleging that she violated his constitutional rights by holding an *ex parte* meeting with Juror Bowman created a conflict of interest. 3 SHCR at 566, 614. Upon losing her reelection campaign, Judge Magee rushed Mr. Cruz-Garcia's state habeas, preventing him from meaningfully participating in order to ensure that she would decide the fate of his conviction and death sentence, which she did two days before her tenure as judge concluded by signing the State's proposed FFCL verbatim. *See* Legal Arguments Applicable to Multiple Claims § A.

### B.  Mr. Cruz-Garcia was denied due process and a fair trial by Judge Magee's bias.

Due process guarantees that an accused will be tried before a judge who harbors no actual bias against the accused. *See, e.g., In re Murchison*, 349 U.S. 133, 136 (1955). A judge free of actual bias is one capable of "hold[ing] the balance nice, clear and true between the state and the accused []." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Because of the impracticability of proving actual bias, the Supreme Court has set forth an objective test for adjudicating judicial bias challenges. *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016). Under this test, relief should be granted when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Thus, the courts ask "whether, as an objective matter, the average judge in [the challenged judge's] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams*, 136 S. Ct. at 1905; *accord Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). Judicial bias is a structural trial error not subject to harmless error analysis. *Williams*, 136 S. Ct. at 1909. Upon a showing of a constitutionally intolerable risk of bias, relief is automatic.

The Supreme Court has found a Fourteenth Amendment violation when the judge "earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Williams*, 136 S. Ct. at 1905. Judge Magee's status as a senior felony supervising prosecutor during the time period leading up Mr. Cruz-Garcia's indictment and for the first four years of his case creates a constitutionally intolerable likelihood that she was aware of and involved in prosecutorial decision-making before taking the bench and presiding over the trial. Certainly, the average judge presiding over a capital murder trial being prosecuted by the same office the judge worked for as a supervisor during the first four years of the case would not sit as a neutral arbitrator. Moreover, Judge Magee's conduct in the state habeas proceedings, which was decidedly biased in favor of the prosecution, casts additional doubt on Judge Magee's neutrality. At the very least, the Court should permit Mr. Cruz-Garcia to conduct discovery concerning Judge Magee's involvement as a prosecutor in his case.

### C.  This court can review this claim *de novo* to avoid a fundamental miscarriage of justice.

Mr. Cruz-Garcia raised this claim as Claim 9 in his second subsequent application for state habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 at *1. This claim is therefore exhausted and procedurally defaulted. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

### Claim Thirteen: The trial court prohibited Mr. Cruz-Garcia from presenting mitigation evidence, in violation of the Eighth and Fourteenth Amendments.

In violation of the Eighth and Fourteenth Amendments, the trial court precluded Mr. Cruz-Garcia from presenting powerful mitigating evidence at the punishment phase. Mr. Cruz-Garcia

sought to introduce certificates establishing that he had completed multiple Bible study courses while in prison in Puerto Rico. 23 RR 55–58. The evidence would have, among other things, supported the testimony of Angel Meza, a trustee at the Harris County jail where Mr. Cruz-Garcia was held while awaiting trial, that Mr. Cruz-Garcia was a genuine "Man of God." *Id.* at 81-85. Mr. Cruz-Garcia also sought to introduce evidence through a Puerto Rican police officer named Juan DeJesus Rodriguez, a witness for the State, that Mr. Cruz-Garcia worked as a confidential informant for the INS, DEA, and FBI. *Id.* at 69. The trial court excluded the evidence on hearsay grounds and rejected Mr. Cruz-Garcia's argument that exclusion of the evidence implicated Mr. Cruz-Garcia's right to present a defense. 23 RR 58.

### A.  This Court can review the merits of this claim because 28 U.S.C. § 2254(d) is satisfied.

Mr. Cruz-Garcia raised this claim as Claims 6 and Claim 7 on direct appeal. ECF No. 22–7 at 106–112. This claim is therefore exhausted. The CCA held that the trial court's exclusion of the mitigation evidence did not violate Mr. Cruz-Garcia's right to present a complete defense. *Cruz-Garcia v. State*, 2015 WL 6528727, at *25.

Mr. Cruz-Garcia, however, can meet the relitigation bar under 28 U.S.C. § 2254(d) because the state court's adjudication both involved an unreasonable application of *Lockett v. Ohio*, 438 U.S. 586 (1978) as to the Eighth Amendment allegations and of *Chambers v. Mississippi*, 410 U.S. 284 (1972) and other Supreme Court precedent set out *supra* Claim Two, and was based on an unreasonable determination of the facts. Specifically, to the extent the court finds that Mr. Cruz-Garcia's counsel were not deficient in failing to present evidence of Mr. Cruz-Garcia's genuine religiosity and his assistance to federal law enforcement in an admissible form, then the CCA erred in holding that the exclusion of the evidence merely prevented Mr. Cruz-Garcia from presenting the evidence in "the form he desired." *Cruz-Garcia v. State*, 2015 WL 6528727, at *25. Rather, the

exclusion of the evidence prevented Mr. Cruz-Garcia from presenting his mitigation defense on those points entirely. Hence, because 28 U.S.C. 2254(d) is satisfied, this Court can review the merits of this claim.

**Claim Fourteen: Repeated emotional outbursts from the gallery rendered Mr. Cruz-Garcia's conviction and death sentence fundamentally unfair.**

Under clearly established Supreme Court precedent, a defendant is entitled to be "fairly tried in a public tribunal free of prejudices, passion, [and] excitement." *Sheppard v. Maxwell*, 384 U.S. 33, 350 (1966); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (State misconduct violates a defendant's due process rights to a fair trial when the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."). Repeated emotional outbursts from the gallery rendered Mr. Cruz-Garcia's conviction and death sentence fundamentally unfair. These outbursts include, but are not limited to, the following occurrences.

During the guilt/innocence phase, a bench conference occurred where trial counsel explained that there were audible reactions from the victim's family during testimony. Trial counsel stated that "there's no excuse for the family being here crying and making sounds and all this stuff in front of the jury." 20 RR 14. The outburst was noticeable, and the State agreed to have the family removed. *Id.* The trial court also commented that "I don't think [the outbursts are] appropriate." *Id.*

Later the same day, another emotional outburst occurred. During testimony, the trial court was forced to stop the proceedings and remove the jury. 20 RR 107. The trial court directly addressed the audience:

> I realize the testimony in this case is emotional, but if you cannot hold your emotions in and be quiet in the courtroom, then you will have to leave the courtroom. And that includes the family. I'm sorry to say that, but we cannot have this jury swayed by emotion and emotional outbursts. Okay? So, if you feel that you can't keep from having that happen, you will need to step out.

*Id.* at 108.

These repeated, emotional outbursts from the gallery resulted in Cruz-Garcia's conviction and death sentence being fundamentally unfair.

**A.  This court can review this claim de novo to avoid a fundamental miscarriage of justice.**

Mr. Cruz-Garcia raised this claim as Claim 12 in his second subsequent application for state habeas relief. Ex. 149. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1. This claim is therefore exhausted and procedurally. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

**Claim Fifteen: The State made numerous inflammatory comments throughout trial, in violation of Mr. Cruz-Garcia's due process rights and right to a fair trial under the Fourteenth Amendment.**

Under clearly established federal law, prosecutorial misconduct, such as the State's inflammatory rhetoric in this case, warrants habeas relief when the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Throughout Mr. Cruz-Garcia's trial, the State made numerous inflammatory comments, including about Mr. Cruz-Garcia, that denied Mr. Cruz-Garcia his due process rights and right to a fair trial under the Fourteenth Amendment. Already during *voir dire*, the State repeatedly relied on the examples of Adolf Hitler and Charles Manson to explain the law applicable to Mr. Cruz-Garcia's case. *See, e.g.,* 6 RR 26–27. The State also repeatedly invoked gruesome, well-known cases with multiple child victims: the Boston Marathon bombing, the Andrea Yates case, the Candy Man case. *See, e.g.,* 5 RR 174.

Building on the foundation laid in *voir dire*, the State subsequently invoked these considerations during closing argument for the punishment phase: "I will also ask you that you remember those conversations that we had with each of you individually over the last month or so back in jury selection." 26 RR 145. Echoing the *voir dire*—"Charles Manson or Hitler . . . they have been evil inside," 8 RR 95—the State then argued that Mr. Cruz-Garcia was evil, less than human, and deserved to die: "Those are just the facts. . . Mr. Cruz-Garcia is a monster. He is an evil person who likes to torture and taunt his victims." 26 RR 175. The State also argued that while they and the jurors were human beings, the person they would be sentencing was something less than: "many of us and many of you probably would like to think that there aren't people in the world that can do the kind of things that you have heard about over the last two weeks. Surely there aren't *those type of people*. Those type of people can't exist because *you and I as human beings* can't really fathom that." *Id.* at 154 (emphasis added). In doing so, the State thus urged the jury to rely not on the jury charge, not on the applicable law, but on raw emotions and anger in reaching their sentencing decision.

The State also improperly injected considerations of racial and ethnic animus into the jury's deliberations by appealing to the jury's sense of nationalism while the fate of a foreign defendant, who doesn't speak English, was in their hands. The theme of "us versus them" (or Americans versus foreigners) is how the State opened its closing argument: "we live in the United States of America, the best country in the entire world. And thank God for that. We get to live with freedoms that so many people do not get to live with. We get to, hopefully, walk around *in our streets* and feel safe. We get to live out our dreams because this is America." 26 RR 142. The State made that argument to a jury acutely aware that Mr. Cruz-Garcia is a foreigner, implying that this was not his country and these were not his streets.

During closing argument for the guilt/innocence phase of the trial, the prosecutor invoked the Bible as a litmus test for determining evil and wickedness and guilt: "The 28th Chapter of Proverbs says: The wicked flee so [sic] no one pursues them, but the righteous are as bold as lions. Ladies and gentlemen, there is the wicked right there." 23 RR 95. Then, during the closing for the punishment phase, the State told the jury "I will tell you right now, if it were up to Roger [Rogelio Avlies-Barroso] alone, Angelo would still be alive." 26 RR 163–64. From this argument, based on nothing in the record but the prosecutor's opinion, the jury would logically surmise that there was inadmissible evidence, which, if revealed, would show them other acts or character traits of the defendant that they should know about.

Given how far beyond the pale the State's comments went, there can be no question that they seriously prejudiced the jury's ability to judge Mr. Cruz-Garcia fairly.

### A.  This court can review this claim *de novo* to avoid a fundamental miscarriage of justice.

Mr. Cruz-Garcia raised this claim as Claim 11 in his second subsequent application for state habeas relief. Ex. 149. This claim is therefore exhausted and procedurally defaulted. The CCA dismissed this claim "as an abuse of the writ without considering the merits of the claims." *See Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

### Claim Sixteen: Violation of the Vienna Convention on Consular Relations.

Mr. Cruz-Garcia's rights to equal protection, due process, and the effective assistance of counsel were violated when the State failed to inform him of his right to seek the assistance of the Dominican Consulate as required by Article 36(1)(b) of the Vienna Convention on Consular Relations ("VCCR"). *See also supra* Claim Four § K. Mr. Cruz-Garcia acknowledges that this claim is

foreclosed by binding precedent. *See United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2011) (holding that VCCR does not create judicially enforceable rights of consultation between a detained foreign national and his consular office); *Medellin v. Dretke*, 371 F.3d 270, 280 (5 th Cir. 2004) ("Article 36 of the Vienna Convention does not create an individually enforceable right.").

Mr. Cruz-Garcia raised this claim as Claim 5 in his initial application for state habeas corpus relief. 1 SHCR 114–23. The CCA dismissed this claim as procedurally defaulted. See *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1. This claim is therefore exhausted and procedurally defaulted. This court can, however, excuse the procedural default so as to avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent. *Schlup*, 513 U.S. at 316; *See supra* Claim Two § D.2.

**Claim Seventeen: Mr. Cruz-Garcia is actually innocent.**

Mr. Cruz-Garcia's death sentence violates the Eighth and Fourteenth Amendments because he is actually innocent.[73] *See*, *supra*, Claim Two § D.2. Mr. Cruz-Garcia's actual innocence excuses the procedural default of this claim. *Id.* Mr. Cruz-Garcia acknowledges that this claim is foreclosed by precedent. *Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998) (claim of actual innocence is not itself a constitutional claim (citing to *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

**Claim Eighteen: The punishment phase jury instructions restricted the evidence that the jury could consider as mitigating, in violation of Mr. Cruz-Garcia's rights.**

The jury instructions at punishment prevented the jury from considering "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense[,]"

---

[73] In *Herrera v. Collins*, the Supreme Court assumed, without deciding, that the execution of an innocent person would violate the Constitution. *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *accord House v. Bell*, 547 U.S. 518, 554-55 (2006); *see also Schlup,* 513 U.S. at n.28.

in violation of the Eighth and Fourteenth Amendments. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original).   Pursuant to TCCP art. 37.071, penalty-phase jury instructions in Texas impermissibly limit the jury's inquiry on mitigation to evidence going to the defendant's "moral blameworthiness."

Mr. Cruz-Garcia raised this claim as Claim 11 in his initial application for state habeas corpus relief. 1 SHCR 165–71. This claim is therefore exhausted and was adjudicated on the merits. . See *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This claim is foreclosed by this Circuit's precedent. *Beazley v. Johnson*, 242 F.3d 249, 260 (5th Cir. 2001). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

**Claim Nineteen: The trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence, in violation of Mr. Cruz-Garcia's rights.**

The jury was not instructed that Mr. Cruz-Garcia would be sentenced to life without parole if any single juror did not answer the special issues such as to return a sentence of death, in violation of the Eighth and Fourteenth Amendments. Here, a lone holdout juror, Angela Bowman, explained to the trial court that she felt "pressured" to change her vote on the special issues so as to return a unanimous verdict of death. 3 CR 611, 636.

Mr. Cruz-Garcia raised this claim as Claim 12 in his initial application for state habeas corpus relief. 1 SHCR 171–78. This claim is therefore exhausted and was adjudicated on the merits. See *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This claim is foreclosed by this Circuit's precedent. *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2000) (citing *Alexander v. Johnson*, 211 F.3d 895, 897 n. 5 (5th Cir. 2000) (per curiam)). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

**Claim Twenty: Mr. Cruz-Garcia's death sentence was based on Texas's unconstitutionally vague first special issue, in violation of Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments.**

Mr. Cruz-Garcia was sentenced to death according to "standards so vague that they [. . .] fail adequately to channel the sentencing decision patterns of juries[,]" in violation of the Eighth and Fourteenth Amendments, *Gregg v. Georgia*, 428 U.S. 153, n.46 (1976). Texas law requires that the jury determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). These terms are not defined and the CCA has declined to provide any further guidance on the future dangerousness inquiry. *Curry v. State*, 541 S.W.3d 751, 751-52 (Tex. Crim. App. 2017) (Alcala J., dissenting) (not error for trial court to fail to define "society" in future dangerousness context so as to preclude jury from engaging in "fictional inquiry into [defendant's] future dangerousness in the free society into which he would never re-enter as a matter of law"). Under clearly established federal law, the State "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (internal quotations and citations omitted).

Mr. Cruz-Garcia raised this claim as Claim 13 in his initial application for state habeas corpus relief. 1 SHCR 164–82. This claim is therefore exhausted and was adjudicated on the merits. See *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This claim is foreclosed by this Circuit's precedent. *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

**Claim Twenty-One: Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated based on Texas's arbitrary and discriminatory system of administering the death penalty.**

Mr. Cruz-Garcia was sentenced to death based on an arbitrary and discriminatory system

for the administration of the death penalty, in violation of the Eighth and Fourteenth Amendments. At the time of Mr. Cruz-Garcia's trial, a statistical study on the administration of the death penalty by the office of the Harris County District Attorney demonstrated that, while there was a 20% likelihood that the district attorney would advance a capital murder charge to a capital trial against a white defendant, that likelihood escalated to 80% against a Hispanic defendant. *See* Raymond Peternoster, *Racial Disparity in the Case of Duane Edward Buck*, at (Dec. 29, 2012) [Amended Petition, Ex. 47]; *see also*, Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131, 131-32 (2012) (showing that "death sentences were imposed on behalf of white victims at 2.5 times [. . .] and death sentences were imposed on behalf of white female victims at 5 times the rate one would expect if the system were blind to race and gender."). Excluding retrials, Harris County has not sentenced a white capital defendant to death since 2004.

The State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). Here, "if any discernible basis could be identified for the selection of those few who were chosen to die, it was the constitutionally impermissible basis of race." *Callins v. Collins*, 510 U.S. 1141, 1147 (Blackmun J., dissenting) (internal quotations omitted). Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

Mr. Cruz-Garcia raised this claim as Claim 14 in his initial application for state habeas corpus relief. 1 SHCR 182–92. This claim is therefore exhausted and was adjudicated on the merits. See *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This claim is foreclosed by precedent. *See generally Jurek v. Texas*, 428 U.S. 262, 275–77 (1976); *see also Kelly v. Lynaugh*, 862 F.2d 1126,

1135 (5th Cir. 1988) (rejecting argument that Texas's death penalty system has been applied in an arbitrary and capricious manner since 1973). However, Mr. Cruz-Garcia does not concede this point of error and preserves it for later review.

## PRAYER FOR RELIEF

WHEREFORE, Obel Cruz-Garcia, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases;

4. Grant such other relief as law and justice require; and

5. If this Court denies any of the above-requested relief, grant a Certificate of Appealability.

Respectfully submitted,

DATED: May 4, 2022

Jason D. Hawkins
Federal Public Defender

*/s/ David C. Currie*
David C. Currie (TX 24084240)
Assistant Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
david_currie@fd.org

*Counsel for Petitioner*

## EXHIBIT LIST

| | |
|---|---|
| ECF No. 18-1 | Opening brief on direct appeal |
| ECF No. 18-2 | Direct appeal opinion, *Cruz-Garcia v. Texas*, No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015) (unpublished) |
| ECF No. 18-3 | Initial application for writ of habeas corpus |
| ECF No. 18-4 | Subsequent application for writ of habeas corpus |
| ECF No. 18-5 | *Ex parte Cruz-Garcia*, Order, Nos. WR-85,051-02 and WR-85,051-03 (Tex. Crim. App. Nov. 1, 2017) (per curiam) |
| ECF No. 18-6 | Affidavit of Steven Shellist |
| ECF No. 18-7 | Billing records for Skip Cornelius |
| ECF No. 18-8 | Letter from Gradoni & Associates |
| ECF No. 18-9 | Affidavit of Elizabeth Johnson |
| ECF No. 18-10 | Affidavit of Daniel Hellwig |
| ECF No. 18-11 | Amended DNA Report |
| ECF No. 18-12 | Letter from Carmelo Rudy Santana Martinez to U.S. district court |
| ECF No. 18-13 | *U.S. v. Carmelo Martinez*, Motion for Psychiatric Examination, CR-H-98-12 (S.D. Tex. June 23, 1998) |
| ECF No. 18-14 | *U.S. v. Carmelo Martinez*, Order for Psychiatric Examination, CR-H-98-12 (S.D. Tex. Jul.6, 1998) |
| ECF No. 18-15 | Memo from Eric Johnson (2/9/1993) |
| ECF No. 18-16 | Report on second theory of offense |
| ECF No. 18-17 | Report on $30,000 ransom call |
| ECF No. 18-18 | Report on $10,000 ransom call |
| ECF No. 18-19 | Report from HPD Sergeant Stephens to HPD Crime Lab (1/6/1993) |
| ECF No. 18-20 | Handwritten notes (5/1/1996) |
| ECF No. 18-21 | Affidavit Cesar Amado Rios |
| ECF No. 18-22 | Affidavit of Jose Martin Valdez |
| ECF No. 18-23 | Affidavit of Hector Saavedra |
| ECF No. 18-24 | Excerpts from law enforcement report (11/9/1992) |
| ECF No. 18-25 | *Texas v. Cruz-Garcia*, Probable cause findings |

| | |
|---|---|
| ECF No. 18-26 | Affidavit of Sandra Babcock |
| ECF No. 18-27 | Letter from Dominican Republic Consulate |
| ECF No. 18-28 | Letter from Texas Forensic Science Commission |
| ECF No. 18-29 | Johnny Lopez Statement to HPD (1989) |
| ECF No. 18-30 | Declaration of Elizabeth Ramos |
| ECF No. 18-31 | Affidavit of Michael Casaretto |
| ECF No. 18-32 | Affidavit of Sharon Alexander |
| ECF No. 18-33 | Affidavit of Angela Bowman |
| ECF No. 18-34 | Magistrate Warning to Cruz-Garcia |
| ECF No. 18-35 | Subpoena to Juan DeJesus Rodriguez |
| ECF No. 18-36 | Subpoena to custodian of records |
| ECF No. 18-37 | Angelita Rodriguez Statement to FBI (6/21/1994) |
| ECF No. 18-38 | Excerpts from Puerto Rico prison records |
| ECF No. 18-39 | Declaration of Dorcas Noelia de la Cruz Fana |
| ECF No. 18-40 | Affidavit of Lorenzo Villalba-Rolón |
| ECF No. 18-41 | Affidavit of Dr. Gina Perez |
| ECF No. 18-42 | Declaration of José de la Cruz |
| ECF No. 18-43 | Declaration of Menagen Valerio de la Cruz |
| ECF No. 18-44 | Declaration of Julia de la Cruz Santos |
| ECF No. 18-45 | Declaration of Dr. Alejandro Lebrón |
| ECF No. 18-46 | U.S. D.O.J., Immigration and Naturalization Services |
| ECF No. 18-47 | Raymond Paternoster, *Racial Disparity in the Case of Duane Edward Buck* (Dec. 29, 2012) |
| ECF No. 18-48 | Allan Turner, *Former DA Ran Powerful Death Penalty Machine*, Hous. Chron., July 25, 2007 |
| ECF No. 18-49 | Matt Dempsey & Karen Chen, *Hispanic Representation on Harris County Grand Juries Far Below Population*, Hous. Chron., Dec. 19, 2014. |
| ECF No. 18-50 | Leslie Casimir, *Blacks Urge Rosenthal to Quit*, Hous. Chron., Jan. 11, 2008 |

| ECF No. 18-51 | Texas Monthly, *A Hard Look at the Harris County District Attorney's Office* (Sept. 11, 2016) |
| ECF No. 18-52 | Matt Stiles & Alan Bernstein, *County Judge Calls for Investigation into Rosenthal*, Hous. Chron., Jan. 10, 2008 |
| ECF No. 18-53 | Cindy George, *Activists Renew Call for Sheriff, DA to Apologize in Goforth Case*, Hous. Chron., Feb. 16, 2016 |
| ECF No. 18-54 | *State v. Perkins*, Complaint, Case No. 1244038 (337th Dist. Ct. Dec. 10, 2009) |
| ECF No. 18-55 | *State v. Perkins*, Orders, Case No. 1244038 (337th Dist. Ct. Dec. 10, 2009) |
| ECF No. 18-56 | *State v. Reyes*, Complaint, Case No. 129611101010 (337th Dist. Ct. Feb. 18, 2011) |
| ECF No. 18-57 | *State v. Reyes*, Judgment, Case No. 129611101010 (337th Dist. Ct. Feb. 18, 2011) |
| ECF No. 18-58 | Judge Renee Magee website |
| ECF No. 18-59 | *Death Penalty Sought in Boy's Abduction, Slaying*, Hous. Chron., July 7, 2013. |
| ECF No. 18-60 | Judge Renee Magee website |
| ECF No. 18-61 | Final Bromwich Report |
| ECF No. 18-62 | HPD Crime Lab employee records for Dr. Baldev Sharma, Deetrice Wallace, Joseph Chu |
| ECF No. 18-63 | Trial Defendant's ECF No. 18-17, Judgment of conviction against Deetrice Wallace |
| ECF No. 18-64 | Transcript of phone call between HPD Officer U.P. Hernandez and Diana Garcia |
| ECF No. 18-65 | Audio of phone call between HPD Officer U.P. Hernandez and Diana Garcia |
| ECF No. 18-66 | Report by HPD Officer W.I. Stephens (11/9/1992) |
| ECF No. 18-67 | HPD interview of Santana (10/1992) |
| ECF No. 18-68 | HPD interview of Santana (11/5/1992) |
| ECF No. 18-69 | HPD interview of Santana (3/2/2009) |
| ECF No. 18-70 | *Brady* Notice (6/3/2013) |
| ECF No. 18-71 | *Brady* Notice (6/26/2013) |

| | |
|---|---|
| ECF No. 18-72 | Angelita Rodriguez interview by HPD (10/6/1992) |
| ECF No. 18-73 | FBI Arrest of Angelita Rodriguez (8/20/1993) |
| ECF No. 18-74 | Angelita Rodriguez interview by HPD (10/08/2008) |
| ECF No. 18-75 | Criminal docket for *U.S. v. Angelita Rodriguez.* 4:93-mj-00764 (S.D. Tex. 1993) |
| ECF No. 18-76 | INS records for Carmelo "Rudy" Santana Martinez |
| ECF No. 18-77 | Diana Garcia Statement to HPD (10/1/1992) |
| ECF No. 18-78 | Arturo Rodriguez Statement to HPD (10/1/1992) |
| ECF No. 18-79 | Carmelo "Rudy" Santana Martinez Santana criminal record |
| ECF No. 18-80 | Email from HCDAO A.D.A. Natalie Tise (4/24/2015) |
| ECF No. 18-81 | Declaration of Eledemas Mercedes Fana |
| ECF No. 18-82 | Declaration of Carlos Adame Martinez |
| ECF No. 18-83 | Declaration of Daisy Melendez |
| ECF No. 18-84 | Declaration of Idaliz Perez De La Cruz |
| ECF No. 18-85 | Declaration of Joel Cruz-Garcia |
| ECF No. 18-86 | Declaration of Margarita Martinez |
| ECF No. 18-87 | Declaration of Mireya Perez Garcia |
| ECF No. 18-88 | Declaration of Maria Altagracia Capellan |
| ECF No. 18-89 | Declaration of Nilsa Ela Garcia Marine |
| ECF No. 18-90 | Declaration of Noemi Margarita Cruz-Garcia |
| ECF No. 18-91 | Declaration of Piruquinu "Piruca" Acosta |
| ECF No. 18-92 | Declaration of Ramona Altagracia Mosquea |
| ECF No. 18-93 | Declaration of Sandra Hilvania Vazquez |
| ECF No. 18-94 | Declaration of Leurides Vasquez Faña |
| ECF No. 18-95 | Crime Scene Investigators Supplement |
| ECF No. 18-96 | HPD Supplemental Narrative of Diana Garcia and Arturo Rodriguez |
| ECF No. 18-97 | HPD Supplemental Narrative of investigation |
| ECF No. 18-98 | Excerpts from Reporter's Record, *Aviles-Barroso v. Texas* |
| ECF No. 18-99 | HPD interview of Jose Valdez |

| | |
|---|---|
| ECF No. 18-100 | HPD interview of Arturo Garcia Sr. |
| ECF No. 18-101 | FBI interview of Santana (5/23/2011) |
| ECF No. 18-102 | Car registration for Angelita Rodriguez |
| ECF No. 18-103 | SANE exam notes from 1992 (SEALED) |
| ECF No. 18-104 | HPD report on forensic examination of Oldsmobile |
| ECF No. 18-105 | Declaration of Chaplain Irma Iglesias Cruz |
| ECF No. 18-106 | Declaration of Chaplain Ivan Negron Vera |
| ECF No. 18-107 | Declaration of Jimmy Osorio |
| ECF No. 18-108 | Declaration of Luis Gonzales Martinez |
| ECF No. 18-109 | Dr. Rami Hashish Report (SEALED) |
| ECF No. 18-110 | Declaration of Dr. Claudia Ahumada Degrati, Ph.D. |
| ECF No. 18-111 | Passport for Cruz-GarciaCruz-Garcia |
| Exhibit 112 | Email from HCDAO A.D.A Lori DeAngelo (12.29.2016) |
| Exhibit 113 | Letter from HCDAO A.D.A. Natalie Tise in support of adjustment of status by Angelita Rodriguez |
| Exhibit 114 | Excerpts from Reporter's Record, *Aviles-Barroso v. Texas* |
| Exhibit 115 | Harris County criminal record for Angelita Rodriguez |
| Exhibit 116 | PIA request - 1989 murder of Saul Flores |
| Exhibit 117 | Response to PIA request – 1989 murder of Saul Flores |
| Exhibit 118 | Follow-up to PIA request – 1989 murder of Saul Flores – records not subject to disclosure |
| Exhibit 119 | Letter from Office of the Attorney General of Texas re: PIA request – 1989 murder of Saul Flores |
| Exhibit 120 | Declaration of Joanne Heisey |
| Exhibit 121 | Declaration of Adrián de la Rosa |
| Exhibit 122 | OCFW Motion for Disclosure of *Brady v. Maryland* Materials |
| Exhibit 123 | State's Objections and/or Request for Reconsideration of Order granting Defendant's Motion for Disclosure |
| Exhibit 124 | Email from HCDAO A.D.A Natalie Tise (6/10/2013) |
| Exhibit 125 | Email from HCDAO A.D.A Natalie Tise (681/2011) |

Exhibit 126        Emails about chain of DNA testing (5/2011)

Exhibit 127        Email from HCDAO A.D.A Natalie Tise about DNA of Santana (5/19/2011)

Exhibit 128        Emails about chain of DNA testing of hair (5/2011)

Exhibit 129        Emails about DNA results (5/2011)

Exhibit 130        Forensic testing in connection with extraneous offense (10/2011)

Exhibit 131        Emails about chain of DNA testing (2) (5/2011)

Exhibit 132        DNA timeline

Exhibit 133        Emails about chain of DNA testing (3) (5/2011)

Exhibit 134        Hairs Orchid DNA reports

Exhibit 135        Witness contacts

Exhibit 136        PIGs reports

Exhibit 137        Supplemental Declaration of Joanne Heisey

Exhibit 138        Skip Cornelius billing records

Exhibit 139        Skip Cornelius appointment records

Exhibit 140        Harris County Fee Schedule

Exhibit 141        Gina Vitale invoice

Exhibit 142        Texas Indigent Defense Commission, *Judgment and Justice, An Evaluation of the Texas Regional Public Defender for Capital Cases* (June 2013)

Exhibit 143        Texas Indigent Defense Commission, *Recommendations for a Unified Harris County Managed Assigned Counsel Program*

Exhibit 144        Texas Indigent Defense Commission, *Guidelines for Indigent Defense Caseloads* (January 2015)

Exhibit 145        Texas Indigent Defense Commission, *RPDO Making a Difference in Texas* (December 2016)

Exhibit 146        Texas Indigent Defense Commission, *Policy Monitoring Review of Harris County's Felony Indigent Defense Systems* (October 2016)

Exhibit 147        Council of State Governments Justice Center, *Harris County Public Defender* (September 2013)

Exhibit 148        Skip Cornelius capital appointment records

Exhibit 149        Second subsequent application for writ of habeas corpus

Exhibit 150          Judge Magee Website Bio

Exhibit 151          KHOU article about Harris County appointment system

## VERIFICATION BY ATTORNEY

I, the undersigned, am an attorney at the office appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Obel Cruz-Garcia in these proceedings. I have met with Mr. Cruz-Garcia, consulted with other staff in the Federal Defender's Office regarding the case, and we have directed experts and investigators regarding the circumstances of Mr. Cruz-Garcia's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on May 4, 2022.

Subscribed by me May 4, 2022,
in Dallas, Texas.

*/s/ David C. Currie*

David C. Currie

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for a Writ of Habeas

Corpus has been served by CM/ECF upon counsel for Respondent on May 4, 2022:

> Cara Hanna
> Criminal Appeals Division
> Office of the Attorney General
> P.O. Box 12548
> Capitol Station
> Austin, TX 78711
> cara.hanna@oag.texas.gov

*/s/ David C. Currie*

David C. Currie