1                     REPORTER'S RECORD

2              **VOLUME 6 OF 9 VOLUMES**

3            TRIAL COURT CAUSE NO. 1364839

4          COURT OF APPEALS NO. 14-14-00142-CR

5

6  ROGELIO AVILES-BARROSO      ) IN THE DISTRICT COURT
                               )
7      Appellant               )
                               )
8                              )
                               )
9  VS.                         ) HARRIS COUNTY, TEXAS
                               )
10                             )
                               )
11 THE STATE OF TEXAS          )
                               )
12     Appellee                ) 337TH JUDICIAL DISTRICT

13

14

15              *******************

16         **GUILT-INNOCENCE PROCEEDINGS**

17              *******************

18

19

20     On the 31st day of January, 2014, the following

21 proceedings came on to be heard in the above-entitled

22 and numbered cause before the Honorable Renee Magee,

23 Judge presiding, held in Houston, Harris County, Texas;

24     Proceedings reported by computer-aided

25 transcription/stenograph shorthand.

EXHIBIT 114 Page 001

 1                      May this witness be excused?

 2                      MS. TISE:  Yes, Your Honor.

 3                      THE COURT:  You may step down, sir.

 4                      Please call your next.

 5                      MS. TISE:  The State will call Ray Castro.

 6                      THE BAILIFF:  The witness has not been

 7   sworn, Your Honor.

 8                      THE COURT:  Thank you, Your Honor.

 9                      (Witness sworn)

10                      THE COURT:  You may proceed.

11                              **RAY CASTRO,**

12   having been first duly sworn, testified as follows:

13                          **DIRECT EXAMINATION**

14   **BY MS. TISE:**

15       Q.   Would you introduce yourself to the jury,

16   please, sir?

17       A.   Yes.  My name is Ray Castro.

18       Q.   And what do you do for a living?

19       A.   I'm a lawyer.

20       Q.   Okay.  What kind of law do you practice

21   specifically?

22       A.   Specifically, I practice criminal law.

23       Q.   And is your practice primarily here in the

24   Harris County courthouse?

25       A.   Yes, ma'am, it is.

EXHIBIT 114 Page 002

1      Q.   And, in fact, you've known Mr. Brown for years,

2  have you not?

3      A.   We have been colleagues.

4      Q.   How long do you think you have known him?

5      A.   Twenty-five plus years.

6      Q.   And you are colleagues as members of the

7  criminal defense bar?

8      A.   That's correct.

9      Q.   And you've known me a long time?

10     A.   That's correct.

11     Q.   How long do you think you have known me?

12     A.   About the same time, if not more.

13     Q.   Okay.  And you also know Judge Magee?

14     A.   I do.

15     Q.   You are a regular here in the courthouse?

16     A.   Yes, ma'am.

17     Q.   A respected and experienced criminal defense

18  lawyer?

19     A.   Yes, ma'am.

20     Q.   I want to ask you if at some point in time you

21  were appointed to represent an individual by the name of

22  Carmelo Martinez Santana?

23     A.   Yes, I was.

24     Q.   And who appointed you?

25     A.   I believe I was appointed by Judge Guerrero.

EXHIBIT 114 Page 003

1    Q.    Okay.  And you were going to represent him in

2    his capacity as a witness, were you not?

3    A.    That's correct.

4    Q.    Is it fair to say that you were appointed

5    almost immediately?  Pretty much as soon as he got here,

6    the Court was notified that he was here and he needed an

7    attorney?

8    A.    Yes.  To the best of my recollection, I think

9    that was the case.

10    Q.    Okay.  And what did you do after you got that

11    appointment?

12    A.    During that time, I remember I was in a trial

13    phase, so I didn't get to see him until probably at

14    least about two or three weeks later down the road, but

15    I did have an interview with him.

16    Q.    Okay.  And did you kind of apprise yourself,

17    basically, of why he was here and what was going with

18    the case prior to that time?

19    A.    Yes, I did.

20    Q.    And when you went to see him, did you go alone?

21    A.    I did.

22    Q.    Okay.  And did you talk to him, without going

23    into what you said, basically about what his rights are?

24    A.    Definitely, yes.

25    Q.    Okay.  Because you were appointed to protect

EXHIBIT 114 Page 004

1    his rights?

2         A.   That's correct.

3         Q.   And that's the sole reason you were appointed?

4         A.   That's correct.

5         Q.   Was he charged with a crime at the time?

6         A.   At the time as far as I know, no.

7         Q.   Okay.  Other than the federal time that he was

8    completing?

9         A.   Other than that.  He already had a conviction.

10        Q.   Has he been charged with a crime since?

11        A.   To my knowledge at this point, no.

12        Q.   Okay.  Early on you learned that he had given a

13   statement to the FBI --

14        A.   That's correct.

15        Q.   -- in Pennsylvania?

16        A.   Yes, he did.

17        Q.   Making himself a witness on this case?

18        A.   That's correct.

19        Q.   And you knew this was a capital murder case?

20        A.   That's correct.

21        Q.   And the penalties were -- are very serious?

22        A.   That's correct.

23        Q.   And I'm sure you talked to him about that?

24        A.   We did.

25        Q.   At some point during that time period do you

EXHIBIT 114 Page 005

1   recall being contacted by me and asking if we would be

2   able to go and interview Rudy?

3      A.   Yes.

4      Q.   And did you arrange for that to happen?

5      A.   That's correct, I did.

6      Q.   And were you present during that interview?

7      A.   I was present, as far as I know, in all of the

8   interviews that we had, yes.

9      Q.   Right.  You and one or both of my investigators

10  and another attorney, Justin Wood, on some cases?

11     A.   Correct.

12     Q.   But you were always there when we would meet

13  with him?

14     A.   That's correct, yes, ma'am.

15     Q.   Prior to our meetings with him, had you kind of

16  had an opportunity, basically, to determine what Rudy's

17  intentions were as far as testifying on this case?

18     A.   I think he made that known to me immediately

19  that first time that I interviewed him as to the purpose

20  that he was here.

21     Q.   And what was his intention?

22     A.   To testify.

23     Q.   Okay.  And did you talk to him about some of

24  the consequences of him testifying?

25     A.   I did tell them the consequences of how that

EXHIBIT 114 Page 006

1   could very well affect him down the road if, in fact,

2   charges were pending.  Whatever may have happened, that

3   definitely would be held against him and it would not be

4   in his best interest.

5        Q.   Okay.  And did he persist in wanting to

6   testified anyway?

7        A.   He did.

8        Q.   Okay.  In fact, was he fairly stubborn about

9   that?

10       A.   He was insistent to do that.

11       Q.   And did he tell you why?

12       A.   Yes.  He told --

13            MR. BROWN:  Objection.  Calls for hearsay.

14            THE COURT:  That's sustained.

15       Q.   (By Ms. Tise) Did you talk to him about things

16   like, when you testify in a situation like this it could

17   be dangerous for you at some point, sometimes other

18   inmate will retaliate?

19            MR. BROWN:  Judge, we're going to object.

20   That's starting to get into attorney-client privilege.

21            THE COURT:  I will allow a little bit of

22   it.  I'll allow a little bit, as long as it doesn't call

23   for hearsay.

24            MS. TISE:  May we approach on that?

25            THE COURT:  Yes.

EXHIBIT 114 Page 007

```
 1                    (At the Bench, on the record)
 2                    MS. TISE:  Mr. Brown can't invoke the
 3  attorney-client privilege for him.
 4                    THE COURT:  I understand.
 5                    MS. TISE:  And so, I understand you are
 6  allowing me to go there, but I just want -- in case
 7  there's further objections on that point --
 8                    MR. BROWN:  I think -- I'm not invoking it.
 9  I just said --
10                    MS. TISE:  Mr. Castro can invoke it.
11                    MR. BROWN:  My objection was that it's
12  basically hearsay and he's going into attorney-client
13  privilege.  What he talks about with his client is
14  supposedly between him and his client.
15                    THE COURT:  Well, that's true as long as
16  he's waiving it.  And you may want to ask him that, if
17  he is, but I'm still not going to let you go into
18  hearsay about what the defendant said.  Okay?
19                    MS. TISE:  I agree.
20                    (Open court, defendant and jury present)
21      Q.  (By Ms. Tise) I will ask you, Mr. Castro, Rudy
22  knows that you're going to testify, does he not?
23      A.  He was aware of that, yes.
24      Q.  And does he have any objection to that?
25      A.  No, he does not.
```

EXHIBIT 114 Page 008

1       Q.   Okay.  And so, talking to you about your

2   meetings with him, what were some of the things that you

3   expressed to him -- not his responses, but what you

4   expressed to him about things that he ought to think

5   about before doing this?

6       A.   Initially, we had gone over his version.  It

7   was over a period of maybe a couple of hours or so.  And

8   soon after we met after that, we definitely would go

9   over the options, consequences, the range of punishment,

10  whatever was involved here, as well as every time I

11  always emphasized to him, you know, there's some serious

12  dangers here in you wanting to testify and proceed to

13  want to do that.  His response was constantly that he

14  wanted to do it.

15      Q.   And those dangers included possible danger from

16  retaliation from other inmates?

17      A.   If they found out about what he was doing, yes.

18      Q.   And possibly saying something that would lead

19  to him being charged with a crime?

20      A.   That was my primary concern for him, is being

21  charged with another offense, which could very well

22  happen.

23      Q.   And you explained that to him?

24      A.   Thoroughly.

25      Q.   And he persisted that he wanted to do this?

EXHIBIT 114 Page 009

 1      A.   Yes.  Yes, ma'am.

 2      Q.   Why?

 3      A.   Primary reason -- every time I've talked to

 4  him, his primary, he wants to get it off his conscience

 5  and tell the truth.  That's primarily what he was

 6  saying.

 7      Q.   And did he ever ask you:  Should I answer the

 8  prosecutor's questions a certain way so that I won't be

 9  charged?  Did he ever do that?

10      A.   No, never.

11      Q.   Did he ever ask you for advice on what's going

12  to make me, you know, get drug into this case as far as

13  the law of parties or anything like that is concerned?

14      A.   No.  Our primary conversations were mainly

15  confined to what actually had happened.

16      Q.   Right.  And his story to you was consistent?

17      A.   That's correct.

18      Q.   And you were here when he testified in the last

19  trial?

20      A.   I was.

21      Q.   And was it consistent with what he had said

22  before in our meetings?

23      A.   Yes, it was.  At the last trial and our prior

24  meetings, yes.

25      Q.   Okay.  And because you were going to testify in

EXHIBIT 114 Page 010

1   this trial, you were unable to be present for his

2   testimony this time?

3        A.   That's correct.

4        Q.   But he's always been very consistent in his

5   story?

6        A.   Yes, ma'am.

7        Q.   And he never said:  How do I tell my story so

8   that I don't get into any trouble?

9        A.   That's correct.

10       Q.   His story was just what his story was?

11       A.   That's correct.

12       Q.   When we would come meet with him, you were

13   always present?

14       A.   Yes, ma'am.

15       Q.   Sometimes you would help translate, would you

16   not?

17       A.   Yes.

18       Q.   You are a fluent Spanish speaker?

19       A.   Yes, ma'am, I am.

20       Q.   And did you or he ever tell us that we couldn't

21   ask him anything, that there was something off limits?

22       A.   No.

23       Q.   It was always wide open?

24       A.   Yes, ma'am.

25       Q.   And was this all in accordance with the way

EXHIBIT 114 Page 011

1    Rudy wanted it to be?

2         A.   Yes, ma'am.

3         Q.   At any point in time did you and I or you and

4    any member of the D.A.'s office ever talk about a deal

5    for Rudy in exchange for his testimony?

6         A.   No, ma'am.

7         Q.   Did Rudy ever ask you to talk to us about a

8    deal?

9         A.   No.

10        Q.   Okay.  As far as you're concerned, has there

11   ever been any assurances to you or anyone that he

12   wouldn't be charged with a crime if the evidence led us

13   that direction?

14        A.   No, ma'am.  Not even explicitly or implicitly.

15        Q.   And as far as you know, I could charge him with

16   a crime tomorrow if the evidence led me in that

17   direction?

18        A.   Which was my concern if he testified, yes.

19        Q.   Sure.  But -- and you explained that to him?

20        A.   Very much so, yes.

21        Q.   And he did not ask for or want any assurances

22   from us?

23        A.   He continued to want to -- he insisted on

24   testifying.

25        Q.   He is still in custody, correct?

EXHIBIT 114 Page 012

```
 1        A.    Yes, ma'am.

 2        Q.    And why is that?

 3        A.    As far as I know, he was finishing out his

 4   federal sentence and I think he completed it, and he's

 5   still here.

 6        Q.    Okay.  And he's here because he is a material

 7   witness on a capital murder case?

 8        A.    That's correct.

 9        Q.    And there is a process for that called a

10   material witness bond, isn't there?

11        A.    That's correct.

12        Q.    And because he -- because he's persisting in

13   wanting to testify, we put that material witness bond in

14   place and that's keeping him in custody?

15        A.    That's correct.

16        Q.    Is it your understanding that once the material

17   witness bond is lifted then he will be deported back to

18   his homeland, the Dominican Republic?

19        A.    Immigration procedures will definitely start

20   soon thereafter.

21        Q.    And if we didn't have a witness bond in place,

22   the feds would have deported him and we wouldn't have

23   him available for trial?

24        A.    Immediately.

25        Q.    So, that's why we have to keep him in custody?
```

EXHIBIT 114 Page 013

1      A.   That's correct.

2      Q.   Because, otherwise, the feds are going to take

3  him and we're going to lose him?

4      A.   Right.

5      Q.   He wants to go back to the Dominican Republic,

6  doesn't he?

7      A.   He is prepared to go.  So, yes.

8      Q.   And looking forward to being with his family

9  and seeing them again?

10      A.   That's correct, yes, ma'am.

11      Q.   And you've explained to him, because he's been

12  willing to testify in this case, that's what's keeping

13  him in custody?

14      A.   Yes.  He's aware of that.

15      Q.   And he continues to want to testify.

16           THE COURT:  Is that a question?

17           MS. TISE:  Sorry.

18      A.   Yes.

19      Q.   (By Ms. Tise) Does he continue to want to

20  testify?

21      A.   Yes.  He will stay as long as necessary.

22      Q.   Is it fair to say that, in fact, in the last

23  trial Rudy thought he had been charged with capital

24  murder?

25      A.   Yes.

EXHIBIT 114 Page 014

```
 1                   MR.  BROWN:   Objection, Your Honor --
 2        A.   Yes.
 3                   MR.  BROWN:   -- that's hearsay.
 4                   THE  COURT:   Hang tight a minute when one of
 5   the lawyers stand up, Mr. Castro.  I know you know that,
 6   but didn't be too quick to answer if a lawyer stands up.
 7                   THE  WITNESS:   Yes, ma'am.
 8                   THE  COURT:   Thank you.  Please proceed.
 9                   MS.  TISE:   I'm sorry.  I didn't hear your
10   ruling.  Did you sustain it?
11                   THE  COURT:   Well, he had already answered
12   the question.
13                   MS.  TISE:   Okay.  I'm sorry.
14                   Pass the witness.
15                        CROSS-EXAMINATION
16   BY MR. BROWN:
17        Q.   What's the other reason for a material witness
18   bond?
19        A.   To assure that he's here, he stays here.
20        Q.   So, he can't run?
21        A.   That could be another reason, too.
22        Q.   If he gets deported, that's the same as
23   running, correct?
24                   MS.  TISE:   I'll object to that.  It's not
25   the same as running.
```

EXHIBIT 114 Page 015

1          THE COURT:  I will sustain the

2   mischaracterization.

3      Q.   (By Mr. Brown) If he was deported, he'd be home

4   where he wanted to be, right?

5      A.   That could be implied, yes.

6      Q.   He's running, correct?

7      A.   He is not here, not present.

8      Q.   Now, you were appointed to be his attorney once

9   he was brought into Houston, Harris County, Texas; is

10  that correct?

11     A.   Yes, sir.

12     Q.   You were not aware of anything that was said to

13  him in 1998 -- no -- '97 by the first investigators that

14  went to talk to him in Orlando, Florida; is that

15  correct?

16     A.   No, I was not aware of that.

17     Q.   So, you don't know if anything was said to him

18  about what could happen to him, what deals could be

19  made; you don't know any of that kind of information?

20     A.   I was not aware.

21     Q.   When he was talked to again in Pennsylvania,

22  you weren't there at that time?

23     A.   I was not present.

24     Q.   So, you don't know if any deals -- anything

25  that was said about his testimony, you weren't aware of

EXHIBIT 114 Page 016

1  what his -- the transcripts of what his statement were;

2  is that correct?

3       A.   Just what happened here in Harris County and

4  what he had said.

5       Q.   Right.  But the question is:  You saw his

6  transcript of his statements made to the FBI in

7  Pennsylvania, correct?

8       A.   I think I saw it later on after I had been

9  appointed to represent him, but, initially, I was not

10  aware of that.

11       Q.   Now, you've been with him on one or many

12  occasions when the D.A. went to talk to him about his

13  testimony?

14       A.   Yes.  I believe about three times, if I'm not

15  mistaken.

16       Q.   Was that three times before Obel's trial?

17       A.   I think before Obel's trial, it might have been

18  twice.

19       Q.   And one time before this trial?

20       A.   That's correct.

21       Q.   Now, I'm just going to -- you talked to him

22  about the consequences of testifying, correct?

23       A.   Right.

24       Q.   You talked to him about the consequences of

25  changing his story, too, didn't you?

EXHIBIT 114 Page 017

1        A.   That's correct.

2        Q.   So, if he changes his story in any way, he goes

3   to prison, correct?

4        A.   Well, I've always admonished him about perjury

5   issues also.

6        Q.   What's the difference between explicit and

7   implicit deals?

8        A.   Explicit is coming right -- forthright and

9   coming out and saying them.  Implicitly is something you

10  can read between the lines.

11       Q.   Now, he was never given an explicit deal; is

12  that correct?

13       A.   That's correct.

14       Q.   He hasn't been charged with capital murder, has

15  he?

16       A.   As far as I know, no.

17       Q.   What is the implicit deal then regarding his

18  testimony in these two trials?

19       A.   Implicitly, I don't think -- we haven't even

20  gotten close to even discussing any kind of resolution

21  as to his status other than just testifying.

22       Q.   If he testifies the way the State wants him to

23  testify and tells the story the same way and

24  consistently, does he go home?

25       A.   At this point, if -- like I said earlier, if he

EXHIBIT 114 Page 018

1   is finished with his federal sentence, immigration -- of

2   course, assuming that he's let go from here, released

3   from Harris County, then immediately has to go under

4   immigration proceedings.

5       Q.   And the Dominican Republic is home, right?

6       A.   As far as I know, yes.

7       Q.   So, he gets to go home, right?

8       A.   That's correct.

9       Q.   All right.  Now, we've done this for many,

10   many, many, many, many, many years, correct?

11      A.   Yes, sir.

12      Q.   All right.  And a lot of what you talk to a

13   client about is privileged as to even co-defendants and

14   co-defendants' attorneys, correct?

15      A.   That's correct.

16      Q.   All right.  And it's also privileged as to the

17   D.A.'s office, correct?

18      A.   Definitely, yes.

19      Q.   Did you go over the police report with your

20   client?

21      A.   The police report meaning the incident report

22   prepared for this particular case here?  I don't recall

23   that I did go over it extensively with him.  I think

24   mainly I went over the -- his version of what happened.

25   And I think I had sort of like a synopsis of what

EXHIBIT 114 Page 019

1  actually transpired.  I think I got probably the

2  first -- the original report.  That's basically it, but

3  as far as supplements, no.

4     Q.  Did he tell you that they were in a blue car

5  when they went and did this act on September 30th and

6  the early morning of October 1st, 1992?

7           MS. TISE:  Objection.  Calls for hearsay.

8           MR. BROWN:  I believe she's opened up the

9  door, Judge, as far as attorney-client privilege, as far

10 as hearsay.  I believe he has testified already -- I'm

11 just asking --

12           THE COURT:  Well, Mr. Brown, as to hearsay

13 that is sustained.  If you are trying to impeach

14 Mr. Carmelo Martinez Santana with something that was

15 said to this witness, then just set it up for

16 impeachment and I will allow that.

17    Q.  (By Mr. Brown) Did he tell you why the gold car

18 that they used had sand and dirt in it when it was

19 returned to Charlie?

20    A.  I don't recall him saying why, but I do

21 remember him saying, yes, it did have some dirt.

22    Q.  Did he tell you that he and Obel had the knife

23 that night?

24    A.  I don't recall if he said he had it, but I do

25 remember that Obel -- he said Obel had it.

EXHIBIT 114 Page 020

1     Q.   Did he tell you that Obel was the only person

2  with a weapon that night?

3     A.   I believe, yes, that is what he had told me, if

4  I remember correctly.  I'm not sure.  I can't tell you

5  for a fact.

6     Q.   Did he tell you that when he went to Diana

7  Garcia's home he knew what was going to happen?

8     A.   I don't remember if it was before or after they

9  had left Diana Garcia's home.

10    Q.   What's the definition of law of parties?

11         MS. TISE:  Objection.  That's calls for a

12  legal conclusion.

13         MR. BROWN:  He's a lawyer, Your Honor.

14         MS. TISE:  That's true, but --

15         THE COURT:  That's sustained.

16         Members of the jury, you will be instructed

17  on what the law of parties is and how it applies for you

18  to apply it to the facts in this case.

19         You may proceed.

20    Q.  (By Mr. Brown) Did you explain to your client

21  the differences between law of parties, conspiracy, and

22  any other forms of legal consequences as a person who's

23  at a criminal event?

24     A.   Yes.

25     Q.   You did talk to him about the difference

EXHIBIT 114 Page 021

 1  between law of parties, conspiracy, accessory,

 2  unindicted co-conspirators, all those things, didn't

 3  you?

 4      A.   Everything was explained to him with regards to

 5  how this could affect him.

 6      Q.   Did you have conversations -- and I'm not

 7  asking what you said, but did you have conversations

 8  outside of the presence of your client with the district

 9  attorney's office?

10      A.   As far as making arrangements for meetings and

11  scheduling purposes.  And I think there may have been

12  some other things, but I don't think it was very

13  relevant to the case that's being tried or any of the

14  cases that were being tried.

15      Q.   Did you ever go to the D.A.'s office and ask

16  for a deal?

17      A.   No.

18      Q.   Did they come to you and say there would be no

19  deals?

20      A.   No.

21              MR. BROWN:  Pass the witness.

22              THE COURT:  Thank you.

23              Anything further, Ms. Tise?

24              MS. TISE:  No, Your Honor.

25              THE COURT:  May the witness be excused?

EXHIBIT 114 Page 022

```
 1              MS. TISE:  Yes, Your Honor.

 2              MR. BROWN:  Yes, Your Honor.

 3              THE COURT:  Step down.  Thank you,

 4    Mr. Castro.

 5              Please call your next.

 6              MS. TISE:  State calls Kerry Gillie.

 7              THE COURT:  Please raise your right hand.

 8              (Witness sworn)

 9              THE COURT:  Please be seated.

10              You may proceed, Ms. Tise.

11                      KERRY GILLIE,

12    having been first duly sworn, testified as follows:

13                    DIRECT EXAMINATION

14    BY MS. TISE:

15       Q.   State your name, please, sir.

16       A.   My name is Kerry Gillie.  I'm a licensed police

17    officer investigator employed here at the Harris County

18    D.A.'s Office.

19       Q.   Can you tell the jury a little bit about your

20    background?

21       A.    I have had over 30 years of law enforcement

22    experience.  The majority of that has been in the

23    investigative side.  I retired as a detective from the

24    Deer Park P.D. and was recruited by the Attorney

25    General's Office to do fraud.  When I was there, after
```

EXHIBIT 114 Page 023

1                    **REPORTER'S CERTIFICATE**

2  THE STATE OF TEXAS   )
   COUNTY OF HARRIS     )

3

4       I, Mary Ann Rodriguez, Official Court Reporter in

5  and for the 337th District Court of Harris County, State

6  of Texas, do hereby certify that the above and foregoing

7  contains a true and correct transcription of all

8  portions of evidence and other proceedings requested in

9  writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13      I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, admitted by the respective parties.

16      WITNESS MY OFFICIAL HAND this the 3rd day of March,

17  2014.

18

19

20

21  /s/ Mary Ann Rodriguez
    Mary Ann Rodriguez, Texas CSR 3047
22  Expiration Date:  12/31/2015
    Official Court Reporter
23  337th Court
    1201 Franklin
24  Houston, Texas  77002
    713.755.7746

25

EXHIBIT 114 Page 024