



Public Policy Research Institute

Texas Indigent Defense Commission

**June 2013**

Office of Court Administration



# Judgment and Justice

An Evaluation of the Texas Regional
Public Defender for Capital Cases

EXHIBIT 142 Page 001

EXHIBIT 142 Page 002

# Judgment and Justice

## An Evaluation of the Texas Regional Public Defender for Capital Cases

June 2013

Dottie Carmichael, Ph.D.
*Research Scientist*

Heather Caspers, M.A.
*Research Assistant*

Public Policy Research Institute

4476 Texas A&M University

College Station, Texas  77843

(979) 845-8800

Funding for this research was provided by the Texas Indigent Defense Commission, Office of Court Administration.  Established in 2001 by the Texas legislature, the Commission is charged with setting policies and standards, monitoring compliance, and administering grants to counties.  The Commission supports research to identify evidence-based practices and improve the quality of indigent defense services in Texas.

Points of view or opinions in this document are those of the authors and do not represent the official position or policies of the Texas Indigent Defense Commission.

© 2013 Public Policy Research Institute.  All Rights Reserved.

EXHIBIT 142 Page 003

EXHIBIT 142 Page 004

# ACKNOWLEDGEMENTS

*The Public Policy Research Institute would like to thank the stakeholders that supported this research endeavor. The people we encountered during this study share a commitment to advancing justice for capital defendants. We are grateful to everyone who assisted, and specifically acknowledge the following individuals and organizations.*

*Policy leadership and funding to implement the study was provided by the Texas Indigent Defense Commission, chaired by the Honorable Sharon Keller, Presiding Judge, Court of Criminal Appeals. The Commission has been consistently committed to strengthening the capacity of the defense community since its inception a decade ago. The Regional Public Defender Office for Capital Cases (RPDO) is innovative in Texas and nationally.*

*The administration and staff of the Regional Public Defender Office were a tremendous resource throughout the evaluation. Chief Public Defender Jack Stoffregen welcomed the research team and provided access to all the necessary information. Elaine Nauert, Office Administrator, helped arrange meetings and interviews, and spent considerable time assembling special information requests. Members of the RPDO defense staff took time to talk about their work, and helped the research team understand the workings of the office.*

*Kathryn Kase, Executive Director of the Texas Defender Service (TDS), provided invaluable assistance in all phases of the project. The TDS database was instrumental for identifying capital death cases suitable to match with RPDO cases. Ms. Kase was a significant resource in technical and legal matters pertaining to capital defense in Texas. She contributed many hours of her time and immense expertise at no cost, elevating the quality and usefulness of the research.*

*RPDO Oversight Board members devoted considerable effort to providing information about the objectives and implementation of the office. The group convened on two occasions over the course of the study to share their knowledge and experience regarding the capital indigent defense system. Members of the Board include the following:*

The Honorable Kelly G. Moore, Presiding Judge, Ninth Administrative Judicial Region
The Honorable Dean Rucker, Presiding Judge, Seventh Administrative Judicial Region

The Honorable John B. Board, 181st District Court, Randall County
The Honorable Steve Ellis, 35th District Court, Brown and Mills Counties
The Honorable David Gleason, 47th District Court, Retired, Potter County
The Honorable Pat Phelan, 286th District Court, Hockley County
The Honorable Brad Underwood, 364th District Court, Lubbock County
The Honorable John Weeks, 42nd District Court, Taylor County

i

EXHIBIT 142 Page 005

The Honorable Denn Whalen, 70th District Court, Ector County
The Honorable Ben Woodward, 119th District Court, Tom Green County

The Honorable Susan Redford, County Judge, Ector County
The Honorable Arthur Ware, County Judge, Potter County

The Honorable Bill McCay, County Commissioner, Lubbock County Precinct 1
The Honorable Chuck Statler, County Commissioner, Taylor County Precinct 4

Jackie Latham, Auditor, Lubbock County
Dean Stanzione, Director of Court Administration, Lubbock County

William Bowden, Defense Attorney, Odessa, TX.
Selden Hale, Defense Attorney, Amarillo, TX.
Chuck Lanehart, Defense Attorney, Lubbock, TX.

James Bethke, Executive Director, Texas Indigent Defense Commission
Kathryn Kase, Executive Director, Texas Defender Service
Andrea Marsh, Executive Director, Texas Fair Defense Project

*Other individuals who also contributed significant expertise include the following:*

Daniel Burkeen, County Judge, Limestone County
Patrick Metze, Law Professor and Director, Capital Defense Clinic, Texas Tech Law School
David Slayton, Executive Director, Office of Court Administration
Rick Wardroup, Capital Assistance Attorney, Texas Criminal Defense Lawyers Association

*At the Public Policy Research Institute, the authors would like to thank Stephanie Arrellano for her help acquiring cost and case processing records from counties. Her persistence and accuracy were essential to the success of the project. We also thank Joe Peebles for his assistance with survey data collection, Gena Monroe for document preparation, and Aaron Williams for cover art design.*

EXHIBIT 142 Page 006

# TABLE OF CONTENTS

**ACKNOWLEDGEMENTS** ..................................................................................................... i

**TABLE OF CONTENTS** ..................................................................................................... iii

**EXECUTIVE SUMMARY** ................................................................................................... vii


**CHAPTER 1**  INTRODUCTION ......................................................................................... 1

OBJECTIVES OF THE CAPITAL PUBLIC DEFENDER'S OFFICE ......................................... 1

ORGANIZATION OF THE REPORT ..................................................................................... 2


**CHAPTER 2**  RESEARCH METHODS .................................................................................. 5

STAKEHOLDER INTERVIEWS ............................................................................................. 5

SURVEY OF CAPITAL DEFENSE STAKEHOLDERS ............................................................. 6

MATCHED CASE ANALYSIS ............................................................................................... 9

CONCLUSION ................................................................................................................... 10


**CHAPTER 3**  RPDO OPERATIONAL AND FINANCIAL STRUCTURE .................................... 11

RPDO IMPLEMENTATION ................................................................................................ 11

RPDO FUNDING STRUCTURE .......................................................................................... 13

CONCLUSION ................................................................................................................... 15


**CHAPTER 4**  FACTORS INFLUENCING RPDO MEMBERSHIP AND SATISFACTION ............. 17

FACTORS ASSOCIATED WITH RPDO MEMBERSHIP ........................................................ 17

RPDO MEMBER SATISFACTION ....................................................................................... 20

CONCLUSION ................................................................................................................... 21


**CHAPTER 5**  RPDO CONFORMANCE WITH JURISDICTION STANDARDS ........................... 23

PROMPT ACCESS TO A QUALIFIED CAPITAL TEAM ........................................................ 23

OVERSIGHT OF CAPITAL DEFENSE SERVICES ................................................................. 24

ADEQUATE FUNDING OF CAPITAL DEFENSE SERVICES .................................................. 27

CONCLUSION ................................................................................................................... 30

EXHIBIT 142 Page 007

**CHAPTER 6**  RPDO CONFORMANCE WITH ATTORNEY STANDARDS ........................................... 31
APPOINTMENT OF CAPITAL COUNSEL ..................................................................... 31
PRIORITIZING DEATH-PENALTY CLIENTS .................................................................. 34
ATTORNEY-CLIENT RELATIONSHIP ........................................................................... 35
CONCLUSION ................................................................................................................ 39

**CHAPTER 7**  RPDO CONFORMANCE WITH NON-ATTORNEY DEFENSE TEAM STANDARDS ...... 41
ASSEMBLY OF THE CAPITAL TEAM .......................................................................... 41
RESPONSIBILITIES OF NON-ATTORNEY DEFENSE TEAM MEMBERS ..................... 43
DEFENSE TEAM COORDINATION .............................................................................. 46
CONCLUSION ................................................................................................................ 47

**CHAPTER 8**  CASE PROCESSING OUTCOMES IN RPDO AND NON-RPDO ................................ 49
TIMELINESS OF APPROPRIATE ATTORNEY REPRESENTATION ............................. 49
CASE DISPOSITION OUTCOMES ............................................................................... 52
SENTENCING ................................................................................................................ 54
CONCLUSION ................................................................................................................ 55

**CHAPTER 9**  COST OUTCOMES IN RPDO AND NON-RPDO CAPITAL CASES ........................... 57
RELATIVE VALUE OF RPDO SERVICES ..................................................................... 57
VALUE ADDED BY RPDO MEMBERSHIP .................................................................... 64
CONCLUSION ................................................................................................................ 66

**CHAPTER 10**  SUMMARY OF FINDINGS ..................................................................................... 69
ACCESS TO CAPITAL DEFENSE COUNSEL .............................................................. 69
QUALITY OF CAPITAL DEFENSE COUNSEL ............................................................. 70
COST OF CAPITAL DEFENSE COUNSEL ................................................................... 74
CONCLUSION ................................................................................................................ 76

**APPENDIX A**  OVERSIGHT ADVISORY BOARD ........................................................................... 79
**APPENDIX B**  REGIONAL PUBLIC DEFENDER OFFICE ACTUAL EXPENDITURES ...................... 81

EXHIBIT 142 Page 008

# Executive Summary

EXHIBIT 142 Page 009

EXHIBIT 142 Page 010

# EXECUTIVE SUMMARY

In the fall of 2008, Lubbock County applied to the Texas Indigent Defense Commission (TIDC) for funding to establish the Regional Public Defender for Capital Cases (RPDO).  The office was designed to make high-quality indigent defense counsel more available in small and mid-sized jurisdictions, and to increase budget predictability in counties vulnerable to the expense of a capital death trial.  Over nearly six years of operation, the program has now been expanded statewide and sufficient data is available on the performance of the office to evaluate its success.

In addition to surveying stakeholders in RPDO-eligible counties, actual case processing and cost data was acquired for a matched sample of 60 capital death cases represented by either an RPDO or a non-RPDO attorney.  Quality of defense was assessed in terms of the criteria established by the State Bar of Texas (SBOT) in "Guidelines and Standards for Texas Capital Counsel." [1]  Results show public defender attorneys provide a superior service and achieve better outcomes than other assigned counsel by a number of important criteria.

## Conformance with State Bar of Texas' Capital Defense Guidelines

Counties that choose to contract with the public defender are in immediate conformance with all of the SBOT quality standards.  Capital defendants receive prompt access to a complete defense team including two attorneys, an investigator, and a mitigation specialist.  Public defenders are also well-supported professionally.  They receive 30 percent more continuing legal education, most directly related to death-penalty law, and are formally supervised and evaluated against performance standards.  Workloads are controlled, as well.  While private capital defense attorneys have an average active caseload of 54 cases of widely varying types, RPDO attorneys have a maximum of 5 concurrent cases, all capital death.

## Independence from Judicial Influence

RPDO attorneys are better positioned than other appointed counsel to implement the defense most appropriate for the client without interference from the court.  For example, 40 percent of judges surveyed sometimes limit the amount they will approve for compensation of mitigation specialists or experts in private appointed cases.  Sixty percent of capital defense attorneys surveyed say insufficient compensation then limits their ability to attract the best non-attorney capital team members.  The public defender is insulated from these forms of judicial influence because they retain direct control over the allocation of defense team resources.

---

[1] State Bar of Texas, "Guidelines and Standards for Texas Capital Counsel," *Texas Bar Journal* 69 (2006).

EXHIBIT 142 Page 011

## More Prompt and More Frequent Capital Team Appointment

The RPDO creates incentives for counties to appoint a capital-qualified defense team more quickly and in a larger proportion of cases.  Public defender clients arrested on capital charges virtually always have a defense team available well before indictment. Less than one-third of defendants with private assigned counsel are as fortunate.

Furthermore, in about one-third of all private assigned cases, death penalty waivers or charge reductions are used to prevent capital counsel from being assigned even though the charges remain capital murder.  Where jurisdictions have already paid for RPDO membership, on the other hand, they consistently prefer to request a full capital defense team be provided whenever possible, significantly elevating the overall quality of services to the defendant.

## Better Non-Attorney Defense Team Services

The evidence shows that public defender clients receive a higher level of support from non-attorney defense team members.  RPDO investigators and mitigation specialists ordinarily begin work within two weeks of being appointed, and then meet with the client at least every two weeks over the course of the case.  This type of close communication not only involves the defendant in developing his or her own defense strategy, but also helps establish a relationship of trust required for clients to listen to attorneys' advice in matters such as whether to accept a plea. Only about one-third of capital defendants with private assigned attorneys receive this degree of defense team support.

## Greater Investment in Mitigation to Increase Plea Rates

Capital cases resolved in a jury trial stand an 80 percent chance of ending in a death sentence.  The pursuit of pleas is therefore a central strategy employed by the public defender.  By investing two to three times as much of the overall defense budget in mitigation work, the RPDO team aims to develop a defense narrative capable of convincing a jury to reject the death penalty.  In so doing, they can often dissuade prosecutors from pursuing a capital death trial.

## Fewer Cases Ending in a Death Sentence

As a result of their strategic emphasis on resolving cases by plea, just one in 26 RPDO cases in the study sample ended in a sentence of death.  Among private assigned counsel, a much higher proportion of clients – one in five – received this worst possible outcome.  Not only is the public defender more likely to save the life of the defendant, but they also achieve better non-death sentencing outcomes.  While most public defender clients received life or a term of years sentence, two-thirds of people with private assigned counsel got a life sentence with no possibility of parole.

EXHIBIT 142 Page 012

## Lower Average Cost per Case

The public defender's plea-oriented defense strategy contains costs to counties. The defense strategy favored by private attorneys in the study sample resulted in six capital death trials at an average cost of more than $250,000 each. The public defender had only two such cases. Fully 73 percent of RPDO cases in the study sample were pled compared to just 21 percent of non-RPDO cases. As a result of this fundamental difference in approach, the estimated value of a capital defense provided by an RPDO attorney ($55,198 average) is 25 percent less than a similar case defended by private assigned counsel ($73,571 average).

Furthermore, whenever a capital death case ends in a plea, waiver of the right to appeal is ordinarily part of the agreement. Higher plea rates therefore help contain long-term appeals costs to counties and the state. To illustrate the magnitude of these expenses, every death penalty trial led by private assigned attorneys is exposed to potential appeals costs estimated to be between $1.2 and $2.3 million.[2]

## Value for Member Counties

Public defender membership represents a good value for counties, but efficiencies operate differently in large and small communities. Based on data from Administrative Judicial Regions Seven and Nine, the average annual cost of membership in counties with a population below 50,000 is $5,124 per year. A single capital case in these jurisdictions (at $73,571 on average) will offset fourteen years of RPDO membership payments while a capital death trial (at $280,734 on average) will offset 50 years of payments.

In jurisdictions with populations above 100,000, the average cost of membership ($78,684) is about equal to the defense costs incurred in an average capital case. However, because jurisdictions of this size have averaged nearly one capital case per year since the RPDO was established, membership in these larger counties is effectively a break-even calculation. Counties gain budget predictability with the added assurance that costs will be covered if there are multiple capital cases. A single capital death trial offsets nearly four years of membership payments in these larger jurisdictions.

## CONCLUSION

This study finds that the Texas Regional Public Defender for Capital Cases (RPDO) increases access, improves quality, and reduces costs of death penalty representation in small to mid-sized counties. The program makes attorney and non-attorney capital team

---

[2] Logan Carver, "Death Penalty Cases More Expensive than Lifetime Imprisonment, but Local DA Says Cost Never a Consideration," *Lubbock Avalanche-Journal*, (December 13, 2009); C. Hoppe, "Executions Cost Texas Millions," *The Dallas Morning* News, (March 8, 1992).

EXHIBIT 142 Page 013

members readily available in the most remote regions of the state.  In addition, specific strategies are employed by the office to raise the quality of counsel.  By starting to work as early in the case as possible, developing a strong relationship of trust with each client, and constructing a convincing argument for mitigation of death, public defenders create the conditions most likely to result in a plea agreement.  Cases ending in a plea are less costly to counties, both in terms of the initial disposition and subsequent appeals.  Pleas also save the life of the defendant.

These findings show the public defender model is a successful means to deliver affordable, high-quality, specialized capital defense expertise in non-metro areas of the state.  The model is worthy of consideration by eligible Texas counties as well as by other states contemplating replication.

x

EXHIBIT 142 Page 014

# Judgment and Justice

## An Evaluation of the Texas Regional Public Defender for Capital Cases

EXHIBIT 142 Page 015

EXHIBIT 142 Page 016

# CHAPTER 1

# INTRODUCTION

Since 2001, the Texas Indigent Defense Commission (TIDC) has been responsible for providing policy guidance to Texas counties for the improvement of indigent defense.   In FY 2012, the Commission awarded nearly $30 million to counties for indigent defense system improvements.  In that same year, over 40 percent of those funds went toward discretionary grants intended to promote innovation and help disseminate effective practices.

Public defender offices are one of many approaches to defense improvement being advanced by the Commission.  When TIDC was established in 2002, only seven of Texas' 254 counties utilized the public defender model.  Today, 19 public defender offices are in operation serving 140 counties.  Many of these new offices are regional in scope, and most target specialized caseloads, such as mentally ill defendants, juvenile defendants, appeals cases, and rural regions.

In FY 2008, Lubbock County submitted an application to TIDC's Discretionary Grant funding program to test a new variation of the public defender approach.  The application sought funding to establish the Regional Public Defender for Capital Cases (RPDO), serving counties with populations below 300,000 in Administrative Judicial Regions Seven and Nine.

After nearly six years of operation, the RPDO model has been expanded to serve similar counties statewide.  The purpose of this report is to describe the structure and operation of the office and evaluate its impacts on the quality, cost, and outcomes of capital cases.

## OBJECTIVES OF THE CAPITAL PUBLIC DEFENDER'S OFFICE

The capital public defender office was designed to address two concerns faced by small and mid-sized jurisdictions:  availability of qualified indigent defense counsel in death-penalty cases and cost.  Most of the counties comprising the west Texas Judicial Regions Seven and Nine are geographically remote, while capital-qualified attorneys typically practice in urban centers like Amarillo, Lubbock, or Midland-Odessa.  Only 13 private sector lawyers are currently qualified as first chair attorneys in an area spanning over

EXHIBIT 142 Page 017

80,000 square miles.[3]  Fact investigators and mitigation specialists, necessary members of a capital defense team, are equally sparse in isolated parts of the state.

Capital murder cases can create significant financial challenges in small jurisdictions.  With the costs of defense in death-penalty cases commonly exceeding $100,000, many of these low-population jurisdictions lack a sufficient tax base to easily pay for comprehensive defense services.

To address these concerns, in FY 2008, TIDC awarded Lubbock County a competitive grant to test a regional public defender office as a model program.  The original grant created an administrative office in Lubbock and satellite offices in Amarillo and Midland, Texas.  Seven objectives were specified.[4]

1) Provide expert qualified legal counsel for all defendants charged with capital murder except in the instance of conflicts.

2) Provide attorney contact with capital murder clients within 24 hours of appointment.

3) Provide litigation support services including mitigation specialists and investigators as quickly as possible after contact by counsel.

4) Maintain a caseload not to exceed five active cases per attorney.

5) Demonstrate quality representation as determined by judges and appellate counsel.

6) Reduce litigation costs for capital murder.

7) Establish a reasonable funding model that can be applied in other Judicial Regions.

## ORGANIZATION OF THE REPORT

This report presents the evidence regarding the regional public defender program's success improving outcomes for both counties and clients.  Research methods used are described in Chapter Two.  Chapter Three reviews the operational and financial structure of the office, and Chapter Four considers counties' perceptions of the program.  Chapters Five through Seven document the ways in which the public defender is helping jurisdictions, attorneys, and capital team members reach the quality standards established by the State Bar of Texas.   In Chapters Eight and Nine, RPDO case processing and cost

---

[3] Texas Indigent Defense Commission, http://www.txcourts.gov/tidc/.  Supplemental attorney lists were also provided to the research team by the offices of the Presiding Judges in Administrative Judicial Regions Seven and Nine.

[4] Source: Lubbock County, *Regional Public Defender for Capital Murder Cases Discretionary Grant Application.* Submitted to the Texas Indigent Defense Commission (2008).  Available on March 6, 2013 at http://tidc.tamu.edu/ public.net/Reports/DGPayments.aspx.

EXHIBIT 142 Page 018

outcomes are compared to those achieved by private practice attorneys.  Chapter Ten summarizes the main conclusions of importance to practitioners and policymakers.

EXHIBIT 142 Page 019

This page intentionally left blank.

EXHIBIT 142 Page 020

# CHAPTER 2

# RESEARCH METHODS

Evidence regarding the impacts of the Regional Public Defender for Capital Cases was taken from four data sources including:

- Interviews with key stakeholders,
- A statewide survey of elected district judges, county judges, and commissioners in counties below 300,000 population,
- A statewide survey of capital defense attorneys representing defendants in counties below 300,000 population,
- Analysis of case processing and cost data provided by counties for RPDO and non-RPDO death-penalty cases, and
- Descriptive information extracted from the RPDO's internal case management system.

These measures provided both qualitative and quantitative evidence of the implementation and impacts of the RPDO.  The research was conducted between March and December of 2012.

## STAKEHOLDER INTERVIEWS

An Oversight Board was appointed by the Lubbock County Commissioners' Court to provide guidance in administering the Regional Public Defender Office.  The board is made up of state, regional, and local stakeholders knowledgeable about the issue of capital defense.[5]  Members include regional presiding judges, district judges, capital defense attorneys, advocates, as well as ex-officio representation from the Executive Director of the Texas Indigent Defense Commission, the Lubbock County Auditor, and the Lubbock County Director of Court Administration.

Members of the RPDO Oversight Board were convened in Lubbock twice during the study.  In the first meeting, held on June 28, 2012, the group was asked to provide information for planning the evaluation.  In a guided discussion, participants discussed the challenges related to capital defense in rural communities, the ways in which the public defender office is expected to ameliorate those challenges, and successes and difficulties experienced during the first years of RPDO operation.  This input was used to refine the research objectives.

---

[5] A list of RPDO Oversight Board Members is provided in Appendix A.

EXHIBIT 142 Page 021

At a second meeting on November 8, 2012, preliminary study findings were shared with these same board members.  They responded to the early results and offered comments from the perspective of individuals most informed about the history and evolution of the office.  The insights of RPDO Oversight Board helped provide context for the study findings and conclusions.

Separately, interviews were conducted with selected RPDO staff.  These included the chief public defender and his administrative team as well as defense team members, including an attorney, an investigator, and a mitigation specialist.

## SURVEY OF CAPITAL DEFENSE STAKEHOLDERS

During August and September of 2012, internet surveys were conducted to assess the attitudes and experiences of key stakeholders in 240 counties eligible for RPDO membership because they have populations below 300,000.  Elected respondents included district judges, constitutional county judges, and commissioners.[6]  A parallel survey was administered to attorneys who practice capital defense in the same sized counties.

### Table 2.1.  Internet Survey Response Rate

| | Invited | RPDO Respondents | Non-RPDO Respondents | Response Rate |
|---|---|---|---|---|
| District Judges | 210 | 31 | 34 | 31% |
| Constitutional County Judges | 239 | 45 | 22 | 28% |
| County Commissioners | 574 | 21 | 18 | 7% |
| Defense Attorneys[7] | 322 | 9 | 35 | 16% |

### Elected Officials Surveyed

Among elected officials, response rates were highest for district judges (31 percent) and constitutional county judges (28 percent) with more than one in four of these office-holders completing a survey (Table 2.1).  County commissioners were the least likely to respond (7 percent).  Officials completing a survey have five to ten years of experience in office on average.  District judges have the longest average tenure (10.5 years, Figure 2.1).

---

[6] Because the Texas Court of Criminal Appeals has exclusive jurisdiction over direct appeals and applications for writ of habeas corpus in death-penalty cases (Tex.  Code Crim. Proc. Art. 4.04, Sec. 2), intermediate appellate court judges are not involved in death-penalty cases.  Of the 79 appellate judges invited to participate, only 11 attempted a response, and many questions were left blank.  For these reasons, their responses were not included in the analysis.

[7] Invited attorneys were asked to respond only if they represented capital cases in counties with populations less than 300,000.

EXHIBIT 142 Page 022

They also have about twice as much previous experience with capital cases (about 3.2 cases on average) compared to county judges and commissioners (Figure 2.2).



Response rates may also be considered in terms of the proportion of RPDO-eligible counties represented in the study (Table 2.2). Because many district judges and defense attorneys serve multiple jurisdictions, respondents were asked to identify all the counties they serve. District judges from 41 percent of eligible counties responded to the survey. County judges and commissioners from 37 percent of eligible counties responded, and defense attorneys represented cases in 60 percent of eligible counties.

### Table 2.2.  Counties Represented by Internet Survey Respondents

| | Number of Eligible Counties Represented | | Percent of Eligible Counties |
|---|---|---|---|
| | Member Counties | Non-Member Counties | |
| **District Judges** | 50 | 49 | 41% |
| **County Judges and Commissioners** | 55 | 33 | 37% |
| **Defense Attorneys** | 78 | 65 | 60% |

Survey questions for elected officials asked about their experience in office, concerns about arranging for the defense if a capital death case should occur, and how their county budgets for this purpose. Respondents were asked how much they know about the RPDO and their perceptions of the office in terms of both value and quality of representation. District judges were asked additional questions about their considerations and practices when making attorney assignments in capital cases.

EXHIBIT 142 Page 023

## Attorneys Surveyed

Lawyers qualified to accept court-appointed capital cases (n=345) were identified from lists provided by the Presiding Judges in each of Texas's nine Administrative Judicial Regions.  Attorneys were invited to complete a survey if they provide death-penalty indigent defense counsel in counties with populations below 300,000.  Response rates are difficult to compute because it is not known how many attorneys were ineligible based on these criteria.  A 13 percent response rate based on 44 completed surveys is therefore considered conservative.  Attorneys were asked about their qualifications, practice characteristics, capital defense strategy, non-attorney capital team members, and experiences representing death-eligible cases.

Most of the private practice attorneys responding to the survey were solo practitioners (80 percent).  Private practice attorneys carry an average of 54 active cases compared to RPDO attorneys' average of 4 active cases (see Figure 5.1).  While RPDO attorneys specialize exclusively in death-penalty cases, other capital-qualified attorneys balance a diverse practice including criminal, civil, and juvenile cases.



Responding private attorneys have practiced criminal law longer (23.4 years on average) than RPDO attorneys (19.7 years on average), but generally have less capital case experience than RPDO attorneys (Figure 2.3).  There are, however, exceptions.  Seven of the 35 private attorneys surveyed have served in the first chair position on 15 or more capital cases.  The single most experienced RPDO attorney has filled the first chair in just 10 cases.

It is noteworthy that RPDO attorneys have much greater experience in the second chair with virtually every attorney having served in that position on at least two occasions. By contrast, two in five private assigned attorneys surveyed have never served in the second

8

EXHIBIT 142 Page 024

chair, suggesting that a significant proportion have been lead counsel in a death case with no prior capital experience.

## MATCHED CASE ANALYSIS

To evaluate the effectiveness of capital defender counsel relative to traditional assigned counsel, a matched sample of RPDO and non-RPDO cases was constructed. Selection began with all 32 cases that had been closed in the RPDO database at the start of the study in February 2012.  These were cases that had either been disposed by public defenders or handed off after the death penalty was removed as an option.  Because the pool of cases to select from was small, a matched sample design allowed for the comparison of similar cases represented by RPDO and non-RPDO attorneys. For each of these cases, the Texas Defender Service (TDS) assisted the research team in finding a comparable case represented by a court-appointed private practice attorney.  Criteria for matching were county size and aggravating factors.  Two cases were excluded because a comparable match could not be found.



Figure 2.4 — County Population

Figure 2.5 — Year Charges Were Filed

The final sample of matched RPDO and non-RPDO cases was similar in terms of county size (Figure 2.4), the year capital charges were filed (Figure 2.5), aggravating factors (Figure 2.6), and defendant characteristics including sex and ethnicity (Figure 2.7).  There were two RPDO cases for which the closest available matches came from Dallas County.  As a result, two cases in the study are associated with a county greater than 2 million in population (Figure 2.4).  In addition, three non-RPDO cases were excluded from Figure 2.6 because they had multiple aggravating factors and could not be uniquely classified.[8]

---

[8] The combinations of aggravating factors not shown in Figure 2.6 included robbery and multiple murder; kidnapping, aggravated sexual assault, and burglary; and robbery and multiple murder.

9

EXHIBIT 142 Page 025



For each case in the sample represented by private attorneys, identical data elements were requested from counties to assess case processing, outcomes, and costs.  Sheriffs were asked to provide information about defendant demographics and charges at arrest. District clerks were asked for information about milestone events such as attorney appointment, indictment, death-penalty waivers, disposition, and sentencing.  Auditors were asked to provide cost information for attorneys, investigators, experts, and other litigation expenses including mitigation.  Cost data for public defender cases was extrapolated by assigning market rates for defense team expertise based on RPDO time records.  These data were then analyzed in order to quantify the relative efficacy of death-penalty cases with a RPDO versus a private assigned attorney.

## CONCLUSION

A blend of qualitative and quantitative research methods was used to evaluate the regional public defender office.  Different but complementary approaches included group and individual interviews, internet surveys, matched case comparison, and county records analysis.  Multiple methods offer converging evidence regarding the effect of attorney type on case processing and outcomes for indigent defendants and counties in capital death cases.

EXHIBIT 142 Page 026

# CHAPTER 3

# RPDO OPERATIONAL AND FINANCIAL STRUCTURE

## RPDO IMPLEMENTATION

The Regional Public Defender for Capital Cases was initially established to address the particular challenges of indigent death-penalty defense in the small- to mid-sized counties of the Seventh and Ninth Administrative Judicial Regions. Lubbock County administers the program, and other counties participate through inter-local agreements. As the model was refined and the program met with success, a series of expansions in 2011, 2012, and 2013 have now made RPDO services available to all 240 Texas counties with populations below 300,000 (Table 3.1).

> **RPDO Mission Statement**
>
> *The Regional Public Defender's Office shall represent those indigents charged with commission of capital offenses in the participating counties by providing high quality, cost-effective legal services in an ethical, professional, and competent manner. We shall seek to secure the legal protection of our clients, and enhance the quality of life in our community. In accomplishing our mission, we shall treat all people with dignity, respect, honesty and fairness.*

### Table 3.1.  RPDO Implementation by Regional Expansion Areas

| Expansion Area | Fiscal Year RPDO Became Available | Administrative Judicial Region | Number of Eligible Counties | Number of Member Counties as of FY 2012 | % of Eligible Counties Participating |
|---|---|---|---|---|---|
| 1 | 2008 | 7 | 40 | 36 | 90% |
|   |      | 9 | 45 | 44 | 98% |
| 2 | 2011 | 4 | 21 | 13 | 62% |
|   |      | 5 | 8 | 4 | 50% |
|   |      | 6 | 23 | 21 | 91% |
| 3 | 2012 | 2 | 31 | 16 | 52% |
|   |      | 3 | 24 | 13 | 54% |
| **TOTAL** |  |  | **192** | **147** | **77%** |
| 4 | 2013 | 1 | 32 | Enrollment in Process |  |
|   |      | 8 | 16 |  |  |

At the end of fiscal year 2012, the RPDO had a total membership of 147 counties representing 77 percent of those eligible to join.  Services are delivered through seven

11

EXHIBIT 142 Page 027

offices located in Lubbock, Wichita Falls, Amarillo, Midland, Burnet, Angleton, and Kingsville, Texas (Figure 3.1).  Participation differs by region.  In Judicial Regions Six, Seven, and Nine, approximately 90 percent of qualifying counties are members.  Participation is lowest in Regions 2, 3, and 5 where about 50 percent of counties have opted to join.  Recruitment is currently underway in Regions One and Eight where enrollment opened in October of 2012.

**Figure 3.1**



Between January 2008 and February 2013, the public defender represented 67 cases in 36 counties.  Seven out of every ten of these have been in Judicial Regions Seven and Nine, where the office has been open for the longest period of time.  Although the large majority of member counties (90 percent) are small with populations below 50,000 (Figure 3.2), most RPDO cases (63 percent) come from jurisdictions with much larger populations averaging over 140,000 (Figure 3.3).

EXHIBIT 142 Page 028



## RPDO FUNDING STRUCTURE

The RPDO operating budget was determined based on the projected capital case volume of the 85 eligible counties in Judicial Regions Seven and Nine extrapolated from a ten-year history.  Table 3.2 illustrates how the RPDO was funded in these two regions over the first five years of the program.   Start-up costs during FY 2008 and FY 2009 were fully covered by TIDC grants, with increasing reliance on member payments in subsequent years.

### Table 3.2.  RPDO Costs for Judicial Regions 7 and 9 by Year

| Fiscal Year | # County Members | TIDC Expenditures | | Member Counties' Expenditures | Total Program Cost |
|---|---|---|---|---|---|
| | | Percent | Amount | | |
| 2008 | 85 | 100% | $567,329 | $0 | $567,329 |
| 2009 | 70 | 100% | $963,219 | $0 | $963,219 |
| 2010[9] | 70 | 80% | $772,692 | $193,173 | $965,865 |
| 2011[10] | 72 | 60% | $529,033 | $352,689 | $881,722 |
| 2012[11] | 80 | 0% | $0 | $585,340 | $585,340 |

---

[9] TIDC and Member County Expenditures in FY 2008 through FY 2010 were taken from TIDC records of total program costs and state expenditures each year.

[10] In FY 2011, the Statement of Grant Award shows 27% of the TIDC grant expenditures ($2,797,532*27%=$529,033) covered 60% of the costs in Regions Seven and Nine.  Total costs for the two regions were therefore estimated at $881,723 ($529,033/60%).

[11] In FY 2012, grant administrators determined member counties in Regions Seven and Nine covered 19% of total RPDO costs.  Member County Expenditures were therefore estimated at $585,340 ($3,080,737*19%).  There was no state contribution in this year.

EXHIBIT 142 Page 029

In this initial outlay, counties could join at any time, but those enrolling after 2008 were charged a cumulative initial premium covering prior years of eligibility.  In exchange for an annual fee, RPDO member jurisdictions gain budget predictability and an assurance that a highly qualified defense team will be immediately available in the event of a death-penalty case.

## Determination of County Premiums

The costs of membership are determined by a formula applied independently in each of the four multi-region expansion areas.  Factors considered in the calculation include the projected public defender budget for the area, county population size, historical frequency of capital cases, and the population and capital case history of other counties in the same expansion area.  The formula is as follows:

- Half of projected RPDO costs are allocated across all counties in the expansion area based on population.  For example, a county that contains ten percent of the area population would pay five percent of the annual cost of the RPDO according to the formula:

> **[50% of RPDO budget] x [County population/Expansion area population]**

- Half of projected RPDO costs are allocated across all counties in the expansion area based on capital case history.  For example, in a region that had 25 capital cases in the preceding decade, a county that prosecuted five of those cases (20 percent) would be expected to pay ten percent of the annual cost of the RPDO according to the formula:

> **[50% of RPDO budget] x [# capital cases in the county over 10 yrs./# capital cases in the expansion area over 10 yrs.]**

## Available Reserve Funding

The RPDO Oversight Board determined that a reserve fund should be available with a half-year's operating budget to protect member counties with active cases if the office should close unexpectedly.  With an operating budget of approximately $1 million in Regions Seven and Nine, a $500,000 reserve is maintained for that area.  The fund assures that member counties will be guaranteed to receive the services for which they have paid.

14

EXHIBIT 142 Page 030

## Budgeting in Expansion Areas

As the Regional Public Defender for Capital Cases has expanded incrementally over the past five years, one of the biggest challenges has been accurately anticipating the staff and budget needed to accommodate changing levels of county participation.  In the original 2008 outlay, counties in Judicial Regions Seven and Nine were allowed to join the RPDO at any time, but this practice made workloads and staffing needs unpredictable from year to year.



To increase stability in subsequent expansion regions, clear two-year enrollment intervals have been defined.  Costs are higher for counties that join in the second year of eligibility, and enrollment is closed for two years thereafter (Figure 3.4).  This structure creates incentives for counties to make a decisive commitment as early as possible.  The RPDO has the information needed to make staffing and budget decisions, and county officeholders have the option to reconsider their decision during the next open enrollment period.

## CONCLUSION

Since being established in 2008 to serve Judicial Regions Seven and Nine, the Regional Public Defender for Capital Cases is now available to all Texas counties with populations of 300,000 or below (Table 3.1).  There are currently seven capital public defender offices statewide with the administrative office located in Lubbock.  To date, the office has represented 67 individuals accused of a death-penalty offense.

EXHIBIT 142 Page 031

The first four years of funding in each expansion region have been offset by decreasing annual grant funding provided by the Texas Indigent Defense Commission.  The size and budget of each office is determined by the number of cases expected in member counties based on their past history.  Counties that have paid an annual membership fee can be assured that any capital cases in their jurisdiction will receive complete defense services because the RPDO maintains a half-year's operating budget in reserve.  Through these mechanisms, the regional public defender is able to provide full coverage of capital cases for member counties while also keeping operating costs and membership fees in proportion to regional demand for services.

16

EXHIBIT 142 *Page 032*

# CHAPTER 4

# FACTORS INFLUENCING RPDO MEMBERSHIP AND SATISFACTION

When the RPDO expands into a new judicial region, county officials weigh a number of factors in their decision whether to enter into an inter-local agreement for services.  Survey data from elected officials including district judges, county judges, and commissioners offers some insight into their considerations.  RPDO members were also asked to report on their satisfaction with the office on dimensions including effectiveness of representation, defense quality, and value.

## FACTORS ASSOCIATED WITH RPDO MEMBERSHIP

Perspectives of stakeholders in RPDO member and non-member counties were found to differ in several potentially meaningful ways.  These include their access to capital-qualified attorneys, ability to pay for a capital murder defense, and knowledge about the public defender office.

### Access to Capital-Qualified Attorneys

A key reason some counties choose to join the RPDO is to increase certainty they will be able to find a qualified two-attorney team if a capital murder should occur.  Respondents in RPDO counties are 17% more likely to believe that it is difficult to locate a capital defense attorney than respondents in non-RPDO counties (Figure 4.1).  This finding suggests that RPDO membership fills an important gap in access to death-penalty attorneys in many local indigent defense systems.



17

EXHIBIT 142 Page 033

## Ability to Pay for Capital Defense

Helping small counties contain the costs of defense in death-penalty cases has been a primary objective since the public defender office was initially established.  Figure 4.2 shows that cost considerations are important for the majority of all stakeholders surveyed (89 percent).  Nonetheless, some counties have opted not to join despite the protections membership offers against the financial disruption of a capital case.



## Familiarity with the RPDO

Seventy-five percent of all individuals surveyed were extremely or somewhat familiar with the RPDO.  Officials in counties that have joined the public defender office are more knowledgeable about the program and its operation (88 percent familiar) than people in counties that have not joined (61 percent familiar; Figure 4.3).  Even among non-members, the office is best known in Judicial Regions Seven and Nine where it has been available since 2008.  Non-members in more recent expansion areas are less familiar (Figure 4.4).

Certainly, interactions with the public defender and his staff are more frequent in RPDO member counties, providing opportunities to learn about the workings of the office.  However, the public defender has worked to increase awareness in non-member jurisdictions as well.  During expansions into new judicial regions, town hall meetings are held where county judges, commissioners, district court judges, district and county attorneys, and other interested stakeholders can learn about costs and services, and can ask questions relevant to their unique needs and interests.  Some of the knowledge

EXHIBIT 142 Page 034



differential between member and non-member counties may therefore be explained by the degree to which elected officials have taken advantage of these opportunities to understand the program better.

## Other Membership Considerations Cited by Counties

In an open-ended item, elected survey participants in non-member counties were asked to explain why they had chosen not to join. Though it is not known how widely these opinions are held, the following general reasons were mentioned by at least some respondents:

- My county has enough money to cover the cost of a capital defense.

- My county does not have enough money to pay the RPDO membership fee.

- Death-penalty cases are rare.

- The prosecutor in my county is not likely to pursue the death-penalty.

- Local elected officials prefer to be responsible for arranging capital indigent defense.

- Some local elected officials oppose RPDO membership.

- My county has adequate access to local attorneys without the RPDO.

- Local attorneys are more qualified than RPDO attorneys.

- The public defender has just become available in my judicial region.

19

EXHIBIT 142 Page 035

## RPDO MEMBER SATISFACTION

The RPDO actively seeks feedback from members regarding their satisfaction with the services they have received.  Upon the conclusion of each case, the chief public defender frequently speaks with the presiding judge regarding the performance of the defense team.  Judges are provided information about the cost of the defense relative to the

> "It's not unusual for a judge – when a case is concluded – to either email or to call and just say, 'Your guys did a really good job and you've got a lot to be proud of.'  I've never heard any dissatisfaction from a trial judge that we've appeared before."
>
> *-Jack Stoffregen, Chief Public Defender*

same services provided by a private appointed attorney, and are given a sealed accounting of funds applied toward experts.  These data help local officials evaluate the efficacy of RPDO membership in terms of both cost and quality of counsel.

Only RPDO members were asked about their satisfaction with the office.  Results are reported separately for respondents depending on whether their jurisdiction has had at least one capital case represented by public defender attorneys.

### Satisfaction with Cost of RPDO Counsel

Among members, the overwhelming majority of all elected officials (83 percent overall) believe RPDO membership is a good value (Figure 4.5).  While member counties that have used public defender services feel most positively about the program's worth, stakeholders in counties that have not used the office also strongly believe that membership is a beneficial investment.



Figure 4.5

**Members:  RPDO Is a Good Value**

Figure 4.6

**Non-RPDO Counties with a Line Item for Capital Defense**

EXHIBIT 142 Page 036

The RPDO offers members budget stability by providing a means to cover the potentially high cost of a capital death case.  In contrast, only about 25 percent of non-member counties say their county reserves a line item in the budget for this purpose (Figure 4.6).  Assuming the amount set aside in these counties is enough for even a single capital trial, the majority of non-member jurisdictions remain vulnerable to the possibility of significant budget impact if a capital murder should occur.

## Satisfaction with Quality of RPDO Counsel

Perceptions of the RPDO's effectiveness increase after local officials observe public defenders in action (Figure 4.7).[12]  Perceptions of effectiveness (29 percent) were much lower among members who have no experience with an actual RPDO defense team than among those that have appointed public defender counsel in the past (63 percent).



When asked if the RPDO has improved the overall quality of capital defense, just one in five respondents from member counties agreed (Figure 4.8).  More experienced judges held more positive opinions about the office.  Thirty-three percent of those with capital death case experience felt the quality of defense was better with public defenders while just 22 percent of those with no capital death case experience held this view.  Importantly, a large proportion of judges with (44 percent) and without (82 percent) capital experience said they did not know enough about the office to express an opinion.

## CONCLUSION

Awareness of the RPDO is high overall, with 75 percent of all survey respondents knowledgeable about the public defender office and its services.  Membership levels are

---

[12] Most county judges and commissioners (83%) and district judges (100%) in member counties were extremely or somewhat familiar with the office.

EXHIBIT 142 Page 037

17 percent higher in communities where stakeholders express the greatest concerns about locating capital-qualified attorneys, suggesting the RPDO is viewed as a means to fill this important indigent defense system gap.

In counties that have joined the public defender, 83 percent say the office is a good value, reflecting one of the most positive aspects of participation.  Counties that have actually used public defender attorneys are much more likely to say the office provides effective representation (63 percent of members vs. 29 percent of non-members) and that the quality of capital defense has improved since the services became available (32 percent of members vs. 10 percent of non-members).  As counties gain direct experience with the RPDO team, approval ratings grow increasingly positive.

EXHIBIT 142 Page 038

# CHAPTER 5

# RPDO CONFORMANCE WITH
# JURISDICTION STANDARDS IN CAPITAL CASES

In 2006, the State Bar of Texas (SBOT) adopted "Guidelines and Standards for Texas Capital Counsel,"[13] promulgated by the association's Standing Committee on Legal Services to the Poor in Criminal Matters. The guidelines delineate criteria for high-quality representation in death-penalty cases. The first eight points of the guidelines specify protocols for jurisdictions. It is recommended that each county's approach for conforming with these procedures should be specified in a published Legal Representation Plan ready to implement as soon as an individual is taken into custody on death-eligible charges (Guideline 1.1 and 2.1).

Importantly, counties that join the RPDO are immediately in conformance with all of the jurisdiction-level quality control procedures advocated by the SBOT. The following paragraphs demonstrate the ways in which the capital public defender office addresses these standards.

## PROMPT ACCESS TO A QUALIFIED CAPITAL TEAM

Under Texas State Bar guidelines, each county's Legal Representation Plan should provide for a pool of capital defense professionals sufficient to guarantee people accused of capital crimes have prompt access to at least two qualified defense attorneys (Guideline 3.1). The Plan should further ensure these attorneys are supported by an investigator, a mitigation specialist, and an individual qualified to conduct mental health screenings, as well as other ancillary professional services reasonably required during the proceedings (Guideline 4.1).

Counties that contract with the RPDO have speedy access to the requisite expertise as part of their membership agreement. The public defender office has permanent staff in each of the core skill areas making it possible to provide an entire capital defense team on short notice. Experts, funded by counties through a blind trust,[14] are requested by the defense team as needed depending on the demands of each case.

---

[13] State Bar of Texas, "Guidelines and Standards for Texas Capital Counsel," *Texas Bar Journal* 69 (2006).

[14] Experts are funded by counties through a blind trust in order to protect the confidentiality of the defense strategy.

EXHIBIT 142 Page 039

## OVERSIGHT OF CAPITAL DEFENSE SERVICES

In addition to delivering prompt access to counsel, SBOT guidelines state that jurisdictions should also have provisions to ensure the quality of defense services provided is adequate. Specific elements of quality include a reasonable workload for attorneys representing clients facing death-eligible charges (Guideline 5.1), removal of attorneys who have failed to provide high-quality representation (Guideline 6.1), and adequate training in the defense of capital cases for all members of the defense team (Guideline 7.1).  Again, counties that contract with the RPDO meet each of these standards.

### Reasonable Workloads

Because RPDO attorneys specialize exclusively in capital defense services, they carry much smaller and more specialized caseloads than lawyers in private practice.  Office policy limits the maximum number of concurrent death-penalty clients to five, but the actual average caseload is just four cases per attorney (Figure 5.1).



Lawyers in private practice not only represent a larger total number of active cases, but they are also required to divide their attention among different case types, including criminal misdemeanors and felonies as well as civil and juvenile cases. Each month the average profile of new cases accepted by private attorneys surveyed includes:

- 7.6 misdemeanors (median=5)
- 9.9 felonies (median=7)
- 1.9 civil cases (median=0)
- 0.2 juvenile cases (median=0)

> "I look at my job sometimes… as quality control.  We talk a lot about being efficient, being ethical, and being effective.  We want to make sure we stay on point with those three goals."
>
> *- Jack Stoffregen, Chief Public Defender*

24

EXHIBIT 142 Page 040

Few Texas counties currently monitor total case volume among private attorneys accepting capital appointments.  Therefore, the caseload standards in place for public defenders offer important assurances to jurisdictions.  Given the weighty matter of life and death at stake in capital murder cases, the RPDO model provides counties a means to verify that court-appointed attorneys can provide their full attention to the client with minimal interference from competing caseloads.

## Monitoring to Ensure High Quality Representation

Attorneys of the capital public defender office are seasoned professionals with nearly 20 years of experience on average.  While these expert staff are primarily guided by the standards of their profession, the Chief Public Defender and his administrative team provide additional oversight and quality control that sets the tone for a high level of practice.

In the RPDO office, public defenders receive performance feedback both formally and informally.  Once each year, RPDO staff are evaluated against a uniform set of criteria including client service, teamwork, communication, initiative, flexibility, and leadership. Supervisors monitor and support the day-to-day operation of the office.  All case-related memos and pleadings are reviewed by administrators.  Attorneys, investigators and mitigation specialists throughout the multi-office network routinely problem-solve together via email.  The Chief and Assistant Chief Public Defender are copied in these exchanges and frequently offer guidance based on their own extensive experience.  Though rare, when performance issues arise, administrators are positioned to respond.

Some private practice lawyers and other defense team members may receive a similar level of performance-related support.  However, many do not.  Even the best capital attorneys in solo practice work in relative isolation without these types of professional safeguards.  Counties using the public defender, on the other hand, can be certain mechanisms are in place to monitor and enhance the quality of work among defense team members, including provisions for the removal of those that fail to meet the highest professional standards.

> "They're recognized around the state as the 'go to' people.  Not just lawyers -- our investigators and mitigation specialists have presented at seminars for attorneys."
>
> *- Jack Stoffregen, Chief Public Defender*

EXHIBIT 142 Page 041



### Training in the Defense of Capital Cases

RPDO attorneys also have access to extensive external professional development opportunities associated with their specialized practice.  All Texas attorneys are required to receive at least 15 hours of continuing legal education (CLE) each year.  Capital-qualified attorneys surveyed get more than twice the annual minimum required.  However, public defenders receive an average of 30 percent more CLE hours than even their peers in private practice (Figure 5.2).

In addition, while 44 percent of private appointed attorneys' CLEs are on topics relevant to death-penalty cases, almost all of RPDO lawyers' training (81 percent) applies directly to capital defense (Figure 5.3).  As specialists in capital defense, public defender attorneys, mitigation specialists, and investigators are also highly sought after as presenters at the state and national levels.



Public defenders also appear to be better networked within the capital defense community.  More RPDO (67 percent) than non-RPDO attorneys (52 percent) say it is extremely easy to get help with questions related to capital defense (Figure 5.4).  When

EXHIBIT 142 Page 042

asked who they turn to for assistance, sources mentioned included (from most to least frequently named):

- Texas Criminal Defense Lawyer Association Resource Attorney
- Texas Defender Service
- Other experienced capital litigators
- Regional Public Defender for Capital Cases
- Online capital defense list serve
- Federal Resource Counsel
- Texas Office of Capital Writs

## ADEQUATE FUNDING OF CAPITAL DEFENSE SERVICES

According to the State Bar of Texas, each jurisdiction's Legal Representation Plan should ensure funding is available for the full cost of high-quality defense services (Guideline 8.1). Compared to private assigned attorneys, the RPDO has considerably greater independence in determining how defense resources can be used to achieve this objective.

### Judicial Influence on Defense Funding

Judges surveyed say they exert controls over defense resources in capital cases.  Four of every ten district court judges sometimes limit the amount the court will pay for experts and mitigation specialists (Figure 5.5).  Most judges also say they are willing to delay the appointment of mitigators until after the state has announced it will pursue the death penalty (Figure 5.6).  This policy undermines the defense of a capital case, and is counter to the tenet that funding decisions should be determined by the best interest of the client rather than the interests of the jurisdiction.

> "There's still a culture in the rural counties to deny money for mitigation specialists… So that the public defender does not have to ask the judge is a great benefit."
>
> - RPDO Oversight Board Member

As an example, it is the philosophy of the RPDO that disproportionate investment in early mitigation is needed to develop a strong defense narrative capable of incentivizing the state to offer a plea deal.  Judges who have seen RPDO attorneys implement this practice generally agree that early involvement of mitigation specialists is beneficial to a defendant's case (Figure 5.6).  However, private assigned attorneys could be prohibited from implementing a similar approach where judges choose to constrain mitigation expenditures.

27

EXHIBIT 142 Page 043



**Figure 5.5**

District Judges: Sometimes Limit the Amount the Court Will Pay for Experts and Mitigators

**Figure 5.6**

District Judges: Agree No Reason to Hire a Mitigator until Death is Announced

While private attorneys are highly vulnerable to judicial reductions and delays in allocating defense team resources, RPDO attorneys retain direct control over how resources will be utilized. For example, RPDO defense team salaries are set by the Oversight Board to match the pay of comparable experts in the private sector. Independent and competitive rate setting appears to be a key factor in the public defender's ability to recruit highly qualified defense team staff. While RPDO attorneys are satisfied with their team members' pay, more than two-thirds of private attorneys surveyed say attracting the best support team members is a major problem because of low compensation by counties (Figure 5.7).



**Figure 5.7**

Not Enough Compensation to Retain Best Team Members Is a Major Problem

28

EXHIBIT 142 Page 044

Also, with mitigation, investigation, and attorney expenses covered in the RPDO budget, judges have neither the incentive nor the ability to influence public defenders' decisions regarding resource deployment in these areas. Although counties are still responsible for costs of expert witnesses and forensic analysis, public defenders are better able to implement a defense strategy that is in the best interest of the client with less influence by extraneous political or financial factors, resulting in a much more client-centered defense in RPDO cases.

## Salary Parity between Prosecutors and Defenders

The SBOT capital guidelines further stipulate that the salary scales for both the defense and the prosecution should be commensurate in order to ensure a fair defense. By design, RPDO attorneys meet this standard. In 2007 when the Regional Public Defender Office for Capital Cases was being developed, fair compensation for staff was a priority consideration. In setting rates, Lubbock County planners reviewed pay scales in Judicial Regions Seven and Nine for capital attorneys, investigators, and mitigation specialists as well as for assistant district attorneys and investigators for the state.



Figure 5.8

Average Salary for RPDO vs ADA Attorneys with 15+ Years of Experience

Due to this deliberate emphasis on fair compensation, for the cost of their membership, counties contracting with the RPDO meet SBOT standards for salary parity between defense professionals and the prosecution. Sample salary data available from the Texas District and County Attorneys Association[15] shows public defenders are paid about nine percent more than prosecutors in counties like those they serve. The RPDO compensation structure is slightly higher than that for assistant district attorneys (ADAs) in small- to mid-sized offices, but below that for ADAs in the state's largest offices (Figure 5.8). Though the ADA and public defender attorneys are similarly experienced, the moderate salary differential is in line with the highly specialized work of capital defense counsel.

---

[15] Texas District and County Attorneys Association, *The Texas Prosecutor: Justice in Action*.

EXHIBIT 142 Page 045

## CONCLUSION

In accordance with guidelines adopted by the State Bar of Texas, each county should have a Legal Representation Plan to ensure that individuals accused of a crime have ready access to a qualified capital defense team. The jurisdiction plan should make defense services available as soon as an individual is taken into custody on death-penalty charges. The accused should be provided with at least two qualified defense attorneys supported by an investigator, mitigation specialist, and other expertise as needed. All members of the capital team should be supervised to ensure a reasonable workload and removed if they fail to provide high-quality representation. Adequate training and development is also required so capital defense lawyers are able to meet the special demands of death-penalty cases.

Counties that choose to join the RPDO are in immediate compliance with all of these jurisdiction-level recommendations. The public defender office is ready to respond promptly with a full defense team in the event of an arrest or indictment on capital death charges. In addition, mechanisms are in place within the office to make sure attorneys are properly trained, monitored, and compensated. While some private assigned lawyers may be equal by these criteria, counties that are not RPDO members must develop independent means to verify court-appointed capital defense attorneys meet these important SBOT standards.

30

EXHIBIT 142 Page 046

# CHAPTER 6

# RPDO CONFORMANCE WITH
# ATTORNEY STANDARDS IN CAPITAL CASES

Guidelines Nine through Twelve of the State Bar of Texas' "Guidelines and Standards for Texas Capital Counsel" specify the particular responsibilities of defense attorneys. In keeping with these professional standards, public defenders are appointed more promptly than private assigned counsel, and they devote more time and attention to death-penalty clients as evidenced by their smaller caseloads, faster contact time, and frequency of interaction.

## APPOINTMENT OF CAPITAL COUNSEL

According to Article 26.052(e) of the Texas Code of Criminal Procedure, unless there is a written waiver of the death penalty, an individual must be assigned two defense attorneys as soon as practicable after capital charges are filed. The State Bar of Texas[16] likewise requires a capital team appointment as soon as a person is taken into custody on death-penalty charges. Using data from 60 matched RPDO and non-RPDO cases, time to appointment was examined separately for individuals assigned capital charges at arrest versus at indictment.

> **Article 26.052 (e)**
>
> **Texas Code of Criminal Procedure**
>
> "The presiding judge of the district court in which a capital felony case is filed shall appoint two attorneys, at least one of whom must be qualified under this chapter, to represent an indigent defendant as soon as practicable after charges are filed, unless the state gives notice in writing that the state will not seek the death penalty."

### Capital Charges at Arrest

In the study sample, 94 percent of RPDO clients arrested on capital charges were appointed a qualified attorney team prior to indictment (Figure 6.1). [17, 18]  In cases

---

[16] State Bar of Texas, supra note 13.

[17] Four cases, all represented by the public defender, were excluded from this analysis because the capital team appointment was delayed by unavoidable intervening factors.  In one case, the RPDO did not have services available in the region at the time the defendant was arrested, though the office was appointed promptly after they began taking cases. Two cases involved defendants who fled Texas and were indicted while they were out of state. In these cases, the RPDO was appointed the day after the defendants were returned to Texas custody. In one case the defendant was serving time in prison on another charge at the time of indictment and had to be transferred by the court back to the county jail. The public defender was appointed promptly upon his return to the county.

EXHIBIT 142 Page 047

represented by private assigned attorneys, by contrast, less than one-third of clients with a capital arrest charge (29 percent) were appointed a capital team before indictment. The same proportion (29 percent) received qualified counsel after indictment (151 days after arrest on average). An additional 41 percent were never assigned capital counsel. In these cases the state either waived the death penalty[19] or reduced the charges[20] -- a decision made an average 690 days after arrest.[21]



If public defenders learn of a capital arrest through the media or other sources, it is typical for staff to contact the judge directly and ask to begin immediate work on the defense. In addition, appointment at arrest rather than indictment is both easy and cost effective in RPDO-member counties. Judges can arrange for defense services through a single phone call to the public defender office, and costs to the county are the same if the defense is appointed sooner rather than later. In fact, the county stands to save money if faster action by the capital team can prompt an early plea agreement, avoiding the costs of trials and appeals.

---

[18] Four cases in the matched sample (i.e., two RPDO cases and their corresponding matched non-RPDO cases) were excluded from this analysis because they involved re-trials. Defendants in these cases were initially indicted and convicted on capital charges more than a decade earlier (i.e., 1988, 1989, 1991, and 1998), distorting the time from the initial filing of death-penalty charges until the appointment of the capital re-trial team.

[19] Written waivers of the death penalty were given in two cases and verbal waivers were given in three cases. It should be noted that under Texas law, if a person faces capital death charges and a two-attorney capital team has not been appointed, a prosecutors' waiver is required to be submitted in writing (Tex. Code Crim. Proc., Article 26.052(e)).

[20] In two cases, the defendants were arrested on a capital offense but charges were later reduced.

[21] This average does not include three cases with a verbal waiver of the death penalty because the date the waiver was given is unavailable. In addition, if a capital defense team has not been appointed, a verbal waiver of the death penalty is not recognized under Texas law (Tex. Code Crim. Proc., Article 26.052(e)).

32

EXHIBIT 142 Page 048

## Capital Charges at Indictment

In instances where defendants are not initially arrested on capital charges, appointment of death-qualified counsel always occurs after indictment.  In both RPDO and non-RPDO counties, defendants facing lesser charges at arrest have access to non-capital indigent defense counsel within about ten days on average (Figure 6.2).  The non-capital attorney remains on the case at least until indictment on death-penalty charges, typically about three months later (Figure 6.3).



After indictment, there are striking differences in the speed with which a two-attorney capital team is assigned depending on RPDO membership (Figure 6.4).[22]  In counties using the public defender, capital lawyers are on the case in less than one week post-indictment.  In counties relying on assigned private attorneys, by contrast, defendants wait nearly one full month, on average,[23]  before being assigned two qualified attorneys.

RPDO attorneys monitor cases due to appear before a grand jury so they are prepared to respond promptly in the event of a capital indictment.  While the RPDO can be proactive in advocating for client access to counsel, their peers in private practice cannot take action until notification of appointment by the court.  Yet assertive engagement of the defense appears to be an important factor in reducing the time to appointment of a death-penalty attorney team.

---

[22] In one extreme case, a single capital-qualified attorney was appointed for 206 days before a second attorney was assigned.  Although the prosecutor verbally waived the death penalty at indictment, a capital attorney team was eventually made available.

[23] Three non-RPDO cases were excluded from Figure 6.4 because the death penalty was waived prior to the appointment of a capital team.  Of these, two defendants received verbal waivers and one received a written waiver.  These individuals were represented for the duration of their case by the non-capital attorney assigned prior to indictment.

33

EXHIBIT 142 Page 049



PRIORITIZING DEATH-PENALTY CLIENTS

SBOT guidelines instruct lawyers to prioritize cases where death is a potential outcome (Guideline 9.3).  Attorneys are advised to seek assistance, reduce their caseload, or withdraw if needed to ensure these high-stakes cases get the attention they deserve.



Survey data show that most attorneys honor this professional obligation.  The RPDO limits the number of concurrent cases to a maximum of five per attorney.  Private assigned counsel carry much larger active caseloads (average=54 cases, see Figure 5.1), and most (67 percent) anticipate a reduction of at least 20 percent when representing a capital defendant (Figure 6.5).  Still, about one in four private practice attorneys (23 percent) say they expect little or no caseload reduction for capital cases.  Of these, some carry as many as 65 to 100 active cases (average=54 cases).

34

EXHIBIT 142 Page 050

Thus, while most attorneys understand that caseload adjustments and increased time commitments are needed to fulfill the special demands of death-penalty defense, some choose to ignore this professional imperative.  Because tools to monitor and enforce good judgment are not readily available to the courts, RPDO-membership is a means for counties to guarantee that capital defenders comply with SBOT recommendations for reasonable caseload standards.

> "I think you have to resist the temptation to go too fast…  That's not going to work in these cases because ultimately there's more at stake.  You are charged with a lot more duty in a death case than you are in any other case."
>
> - *Capital Public Defender*



**Figure 6.6**

**Average Hours Required for Entire Capital Team to Dispose a Plea**

RPDO attorneys also prioritize death-penalty clients by spending considerably more time on each case than their peers in private practice (Figure 6.6).  Private assigned counsel report 486 hours (61 staff days) for all members of the defense team to dispose an average capital plea.  Database records show public defender team members spend 43 percent more hours per plea on average (87 staff days).  Capital public defenders are able to invest more time in each case because of their exclusive specialization in death-penalty cases.

## ATTORNEY-CLIENT RELATIONSHIP

Attorneys have an obligation to make every appropriate effort to develop and sustain a relationship of trust with death-penalty clients (SBOT Guideline 10.2).  If clients see the attorney and other members of the defense team as helpful and supportive, they may be more willing to assist in important ways – by signing releases to access confidential records, for example.  Perhaps more importantly, clients who believe counsel is working on their behalf can participate more effectively in defense-related planning and decision-making.

35

EXHIBIT 142 Page 051

The State Bar of Texas advises that a respectful, client-centered orientation combined with frequent communication through the duration of the case help achieve this objective.

> "One of the first things you'll do… is find out if [clients] have any immediate needs that can be met. Are you too cold in your jail cell?  Is there someone you need to contact?  And we'll try to address some of those very immediate needs insofar as we can."
>
> *- RPDO Mitigation Specialist*

## First Contact

The first contact with clients is ordinarily face-to-face for both RPDO and private assigned capital attorneys.  Because they do not have to accommodate the demands of a private practice, RPDO lawyers can mobilize to travel long distances at a moment's notice. Public defenders surveyed say they arrive at the jail within 19 hours of notification – an average 11 hours sooner than their peers in private practice (Figure 6.7).  In addition, RPDO attorneys are able to serve the most remote jurisdictions, travelling 100 miles farther than private assigned counsel on average to reach their most distant clients (Figure 6.8).



| Figure 6.7 | Figure 6.8 |

**Figure 6.7** — Average Hours from Notification to First Meeting with Client: RPDO Attorney (n=9) 19 hours; Non-RPDO Attorney (n=30) 30 hours.

**Figure 6.8** — Farthest Average Distance Traveled to See a Capital Client: RPDO Attorney (n=9) 250 miles; Non-RPDO Attorney (n=29) 156 miles.

While private assigned counsel typically do not have the involvement and support of capital team members for many weeks after they start work on a case (see Figure 7.3), public defenders are usually accompanied by an investigator and/or mitigation specialist at the initial meeting.  During the first visit, the RPDO defense team begins the important work of establishing rapport with the client and making preparations with the county.  They

EXHIBIT 142 Page 052

assess the client's housing arrangements, review privacy protections in the area where attorney-client meetings will occur, and, if appropriate, collect signed releases from the defendant authorizing access to confidential records. They introduce themselves to the judge and the court coordinator if possible, and a "no contact" letter is issued to prosecutors and law enforcement instructing them not to speak with the client without the attorney being present.

> "I think that's the advantage of this office. We don't have to run back to the office and type up a divorce decree and handle six misdemeanors. You know, that's the kind of constraints people in private practice are under."
>
> - *Capital Public Defender*

## Continuing Interactive Dialogue

SBOT guidelines state defense counsel should meet regularly with clients over the course of the relationship, to keep them informed of case developments. Regular face-to-face communication helps promote trust and keeps the defendant engaged in their own defense. Client input can also be important for the defense team to fully understand and apply the findings of mitigators and fact investigators.[24] If clients are kept informed of the seriousness of the case against them, they can make a more objective and informed decision regarding whether to negotiate a plea.



Public defenders are in much more frequent contact with clients than their peers in private practice. At least one member of the RPDO defense team visits the defendant at least once every two weeks. Less than one-third of private assigned counsel is able to sustain

---

[24] Kathryn M. Kase, "The Plea Strategy: How to Persuade Your Capital Client that Resolving the Case with a Plea Is In His Best Interests," *Voice for the Defense Online* (June 2, 2012). Available as of March 7, 2013 at http://voiceforthedefenseonline.com/story/plea-strategy-how-persuade-your-capital-client-resolv-ing-case-plea-his-best-interests.

EXHIBIT 142 Page 053

this level of engagement (Figure 6.9).  Likewise, more RPDO attorneys (89 percent) than private practice attorneys (63 percent) arrange monthly meetings with their clients (Figure 6.10).

## Attorney-Client Participation in the Decision Whether to Plea

SBOT guidelines clearly state that lawyers are obliged to assertively seek resolutions other than death in capital cases (Guideline 10.9.1).  At the same time, death-penalty clients must ultimately make the decision whether to plead guilty (Guideline 11.4).  Counsel therefore bears responsibility for educating clients regarding potential defense strategies and outcomes.  In addition to explaining maximum penalties and possible pleas, the attorney must make clients aware of factors that could affect plea negotiations and the potential collateral consequences of different plea options (Guideline 11.3).[25]



**Figure 6.11**

Average Number of Death-Eligible Cases Capital Attorneys Say Were Disposed by Plea or Trial

Pleas generally result in better case outcomes.[26]   Still, when defense attorneys surveyed were asked how their death-eligible cases were being resolved, results showed very different decisions are being made by people with public defender and private assigned counsel.  While RPDO clients virtually always decide to plea, clients of private appointed attorneys are about equally likely to resolve the charges by either plea or trial (Figure 6.11).[27]  The data therefore suggests capital public defenders are either more aware of the potential risks associated with a trial, or they are more successful at conveying those risks to the accused.  Helping defendants objectively assess the evidence and the odds against them is an important aspect of defense quality.

---

[25] Kathryn M. Kase, supra note 24.  Over the past decade, 99 percent of capital cases tried before a jury in Texas resulted in a conviction, with a death sentence imposed more than 80 percent of the time.

[26] Id.

[27] See also Figure 8.4.

EXHIBIT 142 Page 054

## CONCLUSION

The State Bar of Texas provides guidance for attorney responsibilities in the delivery of capital defense services.  Data from the matched case sample finds measurable differences in the services delivered by public defender lawyers compared to private assigned counsel.

Public defenders are appointed earlier than private practice attorneys and are in contact with clients more quickly after being assigned.  Because RPDO attorneys specialize exclusively in capital cases and carry much smaller caseloads than private assigned counsel, they offer greater assurances that their clients will receive attention commensurate with the severity of the charges against them.

Public defenders also appear more successful in establishing trusting relationships with their clients.  A member of the RPDO capital team is in contact at least every two weeks, while less than one-third of private appointed defense teams meet with clients this regularly.  This close ongoing contact with clients pays off in higher plea rates as public defenders are able to educate defendants on the dangers of a trial.  In all, these indicators show that public defender attorneys offer a measurably higher level of client service than their peers in private practice.

EXHIBIT 142 Page 055

This page intentionally left blank

EXHIBIT 142 Page 056

# CHAPTER 7

## RPDO CONFORMANCE WITH NON-ATTORNEY
## DEFENSE TEAM STANDARDS IN CAPITAL CASES

The lead attorney in capital cases is responsible for assembling a team of professionals with the expertise required for robust litigation (Guideline 10.1).  Core members include second-chair counsel, an investigator, a mitigation specialist, and other expertise as needed (Guideline 3.1).  When assembled promptly, the defense team can begin to gather facts while evidence and witness recollections are still fresh.  Early access to case-related information can guide decisions about what experts will be needed and can allow the team time to identify and address potential weaknesses in their case.  Perhaps most important, timely information favorable to the defense can be shared with the prosecutor to encourage a waiver of the death penalty or a plea agreement.



## ASSEMBLY OF THE CAPITAL TEAM

With the necessary expertise available on staff, public defenders find it easier than private practice lawyers to locate capital defense team members (Figure 7.1). RPDO attorneys are consistently able to have the entire defense team assembled within two weeks of court appointment. Only about one-third of non-RPDO attorneys can meet this time frame (Figure 7.2).

> "Usually the same day we are appointed, we have one person, and sometimes two or three, who are able to go and see the client."
>
> *-Jack Stoffregen, Chief Public Defender*

41

EXHIBIT 142 Page 057



Team assembly takes longer in the private sector because qualified members must be identified in the community and retained.  Hours and compensation must be negotiated in each new case based on fee guidelines set by the court.  In addition, many professionals with the necessary expertise have a practice in law, investigation, or social work outside of their court-appointed work that can limit availability and time commitments.  Because RPDO team members are already employed and working together, they can ordinarily begin developing the defense within hours of the attorney appointment (Figure 7.3).

## Thorough and Independent Investigation

The defendant's life often depends on the quality of the work performed by fact investigators, mitigation specialists, and other experts.  Attorneys rely on these professionals to assemble independent research and evidence informing both the guilt and penalty phases (Guidelines 11.1 and 11.7).  RPDO attorneys are generally more satisfied with the quality of work performed by these essential defense team members than are appointed attorneys in private practice (Figure 7.4).

The RPDO compensation structure may be one reason they are able to attract more highly-qualified team members (see Figure 5.7).  While public defender support team salaries are set by the RPDO Oversight Board to match the pay of comparable experts in the private sector, private appointed counsel are often constrained by counties and courts on what they can pay (see Figures 5.5 and 5.6).  Availability can also be a challenge for private sector counsel as the best non-attorney defense team members often have competing obligations that prevent or limit participation in capital defense cases.  RPDO team members, on the other hand, are readily available on permanent staff.

EXHIBIT 142 Page 058



**Figure 7.4**

**Extremely Satisfied with Quality of Capital Team Members**

## RESPONSIBILITIES OF NON-ATTORNEY DEFENSE TEAM MEMBERS

Each non-attorney member of the capital defense team brings special expertise that is essential for the provision of competent capital defense. The following paragraphs briefly review their respective functions.

### Fact Investigators

The job of fact investigators is to learn as much as possible about the crime with which the accused is charged. The work commonly involves reviewing prosecutors' discovery, law enforcement reports, autopsy reports, and crime scene photos. In addition, investigators collect new information by re-interviewing witnesses, locating new sources, and documenting the crime scene. About 15 percent of the time spent on an average RPDO case is devoted to investigation (Figure 7.5).

> "In all our cases there is obviously a deceased person, but a lot of times understanding the 'why' or the 'how' may help shift the case just enough where we get a [plea] offer or it's beneficial to our defense."
>
> *- RPDO Investigator*

43

EXHIBIT 142 Page 059



Figure 7.5

**Allocation of Staff Time Per Disposed Case**

| 18% | 18% | 49% | 15% |

- First Chair Attorney
- Second Chair Attorney
- Mitigator
- Investigator

## Mitigation Specialists

Mitigation specialists are charged with developing a broad psychosocial history of the client based on education, medical, legal, and social documentary sources as well as witness interviews.  Over the past 30 years, a series of Supreme Court decisions have established that failure to include a mitigation specialist in a death-penalty case constitutes ineffective assistance of counsel.[28]  The mitigator's ability to construct a compelling and persuasive story about the client's life is often a determining influence in prosecutors' decision to forego trial.  For this reason, mitigation specialists in the public defender's office average nearly three times as much time per case as any other member of the defense team (Figure 7.5).

> "Once you come to know somebody it's much easier to be in a position where you can… grant those people mercy.  And that's how we can most often save their lives."
>
> *- RPDO Mitigation Specialist*

Still, national experts[29] and knowledgeable stakeholders interviewed say some Texas judges are willing to constrain funding for rigorous mitigation of the death penalty, a finding confirmed in the data (see Figures 5.5 and 5.6).  Public defenders invest up to three times more of the defense budget on mitigation than their peers in private practice (see Figure 9.1), likely contributing to the lower rates of trial and death sentences observed for RPDO clients (Figures 8.4 through 8.6).

---

[28] See Strickland v. Washington, 466 U.S. 668 (1984): Ake v. Oklahoma, 470 U.S. 68 (1985); Wiggins v. Smith, 539 U.S. 510 (2003): Rompilla v. Beard, 125 S. Ct. 2456 (2005).  See also, Terence M. Lenamon, "What is a Mitigation Specialist in a Death Penalty Case?"  Criminal Law Updates, June 3, 2010.  Available as of March 7, 2013 at: http://www.jdsupra.com/legalnews/what-is-a-mitigation-specialist-in-a-dea-66616/

[29] Personal communication with Director of the Capital Trial Project at the Texas Defender Service, John Niland.  (July 13, 2012).

EXHIBIT 142 Page 060

## Experts

The RPDO agreement with counties specifies that funds for experts will be made available through a blind trust.  The trust mechanism allows the court to monitor the expenditures being requested while also shielding the independence and confidentiality of the defense.  Attorneys can work independently of the court and the state to contract with professionals they believe most appropriate for the case.  Also, because facts and information are assembled so promptly, public defenders can determine their needs for specialists quickly and precisely.  Even though their spending is less constrained by the courts, RPDO attorneys use a smaller proportion of the overall defense budget on experts than other attorneys (see Figure 9.2).

Experts may support the defense in a number of ways.  They may be required to address a physical problem or mental health issue in need of treatment for a client to participate effectively in their own defense.  Experts are also frequently called to challenge the state's facts.  For this reason, typically, the defense will at least seek to match specialists brought in by the prosecution.  Finally, experts play an important role in matters of mitigation by administering evaluative tests or assessing the potential effects of various events in the defendant's life on their history and behavior.

## Non-Traditional Defense Experts

It is noteworthy that the RPDO regularly takes advantage of non-traditional sources of assistance.  Several RPDO cases have benefited from both paid and unpaid contributors, often affiliated with Texas Tech University, who have made themselves available at little or no cost to the program.

- A Ph.D.-level non-fiction writer has worked with investigators and mitigation specialists to document defendants' stories in a compelling way using both written and video formats.
- A volunteer from the Texas Tech Theater Department has helped public defenders apply concepts from communications research to the process of jury selection – by showing ways to identify jurors who are not being truthful, for example.  By videotaping attorneys selecting juries, the Department has provided useful training and feedback to RPDO attorneys.
- A Ph.D. student in management has conducted team-building exercises in the RPDO offices.

These examples illustrate the ability of the public defender to leverage expertise in creative and non-traditional ways.

45

EXHIBIT 142 Page 061

## DEFENSE TEAM COORDINATION

The institutional structure of the public defender office supports daily communication and collaboration between defense team members.  Within each office, sustained professional relationships between attorneys, investigators, and mitigators help establish routine work protocols and performance standards.  Peers across the seven RPDO office sites frequently rely on each other for expertise in specialty issue areas.  RPDO staff in different offices also support each other logistically.  For instance, it is not uncommon for a mitigator to ask a colleague in a different office to interview a collateral witness located nearby.

Private practice attorneys face greater challenges coordinating work and information.  Eighty percent of private assigned counsel are in solo practice.  For these lawyers, capital team members work independently, integrating their disparate findings only intermittently.  While this approach is not necessarily ineffective, it may reduce opportunity for team members to combine and leverage information and expertise to the maximum benefit of the defendant.



**Figure 7.6**

**Able to Share Records Electronically among Capital Team Members**

Information sharing and case coordination are supported by technology within the public defender office (Figure 7.6).  RPDO team members have simultaneous access to all case-related files through a shared electronic record system.  Only about half of private appointed attorneys (56 percent) have a common knowledge bank with their mitigators and investigators.

EXHIBIT 142 Page 062

Despite very different collaborative frameworks, private assigned attorneys and RPDO attorneys feel they are equally able to oversee the work of the defense team.  Virtually every attorney surveyed is extremely satisfied with their ability to supervise the work of investigators and mitigators.  It is worth noting, however, that private attorneys relying on independent contractors may have less information about how the work is proceeding.  Public defenders are generally less vulnerable to problems with poor work practices or outright abuses among capital team members that might degrade the quality of the defense.

> "We took over a case that a private team had, and… we saw that the mitigation specialist that was privately retained had indicated she had traveled… to interview the client's mom.  But we couldn't find any record….
>
> She had billed the court for that interview – rental car, air fare, time – and she had never gone.  Now, we would have terminated her immediately when we saw she hadn't made that trip. That's because we monitor our teams' work."
>
> *-Jack Stoffregen, Chief Public Defender*

## CONCLUSION

Because they have investigators and mitigation specialists available on staff, public defenders are able to assemble a capital team more quickly than private practice attorneys.  RPDO attorneys are also more satisfied with the work performed by their defense team members.  Better compensation rates help the office attract and retain the most highly qualified professional auxiliary staff.

Members of the public defender defense team enjoy a collaborative climate that benefits the defense.  Attorney and non-attorney defense team members are co-located, they share access to case files through a common electronic record system, and they are able to draw upon the expertise and experiences of their colleagues in any of the RPDO offices statewide.  These findings show that the public defender's team members are more professionally supported than private practice investigators or mitigation specialists, exerting a positive effect on both the timeliness and quality of the defense.

EXHIBIT 142 Page 063

This page intentionally left blank

48

EXHIBIT 142 Page 064

# CHAPTER 8

# CASE PROCESSING OUTCOMES
# IN RPDO AND NON-RPDO CAPITAL CASES

This research sought to determine whether outcomes for capital defendants represented by public defenders are appreciably different from those for individuals with assigned private counsel.  Three different measures were considered.  These included the time required for counties to provide legal representation appropriate for the case status, means of disposition, and sentence received.  Results are based on a matched sample of 60 capital murder cases represented by either a public defender or a private assigned attorney.

## TIMELINESS OF APPROPRIATE ATTORNEY REPRESENTATION

As soon as a person is in custody on death-penalty charges, State Bar of Texas Guideline 1.1 states that they should be promptly assigned a team of two capital qualified attorneys.[30]  Once assigned, the two-attorney team should remain in place until death is no longer a possible outcome.  This can occur if either the charges are reduced or the prosecutor files notification that the death penalty will not be sought.

In the matched case dataset, there were instances when these conditions were not met.  Most commonly,

> **Time to Appropriate Attorney Status**
>
> The number of days from when death first becomes a possibility (at arrest or indictment) until one of the following is achieved:
>
> - Two capital-qualified attorneys
> - A non-capital attorney and a written waiver of the death penalty
> - A non-capital attorney and charges reduced to a non-capital offense

defendants facing death-eligible charges were assigned a single court-appointed attorney during an interval when the death penalty had not been waived in writing and charges were not reduced.  To quantify the average frequency of occurrence and amount of time spent in this state of legal non-compliance, a measure called "time to appropriate attorney status" was created.

---

[30] See Tex. Code Crim. Proc., Article 26.052(e).

EXHIBIT 142 Page 065

**Figure 8.1.  Average Time from Capital Charges to "Appropriate Attorney Status"**

### A.  Disposed RPDO Cases



### B.  Disposed Private Assigned Counsel Cases



50

EXHIBIT 142 Page 066

The means and time required to attain "appropriate attorney status" was assessed separately for individuals with RPDO and other counsel (Figure 8.1A and 8.1B). [31]   Clients with public defender counsel all achieved "appropriate attorney status" as soon as the public defender was appointed.  For the overwhelming majority of clients (82 percent), this occurred within two weeks of arrest or indictment.

People with private assigned attorneys, on the other hand, spent more time out of compliance.  Less than half (43 percent) achieved "appropriate attorney status" within two weeks of death-eligible charges.  The remainder had diverse experiences.

Failures to Appoint Appropriate Representation.  Five non-RPDO cases (18 percent) were deemed to have inappropriate attorney status.  Defendants were never assigned a capital team even though the charges remained death-eligible.  Prosecutors in these cases maintain that death was verbally waived before the court.  However, in the absence of a capital team, only written waivers satisfy the requirements of the law. [32]  In these instances, death was only formally removed as an option when the cases were finally disposed an average of nearly 16 months after the initial filing.

Reduced Charges.  In two cases (7 percent), prosecutors reduced charges to a non-capital offense an average 14 months after the initial capital charges.

Delayed Capital Appointment.  In six cases (21 percent), a single attorney was on the case an average four months after capital arrest or indictment before a two-attorney capital team was assigned.

Written Waiver of the Death-Penalty.  In three cases (11 percent), the prosecutor filed a written waiver of the death penalty an average 22 months after capital charges occurred.  In these cases a single attorney remained on the case for between 72 and 1,054 days before death was formally removed from consideration.

Among the cases that did reach "appropriate attorney status" prior to disposition, RPDO clients did so just 11 days after the filing of capital charges on average. Defendants with private assigned counsel, by contrast, waited an average 167 days, or more than five months, until they got legally compliant counsel (Figure 8.2). [33]

To the extent that capital cases fail to conform to the SBOT's prompt team appointment guidelines, it should be noted that it is not the fault of attorneys. Judges are responsible for the assignment of court-appointed counsel and prosecutors have the duty to complete written waivers if death will not be sought.  Delays in meeting successful attorney status are therefore solely attributable to these officials.

---

[31] Four retrials (two RPDO and two non-RPDO cases) were excluded from this analysis.

[32] See Tex. Code Crim. Proc., Article 26.052(e).

[33] Five cases that did not reach appropriate attorney status were excluded from this analysis.

EXHIBIT 142 Page 067



**Figure 8.2**

**Average Days from Capital Charges to "Appropriate Attorney Status"**

Why, then, are defendants in RPDO member counties so much more likely to receive timely capital representation?  First, public defender attorneys assertively monitor potential capital cases in member counties.  If there is an arrest or indictment on capital charges, the judge can expect to hear from the RPDO team shortly thereafter with a request to start work on the case.  Second, when a county has already paid for the RPDO service, there is no financial benefit in delaying a two-attorney court appointment.  Instead, judges have every incentive to provide a full capital defense team as early as possible, particularly if early case development can potentially increase the chance of avoiding a capital death trial.

## CASE DISPOSITION OUTCOMES

The RPDO capital defense team remains on a case until one of four outcomes is achieved:

- The prosecutor waives the death penalty,

- Charges are reduced to a non-capital offense,

- A non-death plea agreement is reached, or

- If no waiver or plea occurs, until the trial is concluded.

With few exceptions, once death is no longer a possible outcome, the RPDO exits and the case is taken over by a local attorney.  Nearly half of the public defender clients in the

52

EXHIBIT 142 Page 068

matched sample were handed off in this manner.[34]  Public defenders represented the remaining half of the RPDO clients until their cases were disposed.

With the exception of two RPDO cases,[35] all capital defendants in the research sample were determined to be guilty of the charges against them.  Still, there are notable differences in the defense strategy used by public defenders and other attorneys.  RPDO clients in the study sample were much more likely than other defendants to have their charges resolved by plea (Figure 8.3), and the public defender office had just a single capital death trial.[36]  By comparison, only 30 percent of study cases represented by private assigned attorney were resolved by plea while one in five was decided in a capital death trial.



Figure 8.3

Avoidance of capital trials is intentional because the RPDO holds avoiding the death penalty as its highest objective.  According to data from the Texas Defender Service, over the past decade 99 percent of capital cases tried before a jury in Texas resulted in a conviction, and death sentences were imposed in more than 80 percent of those cases.[37]  In the face of these odds favoring the state, a plea increases the chance a client will live.

Pleas have other advantages as well.  Costs of defense are substantially lower when a capital death trial can be avoided.  It is not clear whether greater attorney fees may incentivize some private appointed lawyers to recommend trial to their clients.  It is, however, known that savings resulting from trial avoidance by the public defender

---

[34] Four RPDO cases, all of which were handed off to local attorneys, and two non-RPDO cases were excluded from this analysis because they had not been disposed at the time of writing.

[35] The first, an RPDO client, was found not guilty by reason of insanity.  The second, handed off by the RPDO to a local court-appointed attorney, was found not guilty in a trial by jury.

[36] This case was a re-trial of the punishment phase.

[37] Kathryn M. Kase, supra note 24.

53

EXHIBIT 142 Page 069

translate directly into lower RPDO fees for member counties.  In addition, plea agreements ordinarily include a stipulation limiting appeals, eliminating the risk of more time-consuming and costly litigation after the case is initially resolved.

## SENTENCING OUTCOMES

The effect of the public defender's trial avoidance strategy is also reflected in the sentencing data.[38]  Every individual in the study sample tried on capital death charges received a death sentence.  However, because the RPDO works to minimize trial exposure, of the 26 disposed RPDO cases in the matched case sample, just one client received a death sentence (Figure 8.4).



Of the 28 cases in the matched sample disposed by non-RPDO attorneys, six were tried on death-penalty charges and all six ended in death (Figure 8.5).  This contrast offers a sobering measure of the difference in quality of counsel based upon attorney type.  By the ultimate standard – whether the client lives or dies – public defender outcomes far exceed the results achieved by their peers in private practice.

Public defender clients received more favorable non-death sentences, as well (Figure 8.6). In similar types of cases, two-thirds of defendants with private assigned counsel got life without parole, while less than half of RPDO clients faced this outcome.  Instead, public defender clients were more likely to receive life or a sentence for a term of years, holding

---

[38] It should be noted that public defenders working for the RPDO come to their position with extensive capital and non-capital trial experience.  The decision to resolve cases by plea is strategic and does not reflect on attorneys' ability to present a case before a jury.

EXHIBIT 142 Page 070

the possibility of release in the future.  In addition, the only cases not resulting in a guilty finding were represented by an RPDO defense team.[39]



### Figure 8.6

#### Non-Death Sentencing Outcomes

CONCLUSION

Outcomes are notably better for capital defendants represented by RPDO attorneys than for those with private assigned counsel by at least three metrics.  First, public defender clients are in conformance with legal requirements for appointed counsel within two weeks of capital charges (either at arrest or indictment).  Defendants with court-appointed attorneys typically do not meet these standards for more than five months on average.  In most instances this is because of the continued involvement of a single attorney and delay in the appointment of a two-attorney capital defense team.

Matched case data also shows people represented by RPDO attorneys are much more likely to have their charges resolved by plea – the strategy most likely to save the life of the defendant.  Among private assigned counsel, by contrast, one in five cases was resolved in a capital death trial, all ending in a sentence of death.  Public defender clients also got better non-death dispositions than people represented by private assigned attorneys.  These measures indicate RPDO attorneys deliver higher quality counsel than other court-appointed attorneys as reflected in better case processing and sentencing outcomes.

---

[39] The first defendant found not guilty by reason of insanity was represented by the RPDO.  The second defendant found not guilty by a jury was initially assigned to the RPDO then handed off to a private attorney following a waiver of the death penalty.

EXHIBIT 142 Page 071

This page intentionally left blank

56

EXHIBIT 142 Page 072

# CHAPTER 9

# COST OUTCOMES IN

# RPDO AND NON-RPDO CAPITAL CASES

A prime reason for creating the Regional Public Defender Office was to help small- to mid-sized counties insure themselves against the costs of defense in the event of a capital murder.  This chapter uses data from the matched case sample to illustrate the cost impacts of the different approaches used by RPDO attorneys compared to assigned private counsel.

## RELATIVE VALUE OF RPDO SERVICES

### Method for Assigning Value to Defense Services

In the analyses that follow, actual costs for cases represented by private assigned attorneys were taken from payment records provided by county auditors.  Because the public defender office is not compensated for individual cases, a different method of valuation was required for their services.  The hours expended by attorneys, mitigation specialists, and investigators on each case, available in RPDO office records, were assigned the estimated market rates illustrated in Table 9.1.[40]  The rates used were established through an informal survey of counties in Regions Seven and Nine conducted by program administrators during the planning phase of the program.[41]  In effect, the value assigned to RPDO services represents the amount counties would pay for like services if they were provided by private sector defense professionals appointed by the courts.

---

[40] Cost per hour for public defender services based on actual office expenditures was not available.  Even if it were available, however, this metric would not usefully convey the value of RPDO services to the counties served.  The method of market rate valuation, on the other hand, allows for a direct comparison of the value of services delivered by RPDO counsel relative to private assigned counsel.  This is more relevant basis of comparison for counties interested in contrasting the services and costs under the two different capital defender systems.  Moreover, the estimated market value of the RPDO provides a reasonable basis for assessing differences in resource deployment compared to private assigned counsel, as well as the impacts of those differences on overall costs.

[41] Additional information about the annual cost of RPDO operations is provided in Appendix B.

EXHIBIT 142 Page 073

**Table 9.1.  Rates Used to Estimate the Market Value
of RPDO Capital Defense Services**

| Position | Hourly Rate |
|----------|-------------|
| First Chair Attorney | $150 |
| Second Chair Attorney | $125 |
| Mitigation Specialist | $ 60 |
| Investigator | $ 50 |

Data documenting either actual costs (for non-RPDO cases) or estimated value (for RPDO cases) of litigation services, investigation, experts, and mitigation were collected for each case in the matched study sample.  A "cost per case" was then assigned by summing across these categories.  These actual (for non-RPDO cases) or estimated (for RPDO cases) "costs per case" were then averaged within like types of cases making it possible to compare the value of services provided by RPDO and non-RPDO attorneys in pleas, non-capital trials, capital death trials, capital death retrials, and death penalty waivers.

Some cases were excluded because costs could not be clearly assigned.[42]  The remaining 23 RPDO and 25 non-RPDO cases were classified based on the means by which they were resolved (Table 9.2).  In some cases resolved by pleas or by a non-capital trial, waivers of the death penalty preceded the final disposition.  Because the capital team has the option to step down from the case at that time, figures are reported separately for the periods before and after death was removed as an option.

## Impact of Resource Deployment on Costs

One of the most notable differences between public defenders and private assigned attorneys is the way in which defense resources are deployed.  As part of their plea-based approach, public defenders invest heavily in mitigation so they can develop a strong and convincing client narrative.  Because of this early work done by mitigation specialists and investigators, the need for experts can be precisely determined, containing costs in that area.

---

[42] Four RPDO and two non-RPDO cases were still pending at the time of the study.  Five defendants had "hybrid" counsel.  These involved two RPDO clients that had a private appointed attorney before the public defender was assigned and three non-RPDO cases that had a retained attorney before the private appointed counsel was assigned.  One RPDO plea agreement was excluded because the demands of the case and the expenditures were so extremely atypical that it is not representative of the costs of work ordinarily done by the office.  This case costing nearly a half-million dollars involved a trial team of eight staff interviewing over five hundred witnesses in four states to assemble a mitigation package strong enough to result in a plea.

EXHIBIT 142 Page 074

**Table 9.2.  Capital Defense Resource Allocation in the Matched Case Sample**

| | | PERCENT EXPENDED BY CATEGORY | | | |
|---|---|---|---|---|---|
| | Average Value | Attorneys | Investigation | Experts | Auxiliary/ Mitigation |
| **PLEA** | | | | | |
| **RPDO** | | | | | |
| Up to Waiver or Plea (n=16) | $45,628 | 49% | 7% | 3% | 41% |
| *After Waiver (n=3)* | *$10,813* | *72%* | *0%* | *23%* | *4%* |
| | | | | | |
| **Non-RPDO** | | | | | |
| Up to Waiver or Plea (n=5) | $31,503 | 71% | 13% | 3% | 12% |
| *After Waiver (n=3)* | *$3,427* | *91%* | *9%* | *0%* | *0%* |
| **NON-CAPITAL TRIAL** | | | | | |
| **RPDO** | | | | | |
| Up to Waiver or Trial (n=5) | $18,818 | 65% | 9% | 3% | 23% |
| *After Waiver (n=2)*[43] | *$11,415* | *82%* | *0%* | *18%* | *0%* |
| | | | | | |
| **Non-RPDO** | | | | | |
| Up to Waiver or Trial (n=7) | $16,667 | 60% | 14% | 12% | 13% |
| *After Waiver (n=6)* | *$35,580* | *71%* | *13%* | *9%* | *8%* |
| **CAPITAL DEATH TRIAL** | | | | | |
| **RPDO** (n=0) | --- | --- | --- | --- | --- |
| **Non-RPDO** (n=3)[44] | $280,734 | 59% | 6% | 19% | 16% |
| **RE-TRIAL (Capital Death Penalty Phase)** | | | | | |
| **RPDO** (n=2) | $237,059 | 68% | 6% | 3% | 23% |
| **Non-RPDO** (n=2) | $255,073 | 64% | 5% | 15% | 16% |
| **VERBAL WAIVER PRIOR TO CAPITAL TEAM APPOINTMENT** | | | | | |
| **RPDO** (n=0) | --- | --- | --- | --- | --- |
| **Non-RPDO** (n=8)[45] | $13,468 | 81% | 6% | 9% | 4% |

*Use of Mitigation Specialists*

In the study sample, private appointed lawyers representing plea cases expend an average 12 percent of the budget on mitigation.  Public defenders, in contrast, invest

---

[43] Costs after the waiver are unavailable for four RPDO cases (3 trials and 1 plea) because counties were still processing bills at the time of writing.

[44] Average costs for non-RPDO capital death trials exclude one case in which the client had a retained attorney before a capital indigent defense team was assigned.  Public costs in the amount of $79,800 are not reflective of the full cost of the defense, and private defense costs are unknown.

[45] Under Article 26.052(e) of the Texas Code of Criminal Procedure, a written waiver is required to legally preclude the appointment of a two-attorney capital defense team.  In order for these waivers to meet legal requirements they would need to be in writing.

59

EXHIBIT 142 Page 075

much more heavily, expending over three times as much in plea cases – or 41 percent of resources – constructing the client's story.  The pattern holds for non-capital trials and capital re-trials as well (Figure 9.1).  In terms of value based on assigned hourly rates, RPDO mitigation averages $14,705 more per case for pleas, $2,106 more per case for non-capital trials, and $12,829 per case for capital re-trials.



This greater investment in mitigation by the RPDO is part of an overall strategy to assertively pursue plea agreements in instances where acquittal is unlikely.  Historically death-penalty cases tried in Texas are virtually certain to end in a conviction and, most probably, a death sentence.[46]  Mitigation specialists are specifically responsible for uncovering information and developing a narrative about the client capable of convincing a jury that death is not an appropriate penalty.  The same evidence can often persuade a prosecutor that a plea agreement is in the best interest of the state.

> "We want to have credibility with the trial judge and we want the trial judge to know that the request we make for funds was made in good faith."
>
> -Jack Stoffregen, Chief Public Defender

### Use of Experts

In public defender cases, just three percent of the total defense budget is directed toward experts.  Other court-appointed lawyers use 12 percent of defense expenditures for experts in non-capital trials and 15 percent in capital re-trials (Figure 9.2).  Converted to actual costs, although the RPDO requests slightly more per case for experts in pleas ($416), the amounts requested by private assigned counsel are substantially larger in non-capital trials ($1,576 more per case) and in capital re-trials ($30,913 more per case).

---

[46] Kathryn M. Kase, supra note 24.

EXHIBIT 142 Page 076



Figure 9.2

The lower RPDO costs result from a general policy that experts are requested only after major investigation and records collection is complete.  This approach is feasible primarily because of the speed with which the RPDO investigators and mitigation specialists are able to start work (Figures 7.2 and 7.3).  If information about the forensics of the case and the client's past history is available in a timely manner, more accurate judgments can be made regarding the number and types of specialists that will be required.  A full prioritized budget request can be presented to the court in a single funding motion for deposit in a blind trust. [47]  Because the cost of experts is borne by local jurisdictions, the public defender's strategy for efficient use generates considerable cost savings for counties.

## Impact of Defense Tactics on Costs

Whether the defense approach favors pleas, non-capital trials, capital death trials, or waivers is another important factor influencing total costs of capital death cases.  Table 9.3 shows the weighted cost per case in the study sample for clients up to either waiver of death or case disposition.[48]  After factoring in the financial impact of various defense tactics (i.e., pleas, trials, or waivers), weighted costs per case for private assigned capital defense attorneys ($73,571/case) are about one-third more than those for public defender attorneys ($55,198/case) using market rates.

---

[47] The judge is privy to details about the experts being requested by the RPDO defense team.  However, because the approved funds are deposited in a blind trust account instead of being disbursed by the auditor, there is no risk that prosecutors will learn of the defense strategy through county payment records.

[48] Supra note 42.  Some cases that were omitted from cost calculations in Table 9.2 due to insufficient cost information are included in the case counts shown in Table 9.3.  These include five (two RPDO and three non-RPDO) cases involving "hybrid" forms of indigent defense counsel and one RPDO plea agreement involving extreme and atypical costs.

EXHIBIT 142 Page 077

**Table 9.3.  Weighted Average Cost of Defense**
**Up to Removal of Death by Waiver or Disposition in the Matched Case Sample**

| | RPDO | | | Non-RPDO | | |
|---|---|---|---|---|---|---|
| | Average Estimated Value | Number/ Percent of Cases | | Weighted Cost | Average Cost | Number/ Percent of Cases | | Weighted Cost |

| | Average Estimated Value | Number/Percent of Cases | | Weighted Cost | Average Cost | Number/Percent of Cases | | Weighted Cost |
|---|---|---|---|---|---|---|---|---|
| Plea | $45,628 | 19 | 73% | $866,927 | $31,503 | 6 | 21% | $189,017 |
| Non-Capital Trial | $18,818 | 5 | 19% | $94,092 | $16,667 | 7 | 25% | $116,672 |
| Capital Death Trial | $0 | 0 | 0% | $0 | $280,734 | 4 | 14% | $1,122,936 |
| Penalty Phase Re-Trial | $237,059 | 2 | 8% | $474,117 | $255,073 | 2 | 7% | $510,147 |
| Verbal Waiver Prior to Capital Team Appointment | $0 | 0 | 0% | $0 | $13,468 | 9 | 32% | $121,216 |
| TOTAL | | 26 | 100% | $1,439,114 | | 28 | 100% | $2,059,988 |
| WEIGHTED AVERAGE COST PER CASE | $55,198 | | | | $73,571 | | | |

62

EXHIBIT 142 Page 078

*Pleas*

Public defenders devote substantially more total resources than private practice attorneys pursuing defense tactics likely to result in a plea.  Table 9.3 shows that the overwhelming majority of RPDO cases in the matched sample (73 percent) end in a plea compared to just 21percent of those represented by private assigned counsel.  The public defender office expends about 45 percent more resources on each case ($45,628 per case on average) than other capital indigent defense lawyers ($31,503 per case on average) up to the time of a plea or waiver.  This greater investment of resources spent preparing each case as if for a jury trial increases the chance that a plea agreement can ultimately be reached.

*Capital Death Trials*

Private assigned attorneys are much more likely than RPDO counsel to expend resources required for a capital death trial.  Four such cases occurred in the matched sample, all lead by court-appointed private attorneys at an average cost of $280,734 each.  Every one of these trials ended in a death sentence, not only resulting in the worst possible outcome for the client, but also setting the stage for the additional costs of appeals for the counties involved.  Total death-penalty costs including appeals have been estimated to be between $1.2 and $2.3 million.[49]  If private assigned attorneys adopted the same trial-avoidance philosophy as the RPDO, these exorbitant costs may have been avoided.  RPDO member counties are assured that every measure will be taken to avoid both the costs and outcomes typically resulting from a capital death trial.

*Penalty Phase Re-trials*

Two RPDO and two non-RPDO cases in the matched study sample involved penalty phase re-trials.  Three of the four cases were resolved by jury trial ending in a death sentence.  In fact, this retrial was the single instance in the study sample in which public defender attorneys represented a capital death case before a jury.  A waiver was negotiated in just one of these cases, also represented by the RPDO.  Defense costs were similar in all four cases.

*Waivers Prior to Capital Team Appointment*

In the largest proportion of non-RPDO cases (32%), the death penalty was waived[50] immediately after the client was arrested or indicted on capital charges but prior to the appointment of a capital defense team.  A prosecutor's waiver is the lowest cost means of achieving a non-death solution ($13,468/case).  However, this tactic also denies the

---

[49] Logan Carver, "Death Penalty Cases More Expensive than Lifetime Imprisonment, but Local DA Says Cost Never a Consideration," *Lubbock Avalanche-Journal*, (December 13, 2009); C. Hoppe, "Executions Cost Texas Millions," *The Dallas Morning News*, (March 8, 1992).

[50] Supra note 45.

EXHIBIT 142 Page 079

defendant access to a capital-qualified attorneys, investigators, and mitigation specialists even though he or she is still facing serious charges.

In RPDO member counties, judges are educated by the public defender to appoint the office as soon as a capital charge is filed.  Joining the RPDO creates new incentives for jurisdictions to encourage rather than restrict capital team appointment.  Financial responsibility for the defense can be shifted to the office, enhancing the value of membership for counties.  At the same time, defendants benefit from the additional services that would not be available in the event of a waiver including two attorneys, investigators, and mitigation specialists.

## VALUE ADDED BY RPDO MEMBERSHIP

Another way to assess the value of RPDO membership is to weigh the amount a county pays for membership against the expenses that might potentially be incurred if they were not a member.  This is a difficult estimation because a county may pay into the RPDO service for a number of years without a capital case.  On the other hand, a single death-penalty crime can more than offsets accumulated membership expenses.  Even if no capital crimes occur, RPDO member counties gain the benefit of budget predictability.  For as little as $1,000/year in the smallest jurisdictions, commissioners can be assured that except in cases of conflict, the costs of providing a high-quality capital defense will be covered.

### Relative Risk for Member and Non-Member Counties

To put fees in perspective, Table 9.4 compares the average annual cost of RPDO membership for counties in Judicial Regions Seven and Nine[51] against the average cost of a single capital case[52] in a county that chose not to join the office.  A sizeable majority of RPDO member counties in these Regions (78 of 85 counties) have populations below 50,000.  In these small counties, at an average cost of $5,124/year to join, the expense of a single capital trial offset at least 14 years of RPDO membership.[53]  At an average actual cost of $280,743, a capital death trial would offset more than 50 years of RPDO fees.

---

[51] Discussion of the relative costs of RPDO membership is limited to Judicial Regions Seven and Nine for several reasons.  Since RPDO services have been available in those regions longer than any other part of the state, new membership has stabilized.  In addition, state grant funds have expired so that jurisdictions are now responsible for the full cost of membership.  As a result, cost projections based on this area are more stable than those from other expansion areas that are still grant-funded and where significant recruitment is still underway.

[52] Average cost per non-RPDO case is $73,571 (see Table 9.3).

[53] Seventy-three RPDO member counties in Judicial Regions Seven and Nine with populations below 50,000 experienced a total of 11 capital death cases in the five-year period from January 2008 through January 2013.  This translates to 0.03 cases per member county per year on average.

EXHIBIT 142 Page 080

An additional seven counties in the same area have populations greater than 100,000.  In these larger jurisdictions, the annual cost of RPDO membership is approximately equal to the expense associated with the defense of a single capital defendant.  However, these higher-population counties also have the largest volume of capital cases, averaging 0.91 cases per county per year.[54]  One county prosecuted 13 defendants on capital charges, or 2.6 per year, over a five-year interval.  Defense costs in all of these cases were covered in the cost of membership for just slightly more than the average expense of a single non-RPDO capital case.

Table 9.4.  Average Capital Case Costs in Regions 7 and 9

| County Size | RPDO Member Costs | Non-Member Costs |
|---|---|---|
| | Average Cost of Defense for All Capital Cases except Conflicts[55] *(up to waiver or disposition)*[56] | Weighted Average Cost of Defense in a Single Capital Case *(up to waiver or disposition)*[57] |
| <50,000 (n=78) | $5,124 | |
| >100,000-200,000 (n=7) | $78,684 | $73,571 |

The RPDO offers counties additional savings that are not directly apparent in these figures.  Because of the public defender's general trial-avoidance strategy, member counties can expect fewer death-penalty trials.  As a result, they should also expect lower subsequent expenditures associated with appeals after such cases are disposed.  Plea agreements favored by the RPDO typically require the client to forego these rights.  The data in this study suggests that counties using private assigned counsel face a one in five likelihood of incurring the expense of a capital death trial and subsequent appeals for each capital case defended (see Figures 8.4 and 8.5).

## Average Annual Benefit in Counties Using RPDO Services

A second analysis considers the costs of the RPDO relative to the actual value of services received.  Table 9.5 shows cost data from the 13 counties in Judicial Regions Seven and Nine that had used assigned public defender counsel as of February, 2012.  The six smallest counties were provided attorneys, investigators, and mitigation specialists valued at

---

[54] Seven RPDO member counties in Judicial Regions Seven and Nine with populations above 100,000 experienced a total of 32 capital death cases in the five-year period from January 2008 through January 2013. This translates to 0.91 cases per county per year on average.

[55] Conflict cases refer to an attorney's simultaneous representation of multiple defendants.  Because multiple representations can invite post-conviction claims of ineffective counsel, the public defender office does not accept more than one client involved in the same criminal matter.  Remaining defendants must be assigned other court-appointed counsel.

[56] These values reflect the average annual RPDO membership costs.

[57] This value is computed in Table 9.3.

EXHIBIT 142 Page 081

$46,448 per case at market rates.  With an average 0.25 cases per county per year over a four year analysis period,[58] the average value of the services received comes to $11,612 per year.  Relative to the average $5,617 annual membership fee, these counties saw a $5,995 average annual benefit due to RPDO membership.

**Table 9.5. Average Benefit of Membership for Counties
Using RPDO Services in Judicial Regions 7 and 9**

| County Size | Average Annual RPDO Membership Cost | Average Value of RPDO Services/ Case | Average # RPDO Cases/Year | Average Value of RPDO Services/Year | Average Annual Benefit of Membership over 4 Years |
|---|---|---|---|---|---|
| >50,000 (n=6) | $5,617 | $46,448 | 0.25 | $11,612 | $5,995 |
| 100,000-200,000 (n=7) | $78,684 | $74,567 | 1.00 | $74,567 | -$4,117 |

A slightly different result was found in the seven larger counties.  After paying an average annual membership cost of $78,684 per year, these counties received capital defense services valued at $74,567 per case.  With an average 1.00 case per county per year over a four year analysis period,[59] the average value of the services received was $74,567 per year on average.  Although membership fees to the counties exceed the cost of a single capital case by an average $4,117 per year, stakeholders are not only getting a nearly equal return on their investment, but they can also rest assured that costs of defense for any capital murders above that number will be covered by the office.  This assurance is a potentially significant value in larger population counties that generate the largest volume of capital murder cases.


## CONCLUSION

Study findings show that public defenders and private assigned attorneys deploy defense resources differently.  In a plea, RPDO lawyers devote a substantially larger proportion of total defense expenditures to mitigation (41% on average) than private appointed attorneys (12% on average).  This investment of expertise is part of a strategy to develop a narrative of the client's life story capable of persuading a jury against a death sentence.  At the same time, the RPDO uses experts more efficiently than other attorneys.  Because

---

[58] January 2008 through February 2012.   Cost data was unavailable for the full five year period used in Table 9.4.

[59] *Id.*

EXHIBIT 142 Page 082

the need for experts is not determined until after investigation and mitigation findings are available, the request to the court is both more accurate and more cost effective.

The study finds the weighted average cost of defense is about one-third higher in non-RPDO counties due to higher capital trial rates and lower plea rates among private assigned attorneys.  Those counties that joined the RPDO not only avoid capital death trials, but they are spared the subsequent costs of appeals which can potentially escalate into the millions of dollars.[60]

The costs of membership in Regions Seven and Nine were compared to the potential expense of a capital defense.  In smaller counties, a single capital case would pay for RPDO membership for at least 14 years on average.  In larger counties, although average annual membership costs are about the same as the cost of a capital case, the greater volume of cases in more populous areas makes the fee cost effective.

A separate analysis compared costs of membership to the value of actual benefits received in counties that have used RPDO services.  Where capital cases have been defended, smaller counties (population below 50,000) showed an average benefit of nearly $6,000 per year over four years.  Larger counties (population above 100,000) showed a loss of $4,117 per year at the observed average of one case per year. However, this incremental expense insures the jurisdiction against the full additional cost of defense for any capital murder cases greater than one.

---

[60] Logan Carter, supra note 49.

EXHIBIT 142 Page 083

This page intentionally left blank

EXHIBIT 142 Page 084

# CHAPTER 10

# SUMMARY OF FINDINGS

With approximately one capital-qualified attorney for every six thousand square miles, communities in Administrative Judicial Regions Seven and Nine face difficulties staffing a two-attorney team required by law for death-eligible criminal defendants.  At the same time, stakeholders in small- to mid-sized Texas counties are concerned about the potentially devastating budgetary consequences of a capital defense.

The Regional Public Defender for Capital Cases, established in 2008, has offered a means to address these challenges.  With the assistance of discretionary grant funding from the Texas Indigent Defense Commission, RPDO services are now available to counties with populations below 300,000 statewide.  An evaluation of the office four years since its inception finds the program is successfully meeting its objectives to increase access to qualified counsel in death-penalty cases, to improve the quality of representation, and to reduce costs to counties.

## ACCESS TO CAPITAL DEFENSE COUNSEL

**RPDO services are increasing availability of death-penalty attorneys in small- to mid-sized communities statewide.**

Before the RPDO was established in the Seventh and Ninth Judicial Regions, just 13 private practice attorneys provided death-penalty counsel for 85 counties covering 80,000 square miles.  Today three public defender offices guarantee a highly-qualified capital defense team will be available to member counties across the region.  In addition, through incremental expansions, four new offices opened between 2011 and 2013; making RPDO services available in all 240 Texas counties with populations below 300,000 (see Table 3.1).

**RPDO attorneys are providing reliable capital defense services in the most remote regions of the state.**

Counties expressing the greatest concerns about locating capital-qualified attorneys are the most likely to join the RPDO (see Figure 4.1).  Public defenders address apprehensions by guaranteeing a fully mobilized capital team will be promptly available in even the most remote regions of the state.  The data show RPDO attorneys meet with the accused earlier than private appointed counsel despite travelling 100 miles farther on average to serve their most distant clients (see Figures 6.7 and 6.8).  In these ways, the public defender is in fact increasing capital defense services in areas where access has been strictly limited.

69

EXHIBIT 142 Page 085

## QUALITY OF CAPITAL DEFENSE COUNSEL

In its volume, "Guidelines and Standards for Texas Capital Counsel,"[61] the State Bar of Texas published criteria for the provision of high-quality representation in death-penalty cases.  Protocols providing direction for jurisdictions, attorneys, and non-attorney capital team members, served as a framework during planning and development of the RPDO model.  Counties that contract with the public defender office can therefore be assured they are meeting recommended standards of quality at all levels.

### Jurisdiction Performance Standards

**Counties that join the RPDO meet all of the jurisdiction-level recommendations for a capital defense system recommended by the State Bar of Texas.**

The SBOT Guidelines assign jurisdictions responsibility for ensuring that court-appointed capital defense attorneys provide high-quality representation to their clients.  The RPDO is a valuable partner in this endeavor because, as part of their service, the office provides oversight and support for meeting recommended standards.  Not only does membership promise that counties will be able to provide defendants prompt access to a full capital defense team, but jurisdictions can be confident that those same attorneys are professionally supervised to support high-quality services.

For example, public defenders represent no more than five active capital death cases at any one time.  Private practice lawyers, on the other hand, carry an average of 54 active cases in criminal, civil, and juvenile law (see Figure 5.1).  Importantly, few counties have any objective means to monitor attorneys' workloads, so the public defender performs this function on their behalf.

The RPDO office infrastructure also contains mechanisms to ensure that lawyers are monitored, given performance feedback, and removed if they fail to provide adequate representation.  RPDO professional standards are high.  Public defender attorneys receive 30 percent more CLE hours each year on average than private practice lawyers, most of which is related specifically to the provision of defense in death-penalty cases (see Figures 5.2 and 5.3).

With these protections, RPDO member counties can be assured that they are providing high quality legal representation for indigent capital defendants.  In the absence of the public defender's oversight, however, other counties must institute independent means to verify that appointed attorneys in their jurisdiction meet SBOT quality and performance criteria.

---

[61] State Bar of Texas, supra note 13.

EXHIBIT 142 Page 086

**The public defender office promotes adequate and equitable funding of capital defense services.**

SBOT Guidelines specify that counties must ensure funding is available to support the full cost of high-quality capital defense services.  Counties that choose to join the RPDO show a positive effect of the public defender on both capital team expenditures and attorney pay equity.

First, public defenders are insulated from judicial influence in the use of defense resources. RPDO attorneys have the liberty to make independent judgments about the amount of mitigation or investigation needed in a particular case.  Private assigned counsel, on the other hand, may be subject to judicial restrictions in defense team resources.

About 40 percent of district judges surveyed say they sometimes limit the amount the court will pay for experts or mitigators (see Figure 5.5) and the majority of non-RPDO judges agree there is no reason to hire a mitigator until the prosecutor has announced he or she will pursue the death penalty (see Figure 5.6).  In fact, over 60 percent of private practice attorneys say compensation rates are too low for them to retain the best capital team members (see Figure 5.7).  Because costs of attorneys, investigators, and mitigators are covered in the public defender's service, judges in member counties have neither the means nor the incentive to control how these defense resources are deployed.

Second, the RPDO Oversight Board has taken steps to ensure that capital defense attorneys are compensated on a scale comparable to similarly experienced assistant district attorneys (see Figure 5.8).  Pay equity is an important aspect of fair defense as it helps ensure the defense and the state are equally matched.

## Attorney Performance Standards

**RPDO attorneys begin working on behalf of the client sooner than private assigned counsel.**

Defendants arrested on death-eligible charges in RPDO member counties can expect to have capital-qualified defenders working on their behalf well before charges are formally filed.  Only about one in three defendants (29%) in non-RPDO counties are as fortunate (see Figure 6.1).  Similarly, among people receiving capital charges at indictment, public defender clients are appointed five days thereafter on average.  Those with private assigned counsel wait nearly a month for capital-qualified representation (see Figure 6.4).

At least two factors explain why RPDO attorneys are appointed faster than other capital attorneys.  First, public defenders assertively contact member counties where a death-eligible crime has occurred.  Non-RPDO attorneys are unable to advocate in this manner

EXHIBIT 142 Page 087

because they are unaware that they will be appointed until they are contacted by the court.

Second, once a county has joined the public defender office, judges gain new incentives to appoint qualified counsel sooner.  With the costs of two capital attorneys and their non-attorney team members covered in the membership fee, delays in appointment no longer generate cost savings.  In fact, faster assignment of the capital team can potentially save the jurisdiction money if early involvement of the defense can help reduce the number of capital death trials.

**RPDO attorneys focus services to build a trusting relationship with clients.  The result is a stronger overall defense and fewer sentences of death.**

A trusting relationship between a death-penalty client and their attorney can be a significant asset in development of a strong defense.  Defendants who believe their lawyer is looking out for their best interests are more likely to help develop their own case.  To demonstrate they care, RPDO lawyers make face-to-face contact with a new client in just 19 hours – 11 hours sooner than their peers in private practice (see Figure 6.7).  Attorneys then arrange for help with as many of the person's physical, emotional, and mental health needs as possible.

Over the course of the relationship, a member of the public defender's team meets with the client at least every two weeks.  By comparison, only one in four non-RPDO attorney teams are in touch with clients that often (see Figure 6.9).

Once a relationship of trust is established, people are more willing to believe their attorney is considering their best interests.  This confidence is key when the accused is facing a decision to take a plea or pursue a capital death trial.[62]  Indeed, the close relationship they build with clients is one reason the public defender has such a high plea rate and a low death rate compared to their peers in private practice (see Figures 6.6, 8.4, 8.5, and 8.6).

## Non-Attorney Defense Team Performance Standards

**Public defenders' non-attorney defense team members begin assembling facts and information much more quickly than other court-appointed defense teams.**

The life of the client often depends on the quality of the work performed by non-attorney members of the defense team.  Investigators bring to light facts that challenge the state or are favorable to the defense.  Mitigation specialists compile information about the defendant's life history needed to develop a compelling and persuasive defense

---

[62] Kathryn M. Kase, supra note 24.

EXHIBIT 142 Page 088

narrative.  If they do their jobs well, these specialists can influence the state to negotiate a settlement rather than try the case before a jury – a near certain death sentence in Texas.[63]

Because the requisite experts are permanently available on staff, public defender attorneys say defense team specialists are both easier to find (see Figure 7.1) and they are able to start work more quickly – usually within two weeks of appointment (see Figures 7.2 and 7.3).  Only about one-third of non-RPDO attorneys have a team assembled within this time frame.

### Public defenders are more satisfied than private sector counsel with the quality of work performed by their non-attorney defense team members.

Public defender attorneys give higher marks than private practice lawyers for the quality of work performed by their non-attorney team members.  Private assigned attorneys face greater challenges attracting the most highly qualified non-attorney support staff for several reasons.  Judges sometimes delay appointment or limit compensation for these professionals (see Figures 5.5 and 5.6), making it more difficult to attract the best personnel.  Many of the most highly sought-after investigators and mitigation specialists also manage their own practice which may restrict availability for capital defense work.

Close ongoing working relationships may also improve RPDO attorneys' relationship with team members within the public defender office.  The large majority of private appointed lawyers are solo practitioners, meeting with investigators and mitigation specialists only intermittently.  Members of the RPDO staff, on the other hand, work together on a daily basis making it more feasible to develop routine protocols and leverage diverse expertise available in the office to benefit the defense.

## Case Outcomes

### RPDO cases achieve "appropriate attorney status" much more quickly than cases represented by private assigned counsel.

For an individual facing capital charges, "appropriate attorney status" can be attained with the appointment of a two-attorney capital team, a prosecutor's written waiver of the death penalty, or with the reduction of capital charges.  In the matched case data, 82 percent of RPDO cases achieved success with the appointment of a capital defense team within two weeks of capital charges at either arrest or indictment.  Just 43 percent of non-RPDO cases were deemed to be appropriate as quickly, and the average case required over five months to achieve that status.

---

[63] Id.

EXHIBIT 142 Page 089

Because public defender attorneys are often aware when a case might be assigned, they are able to encourage the court to make the appointment as soon as feasible.  With the costs of counsel already covered, judges have clear incentives to appoint the capital team promptly.  Judges in non-member counties have different incentives as delaying the assignment of second-chair counsel may be seen as a means to help contain the costs of representation in death-penalty cases.

**Public defender clients are much less likely to receive a death sentence, and are more likely to receive a sentence holding the possibility of future release, than defendants with private assigned counsel.**

The public defender is also much more likely to save the life of the client.  In the 60 matched cases studied, one in five private assigned counsel clients had their charges resolved in a capital death trial compared to just one in 26 RPDO cases (see Figures 8.4 and 8.5).  Every one of these capital death trials ended in a sentence of death.  Trial avoidance is therefore an intentional strategy favored by the RPDO because it offers the best chance of saving the defendant's life – the ultimate standard of defense quality.

Among the remaining cases, public defender clients also had better non-death dispositions.  While more than two-thirds of people with private assigned counsel received a sentence of life without possibility of parole, public defender clients were more likely to get a life sentence, a sentence for a term of years, or a not-guilty finding (see Figure 8.6).

## COST OF CAPITAL DEFENSE COUNSEL

**The RPDO defense approach favoring pleas is more cost effective and achieves better outcomes for clients than a trial-based defense strategy.**

Public defenders and private assigned attorneys differ in their approaches for resolving capital charges, and those differences hold important implications for the cost of defense.  Because attorneys target resources to seek pleas and avoid trials, the average value of an RPDO plea is about $15,000 higher than for private appointed counsel (see Table 9.2). The reason is strategic.  Virtually all of this cost increment is invested in mitigation with the intent of developing a defense narrative sufficiently compelling to incentivize the state to offer a plea deal.  By preparing as thoroughly as for a trial, the RPDO is able to resolve 73 percent of cases through a plea agreement.

Among private appointed attorneys, on the other hand, just 21 percent of non-RPDO cases are resolved in a plea.  The same proportion (21 percent) are also resolved in a capital death trial.  The average cost of defense in these instances exceeds $250,000 per

EXHIBIT 142 Page 090

case on average, not including the additional expense of appeals.[64]   Because of the RPDO's advocacy for pleas instead of capital death trials, the average value of capital defense is $18,000 lower per case for public defender attorneys ($55,198 per case) than for their peers in private practice ($73,571 per case). (See Table 9.3).

**RPDO member counties have a means and an incentive to provide defendants with a capital defense team very early in the process even when the state intends to waive the death penalty.**

The data suggests that, once a capital crime occurs, counties often seek to save money by avoiding the appointment of a capital defense team.  In non-RPDO counties, 41 percent of defendants arrested on capital charges never receive two capital-qualified attorneys (see Figure 6.1).  In fact, the least expensive way to resolve capital charges is with a prosecutor's waiver of the death penalty before a capital team is appointed ($13,469 per case).  The financial incentive is to avoid the cost of a second-chair attorney, investigators, and mitigation specialists, even though the defendant still faces charges that could result in a lifetime behind bars.

In RPDO member jurisdictions, by contrast, the incentive is for the state to delay a waiver of the death penalty and appoint the public defender office instead.  By keeping the death penalty option open, the cost of defense can be shifted to the public defender office.  Not only does this strategy enable counties to get a return on their membership investment, but the accused receive an attorney with specialized skills commensurate with the severity of the charges they face.  RPDO attorneys, mitigation specialists, and investigators can develop a stronger case than could be assembled by a single non-capital attorney, likely producing a plea agreement and saving the cost of a non-capital attorney appointment.  The public defender therefore induces members to take advantage of the service in ways that benefit both counties and defendants.

**The cost of RPDO membership is moderate compared to the expense of a capital defense, though efficiencies operate differently in small and large counties.**

Counties considering joining the public defender office typically assess the costs of membership against the expense of a capital case.  Data from RPDO counties in Judicial Regions Seven and Nine shows efficiencies are different in large and small jurisdictions.  For an average yearly fee of $5,124, a county with a population below 50,000 could pay premiums for 14 years for the projected cost of a single non-RPDO capital case ($73,571). A capital death trial ($280,734) would offset 50 years of RPDO fees (see Table 9.4).  The six small counties that actually had a capital case during the four-year study period received

---

[64] Logan Carter, supra note 49.

EXHIBIT 142 Page 091

RPDO services valued at $11,612 per year on average – a $5,995 annual benefit over the costs of membership (see Table 9.5).

In counties with populations above 100,000, the average annual cost of RPDO membership ($78,684) is similar to the average cost of a single non-RPDO capital case ($73,571). (See Table 9.4).  However, these jurisdictions also generate a larger number of death-penalty charges.  The average is one capital case per year, though one county prosecuted 13 such cases over a five-year interval.  The seven mid-sized counties in Judicial Regions Seven and Nine that have had capital cases received public defender services valued at $74,567 per year – just $4,117 less than their average annual membership costs (see Table 9.5).  Given the high probability that one or more capital crimes will occur each year, RPDO membership is a cost-effective strategy to allay the potential financial impacts of defense.

**Elected officials in member counties are satisfied with the value offered by the RPDO.**

When asked if membership is a good value, fully 83 percent of elected officials in RPDO member counties said they believe it is money well-spent (see Figure 4.5).  County judges and commissioners were slightly more positive than district judges about the financial benefits, presumably because responsibility for paying for a capital defense would fall upon them.  As intended, the public defender offers jurisdictions budget predictability and an assurance that even the costs of a capital death trial can be managed.

Satisfaction with the public defender service is higher in counties that have used the service.  The majority of elected officials (63 percent) in counties that have used RPDO attorneys believe the office delivers effective representation compared to 29 percent of non-users. Similarly, 32 percent of users say the office has improved the quality of capital defense.  Just ten percent of non-users share this view (see Figures 4.5, 4.7, and 4.8).

## CONCLUSION

Unique nationally, Texas's Regional Public Defender for Capital Cases is a groundbreaking model.  Evaluation results show the approach has successfully elevated the quality of legal representation in death-penalty cases while also helping to contain costs of defense in small- to mid-sized counties.

Jurisdictions that contract with the public defender automatically meet all of the State Bar of Texas criteria for the prompt provision of high-quality capital defense counsel.  Differences in the quality of defense are apparent in the data.  RPDO attorneys represent people in the most remote regions of the state.  They make contact more quickly and

EXHIBIT 142 Page 092

meet with the accused more often, promoting stronger and more trusting relationships needed to keep the client engaged in his or her own defense.

Because the RPDO operates independently from the judiciary, resources can be deployed in the manner deemed by counsel to be in the best interests of the client.  For the RPDO, this often means a significant investment in mitigation work to tell the client's story in a way that can encourage a plea agreement.  Public defender attorneys are more pleased with the quality of the work performed by non-attorney defense team members, in part because these essential support personnel are fairly compensated for their work and enjoy permanent staff status in a collaborative working environment.

Public defender attorneys produce substantially better outcomes for their clients than other court-appointed attorneys.  Most importantly, RPDO clients are much less likely to receive a death sentence.  The intentional strategy of seeking pleas and avoiding capital death trials saves both money and lives.  Member counties realize these savings through lower membership fees.  The overwhelming majority of elected stakeholders in member counties see the RPDO as a good value.

Taken together, these findings show the Texas public defender for capital cases is successfully achieving its objective of improving the quality of counsel and containing costs of defense for counties with populations below 300,000.  Data confirms that not only are clients more likely to avoid a sentence of death, but it is a cost-effective capital defense solution for the state and Texas counties.

EXHIBIT 142 Page 093

78

EXHIBIT 142 Page 094

# APPENDIX A

## OVERSIGHT ADVISORY BOARD

Kelly G. Moore - Presiding Judge 9th Administrative Judicial Region
Dean Rucker - Presiding Judge 7th Administrative Judicial Region

John Board – District Judge
William Bowden –Attorney at Law
Stephen Ellis - District Judge
David Gleason – District Judge
Selden Hale – Attorney at Law
Kathryn Kase – Texas Defender Service
Chuck Lanehart – Attorney at Law
Bill McCay - County Commissioner
Andrea Marsh – Fair Defense Project
Pat Phelan – District Judge
Susan Redford – County Judge
Chuck Statler, County Commissioner
Brad Underwood – District Judge
Arthur Ware – County Judge
Denn Whalen - District Judge
Ben Woodward - District Judge


Ex-Officio/Advisory Members


Jim Bethke – Task Force on Indigent Defense
Jackie Latham – Lubbock County Auditor
Dean Stanzione - Director of Court Administration

EXHIBIT 142 Page 095

80

EXHIBIT 142 Page 096

## APPENDIX B

## REGIONAL PUBLIC DEFENDER OFFICE FOR CAPITAL CASES

## ACTUAL EXPENDITURES

| Judicial Regions Served: | 7 & 9 | | | 4, 5, 6, 7 &9 | 2, 3, 4, 5, 6, & 9 |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2011** | **2012** |
| Personnel | $376,127.23 | $711,591.43 | $726,021.17 | $1,509,555.08 | $1,513,633.64 |
| Fringe Benefits | $89,669.01 | $171,347.93 | $177,548.71 | $353,676.62 | $367,849.91 |
| Travel and Training | $32,209.45 | $59,739.95 | $45,261.01 | $107,807.22 | $137,079.65 |
| Equipment | $31,814.00 | $0.00 | $0.00 | $98,302.90 | $41,838.66 |
| Supplies | $34,730.96 | $14,039.84 | $15,034.27 | $16,094.47 | $23,141.54 |
| Contract Services | $2,778.75 | $6,500.00 | $0.00 | $7,250.00 | $6,072.57 |
| Other (Please Specify) | $0.00 | $0.00 | $0.00 | $204,846.00 | $0.00 |
| | | | | | |
| Total Direct Costs | $567,329.40 | $963,219.15 | $965,865.16 | $2,297,532.29 | $2,089,615.97 |
| Indirect Costs | $0.00 | $0.00 | $0.00 | $0.00 | $405,781.00 |
| Total Costs | $567,329.40 | $963,219.15 | $965,865.16 | $2,297,532.29 | $2,495,396.97 |

EXHIBIT 142 Page 097