

# RPDO

## MAKING A DIFFERENCE

## IN TEXAS

DECEMBER 2016



"EXCESSIVE BAIL SHALL NOT BE REQUIRED, NOR
EXCESSIVE FINES IMPOSED, NOR CRUEL AND
UNUSUAL PUNISHMENTS INFLICTED."

8TH AMENDMENT, UNITED STATES CONSTITUTION

EXHIBIT 145 Page 001



# MAKING A DIFFERENCE IN TEXAS: NAPD REPORT ON THE REGIONAL PUBLIC DEFENDER OFFICE

1

EXHIBIT 145 Page 002

# TABLE OF CONTENTS

**3**   **Executive Summary**

**5**   **NAPD and the Systems Builders Committee**

**5**   **Consultants**

**6**   **Methodology**

**6**   **History**

**9**   **Operations**

**9**   Structure

**9**   Culture

**10**   Policies and Procedures

**11**   Budget

**11**   **Management**

**11**   Leadership

**12**   Supervision

**12**   Communications

**13**   Relations with the capital community

**13**   **Staffing, Training, and Recruitment**

**13**   Staffing

**13**   Caseloads

**15**   Excellence in representation

**15**   Training

**16**   **Long-term plan**

**17**   **What's Working**

**20**   **Things to Improve**

**24**   **Recommendations**

**30**   **Materials**

EXHIBIT 145 Page 003

## Executive Summary

This report is the result of a request by the Texas Indigent Defense Commission (TIDC) as well as the Regional Public Defender Office for Capital Cases (RPDO).  The National Association for Public Defense (NAPD) through its Systems Builders Committee took the request and authorized Ernie Lewis, Executive Director of NAPD, and Doug Wilson, Colorado State Public Defender, to conduct the assessment and write the report following a site visit and review of numerous materials.

The primary finding of the assessment is that the RPDO is making a huge difference in the delivery of capital defense representation in rural Texas.   The office has closed 112 cases in its first eight years of existence, only six of which resulted in a death sentence.  RPDO presently is representing 26 persons charged with a capital crime.  The office culture is developing, and new leadership has recently been appointed.  178 of Texas' 254 counties have opted-in to RPDO.  It is clear to the authors that, like Dr. Dottie Carmichael found in 2013, RPDO has improved the representation provided by capital defendants, that the public defender model is working in rural Texas, and that RPDO is making a difference in Texas.

RPDO and TIDC are not content to rest on the present progress.  Both entities are seeking to improve, and this assessment and report are in response to their intent to improve.  There are twenty-one steps that RPDO and TIDC can take to continue the impressive and rapid progress made.  These recommendations are as follows:

1. **The RPDO should move the Terrell Office to Dallas, the Burnet Office to Austin, and the Clute Office to Houston.**
2. **RPDO should create additional positions for Regional Managers**.
3. **RPDO should send their Regional Managers to significant leadership, management, and supervisory training**.
4. **RPDO should hire a Director of Training.  This person should work with public defenders in Texas to become the primary trainer of persons handling capital cases. The new trainer should work closely with other providers of public defense training to improve training overall in Texas.**
5. **RPDO, TIDC, and other stakeholders need to come together to create a common vision for RPDO.**
6. **A leadership team consisting of the Chief Public Defender, the Deputy, the Director of Training, and the Regional Managers should meet to plan strategically, implement the plan, and advise the Chief Public Defender in leading the organization.**
7. **The newly reconstituted advisory board must strive to meet national standards with the purpose being to provide oversight, support, and independence to RPDO.**
8. **RPDO should reevaluate its salary structure.**
9. **RPDO should reclassify the positions of chief mitigation specialist and chief investigator since there is no supervisory responsibility in those positions.**
10. **RPDO should continue to develop its personnel evaluation system.**
11. **A series of case reviews should take place for all capital cases.**
12. **RPDO should engage in debriefing of all cases, including those that went to trial and those that were resolved with a disposition of less-than-death**
13. **RPDO needs to deal with several outstanding human resource issues.**

EXHIBIT 145 Page 004

14. **Leadership of RPDO, TIDC, and the capital community, should work together to mitigate the tension that occurs naturally between a trial organization and a primarily post-trial organization.**

15. **RPDO should request a mentor from NAPD's Systems Builders who would commit to being available to give confidential advice.**

16. **RPDO should commit to recruiting and maintaining diversity.**

17. **RPDO should hire persons committed to vigorous death penalty advocacy who do not meet the five-year requirement.**

18. **RPDO should have a pool of money to hire private counsel or temporary employees when staffing cases become impossible.**

19. **RPDO should take steps proactively to address the problem of secondary trauma and burnout.  Burnout is becoming a problem in RPDO.**

20. **Attention should be paid by RPDO in collaboration with the capital community to building a culture in RPDO that attracts high quality professionals to work there.**

21. **RPDO AND TIDC should work together to seek additional funding from the State of Texas to fund these recommendations.**

4

EXHIBIT 145 Page 005

**NAPD and the Systems Builders Committee.**  This report was undertaken by the National Association for Public Defense (NAPD) at the request of Jim Bethke, Executive Director of the Texas Indigent Defense Commission, and Ray Keith, Chief Public Defender of the Regional Public Defender for Capital Cases, also known as the Regional Public Defender Office (RPDO).

The National Association for Public Defense is an almost-15,000-member strong association of public defenders and other public defense professionals.  NAPD seeks to be the voice of public defense in America, seeking to engage "all public defense professionals into a clear and focused voice to address the systemic failure to provide the constitutional right to counsel, and to collaborate with diverse partners for solutions that bring meaningful access to justice for poor people."

The above request was for NAPD's Systems Builders Committee, chaired by Bill Ward, Public Defender of Minnesota, to conduct the assessment and to make recommendations.  A specific request was made for the assessment to be conducted by Ernie Lewis, NAPD Executive Director, and Doug Wilson, Colorado Public Defender, both of whom have extensive capital experience at both the trial and leadership levels.  The Systems Builders Committee "works to strengthen the quality of public defense delivery systems throughout the country. The Systems Builders Committee is comprised of current and retired defender leaders, public defender board and/or commission members, and system advocates representing a range of experiences and perspectives on public defense issues."  The mission of the committee is "… to assist leaders who are building excellent, client-centered public defense programs, through training, consultation, collaboration, and on-site technical assistance."

**Consultants.**  Ernie Lewis is the Executive Director of the National Association for Public Defense.  He served as a public defender with the Kentucky Department of Public Advocacy from 1977 until 2008.  During this time, he served as an appellate defender, the directing attorney of a trial office, a regional manager, and the head of the Trial Division.  In 1996, he was appointed by Governor Paul Patton to be the Kentucky Public Advocate.  He served as the chief executive of the statewide public defender system from that date until he retired in 2008.  As part of his duties, he oversaw a Capital Trial Branch as well as the Post-Trial Division that had responsibility for capital state and federal post-conviction services.  He has extensive experience representing capital clients, including seventeen at the trial level, two at the appellate level, and one in post-conviction.  He has tried six cases to a death-qualified jury.

Doug Wilson is the Colorado State Public Defender.  He started with the Colorado system in 1981 and was assigned to the Pueblo, Colorado trial office in January of 1982 where he handled all types of cases from juvenile delinquency to adult misdemeanors and felonies.  He went into private practice in 1985 and handled his first capital case in 1986 and continued to represent capital defendants in trial courts for the next 20 years.  In 1992, he returned to the Office of the State Public Defender as the Office Head in the Pueblo trial office where he was responsible for supervising that office, as well as handling capital cases across the state.  In 2005, he was appointed by the State Public Defender to the position of Chief Trial Deputy in the State Office where he handled only capital cases across the state.  He remained in that position until

EXHIBIT 145 Page 006

November 1, 2006, when he was appointed by the Colorado Public Defender Commission to become Colorado's sixth State Public Defender.

**Methodology.** This report is the result of review of extensive materials (listed at the end of this report under "Materials". This report will be referring to the reports and articles listed in Materials without further citation), as well as interviews conducted with thirty-seven individuals. Most of the interviews were of persons working for RPDO. Other interviews were conducted with law professors, persons who formerly worked with RPDO and TDS, and persons familiar with the landscape of capital work in Texas. Most of the interviews were conducted in Austin, Clute, San Antonio, and Lubbock during the week of November 6-11, 2016.

### History

Texas has long been the epicenter of capital punishment in the United States. From 1974 to 2013, 1062 persons were sentenced to death in Texas. Texas has executed 538 people, over a third of all inmates executed nationwide over the past 40 years.

Texas has a unique and challenging geography as the second largest state in the country. There are over 268,000 square miles in the state divided among 254 counties. Over 84% of the population of 27.4 million live in cities. That leaves approximately 4.3 million in rural Texas, where most of the clients of RPDO have been charged with committing capital crimes.

This geography has resulted in a paucity of lawyers qualified to handle a capital case in rural Texas. As of 2000, the Fair Defense Report stated that "[a]ppropriately skilled and experienced capital defense lawyers are unequally distributed around the state. We found that most of the well-qualified and experienced criminal defense lawyers are concentrated in the major metropolitan areas, with some smaller counties wholly lacking attorneys with the necessary skills or expertise to represent defendants in capital cases." At that time, it was found that "[a]mong all the states which actively impose the death penalty, Texas is the only state in which capital cases are defended almost exclusively by members of the private bar rather than by public defender programs or some combination of private counsel and public defenders or capital trial support units." That same report recommended that Texas "establish a specialized statewide capital defense support unit to assist appointed counsel. This capital support unit should have the capacity to: Provide the specially trained attorney staff necessary to represent indigent capital defendants at trial in appropriate cases; Provide expert attorney staff to co-counsel, in appropriate cases, with local appointed counsel from the community where the case will be tried; Provide other forms of assistance to private capital defense counsel, including: specialized training programs across the state to enhance the quality of capital defense representation; trained and experienced capital defense investigators; and maintenance of a regularly updated database of experts of all types, to which local appointed defense counsel could have ready access."

In 2001, the Texas Fair Defense Act was passed requiring local courts to create plans for providing indigent defense services. As part of the act, the Task Force on Indigent Defense,

6

EXHIBIT 145 Page 007

now called the Texas Indigent Commission (TIDC) was created.  TIDC has as its mission the provision of "… financial and technical support to counties to develop and maintain quality, cost-effective indigent defense systems that meet the needs of local communities and the requirements of the Constitution and state law. In addition, we require local planning for indigent defense and reporting of expenditures and provide an array of resources for counties to improve these services."

In 2008, Lubbock County submitted a grant to TIDC to create a new organization to provide counsel in capital cases in rural Texas.  RPDO began accepting cases on January 1, 2008 with Jack Stoffregen as the Chief Public Defender.  Counties with populations of under 300,000 were invited to participate.  RPDO was conceived as a way for rural counties to avoid paying large sums for counsel in the rare capital cases occurring in their counties.  Some have called this an "insurance policy."  Currently, approximately 50% of funding for RPDO comes from TIDC and 50% comes from the participating counties.

The grant from TIDC to Lubbock County included seven laudable purposes for the establishment of RPDO: "1) Provide expert qualified legal counsel for all defendants charged with capital murder except in the instance of conflicts. 2) Provide attorney contact with capital murder clients within 24 hours of appointment. 3) Provide litigation support services including mitigation specialists and investigators as quickly as possible after contact by counsel. 4) Maintain a caseload not to exceed five active cases per attorney. 5) Demonstrate quality representation as determined by judges and appellate counsel.  6) Reduce litigation costs for capital murder.  7) Establish a reasonable funding model that can be applied in other Judicial Regions." (*Judgment and Justice*)

Expansion of RPDO has been rapid as counties have witnessed its success.  RPDO initially covered the 7th and 9th Administrative Judicial Regions.  It was located in Lubbock with sub-offices in Amarillo and Midland.  In that configuration it was appointed to 60 cases.  Thereafter, it opened an office in Uvalde and Kingsville and added the 4th, 5th, and 6th Administrative Judicial Regions.  Those offices were combined into an office in Corpus Christi, which thereafter moved to San Antonio.  There have been 22 appointments from that region.  The next expansion was into the 2nd and 3rd Administrative Judicial Regions, with offices located in Burnet and Angleton.  The Angleton Office thereafter moved to Clute.  There have been 33 appointments in that region.  The 1st and 8th Administrative Judicial Regions were thereafter added with offices in Wichita Falls and Terrell.  Thirteen appointments have been made from this region.  There have been appointments originating in 60 counties.  178 of Texas' 254 counties now participate in the program.

There has been a good bit of churn in the location of offices.  Offices were often placed in counties offering free space.  Once the county opted out of RPDO, the office was then moved to another location.  It appears that office location was not selected based upon where the prime place would be to recruit and retain high quality professionals.  This will be addressed further in this report.

7

EXHIBIT 145 Page 008

In 2013, the ABA issued an assessment of the death penalty in Texas (*Evaluating Fairness and Accuracy in State Death Penalty Systems:  The Texas Capital Punishment Assessment Report* (2013)).  The creation of RPDO in 2007 was said to have been a "significant step forward in the improvement of the quality of representation available to Texas's indigent defendants and inmates in death penalty cases."

That same year the Public Policy Research Institute wrote a report authored by Dr. Dottie Carmichael and Heather Caspers entitled *Judgment and Justice* evaluating RPDO from 2008-2013.  This is a remarkable and thorough resource on the first five years of RPDO; our report does not attempt to revisit the findings and conclusions drawn by Dr. Carmichael.  Her report should be consulted for the full history of RPDO, as well as an evaluation of their work up to 2013.   Dr. Carmichael's report found that: RPDO was in conformance with Texas capital guidelines; it was more independent from judicial influence than private counsel in capital cases; a trial team was being promptly put together; the teams consisted of non-attorney mitigation specialists and investigators; and the teams were investing in developing mitigation resulting in a high rate of pleas.   Only one of the 26 cases as of that time had resulted in a death sentence.  The report concluded that "Results show public defender attorneys provide a superior service and achieve better outcomes than other assigned counsel by a number of important criteria." The report noted that using RPDO resulted in a lower cost-per-case than using private counsel and that RPDO was a "good member value" for the counties that had opted into RPDO.  Its conclusion was: "This study finds that the Texas Regional Public Defender for Capital Cases (RPDO) increases access, improves quality, and reduces costs of death penalty representation in small to mid-sized counties… These findings show the public defender model is a successful means to deliver affordable, high-quality, specialized capital defense expertise in non-metro areas of the state.  The model is worthy of consideration by eligible Texas counties as well as by other states contemplating replication."

Since the PPRI report, there have been several developments.  Additional trials have been held resulting in five death sentences.  Since its beginning, six death sentences have been returned involved RPDO.  Two of these came from the Lubbock office, one from the Clute Office, one in Burnet, and two in Terrell.  These developments have caused considerable concern in the broader capital defense community.

Despite the new death sentences, from a broader perspective, new death sentences have been consistently declining in Texas, with only three new death sentences in 2015.   By the end of 2016, there have been 5 death sentences, including one that was rendered in 2015 but became final in 2016.  One of those cases was handled by RPDO.

In its history, RPDO has closed 112 capital cases.  There have been six death sentences.  At the time of this report, RPDO had 26 open cases.

Ray Keith was chosen to be the Chief Public Defender for RPDO in the summer of 2016, replacing Jack Stoffregen upon his retirement.

EXHIBIT 145 *Page 009*

### Operations

**Structure.**  RPDO has a central office located in Lubbock.  There are two "sub-offices" located in Amarillo and Midland that operate virtually as one office.  There are additional field or satellite offices located in San Antonio, Clute, Burnet, Terrell, and Wichita Falls.  Ray Keith's office is in Lubbock, where he serves as the chief administrator of RPDO.  There is a deputy position that has been filled by Keri Mallon.  As the central administrative office, the Lubbock Office coordinates with Lubbock County government on matters such as information technology, employment practices, policies and procedures, and accounting.  While RPDO is a quasi-statewide organization, it is run as an entity of Lubbock County government.  The reasons for its being located in Lubbock County government are historical in nature.  Lubbock County government made the first grant application to TIDC, leading the way for rural Texas counties to deliver representation in capital cases.  This was done within the confines of the Texas Fair Defense Act.  At some point in the future, it makes sense for RPDO to be structured as a statewide office.

The decision to hire Ray Keith was made by the Lubbock County Commissioners with input from an advisory committee.  An oversight board was created in 2008; however, it was mostly inactive during a period when substantive oversight was shifted to the Lubbock County Commissioner's Court.  Lubbock County recently formally reconstituted the advisory board in December 2016.

The satellite offices do not have directing attorneys or leaders.  The design is to have complete capital teams located in each office.  This is the case in most of the offices, although Midland is viewed as a "sub-office" consisting of only one attorney and a mitigation specialist.  One attorney is located in Amarillo, also classified as a "sub-office."   Management decisions are made "in Lubbock" for the most part, although each team has considerable autonomy.  Hard copy and electronic files are all kept in Lubbock.  Teams handle cases primarily together and within a particular region, although there have been numerous exceptions to this model.  At present there are two split teams, with four cases out-of-region.  The larger issue is that coverage is "statewide".  Essentially if there are lawyers with capacity, they will be assigned regardless of case location.  This was never conveyed to staff when they were hired.  Some staff cannot and/or will not accept the task if assigned to a case across the state.  Under this model caseload for the RPDO is viewed as a whole based on the number of attorneys on staff.

**Culture.**  Culture is the way things are and the inertia that comes with it.  Culture is how an organization thinks of itself, what stories it tells about itself, who its heroes are, how its clients are treated, what the furniture and office space says about how the organization feels about itself, its employees, and its clients.  Culture is the traditions developed by an organization, the ceremonies it holds, the awards it grants.  Morale increases or decreases primarily because of the culture.  Norms are passed on to new employees through culture.  Behavior is permitted, enforced, or condemned through culture.   It is involved in organizational morale, in why people seek to be employed by an organization and why they leave it.  Culture can build up the health of employees or it can drag it down through secondary trauma.  It can provide meaning or it

9

EXHIBIT 145 Page 010

can drive employees to indifference or even to despair.  Culture is powerful, and potentially both destructive or life-giving.

What is the culture of RPDO?  Spending one week interviewing employees and reviewing materials is not sufficient to be informed fully on what culture RPDO has.  Having said that, there are some observations that can be made.  RPDO is creating a culture in which staff is highly supportive of one another.  Inside each of the offices there is pride over what is being accomplished, and particularly over the numerous capital cases that have been settled to less than death during the first eight years of existence.   RPDO values teamwork for the most part.  It also values clients.    RPDO has a rural culture, with something of a west Texas flavor.  It is isolated and a bit insular to the point of defensiveness.  It highly values training, and seeks the influence that outside training offers.  It is not a culture of swagger that some capital defender organizations have.  It does not feel like an aggressively anti-death penalty organization.  It is an organization that has an active rumor mill.  It is staffed primarily by Texas attorneys as well as in-state staff, although there does not seem to be an opposition to including others from outside.  Morale appears to have been low at the point the new administration took over; this has since been reversed and morale now appears to be improving significantly.

This culture is still developing.  Eight years is not sufficient to constitute a hard-to-change culture.   Leaders of RPDO should seek to analyze its culture and identify parts of the culture that they want to preserve.  At the same time, there are parts of the culture that need to change.  That change will take time and will occur primarily from new hires, relocation of offices, new recruiting efforts, enhanced training opportunities, increased communications, development of an awards program, and more frequent meetings of the entire organization.

**Policies and Procedures.**  There are two policy and procedure manuals used by RPDO.  While the two manuals overlap in places, one is from Lubbock County and contains what is normally expected from an employee handbook.  It addresses mostly personnel issues such as business hours, outside employment, sexual harassment and discrimination, and the like.

The second manual is RPDO's manual.  A few policies are noteworthy.  Policy 4.2 states that employees are at will employees.  Policy 5.1 states that employee evaluations are to be done once annually, a policy that has not been followed in the past.  Policy 9.2 sets six as the caseloads for attorneys "barring special circumstances."  Policy 9.3 sets out those circumstances when RPDO can continue to represent a charged individual after a waiver takes place.  Policy 10.1 states that the Chief Public Defender is to be appointed by the Lubbock County Commissioners, while all other RPDO employees are to be hired and fired by the Chief Public Defender. Policy 11.1 states that RPDO employees are to be paid on pay scales similar to other Lubbock County employees, "particularly the District Attorney's Office."  Policy 13.3 states that all lawyers, investigators, and mitigation specialists must complete 15 hours of continuing education each year.  Policy 13.4 sets out several duties of RPDO attorneys, although Policy 14.1 states that "Texas Capital Counsel Guidelines" set the floor for the handling of capital cases.  The remainder of Chapter 14 appear to include the ABA and Texas guidelines for handling capital cases.

EXHIBIT 145 Page 011

All in all, these manuals contain solid management and human resources guidelines.  In addition, they clearly express that handling capital cases is unique and requires a high level of training, continuing education, and commitment.

**Budget.**  The budget for fiscal year 2016-2017 is $5,300,000. This includes $1,800,000 from state general revenue appropriated by the legislature specifically for this program, $1,194,188 from a TIDC discretionary grant, $1,655,600 from participating counties, $84,051 from Lubbock County general funds for Lubbock's own participation cost, and $566,161 from operating reserves.  The TIDC discretionary grant amount steps down each year. The program decided to keep county participation rates stable for each year of the FY16/FY17 biennium. This resulted in some county participation fees collected in FY16 being held in reserve and used in FY17.

The counties' contribution is computed using the following formula: "Half of projected RPDO costs are allocated across all counties in the expansion area based on population.  For example, a county that contains ten percent of the area population would pay five percent of the annual cost of the RPDO according to the formula: [50% of RPDO budget] x [County population/Expansion area population].

Half of projected RPDO costs are allocated across all counties in the expansion area based on capital case history.  For example, in a region that had 25 capital cases in the preceding decade, a county that prosecuted five of those cases (20 percent) would be expected to pay ten percent of the annual cost of the RPDO according to the formula: [50% of RPDO budget] x [# capital cases in the county over 10 yrs./# capital cases in the expansion area over 10 yrs.]"

This budget is sufficient to sustain present staffing with existing caseloads.  Elsewhere in this report, it is noted that caseloads/workloads are excessive.  In addition to lowering workloads, there are acute needs for RPDO that are called for in this report that will require additional funding.  Any increase in the number of counties being covered will also require an increase in the budget.

**Management**

**Leadership.**  To a person interviewed, RPDO staff believes that the new Chief Public Defender recognizes the issues confronting RPDO.   They believe that he has the best interests of their clients and the staff at the forefront of his decisions, and that he is trying to address the challenges associated with the growth and expansion of the system.  He is listening to his people as evidenced by his setting up several committees to address their concerns, including committees on communication, salary, evaluations and training. However, he needs assistance in leading and supervising an office that has grown so quickly, and across such a large geographical area.  A deputy has been hired.  The need for additional supervisors/managers, a training director and leadership training is critical to the continued success of RPDO. Administration solely from the Lubbock office is no longer a viable model.  A national recruiting

11

EXHIBIT 145 Page 012

effort should commence to fill the identified positions.  Those additional positions should be at least initially funded by TIDC.

**Supervision.**  RPDO's supervision of its seven offices is handled by the Chief Public Defender from the Lubbock office.  There are no supervisors or management level employees in the regional offices outside of Lubbock.  This makes it very difficult to supervise the employees across each office.  The remote supervision model has resulted in non-existent or, at best, infrequent performance evaluations or supervisory input to the staff. Long-term employees have reported they been evaluated only one or two times.  One employee reported that the only evaluation that they had received was a verbal one when the prior Chief Public Defender visited the office.  Others reported that the only evaluations they had received were self-evaluations.  This supervision model also makes it difficult to timely resolve human resource or personnel issues.  The growth of RPDO, without commensurate administrative and supervisory development, has exacerbated these issues. Ray Keith has recognized the problems associated with the lack of evaluations and remote supervision, and has set up a committee to review these concerns.  Establishing Regional Managers will help address these issues and allow more direct administrative supervision of the regional offices.

The Chief Public Defender monitors the caseloads of the offices and attorneys, and works to ensure that the cases are properly staffed.  RPDO has been successful in meeting the ABA Guidelines as they relate to the staffing of the offices with appropriate personnel.  (See below). The Chief Public Defender also monitors the number of cases handled by each office.  The policies of the RPDO cap the number of cases at six per attorney, and the Chief Defender monitors those caps as well.  However, as the office has grown, it has become more difficult to do so.  The caps should be revisited as six capital cases appears to be too high to comply with the ABA Guidelines.   ABA Guideline 6.1 requires RPDO to implement mechanisms to ensure that caseloads enable counsel to provide high quality representation to all of their clients.

Few indigent defenders across the country have management or supervisory training as a prerequisite to becoming an administrator.   RPDO is no different.  All supervisors and managers for RPDO must be required to participate in leadership and management training.

**Communication.**  Communication suffered during the time of expansion under the first Chief Public Defender.  The residual effect of this has continued to this day.  Staff felt like they were isolated and that communication was sporadic.  This effected morale significantly.  This is particularly important in an organization like RPDO, which handles the most serious of cases, in a state like Texas with a high rate of executions.  This is exacerbated by the geographical challenges—RPDO staff is mostly located in distant offices handling cases in rural counties.

The current Chief Public Defender recognizes the importance of communication.  To a person, staff believe he recognizes that he needs to reverse the previous communication problems.  He initiated a survey of employees during the summer of 2016.  The results of the survey were then reported on by Jim Bethke at the annual 4-day retreat.   One of the most important findings from the employee survey was that fewer than 50% of the staff believed that RPDO

EXHIBIT 145 Page 013

leadership communicated information in a timely manner.  A more current survey would likely show the increased communication from the new Chief Public Defender.

A new development has been the RPDO newsletter, the first edition of which came out during the assessment in November.  It was newsy with stories about staff as well as case developments.  This kind of communication should be continued and increased.  In addition to newsletters, personal visits by the Chief Public Defender as well as his new deputy is to be encouraged.

**Relations with the capital community**.  This is an area of major concern that must be addressed by all the partners in capital defense in Texas.  This is addressed fully in the recommendation section below.

**Staffing, Training, and Recruitment**

**Staffing**.  The staffing of the offices should be a result of an intensive national recruitment effort, especially if the RPDO is going to continue to expand.  (As a side note, centralized recruitment, hiring and staff assignments going forward might be significantly easier if RPDO were a state-wide office).  The ABA Guidelines require a minimum of two attorneys, a fact investigator and a mitigation specialist familiar with mental health issues.  RPDO meets those staffing requirements in the offices.  Additionally, Texas has their own excellent state-wide standards for staffing and representation that RPDO meets.  However, additional resources are needed to provide representation that meets the ABA and Texas Guidelines.  The backlog of cases will continue if the additional resources are not forthcoming.  RPDO has been a welcome addition to the capital community in Texas and clearly a step in the right direction, but without further financial support from TIDC and the other interested funders at the state and local level, RPDO cannot keep up with the cases without significant burnout, loss of staff, and lack of quality representation.

It is the opinion of the authors, from discussing the same with many of RPDO staff, that recruitment, staffing and retention would be improved if the Terrell office were relocated to Dallas; the Burnett office were relocated to Austin and the Clute office to Houston.  While not all staff may want to relocate, now that RPDO is paying rent, recruitment of excellent staff from within and without the state should be significantly easier when offices are closer to large metropolitan areas.

**Caseloads.** RPDO policies cap caseloads at six per attorney, unless special circumstances exist.  Not all attorneys seem to be aware of the caps, nor are they always maintained.  At least one attorney reported having as many as eight cases at one time, while other attorneys indicated that there was a soft cap of four.  Either way, the caps should be reviewed by the Chief Public Defender and TIDC to verify that the caps are being complied with, and to determine if they are too high.  There are other places in the country where the caps are significantly lower than that maintained by RPDO, including some with a cap of one or two open cases at a time.  This is data that should be considered in conjunction with a workload study, as called for below.

13

EXHIBIT 145 Page 014

As indicated, the cap number does not seem to be consistently enforced.  RPDO must have a mechanism to enforce the caps, or else the presence of RPDO in a jurisdiction may entice the prosecution to over file death cases due to the "insurance" nature of the RPDO.  This is not to suggest that caps be enforced to the detriment of the county.  Rather, this report is recommending below (See Recommendaton #18) that RPDO have an amount of money to be able to either hire private counsel or temporary employees.  No team can comply with the Texas and/or ABA guidelines with eight cases.  RPDO has handled an extraordinary number of death eligible cases since its inception.  While it is true that the results of the last five trials have been death, the numbers of clients who have been saved from the death penalty have been as a direct result of the creation of the RPDO office.  However, this standard of representation cannot continue without a strict adherence to caps and the allocation of additional resources.

One of the critical mistakes that indigent defense organizations make is a reliance on "caseloads", when the "workload" of those cases is the more germane measurement.  There have been significant developments on the importance of workloads during the past fifteen years.  The American Council of Chief Defenders issued a statement in 2007 in which they called for "each jurisdiction [to]develop caseload standards for practice areas that have expanded or emerged since 1973 and for ones that develop because of new legislation.  Case weighting studies must be implemented in a manner which is consistent with accepted performance standards and not simply institutionalize existing substandard practices."

NAPD has likewise recently published its *NAPD STATEMENT ON THE NECESSITY OF MEANINGFUL WORKLOAD STANDARDS FOR PUBLIC DEFENSE DELIVERY SYSTEMS* (2015).  In this report developed by the NAPD Workload Committee it is stated that "…the time has come for every public defense provider to develop, adopt, and institutionalize meaningful workload standards in its jurisdiction."  The report goes on to delineate that workload standards should be "…derived and institutionalized through ongoing, contemporaneous timekeeping by public defense providers."

Texas has experience with focusing on workloads and not just caseloads.  In 2015, TIDC published a study by Dr. Dottie Carmichael and others entitled *Guidelines for Indigent Defense Caseloads:  A Report to the Texas Indigent Defense Commission* (2015).  Within the last few weeks, TIDC has released an addition workload study.  See: http://www.tidc.texas.gov/resources/publications/news/press-releases/161213pressrelease.aspx.  It would be appropriate for a similar study to be conducted to determine the appropriate workload standards for RPDO attorneys. If done properly such a study would most likely show that six capital cases per attorney are too many.

Excessive workloads are exacerbated by cross region case assignments.  While cross training and support among the offices is a critical component of a strong indigent defense delivery system, the regional offices should not be required to cover for other offices except in extraordinary circumstances.  Instead, RPDO must be appropriately staffed in each regional office to cover the workload of that office.  While there will be "down time" from the perspective of attorneys not carrying the maximum number of cases, capital litigation is such a

EXHIBIT 145 Page 015

high level, stress filled litigation area that while consultation and support can be, and is necessary, across the system, indigent defense staff are not fungible goods that can be pulled from their regions, and required to live away from their families for months at a time without a physical, emotional and psychological toll. Prosecutors and judges continue to live in their jurisdiction and defense counsel should be allowed to do the same.  The impact on quality representation and effective assistance of counsel to that individual client will be compromised otherwise; a critical component of the regional concept is to ensure that the local offices handle the local cases.  Pulling staff from other offices does not meet this goal.

Additionally, there should be consideration through rule change or legislation that mandate that the bench cannot require the RPDO attorneys and staff to try back-to-back death cases. The burnout of the capital teams and the potential for violations of due process and effective assistance of counsel should be paramount considerations.  A minimum of three months should be allowed to elapse between trials.

Caseloads for mitigation specialists and fact investigators should also be addressed, as it was reported that often they carry caseloads that are significantly higher than the caseloads of the attorneys.  It is a distinct possibility that these caseloads have contributed to the higher turnover levels of mitigation specialists and fact investigators.

**Excellence in representation**.  RPDO has appropriate staffing on its cases with a minimum of two attorneys, a fact investigator and at least one mitigation specialist, as required by ABA Guideline 4.1.  RPDO must comply with ABA guidelines and Texas guidelines as they relate to capital representation, especially Guideline 5.1 (Qualifications of Defense Counsel).  RPDO strives to comply with both.  Because they can conflict with the ABA and Texas guidelines, the local requirements for representation in capital cases should be eliminated, especially those that are numerically based guidelines, as opposed to requiring professional and competent standards for capital representation.

An additional measure that should be taken to comply with Guideline 5.1 is to engage in recruitment of attorneys on a national level.  The indigent defense culture and heart must continue to be injected into RPDO through its exposure to other indigent defenses systems. Additionally, national training opportunities and association with the Texas law schools should be developed and nurtured thorough internships and recruitment.  While not optimal due to the youth of the law school graduates, development of their own attorneys will help build the culture of the organization.  This should include the development of "third chair" attorneys who can progress to becoming capital litigators who as "home grown" defense attorneys will be infused with RPDO's culture.  This may also reduce the need to hire outside the organization in future years.

**Training.**  Training is of vital importance in capital work.  Some call this work the brain surgery of criminal defense work.  Each of the members of the team must be specialists with a high degree of commitment, training, and experience.  Rule 7.1 (*STATE BAR OF TEXAS, GUIDELINES AND STANDARDS For TEXAS CAPITAL COUNSEL)* requires extensive training for attorneys

EXHIBIT 145 Page 016

handling capital cases.  Policy 13.3 of RPDO's policy and procedure manual also requires 15 hours of continuing education for all professional positions.  The Chief Public Defender states that 30 hours of CLE is required each year for RPDO attorneys, more than required by the policy and procedure manual.

Almost all staff expressed a hunger for more first-rate training.   Attorneys are required to attend training conducted in Plano by the Center for American and International Law. Extensive training is offered there on voir dire, general capital defense, cross examination, and other topics.  It should be noted that this Center offers extensive training to most parts of the criminal justice system.  Training on voir dire features the Colorado Method.

It has been reported by staff that in the past the Chief Public Defender of RPDO was rarely willing to send RPDO staff to national training.  As a result, staff felt that RPDO was insular and Texas-oriented, reinforced by the CAIL training.  On the employee survey conducted in the summer of 2016, fewer than 50% of those surveyed reported receiving sufficient training to do their job.

However, it is apparent that in more recent years, including under the prior Chief Public Defender, this informal policy has been relaxing.  This is particularly the case under the new Chief Public Defender. Since 2011, 41 staff have been sent to national training, including Airlie, the National College of Capital Voir Dire in Boulder, the National Death Penalty College at Santa Clara Law School, Darrow, the Kentucky Investigator Training at Faubush, CACJ Mitigation in Missouri, Mitigation Training in New Orleans and Life in the Balance.  Staff appreciate these opportunities, and hopefully this will be continued.

It is to be emphasized that training is also vital for mitigation specialists and investigators. There are national programs that mitigation specialists can attend.  This is to be encouraged. However, training for capital investigators has been a major deficit in the capital arena.  Out-of-state opportunities should be found and made available, and in-state training should be developed.  Those who have been trained out-of-state can then in turn be utilized to train in-state.

### Long-term plan for indigent capital defense in Texas

Like indigent defense generally, the provision of capital defense services has long been a patchwork, with some excellent lawyers providing first rate representation, cutting-edge NGO's such as the Texas Defender Service (TDS) pushing reform, countered by embarrassing stories of inept lawyers with multiple death sentences.  For decades, judges appointed private criminal defense lawyers to defend persons charged with capital crimes.  Much criticism was hurled at Texas for the quality of its capital representation, focusing on sleeping lawyers and inadequate resources.  In response to the criticism, standards were adopted in 2002 governing representation in capital cases.  The patchwork remained, however.  There was no long-term plan for how capital defense might be provided in all 254 counties.  That remains to this today.

EXHIBIT 145 Page 017

Because indigent defense remains controlled locally, there is no plan that governs the entire state.

However, in the mid-2000s, several creative people, including Jim Bethke of the TIDC and David Slayton of Lubbock County (now with the State of Texas Office of Court Administration), envisioned a new organization that would provide capital representation only in rural counties. Other leaders in the capital community, such as Kathryn Kase of TDS, Andrea Marsh of the Texas Fair Defense Project, and others, worked with TIDC and Lubbock County government to create the RPDO.  No grand plan was announced.  Instead, RPDO was limited at first to two administrative regions with one office and two satellite offices in West Texas.  RPDO proceeded to expand exponentially, not in response to a long-term plan, but instead pursuant to the requests of participating counties choosing to opt-in on a biennial basis, county interest from other regions of the state, and the rapid expansion of the number of counties (new regions) eligible to opt in. This has now grown to 178 of Texas' 254 counties.  Using RPDO as the beginning of a statewide organization, Texas' criminal justice leaders should now sit down and consider how effective and well-resourced capital defense can be provided for all the counties, using RPDO as the foundation.  RPDO's successful expansion has made that a real and desired possibility.

### What's Working

- **RPDO has been able to resolve a remarkable number of cases to a sentence other than death.**  There have been 112 cases closed by RPDO since its inception in 2008.  There have only been six death sentences (Brewer, Harris, Suniga, Williams, Hall, and Brownlow), and no life without parole (LWOP) or other non-death verdicts before death-qualified juries.  One attorney with RPDO had settled 33 cases while trying only one case, which resulted in a death sentence.  This is an excellent record, particularly for an organization still establishing itself.
- **The organization has been in existence for eight years and now is operating as an effective capital law firm.  There are very committed commission members in Lubbock County as well as leadership at the state level that envisioned the creation of the organization and have sustained it in its development.** It appears that RPDO is here to stay.  Texas has proven that a state with its geographical challenges can create and sustain a public defender model in a largely rural area and improve the quality of representation in the process.
- **The organization is well on its way to covering all or most of the rural counties in the State of Texas.**  The growth of RPDO into 178 of Texas' counties has been nothing short of remarkable.  There does need to be a more stable planning model.  Allowing counties to opt-in and out every two years makes long-range planning, locating offices, putting together teams that may need to last for 3-5 years, all the more difficult.
- **RPDO is committed to compliance with the Guidelines and Standards for Texas Capital Defense Counsel.**  Texas criminal justice leaders have taken remarkable action to respond to the chaos that was capital defense by using the ABA Guidelines

EXHIBIT 145 Page 018

to adopt their own guidelines.  No doubt these guidelines will influence appellate and post-conviction decisions similar to the response by the US Supreme Court in *Rompilla v.* Beard, 545 U.S. 374 (2005) and *Wiggins v. Smith*, 539 U.S. 510 (2003).  In those cases, the Court affirmed the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003) as highly persuasive in the evaluation of whether counsel was ineffective or not under the Sixth Amendment.

- **There is a strong commitment to clients.**  Being client-centered is an expressed value in RPDO.  Many of the policy statements stress this point.  Interviews with staff reinforced that this remains a strong value for RPDO.  A good example expressing this value is the protocol of requiring someone from the team to see the client every two weeks.

- **There is a strong commitment to mitigation.**  This is seen in the ample number of mitigation specialists who have been hired.  Mitigation specialists are part of the team and are given a good bit of freedom to develop their cases and express their opinions.  This too expresses the value of client-centeredness.

- **RPDO uses the team concept for all cases.  Many employees feel a real sense of teamwork throughout the organization.**  The model for RPDO is to put a team in a small office.  That team shares the same cases for the most part.  They make decisions through meetings, sharing of information, and reaching a consensus. It should be noted that there is a minority opinion that the team concept has been "taken too far" in that there are too many meetings that take too long in order to arrive at a decision, as well as no one having ultimate responsibility for how the case is being handled.

- **Attorneys are paid a reasonable amount.** Attorneys are paid over $100,000 per year.  This is a good salary that should be sufficient to attract excellent attorneys from Texas and around the country.  They are viewed as "appointed officials", enabling them to be paid a higher salary than the Lubbock pay scale would allow.  It should be noted that the DA's office has additional "perks" not available to RPDO attorneys.  Bar dues are paid on an annual basis, which has not always been the case in RPDO.  "Company cars" are available to prosecutors from forfeiture funds. Prosecutors are able to handle 15.17 hearings (preliminary hearings) for additional pay.

- **There are limits on the number of cases.**  Excessive workloads are one of the biggest problems in public defense.  Only the most progressive of organizations limit the workload of their attorneys.  RPDO is among those, limiting workload in their policy and procedure manual to no more than six while recognizing that circumstances may militate in favor of a lower caseload.  (See above for a more extensive discussion of workloads).

- **RPDO is committed to training, particularly training on conducting capital voir dire.** The new Chief Public Defender has a strong commitment to providing extensive training to staff.  This includes out-of-state training.

EXHIBIT 145 Page 019

- **There appears to be wide acceptance of the new Chief Public Defender and praise for steps he has taken to improve the organization.** The new Chief Public Defender has taken several steps that have improved morale in the organization. An example is that he is not restricting the seeking of experts, as had been the case in the previous administration. Attorney staff who were looking for work elsewhere have now stopped their efforts to transition to other work. Another example is that training out-of-state is being made more widely available. There is a sense that RPDO is more open to outside thinking than it once was. A third example is the creation of the four committees that are making recommendations to the Chief Public Defender. This has gone a long way toward improving morale among the entire organization. There is growing hope that RPDO will improve as an organization under his leadership. The Chief Public Defender is believed to have the backs of his attorneys who have cases stacked up and who may need to take steps to space them out in a more reasonable fashion.

- **The new Chief Public Defender has created four committees to address organizational issues.** Nothing has provided more hope to the staff of RPDO than the creation of the committees. The four committees, training, evaluations, communication, and salary, were created in response to feedback from staff. Field office personnel staff these committees, which have worked hard to create tangible and favorable results. Implementation of recommendations was already occurring just a few months after the formation of the committees. This kind of openness to staff suggestions will hopefully be continued.

- **The annual retreat is appreciated by all staff and contributes significantly to the building of the organization.** The annual retreat lasts for four days and has both substantive and social components. Staff from the field offices meet one another for the first time. Stories are told and passed on. Information is provided. Teams that have been insular mix with other teams; mitigation specialists meet with other mitigation specialists, investigators with investigators, and so on. By all accounts, this is a very positive occurrence, and a contributor to an improving culture.

- **There is a community of committed persons who want RPDO to succeed.** Texas has within it many reform-minded capital organizations. They are staffed by intelligent and forward thinking people. To a person, they expressed that they support RPDO and want it to succeed. This is a significant resource.

- **There are two policy and procedure manuals that set out what the expectations of employees are.**

- **Some of the offices are located near universities creating the opportunity for internships, clerkships, and other synergies.** Being located near a law school or university has a lot of benefits, from obtaining experts to securing internships. For example, the new San Antonio Office is located near St. Mary's Law School. The Lubbock Office is located near Texas Tech School of Law. In addition, there is a social work department in Texas Tech University.

- **Some of the offices, such as San Antonio, are healthy with staff who are strongly supportive of one another. The same office has an excellent working relationship**

19

EXHIBIT 145 Page 020

with TDS.  It was interesting to meet with all the staff of the San Antonio office.  Not only did they have an attractive office in a thriving urban area, they were universally in favor of moving from Corpus Christi.  They were all excited about their work and upbeat about their cases.  San Antonio staff spoke about their work with TDS, particularly their director, Kathryn Kase.  TDS has been available to them, and this relationship has been quite helpful to clients.

- **While the cross-office staffing has created problems, it also increases cross-fertilization, which is a strength.**  Cross-office staffing, which is one of the issues that cuts both ways, has its benefits.  A rural office, already isolated, can be insular and feature group-think.  Many of the people we interviewed spoke favorably of working outside their team.
- **There is a good mix of attorneys with trial experience and appellate and post-conviction experience.**
- **The Chief Public Defender has streamlined the process for obtaining experts.**  It was reported that under the previous director, funding request could go weeks without approval.  The procedure has now been changed so that a form is filled out for under $15,000 requests, and if they are not rejected or questioned within 72 hours, the attorneys can move forward.
- **Handling most death penalty cases in 178 of 254 counties in Texas for $4.8 million per year is an exceptional value to the counties and state of Texas.**

### Things to improve

- **RPDO is a new organization, and as such is just beginning to develop a culture.  As a result, the culture is not yet that of an organization committed to excellence at all levels.**  The culture of RPDO is described above.  A commitment to excellence in representation is certainly shared by many in the organization.  A goal should be to embed that commitment into the culture of the organization. This includes a commitment to the client that extends past the trial level into the appellate and post-conviction levels.  A laudable goal should be for RPDO to think of itself as the "best damn capital law firm in Texas."
- **Some of the offices are located in places that are problematic for recruiting purposes.**  Offices have been located in places primarily for financial reasons.  Some of the offices have had to move when the host county opted out of the program for subsequent years.  Locating an office in a thriving urban area can have positive benefits.  The improved staff morale resulting from moving the office from Uvalde to Corpus Christi and finally to San Antonio demonstrates how much office location matters.  Similar moves should be made in Burnet, Clute, and Terrell.  This is not meant to take away from the desirability of rural Texas, but rather to enhance the recruiting and retention of excellent staff and to provide further stability.
- **RPDO grew very quickly and has suffered from that growth.**  The new Chief Public Defender Director agrees that expansion occurred too quickly, and that the organization suffered somewhat from it.  For example, office locations were chosen

EXHIBIT 145 Page 021

that were inconsistent with the overall mission, resulting in difficulty recruiting as well as establishing high quality and reliable IT in some of the offices.  This does not mean that the organization needs to shrink in size or close offices.  Rather, it means that this expansion now needs to be assessed and managed, backfilling where growth occurred too quickly.  Additional growth should occur thoughtfully and slowly.

- **There have not been regular evaluations of personnel conducted by leadership.** There is a requirement of personnel evaluations in the policy manuals, but this has occurred only sporadically.  The most likely reason for this is that the Chief Public Defender has far too many people to evaluate with any kind of factual basis.  A person can only evaluate effectively 5-10 persons.  An effective evaluation system requires a performance agreement, careful monitoring of individual performance through in-court reviews, file reviews, case reviews, and frequent one-on-one coaching conversations.  That cannot take place under the present system where there are no supervisors outside of Lubbock and where the Chief Public Defender would have to evaluate almost fifty individuals.

- **Having a statewide office placed in one county government has caused issues.** Lubbock County is to be praised for the forward thinking that led to the creation of RPDO.  It is further to be praised for working with TIDC to build the office to the point where it is today.  However, there have been problems with this arrangement that are endemic to being housed in a county structure.  For example, rules regarding hours an investigator can work are problematical.  In addition, the fact that all the offices outside of Lubbock are by definition "out-of-network" with health insurance is unacceptable.  Third, Lubbock County has been very helpful with IT problems in the Lubbock Office, but there are problems with IT outside of Lubbock that have not been addressed satisfactorily.

- **Health insurance for employees outside of Lubbock is highly problematic.**  There are employees going without necessary drugs due to the monthly cost of out-of-network pharmaceuticals.  One employee related that he had recently gone to a doctor and instead of a $6 charge, which would have occurred in Lubbock, had to pay $184.  That is not acceptable and a solution must be found that places employees outside of Lubbock in the same position as Lubbock employees.

- **Hours have been restricted for investigators, including during trial.**  Investigators are classified as non-exempt by Lubbock County government.  That means that they cannot work over 40 hours without paying overtime.  RPDO has chosen not to pay overtime. This is a financial limitation.   In one instance, a fact investigator was ordered to go home during a trial that resulted in a death sentence.  Mitigation specialists report that traveling with a fact investigator can be problematic at times.  That is not acceptable.  Lubbock County budget rules make it difficult to pull money across from the "appointed officials" budget line item for use in the "personnel" line item.  It likely requires approval of the commissioner's court.  The most current information from the auditor's office indicates that if TIDC directs such a budget line item shift, it would be possible.  In any case, all parties should work to ensure that RPDO has the flexibility to pay overtime when needed.

EXHIBIT 145 Page 022

- **Teams are split between offices when necessary, causing problems.**  There are both good and bad consequences from splitting teams.  Splitting teams has caused some lawyers with back-to-back trials as well as intractable scheduling problems.  It has also caused lawyers to have to leave their families and live in a faraway place for months at a time during a trial.
- **All staff is paid the same no matter their experience or their meritorious conduct.**  Staff is frustrated because they cannot advance no matter how hard they work or how much they accomplish.  The pay for mitigation specialists, investigators, legal assistants, and administrators is insufficient for some of them to pay their bills.  Among those three categories, the stagnancy of the salaries is particularly frustrating.  There are classification ranges in Lubbock County government.  Investigators, for example, are classified as PS05, with a salary range from $30,176 to $57,347.  Mitigation specialists are classified as PR02, with salary ranges from $33,798 to $63,371.  Legal assistants are classified as CL02, with salary ranges from $23,774 to $39,939.  These ranges are not being followed, however, causing considerable frustration among staff.
- **Many employees have complained about the communication coming from the office in Lubbock.**  A good start to improving communication has occurred with the initiation of an organization-wide newsletter.  The committees are also a good idea.  Staff perceive the new Chief Public Defender as being receptive to more open communication.  At the same time, there is a rumor mill which can be quite destructive to an organization, but will occur unless healthy and robust communication occurs throughout the organization.  A commitment to constant communication will go a long way to remedy this.
- **Training.**  While there has been capital voir dire training in Plano that all lawyers have been required to attend, there is a sense among staff that that is not sufficient.  Some staff have also started going to national training.  Training for mitigation specialists has consisted primarily of working with the office administrator.  Training for investigators has been virtually nonexistent.  For a period of time during the last leadership, training became somewhat insular, with a prohibition on attending bring-your-own case training.
- **There is a sense among staff that under-performing staff are not disciplined or removed from service.**  There is a sense that some staff do not buy-in to the mission of excellence in capital representation, and that their behavior demonstrates this lack of commitment.  At the same time, there is also a sense that there are no consequences from either the attitude or the behavior.  This cannot be allowed to continue.
- **While there are caseload limits, there is significant sentiment that those caseload limits are set too high.  Mitigation specialists and investigators often carry as many as eleven cases at a time, which is perceived as too many.**  One of RPDO's strengths is that, as opposed to some defender systems, there is a caseload limit.  The policy and procedure manual places that limit at no more than six cases, with special circumstances militating a downward limit.  This policy should be revisited to ensure

22

EXHIBIT 145 Page 023

that caseloads are not too high to achieve excellence.  The gold standard for this would be to conduct a workload study much like the one that TIDC did for the indigent defense community.  (See more extensive discussion regarding workloads and caseloads above).

- **Turnover among investigators and mitigation specialists appears to be too high.** The turnover rate for these two positions appears to be high.  Leadership needs to get to the bottom of this by conducting exit interviews with those employees who have left as well as surveying current investigators and mitigation specialists.  Certainly, the stagnant salaries, the health care out-of-network issue, and the difficulty of the work contributes to this issue.

- **IT is a big problem outside of the Lubbock Office.**  There were no complaints in the Lubbock Office regarding the quality of IT.  RPDO is highly dependent on IT, with all files being located in Lubbock.  Lubbock County needs to work with RPDO to solve this in the field offices.  Moving the more rural offices into larger cities would likely solve the IT issue.

- **Due to the geography of the organization, there has been little opportunity for mitigation specialists and investigators to get together.**  At present the annual meeting is the only time that these vital staff members can get together.  Much could be gained by increasing communication between these groups, perhaps by hosting several in-person meetings throughout the year.

- **There has not been sufficient diversity in hiring practices.**  Hiring of lawyers has mostly been done in-state.  Hiring of investigators appears to be primarily of ex-law enforcement.  The organization could benefit from nationwide recruiting for all positions.

- **There has been concern raised about the increasing number of death verdicts during the past three years**.  It is too early to push the panic button, but certainly it is time to figure out what is occurring and why.  Are prosecutions increasing for financial or nonfinancial reasons?  Are prosecutors responding to other death verdicts, or to political pressure?  These questions and more should be asked and considered.  That should not, however, diminish the accomplishments of RPDO during its first eight years of existence.

- **RPDO and the post-trial capital organizations such as the Office of Capital Writs have not worked out how to remain client-centered after a death verdict is rendered.**  There is a very natural conflict between trial teams and post-conviction attorneys.  Trial teams work hard to develop rapport with clients.  When a trial results in a death sentence, a committed trial team suffers in the aftermath.  When post-conviction lawyers begin their representation, they can be accusatory and judgmental when they begin preparing their case.  These are natural tensions suffered by many other public defense organizations.  This threatens to harm the effort to provide excellent representation throughout the criminal justice process unless properly and wisely managed.

- **The Hall and Harris cases have taken on symbolic importance which is inhibiting the growth of a strong culture.**  These two recent cases, both of which resulted in a

23

EXHIBIT 145 Page 024

death sentence, have had a profound effect on RPDO and its staff.  Criticism from outside the organization has been significant.  It is apparent that in neither case was there adequate supervision of the case as it was being developed.  Case reviews throughout the case might have picked up that the teams were not ready to go to trial so that corrective action could have been taken.  Death sentences can be expected in any organization with the volume carried by RPDO in a state such as Texas.  However, the stories that are being told around these two cases cannot be allowed to characterize RPDO as a whole or to damage its future

- **As might be expected of an organization of this nature, burnout and secondary trauma seems to be increasing.**  The Chief Public Defender is vitally interested in this issue, and avoiding or mitigating the effect of burnout.  Other organizations, such as EMT's and police departments have embedded a process whereby burnout is talked about and steps are taken to avoid it.

- **Having counties decide on a biennial basis whether to participate in RPDO or not interferes with efficient management of RPDO.**   RPDO was built on the opt-in decision by the counties.  It will be hard to change this.  A long-term goal should be to bring about a more stable situation.  One way to achieve that would be to establish a statewide capital organization.

### RECOMMENDATIONS

1.  **The RPDO should move the Terrell Office to Dallas, the Burnet Office to Austin, and the Clute Office to Houston.** This will make it easier to recruit and retrain high quality professional staff.

2. **RPDO should create additional positions for Regional Managers**.  These managers would be charged with oversight of the offices within their region, ensuring proper staffing, trouble-shooting, mentoring, training, and conducting personnel evaluations of staff within the region. They should be located within the regions they are overseeing.  A major task of the regional managers should be to assist leadership with staffing to ensure that cases are not inappropriately stacked.   There should be a national search for these positions.  These positions should be funded by TIDC, and should be in addition to present staffing.  These positions should have either a reduced caseload or no caseload.

3. **RPDO should send their Regional Managers to significant leadership, management, and supervisory training.**  Public defenders are not typically trained in leadership and supervision.  Such training is available and RPDO should invest in these new positions by sending them to training.

4. **RPDO should hire a Director of Training.  This person should work with public defenders in Texas to become the primary trainer of persons handling capital cases.  The new trainer should work closely with other providers of public defense training to improve training overall in Texas.**  One of the most significant requests among RPDO staff was to have additional training.  While both in-state and out-of-state training is excellent, RPDO should go beyond this and hire a Director of Training.  He or she would develop training for attorneys, investigators, and

24

EXHIBIT 145 Page 025

mitigation specialists.  He or she should become part of the national public defender training community.  The Training Director should work with law schools to create a robust internship program.  There is some sentiment for the training director to also consult on cases and to handle some cases.  Part of the role of trainer will be to reinstitute "bring-your-own-case" training with the help of the capital community.  If this is to work trust with the larger capital community will have to be restored, which has been lost with the recent Harris case.  The trainer is also a perfect position to become the primary recruiter.  TIDC should invest in this position, or perhaps several trainers, and a long-term plan should be created to provide more comprehensive training in collaboration with existing trainers for all public defenders in Texas.  A boot camp similar to what occurs in Colorado or Faubush in Kentucky should be part of that plan.

5. **RPDO, TIDC, and other stakeholders need to come together to create a common vision for RPDO.**  As discussed above, RPDO developed to meet a specific need in West Texas.  Expansion occurred quickly thereafter because the model was appealing to rural counties.  What has been missed is a long-term vision for public defense in Texas, both statewide and capital.

6. **A leadership team consisting of the Chief Public Defender, the Deputy, the Director of Training, and the Regional Managers should meet to plan strategically, implement the plan, and advise the Chief Public Defender in leading the organization**. Strategic planning should occur on an annual basis.  It should be done with input from everyone in the organization.  Strengths and weaknesses should be identified and goals should be set with timelines.  Leadership would then have the responsibility for ensuring that the plan was been implemented.

7. **The newly reconstituted advisory board must strive to meet national standards with the purpose being to provide oversight, support, and independence to RPDO.**  There has been an advisory board for RPDO from the beginning.  The duties and authority of the advisory board have been ambiguous.  The board has been reconstituted.  The *ABA Standards for Criminal Justice:  Providing Defense Services* (3d Ed. 1992) Standard 5-1.3 on professional independence states that an "effective means of securing professional independence for defender organizations is to place responsibility for governance in a board of trustees…Boards of trustees should not include prosecutors or judges.  The primary function of boards of trustees is to support and protect the independence of the defense services program.  Boards of trustees should have the power to establish general policy for the operation of…" the program.  The ABA *Ten Principles of a Pubic Defense Delivery System* (2002) commentary to Principle #1 states that to "safeguard independence and to promote efficiency and quality of services, a nonpartisan board should oversee defender, assigned counsel, or contract systems.  Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense."  An oversight or advisory board is provided for in Texas statutes.  See Texas Code of Criminal Procedure, Art. 26.045. PUBLIC DEFENDER OVERSIGHT BOARD.  This statute does not mandate that judges be included in the oversight board.  A new oversight board has been

25

EXHIBIT 145 Page 026

reconstituted. Three members of the proposed advisory board are judges, which is inconsistent with national standards.  That is the only problematic provision of the new board.

8. **RPDO should reevaluate its salary structure**.  Paying each of their staff the same is not consistent with good human resources principals.  There should be an incentive for both outstanding work (merit pay) and longevity and increased duties. While performance based pay increases should be the preferred method of rewarding performance, they are also the most difficult to budget for and enforce, especially under RPDO's present centralized supervision model.  Merit and longevity should be the incentive for moving up in the organization. There must be pay ranges within each job classification to allow for merit and longevity increases.

9. **RPDO should reclassify the positions of chief mitigation specialist and chief investigator since there is no supervisory responsibility in those positions**.  It is recommended that these positions be downgraded, and that supervisory responsibilities be adopted by the Regional Managers.  This recommendation should be understood in conjunction with the recommendation regarding the creating of a salary structure.

10. **RPDO should continue to develop its personnel evaluation system.**  Regional Managers should be tasked with performing personnel evaluations.  There is a committee that has been working to revitalize RPDO's personnel evaluation system.  This system should employ progressive discipline as contemplated in the policy and procedure manual.  It should emphasize performance agreements, performance improvement plans, and interim and final annual evaluations.  This system should be utilized to reward high performing employees, improve employees with potential, and remove from service those employees not committed to the mission or performing satisfactorily.

11. **A series of case reviews should take place for all capital cases**.  There should be at least three case reviews before a case comes to trial.  The first review should be held within the first few months of appointment.  The purpose of this review is to ensure that the team is properly constituted, that the team is in compliance with the ABA and Texas Guidelines, that the team is attuned to the needs of the client, and that the team is beginning to formulate and investigate a theory of life.  The second review is conducted after considered investigation of the merits and sentencing phases have been done.  The purpose of this review is to brainstorm a theory of life and possible developing themes.  If there has been tension developing within the team, this is the time to deal with that.  A focus on how to resolve the case without a trial is also a significant part of the second case review.  The third case review is held within months or even weeks of trial.  For this review, the team prepares to present the opening statement and closing arguments from each phase.  A particularly difficult cross-examination can also be presented.  Active feedback is encouraged.  If there are any loose ends, they are identified at this point.  This third review has part of its purpose to ensure that the theory of the case is set, that it has been fully investigated, and that the team now has its face set for trial.  The reviews are attended by not only of the team from the case but also staff from other RPDO

26

EXHIBIT 145 Page 027

offices as well as the broader capital community.  Anywhere from 8-12 is an ideal number for this review.  At this size, those assembled become a virtual focus group for the team.  The reviews are facilitated by a person familiar with case reviews, and ideally attended by a mental health professional not associated with the case.  They should be conducted by the new regional managers or others trained to facilitate case reviews.  It should be noted that the Chief Public Defender has already instituted some review of cases where attorneys from outside the team review the case files and brainstorm the case with the team. It is essential that there be confidentiality within those in attendance.  The tension that now exists with persons attending reviews later filing an affidavit in support of a writ must be solved before these reviews will have their maximum impact.

12. **RPDO should engage in debriefing of all cases, including those that went to trial and those that were resolved with a disposition of less-than-death.**  Early on in the history of RPDO, the great majority of cases were solved by pleas to less than death.  Over the last 5 years, cases have increasingly gone to trial, and there have now been six death sentences.  It is essential that RPDO mine the lessons learned by those capital teams.  What worked and what didn't work can be lost in the days following a trial unless a debriefing is held within a reasonable period of time.

13. **RPDO needs to deal with several outstanding human resource issues**.  These include the out-of-network problem that so severely effects those residing out of Lubbock, as well as the prohibition of investigators from working over 40 hours per week, including during a trial.  Both problems must be solved to improve the morale and equity of those working outside of Lubbock.

14. **Leadership of RPDO, TIDC, and the capital community, should work together to mitigate the tension that occurs naturally between a trial organization and a primarily post-trial organization**.  The post-conviction community has a job to do that usually involves claims of ineffective assistance of counsel.  That part of the case is also critical to due process for the clients.  However, if persons outside of RPDO are going to be involved in the pre-or-post-trial case review process, the confidentiality of that process must be maintained.  Otherwise, RPDO should not involve outside agencies in those review processes.  Case reviews are necessary and critical to the defense of the client.  However, they should not be conducted to the detriment to the team, the client or the case review process.  While the post-conviction process is uncomfortable at times for trial counsel, to effectively represent the client throughout the entire process, the post-conviction review process is critical to death penalty litigation.  With that said, there are many in Texas who assert that according to Texas court rules, a judicial declaration of an ineffective assistance claim against an attorney in a capital case eliminates the ability of that attorney from participating in future capital cases. While the rule may be a laudable attempt to ensure quality counsel in capital cases, it actually exacerbates an already almost unbearable tension between trial counsel and post-conviction counsel.  If such a rule exists, it must be modified, at least for RPDO, to allow post –conviction litigation without fear of losing one's employment with RPDO.

EXHIBIT 145 Page 028

RPDO is encouraged to develop a culture that is client centered as applied to working with the broader capital community.  An element of this is that RPDO staff would include post-trial lawyers in case reviews and case conferences as the case being put together.  Together the team, consultants, and post-trial lawyers would talk about proactively creating a record.  At present, there are identified deficiencies in the system of appellate representation in capital cases.  See *Lethally Deficient Direct Appeals in Texas Death Penalty Cases* (2016).  If these deficiencies are dealt with, or if competent and client-centered appellate counsel are identified, they too could be part of the process of improving the development of the case at the front-end.

Finally, there must be a "sit-down" with the entire capital community where concerns are aired on all sides.  If trial counsel or their team has done something wrong, then clearly counsel must be forthcoming.  However, personal and inaccurate attacks are neither warranted nor appropriate.  It is imperative that the parties sit down, perhaps with a mediator, and discuss the process going forward.  The Chief Public Defender and the RPDO are understandably sensitive as a result of the *Harris* writ.  It is also clear that the death penalty community must work together for the benefit of the client.  This is especially true in Texas where so many capital cases are filed.  Division amongst the defense community cannot continue as only the prosecution will benefit.  NAPD would be happy to facilitate a meeting if everyone felt such a "sit-down" would be beneficial and everyone is willing to participate in a meaningful dialogue.

15. **RPDO should request a mentor from NAPD's Systems Builders who would commit to being available to give confidential advice**. Doug Wilson, Colorado State Public Defender, and a consultant on this report, has agreed to serve in this capacity.  The Systems Builders Committee can assist upon request.

16. **RPDO should commit to recruiting and maintaining diversity**.  It is essential that RPDO be a diverse and dynamic organization.  The history of racial discrimination in capital punishment in Texas is similar to that of many southern states.  This is exacerbated when the teams do not look in any sense like the person being represented. It is essential that one recruiting goal, whether by the new trainer or the Chief Public Defender, be the recruiting and hiring of excellent employees reflective of Texas' diversity.

17. **RPDO should hire persons committed to vigorous death penalty advocacy who do not meet the five-year requirement.**  The ABA Assessment (2013) noted that "Texas's standards emphasize experiential requirements which may do very little to improve the quality of representation since many of the worst lawyers are 'those who have long taken criminal appointments and would meet the qualifications.'" This is consistent with what was heard from several sources during the assessment. The goal should be to not only recruit excellent high quality attorneys, but also to grow new future staff through internships, law clerks, and the hiring of enthusiastic and excellent lawyers who can serve (and learn) as third chairs.  RPDO should be funded to be able to hire newer lawyers who would be third chair in capital cases to

EXHIBIT 145 *Page 029*

be able to be trained for future representation.  Funding should also be made available to hire interns and law clerks to build the bench for this difficult work.  RPDO needs lawyers who know how to try difficult felony cases while at the same time RPDO needs to build the capital staff of the future.

18. **RPDO should have a pool of money to hire private counsel or temporary employees when staffing cases become impossible**.  One of RPDO's most significant management problems is the staffing of cases with insufficient resources.  This has resulted in cases backing up, pressure of judges to move cases along, and burnout by employees.  This may become a critical area with the growth of non-English speaking clients.  One possible solution is for TIDC to establish a fund that the Chief Public Defender would have available to hire private counsel when cases stack up.  Lubbock County will need to take steps to make this possible if the funds become available.  An alternative that works in Colorado is to allow a temporary attorney position when staffing becomes problematic.  Temporary professional or clerical positions could also be filled using the temporary employee model.

19. **RPDO should take steps proactively to address the problem of secondary trauma and burnout**.  Burnout is becoming a problem in RPDO.  Left untreated, the organization will lose some of its best people, and those who remain will be fragile and unhealthy.  This could involve bringing in an outside facilitator, creating a policy limiting the number of trials in a given period of time, requiring taking time off after a death sentence, creating a period of a sabbatical, or a combination of these strategies.

20. **Attention should be paid by RPDO in collaboration with the capital community to building a culture in RPDO that attracts high quality professionals to work there**.  With recent death sentences and the writs that have been filed, there is a risk of decline in morale and an increase in burnout and turnover.  There are excellent attorneys and other professionals in RPDO who work hard and are committed to the work.  The office should not be defined by the death sentences that occur and the stories that are told about them.  There have been and will be successes, and those stories need to be told and treasured.  Efforts should be made to hire attorneys with trial experience who are also committed to the mission and committed to improving RPDO.  Many of the staff expressed the desire to be with an organization that has a national reputation of which they can be proud. This is done through the creation of a culture of excellence.  The retreat is one place that is already contributing to that culture.  Developing a rigorous and high quality training program can also contribute to the development of the culture.  In many places, such as Colorado and Kentucky, the Training Director becomes virtually a cheerleader for the culture.  This should be emulated in RPDO.

21. **RPDO AND TIDC should work together to seek additional funding from the State of Texas to fund these recommendations.**

EXHIBIT 145 Page 030

**Materials**

*Judgment and Justice*, An Evaluation of the Texas Regional  Public Defender for Capital Cases, file:///C:/Users/Ernie/Google%20Drive/NAPD%20PC/Texas/130607_finalcapitaldefenderreport.pdf (2013)

*Evaluating Fairness and Accuracy in State Death Penalty Systems:  The Texas Capital Punishment Assessment Report*  (2013).

*A Great Divide: How Texas and Colorado Provide Indigent Defense Services and the Lessons We Can Learn From It* (2014)(excerpt).

*Too Broken to Fix: Part II  An In-depth Look at America's Outlier Death Penalty Counties*
        file:///C:/Users/Ernie/Google%20Drive/NAPD%20PC/Texas/FPP-TooBroken_II.pdf

*Lethally Deficient Direct Appeals in Texas Death Penalty Cases* (2016)

*STATE BAR OF TEXAS, GUIDELINES AND STANDARDS For TEXAS CAPITAL COUNSEL* (Adopted by the State Bar Board of Directors, April 21, 2006)

*Texas Death Penalty Developments in 2015: The  Year in Review*

Legislative Appropriations Request by TDIC for 2018-2019

*Giving Timbre to Gideon's Trumpet* (Moore and Butcher)

Catherine Greene Burnett,* Michael K. Moore,** Allan K. Butcher, "In Pursuit of Independent, Qualified, and Effective Counsel: The Past and Future of Indigent Criminal Defense in Texas", South Texas Law Review (2001).

*Fair Defense Report*, *Findings and Recommendations on Indigent Defense Practice in Texas* (2000) (Spangenberg, et. Al).
Regional Public Defender Office for Capital Cases Program Oversight Board Membership and Policies (Draft)

FY 12 Lubbock County Compensation Classification Schedule

Regional Public Defender Office for Capital Cases Program Oversight Board Membership and Policies 2016) (Draft)

*American Council of Chief Defenders Statement on Caseloads and Workloads* (2007)

*NAPD STATEMENT ON THE NECESSITY OF MEANINGFUL WORKLOAD STANDARDS FOR PUBLIC DEFENSE DELIVERY SYSTEMS* (2015)

*Guidelines for Indigent Defense Caseloads:  A Report to the Texas Indigent Defense Commission* (2015)

EXHIBIT 145 *Page 031*



National Association for Public Defense
PO Box 211
Frankfort, Kentucky    40602



Texas Indigent Defense Commission
209 West 14th Street, Room 202
Austin, Texas    78701

EXHIBIT 145 Page 032