IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OBEL CRUZ-GARCIA, | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL NO. 4:17-cv-03621 |
| | § | (Death Penalty Case) |
| BOBBY LUMPKIN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| *Respondent*. | § | |

**RESPONDENT'S SUPPLEMENTAL ANSWER WITH BRIEF IN SUPPORT**

KEN PAXTON
Attorney General of Texas

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

CARA HANNA
Assistant Attorney General
State Bar No. 24055622
Southern ID No. 915870
*Counsel of Record*

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *cara.hanna@oag.texas.gov*

*Counsel for Respondent*

1

# TABLE OF CONTENTS

ANSWER ................................................................................................ 1

CRUZ-GARCIA'S ALLEGATIONS .................................................... 1

STATEMENT OF THE CASE ............................................................ 6

I.      State Court Proceedings ........................................................ 6

II.     Federal Court Proceedings. ................................................... 7

STATEMENT OF FACTS ................................................................. 9

ANSWER ............................................................................................ 9

I.      Standard of Review ................................................................ 9

II.     The Court Is Foreclosed from Considering Evidence Outside the State Court Record because Cruz-Garcia does not meet the requirements of § 2254(e)(2). ................................................ 11

III.    The CCA's Denial of Relief Is Entitled to Deference. ......... 14

IV.     Cruz-Garcia's Is Not Entitled to Relief on His Claim of Cumulative Error. ................................................................ 16

V.      Cruz-Garcia Is Not Entitled to Relief for His Claims of Juror Misconduct (Claim 1). ................................................. 17

        A. The Bible was not an outside influence. ......................... 19

        B. Cruz-Garcia does not demonstrate he was harmed by the jurors' discussion, if any, of the evidence and sentence outside of jury deliberations on punishment. .................... 23

VI.     Cruz-Garcia's Claim 2 is Partially Procedurally Barred from Review, and, Alternatively, Without Merit. ......................... 25

        A. Confrontation Clause ..................................................... 25

        B. Cruz-Garcia was not prevented from presenting a meaningful defense. ....................................................... 32

VII.    Claim 3 Should Be Denied because It Is Procedurally Defaulted; Alternatively, It Is Without Merit. ...................... 35

        A. This claim is procedurally defaulted. ............................ 35

        B. Alternatively, this claim is without merit. ..................... 36

VIII.   Claim 5 Alleging False Testimony Is Defaulted and Without Merit. 37

        A. This claim is exhausted but defaulted. .......................... 37

B. This claim is without merit. ............................................................... 39

IX. Claim 6 Alleging a *Brady* Violation Is Procedurally Defaulted and Without Merit. .......................................................................................... 60

A. This claim is procedurally defaulted. ................................................ 60

B. Alternatively, this claim fails on the merits. .................................... 61

X. Cruz-Garcia's Claim of Coercive Supplemental Jury Instructions is Procedurally Barred and Without Merit (Claim 7)............................ 72

XI. Cruz-Garcia Fails to Demonstrate that the State Court Unreasonably Denied His Claim of Ineffective Assistance of Counsel on Appeal ("IAAC") (Claim 8). .................................................. 75

XII. In Addition to the Claim Being Procedurally Defaulted, Cruz-Garcia Does Not Show He Was Excluded from a Critical Stage of Trial (Claim 9)............................................................................................ 77

XIII. Cruz-Garcia Confrontation Claim Is Defaulted and, Alternatively, Meritless (Claim 10). .............................................................................. 80

XIV. No Constitutional Right to an Interpreter Exists, thus Cruz-Garcia's Procedurally Defaulted Claim of Inadequate Translation Should Be Dismissed (Claim 11).............................................................. 82

XV. Cruz-Garcia's Procedurally Defaulted Claim of Judicial Bias Is Meritless (Claim 12). .............................................................................. 84

XVI. Cruz-Garcia Does Not Meet His Burden Under AEDPA To Show He Is Entitled to Relief for Claim 13. ................................................... 88

XVII. Cruz-Garcia's Procedurally Defaulted Claim Concerning Emotional Outbursts Is Without Merit (Claim 14). ............................ 90

XVIII. Cruz-Garcia's Procedurally Defaulted Claim that the State Made Inflammatory Comments throughout Trial Violated His Due Process Rights and Fourteenth Amendment Right to a Fair Trial Is Without Merit (Claim 15)................................................................... 93

XIX. Cruz-Garcia's Vienna Convention Claim is Procedurally Defaulted and Meritless (Claim 16). ...................................................... 96

A. Review of this claim is barred by the *Gardner* bar, thus Cruz-Garcia has procedurally defaulted his claim.............................. 96

B. In the alternative, Cruz-Garcia fails to demonstrate that his claim has merit. .......................................................................... 97

XX.   Cruz-Garcia's Claim of Actually Innocence Is Without Merit (Claim 17). ................................................................. 97

XXI.   The Mitigation Special Issue Does Not Preclude Consideration of Mitigating Evidence (Claim 18). ............................................. 99

XXII.  The "10-12 Rule" is Constitutionally Sound (Claim 19). ................... 100

XXIII. Cruz-Garcia's Death Sentence Is Not Based on an Unconstitutionally Vague First Special Issue (Claim 20). ................. 101

XXIV.  Cruz-Garcia's Death-Penalty-Administration Claim is Procedurally Defaulted and Meritless (Claim 21). ............................ 103

XXV.   Several of Cruz-Garcia's Claims of Ineffective Assistance of Trial Counsel (IATC) (Claim 4) Are Procedurally Defaulted, and All IATC Claims Are Without Merit............................................................. 105

       A. The Director previously addressed several of Cruz-Garcia's IATC claims in his Answer and Motion for Summary Judgment, ECF No. 47. ....................................................................... 105

       B. Claims 4(D), 4(E), and a portion of Claim 4(C)(7) were not raised in Cruz-Garcia's first petition, thus they are time-barred. ............... 106

       C. Cruz-Garcia raises several IATC claims that are procedurally defaulted and barred from review. ................................................. 109

       D. Cruz-Garcia does not overcome his burden under AEDPA to show he is entitled to relief on his properly exhausted IATC claims.......... 127

CONCLUSION .............................................................................................. 145

# TABLE OF AUTHORITIES

**Cases**

*Abdul–Kabir v. Quarterman*, 550 U.S. 233 (2007) ..................................................... 89

*Adams v. Texas*, 448 U.S. 38 (1980) ................................................................ 123, 145

*Allen v. Stephens,* 805 F.3d 617 (5th Cir. 2015) ........................................................ 104

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) ........................................... 88

*Avila v. Quarterman,* 560 F.3d 299 (5th Cir. 2009)........................................... *passim*

*Ayestas v. Davis,* 138 S. Ct. 1080 (2018) ................................................................... 104

*Banks v. Dretke,* 540 U.S. 668 (2004)........................................................................ 62

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000)......................................... *passim*

*Beazley v. Johnson,* 242 F.3d 248 (5th Cir. 2001).................................................... 101

*Bell v. Cone*, 535 U.S. 685 (2002) ..................................................................... 129, 130

*Berger v. United States*, 295 U.S. 78 (1935)............................................................... 95

*Bible v. Stephens*, No. 4:13-CV-200, 2014 WL 5500722 (S.D. Tex. Oct. 30, 2014) ........

................................................................................................................................ 95, 96

*Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005)........................................................... 86

*Blue v. Thaler,* 665 F.3d 647 (5th Cir. 2011) .................................................... 101, 102

*Bobby v. Van Hook,* 558 U.S. 4 (2009) ............................................................. 114, 138

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ........................................................... 43

*Borjan v. State*, 787 S.W.2d 53 (Tex. Crim. App. 1990) ........................................... 95

*Bracy v. Gramley*, 520 U.S. 899 (1997) ..................................................................... 86

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................... *passim*

iv

*Brecht v. Abrahmson*, 507 U.S. 619 (1993) .......................................................... *passim*

*Brewer v. Quarterman*, 550 U.S. 286 (2007) ............................................................. 89

*Brown v. Cain*, 104 F.3d 744 (5th Cir. 1997) ........................................................... 63

*Busby v. Davis,* 925 F.3d 699 (5th Cir. 2019) ........................................................... 39

*Busby v. Dretke*, 359 F.3d 708 (5th Cir. 2003) ......................................................... 73

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ........................................................... 95

*Cardenas v. Dretke*, 405 F.3d 244 (5th Cir. 2005) .................................................... 27

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) ........................................................ 139

*Castilleja v. State*, No. 05-20-00866-CR, 2022 WL 2448088 (Tex. App.—Dallas, July 6, 2022) ................................................................................................................... 16

*Castillo v. Johnson*, 141 F.3d 218 (5th Cir. 1998) .................................................... 63

*Castro v. State*, 233 S.W.3d 46 (Tex. App.—Houston 2007) ..................................... 75

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .................................................... 34, 89

*Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ........................... 116, 126, 127, 128

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ........................................... 92

*Coleman v. Johnson*, 184 F.3d 398 (5th Cir. 1999) ................................................. 108

*Coleman v. Quarterman*, 456 F.3d 537 (5th Cir. 2006) ..................................... *passim*

*Coleman v. Thompson*, 501 U.S. 722, (1991) ..................................................... *passim*

*Colyer v. State*, 428 S.W.3d 117 (Tex. Crim. App. 2014) .......................................... 20

*Crane v. Kentucky*, 476 U.S. 683 (1986) ............................................................. 33-34

*Crawford v. Washington*, 541 U.S. 36, 59 (2004) .................................................... 82

*Cross v. Johnson*, 169 F. Supp. 2d 603 (N.D. Tex. 2001) ........................................ 87

*Cruz v. New York*, 481 U.S. 186 (1987) .................................................................. 81

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ............................................................ *passim*

*Darden v. Wainwright*, 477 U.S. 168 (1986) ............................................................... 15

*Davis v. Alaska*, 415 U.S. 308 (1974) ...................................................................... 30

*Davis v. Johnson*, 158 F.3d 806 (5th Cir. 1998) ...................................................... 108

*Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010) ......................................... 102

*Delaware v. Fensterer*, 474 U.S. 15 (1985) ........................................................ 30, 31

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) .................................................... 17

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) ................................. 138, 139, 141

*Drew v. Collins*, 964 F.2d 411 (5th Cir. 1992) .......................................................... 96

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007)) ....................................... 43

*Druery v. Thaler,* 647 F.3d 535 (5th Cir. 2011) ................................. 85, 102, 114, 137

*Duncan v. Walker*, 533 U.S. 167 (2001) .................................................................. 108

*Duren v. Missouri*, 439 U.S. 357 (1979) .......................................................... 118, 119

*Early v. Packer*, 537 U.S. 3 (2002) ........................................................................... 36

*Edwards v. Stephens*, 612 F. App'x 719 (5th Cir. 2015) ......................................... 124

*Ellis v. Lynaugh*, 873 F.2d 830 (5th Cir. 1989) ........................................................ 27

*Estelle v. McGuire*, 502 U.S. 62 (1991) .............................................. 33, 91, 114, 184

*Evitts v. Lucey*, 469 U.S. 387 (1985) ........................................................................ 76

*Ex parte Barber*, 879 S.W.2d 889 (Tex. Crim. App. 1994) ....................................... 37

*Ex parte Brown*, 205 S.W.3d 538 (Tex. Crim. App. 2006) ........................................ 17

*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009) ....................................... 36

*Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012) ....................................... 36

*Ex parte Cruz-Garcia*, Nos. WR 85,051-02 and No. WR-85,051-03, 2017 WL 4947132, at *1–2 (Tex. Crim. App. Nov. 1, 2017) ............................................................. *passim*

*Ex parte Cruz-Garcia*, No. WR-85,051-05, 2021 WL 4571730 (Tex. Crim. App. Oct. 6, 2021) ..................................................................................................... *passim*

*F.D.I.C. v. Conner*, 20 F.3d 1376 (5th Cir. 1994) ..................................................... 110

*Faulder v. Johnson*, 81 F.3d 515 (5th Cir. 1996) ...................................................... 40

*Fierro v. Cockrell*, 294 F.3d 674 (5th Cir. 2002) ...................................................... 107

*Fisher v. Johnson*, 174 F.3d 710 (5th Cir. 1999) ..................................................... 109

*Fisher v. State*, 169 F.3d 295 (5th Cir. 1999) ............................................................. 27

*Flores v. Quarterman*, 467 F.3d 484 (5th Cir. 2006) ............................................... 108

*Ford v. Wainwright*, 477 U.S. 399 (1986) ................................................................. 15

*Foster v. Quarterman*, 466 F.3d 359 (5th Cir. 2006) ................................................ 99

*Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) ............................................................... 93

*Galvan v. Cockrell,* 293 F.3d 760 (5th Cir. 2002) .............................................. 25, 85

*Gamboa v. State*, 296 S.W.3d 574 (Tex. Crim. App. 2009) ....................................... 92

*Garcia v. Lumpkin*, No. 18-41150, 824 F. App'x 252, 255 (5th Cir. Aug. 20, 2020) .. 84

*Garza v. Stephens*, 738 F.3d 669 (5th Cir. 2013) ..................................................... 112

*Giglio v. United States,* 405 U.S. 150 (1972) ....................................................... 37, 40

*Gochicoa v. Johnson*, 118 F.3d 440 (5th Cir. 1997) ...................................... 33, 35, 91

*Godfrey v. Georgia,* 446 U.S. 420 (1980) ................................................................ 104

*Gomez v. Quarterman*, 529 F.3d 322 (5th Cir. 2008) .............................................. 123

*Gray v. Lucas,* 677 F.2d 1086 (5th Cir. 1982) ......................................................... 137

*Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012) ............................................ 15, 88

vii

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ...................................................... 130

*Harrington v. Richter*, 562 U.S. 86 (2011) ...................................................... *passim*

*Harris v. Reed*, 489 U.S. 255 (1989) ...................................................... *passim*

*Hathorn v. Lovorn*, 457 U.S. 255 (1982) ...................................................... 27

*Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009) ................................................ 17

*Hernandez v. Johnson*, 213 F.3d 243 (5th Cir. 2000) .......................................... 37, 38

*Hernandez v. New York*, 500 U.S. 352 (1991) ...................................................... 121

*Herrera v. Collins*, 506 U.S. 390 (1993) ...................................................... 29

*Holland v. Florida*, 560 U.S. 631 (2010) ...................................................... 108

*Holland v. Jackson*, 542 U.S. 649 (2004) ...................................................... 12, 14

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ................................................ *passim*

*House v. Bell*, 547 U.S. 518 (2006) ...................................................... 29

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005) ...................................................... 18

*Hughes v. Johnson,* 191 F.3d 607 (5th Cir. 1999) .............................................. 43, 104

*Hutchison v. Bell*, 303 F.3d 720 (6th Cir. 2002) ...................................................... 96

*J. E. B. v. Alabama ex rel. T. B.*, 511 U.S. 127 (1994) ...................................... 22, 121

*James v. Collins*, 987 F.2d 1116 (5th Cir. 1993) ...................................................... 102

*Jefferson v. Upton*, 560 U.S. 294 (2010) ...................................................... 88

*Johnson v. Mississippi,* 486 U.S. 578 (1988) ...................................................... 37

*Johnson v. Scott*, 68 F.3d 106 (5th Cir. 1995) ...................................................... 74

*Johnson v. Texas,* 509 U.S. 350 (1993) .......................................................... 103, 145

*Jones v. Barnes*, 463 U.S. 745 (1983) ...................................................... 77, 78

*Jones v. Davis*, 890 F.3d 559 (5th Cir. 2018) .............................................................. 14

*Jones v. Dretke*, 375 F.3d 352 (5th Cir. 2004) ............................................................ 124

*Jones v. United States,* 527 U.S. 373 (1999) .............................................................. 102

*Jurek v. Texas*, 428 U.S. 262 (1976) ............................................................................ 103

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .......................................................... 130

*Kinnamon v. Scott*, 40 F.3d 731 (5th Cir. 1994) .......................................................... 93

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ..................................................... 113, 130

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ........................................... 40, 41, 126

*Kotteakos v. United States*, 328 U.S. 750 (1946)..................................................... 19, 81

*Kutzner v. Cockrell,* 303 F.3d 333, 337 (5th Cir. 2002) ...................................... 40, 50

*Kutzner v. Johnson*, 242 F.3d 605 (5th Cir. 2001) ............................................... 40, 54

*Landry v. State*, 706 S.W.2d 105 (Tex. Crim. App. 1985) ........................................ 92

*Leal v. Dretke,* 428 F.3d 543 (5th Cir. 2005)............................................................. 104

*Lewis v. Thaler,* 701 F.3d 783 (5th Cir. 2012) ........................................................... 25

*Liteky v. United States*, 510 U.S. 540 (1994) ...................................................... 86, 87

*Lockett v. Ohio*, 438 U.S. 586 (1978) .......................................................................... 89

*Lockhart v. Fretwell*, 506 U.S. 364 (1993)................................................................. 129

*Lookingbill v. Cockrell,* 293 F.3d 256 (5th Cir. 2002).......................................... *passim*

*Lowenfield v. Phelps*, 484 U.S. 231 (1988)............................................................. 74-75

*Lucio v. Lumpkin*, 987 F.3d 451 (5th Cir. 2021).......................................................... 35

*Malicoat v. Mullin*, 426 F.3d 1241 (10th Cir. 2005) ................................................... 96

*Manning v. Epps*, 688 F.3d 177 (5th Cir. 2012) ....................................................... 108

ix

*Martinez v. Ryan*, 566 U.S. 1 (2012) .................................................................. *passim*

*Maryland v. Craig*, 497 U.S. 836 (1990) .................................................. 82

*Massaro v. United States* 538 U.S. 500 (2003) ........................................ 130

*Matchett v. Dretke*, 380 F.3d 844, 848–49 (5th Cir. 2004)................................. 73, 113

*Mayle v. Felix*, 545 U.S. 644 (2005)........................................................... 109

*Maynard v. Cartwright,* 486 U.S. 356 (1988) ........................................... 104

*Mayo v. Lynaugh*, 882 F.2d 134 (5th Cir. 1989) .................................... 77, 78

*McCleskey v.* Kemp, 481 U.S. 279 (1987)................................................... 105

*McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 864 (5th Cir. 1993) 110

*McQuarrie v. State,* 380 S.W.3d 145 (Tex. Crim. App. 2012)..................................... 20

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) .............................................. 108

*Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009) ......................................... 82-83

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999)....................................... 137

*Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008) ................................... 28

*Moreno v. Dretke,* 450 F.3d 158 (5th Cir. 2006)...................................... 77, 78

*Moreno v. Estelle*, 717 F.2d 171 (5th Cir. 1983)........................................ 84

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................. 125

*Murphy v. Davis,* 737 F. App'x 693 (5th Cir. June 11, 2018) .................................. 114

*Murphy v. Johnson,* 205 F.3d 809 (5th Cir. 2000)................................... 43, 63

*Murray v. Giarratano*, 492 U.S. 1 (1989)................................................. 16

*Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984) .................................... 115

*Napue v. Illinois,* 360 U.S. 264 (1959) ................................................. 38, 44

x

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ............................................................ 11

*Neal v. State,* 150 S.W.3d 159 (Tex. Crim. App. 2004) ............................................... 43

*Nelson v. Hargett*, 989 F.2d 847 (5th Cir. 1993) ..................................................... 138

*Newbury v. Stephens*, 756 F.3d 850 (5th Cir. 2014) ...........................................113-14

*Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995) .................................................... 18, 88

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997) ...................................................... 99

*O'Dell v. Netherland*, 521 U.S. 151 (1997) ............................................................... 92

*Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008) ...........................................22-24

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................... 129

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ........................................................... 15

*Parker v. Randolph*, 442 U.S. 62 (1979) .............................................................80-81

*Payne v. Tennessee*, 501 U.S. 808 (1991) ............................................................... 116

*Pennsylvania v. Finley*, 481 U.S. 551 (1987) ........................................................... 16

*Phillips v. Donnelly*, 216 F.3d 508 (5th Cir. 2000) .................................................. 109

*Pulley v. Harris*, 465 U.S. 37 (1984) ....................................................................... 103

*Purkett v. Elem*, 514 U.S. 765 (1995) ..................................................................... 121

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998) .................................................. 18-19

*Ramey v. Davis*, 314 F.Supp. 3d. 785 (S.D. Tex. July 11, 2018) ............................. 120

*Rashidi v. American President Lines*, 96 F.3d 124 (5th Cir. 1996) ........................ 109

*Ray v. State*, 178 S.W.3d 833 (Tex. Crim. App. 2005) .............................................. 27

*Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) ....................................................... 99

*Rhines v. Weber*, 544 U.S. 269 (2005) ....................................................................... 8

*Richards v. Thaler*, 710 F.3d 573 (5th Cir. 2013) ..................................................... 108

*Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987) ............................................. 81, 85

*Riley v. Cockrell*, 339 F.3d 308 (5th Cir. 2003) ........................................... 129, 136-37

*Ristaino v. Ross*, 424 U.S. 589 (1976) ....................................................................... 120

*Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App. 2007) ....................................... 117

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012) ............................................... 117, 119

*Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006). ................................................. 22, 23

*Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010) ........................................................... 39

*Rock v. Arkansas*, 483 U.S. 44 (1987) ....................................................................... 89

*Rockwell v. Davis,* 853 F.3d 758 (5th Cir. 2017) ..................................................... 101

*Rodriguez v. Johnson*, 104 F.3d 694 (5th Cir. 1997) ................................................ 73

*Rogers v. Lynaugh*, 848 F.2d 606 (5th Cir. 1988) ..................................................... 95

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ............................................. 125-26, 142

*Ross v. Oklahoma*, 487 U.S. 81 (1988) .................................................................... 124

*Ruiz v. Quarterman*, 460 F.3d 638 (5th Cir. 2006) .................................................... 99

*Rushen v. Spain*, 464 U.S. 114 (1983) ................................................................... 79-80

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) ...................................................... 98

*Sawyer v. Whitley*, 505 U.S. 333, 338 (1992) .................................................... *passim*

*Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003) ................................................... 76

*Scheanette v. Quarterman,* 482 F.3d 815, 824-25 (5th Cir. 2007) ..................... 28, 104

*Schlang v. Heard*, 691 F.2d 796 (5th Cir. 1982) ............................................. 126, 142

*Schlup v. Delo*, 513 U.S. 2985 (1995) ................................................................ *passim*

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ...................................................... 13, 38, 89

*Segundo v. Davis*, 831 F.3d 345 (5th Cir. 2016) ......................................................... 14

*Shinn v. Martinez Ramirez*, 142 S. Ct. 1718, 1738 (2022) ................................. *passim*

*Shoop v. Twyford*, 142 S. Ct. 2037, 2046 (2022) ........................................................ 13

*Skillern v. Estelle,* 720 F.3d 839 (5th Cir. 1983)........................................................ 91

*Skilling v. United* States, 561 U.S. 358, 386 (2010) ................................................. 120

*Skipper v. South Carolina*, 476 U.S. 1 (1986)........................................................... 89

*Smith v. Black*, 970 F.2d 1383 (5th Cir. 1992) ......................................................... 27

*Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) ........................................... 27, 141

*Smith v. Illinois*, 390 U.S. 129 (1968) ..................................................................... 31

*Smith v. Phillips*, 455 U.S. 209 (1982) ..................................................................... 79

*Smith v. Robbins*, 528 U.S. 259 (2000) ................................................. 76, 77, 78, 113

*Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007) ..................................... 143, 144

*Soria v. Johnson*, 207 F.3d 232 (5th Cir. 2000) ...................................................... 124

*Sparks v. Davis,* 756 F. App'x 397 (5th Cir. 2018) ............................................. 41, 58

*Spencer v. Texas*, 385 U.S. 554 (1967) ...................................................................... 34

*Sprouse v. Stephens,* 748 F.3d 609 (5th Cir. 2014).......................................... 102, 103

*State v. Norwood,* No. 09-15-00083, 2015 WL 5093332 (Tex. App.—Beaumont Aug. 31, 2015)............................................................................................................... 66

*Strickland v. Washington*, 466 U.S. 668 (1984)................................................. *passim*

*Strickler v. Greene*, 527 U.S. 263 (1999) .................................................................. 62

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ............................................................... 118

*Teague v. Lane*, 489 U.S. 288 (1989) ................................................................. 85, 92

xiii

*Timmel v. Philips*, 799 F.3d 1083 (5th Cir. 1986) ..................................................... 118

*Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999) ..................................................... 88

*Trevino v. Thaler*, 569 U.S. 413, 428–29 (2013) ............................................. 111, 113

*Turner v. Louisiana*, 379 U.S. 466 (1965)................................................................. 18

*Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2000) ......................... 28, 101, 104

*United States v. Agurs,* 427 U.S. 97 (1976)............................................................... 46

*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013) ......................................... 104

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979).............................................. 48

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................. *passim*

*United States v. Brummitt*, 665 F.2d 521 (5th Cir. 1981) ........................................ 119

*United States v. Ciampi*, 419 F.3d 20 (1st Cir. 2005)............................................. 110

*United States v. Cook*, 432 F.2d 1093 (7th Cir. 1970) .............................................. 95

*United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999)........................... 109-10

*United States v. Cronic*, 466 U.S. 648 (1984)........................................................ 130

*United States v. Dula,* 39 F.3d 591 (5th Cir. 1994) .................................................. 66

*United States v. Fields*, 72 F.3d 1200 (5th Cir. 1996) ............................................... 95

*United States v. Fields*, 761 F.3d 443 (5th Cir. 2014) ............................................... 99

*United States v. Frady*, 456 U.S. 152 (1982)........................................................... 28

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966).............................................. 86

*United States v. Guerrero,* 768 F.3d 351 (5th Cir. 2014) .......................................... 41

*United States v. Harris*, 458 F.2d 670 (5th Cir. 1972) .............................................. 87

*United States v. Malatesta*, 583 F.2d 748 (5th Cir. 1978) ......................................... 96

xiv

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000) ......................................... 124

*United States v. Nixon*, 881 F.2d 1305 (5th Cir. 1989)........................................ 62, 66

*United States v. Olis*, No. H:03–CR–217, , 2008 WL 5046342 (S.D. Tex. Nov. 21, 2008) ...................................................................................................................... 79

*United States v. Patino–Prado*, 533 F.3d 304 (5th Cir. 2008).................................... 97

*United States v. Phillips*, 210 F.3d 345 (5th Cir. 2000) ...................................... 76, 77

*United States v. Reeves*, 782 F.2d 1323 (5th Cir. 1986)............................................. 87

*United States v. Scheffer*, 523 U.S. 303 (1998) ...................................................... 33, 89

*United States v. Stewart,* 433 F.3d 2739 (2nd Cir. 2006) .......................................... 49

*United States v. Thomas*, 724 F.3d 632 (5th Cir. 2013) ............................................ 79

*United States v. Thompson*, 482 F.3d 781 (5th Cir. 2007) ........................................ 94

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998)........................................... 105

*United States v. Williams*, 264 F.3d 561 (5th Cir. 2001)......................................... 119

*United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971)........................................ 82

*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999)...................................... 76

*Uttecht v. Brown*, 551 U.S. 1 (2007) ................................................................ 123, 124

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ........................................ 12, 15, 17

*Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983) ......................................................... 100

*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................................ 123, 124

*Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996)....................................................... 18

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................... 114, 129, 137-38

*Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010) ............................................................ 15

*Wiley v. Puckett*, 969 F.2d 86 (5th Cir. 1992) ........................................................ 122

*Williams v. Illinois*, 567 U.S. 50 (2012) ..................................................... 83

*Williams v. Taylor*, 529 U.S. 362 (2002) ............................................. 10, 11

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) ........................................ 11

*Yohey v. Collins,* 985 F.2d 222 (5th Cir. 1993) ..................................... 141

*Young v. Davis,* 835 F.3d 520 (5th Cir. 2016) ........................................ 102

## Statutes

28 U.S.C. § 2254(d) ............................................................................. *passim*

28 U.S.C. § 2254(e) .............................................................................. *passim*

Texas Code of Criminal Procedure art. 11.071 .................................. 15, 36

Texas Code of Criminal Procedure art. 33.011(b) ................................... 75

## Constitutional Provisions

U.S. Const. amend. VI ............................................................................ 128

U.S. Const. amend. VIII .......................................................................... 128

U.S. Const. amend. XIV ........................................................................... 128

# ANSWER

This is a federal habeas case. Petitioner Obel Cruz-Garcia is a Texas state inmate under a sentence of death. Respondent Director Bobby Lumpkin ("the Director") is Cruz-Garcia's custodian. Cruz-Garcia presently seeks federal habeas relief. But Cruz-Garcia has alleged claims that are, in part, procedurally barred, procedurally defaulted, and without merit. Accordingly, his petition should be dismissed.

# CRUZ-GARCIA'S ALLEGATIONS[1]

The Director understands Cruz-Garcia to allege the following claims in his Second Amended Petition, ECF No. 73 ("Pet'r Br."):

1.  Cruz-Garcia was denied a fair and impartial trial due to juror misconduct during the punishment phase where a juror brought his Bible into the deliberation room, two jurors discussed evidence on the courthouse elevator, and jurors discussed the evidence during trial breaks.

2.  *The trial court refused to allow him to* present evidence regarding the unreliability of the DNA evidence, violating Cruz-Garcia's rights to present a defense and *cross-examine witnesses.*

3.  *Cruz-Garcia's conviction is based on inaccurate and unreliable DNA evidence, violating Cruz-Garcia's rights under the Eighth and Fourteenth Amendments.*

4.  Cruz-Garcia was denied effective assistance of counsel at trial where counsel failed to:

    A.   Review the State's file (Cruz-Garcia's Claim 4(C)(7)),[2]

---

[1]    The Director has italicized claims that are procedurally defaulted, in whole or in part.

[2]    For ease of comparison between the Director's answer and Cruz-Garcia's second amended petition, the Director will address Cruz-Garcia's claims of ineffective assistance of trial counsel ("IATC") by number as listed in Cruz-Garcia's second amended petition, rather than by the claim numbers listed in this Allegations section.

1

B.   *Adequately communicate with Cruz-Garcia* (Cruz-Garcia's Claim 4(D)),

C.   *Seek a continuance based on their caseload and lack of communication with Cruz-Garcia* ((Cruz-Garcia's Claim 4(E)),

D.   Effectively investigate, prepare, and perform during the guilt/innocence phase (Cruz-Garcia's Claim 4(F)):

   i.   Counsel failed to retain a DNA expert and adequately investigate the State's DNA evidence.

   ii.   Counsel failed to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old Houston Police Department (HPD) Crime Lab.

   iii.   Counsel failed to investigate State witness Carmelo Rudy Martinez Santana's mental health issues, crime of moral turpitude, and evidence contradicting Santana's testimony.

   iv.   Counsel failed to investigate Angelita Rodriguez.

   v.   Counsel failed to investigate Diana Garcia and Arturo Rodriguez.

   vi.   Counsel failed to investigate law enforcement's theory of the case at trial.

E.   Effectively investigate, prepare, and perform during the punishment phase (Cruz-Garcia's Claim 4(G)):

   i.   Counsel performed deficiently when they presented a weak mitigation case, failed to retain a mitigation specialist, failed to consult with any experts except for one psychologist, and failed to investigate in Puerto Rico.

   ii.   Counsel's actions prejudiced Cruz-Garcia when they failed to conduct an adequate mitigation investigation that would have revealed Cruz-Garcia's life history, failed to retain a trauma expert and expert on Dominican culture and history, and

2

        failed to discover and present evidence of Cruz-Garcia's assistance to federal law enforcement agencies.

    iii.    Counsel failed to investigate and rebut the State's case on future dangerousness regarding Cruz-Garcia's extraneous offenses and exemplary prison record.

F.    *Object to error and preserve error for appellate review (Cruz-Garcia's Claim 4(H)):*

    i.    *Violations of the Confrontation Clause when Matt Quartaro and Dr. Dwayne Wolf testified to the work performed by others*;

    ii.    *Trial court error in limiting Cruz-Garcia's cross-examination regarding the reliability of the DNA evidence*;

    iii.    *Improper admission of victim impact testimony at the punishment phase of trial from witnesses to extraneous offenses, Manuel Buten and Andres Castillo Buten, in violation of the Eighth Amendment*;

    iv.    *Improper jury argument by the State*;

    v.    *Repetitive emotional outbursts from the gallery that tainted Cruz-Garcia's trial in violation of the Fifth, Sixth, and Fourteenth Amendments*;

    vi.    *Incorrect translation of testimony*; and

    vii.    *Cruz-Garcia's absence from an ex parte discussion with one juror and an ex parte discussion about two jurors' discussion of the case outside the courtroom*;

G.    Investigate two jurors' discussion of the case outside the courtroom, and object to the trial court's *ex parte* meeting with Juror Bowman ((Cruz-Garcia's Claim 4(I)),

H.    *Act effectively during jury selection* ((Cruz-Garcia's Claim 4(J)):

  i. *Counsel failed to raise and preserve error that Cruz-Garcia's jury was selected from a venire that was not representative of a fair cross section of the community, in violation of the Sixth and Fourteenth Amendments*;

  ii. *Counsel failed to make a full and accurate record of jury selection and require the State to exercise its cause for challenges on the record*;

  iii. *Counsel failed to raise a challenge pursuant to Batson v. Kentucky*, 476 U.S. 79 (1986);

  iv. *Counsel failed to raise challenges pursuant to Witherspoon v. Illinois*, 391 U.S. 510 (1968);

  v. *Counsel failed to identify potential jurors' biases based on the alleged facts of the offense*; and

  vi. *Counsel failed to object to the State's inflammatory voir dire questioning*;

 I. Recognize the significance of Cruz-Garcia's foreign nationality and seek assistance from the Dominican Republic Consulate under the Vienna Convention on Consular Relations (Cruz-Garcia's Claim 4(K)).

5. The State relied on false testimony:

 A. From Santana regarding Cruz-Garcia's participation in the capital murder, Santana's favorable treatment in exchange for his testimony, and Santana's criminal history;

 B. Relating to DNA evidence;

 C. From Angelita Rodriguez;

 D. From Diana Garcia and Arturo Rodriguez;

 E. From law enforcement;

 F. From Johnny Lopez and Mr. Santana regarding Cruz-Garcia murdering Saul Flores; and

4

G.      Regarding a separate kidnapping committed by Cruz-Garcia.

6.     *The State withheld exculpatory evidence in violation of the Sixth, Eighth, and Fourteenth Amendments and Brady v. Maryland, 373 U.S. 83 (1963).*

7.     The trial court's ex parte meeting with a holdout juror and its coercive instructions during the punishment phase deliberations violated Cruz-Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments.

8.     Cruz-Garcia was denied effective assistance of counsel on appeal because appellate counsel failed to challenge the trial court's ex parte meeting with, and coercive instructions to, a holdout juror.

9.     *Cruz-Garcia was excluded from two critical stages of trial, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.*

10.    *In violation of the Confrontation Clause, Cruz-Garcia was unable to confront witnesses who actually performed the DNA labwork and autopsies that were presented through other witnesses.*

11.    *Testimony was translated incorrectly to the jury, violating Cruz-Garcia's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.*

12.    The trial judge presiding over the case had a conflict of interest and was biased against Cruz-Garcia.

13.    The trial court prohibited Cruz-Garcia from presenting mitigation evidence in the form of biblical course certificates from his imprisonment in Puerto Rico.

14.    *Repeated emotional outbursts from the gallery rendered Cruz-Garcia's conviction and death sentence fundamentally unfair.*

15.    Prosecutors made numerous inappropriate and inflammatory comments throughout the trial, denying Cruz-Garcia his right to due process and a fair trial.

16.    *The State failed to provide Cruz-Garcia his guaranteed consular notification under the Vienna Convention on Consular Relations.*

17.    Cruz-Garcia is actually innocent.

18.    The punishment phase jury instructions impermissibly restricted the evidence the jury could determine was mitigating.

19.    The trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence, violating Cruz-Garcia's rights under the Eighth and Fourteenth Amendments.

20.    Cruz-Garcia's death sentence was imposed based on Texas's unconstitutionally vague first special issue in violation of his rights under the Eighth and Fourteenth Amendments.

21.    *Texas utilizes an arbitrary and discriminatory system to administer the death penalty, violating Cruz-Garcia's rights under the Eighth and Fourteenth Amendments.*

Pet'r Br. at 22–56, 102–254.[3]

## STATEMENT OF THE CASE

## I.    State Court Proceedings

Cruz-Garcia was convicted and sentenced to death for capital murder in a judgment of the 337th District Court of Harris County, entered on July 22, 2013. 3 CR 50.[4] The Texas Court of Criminal Appeals (CCA) affirmed Cruz-Garcia's conviction on direct appeal. *Cruz-Garcia v. State*, No. AP-77,025, 2015 WL 6528727, at *1–30 (Tex. Crim. App. Oct. 28, 2015). Cruz-Garcia filed three state applications for writ of habeas corpus; the first was denied as meritless, and the latter two were dismissed as a subsequent application. *Ex parte Cruz-Garcia*, Nos. WR 85,051-02 and No. WR-

---

[3]    The Director cites to the page numbers of Pet'r Br. as paginated by Cruz-Garcia.

[4]    The Director refers to the state records as follows, each preceded by the volume number and followed by the relevant Bates-stamped page number: "CR" for the Clerk's Record of papers filed in the trial court for Cruz-Garcia's appellate proceedings under cause number No. AP-77,025, and "RR" for the statement of facts of the jury trial in the Reporter's Record. The Director cites to the Bates-stamped page numbers of the pleadings contained within *Ex parte Cruz-Garcia*, Nos. WR-85,051-02, -03, and -05 as "SHCR-xx," respectively.

85,051-03, 2017 WL 4947132, at *1–2 (Tex. Crim. App. Nov. 1, 2017);[5] *Ex parte Cruz-Garcia*, No. WR-85,051-05, 2021 WL 4571730 (Tex. Crim. App. Oct. 6, 2021).

## II.   Federal Court Proceedings.

After Cruz-Garcia had filed his first and first subsequent state habeas application, he turned to the federal court for relief, filing his initial federal petition on October 31, 2018. ECF No. 12. Pursuant to the scheduling order and two thirty-day extensions, Cruz-Garcia then filed his amended petition on July 1, 2019. ECF No. 18. The Director filed a Motion for Summary Judgment in response on September 30, 2019. ECF No. 25. In reply, Cruz-Garcia filed a Motion to Preclude the Director from Raising Procedural Defenses Due to Her Failure to File an Answer and Proposed Discovery Schedule. ECF No. 29. On April 30, 2020, this Court suspended the scheduling order, denied Cruz-Garcia's motion to preclude Respondent from raising affirmative defenses; denied the Director's motion for summary judgment without prejudice; and ordered Cruz-Garcia to file a memorandum in support of his amended petition, directing Cruz-Garcia to raise the legal and factual bases of all claims he wished to present. ECF No. 33 at 3–4. This Court also directed the Director to file an answer and any dispositive motion in response to Cruz-Garcia's brief within sixty days of Cruz-Garcia's petition. *Id.* at 5.

Cruz-Garcia filed his supporting memorandum on July 13, 2020, which he followed with a motion for discovery on October 20, 2020. ECF No. 38, 43. This Court denied Cruz-Garcia's motion without prejudice on November 6, 2020, finding that motion was "not appropriate until the parties have litigated the question of whether a *Rhines v. Weber*, 544 U.S. 269 (2005)] stay is available in this case." ECF No. 45

---

[5]    The CCA disposed of Cause Nos. WR-85,051-02 and -03 in the same order. *Ex parte Cruz-Garcia*, 2017 WL 4947132 at *1–2.

at 4. Shortly thereafter, Cruz-Garcia filed a Motion to Stay and Abey Federal Proceedings. ECF No. 46.

After two extensions of time to file his responsive pleading to Cruz-Garcia's petition, the Director filed his answer and motion for summary judgment on December 11, 2020. ECF Nos. 42, 45, 47. The Director filed his Response in Opposition to Cruz-Garcia's motion for stay three days later, to which Cruz-Garcia replied on December 21, 2020. ECF Nos. 51, 53. Ultimately, this Court granted a stay and abeyance for Cruz-Garcia to exhaust several claims. ECF No. 59.

The case was re-opened on November 9, 2021, upon the joint motion of both parties, after the CCA dismissed Cruz-Garcia's second subsequent state habeas application for abuse of the writ. ECF Nos. 64, 65. Including the Court's original show cause order and two extensions, Cruz-Garcia filed his second amended petition on May 4, 2022, in which he raised several new claims and reorganized the claims he raised in his supporting legal memorandum for first amended petition, ECF No. 38. *See* ECF Nos. 65, 68, 72, 73.

The Director's answer was initially due September 1, 2022. Cruz-Garcia later filed motions for an evidentiary hearing and discovery, responses to which were initially due August 2, 2022. ECF Nos. 74, 75. The Director sought to carry his responses to the motions to coincide with the filing of his answer to the petition, i.e., September 1, 2022. ECF No. 76. This Court granted the Director's motion to amend the scheduling order to respond to Cruz-Garcia's second amended petition and carried motions until October 3, 2022. ECF No. 79. The Director again moved for an amended scheduling order, requesting a forty-three-day extension to file his answer and responses to Cruz-Garcia's motions for an evidentiary hearing and discovery. ECF No. 80. On October 5, 2022, the Court granted the Director's motion, in part, and ordered the Director to file a responsive pleading to Cruz-Garcia's motions and an

answer to Cruz-Garcia's petition on October 17, 2022. ECF No. 81. The Director moved for this Court to reconsider amending the scheduling order to allow him to file his answer to Cruz-Garcia's petition, which the Court granted, in part, ordering the Director to file his answer to Cruz-Garcia's petition on November 1, 2022. ECF Nos. 82, 83. In keeping with the Court's orders of October 5 and 7, 2022, the Director filed his response in opposition to Cruz-Garcia's motions for an evidentiary hearing and discovery on October 17, 2022. ECF No. 84. This answer follows.

## STATEMENT OF FACTS

In the interest of judicial efficiency, the Director incorporates by reference the statement of facts for this case as set forth in the Director's Motion for Summary Judgment. ECF 25 at 3–13 (citing *Cruz-Garcia*, 2015 WL 6528727, at *1–7).

## ANSWER

### I.   Standard of Review

28 U.S.C. § 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in state criminal justice systems, not a substitute for ordinary error correction through appeal. For claims that were adjudicated in state court, § 2254(d) imposes a highly deferential standard that demands a federal court grant habeas relief only where one of two conditions are present in the state court judgment. A federal court may grant relief if the state court adjudicated a constitutional claim contrary to, or unreasonably applied clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 100–01 (2011) (citing *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2002)). Or the court may grant relief if the state court decision was based on an unreasonable determination of facts in light of the record. *Id*. Section 2254(d)'s standard is necessarily difficult to meet because it was so designed.

9

A state court decision can be "contrary" to established federal law in two ways. *(Terry) Williams*, 529 U.S. at 405–06. First, if the state court applies a rule that contradicts Supreme Court precedent. *Id.* at 405. Second, if the state court confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result. *Id.* at 406.

A state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *(Terry) Williams*, 529 U.S. at 406. A state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. The focus of this test is not on the state court's method of reasoning, but rather on its ultimate legal conclusion. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.").

To determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 87. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, in reviewing a state court's merits adjudication for reasonableness, a federal court is limited to the record that was before the state court. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

10

Under AEDPA, the state court's factual findings "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). Further, because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2).

## II.  The Court Is Foreclosed from Considering Evidence Outside the State Court Record because Cruz-Garcia does not meet the requirements of § 2254(e)(2).

Cruz-Garcia largely relies on evidence in support of his arguments that were not properly presented to the state court. Cruz-Garcia fails to show that his claims fall within § 2254(e)(2)'s stringent exceptions to allow him to develop the record before this Court and present new evidence.

Review pursuant to § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. Use of evidence not properly presented to the state court is generally foreclosed in federal court. *See Shinn v. Martinez Ramirez*, 142 S. Ct. 1718, 1738 (2022) (discussing *Holland v. Jackson*, 542 U.S. 649, 653 (2004)); *see also id.* at 1739 ("[A] federal court may not hold an evidentiary hearing—*or otherwise consider new evidence*—to assess cause and prejudice under *Martinez*.") (emphasis added). Also, an evidentiary hearing is precluded unless: (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence;

11

and (2) the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2); *Martinez Ramirez*, 142 S. Ct. at 1734 (quoting § 2254(e)(2)(B)). Except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court. *Pinholster*, 563 U.S. at 180–81; *Shoop v. Twyford*, 142 S. Ct. 2037, 2046 (2022) ("[W]hen a federal habeas court . . . admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied.") (quoting *Martinez Ramirez*, 142 S. Ct. at 1738). Accordingly, even if a petitioner can leap the § 2254(e)(2) hurdle, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.*

Additionally, the Supreme Court recently emphasized, "under § 2254(e)(2), a federal habeas court may *not* conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Martinez Ramirez*, 142 S. Ct. at 1734 (emphasis added). That is because "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent." *Id.* at 1735.

Furthermore, a court improperly holds an evidentiary hearing or considers new evidence to determine whether cause and prejudice exist to overcome procedural default "if the newly developed evidence never would 'entitle the prisoner to federal habeas relief.'" *Id.* at 1739 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).

Cruz-Garcia fails to meet these standards for a hearing and extra-record development, and the evidence that he did not properly present to the CCA—including the evidence he submitted in his subsequent state habeas proceedings—may not be considered. Indeed, a petitioner's failure to diligently present his

12

unexhausted evidence to the state court precludes evidentiary development of the claims in this Court. *See Jones v. Davis*, 890 F.3d 559, 566 (5th Cir. 2018).

Further, an allegation that state habeas counsel performed ineffectively by failing to raise the petitioner's unexhausted claims does not serve as an exception to the statute. *See Martinez v. Ryan*, 566 U.S. 1, 15–16 (2012). The Supreme Court in *Martinez* did not purport to create an equitable exception to § 2254(e)(2), and it expressly reaffirmed the continuing viability of its habeas precedent. *Id.*; *see Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016) ("The Supreme Court, in *Martinez*, created a narrow exception to procedural default that 'merely allows' federal merits-review 'of a claim that otherwise would have been procedurally defaulted.'") (quoting *Martinez*, 566 U.S. at 17). Exempting the petitioner from § 2254(e)(2) based on state habeas counsel's purported lack of diligence in developing a claim would be contrary to the plain language of the statutory bar.

Furthermore, because Cruz-Garcia cannot meet § 2254(e)(2)'s exceptions, this Court "may not . . . consider new evidence—to assess cause and prejudice under *Martinez*," *Martinez Ramirez*, 142 S. Ct. at 1739, and this Court's adjudication of Cruz-Garcia's defaulted IATC claims is limited to the properly-developed state court record, *id.* at 1734. Thus, § 2254(e)(2) prevents this Court from considering Cruz-Garcia's new evidence that was not properly presented to the state court on direct appeal or in his initial state habeas proceedings. *See Martinez Ramirez*, 142 S. Ct. at 1738 (discussing *Holland*, 542 U.S. at 653).

For these reasons, Cruz-Garcia's additional evidence outside the state court record that he submits to this Court may not be considered. Further, his request for remand for an evidentiary hearing and discovery should be denied for the reasons stated in the Director's response in opposition to those motions. *See* ECF No. 84.

### III.   The CCA's Denial of Relief Is Entitled to Deference.

Cruz-Garcia argues this Court should not give deference to the state court's adjudication of the merits of the claims he raised in his initial state habeas application because the state courts did not provide him due process. Pet'r Br. at 12–20. He is incorrect, and AEDPA's deferential standard applies.

Of the claims the CCA denied on the merits, it did so based upon its own review and the trial court's findings. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1–2. Cruz-Garcia contends that deference under § 2254(d) should not apply because the state post-conviction proceedings violated due process. Pet'r Br. at 12–20. Namely, Cruz-Garcia claims he was denied a meaningful opportunity to be heard in the state postconviction proceedings because the state habeas proceedings were not held in compliance with article 11.071 § 8 of the Texas Code of Criminal Procedure. Pet'r Br. at 14–18. But a "full and fair hearing in state court is not a prerequisite to applying AEDPA's deferential scheme." *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010), as revised (Nov. 17, 2010) (citing *Valdez*, 274 F.3d at 946); *see Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012) (deference is due where the state court adopts the State's proposed findings verbatim).

Cruz-Garcia also argues that under *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007), deference to the state court's adjudication is not required. Pet'r Br. at 13. But *Panetti* is inapposite. There, the Supreme Court explained that the state court's failure to provide the petitioner the process mandated by *federal law* was an unreasonable application of clearly established law—in that case, the Supreme Court's holding in *Ford v. Wainwright*, 477 U.S. 399 (1986), that the Eighth Amendment confers a right not to be executed if insane and that minimum procedures are required to protect that right where a petitioner makes a threshold showing of insanity. *Panetti*, 551 U.S. at 948–50, 952. Cruz-Garcia cites no such

14

antecedent constitutional right that the state court's adjudication of his claims violated. Indeed, the absence of *any* constitutional right to a state habeas proceeding necessarily means Cruz-Garcia cannot rely on any such right. *See Murray v. Giarratano*, 492 U.S. 1, 7–8 (1989) ("The additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the reliability of the process by which the death penalty is imposed."); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987).

Cruz-Garcia maintains that due process was violated because, (1) the state habeas court trial judge presided over Cruz-Garcia's attempt to have her recused, (2) the court erred by not designating additional contested issues of fact for further development, (3) the trial judge's campaign referenced Cruz-Garcia's case, (4) the state court's proceedings were compressed following the trial judge's election loss, and (5) the State provided incorrect information to the trial court regarding the court's jurisdiction. Pet'r Br. at 19–20. Again, Cruz-Garcia fails to identify any antecedent federal constitutional right that was violated and therefore fails to show deference should not be afforded to the state court's adjudication of the merits of his claims.

Nonetheless, as Cruz-Garcia acknowledges, his motion seeking to recuse the state habeas court trial judge was referred to the Presiding Judge of the Second Administrative Judicial Region. SHCR-02 at 653. Moreover, it appears the motion was denied for noncompliance because it did not raise a "valid" allegation of ex parte contact between the trial judge and a juror. *Id.*; *see Castilleja v. State*, No. 05-20-00866-CR, 2022 WL 2448088, at *11 (Tex. App.—Dallas, July 6, 2022) (no hearing is required when a recusal motion does not comply with Texas Rule of Civil Procedure 18a). And notably, the CCA denied Cruz-Garcia's motion for leave to file a writ of mandamus challenging the denial of his recusal motion. *In re Cruz-Garcia*, No. WR-

85-051-01 (Tex. Crim. App. July 27, 2016). Cruz-Garcia fails to justify a departure from AEDPA deference in such a circumstance.

Additionally, Cruz-Garcia argues he was entitled to additional fact development and that the manner in which the trial judge conducted the habeas proceedings after her election defeat violated his right to due process. ECF No. 73 at 20. But again, a full and fair hearing in state court is not required for deference to apply to its adjudication. *Valdez*, 274 F.3d at 948–50. Moreover, as noted above, the CCA denied Cruz-Garcia's claims based upon the trial court's findings and conclusion, as well as the CCA's own review. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1–2. He fails to justify jettisoning AEDPA deference in light of the CCA's role as the ultimate adjudicator. *See Hatten v. Quarterman*, 570 F.3d 595, 599 n.3 (5th Cir. 2009) ("Texas trial courts only make recommendations to the [CCA] but do not rule on habeas petitions.") (citing *Ex parte Brown*, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006)). Accordingly, AEDPA deference should apply to the state court's adjudication of the merits of his claims.

## IV. Cruz-Garcia's Is Not Entitled to Relief on His Claim of Cumulative Error.

In arguing § 2254 does not apply to his claims, Cruz-Garcia also asserts he is entitled to habeas relief because the cumulation of prejudice he suffered from several trial court errors undermined "all reasonable confidence in the outcome of the trial and sentence." Pet'r Br. at 20–22. But the Fifth Circuit has declined to aggregate non-constitutional errors to form an independent claim on collateral review. Federal habeas relief for cumulative error is available only where (1) individual errors involved matters of constitutional dimension; (2) the errors are not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th

Cir. 1992); *see also Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995). This cumulative error doctrine presupposes that error must first be found before a court could consider the aggregate impact of that error. Additionally, "[m]eritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated." *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005) (citing *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996)).

As discussed below in Parts XV, XVI, and XXII, *infra*, several trial court error claims are procedurally defaulted, and Cruz-Garcia fails to show any trial court errors of constitutional dimension—let alone any trial court errors that so infected the entire trial, the resulting conviction violates due process. Accordingly, there is nothing for the court to cumulate, and Cruz-Garcia is not entitled to habeas relief on this ground.

## V.   Cruz-Garcia Is Not Entitled to Relief for His Claims of Juror Misconduct (Claim 1).

Cruz-Garcia alleges that he was deprived of a fair trial, impartial jury, and due process of law because Juror Clinger brought his Bible into the jury deliberation room during the punishment phase of trial. Pet'r Br. at 22–28, 31–32. He also alleges juror misconduct occurred when two jurors were observed by a third party and appeared to be discussing an issue related to trial, and also occurred when the jurors talked during breaks about the evidence and possible sentence. Pet'r Br. at 28–29. But his claims fail to merit relief.

The Sixth Amendment right to a trial by jury "implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). A claim that "the jury improperly considered extrinsic material evidence in reaching its verdict" is to be reviewed under the harmless-error standard

17

of *Brecht v. Abrahmson*, 507 U.S. 619, 635 (1993). *Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir. 1998). Under *Brecht*, Cruz-Garcia must demonstrate that the impact of (1) Jury Foreman Clinger having brought in his Bible during punishment deliberations, (2) the conversation between the two jurors outside of the deliberations room but within the courthouse, and (3) the jurors' discussions of the case during the breaks "'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Cruz-Garcia raised these claims in his state habeas application, SHCR-02 at 153–61, (reading scripture), 162–164 (conversation outside of deliberations), 147–53 (IATC for failing to investigate juror misconduct). The CCA denied the Bible-related issue, concluding the claim was raised and rejected on appeal. *Cruz-Garcia*, 2017 WL 4947132, at *1. Cruz-Garcia's claim on direct appeal alleged that the *trial court erred* when it denied his motion for new trial regarding the question of scripture reading. *Cruz-Garcia*, No. AP-77,025, "Appellant's Brief" at 107–13, 116–17. But as argued in the Director's opposition to discovery or an evidentiary hearing, ECF No. 84, the CCA on direct appeal clearly addressed the constitutionality of the Bible reading in concluding the trial court did not abuse its discretion. *Cruz-Garcia v. State,* 2015 WL 6528727 at *28–29. And in denying relief on state habeas, the CCA adopted the trial court's findings that, *alternatively*, "as held by the [CCA] on direct appeal, the reference to the Bible during jury deliberations did not constitute an outside influence. . . . The applicant fails to show *that he was denied a fair trial or that his right to due process was violated.*" SHCR-02 at 1079 (Nos. 9 and 10) (emphasis added). AEDPA thus applies to the CCA's denial of this claim, as well as to the findings which are entitled to deference by this Court.

18

Cruz-Garcia did not allege on direct appeal juror misconduct on the grounds that two jurors conversed outside the jury deliberation room inside the courthouse, nor did he challenge the alleged discussions between jurors on breaks. On state habeas, the trial court did not address this specific allegation of juror misconduct, However, in adopting the trial court's findings and denying relief, the CCA concluded, "Based upon the trial court's findings and conclusions and our own review, we deny relief." *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This finding is sufficient to warrant AEDPA deference. *Richter,* 562 U.S. at 100 (holding "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"). Furthermore, in finding the related IATC claim for failure to investigate to be without merit, *see* SCHR-02, at 1066–68, 1078, the court made credibility findings that are entitled to deference pursuant to § 2254(e)(1). Cruz-Garcia does not demonstrate he is entitled to relief on either claim.

## A.     The Bible was not an outside influence.

When the CCA reviewed Cruz-Garcia's claim related to scripture reading in the context of the denial of his motion for new trial, the court held that the Bible does not constitute an outside influence—or "a source outside of the jury room and other than from jurors themselves." 2015 WL 6528727 at *28 (citing *McQuarrie v. State,* 380 S.W.3d 145, 154 (Tex. Crim. App. 2012)). The court recognized an earlier holding that "influences or information that are unrelated to trial issues" do not fall within the boundaries of "outside influence." *Id.* (citing *Colyer v. State*, 428 S.W.3d 117, 127 (Tex. Crim. App. 2014)). The court, when ultimately rejecting Cruz-Garcia's complaint about his motion for new trial, reasoned:

> Here, the alleged "outside influence" that [Cruz-Garcia] complains of is a scripture from the Bible that the jury foreman recommended to another juror in an effort to comfort her. While this scripture did literally come from outside the jury room, as neither the Bible nor any

19

of its contents were ever offered into evidence, we cannot say that it meets the definition of "outside influence" this Court established in *McQuarrie*.

When a jury has before it evidence that was not offered at trial, or subject to cross-examination, a defendant's right to a fair and impartial jury may be compromised. This compromise occurs, however, only when the outside evidence or influence relates directly to a question of fact left to the jury's determination and improperly influences their verdict.

Referring to the Bible did not directly relate to a fact at issue before the jury in [Cruz-Garcia]'s case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it. Had the foreman merely recited a Bible verse from memory, we could not consider it an outside influence. Indeed, evidence of such a recitation would not have even been admissible per the constraints of Rule 606(b). [107]

The fact that the foreman in this instance referred a juror to the Bible verse instead of quoting it from memory is a distinction without a difference. Either way, there is no evidence that the biblical reference related to the facts at issue in this case, and it was therefore not an outside influence under Rule 606(b) and as interpreted by this Court in *McQuarrie* and *Colyer*.[108]

Because the Bible was not an outside influence, the trial court erred when it admitted State and defense affidavits describing jury deliberations. Additionally, because the affidavits describing the inner goings-on of the jury's deliberations were improperly admitted, any live testimony to that effect would have been inadmissible under Rule 606(b) as well. Even had the affidavits been admissible, it was within the trial court's discretion to rule on a motion for new trial on affidavits without oral testimony. [fn omitted] Either way, the trial court did not abuse its discretion when it denied [Cruz-Garcia]'s request for an evidentiary hearing on his motion for new trial.

When citizens are selected for jury service, the law does not ask them to set aside every personal or moral directive to which they adhere, nor will this Court do the same by holding that reference to such a directive during jury deliberations is improper. If trial attorneys are troubled by jurors who call upon such beliefs during their deliberations, this trouble is better addressed in voir dire than it is in by way of a motion for new trial.

The jury foreman's reference to his Bible in an attempt to comfort his fellow juror was not an outside influence improperly brought to bear on the jury's deliberations, and affidavits to that effect were not properly admissible under Rule 606(b). Regardless, although the trial court erred in admitting the affidavits, the trial court did not abuse its discretion when it overruled [Cruz-Garcia]'s motion for new trial.

> [fn 107] Our analysis is guided by the 4th Circuit's analysis in *Robinson v. Polk*, where the court was presented with a factually analogous situation and determined that, because the Bible reading did not go to a fact at issue in the case, and because a juror merely quoting the Bible from memory "assuredly would not be considered an improper influence," there was no improper outside influence in violation of Rule 606(b). *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006).

> [fn 108] We are mindful of the fact that the 5th Circuit has held that the Bible can be an external influence on the jury, but the facts of that case distinguish it from this one.

2015 WL 6528727 at *29.

Footnote 108, *supra*, clearly refers to *Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008) —a case cited by Cruz-Garcia in his Appellant's Brief, at 116-17—where the Fifth Circuit found:

> The Bible served as an external influence [in this case] precisely because it may have influenced the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry into these factual areas. Further, the Bible passage in this instance was evidence of the "circumstances of the offense that militates for . . . the imposition of the death penalty." [Tex. Code Crim. Ann.] Art. 37.071(d)(1) (discussing the instructions the court must give to the jury in a death penalty case).

> . . . It may be true that the Bible informs jurors' general outlook of the world and their moral values in particular, and jurors may constitutionally rely upon those morals in their deliberations. *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 149[ ](1994) (O'Connor, J., concurring) ("Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them." (internal citation and quotation marks omitted)). But the particular passage at

issue here does not generally inform a juror's moral understanding of the world.

*Id.* at 340.

But *unlike Oliver*, the Bible passages here were not used in substitution for the facts for punishment or in guidance to interpret the facts before the jury. Rather, the CCA found the passage was passed along for the purpose of offering comfort to a juror. 2015 WL 6528727 at *29. The TCCA's distinction of *Oliver* on the facts is not an unreasonable application of federal law. Rather, it is consistent with *Oliver,* where the Fifth Circuit indicated that, while "part[ing] company with the Fourth Circuit," the Fourth Circuit cases "are distinguishable in that they all involved a juror reading general Biblical statements, as opposed to a command that directly tracked the specific facts of those cases," as occurred in *Oliver*, 541 F.3d at 339; *see also Robinson,* 438 F.3d at 364-66. "This analysis persuades us that when a juror brings a Bible into the deliberations and points out to her fellow jurors specific passages that describe the very facts at issue in the case, the juror has crossed an important line." *Oliver,* 541 F.3d at 339. The appellate court affirmed its holding was limited to the facts of that case when it declined to address "whether a juror must leave his or her moral values at the door or even whether a juror may consult the Bible for his or her own personal inspiration during the deliberation process[, or] whether jurors must forget that, generally, the Bible includes the concept of an 'eye for an eye.'" *Id.* at 340. Thus, the CCA's distinction contravened no clearly established federal precedent,

Regardless, Cruz-Garcia cannot show harm, as required under *Brecht*. In *Oliver,* the Fifth Circuit concluded the state court finding that the Bible did not influence the jury had "fair support in the record" because (1) the record displayed contradictory evidence regarding when the jury consulted the Bible; (2) several jurors testified that the Bible was not the focus of discussions; (3) the jury was instructed

not to discuss any matter not in evidence before them and that they are bound to receive the law from the court; and (4) the jurors brought the Bibles into the room by themselves. 541 F.3d at 342-43. Because Oliver could not rebut the state court's finding, he could not prove harm under *Brecht*. *Id.* at 344. The thoroughly developed state court record, including extensive factual findings and credibility determination by the trial court who presided over trial and state habeas, *see* SHCR-02 at 1059–66, demonstrates that these four factors similarly exist in this case. *See also* 3 CR 522 (Jury instructions on evidence). Therefore, the record is sufficient for this Court to conclude any alleged error was harmless. Accordingly, Cruz-Garcia cannot show any outside influence or resulting harm, and he fails to show he is entitled to relief on this ground for his claim of juror misconduct.

### B.     Cruz-Garcia does not demonstrate he was harmed by the jurors' discussion, if any, of the evidence and sentence outside of jury deliberations on punishment.

In his second claim of juror misconduct, Cruz-Garcia complains about two jurors' discussion of evidence outside the courtroom in an elevator, as well as jurors discussing the evidence on breaks in the trial. Pet'r Br. at 28–29. But these claims should also be denied because he does not show juror misconduct or harm under *Brecht*.

The CCA reviewed Cruz-Garcia's claim of ineffective assistance of trial counsel (IATC) that rested on counsel's investigation of this ground, rejected that claim, and adopted the following trial court findings of fact surrounding the conversation in the elevator:

> 128.   On the morning of July 16, 2013, before the State began presenting evidence in the punishment phase of the trial, the trial judge related to the parties what defense attorney Casaretto had told her that morning: that Casaretto was waiting for an elevator when he heard two men—both wearing badges indicating they were jurors in the 337th District Court—having what was "possibly an innocuous conversation;"

that it was hard for Casaretto to hear the jurors, but they seemed to be speaking about the case and struggling with the issues; that the younger juror thanked the older juror for his words of encouragement the day before; that the jurors discussed nothing specific about the issues; that Casaretto could not tell if the jurors were actually talking about evidence in the case; and, that the conversation ceased once the jurors got on the elevator ([24 RR] 3–4).

129.    The trial judge then told the parties that she intended to, once again, strongly admonish the jury not to discuss the evidence, or any deliberations, or any aspect of the deliberations, outside the presence of the jury where they were all seated together and are supposed to be deliberating ([24 RR] 4).

130.    In response to trial counsel's question asking whether the judge had spoken to Casaretto herself and whether she was satisfied that was all of Casaretto's information, the trial judge confirmed to the parties that she talked to Casaretto in chambers, took notes as to what Casaretto told her, and read her notes back to Casaretto; and, that Casaretto told the trial judge, "Yes, that's it, that is exactly what I observed today" ([24 RR] 5)

131.    The trial judge told the parties that she was not going to make her actual notes part of the record because she read everything in her notes to the parties verbatim as to what she wrote down, and she gave the parties Casaretto's phone number ([24 RR] 5).

SHCR-02 at 1066–1068. The trial court found a later-submitted affidavit from Casaretto, attesting to an "obvious violation" by the jurors to be "suspect and unpersuasive," and unreliable compared to the judge's own notes and recollections. SHCR-02 at 1067–68 (nos. 132–33). The state habeas court's fact findings and credibility determinations are entitled to deference, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Lewis v. Thaler,* 701 F.3d 783, 795 (5th Cir. 2012); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002). These facts do not demonstrate that the jurors' "possibly" "innocuous conversation" was improper, let alone that it had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 623. Further, Cruz-Garcia does

nothing more than offer speculation and references an alternate juror's assertion that the jurors discussed evidence on breaks—in other words, he fails to show that the jurors were not impartial when they arrived at their decision of the Special Issues that led to Cruz-Garcia's sentence of death. *See* Pet'r Br. at 28–29. Cruz-Garcia's failure is insufficient to show harm under *Brecht*, and his claim of juror misconduct on this ground should be denied.

## VI. Cruz-Garcia's Claim 2 is Partially Procedurally Barred from Review, and, Alternatively, Without Merit.

In Claim 2, Cruz-Garcia asserts the trial court erred by excluding the Bromwich Report,[6] HPD crime lab personnel reports, and a judgment of conviction of tampering with a government document against a staff member of the HPD crime lab, all of which violated his rights to cross-examination and to present a defense. Pet'r Br. at 32–51. But this claim is procedurally barred from review, in part, and without merit.

### A. Confrontation Clause

#### 1. Cruz-Garcia's claim under the Confrontation Clause is procedurally barred from review.

Cruz-Garcia alleges that he was denied his right to "a meaningful opportunity to present a complete defense," "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment," when the trial court ruled against allowing Cruz-Garcia to introduce the "independent investigation of the HPD facilities" documented in the Bromwich Report, the complaint histories of three HPD employees, and the judgment

---

[6]     "The Bromwich Report was initiated in response to the closure of the old HPD crime lab in 2003 and heavily criticized the lab in the areas of quality assurance, internal auditing, training, and standard operating procedure." *Cruz-Garcia v. State*, 2015 WL 6528727 at *14.

of conviction of one lab employee. Pet'r Br. at 32–40, 43–44. He raised his Confrontation Clause complaint on direct appeal. *Cruz-Garcia*, No. AP-77,025, "Appellant's Brief," at 74–76, 76 (citing *Holmes v. South Carolina*, 547 U.S. 319 (2006), *Ray v. State*, 178 S.W.3d 833 (Tex. Crim. App. 2005)). There, the CCA ruled that Cruz-Garcia did not properly preserve his complaint on Confrontation Clause grounds related to the "limitations placed on his cross-examination" of HPD Sergeant Eric Mehl in the cold case division; Matt Quartaro, a supervisor of forensics at Orchid Cellmark that performed the DNA testing of evidence sent by Sergeant Mehl; Courtney Head, a criminalist specialist with the "new" Houston Police Department crime lab; and FBI Agent Griselle Guzman, about whom Cruz-Garcia does not now complain. *Cruz-Garcia*, 2015 WL 6528727, at *15–16. Cruz-Garcia's claim on this ground is therefore procedurally barred.

A federal court may not consider the merits of a habeas claim if a state court has denied relief due to a procedural default. *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *Ellis v. Lynaugh*, 873 F.2d 830, 837–38 (5th Cir. 1989). The state court opinion must contain a "plain statement" that its decision rests on adequate and independent state grounds. *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Smith v. Collins*, 977 F.2d 951, 955 (5th Cir. 1992). Only procedural rules that are firmly established and regularly followed by state courts can prevent habeas review of federal constitutional rights. *Hathorn v. Lovorn*, 457 U.S. 255, 262–63 (1982); *Smith v. Black*, 970 F.2d 1383, 1386 (5th Cir. 1992).

The Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of Cruz-Garcia's claim. *Fisher v. State*, 169 F.3d 295, 300 (5th Cir. 1999); *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005). The doctrine of independent and adequate state ground applies not only when federal courts review a state court judgment, "but in

26

deciding whether federal district courts should address the claims of state prisoners in habeas corpus actions . . . . The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). Given the CCA's application of the contemporaneous-objection bar against Cruz-Garcia, this claim is barred from federal habeas review.

The law in this jurisdiction is well settled that failure to make a contemporaneous objection required by state law will preclude federal habeas review of a petitioner's claim unless he can show sufficient cause for failure to object and actual prejudice resulting from that failure, or a miscarriage of justice. *Scheanette v. Quarterman,* 482 F.3d 815, 824–25 (5th Cir. 2007); *Turner v. Quarterman,* 481 F.3d 292, 301 (5th Cir. 2007). A procedural bar may be overcome, however, if the petitioner can show cause and prejudice, or that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Cruz-Garcia makes no such showing. First, to invoke the cause-and-prejudice exception, a petitioner must show that he was impeded from complying with the State's procedural rule by something external to him, *id.* at 753, and that his entire trial was infected with error of constitutional dimensions, *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). This, Cruz-Garcia fails to do, as discussed further below.

### 2. Cruz-Garcia does not demonstrate he can overcome this bar.

To show a miscarriage of justice in this context, a prisoner must show he is actually innocent of the crime of which he was convicted. *See Sawyer*, 505 U.S. at 339–40. A "truly persuasive showing" of actual innocence may act as a "gateway" to

review of an otherwise procedurally barred claim. *See Herrera v. Collins*, 506 U.S. 390, 404, 417 (1993*); Schlup v. Delo*, 513 U.S. 298, 315 (1995). But only in a "rare" and "extraordinary case" may an inmate overcome a procedural default by demonstrating a miscarriage of justice. *Schlup*, 513 U.S. at 321. This requires an inmate to demonstrate "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327. This standard cannot be met by "merely . . . showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Id.* at 329. Importantly, "[t]o be credible, such a claim requires petitioner to support his allegations with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. Thereafter, "the habeas court must consider 'all of the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28). Then, the habeas "court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *Schlup,* 513 U.S. at 329).

Here, Cruz-Garcia provides no new evidence as that contemplated in *Schlup* to demonstrate he is actually innocent. His complaint is centered on his inability to present the Bromich report at trial, as well as an amended DNA report that was generated years ago; thus, neither of these constitute new evidence. Further, while Cruz-Garcia asserts the DNA evidence is false and inaccurate based on the results from re-testing the samples, the DNA evidence does not exonerate him. Pet'r Br. at 46–48, 50–51. Rather, despite making no conclusions on the vaginal swab from Ms. Garcia due to the mixture of DNA from at least three individuals, the 2015 report

28

still links Cruz-Garcia to the cigar left at Ms. Garcia and Mr. Rodriguez's apartment, and still states that he could not be excluded as a contributor to the *major component* of the DNA mixture from the sample cut of the crotch from Ms. Garcia's underwear. *See* SHCR-02 at 743 (probability that a randomly chosen unrelated individual would be included as a possible contributor for the cigar, and possible contributor to the major component on the panties cutting, is approximately 1 in 6.0 quintillion for Caucasians, 1 in 700 quintillion for African Americans, and 1 in 100 quintillion for Southwest Hispanics). Because Cruz-Garcia has not demonstrated he is actually innocent through evidence that meets *Schlup*'s standard, this claim must be dismissed as procedurally defaulted. Further, his challenges to the testimony of Rudy Santana, Diana Garcia, and Angelita Rodriguez, Pet'r Br. at 48–51, are meritless, as discussed below in Part VIII.

Because Cruz-Garcia fails to demonstrate a miscarriage of justice, he cannot overcome the procedural default of his claim that his rights under the Confrontation Clause were violated. He is therefore not entitled to habeas relief on this ground.

### 3.   Alternatively, Cruz-Garcia's confrontation claim is without merit.

Alternatively, Cruz-Garcia fails to demonstrate a confrontation violation. One of the two broad categories in which cases alleging a violation of the Confrontation Clause may fall includes cases involving restrictions imposed by law or by the trial court on the scope of cross-examination. *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985). "Confrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Rather, the defense must be able to use cross-examination to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318. "Confrontation Clause questions will arise because [trial

court restrictions on the scope of cross-examination] may 'effectively . . . emasculate the right of cross-examination itself.'" *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

Relevant here, in a hearing on Cruz-Garcia's motion to suppress, Ms. Head testified that she worked in the Houston Police Department Crime Lab as a criminal specialist. 16 RR 79. She became involved with Cruz-Garcia's case when she was asked to perform an extraction analysis and obtain a DNA profile on a buccal swab from Cruz-Garcia. 16 RR 89–90. She then compared that profile to evidentiary samples from the cigar left behind at Ms. Garcia and Mr. Rodriguez's apartment, Ms. Garcia's vaginal swab from her sexual assault exam, and a cutting from the crotch of Ms. Garcia's panties. 16 RR 91–92. Her analysis revealed that Cruz-Garcia could not be excluded as a contributor to those DNA samples.[7]

She also testified that she worked with Joseph Chu, one of the employees whose disciplinary history trial counsel sought to introduce. But from her review of notes and information, Mr. Chu did not perform any DNA analysis on the samples taken from Ms. Garcia and the cigar, and his involvement was limited to obtaining a hair sample and receiving buccal swabs of Cruz-Garcia. 16 RR 85–86. She reviewed the notes and photos taken by the second individual whose disciplinary history trial counsel wanted to introduce, that of Dr. Sharma, who tested the samples that were gathered in 1992 and analyzed using a different type of testing than performed at the time near Cruz-Garcia's trial. 16 RR 86–89. But Ms. Head reviewed evidentiary samples that were obtained from an independent lab, Orchid Cellmark, and not the

---

[7]     In addition to Part VI(A)(2), the Director discusses the results of the re-testing of these samples—only one of which slightly impacts Cruz-Garcia from the original testing—in Part VIII(B)(2), *infra*.

samples tested by Dr. Sharma, and did not rely on Dr. Sharma's results to compare against the DNA profile she generated from Cruz-Garcia's buccal swab. 16 RR 90–91.

During closing argument at the suppression hearing, the State informed the trial court that they had no intent to call as witnesses or offer reports from Mr. Chu, Dr. Sharma, or Ms. Wallace, the third subject whose criminal history trial counsel wished to introduce at trial. 16 RR 113–14. As questioned by the trial court, it is unclear how any of the disciplinary or hearing records would come in for witnesses who would not be called, and who either had no or only tangential contact with the DNA samples obtained in relation to Angelo's murder, but which were not used in Cruz-Garcia's trial. 16 RR 114–16. Without showing here how he would even be able to introduce these personnel histories, and without live witnesses to impeach, Cruz-Garcia cannot demonstrate that his right to confrontation was violated.

Regarding the Bromwich Report, retired Sergeant Eric Mehl testified that he found the evidence for testing were sealed in bags that bore no markings of damage. 16 RR 31–33. Mr. Quartaro affirmed on direct examination that even if evidence "was stored in atrocious conditions" and got wet, the results would not "make [Cruz-Garcia]'s DNA appear on that evidence when it wasn't there before[.]" 16 RR 61 (responding to hypothetical posed by the State). And at closing of the suppression hearing, the trial court colloquied with trial counsel, discussing whether the report would be offered to "impeach the HPD Crime Lab, which [the State is] not really even offering the results from." 16 RR 117. Without showing any relation between the HPD Crime Lab and the fully intact evidence that was tested by an independent lab, Cruz-Garcia thus cannot show a violation of his right to confrontation.

### B.   Cruz-Garcia was not prevented from presenting a meaningful defense.

Cruz-Garcia asserts he was deprived of the opportunity to present a meaningful defense because the trial court ruled the Bromwich report and "other evidence about the lab and employees who handled the evidence against Mr. Cruz-Garcia were 'not to be mentioned or alluded or discussed.'" Pet'r Br. at 42 (citing 17 RR 14); *see generally* Pet'r Br. at 32–43. But the trial court's evidentiary rulings are matters of state law which are not subject to re-examination by the federal courts. It is not "the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "[A] federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair." *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997).

Under Texas Rules of Evidence 401, evidence is relevant only if it tends to make a fact of consequence more or less probable than it would be without the evidence." *Cruz-Garcia v. State*, 2015 WL 6528727 at *14 (citing *id.*). The CCA determined that the trial court's evidentiary ruling was "not outside the zone of reasonable disagreement to determine the evidence regarding these witnesses was irrelevant," particularly "because these exhibits did not comprise the entire substance of [Cruz-Garcia's] defense," thus the court could not "say their exclusion prevented him from presenting a defense." *Id.* As noted by Cruz-Garcia, "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also Crane v. Kentucky*,

476 U.S. 683, 689–690 (1986); *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302–303 (1973); *Spencer v. Texas*, 385 U.S. 554, 564 (1967)). In *Holmes*, the Supreme Court recognized that arbitrary rules of excluding evidence "infring[e] upon a weighty interest of the accused." *Holmes*, 547 U.S. at 324–25 (citations and internal quotations omitted). But the Court also recognized that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" *Id.* at 326 (citations omitted).

> When denying Cruz-Garcia's pre-trial motion to suppress, the trial court found:

> All the recommendations that were recommended by the Bromwich Report were followed by the agency and by the State in this case in order to remedy any potential issues. No issues have been identified in the Bromwich Report or in this hearing or in any discovery that the Court has been made aware of that there were any concerns addressed in those items regarding the evidence in this case.

> Therefore, [the court] finds that the Bromwich Report . . . is irrelevant under [Tex. R. Evid.] 401 and 402. And even if some portions may be relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading to the jury.

17 RR 13–14. The trial court then proceeded to examine each lab employee's personnel records and criminal history that Cruz-Garcia moved to admit. The court found that analyst Dr. Joseph Chu "did nothing on this case except for the hair analysis," which was "not being offered and is not admissible," and was further inadmissible and improper because he was not going to be called as a witness to testify. 17 RR 14–15 (citing Tex. R. Evid. 608, 609, 401, 402, 403, 404). Regarding DNA analyst Dr. Belda Sharma, the trial court found that the instances of Dr. Sharma's misconduct "relate to the evidence in this case," nor were any allegations of criminal activity by Dr. Sharma had been sustained, thus his history was

inadmissible under Tex. R. Evid. 608 and 609 because they were irrelevant. 17 RR 16–17. Related to Deetrice Wallace, the court found that she "received the sexual assault kit in 1992 and screened a portion of the sexual assault kit for blood evidence" when she was an employee of the HPD Crime Lab. 17 RR 16. But the court further found that "she performed no DNA analysis and no extractions on the sexual assault kit evidence," no evidence of any testing she performed was being offered, nor would she be called as a witness and "any results from her testing are not admitted." *Id.* Further, the trial court found that Ms. Wallace's conviction of tampering with a government document occurred in a different laboratory, ten years after she handled the evidence here, and no instances of employee misconduct alleged while she was at the HPD Crime Lab, and it was "improper to impeach her with that criminal history if she is not called as a witness and that that criminal history is irrelevant to this case." 17 RR 16–17.

All of the trial court's rulings were based on non-arbitrary rules of evidence, as recognized by the *Holmes* court as proper—unlike, for example, the applied rule of evidence at issue in *Holmes* that pertained to third-party guilt, which did not "focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." 547 U.S. at 330. Cruz-Garcia thus fails to demonstrate that the CCA's determination related to the trial court's ruling violated a specific federal constitutional right or rendered Cruz-Garcia's trial fundamentally unfair. *See Gochicoa*, 118 F.3d at 446.

Further, Cruz-Garcia argues this Court can review his claim de novo because the CCA did not cite federal law. Pet'r Br. at 44–45. First, he ignores the above analysis under *Gochicoa*. Second, "[t]he Supreme Court has repeatedly explained that a state court need not cite any legal principle at all." *Lucio v. Lumpkin*, 987 F.3d 451, 483 (5th Cir. 2021) (citing *Richter*, 562 U.S. at 98 ("By its terms § 2254(d) bars

relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2). There is no text in the statute requiring a statement of reasons.")). Further, even where a "state court offers an explanation, it 'need not cite or even be aware of our cases under § 2254(d).'" *Id.* (citing *Richter*, 562 U.S. 98 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).

For the above reasons, Cruz-Garcia is not entitled to habeas relief on this ground.

## VII. Claim 3 Should Be Denied because It Is Procedurally Defaulted; Alternatively, It Is Without Merit.

In Claim 3, Cruz-Garcia alleges that his Eighth and Fourteenth Amendment rights were violated due to the inaccurate and unreliable DNA evidence used to convict him. Pet'r Br. at 51–54. But this claim is procedurally barred from review; in the alternative, his claim is without merit.

### A.    This claim is procedurally defaulted.

In the instant case, Cruz-Garcia raised the grounds for Claim 3 in his second subsequent state habeas application.[8] SHCR-05 at 84–95. The CCA dismissed that application pursuant to Texas Code of Criminal Procedure 11.071 § 5(a) as an abuse of the writ, without consideration of the merits. *Ex parte Cruz-Garcia*, 2021 WL 4571730 at *1.

As discussed in Part VI(A)(1), *supra*, a federal court may not consider the merits of a habeas claim if a state court has denied relief due to a procedural default, where its decision is plainly stated and rests on adequate and independent state

---

[8] In his Answer and Motion for Summary Judgment, the Director mistakenly asserted this claim was raised in Cruz-Garcia's first subsequent application. ECF No. 47 at 74 (citing SHCR-03 at 19–20). However, Cruz-Garcia only raised a claim of false evidence in that state habeas application, alleging error under *Ex parte Chabot*, 300 S.W.3d 768, 770–71 (Tex. Crim. App. 2009) and *Ex parte Chavez*, 371 S.W.3d 200, 207–08 (Tex. Crim. App. 2012). SHCR-03 at 19–24.

grounds. *Sawyer*, 505 U.S. at 338; *Harris*, 489 U.S. at 262. The dismissal of a petition for abuse of the writ constitutes a procedural default under Texas law, barring federal habeas review of these claims. *Fearance*, 56 F.3d at 642 (citing *Ex parte Barber*, 879 S.W.2d 889, 892 n.1 (Tex. Crim. App. 1994)). Cruz-Garcia clearly had the opportunity to raise these claims in his first state writ and failed to do so, given that he moved at trial to submit the Bromwich report, HPD lab employees' records, and the 1993 police report to which he refers were available before Cruz-Garcia filed his first state habeas application. Further, Cruz-Garcia cannot overcome this procedural default through his allegation of actual innocence, as discussed above in Part VI(A)(2). Consequently, this claim is barred from review.

### B.   Alternatively, this claim is without merit.

Alternatively, this claim is without merit. For the reasons discussed in Part VIII(B)(2), *infra*, the Court should deny Cruz-Garcia's claims that the DNA evidence was "false" and unreliable because the DNA evidence still connects him to the crime, and it was neither false in its entirety nor material—i.e., there is no reasonable likelihood that the testimony affected the jury's verdict. *Giglio v. United States,* 405 U.S. 150, 154 (1972).

Furthermore, the Court should reject Cruz-Garcia's efforts to extend *Johnson v. Mississippi,* 486 U.S. 578 (1988), to these circumstances. In *Johnson,* the Supreme Court held that his death sentence could not stand because it was predicated on an aggravating circumstance that was "materially inaccurate." *Id*. at 589. *Johnson* simply does not apply to this claim alleging inaccurate testimony at the guilt-innocence stage. *See Hernandez v. Johnson*, 213 F.3d 243, 252 (5th Cir. 2000) ("[t]he present case does not parallel the situation addressed in *Johnson* nor the vast majority of cases that have relied upon *Johnson* [. . .] Instead of a materially inaccurate criminal conviction, we confront purportedly materially inaccurate

36

testimony."). Cruz-Garcia fails to sufficiently brief this argument and it should be deemed waived. *Lookingbill v. Cockrell,* 293 F.3d 256, 263 (5th Cir. 2002).

But even expanding *Johnson* beyond its initial confines, Cruz-Garcia must still demonstrate that the testimony was both false and material. *Hernandez*, 213 F.3d at 252–53. As noted, this he cannot do. Therefore, Cruz-Garcia's claim that his sentence is in violation of the Eighth Amendment should be dismissed on those bases.

## VIII.   Claim 5 Alleging False Testimony Is Defaulted and Without Merit.

Cruz-Garcia alleges that the State relied upon false testimony that infected all critical aspects of his case, in violation of the Fourteenth Amendment and *Napue v. Illinois,* 360 U.S. 264, 269 (1959). Pet'r Br. at 190–213. The Court should dismiss this claim as it is procedurally defaulted. In the alternative, Cruz-Garcia fails to demonstrate that the State knowingly presented false testimony, let alone testimony that was reasonably likely to affect the jury's verdict.[9] His claim thus fails on the merits.

### A.   This claim is exhausted but defaulted.

Cruz-Garcia raised this claim in his second subsequent state application, SHCR-05 at 47–83, which the CCA dismissed as an abuse of the writ without reviewing the merits. *Ex parte Cruz-Garcia,* 2021 WL 4571730, at *1. In support of overcoming the default Cruz-Garcia argues first that the CCA's determination was

---

[9]    As argued in Part II, *supra*, evidence presented to the CCA in a manner that the CCA could not and does not review—such as here, attached to a state habeas application that was dismissed as an abuse of the writ, without consideration of the merits, *see Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1—cannot be considered by this Court, as Cruz-Garcia fails to argue or demonstrate he meets the requirements under 28 U.S.C. § 2254(e). *See Pinholster*, 563 U.S. at 181; *Martinez Ramirez*, 142 S. Ct. at 1738; *Landrigan*, 550 U.S. at 474. But even still, the evidence Cruz-Garcia submits does not demonstrate he is entitled to habeas relief, as discussed in Parts VIII and IX, *infra*.

actually an adjudication on the merits because it was dismissed under §5(a)(2), which requires an assessment of the merits. Pet'r Br. at 212–13. But the CCA dismissed all claims under Section 5(a) only, and specifically held that it did not consider the merits of any claim. This explicit statement on the merits is sufficient to rebut the presumption that the claims were adjudicated on the merits. *See Rocha v. Thaler,* 626 F.3d 815, 823–24 (5th Cir. 2010) ("A state court does not undermine the independent state-law character of its procedural-default doctrine by using a federal standard to determine whether an otherwise defaulted successive habeas application should be permitted to bypass a procedural bar."); *id.* at 825–26 (In concluding petitioner did not satisfy § 5(a)(3), "the CCA did not decide the merits of Rocha's *Wiggins* claim when it concluded that Rocha is not actually innocent of the death penalty."); *see also Busby v. Davis,* 925 F.3d 699, 707 (5th Cir. 2019) (apart from *Atkins* claims, order stating denial of application as abuse of writ without addressing merits "would appear to be sufficient to rebut the presumption that [the petitioner's] federal claims were adjudicated on the merits"). Because the CCA specifically stated the petition was an abuse of the writ and the court did not reach the merits of any claim, Cruz-Garcia must demonstrate cause and prejudice or a miscarriage of justice sufficient to overcome the procedural bar.

Cruz-Garcia contends that he can also meet this standard because the State's knowing use of false testimony provides cause and prejudice, and the Court should excuse the default to avoid a miscarriage of justice because he is actually innocent. Pet'r Br. at 213–14. As will be discussed below, his claim fails to demonstrate the knowing presentation of any false or material testimony. And, as discussed in Part VI(A)(2), *supra*, he cannot demonstrate his innocence—indeed, the DNA evidence still connects him to this crime. Cruz-Garcia fails to overcome the procedural default and the Court should dismiss this claim.

38

### B. This claim is without merit.

A criminal defendant is denied due process when the State knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996); *see also Giglio*, 405 U.S. at 154. To obtain relief on such a claim, a petitioner must show that (1) the testimony was false, (2) the State knew the testimony was false, and (3) the testimony was material. *Faulder*, 81 F.3d at 519. To show that the statements were material, the petitioner must establish that there is a reasonable likelihood that the false testimony could have affected the jury's verdict. *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000); *see Giglio*, 405 U.S. at 154. But, "[c]onflicting or inconsistent testimony is insufficient to establish perjury." *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001). Cruz-Garcia cannot meet his burden of proof.

### 1. Carmelo "Rudy" Santana

Rudy Santana testified at the guilt phase of trial, directly implicating Cruz-Garcia in the kidnapping and murder. 20 RR 135–64. Cruz-Garcia first alleges that Santana's testimony was "riddled with falsities" that contradicted prior statements to law enforcement, was inconsistent with other witness testimony, or inconsistent with the investigation. Pet'r Br. at 193–99.

First, inconsistencies between witnesses or between a witness and prior statements provide insufficient grounds to prove false testimony. *See Kutzner v. Cockrell,* 303 F.3d 333, 337 (5th Cir. 2002) (Due process is not implicated unless State knowingly presents false testimony, and "it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements."); *Kutzner v. Johnson*, 242 F.3d at 609 ("Conflicting or inconsistent testimony is insufficient to establish perjury."). Contradictory trial testimony "merely establishes a credibility question for the jury." *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990).

39

Second, while these inconsistencies do not amount to false testimony, many of these inconsistencies were known and addressed at trial. *See United States v. Guerrero,* 768 F.3d 351, 364 (5th Cir. 2014) (finding no *Giglio* violation as government did disclose relevant information consistent with defendant's cross-examination eliciting same information); *Sparks v. Davis,* 756 F. App'x 397, 401 (5th Cir. 2018) (in finding no cause to excuse default of false testimony claim, court found petitioner "can hardly claim that he was unaware of its inaccuracy" where defense counsel focused on correcting false testimony on cross-examination). Trial counsel knew of Special Agent Ebersole's report documenting his interview with Santana; counsel specifically refers to the "16-page, single-spaced document that reflects the conversation that you had with the FBI agents in 2011" when cross-examining Santana. 21 RR 39. Indeed, trial counsel confronted both Santana and Special Agent Ebersole with inconsistencies between Santana's testimony and his FBI interview. 21 RR 37–39, 45–63, 67–77. Similarly, any inconsistency between his testimony and Diana Garcia and Arturo Rodriguez would also have been apparent from their testimony at the time of trial. And it was known at the time of trial that Santana initially denied knowledge of this crime. *See* 20 RR 178–79 (Ebersole testified to knowing that, prior to his interview, Santana had been uncooperative in past and had denied knowledge of crime). Any inconsistency in testimony creates a credibility determination to be decided by the jury. *Koch*, 907 F.2d at 531.

Cruz-Garcia next contends that the State bolstered Santana's testimony by soliciting false testimony that Santana testified at his own peril because he could be charged with this crime or, alternatively that he did not have a deal with the State in exchange for his testimony. Pet'r Br. at 196–99. Cruz-Garcia fails to demonstrate that any of Santana's testimony on this point was false. Cruz-Garcia only speculates that a deal existed for Santana's testimony against him, but the record refutes this.

40

Santana agreed to talk to an FBI agent, nearly twenty years after the murder and while in federal prison on another charge. Special Agent Ebersole testified that he asked Santana to talk about the crime but made him no promises and told him he had no authority to offer a deal; he read Santana his rights, but he did not request an attorney. 20 RR 176–83. Santana spoke to the district attorney's office only after confessing to Agent Ebersole. Santana confirmed that neither Agent Ebersole nor the State made him any promises. 20 RR 173–74; 21 RR 11–12.

Santana testified that he never asked for a deal—he willingly agreed to testify as a way of seeking forgiveness from God, the victim's mother, and to let the truth be known. 21 RR 12–14. Santana's change of heart was confirmed by (1) Agent Ebersole's testimony that Santana finally agreed to talk after discussing his own sons and being shown pictures of the victim, 20 RR 176–79; ECF No. ex. 18-101; (2) his attorney Ray Castro's testimony in the trial against Cruz-Garcia's co-defendant Rogelio Aviles-Barroso, ECF No. ex. 43-1, at 101–03; and (3) a 2015 email from state prosecutor Natalie Tise asserting there was never a deal, "Rudy testified because Angelo's death was weighing on him, and he decided that he finally wanted to do the right thing." ECF No. ex. 18-80. This thoroughly developed record does not support Cruz-Garcia's speculation that a deal had to exist, simply because Santana was never charged after his testimony. Indeed, Santana confessed and gave a statement to the FBI agent *before* speaking to the State prosecutor, and every person involved has denied on the record the existence of a deal.

That the prosecutor asked Santana, "And you know as you sit there that you could be charged with a crime, don't you?", 20 RR 166, then later argued against an instruction that he could be charged as an accomplice as a matter of law, 22 RR 16, is not evidence of false testimony. Pet'r Br. at 197–98. Indeed, depending on how Santana testified, he could be charged with "a crime." The prosecutor did not suggest

41

capital murder, only that he could be charged with "a crime." And while the trial court determined, at trial, that the jury should be instructed that Santana was an accomplice as a matter of law, *see* Pet'r Br. at 198, the prosecutor disagreed, arguing that the jury should be instructed on whether he was an accomplice *as a matter of fact*, allowing the jury to decide whether this inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term "accomplice." 22 RR 3–4, 16 (citing *Druery v. State,* 225 S.W.3d 491, 498–99 (Tex. Crim. App. 2007)).[10]

Regardless of what the trial court thought at trial, the 2015 email from prosecutor Tise indicates that, upon further review after trial, she did not believe that the facts supported charging Santana as a party. ECF No. ex. 18-80. That the State also chose not to prosecute on any lesser charge is of no moment. The decision not to prosecute a cooperating witness who helped solve a twenty-year-old cold-case capital murder that resulted in two convictions is not evidence of a secret deal. "[P]rosecutors have broad discretion in deciding which cases to prosecute." *Neal v. State,* 150 S.W.3d 159, 173 (Tex. Crim. App. 2004); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Cruz-Garcia's incessant speculation about the existence of a deal does not support a claim under either *Brady* or *Napue. Murphy v. Johnson,* 205 F.3d 809, 814 (5th Cir. 2000) ("Allegations that are merely 'conclusionary' or are purely speculative cannot support a *Brady* claim."); *Hughes v. Johnson,* 191 F.3d 607, 629–30 (5th Cir. 1999).

Finally, Cruz-Garcia complains that the State allowed Santana to falsely testify on voir dire that the victim of his 1992 misdemeanor assault conviction was a boy rather than a girl, thus precluding him from using this conviction to impeach Saldana with a crime of moral turpitude. Pet'r Br. at 199; *see* 21 RR 21. The record

---

[10]   Notably, both instructions require evidence of an affirmative act on the part of the witness to assist with the commission of the offense. *Druery,* 225 S.W.3d at 499.

does not reflect that the State knew Santana's victim was female. But, even assuming the prosecutor had that knowledge, his claim of false testimony fails because he cannot show testimony was material—that is, it reasonably could have affected the judgment of the jury. *Napue*, 360 U.S. at 271. He cannot make this showing because that testimony was provided outside the presence of the jury. Also, any impeachment value would have been minimal, given that trial counsel elicited from Santana that he was serving a 17-year sentence in federal prison for charges related to drugs and weapons, and he had previously been convicted for assaulting a woman in 1991. 21 RR 29–31. Cruz-Garcia cannot demonstrate the omission of this additional assault is material, and he cannot demonstrate that Santana's misstatement about the gender of the child he injured "had substantial and injurious effect or influence" in determining the outcome of the case. *Napue*, 360 U.S. at 271.

Nor could Cruz-Garcia demonstrate prejudice from any allegation regarding Santana's testimony. As will be discussed, DNA still connected Cruz-Garcia to this crime, as did Angelita Rodriguez's testimony. And Santana was cross-examined on the fact that he was never charged with any crime in connection with this case. 21 RR 15–17. Santana and Agent Ebersole were confronted with inconsistencies between his testimony and his FBI interview. 21 RR 37–39, 45–63, 67–77. Santana's credibility was also challenged by his admissions to being a drug dealer, drug-abuser, and convicted felon currently serving the last year of a seventeen-year-seven-month sentence in the federal penitentiary for trafficking drugs. 20 RR 118–23; 21 RR 30–32. The jury still credited his testimony. Cruz-Garcia fails to demonstrate a reasonable likelihood that any alleged falsity in Santana's testimony could have affected the jury's verdict. *Barrientes*, 221 F.3d at 756. His claim on this ground thus fails to merit relief.

### 2.    DNA evidence

Cruz-Garcia alleges the State sponsored false testimony on DNA linking Cruz-Garcia to Diana Garcia's rape because "it was based on unreliable and incorrect analysis" where the State later produced an amended report "recant[ing] much of their DNA testimony." Pet'r Br. at 200–01. In a second allegation, he contends the State relied on false testimony to bolster the reliability of the DNA evidence, where State knew that reliability was questionable before trial. *Id.* at 201–02. These allegations fail to demonstrate the State knowingly sponsored false testimony at trial or that any ultimately incorrect testimony was material.

First, the results from the DNA re-testing that differ from the original testing do not demonstrate that the State knowingly presented false evidence. Cruz-Garcia cites to two discrepancies following re-testing in 2015[11] of samples that initially implicated him as a contributor of DNA: (1) upon retesting, the vaginal swab from the rape-kit was found to contain essentially a mixture of DNA that could not be sufficiently separated to determine specific contributors, unlike the previous finding that Cruz-Garcia could not be excluded as a main contributor; and (2) upon re-testing of the cutting from the panties, no conclusions could be made regarding the minor component of this DNA mixture, but the results specifically relating to Cruz-Garcia did not change: he could not be excluded as a *major* contributor. *See* SHCR-02 at 741–44. Also unchanged—Cruz-Garcia's DNA profile could not be excluded as a

---

[11]    Retesting of the DNA evidence was performed by the Houston Forensic Science Center which generated a report on November 3, 2015. The testing was performed in response to the August 21, 2015, announcement from the Forensic Sciences Commission (FSC) to "Members of the Texas Criminal Justice Community," indicating "concerns involv[ing] the interpretation of DNA results where multiple contributors may be present, commonly referred to as DNA mixture interpretation." SHCR-02 at 793–95; *see also id.* at 771–72.

contributor to the DNA profile found on a cigar left at the crime scene. SHCR-02 at 743 (probability that a randomly chosen unrelated individual would be included as a possible contributor for the cigar and to the major component on the panties cutting, is approximately 1 in 100 quintillion for Southwest Hispanics). As such, the now-inaccurate testimony regarding the vaginal swab and "minor component" testimony are not material statements. Cruz-Garcia cannot demonstrate a reasonable likelihood that any false testimony could have affected the outcome of trial. *United States v. Agurs,* 427 U.S. 97, 103 (1976). Because his DNA could not be excluded from the cigar sample and the sexual assault evidence, even if the testimony regarding the vaginal swab had been excluded, there is no reasonable likelihood of a different result.

And while we now know the cited testimony was inaccurate, Cruz-Garcia cannot demonstrate that it was intentionally false, or that the State was aware of any falsity at the time of trial. *See In re Raby,* 925 F.3d 749, 756–57 (5th Cir. 2019) (petitioner fails to demonstrate State knowingly sponsored false testimony when it failed to correct serologist's misstatements regarding exculpatory blood typing results where serologist's testimony was probably the result of inadequate training or procedures by crime lab, and nothing suggests prosecutors were aware of crime lab deficiencies). This, Cruz-Garcia must prove to satisfy *Napue.* Therefore, his claim fails.

Regarding reliability of this evidence, Cruz-Garcia contends the State knew at the time of trial that the reliability of the evidence was questionable because the evidence was stored with the HPD Crime Lab which was shuttered in 2007 after an independent investigation uncovered "false test results, mishandling of evidence, improper police procedure, criminal activity, and incompetence. Pet'r Br. at 202 (citing 3 CR 455). Cruz-Garcia cites the testimony of HPD Sergeant Eric Mehl and Orchid Cellmark forensics supervisor Matt Quartaro as falsely claiming the rape kit

was in a sealed bag. Pet'r Br. at 202. But Cruz-Garcia does not demonstrate false testimony, the State's knowledge of false testimony, or the materiality of said testimony.

Sgt. Mehl testified that (1) the cigar was packed in "excellent" condition, stored in plastic bag, inside a manilla envelope, both in "excellent" condition, 20 RR 45; and (2) the sexual assault kit evidence "was in a box placed in a plastic bag and the plastic bag was sealed"; Sgt. Mehl agreed, it was "all sealed up" and "in very good condition," 20 RR 46–47. Sgt. Mehl did not testify about the condition of the cutting from the panties, indicating only that he asked Orchid Cellmark to examine the sexual assault kit, the cigar, and the cutting to develop a DNA profile. 20 RR 39, 48.

Quartaro testified that he received from Sgt. Mehl a cigar, a sexual assault kit, and reference samples from Diana Garcia and Arturo Rodriguez. 21 RR 105–07. Quartaro testified that he saw no "notations" of "potential tampering with any of this evidence"; he agreed, the evidence was in good condition and packaged appropriately. 21 RR 136–37. He agreed that separate items were packaged in their plastic bags; the items in the rape kit were in a bag in the box; the cutting from the panties was in a separate little bag and was sealed up; and the cigar came in its own sealed package, 21 RR 137–38. In a separate voir dire examination, Quartaro clarified that cutting from the panties was "packaged separate. It was packaged as a cutting, but initially, I believe it all was [contained within the sexual assault kit]." 21 RR 122–23.

Cruz-Garcia now relies on an affidavit from his own expert, Daniel Hellwig, who was retained in 2014 to review the DNA testing. Pet'r Br. at 202; SHCR-02 at 220–28. Hellwig reviewed the chain of custody documentation and cites to potential problems with the sexual assault kit—namely, while the FedEx box that contained the evidence was indeed sealed, the sexual assault kit housed within that box was unsealed when received by Orchid Cellmark. SHCR-02 at 221–22. Also, Hellwig

noted, although the manila envelope containing the cutting from panties was identified as a sealed container, two envelopes contained within this package were unsealed—the cutting from the crotch of the red panties and the liquid blood known sample from Arturo Rodriguez. SHCR-02 at 222. Hellwig thus had concerns about the integrity of the evidence.

Cruz-Garcia fails to demonstrate that any testimony from trial was actually false. Cruz-Garcia does not include the data reviewed by Hellwig in reaching his conclusions. The Court need not presume Hellwig's opinion is more accurate than Quartaro, who actually received the evidence. But, assuming Hellwig's observations are accurate, his observations are not inconsistent with Sgt. Mehl's testimony. Sgt. Mehl stated only that the box was sealed within a bag. 20 RR 46–47. He did not discuss the condition of the evidence within the box or the cutting from the panties. Hellwig and Quartaro differ only on whether some of the packages contained within the box and the envelope were sealed—Hellwig does not dispute Quartaro's observation that everything was packaged separately.

Cruz-Garcia cannot demonstrate that any knowledge of any alleged falsity on this point should be imputed to the State. While knowledge by a member of the prosecution team is indeed imputed to the prosecutors, an expert witness is not necessarily part of the "prosecution team." *Avila v. Quarterman,* 560 F.3d 299, 307–08 (5th Cir. 2009). Traditionally, the prosecution team includes investigative and prosecutorial personnel. *See id.* at 308; *United States v. Antone,* 603 F.2d 566, 569 (5th Cir. 1979). The relevant question is whether the expert played a role in the prosecution. *Avila,* 560 F.3d at 308. In *Avila,* the Fifth Circuit cited to a Second Circuit case finding that, where the expert's duties were limited to matters concerning his area of expertise in ink—including analyzing documents, explaining tests to the prosecutor, discussing possible testimony of the defense expert, assisting

47

the prosecution in developing cross-examination questions, taking part in mock examinations, and testifying at trial—the expert was not involved in the investigation and preparation of the case and was not a "fully functioning member of the prosecution team" so that his knowledge must be imputed to the prosecution. *Id.* at 308–09 (citing *United States v. Stewart,* 433 F.3d 273, 297–99 (2nd Cir. 2006)). Similarly here, Mr. Quartaro's involvement was limited to matters concerning his expertise in DNA analysis.

Regardless, any alleged falsity in testimony regarding whether the packages were sealed within the sealed box is not material. Hellwig's concerns about cross-contamination or degradation are irrelevant as Cruz-Garcia's DNA was not transmitted to Orchid Cellmark at the same time as the evidence. Quartaro received the evidentiary samples from Sgt. Mehl on October 3, 2007, and the reference sample for Cruz-Garcia on May 28, 2008. 21 RR 105–06, 117–18. Thus, there was no risk that his DNA was transmitted to this evidence inadvertently. And Hellwig's concerns regarding degradation fail to explain why testing done in 2015 continued to link Cruz-Garcia's DNA to this evidence. There is no reasonable likelihood that the false testimony could have affected the jury's verdict. *Barrientes*, 221 F.3d at 756. For the above reasons, Cruz-Garcia's allegations regarding DNA testing should be denied.

### 3. Angelita Rodriguez

Cruz-Garcia's ex-wife, Angelita Rodriguez, testified that he confessed to being involved in Angelo's death. 20 RR 107. Cruz-Garcia complains that (1) Angelita's trial testimony conflicts with prior statements to law enforcement where she failed to tell police about Cruz-Garcia's involvement, *see* ECF Nos. ex.'s 18-73; 18-37; 18-74; (2) Angelita falsely testified that she had not seen Cruz-Garcia until she traveled to the Santo Domingo to ask for a divorce, but cited exhibits indicate that, on February 8, 1993, she was living with him in the Dominican Republic, ECF No. 18-15; 20 RR

105-07; and (3) Cruz-Garcia did not leave Houston suddenly, as stated by Angelita, but had been preparing to leave for some time, 20 RR 99–100; *see also* ECF No.'s ex.'s 18-81; 18-91. Pet'r Br. at 203–04.

That Angelita did not initially tell the police about Cruz-Garcia's involvement does not demonstrate she testified falsely at trial. Inconsistencies between a witness and prior statements does not provide sufficient grounds to prove false testimony. *Kutzner,* 303 F.3d at 337. Regardless, these inconsistencies were known to Cruz-Garcia at the time of trial, and Angelita was cross-examined on the fact that she failed to tell police officers that Cruz-Garcia confessed; she stated that she was scared. 20 RR 112.

Cruz-Garcia's cited evidence also fails to demonstrate that Angelita testified falsely when she said she did not see Cruz-Garcia again until she traveled to the Dominican Republic to seek a divorce. The cited document—an FBI memorandum dated February 9, 1993—indicated that Cruz-Garcia was currently residing with Angelita at her mother's house in the Dominican Republic. ECF No. 18-15. It appears this information was conveyed to Special Agent Johnson by way Angelita's attorney and is hearsay at best. Regardless, that he may have been "currently residing" with Angelita and her mother does not demonstrate that Angelita did not also travel to the Dominican Republic to seek a divorce. Regardless, Cruz-Garcia fails to demonstrate how knowledge of this testimony could have affected the jury's verdict. *Barrientes*, 221 F.3d at 756. Indeed, he does not dispute Angelita's testimony from trial that he was her ex-husband and that she had not seen him in twenty years. *See* 20 RR 82.

Finally, Cruz-Garcia fails to demonstrate that Angelita falsely testified that he left Houston suddenly, rather than on a planned trip. Cruz-Garcia offers a statement from Piruquinu Acosta, a resident of Dominican Republic, who asserts that he knew

49

Cruz-Garcia as a child, and that he learned Cruz-Garcia was planning to return to the Dominican Republic because his father was building him a house, that when Cruz-Garcia did return with his wife Angelita, he helped his father build the house, it took him a long time to finish it, and they eventually stayed there. ECF No. ex. 18-91. The document offers no dates or timelines. A second statement from another Dominican Republic resident, Eledemas Mercedes Fana, stated that Cruz-Garcia's father began building a shop on his property after Cruz-Garcia left at age seventeen; he ran out of money and did not finish. ECF No. 18-81. A few years later, Cruz-Garcia started sending money home to his father to finish the shop, with the intention of eventually returning and living there with his family. *Id.* Fana testified that he helped, but it "took us years to finish the house." *Id.* Cruz-Garcia also helped when he finally returned home. *Id.* This statement similarly offers no timeline for these events, and makes no mention of Angelita. At best, these statements support a conclusion that Cruz-Garcia eventually wanted to return to the Dominican Republic, but in no way suggest that his return was a pre-planned event that simply coincided with Angelo's death. And there is no reason to believe the State would have known this testimony was false at trial.

At best this information could have served as impeachment, but Angelita was sufficiently impeached on many points, including her prior arrest, the fact that she was also selling drugs with Cruz-Garcia and she benefitted financially from drug dealing, and that she did not initially tell the police about Cruz-Garcia's involvement in the murder. *See* 20 RR 92, 112–13. Cruz-Garcia does not assert what else could have been done with this information. Regardless, his DNA still connected him to the rape and subsequent kidnapping and murder, as did Santana's testimony. Thus, Cruz-Garcia cannot demonstrate a reasonable probability of a different result at trial.

### 4. Diana Garcia and Arturo Rodriguez

Cruz-Garcia alleges that the State relied upon the false testimony of the victim's parents, Diana Garcia and Arturo Rodriguez. His various citations to inconsistencies in their testimony fail to prove false, material testimony or that the State was aware of any falsity.

Specifically, Cruz-Garcia alleges that both testified he took Angelo as retaliation for their decision to stop dealing drugs, 18 RR 133, 204; but law enforcement knew they were still dealing drugs that night, *see* SHCR-02 at 509–10, 512. Pet'r Br. at 204. However, their testimony comports with the State's theory that they did not want to sell drugs for Cruz-Garcia anymore. Diana testified that Cruz-Garcia had left drugs at their apartment, but Arturo told him come back and pick them up, they did not want to sell them anymore. 18 RR 133–34. Arturo similarly testified that he told Cruz-Garcia they were going to stop selling drugs for him. 18 RR 204. Rudy Santana confirmed that Cruz-Garcia was angry that they were no longer selling drugs for *him*. Santana testified that they went to the apartment that night to get Cruz-Garcia's drugs and money. 20 RR 135–36. Santana testified that Cruz-Garcia got angry if anyone interfered with his customers; when asked about how Cruz-Garcia would react when people who sold drugs for him wanted to work for someone else, Santana said he was quick to anger and was a very violent person. 20 RR 124–26. Santana agreed, Cruz-Garcia was "very protective of his drug business." 20 RR 127. Further, police officer U.P. Hernandez testified that, when he interviewed Diana about the crime, she initially denied any drug dealing but ultimately admitted to dealing small quantities, and that Cruz-Garcia was her supplier. 19 RR 73–74. That Diana and Arturo no longer wanted to sell drugs for Cruz-Garcia but may have been selling drugs for another dealer is consistent with the cited police report

51

indicating Diana sold drugs on the night of the murder. Regardless, any inconsistency in the testimony was before the jury and is thus immaterial.

Cruz-Garcia claims Arturo testified that his head was stuffed inside a pillowcase by his assailants, when no pillowcase was found at the scene. Pet'r Br. at 204.  Cruz-Garcia cites to no specific testimony on this point but, at various times in the record, Arturo indicated that a pillowcase had been placed over his head while his wife was being raped, and that he removed it to go look for Angelo, while he was "all full of blood." 18 RR 214, 216; *see also* 19 RR 14-15 ("a pillow was placed on me"). Diana similarly testified that a blanket or pillow was placed over her head before she was raped. 18 RR 157–58. Diana testified that Arturo had a "pillowcase or something" on or in his mouth, and a pillow covering his head. 18 RR 159–60. A pillow with blood on it was observed at the scene, 18 RR 74–75, and the police information sheet indicated that "a pillow with no pillow case on it" was found on the bed, with "a round pool of blood on the pillow." ECF No. ex. 18-95, at 4. Also, the police report indicates that the floor around the area where Diana was raped was "nothing but a floor of clothing, on top of this clothing were several small pools of blood". *Id.* That an actual pillowcase was not recovered is not evidence of false testimony. Indeed, Arturo and Diana's testimony on this point was consistent with each other, and with the bloody pillow observed at the scene, as well as the "floor of clothing" topped with pools of blood. Cruz-Garcia demonstrates no evidence of false testimony, or how he could undermine the verdict with this evidence.

Cruz-Garcia next argues that Garcia falsely testified that Arturo was her common-law husband and said Angelo lived with them full-time, when she was actually legally married to Angelo's father, and Angelo began living with them much later than represented. Pet'r Br. at 204–05; *see* ECF No. ex.'s 18-100; 18-97. Cruz-Garcia fails to demonstrate false or material testimony. Garcia testified that she was

married to Angelo's father, but she left him for Arturo, that Arturo was her common-law husband and that they were still together at the time of trial. 18 RR 121–25. Cruz-Garcia tries to discredit her testimony with a statement from Angelo Garcia, Sr., given at the time of the murder in 1992, indicating he was still married to Diana. ECF No. ex. 18-100. This does not prove that, at the time of her 2013 trial testimony, they will still married, or that the State would have known this. Regardless, given her admission to leaving her husband for Arturo, and that she and Arturo remain together, it is unclear how knowledge of this fact could undermine the outcome of the trial.

Further, Garcia testified, at guilt-innocence, that Angelo lived with her, 18 RR 125; and, at punishment, that Angelo saw his father regularly on weekends. 25 RR 194. This is confirmed by Angelo Garcia, Sr.'s statement indicating that "he gets Angelo on weekends sometimes." ECF No. ex. 18-100. Nevertheless, Cruz-Garcia cites testimony that he lived with her as false because Arturo testified that "Baby Angelo" did not initially live with them but did only later on. 18 RR 197. Such a minor inconsistency in testimony otherwise confirmed by another source is insufficient to prove the testimony was false. *Kutzner*, 242 F.3d at 60 ("Conflicting or inconsistent testimony is insufficient to establish perjury."). Cruz-Garcia fails to demonstrate that this, or any minor inconsistency in testimony discussed above, was actually false or that it could have affected the outcome of his trial.

### 5.    Law enforcement

Parsing two sentences from their extensive trial testimony, Cruz-Garcia alleges that the State relied upon false testimony of two police officers to bolster the credibility of Diana and Arturo. Pet'r Br. at 205. In context, the testimony does not reflect the State presented any false or material testimony.

53

Sergeant C.E. Elliott testified that Diana and Arturo initially denied they were selling drugs. 18 RR 87–88. Sgt. Elliott admitted on cross-examination that he did not believe Diana and Arturo were being truthful. 18 RR 98. He said, while their story of the crime was consistent and did not change between what they told the officers, he knew they were lying about being drug dealers. 18 RR 103. He repeated, he knew at the scene that they weren't being truthful. 18 RR 109. When asked, on redirect, if his opinion on untruthfulness was a general statement or about something specific, Sgt. Elliott replied:

> Other than the reason why this occurred, they were truthful about everything. All the physical evidence, all the statements, and the motions matched everything that I saw there at the scene, expect (sic) they weren't admitting they had some dope dealings. And I knew that already, so that wasn't that big of a deal with me.

18 RR 119.

Officer U.P. Hernandez testified that, on the night of the crime, Arturo would not admit to dealing drugs. 19 RR 72–73. Diana also initially denied dealing drugs but, when confronted with the threat to her son, she said she was "going to quit lying to you and tell you the truth" about her drug dealing. 19 RR 74, 98–100. On cross-examination, Officer Hernandez stated that Arturo never admitted to being a drug dealer but, apart from that, Diana and Arturo's statements were consistent. 19 RR 97–98, 100–01.

From this testimony, both officers believed Diana and Arturo were being truthful about the details of the crime itself but were untruthful about the motive for the crime or their own drug dealing. Indeed, both officers stated that they knew this crime was about drugs from the very beginning. 18 RR 87–88, 119; 19 RR 74–76, 77–78. The cited exhibits do not suggest otherwise. *See e.g.,* SHCR-02 at 509–10 (while both failed polygraphs, Diana "was deemed truthful about her knowledge concerning

54

this abduction"); ECF No. ex, 18-64, at 7 ("I know you all were dealing dope. We know it. We know it all, but you all, you all just haven't been truthful[.]"); ECF No. ex. 18-19 ("Diana and Arturo have been untruthful throughout the investigation with regard to the events inside the apartment and the identity of the suspects."); ECF No. ex. 18-66 (Diana "is not being completely truthful with us concerning her drug activity and her knowledge of a possible motive".) The fact that they were lying about drug dealing was clearly before the jury.

Additionally, while Officer Hernandez testified that there was never a ransom demand, 19 RR 79, of the two documents Cruz-Garcia cites to discredit this testimony, one indicates that a purported ransom call seeking $30,000 was a hoax, and that HPD and FBI were still attempting to locate "suspect" Cruz-Garcia, ECF No. ex. 18-17, 18-18. While HPD followed up on all leads, Cruz-Garcia was indeed the primary and even "second" suspect. *See* ECF No. ex. 18-16 (HPD believed Cruz-Garcia was "behind the kidnapping" and "believed that [Cruz-Garcia] took Angelo," but "*the second theory*, involves a drug rip-off committed by [Cruz-Garcia]") (emphasis added); ECF No. ex. 18-17 (HPD and FBI were attempting to locate "suspect" Cruz-Garcia). Thus, he fails to prove his testimony was false, or that it had a material effect on the jury's verdict.

### 6. Murder of Saul Flores

Cruz-Garcia argues that the State relied upon false testimony from Johnny Lopez and Rudy Santana to tie him to the murder of Saul Flores at punishment. Once again, he fails to prove the testimony was false. Rather he cites inconsistencies among witnesses, most of which were addressed at trial.

For the State, Lopez testified that his friend Flores was having problems with Cruz-Garcia, and that he observed Flores run away from Cruz-Garcia when he saw him approach. 25 RR 50–51. Lopez did not know Flores's friends or associates but

identified Cruz-Garcia as someone he had seen around but had no personal dealings with. 25 RR 48-49.

Santana testified that Flores worked with him and Cruz-Garcia for a short period of time, selling drugs, and they met Flores through a man called "Shorty," who also worked for them. 25 RR 72–73. Santana testified that Flores was using drugs and propositioned Cruz-Garcia's then girlfriend, Elizabeth at her apartment. 25 RR 74–75. Cruz-Garcia, Santana, and another man confronted Flores at Elizabeth's apartment; a fourth man joined them at the apartment. 25 RR 75–78. The four men put Flores in a car and took him to another apartment used for selling drugs and where Shorty sometimes lived. 25 RR 75–77. At the apartment Cruz-Garcia and two others bound and beat Flores with a heavy object, injected him with drugs, "destroyed" his hands, and broke his neck; Cruz-Garcia told Santana to leave the room so he did not participate but could still see what was happening from another room. 25 RR 79–83. The men placed Flores's body in the bathtub and left; they disposed of his body in a dumpster a few days later. 25 RR 83–85.[12] Santana told no one about this murder until his current attorney, Ray Castro, and then the State prosecutors. 25 RR 85–86.

The State also presented testimony from the medical examiner indicating that Flores showed signs of ligature strangulation and blunt force trauma; his hands were bound and had abrasions, contusions, and bruising caused by the impact of blunt-force object; and his feet were bound. 25 RR 104–10. Toxicology tests showed cocaine in Flores's blood. 25 RR 111.

Cruz-Garcia now alleges Lopez testified falsely, relying on a 1989 statement to HPD in which he stated that Flores sold drugs for Shorty until they had a falling out,

---

[12]    Witness Tina Perez confirmed seeing Flores's body in the bathtub when she went to the apartment to buy drugs. 25 RR 24–35.

and Flores was on the run from him. Lopez did not mention Cruz-Garcia in this statement. ECF ex. 18-29. Cruz-Garcia also asserts that Lopez's statement was not given to the defense at trial. Pet'r Br. at 207. However, this latter accusation is refuted by the record—trial counsel clearly had the statement and thoroughly cross-examined Lopez with it. Trial counsel questioned Lopez extensively about Shorty: Lopez could not recall telling the police in 1989 that his friend was running from Shorty; he could not recall the name of the police officer he talked to; he did not recall anyone named Shorty; he could not recall telling officers that Shorty and Saul had a falling out. 25 RR 51–55. Lopez *did* recall the police showing him a picture of Cruz-Garcia and telling them that that was who Flores was running from. 25 RR 55. Trial counsel even tried to refresh Lopez's memory with the name of the detective in ECF No. ex. 18-29—R.E. Gonzalez—but could not. *See* 25 RR 53. Therefore, the inconsistency between his 2013 testimony and the 1989 statement was known to the defense and presented to the jury at the time of trial. *See Sparks,* 756 F. App'x at 401.

Further, the 1989 statement does not prove the 2013 testimony was false. Any discrepancy in Flores's testimony and his statement, as identified by cross-examination, was for the jury to resolve. *Koch,* 907 F.2d at 531 ("[C]ontradictory trial testimony . . . merely establishes a credibility question for the jury.") Indeed, Santana's testimony suggested that Cruz-Garcia, Shorty, and Flores were all closely intertwined in selling drugs, while Lopez denied knowing Flores's friends and associates. 25 RR 48–49. The jury may have credited Santana's personal knowledge over Lopez's twenty-four-year-old recollections. Apart from this thorough cross-examination, it is unclear what more could have been done to change the outcome of the trial.

Cruz-Garcia suggests the State relied upon Santana's testimony to bolster Lopez, when in reality Santana actually witnessed the murder whereas Lopez only

stated Flores was on the run from Cruz-Garcia. Regardless, he now claims Santana also testified falsely regarding the injuries sustained by Flores. But once again, trial counsel extensively cross-examined both Santana and the medical examiner on this point. Trial counsel questioned Santana about the injuries to Flores's hands, burns from cigarettes, injection of drugs, and broken neck. 25 RR 92–95. Upon cross-examination of the medical examiner, he confirmed Flores's body had no broken bones, no cigarette burns, no fresh needle tracks from drugs, and did not have a broken neck. 25 RR 112–15. Again, the counsel clearly was aware of, and presented to the jury, any discrepancy in Santana's testimony with the medical examiner's findings. Notably, Santana admitted to watching the murder from another room despite proclaiming he could see "perfectly." 25 RR 79–82. Any discrepancy in this testimony and potential impact on Santana's credibility was for the jury to decide. And given how thoroughly trial counsel refuted this testimony, Cruz-Garcia cannot claim a reasonable likelihood of a different result.

He also claims Santana falsely stated that Cruz-Garcia killed Flores over a girl named Elizabeth Ramos. 25 RR 74–79. At no point does Santana identify her as Elizabeth *Ramos*. Presuming she is the same Elizabeth Ramos as the affiant in ECF No. 18-30, her contrary affidavit does not prove Santana's testimony is false. Furthermore, there is no suggestion that the State knew, or should have known who Elizabeth was—Santana did not suggest she witnessed Flores's murder. More importantly, if she was indeed his girlfriend, Cruz-Garcia could have provided her information to trial counsel who could have contacted her to refute Santana's testimony. He did not.

Regardless, he cannot demonstrate there is a reasonable likelihood that the admission of testimony regarding Flores's murder could have affected the jury's verdict. *Barrientes*, 221 F.3d at 756. Cruz-Garcia stood convicted of the kidnapping

58

and murder of a six-year-old boy, committed after raping his mother and beating her boyfriend in retaliation for disloyalty over drug dealing. In addition, aggravating evidence presented at the punishment phase of trial was substantial—Santana testified about a number of criminal offenses that he witnessed or committed with Cruz-Garcia. Cruz-Garcia once tied him up and assaulted him because he thought Santana was taking his customers. 25 RR 61–64. Santana described his participation with Cruz-Garcia in the robbery of a competitor drug dealer named "Patiko," where Cruz-Garcia beat Patiko and raped his wife. 25 RR 64–71. The facts of this crime are distinctly similar to those surrounding Angelo's murder. 25 RR 66–69. Santana testified that they frequently burglarized others in the drug business. 25 RR 71.

The State also presented testimony that Cruz-Garcia pled guilty in 2001 to kidnapping and possession of weapons for his participation in the kidnapping of a restaurant owner's brother and 16-year-old stepson for ransom, beating and threatening both during their capture. *See* 24 RR 14–42, 47–60, 64–65, 82–111. While incarcerated in Puerto Rico for this crime, a cell-inspection revealed plans to escape, as well as possession of an illegal cell phone. 24 RR 120–28.

While incarcerated in Harris County jail in February 2010, Cruz-Garcia was classified as high-risk and placed in administrative separation for two years. 25 RR 145. Two months after being moved, he was found in possession a razor blade hidden inside his bed. 25 RR 126–33, 137–38, 145–47. Given this evidence, there is no reasonable likelihood that excluding Flores's murder would have an effect on the jury's verdict.

### 7.   Puerto Rico kidnapping

In his final claim, he alleges the State presented false testimony regarding the 2001 kidnapping in Puerto Rico. Pet'r Br. at 208. Specifically, on cross-examination, the trial court prevented counsel from questioning a federal agent about the

circumstances of the kidnapping and Cruz-Garcia's role as a federal law enforcement informant. *Id.*; *see also* 24 RR 72–73. Cruz-Garcia asserts, "Upon information and belief, testimony regarding [his] role in the 2001 kidnapping was misleading." Pet'r Br. at 208. This claim is insufficiently briefed and should be deemed waived. *Lookingbill,* 293 F.3d at 263. He fails to even allege what portion of this testimony was false or misleading, or what the federal agent might have attested to if allowed. Indeed, the record reflects that, while Cruz-Garcia may have cooperated in some capacity with a federal law enforcement agency in the past, he was not cooperating with them on this particular case. 24 RR 72–73.

For the foregoing reasons, relief on this entire claim should be denied.

## IX.   Claim 6 Alleging a *Brady* Violation Is Procedurally Defaulted and Without Merit.

Cruz-Garcia next alleges that the State withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 87 (1963). Pet'r Br. at 214–25. Specifically, he alleges that the State withheld (1) impeachment evidence against Rudy Santana; 2) mitigation evidence; (3) exculpatory and impeachment evidence in connection with a number of witnesses. His claims should be dismissed as procedurally defaulted or, alternatively, without merit.

### A.   This claim is procedurally defaulted.

Cruz-Garcia did not raise his *Brady* claims before the CCA in his initial state habeas application. Following this Court's stay and abeyance, he raised these claims in his second subsequent state habeas application, SHCR-05 at 68–85, and the CCA dismissed the application as successive without considering the merits of any claim. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. Again, a federal court may not consider the merits of a habeas claim if a state court has denied relief due to a procedural default, where its decision is plainly stated and rests on adequate and

independent state grounds. *Sawyer*, 505 U.S. at 338; *Harris*, 489 U.S. at 262. The dismissal of a petition for abuse of the writ constitutes a procedural default under Texas law, barring federal habeas review of these claims. *Fearance*, 56 F.3d at 642; *Coleman*, 501 U.S. at 729–730.

Cruz-Garcia alleges he can show cause to excuse the default because the State suppressed exculpatory, impeachment, and mitigating evidence; and prejudice because such evidence was material. Pet'r Br. at 224–25 (citing *Banks v. Dretke,* 540 U.S. 668, 691 (2004)). Therefore, the Court can review his claim de novo. However, as will be discussed below, Cruz-Garcia clearly had the opportunity to raise these claims in his first state writ and failed to do so, and, again, he cannot demonstrate that a fundamental miscarriage of justice will result from his claim being barred from review. He is not actually innocent. Consequently, Cruz-Garcia is barred from seeking relief on this ground in federal court. *See Fearance*, 56 F.3d at 642.

## B.    Alternatively, this claim fails on the merits.

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). But *Brady* "applies only to impeachment and exculpatory evidence; neutral or inculpatory evidence lies outside its coverage." *United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir. 1989). Additionally, under *Brady*, the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise

61

of reasonable diligence. *Castillo v. Johnson*, 141 F.3d 218, 223 (5th Cir. 1998) (citing *Brown v. Cain*, 104 F.3d 744, 750 (5th Cir. 1997)).

### 1.   The State did not withhold impeachment evidence against Rudy Santana.

Cruz-Garcia first alleges the State failed to disclose impeachment evidence against Rudy Santana, including (a) evidence of an agreement between the State and Santana in exchange for his testimony; (b) the mental health records for Santana, whose competency was evaluated in 1998 for a federal prosecution and who asserted in 2011 that he was incompetent to enter a guilty plea; and (c) evidence that Santana was convicted of a crime involving moral turpitude. Pet'r Br. at 215–19. Additionally, he alleges, without sufficient briefing, that the State withheld records indicating Santana's immigration status was revoked. *See* ECF No. ex. 18-76.

First, as discussed at length in response to Claim 5, the record clearly refutes any allegation of a deal in exchange for Santana's testimony against Cruz-Garcia. Multiple witnesses confirmed, at trial or after, that Santana testified to clear his conscience. *See* 20 RR 176–79; 21 RR 12–14; *see also* ECF No. ex. 43-1, at 101–03; ECF No. ex. 18-80; ECF No. ex. 18-101. There can be no evidence for the State to disclose if a deal did not exist.

Regardless, Santana was cross-examined on the fact that he was never charged with any crime in connection with this case. 21 RR 15–17. And, as noted by Cruz-Garcia, the jury charge instructed that Santana was an accomplice as a matter of law. *See* 22 RR 3–5; 3 CR 499. Thus the jury was reminded to take into account his own culpability. Cruz-Garcia fails to demonstrate the elements of a *Brady* claim based purely on speculation that a deal existed. *See Murphy,* 205 F.3d at 814 (finding no prima facie *Brady* claim where conclusory allegation that prosecutor failed to

disclose evidence of a deal with a witness was based purely on speculation, and the existence of an alleged deal was addressed at trial and thus not material).

Regarding Santana's sealed mental health records retained by the United States District Court for the Southern District of Texas, ECF No. ex.'s 18-12, 18-13, and 18-14, there is no evidence that the State prosecutor had any more access to or knowledge of these sealed mental health records than did Cruz-Garcia. And knowledge of documents retained by a federal district court, with no investigative role in the state court litigation, should not be imputed to the State. *See Avila,* 560 F.3d at 307–10. Regardless, he cannot demonstrate the records were favorable or material to the outcome of his trial.

Cruz-Garcia also fails to demonstrate these sealed records contain favorable evidence. Despite Santana's claim in 2011 that he was "undeniab[ly] incompetent to accept a guilty plea," ECF No. ex. 18-12, and the federal court's agreement to a competency evaluation, ECF No. ex. 18-13, 18-14, Santana remained in federal prison at the time of Cruz-Garcia's 2013 trial. This result indicates Santana was found competent, and the sealed records would be of little impeachment value. Regardless, as discussed in response to Claim 5, Santana's credibility was sufficiently impeached by his prior criminal record and inconsistencies in his testimony and prior statement. There is no reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Bagley*, 473 U.S. at 682.

Regarding the evidence that Santana was guilty of a crime of moral turpitude—specifically that he committed a misdemeanor assault of a girl rather than a boy, as he testified, as discussed above, it is unclear that the State knew the sex of the victim outside of Santana's testimony. *See* 21 RR 21. But, assuming the prosecutor had that knowledge, the *Brady* claim still fails because Cruz-Garcia cannot show the testimony was material—that is, any reasonable probability that,

had the evidence been disclosed, the result of the trial would have been different. *Bagley*, 473 U.S. at 682. He cannot make this showing because any impeachment value would have been minimal, given that trial counsel elicited from Santana that he was serving a 17-year sentence in federal prison for charges related to drugs and weapons, and he had previously been convicted for assaulting a woman in 1991. 21 RR 29–31.

Finally, in a separate claim, Cruz-Garcia alleges the State withheld records indicating Santana's immigration status was revoked. *See* ECF No. ex. 18-76. But Cruz-Garcia fails to demonstrate that this information was not already known or equally discoverable. He also fails to demonstrate how this information is exculpatory or impeaching. Indeed, the lack of a deal has been sufficiently addressed in the pleading. The fact that Santana's immigration status has been revoked further weighs against the existence of a deal. But regardless, Santana's credibility was thoroughly and sufficiently impeached at trial. There is no reasonable probability that this information, had it been revealed, would have had a material impact on the outcome of trial.

> ### 2. The State did not withhold evidence of Cruz-Garcia's alleged assistance to federal law enforcement.

Cruz-Garcia alleges the State withheld mitigating evidence that he assisted federal law enforcement agencies as an informant. Pet'r Br. at 219–20. It is unclear how the State could withhold evidence that is also known to Cruz-Garcia at the time of trial. If Cruz-Garcia was an informant, he would know the agencies and names of his contacts. Indeed, as addressed in the Director's response in opposition to discovery and an evidentiary hearing, *see* ECF No. 84, Cruz-Garcia seeks discovery on retired INS agent Wilson Pellot, who is willing to be deposed if subpoenaed. ECF No. 75, at 19. However, if Agent Pellot is willing to give a deposition, clearly trial or appellate

counsel could have taken these steps long before now.[13] *See Castillo,* 141 F.3d at 223 ("Under *Brady,* the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of diligence.").

Further, the State is not imputed with the knowledge of any federal agency not acting as an agent of the State or part of the investigative process for this case. *See Avila,* 560 F.3d at 307–10; *see also State v. Norwood,* No. 09-15-00083, 2015 WL 5093332, at *1 (Tex. App.—Beaumont Aug. 31, 2015) (pet. ref'd) (trial court could not require State to disclose evidence in the DEA's possession, custody, or control). Thus, aside from the FBI—from whom the State did seek information on Cruz-Garcia's informant status but received none, ECF No. 18-80—the State is not imputed with knowledge of agencies not assisting the investigation.

Regardless, mitigating evidence such as this does not satisfy *Brady,* as it is neither exculpatory nor impeaching. *See Nixon*, 881 F.2d at 1308; *see also United States v. Dula,* 39 F.3d 591, 593–94 (5th Cir. 1994) ("This statement is neutral and non-exculpatory; it is immaterial to guilt and it is outside the scope of the *Brady* rule."). That Cruz-Garcia may have served as an informant for a federal law enforcement agency does not exculpate him of murder. While the trial court refused to allow the evidence in as hearsay through the State's witness, Agent Rodriguez, the court suggested it might be admissible as mitigation, through a proper witness. 24

---

[13]    From the trial record, Cruz-Garcia did instruct his attorneys to ask specific questions of Federal Agent Juan DeJesus Rodriguez regarding contact with the United States government, the FBI, INS, and DEA. 24 RR 69–71. Agent Rodriguez testified, outside the jury's presence on voir dire, that Cruz-Garcia told him that he was an "important person with the DEA", but the agent was unable to confirm this information in writing. 24 RR 71–74. Agent Rodriguez received oral confirmation that Cruz-Garcia had cooperated with them in the past, but not on the kidnapping case the agent was investigating. 24 RR 71–73.

65

RR 72–74. But Cruz-Garcia did not offer such witness. As noted above, the information was surely known to the man who served as the informant, and thus discoverable by his attorneys.

Regardless, it is unclear how such information would have been useful. Despite his alleged status as an informant, he continued to engage in extensive criminal activities in Puerto Rico and the United States. Agent Rodriguez indicated that he was not acting as an informant when he committed kidnapping in Puerto Rico. 24 RR 71–73. Such evidence could be double-edged as a jury could presume he used his status as an informant to avoid punishment for his illegal behavior. And, as discussed in response to Claim 5, given his extensive and violent criminal record, Cruz-Garcia fails to demonstrate any reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Bagley*, 473 U.S. at 682.

### 3. The State withheld no additional exculpatory or impeachment evidence.

Cruz-Garcia argues the state failed to disclose: a) evidence of a deal for Angelita Rodriguez's testimony; b) Angelita's criminal records; c) prior inconsistent statements of Johnny Lopez; d) an FBI memo indicating Angelita and Cruz-Garcia were living with her mother in the Dominican Republic following the murder; e) reports from law enforcement indicating they doubted the truthfulness of Diana Garcia and Arturo Rodriguez; f) redacted law enforcement reports; g) evidence of a "second theory" of the crime; and g) subpoenaed documents from FBI Puerto Rico Agent Juan DeJesus Rodriguez. Pet'r Br. at 220–22. Cruz-Garcia fails to show any *Brady* violation.

The allegations in this section are insufficiently briefed and thus should be deemed waived. *Lookingbill,* 293 F.3d at 263. Cruz-Garcia only lists documentary evidence he claims, without explanation, was withheld, but offers no explanation of

how this evidence is exculpatory or impeaching, or how this evidence was material to the outcome of trial.

In the alternative, he fails to prove a *Brady* claim.

### a.   Angelita Rodriguez

Cruz-Garcia fails to show evidence of any agreement between Angelita Rodriguez and the State for her testimony. Cruz-Garcia cites to an arrest warrant issued in federal district court on August 6, 1993, and a combined motion to dismiss the warrant and order granting dismissal filed on September 22, 1993, ECF No. ex. 18-75; as well as an FBI report dated August 20, 1993, indicating Angelita voluntarily surrendered to arresting agents in Puerto Rico on an arrest warrant for unlawful flight to avoid prosecution. ECF No. ex. 18-73. She was questioned but denied knowledge of Angelo's murder or the whereabouts of Cruz-Garcia, and was turned over to the custody of the Police of Puerto Rico Extraditions Division. *Id*. From this he surmises that she was a deportable alien at the time of the 2013 trial and that she benefited from her testimony. *See* Pet'r Br. at 221; ECF No. 75 at 13-14. As proof of a benefit, he cites to a letter written in 2016 by the State prosecutor, addressed to Angelita's attorney, acknowledging that she was as a very important witness in Cruz-Garcia's 2013 capital murder trial and expressing appreciation for her willingness to testify despite threats to her safety. *See* ECF ex. 38-2.

However, documentation indicating an "arrest warrant for unlawful flight to avoid prosecution" that was ultimately dismissed the next month— and twenty years *before* trial—and a favorable letter sent to Angelita's attorney three[14] years *after* trial

---

14   In his response in opposition to Cruz-Garcia's motions for discovery and an evidentiary hearing, the Director incorrectly cited the time difference as six years, not three. The Director apologizes for this unintentional error. However, the cited exhibit appears to contain a typo on the date of the letter:  the email asking that the letter be sent to attorney J.C. Castillo is dated October 6, 2016, whereas the attached

are not evidence that a deal existed at the time of trial for her testimony. The 2016 letter does not mention her immigration status or whether her cooperation warranted a favorable decision on her status. And given the twenty-three-year gap in time between dismissal of the arrest warrant and the favorable letter, it is unlikely that the two are related.

Furthermore, Cruz-Garcia fails to show that he could not have discovered this evidence through reasonable diligence. But more importantly, he cannot show this evidence should have been disclosed because he has not demonstrated that the offenses may be used to impeach Angelita—under Texas Rules of Evidence 609(a)(1) and 609(b), only final felony convictions or convictions for crimes of moral turpitude within 10 years of release may be used for impeachment purposes. This evidence shows no conviction whatsoever.

Regarding the FBI memorandum dated February 9, 1993, indicating a hearsay report that Cruz-Garcia was currently residing with Angelita at her mother's house in the Dominican Republic, ECF No. 18-15, as discussed under the false evidence claim, this document does not disprove Angelita's testimony that she did not see Cruz-Garcia again until she traveled to the Dominican Republic to seek a divorce. Angelita testified that she found Cruz-Garcia in Santo Domingo and asked for a divorce; Cruz-Garcia refused her request for divorce, threatened her, and she was afraid of him. 20 RR 105–07, 112–13.

It is unclear what impeachment value could be obtained from evidence that, for a period of time, Cruz-Garcia lived with Angelita and her mother in the Dominican Republic. As noted, there is no evidence of a deal for her testimony. And given her

letter itself is dated August 8, 2019. The undersigned counsel cited to the presumably incorrect date on the letter, not the earlier date on the email, and did not notice this discrepancy until drafting this claim for the supplemental answer.

68

testimony that, after she asked for a divorce, Cruz-Garcia refused and threatened her and her family, and that she was afraid of him, 20 RR 106–07, 112–13, the hearsay representation that she was living with him (if it could be used at trial) might suggest she was with him out of fear. Her fear of him certainly explains her willingness to testify against him without a deal.

Regardless, as noted, Angelita was sufficiently impeached on many points, including her prior arrest for a drug offense, the fact that she was also selling drugs with Cruz-Garcia and she benefitted financially from drug dealing, that she did not initially tell the police about Cruz-Garcia's involvement in the murder, and that she left the county to find Cruz-Garcia, albeit to seek a divorce. *See* 20 RR 92–93, 105–06, 112-13. Cruz-Garcia does not assert what else could have been done with this information. Regardless, his DNA still connected him to the rape and subsequent kidnapping and murder, as did Santana's testimony. Thus, Cruz-Garcia cannot demonstrate a reasonable probability of a different result at trial. *Bagley*, 473 U.S. at 682.

### b.    Johnny Lopez

The prior inconsistent statement by Johnny Lopez to HPD in 1989 concerning the murder of Saul Flores, ECF No. 18-29, has been addressed in connection with the false testimony claim—any suggested that this statement was withheld is refuted by the record. Trial counsel clearly had the statement and thoroughly cross-examined Lopez with it. *See* 25 RR 51–55. And because any inconsistency between his 2013 testimony and the 1989 statement was presented to the jury, and trial counsel cross-examined Lopez on the very information contained within the allegedly withheld report, if the report was withheld, there is no reasonable probability that the result of the proceeding would have been different, had it been disclosed. *Bagley*, 473 U.S. at 682

### c.    Diana Garcia and Arturo Rodriguez, and redacted reports

The Director has already addressed the allegations that the State withheld (1) law enforcement reports questioning the credibility and truthfulness of Diana Garcia and Arturo Rodriguez, *see* ECF Nos. ex. 18-19; 18-64; 18-65; 18-66; (2) redacted law enforcement reports which appear to contain exculpatory evidence, *see* ECF Nos. ex. 18-16; 18-17; 18-18; and (3) law enforcement records indicating a second theory and that other, unnamed individuals claimed knowledge of the offense, *see* ECF No. 18-16.

That law enforcement questioned the truthfulness of Diana and Arturo was thoroughly addressed at trial. Sgt. Elliott testified repeatedly that Diana and Arturo were not being truthful about selling drugs. 18 RR 87–88, 98, 103, 109, 119. Officer Hernandez testified that Arturo would not admit to dealing drugs, 19 RR 72–73; and that Diana initially denied dealing drugs but, when confronted with the threat to her son, she said she was "going to quit lying to you and tell you the truth" about her drug dealing. 19 RR 74, 97–101. Both officers believed Diana and Arturo were being truthful about the details of the crime itself but were untruthful about the motive for the crime or their own drug dealing. The cited exhibits do not suggest otherwise. To the extent these documents were withheld, there is no reasonable probability of different result had they been disclosed. The fact that the police believed Diana and Arturo were being untruthful about drug dealing and a motive for the crime was clearly before the jury.

Regarding the redacted documents that allegedly contain exculpatory evidence or evidence of a "second theory," as discussed under Claim 5, none of these documents are exculpatory or material. Indeed, one indicates that a purported ransom call was a hoax, and that HPD and FBI were still attempting to locate "suspect" Cruz-Garcia,

70

ECF No. ex. 18-17. A second indicated Cruz-Garcia was the primary and even "second" suspect. *See* ECF No. ex. 18-16 (HPD believed Cruz-Garcia was "behind the kidnapping" and "believed that [Cruz-Garcia] took Angelo," but "*the second theory*, involves a drug rip-off committed by [Cruz-Garcia]") (emphasis added). The third document indicated police were following up on a phone call from an unidentified person who, while not involved in the kidnapping was concerned, and could possibly get the boy back for $10,000. ECF No. ex. 18-16. In light of the fact that Cruz-Garcia was both the primary suspect and part of the "second theory," he was identified as the responsible party by both Angelita and Santana, and his DNA was found at the scene of the kidnapping and on the rape kit evidence, there is no reasonable probability that, if this information was indeed withheld, the outcome of the trial would have been different had it been disclosed.

### d.    Agent Juan DeJesus Rodriguez

Regarding the allegation that the State withheld documents received in response to a subpoena issued by the Harris County District Attorney's Office to Agent Juan DeJesus Rodriguez from the FBI Puerto Rico Field Office, the cited document does not suggest any exculpatory documents exist or were not turned over if they did. Indeed, ECF No. 18-35 indicates only that Agent DeJesus Rodriguez was subpoenaed "to appear before the Honorable MIKE ANDERSON, District Court No. 337, Harris County, Texas, on JANUARY 18, 2011 at 8:45 a. m., to give evidence in behalf of the State and Defendant". The described evidence could be testimony. Notably, Agent Rodriguez testified, on voir dire, that Cruz-Garcia told him about his status as a DEA informant, but the agent was unable to confirm this information in writing, and that he received only oral confirmation that Cruz-Garcia had cooperated with them in the past, but not on the kidnapping case the agent was investigating. 24 RR 71–74. The trial record suggests such documentation does not exist.

Regardless, for the reasons discussed above, this evidence would not have had a material impact on the outcome of trial.

For the foregoing reasons, Cruz-Garcia fails to show the materiality of any of this evidence, let alone that it was withheld or exculpatory. The Court should deny his *Brady* claim in its entirety.

## X.    Cruz-Garcia's Claim of Coercive Supplemental Jury Instructions is Procedurally Barred and Without Merit (Claim 7).

Cruz-Garcia asserts that, when the trial court met with Juror Bowman upon the juror's request, their on-the-record discussion amounts to a coercive jury instruction. Pet'r Br. at 225–29. Cruz-Garcia raised this claim in his first state habeas application, and the CCA found it procedurally barred because the claim should have been raised on direct appeal. SHCR-02 at 135–143, 1059 (no. 104); *Cruz-Garcia*, 2017 WL 4947132, at *1. The CCA has held that record-based claims not raised on direct appeal will not be considered in habeas proceedings (*Gardner* bar). *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996, clarified on reh'g Feb. 4, 1998). The Fifth Circuit recognizes that the *Gardner* bar sets forth an adequate state ground capable of barring federal habeas review. *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2003).

Cruz-Garcia now claims that he can overcome the bar of procedural default by showing cause for failing to raise the claim on direct appeal and prejudice resulting from the alleged error. Pet'r Br. at 228–29; *Coleman*, 501 U.S. at 750. But again, to invoke the cause-and-prejudice exception, a petitioner must show that he was impeded from complying with the State's procedural rule by something external to him. *Coleman*, 501 U.S. at 753. Further, "[i]f a petitioner fails to demonstrate cause, the court need not consider whether there is actual prejudice." *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004) (citing *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)).

Here, Cruz-Garcia alleges that external cause stems from the trial court's "fail[ure] to give an accurate accounting of that ex parte meeting to trial counsel," thus preventing him from preserving the claim for review on direct appeal. Pet'r Br. at 229. But he provides nothing to support his allegation that the trial court did not provide a truthful account of her meeting with Juror Bowman. Conclusory assertions are insufficient to furnish a basis for federal habeas corpus relief. *Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995). The trial court's extensive findings on the conversation between the court and juror Bowman, *see* SHCR-02 at 1059–66, are presumed correct, absent clear and convincing evidence to the contrary. § 2254(e)(1). In failing to demonstrate an external impediment to raising this claim on appeal, Cruz-Garcia fails to overcome the procedural default of his claim.

Alternatively, Cruz-Garcia's Claim 7 should be denied because it is without merit. Relatedly, the trial court found that, based upon personal recollection of the conversation with Bowman, the court's instructions did not constitute an impermissible or coercive charge, the judge did not pressure Bowman to reach a particular result, Cruz-Garcia was not prejudiced as a result of this conversation, and he has failed to demonstrate a violation of his constitutional rights. SHCR-02 at 1065–66; s*ee also* SHCR-02 at 1059–66. The CCA based its denial of habeas relief upon the trial court's findings and conclusions and their own review. *Ex parte Cruz-Garcia*, 2017 WL 4947132 at *2. Cruz-Garcia does not address these findings or rebut the presumption of correctness afforded these findings. *See* Pet'r Br. at 225–29; 28 U.S.C. § 2254(e)(1).

Additionally, Cruz-Garcia cites *Lowenfield v. Phelps*, 484 U.S. 231 (1988) in support of his claim. Pet'r Br. at 27–28. There, the Court repeated that the review of a petitioner's assertion that the "jury was improperly coerced requires that [the Court] consider the supplemental charge given by the trial court 'in its context and

73

under all the circumstances.'" *Lowenfield*, 484 U.S. at 237 (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)).

The full context of the instruction here is that Juror Bowman sent a note after jury deliberations had begun, asking to speak to the judge. 3 CR 512, 587; 35 RR 3. Juror Bowman requested an alternate in her stead for a non-excusable reason: disagreement with her fellow jurors. 27 RR 5–6; *see* Tex. Code Crim. Proc. art 33.011 (b);[15] *see also Castro v. State*, 233 S.W.3d 46, 48 (Tex. App.—Houston 2007) ("A juror is disabled if he has a physical illness, mental condition, or emotional state that hinders his ability to perform his duties as a juror."). Juror Bowman said, "I know it shouldn't be an easy thing. It shouldn't be an easy thing, but it's harder –," to which the court responded, "It shouldn't be an easy thing. This is what we talked about on voir dire. It should take – some serious consideration should go into it, but I do want you to recall the voir dire and my instructions at voir dire, as well as you should answer the questions according to what the evidence is." 27 RR 7. Additionally, the court's discourse included, "You have to deliberate back there and try to find out *whether you can reach* a verdict or not. Okay?" 27 RR 8 (emphasis added). In other words, the trial court did not "charge" Juror Bowman with "reaching a verdict," but advised to figure out if she could.  Given this full context, the trial court did not issue a coercive supplemental instruction, and Cruz-Garcia's Claim 7 fails to merit relief.

---

[15]    Texas Code of Criminal Procedure art. 33.011(b) provides, in relevant part: Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury renders a verdict on the guilt or innocence of the defendant and, if applicable, the amount of punishment, become or are found to be unable or disqualified to perform their duties or are found by the court on agreement of the parties to have good cause for not performing their duties.

XI.   **Cruz-Garcia Fails to Demonstrate that the State Court Unreasonably Denied His Claim of Ineffective Assistance of Counsel on Appeal ("IAAC") (Claim 8).**

In his eighth ground for relief, Cruz-Garcia alleges appellate counsel was ineffective for failing to challenge the trial court's meeting with a juror outside the presence of counsel during the punishment phase of trial, on request of the juror and consent of all parties, including Cruz-Garcia. Pet'r Br. at 229–32. However, Cruz-Garcia fails to show that the state court was unreasonable in denying his IAAC claim. This Court should, therefore, deny Cruz-Garcia's IAAC claim.

A criminal defendant is constitutionally entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985); *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). The familiar standard set out in *Strickland* to prove that counsel rendered unconstitutionally ineffective assistance applies equally to both trial and appellate attorneys. *Busby*, 359 F.3d at 714 (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). Thus, to obtain relief, Cruz-Garcia must demonstrate that his appellate counsel's performance was deficient and that such deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

It is well settled that effective assistance of counsel on appeal does not mean that counsel must raise every non-frivolous ground of appeal available. *Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003); *Robbins*, 528 U.S. at 288. Instead, the Supreme Court has recognized the importance of allowing appellate attorneys the freedom to select from available issues in order to maximize the likelihood of success on appeal. *Robbins*, 528 U.S. at 288. Only "solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462–63 (5th Cir. 1999). Thus, counsel should choose the strongest arguments to present to the appellate court, by "winnow[ing] out weaker arguments and focus[ing] on a few key issues." *Mayo v.*

75

*Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). Appellate counsel is only constitutionally obligated to raise and brief those issues believed to have the best chance of success. *Barnes*, 463 U.S. at 751–53.

For this reason, the Supreme Court has recognized that, while it is still possible to raise an ineffective-assistance claim based on counsel's failure to raise a particular issue on appeal, it is difficult to demonstrate that counsel was deficient. *Robbins*, 528 U.S. at 288. In order to prove that counsel's failure to raise certain issues constitutes deficient performance and falls "below an objective standard of reasonableness," a petitioner must convince the court that the issues ignored were sufficiently meritorious such that counsel should have asserted them on appeal. *Phillips*, 210 F.3d at 348. The Supreme Court has indicated that a petitioner is able to satisfy this first prong of *Strickland* by showing that a particular non-frivolous issue neglected by counsel was "clearly stronger" than those issues actually presented. *See Robbins*, 528 U.S. at 288. Thus, to prove that counsel's performance was deficient, Cruz-Garcia must demonstrate that the unraised points of error were clearly stronger in posture than those counsel actually brought on direct appeal.

And, to prove prejudice, Cruz-Garcia must demonstrate a reasonable probability that, but for counsel's omitting a particular ground of error, the case would have been reversed on appeal. *Robbins*, 528 U.S. at 285; *see also Moreno v. Dretke,* 450 F.3d 158, 168 (5th Cir. 2006).

The Director addressed the underlying allegation of Cruz-Garcia's sole remaining IAAC claim in Part X, *supra*. Because that ground is without merit, Cruz-Garcia cannot demonstrate appellate counsel was ineffective for failing to raise that purported error on appeal, since it could not have been "clearly stronger" than those issues actually presented. *See also Phillips*, 210 F.3d at 348; *Robbins*, 528 U.S. at 288. That appellate counsel chose to pursue claims that Cruz-Garcia may have

76

disagreed with, and that appellate counsel did not pursue the claims about which Cruz-Garcia now complains, does not demonstrate appellate counsel was ineffective. *See Mayo*, 882 F.2d at 139; *Barnes*, 463 U.S. at 751–53. Further, Cruz-Garcia cannot demonstrate that, but for counsel's deficient performance, "he would have prevailed on appeal." *Robbins*, 528 U.S. at 286; *Moreno,* 450 F.3d at 168.

Moreover, when reviewing Cruz-Garcia's claim on state habeas, the CCA denied his claim, stating:

> . . . [A]s the underlying issue was procedurally barred, [Cruz-Garcia] contends that his appellate counsel was ineffective for failing to assert that his due process rights were violated by constitutional errors relating to the trial court's ex parte discussion with a single juror. [Cruz-Garcia] fails to meet his burden under [*Strickland*]. He fails to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Id.* at 689.

*Cruz-Garcia*, 2017 WL 4947132 at *2. Cruz-Garcia has failed to demonstrate that the state court's decision to deny his habeas claim was contrary to or involved the unreasonable application of federal law, or that the state court's decision was based upon an unreasonable determination in light of the facts before the court. 28 U.S.C. § 2254(d); *see Richter*, 562 U.S. at 89, 100–01; *see* Pet'r Br. at 228–32. Accordingly, Cruz-Garcia's IAAC claim should be denied.

## XII.   In Addition to the Claim Being Procedurally Defaulted, Cruz-Garcia Does Not Show He Was Excluded from a Critical Stage of Trial (Claim 9).

Cruz-Garcia alleges he was not present in two instances during the punishment phase of trial: at an ex parte meeting between Juror Bowman and the trial judge during the punishment phase, and a bench conference with the State and defense counsel regarding two jurors observed talking outside of the courtroom while waiting for an elevator. ECF 73 at 257–260. This claim was first brought in Cruz-Garcia's second subsequent state writ application, SHCR-05 at 371–375, which was

77

denied as an abuse of writ. *Ex parte Cruz-Garcia*, 2021 WL 4571730, at *1; *see* SHCR-02, SHCR-03. As Cruz-Garcia concedes, this claim is procedurally defaulted. *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review."); *see* ECF 73 at 260.

Cruz-Garcia contends that the procedural default should be excused to "avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent." Pet'r Br. at 235. The Director addressed this contention in Part VI(A)(2), *supra*, and incorporates his arguments regarding the alleged fundamental miscarriage of justice and actual innocence. But even if the procedural default were excused, the claim should be denied because Cruz-Garcia fails to show his claim has merit.

Generally, a defendant has the fundamental right to be present at all critical stages of the trial. *Rushen v. Spain*, 464 U.S. 114, 117 (1983). But "[t]he defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *United States v. Thomas*, 724 F.3d 632, 644 (5th Cir. 2013); *cf. United States v. Olis*, No. H:03–CR–217, 2008 WL 5046342 at *22–26 (S.D. Tex. Nov. 21, 2008) (finding no constitutional violation where the judge held an ex parte discussion with a jury member who expressed concerns about her ability to fairly deliberate a case in light of the financial hardship her jury service imposed upon her).

The Supreme Court has recognized that "'it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote,'" including the "occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Spain*, 464 U.S. at 118 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). And the *Spain* Court continued, "When an ex parte communication relates to some aspect of the trial, the trial judge

generally should disclose the communication to counsel for all parties." *Id.* at 119 (citations omitted).

Here, Cruz-Garcia alleges his right to be present was violated when the trial court met with Juror Bowman at Juror Bowman's request—to which both the State and trial counsel agreed in Cruz-Garcia's presence. Pet'r Br. at 234; 27 RR 3–4. The meeting in chambers was recorded. 27 RR 4–8. Cruz-Garcia provides nothing to demonstrate "substantial and injurious effect"[16] upon the jury, other than the timing of the jury's verdict in relation to the trial court's discussion with Juror Bowman— meaning Cruz-Garcia does not address or prove that the juror did not follow the court's instructions to determine *"whether* you can reach a verdict or not." *See* Pet'r Br. at 234; 27 RR 8 (emphasis added). Accordingly, his claim should be denied, if not procedurally barred. Because Cruz-Garcia has no constitutional right to be at the juror's ex parte meeting, and because he fails to show harm, this claim should be denied.

Cruz-Garcia also alleges the State, trial counsel, and the trial court discussed two jurors talking to each other outside of the courtroom when he was not present. Pet'r Br. at 234. Both the State and trial counsel were informed and a record was made based on the judge's notes from her discussion with the third-party observer of the jurors. 24 RR 3–4. Trial counsel Cornelius did not object after confirming with the court that she personally spoke with the observer and that the court was "satisfied that that's all the information he really has to give us[.]" 24 RR 4–6. After the jury was recalled, the court admonished the jury to "not talk amongst yourselves or with anyone else on any subject connected with trial or to form or express any opinion thereon until the end of the trial." 24 RR 6–7. Jurors are presumed to follow

---

[16] *See Brecht*, 507 U.S. at 637–38.

instructions given them by the trial judge. *Parker v. Randolph*, 442 U.S. 62, 73 (1979), *overruled on other grounds by Cruz v. New York*, 481 U.S. 186 (1987); *see also Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987) ("[there is an] almost invariable assumption of the law that jurors follow their instructions") (citation omitted). Cruz-Garcia's claim on this ground should be denied.

Further, regarding both claims, the standard for reviewing trial court error in a federal habeas petition is outlined in *Brecht*, and the petitioner must show that the trial court's error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38 (quoting *Kotteakos*, 328 U.S. at 776). Under this standard, a habeas petitioner is not entitled to relief based on trial error unless he can establish that it resulted in "actual prejudice." *Id.* at 637. This, Cruz-Garcia has failed to do, as he merely provides his own suppositions without evidence. *See* Pet'r Br. at 232–35.

For the above reasons, Cruz-Garcia's Claim 9 should be dismissed.

## XIII. Cruz-Garcia Confrontation Claim Is Defaulted and, Alternatively, Meritless (Claim 10).

In Claim 10, Cruz-Garcia alleges his right to confront witnesses was violated because Quartaro and Deputy Chief Medical Examiner Dr. Dwayne Wolf testified using the work collected or analyzed by others who did not testify. Pet'r Br. at 235–37. His claim should be denied because it is procedurally defaulted and without merit.

Cruz-Garcia admits this claim is defaulted because he raised it in his second subsequent state habeas application that the CCA dismissed as an abuse of the writ without consideration of the merits of his claims. *Id.* at 237; SHCR-05 at 369–70; *Ex Parte Cruz-Garcia*, 2021 WL 4571730 at *1. Again, a federal court may not consider the merits of a habeas claim if a state court has denied relief due to a procedural default, where its decision is plainly stated and rests on adequate and independent

state grounds. *Sawyer*, 505 U.S. at 338; *Harris*, 489 U.S. at 262. Therefore, under the federal procedural default doctrine, Cruz-Garcia's claims of a violation of the Confrontation Clause is barred from federal habeas review. *Fearance*, 56 F.3d at 642; *Coleman*, 456 F.3d at 542. Cruz-Garcia clearly had the opportunity to raise these claims in his first state writ and failed to do so. And while Cruz-Garcia argues the procedural default should be excused because he is actually innocent, Pet'r Br. at 237, he does not demonstrate actual innocence, as discussed above in Part VI(A)(2), *supra*. This claim should thus be dismissed. *See Coleman*, 501 U.S. at 750.

Alternatively, his claim is without merit. The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Generally, an expert's opinion may be based on both the evidence in the case and his education and experience. *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971) (en banc). "Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise." *Id.* Later, however, the Supreme Court expanded the definition of testimonial statements to include statements that are "functionally identical to live, in-court testimony." *Melendez–Diaz v. Massachusetts*,

81

557 U.S. 305, 310–11 (2009). There, the Court held that the prosecution violated the defendant's right to confrontation by admitting certificates of analysis identifying a substance found in the defendant's possession as cocaine. *See id.* at 329.

However, more recently, the Supreme Court reiterated that "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams v. Illinois*, 567 U.S. 50, 57 (2012). Relevant here, the Court continued, "It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. . . [I]n appropriate cases, [modern practice] permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts." *Id.* at 57. The Court ultimately held that

> this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

*Id.* at 57–58.

Under *Williams*, Cruz-Garcia cannot demonstrate his rights under the Confrontation Clause have been violated, given the availability of DNA Analyst Quartaro and Dr. Wolf for cross-examination on their opinions. Cruz-Garcia's Claim 10 should be denied.

## XIV.  No Constitutional Right to an Interpreter Exists, thus Cruz-Garcia's Procedurally Defaulted Claim of Inadequate Translation Should Be Dismissed (Claim 11).

Cruz-Garcia alleges that he was denied due process based on the court interpreter's self-corrected translations and also one jury note asking whether the

jurors' understanding of Spanish could be used, in contrast to the court interpreter's translation. Pet'r Br. at 237–41. This claim was first brought in Cruz-Garcia's second subsequent state writ application, SHCR-05 at 380–384, which was denied as an abuse of writ without consideration of the merits. *Cruz-Garcia*, 2021 WL 4571730, at *1. As Cruz-Garcia concedes, this claim is procedurally defaulted. Pet'r Br. at 266; *see Fearance*, 56 F.3d at 642; *Coleman*, 456 F.3d at 542.

Cruz-Garcia contends that the procedural default should be excused to "avoid a miscarriage of justice because Mr. Cruz-Garcia is actually innocent." Pet'r Br. at 244. The Director addressed this contention in Part VI(A)(2), *supra*, and incorporates by reference his arguments regarding the alleged fundamental miscarriage of justice and actual innocence. But even if the default were excused, this claim is not eligible for federal habeas relief.

Under state law, defendant has the right to an interpreter upon motion of the court or either party if it is determined a defendant or witness does not understand English. Tex. Crim. Proc. Code Ann. art. 38.30 (West 2013, 2020). But, when looking at the federal habeas review of the need for an explicit waiver of the state right to an interpreter, the Fifth Circuit noted that, "in fact, [the Supreme Court] has never discussed a constitutional right to an interpreter in any context." *Garcia v. Lumpkin*, No. 18-41150, 824 F. App'x 252, 255 (5th Cir. Aug. 20, 2020). Accordingly, no federal habeas relief is available for Cruz-Garcia's complaint about the adequacy of the interpretation he received.[17] Moreover, since no such right has been established, this

---

[17]    Also, federal habeas relief is not available for a violation of state law. *Weeks v. Scott,* 55 F.3d 1059, 1063 (5th Cir. 1995); *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983); *McGuire*, 502 U.S. at 67–68; *see also Gonzales v. Cain*, Civ. Action No. 11-1846, 2011 WL 6826640, at *9 (E.D. La. Nov. 21, 2011) (report and recommendation finding that claim alleging a violation of state law in denying a request for an interpreter was not cognizable in federal habeas).

Court is prohibited from creating and applying new rules retroactively in a habeas proceeding such as this one. *Teague v. Lane*, 489 U.S. 288 (1989).

Furthermore, the inconsistencies pointed out by Cruz-Garcia do not demonstrate he has been deprived of a fair trial. Pet'r Br. at 240; *see Gonzales*, 2011 WL 6826640, at *9–10 (rejecting claim that trial court's use of an unqualified interpreter violated the petitioner's right to due process and recognizing that the appointment of an interpreter largely rests in the discretion of the trial court). Trial counsel Mario Madrid was fluent in Spanish, 4 RR 8, and made no objection at the time of the interpreter's corrections or to the jury's note. Indeed, both the State and defense counsel agreed to the instruction given by the trial court to the jury in response to the jury's note: "The interpreter's response is the official record and evidence in the case." 23 RR 100; *see Galvan*, 293 F.3d at 765–66 (juries presumed to follow the instructions from the trial judge); *Marsh*, 481 U.S. at 206–07 (same). Consequently, Cruz-Garcia's failure to object to the interpreter's self-corrections and his agreement to the jury note means the due process fails because of invited error. *Druery v. Thaler,* 647 F.3d 535, 546 (5th Cir. 2011). Nor does Cruz-Garcia concretely establish any harm resulted from the purported due process violation. *See* ECF 73 at 265.

For these reasons, in addition to being procedurally defaulted and *Teague*-barred, Claim 11 should be denied.

## XV. Cruz-Garcia's Procedurally Defaulted Claim of Judicial Bias Is Meritless (Claim 12).

Cruz-Garcia alleges Judge Renee McGee was biased at trial because she had previously been employed in the Harris County District Attorney's Office for twenty years, including four years during Cruz-Garcia's pre-trial proceedings; she served as a felony district court chief for twelve years, which included the period when Cruz-Garcia was re-indicted for capital murder; she assumed the bench and presided over

Cruz-Garcia's trial proceedings six months after leaving the DA's office; she presided over two cases where she had signed complaints as a prosecutor; she cited Cruz-Garcia's case in her campaign for re-election; she refused to recuse herself after Cruz-Garcia filed a motion alleging that she had a conflict of interest due to holding an ex parte meeting with Juror Bowman; and she rushed to enter findings of fact and conclusions of law in Cruz-Garcia's state habeas proceedings before she vacated the bench. Pet'r Br. at 241–43. But in addition to this claim of judicial bias being procedurally defaulted, Cruz-Garcia does not show the court was actually biased.

Cruz-Garcia admits he raised this claim in his second subsequent state habeas application, which the CCA dismissed as an abuse of the writ without considering the merits of the claims. Pet'r Br. at 244; SHCR-05 at 375–79; *Ex parte Cruz-Garcia*, 2021 WL 4571730 at *1. Therefore, as argued in Part VII(A), *supra*, his claim is procedurally defaulted. *Fearance*, 56 F.3d at 642; *Cardenas*, 405 F.3d at 249; *Coleman*, 456 F.3d at 542. Further, as discussed in Part VI(A)(2), Cruz-Garcia fails to demonstrate he can overcome the procedural default because he does not demonstrate he is actually innocent.

Alternatively, he does not show he is entitled to relief on this claim. The Fourteenth Amendment Due Process Clause requires a "fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (citations and internal quotation marks omitted); *see also Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005) ("Stated succinctly, the cornerstone of the American judicial system is the right to a fair and impartial process."). Actual bias must be personal, *see Bracy*, 520 U.S. at 909, and must stem from an "extrajudicial source." *Liteky v. United States*, 510 U.S. 540, 544 (1994) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). By contrast, judicial rulings and intemperate remarks, even those that

criticize or disapprove of, or are hostile to, counsel and the parties, almost never constitute actual bias unless they display such a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

Cruz-Garcia fails to demonstrate that an "extrajudicial source" influenced Judge Magee's rulings, or that Judge Magee was personally biased against him so "extreme[ly] as to display clear inability to render fair judgment." *Liteky*, 510 U.S. at 544, 551, 555. Rather, Cruz-Garcia appears to simply take issue with the trial court's prior employment and rulings during his trial proceedings, which is insufficient to show bias. *See Cross v. Johnson*, 169 F. Supp. 2d 603, 618 (N.D. Tex. 2001) ("Cross needs to establish that the trial judge was influenced by interests apart from the administration of justice and that the alleged bias or prejudice resulted in rulings based on other than facts developed at trial or, as in this case, facts that were not a matter of public record.") (citing *United States v. Reeves*, 782 F.2d 1323, 1325 (5th Cir. 1986)). Cruz-Garcia also complains of Harris County's lack of "conflict-management system," but such a complaint is irrelevant to Judge Magee's alleged bias.

Further, while Cruz-Garcia alleges that Judge Magee's bias is demonstrated by her presiding over his state habeas proceeding, Pet'r Br. at 242–43, "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky*, 510 U.S. at 551. Although the *Liteky* court was discussing bias in terms of information judges may learn from prior proceedings that was used at trial, the same principle should apply here when looking at Judge Magee's involvement in Cruz-Garcia's state habeas proceeding. *See Reeves*, 782 F.2d at 1325 ("The fact that the trial judge ruled against the defendant in an earlier appearance does not render the trial judge biased.") (citing *United States v. Harris*, 458 F.2d 670, 678 (5th Cir. 1972)).

Cruz-Garcia also fails to show Judge Magee's purported bias by her use of Cruz-Garcia's trial outcome in her campaign materials for her 2016 re-election, if any.[18] *See* Pet'r Br. at 242. To find bias in such a circumstance requires an assumption that Judge Magee issued her rulings with the ultimate intent to gamble on the jury's verdict against Cruz-Garcia for her own gain. Cruz-Garcia fails to show such intent.

Lastly, Cruz-Garcia's complaint that Judge Magee adopted the State's proposed findings of fact and conclusions of law verbatim within two days of leaving the bench, Pet'r Br. at 243, is also unavailing. Certainly, the Supreme Court "has criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985) (citations omitted); *see also Jefferson v. Upton*, 560 U.S. 294, 294–95 (2010). "But despite criticizing the practice, the Supreme Court has never found it to violate due process or to entitle a state court's decision to less deference under the AEDPA." *Green*, 699 F.3d at 416. The Fifth Circuit has likewise rejected the argument that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *Id.* at 416 n.8 (citing *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999); *Nichols*, 69 F.3d at 1277).

The Court should deny Cruz-Garcia's claim for the reasons above, in the alterative to dismissing Claim 12 as procedurally defaulted.

---

[18] While Judge Magee lists a defunct website (www.judgereneemagee.com) on her Facebook page, the Director has been unable to find any 2015–2016 campaign materials, nor an article link to those materials on Judge Magee's current Facebook page. *See* Pet'r Br. at 242 n.72; https://www.facebook.com/reneemageeforjudge/ (last visited Oct. 26, 2022).

## XVI.   Cruz-Garcia Does Not Meet His Burden Under AEDPA To Show He Is Entitled to Relief for Claim 13.

Cruz-Garcia alleges that the trial court improperly ruled against allowing him to present his Bible course certificates and his possible work as an informant with several federal agencies. Pet'r Br. at 244–46. But his claim should be denied because he fails to show that the CCA denied his claim upon an unreasonable application, or contrary to, well-established federal law, or based on an unreasonable determination of facts in light of the record.

The Supreme Court has long recognized that a capital defendant has the right to present mitigating evidence. *See*, *e.g.*, *Landrigan*, 550 U.S. at 486 (citing *Abdul–Kabir v. Quarterman*, 550 U.S. 233 (2007)); *Brewer v. Quarterman*, 550 U.S. 286 (2007); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Lockett v. Ohio*, 438 U.S. 586 (1978)). However, the Supreme Court has also held that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A defendant's interest in presenting relevant evidence may "'bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers,* 410 U.S. at 295; *Scheffer,* 523 U.S. at 308. And rules ensuring that only reliable evidence is introduced at trial serve a legitimate interest in the criminal trial process. *Scheffer*, 523 U.S. at 309. "Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules." *Id.*

On direct appeal, Cruz-Garcia raised claims alleging the trial court erred by sustaining the State's hearsay objections. The CCA found no abuse of discretion in the trial court's rulings. *See Cruz-Garcia v. State*, 2015 WL 6528727 at *23–25. Again, regarding the Bible certificates Cruz-Garcia attempted to offer through his brother, the CCA found the "certificates were indeed hearsay because they each contained out-

of-court statements that appellant was offering for their truth." *Id.* at 23.  The CCA also found the certification met no exception to the hearsay rule asserted by Cruz-Garcia, *id.* at 24 (Tex. R. Evid. 803(11), 803(13), 803(19), and 804(3)), and did "not bear 'persuasive assurances of trustworthiness,' which weighs in favor of the trial court's exclusion." *Id.* at 24 (internal footnotes and citations omitted). And the court continued:

> While [Cruz-Garcia] contends that the hearsay rule should give way in favor of his right to put on a defense, "[t]he fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury." Because [Cruz-Garcia] was not prevented from presenting the substance of his defense, the trial court did not abuse its discretion when it sustained the State's hearsay objection and excluded [Cruz-Garcia]'s Bible study certificates.

*Cruz-Garcia*, 2015 WL 6528727 at *25 (internal footnotes and citations omitted).

Regarding Cruz-Garcia's allegation of being denied the opportunity to present evidence of his work as an informant with federal agencies, the CCA held:

> The testimony [Cruz-Garcia] attempted to elicit through Puerto Rican police officer, Agent Juan DeJesus Rodriguez, about [Cruz-Garcia]'s work as a federal informant was hearsay because Agent Rodriguez had no personal knowledge of [Cruz-Garcia]'s work and had learned about this alleged work only through conversations with other agents. Because the testimony about what other agents told Agent Rodriguez was an out-of-court statement being offered for its truth, the State's hearsay objection was proper. [Tex. R. Evid. 801 (West 2014).]

> In response to the State's objection, [Cruz-Garcia] offered no applicable exceptions or exclusions to the hearsay rule. [Cruz-Garcia] now asserts that Agent Rodriguez's testimony was admissible under Texas Rule of Evidence 803(21). Again, without deciding whether [Cruz-Garcia] has forfeited this claim, we hold that it lacks merit. Agent Rodriguez's testimony did not concern [Cruz-Garcia]'s character among [Cruz-Garcia]'s associates or within his community, so it does not meet the requirements of Rule 803(21).

> The exclusion of Agent Rodriguez's testimony as hearsay did not effectively preclude [Cruz-Garcia] from putting on a defense, and the

89

application of the hearsay rule was not arbitrary or unjust. Consequently, the trial court did not abuse its discretion when it sustained the State's objection and excluded [Cruz-Garcia]'s evidence. [Cruz-Garcia]'s seventh point of error is overruled.

*Id.* at *25.

Cruz-Garcia provides nothing more than a recitation of the standard of review and a conclusory statement to attempt to overcome his burden under § 2254(d), and he entirely fails to show that the sustained-evidentiary ruling was arbitrarily applied in his case. *See* Pet'r Br. at 245–46. Regardless, again, a trial court's evidentiary rulings are matters of state law which are not subject to re-examination by the federal courts. That is, only where an evidentiary error is "of such magnitude as to constitute a denial of fundamental fairness under the due process clause in a state trial" that federal habeas corpus relief is warranted *Skillern v. Estelle,* 720 F.3d 839, 852 (5th Cir. 1983); *McGuire*, 502 U.S. at 67–68; *Gochicoa*, 118 F.3d at 446.Cruz-Garcia makes no effort to demonstrate that the exclusion of this evidence resulted in a denial of fundamental fairness. For these reasons, Cruz-Garcia's Claim 13 should be denied.

## XVII. Cruz-Garcia's Procedurally Defaulted Claim Concerning Emotional Outbursts Is Without Merit (Claim 14).

Cruz-Garcia alleges his due process rights were violated due to "[r]epeated emotional outbursts from the gallery." Pet'r Br. at 246–47. He concedes this claim is foreclosed by binding precedent. *Id.* at 250. He also asserts he has exhausted his claim by presenting it to the CCA in his second subsequent state habeas application, and the Court can thus review his claim de novo, or that the procedural default of this claim can be excused to avoid miscarriage of justice since Cruz-Garcia is actually innocent. Pet'r Br. at 247. However, his claim is defaulted, *Teague*-barred, and without merit.

There is no clearly established federal law, as stated by the Supreme Court, addressing spectator misconduct. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("This court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial."). Because finding error in this case would be a new constitutional rule, *Teague v. Lane,* 489 U.S. 288, applies. Reviewed under *Teague*, Cruz-Garcia's claim fails.

Again, at the time his conviction became final on April 4, 2016, after the Supreme Court of the United States denied his petition for a writ of certiorari, *Cruz-Garcia*, No. 15-7907, 136 S. Ct. 1518, no state court would have felt compelled to find a due process violation based on Supreme Court precedent. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). Additionally, at the time of Cruz-Garcia's trial, the CCA held that an outburst from a spectator that interrupts a trial proceeding will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010); *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) ("This Court has long held that conduct by a bystander 'which interferes with the normal proceedings of a trial will not result in reversible error[19] unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict.'") (citing, *e.g.*, *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985)). In sum, this rule would be a new constitutional rule.

Further, looking at the third prong of the *Teague* analysis, spectator outbursts do not fall in either exception: there is no criminal punishment involved, nor has

---

[19] Moreover, a trial court's instructions to disregard an outburst are generally considered sufficient to cure any improper outburst because "it is presumed that the jury will follow those instructions." *Coble*, 330 S.W.3d at 292; *see Gamboa*, 296 S.W.3d at 580.

Cruz-Garcia shown that fundamental fairness and accuracy of the criminal proceeding would be implicated by a new retroactive application of a watershed rule of this nature. Cruz-Garcia's claim is therefore *Teague*-barred.

Alternatively, as Cruz-Garcia admits, his claim is procedurally defaulted. Pet'r Br. at 247. He raised this claim in his second subsequent state habeas application, which the CCA dismissed as an abuse of the writ without consideration of the merits. SHCR-05 at 386–87; *Ex parte Cruz-Garcia*, 2021 WL 4571730 at *1. Cruz-Garcia's claim is therefore procedurally defaulted. *Fearance*, 56 F.3d at 642; *Cardenas*, 405 F.3d at 249; *Coleman*, 456 F.3d at 542. Further, as discussed in Part VI(A)(2), Cruz-Garcia fails to demonstrate he can overcome the procedural default because he does not demonstrate he is actually innocent.

In the final alternative, Cruz-Garcia's claim is without merit. The standard for reviewing trial court error in a federal habeas petition is outlined in *Brecht*, 507 U.S. 619. *See also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding that, on federal habeas corpus review under 28 U.S.C. § 2254, the *Brecht* standard of harmless error applies). Cruz-Garcia cites to two instances, occurring on the same day, where the victim's family could be heard making emotional outbursts. Pet'r Br. at 246–47. Outside the presence of the jury, the family members were removed, and the audience was admonished against further outbursts. *See* 20 RR 14, 107–08. Similar to the instant case, the Fifth Circuit found no "prejudicial error of constitutional magnitude" from the outbursts from the daughter of the murder victim. *See Kinnamon v. Scott*, 40 F.3d 731, 734 (5th Cir. 1994). The court reasoned that evidence that "the young girl was upset and angry at the person" accused of murdering her father "communicated nothing new to the jury." *Id*. The same can be said of the outbursts from the family of a murdered child. In the alternative to being dismissed as *Teague*-

92

barred or procedurally defaulted, Cruz-Garcia's claim should be dismissed because he fails to demonstrate meaningful error.

## XVIII. Cruz-Garcia's Procedurally Defaulted Claim that the State Made Inflammatory Comments throughout Trial Violated His Due Process Rights and Fourteenth Amendment Right to a Fair Trial Is Without Merit (Claim 15).

In his procedurally-defaulted Claim 15, Cruz-Garcia asserts that the State improperly referenced Biblical passages and Adolf Hitler and infamous serial killers, and suggested Cruz-Garcia was "subhuman," and appealed to the jurors' nationalism. Pet'r Br. at 248–49. But his claim is procedurally defaulted and without merit.

First, Cruz-Garcia concedes his claim is procedurally defaulted. Pet'r Br. at 249. He raised this claim in his second subsequent state habeas application, which the CCA dismissed as an abuse of the writ without consideration of the merits. SHCR-05 at 384–86; *Ex parte Cruz-Garcia*, 2021 WL 4571730 at *1. Cruz-Garcia's claim is therefore procedurally defaulted. *Fearance*, 56 F.3d at 642; *Cardenas*, 405 F.3d at 249; *Coleman*, 456 F.3d at 542. Further, as discussed in Part VI(A)(2), Cruz-Garcia fails to demonstrate he can overcome the procedural default because he does not demonstrate he is actually innocent.

Alternatively, Cruz-Garcia fails to demonstrate he is entitled to federal habeas relief on this ground. In determining whether the prosecutor's comments prejudiced a defendant's substantive rights, the relevant inquiry considers "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007) (citations and quotation marks omitted). Under Texas law, proper jury argument must fall within one of four general categories: (1) summation of evidence; (2) reasonable

deduction from the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement. *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990).

Here, Cruz-Garcia alleges that the prosecutor inappropriately argued that Cruz-Garcia was evil, a monster, and distinct from "human beings." Pet'r Br. at 248. "The Due Process Clause protects against prosecutorial excess in closing summation." *Bible v. Stephens*, No. 4:13-CV-200, 2014 WL 5500722, at *31 (S.D. Tex. Oct. 30, 2014) (citing *Darden v. Wainwright*, 477 U.S. 168, 180 (1986); *Caldwell v. Mississippi*, 472 U.S. 320, 337–38 (1985)); *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988). And certainly, "[t]he Supreme Court has cautioned that a government attorney 'may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'"[20] *Bible*, 2014 WL 5500722 at 31. Additionally, the Fifth Circuit "has held that appeals to the jury to act as the conscience of the community are permissible, so long as they are not intended to inflame." *United States v. Fields*, 72 F.3d 1200, 1208 (5th Cir. 1996).

Here, the prosecutor's statements were a plea to the jury to carry out its duty and a reasonable deduction from the evidence that Cruz-Garcia physically carried Angelo from the apartment and ordered his death; raped Ms. Garcia; beat Mr. Martinez Saldana; and personally arranged for others to abduct, beat, and assault Andres Buten and then 16-year-old William Garay Martinez in Puerto Rico. 20 RR 143–45; 21 RR 49–51, 59–60; 25 RR 62–65; 24 RR 26–42, 82–96, 102–15. In sister circuits, courts have found that characterizations of the defendant did not constitute prosecutorial misconduct. *See United States v. Cook*, 432 F.2d 1093, 1106–07 (7th Cir.

---

[20] *Berger v. United States*, 295 U.S. 78, 88 (1935).

1970) (prosecutor's characterization of defendant as "subhuman man" with "rancid, rotten mind," a "true monster" not improper in view of evidence); *see also Bible*, 2014 WL 5500722, at *30 n.18 (citing *Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (upholding state courts' rejection of prosecutorial misconduct claim where the prosecutor had called the defendant "evil" and a "monster")); *Hutchison v. Bell*, 303 F.3d 720, 751 (6th Cir. 2002) (upholding state courts' rejection of prosecutorial misconduct claim where the prosecutor had described the defendant as having "evil ways" and being an "evil force")). Likewise, the Fifth Circuit has found that a petitioner was not entitled to habeas relief where the prosecutor referred to the petitioner as a "sadistic killer" and "a macho man." *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992); *see also United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978) (defendant not denied fair trial when prosecutor called defendant "con man" and "hoodlum" where unflattering characterization supported by evidence).

Here, the prosecutor's reference to the Biblical proverb, "The wicked flee so no one pursues them, but the righteous are as bold as lions"—one phrase out of 20 pages of closing argument at rebuttal in the guilt-innocence phase—was followed by the prosecutor's statements, "Ladies and gentlemen, there is the wicked right there. And you can ask yourself why he left and why he forfeited on a bond on a case pending out of this very court to do it the day after Angelo Garcia, Jr. was killed and that tells you a lot." 23 RR 95–96. This therefore speaks to the summation of evidence that he once failed to appear in court, which falls within an approved area of argument.

Likewise, the prosecutor's statement during closing argument at the punishment phase of trial—"I will tell you right now, if it were up to Roger alone, Angelo would still be alive"—is a reasonable deduction from Mr. Martinez Saldana's testimony that Roger killed Angelo after Cruz-Garcia told him, "You already know

what you have to do." Pet'r Br. at 249; 26 RR 163–64; 20 RR 149–50. The prosecutor's statement thus falls within one of the four categories of appropriate jury argument.

Additionally, any error that may have been resulted from the prosecutor's arguments was cured by the trial court's instruction in response to Cruz-Garcia's objection—that argument is not evidence and to consider evidence that came from the witness stand. 26 RR 164. Jurors are presumed to understand and follow the court's instructions. *See United States v. Patino–Prado*, 533 F.3d 304, 313 (5th Cir. 2008).

For the above reasons, Claim 15 should be denied.

## XIX.  Cruz-Garcia's Vienna Convention Claim is Procedurally Defaulted and Meritless (Claim 16).

Cruz-Garcia complains that his rights to equal protection, due process, and effective assistance of counsel were violated when he was not informed of his right to seek the assistance of his consulate per the Vienna Convention on Consular Relations (VCCR). Pet'r Br. at 249–250. He concedes this claim is foreclosed by binding precedent. *Id.* at 250. He also acknowledges this claim was dismissed as procedurally defaulted in his first state habeas application, where the CCA found his claim should have been raised at trial or on direct appeal. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1 (citations omitted). *Id.* at 250.  For these reasons, Cruz-Garcia's claim should be denied.

### A.  Review of this claim is barred by the *Gardner* bar, thus Cruz-Garcia has procedurally defaulted his claim.

As discussed in Part VI(A)(1), (2), and Part X, *supra*, federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default. *Coleman*, 501 U.S. at 729. In Cruz-Garcia's first state habeas application, the CCA applied the *Gardner* bar—that is, the court found Cruz-Garcia's claims related to the Vienna

Convention were procedurally barred because "habeas is not a substitute for matters which should have been raised at trial or on direct appeal." *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1 (citations omitted); SHCR-02 at 114–23. Again, the Fifth Circuit has recognized this same state procedural bar. *Busby*, 359 F.3d at 719. Further, "the rule of procedural default . . . applies to Vienna Convention claims." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356, 360 (2006). Cruz-Garcia was not impeded from objecting at trial or raising his complaint on appeal, nor did his failure to do so infect his trial with error of constitutional dimensions.

Also, because consular notification has no bearing on factual innocence, the miscarriage-of-justice exception cannot save his claim from default. Alternatively, as discussed in Part VI(A)(2), Cruz-Garcia fails to demonstrate he is actually innocent, thus he fails to demonstrate a miscarriage of justice that would excuse his procedural default. Accordingly, this Court should deny the instant claim without reaching its merits. *Coleman*, 501 U.S. at 729.

## B.     In the alternative, Cruz-Garcia fails to demonstrate that his claim has merit.

Cruz-Garcia's prior allegations are contradicted by the record, and the law does not authorize the remedy he seeks, or any remedy. In the interest of judicial economy, the Director incorporates by reference his response in Part XV(B). Resp't Answer and Mot. Summ. J., ECF 47, at 83–87.

## XX.   Cruz-Garcia's Claim of Actually Innocence Is Without Merit (Claim 17).

In Claim 17, Cruz-Garcia asserts that his "death sentence violates the Eighth and Fourteenth Amendments because he is actually innocent." Pet'r Br. at 250. First, Cruz-Garcia acknowledges this claim is foreclosed by binding precedent, but he does not concede this point of error and preserves it for later review. Pet'r Br. at 250. Because his claim is foreclosed by jurisprudence, it should be denied.

Further, this Court does not have jurisdiction to consider his claim because freestanding claims of actual innocence are not cognizable on federal habeas review. Indeed, the Supreme Court has never held that claims of actual innocence are cognizable on federal habeas review. A claim of innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315. The Fifth Circuit has repeatedly held that actual-innocence allegations are not cognizable on federal habeas. *Reed v. Stephens*, 739 F.3d 753, 776 (5th Cir. 2014); *United States v. Fields*, 761 F.3d 443, 479 (5th Cir. 2014) ("We are bound by our clear precedent that we do not recognize freestanding claims of actual innocence."); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006). Bound by AEDPA and Fifth Circuit precedent, this Court should not "entertain [Cruz-Garcia's] stand-alone claim." *Foster*, 466 F.3d at 368. This claim should thus be dismissed.

Lastly, he did not present a freestanding claim of actual innocence to the CCA, and it is therefore procedurally defaulted. Namely, where a petitioner has failed to exhaust a claim in state court and that failure would now result in the State procedurally rejecting those claims, the petitioner has procedurally defaulted the claim, and the federal reviewing court must find the claim procedurally barred. *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006) (citing *Coleman*, 501 U.S. at 735 n.1); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred). The Fifth Circuit has said on this subject, "We have held that a habeas petitioner fails to exhaust state remedies when he presents material additional evidentiary support to the federal court that was not presented to the state court." *Graham v. Johnson,* 94 F.3d 958, 968–69 (5th Cir. 1996). Further, "normally, the exhaustion requirement is not

satisfied if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court." *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983) (citations and footnote omitted). For these reasons, Cruz-Garcia's claim of actual innocence is procedurally defaulted and cannot be considered.

Lastly, Cruz-Garcia fails to make a truly persuasive showing of actual innocence. As discussed above in Part VI(A)(2), he fails to provide new evidence that meets the strict standard of *Schlup* to demonstrate he is actually innocent. Nor do his arguments regarding DNA evidence and the credibility of witnesses demonstrate that he is actually innocent. *See id.* Accordingly, Cruz-Garcia's claim of actual innocence cannot serve a gateway to this Court's consideration of any procedurally defaulted constitutional claim. This Court should therefore deny relief on Cruz-Garcia's procedurally defaulted and meritless claim.

## XXI. The Mitigation Special Issue Does Not Preclude Consideration of Mitigating Evidence (Claim 18).

Cruz-Garcia argues that the jury was prevented from considering "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offenses," and that Texas Code of Criminal Procedure art. 37.071 impermissibly limits the jury's inquiry on mitigation to evidence going to the defendant's "moral blameworthiness." Pet'r Br. at 250–251.

While acknowledging that this claim is foreclosed by circuit precedent, Cruz-Garcia complains that the failure to define the term "moral blameworthiness" in the mitigation special issue precluded his jury from considering mitigating evidence, in violation of the Eighth and Fourteenth Amendments. Pet'r Br. at 250. The state trial court found and concluded that the claim violated no constitutional right and was foreclosed by state law. SHCR-02 at 1071–1072, 1079–80 (no. 12); *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2; *Coble*, 330 S.W.3d at 297. These findings are entitled

to AEDPA deference, which Cruz-Garcia does not rebut. 28 U.S.C. § 2254(e)(1); *see* Pet'r Br. at 250–251. The state court's rejection was neither contrary to nor an unreasonable application of federal law, and Cruz-Garcia fails to demonstrate he is entitled to habeas relief on this ground. 28 U.S.C. § 2254(d).

Additionally, Cruz-Garcia correctly notes that this claim is foreclosed by Fifth Circuit precedent and meritless. Pet'r Br. at 251; *Rockwell v. Davis,* 853 F.3d 758, 763 (5th Cir. 2017); *Blue v. Thaler,* 665 F.3d 647, 665–67 (5th Cir. 2011); *Beazley v. Johnson,* 242 F.3d 248, 259–60 (5th Cir. 2001). Accordingly, his claim should be denied.

## XXII. The "10-12 Rule" is Constitutionally Sound (Claim 19).

Cruz-Garcia argues that the trial court's refusal to inform the jury of the consequence of their failure to agree on a special issue violates his Eighth and Fourteenth Amendments, essentially challenging the statutorily-mandated "10-12 Rule," pointing to Juror Bowman. Pet'r Br. at 251. Once again, he concedes the argument is foreclosed by circuit precedent. *See Turner v. Quarterman,* 481 F.3d 292, 300 (5th Cir. 2000); Pet'r Br. at 251.

In Cruz-Garcia's first state habeas application, the state trial court concluded this claim was procedurally barred by Cruz-Garcia's failure to request an instruction on the jury's failure to agree, or object to the lack of such instruction at trial. SHCR-02 at 1072, 1080. However, for a procedural bar to be a valid, the CCA must make a "plain statement" that its decision rests on adequate and independent state grounds. *Sawyer*, 505 U.S. at 338 and *Harris*, 489 U.S. at 262. Here, the CCA did not explicitly find that this claim was barred under the contemporaneous objection rule, although it did base its denial on the trial court's findings and conclusions of law. *Ex parte Cruz-Garcia*, No. WR-85,051-02 & -03, 2017 WL 4947132, at *2.

100

Alternatively, the trial court concluded the "10-12 Rule" violated no constitutional right. SHCR-02 at 1072–74, 1080–81. And the CCA found that this claim has "been repeatedly rejected by this Court and [Cruz-Garcia] raises nothing new to persuade [the court] to reconsider those holdings." *Cruz-Garcia*, 2017 WL 4947132, at *2; *see Davis v. State*, 313 S.W.3d 317, 354–55 (Tex. Crim. App. 2010). Further, the Supreme Court has specifically held that "the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree." *Jones v. United States,* 527 U.S. 373, 381 (1999). Likewise, the Fifth Circuit has consistently rejected similar "10-12 Rule" challenges. *See Young v. Davis,* 835 F.3d 520, 527–29 (5th Cir. 2016); *Sprouse v. Stephens,* 748 F.3d 609, 622–23 (5th Cir. 2014); *Blue,* 665 F.3d at 669–70; *Druery,* 647 F.3d at 543–44. Accordingly, the state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). And, to the extent that this challenge to the "10-12 Rule" urges the adoption of a new rule of constitutional criminal procedure, it also is barred under *Teague. See Blue,* 665 F.3d at 670.[21]

### XXIII. Cruz-Garcia's Death Sentence Is Not Based on an Unconstitutionally Vague First Special Issue (Claim 20).

Cruz-Garcia argues that the future dangerousness special issue is unconstitutionally vague in violation of the Eighth and Fourteenth Amendments. Pet'r Br. at 252. Once again, Cruz-Garcia concedes this issue is foreclosed by circuit precedent. *Id.*; *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993) (holding that the

---

[21]   The state court found juror affidavits proffered in support of this claim inadmissible under Tex. R. Evid. 606(b). SHCR-02 at 1074. The Fifth Circuit has rejected similar attempts to offer juror affidavits in support of this claim, finding them inadmissible under the Fed. R. Evid. 606(b), which prohibits juror testimony or other evidence regarding a juror's mental processes concerning the verdict. *See Young*, 835 F.3d at 528–29. For this reason, this Court should also reject any such evidence in these proceedings.

terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," "have a common-sense core of meaning that criminal juries should be capable of understanding") (citation omitted). But to preserve error, the Director addresses this claim below.

The state trial court found this claim to be procedurally barred by Cruz-Garcia's failure to object to the instruction at trial or raise the claim on direct appeal, and, in the alternative, meritless. SHCR-02 at 1074–75, 1081–82. But as recognized in Part XXII, the CCA did not explicitly find that this claim was barred, and it cannot be said the CCA plainly stated the *Gardner* or contemporaneous-objection bars applied. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2; *see Sawyer*, 505 U.S. at 338, *Harris*, 489 U.S. at 262.

Rather, the CCA found this allegation pertaining to jury instructions has been "repeatedly rejected by this Court and [Cruz-Garcia] raises nothing new to persuade [the court] to reconsider those holdings." *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2 (citing, e.g., *Coble*, 330 S.W.3d at 297). Cruz-Garcia does not demonstrate this decision was based on an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts in light of the record. 28 U.S.C. § 2254(d).

Furthermore, the future dangerousness special issue is part of the Texas capital-punishment scheme that has been repeatedly upheld by the United States Supreme Court against similar challenges. *See Johnson v. Texas,* 509 U.S. 350, 373 (1993); *Franklin*, 487 U.S. at 164; *Jurek v. Texas*, 428 U.S. 262 (1976); *see also Pulley v. Harris*, 465 U.S. 37, 50 n.10 (1984) (stating that Texas's punishment issues are not impermissibly vague because they have a "common sense core of meaning"). The Fifth Circuit has also repeatedly rejected claims that the words used in the punishment issues have such imprecise meanings in the context of a capital murder trial that the

jury cannot discern what is being asked without having those terms defined in the jury instructions. *See Sprouse,* 748 F.3d at 622–23 (holding "Texas does not run afoul of [*Maynard v. Cartwright,* 486 U.S. 356 (1988), or *Godfrey v. Georgia,* 446 U.S. 420 (1980)] by not expressly defining these terms."); *Scheanette*, 482 F.3d at 827–28 (denying COA on claim that failure to define "probability" dilutes states burden of proof, on grounds that Court has "repeatedly held that the term 'probability' as used in the Texas special issue is not so vague as to require additional instructions (such as definition by the court)"); *Turner,* 481 F.3d at 299 (rejecting claim that the jury instructions unconstitutionally vague because they failed to define "probability," "criminal acts of violence," and "continuing threat to society"); *Leal v. Dretke,* 428 F.3d 543, 553 (5th Cir. 2005) (rejecting unconstitutionally-vague argument for failure to define "probability," "criminal acts of violence," and "continuing threat to society"); *Hughes,* 191 F.3d at 615–16 (holding that term "probability," as used in Texas capital sentencing special issues, does not require definition).

Absent any intervening Supreme Court authority, this Court is bound by Fifth Circuit precedent. *See Allen v. Stephens,* 805 F.3d 617, 632–33 (5th Cir. 2015), *abrogated in part on other grounds by Ayestas v. Davis,* 138 S. Ct. 1080 (2018); *United States v. Alcantar,* 733 F.3d 143, 145–46 (5th Cir. 2013). And because controlling federal law upholds the constitutionality of the Texas future dangerousness issue, this claim is barred by *Teague. See Scheanette,* 482 F.3d at 827.

## XXIV. Cruz-Garcia's Death-Penalty-Administration Claim is Procedurally Defaulted and Meritless (Claim 21).

Cruz-Garcia asserts he was sentenced to death based on an arbitrary and discriminatory system for the administration of the death penalty, in violation of the Eighth and Fourteenth Amendments. Pet'r Br. at 252–54. He acknowledges this claim is foreclosed by binding precedent but does not concede this point of error and

103

preserves it for later review. Pet'r Br. at 253–54. Likewise, the Director addresses Cruz-Garcia's claim below to preserve it for later review.

The state habeas court found Cruz-Garcia's claim procedurally barred based on his failure to contemporaneously object to this claim and, in the alternative, the claim was meritless. SHCR-02 at 1075, 1082. As recognized in Parts XXII and XXIII, the CCA did not make a "plain statement" that this claim was barred; therefore, this claim is not barred from review. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2; *see Sawyer*, 505 U.S. at 338, *Harris*, 489 U.S. at 262. Like Claims 19 and 20, the CCA in *Ex parte Cruz-Garcia* found this claim to have been "repeatedly rejected by this Court and [Cruz-Garcia] raises nothing new to persuade [the court] to reconsider those holdings." 2017 WL 4947132, at *2. The CCA's determination is given deference under AEDPA. 28 U.S.C. § 2254(d).

Because the CCA rejected this claim on the merits, he must show that, in so doing, it contravened or unreasonably applied Supreme Court precedent. In *Pinholster*, the Supreme Court clarified that federal habeas review is limited to the record before the state court that adjudicated the merits of a petitioner's claim. 563 U.S. at 181. With respect to the instant claim, the state habeas record included only statistics. *See* SHCR-02 at 182–92 (Cruz-Garcia's application listing statistical studies to support his claim), 198–99 (Cruz-Garcia's exhibit list in state court), 749–50 (additional exhibit). *McCleskey v. Kemp* clearly establishes that statistics are insufficient to sustain an equal protection claim in this context—rather, a defendant must provide "exceptionally clear proof" of purposeful discrimination that had a discriminatory effect on him. 481 U.S. 279, 292–97 (1987); *accord United States v. Webster*, 162 F.3d 308, 334 (5th Cir. 1998). The state court's denial of Cruz-Garcia's claim is consistent with Supreme Court precedent, and his claim must be denied.

**XXV. Several of Cruz-Garcia's Claims of Ineffective Assistance of Trial Counsel (IATC) (Claim 4) Are Procedurally Defaulted, and All IATC Claims Are Without Merit.**

**A.     The Director previously addressed several of Cruz-Garcia's IATC claims in his Answer and Motion for Summary Judgment, ECF No. 47.**

Cruz-Garcia alleges several IATC claims before and during both stages of trial. Pet'r Br. at 54–56, 102–90. Many of these claims correspond to those asserted in Cruz-Garcia's previous legal memorandum supporting his first amended petition, ECF 38. The Director incorporates by reference his arguments in his prior Answer and Motion for Summary Judgment, ECF 47, including but not limited to the merits and findings of fact to which AEDPA deference is owed, procedural defenses, and alternative merits. Most of the corresponding claims are identified below:

| Claims Raised in Pet'r Br., ECF No. 73, as Numbered within Petition | Corresponding Claims Raised, in Whole or in Part, in ECF No. 38 |
|---|---|
| Claim 4(C)(7)[22] | Claim 1(B)(1) |
| Claim 4(F)) | *See, generally*, Claim 1(C)(1) |
| Claim 4(F)(1)(a) | Claim 1(B)(2) |
| Claim 4(F)(1)(b) | Parts raised throughout petition |
| Claims (F)(3)(a), (b) | Claim 1(C)(2) |
| Claim 4(F)(3)(d) | Claim 1(C)(2) |
| Claim 4(F)(4) | Claim 1(C)(4) |
| Claim 4(F)(5)(b) | Claim 1(C)(3) |
| Claim 4(F)(6)(a) | *See* Claim (1)(C)(1)(a) |
| Claim 4(F)(6)(b) | Claim 1(C)(3) |
| Claim 4(F)(6)(c) | Claim 1(C)(6) |
| Claim 4(F)(6)(d) | *See* Claim 1(C)(1)(a) |

---

[22]     Because Cruz-Garcia does not allege counsel's deficiency or prejudice in items 4(A), 4(B), and the majority of 4(C) in his second amended petition, the Director views these sections as facts alleged to generally support trial counsel's purported ineffectiveness. Pet'r Br. at 54–102. Should the Court construe these sections as separate legal claims, they are insufficiently briefed and are waived. *Lookingbill*, 293 F.3d at 263. Alternatively, the Director reserves argument against these items.

105

| Claim 4(G)(1) | Claim 1(C)(6) |
|---|---|
| Claim 4(G)(1)(b) | Claim 1(C)(1)(b), 1(C)(6), 1(B)(2) |
| Claim 4(G)(1)(e) | Claim 1(B)(2) |
| Claim 4(G)(2)(a) | Claim 1(G)(6)(a) |
| Claim 4(G)(3) | Claim 1(C)(6)(b) |
| Claims 4(G)(3)(d)(iii), 4(G)(3)(iv), (vi) | Claim (1)(C)(6)(a) |
| Claim 4(G)(3)(d)(vii) | *See* Claim 1(C)(6)(a) |
| Claims 4(I)(1), (2), (3) | Claim 1(C)(7) |
| Claim 4(K) | Claim 1(C)(8) |

This list is not exhaustive. The Director argues below that several of Cruz-Garcia's IATC claims are procedurally barred and defaulted, and all are without merit.

**B.    Claims 4(D), 4(E), and a portion of Claim 4(C)(7) were not raised in Cruz-Garcia's first petition, thus they are time-barred.**

To begin, some of Cruz-Garcia's current arguments are barred by the statute of limitations provision of § 2244(d). Indeed, Cruz-Garcia's Claims 4(D), (E), and (C)(7) were not brought in Cruz-Garcia's first petition, ECF No. 12, filed on October 31, 2018. For that reason, they are untimely under the statute.

Section 2244(d)(1)(A) provides that the one-year limitation period shall run from the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review. Here, Cruz-Garcia's conviction became final on April 4, 2016, when the Supreme Court denied Cruz-Garcia's petition for a writ of certiorari. § 28 U.S.C. 2244(d)(1)(A).

Because the statute is tolled during state court petitions for habeas corpus relief, *see* 28 U.S.C. § 2244(d)(2), and because Cruz-Garcia filed his state habeas application before his conviction became final, *see* SHCR-02 at 2 (filed August 28, 2015), the limitations period did not begin to run until November 1, 2017—the date the CCA denied his state habeas application. *Ex parte Cruz-Garcia,* 2017 WL 4947132; s*ee also Fierro v. Cockrell,* 294 F.3d 674, 679 (5th Cir. 2002). To that end,

Cruz-Garcia needed to present all claims to this Court by November 1, 2018.[23] Because Cruz-Garcia's Claims 4(D), (E), and (C)(7), pertaining to the guilt/innocence phase of trial, in the present amended petition were not presented within the statutory limitations period, they are untimely. Thus, they should be dismissed as time-barred.

### 1.   Cruz-Garcia is not entitled to equitable tolling.

A federal habeas corpus petitioner is entitled to equitable tolling "'only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). Equitable tolling is only available in cases presenting "rare and exceptional circumstances." *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998). It is "not intended for those who sleep on their rights." *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir. 2012). Equitable tolling mainly applies where the plaintiff is "actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Flores v. Quarterman*, 467 F.3d 484, 487 (5th Cir. 2006) (quoting *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999), *abrogated on other grounds by Richards v. Thaler*, 710 F.3d 573, 578–79 (5th Cir. 2013)). But a "garden variety claim of excusable neglect" does not support equitable tolling. *Lookingbill*, 293 F.3d at 264 (citation omitted).

Moreover, "[i]n order for equitable tolling to apply, [Cruz-Garcia] must diligently pursue his § 2254 relief." *Coleman*, 184 F.3d at 403. "Where [petitioner]

---

[23]   Federal habeas proceedings do not toll the statute of limitations for new claims. *See Duncan v. Walker*, 533 U.S. 167, 181–82 (2001) (limitation period during the pendency of respondent's first federal habeas petition is not tolled by § 2244(d)(2)).

could have filed his claim properly with even a modicum of due diligence, we find no compelling equities to justify tolling." *See Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996); *see also In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006); *Fisher v. Johnson*, 174 F.3d 710, 715 (5th Cir. 1999). And Cruz-Garcia bears the burden of proving that equitable tolling is justified. *Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000).

Cruz-Garcia omits any argument about the statute of limitations issue, and he gives no excuse why tolling should apply. For those reasons alone, his claims should be time-barred.

## 2.   The time-barred claims do not relate back to Cruz-Garcia's original petition.

To be considered, Cruz-Garcia's time-barred claims should relate back to his original timely petition. But they do not. Federal Rule of Civil Procedure 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." While Rule 15(c)(1)(B) does apply to federal habeas corpus proceedings, the Supreme Court has rejected the argument that the "same conduct or transaction" refers to any claim that arises out of a habeas petitioner's trial, conviction, or sentence. *Mayle v. Felix*, 545 U.S. 644, 656–65 (2005). Under that erroneous interpretation, the AEDPA limitations period would have "slim significance" and, in essence, would be repealed. *Id*. at 662–63. Instead, "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Id*. at 659. Further, "relation back" does not occur "when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." *Id*. at 657 (quoting *United States v. Craycraft*, 167 F.3d 451, 457

(8th Cir. 1999)). And to "relate back," the initial petition must apprise the respondent of the claim raised in the amended petition. *See F.D.I.C. v. Conner*, 20 F.3d 1376, 1385–86 (5th Cir. 1994); *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850, 864 (5th Cir. 1993).

Here, Cruz-Garcia's Claims 4(D), 4(E), and the portion of 4(C)(7) pertaining to the guilt/innocence phase of trial do not relate back to his original petition. Even though these claims are IATC claims and rest on similar facts previously raised, these factors do not automatically render the claims as relating back to any of his other IATC claims. That is because a petitioner "does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney misfeasance." *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) (citations omitted); *see also United States v. Gonzales*, 592 F.3d 675, 680 (5th Cir. 2009) ("We agree with the approach adopted by our sister circuits. New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision."). Accordingly, Cruz-Garcia's time-barred claims cannot be saved by the Relation-Back Doctrine.

### C. Cruz-Garcia raises several IATC claims that are procedurally defaulted and barred from review.

Cruz-Garcia's Claims 4(D), 4(E), 4(H), 4(J), and 4(C)(7) were presented for the first time to the CCA in his second subsequent state habeas application. SHCR-05 at 208–354. The CCA dismissed that application as an abuse of the writ, without considering the merits. *Ex parte Cruz-Garcia*, 2021 WL 4571730 at *1. For the reasons discussed in Part VII(A), *supra*, those IATC claims are procedurally defaulted. *See Fearance*, 56 F.3d at 642; *Coleman*, 456 F.3d at 542. First, Cruz-Garcia

argues that, in the alternative to meeting the exception under *Martinez v. Ryan* to overcome this procedural default, he can show a miscarriage of justice because he is actually innocent. Pet'r Br. at 190. But he has failed to demonstrate actual innocence; the Director addressed this contention in Part VI(A)(2), *supra*, and incorporates his arguments regarding the alleged fundamental miscarriage of justice and actual innocence.

Primarily, though, Cruz-Garcia argues that the procedural default of his claims is due to ineffective assistance of state habeas counsel, and he can overcome this procedural bar through cause and prejudice as set out in *Martinez*. Pet'r Br. at 186–90 (citing *Martinez*, 566 U.S. 1; *Trevino v. Thaler*, 569 U.S. 413, 428–29 (2013). But his attempt is baseless.

A reviewing court looks to *Strickland*, 466 U.S. 668, to determine whether state habeas counsel was ineffective. *Martinez*, 566 U.S. at 14.  In *Martinez*, the Supreme Court held that: where state law requires a defendant to bring an IATC claim in state habeas proceedings only, where state habeas counsel fails to bring such a claim, and where the State in federal habeas proceedings raises a defense based upon the failure to raise the issue in state court, the defendant can plead state habeas counsel's failure as cause to avoid the default. 566 U.S. at 17; s*ee also Coleman*, 501 U.S. at 735 n.1 (stating that prisoner may avoid procedural bar in federal court by showing cause for the default and actual prejudice that is attributable to the default). *Martinez* did not establish a constitutional right to counsel in state habeas proceedings. 566 U.S. at 8. Rather, acting in equity, the Court allowed the federal petitioner to avoid default of an IATC claim by pleading the state habeas counsel's failure to raise it. *Id.* at 13. Where the petitioner could show state habeas counsel's failure deprived him of his opportunity to raise a substantial claim regarding the assistance of trial counsel, the Court permitted the federal district court to review the trial-counsel-related claim on

the merits. *Id.* at 16–17. In *Trevino*, the Supreme Court held that the *Martinez* exception applies to Texas inmates seeking federal habeas review. 569 U.S. at 428–29.

Under *Martinez*, "to succeed in establishing cause, the [inmate] must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). To prove a claim "substantial," a "prisoner must demonstrate that the claim has some merit." *Id.* Further, state habeas counsel cannot be ineffective for failing to raise a meritless claim. *Id.*

Here, as discussed in the remainder of Part XXV, *infra*, Cruz-Garcia's defaulted IATC claims are insubstantial and meritless, which is dispositive of both prongs of *Martinez*. And Cruz-Garcia's assertions that his state habeas counsel were inadequate find no support in the record that was properly presented to the CCA, i.e., in his first state habeas proceeding. Indeed, Cruz-Garcia relies upon extra-record evidence in his attempt to evade the procedural default by way of *Martinez*. Pet'r Br. at 187–88. Such evidence, however, cannot be reviewed unless a petitioner meets the exceptions under § 2254(e)(2), including evidence beyond the state-court record to be considered for ineffective assistance of state postconviction counsel. *Martinez Ramirez*, 142 S. Ct. at 1734. Cruz-Garcia fails to establish he meets the exceptions under 28 U.S.C. § 2254(e), and this evidence cannot be considered, as discussed in Part II, *supra*.

Even if looking to these records, Cruz-Garcia certainly cannot show that it was objectively unreasonable for his state habeas attorneys to use their limited time and resources to investigate and present the claims they ultimately chose to present. *See Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was

reasonable at the time and to balance limited resources in accord with effective []
tactics and strategies."). Evaluating the facts and deciding upon the strongest claims
is the essence of an appellate lawyer's craft, undermining any assertions by counsel
that they did not make strategic decisions not to raise certain claims. *See Knowles v.
Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every
available nonfrivolous defense. Counsel also is not required to have a tactical
reason—above and beyond a reasonable appraisal of a claim's dismal prospects for
success—for recommending that a weak claim be dropped altogether." (internal
citations omitted)); *Robbins*, 528 U.S. at 285 (counsel is not ineffective for failing to
raise every possible point on appeal; instead counsel should raise and brief only those
issues he believes have the best chance of success). Obviously, an appellate lawyer
does not need to fully develop and brief the entire universe of possible claims and
then consciously choose amongst them to be credited with having a strategic
approach. The idea that OCFW was ineffective also only has purchase if the defaulted
claims are stronger than the claims provided in the initial writ, *Robbins*, 528 U.S. at
288, but they are not, as addressed below.

Further, the Fifth Circuit has recognized that "[c]ause is defined as something
external to the petitioner, something that cannot fairly be attributed to him that
impedes his efforts to comply with the [state] procedural rule," such as "a showing
that the factual or legal basis for the claim was not reasonably available to counsel."
*Matchett*, 380 F.3d at 848–49 (internal quotations and citations omitted). Even if
Cruz-Garcia's extra-record evidence could be considered, he does not demonstrate
that the information he now provides was not reasonably available to counsel.

For the same reason, Cruz-Garcia cannot show prejudice under *Martinez*—
"that is, that there is a reasonable probability that he would have been granted state
habeas relief had the [claim] been presented in state habeas proceedings." *Newbury*

112

*v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014). The Director addresses Cruz-Garcia's defaulted IATC claims in the alternative below, which demonstrates that they are without merit—that is, they are neither substantial, nor does Cruz-Garcia show by a reasonable probability that the claims would have garnered state habeas relief. Because Cruz-Garcia fails to show substantiality or *Strickland* prejudice, he fails to prove cause for purposes of *Martinez*.

### 1.    Cruz-Garcia's Claims 4(D) and 4(E) are not substantial.

In Cruz-Garcia's Claim 4(D), he asserts he was denied effective assistance of counsel at trial because counsel did not adequately communicate with him. Pet'r Br. at 104–06. In Claim 4(E), Cruz-Garcia alleges trial counsel failed to a seek a continuance due to their caseload and lack of communication with him. Pet'r Br. at 106–07. Cruz-Garcia primarily relies upon Texas Guidelines in support of his claims. Pet'r Br. at 104, 106. But in conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *McGuire,* 502 U.S. at 68. The Texas Guidelines do not dictate the reasonableness of counsel's performance. Relatedly, the Supreme Court has stressed that ABA Guidelines "are 'only guides' to what reasonableness means, not its definition." *Bobby v. Van Hook,* 558 U.S. 4, 8–9 (2009) (citing *Strickland,* 466 U.S. at 688); *Wiggins v. Smith*, 539 U.S. 510, 543 (2003) (Scalia, J., dissent) (*Strickland* rejected imposing "rules" on counsel's performance); *see also Murphy v. Davis,* 737 F. App'x 693, 703 (5th Cir. June 11, 2018); *Druery,* 647 F.3d at 541 n.2 . Therefore, any alleged failure to follow the Texas Guidelines does not demonstrate deficient performance by counsel.

Additionally, Cruz-Garcia's extrapolations from mitigation investigator J.J. Gradoni's affidavit as to counsels' meetings and communication with Cruz-Garcia is merely speculation. Cruz-Garcia asserts that counsel Cornelius "was present on two of the interviews" and only met with Cruz-Garcia with the assistance of Edna Valez, an associate of Gradoni, and therefore counsel must have "barely" met with Cruz-Garcia. Pet'r Br. at 104–05. But Gradoni also attested that Velez reported "directly to [him] and Mr. Cornelius," and Velez had met with Cruz-Garcia in the Harris County Jail seven times. SHCR-02 at 1100. Cruz-Garcia cites no case law that requires lead counsel to be present at every meeting with a defendant, or that information or evidence gathered by a member of the defense who is not lead counsel cannot be pursued or used at trial. Cruz-Garcia also glosses over counsel Madrid's ability to speak Spanish, and thus Madrid would not have required Velez's presence to meet with Cruz-Garcia. Regardless, the "brevity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel." *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984).  Cruz-Garcia fails to show counsel was deficient, and he fails to demonstrate prejudice resulted from trial counsels' actions. Accordingly, Cruz-Garcia cannot show his IATC claims are substantial, and he therefore cannot avoid the default of his claims.

### 2.     Cruz-Garcia's Claim 4(H) is not substantial.

In Cruz-Garcia's Claim 4(H), he asserts trial counsel failed to object and preserve error for appellate review on seven grounds: violation of the Confrontation Clause when Orchid Cellmark forensics supervisor Quartaro and medical examiner Dr. Wolf testified to work performed by others; trial court error in limiting Cruz-Garcia's cross-examination regarding the reliability of the DNA evidence; improper admission of victim impact testimony at the punishment phase of trial from witnesses who were victims of extraneous offenses; improper jury argument by the State;

114

repetitive emotional outbursts from the gallery that tainted his trial; instances of incorrect translation of testimony; and Cruz-Garcia's absence from an ex parte discussion with Juror Bowman and an ex parte discussion about two jurors' discussion of the case outside the courtroom. Pet'r Br. at 167–71.

All but one of these underlying grounds were addressed above, and each are meritless. *See*, *supra*, Part XIII (Confrontation Clause, Claim 4(H)(i)), Part VI(A)(3) (cross-examination regarding the reliability of the DNA evidence, Claim 4(H)(ii)), Part XVIII (improper jury argument by the State, Claim 4(H)(iv)), Part XVII (repeated emotional outbursts from the gallery, Claim 4(H)(v)), Part XIII (instances of incorrect translation, Claim 4(H)(vi)), and Part XII (Cruz-Garcia's absence from two portions of trial, Claim (H)(vii)). Accordingly, counsel had no grounds to object, nor error to preserve for appeal, and Cruz-Garcia cannot demonstrate deficiency or show that he suffered actual prejudice as a result of trial counsel's actions. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) (counsel has no duty to make meritless objections).

Also meritless is Cruz-Garcia's remaining allegation, Claim 4(H)(iii), that trial counsel failed to object and preserve error regarding the admission of testimony from Andres Castillo Buten, a victim of Cruz-Garcia's extraneous offense of kidnapping, and from Andres's brother Manuel, a witness to the kidnapping. Pet'r Br. at 169–70. Cruz-Garcia relies on *Payne v. Tennessee*, 501 U.S. 808, 825–27 (1991), where the Court found victim-impact and victim-character testimony is permissible in the punishment stage of a capital trial. The Court left it to the states to devise procedures for admissibility, holding only that the admission of such evidence during the punishment phase violates the Constitution if the evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id*. at 824–25.

Regarding the testimony of Andres Buten, counsel had no grounds to object because Andres's testimony was not victim-impact testimony. The CCA has defined victim impact evidence as "evidence of the effect of an offense on people *other* than the victim." *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (footnoted citations omitted). In *Roberts*, the victim of an extraneous offense of robbery committed by the defendant had testified as to the "emotional impact the robbery had on her life." 220 S.W.3d at 531. The CCA held the victim's testimony was not victim-impact testimony. Andres similarly testified about his suffering during and after being kidnapped and tortured by Cruz-Garcia; as the victim, his testimony was not objectional as victim-impact testimony. 24 RR 78–97.

Counsel also had no grounds to object to Manuel's testimony. Manuel testified that Cruz-Garcia violently kidnapped Andres and his sixteen-year-old nephew right in front of him, and he received calls from Cruz-Garcia, demanding drugs in exchange for releasing Andres and his nephew alive. 24 RR 20–42. Manuel also testified about the impact of the kidnapping on Andres and his nephew. 24 RR 42. Manuel did not testify about the impact of this violent crime on his own life. Accordingly, Manuel's testimony was not objectionable as victim-impact or victim-character evidence. *See Roberts*, 220 S.W.3d at 531.

Trial counsel is not ineffective for failing to make a futile objection. *See Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012). Accordingly, Cruz-Garcia cannot show his claim is substantial; he therefore fails to meet the standard under *Martinez* to excuse his default of Claim 4(H)(iii).

### 3.    Claim 4(J) is not substantial.

In Claim 4(J), Cruz-Garcia alleges trial counsel were ineffective during jury selection for failing to raise and preserve error that Cruz-Garcia's jury was selected from a venire that was not representative of a fair cross section of the community

116

(Claim 4(J)(i)), make a full and accurate record of jury selection and require the State to exercise its cause for challenges on the record (Claim 4(J)(ii)), raise a *Batson* challenge(Claim 4(J)(iii)), raise a *Witherspoon* challenge (Claim 4(J)(iv)), identify potential jurors' biases based on the alleged facts of the offense (Claim 4(J)(v)), and object to portions of the State's voir dire questioning (Claim 4(J)(vi)). Pet'r Br. at 174–82. For the reasons discussed below, Cruz-Garcia fails to show trial counsel were ineffective, and he therefore cannot establish these claims are substantial so as to excuse his default under *Martinez*.

### a.      Venire composition

Cruz-Garcia alleges trial counsel should have objected to the composition of his venire because it did not represent a fair cross-section of the community and because Harris County's jury-selection method discriminates against Hispanic jurors and discriminated against him. Pet'r Br. at 174–75. Because there was nothing for counsel to object to, Cruz-Garcia cannot show this claim is substantial under *Martinez*.

The Sixth Amendment guarantees a criminal defendant the right to a trial by jury selected from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). To establish a prima facie violation of the fair cross-section requirement, the defendant must show that (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). A defendant's failure to establish any of these elements is futile to his claim. *Timmel v. Philips*, 799 F.3d 1083, 1086 (5th Cir. 1986). Cruz-Garcia fails to meet the second and third.

To satisfy the second element, Cruz-Garcia alleges that his venire was 18.67% Hispanic, whereas Hispanics made up 42.8% of Harris County's general population at the time. But his calculation of his venire at 18.67% Hispanic has no apparent source, and the Director was unable to find any in the record. Assuming his data is reliable, his claim fails because he uses the wrong ratio (again). *Duren* requires him to show Hispanic underrepresentation in his venire compared to the Hispanics eligible to serve as jurors in Harris County. *See United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir. 1981); *United States v. Williams*, 264 F.3d 561, 568–69 (5th Cir. 2001) (clarifying that the relevant "community" is those who are eligible to serve as jurors in the jurisdiction in question). His failure to provide any evidence of the percentage of Hispanics eligible to serve as jurors is fatal to his claim. *See Williams*, 264 F.3d at 569; *United States v. Harper*, 369 F. App'x 556, 564 (5th Cir. 2010).

But if that is not enough, he also fails to show that Harris County's jury-selection method systematically excludes Hispanics. Cruz-Garcia says nothing about the jury-selection method used. Pet'r Br. at 174–75. Further, while we know that "[o]ne incidence of a jury venire being disproportionate is not evidence of 'systematic' exclusion," *Timmel*, 799 F.2d at 1087, Cruz-Garcia simply asserts without support "statistical evidence in Mr. Cruz-Garcia's case and numerous other cases across Harris County." Pet'r Br. at 175–76. But this is insufficient to support his claim. *Cf. Duren*, 439 U.S. at 366 (finding systematic exclusion based on petitioner's demonstration that a large discrepancy occurred in every weekly venire for nearly a year). And even if allegations in two other cases could be taken as evidence of systematic exclusion, the cases Cruz-Garcia relies upon cannot, for their analysis appear to use the same ratio he uses—*i.e.*, the percentage of Hispanics on their venires Cruz-Garcia fails to demonstrate systematic exclusion, which renders this IATC claim meritless. *See Roberts*, 681 F.3d 597. Accordingly, Cruz-Garcia's IATC

118

claim on this ground is not substantial, and it should be dismissed as procedurally defaulted.

### b.    Record of jury selection

Cruz-Garcia's IATC complaint that trial counsel did not create a record during jury selection is meritless, thus it is not substantial under *Martinez*. In reviewing a claim of excusing jurors by agreement, this Court has noted, "No authority requires all potential jurors to be questioned[,]" and that "[e]ven if trial counsel agreed to remove all jurors unequivocally opposed to or in favor of a death sentence, such an approach falls within an area reserved traditionally for strategic decision making." *Ramey v. Davis*, 314 F.Supp. 3d. 785, 812 (S.D. Tex. July 11, 2018). In *Skilling v. United States*, a federal criminal case that likewise examined the excusal of jurors by agreement, the Court noted that "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire. Jury selection, we have repeatedly emphasized, is 'particularly within the province of the trial judge.'" 561 U.S. 358, 386 (2010) (quoting *Ristaino v. Ross*, 424 U.S. 589, 594–595 (1976)). Cruz-Garcia's complaints underlying this allegation of IATC lie in this exact issue—that jurors were excused by agreement, and also were stricken for cause without record of the reason or questioning. Pet'r Br. at 176–77. For the reasons above, Cruz-Garcia's allegation of IATC on this ground is without merit, and is thus not substantial so as to meet *Martinez*'s prongs to excuse the claim's procedural default.

### c.    *Batson* challenges

Cruz-Garcia alleges that trial counsel was ineffective for not objecting when the prosecution struck four prospective jurors on the basis of race in violation of *Batson*, 476 U.S. 79 (holding that the equal protection clause bars the use of race-based peremptory jury challenges. Pet'r Br. at 177–78. Specifically, Cruz-Garcia contends that the State improperly struck veniremembers Latoya Johnson, Melinda

Dixon, Johnny Bermudez, and Gilberto Vasquez. Pet'r Br. at 177–78. But his claims should be denied.

A criminal defendant suffers a violation of his equal protection rights when the State, with the intent to purposefully discriminate, exercises its peremptory challenges to remove venirepersons based on their race. *Batson*, 476 U.S. at 87. The *Batson* Court ruled that once a minority criminal defendant establishes a prima facie case of racial discrimination based on the State's use of peremptory challenges to strike members of the defendant's race from the venire, the burden shifts to the State to give race-neutral reasons for the peremptory challenge. Once the prosecutor offers the race-neutral reason, the trial court must then decide whether the defendant has proven purposeful racial discrimination. *Id.* at 96–98; *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995). The prosecutor meets the requirement of a race-neutral explanation where his reason for the challenge is something other than race. *Hernandez v. New York*, 500 U.S. 352, 360 (1991). A legitimate reason is "not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769. Unless discriminatory intent is inherent in the explanation, the trial court should deem the reason offered race-neutral. *Id. Batson* also applies to gender discrimination. *See J. E. B. v. Alabama ex rel. T. B.*, 511 U.S. 127, 129 (1994).

Scrutiny of counsel's performance must be "highly deferential," and, in order to avoid the effects of hindsight bias, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be sound trial strategy.'" *Strickland*, 466 U.S. at 689. Here, the record is silent as to the reasons the State exercised peremptory strikes against two black jurors and two Hispanic jurors, and there is likewise nothing to rebut the presumption that trial counsel strategically elected not to raise

a *Batson* challenge to Jurors Johnson, Bermudez, Dixon, and Vazquez. *See Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (holding that counsel made a strategic decision because he "undoubtedly decided that he was unlikely to mount a successful constitutional challenge to the prosecutor's peremptory strikes.").

Indeed, the record supports finding that trial counsel strategically elected not to raise a *Batson* challenge against Jurors Johnson, Bermudez, Dixon, and Vazquez. For example, the prosecutor commented that Ms. Johnson was "very, very laid back," and Ms. Johnson often offered one-word answers. 11 RR 161–62; *see generally*, *id.* at 138–80. This, in addition to Ms. Johnson's possible demeanor which is not reflected in a cold record, may have signaled to the prosecutor that Ms. Johnson was not the right juror to hear this death penalty case. Regarding Mr. Bermudez, he indicated that he would not elect to have the death penalty as a possible punishment when asked by the prosecutor. 11 R 233–34. And while he ultimately said the death penalty may be appropriate in "certain circumstances" and "might be warranted based on the facts of the case," he earlier stated that he "do[es]n't know if it's necessarily effective as a deterrent" and that he is "personally opposed to it." 11 RR 236, 234. The State may have been concerned with Mr. Bermudez's initial response, despite his change in mind later. Regarding Ms. Dixon, she shared that she was struggling with assessing punishment against a co-conspirator because she "had an uncle that his girlfriend did the murder, but he was there," and was sentenced to 13 years' imprisonment under conspiracy. 12 RR 211. She ultimately answered that her uncle's experience would not make it difficult for her to follow the law regarding parties and accomplice witnesses, *id.*, but the prosecutor may have considered her family member's experience and her possible demeanor, not visible on a cold record, and decided Ms. Dixon was not the juror for Cruz-Garcia's case. Lastly, regarding Mr. Vazquez, he stated that he was unsure about how he felt about evidence consisting

121

solely of testimony as enough evidence for conviction. 13 RR 168. While he eventually agreed with the State that there are certain scenarios where "witness testimony alone might be enough," his initial answers, in addition to his demeanor which the record cannot convey, may have signaled to the State that he was not the right juror for their case.

But ultimately, again, the trial court looks to the reasons the prosecutor offers, and the credibility of the race-neutrality behind those reasons. Because the record is silent on these reasons and any new evidence would likely not be able to be considered, Cruz-Garcia cannot demonstrate trial counsel had a basis upon which to raise *Batson* challenges; accordingly, this claim is not substantial.

### d. *Witherspoon* challenges

Cruz-Garcia's IATC claim predicated on *Witherspoon* claim is also baseless. The relevant standard for first determining whether jurors could have been excused for cause because of their respective views on the death penalty is set out in *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). There, the Supreme Court stated that the critical inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Importantly, a state trial court's refusal to grant a defendant's challenge for cause is a factual finding entitled to a presumption of correctness. *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (finding that deference to the trial court is appropriate because the trial court is in the best position to evaluate the demeanor of the jury venire, which is "of critical importance in assessing the attitude and qualifications of potential jurors"); *Gomez v. Quarterman*, 529 F.3d 322, 331 (5th Cir. 2008). Even when there is ambiguity in the record concerning a potential juror's statements, the Court found that "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor,

122

[is] entitled to resolve [the question] in favor of the State." *Uttecht*, 551 U.S. at 7 (citing *Witt*, 469 U.S. at 434).

As a general rule, a trial court's erroneous venire rulings do not constitute reversible constitutional error "so long as that jury the sits is impartial." *Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004) (citing *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000)). Thus, if a juror is struck with a peremptory, no Sixth Amendment violation occurs when the court refuses to remove that juror for cause. *Ross v. Oklahoma*, 487 U.S. 81, 85–89 (1988) (holding that the trial court's refusal to grant a challenge for cause did not give rise to defendant's Sixth Amendment right to a fair trial where the defendant exercised a peremptory challenge to excuse that juror); *Soria v. Johnson*, 207 F.3d 232, 241 (5th Cir. 2000) (relying upon the Supreme Court's decision in *Ross* for the proposition that "so long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated") (internal citations and quotations omitted); *Edwards v. Stephens*, 612 F. App'x 719, 722 (5th Cir. 2015) ("Assuming, *arguendo*, that Redden should have been dismissed for cause, Edwards cannot establish a constitutional violation because he used a peremptory strike to exclude Redden from the jury that ultimately sat.").

Here, Cruz-Garcia argues that counsel should have objected to the removal of veniremembers who were excluded from serving as a juror because of their objections to the death penalty, either morally or religious-based, without attempting to rehabilitate them. Pet'r Br. at 178–79. He specially complains about veniremembers M. Lara and M. Mehl, and also generally alleges counsel did not object to the exclusion of, or later attempt the rehabilitation of, "dozens of such jurors." Pet'r Br. at 179. By failing to brief those dozens of jurors, Cruz-Garcia fails to demonstrate that he meets "the proper standard for determining when a prospective juror may be

excluded for cause because of his or her views on capital punishment," which is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Morgan v. Illinois*, 504 U.S. 719, 727–28 (1992) (discussing *Witherspoon*).

Regarding Juror Lara, Cruz-Garcia fails to mention the trial court engaged her after she made the statement about which Cruz-Garcia complains; the trial court explained that the law is written so that a juror does not have to decide whether to assess the death penalty or not—just to answer questions based on the evidence, and not feelings about the death penalty. 31 RR 83. Even after the trial judge probed further about whether Juror Lara could base her answer to the Special Issues on the evidence and not feelings, Juror Lara responded, "I will say that I will be swayed, most likely, only because I'm not for it and I just don't feel that we can judge somebody and give the maximum sentence." 31 RR 83–84.

Cruz-Garcia likewise glosses over the record that rebuts his allegation of bias by Juror Mehl. Prior to Juror Mehl's statement, the court questioned the venire generally, "Does anybody feel – and this is the question I want to commit you on. Does everyone feel . . .they can commit to following the law as to those special issues knowing that in a proper case the answer to their questions may result in assessing the death penalty?" 31 RR 80. Juror Mehl followed another veniremember's admission that their "answers to these [Special Issues] would be swayed based on what you know they would result in" and "[n]ot really by the evidence." 31 RR 82. Directly after that veniremembers responses, Juror Mehl's statement thus indicates she also would not base her answers to the Special Issues solely on the evidence presented. *Id.*

Regarding the "dozens of jurors," Cruz-Garcia's lack of detail renders his claim inadequate to serve as the basis for federal habeas corpus relief. *See Ross v. Estelle*,

694 F.2d 1008, 1011–12 (5th Cir. 1983) (reviewing a claim of ineffective assistance of counsel) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value."); *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982) ("Mere conclusory statements do not raise a constitutional issue in a habeas case.").

Finally, Cruz-Garcia cannot point to any statement from counsel that was properly presented to the CCA that might indicate this practice was not strategic; such a conclusory claim must fail. *Koch*, 907 F.2d at 530 ("Mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue."). Moreover, "[c]ounsel [is] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective [ ] tactics and strategies." *Richter*, 562 U.S. at 107.

Altogether, because counsel either had no grounds to object or counsel could have strategically elected not to object, Cruz-Garcia cannot demonstrate deficiency, nor show that he suffered actual prejudice as a result of trial counsel's actions. *See Clark*, 19 F.3d at 966; *Green*, 116 F.3d at 1122; *see also Pondexter*, 537 F.3d at 521 (5th Cir. 2008). Accordingly, in the alternative to being dismissed as procedurally defaulted, this claim should be denied as meritless.

### e.    Juror biases related to the capital murder

In Claim 4(F)(v), Cruz-Garcia argues trial counsel were ineffective for failing to conduct a "broad" voir dire to determine if veniremembers could be impartial where the case involved a child victim and sexual assault allegations.  Pet'r Br. at 179–80.

Again, he supports his claim on ABA Guidelines, which are insufficient to support habeas relief. *See Hook,* 558 U.S. at 8–9.

Cruz-Garcia also fails to show his remaining assertions of IATC at voir dire for agreeing to not mention the murder victim is a child and for failing to object to the State's references in voir dire to infamous murderers are substantial. Cruz-Garcia has failed to allege any specific facts showing it was objectively unreasonable for trial counsel to agree not to voir dire the jury venire on their views of offenses involving child victims. Moreover, Cruz-Garcia identifies no answers given by any members of his jury venire during voir dire which should have alerted trial counsel to any potential bias against him harbored by a particular venire member on these grounds.

For these reasons, counsel had no grounds to object, nor error to preserve for appeal, and Cruz-Garcia cannot demonstrate deficiency or show that he suffered actual prejudice as a result of trial counsel's actions. *See Clark*, 19 F.3d at 966. Cruz-Garcia therefore cannot demonstrate his claim is substantial under *Martinez*, and he cannot show his procedural default should be excused.

### f.   State's voir dire questioning

Cruz-Garcia alleges trial counsel's assistance during voir dire was ineffective when they did not object to the State's inflammatory comments that included references to Adolf Hitler, Charles Manson, Andrea Yates, and to highly publicized criminal incidents such as the Boston marathon bombing. Pet'r Br. at 180–81. The Director addressed this underlying basis above in Part XVIII and demonstrated there was no merit to that issue.

Accordingly, counsel had no grounds to object, nor error to preserve for appeal, and Cruz-Garcia cannot demonstrate deficiency or show that he suffered actual prejudice as a result of trial counsel's actions. *See Clark*, 19 F.3d at 966. Cruz-Garcia therefore cannot demonstrate his claim is substantial, and he is not entitled to the excusing of his procedural default under *Martinez*.

### D. Cruz-Garcia does not overcome his burden under AEDPA to show he is entitled to relief on his properly exhausted IATC claims.

#### 1. Standard of review

Again, a defendant who wishes to demonstrate ineffective assistance of counsel must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. *Richter*, 562 U.S. at 104 (*citing Strickland*, 466 U.S. at 688). A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation fell within the wide range of reasonable professional assistance. *Id*. The challenger must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id*.

With respect to prejudice, a challenger must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 787–88.

With respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [ ] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel.") (internal quotation marks omitted)). "In assessing prejudice, [the reviewing court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

"Surmounting *Strickland*'s high bar is never an easy task." *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). The *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689–90). Even under de novo review, the standard for judging counsel's representation is most deferential. *Id*. Unlike a later reviewing court, the attorney saw the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. *Id*. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*. (quoting *Strickland*, 466 U.S. at 689); *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. *See Strickland*, 466 U.S. at 690 (counsel is "strongly presumed" to make decisions in the exercise of professional judgment).

That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *Massaro v. United States* 538 U.S. 500, 505 (2003). Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight. *See Bell*, 535 U.S. at 702; *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984).

Further, establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *Richter*, 562 U.S. at 105. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Richter*, 562 U.S. at 105, and when applied in tandem, review is "doubly" so. *Id.* (quoting *Mirzayance*, 556 U.S. at 123). Because the *Strickland* standard is general, the range of reasonable applications is substantial. *Richter*, 562 U.S. at 105. Federal habeas courts must not equate unreasonableness under *Strickland* with unreasonableness under § 2254(d). *Id.* When § 2254(d) applies, the question is not whether counsel's actions were reasonable. *Id.* The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id.*

Under § 2254(d), the reviewing court must grant deference not only to the decisions of trial counsel but must grant additional deference to the decision of the

state court. *See Richter,* 562 U.S. at 99–100. The state court must be granted a deference and latitude that do not apply in a bare *Strickland* review. *See id.*

> **2.** **Cruz-Garcia does not meet his burden under AEDPA to show the CCA's denial of his properly exhausted IATC Claims 4(F), (I), and (K) were an unreasonable application of, or contrary to, federal law, or based on an unreasonable determination of the facts.**

Generally, Cruz-Garcia raises claims of ineffective assistance of trial counsel on 27 grounds, 12 of which Cruz-Garcia raised in his first state habeas application. Pet'r Br. at 102–86; SHCR-02 at 31–114, 123–35, 145–47, 150–53. The merits of the underlying claim of the majority of these IATC claims have been addressed above; the chart below identifies these claims.

| Cruz-Garcia's Claims | | Corresponding Merits Argument, *supra* |
|---|---|---|
| 4(F)(i) | Counsel failed to retain a DNA expert and adequately investigate the State's DNA evidence. | Part VIII |
| 4(F)(ii) | Counsel failed to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab | Part VI |
| 4(F)(iii) | Counsel failed to investigate Santana's mental health issues, crime of moral turpitude, and evidence contradicting Santana's testimony. | Part VIII |
| 4(F)(iv) | Counsel failed to investigate Angelita Rodriguez. | |
| 4(F)(v) | Counsel failed to investigate Diana Garcia and Arturo Rodriguez. | |
| 4(F)(vi) | Counsel failed to investigate law enforcement's theory of the case. | |
| 4(I) | Counsel failed to investigate two jurors' discussion of the case outside the courtroom, and object to the trial court's ex parte meeting with Juror Bowman. | Part XII |
| 4(K) | Counsel failed to recognize the significance of Cruz-Garcia's foreign nationality and seek | Part XIX |

130

| Cruz-Garcia's Claims | | Corresponding Merits Argument, *supra* |
|---|---|---|
| | assistance from the Dominican Republic Consulate under the Vienna Convention on Consular Relations. | |

The Director incorporates by reference his arguments above to demonstrate there was no error for trial counsel to have acted deficiently, thus Cruz-Garcia fails to show deficiency and cannot demonstrate prejudice under *Strickland*.

More importantly, the CCA found that Cruz-Garcia failed to meet his burden under *Strickland*, determining that he "fail[ed] to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense," *Ex parte Cruz-Garcia*, 2017 WL 4947132 at *2 (citing *Strickland*, 466 U.S. at 689). The TCCA denied relief upon its own review and the findings of the trial court, which included findings that "the totality of the representation afforded [Cruz-Garcia] at trial was competent under prevailing professional norms," that Cruz-Garcia failed to "demonstrate that trial counsel was deficient" at either phase of trial, and that he did not show he was "harmed on the basis of any alleged deficiency in trial counsel's representation" SHCR-02 at 1045 no. 48. Cruz-Garcia fails to overcome the presumption of correctness afforded those findings, as well as fails to overcome the AEDPA relitigation bar against these claims. 28 U.S.C. § 2254(d), (e); *Ex parte Cruz-Garcia*, 2017 WL 4947132. Accordingly, the Court should deny Cruz-Garcia's IATC Claims 4(F), (I), and (K) raised before the TCCA.

> **3.    Cruz-Garcia does not meet his burden under AEDPA to show the CCA's denial of Claim 4(C)(7) pertaining to the punishment phase entitles him to habeas relief; this claim in relation to the guilt/innocence phase is procedurally defaulted.**

131

Cruz-Garcia asserts trial counsel was ineffective for "fail[ing] to perform even the most basic defense tasks: to review the State's file." Pet'r Br. at 102–04. As discussed below, this claim is without merit and should be denied where it applies to the punishment phase of trial, and this IATC claim pertaining to the guilt-innocence phase of trial should not be found substantial for the same reasons.

> **a.** **The full context of counsel's record statement on previewing the State's files before trial shows counsel was not ineffective.**

Cruz-Garcia asserts that trial counsel refused to review the State's file. Pet'r Br. at 102–04. Cruz-Garcia raised this claim in his state habeas application pertaining to the punishment phase of trial. SHCR-02 at 57 ("Trial Counsel Performed Ineffectively in Failing to Review the District Attorney's File and Identify Evidence that Cruz-Garcia Would Not Be a Future Danger."). The CCA denied on the findings of the trial court and upon its own review. *Ex parte Cruz-Garcia*, 2017 WL 4947132. The CCA thus adopted the trial court's finding that, "according to the credible affidavits of trial counsel Cornelius and trial counsel Madrid, that trial counsel reviewed the State's files 'many times' and that when Cornelius needed additional time to read over a particular report from FBI Special Agent Ebersole, it was because Cornelius could not find the documents in his files at that moment, but did later locate the documents at issue." SHCR-02 at 1054 no. 79.

In Cruz-Garcia's state habeas proceeding, Counsel Madrid affirmed that he reviewed the State's file in preparation for trial. SHCR-02 at 853. And in Counsel Cornelius's affidavit at state habeas, Cornelius attested in response to whether he saw the State's file, "Yes, many times, the files where [sic] brought to court by a number of prosecutors who worked, at various times, on the case. I am also certain that the State provided me with every piece of discovery we were entitled to." SHCR-02 at 945 no. 4. The trial court found both affidavits to be credible, as well as finding

132

that when "Cornelius needed additional time to read over a particular report from FBI Special Agent Ebersole, it was because Cornelius could not find the documents in his files at that moment, but did locate the documents at issue." SHCR-02 at 1055 (no. 79). Further, the adopted findings of the trial court include finding "unsupported [Cruz-Garcia]'s habeas assertion that trial counsel failed to review the State's file in preparation for [his] trial," that the "email exchanges between prosecutor Tise and former trial counsel Capitaine have no bearing on the issue of whether trial counsel Cornelius and trial counsel Madrid reviewed the State's files before trial," and "[d]uring punishment, there was an exchange between prosecutor Tise and trial counsel Cornelius after Tise questioned FBI Special Agent Ebersole in which Cornelius requested more time to look at a report ([20 RR 183–87])." SHCR-02 at 1054 (nos. 76–78). Cruz-Garcia fails to rebut the state court's fact findings, including the credibility of trial counsel, and provides nothing of substance to overcome AEDPA's relitigation bar. Cruz-Garcia's claim should therefore be denied.

> **b.  To the extent Cruz-Garcia's complaints of counsel's alleged failure to review the State's files applies beyond the punishment phase, this claim is procedurally defaulted, and his supporting evidence is barred from review.**

To the extent that Cruz-Garcia asserts IATC on the above ground (Claim 4(C)(7)) affected the guilt/innocence portion of trial, such a claim is procedurally defaulted because Cruz-Garcia only gave the state court the chance to review this claim in relation to the punishment phase of trial. There, Cruz-Garcia only claimed in his state habeas proceeding that counsel failed to review the State's file and was prejudiced in the punishment phase of trial. SHCR-02 at 56–58 ("Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence that Cruz-Garcia Would Not Be a Future Danger"), 67 ("Counsel's failure to inspect the file held open by the District Attorney . . . prejudiced the presentation at Cruz-Garcia's penalty phase of

trial."), 76 (same). Cruz-Garcia then raised it in his second subsequent state habeas application that was dismissed as an abuse of the writ. SHCR-05 at 76; *see generally, id.* at 56–67, 76–79; SHCR-05 at 57–67. Therefore, as discussed above in Part VII(A), *supra*, this claim is procedurally defaulted, and Cruz-Garcia has not overcome this procedural default, *see* Part XXV(C).

### c.     In the alternative, this claim is without merit.

Alternatively, his IATC claim is without merit. Trial counsel Cornelius attested on state habeas:

> Let me address what I feel is the reason this question [of whether he reviewed the State's file] is being asked. During the trial I couldn't find in my files two documents that I needed to use for cross examination and each time I asked the State for another copy. Both times the State thought I was trying to imply that they had not followed the rules of discovery and commented that I should have come to their office with my file and compared every document to make certain that I had every piece of paper I was entitled to. I thought that was a ridiculous statement and said so on the record. The State has the duty to give the defense what the defense is entitled to. The defense does not have to go to their office and figure it out. In both instances, however, I later found the documents in my files and told them so. I also expressed, sincerely, that I was not implying that they had not followed the rules of discovery I just didn't wish to delay the trial while I looked through literally a thousand pages of discovery to find the one or two pages I was having difficulty finding.

SHCR-02 at 945. Also, while the reporter's record reflects that the dialogue between trial counsel and the State arose concerning a fifteen-page FBI report that counsel had not seen, 20 RR 183–85, 187, counsel initially stated that he could not cross-examine the State's witness because he "got new information about all of this just now." 20 RR 183. And, as Cruz-Garcia points out, Mr. Cornelius attested, "Yes, many times [counsel saw the State's file], the files were brought to court by a number of prosecutors who worked, at various times, on the case. I am also certain that the State provided me with every piece of discovery we were entitled to." SHCR-02 at 945.

All of this points to counsel having previously viewed the State's file, which may or may not have contained the above documents. Accordingly, Cruz-Garcia's complaint to the contrary, as pertains to the guilt-innocence phase of trial, is meritless and therefore not substantial under *Martinez*.

> ### 4. Cruz-Garcia's IATC claim on counsel's investigation, preparation and performance during the punishment phase of trial is without merit (Claim 4(G)).

Cruz-Garcia asserts three main claims of IATC at the punishment phase of trial. Pet'r Br. at 131–67. In Claim 4(G)(i), Cruz-Garcia complains that trial counsel presented a weak mitigation case, failed to retain a mitigation specialist, failed to consult with any experts except for one psychologist, and failed to investigate in Puerto Rico. Pet'r Br. at 131–38. In Claim 4(G)(ii), he alleges he was prejudiced by counsels' actions when they failed to conduct an adequate mitigation investigation that would have revealed Cruz-Garcia's life history, failed to retain a trauma expert and expert on Dominican culture and history, and failed to discover and present evidence of Cruz-Garcia's assistance to federal law enforcement agencies. Pet'r Br. at 138–54. Finally, in Claim 4(G)(iii), Cruz-Garcia argues counsel failed to investigate and rebut the State's case on future dangerousness regarding Cruz-Garcia's extraneous offenses and exemplary prison record. Pet'r Br. at 154–67. But Cruz-Garcia fails to overcome the AEDPA relitigation bar against his claims that trial counsels' actions and decisions relating to the punishment phase of trial constitute ineffective assistance.

> ### a. Investigate and present mitigation evidence (Claims 4(G)(i), (ii)).

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized

135

sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley*, 339 F.3d at 316 (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

Thus, a particular decision not to investigate further "must be directly assessed for reasonableness in all the circumstances," and a heavy measure of deference is given to counsel's strategic decisions. *Id.* at 691. It is improper to judge in hindsight "[c]ounsel's decision to pursue one course rather than another," and the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance. *Gray v. Lucas,* 677 F.2d 1086, 1094 (5th Cir. 1982). Indeed, a "conscious and informed decision on trial tactics and strategy is not a permissible basis for a claim of ineffective assistance of counsel unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial." *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

In terms of a mitigation investigation, an inmate "'must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Druery*, 647 F.3d at 541 (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)). In assessing reasonableness in this context, the courts should "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,'" which must include a "context-dependent consideration of the challenged conduct as seen 'from counsel's

136

perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 688–89). The question of the effectiveness of pretrial investigation is one of degree; it is not subject to precise measurement. *Strickland*, 466 U.S. at 680; *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th 2000). Indeed, *"Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

First, as discussed in Part XXV(C)(1), Cruz-Garcia cites ABA Guidelines and Texas Guidelines in support of his complaint regarding hiring a mitigation specialist—sources which, again, "are 'only guides' to what reasonableness means, not its definition." *Van Hook,* 558 U.S. at 8–9; *see Wiggins,* 539 U.S. at 543 (Scalia, J., dissent). Therefore, any alleged failure to follow the Texas and ABA Guidelines does not demonstrate deficient performance by counsel.

Further, while Cruz-Garcia argues that trial counsel could not have "worn two hats" as both counsel and a mitigation specialist, Pet'r Br. at 135, he ignores trial counsel's wealth of experience that "predates mitigation experts" in Harris County, and he slights the combined efforts of the team that trial counsel was able to put together on the budget he obtained. *See* SHCR-02 at 947. Additionally, Cruz-Garcia asserts that there was a mitigation specialist in one case nine months before Cruz-Garcia's trial that would have worked at the Harris County fee. Pet'r Br. at 135. Even if this Court were able to consider this evidence from another case, outside the state court record, the assertion of one instance which purportedly occurred nearly one year before his trial does not refute trial counsel Cornelius's attestation that the case came to him when indigent defense spending was cut across the board, and that several Harris County experts "refused to take case for the money the County was willing to

137

pay," and even when counsel looked outside of Harris County, no mitigation experts "would take the case because they feared, and said they heard, the County Auditor would not pay it even if we had an [sic] Court Order directing them and, in essence, they said life is too short to have to file a law suit to require Harris County to honor their debts." SHCR-02 at 947. In reviewing Cruz-Garcia's complaint of no mitigation specialist, the trial court found that trial counsel "could not find a 'mitigation expert' in Harris County, Dallas, or Fort Worth that would look at [Cruz-Garcia]'s case for the amount of money that the Harris County Commissioner's Court was willing to pay." SHCR-02 at 1055 (no. 85). The trial court further found that, in place of a mitigation expert, trial counsel hired "a psychologist and a private investigator who were devoted to developing mitigation evidence with the guidance of trial counsel." SHCR-02 at 1055 (no. 84). Cruz-Garcia has not rebutted the presumption of correctness afforded these findings that were adopted by the CCA in its denial of habeas relief.

Moreover, the crux of Cruz-Garcia's allegations that counsel conducted a meager mitigation investigation is that trial counsel did not present additional information about Cruz-Garcia's life that exists. But this level of scrutiny has been discouraged by the Fifth Circuit. *See Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) ("We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." (quoting *Dowthitt*, 230 F.3d at 743). Namely, Cruz-Garcia argues trial counsel's mitigation investigation was lacking because they failed to develop and present Cruz-Garcia's life history, model behavior as an inmate, and assistance he provided to federal law enforcement agencies. Pet'r Br. at 138–51, 53–54. But Cruz-Garcia ignores the findings of fact that the CCA adopted when it denied Cruz-Garcia's first

state habeas application on the merits—namely "based on the credible habeas affidavits of trial counsel," the state court found that Cruz-Garcia "refused to discuss the facts of the primary case with counsel, merely making statements to the effect that God would deliver him and would turn the witnesses tongues into snakes." SHCR-02 at 1051 (no. 67). The court also found, based on defense investigator Gradoni's affidavit, that "the defense gave [Cruz-Garcia] every opportunity to inform them of anyone who could say something good about [Cruz-Garcia]; that [Cruz-Garcia] was not very forthcoming about much of anything regarding the primary case, saying that he was not concerned about being convicted, God or Jesus would deliver him and the witnesses would not testify against him[.]" SHCR-02 at 1052 (nos. 68, 69). With that limited cooperation from their client, counsel cannot be ineffective for presenting Cruz-Garcia's mitigation evidence of his life history through direct- and cross-examination of the witnesses who were able to testify at trial: Cruz-Garcia's wife, younger brother, seventeen-year-old son, fellow drug dealer Santana, and Angelita Rodriguez, Cruz-Garcia's ex-wife. *See* SHCR-02 at 1055 (no. 87–88).

Nor can counsels' efforts be discounted—efforts found by the state court to have included hiring investigator Gradoni "to interview witnesses, talk to experts, and interview [Cruz-Garcia]'s family members in the Dominican Republic and Puerto Rico;" "obtain[ing] funds from the court to send Gradoni to the Dominican Republic in order to follow up with witnesses;" and "mak[ng] contact with witnesses in Puertor Rico and the Dominican Republic" without feeling "they needed to personally travel to those locations" because of investigator Gradoni's competence and professionalism. SHCR-02 at 1054–56 (nos. 81, 82, 84, 87, 89). The state court also found investigator "Gradoni and his associate Edna Velez, a native of Puerto Rico who assisted Gradoni in the investigation, travelled to the Dominican Republic, where they located and interviewed witnesses, took photographs, and obtained useful and important

139

information for trial counsel Cornelius and trial counsel Madrid to use for mitigation purposes." SHCR-02 at 1055 (no. 83). Cruz-Garcia does not contest these findings—only the depth of degree of the investigation, which they fail to prove would have altered the outcome of the case. *Moawad*, 143 F.3d at 948.

Cruz-Garcia also asserts that counsel could have, with the assistance of a retained trauma expert and expert with knowledge about Dominican culture and history, presented the underlying theory of his "suffer[ing] chronic, repeated, trauma with its long-lasting consequences and effects." Pet'r Br. at 151–52. But federal law is clear that whether or not to retain a defense expert is the very sort of trial decision that is insulated from IATC claims and disfavored on federal habeas review because it is a matter of strategy. *See Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."). Counsel cannot be considered ineffective for not hiring every kind of expert to contest the State's case or develop a theory that might have supported Cruz-Garcia's defense. *See Smith*, 977 F.2d at 960 ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."). Nor does *Strickland* require counsel to "canvass[] the field to find a more favorable defense expert." *Dowthitt*, 230 F.3d. at 748. Pertinent here, the trial court's findings that were adopted by the CCA in state habeas included "trial counsel did not believe that they needed an anthropologist or sociologist to present evidence of [Cruz-Garcia's] life history," but rather chose to present that evidence through lay witnesses who knew Cruz-Garcia. SHCR-02 at 1055–56 (no. 86). Indeed, the court found "unpersuasive the habeas affidavit of Dr. Gina Perez, anthropology professor, in which she explains [Cruz-Garcia]'s ultimate involvement in the drug trade in the context of the broader experience of men and

women emigrating from the Dominican Republic to Puerto Rico from the 1970's to the 1990's," and—overall—that Cruz-Garcia "fails to demonstrate deficient performance, much less harm, based on trial counsels' strategy decisions regarding the presentation of punishment evidence." SHCR-02 at 1055–56 (nos. 86–90). Cruz-Garcia does not rebut the presumption of correctness afforded these claims under § 2254(e).

Cruz-Garcia similarly asserts in a conclusory fashion that trial counsel was "ineffective for failing to do the legwork necessary to introduce" evidence of Cruz-Garcia's religious studies while in prison "in a form that would not have drawn a sustained objection from the State."[24] Pet'r Br. at 135–36. But he provides no such answer, thus his claim should also be dismissed for mere speculation that such evidence would have been admissible. *See Ross*, 694 F.2d at 1011–12; *Schlang*, 691 F.2d at 799. Nor has he demonstrated how he would have introduced information about "exemplary" prison behavior or statements from several inmates whose lives Cruz-Garcia helped improve, such as Angel Meza—a fellow jail inmate who testified

---

[24]     Outside the presence of the jury, trial counsel urged the admission of Bible study certificates that Cruz-Garcia had earned while incarcerated in Puerto Rico, which they intended to introduce through Cruz-Garcia's brother. 26 RR 56–58. As anticipated by counsel, the State objected on hearsay grounds, Tex. R. Evid. 802, because Cruz-Garcia's brother did not attend these courses with him; the trial court sustained the objection after finding the certificates to be relevant. *Id.* at 58. And, while the trial court and trial counsel both recognized the certificates and "other items" constituting the exhibits could be introduced through the course instructors in Puerto Rico—an unavailable option—or through Cruz-Garcia, trial counsel declined to call him to the stand. *Id.* The trial court also indicated Cruz-Garcia could not fall under the hearsay exception to records of a regularly conducted activity, or attachment upon a business records affidavit, Tex. R. Evid. 803(6). *Id.* On direct appeal, the TCCA rejected Cruz-Garcia's complaint about the trial court's evidentiary ruling on hearsay, finding that Cruz-Garcia did not meet the hearsay exceptions that he cited, and the trial court did not err. *Cruz-Garcia v. State*, 2015 WL 6528727, at *23–25.

at trial, 26 RR 83–86—nor how Cruz-Garcia would have introduced his purported assistance to federal agencies as an informant.[25] Pet'r. Br. at 150–51.

And, due to either the speculative or cumulative nature of the evidence that Cruz-Garcia now alleges that trial counsel should have presented, along with the overwhelming evidence presented by the State during punishment, Cruz-Garcia simply cannot show that the jury would have answered the special issues differently but for counsels' alleged errors. Here, the aggravating evidence in this case was substantial—beyond the facts of the crime, the State presented testimony that Cruz-Garcia participated in the kidnapping of a restaurant owner's brother and 16-year-old stepson for ransom, beating and threatening both during their capture; kidnapping and killing of a drug associate who Cruz-Garcia believed was interested in his girlfriend; attempting to escape prison while incarcerated for the kidnapping; having assaulted Mr. Martinez Santana when he believed Mr. Martinez Santana was interfering with his drug business; and beating a drug-competitor and raping his competitor's girlfriend. 24 RR 14–42, 82–97, 102–08, 120–28; 25 RR 22–23, 49, 50, 61–64, 65–71, 72–85, 99, 121. In light of the State's overwhelming case in aggravation, Cruz-Garcia cannot demonstrate prejudice. *Sonnier v. Quarterman*, 476 F.3d 349, 356–57 (5th Cir. 2007) ("To find prejudice, there must be a reasonable

---

[25]     Cruz-Garcia attempted to introduce testimony from Puerto Rican police officer Agent Juan DeJesus Rodriguez that Cruz-Garcia worked with several federal agencies as an informant. 24 RR 44 (identifying himself), 69. While outside the presence of the jury, Agent DeJesus testified he was able to orally confirm Cruz-Garcia's cooperation, but could not obtain confirmation in writing. 24 RR 71–72. On direct appeal, after reviewing Cruz-Garcia's allegation of trial court error in its evidentiary ruling, the TCCA affirmed that Agent DeJesus's testimony of Cruz-Garcia's work as a federal informant was hearsay and did not meet the hearsay exception asserted on appeal. *Cruz Garcia*, 2015 WL 6528727, at *25.

probability that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").

Cruz-Garcia cannot show prejudice from trial counsels' failure to present even more witnesses who would have testified to the same effect, and cannot show prejudice in light of the aggravating evidence discussed above. *Anderson*, 18 F.3d at 1220–21; *Sonnier*, 476 F.3d at 356–57. The Court should deny relief. Because he fails to show the CCA unreasonably, or contrary to federal law, determined trial counsel was neither deficient no prejudiced Cruz-Garcia through their actions related to mitigation, Cruz-Garcia's Claims 4(G)(i) and (ii) should be denied.

### b. Investigate and present future dangerousness (Claim 4(G)(iii)).

In his remaining IATC claim, Cruz-Garcia asserts trial counsel failed to investigate or present a rebuttal case to the State's case on future dangerousness. Pet'r Br. at 154–67. More specifically, he alleges counsel did not investigate his extraneous offenses of murdering Saul Flores, kidnapping of Andres Buten and Buten's sixteen-year-old nephew in Puerto Rico, and the beating of Bettico (or "Patiko"), a fellow drug associate, and raping Bettico's wife. Pet'r Br. at 154–60. Cruz-Garcia also asserts counsel failed to investigate his prison record in Puerto Rico, which would have revealed he was well-behaved and inspirational in his religious conversion and work with fellow prisoners and prison staff. Pet'r Br. at 160–67.

In his state habeas application that the CCA denied on the merits, Cruz-Garcia discounted the violent acts he committed as an indicator of future dangerousness because he had committed them a "decade or more before his trial and while he was not in prison." SHCR-02 at 76. In that application, Cruz-Garcia primarily focused on counsel's failure to have reviewed the State's files that would have provided counsel with records of Cruz-Garcia's exemplary prison behavior. SHCR-02 at 70–79. In his

first state habeas proceeding, Cruz-Garcia submitted prison records from the Commonwealth of Puerto Rico Rio Pedras Correctional Institution Correctional Administration of Cruz-Garcia's good conduct, SHCR-02 at 515–36, and affidavits from Puerto Rican prison chaplains Irma Iglesias Cruz, Luis Gonzalez Martinez, Ivan Negron Vera, and Jimmy Osorio, as well as prison psychologist Alejandro Lebron, SHCR-02 at 362–402. Still, the CCA denied his claim.

Again, to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 87. In *Adams*, 448 U.S. 38, the Court "still expressed the view that the statute allowed members of the jury to consider all relevant evidence, and to use that evidence in answering the special questions[.]" *Johnson*, 509 U.S. at 383. Here, the CCA could have determined that the jury, when weighing not only this evidence of Cruz-Garcia's good behavior in prison against his history of violence, found the latter to be a more compelling indicator of future dangerousness—particularly given Cornelius's testimony through affidavit about investigating Cruz-Garcia's future dangerousness:

> . . . Even though no juror has ever been seated by me in a death penalty case where that juror has admitted that if they, in fact, convicted someone of capital murder they would automatically find that there is at least a "probability" that person will be a continuing threat, I know better. I certainly see why that question is part of [the] death penalty scheme and it is very helpful in eliminating intellectually honest jurors. But, *and this is a huge "but"*, a great majority of potential jurors absolutely can not get past their belief that they are fair minded people who want to do the right thing. *But*, in the serenity of the court room, and before they have seen the victims [sic] family cry and the crime scene photos and the autopsy photos and the bloody clothing and the murder weapon, and on and on, they truly believe they are not hard wired to automatically find that in a case where a defendant who

144

> commits a grisly capital murder, it is, at least, automatically probable that he or she will be a continuing threat . . . I have not won a case on the future dangerousness question, or seen it done. I have had a few cases where the capital murder was the defendant's only crime and I felt it was a compelling argument to challenge the State on future dangerousness but as I said, to no avail.

SHCR-02 at 945–46 (no. 5) (emphasis in original). Trial counsels' strategic decision to use their limited resources to pursue a different path to prevent their client from receiving the death penalty cannot be doubted, nor does Cruz-Garcia demonstrate such strategy was unreasonable and outside the range of reasonable professional assistance.

Cruz-Garcia simply does not demonstrate the CCA's determination was contrary to, or involved an unreasonable application of, clearly established Federal law, or an unreasonable determination in light of the facts presented to it. For these reasons, this claim of IATC should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Cruz-Garcia's petition and deny a certificate of appealability on all claims.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Cara Hanna

145

*Lead Counsel

CARA HANNA*
Assistant Attorney General
State Bar No. 24055622
Southern I.D. No. 915870

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (FAX)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that, on November 1, 2022, I electronically filed the foregoing

document with the clerk of the court for the U.S. District Court, Southern District of

Texas, using the electronic case filing system. The electronic case filing system sent

a "Notice of Electronic Filing" to counsel, who has consented in writing to accept this

Notice as service of this document by electronic means:

Jeremy Don Schepers
Federal Public Defender
525 S Griffin St
Ste 629
Dallas, TX 75202
Email: jeremy_schepers@fd.org

   _s/ Cara Hanna_____
CARA HANNA
Assistant Attorney General

146