IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **OBEL CRUZ-GARCIA,** <br> Petitioner, <br><br> *v.* <br><br> **BOBBY LUMPKIN, Director,** <br> Texas Department of Criminal Justice, <br> Correctional Institutions Division, <br> Respondent. | Case No. 4:17-CV-03621 <br><br><br><br> District Judge Lee H. Rosenthal <br><br> **CAPITAL CASE** |

REPLY IN SUPPORT OF SECOND AMENDED PETITION

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit

David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
david_currie@fd.org

TABLE OF CONTENTS

I. LEGAL ARGUMENTS APPLICABLE TO MULTIPLE CLAIMS .......................................... 1

    A. Standard of Review ......................................................................................... 1

    B. 28 U.S.C. § 2254(e)(2) does not preclude this Court from considering evidence in the state court record and from conducting fact-development. ...................... 5

    C. The relitigation bar should not apply because the state habeas process did not comport with state law or due process. ............................................................ 10

    D. Cumulative Prejudice ..................................................................................... 11

II. CLAIMS FOR RELIEF ............................................................................................. 12

Claim One:    Mr. Cruz-Garcia is entitled to relief on his juror misconduct claim .............. 12

    A. This Court can review this claim *de novo*. ...................................................... 12

    B. The Bible was a harmful external influence ................................................... 17

    C. Mr. Cruz-Garcia was harmed by the jurors' discussion of the evidence and sentence outside of deliberations. .................................................................. 19

Claim Two:    Mr. Cruz-Garcia is entitled to relief on his claim that his right to present a complete defense and to confront-examine witnesses was violated. .............. 20

    A. Confrontation Clause ...................................................................................... 20

        1. This Court can review Mr. Cruz-Garcia's claim to avoid a miscarriage of justice ..................................................................................................... 20

        2. Violation of the right to confront witnesses. ............................................. 23

    B. Right to present a complete defense. ............................................................... 24

        1. Violation of the right to present a complete defense. ................................. 24

        2. This Court can review Mr. Cruz-Garcia's right to present a complete defense claim *de novo*. .......................................................................................... 25

Claim Three:    Mr. Cruz-Garcia is entitled to relief on the merits of his inaccurate and unreliable DNA evidence claim ................................................................... 27

Claim Four:    Mr. Cruz-Garcia is entitled to relief on the merits of his ineffective assistance of counsel claim. ........................................................................................... 30

    A. The Director improperly attempts to claim-split ............................................. 30

    B. The Director contends that the bulk of the IATC claim is subject to §2254(d) ........................................................................................................ 31

        1. The sections pertaining to guilt phase ineffectiveness that the Director contends are not procedurally defaulted meet §§ 2254(d)(1) or (d)(2) or both. ........................................................................................................ 32

            i.  Trial counsel failed to investigate the State's DNA evidence. ............... 33

i

ii. Trial counsel failed to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab. ............................................................................ 36

iii. Trial counsel failed to investigate critical witnesses and law enforcement's theory of the offense. .................................... 37

iv. Trial counsel failed to investigate issues impacting jury deliberations ... 41

v. Trial counsel failed to recognize the significance of Mr. Cruz-Garcia's foreign nationality ................................................................ 43

2. Ineffective assistance of trial counsel at the punishment phase ................. 45

i. Unreasonable application of clearly established federal law on deficient performance ...................................................................... 45

a. Mitigation ................................................................... 45

b. Future dangerousness .................................................. 49

ii. Unreasonable application of clearly established federal law to prejudice ............................................................................ 53

C. Subparts 4(D), 4(E), and 4(C)(7) are not barred by the statute of limitations .... 55

D. The Director's arguments concerning the subparts he contends are procedurally defaulted should not persuade the court ................................................. 57

**Claim Five:**      **Mr. Cruz-Garcia is entitled to relief on the merits of his false testimony claim.** ...................................................................................... **60**

A. This Court can review the merits of this claim. .................................. 60

B. False testimony impacted all critical aspects of the State's case on guilt and punishment. ......................................................................... 62

1. Carmelo "Rudy" Santana ...................................................... 62

2. DNA evidence ..................................................................... 65

3. Angelita Rodriguez .............................................................. 67

4. Diana Garcia and Arturo Rodriguez & law enforcement ................ 68

5. Murder of Saul Flores & Puerto Rico kidnapping ........................ 69

**Claim Six:**       **Mr. Cruz-Garcia is entitled to relief on the merits of his *Brady* claim** ........... **70**

A. This Court can review the merits of this claim. .................................. 70

B. The State suppressed material evidence. ........................................... 71

1. State suppression of impeachment evidence against Mr. Santana ............ 71

2. State suppression of mitigation evidence .................................... 73

3. State suppression of other exculpatory and impeachment evidence .......... 73

4. Materiality .......................................................................... 74

Claim Seven:      Mr. Cruz-Garcia is entitled to relief on his claim that the trial court coercively instructed Juror Bowman.......................................................................... 75

    A. Mr. Cruz-Garcia can show cause and prejudice for his procedural default. ..............................................................................................75

    B. Mr. Cruz-Garcia's claim that the trial court coercively instructed a juror has merit ...................................................................................... 76

Claim Eight:      Mr. Cruz-Garcia is entitled to relief on his ineffective assistance of direct appeal counsel claim. .......................................................................... 78

    A. It was legally unreasonable under § 2254(d)(1) for the state habeas court to conclude that direct appeal counsel was not ineffective for failing to raise this claim ...................................................................................... 78

    B. It was factually unreasonable under § 2254(d)(2) for the state habeas court to conclude that direct-appeal counsel was not ineffective for failing to raise this claim ...................................................................................... 80

Claim Nine:       Mr. Cruz-Garcia is entitled to relief on the merits of his claim that he was excluded from critical stages of the trial....................................................... 81

Claim Ten:        Mr. Cruz-Garcia is entitled to relief on the merits of his claim that his rights under the Confrontation Clause were violated. ............................................. 83

Claim Eleven:     Mr. Cruz-Garcia is entitled to relief on the merits of his claim that incorrect translation of testimony violated his constitutional rights ............................ 84

Claim Twelve:     Mr. Cruz-Garcia is entitled to relief on his claim that the trial court judge had a conflict of interest and was biased against him. ............................................ 85

Claim Thirteen:   Mr. Cruz-Garcia is entitled to relief on the merits of his claim that the trial court prevented him from presenting mitigating evidence. .......................... 87

Claim Fourteen:   Mr. Cruz-Garcia is entitled to relief on his claim that emotional outbursts violated his right to a fair trial. ..................................................................... 88

Claim Fifteen:    Mr. Cruz-Garcia is entitled to relief on the merits of his claim that the prosecution's inflammatory comments violated his due process rights and right to a fair trial. ...................................................................................... 89

Claims Sixteen through Twenty-One ................................................................................... 90

CERTIFICATE OF SERVICE ........................................................................... 92

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anderson v. Johnson,*
 338 F.3d 382 (5th Cir. 2003) ........................................................................ 35, 38

*Andrus v. Texas,*
 140 S. Ct. 1875 (2020) ........................................................................................ 50

*Apelt v. Ryan,*
 878 F.3d 800 (9th Cir. 2017) .............................................................................. 9

*Banks v. Dretke,*
 540 U.S. 668 (2004) ........................................................................................... 71

*Banks v. Dretke,*
 540 U.S. 696 (2004) ........................................................................................... 71

*Brady v. Maryland,*
 373 U.S. 83 (1963) ...................................................................................... *passim*

*Brumfield v. Cain,*
 576 U.S. 305 (2015) ..................................................................................... 32, 45

*Canales v. Davis,*
 966 F.3d 409 (5th Cir. 2020) .............................................................................. 5

*Canales v. Stephens,*
 765 F.3d 551 (5th Cir. 2014) ............................................................................ 61

*Carey v. Musladin,*
 549 U.S. 70 (2006) ............................................................................................. 89

*Chambers v. Mississippi,*
 410 U.S. 284 (1973) ..................................................................................... 24, 87

*Coleman v. Bradshaw,*
 974 F.3d 710 (6th Cir. 2020) .............................................................................. 3

*Cone v. Bell,*
 556 U.S. 449 (2009) ........................................................................................... 73

iv

*Crane v. Kentucky,*
    467 U.S. 683 (1986) ............................................................................... 87

*Crane v. Kentucky,*
    476 U.S. 683 (1986) ............................................................. 25, 27, 87

*Cueva v. Davis,*
    750 F. Appx. 330 (5th Cir. 2018) ........................................................... 3

*Danforth v. Minnesota,*
    552 U.S. 264 (2008) ............................................................................... 5

*Day v. McDonough,*
    547 U.S. 198 (2006) ............................................................................... 5

*Dennis v. Sec., Penn. Dep't Corrs.,*
    834 F.3d 263 (3d Cir. 2016) ............................................................... 38

*Derden v. McNeel,*
    978 F.2d 1453 (5th Cir. 1992) ........................................................... 12

*Drope v. Missouri,*
    420 U.S. 162 (1975) ............................................................................. 85

*Elmore v. Ozmint,*
    661 F.3d 783 (4th Cir. 2011) ............................................................. 35

*F.D.I.C. v. Conner,*
    20 F.3d 1376 (5th Cir. 1994) ............................................................. 57

*Gardner v. Davis,*
    779 F. Appx. 187 (5th Cir. 2019) ......................................................... 3

*Giglio v. United States,*
    405 150, 154 ........................................................................... 64, 69, 73

*Gilkers v. Vannoy,*
    904 F.3d 336 (5th Cir. 2018) ............................................................... 3

*Gochicoa v. Johnson,*
    118 F.3d 440 (5th Cir. 1997) ....................................................... 24, 25

*Grant v. Lockett,*
    309 F.3d 224 (3d Cir. 2013) ............................................................... 38

*Gray v. Epps,*
    616 F.3d 436 (5th Cir. 2010) ............................................................. 32

*Gray v. Netherland,*
    518 U.S. 152 (1996) ................................................................................ 5

*Hafdahl v. Johnson,*
    251 F.3d 528 (5th Cir. 2001) ................................................................ 29

*Harrington v. Richter,*
    562 U.S. 86 (2011) ................................................................................ 2

*Hernandez v. Johnson,*
    213 F.3d 243 (5th Cir. 2000) .................................................... 27, 28, 29

*Hinton v. Alabama,*
    571 U.S. 263 (2014) .............................................................................. 37

*Holmes v. South Carolina,*
    547 U.S. 319 (2006) .............................................................................. 27

*House v. Bell,*
    547 U.S. 518 (2006) .............................................................................. 21

*Jenkins v. United States,*
    380 U.S. 445 (1965) .............................................................................. 79

*Johnson v. Mississippi,*
    486 U.S. 578 (1988) .............................................................................. 27

*Johnson v. Williams,*
    568 U.S. 289 (2013) .................................................... 13, 26, 27, 28

*Jones v. Davis,*
    890 F.3d 559 (5th Cir. 2018) .................................................................. 8

*Kelly v. Cockrell,*
    72 F. Appx. 67 (5th Cir. 2003) ............................................................ 29

*Kinnamon v. Scott,*
    40 F.3d 731 (5th Cir. 1994) .................................................................. 89

*Kipp v. Davis,*
    971 F.3d 939 (9th Cir. 2020) .................................................................. 4

*Knox v. Johnson,*
    224 F.3d 470 (5th Cir. 2000) .......................................................... 28, 29

*Langley v. Prince,*
    926 F.3d 145 (5th Cir. 2019) .................................................................. 3

*Leonard v. Michigan,*
   256 F. Supp. 2d 723 (W.D. Mich. 2003) ............................................................ 36

*Liteky v. United States,*
   510 U.S. 540 (1994) ............................................................................................ 86

*Lockett v. Ohio,*
   438 U.S. 586 (1978) ............................................................................................ 87

*Lowenfield v. Phelps,*
   484 U.S. 231, 237 (1988) ............................................................................ 76, 79

*Lucio v. Lumpkin,*
   987 F. 3rd 451 (5th Cir.2021) ...................................................................... 25, 26

*Martinez v. Hooks,*
   2021 WL 5100956 (W.D.N.C. 2021) .................................................................. 55

*Martinez v. Ryan,*
   566 U.S. 1 (2012) ..................................................................................... *passim*

*Mayle v. Felix,*
   545 U.S. 664 (2005) ...................................................................................... 55, 56

*McGregor v. La. State Univ. Bd. Of Sup'rs,*
   3 F.3d 850 (5th Cir. 1993) .................................................................................. 57

*McNair v. Campbell,*
   416 F. 3rd 1291 (11th Cir.2005) ......................................................................... 17

*Napue v. People of State of Ill.,*
   360 U.S. 264 (1959) ...................................................................................... 62, 68

*Neal v. Puckett,*
   286 F.3d 230 (5th Cir. 2002) ............................................................................... 1

*Oliver v. Quarterman,*
   541 F3d 329 (5th Cir. 2008) ....................................................................... *passim*

*Parker v. Gladden,*
   385 U.S. 363 (1966) ............................................................................................ 14

*Porter v. Coyne-Fague,*
   35 F.4th 68 (1st Cir. 2022) ............................................................................. 4, 54

*Porter v. McCollum,*
   558 U.S. 30 (2009) ....................................................................................... 40, 49

*Ramey v. Davis,*
    942 F.3d 241 (5th Cir. 2019) ................................................................. 59

*Ramirez v. Collier,*
    142 S. Ct. 1264 (2022) ........................................................................... 88

*Remmer v. United State,*
    347 U.S. 227 (1954) ........................................................................ 14, 15

*Rhines v. Weber,*
    544 U.S. 269 (2005) ................................................................................. 9

*Richardson v. Kornegay,*
    3 F.4th 687 (4th Cir. 2021) ..................................................................... 4

*Robinson v. Polk,*
    438 F.3d 350 (4th Cir. 2006) ............................................................ 15, 16

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ......................................................................... 51, 56

*Schlup v. Delo,*
    513 U.S. 298 (1998) ........................................................... 20, 21, 22, 23

*Scrimo v. Lee,*
    935 F.3d 103 (2d Cir. 2019) ................................................................... 4

*Sheppard v. Davis,*
    967 F.3d 458 (5th Cir. 2020) ................................................................. 3

*Sheppard v. Maxwell,*
    384 U.S. 33 (1966) ............................................................................... 89

*Shinn v. Martinez Ramirez,*
    142 S. Ct. 1718 (2022) ................................................................... *passim*

*Shoop v. Twyford,*
    142 S. Ct. 2037 (2022) ........................................................................... 6

*Smith v. Cain,*
    708 F.3d 628 (5th Cir. 2013) ................................................................. 4

*Smith v. Davis,*
    927 F.3d 313 (5th Cir. 2019) ................................................................. 3

*Smith v. Robbins,*
    528 U.S. 259 (2000) ......................................................................... 78, 80

*Sparks v. Davis,*
    756 F. Appx. 397 (5th Cir. 2018) .......................................................... 61

*Strickland v. Washington,*
    466 U.S. 668 (1984) ............................................................ *passim*

*Strickler v. Greene,*
    527 U.S. 263 (1999) ......................................................... 71, 72

*Swarthout v. Cooke,*
    562 U.S. 216 (2011) .............................................................. 10

*Teague v. Lane,*
    489 U.S. 288 (1989) ........................................................... 5, 88

*Trevino v. Davis,*
    861 F.3d 545 (5th Cir. 2017) ..................................................... 9

*Trevino v. Thaler,*
    569 U.S. 413 (2013) ............................................................. 8, 9

*Turner v. Louisiana,*
    379 U.S. 466 (1965) ............................................................... 14

*United States v. Ciampi,*
    419 F.3d 20 (1st Cir. 2005) ..................................................... 56

*United States v. Gagnon,*
    470 U.S. 522 (1985) ......................................................... 81, 82

*United States v. Gonzalez,*
    592 F.3d 675 (5th Cir. 2009) .................................................. 56

*United States v. Phillips,*
    210 F.3d 345 (2000) ............................................................. 78

*United States v. Scheffer,*
    523 U.S. 303 (1998) ......................................................... 24, 26

*United States v. Thomas,*
    724 F.3d 632 (5th Cir. 2013) .................................................. 82

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978) .................................................. 76, 77, 79, 80

*United States v. United States Gypsum Co.,*
    550 F.2d 115 (3rd Cir. 1977) .................................................. 76

*United States v. Williamson,*
   183 F.3d 458 (5th Cir. 1999) ............................................................... 79

*Uranga v. Davis,*
   893 F.3d 282 (5th Cir. 2018) ................................................................. 3

*Wiggins v. Smith,*
   539 U.S. 510 (2003) ............................................................ *passim*

*Williams v. Illinois,*
   567 U.S. 50 (2012) ....................................................... 83, 84

*Williams v. Pennsylvania,*
   579 U.S. 1 (2016) .............................................................. 86

*Williams v. Taylor,*
   562 U.S. 362 (2000) ............................................................ *passim*

*Wilson. Thomas v. Vannoy,*
   898 F.3d 561 (5th Cir. 2018) ................................................................. 3

*Wilson v. Sellers,*
   138 S. Ct. 1188 (2018) .................................................... 1, 2, 3, 4

*Winfield v. Dorethy,*
   956 F.3d 442 (7th Cir. 2020) ................................................................. 3

**State Cases**

*Coble v. State,*
   330 S.W.3d 253 (Tex. Crim. App. 2010)................................................. 89

*Cruz-Garcia v. State,*
   2015 WL 6528727 (Tex. Crim. App. 2015)................................... *passim*

*Ex parte Cruz-Garcia,*
   2017 WL 4947132 (Tex. Crim. App. 2017)................................... *passim*

*Gamboa v. State,*
   296 S.W.3d 574 (Tex. Crim. App. 2010)................................................. 89

**Federal Statutes**

28 U.S.C. § 455(a) ............................................................ 86

28 U.S.C. § 2244............................................................. 5, 55

28 U.S.C. § 2254 ............................................................................................. 12

28 U.S.C. § 2254(d) ................................................................................. *passim*

**State Statutes**

Tex. Code Crim. Proc. Art. 11.071 § (5)(a)(2) ............................................ 61

Tex. Code Crim. Proc. Art. 37.071 § 2(d)(1) .............................................. 50

**Constitutional Provisions**

U.S. CONST. ...................................................................................... 12, 13, 26

U.S. CONST. amend. V ............................................................................ 41, 56

U.S. CONST. amend. VI ........................................................................... *passim*

U.S. CONST. amend. VIII ................................................................... 27, 29, 88

U.S. CONST. amend. XIV ................................................................... 24, 37, 41

## I.   LEGAL ARGUMENTS APPLICABLE TO MULTIPLE CLAIMS

### A.  Standard of Review

In federal habeas corpus review, the relitigation bar of 28 U.S.C. § 2254(d) must be met, or shown not to apply,[1] before a federal court may grant relief on a claim that was adjudicated on the merits in state court. To satisfy the relitigation bar, the state court adjudication must have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

The Director asserts that "the focus of th[e] [§ 2254(d)] test is not on the state court's method of reasoning, but rather on its ultimate legal conclusion." ECF No. 85 at 27. In support, the Director cites the following passage from *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc): "It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision." Quoting *Harrington v. Richter*, 562 U.S. 86 (2011), the Director also asserts that "[t]o determine if the state court made an unreasonable application, a federal court 'must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.'" ECF No. 85 at 27 (quoting *Richter*, 562 U.S. at 87).

The Director's summary of the law is incorrect and ignores the Supreme Court's later decision in *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). In that case, the Supreme Court made clear that

---

[1] *See* below Section I C (on why § 2254(d) should not apply to Mr. Cruz-Garcia's case)

where, as here, there are reasoned state court decisions explaining the basis of the state court's rejection of the petitioner's claims on the merits, *Richter*'s "could have supported" framework does not apply. *Id.* at 1195–96. Instead, the federal habeas court "reviews *the specific reasons* given by the state court and defers to *those reasons* if they are reasonable." *Id.* at 1192 (emphasis added).

*Wilson* addressed the situation where a federal court reviews a decision from the state's highest court that does not explain its reasoning for denying relief, but where a lower state court has articulated its reasoning for the denial. In that instance, federal courts have been clearly instructed to "look through the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson*, 138 S. Ct. at 1192 (internal quotation marks omitted). A federal court must assume that the unexplained decision utilized the same reasoning as the explained decision, subject to rebuttal. *Id.*

The Supreme Court made clear that the framework outlined in *Richter* is not applicable where the "look through" presumption exists. Under *Richter*, when a reasoned state court decision does not exist, a federal court may "imagine what might have been the state court's supportive reasoning." *Wilson*, 138 S. Ct. at 1194–95. When the "look through" presumption applies, however, a federal habeas court cannot invent reasons not articulated by the state court when conducting its § 2254(d) assessment. Rather, § 2254(d) "requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims,' and to give appropriate deference to that decision." *Wilson*, 138 S. Ct. at 1191–92 (quoting *Hittson v. Chatman*, 135 S. Ct. 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)). That is, when the highest state court either issues its own reasoned opinion or adopts the reasoned

2

opinion of a lower state court, the federal court must base its § 2254(d) review on the state court's articulated reasons for denying the petitioner's claims.

The Fifth Circuit has summarized *Wilson*'s holding as follows:

> The Supreme Court recently explained in its decision in *Wilson v. Sellers* that applying the AEDPA deferential standard found in § 2254(d) "requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims,' and to give appropriate deference to that decision." When the relevant state court decision on the merits does not provide reasons, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." The federal habeas court "should then presume that the unexplained decision adopted the same reasoning."

*Gilkers v. Vannoy*, 904 F.3d 336, 344–45 (5th Cir. 2018) (quoting *Wilson*, 138 S. Ct. at 1191–92). The Fifth Circuit has questioned "[t]he continued viability" of *Neal*'s approach in light of *Wilson*. *Thomas v. Vannoy*, 898 F.3d 561, 568–69 (5th Cir. 2018). The Fifth Circuit has also made clear that, post-*Wilson*, "the state court's reasoning can matter." *Langley v. Prince*, 926 F.3d 145, 168 (5th Cir. 2019) (en banc).

Although the Fifth Circuit has not had the occasion to directly rule on "*Neal*'s continuing vitality in the wake of *Wilson*," *Sheppard v. Davis*, 967 F.3d 458, 467 (5th Cir. 2020) (en banc), it has regularly applied the *Wilson* framework, *see, e.g.*, *Gardner v. Davis*, 779 F. Appx. 187, 189 (5th Cir. 2019); *Smith v. Davis*, 927 F.3d 313, 321 (5th Cir. 2019); *Cueva v. Davis*, 750 F. Appx. 330, 333 n.2 (5th Cir. 2018); *Uranga v. Davis*, 893 F.3d 282, 287 n.33 (5th Cir. 2018). The prevailing view in other circuits is that *Wilson* requires the federal habeas court to conduct its § 2254(d) analysis based on the state court's specific reasoning and factual findings, rather than only the state court's ultimate decision. *Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("AEDPA requires this court to review the actual grounds on which the state court relied."); *Winfield v. Dorethy*, 956 F.3d 442, 454

(7th Cir. 2020) ("Having found the state court's 'specific reasons' for denying relief, the next question is whether that explanation was reasonable thereby requiring our deference."); *see also Porter v. Coyne-Fague*, 35 F.4th 68, 74–75 (1st Cir. 2022); *Richardson v. Kornegay*, 3 F.4th 687, 697–98 (4th Cir. 2021); *Kipp v. Davis*, 971 F.3d 939, 948–60 (9th Cir. 2020); *Scrimo v. Lee*, 935 F.3d 103, 111–12 (2d Cir. 2019).

Here, the CCA denied Mr. Cruz-Garcia's direct appeal claims in a reasoned opinion. *Cruz-Garcia v. State*, 2015 WL 6528727 (Tex. Crim. App. 2015). In state habeas, the trial court issued findings of fact and conclusions of law, which the CCA accepted with respect to the claims it adjudicated on the merits, although it defaulted other claims on state law grounds.[2] *Ex parte Cruz-Garcia*, 2017 WL 4947132 (Tex. Crim. App. 2017). Accordingly, for those claims to which § 2254(d) applies, this Court must "train its attention on the particular reasons—both legal and factual—why state courts rejected" Mr. Cruz-Garcia's claims in conducting its § 2254(d) analysis. *Wilson*, 138 S. Ct. at 1191–92. As discussed below, because those particular legal and factual findings were not reasonable, this Court can consider the claims *de novo* and in light of new evidence, including the evidence Mr. Cruz-Garcia develops in discovery. *Smith v. Cain*, 708 F.3d 628, 635 (5th Cir. 2013) (finding that if a federal court determines that § 2254(d) is satisfied, it may hold a hearing and consider evidence outside the state court record).

---

[2] *See, e.g,* Claim One (explaining why the trial court's fact findings on procedurally defaulted claims are inoperative).

4

### B. 28 U.S.C. § 2254(e)(2) does not preclude this Court from considering evidence in the state court record and from conducting fact-development.

At the outset of his Answer, the Director states:

Cruz-Garcia largely relies on evidence in support of his arguments that were not properly presented to the state court. Cruz-Garcia fails to show that his claims fall within § 2254(e)(2)'s stringent exceptions to allow him to develop the record before this Court and present new evidence.

ECF No. 85 at 28. The Director, however, does not identify what claims or evidence this argument pertains to. The Director also does not explain what he means by evidence or arguments "not properly presented to the state court." This argument is insufficiently briefed and the Director's arguments pertaining to 28 U.S.C. § 2254(e)(2) should therefore be deemed waived or forfeited.

Whether § 2254(e)(2) can be waived or forfeited remains an open question in the Fifth Circuit. *Canales v. Davis*, 966 F.3d 409, 412 n.1 (5th Cir. 2020). The respondent to a habeas petition can waive or forfeit affirmative procedural defenses, including the statute of limitations, procedural default, and nonretroactivity, based on a failure to raise them at the appropriate time or manner. *See Day v. McDonough*, 547 U.S. 198, 202 (2006) (noting that the State can waive a statute of limitations defense); *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996) (explaining that the State is "obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter."); *Danforth v. Minnesota*, 552 U.S. 264, 289 (2008) ("We have held that States can waive a *Teague* defense, during the course of litigation, by expressly choosing not to rely on it . . . or by failing to raise it in a timely manner."). Just like the statute of limitations, codified in § 2244(d)(1), the language of § 2254(e)(2) is not framed in jurisdictional terms and it can be waived or forfeited. This is further supported by that fact that when Congress wanted to apply heightened waiver

5

standards under AEDPA, it explicitly did so. *See* § 2254(b)(3). It did not do so in § 2254(e)(2). Thus, that Section can be waived or forfeited, as has occurred here.

To the extent this Court nevertheless considers the Director's arguments on the application of § 2254(e)(2), the Director is wrong on the applicable law and its operation. He argues that Mr. Cruz-Garcia's claims must "fall within § 2254(e)(2)'s stringent exception to allow him to develop the record before this Court and present new evidence." ECF No. 85 at 28. This argument should not persuade the Court for several reasons.

First, the Director does not allege that Mr. Cruz-Garcia is at fault for failing to develop the state court record. *See* ECF No. 85 at 28–30. Indeed, the Director's recitation of §§ 2254(e)(2)(A) and (B) omits the opening clause of § 2254(e)(2), which establishes that subsections (A) and (B) apply only where "the applicant has failed to develop the factual basis of a claim in State court proceedings." Indeed, as the Director's quote from *Shoop v. Twyford* explains, "when a federal habeas court . . . admits or reviews new evidence for any purpose, it may not consider the evidence on the merits of a *negligent prisoner's* defaulted claim unless the exceptions in § 22254(e)(2) are satisfied." ECF No. 85 at 29 (quoting 142 S. Ct. 2037, 2046 (2022)) (emphasis added); *see also Martinez Ramirez*, 142 S. Ct. 1718, 1734 (2022) (stating that "§ 2254(e)(2) applies *only* when a prisoner 'has failed to develop the factual basis of a claim.'" (emphasis added)).

Second, as *Williams v. Taylor*, 529 U.S. 420, 431 (2000), makes clear, the absence of fact development in state court does not in and of itself constitute fault under § 2254(e)(2). In other words, the absence of fact development in state court does not automatically trigger the application of §§ 2254(e)(2)(A) and (B). Instead, under the opening clause of § 2254(e)(2), "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault,

attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. Hence, where "the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court," § 2254(e)(2) does not preclude his request for fact development in federal court and subsections (A) and (B) do not apply. *Id.* at 435. For example, where a petitioner alleges that he was unable to develop the state court record on a *Brady* claim due to state suppression, a petitioner need not meet §§ 2254(e)(2)(A) and (B). *See id.* at 434.

Finally, in this section of his brief, the Director also relies heavily on the Supreme Court's recent holding in *Martinez Ramirez* that the ineffectiveness of state habeas counsel does not disarm 28 U.S.C. § 2254(e)(2). ECF No. 85 at 29–30. There, the Supreme Court held that, where a petitioner is at fault under § 2254(e)(2) for failing to develop his ineffective-assistance-of-trial-counsel claim and cannot meet subsections (A) and (B), a federal court "may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*.[3]" *Martinez Ramirez*, 142 S. Ct. at 1739. As this language makes clear, however, this bars a petitioner from developing facts establishing cause and prejudice only where (1) the defaulted claim is an ineffective assistance of trial counsel claim, and (2) the petitioner is at fault within the meaning of § 2254(e)(2) for failing to develop the factual record on that claim in state court. Conversely, a federal court may still allow a petitioner to develop facts on the cause-and-prejudice question where the petitioner seeks to overcome the default of a claim on a ground other than *Martinez* and the petitioner is not at fault within the meaning of § 2254(e)(2) for failing to develop the state court record on that claim.

---

[3] *Martinez v. Ryan*, 566 U.S. 1 (2012).

The Director also argues that this Court may not consider "the evidence that [Mr. Cruz-Garcia] did not properly present to the CCA—including the evidence he submitted in his subsequent state habeas proceedings[.]" ECF No. 85 at 29. Again, the Director does not identify what specific evidence he thinks is excluded.[4] Nor does the Director explain what he means by "not properly before the CCA." *Id.* The Director continues, "[i]ndeed, a petitioner's failure to diligently present his unexhausted evidence to the state court precludes evidentiary development of the claims in this Court." *Id.* at 29–30 (citing *Jones v. Davis*, 890 F.3d 559, 566 (5th Cir. 2018)).[5] But that observation merely restates the § 2254(e)(2) bar on fact development in federal court, which is triggered when a petitioner is at fault for failing to develop the factual record in state court. It does not follow from this statement that a federal court cannot consider evidence that was raised in successive state habeas proceedings. That evidence is part of the state court record and § 2254(e)(2) is therefore not implicated. Put another way, a petitioner's reliance on evidence included in successive state habeas proceedings does not amount to requesting fact development in federal court.

Indeed, the state court record is not limited to the record that the petitioner developed in initial state court proceedings. Rather, the state court record may be expanded by subsequent state court litigation that occurs after initial state proceedings have commenced and after the federal proceedings have begun. The Supreme Court's decision in *Trevino v. Thaler*, 569 U.S. 413 (2013), illustrates this point.

---

[4] Mr. Cruz-Garcia's Second Subsequent Petition in state court relied on evidence that was also before the CCA in the context of his initial state habeas proceedings.

[5] The Director cites to *Jones v. Davis*, 890 F.3d 559, 566–67 (5th Cir. 2018) in support of this argument. There, however, the Fifth Circuit confronted a very different scenario, in which the petitioner sought to introduce new evidence in support of a procedurally defaulted claim *for the first* time in federal court. That evidence was barred by 28 U.S.C. § 2254(e)(2), not by the procedural default in state court.

In *Trevino*, the petitioner's ineffective-assistance-of-counsel claim was initially unexhausted (i.e., the petitioner had not presented the claim during his state post-conviction proceedings). *Id.* at 419. The federal district court issued a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), so that the petitioner could return to state court to exhaust the claim. *Trevino*, 569 U.S. at 419. The state court held that the claim was procedurally defaulted because the petitioner had not raised it in his initial state court proceedings. *Id.* The federal district court likewise held that the claim was procedurally defaulted but was subsequently reversed by the Supreme Court. *Id.* at 419–20. In doing so, the Court held that the equitable exception to procedural default announced in *Martinez v. Ryan* (ineffective assistance of state habeas counsel) applies to Texas cases. *Id.* at 429. On remand, the lower federal courts were free to consider the evidence that the petitioner had submitted in his successive state court application. It did not matter that the evidence at issue had not been submitted in the petitioner's initial state habeas application, nor did it matter that the state courts had rejected the claim on procedural grounds when that evidence was presented in a subsequent petition. *See Trevino v. Davis*, 861 F.3d 545, 549–51 (5th Cir. 2017).

Hence, as in *Trevino*, the evidence that Mr. Cruz-Garcia presented in his successive state habeas proceedings—even where those proceedings resulted in the procedural default of the underlying claims—is part of the state record that is now before this Court. [6] Section 2254(e)(2) does

---

[6] This view was endorsed by the State of Texas in an amicus brief authored by the Texas Attorney General's Office and submitted to the Supreme Court in *Martinez Ramirez*:

> Moreover, evidence developed in state court for other purposes, such as to support a different claim or overcome a state procedural bar, can be considered in federal court to support a *Martinez*-excused ineffective-assistance claim consistent with section 2254(e)(2). *See, e.g.*, *Apelt v. Ryan*, 878 F.3d 800, 825–34 (9th Cir. 2017) (considering evidence presented in state court and rejected on state-law procedural grounds in conjunction with a claim excused by *Martinez*). *Trevino* itself was an example of this principle in action. Before that case reached this Court, Trevino discovered evidence which could support claims that he did not raise in initial state habeas proceedings. 569 U.S. at 419. The district court stayed federal-habeas proceedings so Trevino could exhaust state remedies. *Id.* at 419–20. When

not preclude this Court from considering that evidence, whether to resolve cause and prejudice or to resolve the merits of his claims.

### C. The relitigation bar should not apply because the state habeas process did not comport with state law or due process.

In his Second Amended Petition, Mr. Cruz-Garcia identified a variety of ways in which his due-process rights were violated during state habeas proceedings. *See* ECF No. 73 at 12–20. This included allegations both that the state court failed to follow the statutory framework and that the process by which his claims were resolved violated due process. *Id.* The Director's Answer fails to engage in any analysis of most of Mr. Cruz-Garcia's assertions. Instead, the Director argues that the state court could not have violated Mr. Cruz-Garcia's due-process rights because none of the infirmities that Mr. Cruz-Garcia has asserted regarding the state court process violated a "process mandated by *federal law*." ECF No. 85 at 31 (emphasis in original).

But it does not matter whether the underlying liberty interest was created by the state or by the federal government. Because Texas decided to create a statutory framework for processing habeas claims, it must comport with due process in deploying it. *See Swarthout v. Cooke*, 562 U.S. 216, 220 (2011) ("When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication—and federal courts will review the application of those constitutionally required procedures."). It makes no difference to the due-process analysis whether the state system was designed to vindicate state or federal rights. The Director's repeated claims that Mr. Cruz-Garcia

---

Trevino returned to federal court, his ineffective-assistance claim and the evidence supporting it were incorporated in the state-court record and cognizable in federal-habeas proceedings (provided cause and prejudice existed to overcome procedural default). *See id.* at 420–21. That result is consistent with a faithful reading of section 2254(e)(2).

Brief amici curiae of The States of Texas, Alabama, Arkansas, Florida, Indiana, Kentucky, Mississippi, Missouri, Nebraska, Ohio, Oregon, South Carolina, and Utah, p. 16, *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022).

is not entitled to due-process protections unless he can show a federal constitutional right to a state habeas proceeding is incorrect as a matter of law. ECF No. 85 at 32.

Although the Director repeatedly cautions that a "full and fair hearing in state court is not a prerequisite to applying AEDPA's deferential scheme," that does not end the matter. ECF No. 85 at 31, 33 (citing *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010)).   Regardless of whether a "full and fair hearing" occurred, the state proceeding that did occur must comport with due process to be entitled to deference under AEDPA. Here, it did not. Thus, this Court does not owe deference to the state court resolution of these claims under § 2254(d), § 2254(e), or any other provision of AEDPA that would normally require deference to the state proceeding.

### D.  Cumulative Prejudice

In Mr. Cruz-Garcia's Second Amended Petition, he explained why this Court should cumulate the prejudice resulting from the numerous constitutional violations that occurred during this trial. ECF No. 73 at 45–47. In support of that argument, Mr. Cruz-Garcia identified cases from the United States Supreme Court, the Fifth Circuit, and other circuit courts that have vacated criminal convictions due to the cumulative prejudice resulting from multiple constitutional violations. *Id.* The Director does not directly dispute this in his Answer. ECF No. 85 at 33–34. Nor does the Director address or distinguish any of the case law cited by Mr. Cruz-Garcia. Instead, the Director asserts that "the Fifth Circuit has declined to aggregate non-constitutional errors to form an independent claim on collateral review." *Id.* at 33 (emphasis added). Mr. Cruz-Garcia is not requesting that the Court "form an independent claim," but rather that the court cumulate prejudice across the claims in which the Court finds constitutional violations.

The Director asserts that Mr. Cruz-Garcia cannot establish cumulative prejudice because his "trial court error claims are procedurally defaulted, and Cruz-Garcia fails to show any trial court

11

errors of constitutional dimension[.]" ECF No. 85 at 34. The Director does not identify what he means by "trial court errors." Every claim Mr. Cruz-Garcia raised in his Second Amended Petition alleges a violation of the federal Constitution and is therefore "of constitutional dimension." Moreover, as set out under the relevant claims, Mr. Cruz-Garcia can overcome the procedural default of his claims.

Mr. Cruz-Garcia has shown errors of constitutional magnitude throughout his Petition that individually each entitle him to relief. Taken together, the prejudice from these errors is overwhelming and "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992).

## II.   CLAIMS FOR RELIEF

**Claim One:**      **Mr. Cruz-Garcia is entitled to relief on his juror misconduct claim.**

### A.   This Court can review this claim *de novo*.

In his Second Amended Petition, Mr. Cruz-Garcia explained that this Court could review Claim One A (external influence) and Claim One B (jurors discussing the evidence and sentence outside of deliberations) *de novo* because the CCA failed to adjudicate these federal claims on the merits. *See* ECF No. 73 at 54–57. He also argued, in the alternative, that if the state court did adjudicate the merits of Claim One A, this Court could review that claim *de novo* because the claim met the relitigation bar under 28 U.S.C. § 2254(d). *Id.* at 56–57.

The Director asserts that "the CCA on direct appeal clearly addressed the constitutionality of the Bible reading in concluding the trial court did not abuse its discretion." ECF No. 85 at 35. But, as is made clear by the Director's framing of the CCA's conclusion, the CCA resolved only the state law question of whether the trial court had erred under the Texas Rules of Evidence. *See Cruz-Garcia v. State*, 2015 WL 6528727, at *29 (Tex. Crim. App. 2015). The CCA discussed whether the

12

Bible constituted an external influence only to determine whether the Texas Rules of Evidence prohibited the trial court's admission of jurors' affidavits. But the CCA did not consider whether Bible reading violated the federal Constitution. Tellingly, the Director does not identify any reliance by the CCA on the federal Constitution or federal law. *See* ECF No. 85 at 35. Although a state court does not necessarily need to reference federal law to resolve a federal claim, the CCA's decision here did not rule on the federal claim raised. Because Mr. Cruz-Garcia has rebutted the presumption that Claim One A was adjudicated on the merits by the CCA, this Court can conduct *de novo* review. *See Johnson v. Williams*, 568 U.S. 289, 301–02 (2013).

Likewise, the Director argues that the CCA did adjudicate Claim One B in state habeas by adopting the trial court's findings of fact and conclusions law relating to jurors discussing the evidence and sentence outside of punishment deliberations. ECF No. 85 at 36. This argument ignores the CCA's express rejection of those findings, based on its own ruling that state habeas Claim 9 (alleging both external influence and juror misconduct) was procedurally barred because it was "raised and rejected on direct appeal." *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1 (Tex. Crim. App. 2017). However, the allegation that jurors discussed the evidence and sentence outside deliberations was not raised on direct appeal and therefore could not have been adjudicated on the merits on direct appeal. It is of no avail to the Director's argument that the CCA adopted the trial court's findings as to *other* claims. *See* ECF No. 85 at 36. Because Mr. Cruz-Garcia has rebutted the presumption that Claim One B was adjudicated on the merits by the CCA, this Court can conduct *de novo* review. *See Johnson*, 568 U.S. at 301–02.

The Director does not expressly argue that Mr. Cruz-Garcia cannot meet the relitigation bar under 28 U.S.C. § 2254(d) as to Claim One A. *See* ECF No. 85 at 34–42. In a separate section on

the merits of Claim One A, however, the Director only asserts that "the CCA's distinction [between Mr. Cruz-Garcia's case and *Oliver v. Quarterman*[7]] contravened no clearly established federal precedent." *Id.* at 39. To the extent that this argument is intended to rebut Mr. Cruz-Garcia's arguments under § 2254(d)—assuming that § 2254(d) applies—it misses the mark. As shown by Mr. Cruz-Garcia in his Second Amended Petition, the CCA's adjudication on direct appeal of Mr. Cruz-Garcia's external influence claim resulted in a decision that was contrary to or unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d)(1). Indeed, on direct appeal, the CCA held as a matter of law that the Bible does not constitute an external influence for purposes of the relevant state evidentiary rule:

> This Court has never determined whether reference to the Bible during jury deliberations is an outside influence. Today we hold it is not.

*Cruz-Garcia v. State*, 2015 WL 6528727, at *28. That conclusion is plainly contradicted by the Fifth Circuit's holding in *Oliver* that, as a matter of clearly established Supreme Court precedent, the Bible can constitute an external influence:

> Stemming from these clearly established Supreme Court precedents, it is clear that the prohibition of external influences from *Remmer*,[8] *Turner*,[9] and *Parker*[10] applies to this factual scenario.

*Oliver*, 541 F.3d at 336. In other words, the CCA's conclusion that the Bible does not constitute an external influence cannot be reconciled with clearly established Supreme Court precedent that it can.

---

[7] 541 F3d 329 (5th Cir. 2008)

[8] *Remmer v. United State*, 347 U.S. 227 (1954)

[9] *Turner v. Louisiana*, 379 U.S. 466 (1965)

[10] *Parker v. Gladden*, 385 U.S. 363 (1966)

The Director nevertheless argues that the CCA's "distinction of *Oliver* on the facts is not an unreasonable application of federal law." ECF No. 85 at 39. That argument, however, is unavailing. First, the passages that the Director relies upon from the CCA's opinion only serve to further underscore the CCA's misapplication of clearly established Supreme Court precedent about external influences. On whether the Bible could constitute an external influence, the CCA explained that:

> This compromise occurs, however, only when the outside evidence or influence relates directly to a question of fact left to the jury's determination and improperly influences their verdict.

ECF No. 85 at 37 (citing *Cruz-Garcia*, 2015 WL 6528727, at *29). This very argument was rejected by the Fifth Circuit in *Oliver*:

> The state urges us to consider solely whether the Bible passage at issue had any bearing on the factual questions the jury had to decide during the sentencing phase. [. . .] This argument misses the mark. The Bible served as an external influence precisely because it may have influenced the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry into these factual areas.

541 F.3d at 340. The Fifth Circuit cautioned that "a contrary holding would eviscerate the rule from *Remmer* that jurors must rely on only the evidence and law presented in an open court room." *Id.*

Second, the Director points to the distinction drawn by the Fifth Circuit in *Oliver* with Fourth Circuit precedent, *Robinson v. Polk*,[11] finding that the Bible did not constitute an external influence where "a juror read[] general Biblical statements." ECF No. 85 at 39 (quoting *Oliver*, 541 F.3d at 339). But Juror Clinger indicated that he read from Genesis 9 and Deuteronomy, which include passages about the imposition of the death penalty, and from Romans 13, which discusses the imposition of punishment. 3 CR 634. Hence, this is not a case where a juror read "general

---

[11] 438 F.3d 350 (4th Cir. 2006)

Biblical statements." The Director also fails to point out that the Fifth Circuit found the dissent in *Robinson* "more persuasive than the majority's opinion." *Oliver*, 541 F3d at 339. There, Judge King unequivocally stated that he believed that *Robinson* was "being wrongly decided." *Robinson*, 438 F.3d at 368 (King J., dissenting in part). The *Oliver* court did not just distinguish *Robinson* on its facts; it disagreed with *Robinson*'s legal conclusions. *Oliver*, 541 F3d at 339.

Third, the Director's reading of *Oliver* is far narrower than the plain language of that opinion regarding the clearly established Supreme Court precedent on external influences. The Director argues that the Fifth Circuit limited its opinion to the facts of the case by declining to address the broader question of "whether a juror must leave his or her moral values at the door or even whether a juror may consult the Bible for his or her own personal inspiration during the deliberation process[, or] whether jurors must forget that, generally, the Bible includes the concept of an 'eye for an eye.'"[12] ECF No. 85 at 39 (quoting *Oliver*, 541 F3d at 340). But that limitation does not vitiate the Fifth Circuit's finding that the Bible can—and on the facts of *Oliver* did—constitute an external influence as a matter of clearly established Supreme Court precedent. Moreover, the Fifth Circuit observed only that the similarity between the facts of the offense in *Oliver* and the Bible passages at issue made the case "more egregious." *Oliver*, 541 F3d at 340. In no way did the Fifth Circuit rule that a Bible is an external influence *only* where the Bible passages at issue track the facts that jurors are deliberating on.

Finally, the Director's argument that the CCA drew a meaningful factual distinction with *Oliver* would require the Director to contradict the CCA's own conclusion that any factual inquiry

---

[12] Moreover, Mr. Cruz-Garcia does not allege that jurors consulted the Bible "for their personal inspiration" or simply had the Biblical concept of an 'eye for an eye' in mind.

into the jury's deliberative process was prohibited because the Bible did not constitute an external influence. The CCA ruled that the jurors' affidavits were inadmissible. *Cruz-Garcia*, 2015 WL 6528727, at *29. The CCA could not then have inquired into the facts underpinning Mr. Cruz-Garcia's allegations and thus drawn any meaningful distinction of fact with *Oliver*.

The CCA's holding as a matter of law on direct appeal that the Bible does not constitute an external influence is clearly contrary to and an unreasonable application of established Supreme Court precedent. This Court can therefore review this claim *de novo*.

### B.  The Bible was a harmful external influence.

The Director argues that the Bible did not constitute an external influence because "*unlike Oliver*, the Bible passages here were not used in substitution for the facts for punishment or in guidance to interpret the facts before the jury." ECF No. 85 at 39 (emphasis in original). In *Oliver*, however, the Fifth Circuit rejected an argument along these lines and found that the Bible amounted to an external influence because it "*may* have influenced the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry into" the questions of fact before the jury. *Oliver*, 541 F.3d at 340 (emphasis added). Whether the jurors were thus influenced goes to the harmfulness of that external influence.

Moreover, as noted *supra*, the Fifth Circuit described the facts in *Oliver* as "even more egregious" than in cases in which other circuits have nevertheless found the Bible to amount to an external influence. *Oliver*, 541 F.3d at 339–40. The Fifth Circuit agreed with *McNair v. Campbell*, in which the Eleventh Circuit characterized the Bible as an external influence even though the Bible passages themselves were "innocuous." *Id.* at 336–37 (citing 416 F.3d 1291, 1307–08 (11th Cir.

17

2005)). The Bible does not amount to an external influence *only* where it is used "in substitution" for the facts.

Finally, the Director also contends that "[r]egardless, Cruz-Garcia cannot show harm, as required under *Brecht*." ECF No. 85 at 39. In support of this argument, the Director points to four supposed commonalities between the *Oliver* court's finding of harmlessness and the facts of Mr. Cruz-Garcia's case. *Id.* at 39–40. That comparison misses the mark. Critically, in *Oliver*, the state court had permitted extensive fact development, including live testimony from the jurors, and thus produced a robust state court record to which the federal court owed deference. *See Oliver*, 541 F.3d at 342. That record included specific findings on the question of harm. *Id.* By contrast, Mr. Cruz-Garcia was not permitted to develop the fact record beyond the jurors' affidavits and no findings were ever made on harm.

The Director alleges that the "extensive factual findings and credibility determination by the trial court" enable this Court to decide the harm issue. ECF No. 85 at 40. But the Director does not identify—let alone explain how—these findings purportedly enable this Court to decide harm. On Mr. Cruz-Garcia's Motion for New Trial, the trial court admitted the jurors' affidavits and made no findings of fact.[13] *See* 29 RR 27–28. The CCA later determined that the admission of jurors' affidavits by the trial court was error. *Cruz-Garcia*, 2015 WL 6528727, at *29. And in state habeas, the CCA expressly rejected the trial court's findings on Mr. Cruz-Garcia's claim of external

---

[13] On Mr. Cruz-Garcia's allegation that the Bible constituted an external influence, the trial court said only the following:

> [B]y finding those affidavits are admissible that there is enough question as to whether this Bible production or Bible reading, whatever occurred may be an outside influence. I'm not of the opinion that it was based on everything that's been provided to me in the case law, but we're going to send it up and if the Court of Appeals -- Court of Criminal Appeals agrees with us on that.

29 RR 28.

influence, as explained *supra* Claim One A. Moreover, by the Director's own account in his Response to Motion for Evidentiary Hearing, the trial court "recount[ed] the evidence developed at the motion for new trial as well as during state habeas proceedings. . . noted on the record [its] disagreement with portions of juror Bowman's 2013 affidavit" and "f[ound] the affidavit of juror Clinger more persuasive than juror Bowman's 2015 habeas affidavit." ECF No. 84 at 6–7. A recounting of the evidence does not constitute a resolution of contradictory evidence, and the trial court never addressed any of the other affidavits nor juror Clinger's recorded interview.

The Director cannot point to any resolution of the many contradictions within the state court record, including the contradictions between Mr. Cruz-Garcia's evidence and the State's evidence, as well as contradictions within the State's own evidence. The state court has never purported to resolve these contradictions. Indeed, based on the CCA's determination on direct appeal that the Bible did not constitute an external influence, the Texas Rules of Evidence prohibited the state court from inquiring into the jury's deliberative process. As acknowledged by Mr. Cruz-Garcia in his Second Amended Petition and urged in his Motion for Evidentiary Hearing, a hearing is required to resolve this claim.

### C. Mr. Cruz-Garcia was harmed by the jurors' discussion of the evidence and sentence outside of deliberations.

To rebut any harm arising from jurors' discussion of the evidence and sentence outside of the deliberation room, the Director relies on the trial court's findings of fact as they pertain to Mr. Cruz-Garcia's allegations in state habeas of ineffective assistance of trial counsel. ECF No. 85 at 40–41. The trial court's inquiry asked only whether trial counsel were ineffective for failing to investigate allegations that jurors were overheard discussing the evidence outside of deliberations. *See* 5 SHCR 1066–68. The trial court therefore did not address the merits of Mr. Cruz-Garcia's stand-alone juror

misconduct claim, including whether Mr. Cruz-Garcia was harmed by jurors' discussions outside of the deliberation room. Indeed, the findings quoted by the Director provide only a recap of those discussions by jurors and do not address any resulting harm. ECF No. 85 at 40–41. Moreover, here, the CCA expressly declined to adopt any findings pertaining to, and adjudicate the merits of, Mr. Cruz-Garcia's juror misconduct claim. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1. Because there has been no factfinding on this issue and no adjudication on the merits of these allegations, there are no facts for this Court to defer to and this Court can review Mr. Cruz-Garcia's claim *de novo*.

**Claim Two:**      **Mr. Cruz-Garcia is entitled to relief on his claim that his right to present a complete defense and to confront-examine witnesses was violated.**

   **A. Confrontation Clause**

      **1. This Court can review Mr. Cruz-Garcia's claim to avoid a miscarriage of justice.**

In his Second Amended Petition, Mr. Cruz-Garcia explained that this Court could review his Confrontation Clause claim *de novo* to avoid a fundamental miscarriage of justice. ECF No. 73 at 71–76. In support thereof, Mr. Cruz-Garcia pointed to new evidence not presented at trial, in light of which "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327 (1998).

The Director contends that Mr. Cruz-Garcia cannot meet the miscarriage of justice standard because "his complaint is centered on his inability to present the Bromich [sic] report at trial, as well as an amended DNA report[, and] neither of these constitute new evidence." ECF No. 85 at 45. The Director appears to be arguing that the procedural default of Mr. Cruz-Garcia's Confrontation

Clause claim cannot be excused to avoid a miscarriage of justice because the Confrontation Clause claim itself is not based on new evidence.[14]

But a petitioner is not required to show that the defaulted claim itself or the evidence in support thereof establishes a miscarriage of justice. Where a petitioner shows that it is more likely than not that he is innocent of the offense, a court may review *any* constitutional error alleged to have infected petitioner's trial. *See House v. Bell*, 547 U.S. 518, 537 (2006) ("[A] petition supported by a convincing *Schlup* gateway showing 'raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error'; hence, 'a review of the merits of the constitutional claims' is justified." (quoting *Schlup*, 513 U.S. at 317)). Here, therefore, this Court may review Mr. Cruz-Garcia's defaulted Confrontation Clause claim to avoid a miscarriage of justice.

To the extent that "his complaint" in the Director's argument does refer to Mr. Cruz-Garcia's much broader challenge to the State's case on guilt and in support of a miscarriage of justice exception, the Director's arguments miss the mark. Contrary to the Director's assertion, Mr. Cruz-Garcia's miscarriage of justice arguments do not rely on the Bromwich report. *See* ECF No. 73 at 71–72. And it is unclear how the 2015 DNA report, published after trial and after Mr. Cruz-Garcia's initial writ, would not constitute "new evidence." *See* ECF No. 85 at 45. The Supreme Court has defined new evidence for purposes of *Schlup* as evidence "that was not presented at trial." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324). Obviously, the 2015 DNA report that was released after trial was not presented to the jury and thus constitutes new evidence under *Schlup*.

---

[14] It is unclear whether "his complaint" refers to the Confrontation Clause claim itself, which does center on the Bromwich report but not the 2015 DNA report, or to Mr. Cruz-Garcia's separate arguments on miscarriage of justice, which rely on the 2015 DNA report but not the Bromwich report. *See* ECF No. 73 at 71–72.

21

The Director also argues that Mr. Cruz-Garcia's reliance on the amended DNA evidence is futile because "the DNA evidence does not exonerate him." ECF No. 85 at 45. *Schlup* makes clear, however, that a petitioner is not required to show that the new evidence upon which he now relies "unquestionably establishes [his] innocence." 513 U.S. at 317. A petitioner is required only to show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. As argued by Mr. Cruz-Garcia, the DNA evidence as corrected does not establish Mr. Cruz-Garcia's identity as Ms. Garcia's assailant, does not exclude Mr. Santana as a potential assailant, and leaves open the possibility of an unknown assailant. ECF No. 73 at 71–76.

This possibility further answers the rhetorical question posed by the State in closing:

> Ladies and gentlemen, if Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth – and there is no evidence of that – where is the DNA of the guy who raped Diana? Where is it? Why don't we have it? If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her? She told you he ejaculated. And I don't mean to be graphic, but she told you she felt it running down her legs. Where is his DNA?

23 RR 82–83. As the State now concedes, Mr. Cruz-Garcia cannot be linked to the DNA from the vaginal swabs and Mr. Rodriguez cannot be linked to either the vaginal swabs or the underwear cutting. ECF No. 18-11. Thus, as corrected by the 2015 report, the DNA evidence does not preclude the possibility that the presence of Mr. Cruz-Garcia's DNA on the underwear cutting was the result of a consensual encounter.

Moreover, Mr. Cruz-Garcia did not rely *only* on the 2015 DNA report to show a miscarriage of justice, but further pointed to other new evidence not presented to the jury. This includes the State's beneficial post-trial conduct towards Mr. Santana and Ms. Rodriguez, as well as new evidence that Mr. Cruz-Garcia was engaged in an ongoing, consensual sexual relationship with Diana Garcia

22

at the time of the offense. ECF No. 73 at 73–76. With regards to the State's favorable post-trial conduct, the Director only refers this Court to his arguments on the merits of Mr. Cruz-Garcia's false testimony claim as to both witnesses. ECF No. 85 at 46. As argued below, Claims Five and Six, Mr. Cruz-Garcia can show that Mr. Santana and Ms. Rodriguez received a benefit in exchange for their testimony. And, as to evidence of a consensual sexual relationship, the Director does not confront Mr. Cruz-Garcia's evidence or arguments at all. *See id*. Because Mr. Cruz-Garcia can show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence," this Court can review Mr. Cruz-Garcia's Confrontation Clause claim *de novo*. *Schlup*, 513 U.S. at 327.

### 2.   Violation of the right to confront witnesses.

The Director argues that Mr. Cruz-Garcia's Confrontation Clause claim fails because he cannot show "any relation between the HPD crime lab" and the DNA evidence introduced by the State. ECF No. 85 at 48. That argument, however, ignores that the trial court made findings of fact connecting the now-defunct HPD Crime Lab and its disgraced employees to the DNA evidence that the State relied upon to convict Mr. Cruz-Garcia. ECF No. 73 at 63–64. The trial court itself acknowledged that the reliability of the DNA evidence was likely a pertinent and critical line of cross-examination. 17 RR 19–21. But Mr. Cruz-Garcia's hands were tied, having been prohibited from introducing documentary evidence or witness testimony regarding the HPD Crime Lab *and* prohibited from cross-examining any witnesses on this excluded evidence.[15]

---

[15] The Director argues that Mr. Cruz-Garcia cannot show how he could have brought in any of the evidence upon which he would have cross-examined the State's witnesses. ECF No. 85 at 47–48. That is precisely the heart of his claim—that the trial court's rulings "effectively disabled" Mr. Cruz-Garcia's defense. ECF No. 73 at 67 (quoting *Crane v. Kentucky*, 467 U.S. 683, 689 (1986)).

### B.  Right to present a complete defense.

#### 1.  Violation of the right to present a complete defense.

The Director argues that, because the trial court's exclusion of any evidence going to the reliability of the DNA evidence was based on "non-arbitrary rules of evidence," Mr. Cruz-Garcia "fails to demonstrate that the CCA's determination related to the trial court's ruling violated a specific federal constitutional right or rendered [his] trial fundamentally unfair." ECF No. 85 at 51 (citing *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997)). This argument misses the mark. Mr. Cruz-Garcia certainly did allege a constitutional violation, ECF. No. 73 at 65–68, but the Director's response appears to focus on the state law evidentiary ruling and fails to engage in the constitutional analysis.

First, reliance on a "non-arbitrary" rule of evidence does not immunize a trial court's evidentiary rulings against constitutional scrutiny. ECF No. 85 at 51. The application of an otherwise valid evidentiary rule may nevertheless violate a defendant's constitutional rights. *See Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Gochicoa*, the Fifth Circuit confronted whether the trial court's application of the hearsay rule—an otherwise valid and non-arbitrary evidentiary rule—violated the defendant's rights under the Confrontation Clause. 118 F.3d at 446–48. Hence, that the state evidentiary rules on which the trial court relied to exclude the evidence may be valid in the general sense does not automatically defeat Mr. Cruz-Garcia's claim.

Second, the Director does not address whether the trial court's application of an otherwise valid rule to exclude this evidence of the unreliability of the DNA evidence deprived Mr. Cruz-Garcia of a "meaningful opportunity to present a complete defense," in violation of the Sixth and Fourteenth Amendments. *United States v. Scheffer*, 523 U.S. 303, 329 n.16 (1998). In the State's own words in closing argument, however, the DNA evidence was "the most damning " evidence against

24

Mr. Cruz-Garcia. 23 RR 36. Evidence going to its unreliability was therefore critical to Mr. Cruz-Garcia's defense. ECF No. 73 at 66–68. As set out in Mr. Cruz-Garcia's Second Amended Petition, the trial court's ruling that he could not introduce evidence going to the unreliability of that DNA evidence "effectively disabled" Mr. Cruz-Garcia's defense. *Crane*, 476 U.S. at 689.

> ### 2. This Court can review Mr. Cruz-Garcia's right to present a complete defense claim *de novo*.

The Director makes two arguments in response to Mr. Cruz-Garcia's showing that this Court can review this claim *de novo* because the CCA failed to adjudicate it on the merits on direct appeal. ECF No. 73 at 69–71. Critically, the Director never expressly asserts that the CCA *did* adjudicate Mr. Cruz-Garcia's claim on the merits, although this appears to be the intent of the Director's briefing. *See* ECF No. 85 at 51–52. First, the Director states that Mr. Cruz-Garcia "ignores the [] analysis under *Gochicoa*." ECF No. 85 at 51. The Director offers no further argument and it is unclear how *Gochicoa* impacts Mr. Cruz-Garcia's argument that this Court can review his complete-defense claim. Certainly, the CCA never cited to *Gochicoa*.[16] *See Cruz-Garcia v. State*, 2015 WL 6528727 (Tex. Crim. App. 2015).

Second, the Director quotes language from *Lucio v. Lumpkin* that "[t]he Supreme Court has repeatedly explained that a state court need not cite any legal principle at all." ECF No. 85 at 51 (quoting 987 F.3d 451, 483 (5th Cir. 2021)). But that quote is from the section of the Fifth Circuit's

---

[16] Presumably "the [] analysis" refers to language from *Gochicoa* previously quoted by the Director: "[A] federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair." ECF No. 85 at 49 (quoting *Gochicoa*, 118 F.3d at 446). To the extent the Director's reliance on this language is intended to support an argument that the CCA could not have found a constitutional violation based on the trial court's ruling, that argument misses the mark. On direct appeal, the CCA never even addressed the constitutional dimension of Mr. Cruz-Garcia's complete defense claim. *See* ECF No. 73 at 69–71. That the Director believes Mr. Cruz-Garcia would ultimately have been unsuccessful on his constitutional claim is irrelevant to the inquiry here, namely whether the CCA *ever* adjudicated Mr. Cruz-Garcia's constitutional claim.

opinion on whether Ms. Lucio had shown that the state court's merits adjudication of her claim was contrary to clearly established federal law and thus met 28 U.S.C. § 2254(d). *Lucio*, 987 F.3d at 483. This principle from *Lucio* relied on by the Director thus applies to an entirely different inquiry than that at issue here, namely whether the state court adjudicated the claim on the merits *at all*.

As set out in Mr. Cruz-Garcia's Second Amended Petition, the CCA did not adjudicate the merits of his complete defense claim under the federal Constitution. ECF No. 73 at 69–71. Where a petitioner fairly raised a federal constitutional claim before the state court, the federal court must presume that the state court adjudicated the petitioner's claim on the merits. *Johnson v. Williams*, 568 U.S. 289, 300–01 (2013). This presumption applies even where the state court opinion is entirely silent as to the petitioner's federal constitutional claim. *Id.* Nevertheless, the Supreme Court in *Johnson* rejected an argument that this presumption should be irrebuttable and described various circumstances which may permit a petitioner to rebut this presumption. *Id.* at 301–02. Those circumstances exist here. Mr. Cruz-Garcia fairly raised a complete defense claim under the federal Constitution. The CCA, however, resolved it based on a state law standard that is both "less protective" than and "quite different from" the federal standard.[17] And any reference by the CCA to the federal standard was "simply mentioned in a footnote" underneath an entirely separate claim. ECF No. 73 at 70–71 (citing *Johnson*, 568 U.S. at 301). This Court can therefore review Mr. Cruz-Garcia's claim *de novo*.

---

[17] Indeed, as quoted by the Director, the CCA found no error in the exclusion of the evidence at issue because it "did not comprise the entire substance of [Cruz-Garcia's] defense." ECF No. 85 at 49 (quoting *Cruz-Garcia*, 2015 WL 6528727, at *14). By contrast, under Supreme Court precedent, a violation of the right to present a complete defense arises where a defendant is deprived of a "meaningful opportunity to present a complete defense." *Scheffer*, 523 U.S. at 329 n.16.

In the alternative, if this Court determines that Mr. Cruz-Garcia's complete defense claim was adjudicated on the merits, he can meet the relitigation bar under 28 U.S.C. § 2254(d)(1). The CCA's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of *Holmes v. South Carolina*, 547 U.S. 319 (2006) and *Crane v. Kentucky*, 476 U.S. 683 (1986). As argued on the merits of this claim, the trial court violated Mr. Cruz-Garcia's right to present a complete defense by preventing him from challenging the reliability of the DNA evidence.

**Claim Three:**      **Mr. Cruz-Garcia is entitled to relief on the merits of his inaccurate and unreliable DNA evidence claim**

As set forth in Claim Three of Mr. Cruz-Garcia's Second Amended Petition, Mr. Cruz-Garcia's conviction and death sentence must be vacated under *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988), because the State's inaccurate and unreliable DNA evidence violates the Eighth Amendment's requirement of heightened reliability in death penalty cases. ECF No. 73 at 76–79. In response, the Director asserts that "*Johnson* simply does not apply to this claim" because it "alleg[es] inaccurate testimony at the guilt-innocence stage." ECF No. 85 at 53. In support, the Director quotes a passage from *Hernandez v. Johnson*, 213 F.3d 243, 252 (5th Cir. 2000), stating that most *Johnson* cases do not involve "purportedly materially inaccurate testimony" but rather concern "a materially inaccurate criminal conviction" offered as aggravating evidence at the punishment phase. ECF No. 85 at 53–54.

*Hernandez*, however, does not hold that false or unreliable testimony at the guilt stage does not implicate the Eighth Amendment. Rather, that case provides a roadmap for how federal courts assess a *Johnson* claim predicated on false testimony. Immediately after the passage quoted by the Director, the *Hernandez* opinion continues:

> Notwithstanding the difference, Hernandez must still establish that Grigson's and Erdmann's[18] testimonies were false and material. *See Fuller v. Johnson*, 114 F.3d 491, 497 (5th Cir. 1997) (holding that habeas prisoner's Eighth Amendment claim failed because he had not adequately shown that Erdmann's testimony was false or material).
>
> Although neither the Supreme Court nor this circuit has defined "materially" in the context of an Eighth Amendment violation under *Johnson*, the Supreme Court has had occasion to elaborate on materiality in the analogous context of the government's suppression of material evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). *See Kyles v. Whitley*, 514, U.S. 419, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995). In *Kyles*, it noted that the touchstone of materiality is a "reasonable probability" of a different result. *See id.* at 434, 115 S. Ct. at 1566; *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997). Under such a standard, Hernandez must show that Grigson's and Erdmann's testimonies undermined confidence in the outcome of the trial. *See Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566; *see also O'Keefe*, 128 F.3d at 894 ("Materiality, stated another way, occurs when the falsehood results in a 'corruption of the truth seeking function of the trial process.'") (quoting *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49, L.Ed.2d 342 (1976)).
>
> With those pronouncements in mind, we address the allegations about Grigson and Erdmann in turn.

*Id.* at 252–53.  Under *Hernandez,* therefore, to evaluate a *Johnson*-based Eighth Amendment claim, the court looks to whether, but for the false or unreliable evidence, there is a "reasonable probability" of a different result. *Id.*

Other Fifth Circuit cases have taken a similar approach to *Johnson* claims predicated on false testimony at the guilt phase. For example, in *Knox v. Johnson*, 224 F.3d 470, 478 (5th Cir. 2000), the petitioner argued that his conviction and death sentence violated the Eighth Amendment's heightened reliability requirement under *Johnson* because a witness testified falsely at the guilt phase. The Fifth Circuit held that the claim lacked merit, not because it concerned guilt-phase testimony,

---

[18] Erdmann appears to have been a guilt-phase witness. *See id.* at 254 (noting that Erdmann testified that he examined the victim's heart and concluded that the victim did not die of a heart attack).

but because it "defer[ed] to the state court's determination that [the witness] did not testify falsely." *Id.* Similarly, in *Kelly v. Cockrell*, 72 F. Appx. 67, 75–76 (5th Cir. 2003), the Fifth Circuit addressed a *Johnson*-based Eighth Amendment claim predicated on false guilt-phase testimony by analyzing record evidence in detail to determine whether petitioner had shown that testimony was false. The Fifth Circuit took the same approach in *Hafdahl v. Johnson*, 251 F.3d 528, 534 (5th Cir. 2001). Citing *Johnson*, the court noted the petitioner's argument that the false testimony of a guilt phase witness "constitutes a violation of the Eighth Amendment's prohibition on cruel and unusual punishment." *Id.* The court resolved the claim as follows: "Because we have determined that Hafdahl has failed to show that Erdmann testified falsely, we find Hafdahl's Eighth Amendment claim to be without merit." *Id.*

Here, as set forth in Mr. Cruz-Garcia's Second Amended Petition, the false and unreliable DNA evidence formed a substantial part of the State's case. The evidence "undermined confidence in the outcome of the trial" and there is a "reasonable probability" the result would have been different but for the false testimony concerning the DNA analysis. *Hernandez*, 213 F.3d at 253 (quoting *Kyles*, 514 U.S. at 434).

The Director asserts that this claim is procedurally defaulted and that Mr. Cruz-Garcia cannot overcome the procedural default through the miscarriage-of-justice exception. ECF No. 85 at 52–53. For the reasons set forth in Claim Two Section A, the Director is mistaken. The Director also asserts that Mr. Cruz-Garcia cannot overcome the procedural default by showing cause and prejudice because he "clearly had the opportunity to raise these claims in his first state writ." ECF No. 85 at 53. The Director ignores, however, that the State did not reanalyze the DNA evidence and conclude that it was false until *after* Mr. Cruz-Garcia filed his first writ. *See* ECF No. 18-11.

**Claim Four:**    **Mr. Cruz-Garcia is entitled to relief on the merits of his ineffective assistance of counsel claim.**

As set forth in his Second Amended Petition, Mr. Cruz-Garcia raised a single, unitary ineffective assistance of trial counsel ("IATC") claim, which the CCA procedurally defaulted when Mr. Cruz-Garcia presented the claim in his second subsequent application for post-conviction relief. ECF No. 73 at 79–215. Because Mr. Cruz-Garcia's state habeas counsel were ineffective, Mr. Cruz-Garcia can overcome the procedural default through the exception recognized in *Martinez v. Ryan*, 566 U.S. 1 (2012). *See* ECF No. 73 at 211–15. And because Mr. Cruz-Garcia relies on evidence he included with his second subsequent state habeas application, the Supreme Court's recent decision in *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022) does not preclude the Court from considering that evidence. *See, supra,* Section I B.

### A.  The Director improperly attempts to claim-split.

The Director does not address Mr. Cruz-Garcia's unitary IATC claim. Instead, the Director divides the IATC Claim into almost two dozen discrete subparts, asserting that each one does not individually entitle Mr. Cruz-Garcia to relief. The Court should reject the Director's claim-splitting approach. *See Williams v. Taylor*, 562 U.S. 362, 396 (2000) (finding deficient performance based on multiple omissions by counsel and finding prejudice because "the entire post-conviction record, viewed as a whole" raised a reasonable probability of a different result). Mr. Cruz-Garcia can overcome the procedural default of this claim based on *Martinez v. Ryan* and relief is warranted. *See* ECF No. 73 at 211–15.

To the extent the Court does split Mr. Cruz-Garcia's unitary IATC claim or finds that Mr. Cruz-Garcia cannot overcome the procedural default on that claim, the Court should still grant relief on the claim for two reasons. First, for the reasons set forth in the Second Amended Petition, the

30

Court should review the subpartss Mr. Cruz-Garcia raised in his initial state habeas application *de novo* because the state habeas process failed to comply with basic due process requirements. ECF No. 73 at 37–45. The Director's responsive arguments on this point should not persuade the Court. *See, supra*, Section I B. Second, Mr. Cruz-Garcia can meet the relitigation bar under 28 U.S.C. § 2254(d) as to the sections of the IATC claim the Director contends are not procedurally defaulted and Mr. Cruz-Garcia is entitled to relief on those allegations.

### B. The Director contends that the bulk of the IATC claim is subject to §2254(d).

The Director asserts that the bulk of the IATC claim is "properly exhausted" and therefore subject to § 2254(d). ECF No. 85 at 147–62. The Director states that Mr. Cruz-Garcia cannot meet the relitigation bar as to these allegations because the state court's rejection of this portion of the IATC claim was not "an unreasonable application of, or contrary to, federal law, or based on an unreasonable determination of the facts." *Id.* at 147. Except with respect to the punishment-phase sections of the IATC claim, however, the Director makes no arguments in support of this assertion. *Id.* at 147–48. The Director does not discuss any fact-finding or legal conclusions by the convicting court, nor make any arguments in support of the supposed reasonableness of the CCA's adjudication of these allegations. Instead, the Director refers this Court to his briefing on other, related claims. *Id.* at 147–48. But these arguments on other claims do not address whether counsel's performance was deficient and whether Mr. Cruz-Garcia was thus prejudiced. Tellingly, the Director makes no effort to defend trial counsel's performance or the state court's factual findings with respect to the allegations he does not separately brief. As set forth below, the trial court's findings were legally and factually unreasonable and were clearly contradicted by the record before it. Mr.

Cruz-Garcia addresses the Director's arguments on the punishment phase IATC allegations separately below.

> **1. The sections pertaining to guilt phase ineffectiveness that the Director contends are not procedurally defaulted meet §§ 2254(d)(1) or (d)(2) or both.**

Under § 2254(d), a federal habeas court defers to a state court adjudication on the merits of a claim unless the state court decision was "(1) 'contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting §§ 2254(d)(1) and (d)(2)). Only one exception to the relitigation bar need be present. Where the relitigation bar is met, a federal court may review the merits *de novo* and based on all evidence put forth by the petitioner. *See Brumfield v. Cain*, 576 U.S. 305, 311 (2015).

As set forth below, the portion of the IATC claim the Director contends was "properly exhausted" satisfies either § 2254(d)(1) (an unreasonable application of clearly established federal law) or (d)(2) (an unreasonable determination of the facts), or both.

Under clearly established federal law, Mr. Cruz-Garcia's claim of ineffective assistance of counsel is governed by the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a petitioner must show that (1) counsel was deficient and (2) petitioner was thus prejudiced. *Id.* at 687. To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This inquiry requires a reviewing court to ask "whether counsel's assistance was reasonable considering all the circumstances." *Id.* The ABA Guidelines and Texas Guidelines "are guides to

determining what is reasonable." *Id.*; *see Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding deficient performance where, *inter alia*, "[c]ounsel's performance fell short of the standards for capital defense work articulated by the [ABA] standards"). To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In state habeas, the CCA held that trial counsel were not ineffective and Mr. Cruz-Garcia was not prejudiced. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This decision, however, involved an unreasonable application of *Strickland v. Washington* and its progeny and involved an unreasonable determination of the facts in light of the state court record. Mr. Cruz-Garcia can therefore meet the relitigation bar, whether under §§ 2254(d)(1) and/or (d)(2), and this Court can review these allegations *de novo*.

### i.   Trial counsel failed to investigate the State's DNA evidence.

This allegation corresponds to Section 4(F)(1) in Mr. Cruz-Garcia's petition. ECF No. 73 at 132–39. The Director refers this Court back to his argument in response to Mr. Cruz-Garcia's Claim Five. ECF No. 85 at 147. Mr. Cruz-Garcia responds to those arguments under Claim Five herein. The Director makes no arguments that the state court's adjudication of this claim was reasonable under §§ 2254(d)(1) or (d)(2).  Mr. Cruz-Garcia adds the following arguments regarding § 2254(d).

As set out in Mr. Cruz-Garcia's Second Amended Petition, trial counsel failed to even consult with a DNA expert and failed to reasonably investigate the State's DNA evidence. ECF No. 73 at 132–39. The state court nevertheless concluded that trial counsel "made a reasonable trial strategy decision regarding whether to retain a DNA expert." 5 SHCR 1050. This was an unreasonable application of *Strickland*, and it was based on an unreasonable determination of the facts.

With respect to the factual determinations, the state court cut and pasted Mr. Cornelius's conclusory, self-serving statement that he "knows a lot about DNA." 5 SHCR 1050; 4 SHCR 944. The court also found that "Cornelius thoroughly reviewed the DNA evidence in the applicant's case." 5 SHCR 1050. However, the trial transcript itself makes clear that was not the case. Mr. Cornelius stated on the record that he was "not going to go through 20 boxes of DNA records" from the State's file. 20 RR 186–87. And Mr. Cornelius's affidavit also does not reflect that he reviewed the State's entire file. Instead, in his affidavit, he states only that "the files where [sic] brought to court by a number of prosecutors who worked, at various times, on the case," and does not say that he reviewed the "20 boxes of DNA records" that were in the prosecutor's office. 4 SHCR 945; 20 RR 86–87. Beyond that, Mr. Cornelius states only that he believes the State "provided" him with everything he thinks he was entitled to. *Id.* Nowhere, does Mr. Cornelius suggest that he actually went to the prosecutor's office to review the *complete* file. Indeed, when that possibility was suggested to Mr. Cornelius, he responded that he "do[es not] play that game." 3 SHCR 607.

The state court also found that trial counsel "made the best record and argument he could to suppress" the DNA evidence. 5 SHCR 1050. This finding, however, contradicts the trial court's ruling that it would not grant the defense's motion to suppress because trial counsel failed to connect the serious problems at the HPD crime lab to the specific evidence in this case. 17 RR 12.

The state court likewise does not acknowledge that, prior to the State's recantation of the DNA evidence, Dr. Daniel Hellwig identified analytical flaws in the State's false DNA evidence and testified that those flaws should have been apparent at the time of trial. ECF No. 18-10. Indeed, besides mimicking Cornelius's conclusory assertion that he "knows a lot about DNA," the state court does not identify any reason why trial counsel should not have at least *consulted* with a DNA expert.

34

Cornelius himself conceded "I do not hold myself out to be a DNA expert." 4 SHCR 944. The state court's adjudication was therefore based on an unreasonable determination of fact under § 2254(d)(2).

The state court's adjudication that trial counsel were not deficient in failing to investigate the State's DNA evidence was also an unreasonable application of clearly established federal law. Under *Strickland*, trial counsel have a duty to investigate the State's evidence. *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003) (holding that the state court unreasonably applied *Strickland* in finding that trial counsel was not ineffective for failing to investigate State's main witness). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. "In short, 'counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary.'" *Anderson*, 448 F.3d at 391 (quoting *Strickland*, 466 U.S. at 691).

Here, trial counsel failed in their duty to conduct a complete investigation when they did not retain a DNA expert. Indeed, without at least *consulting* with a DNA expert, they could not have made a reasonable determination that it was not necessary to retain one, whether for purposes of presenting expert testimony, assisting with the defense's cross-examination of the State's witnesses, or simply reviewing and understanding the State's DNA evidence. Trial counsel's failure to consult with a DNA expert was also a violation of the applicable guidelines, something the Director does not dispute. ECF No. 85 at 149–50. The state court's determination that trial counsel "made a reasonable trial strategy decision regarding whether to retain a DNA expert," 5 SHCR 1050, was therefore an unreasonable application of clearly established federal law. *Elmore v. Ozmint*, 661 F.3d

783, 858 (4th Cir. 2011) (state court was unreasonable in concluding that trial counsel's failure to investigate forensic evidence was not deficient performance); *Leonard v. Michigan*, 256 F. Supp. 2d 723, 731 (W.D. Mich. 2003) (state court was unreasonable in concluding that trial counsel's did not perform deficiently by failing to retain a DNA expert, even though trial counsel had a degree in chemistry).

> ii. **Trial counsel failed to preserve a Confrontation Clause challenge to the trial court's preclusion of defense cross-examination about the old HPD Crime Lab.**

This allegation corresponds to Section 4(F)(2) in Mr. Cruz-Garcia's petition. ECF No. 73 at 140–41. The Director refers this Court back to his argument in response to Mr. Cruz-Garcia's Claim Two (Mr. Cruz-Garcia's right to present a defense and cross-examine witnesses was violated when the trial court refused to allow him to present evidence relating to the unreliability of the DNA evidence). ECF No. 85 at 147. Mr. Cruz-Garcia responds to those arguments under Claim Two herein. The Director makes no arguments that the state court's adjudication of this claim was reasonable under §§ 2254(d)(1) or (d)(2). Mr. Cruz-Garcia adds the following arguments regarding § 2254(d).

As discussed in the Second Amended Petition, the trial court violated Mr. Cruz-Garcia's Confrontation Clause rights by prohibiting the defense from cross-examining the State's witnesses concerning the old HPD Crime Lab. ECF No. 73 at 57–69. Trial counsel's failure to raise a meritorious objection fell below an objective standard of reasonableness. This is not a case where trial counsel elected not to object for strategic reasons; trial counsel did contest the trial court's ruling on state law grounds.

Rather, trial counsel appears to have been either unaware of or seriously misunderstood the Sixth Amendment implications of the trial court's decision. *See* 18 RR 11 (statement by trial counsel

36

suggesting that Sixth Amendment did not apply because "the State doesn't have a Sixth Amendment right"). It likewise appears that trial counsel did not conduct any legal research on the issue. 18 RR 10–11 (trial court noting the State provided case law in support of their position, that "I didn't get anything from you guys," and asking defense counsel if they "have anything else you want me to consider . . . [a]ny case law or anything," to which trial counsel responds "[n]o"). Under clearly established federal law, being mistaken as to the governing law clearly constitutes deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). In short, trial counsel simply failed to raise the corresponding federal constitutional basis for their objection, not through any strategic decision, but because they did not know or understand the governing law.

### iii.   Trial counsel failed to investigate critical witnesses and law enforcement's theory of the offense.

This allegation corresponds to Sections 4(F)(3) through 4(F)(6) in Mr. Cruz-Garcia's petition. ECF No. 73 at 142–56. Regarding these multiple allegations, the Director refers this Court back to his argument in response to Mr. Cruz-Garcia's Five (The State relied on false testimony, in violation of the Fourteenth Amendment). ECF No. 85 at 147. Mr. Cruz-Garcia responds to those arguments under Claim Five herein. The Director makes no arguments that the state court's adjudication of this claim was reasonable under §§ 2254(d)(1) or (d)(2). Mr. Cruz-Garcia adds the following arguments regarding § 2254(d).

Notably, the Director's reference back to his argument on the merits of the false testimony claim are non-responsive with regards to Mr. Cruz-Garcia's claim that trial counsel were deficient for failing to investigate Mr. Santana's crime of moral turpitude. The Director does not, and cannot, contest that Mr. Santana lied on the stand about the gender of the victim of his prior conviction.

*See* ECF No. 85 at 59–60. In other words, it is not disputed that Mr. Santana lied on the stand and trial counsel failed to uncover that falsehood.

The trial record further makes clear that the failure to investigate and impeach Mr. Santana did not result from trial strategy. Trial counsel clearly intended to impeach Mr. Santana with his child-assault conviction, provided that the victim was a girl. 21 RR 17–18. Trial counsel admitted on the record they had not performed a complete investigation of the issue, and so would simply accept whatever Mr. Santana testified to. *Id.* This was an incomplete investigation that was not based on any strategic consideration, which under clearly established federal law is ineffective assistance of counsel. *Strickland*, 466 U.S. at 691.

Likewise, trial counsel's failure to uncover Mr. Santana's mental health issues constituted deficient performance. Evidence of Mr. Santana's mental health was available publicly via PACER filings in Mr. Santana's federal criminal case. ECF Nos. 18-12, 18-13, 18-14. Trial counsel did not strategically determine that they did not need to investigate Mr. Santana's criminal history. Rather, their investigation was unreasonably insufficient. Under clearly established federal law, trial counsel's failure to investigate the State's star witness constituted ineffective assistance of counsel. *Anderson*, 338 F.3d at 391; *Grant v. Lockett*, 309 F.3d 224, 234 (3d Cir. 2013), *abrogated on other grounds*, *Dennis v. Sec., Penn. Dep't Corrs.*, 834 F.3d 263 (3d Cir. 2016) (state court unreasonably determined that trial counsel did not perform deficiently by failing to investigate star witnesses' criminal history).

At trial, the State presented argument and testimony that Diana Garcia and Arturo Rodriguez stopped selling drugs before they were attacked and Angelo was taken. 18 RR 33, 133–34, 204; 19 RR 33. Ms. Garcia's and Mr. Rodriguez's purported decision to stop selling drugs made

them more sympathetic to the jury and supplied the State's theory of Mr. Cruz-Garcia's motive. 18 RR 33, 204; 23 RR 98. Police reports make clear, however, that Ms. Garcia and Mr. Rodriguez were still selling drugs *on the night of the offense*.[19] ECF 18-24 at 1–2. As discussed in the Second Amended Petition, trial counsel performed deficiently by failing to bring this to the jury's attention.

The trial court's only finding on this point is a single sentence: "On cross-examination of Diana Garcia and Arturo, trial counsel obtained admissions from both witnesses that they initially lied about their involvement in drug dealing." 5 SHCR 1053. But whether trial counsel brought out that Ms. Garcia and Mr. Rodriguez initially *lied to the police* about whether they *ever* sold drugs does not prove—or even suggest—that the trial counsel did not perform deficiently by failing to show that Ms. Garcia and Mr. Rodriguez *lied to the jury* about whether they *stopped* selling drugs, thereby somehow causing Mr. Cruz-Garcia to become upset with them. Similarly, there was no reasonable basis to conclude that trial counsel did not perform deficiently in failing to present evidence that Ms. Garcia and Mr. Rodriguez not only lied to police initially, but that the police *never believed they were fully forthcoming*. ECF No. 73 at 154. There is also no reasonable basis for finding that trial counsel were not deficient in presenting evidence that during the initial investigation, law enforcement concluded that the cigar with Mr. Cruz-Garcia's DNA was *not* linked to the offense. *Id.* at 143–54.

The state court's conclusions concerning Cesar Rios, Jose Valdez, and Hector Saavedra were likewise unreasonable, both legally and factually. With respect to its legal determination, the state court repeatedly emphasized the statements in the defense teams affidavits suggesting that Mr. Cruz-Garcia was uncooperative and invoked God in response to their questions. 5 SHCR 1051–52. The

---

[19] Ms. Garcia testified that she and Arturo only ever sold drugs for Mr. Cruz-Garcia. 18 RR 177.

state court concluded that "[b]ecause applicant did not supply trial counsel with the names of Cesar Rios or Cesar Mela Rios, Jose Valdez, or Hector Saavedra as potentially beneficial defense witnesses and the defense was unable to locate Cesar Mala Rios, the applicant fails to demonstrate trial counsels' alleged ineffectiveness for not presenting them as witnesses." 5 SHCR 1052. The state court's conclusion was an unreasonable application of clearly established federal law. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (client's uncooperativeness does not relieve trial counsel of the duty to investigate).

With respect to factual determinations, it is undisputed that trial counsel did not need Mr. Cruz-Garcia's help in identifying Mr. Rios as an important witness. Police reports from 1992 described Mr. Rios as a known associate of Mr. Cruz-Garcia. *See* 5 SHCR 958. As a result, trial counsel's investigator knew that Mr. Rios was an important witness to interview. Although the state court found that "the defense team's efforts to contact Cesar Mala Rios were not successful," the court did so without acknowledging Mr. Rios's own affidavit, which states that he recalls "talking to one person on the defense team briefly," but that the defense never followed up. 5 SHCR 1052; 2 SHCR 405.

Under clearly established federal law, trial counsel also performed deficiently by failing to undercut Angelita Rodriguez's claim that Mr. Cruz-Garcia confessed to her. Ms. Rodriguez dramatically testified that the first time she saw Mr. Cruz-Garcia after he left Houston was to ask him for a divorce; that, in response, Mr. Cruz-Garcia threatened her family; and that he then confessed to the crime. 20 RR 105. In reality, according to an FBI report, Ms. Rodriguez continued

to live with Mr. Cruz-Garcia at her family's house in the Dominican Republic. ECF No. 18-15.[20]

There was no strategic reason for trial counsel not to investigate Ms. Rodriguez's story. *See Strickland*,

466 U.S. at 491.

> iv.   **Trial counsel failed to investigate issues impacting jury deliberations**

This allegation corresponds to Sections 4(I) in Mr. Cruz-Garcia's petition. ECF No. 73 at

142–56. With regards to this allegation, the Director refers this Court back to his argument in

response to Mr. Cruz-Garcia's Claim Nine (Mr. Cruz-Garcia was not present during portions of his

trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments). ECF No. 85 at 147. Mr.

Cruz-Garcia responds to those arguments under Claim Nine herein. The Director makes no

arguments that the state court's adjudication of this claim was reasonable under §§ 2254(d)(1) or

(d)(2). Mr. Cruz-Garcia adds the following arguments regarding § 2254(d).

The state court's finding that trial counsel did not perform deficiently by failing to investigate

Michael Casaretto's report of juror misconduct was an unreasonable application of clearly

established federal law. Trial counsel's failure to interview Mr. Casaretto was not the product of a

strategic decision not to investigate. In fact, Mr. Cornelius himself concluded that he *did* need to

speak personally with Mr. Casaretto to ensure that the record reflected exactly what he had observed.

24 RR 5 ("MR. CORNELIUS: Let me write down his phone number so I can call him. . . . . Okay.

I will call him just to make sure and put whatever he tells me on the record.").

The state court completely failed to acknowledge this point. Instead, the state court

emphasized the differences between what Mr. Casaretto recalled in his affidavit and the court's

---

[20] Mr. Cruz-Garcia mistakenly cites to this exhibit as 118-15 in his Second Amended Petition. The correct ECF No. is 18-15.

description of what Mr. Casaretto reported. 5 SHCR at 1066–68. That, however, only underscores trial counsel's error in failing to "call him just to make sure and put whatever he tells me on the record." 24 RR 5. Had trial counsel done what Mr. Cornelius conceded they needed to do at the time, trial counsel could have learned that Mr. Casaretto recalled the episode of juror misconduct differently than the trial judge. Because trial counsel's failure to investigate was not the result of a reasonable strategic decision, the state court's finding that trial counsel was not ineffective was legally unreasonable. *Strickland*, 466 U.S. at 691.

The state court's conclusion that trial counsel did not perform deficiently in failing to object to the trial court's *ex parte* meeting with a holdout juror or insisting that she be questioned in open court was legally and factually unreasonable. In his affidavit, Mr. Cornelius does not offer any strategic reasons for failing to do so. He concedes that "[t]here is a huge difference between what we knew at the time and what has been said after the verdict was rendered." 4 SHCR 948. He then states that he thought the *ex parte* meeting "was recorded and a part of the record and could be reviewed on appeal if necessary." *Id.* Believing that a transcript of the *ex parte* conference would be available to appellate counsel, however, does not explain why *trial counsel* did not take adequate steps to ensure they would know what Juror Bowman sought to speak with the trial judge about.

Mr. Cornelius next states that he "trusted the Judge to do what she thought to be the appropriate action in the situation." 4 SHCR 948. Without having learned from Juror Bowman what "the situation" was, Mr. Cornelius cannot have made a reasonable strategic decision that whatever the trial court "thought to be the appropriate action" would adequately address it. Finally, Mr. Cornelius states that he does "not *now* think the Judge did anything improper," which obviously does not explain his decision at the time. *Id.* (emphasis added). In short, trial counsel's failure to

42

object was not based on a reasonable strategic decision and therefore constituted ineffective assistance under clearly established federal law. *See Strickland*, 466 U.S. at 691.

The state court's decision was also based on an unreasonable determination of the facts. The state court's decision turned on the following finding:

> The Court finds, based on the habeas record, that the applicant offers nothing to support his allegations that trial counsel, during the applicant's habeas investigation, asserted that they were not told by the court that Bowman was a holdout vote and wanted to stop deliberating; that there was an informal conversation with the judge outside the courtroom during which counsel were informed that Bowman was having a hard time; and, that both counsel would have asked the court to end deliberations and enter a life sentence if they had known that Bowman was a holdout juror who desired to stop deliberations.

5 SHCR 1064. In support of this assertion, the state court notes only that "neither of trial counsels' habeas affidavits contain the statements alleged by the application." *Id.* The state court completely ignored other record evidence, however, including emails from trial counsel containing precisely "the statements alleged by the applicant." 3 SHCR 607–12. The state court's finding therefore was an unreasonable factual determination under § 2254(d)(2).

### v. Trial counsel failed to recognize the significance of Mr. Cruz-Garcia's foreign nationality

This allegation corresponds to Sections 4(K) in Mr. Cruz-Garcia's petition. ECF No. 73 at 142–56. With regards to this allegation, the Director refers this Court back to his argument in response to Mr. Cruz-Garcia's Claim 16 (Violation of Vienna Convention on Consular Relations). ECF No. 85 at 147. The Director makes no arguments that the state court's adjudication of this claim was reasonable under §§ 2254(d)(1) or (d)(2) Mr. Cruz-Garcia adds the following arguments regarding § 2254(d).

The state court unreasonably applied clearly established federal law in finding that trial counsel were not ineffective for failing to seek consular assistance. The state court emphasizes the

43

statements in trial counsels' affidavits that Mr. Cruz-Garcia purportedly had "no interest" in receiving consular assistance. 5 SHCR 1058. Even if trial counsel's affidavits can be credited on this point, it does not end the inquiry. Under Texas Guideline 10.6, counsel is required to "exercise his or her best professional judgment under the circumstances" if the client's consent cannot be obtained. Neither trial counsel, nor the state court, ever explain why trial counsel's "best professional judgment" was to not seek consular assistance.

Additionally, the state court unreasonably determined that consular assistance would not have benefitted Mr. Cruz-Garcia because "the applicant was represented by skilled counsel who were far more qualified to explain the Texas criminal justice system to the applicant than a representative of the applicant's consulate." 5 SHCR 1058–59. As reflected in the affidavit submitted by Mr. Cruz-Garcia from the Dominican consulate and from an expert on consular assistance, the benefit of consular assistance is not to "explain the Texas criminal justice system," but to assist in helping to locate witnesses, documents, and information in the defendant's home country. 1 SHCR 208; 2 SHCR 421. In that regard, "consular officials have been instrumental in obtaining mitigating evidence from the national's home country that has a decisive impact on the penalty phase," which is exactly the type of evidence that trial counsel failed to present in this case. 1 SHCR 208. Because trial counsel did not adhere to the applicable guidelines and because the state court did not reasonably consider the prejudice that resulted from the lack of consular assistance, the state court's finding that counsel were not ineffective was an unreasonable application of clearly established federal law. *See Wiggins*, 539 U.S. at 524.

## 2.  Ineffective assistance of trial counsel at the punishment phase

In state habeas, trial counsel were specifically ordered to address the failure to retain a mitigation expert and the failure to investigate future dangerousness. 4 SHCR 945–47. Hence, this Court need not imagine what trial counsel may or may not have considered.

### i.   Unreasonable application of clearly established federal law on deficient performance

#### a.  *Mitigation*

The CCA held that trial counsel were not deficient and Mr. Cruz-Garcia was not prejudiced where trial counsel did not retain a mitigation specialist, presented a shotgun-style mitigation case without any expert testimony, and did not investigate or attempt to rebut future dangerousness. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. Mr. Cruz-Garcia can meet the relitigation bar under §2254(d) as to the section of his IATC claim concerning the punishment phase because the CCA's adjudication involved an unreasonable application of clearly established federal law. That adjudication was further impacted by unreasonable determinations of fact under § 2254(d)(2). This Court can therefore review Mr. Cruz-Garcia's claim of ineffective assistance of trial counsel at the punishment phase *de novo*. *Brumfield*, 576 U.S. at 311.

The CCA based its adjudication of punishment phase allegations of ineffectiveness on the trial court's only conclusion of law as to ineffectiveness at the punishment phase: that trial counsel had not performed deficiently because "trial counsel filed a dozen pre-trial motions, hired an investigator, obtained funds to send the investigator to the Dominican Republic to follow-up with witnesses, hired a clinical psychologist, questioned potential jurors for eleven days, cross-examined thirty-two witnesses, presented evidence of the applicant's life history, and presented the testimony of four defense witnesses." *See Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. This conclusion did

45

not acknowledge or confront the specific omissions by trial counsel alleged by Mr. Cruz-Garcia to constitute ineffective assistance of counsel. The trial court's findings of fact are likewise simply a recitation of trial counsel's conduct ahead of and during the punishment phase. 5 SHCR 1053–56.

Under clearly established federal law, "[a] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct." *Strickland*, 466 U.S. at 689. A reviewing court may not assume the adequacy of trial counsel's representation and must inquire whether counsel's acts and omissions "actually demonstrated reasonable professional judgment." *Wiggins*, 539 U.S. at 527 (finding that the state court unreasonably applied clearly established federal law when it failed to assess the reasonableness of trial counsel's conduct). That trial counsel performed some basic tasks in their representation of Mr. Cruz-Garcia, including basic tasks unrelated to the punishment phase, does not answer the mandated inquiry under clearly established federal law as to whether the conduct challenged by Mr. Cruz-Garcia was reasonable. The trial court's adjudication, which was adopted by the CCA, was therefore contrary to clearly established federal law.

To the extent the CCA assessed the reasonableness of trial counsel's conduct, its conclusion that trial counsel were not deficient is an unreasonable application of clearly established federal law. Based on the facts of Mr. Cruz-Garcia's case and objectively viewed as of the time of counsel's conduct, trial counsel's acts and omissions do not reflect the exercise of reasonable professional judgment. *See Wiggins*, 539 U.S. at 523. Trial counsel did not retain a mitigation specialist; conducted a rushed, *ad hoc*, and inadequate investigation; and presented a shotgun-style mitigation case.

The failure to retain a mitigation specialist cannot be credited as reasonable professional judgment in a case where, by their own admission, trial counsel "felt [their] best shot at punishment

was on mitigation." 4 SHCR 946. Both the ABA and Texas Guidelines mandate that a mitigation specialist should be retained, *see* ECF No. 73 at 159, and this was standard practice in Harris County at the time of Mr. Cruz-Garcia's trial.[21] Trial counsel touted that, in lieu of a mitigation specialist, they persuaded the trial court to fund a psychologist up to $17,400 to "consult with on any matter of mitigation." 4 SHCR 947. But trial counsel did not consult with that psychologist, Dr. Rosin, until a year after her appointment, and she then performed just seven hours of work in connection with Mr. Cruz-Garcia's case. ECF No. 18-7 at 21.

Under clearly established federal law, trial counsel also have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691. Here, trial counsel flouted that duty by failing to pursue critical lines of mitigation investigation. Tellingly, trial counsel obtained funding to investigate in Puerto Rico, where Mr. Cruz-Garcia had significant ties. But no member of the defense team ever traveled there. This failure is all the more unreasonable considering Mr. Cruz-Garcia told trial counsel about his assistance to federal law enforcement in Puerto Rico. *See Strickland*, 466 U.S. at 691.

The Director argues that Mr. Cruz-Garcia does not dispute the trial court's finding that that investigator JJ Gradoni and interpreter Edna Velez traveled to the Dominican Republic, "where they located and interviewed witnesses, took photographs, and obtained useful and important

---

[21] The Director argues that the fee affidavit from a mitigation specialist in Harris County from a case Mr. Cornelius was appointed to and around the time of Mr. Cruz-Garcia's trial does not refute trial counsel's allegations that they could not have retained a mitigation specialist due to funding cuts to indigent defense. ECF No. 85 at 154. Trial counsel's affidavit, however, stated that "[t]o my knowledge, all of the 'mitigation experts' in Harris County, of which there were not many at that time, refused to take cases for the money the County was willing to pay[.]" The fee affidavit, from one of Mr. Cornelius' own cases, makes clear that was not the case. It also shows that it was standard practice at the time of Mr. Cruz-Garcia's trial for counsel in Harris County to retain a mitigation specialist in capital cases. *See Wiggins*, 539 U.S. at 524 (reasonableness of trial counsel's actions assessed based on standard practice at time).

information for trial counsel [] to use for mitigation purposes." ECF No. 85 at 156–57 (quoting 5 SHCR 1055). This finding, however, underscores the unreasonableness of the scope of trial counsel's mitigation investigation. As this finding makes clear, they uncovered no evidence that could have justified limiting their investigation of mitigation evidence, including by failing to conduct *any* investigation in Puerto Rico. *See Wiggins*, 539 U.S. at 525 (counsel's failure to pursue mitigation investigation was not reasonable where, *inter alia*, they "uncovered no evidence in their investigation to suggest that . . . further investigation would have been fruitless").

Likewise, this finding emphasizes the unreasonableness of trial counsel's presentation of mitigation evidence to the jury, which did not include any "useful and important information" stemming from their truncated investigative efforts. Trial counsel presented the testimony of just four witnesses, two of whom testified via shoddy video link because trial counsel failed to secure their in-person testimony. 26 RR 11–2, 67–79. And the fourth witness was not identified by trial counsel, but instead only testified after hearing about the trial on the news and taking it upon himself to come to the courthouse to ask trial counsel to testify to the transformative impact of Mr. Cruz-Garcia's friendship. 26 RR 81. Tellingly, according to the jury foreperson, this latter testimony was what stayed with the jury during their deliberations on punishment. 3 CR 625 ("[I]f it hadn't been for that kid, it would have been a much easier decision for me.").

The Director contends that trial counsel cannot be ineffective for presenting the testimony of just four witnesses because they received "limited cooperation from their client[.]"[22] ECF No. 85 at 156. Trial counsel, however, only ever complained that Mr. Cruz-Garcia "refused to discuss the

---

[22] The Director argues that trial counsel also presented Mr. Cruz-Garcia's life history through cross-examination of "fellow drug dealer Santana, and Angelita Rodriguez, Cruz-Garcia's ex-wife." ECF No. 85 at 156. But Ms. Rodriguez did not testify at punishment and Mr. Santana testified on cross-examination that Mr. Cruz-Garcia had committed at least one other murder and one other violent assault. 25 RR 87–95.

facts of the primary case with counsel" and never alleged that he refused to discuss mitigation-related matters. Indeed, any such contention is refuted by trial counsel's statements on the record that Mr. Cruz-Garcia informed them of his assistance to federal law enforcement. 24 RR 71. Regardless, under clearly established federal law, a client's alleged uncooperativeness does not relieve trial counsel of their duty to conduct a reasonable mitigation investigation. *See Porter v*, 558 U.S. at 40.

By trial counsel's own admission, they "banked" on their mitigation case. 4 SHCR 947. From this perspective, it cannot then have been reasonable for trial counsel to so limit the investigation and presentation of mitigation evidence. Trial counsel's mitigation and investigation objectively fell below prevailing professional norms, as set out in the ABA and Texas Guidelines and reflected by standard practice in Harris County. The CCA therefore unreasonably applied clearly established federal law by concluding that trial counsel's acts and omissions did not constitute deficient performance.

### b.   *Future dangerousness*

Likewise, the CCA unreasonably applied clearly established federal law by concluding that trial counsel's failure to investigate, and concession of, the future dangerousness special issue did not constitute deficient performance. Under clearly established federal law, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

In state habeas, trial counsel did not dispute the allegation that they had not conducted any investigation pertaining to future dangerousness. *See* 4 SHCR 945–47. By trial counsel's own admission, they conceded the future dangerousness special issue. *Id.* (Trial counsel "felt, and still feel, that if this was what the jury would deliberate on we would lose for sure."). But conceding the

future dangerousness special issue can "hardly be the work of reasonable counsel." *Andrus v. Texas*, 140 S. Ct. 1875, 1885 (2020).

In trial counsel's own words, and upon which the Director relies, *see* ECF No. 85 at 162, trial counsel did not conduct *any* investigation relating to future dangerousness because they "ha[d] not won a case on the future dangerousness question, or seen it done." 4 SHCR 946. This reasoning, however, cannot be credited as reasonably strategy. Clearly established federal law makes clear that trial counsel's decision-making must be based, and therefore evaluated, "on the facts of the particular case." *Strickland*, 466 U.S. at 689. It is not reasonable for trial counsel to not confront at all one of two special sentencing issues mandated by the Texas capital sentencing scheme simply because they have not previously succeeded on that issue in other cases. By that measure, it would be reasonable for trial counsel to fail to pursue any issue irrespective of the client's circumstances, simply because they had not "seen it done."

Trial counsel further opined that, regardless of jurors' sworn testimony on *voir dire* that they would not automatically find the defendant to be a future danger, trial counsel "kn[e]w better." *Id.* But under Texas' capital sentencing scheme, jurors are charged that they must deliberate on the future dangerousness special issue. Tex. Code Crim. Proc. art. 37.071 § 2(d)(1). Here, however, trial counsel avowedly abandoned any case on the future dangerousness special issue based on their belief that jurors do not follow the law as charged. This likewise cannot be credited as reasonable professional judgment.

Trial counsel also represented that they conceded the future dangerousness special issue because "the State does not seek the death penalty on cases where the crime is an aberration or where the defendant does not have a history." 4 SHCR 946. In other words, because the State sought

50

the death penalty against Mr. Cruz-Garcia, he must have had a "history" such that future dangerousness was a foregone conclusion. But, to the extent this version of the State's charging decision-making is to be believed, then trial counsel were firmly on notice of the necessity of investigating the State's case on future dangerousness. *Cf Rompilla v. Beard*, 545 U.S. 374, 385 (2005) ("counsel ha[s] a duty to make all reasonable efforts to learn what they c[an] about the offense[s]" the State intends to introduce against the defendant). It is then "common sense" that trial counsel should have obtained and investigated the information underpinning the State's future dangerousness case against Mr. Cruz-Garcia.[23] *Id.* at 383.

As noted *supra*, trial counsel's abdication on the future dangerousness special issue is all the more unreasonable considering that Mr. Cruz-Garcia himself gave trial counsel information with which to rebut the State's future dangerousness evidence that implicated Mr. Cruz-Garcia in a kidnapping in Puerto Rico. Indeed, the record reflects that Mr. Cruz-Garcia attempted to have trial counsel develop evidence going to his assistance to federal law enforcement in Puerto Rico, and which was likely connected to the kidnapping allegations. 24 RR 70–73. Based on this critical rebuttal information provided by Mr. Cruz-Garcia himself, it was unreasonable under clearly established federal law to not investigate this information at all. *See Strickland*, 466 U.S. at 691.

---

[23] On the record at trial, trial counsel indicated that they would not review the State's file. 20 RR 186–87. In state habeas, however, when confronted with this record, trial counsel alleged that they did review the file, 4 SHCR 945, and the state court entered a finding of fact that trial counsel had reviewed the State's file. 5 SHCR 1054. This finding, however, only further underscores the unreasonableness of trial counsel's failure to investigate and challenge the State's case on future dangerousness. The State's file included, amongst other evidence, Mr. Cruz-Garcia's Puerto Rican prison records reflecting that he had never been disciplined, let alone convicted, in connection with the supposed prison escape relied upon by the State to prove their case on future dangerousness. Those records reflected that, on the contrary, Mr. Cruz-Garcia was a model prisoner who did not have any disciplinary record. ECF No. 18-38. In light of what these records revealed, it was unreasonable under clearly established federal law for trial counsel to conduct no investigation in connection with future dangerousness. *See Wiggins*, 539 U.S. at 527–28.

Finally, trial counsel sought to justify their concession of the future dangerousness special issue by pointing to their case on mitigation. *See* 4 SHCR 946. But the "halfhearted" mitigation evidence they *did* present, including a witness who had to seek out trial counsel to testify on behalf of Mr. Cruz-Garcia, belies this contention. *See Wiggins*, 539 U.S. at 526. Tellingly, trial counsel obtained funding to go to Puerto Rico, where Mr. Cruz-Garcia was alleged to have committed a violent kidnapping and to have attempted to escape from a prison, and was therefore where much of the State's case on future dangerousness would have been investigated. Yet, no member of the defense team ever traveled to Puerto Rico. This supposed decision to dispense with any investigation into future dangerousness "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 526–27.

Moreover, the decision to present a case on mitigation defense certainly does not preclude trial counsel from also investigating future dangerousness, or excuse trial counsel from doing so. *See id.* at 535 ("While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive."). In *Williams*, the Supreme Court rejected the supposed reasonableness of counsel's failure to uncover and present mitigating evidence as a tactical decision to focus on other issues because counsel did not "fulfill their obligation to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396.

Under clearly established federal law, trial counsel have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691. By trial counsel's own admission, they did not investigate the future dangerousness special issue and the state record makes clear that they likewise did not reasonably

decide that such investigation was unnecessary. Reasonable professional judgment does not support the concession of the future dangerousness special issue. The CCA thus unreasonably applied clearly established federal law to Mr. Cruz-Garcia's allegations and this Court can review this claim *de novo*.

> ### ii. Unreasonable application of clearly established federal law to prejudice

The CCA also unreasonably applied clearly established federal law when it held that Mr. Cruz-Garcia had not been prejudiced. *See Ex parte Cruz-Garcia*, 2017 WL 4947132, at *2. Based on the wealth of mitigation evidence, including evidence made known to trial counsel by Mr. Cruz-Garcia but never put to the jury, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

The Director argues that Mr. Cruz-Garcia cannot show that he was prejudiced by trial counsel's failure to investigate and present mitigation evidence because that evidence is "speculative or cumulative." ECF No. 85 at 159. But the jury never heard *any* evidence that Mr. Cruz-Garcia was abandoned by his mother as a young child, forced into child labor, and beaten. *See* ECF No. 73 at 164–73. Nor did the jury hear *any* expert testimony as to the traumatic impact of these events on Mr. Cruz-Garcia's childhood and development. *See id.* at 176–78. The jury also did not hear *any* evidence of Mr. Cruz-Garcia profound and sincere religious conversion while incarcerated in Puerto Rico. *See id.* at 175–76, 184–192. And nor did the jury hear *any* evidence that Mr. Cruz-Garcia was a model prisoner who took on a pastoral role during his incarceration. *See id.* Finally, the jury never heard that Mr. Cruz-Garcia provided assistance to federal law enforcement. *See id.* at 178–79. There is nothing cumulative nor speculative about this wealth of mitigation evidence.

Investigation of future dangerousness would have likewise yielded significant evidence to undermine all critical aspects of the State's case on future dangerousness. Mr. Cruz-Garcia's alleged role in the murder of Saul Flores was a critical tenet of the State's case on future dangerousness. *See* ECF No. 73 at 252 n.56, 182. Had they investigated these allegations, however, trial counsel could have shown that the witnesses who implicated Mr. Cruz-Garcia were not credible. *See* ECF No. 73 at 182. Likewise, had trial counsel investigated the information Mr. Cruz-Garcia provided to his counsel about his assistance to federal law enforcement, trial counsel could have undercut the strength of the State's evidence implicating Mr. Cruz-Garcia in a kidnapping in Puerto Rico. *See id.* at 182–83. And, likewise as to the alleged beating by Mr. Cruz-Garcia of "Betico." *Id.* at 183–84, 232 n.55. Glaringly, the jury never heard of Mr. Cruz-Garcia's exemplary prison record in Puerto Rico. The jury never heard, amongst other evidence, that Mr. Cruz-Garcia was a model inmate who took a leadership role in religious services and was trusted with the keys to the prison, that he was not considered to pose a danger as an inmate, and that Mr. Cruz-Garcia had no disciplinary record. *See* ECF No. 73 at 175–76, 185–92.

"This is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing [jury]'." *Porter*, 586 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700). Because the State court's adjudication resulted in a decision that is contrary to, or based on an unreasonable application of, clearly established federal law under § 22254(d)(1), the Court can review the merits of Mr. Cruz-Garcia's allegations *de novo*.

**C.  Subparts 4(D), 4(E), and 4(C)(7) are not barred by the statute of limitations**

The Director asserts that certain subparts 4(D), 4(E), and 4(C)(7) of Mr. Cruz-Garcia's IATC claim are barred by the statute of limitations because they were not raised in his initial petition. ECF No. 85 at 125–26. The Director is mistaken. The supposedly new subparts concern trial counsel's failure to adequately communicate with Mr. Cruz-Garcia (subpart 4(D)), trial counsel's failure to request a continuance (subpart 4(E)), and trial counsel's failure to review the State's file "pertaining to the guilt/phase of trial" (subpart 4(C)(7)), ECF No. 85 at 124. As an initial matter, the Director's characterization of these subparts as separate "claims" is inaccurate. The subparts mostly consist of record-based facts that, collectively with the entire IATC claim, show that trial counsel's representation was deficient throughout the case. As the statute of limitations applies to *claims*, as opposed to facts supporting claims, the Director's argument that these subparts are barred from consideration is without merit. *Martinez v. Hooks*, 2021 WL 5100956, at *5 (W.D.N.C. 2021) ("Additional facts that 'merely support[] or strengthen[] a claim that could have been properly stated without' such facts do not create 'a new factual predicate for purposes of triggering the statute of limitations under § 2244(d)(1)(D).'" (quoting *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (alternations in original))).

Even if these subparts were somehow separate claims, each were sufficiently identified in Mr. Cruz-Garcia's initial petition such that the allegations in the Second Amended Petition relate back to that filing. "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle v. Felix*, 545 U.S. 664, 664 (2005).

In his initial petition, Mr. Cruz-Garcia discussed trial counsel's failure to review the State's file on multiple occasions. He specifically identified the factual basis for his argument that trial counsel failed to review the DNA evidence in the State's file. ECF No. 12 at 52–54. In his section

of pretrial investigative failures, he also alleged "[t]rial counsel failed to review files made available to them by the District Attorney's Office." ECF No. 12 at 27. Mr. Cruz-Garcia also repeatedly alleged the factual basis for his claim that trial counsel should have sought a continuance by discussing that trial counsel had not dedicated adequate time to preparing for trial. *See* ECF No. 12 at 20 (noting that because "[t]rial counsel's investigation into, and preparation for, Mr. Cruz-Garcia's trial fell below prevailing professional norms[,]" "trial counsel were not adequately prepared to represent Mr. Cruz-Garcia, and in turn the jury did not hear significant exculpatory evidence and evidence that would have militated against the death penalty"); ECF No. 12 at 21 ("Trial counsel failed to maintain a proper workload and as a result were prevented from devoting the time needed to adequately prepare for Mr. Cruz-Garcia's trial."). Finally, in his initial petition, Mr. Cruz-Garcia cited a Guideline discussing trial counsels' need to adequately communicate with their client and noted instances of communication failures. *See, e.g.*, ECF No. 12 at 59, 120–22.

The cases cited by the Director involve inapposite facts because in those cases the petitioner raised claims in their amended petitions that either alleged a different legal theory or was based on entirely new facts. In *Mayle*, the petitioner asserted in his initial petition that his Sixth Amendment Confrontation Clause rights were violated by the introduction into evidence of the videotaped testimony of a prosecution witness. 545 U.S. at 648. In his amended petition, the petitioner then raised a claim that admission of *his own* statements during a pretrial interrogation violated his *Fifth Amendment right against self-incrimination. Id.* at 649. In *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009), the court held that a claim that trial counsel did not file an appeal did not relate back to claims that trial counsel committed errors during the sentencing phase of the trial and in coercing the defendant to take the case to trial. And in *United States v. Ciampi*, 419 F.3d 20, 24 (1st

56

Cir. 2005), the jury convicted the petitioner of one count in the indictment but hung on eighteen other counts. The petitioner subsequently pleaded guilty to two of those eighteen counts. He filed an initial federal habeas petition alleging that his trial counsel performed deficiently by advising him to accept the government's plea offer. In any amended petition, he attempted to add a claim that his trial court rendered ineffective assistance by failing to appeal the count on which the jury convicted him. Because the new claim concerned a completely separate factual universe than what was pled in the initial petition, the court held that the claims did not relate back. The other cases cited by the Director are similarly off the mark. *See F.D.I.C. v. Conner*, 20 F.3d 1376, 1385–86 (5th Cir. 1994) (holding that district court erred in finding that claims alleging losses suffered from loans not referenced in original complaint did not relate back); *McGregor v. La. State Univ. Bd. Of Sup'rs*, 3 F.3d 850, 864 (5th Cir. 1993) (holding that claim that added "a new legal theory unsupported by factual claims raised in the original complaint" did not relate back).

### D. The Director's arguments concerning the subparts he contends are procedurally defaulted should not persuade the court

The Director also argues that subsections 4(D), 4(E), 4(H), 4(J), and 4(C)(7) of Mr. Cruz-Garcia's IATC claim are procedurally defaulted because they were not raised in his initial state habeas petition. ECF No. 85 at 126. Several of the subparts identified by the Director, however, were raised in the initial state petition. Just as he did in his initial federal petition, Mr. Cruz-Garcia discussed trial counsel's failure to review the DNA evidence in the State's file in his initial state habeas application. 1 SHCR 56–61. Additionally, the Director does not dispute—and in fact concedes—elsewhere in his brief that the subparts concerning trial counsel's failure to preserve a Confrontation Clause challenge to the court's refusal to allow him to cross-examine State's witnesses

concerning the Houston Crime Lab and trial counsel's failure to object to the court's *ex parte* meeting with juror Bowman are not procedurally defaulted. ECF No. 85 at 147–48.

The Director acknowledges that Mr. Cruz-Garcia has argued that the procedural default of his IATC claim, whether as a whole or with regards to the sections that are defaulted, is excused because his state habeas counsel were ineffective. *See Martinez v. Ryan*, 566 U.S. 1 (2012). The Director asserts that the Court cannot consider the evidence Mr. Cruz-Garcia has submitted regarding the ineffectiveness of his state habeas counsel because it is barred by § 2254(e)(2) under *Shinn v. Martinez Ramirez*, 142 S. Ct. 1718 (2022). The declaration from state habeas counsel supporting his *Martinez* arguments as to the subparts the Director contends were procedurally defaulted, however, was included with Mr. Cruz-Garcia's second subsequent state habeas petition and is therefore part of the state court record. ECF No. 73-9. And in any event, evidence of state habeas counsel's ineffectiveness, as opposed to evidence supporting the underlying *Strickland* claim, is not barred by § 2254(e)(2) or *Martinez Ramirez* where the evidence supporting the underlying IATC claim is already in the state court record, as it is here. 142 S. Ct. at 1738 (expressly declining to hold that a federal court may not consider new evidence to establish cause and prejudice).

The Director asserts that Mr. Cruz-Garcia cannot show that his state habeas counsel performed deficiently in failing to raise these subparts because it was not "unreasonable for his state habeas attorneys to use their limited time and resources to investigate and present the claims they ultimately chose to present." ECF No. 85 at 128. There was little outside-the-record investigation necessary, however, for state habeas counsel to raise these subparts as they are overwhelmingly based on the trial record.

The Director does not otherwise attempt to defend the performance of state habeas counsel. Instead, the Director asserts that the subparts it contends are procedurally defaulted are not "substantial," and that therefore Mr. Cruz-Garcia was not prejudiced by his state habeas counsel's deficient performance. The Court should not be persuaded by the Director's arguments on this point.

To show that a claim is "substantial" for purposes of the *Martinez* exception to procedural default, the petitioner need only show that the claim "has some merit." *Ramey v. Davis*, 942 F.3d 241, 255 (5th Cir. 2019). The subparts the Director contends are procedurally defaulted meet that standard. For example, with respect to trial counsel's failure to adequately communicate with Mr. Cruz-Garcia and failure to seek a continuance, the Director asserts that the subparts are not substantial because the ABA and Texas capital representation Guidelines trial counsel violated are not themselves "the Constitution, laws, or treaties of the United States." ECF No. 85 at 130. To be clear, nowhere throughout his brief does the Director ever argue that trial counsel did not violate each of the numerous Guidelines identified in Mr. Cruz-Garcia's Second Amended Petition. Moreover, Mr. Cruz-Garcia pointed out in his Second Amended Petition, the Supreme Court has repeatedly identified ABA and local guidelines as highly persuasive authority for whether trial counsel's representation met the prevailing norms, as required by the Sixth Amendment. *See* ECF No. 73 at 79–81. The Director's inability to identify any way in which trial counsel's representation actually complied with the Guidelines makes clear that Mr. Cruz-Garcia's IATC claim—and these subparts in particular—are substantial.

The Director also argues that, in asserting that trial counsel met with Mr. Cruz-Garcia only twice outside the courtroom, Mr. Cruz-Garcia makes "extrapolations from mitigation investigator

J.J. Gradoni's affidavit" that are "merely speculation." ECF No. 85 at 133. That is not the case. The Director omits to mention that the state habeas court itself reached essentially the same conclusion, finding that "whenever any member of the defense team spoke to the applicant, a certified interpreter was present to assist with communication." 5 SHCR 1052. Mr. Cruz-Garcia does not, therefore, "gloss[] over counsel Madrid's ability to speak Spanish." ECF No. 85 at 131. Rather, in light of the state court's finding, Mr. Madrid's ability speak Spanish confirms that he never visited Mr. Cruz-Garcia, as he would not require "a certified interpreter." And, as the Director concedes, Mr. Cornelius only met with Mr. Cruz-Garcia twice throughout his entire representation. ECF No. 85 at 131. Again, these record-based subparts that are clearly substantial.

With respect to the subpart concerning trial counsel's failure's to preserve errors, Mr. Cruz-Garcia addresses those points elsewhere in his reply. *See* Claims Two, Nine, Ten, Eleven, Fourteen, Fifteen. With respect to the subparts concerning trial counsel's deficient performance during *voir dire*, Mr. Cruz-Garcia stands on the briefing in his Second Amended Petition.

**Claim Five:**      **Mr. Cruz-Garcia is entitled to relief on the merits of his false testimony claim.**

**A.  This Court can review the merits of this claim.**

This Court can reach the merits of this claim in one of two ways. First, by finding that the state court's dismissal of this claim was actually a merits adjudication and that Mr. Cruz-Garcia has met the relitigation bar under 28 U.S.C. § 2254(d). ECF No. 73 at 237–38. Or, in the alternative that Mr. Cruz-Garcia can excuse the default of this claim by establishing that cause and prejudice exists or a miscarriage of justice occurred. *Id.* at 238–39. Regardless of which procedural path this claim takes, relief is warranted.

The Director's position is that this claim is defaulted. ECF No. 85 at 54–55. He relies on the CCA's statement that it did not review the merits as "sufficient to rebut the presumption that

the claims were adjudicated on the merits." *Id.* at 55. However, as previously explained, that framing alone does not resolve the question. ECF No. 73 at 237 (citing *Rocha v. Thaler*, 626 F.3d 815, 835 (5th Cir. 2010); *Ruiz v. Quarterman*, 504 F.3d 523, 527 (2007)). Because Mr. Cruz-Garcia raised this claim under Texas Code of Criminal Procedure, Article 11.071 § (5)(a)(2), the state court dismissal required a merits assessment of the federal claim. *See Canales v. Stephens*, 765 F.3d 551, 565 (5th Cir. 2014) ("If the CCA dismisses the petition under § 5(a)(2) or § 5(a)(3), this Court can also review it under the standard in § 2254(d)."). Furthermore, for the reasons previously argued, the relitigation bar under § 2254(d) is met. ECF No. 73 at 238.

Even if the Director's position on default is correct, this Court can still conduct a merits analysis of this claim. The Director does not dispute that, where established, the State's knowing presentation of false testimony constitutes cause and prejudice sufficient to overcome the procedural default of a false testimony claim. *See* ECF No. 85 at 55; *see also Sparks v. Davis*, 756 F. Appx. 397, 401 (5th Cir. 2018) ("Because the merits analysis of Sparks's false testimony claim largely parallels the 'cause' threshold he must clear, it is permissible to consolidate both issues into a single inquiry." (citing *Banks v. Dretke*, 540 U.S. 668, 686 (2004)). He argues, however, that Mr. Cruz-Garcia cannot show cause and prejudice because "his claim fails to demonstrate the knowing presentation of any false or material testimony." ECF No. 85 at 55. As argued below, Mr. Cruz-Garcia can show that the State knowingly presented false testimony that was material to his conviction and sentence, and can therefore establish cause and prejudice to overcome the procedural default of this claim. In the alternative, as argued *supra* Claim Two, Mr. Cruz-Garcia can show a miscarriage of justice and overcome the default of this claim.

**B. False testimony impacted all critical aspects of the State's case on guilt and punishment.**

**1. Carmelo "Rudy" Santana**

The Director dismisses Mr. Santana's false testimony at the guilt phase as "inconsistencies" that were "known and addressed at trial." ECF No. 85 at 56, 57. The Director, however, does not identify what other witness or evidence before the jury establishes Mr. Santana's testimony as inconsistent only. Mr. Cruz-Garcia relies on Mr. Santana's prior statements to establish the falsity of his testimony to the jury. The jury still convicted Mr. Cruz-Garcia on the basis of false testimony that went uncorrected by the State and was relied upon in closing argument. *See* 23 RR 36. Pointing to "other grounds" showing the jury had some information the testimony may have been false does not automatically "turn[] what was otherwise a tainted trial into a fair one." *Napue v. People of State of Ill.*, 360 U.S. 264, 270 (1959).

Furthermore, Mr. Santana's testimony that he risked criminal prosecution based on his testimony at Mr. Cruz-Garcia's trial, as well as his testimony that he neither asked nor requested a benefit in exchange for his testimony, does not reflect "inconsistencies." ECF No. 85 at 56. The Director argues that "the record refutes" that Mr. Santana testified falsely about receiving any benefit in exchange for his testimony. ECF No. 85 at 57. In support thereof, the Director then points to Mr. Santana's own testimony that he did not receive a benefit. *Id.* at 58–59. But this is the very testimony Mr. Cruz-Garcia identifies as false and thus does not refute Mr. Cruz-Garcia's allegations. The Director also argues that Mr. Santana's testimony about his motivations for testifying are "confirmed" by (1) Agent Ebersole's testimony, (2) his attorney Ray Castro's testimony in a separate trial, and (3) a 2015 email from Assistant District Attorney Natalie Tise that there was no deal. *Id.* at 58.

The Director's reliance on Agent Ebersole's testimony is unavailing when compared to Agent Ebersole's report from his interview with Mr. Santana about his involvement in the capital murder. *See* ECF No. 18-101. That report reflects that Mr. Santana was clearly concerned about the risk of prosecution and that Agent Ebersole "advised [Mr. Santana] that his cooperation would be made known to the prosecutor and the presiding judge." *Id.* at 2. Likewise, Ray Castro's testimony at the trial of Mr. Santana's co-accomplice suggests only that Mr. Castro himself was not involved in discussions of a deal. ECF No. 43-1 at 12. Finally, the 2015 email only restates the State's position that Mr. Santana could not be prosecuted for his actions. ECF No. 18-80. As argued in Mr. Cruz-Garcia's Second Amended Petition, however, this argument is not credible based on the trial court's ruling that Mr. Santana was an accomplice as a matter of law. *See* ECF No. 73 at 241–43.

The Director also argues that Mr. Santana's testimony that he risked prosecution—moments before the State argued to the trial court that he was not an accomplice as a matter of law—is not false testimony because the State could have charged Mr. Santana with "a crime" other than capital murder. ECF No. 85 at 58–59. But Mr. Santana had just described to the jury his own role as an accomplice in the kidnapping and murder of Angelo, including weighing down Angelo's body with rocks so that it would sink below the bayou. 20 RR 135–66. The Director cannot divorce the State's follow-up question about Mr. Santana's criminal liability from his graphic testimony and pretend that it was asking, nor that the jury understood, anything other than whether Mr. Santana risked prosecution for his role in the capital murder of Angelo. Furthermore, the State's objection to the instruction that Mr. Santana was an accomplice as a matter of law makes clear its position that he could not be charged with any crime in connection with the facts of the case. 22 RR 16.

Finally, the Director does not dispute that Mr. Santana testified falsely when he lied about the gender of the victim of his prior conviction. ECF No. 85 at 60. He nonetheless argues that no due process violation arises from this false testimony because "the record does not reflect that the State knew Santana's victim was a female." *Id.* at 59–60. Here, however, the State is the same entity who prosecuted Mr. Santana's offense against a child. *See* ECF No. 18-79. The contention that the Harris County District Attorney's Office (HCDAO) somehow did not know the facts of the offense that HCDAO prosecuted is not plausible, and certainly at minimum they are attributed constructive knowledge. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (explaining that "[t]he prosecutor's office is an entity" and actions by individual prosecutors are attributed to the office as a whole for purposes of the knowledge inquiry).

Turning to materiality, the Director argues that Mr. Cruz-Garcia cannot show that Mr. Santana's false testimony was material because the DNA evidence and Angelita Rodriguez's testimony "still connected Cruz-Garcia to this crime." ECF No. 85 at 60. But a claim of false testimony requires only that a petitioner show that the testimony "could. . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 153–54 (internal citation and quotation omitted). This materiality standard does not require Mr. Cruz-Garcia to show that no other evidence could have supported the jury's guilty verdict. Here too, the DNA evidence has since been largely recanted by the State, *see* ECF No. 73 at 77–78, and Mr. Cruz-Garcia also alleges that Ms. Rodriguez's testimony is false. *See* ECF No. 73 at 228–29.

The Director's further contention that defense counsel's cross-examination somehow cured any harm arising from Mr. Santana's false testimony is belied by the Director's own admission that the jury "still credited" that testimony. ECF No. 85 at 60. Moreover, on cross-examination, Mr.

Santana only doubled down on the falsehood that he was testifying at the risk of prosecution by telling the jury that "in the computer it say, when I check it . . . the computer says that I have a charge of killing." 21 RR 15. Nor would Mr. Santana's prior conviction have been of "minimal" impeachment value, as argued by the Director, in light of the fact that it involved harm against a child and would thus have seriously undermined Mr. Santana's supposed horror at the thought of harming Angelo, a child. ECF No. 85 at 60.

Mr. Santana's false statements are material precisely because, in the Director's own words, the jury "still credited his testimony." ECF No. 85 at 60. Mr. Santana's testimony was the only testimony placing Mr. Cruz-Garcia at the scene of Angelo's murder. Absent his testimony, the State had no evidence of the events that allegedly unfolded after the masked men—whom neither Diana Garcia nor Arturo Rodriguez could identify—took Angelo from his parents' home. In closing, the State told the jury that his testimony "filled in all the gaps for you." 23 RR 98. In short, Mr. Santana was the State's star witness.

But the jury would have had reason to doubt Mr. Santana's story if they had known that Mr. Santana would not be charged for any of the crimes he admitted to. Similarly, they likely would have doubted Mr. Santana's version of events if they had known that he had a history of assaulting children. There is therefore a reasonable likelihood that Mr. Santana's false testimony, which the Director agrees was credited by the jury, affected the judgment of the jury.

## 2. DNA evidence

Based on the 2015 report, the Director does not dispute (and certainly cannot dispute) that the State relied on false testimony concerning the DNA evidence. The Director nonetheless argues that "while we now know that the cited testimony was inaccurate, Cruz-Garcia cannot demonstrate

that it was intentionally false, or that the state was aware of any falsity at the time of trial."[24] ECF No. 85 at 62. The Director, however, ignores the report of Dr. Hellwig, who identified flaws in the State's faulty analysis even prior to its own reanalysis. ECF No. 18-10. Hence, the State should have known its DNA analysis was flawed even before it reanalyzed the DNA in 2015. The Director cannot, therefore, excuse the State's reliance on false DNA evidence by casting it as an unavoidable mistake.[25]

The Director also does not dispute that Dr. Hellwig's findings about the conditions in which the forensic evidence was stored and sent "differ" from the testimony of DNA analyst Matt Quartaro. ECF No. 85 at 64. As set forth in the Second Amended Petition, Dr. Hellwig, concluded based on the chain of custody documentation that key pieces of evidence were improperly stored. ECF No. 73 at 138 (quoting ECF No. 18-10). The cutting from the crotch of the red panties and the liquid blood sample of Arturo Rodriguez were both found in unsealed envelopes. ECF No. 73 at 138–39; ECF No. 18-10 at 3. The evidence bag containing the sexual assault kit and the vaginal swabs was

---

[24] The Director argues that the 2015 report revealed "discrepancies." ECF No. 85 at 61. In that report, however, the State recanted most of the DNA evidence from trial. At trial, the State introduced testimony that the DNA evidence tied Mr. Cruz-Garcia to the cigar found at Diana Garcia's apartment, to the vaginal swabs, and to the cutting from her underwear. 21 RR 142–71. The State also introduced testimony that the DNA evidence identified Arturo Rodriguez as the contributor to the minor component on the vaginal swabs and underwear cutting. *Id.* at 111–12, 113–14. This latter identification was relied on by the State in closing to argue that because only Mr. Cruz-Garcia and Mr. Rodriguez's DNA evidence was identified, then Mr. Cruz-Garcia must have been the assailant:

> Ladies and gentlemen, if Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth – and there is no evidence of that – where is the DNA of the guy who raped Diana? Where is it? Why don't we have it? If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

23 RR 82–83. The 2015 DNA report, however, establishes that no conclusion can be drawn as to the identity of the "excessive number of contributors" to the DNA mixture on the vaginal swab, nor as to the identity of the contributor to the minor component of the DNA mixture on the underwear cutting. ECF No. 18-11. In other words, contrary to the testimony at trial, the DNA evidence does not tie Mr. Cruz-Garcia to the vaginal swabs and does not tie Mr. Rodriguez to any of this evidence. The testimony at trial was therefore false.

[25] To the extent the timing of the State's knowledge of the falsity of this testimony is at issue, Mr. Cruz-Garcia has requested discovery on when the State knew or should have known that the DNA evidence was false. ECF No. 75 at 14.

also unsealed. *Id.* at 2. The Director argues, however, that knowledge of the falsity of Mr. Quartaro's testimony cannot be imputed to the State. ECF No. 85 at 64–65. The Director overlooks, however, that the documents showing that the evidence was stored unsealed came from the chain of custody documentation, which the State surely had access to. The State, therefore, should have known that Mr. Quartaro testified falsely.

The Director also asserts that even if Mr. Quartaro testified falsely about the storage of the evidence, this issue was immaterial because "Cruz-Garcia's DNA was not transmitted to Orchid Cellmark at the same time as the evidence." ECF No. 85 at 65. The Director, however, ignores "the extended timeframe between the original HPD/Genetic Design testing and the submission of this evidence to Orchid Cellmark—roughly fifteen years," when the evidence could have been contaminated in any number of ways, not just by potential cross-exposure to Mr. Cruz-Garcia's sample. ECF No. 73 at 138; ECF No. 18-10 at 3. The Director also asserts that "Hellwig's concerns regarding degradation fail to explain why testing done in 2015 continued to link Cruz-Garcia's DNA to this evidence." ECF No. 85 at 65. But, the DNA was not *retested* in 2015. Rather, the previous testing data was *reanalyzed*. ECF No. 18-11. Dr. Hellwig's "serious concerns as to the integrity of this evidence" therefore remain entirely valid. ECF No. 18-10.

### 3. Angelita Rodriguez

Along with Carmelo Santana, the only other witness to tie Mr. Cruz-Garcia to the murder of Angelo was his ex-wife, who was also Mr. Santana's cousin. At trial, she testified that Mr. Cruz-Garcia had confessed to the murder to her when she traveled to the Dominican Republic to ask for a divorce. 20 RR 105–07. But Ms. Rodriguez never made any allegation of the sort in any of the statements she gave to law enforcement over the preceding 16 years. ECF No. 73 at 228–29.

The Director again dismisses Mr. Rodriguez's testimony at trial as evidencing only "inconsistencies." ECF No. 85 at 66. But until her testimony at trial, Ms. Rodriguez never implicated Mr. Cruz-Garcia. In her statements to law enforcement, she repeatedly denied any knowledge of the circumstances of Angelo's disappearance and death. ECF Nos. 18-73; 18-37. Her testimony at trial, according to which she was estranged from Mr. Cruz-Garcia until she asked for a divorce and at which point he supposedly confessed, is contradicted by an FBI report establishing that Ms. Rodriguez was living with Mr. Cruz-Garcia in the Dominican Republic. ECF No. 18-15. The Director further urges that, as with Mr. Santana's testimony, Ms. Rodriguez "was cross-examined" about never previously telling law enforcement about Mr. Cruz-Garcia's supposed confession. ECF No. 85 at 66. This, however, does not cure the due process violation. *Napue*, 360 U.S. at 270.

Turning to materiality, the Director argues that "[a]t best this information could have served as impeachment." ECF No. 85 at 67. But this argument ignores how critical Ms. Rodriguez's testimony of a supposed confession by Mr. Cruz-Garcia was to the State's case. In closing, the State specifically drew the jury's attention to Ms. Rodriguez's testimony as corroboration for Mr. Santana's. 23 RR 37. There is therefore a reasonable likelihood that, had the jury known of her false testimony, the jury's judgment would have been affected.

### 4. Diana Garcia and Arturo Rodriguez & law enforcement

At trial, Diana Garcia and Arturo Rodriguez testified that they had stopped dealing drugs supplied by Mr. Cruz-Garcia shortly prior to the offense. Their testimony allowed the prosecution to argue that Mr. Cruz-Garcia kidnapped and ordered the murder of Angelo as retaliation against Ms. Garcia and Mr. Rodriguez. 18 RR 133, 204. In the absence of their testimony, the prosecution would not have been able to explain why Mr. Cruz-Garcia might be motivated to murder Angelo.

But contemporaneous law enforcement reports establish that Ms. Garcia and Mr. Rodriguez were still dealing drugs on the night of the offense and from the apartment from which Angelo was kidnapped.  ECF No. 18-24. Confronted with this clearly contradictory evidence going to the State's *only* evidence of supposed motive, the Director speculates that Ms. Garcia and Mr. Rodriguez "may have been selling for another dealer" on the night of the offense and still angered Mr. Cruz-Garcia by refusing to deal the drugs he supplied. ECF No. 85 at 64. But there is no evidence at all of this supposed other dealer; indeed, the Director does not cite to anything in support of this theory. *See id.* at 68–69. The Director cannot simply invent other characters in an attempt to save the State's only theory of Mr. Cruz-Garcia's supposed motive. Moreover, Ms. Garcia testified that they never sold drugs for anyone else. 18 RR 177.

Ms. Garcia and Mr. Rodriguez's supposed decision to stop selling drugs supplied by Mr. Cruz-Garcia was the only theory of his supposed motive for kidnapping and ordering the murder of Angelo. *See* 23 RR 98. There is therefore a reasonable likelihood that this false testimony as to motive affected the judgment of the jury. *See Giglio*, 405 U.S. at 153–54.

### 5.  Murder of Saul Flores & Puerto Rico kidnapping

At punishment, Johnny Lopez and Rudy Santana testified extensively that Mr. Cruz-Garcia had gruesomely murdered Saul Flores. *See* 25 RR 46–55, 74–82. Here too, the Director argues that Mr. Cruz-Garcia "cites only inconsistencies among witnesses." ECF No. 85 at 72, 75. There was no testimony, however, contradicting Mr. Lopez and Mr. Santana's testimony identifying Mr. Cruz-Garcia as the perpetrator of Saul Flores's murder. As with Mr. Cruz-Garcia's other allegations of false testimony, the Director further argues that both witnesses were "through[ly] cross-examined" on the cause of death of Saul Flores and "any discrepancy . . . was for the jury to decide." *Id.* at 75.

69

The State nevertheless elicited or failed to correct false testimony. The Director also ignores the declaration of Elizabeth Ramos. ECF No. 18-30.

Their testimony pinning the murder of Saul Flores on Mr. Cruz-Garcia was clearly material. The State relied on the murder of Saul Flores both as a reason to seek the death penalty against Mr. Cruz-Garcia and as an extraneous offense at punishment in support of a death sentence. *See* ECF No. 73 at 232 n.56. Yet, the State to this day continues to deny Mr. Cruz-Garcia access to records relating to the murder of Saul Flores. *See* ECF Nos. 43-3; 43-4; 43-5.

Likewise, the State also introduced extensive testimony of Mr. Cruz-Garcia's alleged role in a 2001 kidnapping in Puerto Rico. *See* ECF No. 73 233–34. The Director faults Mr. Cruz-Garcia for failing to identify specific portions of testimony as false or describing their falsity. ECF No. 85 at 77. Mr. Cruz-Garcia, however, has been unable to obtain further evidence and information on this issue and has accordingly requested discovery on Mr. Cruz-Garcia's assistance to federal law enforcement. *See* ECF No. 75 at 19–20.

**Claim Six:**          **Mr. Cruz-Garcia is entitled to relief on the merits of his *Brady* claim.**

          **A.  This Court can review the merits of this claim.**

The Director acknowledges Mr. Cruz-Garcia's argument that he can establish cause and prejudice based on the State's suppression of material exculpatory, impeachment, and mitigating evidence. ECF No. 85 at 78; *see* ECF No. 73 at 250. However, he asserts that "Cruz-Garcia clearly had the opportunity to raise these claims in his first state writ and failed to do so" and refers this Court to his discussion of the merits of Mr. Cruz-Garcia's discrete *Brady* allegations. ECF No. 85 at 78. The Director, however, makes no argument in support of this assertion with respect to most of Mr. Cruz-Garcia's allegations. This broad statement further ignores the Supreme Court's clear admonishment that "[a] rule thus declaring 'prosecutor may hide, defendant must seek' is not

tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 696, 695 (2004). In *Banks*, the Supreme Court rejected the argument that the petitioner bore the burden of discovering *Brady* evidence and raising a *Brady* claim where state suppression "might have been detected." *Id.* The Supreme Court emphasized that the State represented both at trial and during State habeas that it had complied with its *Brady* obligations. *Id.* at 693; *see also Strickler v. Greene*, 527 U.S. 263, 283–85 (1999). Notably, Mr. Cruz-Garcia filed multiple pre-trial motions for *Brady* disclosure and renewed his request for *Brady* disclosure in state post-conviction, specifically requesting information concerning, among other things, (1) "[a]ll deals or 'consideration' or promise of 'consideration' given to or on behalf of all State witnesses or expected or hoped for by said State witnesses;" and (2) "[e]vidence or information indicating the untruthfulness of a State witness." ECF No. 46-3 at 4; *see also* ECF No. 73 at 254–56. The post-conviction *Brady* motion was granted by the state court. ECF No. 46-3 at 7.

### B. The State suppressed material evidence.

#### 1. State suppression of impeachment evidence against Mr. Santana

Mr. Cruz-Garcia's allegations that Mr. Santana received a deal in exchange for his testimony against Mr. Cruz-Garcia is not based on "speculation." ECF No. 85 at 79. Rather, it is based on the fact that Mr. Santana was never charged with *any* offense after he testified to his role as an accomplice as a matter of law in the capital murder of Angelo, his role in at least one other murder, and the State's implausible explanation for not charging him. *See* ECF No. 73 at 240–43. It is also based on Agent Ebersole's report from his interview with Mr. Santana, which established that Agent Ebersole "advised him that his cooperation would be made known to the prosecutor and the presiding judge."

ECF No. 18-101. This assurance was indeed borne out as the State never brought *any* charges against

Mr. Santana.[26]

The Director argues that "[r]egardless, Mr. Santana was cross-examined on the fact that he

was never charged with any crime in connection with the case." ECF No. 85 at 79. But defense

counsel could not have established through cross-examination that Mr. Santana was never charged;

this would have only become apparent once no charges were ever brought against him. Moreover,

on cross-examination, Mr. Santana testified that he had been charged with "a killing." 21 RR 15.

Cross-examination by the defense further does not demonstrate that the undisclosed deal

was immaterial. ECF No. 85 at 79. As the Director acknowledges, the jury still credited Mr. Santana's

testimony. *Id.* at 60. The Director also argues that "the jury was reminded to take into account [Mr.

Santana's] own culpability." *Id.* at 79. But absent the disclosure of the deal, his culpability only

reinforced his credibility to the jury as a witness who was testifying irrespective of the risk that he

would be prosecuted.

Regarding Mr. Santana's health records, the Director's argument that the State prosecutor

did not personally know of these records ignores that "the [*Brady*] rule encompasses evidence 'known

only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280–81 (quoting *Kyles

v. Whitley*, 514 U.S. 419, 438 (1995)). Mr. Santana, who stated that the maintained a "plethora" of

records that "illustrate my undeniable incompetence," was housed in the Harris County jail, several

employees of which were witnesses at Mr. Cruz-Garcia's trial. 20 RR 164; 25 RR 123–48. The

Director similarly contends that the HCDAO prosecutor did not know the gender of the victim of

Mr. Santana's prior conviction, which determined whether that conviction was an impeachable

---

[26] Mr. Cruz-Garcia has requested discovery on this issue. *See* ECF No. 75.

offense. ECF No 85 at 80. But that prior offense was also prosecuted by the HCDAO. *See Giglio v. United States*, 405 150, 154 (1972) (explaining that "[t]he prosecutor's office is an entity" and actions by individual prosecutors are attributed to the office as a whole); *see also, supra*, Claim Five.

### 2.   State suppression of mitigation evidence

The State suppressed evidence of Mr. Cruz-Garcia's assistance to federal law enforcement. *See* ECF No. 73 at 244–45. The Director argues that "mitigating evidence such as this does not satisfy *Brady*." ECF No. 85 at 82. But this ignores *Brady*'s plain statement that state suppression of evidence favorable to an accused violates due process "where the evidence is material either to *guilt or to punishment*[.]" *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (emphasis added). Mitigation evidence is plainly within the scope of *Brady*. The Director's argument that this evidence "does not exculpate him of murder," ECF No. 85 at 82, does not remove it from the scope of *Brady*. *See Cone v. Bell*, 556 U.S. 449 (2009) (although evidence of drug abuse would have been of no avail to defendant's case on guilt, that evidence "may well have been material to the jury's assessment of the proper punishment in this case" and its suppression would therefore violate *Brady*). Moreover, the Director concedes that the FBI, including an agent who testified on behalf of the State at the punishment phase, was "part of the investigative process in this case," ECF No. 84 at 13 n.5, and the trial record makes clear that the FBI was aware of Mr. Cruz-Garcia's assistance to U.S. law enforcement. 24 RR 71–72.

### 3.   State suppression of other exculpatory and impeachment evidence

The Director argues that Mr. Cruz-Garcia cannot establish that Angelita Rodriguez received a benefit for her testimony because there is no connection between a prior arrest warrant and the 2016 letter from HCDAO Assistant District Attorney Natalie Tise supporting Ms. Rodriguez's

adjustment of status. ECF No. 85 at 163–64. Mr. Cruz-Garcia, however, has never alleged such a link. The benefit received by Ms. Rodriguez, and which was not disclosed to the defense, was Ms. Tise's support in adjusting her immigration status. ECF No. 73 at 246 (citing Ex. 113). Separately, Mr. Cruz-Garcia alleges that the State also withheld other impeachment evidence, including Ms. Rodriguez's criminal and immigration record. *Id.* (citing Ex. 18-73; 18-75).

The Director also argues that documents going to the credibility of Diana Garcia and Arturo Rodriguez are not material because their credibility was thoroughly addressed at trial. ECF No. 85 at 87. The testimony the Director identifies, however, does not support that assertion. Law enforcement testified that Ms. Garcia and Mr. Rodriguez were ultimately truthful about the facts of the crime, whereas law enforcement reports indicate that they did not believe they were being truthful at all. ECF No. 73 at 154. The Director also asserts as to several documents that "none of these documents are exculpatory or material." ECF No. 85 at 87. Those documents, however, are largely redacted and the Director cannot therefore assert that they do not contain exculpatory or material information. *See* ECF Nos. 18-16, 18-17, 18-18. Those portions that are not redacted indicated that law enforcement had a second theory of the crime.

### 4.  Materiality

Throughout his Answer on Claim Six, the Director individually and narrowly disputes the materiality of each item of exculpatory, impeachment, and mitigating evidence suppressed by the State. *Brady* materiality, however, must be assessed cumulatively.

Claim Seven:      **Mr. Cruz-Garcia is entitled to relief on his claim that the trial court coercively instructed Juror Bowman.**

        **A.  Mr. Cruz-Garcia can show cause and prejudice for his procedural default.**

The Director argues that Mr. Cruz-Garcia cannot overcome the procedural default of this claim because he has not shown that anything external to him caused the default. ECF No. 85 at 90. Specifically, the Director asserts that Mr. Cruz-Garcia "provides nothing to support his allegation that the trial court did not provide a truthful accounting of her meeting with Juror Bowman." *Id.*

But this ignores trial counsel's written statements, in which Mr. Madrid recounts that Judge Magee reported only that Juror Bowman "questioned how long deliberations would last." 3 CR 606; ECF No. 73 at 252. And Mr. Madrid later expressed shock when he realized the full scope of Judge Magee's conversation with Juror Bowman, stating "I do not ever remember being told that the juror said that she could never come to an agreement with the other jurors. It sounds unbelievable reading the transcript." 3 SHCR 611. Both Mr. Cornelius and Mr. Madrid agreed that they would have moved for a mistrial if they had known the true scope of Judge Magee's conversation with Juror Bowman. *Id.* at 611–12. Notably, Judge Magee did not contemporaneously apprise counsel of the true content of her conversation with Juror Bowman on the record. *See* 27 RR 8–14.

The Director does not argue that Mr. Cruz-Garcia cannot show prejudice to overcome his procedural default.[27]

---

[27] In the section of his argument on cause and prejudice, the Director argues that "[t]he trial court's findings on the conversation between the court and juror Bowman, *see* SHCR-02 at 1059–66, are presumed correct, absent clear and convincing evidence." ECF No. 85 at 90. The Director does not argue that these findings impact the cause and prejudice analysis, nor is it clear how they would. Regardless, in its last reasoned decision on this claim, the CCA rejected this claim as procedurally barred. *Ex parte Cruz-Garcia*, 2017 WL 4947132, at *1. Accordingly, the convicting court's findings of fact on this claim did not survive the CCA's review, so this Court does not owe deference to them.

### B.  Mr. Cruz-Garcia's claim that the trial court coercively instructed a juror has merit.

The Director argues that Mr. Cruz-Garcia's claim that Judge Magee coercively instructed Juror Bowman is meritless because Judge Magee does not recall coercing Juror Bowman. ECF No. 85 at 90. The Director, however, does not cite any case law in support of the notion that the issue turns on a judge's subjective recollection.

Indeed, it does not. It is not necessary that a trial judge *intend* to coerce a verdict; it is only necessary that the judge's conduct had the *effect* of coercing a verdict. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 460 (1978) ("Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements."). And, although the Director correctly asserts that it is important to consider the supplemental charge "in its context and under all the circumstances," *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)), the Director's "context" is reduced to splitting hairs over the precise language that Judge Magee used in her *ex parte* instruction and whether Juror Bowman could have been replaced with an alternate juror. ECF No. 85 at 91.

But the record in this case mirrors the *ex parte* juror communication that the Supreme Court held was coercive in *Gypsum Co.* down to the precise language that the judge used. In *Gypsum Co.*, trial counsel consented to an *ex parte* meeting between a jury foreman and the presiding judge at the foreman's request. *Gypsum Co.*, 438 U.S. at 460.  During that meeting, the jury foreman stated that the jury was deadlocked, and the trial judge instructed the foreman to "see if [the jury] can come to a verdict." *Id.* at 433 n.9; *see also United States v. United States Gypsum Co.*, 550 F.2d 115, 132 (3rd

Cir. 1977) ("The trial judge then instructed the foreman to 'tell [the jury] to keep deliberating and see if they can come to a verdict.'"). The Supreme Court took issue with the exchange, as it suggested "the strong likelihood that the foreman carried away from the meeting the impression that the judge wanted a verdict 'one way or the other.'" 438 U.S. at 460. The Court ultimately concluded that

> it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone—undesirable as that procedure is—which constitutes the error; rather, it is the fact that the *ex parte* discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

*Id.* at 462.

There is no discernable difference between the improper instruction in *Gypsum Co.* and Judge Magee's instruction to Juror Bowman that she must "deliberate back there and try to find out whether you can reach a verdict or not." ECF No. 85 at 91 (quoting 27 RR 8). Just as in *Gypsum Co.*, the transcript of Judge Magee's meeting with Juror Bowman contained several references to the jury's deadlock. As in *Gypsum Co.*, "The judge's report to counsel summarizing the discussion made no reference to either [the deadlock or the supplemental instruction.]" *Gypsum Co.*, 438 U.S. at 460. And, as in *Gypsum Co.*, counsel were denied any opportunity to correct Juror Bowman's mistaken impression that she must render a verdict or remain sequestered. 3 CR 610–11.

Finally, Mr. Cruz-Garcia does not assert—as the Director appears to suggest—that Judge Magee should have excused Juror Bowman from her jury service. *See* ECF No. 87 at 91. He argues only that his constitutional right to an uncoerced jury verdict be honored; a right "which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction." *Gypsum Co.*, 438 U.S. at 461.

**Claim Eight:**     **Mr. Cruz-Garcia is entitled to relief on his ineffective assistance of direct appeal counsel claim.**

The Director argues that this Court must deny Mr. Cruz-Garcia's claim of ineffective assistance of direct-appeal counsel because he cannot overcome the § 2254(d) relitigation bar. ECF No. 85 at 94. The Director's argument is two-fold. First, he argues that, under § 2254(d)(1), the state habeas court's denial of this claim did not involve an unreasonable application of clearly established federal law. *Id.* Second, he argues that, under § 2254(d)(2), the state habeas court's denial of this claim was not based upon an unreasonable determination of the facts. *Id.* The Director is incorrect as to both.

> **A.  It was legally unreasonable under § 2254(d)(1) for the state habeas court to conclude that direct appeal counsel was not ineffective for failing to raise this claim.**

Under clearly established Supreme Court precedent, a petitioner must show (1) that direct-appeal counsel was deficient and (2) that this deficiency prejudiced the petitioner in order to prevail on a claim of ineffective assistance of direct-appeal counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). To constitute deficient performance, "the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *United States v. Phillips*, 210 F.3d 345, 348 (2000) (quoting *Strickland*, 466 U.S. at 688). "This reasonableness standard requires counsel 'to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful'" and to raise "[s]olid, meritorious arguments based on directly controlling precedent." *Id.* (quoting *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)) Here, as shown *supra* in Claim Seven, direct appeal counsel failed to raise "a sufficiently meritorious issue," and there is a reasonable probability that Mr. Cruz-Garcia would have prevailed on this issue. *Phillips*, 210 F.3d at 348.

Notably, the Director does not dispute that direct appeal counsel *could* have challenged Judge Magee's *ex parte* juror instruction. Instead, the Director argues only that direct-appeal counsel was not deficient for failing to do so "[b]ecause that ground is without merit." ECF No. 85 at 93. As established *supra* in Claim Seven, however, this ground is governed by "directly controlling precedent" and clearly meritorious. *Williamson*, 183 F.3d at 463. As in *Williamson*, the cases relevant to this claim—namely, *Gypsum Co.* and *Lowenfield*—"squarely addressed an issue exactly on point" for Mr. Cruz-Garcia's appeal. *Williamson*, 183 F.3d at 463 (finding that direct-appeal counsel was deficient for failing to raise a claim governed by directly controlling precedent); *see* Claim 7.

The state court's adjudication involved an unreasonable application of the *Robbins/Strickland* standard and the Supreme Court's opinions in *United States Gypsum Co.*, 438 U.S. 422; *Jenkins*, 380 U.S. 445; and *Lowenfield*, 484 U.S. 231. ECF No. 73 at 231. The unreasonableness of the CCA's adjudication of this claim is underscored by the state court's incorrect application of *Gypsum Co.* to the facts of Mr. Cruz-Garcia's case. The convicting court found that "the instant case is factually distinguishable from that contemplated in the United States Supreme Court in *United States v. United States Gypsum Co.*" because, among other things, "the trial judge in the primary case did not seek out juror Bowman." 5 SHCR 1066. But, as discussed in Claim 7, *supra*, the judge in *Gypsum Co.* did not seek out the juror at issue there, either. *Gypsum Co.*, 438 U.S. at 460 (stating that "the jury foreman, on the morning of the seventh day of deliberations, requested a meeting with the judge 'to discuss the condition of the Jury and further guidance.'"). The CCA's conclusions that direct-appeal counsel was not ineffective rely on an obvious misreading of the case "squarely addressing" the issue which direct-appeal counsel failed to raise, which satisfies § 2254(d)(1).

With respect to prejudice, Mr. Cruz-Garcia need only show that there was a reasonable probability that he would have prevailed on direct appeal if counsel had challenged Judge Magee's *ex parte* instruction. *See Robbins*, 528 U.S. at 285. As shown *supra*, the facts of this claim mirror the facts of *Gypsum Co.*, down to the language used in the *ex parte* juror instruction. As a result, the state court's adjudication of this claim unreasonably applied *Gypsum Co.*, which also satisfies § 2254(d)(1).

Direct-appeal counsel was deficient by failing to raise a challenge that, based on directly controlling Supreme Court precedent, would likely have succeeded. The state habeas court was legally unreasonable when it ruled that direct-appeal counsel was not ineffective. Mr. Cruz-Garcia therefore meets the § 2254(d)(1) relitigation bar.

> **B. It was factually unreasonable under § 2254(d)(2) for the state habeas court to conclude that direct-appeal counsel was not ineffective for failing to raise this claim.**

In his Second Amended Petition, Mr. Cruz-Garcia argued that the CCA's adjudication of this claim was based on an unreasonable determination of the facts under § 2254(d)(2). ECF No. 73 at 231–32. The convicting court found that Mr. Cruz-Garcia "fail[ed] to demonstrate that trial counsel were not aware of the substance of the trial judge's conversation with juror Bowman after their meeting in chambers." 5 SHCR 1064. That was an unreasonable factual determination that was squarely contradicted by the evidence before the state court. Mr. Cruz-Garcia therefore meets the relitigation bar under § 2254(d)(2).

This finding, however, is unsupported by the state court record, including trial counsel's affidavits and written statements which were before the convicting court. Notably, these findings were made by Judge Magee, who was alleged to have issued the coercive instruction to Juror Bowman and whose conduct was therefore directly implicated by these allegations. ECF No. 73 at 257. Trial counsel's affidavits and written statements all agree that "[t]here is a huge difference between what

we knew at the time and what has been said after the verdict was rendered." 5 SCHR 948; *see also* 3 SHCR 606–07; 4 SHCR 954. These affidavits thus rebut the presumption of correctness afforded to the state court's findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Indeed, the trial record itself is completely inconsistent with the state court's findings. On the record, the trial judge told trial counsel nothing about her *ex parte* meeting with Juror Bowman. In the affidavit he submitted in support of Mr. Cruz-Garcia's Motion for New Trial, Mr. Madrid stated only that "Judge Magee stated that Ms. Bowman questioned how long deliberations would last." 3 CR 572.

The Director also does not identify *any* part of the habeas record indicating that Judge Magee disclosed the full scope of her *ex parte* discussion with Juror Bowman. *See* ECF No. 85 at 94. The explanation for this is simple: that evidence does not exist. It was therefore unreasonable for the trial court to dismiss trial counsels' affidavits and written statements to the contrary and instead make a factual finding with no basis in the evidence.

**Claim Nine:** **Mr. Cruz-Garcia is entitled to relief on the merits of his claim that he was excluded from critical stages of the trial.**

The Director correctly states that the defense "has no constitutional right to be present at every interaction between a judge and a juror." ECF No. 85 at 95 (citing *United States v. Thomas*, 724 F.3d 632, 644 (5th Cir. 2013)). Mr. Cruz-Garcia has never alleged the contrary. *See* ECF No. 73 at 257–60. But the Director has divorced this quotation from its context in the case law and thus incorrectly applies it to the facts of Mr. Cruz-Garcia's case.

The Director's quotation originates in *United States v. Gagnon*, 470 U.S. 522 (1985), which Mr. Cruz-Garcia discussed and distinguished in his Second Amended Petition. ECF No. 73 at 257–60. There, the Supreme Court ruled that an *in camera* discussion between a judge, a juror, and Gagnon's counsel did not violate due process. *See id.* The conversation originated when a juror

noticed that Gagnon, an artist, was sketching jurors during his trial, and it concluded when the juror was assured that Gagnon would stop sketching. *Id.* at 523–24. The Supreme Court held that the *in camera* discussion was only "a short interlude" and that Gagnon "could have done nothing had [he] been at the conference, nor would [he] have gained anything by attending." *Id.* at 527. The Court in *Gagnon* nonetheless reaffirmed that a defendant *does* have a constitutional right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Id.* at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)).

Here, unlike in *Gagnon*, Mr. Cruz-Garcia was excluded from proceedings where his presence had a reasonably substantial relation to his ability to defend his case. Mr. Cruz-Garcia was not present when Judge Magee gave coercive *ex parte* instructions to a holdout juror, *see supra* Claim Seven, or when Judge Magee recounted her meeting with Mr. Cassareto concerning the improper conversation between jurors on the elevator. *See supra* Claim One (B). Indeed, the trial court explicitly acknowledged that allegations of juror misconduct "could have serious ramifications to the outcome of this case." 24 RR 7. These are not instances where Mr. Cruz-Garcia could have done nothing had he been present. 470 U.S. at 527.

Each of these instances rises above simply sketching during a trial, *Gagnon*, 470 U.S. 522, or deciding how to respond to a juror note, *Thomas*, 724 F.3d 632. Considered in light of the whole record, Mr. Cruz-Garcia was not present at proceedings which impacted his opportunity to defend himself, including by challenging Judge Magee's coercive instructions to a holdout juror and juror misconduct.

82

The Director also asserts that Mr. Cruz-Garcia cannot overcome the procedural default of this claim based on a miscarriage of justice. Mr. Cruz-Garcia responds to those arguments under Claim Two A.

**Claim Ten:**       **Mr. Cruz-Garcia is entitled to relief on the merits of his claim that his rights under the Confrontation Clause were violated.**

In his Second Amended Petition, Mr. Cruz-Garcia argued that he was denied the right to confront witnesses when DNA analyst Matt Quartaro and medical examiner Dr. Dwayne Wolf testified to forensic testing and analyses that they did not themselves perform. ECF No. 73 at 260–62. Mr. Cruz-Garcia also argued that the admission of evidence produced by others via these experts likewise violated his rights under the Confrontation Clause. The Director argues that, "[u]nder *Williams*, Cruz-Garcia cannot demonstrate his rights under the Confrontation Clause have been violated, given the availability of DNA analyst Matt Quartaro and Dr. Wolf for cross-examination on their opinions." ECF No. 85 at 99 (citing *Williams v. Illinois*, 567 U.S. 50, 57–58 (2012)).

*Williams* is inapposite to Mr. Cruz-Garcia's arguments. As the language quoted by the Director from *Williams* shows, there, the Supreme Court examined whether "out-of-court statements that are not offered to prove the truth of the matter asserted" fell within the scope of the Confrontation Clause and held that they do not. 567 U.S. at 57. By contrast, the testimony of Mr. Quartaro and Dr. Wolf were offered for the truth of the matter asserted.

In particular, Mr. Quartaro testified that Orchid Cellmark obtained a complete DNA profile from the cigar, the underwear cutting, and the vaginal swabs, and that Mr. Cruz-Garcia was a match. 21 RR 119–20. The State further admitted the cigar, the underwear cutting, and the vaginal swabs

through Mr. Quartaro. *Id.* at 120, 124.[28] Mr. Quartaro's testimony was clearly introduced for the truth of the matter asserted; namely, that Mr. Cruz-Garcia was a match to the cigar, underwear cutting, and the vaginal swabs. Mr. Quartaro, however, also testified that Orchid Cellmark "didn't perform every step." 16 RR 52–52.

Likewise, Dr. Wolf testified to results of the 1992 autopsy of Angelo that Dr. Wolf did not himself perform, and the results of which were also introduced for the truth of the matter asserted, namely cause of death. 21 RR 4–34.  Dr. Wolf's testimony to the results of the autopsy of Saul Flores, which he did not perform, were also introduced for the truth of the matter asserted, namely injuries to the decedent. *See* 25 RR 97–115. Dr. Wolf opined as to cause of death for both Angelo and Saul Flores.

Although Mr. Quartaro and Dr. Wolf may have been available for cross-examination on their opinions, those who performed the forensic analyses to which they testified were not, a fact the Director does not dispute. Accordingly, Mr. Cruz-Garcia's Confrontation Clause rights were violated.

**Claim Eleven:**     **Mr. Cruz-Garcia is entitled to relief on the merits of his claim that incorrect translation of testimony violated his constitutional rights**

Twelve Spanish-speaking witnesses testifying at Mr. Cruz-Garcia's trial were repeatedly mistranslated to the jury, including translations into English that stated the opposite of what the juror testified to in Spanish. ECF No. 73 at 264. The Director asserts that this does not entitle Mr. Cruz-Garcia to federal habeas relief because the Supreme Court "has never discussed a constitutional

---

[28] In his Second Amended Petition, Mr. Cruz-Garcia mistakenly cited the Volume of the Reporter's Record in which these exhibits as Volume 17.

right to an interpreter in any context." ECF No. 85 at 100 (citing *Garcia v. Lumpkin*, 824 Fed. Appx. 252, 255 (5th Cir. 2020)).

Mr. Cruz-Garcia has never asserted that he had a constitutional right to an interpreter. Rather, he argued that the improper translation of witness testimony frustrated his ability to assist in his defense and to confront the witnesses against him. ECF No. 73 at 262–63 (citing *Drope v. Missouri*, 420 U.S. 162, 171 (1975) and *Crawford v. Washington*, 541 U.S. 36, 42 (2004)).

The only responsive argument that the Director makes is that Mr. Cruz-Garcia's right to fair trial was not violated because trial counsel Mario Madrid speaks fluent Spanish and could understand the witnesses without a translator. ECF No. 85 at 101. But Mr. Madrid's ability to speak Spanish does not cure the mistranslations the jury heard. Nor does it mean that Mr. Cruz-Garcia understood the proceedings before him and could assist in his defense. By this logic, it would be acceptable to try mentally incompetent people because their counsel is known to be sane. But this is not acceptable, and it is not the law. *Drope*, 420 U.S. at 171 (stating that a person "who lacks capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in his defense may not be subjected to trial.").

The Director also asserts that Mr. Cruz-Garcia cannot overcome the procedural default of this claim based on a miscarriage of justice. Mr. Cruz-Garcia responds to those arguments under Claim Two A.

**Claim Twelve:**   **Mr. Cruz-Garcia is entitled to relief on his claim that the trial court judge had a conflict of interest and was biased against him.**

The Director argues that Mr. Cruz-Garcia cannot demonstrate that his due process rights were violated by Judge Magee's bias because he cannot show that "the court was actually biased." ECF No. 85 at 102. But this argument ignores the Supreme Court's instructions that the inquiry is

85

"not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an "unconstitutional potential for bias."'" *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)). Although due process guards against actual bias, Mr. Cruz-Garcia is not required to show that Judge Magee was actually biased. *Id.* ("[T]he Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present.").

The Director also argues that Mr. Cruz-Garcia cannot succeed on the merits of his bias claim because he "fails to demonstrate that an 'extrajudicial source' influenced Judge Magee's rulings[.]" ECF No. 85 at 103 (quoting *Liteky v. United States*, 510 U.S. 540, 544 (1994)). But the Director's reliance on *Liteky* is inapposite. *Likteky* concerns the interpretation of 28 U.S.C. § 455(a), which governs the circumstances under which a federal judge must recuse himself. *See Liteky*, 510 U.S., at 541. By contrast, Mr. Cruz-Garcia's bias claim relies on the Due Process Clause.

Finally, contrary to the Director's argument, Mr. Cruz-Garcia does not allege that Judge Magee presiding over his state habeas proceedings in and of itself demonstrates her bias. ECF No. 85 at 103. Rather, Mr. Cruz-Garcia argued that the manner in which she conducted the state habeas proceedings—including by running for re-election during those proceedings on a campaign that highlighted her role in Mr. Cruz-Garcia's conviction and death sentence—demonstrated her bias. *See* ECF No. 73 at 267–68.

The Director also asserts that Mr. Cruz-Garcia cannot overcome the procedural default of this claim based on a miscarriage of justice. Mr. Cruz-Garcia responds to those arguments under Claim Two A.

**Claim Thirteen:    Mr. Cruz-Garcia is entitled to relief on the merits of his claim that the trial court prevented him from presenting mitigating evidence.**

As set out in Mr. Cruz-Garcia's Second Amended Petition, he was prevented from presenting Bible study certificates as evidence of his devout faith and rehabilitation. ECF No. 73 at 269–70. He was also prevented from presenting testimony that that he had assisted federal law enforcement. *Id.* at 270. Mr. Cruz-Garcia was thus unable to both rebut the State's evidence on punishment and present key aspects of his case in mitigation. *Id.* at 270–71.

The Director argues that Mr. Cruz-Garcia cannot meet the relitigation bar under 28 U.S.C. § 2254(d) as to this claim because the CCA on direct appeal "found no abuse of discretion in the trial court's rulings." ECF No. 85 at 105 (citing *Cruz-Garcia*, 2015 WL 6528727, at *23–25). But this finding by the CCA does not pertain to its adjudication of the federal constitutional claim that the trial court's exclusion of this mitigation evidence violated Mr. Cruz-Garcia's constitutional rights. *Cruz-Garcia*, 2015 WL 6528727, at *23. In ruling on the federal constitutional law claim, the CCA held that "[t]he Constitution is implicated only if the evidentiary rule being employed to exclude evidence is applied arbitrarily or unjustly and its application effectively precludes a defendant from putting forth a defense." *Id.* That adjudication, however, was contrary to clearly established federal law. Under *Chambers v. Mississippi*, *Crane v. Kentucky*, and its progeny, a defendant's right to present a complete defense is not violated only where he is unable to present any defense at all. *See Chambers*, 410 U.S. at 302; *Crane*, 476 U.S. at 690. The CCA's adjudication also resulted in a decision based on an unreasonable application of this Supreme Court precedent to the facts of Mr. Cruz-Garcia's case. *See* ECF No. 73 at 270–71. The CCA's adjudication is also an unreasonable application of *Lockett v. Ohio*, 438 U.S. 586 (1978) because Mr. Cruz-Garcia was prevented from presenting

mitigation evidence in violation of the Eighth Amendment. The Bible certificates[29] and evidence of Mr. Cruz-Garcia's assistance to law enforcement were powerful mitigating evidence.

**Claim Fourteen: Mr. Cruz-Garcia is entitled to relief on his claim that emotional outbursts violated his right to a fair trial.**

On several occasions and over several days of the trial, family members repeatedly had emotional outbursts in the courtroom and in the presence of the jury. ECF No. 73 at 271. These grew so egregious that Judge Magee was forced to stop proceedings and remove the jury before reprimanding the audience in the gallery. *Id.* The State was forced to remove the disruptive family members, and Judge Magee noted that she did not "think [the outbursts were] appropriate. *Id.* (citing 20 RR 14).

The Director asserts that Mr. Cruz-Garcia "concedes this claim is foreclosed by binding precedent." ECF No. 85 at 107. That is simply not the case. The page from Mr. Cruz-Garcia's Second Amended Petition that the Director cites to concerns a different claim entirely.

The Director asserts that Mr. Cruz-Garcia's claim fails because "[t]here is no clearly established federal law, as stated by the Supreme Court." that entitles him to relief. ECF No. 85 at 108. The Director therefore concludes that this claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). But this argument ignores the clearly established federal law at the time of Mr. Cruz-Garcia's trial, which Mr. Cruz-Garcia relies upon in support of this claim. *See* ECF No. 73 at 271 (quoting *Sheppard v. Maxwell*, 384 U.S. 33, 350 (1966); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Indeed, the Director makes no effort to distinguish the case law that Mr. Cruz-Garcia cites.

---

[29] The Supreme Court closely reviews claims that involve religion and religious practices. *See Ramirez v. Collier*, 142 S. Ct. 1264 (2022); *Murphy v. Collier*, 139 S. Ct. 1475 (2019) (Mem).

The case law that the Director does cite is inapposite. The Director cites *Carey v. Musladin*, 549 U.S. 70, 76 (2006), which concerned button-wearing, as opposed to emotional outbursts. The Director then cites to *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010) and *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2010). ECF No. 83 at 108. Both of these state cases involved single outbursts, unlike the repeated outbursts that occurred in Mr. Cruz-Garcia's case.  In *Coble*, the outburst came from a witness while testifying. And in *Kinnamon v. Scott*, 40 F.3d 731, 734 (5th Cir. 1994), it was unclear whether any outburst had even occurred. Moreover, it is unclear whether the CCA resolved those claims under federal constitutional provisions.

Mr. Cruz-Garcia relies on long-standing precedent for this claim. *See Sheppard*, 384 U.S. at 350 (holding that a defendant is entitled to be "fairly tried in a public tribunal free of prejudice passion, [and] excitement"). He is not asking the Court to create a new rule of constitutional law. The outbursts in his case biased the jury and rendered the proceedings fundamentally unfair.

The Director also asserts that Mr. Cruz-Garcia cannot overcome the procedural default of this claim based on a miscarriage of justice. Mr. Cruz-Garcia responds to those arguments under Claim Two A.

**Claim Fifteen:**    **Mr. Cruz-Garcia is entitled to relief on the merits of his claim that the prosecution's inflammatory comments violated his due process rights and right to a fair trial.**

The State made inflammatory comments during *voir dire* and improper closing arguments during the punishment-phase proceedings. These arguments repeatedly compared the facts of this case to high-profile murders and compared Mr. Cruz-Garcia to a notorious serial killer that "likes to torture and taunt his victims." ECF No. 73 at 273. The prosecution also repeatedly dehumanized Mr. Cruz-Garcia while cuing the jury that he was a foreigner, injecting racial and ethnic animus into

the proceedings. *Id.* As the case law quoted by the Director makes clear, these comments were improper because they were designed to be inflammatory. ECF No. 85 at 111 (quoting *United State v. Fields*, 72 F.3d 1200, 1208 (5th Cir. 1996) ("[A]ppeals to the jury to act as the conscience of the community are permissible, *so long as they are not intended to inflame.*" (emphasis added))). Moreover, the State's repeated comparisons in between this case and those of Charles Manson and Hitler were certainly not "a reasonable deduction from the evidence." ECF No. 85 at 111. These inflammatory comments denied Mr. Cruz-Garcia his due process rights and deprived him of a fair trial.

### Claims Sixteen through Twenty-One

Mr. Cruz-Garcia acknowledges in his Second Amended Petition that Claims Sixteen through Twenty-One are foreclosed by precedent. He does not concede those claims and preserves any argument on the merits and in reply to the Director's Supplemental Answer for later review.

Respectfully submitted,

December 16, 2022

/s/ *David Currie*
David Currie (TX 24084240)
Assistant Federal Public Defender

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers (TX 24084578)
Supervisor, Capital Habeas Unit
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org
david_currie@fd.org
naomi_fenwick@fd.org

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Reply in Support of Second

Amended Petition has been served by CM/ECF upon counsel for Respondent on December 16,

2022:

>Cara Hanna
>Criminal Appeals Division
>Office of the Attorney General
>P.O. Box 12548
>Capitol Station
>Austin, TX 78711
>cara.hanna@oag.texas.gov

>_/s/ David Currie_
>David Currie
>Assistant Federal Defender
>Office of Federal Public Defender
>Northern District of Texas
>525 S. Griffin St., Ste. 629
>Dallas, TX 75202
>214-767-2746
>214-767-2886 (fax)