## IN THE COURT OF CRIMINAL APPEALS OF TEXAS
## CLERK'S SUMMARY SHEET FOR
## POSTCONVICTION APPLICATIONS FOR WRIT OF HABEAS CORPUS
## UNDER CODE OF CRIMINAL PROCEDURE, ARTICLES 11.07 AND 11.071

### Application for Writ of Habeas Corpus

RECEIVED
COURT OF CRIMINAL APPEALS
4/16/2021
DEANA WILLIAMSON, CLERK

Ex Parte: Obel Cruz- Garcia _____          From: Harris          County
(*Name of Applicant*)

337_____ Court

TRIAL COURT WRIT NO. 1384794-C

APPLICANT'S NAME (*As reflected in judgment*): Cruz- Garcia, Obel

OFFENSE (*As reflected in judgment*): Capital Murder

CAUSE NO. (*As reflected in judgment*): 138479401010_____

PLEA: _____ GUILTY   __X__ NOT GUILTY   _ TRUE

SENTENCE: DEATH- TDCJ-ID                   DATE: 07/22/2013
(*Terms of years reflected in judgment*)

TRIAL DATE: 07/22/2013

TRIAL JUDGE'S NAME (*Judge presiding at trial*): Renee Magee_____

APPEAL NO. (*If applicable*): Ap- 77,025_____

CITATION TO OPINION (*If applicable*):_____S.W.3d_____

HEARING HELD:____YES__X__NO
(*Pertaining to the application for writ of habeas corpus*)

FINDINGS & CONCLUSIONS ENTERED BY HABEAS JUDGE:_____YES _X_NO
(*Pertaining to the application for writ of habeas corpus*)

RECOMMENDATION:        _____GRANT_____DENY_____DISMISS__X__NONE
(*Habeas judge's recommendation regarding application for writ of habeas corpus*)

HABEAS JUDGE'S NAME: ___Colleen Gaido_____
(*Judge presiding over habeas corpus proceeding*)

NAME OF HABEAS COUNSEL IF APPLICANT IS REPRESENTED: David Currie_____

I certify that all applicable requirements of Texas Rule of Appellate Procedure 73.4 have been complied with in this habeas proceeding, including the requirement to serve on all the parties in the case any objections, motions, affidavits, exhibits, proposed findings of fact and conclusions of law, findings of fact and conclusions of law, and any other orders entered or pleadings filed in the habeas case.

*Ta'Shiqua Reed- Solomon*_____          04/15/2021_____
Signature of District Clerk or Clerk's Representative          Date Signed

Misc. Docket No. 18-025

# SUBSEQUENT

## P O S T   C O N V I C T I O N

FROM:                    351th  DISTRICT COURT


OF


HARRIS COUNTY,  TEXAS


Cruz- Garcia, Obel

APPLICANT


VS.


THE STATE OF TEXAS

RESPONDENT

# <u>INDEX</u>

**PAGE**

APPLICATION FOR WRIT OF HABEAS CORPUS          1

EXHIBIT 1-10          390

EXHIBIT 11-20          913

EXHIBIT 21-30          944

EXHIBIT 31-40          1001

EXHIBIT 41-50          1077

EXHIBIT 51-60          1182

EXHIBIT 61-70          1228

EXHIBIT 71-80          1675

EXHIBIT 81-90          1739

EXHIBIT 91-100          1817

EXHIBIT 101-110          1866

EXHIBIT 111-120          1959

EXHIBIT 121-130          2027

EXHIBIT 131-137          2071

EXHIBIT 138 A          2131

EXHIBIT 138 B          2301

EXHIBIT 139 A          2471

EXHIBIT 139 B          2815

EXHIBIT 139 C          3159

EXHIBIT 140-148          3503

# <u>INDEX</u>

**PAGE**

DA ACKNOWLEDGMEMT LETTER                                    4194

APPLICANTS MOTION AND PROPOSED ARTICLE 11.071 ORDER        4195

CERTIFICATE OF THE CLERK                                   4201

4/9/2021 12:16 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52304203
By: T Reed
Filed: 4/9/2021 12:16 PM

*13847940101C / Court: 337*

# IN THE 337TH JUDICIAL DISTRICT COURT
# HARRIS COUNTY, TEXAS

## AND

# IN THE TEXAS COURT OF CRIMINAL APPEALS
# AUSTIN, TEXAS

| | | |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § | **Writ No.** _____ Trial Court Case No: 1384794 |
| **Applicant.** | § § § § § | **CAPITAL CASE** |

## SUBSEQUENT APPLICATION FOR
## POST-CONVICTION WRIT OF HABEAS CORPUS

JASON HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 (fax)
david_currie@fd.org
naomi_fenwick@fd.org

*Counsel for Obel Cruz-Garcia*

0001

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

EXHIBIT INDEX ................................................................................... xii

TABLE OF AUTHORITIES ..................................................................... xx

STATEMENT OF THE CASE ..................................................................... 1
  I.  Introduction ....................................................................................... 1
    A.  The 1992 disappearance and death of A. ................................... 1
    B.  A cold case revisited. ............................................................... 5
    C.  An eyewitness implicates Cruz-Garcia as a party to the murder of A. ............................................................................. 6
    D.  Cruz-Garcia is found guilty as a party to capital murder and sentenced to death. ................................................................. 8
    E.  A case built on false testimony and false DNA evidence, compounded by the ineffective assistance of trial counsel ... 10
    F.  Cruz-Garcia received ineffective assistance of initial state habeas counsel. ................................................................... 14
  II.  Procedural History ....................................................................... 15
  III.  Statement of Facts ..................................................................... 17

CLAIMS FOR RELIEF ............................................................................. 18
  I.  Claim One: The State relied on false testimony, in violation of the Fourteenth Amendment. ......................................................... 18
    A.  The State relied on the false testimony of Carmelo "Rudy" Santana Martinez. ................................................................. 19
      1.  The State relied on false testimony to establish Cruz-Garcia's guilt as a party to capital murder. ..................... 23
      2.  The State relied on false testimony to bolster Santana's credibility to the jury. ..................................................... 26
      3.  The State relied on false testimony to prevent the defense from impeaching Santana. .............................................. 31

0002

B.   False testimony about the DNA evidence. ...........................32

   1.   The State relied on false testimony regarding DNA evidence to obtain Cruz-Garcia's conviction as a party to capital murder. ...............................................34

   2.   The State relied on false testimony to bolster the reliability of the DNA evidence. .....................................35

C.   The State relied on the false testimony of Angelita Rodriguez. ..............................................................37

D.   The State also relied on false testimony from Diana Garcia and Arturo Rodriguez, and law enforcement. ......................39

   1.   The State relied on the false testimony of Diana Garcia and Arturo Rodriguez to establish motive. ....................40

   2.   The State relied on the false testimony of law enforcement. ..............................................................41

E.   The State relied on the false testimony of Johnny Lopez and Santana at punishment. ......................................................43

F.   The State solicited false testimony regarding a kidnapping in Puerto Rico........................................................46

G.   The State knew, or should have known, of the false testimony...............................................................47

H.   There is a reasonable likelihood that this false testimony impacted the outcome of the case against Cruz-Garcia.......47

I.   Cruz-Garcia's false testimony claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2). ..............................................................52

II.   Claim Two: The State relied on false testimony under the *Chabot* standard. .....................................................54

A.   Cruz-Garcia's false testimony claim under *Ex parte Chabot* meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2).......................................................55

III. Claim Three: Cruz-Garcia's conviction was obtained in reliance on inaccurate and unreliable DNA evidence, in violation of the Eighth and Fourteenth Amendments. ........................................55

    A. The DNA evidence relied on by the State to secure Cruz-Garcia's conviction was unreliable. ....................................64

    B. The DNA evidence relied on by the State was inaccurate. ...65

    C. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated. ................................................66

    D. Cruz-Garcia's unreliability of the DNA evidence claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2). ......................................................67

IV. Claim Four: The State withheld exculpatory evidence, in violation of the Sixth, Eighth, and Fourteenth Amendments and *Brady v. Maryland*. ..............................................................68

    A. The State withheld impeachment evidence against Santana. ...............................................................................69

        1. The State failed to disclose that Santana received a benefit for his testimony against Cruz-Garcia. ...............70

        2. The State failed to disclose further evidence going to Santana's credibility. ......................................................74

        3. The State failed to disclose that Santana was convicted of a crime involving moral turpitude. ................................75

    B. The State withheld mitigation evidence. ...............................75

    C. The State withheld exculpatory evidence and impeachment in connection with several witnesses. ..................................76

    D. The evidence withheld by the State was material. ..............78

    E. Cruz-Garcia's *Brady* claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(1). ..........82

V. Claim Five: The Texas death penalty statute deprived the jury of the power inherent in a single juror's vote as protected by

0004

the Sixth Amendment's jury unanimity requirement
announced in *Ramos v. Louisiana*..............................................85

A.   The Sixth Amendment requires a unanimous verdict. ........88

B.   Texas's death penalty statute violates the Sixth
     Amendment's guarantee of a unanimous jury as announced
     in Ramos..............................................................................91

     1.   The 10-12 Rule. ...............................................................92

     2.   The 10-12 Rule disempowers the single juror who votes
          alone, in violation of Ramos. ...........................................94

C.   The unconstitutional penalty-phase instructions directly
     impacted the verdict at punishment in Cruz-Garcia's case. 99

D.   Cruz-Garcia's *Ramos* claim meets the requirements of Texas
     Code of Criminal Procedure Article 11.071 § 5(a)(1). ........104

VI. Claim Six: Cruz-Garcia's Sixth Amendment right to effective
    assistance of counsel was violated..............................................105

A.   Legal background. .............................................................105

     1.   The Sixth Amendment guarantees the right to effective
          representation................................................................105

     2.   Caseload and fee guidelines for Texas death penalty
          cases. ..............................................................................108

a.   Texas and ABA Guidelines require counsel to limit their
     caseload. ..........................................................................108

b.   The Texas Indigent Defense Commission has concluded that
     five is the maximum number of death penalty cases a fulltime
     capital practitioner can handle...................................110

c.   TIDC has also closely studied felony caseloads. ...............113

d.   Both the ABA and the Texas Guidelines prohibit fixed-fee
     contracts in death penalty cases................................115

B.   Background regarding Cruz-Garcia's counsel...................116

1. Cruz-Garcia's family raised money to retain counsel for him. ...............................................................116

2. When the State decided to seek the death penalty, Cruz-Garcia's retained counsel were forced to withdraw and Skip Cornelius and Mario Madrid were appointed to represent Cruz-Garcia. ...................................................116

3. Cornelius sought and received compensation for his representation of Cruz-Garcia on a flat-fee basis, in contravention of Texas Guideline 8.1.B.1 and ABA Guideline 9.1.B.1. ...........................................................117

4. Cornelius's crushing caseload far exceeded reasonable standards. ......................................................119

5. From jury selection through the punishment phase of Cruz-Garcia's trial, Cornelius spent extraordinary amounts of time working on other cases. ......................153

a. Jury selection. ......................................................157

b. The week of the evidentiary hearing. ...............................158

c. Two weeks before trial. ..........................................159

d. The week before trial. ...........................................159

e. The guilt phase. .................................................160

f. The punishment phase. ...........................................161

6. The billing records of Cornelius's investigator show that Cruz-Garcia's case was not ready to be tried by the beginning of jury selection. ...........................................177

7. Cornelius failed to perform key tasks, such as reviewing the State's file. ...............................................179

C. Trial counsel rendered ineffective assistance of counsel by failing to adequately communicate with Cruz-Garcia and by rushing his case to trial. ...................................................182

D.  Trial counsel's investigation, preparation, and performance during the guilt/innocence phase was ineffective. ............ 189

    1.  DNA Failures. .................................................. 189

a.  Failure to retain a DNA expert. ......................................... 189

b.  Failure to determine that DNA had been improperly stored. 190

    2.  Failure to investigate Carmelo Santana. ...................... 192

a.  Failure to investigate Santana's inconsistent statements. 192

b.  Failure to investigate Santana's mental health. ................ 193

c.  Failure to investigate Santana's crime of moral turpitude. 193

    3.  Failure to investigate Angelita Rodriguez. ................... 197

a.  Failure to investigate lies about Cruz-Garcia leaving suddenly. ...................................................................... 197

b.  Failure to investigate testimony about asking for a divorce from Cruz-Garcia. .................................................... 197

    4.  Failure to investigate Diana Garcia and Arturo Rodriguez. .................................................... 199

a.  Failure to develop evidence of Diana Garcia's consensual relationship with Cruz-Garcia. .................................... 199

b.  Failure to develop evidence that Garcia and Rodriguez were still selling drugs. .................................................... 203

c.  Failure to develop evidence that Garcia was an unreliable witness. .................................................................... 204

    5.  Failure to investigate law enforcement's theory of the case at trial. .................................................... 204

a.  Failure to investigate cigar. ................................................ 204

b.  Failure to investigate whether police believed Garcia and Rodriguez. .................................................... 205

    6.  Failure to challenge subpoenas. ................................... 207

vi

0007

E.   Trial counsel's investigation, preparation, and performance during the punishment phase was ineffective. ................. 208

　　1.   Trial counsel's mitigation presentation was anemic at best. ................................................................................... 208

　　2.   Trial counsel failed to retain a mitigation specialist, despite the Texas Guidelines requiring one .................. 210

　　3.   Trial counsel botched the minimal effort they made to introduce mitigating evidence. ..................................... 213

　　4.   Trial counsel failed to consult with any experts, except for a psychologist who did seven hours of work. ........... 214

　　5.   Trial counsel failed to conduct an investigation in Puerto Rico. ................................................................................. 215

　　6.   Trial counsel failed to investigate extraneous offenses and future dangerousness. ........................................... 216

　　7.   Had trial counsel performed an adequate investigation, the evidence presented at trial would have been very different. ....................................................................... 218

a.   An adequate mitigation investigation by a mitigation specialist would have allowed trial counsel to present evidence of Cruz-Garcia's life history ........................................................... 219

b.   A trauma expert could have testified to the effects of Cruz-Garcia's difficult childhood and early-adult life. ....................... 239

c.   An expert of Dominican culture could have provided valuable contextualization. ....................................................... 246

d.   An investigation in Puerto Rico would have uncovered highly significant evidence from Cruz-Garcia's time in a Puerto Rican prison. ............................................................................... 254

e.   Had trial counsel investigated the state's case on future dangerousness, they could have significantly undermined it ... 262

0008

f.    Had trial counsel not waited until the last minute, they could have presented evidence of Cruz-Garcia's work as a valued asset of United States Law Enforcement agencies. ..................268

g.    Trial counsel also performed deficiently by failing to make appropriate objections and motions...........................................269

F.    Trial counsel was ineffective during jury selection............272

　　1.    Cruz-Garcia's constitutional right to a grand jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments was violated. .......272

　　2.    Failure to raise cross-section claim...............................273

　　3.    Trial counsel's stipulation to exclude jurors and failure to create a full record of that exclusion. ...........................277

　　4.    Failure to raise a *Batson* challenge..............................281

　　5.    Failure to raise *Witherspoon* challenges. ......................282

　　6.    Failure to object to State's request that neither party bring up that the victim was a child. ...........................285

　　7.    Failure to object to inflammatory and objectionable *voir dire* by the prosecution. .................................................286

a.    Trial counsel failed to object to the State repeatedly comparing Cruz-Garcia to Charles Manson and Adolf Hitler. .287

b.    Trial counsel failed to object to the State repeatedly invoking the Boston marathon bombing as well as other well-publicized crimes. .......................................................................288

c.    Trial counsel failed to object to the State repeatedly asked prospective jurors commitment questions.................................290

d.    Trial counsel failed to object to the State repeatedly and improperly suggesting that Cruz-Garcia had a criminal history that would be revealed during the punishment phase..............291

e.    Trial counsel failed to object to the State's biased and discriminatory questions to women..........................................292

G.  Trial counsel was ineffective by failing to preserve issues for review. .................................................................................. 293

    1.  Failure to preserve Confrontation Clause violations.... 294

    2.  Failure to preserve objections to evidentiary rulings that impermissibly limited Cruz-Garcia's right to cross-examine witnesses. ...................................................... 296

    3.  Failure to preserve objections to improper victim impact testimony. ................................................................... 297

    4.  Failure to preserve objections to the prosecutor's inflammatory comments............................................... 298

    5.  Failure to preserve constitutional errors relating to emotional outbursts from the gallery............................ 301

    6.  Failure to preserve constitutional error relating to incorrect translations. .................................................. 303

    7.  Failure to preserve error concerning Cruz-Garcia's absence from the courtroom during critical proceedings. 304

H.  Trial counsel was ineffective during jury deliberations..... 306

    1.  Failure to investigate jury misconduct. ........................ 306

    2.  Failure to object to the trial court's ex parte meeting with a holdout juror ............................................................. 309

a.  During the penalty phase deliberations, Angela Bowman became a holdout juror for life................................................. 309

b.  The the trial court held an ex parte meeting with Juror Bowman. ..................................................................................... 311

I.  Trial counsel rendered ineffective assistance by failing to recognize significance of Cruz-Garcia's foreign nationality. ............................................................................................... 316

    1.  Trial counsel knew that Cruz-Garcia is a citizen of the Dominican Republic..................................................... 319

2.  Trial counsel failed to fulfill their obligations under the Guidelines. ................................................................... 320

J.  Trial counsel's deficient performance prejudiced the defense and Cruz-Garcia is therefore entitled to a new trial based on this Sixth Amendment violation ......................................... 323

K.  This Court should authorize Cruz-Garcia's ineffective assistance of trial counsel claim pursuant to § 5(a)(1) ....... 325

1.  Cruz-Garcia's state habeas counsel were ineffective, rendering a substantial IATC claim unavailable to him. 327

2.  This Court should authorize Cruz-Garcia's IATC claim to safeguard the fundamental Sixth Amendment right to effective assistance of trial counsel, and to allow Texas courts the first opportunity to rule on the merits of the IATC claim and whether state habeas counsel was ineffective. ..................................................................... 335

3.  Remand to the trial court is appropriate because the question of whether state habeas counsel was ineffective is a fact-intensive question. ........................................... 339

VII. Claim Seven: Cruz-Garcia was denied the right to confront witnesses, in violation of the Sixth and Fourteenth Amendments. ............................................................................ 340

A.  Cruz-Garcia was deprived of the right to confront witnesses in connection with forensic analysis relevant to the DNA evidence, and to the cause of death of A. and Saul Flores. 340

B.  Cruz-Garcia's Confrontation Clause claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5. ........................................................................... 341

VIII.  Claim Eight: Cruz-Garcia's constitutional rights were violated when the trial court held proceedings without Cruz-Garcia being present ..................................................... 342

00011

A.   The trial court held two critical proceedings in connection with Cruz-Garcia's trial outside Cruz-Garcia's presence, in violation of his constitutional rights....................................342

B.   Cruz-Garcia's Fourteenth Amendment due process claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5. .............................................................346

IX.  Claim Nine: The trial court judge who presided over Cruz-Garcia's trial and state habeas proceedings had a conflict of interest. ........................................................................346

A.   Judge Magee had a conflict of interest based on several grounds..............................................................347

B.   Cruz-Garcia's judicial bias claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5........350

X.   Claim Ten: Testimony was translated incorrectly to the jury, in violation of Cruz-Garcia's Fifth, Sixth, Eighth, and Fourteenth Amendments..........................................................351

A.   Cruz-Garcia's trial proceedings were not accurately interpreted. ...........................................................352

B.   Cruz-Garcia's inaccurate interpretation claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5. .........................................................355

XI.  Claim Eleven: Prosecutors made numerous inappropriate and inflammatory comments throughout trial, denying Cruz-Garcia his right to due process and fair trial............................355

XII. Claim Twelve: Repeated emotional outbursts from the gallery rendered Cruz-Garcia's conviction and death sentence fundamentally unfair..................................................357

CONCLUSION ........................................................358

CERTIFICATE OF SERVICE..............................................359

00012

# EXHIBIT INDEX

Exhibit 1        Opening brief on direct appeal

Exhibit 2        Direct appeal opinion, *Cruz-Garcia v. Texas*, No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015) (unpublished)

Exhibit 3        Initial application for writ of habeas corpus

Exhibit 4        Subsequent application for writ of habeas corpus

Exhibit 5        *Ex parte Cruz-Garcia*, Order, Nos. WR-85,051-02 and WR-85,051-03 (Tex. Crim. App. Nov. 1, 2017) (per curiam)

Exhibit 6        Affidavit of Steven Shellist

Exhibit 7        Billing records for Skip Cornelius

Exhibit 8        Letter from Gradoni & Associates

Exhibit 9        Affidavit of Elizabeth Johnson

Exhibit 10       Affidavit of Daniel Hellwig

Exhibit 11       Amended DNA Report

Exhibit 12       Letter from Carmelo Rudy Santana Martinez to U.S. district court

Exhibit 13       *U.S. v. Carmelo Martinez*, Motion for Psychiatric Examination, CR-H-98-12 (S.D. Tex. June 23, 1998)

Exhibit14        *U.S. v. Carmelo Martinez*, Order for Psychiatric Examination, CR-H-98-12 (S.D. Tex. Jul.6, 1998)

Exhibit 15       Memo from Eric Johnson (2/9/1993)

Exhibit 16       Report on second theory of offense

Exhibit 17       Report on $30,000 ransom call

Exhibit 18       Report on $10,000 ransom call

Exhibit 19       Report from HPD Sergeant Stephens to HPD Crime Lab (1/6/1993)

Exhibit 20        Handwritten notes (5/1/1996)

Exhibit 21        Affidavit Cesar Amado Rios

Exhibit 22        Affidavit of Jose Martin Valdez

Exhibit 23        Affidavit of Hector Saavedra

Exhibit 24        Excerpts from law enforcement report (11/9/1992)

Exhibit 25        *Texas v. Cruz-Garcia*, Probable cause findings

Exhibit 26        Affidavit of Sandra Babcock

Exhibit 27        Letter from Dominican Republic Consulate

Exhibit 28        Letter from Texas Forensic Science Commission

Exhibit 29        Johnny Lopez Statement to HPD (1989)

Exhibit 30        Declaration of Elizabeth Ramos

Exhibit 31        Affidavit of Michael Casaretto

Exhibit 32        Affidavit of Sharon Alexander

Exhibit 33        Affidavit of Angela Bowman

Exhibit 34        Magistrate Warning to Cruz-GarciaCruz-Garcia

Exhibit 35        Subpoena to Juan DeJesus Rodriguez

Exhibit 36        Subpoena to custodian of records

Exhibit 37        Angelita Rodriguez Statement to FBI (6/21/1994)

Exhibit 38        Excerpts from Puerto Rico prison records

Exhibit 39        Declaration of Dorcas Noelia de la Cruz Fana

Exhibit 40        Affidavit of Lorenzo Villalba-Rolón

Exhibit 41        Affidavit of Dr. Gina Perez

Exhibit 42        Declaration of José de la Cruz

Exhibit 43        Declaration of Menagen Valerio de la Cruz

Exhibit 44        Declaration of Julia de la Cruz Santos

Exhibit 45        Declaration of Dr. Alejandro Lebrón

00014

Exhibit 46          U.S. D.O.J., Immigration and Naturalization Services

Exhibit 47          Raymond Paternoster, *Racial Disparity in the Case of Duane Edward Buck* (Dec. 29, 2012)

Exhibit 48          Allan Turner, *Former DA Ran Powerful Death Penalty Machine*, Hous. Chron., July 25, 2007

Exhibit 49          Matt Dempsey & Karen Chen, *Hispanic Representation on Harris County Grand Juries Far Below Population*, Hous. Chron., Dec. 19, 2014.

Exhibit 50          Leslie Casimir, *Blacks Urge Rosenthal to Quit*, Hous. Chron., Jan. 11, 2008

Exhibit 51          Texas Monthly, *A Hard Look at the Harris County District Attorney's Office* (Sept. 11, 2016)

Exhibit 52          Matt Stiles & Alan Bernstein, *County Judge Calls for Investigation into Rosenthal*, Hous. Chron., Jan. 10, 2008

Exhibit 53          Cindy George, *Activists Renew Call for Sheriff, DA to Apologize in* Goforth *Case*, Hous. Chron., Feb. 16, 2016

Exhibit 54          *State v. Perkins*, Complaint, Case No. 1244038 (337th Dist. Ct. Dec. 10, 2009)

Exhibit 55          *State v. Perkins*, Orders, Case No. 1244038 (337th Dist. Ct. Dec. 10, 2009)

Exhibit 56          *State v. Reyes*, Complaint, Case No. 129611101010 (337th Dist. Ct. Feb. 18, 2011)

Exhibit 57          *State v. Reyes*, Judgment, Case No. 129611101010 (337th Dist. Ct. Feb. 18, 2011)

Exhibit 58          Judge Renee Magee website

Exhibit 59          Judge Renee Magee website (2)

Exhibit 60          Judge Renee Magee website (3)

Exhibit 61          Final Bromwich Report

00015

Exhibit 62      HPD Crime Lab employee records for Dr. Baldev Sharma, Deetrice Wallace, Joseph Chu

Exhibit 63      Trial Defendant's Exhibit 17, Judgment of conviction against Deetrice Wallace

Exhibit 64      Transcript of phone call between HPD Officer U.P. Hernandez and Diana Garcia

Exhibit 65      Audio of phone call between HPD Officer U.P. Hernandez and Diana Garcia

Exhibit 66      Report by HPD Officer W.I. Stephens (11/9/1992)

Exhibit 67      HPD interview of Santana (10/1992)

Exhibit 68      HPD interview of Santana (11/5/1992)

Exhibit 69      HPD interview of Santana (3/2/2009)

Exhibit 70      *Brady* Notice (6/3/2013)

Exhibit 71      *Brady* Notice (6/26/2013)

Exhibit 72      Angelita Rodriguez interview by HPD (10/6/1992)

Exhibit 73      FBI Arrest of Angelita Rodriguez (8/20/1993)

Exhibit 74      Angelita Rodriguez interview by HPD (10/08/2008)

Exhibit 75      Criminal docket for *U.S. v. Angelita Rodriguez.* 4:93-mj-00764 (S.D. Tex. 1993)

Exhibit 76      INS records for Santana

Exhibit 77      Diana Garcia Statement to HPD (10/1/1992)

Exhibit 78      Arturo Rodriguez Statement to HPD (10/1/1992)

Exhibit 79      Santana criminal record

Exhibit 80      Email from HCDAO A.D.A. Natalie Tise (4/24/2015)

Exhibit 81      Declaration of Eledemas Mercedes Fana

Exhibit 82      Declaration of Carlos Adame Martinez

Exhibit 83      Declaration of Daisy Melendez

Exhibit 84      Declaration of Idaliz Perez De La Cruz

Exhibit 85        Declaration of Joel Cruz-Garcia

Exhibit 86        Declaration of Margarita Martinez

Exhibit 87        Declaration of Mireya Perez Garcia

Exhibit 88        Declaration of Maria Altagracia Capellan

Exhibit 89        Declaration of Nilsa Ela Garcia Marine

Exhibit 90        Declaration of Noemi Margarita Cruz-Garcia

Exhibit 91        Declaration of Piruquinu "Piruca" Acosta

Exhibit 92        Declaration of Ramona Altagracia Mosquea

Exhibit 93        Declaration of Sandra Hilvania Vazquez

Exhibit 94        Declaration of Leurides Vasquez Faña

Exhibit 95        Crime Scene Investigators Supplement

Exhibit 96        HPD Supplemental Narrative of Diana Garcia and Arturo Rodriguez

Exhibit 97        HPD Supplemental Narrative of investigation

Exhibit 98        Excerpts from Reporter's Record, *Aviles-Barroso v. Texas*

Exhibit 99        HPD interview of Jose Valdez

Exhibit 100       HPD interview of Arturo Garcia Sr.

Exhibit 101       FBI interview of Santana (5/23/2011)

Exhibit 102       Car registration for Angelita Rodriguez

Exhibit 103       Harris County Fee Schedule

Exhibit 104       HPD report on forensic examination of Oldsmobile

Exhibit 105       Declaration of Chaplain Irma Iglesias Cruz

Exhibit 106       Declaration of Chaplain Ivan Negron Vera

Exhibit 107       Declaration of Jimmy Osorio

Exhibit 108       Declaration of Luis Gonzales Martinez

Exhibit 109       Vitale invoice

Exhibit 110          Declaration of Dr. Claudia Ahumada Degrati, Ph.D.

Exhibit 111          Passport for Cruz-GarciaCruz-Garcia

Exhibit 112          Email from HCDAO A.D.A Lori DeAngelo (12.29.2016)

Exhibit 113          Letter from HCDAO A.D.A. Natalie Tise in support of
                     adjustment of status by Angelita Rodriguez

Exhibit 114          Excerpts from Reporter's Record, *Aviles-Barroso v.
                     Texas*

Exhibit 115          Harris County criminal record for Angelita Rodriguez

Exhibit 116          PIA request - 1989 murder of Saul Flores

Exhibit 117          Response to PIA request – 1989 murder of Saul Flores

Exhibit 118          Follow-up to PIA request – 1989 murder of Saul Flores
                     – records not subject to disclosure

Exhibit 119          Letter from Office of the Attorney General of Texas re:
                     PIA request – 1989 murder of Saul Flores

Exhibit 120          Declaration of Joanne Heisey

Exhibit 121          Declaration of Adrián de la Rosa

Exhibit 122          OCFW Motion for Disclosure of *Brady v. Maryland*
                     Materials

Exhibit 123          State's Objections and/or Request for Reconsideration of
                     Order granting Defendant's Motion for Disclosure

Exhibit 124          *Brady* disclosure - Email from HCDAO A.D.A Natalie
                     Tise (6/10/2013)

Exhibit 125          *Brady* disclosure - Email from HCDAO A.D.A Natalie
                     Tise (681/2011)

Exhibit 126          *Brady* disclosure – Emails about chain of DNA testing
                     (5/2011)

Exhibit 127          *Brady* disclosure - Email from HCDAO A.D.A Natalie
                     Tise about DNA of Santana (5/19/2011)

Exhibit 128        *Brady* disclosure – Emails about chain of DNA testing of hair (5/2011)

Exhibit 129        *Brady* disclosure – Emails about DNA results (5/2011)

Exhibit 130        *Brady* disclosure – Forensic testing in connection with extraneous offense (10/2011)

Exhibit 131        *Brady* disclosure – Emails about chain of DNA testing (2) (5/2011)

Exhibit 132        *Brady* disclosure – DNA timeline

Exhibit 133        *Brady* disclosure – Emails about chain of DNA testing (3) (5/2011)

Exhibit 134        *Brady* disclosure – Hairs Orchid DNA reports

Exhibit 135        *Brady* disclosure – Witness contacts

Exhibit 136        *Brady* disclosure – PIGs reports

Exhibit 137        *Cruz-GarciaCruz-Garcia v. Bobby Lumpkin*, Order, Case NO 17-cv-3621 (S.D. Tex. Jan. 29, 2021)

Exhibit 138(A)     Skip Cornelius billing records

Exhibit 138(B)     Skip Cornelius billing records

Exhibit 139(A)     Skip Cornelius appointment records

Exhibit 139(B)     Skip Cornelius appointment records

Exhibit 139(C)     Skip Cornelius appointment records

Exhibit140         Third Bromwich Report

Exhibit 141        Fourth Bromwich Report

Exhibit 142        Texas Indigent Defense Commission, *Judgment and Justice, An Evaluation of the Texas Regional Public Defender for Capital Cases* (June 2013)

Exhibit 143        Texas Indigent Defense Commission, *Recommendations for a Unified Harris County Managed Assigned Counsel Program*

00019

Exhibit 144          Texas Indigent Defense Commission, *Guidelines for Indigent Defense Caseloads* (January 2015)

Exhibit 145          Texas Indigent Defense Commission, *RPDO Making a Difference in Texas* (December 2016)

Exhibit 146          Texas Indigent Defense Commission, *Policy Monitoring Review of Harris County's Felony Indigent Defense Systems* (October 2016)

Exhibit 147          Council of State Governments Justice Center, *Harris County Public Defender* (September 2013)

Exhibit 148          Skip Cornelius capital appointment records

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ex parte Adams,*
    768 S.W.2d 281 (Tex. Crim. App. 1981)............................................................... 79

*Allen v. United States,*
    164 U.S. 492 (1896) ..................................................................................... 309

*Ex parte Alvarez,*
    468 S.W.3d 543 (Tex. Crim. App. 2015)............................................................ 333

*Andrus v. Texas,*
    140 S. Ct. 1875 (2020) ........................................................ 106, 207, 208, 209, 217

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000) .............................................................................. 90, 350

*Arrington v. State,*
    2015 WL 1247270 (Tex. App.—San Antonio Mar. 18, 2015, pet. ref'd)............... 86

*Banks v. Dretke,*
    540 U.S. 668 (2008) ..................................................................................... 85

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ............................................................................... 279, 280

*Beltran v. Cockrell,*
    294 F.3d 730 (5th Cir. 2002) ........................................................................ 192

*Bobby v. Van Hook,*
    558 U.S. 4 (2009) ....................................................................................... 106

*Brady v. Maryland,*
    373 U.S. 83 (1963) ............ 12, 26, 44, 68, 69, 71, 73, 74, 75, 76, 82, 83, 84, 85, 192

*Ex parte Brooks,*
    219 S.W.3d 396 (Tex. Crim. App. 2007).............................................................. 53

*Brown v. State,*
    2011 WL 2714117 (Tex. App.—El Paso July 13, 2011, pet. ref'd) ....................... 87

*Ex parte Bryant,*
    448 S.W.3d 29 (Tex. Crim. App. 2014)............................................................. 105

*Ex parte Bryant,*
    448 S.W.3d at 38–39.................................................................. 106

*Ex parte Buck,*
    418 S.W.3d 98 (Tex. Crim. App. 2013) (Alcala, J., dissenting, joined by
    Price and Johnson, JJ.) ............................................................ 334

*Burkahlter v. State,*
    493 S.W.3d 214 (Tex. Crim. App. 1973) (State elicited false testimony
    where "the prosecutor's silence as to the plan not to prosecute conveyed
    an impression to the jury which the State knew to be false[.]").................... 30, 49

*Ex parte Campbell,*
    226 S.W.3d 418 (Tex. Crim. App. 2007)................................ 82, 104, 324

*Cannon v. Mullin,*
    383 F.3d 1152 (10th Cir. 2004), *abrogated on other grounds by Simpson
    v. Carpenter,* 912 F.3d 542 (10th Cir. 2018) ....................................... 306

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) .................................................................. 345

*Castaneda v. Partida,*
    430 U.S. 482 (1977) ............................................................ 270, 271

*Ex parte Chabot,*
    300 S.W.3d 771 (Tex. Crim. App. 2009)......................................... 54, 55

*Ex parte Chavez,*
    371 S.W.3d 200 (Tex. Crim. App. 2012)............................................. 54

*Coker v. State,*
    2010 WL 5031098 (Tex. App.—Tyler Dec. 8, 2010, no pet.) .................... 86

*Cossel v. Miller,*
    229 F.3d 649 (7th Cir. 2000) ....................................................... 291

*Crawford v. Washington,*
    541 U.S. 36 (2004) ......................................................... 292, 338, 350

*Cruz-Garcia v. Texas,*
    No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App. Oct. 28, 2015)
    (unpublished)............................................................................ 16

*Ex parte Cruz-Garcia,*
    No. WR-85,051-02-03, 2017 WL 4947132 (Tex. Crim. App. Nov. 1, 2017)........... 17

*Cullen v. Pinholster,*
 563 U.S. 170 (2011) ........................................................................... 106

*Darden v. Wainwright,*
 477 U.S. 168 (1986) (State misconduct violates a defendant's due
 process rights to a fair trial when the conduct "so infected the trial with
 unfairness as to make the resulting conviction a denial of due process."). 300, 353

*Diaz v. United States,*
 223 U. S. 442 (1912) ........................................................................... 340

*Draughon v. State,*
 831 S.W.2d 331 (Tex. Crim. App. 1992) ............................................... 96

*Drope v. Missouri,*
 420 U.S. 162 (1975) ........................................................................... 349

*Duren v. Missouri,*
 439 U.S. 357 (1979) ........................................................................... 272

*Ex parte Elizondo,*
 947 S.W.2d 202 (Tex. Crim. App. 1996) ............................................... 53

*Estrada v. State,*
 313 S.W.3d 274 (Tex. Crim. App. 2010) ............................................... 66

*Fairey v. Tucker,*
 567 U.S. 924 (1970) (Sotomayor, J., dissenting from denial of *certiorari*) . 303, 340

*Ferrell v. Estelle,*
 568 F.2d 1128 (5th Cir. 1978) ..................................................... 301, 349

*Ex parte Flores,*
 387 S.W.3d 626 (Tex. Crim. App. 2012) ............................................. 105

*Freeman v. Class,*
 95 F.3d 639 (8th Cir. 1996) ....................................................... 285, 299

*Gabaree v. Steele,*
 792 F.3d 991 (8th Cir. 2015) ............................................................. 291

*Ex parte Ghahremani,*
 332 S.W.3d 470 (Tex. Crim. App. 2011) ......................................... 18, 48

*Giglio v. United States,*
 405 U.S. 150 (1971) ............................................................... 47, 50, 73

*Gillette v. State,*
    444 S.W.3d 713 (Tex. App.—Corpus Christi 2014, no pet.)................................. 87

*Gilmore v. Taylor,*
    508 U.S. 333 (1993) ................................................................... 350, 351

*Grant v. Lockett,*
    709 F.3d 224 (3d Cir. 2013), *abrogated on other grounds by Dennis v.*
    *Sec., Penn. Dep't of Corrs.,* 834 F.3d 263 (3d Cir. 2016) ............................ 194, 195

*Ex parte Graves,*
    70 S.W.3d 105 (Tex. Crim. App. 2002)................................................... 333

*Griffin v. Harrington,*
    727 F.3d 940 (9th Cir. 2013) ........................................................... 291

*Hardman v. State,*
    868 S.W.2d 404 (Tex. App.—Austin 1993), *pet. dism'd, improvidently*
    *granted,* 891 S.W.2d 960 (Tex. Crim. App. 1995).................................. 32, 75, 193

*Harm v. State,*
    183 S.W.3d 403 (Tex. Crim. App. 2006) (en banc) ..................................... 76

*Harrington v. Richter,*
    562 U.S. 86 (2011) ................................................................. 107, 108

*Ex parte Henderson,*
    246 S.W.3d 690 (Tex. Crim. App. 2007) (Price, J., concurring) ......................... 67

*Henry v. Scully,*
    78 F.3d 51 (2d Cir. 1996)............................................................... 291

*Jenkins v. United States,*
    380 U.S. 445 (1965) ................................................................... 310

*Ex parte Kimes,*
    872 S.W.2d 700 (Tex. Crim. App. 1993) (en banc) ..................................... 78

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ................................................................... 73

*Landor v. Davis,*
    No. 16-cv-03384 (ECF No. 10) (S.D. Tex. Oct. 31, 2017)................................. 273

*Lewis v. State,*
    2011 WL 2755469 (Tex. App.—Fort Worth July 14, 2011, pet. ref'd) .................. 87

00024

*Lowenfield v. Phelps,*
    484 U.S. 231 (1988) ........................................................... 309, 310, 311

*Martin v. Darnell,*
    960 S.W.2d 838 (Tex. App.—Amarillo 1997, no pet.) ......................................... 206

*Martin v. Grosshans,*
    424 F.3d 588 (7th Cir. 2005) ..................................................... 291

*Martinez v. Ryan,*
    566 U.S. 1 (2012) ........................................................... 324, 328, 336

*Ex parte Martinez,*
    233 S.W.3d 319 (Tex. Crim. App. 2007) .............................................. 104, 335, 336

*Mathis v. Dretke,*
    124 F. App'x 865 (5th Cir. 2005) ..................................................... 74

*Ex parte Medina,*
    361 S.W.3d 633 (Tex. Crim. App. 2011) ............................................. 328

*Melendez-Diaz v. Massachusetts,*
    557 U.S. 305 (2009) ................................................... 292, 293, 295, 338

*Mills v. Maryland,*
    486 U.S. 367 (1988) ..................................................... 91, 97, 98

*Moffett v. Kolb,*
    930 F.2d 1156 (7th Cir. 1991) .................................................. 192

*Morgan v. Illinois,*
    504 U.S. 719 (1992) .................................................. 310

*In re Murchison,*
    349 U.S. 133 (1955) .................................................... 344

*Napue v. Illinois,*
    360 U.S. 264 (1959) ..................................................... 18

*Nunez-Quijada v. State,*
    2019 WL 5199263 (Tex. App.—Austin Oct. 16, 2019, no pet.) ........................... 86

*Ex parte Overton,*
    444 S.W.3d 632 (Tex. Crim. App. 2014) ........................................... 105

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) .................................................... 106

*Payne v. Tennessee,*
    501 U.S. 808 (1991) ........................................................................ 295

*Peoples v. Lafler,*
    734 F.3d 504 (6th Cir. 2013) ........................................................ 192

*Phillips v. State,*
    130 S.W.3d 343 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 193
    S.W.3d 904 (Tex. Crim. App. 2006) ............................................... 86

*Ramirez v. State,*
    96 S.W.3d 386 (Tex. App.—Austin 2002, pet. ref'd)................... 30, 48, 49

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) ................85, 86, 87, 88, 89, 90, 91, 94, 95, 98, 99, 104, 105

*Ex parte Reed,*
    271 S.W.3d 698 (Tex. Crim. App. 2008)................................................ 53

*Ring v. Arizona,*
    536 U.S. 584 (2002) ......................................................................... 90

*Rompilla v. Beard,*
    545 U.S. 374 (2005) (O'Connor, J., concurring)................................. 107

*Ex parte Ruiz,*
    543 S.W.3d 805 (Tex. Crim. App. 2016)............................... 333, 334, 335

*Sheppard v. Maxwell,*
    384 U.S. 33 (1966) ......................................................................... 355

*Smith v. Wainwright,*
    741 F.2d 1248 (11th Cir. 1984) ...................................................... 192

*State v. Espinoza,*
    2010 WL 2598982 (Tex. App.—Dallas June 30, 2010, pet. ref'd) ........ 87

*Ex parte Storey,*
    2017 WL 1316348 (Tex. Crim. App. 2017)................................ 325, 337

*Strickland v. Washington,*
    466 U.S. 668 (1984) ...........................105, 106, 107, 108, 188, 285, 299

*Strickler v. Greene,*
    527 U.S. 263 (1999) ......................................................................... 84

00026

*Taylor v. State*,
  671 S.W.2d 535 (Tex. App.—Houston [1st Dist.] 1983, no pet.) ........................... 86

*Thomas v. State*,
  841 S.W.2d 399 (Tex. Crim. App. 1992) (en banc)
  ........................................................................................... 69, 79, 81

*Thomas v. Varner*,
  428 F.3d 491 (3d Cir. 2005) .................................... 291

*Thompson v. State*,
  9 S.W.3d 802 (Tex. Crim. App. 1999) .................................. 107

*Ex parte Torres*,
  943 S.W.2d 469 (Tex. Crim. App. 1997) ........................... 326

*Townsend v. Burke*,
  334 U.S. 736 (1948) .................................... 66

*Trevino v. Thaler*,
  569 U.S. 413 (2013) ........................... 324, 333, 335, 336

*Tumey v. Ohio*,
  273 U.S. 510 (1927) ........................... 345

*United States v. Agurs*,
  427 U.S. 97 (1976) ........................... 78, 80

*United States v. Bagley*,
  473 U.S. 667 (1985) ........................... 69, 75, 80

*United States v. United States Gypsum Co.*,
  438 U.S. 422 (1978) ........................... 310

*Washington v. Texas*,
  388 U.S. 14 (1967) ........................... 350

*Wiggins v. Smith*,
  539 U.S. 510 (2003) ........................... 106, 188

*Williams v. Pennsylvania*,
  136 S. Ct. 1899 (2016) ........................... 345, 348

*Witherspoon v. Illinois*,
  391 U.S. 510 (1968) ........................... 279, 281

00027

*Withrow v. Larkin,*
   421 U.S. 35 (1975) ............................................................................. 345

## Constitutional Provisions

U.S. CONST amend. V...............................206, 285, 286, 287, 299, 301, 303, 304, 354

U.S. CONST. amend. VI
   .......................................................................................................................
   ...68, 85, 86, 87, 88, 89, 90, 91, 95, 99, 104, 105, 206, 274, 280, 285, 286, 287, 290,
   292, 299, 301, 303, 304, 321, 323, 324, 333, 336, 338

U.S. CONST. amend. VIII ........................................................ 66, 68, 280, 290, 354

U.S. CONST. amend. XIV...... 18, 54, 66, 68, 85, 89, 206, 274, 280, 285, 286, 287, 289,
   290, 292, 299, 301, 303, 304, 338, 340, 344, 348, 349, 352, 354, 355

## Statutes

8 C.F.R. § 212.5(b)(4) .................................................................................. 265

Tex. Code Crim. Proc. art. 11.071 .....16, 52, 54, 55, 67, 68, 82, 85, 104, 105, 323, 324,
   325, 326, 327, 328, 329, 330, 332, 333, 337, 339, 344, 348, 353, 354, 355

Tex. Code Crim. Proc. art. 35.15
   ...................................................................................................... 275, 276

Tex. Code Crim. Proc. art. 37.07 .............................................................. 268

Tex. Code Crim. Proc. art. 37.071 ...................................................... 92, 93, 94, 101

Tex. Code Crim. Proc. art. 38.30 .............................................................. 352

Tex. R. Evid. 609................................................................... 32, 75, 193, 194

## Other Authorities

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 06-441............. 108, 109

Bethke & Shell, *Public Defense Innovation in Texas*, 51 IND. L. REV..................... 111

Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2005)........................... 107, 115, 211

Lawrence J. Fox, *Capital Guidelines and Ethical Duties: Mutually
   Reinforcing Responsibilities*, 36 HOFSTRA L. REV. 775, 783 (2008) ................... 110

Robert C. Walters, et al., *Jury of Our Peers: An Unfulfilled Constitutional
   Promise*, 58 SMU L. Rev. 319 (2005) ................................................................. 273

00028

William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tᴇx. L. Rᴇv. 605, 670 (1999)................................................................................. 97

William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Cʀɪᴍ. L. Bᴜʟʟ. 51, 68, 71, 72–73 (2003) ............................................................................. 97

00029

## STATEMENT OF THE CASE

### I.    Introduction

#### A.    The 1992 disappearance and death of A.

Cruz-GarciaCruz-Garcia was convicted and sentenced to death in 2013 as a party to the 1992 capital murder of A.[1] 3 CR 530. A. was reported missing by his mother, Diana Garcia, on the night of September 30, 1992, after a neighbor alerted 911 to the child's disappearance. Ex. 77. At the time, Garcia shared an apartment with a man she identified to law enforcement as her husband, Arturo Rodriguez. *Id.* In the hours that followed A.'s disappearance, Garcia and Rodriguez gave separate statements to the Houston Police Department ("HPD"), in which they described being violently assaulted in their apartment by masked intruders who spoke to them in English. *Id.*; Ex. 78. Garcia described to law enforcement waking up to a loud noise and discovering a masked and armed intruder standing in the living room. Ex. 77. Garcia was ordered to lay face down on the bed, her hands tied, and she was sexually assaulted. *Id.* She could hear Rodriguez being beaten and A. crying. *Id.*

---

[1] In accordance with redaction requirements, the name of A., a minor at the time of the offense, has been abbreviated to his first initial and redacted from exhibits.

1

00030

Rodriguez, too, was ordered to lay face down, his mouth gagged and a pillowcase placed over his head, and beaten until he gasped for air. Ex. 78. After Garcia heard the front door close, she rushed to free Rodriguez and discovered that A. was no longer in the apartment. Ex. 77. Neither Garcia nor Rodriguez recognized the main assailant, who they both described as being a Black man, tall and muscular, who spoke to them in English. *Id.*; Ex. 78.

Following Garcia and Rodriguez's initial statement to HPD, law enforcement quickly ascertained that the child's parents were lying to them. The couple reported that the assailants had broken into the apartment, yet no items of value were taken, including the gold jewelry worn by Garcia and Rodriguez that night. Ex. 96. Garcia denied any drug involvement and was adamant that she could think of no motive for the abduction of her son. *Id.* However, law enforcement soon discovered that Garcia and Rodriguez had been dealing cocaine from the apartment from which A. was taken and on that very night. Ex. 24. HPD officers pled with Garcia to be truthful and to help in recovering her son. Ex. 64; 65. Law enforcement tracked various leads based on neighbors' observations of two men roughly corresponding to Garcia and Rodriguez's description of

00031

the assailants, and interviewed the couples' friends and associates to no avail. Ex. 24; 97.

Of those known associates, law enforcement conducted multiple interviews of Carmelo "Rudy" Santana Martinez. Ex. 67; 68. Although denying any knowledge of the circumstances of A.'s disappearance, Santana admitted that he had met Garcia and Rodriguez as their cocaine supplier. Ex. 68. Santana described making weekly deliveries of cocaine to the couple's apartment, accompanied by his cousin's then-husband, Cruz-Garcia. Ex. 68. Santana had recruited Cruz-Garcia from Puerto Rico to Houston. Law enforcement was unable to interview Cruz-Garcia after learning that "for whatever reason" he had returned to the Dominican Republic. Ex 66.

In addition to interviewing known associates of Garcia and Rodriguez, law enforcement focused their investigation on the forensic evidence recovered from the apartment on the night of A.'s disappearance. Specifically, law enforcement sent to the then-recently inaugurated DNA Section of the HPD Crime Lab a sexual assault kit containing vaginal swabs and underwear from Garcia and a cigar found at the apartment. Law enforcement did not, however, believe that the

3

cigar was connected to the assault and disappearance of A. Ex. 64. The cigar and sexual assault kit were received by HPD Crime Lab employee Deetrice Wallace, who screened the items for blood and semen. 16 RR 98; Ex. 24; 132. After taking a cutting from the underwear, DNA Section supervisor Dr. Sharma performed DNA extractions from the underwear cutting, cigar, and vaginal swabs. 16 RR 86–87, 97; Ex. 132. Dr. Sharma was unable to compare those extractions to DNA samples obtained by law enforcement from known associates of Garcia and Rodriguez. Ex. 132. After sending the DNA evidence to various labs in an attempt to obtain definitive comparisons, the DNA Section reported conflicting results and the forensic evidence was eventually stored in HPD Crime Lab storage. *Id*.

A.'s body was discovered on November 4, 1992, on the banks of a Baytown bayou. An autopsy was performed and, though no cause of death could be ascertained, his death was ruled a homicide. Stonewalled by Garcia and Rodriguez, and with no further leads, the case was eventually classified as cold. In a memo dated January 6, 1993, HPD Sergeant Stephens summarized, "Diana [Garcia] and Arturo [Rodriguez] have been untruthful throughout the investigation with regards to the events

00033

inside the apartment and the identity of the suspects." Ex. 19; *see also* Ex. 66.

### B.    A cold case revisited.

In 2007, HPD Sergeant Eric Mehl reopened the cold case of A.'s disappearance and death. As part of the investigation, he retrieved the cigar and sexual assault kit, stored since 1994 in HPD Crime Lab storage at 1200 Travis St. and Goliad St. Ex. 132; 16 RR 30–32. By 2007, the DNA Section of the HPD Crime Lab had been shuttered since 2002 after an independent audit uncovered widespread mishandling and misanalysis of DNA evidence. Ex. 61. 2007 also marked the end of a five-year investigation by an independent investigator tasked by the City of Houston to review the operating procedures of the HPD Crime Lab generally. *Id.* That investigation and its findings would eventually lead to the closure of the HPD Crime Lab as a whole. Among the many and significant failings uncovered, the independent investigator cautioned that storage conditions at 1200 Travis St. and Goliad St. were likely to cause the contamination and degradation of biological evidence, including through exposure to flooding, high humidity, and extreme heat. Ex. 61; 140.

00034

Sergeant Mehl sent the cigar and sexual assault kit to an independent forensic firm, Orchid Cellmark, to re-compare the DNA on those items to samples newly obtained from associates and friends identified in the course of the initial investigation. 16 RR 33. Of those persons, Sergeant Mehl eventually located Cruz-Garcia in Puerto Rico and, in 2008, obtained a buccal swab for comparison. Orchid Cellmark reported that Cruz-Garcia's DNA matched the DNA profile identified on the cigar, the major DNA profile identified on the underwear cutting, and the minor DNA profile identified on the vaginal swabs. 21 RR 119–20. Orchid Cellmark also reported that Garcia's husband, Rodriguez, could not be excluded as a contributor to the DNA profile identified from the mixture on the vaginal swabs. *Id.* at 111–12. Based on this DNA evidence, Cruz-Garcia was indicted on November 28, 2008, in connection with the disappearance and death of A. 1 CR 6.

## C.   An eyewitness implicates Cruz-Garcia as a party to the murder of A.

Soon after indicting Cruz-Garcia in connection with A.'s disappearance, law enforcement again interviewed Santana, the cousin of Cruz-Garcia's wife and suspected associate of Cruz-Garcia. Ex. 69. At the time, Santana was incarcerated in federal prison in Florida on felony

drug charges. *Id.* Santana again denied any knowledge of the circumstances of A.'s disappearance and death. *Id.* He had not kept in touch with Cruz-Garcia but described a friendly relationship between Cruz-Garcia and Garcia and Rodriguez. *Id.* Garcia and Rodriguez themselves would later describe Cruz-Garcia and his wife as close friends, with whom they often went out to clubs, even dropping by on the afternoon of A.'s disappearance. 18 RR 135.

Over two years after Cruz-Garcia was indicted and with the case seemingly at a standstill, law enforcement interviewed Santana again in May 2011. Ex. 101. By that time, the State was confident of Santana's involvement. Ex. 127. After assuring Santana that his cooperation "would be made known to the prosecutor and the presiding judge[,]" FBI Agent Ebersole explained that the State needed Santana's help "to complete the picture of what happened to the little boy A." Ex. 101. Santana then recounted driving to Garcia and Rodriguez's apartment with Cruz-Garcia and another associate, Rogelio Aviles-Barroso, on the night of A.'s disappearance, taking A. and driving to Baytown, where Santana observed Cruz-Garcia order Aviles-Barroso to murder A. *Id.* Two

months after Santana's statement, the State gave notice of its intention
to seek the death penalty against Cruz-Garcia. 4 RR 9.

**D.   Cruz-Garcia is found guilty as a party to capital
murder and sentenced to death.**

At trial, the State's case against Cruz-Garcia rested on three key
elements: first, Santana's testimony as an eyewitness to Cruz-Garcia
ordering A.'s murder; second, DNA evidence tying Cruz-Garcia to the
sexual assault of Garcia on the night of A.'s disappearance; and third, the
testimony of Angelita Rodriguez that her then-husband had confessed to
killing A. In closing argument, the State summarized to the jury that
these three elements established Cruz-Garcia's guilt as a party to capital
murder. 23 RR 97–98. Defense counsel, Skip Cornelius and Mario
Madrid, presented no case on rebuttal.

At the penalty phase, the State again called Santana to testify as
an eyewitness to Cruz-Garcia ordering another murder in 1989. 25 RR
72–85. The State bolstered its future dangerousness case by eliciting
testimony that Cruz-Garcia was involved in a 2001 kidnapping plot in
Puerto Rico and the further murder of a person identified only by the
name "Betico." 24 RR 14–43, 78–117. Defense counsel presented no case
on rebuttal on future dangerousness and presented the testimony of four

00037

mitigation witnesses over the course of one day. Cruz-Garcia was formally sentenced to death by Judge Magee on July 22, 2013. 3 CR 530.

Attorneys Skip Cornelius and Mario Madrid were appointed to represent Cruz-Garcia after the State announced its intention to seek the death penalty. 1 CR 57–58. Defense counsel agreed with presiding Judge Renee Magee to represent Cruz-Garcia for a flat fee. Cornelius, who sat as First Chair, accordingly did not submit any detailed billing in connection with Cruz-Garcia's case.

Cornelius did, however, bill prolifically to other cases on which he was appointed during Cruz-Garcia's trial. Jury selection in Cruz-Garcia's case started on June 3, 2013, and sentencing occurred on July 22, 2013. Cornelius billed time to other cases *every day*, Monday through Saturday, between June 3 and July 22, 2013. *See* Ex. 138. Cornelius billed *at least 2.5 hours to other cases on each of those days and during Cruz-Garcia's trial. Id.* On each day that the jury heard evidence during the guilt phase, Cornelius billed at least 4 hours to other cases, and as many as 5.5 hours. *Id.* Over the three days of the punishment phase, Cornelius billed an average of 4.83 hours per day in other cases. *Id.*

00038

**E.    A case built on false testimony and false DNA evidence, compounded by the ineffective assistance of trial counsel.**

Within months of Cruz-Garcia's conviction and sentence of death, the State's case against Cruz-Garcia began to crumble. First, in November 2015, the State published an amended DNA report that revealed that much of the DNA evidence introduced at trial was false. Ex. 11. In closing, the State had reasoned to the jury that the DNA evidence established Cruz-Garcia's identity as Garcia's assailant because his DNA was on the sexual assault kit and the remaining DNA was that of her husband, Rodriguez. 23 RR 82. The State further relied on the DNA evidence as corroboration for Santana's accomplice testimony, according to which he himself was never in Garcia's apartment and Cruz-Garcia had confessed to assaulting Garcia. *Id.* However, the Amended DNA report concluded that no conclusions could be drawn as to the identity of any of the contributors to the DNA mixture on the vaginal swabs, and no conclusions could be drawn as to the identity of the contributors to the minor DNA mixture on the underwear cutting.[2] Ex. 11. As corrected, the

---

[2] The Amended DNA report did not dispute that Cruz-Garcia's DNA profile matched that from the cigar and the major contributor to the DNA mixture from Garcia's underwear. Ex. 11. However, during the initial investigation, law enforcement never believed that the cigar was tied to the offense. Ex. 64. The State also refuted evidence

DNA evidence therefore neither establishes Cruz-Garcia's identity as Garcia's assailant, nor corroborates Santana's testimony. Instead, the DNA evidence reveals the likelihood of an unknown assailant.[3]

Second, the State vehemently argued to the jury that Santana neither asked for, nor received a deal in connection with his testimony against Cruz-Garcia. 23 RR 96–98. In his testimony, Santana implicated himself in both the 1992 capital murder of A. and the 1989 murder of Saul Flores (introduced at punishment as an extraneous offense). At the State's prompting, he told the jury that he was testifying despite the risk of prosecution in connection with either offense. *See infra* §§ I.A.2.; IV.A. However, after Santana testified for the State at the guilt and penalty phases, the State never brought *any* charges against him. The absence of any charges reveals that the jury was laboring under a false impression as to the credibility of the State's star witness.

---

of a consensual sexual relationship between Garcia and Cruz-Garcia, arguing to the jury that they would have to be "crazy" to believe that Garcia would have a relationship with a man "15 years her junior[.]" 23 RR 91; *see also infra* § IV.D.4.

[3] The possibility of an unknown assailant was already known to the State by 2011, based on Orchid Cellmark testing that identified an unknown male DNA on the door of the car in which the assailants were alleged to have taken A.. Ex. 133.

00040

Moreover, evidence uncovered in post-conviction further casts serious doubt as to Santana's credibility. Federal court records establish that Santana had a history of mental health issues and had sought to convince a federal judge that he was incompetent shortly before implicating Cruz-Garcia to the FBI. Ex. 12; 13; 14. He had also been convicted of assaulting a child prior to his involvement in the kidnapping and death of A., a crime of moral turpitude based on which he could have been impeached and which would have cast doubt as to his supposed reluctant involvement in a crime against a child, A. Ex. 79.

Third, after she testified for the State that Cruz-Garcia had confessed to her some months after A.'s disappearance, Angelita Rodriguez was able to adjust her immigration status despite having been convicted of deportable offenses. Assistant District Attorney Natalie Tise personally wrote and signed a letter in support of Angelita's bid to adjust her immigration status. Ex. 113. Finally, in the intervening years, successor counsel have uncovered a wealth of exculpatory and mitigation evidence, including material evidence withheld by the State in violation of its *Brady* obligations and evidence missed or ignored due to the ineffective assistance of trial counsel.

00041

Because of the ineffective assistance of counsel, the jury was not presented with a case on rebuttal at the guilt phase. The jury also heard virtually nothing of Cruz-Garcia's life story leading up to the offense. As a child, his family fell from middle-class respectability to grinding poverty in a remote fishing village after his father suffered a debilitating accident that ended his naval career. Cruz-Garcia was subsequently abandoned by his mother, who fled to Venezuela, and was forced to work as a fisherman to sustain his family while still a young teenager. He was also forced to marry a village girl he barely knew, who abandoned him for another man while he—still a teenager—worked on a coffee plantation in Puerto Rico.

Despite being dealt a miserable hand in life, Cruz-Garcia was capable of extraordinary empathy and generosity. When he had money, he made sure the people he knew were in need had food. He also paid for a friend's medical treatment that saved his friend's arm from having to be amputated. And he always sent money back to the Dominican Republic to assist his ailing father. The jury heard none of this, nor any of the rest of Cruz-Garcia's life story because trial counsel failed even to

13

retain a mitigation specialist—despite the ABA and Texas Guidelines requiring one as part of a capital trial team.

### F.   Cruz-Garcia received ineffective assistance of initial state habeas counsel.

After his conviction and sentence of death, two attorneys from the Office of Capital and Forensic Writs ("OCFW") were assigned to represent Cruz-Garcia in state post-conviction proceedings. The OCFW was newly formed and the attorneys assigned to Cruz-Garcia's case were inexperienced, under-resourced, and carried significant caseloads with no supervision. Ex. 120. State habeas counsel thus failed to identify and develop significant evidence of trial counsel's ineffectiveness, including Cornelius's publicly available billing records establishing his startling neglect of Cruz-Garcia's case. They also failed to investigate and develop swaths of evidence that established that Cruz-Garcia was prejudiced by trial counsel's ineffectiveness. *Id.*; Ex. 121. Cruz-Garcia was therefore unable to develop and raise many of the claims presented herein.

00043

## II.   Procedural History

Cruz-Garcia was indicted as a party to capital murder on November 20, 2008. 1 CR 6.[4] In August 2011, the State gave notice of its intention to seek the death penalty against Cruz-Garcia, and attorneys Skip Cornelius and Mario Madrid were appointed as first and second chair.[5] 1 CR 57–58; 4 RR 6–7, 9. After four days of testimony by witnesses for the State at the guilt phase of trial, the defense presented no case on rebuttal and both sides rested. 21 RR 174–75. After two days of testimony by witnesses for the State on punishment, the defense presented the testimony of four witnesses over the course of one day. 26 RR 8–96. The jury was sequestered overnight to deliberate on punishment and, after the trial court held an *ex parte* meeting with a holdout juror, returned a sentence of death. 27 RR 9. Cruz-Garcia was formally convicted and

---

[4] Citations to the Clerk's Record from trial are cited to as "volume CR page" and to the Clerk's Record from initial state post-convictions proceedings as "volume SHCR page." Citations to "RR" are to the Reporter's Record from trial and to "SHRR" to the Reporter's Record from any hearing in connection with initial state post-conviction proceedings.

[5] In the interim period, Cruz-Garcia had retained attorneys Steven Shellist and Christian Capitaine as counsel. 1 CR 19–21. Because neither Mr. Shellist nor Mr. Capitaine were death-qualified, however, they withdrew from the case when the State announced its intention to seek the death penalty. 4 RR 6.

00044

sentenced to death as a party to capital murder on July 22, 2013. 3 CR
530.

The Court of Criminal Appeals ("CCA") affirmed Cruz-Garcia's
conviction and sentence of death on direct appeal on October 28, 2015.
*Cruz-Garcia v. Texas*, No. AP-77,025, 2015 WL 6528727 (Tex. Crim. App.
Oct. 28, 2015) (unpublished). Cruz-Garcia timely filed an initial
application for writ of habeas corpus in the convicting court on August
28, 2015. 1 SHCR 2. Over Cruz-Garcia's objections that the convicting
court contravened the procedures outlined under Tex. Code Crim. Proc.
art. 11.071, the convicting court adopted the State's proposed findings
and conclusions *verbatim* and in full on December 29, 2016.[6] 5 CR 1084–
85.

On November 3, 2015, the State published an Amended Laboratory
Report by the Houston Forensic Science Center. Ex. 11. On May 2, 2016,
Cruz-Garcia filed a Subsequent Application for a Writ of Habeas Corpus
Filed Pursuant to Art. 11.071 § 5 and Art. 11.073 of the Texas Code of
Criminal Procedure. Ex. 4. Cruz-Garcia argued that the DNA evidence

---

[6] Judge Magee lost her bid for reelection on November 8, 2016. 5 SHCR 1109. Her
tenure ended two days after adopting the State's proposed findings, on December 31,
2016.

00045

on which the State relied to obtain his conviction had been discredited by the State's own expert and that his conviction was therefore based on false, misleading, and scientifically invalid evidence. *Id.* On November 1, 2017, the CCA adopted the convicting court's recommendation that relief be denied on Cruz-Garcia's initial application and dismissed the subsequent application. *Ex parte Cruz-Garcia*, No. WR-85,051-02-03, 2017 WL 4947132, at *2 (Tex. Crim. App. Nov. 1, 2017).

Cruz-Garcia timely filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Texas, Houston Division, on October 31, 2018, and an amended petition on July 1, 2019. On January 29, 2021, the federal district court stayed federal proceedings in Cruz-Garcia's case and ordered Cruz-Garcia to file a subsequent state habeas application. Ex. 137.

### III.   Statement of Facts

Cruz-Garcia has incorporated relevant facts under each claim for relief, *infra*.

00046

## CLAIMS FOR RELIEF

### I.   Claim One: The State relied on false testimony, in violation of the Fourteenth Amendment.

The State relied extensively on false testimony to obtain a conviction and sentence of death against Cruz-Garcia, in violation of due process under the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011) ("A conviction procured through the use of false testimony is a denial of due process guaranteed by the Federal Constitution."). A violation of due process is established where (1) false testimony was given; (2) the State knew or should have known that the testimony was false; and (3) the false testimony was material. *Id.* at 477–78. Because Cruz-Garcia satisfies all three elements, he is entitled to a new trial.

At trial, the State's case against Cruz-Garcia turned on the testimony of Carmelo "Rudy" Santana Martinez implicating Cruz-Garcia as a party to the offense, DNA evidence linking Cruz-Garcia to the apartment of Diana Garcia, and the testimony of Angelita Rodriguez

18

00047

alleging that Cruz-Garcia had confessed to her. False testimony, however, impacted all three elements of the State's case. Despite eliciting testimony designed to convey to the jury the impression that Santana was testifying at the risk of being prosecuted, the State never brought *any* charges against him. Then, after Cruz-Garcia was convicted, the State published an amended DNA report in which it recanted much of the DNA evidence it relied on to tie him to the offense and to corroborate Santana's accomplice testimony. Ex. 11. Finally, after Rodriguez testified against Cruz-Garcia, the State supported her bid to adjust her immigration status. Ex. 113. Based on the information available to the State at the time of trial, the State knew or should have known that the testimony of Santana and Rodriguez and the DNA testimony was false.

In combination, this false testimony infected all critical aspects of the State's case against Cruz-Garcia. Absent the false testimony, the jury would have been presented with little evidence supporting the State's theory of the case and Cruz-Garcia's guilt as a party to capital murder.

### A.     The State relied on the false testimony of Carmelo "Rudy" Santana Martinez.

At the guilt phase of trial, the testimony of Carmelo "Rudy" Santana Martinez was critical to the State's case against Cruz-Garcia. In

00048

closing, the State argued that Santana's testimony needed only "the tiniest little bit of corroboration" to prove that Cruz-Garcia was guilty of capital murder as a party. 23 RR 36. Santana, who had recruited Cruz-Garcia from Puerto Rico to Houston, claimed that he, Rogelio Aviles-Barroso,[7] and Cruz-Garcia drove to the apartment of Diana Garcia and Arturo Rodriguez on the night of the offense. 20 RR 135. He alleged that, there, Cruz-Garcia sexually assaulted Diana Garcia, took A., and ordered Aviles-Barroso to murder A. *Id.* at 149. Santana described his own participation in the kidnapping and murder of A. and, at the State's prompting, told the jury that his testimony therefore placed him at risk of prosecution in connection with the capital murder of A. *Id.* at 153–54, 166. The State did not call Aviles-Barroso to testify.[8]

According to Santana, the three men drove to Garcia and Rodriguez's apartment because Cruz-Garcia wanted to get drugs and money from the couple. 20 RR 135. Santana described the vehicle used

---

[7] At the time of Cruz-Garcia's trial, Aviles-Barroso had been arrested in connection with the offense and was housed at the Harris County Jail. 20 RR 166–67. He was convicted of capital murder on January 29, 2014, in trial Cause No. 1346839, in the 337th District Court in Harris County, Texas. The State did not seek the death penalty against Aviles-Barroso and he was sentenced to life.

[8] Santana also testified for the State against Aviles-Barroso in a subsequent trial.

that night as a four-door, blue Chevrolet driven by Cruz-Garcia. *Id.* at 136. Santana alleged that Cruz-Garcia instructed him to remain in the car while he and Aviles-Barroso went up to Garcia's and Rodriguez's apartment. *Id.* at 137. Santana insisted to the jury that he remained in the car, from which he observed Cruz-Garcia returning from Garcia's apartment with A. in his arms. *Id.* at 144. According to Santana, Cruz-Garcia volunteered to him that he had raped Garcia and beaten Rodriguez. *Id.* at 145. Santana was adamant to the jury that he pled with Cruz-Garcia to find Garcia so as to protect the child, at which point Cruz-Garcia walked away while Santana remained in the car with A. *Id.* at 145–46. Santana testified that, sitting alone with A. in the car and with Cruz-Garcia and Aviles-Barroso nowhere in sight, he "was already convinced" that Cruz-Garcia was not going to return A. to Garcia. *Id.* at 147.

Santana then recounted sitting in the backseat of the car alongside A. as the group drove towards Baytown. 20 RR 147. He described to the jury how, upon stopping the car, Cruz-Garcia told Aviles-Barroso that Aviles-Barroso knew what needed to be done. *Id.* at 149. It was at this point that, in his version of the offense, Santana stepped away to defecate

and discovered A. dead only upon walking back towards the group. *Id.* at 150–52. Santana then described to the jury how he tied rocks to A. to weigh the body down and that he and Aviles-Barroso submerged it in a bayou. *Id.* at 153–54. Santana testified that he threw the knife used by Aviles-Barroso out of the car window as they drove away. *Id.* at 166.

Santana testified that the group then drove to a Pasadena motel and called a friend after all four tires on their car blew out. 20 RR 154. He alleged that Cruz-Garcia then swore him and Aviles-Barroso to secrecy. *Id.* at 156. Santana then described driving back to Cruz-Garcia's apartment, while Aviles-Barroso left. *Id.* at 158. After spending the night there, Santana testified that Cruz-Garcia explained to him that he intended to leave Houston immediately and suggested Santana accompany him throughout the day as he prepared to travel back to the Dominican Republic. 20 RR 160–61. Santana never saw Cruz-Garcia thereafter. *Id.* at 164.

Santana's account of the night of the offense to the jury squarely contradicted his prior statements to law enforcement spanning from 1992 to 2011. Moreover, despite Santana's repeated pleas to the jury that he risked grave legal consequences by testifying to his participation in

capital murder, the State never charged Santana in connection with the offense. Finally, Santana misrepresented his criminal record and thus avoided being impeached.

### 1. The State relied on false testimony to establish Cruz-Garcia's guilt as a party to capital murder.

Santana's testimony to the jury was riddled with falsities that were known to the State as contradicted by his prior statements to law enforcement,[9] other witnesses' accounts, and law enforcement's investigation of the offense. Santana was interviewed by law enforcement in connection with the offense as early as October 5, 1992. Ex. 67. In an interview with HPD officers U.P. Hernandez and A.C. Alonzo, Santana "denied knowledge of who kidnapped and murdered the complainant in this case [. . .] and told officers that [Cruz-Garcia] had left for Puerto Rico on a 'planned trip'." *Id.* Santana was interviewed again on November 5, 1992, and again denied any knowledge of the offense. Ex. 68. In February 2009, HPD interviewed Santana after reopening the case but he remained adamant that he did not know about the circumstances of A.'s disappearance and death. Ex. 69.

---

[9] The State did not disclose to the defense a number of prior statements by Santana (as well as other witnesses) made to law enforcement. *See infra* §§ IV.A and C.

It was not until Santana was interviewed by FBI Agent Ebersole in 2011, and was told that "any cooperation he gave would be made known to the prosecutor and the presiding judge," that he connected Cruz-Garcia to the capital murder of A.[10] 20 RR 165; Ex. 101 at 2. Despite the State's suggestion to Santana before the jury that he had told Agent Ebersole that he had not previously implicated Cruz-Garcia because he had been too scared, Santana replied that he could not recall making such statements to the FBI.[11] 21 RR 13.[12]

In his account of the night of A.'s disappearance to the jury, Santana further contradicted his prior statement to the FBI concerning key elements of the offense. In his 2011 statement to the FBI, Santana stated that Cruz-Garcia and Aviles-Barroso had returned to the waiting

---

[10] FBI Agent Ebersole's report of Santana's statement makes clear that Santana was advised from the outset of the interview that "any cooperation he gave would be made known to the prosecutor and the presiding judge." Ex. 101 at 2.

[11] In response to Santana replying that he did not remember ever telling Agent Ebersole that he had not previously implicated Cruz-Garcia because he was concerned about testifying against him, the State commented on the record and before the jury, "I think Agent Ebersole will." 21 RR 13. The court sustained the defense's objection to the State's sidebar. *Id.* at 13–14.

[12] FBI Agent Ebersole's report of Santana's statement reflects that: "MARTINEZ [Santana] *again interjected in his responses that he did not want to go to trial.* MARTINEZ was advised that his cooperation would be made known to the prosecutor and the presiding judge." Ex. 101 at 8 (emphasis added).

00053

car together and that Cruz-Garcia was holding A. in his arms. Ex. 101 at 7. According to this same statement, the two men then returned to Garcia's apartment and Aviles-Barroso carried A. back with them. *Id.* But by the time of his testimony, Santana described Cruz-Garcia returning alone, telling Santana that he had assaulted Garcia and Rodriguez, and A. walking alongside Cruz-Garcia because he was familiar to A. 21 RR 49–50.

In another glaring example of the falsity of Santana's account to the jury, Santana testified that the three men had driven to Garcia's apartment in Cruz-Garcia's car, which he described as a blue four-door Chevrolet. 20 RR 128, 136, 161. Santana specifically distinguished this blue Chevrolet from the blue Thunderbird owned and driven by Cruz-Garcia's wife. *Id.* at 128. Yet, Cruz-Garcia's wife testified that the couple never owned a blue Chevrolet and that, in 1992, Cruz-Garcia owned and drove an Oldsmobile. *Id.* at 95. The State's own pictures of the cars owned by Cruz-Garcia and his wife at the time of the offense further established that both cars were two-door vehicles. *See* 30 RR State's Ex. 37; 38.

Santana's explanation to the jury for why Cruz-Garcia would have taken A. was contradicted by the testimony of A.'s own mother and step-

father, Garcia and Rodriguez. According to Santana, Cruz-Garcia took A. because A. had recognized him. 20 RR 144. Yet, both Garcia and Rodriguez testified that the alleged assailants had been wearing masks. 19 RR 215; 18 RR 214–15. According to Rodriguez, A. was asleep and "didn't even know what was going on." 18 RR 215. No explanation was offered as to why Garcia and Rodriguez, who described themselves as close friends with Cruz-Garcia, did not recognize Cruz-Garcia but A. did.

Finally, Santana testified that Aviles-Barroso had used a knife to cause the death of A. and that A.'s chest had been covered in blood. 20 RR 151–52. Santana further described how he himself later threw that knife out of the car on Cruz-Garcia's orders. *Id.* at 166. But the State provided a supplemental *Brady* notice on the eve of trial stating that a presumptive test for blood on A.'s clothing was negative. 3 CR 482. Santana's testimony to the jury was contrary to his own prior statements, eyewitness testimony provided by two other State witnesses, and law enforcement's own investigation, all of which were known to the State.

### 2.   The State relied on false testimony to bolster Santana's credibility to the jury.

With no forensic evidence tying Cruz-Garcia to any events occurring *after* the alleged assault in Garcia's apartment, Santana's

00055

testimony was key to establishing Cruz-Garcia's participation in the murder of A.[13] In closing, the State summarized as to Santana's testimony, "he filled in all the gaps for you." 23 RR 98. Santana had been interviewed by law enforcement in connection with A.'s death as early as October 5, 1992. Ex. 67. He was also interviewed again in 2009, after the HPD interpreted the DNA evidence as establishing Cruz-Garcia's presence inside Garcia's apartment on the night of A.'s disappearance. Ex. 69. Yet, Santana testified that it was not until he was approached by the FBI in 2011 that he felt compelled to reveal Cruz-Garcia's participation as a party to the capital murder of A. 20 RR 165. By then, it was clear to HCDAO that Santana was involved. Ex. 127.

At trial, the State prompted Santana to tell the jury that he was testifying at grave, personal risk of being prosecuted in connection with the capital murder of A.:

> Q. When Special Agent Ebersole came to talk to you, did he make any promises about your case?
>
> A. No.

---

[13] *See* Ex. 101 ("MARTINEZ [Santana] was advised that the interviewing agent wanted his assistance; and although there was scientific evidence to prove [Cruz-Garcia's] involvement in the invasion of the GARCIA's home as well as the rape of DIANA GARCIA, *there was a need to complete the picture of what happened to the little boy [A.]*") (emphasis added).

00056

Q.   Did he offer any deals or say you were going to get any benefits from this?

A.   No, no way.

Q.   Was there - - was this something, you know, that you did because anybody offered you something to do it?

A.   No, never.

Q.   And you know as you sit there that you could be charged with a crime, don't you?

A.   That's right.

Q.   And you could get in a lot of trouble?

A.   That's right.

20 RR 165–66. The State also elicited testimony that neither the FBI nor the Harris County D.A's Office had made promises to Santana or offered him a deal in connection with his testimony against Cruz-Garcia:

Q.   We talked about, Rudy [Santana], the fact that when the special agent went up to interview you, he didn't make you any promises, correct?

A.   No.

[. . .]

28

00057

> Q.   Have Justin [Wood] or I [Natalie Tise] or any member of
>      the D.A.'s office ever made you any promises about this
>      case?
>
> A.   No, never.
>
> Q.   Have we ever told you that you are going to get any kind
>      of special deal based on your testimony?
>
> A.   No, never.

*Id.* at 173–74. The State further asked Santana to testify that he had also "never even asked for a deal," to which he replied, "No, never."[14] 21 RR 12.

In his statement to the FBI and in his testimony as a witness for the State, Santana described in detail his participation in the kidnapping and death of A., including how he weighed down A.'s body and disposed of the murder weapon.[15] 20 RR 153–54, 66. Yet, contrary to Santana's representations at trial that he risked being prosecuted by testifying, the State never charged him with *any* offense in connection with the capital

---

[14] At punishment, the State similarly elicited testimony from Santana that he had neither asked for nor been offered a deal or benefit. 25 RR 95–96.

[15] At punishment, Santana also implicated himself in the murder of Saul Flores. *See below* § IV.A.1.

murder of A.[16] The State thus elicited false testimony designed to convey to the jury the false impression that Santana could and would be charged based on his sworn testimony that he participated in the capital murder of A. *See Burkahlter v. State*, 493 S.W.3d 214, 218 (Tex. Crim. App. 1973) (State elicited false testimony where "the prosecutor's silence as to the plan not to prosecute conveyed an impression to the jury which the State knew to be false[.]"); *Ramirez v. State*, 96 S.W.3d 386, 395 (Tex. App.—Austin 2002, pet. ref'd) (State elicited false testimony where it did not correct false impression conveyed by witness's testimony, irrespective of the fact that she did not know her testimony was false).

The State's objection to the trial court's charge that Santana's testimony be characterized as accomplice testimony indicates that the State knew that it would not bring charges against Santana. 22 RR 16 (objecting to the jury being instructed on Santana being considered an accomplice as a matter of law). Already in May 2011, two years prior to Santana's testimony, Assistant District Attorney Natalie Tise concluded that that she "might have enough information to charge [Santana]" *if*

---

[16] The State also never charged Santana in connection with the murder of Saul Flores, after Santana testified that he took Flores by force, watched as he was beaten, dumped Flores's body in a bathtub, and then left it in a dumpster. *See infra* § IV.A.1.

00059

Santana's DNA could be linked to the rape kit. Ex. 127. Yet, Santana was excluded as a possible contributor to the rape kit by Orchid Cellmark in June 2011. 21 RR 116–17. Hence, to the extent the State's assessment of Santana's criminal liability in connection with the capital murder of A. turned on whether he was included or excluded by the DNA on the rape kit, the State knew at the time of his 2013 testimony that it would not bring any charges against Santana.[17]

### 3.   The State relied on false testimony to prevent the defense from impeaching Santana.

On *voir dire* by the defense, Santana testified that he was convicted in 1992 in Harris County of misdemeanor assault on a boy. 21 RR 28. The victim of that offense was a girl, a fact known to the Harris County District Attorney's Office. Ex. 79. The State argued, and the trial court agreed, that the defense should be prohibited from introducing this prior

---

[17] In the alternative, the State elicited false testimony by prompting Santana to represent to the jury that he did not receive, nor request, a deal in connection with his testimony against Cruz-Garcia. The FBI's report of Santana's 2011 statement belies his trial testimony that he was entirely unconcerned about obtaining a deal in exchange for his testimony. Agent Ebersole's report establishes that, from the outset and throughout the interview, he was "advised [by the FBI officer] that his cooperation would be made known to the prosecutor and the presiding judge." Ex. 101 at 2, 8. His report also states that "MARTINEZ [Santana] *again* interjected in his responses that he did not want to go to trial. MARTINEZ was advised that his cooperation would be made known to the prosecutor and the presiding judge." *Id.* at 8 (emphasis added).

conviction as impeachment because it was not a crime involving moral turpitude. 21 RR 24. Santana's testimony and the State's characterization of the offense was false because it was committed against a girl and therefore constituted a crime involving moral turpitude under Texas law and grounds for impeachment. *See* Tex. R. Evid. 609; *Hardman v. State*, 868 S.W.2d 404, 407 (Tex. App.—Austin 1993), *pet. dism'd, improvidently granted*, 891 S.W.2d 960 (Tex. Crim. App. 1995) (Mem.) (finding that assault by a man against a woman constitutes a crime involving moral turpitude that is admissible for impeachment pursuant to Texas Rule of Evidence 609).

### B.    False testimony about the DNA evidence.

The case against Cruz-Garcia was ostensibly solved in 2008 on the basis of DNA evidence linking Cruz-Garcia to the assault on Diana Garcia on the night of A.'s disappearance. 23 RR 89. At trial, the State alleged that the DNA evidence established Cruz-Garcia's identity as the masked assailant who assaulted Garcia, thus tying him to the place and time of A.'s disappearance, and that it also corroborated Santana's account of the offense. *Id.* at 82–83, 90–91.

00061

The State introduced the testimony of Orchid Cellmark analyst Matt Quartaro, who testified that Cruz-Garcia's DNA matched (1) the DNA profile identified on the cigar; (2) the major DNA profile of the DNA mixture on the underwear cutting; and (3) that Cruz-Garcia could not be excluded as a possible contributor to the DNA mixture identified on the vaginal swabs. 21 RR 119–20. Quartaro also testified that Garcia's husband, Rodriguez, could not be excluded as a contributor to the minor profile obtained from the DNA mixtures identified on the underwear cutting and vaginal swabs. *Id.* at 111–12, 114. The State also introduced the testimony of HPD Crime Lab analyst Amber Head, who similarly testified that Cruz-Garcia could not be excluded as a contributor to the DNA profile on the cigar and the major DNA profile from the mixture on the underwear cutting, nor from the DNA profile from the mixture on the vaginal swabs.[18] *Id.* at 161–62.

---

[18] Head testified that she compared only Cruz-Garcia's DNA sample to the DNA profiles obtained from Orchid Cellmark testing. She did not compare the DNA profiles obtained by Orchid Cellmark against any other DNA sample. 21 RR 164.

00062

1.     **The State relied on false testimony regarding DNA evidence to obtain Cruz-Garcia's conviction as a party to capital murder.**

In closing, the State described this DNA testimony as "the most damning" evidence against Cruz-Garcia. 23 RR 36. The State argued to the jury that the DNA established Cruz-Garcia's identity as Garcia's assailant on the night of A.'s disappearance.[19] *Id.* at 82–83. The State further contended that, by excluding Santana as a possible contributor to the DNA identified on the rape kit, the DNA corroborated Santana's account according to which he was never in Garcia's apartment. *Id.* at 82. The State reasoned to the jury that, based on the DNA evidence excluding Santana as Garcia's assailant and Garcia's husband being the other contributor to the DNA mixtures, Cruz-Garcia must have been Garcia's assailant and was thus connected to A.'s disappearance and death. *Id.* at 82–83, 93. In closing argument at the guilt phase of trial, the State affirmed to the jury that, "you could literally stop with the DNA" and that, "on the DNA alone, you could convict the defendant." *Id.* at 91.

---

[19] During, the original investigation, law enforcement never believed that the cigar was connected to the assailants. *See* Ex. 64.

In November 2015, after Cruz-Garcia was convicted and after he filed an initial writ of habeas corpus in state court, the State provided to initial habeas counsel an amended DNA report in which the State recanted much of this DNA testimony. Ex. 11. Contrary to the version of the DNA evidence presented at trial, the amended report concluded that no conclusions could be drawn as to the identity of the contributors to the DNA mixture on the vaginal swabs, nor as to the identity of the contributors to the minor component of the DNA mixture on the underwear cutting. *Id.*

### 2.   The State relied on false testimony to bolster the reliability of the DNA evidence.

The State itself described the DNA evidence as the linchpin to its case against Cruz-Garcia. 23 RR 91. However, emails dating back to the months leading up to Cruz-Garcia's trial to and from various State actors establish that the State knew that the reliability of the DNA evidence was at issue. Ex. 124; *see also* Ex. 132; 136. The HPD Crime Lab had been shuttered in 2007 after an independent investigator tasked by the City of Houston with reviewing HPD Crime Lab procedures uncovered "rampant false test results, mishandling of evidence, improper police procedure, criminal activity, and incompetence." 3 CR 455. Among the

significant failings identified, the independent investigator cautioned that the storage conditions of biological evidence, and rape kits specifically, were likely to cause the contamination and degradation of evidence. Ex. 61 at 29. For example, the independent investigator documented the fact that evidence stored at 1200 Travis St., from where Sergeant Mehl retrieved the sexual assault kit in 2007, had been exposed to water. Ex. 140 at 58. Hence, to bolster the reliability of the DNA evidence, the State relied on the false testimony of law enforcement and lab technicians to give the jury the false impression that the only forensic evidence tying Cruz-Garcia to the offense was "in pristine condition." 23 RR 90.

HPD Sergeant Eric Mehl and Orchid Cellmark supervisor Matt Quartaro both testified that the rape kit had been sent to, and received by, Orchid Cellmark in sealed bags.[20] 20 RR 47; 21 RR 137. Sergeant

---

[20] Quartaro also provided false testimony about the source of DNA in the sperm fraction. 21 RR 133–37. Even if it were possible to reliably determine that Cruz-Garcia's DNA was present in the sperm fraction, the mere presence of DNA in the sperm fraction does not mean the DNA came from sperm. DNA from epithelial (skin) cells may also be present in sperm fractions. Quartaro also gave false testimony that it was Cruz-Garcia's sperm on the vaginal swabs and the underwear, and that cross-contamination between the cigar and these samples was not possible. 16 RR 62. DNA testing of these items yielded a mixture of DNA from multiple contributors. This mixture could have resulted from a combination of sperm cells and epithelial cells.

00065

Mehl agreed with the State that the rape kit was "[a]ll sealed up." 20 RR 47. However, a review of the chain of custody of the sexual assault kit revealed that the evidence bag in which it was stored was unsealed prior to being processed by Orchid Cellmark. Ex. 10 at 2. Contrary to Quartaro's testimony as an Orchid Cellmark supervisor, notes made by the person within Orchid Cellmark who received the sexual assault kit establish that the FedEx packaging was sealed but the sexual assault kit itself was unsealed.[21] *Id.* at 2–3. Likewise, the envelope containing the cutting from Garcia's underwear and from which Orchid Cellmark made its own cutting was marked as unsealed. *Id.* at 3.

## C.   The State relied on the false testimony of Angelita Rodriguez.

To further corroborate Santana's testimony and the DNA evidence, the State relied heavily in closing argument on the testimony of Angelita Rodriguez, Cruz-Garcia's wife, who claimed that Cruz-Garcia had "told her he did it." 23 RR 37. Rodriguez testified that on the night of the

That means that, contrary to the State's argument at trial, it cannot be said that Cruz-Garcia's sperm was present.

[21] In his review of HPD Crime Lab storage facilities and procedures, the independent investigator found that storage conditions often required evidence to be unsealed so as to determine the contents of the paper bags, boxes, and containers in which evidence was stored. Ex. 61 at 31.

00066

offense, she and Cruz-Garcia were watching television in their apartment until she went to bed around 9 p.m. 20 RR 101. Rodriguez did not remember Cruz-Garcia leaving the apartment on that night, nor him returning to the apartment in the night. *Id.* at 102. She was clear, however, that the next morning, it was just she and Cruz-Garcia at the apartment. *Id.*

Rodriguez testified that she learned about A.'s disappearance on the news that same morning, and that Cruz-Garcia did not react when she told him about it. 20 RR 89. According to Rodriguez, Cruz-Garcia later told her that he was leaving Houston immediately, did not explain why, and that this was not a planned trip. *Id.* at 99–100. Rodriguez testified that she did not see Cruz-Garcia again until two months later, in Santo Domingo, when she visited to ask him for a divorce. *Id.* at 105. Rodriguez told the jury that it is then that she asked Cruz-Garcia again about A.'s disappearance and that he told her he had killed A. *Id.* at 107.

Rodriguez's trial testimony contradicted her numerous prior statements to law enforcement, from her first interview in October 1992 and continuing until October 2008. Ex. 73; 37; 74. Rodriguez never previously alleged that Cruz-Garcia had confessed to killing A., let alone

to killing A. himself. Moreover, contrary to her testimony that she had not seen Cruz-Garcia again until she travelled to Santo Domingo to ask for a divorce, law enforcement documented in February 8, 1993, that Rodriguez was living with Cruz-Garcia in the Dominican Republic. Ex. 15. Rodriguez and Cruz-Garcia's relationship was not over, nor was Rodriguez unaware of her husband's location in the months that followed the offense. Multiple witnesses further confirmed that, contrary to Rodriguez's testimony that he had left Houston suddenly, Cruz-Garcia's return to Puerto Rico had been planned for some time. Ex. 81; 91.

### D. The State also relied on false testimony from Diana Garcia and Arturo Rodriguez, and law enforcement.

The State's case also relied on Diana Garcia and Arturo Rodriguez's testimony about a supposed motive for Cruz-Garcia's involvement in the offense, namely, that he was acting in retaliation for their decision to stop dealing cocaine. However, police reports establish that the couple were dealing cocaine from their apartment on the night of the offense. The State also introduced testimony from law enforcement to bolster Garcia's and Rodriguez's credibility, including that they were truthful in their statements to police. Yet, recorded interviews with Garcia and Rodriguez reveal that law enforcement did not believe their account of the offense.

00068

1.     **The State relied on the false testimony of Diana Garcia and Arturo Rodriguez to establish motive.**

Diana Garcia and Arturo Rodriguez testified that Cruz-Garcia had taken A. in retaliation for their decision to stop dealing drugs. 18 RR 133; 19 RR 203. However, law enforcement's investigation revealed that Garcia and Rodriguez were dealing drugs on the night of A.'s disappearance, as confirmed by two separate witnesses known to the State. Ex. 24 at 1. In addition to testifying falsely about a supposed motive, critical aspects of Garcia's and Rodriguez's account of the events inside the apartment on the night of the offense were contradicted by forensic evidence known to the State. For example, Rodriguez testified that he "was all bloody" from repeated blows to the head and that his head was then stuffed in a pillowcase. Yet, no pillowcase was found at the scene nor taken into evidence. Ex. 95 (listing items identified by law enforcement at Garcia's and Rodriguez's apartment).

In addition to testifying falsely about the night of the offense, Garcia lied to the jury about her relationship with Rodriguez. Garcia described Rodriguez as her common-law husband and testified that A. lived with the couple full-time. 18 RR 121, 125; 25 RR 194. However, at the time of the offense and of the trial, Garcia remained legally married

00069

to Angelo Garcia Sr. and Rodriguez was therefore not her common-law husband. Garcia and Rodriguez had become a couple when Garcia still lived with, and remained married to, Garcia Sr.[22] Ex. 100; 97. Additionally, A. did not live with the couple until much later than Garcia's representation at trial. 19 RR 197.

## 2. The State relied on the false testimony of law enforcement.

The State relied on the false testimony of law enforcement to bolster the credibility of Diana Garcia and Arturo Rodriguez, whom investigators repeatedly accused of being dishonest in the course of their investigation. Although HPD Officers C.E. Elliott and U.P. Hernandez acknowledged that Garcia and Rodriguez were not truthful in their initial statements, they testified that Garcia and Rodriguez had cooperated and assisted early on in the investigation. 18 RR 119; 19 RR 74. Officer Elliott testified that "they were truthful about everything." *Id.*

---

[22] Garcia had also previously had an affair with a man named Pedro Ortiz, who she told police was the biological father of A. Ex. 97. At trial, Garcia referred to Garcia Sr. as A.'s father. 25 RR 194.

At the time of the offense in 1992, Diana Garcia was also carrying around letters in her purse from Jose Martin Valdez expressing romantic interest in her. Ex. 99. Valdez later provided a declaration that he had an on and off affair with Garcia while she remained married to Garcia Sr. and was living with Rodriguez. Ex. 22.

00070

Similarly, Officer Hernandez told the jury that Garcia had told him, "I'm going to quit lying to you and tell you the truth." 19 RR 74. This testimony is squarely contradicted by law enforcement's reports for months after the disappearance and death of A., documenting law enforcement's distrust in Garcia and Rodriguez. For example, in a November 9, 1992 supplement, investigating officers reported, "It is still our belief that [Garcia] is not being completely truthful with us[.]" Ex. 66. Similarly, in January 6, 1993, law enforcement concluded that "Diana and Arturo have been untruthful *throughout the investigation*[.]" Ex. 19 (emphasis added); *see* Ex. 24; 64; 65; 97.

In addition to misrepresenting Garcia and Rodriguez as reliable witnesses, law enforcement testified falsely to facts connected with the offense. The State elicited false testimony that no ransom was ever demanded after A. disappeared. 19 R 79. However, there were at least two ransom calls made and known to law enforcement. Ex. 17; 18.

... 

### E.    The State relied on the false testimony of Johnny Lopez and Santana at punishment.

The State relied on the false testimony of Johnny Lopez[23] and Santana to tie Cruz-Garcia to the 1989 murder of Saul Flores in Houston, introduced at punishment as an extraneous offense and in support of a sentence of death. Lopez testified that Flores had been a friend and that he had learned of his death when an HPD investigator visited with him in the Harris County Jail in 1989 in connection with Flores's murder. 25 RR 46–47. In response to the State's leading question about whether Flores had been running from Cruz-Garcia, Lopez alleged that Flores had been on the run from Cruz-Garcia. *Id.* at 50–51. Lopez further testified that he had also identified Cruz-Garcia in 1989 as a potential suspect in connection with Flores's murder. 25 RR 54–55.

Lopez's testimony contradicted his 1989 statement to HPD. Ex. 29. In 1989, Lopez formally identified a suspect known as "Shorty" and explained to HPD that Flores had been a dealer for Shorty until the pair fell out. *Id.* According to this same statement, Shorty had made it known that he was looking for Flores after discovering that Flores had stolen

---

[23] Lopez died in 2015.

cocaine from him. *Id.* According to Lopez, Flores had been on the run from Shorty until Flores was murdered. *Id.* In addition to Lopez's 1989 statement naming Shorty as the likely suspect in the murder of Flores, HPD identified Shorty as Alfonso Faustino Cervantes from a photo lineup during the same 1989 interview with Lopez.[24] *Id.* at 4. Lopez never mentioned Cruz-Garcia in his 1989 statement to HPD, nor was his statement given to the defense at trial.[25]

The State relied again on Santana, this time at the penalty phase, to bolster Lopez's testimony that Cruz-Garcia was responsible for Flores's death. According to Santana, Cruz-Garcia had killed Flores after Flores confessed his feelings to Cruz-Garcia's then-girlfriend, Elizabeth Ramos.[26] 25 RR 74. At the State's prompting, Santana graphically described Cruz-Garcia allegedly assaulting Flores before breaking his

---

[24] In all of its reports, law enforcement associated Cruz-Garcia with the alias "Chico." *See, e.g.*, Ex. 101.

[25] This statement, as well as other prior statements by witnesses for the State, was not included in the State's initial and supplemental *Brady* notices. 3 CR 447–50, 482–83.

[26] At punishment, Santana was also called to testify by the State to the alleged rape by Cruz-Garcia of a woman only identified as Betico's wife. 25 RR 66–70. The State's notice of intent to use prior bad acts provides no further identifying information, either concerning "Betico" or the victim of the alleged rape. 3 CR 414. Upon information and belief, this testimony is false.

neck.[27] *Id.* at 81–82. Santana described how Flores was injected with drugs, his hands were "completely destroyed," he was hit "several times, many times," and burned with cigarettes "I can't tell you how many times." *Id.* at 81, 93. Santana further insisted to the jury, "I saw it perfectly when [Cruz-Garcia] broke [Flores's] neck." *Id.* at 82.

However, this testimony was contrary to the autopsy of Flores, which showed no evidence of a broken neck, no evidence of injuries to the hands, no evidence of cigarette burns, and no needle marks. *Id.* at 113–15. Elizabeth Ramos, who was supposed to have provoked the dispute between Flores and Cruz-Garcia, has now provided a sworn declaration that she had never met or even known any individual known as Saul Flores. Ex. 30.

---

[27] The State indicted Cruz-Garcia on a charge of capital murder in 2008, 1 CR 6, but did not give notice of its intention to seek the death penalty against Cruz-Garcia until August 31, 2011, 4 RR 9. In an email dated August 1, 2011, Assistant District Attorney Natalie Tise reports, "due to a newly discovered witness, we are now looking at seeking the death penalty against this defendant . . . Our new witness has told us about an extraneous murder that he saw this defendant commit. We have found a 1989 unsolved case that matches the details provided by this witness." Ex. 125. Upon information and belief, the witness is Santana and the cold case is the 1989 unsolved murder of Saul Flores, and the State sought the death penalty against Cruz-Garcia on the basis of false evidence. In response to an open records request by counsel for Cruz-Garcia to HPD for records in connection with the 1989 murder of Saul Flores, HPD indicated that it believed those records to be excepted from disclosure. Ex. 116; 117.

**F.    The State solicited false testimony regarding a kidnapping in Puerto Rico.**

In support of its case on future dangerousness, the State introduced testimony that Cruz-Garcia was tied to the 2001 kidnapping of several individuals in Puerto Rico. 24 RR 14–43, 78–117. Federal agent Juan DeJesus Rodriguez testified for the State that he arrested Cruz-Garcia in 2001 in Puerto Rico in connection with the kidnapping and release of two individuals. *Id.* at 54. On cross, trial counsel was prevented from questioning Agent Rodriguez about the circumstances of the kidnapping, including Cruz-Garcia's role as an informant for federal law enforcement. The trial court sustained the State's objection, even after Agent Rodriguez testified on *voir dire* that he had verified that Cruz-Garcia cooperated as an informant in connection with federal law enforcement operations. *Id.* at 72–73. Upon information and belief,[28] testimony regarding Cruz-Garcia's role in the 2001 kidnapping was false.

---

[28] In addition to Agent Rodriguez's testimony confirming Cruz-Garcia's cooperation, Cruz-Garcia was granted by INS a three-month visa on September 21, 2001. Ex. 111. Under the "purpose" section, a handwritten note states: "significant public benefit." *Id.*

### G. The State knew, or should have known, of the false testimony.

Cruz-Garcia is not required to prove actual knowledge by the State of the falsity of the testimony it elicited, only that the State should have known. *See Giglio v. Unites States*, 405 U.S. 150, 154–55 (1971)(holding that State violated due process by relying on false testimony despite absence of showing that the prosecutor who elicited the testimony knew of its falsity). Here, the discrete allegations of false testimony are based on information located in emails to and from State actors leading up to Cruz-Garcia's trial, law enforcement and investigative reports and on the basis of which the State built its case, and, in the case of Santana's false testimony that he risked being prosecuted, the State's own representations to the trial court and outside the presence of the jury. Cruz-Garcia can therefore establish that the State knew, or should have known based on information available to State actors involved in Cruz-Garcia's case, that the testimony was false.

### H. There is a reasonable likelihood that this false testimony impacted the outcome of the case against Cruz-Garcia.

The false testimony relied on by the State to secure Cruz-Garcia's conviction was material because "there is a 'reasonable likelihood' that

47

the false testimony affected the outcome." *Ex parte Ghahremani*, 332 S.W.3d at 478 (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Here, false testimony infected every critical aspect of the State's case against Cruz-Garcia, including the only eyewitness account, the only forensic evidence, and the only confession introduced by the State. The cumulative impact of the false evidence relied upon by the State therefore entitles Cruz-Garcia to a new trial.

Santana was "the essential witness linking [Cruz-Garcia] to the acts of [capital murder] alleged in the indictment." *Ramirez v. State*, 96 S.W.3d 386, 396 (Tex. App.—Austin 2002, pet. ref'd). His testimony— according to which Cruz-Garcia sexually assaulted Garcia, took A., and directed Aviles-Barroso to kill A.—enabled the jury to find Cruz-Garcia guilty as a party to capital murder. Santana's testimony to the jury placed Cruz-Garcia inside Garcia's apartment for significantly longer than his previous statements to law enforcement, from 5–10 minutes to 40 minutes, thereby leaving sufficient time for Cruz-Garcia to allegedly sexually assault Garcia, physically assault Rodriguez, and take A. 20 RR 144–45. Similarly, Santana described Cruz-Garcia as returning to the car alone, thus firmly cementing his role as the kidnapper, and A. walking

48

alongside him, thereby confirming Cruz-Garcia's identity because A. knew him and would therefore have followed him willingly. 21 RR 49–50. Finally, Santana's description of A.'s stabbed and bloodied body provided a cause of death where the medical examiner had been unable to establish one. 20 RR 151–52.

But the jury was deprived of any opportunity to assess Santana's credibility when the State prompted him to testify falsely that he was testifying despite the risk of criminal prosecution. As argued *supra* § I.A.2 and n.17, regardless of whether it formally struck a deal with Santana, the State deliberately elicited testimony designed to "convey[] an impression to the jury which the State knew to be false[.]" *Burkhalter v. State*, 493 S.W.3d 214, 218 (Tex. Crim. App. 1973). And that false testimony "was critical in evaluating [Santana's] credibility in view of [his] extremely questionable background[,]" including his confessed participation in at least two murders, a conviction for assault on a child, and 17-year federal sentence on drug-related charges. *Ramirez*, 96 S.W.3d at 396–97. Finally, as the only testimony tying Cruz-Garcia to the scene of A.'s death, false testimony impacting the credibility of Santana

00078

was material. *Id.* at 97; *Giglio*, 405 U.S. at 154–55 (false testimony impacting credibility of prosecution's key witness was material).

There can likewise be little doubt as to the materiality of the false DNA testimony in light of the State's closing argument, which told the jury that "on the DNA alone, you could convict the defendant." 23 RR 91. According to the State, the DNA evidence was critical to its case against Cruz-Garcia because it tied him to the alleged sexual assault of Diana Garcia *and* corroborated its star witness's version of the offense. *Id.* at 36, 93. Absent the DNA evidence, only Santana's testimony directly tied Cruz-Garcia to the sexual assault of Garcia, which was alleged to have preceded the kidnapping and murder of A.[29] Although the 2015 amended DNA report confirmed the presence of Cruz-Garcia's DNA profile on a cigar found at Garcia's apartment, law enforcement accepted that "it wasn't the guys that came in" that had left the cigar. Ex. 64 at 7. Moreover, trial testimony established that Cruz-Garcia, who along with his then-wife Angelita Rodriguez were friends of Garcia and Rodriguez,

---

[29] Neither Diana Garcia nor Arturo Rodriguez identified Cruz-Garcia as one of the assailants who allegedly assaulted them on the night that A. was kidnapped from their apartment, even though they described Cruz-Garcia as a close friend. 18 RR 138.

00079

had visited Garcia's apartment earlier on the day of the offense. 18 RR 133–34, 145, 178–79, 184, 201.

Absent the false testimony that reliable DNA evidence tied Cruz-Garcia to the cutting from Garcia's underwear and tied Cruz-Garcia and Garcia's husband to the vaginal swabs, the State could not have argued in closing that Cruz-Garcia *must* have been the assailant who sexually assaulted Garcia before taking A. 23 RR 82–83, 93. Nor could the State have argued to the jury that the DNA evidence corroborated Santana's account, according to which he was never inside Garcia's apartment on the night of the offense. *Id.* at 82. Moreover, the jury would have been left with little to corroborate Santana's account of the offense, which the jury could then not have relied on because Santana's testimony was accomplice testimony and therefore required corroboration. 3 CR 484.

Finally, Angelita Rodriguez's false testimony was similarly material. At the time of A.'s disappearance, law enforcement did not doubt her or Santana's statements, according to which Cruz-Garcia's departure had been planned. *See* Ex. 67. By the time of trial, Rodriguez's testimony served to further cast guilt on Cruz-Garcia by linking his departure to the timing of A.'s disappearance. By alleging that she had

contacted Cruz-Garcia to ask him for a divorce, Rodriguez also set the scene for Cruz-Garcia's supposed confession. Likewise, Diana Garcia's and Arturo Rodriguez's false testimony concerning the supposed motive was essential to explaining why Cruz-Garcia, who was widely known to be a close friend of the couple, would sexually assault Garcia, physically assault Rodriguez, and kidnap and order the murder of A.

## I. Cruz-Garcia's false testimony claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2).

In combination, false testimony impacted critical aspects of the State's case against Cruz-Garcia such that, but for the State's reliance on false testimony, no rational juror would have convicted Cruz-Garcia of the capital murder of A. Tex. Code Crim. Proc. art. 11.071 § 5(a)(2). Absent the false testimony, there is no credible eyewitness testimony tying Cruz-Garcia to the death of A., no forensic evidence reliably establishing Cruz-Garcia's identity as Garcia's assailant, and no motive for Cruz-Garcia's supposed involvement and later departure from Houston. Hence, by a preponderance of what little evidence remains of the State's case and the extensive allegations of State misconduct uncovered since Cruz-Garcia's conviction, Cruz-Garcia makes a prima

00081

facie showing of innocence. *Ex parte Brooks*, 219 S.W.3d 396, 401 (Tex. Crim. App. 2007); *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996) (petitioner who does not allege bare innocence claim is required only to show that it is "more likely than not that no reasonable juror would have convicted" him as a party to capital murder. (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995))).

After subtraction of evidence infected by the State's misconduct, what evidence remains, both from trial and uncovered in post-conviction proceedings, establishes "a cohesive theory of innocence." *Ex parte Reed*, 271 S.W.3d 698, 746 (Tex. Crim. App. 2008). First, Santana's own testimony places him both at Garcia's apartment on the night of A.'s disappearance and at the scene of A.'s death. Second, the amended DNA report answers the State's question in closing argument to the jury, if not for Cruz-Garcia's DNA, "where is the DNA of the guy who raped Diana?" 23 RR 82. The 2015 amended DNA report establishes that there are unknown DNA profiles on both the vaginal swabs and underwear cutting. Ex. 11. Third, various affidavits and a law enforcement report adduced since Cruz-Garcia's trial establish that Cruz-Garcia neither fled from Houston, nor was his location unknown to law enforcement in the months

00082

that followed A.'s disappearance and death. Ex. 15; 81; 91. This Court should therefore authorize Cruz-Garcia's claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2).

## II.   Claim Two: The State relied on false testimony under the *Chabot* standard.

Under *Ex parte Chabot*, the State's reliance on false testimony violates the Due Process Clause of the Fourteenth Amendment, regardless of whether the State knew the testimony to be false at the time it was relied upon. 300 S.W.3d 768, 771 (Tex. Crim. App. 2009). Cruz-Garcia incorporates here by reference all allegations under Claim I in support of his false testimony claim under the *Chabot* standard. The State violated Cruz-Garcia's due process rights under the Fourteenth Amendment when it relied on false testimony to obtain a conviction and sentence of death against Cruz-Garcia, whether the State knew or did not know of the testimony's falsity at the time of trial. *Id.*; *Ex parte Chavez*, 371 S.W.3d 200, 205 (Tex. Crim. App. 2012). Cruz-Garcia is therefore entitled to a new trial.

A.   **Cruz-Garcia's false testimony claim under *Ex parte Chabot* meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2).**

Cruz-Garcia incorporates here by reference all allegations and arguments under *supra* § I.I in support of authorization of his false testimony claim under *Ex parte Chabot* pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2).

III.   **Claim Three: Cruz-Garcia's conviction was obtained in reliance on inaccurate and unreliable DNA evidence, in violation of the Eighth and Fourteenth Amendments.**

The DNA evidence relied upon by the State to tie Cruz-Garcia to the offense and corroborate Santana's testimony was first obtained and processed by the HPD Crime Lab in October 1992. 16 RR 84; Ex. 132. The HPD Crime Lab had only just begun performing DNA casework the year prior, in 1991, under the supervision of Dr. Baldev Sharma. Ex. 140 at 30. Prior to supervising the small team of five DNA analysts, Dr. Sharma had "no experience in forensic science." *Id.* Despite having a supervisory role, Dr. Sharma's skills as a DNA analyst were described by his manager at the time as "weak[]." *Id.* at 31.[30] At the time of the HPD Crime Lab's

---

[30] Dr. Sharma was removed from his supervisory role in the DNA section of the HPD Crime Lab in August 1996 after it came to light that a defendant accused of sexual assault of a child was proven innocent by DNA analysis that the DNA Section failed to perform for months. Ex. 140 at 34; Ex. 132. Dr. Sharma was cited for incompetence

receipt of the forensic evidence in 1992, Dr. Sharma acted as the main DNA analyst. 16 RR 97. Specifically, on October 25, 1992, Dr. Sharma performed DNA extractions and analysis on the rape kit, including by cutting a section from Garcia's underwear. 16 RR 83, 86–87; 21 RR 13; Ex. 132. While the DNA extractions were sent to a California lab for analysis, the cigar and rape kit remained in storage at HPD Crime Lab facilities until 2007. 16 RR 30; Ex. 132.

In 2007, the independent investigator tasked by the City of Houston in 2002 to investigate allegations of gross misconduct and negligence by the HPD Crime Lab published his Final Report. *See* Ex. 61. The report concluded that "the risk that casework performed by the Crime Lab, particularly the DNA Section, would lead to miscarriages of justice was unacceptably high." *Id.* at 378. The DNA Section of the lab had been shuttered as early as 2002, after it was found to be operating "under conditions that made the risk of an injustice intolerably high." *Id.* at 8.

That closure resulted from a 2002 audit by an outside agency, which uncovered that the DNA Section was "in shambles[.]" Ex. 140 at 8, 64–

---

following an investigation by the HPD Internal Affairs Division in the wake of the scandal. *Id.*

65. Of particular concern, the 2002 audit revealed that "serious deficiencies . . . had become so egregious that analysts in the Lab simply had no perspective on how bad their practices were." Ex. 141 at 5. Among the "major problems" identified, the analysis of DNA mixtures was flagged as a problem area. Ex. 140 at 8. In 2005, the independent investigator reported that, "in several cases involving mixtures, the DNA analysts performed the statistical calculations incorrectly." *Id.*

In addition to detailing the mishandling of forensic evidence and the misreporting of results by the DNA Section, the independent investigator also identified significant issues with the storage of forensic evidence by the HPD Crime Lab. Ex. 61 at 28. The report highlighted that the "[s]torage of biological evidence" had been "an ongoing problem for the Property Room." *Id.* The report further noted that practices surrounding the long-term storage of sexual assault kits in particular made such evidence "much more likely to degrade[.]" *Id.; see id.* at 71–72.

In May 2001, "a significant volume of evidence related to homicides and sexual assaults was water damaged" when Tropical Storm Allison caused extensive damage to the property room located at 1200 Travis St. Ex. 140 at 58. The independent investigator reported that "the Crime Lab

employees had no information about which cases were specifically affected." *Id.* at 59 n.51. Although the HPD Crime Lab expanded its storage capacities by relocating the Property Room to a separate building on Goliad Street, the independent investigator found that this facility too suffered from "major deficiencies[.]" *Id.* at 69. The report concluded that, "[e]ven if repairs are made to the present facility, it may not be adequate for the proper storage and handling of evidence[.]" *Id.*

As detailed in § I.B, at the guilt phase of trial, the State introduced DNA evidence from a cigar and rape kit to tie Cruz-Garcia to Diana Garcia's apartment and to corroborate Santana's accomplice testimony. At a pre-trial hearing on defense counsel's Motion to Suppress Results of All DNA Testing, 3 CR 455, HPD Sergeant Mehl testified for the State that, in 2007, he retrieved the cigar from the HPD Crime Lab Property Room on Goliad Street and the rape kit from the HPD Crime Lab storage rooms on Travis Street. 16 RR 30, 32. Sergeant Mehl testified that he had no training in the collection and storage of biological evidence, including DNA evidence. *Id.* at 27. Sergeant Mehl testified that he did not observe any damage to the plastic bags and envelopes in which the evidence was

00087

stored. 16 RR 31. The cigar and rape kit were then sent to Orchid Cellmark by Sergeant Mehl. 16 RR 33.

Orchid Cellmark DNA analyst Matt Quartaro testified, "[t]here was nothing initially just looking at the evidence that would indicate that any tampering or contamination may have occurred." 16 RR 50. However, he also explained that he did not receive the evidence; an Orchid Cellmark evidence custodian did. *Id.* That custodian was not identified at trial, nor called to testify. Before the jury, Quartaro explained that he would not have been able to observe contamination to the DNA evidence with the naked eye. 21 RR 129. Although he explained that "that's why we have quality control steps," Quartaro acknowledged that Orchid Cellmark could not control how the HPD Crime Lab handled the evidence or ensure that the HPD Crime Lab maintained quality control. *Id.* at 130. Finally, although Orchid Cellmark performed separate DNA extractions, Quartaro testified that they relied on the cutting of the underwear made by HPD Crime Lab employee Dr. Sharma in 1992. *Id.* at 135.

Finally, Amber Head, a criminalist specialist with the HPD Crime Lab, testified that she had obtained a DNA profile from a buccal swab submitted by Cruz-Garcia. 16 RR 89–90. Head explained that she then

compared that DNA profile to those obtained by Orchid Cellmark and confirmed that Cruz-Garcia could not be excluded as a contributor to the cigar, the vaginal swabs, and the cutting from the underwear. *Id.* Head testified that she had not herself obtained DNA profiles from the forensic evidence at issue and had relied entirely on the analysis performed by Orchid Cellmark. *Id.* at 91. Nor did Head compare any other profiles from known individuals connected to law enforcement's investigation with the DNA profiles identified by Orchid Cellmark. 21 RR 164. Head confirmed that Dr. Sharma had acted as the main DNA analyst at the time of the original analysis in 1992, but that HPD Crime Lab employee Deetrice Wallace had initially received and processed the sexual assault evidence. *Id.* at 86–98.

In support of Cruz-Garcia's Motion to Suppress, defense counsel offered all of the reports by the independent investigator ("Bromwich Reports"), an HPD Internal Affairs investigation report, employee and complaint records for Dr. Sharma and Joseph Chu, who both performed DNA lab work on the case, and conviction on three counts of tampering with a government record against Deetrice Wallace, who processed the sexual assault kit. 16 RR 20–21; *see* Def. Ex. 2–7. Defense counsel also

00089

sought to have the same admitted into evidence before the jury. 16 RR 109–10.

With regards to the findings of the independent investigator, the trial court found that:

> The [Bromwich] report sets out facts and discussions of employees at the HPD – old HPD Crime Laboratory and discusses disputes, allegations of misconduct, and potential criminal activity. The report sets out certain issues with the old HPD DNA serology section of the crime lab. Those issues include deficiency in documentation of procedures, mistakes in performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standards of operating procedures.

17 RR 13. As to Dr. Sharma, the trial court found that he "did perform DNA analysis on the extractions in this case" and "had five instances of alleged employee misconduct . . . [f]our of [which] were sustained." *Id.* at 15–16. The trial court likewise found that Joseph Chu had "nine employee misconduct allegations . . . two [of which] were sustained." *Id.* at 14–15. As to Deetrice Wallace, the trial court found that "Deetrice Wallace received the sexual assault kit in 1992" and "subsequently obtained a felony allegation or conviction . . . for tampering with a

61

00090

government document while working at a . . . different laboratory[.]" *Id.* at 16.

The trial court also made findings of fact as to each DNA item offered by the State:

> I find that the cigar evidence was stored at the HPD property room on Goliad Street on October 1st, 1992, and was retrieved from that location by Sergeant Mehl in October 2007. I find that the cigar evidence was inside a larger container of evidence, was taken to the old HPD Crime Lab sometime in 1992, but was returned to the HPD property room and appeared to be unopened by the HPD Crime Lab at the time it was retrieved by Sergeant Mehl and mailed to Orchid Cellmark Laboratory for DNA testing on October 2nd, 2007.
>
> . . .
>
> The sexual assault kit was sealed and stored in the Houston Police Department property room annex on the 24th floor of 1200 Travis. And that was in 1992. I find that sometime in 1992, that sexual assault kit was taken to the old HPD Crime Lab and tested by Dr. B. Sharma. I find that Dr. Sharma took cuttings from the panties in that sexual assault kit and extracted DNA from the cutting that he retrieved from those panties.
>
> . . .
>
> The sexual kit evidence was retrieved from the Houston Police Department's property room annex on the 24th floor of 1200 Travis in October 2007 by Sergeant Eric Mehl, who retrieved it and observed that it appeared to be sealed and it was sent to Orchid Cellmark Laboratories on October 2nd, 2007.

00091

The trial court found that "Orchid Cellmark found no evidence of degradation . . . or contamination on evidence from the old HPD Crime Lab." *Id.* at 10–11. As to what it dubbed the "new" HPD Crime Lab, the trial court found that the lab "did not independently obtain DNA profiles from the evidentiary samples, but rather relied on the DNA profiles already obtained by Orchid Cellmark."[31] *Id.* at 11.

Finally, the trial court denied Cruz-Garcia's Motion to Suppress and ruled that "[t]he results of the new HPD Crime Lab as to the comparison [with the Orchid Cellmark DNA profiles] is admissible and relevant." 17 RR 5–6,11. The trial court also ruled that the complaint records of Dr. Sharma and Joseph Chu, as well as the judgment of conviction against Deetrice Wallace, were inadmissible, and instructed defense counsel that the Bromwich Reports were "not to be mentioned or alluded to or discussed." *Id.* at 15.

---

[31] The trial court found that Orchid Cellmark "performed their own extractions from a cutting of the underwear of Diana Garcia that they obtained, which was a different cutting than that used by the old HPD Crime Lab." 17 RR 8. Quartaro testified that Orchid Cellmark "received . . . the crotch of the pair of underwear [which] was cut out from the original pair of underwear and we took a cutting from the crotch area for our testing." 21 RR 135.

00092

## A. The DNA evidence relied on by the State to secure Cruz-Garcia's conviction was unreliable.

As detailed *supra* § I.B, the DNA evidence relied on by the State was unreliable and neither established that Cruz-Garcia was the assailant who sexually assaulted Garcia nor supported Santana's account of the night of the offense. By the time of Cruz-Garcia's trial, the HPD Crime Lab, and the DNA Section in particular, had been linked by an independent investigation to several miscarriages of justice. *See* Ex. 61; 140; 141. That investigation specifically identified a significant number of issues directly relevant to and impacting the DNA evidence relied on by the State to secure Cruz-Garcia's conviction. Namely, the investigation flagged as problem areas the analysis of DNA mixtures of the type at issue in Cruz-Garcia's case, the work of Dr. Sharma (who was the lead DNA analyst in connection with the forensic evidence relied on by the State), and the storage of rape kits such as the rape kit stored by the HPD Crime Lab and relied on by Orchid Cellmark. *Id.*

Moreover, the independent investigation identified two of the locations at which forensic evidence relied on in the case against Cruz-Garcia was stored, 1200 Travis St. and Goliad St., as suffering from serious problems and likely to result in the contamination and

degradation of forensic evidence. Ex. 140 at 58, 69. Finally, employee complaint histories and criminal records implicated at least three HPD Crime Lab employees (Dr. Baldev Sharma, Joseph Chu, and Deetrice Wallace) who were directly involved in receiving, processing, and storing the DNA evidence that was then relied on by the State to secure Cruz-Garcia's conviction. Ex. 62; 63; 132. The unreliability of the DNA evidence relied on by the State is best summed up by the first chair for the State's closing argument with respect to the DNA evidence, who said "I don't care about quality control." 23 RR 90.

## B.    The DNA evidence relied on by the State was inaccurate.

As detailed *supra* § I.B, the State published an amended DNA report in 2015 that established that the DNA results introduced at trial to tie Cruz-Garcia to the facts of offense were inaccurate. Contrary to testimony by expert witnesses for the State at trial, the amended DNA report stated that no conclusions could be drawn as to the identity of the contributors to the DNA mixture identified on the cutting from Garcia's underwear. Ex. 11 at 2. Similarly, the report stated that no conclusions could be drawn as to the identity of the contributors to the minor DNA profile identified from the vaginal swabs. *Id.* Hence, contrary to the

State's characterization of the DNA evidence in closing argument, the DNA evidence did not establish that Cruz-Garcia must have sexually assaulted Garcia to the extent that the other DNA profile was that of her husband's, nor that Santana was truthful in recounting that he had remained in the car during the offense because his profile was not identified on the sexual assault kit. 23 RR 82, 93.

### C.   Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated.

A conviction and sentence of death obtained in reliance on "materially inaccurate" evidence violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010) (citing *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988)); *see Townsend v. Burke*, 334 U.S. 736, 740–41 (1948) (conviction based on "materially untrue" information violates due process). Cruz-Garcia's rights under the Eighth and Fourteenth Amendment were therefore violated when he was convicted on the basis of evidence that was later revealed to be unreliable and untrue. Cruz-Garcia is therefore entitled to a new trial.

**D.     Cruz-Garcia's unreliability of the DNA evidence claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2).**

Here, Cruz-Garcia's allegations that the only forensic evidence purportedly tying him to the facts of the offense is unreliable is based not on competing evaluations of the reliability of the DNA evidence, but on the State's own admission that it introduced unreliable and inaccurate DNA evidence to secure Cruz-Garcia's conviction as a party to capital murder. This claim therefore does not require hypothesizing how the jury may have been swayed by a conflicting account of the evidence presented at trial. *See Ex parte Henderson*, 246 S.W.3d 690, 694 (Tex. Crim. App. 2007) (Price, J., concurring) (where new evidence is not "conflicting versions of the brute facts . . . we do not hypothetically envision a jury that is now presented with two conflicting versions of the brute facts. Instead, we envision a hypothetical jury that has heard an expert who has renounced his own earlier opinion as scientifically invalid."). There can be little doubt that the jury would not have believed the since-abandoned DNA evidence introduced by the State at trial. *See id.* ("I do not believe a rational juror would choose to rely upon the expert's abandoned view.").

Cruz-Garcia's claim further incorporates by reference all allegations and arguments, *supra* § I.I, in support of his prima facie case of innocence. The State itself argued to the jury that the DNA evidence was the linchpin to its case, both by establishing Cruz-Garcia's identity as Garcia's assailant and as corroborating the only eyewitness testimony. 23 RR 82, 91, 93. However, the amended DNA report no longer supports the State's theory of the case, such that no rational juror could have found Cruz-Garcia guilty as a party to capital murder. Cruz-Garcia's unreliability of the DNA evidence claim should therefore be authorized pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2).

## IV.   Claim Four: The State withheld exculpatory evidence, in violation of the Sixth, Eighth, and Fourteenth Amendments and *Brady v. Maryland*.

The State withheld exculpatory, impeachment, and mitigating evidence impacting critical aspects of its case against Cruz-Garcia in violation of its constitutional duty and of Cruz-Garcia's due process rights. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment[.]"). The State has a duty to disclose such evidence, regardless of whether a

00097

defendant requests the withheld evidence and irrespective of the State's intention in withholding it. *Id.* (due process violation arises from withholding of exculpatory information by the State "irrespective of the good faith or bad faith of the prosecution"); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (withholding of material, exculpatory evidence violates due process irrespective of defense request for evidence); *Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992) (en banc) (duty to disclose exculpatory evidence "attaches with or without a request for the evidence"). Accordingly, the State violates a defendant's due process rights "when a prosecutor 1) fails to disclose evidence 2) which is favorable to the accused 3) that creates a probability sufficient to undermine the confidence in the outcome of the proceeding." *Thomas*, 841 S.W.2d at 404.

## A.   The State withheld impeachment evidence against Santana.

As outlined *supra* §§ I.A and E, the State called Santana to testify against Cruz-Garcia at both the guilt and punishment phase of trial. Santana's testimony was critical to the State's case against Cruz-Garcia as the only *direct* evidence placing Cruz-Garcia at the scene of A.'s death. Moreover, Santana's recounting of Cruz-Garcia's supposed role in the

unsolved 1989 murder of Flores apparently motivated the State to seek the death penalty against Cruz-Garcia and underpinned its case on future dangerousness. *See* Ex. 125; *supra* n.27. The State, however, failed to disclose significant impeachment evidence, including evidence going to Santana's bias, evidence demonstrating that Santana was an unreliable historian, and evidence that he was convicted of a crime involving moral turpitude.

### 1. The State failed to disclose that Santana received a benefit for his testimony against Cruz-Garcia.

In his statements to federal and local law enforcement and in his testimony at Cruz-Garcia's trial, Santana implicated himself in the capital murder of A. and the 1989 murder of Saul Flores. Specifically, in his 2011 statement to the FBI and at trial, Santana described waiting alone with A. after realizing that A. would not be returned to Garcia's apartment, witnessing Aviles-Barroso murder A., tying rocks to A.'s body to submerge it in a bayou, and disposing of the murder weapon on the way back to Houston. 20 RR 145–46, 149, 153–54, 156; Ex. 101. Similarly, in statements to local law enforcement and at trial, Santana described taking Flores by force to an apartment he rented to deal drugs from; watching and listening as Flores was beaten, injected with drugs, and

strangled; helping carry Flores's body to the bathtub and eventually returning to move Flores's body to a dumpster. 25 RR 76–85.

In the course of his testimony, both at guilt and punishment, the State elicited testimony from Santana that he had neither been offered nor requested a deal. *See supra* § I.A.2. In closing argument at the guilt phase, the State further argued to the jury that it could not have offered him a deal because it had "nothing" on Santana in connection with the capital murder of A. 23 RR 96. Thereafter, the State similarly represented to prior state habeas counsel that Santana's conduct did not rise to the level of criminal liability. *See* Ex. 80; 135.[32]

The State's assertion that Santana did not, nor could have, received a deal—whether because the State had no evidence to support *any* criminal charges against Santana, or because Santana did not commit *any* crime in connection with the capital murder of A. or the murder of Flores—is not plausible. First, Santana's own statements to federal and

---

[32] Among the materials turned over by the State in response to the convicting court's order that the State comply with its *Brady* obligations, the State included typed "Meeting Notes from Jail Meeting with Rudy [Santana] on 05.16.12." Ex. 135. Whereas the meeting notes are entirely typed, the document includes undated and unsigned handwritten additions at the bottom of several pages, including the handwritten annotation "No deals, no limits on what we could ask." *Id.*

local law enforcement, as well as his sworn testimony, implicate him in kidnapping A., hiding A.'s body, disposing of the murder weapon, kidnapping Flores, and dumping Flores's body. *See supra* §§ I.A and E. Second, FBI Agent Ebersole's report establishes that already in 2011 Santana made clear to law enforcement that he "did not want to go to trial" for the murder of A. and was repeatedly "advised that his cooperation would be made known to the prosecutor and the presiding judge." Ex. 101 at 2, 8. Third, contrary to the State's argument that it could not have offered Santana a deal at the time of his 2011 statement because it did not know of his involvement in the disappearance and death of A., 23 RR 96–97, A.D.A. Natalie Tise wrote in an email dated prior to Santana's statement: "I know that Rudy [Santana] was likely with the defendant that night."[33] Ex. 127. Finally, the trial court's charge on guilt tied Cruz-Garcia's criminal liability as a party to the criminal acts of "Aviles-Barroso *and/or Carmelo Martinez-Santana*[.]" 3 CR 484–

---

[33] This email, dated May 19, 2011, also casts doubt on FBI Agent Ebersole's testimony to the jury that, going into the interview with Santana on May 28, 2011, he "had no idea" that Santana may have firsthand knowledge of the offense. 20 RR 178. Agent Ebersole testified that he had previously reviewed "background reports, investigative reports" sent by Agent Johnson. *Id.* at 177. Agent Johnson had been part of the investigation since 1992, and Santana was interviewed in connection with the death and disappearance of A. as early as October 5, 1992. Ex. 67.

000101

504 (emphasis added). In ruling that Santana's testimony was accomplice testimony, the trial court made clear that he had committed "two affirmative acts" in furtherance of the conspiracy. 22 RR 3.

Based on these factors, and upon information and belief, the State failed to disclose that Santana received a benefit in connection with his testimony against Cruz-Garcia, in violation of the State's *Brady* obligations and in violation of Cruz-Garcia's due process rights.[34] *Giglio*, 405 U.S. at 154–55 (due process violated where prosecution failed to disclose "evidence of any understanding or agreement as to future prosecution" of prosecution witness); *Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (prosecution failed in its *Brady* obligation and defendant's due process rights violated where prosecution failed to disclose statements going to credibility of eyewitness testimony).

---

[34] In the alternative, if the State's representation in post-conviction proceedings that it could not charge Santana with any offense in connection with the capital murder of A. is an accurate statement, then the State deliberately elicited false testimony by asking Santana to state to the jury that he "could be charged with a crime." 20 RR 166; Ex. 80; *see supra* § I.A.2.

**2.    The State failed to disclose further evidence going to Santana's credibility.**

At the time of his 2011 statement to the FBI, Santana was serving a 17-year sentence on federal drug-related charges. In 1998, leading up to Santana's conviction, a federal court granted his defense counsel's motion for a psychiatric evaluation, citing competency concerns. Ex. 13; 14. In April 2011, just one month prior to his statement to the FBI implicating Cruz-Garcia, Santana addressed a letter to the convicting court seeking to have his sentence set aside on the basis of incompetence. Ex. 12.

Notwithstanding the relevance of these records to Santana's credibility, the State failed to disclose to defense counsel for Cruz-Garcia that a court had previously found sufficient grounds to order a psychiatric evaluation of Santana. Likewise, the State did not disclose that weeks prior to implicating Cruz-Garcia, Santana sought to have his sentence set aside based on his psychiatric history. The State thus violated its *Brady* obligations to disclose Santana's competency evaluation. *Mathis v. Dretke*, 124 F. App'x 865, 877 (5th Cir. 2005) (State failed in its *Brady* obligations when it did not disclose to defense publicly available record of prosecution witness's competency evaluation).

74

000103

### 3. The State failed to disclose that Santana was convicted of a crime involving moral turpitude.

Cruz-Garcia incorporates here by reference all facts under *supra* § I.A.3. The State failed to disclose that Santana was charged with injury to a child and eventually convicted in Harris County in 1992 of misdemeanor assault on a girl, which is a crime involving moral turpitude.[35] Ex. 79. As a crime involving moral turpitude, this conviction was grounds for impeachment. *See* Tex. R. Evid. 609. Additionally, this conviction undermined Santana's allegations that, although present at the scene, he did not witness A.'s murder because he could not withstand harm to a child. 21 RR 9. The State violated its *Brady* obligations when it failed to disclose Santana's criminal history. *Bagley*, 473 U.S. at 676 (*Brady* obligations extends to impeachment evidence).

### B. The State withheld mitigation evidence.

As well as failing to disclose impeachment evidence, the State withheld mitigating evidence that Cruz-Garcia was an informant for federal law enforcement. On *voir dire* by the defense, State witness and federal agent Juan DeJesus Rodriguez testified that he had verified with

---

[35] *Hardman*, 868 S.W.2d at 407.

000104

federal law enforcement that Cruz-Garcia was an informant for federal law enforcement. 24 RR 72–73. The State objected to Agent Rodriguez testifying to Cruz-Garcia's cooperation with federal law enforcement before the jury on hearsay grounds. *Id.* at 74. While sustaining the State's hearsay objection, the trial court ruled that the information may nevertheless be relevant to mitigation. *Id.* Notwithstanding the trial court's cautioning as to the mitigating value of this information, the State did not disclose evidence of Cruz-Garcia's role as a federal law enforcement informant.[36]

## C.   The State withheld exculpatory evidence and impeachment in connection with several witnesses.

In response to Cruz-Garcia's multiple pre-trial motions for disclosure of *Brady* materials and the trial court's corresponding orders, the State responded with a *Brady* notice dated June 3, 2013, and a supplemental *Brady* notice dated June 27, 2013. 3 CR 447–50, 482–83.

---

[36] Outside the presence of the jury, the State argued that it had not been aware that Agent Rodriguez had received confirmation of Cruz-Garcia's role as an informant for federal law enforcement. 24 RR 73. Regardless, the State's obligation to disclose this mitigation evidence was triggered by Agent Rodriguez's statements confirming this information. *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) (en banc) ("The state's duty to reveal *Brady* material to the defense attaches when the information comes into the state's possession, whether or not the defense requested the information.").

Notwithstanding the trial court's order for the disclosure of *Brady* materials generally, including prior statements and criminal records concerning specific witnesses for the State, the State failed to disclose to the defense the following:

- That Angelita Rodriguez received a benefit from the State in connection with her testimony against Cruz-Garcia. Ex. 113.

- Criminal records and immigration records establishing that Angelita Rodriguez was facing state and federal charges, was convicted of a deportable offense, and that she was nevertheless able to adjust her status. Ex. 73; Ex. 75.

- Prior inconsistent statement made by Johnny Lopez to HPD in 1989 concerning the murder of Saul Flores. Ex. 29.

- A Memo by FBI Agent Eric Johnson documenting that Angelita Rodriguez and Cruz-Garcia were living together in the Dominican Republic with her mother a few months after leaving the country in 1992. Ex. 15.

- Reports from law enforcement establishing that law enforcement questioned the credibility and truthfulness of Diana Garcia and Arturo Rodriguez. *See, e.g.*, Ex. 19; 64; 65; 66.

- Reports from various law enforcement and federal agencies, significant portions of which are redacted, including portions that appear to contain exculpatory evidence. *See, e.g.,* Ex. 16; 17; 18.

- Law enforcement records showing that law enforcement was developing a second theory of the case and that other, unnamed individuals claimed knowledge of the offense. Ex. 16.

- Documents received in response to a subpoena issued by the Harris County District Attorney's Office to Agent Juan DeJesus Rodriguez – FBI Puerto Rico Field Office. Ex. 35.

- Immigration records showing that Santana's legal permanent residence status was revoked. Ex. 76.[37]

### D. The evidence withheld by the State was material.

Withheld evidence is deemed material if it "might have affected the outcome of the trial." *United State v. Agurs*, 427 U.S. 97, 104 (1976); *Ex parte Kimes*, 872 S.W.2d 700 (Tex. Crim. App. 1993) (en banc) (evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceedings would have

---

[37] To the extent that this Court finds that these materials were provided to trial counsel, Cruz-Garcia alleges that trial counsel was ineffective for failing utilize them. *See infra* § VI.

000107

been different."). In determining whether evidence is material, the withheld evidence is evaluated cumulatively and "in the context of the overall record [and] in the overall context of the overall strength of the State's case." *Thomas*, 841 S.W.2d at 405 (citing *Agurs*, 427 U.S. at 113).

Here, the withheld evidence of Santana's bias, as well as withheld evidence of his psychiatric history and crime of moral turpitude, would have undermined the credibility *and* reliability of the State's only eyewitness tying Cruz-Garcia to the scene of A.'s murder. The significance of the impeachment evidence withheld by the State is strengthened by the State's deliberate misrepresentations to the jury that no such evidence existed.[38] *See Ex parte Adams*, 768 S.W.2d 281, 291 (Tex. Crim. App. 1981) ("The probable adverse effect disclosure of the statement to the defense would have had upon the State's case is evident by the lengths the State went to see that it was not admitted into evidence."). Finally, defense counsel expressly requested, and the trial court ordered, the State to disclose:

> 4. All promises of benefit or leniency afforded to any accomplice or prospective witness in connection with his/her

---

[38] *See* § I.A.2.

000108

proposed testimony or other cooperation with regard to the alleged offense.

5. All known convictions which are admissible for impeachment concerning any of the State's proposed witnesses.

6. All known convictions, pending charges or suspected criminal offense concerning any accomplice proposed to be used as a witness by the State.

1 CR 184. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106; *see Bagley*, 473 U.S. at 682–83 ("The more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.").

Similarly, at punishment, the State failed to disclose evidence that would have critically undermined its case on future dangerousness. In closing at punishment, the State recounted in vivid detail the alleged murder by Cruz-Garcia of Saul Flores. 26 RR 150. The State argued that the murder "line[d] up with what we know about the defendant[.]" *Id.* at 151. However, the State withheld exculpatory and impeachment evidence implicating the only two witnesses, Santana and Lopez, to tie Cruz-Garcia to the 1989 unsolved murder of Flores. Significantly, the

000109

State withheld Lopez's statement to HPD at the time of the offense, in which Lopez identified by name and in a photo lineup an entirely different individual as Flores's murderer. Ex. 29. This statement was thus not only entirely exculpatory of Cruz-Garcia; it would have further permitted the defense to impeach Lopez with his entirely contradictory statements given at the time of the offense, in 1989.

Santana also testified in gruesome detail how Cruz-Garcia tortured and broke the neck of Flores. 25 RR 76–85. Withheld evidence would have undermined his credibility and further undermined the State's case on future dangerousness. With seemingly no forensic evidence tying Cruz-Garcia to Flores's murder and Lopez's prior identification of another individual, Santana's credibility was crucial to the State's case on future dangerousness. *Thomas*, 841 S.W.2d at 405 (where "State's case rested upon the credibility of only two witnesses . . . [i]t follows that evidence tending to . . . impeach their testimony would have undermined the State's case"). Similarly, withheld evidence of Cruz-Garcia's cooperation

000110

as an informant for federal law enforcement would have weighed heavily in favor of a verdict of life.[39]

In light of the totality of the State's case on guilt and punishment, there is a reasonable probability that the withheld evidence affected the outcome of Cruz-Garcia's conviction and sentence of death. Hence, the State's withholding of exculpatory, impeachment, and mitigating evidence violated Cruz-Garcia's due process rights.

## E.   Cruz-Garcia's *Brady* claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(1).

Cruz-Garcia's *Brady* claim meets the requirements of Tex. Code Crim. Proc. art. § 5(a)(1). Under Texas precedent, § 5(a)(1) requires a showing that (1) the factual basis for an applicant's current claims were unavailable as to all of his previous applications; and (2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence. *Ex parte*

---

[39] Significantly, there was a lone holdout juror in favor of a verdict of life, which further suggests the overall weakness of the State's case for a sentence of death and the heightened relevance of evidence going both to Cruz-Garcia's future dangerousness and of mitigating circumstances.

000111

*Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007). Cruz-Garcia's

*Brady* claim satisfies both prongs.

As well as expressly requesting pre-trial disclosure of evidence that

was then withheld by the State, 1 CR 184, Cruz-Garcia again moved for

disclosure by the State of any exculpatory, impeachment, and mitigating

evidence in initial state postconviction proceedings. Ex. 122. Cruz-Garcia

specifically requested:

> 1. Any information tending to show a witness's bias in favor
> of the government or against Cruz-Garcia or which otherwise
> impeaches a witness's testimony. . . .
> [. . .]
> 3. All deals or "consideration" or promises of "consideration"
> given to or on behalf of all State witnesses or expected or
> hoped for by said State witnesses. . . .
> [. . .]
> 3. Emails between the State and the FBI regarding Carmelo
> Martinez Santana ("Rudy"), specifically discussing:
> a. his willingness to testify;
> b. the anticipated content of his testimony;
> c. any representations made to him regarding the potential
> consequences of his testimony; and
> d. his transfer from federal custody in Pennsylvania to
> Houston to testify.
> [. . .]
> 6. Emails between the State and the FBI or other law
> enforcement entities regarding Cruz-Garcia's use as a
> Confidential Informant by FBI agents in Puerto Rico.

*Id.*

Despite acknowledging "its ongoing obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material, exculpatory and impeachment evidence to the defense[,]" the State nevertheless requested that the convicting court "vacate its order granting the defendant's motion for disclosure." Ex. 123. After the State's motion was denied, it turned over a small number of emails and reports, including an email in response to the convicting court's order in which the State represented that "[t]here were no offers of promises made to any witness to testify[.]" Ex. 80. In that same email, the State further represented that it was unable to verify that Cruz-Garcia had worked as a confidential informant on behalf of law enforcement in Puerto Rico. *Id.*

In ascertaining reasonable diligence in uncovering the new facts on the basis of which an applicant seeks to raise a *Brady* claim, counsel is constitutionally entitled to rely on the State's representations that it has complied with its *Brady* obligations. *Strickler v. Greene*, 527 U.S. 263, 283–84 (1999) (attorney is entitled to rely on State's assurances that it will comply with its *Brady* obligations). Whether at trial or in state post-conviction proceedings, a defendant or applicant is not required to "scavenge for hints of undisclosed *Brady* material when the prosecution

000113

represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695–96 (2008). This Court should therefore find that Cruz-Garcia's *Brady* claim meets the requirements of Tex. Code Crim. Proc. art. 11.071 § 5(a)(1), taking into account the State's express representation to initial state habeas counsel that it had complied with its *Brady* obligations. Ex. 80. Moreover, as argued *supra* §§ III.A–D, Cruz-Garcia has alleged facts which, if established, prove that the State violated his due process rights when it withheld material exculpatory, impeachment, and mitigating information.

## V. Claim Five: The Texas death penalty statute deprived the jury of the power inherent in a single juror's vote as protected by the Sixth Amendment's jury unanimity requirement announced in *Ramos v. Louisiana*.

In *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020), the Supreme Court held, for the first time, that "the Sixth Amendment right to a jury includes the unqualified right to a unanimous jury.[40] That unqualified right to jury unanimity carries with it the corollary right that, where a

---

[40] The case produced a number of opinions and not all of the justices in the majority joined all sections of Justice Gorsuch's opinion. The core holding, that the Sixth Amendment demands jury unanimity and that this rule is applicable to the states under the Fourteenth Amendment, commanded a majority of the Court. *See Ramos*, 140 S. Ct. at 1408 (opinion of the Court); *id.* at 1410 (Kavanaugh, J., concurring); *id.* at 1420–21 (Thomas, J., concurring).

000114

single juror votes in opposition to an otherwise unanimous jury, that single vote carries the day. The power of a single juror's vote, where unanimity is required, is fundamental to the Sixth Amendment right to a jury trial.

Prior to *Ramos*, Texas courts held that "[t]he United States Constitution clearly does not grant a right to a unanimous verdict." *Phillips v. State*, 130 S.W.3d 343, 351 n.6 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 193 S.W.3d 904 (Tex. Crim. App. 2006); *see Arrington v. State*, 2015 WL 1247270, at *2 (Tex. App.—San Antonio Mar. 18, 2015, pet. ref'd) (same); *Taylor v. State*, 671 S.W.2d 535, 539 (Tex. App.—Houston [1st Dist.] 1983, no pet.) ("The due process clause of the Federal constitution does not require a unanimous verdict in criminal cases."); *Nunez-Quijada v. State*, 2019 WL 5199263, at *2 n.2 (Tex. App.—Austin Oct. 16, 2019, no pet.) (Sixth Amendment "does not require a unanimous jury verdict in state criminal trials"); *Coker v. State*, 2010 WL 5031098, at *4 (Tex. App.—Tyler Dec. 8, 2010, no pet.) (unanimity requirement of Sixth Amendment "has not been extended to state criminal trials"). Texas courts had relied on the Supreme Court's pre-*Ramos* precedent stating that the federal constitution did not require jury unanimity in state

000115

courts. *See Gillette v. State*, 444 S.W.3d 713, 726 n.17 (Tex. App.—Corpus Christi 2014, no pet.) ("[T]he United States Supreme Court has ruled the United States Constitution does not require a unanimous jury verdict in state criminal trials." (citing *Apodaca v. Oregon*, 406 U.S. 404, 407–14 (1972), and *Johnson v. Louisiana*, 406 U.S. 356, 359–63 (1972))); *Lewis v. State*, 2011 WL 2755469, at *6 (Tex. App.—Fort Worth July 14, 2011, pet. ref'd) ("[W]e have found no United States Supreme Court authority requiring juror unanimity in state cases."); *Brown v. State*, 2011 WL 2714117, at *6 (Tex. App.—El Paso July 13, 2011, pet. ref'd) ("[T]here is no authority that states the United States Constitution requires a unanimous verdict in state cases."); *State v. Espinoza*, 2010 WL 2598982, at *3 (Tex. App.—Dallas June 30, 2010, pet. ref'd) (same).

The *Ramos* decision upends Texas courts' long-standing position that the federal Constitution did not require unanimous verdicts in state criminal trials. It also calls into question Texas's capital sentencing statute. Ostensibly, the statute reflects the Sixth Amendment right to a unanimous jury verdict by requiring, on paper, that death sentences be unanimous. However, the statute strips away the very power of the single juror inherent in the Sixth Amendment's unanimity requirement by

000116

deliberately and explicitly barring the jurors from understanding that even a single vote is sufficient to ensure that the defendant will be sentenced to life.

The vitality of the Sixth Amendment's right to a unanimous jury derives directly from the jury's understanding of the impact of a single vote in opposition. That vitality is destroyed when the jury is misled by the court's instructions and, thus, barred from understanding the impact of a single juror's vote. Because Texas's sentencing statute intentionally deprives its juries of that understanding, it violates the Sixth Amendment's right to a unanimous jury as announced in *Ramos*.

## A.    The Sixth Amendment requires a unanimous verdict.

In *Ramos*, the Court considered whether non-unanimous jury verdicts permitted under Louisiana and Oregon's criminal statutes violated the Sixth Amendment right to a jury. *Ramos*, 140 S. Ct. at 1394–95. The jury in *Ramos* had voted 10-2 in favor of conviction. *Id.* at 1394. Despite two jurors voting to acquit, the defendant was convicted under Louisiana's statute permitting non-unanimous jury verdicts. *Id. Ramos* held that the Sixth Amendment's unanimity requirement applies to state trials, striking state statutes that permitted guilty verdicts tendered by

a non-unanimous jury as unconstitutional and overruling precedent holding that the Sixth Amendment does not require unanimous juries. *Id.* at 1397. In doing so, the Supreme Court recognized that "the Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice'" and the requirement that a verdict be unanimous is "incorporated against the States under the Fourteenth Amendment." *Id.*

Central to the holding was the Court's reasoning that if the right to "trial by an impartial jury" enshrined in the Sixth Amendment "carried any meaning at all, it surely included a requirement as long and widely accepted as unanimity." *Id.* at 1396. The Court drew this reasoning from a long history in common law, dating back to fourteenth century England, that "no person can be found guilty of a serious crime unless 'the truth of every accusation . . . should . . . be confirmed by the unanimous suffrage of twelve of his equals and neighbors'" because "'[a] verdict, taken from eleven, was no verdict'" at all. *Id.* at 1395 (quoting 4 W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 343 (1769)) (first two alterations in original). This right to trial by jury, including unanimity, is so essential to "[t]he Sixth Amendment promises" and the "powers as

jurors" enshrined in the Bill of Rights that it cannot be "freely abridged by statute." *Id.* at 1395.

The right to jury unanimity in state criminal convictions, which the Supreme Court now recognizes in *Ramos*, extends with equal force to any fact-finding that increases the penalty for a crime, including determinations of future dangerousness for a state's capital sentencing procedures. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that "any fact that increases the penalty for a crime beyond the subscribed statutory maximum must be submitted to a jury"); *Ring v. Arizona*, 536 U.S. 584, 589 (2002) (applying *Apprendi*'s rule to state's capital sentencing statutes). *Ring* similarly examined the long history establishing the jury's role in deciding the facts necessary to determine a defendant's eligibility for capital punishment. *Ring*, 536 U.S. at 599 ("If th[e] question had been posed in 1791, when the Sixth Amendment became law . . . the answer would have been clear . . . ." (quoting *Walton v. Arizona*, 497 U.S. 639, 710 (1990) (Stevens, J., dissenting))). And by the same token, *Ramos*'s requirement for jury unanimity likewise applies to a jury's finding, for example, that the mitigation evidence is

000119

insufficient to secure a life sentence. *See Mills v. Maryland*, 486 U.S. 367 (1988).

The natural corollary to the Sixth Amendment's guarantee of jury unanimity is that a single juror's vote in opposition to that unanimity— either against a guilty verdict or against a sentence of death—precludes a guilty verdict or death sentence. That is, the Sixth Amendment's demand for unanimity, in turn, empowers the lone juror who votes against her eleven counterparts, hanging the jury in guilt-phase verdicts, and securing life in sentencing-phase verdicts. *See Ramos*, 140 S. Ct. at 1395 (recognizing the longstanding history that "[a] verdict, taken from eleven, was no verdict." (quoting 4 W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 343 (1769) (internal quotation marks omitted))).

## B.   Texas's death penalty statute violates the Sixth Amendment's guarantee of a unanimous jury as announced in Ramos.

Though Texas's death penalty statute ostensibly requires a unanimous jury verdict, as demanded by the Sixth Amendment, its jury instruction explicitly and intentionally works to strip the power of a single juror (and up to nine jurors) inclined to vote for life in violation of the Sixth Amendment.

000120

### 1.   The 10-12 Rule.

Under Texas's death penalty scheme, the jury must assess a minimum of two special issues before a death sentence can be imposed. One special issue requires the jury to determine the probability that the defendant will engage in future criminal conduct—i.e., the defendant's future dangerousness. Tex. Code Crim. Proc. art. 37.071 § 2(a)(2)(b)(1). Another requires the jury to assess the mitigation evidence and the defendant's "moral culpability" to determine whether the mitigating circumstances are sufficient to warrant a life sentence rather than death. Tex. Code Crim. Proc. art. 37.071 § 2(e)(1). If the jury unanimously finds that there is a probability of future criminal conduct and that the mitigation evidence is insufficient, the defendant is sentenced to death. Tex. Code Crim. Proc. art. 37.071 § 2(g).[41]

The statute also requires the court to instruct the jury on unusual voting requirements as to the special issues, known as the 10-12 rule. The jury is instructed that it may find future dangerousness only if the jury is unanimous. Tex. Code Crim. Proc. art. 37.071 § 2(d)(2). At the

---

[41] In some cases, including Cruz-Garcia's, the jury is also asked whether the defendant actually caused or intended to kill the victim, or whether he anticipated that a human life would be taken. *See* Tex. Code Crim. Proc. art. 37.071 § 2(b)(2).

000121

same time, the jury is instructed that it may find that the defendant is not a future danger only if at least ten jurors agree. *Id.* The jury receives no instruction explaining what would happen if one or more, but fewer than ten, jurors find that the defendant is not a future danger. On the mitigation special issue, the jury is instructed that it may find that insufficient mitigation exists only if the jury is unanimous. Tex. Code Crim. Proc. art. 37.071 § 2(f)(2). Again, similar to the future dangerousness special issue, the jury is also instructed that it may find that the mitigation is sufficient to warrant a life sentence only if at least ten jurors agree. *Id.* The jury is given no instruction as to what would happen if between one and nine jurors find that the mitigating circumstances are sufficient to warrant a life sentence.

Under the statute, "[i]f the jury . . . is unable to answer any issue . . . the court shall sentence the defendant to . . . life imprisonment." Tex. Code Crim. Proc. art. 37.071 § 2(f). But critically, the jury is not informed of this. On the contrary, the instructions speak in mandatory terms, requiring the jury to answer special issues. Tex. Code Crim. Proc. art. 37.071 § 2(f)(1) (directing the jury that it "shall answer . . . 'yes' or 'no'"). Moreover, the statute explicitly gags "[t]he court, the attorney

93

000122

representing the state, the defendant, [and] the defendant's counsel" from informing any juror that the failure to agree on either special issue will result in a life sentence. Tex. Code Crim. Proc. art. 37.071 § 2(a)(1).

In short, the jury is told a lie: that at least ten jurors must agree on at least one of the special issues to secure a life sentence. These jury instructions inexorably lead the jury to believe that at least ten jurors must agree on at least one of the special issues in order to secure a life sentence. By design, the instructions mislead the jury that they are required to answer the special issues and preclude the jury from understanding that the Sixth Amendment's unanimity requirement endows a lone juror, who finds either special issue in favor of the defendant, with the power to grant that defendant a life sentence. The instructions thus directly violate the Sixth Amendment's guarantee, as announced in *Ramos*, that a single vote is sufficient to avoid a sentence of death and that a lone juror therefore has the power to prevent a verdict of death.

## 2. The 10-12 Rule disempowers the single juror who votes alone, in violation of Ramos.

The 10-12 rule functions to distort the deliberation process, deliberately instructing the jury that a single juror who is inclined to vote

94

000123

for life is barred from doing so unless she can convince nine other jurors to join her. This statutory provision entirely disempowers the single juror, thereby undermining the unanimity requirement that *Ramos* held to be fundamental to the Sixth Amendment right to a jury trial. Although *Ramos* makes clear that a single vote must be sufficient to avoid conviction or a particular sentence, the Texas jury instructions lead the jury to believe that a single vote is not sufficient to produce a sentence of life.

Because the jury is precluded from knowing the effect of a single vote for life, Texas's sentencing statute robs each and every juror of the power of his or her single vote, as enshrined in, and protected by, the Sixth Amendment's unanimity requirement. Under the Texas statute, a single vote can compel a life sentence. However, because of the jury instructions demanded by the statute, directing that a life sentence is only possible if ten or more jurors agree, a single juror inclined to sentence a defendant to life is led to believe that she must convince nine others in order to give any power to her vote and thus obtain a sentence of life. The inevitable effect of the jury instruction is to cut off the purpose

000124

of the Sixth Amendment's unanimity requirement at its knees, making that requirement entirely meaningless in Texas.[42]

This Court has long-recognized concerns surrounding Texas's jury instructions in capital cases and the possible constitutional magnitude resulting from "the danger that jurors, unaware of the operation of the law, might mistakenly think a sentence other than death to be impossible unless ten of them agree." *Draughon v. State*, 831 S.W.2d 331, 337 (Tex. Crim. App. 1992). The court conceded that it was "past serious dispute" that the 10-12 rule is "uncommonly enigmatic" because the failure of even one juror to agree with the group would result, not in a hung jury, but in an automatic sentence of life without parole, yet Texas capital "jurors don't know this."[43] *Id.*

---

[42] Indeed, the effect of this has already manifested in questionable and unconstitutional jury verdicts. As one juror testified in support of proposed legislation that would properly inform jurors about the power of their vote, even if there is a single holdout, a juror should have the opportunity to know that she can "stand [her] ground" and have "the law support [her]." *See, e.g., Hearing on H.B. 3054 Before the H. Comm. on Criminal Jurisprudence*, 2017 Leg., 85th Sess. (Tex. 2017), *available at* http://tlchouse.granicus.com/MediaPlayer.php?view_id=40&clip_id=13351 (testimony of Karyn Paige Gilbeaux found from 2:11:00 to 2:13:52).

[43] Empirical data confirms that the Texas sentencing statute engenders confusion, deprives the jury of understanding the power of a single vote against death, and, thus, undermines the reliability of any unanimous verdict. Studies have demonstrated that when faced with an informational vacuum, jurors tend to fill the gap with their own misperceptions, and act on those misperceptions when making decisions. *See, e.g.,*

The Supreme Court has likewise recognized that where the state's sentencing scheme misleads the jury about the ability to leave a question unanswered, juries are likely to feel compelled to answer all questions posed. *Mills*, 486 U.S. at 381. A survey in one such state, the Court explained, demonstrated that among verdict sheets for twenty-five separate capital jury trials, where the sentencing scheme was unclear about whether the jury was free to leave a question unanswered, "no answer as to the existence of mitigating circumstances was ever left blank." *Id.* The Court thus recognized a jury's compulsion to answer every question put to it, when it is misled about its ability to leave questions blank. *Id.*

Under Texas's sentencing statute, a juror who is inclined to find in favor of the defendant on either of the special issues, but thinking she is foreclosed from doing so unless she can convince nine others to join her, is at the same time barred from knowing that she can simply refuse to

---

William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 TEX. L. REV. 605, 670 (1999) ("In every state examined here, capital jurors vastly underestimate the time that convicted first-degree murderers not given the death penalty will stay in prison."); *see* William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51, 68, 71, 72–73 (2003).

000126

join the otherwise unanimous jury, resulting in an unanswered special issue and a life sentence. The Texas statute likewise bars that juror from knowing that if either special issue is left unanswered, the defendant will be sentenced to life. Such a juror will be inclined to ultimately capitulate to unanimity, as no other options are available to her following the jury instructions. *See id.* Any alleged jury unanimity in a system that is designed to compel a reluctant juror to participate in that unanimity, despite her conscientious desire not to, by directly instructing her that there is no other alternative, rings entirely hollow.

Where the jury is misled about the number of jurors needed to secure a life sentence, and is likewise barred from understanding that her single vote on either of the special issues is sufficient to secure a life sentence, the statute's requirement of unanimity is meaningless. A statute that operates to misinform a jury, forcing it to answer each of the questions posed, while foreclosing any information about how a single juror's refusal to vote for death affects those deliberations, removes from that juror the very power inherent in the Sixth Amendment's requirement for jury unanimity, as outlined in *Ramos*. The "powers as jurors" enshrined in the Sixth Amendment's right to jury unanimity

000127

cannot be "freely abridged by statute." *Ramos*, 140 S. Ct. at 1395. Because the Texas sentencing statute operates to strip those powers from juries in capital cases in which death is sought, the statue is unconstitutional under the Sixth Amendment, and Cruz-Garcia's sentence of death should be vacated.

### C. The unconstitutional penalty-phase instructions directly impacted the verdict at punishment in Cruz-Garcia's case.

During the penalty phase hearing, the court charged Cruz-Garcia's jury as described above. As to the special issue on future dangerousness, the court instructed the jury that it "may not answer . . . yes unless you agree unanimously," and "may not answer . . . no unless ten or more jurors agree." 3 CR 515. At the same time, the court spoke in mandatory terms, instructing the jury: "You *shall* return a Special Verdict of 'YES' or 'NO' on Special Issue No. 1." *Id.* (emphasis added). As dictated by the statute, the jury was not provided any instruction in the event one, and up to nine, jurors were inclined to vote no as to future dangerousness.

Similarly, as to the special issue on mitigating circumstances, the court instructed the jury that it "may not answer . . . yes unless you agree unanimously," and "may not answer . . . no unless ten or more jurors

000128

agree." *Id.* at 517. And again, the jury was not provided any instruction in the event one, and up to nine, jurors were inclined to vote yes as to mitigating circumstances.

The jury's instruction on the 10-12 rule, and the lack of an instruction confirming that a single juror could prevent a death sentence, directly influenced the verdict in Cruz-Garcia's case. There were several jurors who initially favored a life verdict, including juror Angela Bowman. Juror Bowman "was one of the most adamantly opposed" jurors to returning a death sentence, and after the jury was sequestered overnight during punishment phase deliberations, "felt a great deal of pressure" to change her vote on the special issues. 3 CR 611, 639. During the penalty phase deliberations, juror Bowman learned that her ten-year-old daughter was seriously ill, possibly with pneumonia. *Id.* at 610–11; 2 SHCR 355. On the second day of deliberations, juror Bowman sent a note asking to speak to the trial court without explaining the reason why, and the trial court decided to meet with juror Bowman one-on-one in chambers. 27 RR 3–4.

During the *ex parte* meeting, juror Bowman explained that she was the only juror who answered the mitigation and future dangerousness

<div align="center">100</div>

<div align="right">000129</div>

special issues[44] such that Cruz-Garcia would be sentenced to life instead of death and suggested that she be replaced with an alternate juror because she did not think the jury would ever come to an agreement. 27 RR 6. She explained that she felt pressured to change her vote, but that she would not change her opinion. *Id*. At the meeting, she also expressed serious concern about having to be sequestered another night. *Id*. at 8. Juror Bowman told the trial court that, "I am not changing my stance on [the special issues]. I'm not." *Id*. at 5–6. The trial court instructed her to continue to deliberate and that it could be for "a pretty long period of time," but that it would not "be for years." *Id*. The trial court told juror Bowman to "continue trying to reach an agreement with the jury, if you can." *Id*. at 7. She indicated that how long juror Bowman had to deliberate was "completely in the hands of the entire jury." *Id*. at 8.

An hour after their *ex parte* meeting, juror Bowman, who had just plainly asserted, "I am not changing my stance on [life]. I am not," 27 RR 6, joined a unanimous jury verdict sentencing Cruz-Garcia to death. The

---

[44] Special issues 1 and 3 were future dangerousness and mitigation, respectively. 3 CR 523, 525. Special issue 2 asked the jury whether Cruz-Garcia actually caused or intended to kill the victim, or whether he anticipated that a human life would be taken. *See* Tex. Code of Crim. Proc. art. 37.071 § 2(b)(2).

000130

court did not communicate anything about this discussion, or its supplemental instructions, on the record to counsel or Cruz-Garcia. Instead, the court only told counsel that juror Bowman asked how long the deliberations would last. 3 CR 606–07.

The process was so disturbing to juror Bowman that she reached out to trial counsel the same day that the verdict was read and signed a sworn affidavit averring that, "[t]he verdict I returned was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty." 3 CR 611. Juror Bowman was "distraught over her decision to capitulate during the punishment phase deliberations and change her vote" and felt "pressured" to do so. *Id.* at 606–11. Additionally, she explained that her daughter was suffering from a fever and she wanted to take care of her, rather than be sequestered another night. *Id.* at 606, 611.

The lack of any information concerning what would happen if juror Bowman did not either change her vote or persuade 9 other jurors to join her in voting for life was a key factor in juror Bowman casting a vote she did not believe in:

> The judge did not tell me what would happen if I could not change my mind or how long I would be there if I did not

000131

agree. I understood that it could be a long time—days, weeks even. That is something the other jurors talked to me about—that it could take a long time, but we would need to keep deliberating. We did not know what would happen if I could not agree with them, but I think we figured there would be a mistrial.

Ultimately, I went back to deliberations like the judge instructed me to and thought about whether I could find a way to agree with the rest of the jurors. Because of all the pressure from the other jurors and my daughter being sick, I decided to change my vote to death.

At no time did I truly believe the evidence presented warranted a sentence of death, but I had to stop fighting what seemed inevitable.

2 SHCR 356.

The court's instruction that the jury was required to answer yes or no, combined with its instruction that the jury could answer either of the special issues in favor of life only if ten jurors agreed, left the single juror inclined to vote for life with no options. This framework precluded Cruz-Garcia's jury from understanding that a single juror could refuse to join the otherwise unanimous jury, leaving one or both of the special issues unanswered and resulting in a life sentence.

The 10-12 rule prevented the jury from understanding that a single vote was sufficient to depart from a verdict of death and yield a life sentence. Cruz-Garcia was therefore deprived of the protective reach of

000132

the Sixth Amendment requirement of jury unanimity. Because Cruz-Garcia was denied his Sixth Amendment right to a unanimous jury verdict during his penalty phase deliberations, he is entitled to a new penalty phase hearing.

**D.   Cruz-Garcia's *Ramos* claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(1).**

This Court should authorize Cruz-Garcia's *Ramos* claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(1). To satisfy § 5(a)(1), an applicant must show that (1) the factual or legal basis of the claim was previously unavailable, and (2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from the conviction or sentence. *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007).

This Court has recognized that § 5(a)(1) permits authorization when a "subsequent writ is based on binding and directly relevant United States Supreme Court precedent decided after applicant had exhausted [his] claim at trial and on direct appeal and after applicant had filed his first state habeas application" *Ex parte Martinez,* 233 S.W.3d 319, 322 (Tex. Crim. App. 2007). Cruz-Garcia's claim is based on the United States

000133

Supreme Court's decision in *Ramos v. Louisiana*, decided on April 20, 2020, well after Cruz-Garcia's initial and first successive writs were filed in state court in 2015 and 2016. *See* 1 SHCR 2; Ex. 4. Moreover, as argued *supra* §§ V.B and C, Cruz-Garcia has alleged facts which, if proven, establish a violation of the Sixth Amendment right to jury unanimity. Hence, this claim satisfies Tex. Code Crim. Proc. art. 11.071 § 5(a)(1).

## VI.   Claim Six: Cruz-Garcia's Sixth Amendment right to effective assistance of counsel was violated.

### A.   Legal background.

#### 1.   The Sixth Amendment guarantees the right to effective representation.

The Sixth Amendment guarantees every criminal defendant the right to effective representation at trial. This Sixth Amendment right "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012). To prove ineffective assistance of counsel, an applicant must show that his counsel performed deficiently at trial and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Ex parte Bryant*, 448 S.W.3d 29, 39 (Tex. Crim. App. 2014); *Ex parte Overton*, 444 S.W.3d 632, 640 (Tex. Crim. App. 2014).

000134

An applicant establishes deficient performance by showing that trial counsel's performance fell below an objective standard of reasonableness. *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020); *Ex parte Bryant*, 448 S.W.3d at 38–39. In death penalty cases, trial counsel's performance is deficient when it is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time and in the location of the trial]." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). The American Bar Association (ABA) standards, which the Supreme Court "has long referred to as 'guides to determining what is reasonable,'" play an important role in assessing counsel's performance. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688). Because the ABA standards reflect the "[p]revailing norms of practice," *Strickland*, 466 U.S. at 688, they are "valuable measures of the prevailing professional norms of effective representation," *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).

In assessing trial counsel's performance, courts look to the guidelines that were in effect at the time of trial. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009). Where the "prevailing professional norms" as expressed in the ABA standards are different from the "most common customs" of

000135

defense attorneys in a particular locale, the prevailing professional norms nonetheless govern trial counsel's performance. *Harrington v. Richter*, 562 U.S. 86, 88 (2011). That is, a culture of deficiency does not shelter trial counsel's performance from constitutional accountability. The guidelines applicable to Cruz-Garcia's case include the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 HOFSTRA L. REV. 913 (2005) (the "ABA Guidelines"), the ABA Standards for Criminal Justice (3d ed. 1993) (the "ABA Standards"), and the State Bar of Texas Guidelines and Standards for Texas Capital Counsel, 69 Tex. B.J. 966 (2006) (the "Texas Guidelines").

Courts apply a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393–94 (2005) (O'Connor, J., concurring). An applicant must prove deficient performance by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 802, 813 (Tex. Crim. App. 1999).

An applicant establishes prejudice when he shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the

000136

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94. An applicant does not need to show that trial counsel's deficient performance "more likely than not altered the outcome" in his case. *Id.* at 693. Rather, the applicant need only show that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112.

### 2.   Caseload and fee guidelines for Texas death penalty cases.

#### a.   Texas and ABA Guidelines require counsel to limit their caseload.

One of the most important obligations of capital counsel is to maintain a manageable caseload. All lawyers "have an ethical obligation to control their workloads so that every matter they undertake will be handled diligently and competently." ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 06-441, at 9 (2006). ABA Guideline 10.3 provides that "[c]ounsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines." ABA Guideline 10.3. Texas Guideline 9.3, set forth in full below, provides additional detail. It requires counsel to "give priority to death penalty

000137

clients over their other caseload." Texas Guideline 9.3(B). It also requires that if counsel finds himself "overextended" "such that reasonable time is not available to properly complete the tasks necessary for providing quality representation," he is required to "notify the court." Texas Guideline 9.3(C). If counsel finds himself overextended, he is also required to request legal assistance, withdraw from the case, or "take steps to reduce other case load matters." *Id.*

**Guidelines 9.3 – <u>Obligations of Counsel Respecting Workload</u>**

    A.    Counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines.

    B.    Counsel representing the death penalty clients must, due to the severity of nature of the case and the necessity for time-consuming research and preparation, give priority to death penalty clients over their other caseload.

    C.    In the event that counsel's caseload becomes overextended after acceptance of a death penalty case, so that reasonable time is not available to properly complete the tasks necessary for providing maximum quality representation, counsel should notify the court and request additional legal assistance, or seek to withdraw, or take steps to reduce other caseload matters which conflict with his death penalty representation.

The reasons for limits of capital counsel's caseload are obvious. "A sleep-deprived member of a capital defense team, no matter how talented

000138

or dedicated, cannot provide competent representation if his or her workload does not provide the time necessary to handle these extraordinarily taxing engagements." Lawrence J. Fox, *Capital Guidelines and Ethical Duties: Mutually Reinforcing Responsibilities*, 36 HOFSTRA L. REV. 775, 783 (2008). Because death penalty cases "are intense emotionally and demanding of one's time," even the "best of intentions cannot overcome an excessive workload." *Id.* at 784.

> **b.    The Texas Indigent Defense Commission has concluded that five is the maximum number of death penalty cases a fulltime capital practitioner can handle.**

Facing a "statewide crisis in the criminal defense system," the Texas legislature passed the Fair Defense Act ("FDA") in 2001. James D. Bethke and Morgan Shell, *Public Defense Innovation in Texas*, 51 IND. L. REV. 111, 112 (2018). "A key component of the Act was the creation of the Task Force on Indigent Defense," which was subsequently renamed the Texas Indigent Defense Commission ("TIDC"). *Id.* TIDC "distributes funds to counties, monitors their compliance with state and constitutional requirements, provides counties technical support, and develops Texas indigent defense policies." *Id.*

000139

The TIDC has studied the issue of appointed counsel caseloads for both death penalty and non-death penalty cases. In 2013, the TIDC ordered an assessment of the Regional Public Defender for Capital Cases Office ("RPDO") from the Public Policy Research Institute of Texas A&M University. Ex. 142. The RPDO, based in Lubbock County, was created by TIDC in 2008 "to make high-quality capital defense representation more accessible in small and mid-sized jurisdictions," whose budgets could otherwise become overwhelmed by the costs of a capital case. Bethke & Shell, *Public Defense Innovation in Texas*, 51 IND. L. REV. at 115. The RPDO does so by employing salaried attorneys who "specialize exclusively in capital defense services." Ex. 142 at 24, 29. RPDO staffs each case with two attorneys, an investigator, and a mitigation specialist. *Id.* at vii.

When it funded the creation of the RPDO, TIDC mandated that each attorney's caseload not exceed five active cases. *Id.* at 2. The 2013 assessment found that RPDO respected the five-case maximum, with each attorney averaging four cases. *Id.* at 24. The assessment concluded that the five-cases-per-attorney cap was important to RPDO's ability to

000140

provide capital representation consistent with the Texas Guidelines. *Id.* at 2.

Three years later, however, TIDC commissioned another report on RPDO. The assessment, which RPDO joined TIDC in requesting, was conducted by the National Association of Public Defense ("NAPD"). The NAPD found that caseloads had increased, with the cap being raised to six cases per attorney. Ex. 145. The report criticized this development, noting that "[t]here are other places in the country where the caps are significantly lower than that maintained by RPDO, including some with a cap of one or two open cases at a time." *Id.* The report concluded that "six capital cases appears to be too high to comply with the ABA Guidelines." *Id.* at 12.

The lessons from the TIDC reports are clear: An attorney who works exclusively on death penalty cases—as part of a team with at least one other attorney, an investigator, and a mitigation specialist—can handle up to, but no more than, five capital cases to remain compliant with the prevailing professional guidelines.

### c.   TIDC has also closely studied felony caseloads.

TIDC has also looked at the issue of appointed counsel caseloads for non-capital cases. For many years, the default standard for a non-capital caseload was that developed by the National Advisory Commission on Criminal Justice Standards and Goals in 1973. Ex. 144. The "NAC standards," as they became known, provided that caseloads should not exceed 150 felony cases a year. *Id.* According to a September 2013 Report from Council of State Governments Justice Center, the Harris County Public Defender's Office adhered to the NAC standards, with a caseload cap of 150 felony cases per year and a goal of 30-35 cases open at any given time. Ex. 147.

In 2013, the Texas Legislature instructed TIDC to "conduct and publish a study for the purpose of determining guidelines for establishing a maximum allowable caseload for a criminal defense attorney that, when the attorney's total caseload . . . is considered, allows the attorney to give each indigent defendant the time and effort necessary to ensure effective representation." Tex. H.B. 1318, 83rd Leg., R.S. (2013). The legislature further directed that "[t]he study must be based on relevant policies, performance guidelines, and best practices." *Id.*

000142

TIDC reported on the results in a January 2015 report. The report strongly criticized the NAC standards as outdated and lacking an empirical foundation. Ex. 144. Based on an exhaustive analysis of Texas criminal defense practice, the report concluded that caseloads should be capped according to the degree of offense. The report concluded that:

> for the delivery of reasonably effective representation attorneys should carry an annual full-time equivalent caseload of no more than the following:
>
> - • 236 Class B Misdemeanors;
> - • 216 Class A Misdemeanors;
> - • 174 State Jail Felonies;
> - • 144 Third Degree Felonies;
> - • 105 Second Degree Felonies; or
> - • 77 First Degree Felonies.

*Id.* at 34. The TIDC has criticized Harris County for failing to adhere to the caseload guidelines for appointed cases. Ex. 146 at 15; Ex. 143 at 11. Indeed, in 2016, TIDC found that Harris County's appointment system was so badly flawed and led to such high caseloads that it failed TIDC's standard for being a "fair, neutral, and nondiscriminatory system." Ex 146.

000143

### d.   Both the ABA and the Texas Guidelines prohibit fixed-fee contracts in death penalty cases.

Like workload, fee structure is critical to ensure that counsel provide adequate representation in capital cases. Fox, 36 HOFSTRA L. REV. at 777–78 ("Given the fact that the prosecution in capital cases will likely be represented by well-funded and skilled specialists, issues of fees and workload have become central to the defense team's duty of competent performance imposed by Rule 1.1.").

Both the Texas and ABA Guidelines prohibit the use of flat fees in death penalty cases. Texas Guideline 8.1.B.1 ("Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases."); ABA Guideline 9.1.B.1 (same). Fixed fees are prohibited by the Guidelines for obvious reasons: "When assigned counsel is paid a predetermined fee for the case regardless of the number of hours of work actually demanded by the representation, there is an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee." ABA Guideline 9.1, Cmt. "The possible effect of such rates is to discourage lawyers from doing more than what is minimally necessary to qualify for the flat payment."

000144

*Id.* (quoting commentary to Standard 5-2.4 of the ABA Standards for Criminal Justice: Providing Defense Services).

### B. Background regarding Cruz-Garcia's counsel.

#### 1. Cruz-Garcia's family raised money to retain counsel for him.

On February 16, 2010, the Court appointed Mike Fosher as first chair counsel for Cruz-Garcia. 1 CR 8. Mario Madrid was appointed as co-counsel on March 3, 2010. 1 CR 11. Members of Cruz-Garcia's family, however, raised sufficient funds through their church to retain private counsel. Ex. 85 at 9. They hired Steven Shellist and Christian Capitaine to represent Cruz-Garcia in April of 2010. *Id.*

#### 2. When the State decided to seek the death penalty, Cruz-Garcia's retained counsel were forced to withdraw and Skip Cornelius and Mario Madrid were appointed to represent Cruz-Garcia.

Shellist and Capitaine worked on Cruz-Garcia's case until August 2011. When the State decided to seek the death penalty, however, they withdrew from the case. 2 CR 326; 4 RR 4–10; Ex. 6. On August 31, 2011, the court appointed R.P. "Skip" Cornelius as lead counsel and Mario Madrid as second chair. 1 CR 57–58.

000145

### 3. Cornelius sought and received compensation for his representation of Cruz-Garcia on a flat-fee basis, in contravention of Texas Guideline 8.1.B.1 and ABA Guideline 9.1.B.1.

The Texas and ABA Guidelines are clear: flat fees "are improper in death penalty cases." Texas Guideline 8.1.B.1; ABA Guideline 9.1.B.1. Cornelius nonetheless sought and received a $65,000 flat fee for his representation of Cruz-Garcia. Ex. 7. Cornelius's co-counsel, Mario Madrid, likewise sought and received a $60,000 flat fee. 2 CR 375–76. Although flat fees are prohibited by both the ABA and Texas Guidelines, they have long been permitted as part of the Harris County appointment system that TIDC concluded failed the "fair, neutral, and nondiscriminatory" test. Ex. 146. In 2013, the presumptive flat fee was $35,000.00 for first-chair counsel and $30,000.00 for second chair. Ex. 7 at 1. Cornelius justified his being paid a near-doubling of the presumptive flat fee on the grounds that the case was "more than 19 years old" and was "very complex." 2 CR 372. Cornelius also told the court that "[i]n all likelihood there will be a multitude of expert witnesses on many different elements of the various cases."[45] 2 CR 373. He also emphasized Cruz-

---

[45] It is unclear what Cornelius meant by the "various cases."

000146

Garcia's ties to Puerto Rico, telling the court that the case "involves numerous extraneous offenses, both in Texas and in Puerto Rico" and that "[d]efendant's family lives in Puerto Rico, as well as in Texas and other cities." 2 CR 372.

As discussed above, the problem with flat fees in death penalty cases is that they create "an unacceptable risk that counsel will limit the amount of time invested in the representation in order to maximize the return on the fixed fee." ABA Guideline 9.1, Cmt. This makes flat fees particularly problematic in Texas death penalty cases, as counsel have a duty to "give priority to death penalty clients over their other caseload" under Texas Guideline 9.3.B.

Flat fees also impede accountability for appointed counsel. Because they were working on a flat fee, neither Cornelius nor Madrid kept contemporaneous time entries. Yet, as described below, an analysis of Cornelius's billing records in other cases shows that the exact situation the prohibition of flat fees was meant to prevent occurred in Cruz-Garcia's case. Cornelius did not "give priority" to Cruz-Garcia's case. Instead, he worked relentlessly on other, hourly-billed cases from the

000147

beginning of jury selection in Cruz-Garcia's case on June 3, 2013, until sentencing on July 22, 2013. *See* Ex. 138.

### 4. Cornelius's crushing caseload far exceeded reasonable standards.

Throughout his representation of Cruz-Garcia, Cornelius carried a caseload far in excess of TIDC standards. Harris County did not track counsel caseloads during the 2011 to 2013 time period. Accordingly, the only way to determine Cornelius' caseload is to identify and count each of his individual appointments. The appointments Cruz-Garcia has been able to identify paint an extremely troubling picture of Cornelius's caseload.[46]

The chart below summarizes Cornelius's capital murder appointments while he served as Cruz-Garcia's lead counsel. The documents underlying Figure 1 are included in Exhibit 138 and Exhibit 148, showing when Cornelius was appointed and when representation concluded, and billing in corresponding cases.[47]

---

[46] Cruz-Garcia used the docket searching feature of the Harris County District Clerk's website to attempt to identify the capital cases to which Cornelius was appointed during his representation of Cruz-Garcia. Because there is no centralized repository for appointments, though, he cannot be certain that he located all of Cornelius's appointments.

[47] Billing records from Cornelius's capital cases are included with his non-capital billing records. The fact that some of the cases were death penalty cases is only

000148

**Figure 1:** Cornelius's capital appointments during his representation of Cruz-Garcia.[48]

| Case | Type | Appt. | End |
|------|------|-------|-----|
| Andre Sloan | Non-Death | 09/21/10 | 05/25/12 |
| Herbert Nash | Non-Death | 03/10/10 | 09/30/11 |
| **Lucky Ward** | **Death** | **03/02/11** | **09/17/13** |
| Kevin Owens | Non-Death | 04/12/11 | 01/27/14 |
| Judy Hambrick | Non-Death | 04/18/11 | 12/20/12 |
| Bobby Jones | Non-Death | 04/19/11 | 06/08/12 |
| Charles Grabow | Non-Death | 04/24/11 | 01/22/13 |
| **Jeffery Prevost** | **Death** | **05/24/11** | **04/05/14** |
| Daryl Reed | Non-Death | 11/14/11 | 08/23/13 |
| Astin Johnson | Non-Death | 01/30/12 | 01/31/13 |
| Shawn Mayreis | Non-Death | 03/29/12 | 08/08/13 |
| Justin McGee | Non-Death | 05/07/12 | 12/12/13 |
| **Neil Mukherjee** | **Death** | **12/04/12** | **11/14/15** |
| **Juan Reyes** | **Death** | **12/13/12** | **04/04/14** |
| Anthony Alegria | Non-Death | 01/11/13 | 10/01/14 |
| **Curtis Adams** | **Death** | **01/13/13** | **07/15/15** |
| Neva Jane Gonzalez | Non-Death | 02/06/13 | 02/13/14 |
| Johntay Gibson | Non-Death | 02/25/13 | 07/14/14 |
| Randy Segura | Non-Death | 04/24/13 | 11/17/14 |
| Tyran Riley | Non-Death | 05/13/13 | 01/08/15 |
| Osman Irias | Non-Death | 06/21/13 | 04/07/14 |

apparent from the billing records. Cornelius's billing records in the Juan Reyes case include a notation that it was a death case until January 2014, six months after Cruz-Garcia's trial ended. Likewise, Cornelius's billing records in the Neil Mukherjee case state that the State was seeking the death penalty against Mukherjee at the time Cornelius withdrew from the representation in November 2015. Cornelius's billing records in the Curtis Adams, Lucky Ward, and Jeffery Prevost cases also indicate that those cases were death penalty cases.

[48] The documents underlying **Figure 1** are collected in Exhibits 148 and 138. Exhibit 148 contains appointment orders and documents indicating when Mr. Cornelius's representation ended. In some instances, to see that the case was a death case, it is necessary to look to Exhibit 138. The duration of Mr. Cornelius's involvement is also evidenced in the billing records in Exhibit 138.

000149

The documents in Exhibits 138 and 148 show that between August 2011, when he was appointed in Cruz-Garcia's case, and June 2013, when jury selection began in Cruz-Garcia's case, Cornelius worked six non-death capital murder cases to conclusion. These records also show that at the time of Cruz-Garcia's trial, Cornelius had six active death penalty cases. As the 2016 TIDC report on RPDO found, "six capital cases appears to be too high to comply with the ABA Guidelines." Ex. 145 at 12. That figure of six cases further assumes that the attorney works on no other cases and is part of a team comprised of co-counsel, a mitigation specialist, and an investigator. As discussed *infra* § VI.E.3, Cornelius admitted that he did not retain a mitigation specialist in Cruz-Garcia's case.

Moreover, in addition to the already six death penalty cases Cornelius was appointed to, he was appointed to at least ten non-death capital cases, two of which[49] he tried to verdict within a month of concluding Cruz-Garcia's trial. In the time period between when Cornelius was appointed to represent Cruz-Garcia and the trial,

---

[49] Shawn Mayreis and Daryl Reed.

000150

Cornelius saw another six non-death capital cases to conclusion. In total, Cornelius worked on at least sixteen non-death capital murder cases while representing Cruz-Garcia, in addition to the six death cases he was carrying.

Cornelius's capital murder docket alone put his caseload far above the TIDC limit of five death cases per full-time capital attorney. Yet, Cornelius also carried hundreds of non-capital felony cases. Again, although there is no central repository of case appointments in Harris County during the relevant time period, Cruz-Garcia has identified as many of Cornelius's appointments as he could during the time period from September of 2010 to the date of Cruz-Garcia's trial. A list of Cornelius's non-capital appointments from one year before he was appointed to represent Cruz-Garcia until the end of Cruz-Garcia's trial is included below in **Figure 2**. The documents underlying Figure 2, including appointment orders and indictments, are collected in Exhibit 139.

As indicated by Figure 2, Cornelius was appointed to over 500 felony cases in the less-than-three-year period from September 2010 to July 2013. In 2012 alone, Cornelius was appointed to over 250 felony

000151

cases. During his less-than-two-year representation of Cruz-Garcia, Cornelius was appointed to over 400 felony cases.

The TIDC guidelines provide that attorneys should not handle more than 144 cases per year, assuming all the cases are third degree felonies. Yet, much of Cornelius's caseload consisted of first-degree felonies such as non-capital murder, aggravated robbery, aggravated assault, aggravated kidnapping, and aggravated sexual assault. The TIDC guidelines dictate that attorneys should not take on more than 77 first-degree felonies in one year, assuming the attorney has no other cases.

**Figure 2:** Cornelius's felony appointments from September 2010 to July 2013.[50]

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1276750 | Sept. 7, 2010 | Robert Edwin Lewis | Burglary of a habitation |
| 1276472 | Sept. 7, 2010 | Anthana Denmon | Aggravated Assault with a deadly weapon |
| 1276473 | Sept. 7, 2010 | Anthana Denmon | Aggravated Assault |
| 1276862 | Sept. 7, 2010 | Truett Lane Finch | Burglary of a habitation |
| 1276580 | Sept. 7, 2010 | Angela Michelle Palmer | Prostitution |
| 1276950 | Sept. 8, 2010 | Johnny Dawon Hall | Aggravated Robbery – Deadly Weapon |
| 1277012 | Sept. 8, 2010 | Lawrence Price | Aggravated Assault – Family Member |
| 1277059 | Sept. 8, 2010 | Rafael Ochoa Flores | Aggravated Assault |

---

[50] The documents underlying Figure 2 are collected in Exhibit 139.

000152

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1277381 | Sept. 13, 2010 | Johnny Oneal Rosborough | Delivery of a Controlled Substance |
| 1277262 | Sept. 13, 2010 | Zeke Jermaine Rayford | Burglary of a habitation |
| 1277574 | Sept. 13, 2010 | Sheneka Henderson | Aggravated Assault |
| 1277739 | Sept. 14, 2010 | Elmer Yobany Martinez | Possession of a Controlled Substance |
| 1277801 | Sept. 14, 2010 | Eulalio Alejandro Garcia | Evading Arrest or Detention |
| 1277903 | Sept. 15, 2010 | Charles Stevens Woods | Endangering Child |
| 1277810 | Sept. 15, 2010 | Donald Wayne Lewis | Possession of a Controlled Substance |
| 1278042 | Sept. 16, 2010 | Steven Anthony Scanlon | Burglary of a habitation |
| 1278015 | Sept. 16, 2010 | Darla Jean Westerfield | Prostitution |
| 1278092 | Sept. 17, 2010 | Mary K. Beltran | Possession of a Controlled Substance |
| 1277782 | Sept. 17, 2010 | Louis Thomas | Assault – Family Violence – 2nd Offender |
| 1278835 | Sept. 24, 2010 | Deangelis Marshall | Robbery |
| 1281238 | Oct. 13, 2010 | Raymond Richardson | Sexual Assault |
| 1281569 | Oct. 18, 2010 | Clyde Eugene Bradford | Murder |
| 1282123 | Oct. 21, 2010 | Tredric Culclager | Murder |
| 1281298 | Oct. 25, 2010 | Henry Price | Aggravated Sexual Assault |
| 1281146 | Oct. 26, 2011 | Matthew Young | Aggravated sexual assault child under 14 |
| 1282084 | Oct. 29, 2010 | Leonard Keith Campbell | Burglary of a habitation |

| Case No. | Appt. Date | Defendant | Charge |
|----------|------------|-----------|--------|
| 1285192 | Nov. 15, 2010 | Charles Ellium Dees | Possession of a Controlled Substance |
| 1285814 | Nov. 19, 2010 | Ashley Trimont | Possession of a Controlled Substance |
| 1287718 | Dec. 7, 2010 | Floyd Edward Coleman | Aggravated Assault – Family Member |
| 1280414 | Dec. 8, 2010 | Brian Lynn Fairchild | Possession of a Controlled Substance |
| 1288400 | Dec. 13, 2010 | Tevlon John Campbell | Possession of a Controlled Substance |
| 1288718 | Dec. 16, 2010 | Christopher Cash Wilkins | Aggravated Robbery – Deadly Weapon |
| 1288977 | Dec. 17, 2010 | Gregory Scott Jelks | Possession with Intent to Deliver a Controlled Substance |
| 1289316 | Dec. 20, 2010 | Marvin Earl Rumley, II | Criminal Mischief |
| 1289228 | Dec. 20, 2010 | Paul Anthony Archer | Theft |
| 1289199 | Dec. 20, 2010 | Troy Bennings | Burglary of a habitation |
| 1289045 | Dec. 20, 2010 | Tyler Frank | Burglary of a habitation |
| 1289088 | Dec. 20, 2010 | Tyler Frank | Assault |
| 1287026 | Dec. 20, 2010 | Le-Charles Bryant | Aggravated Robbery – Deadly Weapon |
| 1294397 | Feb. 7, 2011 | Lorenzo Rogers | Possession with Intent to Deliver a Controlled Substance |
| 1292242 | Feb. 7, 2011 | Lorenzo Vonzell Rogers | Assault of a family member 2nd offender & impending breathing |
| 1290357 | Feb. 14, 2011 | Michael Walker | Burglary of a habitation |
| 1295252 | Feb. 14, 2011 | Ione Lashay Allen | Theft – Third Offender |
| 1290358 | Feb. 14, 2011 | Michael Walker | Burglary of a habitation |
| 1298168 | March 10, 2011 | Teddrick Batiste | Aggravated Robbery – Deadly Weapon |

000154

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1298422 | March 14, 2011 | Wilson Ennis Barker III | Delivery of a Controlled Substance |
| 1298423 | March 14, 2011 | Wilson Ennis Barker III | Possession of a Controlled Substance |
| 1298424 | March 14, 2011 | Wilson Ennis Barker III | Delivery of a Controlled Substance |
| 1298482 | March 14, 2011 | Frank G Garcia | Possession with Intent to Deliver a Controlled Substance |
| 1291793 | March 15, 2011 | Steven Hanks | Aggravated sexual assault child under 14 |
| 1300376 | March 28, 2011 | Desarian Oneal Cartwright | Burglary – Habitation |
| 1300296 | March 29, 2011 | Jesus Fedibiagini | Aggravated Kidnapping |
| 1300619 | March 30, 2011 | Leland Dazey | Possession of a Controlled Substance |
| 1296660 | April 1, 2011 | James Benton Thomas | Aggravated Assault – Family Member |
| 1287853 | April 4, 2011 | Kyle Bryant | Delivery of Marihuana |
| 1301372 | April 4, 2011 | Miguel Angel Mata | Assault of Family Member – Impeding Breathing |
| 1284004 | April 5, 2011 | Chalyn Stewart | Robbery |
| 1288687 | April 5, 2011 | Esmai Kyet | Aggravated sexual assault of a child 14-17 years of age |
| 1297534 | April 5, 2011 | Amanda Michelle Thornton | Possession with Intent to Deliver a Controlled Substance |
| 1301461 | April 5, 2011 | Jason Ryan Lafeur | Possession of a Controlled Substance |
| 1301618 | April 6, 2011 | Rafael Horazeo Gonzales | Possession of a Controlled Substance |
| 1301482 | April 6, 2011 | Percy Lee Freeman | Aggravated Assault – Family Member |

126

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1301483 | April 6, 2011 | Percy Lee Freeman | Felon in Possession of Firearm |
| 1301484 | April 6, 2011 | Percy Lee Freeman | Possession of a Controlled Substance |
| 1301394 | April 6, 2011 | Justin Lott | Assault |
| 1301396 | April 6, 2011 | Justin Lott | Assault |
| 1299908 | April 6, 2011 | Leonardo Buentello | Theft |
| 1301661 | April 7, 2011 | Morris Banks | Theft |
| 1297594 | April 7, 2011 | Michael Anthony Reescano | Theft |
| 1301545 | April 7, 2011 | Michael Reescano | Theft – Third Offender |
| 1302237 | April 11, 2011 | Ricky Lee Vallejo | Aggravated Assault |
| 1302079 | April 11, 2011 | Vernis Elbert Boyd | Harassment of Public Servant |
| 1302038 | April 11, 2011 | Janice Renne Johnson | Possession of a Controlled Substance |
| 1302122 | April 11, 2011 | Jarvis Eugene Faultry | Aggravated Assault |
| 1302124 | April 11, 2011 | Jarvis Eugene Faultry | Possession of a Controlled Substance |
| 1301900 | April 11, 2011 | Vern Hayward McKinney | Controlled Substance Fraud – Prescription |
| 1302501 | April 13, 2011 | Brandon Lee West | Possession with Intent to Deliver a Controlled Substance |
| 1301953 | April 13, 2011 | Brandon West | Felon in Possession of Firearm |
| 1301954 | April 13, 2011 | Brandon West | Possession of Marihuana |
| 1302509 | April 13, 2011 | Christopher James Franks | Aggravated Robbery – Deadly Weapon |
| 1302510 | April 13, 2011 | Christopher James Franks | Aggravated Assault |
| 1297373 | April 19, 2011 | Bobby Jones | Aggravated Assault |

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1302731 | April 18, 2011 | Judy Lucille Hambrick | Theft of Firearm |
| 1302700 | April 18, 2011 | John Henry Addison | Aggravated Assault – Family Member |
| 1298312 | April 17, 2011 | Ethel Ibarra | Possession with Intent to Deliver a Controlled Substance |
| 1303461 | April 25, 2011 | Mattheaus Reed | Possession of a Controlled Substance |
| 1292299 | April 26, 2011 | Vito Mario Murrugo | Aggravated Assault – Family Member |
| 1301177 | May 4, 2011 | Justin Abels | Bail Jumping and Failure to Appear |
| 1296922 | May 9, 2011 | Broderick Keon Ansley | Possession of Marihuana |
| 1296921 | May 9, 2011 | Broderick Keon Ansley | Possession with Intent to Deliver a Controlled Substance |
| 1305352 | May 9, 2011 | Broderick Keon Ansley | Tampering/Fabricating Physical Evidence |
| 1305885 | May 12, 2011 | Jimmy Calvin Parker | Aggravated Assault – Family Member |
| 1306894 | May 23, 2011 | Patrick Bernard Jackson | Aggravated Robbery – Deadly Weapon |
| 1307048 | May 23, 2011 | Calvin Lavergne | Aggravated Robbery – Deadly Weapon |
| 1307176 | May 23, 2011 | Manuel L. Luna | Assault of Family Member – Impeding Breathing |
| 1307028 | May 24, 2011 | Kenneth Robert Welters | Aggravated Assault – Family Member |
| 1307152 | May 24, 2011 | Torrance Keith Coleman | Possession of a Controlled Substance |
| 1307404 | May 25, 2011 | Tramella A. Waller | Possession of a Controlled Substance |

000157

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1307363 | May 25, 2011 | Julius Murray | Assault of Family Member Second Offender and Impeding Breathing |
| 1307331 | May 25, 2011 | Laura Kim Taylor | Deadly Conduct |
| 1281626 | May 26, 2011 | John Joe Valencia | Possession of a Controlled Substance |
| 1280866 | May 26, 2011 | Deshon Chantez Gilkey | Aggravated Assault |
| 1302296 | May 27, 2011 | Charles Douglas Grabow Jr. | Aggravated Assault |
| 1294356 | May 27, 2011 | Seaver Kardell Gordon | Aggravated Robbery – Deadly Weapon |
| 1307784 | June 17, 2011 | John Joe Valencia | Bail Jumping and Failure to Appear |
| 1295162 | June 21, 2011 | William Hernandez | Aggravated Robbery – Deadly Weapon |
| 1312658 | July 12, 2011 | Esmai Kyet | Robbery |
| 1310708 | July 13, 2011 | Kerri Lashun Livings | Aggravated Robbery – Deadly Weapon |
| 1313253 | July 18, 2011 | Orlando Salinas | Injury to Elderly Individual |
| 1312972 | July 18, 2011 | Tremayne Givens | Violation of Protective Order – Family Violence |
| 1315016 | Aug. 1, 2011 | Damian Orion Smith | Theft – Third Offender |
| 1314871 | Aug. 1, 2011 | James Byron McCauley | Burglary with Intent to Commit Theft |
| 1311512 | Aug. 4, 2011 | Donovan Charles Anderson | Credit/Debit Card Abuse |
| 1309645 | Aug. 4, 2011 | Donovan Charles Anderson | Assault – Family Member – 2nd Offender |
| 1315349 | Aug. 4, 2011 | Paul Curtis Rideaux | Assault of Family Member – Impeding Breathing |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1310753 | Aug. 5, 2011 | Steven Anthony Scanlon | Possession of Marihuana |
| 1315417 | Aug. 5, 2011 | Augustine M. Peralez | Credit/Debit Card Abuse |
| 1315123 | Aug. 5, 2011 | Claudia Elizabeth Munoz | Assault of Family Member – Impeding Breathing |
| 1315938 | Aug. 10, 2011 | Freddy Sanchez | Possession of a Controlled Substance |
| 1316066 | Aug. 11, 2011 | Janice Rena Johnson | Possession of a Controlled Substance |
| 1316076 | Aug. 11, 2011 | Jyamos Edward Maxie-Mouton | Assault of Family Member – Impeding Breathing |
| 1316088 | Aug. 11, 2011 | James Edward Lewis | Possession with Intent to Deliver a Controlled Substance |
| 1316171 | Aug. 12, 2011 | Kevin Antonio Owens | Aggravated Assault |
| 1316317 | Aug. 15, 2011 | Lissandro Pacheco | Burglary of a habitation |
| 1316230 | Aug. 15, 2011 | Nathan Edward Williams | Possession of a Controlled Substance |
| 1316432 | Aug. 15, 2011 | Sergio Luis Gil | Indecency with a Child |
| 1316522 | Aug. 16, 2011 | Juan Manuel Lucio- Lopez | Retaliation |
| 1316624 | Aug. 16, 2011 | Juan Manuel Lucio-Lopez | Aggregate Criminal Mischief |
| 1309846 | Aug. 16, 2011 | Johnathan Matthew Adams | Possession of a Controlled Substance |
| 1313015 | Aug. 17, 2011 | Alejandro Castillo | Possession of a Controlled Substance |
| 1316371 | Aug. 17, 2011 | Nija A. Brown | Assault – Family Violence – 2nd Offender |
| 1316714 | Aug. 17, 2011 | Christopher Bernard Hamlett | Theft – Third Offender |
| 1316737 | Aug. 17, 2011 | Jordan Lee Lane | Theft – Third Offender |

000159

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1298312 | Aug. 17, 2011 | Ethel Ibarra | Possession with Intent to Deliver a Controlled Substance |
| 1312234 | Aug. 18, 2011 | Zackery Lee Hayes | Aggravated Robbery – Deadly Weapon |
| 1316787 | Aug. 18, 2011 | Daniel Martinez | Assault of Family Member Second Offender and Impeding Breathing |
| 1316848 | Aug. 18, 2011 | William Griffin | Assault of Family Member – Impeding Breathing |
| 1316826 | Aug. 18, 2011 | Jeremy Michael Gonzalez | Possession of Marihuana |
| 1316603 | Aug. 18, 2011 | Kayla Michelle Matthews | Harassments of Public Servant |
| 1309558 | Aug. 18, 2011 | Gloria Torres | Aggregated Assault |
| 1283183 | Aug. 19, 2011 | Charles Chilcutt | Theft |
| 1316985 | Aug. 19, 2011 | Tamisha Renee Jones | Delivery of Marihuana |
| 1316953 | Aug. 19, 2011 | Christopher R. Rhodes | Assault – Family Violence – 2nd Offender |
| 1317205 | Aug. 22, 2011 | Kim Anthony Williams | Possession with Intent to Deliver a Controlled Substance |
| 1315485 | Aug. 25, 2011 | Dominic Rendon | Aggravated Robbery – Over 65 or Disable |
| 1304788 | Aug. 25, 2011 | Curtis Pugh | Aggravated Assault – Family Member |
| 1308710 | Sept. 1, 2011 | Colton Lavoire Harris | Burglary of habitation |
| 1318466 | Sept. 1, 2011 | Zacorrieon Tjontrae Nauling | Aggravated Robbery – Deadly Weapon |
| 1318985 | Sept. 6, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |

131

000160

| Case No. | Appt. Date | Defendant | Charge |
|----------|------------|-----------|--------|
| 1313906 | Sept. 6, 2011 | Pete Ramos | Aggravated Robbery – Deadly Weapon |
| 1319096 | Sept. 7, 2011 | Stacy Demon Williams | Assault of Family Member Second Offender and Impeding Breathing |
| 1319138 | Sept. 8, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1305537 | Sept. 9, 2011 | Adolfo Martinez | Burglary with Intent to Commit Theft |
| 1319282 | Sept. 9, 2011 | Desmon Wayne Preston | Aggravated Robbery – Deadly Weapon |
| 1304487 | Sept. 9, 2011 | Adolfo Martinez | Theft |
| 1319301 | Sept. 9, 2011 | Adolfo Martinez | Theft – Third Offender |
| 1319241 | Sept. 9, 2011 | Alexander Scott | Aggravated Assault |
| 1318986 | Sept. 9, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1319441 | Sept. 12, 2011 | Valentina Rebecca Gonzales | Possession of a Controlled Substance |
| 1319596 | Sept. 12, 2011 | James Price Fagan | Driving While Intoxicated |
| 1319827 | Sept. 14, 2011 | Adrian Uriostigue | Burglary of habitation |
| 1319804 | Sept. 14, 2011 | Aaron Davon Kossie | Violation of Protective Order – Family Violence |
| 1320647 | Sept. 21, 2011 | Patrice Annette Breeler | Theft – Third Offender |
| 1320627 | Sept. 21, 2011 | Manuel S. Garcia | Assault – Family Violence – 2nd Offender |
| 1320744 | Sept. 22, 2011 | Roy Charles Findley | Burglary of habitation |
| 1319149 | Sept. 30, 2011 | Damien Deshone Jones | Aggravated Robbery – Deadly Weapon |
| 1318694 | Sept. 30, 2011 | Zacorrien Jhontrae Nauling | Aggravated Robbery – Deadly Weapon |

000161

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1320838 | Oct. 3, 2011 | Kenneth Gradnigo | Aggravated Robbery – Deadly Weapon |
| 1321919 | Oct. 3, 2011 | Kyle Yamcey McWhorter | Injury to Elderly Individual |
| 1322105 | Oct. 3, 2011 | Kenneth Davonne Grandnigo | Evading Arrest or Detention – Second Offender |
| 1322034 | Oct. 3, 2011 | Robert Edward Byrd | Theft – Third Offender |
| 1317118 | Oct. 4, 2011 | Walter J. Gamble | Unauthorized use of a vehicle |
| 1320820 | Oct. 4, 2011 | Adam Wade Buchanan | Prohibited Weapons |
| 1322239 | Oct. 4, 2011 | Kyle Yamcey McWhorter | Burglary with Intent to Commit Theft |
| 1322236 | Oct. 4, 2011 | Alaniz Arturo Espinoza | Possession of a Controlled Substance |
| 1322212 | Oct. 5, 2011 | Jvarro Young | Assault – Family Violence – 2nd Offender |
| 1322415 | Oct. 6, 2011 | Terell D. Jones | Possession of a Controlled Substance |
| 1322453 | Oct. 6, 2011 | Jose Mendoza | Possession of a Controlled Substance |
| 1316148 | Oct. 7, 2011 | Nicholas Ray Bosley | Forgery |
| 1321806 | Oct. 7, 2011 | Ketrick Demonta White | Burglary of a habitation |
| 1322502 | Oct. 7, 2011 | Stefen Kennedy | Theft of Firearm |
| 1322501 | Oct. 7, 2011 | Stefen Kennedy | Aggravated Robbery – Deadly Weapon |
| 1322586 | Oct. 7, 2011 | Elbridge Brown | Delivery of a Controlled Substance |
| 1322568 | Oct. 7, 2011 | Mammie Lakeysha Nelson | Prostitution |
| 1297587 | Oct. 11, 2011 | Desmond Wayne Preston | Robbery |

133

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1322591 | Oct. 14, 2011 | Anita Diamond Washington | Injury to Child – Omission |
| 1315900 | Oct. 24, 2011 | Stephanie Ann Kaiser | Theft by Check |
| 1325912 | Nov. 7, 2011 | Jamal Molizone | Aggravated Assault – Family Member |
| 1326108 | Nov. 7, 2011 | Clifford Jones | Aggravated Assault |
| 1316831 | Nov. 8, 2011 | John V. Danna | Assault – Family Violence – 2nd Offender |
| 1326363 | Nov. 10, 2011 | Thanh Kim Hoang | Aggravated Robbery – Deadly Weapon |
| 1327392 | Nov. 18, 2011 | Frank Kenneth Burnett | Possession of a Controlled Substance |
| 1327299 | Nov. 18, 2011 | Pete Ramos | Burglary of a habitation |
| 1327734 | Nov. 21, 2011 | Angelica Lee Serrano | Murder |
| 1324880 | Nov. 21, 2011 | Charles Douglas Garbow Jr. | Aggravated Robbery – Deadly Weapon |
| 1324881 | Nov. 21, 2011 | Charles Douglas Garbow Jr. | Tampering/Fabricating Physical Evidence |
| 1329482 | Dec. 9, 2011 | Selina Ruby Dominguez | Burglary of a habitation |
| 1329698 | Dec. 12, 2011 | Chezare Rivers | Possession with Intent to Deliver a Controlled Substance |
| 1329463 | Dec. 19, 2011 | Casey Albert Smith | Aggravated Assault |
| 1330357 | Dec. 19, 2011 | Viola Robles | Burglary of a habitation |
| 1330238 | Dec. 19, 2011 | Desmon Wayne Preston | Aggravated Robbery – Deadly Weapon |
| 1330156 | Jan. 9, 2012 | Selina Ruby Dominguez | Burglary of a habitation |
| 1333822 | Jan. 23, 2012 | Ashley Lanerica Jackson | Burglary of a habitation |
| 1334082 | Jan. 23, 2012 | Jose Sorto | Driving While Intoxicated |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1334143 | Jan. 23, 2012 | Nathan Lee Shelton | Aggravated Assault |
| 1333840 | Jan. 23, 2012 | Brian Anthony Pendarvis | Burglary of a habitation |
| 1333885 | Jan. 23, 2012 | Joshua William Anderson | Controlled Substance Fraud – Prescription |
| 1332389 | Jan. 23, 2012 | Joshua William Anderson | Possession with Intent to Deliver a Controlled Substance |
| 1326314 | Jan. 24, 2012 | Melvin Glens Black | Possession of a Controlled Substance |
| 1329804 | Jan. 24, 2012 | Glinda Gail Bustaman | Injury to Child |
| 1334238 | Jan. 24, 2012 | Ronnie Antonio Jordan | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1334208 | Jan. 24, 2012 | Mark Johnson | Possession of a Controlled Substance |
| 1310478 | Jan. 24, 2012 | Brandon Bridges | Aggravated Robbery – Deadly Weapon |
| 1310225 | Jan. 24, 2012 | Brandon Joseph Bridges | Aggravated Robbery – Deadly Weapon |
| 1308369 | Jan. 24, 2012 | Brandon Joseph Bridges | Unauthorized Use of a Vehicle |
| 1334334 | Jan. 25, 2012 | Priscilla Lee Gonzalez | Theft – Third Offender |
| 1334435 | Jan. 26, 2012 | Adrian R. Jameson | Criminal Mischief |
| 1334354 | Jan. 26, 2012 | Ivory S. Delaney | Robbery |
| 1334370 | Jan. 26, 2012 | Christopher Laderrick Amos | Engaging in Organized Criminal Activity |
| 1334416 | Jan. 26, 2012 | Torrey Taylor | Aggravated Robbery – Deadly Weapon |
| 1293300 | Jan. 27, 2012 | Angela Geething | Robbery |
| 1334611 | Jan. 27, 2012 | Bruce Kevin Curry | Theft – Third Offender |

000164

| Case No. | Appt. Date | Defendant | Charge |
|----------|------------|-----------|--------|
| 1334592 | Jan. 27, 2012 | Chatham Hayes Summers | Theft of Metal |
| 1318215 | Jan. 27, 2012 | David Michael Cain | Driving While Intoxicated |
| 1299894 | Jan. 27, 2012 | Latosha Crawford | Theft $1,500-$20,000 (Food Stamps/Snap) |
| 1309773 | Feb. 1, 2012 | Jeremy Wayne Williams | Criminal Mischief |
| 1314000 | Feb. 1, 2012 | Jeremy Wayne Williams | Burglary of Habitation |
| 1318992 | Feb. 1, 2012 | Jeremy Williams | Evading Arrest or Detention – Second Offender |
| 1322789 | Feb. 6, 2012 | Christopher Barillas | Felon in Possession of Firearm |
| 1328640 | Feb. 6, 2012 | Walid Pervez | Driving While Intoxicated with Child Passenger |
| 1335869 | Feb. 6, 2012 | Xin Gu | Forgery – Government Instrument |
| 1335870 | Feb. 6, 2012 | Xin Gu | Theft – Aggregate |
| 1336016 | Feb. 6. 2012 | Yalobeth Levorn Jarra | Possession of a Controlled Substance |
| 1331220 | Feb. 6, 2012 | David Anthony Torreence | Possession of a Controlled Substance |
| 1336036 | Feb. 7, 2012 | Adam Daniel Martinez | Driving While Intoxicated |
| 1335983 | Feb. 7, 2012 | Christian Blair Pillow | Possession of a Controlled Substance |
| 1331011 | Feb. 8, 2012 | Oscar Perez | Injury to Child |
| 1336160 | Feb. 8, 2012 | Richard Allen Powell | Burglary of a motor vehicle |
| 1336271 | Feb. 9, 2012 | Muntaser Hazem Judeh | Possession with Intent to Deliver a Controlled Substance |

000165

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1336273 | Feb. 9, 2012 | Muntaser Hazem Judeh | Harassment of Public Servant |
| 1326527 | Feb. 9, 2012 | Muntaser Hazem Judeh | Aggravated Assault |
| 1296263 | Feb. 9, 2012 | Reginald Tyrone Hollins | Aggravated Robbery – Deadly Weapon |
| 1311807 | Feb. 9, 2012 | Carrington Taylor | Burglary with Intent to Commit Theft |
| 1335652 | Feb. 10, 2012 | Roy Alejos | Theft – Third Offender |
| 1336425 | Feb. 10, 2012 | Jason Andrew Burrow | Driving While Intoxicated |
| 1336461 | Feb. 10, 2012 | Cedric Brown | Aggravated Robbery – Deadly Weapon |
| 1336485 | Feb. 10, 2012 | Matthew Wade Brown | Driving While Intoxicated |
| 1298272 | Feb. 13, 2012 | Leroy D. Taylor | Possession of a Controlled Substance |
| 1336575 | Feb. 13, 2012 | Leroy Devonte Taylor | Burglary of a habitation and theft |
| 1308624 | Feb. 16, 2012 | Pete Fulgencio Ramos | Aggravated Robbery – Deadly Weapon |
| 1337289 | Feb. 17, 2012 | Ronald Glen Simon | Theft – Third Offender |
| 1324169 | Feb. 28, 2012 | Biance Chintel Lewis | Theft – Third Offender |
| 1339165 | March 5, 2012 | Robert Lee Busby | Retaliation |
| 1339164 | March 5, 2012 | Robert Lee Busby | Arson |
| 1339134 | March 5, 2012 | Mandy Lea Melder | Possession of a Controlled Substance |
| 1339699 | March 9, 2012 | Don Morris Washington | Possession of a Controlled Substance |
| 1338227 | March 14, 2012 | Cedric Brown | Burglary of a habitation |
| 1340642 | March 19, 2012 | Muntaser Hazem Judeh | Assault |

137

000166

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1341053 | March 26, 2012 | James Benton Thomas | Aggravated Assault – Family Member |
| 1341866 | March 30, 2012 | James Thomas | Violation of Protective Order – Family Violence |
| 1340574 | March 30, 2012 | William Hernandez | Engaging in Organized Criminal Activity |
| 1342143 | April 2, 2012 | Chesare Denontrae Rivers | Aggravated Assault |
| 1343079 | April 10, 2012 | Amy Lynn Catlett | Robbery |
| 1343774 | April 16, 2012 | Antonio Arturo Herdandez | Possession with Intent to Deliver a Controlled Substance |
| 1344007 | April 16, 2012 | William Chambers | Possession of a Controlled Substance |
| 1343898 | April 17, 2012 | Joshua Cole | Possession of a Controlled Substance |
| 1344184 | April 18, 2012 | Cuong Khanh Nguyen | Theft – Third Offender |
| 1344216 | April 18, 2012 | Vicente Aguilar, Jr | Engaging in Organized Criminal Activity – Participate in Combination |
| 1344379 | April 19, 2012 | Gernette Toran | Prostitution |
| 1344471 | April 20, 2012 | Travone Desean Harris | Evading Arrest or Detention – Second Offender |
| 1342022 | April 20, 2012 | Reginald Hollins | Aggravated Robbery – Deadly Weapon |
| 1346763 | May 9, 2012 | Carlos Garcia | Aggravated Robbery – Deadly Weapon |
| 1347592 | May 16, 2012 | Ashton Vincent Craven | Murder |
| 1343569 | May 21, 2012 | Justin Joseph Morris | Failure To Comply With Sex Registration Requirements |

000167

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1348020 | May 21, 2012 | Clinton Blount | Delivery of a Controlled Substance |
| 1348240 | May 22, 2012 | Brannon Kirk Chappel | Robbery |
| 1348285 | May 22, 2012 | Erick Charles Erminger | Murder |
| 1348948 | May 29, 2012 | Roman Nathan Lazo | Assault of Family Member Second Offender and Impeding Breathing |
| 1348949 | May 29, 2012 | Roman Nathan Lazo | Violation of Protective Order – Family Violence |
| 1348606 | May 29, 2012 | Daniel Velasco | Burglary of a habitation |
| 1347677 | May 29, 2012 | Jeremy Wayne Williams | Assault of a Family Member |
| 1349326 | May 31, 2012 | Ozzie Walker | Theft – Third Offender |
| 1347104 | May 31, 2012 | Laura Eileen Holloway | Theft – Third Offender |
| 1349385 | June 1, 2012 | Jairo Umanzor | Murder |
| 1349399 | June 1, 2012 | Robert Earl Garner | Burglary of a habitation |
| 1322060 | June 4, 2012 | Amber Rae Silver | Possession with Intent to Deliver a Controlled Substance |
| 1349735 | June 4, 2012 | Amber R. Silver | Robbery |
| 1349736 | June 4, 2012 | Amber R. Silver | Possession of a Controlled Substance |
| 1349502 | June 4, 2012 | Rhiannon Michelle Hendon | Attempted Arson |
| 1832776 | June 11, 2012 | Michael William Resnick | Possession of Controlled Substance (M) |
| 1321171 | June 11, 2012 | Justin McGee | Aggravated Robbery – Deadly Weapon |
| 1321172 | June 11, 2012 | Justin McGee | Aggravated Kidnapping |

000168

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1350329 | June 18, 2012 | Clifford Jones | Aggravated Assault with Deadly Weapon |
| 1351322 | June 18, 2012 | Edward Montemayor | Possession with Intent to Deliver a Controlled Substance |
| 1351306 | June 18, 2012 | Edward Montemayor | Murder |
| 1351510 | June 20, 2012 | Joseph Earl Marshall | Murder |
| 1352143 | June 25, 2012 | Juan Jucro Penaluer | Aggravated Robbery – Deadly Weapon |
| 1345586 | June 25, 2012 | Jose Fierros | Unauthorized use of a vehicle |
| 1352328 | June 28, 2012 | Johntrell Anderson Gable | Attempted Burglary of a Habitation |
| 1352329 | June 28, 2012 | Johntrell Anderson Gable | Felon in Possession of Firearm |
| 1353062 | July 5, 2012 | Toni Tavarez | Injury to Child |
| 1353471 | July 9, 2012 | Rory Darnell Jones | Felon in Possession of Firearm |
| 1353155 | July 9, 2012 | Rory Darnell Jones | Aggravated Assault |
| 1353392 | July 9, 2012 | Daniel Ward | Aggravated Robbery – Deadly Weapon |
| 1355800 | July 30, 2012 | Clinton Christopher Graham | Aggravated Robbery – Deadly Weapon |
| 1355874 | July 30, 2012 | Lalo Erick Garza | Robbery |
| 1355648 | July 30, 2012 | Kevin J. Carr | Delivery of a Controlled Substance |
| 1355649 | July 30, 2012 | Kevin J. Carr | Delivery of a Controlled Substance |
| 1355928 | July 31, 2012 | Paula Mendez | Prostitution |
| 1355818 | July 31, 2012 | Ronald Dean Jacksich | Impersonating a Public Servant |

000169

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1350774 | July 31, 2012 | Jerry Wayne Adaway | Failure to Comply with Sex Registration Requirements |
| 1329885 | July 31, 2012 | Saul Melesio, Jr. | Assault – Family Violence – 2nd Offender |
| 1356046 | Aug. 1, 2012 | John Earl Jackson | Possession of a Controlled Substance |
| 1356023 | Aug. 1, 2012 | Jerrell Bell | Felon in Possession of Firearm |
| 1354901 | Aug. 1, 2012 | Rickey Stewart | Assault of Family Member Second Offender and Impeding Breathing |
| 1356193 | Aug. 2, 2012 | Russell Ray Delaune | Theft of Metal |
| 1356136 | Aug. 2, 2012 | Ramon Lopez Elizarraraz Jr | Possession of a Controlled Substance |
| 1355976 | Aug. 2, 2012 | Jose Ruben Perez | Reckless Injury to Child |
| 1355977 | Aug. 2, 2012 | Jose Ruben Perez | Injury Child under 15/B Injury |
| 1355358 | Aug. 2, 2012 | Nestor Dizan Wong | Forgery – Commercial Instrument |
| 1324977 | Aug. 3, 2012 | Jerome Lige | Assault of Family Member – Impeding Breathing |
| 1356244 | Aug. 3, 2012 | Vicki Lynn Kintz | Possession of a Controlled Substance |
| 1356062 | Aug. 3, 2012 | Carl Alexander Turner | Failure to Comply with Sex Offender Registration |
| 1357324 | Aug. 13, 2012 | Andrew Lee Ratcliff | Felon in Possession of Firearm |
| 1358058 | Aug. 20, 2012 | Cesar Martinez | Felon in Possession of Firearm |
| 1358059 | Aug. 20, 2012 | Cesar Martinez | Burglary of a habitation |
| 1358060 | Aug. 20, 2012 | Cesar Martinez | Burglary of a habitation |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1357992 | Aug. 20, 2012 | Arthur Collins | Possession of a Controlled Substance |
| 1358372 | Aug. 22, 2012 | Velma Wiley | Driving While Intoxicated |
| 1358247 | Aug. 22, 2012 | John Gates | Possession with Intent to Deliver a Controlled Substance |
| 1358604 | Aug. 27, 2012 | Delvin Lamar Williams | Aggravated Robbery – Deadly Weapon |
| 1358766 | Aug. 27, 2012 | Ashley Dawn Robinson | Aggravated Assault |
| 1358854 | Aug. 27, 2012 | Jason Lee Road | Aggravated Assault |
| 1358987 | Aug. 28, 2012 | Matthew Ward Albritton | Injury to Child |
| 1358904 | Aug. 28, 2012 | Shadarick Bruce Joseph | Theft – Third Offender |
| 1358936 | Aug. 28, 2012 | Bobby Ray Short | Possession of a Controlled Substance |
| 1358937 | Aug. 28, 2012 | Bobby Ray Short | Tampering/Fabricating Physical Evidence |
| 1352456 | Aug. 28, 2012 | Emily Nichole Medina | Burglary of a building |
| 1351678 | Aug. 28, 2012 | Emily Nichole Medina | Theft of Firearm |
| 1352466 | Aug. 28, 2012 | Victor Manuel Fuentes | Aggravated Robbery – Deadly Weapon |
| 1352467 | Aug. 28, 2012 | Victor Manuel Fuentes | Aggravated Robbery – Deadly Weapon |
| 1359029 | Aug. 29, 2012 | Rolando Tomas Mendez | Injury to Child |
| 1359137 | Aug. 29, 2012 | Elizabeth Ann Esparza | Delivery Simulated Controlled Substance |
| 1359102 | Aug. 29, 2012 | Donald Ray Johnson | Possession of a Controlled Substance |
| 1359224 | Aug. 30, 2012 | Diane Johnson | Theft – Third Offender |

| Case No. | Appt. Date | Defendant | Charge |
|----------|------------|-----------|--------|
| 1359257 | Aug. 31, 2012 | Franklin Jamile Randle | Forgery – Commercial Instrument |
| 1359303 | Aug. 31, 2012 | Darius Yohaunce Moore | Assault |
| 1359304 | Aug. 31, 2012 | Darius Yohaunce Moore | Possession with Intent to Deliver a Controlled Substance |
| 1359305 | Aug. 31, 2012 | Darius Yohaunce Moore | Evading Arrest or Detention – Second Offender |
| 1359451 | Sept. 4, 2012 | Jose Fraga | Theft – Third Offender |
| 1354008 | Sept. 4, 2012 | Jose Fraga Jr | Aggravated Robbery – Deadly Weapon |
| 1359806 | Sept. 4, 2012 | Alfonso Bosquez | Assault – Family Violence – 2nd Offender |
| 1360026 | Sept. 6, 2012 | Otis Lee Thompson | Aggravated Assault |
| 1359693 | Sept. 6, 2012 | Harold Dewayne Bradley | Aggravated Assault – Family Member |
| 1360704 | Sept. 14, 2012 | William Joseph Bernard | Theft |
| 1336674 | Sept. 14, 2012 | Kenneth Arthur | Felon in Possession of Firearm |
| 1333489 | Sept. 14, 2012 | Kenneth Junior Arthur | Tampering/Fabricating Physical Evidence |
| 1354559 | Sept. 15, 2012 | James Thomas | Violation of Protective Order |
| 1360537 | Sept. 17, 2012 | Jorden Marquis Thompson | Assault of Family Member – Impeding Breathing |
| 1360903 | Sept. 17, 2012 | Joshua Deandre Jones | Theft |
| 1360904 | Sept. 17, 2012 | Joshua Deandre Jones | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |

000172

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1353410 | Sept. 17, 2012 | Tryone Lee Brown | Aggravated Robbery |
| 1281978 | Sept. 19, 2012 | Ramiro Ruiz | Theft |
| 1361521 | Sept. 19, 2012 | Rory Keith Chenier | Delivery of a Controlled Substance |
| 1361522 | Sept. 19, 2012 | Rory Keith Chenier | Possession with Intent to Deliver a Controlled Substance |
| 1361249 | Sept. 19, 2012 | Matthew Wadsworth | Burglary with Intent to Commit Theft |
| 1361250 | Sept. 19, 2012 | Matthew Wadsworth | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1361251 | Sept. 19, 2012 | Matthew Wadsworth | Theft |
| 1361675 | Sept. 20, 2012 | Leonard Flowers | Theft of Metal |
| 1361588 | Sept. 20, 2012 | Joseph Norman Payne | Possession of Dangerous Drug |
| 1359426 | Sept. 20, 2012 | Dave Vu Mai, II | Burglary of a habitation |
| 1343978 | Sept. 21, 2012 | Stephen Lucas | Theft – Third Offender |
| 1291817 | Sept. 21, 2012 | Pedro Ernesto Umana | Aggravated Robbery – Deadly Weapon |
| 1361414 | Sept. 21, 2012 | Joe Villarreal | Assault – Family Violence – 2nd Offender |
| 1361437 | Sept. 21, 2012 | Harold Bruise Lackey | Controlled Substance – Fraud – Fraudulent Acquisition of Controlled Substance – Section 481.129(a-1), Health and Safety Code |
| 1362480 | Sept. 27, 2012 | Cesar Alejandro Martinez | Burglary of a habitation |
| 1362630 | Oct. 1, 2012 | Joseph Wayne General | Possession of a Controlled Substance |
| 1362631 | Oct. 1, 2012 | Joseph Wayne General | Possession of a Controlled Substance |

000173

| Case No. | Appt. Date | Defendant | Charge |
|----------|------------|-----------|--------|
| 1362799 | Oct. 1, 2012 | Rachael Channelle Scott | Prostitution |
| 1362945 | Oct. 1, 2012 | Marvis Dominick Collins | Evading Arrest or Detention – Second Offender |
| 1335545 | Oct. 2, 2012 | Christopher J Simpson | Aggravated Assault |
| 1335546 | Oct. 2, 2012 | Christopher J Simpson | Possession of a Controlled Substance |
| 1362557 | Oct. 2, 2012 | Michael Dejean Simmons | Aggravated Assault |
| 1363054 | Oct. 2, 2012 | Ruben Dioniso Stergiou | Possession of a Controlled Substance |
| 1363127 | Oct. 3, 2012 | Carl William Woolery | Aggravated Assault |
| 1357004 | Oct. 3, 2012 | Marvin E Robinson | Aggravated Assault – Family Member |
| 1356608 | Oct. 3, 2012 | Brodrick Lichris Green | Robbery |
| 1363149 | Oct. 4, 2012 | Jason Andrew Furrer | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1363183 | Oct. 4, 2012 | Kale Traylor Forks | Possession of a Controlled Substance |
| 1356588 | Oct. 4, 2012 | Michael James Baker | Theft |
| 1363199 | Oct. 5, 2012 | Samuel Placencia | Aggravated Robbery – Deadly Weapon |
| 1363312 | Oct. 5, 2012 | Steven Davila | Aggravated Assault – Family Member |
| 1363313 | Oct. 5, 2012 | Steven Davila | Violation of Protective Order – Family Member |
| 1354485 | Oct. 5, 2012 | Steven Davila | Aggravated Assault – Family Member |

000174

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1363399 | Oct. 7, 2012 | Fred Michael Anderson | Possession of a Controlled Substance |
| 1363854 | Oct. 7, 2012 | James Ronald Coleman | Possession of a Controlled Substance |
| 1363776 | Oct. 8, 2012 | Lloyd Dewayne Gilbert | Robbery |
| 1363548 | Oct. 8, 2012 | Kelby Swinney | Aggravated Assault |
| 1293965 | Oct. 9, 2012 | Daniel Palacios | Cruelty to livestock animals |
| 1362093 | Oct. 9, 2012 | Markus Dwayne Butler | Possession with Intent to Deliver a Controlled Substance |
| 1364009 | Oct. 11, 2012 | Terry Lee Bagley | Aggravated Assault |
| 1364147 | Oct. 11, 2012 | Christopher Pyse | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1363898 | Oct. 12, 2012 | Jesus Arturo Ventura | Assault – Family Member – 2nd Offender |
| 1364277 | Oct. 12, 2012 | Brandon Lamont Fisher | Possession with Intent to Deliver a Controlled Substance |
| 1365885 | Oct. 31, 2012 | Kelby Swinney | Criminal Mischief |
| 1368826 | Nov. 26, 2012 | Leonel Morillo | Aggravated Assault |
| 1368810 | Nov. 26, 2012 | Dennis Leon Sharp | Robbery |
| 1368690 | Dec. 4, 2012 | Neil Jay Mukherjee | Aggravated Robbery – Deadly Weapon |
| 1367889 | Dec. 6, 2012 | Charles Dixon Moore | Possession with Intent to Deliver a Controlled Substance |
| 1323357 | Dec. 10, 2012 | Edwin James Brooks Jr. | Burglary of a habitation |
| 1370354 | Dec. 10, 2012 | Rodney L. Smith | Aggravated Assault – Family Member |
| 1370355 | Dec. 10, 2012 | Rodney L. Smith | Burglary – Habitation |

146

000175

| Case No. | Appt. Date | Defendant | Charge |
|----------|------------|-----------|--------|
| 1370428 | Dec. 10, 2012 | Jameisha Elainne Kennon | Theft |
| 1370530 | Dec. 10, 2012 | David Yates | Assault – Family Violence – 2nd Offender |
| 1370446 | Dec. 10, 2012 | Anthony John Kaczmarek | Possession of a Controlled Substance |
| 1370070 | Dec. 10, 2012 | Willie Walker | Possession of a Controlled Substance |
| 1370164 | Dec. 10, 2012 | Leonard Gregory | Possession of a Controlled Substance |
| 1366319 | Dec. 10, 2012 | Matthew Vincent Woodard | Aggravated Assault |
| 1311799 | Dec. 10, 2012 | Edwin James Brooks | Theft |
| 1311351 | Dec. 10, 2012 | Edwin Brooks | Burglary of a habitation |
| 1300048 | Dec. 10, 2012 | Edwin Brooks | Burglary of a habitation |
| 1366366 | Dec. 11, 2012 | Rashawn Demond Ross | Theft |
| 1370550 | Dec. 11, 2012 | Kendrick Tamara Mable | Robbery |
| 1370569 | Dec. 11, 2012 | Patricia Martinez | Theft – Third Offender |
| 1369735 | Dec. 11, 2012 | Tyler Kent Wright | Unauthorized use of a vehicle |
| 1370109 | Dec. 12, 2012 | Ricky Pittman | Burglary of a habitation |
| 1370032 | Dec. 12, 2012 | Willie Darries | Possession of a Controlled Substance |
| 1369719 | Dec. 12, 2012 | Antonio Manuel Flores | Assault – Family Violence – 2nd Offender |
| 1367796 | Dec. 12, 2012 | Lindsey Rene Lindquist | Theft – Third Offender |
| 1356096 | Dec. 12, 2012 | Mikesha Matthews | Unauthorized use of a vehicle |
| 1370760 | Dec. 13, 2012 | Christina McCardell | Assault |

147

000176

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1357349 | Dec. 14, 2012 | Barron Keith Williams | Assault of Family Member – Impeding Breathing |
| 1370972 | Dec. 14, 2012 | Jose Tereso Salazar | Assault of Family Member – Impeding Breathing |
| 1370940 | Dec. 14, 2012 | Antonio Bermudez | Aggravated Assault – Family Member |
| 1370896 | Dec. 15, 2012 | Miguel Angel Rios | Possession with Intent to Deliver a Controlled Substance |
| 1368157 | Dec. 15, 2012 | Binh Lam | Possession of a Controlled Substance |
| 1317189 | Dec. 15, 2012 | Laverne M. Brown | Stalking |
| 1370642 | Dec. 17, 2012 | Nathan Patrick Carlisle | Aggravated Assault – Family Member |
| 1371052 | Dec. 17, 2012 | Clarence Alvin Hill | Felon in Possession of Firearm |
| 1371051 | Dec. 17, 2012 | Clarence Alvin Hill | Possession of a Controlled Substance |
| 1371291 | Dec. 17, 2012 | Grady Clyde Nelson | Robbery |
| 1370925 | Dec. 17, 2012 | Jerrell Bell | Aggravated Robbery – Deadly Weapon |
| 1367505 | Dec. 18, 2012 | Korey Donnell Anderson | Aggravated Assault – Family Member |
| 1371354 | Dec. 18, 2012 | Vance Edward Vanhowten | Theft – Third Offender |
| 1371312 | Dec. 18, 2012 | Katrina Rashawn Ben | Aggravated Assault – Family Member |
| 1359876 | Dec. 18, 2012 | Michael Anthony Davila | Aggravated Assault – Family Member |
| 1335856 | Dec. 19, 2012 | Keith Leonard Townsend | Injury to an Elderly Individual |
| 1371404 | Dec. 19, 2012 | Byron White | Assault Family Member Impeding Breathing |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1298678 | Dec. 19, 2012 | Gil Moises Escoto | Robbery |
| 1371561 | Dec. 20, 2012 | Vance Edward Vanhowten | Theft – Third Offender |
| 1371537 | Dec. 20, 2012 | Brandon Garcia | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1369162 | Dec. 21, 2012 | John Mora III | Illegal Dumping |
| 1371686 | Dec. 21, 2012 | Gregory Oneal Jenkins | Possession of a Controlled Substance |
| 1371264 | Dec. 21, 2012 | John Anderson | Theft – Third Offender |
| 1371628 | Dec. 21, 2012 | Judy Lucille Hambrick | Theft of Firearm |
| 1369814 | Dec. 21, 2012 | Carla Denise Jackson | Theft |
| 1374729 | Jan. 24, 2013 | Jonathan Jerome Brooks | Unauthorized Use of a Vehicle |
| 1341148 | Feb. 12, 2013 | Kevin Jamon Johnson | Aggravated Robbery – Deadly Weapon |
| 1377762 | Feb. 19, 2013 | Erric Bernard Bailey | Possession with Intent to Deliver a Controlled Substance |
| 1380193 | March 11, 2013 | Marco Ivan Perez-De Los | Arson |
| 1380147 | March 11, 2013 | Rickie James Bradley | Attempted Aggravated Sexual Assault |
| 1379542 | March 13, 2013 | Marquiet A. Davis | Aggravated Robbery – Deadly Weapon |
| 1380441 | March 18, 2013 | Cindy Bogado | Assault – Family Violence – 2nd Offender |
| 1380810 | March 18, 2013 | Vicente Raul Lopez | Theft of Firearm |
| 1380877 | March 18, 2013 | Randy Dewayne Masters | Aggravated Robbery – Deadly Weapon |
| 1380858 | March 18, 2013 | Cindy Bogado | Assault – Family Violence – 2nd Offender |

000178

| Case No. | Appt. Date | Defendant | Charge |
|----------|-----------|-----------|--------|
| 1381025 | March 19, 2013 | Keenan Shawn Houston | Possession of a Controlled Substance |
| 1369694 | March 19, 2013 | Antonio Gonzales | Possession of a Controlled Substance |
| 1381003 | March 20, 2013 | Brian E. Crouch | Evading Arrest or Detention – Second Offender |
| 1381092 | March 20, 2013 | Frederick Addison | Possession with Intent to Deliver a Controlled Substance |
| 1381171 | March 21, 2013 | Erik Lee Sharp | Burglary of habitation |
| 1381250 | March 21, 2013 | Joe Anthony Fisher | Aggravated Assault – Family Member |
| 1369498 | March 21, 2013 | Erik Lee Sharp | Burglary of habitation |
| 1310116 | March 21, 2013 | Debbie Rae Sherman | Possession of a Controlled Substance |
| 1381376 | March 22, 2013 | Derek Wayne Hemingway | Forgery – Commercial Instrument |
| 1381377 | March 22, 2013 | Derek Wayne Hemingway | Theft |
| 1381335 | March 22, 2013 | Susan Marie Perdomo | Fraudulent use of identifying information |
| 1380485 | March 22, 2013 | William Kaiser | Possession of a Controlled Substance |
| 1383003 | April 8, 2013 | Joseph Wyatt | Assault of Family Member – Impeding Breathing |
| 1382963 | April 8, 2013 | Gunter Nicola | Assault of Family Member – Impeding Breathing |
| 1356874 | April 11, 2013 | Javed Stephen Tafarroji | Burglary of a habitation |
| 1361294 | April 11, 2013 | Javed Stephen Tafarroji | Evading Arrest or Detention – Motor |

000179

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| | | | Vehicle, Watercraft, or Tire Deflation Device |
| 1361295 | April 11, 2013 | Javed Stephen Tafarroji | Unauthorized use of a vehicle |
| 1350164 | April 11, 2013 | Rhonda Denise Sparks | Aggravated Assault |
| 1384132 | April 15, 2013 | Matthew James Hurlock | Harassment to Public Servant |
| 1338908 | April 17, 2013 | Marquiet Antonio Davis | Possession of a Controlled Substance |
| 1376715 | April 19, 2013 | Keith Winston | Burglary of a habitation |
| 1339892 | April 19, 2013 | Michael Slaughter | Kidnapping |
| 1381191 | April 24, 2013 | Randy Allen Segura | Aggravated Assault |
| 1385115 | April 25, 2013 | Derrick Jones | Aggravated Robbery – Deadly Weapon |
| 1385755 | April 29, 2013 | Tristin Terril Williams | Felon in Possession of Firearm |
| 1385712 | April 29, 2013 | Erick Dewayne Lee | Theft |
| 1385713 | April 29, 2013 | Erick Dewayne Lee | Evading Arrest or Detention – Motor Vehicle, Watercraft, or Tire Deflation Device |
| 1385612 | April 29, 2013 | Bernard J. Serrano | Retaliation |
| 1385474 | April 29, 2013 | Ronald Wayne Degrate Jr. | Aggravated Assault – Family Member |
| 1385493 | April 29, 2013 | Hector Mario Gonzalez | Possession with Intent to Deliver a Controlled Substance |
| 1385494 | April 29, 2013 | Nichole Lynn Walko | Possession with Intent to Deliver a Controlled Substance |
| 1385567 | April 29, 2013 | Bernardo Alvarez Serrano | Burglary of a habitation |

151

000180

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| 1385412 | April 29, 2013 | Carl Anthony Bowman | Controlled Substance Fraud – Prescription |
| 1325973 | April 30, 2013 | Mister Eliakim Thomas | Burglary of a habitation |
| 1370501 | April 30, 2013 | Adam Valentine Castro | Burglary of a habitation |
| 1352665 | April 30, 2013 | Kristin Louise Bunch | Possession of a Controlled Substance |
| 1385785 | May 1, 2013 | Kevin Mark Arvay | Driving While Intoxicated |
| 1385786 | May 1, 2013 | Kevin Mark Arvay | Possession of a Controlled Substance |
| 1288489 | May 1, 2013 | Oscar Daniel Ponce | Evading Arrest |
| 1385820 | May 1, 2013 | Gregory Stevenson | Burglary with Intent to Commit Theft |
| 1336563 | May 1, 2013 | Tuan Anh Nguyen | Possession of Marihuana |
| 1339977 | May 2, 2013 | Jesus Angel Chavira | Aggravated Assault |
| 1386001 | May 2, 2013 | Treon Rashard Pruitt | Evading Arrest or Detention – Motor Vehicle |
| 1386002 | May 2, 2013 | Treon Rashard Pruitt | Tampering/Fabricating Physical Evidence |
| 1386003 | May 2, 2013 | Treon Rashard Pruitt | Possession of a Controlled Substance |
| 1385960 | May 2, 2013 | Randy Deshun Lindsey | Aggravated Assault – Family Member |
| 1386924 | May 10, 2013 | Michael Gregory Ceaser, Sr | Engaging in Organized Criminal Activities – Participation in Combination |
| 1386930 | May 10, 2013 | Michael Gregory Ceaser, Sr | Engaging in Organized Criminal Activities – |

| Case No. | Appt. Date | Defendant | Charge |
|---|---|---|---|
| | | | Participation in Combination |
| 1386049 | May 22, 2013 | Gregory Lynn Stevenson | Aggravated Robbery – Deadly Weapon |
| 1387502 | May 23, 2013 | Randy Allen Segura | Assault |
| 1389758 | June 25, 2013 | Keith Aundre Wright | Robbery |
| 1390561 | June 26, 2013 | Cindy Nahir Bogado | Assault – Contract Jail or Detention Facility Employee |
| 1394065 | July 11, 2013 | Muntaser Hazem Jedeh | Aggravated Assault – Family Member |
| 1387261 | July 11, 2013 | Muntaser Hazem Jedeh | Possession with Intent to Deliver a Controlled Substance |
| 1336272 | July 11, 2013 | Muntaser Hazem Jedeh | Possession with Intent to Deliver a Controlled Substance |
| 1395226 | July 22, 2013 | Adrian Roshard Jones | Possession of a Controlled Substance |
| 1395476 | July 26, 2013 | Susan Morris | Aggravated Assault |

**5.    From jury selection through the punishment phase of Cruz-Garcia's trial, Cornelius spent extraordinary amounts of time working on other cases.**

As set forth above in § VI.A.2.a, an attorney's excessive workload can have devastating consequences for a client. For Cruz-Garcia, Cornelius's overwhelming caseload meant not only that Cornelius could not effectively prepare for Cruz-Garcia's trial, but also that Cornelius

000182

dedicated much of his time *during* Cruz-Garcia's death penalty trial to working on other cases.

Using the docket search function of Harris County District Clerk's website, Cruz-Garcia has obtained as many of Cornelius's billing records as he can for the time period from the start of jury selection in Cruz-Garcia's case (June 3, 2013) to sentencing (July 22, 2013). There is no central repository of billing records from this time period, nor was billing done electronically. Rather, Cornelius filled out handwritten time sheets and submitted them to the individual court where each case was venued, at least until around 2015, when an electronic billing system appears to have been implemented. Using the same handwritten form that Cornelius submitted, the courts would then approve or disapprove his fee request. As part of its digitization of criminal court records over the past several years, the Harris County District Clerk added the timesheets to the cases' online dockets.

These records can paint only a partial picture of Cornelius's workload around the time of Cruz-Garcia's trial. This method, however, has considerable limitations. Time sheets are missing for many of Cornelius's cases. The fee request for Johntay Gibson's capital murder

000183

case was filed under seal. And Cruz-Garcia's case was not the only one Cornelius handled on a flat-fee basis. He also sought and received $75,000.00 flat fees in the Jeffery Prevost and Curtis Adams cases. Ex. 128. As in Cruz-Garcia's case, Cornelius did not submit time sheets in either case. Because the below analysis can only reflect cases that Cruz-Garcia was able to identify and in which Cornelius submitted time sheets, it likely understates the amount of work Cornelius performed on other cases around the time of Cruz-Garcia's trial.

In Harris County, attorneys can either bill by the hour, by court appearance, or both. *See* Ex. 103. As indicated in Cornelius's billing records, the hourly rate for capital cases was $100.00/hr.[51] Ex. 7; 138. For felony cases, the hourly rates are $85.00/hr. for a first-degree felony, $60.00/hr. for a second-degree felony, and $40.00/hr. for a third-degree felony. Ex. 103.

When an attorney appears in court, however, he can claim a flat fee for that day. The court day fee for capital cases is $400.00. Ex. 103. For felony cases, the court day fees are $225.00 for a first-degree felony,

---

[51] By the time Cornelius sought payment in Neil Mukherjee's case, the rate appears to have increased to $150.00/hr. *Id.*

000184

$175.00 for a second-degree felony, and $125.00 for a third-degree felony. *Id.* Thus, the system roughly equates a court appearance with between 2.5 and 4 hours of work. Since 2010, attorneys may claim a maximum of four court day fees per day. When a client has multiple charges arising from different offense reports, the attorney may claim a separate court day for court appearances on behalf of the same client but for different charges. *Id.*

Even with limited accessibility to Cornelius's billing records, the records Cruz-Garcia was able to locate paint a disturbing picture. Jury selection in Cruz-Garcia's case started on June 3, 2013, and sentencing occurred on July 22, 2013. As described below and as set forth in Figure 3, Cornelius billed time to other cases *every day* Monday through Saturday, between June 3 and July 22, 2013. Indeed, with the exception of one day of jury deliberations when he billed half an hour and claimed a court day fee in another case, Cornelius billed at least **2.5 hours** to other cases *on each of those days during Cruz-Garcia's trial*. Cornelius did not "give priority" to Cruz-Garcia's case as required by Texas Guideline 9.3.B. Rather, he did exactly what the Texas and ABA

000185

Guidelines prohibition on flat fees is designed to prevent: he prioritized his hourly-billed cases to the detriment of Cruz-Garcia.

### a.   Jury selection.

Jury selection in Cruz-Garcia's case began on June 3, 2013, and lasted eleven days. As described below and as shown in Figure 3, Cornelius regularly worked substantial amounts of time on other cases throughout jury selection.

- On the first day of jury selection, for which the transcript runs **333 pages**,[52] Cornelius billed **7 hours** to other cases and claimed **a $225.00 court day fee** in another case.
- On the seventh day of jury selection, for which the transcript runs **262 pages**, Cornelius billed **7.75 hours** to other cases and claimed a **$125.00 court day fee** in another case.
- On the ninth day of jury selection, for which the transcript runs **237 pages**, Cornelius billed **8 hours** to other cases and claimed a **$225.00 court day fee** and a **$125.00 fee court day** for appearances in other cases.
- On the tenth day of jury selection, for which the transcript runs **292 pages**, Cornelius billed **6.5 hours** to other cases.
- On the Saturday after the second week of jury selection, Cornelius billed **5 hours** to other cases and claimed a **$125.00 court day fee**. (Cornelius likely misdated the court day fee.)
- On the final day of jury selection, for which the transcript runs **201 pages**, Cornelius billed **6 hours** on other cases.

---

[52] Transcript page counts do not include the index. Additionally, because Cruz-Garcia does not speak English, all the proceedings were translated into Spanish—except for the witnesses who testified in Spanish, whose testimony was translated into English.

000186

- In sum, over the **11 days of jury selection**, Cornelius:
  - billed at least **2.5 hours** on other cases on 10 days;
  - billed at least **3.25 hours** on other cases on 8 days;
  - billed at least **6 hours** on other cases on 5 five days; and
  - claimed **19 court day fees** in other cases, for a total of **$3,450.00**, just in flat fee court appearances.

### b.    The week of the evidentiary hearing.

Jury selection ended on Monday, June 17, 2013. On Wednesday June 19, the court held an evidentiary hearing on the defense's motion to exclude DNA evidence, a critically important pretrial motion. 16 RR; 17 RR. Yet, leading up to the evidentiary hearing and throughout the rest of that week, Cornelius spent substantial amounts of time working on other cases.

- On Tuesday, June 18 (the day before the evidentiary hearing), Cornelius billed **10 hours** to other cases.
- On the day of the evidentiary hearing, for which the transcript runs **122 pages**, Cornelius billed **5.5 hours** to other cases. He also claimed a **$400.00 court day fee** for an appearance day in a different capital murder case and **two $125.00 court day fees** for other cases.
- The day following the hearing, Cornelius billed **5.25 hours** in other cases, claimed another **$400.00 court day fee** for an appearance in yet another capital murder case, and claimed a **$225.00 court day fee** and a **$125.00 court day fee** in other cases.
- On Friday, June 21, Cornelius billed **7 hours** in other cases, claimed a **$400.00 court day fee** for an appearance in still yet another capital murder case, and claimed a **$225.00 court day fee** for an appearance in a different case.

000187

- The following Saturday, Cornelius billed **8.5 hours** to other cases.

    **c.    Two weeks before trial.**

In the penultimate week before trial, Cornelius continued to spend significant amounts of time on his other cases.

- On Monday, June 24, exactly two weeks before trial began, Cornelius billed **7 hours** to other cases and claimed a **$125.00 court day fee**.
- The next day, he billed **8 hours** to other cases and claimed one **$175.00 court day fee** for one case, and **three $125.00 court day fees** in other cases.
- On Wednesday, June 26, he billed **5 hours** to other cases and claimed **three $125.00 court day fees**.
- On Thursday, June 27, Cornelius billed **6.5 hours** to other cases and claimed a **$400.00 court day fee** for an appearance day in still yet another capital murder case.
- That Friday, he billed **7 hours** and claimed **two** $**175.00 court day fees**.
- On Saturday, June 29, Cornelius billed **5.5 hours** to other cases.

    **d.    The week before trial.**

The same pattern continued the week before opening arguments in Cruz-Garcia's case. Cornelius continued to dedicate extraordinary amounts of time to other cases, even on the eve of Cruz-Garcia's trial.

- Trial began on Monday, July 8, 2013.
- The Saturday before trial (July 6), Cornelius billed **8.5 hours** to other cases. (He also claimed a **$175.00 court day fee** the Sunday before trial, but that seems like it must be an error).

000188

- The Friday before trial (July 5), Cornelius billed **8.75 hours** other cases.
- The Thursday before trial was the Fourth of July holiday. Cornelius nonetheless billed **8 hours** to other cases.
- The Wednesday before trial, there was a second hearing on the Motion to Suppress DNA evidence in Cruz-Garcia's case. Cornelius billed **7.75 hours** to other cases.
- The Tuesday before trial, Cornelius billed **7.25 hours** to other cases, and claimed **three $225.00 court day fees** in other cases, plus a **$175.00 court day fee** for another case.
- On Monday, July 1, exactly one week before trial, Cornelius billed **9.55 hours** to other cases.

### e.  The guilt phase.

Trial began on July 8, 2013**.** The jury heard evidence from Monday, July 8, until Thursday, July 11. Closing arguments were to have occurred on July 12, but the parties disagreed about whether an accomplice charge should be included. The parties' submissions to the court on this point were not transcribed and do not appear in the clerk's record. Judge Magee issued a decision from the bench at around 4:45 p.m. on July 12. 22 RR 18. Closing arguments were pushed to the following Monday, July 15.

On each day that the jury heard evidence during the guilt phase, Cornelius billed at least **4 hours** to other cases. He also claimed **three $175.00 court day fees** in other cases, and a **$125.00 court day fee** in another case. Specifically:

000189

- On Monday, July 8, Cornelius billed **4 hours** to other cases.
- On Tuesday, July 9, Cornelius billed **5.5 hours** to other cases, and claimed **two $175.00 court day fees**.
- On Wednesday, July 10, Cornelius billed **4 hours** to other cases, claimed a **$225.00 court day fee,** and claimed **two $125.00 court day fees in other cases**.
- On Thursday, July 11, Cornelius billed **4 hours** to other cases and claimed a **$175.00 court day fee.**
- On Friday, July 12, the day of the disputed charge conference, Cornelius billed **4 hours** to other cases.
- On the Saturday before closing arguments in the guilt phase, which were scheduled for the following Monday (and the beginning of the punishment phase that Tuesday), Cornelius billed **6.5 hours** to other cases.
- On Monday, July 15, the day of closing arguments and jury deliberations in the guilt phase, Cornelius billed **2.25 hours** to other cases.

### f.    The punishment phase.

The evidence presentation in the punishment phase lasted three days. The state presented evidence on Tuesday, July 16, and Wednesday, July 17. The defense presented its evidence on Thursday, July 18. The jury reached its verdict late in the day on Friday, July 19. Cruz-Garcia was sentenced to death on Monday, July 22. In the three days that evidence was presented in the punishment phase, Cornelius claimed **four court day fees**, including **two $400.00 fees** in two different capital

000190

cases. Over those same three days, Cornelius billed an average of **4.83 hours per day** in other cases. Specifically:

- On Tuesday, July 16, Cornelius billed **6.25 hours** to other cases and claimed a **$175.00 court day fee**.
- On Wednesday, July 17, 2013—the day before the defense presented its case—Cornelius billed **3.25** hours to other cases, claimed a **$400.00 court day fee** in another capital case, and claimed a **$225.00** court day fee in a different case.
- On Thursday, July 18, 2013—the day the defense presented its case—Cornelius billed **5.5 hours** to other cases and claimed a **$400.00 court day fee** in yet another capital case.
- On the day of jury deliberations, when a serious issue emerged with a holdout juror, Cornelius billed **8 hours** to other cases.
- On the following Saturday, Cornelius billed **5.5 hours** to other cases.
- On the day that Cruz-Garcia was sentenced to death, Cornelius billed **8.5 hours** to other cases, and claimed a **$175.00 court day fee** and a **$125.00 court day fee**.

According to these billing records, Cornelius performed $33,430.75 worth of work in other cases *over the course of Cruz-Garcia's trial*. Based on the $35,000 flat fee permitted by Harris County for first chair in a death penalty case, Cornelius performed the equivalent of an entire other. In other words, Cornelius performed so much work on other cases around the time of Cruz-Garcia's trial, it was as if he had investigated, selected a jury for, and tried to verdict an entire other death penalty case between the time of jury selection and sentencing in Cruz-Garcia's case.

000191

Figure 3 below sets forth the details of Cornelius's billings between June 3 and July 22, 2013. The billing records underlying Figure 3 are collected at Exhibit 138.

**Figure 3:** Cornelius's billings in other cases from June 3, 2013 to July 22, 2013.[53]

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Mon., June 3, 2013 | Jury Selection | **Ward:** 3 hrs. trial prep<br>**Gonzalez:** 1 hr. legal research<br>**Serrano:** 0.5 hrs. witness interview<br>**Taverez**: 2.5 hrs. legal research<br>**Court Day: Jones D** ($225.00) | **7 hours**<br>**1 Court Day** |
| Tues., June 4, 2013 | Jury Selection | **Degrate:** 1 hr. legal research<br>**Mendez:** 1.75 hr. jail visit<br>**Court Day: Gonzalez** ($225.00) | **2.75 hours**<br>**1 Court Day** |

[53] The documents supporting **Figure 3** are collected in Exhibit 138. In some instances, Mr. Cornelius represented a client in multiple charges and billed separately for each charge. For clients with multiple charges, the different cases are indicated by the last 3 digits of the case number.

000192

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Wed., June 5, 2013 | Jury Selection | **Serrano:** 0.50 hrs. witness interview<br><br>**Jones, D:** 0.50 hrs. misc. matters<br><br>**Bogado:** 0.50 hrs. witness interview (-858)<br><br>**Alegria:** 1.25 hrs. legal research<br><br><u>**Court Day**</u>: **Degrate** ($175.00)<br><br><u>**Court Day**</u>: **Alegria** ($400.00) | **2.75 hours**<br>**2 Court Days** |
| Thur., June 6, 2013 | Jury Selection | **Lindsey:** 1 hr. legal research<br><br>**Serrano:** 0.75 hrs. legal research<br><br>**Jones D:** 0.50 hrs. witness interview<br><br>**Bogado:** 0.50 hrs. witness interview (-858)<br><br>**Mendez:** 0.50 hrs. records research<br><br><u>**Court Day**</u>: **Bogado** ($125.00) (-858)<br><br><u>**Court Day**</u>: **Bogado** ($125.00) (-441)<br><br><u>**Court Day**</u>: **Serrano** ($175.00)<br><br><u>**Court Day**</u>: **Chavira** ($125.00) | **3.25 hours**<br>**4 Court Days** |

000193

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Fri., June 7, 2013 | Jury Selection | **Davis:** 1.5 hrs. misc. matters (-542)<br><br>**Winston:** 1.25 hrs. legal research (-716)<br><br>**Judeh:** 0.75 hr. jail visit (-273)<br><br>**Court Day: Lindsey** ($175.00)<br><br>**Court Day: Winston** ($175.00) (-715)<br><br>**Court Day: Winston** ($175.00) (-716)<br><br>**Court Day: Judeh** ($225.00) (-272) | **3.5 hours**<br>**4 Court Days** |
| Sat. June 8, 2013 | No court | **Lindsey:** 0.75 witness interview<br><br>**Winston:** 1.25 hrs. legal research (-715)<br><br>**Mukherjee:** 2 hrs. records research<br><br>**Batiste:** 1.25 hrs. records research | **5.25 hours** |
| Sun. June 9, 2013 | No court | **Ward:** 4 hrs. trial prep | **4 hours** |
| Mon., June 10, 2013 | Jury Selection | **Mukherjee:** 2.5 hrs. records research<br><br>**Court Day: Davis** ($225.00) (-542)<br><br>**Court Day: Davis** ($125.00) (-908) | **2.5 hours**<br>**2 Court Days** |

000194

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Tues., June 11, 2013 | Jury Selection | **Ward**: 3 hrs. trial prep<br>**Bradley:** 0.75 hrs. misc. matters<br>**Gonzales N:** 1.5 hrs. records research<br>**Mukherjee:** 1.5 hrs. court appearance<br>**Ceaser:** 1 hr. records research<br>**Court Day:** Pruitt ($125.00) | **7.75 hours**<br>**1 Court Day** |
| Wed., June 12, 2013 | Jury Selection | **Bradley:** 0.50 hrs. records research<br>**Court Day:** Bradley ($175.00) | **0.50 hours.**<br>**1 Court Day** |
| Thur., June 13, 2013 | Jury Selection | **Ward**: 3 hrs. trial prep<br>**Riley:** 1.25 hrs. legal research<br>**Gonzales N:** 1 hr. records research<br>**Woodard:** 2 hrs. legal research<br>**Ceaser:** 0.75 hrs. records research<br>**Court Day:** Perdomo ($125.00)<br>**Court Day:** Ceaser ($225.00) | **8 hours**<br>**2 Court Days** |
| Fri., June 14, 2013 | Jury Selection | **Reed:** 1.5 hrs. legal research<br>**Ward:** 3 hrs. trial prep<br>**Taverez:** 2 hrs. misc. matters | **6.5 hours** |

166

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Sat., June 15, 2013 | No court | **Reed:** 3 hrs. of trial prep <br> **Taverez:** 2 hrs. misc. matters <br> **Court Day**: Bowman ($125.00)[54] | **5 hours** <br> **1 Court Day** |
| Mon., June 17, 2013 | Jury Selection | **Mayreis:** 5 hrs. legal research <br> **McGee:** 1 hr. legal research (-317) | **6 hours** |
| Tues., June 18, 2013 | No court | **Riley:** 0.5 hrs. witness interview; 1.25 hrs. records research <br> **McGee:** 2 hrs. legal research (-317) <br> **Gonzales N:** 1.25 hrs. misc. matters <br> **Jones R:** 2 hrs. misc. matters <br> **Serrano A:** 3 hrs. misc. matters | **10 hours** |

---

[54] This court date appears to have been misdated by Mr. Cornelius.

000196

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Wed., June 19, 2013 | Motion to Suppress Evidentiary Hearing | **Stevenson:** 1 hr. legal research (-049)<br>**Segura:** 1.75 hrs. legal research<br>**Gonzales N:** 1 hr. records research<br>**Serrano A:** 1.75 hrs. misc. matters<br>**Court Day: Gonzalez N** ($400.00)<br>**Court Day: Lee** ($125.00) (-713)<br>**Court Day: Lee** ($125.00) (-712) | **5.5 hours 3 Court Days** |
| Thur., June 20, 2013 | No court | **Riley:** 0.5 hrs. witness interview<br>**Lee:** 0.25 hrs. written correspondence (-713)<br>**Davis:** 1.5 hrs. misc. matters (-542)<br>**Stergiou:** legal research (hrs. not listed)<br>**Serrano A:** 1 hr. legal research<br>**Ward D:** 0.50 hrs. written correspondence<br>**Sparks:** 1.5 hrs. jail visit<br>**Court Day: Stevenson** ($225.00) (-049)<br>**Court Day: Stevenson** ($125.00) (-820)<br>**Court Day: Riley** ($400.00) | **5.25 hours 3 Court Days** |

000197

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Fri., June 21, 2013 | No court | **Riley:** 3 hrs. document review and conferences.<br><br>**Jones, D:** 2 hrs. legal research<br><br>**Davis:** 1.25 hrs. misc. matters (-542)<br><br>**Irais:** 0.75 hrs. records research<br><br>**Court Day: Irias** ($400.00)<br><br>**Court Day: Jones D** ($225.00) | **7.00 hours 2 Court Days** |
| Sat., June 22, 2013 | No court | **Irias:** 2.5 hrs. legal research<br><br>**Lee:** 0.75 hrs. written correspondence (-713); 0.25 hrs. written correspondence (-713)<br><br>**Perdomo:** 0.50 hrs. written correspondence<br><br>**Darries:** 1.5 hrs. legal research<br><br>**Stergiou:** 2 hrs. legal research | **8.5 hours** |
| Mon., June 24, 2013 | No court | **Mayreis:** 1.5 hrs. records research; 0.5 hrs. meeting with DA<br><br>**McGee**: 2.5 hrs. trial notebook (-317)<br><br>**Alegria:** 2 hrs. records research<br><br>**Court Day: Stergiou** ($125.00) | **6.50 hours 1 Court Day** |

169

000198

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Tues., June 25, 2013 | No court | **Irias**: 1 hr. written correspondence; 1.5 hrs. legal research<br><br>**Wright:** 1 hr. misc. matters<br><br>**Winston:** 1 hr. legal research (-716)<br><br>**Mukherjee:** 3.5 hrs. records research<br><br>**Court Day: Williams** ($125.00)<br><br>**Court Day: Wright** ($175.00)<br><br>**Court Day: Arvay** ($125.00) (-785)<br><br>**Court Day: Arvay** ($125.00) (-786) | **8 hours**<br>**4 Court Days** |
| Wed. June 26, 2013 | No court | **Riley:** 1 hr. legal research<br><br>**McGee:** 2 hrs. records research (-317)<br><br>**Williams:** 1 hr. records research<br><br>**Gonzalez:** 1 hr. legal research<br><br>**Court Day: Bogado** ($125.00) (-858)<br><br>**Court Day: Bogado** ($125.00) (-441)<br><br>**Court Day: Perdomo** ($125.00) | **5 Hours**<br>**3 Court Days** |

000199

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Thur. June 27, 2013 | No court | **McGee:** 2.5 hrs. misc. matters (-317)<br><br>**Degrate:** 0.75 hrs. witness interview<br><br>**Gonzalez:** 1.25 hrs. legal research<br><br>**Brown:** 1 hr. legal research<br><br>**Ceaser:** 1 hr. legal research<br><br>**Court Day: McGee** ($400.00) (-993) | **6.5 hours**<br>**1 Court Day** |
| Fri. June 28, 2013 | No court | **Wright:** 1.5 hrs. records research<br><br>**Jones, D:** 1.75 hrs. records research<br><br>**Gonzales N:** 1.75 hrs. legal research<br><br>**Hernandez:** 2 hrs. legal research<br><br>**Court Day: Winston** ($175.00) (-715)<br><br>**Court Day: Winston** ($175.00) (-716) | **7 hours**<br>**2 Court Days** |
| Sat. June 29, 2013 | No court | **McGee:** 3 hr. witness interview (-317)<br><br>**Hernandez:** 2.5 hrs. legal research | **5.5 hours** |

171

000200

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Mon. July 1, 2013 | No court | **Lindsey:** 1 hr. records research<br><br>**Winston:** 1.75 hrs. records research (-715)<br><br>**Mukherjee:** 5.8 hrs. records research<br><br>**Mendez:** 1 hr. records research | **9.55 hours** |
| Tues., July 2, 2013 | No court | **Mayreis:** 1 hr. Meeting with judge/DA<br><br>**Wright:** 0.75 hrs. written correspondence; 0.75 hrs. legal research; 1.75 hrs. misc. matters; 0.75 misc. matters<br><br>**Jones, D:** 0.75 hrs. witness interview; 1.50 hrs. legal research<br><br>**Court Day:** **Davis** ($225.00) (-542)<br><br>**Court Day:** **Gonzalez** ($225.00)<br><br>**Court Day:** **Jones D** ($225.00)<br><br>**Court Day:** **Lindsey** ($175.00) | **7.25 hours**<br>**4 Court Days** |

000201

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Wed., July 3, 2013 | Motion to Suppress Hearing | **Wright:** 0.75 misc. matters<br>**Gonzalez:** 1.5 hrs. legal research<br>**Jones, D:** 0.75 hrs. witness interview<br>**Sparks:** 1 hr. legal research<br>**Ceaser:** 0.75 hrs. written correspondence<br>**Serrano A:** 1.5 hrs. misc. matters<br>**Hernandez:** 1.5 hrs. written correspondence | **7.75 hours** |
| Thur. July 4, 2013 | No court | **Mayreis:** 3 hrs. legal research<br>**Ward D:** 2 hrs. written correspondence<br>**Hernandez:** 3 hrs. legal search | **8 hours** |
| Fri. July 5, 2013 | No court | **Stevenson:** 1 hr. misc. matters (-049); 0.25 misc. matters (-049)<br>**Gonzalez:** 1 hr. records research<br>**Jones, D:** 1.50 hrs. records research<br>**Davila:** 3 hrs. misc. matters<br>**Williams D:** 2 hrs. legal research | **8.75 hours** |
| Sat. July 6, 2013 | No court | **Davis:** 4 hrs. misc. matters (-542)<br>**Alegria:** 3 hrs. trial notebook<br>**Williams D:** 1.5 hrs. legal research | **8.5 hours** |

000202

| Date | Case Event | Work on Other Cases | Total |
|------|-----------|---------------------|-------|
| Sun. July 7, 2013 | No court | **Court Day**: **Serrano** ($175.00)[55] | **1 Court Day** |
| Mon., July 8, 2013 | Guilt Phase | **Wright:** 0.75 misc. matters <br> **Davila:** 2.5 hrs. misc. matters <br> **Batiste:** 0.75 hr. witness interview | **4 Hours** |
| Tues., July 9, 2013 | Guilt Phase | **Mayreis:** 2 hrs. witness interview; 0.5 hrs. conference with client and DA <br> **Ward:** 2 hrs. DNA evidence <br> **Mendez:** 1 hr. legal research <br> **Court Day**: **Degrate** ($175.00) <br> **Court Day**: **Bowman** ($175.00) | **5.5 Hours** <br> **2 Court Days** |
| Wed., July 10, 2013 | Guilt Phase | **Ward:** 2.5 hrs. DNA evidence <br> **Mendez:** 0.5 hr. jail visit <br> **Batiste:** 1 hr. legal research <br> **Court Day**: **Judeh** ($225.00) (-272) <br> **Court Day**: **Judeh** ($125.00) (-642) <br> **Court Day**: **Judeh** ($125.00) (-273) | **4 Hours** <br> **3 Court Days** |

---

[55] This court date appears to have been misdated by Mr. Cornelius.

000203

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Thur., July 11, 2013 | Guilt Phase | **Judeh:** 0.75 hrs. witness interview (-065)<br><br>**Judeh:** 1 hr. witness interview (-273)<br><br>**Mukherjee:** 1 hr. court appearance<br><br>**Mendez:** 1.25 hrs. misc. matters<br><br>**Court Day: Judeh** ($175.00) | **4 Hours**<br>**1 Court Day** |
| Fri., July 12, 2013 | Guilt Phase Charge Conference | **Mukherjee:** 2 hrs. records research<br><br>**Sparks:** 0.75 hrs. records research<br><br>**Serrano A:** 1.25 hrs. records research | **4 Hours** |
| Sat., July 13, 2013 | No court | **Mayreis:** 3 hrs. trial prep<br><br>**Lee:** 2 hrs. records research (-713)<br><br>**Sparks:** 1.5 hrs. legal research | **6.5 Hours** |
| Mon., July 15, 2013 | Guilt Phase Closing Arguments and Deliberation | **Mayreis:** 1 hr. witness interview<br><br>**Sparks:** 1.25 hrs. records research | **2.25 Hours** |

000204

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Tue., July 16, 2013 | Punishment Phase | **Ward:** 3 hrs. of legal research<br>**Wright:** 1.5 hrs. of legal research<br>**Bradley:** 1 hr. witness interview<br>**Brown:** 0.75 hrs. misc. matters<br>**<u>Court Day</u>: Bradley** ($175.00) | **6.25 Hours**<br>**1 Court Day** |
| Wed., July 17, 2013 | Punishment Phase | **Mayreis:** 2 hrs. trial prep<br>**Owens:** 0.75 hrs. misc. matters<br>**Ceaser:** 0.50 hrs. witness interview<br>**<u>Court Day</u>: Alegria** ($400.00)<br>**<u>Court Day</u>: Ceaser** ($225.00) | **3.25 Hours**<br>**2 Court Days** |
| Thur., July 18, 2013 | Punishment Phase | **Mayreis:** 1 hr. Conference with DA/Review Notes<br>**Irias:** 1.5 hrs. misc. matters<br>**Gonzales N:** 1.5 hrs. records research<br>**Alegria:** 1 hr. witness interview<br>**Batiste:** 0.50 hr. witness interview<br>**<u>Court Day</u>: Gonzales N** ($400.00) | **5.5 Hours**<br>**1 Court Day** |
| Fri., July 19, 2013 | Punishment Phase Jury Deliberation and Verdict | **Mayreis:** 3 hrs. trial prep<br>**Gonzales N:** 1 hr. records research<br>**Alegria:** 2 hrs. records research<br>**Batiste:** 2 hrs. misc. matters | **8 hours** |

000205

| Date | Case Event | Work on Other Cases | Total |
|---|---|---|---|
| Sat., July 20, 2013 | No court | **Mayreis:** 2 hrs. trial prep<br>**Judeh:** 3.5 hrs. legal research (-065) | **5.5 hours** |
| Mon. July 22, 2013 | Sentencing | **Mayreis:** 2.5 hrs. jail visit; 0.75 hrs. meeting with DA; 1.5 hrs. witness interview.<br>**Owens:** 1 hr. trial prep<br>**Irias:** 1 hr. witness interview<br>**Sharp:** 1 hr. legal research<br>**Fraga:** 0.75 hrs. legal research<br>**Court Day:** **Jones A** ($125.00)<br>**Court Day:** **Carrizales** ($175.00) | **8.5 Hours 2 Court Days** |

**6.    The billing records of Cornelius's investigator show that Cruz-Garcia's case was not ready to be tried by the beginning of jury selection.**

While Cornelius and Madrid did not keep time entries, their investigator, J.J. Gradoni, did. It is apparent from those time entries that, after their appointment in August 2011, trial counsel waited almost nine months—until May 2012—to begin investigating the case at all. Ex. 7 at  6–7. Over the course of 2012, the investigator billed fewer than 70 hours. *Id.* Perhaps most troublingly, the vast majority of the investigator's work occurred during or just before trial. Jury selection

began on June 3, 2013, but less than 20% of the investigative work was completed by April 7, 2013. *Id.* at 6–7, 10–11, 26, 46–49. A substantial portion of the investigative activity occurred beginning on June 3, 2013, the first day of jury selection. *Id.* The investigator time entries from jury selection through trial reflect that the defense team was attempting to locate witnesses, conduct interviews, research state's witnesses, do other field work, and set investigative assignments throughout June 2013. *Id.* at 46–49. Given the amount of work Cornelius performed on other cases during that same period, there is no realistic possibility that he could have prepared for trial from June 3, 2013, onward—the defense team was most actively investigating Cruz-Garcia's case.

Moreover, because trial counsel waited until just before trial to investigate in earnest, there was no margin for error and no time for follow-up investigations. Thus, although their investigator did make a short visit to the Dominican Republic (43% of the time billed for the trip was for travel to and from Houston), little was accomplished beyond a few interviews, and no follow-up investigation was possible because sufficient time had not been allocated. Ex. 7 at 26. Likewise, although trial counsel asserted in court filings that investigations in Puerto Rico

000207

would be *necessary* for the defense, 2 CR 384–85, they never travelled there.

### 7. Cornelius failed to perform key tasks, such as reviewing the State's file.

One consequence of Cornelius's failure to "give priority" to Cruz-Garcia's death penalty case, as required by Texas Guideline 9.3.B, is that he failed to perform basic tasks necessary for a competent representation. Cornelius did not even review the district attorney's file. Under the mistaken impression that the State was required to essentially curate a limited set of relevant files for them to review, trial counsel repeatedly refused to take advantage of the district attorney's open file policy. *See* 20 RR 185–86; 16 RR 4–5.

During the guilt phase, frustrated that he had to cross-examine the State's expert without having read his report, Cornelius asked to make a record of his complaints:

| Cornelius: | Yeah. I want to make sure we understand each other. *I don't have a responsibility to go through your file and figure out what's in your file. I don't have to do that*. . . . |
|---|---|
| Tise: | I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's opened to you. . . . |

000208

| The Court: | I don't think we need to put this all on the record. . . . If you want to argue, we'll go off the record. |
| Cornelius: | I'm not going to go try to figure out what's in your file. . . . I'm not going to go through 20 boxes of DNA records. |
| Tise: | I told you, Skip, you need to come by and see my file. |
| The Court: | All right. Let's go off the record, Mary Ann. |

20 RR 186–87 (emphasis added).  Cornelius subsequently confirmed to post-conviction counsel in an email that he, as a matter of policy, did not participate in "open file" systems like that used by the Harris County District Attorney's Office, stating "I don't play that game." 3 SHCR 607.

In his affidavit to the convicting court, Cornelius attempted to walk back the admission he made during trial concerning his failure to review the State's file. He claimed that "the files where [sic] brought to court by a number of prosecutors" and that he reviewed the State's file then and there. 4 SHCR 942–48. Cornelius's billing records, together with other factors, strongly suggest that Cornelius did not actually review the State's file.

First, Cornelius's billing records show that from jury selection to sentencing (i.e., the time when Cruz-Garcia's case was in court), Cornelius was routinely working a substantial number of hours outside

000209

of his full court days for Cruz-Garcia's case. In addition, Cornelius was appearing in court for other clients, often several a day. It is not plausible that, with the amount of time Cornelius was working and billing on other cases, he could have reviewed the State's entire file in the courtroom.

Second, when post-conviction counsel examined the State's file, they found numerous documents that were not in trial counsel's files. 1 SHCR 61. Many of the documents were in Spanish, a language Cornelius does not read, and included extensive evidence from Cruz-Garcia's incarceration in Puerto Rico where he was a model prisoner. *Id.* at 61–62. Cornelius could not have read through these Spanish-language document. Indeed, none of the evidence was introduced at Cruz-Garcia's trial.

Third, the State made clear both during the guilt phase and in writing that its file was located in the District Attorney's office, not in the courtroom. 20 RR 186 ("I told you, Skip, you need to come by and see my file."); 2 CR 491 ("My file . . . remained open to defense counsel up to and during trial. Photos witness statements, evidentiary items, lab reports, and other items were all stored together in my office and were available

000210

for review before and during trial."). There is no indication on the record that the files were ever located or brought into the courtroom.

In combination, Cornelius's affidavit, billing records, and other evidence shows that Cornelius failed to perform even the most basic of defense tasks: to review the State's file.

### C. Trial counsel rendered ineffective assistance of counsel by failing to adequately communicate with Cruz-Garcia and by rushing his case to trial.

The trial defense team submitted in state post-conviction proceedings three affidavits: from lead counsel Skip Cornelius, second chair counsel Mario Madrid, and investigator J.J. Gradoni. Cornelius's affidavit is by far the longest. 4 SHCR 942. Madrid's affidavit is much shorter than and largely parrots select sections of Cornelius's affidavit. 5 SHCR 951.

One common theme to these affidavits is the team's difficulty communicating with Cruz-Garcia, which the defense team blamed entirely on Cruz-Garcia. 5 SHCR 952 ("We were hampered in our defense because our client would not discuss any facts of the case. He insisted that God would set him free but refused to discuss the case."); 5 SHCR 957 ("Cruz-Garcia was not very forthcoming about much of anything with

000211

respect to the case because, as he informed me, God and Jesus were going to deliver him and he was not really concerned about being convicted."); 4 SHCR 943 ("Cruz-Garcia would not discuss the facts of the case with us. At all. He refused to discuss it with us. His statement was that God would deliver him."). Indeed, in response to nearly every issue they were asked about, counsel pointed to their difficulty communicating with Cruz-Garcia.

When examined together with Cornelius's billing records, however, the affidavits suggest a different story. Cornelius was appointed to Cruz-Garcia's case in August 2011. According to Gradoni's billing records, no one visited Cruz-Garcia until May 2012. Ex.7 at 6. Throughout his entire representation, Cornelius met with Cruz-Garcia only twice. 5 SHCR 957. Gradoni also met with Cruz-Garcia only twice. *Id.* Madrid apparently never visited Cruz-Garcia. *Id.*

Texas Guideline 10.2 provides:

## GUIDELINE 10.2 – <u>RELATIONSHIP WITH THE CLIENT</u>

A.   Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client:

1.   Barring exceptional circumstances, the client should be contacted within 24 hours of initial counsel's entry into

000212

the case, with full and complete interviews of the client to be conducted as soon as practically possible.

2.  Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

B.  Counsel at all stages of the case should re-advise the client and government regarding these matters as appropriate.

C.  Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

1.  The progress of and prospects for factual investigation, and what assistance the client might provide to it;

2.  Current or potential legal issues;

3.  The development of a defense theory;

4.  Presentation of the defense case;

5.  Potential agreed-upon dispositions of the case;

6.  Litigation deadlines and the projected schedule of case-related events; and

7.  Relevant aspects of the client's relationship with correctional, parole or other governmental agents (e.g., prison medical providers or state psychiatrists).

As with so much else in his representation of Cruz-Garcia, Cornelius's actions flew in the face of the Texas Guidelines. He did not conduct a "full and complete interviews of the client . . . as soon as

000213

practically possible." Texas Guideline 10.2.A.1. Indeed, no one visited Cruz-Garcia until nine months after Cornelius was appointed. Nor did Cornelius "at all stages of the case . . . engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case." Texas Guideline 10.2.C. Cornelius met with Cruz-Garcia only twice. Further, in light of the failure of anyone on the defense team to meet with Cruz-Garcia for the first nine months of the representation and Cornelius's extremely limited interaction with Cruz-Garcia, it can hardly be said that trial counsel made "every appropriate effort to establish a relationship of trust with the client, and . . . maintain[ed] close contact with the client." Texas Guideline 10.2.A.

Given that Cornelius and his investigator failed to meet at all with Cruz-Garcia for nine months and then met with him only twice, their complaints that Cruz-Garcia "was not very forthcoming about much of anything with respect to the case" and "would not discuss the facts of the case" ring hollow. The Texas Guidelines do not contemplate a one-way street where counsel parachutes in for a couple visits with his client before trial and the client immediately provides counsel everything he

000214

needs to win the case. Rather, the Texas Guidelines speak of "establish[ing] a relationship of trust with the client" and "maintain[ing] close contact with the client" as essential to effective representation. Texas Guideline 10.2.A. Trial counsel thus failed to establish any relationship and communicate with Cruz-Garcia in accordance with the Guidelines.

There were other Guideline failures that also contributed the obviously dysfunctional relationship between Cruz-Garcia and his defense counsel. Cruz-Garcia does not speak English. Neither Cornelius nor Gradoni speak Spanish. As a consequence, "each and every time members of the defense team spoke to Cruz-Garcia it was with the assistance of Edna Velez, who was a certified interpreter with the Customs Service." 5 SHCR 958. Indeed, according to Gradoni, Velez was the only member of the defense team who visited Cruz-Garcia more than twice; he claims that she met with him seven times, including the two visits that Cornelius and Gradoni attended. *Id.*

There are specific provisions of the Texas Guidelines concerning non-English speaking clients. They provide as follows:

## GUIDELINE 10.3 – <u>ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL</u>

000215

B. Counsel representing a foreign national should:

1.  Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

2.  If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission to withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.

Like Texas Guideline 10.2, Texas Guideline 10.3.B strongly emphasizes the importance of effective client communication. It "highly recommend[s] that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel" and gives counsel the option of withdrawing from the case "due to language problems." Texas Guideline 10.3.B.2. Here, neither counsel had adequate communication with Cruz-Garcia, as Madrid apparently did not meet with Cruz-Garcia and Cornelius (and his investigator) required an interpreter. 5 SHCR 957.

In sum, Cornelius had a client he met with only twice and Madrid never, with whom he could not communicate directly. As detailed in

000216

Figure 1, he also had a crushing caseload with more death penalty cases than TIDC recommends for full-time capital practitioners and more felony cases than TIDC recommends for non-capital practitioners. Under the Texas Guidelines, either of these issues would have been sufficient to justify withdrawing from the case or, at the very least, continuing the trial. *See* Texas Guideline 9.3.C (counsel should notify the court and may seek to withdraw if "counsel's caseload becomes overextended"); Texas Guideline 10.3.B.2 ("[C]ounsel may request permission to withdraw due to language problems."). Yet, trial counsel did not even attempt to obtain a continuance.

Instead, trial counsel decided to proceed to trial even though first chair counsel had a caseload well in excess of reasonable standards, had only met with Cruz-Garcia twice and second chair never, and could not communicate directly because of a language barrier,. His decision to proceed to trial without at least attempting to obtain a continuance simply does not square with his and his defense team's attempts to blame their failings at trial on Cruz-Garcia's purported lack of cooperation. As detailed below, had Cornelius sought a continuance and conducted a

000217

thorough investigation, he could have presented evidence that would have undercut the State's case at both the guilt and punishment phases.

### D. Trial counsel's investigation, preparation, and performance during the guilt/innocence phase was ineffective.

One of trial counsel's most critical duties is to thoroughly investigate the defendant's case. To the extent trial counsel fails to investigate a particular thread or item of evidence, that assessment must be based on a reasonable decision that supports trial counsel thus limiting the investigation. *Wiggins*, 539 U.S. at 521; *see Strickland*, 466 U.S. at 690–91. Trial counsel failed to adequately investigate and prepare for the guilt phase of Cruz-Garcia's trial.

#### 1.   DNA Failures.

##### a.   Failure to retain a DNA expert.

Trial counsel failed to retain, or to continue working with, the DNA expert that Cruz-Garcia's original counsel had retained. At the time of their appointment, Dr. Elizabeth Johnson, a private forensic expert and DNA analyst, had already been retained to review the State's DNA evidence. Ex. 6 at 1–2. Trial counsel declined to consult with Dr. Johnson, however, and therefore went to trial with no DNA expert of their own.

In his affidavit, Cornelius attempted to explain his failure to retain an expert by stating that he "know[s] a lot about DNA evidence," and in his opinion the DNA evidence "had been sufficiently preserved." 4 SHCR 944. This, however, was untrue. The chain of custody of the DNA evidence was not properly preserved, as was later determined in post-conviction proceedings. Ex. 10.

Cornelius also stated that a DNA expert was not retained because this expert would have been cross-examined by the State. 4 SHCR 944. While a DNA expert would almost certainly have faced cross-examination, it does not explain Cornelius's failure to consult with a DNA expert at all. Had trial counsel consulted with a DNA expert, trial counsel would have known of significant issues with the chain of custody and reliability of the DNA evidence. Trial counsel could thus have challenged one of the key elements of the State's case against Cruz-Garcia.

### b.    Failure to determine that DNA had been improperly stored.

Cruz-Garcia's state post-conviction counsel retained an outside DNA expert to review the State's trial evidence. The report identified deficiencies in the chain of custody and analysis of the DNA evidence. Ex. 10. Contrary to the testimony of the State's witnesses, the evidence bag

000219

containing the vaginal swabs was *unsealed* when it arrived at Orchid Cellmark. *Id.* Likewise, the cutting from the underwear was stored in the same *unsealed* envelope as the blood sample from Arturo Rodriguez. *Id.*

Had they retained a DNA expert, trial counsel could have brought the DNA storage problems to the jury's attention during trial and thus significantly undercut the reliability of the DNA evidence. These findings by a DNA expert also would have significantly strengthened the defense's motion to suppress the DNA evidence. 3 CR 455. The defense was therefore prejudiced when it was unable to proffer any link between the DNA evidence in Cruz-Garcia's case and the well-publicized and significant problems at the former HPD Crime Lab. In denying Cruz-Garcia's motion to suppress the DNA evidence, Judge Magee cited the lack of connection between the DNA in Cruz-Garcia's case and handling and storage problems within the old HPD Crime Lab. 17 RR 13; 17. The storage and integrity of the evidence issues identified by Cruz-Garcia's DNA expert in post-conviction could have provided that link, had trial counsel retained a DNA expert.

As described *supra* § I.B, the DNA evidence was the linchpin to the State's case. The defense was therefore entirely handicapped by trial

counsel's failure to retain a DNA expert, such that the defense was unable to suppress the DNA evidence, or barring suppression, at least challenge its reliability before the jury.

> ### 2. Failure to investigate Carmelo Santana.

> #### a. Failure to investigate Santana's inconsistent statements.

Had trial counsel reviewed the State's file, they would have found multiple prior inconsistent statements by Santana. During several interrogations in 1992 and in 2009, Santana denied any knowledge of or involvement in the offense. Ex. 67; 68; 69; *see supra* § I.A.1. His testimony to the jury materially contradicted those prior statements, as well as statements made to the FBI and HPD after he agreed to cooperate. *See supra* § I.A.1. Because counsel did not review the State's file, they could not impeach Santana with his prior inconsistent statements. Trial counsel's failure to impeach Santana as well as other key witnesses, *see supra* §§ I.C & D, was constitutionally ineffective. *Peoples v. Lafler*, 734 F.3d 504, 513 (6th Cir. 2013); *Beltran v. Cockrell*, 294 F.3d 730 (5th Cir. 2002); *see Moffett v. Kolb*, 930 F.2d 1156 (7th Cir. 1991) (failure to impeach with prior inconsistent statements); *Smith v. Wainwright*, 741

000221

F.2d 1248 (11th Cir. 1984) (failure to impeach with prior inconsistent statements).

### b. Failure to investigate Santana's mental health.

As set forth *supra* § IV.A.2, Santana suffered from serious mental health issues. These records should have been disclosed to trial counsel pursuant to the State's *Brady* obligation to disclose impeachment evidence. *Id.* However, the information was readily available through public records and could have been discovered by trial counsel had they exercised reasonable diligence. Evidence of Santana's mental health issues was available from the electronic docket entries in connection with Santana's federal prosecution, including the letter he sent to a federal judge around the time he implicated Cruz-Garcia and in which he professed to be mentally incompetent. Ex. 12.

### c. Failure to investigate Santana's crime of moral turpitude.

Trial counsel's failure to investigate Santana does not need to be inferred solely from their failure to introduce evidence of his mental health issues. During trial, trial counsel admitted to having failed to conduct a basic investigation of the State's key witness. 21 RR 17–18. As set forth *supra* §§ I.A.3 & IV.A.3, around the time of A.'s kidnapping,

Santana was convicted in Harris County of assaulting a child. Because the victim was a girl, the assault constituted a crime of moral turpitude that was fair game for impeachment. *See* Tex. R. Evid. 609; *Hardman*, 868 S.W.2d at 407. However, trial counsel had not investigated the conviction and therefore did not know the gender of the victim.

As Cornelius stated during the trial: "Honestly, I'm not sure. In fairness, I've got an investigator's report, but I don't have that much confidence in it." 21 RR 17. Indeed, the billing records of trial counsel's investigator show that, on June 20, 2013, he attempted to "Obtain Offense Report Regarding State Witness Prior Conviction." Ex. 7 at 47. However, it appears that there was no follow-up to determine the specifics of Santana's conviction. Because Cornelius did not investigate Santana's prior conviction, he stated that he would simply trust whatever the State or Santana told him: "I've got some conflicting information from my own investigators and so, I'm going to accept pretty much whatever the State tells me or what he [Santana] tells me." 21 RR 18.

As set forth above *supra* §§ I.A.3 & IV.A.3, Santana lied by asserting that he had committed assault against a boy. 21 RR 21. Not only would a crime of moral turpitude have been grounds for

000223

impeachment, *see* Tex. R. Evid. 609, the fact of Santana's conviction around the time of A.'s disappearance would have further cast doubt as to his claims to the jury that he reluctantly followed along in taking and killing A., a child, so much so that he became physically ill at the scene of A.'s death. 20 RR 150–52. Because trial counsel failed to investigate Santana's prior conviction (compounded by the State's failure to correct false testimony), Santana escaped impeachment.

"A key prosecution witness's prior criminal history and resultant parole status clearly constitute important impeachment evidence" and "[i]t is beyond the range of professionally reasonable judgment to forgo investigation of, and impeachment based upon, such evidence absent some apparent strategic reason that might explain or excuse counsel's failure." *Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013), *abrogated on other grounds by Dennis v. Sec., Penn. Dep't of Corrs.*, 834 F.3d 263 (3d Cir. 2016). As evidenced by trial counsel's own statements on the record that he would "accept pretty much whatever" the very witness that he sought to impeach, counsel's failure to investigate Santana's prior conviction was not based on any strategy. Instead, trial counsel's belated investigation combined with an excessive case-load prevented any

000224

following-up on what was by trial counsel's own admission an incomplete investigation. *Id.*

Trial counsel's failure to investigate and uncover multiple grounds upon which to impeach Santana, including prior inconsistent statements, publicly available records raising questions as to his mental health, and his prior convictions, is made all the more glaring by Santana's critical role in the State's case against Cruz-Garcia. In closing, the State made clear that its only eyewitness's testimony was key. 23 RR 98. As an unindicted accomplice, Santana's testimony could and should have been aggressively impeached. Cruz-Garcia was therefore prejudiced by trial counsel's failure to investigate and impeach the State's star witness, thus leaving the jury to believe that Santana was a reliable witness. Hence, trial counsel was constitutionally ineffective for failing to impeach the State's star witness. *Grant*, 709 F.3d at 234 (failure to discover star witness was on parole and use conviction to impeach him was ineffective assistance of counsel).

000225

### 3. Failure to investigate Angelita Rodriguez.

#### a. Failure to investigate lies about Cruz-Garcia leaving suddenly.

As set forth *supra* § I.C, Rodriguez was not truthful when she testified that Cruz-Garcia's departure to the Dominican Republic shortly after A.'s disappearance was sudden and unplanned. At that time, Cruz-Garcia's father had been building a house for the couple to live in together in the Dominican Republic. Ex. 81–91. The evidence showing that Cruz-Garcia intended to imminently return to the Dominican Republic was readily available from witnesses there. *Id*. However, because trial counsel failed to conduct a reasonable investigation in the Dominican Republic, trial counsel failed entirely to uncover this evidence.

#### b. Failure to investigate testimony about asking for a divorce from Cruz-Garcia.

As detailed *supra* § I.C, Rodriguez testified falsely that she and Cruz-Garcia ended their relationship when he returned to the Dominican Republic. In fact, Cruz-Garcia and Rodriguez continued to live as husband and wife in Rodriguez's mother's home in the Dominican Republic. Ex. 15. This was documented in a law enforcement report that counsel failed to review and would have also been easily discoverable had

000226

trial counsel conducted a reasonable investigation in the Dominican Republic. Ex. 15.

Trial counsel also failed to impeach Rodriguez with her prior inconsistent statements. Indeed, rather than impeaching her, Cornelius bolstered much of Rodriguez's false testimony. Cornelius sought to impeach her by pointing to a 2008 interview in which she stated that Cruz-Garcia had not answered her when she asked whether he was involved in A's death. 20 RR 111–12. In doing so, however, Cornelius confirmed that Rodriguez had told the police "this entire story except for that," suggesting that Ms. Rodriguez was being untruthful only about Cruz-Garcia's purported confession. *Id.* at 112. Rodriguez explained her misstatement at the 2008 interview by saying: "I was scared." *Id*.

As detailed *supra* § I.C, Rodriguez testified falsely to a number of material facts, including Cruz-Garcia's alleged confession and their relationship after he returned to the Dominican Republic. In August 1993, Rodriguez told the FBI she "had no knowledge about the disappearance of [A]." Ex. 73. And in 1994, she remained adamant that Cruz-Garcia "never admitted any involvement in [A's] disappearance" and that she did "not believe his departure had anything to do with [A]."

000227

Ex. 37. Trial counsel failed to bring any of these prior inconsistent statements to the jury's attention.

Had they performed an adequate investigation, trial counsel could have broadly impeached Rodriguez, exposing her general untruthfulness about Cruz-Garcia to the jury. Of significance, Rodriguez's prior inconsistent statements could have served to impeach her testimony about Cruz-Garcia's supposed confession, and at the very least have avoided bolstering her false testimony. Had trial counsel done so, the jury would have been much less inclined to believe that Rodriguez misspoke in 2008 because she was scared. Rather, her prior inconsistent statements would have exposed her to the jury as an unreliable witness.

### 4.    Failure to investigate Diana Garcia and Arturo Rodriguez.

#### a.    Failure to develop evidence of Diana Garcia's consensual relationship with Cruz-Garcia.

The key piece of evidence against Cruz-Garcia was the presence of his DNA in the samples taken from Garcia's vaginal swab and underwear. 23 RR 93. Based on Garcia's allegation that one of the assailants sexually assaulted her, the DNA appeared to link Cruz-Garcia to the time and place of A.'s disappearance. There was substantial evidence, however, that Cruz-Garcia and Garcia had a consensual sexual

000228

relationship. Specifically, several associates of Garcia and Cruz-Garcia could and would have testified that it was well known that they maintained a consensual sexual relationship. Ex. 21 at 1; 22 at 1; 23 at 2. Specifically, Cesar Rios, and his brothers Hector Saavedra and Jose Valdez, knew Garcia and Cruz-Garcia well and could have testified that they had a consensual sexual relationship. *Id.* That relationship would have explained the presence of Cruz-Garcia's DNA and thus prevented the State from arguing to the jury that Cruz-Garcia must have been one of the assailants on the night of A.'s disappearance.

Rios, who was identified in the offense report from 1992 as an associate of Garcia, remembers speaking briefly with someone from the defense team. Ex. 21 at 2. After that brief conversation, however, he was never contacted again. *Id.* All three of the brothers were available to testify at Cruz-Garcia's trial, had the defense team asked them to. Ex. 21 at 2; 22 at 2; 23 at 2.

In their affidavits, trial counsel squarely placed blamed Cruz-Garcia for their failure contact and follow-up with witnesses who could have testified to Garcia and Cruz-Garcia's relationship. These claims, however, cannot withstand scrutiny. In his affidavit, Gradoni

000229

acknowledges that Rios was identified as a possible witness based on the 1992 offense report, 5 CR 958, but Cornelius and Gradoni both claimed that they could not locate or interview Rios. 4 CR 944–45; 5 CR 958. These claims, however, are contradicted by Rios's own recollection of having briefly been contacted by the defense team. Ex. 21.

According to the investigator billing records, the bulk of trial counsel's efforts to locate witnesses occurred in June 2013, *during jury selection* and while Cornelius continued to bill several hours each day to other cases. Ex.7 at 46–49; 138. That jury selection had already begun by the time trial counsel attempted to locate and reach out to witnesses, combined with Cornelius's extensive billing to other cases, lend plausibility to Rios's recollection that the defense team never followed-up.

In his affidavit, however, Cornelius attempts to place the blame on Cruz-Garcia for trial counsel's failure to locate Rios, asserting that (in his two meetings with Cruz-Garcia), "[h]e never told us about the alleged witnesses Cesar Rios [or his brothers] Jose Valdez, or Hector Saavedra." 4 SHCR 944. Yet, by his investigator's own admission, Cornelius did not need Cruz-Garcia to tell him that Rios was a potentially important

000230

witness: he was listed as an associate of Garcia in the 1992 offense reports. 5 SHCR 958. The background check Gradoni claims to have run on Rios would have also turned up his family members. *Id.* Indeed, it is difficult to imagine how Cruz-Garcia could have assisted trial counsel in locating Rios and his brothers, given that Cruz-Garcia had not lived in the United States in over 20 years aside from in pre-trial detention.

Rather, trial counsel's failure to locate and/or follow-up with witnesses who could have testified to Cruz-Garcia and Garcia's relationship  is attributable to trial counsel's failure to begin their investigations in advance of jury selection or by seeking a continuance. Trial counsel's affidavits and Cornelius's billing records make clear that trial counsel did not dedicate sufficient time to investigation ahead of Cruz-Garcia's trial. The defense was thus prevented from presenting evidence of a consensual relationship between Cruz-Garcia and Garcia.

Had trial counsel presented this evidence, the State's case would have been damaged beyond repair. The State described the DNA evidence as "the most damning corroboration for the defendant in this case[.]" 23 RR 36. The State argued to the jury that Cruz-Garcia must have sexually assaulted Garcia because there was no evidence of any

consensual relationship. But for trial counsel's deficient performance, that very evidence would have been presented to the jury.

**b.    Failure to develop evidence that Garcia and Rodriguez were still selling drugs.**

As set forth *supra* §§ I.D and IV.C, the State's theory of Cruz-Garcia's motive for assaulting Garcia and Rodriguez was retaliation because they had stopped selling drugs for him. Garcia and Rodriguez both testified that they had stopped selling drugs a month before A. was kidnapped. 18 RR 133–34, 204; 19 RR 33. The State presented their testimony not only as evidence of Cruz-Garcia's motive, but also to portray Garcia and Rodriguez as a hardworking couple who had recently left their criminal past behind to raise their young son. 18 RR 33.

Evidence from police reports, however, establish that Garcia and Rodriguez lied to law enforcement. Ex. 24 at 1–2. Not only had the couple not stopped dealing drugs; they were dealing drugs on the night of A.'s disappearance and from the apartment from which A. was taken. *Id.* These police reports were easily discoverable to trial counsel, had trial counsel reviewed the State's file. Had trial counsel presented evidence that Garcia and Rodriguez were dealing on the night that, and from the apartment from which A. was taken, the State would have had no theory

000232

as to motive for Cruz-Garcia's involvement. Instead, the jury could readily have tied the assault and A.'s disappearance to Garcia and Rodriguez's continued involvement in dangerous criminal activity.

### c. Failure to develop evidence that Garcia was an unreliable witness.

As set out *supra* § I.D, Garcia testified falsely to a number of material facts, including her relationship with Rodriguez, her son's paternity, and living arrangements. This information was uncovered by law enforcement and available to trial counsel had they reviewed the State's file. *See, e.g.*, Ex. 24.

### 5. Failure to investigate law enforcement's theory of the case at trial.

### a. Failure to investigate cigar.

The cigar found in Garcia's apartment was one of the State's key pieces of evidence. The State contended to the jury that the cigar was left by one of the assailants and, because Cruz-Garcia's DNA was on it, it therefore inculpated Cruz-Garcia. 18 RR 35–36, 80; 21 RR 119.

During the original 1992 investigation, though, the police discarded the possibility that the cigar was left by one of the assailants; in a recorded statement, HPD stated that they did not believe that the cigar was tied to the assault and assailants. Ex. 64 at 7; 65. Had trial counsel

conducted a sufficient investigation, including by reviewing the State's file, trial counsel could have located this recording. As a result, trial counsel failed to present evidence that the police had concluded in 1992 that the cigar was *not* linked to one of the assailants and, therefore, did not establish Cruz-Garcia's identity as one of the assailants on the night of A.'s disappearance. In combination with the information from Rios and his brothers about Cruz-Garcia and Garcia's consensual relationship, the State would have been unable to rely on the DNA to tie Cruz-Garcia to A.'s disappearance and death.

### b. Failure to investigate whether police believed Garcia and Rodriguez.

As discussed *supra* § I, law enforcement witnesses testified that very soon after A.'s disappearance, Garcia and Rodriguez cooperated fully and were truthful with law enforcement. 18 RR 119; 19 RR 66, 67, 74. In fact, according to numerous police reports, Garcia and Rodriguez were uncooperative throughout the investigation and law enforcement did not trust their account of the circumstances of A.'s disappearance. Ex. 19; 64; 66. In 1993, months after A.'s disappearance and the discovery of his body, one investigating officer even summarized: "Diana [Garcia] and Arturo [Rodriguez] have been *untruthful throughout the investigation*

000234

with regards to the events inside the apartment and the identity of the suspects." Ex. 19 (emphasis added). These reports were available to trial counsel as part of the State's file, but because the State failed to review the State's file, law enforcement's false testimony was unchallenged.

The false testimony from law enforcement personnel was not limited to the credibility of Garcia and Rodriguez. As detailed *supra* § I.D, law enforcement further misrepresented to the jury that the investigation had never considered other theories of A.'s disappearance. According to police records, however, several demands for ransom were made. Ex 17; 18. Law enforcement also documented uncovering a "family secret" regarding A.'s paternity. Ex.97.

But based on law enforcement false testimony, the jury was left with the inaccurate impression that there were no other theories as to A.'s disappearance, such as a kidnapping for ransom or being taken by his biological father. Had trial counsel conducted an adequate investigation, trial counsel would have located the police reports concerning the issues above and could have developed an alternative theory of the case. Instead, false testimony went unchallenged and defense counsel presented no case on rebuttal at the guilt phase.

000235

### 6.    Failure to challenge subpoenas.

Cruz-Garcia's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments were violated when the prosecutors engaged in misconduct by issuing improper, extra-judicial subpoenas. In criminal cases during pre-trial, the State may not issue subpoenas to discover documents in third-party possession. *Martin v. Darnell*, 960 S.W.2d 838, 842 (Tex. App.—Amarillo 1997, no pet.).

Here, during pre-trial, the prosecutors issued non-judicial subpoenas that were meant to secure attendance of witnesses at trial to order production of documents. For example, the prosecutors issued a subpoena to the FBI Puerto Rico Field Office for "a certified copy of the complete file on former inmate Cruz-GarciaCruz Garcia [sic]." Ex. 36. This was a misuse of subpoena power.

The prosecutors misused subpoenas to order production of countless documents they otherwise could not have obtained, such as Cruz-Garcia's medical records. The prosecutors then used the evidence obtained through the improper use of the subpoena power, such as prison records from Puerto Rico, to argue—and prevail—on the argument that Cruz-Garcia presented a future danger. Upon information and belief,

000236

prosecutors did not provide copies of any of the documents they obtained to defense counsel. Cruz-Garcia's trial was thus undermined by prosecutorial misconduct, which trial counsel failed to identify and challenge, thus constituting deficient performance.

### E. Trial counsel's investigation, preparation, and performance during the punishment phase was ineffective.

As detailed in prior sections, trial counsel failed to allocate and devote an adequate time to investigate and prepare for Cruz-Garcia's trial. Trial counsel did not retain a mitigation specialist, nor consult with any relevant experts. The defense's entire penalty case, presented through four lay witnesses, lasted just one day and accounted for less than 75 pages of the transcript. 26 RR 8–55, 67–92. A wealth of mitigation evidence uncovered in post-conviction make clear that "effective counsel would have painted a vividly different tableau of aggravating and mitigating evidence than that presented at trial." *Andrus*, 140 S. Ct. at 1886.

### 1. Trial counsel's mitigation presentation was anemic at best.

Trial counsel called only four lay witnesses at the punishment phase. Cruz-Garcia's younger brother Joel had to pay his own way from

000237

the Dominican Republic to Houston, and trial counsel showed little to no interest in him and barely prepared him to testify. Ex. 85 at 10–11. Joel's direct examination lasted only twelve pages of transcript, including lengthy objections from the State. 26 RR 32–43. Because trial counsel were unprepared and had not investigated Cruz-Garcia's life history, they failed to elicit helpful testimony. Instead, Joel provided only the briefest chronology of Cruz-Garcia's childhood and inadvertently made it appear that he had experienced a pleasant childhood in the Dominican Republic. *Id.* Not only was the testimony not particularly mitigating; the false impression it gave was actually aggravating. *See Andrus*, 140 S. Ct. at 1883 ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment.").

The second witness, Cruz-Garcia's wife Mireya, testified via a shoddy video link from the Dominican Republic. Her testimony lasted fewer than ten pages and, due to the poor connection and problems with interpretation, her testimony was extremely difficult to understand. 26 RR 11–20.

000238

Moreover, Mireya could not testify to Cruz-Garcia's childhood or his life leading up to the offense, and instead generally described their life in the Dominican Republic. *Id.* Cruz-Garcia's then 17-year-old son also testified, but because Cruz-Garcia went to prison when he was five years old, there was little he could offer. 26 RR 67–79.

The defense's final witness was Angel Mesa, a teenager who had known Cruz-Garcia while he was in pre-trial detention, and whom Cruz-Garcia had positively influenced. 26 RR 80–86. Mesa was not identified or contacted by the defense; instead, he came to the courtroom and asked to testify after hearing about the trial. *Id.* at 81. The jury foreman later stated that he was by far the most persuasive defense witness. 35 RR Def. Ex. 4; Ex. A at 12 ("[I]f it hadn't been for that kid, it would have been a much easier decision for me.").

### 2.    Trial counsel failed to retain a mitigation specialist, despite the Texas Guidelines requiring one.

Texas Guideline 3.1.A.1 provides: "The defense team should consist of no fewer than two attorneys qualified in accordance with GUIDELINE 4.1, an investigator, and a mitigation specialist." ABA Guideline 4.1.A.1 contains substantially identical language. The commentary to the ABA Guidelines emphasizes the importance of a mitigation specialist:

000239

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in

000240

this process can be the key to persuading a client to accept a plea to a sentence less than death.

For all of these reasons the use of mitigation specialists has become part of the existing 'standard of care in capital cases, ensuring high quality investigation and preparation of the penalty phase.

ABA Guideline 4.1.A.1 Cmt., 31 HOFSTRA L. REV. at 960 (internal citations and quotation marks omitted).

Contrary to the Texas and ABA Guidelines, trial counsel did not retain a mitigation specialist. In his affidavit, Cornelius claimed that although it was true that he did not have a mitigation specialist, the defense team "had my experience, which predates mitigation experts, at least in Harris County." 4 SHCR 947. He also notes that he had an investigator on the case. *Id.* The Texas Guidelines are clear, however, that an investigator is not enough; rather, "[t]he defense team should consist of no fewer than two attorneys . . . , an investigator, ***and a mitigation specialist***." Texas Guideline 3.1.A.1 (emphasis added). The Texas Guidelines do not support Cornelius's suggestion that either he or his investigator could have somehow worn two hats, and also taken on the role of mitigation specialist.

Cornelius also claimed that "all of the 'Mitigation Experts' in Harris, County, of which there were not many at that time, refused to

000241

take cases for the money the County was willing to pay," which was $75.00/hr. 4 SHCR 947. Cornelius's billing records, however, reveal otherwise. In the Jeffrey Prevost death penalty case, he employed a mitigation specialist from September 2012 to April 2014, who was based in Houston, and worked for the $75.00/hr. rate. Ex. 109. Again, Cornelius's affidavit simply is not credible in light of his recently discovered billing records.

### 3. Trial counsel botched the minimal effort they made to introduce mitigating evidence.

Trial counsel also attempted to introduce evidence of Cruz-Garcia's religiosity through Bible study certificates and his assistance to federal law enforcement agencies such as the FBI, DEA, and INS through a Puerto Rican police officer, who was a state's witness. 26 RR 56–58; 24 RR 68–75. This evidence, however, was excluded by the trial court on hearsay grounds. *Id.* Trial counsel was ineffective for failing to do the legwork necessary to introduce the evidence in a form that would not have drawn a sustained objection from the State.

000242

**4.     Trial counsel failed to consult with any experts, except for a psychologist who did seven hours of work.**

When Cornelius sought approval for his $65,000.00 flat fee, he told the court that "[i]n all likelihood there will be a multitude of expert witnesses on many different elements of the various cases."[56] Ex. 7 at 14. The only expert Cornelius sought funding for, however, was a psychologist named Dr. Susana Rosin. According to his funding motion, Dr. Rosin was needed for "testing, review of documents, consultation, and possible testimony" relating to "issues of mental health and mitigation." 2 CR 387. In support of the motion, counsel attached a letter from Dr. Rosin in which she stated that, based on her understanding of her role on the case and its complexity, her role would involve approximately sixty to seventy hours of work. *Id.* at 390. The trial court approved funds up to $17,400 for this purpose. *Id.* at 389.

Yet, trial counsel barely used Dr. Rosin. After receiving approval for expenses for Dr. Rosin in July 2012, counsel did not have her perform any work on the case *for nearly a year*, until May 2013, just before trial. Ex. 7 at 21. Other than a phone call with the investigators on January 6,

---

[56] It is unclear what Cornelius meant by the "various cases."

000243

2013 (for which Dr. Rosin did not bill time), Dr. Rosin reviewed records for two hours on May 9, 2013, and evaluated Cruz-Garcia for three hours on May 15, 2013. *Id.* She then spoke with counsel for an hour on June 27, 2013, and prepared a report in an hour on July 1, 2013, a week before opening statements in Cruz-Garcia's trial. *Id.* Thus, in total, Dr. Rosin performed only seven hours of work on Cruz-Garcia's case, all shortly before trial. What little work was performed by Dr. Rosin appears to have been unused by trial counsel.

### 5.   Trial counsel failed to conduct an investigation in Puerto Rico.

In his motion requesting approval for his $65,000.00 flat fee, Cornelius emphasized Cruz-Garcia's ties to Puerto Rico, telling the court that the case "involves numerous extraneous offenses, both in Texas and in Puerto Rico," and that "[d]efendant's family lives in Puerto Rico, as well as in Texas and other cities." Ex. 7 at 13. When he sought funding his investigator, Cornelius told the court "investigations will in all likelihood be required to go to Puerto Rico to properly investigate this case," as "Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case." 2 CR 384–85.

000244

Yet, no one from the defense team ever travelled to Puerto Rico, nor were any records requested by trial counsel from Puerto Rico. Trial counsel even failed to uncover records that were within the State's possession and accessible as part of the State's open file policy. *See* § VI.B.7.

Addressing why no one from the defense team travelled to Puerto Rico, where Cruz-Garcia was previously incarcerated and where he spent much of his life, Cornelius stated in his affidavit that he "was confident that the investigators would do a very professional and competent job and nothing has convinced me otherwise." 4 SHCR 947. As with so much else in that affidavit, Cornelius seeks to the shift blame for the problems at Cruz-Garcia's trial on to others, in this case his investigator. Gradoni did not address the question in his affidavit. In a subsequent letter, he Gradoni said only: "I have no recollection of suggesting we travel to Puerto Rico." Ex. 8 at 1. Clearly, trial counsel had no strategic reason for failing to conduct an investigation in Puerto Rico.

### 6. Trial counsel failed to investigate extraneous offenses and future dangerousness.

Trial counsel failed to conduct a meaningful investigation into the extraneous offenses offered by the State and into the issue of future

000245

dangerousness generally. Indeed, Cornelius's affidavit alone makes that clear: "We were not going to win on future dangerousness, in my opinion," he wrote. 4 SHCR 946. Yet, Cornelius did not describe any investigative effort explaining this determination. Instead, trial counsel appears to have based this conclusion on their failure to succeed on the future dangerousness special issue in prior cases, and trial counsel's apparent belief that HCDAO would not seek the death penalty unless there were an insurmountable case for future dangerousness. *Id.* ("[T]he State does not seek the death penalty on cases where the crime is an aberration or where the defendant does not have a history.").

As discussed *infra* VI.E.7, there was significant evidence available to combat the State's future dangerousness case. Much of the testimony concerning extraneous offenses was contradicted by forensic evidence and prior witness statements. Significantly, there was significant record-based evidence that Cruz-Garcia had been a model prisoner in Puerto Rico, so much so that he was given the keys to parts of the prison he was incarcerated in. Trial counsel not only failed to present evidence showing that Cruz-Garcia was not a future danger; trial counsel did not even attempt to uncover any such evidence.  As the Supreme Court held in

000246

*Andrus*, it is "hardly the work of reasonable counsel" to "relinquish[] the first of only two procedural pathways for opposing the State's pursuit of the death penalty" by failing to investigate future dangerousness. 140 S. Ct. at 1885.

> **7.    Had trial counsel performed an adequate investigation, the evidence presented at trial would have been very different.**

An adequate mitigation investigation, conducted with the assistance of a mitigation specialist, would have uncovered a substantial amount of mitigation evidence. Likewise, there was a substantial case to be made on the future dangerousness special issue. Among other things, Cruz-Garcia had been a model prisoner in Puerto Rico and was widely praised by the prison personnel as a positive influence on other prisoners. Much of the State's evidence concerning extraneous offenses was wildly contradictory to the forensic and documentary evidence. There is a reasonable probability that, had the evidence detailed below been presented at the punishment phase, at least one juror would have reached a different conclusion regarding either the mitigation or future dangerousness special issue.

000247

a.   **An adequate mitigation investigation by a mitigation specialist would have allowed trial counsel to present evidence of Cruz-Garcia's life history**

i.   **Early life in Santo Domingo, Dominican Republic.**

Cruz-Garcia was born on July 8, 1967, in the capital of the Dominican Republic, Santo Domingo. His father, Valerio "Hungría" Julian Cruz Santos, had worked tirelessly to build a successful life for himself and his young family in Santo Domingo. Hungría was born and raised in the small fishing village of Boba, Dominican Republic. At the time, there was no electricity, no running water, and no highway that reached the village. Hungría was raised in poverty, in a place where even children were required to work both farming and fishing in order for families to survive. The fragile wooden houses were frequently damaged or destroyed in storms, forcing families to repair or relocate. Making things even more difficult was the fact that Hungría's parents divorced when he was young and his father suffered from some form of mental illness. As a teenager, Hungría determined to make a better life for himself. He left Boba at 15 years old and began work driving a bulldozer. He also played the accordion in the streets for change. He moved to Santo Domingo and, at approximately 20 years old, he joined the Dominican

000248

navy, training as a medic. He also began to work in a neighborhood clinic on his days off from the military. While in Santo Domingo, he met a beautiful young girl and asked her family to allow her to marry him. Dalia Margarita Garcia Martinez was just 14 years old and although her family was not affluent, she was raised in the city and was more cultured than Hungría. However, Hungría had a good job with the navy and Dalia's parents consented and the two started a family. They had a daughter, Noemí, and then a son, Obel. *See, e.g.*, Ex. 44; 84; 89; 110.

Shortly after Cruz-Garcia was born, his father purchased a parcel of land near the home of Dalia's parents and built a modest home there. Dalia was a stay-at-home mother and Hungría's military service allowed him to come home most nights. Hungría also put his medical knowledge to work providing advice and homeopathic remedies to people in the neighborhood who could not access hospital services. The family attended a Catholic church.

Cruz-Garcia was very close to his mother, napping in her bed and sharing his sweets with her. He has fond memories of that time and his older sister, Noemí, remembers him being his mother's favorite. A

000249

younger sister, Natalia, and then a brother, Joel, soon joined the family. *See, e.g.*, Ex. 44; 90; 100.

It appeared that Hungría had achieved all he had set out to accomplish. He escaped the poverty and drudgery of Boba, married a beautiful woman, had a successful career that provided a good income, lived in a house with modern amenities, and was able to send his two oldest children to a good primary school where they were receiving a much better education than that available in his village. Any problems in the household and the marriage were hidden. *See, e.g.*, Ex. 44; 90; 100.

All that Hungría achieved, however, was lost one fateful day when Cruz-Garcia was a young child. While Hungría was changing a flat tire on the side of the road, he was struck by a passing truck. He was severely injured in the accident, with broken bones and internal injuries that required multiple surgeries and a long recovery in the hospital. While he was hospitalized, Hungría was visited by women with whom he was having affairs and Dalia was confronted with the fact that her husband had been regularly unfaithful. Those who knew her then remember her fury and devastation. Once Hungría was sufficiently recovered to return home, Dalia left her husband and children and moved to her parents'

000250

home and began making plans to permanently relocate to Venezuela and start a new life. Hungría never fully recovered from his injuries and he was unable to return to his career in the navy. He was given a disability pension, but it was not nearly enough to maintain the family's lifestyle. Hungría briefly tried to maintain the status quo, hiring a neighborhood woman to help with the house and the children (and fathering a child with her), but it was impossible. After struggling for a couple of years, Hungría left Santo Domingo and returned to Boba, moving his four children in with his mother. *See, e.g.*, Ex. 42; 44; 84; 89; 110.

### ii.   Youth in Boba, Dominican Republic.

The psychological effects of so much change cannot be overemphasized. Cruz-Garcia was just nine or ten years old. His mother had abandoned him. His father was a changed man, with no career, no money, and no house. Cruz-Garcia was taken from the only home he had ever known in the capital and moved to a small, rural village where he lived in a tiny two-bedroom, wooden house with a zinc roof that had no running water and no electricity. The family cooked over a fire. A latrine in the backyard served as the family's toilet and a nearby hole provided water for drinking and bathing. The well would become contaminated

000251

during storms by runoff from the latrine, as well as by rat urine. Cruz-Garcia left a good school to continue his education in a rural school that taught the basics in half-day increments because all the children in the village were expected to work the other half of the day. Any evening studies were done after church by the light of an oil lamp. There were no grocery stores and no medical clinic. *See, e.g.,* Ex. 85; 87; 89; 90; 91; 92; 93; 110.

The people in Boba were very different from what Cruz-Garcia had become accustomed to in Santo Domingo. While Cruz-Garcia had been raised catholic, the people in Boba practiced an Evangelic religion. They were poor and superstitious. Everything in Cruz-Garcia's life was upended. *See, e.g.*, Ex. 90; 110.

As Hungría reentered the life he had fled years earlier, his son was forced to adopt a completely new lifestyle. The boy who was spoiled and cuddled by his mother was now required to wake before dawn every day and accompany his father as he went out onto the ocean to fish in a yawl. It was hard and dangerous work, as the sea could be unpredictable and the boat was small. On more than one occasion Cruz-Garcia saved his father's life during fishing accidents. In one instance, Cruz-Garcia's

000252

father fell from the boat and became tangled in the fishing nets. In another, the fishing boat capsized and Cruz-Garcia pulled his father from the water. Cruz-Garcia learned how to make fishing nets and how to swim in strong currents and waves. After fishing in the morning, Cruz-Garcia attended school in the afternoon. He would then go back out fishing until dark. He also helped with planting, tending to, and harvesting the crops grown on his grandmother's plot of land. Cruz-Garcia began to cook and to care for his younger siblings, especially the baby, Joel. There was little time for children's games. *See, e.g.,* Ex. 39; 42; 43; 44; 85; 92; 110.

There was no telephone in Boba. Hungría periodically spoke with Dalia in Venezuela when he went to the capital to collect his pension but the children had no way to hear her voice. From her work as a maid, Dalia sent some money and clothes to her children but that could never replace a mother's love and presence in Cruz-Garcia's life. *See, e.g.*, Ex. 89; 90; 110.

As his father attempted to rebuild his life somewhat, Cruz-Garcia became his companion, friend, and co-worker. Hungría taught his son how to fish and farm. After a time, Hungría felt strong enough to open a

000253

clinic in the village where he could use his skills as a medic to help the villagers who had no access to a doctor. Cruz-Garcia helped his father give injections and clean and suture wounds. Cruz-Garcia was no longer treated as a child, but as an adult who was expected to work side-by-side with his father. *See, e.g*, Ex. 85; 9;, 110.

Although their relationship was close, Hungría was a very strict father who did not demonstrate love. Ex. 85 at 13; Ex. 94 at 2. He demanded unquestioning obedience from Cruz-Garcia and punished disobedience severely. Ex. 85 at 13; Ex. 94 at 2. Hungría drank heavily and on more than one occasion crashed a car in a ditch because he was driving drunk. Ex. 85 at 13. Cruz-Garcia sometimes accompanied Hungría when he was drinking with his friends and he (and later his younger brother, Joel) tried to stop him from responding to medical calls when inebriated. *See, e.g.*, Ex. 85; 94; 110.

The homes in Boba were built of wood and had zinc roofs. Boba was subjected to numerous tropical storms and damage to homes or their complete loss during a storm was frequent. Like everyone in the village, Cruz-Garcia learned to live with the daily uncertainty and to go out and repair whatever damage occurred as quickly as a storm passed. The

000254

villagers all helped each other, with reconstruction or whatever else was needed. Cruz-Garcia's family was known as particularly generous with their time, labor, and food. *See, e.g.*, Ex. 84; 87; 92; 110.

While living in his grandmother's house, Cruz-Garcia fell from the roof while attempting to patch a hole left by a storm. He suffered a head injury so severe that his father felt unable to deal with it himself. Hungría transported his son via boat and truck to the closest town with a hospital, Nagua. For some time afterwards, Cruz-Garcia suffered headaches and was limited in his ability to read and write at school. *See, e.g.*, Ex. 84; 92; 110.

In Boba, Hungría met his second wife, Dorca Cruz Faña. She was single and had no children of her own. Hungría married Dorca, left his children with his mother, and moved to a nearby village, Bella Vista de Boba, with Dorca. Bella Vista de Boba was just as primitive as was Boba, with no running water or electricity. Dorca was jealous of Hungría's relationship with the children from his previous marriage to Dalia. After Dorca had her first child, the other children joined the new family but they were never loved by Dorca. Because Hungría wanted to please his new wife, he distanced himself from his oldest son and took Dorca's side

000255

in any dispute, beating the children if she said they had been disobedient or disrespectful to her. Cruz-Garcia's younger brother, Joel, would leave the house almost every day to go back to his grandmother in Boba and escape Dorca's wrath. Cruz-Garcia was still required to labor like an adult, but he was no longer his father's best friend. This new abandonment was exceedingly painful and his sadness was obvious to his friends. *See, e.g.*, Ex. 85; 87; 93; 94; 110.

When Cruz-Garciawas approximately 12 years old, his mother sent for his older sister, Noemí, to join her in Venezuela. Cruz-Garciadesperately wanted to go, too, and Dalia promised to arrange his immigration paperwork and send for him as soon as possible. However, Dalia never had any intention to bring her son to live with her. She lied and told Cruz-Garciathat the reason she couldn't bring him with her was that his birth certificate had been lost. But Dalia confided to Noemí that this was just a story she made up as an excuse and that she would never bring either of her sons. Cruz-Garciawas rejected again by his mother and now abandoned by his older sister. *See, e.g.*, Exs. 85, 89, 90, 110.

Left as the oldest child, with a stepmother who didn't love him and a father whose discipline had turned harsh, Cruz-Garciafound himself

227

000256

primarily responsible for his now four younger siblings. His step-mother was a teacher at a distant village school, which meant that Cruz-Garcia was responsible for ensuring that his two full siblings and two half-siblings were fed and cared for. He cooked, cleaned, washed, and changed diapers. This was in addition to his continued duties as a fisherman and assistant in his father's medical practice. There was neither time nor money for additional schooling and, like many of his peers in the village, Cruz-Garcia did not attend high school. *See, e.g.*, Exs. 39, 85, 94, 110.

When he was 18, Cruz-Garcia met Mireya Perez, a girl who was visiting Bella Vista de Boba with her family. Although both maintained that nothing inappropriate happened between them, because they were found alone together in a room, they were forced to marry. Neither Hungría nor Dorca approved of the marriage and Cruz-Garcia was quickly forced to move out of his father's home with his new wife. Shortly thereafter, Mireya became pregnant with Cruz-Garcia first child. Cruz-Garcia spent long hours every day fishing in order to support Mireya and he also continued to help his father and stepmother. *See, e.g.*, Exs. 87, 110.

000257

At 19, Cruz-Garcia found himself in a common-law marriage to a girl he barely knew with a baby on the way. In addition, he was expected to continue to help support his father and his four younger siblings. All this in the Dominican Republic, where the economy was depressed and able young people were fleeing the country in droves in order to earn a decent living. Cruz-Garcia decided it was time for him to join the migration and go to Puerto Rico, where he hoped to be able to send money back to his family and to earn enough to purchase his own fishing boat. He planned to return to the Dominican Republic as soon as he was able to support himself and his family. *See, e.g.*, Exs. 85, 87, 110.

### iii.   Young adulthood in Puerto Rico.

After consulting with Mireya, Cruz-Garcia left the Dominican Republic and travelled to Puerto Rico. There, he immediately gained employment on a coffee and banana farm in the area of Lares. Cruz-Garcia lived in quarters on the farm with other laborers, mostly Dominican immigrants. It was hard work, from sunup to sundown in grueling heat. The terrain around Lares is mountainous and slippery and the footing was treacherous. Huge ants lived in the banana trees and fell on the workers as they harvested bananas. At the end of the day, Cruz-

000258

Garcia was exhausted, his fingers were black with sap, his skin was swollen from insect bites, and he had earned $5.00. *See, e.g.*, Ex. 110.

Shortly after arriving in Puerto Rico, Cruz-Garcia called his father at a nearby store in Nagua, Dominican Republic. Hungría told him that although Mireya was carrying Cruz-Garcia's child, she had taken up with another man. Once again, Cruz-Garcia was abandoned by an important woman in his life and he was devastated. He continued to work and send money to his father, intending that it go to support his child, but the relationship with Mireya and his reason to return to the Dominican Republic was gone. *See, e.g.*, Ex. 110.

After a few months of backbreaking labor, Cruz-Garcia fled the farm and went to Rio Piedras. He was alone, without money or contacts. While standing by the side of the road, Cruz-Garcia saw someone he knew, a neighbor from Bella Vista de Boba, Piruquinu "Piruca" Acosta. Recognizing a friend in need, Piruca took Cruz-Garcia back to his home in Rio Piedras and helped him get a job working in a café as a cook. There, Cruz-Garcia met Angelita Rodriguez. *See, e.g.*, Ex. 85, 91, 110.

Angelita Rodriguez was also a Dominican immigrant, but she had family in Puerto Rico. Cruz-Garcia and Angelita fell in love and in 1987,

000259

they were legally married. Cruz-Garcia continued to work hard to support his new wife and to send money home. His work in the informal economy involved cooking, landscaping, and collecting cans and metal. However, he was unable to earn enough money to purchase a home or guarantee a better life for himself or his family. *See, e.g.*, Ex. 110.

It was during this time that Cruz-Garcia met Carmelo "Rudy" Santana Martinez, Angelita's cousin. Rudy had been living in Houston, Texas but had been deported back to the Dominican Republic. He had recently come to Puerto Rico and was planning to return to Houston where, he said, there was money to be made for someone willing to work hard. What he meant was that there was money to be made in selling drugs. *See, e.g.*, Ex. 85, 110.

Cruz-Garcia's younger brother, Joel, also immigrated to Puerto Rico, and established himself in the region of San Jose. He met Angelita and Rudy. Cruz-Garciatold Joel that he was going to move with Rudy and Angelita to the United States in order to improve their economic situation. *See, e.g.*, Exs. 85, 110.

000260

### iv.   Move to Houston, Texas.

In 1989, Cruz-Garcia went with Rudy to Houston and Angelita soon followed. At first, they all shared an apartment. Angelita had a small business in the apartment, styling the hair of neighborhood Dominican immigrants. Some months later, Rudy's pregnant wife, Margarita Martinez Zorrilla, moved to Houston and she and Rudy lived near Cruz-Garcia and Angelita. Rudy introduced Cruz-Garcia to his contacts in the drug business and Cruz-Garcia joined Rudy in selling cocaine. Soon both men were also using the drug. *See, e.g.*, Exs. 86, 110.

In Houston, Rudy became violent and frequently beat Margarita. Margarita was 20 years old, with no family, and she spoke no English. She sought help from Obel, who would try to calm Rudy and would help Margarita and her baby leave the apartment when things were out of control. It was Cruz-Garcia who brought her diapers and food when Rudy was away for days at a time. *See, e.g.*, Ex. 86; 110.

Cesar Rios, Jose Valdez, and Hector Saavedra remember Cruz-Garcia as being a good friend with a big heart. Cruz-Garcia was close to the brothers' parents, and they remember him helping their family out often. Cruz-Garcia would bring the family groceries or buy clothes and

232

000261

books for the brothers for school. He would ask Hector, who was younger, about his grades and encourage him to study. When Hector did well in school, Cruz-Garcia would give him pocket money or a small gift. *See, e.g.*, 20, 21, 22.

Cruz-Garcia treated Cesar, Jose, Hector, and their parents like family. They remember Cruz-Garcia sharing meals with them and being part of their lives, much in the way they themselves would bring food and support to their relatives in Mexico. His generosity struck them, both for how generous Cruz-Garcia was (he gave Cesar his first car) and because he never asked for anything in return. *See, e.g.*, 20, 21, 22.

Particularly memorable for the brothers was the time that Cruz-Garcia helped Cesar get proper medical attention for a gunshot wound, saving Cesar's arm. Cesar had been shot, and his family took him to a nearby hospital. Cruz-Garcia joined the family there, and the hospital intended to amputate the arm. Cruz-Garcia helped get the family to a different hospital, where Cesar was able to receive treatment that saved his arm. Cruz-Garcia even paid for the medical treatment because Cesar did not have any insurance. This was just another example of how the

000262

brothers felt that Cruz-Garcia treated them like family. *See, e.g.*, 20, 21, 22.

During this time in Houston, Cruz-Garcia continued to send money to his father in the Dominican Republic. Hungría used this money to support the family and also to begin building a house in Bella Vista de Boba for Cruz-Garcia and Angelita, as they were planning to return to the country once they had saved enough money to set up a good life there. *See, e.g.*, Ex. 81, 91, 110.

### v.    Return to Dominican Republic.

Cruz-Garcia returned to the Dominican Republic in 1992. Shortly thereafter, Angelita joined him. At first, they stayed in Santo Domingo, with Cruz-Garcia's aunt, Nilsa Garcia. The couple then stayed for a time in Bella Vista de Boba, with Hungría and Dorca, helping work on the house that was being constructed for them. Then they went to Higuey, and stayed for a time with Angelita's family. Cruz-Garcia worked both fishing and driving a bus. Those that saw the couple didn't note any problems but, in 1993, Cruz-Garcia and Angelita decided to divorce. After enduring the loss of another important relationship, Cruz-Garcia decided to return to Puerto Rico. *See, e.g.*, Ex. 81, 89, 91, 110.

234

###### vi. Life in Puerto Rico and the Dominican Republic.

After returning to Puerto Rico, Cruz-Garcia again worked whatever jobs were available. He learned that his first wife, Mireya was now living there and they reconnected and rekindled their relationship. Mireya remembers Cruz-Garcia as a devoted husband, who helped cook, clean, and do laundry. He went out of his way to make Mireya feel special, particularly on her birthday. Soon, she was pregnant with their second child, Abel Cruz-Perez. *See, e.g.*, Exs. 85, 87, 110.

After Abel was born, he and his mother returned to the Dominican Republic. Cruz-Garcia joined Mireya and his two sons there, living first in the house in Bella Vista de Boba, and then in Santo Domingo. Both boys remember a loving, attentive father. Mireya was the disciplinarian and Cruz-Garcia was the fun parent. Cruz-Garcia began driving his own commuter bus, in addition to fishing. He would come home from work with toys for the boys or a flower for Mireya. *See, e.g.*, Ex. 87; 110.

Once, as Cruz-Garcia returned from fishing in his pickup truck, he saw a crowd of people surrounding a badly injured child who had been

000264

struck by a car. Cruz-Garcia ran to help 6-year old Hector "Wandy" Alexander Santos, picking him up, placing him in the truck, and driving him to the nearest hospital. Now an adult, Wandy still has visible scars from the accident. Both he and his mother believe Cruz-Garcia saved his life that day. *See, e.g.*, Ex. 43; 93; 110.

While in Puerto Rico, Cruz-Garcia met an agent of the Immigration and Naturalization Service ("INS"). That agent asked Cruz-Garciato work as a confidential informant to help him uncover criminal activity in Puerto Rico. Cruz-Garcia agreed and after he returned to the Dominican Republic, he was regularly paroled into Puerto Rico at the behest of this agent in order to assist the agency. Once, at the behest of this agent, Cruz-Garcia was at sea with an INS target when the boat was rendered inoperable during a tropical storm. Cruz-Garcia and the target were lost at sea for 3 days and nearly died. They were ultimately rescued by a cargo ship and returned to Puerto Rico. Once there, the agent was able to make a critical arrest. Cruz-Garcia was paid for his work and used this money to establish a real estate business in Santo Domingo. *See e.g.*, Ex. 46; 85; 110; 111.

000265

Having now found some success in business, via his cooperation with INS, Cruz-Garcia took care of his family and others. One day as he drove from Santo Domingo to Bella Vista de Boba, Cruz-Garcia spotted a child begging on the side of the road. He pulled over and asked the child where his parents were. The child responded that his parents were very poor and that he needed help. Cruz-Garcia bought the child a meal and clothes and then took him home. Cruz-Garcia talked to the parents about the importance of educating their son and he stayed in touch with the child and sent money to help the child and his family for some time thereafter. *See, e.g.*, Ex. 87, 110.

Cruz-Garcia also continued to fish with his now elderly father. Neighbors remember a day when the sea was very rough and the yawl containing Cruz-Garcia and Hungría turned over several times. Hungría became trapped under the boat and was too tired to swim to shore. Cruz-Garcia dove under the boat to rescue his father and pulled him to shore. *See, e.g.,* Exs. 82, 110.

Cruz-Garcia spent months at a time in Puerto Rico, apart from his family in the Dominican Republic. He met Maria "Dorca" Altagracia Capellan and they began a relationship and had a child, Obeliz Cruz.

000266

Dorca was aware of Cruz-Garcia's family in the Dominican Republic but she didn't care. She loved Cruz-Garcia and the fact that he was such a supportive and attentive father when he was in Puerto Rico. When Dorca was ill with an ovarian cyst, Cruz-Garcia took her to the doctor and paid for her surgery. He then cared for her while she recovered, carrying her to bed and bathing her. While Dorca was at work, Cruz-Garcia cooked, cleaned the house, and took care of her home business, selling phone cards. He played with Obeliz and took her to daycare. *See, e.g.*, Ex. 88; 110.

### vii.   Incarceration in Puerto Rico.

When working as a confidential informant in Puerto Rico, Cruz-Garcia was arrested in 2001. He was sentenced to 16 years in prison, during which he moved between several prisons on the island.

Prison in Puerto Rico was eye-opening for Obel. He was forced to come to terms with his addiction and he became sober. He also returned to his religious roots. Daisy Melendez, a case worker supervisor at the Bayamon Prison, remembers Cruz-Garcia and his transformation. Cruz-Garcia talked with Ms. Melendez frequently and was remorseful and repentant about his life before. He cried when he spoke about the damage

000267

his choices had done to his family. The prison promoted family unity and Cruz-Garcia was visited frequently by Dorca and Obeliz, as well as Cruz-Garcia's oldest son, Obelito. All of them noted the difference in Obel. *See, e.g.*, Ex. 45; 83; 105; 106; 107; 108.

The prison chaplains spent a lot of time with Cruz-Garcia and considered him a valuable assistant. In addition to assisting with church activities, Cruz-Garcia was asked to speak with new prisoners to help maintain order in the prison. He set a good example for others and wasn't considered to be a problem, therefore he was given privileges such as access to open areas. *See, e.g.*, Ex. 45; 83; 105; 106; 107; 108.

All of the information above could have been obtained prior to Cruz-Garcia's trial in 2013, by conducting in-person interviews with potential witnesses in the Dominican Republic, Puerto Rico, and Houston who were available and willing to testify.

**b.    A trauma expert could have testified to the effects of Cruz-Garcia's difficult childhood and early-adult life.**

Trial counsel did not retain an expert on trauma who could have explained to the jury, after reviewing the available social history evidence set out above and interviewing the client, that what Cruz-Garcia

000268

experienced was more than just "a rough childhood." Cruz-Garcia experienced repetitive, prolonged, and cumulative traumatic events that involved direct harm, exploitation, and maltreatment including neglect, abandonment, and antipathy by primary caregivers during developmentally vulnerable times in his life. As detailed in the declaration of Claudia Degrati (Exhibit 110) and as summarized below, the result is complex trauma.

Cruz-Garcia suffers from complex post-traumatic stress disorder, a psychological disorder that can develop in response to prolonged, repeated experience of interpersonal trauma in a context in which the individual has little or no chance of escape. Had trial counsel hired an expert in the field, they would have been able to present the following information to the jury.

Years of repeated and prolonged adverse experiences profoundly affected Cruz-Garcia. Chronic and repeated exposure to traumatic and stressful events throughout his life, particularly during his developmental period, shaped and substantially impaired his cognitive, psychological, and social functioning and behaviors. The most significant traumatic events in Cruz-Garcia's life, even among a myriad of others

000269

included the chaos, parental discord and maternal abandonment in which he grew up.

Cruz-Garcia's father, even though Cruz-Garcia was only a child, made him feel complicit in his secret liaisons. His father's easy-going and friendlier attitude, compared to his mother's, made Cruz-Garcia idealize his father. However, Valerio's womanizing and drinking exposed Cruz-Garcia to sexual abuse and started him early on the road to alcohol abuse and addition. In doing so, Valerio normalized what were dangerous situations for a child.

Yet the most significant turning points in Cruz-Garcia's life and perhaps the most traumatic experiences for him were his father's accident and his mother's abandonment not long after. Cruz-Garcia was still a child when Valerio had such a serious accident that medical personnel thought he was dead and placed him in the hospital's morgue until they realized he was not. Later, Dalia left the country and moved to Venezuela, leaving her children without a mother. From then on, despite his young age, Cruz-Garcia was propelled into a parental role, forced to become a caretaker for his younger siblings. Cruz-Garcia also had to care for his father, who would not allow anyone other than Cruz-Garcia take

000270

care of his personal hygiene. From then on, Cruz-Garcia was to become not only his siblings' father of sorts, but his father's "crutch." The abandonment by his mother was repeated when his mother sent for his older sister to join her in Venezuela, while falsely promising to send for Cruz-Garcia soon. He suffered the loss of both mother and sister and was left feeling unwanted and unworthy.

After Cruz-Garcia's father remarried, Cruz-Garcia was rejected anew by his stepmother, who treated him and his siblings harshly. She demanded that Cruz-Garcia's father prioritize his relationship with her and her biological children at the expense of his previously close relationship with Obel.

As described in detail throughout his life history above, the long list of traumatic incidents to which Cruz-Garcia was exposed in childhood and adolescence include: familial patterns of trauma and poverty; what appears to be maternal mental illness and stress; extreme poverty and related environmental deprivation; child labor, abandonment, and neglect; repeated exposure to pesticides and other neurotoxins, including alcohol as a child; early loss of sense of safety, loss of his father as a protector and income-earner, loss of familiar surroundings when his

family moved from the capital to a rural area, etc. Each of these traumatic events alone may detrimentally impact an individual's cognitive and behavioral development, however, the presence and interaction of multiple traumatic incidents had an exponential effect on Cruz-Garcia's development and subsequent functioning.

Traumatic childhood experiences like those experienced by Cruz-Garcia are the kind of adverse childhood experiences powerfully linked to detrimental effects on adult health. The Adverse Childhood Experiences (ACE) study by Kaiser Permanente and the Center for Disease Control was based on a questionnaire regarding adverse childhood experiences including abuse, neglect, poverty, family dysfunction, and other traumatic experiences such as those of Cruz-Garcia. The ACE study identified factors that set the stage for illness including mental illness. The study confirmed an unequivocal and highly significant link between repeated traumatization in childhood and depression, alcoholism, drug abuse and sexual promiscuity, as well as various medical illnesses including heart disease, cancer, stroke and diabetes.

000272

In late adolescence and adulthood Cruz-Garcia's exposure to trauma and stress continued. The experiences described above in more detail include: extreme poverty and lack of access to services and resources; many near-death experiences at sea; exposure to serious diseases and severe deformities while helping his father tend to patients that suffered from severe illnesses; being forced into a live-in relationship and start a family at a young age; suffering the dangers of crossing the Mona Passage on a frail boat, as he and many Dominican risked their lives in search of a better life in Puerto Rico; facing discrimination and fear of being detected as an undocumented alien in Puerto Rico; learning that his common-law wife was being unfaithful while pregnant with their child; surviving tropical storms in the Dominican Republic, Puerto Rico and at sea; and experiencing at least two serious car accidents. He also continued to be exposed to neurotoxins, particularly in the form of pesticides and other agro-chemicals.

Exposure to such chronic, multiple and severe instances of trauma, in combination with a genetic predisposition to substance abuse, set the stage for his resorting, early on, to the coping method that is common in victims of trauma: self-soothing and self-medicating his symptoms with

000273

alcohol and ultimately, drugs. In adulthood, religion became not only a source of comfort and hope for him, but when it helped him with a severe addiction to heroin while in prison in Puerto Rico, it became his lifeline. Cruz-Garcia found in religion an adaptive way of coping with the sequelae of the chronic, severe and repeated traumatic life experiences he has had to live through since childhood.

Trauma does not always dissipate in its effects but rather can trickle down from generation to generation—intergenerational trauma. The people at the highest risk of trauma and those with the most difficulty working through it have experienced their own trauma but also have come from a family where there was a trauma in their parents and often in their parents' parents. Where trauma has been untreated, what is fairly common is that the untreated trauma in the parent is transmitted through the child through the attachment bond and through the messaging about self and the world, safety, and danger.

Cruz-Garcia experienced adverse effects of intergenerational trauma. Prior to his birth, as a member of the military his father fought during a civil war. He was apprehended and nearly killed by civilians. Little is known about his mother's experiences. However, the fact that

000274

she abandoned her four young children and left them to fend for themselves to go work in Venezuela could be a sign of a traumatic past.

Cruz-Garcia was also likely exposed to neurotoxins:

- Alcohol forced on him by his father from when he was as young as six, with adverse effects on his developing brain;

- Cruz-Garcia worked in agriculture with his father from an early age;

- He then worked on a coffee plantation as a young man and was exposed to pesticides.

### c.   An expert of Dominican culture could have provided valuable contextualization.

Trial counsel did not retain a culturally competent expert, who could explain to the jury the Dominican Republic's culture and customs, particularly concerning masculinity, traditional gender roles, marriage, divorce, and child rearing. An expert familiar with the history of migration from the Dominican Republic to Puerto Rico could have explained Cruz-Garcia's life as a migrant in a larger socio-economic context and cultural pressures, and the connection between that migration and the drug trade.

Cruz-Garcia's journey from Dominican Republic to Puerto Rico and then to United States was part of a well-recognized pattern that was influenced by a desire for a better life and struggling with poor economic

conditions. An anthropologist or sociologist familiar with this topic could have provided the jury a wealth of information to put Cruz-Garcia's life story into context and to better understand why that story mitigated against the death penalty.

For example, Dr. Gina Perez is a professor of anthropology, whose research focus includes substantial work on the issue of migration in and around Puerto Rico. She is particularly familiar with the experience of Dominican migrants coming to Puerto Rico in the 1980s and 1990s. Dr. Perez was available to testify at Cruz-Garcia's trial had she been contacted by trial counsel and would have provided the information contained in Exhibit 41 and summarized below.

### i. Cruz-Garcia's early life in the Dominican Republic.

Raised in a rural area of the Northeastern region of the Dominican Republic in the early 1960s, Cruz-Garcia's kin network and household was large, fluid, and included extended family members. Like much of the Dominican population at the time, Cruz-Garcia's family was involved in agricultural work. They owned a modest plot of land where they raised food for their families and to sell to earn money. The men in Cruz-Garcia's family were also fishermen, an important economic activity that

000276

fed their family and provided reliable income. The family's economic security through the early 1960s reflects not only the industriousness of the family, but also national political economic policies that characterized the Dominican economy under the Dictator Rafael Trujillo from 1930-1961. This policy supported small-scale agricultural production by family farmers and limited the mobility of rural workers to ensure a robust supply of agricultural labor. From a very early age, Cruz-Garcia was expected to and actively participated in agricultural work, fishing, and helping to care for younger relatives.

Cruz-Garcia's childhood and development were particularly distinguished by the separation of his parents and his mother leaving to live in Venezuela. From the time that Cruz-Garcia's father returned to live with his extended family with Cruz-Garcia and his siblings, it was clear that Cruz-Garcia took on an important role of caring for his brother and sisters by cooking, babysitting, making useful items for the household, fishing, and working with his father. He was a good and hard worker helping his father provide for the family. Cruz-Garcia was someone who protected his family, helped others, and from a very early age took on roles that exceeded his age.

000277

In addition, Cruz-Garcia's view of what constituted family and family relationships was also impacted by his native country. The Dominican Republic has a particularly unique history of family size. Indeed, throughout his thirty-one-year dictatorship, Rafael Trujillo implemented policies to encourage population growth by enforcing strict controls of emigration from the Dominican Republic, encouraging European immigration to the island, and "systematic encouragement of childbirth" and, consequently, large families to ensure a large and available labor pool for agricultural and industrial work. The existence of large families with a range of household arrangements, therefore, was both state-sanctioned and culturally acceptable in the Dominican Republic.

However, as a young man in his late teenage years in the Dominican Republic, Cruz-Garcia was like many young men struggling to work in a changing economy. While the Dominican economy in the 1960s and early 1970s was still largely defined by large numbers of workers in agricultural labor and subsistence economy, the late 1970s and 1980s witnessed unprecedented economic changes that had a dramatic impact on the economic, social, and cultural lives of residents

000278

on the island and throughout the Caribbean. Economic hardship increasingly defined life in the Dominican Republic in the late 1970s and 1980s. According to anthropologist Jorge Duany, "employment and underemployment, the rising cost of living, a chaotic transportation system, near collapse of basic public service like electricity, running water, housing, health care and education" made life very difficult for Dominicans in general, and those residing in rural areas in particular.[57]

### ii.    Emigration in the Dominican Republic.

In addition to deteriorating economic and social conditions, changes in Dominican migration also define the decades of the 1960s, 1970s, and 1980s. From 1930-1961, movement within the Dominican Republic and emigration were severely restricted under Rafael Trujillo. Beginning in 1966, however, these restrictions were lifted, and Dominicans increasingly engaged in internal and international migration. According to Ramona Hernandez, while it was virtually impossible for Dominicans to apply for a passport for more than thirty years, by the late 1960s, anyone who wanted a passport could apply and acquire one. These

---

[57] Jorge Duany, *Dominican Migration to Puerto Rico: A Transnational Perspective* (2005).

000279

changes led to significant internal migration with those residing in rural areas often moving to urban centers like Santo Domingo.

It also led to substantial emigration, legally and illegally. By the 1980s, migration was such a defining feature of Dominican life that Dominicans refer to this massive movement and displacement as "irse para los paises" (literally "moving to the countries").

By the mid-1980s, when Cruz-Garcia began to court Mireya Pérez Garcia, he was one of many young Dominicans engaged in internal migration in search of work, unsuccessfully seeking employment in an economy that increasingly employed women more than men, and considering migration as a way to search for a better life. In 1986, like thousands of other Dominicans, Cruz-Garcia traveled on a yola to Puerto Rico. Not only was Puerto Rico an increasingly popular destination for Dominican migrants, it also held the possibility of getting legal documents that would allow him to travel to and live legally in the United States. These ideas of a better life and the possibility of changing one's status to go to the United States circulated widely in the Dominican Republic in the 1980s and led Cruz-Garcia and tens of thousands of others to leave the Dominican Republic for Puerto Rico.

000280

### iii.   Life and work in Puerto Rico.

While Puerto Rico was often regarded as "a springboard for the U.S.," the cultural, linguistic, and historical ties between Puerto Rico and the Dominican Republic make it attractive and reasonable for Dominicans to remain and reside there.

One element that was especially notable about Cruz-Garcia's migration experience was the degree to which he maintained connection with his family in the Dominican Republic.

Although Dominican migrants began to arrive in Puerto Rico in significant numbers in the 1980s and 1990s seeking a better life, Puerto Rico also was experiencing significant economic, social, and political problems that constrained migrants' experiences. Beginning in the mid-late 1970s, Puerto Rico was in economic crisis. The impact of the oil crisis on the island and the devaluation of the American dollar in the early 1970s, as well as the failure of Puerto Rico's industrialization program to provide adequate jobs for its growing population, led to increased unemployment and underemployment.

Beginning in the 1980s and 1990s, Dominican migrants like Cruz-Garcia increasingly comprised a large number of surplus laborers

000281

involved in the informal economy in Puerto Rico. Often they worked off the books as domestic workers, in construction, landscaping and gardening, and providing childcare. When Cruz-Garcia's wife arrived in Puerto Rico in 1994, she worked cleaning houses. Cruz-Garcia worked in a range of jobs in the informal economy, including working as a gardener and even collecting cans to trade in for money when times were hard.

For Cruz-Garcia, seeking employment as an undocumented Dominican in the late 1980s and 1990s in Puerto Rico was no small matter. He managed to find a range of jobs as a gardener, collecting and recycling cans, and working as a real estate agent—all jobs that were part of the informal economy and paid very little. Like so many Dominican migrants, Cruz-Garcia lived in low-rent neighborhoods like Barrio Obrero, where he could draw on networks with other co-nationals and managed to send money back to the Dominican Republic to help support his wife and their son. Given Cruz-Garcia's demonstrated commitment to financially provide for his extensive families, both in the Dominican and in Puerto Rico, it is not surprising that turning to the drug economy became yet another source of generating income. As the possibilities for formal employment diminished for all residents on the

000282

island, the drug economy grew in Puerto Rico, the Dominican Republic, and the United States. And like many with experiences in the informal economy and limited economic possibilities, selling drugs seemed like a reasonable strategy.

> **d.   An investigation in Puerto Rico would have uncovered highly significant evidence from Cruz-Garcia's time in a Puerto Rican prison.**

Records from Cruz-Garcia time in prison, many of which were in the State's file that trial counsel failed to review, indicate Cruz-Garcia had no disciplinary history or grievances from his time in Puerto Rican prisons. Ex. 38 at 8 (no disciplinary complaints from October 31, 2005 to November, 3, 2008); *id.* at 9 (no grievances from 2005 to 2010); *id.* at 10 (no disciplinary complaints); *id.* at 11 (same). Indeed, the records reflect that rather than being a disciplinary problem, Cruz-Garcia was the opposite. Cruz-Garcia earned numerous recommendations for good time credit based on his behavior and hard work. *Id.* at 1, 4, 6, 7, 12, 14, 16, 18, 20, 21. From October 2005 to July 2009, Cruz-Garcia received frequent commendations for his hard work at the prison. *Id.* In total, Cruz-Garcia received 204 days of credit for his behavior. One notation specifically observed that:

000283

> This prison performs risky jobs and for this reason
> we are asking for this good conduct time to
> compensate him for the effort that he makes and
> by this means help create an example so that other
> prisoners will give their best.

*Id.* at 6.

Cruz-Garcia's behavior in prison was remarkable for both the absence of any disciplinary infractions and the awarding of special privileges for good behavior. During this time, Cruz-Garcia worked as a carpenter building furniture for the prison corporation, a job for which he was permitted to leave the prison grounds to work at this job. Cruz-Garcia was also permitted outside the perimeter of the prison for cleaning duties. He also worked maintenance jobs and in the kitchen, which would have entailed working in the outside perimeters of the institution. The fact that Cruz-Garcia was given these privileges indicates that his conduct was excellent and that he was not seen by the prison authorities as a security threat. Cruz-Garcia did not receive a single disciplinary infraction during this time. *See, e.g.*, Ex. 45; 83; 105; 106; 107; 108.

Chaplains at the facilities where Cruz-Garcia was housed were also available to testify regarding Cruz-Garcia's positive behavior in prison and the resulting trust and freedoms that were bestowed upon him.

000284

Chaplain Irma Iglesias Cruz has worked in the Puerto Rico Department of Correction for roughly forty years. She supervises about sixty other prison workers, including chaplains in other facilities, and oversees the orientation of new chaplains coming in to work in an institutional setting for the first time. Ivan Negron Vera has worked as a chaplain for the Department of Correction for seventeen years. From 2000 to 2012, he supervised roughly two thousand chaplains serving the various facilities run by the Department. He regularly counsels both inmates and correctional facility staff and guards. Jimmy Osorio has been a pastor for thirty years and has volunteered as a chaplain with the Department of Correction for about twenty-two years. And Luis Gonzales Martinez has volunteered as a chaplain at multiple facilities in San Juan for about twenty-eight years. *See, e.g.*, Ex. 45; 105; 106; 107; 108.

These four chaplains each got to know Cruz-Garcia as a volunteer helping with religious services and taking care of the chapel. Each agrees that in the many years they have worked in the criminal justice system, Cruz-Garcia stands out to them as one of the best behaved, most trusted, and well-respected inmates. *See, e.g.*, Ex. 105; 106; 107; 108.

000285

As experienced chaplains, they had witnessed other inmates trying to con their way into positions of trust or pretend to be religious. But each believes through their experiences with Cruz-Garcia that he is a genuine and honest person. To them, Cruz-Garcia's faith is real, as was the encouragement and support he gave to other inmates. At the time, the chaplains noted Cruz-Garcia's leadership skills and how he worked hard to help others become better people and productive inmates. He got along well with other inmates and staff. *See, e.g.*, Ex. 105; 106; 107; 108.

Because of Cruz-Garcia's good behavior, he earned the respect of guards, staff, and other inmates. He was given a significant role in the church services of the prison. He was the most trusted inmate in the chapel and would assist in all matters dealing with the prison's religious services. Cruz-Garcia would help get the chapel ready for worship services and clean up after, moving about freely. He took part in music services and led Bible studies. *See, e.g.*, Ex. 105; 106; 107; 108.

None of the chaplains remember Cruz-Garcia being written up for discipline problems or being considered dangerous. None ever witnessed or heard of him committing any violence; he would not have been given so much freedom if he had. And this was not due to the lack of

000286

opportunity—while in prison in Puerto Rico, Cruz-Garcia was housed in general population and he was frequently left alone outside his cell. *See, e.g.*, Ex. 105; 106; 107; 108.

Cruz-Garcia was given tremendous privileges and trust in the prison not conferred on most other inmates. For example, multiple chaplains at various times gave Cruz-Garcia the keys to the chapel or their offices and allowed him to move around unsupervised. *See, e.g.*, Ex. 105; 106; 107; 108.

Cruz-Garcia was also allowed to work in the "corporation" area, which allowed inmates access to power tools and other potentially dangerous objects that were used for making furniture. Only inmates who were well-behaved, hard-working, and had earned trust were permitted to work there. *See, e.g.*, Ex. 45; 83;105; 106; 107; 108.

In fact, if anything, Cruz-Garcia was seen as a calming influence who helped to maintain order. He would convince other inmates to pay attention to correctional staff and to follow the rules. Correctional staff felt Cruz-Garcia made their jobs easier through his influence on other inmates. When Cruz-Garcia was moved into segregation because he was

being extradited to Texas, he maintained this attitude.[58] *See, e.g.*, Ex. 45; 83; 105; 106; 107; 108.

Overall, these chaplains would have testified that Cruz-Garcia had a tremendous, positive impact on the lives of other inmates and of correctional staff while in prison in Puerto Rico. In addition to being a trustworthy and hard worker, Cruz-Garcia acted as a leader and a counselor to help other inmates obey prison rules. *See, e.g.*, Ex. 45; 83; 105; 106; 107; 108.

Dr. Alejandro Lebron, a clinical psychologist who counseled Cruz-Garcia while he was in prison there, was also available to testify. Dr. Lebron has worked in the field for roughly forty years and, at the time he knew Cruz-Garcia, was providing mental health support and assistance to inmates. Cruz-Garcia began seeing Dr. Lebron by choice. That is, he was not ordered to receive counseling, but instead had sought out therapy on his own. *See, e.g.*, Ex. 45.

---

[58] Copies of the letters found in the DA file support the chaplains' view that Cruz-Garcia maintained his faith even as he was incarcerated in Houston: he continued to take Bible courses by correspondence and engage in nearly daily religious exchanges via post with friends and family. Had trial counsel reviewed the DA file, these letters could have been presented to the jury.

000288

Like the chaplains, Dr. Lebron observed that Cruz-Garcia's faith was genuine and thoughtful. He also felt that his dealings with Cruz-Garcia gave him a new perspective on the Bible and using religion as a common ground to connect with patients. Dr. Lebron's experience in dealing with Cruz-Garcia was that he was open and honest and was not a troublemaker. He witnessed Cruz-Garcia have access to other prison staff and civilians, and never felt he posed a danger to anyone. He never knew of Cruz-Garcia to cause any trouble. Ex. 45.

Dr. Lebron would have told the jury about the Cruz-Garcia he knew: "a deeply spiritual man, who believed that doing good work and living a good Christian life was the most important thing he could do." Having worked with prison populations, and knowing Cruz-Garcia in the years after the crime occurred, Dr. Lebron would have communicated that he had witnessed inmates change and that, even if guilty, he believed Cruz-Garcia was no longer the same individual.  Ex. 45.

It is not surprising, therefore, that when an expert on the Puerto Rico Department of Corrections conducted a review of Cruz-Garcia's disciplinary records in Puerto Rico, he concluded that Cruz-Garcia had exemplary conduct during the nearly eight years he was incarcerated in

Puerto Rico. There was nothing in the records to indicate that Cruz-Garcia was a dangerous or violent inmate; in fact, just the opposite— Cruz-Garcia was a model inmate who was trusted and highly regarded by prison staff. Ex. 40.

Finally, Cruz-Garcia's common law wife Dorca, who trial counsel briefly interviewed by telephone, could have provided helpful information in this regard had she been interviewed earlier and more thoroughly. Dorca had been with Cruz-Garcia during the time he was in prison and had visited him there frequently with their daughter. She recalls the jail guards were friendly with Cruz-Garcia. She also remembers that Cruz-Garcia worked hard to continue to provide as much as he could for his family, even though he was in prison. He would make hammocks, key chains, and other items to sell and then send the money to Dorca and their daughter. Ex. 88.

None of this information about Cruz-Garcia's conduct and life in prison in Puerto Rico was presented to the jury. In failing to conduct an investigation into a clear avenue of mitigating information, counsel's performance under the standards for capital counsel was deficient. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an

000290

obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty").

### e. Had trial counsel investigated the state's case on future dangerousness, they could have significantly undermined it.

Trial counsel failed to conduct a thorough and independent investigation into extraneous offenses. As set forth more fully in Claim 1, much of the testimony that the State presented about extraneous offenses was false. Cruz-Garcia hereby incorporates by reference all facts and allegations in that claim. Had counsel conducted a constitutionally sound inquiry, they would have been able to effectively impeach the State's witnesses and rebut their testimony.

### i. Saul Flores Murder.

Trial counsel failed to thoroughly investigate Saul Flores's murder despite being put on notice that the State intended to introduce testimony and evidence about it. The State presented five lay witnesses and an expert, along with dozens of exhibits related to this extraneous offense. Trial counsel did not present a single rebuttal witness and failed to follow basic procedure for impeaching a witness.

As set forth more fully in Claim I, Johnny Lopez's testimony at trial was completely contradictory to the statement he gave police in 1989. Ex.

000291

29. Even though Lopez had identified another suspect entirely, both by name and in a photo lineup, trial counsel failed to impeach him. Trial counsel elicited all the responses necessary to show that the witness contradicted his prior statement, 25 RR 51–55, but then, instead of reading the statement to the jury to impeach Mr. Lopez, counsel switched to a new line of questioning. 25 RR 56.

Trial counsel then failed to present rebuttal witnesses who could have testified that Johnny Lopez gave a completely different statement in 1989. Mr. Lopez was interviewed by two officers, R.E. Gonzales and A.C. Alonzo, the same officers who were involved in investigating Cruz-Garcia's case. Because they interviewed Mr. Lopez in 1989, they could have testified about what Mr. Lopez told them then, and such testimony would not be hearsay because it would have been offered for purposes of impeachment.

Trial counsel failed to investigate available records on Saul Flores. including the offense report and the results of any DNA testing performed. Trial counsel failed to request updates on the progress of the investigation that the State witness testified had happened since Santana came forth with his information about the Saul Flores murder.

000292

Trial counsel failed to review the DA file and discover dozens of photos of Saul Flores that could have been used to impeach testimony regarding injuries Cruz-Garcia allegedly inflicted.

As set forth more fully in Claim I,  Santana gave dramatic testimony about Saul Flores's murder that was completely false. It was directly contradicted by the autopsy report, photographs, and witness affidavits. In particular, Santana testified that Cruz-Garcia's girlfriend, Elizabeth Ramos, was the source of conflict between Cruz-Garcia and Mr. Flores. 25 RR 74. He testified that "Saul had taken some drugs, he had gone to Elizabeth's apartment, and he wanted to have some type of love relationship with her." *Id.* Ms. Ramos called Cruz-Garcia and told him about it; Cruz-Garcia was furious, and immediately went to her apartment. *Id.* According to Santana, Cruz-Garcia then killed Mr. Flores elsewhere. The State used this testimony to argue in closing that Cruz-Garcia "killed that 18-year-old guy for nothing more than he hit on his girlfriend." 26 RR 174.

Had counsel conducted an adequate investigation, they would have been able to locate and interview Elizabeth Ramos. She would have testified that she does not know Saul Flores. Ex. 30. She was never

000293

"courted" by Flores. Cruz-Garcia never picked up Flores—or any other man—from her apartment under the circumstances described in the testimony. At that time, she was living with her mother, in her mother's apartment. She is certain she would have remembered if several men arrived to remove another man interested in "some type of love relationship." *Id.*

Santana also testified that Cruz-Garcia killed Flores in a rather gruesome manner, inflicting all manner of injuries. 25 RR 79–83. Had counsel requested the records, consulted experts, and hired a medical examiner or a pathologist to testify, he would have been able to present testimony explaining that the injuries shown in the photos and the autopsy report (a small abrasion, bruised face, 25 RR 108) are inconsistent with the injuries Santana testified were inflicted ("completely destroyed hands," cigarette burns, injected drugs, 25 RR 81, 93).

### ii.   Kidnapping Puerto Rico.

Trial counsel failed to investigate the extraneous offense for which Cruz-Garcia was incarcerated. Trial counsel failed to uncover records that would have substantiated the testimony the defense was unable to

000294

introduce at trial: that Cruz-Garcia was working on behalf of law enforcement agencies at the time of the offense, October 11, 2001. Specifically, Cruz-Garcia was admitted to Puerto Rico a couple of weeks prior, on September 21, 2001, for 90 days for "significant public benefit." Ex. 111. This type of benefit is typically used to allow noncitizens to appear for and participate in a civil or criminal legal proceeding in the United States. 8 C.F.R. § 212.5(b)(4). Significant public benefit parole might be granted, for example, to allow a key witness with no legal means of entering the United States to be paroled into the country long enough to testify in a criminal prosecution for drug trafficking.

Again, trial counsel failed to obtain those records, investigate the testifying witnesses, and present any rebuttal witnesses or experts. Here, counsel could have introduced testimony of a retired DEA agent who could have put the actions of Cruz-Garcia that day in context of a multi-agency operation gone sideways and their informant being caught in the middle of it. Trial counsel did none of that.

000295

### iii.  Betico.

Finally, during the punishment phase, Santana testified that Cruz-Garcia, along with others, broke into "Betico's"[59] house. 25 RR 66. According to Santana, Cruz-Garcia stole drugs and money from Betico, beat him, and raped his wife. *Id.* at 70.

Trial counsel failed to conduct any investigation, locate any information about Betico and the alleged rape, and present any rebuttal testimony. Trial counsel failed to make any objection to the introduction of such highly prejudicial, inflammatory testimony that had no indicia of reliability. Aside from issues with Santana's credibility in general, Santana did not witness this offense himself, could not say when this incident allegedly occurred, did not know the names of the people who were present, and did not even know the names of the alleged victims.

---

[59] Spelled phonetically in the transcript as "Patiko" but spelled as "Betico" on the State's notice of intent to use prior bad acts. The notice does not provide the name of Betico's wife, the date the alleged assault occurred, or location. 2 CR 414.

000296

### f. Had trial counsel not waited until the last minute, they could have presented evidence of Cruz-Garcia's work as a valued asset of United States Law Enforcement agencies.

Had counsel timely requested records from government agencies, they would have been able to show that Cruz-Garcia served as a confidential informant for the United States Government. Ex. 46. Although the document from U.S. Department of Justice is heavily redacted, it begins with "As per your request I am submitting a list with case number of aliens prosecuted as a result of the assistance rendered by confidential informant Cruz-GarciaJulian CRUZ-Garcia" and then continues onto the next page. *Id.* As a result of his activities—often at risk to himself—federal agencies were able to make numerous arrests. *Id.* Because trial counsel waited until just before trial to begin their investigation in earnest, however, they were left with an almost fully redacted and practically useless list of matters in which Cruz-Garcia had assisted the United States. Had trial counsel acted more diligently, they would could have taken the steps required to obtain additional information.

These records would have also shown that the U.S. Government repeatedly trusted Cruz-Garcia to enter the country legally for the

000297

purpose of providing "significant public benefit." In fact, even obtaining a copy of Cruz-Garcia's passport—which his family had and would have gladly provided, had trial counsel asked—would have shown that he was repeatedly issued permission to enter the country for "significant public benefit." Ex. 111. These admissions into the country were for the purpose of providing support to United States federal agencies with the apprehension of serious drug traffickers.

Either a passport or immigration records would have also shown that Cruz-Garcia entered the country legally and was in Puerto Rico for one of these assignments when he was arrested for kidnapping. Records from government agencies would have also shown that Cruz-Garcia was making a living legally and receiving payments from the U.S. Government for the services he provided. Thus, records of federal agencies—which trial counsel failed to request——would have provided information relevant to both future dangerousness and mitigation special issues.

### g.   Trial counsel also performed deficiently by failing to make appropriate objections and motions.

As detailed in § VI.G, trial counsel performed deficiently by failing to object to inadmissible evidence and failed to preserve claims for review

000298

on appeal. Trial counsel also failed to challenge the reasonableness and adequacy of the State's notice of intent to use extraneous offenses and prior bad acts under Tex. Code Crim. P. Art. 37.07 § 3(g), including, but not limited to, lack of timely notice necessary to investigate the alleged conduct, lack of names of the victims, lack of precise dates. For example, the notice the State gave regarding the extraneous rape offense it later introduced at a punishment phase states only as follows:

> Sometime between 1989 and 1992, the Defendant and an unknown male committed or attempted to commit a robbery against an individual named "Betico." This incident occurred at an apartment located at the edge of Loop 610 in Houston, Harris County, Texas. The Defendant and the unknown male were driven to the apartment by Carmelo Santana. After the incident, the Defendant admitted to also sexually assaulting a female inside the apartment at that location.

3 CR 468. This statement does not meet the minimum statutory notice requirements, such as the name of the victim or the date on which it is occurred. It also does not give sufficient information for Cruz-Garcia to prepare his defense, such as the location, the names of other person present, or even the full name of the complainant. Nonetheless, trial

000299

counsel did not raise any objections to the sufficiency of this notice or the subsequent introduction of testimony about this alleged offense.

Trial counsel, however, failed to object to the introduction of testimony regarding the above-alleged extraneous offense. By failing to object to the deficiencies in the State's notice, trial counsel failed to hold the State to its burden of proof. Trial counsel likewise made no motions in limine or oral motions to challenge the introduction of unsubstantiated allegations of extraneous offense, thus relieving the State of its burden of proof.

Trial counsel did not retain a mitigation specialist, called just four lay witnesses, conducted no investigation in Puerto Rico despite Cruz-Garcia's community ties there, failed to challenge the State's case on future dangerousness, and failed to uncover and present to the jury a wealth of mitigation evidence. That evidence included Cruz-Garcia's cooperation with U.S. law enforcement authorities, a documented record of good behavior in a prison setting, and numerous witnesses who were available to testify to his generosity.

000300

**F.    Trial counsel was ineffective during jury selection.**

**1.    Cruz-Garcia's constitutional right to a grand jury selected from a fair cross-section of the community under the Sixth and Fourteenth Amendments was violated.**

Cruz-Garcia was indicted by the grand jury twice, first in 2008 and then again in 2013. At that time, Texas employed the "key man" system of grand jury selection, which it finally abolished two years after Cruz-Garcia's trial in 2015, the last state in the nation to do so. Rather than picking from a pool of randomly selected residents to hear criminal cases, judge-appointed commissioners were allowed to nominate prospective jurors under a system the Supreme Court has called "susceptible of abuse." *Castaneda v. Partida*, 430 U.S. 482, 497 (1977) (citing *Hernandez v. Texas*, 347 U.S. 475, 479 (1954)). This system was likely unconstitutional as applied to Cruz-Garcia's case for two main reasons. First, this system—which relied on judicial appointment of prospective jurors—was unconstitutional because it lent itself to the selection of grand jurors with connections to the criminal justice system and law enforcement. Second, the key man system discriminated against the Hispanic population who were unconstitutionally underrepresented as grand jurors. A Houston Chronicle analysis of 1,900 grand jurors who

000301

served from 2007 to 2014 in Harris County showed that there were three times more adult Hispanics living in Harris County than the number who served on grand juries, 36 percent versus 12 percent. *See* Ex. 49. The Supreme Court has held that similar disparities in representation have established a prima facie case of discrimination in grand jury proceedings. *See Castaneda*, 430 U.S. at 495–96. Trial counsel failed object to Cruz-Garcia's indictment by a grand jury selected through the unconstitutional key man system. Had trial counsel raised an objection to the indictment, the indictment either would have been dismissed or the issue of the unconstitutional key man system would have been preserved for appellate review where it would have been successful.

### 2. Failure to raise cross-section claim.

Harris County systematically excludes Hispanics from the jury pool to the extent that jury venires average less than 25% Hispanic representation, while the percentage of Hispanics in the community population exceeds 40%. *See infra* n.55. This practice violates the Constitution's fair-cross-section requirement. *See Duren v. Missouri*, 439 U.S. 357 (1979). Jury venires must be representative of a cross-section of the community. Whenever there is an underrepresentation of a segment

000302

of society on a jury list, there is a denial of equal opportunity or equal participation. Hispanics constitute a distinctive, cognizable group in the Harris County community. Hispanics were underrepresented in Cruz-Garcia's jury venire compared to the percentage of Hispanics in the community. At the time of Cruz-Garcia's trial in 2013, Harris County's population was 4,325,413, of which 1,851,606 people, or 42.81%, were Hispanic.[60] The petit jury venire from which Cruz-Garcia's jury was selected was made up of 150 people. Of those, 28 people, or 18.67%, were Hispanic. The absolute difference between the percentage of Hispanics in the general population and the percentage of Hispanics in Cruz-Garcia's jury venire is 24.14%.

This large discrepancy in the percentage of Hispanics represented in jury venires in Harris County persisted over a number of a years. For example, five years prior to Cruz-Garcia's trial, in 2008, the population of Harris County was 3,965,716 people. Of those, 1,664,403, or 41.96%,

---

[60] Texas Department of State Health Services, Texas Population, 2013 (Estimates), *available at* http://dshs.texas.gov/chs/popdat/ST2013.shtm (last accessed Oct. 27, 2018).

000303

were Hispanic.[61] But during the 2008 capital trial of Mabry Landor in Harris County, the petit jury venire was 195 people, of which 43 or 22% were Hispanic. Petition for Writ of Habeas Corpus, *Landor v. Davis*, No. 16-cv-03384 (ECF No. 10) (S.D. Tex. Oct. 31, 2017). This represents an absolute difference of 19.96%. During the 2002 capital trial of Ronald Prible in Harris County, the absolute disparity between the percentage of Hispanic prospective jurors and the Hispanic proportion of the adult population was 15.6%. *See* Robert C. Walters, et al., *Jury of Our Peers: An Unfulfilled Constitutional Promise*, 58 SMU L. Rev. 319 (2005).

Because this large discrepancy occurred not just in Cruz-Garcia's case, but also in other venires in Harris County over a significant period of time, the cause of the underrepresentation of Hispanics in Harris County jury venires is systematic—that is, inherent in the particular jury-selection process utilized.

Disproportionate exclusion of Hispanics from jury venires in Harris County constitutes infringement of a defendant's constitutional right to a jury drawn from a fair cross-section of the community in violation of

---

[61] Texas Department of State Health Services, Texas Population, 2008, *available at* http://dshs.texas.gov/chs/popdat/ST2008.shtm (last accessed Oct. 27, 2018).

000304

the Sixth and Fourteenth Amendments. The Sixth Amendment, applied to the States through the Due Process Clause of the Fourteenth Amendment, forbids any substantial underrepresentation of minorities, regardless of the motive, and the defendant does not need to demonstrate purposeful discrimination to show that his constitutional right to a jury selected from a fair cross-section was violated.

The discriminatory jury system that produced the petit jury venire from which Cruz-Garcia's jury was selected also violated the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause prohibits underrepresentation of minorities in juries by reason of intentional discrimination. To show that an equal protection violation has occurred in the context of jury selection, a defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs—Hispanics. As set forth above, Hispanics have been systematically under-represented in Harris County jury venires. The jury system employed by Harris County results in substantial underrepresentation of Hispanics in jury venires, including the jury venire from which Cruz-Garcia's petit jury was selected, violating Cruz-Garcia's constitutional rights.

000305

Trial counsel failed to lodge any objection to systematic exclusion and underrepresentation of Hispanics, although all the information necessary to lodge such an objection was publicly available at the time of Cruz-Garcia's trial. As a result, no effort was made to ensure that the jury venire in Cruz-Garcia's case did not exclude or underrepresent Hispanics. Moreover, because counsel failed to make an objection, the issue was not properly preserved for appellate review.

### 3. Trial counsel's stipulation to exclude jurors and failure to create a full record of that exclusion.

Texas allows both the defendant and prosecution a total of fifteen peremptory challenges. Tex. Code Crim. Proc. art. 35.15. Here, trial counsel and the prosecution engaged in negotiated stipulations effectively allowing them to share approximately 80 additional removals by agreement without presentation to the court. 5 RR 104–05; 6 RR 4,118, 186–87, 192; 7 RR 251; 8 RR 35, 180; 9 RR 17; 10 RR 123, 124; 11 RR 4, 105; 13 RR 149. In overwhelming majority of these instances, the agreed exclusions were done without the benefit of individual voir dire examination. 5 RR 104–05 (defense counsel and the State agreeing to excuse thirty-eight people); 11 RR 105 (defense counsel and the State agreeing to excuse thirty-one people). Others were stipulated removals

000306

as the result of voir dire that were not counted as peremptory challenges. 6 RR 4,118, 186–87, 192; 7 RR 251; 8 RR 35, 180; 9 RR 17; 10 RR 123, 124; 11 RR 4; 13 RR 149.

Trial counsel failed to create a proper record for grounds for removal, as the discussions about the questionnaires were held off the record. *See, e.g.*, 5 RR 99 ("Have both sides had an opportunity to review the questionnaires in this case and make agreements as to those questionnaires?"). The court indicated that there was a further discussion at the bench, also off the record. *Id.* After resuming the discussion on the record, the State, the judge, and trial counsel agreed as to which jurors should be dismissed (the basis of which was left entirely off the record) without addressing the arguments for cause. *Id.* at 100.

Here, trial counsel further failed in their duties, saying that they agreed with the prosecutor's strikes for cause, and the trial court considered them excusals by agreement. *See* 5 RR 100. Dismissing a juror for cause, however, is not the same as stipulating to removal of the jurors.

Among those dismissed by the judge, after that discussion was held off the record, were potential jurors like Anita Payne, venireperson No. 18. 5 RR 104. Nothing in her questionnaire or the few questions she asked

000307

during group voir dire suggested a basis for dismissal for cause. *See* 5 RR 34–35, 90–91. Likewise, Meghan Mehl, venireperson No. 20, had little to suggest a basis for removal for cause. *See* 5 RR 82, 104. The same goes for Monica Lara, venireperson No. 8, *see* 5 RR 49–50, 104, and several others, *see generally* 5 RR 8–105. Some expressed hesitancy about the death penalty that did not rise to the level of "cause" sufficient to grant a strike. *See, e.g.*, Venireperson No. 8 statement, 5 RR 83 ("I'm not for the death penalty, so I might possibly be swayed. I don't want to go 100 percent, but I'm not for it. So, it would be a little difficult for me.").

Trial counsel failed to hold the State to its burden of qualifying every juror and make a record of the basis on which the jurors were being struck. Instead, counsel acquiesced to removals, off the record, without any basis for strikes, or attempt to further explore the potential juror's attitudes toward the death penalty.

This was not an isolated incident. Throughout the voir dire, counsel stipulated to removals without any explanation of the basis for them, including removals of Hispanic and other minority jurors. For example, trial counsel inexplicably stipulated to the removal of Rachel Willis, a Hispanic woman and venireperson No. 11. After brief questioning by the

000308

court about some answers on her questionnaire, the State withdrew its motion to strike for cause. 5 RR 105–06. Yet the very next morning, without any further questioning and just before her scheduled individual voir dire, trial counsel agreed to excuse Rachel Willis with no statement as to the reasons. 6 RR 4. The same situation repeated with venireperson No. 54, Elsy Quinanilla, also a Hispanic woman. The court clarified a few answers on her questionnaire in a short voir dire and denied the State's motion to strike. 5 RR 117–18. She was later dismissed "by agreement between the State and the defense" without further record. 7 RR 251. This excusal of Hispanic jurors without voir dire or a thorough record is particularly egregious given that Hispanics were already dramatically underrepresented in the jury venire.

This and other similar failures to create a record, conduct individual voir dire, and rehabilitate the jurors, falls below the standard of care for competent capital defense advocacy. *See* ABA Guideline 10.10.2; Texas Guideline 11.6. Cruz-Garcia was prejudiced by this practice because, but for the deficient performance, at least one juror who may have concerns about assessing a death sentence could have been rehabilitated and ultimately seated. *See Witherspoon v. Illinois*, 391 U.S.

000309

510, 520 (1968) (holding that jurors that have "conscientious or religious scruples against capital punishment" may serve as a juror in a death penalty case if they can follow the law). Moreover, the failure to create a record deprived him of the ability to raise these issues on appeal.

Cornelius's billing records also make clear that his failures in this regard were not the result of any strategic consideration. Rather, given how consumed he was by his other cases during jury selection in Cruz-Garcia's case, it appears Cornelius was simply looking to streamline the jury selection procedure so that he could minimize the time he spent on Cruz-Garcia's case.

### 4.     Failure to raise a *Batson* challenge.

In violation of the Sixth, Eighth, and Fourteenth Amendments, and contrary to *Batson v. Kentucky*, 476 U.S. 79 (1986), the State improperly used peremptory challenges to systematically exclude African-Americans and Hispanics from serving on the jury. These include the discriminatory strikes of venirepersons Latoya Johnson (No. 89), Melinda Dixon (No. 98), Johnny Bermudez (No. 92), and Gilberto Vazquez (No. 115). These jurors had similar answers on their questionnaires and responses during

000310

voir dire as compared to seated white jurors.[62] Yet trial counsel failed to raise a *Batson* objection to the State's peremptory challenge of these four jurors. 11 RR 180, 261; 12 RR 219; 13 RR 181.

Had counsel properly lodged objections based on *Batson*, these jurors would have been seated on Cruz-Garcia's jury. At the very least, the *Batson* issue would have been properly preserved for appellate review. Indeed, "[o]ne of the most fundamental duties of any attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." ABA Guideline 10.8, Cmt. Yet trial counsel failed to do so here.

### 5.  Failure to raise *Witherspoon* challenges.

The Supreme Court in *Witherspoon v. Illinois* recognized that to allow the State to remove from the panel any member who has moral qualms about the death penalty would unfairly cause the jury to be "uncommonly willing to condemn a man to die." 391 U.S. 510, 521 (1968). Failure to follow this protection violates the Sixth and Fourteenth Amendments to the Constitution.

---

[62] If this claim is authorized, Cruz-Garcia will further develop the record for this claim in the trial court.

000311

Numerous individuals were excluded from Cruz-Garcia's venire simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. Yet, trial counsel failed to object and rehabilitate the improperly struck jurors.

For example, the State moved to strike for cause (and the court granted those motions, off the record, 5 RR 100) Monica Lara, No. 8, after she stated "I'm not for the death penalty, so I might possibly be swayed. I don't want to go 100 percent, but I'm not for it. So, it would be a little difficult for me," 5 RR 83, and Meghan Mehl, No. 20, who stated "I feel the same way. I put that I'm opposed, but in a few cases I'm for it [in the questionnaire], but not if I have to make the decision. I would be swayed to go against the death penalty." 5 RR 82. They were subsequently excused without any attempt to determine whether they could nonetheless obey the oath as a juror and return a verdict of death.

Similarly, the court dismissed Karen Taylor, No. 68, after an extremely truncated examination conducted solely by the trial judge. The juror initially indicated ambivalence regarding the death penalty, although she acknowledged that "people need to be punished if they are

000312

guilty." 5 RR 121. The court instructed the juror to "err on the side of caution" in deciding whether she believed she would be able to sit as a juror, all but encouraging the juror to disqualify herself. 5 RR 122. It was only after the court's direction that the juror indicated "it would really bother her" that she was improperly struck for cause. 5 RR 123. Even that statement, taken alone, should not have been enough to dismiss the juror. She was never asked if she could follow the law, despite being "bothered" by it.

Allyn Emert was likewise improperly struck for cause. She expressed unqualified support for the death penalty. The prosecution nonetheless moved to strike her, presumably due to her answers to a series of confusing and convoluted questions regarding the burden of proof. 7 RR 111. After being successfully rehabilitated by defense counsel, the trial court stepped in and began asking the juror hypothetical questions that bore no relation to Cruz-Garcia's case. 7 RR 118–21. The juror was then improperly struck because of her answers to those irrelevant hypotheticals.

Exclusion of dozens of such jurors like that from Cruz-Garcia's venire violated his right to a fair and impartial jury. Trial counsel failed

284

to lodge appropriate objections, which both prevented the jurors from being seated and failed to preserve the improper strikes for appellate review.

### 6. Failure to object to State's request that neither party bring up that the victim was a child.

Trial counsel was ineffective when they agreed to the State's request that it not be mentioned to prospective jurors that the offense was committed against a child and included allegations of sexual assault. Trial counsel thus forewent any opportunity to explore and determine whether prospective jurors could nevertheless render impartial judgment. Instead, trial counsel agreed to the State's motion *in limine* that both sides would abstain from referencing the fact that the offense was committed against a child, as well as mentions of sexual assault.

The relevance of this line of questioning was made evident by testimony from one of the potential jurors: "I think I can be open—I know I can be open-minded in this case, which is a murder. *I think I wouldn't be too open-minded it if it was a rape or something like that.* Because I did have a niece that got raped." 6 RR 161 (voir dire of Adela Rodriguez, venireperson No. 22) (emphasis added).

000314

Moreover, all the while trial counsel stuck to the agreement to not mention that the offense involved a child, trial counsel failed to object to the State's repeated invocation of sensational crimes committed against children or involving victims who were children. For example, the State repeatedly invoked the Boston marathon bombing, the Candy Man case, and the Andrea Yates case. 5 RR 174, 223, 289; 7 RR 27, 73, 104, 144, 151, 220; 8 RR 138; 9 RR 83, 180, 185;  10 RR 13, 139; 11 RR 189, 145; 12 RR 115, 157, 251; 13 RR 209.

Counsel thus both abandoned any chance to diffuse potential jurors' biases, while also permitting the State to rely on examples of crimes committed against children to build up what it suggested seated jurors could expect to hear. Cruz-Garcia was prejudiced by counsel's deficient performance because he did not receive a trial from a fair, impartial, and unprejudiced jury.

### 7. Failure to object to inflammatory and objectionable *voir dire* by the prosecution.

In violation of Cruz-Garcia's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, the State conducted inflammatory, discriminatory, and unduly prejudicial voir dire. Yet, trial counsel failed to raise any objections. *See Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996)

(holding *Strickland* violated due to trial counsel's failure to object to improper argument from prosecutor).

> ### a. Trial counsel failed to object to the State repeatedly comparing Cruz-Garcia to Charles Manson and Adolf Hitler.

The State repeatedly compared the defendant to Adolf Hitler and Charles Manson, suggesting that the defendant (and by association, Cruz-Garcia) was evil, the worst of the worst, and deserving of the most severe punishment. *See* 6 RR 26–27; 8 RR 95; 11 RR 202; 12 RR 261; 13 RR 217; 14 RR 222–23, 262–63. These were not isolated remarks; the State repeatedly made use of these analogies throughout *voir dire*, including with two jurors who were seated. 12 RR 22, 163–64.

Building on the foundation laid in *voir dire*, the State subsequently invoked these same comparisons and imagery during closing argument: "I will also ask you that you remember those conversations that we had with each of you individually over the last month or so back in jury selection." 26 RR 145. Echoing the voir dire—"Charles Manson or Hitler . . . they have been evil  inside"—the State went on to argue that "Cruz-GarciaCruz-Garcia is a monster. He is an evil person who likes to torture and taunt his victims." *Id.* at 175. The demonstrably biased,

000316

inflammatory voir dire by the State violated Cruz-Garcia's constitutional rights under the Fifth, Sixth, and Fourteenth Amendments, including the right to a fair and impartial jury.

### b. Trial counsel failed to object to the State repeatedly invoking the Boston marathon bombing as well as other well-publicized crimes.

Less than eight weeks before the start of voir dire in Cruz-Garcia's case, during the annual Boston Marathon on April 15, 2013, two homemade pressure cooker bombs detonated near the finish line of the race. Three people were killed, including an eight-year-old boy, and several hundred others were injured, including sixteen who lost limbs. This event shocked the nation; images of wounded and screaming people filled every newspaper, TV, and smart phone. The State chose to repeatedly and systematically invoke during voir dire, including with potential, as well as later seated, jurors. 7 RR 27, 104; 8 RR 138; 10 RR 13, 139; 11 RR 189, 145; 12 RR 157, 251; 13 RR 209. This invocation of the horror and associated emotions was done using nearly identical phrasing from one potential juror to the next. The demonstrably biased, inflammatory voir dire by the State violated Cruz-Garcia's constitutional

000317

rights under the Fifth, Sixth, and Fourteenth Amendments, including the right to a fair and impartial jury.

Likewise, the prosecutor repeatedly invoked "the Candy Man case" during *voir dire*—including with those seated as jurors—as an example of a case with facts so egregious that "anyone who can do that, is always going to be a threat to society:" 5 RR 174, 223, 289; 7 RR 144; 9 RR 180. The prosecutor also repeatedly brought up Andrea Yates, a woman who drowned her five children, in voir dire—including the voir dire of several seated jurors. 7 RR 73, 151, 220; 9 RR 83, 185; 12 RR 115.

Both the Candy Man case and the Andrea Yates case involved crimes against children and in which the prosecution sought the death penalty. As the State acknowledged during voir dire, each case was local and well-publicized, involved children as victims, and was designed to evoke strong emotions in the jury.

These actions were inappropriate, inflammatory, and violated Cruz-Garcia's right to an impartial jury and fair trial. Again, trial counsel's failure to be engaged with the jury selection process meant that appropriate objections were not raised and the issue was not properly

000318

preserved. These failures violated Cruz-Garcia's rights to effective assistance of counsel.

### c. Trial counsel failed to object to the State repeatedly asked prospective jurors commitment questions.

During voir dire, the State repeatedly and improperly asked the venirepersons, including jurors who were seated, to commit to its theory that "the defendant"—Cruz-Garcia—was the one who was in charge out of the three co-conspirators and that he controlled the crime scene. 5 RR 162, 171, 282–83; *see* 6 RR 184–85.

When defense counsel finally raised this issue in a verbal motion in limine on the record, the court agreed that the prosecutor tended "to state that it is the defendant that controls the scene." 7 RR 7. The court admonished the prosecutor and ordered that it would be more appropriate to "ask the juror if they agree or disagree that a defendant could control the scene as to what happened. A slight distinction, but that's what I would request, that you stay away from getting them to commit on that, that the defendant does control the scene." *Id.* at 8.

The prosecutor continued, undeterred: "Actually, the person who has the most control over what evidence is presented in a case is the

000319

defendant in that case. He chooses what he leaves behind." 9 RR 33. By this point, even the juror being questioned thought it was too suggestive of guilt and the juror objected and interrupted the voir dire: "But you just said 'the defendant.' And that's presuming guilt . . . You just presumed guilt." *Id.* (Maura Denman, Venireperson No. 62).

Repeated attempts to ask commitment questions violated Cruz-Garcia's right to an impartial jury. The trial court made clear that it did the prosecutor's conduct was improper, yet trial counsel failed to object.

> **d.    Trial counsel failed to object to the State repeatedly and improperly suggesting that Cruz-Garcia had a criminal history that would be revealed during the punishment phase.**

The State also violated Cruz-Garcia's right to an impartial jury by repeatedly suggesting during voir dire that he had a criminal history, even if the jury heard nothing about it during the first stage of the trial: "So, can you see how that other evidence—a lot of jurors are like: Well, we didn't hear anything about criminal history, so he must not have any, during the guilt phase. But that's not true because usually you won't hear about that until the punishment phase, if there is any." 6 RR 16.

With the venireperson who ended up being seated on the jury, the State both suggested that criminal history existed and questioned the

000320

existence of mitigation: "And in the guilt phase, certain things like the defendant's criminal history, good things about the defendant, if there are any of those, those kinds of things are not going to come into play usually until the punishment phase of the trial." 12 RR 14 (voir dire of Jennifer Sims, seated juror). Again, trial counsel failed to object.

> **e.   Trial counsel failed to object to the State's biased and discriminatory questions to women.**

In violation of the Sixth, Eighth, and Fourteenth Amendments, the State's questioning of women was biased, discriminatory, and was designed to develop a line of testimony that would produce a neutral reason for a strike for cause or to justify a peremptory. While in 2013 women comprised 50.20% of the population of Harris County, they comprised 46.67% of Cruz-GarciaCruz-Garcia's jury venire. Trial counsel failed to lodge any objections.

The State targeted already underrepresented women with biased questions unrelated to their qualifications as jurors, such as "Do you know how your husband feels about the death penalty?" 9 RR 120 (voir dire of Patricia Lopez, venireperson No. 69, by the State); *see also* Donna Chambers, venireperson 45, 8 RR 45; Nancee Pyper, venireperson 64, 9 RR 169; Casey Guillotte, venireperson 84, 10 RR 184; Sharon Alexander,

venireperson 149, 15 RR 157. None of the married men in the venire were asked about how their wives felt about the death penalty. However, trial counsel did not object to this obviously discriminatory line of questioning.

## G. Trial counsel was ineffective by failing to preserve issues for review.

Trial counsel has a duty to object and move to exclude inadmissible evidence. *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) (failure to object to inadmissible evidence amounted to deficient performance); *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000) (failure to object to in-court identification); *Gabaree v. Steele*, 792 F.3d 991, 999 (8th Cir. 2015) (failure to object to inadmissible testimony); *Griffin v. Harrington*, 727 F.3d 940, 947–48 (9th Cir. 2013) (failure to object to unsworn testimony); *Thomas v. Varner*, 428 F.3d 491, 501–02 (3d Cir. 2005) (failure to object to in-court identification); *Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (failure to object to inadmissible testimony). As detailed below, however, trial allowed the State to admit substantial amounts of prejudicial evidence that trial counsel should have objected to as unduly prejudicial or in violation of Cruz-Garcia's constitutional rights.

000322

### 1.    Failure to preserve Confrontation Clause violations.

Under the Sixth and Fourteenth Amendments to the United States Constitution, defendants have the right to confront witnesses against them. The Sixth Amendment includes a "bedrock procedural guarantee" that "'[in] all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42, (2004) (quoting U.S. CONST. amend. VI). Testimonial statements are not admissible unless the witness is both unavailable to testify and the defendant had a prior opportunity to cross-examine that witness. *Id.* at 53–54. Results of forensic analysis are testimonial statements for purposes of the Sixth Amendment. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009). This Sixth Amendment right applies to state trials through the Fourteenth Amendment. *See id.* at 309 (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)).

Cruz-Garcia's right to confront witnesses was repeatedly violated when Orchid Cellmark DNA analyst Matt Quartaro was permitted to testify at the suppression hearing and at the guilt phase to forensic work he did not perform himself. 16 RR 48–79; 21 RR 103–42. His testimony included information about the condition in which the DNA evidence was

294

received by Orchid Cellmark, the DNA testing process, and the analysis of the results obtained. *Id.* However, Quartaro did not himself receive the DNA evidence, nor perform all of the DNA lab work. During the suppression hearing, he explained that Orchid Cellmark "work[ed] as a team format, so [he] didn't perform every step along the way." *Id.* at 52–53. Through Mr. Quartaro, the State also admitted a number of exhibits that were collected and/or analyzed by others. *See, e.g.*, *id.* at 120, 124.

Similarly, Dr. Dwayne Wolf testified during the guilt phase and punishment phases of trial about autopsies that he did not himself perform. 20 RR 4–33. The 1992 autopsy of A. was conducted by Dr. Vladimir Parungao, who did not testify. *Id.* at 6. Dr. Wolf was not involved in creating, nor had personal knowledge of the autopsy report, photographs, and related records. *Id.* at 7. This was "pretty much the extent of the information" Dr. Wolf had. *Id.* Through Dr. Wolf, the State also admitted a number of exhibits that were collected by others. *See, e.g.*, *id.* at 10–13. Dr. Wolf further testified about the autopsy of Sault Flores, which was conducted by Dr. Narula. 25 RR 97–115. Despite having no personal knowledge of either case, Dr. Wolf opined as to the cause of death of both A. and Flores. *Id.* at 104–10.

000324

Trial counsel's failure to object to this testimony prejudiced Cruz-Garcia because he was unable to confront and challenge testimonial statements that went to critical aspects of the State's case. Trial counsel's failure to object further prevented Cruz-Garcia from preserving the erroneous admission of these statements for later review.

> **2. Failure to preserve objections to evidentiary rulings that impermissibly limited Cruz-Garcia's right to cross-examine witnesses.**

As detailed *supra* § I.B, the trial court held a hearing on Cruz-Garcia's Motion to Suppress All DNA. At that hearing, the trial court acknowledged that contamination of the DNA evidence by the old HPD crime lab was a relevant and critical line of cross-examination, but nevertheless ruled that it would not permit Cruz-Garcia from introducing any evidence on the issue. 17 RR 19-21. The trial court admitted "it would leave a wrong impression with the jury" should the defense not be permitted to go into the DNA testing performed by the old HPD crime lab. 20 RR 62. Still, the trial court ruled that it was "not going to allow you to go into how they did that or where it was sent or that was sent to another laboratory or anything like that[.]" *Id.*

000325

As outlined above, the trial court's interference with Cruz-Garcia's right to cross-examine witnesses was clear. Trial counsel, however, failed to object to the trial court's findings and rulings concerning the relevance of evidence and testimony going to the reliability of the DNA evidence. Trial counsel thus performed deficiently by not preserving the issue for appellate review. Had trial counsel preserved the issue, the CCA would have reviewed the merits of the claim and, given the trial court's own remarks as to the relevant of such evidence and testimony, ruled in favor of Cruz-Garcia.

### 3.   Failure to preserve objections to improper victim impact testimony.

Trial counsel were ineffective for failing to object to the improper introduction of the extraneous victim impact testimony or ask for an instruction to disregard this testimony. *Payne v. Tennessee*, 501 U.S. 808 (1991) does not contemplate admission of evidence concerning a person who is not the victim for whose death the defendant has been indicted and tried. This evidence is also irrelevant under Rule 401 and article 37.071, and the danger of unfair prejudice from "extraneous victim impact evidence" is unacceptably high.

During Cruz-Garcia's punishment phase, Manuel Buten, a witness to an extraneous offense, testified about his family members' ongoing mobility issues and continuing emotional issues, such as nervousness, feelings of insecurity, inability to continue working, etc. RR 24 at 42. Likewise, Andres Castillo Buten also offered improper extraneous victim impact evidence, testifying that he still has problems to this day. 24 RR 95–96, 97. Trial counsel failed to object to the introduction of this improper and unfairly prejudicial evidence or ask for a limiting instruction, rendering ineffective assistance of counsel.

### 4.   Failure to preserve objections to the prosecutor's inflammatory comments.

Throughout Cruz-Garcia's trial, the prosecutor made numerous unwarranted characterizations that violated Cruz-Garcia's constitutional rights. During closing argument for the guilt/innocence phase of the trial, the prosecutor invoked the Bible as a litmus test for invoking evil and wickedness and guilt: "The 28th Chapter of Proverbs says: The wicked flee so [sic] no one pursues them, but the righteous are as bold as lions. Ladies and gentlemen, there is the wicked right there." 23 RR 95. Then, during the closing for the punishment phase, the State told the jury "I will tell you right now, if it were up to Roger [Rogelio

000327

Avlies-Barroso] alone, [A.] would still be alive." 26 RR 163–64. From this argument, based on nothing in the record but the prosecutor's opinion, the jury would logically surmise that there was inadmissible evidence, which, if revealed, would show them other acts or character traits of the defendant that they should know about.

During voir dire, as set forth in detail above, the prosecutor repeatedly compared the defendant to Adolf Hitler and Charles Manson, suggesting that such men (and by association, Cruz-Garcia) are evil, the worst of the worst, and deserve the most severe punishment. The prosecutor also repeatedly invoked gruesome, well-known cases with multiple child victims: the Boston Marathon bombing, the Andrea Yates case, the Candy Man case.

Building on the foundation laid in voir dire, the prosecutor subsequently invoked these considerations during closing argument for the punishment phase: "I will also ask you that you remember those conversations that we had with each of you individually over the last month or so back in jury selection." 26 RR 145. Echoing the voir dire—"Charles Manson or Hitler . . . they have been evil inside"—the prosecutor then argued that Cruz-Garcia is evil, less than human, and deserves to

000328

die because of that: "Those are just the facts. And they are the facts that you need to base your decision on. Cruz-GarciaCruz-Garcia is a monster. He is an evil person who likes to torture and taunt his victims." *Id.* at 175. In doing so, the prosecutor urged the jury to rely not on the jury charge, not on the applicable law, but on raw emotions and anger in reaching their sentencing decision.

The prosecutor also argued that while he and the jurors were human beings, the person they would be executing was something less than: "many of us and many of you probably would like to think that there aren't people in the world that can do the kind of things that you have heard about over the last two weeks. Surely there aren't *those type of people.* Those type of people can't exist because *you and I as human beings* can't really fathom that." 26 RR 154 (emphasis added).

The prosecutor improperly injected considerations of racial and ethnic animus into the jury trial system by appealing to the jury's sense of nationalism while the fate of a foreign-born defendant, who doesn't speak English, was in their hands. The theme of "us versus them" (or Americans versus foreigners) is how the prosecutor opened the closing argument: "we live in the United States of America, the best country in

the entire world. And thank God for that. We get to live with freedoms that so many people do not get to live with. We get to, hopefully, walk around *in our streets* and feel safe. We get to live out *our dreams* because this is America." 26 RR 142 (emphasis added). The prosecutor made that argument to a jury acutely aware that Cruz-Garcia is a foreigner, implying that this is not his country and these are not his streets.

Counsel has a duty to object to improper argument from the prosecutor. *Freeman v. Class*, 95 F.3d 639, 644 (8th Cir. 1996) (holding *Strickland* violated due to trial counsel's failure to object to improper argument from prosecutor). The prosecutor's comments were sufficient to create prejudicial error, violating Cruz-Garcia's rights to due process under the Fifth and Fourteenth Amendments, yet Cornelius failed to raise objections or move for a mistrial.

### 5. Failure to preserve constitutional errors relating to emotional outbursts from the gallery.

In violation of the Fifth, Sixth, and Fourteenth Amendments, Cruz-Garcia's conviction was unconstitutionally obtained due to repeated, emotional outbursts from the gallery during trial. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (State misconduct violates a defendant's due process rights to a fair trial when the conduct "so infected the trial with

301

unfairness as to make the resulting conviction a denial of due process."). Yet, trial counsel failed to preserve the issue or move for a mistrial. These outbursts include, but are not limited to, the following occurrences.

During the guilt/innocence phase, a bench conference occurred where trial counsel explained that there were audible reactions from the victim's family during testimony. Trial counsel stated that "there's no excuse for the family being here crying and making sounds and all this stuff in front of the jury." 20 RR 14. The outburst was noticeable, and the State agreed to have the family removed. *Id.* The trial court also commented that "I don't think [the outbursts are] appropriate." *Id.*

Later the same day, another emotional outburst occurred. During testimony, the trial court was forced to stop the proceedings and remove the jury. 20 RR 107. The trial court directly addressed the audience:

> I realize the testimony in this case is emotional, but if you cannot hold your emotions in and be quiet in the courtroom, then you will have to leave the courtroom. And that includes the family. I'm sorry to say that, but we cannot have this jury swayed by emotion and emotional outbursts. Okay? So, if you feel that you can't keep from having that happen, you will need to step out.

*Id.* at 108.

000331

These repeated, emotional outbursts from the gallery resulted in Cruz-Garcia's conviction and death sentence being fundamentally unfair. As a result, his conviction and death sentence violated the applicable constitutional protections, namely the Fifth, Sixth, and Fourteenth Amendments. Had Cornelius moved for a mistrial, Cruz-Garcia could have successfully litigated this issue in direct appeal or on collateral review.

### 6.    Failure to preserve constitutional error relating to incorrect translations.

In violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, Cruz-Garcia's conviction was unconstitutionally obtained when witness testimony was translated incorrectly to the jury. *Ferrell v. Estelle*, 568 F.2d 1128, 1132–33 (5th Cir. 1978) ("The Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense. Ensuring that the defendant has that minimum understanding is primarily the task of the trial judge."). Numerous witnesses during Cruz-Garcia's trial testified in Spanish and their answers were translated into English for the jury by interpreters. 18 RR 194; 19 RR 4; 20 RR 80, 116; 21 RR 4; 24 RR 14, 43, 78, 98, 118; 25 RR 59; 26 RR 8. The interpreters, however, had to correct

000332

their translations on numerous occasions, 20 RR 94, 144, 159–60, 165; 24 RR 36, 49–50, 60; 25 RR 61; 26 RR 12, 26, so much so that the jury sent a note to the court that the interpreters were not translating the testimony correctly. 3 CR 508. The trial court read the note into the record, in which the jury asked "[a]re we only allowed to consider the interpreter's response of the witness in English and not the Spanish response as heard by Spanish-speaking jury members." 23 RR 100. After conferring with the lawyers, the trial court responded to the jury note that "[t]he interpreter's response is the official record and evidence in the case." 23 RR 100.

Trial counsel did not object to this response and did not move for a mistrial. *Id*. The jury was then forced to determine Cruz-Garcia's guilt and sentence based on inaccurate translations of what the witnesses actually testified, and in violation of Cruz-Garcia's rights under Fifth, Sixth, Eighth, and Fourteenth Amendments

### 7. Failure to preserve error concerning Cruz-Garcia's absence from the courtroom during critical proceedings.

In violation of the Fifth, Sixth, and Fourteenth Amendments, Cruz-Garcia was not present during meaningful proceedings during his trial.

000333

*Fairey v. Tucker*, 567 U.S. 924, 343 (1970) (Sotomayor, J., dissenting from denial of *certiorari*) (defendant's presence during trial "is a basic premise of our justice system that 'in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)). Cornelius acquiesced in Cruz-Garcia's exclusion from the courtroom. For example, during the punishment phase, Cruz-Garcia was not present when the trial court explained to the prosecutors and trial counsel about potentially improper conversations between jurors. 24 RR 3. At the beginning of this interaction, the trial court noted that "I just want to make it clear the defendant is not present." 24 RR 3. The trial court explained that a local lawyer, Michael Casaretto, approached her because he overheard two jurors discussing the case in the elevator. *Id.* at 3–4. The discussion appeared to revolve around one to of the juror's struggles with the decision-making process at the guilt phase. *Id.* at 4. After this discussion concluded, Cruz-Garcia returned to the courtroom. *Id.* at 6. As a result of his absence during this critical proceeding, his conviction and

death sentence violated the applicable constitutional protections, namely the Fifth, Sixth, and Fourteenth Amendments.

### H.    Trial counsel was ineffective during jury deliberations.

### 1.    Failure to investigate jury misconduct.

On the morning of July 16, 2013, the first day of the punishment phase of trial, local attorney Michael Casaretto was waiting for the elevator at the Harris County Criminal Courthouse when he overheard a conversation between two jurors. 2 SHCR 543. The jurors, who were wearing their badges at the time, were already in conversation when Mr. Casaretto arrived, so he could not be sure how long they had been speaking. *Id.* However, it was clear to him that they were discussing the merits of the case in which they were jurors, including the evidence that had been presented, and how they felt about it. Ex. 31 ¶¶ 2–3. Mr. Casaretto was "immediately troubled by the possibility that the two jurors were discussing an ongoing case publicly and outside the presence of other jurors." *Id.* ¶ 4. Mr. Casaretto took down the court information from the jurors' badges and went to the 337th District Court to discuss what he witnessed with Judge Renee Magee. *See id.* ¶¶ 4–5.

000335

Mr. Casaretto met with Judge Magee off the record in her chambers. He described what he had seen and heard on the elevator and explained that, as an officer of the court, he "felt it necessary to report to her conduct that appeared to . . . reach the level of juror misconduct." Ex. 31 ¶ 5. Mr. Casaretto provided his contact information and told Judge Magee he would be willing to speak with any of the attorneys regarding the incident. *Id.* ¶ 5.

Following the meeting, the trial court summarized the discussion on the record. 24 RR 3–6. The trial court characterized the conversation as "possibly . . . innocuous" and stated that the jurors "did not seem to be conspiring." *Id.* at 3–4. This characterization, however, flatly contradicts Mr. Casaretto's level of concern about the incident. Ex. 31 ¶¶ 7, 9 (describing the conversation as "blatant" misconduct and "extremely important"). The court provided Mr. Casaretto's contact information should counsel for either side choose to contact him. Trial counsel Skip Cornelius represented that he would call Mr. Casaretto to follow up on the issue and place a summary of their conversation on the record. 24 RR 5.

000336

However, trial counsel never contacted Mr. Casaretto. Ex. 31 ¶ 6. Nor did counsel poll the jury, question the individual jurors involved in the misconduct, or move for a mistrial. Trial counsel's failure to do so was constitutionally deficient. *See Cannon v. Mullin*, 383 F.3d 1152, 1170 (10th Cir. 2004), *abrogated on other grounds by Simpson v. Carpenter*, 912 F.3d 542 (10th Cir. 2018) (holding that where trial counsel "was in fact informed about improper juror communications and did nothing, such in action would appear to satisfy *Strickland*'s first prong").

Cornelius's affidavit makes clear that he had not strategic reason for failing to follow up on Michael Casaretto's report of juror misconduct. He states: "Honestly, after the Judge's thorough description of the event, as related to her by Mr. Casaretto, and particularly her notes of the event, I felt that it was insignificant." 4 SHCR 948. Yet, Judge Magee's description was not "thorough" but presented an inaccurate recounting of what Mr. Casaretto had reported, as a brief interview with Mr. Casaretto would have revealed. Ex. 31. Cornelius also attempts, again, to shift to the onus to other members of the defense team, stating that "it was recorded in the record for appellate counsel to consider on appeal." 4 SHCR 948. Yet, without trial counsel having investigated the

misconducted reported by Mr. Casaretto, there was little for appellate counsel to do.

Cornelius lacked any strategic reason for not investigating Mr. Casaretto's report of juror misconduct. His billing records, however, suggest a plausible explanation. Cornelius was simply too occupied by his crushing caseload to bother with things like allegations of jury misconduct.

## 2.   Failure to object to the trial court's ex parte meeting with a holdout juror

### a.   During the penalty phase deliberations, Angela Bowman became a holdout juror for life.

Following three days of punishment phase testimony, the jury retired to deliberate on the afternoon of Thursday, July 18, 2013. 26 RR 176. Unable to reach a decision that afternoon, the jury was sequestered overnight in a local hotel. *Id.* at 177. They returned to deliberate the following morning. When jury foreman Matthew Clinger polled the jury for the first time early Friday, approximately one-third of the jurors favored death, one-third favored life, and one-third were undecided. 3 CR 609; *id.* at 623–24. Although it is unclear where most of the jurors fell in that group, it is certain that Juror Angela Bowman "was one of the most

000338

adamantly opposed" to sentencing Cruz-Garcia to death. 3 CR 639; *see id.* at 611; Ex. 33 ¶ 2.

Just before noon on Friday, the jury sent two notes to the trial court requesting clarification on Cruz-Garcia's parole eligibility should he receive a life sentence and an explanation of the definition of "society" in the first special issue. 3 CR 510–11.

Throughout the day on Friday, several jurors changed their votes to death and Juror Bowman "felt a great deal of pressure from the others" as it became clear that she was the last remaining holdout. 3 CR 611. Bowman "tried to explain to the other jurors why [she] felt . . . death was not the appropriate punishment but after several hours and one night of being sequestered, it was pretty clear [she] was not going to change anyone's mind." Ex. 33 ¶ 2. She became "real emotional" and "upset" in her pleas with the other jurors, until "she would just basically break down." 3 CR 628, 638 [Trans. of Juror Clinger Interview]. The other members of the jury told Bowman she was simply "holding up the process" and "taking it too personally." *Id.* at 611.

At 3:20 p.m. on Friday afternoon, Juror Bowman sent a note asking to meet with the judge. 3 CR 512 ("May I please speak to judge. Angela

000339

Bowman."). Upon receiving the note, the trial court went on the record to discuss the note with the State and trial counsel. Although no one knew why Juror Bowman requested to speak with the judge, trial counsel suggested she may simply have a conflict with spending another night in sequestration. Rather than speak to Juror Bowman in the presence of Cruz-Garcia and his counsel, the trial court decided to meet with Juror Bowman ex parte in her chambers with only the court reporter present. Trial counsel did not object to the ex parte meeting, which led the juror changing her vote to death after an unconstitutional, coercive instruction. 27 RR 3–4.

### b. The trial court held an ex parte meeting with Juror Bowman.

Trial counsel's failure to object to this ex parte meeting allowed the trial court to give Juror Bowman unconstitutionally coercive instructions during the ex parte meeting. Supplemental jury instructions can be given to a deadlocked jury. *Allen v. United States*, 164 U.S. 492 (1896). However, if those instructions are impermissibly coercive, a defendant's constitutional rights are violated. *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988); *see also Morgan v. Illinois*, 504 U.S. 719 (1992) (holding that due process requires an impartial jury). Whether those instructions are

000340

improperly coercive requires a court to consider the instruction "in its context and under all the circumstances." *Jenkins v. United States*, 380 U.S. 445, 446 (1965). When a jury returns with its verdict shortly after the supplemental instruction is given, that weighs in favor of the instruction being coercive. *United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978). The instruction being given during an *ex parte* meeting—even if trial counsel acquiesced to such a meeting—weighs in favor of any supplemental instruction being coercive. *Id.* at 460–62. And, an instruction that targets holdout-jurors specifically is more likely to be coercive. *Lowenfield*, 484 U.S. at 237–38.

The trial court, Judge Renee Magee, called Juror Bowman into her chambers to discuss the note. Juror Bowman immediately relayed to the court that she was the sole holdout juror: "I just – I am the only juror that's completely – I can't agree. I can't agree with the questions. I can't answer the same questions with everyone else and I feel pressured. And I don't want to hold them up." 27 RR 5. When Bowman suggested that the court replace her with an alternate juror, the court instructed her on the law on the use of alternates in the case of a holdout juror:

> Well, there is a manner that we have to proceed with. And just because you can't deliberate with them or – you are not saying

000341

you can't deliberate, but because your answers to the
questions are different from them does not qualify that you
can just sub out with an alternate. That's not what an
alternate is for. There is a long list of things that I would have
to go through. And I don't want to go through those with you
because I don't want to try to figure out what you need to do
to get off the jury. You shouldn't have to figure out what you
want to do. Those things, unfortunately, that would have to
happen to you, and I don't want it to happen to you, like falling
gravely ill, or something like that. And that's the only way
that an alternative would replace you, is for you to become
completely disabled.

*Id.*

Judge Magee further instructed Juror Bowman that she must
continue to deliberate with the other jurors. *Id.* at 5–6 ("Just having a
different opinion than the other jurors at this point, that doesn't exclude
you from being a juror. So, you are going to have to continue to deliberate
with them."). Juror Bowman explained that the only agreement she could
reach with the other jurors was on Special Issue No. 2, whether Cruz-
Garcia "actually caused, intended, or anticipated" the death of the
decedent. "No. 1 and 3, they're all – you know, they are all different. I am
the only one with the different opinion. And I am not changing my stance
on that. I'm not. And they're not." 27 RR 6.

When Juror Bowman stated "it could be years" before the jurors
reached a unanimous verdict, the court "instruct[ed]" her that she would

313

be required to deliberate until the court told them to stop and that "generally, that can be a pretty long period of time." 27 RR 6. The court explained that arrangements had been made for the jury to be sequestered Friday night and into the weekend, if necessary. *Id.* The court further reminded Juror Bowman of the court's instructions at voir dire and stated, "If the evidence leads you to a certain way, that's the way you should answer it, even though it might result in something that bothers you." *Id.* at 7.

The court again instructed Juror Bowman:

> So, I'd like you to go back and continue your deliberations with the jury and continue trying to reach an agreement with the jury, if you can. Do not violate your conscious [sic]. And answer those questions according to where the evidence leads you.

*Id.* at 7–8.

Juror Bowman again pleaded with the court to do something about the fact that she had reached an impasse with the rest of the jurors: "Judge, I don't want to have to stay another night. I really don't know." 27 RR 8. Despite Juror Bowman repeatedly telling the court that she could not come to an agreement with the rest of the jurors on either of the special issues, the court again instructed her to return to the jury

314

room "to find out whether you can reach a verdict or not." The court added that whether Juror Bowman had to spend another night in sequestration was "completely in the hands of the entire jury." *Id.*

When Juror Bowman returned to deliberations, she informed the rest of the jury that the judge had instructed her that "you're here until y'all reach a verdict." 3 CR 629.

Cornelius was also asked to "[e]xplain counsel's reasoning in choosing not to object to or specifically request the trial court to report its conversation with juror Angela Bowman on the record." 4 SHCR 933. In response, Cornelius's stated: "There is a huge difference between what we knew at the time and what has been said after the verdict was rendered." 4 SHCR 948. That, however, is exactly the point. Cornelius permitted the trial judge to conduct an ex parte meeting with the holdout juror during which the judge issued an unconstitutional coercive instruction specifically to that juror and not the rest of the jury. Cornelius failed to object to the ex parte meeting and failed to request that the court inform counsel of what the court said at the meeting. The meeting and the coercive *ex parte* instruction were the consequence.

Beyond acknowledging that "what we knew at the time" turned out to very different from what actually happened inside the judge's chambers, Cornelius again attempts to place responsibility on others. He asserts that he "trusted the Judge to do what she thought to be the appropriate action in the situation" and that he "thought it was recorded and a part of the record and could be reviewed on appeal if necessary." 4 SHCR 948. Irrespective of the trial judge's intentions or whether a matter can be reviewed on appeal, trial counsel has an obligation to advocate for his client and to ensure that he is afforded a trial that comports with constitutional requirements. Cornelius failed to do so.

## I.   Trial counsel rendered ineffective assistance by failing to recognize significance of Cruz-Garcia's foreign nationality.

As a citizen of the Dominican Republic, Cruz-Garcia is entitled to certain protections under the Vienna Convention on Consular Relations (VCCR).[63] Here, Cruz-Garcia was denied effective assistance of counsel when his trial attorneys failed to recognize and act on his rights under

---

[63] Specifically, Cruz-Garcia was entitled to be apprised of his right to contact authorities from his home country if he has been arrested, detained, or indicted. Vienna Convention on Consular Relations Art. 36(1)(b), April 24, 1963, 21 U.S.T. 77, TIAS 6820. Ensuring that this right is properly enforced is crucial in ensuring that foreigners of any nationality, including United States citizens, receive fair treatment when detained outside of their home countries.

000345

the VCCR by contacting the Dominican Republic consulate concerning his prosecution, thereby depriving him of all the benefits that consular involvement would have provided.

Sandra Babcock, a clinical professor of law at Cornell University and a licensed Texas attorney with over twenty years of capital experience, stated that it was standard practice within the capital defense community in 2013 to enlist the help of a foreign consulate to assist a foreign client. Ex. 26 ¶ 8. This is reflected in the ABA Guidelines, which state:

> A.    Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.
>
> B.    Unless predecessor counsel has already done so, counsel representing a foreign national should:
>
>> 1.    immediately advise the client of his or her right to communicate with the relevant consular office; and
>>
>> 2.    obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

ABA Guideline 10.6.

000346

The State Bar of Texas has adopted even more extensive guidelines concerning counsel's obligations under the VCCR:

### GUIDELINE 10.3 Additional Obligations of Counsel Representing a Foreign National

A.   Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B.   Counsel representing a foreign national should:

1.   Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

2.   If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission with withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.

3.   Immediately advise the client of his or her right to communicate with the relevant consular office; and

4.   Obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or

000347

> arrest. Counsel who is unable to obtain consent
> should exercise his or her best professional
> judgment under the circumstances.

Texas Guideline 10.3

### 1. Trial counsel knew that Cruz-Garcia is a citizen of the Dominican Republic.

In addition to the information available to trial counsel through Cruz-Garcia himself—who speaks no English and has a foreign passport—trial counsel had objective information in their possession confirming that Cruz-Garcia is a foreign national. In particular, counsel had a copy of Cruz-Garcia's 2010 Probable Cause Order, which states that he is not a United States citizen.[64] Ex. 25.

Through discovery, trial counsel had access to numerous police and other state-issued reports indicating that Cruz-Garcia is a citizen of the Dominican Republic. A supplemental police report provided to trial counsel identifies Cruz-Garcia as a national of the Dominican Republic. Ex. 26 ¶ 9. Moreover, on June 19, 2013, the prosecution filed a Notice to

---

[64] This Order incorrectly identified Cruz-Garcia as being from Dominica rather than the Dominican Republic. Nevertheless, this Order provides evidence of Cruz-Garcia's foreign nationality. Furthermore, given trial counsel's later efforts to locate and speak with family members of Cruz-Garcia's in the Dominican Republic, it is clear that counsel knew where their client was from.

000348

Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction stating that "[t]he defendant is a citizen of the Dominican Republic who entered the United States as well as the Commonwealth of Puerto Rico on multiple occasions since the late 1980s illegally and remained in both locations for periods of time as an undocumented alien." *Id.*

This information would have been sufficient to place counsel on notice that they were defending a non-United States citizen. Consequently, prevailing norms of professional practice dictated that trial counsel take certain steps in their representation of Cruz-Garcia.

## 2. Trial counsel failed to fulfill their obligations under the Guidelines.

Trial counsel did not inform Cruz-Garcia of his right to communicate with the Dominican Republic Consulate, even though "Guideline 10.6 unequivocally states that counsel should advise a foreign national client of her right to communicate with consular officials." Ex. 26 ¶ 10. Despite myriad professional guidelines clearly outlining counsel's obligations in representing a foreign national, trial counsel never made an attempt to contact the Dominican Republic Consulate on Cruz-Garcia's behalf.

000349

At the time of Cruz-Garcia's trial, the Dominican Republic consulate was unaware of Cruz-Garcia's arrest and that he faced the death penalty. Had the consulate been informed by reasonably diligent trial counsel, multiple services would have been made available to Cruz-Garcia's defense team, including assistance contacting family members, locating witnesses or records in the Dominican Republic, sending out documents and letters to the court, being present in court, and otherwise supporting Cruz-Garcia. Ex. 27. Had it been contacted by the defense team, the Dominican Republic consulate would have sought to assist trial counsel in its representation of Cruz-Garcia, including by facilitating trial counsel's investigation. In addition, had the consulate been involved in this case from the start, they could have sought to use their political influence to negotiate with the State to seek a life sentence for Cruz-Garcia. Consular officials are often successful in persuading prosecutors to waive the death penalty in exchange for a guilty plea. Ex. 26 ¶ 15. Officers of the Dominican Republic Consulate were available to assist but trial counsel never contacted the consulate, in clear contravention of the ABA Guidelines.

Given the significant ways consular assistance can positively impact a defendant's capital case, there is no doubt that failure to seek such assistance—especially when the obligation to do so is codified by various professional guidelines—is prejudicial.

Trial counsel wholly failed to fulfill their obligations under prevailing norms of both national and state professional practice in failing to advise Cruz-Garcia of his right to consular access, seek out consular assistance in the defense of his case, and communicate to the court that the State failed to properly warn Cruz-Garcia of his rights under the VCCR.

In his affidavit, Cornelius asserts: "The defendant expressed no interest at all in receiving help of any kinds from his consulate. He was given warnings about this and it was reiterated by us and his response to almost everything was that Jesus would deliver him." Ex. 4 SHCR 944. The Texas Guidelines on the importance of seeking consular assistance are clear. Counsel must not merely "reiterate[]" the trial court's statements about consular assistance. Counsel is required to "[o]btain the consent of the client to contact the consular office." Texas Guideline

000351

10.3.B.4. Nothing in Cornelius's affidavit suggests that he affirmatively attempted to gain Cruz-Garcia's consent.

Moreover, even if counsel is "unable to obtain consent," that does not mean counsel should not attempt to obtain consular assistance. Rather, the Texas Guidelines direct counsel to "exercise his or her best professional judgment." *Id.* Nowhere in his affidavit does Cornelius explain or even suggest why his "best professional judgment" was not to contact the consulate. Nor does Cornelius explain why, given the extreme importance the Texas Guidelines place on obtaining consular assistance, neither he nor his investigator made a written record of having discussed the issue with Cruz-Garcia.

### J. Trial counsel's deficient performance prejudiced the defense and Cruz-Garcia is therefore entitled to a new trial based on this Sixth Amendment violation.

Trial counsel failed to present any case on rebuttal at the guilt phase, seemingly conceded the special issue on future dangerousness, and presented the testimony of just four lay witnesses on the mitigation special issue. Had trial counsel performed even the most basic tasks, including communicating with Cruz-Garcia, retaining a DNA expert and mitigation specialist, reviewed the State's file, and conducted even some

investigation in Puerto Rico, the jury would have been presented with an entirely different case. Even these basic steps would have enabled Cruz-Garcia to challenge the credibility of key State witnesses, undermine the reliability of the State's linchpin DNA evidence, and present an alternative theory of the case.

Likewise, at punishment, Cruz-Garcia's extensive record of good behavior while incarcerated in Puerto Rico would have provided powerful evidence against the State's case on future dangerousness. The above testimony (or what would have been punishment phase testimony, had trial counsel been effective) is substantially different and more compelling than the brief life history details provided by Cruz-Garcia's trial counsel through the testimony of Cruz-Garcia's brother, wife, and son. Trial counsel's failure to conduct a reasonable investigation into Cruz-Garcia's life history and to consult with an appropriate expert witness meant that ample information was left out of the punishment phase presentation heard by the jury. This absence impaired the jury's ability to effectively weigh the presence of mitigation warranting a life sentence.

As shown above, Cruz-Garcia's Sixth Amendment right to the effective assistance of counsel was violated when trial counsel performed ineffectively and thus prejudiced Cruz-Garcia's defense. *See Strickland*, 466 U.S. at 693–94. Because he has established both deficient performance and resulting prejudice, Cruz-Garcia is entitled to a new trial.

### K.   This Court should authorize Cruz-Garcia's ineffective assistance of trial counsel claim pursuant to § 5(a)(1).

Cruz-Garcia has a substantial and previously unadjudicated claim of ineffective assistance of trial counsel. *See supra* § VI.A–I. Pursuant to Texas Code of Criminal Procedure, Article 11.071 § 5(a)(1), this Court may consider a claim raised in a subsequent application where "the current claim[] and issue[] have not been and could not have been presented previously . . . because the factual. . . basis for the claim was unavailable" at the time of prior filings. The factual basis of a claim is deemed unavailable "if the factual basis was not ascertainable through the exercise of reasonable diligence" at the time any prior application was filed. Tex. Code Crim. Proc. art. 11.071 § 5(e). The claim must rest on "sufficient facts that, if proven, establish a constitutional violation

sufficiently serious as to likely require relief[.]" *Ex parte Campbell*, 226 S.W.3d 418, 422 (Tex. Crim. App. 2007).

This Court should authorize Cruz-Garcia's ineffective assistance of trial counsel ("IATC") claim pursuant to § 5(a)(1) because the facts underlying Cruz-Garcia's IATC claim were rendered unavailable by the ineffective assistance of state habeas counsel. This Court should permit a subsequent state habeas application to proceed where an applicant makes a sufficient showing that the failure to raise a substantial IATC claim was due to initial state habeas counsel's ineffectiveness.[65] *See Trevino v. Thaler*, 569 U.S. 413, 417 (2013) (applying a similar standard to allow federal petitioners to excuse the default of an IATC claim). Doing so would safeguard the "bedrock" Sixth Amendment right to counsel. *Martinez v. Ryan*, 566 U.S. 1, 12 (2012). Authorization would further give Texas courts the first opportunity to rule on Cruz-Garcia's significant allegations of ineffective assistance of trial counsel, as well as allegations of *ineffective assistance of initial state habeas counsel*. As the question of whether state habeas counsel provided ineffective assistance is a fact-

---

[65] In this scenario, state habeas counsel's ineffectiveness would not result in relief from the conviction or sentence, but merely provide a procedurally gateway to allow the IATC claim to be considered on the merits.

000355

bound question, a remand to the trial court for factual development of that issue is appropriate. *See Ex parte Storey*, 2017 WL 1316348, at \*1 (Tex. Crim. App. 2017) (remanding a subsequent state habeas application to the trial court for factual development regarding whether § 5 was met).

### 1. Cruz-Garcia's state habeas counsel were ineffective, rendering a substantial IATC claim unavailable to him.

Cruz-Garcia presents, at minimum, a *prima facie* case of ineffective assistance of state habeas counsel. In initial state post-conviction proceedings, the Office of Capital and Forensic Writs ("OCFW"), conducted a cursory investigation of the factual and legal basis for potential ineffective assistance of trial counsel claims. *See* 1 SHCR 3–6. Affidavits submitted by an OCFW attorney and investigator document a failure to conduct the extra-record investigation mandated by Article 11.071 and the contemporaneous standard of care. Instead, state habeas counsel devoted less than a week to locate, interview, and obtain declarations from critical mitigation witnesses in the Dominican Republic *and* Puerto Rico, overlooked easily accessed and publicly available information, and failed to investigate and develop critical failures establishing the ineffective assistance of trial counsel.

000356

### a. Facts may be rendered unavailable within the meaning of Texas Code of Criminal Procedure Article 11.071 § 5(a)(1) by the ineffective assistance of state habeas counsel.

This Court has acknowledged that a challenge to the ineffective assistance of trial counsel will often be foreclosed on direct appeal because of the unavailability of extra-record fact development, such that state post-conviction proceedings are a death-sentenced applicant's only opportunity to raise an IATC claim. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (holding that because "the record on direct appeal is inadequate to develop an ineffective assistance claim," applicant should be permitted to raise IATC claim anew in state post-conviction). Moreover, initial post-conviction proceedings are critical precisely because an application for writ of habeas corpus may *not* be amended. Hence, Article 11.071 itself makes clear that extra-record fact development is intrinsic to post-conviction review of death sentences, and expressly situates the duty to conduct such fact development with state habeas counsel: Section 3, titled "Investigation of Grounds for Application," states:

> On appointment, *counsel shall investigate expeditiously*, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus.

000357

Tex. Code Crim. Proc. art. 11.071 § 3(a) (emphasis added). The 2006 State

Bar of Texas Guidelines and Standards for Texas Capital Counsel

("Texas Guidelines") similarly state:

> Habeas corpus counsel must treat the habeas corpus stage as
> both the first and last meaningful opportunity to present new
> evidence to challenge the capital client's conviction and
> sentence. Therefore, counsel has a duty to conduct a searching
> inquiry to assess whether any constitutional violations may
> have taken place[.]

State Bar of Texas, Guidelines and Standards for Texas Capital Counsel

("Texas Guidelines"), adopted April 21, 2006, Guideline 12.2.B(1)(c)

(emphasis added).

Article 11.071 further provides that a convicting court "*shall*"

reimburse counsel for "habeas corpus investigation" and does not require

that counsel obtain the prior approval of the reimbursing court. *Id.* § 3(d)

(emphasis added). The duty to investigate and the convicting court's

corresponding obligation to reimburse related expenses expressly applies

to counsel employed by the OCFW. *Id.* § 3(f). Adequate fact investigation

is furthermore essential to satisfying the burden of pleading, which

requires that "an application for writ of habeas corpus . . . contain

sufficient specific facts that, if proven to be true, might entitle the

000358

applicant to relief." *Ex parte Medina*, 361 S.W.3d 633, 640 (Tex. Crim. App. 2011).

This duty, moreover, applies directly to counsel. "While confined to prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record." *Martinez*, 566 U.S. at 12. Here, for example, *any* extra-record investigation was entirely out of reach of Cruz-Garcia, who does not speak English, does not have access to even a phone, and could not read the trial record.[66] Hence, the availability or unavailability of facts upon which an IATC claim may turn depends entirely on the assistance of state habeas counsel. This Court should therefore find that the ineffective assistance of state habeas counsel may render the facts underpinning an IATC claim unavailable within the meaning of Article 11.071 § 5(a)(1).

### b. Initial state habeas counsel for Cruz-Garcia were ineffective.

Initial state habeas counsel for Cruz-Garcia rendered ineffective assistance of counsel as measured against state habeas counsel's duties

---

[66] The convicting court ordered the translation of only volumes 18–28 of the Reporter's Record from trial.

000359

under Article 11.071 and the contemporaneous standard of care. Because of the critical role of extra-fact development in state post-conviction proceedings, Article 11.071 expressly provides that state habeas counsel "*shall*" investigate and develop extra-record facts "*before and after* the appellate record is filed in the court of criminal appeals[.]" Tex. Code Crim. Proc. art. 11.071 § 3(a) (emphasis added). The Texas Guidelines similarly affirm that a thorough investigation is the core duty of state habeas counsel by cautioning that "[c]ounsel should not accept an appointment if he or she is not prepared to undertake *the comprehensive extra-record investigation that habeas corpus demands.*" Texas Guidelines adopted April 21, 2006, Guideline 12.2.B(1)(a) (emphasis added). Hence, the Guidelines mandate that state habeas counsel "must promptly obtain . . . the assistance of a fact investigator *and* a mitigation specialist[.]" *Id.* at 12.2.B(3)(a) (emphasis added).

Here, state habeas counsel failed to obtain trial counsel's publicly available appointment and billing records. Those records lend significant support to Cruz-Garcia's allegations of ineffective assistance of counsel. Those records are readily accessible via the Harris County District Clerk's Office.

000360

Tellingly, state habeas counsel did not seek *any* investigation-related funding. Ex. 120 ¶ 8. Instead, a single investigator, Mr. de la Rosa, was assigned to Cruz-Garcia's case, with no distinction between fact and mitigation investigation. *Id.* ¶ 11. Mr. de la Rosa had very limited prior investigation experience, was assigned to conduct the totality of any investigation in connection with both phases of Cruz-Garcia's case, and was discouraged from seeking support. Ex. 121 ¶¶ 3; 4; 8. Even though state habeas counsel determined that investigation would require travel to Houston, the Dominican Republic, and Puerto Rico, Mr. de la Rosa was given just one week to locate, interview, draft and translate declarations, and obtain signed statements from witnesses in the Dominican Republic *and* Puerto Rico. Ex. 120 ¶¶ 11; 12; Ex. 121 ¶¶ 4–6. Due to a family emergency, Mr. de la Rosa had to cut his trip short. *Id.* at ¶ 7.

Despite Article 11.071's clear mandate that investigation should begin "on appointment" and throughout the pendency of the direct appeal, Tex. Code Crim. Proc. art. 11.071 § 3, it was not until the spring of 2015, nearly two years into appellate and post-conviction proceedings and weeks shy of the initial deadline for filing an initial writ application,

that any investigation in the Dominican Republic and Puerto Rico was conducted. Ex. 120 ¶ 13. Similarly, there is no indication that state habeas counsel sought the assistance of "a fact investigator with specialized training[,]" despite it being "indispensable to discovering and developing the facts that must be unearthed in habeas corpus proceedings." Texas Guidelines at 12.2.B.4(d).

Likewise, despite the Texas Guidelines making clear that state habeas counsel "has a duty to keep the capital client informed" and to "fully discuss[]" case strategy, Texas Guidelines at 12.2.B.2(b), state habeas counsel did not seek to have the trial record translated into Spanish until July 2014, or six months after appointment. 4 SHCR 855–62; Texas Guidelines at 12.2.B.2(e) (expressly alerting state habeas counsel to the additional steps that must be taken where the client is a national of a foreign country). Cruz-Garcia, who does not speak English, was therefore prevented from participating fully in his own case for at least the first six months and the time during which the record was being translated.

Contrary to the Texas Guidelines' clear instruction "to reinvestigate . . . most, if not all, of the critical witnesses for the prosecution and

000362

investigate their background[,]" including "whether motives for fabrication or bias were left uncovered at the time of trial[,]" Texas Guidelines at 12.2.B.4(e), state habeas counsel did not investigate the State's sole eyewitness or the State's only witness to allege that Cruz-Garcia confessed. Ex. 120 ¶ 16.

Based on state habeas counsel's failure to identify evidence of, and raise allegations of, trial counsel's ineffectiveness, this Court should therefore find that prior state habeas counsel was ineffective and thus rendered the facts underpinning Cruz-Garcia's here-presented IATC claim unavailable, and authorize Cruz-Garcia's IATC claim under § 5(a)(1).

State habeas counsel's failures rendered a substantial claim of ineffective assistance of counsel unavailable to Cruz-Garcia. *See supra* §§VI.B-J. Cruz-Garcia should not be barred from having this claim reviewed on the merits due to the inadequate performance of his state habeas counsel. While state habeas counsel's ineffectiveness does not entitle Cruz-Garcia to relief from his conviction or sentence, they should provide a gateway by which the underlying claim can be heard on the merits.

000363

**2.    This Court should authorize Cruz-Garcia's IATC claim to safeguard the fundamental Sixth Amendment right to effective assistance of trial counsel, and to allow Texas courts the first opportunity to rule on the merits of the IATC claim and whether state habeas counsel was ineffective.**

As noted *supra* § VI.K.1.a, in Texas, state post-conviction proceedings are courts' first and potentially only chance to enforce the "bedrock" Sixth Amendment right to effective assistance of trial counsel. *See Trevino v. Thaler*, 569 U.S. 413, 422 (2013). Hence, where initial state habeas counsel fails to effectively investigate and develop IATC allegations, Texas courts may be deprived of *any* opportunity to enforce this right. Although this Court held in *Ex parte Graves* that the ineffective assistance of state habeas counsel "cannot fulfill the requirement of article 11.071 section 5[,]"[67] since then this Court and its members have weighed in favor of recognizing the ineffective assistance of state habeas counsel as sufficient to overcome Article 11.071 § 5. *See Ex parte Ruiz*, 543 S.W.3d 805, 826–32 (Tex. Crim. App. 2016) (across different opinions, all members of the court suggesting that there was "good cause" to revisit *Graves*); *Ex parte Alvarez*, 468 S.W.3d 543, 545

---

[67] 70 S.W. 3d 103, 105 (Tex. Crim. App. 2002).

000364

(Tex. Crim. App. 2015) (Yeary, Johnson, and Newell, JJ., concurring) ("[R]ecent developments in federal habeas procedure, as well as, to a certain extent, the rationale underlying those new developments, counsel that the Court should revisit the holdings of *Graves*."); *Ex parte Buck*, 418 S.W.3d 98, 113 (Tex. Crim. App. 2013) (Alcala, J., dissenting, joined by Price and Johnson, JJ.) (concluding that *Graves* should be overturned).

This case differs in critical aspects from previous cases that have weighed against recognizing the ineffective assistance of state habeas counsel as grounds for overcoming § 5. First, no state or federal court has yet adjudicated the allegations underpinning the IATC claim before this Court. *Cf. Ruiz*, 543 S.W.3d at 826 (declining to address IATC claim where "the merits of [applicant's] IAC claims have already been thoroughly addressed by two federal courts"). On the contrary, here a federal court has stayed federal proceedings so as to give Texas courts the *first* opportunity to adjudicate Cruz-Garcia's previously unpresented claims. *See* Ex. 137. It therefore follows that Cruz-Garcia's IATC claim has not been adjudicated in state court. *See Ex parte Ruiz*, 543 S.W.3d 805, 826 (Tex. Crim. App. 2016) (declining to revive IATC claim on basis of ineffective assistance of state habeas counsel where IATC claim was

found by federal court to have been exhausted in state court). Whether state habeas counsel rendered ineffective assistance as to permit review in state court of Cruz-Garcia's claim is therefore ripe for adjudication. *Id.* (finding that issue was "moot" based on state court exhaustion and federal court adjudication of underlying IATC claim).

Second, because neither a Texas court nor a federal court has reviewed the merits of Cruz-Garcia's underlying IATC claim, federalism and finality concerns dictate that Texas courts should adjudicate this IATC claim first. In the companion cases *Martinez* and *Trevino*, the United States Supreme Court held that ineffective assistance of state habeas counsel may constitute cause sufficient to overcome procedural default, and thus permit federal habeas review, of an otherwise defaulted IATC claim. *See Martinez*, 566 U.S. at 12.Here, should this Court decline to authorize Cruz-Garcia's IATC claim, principles of finality and federalism may be jeopardized by the eventuality of a federal court finding that it may nevertheless reach the merits of the IATC claim. Notably, in *Trevino*, the State of Texas echoed these concerns and cautioned that, "[i]f [the United States Supreme Court] changes the rules [against excusing procedural default of IATC claims] now, equity

000366

demands at a minimum that the CCA have an opportunity to reevaluate its procedural ruling, and adjudicate [petitioner's IATC claim] on the merits." *Martinez v. Ryan*, 566 U.S. 1 (2012) (Brief for petitioner). In light of *Martinez* and *Trevino*, Texas courts "should be permitted, in the first instance, to decide the merits" of his IATC claim. *Trevino*, 569 U.S. at 420 (citing Brief for Respondent at 58–60).

Third, any concern that recognizing the ineffective assistance of state habeas counsel as grounds for overcoming Section 5 would open the floodgates to "endless and repetitious writs" are easily mitigated here. *See Graves*, 70 S.W.3d at 115. Cruz-Garcia has alleged both a *prima facie* case of ineffective assistance of *trial* counsel *and* ineffective assistance of *state habeas* counsel. Hence, as in *Martinez* and *Trevino*, this Court could readily limit the effect of authorization here by requiring petitioners to establish a *prima facie* claim, as Cruz-Garcia has, that state habeas counsel was ineffective *and* a potentially meritorious IATC claim.

By recognizing that ineffective assistance of prior state habeas counsel is sufficient to overcome Section 5, this Court will ensure the safeguard of the Sixth Amendment right to effective assistance of trial counsel, give Texas courts the first opportunity to review the merits

of Cruz-Garcia's IATC claim, and thus preserve Texas courts' federalism and finality interest.

### 3. Remand to the trial court is appropriate because the question of whether state habeas counsel was ineffective is a fact-intensive question.

The question of whether state habeas counsel provided ineffective assistance is a fact-bound question, a remand to the trial court for factual development of that issue is appropriate. *See Ex parte Storey*, 2017 WL 1316348, at *1 (remanding a subsequent state habeas application to the trial court for factual development regarding whether § 5 was met). Here, Cruz-Garcia has presented a strong *prima facie* case of state habeas counsel's ineffectiveness. *See* § VI.K.1 *supra*. Article 11.071, § 9(a) empowers the trial court to use "affidavits, depositions, interrogatories, and evidentiary hearings" as necessary to resolve disputed factual issues. As the trial court is statutorily positioned as the initial factfinder in state habeas proceedings, remand to that court is appropriate for an initial determination of state habeas counsel's ineffectiveness. This Court need not pass final judgment on that question now.

000368

## VII. Claim Seven: Cruz-Garcia was denied the right to confront witnesses, in violation of the Sixth and Fourteenth Amendments.

Under clearly established Supreme Court precedent, testimonial witness statements are not admissible unless both the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine that witness. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Results of forensic analysis are testimonial statements for purposes of the Sixth Amendment. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009). As argued *supra* §§ VI.G.1, Cruz-Garcia's Sixth and Fourteenth Amendment rights to confront witnesses were violated when the State called witnesses to testify about forensic analysis performed by non-testifying persons.

### A. Cruz-Garcia was deprived of the right to confront witnesses in connection with forensic analysis relevant to the DNA evidence, and to the cause of death of A. and Saul Flores.

At trial, Matt Quartaro, a DNA analyst at Orchid Cellmark, repeatedly testified regarding lab work that was performed by others who did not testify at trial. *See supra* §§ I.B and G. He also sponsored exhibits that others collected and/or analyzed. *Id.* Likewise, Dr. Dwayne Wolf testified regarding autopsy work that others performed, concerning both

340

A. (at the guilt phase) and Saul Flores (at the punishment phase). *See supra* §§ I.E and G. Because the DNA and autopsy evidence significantly contributed to Cruz-Garcia's conviction, and because the murder of Saul Flores was a critical aspect of the punishment phase, the Confrontation Clause violation was not harmless.

**B.    Cruz-Garcia's Confrontation Clause claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5.**

This Court should authorize Cruz-Garcia's Confrontation Clause claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2). In support thereof, Cruz-Garcia incorporates here by reference all facts, allegations, and statements of law included *supra* § I.I demonstrating that no rational juror could have convicted Cruz-Garcia. The merits of that argument are distinct from the underlying constitutional violation alleged–that is, this Court must first evaluate Cruz-Garcia's *prima facie* case of innocence, separately from the merits of the claim he seeks to have authorized.

This claim should also be authorized to proceed as explained in § VI. K *supra*, establishing that prior state post-conviction counsel was ineffective for failing to raise this claim in initial and first successive

state post-conviction proceedings. Thus, Cruz-Garcia has met the requirements of § 5.

## VIII. Claim Eight: Cruz-Garcia's constitutional rights were violated when the trial court held proceedings without Cruz-Garcia being present.

"It is a basic premise of our justice system that 'in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Fairey v. Tucker*, 567 U.S. 924, 343 (1970) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)) (Sotomayor, J., dissenting from denial of *certiorari*). The Supreme Court has long recognized that the right to be present is "scarcely less important to the accused than the right of trial itself." *Diaz v. United States*, 223 U. S. 442, 455 (1912).

### A. The trial court held two critical proceedings in connection with Cruz-Garcia's trial outside Cruz-Garcia's presence, in violation of his constitutional rights.

The first critical stage of his trial from which Cruz-Garcia was excluded was the *ex parte* meeting with Juror Bowman, at which the trial court gave unconstitutionally coercive supplemental instructions. The

342

factual allegations set forth in § VI.H *supra* are incorporated herein by express reference. Cruz-Garcia was also absent when the trial court conferred with defense counsel and the prosecution regarding a conversation that a third-party attorney overheard between two jurors outside the courtroom. 24 RR 6–6. During the discussion with counsel, Judge Magee related the following notes from her conversation with the reporting attorney:

> He stated that the two individuals were speaking about people on the jury with struggles. It was hard to hear them. He seemed – they seemed to be speaking about the case. The younger individual thanked the older individual for words of encouragement yesterday, which yesterday would have been July 15th, 2013. He said they seemed to be speaking about struggling with the issues. There was nothing specific about the issues discussed and they did not seem to be conspiring. He said he could not tell if they were actually talking about evidence. He said the conversation went on for approximately five minutes and that was while they were waiting on the elevator because the elevator took a long time. Once they got on the elevator, the conversation did not continue.

*Id*. at 5–6.

Judge Magee did not make her notes from the conversation a part of the record on the ground that she had read them "verbatim" in open court (but outside Cruz-Garcia's presence). *Id*. at 7. Counsel took the attorney's name and phone number for a follow-up conversation and the parties agreed to the court's proposal to admonish the jury "strongly" not

to discuss the case outside deliberations "and leave it at that." *Id*. at 6.
Shortly after this discussion, Cruz-Garcia and the jury were brought into
the courtroom. *Id*. at 8. Other than reiterating the admonishments, the
court warned the jurors that a violation "could have serious ramifications
to the outcome of this case." *Id*. at 8–9. Nothing about the inappropriate
conversation was discussed in Cruz-Garcia's presence.

Both of Cruz-Garcia's absences occurred during critical phases of
his trial. Both discussions took place during the jury's deliberations and
both exposed jurors' struggles to arrive at a unanimous verdict.
Furthermore, the conversation between the court and the attorneys
during the guilt-phase deliberations also addressed potential juror
misconduct that, as the court itself acknowledged, "could have serious
ramifications to the outcome of this case." 24 RR at 6.

This discussion should have led to questioning of both of the jurors
involved and the reporting attorney in open court. Without Cruz-Garcia's
input, that did not occur, to his own prejudice. The court's *ex parte*
discussion with Juror Bowman was even more critical to the outcome of
the trial. Juror Bowman adamantly insisted that she would not change
her answers to special issues 1 and 3, that the other jurors were

000373

frustrated with her for being a holdout, and that she did not want to continue deliberations because "it could be years" before they agreed on a verdict. 27 RR at 5–8. The court did not relate any of the conversation it had with Juror Bowman to counsel or directly to Cruz-Garcia, though counsel had clearly agreed to the *ex parte* meeting on the assumption that the Judge would simply determine whether the juror had a scheduling conflict. *Id.* at 3–4. Immediately after Juror Bowman spoke with the trial court outside the presence of Cruz-Garcia and his counsel, she changed her verdict and agreed to a death sentence. She immediately contacted trial counsel expressing how much the conversation with the court and her verdict disturbed her. She even signed sworn affidavit averring that, "[t]he verdict I returned was not a true and honest expression of my belief in the evidence supporting the special issues that called for the death penalty." 3 CR 611.

Had Cruz-Garcia and his counsel been present during the meeting with Juror Bowman, the coercive nature of Judge Magee's questions and responses would have been challenged, counsel themselves would have questioned Juror Bowman, and a motion to poll the jury to determine whether they were hopelessly deadlocked—necessitating a mistrial—

would have been filed. Cruz-Garcia was clearly prejudiced by his and his attorneys' absence during this colloquy.

## B. Cruz-Garcia's Fourteenth Amendment due process claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5.

This Court should authorize Cruz-Garcia's Fourteenth Amendment due process claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2). In support thereof, Cruz-Garcia incorporates here by reference all facts, allegations, and statements of law included *supra* § I.I demonstrating that no rational juror could have convicted Cruz-Garcia.

This claim should also be authorized to proceed as  explained in § VI.K, *supra*, establishing that prior state post-conviction counsel was ineffective for failing to raise this claim in initial and first successive state post-conviction proceedings. This claim is a record-based claim and was entirely overlooked by prior state habeas counsel. *See* Ex. 120 at ¶ 17. Thus, Cruz-Garcia has met the requirements of § 5.

## IX. Claim Nine: The trial court judge who presided over Cruz-Garcia's trial and state habeas proceedings had a conflict of interest.

Due process guarantees that an accused will be tried before a judge who harbors no actual bias against the accused. *See*, *e.g.*, *In re Murchison*, 349 U.S. 133, 136 (1955). A judge free of actual bias is one capable of

"hold[ing] the balance nice, clear and true between the state and the accused[]." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Because of the impracticability of proving actual bias, the Supreme Court has set forth an objective test for adjudicating judicial bias challenges. *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016). Under this test, relief should be granted when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Thus, the courts ask "whether, as an objective matter, the average judge in [the challenged judge's] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams*, 136 S. Ct. at 1905; *accord Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). Judicial bias is a structural trial error not subject to harmless error analysis. *Williams*, 136 S. Ct. at 1909. Upon a showing of a constitutionally intolerable risk of bias, relief is automatic.

## A.   Judge Magee had a conflict of interest based on several grounds.

First, Judge Magee, who presided over Cruz-Garcia's trial, was an assistant district attorney ("A.D.A") with the Harris County District Attorney's Office from 1992 to 2012. The HCDAO secured an indictment against Cruz-Garcia for capital murder on November 20, 2008, four years

before Judge Magee left their office. The trial of Cruz-Garcia began only six months after she left the Harris County District Attorney's Office to assume her judgeship. Moreover, during twelve of her twenty-one years at the Harris County District Attorney's Office, Judge Magee served as a felony district court chief, supervising other ADA's in four district courts. She also personally tried ten capital murder cases to jury. Thus, Judge Magee would have had unfettered access to, and potentially direct personal involvement in, the investigative and prosecutorial materials against Cruz-Garcia.

Second, Judge Magee held improper *ex parte* communication with Juror Bowman regarding her position as the lone holdout juror refusing to sentence Cruz-Garcia to death. *See supra* § VIII.H. Judge Magee thus violated Cruz-Garcia's right to be present at all critical stages of his trial and unconstitutionally coerced Juror Bowman into rendering an untrue verdict.

Third, Cruz-Garcia also challenges Judge Magee's highly unusual and improper ruling disallowing him from cross-examining State's witnesses and presenting his own evidence concerning a history of misconduct at the HPD crime lab that handled the DNA evidence in his

000377

case. For instance, Cruz-Garcia sought to introduce evidence that three of the HPD crime lab employees involved in the handling of evidence in this case were incompetent and engaged in misconduct and criminal behavior.

Finally, evidence from Judge Magee's handling of Cruz-Garcia's state habeas proceeding also tends to establish her bias during the trial. First, while running for re-election during Cruz-Garcia's state habeas proceedings, Cruz-Garcia's case was the *only* case cited in support of her candidacy. Judge Magee's campaign website even linked to a *Houston Chronicle* article about the trial. Ex. 60. Judge Magee also refused to recuse herself upon Cruz-Garcia's motion alleging that his claim that she violated his constitutional rights by holding an *ex parte* meeting with Juror Bowman created a conflict of interest. Upon losing her reelection campaign, Judge Magee rushed Cruz-Garcia's state habeas, preventing him from meaningfully participating in order to ensure that she would decide the fate of his conviction and death sentence, which she did two days before her tenure as judge concluded by signing the State's proposed FFCL verbatim. *See supra* §I.F.

000378

Judge Magee's status as a felony supervisor creates a constitutionally intolerable likelihood that she was aware of and involved in prosecutorial decision-making before taking the bench and presiding over the trial. *Williams*, 136 S. Ct. at 1905 (Fourteenth Amendment violated where the judge "earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case."). Certainly, the average judge presiding over a capital murder trial being prosecuted by the same office the judge worked for as a supervisor during the first four years of the case would not sit as a neutral arbitrator. Moreover, Judge Magee's conduct throughout the trial, and continuing into the state habeas proceedings, which was decidedly biased in favor of the prosecution, casts additional doubt on Judge Magee's neutrality.

## B. Cruz-Garcia's judicial bias claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5.

This Court should authorize Cruz-Garcia's judicial bias claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2). In support thereof, Cruz-Garcia incorporates here by reference all facts, allegations, and statements of law included *supra* § I.I demonstrating that no rational juror could have convicted Cruz-Garcia. This claim should also be

000379

authorized to proceed as  explained in § VI.K, *supra*, establishing that prior state post-conviction counsel was ineffective for failing to raise this claim in initial and first successive state post-conviction proceedings. Thus, Cruz-Garcia has met the requirements of § 5.

## X.   Claim Ten: Testimony was translated incorrectly to the jury, in violation of Cruz-Garcia's Fifth, Sixth, Eighth, and Fourteenth Amendments.

Cruz-Garcia's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the trial court's failure to provide accurate interpretations of the testimony. The Supreme Court has not specifically addressed whether provision of an interpreter is a fundamental trial right. Nonetheless, in the context of competency challenges, the Court has long held that a criminal defendant who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial" because, "though physically present in the courtroom, [he] is in reality afforded no opportunity to defend himself." *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *see Ferrell v. Estelle*, 568 F.2d 1128, 1132–33 (5th Cir. 1978) ("The Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist

in his own defense. Ensuring that the defendant has that minimum understanding is primarily the task of the trial judge.").

Moreover, as a criminal defendant, Cruz-Garcia enjoyed the "bedrock procedural guarantee" of confrontation of the witnesses against him, *Crawford*, 541 U.S. at 42 (citation omitted); "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies," *Washington v. Texas*, 388 U.S. 14, 19 (1967); and the right to have a jury determine every element of the crime of which he was charged, *Apprendi*, 530 U.S. at 476–77. Criminal defendants are deprived of these and other "constitutional protections of surpassing importance," *id.* at 476, when the evidence at their trials is inaccurately conveyed to both themselves and their juries. The injustice resulting from inaccurate interpretation is amplified when not only the defendant's liberty, but his life, is at stake in a capital trial. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (capital defendants entitled to "a greater degree of accuracy . . . than would be true in a noncapital case").

### A.   Cruz-Garcia's trial proceedings were not accurately interpreted.

Eleven witnesses at Cruz-Garcia's trial testified in Spanish because they did not adequately speak or understand English. *See* 18 RR 194; 20

000381

RR 80, 116; 21 RR 4; 24 RR 14, 43, 78, 98, 118; 25 RR 59; 26 RR 9.[68] The record contains several instances of the interpreters self-correcting their interpretations of these witnesses' testimony, raising doubts as to both the interpreters' qualifications and the accuracy of the testimony that was related to the jury. *See, e.g.*, 20 RR 94 (correcting original interpretation stating "I was in trouble" to "that was a problem"), 165 (correcting original interpretation stating "I didn't want to die" to "I wanted to die"); 25 RR 65 (correcting original interpretation stating the defendant was wearing "a grey coat and a grey tie" to a "blue shirt").

Solidifying the concerns raised by the record, the jury sent a note to the trial court during their guilt-phase deliberations in which they asked: "Are we only allowed to consider the interpreter's response of the witness in English and not the Spanish response as heard by the Spanish-speaking jury members[?]" 23 RR 100. After conferring with counsel, and without objection, the court instructed the jury that "[t]he interpreter's response is the official record and evidence in the case." *Id.*

---

[68] The State presented Spanish-language testimony from three guilt-phase witnesses and six penalty-phase witnesses. Cruz-Garcia presented Spanish-language testimony from two penalty-phase witnesses.

000382

Finally, Ronaldo Hernandez, one of the interpreters for the jury, also interpreted the English language testimony and argument into Spanish for Cruz-Garcia, a foreign national who does not speak or understand English. 4 RR 5. Based on the record evidence that he and fellow interpreter Marilu Flores struggled to accurately interpret the Spanish testimony into English, it is more likely than not that Mr. Hernandez also failed to adequately interpret the English testimony into Spanish for Cruz-Garcia.

The trial court's failure to provide accurate interpretations of the evidence and arguments, and the failure of the parties to identify and request amelioration of this error under Tex. Code Crim. Proc. art. 38.30(a), resulted in a violation of Cruz-Garcia's constitutional rights to due process and a fair trial, right to a jury trial, right to a unanimous verdict, right to be present and confront the witnesses against him, and right to present a defense. Because Cruz-Garcia's trial was infected with inaccurate interpretations of the evidence and arguments, and because the jurors deliberated over different testimony based on their comprehension or not of the Spanish language, Cruz-Garcia's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated.

B. **Cruz-Garcia's inaccurate interpretation claim meets the requirements of Texas Code of Criminal Procedure Article 11.071 § 5.**

This Court should authorize Cruz-Garcia's inaccurate interpretation claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5(a)(2). In support thereof, Cruz-Garcia incorporates here by reference all facts, allegations, and statements of law included *supra* § I.I demonstrating that no rational juror could have convicted Cruz-Garcia. This claim should also be authorized to proceed as explained in § VI.K, *supra*, establishing that prior state post-conviction counsel was ineffective for failing to raise this claim in initial and first successive state post-conviction proceedings. This claim is a record-based claim and was entirely overlooked by prior state habeas counsel. *See* Ex. 140 at ¶ 17. Thus, Cruz-Garcia has met the requirements of § 5.

XI. **Claim Eleven: Prosecutors made numerous inappropriate and inflammatory comments throughout trial, denying Cruz-Garcia his right to due process and fair trial.**

Prosecutorial misconduct, such as the State's inflammatory rhetoric in this case, violates a defendant's due process rights to a fair trial when the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*,

477 U.S. 168, 181 (1986). The State made numerous inappropriate, inflammatory, and prejudicial statements throughout trial, in violation of Fifth, Eighth and Fourteenth Amendments. Among other things, the State recited Biblical passages, attempted to elicit religious fury from the jurors, compared Cruz-Garcia to Adolf Hitler and infamous serial killers, and suggested to the jury that Cruz-Garcia was subhuman. 12 RR 22; 163–64; 6 RR 26–27; 8 RR 95; 11 RR 202; 12 RR 261; 13 RR 217; 14 RR 222–23, 262–63; 26 RR 175. Given how far beyond the pale the State's comments went, there can be no question that they seriously prejudiced the jury's ability to judge Cruz-Garcia fairly.

This Court should authorize Cruz-Garcia's prosecutorial misconduct claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5. In support thereof, Cruz-Garcia incorporates here by reference all facts, allegations, and statements of law included *supra* § I.I demonstrating that no rational juror could have convicted Cruz-Garcia. This claim should also be authorized to proceed as explained in § VI.K*, supra*, establishing that prior state post-conviction counsel was ineffective for failing to raise this claim in initial and first successive state post-

conviction proceedings. Thus, Cruz-Garcia has met the requirements of §

5.

## XII. Claim Twelve: Repeated emotional outbursts from the gallery rendered Cruz-Garcia's conviction and death sentence fundamentally unfair.

Pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendment right to a fair trial, a defendant is entitled to be "fairly tried in a public tribunal free of prejudices, passion, [and] excitement." *Sheppard v. Maxwell*, 384 U.S. 33, 350 (1966). Cruz-Garcia's conviction was therefore unconstitutionally obtained due to repeated, emotional outbursts from the gallery during his trial. *See* 20 RR 14, 107–08.

This Court should authorize this claim pursuant to Tex. Code Crim. Proc. art. 11.071 § 5. In support thereof, Cruz-Garcia incorporates here by reference all facts, allegations, and statements of law included *supra* § I.I demonstrating that no rational juror could have convicted Cruz-Garcia. This claim should also be authorized to proceed as explained in § VI.K, *supra*, establishing that prior state post-conviction counsel was ineffective for failing to raise this claim in initial and first successive state post-conviction proceedings. This claim is a record-based claim and

000386

was entirely overlooked by prior state habeas counsel. *See* Heisey Dec. at

¶ 17. Thus, Cruz-Garcia has met the requirements of § 5.

## CONCLUSION

For the foregoing reasons, the Court should authorize Cruz-Garcia's claims and remand for consideration by the convicting court.

Dated: April 9, 2021                    Respectfully submitted,

                                        JASON HAWKINS
                                        Federal Public Defender

                                        JEREMY SCHEPERS
                                        Supervisor, Capital Habeas Unit

                                        /s/ David Currie_____
                                        David Currie  (TX 24084240)

                                        /s/ Naomi Fenwick_____
                                        Naomi Fenwick (TX 24107764)
                                        Federal Public Defender's Office
                                        Northern District of Texas
                                        Capital Habeas Unit
                                        525 S. Griffin, Ste. 629
                                        Dallas, TX 75202
                                        david_currie@fd.org
                                        naomi_fenwick@fd.org
                                        Tel: (214) 767-2746
                                        Fax: (214) 767-2886

                                        *Counsel for Obel Cruz-Garcia*

## VERIFICATION

## STATE OF TEXAS

## COUNTY OF DALLAS

BEFORE ME, the undersigned authority, on this day personally appeared Naomi Fenwick, who upon being duly sworn by me testified as follows:

1. I am a member of the State Bar of Texas in good standing.

2. I am the duly authorized attorney for Obel Cruz-Garcia, having the authority to prepare and to verify Cruz-Garcia's subsequent application for a writ of habeas corpus.

3. I have prepared and read the foregoing application and I believe all allegations in it to be true to the best of my knowledge.

Signed under penalty of perjury:

_____
Naomi Fenwick

SUBSCRIBED AND SWORN TO BEFORE ME on APRIL 8, 2021.

_____
Notary Public, State of Texas

RUBEN VILLEGAS
Notary Public, State of Texas
Comm. Expires 02-04-2025
Notary ID 129293833

329

000388

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2021, I served a copy of the foregoing

application upon counsel for the Respondent via email at:

Josh Reiss
reiss_josh@dao.hctx.net
Harris County Criminal District Attorney
500 Jefferson St.
Houston, TX 77002


/s/ Naomi Fenwick
Naomi Fenwick

000389

4/9/2021 12:23 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52308531
By: T Reed
Filed: 4/9/2021 12:23 PM

## 13847940101C / Court: 337

### IN THE 337TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

### AND

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

| | | |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § | **Writ No.** _____ Trial Court Case No: 1384794 |
| **Applicant.** | § § § § | **CAPITAL CASE** |

## SUBSEQUENT APPLICATION FOR
## POST-CONVICTION WRIT OF HABEAS CORPUS
## EXHIBITS 1 THROUGH 10

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

000390

13847940101C / Court: 337

# EXHIBIT 1

FILED IN
COURT OF CRIMINAL APPEALS

September 15, 2014

ABEL ACOSTA, CLERK

COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/12/2014 5:27:44 PM
Accepted 9/15/2014 3:53:10 PM
ABEL ACOSTA
CLERK

AP - 77,025

IN THE TEXAS COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

OBEL CRUZ-GARCIA
Appellant

VS.

THE STATE OF TEXAS
Appellee

# APPELLANT'S  BRIEF

Appealed from the 337TH  District Court
Harris County, Texas

Trial Court Cause Number:

1384794

DEATH PENALTY APPEAL

WAYNE T. HILL
Texas Bar No: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77027
Tel: (713) 623-8312  Fax: (713) 626-0182
wthlaw@aol.com

Oral argument is not  requested

EXHIBIT 1 Page 001

## IDENTITY OF PARTIES AND COUNSEL

**Presiding Judge at Trial**
Honorable Renee Magee
337th Judicial District Court
1201 Franklin
Houston, Texas 77002

**Trial attorneys for State**
Natalie Tise
Justin Wood
Assistant District Attorneys
1201 Franklin
Houston, Texas 77002

**On Appeal:**
Alan Curry
Assistant District Attorney
1201 Franklin
Houston, Texas 77002

**Trial Attorneys for Appellant**
R.P. Cornelius
2028 Buffalo Terrace
Houston, Texas 77019

Mario Madrid
440 Louisiana, Suite 1225
Houston, Texas 77002

**On appeal:**
Wayne T. Hill
4615 Southwest Freeway, Suite 600
Houston, Texas 77027

**The Appellant**
Obel Cruz-Garcia

i

EXHIBIT 1 Page 002

# TABLE OF CONTENTS

| | |
|---|---|
| IDENTITY OF PARTIES AND COUNSEL | i |
| TABLE OF CONTENTS | ii |
| ISSUES PRESENTED | iii |
| INDEX OF AUTHORITIES | iv |
| SUMMARY OF ARGUMENTS | v |
| STATEMENT OF THE CASE | vi |
| RECORD CITATIONS | vi |
| STATEMENT REGARDING ORAL ARGUMENT | vi |
| STATEMENT OF FACTS IN THE CASE | 1 |
| POINT OF ERROR #1 | 61 |
| POINT OF ERROR #2 | 70 |
| POINT OF ERROR #3 | 76 |
| POINT OF ERROR #4 | 89 |
| POINT OF ERROR #5 | 93 |
| POINT OF ERROR # 6 | 95 |
| POINT OF ERROR # 7 | 98 |
| POINT OF ERROR # 8 | 101 |
| POINT OF ERROR # 9 | 103 |
| POINT OF ERROR # 10 | 105 |
| POINT OF ERROR # 11 | 106 |
| POINT OF ERROR # 12 | 107 |
| PRAYER FOR RELIEF | 117 |
| CERTIFICATE OF WORD COUNT COMPLIANCE | 118 |
| CERTIFICATE OF SERVICE | 118 |

000394

EXHIBIT 1 Page 003

## ISSUES PRESENTED FOR REVIEW

**POINT OF ERROR NUMBER ONE**
THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO
SUPPRESS THE STATE'S DNA EVIDENCE WHERE THE STATE FAILED TO
ESTABLISH A PROPER CHAIN OF CUSTODY DUE TO THE INVOLVEMENT
OF THE HOUSTON POLICE DEPARTMENT CRIME LAB WHICH WAS SHUT
DOWN AND WIDELY CRITICIZED IN THE REPORT OF INDEPENDENT
INVESTIGATOR MICHAEL R. BROMWICH COMMISSIONED TO REVIEW
AND EVALUATE THE HOUSTON POLICE DEPARTMENT CRIME
LABORATORY AND PROPERTY ROOM (CR-III-454)

**POINT OF ERROR NUMBER TWO**
THE TRIAL COURT ERRED IN DENYING APPELLANT THE RIGHT TO
CONFRONT AND CROSS EXAMINE HIS ACCUSERS AND THUS THE
OPPORTUNITY TO PRESENT A DEFENSE BASED IN PART ON EVIDENCE
CRITICAL OF THE HOUSTON POLICE DEPARTMENT CRIME LAB AND
PROPERTY ROOM DURING HIS MOTION TO SUPPRESS AND AT TRIAL
(CR-III-454-456)(R-XXXI-DX2/3/4)R-XVI-21);(R-XXXII-DX5/6)(R-XVI-21);(R-
XXXIII-DX6)(R-XVI-21);(R-XXXIV-DX7-19)(R-XVI-21)

**POINT OF ERROR NUMBER THREE**
THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO
SUSTAIN APPELLANT'S CONVICTION FOR THE OFFENSE OF
CAPITAL MURDER (CR-I-2)(CR-III-484-507)(CR-III-530)

**POINT OF ERROR NUMBER FOUR**
THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO
INTRODUCE EVIDENCE OF AN EXTRANEOUS OFFENSE [POSSESSION OF
A CONTROLLED SUBSTANCE] BY PERMITTING THE STATE SHOW THAT
APPELLANT FAILED TO APPEAR FOR A COURT SETTING ON OCTOBER 8,
1992 ON AN UNRELATED FELONY CHARGE AND THAT HIS BOND WAS
FORFEITED ON THAT CHARGE ALL TO SHOW FLIGHT ON THE PART OF
APPELLANT AT HIS CAPITAL MURDER TRIAL EVEN THOUGH THERE
WAS NO CHARGE OF CAPITAL MURDER FILED AGAINST APPELLANT
UNTIL 2008. (R-XIX-111,113,115,119,122-124,126,128,129,141,142)

000395

EXHIBIT 1 Page 004

**POINT OF ERROR NUMBER FIVE**
**THE TRAIL COURT ERRED WHEN OVER APPELLANT'S OBJECTION IT ADMITTED THE EXTRANEOUS OFFENSE EVIDENCE [SET FORTH IN THE PREVIOUS POINT OF ERROR] BECAUSE UNDER RULE 403 OF THE TEXAS RULES OF EVIDENCE ITS PROBATIVE VALUE, IF ANY, WAS OUTWEIGHED BY THE PREJUDICIAL EFFECT OF ITS ADMISSION DURING APPELLANT'S CAPITAL MURDER TRIAL.(R-XIX-111,113,115,119,122-124,125,126-128,129,141,142)**

**POINT OF ERROR NUMBER SIX**
**THE TRIAL COURT ERRED WHEN IT PROHIBITED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE INCLUDING BIBLE STUDY CERTIFICATES DURING THE PUNISHMENT PHASE OF THE TRIAL THUS PREVENTING APPELLANT FROM PRESENTING A COMPLETE DEFENSE (R-XXVI-55-58)(R-XXXIV-DX48-55)**

**POINT OF ERROR NUMBER SEVEN**
**THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE THAT HE WAS AN INFORMANT FOR THE FBI, DEA OR INS(R-XXIV-70-74)**

**POINT OF ERROR NUMBER EIGHT**
**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT INJECTING FACTS OUTSIDE THE RECORD (R-XXIII-80)**

**POINT OF ERROR NUMBER NINE**
**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT ASKING THE JURY TO CONVICT APPELLANT OF CAPITAL MURDER AS A PARTY BECAUSE THAT WAS WHAT THE STATE BELIEVED ACTUALLY HAPPENED - THAT APPELLANT DIRECTED AND ENCOURAGED. (R-XXIII-92)**

**POINT OF ERROR NUMBER TEN**
**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT WHICH WAS OUTSIDE THE RECORD AND INJECTED HER PERSONAL BELIEF THAT IF IT HAD BEEN UP TO THE CO-DEFENDANT, ███████████ WOULD STILL BE ALIVE (R-XXVI-163-165)**

**POINT OF ERROR NUMBER ELEVEN**
**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR MISTRIAL BASED UPON THE IMPROPER JURY ARGUMENT OF THE PROSECUTOR WHEN SHE WENT OUTSIDE THE RECORD (R-XXVI-171,172)**

EXHIBIT 1 Page 005

**POINT OF ERROR NUMBER TWELVE**
**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR NEW TRIAL BASED UPON JURY MISCONDUCT DURING THE PUNISHMENT DELIBERATIONS WHERE THE JURY FOREMAN INFLUENCED THE DELIBERATION BY QUOTING FROM HIS BIBLE ABOUT THE CORRECTNESS OF THE DEATH PENALTY THUS CONSTITUTING AN IMPERMISSIBLE OUTSIDE INFLUENCE (CR-III-522,538)**

000397

EXHIBIT 1 Page 006

# INDEX OF AUTHORITIES

**CONSTITUTIONS**

| | |
|---|---|
| U.S. Constitution Fifth Amendment | 88 |
| U.S. Constitution Sixth Amendment | 70,74,76,97,100,115 |
| U.S. Constitution Fourteenth Amendment | 67,74,76,97,100 |

**STATUTES**

| | |
|---|---|
| Texas Penal Code - Section 19.03 | 85 |
| Texas Code of Criminal Procedure - Article 37.071 | 95 |
| Texas Code of Criminal Procedure - Article 64.03 | 68 |
| Texas Rules of Evidence - 102 | 96 |
| Texas Rules of Evidence - 104(e) | 97 |
| Texas Rules of Evidence - 401 | 75 |
| Texas Rules of Evidence - 403 | 93 |
| Texas Rules of Evidence - 404(b) | 91 |
| Texas Rules of Evidence - 606(b) | 114,116 |
| Texas Rules of Evidence - 611(b) | 74 |
| Texas Rules of Evidence - 803(11) | 96 |
| Texas Rules of Evidence - 803(13) | 96 |
| Texas Rules of Evidence - 803(19) | 96 |
| Texas Rules of Evidence - 804(3) | 97 |
| Texas Rules of Evidence - 803(21) | 100 |
| Texas Rules of Appellate Procedure - 21.3© | 113 |
| Texas Rules of Appellate Procedure - 21.3(f) | 113 |
| Texas Rules of Appellate Procedure - 21.3(h) | 114 |
| Texas Rules if Appellate Procedure - 21.7 | 114 |
| Texas Rules of Appellate Procedure - 38.1 (f) & (I) | 65,70,100 |

**CASE LAW**

| | |
|---|---|
| Borjan v. State | 107 |
| Brandley v. State | 91 |
| Brooks v. State | 86 |
| Brown v. State | 105 |
| Burks v. U.S. | 89 |
| Campbell v. State | 104 |
| Canady v. State | 102,104 |
| Cantrell v. State | 91 |

iv

EXHIBIT 1 Page 007

| | |
|---|---|
| Casey v. State | 94 |
| Clewis v. State | 86 |
| Chambers v. Mississippi | 98 |
| Colyer v. State | 116 |
| Damron v. State | 92 |
| Douglas v. Alabama | 74 |
| Druery v. State | 69 |
| Garrison v. State | 102,104 |
| Garza v. State | 88 |
| Gollihar v. State | 85 |
| Greene v. Massey | 89 |
| Hicks v. State | 92 |
| Hightower v. State | 85 |
| Holmes v. South Carolina | 70,76,98 |
| Hudson v. United States | 88 |
| In re Winship | 85 |
| Jackson v. Virginia | 86 |
| Laster v. State | 87 |
| Lockett v. Ohio | 97 |
| Love v. State | 75 |
| Martin v. State | 100 |
| McCullen v. State | 85 |
| McQuarrie v. State | 115 |
| Montgomery v. State | 68 |
| Mozon v. State | 94 |
| Mullaney v. Wilbur | 85 |
| Naraviz v. State | 87 |
| Norris v. State | 68 |
| Oliver v. Quarterman | 116 |
| Parker v. Gladden | 117 |
| Portier v. State | 76 |
| Ramson v. State | 105 |
| Ray v. State | 76 |
| Reed v. State | 75 |
| Remmer v. State | 117 |
| Reyes v. State | 115 |
| Routier v. State | 68 |
| Skipper v. South Carolina | 97 |
| State v. Harrington | 117 |
| Stearn v. State | 104 |
| Stobaugh v. State | 89 |
| Turner v. Louisiana | 117 |
| Turner v. State | 100 |
| Williams v. State | 104 |
| Winn v. State | 88 |

EXHIBIT 1 Page 008

000399

# SUMMARY OF ARGUMENT

**POINT OF ERROR #1**
The State did not establish a proper chain of custody regarding sixteen year old DNA evidence which involved the disgraced Houston Police Department Crime Lab and Property Room. The trial court prevented Appellant from questioning the State's witnesses regarding the collection, storage and transportation of this DNA evidence.

**POINT OF ERROR #2**
The trial court denied Appellant's right to confront and cross examine his accusers when it did not allow him to question the State's witnesses about problems in the HPD Crime Lab and Property Room and did not permit Appellant to introduce documentary evidence to establish his defense.

**POINT OF ERROR #3**
The evidence was insufficient to sustain the jury's guilty verdict where there was no evidence establishing the actual cause of death and the remaining evidence was seriously undermined and did not amount to proof beyond a reasonable doubt.

**POINT OF ERROR #4**
The admission of an extraneous offense (bond forfeiture) alleged to have occurred in 1992 was admitted as evidence of "flight" in Appellant's 2013 capital murder trial even though no charge was pending against Appellant for capital murder in 1992 and Appellant was not charged with capital murder until 2008.

**POINT OF ERROR #5**
The probative value, if any, of the admission of the extraneous offense noted in Point of Error #4 , was outweighed by its prejudicial effect on the jury.

**POINT OF ERROR #6**
The exclusion of Appellant's mitigating evidence showing his attendance at Bible Study classes prevented him from presenting a meaningful and complete defense.

**POINT OF ERROR #7**
The exclusion of Appellant's mitigating evidence confirming that he was an informer for the FBI, DEA or INS prevented him from presenting a meaningful and complete defense.

**POINT OF ERROR #8**
The State's argument injected facts outside the record.

**POINT OF ERROR #9**
The State's argument injected the prosecutor's personal opinion of Appellant's guilt.

v

000400

EXHIBIT 1 Page 009

**POINT OF ERROR # 10**
The State's argument injected the prosecutor's personal belief of Appellant's culpability.

**POINT OF ERROR # 11**
The State's argument was outside the record.

**POINT OF ERROR # 12**
An improper outside influence requiring a new trial occurred when the jury foreman quoted Scripture from his Bible during punishment deliberations.

000401

EXHIBIT 1 Page 010

## STATEMENT OF THE CASE

On September 5, 2008, Appellant was charged by complaint with the 1992 murder of ███████████. while in the course of and attempting to commit the kidnapping of ████████████. (CR-I-4)  On April 19, 2013, Appellant was indicted for capital murder in this case. (CR-I-2)  A jury  found Appellant guilty of capital murder as alleged in the indictment. (CR-III-506)  The jury returned answers to the Special Issues submitted at the punishment phase which resulted in the trial court sentencing Appellant to death. (CR-III-513-527,530) Appellant filed a Motion for New Trial alleging jury misconduct. (CR-III-538) After conducting a hearing (by affidavits), the trial court denied Appellant's Motion for New Trial. (CR-III-665)

## RECORD DESIGNATION

Record citations are designated:

Clerk's Record            (CR-vol-page)

Reporter's Record     (R-vol-page)

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested

000402

EXHIBIT 1 Page 011

## STATEMENT OF FACTS IN THE CASE

## MOTION TO SUPPRESS

Prior to trial, the court asked for an explanation as to what exactly was being pursued in the suppression hearing regarding DNA. The prosecutor noted that there was "Brady" material associated with the old crime lab investigation, including internal memos from the District Attorney's office and the Bromwich Report which was provided to Appellant. When the trial court asked exactly what was sought to be suppressed, Appellant's counsel made an opening statement to outline the items for the court. (R-XVI-16) 1) Some of the people that handled the evidence in this case were severely criticized as a result of the HPD Crime Lab investigation. 2), Although the State had the evidence re-examined by an independent lab, Appellant's counsel noted that he had no confidence in the HPD Crime Lab. (R-XVI-17) 3), Specific evidence consisting of a pair of panties and a cigar from which a DNA profile were determined or handled by the HPD Crime Lab for latter cuttings or swabs were items produced by HPD Crime Lab or sent to Orchid Cellmark for analysis. (R-XVI-17) Appellant's counsel noted that because the HPD Crime Lab had been completely closed, the trial court should not have any confidence in any items transferred from that now closed lab to anywhere else for fear of contamination. (R-XVI-18) Appellant argued that no evidence even handled by the HPD Crime Lab should be trusted for evaluation even by an independent crime lab and the Appellant sought to suppress it as a result. (R-XVI-18) This would include evidence testimony from Orchid Cellmark. (R-XVI-18) Appellant offered Defendant's Exhibits 2 through 9, which included various reports regarding the Bromwich Report, and

1

the HPD Crime Lab investigation. These items were admitted in evidence at the pretrial hearing. (R-XVI-21)

The State responded that it followed the recommendations of the Bromwich Report in this case and sent all the evidence out to an independent lab so that they could start from scratch and do their own testing. (R-XVI-22) The State's position with regard to the contamination issue was that it could not have happened because the old HPD crime lab didn't have a sample of Appellant's DNA at that time - because he was in Puerto Rico.

By agreement, the State made a proffer regarding the testimony of Gloria Kologinczok who performed the sexual assault examination in this case. (R-XVI-23, 24) In 1992, this was one of the first sexual assault nurse examiners [SANE]. She performed an examination on ███████████. (R-XVI-25) The examination was performed on October 1, 1992, at St. Joseph's Hospital in Houston, Texas. (R-XVI-25) The sexual assault evidence collection kit was turned over to Officer W. T. Bredemeyer of the Houston Police Department. (R-XVI-25)

The State then called Eric Mehl a retired Houston Police Department Homicide investigator. (R-XVI-26) In 2004, Mehl was assigned to a cold case squad within the homicide division of the Houston Police Department. (R-XVI-28) Mehl would look for cases that required DNA analysis to go any further. (R-XVI-29) He became familiar with a case that involved the homicide of six year old boy named ███████████. (R-XVI-29) The homicide of ███████████. also indicated that his mother had been sexually assaulted during the course of the events back in 1992. (R-XVI-29) In September, 2007, Mehl set out to find the evidence that he wanted to ship to Orchid Cellmark for analysis. (R-XVI-30) The

2

evidence was a cigar that had been left at the scene of the crime, as well as the rape kit which was taken from ███████, which included cuttings from a pair of underpants. (R-XVI-30) The cigar had been stored at the HPD property room (not the crime laboratory). (R-XVI-30) The cigar was inside a plastic ziplock bag which was then inside a brown evidence envelope that had been sealed. (R-XVI-31) No damage to the evidence bag or its contents was noted. (R-XVI-31) The rape kit was located in the HPD annex building on the 24th Floor (also not stored in the crime laboratory room). (R-XVI-32) No damage to the rape kit or the bag it was stored in was noted. (R-XVI-33) The items were then packaged by Mehl and sent to Orchid Cellmark. (R-XVI-33) Evidence which was stored at the crime laboratory, included a cutting from the panties, biological samples from Arturo Rodriguez and ███████. The individual bags which contained the evidence were not opened by Mehl. (R-XVI-35) Blood samples for potential DNA analysis belonging to ███████, Arturo Rodriguez and others were also preserved. (R-XVI-35)

Mehl said that from 1992 no contact had been made with Appellant, Obel Cruz Garcia, because he had fled the country. (R-XVI-36) As a result, there was no DNA sample from Appellant at any time in the 1990's after this crime had occurred. (R-XVI-36, 37) When Mehl shipped off the evidence to Orchid Cellmark on October 2, 2007, the State still did not have possession of a DNA sample from Appellant. (R-XVI-37) Subsequently, in 2008, it was learned that Appellant was in custody in Puerto Rico. (R-XVI-37) The FBI in Puerto Rico went to the prison where Appellant was being held and obtained a DNA sample from him on May 23, 2008. (R-XVI-38) By May 23, 2008, all the original evidence that might

EXHIBIT 1 Page 014

have contained biological material had already been shipped off to Orchid Cellmark for analysis. (R-XVI-38) When Mehl obtained the DNA sample from Appellant, he did not open the package but rather repackaged the original FedEx package into another one and sent it to Orchid Cellmark. (R-XVI-39) The results of the testing revealed that the cigar contained DNA matching Appellant. A cutting from the panties contained a mixture and the major DNA profile obtained from the sperm fraction belonged to Appellant. (R-XVI-39) Appellant also was not excluded as a contributor to the vaginal swab taken in the case. (R-XVI-39) Mehl acknowledged that in 1992, DNA testing was in its infancy. (R-XVI-40) Mehl stated that at that time the type of DNA evidence that was being considered was blood and semen. He indicated that HPD was not necessarily looking for epithelial cells on items like cigars. (R-XVI-40, 41) Mehl indicated that had he been the investigator in 1992, he would not have even thought to look for DNA on the cigar. (R-XVI-41)

**During cross-examination, Mehl acknowledged that items that had been extracted from** ▮▮▮▮▮▮▮ **were stored by HPD Crime Lab. This included the blood and cutting from the underpants.** (R-XVI-43, 44) Mehl was unaware of where blood samples would have been taken from ▮▮▮▮▮▮, whether or not it was part of the rape kit. (R-XVI-44) **Mehl admitted that at some point the rape kit would have gone through the crime lab. (R-XVI-44) Blood was extracted from Arturo Rodriguez for elimination purposes and that was also done at the HPD Crime Lab. (R-XVI-45)** In response to the court's question, Mehl said that he sent the entire rape kit, along with the things that the crime lab removed from the rape kit which was the crotch of the panties. (R-XVI-46)

000406

EXHIBIT 1 Page 015

Matt Quartaro, a supervisor of forensics at Cellmark Forensics in Dallas, Texas, testified that he conducted part of the testing on Appellant's case when he received evidence on October 3, 2007. (R-XVI-49)  This witness did not observe anything irregular about the evidence. (R-XVI-50)  Cellmark performed its own DNA extraction from the samples submitted.  Essentially, they set aside extractions that had been taken by HPD. (R-XVI-51)  The lab took their own cuttings from the panties to do a DNA analysis. (R-XVI-52)  At the time the initial shipment was received, this laboratory had not received any of Appellant's DNA profile or any of his associates. (R-XVI-52)  The laboratory started from scratch with the items. (R-XVI-53)  The initial testing revealed that there was a third unknown individual who was a male whose DNA was found on the vaginal swab and the cigar. (R-XVI-55)  The witness indicated that the unknown profile from the cigar couldn't be excluded as a contributor to the vaginal swab. (R-XVI-55)  It was only a single source DNA on the cigar, meaning there was only one person's DNA present. (R-XVI-56)  Arturo Rodriguez was a contributor to the male DNA in the panties because he could not be excluded as a minor contributor.  The major contributor was the unknown male. (R-XVI-57)

On May 28, 2008, the laboratory obtained a full DNA profile from Appellant. (R-XVI-59)  The witness indicated that the profile of Appellant matched the profile from the sperm fraction of the panties and to the cigar. (R-XVI-59)  When asked about the possibility of contamination, the witness indicated without having the defendant's DNA to contaminate it with, he could not see a way that Appellant's DNA profile could have shown up on the evidence. (R-XVI-61)  While the witness indicated that the storage conditions, even the

5

freshest ones, could have made it more difficult to obtain a DNA profile, he didn't see it compromising the evidence. (R-XVI-62) The witness agreed that you would have had sperm cells on the cigar or the cigar could have contaminated the panties. (R-XVI-63) The witness also indicated that the storage conditions would not change the DNA to some else's DNA, it would just break up the DNA to where they were not able to obtain results from it. (R-XVI-66)

During cross-examination, this witness acknowledged that the tested evidence had been in HPD's possession at one point. (R-XVI-67) **Quartaro noted that there was evidence of active testing by the HPD crime lab. (R-XVI-68)** This witness admitted that even though two people had touched the cigar, it's possible that only a DNA profile from one person would be obtained. (R-XVI-72) **The witness also acknowledged that he could not tell when a sperm cell was deposited, just whose DNA was there. (R-XVI-72, 73)**

The State and Appellant stipulated that Appellant gave his consent to provide blood, hair and saliva sample on February 16, 2010. A further stipulation was that the District Attorney's office obtained buccal swabs from Appellant on February 18, 2010. (R-XVI-78)

Courtney Head worked for the Houston Police Department Crime Lab. (R-XVI-79) Her employment with the crime lab was not related in any way to the HPD crime lab in 1992. (R-XVI-82) Head testified that there was a letter from the HPD crime lab in 1992 indicating that extractions from the evidence of the vaginal swab in the crotch panties were sent to Genetic Design Lab for analysis. (R-XVI-85) In the 1992 Genetic Design Lab letter there was no cigar or any extraction from that cigar in evidence. (R-XVI-85) This witness, who

6

EXHIBIT 1 Page 017

was familiar with Joseph Chew from the Houston Police Department Crime Lab, stated that she was unaware of any DNA analysis he performed on the evidence in this case. (R-XVI-85) At one point in 1992, Chew obtained a hair sample from Appellant. (R-XVI-86) Chew was also in receipt of some buccal swabs of Appellant from Michael Webb on February 18, 2010. (R-XVI-86) B. Sharma who previously worked with the Houston Police Department Crime Lab conducted some DNA analysis on some of the extractions from the rape kit in October, 1992. (R-XVI-87) Sharma's comments in her analysis indicated that the male fraction of DNA was too degraded to make or form any conclusions back in October, 1992. (R-XVI-87) The witness noted that with time and advancements the ability to analyze DNA improved and the techniques had improved as well. (R-XVI-89) In October, 2010, this witness became involved in the case prior to performing extractions on buccal swabs belonging to Appellant. (R-XVI-90) Based on her work alone, she was able to obtain a DNA profile for Appellant. (R-XVI-90) Head performed a DNA test on the cigar that had been recovered and compared it to the DNA profile of Appellant and found that he could not be excluded as a contributor to the DNA on that cigar. (R-XVI-91) The same results occurred when Appellant's DNA profile was compared against the evidence received which was the sperm fraction from the panties from ▮▮▮▮▮▮. (R-XVI-92)

**During cross-examination, the witness confirmed that the letter marked State's Exhibit No. 4 revealed that the evidence in the case, including a vaginal swab from ▮▮▮▮▮▮, the crotch from the panties of ▮▮▮▮▮▮, and blood from various individuals was handled by the Houston Police Department Crime Lab. (R-XVI-95)**

7

000409

EXHIBIT 1 Page 018

The trial court ruled that the evidence was admissible. (R-XVI-111) There was a discussion between the court and Appellant's counsel regarding what the theory of admissibility for disciplinary records and crime lab problems was. (R-XVI-115) Appellant raised the issue of contamination. (R-XVI-117)

The trial court found that the DNA evidence that related to Orchid Cellmark testing was sufficiently reliable and relevant and was therefore admissible. (R-XVII-4) The court admitted the DNA from the cigar found at the crime scene, one sexual assault kit taken from ███████████ by Gloria Kologinczok, and certain blood samples taken from ███████████, Arturo Garcia, Candido Lebrom, Bienviendo Melo, Leonardo German, and Carmelo Martinez. (R-XVII-5) **The court denied the Motion to Suppress. (R-XVII-5, 6) The court also found that evidence that was extracted and examined by the old HPD Crime Lab would not be admitted. (R-XVII-7) The court found that testing done by the old HPD Crime Lab on blood samples was not admissible, but testing performed by Orchid Cellmark Laboratory on those samples was admissible. (R-XVII-8)** The trial court also found that none of the evidence stored was placed in a location where contamination mishandling or malfeasance by the HPD Crime Lab was shown. (R-XVII-12) The court noted the Bromwich Report concerning the old HPD Crime Lab found that all of the specific recommendations made in the Bromwich Report were followed in this case. (R-XVII-13) **The court held that the Bromwich Report would not be admitted because there was nothing specific about this case. (R-XVII-13, 14) The court held the evidence was not admissible. (R-XVII-14)** The court then went on to hold that impeachment of several of the

8

EXHIBIT 1 Page 019

000410

State's would be witnesses Mr. Chew and Dr. Sharma would not be allowed because they were not even going to testify. (R-XVII-14, 15) **The trial court indicated it would allow wide cross examination concerning the evidence, but it would not allow the defense to go into the Bromwich Report or the closure of the HPD Crime Lab or the reasons for the closure of the lab or the impeachment of witnesses at the laboratory that do not testify. (R-XVII-17, 18)** Appellant's counsel then made a record of what he had tried to do to get certain things into evidence or have them suppressed. (R-XVIII-19) He went further to point out that the reasoning behind wanting to get evidence of the Bromwich Report and the old crime lab problems was because to show the jury the inherent unreliability of anything that the crime lab touched. (R-XVIII-21) Defendant's Exhibit No. 19, which was the entire original file from what was Genetic Design, which was the crime lab that had the original cuttings from the original rape kit. (R-XVIII-22) He also discussed the fact that there was a DNA profile developed in 1993 by Genetic Design, but an analysis was never compared to the buccal swab of the Appellant and he wanted to cross examine the State's witnesses or call his own witnesses to state that was a DNA profile that was never resolved in the case. (R-XVIII-22, 23) Appellant's Exhibits 10 through 19 were offered and admitted. **The trial court said that her ruling remained the same. (R-XVIII-23, 24)** Appellant made it clear to the record that his intent was to offer these items before the jury, but understanding the court's ruling he would not do that. (R-XVIII-24)

EXHIBIT 1 Page 020

## THE GUILT / INNOCENCE PHASE OF THE TRIAL

Appellant pled "Not Guilty" to the charge of capital murder. (R-XVIII-17,18)

HPD officer James Devereaux was dispatched to 6705 Fairway just before midnight on September 30, 1992. (R-XVIII-48) This officer met ███████ and Arturo Rodriguez and learned that their son was missing. (R-XVIII-50) The officer described Ms. ███ as excited, hysterical and really nervous and scared. (R-XVIII-50)

During cross examination, the witness indicated that he put out a description on the air that there were two black males, one wearing a mask, and the description of the vehicle as well. No height, weight or age was broadcast. (R-XVIII-55) He learned from others at the apartment complex that there may have been drugs being dealt at the apartment. (R-XVIII-56) This information was turned over to homicide detectives. (R-XVIII-56) He indicated that the police believed that the Complainants knew who their attackers were and that it was possibly drug related. (R-XVIII-57)

Sergeant C. E. Elliott with the Houston Police Department Homicide Division made the scene involving a 7-year old boy who had been kidnaped. (R-XVIII-63) One picture from the scene depicted that a door had been kicked in. (R-XVIII-69) Elliot explained that the bedroom was in complete disarray and that it had been ransacked as if someone were looking for something or searching for stuff. (R-XVIII-71) Elliott described a clock radio wire (SX#22) which had been used to tie someone up in the house. (R-XVIII-74) There was a pillow (SX#25) that had blood on it. (R-XVIII-75) The officer described Arturo Rodriguez as having been pistol whipped. (R-XVIII-75) A handgun (SX#26) that was found unfired

10

000412

EXHIBIT 1 Page 021

in the bedside table. (R-XVIII-76) The detective observed a cigar in the living room area of the apartment. He thought this was significant because neither of the adults in the apartment were smokers. (R-XVIII-79) Elliott testified that even though HPD looked for fingerprints, none were found on the immobile surfaces in the home. (R-XVIII-82) The police put out a broadcast with the description of the child. (R-XVIII-84) The FBI became involved in the case. (R-XVIII-84) opined that the individuals responsible for taking ███, did so to bring pressure on the mother and father (believing that it was a drug related situation). (R-XVIII-87) Initially, both parents denied drug involvement. ███ was transported to St. Joseph's Hospital for a sexual assault kit and then transferred to the homicide division. (R-XVIII-89) On November 5, 1992, Elliot was notified that ███ body was found in Baytown by a crabber. The body was found in a mud flat, in a desolate marsh area of Baytown. (R-XVIII-91) The identity of ███ was later confirmed by dental records. (R-XVIII-92) The officer indicated that Obel Cruz Garcia or "Chico" was developed pretty quickly as a primary suspect. (R-XVIII-94)

During cross-examination, Elliott acknowledged that he had concerns about the two Complainants being truthful with him. (R-XVIII-98) Elliott admitted that the description put out by patrol officers was that they were looking for two black males. (R-XVIII-99, 100) The two Complainants, who were both Hispanic, identified the individuals as black as opposed to Hispanic or black Hispanic. (R-XVIII-101) Elliott attempted to explain away the fact that these two individuals described the two assailants as black, by claiming that it was cultural and that people who are Hispanic people from Mexico may not be able to describe

11

000413

EXHIBIT 1 Page 022

a black from Columbia who is Hispanic. (R-XVIII-101) Elliott became defensive when Appellant's counsel began questioning why he could not be more specific in his report, while maintaining that he thought that they meant black Hispanics. (R-XVIII-102, 103) After asking several times, Elliott finally admitted that he never wrote in his report that the assailants were black Hispanics. (R-XVIII-105) Elliott also stated that the female complainant stated the suspect used English but spoke with a unknown foreign accent. (R-XVIII-106) Although he was trying to suggest that the suspects were Spanish speaking, he acknowledged that he interviewed ████ in English and she described a foreign accent. (R-XVIII-108) Elliott never took information concerning the color of the masks that were worn by the assailants. (R-XVIII-108, 109) Elliott again acknowledged that he knew the Complainants were not being truthful with him. (R-XVIII-109) Elliott also found that the scene suggested it was a drug related offense. (R-XVIII-110, 111) Elliott described a chrome plated .25 automatic pistol that was found in a bedside drawer. (R-XVIII-112)

On redirect examination, Elliott stated that he was just trying to get something basic out to the patrol units. (R-XVIII-113) Elliott explained cultural identification and stated that on the evening when he left he was looking for a Caribbean islander, black Hispanic, or Columbian of that nature Hispanic black. (R-XVIII-117) Elliott stated that he believed that the Complainant (████████) did not get a good look at both individuals. (R-XVIII-118) She had seen one of the individuals in a mask, but did not see the other one. (R-XVIII-118)

████████ testified that her first husband was Angelo Garcia, Sr. (R-XVIII-123) She testified that she had an affair Jose Arturo Rodriguez. (R-XVIII-124, 125) She

12

EXHIBIT 1 Page 023

eventually moved in with him, along with her son, ███████. (R-XVIII-125) ███████ knew that Rodriguez was involved in cocaine. (R-XVIII-126) A while after she moved in with Rodriguez, she learned that he was drug dealing. (R-XVIII-128) ███████ also became involved in the drug dealing by helping Rodriguez. (R-XVIII-128) She identified "Chico" as the person who sold them drugs. (R-XVIII-129) She stated that they sold drugs out of their first residence on Winfrey, as well as the second one where ███████ was abducted. (R-XVIII-130) The Winfrey location had been broken into because individuals thought they had lots of money because they were selling drugs. (R-XVIII-131) She did not make a police report because she realized she was drug dealing at the time. (R-XVIII-131) She described a vehicle parked for about two weeks by her second residence on Fairway thinking that it was staking out the place. (R-XVIII-132, 133) There were times when Chico brought drugs over to them at their Fairway location, but they did not want to sell anymore. (R-XVIII-134) When Arturo called Chico and told him to come back and get the drugs, she was not sure what happened. She stated that it was two or three weeks later that her son ███████ was kidnaped. (R-XVIII-134) ███████ described Chico bringing his wife Angelita over to the house and playing with little ███████. (R-XVIII-134, 135) ███████ even helped them get an apartment because Chico had a problem with his credit. (R-XVIII-136) She went so far as to sign the lease on their apartment for them. (R-XVIII-136) There were times when Chico would come over to her apartment along with a friend (Rudy) who was related to Angelita. (R-XVIII-138) Rudy worked for Chico and did what he was told. (R-XVIII-138) She identified State's Exhibit No. 83 as being Chico, State's Exhibit No. 86 was Angelita, State's

13

EXHIBIT 1 Page 024

Exhibit No. 85 was Rudy, State's Exhibit No. 87 was a picture of a witness and State's Exhibit No. 88 was a picture of Arturo. All the pictures were of the individuals at that time. (R-XVIII-142) ███ described that they were able to get by with their drug dealing money and that neither one of them had to work. She indicated that Arturo was able to buy a vehicle. (R-XVIII-143) Once they stopped selling drugs, they had difficulty making the payments on the vehicle. (R-XVIII-144) She was involved in dealing to people on a regular basis and had a group of people that were fairly regular and known to her. (R-XVIII-144) On September 30, 1992, Arturo and his brother were outside and Chico came by for a visit. (R-XVIII-145) ███ was six years old at the time and in first grade. (R-XVIII-145) On the evening of September 30, 1992, ███ wanted to sleep in his parents' room. (R-XVIII-146) ███ went to bed wearing a t-shirt and Batman shorts. (R-XVIII-147) ███ slept on a little pallet on the floor next to this witness's bed. (R-XVIII-148) While asleep, ███ heard a bang and woke up. Rodriguez got up and walked towards the living room and then was backing up into the bedroom. (R-XVIII-149) He was walking backwards because there was a gun pointed at him. (R-XVIII-150) The man holding the gun was described as a big man with big shoulders. (R-XVIII-150) The man was wearing a long sleeve shirt, but ███ could still see his skin. He was also wearing a ski mask. (R-XVIII-151) The man spoke but she was unable to understand what he was saying. (R-XVIII-152) She described the man as dark and black. (R-XVIII-152) She said the man didn't speak Spanish or English. (R-XVIII-152) The man started beating Arturo and told her to turn over face down. (R-XVIII-152) ███ was tied up but she did not know who did that. (R-XVIII-153) After she was face

14

down, she noticed another man come into the room. (R-XVIII-153) She heard her son saying "Mommy," calling out for her. (R-XVIII-155) She saw the second man in the doorway with a gun, but she was unable to identify that person. (R-XVIII-156) The second man, who was touching her, put a blanket or pillow over her face and raped her. (R-XVIII-157) She described her rape taking place in front baby ███ while the tall man kept beating Arturo. (R-XVIII-158) ███ described Arturo as unconscious with a pillowcase stuffed in his mouth. His head was covered with a pillow. (R-XVIII-159) His hands had been tied with an alarm clock wire. (R-XVIII-159) Before leaving, the men took several items, including Arturo's wallet, a bracelet, and some cash. (R-XVIII-160) She thought that the individuals looked around the apartment for 10 or 15 minutes looking for something. (R-XVIII-161) The second man who had come into the room never said anything. ███ never got a look at him and she never saw his face because she was face down. (R-XVIII-162) As soon as she untied Arturo, ███ looked down and saw that baby ███ was not there. (R-XVIII-163) As they walked out of the bedroom, one of the other men (the tall one) was coming back into the apartment. They walked back towards the bedroom and the man left. (R-XVIII-164) This witness was taken to the hospital where a rape kit was prepared. She indicated that the man had ejaculated in her. (R-XVIII-165) After she had been raped, she placed her underwear back. (R-XVIII-165) ███ acknowledged that when police asked her about drug dealing, she lied to them because she was afraid. (R-XVIII-166) She did state that she told the truth about everything else. (R-XVIII-166) ███ went to the police station and eventually told them that Chico was her drug supplier. (R-XVIII-167) Her phone calls were being tapped

15

000417

EXHIBIT 1 Page 026

by police and at one point Angelita Rodriguez, Chico's wife called her. (R-XVIII-167) Angelita called trying to help her. (R-XVIII-167) When Angelita came to help, ████ noticed that Chico was not with her. (R-XVIII-167, 168) In November 1992, ████ was told that the police had found ████ body. (R-XVIII-168) ████ identified the clothing (SX#61) worn by ████ on September 30, 1992. (R-XVIII-169) The witness identified the individuals in color as dark black. (R-XVIII-172) ████ identified Appellant in Court as Obel Cruz Garcia ("Chico"). (R-XVIII-172) She described his skin color as dark black. (R-XVIII-172

During cross-examination, ████ acknowledged that for a year and half to two years they sold cocaine and that was how they made a living. (R-XVIII-176) During that entire time, they received their cocaine from Chico. (R-XVIII-177) She stated that Chico would come to her apartment one or two times per week. (R-XVIII-179) She knew of no reason why Chico would be mad at her or Arturo. (R-XVIII-179) She stated that she met Chico through Arturo. (R-XVIII-180) ████ described herself as brown and the tall person who came into the room as darker so they're black. (R-XVIII-182) She indicated that she never saw the second man who entered the bedroom so she could not say whether he was black, brown or white. (R-XVIII-182) She couldn't understand Spanish or English from him. (R-XVIII-184) She did not recall giving the police any description of the second man who had come into the room. (R-XVIII-184) ████ indicated that Chico had been over to her apartment earlier that day. (R-XVIII-184) She indicated that Arturo and her were not selling drugs at that time, so Chico would not have left drugs with him. (R-XVIII-185) She did tell

EXHIBIT 1 Page 027

the police that there was a $4,000 piece of jewelry (Arturo's bracelet) which was taken that day. (R-XVIII-185, 186) ██████ purse, which was on top of a table, was not touched at all. (R-XVIII-186) ██████ acknowledged that the police questioned her for several days, but she stated that on the second day she told the police about the drug dealing even though she had denied it the first night. (R-XVIII-188) ██████ admitted the .25 automatic pistol was hers. (R-XVIII-191) ██████ told the jury that it had been a few months between the first burglary at her old location (Winfrey) and the one on Fairway on September 30, 1992. (R-XVIII-192) She stated that drugs and money had been taken during the first burglary. (R-XVIII-192)

Jose Arturo Rodriguez testified that he and ██████████ had been together for 26 or 27 years. (R-XVIII-195) Rodriguez stated that after coming to Houston from Mexico and California, he became involved in drugs. (R-XVIII-197) He and ██████ started selling cocaine just to live a better life. (R-XVIII-198) Rodriguez identified Appellant in Court as "Chico." (R-XVIII-199) Rodriguez identified a picture of him and Appellant (SX#83). (R-XVIII-200) Rodriguez described his relationship with Appellant as friendly and a business relationship. (R-XVIII-201) Rodriguez was unable to remember that he and ██████████ helped Chico with an apartment or that he remembered where Chico and his wife Angelita lived. (R-XVIII-202) He stated that he sold drugs for about three years. (R-XVIII-202) Rodriguez became concerned at one point ibn 1992 because a car was parked down the street from his residence. This scared Rodriguez and he told Appellant about it and of his intention to stop selling drugs. (R-XVIII-204) Rodriguez said that he never had any problems with Appellant. He denied that Appellant ever left drugs at his house after he stopped selling

000419

EXHIBIT 1 Page 028

drugs. (R-XVIII-204)  Rodriguez stated that when he was sleeping on the night of September 30, 1992, he heard a noise that sounded like a kick. (R-XVIII-207)  When he went to check on the noise, he was confronted by someone wearing a mask and pointing a gun at him. (R-XVIII-208)  Rodriguez was unable to see the face of that individual. (R-XVIII-209) He described the individual as tall and like a colored person. (R-XVIII-209)  The man was telling him to go back, go back.  The individual was speaking in English, but Rodriguez did not understand what he was telling him. (R-XVIII-210)  He was unsure whether the person was actually saying it in English or Spanish, but he said he understood that he needed to go. (R-XVIII-211) Rodriguez described the man as having an accent, but not like his. (R-XVIII-211) Rodriguez was taken into the bedroom where his wife was being raped. Rodriguez was beaten with a gun. (R-XVIII-212)  Rodriguez stated that he did not see the face of the individual that was raping his wife because he was also wearing a mask. (R-XVIII-214) Rodriguez stated that little ▮▮▮▮ didn't even know what was going on. (R-XVIII-215) Rodriguez stated that the person that was raping his wife never said anything. (R-XVIII-215) Rodriguez stated that it ended when he felt baby ▮▮▮▮ being taken by the arm.  He actually said that he did not see it, it felt like it and he heard it. (R-XVIII-215) Rodriguez stated that on the night that ▮▮▮▮ was abducted, he never saw Chico again until his appearance in court. (R-XVIII-219) Rodriguez indicated that neither he, nor ▮▮▮▮, smoked cigars. He was aware that police found a cigar in his house on the night of September 30, 1992. (R-XIX-4)

During cross-examination, Rodriguez indicated that he had only been selling drugs

EXHIBIT 1 Page 029

for about two years. He denied saying three years the day before during this testimony. (R-XIX-6) Rodriguez then stated that he had sold drugs for about four years and that he had sold drugs for other people as well. (R-XIX-6) Rodriguez indicated that he could not recall whether the police questioned him and asked whether this incident involved drugs. He stated that he was only making about $560 a week selling cocaine. He then stated that the .25 automatic pistol that was in the apartment may have belonged to the person that threatened him. When asked if it was ███████ gun, he indicated it was not and that he was sure about that. (R-XIX-9) Rodriguez denied having seen Appellant earlier in the day when Angelo was abducted. (R-XIX-11) When asked whether he had an argument at a store involving a tall black man and a Hispanic man on the day ██████ was taken, Rodriguez stated that he did not remember. (R-XIX-12) Rodriguez acknowledged that some people were Hispanic, others were black, and some were white, and that he knew the differences. (R-XIX-12) Rodriguez admitted that when he spoke to officer Hernandez, he stated that the man behind the mask was not a Mexican nor a white man because the way the man spoke, he spoke like a black man. (R-XIX-13) Rodriguez acknowledged that he concentrated on the one black man that was threatening him. (R-XIX-14) He stated that he did see the person that was raping his wife, but he did not know who it was. (R-XIX-15) Rodriguez said that after the police interrogated him, and he told them what he did, then he and the police thought it would be Appellant that was responsible. (R-XIX-15, 16) When questioned about the color of the mask worn by the man, Rodriguez stated that it was either blue or black. When cross-examined about whether he told police that it was brown or black, he stated that

19

EXHIBIT 1 Page 030

he did not recall saying that. (R-XIX-17) (R-XIX-18) Rodriguez identified the only picture

showing blood on a pillow (SX#25). He also stated that he did not require stitches or

bandages or treatment of any kind for the injuries claimed. (R-XIX-19) Rodriguez denied

telling the police that he was not involved in drugs. He said he always told them what he did.

(R-XIX-21) Rodriguez said that he went back to the police over a three to four week period,

every day. (R-XIX-22) Again Rodriguez said in front of the jury that he never denied being

a drug dealer when he talked to the police. (R-XIX-24) Rodriguez was then asked

specifically about the conversation he had with officer Hernandez and again denied that he

ever told Hernandez that he was not involved in drugs. (R-XIX-24) Rodriguez denied telling

Hernandez that he didn't know why anyone would enter his apartment and beat them up. (R-

XIX-24) Rodriguez stated the first time his home was burglarized on Winfrey, he was unable

to remember if drugs or money were taken. (R-XIX-29) Rodriguez also acknowledged that

on direct examination the day before in court, he said he had been hit two or three times in

the head and never lost consciousness. (R-XIX-33)

Gloria Kologinczok, a registered nurse, became a sexual assault nurse examiner

(SANE) 1985. (R-XIX-38) This witness described how a SANE examination takes place.

(R-XIX-38 - 42) This witness stated that in October, 1992, she performed a sexual assault

examination on ███████ while working at St. Joseph's Hospital. (R-XIX-42, 43) Some

of the items in the sexual assault kit (SX#33) contained panties, vaginal swabs and smears,

and a known saliva sample, and a blood sample. (R-XIX-46, 47) During her examination

with ███, this witness did not note any physical injury to ███████ or any physical

000422

EXHIBIT 1 Page 031

trauma either. (R-XIX-48) She stated that it was not unusual to have an examination that did

not show physical trauma or physical injury. (R-XIX-49) This witness completed the rape

kit and submitted it at 4:25 a.m. on the morning of October 1, 1992. (R-XIX-49)

During cross-examination, this witness indicated that she was only testifying from her

notes and not her independent recollection. She acknowledged that it was not her job to be

the judge or the jury in determining whether someone was sexually assaulted or not, it was

only her job to collect the information. (R-XIX-50)

Deputy W. T. Bredemeyer, with the Precinct 4 Constable's Office, testified that on

September 30, 1992, he responded to a call at 6705 Fairway in Houston, Texas. (R-XIX-55)

He met with ███████ who was pretty upset, crying and had a hard time communicating.

(R-XIX-57) He also observed Arturo Rodriguez who had been assaulted. (R-XIX-57) The

only thing Bredemeyer could remember was that the door had been broken in. (R-XIX-58)

He transported Ms. ████ to St. Joseph's Hospital for a sexual assault kit and took

possession of it after it was completed. (R-XIX-58) He identified State's Exhibit No. 33 as

that sexual assault kit. (R-XIX-59) He received the kit from the nurse Gloria Kologinczok.

(R-XIX-59) He took the kit to the homicide division and then to the HPD property room for

storage. (R-XIX-59)

HPD Officer, U. P. Hernandez, was assigned to the homicide division in September,

1992. (R-XIX-64) Hernandez interviewed two of the Complainants in a kidnaping incident.

(R-XIX-65) He took statements from each of these individuals on October 1, 1992. (R-XIX-

66) He interviewed Arturo Rodriguez and ███████. (R-XIX-67) Rodriguez's statement

21

000423

EXHIBIT 1 Page 032

was taken at 4:26 a.m. Rodriguez did not speak English. (R-XIX-67) Ms. ███'s statement was taken at 6:28 a.m. and she did speak English. (R-XIX-67) Hernandez was the first Spanish speaking officer to be able to speak with Rodriguez. (R-XIX-68) Hernandez described both witnesses as having been through a very traumatic event. (R-XIX-69) Rodriguez told Hernandez that one of the men in the room was a black man. (R-XIX-69) Hernandez stated that black Columbians and black Dominicans (or individuals from those countries) have a different accent that people who speak Spanish from Mexico. (R-XIX-70) He stated that he believed that both witnesses' statements were consistent with each other. (R-XIX-71) When Hernandez questioned Arturo Rodriguez about being a drug dealer, Rodriguez denied it several times. (R-XIX-72,73) When Hernandez spoke with ███ ███, she did admit to the drug dealing after first denying it. (R-XIX-73) ███ said she would quit lying and tell him the truth. (R-XIX-74) She identified Chico and Angelita as her supplier. (R-XIX-74) Hernandez was able to determine that "Chico" was Obel Cruz Garcia. (R-XIX-74) Hernandez explained that ███ and Rodriguez were really deep into drug dealing, otherwise the assaults would not have occurred the way they did. (R-XIX-75, 76) He stated that from his experience he knew that right from the beginning. (R-XIX-76) When Rodriguez described the mask being worn by the man, he said it was either brown or black, but the lighting was not so good. (R-XIX-77) During his investigation, Hernandez received a tip about the Rendon Auto Shop. (R-XIX-84) By October 5, 1992, officers had not been able to find Obel Cruz Garcia. (R-XIX-85) On November 5, 1992, Hernandez spoke with the owner Rogelio Rendon. (R-XIX-85) Hernandez saw Mr. Rendon drive up to his shop

22

accompanied by Candido LeBron. (R-XIX-86) Hernandez indicated that Angelita Rodriguez

was the wife of Obel Cruz Garcia. (R-XIX-89)

During cross-examination, Appellant's counsel questioned Hernandez about how he

related the description of the individuals involved. (R-XIX-95, 96) In his report, Hernandez

noted that the individual that they were looking for was not a Mexican nor was he a white

man and that the individual identified as he spoke like a black man. (R-XIX-97) (R-XIX-98)

Even as Ms. ███████ spoke to this witness about her son being abducted, she did not

immediately tell the truth about the drug business. (R-XIX-99) He indicated that finding the

child was the number one priority. (R-XIX-100) Hernandez also acknowledged that Arturo

Rodriguez volunteered to him that he had no idea why anybody would break into the house

and assault him and assault his wife. (R-XIX-101) Appellant's counsel was prohibited from

questioning the witness about whether it would be just an oversight on the part of Rodriguez

or that he was lying. (R-XIX-101, 102) He also noted that at page 2.023 of his offense

report, ███████ had described the mask being worn by the tall black man as a red and

white. (R-XIX-104)

Eric Johnson testified that in 1992 he was assigned to the Violent Crime Squad in the

Houston division of the FBI. (R-XIX-134) He was assigned to the abduction or kidnaping

investigation of ███████ (R-XIX-135) He spoke to individuals involved in the

investigation, including ███████ and Arturo Rodriguez. (R-XIX-137) He stated that the

number one priority was to locate the child. (R-XIX-138) He stated that Appellant was

developed as a suspect early on in the case. (R-XIX-138, 139) The agent testified that

000425

EXHIBIT 1 Page 034

initially they used surveillance and interviews were conducted in an effort to find Appellant, but they were unsuccessful. (R-XIX-139)  The investigation led to Angelita Rodriguez, Appellant's wife. (R-XIX-140)  He stated that he knew that Appellant was to appear in a court on October 8, 1992, but he did not appear. (R-XIX-140)  He noted that the court date was one week after ███████████. went missing. (R-XIX-142)  The agent stated that at some point his investigation shifted from Houston to Puerto Rico. (R-XIX-144)

Linda Hernandez testified that in 1992 she was having a relationship with an individual she knew as Charles whose real name was Bienviendo Melo (R-XIX-148)  She identified a picture of Charlie (SX#89). (R-XIX-150)  Hernandez stated the last time that she had contact with Charlie was some 11 years ago. (R-XIX-151, 152)  She stated that Charlie was involved in drug dealing with "Chico "who was Obel Cruz Garcia. (R-XIX-152)  From observing the two individuals, Hernandez said that Appellant was the one in charge. (R-XIX-153)  She identified the person that she knew to be Rudy who was also dealing drugs with Appellant.  Rudy's actual name was noted as Carmelo Martinez Santana. (R-XIX-154)  The witness indicated that both Charles and Rudy did whatever Appellant told them to do. (R-XIX-155)  She described Rudy's complexion as dark and they would often mistake him as being black. (R-XIX-155)  She said that in places like Puerto Rico, the Dominican Republic or Columbia individuals refer to people as black because they have dark skin. (R-XIX-156)  She recounted how in the early  morning hours of October 1, 1992, the police came and talked with her and Charlie. (R-XIX-156)  Hernandez stated that the police believed that they had information regarding the case, but they actually didn't. (R-XIX-157)  She stated that she

24

was home asleep when this incident took place. (R-XIX-157) She stated that they slept until she received a telephone call from Appellant. (R-XIX-159) Appellant was asking for a ride, but Hernandez told Charlie not to do it and he did not. (R-XIX-159) Hernandez said that Appellant had mentioned that he was in Baytown when he needed the ride. (R-XIX-159) Rudy was with Appellant when Hernandez received the call at about 2:00 a.m. (R-XIX-160) Appellant indicated that he still needed the use of a vehicle and Hernandez said that "We told them they could use it, they just had to come over." (R-XIX-160) She stated that Appellant and Rudy arrived at her house in a taxi somewhere between 2:30 a.m. and 3:00 a.m. (R-XIX-162) She stated that they came and got the car and only stayed a brief period of time. Rudy was acting real nervous. (R-XIX-163) She stated that Appellant did not seem nervous. (R-XIX-163) She described Appellant's look as a scary one. (R-XIX-163) Appellant borrowed a gold car in the early morning hours of October 1, 1992. It was brought back a few days later by Rudy. (R-XIX-168) The witness indicated that when the car was brought back, it was very dirty. She noticed it because Charlie was real clean and always kept it clean. (R-XIX-169) She stated that after October 1, 1992, she did not Appellant again. Hernandez had a conversation with Angelita (R-XIX-170) Angelita ended up staying at a hotel not at this witness's house. (R-XIX-171) The witness indicated that she thought it was strange that Angelita would not stay in her own home after October 1, 1992. (R-XIX-171) This witness then identified Appellant in the courtroom. (R-XIX-172)

During cross-examination, she described Rudy as having a light complexion. She also said that her mom didn't really trust Rudy. (R-XIX-173) It bothered this witness that Rudy

25

EXHIBIT 1 Page 036

000427

always wanted to take her son to the store with him, She never allowed this. (R-XIX-173)

John Swaim, a retired Houston Police Department officer, testified that he was involved in the ████████ case in 1992. (R-XIX-177) On October 5, 1992, Swaim went to a location in Humble attempting to investigate a possible drug supplier and to find Chico. (R-XIX-180) His investigation revealed that Chico and another Hispanic male moved out over the weekend which would have been October 3rd or 4th. (R-XIX-181) When the officer learned that Chico may have been back at the apartment on October 6th, he went there and the door was answered by Candido LeBron. (R-XIX-185) The officer was suspicious of LeBron because he spoke with a Spanish accent which people from the Virgin Islands don't use. (R-XIX-185) Swaim identified a photograph of LeBron. (R-XIX-185) Later in the investigation, this individual was actually identified as Rogelio Aviles. (R-XIX-187)

Randy Rhodes, with the Baytown Police Department, testified that on November 4, 1992, at about 5:00 p.m., he responded to the scene of a body in a waterway. (R-XIX-192) Evidence from the scene included a pair of shorts with a Batman logo on it and a t-shirt. (R-XIX-203)

Dr. Dwayne Wolf, the Deputy Chief Medical Examiner for Harris County, Texas, testified that he was familiar with Dr. Vladimir Parungao who was employed by the Harris County Institute of Forensics Sciences in 1992. (R-XX-6) Dr. Wolf testified that the cause of death is the injury or disease that initiates the sequence of events that culminates in death. (R-XX-7) He stated that manner of death is listed as either natural, accidental, suicidal, or homicide and a fifth category of undetermined. (R-XX-8) He stated that in some cases the

26

EXHIBIT 1 Page 037

cause of death is going to be undetermined, but that a manner of death could still be determined by looking at the investigation and all the circumstances surrounding what happened to the individual. (R-XX-9) Dr. Wolf reviewed the 1992 autopsy of ███████ ███████ done by Dr. Parungao and did not find any injuries on the bones, such as cut marks, bullet holes. (R-XX-11) After reviewing everything, Dr. Wolf concluded that his opinion was that the manner of death was a homicide. (R-XX-12) He testified that the remains found of the decedent were consistent with the body being submerged in water for up to five weeks. (R-XX-12) Dr. Wolf was asked what would happen if there had been blood on an item of clothing that was submerged in water for several weeks. Dr. Wolf indicated that blood washes away. (R-XX-15)

During cross-examination, Dr. Wolf was asked about bones that were found at the scene and that 18 of the 24 rib bones were located. (R-XX-17) After having Dr. Wolf show the various location of the different bones that were recovered, Appellant's counsel asked Dr. Wolf if he agreed that he couldn't conclude that the person was stabbed or shot or beaten to death. Dr. Wolf agreed. (R-XX-20) He also stated he had no prior medical records so he did not know what type of health the child was in prior to death. He also indicated that he could not tell whether the person had drowned. (R-XX-20) He stated he could not tell whether this individual drowned or not based on the examination of the remains. (R-XX-20) When asked a hypothetical question whether the child could have been out fishing, could someone have accidently fell out of a boat and drowned, the doctor indicated that was possible. (R-XX-21)

EXHIBIT 1 Page 038

On redirect examination, Dr. Wolf, in response to the Prosecutor's questions, indicated that his evaluation of this case was predicated upon the investigator's report and the fact that the child had been taken from his home and he didn't simply wander away. (R-XX-24)

During re-cross examination, Dr. Wolf acknowledged that all of the information he had received regarding the abduction of the child and it being done in a violent manner is all based on what somebody else had told him and was not based upon any medical evaluation that he performed. (R-XX-31)

Eric Mehl, a former officer with the Houston Police Department, testified that in 1993 he was reassigned to the homicide division. (R-XX-35) In 2004, HPD started a cold case squad within the homicide division. (R-XX-35) Mehl looked for cases that would have possible DNA that could be tested. (R-XX-37) Mehl testified that when he saw that ███████ ███████ was listed as a victim along with her son, he thought that there might be DNA that could be tested. (R-XX-38) He evaluated what articles of evidence he needed to send off to a private lab for testing. (R-XX-39) When asked if back in 1992 DNA was in its infancy, as far as using it for law enforcement purposes, Mehl responded "It was." He had never even thought of using DNA technology to solve a crime over at HPD at that time. (R-XX-40) When asked if in 1992 he would have collected a cigar from the scene because of DNA, he responded he would have collected the cigar, but not for DNA purposes. (R-XX-41) He stated that DNA was not what was being thought about, but rather blood and semen. (R-XX-42) Mehl stated that he did not have a DNA sample from Appellant because he was not

EXHIBIT 1 Page 039

available to give one. (R-XX-42) Mehl said that he opened the case in September, 2007 and

that he wanted to obtain a CODIS for the DNA profile that he could have entered into the

CODIS System which is the Combined DNA Index System. (R-XX-43) He stated that he

went to the HPD property room and recovered the cigar which was packed in a plastic bag

within a large manila type envelope. (R-XX-45) He took the cigar and put in the cold case

storage room located at 1100 Goliad. (R-XX-46) Mehl also retrieved the sexual assault

evidence kit (SX#33) from the property annex room located at 1200 Travis. (R-XX-46) He

took the sexual assault kit which appeared to be in good condition and sealed up and put it

in a shipping box. He then shipped it to a private lab Orchid Cellmark. (R-XX-47) The

items, including the sexual assault kit, the cigar, the cutting from the panties were sent to

Orchid Cellmark to develop a DNA profile from them, as well as to develop ████████

and Arturo Rodriguez's DNA profile for comparison. (R-XX-48) On December 5, 2007, an

analysis was received by Mehl. (R-XX-48) Even after comparison, as of January 16, 2008,

there was still an unidentified male profile which was found on the evidence. (R-XX-49)

Mehl, with the assistance of the FBI in Puerto Rico, obtained a DNA sample from Appellant.

(R-XX-50) The FBI sent the sample by FedEx to Mehl who in turn sent it to Orchid

Cellmark via FedEx. (R-XX-50) The DNA sample from Appellant was obtained by HPD

on May 23, 2008. (R-XX-51) Mehl left the DNA in the sealed packaging and sent it directly

to Orchid Cellmark with instructions to develop the DNA profile of Appellant and compare

it against the DNA profile that was developed in this case. (R-XX-51) The results of that

testing were received by Mehl on July 30, 2008. (R-XX-52) Once Mehl had the results, he

000431

EXHIBIT 1 Page 040

contacted ███████ and Arturo Rodriguez and interviewed them regarding the case. (R-XX-54) On September 5, 2008, Mehl filed a capital murder charge against Appellant. (R-XX-56)

Prior to cross-examination, Appellant's counsel approached the bench and pointed out that the officer said that DNA was not even thought about at HPD in 1992 and that he wanted to question him about that. (R-XX-56) The court indicated that would be done outside the presence of the jury. (R-XX-58) While the court was attempting to determine exactly what Mehl had said on direct examination, the court reiterated that it was not going to allow Appellant to go into the crime lab situation. (R-XX-59) Outside the presence of the jury, Mehl acknowledged that the crime lab was processing evidence in 1992 and it was being processed to solve crimes. (R-XX-61) The trial court ruled that in order to not leave a wrong impression on the jury, Appellant would be allowed to question the officer about the fact that the crime lab did process DNA, but he was not allowed to go into any details about the crime lab. (R-XX-62, 63) The trial court specifically noted for the record that the Prosecutor left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD crime lab for DNA analysis. Appellant's counsel again reurged his desire to go into a more deep evaluation of genetic design and the HPD crime lab studies which was denied by the trial court. (R-XX-66)

Appellant cross-examined Eric Mehl regarding his role in the case. (R-XX-66) Mehl admitted that in 1992 HPD did have a crime lab that was processing evidence for DNA analysis. (R-XX-67) He also admitted that in this very case, items were submitted to the

EXHIBIT 1 Page 041

HPD crime lab for processing of DNA. (R-XX-67) Mehl admitted that when he went to see

███████ he told her about the results of the DNA testing in this case. (R-XX-68)

Griselle Guzman, with the FBI, testified that her work centered on San Juan, Puerto

Rico. (R-XX-71) In May, 2008, she received an assignment to obtain a buccal swab from

Appellant. (R-XX-73) On May 21, 2008, this agent took a buccal swab from Appellant. (R-

XX-74) After sealing the buccal swabs, this agent submitted the items as evidence. (R-XX-

76, 77) The court admitted State's Exhibit Nos. 65 and 66 into evidence. (R-XX-77)

Guzman stated that she sent her report along with the evidence in a FedEx envelope to

Detective Eric Mehl with the Houston Police Department. (R-XX-78)

Angelita Rodriguez, from the Dominican Republic, testified that her ex-husband was

Appellant, Obel Cruz Garcia. (R-XX-82) She identified Appellant in court. (R-XX-82) She

stated that Appellant was originally from Dominican. (R-XX-84) She stated that she knew

her husband by the name of Obel and also "Chico." (R-XX-84) She stated that she knew an

individual by the name of "Rudy" who was actually her cousin, Carmelo Martinez. (R-XX-

85) This witness introduced her cousin to Appellant. (R-XX-85) At some point after the

couple arrived in Houston, she suspected that Appellant was involved with drugs. (R-XX-87)

Rodriguez suspected that Appellant was using and dealing drugs. She also knew him to

occasionally smoke cigars. (R-XX-88) Rodriguez stated that her relationship with Appellant

was different in the United States than what it was in Puerto Rico. (R-XX-89) She indicated

that at some point she met a couple by the name of ███████ and Arturo Rodriguez. (R-

XX-89) Rodriguez stated that at one point she even began dealing drugs with Appellant and

31

EXHIBIT 1 Page 042

that she had a case for drugs which she ended up being convicted of. (R-XX-92) Rodriguez and Appellant lived in Humble at the time that they knew ▆▆▆▆ and Rodriguez. (R-XX-94) The apartment they stayed in was actually rented for them by ▆▆▆▆▆▆. (R-XX-94) Rodriguez stated that the couple owned two cars, a blue Thunderbird and an Oldsmobile. (R-XX-95) In September, 1992, ▆▆▆ was at her home in Humble when she saw a news broadcast that ▆▆▆▆▆▆ was missing. (R-XX-97) Rodriguez woke up Appellant and told him about the news, but he did not respond. When she stated that she wanted to go over to ▆▆▆'s, Appellant told her to go if she wanted to. (R-XX-98) Rodriguez stated that Appellant did not go with her and it seemed strange that he acted so calmly about that news. (R-XX-98) At that point, Appellant told his ex-wife that he was leaving to go to Puerto Rico. (R-XX-99) She stated that Appellant simply said that he had to leave and that it was not a planned trip. (R-XX-100) Appellant made the comment that he had to leave, but that if she stayed the police would come and get her. (R-XX-100) On the evening before the abduction of ▆▆▆, Rodriguez stated that she went to bed around 9:00 p.m. and that Appellant was there at the apartment in Humble. (R-XX-101) She stated that because of a fight months before, they stayed in separate rooms and she was unaware of when Appellant may have left the apartment that night. (R-XX-102) When she woke up the next morning, Appellant was at the apartment. (R-XX-102) Once Appellant left for Puerto Rico, he never returned to Houston. (R-XX-103) Rodriguez testified that Appellant had an upcoming court date which he missed it. She stated that he had never missed court dates before. (R-XX-103, 104) Rodriguez left Houston and went to Santa Domingo where she found Appellant. She went

32

000434

EXHIBIT 1 Page 043

there wanting a divorce. (R-XX-105) Appellant told Rodriguez that he would not give her a divorce. (R-XX-106) She stated that Appellant insulted her and then told her that he was going to harm her family. (R-XX-106) Rodriguez asked Appellant whether he had anything to do with ████. Appellant said that he did and that he had killed him. (R-XX-107) When Rodriguez was asked "Did he say anything about why he had done it", she stated that she did not remember what else he said. (R-XX-107)

During cross-examination, Rodriguez stated that on May 3rd when two defense investigators came to her salon, she told them she didn't have to talk to them or answer their questions. (R-XX-109) She stated that when she was asked questions by the investigators, she did not tell them anything about Appellant confessing to murdering the little boy. (R-XX-110) She admitted that she had previously met with the detective and a district attorney along with her own lawyer about this case. (R-XX-110, 111) Although Rodriguez related how she had discussed a number of things with these individuals in the investigation, she stated that she was scared and that's why she forgot to mention that Appellant had confessed to her about killing the boy. (R-XX-112)

Carmelo Martinez Santana testified that he was originally from the Dominican Republic. (R-XX-172) He stated that Angelita Rodriguez was his cousin and Appellant was her ex-husband. (R-XX-118) He stated he came to the United States in the late 1980's to sell drugs. (R-XX-118) At the time of this trial, this witness was serving time in a federal penitentiary for trafficking drugs. (R-XX-119) Santana met Appellant through his cousin Angelita Rodriguez. (R-XX-119) He stated that Appellant came to the United States with

33

EXHIBIT 1 Page 044

him to sell drugs. (R-XX-120)  While living with Appellant in Houston, both were using cocaine. (R-XX-122)  When Santana began using cocaine, he became addicted, Appellant took over control of the drug selling operation. (R-XX-123)  He described Appellant as somebody who nobody would mess around with because he controls everything. (R-XX-123)  Santana said that on one occasion he was especially frightened by Appellant because he had taken him by the neck and tied him up.  Appellant told him that he was going to kill him because he thought he was taking customers away from him. (R-XX-124)  Santana said that when Appellant and his wife moved to Humble he would stay with them at times.  He described Appellant having a 4-door Chevrolet, blue in color, as well as Angelita having a Thunderbird. (R-XX-128)  He said that sometimes Appellant would loan his cars to people who worked for him. (R-XX-128)  Santana said the he would often lend his cars to an individual named Charlie (SX#37). (R-XX-129)  Santana said that Appellant had guns, including a .45. (R-XX-129)  In 1992, Santana said that Appellant also had a .22 rifle. (R-XX-129)  Santana testified that Appellant would often go to ███ and Arturo's apartment for the purpose of drugs. (R-XX-132)  Santana described the relationship between Appellant and his wife and Arturo and ███ as close friends. (R-XX-133)  He was not aware of any romantic relationship between Appellant and ███. (R-XX-133)  Santana said that Appellant was fairly open about the fact that he was not faithful to his wife Angelita Rodriguez. (R-XX-134)  On the evening that Angelo was taken, Santana said that Appellant said that he wanted to go and get his drugs and money from ███ and Arturo. (R-XX-135)  Santana stated that on that evening, he along with Appellant and an individual named Roger

34

EXHIBIT 1 Page 045

000436

went in Appellant's blue Chevrolet 4-door car to ███'s to pick up the money. (R-XX-137)

Once they arrived at ███'s apartment, Appellant and Roger left Santana sitting in the car

behind the apartment. (R-XX-137) Santana said that Appellant had him move over to the

driver's seat to wait there for him. He said that Appellant took a .45 pistol with him, along

with Roger. (R-XX-141) He described Roger as tall and having a strong build and being

larger than Chico (Appellant). (R-XX-142) He also described Roger as having a dark

complexion. (R-XX-142) Santana stated that Roger had a small pocket knife with him and

also said that both individuals had black masks. He wasn't exactly sure what masks they had

that night. (R-XX-143) Appellant and Roger were gone for about a half hour and when they

returned, Appellant had a little boy in his arms. He also saw the .45 caliber weapon at that

time. (R-XX-143) Santana got up from his seat and asked Appellant "What's going on?

Why do you have the little boy?" He stated that the little boy was ███████

Santana stated that Appellant said he (referring to ███████) "saw". (R-XX-144)

Santana told Appellant to take the child back to his mother. (R-XX-145) Appellant told

Santana that he had raped ███ and that Arturo had been beaten. (R-XX-145) Santana kept

wanting Appellant to take the child back to his mother and Appellant left for about

5 minutes. (R-XX-146) Santana could not recall whether Appellant had the boy with him

when he went to the mother. He stated that it's that he may have had the boy in his own arms

at the time. (R-XX-146) When Appellant came back to the car, Roger was with him. (R-XX-

146) Santana moved to the back seat and sat with ███████. (R-XX-147) Santana

described Appellant driving the car holding while holding a gun. (R-XX-148) Appellant

000437

EXHIBIT 1 Page 046

drove to Baytown. (R-XX-148) He stated that Appellant drove the car to a street where ended. (R-XX-148) Santana believed that Appellant was going to kill the little boy. (R-XX-149) Appellant said " Bory, you already know what you have to do" (R-XX-149) As they were walking, Santana became ill, actually defecating. (R-XX-150) Santana heard a scream from the little boy. When Santana walked back towards the car, he saw the body of the little boy. (R-XX-151) Appellant then ordered Bory and Santana to put the body in the back seat - which they did. (R-XX-152) They drove around Baytown and came to an area near a river where they were ordered to dump the body into the river. (R-XX-153) Appellant told Bory and Santana to get something so that the body would sink under the water. (R-XX-153) As they were driving away, Santana said the tires on the vehicle were blowing up, eventually all four tires blew up. (R-XX-155) They all then went to a motel on 225. (R-XX-155) On the next day, while they were at Chico's house in Humble, Appellant said that he was leaving Houston. (R-XX-158) On that next morning, Appellant took his car to the Rendon garage to get new tires. (R-XX-161) After cleaning up the car, it was sold. (R-XX-161) Appellant used the money from the sale of the car to buy a plane ticket either to Puerto Rico or the Dominican. (R-XX-162) Santana drove Appellant to the airport on Friday, then went back to his Appellant's apartment in Humble. (R-XX-162) Other than seeing Appellant in jail where he was currently housed, Santana said he had not seen Appellant since dropping him off at the airport. (R-XX-164) Santana stated a couple of years ago while he was doing prison time in Pennsylvania, an FBI agent named Bill Eversol came to see him and that was the first time he told the whole story about that night. (R-XX-165) Santana said that no

000438

EXHIBIT 1 Page 047

promises were made to him to testify and he knew he could get in a lot of trouble because of his involvement. (R-XX-166)  Santana said that as they drove on Highway 59 North, Appellant told him to throw the knife away which he did. (R-XX-166)  The Prosecutor then had Rogelio Aviles Barroso (SX#34) brought into court to stand next to Appellant. (R-XX-167)

William Ebersol, with the Federal Bureau of Investigations, testified that he was asked to interview Carmelo Martinez at a prison in Pennsylvania. (R-XX-176)  Ebersol hoped that Martinez would have information about Appellant.  Ebersol did not realize that he was going to be receiving first-hand knowledge about the killing. (R-XX-178)  The touchstone event which seemed to change Martinez's view of things was when the agent showed him the photographs of the victim in this case. (R-XX-179)  The agent purposely did not disclose a lot of the details of the case in an effort to give Martinez to supply information about the case. (R-XX-180)

Carmelo Martinez Santana was recalled as a State's witness. (R-XXI-4)  Santana then identified Appellant as Obel Cruz Garcia also known as "Chico." (R-XXI-6)  Santana then identified a photograph of Roger, "Bory". (SX#91). (R-XXI-7)  He described Roger in 1992 as a big man with a bulky build. (R-XXI-8)  He also identified Angelo (SX#31). (R-XXI-11)  Santana testified that he had no type of deal for his testimony in this case. (R-XXI-12)  When questioned about his concern of leaving the federal penitentiary in Pennsylvania and being secured because he was going to testify against Appellant, this witness said he did not remember.  The prosecutor then stated *"I think Agent Ebersol will."* (R-XXI-13)

EXHIBIT 1 Page 048

During cross-examination, this witness reluctantly acknowledged that he never had any type of charge in this case. He attempted to avoid answering the questions of whether he had ever been charged in this matter by saying he did not care and he was there to tell the truth. (R-XXI-15, 16)

The witness admitted that Appellant was in Puerto Rico when he first came to the United States and began using drugs and selling drugs and that Appellant was not part of that. (R-XXI-32) Santana denied that it was inconsistent that on the one hand he tried blaming Appellant for his problems while staying with Appellant through thick and thin. (R-XXI-33, 34)

During cross-examination, this witness denied saying that he described the place where the little boy was killed as an area near where ███████ and he had lived. (R-XXI-35, 36) Yet, during his direct examination by the State, he said that there's where we used to live before Ms. ████ and I we were neighbors. (R-XXI-9) Santana denied telling the FBI agents when they first came to visit him that he was familiar with the Baytown area because he used to sell drugs in that area. (R-XXI-37) He stated that he was able to recall the specific route that they took when they took the little boy 21 years ago, just based on just one trip there. (R-XXI-37) This witness again said that he was not familiar with Baytown and that he had not sold drugs to people in Baytown. (R-XXI-38) Once again, Santana said that he never told the jury that the place where the boy was killed was near where he and ████ used to live. (R-XXI-38, 39) He also denied telling the jury the day before that (Appellant) slept with his wife Angelita on the night that the young boy was killed. (R-XXI-40)

38

EXHIBIT 1 Page 049

During further cross-examination, he stated that Appellant stayed up the rest of the night using drugs. (R-XXI-40)  The witness then attempted to explain that "go to sleep" meant go to the apartment. (R-XXI-42)  Santana stated that it was possible that he and Appellant had been to ████████ apartment earlier in the day of the killing. (R-XXI-43) Santana then said that Appellant used a pay phone to call a taxi after the young boy was killed. (R-XXI-44)  Santana said he told the FBI that all four tires blew on their vehicle.  He stated that he did not recall telling the FBI that only two of the tires blew on the car. (R-XXI-45)  Appellant's counsel questioned Santana about whether he had told the FBI that he had defecated that night.  The witness again attempted to sidestep the question, but eventually said he did not remember. (R-XXI-48)  Santana said that the time Appellant was gone from the car to Diana's apartment on that night was 30 to 40 minutes.  He denied telling the FBI that it was 5 to 10 minutes because he said that's not how it was. (R-XXI-49)  When questioned about the demeanor of the young boy, Santana said that he was not crying and that he was very calm because we're family. (R-XXI-50)  When Appellant was carrying the little boy, he did not have a mask on. (R-XXI-51)  When questioned about whether the boy was left with him in the car when Appellant went back to the mother's apartment, this witness was unsure of whether the boy stayed with him or went with Appellant. (R-XXI-51)  He denied telling the FBI that Appellant had given the boy to Rogelio. (R-XXI-51)  Santana said that Appellant had a firearm and Rogelio had a pocket knife. (R-XXI-52)  When asked where he was when the little boy was killed, Santana said that he was walking. (R-XXI-54)

Santana could not say where Roger or Rogelio was at the very point in time that the

39

EXHIBIT 1 Page 050

little boy screamed. (R-XXI-55) Santana responded to questions about the location of Rogelio by stating that "*I have always believed that Rogelio is the one who killed him because he ordered it. He is the one who told him you know what you have to do.*" (R-XXI-57) Santana said that he may have told the FBI that Rogelio exited the vehicle and took ███████ to the driver's side rear of the car. (R-XXI-57) Again, Santana said that he believed that Rogelio killed the boy, but he did not actually see him kill the boy. (R-XXI-60) Santana stated to the jury that he felt threatened by Appellant when they got back from the boy's killing. (R-XXI-61) He admitted that he told the FBI that Appellant, Rogelio and Martinez made a pact never to tell what had happened and wasn't based upon threats. (R-XXI-61)

William Ebersol, with the FBI, was recalled for cross-examination. (R-XXI-64) Ebersol stated that he and Agent Mike Hawthorne went to interview Martinez in prison. (R-XXI-65) Ebersol testified that the interview with Martinez was not recorded / it was an oral conversation. (R-XXI-65) He stated that he took notes of the conversation he had with Santana Martinez. (R-XXI-66) Ebersol agreed that he and Hawthorne did the very best they could to record what was said during the conversation. (R-XXI-67) Ebersol stated that he had no problem communicating with Martinez when they interviewed him. (R-XXI-68) He stated that he stood by the accuracy of the report that he made concerning this interview as reflected in the 302 document. (R-XXI-68) Ebersol agreed that a traumatic event like defecating would not have been something he left out of his report. (R-XXI-69) He stated he never recalled Martinez ever saying that he defecated. (R-XXI-69) Ebersol also contradicted Martinez when he related that on page 9 of his report that Martinez told him he

40

EXHIBIT 1 Page 051

was familiar with Baytown because that is where he sold drugs. (R-XXI-69) He also stated that Martinez told him that he was familiar with Baytown because he had been there many times and had friends there for the purpose of dealing drugs. (R-XXI-70) He also stated that there was a reference to the fact that Martinez said that when Rogelio and Chico returned, it was approximately 5 to 10 minutes later and that Appellant was holding Angelo. (R-XXI-71) He also stated that in the report Martinez told him he believed that Appellant handed █████ to Rogelio. (R-XXI-71) Ebersol agreed that one of the ways to determine if an individual played a role in an offense was to see where they were at the time the killing actually took place. (R-XXI-72) Ebersol said that Martinez told him that Rogelio exited the vehicle and took █████ to the driver's side rear area of the vehicle. (R-XXI-73) He also stated that while Martinez did not say he saw Rogelio stab or slash █████, he did hear █████ cry out one time, then heard Angelo say "*UH*" and then he heard him hit the ground. (R-XXI-74) He also said that the very next thing was that he said that Chico (Appellant) was at the front of the car looking around. To which Ebersol said, yes, that is what Martinez told him. (R-XXI-74) Ebersol also said that Martinez told him that in order to try and get the body to go under water, they had to put blocks on it. (R-XXI-74) When Ebersol interviewed Martinez, Martinez only said that there were two tires that blew out on the car, he never mentioned the third or a fourth tire blowing out. (R-XXI-75) He also said that the individuals, Appellant, Rogelio and Martinez made a pact never to tell what happened that night. (R-XXI-76) He characterized the agreement as referring to an agreement amongst the three parties, not a threat. (R-XXI-76) He also noted that Martinez said that when they got

41

EXHIBIT 1 Page 052

back to the apartment, Appellant went in to sleep with Angelita. (R-XXI-77) Ebersol noted that if there had been any mention of drug use as Martinez claimed, Appellant had stayed up all night using drugs, he would have typed it in his report. (R-XXI-77)

Micah Webb, an investigator with the Harris County District Attorney's Office, testified that he assisted in the preparation of Appellant's case for trial. (R-XXI-84. 85) Webb stated that after the FBI had interviewed Martinez in jail, locating Rogelio Aviles became more important. (R-XXI-90) After interviewing this individual known as Candido LeBron or Roger, Webb participated in preparing capital murder charges against Rogelio Aviles Barroso. (R-XXI-91) Webb also took a buccal swab from Appellant on February 16, 2010.

Matt Quattaro, a supervisor of forensics at Orchid Cellmark in Dallas, Texas, testified that Orchid was an independent lab that performed DNA testings on specimens from criminal cases around the country. (R-XXI-103) Quattaro testified that a DNA analysis was done in the Obel Cruz Garcia case. (R-XXI-105) Orchid Cellmark first received evidence in the case on October 3, 2007. (R-XXI-105) The evidence which was sent to Orchid Cellmark by Detective Mehl included a cigar, sexual assault kit, and referenced samples from ██████ ██████ and Arturo Rodriguez. (R-XXI-106) At that point in time, no sample from Appellant had been received. (R-XXI-106) The initial evaluation of the cigar revealed two referenced samples, neither of them matched, so they had an unknown male contributor. (R-XXI-109) The sexual assault kit was tested and DNA from ██████ was found, as well as Arturo Rodriguez not being excluded as a possible contributor. Since there was a mixture, this left

42

EXHIBIT 1 Page 053

another unidentified male contributor. (R-XXI-112) The profile of the cigar could also not be excluded as a contributor to the vaginal swab. (R-XXI-113) Testing was done on the cutting from a pair of panties and the results were that ██████████ DNA was located on them. (R-XXI-113) Again there was a mixture of semen on the panties and Arturo Rodriguez could not be excluded as one of the minor contributors to the sample. (R-XXI-114) The major profile or contributor to the most of the DNA was an unknown individual whose DNA was also on the cigar. (R-XXI-114) Additional evidence was received from Sergeant Mehl on December 7, 2007. (R-XXI-115) Other samples were sent in for testing. (R-XXI-115) On May 28, 2008, Orchid Cellmark received a referenced sample from Appellant, Obel Cruz Garcia. (R-XXI-115) The swabs were sent from Gracel Guzman from the FBI as documented in State's Exhibit No. 95. (R-XXI-119) The DNA profile from the cigar matched the DNA profile that came from Appellant. (R-XXI-119) Appellant could not be excluded as a possible donor to the sperm fractions of the vaginal swabs, and the DNA that was obtained from the cutting of the panties as well. (R-XXI-119, 120) Appellant was identified as the major contributor to the profile found on the panties. (R-XXI-120)

During cross-examination, this witness agreed that Orchid Cellmark had quality control procedures to assure that they are getting the best and most accurate results from their testing. (R-XXI-128) He agreed that quality control is in place to try and avoid contamination. (R-XXI-128) The witness detailed the steps taken to try and avoid any type of contamination of the DNA sampling under test. (R-XXI-129, 130) He agreed that Orchid Cellmark could not control or attempt to control other labs quality control. (R-XXI-130)

43

000445

EXHIBIT 1 Page 054

When asked whether or not the evidence was handled by the HPD crime lab, the witness stated that he could tell it was somewhere before it was sent to him, but he did not know who beforehand. (R-XXI-130) He stated that he did not know Appellant and that the sample that he received was marked with Appellant's name on it. (R-XXI-130) The samples that he received were simply in an envelope with his name on it. (R-XXI-131) He stated that he did not know exactly where that came from but that somebody else provided that to him. (R-XXI-131) He stated that epithelial cells which were being examined are not observable by the naked eye, but could be seen with a microscope. (R-XXI-132) The same held true for the sperm fractions which are microscopic. (R-XXI-132) Quattaro stated with regard to the sperm cell there was no way to tell where that really came from, that he had to rely on the labeling that somebody else gave him. (R-XXI-134) He agreed that prior to receiving the evidence, he did not know how it was placed, where it was placed, when it was placed, how it was collected and how it was stored before it got to him. (R-XXI-134) He could not indicate whether the spermatozoa was the result of consensual sex or a sexual assault. (R-XXI-134) He confirmed that the epithelial cells which were collected in 1992 were not examined until 2007, some 15 years later. (R-XXI-135)

During re-direct examination, the witness said that he made no observation of anything indicating that the evidence had been tampered with. (R-XXI-136. 137) He testified that Orchid Cellmark had received a large cutting from the crotch of the panties and that they in turn took a smaller portion or cutting from that for testing. (R-XXI-137, 138) He stated that he could not contaminate evidence to create a DNA sample with someone's DNA that

000446

EXHIBIT 1 Page 055

he did not have at the time. (R-XXI-138)

During re-cross examination, this witness admitted and agreed that contamination does occur. It doesn't necessarily mean that people are evil. (R-XXI-140) When he received the evidence, there was no HPD notations of quality control procedures for assurances connected with the evidence. (R-XXI-141)

Courtney Head, a criminal specialist with the Houston Police Department Crime Laboratory, testified that with the exception of identical twins, everybody's DNA is unique to that specific individual. (R-XXI-145) She explained the difference between a known sample or referenced sample and an evidence sample which is collected and submitted for analysis. (R-XXI-146) She identified State's Exhibit No. 64 (already in evidence) as a t-shirt that was submitted in this case and tested. (R-XXI-154) No blood was detected on the t-shirt. (R-XXI-155) She testified that in a hypothetical case where the item had been in water for 30 plus days and exposed to the elements, she would not expect blood to be on the item. (R-XXI-155) She testified that there was a known sample which had been taken from Appellant but which never was seen or touched by Orchid Cellmark. (R-XXI-156) The witness stated that she performed extractions on the items. (R-XXI-157) She stated that she compared the referenced samples to the evidence. She stated that she compared the known profile with the profile that Orchid Cellmark had generated on the same sample. (R-XXI-159) She ultimately made comparisons between the known referenced sample, the DNA profile of Obel Cruz Garcia, and those three items. She found that Appellant could not be excluded as a contributor to the DNA profile that came from the cigar. (R-XXI-161) She also found that

000447

EXHIBIT 1 Page 056

Appellant could not be excluded as a possible contributor to the DNA mixture found in the sperm fraction from the vaginal swab of ███████████. (R-XXI-162) Likewise, she stated that Appellant could not be excluded as a contributor to the major component of the profile from the DNA found on the panties of ███████████. (R-XXI-162)

During cross-examination Head acknowledged that she had not personally performed any testing on the cigar, the vaginal swabs, or the cutting from the panties. (R-XXI-172) She admitted that there was no quality control or technical review of her because she didn't do any work on them. (R-XXI-172) She stated that she simply reviewed their work. (R-XXI-172)

Appellant was found guilty of capital murder. (R-XXIII-102)

### PUNISHMENT PHASE OF THE TRIAL

Manuel Buten testified that he was from Puerto Rico. (R-XXIV-15) Buten was married and had children, including a stepson named William. (R-XXIV-15) He stated that he had a food truck business in 2001. The name of his business was "El Tropical." (R-XXIV-17) In 2001, along with his brother Andres Castillo Buten and his stepson, ████████ ███████████, Mr. Buten operated the food truck. (R-XXIV-18) In October, 2001, while at the food truck, a man and woman came up and ordered food. That same man later came up and said that he liked the music and asked Buten to "pump up the volume." (R-XXIV-22) Buten identified Appellant as the individual who requested that the music be turned up. He stated that Appellant kept asking him to come down and turn the music up himself, which would require him to come out of the truck. (R-XXIV-24) Appellant later came up to the

46

EXHIBIT 1 Page 057

000448

truck and pulled out a .38 revolver and tried to fire it twice, but it did not fire. (R-XXIV-25)

Buten took off running towards the back leaving the keys to the truck as he ran away. (R-

XXIV-26) Buten was told that Appellant had taken the boys from the truck and had left. (R-

XXIV-26) He flagged down police to ask them to look for ▮▮▮▮▮ and Andres. (R-XXIV-

27) Appellant later called Buten and said that in order to release the boys he would have to

supply Appellant with 2 kilos of drugs. (R-XXIV-29) When Buten said that he sold mofango

and fried plantains, a woman got on the line and said that's how they would return the kids

as mofango and chopped meat. (R-XXIV-29) Buten said that he went to the police station

and while there Appellant contacted him. Appellant was unaware that Buten was at the

police station and threatened to kill the boys if he did go to the police station. (R-XXIV-31)

In speaking with Appellant, Appellant told him that Buten had to give him 75 Kilos and a

$150,000 cash. (R-XXIV-32) In a subsequent conversation with Appellant, Buten asked to

speak with the boys to make sure that they were alive and he did so. (R-XXIV-33) In yet

another phone conversation, Appellant threatened to kill the boys if Buten was inside a police

station. (R-XXIV-36) Appellant also stated that he would see his family on the news. (R-

XXIV-37) The police came up with a plan to try and trick Appellant into thinking that Buten

was going to meet him at another location. (R-XXIV-38) He made believe that he was

honking the horn and arguing with other drivers that were around him even though he was

actually at the police station. (R-XXIV-38) The police went to an area where Appellant was

supposed to be to meet Buten. (R-XXIV-39) At the scene, the police watched and observed

somebody they thought was talking on the phone. They gave chase and the person crashed

EXHIBIT 1 Page 058

000449

the car. (R-XXIV-40)  Appellant had said during conversations with Buten that if he continued with his "bullshit" he was going to read about his family in the paper the next morning. (R-XXIV-40)  A few hours later, the boys were released. (R-XXIV-40)  The individuals were kidnapped for approximately three days. (R-XXIV-41)  Upon their release, ▇▇▇▇ had marks on his face and Andres' head was swollen because he had been hit on the head with a pipe. (R-XXIV-41) ▇▇▇▇ and Andres' toes were smashed with a hammer and they were taken to the hospital. (R-XXIV-42)

Sergeant Juan DeJesus Rodriguez from the Puerto Rico Police Department testified that he was involved in a kidnapping case involving Appellant in October, 2001.  He identified Appellant in Court. (R-XXIV-45, 46)  DeJesus arranged for Buten to come to his office so that they could monitor calls made by Appellant and assist in the apprehension of him. (R-XXIV-47)  Since there was no technology to trace the calls or record them, Buten would explain to the police what was being said. (R-XXIV-48)  DeJesus would counsel and advise Buten about what to say in response to questions during the conversation . (R-XXIV-48)  DeJesus had Buten receive "signs of life" indicating that the subjects ▇▇▇▇ and Andres were alive by placing them on the phone. (R-XXIV-49)  DeJesus then explained the scenario that played out involving Buten and Appellant. (R-XXIV-52 - 54)  Appellant was ultimately found hiding in a tree and was taken into custody by the police. (R-XXIV-54)  DeJesus said that he, along with his partner Melvin Torres, interviewed Appellant. (R-XXIV-58)  After Appellant was allowed to call the woman he was married to in 2001, both individuals were released. (R-XXIV-59)  Appellant was filed on for kidnapping, a gun case,

EXHIBIT 1 Page 059

and a knife case. Another individual, Pablo Esquivez was implicated in the kidnapping as well. (R-XXIV-65) Appellant pled guilty and received a 16 year prison sentence. (R-XXIV-65)

During cross-examination, DeJesus was asked whether or not it seemed odd that an individual who owned a small food truck would be asked to supply a $1,000 in cash and 100 kilos of cocaine to secure the release of these individuals. (R-XXIV-76, 77) He said in his training and experience that type of question would be asked to people that might have that type of stuff. (R-XXIV-77) He did further investigate to see if these people were involved with drugs. (R-XXIV-77) He stated that it turned out that Buten was not involved in drugs. (R-XXIV-77)

Andres Castillo Buten testified that he had a small food truck just like his brother Manuel Buten. (R-XXIV-79) Buten identified Appellant as an individual he came into contact with on October 11, 2001 at a food truck. (R-XXIV-81) He stated that after eating his meal, Appellant came up and produced a weapon and pointed it at his brother. (R-XXIV-82) When his brother ran off after Appellant tried to shoot at him, Appellant kept ████ and this witness. (R-XXIV-83) Buten then described how he and the other were kidnapped. (R-XXIV-85) He was thrown to the ground and into a house by Appellant. (R-XXIV-86) He was also assaulted by Appellant inside the house. (R-XXIV-86) Buten was able to identify Appellant because Appellant had taken the hood off of his head and he observed Appellant's face. (R-XXIV-87) Buten described Appellant having sex with the women he was at the food truck with. He stated that he had sex right in front of him. (R-XXIV-90) Buten also

49

EXHIBIT 1 Page 060

described Appellant hitting him with a mallet on his feet. (R-XXIV-91, 92) Buten also observed ▮▮▮▮▮▮ and that he had been beaten up as well. (R-XXIV-93) He described Appellant as being the person in charge while all this was going on. (R-XXIV-94) Buten was eventually released and he eventually found a patrol car and told him what happened. (R-XXIV-95)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ also testified about his kidnapping on October 11, 2001 while at the food truck in Puerto Rico. (R-XXIV-99) He testified that after Appellant attempted to shoot Manuel and Manuel got away, Appellant told the others to get the two that were up there which were this witness and Buten. (R-XXIV-102. 103) He identified Appellant in court. (R-XXIV-102) Martinez was taken to a house, along with the other individual who had been kidnapped, where he was assaulted. (R-XXIV-106) When Appellant left the room momentarily, the other individual did nothing to this witness. (R-XXIV-108) He described having been hit by Appellant with a revolver and also being cut by a knife that Appellant had with him. He also described other threats made by Appellant. (R-XXIV-109) This witness remembered times when Appellant told him that he was going to kill him. (R-XXIV-113) This witness again identified Appellant as the person that had kidnapped him. (R-XXIV-116)

Officer Efrain Hernandez with the Department of Corrections in Puerto Rico testified that he has always worked on medical services at the Unit. (R-XXIV-120) On October 10, 2003, this witness stated that he inspected the cell of Appellant. (R-XXIV-120) When Hernandez inspected Appellant's prison cell, he noticed something irregular. (R-XXIV-123) He noticed that window pane fell out of Appellant's window when touched by a rubber

000452

EXHIBIT 1 Page 061

mallet. (R-XXIV-124) Inside Appellant's cell a rope made up of bed sheets as well as a map of Puerto Rico were found. He stated that the space opened by the window was enough for an individual to climb out. (R-XXIV-125) He explained that these items were not permissible for inmates to have in their cells. (R-XXIV-127) When Appellant was searched after being detained in the prison unit, a cell phone was found in his possession. (R-XXIV-128) Again, this was a prohibited item. (R-XXIV-128)

During cross-examination, this witness acknowledged that the main purpose of the window which was made of metal was for ventilation. He also noted that if an individual jumped out of the window, he would still be in a restricted area within the institution, not the free world. (R-XXIV-136)

James Kennedy with the Houston Police Department that on July 1, 1989, he worked in the Crime Scene Unit. (R-XXV-7) He went to the scene at 123 Winkler in Houston, Texas on that date. (R-XXV-7) He was investigating a dead body found in an apartment complex dumpster at that location. (R-XXV-8) He identified the body as being a Hispanic male. (R-XXV-9) State's Exhibit No. 118 showed three ligature strangulation marks on the deceased's neck on the left side.

Tina Perez testified that when she was sixteen she got separated from her current husband and got involved in some stuff that she was not proud of, notably drugs. (R-XXV-23) The individuals she was involved with was Elizabeth Ramos, who was a girlfriend of Appellant. (R-XXV-24) She stated that she would get drugs through Ramos who in turn received them from Appellant. (R-XXV-24) Perez then identified Appellant in court. (R-

51

EXHIBIT 1 Page 062

000453

XXV-26) In 1989, when she was hanging around with Appellant, she knew some of his other friends, including "Shorty," Rudy, Saul, and a guy named Robert, whose real name was Leo. (R-XXV-26) She described Rudy as Appellant's right hand man and that they were inseparable. (R-XXV-27) She described Appellant as being the person of those individuals who was kind of in charge or the boss. (R-XXV-28) One time, Perez went to an apartment on Winkler and when she went in to buy drugs, she saw a body in the tub of the apartment. (R-XXV-30) She noticed when she went into the apartment that stuff was scattered everywhere. (R-XXV-31) She remembered seeing the body bound with the hands tied behind his head and his feet were also bound and he was face down. (R-XXV-32) She identified the body as Saul. (R-XXV-33) She later told the police what she had seen. After seeing Saul's body in the tub, Perez changed and started going back to school. She subsequently saw Appellant and he told her not to say anything. (R-XXV-35)

Johnny Lopez stated he was in a common law relationship with Lupita Marie Martinez. (R-XXV-42) After high school, Lopez went into the army for four years. (R-XXV-43) Lopez eventually got into drugs and ended up going to jail. (R-XXV-44) In 1989, Lopez knew Saul Flores. (R-XXV-45) Lopez learned that Saul had died while Lopez was in jail. (R-XXV-46) State's Exhibit No. 122 was identified as a picture of Saul. (R-XXV-48) Lopez then identified Appellant in the courtroom. (R-XXV-49) Lopez said that his friend Saul would run away whenever he would see Appellant coming towards him. (R-XXV-51)

During cross-examination, Lopez denied that he told the police in 1989 that he was actually running from "Shorty." (R-XXV-52) Appellant's counsel then questioned him about

EXHIBIT 1 Page 063

the number of times he had met face to face with the prosecutors concerning this case. (R-XXV-54, 55) Appellant's counsel then questioned this witness about his criminal history. (R-XXV-55- 57)

Carmelo Martinez Santana ("Rudy"),who had testified during the guilt phase of the trial, testified again on punishment. (R-XXV-60) Rudy again identified Appellant in court. (R-XXV-61) He testified about a previous incident when Appellant and Cesar tied him up. (R-XXV-61) Appellant and Cesar took Rudy and placed him in a bathtub because Appellant thought that Rudy was taking his drug customers away from him. (R-XXV-63) When Rudy produced money from his pocket he was released. (R-XXV-64) He testified that he was aware of other robberies or burglaries where masks were worn. (R-XXV-65) Rudy described a situation where Appellant and he went to an individual's apartment (Batiko) to break in. (R-XXV-66) State's Exhibit Nos. 126 and 127 were shown to Rudy. He identified them as Batiko's apartment. (R-XXV-68) Rudy explained that Bory also known as Roger went along with Appellant. (R-XXV-69) The two came back to Rudy's car with drugs and money from the apartment. (R-XXV-70) When Appellant returned to the car, he stated that he had raped Batiko's woman and he had beaten Batiko up. (R-XXV-70) He went on to say that there were other times when apartments were robbed and burglarized. (R-XXV-71) Rudy described Saul Flores as an individual who worked with both of them selling drugs. (R-XXV-72) He stated that Appellant met Saul through another Mexican named "Shorty." (R-XXV-72) Rudy also described that at one point Saul had taken some drugs to Appellant's girlfriend's apartment. Appellant's girlfriend (Elizabeth) called Appellant and told him about

EXHIBIT 1 Page 064

the fact that Saul was trying to court her and this made Appellant furious. (R-XXV-75) Rudy went to Elizabeth's apartment, along with Robert and the Appellant. (R-XXV-76) Saul was placed in the car and driven to an apartment complex on Winkler. (R-XXV-76) This was an apartment there that was used to sell drugs. (R-XXV-77) The group went upstairs into the apartment. (R-XXV-77) On the way to the apartment on Winkler, the group picked up another individual Richard. (R-XXV-78) Once inside the apartment, Appellant began beating Saul. (R-XXV-79) In addition to the beating they were giving Saul, he was also injected with drugs. (R-XXV-81) He then stated that Obel Cruz-Garcia broke Saul's neck. (R-XXV-82) Subsequently, Saul's body was moved and placed in the dumpster outside. (R-XXV-85) Rudy said the first time he told anybody about this was when he spoke with his attorney, Mr. Castro. (R-XXV-85)

During cross-examination, Martinez denied reaching out to law enforcement in 2011 to talk about this case. He stated that they appeared unannounced to discuss the matter with him. (R-XXV-87) When asked whether he had any pending cases against him, Martinez attempted to sidestep the question by saying he was just there to tell the truth. Martinez stated that the incident involving him had occurred prior to the incident involving the death of ▪▪▪▪. (R-XXV-89) Martinez described himself as the getaway driver in the case involving Batiko. (R-XXV-90) He admitted that it was the same thing he did when baby ▪▪▪▪ was taken. (R-XXV-90) He acknowledged staying with Appellant even after the baby's case, even helping him to clean up the car that was used to transport the body. (R-XXV-91) He stated that he took Appellant to the airport and then resumed his drug business

54

EXHIBIT 1 Page 065

himself. (R-XXV-91, 92)

On re-direct examination, Martinez said that he had not been promised anything by the State to get him to testify against Appellant. (R-XXV-95)

Dr. Dwayne Wolf, Deputy Chief Medical Examiner for Harris County, testified that the Saul Flores autopsy was performed July 1, 1989, Dr. Narula. (R-XXV-100) Dr. Wolf found that the injuries sustained by Saul Flores were consistent with ligature strangulation. He also described some contusions around the eyes. (R-XXV-108) Dr. Wolf testified that a toxicology test was performed and Saul Flores' body contained cocaine in his blood. (R-XXV-111)

Micah Webb testified again at the punishment phase of this trial. (R-XXV-116) Webb, as part of his investigation in this case, went to the Harris County jail to speak with Carmelo Martinez Santana. (R-XXV-117) During the interview, Martinez provided new information to the investigator regarding an unrelated murder. (R-XXV-118)

During cross-examination, Webb confirmed that Martinez had not been charged in any of the cases he testified to. (R-XXV-122)

Darryl Novak with the Harris County Sheriff's Department testified that he was employed as a detention officer. (R-XXV-123) On September 23, 2012, this detention officer had interaction with Appellant. (R-XXV-126) He identified Appellant in court. (R-XXV-127) On September 23, 2012, Appellant was given a razor to use, one the day of the week when inmates received razors. (R-XXV-128) After the razors are used, they are collected as part of a count. (R-XXV-128) When this witness retrieved Appellant's razor he

EXHIBIT 1 Page 066

noticed that it had been altered. (R-XXV-131) Appellant was brought up on disciplinary action of altering the razor. (R-XXV-133)

David Davis, Jr., with the Harris County Sheriff's Department, testified that he was a jailer and a classification supervisor. (R-XXV-144) He testified that Appellant was booked into the Harris County Jail on February 12, 2010, and he was assigned as a high risk inmate and placed into administrative separation. (R-XXV-145) Davis described the restrictions placed on an individual in that type of housing arrangement. (R-XXV-146) This witness then testified that a razor blade is a prohibitive weapon in the penal institution. (R-XXV-147) He stated that if an individual chose to charge Appellant with something lesser than that it was basically an act of kindness on the part of the officer. (R-XXV-147)

Bonnie Fiveash, testified that she classified inmates and offenders for statewide placement. (R-XXV-149) She testified that she had 21 years experience with the Texas Department of Criminal Justice, all of which was classifying offenders. (R-XXV-150) She testified that while her and her committee make an initial assignment and custody level of the offenders, once they reach a particular facility it depends on the behavior where that inmate goes from there. (R-XXV-151) She then testified regarding the general categories of G-1 through G-5 regarding general prison populations. (R-XXV-154) She stated that most inmates convicted of capital murder, and not sentenced death, start out as a G-3 inmate. (R-XXV-156) She stated that based on the information sheet, Appellant would be classified as a G-3 offender. (R-XXV-157) She testified that Appellant would be with other inmates as a G-3 offender. (R-XXV-159)

EXHIBIT 1 Page 067

The State pointed out through this witness that Appellant could be housed with somebody in prison for a DWI 3rd, as well as a white collar theft case. (R-XXV-160) The State then elicited testimony from this witness regarding the ability of the Appellant to be in contact with other individuals, including employees of the prison system. (R-XXV-161) She also brought out that guards within the prison unit do not have weapons and they could be in the company of capital murderers and have no way to defend themselves. (R-XXV-166) The State made it a point to point out that inmates can buy Blue Bell ice cream while they are in prison. (R-XXV-169) The State also referenced a security officer at the Wynn Unit named Susan Canfield who was on horseback and when an escaped occurred and her horse was hit by a car causing Canefield to be killed. (R-XXV-174)

During cross-examination, Appellant's counsel asked the obvious question which was "Have we left out any nightmare scenarios in this conversation?" to which the witness indicated, "No, sir." (R-XXV-178) She also acknowledged that in her opinion TDC was competent in handling inmates. (R-XXV-179) She did not indicate that she had a reason to think that there was anything "wack" in terms of the Texas Department of Criminal Justice's ability to deal with inmates. (R-XXV-179) She indicated that she would have a vote of confidence for other individuals who worked at TDC. (R-XXV-179) This witness also indicated what would happen to individuals who had disciplinary problems while in prison. (R-XXV-180, 181) Ultimately, the witness agreed that if an individual's conduct was bad enough they could be placed in individual segregated units away from everyone else. (R-XXV-182) Fiveash stated that TDC was not going to risk the safety of other offenders or

000459

EXHIBIT 1 Page 068

staff. (R-XXV-182) She also pointed out that if an individual attempted to escape he would be ordered to stop first and then the guards would shoot the individual. This also applied to individuals who worked in the field and that was why guards carry rifles on the horses. (R-XXV-183) This witness indicated that she was not trying to make any kind of admission to the jury that TDC just can't handle its business or can't handle the inmates. She indicated that she was not there to sway them either way. (R-XXV-186) When asked "I guess the fear from our standpoint might be that through your testimony, the jury is getting the impression that it's just too dangerous to send anybody to TDC." The witness said, "No, sir." Initially, when counsel commented that "These situations that – – these catastrophic situations that occur at TDC, even though they have occurred there, these are not the normal things that happen at TDC, are they?" To which the witness indicated, "No." (R-XXV-186)

The State rested its case at punishment. (R-XXV-202)

The first witness for Appellant, Mireya Perez-Garcia testified via Skype from the Dominican Republic. (R-XXVI-9) She testified that she met Appellant when she was 15 and that after dating for several weeks she married him. (R-XXVI-12) She described how Appellant would fish with his father for a living at the time. (R-XXVI-13) Appellant left about six months after marrying this witness to go to Puerto Rico for a better life. (R-XXVI-13) She continued her relationship again with him in 1994 in Puerto Rico. (R-XXVI-13) Garcia and Appellant had a family in Rio Pedra, Puerto Rico. (R-XXVI-14) She stated that Appellant worked in real estate and was a very hard worker. (R-XXVI-15) She described him as sincere and noble and an impeccable person. She stated that he interacted with all of

58

EXHIBIT 1 Page 069

the friends that he had from church. (R-XXVI-15) She described how as a member of the church, Appellant would go and do mission work with others at the church. (R-XXVI-16) Appellant and his wife owned their own home. (R-XXVI-17) She described Appellant as an excellent father because he wanted to be the best he could for his children. (R-XXVI-18) Appellant like to read his bible and especially read psalms. (R-XXVI-19)

When this witness was asked whether she was aware that her son was in prison or not, she said "No, no, no." (R-XXVI-29) She stated that she did not know about his life at that time. (R-XXVI-29) This witness indicated that she was aware that Appellant had married a woman by the name of Dorka. (R-XXVI-29)

Joel Cruz-Garcia, Appellant's brother, testified that his father suffered an injury which made him leave the military and become a fisherman. He said that the parents stayed together for 17 years and then his mother moved to Venezuela when Obel, the Appellant, was about 12 years of age. (R-XXVI-35) He described Appellant as a good brother who cared for him and they had a good relationship. (R-XXVI-36) He described his relationship with his brother over the years and gave an opinion that Appellant was a good father to his son. (R-XXVI-39) During cross-examination, he said that Appellant stayed with his wife Mireya for six months and left for Puerto Rico for a better life and when he left his wife was pregnant with their first child. (R-XXVI-44) Appellant's brother explained how Appellant came back to Puerto Rico and had a relationship with Angelita. He also testified that later he resumed his relationship with his first wife Mireya. He also testified that Appellant who left Mireya again and then established a relationship with Dorka. (R-XXVI-49)

59

000461

EXHIBIT 1 Page 070

Appellant called Abel Cruz-Perez. (R-XXVI-66) He testified that Appellant was his father. He also stated that he was married and had a little girl of his own. (R-XXVI-68) This witness described the relationship he had with his father and the type of work that his father did when he was younger. (R-XXVI-69-70) Abel described the house where they grew up and the relationship he had with his father and how he helped build a church in town. (R-XXVI-73)

Angel Meza testified that he and Appellant met while in jail. (R-XXVI-81) This witness stated that he was a trustee at the jail and would feed Appellant when he was in lock down. (R-XXVI-82) When he would visit Appellant in the jail, Appellant was talking about his bible. (R-XXVI-83) This witness would have face to face contact for about two months with Appellant during which time he described Appellant as a man of God. He stated that Appellant tried to help him in every possible way he could. (R-XXVI-85)

During cross-examination, the witness recognized that there was a difference between someone talking a good game versus having lived and made choices. (R-XXVI-87) He agreed that was a pretty important distinction. (R-XXVI-87)

While the jury was deliberating , a juror sent out a note to speak with the Judge privately.(R-XXVII-3) The trial court discussed Ms. Bowman's matter in chambers without other parties present. (R-XXVII-4, 5, 6) The juror expressed concern about reaching an agreement, stating that she was at a different opinion and that she was not changing her stance on that. (R-XXVII-6) The court indicated that she needed to keep deliberating. The jury returned a verdict which resulted in the assessment of the death penalty. (R-XXVII-11)

000462

EXHIBIT 1 Page 071

The trial court sentenced Appellant to death. (R-XXVIII-4)

## POINT OF ERROR NUMBER ONE

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS THE STATE'S DNA EVIDENCE WHERE THE STATE FAILED TO ESTABLISH A PROPER CHAIN OF CUSTODY DUE TO THE INVOLVEMENT OF THE HOUSTON POLICE DEPARTMENT CRIME LAB WHICH WAS SHUT DOWN AND WIDELY CRITICIZED IN THE REPORT OF INDEPENDENT INVESTIGATOR MICHAEL R. BROMWICH COMMISSIONED TO REVIEW AND EVALUATE THE HOUSTON POLICE DEPARTMENT CRIME LABORATORY AND PROPERTY ROOM (CR-III-454)**

## STATEMENT OF FACTS

Prior to trial, Appellant filed a Motion to Suppress Results of all DNA Testing. (CR-III-454) The Motion, in part, stated that Appellant was anticipating that the State would seek to introduce evidence that the Appellant's DNA was found at the scene of the alleged crime - specifically from physical evidence recovered from a witness who claimed to have been sexually assaulted and from a cigar allegedly found at the scene of the alleged sexual assault. The DNA evidence was submitted to the former, now defunct, HPD Crime Lab for processing. The Motion went on to state that this same evidence was later submitted to other labs for testing and the State would seek to offer the results of such testing. Appellant pointed out that various investigations and reports had been generated over the years as to the incompetence of the employees and former, now defunct, HPD Crime Lab itself which led to its complete closing. These investigations included the time period that the DNA evidence in this case was handled by the now defunct HPD Crime Lab. The investigations found rampant false test results, mishandling of evidence, improper police procedure, misconduct, criminal activity, and incompetence. Appellant asserted that he would be denied

61

EXHIBIT 1 Page 072

000463

a fair trial and Due Process if any evidence was admitted at his trial that was stored and / or

processed by the former, now defunct, HPD Crime Lab. (CR-III-454,455)

A hearing was held on the Motion to Suppress. (R-XVI-17) When the trial court

inquired as to the scope of the Motion to Suppress, Appellant's counsel noted that: 1). Some

of the people that handled the evidence in this case were severely criticized as a result of the

Houston Police Department Crime Lab Investigation; 2). Although the State had the evidence

re-examined by an independent lab, he had no confidence in the HPD Crime Lab, and 3).

Specific evidence consisting of a pair of panties and a cigar from which a DNA profile were

determined or handled by the HPD Crime lab for latter cuttings or swabs were items

produced by the HPD Crime Lab or sent to Orchid Cellmark for analysis. (R-XVI-16)

Appellant urged the trial court to suppress all the DNA results because the HPD Crime Lab

had been completely closed, and therefore, the court should not have any confidence in any

items transferred from that now-closed lab to anywhere else for fear of contamination. (R-

XVI-18) Appellant further argued that no evidence even handled by the HPD Crime Lab

should be trusted for evaluation, even by an independent crime lab - this would include

testimony from Orchid Cellmark. (R-XVI-18) The trial court admitted Defense Exhibits 2

through 9 into evidence on the Motion to Suppress. (R-XVI-21) These exhibits included

reports from the ***Bromwich Report*** and the Houston Police Department Crime Lab

Investigation. (R-XVI-21) The State responded that it had followed the recommendations of

the ***Bromwich Report*** and had the evidence sent out to an independent lab to do its own

testing. The prosecutor argued that the lab didn't have a sample of Appellant's DNA

EXHIBIT 1 Page 073

[because he was in Puerto Rico] and therefore contamination could not have occurred. (R-XVI-22)

Physical evidence, consisting of cuttings from a pair of panties, was recovered by Gloria Kologinczok, a nurse at St. Joseph's Hospital when she performed a sexual assault examination on ██████████ on October 1, 1992. (R-XVI-25) This evidence was stored at the Houston Police Department Crime Laboratory until 2007, when it was retrieved by HPD Cold Case Investigator, Eric Mehl. (R-XVI-30,32,35) Mehl testified that he did not open the evidence envelope which contained the cuttings, but rather re-packaged it and sent it to Orchid Cellmark for analysis. (R-XVI-35) A cigar which had been recovered at ██████ ██████ residence on October 1, 1992, also remained in storage at the Houston Police Department Property Room until its retrieval by Mehl in 2007. (R-XVI-30) Mehl testified that by the date a sample of Appellant's DNA was obtained, all the biological evidence had already been in Orchid Cellmark's possession. (R-XVI-38)

During cross examination, Mehl acknowledged items extracted from ██████████ had, in fact, been stored by the Houston Police Department Crime Lab, including blood and a cutting from her panties. (R-XVI-43,44) Mehl further admitted that at some point the rape kit would have gone through the Crime Lab. (R-XVI-44)

**Matt Quartaro from Orchid Cellmark confirmed that HPD sent DNA extractions taken in this case to Orchid Cellmark. He testified Orchid took its own cutting from the panties which had been through the Houston Police Department Crime Lab. (R-XVI-51)** On May 28, 2008, Orchid obtained a full DNA profile from Appellant. Quartaro

EXHIBIT 1 Page 074

testified that profile of Appellant matched the profile from the sperm fraction of the panties and the cigar. (R-XVI-59) **Quartaro confirmed that there had been active testing of the evidence by the HPD Crime Lab.** (R-XVI-68) He went on to note that even if two people had come into contact with the cigar, it was possible that only a DNA profile from one person would be obtained. He also confirmed that there was no way to establish when a sperm cell would have been deposited - only whose DNA it was. (R-XVI-72,73)

Courtney Head from the Houston Police Department Crime Laboratory testified that there was a letter indicating that in 1992 extractions from the evidence of the vaginal swab in the crotch panties were sent to Genetic Design Lab. (R-XVI-85) **There was no testimony from officials at Genetic Design Lab regarding the evidence. Courtney admitted that she knew Joseph Chew (HPD Crime Lab) and confirmed that Chew had obtained a hair sample from Appellant on October 7, 1992.** (R-XVI-86) **Chew did not testify.** She also stated that another **Crime Lab analyst (B. Sharma) performed an analysis on the rape kit on October 28, 1992 and found the male fraction of the DNA sample was too degraded to form any conclusions. Sharma did not testify.** (R-XVI-87) Head testified that Appellant could not be excluded as contributor to the DNA on the cigar or the sperm fraction from the panties. (R-XVI-92) **During cross examination, Head again admitted that biological evidence, including a vaginal swab from the crotch of the panties and blood from various individuals had been handled by the Houston Police Department Crime Laboratory.** (R-XVI-95)

**The trial court denied Appellant's Motion to Suppress. (R-XVII-5,6) (CR-III-**

EXHIBIT 1 Page 075

000466

**456)** The court ruled that evidence extracted by the old HPD Crime lab would not be admitted, but that testing performed by Orchid Cellmark on those items would be. (R-XVII-8) The court precluded Appellant from presenting the ***Bromwich Report*** to the jury - finding the report had nothing specific about this case. The court also prevented Appellant from impeaching HPD Crime Lab analysts Joseph Chew or B. Sharma because they were not going to testify. (R-XVII-14,1517,18) **Appellant was also prevented from mentioning the closure of the Houston Police Department Crime Lab.** (R-XVII-22,23,24)

Throughout the course of the trial, Appellant relied on his pre-trial Motion to Suppress to address physical and testimonial evidence offered by the State. Appellant also relied upon his pre-trial Motion to Suppress when he would lodge additional objections concerning the admissibility of DNA evidence. The Motion to Suppress and those additional objections are grouped together under this Point of Error pursuant to **Rule 38.1 (f) and (i) of the Texas Rules of Appellate Procedure** to avoid the unnecessary repetition of arguments in support of the issues or points presented for review. In addition to the record made during the pre-trial Motion to Suppress, the following matters are included under this Point of Error:

A    Appellant was instructed that he was not allowed to cross examine Detective Eric Mehl concerning the Houston Police Department Crime Lab (R-XX-59)

B    The trial court ruled that in order to not leave a wrong impression on the jury, Appellant would be allowed to question the officer about the fact that the Crime Lab did process DNA, but he was not allowed to go into any details about the Crime Lab. (R-XX-62,63)

C    The trial court specifically noted for the record that the prosecutor left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD Crime Lab for DNA analysis. (R-XX-66)

65

000467

EXHIBIT 1 Page 076

D      Appellant's counsel again reurged his request to go into a more deep evaluation of Genetic Design and the HPD Crime Lab studies which was denied by the trial court. (R-XX-66)

E      During FBI Agent Griselle Guzman's testimony, Appellant objected to the introduction of State's Exhibits 65 and 66 [buccal swabs taken from Appellant] noting that the basis for his objection was covered by his Motion to Suppress - he otherwise had no further objections. (R-XX-77)

F      Appellant objected to the introduction of State's Exhibit # 33 [sexual assault kit results] and State's Exhibit # 95 [cutting of panties] reiterating the issues that were previously stated and made reference to a breach in the chain of custody of the items. (R-XXI-123)

G      Over Appellant's objections, the trial court admitted State's Exhibits 95, 33, 33A, 33B, 33C and 33D [panties from the sexual assault kit, the vaginal swabs, and smears from the sexual assault kit, and saliva samples of █████ █████ and the blood sample of █████████] (R-XXI-124)

H      The trial court reiterated that certain questions were allowed and others would not be permitted. Specifically, the trial court stated it would not allow in the results of the Houston Crime Lab or any testing that was done by the HPD Crime Lab. (R-XXI-125-127)

I      Over Appellant's objections, the trial court admitted State's Exhibit # 70 - the report from Courtney Head with the Houston Police Department Crime Lab regarding her DNA analysis in this case. (R-XXI-152)

J      State's Exhibits # 76 and 77 [buccal swabs collected from Appellant] were admitted when Appellant commented "no additional objections". (R-XXI-157)

K      State's Exhibit # 92 [DNA statistics] State's Exhibit# 96 [DNA summary on cigar] and State's Exhibit # 97 [DNA summary on vaginal swabs] were all admitted over Appellant's objections.

L      The trial court prevented Appellant from cross examining Head concerning quality control that existed on other things when they ran by the crime lab. (R-XXI-173)

66

EXHIBIT 1 Page 077

## ARGUMENT AND AUTHORITIES

**The Fourteenth Amendment to the Constitution of the United States** provides that no State shall deprive any person of life, liberty, or property, without **due process of law**.

As noted above, Appellant's Motion to Suppress contained several sub-parts which are addressed herein, beginning with the Chain of Custody Issue.

### Chain of Custody Objections

In the instant "Cold Case" appeal, the State of Texas prosecuted Appellant in 2013 for a crime alleged to have occurred in 1992. Evidence, consisting of cuttings from a pair of women's panties, a vaginal swab and a cigar, was tested for the presence of biological evidence to be compared with people who may have been associated with the evidence. Appellant's counsel urged the trial court to suppress the evidence because, among other reasons, there was no showing of a proper and adequate chain of custody. (R-XXI-123) Several issues came into play as Appellant sought to exclude evidence allegedly connecting Appellant to the crime scene from September 30, 1992, including **[1]** the fact that the **Houston Police Department Crime Lab** processed evidence recovered from the crime scene - sexual assault kit from ▮▮▮▮▮▮▮; a hair sample from Appellant; DNA extractions from ▮▮▮▮▮▮ and Arturo Rodriguez **[2] Genetic Design** which processed some of the evidence was no longer in business and there was no evidence offered to explain what had been done to the evidence while in the possession of the company. The State was allowed to use evidence which had not been shown to have been maintained in a proper and adequate chain of custody. Chain of custody complaints are **generally viewed** as going to the weight,

67

EXHIBIT 1 Page 078

000469

not the admissibility, of the evidence. **Norris v. State, 507 SW2d 796 (Tex. Crim. App. 1974)** In the instant appeal, Appellant submits that the trial court abused its discretion in allowing the DNA evidence to be admitted at trial. **Montgomery v. State, 810 SW2d 372 (Tex. Crim. App. 1990)** The amendments to the Code of Criminal Procedure relating to post-conviction DNA testing are instructive. **Article 64.03** provides that the trial must find that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect". Appellant submits that the stringent prerequisite set forth under **64.03** should apply with equal force to the State of Texas when it relies upon 21 year-old biological evidence in the prosecution of a capital murder case. The State provided no proof concerning what had happened to the biological evidence sent to Genetic Design. Likewise, the State failed to offer any proof establishing a proper chain of custody of the evidence while in the possession of the Houston Crime Lab and Property Room. Numerous individuals, including detective Mehl, had access to, and handled, the evidence without being able to provide any meaningful information regarding the chain of custody. A complete chain of custody must be maintained in order to ensure that biological evidence was collected and preserved properly. **Routier v. State, 273 SW3d 241 (Tex. Crim. App. 2008)** Appellant's efforts to introduce numerous documents concerning the Crime Lab fiasco (Def. Ex's 2-19) is intertwined with this chain of custody issue. The second ***Bromwich Report*** (5/31/2005) (Def. Ex. 2) noted that it is already clear, however, that the circumstances that led to the troubling crisis of confidence in the Crime Lab are complex and deeply rooted in the history of the Crime Lab and HPD as a whole over

EXHIBIT 1 Page 079

000470

the past two decades. (R-XVI-21)(R-XXXI-15)  The third ***Bromwich Report*** (6/30/2005)

Def. Ex. 3) addressed the storage room at the HPD Property Room where high temperatures

and high humidity created problems.  The ***Bromwich Report*** also noted that the chain of

custody forms were cumbersome and archaic and increased the chances of errors and risk of

misplaced evidence.  R-XVI-21)(R-XXXI-59)    Appellant submits that there was a

insurmountable gap in the chain of custody - so much so that the admission of the evidence

violated Appellant's right to due process.  The trial court simply excised the HPD Crime Lab

out of the evidentiary equation in this case.  In light of the fact that Mr. Chu at the HPD

Crime Lab had Appellant's hair sample from 1992 and the HPD lab did testing on the panties

before sending them off to other labs, Appellant submits the trial court erred in not granting

his Motion to Suppress.  The question remains: What happened to all the DNA evidence

during the 15 years it was in HPD's custody?

This Court has stated that a trial court has great discretion in the admission of

evidence at trial, and although the evidentiary rules do not specifically address proper chain

of custody, they do state that identification for admissibility purposes is satisfied if the

evidence is sufficient to support a finding that the matter in question is what its proponent

claims.  Absent evidence of tampering or other fraud, problems in the chain of custody do

not affect the admissibility of evidence.  Instead, such problems affect the weight that the fact

finder should give the evidence, **which may be brought out and argued by the parties**.

**Druery v. State. 225 SW3d 491 (Tex. Crim. App. 2007)** Unfortunately, in the instant case,

the trial court did not allow the very evidence needed to raise the question of chain of custody

000471

EXHIBIT 1 Page 080

in a meaningful way. Therefore, Appellant had no evidence to bring to the attention of the jury to argue that point. The trial court abused its discretion in admitting the DNA evidence, comparisons and testimony based thereon. Appellant was denied a meaningful opportunity to present a complete defense for the jury's consideration in violation of the **Sixth Amendment.. Holmes v. South Carolina, 476 U.S. 1 (2006)**

## POINT OF ERROR NUMBER TWO

**THE TRIAL COURT ERRED IN DENYING APPELLANT THE RIGHT TO CONFRONT AND CROSS EXAMINE HIS ACCUSERS AND THUS THE OPPORTUNITY TO PRESENT A DEFENSE BASED IN PART ON EVIDENCE CRITICAL OF THE HOUSTON POLICE DEPARTMENT CRIME LAB AND PROPERTY ROOM DURING HIS MOTION TO SUPPRESS AND AT TRIAL (CR-III-454-456)(R-XXXI-DX2/3/4)R-XVI-21);(R-XXXII-DX5/6)(R-XVI-21);(R-XXXIII-DX6)(R-XVI-21);(R-XXXIV-DX7-19)(R-XVI-21)**

### STATEMENT OF FACTS

Pursuant to **Rule 38.1 (f) & (i) of the Texas Rules of Appellate Procedure** and to avoid repetition, Appellant again incorporates the entirety of the preceding Point of Error for this Court's consideration of this Point of Error.

During the Motion to Suppress hearing, and subsequently throughout the trial, Appellant sought to introduce evidence concerning the Houston Police Department Crime Lab and Property Room which were shuttered and closed in the wake of a crime lab scandal which first came to light when a Houston television station (**KHOU**) uncovered wrongdoing. Appellant presented significant documentary evidence in the form of independent reports which were extremely critical of the HPD Crime Lab to the trial court. (R-XVI-21) Appellant complained that the trial court was denying him the right to confront and cross

70

EXHIBIT 1 Page 081

examine his accusers in violation of the **Sixth Amendment** and his right to a fair trial with

**Due Process**. (CR-III-455)  In addition to the record made during the pre-trial Motion to

Suppress, the following matters are again included under this Point of Error:

A      Appellant was instructed that he was not allowed to cross examine Detective Eric Mehl concerning the Houston Police Department Crime Lab (R-XX-59)

B      The trial court ruled that in order to not leave a wrong impression on the jury, Appellant would be allowed to question the officer about the fact that the Crime Lab did process DNA, but he was not allowed to go into any details about the Crime Lab. (R-XX-62,63)

C      The trial court specifically noted for the record that the prosecutor left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD Crime Lab for DNA analysis. (R-XX-66)

D      Appellant's counsel again reurged his request to go into a more deep evaluation of Genetic Design and the HPD Crime Lab studies which was denied by the trial court. (R-XX-66)

E      During FBI Agent Griselle Guzman's testimony, Appellant objected to the introduction of State's Exhibits 65 and 66 [buccal swabs taken from Appellant] noting that the basis for his objection was covered by his Motion to Suppress - he otherwise had no further objections. (R-XX-77)

F      Appellant objected to the introduction of State's Exhibit # 33 [sexual assault kit results] and State's Exhibit # 95 [cutting of panties] reiterating the issues that were previously stated and made reference to a breach in the chain of custody of the items. (R-XXI-123)

G      Over Appellant's objections, the trial court admitted State's Exhibits 95, 33, 33A, 33B, 33C and 33D [panties from the sexual assault kit, the vaginal swabs, and smears from the sexual assault kit, and saliva samples of ████ ████ and the blood sample of ████████] (R-XXI-124)

H      The trial court reiterated that certain questions were allowed and others would not be permitted. Specifically, the trial court stated it would not allow in the results of the Houston Crime Lab or any testing that was done by the HPD Crime Lab. (R-XXI-125-127)

000473

EXHIBIT 1 Page 082

I     Over Appellant's objections, the trial court admitted State's Exhibit # 70 - the report from Courtney Head with the Houston Police Department Crime Lab regarding her DNA analysis in this case. (R-XXI-152)

J     State's Exhibits # 76 and 77 [buccal swabs collected from Appellant] were admitted when Appellant commented "no additional objections". (R-XXI-157)

K     State's Exhibit # 92 [DNA statistics] State's Exhibit# 96 [DNA summary on cigar] and State's Exhibit # 97 [DNA summary on vaginal swabs] were all admitted over Appellant's objections.

L     The trial court prevented Appellant from cross examining Head concerning quality control that existed on other things when they ran by the crime lab. (R-XXI-173)

## THE BROMWICH REPORT

Michael R. Bromwich was appointed to conduct an independent investigation of the Houston Police Department Crime Lab and Property Room stemming from the **KHOU** report. A sampling of the comments from the various stages of Mr. Bromwich's investigation is included to acquaint this Court with the problems Appellant sought to introduce before the jury in this trial.

In the Second Report on the HPD Crime Lab, dated May 31, 2005, Bromwich's mandate was to conduct a comprehensive and independent investigation of the crime lab. It was noted that the problems with the HPD Crime lab first surfaced in 2002, based on a **KHOU T.V.** report. Shortly thereafter, profound deficiencies were found in the operations section. As a result, HPD suspended DNA analysis by the crime lab. (R-XXXI-DX2)(R-XVI-21) Bromwich concluded that it is already clear, however, that the circumstances that led to the troubling crisis of confidence in the Crime Lab are complex and deeply rooted in the history of the Crime Lab and HPD as a whole over the past two decades. (R-XXXI-

72

000474

EXHIBIT 1 Page 083

DX2)(R-XVI-21) In the Third Report, dated June 30, 2005, issues were made of the fact that high temperatures and high humidity were problems in the HPD Property Room, and the chain of custody of custody forms are cumbersome and archaic increasing the chances of errors and risk of misplaced evidence. (R-XXXI-DX3)(R-XVI-21) In his Fourth report, dated January 4, 2006, Bromwich stated that **the review of serology and DNA analysis has shown a near total breakdown in the forensic science foundation in those sections for at least a 15 year period from 1987-2002. There was a pervasive pattern involving repeated failures to report results on scientific testing, including results that were exculpatory**; general failure to use appropriate scientific controls to ensure reliability of reported results. (R-XXXI-DX4)(R-XVI-21) In the Fifth Report, there was a disturbing revelation about a Harris County capital murder case. In referencing the capital murder case against Derrick Leon Jackson, the report noted that DNA analysts in many cases tended toward reporting only those results that, from their perspective, were "safe" in the sense that they were consistent with other evidence in the case or with the investigators' expectations. (R-XXXII-DX5)(R-XVI-21) Appellant submits that the existence of this form of "evidence shaping" should have been available for the jury to consider in evaluating the integrity and veracity of the evidence. The Final Report, dated June 13, 2007, included a portion pointing out that contamination of a victim's (DNA) reference sample should have been a pristine single-source, yet the victim's reference sample was contaminated at some point in time in the handling of the sample. (R-XXXII-DX6)(R-XVI-21) These are but a few of the examples uncovered in **Bromwich's Independent Investigation of the HPD Crime Lab.** Additional documentation was offered by Appellant all in support of his Motion to Suppress

73

000475

EXHIBIT 1 Page 084

Evidence, including HPD Internal Affairs Investigations; City of Houston internal complaints and memos. The trial court refused to allow Appellant to use or make reference to any of these matters during trial (CR-III-456)(R-XVII-5,6,14)

## ARGUMENT AND AUTHORITIES

**Rule 611(b) of the Texas Rules of Evidence,** regarding the scope of cross examination, provides that a witness may be cross-examined on any matter relevant to the issue in the case, including credibility. **Rule 611(b)** differs from the federal rule which limits cross examination to the scope of direct examination.

The **Sixth Amendment** guarantees Appellant the right of confrontation and cross examination. **The Fourteenth Amendment** guarantees **Due Process** to the accused.

## LIMITATION OF CROSS EXAMINATION

In the instant case, Appellant was denied a full and fair opportunity to cross examine the State's witnesses on critically important issues pertaining to DNA scientific evidence. Appellant was prohibited from inquiring into the very areas he needed to educate the jury about the validity of the scientific evidence relied upon by the State. Appellant was not permitted to inquire about any matters relating to the HPD Crime Lab, including quality controls or methodology. The Confrontation Clause of the **Sixth Amendment**, applicable to the states by virtue of the **Fourteenth Amendment**, guarantees the right of the accused to be confronted by the witnesses against him. The primary interest secured by the Confrontation Clause is the right of cross examination. **Douglas v. Alabama, 380 U.S. 415 (1965)** Cross examination is the cornerstone of the criminal trial process and, as such, a

74

EXHIBIT 1 Page 085

defendant must be given wide latitude. **Love v. State, 861 SW2d 899 (Tex. Crim. App. 1993)** In the instant case, Appellant was specifically provided with "Brady" material by the State, but then denied the opportunity to use that very information during his cross examination of the State's witnesses. In addition to the denial of his right to confront and cross examine these witnesses, Appellant was denied the opportunity to present a complete and meaningful defense. **Holmes v. South Carolina, 476 U.S. 1 (2006)**

## EXCLUSION OF EXCULPATORY EVIDENCE

The State provided Appellant with a "Brady Notice" which included references to the ***Bromwich Report***. (CR-II-447) Appellant's counsel sought to introduce this exculpatory evidence before the jury, but the trial court denied Appellant's proffer. Before evidence is admissible, it must be relevant. Evidence is relevant within the meaning of **Rule 401 of the Texas Rules of Evidence** if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In determining whether evidence is relevant, courts look to the purpose for offering the evidence and whether there is a direct or logical connection between the offered evidence and the proposition sought to be proved. So long as there is any logical nexus, the evidence will pass the relevancy test. Furthermore, evidence merely tending to affect the probability of the truth or falsity of a fact in issue is logically relevant. Evidence is relevant even if it only provides a small nudge in proving or disproving a fact of consequence to the trial. **Reed v. State, 59 SW3d 278 (Tex. App. - Fort Worth, 2001)**

Appellant was faced with 16 year-old DNA evidence which began its journey into

75

EXHIBIT 1 Page 086

the courtroom at the Houston Police Department Crime Lab and Property Room. Custody of the DNA evidence then went elsewhere (Genetic Design) before returning. The independent investigation of the HPD facilities was documented in **The Bromwich Report** which , along with other documentary evidence, Appellant sought to introduce into evidence as part of his defense. Defense Exhibits 2-9 were excluded from evidence and were never viewed or considered by the jury when it passed on the integrity and validity of the State's DNA evidence used to connect Appellant to this capital murder case. The exclusion of this evidence amounted to a violation of Appellant's right to compel the attendance of witnesses in his favor. **Potier v. State, 68 SW3d 657 (Tex. Crim. App. 2002)**

The trial court erred when it denied Appellant the opportunity to present affirmative exculpatory evidence **[Bromwich Report, etc.]** in support of his defense. Whether rooted directly in the **Due Process Clause of the Fourteenth Amendment** or in the **Compulsory Process or Confrontation Clause of the Sixth Amendment**, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" **Holmes v. South Carolina, 547 U.S. (2006); Ray v. State, 178 SW3d 833 (Tex. Crim. App. 2005)** Appellant submits that he was not afforded these constitutional protections during his trial.

## POINT OF ERROR NUMBER THREE

**THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN APPELLANT'S CONVICTION FOR THE OFFENSE OF CAPITAL MURDER (CR-I-2)(CR-III-484-507)(CR-III-530)**

### STATEMENT OF FACTS

The Statement of Facts appearing at the beginning of this brief, along with those

EXHIBIT 1 Page 087

000478

appearing below, will be used in conjunction with this Point of Error.

Appellant was charged with the offense of capital murder in the death of ██████ ████████ The indictment contained two paragraphs alleging that Appellant, while in the course of committing or attempting to commit the kidnapping of ██████████ intentionally caused the death of ██████████., by: [1] stabbing ████████████ with a deadly weapon, namely a sharp instrument, and [2] an unknown manner and means. (CR-I-2)

The jury charge included a "parties" charge, naming Rogelio Aviles and/or Carmelo Martinez-Santana, as possible actors. (CR-III-484-507) The jury was instructed on the lesser-included offenses of murder and aggravated kidnapping. (CR-III-484-507) Appellant was found guilty of capital murder as charged in the indictment. (CR-III-506)

The State's witnesses contradicted themselves, and each other, concerning significant issues relied upon by the State to secure a conviction for capital murder in this case.

Identity became an issue from the outset when the first responding officer put out a description of two black males. There were no additional comments that the individuals the police would be looking for were Hispanic or from the Carribean. (R-XVIII-55) This issue was compounded when homicide officer C.E. Elliott confirmed that police were looking for two black males, but then tried to explain away the conflict (Appellant is not Black) by claiming that the descriptions were a result of "cultural" differences. (R-XVIII-101) Elliott finally admitted during cross examination that he never put any information in his offense report reflecting about the cultural issue - he did not modify the description of the alleged assailants to include any other race or ethnicity. (R-XVIII-105) Elliott confirmed that ██████

EXHIBIT 1 Page 088

█████ did not get a good look at the individuals she claimed assaulted her and Arturo Rodriguez. (R-XVIII-118) **Sufficiency Issues: The witnesses specifically stated two black males were the perpetrators. Although the police could have given more detailed descriptors in the offense report, they did not - two black males were always the suspects. Arturo Rodriguez told police the man spoke like a black man.**

The truthfulness of █████ was immediately cast into doubt when she lied to responding officers about her drug dealing from her residence. (R-XVIII-166) This fact was obvious the officer Elliott who initially interviewed her about the facts of the case. (R-XVIII-109) Elliott stated he knew █████ was not being truthful with him. (R-XVIII-109) It was only later that █████ would admit that she, and Arturo Rodriguez, made a living selling cocaine. (R-XVIII-143) In fact, █████ later admitted that she knew Arturo Rodriguez (with whom she was having an affair) was involved in cocaine and she became involved in drug dealing with him. (R-XVIII-126,128) █████ acknowledged that her drug dealing took place at their first residence on Winfrey, as well as the Fairway address. (R-XVIII-130) █████ testified that Appellant was a frequent visitor at their apartment (two times a week) and had been there earlier in the day on September 30, 1992. (R-XVIII-138,145,179,184) █████ **knew of no reason why Appellant would be mad at her or Arturo Rodriguez.** (R-XVIII-179) █████ claimed that she saw a second man in the doorway of her bedroom, but she was unable to identify him. (R-XVIII-156) She could not say whether the second man was black, brown or white. (R-XVIII-182) █████ **could not identify who tied her up.** (R-XVIII-153) **Sufficiency Issue:** █████ **lied to the police about her involvement as a drug dealer. Her**

78

EXHIBIT 1 Page 089

claim that Appellant was at her apartment weekly, and earlier on that day, provides an alternate explanation for the presence of the cigar. As noted during final argument, her story about an armed man wearing a mask coming in with a cigar doesn't make sense. Additionally, the presence of spermatozoa, while it may prove sexual contact, doesn't prove sexual assault. The SANE nurse verified that ███ sustained no physical injuries. Although ███ personally knew Appellant, she did not allude to him by description, or otherwise, as her "attacker".

According to officer Elliott, Arturo Rodriguez lied to the police about his drug dealing. (R-XVIII-109) ███ tried to contradict that impression by claiming that he had always told the police that he was involved in drugs. (R-XIX-21,24) Although Rodriguez told the jury the previous day that he had sold drugs for three years, he tried to claim it was only two years when cross examined. (R-XIX-6) Rodriguez then stated that he sold drugs for four years. (R-XIX-6) Rodriguez stated that he and ███ sold drugs just to have a better life. (R-XVIII-198) Rodriguez described his relationship with Appellant as friendly and a business relationship. He said he never had any problems with Appellant. (R-XVIII-201,204) Rodriguez was contradicted by ███ concerning several issues: ███ said her son, ███, was aware of what was taking place, while Rodriguez said ███ was not aware at all. (R-XVIII-155) (R-XVIII-215); ███ admitted the .25 handgun was hers., while Rodriguez tried to claim it may have belonged to the assailants.(R-XVIII-191)(R-XIX-9); ███ claimed that Rodriguez went unconscious, but Rodriguez claimed he had been hit in the head three times and never lost consciousness. (R-XVIII-159)(R-XIX-3). Although ███ testified that Appellant came to their residence during the afternoon of September 30,

EXHIBIT 1 Page 090

1992, Rodriguez denied having seen Appellant earlier that day. (R-XVIII-184)(R-XIX-11) Rodriguez claimed he could not remember if he had an argument that same day at a store with a tall black man and a Hispanic male. (R-XIX-11,12) Rodriguez said he saw the person who was raping his wife, but he did not know who it was. (R-XIX-15) **Sufficiency Issues: This witness lied to the police about being a drug dealer, then tried telling the jury he had been honest with the police and admitted his involvement with drugs. His testimony was contradicted by ███ testimony about how the events allegedly took place. Rodriguez never had a problem with Appellant and did not offer any reason why Appellant would steal drugs or money from them or take ███ or sexually assault ███. He didn't recall seeing Appellant at the apartment earlier in the day as his wife testified. Curiously, when he was asked if Appellant and ███ ever dated, he paused before stating - not that I know of. Recalling that Rodriguez described the intruders as black, it is questionable that he could not remember if he had an argument at a store with a tall black man and a Hispanic male earlier that same day.**

SANE nurse, Gloria Kologinczok, who performed a sexual assault examination on ███, found no evidence of physical injury or trauma to ███. (R-XIX-48) **Sufficiency Issue: No medical verification that a sexual assault occurred.**

HPD officer U.P. Hernandez interviewed Arturo Rodriguez. Hernandez contradicted the earlier testimony from Rodriguez when he claimed he had been honest with police about his drug dealing. (R-XIX-24,72,72) Hernandez acknowledged that this was a huge inconsistency between his testimony and that of ███, who eventually did admit to

80

000482

EXHIBIT 1 Page 091

being a drug dealer. (R-XIX-98)  In fact, Hernandez documented in his offense report that Rodriguez denied being involved with drugs at all. (R-XIX-101)  **Sufficiency Issue: The police found Rodriguez to be untruthful with them during the investigation.**

Dr. Dwayne Wolf, the deputy chief medical examiner for Harris County, Texas, could not state how ███████████ died. (R-XX-20)  Dr. Wolf admitted that he had no medical records establishing ██████ earlier health history.  He could not even say whether ██████ had drowned. (R-XX-20)  Wolf ruled ██████ death a homicide based not on medical findings, but rather the investigator's report of what had allegedly transpired. (R-XX-24,31) The State simply did not establish the cause of death through verifiable medical evidence. **Sufficiency Issue: No proof to establish either of the allegations in the indictment concerning how ███████████ supposedly died.**

Eric Mehl, a retired HPD officer, testified that in 2007, he initiated a "cold case" file in this matter. (R-XX-43)  Mehl testified on direct examination that he never even thought of using DNA technology to solve a crime over at HPD back in 1992. (R-XX-40)  The trial court found that the prosecutor had left the impression with the jury that DNA was not even thought about in 1992 in general, much less this case, and it was submitted to the HPD Crime Lab for analysis. (R-XX-66)  Mehl then admitted that in 1992, HPD did have a crime lab that was processing evidence for DNA.  He further admitted that in this very case, items were submitted to the HPD Crime Lab for processing of DNA. (R-XX-67)  **Sufficiency Issue: Mehl did not offer concrete testimony regarding the previous collection, storage or transportation of the biological evidence relating to the HPD Crime Lab prior to him sending it to Orchid Cellmark.**

81

000483

EXHIBIT 1 Page 092

Angelita Rodriguez, Appellant's ex-wife, testified that when she went to bed on the evening of September 30. 1992, Appellant was at home. She testified he was also home when she woke up the next morning. (R-XX-101,102(R-XX-92) Appellant and Rodriguez had a fight months before and they no longer shared the same bedroom. (R-XX-102) The next morning Appellant told Rodriguez he was leaving her and going to Puerto Rico - never to return to Houston. (R-XX-99) When Rodriguez went after Appellant, she claimed that he simply confessed that he had killed ███████████ (R-XX-107) Incredibly, Rodriguez said she did not remember what else he said. (R-XX-107) Rodriguez conveniently claimed that she was scared when defense investigators approached her in 2012 for an interview - stating that's why she forgot to mention that Appellant had confessed to her. (R-XX-112)

**Sufficiency Issues: Appellant's ex-wife had reason to despise Appellant for his infidelity and for leaving her to go to Puerto Rico. Her specific memory that in 1992 Appellant only confessed to killing ███████████ and nothing more, is questionable at best. She conveniently forgot to tell defense investigators this "fact" when interviewed.**

Carmelo Martinez Santana "Rudy", the cousin of Angelita Rodriguez was serving a seventeen year federal prison sentence in Pennsylvania for drugs and weapons, when he had a visit from the FBI. (R-XX-119) Santana stated that he was not personally aware of a romantic relationship between Appellant and ███████. He testified that Appellant did not hide the fact that he was unfaithful to Santana's cousin [Appellant's wife]. (R-XX-134) Santana claimed that he accompanied Appellant and "Roger" to ██████ apartment where the other two went in wearing masks. (R-XX-143) Santana went on to share details of what Appellant allegedly said when he exited the apartment and got back in the car - claiming that

EXHIBIT 1 Page 093

a young boy accompanied Appellant and Roger. Santana was careful to posture himself as an unwitting passenger while telling the jury he was so upset by what was happening, that he defecated. (R-XX-150) This detail ,which Santana used to exemplify how horrified he was, escaped him when he told his story to FBI Agent Ebersol at the federal prison. (R-XXI-69) Additional impeachment of Santana included his claim that he had never been to Baytown before that night, but was able to provide precise directions how to get there. Santana denied selling drugs in Baytown as well. (R-XXI-37,38) This recollection, along with his remembrance of how many tires blew out on their car when leaving Baytown, was contradicted by the testimony of FBI Agent Ebersol. (R-XXI-69,70,75) Santana's claim that they stayed up all night doing drugs was contradicted again by Agent Ebersol who stated that Santana claimed that when he and Appellant returned to Humble, Appellant went to sleep with Angelita. (R-XXI-40,77) Throughout cross examination, Santana attempted to avoid answering the question about him not being charged with anything as a result of his involvement, by saying he just wanted to tell the truth and that he had no "deal" with the State to give his testimony. (R-XXI-12,15,16) Santana told the jury that he believed that Rogelio was actually the person responsible for killing ███████████ (R-XXI-57) FBI Agent Ebersol would later tell the jury that Santana acknowledged that the boy went off with Rogelio and that he recalled Appellant actually being at the front of the car. (R-XXI-71-74)

**Sufficiency Issues: Serving a seventeen year federal prison sentence, this witness was contradicted by FBI Agent Ebersol on critical points of his testimony against Appellant. He wanted the jury to believe that he had no deal to provide testimony and just wanted**

EXHIBIT 1 Page 094

**to tell the truth. Santana believes Rogelio "Bory" killed ████████. No evidence that Appellant caused the death of ████████**

Linda Hernandez knew Santana "Rudy" through Bienviendo Melo "Charlie". She described how her own mother didn't trust Rudy. She was especially bothered by the fact that Rudy always wanted to take her son to the store with him. She never allowed this to happen. (R-XIX-173) **Sufficiency Issue: Hernandez provides insight into Santana's bad character and his interest in being alone with her young son. This further discredits Santana's testimony.**

The State's DNA evidence offered through Matt Quattaro from Orchid Forensics could not exclude Appellant as a possible contributor to the DNA found on a cigar found at ████████ apartment and as a major contributor to a mixture found on a cutting from a pair of underwear worn by ████ (R-XXI-112-119) Quattaro admitted during cross examination that he had no personal knowledge concerning what, if any, quality controls existed at other labs (HPD Crime lab) where the evidence had been previously stored for over 15 years. (R-XXI-130) He acknowledged that prior to receiving the evidence from the HPD Crime Lab, he did not know how it was collected or how or where it was stored - there were no notations concerning previous quality control, (R-XXI-134,141) Quattaro certainly could not specify that the presence of spermatozoa was a result of consensual sex or assault. (R-XXI-134) Courtney Head (HPD Crime Lab) who served as a "reviewer", testified that Appellant could not be excluded as a contributor on the evidence (cigar, vaginal swab and cutting from the panties) (R-XXI-161,162) On cross examination, Head admitted that she was only a "reviewer" and because she had not performed any testing, her work was not

84

EXHIBIT 1 Page 095

subject to quality control or technical review. (R-XXI-172) **Sufficiency Issues: State did not establish a proper chain of custody of all the biological evidence in this case. Defense evidence was never permitted which would have allowed the jury to consider and decide, what part, if any, the HPD Crime Lab played in this case.**

## INSUFFICIENT EVIDENCE TO PROVE APPELLANT'S GUILT

The jury was instructed that it could not convict appellant of capital murder unless it found each and every element of the offense charged beyond a reasonable doubt and if the State failed to do so, it must acquit the defendant [Appellant]. (CR- III-503)

## ARGUMENT AND AUTHORITIES

**Section 19.03(2) of the Texas Penal Code**, provides that a person commits an offense if the person commits murder as defined under **Section 19.01(b)(1)** and the person intentionally commits the murder in the course of committing or attempting to commit kidnapping. The State is obligated to prove beyond a reasonable doubt that Appellant had the specific intent to cause the death of ███████████

The burden of proof is on the State to establish beyond a reasonable doubt that Appellant committed the offense alleged. **Hightower v. State, 389 SW2d 674 (Tex. Crim. App. 1965); McCullen v. State, 372 SW2d 693 (Tex. Crim. App. 1964)** This burden of proof is on the State to prove each and every element of the offense beyond a reasonable doubt. **Mullaney v. Wilbur, 421 US 684 (1975) In re Winship, 397 US 358 (1970)**

In Texas criminal jurisprudence, the concept of "legal sufficiency" of the evidence is based upon the law of due process. See: **Gollihar v. State, 46 SW3d 243 (Tex. Crim.**

85

EXHIBIT 1 Page 096

000487

App.2001) citing *In re Winship*, 397 U.S. 358, where the court expressed it as follows: We expressly hold that the **Due Process Clause** protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

Sufficiency of the evidence is measured by the standard enunciated by the United States Supreme Court in **Jackson v. Virginia, 443 US 307 (1979)**: whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

In **Brooks v. State, 323 SW3d 893 (Tex .Crim. App. 2010)** this Court held there is no meaningful distinction between a **Clewis v. State, 922 SW2d 126 (Tex. Crim. App. 1996)** factual sufficiency standard and a **Jackson v. Virginia, 443 U.S. 307 (1979)** legal sufficiency standard. This Court announced that the **Jackson v. Virginia** legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. The court noted that it bears emphasizing that a rigorous and proper application of the **Jackson v. Virginia** legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is "barely distinguishable" or indistinguishable from a **Jackson v. Virginia** legal-sufficiency standard). Reversal and acquittal are required under this standard of review, if, after considering all the evidence the jury's finding of guilt is not a rational finding.

In her concurring opinion in **Brooks,** Judge Cochran noted that the **Jackson** Court

000488

EXHIBIT 1 Page 097

stated the correct standard must incorporate the prosecution's burden of proof - beyond a reasonable doubt - in a due-process review. The court noted that a reasonable doubt has often been described as one based on reason which arises from the evidence of lack thereof. A reasonable doubt might arise because the verdict is manifestly against the great weight and preponderance of the credible evidence or because there is nothing more than a mere scintilla of evidence to support some element of the offense. Judge Cochran, cited **Black's Law Dictionary**, which states that legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." Judge Cochran went on to state that in criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a fact finder in concluding that *every element* of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. After giving proper deference to the role of the trier of fact, an appellate court must uphold the verdict unless a rational fact finder must have had a reasonable doubt as to any essential element. **Laster v. State, 275 SW3d at 518, citing Narvaiz v. State, 840 SW2d 415 (Tex. Crim. App. 1992)**

The complete record in this case fails to establish beyond a reasonable doubt that Appellant intentionally and knowingly caused the death of ▮▮▮▮▮▮▮▮▮ as alleged in the indictment. There is no proof in the record to establish that ▮▮▮▮▮▮▮▮▮ came to his death as alleged in the indictment.

In the absence of proof beyond a reasonable doubt that Appellant was responsible for

87

EXHIBIT 1 Page 098

the death of ████████ a conviction for the offense of capital murder cannot withstand appellate review and the entry of a judgment of acquittal by the reviewing court. The evidence offered by the State's witnesses did not enhance the weight or sufficiency of the evidence on this issue. Viewing the evidence in the light most favorable to the verdict, the appellate court determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

An appellate court must always address challenges to the sufficiency of the evidence. **Garza v. State, 715 SW2d 642 (Tex. Crim. App.)** Such a review must be conducted when a legal sufficiency challenge is raised, even if the conviction must be reversed on other grounds, because a finding that the evidence is legally insufficient to support the conviction prevents a retrial under the double jeopardy clause of the **Fifth Amendment. Hudson v. U.S., 522 U.S. 93 (1977)** If this Court finds that the verdict is contrary to the evidence presented at trial, this Court can reverse the conviction and enter a judgment of acquittal. **Texas Code of Criminal Procedure, Art. 44.25; Texas Rules of Appellate procedure 43.2(c).**

Whether viewed individually, or collectively, the issues addressed in this Point of Error require reversal based on legally insufficient evidence. Appellant submits that this result will be reached after the Court conducts a rigorous and proper application of **Jackson** and **Brooks**. The jury's verdict was not based on a rational review of the evidence. **Winn v. State, 871 SW2d 756 (Tex. App. - Corpus Christi 1993)**

Appellant submits that even though a jury is charged with the responsibility of determining the credibility of witnesses and the weight to be given their testimony, in this

000490

EXHIBIT 1 Page 099

case, as a matter of **Due-Process**, this appellate court should find that the verdict is not right or just, and therefore it cannot stand. Appellant submits that when this Court conducts its **Due-Process** review of the sufficiency of the evidence to support the conviction, even when viewing the evidence in the light most favorable to the verdict, it must find that no rational trier of fact could have found the essential elements of the crime of capital murder in this case beyond a reasonable doubt. **Stobaugh v. State, 02-11-00157-CR (Tex. App. - Fort Worth, January 23, 2014)** citing: **Jackson v. Virginia.**

Where the evidence is insufficient to sustain a conviction on appeal, double jeopardy bars a retrial. **Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).**

### POINT OF ERROR NUMBER FOUR

**THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO INTRODUCE EVIDENCE OF AN EXTRANEOUS OFFENSE [POSSESSION OF A CONTROLLED SUBSTANCE] BY PERMITTING THE STATE SHOW THAT APPELLANT FAILED TO APPEAR FOR A COURT SETTING ON OCTOBER 8, 1992 ON AN UNRELATED FELONY CHARGE AND THAT HIS BOND WAS FORFEITED ON THAT CHARGE ALL TO SHOW FLIGHT ON THE PART OF APPELLANT AT HIS CAPITAL MURDER TRIAL EVEN THOUGH THERE WAS NO CHARGE OF CAPITAL MURDER FILED AGAINST APPELLANT UNTIL 2008. (R-XIX-111,113,115,119,122-124,126,128,129,141,142)**

### STATEMENT OF FACTS

During the guilt / innocence phase of the trial, the State sought to introduce evidence showing that on October 8,1992, Appellant failed to appear for a court setting on an unrelated felony drug charge which was pending in the 337th District Court of Harris County, Texas. (R-XIX-105-120) Appellant's bond was forfeited on this unrelated case in the 337th District Court of Harris County, Texas. (R-XIX-111123,124,126)   The State

EXHIBIT 1 Page 100

theorized that this evidence established "flight" on the part of Appellant, and was therefore relevant to Appellant's charge of capital murder. (R-XIX-120)

Appellant objected to the introduction of this extraneous offense as violating **Rule 404(b)**. (R-XIX-119,124,125,126,128,129,141)  Appellant also made a **403** objection that the extraneous offense was not relevant and that any probative value was outweighed by its prejudice to Appellant. (R-XIX-122,124,129)  The trial court found that the proffered evidence constituted an extraneous offense - ***"So, it's still an extraneous offense. I think it is still prejudicial and it was an unproven offense in that it was still only a charged offense. He was not convicted of it or anything."*** (R-XIX-115)  The prosecutor conceded this fact as well - ***"It's clearly an extraneous offense***, *which is what **404(b)** is for, and it creates exceptions outside of character conformity."* (R-XIX-120)

The trial court ordered that the docket sheet be redacted to remove any reference to the actual felony charge pending against Appellant from 1992. (R-XIX- 123,124).  The trial court also ordered that the FBI Agent who was testifying when the documents were admitted, could not mention the existence of a federal flight to avoid prosecution warrant issued after Appellant failed to appear in the 337th District Court on October 8,1992.  The documents admitted for the jury's consideration still contained the printed designation "337th" at the top of the docket sheet. (R-XIX-123,124,126)(SX #36)(R-XXX-42)  Despite the trial court's effort to conceal that fact, the jury, realizing that Appellant's capital murder case was in the 337th District Court, could easily conclude that the offense Appellant bond forfeited on was a felony. (R-XXX-42)(SX #36)  FBI Agent Eric Johnson was then allowed

90

EXHIBIT 1 Page 101

to discuss the contents of State's Exhibit #36 before the jury, explaining that Appellant failed to appear in court on October 8, 1992 to answer an un-related pending drug charge. (R-XIX-141,142)

## ARGUMENT AND AUTHORITIES

**Rule 404(b) of the Texas Rules of Evidence** provides that: "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....." **"Flight"** is not listed in **Rule 404(b)** as an exception to the rule prohibiting the admission of extraneous offenses during the State's case-in-chief.

The State argued that evidence of Appellant's failure to appear for an unrelated drug charge in 1992 was relevant to show "flight" on the part of Appellant regarding the capital murder case on trial. It is critically important to understand the juxtaposition of the 1992 drug charge and the 2008 capital murder charge. When Appellant did not appear in 1992 at his court setting in the 337th District Court (where he was charged with possession of a controlled substance) there were no pending charges against Appellant for capital murder or aggravated kidnapping. When Appellant did not appear in the 337th District Court on October 8, 1992, his bond was forfeited and a new bond was set by the court in the amount of only $10,000.00. (SX # 36)(R-XXX-42). Appellant was not charged with capital murder until September 5,2008. (CR-I-4)

In **Cantrell v. State, 731 SW2d 84 (Tex. Crim. App. 1987)** this Court held that the

EXHIBIT 1 Page 102

forfeiture of an accused's bail bond **may** be proved as **tending to show** flight. (emphasis added) Appellant submits on appeal, as he did in the trial court below, that there is a critical distinction between showing an individual bond-forfeited on the very case he is being tried for, versus showing an individual bond-forfeited on an unrelated charge, especially where the charge for which that person is on trial did not exist at the time of the bond forfeiture - and in fact did not exist until 16 years later [1992 to 2008]. In **Cantrell,** this Court went on to note that the general rule in all English speaking jurisdictions is that an accused person is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The admission of court documents from the 1992 case pending in the 337th District Court clearly constituted evidence of a prohibited extraneous offense.

Extraneous transactions must be analyzed for relevance within the context of the facts and circumstances of the individual case in order to determine admissibility. **Cantrell, citing: Brandley v. State, 691 SW2d 699 (Tex. Crim. App. 1985)** In the instant appeal, Appellant had not been adjudicated on the 1992 drug charge when he went to Puerto Rico. Angelita Rodriguez testified that Appellant left for Puerto Rico shortly after the disappearance of ███████████ - her testimony on this point made evidence of the extraneous offense completely irrelevant. This Court has long held that to support admission of evidence of flight it must appear that the flight has some legal relevance to the offense under prosecution. **Hicks v. State, 199 SW 487 (Tex. Crim. App. 1917)** The reasoning from this Court's opinion in **Damron v. State, 125 SW 396 (Tex. Crim. App.**

92

EXHIBIT 1 Page 103

**1910)** is instructive: Evidence of flight is admissible, where one is charged with an offense, on the ground, in substance that it is some evidence of guilt, and amounts to a quasi admission of guilt of the offense charged.  If, however, the flight is in respect to another and different offense, it ought not be considered as evidence of the guilt of an offense in which there was no flight.  Appellant submits the trial court erred in admitting evidence of the 1992 extraneous offense and bond forfeiture in his capital murder trial.

## POINT OF ERROR NUMBER FIVE

**THE TRAIL COURT ERRED WHEN OVER APPELLANT'S OBJECTION IT ADMITTED THE EXTRANEOUS OFFENSE EVIDENCE [SET FORTH IN THE PREVIOUS POINT OF ERROR] BECAUSE UNDER RULE 403 OF THE TEXAS RULES OF EVIDENCE ITS PROBATIVE VALUE, IF ANY, WAS OUTWEIGHED BY THE PREJUDICIAL EFFECT OF ITS ADMISSION DURING APPELLANT'S CAPITAL MURDER TRIAL.(R-XIX-111,113,115,119,122-124,125,126-128,129,141,142)**

### STATEMENT OF FACTS

The Statement of Facts appearing in the previous Point of Error are re-incorporated for consideration under this Point of error

### ARGUMENT AND AUTHORITIES

**Rule 402 of the Texas Rules of Evidence** provides, in part, that evidence which is not relevant is inadmissible.  **Rule 403** states that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...

The trial court was obviously concerned, and rightfully so, that the admission of the extraneous offense was prejudicial to Appellant.  The trial court, in deciding whether to

93

EXHIBIT 1 Page 104

admit the evidence noted: "Because at this point still we may have testimony from the complainants that he was involved in drugs. We don't have any admission from the defendant that he was involved in drugs. So, it's still an extraneous offense. I think it is still prejudicial and it was an unproven offense in that it was still only a charged offense. He was not convicted of it or anything." (R-XIX-115)   The prejudice to Appellant is underscored by the fact that the State had another witness [Angelita Rodriguez] who could testify that Appellant went Puerto Rico shortly after ███████████ went missing, but without referencing the extraneous offense which the State of Texas fought to have admitted before the jury under the theory that it constituted "flight" by Appellant. (R-XIX-117)

Where an appellant objects based on **Rule 403**, that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice..... the trial court has no discretion as to whether or not to engage in the balancing process. **Mozon v. State, 991 SW2d 841 (Tex. Crim. App. 1999)** Probative value refers to the inherent probative force of an item of evidence - that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation - coupled with the proponent's need for that item of evidence. **Casey v. State, 215 SW3d 870 (Tex. Crim. App. 2007)**  In the instant appeal, the trial court's initial comments regarding the prejudicial effect of the extraneous offense evidence (R-XIX-115) were compounded, not cured, by determining the amount of information the jury learned.  The probative value [which Appellant asserts was non-existent] was clearly outweighed by the admission of the extraneous offense which sought to establish that Appellant left Harris County, Texas shortly after ███████████

000496

EXHIBIT 1 Page 105

went missing - a fact subject to alternative proof not spotlighting an extraneous offense.

Appellant submits that he is entitled to relief under both Points of Error addressing the admission of evidence of an the extraneous offense.

## POINT OF ERROR NUMBER SIX

**THE TRIAL COURT ERRED WHEN IT PROHIBITED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE INCLUDING BIBLE STUDY CERTIFICATES DURING THE PUNISHMENT PHASE OF THE TRIAL THUS PREVENTING APPELLANT FROM PRESENTING A COMPLETE DEFENSE (R-XXVI-55-58)(R-XXXIV-DX48-55)**

## STATEMENT OF FACTS

During the punishment phase of the trial, Appellant sought to introduce Bible certificates he had earned while incarcerated in a Puerto Rican prison. (R-XXVI-55-58)(R-XXXIV-DX48-55)  These certificates were offered as mitigating evidence for the jury's consideration of the Special Issues they were called upon to answer.  The State objected that the Bible certificates constituted hearsay. (R-XXVI-58)  Appellant's counsel urged the trial court to admit the Bible certificates because there was no suggestion that they were not Appellant's certificates and, given that it was the punishment phase of a capital murder trial, the court should view it as a question of weight, not admissibility. (R-XXVI-57)  The trial court found the Bible certificates to be relevant, but excluded them on hearsay grounds. (R-XXVI-58)

## ARGUMENT AND AUTHORITIES

**Article 37.071 of the Texas Code of Criminal Procedure** requires the jury to answer Special Issues at the conclusion of the punishment phase of a capital murder trial where the death penalty is in issue. **Article 37.071** instructs the jury that in deliberating on

95

EXHIBIT 1 Page 106

the issues submitted.......**it shall consider all evidence** admitted at the guilt or innocence stage and the punishment stage, **including evidence of the defendant's background or character** or the circumstances of the offense **that** militates for or **mitigates against the imposition of the death penalty.** Concerning "mitigation", the jury is asked**: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment........be imposed.** The jury is further charged that **it shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.**

In the instant appeal, Appellant sought to introduce mitigating evidence in the form of Bible certificates. **Rule 102 of the Texas Rules of Evidence - Purpose & Construction** states: These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined. Appellant submits that the Bible certificates were admissible under the following Rules: **Rule 803(11) -** the Bible certificates contained facts relating to Appellant's personal or family history maintained by the religious organization providing spiritual guidance to incarcerated individuals ; **Rule 803(13) -** the Bible certificates also provided a statement of fact concerning Appellant's personal or family history even if not "contained" in any particular format. **Rule 803(19) -** Appellant's brother was aware of his brother's

000498

EXHIBIT 1 Page 107

involvement in Bible classes which formed part of Appellant's reputation concerning personal or family history. The Bible certificates could also have been admitted pursuant to **Rule 804(3)** as statements of personal or family history.

The State's hearsay objection should have been overruled. The State would have been free to address the weight and credibility of the Bible certificates before the jury pursuant to **Rule 104(e)** The exclusion of the Bible certificates preventing Appellant from giving meaningful context to the testimony of Angel Meza. Meza was a trustee at the Harris County Jail while Appellant was awaiting trial on this capital murder charge. Appellant would meet with Meza and talk about his Bible. Meza described Appellant as a "Man of God" who tried to help him in every way he could. (R-XXVI-81-85) In the absence of the Bible certificates showing that Appellant was immersed in religious study after 1992, but before being charged with capital murder, the jury had no meaningful way to consider the limited testimony of Meza as a mitigating factor. Appellant submits that the Bible certificates were improperly excluded in violation of the **Eighth and Fourteenth Amendments** by preventing him from presenting mitigation evidence as recognized in **Skipper v. South Carolina, 476 U.S. 1 (1986) The Eighth and Fourteenth Amendments** require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record........that the defendant proffers as a basis for a sentence less than death. **Lockett v. Ohio, 438 U.S. 586 (1978)** Appellant further urges this Court to find that in the instant case the hearsay rule (if found to apply) must yield, because the State had no sufficient basis for doubting the reliability of the hearsay and it

EXHIBIT 1 Page 108

000499

could have aided the jury in its determination of a material issue. **Chambers v. Mississippi, 410 U.S. 284 (1972)** In disallowing the introduction of the Bible certificates, especially in light of Meza's testimony, the trial court violated **Appellant's Sixth Amendment** by not affording him a "meaningful opportunity to present a complete defense". **Holmes v. South Carolina, 547 U.S. 319 (2006)**

### POINT OF ERROR NUMBER SEVEN

**THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT FROM INTRODUCING MITIGATING EVIDENCE THAT HE WAS AN INFORMANT FOR THE FBI, DEA OR INS (R-XXIV-70-74)**

### STATEMENT OF FACTS

The State presented testimony from Agent Juan DeJesus Rodriguez (hereinafter Agent DeJesus) with the Police of Puerto Rico. (R-XXI-44) After testifying about an investigation he conducted which involved Appellant as a suspect in the kidnapping of Andres Buten and ▇▇▇▇. (R-XXIV-46) The details of the investigation are set forth in the Statement of Facts in this Brief.

At the commencement of his cross examination of Agent DeJesus, Appellant's counsel asked the witness about his knowledge of Appellant's role as an informant for the FBI, DEA or INS. (R-XXIV-69) The State objected that the this evidence was irrelevant. (R-XXIV-69) The trial court called the parties to the bench and stated: Does it have to do with the fact that - - - I can see some relevance, but not getting into anything that he is not supposed to get into. (R-XXIV-69) The trial court conducted a hearing into the matter outside the presence of the jury. (R-XXIV-70,71)

000500

EXHIBIT 1 Page 109

| | |
|---|---|
| Mr. C: | Okay. Did you have a conversation with my client after he was in custody wherein he informed you that he was some sort of informant for either the FBI, the DEA, or INS? |
| DeJesus: | Yes. |
| Mr. C: | And did you attempt to confirm whether that was true or not? |
| DeJesus: | Yes. |
| Mr. C: | Were you able to confirm that it was true? |
| DeJesus: | The agents said that he cooperated with the agency, but it was never confirmed in writing. |
| Mr. C: | So, it was confirmed, but you didn't get anything in writing? |
| DeJesus: | Yes. |
| Mr. C: | Was the defendant claiming that he was acting in this capacity when these events occurred for which he got convicted in Puerto Rico? |
| DeJesus: | Yes. |
| Mr. C: | But that was never confirmed to you; is that what you're saying? |
| DeJesus: | No. |
| Mr. C: | Not orally or in writing, or was it confirmed orally but not in writing? |
| DeJesus: | Orally that he had cooperated with them, but not in writing. |
| Mr. C: | Okay. Let me see if I can be certain of this. Orally that he had cooperated - - - strike that. Orally that - - - somebody from the United States government confirmed that he was cooperating with them during the course of these events for which he was arrested and got convicted or just that he cooperated with them in the past? |
| DeJesus: | That he had cooperated previously. |

The State renewed its objection that the testimony was irrelevant hearsay.

000501

EXHIBIT 1 Page 110

The trial court asked: Do you find it mitigating in any way? We're here for punishment. Is that mitigation punishment - - - is that mitigation evidence?

Although the trial court found that the evidence may be relevant to mitigation in some form or fashion in this case, it sustained the State's objection on the basis that the proffered evidence was hearsay. (R-XXIV-71-74)

## ARGUMENT AND AUTHORITIES

In addition to the Argument and Authorities supplied below, Appellant incorporates the Argument and Authorities relied upon in the previous Point of Error for this Court's consideration of this Point of Error pursuant to **Rule 38.1(f) & (i) of the Texas Rules of Appellate Procedure** to avoid duplication and repetition of argument.

**Rule 803(21) of the Texas Rules of Evidence** allows for testimony concerning reputation of a person's character among associates or in the community. This Court has held that discussions with other police officers are sufficient to qualify a witness on reputation. **Turner v. State, 810 SW2d 423 (Tex. Crim. App. 1991) citing: Martin v. State, 449 SW2d 257 (Tex. Crim. App. 1970)** Reputation must at least partially based on a discussion of matters other than the actions or offenses for which the defendant is being tried.

The trial court clearly recognized that Appellant's proffered evidence was mitigating. (R-XXIV-71-74)

Appellant submits that the relationship between fellow law enforcement officials cooperating in an investigation establishes the reliability of the information needed to

EXHIBIT 1 Page 111

overcome any concern the State might have concerning the reliability of that very information.  The confirmation provided to Agent DeJesus in the instant appeal is not the sort of information that would be disseminated to others outside the law enforcement community.  Keeping in mind that this evidence was offered during the punishment phase of Appellant's death penalty trial, the trial court's refusal to admit this evidence was, at the very least, an abuse of discretion.  Appellant submits that prohibiting Agent DeJesus from testifying that he had confirmed Appellant's role as a law enforcement informer violated the **Sixth, Eighth and Fourteenth Amendments** by preventing Appellant from presenting mitigation evidence to the jury tasked with answering the Special Issues presented to it in accordance with **Article 37.071.**  As noted in the preceding Point of Error , Appellant again relies upon the Supreme Court's holdings in **Lockett v. Ohio; Chambers v. Mississippi; and Holmes v. South Carolina** to show he was not afforded a "meaningful opportunity to present a complete defense.

## POINT OF ERROR NUMBER EIGHT

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT INJECTING FACTS OUTSIDE THE RECORD (R-XXIII-80)**

### STATEMENT OF FACTS

During her final summation to the jury, the prosecutor assailed Appellant's defense by claiming that it had only given " half truths" when presenting its case. (R-XXIII-80)

The prosecutor stated: *"I'm responsible for the whole story and you hold me accountable.* ***I will tell you the whole story****.  And I'm not going to leave out and talk about*

EXHIBIT 1 Page 112

000503

*half of what a witness said and not talk about the whole thing, I promise you that. That's*

*my job. **Let me give you another example, another example of half the story. The SANE***

***nurse. She came here and she said: Well, there were no injuries.*** *Wow, that must mean*

*Obel Cruz-Garcia is guilty— is not guilty of capital murder according to the defense*

*attorneys. No. Let's talk about what else the SANE nurse said. And **I want to say she said***

***95% ----- it is a very high percentage– of rape cases that she does SANE nurse***

***examinations on—*** *"* (R-XXIII-80)

Appellant objected that the prosecutor's argument was outside the record. (R-XXIII-80)The trial court overruled Appellant's objection. (R-XXIII-80)

## ARGUMENT AND AUTHORITIES

Permissible jury argument falls into one of four areas. **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000)** The four areas of proper argument are:

1. Summation of the evidence;

2. Reasonable deduction from the evidence;

3. An answer to the argument of opposing counsel; or

4. A plea for law enforcement.

In the instant appeal, the prosecutor's comments fell outside the permissible scope of final argument set out above. The Prosecutor's comments were outside the record and amounted to unsworn testimony being provided to the jury. The testimony of the SANE nurse was critically important to the State's case because she was the individual who began the evidentiary chain of custody of by performing a sexual assault examination on ████

102

000504

EXHIBIT 1 Page 113

█████ The evidence, including all results of testing on items taken by the SANE nurse, were contested throughout trial. The State obviously felt compelled to try and dispel any doubt created by the absence of "injuries" found by the SANE nurse when she examined █████. In asserting that 95% of the SANE examinations do not reveal injuries, the prosecutor misstated the testimony and went outside the record. The SANE nurse actually stated that: "I mean, it doesn't have to be physical injury or bruising or anything to say that there was a sexual assault. I mean, that doesn't mean that there's not going to be some assault. I mean, the crime lab will analyze the evidence that I have collected otherwise." When asked if it was common for her not to find physical injury or trauma in the examinations that she performs, Kologinczok stated that most of the sexual assault exams that she performed didn't find bruising or other injuries. She did not further quantify her response. (R-XIX-49) Appellant submits that the State's comments fell outside the accepted scope of final argument. **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000); Garrison v. State, 528 SW2d 837 (Tex. Crim. App. 1975)**

### POINT OF ERROR NUMBER NINE

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT ASKING THE JURY TO CONVICT APPELLANT OF CAPITAL MURDER AS A PARTY BECAUSE THAT WAS WHAT THE STATE BELIEVED ACTUALLY HAPPENED - THAT APPELLANT DIRECTED AND ENCOURAGED. (R-XXIII-92)**

### STATEMENT OF FACTS

During her continuing summation to the jury, the Prosecutor discussed all the different ways the jury could find Appellant guilty of capital murder as set forth in the

000505

EXHIBIT 1 Page 114

court's jury charge. The Prosecutor then stated that what "we" believe happened is the defendant directed and encouraged. (R-XXIII-92) The trial court overruled Appellant's objection that this argument was improper because it put the beliefs of the prosecutors into the argument. The trial court overruled Appellant's objection and made no further comment to the jury. (R-XXIII-92)

## ARGUMENT AND AUTHORITIES

The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at the trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence. **Stearn v. State, 487 SW2d 734 (Tex. Crim. App. 1972)**

As noted in the preceding Point of Error, to receive the stamp of approval of this Court, jury arguments must be within the four areas set forth in **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000); Campbell v. State, 610 SW2d 754 (Tex. Crim. App. 1980)**

It is not proper for the personal beliefs of the prosecutor (individually or collectively) to be presented to the jury as part of its consideration of the case. A prosecutor may not inject personal opinion of guilt into the jury argument. **Williams v. State, 1989 WL 97549 (Tex. App. [14th Dist.] 1989)** not designated for publication. The State's argument went outside the record and invited the jury to consider and weigh the prosecutor's unique knowledge and evaluation of the evidence in rendering its verdict. Appellant submits that the trial court erred when it failed to sustain Appellant's objection. **Garrison v. State, 528**

000506

EXHIBIT 1 Page 115

SW2d 837 (Tex. Crim. App. 1975)

Unlike **Cannady,** where the trial court gave an instruction to disregard, in the instant appeal the jury was allowed unfettered consideration of the State's argument. **Cannady v. State, 11 SW3d 205 (Tex. Crim. App. 2000)** In the absence of an instruction to disregard the improper argument, the error asserted under this Point of Error was not cured. **Ramson v. State, 920 SW2d 288 (Tex. Crim. App. 1996)**

<div align="center">

**POINT OF ERROR NUMBER TEN**

</div>

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE PROSECUTOR'S IMPROPER ARGUMENT WHICH WAS OUTSIDE THE RECORD AND INJECTED HER PERSONAL BELIEF THAT IF IT HAD BEEN UP TO THE CO-DEFENDANT,█████████ WOULD STILL BE ALIVE (R-XXVI-163-165)**

<div align="center">

**STATEMENT OF FACTS**

</div>

During her punishment summation, the prosecutor argued:

*"Because I will tell you right now, if it were up to Roger alone,* ████ *would still be alive."* (R-XXVI-163,164) Appellant objected that the comments were outside the record and there was no evidence to support it. (R-XXVI-164) The trial court overruled Appellant's objection. (RE-XXVI-164,165)

<div align="center">

**ARGUMENT AND AUTHORITIES**

</div>

As noted in Point of Error Number Eight above, there are four recognized and permissible areas of final argument. Error is found when facts not supported by the record are injected in the argument. Reversal will follow if the complained-of argument is extreme or manifestly improper. **Brown v. State, 270 SW3d 564 (Tex. Crim. App. 2008)** When

<div align="center">

105

</div>

EXHIBIT 1 Page 116

000507

the prosecutor made the factual statement set forth above, she injected evidence outside the record into the jury deliberation process. **In Stearn v. State, 487 SW2d 734 (Tex. Crim. App. 1972)** this Court reversed a conviction when the prosecutor stated in his argument to the jury that "we couldn't bring you all the circumstances surrounding the arrest". In that case, the Court concluded that the jury would logically surmise from the complained of argument that there was inadmissible evidence which, if revealed, would show them other acts committed by the appellant during the arrest that they should know about. Similarly, in the instant case, the prosecutor left the distinct impression that she knew "Roger" never intended to cause the death of ▮▮▮▮▮▮▮▮▮▮ This constituted an improper argument that went outside the record. This punishment phase argument was extreme and manifestly improper requiring reversal.

### POINT OF ERROR NUMBER ELEVEN

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR MISTRIAL BASED UPON THE IMPROPER JURY ARGUMENT OF THE PROSECUTOR WHEN SHE WENT OUTSIDE THE RECORD (R-XXVI-171,172)**

### STATEMENT OF FACTS

Continuing with her punishment summation to the jury, the prosecutor said:

*"What else? They want to minimize the escape attempt. Justin talked to you about that. What do you think happened after he attempted to escape? You think he might have wound up in administrative segregation. I bet he did."* (R-XXVI-171)

Appellant objected this argument was outside the record. (R-XXVI-171,172) When the prosecutor responded that it was invited argument, the trial court sustained Appellant's

EXHIBIT 1 Page 117

objection and admonished the prosecutor to stay within the record. (R-XXVI-172) Appellant asked for an instruction to the jury to disregard the prosecutor's comment. The trial court granted the instruction, but denied Appellant's Motion for Mistrial. (R-XXVI-172)

## ARGUMENT AND AUTHORITIES

Appellant incorporates the Argument and Authorities set forth in the preceding Point of Error in support of this Point of Error again complaining of the State's improper jury argument. The sarcasm inherent in the prosecutor's comment constituted an argument outside the record. While the trial court recognized this fact and admonished the prosecutor, it did not go far enough in providing relief to Appellant. A prosecutor may not use final argument to invite the jury to speculate about matters that are outside of or unsupported by the record. See: **Borjan v. State, 787 SW2d 53 (Tex. Crim. App. 1990)**

## POINT OF ERROR NUMBER TWELVE

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR NEW TRIAL BASED UPON JURY MISCONDUCT DURING THE PUNISHMENT DELIBERATIONS WHERE THE JURY FOREMAN INFLUENCED THE DELIBERATION BY QUOTING FROM HIS BIBLE ABOUT THE CORRECTNESS OF THE DEATH PENALTY THUS CONSTITUTING AN IMPERMISSIBLE OUTSIDE INFLUENCE (CR-III-522,538)**

## STATEMENT OF FACTS

The jury charge at the punishment phase of the trial included the following instructions:

*"During your deliberations upon the "Special Issues", you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor*

107

EXHIBIT 1 Page 118

000509

*mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence."* (CR-III-522)

*"In arriving at the answers to the "Special Issues" submitted, **it will not be proper for you to fix the same by lot, chance, or any other method than by a full, fair and free exchange of the opinion of each individual juror."*** (CR-III-522)

*"You are the exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given to their testimony, but **you are bound to receive the law from the Court which has been given to you and you are bound thereby."*** (CR-III-522)

After the jury began its deliberations at the punishment phase of the trial, the court received a note indicating that one of the jurors needed to speak with the judge. (CR-III-512)  The note stated: ***"May I please speak to judge"***.  The Note  was signed by Angela Bowman and the Foreman of the Jury.  The Clerk's file stamp reflects the date of July 19, 2013 at 3:20 p.m. (CR-III-512)  In response to the note, the trial court summoned the parties to the bench and announced that she would visit with Ms. Bowman in her chambers to find out what Bowman wanted to discuss. (R-XXVII-4)  The court interviewed Ms. Bowman outside the presence of the other jurors.  Bowman expressed her concerns to the court by relating that she was the only juror who could not agree with th questions - that she couldn't answer the same questions with everyone else and that she felt pressured.  Bowman stated that she didn't want to hold the jury up and asked whether she could be replaced by one of the alternates. (R-XXVII-5)  The trial court acknowledged that Bowman's answers were different from the rest of the jury, but indicated to her that her situation didn't qualify for replacing her with an alternate. (R-XXVII-5)  When the court told Bowman she would not

EXHIBIT 1 Page 119

be replaced and would have to continue deliberating with the others, Bowman said she didn't think she would ever come to an agreement - we're never coming to an agreement. (R-XXVII-6) Bowman told the court that she was not in agreement with the other jurors concerning Special Issues 1 & 3. Bowman confirmed that she was the only one with the different opinion. She told the court that she was not changing her stance and neither were the remaining jurors. (R-XXVII-6) The court again told Bowman that she would have to continue deliberating and it could take a pretty long period of time. (R-XXVII-6) Bowman was told that if no verdict was reached that day, she and the other jurors would be staying again that night and the next. (R-XXVII-6) At that juncture, the court made comments to Bowman that the jury is not being asked to vote to give the death penalty or not give the death penalty. When Bowman was told to continue her deliberations, she said didn't want to have to stay another night. The court again told Bowman she had to continue deliberating. (R-XXVII-8)

The Clerk's record reflects that the jury returned its punishment verdict on July 19, 2013 at 4:30 p.m. a little more than one hour after the court received the note from the juror. (CR-III-663) The jury's answers to the Special Issues resulted in the trial court sentencing Appellant to DEATH. Formal sentencing took place on July 22, 2013. (R-XXVIII-4)

On the evening of July 19, 2013 (the same day that the jury returned its punishment verdict) Mario Madrid, one of Appellant's trial attorneys, received a phone call from Angela Bowman - the juror who had expressed her concerns to the trial court judge earlier that day. In an Affidavit provided by Mr. Madrid, he related how Ms. Bowman told him that she was distraught over her decision to capitulate during the punishment phase deliberations by

109

000511

EXHIBIT 1 Page 120

changing her vote from life in prison to the death penalty. Bowman stated that she had been pressured to change her position on the life vs. death decision. She said her decision was especially complicated by virtue of the fact that her daughter was suffering from a fever and she (Bowman) was unable to attend to her because of being sequestered. Bowman went on to complain that the jury Foreman improperly influenced the jury by quoting from his Bible during the decision-making process. Bowman believed the Foreman's introduction of the Bible into the process ended up swaying other jurors toward death rather than life in prison. (CR-III-541,542) Mr. Madrid also provided his professional opinion that a new trial or new trial on punishment was mandated because the death verdict returned in this matter was decided in a manner other than the fair expression of the juror's opinion. Madrid further noted, that in his opinion, the jury had received other evidence in the form of Biblical passages (not evidence admitted at trial) and that this constituted jury misconduct requiring relief. (CR-III-541,542)

On August 19, 2013, Appellant filed a Motion for New Trial. (CR-III-538)  The Motion for New Trial included the Affidavits of Mario Madrid [referenced above] and private investigator, J.J. Gradoni who interviewed Angela Bowman as well as jury Foreman, Matthew Clinger. Gradoni's Affidavit noted that when speaking with the Foreman, Clinger readily admitted that he had read Romans 13, Genesis 9 and from Deuteronomy while other jurors were present.  When Gradoni asked Clinger if he felt that his Bible verses changed a juror's vote, Clinger responded that he thought the Bible verses were contributing factors. (CR-III-554) Angela Bowman's Affidavit included in the Motion for New Trial, reaffirmed that her punishment vote was not her true and honest verdict. (CR-III-555) Bowman stated

000512

EXHIBIT 1 Page 121

that Clinger's use of his Bible did influence other jurors. She explained how exasperated she became over her inability to know the current status of her daughter's health - concerned that she might have had pneumonia. Bowman noted that as soon as she left court, she took her daughter to the emergency room. Ultimately, Bowman said she was unduly pressured by other members of the jury to change her vote because she was taking too long and holding up the process and wasting their time. Bowman stated that her verdict was not a true and honest expression of her belief in the evidence supporting the special issues that called for the death penalty. She believed that jury misconduct deprived Appellant of a fair and impartial trial.

After the Motion for New Trial was filed, Appellant requested a live hearing to present live testimony in support of his Motion for New Trial. (CR-III-580)(R-XXIX-3) The trial court denied Appellant's request for a live hearing. (CR-III-584)(R-XXIX-3-4) The State of Texas opposed Appellant's Motion for New Trial. (CR-III-585) In compliance with the trial court's prior ruling, Appellant filed Affidavits in support of his Motion for New Trial and Supplement to his Motion for New Trial. (CR-III-602) The affidavits submitted by Appellant included: 1). A certified copy of Mario Madrid's Affidavit; 2). A certified copy of the first affidavit from J.J. Gradoni; 3). A certified copy of Angela Bowman's affidavit; and 4) A second affidavit from J.J. Gradoni with a transcript of his interview of jury Foreman, Matthew Clinger, accompanied by the compact disc [CD] of that interview. (CR-III-603)

The trial court conducted a hearing (restricted to affidavits) on Appellant's Motion for New Trial and Supplement to the Motion for New Trial. (R-XXIX-3-33)

000513

EXHIBIT 1 Page 122

During the hearing, the court admitted the State's affidavits in opposition to Appellant's request for a new trial. (R-XXIX-16,28) (R-XXXV) (SX#1 & 2)  When Appellant sought to introduce affidavits in support of his Motion for New Trial, the trial court admitted the affidavits of Mario Madrid (Def #1); J.J. Gradoni (Def # 2) and Angela Bowman (Def # 3) (R-XXIX-26) The second affidavit of J.J. Gradoni (Def # 4) which included the authenticated transcript of Gradoni's entire taped interview of jury foreman, Matthew Clinger, was not admitted. (R-XXIX-26)  This exhibit (Def # 4) is before this Court on the Bill of Exception made in the trial court below.(R-XXIX-26-32)  Appellant urges this Court to review and compare the sworn affidavit of Matthew Clinger prepared on behalf of the State (R-XXXV/SX#2) with the content of his recorded statement give to investigator, J.J. Gradoni. (R-XXXV/Def # 4) Clinger's written affidavit asserting he did not read his Bible out loud and the Bible did not influence other jurors, appears to be contradicted by his own words beginning  on page 22 of the transcript of that interview:

MC:     Yeah, but I had my Bible there too. I had it in my overnight bag.
JJ:     So did you read the Bible or did you quote it from memory?
MC:     No, I read it.
JJ:     Read it from the Bible?
MC:     Yeah
JJ:     Did it offend anybody?
MC:     Uh, no one said that, no.
MC:     And as I..I kind of qualified it by saying, you know, I'm not trying...as I said, Im not trying to be offensive. I just think, I think this will be helpful to Casey [referring to Casey Guillotte] and so, I just want to share it.
JJ:     So, after you read that was Casey able to say death?
MC:     Uh, after I read that she was able to move, that was, we were finishing up talking about the first question and she was able to move on from the first question. Uh, we still talked about a lot more stuff throughout the course of the day, but she was able to move on...
JJ:     No, no, that helped her to move on to question number two?

112

EXHIBIT 1 Page 123

000514

MC:   Correct. (Page 22)

CK:   And the people were listening, I guess, when you were saying this, and did it help them to understand? You think it made a difference to them?

MC:   It made a difference to Casey. I don't know if it made a difference with anyone else.

CK:   Did it make a difference to you?

MC:   Uh, it felt good to be able to kind of share what I had, you know, what I had researched and spent time processing. I, I had already, that was a path I'd been down a number of times already (Page 23)

JJ:   So, but in your opinion, Cas, it is Casey?

MC:    Casey.

JJ:   Casey was able to come to peace with the first question after the scriptures?

MC:   Not just that, I mean, there were probably nine of the twelve that shared something during that time. And she, it was not just the scriptures. (Page 27)

As J.J. Gradoni is finishing his conversation with Matthew Clinger, the following concern is expressed by Clinger:

MC:   Alright, thank ya'll. Pleasure to meet you. Just curious if, I mean was the, you asked me about the scripture thing (unintelligible) Was that a problem at all of just kind of a...? (Page 33)

The trial court denied Appellant's Motion for New Trial. (CR-III-665)(R-XXIX-31-33)

## ARGUMENT AND AUTHORITIES

**Rule 21.3 of the Texas Rules of Evidence** provides that a defendant must be granted a new trial, or a new trial on punishment, for any of the following reasons:

**Rule 21.3(c)** - when the verdict has been decided by lot or in any manner other than the fair expression of the juror's opinion;

**Rule 21.3(f)** - when, after retiring to deliberate, the jury has received other evidence; when a juror has talked with anyone about the case.

113

EXHIBIT 1 Page 124

000515

**Rule 21.3(h)** - when the verdict is contrary to the law and evidence.

**Rule 21.7 of the Texas Rules of Appellate Procedure** states that the court may receive evidence by affidavit or otherwise.

**Rule 606(b) of the Texas Rules of Evidence** provides that upon inquiry into the validity of a verdict.....a juror may not testify as to any matter or statement occurrinbg during the jury's deliberation........However, a juror may testify: (1) whether an outside influence was improperly brought to bear upon any juror.

## FAILURE TO PROVIDE A LIVE WITNESS HEARING

This court has held that it would not apply a *per se* rule that a trial court must hear live testimony whenever there is a factual dispute in affidavits and a party asks for testimony. **Holden v. State, 201 SW3d 761 (Tex. Crim. App. 2006)** However, this court has also held that a trial court abuses its discretion in failing to hold a hearing when a defendant presents a motion for new trial raising matters not determinable from the record. **Reyes v. State, 849 SW2d 812 (Tex. Crim. App. 1993 )** In the instant appeal, a juror came forward during guilt / innocence deliberations to notify the court of problems inside the jury room.   In response, the trial court focused on the need for the jury to continue its deliberations - sending Ms. Bowman back into the jury room.  Appellant submits that this "early warning signal" should have prompted the trial court to hold a live hearing on Appellant's Motion for New Trial to determine the cause of the problems Ms. Bowman tried to express to the court.  The trial court abused its discretion in failing to provide a full and complete "live" hearing to Appellant so that all the issues raised in the Motion for New Trial

EXHIBIT 1 Page 125

could be addressed through the testimony of live witnesses subject to contemporaneous cross examination. **Reyes v. State, 849 SW2d 812 (Tex. Crim. App. 1993)**

On numerous occasions, Appellant requested a live hearing to decide the merits of his Motion for New Trial. The trial court denied Appellant's requests, instead Ordering that Appellant and the State of Texas prepare affidavits to be submitted to the court for its consideration of the Motion for New Trial. (R-XXIX-4,6) Appellant's investigator, J.J. Gradoni. Conducted post-trial interviews with the jurors. Ms. Bowman, who came forward to speak with the trial judge during guilt/innocence deliberations, provided an affidavit. Jury Foreman, Matthew Clinger had a lengthy recorded conversation with Mr. Gradoni. During the interview, Clinger was asked whether he felt that his Bible verses changed a juror's vote. Clinger responded that he thought the Bible verses were contributing factors. (CR-III-554) When Mr. Gradoni subsequently contacted Mr. Clinger to obtain a sworn affidavit from him in accordance with his interview, Clinger told Gradoni that his corporate counsel advised him against signing an affidavit, but to appear live in front of the court. (R-XXIX-8)

Appellant objected to the court's failure to provide Appellant with a live hearing on his Motion for New Trial at which witnesses would testify under oath as violating his **Sixth Amendment** right to confrontation. (R-XXIX-9) Appellant also objected that he was denied **Due Process** when the jury ignored the trial court's instructions set out above. (R-XXIX-9) The trial court erred and abused its discretion in failing to provide a full and complete hearing on Appellant's Motion for New Trial. **McQuarrie v. State, 380 SW3d 145 (Tex.**

000517

EXHIBIT 1 Page 126

**Crim. App. 2012)** Appellant submits that in the interest of justice, this Court should abate the appeal and order the trial court to conduct a supplemental hearing at which sworn testimony from in-person witnesses would be received and made part of this record.

## OUTSIDE INFLUENCE IMPROPERLY BROUGHT TO BEAR ON JURY

A review of the documentation in support of Appellant's Motion for New Trial supports a finding that an outside influence was introduced before the jury when the foreman shared Bible scripture with the jury during punishment deliberations.

In **Oliver v. Quarterman, 541 F3d 329 (C.A. 5th Cir.)** The court noted that the **Sixth Amendment** forbids a jury from being exposed to external influences during its deliberations. In **Oliver**, the court held that the jury's consultation of Bible passages was external influence on the jury's deliberation. In the instant appeal, the trial court was presented with more than adequate evidence to establish that an outside influence [Bible scripture] during the jury's deliberation. (R-XXIX-3-33)(R-XXXV) In **Colyer v. State, 428 SW3d 117 (Tex. Crim. App. 2014)** this Court defined the permissible areas of inquiry pursuant to **Rule 606(b) of the Texas Rules of Evidence**. The Court reaffirmed that juror testimony regarding an outside influence was a proper area for post-trial consideration by the court. Appellant sought to further develop his complaint at a Motion for New Trial, but was prevented from doing so when the trial court both limited the hearing to affidavits and refused to admit the affidavit of J.J. Gradoni along with the un-edited tape recording of his interview of jury foreman, Matthew Clinger. (See original CD presented on Appellant's Bill of Exception)(R-XXXV) The evidence developed against a defendant shall come from the

000518

EXHIBIT 1 Page 127

witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation and cross examination.  The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the integrity of all that is embraced in the constitutional concept of trial by jury.  **Oliver, citing: Parker v. Gladden, 385 US 363 (1966) and Turner v. Louisiana, 379 US 466 (1965)**  The Supreme Court has held that in a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. **Remmer v. US, 347 US 227 (1954)**  A juror is exposed to an external influence when the juror reads information not admitted into evidence, such as....prejudicial statements from others. This issue has even been addressed in a sister state when the Supreme Court of Tennessee found a constitutional error when the jury foreman buttressed his argument for imposition of the death penalty by reading to the jury selected Bible passages. See: **State v. Harrington, 627 SE2d 345 (Tenn. 1981)**

## PRAYER FOR RELIEF

Appellant prays this Court will review each Point of Error raised herein and grant him relief as follows: Appellant prays the Court set aside the jury's verdict on the charge of capital murder and enter a judgment of acquittal . In the alternative, without waiving the foregoing prayer for relief, Appellant prays the Court enter an Order remanding this case to the trial court for a new trial.  Further in the alternative, without waiving any of the foregoing prayers for relief, Appellant prays the Court enter an Order remanding this case to the trial court for a new trial on the issue of punishment.  Without waiving the foregoing,

000519

EXHIBIT 1 Page 128

Appellant prays this Court remand this case to the trial court for a new hearing on Appellant's Motion for New Trial with instructions to receive live testimony.

Respectfully submitted,

Wayne T. Hill
SBOT: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77027
Phone: (713) 623-8312
Fax:    (713) 626-0182
Email: wthlaw@aol.com

## CERTIFICATE OF COMPLIANCE

This Brief is in compliance with Rule 9.4(2)(a) & (3) of the Texas Rules of Appellate Procedure. The total word count shown in the computer program used to prepare this document is 35,103..

Wayne T. Hill

## CERTIFICATE OF SERVICE

On this 12TH day of September, a true and correct copy of this Brief was mailed to the Harris County District Attorney's Office - Appellate Division, 1201 Franklin, 6th Floor, Houston, Texas 77027.

Wayne T. Hill

118

EXHIBIT 1 Page 129

000520

13847940101C / Court: 337

# EXHIBIT 2



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,025

**OBEL CRUZ-GARCIA, Appellant**

v.

**THE STATE OF TEXAS**

## ON DIRECT APPEAL
## FROM CAUSE NO. 1384794 IN THE 337th DISTRICT COURT
## HARRIS COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, JOHNSON, KEASLER, ALCALA, RICHARDSON and YEARY, JJ., joined. HERVEY and NEWELL, JJ., concurred.

In June 2013, appellant was convicted of capital murder and sentenced to death.[1]  Direct

---

[1] TEX. PENAL CODE § 19.03(a)(2); TEX. CODE CRIM. PROC. art. 37.071.  Unless otherwise indicated, all future references to articles refer to the Code of Criminal Procedure.

EXHIBIT 2 Page 001

CRUZ–GARCIA–2

appeal to this Court is automatic.[2]  Appellant raises twelve points of error.  Finding no reversible

error, we affirm the conviction and sentence.

## I. Background

On September 30, 1992, two masked intruders broke into an apartment shared by Arturo

Rodriguez, Diana Garcia, and Diana Garcia's six-year-old son, ███████.  Diana was

awakened by a loud sound coming from her living room.  Her husband, Arturo, walked toward the

sound but was quickly met by a large male wearing a mask and pointing a gun at him.  Both Diana

and Arturo testified that this man spoke to them, but neither could understand him because he spoke

in an unknown accent.  Additionally, they both described the man as "black" or dark-complexioned.

When the initial responding officer made his report about this case, he described Diana's and

Arturo's assailants as "black" but testified at trial that he meant "black Hispanics."

The masked man instructed Diana to turn face down on her bed and then began beating

Arturo.  After Diana complied with the instruction to lie face down, a second man entered the room

holding a gun, and one of the intruders tied up Diana.  Arturo was tied up with the cord from his

alarm clock, a rag was put in his mouth, and he was beaten on his head with a gun while he knelt by

his bed.  At this point, █████ who had been sleeping on a pallet by the bed, began crying out for

Diana.

The second intruder then started touching Diana on her buttocks, turned her over so that she

was lying on her back, and put a blanket over her face.  The second intruder removed Diana's panties

and sexually assaulted her.  Diana testified that the assailant ejaculated during the sexual assault.

Arturo testified that he saw an unknown male sexually assaulting his wife before the other assailant

---

[2]  Art. 37.071, § 2(h).

EXHIBIT 2 Page 002

CRUZ-GARCIA--3

placed a pillowcase over his head. All the while, ▆▆▆▆ was present in the room and crying.

Once the sexual assault ended, the two men ransacked the bedroom and then left. Arturo testified that his passport and a bracelet were missing after the incident. After the men left, Diana got up and untied Arturo's hands. Diana and Arturo then noticed that ▆▆▆▆ was missing and walked into their living room to look for him. Upon entering their living room, they saw the first, tall, masked intruder returning to the apartment. When Diana and Arturo saw this man, they turned and walked back into their bedroom, and the masked man turned and left the apartment.

After both intruders left, Diana and Arturo left their apartment and began looking for ▆▆▆▆ They called out his name at their own apartment complex and across the street but received no response. At some point, Diana's neighbor called 911. Houston Police Department ("HPD") responded to a 911 call claiming that a child had been kidnapped from Diana and Arturo's apartment. Upon arriving, officers found Arturo injured and Diana distraught. An inspection of the apartment revealed the bedroom to be in disarray, with drawers pulled out of dressers and items of clothing strewn about. Officers found a cigar in the living room, although at trial both Diana and Arturo testified that neither one of them smoked.

Police officers interviewed Diana and Arturo on-scene and asked them whether they sold drugs. Both were untruthful. Diana was transported to a hospital for a sexual assault examination. A Sexual Assault Nurse Examiner (SANE), Gloria Kologinczok, testified that she performed a sexual assault examination on Diana Garcia during the early morning hours of October 1 and produced a sexual assault kit containing evidence from Diana.

On October 1, 1992, police interviewed Diana at the police station, and she came clean about her and Arturo's drug dealing. She also told police that appellant was her drug supplier until

EXHIBIT 2 Page 003

000524

CRUZ–GARCIA–4

recently, when she and Arturo had told appellant that they no longer wanted to sell drugs for him.

Officer U.P. Hernandez interviewed both Diana and Arturo. Arturo testified that, when he spoke to

police, he never lied about his drug dealing, but Officer Hernandez testified to the contrary.

During their investigation, officers also met with or interviewed Leonardo German (friend

of Diana and Arturo), Rogelio Rendon, Carmelo Martinez Santana[3] (also known as "Rudy;" friend

of appellant), and Angelita Rodriguez (appellant's wife).

At trial, Diana and Arturo both testified about their relationship with appellant. Arturo and

Diana sold cocaine for appellant for several years when all three lived in Houston. They also

associated socially with appellant and his wife, Angelita, on several occasions. Arturo testified that

he considered his relationship with appellant to be a friendly one, and Diana testified that Angelita

was her friend. A few months prior to ███████ kidnapping, Arturo and Diana told appellant they

no longer wanted to sell drugs for him, and Arturo testified that this upset appellant.

Angelita also testified about her relationship with appellant. Her cousin, Rudy, was good

friends with appellant, and the three of them moved to Houston from Puerto Rico around the same

time in 1989. Angelita and appellant shared an apartment in Humble, a suburb of Houston. Angelita

testified that appellant smoked both cigarettes and cigars and that he owned a gold Oldsmobile and

a blue Thunderbird. Angelita met Diana and Arturo through appellant because of appellant's drug

dealing.

Angelita learned of ███████ disappearance on the news on the afternoon of October 1.

Upon hearing of his disappearance, she immediately approached appellant in their apartment and told

---

[3] Several witnesses are referred to throughout the record by their nicknames. We will do the same.

EXHIBIT 2 Page 004

000525

CRUZ-GARCIA--5

him that ███ had gone missing. Angelita told appellant she wanted to go see Diana and Arturo, but he refused to go with her. Angelita testified that appellant seemed calm and "normal" upon hearing the news that ███ had disappeared, despite the fact that Diana and Arturo were their friends and their child had gone missing. Appellant then told Angelita that he was leaving Houston for Puerto Rico immediately and began to pack his bags.

Angelita testified that, due to his sudden departure from Houston, appellant missed a scheduled court date. He had never missed one prior to that. After appellant left for Puerto Rico, Angelita could not afford to continue paying rent in their Humble apartment, so she moved to a hotel in Pasadena. Some time later, Angelita went to the Dominican Republic, where appellant was then living, to ask him for a divorce. Appellant refused. Angelita then asked him about ███ and appellant confessed to her that he had killed him.

Rudy, Angelita's cousin, testified that he met appellant when they were both living in Puerto Rico, prior to their initial move to Houston. Both are originally from the Dominican Republic. Rudy and appellant moved to Houston to sell drugs in the late 1980s, and Angelita followed them shortly thereafter. Rudy and appellant worked together selling drugs until Rudy's drug addiction became too severe for him to continue dealing. At that point, appellant took over the operation. Rudy testified that appellant was a violent, angry, and controlling person. Once when appellant thought Rudy was stealing drug customers from him, he assaulted Rudy and threatened to kill him.

Rudy testified that appellant owned three cars: a blue Chevrolet, a blue Thunderbird, and a gold Oldsmobile. Appellant routinely lent the Oldsmobile to Bienviendo Melo (also known as "Charlie"). On September 30, appellant drove his blue Chevrolet to Diana and Arturo's apartment to collect his drugs and money. Rudy and Rogelio Aviles (also known as "Roger") went with him.

EXHIBIT 2 Page 005

Case 4:14-cv-03621 Document 14-2 Filed on 09/04/19 in TXSD Page 6 of 58

CRUZ-GARCIA--6

Rudy described Roger as tall, strongly built, and dark-complexioned. Appellant parked his car behind Diana and Arturo's apartment complex and instructed Rudy to sit in the passenger seat while he and Roger went inside. Appellant took a .45 caliber pistol with him, Roger carried a knife, and both appellant and Roger wore black stocking masks.

Approximately thirty minutes after appellant and Roger left the car, appellant came back with a child in his arms. Rudy recognized the child as ▮▮▮▮▮▮. When Rudy asked why appellant was carrying ▮▮▮▮ appellant responded, "He saw me."

Rudy tried to persuade appellant to retrieve Diana to care for ▮▮▮▮ Appellant left the car for the apartment again, leaving ▮▮▮▮ with Rudy, but returned with Roger instead of Diana. When appellant returned, he told Rudy to sit in the back seat with ▮▮▮▮ Appellant maintained a grip on his gun while he drove Rudy, ▮▮▮▮ and Roger to Baytown. Appellant stopped the car not far into Baytown, and all three men exited the car. Rudy testified that by this time he was very scared and had grown convinced appellant was going to kill ▮▮▮▮

Appellant told Roger, "You already know what you have to do." Rudy testified that he walked away from the two other men and then became ill, defecating nearby. As Rudy was walking away, he heard ▮▮▮▮ scream. Rudy returned to the car where he saw ▮▮▮▮ with blood on his chest. Appellant ordered Rudy and Roger to put ▮▮▮▮'s body in the backseat, and they complied.

Appellant drove them to another location in Baytown near a waterway and ordered Rudy and Roger to put ▮▮▮▮ body in the water. The two men once again complied. Rudy and Roger piled rocks on top of ▮▮▮▮ body to make it sink. Rudy testified that appellant had his gun with him the entire time. The three men then left Baytown and drove to Pasadena. On their way there, several of their tires blew out.

EXHIBIT 2 Page 006

000527

CRUZ-GARCIA–7

They managed to make it to a hotel where appellant made Rudy and Roger swear they would never tell what had happened to ▇▇▇▇ At the hotel, the men attempted to make other transportation arrangements by calling Charlie. Appellant, Rudy, and Roger eventually went to Charlie's apartment in a taxi, where they retrieved appellant's car. There, Rudy saw Charlie and his girlfriend, Linda.

Linda also testified about appellant's phone call to Charlie. In the early morning hours of October 1, 1992, Linda and Charlie were staying together at Linda's mother's house when they received several phone calls from appellant. Linda and Charlie were both familiar with appellant because Charlie sold drugs for appellant. Linda described appellant as controlling.

When Charlie finally answered the phone around 2:00 a.m., appellant asked Charlie to pick him up. Charlie declined. Approximately thirty minutes later, appellant and Rudy appeared at Charlie's house to borrow a car. Linda testified that, while Rudy appeared nervous, appellant did not. After October 1, 1992, Linda never saw appellant again. Prior to that date, appellant visited Linda and Charlie's residence several times a week.

Later in the day on October 1, Rudy and appellant took appellant's blue Chevrolet to Rendon's Garage to have the tires changed. At this time, appellant told Rudy that appellant was leaving Houston. Rudy helped appellant wash ▇▇▇▇ blood and vomit from the interior of the car. Appellant then sold the car and used the money to buy a plane ticket to Puerto Rico. Rudy drove appellant to the airport the following day, October 2, 1992, and he did not see appellant again until they both returned to Houston for appellant's capital murder trial.

Agent William Ebersole testified that he interviewed Rudy while Rudy was in a federal prison in Pennsylvania. Agent Ebersole obtained a statement from Rudy about what happened the

EXHIBIT 2 Page 007

CRUZ-GARCIA--8

night of September 30, 1992, and about appellant's involvement in ███████ murder.

On cross-examination of both Rudy and Agent Ebersole, defense counsel highlighted inconsistencies between Rudy's trial testimony and the statement he gave to Agent Ebersole while imprisoned. Rudy omitted from his story to Agent Ebersole any reference to him defecating while ███████ was being killed. Rudy told Agent Ebersole that he was familiar with the Baytown area because he had sold drugs there prior to September 30, 1992, but Rudy denied this at trial. Rudy told Agent Ebersole that Roger took ███████ to the rear of the driver's side of the car and that is where he killed him while appellant stood near the front of the car, but this did not exactly comport with Rudy's trial testimony.

While Rudy testified at trial that appellant threatened him and ordered him not to tell anyone what the three of them did to ███████ Agent Ebersole's notes reflected that the three merely made a pact to keep their secret. Additionally, Rudy's recollection of how long appellant and Roger were in Diana and Arturo's apartment and how many tires blew out on their car once they left Baytown was inconsistent with the recollection given to Agent Ebersole.

During their investigation into ███████ kidnapping, local police officials learned that Diana and Arturo had rented an apartment in Humble for appellant and his wife. When HPD officers went to that apartment to look for appellant on October 5, 1992, they found it vacated. Additionally, officers learned that, prior to it being vacated, the apartment had been occupied by two "black-Hispanic males" and one light-skinned Hispanic female.

One of the men who had occupied the Humble apartment had been seen wearing a shirt from Rendon's Garage with the name Luis on it. Upon learning this, officers went to Rendon's Garage where they met with Juanita Rendon, the wife of the owner, Rogelio Rendon. Rogelio was initially

EXHIBIT 2 Page 008

unavailable to speak with officers. Officer Hernandez returned to the garage and observed Rogelio driving up in a blue Thunderbird. Rogelio was accompanied by a man who identified himself as Candido Lebron. While Officer Hernandez was speaking with Rogelio, Angelita and Rudy came to the garage to claim the blue Thunderbird.

The next day, on October 6, HPD received a tip that a Hispanic male was seen at the Humble apartment. HPD officers returned to the apartment, knocked on the door, and were met by an individual who again identified himself as Candido Lebron. They later learned his true name was Rogelio Aviles (also known as "Roger," the third adult male with appellant and Rudy on the night of September 30, 1992). HPD officers continued to look for appellant in Houston and surrounding cities but were unable to locate him.

FBI Agent Eric Johnson testified that he became involved in the current case in 1992 because it involved the kidnapping of a child under the age of twelve. The FBI worked in conjunction with local authorities in an attempt to locate ███████ Appellant was a suspect early on in the FBI's investigation. During his investigation, Agent Johnson learned that on October 8, 1992, appellant was set to appear in a Harris County district court on an unrelated felony drug case.

Agent Johnson testified from court documents that reflected that appellant was scheduled to appear in court on October 8, 1992, that appellant failed to appear in court on that date, and that his bond was subsequently forfeited for this failure to appear.

On the afternoon of November 4, 1992, a fisherman walking the banks of Goose Creek in Baytown discovered ███████ body. Because of a cold front that had blown through the area, eight to ten feet of beach that was normally submerged was exposed; this is where ███████ body was found. Baytown Police Corporal Randy Rhodes was dispatched to the waterway.

EXHIBIT 2 Page 009

CRUZ-GARCIA–10

Upon arriving, he observed the skeletal remains of a small child on the sandy part of the beach. The skeleton was mostly intact, but the skull had disconnected from the torso, and some rib bones and vertebrae had been disturbed. From the same area, officers also recovered a pair of shorts with a Batman logo and a t-shirt. Diana testified that ███ had been wearing Batman pajamas on the night he was kidnapped.

An autopsy was performed on ███ remains in 1992 by Dr. Vladimir Parungao. Dr. Parungao was no longer employed by the Harris County Institute of Forensic Sciences at the time of trial, so Harris County Deputy Chief Medical Examiner, Dr. Dwayne Wolf, testified at trial. After reviewing photographs and ███ autopsy report, Dr. Wolf testified that ███ manner of death was homicide and that his body appeared in a state that was consistent with it having been submerged for several weeks. The fact that ███ was abducted, that his body was found in an advanced state of decomposition, and that his body was found many miles from his home all contributed to Dr. Wolf's opinion that ███ was murdered.

Dr. Wolf also examined the clothing found near ███ body and testified that any blood that may have been on the clothing would have washed away after the clothing was submerged in water. On cross-examination, Dr. Wolf confirmed that he did not find any injuries to any of ███ bones and that he could not rule out drowning as a cause of death.

DNA evidence was also presented at trial. Sergeant Eric Mehl worked in the cold case division of HPD in 2007 when this case was reopened. As part of his investigation, Sergeant Mehl submitted several pieces of evidence to a private forensics lab called Orchid Cellmark[4] for DNA testing. Sergeant Mehl sent the cigar that was collected from the crime scene, Diana's sexual assault

---

[4] Orchid Cellmark was called "Cellmark Forensics" at the time of trial.

EXHIBIT 2 Page 010

kit, and a cutting from the pair of panties Diana was wearing the night of her sexual assault. The cutting from Diana's panties was a cutting from the crotch area. From that cutting, Orchid Cellmark cut away a small piece on which they performed their testing. Orchid Cellmark developed an unidentified male DNA profile from these pieces of evidence.

Matt Quartaro, a supervisor of forensics at Orchid Cellmark, testified about the DNA testing his lab performed after it received evidence from Sergeant Mehl. After testing the cigar, Orchid Cellmark was able to generate a full DNA profile of an unknown male. This profile was compared to the profiles of Diana and Arturo, but it did not match either of them.

Orchid Cellmark also tested vaginal swabs from the sexual assault kit. The vaginal swabs contained a mixture of epithelial cells and sperm cells. The epithelial cells belonged to Diana, and the sperm cells belonged to more than one male individual. Arturo could not be excluded as a contributor to the sperm-cell fraction from the vaginal swab. Additionally, the unknown male whose DNA was found on the cigar could not be excluded as a contributor to the sperm-cell fraction from the vaginal swab.

When Orchid Cellmark tested the portion of the panties they had received, they once again found Diana's epithelial cells and a sperm-cell fraction with more than one contributor. The unknown male from the cigar DNA sample could not be excluded as a major contributor to the sperm sample in the panties. Additionally, Arturo could not be excluded as a contributor to that sperm sample.

Later, in December 2007, Orchid Cellmark received DNA samples from Roger, Charlie, Leonardo German, and Rudy to compare to the DNA profiles they had obtained from the cigar, sexual assault kit, and panties. Roger, Charlie, and Leonardo were all excluded as contributors to

EXHIBIT 2 Page011

CRUZ-GARCIA–12

any of the DNA evidence found on the cigar, sexual assault kit, and panties.

The first sample received from Rudy was not sufficient to compare to the DNA profiles Orchid Cellmark had obtained. In June of 2011, Orchid Cellmark received a second DNA sample from Rudy and at that time was able to exclude him as a contributor to any of the DNA on the evidence that Orchid Cellmark tested.

In early 2008, Sergeant Mehl learned that appellant was in Puerto Rico. Sergeant Mehl, working in conjunction with the FBI in Puerto Rico, obtained a DNA sample from appellant on May 23, 2008. He then sent that DNA sample to Orchid Cellmark. On May 28, 2008, Orchid Cellmark received a sample of appellant's DNA. The sample arrived in a sealed envelope with appellant's name written on it.

Appellant's DNA matched the profile that had been obtained from the cigar found in Diana and Arturo's apartment in September of 1992. Additionally, appellant's DNA could not be excluded as a contributor to the unknown male profile found on the vaginal swabs from Diana's sexual assault kit. Lastly, appellant's DNA matched the unknown male profile that was the major contributor to the DNA in the sperm-cell fraction from Diana's panties.

Quartaro also discussed the quality-control procedures in place at Orchid Cellmark to prevent contamination of the evidence they receive and the profiles they obtain. Quartaro acknowledged that Orchid Cellmark cannot implement or monitor quality-control procedures at other labs. But on redirect, Quartaro testified that none of the evidence that he received appeared to be contaminated. All the evidence appeared to be in good condition; it was packaged separately to prevent cross-contamination, and all containers were sealed. Quartaro also testified that it would be impossible to contaminate a sample in such a way that appellant's DNA would appear on that sample unless the

EXHIBIT 2 Page012

CRUZ-GARCIA–13

contaminator had some of appellant's DNA.

Moreover, Quartaro testified that cross-contamination between the cigar and the sexual assault kit or panties was not possible because appellant's epithelial cells were found on the cigar, while appellant's sperm cells were found on the swabs from the sexual assault kit and the panties. Additionally, no epithelial cells belonging to appellant were found in the samples from the sexual assault kit or panties.

The Houston Police Department Crime Lab was also involved in DNA analysis in the instant case. Courtney Head, an analyst from the crime lab, testified that in February 2010 she received a known DNA sample from appellant. This sample was collected separately from the sample collected and sent to Orchid Cellmark in 2008. From this sample, Head performed her own DNA extraction to create a DNA profile. She then compared that profile to the profiles obtained by Orchid Cellmark from the cigar, the sexual assault kit, and the panties.

Appellant could not be excluded as a contributor to the male DNA profile found on the cigar and the vaginal swabs from the sexual assault kit. Additionally, appellant could not be excluded as the major contributor to a male DNA profile in the sperm-cell fraction obtained from Diana's panties. Head testified that, to a reasonable degree of scientific certainty, appellant was the source of the DNA profile on the cigar and the panties.

Pursuant to his cold case investigation, Sergeant Mehl interviewed Diana, Arturo, Linda Hernandez, and Angelita Rodriguez. A Spanish-speaking officer interviewed Rudy. Sergeant Mehl attempted to locate Charlie for an interview but was unable to find him. At the conclusion of his investigation, Sergeant Mehl filed charges against appellant. Appellant was later tried and convicted of capital murder and sentenced to death.

EXHIBIT 2 Page013

CRUZ-GARCIA–14

## II. Guilt

### A. Sufficiency of the Evidence

In his third point of error, appellant challenges the sufficiency of the evidence to support his conviction for capital murder. Appellant highlights the following areas in which he claims the evidence is insufficient: Rudy's credibility and motive to testify, Diana's and Arturo's descriptions of their intruders, Diana's and Arturo's dishonesty about their drug dealing, Angelita's potential ulterior motive to testify against appellant, whether a sexual assault or consensual sexual encounter occurred, the chain of custody for the forensic evidence, and ███████ cause of death. We review these complaints specifically, in addition to reviewing the totality of the evidence supporting appellant's conviction.

This Court does not engage in a factual-sufficiency review. Instead, we engage only in the legal-sufficiency review enunciated in *Jackson v. Virginia*.[5] In so doing, we review the entire record in the light most favorable to the verdict to determine whether any rational fact-finder could have found the elements of the offense beyond a reasonable doubt.[6] If a rational fact-finder could have so found, the verdict will not be disturbed on appeal.[7]

Here, appellant was convicted of capital murder, having intentionally or knowingly caused

---

[5] *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). *See also Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (holding that the relevant inquiry for appellate courts reviewing the sufficiency of the evidence to support a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original)).

[6] *Jackson*, 443 U.S. at 319.

[7] *See id.* at 319 (upholding conviction where evidence was legally sufficient). *See Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013) (affirming judgment because evidence was legally sufficient to support a conviction).

EXHIBIT 2 Page014

CRUZ-GARCIA–15

the death of another during the course of committing a kidnapping.[8] Circumstantial evidence is just as probative as direct evidence in establishing guilt.[9] Every piece of circumstantial evidence need not point directly to appellant's guilt.[10] Instead, we examine the cumulative effect of all the evidence when determining whether such evidence is sufficient to sustain a conviction.[11]

Further, we permit juries to draw reasonable inferences from the facts they are presented, so long as their inferences are supported by the evidence adduced at trial.[12] After a thorough review of the record, we conclude that the evidence is sufficient to support appellant's conviction.

*1. Appellant's Specific Sufficiency Complaints*

The jury heard testimony from twenty witnesses, including Diana Garcia, Arturo Rodriguez, and Rudy. Although appellant attacks the credibility of these three witnesses in particular, all credibility determinations are solely within the province of the jury.[13] The jury is the sole judge of credibility and of the weight to be attached to the testimony of witnesses.[14]

The jury was free to believe Rudy's account of September 30, 1992, at trial and disregard any inconsistencies with previously-made statements. Rudy's testimony presented compelling evidence of appellant's direct involvement in the kidnapping and killing of ███ Rudy's testimony about

---

[8] *See* TEX. PENAL CODE § 19.03(a)(2).

[9] *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[10] *Hooper*, 214 S.W.3d at 13.

[11] *Id.*

[12] *Temple*, 390 S.W.3d at 360; *Hooper*, 214 S.W.3d at 15.

[13] *Temple*, 390 S.W.3d at 363.

[14] *Id.* at 360.

EXHIBIT 2 Page015

000536

CRUZ-GARCIA–16

the events of September 30, 1992, was corroborated by Diana's and Arturo's accounts that two

masked men entered their apartment and left with their child and by the location where ▮▮▮▮▮▮▮

body was discovered. Appellant also highlights the fact that Rudy was in federal prison when he was

first approached by law enforcement officers during their cold case investigation into ▮▮▮▮▮▮ death.

This fact goes to Rudy's credibility, a determination left to the jury.

Additionally, the jury was free to find credible Diana's and Arturo's testimony, despite

evidence of previous dishonesty or inconsistent testimony about the disclosure of their drug dealing.

Diana testified that two masked men broke into her apartment, that one sexually assaulted her, and

that when they left, her child was gone. Diana's testimony was corroborated by Rudy's testimony

that appellant and Roger, while wearing masks, went to Diana and Arturo's apartment to retrieve

their drugs and money and left that apartment with ▮▮▮▮▮▮

Further, Diana's claim that she was sexually assaulted on the night in question is

corroborated by the DNA results from the evidence in her sexual assault kit. Diana testified that she

and appellant had never had a consensual sexual relationship, yet appellant's DNA was found in

sperm from vaginal swabs obtained the night that Diana claims she was sexually assaulted.

Appellant also complains that the evidence is insufficient to support his conviction because

of the descriptions Diana and Arturo gave the police of their intruders. Diana, Arturo, and various

police officers testified that Diana and Arturo both described their intruders as "black." Appellant

is not African-American and therefore contests the applicability of this description to him.

At trial, however, numerous witnesses testified that Mexican Hispanics routinely use the

descriptor "black" to describe dark-complexioned Hispanics who are not from Mexico. The jury was

free to believe this explanation and could reasonably infer from the testimony they heard that Diana

EXHIBIT 2 Page016

000537

CRUZ-GARCIA–17

and Arturo were describing dark-complexioned Hispanic males, not African-American males.

Appellant also contests Angelita's motive to testify and claims her testimony was untrustworthy. But Angelita's credibility was for the jury alone to decide. Angelita testified that appellant was a drug dealer who sold drugs to Diana and Arturo. On October 1, 1992, the night after ▉▉▉ was abducted, appellant abruptly told Angelita he was moving back to Puerto Rico and expressed no concern over ▉▉▉s abduction, despite appellant's friendship with Diana and Arturo. Angelita's testimony as to appellant's flight presented circumstantial evidence of appellant's guilt, and the jury was free to believe that testimony and draw reasonable inferences regarding appellant's guilt therefrom.

Appellant complains that there was insufficient evidence of the chain of custody of the forensic evidence admitted by the State. Absent a showing of tampering, discrepancies in the chain of custody go to the weight to be given a piece of evidence, not its admissibility.[15] The jury is the sole decider of the weight to be given a piece of evidence.

Here, the jury heard testimony that the forensic evidence at issue was stored in sealed plastic bags. Quartaro testified that, when he received the evidence for testing, he observed no signs of tampering or contamination. The jury was free to lend credence to Quartaro's examination of the evidence and the state it was in based on his training and experience and disregard implications from defense counsel that the evidence had been compromised.

Lastly, appellant complains of insufficient evidence to support a determination that ▉▉▉ was murdered. But the jury heard evidence from Dr. Wolf, the Deputy Chief Medical Examiner in Harris County, that, based on all the circumstances surrounding the case, he believed ▉▉▉ death

---

[15] *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

EXHIBIT 2 Page017

CRUZ-GARCIA–18

to be a homicide. Dr. Wolf's testimony, combined with the circumstances surrounding ████

kidnapping and the discovery of his body, was sufficient for a rational juror to determine that ████

had been murdered. The jury was free to believe Dr. Wolf's testimony and disregard evidence to the

contrary.

Appellant also alludes to an argument that there was insufficient evidence for a fact-finder

to determine ████ came to his death "as alleged in the indictment." But here, the State alleged

two separate manner and means for how ████ died: first, that ████ was stabbed to death, and

second, that ████ died by unknown means. Rudy's testimony provided sufficient evidence, if

believed, that ████ was stabbed to death. Dr. Wolf's testimony provided sufficient evidence, if

believed, that at the very least, ████ was murdered, even if the particular manner and means were

unknown.

It was within the purview of the jury to lend credence to the testimony of Rudy and Dr. Wolf

about how ████ died. Viewing the evidence in the light most favorable to the verdict, there was

sufficient evidence to support the jury's verdict that ████ died at the behest of appellant, in a

manner alleged in the indictment.

*2. Other Evidence Supporting Appellant's Conviction*

Beyond appellant's specific sufficiency complaints, we hold that there is sufficient evidence

in the record for a rational trier of fact to find every element of capital murder beyond a reasonable

doubt. Appellant knew Diana and Arturo through his drug business. When Diana and Arturo

withdrew from appellant's drug business, appellant became upset with them. Shortly thereafter, two

dark-complexioned males broke into Diana and Arturo's apartment on the night of September 30,

1992, and assaulted Arturo and sexually assaulted Diana. A sexual assault examination was

EXHIBIT 2 Page018

000539

performed on Diana that very night and a sexual assault kit was created with the biological material collected. Subsequent DNA testing revealed that that evidence contained sperm from appellant.

Rudy testified that he saw appellant carry ███████ from Diana and Arturo's apartment to their car on the night of September 30, 1992. Appellant then drove to a remote area of Baytown where he ordered Roger to kill ███████ Rudy saw ███████ body lifeless and covered in blood immediately after this order and helped Roger dispose of the body in a nearby waterway while appellant looked on.

One day later, on October 1, 1992, appellant told his wife, Angelita, that he was leaving Houston to return to Puerto Rico. Angelita testified that this trip was sudden and unplanned. Appellant cleaned out the interior of the car he had been driving on September 30, sold the car, and used the proceeds to purchase a plane ticket to Puerto Rico. The next time Angelita saw appellant was in the Dominican Republic, when he confessed to her that he had killed ███████

Appellant was scheduled to appear in a Harris County district court on October 8, 1992, on a pending drug case. Appellant failed to appear on that date and subsequently forfeited his bond. Appellant had been present at every court setting prior to the October 8 setting. In November 1992, ███████ body was found in a waterway in Baytown, and Rudy testified that he and Roger had left ███████ body in a Baytown waterway a month prior. We conclude that the evidence is sufficient to support appellant's conviction for capital murder. Appellant's third point of error is overruled.

*B. Motion to Suppress*

In his first point of error, appellant contends that the trial court denied him due process when it denied his motion to suppress DNA and other forensic evidence that had been stored by the "old" Houston Police Department Crime Lab ("old HPD crime lab"). We review a trial court's ruling on

EXHIBIT 2 Page019

000540

CRUZ-GARCIA–20

a motion to suppress under a bifurcated standard of review.[16] We afford almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that turn on the evaluation of credibility and demeanor.[17] Questions of law and mixed questions of law and fact not turning on credibility are reviewed de novo.[18] We will not disturb the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case.[19]

At the hearing on appellant's motion to suppress, appellant argued against the admission of forensic evidence that had been stored by the old HPD crime lab. Specifically, the pieces of evidence to which appellant objected were (1) a cigar found at the crime scene, (2) a sexual assault kit performed on Diana Garcia on the morning after ██████ was kidnapped, and (3) a cutting from the pair of panties Diana wore the night of the instant offense.

Appellant also argued against the admission of results from DNA testing performed on the cigar, sexual assault kit, and panties, despite the fact that the proffered test results were not generated by the old HPD crime lab. In support of his motion, appellant argued that the mere fact that the forensic evidence at issue had been stored by HPD, and subsequent to that storage the old HPD crime lab was shut down because of quality-control problems, provided sufficient indicia that the evidence had been contaminated and was therefore untrustworthy to put before a jury.

The State countered with testimony from three witnesses. First, Eric Mehl, a retired police sergeant, testified that he had worked on appellant's case as a member of the cold case squad in the

---

[16] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[17] *Id.*

[18] *Id.*

[19] *State v. Ross*, 32 S.W.3d 853, 855-56. (Tex. Crim. App. 2000).

EXHIBIT 2 Page020

000541

CRUZ-GARCIA–21

homicide division of the Houston Police Department. Pursuant to that role, in October 2007, Sergeant Mehl obtained the cigar and sexual assault kit that had been collected as evidence in 1992. At the time it was retrieved, the cigar was being stored in the HPD property room on Goliad Street. The sexual assault kit was being stored in the property room annex on the 24th floor on Travis Street. Both the cigar and the sexual assault kit were sealed in separate plastic bags. Sergeant Mehl testified that both pieces of evidence appeared to be in good condition and neither appeared to have been damaged.

On October 2, 2007, Sergeant Mehl shipped the cigar and sexual assault kit to Orchid Cellmark, a private forensics lab that contracted with HPD, for testing. Subsequently, Sergeant Mehl obtained the cutting of the crotch from the panties that had belonged to Diana, a biological sample from Diana, and a biological sample from Arturo, that had all been stored in the crime lab. Each piece of evidence was stored separately in its own sealed plastic bag. Additionally, Sergeant Mehl obtained stored blood samples of various known associates of appellant.

On May 23, 2008, Sergeant Mehl received a sample of appellant's DNA after Mehl's colleague, Sergeant Stephens, informed Mehl that appellant was in custody in Puerto Rico. An FBI agent in Puerto Rico obtained appellant's DNA sample and sent that sample to Sergeant Mehl. Sergeant Mehl did not open the package containing appellant's DNA sample but instead repackaged it and shipped it to Orchid Cellmark for comparison with the evidence already in its possession.[20]

At the time Sergeant Mehl sent appellant's DNA sample to Orchid Cellmark, Orchid

---

[20] While the record is clear that Sergeant Mehl sent the cigar and sexual assault kit to Orchid Cellmark on October 2, 2007, the record is unclear as to when Sergeant Mehl sent the panties and the known DNA samples from Diana, Arturo, and appellant's associates. Sergeant Mehl testified only that, by the time he obtained appellant's DNA sample from Puerto Rico (May 23, 2008), he had already sent "all of the original evidence that might contain biological material" to Orchid Cellmark.

EXHIBIT 2 Page021

Case 4:17-cv-03621 Document 18-2 Filed on 09/05/19 in TXSD Page 22 of 38

CRUZ-GARCIA–22

Cellmark already had all the original evidence that potentially contained biological material. Later, Sergeant Mehl received the results of Orchid Cellmark's testing and comparison. After learning of Orchid Cellmark's results, Sergeant Mehl arrested appellant for capital murder.

Second, the State called Matt Quartaro, a supervisor at Orchid Cellmark. Quartaro testified to his qualifications and to the procedures he employs when he analyzes DNA evidence. Orchid Cellmark received evidence connected to appellant's case on October 3, 2007. The evidence arrived in a sealed box. Within the box were several manilla envelopes and within those envelopes were sealed plastic bags, each containing an individual piece of evidence. Quartaro testified that nothing appeared to have been tampered with or contaminated.

Ultimately, Orchid Cellmark took possession of the cigar, the sexual assault kit, Diana's panties, DNA extractions that had already been performed on several pieces of evidence, and the known DNA samples from ██████ family and appellant's associates. Instead of relying on the existing DNA extractions it received, that were generated by the old HPD crime lab, Orchid Cellmark performed its own DNA extractions and analyses on the panties, the cigar, and the vaginal swabs from the sexual assault kit.

An unknown male DNA profile was found on the cigar. That DNA profile could not be excluded as a contributor to an unknown male DNA profile from sperm found on a vaginal swab in the sexual assault kit. Additionally, an unknown male DNA profile was discovered on the panties that was consistent with the unknown male DNA profile found on the cigar and the vaginal swab.

The DNA on the cigar was single-source; only one individual's DNA was present. The vaginal swab contained Diana's epithelial cells, Arturo's DNA in the form of sperm cells, and an unknown male contributor's DNA, also in the form of sperm cells. This unknown male profile

EXHIBIT 2 Page022

CRUZ-GARCIA–23

matched the profile obtained from the cigar. Diana's epithelial cells were also found on her panties along with sperm from two contributors. The major contributor to the sperm-cell fraction in the panties matched the unknown male DNA profile found on the cigar. Arturo, Diana's husband, could not be excluded as the minor contributor to the sperm-cell fraction in the panties.

On May 28, 2008, Orchid Cellmark received a sample of appellant's DNA. From that sample, it obtained a full DNA profile for appellant, which matched the DNA profile found on the cigar and the major contributor profile obtained from the sperm-cell fraction of the panties. Appellant could not be excluded as a contributor to the sperm-cell fraction from the vaginal swabs in the sexual assault kit. Orchid Cellmark eliminated as contributors all of appellant's associates for whom they had known DNA samples.

On the topic of contamination, Quartaro testified that without a sample of appellant's DNA in the crime lab where the evidence at issue was stored, it would be difficult to contaminate the evidence with appellant's DNA. Put another way, it is highly unlikely under existing circumstances that appellant's DNA would appear on the evidence at issue if he did not put it there himself. Quartaro also quelled fears regarding cross-contamination between the cigar and the panties or sexual assault kit because the cells containing appellant's DNA on the cigar were saliva and skin cells, while the cells on the panties and vaginal swabs were sperm cells.

Finally, Quartaro noted that contamination from excess moisture, heat, or other environmental factors would manifest itself as a degradation of the biological sample found on a particular piece of evidence. Such contamination would not result in the manifestation of an otherwise-absent DNA profile.

Third, the State called Courtney Head, a criminalist specialist with the "new" Houston Police

EXHIBIT 2 Page023

000544

Department crime lab ("new HPD crime lab").[21]  Head testified to her qualifications as a DNA analyst and then testified about the involvement of Genetic Design Lab in the instant case.  Genetic Design Lab is an independent, California-based lab that received DNA extractions from evidence in appellant's case in the 1990s.  Head testified that her notes indicated that in 1992 the old HPD crime lab extracted DNA from evidentiary samples and sent those extractions to Genetic Design Lab for testing.  There is no indication that any pieces of actual evidence, as opposed to mere extractions, were sent to Genetic Design Lab.

Head also testified to analyses she performed at the new HPD crime lab.  After receiving a buccal swab from appellant, Head extracted appellant's DNA and obtained his DNA profile.  Head then compared that profile to the profiles that had been generated by Orchid Cellmark from the cigar, the panties, and the vaginal swab.  According to Head's tests, appellant could not be excluded as the contributor to the DNA on the cigar, appellant could not be excluded as the contributor to the major DNA profile on the panties, and appellant could not be excluded as a contributor to the DNA found on the vaginal swab in the sexual assault kit.

Appellant cross-examined all three of the State's witnesses, focusing on the time each piece of evidence spent at the old HPD crime lab.  Appellant also emphasized the fact that some of the evidence at issue had even been tested by the old HPD crime lab when it first reached the lab in 1992, including one of the vaginal swabs from the sexual assault kit.  Appellant argued to the trial court that the evidence was contaminated as a result of the time it spent at the old HPD crime lab.

Absent evidence of tampering, allegations or questions regarding the care and custody of a

---

[21]  Some years after the closure of the old HPD Crime Lab, HPD opened a new crime lab.

EXHIBIT 2 Page024

Case 4:17-cv-03621 Document 13-2 Filed on 07/25/19 in TXSD Page 250 of 531

piece of evidence go to the weight to be given that evidence, not its admissibility.[22] Here, the only evidence appellant put forth regarding contamination of the evidence is the fact that it was stored by the old HPD crime lab. Although appellant offered evidence challenging the reliability of the old HPD crime lab as a whole, he offered no evidence that the particular evidence at issue in the instant case had been tampered with or contaminated. In response to appellant's claims, the State introduced testimony to support the reliability of the evidence at issue.

The trial court made oral findings of fact on the record.[23] The court found Mehl, Quartaro, and Head to be credible witnesses, qualified to testify in their areas of expertise. The trial court then recited findings of fact adopting the testimony of the State's witnesses as it is summarized above. The court explicitly found that there was no indication that any of the evidence at issue in appellant's case had been contaminated or mishandled during the time it was stored by the old HPD crime lab.

Ultimately, the court ruled the cigar, sexual assault kit, and panties admissible as reliable and relevant evidence. The court determined that the results of the DNA tests performed by Orchid Cellmark on the cigar, sexual assault kit, and panties were also admissible as reliable and relevant evidence. Lastly, the court ruled that the DNA comparison performed by Head at the new HPD crime lab was admissible.

The record supports the trial court's conclusion that the DNA evidence was reliable. The trial court heard evidence about how and where each piece of evidence at issue was stored. Quartaro and Sergeant Mehl both testified that the evidence appeared to have been stored appropriately,

---

[22] *Lagrone*, 942 S.W.2d at 617.

[23] *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (stating that findings of fact rendered after a ruling on a motion to suppress can be in written form or stated orally on the record).

EXHIBIT 2 Page025

Case 4:17-cv-03621 Document 13-2 Filed on 07/05/19 in TXSD Page 26 of 30

CRUZ-GARCIA–26

separated and sealed in individual containers. Additionally, the trial court found that the locations

where the evidence in this case was stored were not the locations described as being deficient in any

of the reports critical of the old HPD crime lab.

The record also supports the trial court's conclusion that the DNA evidence was relevant.

Evidence is relevant if it makes any fact of consequence more or less probable than it would be

without the evidence.[24] Here, the DNA evidence makes appellant's presence at Diana and Arturo's

apartment the night ███████ was kidnapped more probable.

Because we defer to the trial court's factual determinations so long as those determinations

are supported by the record, we will not disturb the trial court's findings on appeal. The trial court

did not abuse its discretion in admitting the forensic evidence, and appellant's due process rights

have not been violated. Appellant's first point of error is overruled.

In his second point of error, appellant contends that the trial court erred when it limited his

ability to present a defense by excluding evidence critical of the old HPD crime lab and limiting his

cross-examination of witnesses with respect to testimony critical of the old HPD crime lab. We will

address each complaint in turn.

Although defense exhibits 2-9 were offered into evidence at the motion-to-suppress hearing,

they were not the subject of the defense's motion to suppress. Instead, they were offered in support

of the defense's motion to suppress, and the trial court included a ruling on their admissibility at trial

in its findings of fact. Because the trial court's ruling on defense exhibits 2-9 was an evidentiary

ruling, separate from its ruling on the defense's motion to suppress the State's evidence, we review

---

[24] Tex. R. Evid. 401 (West 2014). We cite to the version of the Rules of Evidence that was in effect at the time of appellant's trial. Although the Rules of Evidence have been amended, effective April 1, 2015, we note no substantive changes to the rules pertinent to this case.

EXHIBIT 2 Page026

the denial of exhibits 2-9 for an abuse of discretion only.[25]

First, appellant complains of the trial court's exclusion of defense exhibits 2-9 as a violation of his right to compel the attendance of witnesses in his favor and a limitation on his ability to present a defense. Absent an abuse of discretion, a trial court's evidentiary ruling will not be disturbed on appeal.[26] A trial court abuses its discretion only if its ruling lies outside the zone of reasonable disagreement.[27]

Defense exhibits 2-9 were offered at the hearing on the motion to suppress the State's DNA evidence. At that hearing, the trial court ruled that defense exhibits 2-9 were inadmissible at trial. Defense exhibits 2-7 consisted of a report termed the "Bromwich Report." The Bromwich Report was initiated in response to the closure of the old HPD crime lab in 2003 and heavily criticized the lab in the areas of quality assurance, internal auditing, training, and standard operating procedure.

The trial court determined that nothing in the Bromwich Report related to the specific evidence being offered by the State and, as such, was irrelevant under Rule 401 and inadmissible under Rule 402. Alternatively, the court held that, even if some portions were relevant, the probative value substantially outweighed the danger of unfair prejudice, confusion of the issues, and the misleading of the jury under Rule 403.

Defense exhibits 8 and 9 consisted of misconduct reports and criminal histories for three former HPD crime lab employees, J. Chu, B. Sharma, and D. Wallace, who dealt with the forensic

-------------------------------------------------

[25] *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) ("An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse-of-discretion standard of review."); *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999).

[26] *Weatherred*, 15 S.W.3d at 542.

[27] *Id.*

EXHIBIT 2 Page027

evidence offered by the State when it was first collected and sent to HPD in 1992. None of these employees were called to testify in appellant's trial. Additionally, none of the results of tests performed by any old HPD crime lab employees were offered into evidence. That being true, the trial court determined that evidence concerning any misconduct on the part of Chu, Sharma, or Wallace was irrelevant under Rule 401 and inadmissible under Rules 402, 403, 404, 608, and 609.

Evidence is relevant only if it tends to make a fact of consequence more or less probable than it would be without the evidence.[28] Based on the fact that none of the old HPD crime lab employees were called to testify for the State, coupled with the fact that results from the tests each performed were not offered into evidence, it was not outside the zone of reasonable disagreement to determine that evidence regarding these witnesses was irrelevant. Additionally, because these exhibits did not comprise the entire substance of appellant's defense, we cannot say that their exclusion prevented him from presenting a defense.[29] Finding support in the record for the trial court's ruling, we hold that the trial court did not abuse its discretion in refusing to admit defense exhibits 2-9.

Appellant also complains in his second point of error that the trial court erred when it limited his cross-examination as it related to the State's DNA evidence and the old HPD crime lab. Specifically, appellant complains that his cross-examination of Sergeant Mehl, FBI Agent Griselle Guzman, Matt Quartaro, and Courtney Head was impermissibly limited. Appellant's claim in this Court is grounded in the Confrontation Clause of the Sixth Amendment. As a threshold matter, the State asserts that appellant has not preserved a confrontation objection for review. A party must object in the trial court, and obtain a ruling on his objection, before he can present his complaint for

---

[28] TEX. R. EVID. 401 (West 2014).

[29] *See infra* Part III.A.

EXHIBIT 2 Page028

CRUZ-GARCIA–29

appellate review.[30]  Because appellant did not object in the trial court on Confrontation Clause grounds, he has not preserved that claim for review in this Court.

At the hearing on the motion to suppress, the trial court ruled that appellant would not be permitted to go into the Bromwich Report, the closure of the old HPD crime lab, the reasons for that closure, or the misconduct of former HPD crime lab employees who were not going to testify.  The trial court explicitly stated it would allow cross-examination on the issues of where the evidence was stored, whether those locations were proper, to whom the evidence was taken, and whether the storage conditions were proper for reducing or preventing contamination.

At trial, on direct examination, Sergeant Mehl testified that law enforcement officers did not consider the presence of DNA as evidence when they investigated crimes in 1992, the year of the instant offense.  In order to correct the impression that DNA evidence and analysis was not utilized by law enforcement in 1992, the trial court permitted appellant to cross-examine Sergeant Mehl on the fact that the existence of DNA testing was known by police agencies in 1992 and that some of the evidence relevant to the case at bar had been submitted to the old HPD crime lab for DNA analysis.

Prior to beginning his cross-examination, defense counsel attempted to re-urge his objection to the trial court's ruling at the hearing on his motion to suppress limiting his cross-examination on the topics of the Bromwich Report and the old HPD crime lab's closure.  Specifically, defense counsel stated:

[Defense counsel]: Yes, Your Honor. You know I want to go into all that other stuff?

[The court]: I understand that.

--------------------------------------------------------

[30] TEX. R. APP. P. 33.1.

EXHIBIT 2 Page029

000550

[Defense counsel]: Just so my record is clear, I'm not withdrawing my attempt to go into it. I'm just–

[The court]: I'm not allowing you to go into the other stuff. Genetic Design, any of the HPD crime lab studies or anything that's contained in that study or anything about its closure. Okay?

[Defense counsel]: Yes ma'am.

Appellant's objection does not in fact make his record clear. "[T]o preserve an issue for appeal, a timely objection must be made that states the specific ground for the objection, if the specific ground is not apparent from the context."[31] An objection must be sufficiently specific to tell the trial court what a party wants and why he feels himself entitled to it. The trial colloquy excerpted above does not specifically indicate the legal basis for appellant's objection to the trial court's limitation on his cross-examination. Indeed, appellant specifies no grounds for his objection.

Even without a specific objection, error may be preserved if the grounds for the objection are apparent from its context, such that context can save an otherwise ambiguous objection.[32] But even when the above exchange is read in the context of the motion to suppress, we cannot discern a Confrontation Clause objection. In his written motion to suppress, appellant contests the admission of the State's forensic evidence and related testimony on Fourth Amendment grounds. Then, at the hearing on the motion to suppress, where the trial court first ruled on the extent of appellant's cross-examination, the focus was on the relevance of the testimony sought to be elicited, not on the Confrontation Clause. Because appellant did not specifically state he was objecting on

---

[31] *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

[32] *Id*. *See Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (holding that the circumstances surrounding the defendant's objection and the trial court's ruling made it clear that the trial court was aware of the basis of the defendant's objection).

EXHIBIT 2 Page030

Case 4:17-cv-03621 Document 89-11 Filed on 01/05/23 in TXSD Page 556 of 919
Case 4:17-cv-03621 Document 13-2 Filed on 07/05/19 in TXSD Page 32 of 83

Confrontation Clause grounds at the hearing on the motion to suppress or at trial, an objection on that basis with regard to Sergeant Mehl's cross-examination is not preserved for our review.[33]

Second, appellant complains that his cross-examination of FBI Agent Griselle Guzman was erroneously limited. During the State's direct examination of Agent Guzman, the State introduced two buccal swabs taken from appellant. In response to the State's offer, appellant informed the court that the swabs were covered by his motion to suppress and indicated that he had no "further objections." When given the opportunity to cross-examine Agent Guzman, appellant declined, and Guzman was released. Appellant lodged no Confrontation Clause objection to the trial court's limitation on his cross-examination at trial or during the hearing on his motion to suppress, so his Confrontation Clause claim as it relates to the cross-examination of Agent Guzman is not preserved for our review.

Third, appellant complains that his cross-examination of Matt Quartaro was limited. During the State's direct examination of Quartaro, it offered the cigar, sexual assault kit, and panties into evidence. Appellant objected to the admission of this evidence on chain of custody grounds. The trial court overruled appellant's objection and at the same time reiterated its limitation on appellant's cross-examination to questions about apparent contamination or degradation. At no point did appellant object on the basis of the Confrontation Clause. Appellant made no Confrontation Clause objection during the hearing on his motion to suppress either. Again, because appellant did not specifically state an objection based on the Confrontation Clause, this claim is not preserved for our review.

---

[33] *Cf. Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (holding that a hearsay objection does not preserve a Confrontation Clause objection for appellate review).

EXHIBIT 2 Page031

000552

Lastly, appellant complains of the limitations placed on his cross-examination of Courtney Head. During Head's direct examination the State offered several items into evidence. Each time appellant said, "No additional objections," and the State's evidence was admitted. During his cross-examination, defense counsel approached the trial court and asked to expand the scope of his cross-examination to include quality-control issues at the old HPD crime lab. The following colloquy ensued:

> [Defense counsel]: I'm thinking, if you'll allow me to go into the quality control that existed on other things when they were ran by the crime lab because of what–she didn't work there, number one. And, number two, the old crime lab–I want to do that, but I don't want to do it if you've told me not to.
>
> [The court]: Do not go into that.
>
> [Defense counsel]: Okay.

Nothing further was said on the subject, and Head was released. Appellant lodged no Confrontation Clause objection to the trial court's limitation of his cross-examination of Head at trial or at the hearing on his motion to suppress. Accordingly, his Confrontation Clause claim has not been preserved for our review.

An appellant forfeits his confrontation complaint if he fails to object at trial.[34] In this case, appellant never objected on the basis of the Confrontation Clause at trial or during his pretrial motion-to-suppress hearing. We have previously emphasized the importance of specifying

---

[34] *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) ("We hold that in failing to object at trial, appellant waived any claim that admission of the videotape violated his rights to confrontation and due process/due course of law."); *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("[A]lmost all error–even constitutional error–may be forfeited if the appellant failed to object. We have consistently held that the failure to object in a timely manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant.").

EXHIBIT 2 Page032

CRUZ-GARCIA–33

constitutional bases for objections because of the stricter harm analysis performed on appeal.[35]

Because appellant failed to lodge a Confrontation Clause objection in the trial court, this claim has

not been preserved and we do not reach the merits of appellant's Confrontation Clause complaint

as it relates to the limitations placed on his cross-examination. Appellant's second point of error is

overruled.

*C. Extraneous Offense Evidence*

In his fourth and fifth points of error, appellant complains that the trial court erred when it

admitted evidence of an extraneous offense. Appellant's objection is two-fold: the actual extraneous

offense appellant complains of is a drug charge, unrelated to the capital murder, but his objection

encompasses the admission of the fact of the drug charge along with the admission of the fact of his

subsequent bond forfeiture on that charge when he failed to appear at a scheduled court date.

We note at the outset that the trial court did not admit any evidence as to the character of the

underlying offense for which appellant was on bond. Instead, the trial court limited the evidence to

the mere fact that appellant forfeited a bond by failing to appear on an unrelated criminal offense.

Therefore, our analysis will address only the admission of evidence of appellant's bond forfeiture

and flight as shown by appellant's failure to appear in an unrelated, unnamed criminal case.

In his fourth point of error, appellant contends this evidence was inadmissible under Rule

404(b). In his fifth point of error, appellant contends the evidence was inadmissible under Rule 403.

Because our analysis is the same for both complaints, we will address them together.[36] We review

---

[35] *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012).

[36] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

EXHIBIT 2 Page033

000554

CRUZ-GARCIA–34

a trial court's evidentiary ruling for an abuse of discretion.[37] We will affirm an evidentiary ruling unless it lies outside the zone of reasonable disagreement.[38]

During trial, the State sought to introduce evidence that appellant failed to appear at a scheduled court date on an unrelated drug charge approximately one week after the instant offense occurred. Through FBI Agent Eric Johnson, the State attempted to introduce testimony that, at the time of ██████ kidnapping, appellant had a pending felony drug case in Harris County for which he had posted a bond, that appellant forfeited that bond when he failed to appear for a scheduled court date, and that, subsequent to his failure to appear, a federal warrant for unlawful flight to avoid prosecution was issued.

Appellant objected to the admission of Agent Johnson's testimony on Rule 404(b), Rule 403, and hearsay grounds. Ultimately, the trial court allowed Agent Johnson to testify to the fact that appellant had a pending criminal case in Harris County at the time of the commission of the instant offense and that, approximately one week after the instant offense took place, appellant failed to show up at a scheduled appearance for his pending case. Agent Johnson also testified that, at the time of his flight, appellant was a suspect in ██████ kidnapping. The trial court specifically excluded evidence about the federal flight warrant and about the type of case for which appellant failed to appear.

Additionally, the court admitted a docket sheet that indicated appellant had been present at all of his previous court appearances in his pending drug case–approximately twelve settings over

---

[37] *Id; Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005).

[38] *Montgomery*, 810 S.W.2d at 391; *Cantrell v. State*, 731 S.W.2d 84, 90 (Tex. Crim. App. 1987) ("[T]he trial judge's discretion in admitting an extraneous offense is to be given due deference.").

EXHIBIT 2 Page034

000555

fifteen months. The trial court found consciousness of guilt as indicated by flight to be a permissible use for the extraneous offense evidence under Rule 404(b) and found that the probative value of the evidence was not outweighed by its prejudicial effect.

"Extraneous-offense evidence is admissible under both Rules 403 and 404(b) if that evidence satisfies a two-pronged test: (1) whether the extraneous-offense evidence is relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character; and (2) whether the probative value of the evidence is not substantially outweighed by unfair prejudice."[39] The first prong of this test requires us to determine (a) whether the evidence is relevant at all and (b) whether the evidence is relevant to something other than a showing of character conformity.

Rule 401 governs relevance and provides, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[40] Generally, evidence of flight is a relevant circumstance from which a jury can infer guilt.[41] This is true specifically in the context of bail-jumping.[42] Indeed, flight is admissible "even though it may show the commission

---

[39] *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *Johnston v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004).

[40] TEX. R. EVID. 401 (West 2014).

[41] *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn."); *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994) (same); *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989) (same).

[42] *Cantrell*, 731 S.W.2d at 93 ("The forfeiture of an accused's bail bond may be proved as tending to show flight....And flight, in the context of bail-jumping, may be construed as evidence of guilt."). *See Wockenfuss v. State*, 521 S.W.2d 630, 632 (Tex. Crim. App. 1975) (holding that evidence of defendant's bond forfeiture was admissible absent the defendant showing the bond
(continued...)

EXHIBIT 2 Page035

CRUZ-GARCIA–36

of other crimes."[43]  But before evidence of flight can be admitted, it must appear the flight has some

legal relevance to the case being prosecuted.[44]

Here, the timing of appellant's flight from prosecution on his drug case is a relevant

circumstance of guilt in the instant case.  Appellant fled the jurisdiction only one week after ███

was kidnapped and killed.  The docket sheet for appellant's drug offense indicated appellant had

never missed a court date until the court date immediately following the date of the instant offense

and that appellant forfeited his bond when he fled.  The trial court did not abuse its discretion in

finding that appellant's flight one week after ███ was kidnapped and killed was relevant.

After relevance has been established, the burden shifts to appellant to make an affirmative

showing that the flight is not connected with the offense on trial and is instead connected to some

other transaction.[45]

Appellant argues that any evidence of flight from the drug prosecution was unrelated to the

capital murder prosecution and showed only consciousness of guilt as to the drug charge.  Further,

appellant argues that, because he was not yet charged in the instant case at the time he forfeited his

bond on the drug case, such forfeiture cannot be construed as an act designed to avoid prosecution

-------------------------------

(...continued)
forfeiture was related to another offense).

   [43]  *Cantrell*, 731 S.W.2d at 92; *McWherter v. State*, 607 S.W.2d 531, 534-35 (Tex. Crim.
App. 1980) ("The fact that circumstances of flight incidentally show the commission of another
crime does not render the evidence inadmissible.").

   [44]  *Hodge v. State*, 506 S.W.2d 870, 873 (Tex. Crim. App. 1974) (op. on reh'g).  *See
Wockenfuss*, 521 S.W.2d at 632.

   [45]  *Burks*, 876 S.W.2d at 904; *Hodge*, 506 S.W.2d at 873.  *See Wockenfuss*, 521 S.W.2d at
632.

EXHIBIT 2 Page036

Case 4:17-cv-03621 Document 13-2 Filed on 07/05/19 in TXSD Page 52 of 89

in the instant case. We disagree.

While appellant's failure to appear for his drug case could have been motivated by his desire to avoid prosecution in that case alone, there is evidence to support the trial court's conclusion that appellant's failure to appear related to the instant capital murder prosecution. The timing of appellant's absence, combined with his status as a suspect in ███████ kidnapping and the fact that he had been present at all prior court dates, supports the finding that appellant's failure was, at least in part, motivated by a desire to avoid arrest and prosecution for ███████ murder.[46]

Evidence of appellant's absence from court one week after the commission of the capital murder meets the low threshold for relevance imposed by Rule 401, but this is not the end of our inquiry, because Rule 401 is limited by Rule 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.[47]

Therefore, Rule 404(b) tempers what would otherwise be admissible under Rule 401 by distinguishing between acceptable and unacceptable uses of relevant extraneous-offense evidence. Rule 404(b) prohibits the use of extraneous-offense evidence to show character conformity. And while the latter half of Rule 404(b) provides a list of potential permissible uses of extraneous-offense evidence, it does not contain an exhaustive list of the "other purposes" for which extraneous-offense

---

[46] In *Burks*, we stated, "Since appellant was already identified as a suspect in the case, his flight when confronted by the police was relevant to the issue of whether or not he committed the instant crime." *Burks*, 876 S.W.2d at 903-04.

[47] Tex. R. Evid. 404(b) (West 2014).

EXHIBIT 2 Page037

evidence can be used.[48]

It follows, then, that once extraneous-offense evidence meets Rule 401's test, it will be admitted if it serves any relevant purpose–whether listed in 404(b) or not–other than showing character conformity.

"[C]riminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing 'consciousness of guilt.'"[49] Here, appellant failed to appear in court on an unrelated drug charge. Failure to appear at a scheduled court date is a criminal act.[50] Based on the timing of appellant's bond forfeiture, there is evidence to support the trial court's conclusion that such forfeiture was motivated by a desire to reduce the likelihood of arrest and prosecution for ████ murder, making evidence of the forfeiture admissible under Rule 404(b).

Furthermore, evidence of appellant's flight was not used to show conformity with a general criminal disposition. Instead, the evidence of appellant's failure to appear was used to show a disruption in appellant's normal course of attending his scheduled court dates after the commission of the offense in this case. The trial court did not abuse its discretion in finding that evidence of appellant's bond forfeiture was admissible under Rule 404(b).

Next, we determine whether the extraneous-offense evidence was barred by Rule 403. Rule

---

[48] *Banda v. State*, 768 S.W.2d 294, 296 (Tex. Crim. App. 1989) ("Whether or not it neatly fits one of [the 404(b)] categories, an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable."); *Johnston*, 145 S.W.3d at 220 ("This list is illustrative, not exhaustive.").

[49] *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (op. on reh'g).

[50] TEX. PENAL CODE § 38.10(a).

EXHIBIT 2 Page038

403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[51]

Rule 403's prohibition against the admission of evidence whose probative value is substantially outweighed by the danger of unfair prejudice is not intended to keep out all evidence that tends to prejudice the opponent's case.[52] Instead, it aims to prevent only the admission of evidence that promotes a jury decision on an improper basis.[53]

Here, the court determined that the probative value of the extraneous-offense evidence was that it made a showing of flight and potentially provided evidence of guilt. Additionally, the court took steps to ameliorate the prejudicial effect of the extraneous-offense evidence by redacting the name of the offense. We cannot say that the prejudicial effect of the extraneous-offense evidence substantially outweighed its probative value. The trial court did not err in finding that this evidence was admissible under Rule 403.

The trial court's decision to admit Agent Johnson's testimony concerning appellant's bond forfeiture does not lie outside the zone of reasonable disagreement as to its admissibility, so the trial court did not abuse its discretion in admitting the evidence under Rule 404(b) or Rule 403. Appellant's fourth and fifth points of error are overruled.

---

[51] TEX. R. EVID. 403 (West 2014).

[52] *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) ("All testimony and physical evidence are likely to be prejudicial to one party or the other. It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 is applicable.") (internal citations omitted).

[53] *Montgomery*, 810 S.W.2d at 389. *See Davis*, 329 S.W.3d at 806.

EXHIBIT 2 Page039

CRUZ-GARCIA–40

*D. Improper Jury Argument*

In points of error eight and nine appellant contends that the State engaged in improper jury argument during the guilt phase of trial. In his eighth point of error, appellant complains of the following statements made by the prosecutor as being outside the record:

> [The State]: Let me give you another example, another example of half the story. The SANE nurse. She came here and she said: Well there were no injuries. Wow, that must mean Obel Cruz-Garcia is guilty–is not guilty of capital murder according to the defense attorneys. No. Let's talk about what else the SANE nurse said. And I want to say she said 95%–it is a very high percentage–of rape cases that she does SANE nurse examinations on–
>
> [Defense counsel]: Objection. Outside the record.
>
> [The State]: –do not have any injuries.

The trial court overruled appellant's objection and stated, "But I will remind the jury that you recall the testimony from the witness stand and that is–that will be your guide in your deliberations. Arguments of counsel is not evidence."

The State concedes that the prosecutor mischaracterized the SANE nurse's testimony. At trial Gloria Kologinczok, the SANE nurse who examined Diana, testified that she does not see physical injuries resulting from sexual assaults in most of the sexual assault exams she performs. Kologinczok did not further quantify how often she sees physical injuries during sexual assault exams, as the prosecutor did during her closing argument.

Jury argument generally serves at least four permissible purposes: summation of the evidence, reasonable deductions from the evidence, answers to arguments of opposing counsel, and pleas for law enforcement.[54] It is error to insert facts into closing argument that are not supported

---

[54] *Davis*, 329 S.W.3d at 821.

EXHIBIT 2 Page040

000561

by the record.[55]   Because her statement was not supported by the record, the prosecutor's

quantification of Kologinczok's testimony was improper, and the trial court erred when it overruled

appellant's objection.

"However, every inappropriate remark made during closing arguments does not require the

reversal of a conviction."[56]   A reversal will be required only if the improper argument is harmful.[57]

To determine whether the argument was harmful, we must engage in a harm analysis.[58]   The Rules

of Appellate Procedure provide two avenues for harm analysis, depending upon the type of error

committed: constitutional or nonconstitutional.[59]

We have held that jury argument that injects facts outside the record is nonconstitutional

error.[60]   As such, it is governed by Texas Rule of Appellate Procedure 44.2(b).[61]   Rule 44.2(b)

provides, "Any other error, defect, irregularity, or variance that does not affect substantial rights must

---

[55] *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999) ("Error exists when facts not supported by the record are injected in the argument...."); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011).

[56] *Lagrone*, 942 S.W.2d at 619 (citing *Hernandez v. State*, 819 S.W.2d 806, 820 (Tex. Crim. App. 1991)).

[57] *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

[58] *Id.*

[59] *Compare* TEX. R. APP. P. 44.2(a) and TEX. R. APP. P. 44.2(b).

[60] *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000) ("Comments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status. We shall therefore apply the standard of harm for nonconstitutional error."). *See Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) (stating improper-argument error that arose when prosecutor "delved into matters that were well outside the record" was nonconstitutional in nature).

[61] *Martinez*, 17 S.W.3d at 692.

EXHIBIT 2 Page041

000562

CRUZ-GARCIA–42

be disregarded.'"[62]  Therefore, unless the State's improper jury argument error affected appellant's substantial rights, it will not call for a reversal of appellant's conviction.[63]

To determine whether the error affected a substantial right, and was therefore harmful, this Court looks at three factors: (1) the severity of the misconduct, (2) any curative measures employed to correct the misconduct, and (3) the certainty of conviction without the misconduct.[64]

First, we examine the severity of the misconduct.  The error arose during the State's final closing argument in the guilt phase of trial.  After objection, the prosecutor immediately moved on from the topic of the SANE nurse.  The error did not relate directly to the act of kidnapping or killing ▆▆▆▆ but instead related only to the sexual assault alleged to have taken place prior to the kidnapping.  The SANE nurse did indeed testify that, in most of the sexual assault exams that she performs, she does not see injuries, so the prosecutor erred only in assigning a numerical value to the nurse's testimony.

Additionally, viewing the misconduct in light of the entire record of jury arguments, the statement was not extreme or manifestly improper.  The statement was made in the middle of a closing argument that spans twenty-one pages of the record, and the prosecutor never emphasized the statement or returned to the topic of the sexual assault after appellant's objection.  We find the severity of the misconduct to be slight.

With respect to curative measures, the trial court immediately reminded the jury that statements made in closing arguments are not evidence, decreasing the likelihood that jurors would

---

[62] TEX. R. APP. P. 44.2(b).

[63] *Id.*; *Martinez*, 17 S.W.3d at 692.

[64] *Mosley*, 983 S.W.2d at 259; *Martinez*, 17 S.W.3d at 692-93.

EXHIBIT 2 Page042

000563

CRUZ-GARCIA–43

attach significance to the improper statement. Although this does not amount to a curative instruction, it weighs in favor of the error being harmless.[65]

Lastly, appellant's conviction was relatively certain, even without the misconduct. As discussed extensively above, there was direct and circumstantial evidence connecting appellant to █████ kidnapping and murder. Based upon the evidence before the jury, it is highly unlikely that the prosecutor's misstatement impacted appellant's conviction. Appellant's eighth point of error is overruled.

In his ninth point of error, appellant complains that the prosecutor injected her personal beliefs into her closing argument. Appellant contends that the following argument was improper:

> [The State]: We ask you to find him guilty as a party because what we believed happened is the defendant directed and encouraged–
>
> [Defense counsel]: Objection to putting beliefs into argument, Your Honor. It's improper.
>
> [The court]: That will be overruled.

It is improper for a prosecutor to inject her opinion into statements made before the jury.[66] However, it is proper for a prosecutor to argue her opinion where that opinion is based upon evidence in the record.[67]

As stated above, permissible jury argument generally falls into one of four categories: summation of the evidence, reasonable deductions from the evidence, answers to arguments of

---

[65] *Freeman*, 340 S.W.3d at 728-29.

[66] *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985).

[67] *Wolfe v. State*, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996) (quoting *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985)).

EXHIBIT 2 Page043

opposing counsel, and pleas for law enforcement.[68]

We conclude that the prosecutor's discussion of what the State believed happened was a summation of the evidence presented at trial. Rudy testified that appellant kidnapped ███ drove him to Baytown, and then ordered Roger to kill to him. After ███ death, appellant ordered Rudy and Roger to submerge ███ body. Even if the prosecutor's statement injected her opinion into her argument, her opinion was sufficiently supported by the evidence presented at trial.

Even assuming *arguendo* that the prosecutor's argument was improper, it was harmless. Jury argument error is analyzed for harm under Texas Rule of Appellate Procedure 44.2(b).[69] Under the 44.2(b) standard, error will not require reversal unless it affects a substantial right.[70] To determine whether error affects a substantial right in the improper-jury-argument realm, we weigh the three factors discussed above: the severity of the misconduct, any curative measures taken, and the likelihood of conviction absent the misconduct.[71]

Here, any possible misconduct was not severe. After reading the prosecutor's statement in the context of the entire record of jury arguments, we conclude the prosecutor was merely summarizing the State's theory of the case and not suggesting to the jury that she had outside knowledge about contested facts.

Further, while the trial court did not take any steps to cure the error, the prosecutor immediately rephrased her statement and said, "What the evidence supports is that the defendant

---

[68] *Davis*, 329 S.W.3d at 821.

[69] *Martinez*, 17 S.W.3d at 692.

[70] Tex. R. App. P. 44.2(b).

[71] *Mosley*, 983 S.W.2d at 259.

EXHIBIT 2 Page044

CRUZ-GARCIA—45

directed and encouraged Roger to kill the little boy." This quasi-curative measure works in favor of the error being harmless.[72]

Additionally, appellant's conviction was relatively certain, even absent the prosecutor's statement. Appellant's ninth point of error is overruled.

### III. Punishment

*A. Mitigating Evidence in Punishment*

In his sixth and seventh points of error, appellant complains that the trial court erred when it sustained the State's hearsay objections to two items of evidence he offered during the punishment phase of trial. The first piece of evidence, complained of in point of error six, was a series of Bible study certificates that appellant earned while incarcerated in Puerto Rico. The second piece of evidence, complained of in point of error seven, was testimony that appellant worked as an informant for several American federal agencies. Appellant now complains that the trial court's exclusion of these pieces of evidence violated his right to put forth a complete defense. Assuming without deciding that appellant preserved this complaint, we overrule appellant's sixth and seventh points of error.

We review a trial court's evidentiary ruling for an abuse of discretion.[73] So, if the trial court's determination falls within the zone of reasonable disagreement, we will not disturb it on

---

[72] *Hawkins v. State*, 135 S.W.3d 72, 85 (Tex. Crim. App. 2004) ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless."). *See Canales v. State*, 98 S.W.3d 690, 695-96 (Tex. Crim. App. 2003) (holding that a prosecutor's misstatement of the law was harmless when, immediately following the misstatement, the prosecutor corrected his mistake).

[73] *Weatherred*, 15 S.W.3d at 542.

EXHIBIT 2 Page045

000566

CRUZ-GARCIA–46

appeal.[74] We begin with appellant's sixth point of error. Appellant attempted to offer his own Bible study certificates through his brother, Joel Cruz-Garcia. The State objected that the certificates were hearsay, and the trial court sustained the objection. Appellant now complains that the trial court's ruling excluding the certificates from evidence violated his right to put forth a complete defense.

A criminal defendant's right to present relevant evidence is not absolute.[75] Instead, it is subject to reasonable restrictions that accommodate other legitimate interests in the criminal trial process.[76] Where mitigating evidence comes in an objectionable form, neither the Texas nor the United States Constitutions require its admission.[77] The Constitution is implicated only if the evidentiary rule being employed to exclude evidence is applied arbitrarily or unjustly and its application effectively precludes a defendant from putting forth a defense.[78]

Here, appellant's proffered evidence was limited by the application of the hearsay rule. The rule against hearsay prohibits the admission of out-of-court statements offered to prove their truth.[79]

---

[74] *Id.*

[75] *United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions."); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) ("Although the Eighth Amendment to the United States Constitution assures that no person shall be put to death without the opportunity to bring before the sentencing authority all evidence of mitigating circumstances, the Constitution does not assure that the evidence be received in a form which is otherwise objectionable.").

[76] *Scheffer*, 523 U.S. at 308.

[77] *Id.*; *See Renteria v. State*, 206 S.W.3d 689, 697 (Tex. Crim. App. 2006) (concluding that admission of constitutionally relevant evidence is not required if it is otherwise objectionable under state law).

[78] *Potier v. State*, 68 S.W.3d 657, 662 (Tex. Crim. App. 2002).

[79] Tex. R. Evid. 801(d) (West 2014).

EXHIBIT 2 Page046

CRUZ-GARCIA–47

Appellant's certificates were indeed hearsay because they each contained out-of-court statements that appellant was offering for their truth. As hearsay, the evidence was inadmissible unless it fit within an exception or exclusion.[80] Appellant, as the proponent of the evidence, bore the burden of articulating an exception or exclusion under which the Bible study certificates would be properly admissible.[81] Appellant offered no such exceptions.

Appellant now asserts that the Bible study certificates were admissible under Texas Rules of Evidence 803(11), 803(13), 803(19), and 804(3). Without deciding whether appellant has forfeited his error by failing to allege his hearsay exceptions in the trial court, we hold that none have merit.

First, appellant's certificates do not qualify as Records of a Religious Organization under Rule 803(11) because they are not statements of birth, marriage, divorce, death, legitimacy, ancestry, relationship, or other fact of personal history. Second, appellant's certificates do not qualify as Family Records under Rule 803(13) because they are not statements of fact concerning personal or family history, nor are they contained in any of the documents listed in Rule 803(13). Third, appellant's certificates do not meet the requirements in Rule 803(19) because they do not concern a person's birth, adoption, marriage, divorce, death, legitimacy, relationship, ancestry, or other fact of personal or family history. Lastly, appellant's certificates do not qualify under Rule 804(b)(3) because appellant has failed to establish the unavailability of the certificates' declarant. Further, the certificates do not contain any statements about the declarant's own birth, adoption, marriage,

---

[80] *Valle v. State*, 109 S.W.3d 500, 505 (Tex. Crim. App. 2003).

[81] *Martinez v. State*, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005) ("The State, as the proponent of the evidence, had the burden of demonstrating the applicability of that exemption or exception.").

EXHIBIT 2 Page047

ancestry, or fact of personal or family history, nor do they contain statements about any of the foregoing with respect to a person related to or intimately associated with the declarant. Additionally, appellant's Bible study certificates do not bear "persuasive assurances of trustworthiness," which weighs in favor of the trial court's exclusion.[82]

The rule excluding hearsay that does not fit within an exception or exclusion is not an arbitrary rule, nor was it arbitrarily or unjustly applied to appellant.[83] Instead, the rule represents a reasonable restriction on the admission of evidence that accommodates other legitimate criminal-trial interests, namely, ensuring the reliability of evidence.[84]

While appellant contends that the hearsay rule should give way in favor of his right to put on a defense, "[t]he fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his

---

[82] *See Valle*, 109 S.W.3d at 506 (affirming the exclusion of hearsay evidence because it did not meet an exception to the hearsay rule and did not bear persuasive assurances of trustworthiness).

[83] *Potier*, 68 S.W.3d at 662 ("These cases show that the exclusion of relevant, material, important evidence by the application of particular rules that are arbitrary or disproportionate to their purposes may offend the Constitution. They also show that courts are free to apply evidentiary rules that are not arbitrary and unjustified.").

[84] *Id.* at 666 (holding that the hearsay rule, when properly applied, is a valid limitation on a defendant's evidence). *See Renteria*, 206 S.W.3d at 697. ("'[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary only where it has infringed upon a weighty interest of the accused."). *See Valle*, 109 S.W.3d at 506 (holding that defendant's hearsay evidence that was not within an exception and that did not bear "persuasive assurances of trustworthiness" was properly excluded).

EXHIBIT 2 Page048

CRUZ-GARCIA–49

defense to the jury."[85]  Because appellant was not prevented from presenting the substance of his

defense, the trial court did not abuse its discretion when it sustained the State's hearsay objection and

excluded appellant's Bible study certificates.  Appellant's sixth point of error is overruled.

Turning now to appellant's seventh point of error, appellant once again contends that the trial

court violated his right to put forth a meaningful defense when it sustained the State's hearsay

objection to testimony about whether appellant worked as an informant for various federal law

enforcement agencies in the United States.  But again, appellant's right to the admission of evidence

in his defense is not absolute.[86]  If defense evidence is presented in a form that violates the rules of

evidence, and those rules are not being arbitrarily applied, it is not properly admissible.[87]

The testimony appellant attempted to elicit through Puerto Rican police officer, Agent Juan

DeJesus Rodriguez, about appellant's work as a federal informant was hearsay because Agent

Rodriguez had no personal knowledge of appellant's work and had learned about this alleged work

only through conversations with other agents.  Because the testimony about what other agents told

Agent Rodriguez was an out-of-court statement being offered for its truth, the State's hearsay

objection was proper.[88]

In response to the State's objection, appellant offered no applicable exceptions or exclusions

---------------------------------------------------

[85] *Valle*, 109 S.W.3d at 507; *See Potier*, 68 S.W.3d at 665 ("We hold that the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.").

[86] *Scheffer*, 523 U.S. at 308; *Lewis*, 815 S.W.2d at 568.

[87] *See Potier*, 68 S.W.3d at 666 (holding that the hearsay rule is a valid limitation on a defendant's evidence when it is correctly applied).

[88] Tex. R. Evid. 801 (West 2014).

EXHIBIT 2 Page049

000570

CRUZ-GARCIA–50

to the hearsay rule. Appellant now asserts that Agent Rodriguez's testimony was admissible under Texas Rule of Evidence 803(21). Again, without deciding whether appellant has forfeited this claim, we hold that it lacks merit. Agent Rodriguez's testimony did not concern appellant's *character* among appellant's associates or within his community, so it does not meet the requirements of Rule 803(21).

The exclusion of Agent Rodriguez's testimony as hearsay did not effectively preclude appellant from putting on a defense, and the application of the hearsay rule was not arbitrary or unjust. Consequently, the trial court did not abuse its discretion when it sustained the State's objection and excluded appellant's evidence. Appellant's seventh point of error is overruled.

## B. Improper Jury Argument

In his tenth and eleventh points of error, appellant complains of improper jury argument during the punishment phase of trial. In point of error ten, appellant complains that the trial court erred when it overruled his objection to part of the State's argument, which he contends went outside the record. During her punishment summation, the prosecutor stated:

> Who is orchestrating this deal? Who is orchestrating all the criminal conduct that he's involved in from all the evidence that you've heard? Him. He is the boss. And that's why when he told Roger to stab that little boy, he did. And Roger will pay the price for that when his turn comes, but don't take the blame off of the man who told him to do it. Don't excuse him. Because I will tell you right now, if it were up to Roger alone, ▓▓▓▓▓ would still be alive.

Appellant objected that the last sentence was outside the record. The trial court overruled the objection and instructed the jury that the arguments of counsel are not evidence. Appellant now complains of this ruling on appeal. In response, the State contends appellant forfeited his error with respect to this argument, or alternatively, that the statement was a proper deduction from the

EXHIBIT 2 Page050

000571

CRUZ-GARCIA–51

evidence.

Assuming without deciding that error was preserved, we agree with the State's contention that the statement was a proper deduction from the evidence. Throughout trial, the jury heard ample evidence of appellant's role as the ringleader of the violence that unfolded on the night ████ died. Rudy testified that appellant was in charge and ordered ████ death because ████ saw appellant sexually assaulting Diana. The prosecutor's statement that, if it were up to Roger, ████ would still be alive, was merely a restatement of what was already before the jury as the State's theory of its case and was a proper deduction from the evidence presented at trial. Appellant's tenth point of error is overruled.

In his eleventh point of error, appellant complains that the trial court erred when it denied his motion for a mistrial after improper jury argument from the State during closing arguments in the punishment phase of trial. Appellant complains that the State went outside the record when it argued, "What else? They want to minimize the escape attempt. Justin talked to you about that. What do you think happened after he attempted to escape? You think he might have wound up in administrative segregation? I bet he did."

Appellant objected, and the trial court sustained his objection. The trial court instructed the jury to "disregard the last comment by [the prosecutor] and not consider it for any reason." Appellant then moved for a mistrial, which was denied. Appellant now complains of this denial. We review a trial court's refusal to grant a mistrial for an abuse of discretion.[89] Unless the trial

---

[89] *Hawkins*, 135 S.W.3d at 77.

EXHIBIT 2 Page051

000572

CRUZ-GARCIA–52

court's ruling was outside the zone of reasonable disagreement, it will not be disturbed on appeal.[90]

A mistrial will be required only in extreme circumstances where the improper conduct is so harmful that continuing with the trial would be wasteful and futile.[91] We apply the same three-factor test articulated in *Mosley*[92] and extended in *Martinez*[93] to evaluate "whether the trial court abused its discretion in denying a mistrial for improper argument."[94]

The first factor examines the severity of the misconduct. When determining the severity of the misconduct, we look at the magnitude of the prejudicial effect and whether the misconduct was extreme or manifestly improper.[95] The misconduct here was slight, and its prejudicial effect was minimal. The State's reference to administrative segregation was brief and was perhaps the most benign evidence offered against appellant during the punishment phase.

Second, we examine curative measures taken by the trial court. Here, the trial court sustained appellant's objection and instructed the jury to disregard the prosecutor's statement. Ordinarily, an instruction to disregard will sufficiently relieve harm, except with respect to the most inflammatory

---

[90] *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

[91] *Hawkins*, 135 S.W.3d at 77.

[92] *Mosley*, 983 S.W.2d at 259 (establishing the three-factor test for determining when improper jury argument during the guilt phase is harmful).

[93] *Martinez*, 17 S.W.3d at 693 (extending the *Mosley* three-factor test to apply to improper jury argument during the punishment phase of trial).

[94] *Hawkins*, 135 S.W.3d at 77.

[95] *Mosley*, 983 S.W.2d at 259; *Brown*, 270 S.W.3d at 573.

EXHIBIT 2 Page052

000573

statements.[96]  The statement at issue was not so inflammatory,[97] and the trial court's actions "sufficiently ameliorated any potential harm."[98]

Lastly, we examine the certainty of the punishment assessed, absent the improper argument. During the punishment phase of trial, the jury heard evidence that appellant murdered another individual for flirting with appellant's girlfriend, and that appellant kidnapped, tortured, and held for ransom two teenagers in Puerto Rico.  Given the severity of the punishment evidence, we cannot say that, absent the State's reference to administrative segregation, appellant would have received a different sentence.  The trial court did not abuse its discretion when it denied appellant's motion for a mistrial.  Appellant's eleventh point of error is overruled.

*C. Motion for New Trial*

In his twelfth and final point of error, appellant asserts that the trial court erred when it denied his motion for a new trial based on alleged jury misconduct during the punishment phase.  Appellant also contends that the trial court erred when it refused his request for an evidentiary hearing on his motion.  Although the trial court heard argument on appellant's motion for new trial, testimony at the hearing was restricted to affidavits.  We review a trial court's decision to hold a live hearing on a motion for new trial, as well as the ruling on such motion, for an abuse of discretion.[99]  A trial court

---

[96] *Long v. State*, 823 S.W.2d 259, 269 (Tex. Crim. App. 1991).

[97] *See Martinez*, 17 S.W.3d at 691 (holding that the prosecutor's statement about facts outside the record was not so extreme that it could not be cured by an instruction to disregard).

[98] *Archie*, 221 S.W.3d at 700 (holding that sustaining an objection to the prosecutor's comment on the defendant's failure to testify combined with an instruction to disregard was sufficiently ameliorative of any potential harm such that the error did not require reversal).

[99] *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *State v. Zalman*, 400
(continued...)

EXHIBIT 2 Page053

000574

abuses its discretion in denying a motion for new trial only if no reasonable view of the record could support the trial court's ruling.[100]

The jury began its punishment deliberations on the afternoon of Thursday, July 18, 2013. The following morning, Friday, July 19, the jurors resumed their punishment deliberations. At some point during their discussion, juror Casey Guillotte asked her fellow jurors how they were going to emotionally cope with their verdict. Ms. Guillotte testified by way of affidavit that her inquiry came after the jury had already agreed on each of the special issues. The other affidavits received by the trial court are ambiguous as to when her question was posed.

In response to this inquiry, several jurors offered words of encouragement. Then, jury foreman Matthew Clinger pulled his Bible from his overnight bag and directed Ms. Guillotte to several passages. Mr. Clinger told Ms. Guillotte that he felt comforted by passages in the book of Romans. Both Mr. Clinger and Ms. Guillotte testified through their affidavits that Mr. Clinger never read aloud from his Bible. Juror Angela Bowman's affidavit indicates that Mr. Clinger "read scriptures from the Bible," but she does not indicate those scriptures were read aloud to the entire jury.

At approximately 3:20 p.m., Ms. Bowman sent a note to the judge asking to speak with her privately. After discussing the request with the attorneys for the State and defense, the judge spoke with Ms. Bowman on the record in her chambers. During this conversation, Ms. Bowman expressed her desire to be replaced with an alternate juror because she could not come to an agreement with

-------------------------------------------------------------

(...continued)
S.W.3d 590, 593 (Tex. Crim. App. 2013).

[100] *Holden*, 201 S.W.3d at 763.

EXHIBIT 2 Page054

CRUZ-GARCIA–55

the remaining eleven jurors. Ms. Bowman also expressed hesitancy at the idea of having to be sequestered over the weekend. The trial judge told Ms. Bowman that she was unable to replace her with an alternate simply because she was disagreeing with the other jurors and urged Ms. Bowman to continue deliberating.

Approximately one hour later, the jury returned its punishment verdict in such a way that the trial court would sentence appellant to death. The trial court polled the jury, and each juror confirmed that the verdict rendered was his or her true and correct verdict.

Later that evening, Mario Madrid, one of appellant's trial attorneys, received a phone call from Ms. Bowman in which she told him that she had been pressured by the other jurors to return a verdict that would result in a death sentence and that the verdict actually rendered was not her personal verdict. Mr. Madrid brought this to the attention of the trial court by way of an affidavit attached to appellant's motion for new trial.

Appellant complains that alleged jury misconduct tainted the verdict on punishment because of the foreman's Bible reading during deliberations. Appellant asserts that this reading was an outside influence that inappropriately impacted the verdicts of jurors Angela Bowman and Casey Guillotte, so affidavits to that effect were admissible under Rule 606(b). At the hearing on the motion for new trial, the State objected to the admission of any affidavits regarding jury deliberations, but prepared affidavits from Mr. Clinger and Ms. Guillotte should the trial court choose to admit affidavits.

Inquiring into the deliberative processes of a jury to ferret out misconduct has been prohibited

EXHIBIT 2 Page055

CRUZ-GARCIA–56

in this country, save for a few, narrow exceptions.[101]  This state currently recognizes only two

exceptions to this general rule.[102]  First, jurors may testify about their deliberations to rebut an

accusation that a juror was unqualified to serve, and second, jurors may testify about whether an

outside influence was improperly brought to bear upon their deliberations.[103]

     This Court has never determined whether reference to the Bible during jury deliberations is

an outside influence.  Today we hold that it is not.

     This Court first explained in *McQuarrie v. State* that an outside influence is one that

originates "from a source outside of the jury room and other than from the jurors themselves."[104]

But, as we later explained in *Colyer v. State*, this does not necessarily encompass every influence

originating from outside the physical jury deliberation room.[105]  "The 'outside influence' exception

to Rule 606(b) does not include influences or information that are unrelated to trial issues."[106]

     Here, the alleged "outside influence" that appellant complains of is a scripture from the Bible

---

[101]  FED. R. EVID. 606(b)(2) ("A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict form."); TEX. R. EVID. 606(b)(2) ("A juror may testify: (A) about whether an outside influence was improperly brought to bear on any juror; or (B) to rebut a claim that a juror was not qualified to serve.").

[102]  TEX. R. EVID. 606(b)(2).

[103]  *Id.*

[104]  *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012).

[105]  *Colyer v. State*, 428 S.W.3d 117, 127 (Tex. Crim. App. 2014) (holding that a telephone call from a juror's physician that the juror's daughter was sick did not qualify as an "outside influence" for the purposes of Rule 606(b) despite the fact that it did indeed originate from a source outside the jury room).

[106]  *Id.*

EXHIBIT 2 Page056

000577

CRUZ-GARCIA–57

that the jury foreman recommended to another juror in an effort to comfort her. While this scripture did literally come from outside the jury room, as neither the Bible nor any of its contents were ever offered into evidence, we cannot say that it meets the definition of "outside influence" this Court established in *McQuarrie*.

When a jury has before it evidence that was not offered at trial, or subject to cross-examination, a defendant's right to a fair and impartial jury may be compromised. This compromise occurs, however, only when the outside evidence or influence relates directly to a question of fact left to the jury's determination and improperly influences their verdict.

Referring to the Bible did not directly relate to a fact at issue before the jury in appellant's case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it. Had the foreman merely recited a Bible verse from memory, we could not consider it an outside influence. Indeed, evidence of such a recitation would not have even been admissible per the constraints of Rule 606(b).[107]

The fact that the foreman in this instance referred a juror to the Bible verse instead of quoting it from memory is a distinction without a difference. Either way, there is no evidence that the biblical reference related to the facts at issue in this case, and it was therefore not an outside influence under Rule 606(b) and as interpreted by this Court in *McQuarrie* and *Colyer*.[108]

---

[107] Our analysis is guided by the 4th Circuit's analysis in *Robinson v. Polk*, where the court was presented with a factually analogous situation and determined that, because the Bible reading did not go to a fact at issue in the case, and because a juror merely quoting the Bible from memory "assuredly would not be considered an improper influence," there was no improper outside influence in violation of Rule 606(b). *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006).

[108] We are mindful of the fact that the 5th Circuit has held that the Bible can be an external influence on the jury, but the facts of that case distinguish it from this one.

EXHIBIT 2 Page057

000578

CRUZ-GARCIA–58

Because the Bible was not an outside influence, the trial court erred when it admitted State and defense affidavits describing jury deliberations. Additionally, because the affidavits describing the inner goings-on of the jury's deliberations were improperly admitted, any live testimony to that effect would have been inadmissible under Rule 606(b) as well. Even had the affidavits been admissible, it was within the trial court's discretion to rule on a motion for new trial on affidavits without oral testimony.[109] Either way, the trial court did not abuse its discretion when it denied appellant's request for an evidentiary hearing on his motion for new trial.

When citizens are selected for jury service, the law does not ask them to set aside every personal or moral directive to which they adhere, nor will this Court do the same by holding that reference to such a directive during jury deliberations is improper. If trial attorneys are troubled by jurors who call upon such beliefs during their deliberations, this trouble is better addressed in voir dire than it is in by way of a motion for new trial.

The jury foreman's reference to his Bible in an attempt to comfort his fellow juror was not an outside influence improperly brought to bear on the jury's deliberations, and affidavits to that effect were not properly admissible under Rule 606(b). Regardless, although the trial court erred in admitting the affidavits, the trial court did not abuse its discretion when it overruled appellant's motion for new trial. Appellant's twelfth point of error is overruled.

We affirm the judgment of the trial court.

Delivered: October 28, 2015
Do Not Publish

---

[109] *Holden*, 201 S.W.3d at 763.

EXHIBIT 2 Page058

13847940101C / Court: 337

# EXHIBIT 3

# IN THE 337th DISTRICT COURT

# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE )<br>Obel Cruz-Garcia, )<br>　　　　　APPLICANT )<br> )<br> ) | Trial Cause No.<br>1384794 – *A* |

## INITIAL APPLICATION FOR WRIT OF HABEAS CORPUS
### (FILED PURSUANT TO TEX. CODE CRIM. PROC. ART. 11.071)

OFFICE OF CAPITAL WRITS
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

**FILED**
Chris Daniel
District Clerk

AUG 28 2015

Time: 11:34 ₵
Harris County, Texas

By_____
Deputy

EXHIBIT 3 Page 001

000581
: 000002

# TABLE OF CONTENTS

APPLICATION FOR A WRIT OF HABEAS CORPUS .......................... 1

PROCEDURAL HISTORY ................................................................ 4

    A. Trial Court Proceedings ...................................................... 4

    B. State Appellate Proceedings ............................................... 5

    C. State Habeas Proceedings .................................................. 6

STATEMENT OF FACTS ................................................................ 6

    A. Guilt/Innocence Phase of Trial .......................................... 6

    B. Punishment Phase of Trial ................................................. 8

    C. Information Uncovered in Post-Conviction Investigation ............... 9

STANDARD OF CARE ................................................................ 10

    A. Ineffective Assistance of Trial Counsel ............................. 10

    B. Ineffective Assistance of Appellate Counsel ..................... 13

    C. Scope of the Waiver of Attorney-Client Privilege .............. 14

ARGUMENT ................................................................................ 17

CLAIM ONE: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY
FAILED TO PRESENT EVIDENCE FROM A DNA EXPERT TO CHALLENGE
THE DNA EVIDENCE PRESENTED AT TRIAL ................................. 17

    A. DNA Evidence and Trial Counsel's Attempt to Suppress ............ 18

        1. Suppression Hearing........................................... 20

        2. Trial ................................................................ 24

    B. Findings of Post-Conviction Review by DNA Expert ................. 24

        1. Chain of Custody................................................ 24

        2. The Mixture DNA Profile ................................... 25

i

EXHIBIT 3 Page 002

000582

3.  The Vaginal Swabs ................................................................. 26

4.  The HPD Crime Lab's Reinterpretation of the Orchid Cellmark Data.. ........................................................................................... 28

C. Trial Counsel Performed Ineffectively by Failing to Retain an Independent DNA Expert ................................................................................ 30

1.  Deficient Performance ........................................................... 30

2.  Prejudice ............................................................................... 32

CLAIM TWO: TRIAL COUNSEL PERFORMED INEFFECTIVELY BY FAILING TO INVESTIGATE AND PRESENT REASONABLE DOUBT AT THE GUILT/INNOCENCE PHASE OF TRIAL ....................................... 35

A. Cruz-Garcia Had an Ongoing Consensual Sexual Relationship with Diana Garcia ...................................................................................... 36

B. Diana Garcia and Arturo Rodriguez Had Not Stopped Selling Drugs for Cruz-Garcia ..................................................................................... 38

C. Trial Counsel Performed Ineffectively by Failing to Investigate and Present this Evidence at Trial ........................................................... 39

1.  Deficient Performance ........................................................... 39

2.  Prejudice ............................................................................... 41

CLAIM THREE: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT CRUZ-GARCIA WOULD NOT BE A FUTURE DANGER ............................................................ 42

A. Trial Counsel Performed Ineffectively in Failing to Review the District Attorney's File and Identify Evidence that Cruz-Garcia Would Not Be a Future Danger ............................................................................. 43

1.  Relevant Facts ...................................................................... 44

2.  Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance and Should Not Be Afforded Deference Because It Was Based on a Misunderstanding of the Law ........................... 48

ii

EXHIBIT 3 Page 003
000583

3.    Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance Because Trial Counsel Has an Affirmative Duty to Investigate in Preparation for Trial.............................. 51

4.    Trial Counsel's Failure to Inspect the District Attorney's File Prejudiced Cruz-Garcia................................................................ 53

B. Trial Counsel Were Ineffective for Failing to Investigate and Present Testimony from Puerto Rican Prison Officials and Other Witnesses To Rebut the State's Case ................................................................................... 53

    1.    Trial Counsel's Investigation ............................................. 54

    2.    Available Evidence to Rebut Future Danger...................... 56

C. Trial Counsel's Failure to Review the Prosecution's File and Sufficiently Investigate Prejudiced the Defense................................................. 62

CLAIM FOUR: TRIAL COUNSEL PERFORMED INEFFECTIVELY IN FAILING TO SUFFICIENTLY INVESTIGATE AND PRESENT MITIGATION EVIDENCE ........................................................................................ 66

A. Trial Counsel's Investigation................................................. 67

    1.    Fact Investigation ........................................................... 68

    2.    Mitigation Specialist and Expert Witnesses....................... 70

B. Counsel's Failure to Retain a Mitigation Specialist, Ensure a Sufficient Investigation of Lay Witnesses, or Consult with Necessary Expert Witnesses Constitutes Deficient Performance ................................................. 72

C. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Early Life History .................................. 77

    1.    Available Lay Witness Testimony ...................................... 79

    2.    Available Expert Witness Testimony.................................. 83

D. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence to Rebut the Prosecution's Aggravating Evidence .......... 96

EXHIBIT 3 Page 004
000584

E. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Ability to Contribute Productively in Prison ................................................................................................................ 98

F. Conclusion .................................................................................................. 99

CLAIM FIVE: CRUZ-GARCIA'S CONVICTION AND DEATH SENTENCE ARE UNLAWFUL BECAUSE THEY WERE OBTAINED IN VIOLATION OF THE PROVISIONS OF THE VIENNA CONVENTION ON CONSULAR RELATIONS .................................................................................................. 100

A. As A Foreign National Detained and On Trial for a Capital Offense in the United States, Cruz-Garcia Had a Right to Be Notified of His Right to Consular Access under the Vienna Convention on Consular Relations ........................ 101

B. In Texas, the Vienna Convention Conveys an Individually Enforceable Right .............................................................................................................. 102

C. The State Violated the Vienna Convention in Cruz-Garcia's Case ........... 103

D. Cruz-Garcia was Prejudiced as a Result of the Violation of His Rights under the Vienna Convention ................................................................................. 107

E. Conclusion ................................................................................................ 108

CLAIM SIX: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RECOGNIZE THE SIGNIFICANCE OF CRUZ-GARCIA'S FOREIGN NATIONALITY AND SEEK THE HELP OF THE DOMINICAN REPUBLIC CONSULATE IN DEFENDING THIS CASE ..................................................... 109

A. Trial Counsel's Failure to Apprise Cruz-Garcia of His Right to Consular Access and To Seek Assistance from the Dominican Republic in Defending His Case Was Objectively Unreasonable and Constitutes Deficient Performance 111

1. Trial Counsel Knew that Cruz-Garcia Is a Citizen of the Dominican Republic .......................................................................................................... 111

2. Both National and State Bar Guidelines Highlight the Steps That Need to Be Taken in Representing a Foreign National in a Capital Case ........... 112

3. Trial Counsel Failed to Act in Accordance with the Recommendations of the ABA Guidelines, the Texas State Bar Guidelines, and Other Available

iv

EXHIBIT 3 Page 005

000585

Legal Materials in Representing Cruz-Garcia, Which Constitutes Deficient Performance Under *Strickland v. Washington* ........................................... 116

B. Trial Counsel's Failure to Involve the Dominican Republic Consulate in This Case Prejudiced Cruz-Garcia's Defense................................................. 117

C. Trial Counsel Were Ineffective for Failing to Ensure That Cruz-Garcia's VCCR Rights Were Protected by the State and for Failing to Raise This Issue at Trial ........................................................................................................ 120

D. Conclusion .......................................................................................... 121

CLAIM SEVEN: CRUZ-GARCIA'S DUE PROCESS RIGHTS TO A FAIR TRIAL WERE VIOLATED BY CONSTITUTIONAL ERRORS RELATING TO THE COURT'S EX PARTE DISCUSSION WITH A SINGLE JUROR............ 121

A. Relevant Facts..................................................................................... 122

B. Cruz-Garcia's Due Process Rights Were Violated When the Trial Court Failed to Inform Trial Counsel of the Details of Its Conversation with Juror Bowman and Instead Instructed Her to Resume Deliberations....................... 124

C. Appellate Counsel Provided Ineffective Assistance in Failing to Raise the Foregoing Errors on Direct Appeal ................................................................ 129

D. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Object or Request the Trial Court Report Its Conversation with Juror Bowman on the Record ................................................................................................. 131

CLAIM EIGHT: CRUZ-GARCIA'S RIGHTS TO A FAIR TRIAL WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE JUROR MISCONDUCT ............................................................................................ 133

A. Relevant Facts..................................................................................... 134

B. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Interview Casaretto or Take Other Action...................................................... 136

CLAIM NINE: JURORS IN CRUZ-GARCIA'S TRIAL COMMITTED MISCONDUCT THAT VIOLATED CRUZ-GARCIA'S RIGHT TO A FAIR TRIAL .......................................................................................................... 139

A. Scripture Reading During Punishment-Phase Deliberations..................... 140

v

EXHIBIT 3 Page 006

000586

1.   Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Constitutes an Improper Outside Influence ........................ 145

2.   Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Prejudiced Cruz-Garcia ...................................................... 146

B. Jurors Committed Misconduct by Discussing the Case Outside of Deliberations ................................................................................. 148

1.   Jurors' Conversations with an Unauthorized Person Raise a Presumption of Prejudice to Cruz-Garcia.................................................. 149

C. Conclusion ................................................................................ 150

CLAIM TEN: TRIAL COUNSEL'S CUMULATIVE DEFICIENT PERFORMANCE OVER THE COURSE OF TRIAL PREJUDICED CRUZ-GARCIA.................................................................................................. 150

CLAIM ELEVEN: CRUZ-GARCIA'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING ................................................................................. 151

A. The Texas Statute and Cruz-Garcia's Jury Instructions ............................ 152

B. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence ................ 153

C. Conclusion ................................................................................ 156

CLAIM TWELVE: CRUZ-GARCIA'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE.................................................................... 157

A. The Supreme Court Has Invalidated Jury Instructions That Place an Undue Burden on the Sentencer Before Finding Mitigating Circumstances .............. 159

B. Texas's 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence.................................................................. 160

C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations ................................................................................. 161

vi

EXHIBIT 3 Page 007

000587

[off]

D. Conclusion ................................................................ 164

CLAIM THIRTEEN: CRUZ-GARCIA'S DEATH SENTENCE WAS
ARBITARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S
ANSWER TO THE UNCONSTITUTIONALLY VAGUE FIRST SPECIAL
ISSUE ............................................................................ 164

A. The First Special Issue is Unconstitutionally Vague and Fails to Narrow the
Class of Death-Eligible Defendants ................................................ 165

CLAIM FOURTEEN: CRUZ-GARCIA'S DEATH SENTENCE IS
UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'S
ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY ..... 168

A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied
Arbitrarily ................................................................ 169

B. Texas's Death Penalty Scheme Is Unconstitutional ................................. 171

1.   Geography ................................................................ 171

2.   Race ................................................................ 175

C. Conclusion ................................................................ 178

PRAYER FOR RELIEF ................................................................ 179

EXHIBIT 3 Page 008

000588

# TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ................................ 154, 155, 156

*Allen v. United States*, 164 U.S. 492 (1896) ................................................ 125, 162

*Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006) ........................................ 130

*Arizona v. Washington*, 434 U.S. 497 (1978) ........................................................ 162

*Barefoot v. Estelle*, 463 U.S. 880 (1983) .............................................................. 164

*Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995) .................................................. 52

*Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003) .............................................. 15

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ..................................................................... 11

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................. 43

*Brewer v. Quarterman*, 550 U.S. 286 (2007) ........................................................ 157

*Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) .................................................. 30, 39

*California v. Brown*, 479 U.S. 538 (1987) .............................................................. 170

*Cornejo v. County of San Diego*, 504 F.3d 853 (9th Cir. 2007) .......................... 102

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) .......................................................... 11

*Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) ...................................................... 115

*Downum v. United States*, 372 U.S. 734 (1963) .................................................... 162

*Evitts v. Lucey*, 469 U.S. 387 (1985) .............................................................. 13, 131

*Foster v. Neilson*, 27 U.S. 253 (1829) .................................................................... 102

*Furman v. Georgia*, 408 U.S. 238 (1972) .............................................................. 169

*Gandara v. Bennett*, 528 F.3d 823 (11th Cir. 2008) ............................................ 102

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ...................................................... 166, 171

*Gregg v. Georgia*, 428 U.S. 153 (1976) .......................... 166, 169, 170, 174

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) ............................................ 49

*Harrington v. Richter*, 562 U.S. 86 (2011) ...................................................... 11, 12

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ............................................................ 49

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687 (C.D. Cal. 1988) .......................................................................................... 15

*Jenkins v. United States*, 380 U.S. 445 (1965) ...................................................... 125

*Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001) ............................................ 15

*Jones v. Kemp*, 706 F.Supp. 1534 (N.D. Ga. 1989) .............................................. 147

*Jurek v. Texas*, 428 U.S. 262 (1976) ................................................................ passim

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ...................................................... 49

*Laughner v. United States*, 373 F.2d 326 (5th Cir. 1967) ...................................... 15

*Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876 (E.D. Pa. 1976) .................... 15

*Lockett v. Ohio*, 438 U.S. 586 (1978) .................................................................... 152

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) .......................................................... 125

viii

EXHIBIT 3 Page 009
000589

*Maynard v. Cartwright*, 486 U.S. 356 (1988)............................................ 166

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ...................................... 154, 166

*McKoy v. North Carolina*, 494 U.S. 433 (1990)........................... 159, 160

*Medellín v. Texas*, 552 U.S. 491 (2008)............................................... 102

*Mills v. Maryland*, 486 U.S. 367 (1988) ........................... 159, 160, 170

*Moore v. Illinois*, 408 U.S. 786 (1972) .................................................. 50

*Morgan v. Illinois*, 504 U.S. 719 (1992).................................... 121, 133

*Murphy v. Netherland*, 116 F.3d 97 (4th Cir. 1997)........................... 115

*Osagiede v. United States*, 543 F.3d 399 (7th Cir. 2008) .................. 120

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .............................................. 11

*Penry v. Johnson*, 532 U.S. 782 (2001) ...................................... 156, 171

*Penry v. Lynaugh*, 492 U.S. 302 (1989).......................................... passim

*Porter v. McCollum*, 558 U.S. 30 (2009)........................................ passim

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998)................................... 145

*Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009) .................... 150

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008)..................... 13, 130

*Rompilla v. Beard*, 545 U.S. 374 (2005)................................ 11, 12, 52

*Rummell v. Estelle*, 590 F.2d 103 (5th Cir. 1979).......................... 30, 39

*Sears v. Upton*, 130 S. Ct. 3259 (2010) ............................ 72, 96, 99

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ........................... 155, 157

*Smith v. Robbins*, 528 U.S. 259 (2000)......................................... 13, 130

*Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801 (11th Cir.
1995)................................................................................................ 50

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................. passim

*Tennard v. Dretke*, 542 U.S. 274 (2004)................................ 66, 154, 168

*United States v. Bagley*, 473 U.S. 667 (1985) ...................................... 49

*United States v. Basham*, Cr. No. 4:02-992-JFA, 2012 WL 1130657 (D.S.C. Apr.
4, 2012)............................................................................................ 15

*United States v. Cervantes*, 706 F.3d 603 (5th Cir. 2013)................... 150

*United States v. Comosona*, 848 F.2d 1110 (10th Cir. 1988)............... 50

*United States v. Pinson*, 584 F.3d 972 (10th Cir. 2009) ................ 14, 15

*United States v. Rhodes*, 569 F.2d 384 (5th Cir. 1978) ......................... 50

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ...... 128

*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999)............... 130

*Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) ..................................... 10

*Walbey v. Quarterman*, 309 Fed. App'x 795 (5th Cir. 2009) ............. 99

*Wiggins v. Smith*, 539 U.S. 510 (2003)........................................... passim

*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................... passim

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ...................... 170, 171

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................ 178

EXHIBIT 3 Page 010

000590

## State Cases

*Alabama v. Lewis*, 36 So. 3d 72 (Ala. Crim. App. 2008) ...................................... 16

*Barnett v. State*, 189 S.W.3d 272 (Tex. Crim. App. 2006)................................... 125

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ...................................... 32

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007) ................................... 166

*Ex parte Bryant*, 448 S.W.3d 29 (Tex. Crim. App. 2014) ..................................... 10

*Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005)............................... 100

*Ex parte Ellis*, 233 S.W.3d 324 (Tex. Crim. App. 2007) ...................................... 100

*Ex parte Flores*, 387 S.W.3d 626 (Tex. Crim. App. 2012) ..................................... 10

*Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).............. 12, 13, 52, 65

*Ex parte Jimenez*, 364 S.W.3d 866 (Tex. Crim. App. 2012).................................. 10

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ................................ 13

*Ex parte Medellín*, 223 S.W.3d 315 (Tex. Crim. App. 2006)............................... 103

*Ex parte Miles*, 359 S.W.3d 647 (Tex. Crim. App. 2012)...................................... 50

*Ex parte Napper*, 322 S.W.3d 202 (Tex. Crim. App. 2010)................................... 31

*Ex parte Overton*, 444 S.W. 3d 632 (Tex. Crim. App. 2014)................................. 10

*Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007)................. 13, 130, 139

*Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997) .......................... 130, 139

*Ex parte Troha*, 462 So.2d 953 (Ala. 1984) ....................................................... 147

*Ex parte Welborn*, 785 S.W.2d 391 (Tex. Crim. App. 1990)............................... 151

*Ex parte Woods*, 176 S.W.3d 224 (Tex. Crim. App. 2005).................................... 75

*Givens v. State*, 749 S.W.2d 954 (Tex. App.—Fort Worth 1988)......................... 49

*Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex. 2000).................. 136

*Granados v. State*, 85 S.W.3d 217 (Tex. Crim. App. 2002)........................ 137, 145

*Granviel v. State*, 552 S.W.2d 107 (Tex. Crim. App. 1976) ............................... 167

*Green v. State*, 840 S.W.2d 394 (Tex. Crim. App. 1992) ............................ 124, 129

*Harm v. State*, 183 S.W.3d 403 (Tex. Crim. App. 2006) ..................................... 48

*Howard v. State*, 941 S.W.2d 102 (Tex. Crim. App. 1996)................. 124, 125, 128

*In re Dean*, 711 A.2d 257 (N.H. 1998) ................................................................. 16

*Joseph v. State*, 3 S.W.3d 627 (Tex. App.—Houston [14th Dist.] 1999).............. 14

*Jurek v. State*, 522 S.W.2d 934 (Tex. Crim. App. 1975)........................... 167, 170

*Ledezma v. State*, 626 NW.2d 134 (Iowa 2001) ................................................. 115

*Lucero v. State*, 246 S.W.3d 86 (Tex. Crim. App. 2008) ............................. 146, 147

*Maryland Am. Gen. Ins. Co. v. Blackmon*, 639 S.W.2d 455 (Tex. 1982) .............. 14

*McQuarrie v. State*, 380 S.W.3d 145 (Tex. Crim. App. 2012)............................ 145

*Meza v. State*, 206 S.W.3d 684 (Tex. Crim. App. 2006) ...................................... 14

*Montoya v. State*, 810 S.W.2d 160 (Tex. Crim. App. 1989) ............................... 124

*Ocon v. State*, 284 S.W.3d 880 (Tex. Crim. App. 2009)............. 133, 136, 138, 149

*People v. Harlan*, 109 P.3d 616 (Colo. 2005) .................................................... 147

*Quinn v. State*, 958 S.W.3d 395 (Tex. Crim. App. 1997)................................... 149

x

EXHIBIT 3 Page 011

000591

*Ryser v. State*, 453 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2014) .............. 145
*State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981).............................. 147
*Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992) .................................. 50
*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999)................................. 10
*Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002) ......................................... 115
*Waldrip v. Head*, 532 S.E.2d 380 (Ga. 2000)......................................... 16
*West v. Solito*, 563 S.W.2d 240 (Tex. 1978).......................................... 14

**Statutes**
TEX. CODE CRIM. PROC. art. 37.071 ........................................ passim
TEX. R. EVID. 503 ........................................................ 14
TEX. R. EVID. 801 ........................................................ 40

**Other Authority**
ABA, *ABA Standards for Criminal Justice* (3d ed. 1993)..................... 12, 132, 136
ABA, Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report* (September 2013)................................. 42, 165, 176
ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) .............................. passim
ABA, *Standing Comm. on Ethics & Prof'l Responsibility, Formal Opinion 10-456* (2010) ................................................................ 16
Adam Gershowitz, *Statewide Capital Punishment: The Case For Eliminating Counties' Role in the Death Penalty*, http://works.bepress.com/adam_gershowitz/5 (2009)................................. 173
Attorney General of Texas, *Summary of Requirements Pertaining to Foreign Nationals*, Magistrate's Guide to Consular Notification Under the Vienna Convention ................................................ 102
Christopher Slobogin, *Capital Punishment and Dangerousness, in* MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119 (Robert F. Schopp et al. eds., 2009)................................. 167
Cindy Galway Buys et. al., *Do Unto Others: The Importance of Better Compliance with Consular Notification Rights*, 21 DUKE J. COMP. & INT'L L. 461 (2011) . 102
David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007) ................................. 175
Hernan de J. Ruiz-Bravo, *Suspicious Capital Punishment*, 3 SAN DIEGO JUST. J. 396 (1995) ................................................. 102
Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009) ................................. 175

xi

EXHIBIT 3 Page 012

000592

Jack Glaser, et al., *Possibility of Death Sentence Has Divergent Effect on Verdicts for Black and White Defendants* (June 24, 2009) ............................................ 177

John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4 (Aug. 1995) ..................................................................................... 77, 83

Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010)............................ 173

Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305 (2009) ................................................................................................ 173

Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012 ...................... 168

Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845 (1989-1990) .............. 167

Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUS. L. REV. 131 (2012)............................................ 176

Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008) ....................................................................................... 176

State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006).................................................................................... passim

State Bar of Tex., *Supplementary Guidelines and Standards for the Mitigation Function of Defense Teams in Texas Capital Cases* (June 2015) .......... 74, 76, 78

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 .................................................................... 100, 101, 110

William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51 (2003) ...................................................................................................... 161

EXHIBIT 3 Page 013

000593

## APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a Capital Case

The maxim that "death is different" has become a standing principle in our law that capital cases require the utmost care and scrutiny to ensure a defendant's rights have not been infringed before imposing a sentence of death. The need for such attention is never more true than in the case of a foreign national, unable to speak English and unfamiliar with the rights and privileges afforded to defendants in the United State justice system. Reading nothing but the cold record of Obel Cruz-Garcia's trial, one might presume that despite his position as a foreign national who could not speak English, his rights were still fully honored and safeguarded. That presumption falls away, however, as post-conviction investigation has revealed numerous instances in which Cruz-Garcia was denied his constitutional rights to consular assistance, effective legal representation, and a fair trial.

First, Cruz-Garcia's conviction rests on faulty DNA evidence—the only physical evidence tying him to a more than twenty-year-old crime—that should have been suppressed. The prosecution presented evidence that Cruz-Garcia's DNA was found on a sexual assault kit taken from one of the surviving victims, Diana Garcia. Trial counsel moved to suppress this evidence, citing as grounds the fact that the Houston Police Department (HPD) crime lab, which originally stored and handled the evidence in Cruz-Garcia's case, was later found to have widespread and serious problems in storage and analysis of DNA evidence during the time that evidence in Cruz-Garcia's case was in its possession. However, because counsel could point to no evidence that any of the systemic problems at the HPD lab had occurred with respect to any of the evidence in Cruz-Garcia's case, the trial court ruled the DNA evidence admissible.

1

EXHIBIT 3 Page 014

000594

Yet Cruz-Garcia's trial counsel failed to develop and present evidence that the very errors in storage and analysis of DNA evidence endemic to the HPD crime lab were, in fact, present in Cruz-Garcia's case, including alarmingly improper storage of the two key pieces of evidence and erroneous statistical calculations in analyzing the evidence. Had trial counsel presented evidence of these errors in support of their motion to suppress, the DNA evidence would likely have been suppressed, obliterating the State's case against Cruz-Garcia. Even if the DNA evidence had still been admitted at trial, evidence from a DNA expert that there was a second unknown contributor to the DNA evidence and testimony that Cruz-Garcia had an ongoing consensual sexual relationship with Diana Garcia could have persuaded the jury there was an innocent explanation for the presence of Cruz-Garcia's DNA and that the unknown second contributor was the true assailant. But the jury never heard this evidence.

Additionally, the jury never heard evidence that would have undermined the State's theory of Cruz-Garcia's motive. The State argued that Cruz-Garcia abducted and killed Diana Garcia's son, Angelo, in retaliation after she and her husband stopped selling drugs for him. Yet the jury did not hear evidence that Diana Garcia and her husband never stopped selling drugs—that, in fact, they were selling drugs on the day of the crime. This evidence would have directly contradicted the State's theory of motive. Given his admitted friendship with the victims, without prescribing a motive for Cruz-Garcia to commit the crime the State's theory of his guilt would have made no sense.

All of this evidence taken together at the guilt/innocence phase would have presented an entirely different evidentiary picture and created a reasonable doubt in the minds of the jurors.

Counsel's lack of effective assistance also extended to their presentation at the penalty phase of trial. At punishment, the jury heard from just three of Cruz-

2

EXHIBIT 3 Page 015

000595

Garcia's family members, who provided basic details about his family background, and a fourth witness who had met Cruz-Garcia in the Harris County jail and came to court on his own initiative to testify.  However, significantly more evidence was available that the jurors never heard—evidence that would likely have changed their verdict from death to life in prison.

Inexplicably, trial counsel declined to review the District Attorney's file, which remained open to them throughout the course of their representation.  Had they done so, they would have discovered records of Cruz-Garcia's time in prison in Puerto Rico.  These records indicated that Cruz-Garcia had an impeccable disciplinary record over the nearly ten years he spent there and could have been presented to the jury to strongly support an answer of "No" to the first Special Issue.  The jurors also never heard from prison personnel who knew Cruz-Garcia well and would have spoken glowingly of him as one of the most trusted and well-respected inmates they had ever encountered.  Such testimony would surely have made a difference to the jury's assessment of whether Cruz-Garcia would present a risk of committing future acts of violence if sentenced to life in prison.

Trial counsel also failed to retain a mitigation specialist, who could have provided invaluable assistance in investigating and preparing mitigation evidence.  The jury thus never heard from myriad family members who could have provided them with a more complete picture of who Cruz-Garcia was.  Nor did the jury hear expert testimony that could have explained Cruz-Garcia's life history in the context of his cultural background

Finally, Cruz-Garcia, a citizen of the Dominican Republic who can neither speak nor understand English, was deprived of due process when the State failed to properly inform him of his right to seek consular assistance, in violation of the Vienna Convention on Consular Relations.

3

EXHIBIT 3 Page 016

000596

These and other constitutional errors rendered Cruz-Garcia's trial fundamentally unfair. Because of these errors, Cruz-Garcia must be granted a new trial.

## I.

## PROCEDURAL HISTORY

Obel Cruz-Garcia is confined under a sentence of death pursuant to the judgment of the 337th District Court, Harris County, Texas, case number 1384794, which was rendered on July 19, 2013 (3 CR at 104) and entered on July 22, 2013 (28 RR at 3-6).[1]

### A. Trial Court Proceedings

Cruz-Garcia was indicted on November 20, 2008, on the charge of capital murder for intentionally and knowingly causing the death of Angelo Garcia while in the course of committing kidnapping. (1 CR at 6.) Cruz-Garcia was extradited from Puerto Rico in early 2010 to stand trial in Houston, Texas. Initially, attorneys Mike Fosher and Mario Madrid were selected as appointed counsel in February 2010. (1 CR at 8, 11.) About a month later, in April 2010, Cruz-Garcia's family retained Steven Shellist and Christian Capitaine as counsel for Cruz-Garcia, and Mr. Fosher and Mr. Madrid were removed. (1 CR at 19-21.)

However, the State later determined that it would seek death against Cruz-Garcia. (4 RR at 9.) Neither Mr. Shellist nor Mr. Capitaine were on the approved list of capital counsel and withdrew from the case on August 31, 2011. (2 CR at 326; 4 RR at 6-7.) Attorney Skip Cornelius was appointed as first chair and attorney Mario Madrid was appointed as second chair counsel that same day. (1 CR at 57-58.) Cruz-Garcia was represented at trial by Mr. Cornelius and Mr. Madrid. (1 RR at 3.)

---

[1]"CR" refers to the Clerk's Record in Cruz-Garcia's trial. "RR" refers to the Reporter's Record in Cruz-Garcia's trial.

EXHIBIT 3 Page 017

000597

Voir dire commenced on June 3, 2013, with the general panel and individual voir dire, and concluded on June 17, 2013. (5 RR; 15 RR.) On June 19, 2013, the Court held a hearing on the defense's motion to suppress DNA evidence. (16 RR at 16.) The defense presented argument, and the State presented witness testimony and argument. (16 RR at 16-21, 26-99.) After consideration, the Court denied the defense's motion to suppress. (17 RR at 5.)

The guilt/innocence phase of trial began on July 8, 2013, with Cruz-Garcia entering a plea of not guilty. (18 RR.) After four days of testimony, the State rested its case. (21 RR at 174.) The defense rested without presenting any witnesses or testimony of its own. (*Id.* at 175.) Both sides presented closing arguments, and the jury returned with a verdict finding Cruz-Garcia guilty of capital murder on July 15, 2013. (23 RR at 101.)

The punishment phase of Cruz-Garcia's trial began on July 16, 2013. (24 RR at 7.) The State presented its case for punishment and rested on July 17, 2013. (25 RR at 202.) The defense presented its punishment case through the testimony of four witnesses on July 18, 2013. (26 RR at 8-93.) The same day, both sides rested and presented closing argument. (*Id.* at 105, 141.) Jury deliberations commenced, with the jury being sequestered that evening. The next day, the jury returned with a verdict, and Cruz-Garcia was formally sentenced to death on July 22, 2015. (27 RR at 9; 28 RR at 3.)

**B. State Appellate Proceedings**

On July 22, 2013, this Court appointed attorney Wayne Hill to represent Cruz-Garcia for purposes of the direct appeal. (3 CR at 536.) Hill filed a motion for new trial on August 19, 2013, and argument was heard on the motion on September 20, 2013. The Court denied the defendant's request for live testimony in support of his motion and denied the motion. (*Id.* at 28.) An appellate brief was filed with the Court of Criminal Appeals (CCA) on September 15, 2014. The State

5

EXHIBIT 3 Page 018

000598

filed its response on April 15, 2015. Oral argument was waived. At the filing of this Application, the appeal continues to be under consideration by the CCA.

### C. State Habeas Proceedings

On July 22, 2013, this Court appointed the Office of Capital Writs (OCW) to represent Cruz-Garcia in his post-conviction habeas litigation, pursuant to Article 11.071, section 2 of the Code of Criminal Procedure. (3 CR at 535.) In order to facilitate the investigation into Cruz-Garcia's case, the trial court granted OCW motions: (1) to receive access to items sealed in the clerk's record; (2) to be allowed to inspect physical exhibits offered at trial; (3) to receive copies of all sealed materials and juror questionnaires; and (4) for the disclosure of certain potentially exculpatory or mitigating materials from the District Attorney's file. The trial court also granted a single ninety-day extension of time for Cruz-Garcia to file his application.

This Application follows.

## II.

## STATEMENT OF FACTS

Cruz-Garcia was indicted on November 20, 2008, for the 1992 murder of Angelo Garcia. (1 CR at 6.) In early 2010, he was extradited from Puerto Rico to face trial for capital murder. Trial presentations began on July 8, 2013, more than twenty years after the crime and nearly five years after the indictment. (18 RR at 29.)

### A. Guilt/Innocence Phase of Trial

During the guilt/innocence phase of trial, the State presented testimony from Angelo Garcia's mother, Diana Garcia. (18 RR at 120.) Diana testified that on the night of September 30, 1992, two men entered the bedroom where she, her common-law husband, Arturo Rodriguez, and her six-year-old son, Angelo, were sleeping. (*Id.* at 144-53.) Diana testified that one of the men beat Arturo

6

EXHIBIT 3 Page 019
000599

unconscious while the other one sexually assaulted her. (*Id.* at 153-58.) She stated
that when the men then left, she discovered that Angelo was gone. (*Id.* at 162-63.)
Arturo Rodriguez testified to the incident as well. (*Id.* at 205-219.) Diana and
Arturo testified that Cruz-Garcia was a friend of theirs for whom they had sold
drugs, but that they had stopped selling a few weeks before the crime occurred.
(*Id.* at 129-38, 199-205.) They testified that the men who assaulted them were
wearing masks and that they were unable to identify them. (*Id.* at 151-62, 208-15.)

The State also presented the testimony of several law enforcement officers
who participated in the initial investigation into the crime as well as a nurse who
performed a sexual assault exam of Diana Garcia the night of the crime. (*See
generally* 18 RR–19 RR.) The investigation led to the discovery of Angelo
Garcia's remains on the shore of Goose Creek in Baytown on November 4, 1992.
(19 RR at 191-92.) The State also presented the testimony of Eric Mehl, a former
HPD sergeant who reopened the investigation in 2007 while working in the cold
case unit. (20 RR at 42-43.)

The State presented the testimony of an alleged co-conspirator named
Carmelo Martinez Santana, who went by the name Rudy. (20 RR at 116.) Rudy
claimed that on the night of the incident, he, Cruz-Garcia, and a third man named
Roger drove to Diana Garcia's apartment and that Cruz-Garcia and Roger entered
the apartment while he waited in the car. (*Id.* at 135-41.) Rudy testified that after
about thirty minutes, Cruz-Garcia and Roger came back to the car and that Cruz-
Garcia was carrying Angelo Garcia. (*Id.* at 143-44.) Rudy stated that they drove
to Baytown, where Cruz-Garcia ordered Roger to kill Angelo, which he did. (*Id.* at
148-51.) Rudy testified that they then drove to another location close to a river,
where Cruz-Garcia ordered him and Roger to dump Angelo's body into the river.
(*Id.* at 152-53.)

7

EXHIBIT 3 Page 020
000600

Angelita Rodriguez, Cruz-Garcia's wife at the time of the incident, also testified that Cruz-Garcia confessed the crime to her a few months after it occurred. (20 RR at 107.)

Finally, the State presented the testimony of two DNA analysts who testified that Cruz-Garcia's DNA was present on items of evidence recovered from the crime scene, including the sexual assault kit of Diana Garcia. (21 RR at 103-73.)

The defense did not present any affirmative evidence at the guilt/innocence phase. (21 RR at 173.)

**B. Punishment Phase of Trial**

At punishment, the State presented evidence of an extraneous kidnapping in Puerto Rico for which Cruz-Garcia was convicted in 2002. (24 RR at 14-117.) The State also presented evidence of an uncharged extraneous murder in Houston in 1989. (25 RR at 4-122.)

In addition, the State presented testimony from a correctional officer from the Puerto Rican prison where Cruz-Garcia was previously held. (24 RR at 118.) He testified that Cruz-Garcia was reprimanded for possessing a cell phone, rope, and a map, which the officer believed he planned to use for an escape attempt. (*Id.* at 124-28.) The State also presented testimony from a Harris County jail guard, who testified that Cruz-Garcia once failed to promptly return a razor blade that was checked out to him. (25 RR at 130-36.) The State additionally presented the testimony of a Texas Department of Criminal Justice (TDCJ) employee, who testified generally about the inmate classification system. (*Id.* at 149-89.)

Finally, the State presented victim impact testimony from Diana Garcia. (25 RR at 190-201.)

The defense presented the testimony of Cruz-Garcia's wife Mirella, brother Joel, and son Abel. (26 RR at 8-79.) These witnesses provided basic information about Cruz-Garcia's background—that he grew up in the Dominican Republic,

8

EXHIBIT 3 Page 021

000601
000022

moved to Puerto Rico as a young man, and later immigrated to the United States. (*Id.*) They testified that Cruz-Garcia was loving, generous, and hard-working, and that he was a good father. (*Id.*)

Finally, Angel Meza, a young man who met Cruz-Garcia while incarcerated at the Harris County Jail, testified that Cruz-Garcia had had a positive impact on him. (26 RR at 81-92.)

### C. Information Uncovered in Post-Conviction Investigation

Post-conviction counsel have uncovered significant evidence that was not presented at Cruz-Garcia's trial. Consultation with an independent DNA expert has revealed that numerous errors occurred in the handling and analysis of the DNA evidence in Cruz-Garcia's case—information which could have led to the suppression of the DNA evidence altogether or to an entirely different theory being presented to the jury at the guilt/innocence phase. Additionally, several witnesses were available who could have testified to Cruz-Garcia's ongoing sexual relationship with Diana Garcia, which would have provided the jury with an alternative explanation for the presence of his DNA on the sexual assault kit.

Post-conviction investigation has also uncovered substantial information that could have been presented at the punishment phase to sway the jury in favor of a life sentence. This includes voluminous records from Cruz-Garcia's time in prison in Puerto Rico indicating that Cruz-Garcia had an impeccable disciplinary record during his nearly ten years there, as well as testimony from personnel who worked in the prison that Cruz-Garcia was a model inmate. Additionally, many of Cruz-Garcia's family members in both the Dominican Republic and Puerto Rico were never interviewed by the defense team, but could have provided the jury with a much more robust picture of Cruz-Garcia's life history and his role in their family. Additionally, expert witness testimony was available to explain the relevance of Cruz-Garcia's life story to the mitigation question.

EXHIBIT 3 Page 022

000602

Finally, post-conviction investigation has uncovered numerous instances of juror misconduct that infringed upon Cruz-Garcia's right to a fair trial.

## III.

## STANDARD OF CARE

### A. Ineffective Assistance of Trial Counsel

A criminal defendant is guaranteed the right to trial representation. This Sixth Amendment right to counsel "preserves the fairness, consistency, and reliability of criminal proceedings by ensuring that the process is an adversarial one." *Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012).

An ineffective assistance of counsel claim has two components: Cruz-Garcia must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006); *Ex parte Bryant*, 448 S.W.3d 29, 39 (Tex. Crim. App. 2014); *Ex parte Overton*, 444 S.W. 3d 632, 640 (Tex. Crim. App. 2014) (granting habeas relief pursuant to *Strickland*); *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) ("[A]ppellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

To establish deficiency, Cruz-Garcia must show his counsel's representation fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38-39 (quoting *Strickland*, 466 U.S. at 688); *Ex parte Bryant*, 448 S.W.3d at 39. A defendant need only prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. This standard governs the claim as a whole, and does not replace the more lenient "reasonable probability" standard for the prejudice prong.

10

EXHIBIT 3 Page 023

000603

The Supreme Court has reiterated that it applies a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 393-94 (2005) (O'Connor, J., concurring) (citing *Strickland*, 466 U.S. 668).

Deficient performance is performance that is "inconsistent with the standard of professional competence in capital cases that prevailed [at the time of the trial]." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting that the *ABA Standards* "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("'[W]e long have referred [to the ABA *Standards for Criminal Justice*] as "guides to determining what is reasonable."'" (quoting *Wiggins*, 539 U.S. at 524)). Because adequacy is based upon "counsel's perspective at the time," *Strickland*, 466 U.S. at 689, courts must look to the guidelines then in effect. *See Bobby v. Van Hook*, 558 U.S. 4 (2009).

At the time of Cruz-Garcia's trial, his attorneys' obligations were governed by "prevailing professional norms," even if those norms did not align with a less rigorous defense based on "most common custom[s]." *Harrington v. Richter*, 562 U.S. 86, 88 (2011). The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Strickland*, 466 U.S. at 688. These sources of norms include the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (2003) ("*ABA Guidelines*"), the ABA *Standards for Criminal Justice* (3d ed. 1993) ("*ABA*

11

EXHIBIT 3 Page 024

000604

*Standards*"), and the State Bar of Texas *Guidelines and Standards for Texas Capital Counsel*, 69 TEX. B.J. 966 (2006) ("*Texas Guidelines*").

Trial counsel have a duty to undertake reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. "[The] Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7. Once capital trial counsel completes the necessary pretrial investigation, he or she must then formulate a defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1. The Court of Criminal Appeals holds capital counsel to an even higher standard: "It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, [capital] defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic." *Ex parte Gonzales*, 204 S.W.3d 391, 400-01 (Tex. Crim. App. 2006) (Cochran, J., concurring).

To establish prejudice, Cruz-Garcia "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 558 U.S. at 44 (quoting *Strickland*, 466 U.S. at 693-94). Cruz-Garcia need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693, but he must demonstrate that "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112. State courts "must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury

12

EXHIBIT 3 Page 025
000605

heard it, the jury's verdict would have been different." *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

State post-conviction courts must analyze a capital punishment phase ineffectiveness claim by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. It is not necessary for the petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000). The Constitution requires that state post-conviction courts "engage with what [a defendant] actually went through," as expressed in mitigating evidence. *Porter*, 558 U.S. at 44. It is not only incorrect but "unreasonable to discount to irrelevance [mitigating] evidence . . . [or] to conclude that [certain mitigating evidence] would be reduced to inconsequential proportions simply because the jury would also have learned [of related aggravating evidence]." *Id.* at 43. The Court of Criminal Appeals has "adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Ex parte Gonzales*, 204 S.W.3d at 394.

**B. Ineffective Assistance of Appellate Counsel**

Ineffective assistance of appellate counsel claims are governed by *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("[T]he proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*."); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (holding the Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right); *accord Ries v. Quarterman*, 522 F.3d 517, 531-32 (5th Cir. 2008); *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007). Appellate counsel has a duty to review the record and present any potentially meritorious claims. *Meza v. State*, 206 S.W.3d 684, 689 (Tex.

13

EXHIBIT 3 Page 026
: 000627
000606

Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error").

## C. Scope of the Waiver of Attorney-Client Privilege

Cruz-Garcia recognizes that raising specific issues of ineffective assistance of counsel as developed in this Application operates as a limited waiver of privileged information; however, he asserts his right to have all privileged information not directly relevant to his claims remain privileged.

Under the Texas Rules of Evidence, confidential communications between a client and his attorney are privileged. TEX. R. EVID. 503(b)(1)(A) ("A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client . . . between the client . . . and the client's lawyer."). The privileged nature of communications between client and attorney remains intact, even upon the termination of the attorney-client relationship. *See Maryland Am. Gen. Ins. Co. v. Blackmon*, 639 S.W.2d 455, 458 (Tex. 1982).

The privilege between attorney and client is not absolute. It is "well-established . . . that when an attorney's professional conduct is challenged by the client, the privilege is waived so far as necessary to defend the attorney's character." *West v. Solito*, 563 S.W.2d 240, 245 n.3 (Tex. 1978). In the context of criminal law, courts across the nation have consistently "held that a claim of ineffective assistance of counsel by a defendant against a former attorney waives the attorney-client privilege." *Joseph v. State*, 3 S.W.3d 627, 637 (Tex. App.—Houston [14th Dist.] 1999) (citing *Laughner v. United States*, 373 F.2d 326, 327 (5th Cir. 1967)); *see also United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009).

However, any waiver of the attorney-client privilege only applies to communications relevant to the claim of ineffective assistance of counsel.

14

EXHIBIT 3 Page 027

000607

*Laughner*, 373 F.2d at 327 (noting where "the client alleges a breach of duty to him by the attorney, . . . he thereby waives the privilege as to all communications *relevant* to that issue" (emphasis added)). Courts have consistently limited the scope of these waivers, permitting disclosure of only those confidential communications that are "*necessary* to prove or disprove [the client's] claims." *Pinson*, 584 F.3d at 978 (emphasis added).[2]

---

[2] *See also Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) ("Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question."); *Johnson v. Alabama*, 256 F.3d 1156, 1179 (11th Cir. 2001) ("[A] habeas petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel *relevant* to assessing the reasonableness of those decisions in the circumstances." (emphasis added)); *United States v. Basham*, Cr. No. 4:02-992-JFA, 2012 WL 1130657 at *6 (D.S.C. Apr. 4, 2012) (unpublished) ("[T]he Government will not use and will not make copies of any material or information in trial counsel's files that is not *related or relevant* to a claim in Basham's § 2255 Motion." (emphasis added)); *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litig.*, 120 F.R.D. 687, 692 (C.D. Cal. 1988) (rejecting "the suggestion made by some parties that 'selective' disclosure should not be allowed, that if the exception is permitted to be invoked, *all* attorney-client communications should be disclosed" as "directly contrary to the reasonable necessity standard"); *Levin v. Ripple Twist Mills, Inc.*, 416 F. Supp. 876, 886-87 (E.D. Pa. 1976) ("In almost any case when an attorney and a former client are adversaries in the courtroom, there will be a credibility contest between them. This does not entitle the attorney to rummage through every file he has on that particular client (regardless of its relatedness to the subject matter of the present case) and to publicize any confidential communication he comes across which may tend to impeach his former client. At the very least, the word 'necessary' in the disciplinary rule requires that the probative value of the disclosed material be great enough to outweigh the potential damage the disclosure will cause to the client and the legal profession."); *Alabama v. Lewis*, 36 So. 3d 72, 77-78 (Ala. Crim. App. 2008) (noting that, by alleging "ineffective assistance of counsel during the trial and direct appeal of these cases, the defendant waived the benefits of both the attorney-client privilege and the work product privilege, but

15

EXHIBIT 3 Page 028

000608
000029

Predecessor counsel's duty to limit disclosure to information relevant to the claim of ineffective assistance also flows from counsel's continuing duty to the former client. Both the *ABA Guidelines* and the *Texas Guidelines* stipulate that, "[i]n accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client." *ABA Guidelines*, Guideline 10.13; *Texas Guidelines*, Guideline 11.8. ABA Formal Opinion 10-456 states that, in the context of an ineffective assistance of counsel claim, lawyers may disclose information "reasonably necessary" for resolution of the ineffectiveness claim. ABA Standing Comm. on Ethics & Prof'l Responsibility, *Formal Opinion 10-456*, at 5 (2010). However, the opinion further states that it is "highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable." *Id.*

---

*only* with respect to matters *relevant* to his allegations of ineffective assistance of counsel" (second emphasis added)); *Waldrip v. Head*, 532 S.E.2d 380, 387 (Ga. 2000) ("[W]e hold that a habeas petitioner who asserts a claim of ineffective assistance of counsel makes a limited waiver of the attorney-client privilege and work product doctrine and the state is entitled only to counsel's documents and files *relevant* to the specific allegations of ineffectiveness." (emphasis added)); *In re Dean*, 711 A.2d 257, 258-59 (N.H. 1998) ("We hold that claims of ineffective assistance of counsel, whether brought in a motion for new trial or in a habeas corpus proceeding, constitute a waiver of the attorney-client privilege to the extent *relevant* to the ineffectiveness claim; the waiver is a limited one." (emphasis added)).

16

EXHIBIT 3 Page 029

000609

## IV.

## ARGUMENT

## CLAIM ONE

## TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PRESENT EVIDENCE FROM A DNA EXPERT TO CHALLENGE THE DNA EVIDENCE PRESENTED AT TRIAL

The State's case against Cruz-Garcia at the guilt/innocence phase rested largely on DNA evidence, the only physical evidence linking Cruz-Garcia to the crime.  Indeed, the State presented evidence that Angelo Garcia's 1992 murder had remained unsolved until 2008, when the HPD obtained a DNA sample from Cruz-Garcia and compared it to evidence collected at the time of the crime.  Recognizing the importance of the DNA evidence to the State's case for guilt, trial counsel filed a pretrial motion to suppress the DNA evidence.  In support of this motion, counsel cited to the fact that, through multiple investigations, the "now defunct HPD crime lab" had been found to have engaged in improper handling and testing of DNA evidence during the time that that lab was in possession of the DNA evidence in Cruz-Garcia's case.

After a hearing, the trial court denied counsel's motion to suppress the DNA evidence, finding that counsel had presented no evidence that the general issues of malfeasance at the HPD crime lab had affected the lab's handling of evidence in this case.  Had trial counsel retained an independent DNA analyst to review the DNA testing performed by the State, they could have presented testimony at the suppression hearing that, in fact, the very issues endemic to the HPD crime lab in the early 1990s were present here.  Moreover, such a review also would have revealed problems in the DNA testing and analysis performed later by Orchid Cellmark, calling into question the statistical and scientific validity of the DNA evidence presented by the State.  Had trial counsel presented this testimony at the

17

EXHIBIT 3 Page 030

000610

suppression hearing, there is a reasonable probability that the DNA evidence would have been suppressed.

Furthermore, even if the DNA evidence had not been suppressed, trial counsel could have presented this testimony to substantially undermine the State's case for guilt. Trial counsel performed ineffectively by failing to present a DNA expert to challenge the DNA evidence presented in Cruz-Garcia's case. Thus, Cruz-Garcia's conviction was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and the appropriate remedy is a new trial.

## A. DNA Evidence and Trial Counsel's Attempt to Suppress

Cruz-Garcia was indicted in November 2008 after HPD obtained a DNA sample from him and compared it to the DNA profile obtained from the sexual assault kit of Diana Garcia and from a cigar that was found at her house after Angelo Garcia was kidnapped. (1 CR at 6; 20 RR at 51, 55-56.) Prior counsel for Cruz-Garcia, Mr. Shellist and Mr. Capitaine, filed a Motion for Continuance in January 2011 to allow time for an independent DNA expert to review the State's DNA evidence. (2 CR at 221; Ex. 4 [Aff. of Steven Shellist] at ¶4.) Mr. Shellist and Mr. Capitaine recognized that because DNA evidence was the only physical evidence linking Cruz-Garcia to the crime, "evaluating the integrity of the DNA evidence would be crucial in determining whether or not Cruz-Garcia could be connected to the sexual assault of Diana Garcia and the kidnapping and subsequent death of her son." (Ex. 4 at ¶3 [Aff. of Shellist]; 2 CR at 227.) Mr. Shellist and Mr. Capitaine were also aware that specific employees of the HPD crime lab who had handled evidence in Cruz-Garcia's case had since been found to have engaged in serious, and in some cases criminal, misconduct. (2 CR at 227-28; Ex. 4 at ¶3 [Aff. of Shellist].) Mr. Shellist and Mr. Capitaine therefore knew that retaining an

18

EXHIBIT 3 Page 031
000611
000032

independent forensic DNA expert to review the State's handling and processing of the DNA evidence would be necessary to render effective assistance of counsel and guarantee Cruz-Garcia a fair trial. (Ex. 4 [Aff. of Shellist at ¶3.)

To that end, Mr. Shellist and Mr. Capitaine contacted Dr. Elizabeth Johnson, a private forensic scientist and DNA analyst, to consult with them about the DNA evidence in the case. (2 CR at 229; Ex. 4 at ¶4 [Aff. of Shellist]; Ex. 32 at p. 2 [Trial Affidavit of DNA Expert Johnson].) Dr. Johnson provided an affidavit in support of the Motion for Continuance detailing the amount of time she would need to review the DNA evidence in the case. (Ex. 4 at ¶4 [Aff. of Shellist]; Ex. 32 at p. 2 [Trial Affidavit of DNA Expert Johnson].) Mr. Shellist and Mr. Capitaine intended to have Dr. Johnson review the DNA testing performed by the State. (2 CR at 229; Ex. 4 at ¶4 [Aff. of Shellist].) Had that review produced helpful results, they intended to use that information to suppress the DNA evidence. Alternatively, they intended to present Dr. Johnson as a witness at trial or to consult with her for assistance in cross-examining the State's witnesses pertaining to DNA. (Ex. 4 at ¶5 [Aff. of Shellist].)

When Mr. Shellist and Mr. Capitaine withdrew from Cruz-Garcia's case, they told new counsel that they would be happy to consult with him about the case and share their thoughts and ideas for Cruz-Garcia's defense. (Ex. 4 at ¶6 [Aff. of Shellist].) Trial counsel declined to consult with them about the case. (*Id.*) Trial counsel did not retain Dr. Johnson or any other DNA expert to review the DNA testing performed in Cruz-Garcia's case.

On June 14, 2013, trial counsel filed a Motion to Suppress Results of All DNA Testing. (3 CR at 454-456.) A suppression hearing was held on June 19, 2013. (16 RR at 1.)

19

EXHIBIT 3 Page 032

000612
000033

## 1. Suppression Hearing

At the suppression hearing, the State presented testimony from Eric Mehl, a retired HPD sergeant. (16 RR at 26.) Sgt. Mehl testified that while working in the HPD cold case squad in 2007, he decided to reinvestigate the death of Angelo Garcia fifteen years earlier. (*Id.* at 29-30). Sgt. Mehl retrieved several items of evidence from storage that had been collected at the time of the crime, including a cigar that had been recovered at the scene of the crime, a sexual assault kit that was taken from Diana Garcia the night of the assault, a cutting from Diana Garcia's panties, and blood samples taken from Diana Garcia and Arturo Rodriguez. Sgt. Mehl sent these items to forensic testing lab Orchid Cellmark for analysis. (*Id.* at 30-35.) Sgt. Mehl testified that the cigar had been stored at the HPD property room and that the sexual assault kit had been stored in the property room annex. (*Id.* at 30-32.) According to Sgt. Mehl, the sexual assault kit was sealed in a plastic bag, and there did not appear to be any problems with the storage of this item of evidence, nor with the storage of the cigar. (*Id.* at 30-33.) Sgt. Mehl also stated that the cutting from the panties and the blood samples from Diana Garcia and Arturo Rodriguez had been stored at the HPD crime lab and that each of these items was in individually sealed plastic bags and stored together in a larger bag. (*Id.* at 33-35.)

Sgt. Mehl further testified that in 2008, he obtained a DNA sample from Cruz-Garcia and also sent it to Orchid Cellmark for analysis and comparison to the DNA profiles obtained from the items of evidence. (16 RR at 38-39.) After performing this analysis, Orchid Cellmark reported back to Sgt. Mehl that the DNA profile obtained from the cigar matched that of Cruz-Garcia, that the major component of the DNA mixture obtained from the cutting of the panties belonged to Cruz-Garcia, and that Cruz-Garcia could not be excluded as a contributor to the DNA mixture found on the vaginal swab. (*Id.* at 39.)

EXHIBIT 3 Page 033

000613

The State then presented the testimony of Matt Quartaro, a DNA analyst at Orchid Cellmark. (16 RR at 49.) Quartaro testified that when he received the evidence in this case from Sgt. Mehl, there did not appear to be any problems in the packaging of the evidence. (*Id.* at 49-50, 60.) Orchid Cellmark's analysis of the DNA evidence provided by Sgt. Mehl resulted in a finding that Cruz-Garcia's DNA profile matched the profile obtained from the cigar; that the sperm cell fraction obtained from the vaginal swabs was a mixture of multiple individuals, to which Cruz-Garcia and Arturo Rodriguez could not be excluded as contributors; and that the sperm cell fraction obtained from the cutting of the panties was a mixture of at least two individuals, to which Cruz-Garcia was a major contributor and Arturo Rodriguez could not be excluded as a minor contributor. (*Id.* at 54-60.)

Finally, the State presented testimony from Courtney Head, a criminalist with the HPD crime lab. Head testified that in 1992, the HPD crime lab had performed DNA extractions on the evidence and reference samples collected in the case and that those extractions were sent to Genetic Design Lab in California for testing. (16 RR at 84.) In 2010, Head performed a DNA extraction on a buccal swab taken from Cruz-Garcia. (*Id.* at 89-90.) Head then compared the DNA profile she obtained of Cruz-Garcia to the DNA profiles that Orchid Cellmark had obtained from the evidentiary samples. (*Id.* at 91.) Head did not herself perform any DNA testing on the items of evidence; rather, she relied solely on the DNA profiles obtained by Orchid Cellmark. (*Id.*) Based on her comparison of Cruz-Garcia's DNA profile to Orchid Cellmark's findings, Head found that Cruz-Garcia could not be excluded as a contributor to the DNA on the cigar; that Cruz-Garcia could not be excluded as a contributor to the mixture DNA profile obtained from the sperm cell fraction of the vaginal swabs; and that the DNA profile obtained from the sperm cell fraction of the panties was a mixture of at least two

21

EXHIBIT 3 Page 034

000614

individuals, to which Cruz-Garcia could not be excluded as a contributor to the major component. (*Id.* at 91-92.)

Head also testified to the involvement of several specific HPD crime lab analysts in the handling of DNA evidence in Cruz-Garcia's case. Head testified that a criminalist named Joseph Chu had obtained a hair sample from a suspect in 1992 and also had received buccal swabs from Cruz-Garcia in 2010. (16 RR at 85-86.) Head also testified that a former HPD crime lab employee named B. Sharma was the main DNA analyst on the extractions taken from the sexual assault kit in 1992. (*Id.* at 86-87, 97.) Head further testified that another HPD crime lab employee named Deetrice Wallace initially received the sexual assault kit and did some screening to detect blood or semen. (*Id.* at 98.)

In response to this testimony, the defense argued that investigations into the workings of the HPD crime lab over the time period that the lab was in possession of evidence in Cruz-Garcia's case had resulted in scathing reports of malfeasance at the lab, including contamination of evidence and incorrect analyses, and the eventual closure of the lab. (16 RR at 16-18.) Additionally, trial counsel argued that specific individuals who had handled evidence in Cruz-Garcia's case were found through these investigations to have committed misconduct in their work at the lab. (*Id.* at 17, 108.) In support of their motion, trial counsel also submitted several reports of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room, Michael Bromwich; the HPD Internal Affairs Division investigation summary; employee complaint histories of Joseph Chu and Baldev Sharma; and judgments of conviction of Deetrice Wallace. (*Id.* at 21; 18 RR at 28.) These records demonstrated that Joseph Chu had received nine allegations of misconduct as an employee of the HPD crime lab and that he had on several occasions failed to report DNA statistics properly. (Defense Ex. 8-9; 17 RR at 14-15.) The records also showed that Baldev Sharma had received five

22

EXHIBIT 3 Page 035
000615

allegations of misconduct as an employee of the HPD crime lab, including an allegation of criminal activity; that he had been cited for violations of competence and truthfulness; and that the DNA/Serology Section of the lab was a "total disaster" under his management. (Defense Ex. 2-3, 8-9; 17 RR at 15-16.) The records further demonstrated that, as an employee with the Department of Public Safety, Deetrice Wallace had been convicted of three counts of tampering with a governmental record. (Defense Ex. 17; 17 RR at 16.) Nevertheless, trial counsel conceded they could not show that the type of mishandling of evidence detailed in the investigative reports and employee records occurred with respect to any of the evidence in Cruz-Garcia's case. (16 RR at 18, 107.)

In ruling on counsel's Motion to Suppress, the trial court held that "the DNA evidence as it relates to Orchid Cellmark testing is sufficiently reliable and relevant and is admissible." (17 RR at 4.) Specifically, the court found that the sexual assault kit was sealed when Sgt. Mehl retrieved it from the HPD property room annex and sent it to Orchid Cellmark in 2007 and that "there is no evidence in this case that any of the…DNA evidence in question was stored in a manner or placed in a location that is alleged to be subject to contamination, mishandling, or malfeasance by the HPD property room or the old HPD Crime Lab." (*Id.* at 7, 12.) The court found that the Bromwich Report submitted by trial counsel detailed myriad issues with the DNA serology section of the old HPD crime lab, including "deficiency in documentation of procedures, mistakes in performing analysis of samples containing mixtures of more than one person's DNA, errors in calculating statistical probabilities, mischaracterization of DNA results and testimony, lack of established quality assurance and internal auditing systems, inadequate resources, a technical leader with inadequate qualifications, inadequate training program, insufficient educational background for analysts, and inadequate standard of operating procedures." (*Id.* at 13.) However, the court held that "[n]o issues have

23

EXHIBIT 3 Page 036

000616

been identified in the Bromwich Report or in this hearing or in any discovery that the Court has been made aware of that there were any concerns addressed in those items regarding the evidence in this case." (*Id.*)

## 2. Trial

The State again presented the testimony of Sgt. Mehl, Quartaro, and Head at trial. Their testimony largely mirrored the testimony they gave at the suppression hearing. (20 RR at 33-68; 21 RR at 103-73.)

## B. Findings of Post-Conviction Review by DNA Expert

Daniel Hellwig is the Laboratory Director of Sorenson Forensics, a private forensic lab in Salt Lake City, Utah, that provides forensic DNA casework services for entities including crime labs, law enforcement agencies, and courts throughout the country. (Ex. 2 at ¶1 [Aff. of Daniel Hellwig].) Had trial counsel retained an independent DNA analyst such as Mr. Hellwig to review the results of the DNA testing performed in Cruz-Garcia's case, they would have discovered that the same issues detailed in the Bromwich Report—including improper storage of evidence and errors in analyzing mixture DNA profiles and calculating statistical probabilities—were, in fact, present in Cruz-Garcia's case, not only with regard to the HPD crime lab's initial handling of the evidence, but with regard to the testing performed later by Orchid Cellmark as well.

## 1. Chain of Custody

Mr. Hellwig's review of the chain of custody documentation uncovered serious concerns about the integrity of the probative pieces of evidence in Cruz-Garcia's case—specifically, the sexual assault kit and the cutting of the panties from which incriminating DNA evidence was later discovered. Contrary to the testimony of Sgt. Mehl and Matt Quartaro at the suppression hearing and trial, the Orchid Cellmark chain of custody documentation revealed that the evidence bag containing the sexual assault kit that housed the vaginal swabs was *unsealed* prior

24

EXHIBIT 3 Page 037
000617
000038

to laboratory processing.  While the outer FedEx box in which Orchid Cellmark received the sexual assault kit was sealed, the sexual assault kit itself was unsealed when it was received by Orchid Cellmark.  This sexual assault kit was in the custody of HPD for approximately fifteen years before it was sent to Orchid Cellmark.  Furthermore, although the manila envelope containing the cutting from the panties was identified as a sealed container, two integral pieces within that sealed package were noted as unsealed.  The unsealed envelopes contained within this package housed the cutting from the panties and the known blood sample from Arturo Rodriguez.  (Ex. 2 at ¶¶9, 10 [Aff. of Hellwig].)

The fact that key pieces of evidence—including the sexual assault kit—were received unsealed by Orchid Cellmark undoubtedly calls into question the integrity of the physical evidence in Cruz-Garcia's case.  Moreover, the fact that an unsealed known sample—the blood of Arturo Rodriguez—was housed together with an unsealed piece of evidence—the cutting from the panties—is also alarming and against best scientific practice.  Ultimately, this failure to adhere to basic chain of custody protocols calls into doubt the overall reliability of the evidence handling in Cruz-Garcia's case.  (Ex. 2 at ¶¶10, 23 [Aff. of Hellwig].)

## 2.  The Mixture DNA Profile

Mr. Hellwig further found that the comparison between Arturo Rodriguez and the mixture DNA profile obtained from the cutting of the panties should have been deemed inconclusive and that, therefore, the second contributor to this mixture should correctly have been described as "unknown."  Orchid Cellmark failed to follow prevailing guidelines with regard to its inclusion of Arturo Rodriguez in the mixture DNA profile obtained from the cutting of the panties.  Furthermore, Orchid Cellmark failed to report any statistical evaluation with respect to the inclusion of Arturo Rodriguez in the mixture DNA profile.  This failure directly contradicts the Scientific Working Group on DNA Analysis

EXHIBIT 3 Page 038

000618

Methods (SWGDAM) guidelines, which state that any inclusion (or non-exclusion) must be reported along with a statistical weight to aid the trier of fact in the strength of the inclusion. Because Orchid Cellmark did not do a statistical calculation on this DNA mixture, they should not have included Arturo Rodriguez as a possible contributor to this mixture. (Ex. 2 at ¶¶12-14 [Aff. of Hellwig].)

Furthermore, the DNA mixture obtained from the cutting of the panties was only detected in four of fifteen DNA loci and at very low levels. It is, therefore, very unlikely that any of these loci would be deemed suitable for statistical analysis, and, thus, it would be impossible to obtain the required statistical weight. The comparison between the cutting of the panties and Arturo Rodriguez should, therefore, have been deemed inconclusive. (Ex. 2 at ¶13 [Aff. of Hellwig].)

Testimony at trial that Arturo Rodriguez was the second contributor to the mixture DNA profile obtained from the sperm cell fraction from the cutting of the red panties was, therefore, misleading. The second contributor to this mixture should correctly have been described as an unknown source. Based on the genetic material recovered, there is insufficient information for a laboratory to conclude that Arturo Rodriguez, rather than an unknown contributor, was the second source of the male DNA present in this mixture. (Ex. 2 at ¶¶14, 24 [Aff. of Hellwig].)

**3. The Vaginal Swabs**

Mr. Hellwig also found that Orchid Cellmark failed to follow the SWGDAM guidelines with regard to the lab's statistical analysis of the sperm cell fraction of the vaginal swab. When utilizing the statistical method used in this analysis, called the Combined Probability of Inclusion (CPI), it is essential to evaluate the DNA profile obtained to ensure that no allelic dropout has occurred—that is, that no DNA information is "missing" from the profile due to minute amounts of input DNA or DNA degradation—as this will invalidate the CPI statistic. With regards to the sperm cell fraction of the vaginal swab, there are several DNA loci that

26

EXHIBIT 3 Page 039

000619

appear to be at a low enough level that the Orchid Cellmark laboratory should have precluded them from statistical analysis.   There are even indications of missing alleles where the laboratory still improperly utilized this DNA locus for statistical analysis, raising concerns of allelic dropout.  (Ex. 2 at ¶¶15-16 [Aff. of Hellwig].)

The SWGDAM guidelines recommend incorporation of a stochastic threshold to ensure that no allelic dropout is occurring.  However, Orchid Cellmark apparently failed to utilize a stochastic threshold in this case.   In fact, the laboratory chose to preclude the use of only one DNA locus from the statistical calculation when there are definite questions as to the allelic dropout at several other DNA loci.  (Ex. 2 at ¶16 [Aff. of Hellwig].)

Additionally, Orchid Cellmark violated fundamental principles of forensic analysis by providing two separate statistical analyses for the DNA profile obtained from the vaginal swab, one for the inclusion of Arturo Rodriguez and another for the inclusion of Cruz-Garcia.   It is essential that evaluation of the unknown, evidentiary DNA profile occur with no bias from the known samples that will be compared.   Essentially, an unknown evidentiary profile should be evaluated for suitability for comparison as well as statistical analysis before introducing the known, potential suspect samples.   Conversely, in this case, the statistics were changed for the subsequent inclusion of Cruz-Garcia.  This practice is a violation of both SWGDAM guidelines as well as fundamental principles of forensic analysis.    It is essential to do everything possible to remove interpretational bias toward any individual by analyzing the evidentiary DNA profiles previous to and blind to the analysis and subsequent comparison to the known sample.   Orchid Cellmark's failure to do so calls into question the comparison as well as the statistics generated as a result of this comparison.  (Ex. 2 at ¶¶17, 25 [Aff. of Hellwig].)

27

EXHIBIT 3 Page 040

000620

## 4. The HPD Crime Lab's Reinterpretation of the Orchid Cellmark Data

HPD criminalist Courtney Head testified that she compared Cruz-Garcia's DNA profile to the DNA profiles that Orchid Cellmark had obtained from the evidentiary samples, rather than performing DNA testing on the evidentiary items herself. (21 RR at 91.) The HPD crime lab's reinterpretation of data and DNA profiles that were generated by Orchid Cellmark approximately three years prior to the issuing of the HPD report presents a further problem in the DNA analysis performed in Cruz-Garcia's case. A laboratory's reanalysis of the work of another forensic DNA laboratory runs counter to best scientific practice. The analysis and interpretation of forensic DNA profiles should be done utilizing the procedures, protocols, and interpretation thresholds of the laboratory that originally processed and created the profiles. (Ex. 2 at ¶18 [Aff. of Hellwig].)

In addition to the problems in Orchid Cellmark's initial interpretation and reporting of the DNA profile from the sperm cell fraction of the vaginal swab, HPD's reinterpretation of this profile is itself problematic. It would be impossible for the HPD laboratory to evaluate for stochastic dropout when Orchid Cellmark did not appear to use a stochastic threshold in its original interpretation. Furthermore, the HPD laboratory could not have a thorough understanding of the validation documentation, procedures, and thresholds specific to the Orchid Cellmark laboratory processing necessary to accurately reinterpret this profile. Without intimate knowledge of and proper adherence to the validated procedures, thresholds, and specifications of the Orchid Cellmark laboratory at the time of its interpretation, the HPD laboratory would not be utilizing the interpretation that is unique to the laboratory that the data was created in and interpreted under. (Ex. 2 at ¶19 [Aff. of Hellwig].)

Additionally, in its reinterpretation of the DNA mixture obtained from the vaginal swab, the HPD laboratory *excluded* a DNA marker in its statistical

EXHIBIT 3 Page 041   000621

calculations that was originally included by the Orchid Cellmark interpretation and *included* a DNA marker that was originally excluded by the Orchid Cellmark interpretation. There is no documentation that explains the reason behind this interpretation decision by the HPD laboratory. Such an action is another example of the problems that stem from HPD's reinterpreting data that was not generated at its own laboratory. (Ex. 2 at ¶20 [Aff. of Hellwig].)

Furthermore, while reinterpreting the two single source profiles (the cigar and the major component of the sperm cell fraction from the panties), the HPD laboratory increased the rarity of the profile by including two DNA loci in its statistical calculations that were previously not reported in the Orchid Cellmark report. It is problematic that the original laboratory that created the profile did not denote these two markers as suitable for comparison (and thus suitable for statistical calculation) in any way. It is impossible to be sure that the use of these two markers in the statistical calculation was proper since Orchid Cellmark originally interpreted the profiles in question and did not sufficiently document the suitability of these markers for comparison to remove any doubt. This practice further illustrates the problems with HPD's interpreting data that was not generated by its own laboratory. (Ex. 2 at ¶¶21, 26 [Aff. of Hellwig].)

The findings of Mr. Hellwig's review indicate that the very types of issues detailed in the Bromwich Report—and in the disciplinary reports of specific HPD crime lab employees who handled evidence in this case—*did* exist with regard to the handling and testing of DNA evidence in this case. The failure of HPD and Orchid Cellmark to adhere to basic best practices and prevailing guidelines calls into question the entirety of the handling and analysis of DNA evidence in this case.

EXHIBIT 3 Page 042
000622

### C. Trial Counsel Performed Ineffectively by Failing to Retain an Independent DNA Expert

Trail counsel's failure to retain an independent DNA expert to review the DNA testing performed in this case—a case in which the State's case for guilt rested primarily on DNA evidence and in which counsel were aware of myriad problems at the lab that initially handled the evidence—was objectively unreasonable. Moreover, counsel's failure to retain a DNA expert prejudiced Cruz-Garcia. Had the problems in the handling and analysis of the DNA evidence in this case been presented at the suppression hearing, there is a reasonable probability that the evidence would not have been admitted at trial. Even had the evidence still been admitted, counsel could have presented this evidence to effectively undermine the State's theory at the guilt/innocence phase. There is, therefore, a reasonable probability that, had trial counsel retained an independent DNA expert, the outcome of Cruz-Garcia's trial would have been different.

#### 1. Deficient Performance

Investigation and preparation are the keys to effective representation. Counsel must engage in a reasonable amount of pretrial investigation and make an independent investigation of the facts and circumstances involved in the case. *Rummell v. Estelle*, 590 F.2d 103, 104 (5th Cir. 1979); *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994). Trial counsel have a duty "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7(A); *see also id.* at cmt. (noting the "importance of defense counsel's duty to take seriously the possibility of the client's innocence, to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses"). From the fruits of that investigation, counsel also must present all possible legal claims and defenses and, in doing so, present them as forcefully as possible. *ABA Guidelines*, Guideline 10.8; *see also id.* at

30

EXHIBIT 3 Page 043

000623

cmt. ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.").

Here, the State's case rested largely on DNA evidence. Counsel were clearly aware of the myriad problems that existed in the HPD crime lab's storing, handling, and testing of DNA evidence during the time period that the lab possessed the DNA evidence in this case. Trial counsel were also aware that specific individuals at the HPD crime lab who handled the DNA evidence in this case had histories of serious misconduct and malfeasance. Moreover, the need for an independent DNA analyst had already been flagged by prior counsel, and an available expert already had been identified. In light of these facts, trial counsel could have had no strategic reason for failing to retain an independent DNA analyst.

Significantly, the Court of Criminal Appeals has previously found counsel performed deficiently when they failed to retain an independent DNA expert. *See Ex parte Napper*, 322 S.W.3d 202, 247-48 (Tex. Crim. App. 2010). That case similarly involved problematic DNA testing by the HPD crime lab. *Id.* at 224. The Court found deficient performance for counsel's failure to retain an independent DNA expert, even though the problems with the crime lab had not become public knowledge at the time of the defendant's 2001 trial. *Id.* at 246. In that case, the Court found that, had trial counsel retained an independent DNA expert, "he would have known that the HPD Crime Lab failed to adhere to accepted practices…, and he would have understood that [the] statistical frequency estimate was probably incorrect." *Id.* at 247. The same is true in this case with respect to the handling and analysis of the DNA evidence both by the HPD crime lab and by Orchid Cellmark. Counsel's failure to present a DNA expert thus constituted deficient performance under prevailing professional norms.

<center>31</center>

EXHIBIT 3 Page 044

000624

## 2. Prejudice

There can be no doubt that trial counsel's failure to retain a forensic DNA analyst to review the State's DNA evidence prejudiced Cruz-Garcia. An expert like Mr. Hellwig could have provided relevant, persuasive testimony to challenge the reliability of the State's DNA evidence. Indeed, expert witness testimony is one of the most powerful tools at an attorney's disposal to present a compelling claim. *Coble v. State*, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010).

In denying trial counsel's motion to suppress the DNA evidence, the trial court pointed to the fact that, although counsel had presented substantial evidence of the many problems that existed at the HPD crime lab at the time the lab was in possession of evidence in Cruz-Garcia's case, as well as evidence of misconduct by specific HPD crime lab employees who had handled evidence in this case, counsel presented no evidence that any of those problems actually existed with respect to the DNA evidence in this case. Had trial counsel retained an independent DNA expert, they could have presented testimony at the suppression hearing that, in fact, some of the very issues flagged by the independent investigation of the lab were present in the handling and analysis of DNA evidence in Cruz-Garcia's case.

Specifically, such an expert could have testified to serious problems in the chain of custody of two key pieces of evidence in this case. An expert would have informed the court that the sexual assault kit was unsealed when it was received by Orchid Cellmark and that the cutting from the panties was housed unsealed together with the unsealed reference sample of Arturo Rodriguez. Moreover, these key pieces of evidence had potentially been stored in this state for roughly fifteen years. Given the significance of the DNA evidence in this case, identifying such basic problems in its storage and handling necessarily would have called into question its reliability in inculpating Cruz-Garcia.

32

EXHIBIT 3 Page 045

000625

Furthermore, an expert also could have testified that Orchid Cellmark improperly included Arturo Rodriguez as a second contributor to the mixture DNA profile obtained from the cutting of the panties and that, instead, this second contributor profile should have properly been described as coming from an unknown source.  This information would have been crucial for the Court to consider, as an unknown contributor to the DNA mixture in the sexual assault kit opens the door to the possibility that this unknown contributor was, in fact, the true perpetrator of the assault against Diana Garcia.  By identifying Arturo Rodriguez as the second male contributor to the genetic material obtained from the physical evidence, the lab not only flouted best scientific practices, it also removed the possibility—which based on a correct interpretation of the DNA testing exists— that an unknown male contributed to the DNA present in the sexual assault testing. In ignoring this possibility, the lab's actions call into question the overall integrity of the DNA test results that incriminate Cruz-Garcia.  This is precisely the sort of information that the Court concluded had not been presented in ruling that none of the clearly identified problems with the HPD crime lab appeared to have tainted the evidence involved in Cruz-Garcia's case.

A DNA expert could have testified further to the fact that Orchid Cellmark violated SWGDAM guidelines in its calculation of statistical conclusions regarding the mixture DNA sample obtained from the vaginal swabs and that the HPD crime lab violated best scientific practice by reinterpreting the data obtained by Orchid Cellmark, rendering its results unreliable.  This testimony also would have called into serious doubt the integrity of the evidence itself and the competence of the analysis performed by HPD and Orchid Cellmark.  Had trial counsel presented this testimony, there is a reasonable probability that the trial court would have granted their Motion to Suppress the DNA evidence.

33

EXHIBIT 3 Page 046

000626

Without the DNA evidence, the State's case for guilt would have rested entirely on the testimony of Carmelo Martinez Santana (Rudy) and Angelita Rodriguez, both of whom had substantial credibility issues. Rudy was a convicted felon serving a seventeen-year federal prison sentence for possession of drugs and a firearm, who also had a prior conviction for assault in the early 1990s, and whose testimony at trial conflicted in many respects from the statement he gave to FBI agents. (*See, e.g.*, 21 RR at 29-31, 45-57, 68-72.) Rudy placed himself at the scene, yet he was never charged with anything in relation to the crime and had an obvious incentive to point the finger at Cruz-Garcia. Moreover, without the DNA evidence, Rudy's testimony itself would likely have been inadmissible as accomplice-witness testimony under Article 38.14 of the Texas Code of Criminal Procedure.

Likewise, Angelita Rodriguez, Cruz-Garcia's ex-wife, gave testimony that departed significantly from the statement she gave to police. (20 RR at 110-13.) Notably, Angelita Rodriguez admitted to having been involved in the drug-dealing activities of Cruz-Garcia, Diana Garcia, and Arturo Rodriguez; as such, she could have had any number of motives to testify against Cruz-Garcia. Therefore, had the trial court suppressed the results of the DNA testing in this case, there is a reasonable probability that the result of Cruz-Garcia's trial would have been different. Indeed, had this evidence been suppressed, it is likely that the charges against Cruz-Garcia would have been dropped. At trial, the DNA evidence— problematic as it is—was the only compelling evidence implicating Cruz-Garcia in this more than twenty-year-old crime.

Furthermore, even if the Court had still ruled the DNA evidence admissible, defense counsel could have presented a DNA expert at trial to substantially undermine the State's theory. Specifically, trial counsel could have presented such an expert to contest the inclusion of Arturo Rodriguez as the second contributor to

34

EXHIBIT 3 Page 047

000627

the mixture DNA profile obtained from the cutting of the panties and to testify that this second contributor should properly be described as unknown. Had trial counsel simultaneously presented available testimony from friends of Cruz-Garcia, Diana Garcia, and Arturo Rodriguez to confirm that Cruz-Garcia had an ongoing consensual sexual relationship with Diana Garcia to explain the presence of Cruz-Garcia's DNA on the evidentiary items,[3] the presence of an unknown contributor to the DNA mixture found on the cutting of the panties would have entirely "alter[ed] the entire evidentiary picture" presented at trial. *See Strickland*, 466 at 695. Counsel could have argued to the jury that this second unknown contributor, and not Cruz-Garcia, was the perpetrator of the sexual assault and, thereby, the kidnapping and murder of Angelo Garcia. There is a reasonable probability that, had trial counsel presented this testimony, the result at trial would have been different. Because Cruz-Garcia was prejudiced by trial counsel's deficient performance, he must be granted a new trial.

## CLAIM TWO

### TRIAL COUNSEL PERFORMED INEFFECTIVELY BY FAILING TO INVESTIGATE AND PRESENT REASONABLE DOUBT AT THE GUILT/INNOCENCE PHASE OF TRIAL

The State's theory at the guilt/innocence phase of trial was that Cruz-Garcia had sexually assaulted Diana Garcia and kidnapped Angelo Garcia in retaliation for Diana and Arturo Rodriguez having recently stopped selling drugs for him. In support of this theory, the State presented DNA evidence that linked Cruz-Garcia to the scene of the crime, as well as testimony from Diana and Arturo that they had stopped selling drugs for Cruz-Garcia shortly before the crime occurred. Evidence was available at the time of trial that would have effectively countered the State's theory that Cruz-Garcia was the perpetrator of the sexual assault and, thereby, the

---

[3] See Claim Two, *post*.

35

EXHIBIT 3 Page 048

000628

kidnapping of Angelo.    Additional evidence was available that would have substantially undermined the State's theory of Cruz-Garcia's motive for committing the crime.  This evidence would have established reasonable doubt for the jury as to Cruz-Garcia's guilt, yet trial counsel failed to conduct a reasonable investigation to uncover and utilize this evidence.    Trial counsel's failure to investigate and present evidence creating a reasonable doubt at the guilt/innocence phase constituted ineffective assistance of counsel.      Thus, Cruz-Garcia's conviction was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and the appropriate remedy is a new trial.

## A. Cruz-Garcia Had an Ongoing Consensual Sexual Relationship with Diana Garcia

At trial, the State argued the presence of Cruz-Garcia's DNA in the sexual assault kit was evidence that he raped Diana Garcia and committed the kidnapping and murder of Angelo Garcia.   Though lacking any evidence to support their argument, counsel attempted to suggest that the presence of Cruz-Garcia's DNA on the cutting of the panties and the vaginal swabs was the result of a consensual sexual encounter with Diana.  On cross-examination, trial counsel asked Arturo whether Diana had a dating relationship with Cruz-Garcia.  (19 RR at 21.)  Arturo answered, "That I know of, no." (*Id.*)  In crossing Orchid Cellmark DNA analyst Matt Quartaro, trial counsel established that the witness could not tell whether sperm ended up on the pieces of evidence through consensual sex or sexual assault or how long the sperm cells had been there.  (21 RR at 134-35.)  In closing argument, trial counsel again suggested that Cruz-Garcia and Diana could have had a consensual sexual relationship.  (23 RR at 48-50.)

Trial counsel did not, however, present any evidence to support their suggestion that Cruz-Garcia had a consensual sexual relationship with Diana.  In

<center>36</center>

EXHIBIT 3 Page 049

000629

closing argument, the State easily dismissed trial counsel's suggestion of a consensual relationship between Cruz-Garcia and Diana. The State asked,

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth—and there is no evidence of that—where is the DNA of the guy who raped Diana? Where is it? Why don't we have it? If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

(23 RR at 82.)

While a DNA expert could have testified to the presence of an unknown contributor in the mixture DNA profile obtained from the cutting of the panties in support of the theory that an unknown male was "the guy who raped Diana,"[4] other witnesses available at the time of trial could have testified that Cruz-Garcia had an ongoing consensual sexual relationship with Diana at the time to explain the presence of his DNA on the items of evidence. Brothers Cesar Rios, Jose Valdez, and Hector Saavedra were friends of Cruz-Garcia, whom they called Chico, as well as Diana and Arturo. (Ex. 20 at ¶2 [Aff. of Cesar Rios]; Ex. 24 at ¶¶2-3 [Aff. of Jose Valdez]; Ex. 21 at ¶¶2, 6 [Aff. of Hector Saavedra].) In fact, Valdez was friends with Diana and Arturo before he met Cruz-Garcia. (Ex. 24 at ¶3 [Aff. of Valdez].) Around the time that Angelo was kidnapped, Valdez was himself having a sexual relationship with Diana. (*Id.* at ¶4; Ex. 21 at ¶6 [Aff. of Saavedra].) The three brothers were aware that, during this time period, Cruz-Garcia was also having an ongoing sexual relationship with Diana. (Ex. 24 at ¶4 [Aff. of Valdez] ("To my knowledge, Diana was also messing around with other guys, including Chico....The time period that Chico and Diana were having sex was around the same time Angelo was kidnapped."); Ex. 20 at ¶3 [Aff. of Rios] ("Around the time

---

[4] See Claim One, *ante*.

EXHIBIT 3 Page 050

000630

Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana."); Ex. 21 at ¶6 [Aff. of Saavedra] ("I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel.").)  Rios was also aware that Cruz-Garcia had been at Diana's apartment earlier on the day that Angelo was kidnapped.  (Ex. 20 at ¶3 [Aff. of Rios].)  Although Rios was interviewed by HPD detectives and identified in police reports, neither he nor his two brothers were ever properly interviewed by trial counsel.  (Ex. 20 at ¶8 [Aff. of Rios]; Ex. 24 at ¶6 [Aff. of Valdez]; Ex. 21 at ¶7 [Aff. of Saavedra].)

## B. Diana Garcia and Arturo Rodriguez Had Not Stopped Selling Drugs for Cruz-Garcia

The only motive that the State provided for its theory that Cruz-Garcia sexually assaulted Diana and kidnapped Angelo was that Diana and Arturo had recently stopped selling drugs for him.  In its opening statement, the State suggested that it was after Diana and Arturo informed investigators that they had recently stopped selling drugs for Cruz-Garcia that investigators initially began to consider him a suspect.  (18 RR at 33.)  Diana testified that she and Arturo had sold drugs for Cruz-Garcia but had decided to stop shortly before the incident occurred.  (*Id.* at 133.)  She stated that in fact, two or three weeks before Angelo was kidnapped, Cruz-Garcia brought drugs to their house even though they had told him they wanted to stop dealing, and Arturo called him and told him to take the drugs back.  (*Id.* at 133-34.)

Arturo also testified that he and Diana had stopped selling drugs for Cruz-Garcia.  (18 RR at 203.)  Arturo testified that Cruz-Garcia "didn't like it very much" when he told him he was going to stop selling drugs for him and that he knew this because he "could see it in his face" even though Cruz-Garcia never said anything to him about it.  (*Id.* at 204.)  Arturo testified that it had been "about

38

EXHIBIT 3 Page 051

000631

a month to a month-and-a-half" prior to the incident that he had stopped selling drugs. (19 RR at 33.)

This testimony was the only evidence the State presented to explain why Cruz-Garcia would have committed a crime of this nature against people who were close friends and business associates of his. Yet evidence was available that Diana and Arturo had not, in fact, stopped selling drugs for Cruz-Garcia at the time Angelo was kidnapped. Police reports that trial counsel obtained from the State through discovery indicated that Diana and Arturo were still selling drugs as of the day of the incident. (Ex. 33 at pp. 1-2, 4 [Excerpts of Police Reports].) These police reports indicate that a man named Thomas Thoms and his girlfriend, Tracy Pressly, bought cocaine from Diana Garcia on the night Angelo Garcia was kidnapped. (*Id.* at p. 1.) Pressly described the transaction to detectives, and her statement was corroborated by Anita Dorr, a relative who was at Diana and Arturo's house until approximately 9:00 p.m. on the night Angelo was kidnapped. (*Id.*) Furthermore, detectives received a call from an anonymous woman who stated that she was close to the family and informed the detectives that Diana and Arturo were selling drugs out of their apartment up until the night of the incident. (*Id.* at p. 4.)

## C. Trial Counsel Performed Ineffectively by Failing to Investigate and Present this Evidence at Trial

Counsel's failure to sufficiently investigate and present evidence to counter the State's theory at the guilt/innocence phase of trial was objectively unreasonable and prejudiced Cruz-Garcia.

### 1. Deficient Performance

Counsel must engage in a reasonable amount of pretrial investigation and make an independent investigation of the facts and circumstances involved in the case. *Rummell*, 590 F.2d at 104; *Bryant*, 28 F.3d at 1415. The 2003 ABA

39

EXHIBIT 3 Page 052

000632

Guidelines—the prevailing professional norms at the time of Cruz-Garcia's trial—instruct counsel "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7(A). Specifically, counsel must "investigate all sources of possible impeachment of defense and prosecution witness." *Id.* at cmt. Counsel also must present all possible legal claims and defenses and, in doing so, present them as forcefully as possible. *ABA Guidelines*, Guideline 10.8; *see also id.* at cmt. ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.").

While trial counsel attempted to suggest that Cruz-Garcia had a consensual sexual relationship with Diana, they failed to present readily-available testimony from Rios, Valdez, and Saavedra that in fact he did. Counsel could have had no strategic reason for failing to present this testimony, as it would have supported a theory they themselves attempted to advance at trial. Moreover, counsel never even interviewed these witnesses. Counsel's failure to interview available witnesses who were known associates of Cruz-Garcia, Diana, and Arturo, was objectively unreasonable.

Similarly, trial counsel's failure to impeach Diana and Arturo with evidence that they continued to deal drugs up to the time of Angelo's kidnapping was also unreasonable. This evidence was in trial counsel's possession, as it was in the discovery materials counsel obtained from the State, and was admissible at trial as impeachment evidence. TEX. R. EVID. 801. Trial counsel's failure to use this readily-available evidence to counter the State's motive theory was objectively unreasonable.

EXHIBIT 3 Page 053

000633

## 2. Prejudice

Had trial counsel conducted a reasonable investigation, they would have uncovered evidence that would have substantially undermined the State's theory at the guilt/innocence phase. Testimony of Cruz-Garcia's ongoing consensual sexual relationship with Diana would have provided an innocent explanation for the presence of his DNA on the items of evidence collected from the crime. Had trial counsel also presented the testimony of a DNA expert at trial to show that the second contributor to the mixture DNA profile obtained from the cutting of the panties was in fact an unknown contributor,[5] trial counsel could have pointed to this unknown contributor as the actual perpetrator of the sexual assault and kidnapping. This evidence would have thus created reasonable doubt in the minds of the jurors and would have changed the outcome of the trial.

Moreover, evidence that Diana and Arturo were still actively selling drugs at the time of the crime would have substantially undermined the State's only theory of motive. Without the testimony that Diana and Arturo had stopped selling drugs for Cruz-Garcia, the State would have had no theory to explain why Cruz-Garcia would have committed the charged offense against his close friends.

Had trial counsel presented evidence of Cruz-Garcia's consensual sexual relationship with Diana and of the fact that Diana and Arturo were still selling drugs at the time of the crime, there is a reasonable probability that the result of Cruz-Garcia's trial would have been different. Because trial counsel rendered ineffective assistance during the guilt/innocence phase, Cruz-Garcia's sentence must be vacated.

---

[5] See Claim One, *ante*.

41

EXHIBIT 3 Page 054

000634

## CLAIM THREE

## TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT CRUZ-GARCIA WOULD NOT BE A FUTURE DANGER

Texas's unique sentencing scheme requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1).[6] Unlike in most other states where jurors weigh aggravating and mitigating circumstances to determine whether a sentence of death is appropriate, Texas juries must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of mitigation. *Id.* at § 2(b)-(e). The sentencing structure consequently places the first special issue of future dangerousness "at the center of the jury's punishment decision." *See Jurek v. Texas*, 428 U.S. 262, 274-75 (1976) (reviewing Texas's first special issue and stating that "prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system"); American Bar Association Death Penalty Due Process Review Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Texas Capital Punishment Assessment Report*, at 307 (Sept. 2013) ("ABA Texas Assessment Report").

Because of the importance of the first special issue, it is incumbent upon trial counsel to present a rebuttal to the State's case. However, Cruz-Garcia's trial counsel failed to conduct a reasonable investigation that would have led to evidence vital to rebut the State's assertion that Cruz-Garcia would be a future danger. Counsel committed deficient performance first in failing to review the District Attorney's file relating to Cruz-Garcia's case and second in failing to

---

[6] If jurors answer this question, referred to as Special Issue One, with a "Yes," jurors are asked to answer another Special Issue. If the jurors answer "No" to this question, the defendant is automatically sentenced to a life sentence.

42

EXHIBIT 3 Page 055
000635

conduct any investigation in Puerto Rico, where Cruz-Garcia had lived and had been imprisoned for nearly a decade. Because of this failure, substantial evidence was not presented to Cruz-Garcia's jury that would have led to a finding that the State had not met their burden under the first special issue. Counsel's ineffective assistance in this regard violated Cruz-Garcia's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law. Accordingly, his sentence must be reversed.

### A. Trial Counsel Performed Ineffectively in Failing to Review the District Attorney's File and Identify Evidence that Cruz-Garcia Would Not Be a Future Danger

At the time of Cruz-Garcia's capital murder trial in Harris County, the District Attorney's Office maintained an "open-file" policy, meaning that the defense had the opportunity to review all non-privileged files in the State's possession. Despite this policy, trial counsel refused to review those files. Trial counsel asserted on the record that they believed the prosecution had a duty to *deliver* any relevant files to the defense under *Brady v. Maryland*. 373 U.S. 83 (1963). This, however, was an incorrect understanding of the law.

Because of this mistake, counsel failed to review the files in the possession of the State. Had counsel done so, they would have discovered records in the State's possession pertaining to Cruz-Garcia's incarceration in Puerto Rico. These records establish that Cruz-Garcia had significant good behavior in his near decade in prison there—a fact especially relevant to the jury's determination of Cruz-Garcia's likelihood of committing acts of violence if sentenced to life in prison. Counsel's failure to review the District Attorney's file—or to independently investigate Cruz-Garcia's incarceration in Puerto Rico—constituted deficient performance. This deficiency led to the absence of compelling evidence to refute

43

EXHIBIT 3 Page 056

000636

the State's argument that Cruz-Garcia would be a future danger, prejudicing Cruz-Garcia's trial.

### 1. Relevant Facts

During the investigation of Cruz-Garcia's case and through trial, the District Attorney's office held open their file to defense counsel for inspection. (Ex. 30 [DA Open File Notice].) Although the District Attorney did make copies and deliver certain materials it believed necessary under *Brady v. Maryland*, as well as any materials specifically requested by counsel, the District Attorney otherwise required counsel to come review the materials in their offices. (Ex. 31 [Emails between DA Tise and Defense Counsel].)

Cruz-Garcia's trial counsel, Mr. Cornelius and Mr. Madrid, regularly practice in Harris County and were familiar with this policy by the Harris County District Attorney's office. Even if they were not already aware of the policy, however, the policy had been made known to their predecessor counsel, Mr. Shellist and Mr. Capitaine. (Ex. 31 at 9-10, 12 [Emails between DA Tise and Defense Counsel].) Further, it appears that the policy was communicated directly to Mr. Cornelius and Mr. Madrid. (20 RR 186 ("Tise: I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's open to you. . . . I told you, Skip, you need to come by and see my file.").) The District Attorney took the step of placing in her file multiple copies of a note stating:

> Obel Cruz Garcia and Rogelio Aviles Barroso are co-defendants. My file on both cases remained open to defense counsel up to and during the trial. Photos, witness statements, evidentiary items, lab reports, and other items were all stored together in my office and were available for review before and during the trial.

(Ex. 30 [DA Open File Notice].)

Trial counsel made no objection to the open file policy or being required to travel to the District Attorney's offices to review their file. As late as the day

<center>44</center>

EXHIBIT 3 Page 057

000637

before trial began, at a pretrial setting, counsel communicated to the court that they were happy with the discovery process that had being occurring.

> I'm very convinced that there isn't anything left for the defendant to discover. I believe that I have been given access to every piece of evidence the State has, everything in their file other than work product. So, I'm not feeling the need to have any testimony or any hearing on discovery . . . . I know the State has some continuing responsibility to turn things over to us, but I think they are complying with that.

(16 RR 4-5). At no point before trial did counsel object or inform the court that the open file policy was unacceptable. Yet, counsel also continued to decline to review the District Attorney's files in Cruz-Garcia's case (making their assertions that they believed there was nothing left to discover without foundation). Ultimately, despite the District Attorney's clear statements that it was not delivering the entire file and that trial counsel needed to review the file, it appears counsel believed they were under no duty to review the prosecution's file and that it was incumbent on the prosecution to deliver any relevant materials to them. Mid-trial, an argument arose about whether a particular FBI report had been provided to the defense. Counsel stated "I don't have a responsibility to go through your file and figure out what's in your file. I don't have to do that . . . . I'm not going to go try to figure out what's in your file . . . . I'm not going to go through 20 boxes of DNA records." (20 RR 186.) At this point, the court went off the record, ending the discussion. In post-conviction investigation, counsel were asked about the statements made on the record and why they had not reviewed the open file. Counsel Skip Cornelius responded by email:

> I remember being pissed that Ms. Tise attempted to make it my responsibility to come to her office and go through her file and figure out what I was entitled to. I told her I want what I am entitled to and it is up to her to figure that out and give it to me. She said that every lawyer in town comes to her office and figures out what they want and

45

EXHIBIT 3 Page 058

000638

she gives it to them. I said I was not letting her off the hook by her reversing the responsibility, it is her responsibility to give me the discovery that I am entitled to, not up to me to be smart enough to ask for the right things. . . . In the past some DAs have had an "open file" policy which puts the burden on you to figure out what you are entitled to, however how do you know if you are seeing all they have, or what comes in later? If they say they had an open file policy and showed you everything and would have copied anything you wanted they can then claim it is your fault if you don't have something. I don't play that game and, as I told you in our meeting, received full support by the Michael Morton Act which was passed a very short time after our trial.

While counsel's statements explain his belief that the State was required to disclose evidence to the defense, it does not address counsel's failure to object to the open file policy prior to trial or their failure to accept the policy and make reasonable effort to review the District Attorney's file. This failure is all the more strange, as counsel did in fact go to the District Attorney's offices and review some files relating to their presentation in this case. Despite counsel's statement on the record of "I'm not going to go through 20 boxes of DNA records" (20 RR at 186), according to counsel in their post-conviction interview, they had actually done just that—they went to the District Attorney's office to review the dozens of boxes held relating to the investigation of the HPD Crime Lab's DNA testing in the 1980s and 1990s.

However, counsel did not then or at any other time review the six or seven boxes of materials in Cruz-Garcia's case. Counsel has stated in post-conviction that the only documents they reviewed from the State were the ones provided to them and that all of those materials are in their trial file of this case. Specifically, counsel did not recall being provided or reviewing any substantial documents written in Spanish.

<div align="center">46</div>

EXHIBIT 3 Page 059

000639

Post-conviction counsel for Cruz-Garcia were afforded the same open file policy by the District Attorney's office. Counsel traveled to that office and reviewed the file boxes associated with Cruz-Garcia's case. Upon inspection, counsel discover a full banker's box worth of documents in Spanish that appeared to be records from Cruz-Garcia's incarceration in Puerto Rico in the decade before he was extradited to Houston for his capital trial. Review of those records has revealed significant evidence of Cruz-Garcia's positive behavior while in prison which would have been instrumental in rebutting the State's argument that Cruz-Garcia would constitute a future danger under the first special issue.

First, the records indicate that numerous institutions where Cruz-Garcia was housed in Puerto Rico reported finding no instances of disciplinary actions or grievances filed against Cruz-Garcia. (Ex. 34 [Excerpts of Puerto Rico Jail Records] at 8 (no disciplinary complaints from October 31, 2005 to November, 3, 2008), 9 (no grievances from 2005 to 2010), 10 (no disciplinary complaints), 11 (same).) Next, the records reflect that rather than being a disciplinary problem, Cruz-Garcia was the opposite. Cruz-Garcia earned numerous recommendations for good time credit based on his behavior and hard work. (*Id.* at 1, 4, 6, 7, 12, 14, 16, 18, 20, 21.) From October 2005 to July 2009, Cruz-Garcia received frequent commendation for his hard work at the prison. (*Id.*) In total, Cruz-Garcia received 204 days of credit for his behavior. One notation specifically observed that:

> This prison performs risky jobs and for this reason we are asking for this good conduct time to compensate him for the effort that he makes and by this means help create an example so that other prisoners will give their best.

(*Id.* at 6.) None of the records discussed above appear in Cruz-Garcia's trial file. Nor does it appear that trial counsel made any attempts to get these records independently from the Puerto Rico Department of Corrections.

47

EXHIBIT 3 Page 060

000640

At trial, the State presented testimony from a Puerto Rican Department of Corrections official, who stated that on one occasion Cruz-Garcia received discipline for possession of a cell phone, a homemade rope, and a map of Puerto Rico. (24 RR at 118-29.) The official testified that he believed Cruz-Garcia was attempting to escape through a broken window in his prison cell. (*Id.*) No other testimony was given about Cruz-Garcia's conduct while incarcerated in Puerto Rico, either to dispute the statements made by the State's witness or to offer evidence of Cruz-Garcia's good conduct while in prison as reflected in his records.

## 2. Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance and Should Not Be Afforded Deference Because It Was Based on a Misunderstanding of the Law

Trial counsel committed deficient performance by misunderstanding the law relating to the State's disclosure requirement under *Brady*, believing that the prosecution had to go further than merely make available its files to the defense and to actually *deliver* them. This is an incorrect understanding of the law, both because an open-file policy has repeatedly been held to comport with the strictures of *Brady*, and also because trial counsel could not assume that all relevant information would necessarily constitute materials required to be disclosed under *Brady*.

First, "an open-file policy . . . generally satisfies the prosecution's duty to disclose exculpatory evidence." *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006).[7]  "[I]f the prosecutor opens his files for examination by defense

_____

[7] Cruz-Garcia believes the holding in *Harm v. State* continues to be good law. However, should an open file policy be found to not fulfill the requirements of *Brady*, Cruz-Garcia asserts that the Harris County District Attorney's Office committed constitutional error when it failed to provide his trial counsel with the entirety of the Puerto Rican prison records and all other records the District Attorney's office believed it had sufficiently disclosed through the use of an open file policy.

48

EXHIBIT 3 Page 061

000641

counsel, he fulfills his duty to disclose exculpatory evidence." *Givens v. State*, 749 S.W.2d 954, 957 (Tex. App.—Fort Worth 1988, pet. ref'd); *see also, e.g., United States v. Bagley*, 473 U.S. 667, 675 (1985) (noting "[t]he prosecutor *is not required to deliver his entire file to defense counsel*," and suggesting that an open-file policy goes above and beyond a prosecutor's legal obligations (emphasis added)).

To provide objectively reasonable assistance, trial counsel must have a firm and consistent understanding of relevant legal standards. *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*."); *see also Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("[A] tactical or strategic decision is unreasonable," for the purposes of establishing an ineffective assistance of counsel claim, "if it is based on a failure to understand the law.").

In this case, trial counsel incorrectly believed that the District Attorney's office was required to deliver its files to the defense. This belief, however, was not based on reasonable interpretation of the law as it existed at the time of Cruz-Garcia's trial. Trial counsel indicate that they were justified in their position that they had no duty to inspect the District Attorney's file by pointing to the passage of the Michael Morton Act. However, that act was enacted *after* Cruz-Garcia's trial. Thus, the change in Texas law created by the act to require the kind of disclosure envisioned by trial counsel did not take effect until after Cruz-Garcia's trial. Instead of supporting counsel's conduct, the passage of the Michael Morton Act further explains why counsel was unreasonable in believing prior to that change in law that the District Attorney was under a duty to disclose their entire file. It is also telling that trial counsel failed to object to the District Attorney's open file

49

EXHIBIT 3 Page 062
000642

policy during pretrial proceedings when the issue of discovery arose, waiting instead to complain about the policy mid-trial, only after the time for a prudent review of relevant materials had long passed.

Next, trial counsel's misunderstanding of the law was itself no justification to refuse to inspect the District Attorney's file. It is unlikely, even under trial counsel's misinterpretation of *Brady*, that the District Attorney would have been required to deliver *all* the materials it had chosen to make available for counsel's inspection. Under *Brady*, the prosecutor is only required to disclose evidence that is "favorable to an accused," otherwise defined by the courts as evidence that is exculpatory, impeaching, or mitigating. *Ex Parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) ("Favorable evidence includes exculpatory evidence and impeachment evidence. Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence.") (citing *Harm*, 183 S.W.3d at 408); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). While this might include some portions of the District Attorney's file, courts have frequently held that evidence that does not fit neatly into these categories need not be disclosed. *See, e.g., Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."); *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801, 824 (11th Cir. 1995) ("The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."); *United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir. 1988) ("The Government has no obligation to disclose possible theories of the defense to a defendant."); *United States v. Rhodes*, 569 F.2d 384, 388 (5th Cir. 1978) (The "inability of certain eyewitnesses to positively identify [the defendant]" is neither

50

EXHIBIT 3 Page 063

000643

"obviously exculpatory" nor "clearly supportive of a claim of innocence," and the prosecution has no duty to disclose it.).

Without already knowing the full contents of the District Attorney's file, it would have been impossible for trial counsel to ensure there was no potentially beneficial information within that file that had not been disclosed to them. Thus, even under counsel's misinterpretation of *Brady*, it was unreasonable and not strategic to refuse to travel to the District Attorney's offices in the Harris County courthouse to inspect the entire file held open for counsel. Specifically, while the Puerto Rican prison records contained in the State's files are unquestionably favorable to Cruz-Garcia, it would be purely speculative to assume the District Attorney would have recognized that fact and provided copies to the defense. It was incumbent upon Cruz-Garcia's trial counsel, as experienced capital attorneys, both to know the strictures of *Brady* and to otherwise make diligent investigation of all information available to them. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty").

Trial counsel's insistence that the prosecutor deliver her files to the defense revealed a flawed understanding of *Brady* and is especially inconsistent with what is expected of trial counsel in a death penalty case. By not having a firm understanding of relevant legal standards, trial counsel failed to provide objectively reasonable assistance. Under these circumstances, trial counsel's performance was deficient and should be afforded no deference.

### 3. Trial Counsel's Failure to Review the District Attorney's File Constitutes Deficient Performance Because Trial Counsel Has an Affirmative Duty to Investigate in Preparation for Trial

Regardless of the issue of disclosure of materials under *Brady*, trial counsel have a "general duty to investigate [that] takes on supreme importance to a

EXHIBIT 3 Page 064

000644

defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death." *Strickland*, 466 U.S. at 706. This duty to investigate is independent of a prosecutor's disclosure obligations under *Brady*, and it is certainly not lessened in the context of an open-file policy. "In determining whether counsel conducted a reasonable investigation, an appellate court's initial inquiry is whether a reasonable investigation should have uncovered the mitigating evidence." *Ex parte Gonzales*, 204 S.W.3d at 396 (citing *Baxter v. Thomas*, 45 F.3d 1501, 1513 (11th Cir. 1995)). At minimum, a reasonable investigation would have involved reviewing the evidence in the files that the prosecution expressly made available. *Rompilla*, 545 U.S. at 387 n.6 ("Any investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.") (quoting *ABA Standards for Criminal Justice*, Prosecution Function and Defense Function 4-4.1 (3d ed. 1993)). If they had done so, trial counsel would have uncovered valuable evidence to present to the jury, including Cruz-Garcia's Puerto Rico prison records, which reveal an image of Cruz-Garcia sharply different than that painted by the prosecution. Under these circumstances, trial counsel's failure to review the prosecution's file on Cruz-Garcia was unreasonable.

Thus, trial counsel's failure to investigate and present evidence from the prosecution's file, including the Puerto Rican prison records, was not a strategic decision and should not be accorded deference. *Compare Baxter*, 45 F.3d at 1513 (if "the failure to put this evidence before the jury was a *tactical choice* by trial counsel . . . . that decision is afforded a 'strong presumption of correctness'") (emphasis in original). Trial counsel's failure to review the State's file constitutes deficient performance that prejudiced Cruz-Garcia.

52

EXHIBIT 3 Page 065
000645

### 4. Trial Counsel's Failure to Inspect the District Attorney's File Prejudiced Cruz-Garcia

Counsel's failure to inspect the file held open by the District Attorney, or to independently secure Cruz-Garcia's Puerto Rico prison records through reasonable investigation, prejudiced the presentation at Cruz-Garcia's penalty phase of trial. In the absence of the information uncovered in those files, the State was able to present the testimony of the Puerto Rican prison official largely unchallenged. As discussed more fully below, had counsel obtained Cruz-Garcia's prison records, they could have used the records to present the jury with a competing account of Cruz-Garcia's time in prison. Counsel might have used them to cross-examine the prison official to show that he was not familiar with Cruz-Garcia's record and to discredit his belief that Cruz-Garcia had planned an escape. Or counsel might have presented the records through the testimony of an expert witness who could have used the information therein to draw an opinion about Cruz-Garcia's lack of future danger in prison. Had such information been presented to the jury, there is a reasonable probability that at least one juror would have voted for a life sentence instead of death.

### B. Trial Counsel Were Ineffective for Failing to Investigate and Present Testimony from Puerto Rican Prison Officials and Other Witnesses To Rebut the State's Case

Trial counsel were aware that Cruz-Garcia had spent seven years prior to his extradition to Houston in 2008 in Puerto Rico serving a sentence of sixteen years for a kidnapping conviction. In addition, counsel were aware that the State intended to use evidence relating to this conviction and an alleged escape attempt while in jail in Puerto Rico as aggravating evidence during the punishment phase of his capital trial. Despite this knowledge, counsel failed to conduct a sufficient investigation into available witnesses and records relating to Cruz-Garcia's time in Puerto Rico. And as discussed above, had counsel performed effectively in

53

EXHIBIT 3 Page 066

000646

reviewing the files held by the District Attorney's office, they would have learned, at a minimum, that there was potential positive information regarding Cruz-Garcia's time in prison in Puerto Rico—information that could have rebutted the State's aggravating evidence and provided reasonable doubt as to Cruz-Garcia's likelihood of future danger.

## 1. Trial Counsel's Investigation

During the punishment phase, the prosecution presented testimony that Cruz-Garcia had been convicted of a kidnapping in 2001 in San Juan, Puerto Rico, for which he was sentenced to sixteen years in prison. (24 RR at 19-26, 64-68.) As early as December 2010, the State had notified the defense that it intended to use this conviction as aggravating evidence at trial. (1 CR at 71; *see also* 1 CR at 196.) The State also presented testimony at trial from a Puerto Rican Department of Corrections official, who stated that Cruz-Garcia received discipline for possession of a cell phone, a homemade rope, and a map of Puerto Rico. (24 RR at 118-29.) The official testified that he believed Cruz-Garcia was attempting to escape through a broken window in his prison cell. (*Id.*) The State had notified the defense in January 2011 (more than two years before trial) that it intended to use this information as aggravating evidence at trial. (2 CR at 283.) The State again notified the defense of its intent to use the extraneous conviction and bad acts evidence on May 15, 2013. (2 CR at 413.)

Despite this information, trial counsel failed to conduct any meaningful investigation in Puerto Rico. Trial counsel retained investigators J.J. Gradoni and Edna Velez, who started working on the case in May 2012. (Ex. 28 at 6 [Cornelius Billing Voucher].) Based on review of the billing records and interviews memos created by the investigators, it appears their investigation was focused almost exclusively on interviewing family and friends in the Dominican Republic and

54

EXHIBIT 3 Page 067
000647

witnesses in Houston.[8]    Although the investigators traveled to the Dominican Republic for on-the-ground investigation, no similar trip was made to Puerto Rico. The only interviews listed in the investigation files as being conducted of Puerto Rican witnesses were phone calls with Cruz-Garcia's brother Joel—once in June 2012 and again in July 2013, shortly before trial—and with Dorca Capellan, Cruz-Garcia's common law wife—on July 5, 2013, days before trial began.  There is no indication in the investigation files that any attempts were made to contact officials or other witnesses from the Puerto Rican prison where Cruz-Garcia was held. Likewise, there is no indication that any attempts were made to request records from Cruz-Garcia's time in Puerto Rico (in or out of prison), except for a May 17, 2013, request for copies of Cruz-Garcia's kidnapping conviction.

Yet counsel were clearly aware of the potential importance of Puerto Rico as a source of information about Cruz-Garcia.  Counsel knew that Cruz-Garcia had spent much of the 1990s residing both in Puerto Rico and the Dominican Republic. He had a partner and child in Puerto Rico and his brother lived there as well. Further, counsel knew that from 2001 until being extradited to Houston, Cruz-Garcia has been imprisoned in Puerto Rico.

In their motion to the Court to justify investigation expenses, filed in July 2012, counsel stated: "[I]nvestigators will in all likelihood be required to go to Puerto Rico to properly investigate this case.  Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case." (2 CR at 384-85.)  Counsel were thus aware not only of potential mitigating family witnesses in Puerto Rico but also of the need to investigate Cruz-Garcia's time in prison while in Puerto Rico.

---

[8] The instructions given to the investigators and the timeline of when and which witnesses were contacted are factual issues best resolved through live testimony of trial counsel and the investigators at an evidentiary hearing.

55

EXHIBIT 3 Page 068

: 000648

Further, as previously discussed, had counsel performed effectively by inspecting the file held at the District Attorney's office, they would have had access to Puerto Rican prison records that indicated Cruz-Garcia had a history of positive, productive behavior while in prison.

Armed with this knowledge, reasonable capital counsel would have seen the potential opportunity for mitigating evidence arising from Cruz-Garcia's time in Puerto Rico, and investigated accordingly.[9]   By failing to conduct any such investigation, counsel missed a clear opening to pursue favorable evidence on behalf of their client, failing to meet professional norms for capital counsel. *See ABA Guidelines*, Guideline 10.7, 10.11.

### 2. Available Evidence to Rebut Future Danger

Had even a cursory investigation taken place in Puerto Rico, counsel would have discovered numerous officials and employees within the Puerto Rican justice system willing to speak on Cruz-Garcia's behalf.  The picture this testimony would have painted for the jury would have directly refuted the State's argument that Cruz-Garcia would be likely to commit future acts of violence if given a life sentence.

---

[9] There is no reason to believe that counsel had a strategic reason for their failure to investigate in Puerto Rico.   Following the conclusion of the case, counsel submitted a motion and memo in support of being paid twice the usual capital defense flat fee rate. (Ex. 28 at 1, 13-16 [Cornelius Billing Records].)   In the motion, counsel reiterated that the case "involves numerous extraneous offense [sic], both in Texas and in Puerto Rico.  Defendant's family lives in Puerto Rico and he has witnesses in Puerto Rico, as well as in Texas and other cities." (*Id.* at 13.)  In the memo supporting the motion, counsel again noted that witness were to be found in both the Dominican Republic and Puerto Rico, that Cruz-Garcia had been in prison in Puerto Rico, and that prison officials from Puerto Rico testified at his trial. (*Id.* at 16.)  Despite using these facts as justification for why additional fees were warranted for such a complex case, counsel failed to ensure that any investigation of Puerto Rican witnesses, prison officials, or other evidence was conducted.

56

EXHIBIT 3 Page 069

000649

For example, multiple witnesses who work as chaplains at the facilities where Cruz-Garcia was housed were available to testify regarding Cruz-Garcia's positive behavior in prison and the resulting trust and freedoms that were bestowed upon him. Chaplain Irma Iglesias Cruz has worked in the Puerto Rico Department of Correction for roughly forty years. She supervises about sixty other prison workers, including chaplains in other facilities, and oversees the orientation of new chaplains coming in to work in an institutional setting for the first time. (Ex. 15 at ¶1 [Aff. of Irma Iglesias Cruz].) Ivan Negron Vera has worked as a chaplain for the Department of Correction for seventeen years. From 2000 to 2012, he supervised roughly two thousand chaplains serving the various facilities run by the Department. He regularly counsels both inmates and correctional facility staff and guards. (Ex. 18 at ¶¶1-2 [Aff. of Ivan Negron Vera].) Jimmy Osorio has been a pastor for thirty years and has volunteered as a chaplain with the Department of Correction for about twenty-two years. (Ex. 19 at ¶1 [Aff. of Jimmy Osorio].) And Luis Gonzales Martinez has volunteered as a chaplain at multiple facilities in San Juan for about twenty-eight years. (Ex. 17 at ¶1 [Aff. of Luis Gonzales Martinez].)

These four chaplains each got to know Cruz-Garcia as a volunteer helping with religious services and taking care of the chapel. Each agrees that in the many years they have worked in the criminal justice system, Cruz-Garcia stands out to them as one of the best behaved, most trusted, and well-respected inmates they recall. (Ex. 15 at ¶10 [Aff. of Iglesias Cruz]; Ex. 17 at ¶5 [Aff. of Gonzales Martinez]; Ex. 18 at ¶14 [Aff. of Negron Vera]; Ex. 19 at ¶6 [Aff. of Osorio].)

As experienced chaplains, they had witnessed other inmates trying to con their way into positions of trust or pretend to be religious. But each believes through their experiences with Cruz-Garcia that he is a genuine and honest person. To them, Cruz-Garcia's faith is real, as was the encouragement and support he

EXHIBIT 3 Page 070

000650

gave to other inmates. At the time, the chaplains noted Cruz-Garcia's leadership skills and how he worked hard to help others become better people and productive inmates. He got along well with other inmates and staff. He seemed to be a loving and caring person. (Ex. 15 at ¶5 [Aff. of Iglesias Cruz]; Ex. 17 at ¶2 [Aff. of Gonzales Martinez]; Ex. 18 at ¶4 [Aff. of Negron Vera]; Ex. 19 at ¶¶2, 6 [Aff. of Osorio].)

Because of Cruz-Garcia's good behavior, he earned the respect of guards, staff, and other inmates. He was given a significant role in the church services of the prison. He was the most trusted inmate in the chapel and would assist in all matters dealing with the prison's religious services. Cruz-Garcia would help get the chapel ready for worship services and clean up after, moving about freely. He took part in music services and led Bible studies. (Ex. 15 at ¶3 [Aff. of Iglesias Cruz]; Ex. 18 at ¶4 [Aff. of Negron Vera]; Ex. 19 at ¶¶2, 6 [Aff. of Osorio].)

None of the chaplains remember Cruz-Garcia being written up for discipline problems or being considered dangerous. None ever witnessed or heard of him committing any violence; he would not have been given so much freedom if he had. And this was not due to the lack of opportunity—while in prison in Puerto Rico, Cruz-Garcia was housed in general population and he was frequently left alone outside his cell. (Ex. 15 at ¶6 [Aff. of Iglesias Cruz]; Ex. 17 at ¶3 [Aff. of Gonzales Martinez]; Ex. 18 at ¶5 [Aff. of Negron Vera]; Ex. 19 at ¶3 [Aff. of Osorio].)

Cruz-Garcia was given tremendous privileges and trust in the prison not conferred on most other inmates. For example, multiple chaplains at various times gave Cruz-Garcia the keys to the chapel or their offices and allowed him to move around unsupervised. As one chaplain noted:

> Let me be clear, not everyone is given these types of duties. We only
> gave them to the people we truly trusted and confided in because they

EXHIBIT 3 Page 071

000651

were given important keys. I can count on my hand the number of
individuals that I have given this level of responsibility, the level of
responsibility that I gave Obel, and I would still have fingers left over.
That is how much I trusted him.

(Ex. 18 at ¶6 [Aff. of Negron Vera]; *see also* Ex. 15 at ¶5 [Aff. of Iglesias Cruz];
Ex. 17 at ¶3 [Aff. of Gonzales Martinez]; Ex. 19 at ¶3 (Aff. of Osorio).) Cruz-
Garcia was also allowed to work in the "corporation" area, which allowed inmates
access to power tools and other potentially dangerous objects that were used for
making furniture. Only inmates who were well-behaved, hard-working, and had
earned trust were permitted to work there. (Ex. 17 at ¶3 [Aff. of Gonzales
Martinez]; Ex. 18 at ¶7 [Aff. of Negron Vera]; Ex. 19 at ¶¶3, 4 [Aff. of Osorio].)

In fact, if anything, Cruz-Garcia was seen as a calming influence who helped
to maintain order. He would convince other inmates to pay attention to
correctional staff and to follow the rules. Correctional staff felt Cruz-Garcia made
their jobs easier through his influence on other inmates. (Ex. 18 at ¶8 [Aff. of
Negron Vera].) When Cruz-Garcia was moved into segregation because he was
being extradited to Texas, he maintained this attitude:

> I thought that Obel would find it very difficult to maintain his faith
> and conviction after he was moved into segregation. To the contrary,
> even after Obel was transferred into a segregated cell, we could hear
> him, from our chapel, giving sermons to the other inmates in
> segregation. He took the initiative to lead services. His faith never
> failed him. We were all so proud of him. Everyone would listen to
> him. I knew his faith and beliefs were strong.

(Ex. 15 at ¶8 [Aff. of Iglesias Cruz].)

Overall, these chaplains would have testified that Cruz-Garcia had a
tremendous, positive impact on the lives of other inmates and of correctional staff
while in prison in Puerto Rico. In addition to being a trustworthy and hard worker,
Cruz-Garcia acted as a leader and a counselor to help other inmates obey prison
rules. (Ex. 18 at ¶¶10, 12 [Aff. of Negron Vera].) As one chaplain stated:

59

EXHIBIT 3 Page 072

000652

I have to stress the he gained tremendous trust and confidence from the jail staff and the chaplains. During my time working at the [prison], I never heard any complaints about Obel or knew him to have any disciplinary problems. Obel was well respected by everyone in the facility, including jail administrators, guards, and other inmates.

(Ex. 17 at ¶3 [Aff. of Gonzales Martinez].)

None of the chaplains were contacted by anyone on Cruz-Garcia's defense team. Had they been, each would have been willing to come to Houston as a witness on Cruz-Garcia's behalf. One would have raised his own money to fly to Houston if the defense could not afford the ticket. (Ex. 15 at ¶11 [Aff. of Iglesias Cruz]; Ex. 17 at ¶6 [Aff. of Gonzales Martinez]; Ex. 18 at ¶15 [Aff. of Negron Vera]; Ex. 19 at ¶7 [Aff. of Osorio].) Further, the seriousness of the charges he faced would not have deterred their speaking about the person they knew he had become. They could have talked about conversations they had had with Cruz-Garcia where he indicated remorse for the bad decisions he had made in his life prior to being in prison. And they could have told the jury about the depth of his faith and the way he had touched their lives. (Ex. 15 at ¶9 [Aff. of Iglesias Cruz]; Ex. 17 at ¶4 [Aff. of Gonzales Martinez]; Ex. 18 at ¶¶9, 12, 13 [Aff. of Negron Vera].)

Had an investigation been conducted in Puerto Rico, counsel also could have secured the testimony of Dr. Alejandro Lebron, a clinical psychologist who counseled Cruz-Garcia while he was in prison there. Dr. Lebron has worked in the field for roughly forty years and, at the time he knew Cruz-Garcia, was providing mental health support and assistance to inmates. Cruz-Garcia began seeing Dr. Lebron by choice. That is, he was not ordered to receive counseling, but instead had sought out therapy on his own. (Ex. 16 at ¶¶1-2 [Aff. of Dr. Alejandro Lebron].)

EXHIBIT 3 Page 073

Like the chaplains, Dr. Lebron observed that Cruz-Garcia's faith was genuine and thoughtful. He also felt that his dealings with Cruz-Garcia gave him a new perspective on the Bible and using religion as a common ground to connect with patients. (Ex. 16 at ¶¶3-4 [Aff. of Dr. Lebron].) Dr. Lebron's experience in dealing with Cruz-Garcia was that he was open and honest and was not a troublemaker. He witnessed Cruz-Garcia have access to other prison staff and civilians, and never felt he posed a danger to anyone. He never knew of Cruz-Garcia to cause any trouble. (*Id.* at ¶5.)

Dr. Lebron was never contacted by anyone on Cruz-Garcia's defense team. Had he been, he would have testified at Cruz-Garcia's capital trial. Even knowing the charge of capital murder, Dr. Lebron would have told the jury about the Cruz-Garcia he knew: "a deeply spiritual man, who believed that doing good work and living a good Christian life was the most important thing he could do." Having worked with prison populations, and knowing Cruz-Garcia in the years after the crime occurred, Dr. Lebron would have communicated that he had witnessed inmates change and that, even if guilty, he believed Cruz-Garcia was no longer the same individual. (Ex. 16 at ¶¶7-8 [Aff. of Dr. Lebron].)

With sufficient investigation, these potential witnesses—and likely others—could have been located in the Puerto Rico prison system to speak about Cruz-Garcia's good behavior and likelihood that he would not commit future acts of violence. Moreover, one of the witnesses that was interviewed—Cruz-Garcia's common law wife Dorca—could have provided helpful information in this regard had she been interviewed earlier than the eve of trial. Dorca had been with Cruz-Garcia during the time he was in prison and had visited him there frequently with their daughter. (Ex. 12 at ¶¶11-12 [Aff. of Maria Capellain Romero].) She recalls the jail guards were friendly with Cruz-Garcia. Specifically, she remembers that the guards trusted Cruz-Garcia enough to bend the rules for him, allowing the two

61

EXHIBIT 3 Page 074

000654
000075

of them to hug when she would go to visit him. (*Id.* at ¶11.) She also remembers that Cruz-Garcia worked hard to continue to provide as much as he could for his family, even though he was in prison. He would make hammocks, key chains, and other items to sell and then send the money to Dorca and their daughter. (*Id.* at ¶4.)

None of this information about Cruz-Garcia's conduct and life in prison in Puerto Rico was presented to his capital jury. In failing to conduct an investigation into a clear avenue of potentially beneficial information, counsel's performance under the standards for capital counsel was deficient. *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty"). Further, the resulting absence of this information to be considered by the jury prejudiced Cruz-Garcia's trial.

## C. Trial Counsel's Failure to Review the Prosecution's File and Sufficiently Investigate Prejudiced the Defense

In combination, trial counsel's failure to review the District Attorney's file and their failure to independently investigate potential witnesses and evidence in Puerto Rico significantly prejudiced the punishment phase of Cruz-Garcia's trial. Substantial evidence existed that, had it been presented, would have likely changed at least one juror's vote to life.

During the State's case at punishment, the prosecution put forward evidence that Cruz-Garcia committed an extraneous, uncharged murder; was convicted of kidnapping in Puerto Rico; and had commit other assaults and violent behavior toward individuals before and after the capital murder. (*See* 24 RR at 64-68; 25 RR at 32-36, 59-71.) However, all of these incidents occurred a decade or more before his trial and while he was not in prison. Following his conviction for kidnapping, Cruz-Garcia spent nearly a decade in prison in Puerto Rico, and then

EXHIBIT 3 Page 075

000655

spent time awaiting his trial in the Harris County jail.   From that period, the prosecution offered only two incidents of negative conduct.

First, an official from the Puerto Rico Department of Correction testified that Cruz-Garcia was written up for possession of a cell phone, rope, and a map, which the official believed was an escape attempt.  (24 RR at 124-28.)  However, while Cruz-Garcia's classification was changed due to the incident, there was no evidence that any other disciplinary action resulted.  (24 RR at 128.)  Next, the State presented testimony from a Harris County jail corrections officer.  (25 RR at 122.)  The officer testified that Cruz-Garcia had been written up once during his more than three years in Harris County jail because Cruz-Garcia tried to keep a razor blade he had checked out instead of returning it.   (25 RR at 130-36.) However, it was common for inmates to get in trouble for this and Cruz-Garcia was simply charged thirteen cents for the cost of the razor and lost seven days of commissary and visitation. (25 RR at 136-39.)

Yet, despite the limited evidence presented regarding Cruz-Garcia's likelihood of committing violence while in prison with a life sentence, the State was able to argue the point largely uncontested by evidence from the defense.  In the absence of evidence regarding Cruz-Garcia's decade of good behavior and earning the trust of prison officials in Puerto Rico, the State was able to put significant weight on the two incidents they had presented.   At closing, the prosecution argued:

> They were sheets that had been designed in a way to form a rope that you could get down from the second floor of that prison cell.  And what else did they find? A map of Puerto Rico and a cell phone on the defendant's person.

> Ladies and gentleman, this is not a man who just has been sitting in prison leading Bible study and finding God.  This was a man, back in 2001, that was trying to find a way to get out of there.  And they want

EXHIBIT 3 Page 076

000656
000077

you to think that that's not a factor in considering whether Obel Cruz-Garcia will be a continuing threat to society.

(26 RR at 155.)  The prosecution stated further:

You know all about Obel Cruz-Garcia's history.  Knowing him, knowing that he is the kind of man who will kill you for the smallest thing, like flirting with his girlfriend.  Why do you think he was hoarding razor blades?  You can make your own conclusion.

(26 RR at 173.)  Ultimately, the prosecution stated to the jury that the evidence they presented was uncontroverted and proved beyond a reasonable doubt that Cruz-Garcia was likely to commit future acts of violence, meeting the burden for the first special issue.

Had counsel performed a reasonable investigation by reviewing the District Attorney's file and conducting an investigation into witnesses and evidence in Puerto Rico, the jury would have heard evidence directly refuting the State's case in the first special issue.  *ABA Guidelines*, Guideline 10.7(A) ("[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.").  First—and most significantly—the testimony of witnesses from the Puerto Rican prison system and the records from Cruz-Garcia's time there would have provided clear and convincing evidence that Cruz-Garcia was unlikely to be a danger of violence if given a life sentence.  This evidence would have established for the jury that Cruz-Garcia had not engaged in any violence with other inmates or jail staff in the decade he was in prison.  It would have shown that besides the alleged escape attempt, Cruz-Garcia had received no other disciplinary actions or grievances.  The jury would have been able to compare the State's allegations with the fact that Cruz-Garcia was given liberal access to the prison and to power tools and other dangerous objects, and that Cruz-Garcia had not acted out or abused these privileges.  This evidence would have directly rebutted the State's assertion that if Cruz-Garcia were housed

64

EXHIBIT 3 Page 077

000657
000678

in the general population, he would have a dangerous level of access to visitors, other inmates, and potential weapons. (25 RR 157-78).

Next, this evidence would have specifically helped to mitigate and rebut the State's argument that Cruz-Garcia was attempting to escape when he was found with a rope and map in his cell. Though counsel cross-examined the prison official regarding flaws in his account of Cruz-Garcia's alleged escape plan, a more compelling indictment of the incident would have been for the jury to learn that Cruz-Garcia was not only granted more access to prison areas than other prisoners, he even had earned the privilege of possessing the chaplains' keys. With this information, it is likely that at least one juror would have found it improbable that Cruz-Garcia would have plotted an escape through his cell window when he literally possessed keys that likely provided an easier means to attempt an escape.

Ultimately, all the evidence available regarding Cruz-Garcia's time spent in the Puerto Rico prison system would have painted a far different picture than the jury heard about Cruz-Garcia's likelihood of conforming to a positive role in prison. The jury would have heard direct evidence of the type of positive contributions Cruz-Garcia was capable of toward other inmates, prison staff, and the prison system as a whole. As a result of trial counsel's deficient performance, the resulting presentation of evidence to the jury during Cruz-Garcia's capital trial bore little resemblance to Cruz-Garcia's true behavior while incarcerated. Under these circumstances, there is "a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Ex parte Gonzales*, 204 S.W.3d at 393-94.

EXHIBIT 3 Page 078

000658
000079

## CLAIM FOUR

## TRIAL COUNSEL PERFORMED INEFFECTIVELY IN FAILING TO SUFFICIENTLY INVESTIGATE AND PRESENT MITIGATION EVIDENCE

Capital counsel are required to conduct a far-reaching, exhaustive investigation into their client's life history for potential mitigation evidence that will motivate a jury to vote for life over death. *ABA Guidelines*, Guideline 10.7 cmt. (describing the "extensive and generally unparalleled investigation" required of capital counsel). Indeed, mitigating evidence can be *any* evidence that "might serve 'as a basis for a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) (emphasis added). To accomplish this task, professional norms for capital counsel have come to recognize it as standard practice to retain the use of a mitigation specialist. *ABA Guidelines*, Guideline 4.1. In addition, when considering how to present mitigating information to the jury, counsel must consult with and present testimony from any expert witnesses necessary to explain "medical, psychological, sociological, cultural" or other mitigating themes. *ABA Guidelines*, Guideline 10.11(F).

In Cruz-Garcia's case, counsel failed to sufficiently conduct the required comprehensive investigation into potential mitigation evidence on Cruz-Garcia's behalf. As an initial matter, counsel failed to retain the assistance of a qualified mitigation specialist. Additionally, the investigation that was conducted failed to explore any available mitigation evidence in Puerto Rico, where Cruz-Garcia had lived at various points in his life and had been imprisoned in the decade before being brought to Houston for trial. Counsel also failed to interview numerous family members in the Dominican Republic who could have provided the jury with a more robust picture of Cruz-Garcia's life history and his role in their family.

66

EXHIBIT 3 Page 079

000659

Furthermore, counsel failed to consult with potential expert witnesses, beyond a single psychological evaluation, who might have shed light for the jury on the reason the information from his life history was mitigating. For all these reasons, counsel's performance in investigating Cruz-Garcia's case was deficient. Cruz-Garcia's punishment phase of trial was prejudiced by the absence of significant mitigating information. Had that information been presented, there is a reasonable probability that at least one juror would have voted for life instead of death. Because of counsel's ineffective assistance, Cruz-Garcia's rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law were violated. Accordingly, his sentence must be reversed.

## A. Trial Counsel's Investigation

In early 2010, after Cruz-Garcia was indicted for capital murder and extradited from Puerto Rico but before the State had decided to seek the death penalty, attorneys Mike Fosher and Mario Madrid were selected as appointed counsel. (1 CR at 8, 11.) About a month later, in April 2010, Cruz-Garcia's family retained Steven Shellist and Christian Capitaine as counsel for Cruz-Garcia, and Mr. Fosher and Mr. Madrid were removed. (1 CR at 19-21.) From April 2010 to August 2011, Mr. Shellist and Mr. Capitaine focused their investigation of the case on the DNA testing they believed would be the focus of the State's case. Because the State had not indicated it would seek death, Mr. Shellist and Mr. Capitaine conducted no punishment-phase investigation whatsoever and did not hire a mitigation specialist. (Ex. 4 [Affidavit of Steven Shellist].)

At some point, however, the State determined that it would seek death against Cruz-Garcia. (4 RR at 9.) Because neither Mr. Shellist nor Mr. Capitaine were on the approved list of capital counsel, they withdrew from the case on August 31, 2011. (2 CR at 326; 4 RR at 6-7.) That same day, attorney Skip

EXHIBIT 3 Page 080

Cornelius was appointed as first chair and attorney Mario Madrid was appointed as second chair counsel. (1 CR at 57-58.)

### 1. Fact Investigation

Despite being appointed to a case that had already been pending for over a year and a half and whose crime had occurred twenty years earlier, it does not appear counsel made efforts to begin investigating the case until May 2012. (Ex. 28 at 6 [Cornelius Billing Records].) That month, counsel retained the Houston-based private investigation firm of J.J. Gradoni and Associates, who had a licensed investigator named Edna Velez who could speak Spanish. Though the investigators were tasked with interviewing family, friends, and other witnesses that could provide mitigation information, it does not appear the investigators were qualified as mitigation specialists or that counsel believed they were operating as mitigation specialists for the defense team. The Gradoni and Associates website regarding their capital murder defense services makes no mention of mitigation, focusing instead on elements of fact-based investigation. *See* Capital Murder Defense, at http://www.gradoni.com/capital-murder-defense.html (last visited on August 12, 2015). Further, Gradoni's responses to post-conviction inquiry make clear their many years of experience in guilt/innocence investigations meant they were not given much direction in that regard from counsel. (Ex. 35 at ¶2 [Letter from Gradoni & Associates].) Mitigation investigation appears to have been a secondary assignment, as they were instructed merely "to get as much beneficial information that we could about the defendant's upbringing, family members, etc." (*Id.*)

During the remaining seven months of 2012, the investigators worked a total of only fifty-six hours on Cruz-Garcia's case. (Ex. 28 at 6-7 [Cornelius Billing Records].) This included only twenty-five hours of interviews of Cruz-Garcia and family members in the Dominican Republic and Venezuela. (*Id.*) Regarding

68

EXHIBIT 3 Page 081

000661

witnesses in Puerto Rico, the interviews conducted included a single phone interview with Cruz-Garcia's brother, Joel, in June 2012.

During 2013, the investigators conducted numerous witness interviews in and around the Houston area, primarily between April and the start of trial in July 2013.  (Ex. 28 at 10-11, 46-49 [Cornelius Billing Records].)  In addition, investigators conducted phone interviews of family witnesses in the Dominican Republic and traveled to the Dominican Republic from May 5-9, 2013, for in-person interviews. (*Id.* at 26.)

In contrast, investigators performed virtually no investigation into family and other witnesses or other evidence in Puerto Rico.  After the June 2012 interview of Cruz-Garcia's brother Joel, investigators only record two follow-up conversations with him in June and July 2013 in preparation for him to be a witness at trial.  Cruz-Garcia's common law partner, Dorca, was interviewed by phone on July 5, 2013, just days before trial began.  The investigators state they have no recollection of counsel suggesting they travel to Puerto Rico.  (Ex. 35 at ¶¶4-5 [Letter from Gradoni & Associates].)  There are no records or memos to indicate that other witnesses from Puerto Rico were contacted or that attempts were made to collect records relating to Cruz-Garcia's life history in Puerto Rico.

Yet counsel were clearly aware of the potential importance of Puerto Rico as a source of information about Cruz-Garcia.  In their motion to justify investigation expenses, counsel stated that "investigators will in all likelihood be required to go to Puerto Rico to properly investigate this case.  Defendant's family lives in Puerto Rico and there are alleged extraneous offenses in Puerto Rico that the State intends to attempt to prove at punishment in this case."  (2 CR at 384-85.)  As discussed more fully in Claim Three, *ante*, counsel were thus aware not only of potential mitigating family witnesses in Puerto Rico but also of the need to investigate Cruz-Garcia's time in prison while in Puerto Rico, as the State had already indicated

69

EXHIBIT 3 Page 082

000662

their intent to use what it alleged to be an escape attempt against Cruz-Garcia at the punishment phase of trial.

## 2. Mitigation Specialist and Expert Witnesses

Around the same time that investigators were retained and began work on the case in mid-2012, counsel submitted motions to the Court asking for out-of-court expenses for "investigation" and for "mental health and mitigation." (2 CR at 384, 387.) The "investigation" motion requested funds for using Gradoni and Associates. (2 CR at 384.) The "mental health and mitigation" motion sought funds for an expert witness related to mental health and mitigation issues. (2 CR at 387.) Trial counsel has indicated that they were aware of the need to retain a mitigation specialist as part of the defense team on Cruz-Garcia's case. However, counsel stated they were unable to find a mitigation specialist who both spoke Spanish and was willing to work at the fee rate typically approved by Harris County courts. Instead, counsel indicated that they retained psychologist Dr. Susana Rosin to provide essentially the same function as a mitigation specialist.

Counsel's "mental health and mitigation" motion supports this fact, as counsel states in the motion that Dr. Rosin had been retained to do "testing, review of documents, consultation, and possible testimony" relating to "issues of mental health and mitigation." (2 CR at 387.) In support of the motion, counsel attached a letter from Dr. Rosin in which she stated that based on her understanding of her role on the case and its complexity, her work would involve approximately sixty to seventy hours of work. (2 CR at 390.) The Court approved funds up to $17,400 for this purpose. (2 CR at 389.) It appears that because the atypical use of a Ph.D. psychologist in the role of mitigation specialist would mean a significantly higher hourly rate, special approval was sought from presiding Judge Belinda Hill before the Court authorized the expense. (*Id.*)

70

EXHIBIT 3 Page 083

000663

However, whatever counsel's original intent, the work performed by Dr. Rosin on Cruz-Garcia's case makes clear she did not serve the function of mitigation specialist for the defense team, and counsel did not attempt to use her as such. After receiving approval for expenses for Dr. Rosin in July 2012, counsel did not have her perform any work on the case until May 2013. Other than a phone call with the investigators on January 6, 2013 (for which Dr. Rosin did not bill time), Dr. Rosin reviewed records for two hours on May 9, 2013, and evaluated Cruz-Garcia for three hours on May 15, 2013. (Ex. 28 at 7, 21 [Cornelius Billing Records].) She then spoke with counsel for an hour on June 27, 2013 and prepared an expert report in an hour on July 1, 2013. (*Id.* at 21.) Thus, in total, Dr. Rosin performed only seven hours of work on Cruz-Garcia's case. Her role appears to have been that of providing a standard psychological evaluation of the client—a relatively narrow and defined task—and not the broad-reaching investigative role of a mitigation specialist.

It is unclear why counsel failed to use Dr. Rosin as a mitigation specialist or when that decision was made. However, what is clear is that at no time did counsel hire any other mitigation specialist for the defense. Nor does it appear counsel consulted with any other potential expert witnesses for Cruz-Garcia's case. Nor did counsel at any time return to the Court to express inability to find a suitable mitigation specialist, to ask the Court to appoint a mitigation specialist, or to ask for extra funding to secure a mitigation specialist outside the normal Harris County-approved fee structure. As a result, when Cruz-Garcia's trial began, the investigation of his case had been done without the assistance of a mitigation specialist or of any expert consultation beyond a single psychological evaluation.

EXHIBIT 3 Page 084

000664

**B. Counsel's Failure to Retain a Mitigation Specialist, Ensure a Sufficient Investigation of Lay Witnesses, or Consult with Necessary Expert Witnesses Constitutes Deficient Performance**

To provide effective assistance, trial counsel must conduct a reasonable investigation into potential mitigating evidence. *Wiggins*, 539 U.S. at 522-23. This reasonable investigation must occur prior to deciding on a punishment phase strategy:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. Trial counsel cannot insulate their decision from collateral attack by claiming that it was a strategic choice not to pursue or present mitigating evidence if they did not first complete a reasonable investigation. *Sears v. Upton*, 130 S. Ct. 3259, 3265 (2010) (per curiam); *Williams v. Taylor*, 529 U.S. at 396.

Counsel's failure to retain a qualified mitigation specialist to assist in the investigation of Cruz-Garcia's case falls below standard professional norms for capital counsel in Texas. The use of a mitigation specialist as part of the defense team is a particularly indispensable piece of their duty to investigate. The commentary to the ABA Guidelines explains both the function of a mitigation specialist and why that role must be filled by someone qualified to undertake that function. The length of the discussion of this role is itself notable and worth recounting to underscore the significance the mitigation specialist role has on the defense team.

72

EXHIBIT 3 Page 085

000665

A mitigation specialist is also an *indispensable member* of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending. The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death.

For all of these reasons the use of mitigation specialists has become "part of the existing 'standard of care'" in capital cases, ensuring "high quality investigation and preparation of the penalty phase."

ABA Guidelines, Guideline 4.1 cmt. (footnotes omitted) (emphasis added).

Particularly in Cruz-Garcia's case, given his Dominican nationality and history of

living there and in Puerto Rico, a mitigation specialist would have been helpful to

73

EXHIBIT 3 Page 086

000666
: 000087

identify and interview witnesses in a culturally competent manner, and to be able to recognize information relevant to Cruz-Garcia's particular life history. *See* State Bar of Tex., *Supplementary Guidelines and Standards for the Mitigation Function of Defense Teams in Texas Capital Cases*, Guideline 5.1(B)-(C) (June 2015) ("*Texas Supplementary Guidelines*").

Yet trial counsel failed to retain a mitigation specialist as part of their defense team, despite understanding the importance of having one. Counsel went so far as to retain a psychologist, ostensibly to fill this role, and to get special permission from the presiding judge to cover the expense. Instead of seventy hours of work, however, the defense psychologist performed only seven. While counsel may have had a strategic reason to limit the psychologist's actual work on the case to only seven hours rather than use her as a mitigation specialist, that reason does not explain counsel's failure to secure an actual qualified mitigation specialist. Though counsel indicate in post-conviction that they were unable to find someone willing to work for the hourly rate typically approved by Harris County courts, this is not a strategic reason justifying failure to retain a mitigation specialist. First, counsel were able to obtain special permission from the presiding judge for the increased expense of using a psychologist. Thus, they should have had every reason to believe similar permission could have been obtained to pay for a mitigation specialist. Yet counsel did not ever request such funding. Nor did counsel ever file a motion with the Court explaining their inability to retain a mitigation specialist and asking the Court to intervene or assist. Next, when the decision was made to not use Dr. Rosin beyond her single evaluation, counsel neither asked for a continuance nor asked for assistance in finding a mitigation specialist at that point.

These actions resulted in the failure of counsel to retain the assistance of an integral part of the defense team. As will be discussed below, the absence of a

74

EXHIBIT 3 Page 087

000667

mitigation specialist likely contributed to the fact that several areas of mitigation evidence were not investigated by counsel. Indeed, the full extent of the prejudice caused to Cruz-Garcia by the absence of a mitigation specialist can only be estimated. Because counsel were aware of their professional obligation to retain a mitigation specialist but failed to do so, counsel's performance in the investigation of this case was deficient.

Separate from the issue of a mitigation specialist, counsel is nonetheless required to conduct a thorough investigation into their client's background. *Porter*, 558 U.S. at 39; *Williams*, 529 U.S. at 396. The ABA Guidelines echo this constitutional requirement. They direct that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines*, Guideline 10.7(A). Furthermore, the commentary instructs counsel that investigation regarding potential punishment phase issues "requires extensive and generally unparalleled investigation into personal and family history." *Id.* at cmt. When trial counsel's initial investigation provides beneficial mitigating evidence, professional norms require that they follow up on those leads. *Wiggins*, 539 U.S. at 524, 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Ex parte Woods*, 176 S.W.3d 224, 226 (Tex. Crim. App. 2005) ("While *Strickland* does not require defense counsel to investigate each and every potential lead, or present any mitigating evidence at all, it does require attorneys to put forth enough investigative efforts to base their decision not to present a mitigating case on a thorough understanding of the available evidence.").

In this case, counsel knew (or should have known) that Cruz-Garcia spent significant time in Puerto Rico, both living there and being incarcerated there prior to trial. Given this knowledge, counsel should have had every reason to believe

EXHIBIT 3 Page 088

000668

some investigation in Puerto Rico, beyond the two individuals interviewed by phone, would be necessary. Further, nothing in counsel's files indicate they learned something to justify a decision not to investigate in Puerto Rico. Certainly, capital counsel must make strategic decisions regarding resources and how to allocate investigation efforts. However, counsel knew as early as July 2012 that investigation in Puerto Rico was necessary. (*See* 2 CR at 384.) Counsel's investigators did not travel to the Dominican Republic until May 2013. (Ex. 28 at 26 [Cornelius Billing Records].) There was significant time in between those two dates to facilitate investigation in Puerto Rico. Further, counsel did not spend the entirety of the investigation funds for which they had gotten pre-approval, nor did they seek extra funds from the Court to fund a trip to Puerto Rico. For these reasons, counsel's failure to investigate thoroughly, particularly in Puerto Rico, was not based on any strategic decisions, but was instead deficient performance failing to meet the prevailing standards for capital counsel.

Finally, counsel performed deficiently in failing to consult with potential expert witnesses, beyond a single psychological evaluation, who might have provided compelling testimony regarding the mitigation themes investigation into Cruz-Garcia's life history uncovered. Professional norms at the time of Cruz-Garcia's trial instructed capital counsel that they should consider retaining experts to provide "medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense." *ABA Guidelines*, Guideline 10.11(F)(2); *Texas Supplementary Guidelines*, Guideline 5.1(B), 10.11.

It is not enough to simply gather the facts of a defendant's life story and then present it through lay witness testimony. An expert must also be retained to synthesize that information into a coherent psycho-social narrative for presentation to the jury. *See ABA Guidelines*, Guideline 10.11 (commentary) (noting the

76

EXHIBIT 3 Page 089

000669

importance of presenting "the client's complete social history" at punishment). Such an expert uses his or her particularized expertise relevant to the defendant to present the social history developed by a mitigation specialist in a cohesive narrative. John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, 17 THE ADVOCATE 4, 10 (Aug. 1995) ("[P]ersuasive expert testimony must . . . enable the jury to see the world from your client's perspective, i.e., to appreciate his subjective experience.").

In Cruz-Garcia's case, counsel failed to consult with any expert witnesses besides Dr. Rosin. While the decision not to use Dr. Rosin any further, or even to cease investigation into potential mental health evidence based on her evaluation, may be the type of decision based on investigation that is considered strategic, no reasonable or strategic grounds serve as a basis for counsel's failure to consult with any other potentially valuable expert witnesses. Mental health evidence is not the only area of mitigation capital counsel is expected to investigate and about which to retain an expert for assistance. *See Texas Guidelines*, Guideline 11.7 (requiring counsel to consider expert witnesses relating to "medical, psychological, sociological, cultural," or other potential mitigation topics). As will be discussed, expert testimony could have assisted Cruz-Garcia's jury with understanding the mitigating impact of his life history. Counsel's failure to investigate potential expert testimony therefore fell short of the prevailing standards for capital counsel and constituted deficient performance.

## C. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Early Life History

Counsel's deficient performance in their investigation of Cruz-Garcia's case for mitigation information particularly prejudiced his opportunity to explain to the jury why Cruz-Garcia's early life history warranted a life sentence over death.

EXHIBIT 3 Page 090

Whether through the absence of a mitigation specialist or thorough investigation, the defense ultimately only presented the live testimony of Cruz-Garcia's brother Joel and son Abel and the testimony of Cruz-Garcia's wife Mirella via internet video feed during the punishment phase of trial.[10] (26 RR at 8, 32, 66.) While their testimony touched on Cruz-Garcia's life history and character, the presentation fell far short of the kind of robust mitigation presentation anticipated in a capital case.

Possibly the most important duty of capital trial counsel is to present evidence to explain how their client's life story explains and mitigates what led the client to the present scenario. *See Wiggins*, 539 U.S. at 523-24 (recognizing the importance of social history presentations in capital cases); *ABA Guidelines*, Guideline 10.11(F)(2); *Texas Guidelines*, Guideline 11.7(F)(2); *Texas Supplementary Guidelines*, Guideline 5.1(B), 10.11. Presentation of this evidence educates the jury and allows it to make an informed decision when determining which punishment to assess in a capital case. *See ABA Guidelines*, Guideline 4.1 cmt. ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to a jury's decision at the punishment phase.").

Numerous lay witnesses—some who had been interviewed by counsel and some who had not—were available to explain how Cruz-Garcia had gone from a poor child in the Dominican Republic to being involved in the drug trade in the

---

[10] In addition to these three witnesses, counsel presented testimony from a young man who had known Cruz-Garcia in the Harris County jail. (26 RR at 80.) However, this young man literally walked off the street and introduced himself to counsel on the morning of his testimony. (26 RR at 81.) While fortuitous, his presence as a witness was not due to any planning or investigation by trial counsel and, thus, should not be weighed in considering the punishment phase investigation and presentation they put forward.

78

EXHIBIT 3 Page 091

000671

United States. Expert testimony was also available to explain how this life trajectory was not unique to Cruz-Garcia, but was explainable by an understanding of the culture and historical setting in which Cruz-Garcia developed. All of this evidence would have presented a significantly more complete and compelling explanation of Cruz-Garcia's life story than the presentation of Cruz-Garcia's brother, wife, and son offered by trial counsel. (*See* 26 RR at 8, 32, 66.)

### 1. Available Lay Witness Testimony[11]

Although defense investigators had traveled to the Dominican Republic and interviewed some of Cruz-Garcia's family members, the defense presentation at punishment was largely absent of the many family members willing to testify on Cruz-Garcia's behalf and who could speak of his early life. For example, Cruz-Garcia's father and step-mother, Valerio and Dorcas, had spoken with defense investigators and were willing to come testify. (Ex. 10 at ¶13 [Aff. of Valerio Julian de la Cruz Santos]; Ex. 6 at ¶12 [Aff. of Dorcas Noelia de la Cruz Fana].) So was Cruz-Garcia's half-brother Menagen, who had spoken with an investigator by phone. (Ex. 8 at ¶6 [Aff. of Menagen Valerio de la Cruz].) Cruz-Garcia's half-sister Yeli and his uncle Jose were also available and willing to testify for Cruz-Garcia, and neither were interviewed prior to trial. (Ex. 7 at ¶8 [Aff. of Dorcas Yelietza de la Cruz]; Ex. 9 at ¶10 [Aff. of Jose de la Cruz].) Finally, two of the three defense witnesses who did testify—Cruz-Garcia's brother Joel and wife Mirella—were only interviewed briefly and could have provided more information about Cruz-Garcia's origins. (Ex. 5 at ¶¶3-5 [Aff. of Joel Cruz-Garcia]; Ex. 11 at ¶¶3-4 [Aff. of Mirella Perez Garcia].)

---

[11] For ease of reference, these witnesses will typically be referred to by their first name.

EXHIBIT 3 Page 092

000672

Had these individuals testified, the jury would have learned substantially more information about the good son, brother, and father he was, and how the circumstances of his early life shaped who he would become.

Cruz-Garcia was born to Valerio de la Cruz Santos and his wife Dahlia in the Dominican Republic. Like many in the Dominican Republic, the men in Cruz-Garcia's family had numerous children with multiple women. Valerio was trained as a paramedic in the military and then worked as a civilian medic, which is how he met Cruz-Garcia's mother. They married, had Cruz-Garcia, his sisters Noemi and Natalia, and his brother Joel, and lived in Santo Domingo. (Ex. 10 at ¶¶2-6 [Aff. of Valerio]; Ex. 9 at ¶2 [Aff. of Jose].)

When Cruz-Garcia was ten years old, his father and mother separated. Valerio had been hurt in a car accident, and Dahlia's family convinced her he would not be able to support the family anymore. They decided to separate, and Dahlia moved back to Venezuela where her family was. (Ex. 10 at ¶7 [Aff. of Valerio].) When Cruz-Garcia's father and mother separated, Cruz-Garcia and his siblings moved with their father from Santo Domingo to a small village on the northern coast where his father's family lived. There they lived with uncles, aunts, grandparents, and numerous other family members. (Ex. 5 at ¶7 [Aff. of Joel]; Ex. 10 at ¶8 [Aff. of Valerio]; Ex. 9 at ¶4 [Aff. of Jose].)

Cruz-Garcia was a hard worker and was loved by his family and friends. He was a happy youth, respectful, and well-behaved. He was hard working, but laid back. His uncle remembers fondly how they would pick mangos together or work in the rice fields. Cruz-Garcia went to church often. He got along with friends and neighbors, who to this day remember him fondly. (Ex. 10 at ¶8 [Aff. of Valerio]; Ex. 6 at ¶¶6, 9 [Aff. of Noelia]; Ex. 9 at ¶6 [Aff. of Jose].)

The loss of his mother impacted the way Cruz-Garcia approached the world. He became more serious, keeping his feelings hidden, and focusing instead on

80

EXHIBIT 3 Page 093

000673

always providing for his family.  His brother felt that Cruz-Garcia grew up very fast to act like a parent to him and the other siblings.  His wife could later tell that it left an emptiness in Cruz-Garcia, driving him to value family.  When his father took interest in his stepmother, Cruz-Garcia encouraged their romance and ultimate marriage, taking messages back and forth between them. (Ex. 5 at ¶8 [Aff. of Joel]; Ex. 6 at ¶5 [Aff. of Noelia]; Ex. 11 at ¶6 [Aff. of Mirella].)

When Cruz-Garcia's mother left, he took on a share of his father's responsibility to raise and provide for the rest of the family.  (Ex. 11 at ¶7 [Aff. of Mirella].)  Both he and his father would work and fish to take care of everyone. The family subsisted on fishing and growing rice and fresh foods, which they also sold.  Cruz-Garcia would get up early in the morning to go fishing before school and then again after school until dark.  When he was not working, he would help around the house, cooking and taking care of the other children.  He would make them hammocks or take them fishing.  To them, he was a very loving older brother who gave them good memories of their childhood.  (Ex. 5 at ¶7 [Aff. of Joel]; Ex. 6 at ¶7 [Aff. of Noelia]; Ex. 9 at ¶5 [Aff. of Jose]; Ex. 7 at ¶4 [Aff. of Yeli]; Ex. 8 at ¶3 [Aff. of Menagen]; Ex. 11 at ¶¶5, 8 [Aff. of Mirella].)

Cruz-Garcia was caring and protective.  He had a reputation in the family as being the one who would help you if you needed it.  He would stand up for his younger siblings to other kids, or give his siblings the best food because they were younger.  He was also brave.  One time when he was out fishing with his father, the boat turned over, trapping Valerio.  Cruz-Garcia pulled his father to safety even though he was only nine years old.  (Ex. 5 at ¶8 [Aff. of Joel]; Ex. 10 at ¶9 [Aff. of Valerio]; Ex. 9 at ¶7 [Aff. of Jose].)

Cruz-Garcia left the Dominican Republic when he was nineteen and immigrated to Puerto Rico to work for a better life for him and his family.  Around that time, a lot of people were going to Puerto Rico for the opportunity to find

81

EXHIBIT 3 Page 094

000674

better work and to eventually get to the United States. His family missed him, but understood that Cruz-Garcia would be able to make a better life in the United States. Cruz-Garcia's brother Joel also moved to Puerto Rico a few years later, as did his half-brother Menagen. Even after leaving for Puerto Rico, though, Cruz-Garcia continued to always send money back for his family. (Ex. 5 at ¶¶9-10 [Aff. of Joel]; Ex. 10 at ¶10 [Aff. of Valerio]; Ex. 6 at ¶10 [Aff. of Noelia]; Ex. 8 at ¶2 [Aff. of Menagen]; Ex. 11 at ¶¶9-10 [Aff. of Mirella].)

It was in Puerto Rico that Cruz-Garcia met Angelita Rodriguez and her cousin Rudy. They introduced him into the world of selling drugs and eventually took him with them to the United States. Drugs were ubiquitous in Puerto Rico in the 1980s, and Cruz-Garcia saw it as the only way someone from a rural fishing village in the Dominican Republic would become successful. (Ex. 5 at ¶¶10, 14 [Aff. of Joel].)

Despite getting involved in criminal activity and the drug trade, Cruz-Garcia continued to also maintain the side of himself that was the protective, hard-working, caregiver of his family. Over the years he would travel often to the Dominican Republic and Puerto Rico to see family. He worked multiple jobs to earn money for them. No job was too small; family remembers him collecting cans to trade in for money. Even while in prison, Cruz-Garcia used his time to make hammocks and other items to sell to provide for his family. He worked in his local community, giving to churches or people who needed money for food or medical care. He continued to encourage his other siblings to work hard and live good lives. One time, Cruz-Garcia jumped in when a boy was hit by a car and ran the boy to a hospital, saving his life. He continued to be loved and respected by the people who knew him, who saw him as a happy, genuine person. (Ex. 5 at ¶11 [Aff. of Joel]; Ex. 12 at 4 [Aff. of Dorca]; Ex. 10 at ¶11 [Aff. of Valerio]; Ex. 7 at ¶¶5-6 [Aff. of Yeli]; Ex. 8 at ¶4 [Aff. of Menagen].)

82

EXHIBIT 3 Page 095

000675

It was this side of Cruz-Garcia that his family members would have shared with his capital jury.  Each would have shared their disbelief that the man they knew could have been involved in the crime—not to question the jury's guilty verdict but rather to explain that there was another side to Cruz-Garcia that was completely different than the picture being portrayed by the State.  (Ex. 10 at ¶12 [Aff. of Valerio]; Ex. 6 at ¶11 [Aff. of Noelia]; Ex. 9 at ¶10 [Aff. of Jose]; Ex. 8 at ¶7 [Aff. of Yeli]; Ex. 7 at ¶¶4, 6 [Aff. of Menagen]; Ex. 11 at ¶14 [Aff. of Mirella].)

### 2. Available Expert Witness Testimony

Just as Cruz-Garcia's punishment phase of trial was prejudiced by the absence of the testimony discussed above, his capital trial was also prejudiced by counsel's failure to consult with and present the testimony of an expert witness to explain the relevance of Cruz-Garcia's life story to the mitigation question the jury was being asked to answer.  Like any subject matter that is not immediately intuitive, a defendant's life story must be explained to the jury in a way that illuminates why it is relevant to moral culpability.  It is not sufficient to present a parade of witnesses discussing the defendant's history—an expert must also be hired to give that life history context.

> In other words, you have to give the fact-finder a view of the crime from the defendant's perspective.  If you don't, you run the risk of making your client seem "otherly," frightening and thus expendable. What you strive for is to enable the fact-finder to look through your client's eyes and to walk, at least for a few minutes, in his shoes.

Blume, *supra* at 10.

For example, trial counsel might have consulted with an expert familiar with the history of migration from the Dominican Republic to Puerto Rico, and the connection between that migration and the drug trade.  It is likely that an average juror, without any other information, would consider Cruz-Garcia's decision to

83

EXHIBIT 3 Page 096
000676

leave the Dominican Republic and travel to Puerto Rico and the United States, where he became involved in selling drugs, as an aggravating fact about him. In actuality, Cruz-Garcia's journey was part of a well-recognized pattern that was influenced by a desire for a better life and struggling with poor economic conditions. An anthropologist or sociologist familiar with this topic could have provided the jury of wealth of information to put Cruz-Garcia's life story into context and to better understand why that story mitigated against the death penalty.[12]

### a. Cruz-Garcia's Early Life in the Dominican Republic

Raised in a rural area of the Northeastern region of the Dominican Republic in the early 1960s, Cruz-Garcia's kin network and household was large, fluid, and included extended family members. Like much of the Dominican population at the time, Cruz-Garcia's family was involved in agricultural work. They owned a modest plot of land where they raised food for their families and to sell to earn money. The men in Cruz-Garcia's family were also fishermen, an important economic activity that fed their family and provided reliable income. The family's economic security through the early 1960s reflects not only the industriousness of the family, but also national political economic policies that characterized the Dominican economy under the Dictator Rafael Trujillo from 1930-1961 that supported small-scale agricultural production by family farmers and limited the mobility of rural workers to ensure a robust supply of agricultural labor. At a very early age, Cruz-Garcia was expected to and actively participated in agricultural

---

[12] For example, Dr. Gina Perez is a professor of anthropology at Oberlin College in Ohio. Dr. Perez's research focus includes substantial work on the issue of migration in and around Puerto Rico. She is particularly familiar with the experience of Dominican migrants coming to Puerto Rico in the 1980s and 1990s. She was available to testify at Cruz-Garcia's trial had she been contacted by trial counsel. (Ex. 3 at ¶¶1-5, 32 [Aff. of Dr. Gina Perez].)

EXHIBIT 3 Page 097

000677

work, fishing, and helping to care for younger relatives. (Ex. 3 at ¶10 [Aff. of Dr. Perez].)

Cruz-Garcia's childhood and development were particularly distinguished by the separation of his parents and his mother leaving to return to Venezuela. From the time that Cruz-Garcia's father returned to live with his extended family with Cruz-Garcia and his siblings, it was clear that Cruz-Garcia took on an important role of caring for his brother and sisters by cooking, babysitting, making useful items for the household, fishing, and working with his father and uncle. He was a good and hard worker helping his father provide for the family. Cruz-Garcia was someone who protected his family, helped others, and from a very early age took on roles that exceeded his age. (Ex. 3 at ¶11 [Aff. of Dr. Perez].)

In addition, Cruz-Garcia's view of what constituted family and family relationships was also impacted by his native country. While having large families, multiple partners, and households headed by one parent is not unusual throughout Latin America and the Caribbean, the Dominican Republic has a particularly unique history of family size. Indeed, throughout his thirty-one year dictatorship, Rafael Trujillo implemented policies to encourage population growth by enforcing strict controls of emigration from the Dominican Republic, encouraging European immigration to the island, and "systematic encouragement of childbirth" and, consequently, large families to ensure a large and available labor pool for agricultural and industrial work. The existence of large families with a range of household arrangements, therefore, was both state-sanctioned and culturally acceptable in the Dominican Republic and throughout the Caribbean. Although by Dominican standards, Cruz-Garcia was from a small family (one of four full siblings), he was surrounded by a large extended family of aunts, uncles, cousins, and grandparents. His father was one of twenty-four children. Further, it was not uncommon for men to have large families with more than one woman.

85

EXHIBIT 3 Page 098

000678

His uncle, for example, described having eight children with four different women. (Ex. 3 at ¶12 [Aff. of Dr. Perez].)

Cruz-Garcia was raised within this rich extended family, and his relatives described him as helpful, loving, responsible, and industrious. With his uncle and father, Cruz-Garcia fished, helped with farm animals, and helped with agricultural work. In 1980, Cruz-Garcia's father met and eventually married Dorcas Noelia de la Cruz Faña. Once Dorcas and Valerio married, they had two daughters, who described Cruz-Garcia as someone who was a caretaker and who was loving and generous with them as they were growing up in the Dominican Republic. His willingness to care for his siblings and to use his hands to make things for others and cook for them define Cruz-Garcia's childhood as someone who from early on cared for people in the ways he could. (Ex. 3 at ¶¶13-14 [Aff. of Dr. Perez].)

However, as a young man in his late teenage years in the Dominican Republic, Cruz-Garcia was like many young men struggling to work in a changing economy. While the Dominican economy in the 1960s and early 1970s was still largely defined by large numbers of workers in agricultural labor and subsistence economy, the late 1970s and 1980s witnessed unprecedented economic changes that had a dramatic impact on the economic, social, and cultural lives of residents on the island and throughout the Caribbean. Foreign investment in the Dominican Republic, robust foreign aid, expansion of the island's industrialization program, and high commodity prices for Dominican goods meant that the economy expanded at unprecedented rates. But economic growth was also accompanied by growing unemployment caused, in part, by the rising number of uprooted rural workers unable to rely on past economic strategies of subsistence agriculture and agricultural production for their wages and incomes. Economic hardship increasingly defined life in the Dominican Republic in the late 1970s and 1980s. According to anthropologist Jorge Duany, "employment and underemployment,

86

EXHIBIT 3 Page 099

000679

the rising cost of living, a chaotic transportation system, near collapse of basic public service like electricity, running water, housing, health care and education" made life very difficult for Dominicans in general, and those residing in rural areas in particular.[13] (Ex. 3 at ¶16 [Aff. of Dr. Perez].)

### b. Emigration in the Dominican Republic

In addition to deteriorating economic and social conditions, changes in Dominican migration also define the decades of the 1960s, 1970s, and 1980s. From 1930-1961, movement within the Dominican Republic and emigration were severely restricted under Rafael Trujillo. Beginning in 1966, however, these restrictions were lifted, and Dominicans increasingly engaged in internal and international migration. According to Ramona Hernandez, while it was virtually impossible for Dominicans to apply for a passport for more than thirty years, by the late 1960s, anyone who wanted a passport could apply and acquire one. In fact, she writes, "The granting of passports made concrete the opening of the door and, through the opening of the door, emigration was tacitly encouraged by the ruling structure of the Dominican Republic."[14] These changes led to significant internal migration with those residing in rural areas often moving to urban centers like Santo Domingo. It also led to substantial emigration, legally and illegally. By the 1980s, migration was such a defining feature of Dominican life that Dominicans refer to this massive movement and displacement as "irse para los paises" (literally "moving to the countries"). (Ex. 3 at ¶17 [Aff. of Dr. Perez].)

While New York City was and continues to be the principal destination for Dominican migrants, Puerto Rico is the second largest destination for Dominican

---

[13] Jorge Duany, *Dominican Migration to Puerto Rico: A Transnational Perspective* (2005).

[14] Ramona Hernandez, *The Mobility of Workers Under Advanced Capitalism: Dominican Migration to the United States* (2002).

EXHIBIT 3 Page 100

000680

migrants. Between 1966-2002, nearly 119,000 Dominicans were legally admitted to San Juan, constituting 12% of Dominican migration to the US between 1961-2002. This substantial growth of the Dominican population in Puerto Rico reached an apex in 1991 and 1996 with more than 9,000 Dominicans legally migrating to the island. Dominicans were the largest and most visible minority on the island. Notably, these numbers do not include the thousands of undocumented Dominicans who arrived on the island, either by overstaying a tourist visa or by entering illegally by boat, crossing the forty-five mile Mona Passage separating the Eastern Dominican Republic from Western Puerto Rico. Both documented and undocumented Dominican migration to Puerto Rico has made San Juan the city with the largest number of Dominicans outside of the Dominican Republic and second only to New York City. (Ex. 3 at ¶18 [Aff. of Dr. Perez].)

By the mid-1980s when Cruz-Garcia began to court Mirella Pérez Garcia, he was one of many young Dominicans engaged in internal migration in search of work, unsuccessfully seeking employment in an economy that increasingly employed women more than men, and considering migration as a way to mejorarse la vida, or to search for a better life. In 1986, like thousands of other Dominicans, Cruz-Garcia traveled on a yola (a makeshift raft/boat) to Puerto Rico. Not only was Puerto Rico an increasingly popular destination for Dominican migrants, it also held the possibility of getting legal documents that would allow him to travel to and live legally in the United States. These ideas of a better a life and the possibility of regularizing one's status to go to the United States circulated widely in the Dominican Republic in the 1980s and led Cruz-Garcia and tens of thousands of others to leave the Dominican Republic for Puerto Rico. (Ex. 3 at ¶19 [Aff. of Dr. Perez].)

EXHIBIT 3 Page 101

000681

### c. Life and Work in Puerto Rico

While Puerto Rico was often regarded as "a springboard for the U.S.," the cultural, linguistic, and historical ties between Puerto Rico and the Dominican Republic make it attractive and reasonable for Dominicans to remain and reside there. Undocumented Dominicans arriving to the island often entered through rural areas of Western Puerto Rico but eventually made their way to urban areas like San Juan. This is precisely what Cruz-Garcia did as he and others made their way to neighborhoods in Rio Piedras and Santurce, which experienced significant population growth during the 1980s as increasing numbers of Dominican emigrants arrived seeking work in the formal and informal economy to support themselves and their families in the Dominican Republic. (Ex. 3 at ¶21 [Aff. of Dr. Perez].)

One element that was especially notable about Cruz-Garcia's migration experience was the degree to which he maintained connection with his family in the Dominican Republic. While migration is a feature that defines human experiences across millennia, since the 1990s, migration scholars have identified a distinctiveness of migration patterns in the late 20th century that is not about uprooting and leaving one's home behind. Instead, new migration patterns are increasingly transnational in character, meaning they involve the development, maintenance, and reproduction of migrant networks, households, economic, and affective ties across time and space. According to Jorge Duany, "Dominican transnationalism is most forcefully expressed through long-distance kinship networks, households and child-rearing practices," a phenomena that has been well-documented by many scholars.[15] These transnational practices are not unique to Dominican migrants, but the particular experiences, hardships, and opportunities

---

[15] Jorge Duany, *Quisqueya on the Hudson: The Transnational Identity of Dominicans in Washington Heights* (1994).

89

EXHIBIT 3 Page 102

000682

of Dominican migrants in Puerto Rico is one that many scholars, writers, politicians, and journalists have explored in great detail. (Ex. 3 at ¶22 [Aff. of Dr. Perez].)

Although Dominican migrants began to arrive in Puerto Rico in significant numbers in the 1980s and 1990s seeking a better life, Puerto Rico also was experiencing significant economic, social, and political problems that constrained migrants' experiences.   Beginning in the mid-late 1970s, Puerto Rico was in economic crisis.  The impact of the oil crisis on the island and the devaluation of the American dollar in the early 1970s, as well as the failure of Puerto Rico's industrialization program to provide adequate jobs for its growing population, led to increased unemployment and underemployment.  In response to the deepening economic crisis, the island and U.S. federal government developed specific economic policies in Puerto Rico in order to attract high tech and capital-intensive industries to the island.   And while this strategy did, indeed, create new jobs and possibilities for Puerto Rican workers, these jobs required high levels of education and failed to generate enough jobs for the large numbers of unskilled workers and the unemployed.   In response, the local Puerto Rican government focused on expanding employment opportunities in the public sector to compensate for diminishing employment opportunities in the private sector.  Thus by 1992, one-third of the island's labor force was employed in the public sector. (Ex. 3 at ¶23 [Aff. of Dr. Perez].)

As many scholars have noted, the failure of the formal economy to provide jobs for its population, and the social and economic marginalization that ensues, leads to the development and growth of the informal or underground economy. This is certainly the case in Puerto Rico.   According to sociologist Sudhir Venkatesh, "At its core, the underground economy is a widespread set of activities, usually scattered and not well-integrated, through which people earn money that is

90

EXHIBIT 3 Page 103

000683

not reported to the government and that, in some cases, may entail criminal behavior."[16]   According to historian Marisol LeBrón, "The informal economy encompasses semi-legal activities such as unlicensed day cares, food peddlers or car repair operations operating out of someone's home to illicit organizations dedicated to drugs, robbery, sex work and gambling.  In Puerto Rico, high levels of unemployment combined with low labor force participation rates indicate that the informal economy, alongside migration and federal assistance, played a key role in absorbing surplus laborers and stabilizing the Puerto Rican economy."  (Ex. 3 at ¶24 [Aff. of Dr. Perez].)

Beginning in the 1980s and 1990s, Dominican migrants increasingly comprised a large number of surplus laborers involved in the informal economy in Puerto Rico.   Often they worked off the books as domestic workers, in construction, landscaping and gardening, and providing childcare. When Cruz-Garcia's wife arrived in Puerto Rico to join him in 1994, she worked cleaning houses.  Cruz-Garcia worked in a range of jobs in the informal economy, including working as a gardener and even collecting cans to trade in for money when times were hard.  These economic activities, however, are often concomitant with illicit economic strategies, and the growth of the drug-based informal economy became a source of income for a number of Puerto Ricans, much to the consternation of Puerto Rican and American officials.  It also became a source of income for some Dominican residents on the island who, like poor, socially, racially, and politically-marginalized Puerto Rican residents on the island, faced significant resentment, discrimination and isolation from mainstream Puerto Rican society.  (Ex. 3 at ¶25 [Aff. of Dr. Perez].)

---

[16] Sudhir Alladi Venkatesh, *Off the Books: The Underground Economy of the Urban Poor* (2009).

EXHIBIT 3 Page 104

000684

The existence of underground economies is not new. In fact, as sociologist Sudhir Venkatesh notes, they are a familiar feature of many communities, and their participants span the race, class, and gender spectrum, seeking to make ends meet. The dominant perception circulating in mainstream society, however, focuses on some underground economic activities as aberrant, anti-social, and diametrically opposed to mainstream values. Researchers have tackled this question and many have demonstrated how "hustling," "getting paid," and making ends meet are all survival strategies for people to address their individual and collective needs. Sudhir Venkatesh writes, "Gangs and mafias anchor our popular imagination of underground trading, but the reality is far more complicated." Some activities, he continues, "such as snow shoveling or weekend poker games are so ingrained that they are not really perceived as 'underground economic activity' even though participants can make substantial earning from them and they might produce some financial gain for a wider circle of families, friends and neighbors." Yet other underground activities are readily stigmatized and are the objects of police surveillance and repression. This is certainly the case of the underground drug economies. And the response by local law enforcement in Puerto Rico and U.S. federal officials had a dramatic impact on the lives of poor communities on the island, many of whom were Dominican and who were increasingly stigmatized by mainstream Puerto Rican society as being the source of all social and economic ills facing the island in the 1980s and 1990s. (Ex. 3 at ¶26 [Aff. of Dr. Perez].)

According to Jorge Duany, Dominican immigration in the 1980s and 1990s generated significant hostility and contributed to the development of anti-Dominican discourse. "The figure of the Dominican—especially the undocumented immigrant—appears as the Other par excellence: a strange, dangerous, and incomprehensible character who occupies a marginal and clandestine status." This perception and stigmatization of Dominican immigrants

92

EXHIBIT 3 Page 105

000685

continues into the present, with recent investigative reports documenting on the ways these perceptions have contributed to employment discrimination, economic and social marginalization, and isolation among Dominicans in Puerto Rico. (Ex. 3 at ¶27 [Aff. of Dr. Perez].)

For Cruz-Garcia, seeking employment as an undocumented Dominican in the late 1980s and 1990s in Puerto Rico was no small matter. He managed to find a range of jobs as a gardener, collecting and recycling cans, and working as a real estate agent—all jobs that were part of the informal economy and paid very little. Like so many Dominican migrants, Cruz-Garcia lived in low-rent neighborhoods like Barrio Obrero, where he could draw on networks with other co-nationals and managed to send money back to the Dominican Republic to help support his wife and their son. Given Cruz-Garcia's demonstrated commitment to financially provide for his extensive families, both in the Dominican and in Puerto Rico, it is not surprising that turning to the drug economy became yet another source of generating income. As the possibilities for formal employment diminished for all residents on the island, the drug economy grew in Puerto Rico, the Dominican Republic, and the United States. And like many with experiences in the informal economy and limited economic possibilities, selling drugs seemed like a reasonable strategy. Indeed, this was and continues to be a gamble many take in spite of the dangers involved. "If we look beyond the surface, we find an element of necessity, of pragmatic logic, even while laws are broken and even while the standards of a just life are constantly changing." (Ex. 3 at ¶¶28-29 [Aff. of Dr. Perez].)

### d. Conclusions Regarding Cruz-Garcia's Life Trajectory

Given the background and historical context of Cruz-Garcia's life story, a suitable expert could have provided compelling information to explain why his emigration to Puerto Rico and the United States, and his involvement in the drug

93

EXHIBIT 3 Page 106

000686

trade, were mitigating rather than aggravating.  For example, on its face the fact that Cruz-Garcia had multiple children with multiple partners, and was maintaining those relationships at the same time, would likely have seemed to average American jurors as an aggravating fact.  Indeed, the State argued as much to the jury at closing argument during the punishment phase.  (26 RR at 171.)  In contrast, an expert could have explained that having large extensive families with multiple partners was not culturally unusual.  What's more, the fact that Cruz-Garcia maintained these relationships in multiple countries while often traveling and/or living elsewhere, was not a sign that he disregarded his family but was the opposite.  Transnational migration patterns mean that families can still keep strong, loving bonds despite being great distances apart.  Indeed, Cruz-Garcia's family members recalled how he was an excellent provider, never forgetting his family back at home.  When he was with his family, his wife in the Dominican Republic recalled that he was an excellent father, participating in school and homework, taking his children to church and parks, and cooking for his family.  Similarly, Cruz-Garcia's partner in Puerto Rico also noted how dedicated Cruz-Garcia was as a provider and father.  This was even true while Cruz-Garcia was in jail, where he would make hammocks, key chains, and other items to sell in order to make money for his family.  This transnational strategy is a familiar one for many migrants: they are sometimes part of multiple households with multiple partners.  And while they are not physically present, they remain integral parts of family life through the remittances they send to their households.  While not necessarily typical American traits of a good spouse and father, these efforts by Cruz-Garcia to provide for all of his family exhibit a very recognizable pattern of responsible and positive behavior when viewed in the appropriate culture context.  (Ex. 3 at ¶¶28, 30 [Aff. of Dr. Perez].)

94

EXHIBIT 3 Page 107

000687

Next, an expert could have explained why Cruz-Garcia's entrance into the drug trade in Puerto Rico was more akin to earning money under the table for gardening work or manual labor than to joining the mafia. Being a migrant is never easy. To be poor, undocumented, socially-marginalized, and regarded as the source of economic and social problems while one struggles to meet one's familial responsibilities is even more difficult. These are precisely the conditions in which Cruz-Garcia found himself in Puerto Rico in the late 1980s and 1990s. Like thousands of Dominicans seeking a better life in Puerto Rico, Cruz-Garcia arrived by boat in Puerto Rico and successfully found jobs that paid little and had little social status, jobs in the informal economy that employed thousands of undocumented immigrants in Puerto Rico. As Puerto Rico's economy continued to experience uncertainty, the informal drug economy provided some certainty and economic security for many already on the economic margins. Cruz-Garcia's income-generating activities certainly fall outside what mainstream society regards as legitimate work. But upon closer examination, they also reflect the strategies people often turn to in order to meet their obligations as a father, son, brother, uncle, and community member in severely constrained circumstances. Rather than aberrations or pathology, these actions suggest the lengths people often go to in order to provide a decent life for themselves and their families. And given the constrained conditions in which he lived and worked, it is notable how all of Cruz-Garcia's family members praise him for his industriousness, his ability to meet his responsibilities as a father and a provider, and his generosity to family, church, and community across borders. (Ex. 3 at ¶¶29-31 [Aff. of Dr. Perez].)

Such testimony is substantially different and more compelling that the brief life history details provided by Cruz-Garcia's trial counsel through the testimony of Cruz-Garcia's brother, wife, and son. While counsel did present some mitigation evidence, their failure to conduct a reasonable and thorough

<div align="center">95</div>

EXHIBIT 3 Page 108

000688

investigation into Cruz-Garcia's life history and to consult with an appropriate expert witness meant that ample information was left out of the punishment phase presentation heard by the jury.  This absence impaired the jury's ability to effectively weigh the presence of mitigation warranting a life sentence and prejudiced Cruz-Garcia's capital punishment trial.  *See Sears*, 130 S. Ct. at 3266 ("We have certainly never held that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.").

### D. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence to Rebut the Prosecution's Aggravating Evidence

Likely due to the absence of a qualified mitigation specialist, counsel's investigation into potential witnesses who could shed light on Cruz-Garcia's time in the United States was also deficient and prejudiced the punishment phase of trial.  As previously discussed, the investigators selected by counsel appear to have a background in fact investigation.  Because of this, though their investigation included interviewing numerous witnesses in and around the Houston area, those interviews largely focused on investigating the details of the crime or other bad acts alleged by the State.  Few witnesses were asked about their overall experience with Cruz-Garcia, and no witnesses from Cruz-Garcia's time in Houston were presented during the punishment phase of trial.  As a result, the narrative put forward by the State of Cruz-Garcia being an evil drug king-pin who committed violent acts went almost completely unchallenged.  Counsel missed an opportunity to rebut the State's narrative by presenting testimony from witnesses of their own, who could have offered a strikingly different impression of Cruz-Garcia.

For example, counsel could have offered the testimony of three brothers who knew Cruz-Garcia and had very positive dealings with him while he lived in

96

EXHIBIT 3 Page 109

000689

Houston. Cesar Rios, Jose Valdez, and Hector Saavedra remember Cruz-Garcia as being a good friend with a big heart. (Ex. 20 at ¶6 [Aff. of Cesar Rios]; Ex. 24 at ¶5 [Aff. of Jose Valdez]; Ex. 21 at ¶¶4-5 [Aff. of Hector Saavedra].) Cruz-Garcia was close to the brothers' parents, and they remember him helping their family out often. Cruz-Garcia would bring the family groceries or buy clothes and books for the brothers for school. He would ask Hector, who was younger, about his grades and encourage him to study. When Hector did well in school, Cruz-Garcia would give him pocket money or a small gift. (*Id.*)

Cruz-Garcia treated Cesar, Jose, Hector, and their parents like family. They remember Cruz-Garcia sharing meals with them and being part of their lives, much in the way they themselves would bring food and support to their relatives in Mexico. His generosity struck them, both for the size (he gave Cesar his first car) and because he never asked for anything in return. (Ex. 20 at ¶6 [Aff. of Rios]; Ex. 24 at ¶5 [Aff. of Valdez; Ex. 21 at ¶¶4-5 [Aff. of Saavedra].) Particularly memorable for the brothers was the time that Cruz-Garcia helped Cesar get proper medical attention for a gunshot wound, saving Cesar's arm. Cesar had been shot, and his family took him to a nearby hospital. Cruz-Garcia joined the family there, and the hospital intended to amputate the arm. Cruz-Garcia helped get the family to a different hospital, where Cesar was able to receive treatment that saved his arm. Cruz-Garcia even paid for the medical treatment because Cesar did not have any insurance. This was just another example of how the brothers felt that Cruz-Garcia treated them like family. (Ex. 20 at ¶7 [Aff. of Rios]; Ex. 21 at ¶3 [Aff. of Saavedra].)

Testimony like this would have provided meaningful mitigation evidence at Cruz-Garcia's punishment phase. Such testimony would benefit from a live evidentiary hearing to fully develop the available witnesses and evidence on Cruz-Garcia's behalf. Rather than attempting to rebut the State's evidence regarding the

97

EXHIBIT 3 Page 110
000690

crime or other extraneous acts, such witnesses could have been employed to divert the jury's focus from the State's argument in aggravation to an argument of why Cruz-Garcia's character and background exhibit sufficiently mitigating circumstances to warrant a life sentence. The development of these types of witnesses and punishment phase themes is precisely the role undertaken by a qualified mitigation specialist, and its importance to a capital case is precisely why having a mitigation specialist as part of the defense team is now part of the standard of care for capital defense. *ABA Guidelines*, Guideline 4.1 cmt. Counsel's failure to develop any testimony along these lines prejudiced Cruz-Garcia's trial, and his sentence should therefore be reversed.

### E. Counsel's Deficient Investigation Prejudiced Cruz-Garcia's Presentation of Mitigation Evidence Regarding His Ability to Contribute Productively in Prison

Lastly, as discussed in Claim Three, *ante*, counsel's failure to conduct a reasonable investigation in Puerto Rico meant that substantial evidence that would have led the jury to answer the first special issue negatively was never presented to the jury. That same evidence would have been compelling from a mitigation perspective as well. Had the various prison staff testified regarding their interactions with Cruz-Garcia, the jury would have learned that Cruz-Garcia had been a model inmate for nearly a decade in the Puerto Rican prison system. (Ex. 19 at ¶6 [Aff. of Jimmy Osorio]; Ex. 18 at ¶14 [Aff. of Ivan Negron Vera]; Ex. 17 at ¶5 [Aff. of Luis Gonzales Martinez]; Ex. 15 at ¶10 [Aff. of Irma Iglesias Cruz]; Ex. 16 at ¶4 [Aff. of Dr. Lebrón].)

The witnesses would have testified that Cruz-Garcia had been a positive influence on other inmates' behavior, encouraging them to follow rules and even leading them in religious services. (Ex. 18 at ¶¶8, 10, 12 [Aff. of Negron Vera], Ex. 15 at ¶8 [Aff. of Iglesias Cruz].) Cruz-Garcia made a positive contribution to

98

EXHIBIT 3 Page 111

000691

the daily workings of the prison, helping with church services and working in the prison factory. (Ex. 19 at ¶¶3, 4, 6 [Aff. of Osorio]; Ex. 18 at ¶¶4, 7 [Aff. of Negron Vera]; Ex. 15 at ¶3 [Aff. of Iglesias Cruz]; Ex. 17 at ¶3 [Aff. of Gonzales Martinez].) Finally, Cruz-Garcia continued to contribute to his family even though he was in prison, maintaining relationships with his children and trying to provide for them by making goods to sell. Ex. 12 at ¶¶4, 11-12 [Aff. of Dorca].

In addition to being significant evidence on the question of future dangerousness, this evidence is mitigating in its own right. Had the jury heard this evidence, there is a reasonable probability that at least one juror would have been found mitigating the positive acts Cruz-Garcia had accomplished while in prison. Rather than believing his crimes warranted the death penalty, that juror might have been persuaded that a life sentence would allow Cruz-Garcia to continue contributing to society through positive behavior in prison. Because counsel failed to develop this evidence, Cruz-Garcia lost the opportunity to present that argument to the jury, prejudicing his trial.

**F. Conclusion**

Trial counsel's presentation of some mitigating evidence does not automatically mean that they provided Cruz-Garcia with effective assistance. *See Sears*, 130 S. Ct. at 3266. Instead, that presentation must be judged by counsel's investigation and their failure to investigate where evidence would have motivated objectively reasonable counsel to investigate. Cruz-Garcia's counsel failed to conduct the thorough, searching inquiry into his background that is mandated by relevant case law and the ABA and Texas Guidelines. *See Porter*, 558 U.S. at 39; *Williams*, 529 U.S. at 396; *ABA Guidelines*, Guideline 10.7(A); *Texas Guidelines*, Guideline 11.1(A)(3)(b). As a result, substantial evidence was missing from Cruz-Garica's punishment phase of trial. *See Walbey v. Quarterman*, 309 Fed. App'x 795, 802 (5th Cir. 2009) (not published) ("This standard clearly contemplates that

99

EXHIBIT 3 Page 112
000692

Case 4:17-cv-03621   Document 16-3   Filed on 07/01/19 in TXSD   Page 113 of 194

even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete." (emphasis in original)).   Had that evidence been presented, when compared with the testimony the jury did hear, there is a reasonable probability that a least one juror would have voted for a life sentence. *See Strickland*, 466 U.S. at 694; *Ex parte Ellis*, 233 S.W.3d 324, 329-30 (Tex. Crim. App. 2007); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

## CLAIM FIVE

### CRUZ-GARCIA'S CONVICTION AND DEATH SENTENCE ARE UNLAWFUL BECAUSE THEY WERE OBTAINED IN VIOLATION OF THE PROVISIONS OF THE VIENNA CONVENTION ON CONSULAR RELATIONS

State authorities and their agents—unreasonably and in violation of state law and state and federal constitutional mandates—failed to properly inform Cruz-Garcia during and after his arrest of his right to seek the assistance of the Dominican Consulate as required by Article 36(1)(b) of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (VCCR).   Law enforcement agents and the prosecution were aware at the time of Cruz-Garcia's arrest and throughout his prosecution for capital murder that Cruz-Garcia is a Dominican national who had not been naturalized.   Yet instead of correctly providing Cruz-Garcia the opportunity to contact his country's consulate, the State instead notified a different, incorrect country of Cruz-Garcia's arrest.   As a result, Cruz-Garcia was led to incorrectly believe his home country had been notified and was thus prejudiced by state authorities' unlawful acts.   Had Cruz-Garcia been properly provided his right to alert the Dominican consulate of his arrest, the Dominican government would have offered Cruz-Garcia support and assistance, and there is a reasonable probability he would have received a sentence other than death.   As a result of state authorities' failure to properly apprise Cruz-Garcia of

100

EXHIBIT 3 Page 113

000693

his right to consular notification, and the prejudice stemming therefrom, Cruz-Garcia's conviction and sentence of death were rendered in violation of his rights to equal protection, due process, and the effective assistance of counsel as guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Consequently, Cruz-Garcia's conviction and sentence of death are unlawful and should be overturned.

### A. As A Foreign National Detained and On Trial for a Capital Offense in the United States, Cruz-Garcia Had a Right to Be Notified of His Right to Consular Access under the Vienna Convention on Consular Relations

The Vienna Convention is an international treaty that governs the relationship between individual nations and foreign consular officials. Among its primary purposes is to ensure that foreign nationals facing prosecution outside of their countries of citizenship are advised of the right to communicate with representatives from their home countries. In 1963, the United States and several other nations entered into an agreement about this basic right. This agreement was codified in Article 36 of the Vienna Convention on Consular Relations. Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77.

Article 36 of the Vienna Convention requires that when a foreign national is arrested, the country detaining him must: (1) inform the consulate of the foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of his rights under Article 36 without delay. Vienna Convention on Consular Relations, Article 36(1)(b), April 24, 1963, 21 U.S.T. 77. In addition, the United States Department of State has recognized that:

> The Vienna Convention contains obligations of the highest order and should not be dealt with lightly. Article 36, paragraph 1 (b), requires the authorities of the receiving state to notify the consular post of the sending state without delay of the arrest or commitment of a national of the sending state, if that national so requests. While there is no

101

EXHIBIT 3 Page 114
000694

precise definition of delay, it is the Department's view that such
notification should take place as quickly as possible, and, in any
event, no later than the passage of a few days.

Hernan de J. Ruiz-Bravo, *Suspicious Capital Punishment*, 3 SAN DIEGO JUST. J.
396-97 (1995) (quoting Department of State File L/M/SCA: Department of State
Digest, October 24, 1973, p. 161).

## B. In Texas, the Vienna Convention Conveys an Individually Enforceable Right

While the Supreme Court has not yet ruled definitively as to whether the
Vienna Convention, on the whole, is self-executing,[17] all lower courts that have
examined the issue have responded in the affirmative. *See* Cindy Galway Buys et.
al., *Do Unto Others: The Importance of Better Compliance with Consular
Notification Rights*, 21 DUKE J. COMP. & INT'L L. 461, 480 (2011) ("every lower
court that has considered the issue has expressly held that the VCCR is self-
executing"); *see also Cornejo v. County of San Diego*, 504 F.3d 853, 856 (9th Cir.
2007); *Gandara v. Bennett*, 528 F.3d 823, 828 (11th Cir. 2008).

In Texas, the fact that the Vienna Convention conveys binding obligations
onto state actors in their dealings with foreign nationals does not appear to be in
dispute. *See, e.g.*, Attorney General of Texas, *Summary of Requirements
Pertaining to Foreign Nationals*, Magistrate's Guide to Consular Notification
Under the Vienna Convention, at 6 (advising state actors that "when foreign
nationals are arrested or detained, they must be advised of the right to have their
consular officials notified"); *see also* Attorney General of Texas, *Detained Foreign
Nationals and Consular Notification*, available at

---

[17] A treaty is self-executing if it is directly enforceable in the United States without
the need for additional legislation to ensure implementation. *See Foster v. Neilson*,
27 U.S. 253, 314 (1829). "What we mean by 'self-executing' is that the treaty has
automatic domestic effect as federal law upon ratification." *Medellín v. Texas*, 552
U.S. 491, 505 n.2 (2008).

102

EXHIBIT 3 Page 115
000695

https://www.texasattorneygeneral.gov/cj/detained-foreign-nationals-and-consular-notification (last visited August 23, 2015).

But while Texas state actors and courts appear to recognize the treaty to be self-executing, the Court of Criminal Appeals has not yet explicitly stated whether a violation of the Vienna Convention creates an individually enforceable legal right. In *Ex Parte Medellín*, the CCA deliberately sidestepped the question, stating "[a]s an initial matter, while we recognize the competing arguments before us concerning whether Article 36 confers privately enforceable rights, a resolution to that issue is not required for our determination of whether *Avena* is enforceable in this Court." *Ex parte Medellín*, 223 S.W.3d 315, 330 (Tex. Crim. App. 2006) *aff'd sub nom. Medellín v. Texas*, 552 U.S. 491 (2008).

In that case, the CCA examined whether a judgment from the International Court of Justice (ICJ) concerning the Vienna Convention constituted binding federal law. There, the Court found that it did not, and found that an ICJ judgment stating that claims under the Vienna Convention were not intended to be subject to state procedural default had no effect on Texas state habeas procedure. Correspondingly, the Court found that a claim under the Vienna convention *can* be waived on state habeas. For a claim to be waived, it must necessarily exist. Thus precedent suggests that, while subject to waiver, the Vienna convention may create individually enforceable legal rights.

## C. The State Violated the Vienna Convention in Cruz-Garcia's Case

The State violated the Vienna Convention in Cruz-Garcia's case, as Cruz-Garcia was never properly informed of his rights under the Convention. Although state authorities knew that Cruz-Garcia was a foreign national and a citizen of the Dominican Republic, they did not properly inform him that he had the right to seek consular assistance. Instead, the State acted erroneously by informing Cruz-Garcia

103

EXHIBIT 3 Page 116
000696

that his home country had been contacted, when in fact the State informed a different, incorrect country.

On February 12, 2010, shortly after Cruz-Garcia's extradition to the United States, the State of Texas issued a finding of Probable Cause for further detention of Cruz-Garcia on the charge of capital murder.  (Ex. 26 [Probable Cause Finding and Warnings].)  This same document also contained "Statutory Warnings by Magistrate," relating specifically to the magistrate's duty, under the Vienna Convention, to advise non-nationals of their constitutional rights.  As Cruz-Garcia does not speak English, this document was also signed by interpreter Manuel Barrios.  *Id.*  When asked by the Court, Cruz-Garcia affirmed that he wanted the State to notify his country's consular officials.  (*Id.*)

However, on the section of the form detailing warnings under the Vienna Convention, the box next to "mandatory notification" is checked, and the court clerk is advised to notify "Dominica."[18]

---

[18] Dominica, an island nation in the Caribbean, is one of several countries that the State Department requires be notified automatically when a foreign national is arrested, detained, or taken into custody.  *See* Bureau of Consular Affairs, U.S. Department of State, *Countries and Jurisdictions with Mandatory Notifications, available at* http://travel.state.gov/content/travel/english/consularnotification/ countries-and-jurisdictions-with-mandatory-notifications.html (last visited July 31, 2015).  The Dominican Republic, on the other hand, of which Cruz-Garcia is in fact a citizen, does not require mandatory notification.  Rather, a Dominican Republic citizen must be advised of his rights to have his consulate notified on his behalf, and then United States actors must facilitate access to the consulate if the individual so requests.

104

EXHIBIT 3 Page 117

000697

If you are not a United States citizen, you may be entitled to have us notify your country's consular representative here in the United States. Do you want us to notify your country's consular officials? (check one)

☐ NO.

☐ YES. What country? _____ . If you are a citizen of a country that requires us to notify your country's consular representative, we shall notify them as soon as possible.

☐ MANDATORY NOTIFICATION. CLERK, NOTIFY _Dominica_____ (Country) CONSULATE.

If you are a foreign national, please provide the following information:
Mr./Ms: _____

_____
(father's name [surname]/ mother's maiden name / first name)        Date of birth (mm/dd/yy)

_____
Place of birth

_____
Passport number          Date of passport issuance      Place of passport issuance

This proceeding was interpreted by: _Manuel Barrios_____ (Print name of interpreter)

**ORDER**

*Id.*

As a result, a notification was sent to the Commonwealth of Dominica on February 12, 2010. (Ex. 26 at 2 [Probable Cause Findings and Warnings].) It appears Cruz-Garcia received a second set of magistrate warnings on February 16, 2010, in which the court again included the notification warning that Cruz-Garcia had a right to contact his consulate for assistance. (Ex. 27 [Second Magistrate Warning].) Although signed by Cruz-Garcia, there is no indication whether and how these warnings were translated to him. Further, as he had just days before been told that a notice was being sent to his country, it is reasonable to conclude that at this second magistrate warning Cruz-Garcia already believed his consulate was being contacted for him. He therefore had no reason to again request that his consulate be contacted.

The Court's error in not correctly identifying Cruz-Garcia's country of origin and advising him of his right to contact his consulate was compounded when the Court received notice back from the Commonwealth of Dominica that it was the incorrect country to be contacted. (Ex. 26 at 4 [Probable Cause Findings and Warnings].) On September 12, 2010, a notation was made that the notification had been sent to the "wrong embassy." (*Id.*) Yet there is no evidence that the discovery of this error led to either notifying the Dominican Republic of Cruz-Garcia's arrest or notifying Cruz-Garcia that he could request assistance from his

105

EXHIBIT 3 Page 118                                    000698

consulate. (*See* Ex. 25 at 1 [DR Consulate letter] "[T]his office has no records whatsoever of a consular notification of Mr. Cruz-Garcia's arrest").

Because of this error, Cruz-Garcia was not properly notified of his right to communicate with the Dominican Republic consulate. Rather than accurately determine Cruz-Garcia's citizenship—which would have been a simple matter of communicating with law enforcement and prosecutors who were aware that Cruz-Garcia was born in the Dominican Republic—the Court instead relied on what must have been an improper translation by the interpreter assigned to communicate for Cruz-Garcia. As a result, Cruz-Garcia likely believed that his consulate had been notified but declined to become involved in his case. The mistake in identifying Cruz-Garcia's correct country and the resulting incorrect consular notification worked to deprive Cruz-Garcia of his rights under the Vienna Convention.[19]

Given that Cruz-Garcia never properly received his rightful statutory warnings, his failure to raise this claim at trial or in direct appeal proceedings should not be held against him. Indeed, Cruz-Garcia was likely under the impression that his home consulate had been notified of his arrest and detention. As the court apparently thought that Cruz-Garcia was from Dominica, and as Dominica requires automatic notification from the United States when one of its citizens is arrested, Cruz-Garcia was likely led incorrectly to believe that his home

---

[19] Importantly, this circumstance distinguishes Cruz-Garcia's case from other Vienna Convention violations. Whereas courts have previously held in some cases that the mere failure to inform a defendant of his consular notification rights does not rise to reversible error, in Cruz-Garcia's case the State took the affirmative step of informing Cruz-Garcia that they were notifying his consulate and then erroneously failed to do so. The error caused by the State's action (as opposed to inaction) leading to Cruz-Garcia's lack of consular notification—notification that would very likely have resulted in consular assistance—demands the reversal of Cruz-Garcia's conviction and sentence.

106

EXHIBIT 3 Page 119

country was notified of his arrest.   Given the court's error in determining his country of origin, however, Cruz-Garcia could not have known that his rights under the Vienna Convention had been violated.  Thus, this Court should find this claim not to be waived.

Further, this Court should find that Cruz-Garcia's rights under the Vienna Convention were violated, and his conviction and sentence of death should be vacated, without a showing of harm, given the serious nature of the constitutional violation.   However, should a harm showing be required, Cruz-Garcia was substantially prejudiced by the violation of his right to consular notification on the Vienna convention.

### D. Cruz-Garcia was Prejudiced as a Result of the Violation of His Rights under the Vienna Convention

Had Cruz-Garcia been properly apprised of his rights, he immediately would have sought counsel and assistance from the Dominican Republic consulate in defending his capital case.  Indeed, had Dominican consular officials known that one of their nationals was facing a death sentence in the United States, they would have provided considerable assistance to Cruz-Garcia throughout both the pretrial and trial process.   (Ex. 25 [Dominican Republic Consulate Letter].)   The Dominican Republic has been previously involved in providing various kinds of assistance in criminal cases, ranging from ensuring proper legal representation and contacting family members, to assistance in the judicial process, to assisting defense counsel directly in the development of the case by helping to locate witnesses or records in the Dominican Republic.  (*Id.*)  Given the absence of a mitigation specialist on the defense team, as discussed in Claim Four, *ante*, consular assistance could have potentially corrected some of the deficiency in investigation that occurred as a result.   Indeed, there is every reason to believe Cruz-Garcia suffered prejudice purely on account of his inability to speak English

107

EXHIBIT 3 Page 120

: 000700

and the failure to receive robust translation and interpretation services throughout the judicial process, as evidenced by the communication failure during the probable cause hearing.

Further, had the Dominican Republic been notified at the time of Cruz-Garcia's arrest in 2010 and become involved in assisting on his case, its consulate could have influenced the State's willingness to accept a guilty plea in exchange for a life sentence or to have foregone seeking the death penalty at all. Consular officials are often successful in persuading prosecutors to seek a life sentence. (Ex. 1 at ¶15 [Aff. of Sandra Babcock].)

Even had the State still chosen to seek death in spite of the consulate's involvement, the consulate nevertheless could have provided Cruz-Garcia with invaluable support throughout his confinement and trial. For example, the consulate could have helped Cruz-Garcia to make informed choices about how to proceed, both by explaining the intricacies of local criminal procedure and by providing information necessary to help prepare his defense. [Ex. 25 [Dominican Republic Consulate Letter].) In addition, they could have assisted trial counsel in obtaining mitigating information from Cruz-Garcia's family and friends and served as a necessary Spanish-speaking liaison to assist in the investigative process. (*Id.*) Consular agents could have helped the defense investigators locate witnesses in the Dominican Republic who were not interviewed, or assist in travel arrangement for witnesses the defense wished to testify at trial. (*Id.*) Or, as discussed in Claim Three, *ante*, had counsel reasonably made efforts to procure the records from Cruz-Garcia's time in prison in Puerto Rico, which are in Spanish, a consular agent could have assistance in reviewing or translating these documents. (*Id.*)

**E. Conclusion**

If not for the violation of Cruz-Garcia's rights under the Vienna Convention, there is a reasonable likelihood that the outcome of his proceedings would have

108

EXHIBIT 3 Page 121

000701
000122

been different. Because Cruz-Garcia was never afforded his proper notification, he should not be required to show specific harm, as the violation of the Vienna Convention itself constitutes a fundamental error. If a harm analysis is warranted, given the State conduct in creating the error, the violation should be considered the type of constitutional error that presumes harm in the absence of showing harmless error by the State. In this case, because Cruz-Garcia's rights were violated from the time of his extradition in 2010—meaning that he lost the opportunity for assistance from his home country in securing adequate legal representation early in the process, assistance in persuading the State not to seek the death penalty, and assistance in investigating and presenting his defense at trial—the State cannot prove beyond a reasonable doubt that he was not harmed by the deprivation of his Vienna Convention rights. Rather, the violation substantially and injuriously affected the fairness of the proceedings and prejudiced Cruz-Garcia. Even should Cruz-Garcia be required to affirmatively show harm, the circumstances in this case clearly establish that prejudice.

Under international law, the recognized remedy for a treaty violation is to restore the status quo ante, and return the parties to the position they would have occupied had the violation not taken place. Cruz-Garcia should be restored to the position he occupied before the State failed to properly inform him of his rights under the Vienna Convention. As a result, his conviction and sentence of death must be reversed.

<div align="center">

**CLAIM SIX**

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO RECOGNIZE THE SIGNIFICANCE OF CRUZ-GARCIA'S FOREIGN NATIONALITY AND SEEK THE HELP OF THE DOMINICAN REPUBLIC CONSULATE IN DEFENDING THIS CASE**

</div>

Cruz-Garcia, the defendant in the instant case, is a citizen of the Dominican Republic. As such, Cruz-Garcia is entitled to certain protections under

<div align="center">109</div>

EXHIBIT 3 Page 122

000702
00123

international law, namely the Vienna Convention on Consular Relations (VCCR).[20] In addition, Cruz-Garcia is entitled to the effective assistance of counsel in defending his capital case. *Strickland*, 466 U.S. at 694. Here, both of these rights were violated. First, Cruz-Garcia received inadequate warning regarding his rights to consular access under the VCCR, which itself is a violation of his rights under international law. (*See* Claim Five, *ante*.) Second, Cruz-Garcia was denied the effective assistance of counsel in this case when his trial attorneys failed to contact the Dominican Republic consulate concerning his prosecution, thereby depriving him of all the benefits that consular involvement would have accrued. In addition, trial counsel were ineffective in that they made no effort to remedy the State's violation of Cruz-Garcia's rights under the VCCR, thereby failing to raise this significant issue at trial to preserve it for appeal.

There is no doubt that consular involvement would have greatly benefited Cruz-Garcia's defense. Indeed, had trial counsel involved the Dominican Republic consulate in their defense of this case from the start, there is a significant possibility that the outcome of this proceeding would have been different. As such, trial counsel's failure to involve the Dominican Republic in Cruz-Garcia's defense was prejudicial. Therefore, Cruz-Garcia's rights under the United States and Texas Constitutions, as well as international, federal, and state law, were violated, and his conviction and sentence of death must be overturned.

---

[20]Specifically, Cruz-Garcia is entitled to be apprised of his right to contact authorities from his home country if he has been arrested, detained, or indicted. Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, Art. 36(1)(b). Ensuring that this right is properly enforced is crucial in ensuring that foreigners of any nationality, including United States citizens, receive fair treatment when detained outside of their home countries.

110

EXHIBIT 3 Page 123

000703

A. **Trial Counsel's Failure to Apprise Cruz-Garcia of His Right to Consular Access and To Seek Assistance from the Dominican Republic in Defending His Case Was Objectively Unreasonable and Constitutes Deficient Performance**

At the time of Cruz-Garcia's capital trial in 2013, reasonably competent counsel should have known the significance of Cruz-Garcia's foreign nationality, ensured that Cruz-Garcia was apprised of his rights under the VCCR, and made every effort to involve the Dominican Republican consulate in defending his case.

1. **Trial Counsel Knew that Cruz-Garcia Is a Citizen of the Dominican Republic**

In addition to the information available to trial counsel through Cruz-Garcia himself—who speaks no English and has a foreign passport—trial counsel had objective information in their possession confirming that Cruz-Garcia was a foreign national.

In particular, counsel had a copy of Cruz-Garcia's 2010 Probable Cause Order, which states that Cruz-Garcia is not a United States citizen.[21] (Ex. 26 [Probable Cause Findings and Warnings].) Furthermore, through discovery, trial counsel had access to numerous police and other state-issued reports indicating that Cruz-Garcia is a citizen of the Dominican Republic.

> A supplemental police report drafted by Officer E.S. Mehl on October 8, 2008 identifies Mr. Cruz Garcia as a national of the Dominican Republic. ... On June 19, 2013, the prosecution filed a Notice to Defendant of State's Intent to Use Extraneous Offenses and Prior Conviction. This notice indicates that "[t]he defendant is a citizen of the Dominican Republic who entered the United States as well as the Commonwealth of Puerto Rico on multiple occasions since the late

---

[21] As discussed at length in Claim Five, *ante,* this Order incorrectly identified Cruz-Garcia as being from Dominica rather than the Dominican Republic. Nevertheless, this Order provides evidence of Cruz-Garcia's foreign nationality. Furthermore, given trial counsel's later efforts to locate and speak with family members of Cruz-Garcia's in the Dominican Republic, it is clear that counsel knew where their client was from.

111

EXHIBIT 3 Page 124

: DS125 000704

1980s illegally and remained in both locations for periods of time as
an undocumented alien."

(Ex. 1 at ¶9 [Aff. of Sandra Babcock].)

This information would have been sufficient to place counsel on notice that
they were defending a non-United States citizen.  Consequently, prevailing norms
of professional practice dictated that trial counsel take certain steps in their
representation of Cruz-Garcia.

### 2. Both National and State Bar Guidelines Highlight the Steps That Need to Be Taken in Representing a Foreign National in a Capital Case

According to Sandra Babcock, a clinical professor of law at Cornell
University and a licensed attorney in Texas with over twenty years of capital
defense experience, by 2013 it was standard practice within the capital defense
community to enlist the help of a foreign consulate in defending a foreign national
in a capital case.  (Ex. 1 at ¶8 [Aff. of Babcock].)  Indeed, this practice was so well
accepted that by the mid-2000s, the steps that would need to be taken in
representing a foreign national in a capital case were codified in both the ABA
Guidelines for the Appointment and Performance of Defense Counsel in Death
Penalty Cases, as well as in the guidelines governing the obligations of counsel in
capital cases promulgated by the State Bar of Texas in 2006.  *See Texas
Guidelines*, Guideline 10.3.

### a. The American Bar Association Guidelines Highlight the Professional Obligations that Attach When Representing a Foreign National

The starting point for any inquiry into the reasonableness and quality of
legal representation in a capital case is the American Bar Association's Guidelines
for the Appointment and Performance of Defense Counsel in Death Penalty Cases.
(Ex. 1 at ¶10 [Aff. of Babcock]; *Strickland*, 466 U.S. at 688.)  As soon as trial
counsel were aware that Cruz-Garcia was born in the Dominican Republic to
parents also from the Dominican Republic, they incurred an obligation under the

112

EXHIBIT 3 Page 125

: 000705

ABA Guidelines to seek consular assistance on his behalf. The Guidelines specifically state:

> A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.
>
> B. Unless predecessor counsel has already done so, counsel representing a foreign national should:
>
> 1. *immediately advise the client of his or her right to communicate with the relevant consular office; and*
>
> 2. *obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.*

*ABA Guidelines*, Guideline 10.6 (emphasis added).

These additional obligations would have attached as soon as trial counsel suspected Cruz-Garcia's Dominican Republic nationality based on his family background and birthplace. Even in cases where nationality is in dispute, counsel incur an obligation to try to determine nationality in order to assess whether additional steps must be taken to appropriately represent the individual. The ABA Guidelines explain:

> Subsection A is included in the Guideline to emphasize that the determination of nationality may require some effort by counsel. A foreign government might recognize an American citizen as one of its nationals on the basis of an affiliation (e.g. one grandparent of that nationality) that would not be apparent at first glance.

*ABA Guidelines*, Guideline 10.6. The fact that the ABA Guidelines suggest that counsel has an obligation to determine nationality in cases where it is not immediately apparent only further emphasizes the significance of recognizing a defendant's foreign nationality in a capital case.

113

EXHIBIT 3 Page 126

000706

**b. Guidelines Adopted by the State Bar of Texas in 2006 Emphasize the Significance of Taking Certain Additional Steps in Representing a Foreign National in a Capital Case**

In addition to the ABA, the State Bar of Texas has also adopted guidelines highlighting trial counsel's additional obligations in defending a foreign national in a capital case. *Texas Guidelines*, Guideline 10.3. These guidelines are specifically tailored to the representation of capital defendants in Texas, thus embodying the most up-to-date norms of professional practice in this state. The section of the Texas Guidelines specifically concerned with the representation of a foreign national is in fact more extensive than the corresponding section within the ABA Guidelines. This section reads as follows:

**GUIDELINE 10.3 Additional Obligations of Counsel Representing a Foreign National**

A. Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B. Counsel representing a foreign national should:

1. Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

2. If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission to withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.

3. Immediately advise the client of his or her right to communicate with the relevant consular office; and

4. Obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

114

EXHIBIT 3 Page 127 : 000707

> Counsel who is unable to obtain consent should exercise his or her
> best professional judgment under the circumstances.

*Id.* As the above text makes clear, prevailing norms of professional practice in Texas recognize that it is incumbent on trial counsel to take certain steps in representing a foreign national in a capital case. Accordingly, failure to take such steps falls below the threshold of reasonable professional practice and is objectively unreasonable.

### c. Basic Legal Research Would Have Revealed the Significance of Taking Additional Steps in the Representation of a Foreign National in a Capital Case

Finally, basic legal research would have quickly revealed the importance of seeking consular assistance. By the time trial counsel were preparing Cruz-Garcia's defense, it had already been established in neighboring jurisdictions that the failure to seek consular assistance on behalf of a foreign national facing the death penalty can fall below minimum standards of legal representation. *See Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (granting post-conviction relief because it was ineffective assistance for trial counsel not to "inform Petitioner he could have obtained financial, legal and investigative assistance from his consulate"); *cf. Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) (remanding non-capital case to determine if trial attorney's failure to "notify Deitz of his right to contact the Mexican consulate...deprived him of the effective assistance of counsel"); *see also Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (in capital cases, treaties such as the VCCR "are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national"); *Ledezma v. State*, 626 NW.2d 134, 152 (Iowa 2001) (observing that "all criminal defense attorneys representing foreign nationals should be aware of the right to consular access . . . and should advise their clients of this right").

115

EXHIBIT 3 Page 128

000708

By the time of Cruz-Garcia's capital trial, therefore, there was a well-developed and readily accessible body of legal materials emphasizing the indispensable significance of consular assistance in capital cases.

### 3. Trial Counsel Failed to Act in Accordance with the Recommendations of the ABA Guidelines, the Texas State Bar Guidelines, and Other Available Legal Materials in Representing Cruz-Garcia, Which Constitutes Deficient Performance Under *Strickland v. Washington*

There is no indication in trial counsel's records that Cruz-Garcia was ever informed of his right to communicate with the Dominican Republic Consulate, even though "Guideline 10.6 unequivocally states that counsel should advise a foreign national client of her right to communicate with consular officials." (Ex. 1 at ¶10 [Aff. of Babcock].)   Despite the myriad professional guidelines clearly outlining counsel's obligations in representing a foreign national, trial counsel's post-conviction representations confirm that they never made an attempt to communicate with the Dominican Republic Consulate on Cruz-Garcia's behalf. Indeed, trial counsel believed that the Dominican Republic was "aware" of this case because, prior to trial, one of Cruz-Garcia's ex-wives was involved in trying to procure a visa from the Dominican Republic to come and testify on Cruz-Garcia's behalf.

Upon learning that Cruz-Garcia was a citizen of the Dominican Republic, reasonably diligent counsel would have contacted the nearest consulate in order to confirm his citizenship status and eligibility for consular assistance.   The Dominican Republic Consulate would have offered services and means of support had they known Cruz-Garcia was facing the death penalty. (Ex. 25 [Dominican Republic Consulate Letter].)  Officers of the Dominican Republic Consulate were available to assist, but trial counsel never contacted the consulate, in clear contravention of the ABA Guidelines.

EXHIBIT 3 Page 129

: 000709

Under the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and prevailing Texas practice, competent defense counsel would have notified Mr. Cruz Garcia of his rights under Article 36 of the Vienna Convention. After obtaining Mr. Cruz Garcia's consent, they would have notified consular officials of his detention and sought assistance from the consulate. *If Mr. Cruz Garcia's trial counsel failed to take these actions, that failure was objectively unreasonable.*

(Ex. 1 at ¶8 [Aff. of Babcock] (emphasis added).)

Particularly here, where multiple sources articulate the obligations that competent counsel ought to take in representing a foreign national, trial counsel's failure to undertake any of these vital steps must be viewed as meeting the first prong of the ineffectiveness enquiry under *Strickland*.

**B. Trial Counsel's Failure to Involve the Dominican Republic Consulate in This Case Prejudiced Cruz-Garcia's Defense**

Had trial counsel acted in accordance with their professional obligations and sought to notify and involve the Dominican Republic consulate in Cruz-Garcia's defense, there is a reasonable likelihood that the outcome of the proceeding would have been different.

Post-conviction counsel for Cruz-Garcia contacted the Dominican Republic and learned that the consulate was unaware of Cruz-Garcia's arrest, prosecution, and death sentence. In a letter written on Cruz-Garcia's behalf, dated August 13, 2015, the consulate states, "In the case of Mr. Obel Cruz-Garcia, this office has no records whatsoever of a consular notification of Mr. Cruz-Garcia's arrest, in accordance to Vienna Convention stipulations." (Ex. 25 [Dominican Republic Consulate Letter].) The letter goes on to explain the significance of consular notification under the Vienna Conventions, and highlights the fact that the consulate could have been of great assistance had it been contacted by Cruz-Garcia's trial counsel in a timely fashion.

117

EXHIBIT 3 Page 130

000710

The Vienna Convention…[helps to guarantee foreign nationals]…the protection of their rights, proper legal representation and the opportunity to contact family members who can participate in the judicial procedure and aid in the investigations; the consular agents can also work with the defendant's lawyers to locate witnesses or records in the Dominican Republic. The [VCCR] also allows the Consulate to send documents and letters to the court, and to be present in court, to support the foreign national and protect the rights of the defendant.

. . . If Mr. Cruz-Garcia had contacted our offices and requested our help, this consulate general would have provided Mr. Cruz-Garcia with whatever partial or total assistance it could [provide], at that moment, as stated above.

According to our experience, consular intervention can make the difference in a legal procedure. There are many examples of cases to prove the big difference such assistance can make in the fate of a person accused of committing a crime.

(Ex. 25 [Dominican Republic Consulate Letter].)

Had it been contacted by the defense team, the Dominican Republic consulate would have sought to assist trial counsel in its representation of Cruz-Garcia in whatever way possible. Specifically, the consulate could have been of significant assistance in facilitating trial counsel's mitigation investigation in the Dominican Republic, and could have helped to ensure that counsel could gain access to records, individuals, and facilities in the Dominican Republic that may have assisted in Cruz-Garcia's defense—assistance particularly needed by the defense in the absence of a qualified mitigation specialist. (*See* Claim Four, *ante*.)

In addition, had the consulate been involved in this case from the start, they could have sought to use their political influence to negotiate with the State to seek a life sentence for Cruz-Garcia. Consular officials are often successful in persuading prosecutors to waive the death penalty in exchange for a guilty plea. (Ex. 1 at ¶15 [Aff. of Babcock].)

118

EXHIBIT 3 Page 131

000711

Furthermore, consular involvement would have made a significant impact on the mitigation investigation in this case. Had counsel been working with the consulate from the start, they could have received considerable help in locating witnesses in the Dominican Republic; securing statements from said witnesses; and bringing them to the United States to testify on Cruz-Garcia's behalf at trial. (*See* Claim Four, *ante*, for the many available mitigation witnesses in the Dominican Republic that trial counsel failed to locate and interview.)

Indeed, had the Consulate been involved, it is highly likely that trial counsel would have been able to present a far more robust punishment-phase case than they ultimately brought before the jury. Had the jury had the opportunity to see and hear from more members of Cruz-Garcia's family in the Dominican Republic, a reasonable likelihood exists that they would have voted for life rather than death. Without consular assistance in securing and presenting these witnesses, however, the jury was left with an incomplete picture of Cruz-Garcia's many family connections within the Dominican Republic.

Ultimately, it is difficult to know exactly what shape consular involvement may take in assisting in the defense of a capital case. Nevertheless, what is clear is that consular involvement can have a decisive positive impact on a case's outcome.

> The assistance provided by consular officials varies from case to case. I have been involved in at least two-dozen cases in which consular officials have interceded with prosecutors prior to trial to persuade them not to seek the death penalty. In most of these cases, the prosecution decided to waive the death penalty in exchange for a guilty plea. In other cases, consular officials have been instrumental in obtaining mitigating evidence from the national's home country that has a decisive impact on the penalty phase defense. Consular officials have also recruited legal counsel to represent foreign nationals facing the death penalty where trial counsel lacks the requisite experience or competence to defend a capital case.

(Ex. 1 at ¶15 [Aff. of Babcock].)

EXHIBIT 3 Page 132

000712

Given the significant ways consular assistance can positively impact a defendant's capital case, there is little doubt that failure to seek such assistance—especially when the obligation to do so is codified by various professional guidelines—is prejudicial. Had the consulate been involved in the defense of Cruz-Garcia's case, there is a reasonable likelihood that at least one juror would have been moved to vote for life rather than death. As such, Cruz-Garcia received ineffective assistance of counsel in the defense of his capital case, and his conviction and death sentence should be overturned.

### C. Trial Counsel Were Ineffective for Failing to Ensure That Cruz-Garcia's VCCR Rights Were Protected by the State and for Failing to Raise This Issue at Trial

Upon appointment to this case, trial counsel should have immediately ensured that Cruz-Garcia's rights under the VCCR were protected during his arrest and detainment. *See Osagiede v. United States*, 543 F.3d 399 (7th Cir. 2008) (finding trial counsel ineffective for failing to seek a remedy for an Article 36 violation and remanding for prejudice determination). Had trial counsel been diligent in their pretrial review of Cruz-Garcia's case, they would have realized that the State of Texas mistakenly listed Cruz-Garcia as coming from the country of Dominica on his probable cause form. (*See* Claim Five, *ante*; Ex. 25 [Probable Cause Findings and Warnings].) Had trial counsel caught this obvious error, they could have informed the Court during Cruz-Garcia's trial that his rights under the Vienna Convention were violated. In raising the issue before the court, trial counsel not only would have preserved the issue on direct appeal, but also would have given the Court the opportunity to correct the error. In so doing, the Court could have ordered the Dominican Republic Consulate contacted and ordered a continuance of the proceeding until such time as Cruz-Garcia had the opportunity to communicate with them and receive any assistance they were able to offer. In

120

EXHIBIT 3 Page 133

000713

failing to both preserve this issue and notify the Court about this error, counsel were ineffective.

### D. Conclusion

Trial counsel wholly failed their obligations under prevailing norms of both national and state professional practice in failing to advise Cruz-Garcia of his right to consular access; seek out consular assistance in the defense of his case; and communicate to the Court that the State failed to properly warn Cruz-Garcia of his rights under the Vienna Conventions. Such failures on the part of trial counsel deprived Cruz-Garcia of his right to effective representation under the Sixth Amendment to the United States Constitution and necessarily impacted the outcome of his capital case. As a result, his conviction and sentence of death were rendered in violation of state, federal, and international law, and should be overturned.

<div align="center">

**CLAIM SEVEN**

**CRUZ-GARCIA'S DUE PROCESS RIGHTS TO A FAIR TRIAL WERE VIOLATED BY CONSTITUTIONAL ERRORS RELATING TO THE COURT'S EX PARTE DISCUSSION WITH A SINGLE JUROR**

</div>

The right to an impartial and fair jury is paramount in a capital case. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). Yet in Cruz-Garcia's case, error by the trial court invaded the sanctity of the jury's deliberations and placed a thumb on the scale for a death verdict. During punishment phase deliberations, Juror Bowman was a lone holdout for a life sentence and sent a note requesting to speak with the Court. During that conversation, which was on the record but happened privately in the judge's chambers without counsel present, the Court effectively gave Juror Bowman supplemental instructions telling her to attempt to agree with the rest of the jury. This information was never communicated to trial counsel, who lost the opportunity to object or ask for an end to deliberations. As a result,

<div align="center">121</div>

EXHIBIT 3 Page 134

000714

Cruz-Garcia's due process rights were violated under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law. Accordingly, his sentence must be reversed.

### A. Relevant Facts

On July 19, 2013, on the second day of the jury's deliberations at the punishment phase of trial, the Court received a note from Juror Bowman asking to speak with the judge. (27 RR at 3.) The note did not give any indication of what the juror wished to speak about. After showing the note to both the State and defense counsel, the Court asked either party if they objected to her speaking with Juror Bowman in private in her chambers. Both sides agreed that was the proper way to determine what the juror needed to speak about. (*Id.*) However, neither side discussed what the Court should do once she learned what the issue was.

The Court brought Juror Bowman to her chambers and halted deliberations. (27 RR at 4.) Juror Bowman then explained to the judge:

> I'm sorry. I don't mean to waste your time. You are important, Judge, and everything like that. I just -- I am the only juror that's completely -- I can't agree. I can't agree with the questions. I can't answer the same questions with everyone else and I feel pressured. And I don't want to hold them up. So, I feel like maybe they can exchange me out with one of the alternates.

(*Id.* at 4-5.) The Court explained to the juror that having a different opinion than the other jurors did not disqualify her as a juror and that she would essentially have to become disabled to be replaced by an alternate. (*Id.* at 5-6.) The juror continued, though:

> Here's my thing. I don't think I'll ever come to an agreement. We're never going to come to an agreement. They all have the same answers. The only question -- the only answer I'm in agreement with them is No. 2. No. 1 and 3, they're all -- you know, they are all different. I am the only one with the different opinion. And I am not changing my stance on that. I'm not. And they are not.

<div align="center">122</div>

EXHIBIT 3 Page 135

000715

So, I mean, if we keep on going to deliberations, it could be years, I mean, because I'm not the type of person --

(27 RR at 6.) The Court interrupted, instructing Juror Bowman that she needed to continue deliberating until the Court told her to stop. The Court explained that multiple nights of hotel lodging had been booked in case the jury needed to be sequestered more than the night they had already been sequestered. (*Id.* at 6-7.) The Court further instructed:

> If the evidence leads you to a certain way, that's the way you should answer it, even though it might result in something that bothers you. That's why we don't ask you to vote to give the death penalty or to not give the death penalty.

> So, I'd like you to go back and continue your deliberations with the jury and continue trying to reach an agreement with the jury, if you can.

(27 RR at 7.) Juror Bowman closed the conversation by stating: "Judge, I don't want to have to stay another night. I really don't know." (*Id.* at 8.) The Court replied: "That's completely in the hands of the entire jury. You have to deliberate back there and try to find out whether you can reach a verdict or not. Okay?" (*Id.*)

After indicating that Juror Bowman was sent back to deliberations, the record is silent, resuming after deliberations have concluded and the jury is brought back with their verdict later that same day. (27 RR at 8.) There is no indication in the record that the Court informed either the State or defense counsel about the content of the conversation with Juror Bowman. Nor is there any indication in the record of objections by defense counsel, asking the Court to put on record what Juror Bowman had said and what the Court had instructed her.

In post-conviction investigation, trial counsel was asked to review the transcript of the in-chambers conversation with Juror Bowman. Trial counsel have stated that they were not told by the Court that Juror Bowman was a holdout vote and wanted to stop deliberating. Trial counsel recalls an informal conversation

123

EXHIBIT 3 Page 136

000716

with the judge outside the courtroom, in which the judge stated that Juror Bowman was having a hard time.  In his affidavit filed with the motion for new trial, counsel Mario Madrid stated the court only informed them that Juror Bowman "questioned how long deliberations would last."  (35 RR at 28 (Def Ex. 1).)  Counsel were not given the specifics that Juror Bowman stated she could not come to an agreement with the other jurors, was not going to change her opinion, and wanted to stop deliberating for that reason.   Both counsel state that if they had known Juror Bowman was a holdout juror who desired to stop deliberations, they would have asked the court to end deliberations and enter a life sentence.

## B. Cruz-Garcia's Due Process Rights Were Violated When the Trial Court Failed to Inform Trial Counsel of the Details of Its Conversation with Juror Bowman and Instead Instructed Her to Resume Deliberations

The Court's failure to inform defense counsel about the content of the conversation with Juror Bowman prejudiced Cruz-Garcia's right to a fair trial in two ways.  First, this failure prevented counsel from being able to object to the Court's private instructions to Juror Bowman, which operated essentially as an impermissible coercive *Allen* charge.  Next, the failure to inform counsel denied them the opportunity to request that the Court end deliberations based on Juror Bowman's holdout vote.

Article 37.071(e) of the Texas Code of Criminal Procedure states that a court shall enter a life sentence if the jury is unable to answer one of the special issues. TEX. CODE CRIM. PROC. art. 37.071; *Montoya v. State*, 810 S.W.2d 160, 166 (Tex. Crim. App. 1989).   The court may do so when it determines a jury has been deliberating "for such a time as to render it altogether improbable that it can agree."  *Howard v. State*, 941 S.W.2d 102, 121 (Tex. Crim. App. 1996).  There is no set time for deliberations, though.   *Id.*; *Green v. State*, 840 S.W.2d 394, 407 (Tex. Crim. App. 1992).  It is within the court's discretion to continue deliberations

124

EXHIBIT 3 Page 137

000717

if it believes it could be productive.  It may also issue a supplemental charge to the jury known as an *Allen* or "dynamite" charge.  *See Allen v. United States*, 164 U.S. 492 (1896).   Such a charge essentially reminds jurors of the object of deliberations—to come to an agreement if possible—and that jurors should be open to being persuaded to change their vote.  *Howard*, 941 S.W.2d at 123.

As the term "dynamite" suggests, however, an *Allen* charge carries the risk of coercing jurors into changing their vote not based on deliberation or consideration of the evidence, but instead based on the court instructing them to do so.  *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (reversing a conviction where the court, after two hours of deliberations, instructed the jury: "You have got to reach a decision in this case."); *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006) ("While such a charge is permissible in both the federal system and Texas courts, trial courts must be careful to word it and administer it in a non-coercive manner.").  This has been found particularly true for *Allen* charges that single out the fewer holdout jurors in the instruction.  *See Lowenfield v. Phelps*, 484 U.S. 231, 238 (1988); *Barnett*, 189 S.W.2d at 278 (reversing a conviction where the trial court singled out two holdout jurors and asked them if they would be able to change their vote).  It is for this reason that proper supplemental charges have focused on instructing all jurors to reevaluate their opinions based on the divided deliberations.  *Howard*, 941 S.W.2d at 123.

In the present case, the Court's discussion with Juror Bowman and instructions to her to return to the deliberation room created a situation where the Court was essentially giving Juror Bowman—and only Juror Bowman—a coercive *Allen* charge.  By instructing Juror Bowman to "continue trying to reach an agreement with the jury," the Court singled Juror Bowman out as being the juror that needed to consider changing her vote.  Indeed, this was the message that was received by Juror Bowman from her conversation with the Court.  (Ex. 14 at ¶4

125

EXHIBIT 3 Page 138
000718

[Aff. of Juror Bowman] ("I do not remember her exact words to me, but I understood that she was telling me I had to go back into deliberations and see whether I could find it within myself to vote with the other jurors, without violating my conscience.").) Juror Bowman was sent back to deliberations with this instruction, and the rest of the jury did not receive any supplemental instructions. Juror Bowman's subsequent change of her vote to agree with the other jurors in assigning the death penalty is directly linked to the Court's instruction to her. (*Id.* ("Ultimately, I went back to deliberations like the judge instructed me to and thought about whether I could find a way to agree with the rest of the jurors. Because of all the pressure from other jurors and my daughter being sick, I decided to change my vote to death.").)

The instruction given to Juror Bowman was, therefore, independently an error by the Court. In addition, the Court gave the instructions outside the presence of the State and defense counsel and failed to report the entire conversation and instructions back to the defense. The U.S. Supreme Court reversed a case under strikingly similar circumstances. The gravity of the error expressed in the Supreme Court opinion bears repeating at length.

> The District Judge suggested that he meet alone with the jury foreman and counsel acquiesced. The transcript of the meeting, which was initially impounded but released for purposes of the appeal, contained several references by the foreman to the jury's deadlock, as well as an exchange suggesting the strong likelihood that the foreman carried away from the meeting the impression that the judge wanted a verdict "one way or the other." The judge's report to counsel summarizing the discussion made no reference to either of these matters.

> We find this sequence of events disturbing for a number of reasons. Any ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise. First, it is difficult to contain, much less to anticipate, the

126

EXHIBIT 3 Page 139                                    000719

direction the conversation will take at such a meeting.  Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury -- all the more so when counsel are not present to challenge the statements.  Second, any occasion which leads to communication with the whole jury panel through one juror inevitably risks innocent misstatements of the law and misinterpretations despite the undisputed good faith of the participants.  Here, there developed a set of circumstances in which it can fairly be assumed that the foreman undertook to restate to his fellow jurors what he understood the judge to have implied regarding the resolution of the case in a definite verdict "one way or the other."  There is, of course, no way to determine precisely what the foreman said when he returned to the jury room.

Finally, the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel.  While all counsel acquiesced to the judge's ex parte conference with the jury foreman, they did so on the express understanding that the judge merely intended -- as no doubt at the time he did -- to receive from the foreman a report on the state of affairs in the jury room and the prospects for a verdict.  Certainly none of the parties waived the right to a full and accurate report of what transpired at the meeting nor did they agree that the judge was to repeat the instructions as to his understandable reluctance to accept the jury's inability to reach a verdict.  Because neither counsel received a full report from the judge, they were not aware of the scope of the conversation between the foreman and the judge, of the judge's statement that the jury should continue to deliberate in order to reach a verdict, or of the real risk that the foreman's impression was that a verdict "one way or the other" was required.  Counsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction.  Thus, it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone -- undesirable as that procedure is -- which constitutes the error; rather, it is the fact that the ex parte discussion was inadvertently allowed to drift into what

127

EXHIBIT 3 Page 140
000720
000141

amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

*United States v. United States Gypsum Co.*, 438 U.S. 422, 460-62 (1978) (internal citations omitted). For the same reasons expressed in the Supreme Court's opinion, the trial court's private meeting with Juror Bowman in Cruz-Garcia's case, and her instructions to return to deliberations in an attempt to agree with the other jurors, constitute error. The instructions, though almost certainly given with the benign purpose of encouraging Juror Bowman to continue deliberations, instead likely caused a coercive effect on her vote. *Howard*, 941 S.W.2d at 124 (noting that, even if unintended, "a trial court might engender coercion by actively identifying jurors with minority viewpoints and tacitly instructing them to reexamine their perspectives."). In her affidavit filed with the motion for new trial, Juror Bowman's description of feeling like the "last holdout" and that she was "holding up the process" is indicative that her mindset during the end of deliberations was the she was the one who was required to change her vote. (35 RR at 36 (Def. Ex. 3).) The other jurors "weren't changing their minds" and, significantly, had not been asked to reconsider their votes as Juror Bowman had. (*Id.*) Like the juror in *United State Gypsum Co.*, there is a real risk that Juror Bowman left the judge's chambers believing that she had to come to agreement with the other jurors. 438 U.S. at 461.

Further, by conducting the conversation in private and not reporting back the language of her instruction to Juror Bowman, the Court prevented trial counsel from having the opportunity to weigh in on those instructions or request to correct any mistaken impression about what she was required to do. And this was not the only opportunity lost to counsel.

EXHIBIT 3 Page 141

000721

In failing to report to counsel that Juror Bowman was a holdout juror who did not wish to continue deliberating, the Court deprived counsel of the opportunity to ask the Court to end deliberations. Unlike most cases, the failure of the jury to reach a unanimous sentencing verdict in a capital case does not result in a mistrial. Rather, the Court is instructed by statute to enter a life sentence. TEX. CODE. CRIM. PROC. art. 37.071. While a court has broad discretion to continue deliberations, that necessarily means the court has discretion to end deliberations where called for. *See Green*, 840 S.W.2d at 407. In the present case, trial counsel have stated they would have asked the Court to end deliberations had they known the details of the conversation with Juror Bowman. Because a juror's decision regarding the special issues in a death penalty case necessary impact an individual, moral judgment of the evidence (particularly regarding mitigation), the Court might have been amenable to argument from counsel regarding the need to avoid undue pressure on the jury to come to unanimity and that ending deliberations was the appropriate step given Juror Bowman's comments. We cannot presently know how the Court would have ruled, had such arguments been presented to it, because trial counsel were never given the opportunity.

For both the error in the instructions given to Juror Bowman—substantively and by being done in private, individually—and the missed opportunity of counsel to object and to request an end to deliberations, Cruz-Garica's due process rights to a fair trial proceeding were infringed. As such, his sentence should be vacated and his case remanded for a new trial.

## C. Appellate Counsel Provided Ineffective Assistance in Failing to Raise the Foregoing Errors on Direct Appeal

It is well established that criminal defendants are entitled to effective assistance of counsel during their direct appeals. The effectiveness of appellate counsel is determined using the two-prong *Strickland* standard. *See Robbins*, 528

129

EXHIBIT 3 Page 142

000722

U.S. at 285; *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008); *Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006); *Ex parte Santana*, 227 S.W.3d at 704-05. Appellate counsel is considered ineffective if counsel's performance was objectively unreasonable, and this deficient performance prejudiced the defendant. *See Ries*, 522 F.3d at 531; *Amador*, 458 F.3d at 411.

Appellate counsel has an obligation to research relevant facts and law, so as to raise "solid, meritorious arguments" based on controlling precedent in an appellate brief. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); *accord Ries*, 522 F.3d at 531-32; *see Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims). Section 12.2(A) of the Texas Guidelines outlines the duties of appellate counsel, stating that counsel must "review the appellate record for all reviewable errors" and prepare "a well-researched and drafted appellate brief." *Texas Guidelines*, Guideline 12.2(A)(8).

In the present case, full development and litigation of the foregoing errors regarding Juror Bowman's instructions will require an evidentiary hearing with live testimony from trial counsel concerning what information they received from the Court regarding the conversation with Juror Bowman and what they would have done had they been provided the complete transcript. Thus, these issues are properly raised and preserved for review in this Application and collateral proceeding. *See Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (noting that claims relying on outside-the-record evidence are best raised on habeas). However, certain information forming the basis of this claim was available in the record of trial. Should the issues herein be found to have been waived by not having been pled in Cruz-Garcia's direct appeal proceedings, he should be found to have received ineffective assistance of appellate counsel.

EXHIBIT 3 Page 143

000723

First, the transcript of the conversation between the Court and Juror Bowman was part of the trial record and had even been included in the motion for new trial proceedings shortly after trial. (35 RR at 11 (State's Ex. 3).) It was clear from that record that trial counsel had not been made part of the conversation and that the contents of the conversation had not been reported back to counsel on the record. Further, trial counsel Mr. Madrid referenced the incident in his affidavit, filed with the motion for new trial by direct appeal counsel. In that affidavit, Mr. Madrid stated that the Court had only informed counsel that Juror Bowman "questioned how long deliberations would last." (35 RR at 28 (Def Ex. 1).) Thus, it would have been reasonable to assume from this notation that counsel had not been informed of the full extent of Juror Bowman's conversation with the Court.

Based on this information, direct appeal counsel knew or should have known of the Court error in its instructions to Juror Bowman and the failure to disclose the conversation to trial counsel. There is no reasonable, strategic ground to have failed to raise this meritorious issue on appeal. Thus, appellate counsel's performance fell below the reasonable standards of professional conduct and prejudiced Cruz-Garcia's appeal. *Lucey*, 469 U.S. at 394 n.6 ("In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all.") As a result, Cruz-Garcia's must be granted a new direct appeal process.

**D. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Object or Request the Trial Court Report Its Conversation with Juror Bowman on the Record**

Trial counsel has a duty to object to trial errors and establish a record reflecting adverse rulings by the court. *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at

131

EXHIBIT 3 Page 144

000724

trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.") (internal citation omitted); *ABA Standards*, Standard 4-7.1(d) (defense counsel "has a duty to have the record reflect adverse rulings"). In a capital trial, trial counsel has a duty to "protect[] the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited." *ABA Guidelines*, Guideline 10.8(A)(3)(c). The ABA Guidelines advise that trial counsel in a capital case should "know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings." *Id.* at cmt.

As discussed above, trial counsel were not told of the Court's full conversation with Juror Bowman. At an evidentiary hearing on this Application, it is anticipated that counsel will state that the Court informally told them after the conversation with Juror Bowman that she was having a hard time and asked how long deliberations would last. In light of that explanation from the Court, it is likely counsel did not believe any formal recitation of these facts on the record was necessary by the Court.

However, should it be determined that the errors herein complained of were not properly preserved by trial counsel, it should be found that Cruz-Garcia received ineffective assistance of trial counsel through their failure to request to be present at the meeting with Juror Bowman or a recitation of the conversation on the record. Counsel knew that Juror Bowman had some issue sufficient to warrant sending a note to speak with the Court. Upon learning that Juror Bowman was having a hard time with deliberations, counsel should have exercised all due diligence to preserve the rights of their client. Following the guidelines and norms for capital counsel, Cruz-Garcia's trial counsel should have requested the Court

<center>132</center>

EXHIBIT 3 Page 145
000725

give a full accounting of the conversation on the record in order to determine whether any error existed that might prejudice Cruz-Garcia's case. Because counsel failed to do so, and no reasonable, strategic grounds exist to have done so, they provided ineffective assistance of counsel. Cruz-Garcia's sentence should be reversed and his case remanded for a new trial.

## CLAIM EIGHT

## CRUZ-GARCIA'S RIGHTS TO A FAIR TRIAL WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE JUROR MISCONDUCT

In a capital case, a defendant's right to a fair and impartial jury is paramount. *See Morgan*, 504 U.S. at 727. This fairness is not only necessary in the selection of the jury, but also in a requirement that they do not receive outside information or make decisions about the case outside of the deliberation room. "A juror must make decisions at the guilt and punishment phases using information obtained in the courtroom: the law, the evidence, and the trial court's mandates." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Notably, during Cruz-Garcia's trial, it came to light that two jurors had a discussion outside of deliberations about the case. This was reported to the Court by an attorney not connected to the proceedings. Yet trial counsel did not investigate this event further, neither speaking with the attorney nor requesting the jurors themselves be questioned. Counsel also did not raise any objections or request for mistrial based on the jurors' misconduct. This failure constitutes deficient performance that prejudiced Cruz-Garcia's right to a fair trial. His rights under the state and federal Constitutions, Texas criminal law, and United States Supreme Court and Texas case law were violated. Accordingly, his conviction and sentence must be reversed.

133

EXHIBIT 3 Page 146

000726

### A. Relevant Facts

On the morning of July 16, 2013, during Cruz-Garcia's capital trial, an attorney unrelated to the case named Michael Casaretto came to the 337th District Court and asked to speak with the Court in chambers. (24 RR at 3.) Casaretto reported to the Court that he had seen and heard two jurors in Cruz-Garcia's case talking to each other that same morning, and felt he should report it to the Court. (*Id.*)

After speaking with Casaretto in chambers, the Court put a summary of the conversation on the record, with both the State and defense counsel present. (24 RR at 3.) The Court reported that Casaretto had described the two jurors and what they were wearing that day. However, the description the Court gave minimized the seriousness of the conversation between the jurors, reporting that Casaretto had "said they were having what was possibly an innocuous conversation." (*Id.*) The Court reported that Casaretto had heard the jurors speaking about other jurors struggling with the case and about words of encouragement from the older of the two jurors. (*Id.* at 3-4.) Any implication of seriousness was minimized, though, when the Court stated that Casaretto had said: "There was nothing specific about the issues discussed and they did not seem to be conspiring. He said he could not tell if they were actually talking about evidence." (*Id.* at 4.)

The Court stated that it was notifying the State and defense counsel "to do whatever you want with the information and make them available. [Casaretto] is obviously available if you need to speak to him further." (24 RR at 3.) The Court was satisfied that was all the information Casaretto had, but gave both parties Casaretto's name and phone number if they wished to speak with him. (*Id.* at 5.) The Court again stated "he said it probably or possibly was innocuous and he wanted to report it just because . . ." (*Id.*) Trial counsel then stated: "I will call him just to make sure and put whatever he tells me on the record." (*Id.*)

134

EXHIBIT 3 Page 147

000727

At no time did counsel ask to poll the jury, interview the individual jurors, remove the individual jurors, or for a mistrial. Nor did counsel ask for a brief continuance in order to speak with Casaretto before continuing the trial. Nor did the Court independently interview the two jurors identified by Casaretto to determine whether the conversation was a more serious case of juror misconduct. Instead, the Court simply re-issued the usual warning to the entire jury at the beginning of that morning's presentation that the jury was not to speak amongst themselves or to anyone else about the evidence or any other matter relating to the case. (24 RR at 6-7.)

Trial counsel ultimately failed to do the one thing they said they would— contact Casaretto directly. After leaving the court that day, Casaretto was not contacted again by the Court, the State, or defense counsel. (Ex. 36 at ¶¶6, 10 [Aff. of Michael Casaretto].) Had counsel spoken with him, they would have learned that, contrary to the innocuous conversation the Court understood had occurred, Casaretto believed the jurors' conversation was serious misconduct. (*Id.* at ¶7.)

When Casaretto encountered the jurors coming to court that day, they were already in conversation, so Casaretto could not have known how long they had been speaking. But he could hear them clearly and it was evident they were discussing the case for which they were jurors. Though he did not know the case, and thus did not understand what exactly the jurors were talking about, it was unmistakably about the merits of the case. They were speaking about evidence they had heard, including how they felt about it. (Ex. 36 at ¶¶2-3 [Aff. of Casaretto].)

While the Court's recounting of how Casaretto came to the Court to inform it of the jurors' conduct was mostly accurate, the way the Court explained it left the impression on the record that Casaretto was not particularly concerned about

135

EXHIBIT 3 Page 148

000728

the conversation but was simply exercising all due diligence. Had counsel spoken with Casaretto directly as they said they would, rather than relying on the Court's recounting, they would have learned the opposite was true. Casaretto would have stated that he was "immediately troubled by the possibility that two jurors were discussing an ongoing case publicly and outside the presence of the other jurors." (Ex. 36 at ¶4 [Aff. of Casaretto].)  Indeed, he had told the Court that, as an officer of the court, he felt it necessary to report conduct that appeared to reach the level of juror misconduct. (*Id.* at ¶5.)

Before this occurrence, Casaretto had never before had to report juror misconduct, nor has he since—highlighting the significance of his actions in this case and how blatant he must have considered the misconduct. (Ex. 36 at ¶7 [Aff. of Casaretto].)   Indeed, when interviewed in post-conviction, Casaretto was shocked to learn that these were jurors serving on a capital trial, that there was no motion for a mistrial by the defense, and that the judge did not remove the jurors. (*Id.* at ¶8.)

## B. Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Interview Casaretto or Take Other Action

Trial counsel has a duty to object to trial errors. *See ABA Guidelines*, Guideline 10.8, cmt.; *ABA Standards*, Standard 4-7.1(d).  Moreover, trial counsel has a duty to "protect[] the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited." *ABA Guidelines*, Guideline 10.8(A)(3)(c).

It is well understood that jurors are prohibited from discussing the facts of a case or their opinions outside of deliberations. *Ocon*, 284 S.W.3d at 884; *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 371 (Tex. 2000) ("None of the rules contemplate that the jury may begin deliberating during a trial break.  On the contrary, the approved jury instructions direct courts to admonish the jury against

136

EXHIBIT 3 Page 149
000729

informal discussions of the case."). Such conversations are especially concerning because "where a sitting juror makes statements outside of deliberations that indicate bias or partiality, such bias can constitute jury misconduct that prohibits the accused from receiving a fair and impartial trial." *Granados v. State*, 85 S.W.3d 217, 235 (Tex. Crim. App. 2002). Should such conversations occur, the trial court is authorized to make an inquiry of the juror as to his or her intent or bias and to grant a motion for mistrial based on the allegations of misconduct. *Id.* at 236.

In the present case, trial counsel acted unreasonably and failed to meet prevailing standards for capital counsel by failing to either interview Casaretto or take other action when they learned that two jurors had been speaking about the case outside of deliberations. Professional standards required that capital counsel at a minimum interview a fellow attorney held out to them as available—they were even given Casaretto's phone number—and who they were told observed possible juror misconduct. *See Texas Guidelines*, Guideline 11.2 (A)(2) (requiring counsel to "thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted"). Counsel seemed to know this was required on their part when they indicated to the Court they would contact Casaretto, but they then failed to do so.

Had counsel interviewed Casaretto, they would have learned how serious Casaretto (as the direct observer of the conversation) felt the jurors' misconduct was. At that point, they could have requested a mistrial or other remedial action to protect their client's rights to a fair and impartial verdict. Even with just the information learned from the Court's description of its conversation with Casaretto, counsel could have requested a mistrial or to remove the two jurors. At a minimum, counsel should have requested the Court interview the two jurors in question to determine if more action was necessary. *See Ocon*, 284 S.w.3d at 886

EXHIBIT 3 Page 150

000730

(noting that it is incumbent upon the party alleging juror misconduct to request an inquiry of the jury).

Cruz-Garcia's right to a fair trial was prejudiced by counsel's deficient performance in multiple ways. First, Cruz-Garcia lost the opportunity to complain of error related to the two jurors' conversation and the impact that had on their verdict. *See Ocon*, 284 S.W.3d at 885 ("Though requesting lesser remedies is not a prerequisite to a motion for mistrial, when the movant does not first request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured by the less drastic alternative."). Second, Cruz-Garcia lost the opportunity to investigate whether jurors were impacted by that discussion or other discussions outside of deliberations. In the conversation as noted by the Court, the younger of the two jurors thanked the older of the two for providing "words of encouragement" the day before. (24 RR at 4.) No investigation occurred into whether the referenced conversation the day before happened in or out of deliberations, or how it impacted the jurors.

Finally, the overall failure to investigate this issue prevented counsel from evaluating the incident as part of a broader issue of jury misconduct in this case. In the motion for new trial, Cruz-Garcia identified misconduct on the part of the jury foreman for improperly reading Bible passages to influence jury deliberations. (3 CR at 549, 555.) In post-conviction, Cruz-Garcia has learned that jurors impermissibly discussed deliberations with an alternate juror outside the deliberation room. (*See* Claim Nine, *post.*)

When viewed alongside these other incidents of jury misconduct, the conversation between jurors outside of deliberations observed by Casaretto takes on even more significance. With reasonable investigation, counsel might have developed the pattern of juror misconduct and brought it to the Court's attention,

138

EXHIBIT 3 Page 151

000731

requiring a mistrial.[22]  Instead, counsel failed to investigate the jurors' discussion of the case outside of deliberations and object to the potential negative impact to Cruz-Garcia's right to a fair trial.  Because of this ineffective assistance of counsel, Cruz-Garcia's conviction and sentence should be reversed.

## CLAIM NINE

### JURORS IN CRUZ-GARCIA'S TRIAL COMMITTED MISCONDUCT THAT VIOLATED CRUZ-GARCIA'S RIGHT TO A FAIR TRIAL

Jurors in Cruz-Garcia's trial committed serious misconduct that violated Cruz-Garcia's right to a fair trial.  Specifically, the jury foreman read Bible passages commanding the death penalty for murderers during the punishment phase deliberations, and he and another juror indicated that his reading of scripture made the difference in changing another juror's vote from life to death.  Moreover, jurors violated the trial court's instructions by discussing the case outside of deliberations on multiple occasions.  These incidents of misconduct impacted the jurors' deliberations and, thereby, prejudiced Cruz-Garcia.  Due to the jurors' misconduct, Cruz-Garcia's conviction and death sentence were unlawfully and unconstitutionally imposed in violation of his applicable state and federal

---

[22] In the present case, full and fair litigation of the foregoing errors must necessarily include testimony from trial counsel regarding their failure to contact Casaretto.  Thus, it is more appropriate that this claim of ineffective assistance be raised on habeas proceedings rather than on direct appeal.  *Ex parte Torres*, 943 S.W.2d at 475.  However, direct appeal counsel was, or should have been, aware of the record of the failure of counsel to request a mistrial or other remedial action by the Court after having been informed of Casaretto's report to the Court.  (*See* 24 RR at 3-6.)  Should it be determined that appellate counsel caused this error to be waived by failing to raise the issue on direct appeal, that failure constitutes deficient performance that prejudiced Cruz-Garcia's rights.  *Ex parte Santana*, 227 S.W.3d at 704-05 (*Strickland* standard controls ineffective assistance of appellate counsel claims).  This ineffective assistance warrants a new direct appeal process.

139

EXHIBIT 3 Page 152

000732

Constitutional rights, state statutory law, and United States Supreme Court and state case law. Therefore, his conviction and sentence must be vacated.

### A. Scripture Reading During Punishment-Phase Deliberations

On the afternoon of Friday, July 19, 2013, the jury returned a verdict of death. (3 CR at 523-27.) Later that evening, Juror Bowman contacted trial counsel Mr. Madrid and informed him, among other things, that the jury foreman had quoted from the Bible during the punishment-phase deliberations and that the reading of scripture had appeared to sway other jurors in favor of a death verdict. (*Id.* at 541.) Juror Bowman repeated this information in an interview with defense investigator J.J. Gradoni and also attested to these facts in an affidavit provided to appellate counsel and submitted in support of a Motion for New Trial. (*Id.* at 553-56.)

Mr. Gradoni and defense investigator Cindy Klein conducted a recorded interview of the foreman, Juror Clinger. In that interview, Juror Clinger stated that he brought out his Bible during punishment-phase deliberations on Friday morning. (3 CR at 633.) Juror Clinger stated that he read from Romans 13, Genesis 9, and "a lot of places in Deuteronomy." (*Id.* at 634.) Juror Clinger stated that he read these passages as the jurors were finishing up their deliberation on the first special issue. (*Id.* at 635.) Juror Clinger explained that another juror who went to his church, Juror Guillote, had been struggling in deliberations and that after he read from the Bible, Juror Guillote was able to answer the first special issue and move on to the second. (*Id.* at 633, 635.) Juror Clinger stated that his reading of scripture "made a difference with [Juror Guillote]." (*Id.* at 636.)

Romans 13 reads:

Let everyone be subject to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God. Consequently, whoever rebels against the authority is rebelling against what God has instituted, and

140

EXHIBIT 3 Page 153

000733

those who do so will bring judgment on themselves. For rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear of the one in authority? Then do what is right and you will be commended. For the one in authority is God's servant for your good. But if you do wrong, be afraid, for rulers do not bear the sword for no reason. They are God's servants, agents of wrath to bring punishment on the wrongdoer. Therefore, it is necessary to submit to the authorities, not only because of possible punishment but also as a matter of conscience.

This is also why you pay taxes, for the authorities are God's servants, who give their full time to governing. Give to everyone what you owe them: If you owe taxes, pay taxes; if revenue, then revenue; if respect, then respect; if honor, then honor.

Let no debt remain outstanding, except the continuing debt to love one another, for whoever loves others has fulfilled the law. The commandments, "You shall not commit adultery," "You shall not murder," "You shall not steal," "You shall not covet," and whatever other command there may be, are summed up in this one command: "Love your neighbor as yourself." Love does no harm to a neighbor. Therefore love is the fulfillment of the law.

And do this, understanding the present time: The hour has already come for you to wake up from your slumber, because our salvation is nearer now than when we first believed. The night is nearly over; the day is almost here. So let us put aside the deeds of darkness and put on the armor of light. Let us behave decently, as in the daytime, not in carousing and drunkenness, not in sexual immorality and debauchery, not in dissension and jealousy. Rather, clothe yourselves with the Lord Jesus Christ, and do not think about how to gratify the desires of the flesh.

*Romans* 13 (New International Version).

Genesis 9 reads:

Then God blessed Noah and his sons, saying to them, "Be fruitful and increase in number and fill the earth. The fear and dread of you will fall on all the beasts of the earth, and on all the birds in the sky, on every creature that moves along the ground, and on all the fish in the sea; they are given into your hands. Everything that lives and moves

141

EXHIBIT 3 Page 154

000734

about will be food for you. Just as I gave you the green plants, I now give you everything.

"But you must not eat meat that has its lifeblood still in it. And for your lifeblood I will surely demand an accounting. I will demand an accounting from every animal. And from each human being, too, I will demand an accounting for the life of another human being.

> "Whoever sheds human blood,
>      by humans shall their blood be shed;
>  for in the image of God
>      has God made mankind.

As for you, be fruitful and increase in number; multiply on the earth and increase upon it."

Then God said to Noah and to his sons with him: "I now establish my covenant with you and with your descendants after you and with every living creature that was with you—the birds, the livestock and all the wild animals, all those that came out of the ark with you— every living creature on earth. I establish my covenant with you: Never again will all life be destroyed by the waters of a flood; never again will there be a flood to destroy the earth."

And God said, "This is the sign of the covenant I am making between me and you and every living creature with you, a covenant for all generations to come: I have set my rainbow in the clouds, and it will be the sign of the covenant between me and the earth. Whenever I bring clouds over the earth and the rainbow appears in the clouds, I will remember my covenant between me and you and all living creatures of every kind. Never again will the waters become a flood to destroy all life. Whenever the rainbow appears in the clouds, I will see it and remember the everlasting covenant between God and all living creatures of every kind on the earth."

So God said to Noah, "This is the sign of the covenant I have established between me and all life on the earth."

The sons of Noah who came out of the ark were Shem, Ham and Japheth. (Ham was the father of Canaan.) These were the three sons of Noah, and from them came the people who were scattered over the whole earth.

EXHIBIT 3 Page 155

000735

Noah, a man of the soil, proceeded to plant a vineyard. When he drank some of its wine, he became drunk and lay uncovered inside his tent. Ham, the father of Canaan, saw his father naked and told his two brothers outside. But Shem and Japheth took a garment and laid it across their shoulders; then they walked in backward and covered their father's naked body. Their faces were turned the other way so that they would not see their father naked.

When Noah awoke from his wine and found out what his youngest son had done to him, he said,

"Cursed be Canaan!
    The lowest of slaves
    will he be to his brothers."

He also said,

"Praise be to the LORD, the God of Shem!
    May Canaan be the slave of Shem.
    May God extend Japheth's territory;
    may Japheth live in the tents of Shem,
    and may Canaan be the slave of Japheth."

After the flood Noah lived 350 years. Noah lived a total of 950 years, and then he died.

*Genesis* 9 (New International Version) (emphasis added).

Juror Clinger agreed to sign an affidavit memorializing his statements to the defense investigators. (3 CR at 612.) However, when Mr. Gradoni attempted to arrange to have Juror Clinger sign the affidavit, Juror Clinger informed him that his corporate counsel at work had advised him not to sign the affidavit and to instead give live testimony before the court. (*Id.*) After refusing to sign an affidavit for the defense for this stated reason, Juror Clinger instead signed an affidavit for the State that was submitted in support of the State's Reply to Defendant's Motion for New Trial. (*Id.* at 599-601.)

The affidavit Juror Clinger provided to the State directly contradicts his statements made to the defense investigators. (*Compare* 3 CR at 635 ("JJ: So did

143

EXHIBIT 3 Page 156

000736

you read from the Bible or did you quote it from memory?  MC: No, I read.  JJ: Read it from the Bible.  MC: Yeah….After I read that…she was able to move on from the first question.") with *id.* at 600 ("At no point did I read directly from the Bible.") and *id.* at 635-36 ("JJ: So, after you read that was [Juror Guillote] able to say Death?  MC: Uh, after I read that she was able to move, that was, we were finishing up talking about the first question and she was able to move on from the first question.  Uh, we still talked about a lot more stuff throughout the course of the day, but she was able to move on…  JJ: No, no, that helped her move on to question number two.  MC: Correct….CK: And the people were listening, I guess, when you were saying this, and did it help them understand?  You think it made a difference to them?  MC: It made a difference with [Juror Guillote].  I don't know if it made a difference with anyone else.") with *id.* at 600 ("I do not believe [Juror Guillote] or any other juror changed their answers to the Special Issues based on this brief exchange.").)  Given Juror Clinger's about-face in his description of these events between his candid conversation with the defense investigators and his providing an affidavit to the State, and the fact that his explanation for not signing an affidavit for the defense is belied by his signing an affidavit for the State, the statements in his affidavit that he did not read from the Bible and that the discussion of scripture did not impact Juror Guillote's verdict are not credible.

Juror Guillote also provided an affidavit to the State in support of its Reply to Defendant's Motion for New Trial.  Juror Guillote's affidavit also contradicted both Juror Clinger's statements made to the defense investigators and the affidavit he provided to the State.  Juror Guillote stated that Juror Clinger opened his Bible "[a]fter we had come to a unanimous decision on all three special issue questions and before the jury foreman, [] Clinger, signed the verdict form."  (3 CR at 597.)  Conversely, Juror Clinger told investigators that after he read from the Bible, "we still talked about a lot more stuff throughout the course of the day."  (*Id.* at 635.)

144

EXHIBIT 3 Page 157

: ZC000737

Likewise, his affidavit stated that after this exchange took place, "we went back to discussing the facts of the case and deliberating the answers to the Special Issues presented to us." (*Id.* at 600.) Juror Clinger stated in his affidavit that this exchange took place "[a]t one point during the discussion Friday morning"; likewise, he told the investigator that he brought out his Bible "about 10:00 AM Friday morning." (*Id.* at 599, 633.) The jury's verdict form was not signed and filed with the clerk until 4:30 p.m. on Friday, July 19, 2013. (*Id.* at 523-27.) Juror Guillote's claim that the discussion of the Bible verses took place "[a]fter we had come to a unanimous decision on all three special issue questions" is, therefore, not credible. (*Id.* at 597.)

### 1. Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Constitutes an Improper Outside Influence

Jurors must only "use the law, the evidence, and the trial court's mandates as [their] ultimate guides in arriving at decisions as to guilt or innocence and as to punishment." *McQuarrie v. State*, 380 S.W.3d 145, 153 (Tex. Crim. App. 2012) (quoting *Granados*, 85 S.W.3d at 235). "The Sixth Amendment right to a trial by jury . . . implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* (quoting *Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998)) (internal quotations omitted). Texas courts have found improper outside influence where jurors have brought outside-the-record information to bear on their deliberations. *See, e.g., id.* at 154 (holding that a juror's internet research of the effects of date rape drugs constituted an outside influence); *Ryser v. State*, 453 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2014) (holding that a juror's consultation of a dictionary to obtain definitions of a word contained in the jury instructions constituted an

145

EXHIBIT 3 Page 158

000798

outside influence). Before the jurors retired to deliberate at the punishment phase, the trial court instructed them:

> During your deliberations upon the Special Issues, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence. . . . You are the exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

(26 RR at 101.) Juror Clinger's reading of scripture constituted an improper outside influence, as it violated the trial court's charge to not consider, discuss, nor relate matters not in evidence and to be bound only by the law of the court.

### 2. Juror Clinger's Reading of Scripture During Punishment-Phase Deliberations Prejudiced Cruz-Garcia

In *Lucero v. State*, the court declined to decide whether the jury foreman's Bible reading constituted an "outside influence" because it found that the Bible reading did not affect the jury's verdict. 246 S.W.3d 86, 95 (Tex. Crim. App. 2008). The jury foreman in that case read only from *Romans* 13. *Id.* at n.4. The court found this passage of Biblical scripture to be "essentially an admonishment to follow man's law." *Id.* at 95. In finding that the scripture reading was harmless, the court relied on an affidavit provided by one of the jurors stating that "[t]here was no passage read suggesting that a murderer should be executed under Biblical law. There was no Bible passage read about the principal of a limb for a limb or an eye for an eye or tooth for a tooth." *Id.* at 93. Conversely, in this case, just such a passage was read: "Whoever sheds human blood, by humans shall their blood be shed." (3 CR at 634; *Genesis* 9:6.)

In finding the Biblical scripture reading harmless, the *Lucero* court also relied on the fact that the reading occurred near the beginning of jury deliberations.

146

EXHIBIT 3 Page 159

000739

246 S.W.3d at 95. Conversely, in this case, the scripture reading occurred not at the outset of deliberations but on the second day of deliberations, after the jury had been sequestered overnight and, specifically, while the jurors "were finishing up talking about the first question." (3 CR at 522, 599, 633.)

Finally, in finding the Biblical scripture reading harmless, the *Lucero* court relied on the fact that affidavits submitted by the jurors in the case indicated that the scripture had no effect on the jury's verdict. 246 S.W.3d at 95. In this case, the opposite is true. Juror Clinger told the defense investigator that after he read from the Bible, Juror Guillote "was able to move on from the first question" to answer special issue number two and that the scripture reading "made a difference with [Juror Guillote]." (3 CR at 635-36.)

Courts throughout the country have found prejudice where jurors have consulted Biblical scripture during deliberations. *See, e.g., Jones v. Kemp*, 706 F.Supp. 1534, 1559-60 (N.D. Ga. 1989) (reversing death sentence where jurors brought Bible into deliberations); *Ex Parte Troha*, 462 So.2d 953, 954 (Ala. 1984) (reversing rape conviction where juror consulted with his minister brother for scripture references during deliberations); *People v. Harlan*, 109 P.3d 616, 622, 634 (Colo. 2005) (vacating death sentence where jurors researched Bible verses, brought a Bible into the jury room during deliberations, and shared a verse stating that "whoever kills a man shall be put to death"); *State v. Harrington*, 627 S.W.2d 345 (Tenn. 1981), *cert. denied*, 457 U.S. 1110 (1982) (new sentencing hearing required where jury foreman read Biblical passages during punishment-phase deliberations). In this case, the jury foreman read from a passage of scripture that commands the death penalty for murderers and candidly told the defense investigators that his reading of scripture made a difference to another juror in her deliberation of the special issues. It is thus clear that Juror Clinger's reading of scripture prejudiced Cruz-Garcia, and the proper remedy is a new punishment trial.

147

EXHIBIT 3 Page 160

000740

## B. Jurors Committed Misconduct by Discussing the Case Outside of Deliberations

Jurors at Cruz-Garcia's trial were instructed on the first day of trial that they were not to discuss amongst themselves or with anyone else any subject connected with the trial or to form or express any opinion about the trial until the end of trial. (18 RR at 96.) Jurors were reminded of this instruction throughout the course of the trial, before retiring to deliberate at each phase, and before being sequestered overnight at the punishment phase. (18 RR at 146-47, 194; 19 RR at 206; 20 RR at 187; 21 RR at 176-77; 22 RR at 14; 23 RR at 28, 105; 24 RR at 6-7; 25 RR at 86 202; 26 RR at 101, 177.) Jurors violated these instructions by discussing the case outside of deliberations on multiple occasions.

On the morning of the first day of the punishment phase, Michael Casaretto, a defense attorney not connected to Cruz-Garcia's case, overheard two members of Cruz-Garcia's jury discussing the case in the elevator lobby of the Harris County District Courthouse.[23] (Ex. 36 at ¶¶2-3 [Aff. of Casaretto]; 24 RR at 3-4.) Although Casaretto was not familiar with the facts of Cruz-Garcia's case, it was apparent to him that the jurors were discussing the case itself and their thoughts about the evidence. (*Id.*) Casaretto approached the trial court that same morning to report the incident. (24 RR at 3.) Casaretto was deeply troubled by what he perceived to be an obvious violation of the jurors' obligations during trial and blatant misconduct. (Ex. 36 at ¶4 [Aff. of Casaretto].)

Following this incident, the trial court again admonished the jurors not to discuss anything about the trial amongst themselves or with anyone else prior to deliberations. (24 RR at 6-7.) Yet jurors continued to discuss the case outside of deliberations. (Ex. 13 at ¶4 [Aff. of Juror Alexander].) According to Juror Alexander, an alternate juror in Cruz-Garcia's case, they "would talk as a jury

---

[23] For a more extended discussion of this incident, *see* Claim 8, *ante.*

148

EXHIBIT 3 Page 161

000741

about the case and what was going on, some during the trial and some after the trial was over. We would talk during breaks, when we were in the jury room waiting."

(*Id.*) Juror Alexander

> learn[ed] from the other jurors that one of the jurors in particular was having a hard time voting for the death penalty. That was one of the things we talked about during the trial when we were together. The rest of the jurors had to work really hard to convince her. I remember her struggle was something that the jurors talked about during the trial because we knew the decision had to be unanimous.

(Id. at ¶5.) Because Juror Alexander was an alternate and did not participate in deliberations, she could only have known the details of those deliberations as they were going on through discussions with the other jurors outside of deliberations.

## 1. Jurors' Conversations with an Unauthorized Person Raise a Presumption of Prejudice to Cruz-Garcia

The seated jurors' conversations with an alternate juror about the case and about the deliberative process violate Article 36.22 of the Texas Code of Criminal Procedure, which states, "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." When a juror communicates with an unauthorized person about the case at trial, there is a presumption of injury to the defendant. *Ocon*, 284 S.W.3d at 884; *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997). Juror Alexander, as an alternate, was an unauthorized person and was not permitted to participate in deliberations. Because seated jurors discussed the case and their deliberations with Juror Alexander during trial, prejudice to Cruz-Garcia is presumed. Moreover, in this case, the jurors' discussion of their deliberations outside the deliberation room was particularly prejudicial. Juror Bowman discussed both with the trial court and in the affidavit she supplied to appellate counsel post-trial the fact that she was the lone holdout juror for a life verdict and felt pressured to agree with the other jurors. (27 RR at 5-6; 3 CR at 555-56.) Discussion of Juror Bowman's status as a holdout

149

EXHIBIT 3 Page 162
000742

juror with persons outside the seated jury during the deliberation process would only have added to the pressure she faced as a holdout. Thus, the State cannot overcome the presumption that Cruz-Garcia was prejudiced by the jurors' discussion of the case with an unauthorized person.

## C. Conclusion

Misconduct committed by jurors in Cruz-Garcia's case, individually and cumulatively, violated his right to a fair trial. Juror Clinger's reading of scripture during the punishment-phase deliberations constituted an improper outside influence and impacted the verdict of at least one of the other jurors. The jurors' discussion of the case and of deliberations with an alternate juror outside of deliberations violated the Court's repeated instructions and Texas law and raises a presumption of prejudice. Because Cruz-Garcia was prejudiced by multiple instances of juror misconduct, he must be granted a new trial.

## CLAIM TEN

## TRIAL COUNSEL'S CUMULATIVE DEFICIENT PERFORMANCE OVER THE COURSE OF TRIAL PREJUDICED CRUZ-GARCIA

Instances of ineffective assistance of counsel should not only be individually analyzed under *Strickland*, but also evaluated cumulatively with other instances where counsel's performance was deficient and prejudiced the defendant's case. *See United States v. Cervantes*, 706 F.3d 603, 619 (5th Cir. 2013) ("The cumulative error doctrine provides for reversal when an aggregation of non-reversible errors, *i.e.*, plain and harmless errors that do not individually warrant reversal, cumulatively deny a defendant's constitutional right to a fair trial."); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby"); *Ex parte Welborn*, 785 S.W.2d 391, 396 (Tex. Crim. App. 1990) (en banc) ("Although, no one instance in

150

EXHIBIT 3 Page 163　000743

the present case standing alone is sufficient proof of ineffective assistance of counsel, counsel's performance taken as a whole does compel such a holding.").

As noted in the preceding claims, trial counsel performed deficiently in investigating and presenting evidence at both the pre-trial and the guilt/innocence phases of trial, as well as failing to sufficiently investigate and present vital evidence to support a sentence of life in prison for Cruz-Garcia during the punishment phase. Each instance of deficient performance individually prejudiced Cruz-Garcia at trial. Moreover, when viewed collectively, these errors create a cumulative effect that deprived Cruz-Garcia of a constitutionally sound trial. *See Strickland*, 466 U.S. at 686. The cumulative prejudice of counsel's deficiencies during pre-trial proceedings, the guilt/innocence phase, and the punishment phase of Cruz-Garcia's trial violated Cruz-Garcia's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Considering these instances of deficient performance in conjunction, there is a reasonable probability that taken as a whole they affected the outcome of Cruz-Garcia's trial. *See Strickland*, 466 U.S. at 686. Thus, even if the court were to determine that Cruz-Garcia was not prejudiced by any of these failures individually, their combined effect requires a new trial. Accordingly, Cruz-Garcia's conviction and sentence must be reversed.

## CLAIM ELEVEN

### CRUZ-GARCIA'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

151

EXHIBIT 3 Page 164

000744

less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original). The *Lockett* Court's decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605. Texas's statute governing capital trials gives rise to this risk by expressly limiting the evidence that a jury may consider mitigating, in violation of the Eighth and Fourteenth Amendments. Cruz-Garcia's sentence therefore violates his applicable rights under the Texas and United States Constitutions, as well as state statutory law and United States Supreme Court case law and state case law. Accordingly, Cruz-Garcia's sentence should be vacated.

## A. The Texas Statute and Cruz-Garcia's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. With respect to the mitigating circumstances special issue, the court must instruct the jury that, if it answers that a circumstance warrants a sentence of life imprisonment rather than a sentence of death, the defendant will receive a life sentence. TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(2)(A)-(B). Furthermore, the court must instruct the jury to answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree, and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3). In addition to these procedural instructions, Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). No definition of

152

EXHIBIT 3 Page 165

000745

"moral blameworthiness" is provided, nor are additional instructions given as to the relationship between this instruction and the demands of the special issue itself.

As directed by the statute, the trial court in Cruz-Garcia's case gave the statutorily required instructions during the punishment phase of trial and before the jury retired to deliberate. (*See* 3 CR at 513.) In particular, the Court's charge included the following:

> In deliberating on Special Issue No. 3 you shall consider all the evidence admitted at the trial, including but not limited to evidence of the defendant's background, character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."

(*Id.* at 516-517.) In addition, tracking Article 37.071, the charge immediately instructed further: "You shall consider mitigating evidence to be evidence that you might regard as reducing *as reducing the Defendant's moral blameworthiness*." (*Id.* (emphasis added).) The State then emphasized this definition in closing argument at punishment, stating:

> Mr. Cornelius -- I'm sorry I have to differ with him -- is incorrect when he says mitigation is not defined. It says right here in the charge: Mitigation is anything that removes -- I'm sorry -- the moral blameworthiness of the defendant. Removes or alleviates his moral blameworthiness. For what? For murdering Angelo Garcia. That's what mitigation is. And I'm not just making it up. It's in your charge.

(26 RR at 169-170.)

### B. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence

The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful,

EXHIBIT 3 Page 166

000746

mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of that mitigating evidence which the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating. As the Court said in *Tennard v. Dretke*: "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 542 U.S. at 285 (internal quotations omitted); *see also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," *viz.*, that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"). For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett*, 438 U.S. at 604). Importantly, the *Skipper* Court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4. Even still, it could "hardly be disputed" that the evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4; *see also Abdul-Kabir*, 550 U.S. at

154

EXHIBIT 3 Page 167

000747

259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence.").

At the punishment phase, Cruz-Garcia presented evidence that, while mitigating in nature, could have yet been considered by the jury to bear no relationship to his legal or moral blameworthiness for the capital crime. For example, evidence that Cruz-Garcia was a loving brother, husband, and father, who had done charitable works while living in the Dominican Republic, could reasonably have been discounted by the jury as not having any relationship to his culpability for the crime. This evidence, though unrelated to Cruz-Garcia's blameworthiness, bolstered the argument that Cruz-Garcia nevertheless was a worthwhile person, undeserving of a death sentence. Such evidence is meaningful for jurors when deciding whether to impose a sentence of death. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) (*Penry I*) ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence by calling upon jurors to "consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). In Cruz-Garcia's case, this error was made even more prejudicial by the prosecution's reliance on the truncated definition of mitigation evidence in their closing argument. (26 RR at 171 ("Happy birthday pictures do not take away his moral blameworthiness for killing Angelo Garcia, do they?").)

155

EXHIBIT 3 Page 168

Texas's instruction precluded jurors from considering mitigating evidence unrelated to Cruz-Garcia's "moral blameworthiness," a limitation wholly at odds with three decades of Supreme Court precedent. Were any of Cruz-Garcia's jurors to credit such evidence—that is, evidence they found to warrant a life sentence but that did not reduce Cruz-Garcia's moral blameworthiness for the crime—that juror necessarily and untenably would violate the Court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001) (*Penry II*). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Cruz-Garcia's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

## C. Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. At Cruz-Garcia's trial, the jury was prohibited from giving effect—meaningful or otherwise—to mitigating evidence falling outside the boundaries specified in their instructions, and this prohibition thereby unconstitutionally limited the jury's ability to give their "reasoned moral response." *See also Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

Although the Supreme Court has upheld Texas's capital punishment statute, it did so "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry I*, 492 U.S. at 318. Since then, the Court has repeatedly expressed its concerns "regarding the extent to

156

EXHIBIT 3 Page 169

000749

which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007). In this case, application of the Texas capital punishment statute impaired Cruz-Garcia's right to have *all* mitigating evidence considered by the jurors as they assessed whether he deserved a life or death sentence. *Penry I*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced."). Therefore, Cruz-Garcia's death sentence should be reversed.

## CLAIM TWELVE

### CRUZ-GARCIA'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society [hereinafter "first special issue"]; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased [hereinafter "party complicity special issue"]; (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole [hereinafter "mitigating circumstances special issue"]. TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1)-(2), (e)(1).

The court must sentence a defendant to death if the jury unanimously answers "Yes" to the first two special issues and "No" to the third special issue. Furthermore, the jury must be instructed as to these unanimity requirements. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2), (f)(2). By contrast, if the jury answers

157

EXHIBIT 3 Page 170

000750

"No" to either of the first two special issues or a "Yes" to the third special issue, then the court must sentence the defendant to life imprisonment. TEX. CODE CRIM. PROC. art. 37.071, § 2(g). These answers need not be unanimous; instead, the jury may find *against* the first special issue or party complicity or *in favor of* mitigating circumstances so long as ten or more jurors agree. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2), (f)(2). This contrast is generally known as the 10-12 Rule.

In addition to these circumstances, the court also must sentence the defendant to life imprisonment without parole if the jury is unable to answer any of the special issues consistent with these guidelines. TEX. CODE CRIM. PROC. art. 37.071, § 2(g). Under Texas law, however, the jury cannot be informed of the consequences should it fail to answer a special issue: "The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues." TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1). Jurors thus remain free to speculate—or to be persuaded to make assumptions by their peers equally ignorant as to the law's requirements—that a failure to answer a special issue will produce a mistrial. As Texas's capital sentencing scheme misinforms the jury by bringing outside, impermissible considerations to bear on the verdict, Texas's statute deprived Cruz-Garcia of his constitutional rights under the principles of the Eighth and Fourteenth Amendments, the tenets of the federal and state Constitutions, and the holdings of applicable state and federal case law.[24]

---

[24] The defense filed a pretrial motion objecting to the statutory scheme of the 10-12 Rule. (1 CR at 43.) The Court denied the defense's motion and all objections were overruled. (4 RR at 19.) Appellate counsel appealed the trial court's error in denying the defense motion. (*See* Appellate Opening Brief, Issue No. 47, at 131.) This claim is therefore raised here in order to further preserve review of this constitutional error at Cruz-Garcia's trial.

158

EXHIBIT 3 Page 171
000751

## A. The Supreme Court Has Invalidated Jury Instructions That Place an Undue Burden on the Sentencer Before Finding Mitigating Circumstances

Two Supreme Court cases—*Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990)—stand for the proposition that a capital sentencing scheme cannot unduly burden a sentencer before he finds the presence of a mitigating circumstance.

In *Mills*, the Court considered a capital sentencing scheme that required jurors to unanimously agree on mitigating factors. The Maryland scheme consisted of a verdict form in three sections: In Section I, the jury was asked whether it found unanimously one or more aggravating factors (out of ten aggravating factors listed), *Mills*, 486 U.S. at 385-86; in Section II, the jury was asked whether it found unanimously one or more mitigating factors, *id.* at 386-88; in Section III, the jury was asked to balance the aggravating factor(s) it found against the mitigating factor(s) it found, *id.* at 388-89. To proceed to Section II, the jury had to find unanimously one or more aggravating factors; if not, a life sentence would result. *Id.* at 386-88. To proceed to Section III upon completing Section II, the jury had to find unanimously one or more mitigating factors; if not, a death sentence would result. *Id.* at 389. Because a reasonable juror could have interpreted the instruction and accompanying verdict form as requiring unanimous agreement respecting each mitigating circumstance, the *Mills* Court adjudged this scheme unconstitutional. *Id.* at 384 ("Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."). Indeed, the Maryland scheme bore the additional risk that, even if all twelve jurors believed *some* mitigating circumstance

159

EXHIBIT 3 Page 172

000752

existed, the jury would be prevented from giving effect to any such circumstance unless they unanimously agreed on *which* circumstance(s) existed.

In *McKoy*, the Court likewise confronted a sentencing scheme that unduly burdened the jury's ability to reach a life sentence. The North Carolina sentencing scheme—more so than the Maryland one at issue in *Mills*—explicitly required the jury to find unanimously the presence of a mitigating factor. *Id.* at 435. This unanimity "requirement prevent[ed] the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find," violating the Eighth and Fourteenth Amendments "by preventing the sentencer from considering all mitigating evidence." *Id.*

### B. Texas's 10-12 Sentencing Scheme Impairs the Ability of a Majority of Jurors to Reach a Life Sentence

Inconsistent with *Mills* and *McKoy*, Texas's 10-12 Rule permits a minority of a capital jury to impermissibly sway the verdict toward a sentence of death. It is perfectly within the realm of possibility that a majority of Cruz-Garcia's twelve jurors would have, at some point in the penalty phase deliberations, voted for a life sentence, but that a death sentence would have resulted by operation of the 10-12 Rule. Consider the following hypothetical: Jurors 1 through 5 initially would answer "No" to the future dangerousness special issue but, fearing a mistrial, they change their votes to "Yes," while Jurors 6 through 10 initially would answer "Yes" to the mitigating circumstances special issue but, also fearing a mistrial, they change their votes to "No." At each stage of the deliberations, both minorities-of-five are well short of the ten votes needed to reach a life sentence, yet together they constitute ten votes in favor of a life sentence.

One might suppose that jurors would surmise the actual outcome in the event that they fail to agree to an extent necessary to conclude their deliberations—that is, twelve votes for death or ten or more votes for life—but this supposition is

160

EXHIBIT 3 Page 173

ZG000753

belied by ample evidence collected by the Capital Jury Project in its interviews with capital jurors. As summarized in a 2003 article by that Project's principal investigator, 66% of interviewed Texas capital jurors incorrectly thought that they had to be convinced beyond a reasonable doubt on findings of mitigation; 73% incorrectly assumed that any findings on mitigation had to be unanimous; and 68% incorrectly believed that death was required if the defendant was determined to be dangerous in the future—the highest level of misunderstanding among the fourteen jurisdictions surveyed by the Capital Jury Project. William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51, 68, 71, 72-73 (2003). That Cruz-Garcia's jurors would presume a mistrial upon their failure to agree at sentencing is not merely thinkable, it is *probable*. The Texas sentencing scheme, by hiding from the jury the consequences of falling short of ten and twelve votes, gives rise to the very risk which animated the Court in *Mills* and *McKoy*. The 10-12 Rule, then, serves as an impediment to even a majority of jurors who desire a life sentence for the defendant, and it thereby tramples upon the protections of the Eight and Fourteenth Amendments. As the 10-12 Rule is an integral part to Texas's capital sentencing scheme, the scheme itself cannot withstand constitutional scrutiny.

## C. The 10-12 Rule Constitutes an Impermissible Outside Influence on Jury Deliberations

In addition to violating Supreme Court precedent in *Mills* and *McKoy* by giving improper weight to a minority voice among the jurors, Texas's 10-12 Rule functions as an impermissible outside influence which acts upon the jury as they deliberate. The rule misleads jurors as to the result of their failure to reach a statutorily-prescribed agreement and coerces them to favor a death sentence on the basis of considerations independent of a case's merits.

EXHIBIT 3 Page 174

: 000754

A feature of American jurisprudence—one broadly understood by the public—is that when a jury is unable to agree, a mistrial may be declared and a new trial held. *Arizona v. Washington*, 434 U.S. 497, 509 (1978); *Downum v. United States*, 372 U.S. 734, 736 (1963). Because this option is both costly and cumbersome, the law expects that jurors will enter into their deliberations able to be swayed in their opinions. *Allen*, 164 U.S. at 501 . A reasonable juror should feel the weight of the instructions from the trial court and, consistent with their convictions, attempt to avoid an impasse.

In a capital case, the shadow of a mistrial understandably looms larger. Jurors cannot help but be aware of those cases' more involved procedures, improved safeguards, and greater expense. They experience first-hand the care taken by the State and the defense to select from the venire twelve jurors suitable for the high stakes of a capital trial. They are told to expect—and they usually sit through—a long trial with copious amounts of evidence and lengthy testimony from lay and expert witnesses alike. They are led to believe that distinguished and doubtlessly high-priced experts from a wide range of disciplines are not only available to testify but relevant to the trial's outcome.

In this setting a reasonable juror would be reluctant to force a mistrial, especially at that stage of the proceedings when the defendant's culpability already has been unanimously agreed to. But while the guilt/innocence phase of a capital trial tracks the public's understanding of the criminal law—*viz.*, acquittals and convictions must be unanimous—the penalty phase does not. Moreover, after being informed by the court that ten votes are necessary to answer the special issues in a way that favors a life sentence, it would be strange for a juror to conclude that fewer than ten such votes would achieve the very same result.

In Cruz-Garcia's case in particular, this scheme worked to deceive the jurors about the true nature of their deliberations and to influence their ultimate verdict

162

EXHIBIT 3 Page 175

000755

based on something other than a true deliberation on the evidence. The jurors noted the expense and effort that had gone into the trial, and assumed that the absence of a verdict would jeopardize all that work, causing a mistrial. (Ex. 23 at ¶5 [Aff. of Juror Torres] ("I think we all felt strongly that we had invested so much time and effort, and that it was our civic duty to support the process through to the final conclusion. There was, from what it appeared, no expense spared by the court to reach a conclusion."); Ex. 13 at ¶5 [Aff. of Juror Alexander].) The jurors did not know how long deliberations would last, but assumed it could take days or weeks if an agreement was not reached. (Ex. 14 at ¶5 [Aff. of Juror Bowman]; Ex. 22 at ¶3 [Aff. of Juror Sanchez].) For the juror who wished to vote for life without parole rather than death, the instructions created an untenable position where she believed her choice was to agree with the other jurors or to cause a mistrial. (Ex. 14 at ¶¶5, 7 [Aff. of Juror Bowman].) Rather than a debate about the merits of the evidence, in which each juror understood they were allowed to vote their conscience without interfering with the judicial system, Cruz-Garcia's punishment verdict ultimately rested on the jurors' discussion about how long one juror would continue to assert her opinion and the believed negative consequences if she did so. (Ex. 14 at ¶5 [Aff. of Juror Bowman]; Ex. 22 at ¶3 [Aff. of Juror Sanchez]; Ex. 23 at ¶5 [Aff. of Juror Torres].)

Texas's sentencing scheme not only denies jurors information about the effect of their vote but, by omission, invites them to assume that the consequence for failure to reach agreement pursuant to the 10-12 Rule is a costly mistrial, regardless of any one juror's belief that a life sentence is appropriate. For such a juror *not* to labor under this misapprehension demands a counter-intuition both unreasonable and nowhere else presumed in the law. Thus, rather than operate as an incentive to reach a verdict in a capital case, the 10-12 Rule functions as an outside influence against a juror's vote for mercy.

EXHIBIT 3 Page 176

## D. Conclusion

For the reasons stated above, the Texas death penalty scheme violates the principles of the Eighth and Fourteenth Amendments, the tenets of the federal and state Constitutions, and the holdings of applicable state and federal case law. Accordingly, Cruz-Garcia's death sentence was impermissibly imposed and should be vacated.

## CLAIM THIRTEEN

### CRUZ-GARCIA'S DEATH SENTENCE WAS ARBITARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE FIRST SPECIAL ISSUE

Texas employs a unique sentencing scheme which requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). The ABA has long recognized the problems with this first special issue. *See Barefoot v. Estelle*, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting) (citing the ABA amicus brief for the claim that jurors are not well suited to predict the probability of a defendant committing criminal acts of violence in the future). Most recently, the ABA released The Texas Capital Punishment Assessment Report, which called on Texas to "abandon altogether the use of the 'future dangerousness' special issue" as it and other aspects of the Texas sentencing scheme "place limits on a juror's ability to give full consideration to any evidence that might serve as a basis for a sentence less than death." ABA Texas Assessment Report at viii, xxxix ("ABA Texas Assessment Report").

Among the ABA's concerns with the Texas scheme is that the key terms of the first special issue are undefined. *See* ABA Texas Assessment Report at 308. Additionally, the ABA notes that juries must unanimously find a probability that a defendant will commit future acts of violence before reaching the question of

164

EXHIBIT 3 Page 177

000757

mitigation, thus placing the first special issue "at the center of the jury's punishment decision." ABA Texas Assessment Report at 307.

The concerns raised by the ABA are consistent with violations of Cruz-Garcia's Eighth and Fourteenth Amendment rights as articulated in Supreme Court doctrine. The first special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the death penalty, and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death. As such, Cruz-Garcia's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights and United States Supreme Court and state case law, and must therefore be reversed.

### A. The First Special Issue is Unconstitutionally Vague and Fails to Narrow the Class of Death-Eligible Defendants

Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the first special issue. TEX. CODE CRIM. PROC. art. 37.071. As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder case." ABA Texas Assessment Report at viii.

The Supreme Court has long held that juror discretion must be channeled in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). In *Godfrey v. Georgia*, the Court held that a state's aggravating factors must not be defined in such a way that people of ordinary sensibilities could find that nearly every murder

165

EXHIBIT 3 Page 178

000758

met the stated criteria. 446 U.S. 420, 428-29 (1980). In order to avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer." *McCleskey*, 481 U.S. at 303 (internal citations and quotation omitted); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

While the first special issue is not presented to the jury until the punishment phase of trial, it must be found beyond a reasonable doubt before mitigating evidence may be considered. TEX. CODE CRIM. PROC. art. 37.071 § 2(b)–(e). Accordingly, it acts as a *de facto* determinant of death-eligibility and therefore must meaningfully narrow the class of death-eligible defendants.

Texas does not statutorily define the key terms in the first special issue. Rather, the terms are left to be interpreted according to their ordinary meaning. *See Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007). Absent a statutory definition to the contrary, the term "probability" is reasonably understood to mean some "likelihood of the occurrence of any particular form of an event." *Granviel v. State*, 552 S.W.2d 107, 117 n. 6 (Tex. Crim. App. 1976); *see also Jurek v. State*, 522 S.W.2d 934, 945 (Tex. Crim. App. 1975) (Odom, J., dissenting) *aff'd sub nom. Jurek v. Texas*, 428 U.S. 262 (1976) ("The statute does not require a particular degree of probability but only directs that some probability need be found.").

Neither is the degree of violence specified. "Criminal acts of violence" could reasonably range from capital murder all the way down to simple assault. *See* Christopher Slobogin, *Capital Punishment and Dangerousness*, *in* MENTAL

166

EXHIBIT 3 Page 179

000759

DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119, 121, 125 (Robert F. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and "criminal acts of violence"). Essentially, the jury charged with determining Cruz-Garcia's fate was asked to determine whether there is any likelihood that Cruz-Garcia might commit *any* act of violence in the future that poses a continuing threat to society. Professionals, however, are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person that was just convicted of a violent crime. *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845, 849 (1989-1990) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional. That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another."). Even when predictions are based on actuarial data, which are now considered to be slightly more accurate than clinical determinations, a defendant's risk of committing future acts of criminal violence is phrased in terms of non-zero probabilities. *See, e.g.*, Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012, at 272 ("[Mental Health Professionals] are encouraged to communicate level of risk using categorical levels of low, moderate, and high.").

The fact that every person has a non-zero probability of committing future acts of violence shows that the first special issue fails to narrow the class of death-eligible defendants. Moreover, the fact that any capital defendant is found *not* to be a future danger is evidence that the determination is based on caprice rather than reason. In Cruz-Garcia's case, the fact that this dubious determination had to be made beyond a reasonable doubt before the jury was presented with the mitigation special issue limited the jury's ability to give full consideration to evidence that

167

EXHIBIT 3 Page 180

: 000760

might serve as a basis for a sentence less than death. *See Tennard*, 542 U.S. at 278 ("It is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing the sentence.").

As a result, Cruz-Garcia's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, and therefore must be reversed.

## CLAIM FOURTEEN

### CRUZ-GARCIA'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS'S ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY

As actors within Texas's criminal justice system, prosecutors exercise considerable discretion. Partly as a consequence of this discretion, a small minority of Texas's counties are responsible for an overwhelming majority of the death sentences that have been assessed in the past thirty-nine years. In addition to this geographic disparity—a disparity that cannot be explained merely by reference to county populations—Texas's system of administering the death penalty also reflects disparities based on race and ethnicity, particularly in Harris County where Cruz-Garcia was convicted. Thus, whereas sentences of death are perforce reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one. As Cruz-Garcia received his capital sentence by operation of this arbitrary system, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Cruz-Garcia's sentence therefore violates his applicable rights under the Texas and United States Constitutions, just as it violates Texas statutory law and United States Supreme Court and Texas case law. Accordingly, Cruz-Garcia's sentence should be reversed.

168

EXHIBIT 3 Page 181

000761

## A. Supreme Court Precedent Mandates That the Death Penalty Not Be Applied Arbitrarily

Over forty years ago, the Supreme Court briefly suspended imposition of the death penalty throughout the United States. *See Furman v. Georgia*, 408 U.S. 238, 239 (1972) (per curiam). Four years later, the Court validated newly-enacted capital punishment statutes which included safeguards against the "arbitrariness and caprice" that had animated the Court in *Furman*. *Gregg*, 428 U.S. at 189 (plurality opinion) ("*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). While capital juries would enjoy some discretion in reaching their determinations regarding sentencing, their discretion under the new statutes would be "'controlled by clear and objective standards so as to produce non-discriminatory application.'" *Id.* at 196 (quoting *Coley v. State*, 204 S.E.2d 612, 615 (Ga. 1974)). Accordingly, the plurality in *Gregg* supposed, juries' decisions no longer would suffer from a lack of guidance and narrowing considerations as to who should receive the death penalty, and this, in turn, would do away with the arbitrariness which *Furman* found constitutionally intolerable. *Id.* at 309 (Stewart, J., concurring) (likening imposition of a death sentence to "being struck by lightning"); *see also Jurek*, 522 S.W.2d at 940 ("If discretion in the assessment of punishment under a statute can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of *Furman* will be met."), *aff'd sub nom. Jurek v. Texas*, 428 U.S. 262 (1976).

In the intervening decades, the Supreme Court has continued to examine capital sentencing schemes to determine whether they include suitable safeguards to prevent the arbitrary assignment of death sentences. *See, e.g., California v.*

169

EXHIBIT 3 Page 182

000762

*Brown*, 479 U.S. 538, 541 (1987); *Mills*, 486 U.S. at 374. At the same time, the Court has rejected mandatory sentencing determinations in capital cases because "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (internal citations omitted); *see also Penry I*, 492 U.S. at 319 ("*Eddings* [*v. Oklahoma*] makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger*, [481 U.S. 393 (1987)]."). Far from being contradictory, the simultaneous pursuit of these objectives ensures that death is a penalty neither wanton nor freakish. And while certain procedural reforms—bifurcated capital trials, a narrowing of death-eligible crimes, appellate review for sentencing proportionality—continue to pass constitutional muster, others have proven themselves inadequate to the task of "minimiz[ing] the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. *Compare Jurek*, 428 U.S. at 275 (approving Texas's guided-discretion statute), *with Penry I*, 492 U.S. at 328 (disapproving same); *compare Gregg*, 428 U.S. at 189 (approving Georgia's guided-discretion statute), *with Godfrey*, 446 U.S. at 432-33 (plurality opinion) (disapproving same).

In a nutshell, then, capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson*, 428 U.S. at 303. When these schemes lack such standards, or when such standards fail in their application, or when "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," it cannot be maintained that the imposition of a death sentence was "based on reason rather than caprice or

170

EXHIBIT 3 Page 183

emotion." *Godfrey*, 446 U.S. at 433.

## B. Texas's Death Penalty Scheme Is Unconstitutional

The Supreme Court upheld Texas's death penalty statute in *Jurek v. Texas* in 1976, having concluded that the state's bifurcation of the guilt/innocence and penalty phases and narrowing of death-eligible crimes "provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Jurek*, 428 U.S. at 276. This judgment has not withstood the scrutiny of later cases. *See, e.g., Penry I*, 492 U.S. at 302 (invalidating Texas's statute for failing to instruct juries that they may consider mitigating evidence); *Penry II*, 532 U.S. at 782 (invalidating Texas's supplemental instruction on mitigation for failing to provide the jury with a sufficient mechanism to consider mitigating evidence). Were a court to review the current operation of Texas's capital punishment system, it would find the same "struck by lightning" phenomenon which so troubled the Court in *Furman*.

In 2013, 1,151 murders were committed in Texas. Tex. Dep't Pub. Safety, *Index Crime Analysis 2013*, http://dps.texas.gov/crimereports/13/citCh3.pdf (last visited August 19, 2015). And yet, only nine death sentences were assessed by Texas juries in that same year.[25] Tex. Dep't Crim. Just., *Offenders on Death Row*, https://www.tdcj.state.tx.us/death_row/dr_offenders_on_dr.html (last visited August 19, 2015). The number of death sentences assessed throughout the state has declined significantly in the past three decades. *See id.* Within these statistics, however, one finds at work factors that have no place in the "evenhanded, rational, and consistent imposition of death." *Jurek*, 428 U.S. at 276.

### 1. Geography

Since 1976, 1,092 defendants have been sentenced to death in Texas. Tex.

---

[25] Similarly disparate statistics are expected for 2014 and 2015. As of this filing, however, crime statistics for 2014 have not yet been published.

EXHIBIT 3 Page 184

000764

Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death from Each County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited August 19, 2015). Collectively, less than half of Texas's 254 counties account for these 1,092 sentences. *Id.* (listing 120 Texas counties). Four counties—Harris, Dallas, Bexar, and Tarrant—account for over 50% of these defendants, as well as for almost 49% of those who have been executed. Tex. Dep't Crim. Justice, *County of Conviction for Executed Offenders*, https://www.tdcj.state.tx.us/death_row/dr_county_conviction_executed.html (last visited June 15, 2015) (257 out of 526). In the past thirty-nine years, 214 of Texas's 254 counties (84%) have sentenced someone to death three times or less, or not at all. Tex. Dep't Crim. Justice, *Total Number of Offenders Sentenced to Death          from          Each          County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited August 19, 2015).

Texas is not alone in this phenomenon. Multiple studies conducted throughout the country have identified intra-state geographic discrepancies in the imposition of the death penalty.[26] *See, e.g.*, Jules Epstein, *Death-Worthiness and Prosecutorial Discretion in Capital Case Charging*, 19 TEMPLE POL. & CIV. RTS. L. REV. 389 (2010) (discussing studies in Arizona, Missouri, Pennsylvania, and South Carolina); Adam Gershowitz, *Statewide Capital Punishment: The Case For*

---

[26] These observations are, of course, distinct from the *inter*-state geographic discrepancies in the imposition of the death penalty. *See* Jeffrey Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345, 386-87 (1998) ("Because each jurisdiction creates its own death penalty statute, each statute is unique. The result is that—not only does punishment differ between death penalty jurisdictions and jurisdictions without the death penalty—significant discrepancies exist among the death penalty jurisdictions.").

EXHIBIT 3 Page 185

000765

*Eliminating Counties' Role in the Death Penalty*, http://works.bepress.com/ adam_gershowitz/5 (2009). In one study, the researchers found that, over a four-year period in Missouri, 76% of cases charged as either first-degree murder, second-degree murder, or involuntary manslaughter met that State's statutory definition to be eligible for the death penalty. Katherine Barnes, et al., *Place Matters (Most): An Empirical Study of Prosecutorial Decision-Making in Death-Eligible Cases*, 51 ARIZ. L. REV. 305, 309-11 (2009). However, only 5% of those cases occasioned a death penalty trial. *Id.* at 309. As a result, prosecutors throughout the state made the decision not to seek death in 95% of death-eligible cases. *Id.* This discretion was not spread evenly, however, as prosecutors in the City of St. Louis and Jackson County (where Kansas City is located) charged capital cases far less frequently (6.5%) than prosecutors in the rest of the state (20%).[27] *Id.* at 344.

In *Jurek* and in *Gregg*, the Supreme Court considered whether impermissible arbitrariness in capital sentencing resulted from prosecutorial discretion to choose those cases in which a death sentence would be sought. *Gregg*, 428 U.S. at 199; *Jurek*, 428 U.S. at 274. The Court determined that this decision-making served to remove defendants from the risk of death and did not violate the U.S. Constitution, provided the "decision to impose [a death sentence was] guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg*, 428 U.S. at 199. Justice White, in his concurrence, noted that the decision of prosecutors would likely reflect that of juries and be rooted in the seriousness of the offense:

---

[27] A commission created to examine the fairness of New Jersey's capital punishment system likewise noted its concerns regarding "the existence of variability among counties in the application of the death penalty." N.J. Death Penalty Study Comm., *New Jersey Death Penalty Commission Report* 43 (2007), *available at* http://www.njleg.state.nj.us/ committees/dpsc_final.pdf.

173

EXHIBIT 3 Page 186

Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence.

*Id.* at 225 (White, J., concurring).

The experience of the last thirty-nine years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. It strains credulity to believe that Texas's four most populous counties—where 50% of Texas's post-1976 death-row cases originated—have had as many heinous crimes within their geographical limits as have Texas's 250 remaining counties. Far more likely, factors such as ideology, experience litigating capital cases, and resource availability exert significant influence on prosecutors' decisions to seek the death penalty. *See* Gershowitz, *supra* at 11-15 (noting several instances in which prosecutors have declined to pursue the death penalty based on resource limitations).

The influence of these factors within Texas's capital punishment system has undermined the Supreme Court's expectations, voiced in *Jurek*, that this system would be an "evenhanded, rational, and consistent" one. *Jurek*, 428 U.S. at 276. Thirteen years after *Jurek*, the Court began to recognize the error in its assumption that Texas's system would, in practice, answer the several concerns expressed by a majority of the justices in *Furman*. *Compare Jurek*, 428 U.S. at 272 (expressing confidence that the Texas Court of Criminal Appeals would "interpret [the statutory special issue] so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show"), *with Penry I*, 492 U.S. at 318 (finding inadequate and therefore unconstitutional the statutory special

174

EXHIBIT 3 Page 187

000767

issues). The geographic disparities in the imposition of the death penalty in Texas offer equally compelling grounds to abandon the belief that prosecutorial discretion will produce a consistent application of the law.

### 2. Race

In addition to geography, studies continue to show that race is a motivating factor both behind the seeking of death sentences and behind jury verdicts in capital cases. *See, e.g.*, David Baldus, et al., *Race and Proportionality Since McCleskey v. Kemp (1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims).

This fact is especially evident in the application of the death penalty in Harris County, where Cruz-Garcia was convicted. In the last decade, the only defendants sentenced to death in Harris County have been of non-white races, except for white defendants already on death row receiving a re-trial. What's more, preliminary analysis of TDCJ data suggests that Harris County did not even choose to seek a new death sentence against a white defendant in the past decade. Given that in that same decade there were over 1,300 convictions for murder and capital murder, it raises a reasonable inference that the complete absence of seeking and/or receiving a death sentence for white defendants in Harris is attributable in some manner to race-based decision-making.

This improper decision-making extends to juries in Harris County as well. One study specific to Texas examined the influence of race in Harris County capital cases from 1992 to 1999. Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008). Using statistical techniques

EXHIBIT 3 Page 188

: 000768

to control for potential confounders,[28] the study showed that "black defendants who committed crimes *less* likely to lead to a death trial tended to face a capital trial *more* frequently than their white and Hispanic counterparts." ABA Texas Assessment Report (citing Phillips, 45 HOUS. L. REV. at 830). A defendant also faced increased odds of receiving a death sentence if he was black than if he was white or Hispanic. Phillips, 45 HOUS. L. REV. at 834. The study also confirmed that, in Harris County within the eight-year period, those convicted of killing a white victim were more likely to receive a death sentence than those convicted of killing a black victim. *Id.*

A subsequent study conducted largely the same analysis for the period beginning January 1, 2001, and ending February 15, 2008. Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 HOUS. L. REV. 131, 134 (2012). While the race of the defendant no longer appeared to influence the prosecution's charging decisions and the juries' sentencing decisions, the race of the victim still proved to be a controlling factor. *Id.* at 148. Specifically, this study found that "the death penalty was imposed on behalf of white victims at more than twice the rate one would expect if the system were blind to race, and . . . on behalf of white female victims at more than five times the rate one would expect if the system were blind to race and gender." *Id.* at 150.

In a third, national study—one that used a controlled experiment to examine the subtle influence of race on juror decision-making—researchers at the University of California at Berkeley found that members of a random sample of 276 adults were more inclined, after reviewing a file summary of a triple-murder

---

[28] Potential confounders include "the social characteristics of the defendant, the social characteristics of the victim, and the legal dimensions of the case." Phillips, 45 HOUS. L. REV. at 822-27.

176

EXHIBIT 3 Page 189

000769

case and being told that the maximum punishment was death, to find a defendant guilty based on the evidence provided if the defendant had a name traditionally associated with minorities (e.g., Darnel, Lamar, Terrell) than if he had a more race-neutral name (e.g., Andrew, Frank, Peter). Jack Glaser, et al., *Possibility of Death Sentence Has Divergent Effect on Verdicts for Black and White Defendants* 5-6 (June 24, 2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1428943. By contrast, other members of that same random sample were no more likely, after reviewing that same file and being told that the maximum punishment was life without possibility of parole, to find a defendant guilty if his name happened to be one traditionally associated with minorities. *Id.*

Although the precise causal mechanism at work only could be guessed at, the researchers nevertheless postulated that "a more severe penalty raises the juror's estimated 'cost' of a wrongful conviction." *Id.* (citing N. Kerr, *Severity of Prescribed Penalty and Mock Jurors' Verdicts*, 36 J. PERSONALITY & SOC. PSYCH. 1431 (1978)). Or, perhaps, "for participants with Black defendants, wrongful conviction was a lesser concern, and instead the death penalty reinforced the brutality of the crime." *Id.* at 6. Still more perverse, "capital punishment may feel more appropriate for Black defendants, given that they are overrepresented on death row, and [] research has indicat[ed] that convicted capital defendants who look more stereotypically Black are more likely to be given a death sentence." *Id.* (citing Jennifer L. Eberhardt, et al., *Looking Deathworthy*, 17 PSYCH. SCI. 383 (2006)).

Whatever the participants' motivation, the conclusion compelled by these statistics and studies is inescapable: Race continues to influence the imposition of the death penalty, regardless of whether that influence is conscious or unconscious. When a law is applied in such a way that it becomes more directed at a "particular

177

EXHIBIT 3 Page 190

000770

class of persons"—particularly when that class of persons is distinguished by race—the application of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

### C. Conclusion

For the foregoing reasons, Texas's death penalty scheme is unconstitutional. Therefore, Cruz-Garcia's sentence of death should be vacated.

EXHIBIT 3 Page 191

: 000771

# V.

## PRAYER FOR RELIEF

WHEREFORE, Obel Cruz-Garcia prays that this Court:

1. Order an evidentiary hearing for the purpose of examining the merits of his claims;

2. Vacate his death sentence and conviction;

3. Grant any other relief that law or justice may require.

Respectfully submitted,[29]

DATED:    August 27, 2015

By _Robert Romig_
Robert Romig
Post-Conviction Attorney

By _____
Joanne Heisey
Post-Conviction Attorney

---

[29] The OCW wishes to acknowledge post-conviction fellow Laura Schaefer for her contribution to this pleading.

EXHIBIT 3 Page 192

: 000732

STATE OF TEXAS       §
COUNTY OF DALLAS     §

VERIFICATION

         BEFORE ME, the undersigned authority, on this day personally appeared Robert Romig, who upon being duly sworn by me testified as follows:

       1.      I am a member of the State Bar of Texas.

       2.      I am the duly authorized attorney for Obel Cruz-Garcia, having the authority to prepare and to verify Obel Cruz-Garcia's Application for Post-Conviction Writ of Habeas Corpus.

       3.      I have prepared and have read the foregoing Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true.

                                            _Robert Romig_
                                            Robert Romig

         SUBSCRIBED AND SWORN TO BEFORE ME on this 27th day of August, 2015.



                                            Notary Public, State of Texas

180

EXHIBIT 3 Page 193

000773

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Application for Writ of Habeas Corpus to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on August 27, 2015, at Austin, Texas.
I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Robert Romig

181

EXHIBIT 3 Page 194

000774

13847940101C / Court: 337

# EXHIBIT 4

# IN THE 337th JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

**AND**

COURTESY COPY

This document contains some pages that are of poor quality at the time of imaging.

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAY 04 2016

Abel Acosta, Clerk

| | |
|---|---|
| EX PARTE | ) Trial Cause No. |
| Obel Cruz-Garcia, | ) 1384794 |
| APPLICANT | ) |
| | ) |
| | ) |
| | ) |

## SUBSEQUENT APPLICATION FOR A WRIT OF HABEAS CORPUS FILED PURSUANT TO ART. 11.071, § 5, AND ART. 11.073 OF THE TEXAS CODE OF CRIMINAL PROCEDURE

### This is a death penalty case.

BENJAMIN WOLFF (No. 24091608)
Director, Office of Capital and Forensic Writs
(E-Mail: Benjamin.Wolff@ocfw.texas.gov
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocfw.texas.gov)
Post-Conviction Attorney
GRETCHEN SWEEN (No. 24041996)
Office of Capital and Forensic Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

*Attorneys for Applicant*

EXHIBIT 4 Page 001

000776

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................... 1

II.   FACTUAL BACKGROUND .............................................................. 3

A.    The State's Evidence at Trial .......................................................... 3

    1.    The State's eyewitness testimony exculpates Mr. Cruz-Garcia .......... 3

    2.    The State's DNA evidence seemed to inculpate Mr. Cruz-Garcia ...... 4

B.    Evidence Uncovered in Post-Conviction ........................................ 6

    1.    The new scientific evidence supports the defense's theory ................ 6

    2.    The new scientific evidence bolsters other evidence only uncovered during the post-conviction investigation ............................................ 8

III.  LEGAL STANDARDS ...................................................................... 9

IV.   CLAIMS FOR RELIEF ................................................................... 12

A.    Mr. Cruz-Garcia Is Entitled to Relief under Article 11.073 ......................... 12

    1.    The amended lab report was not available to Mr. Cruz-Garcia at trial, and it also contradicts scientific evidence the State relied on at trial ........... 12

    2.    The relevant scientific evidence was not ascertainable through the exercise of reasonable diligence as of the date Mr. Cruz-Garcia filed his Initial Application ........................................................................ 13

    3.    The new scientific evidence would be admissible under the Texas Rules of Evidence ...................................................................... 14

    4.    Had the new scientific evidence been presented at trial, Mr. Cruz-Garcia would not have been convicted ........................................ 15

B.    Mr. Cruz-Garcia Is Entitled to a New Trial Because His Conviction Was Based on False, Misleading, and Scientifically Invalid Testimony ............. 19

    1.    The Chabot/Chavez standard .......................................................... 19

i

EXHIBIT 4 Page 002

000777

2.      Chabot/Chavez standard is satisfied ................................................ 21

V.   PRAYER FOR RELIEF ........................................................................ 25

CERTIFICATE OF COMPLIANCE ................................................................ 27

CERTIFICATE OF SERVICE ......................................................................... 27

ii

EXHIBIT 4 Page 003

000778

# TABLE OF AUTHORITIES

**Federal**

*Brady v. Maryland*, 373 U.S. 83 (1963)................................................................... 22

*Johnson v. Mississippi*, 486 U.S. 578 (1988)....................................................... 20

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................. 22

*Smith v. Cain*, 132 S. Ct. 627 (2012) ................................................................... 22

*Townsend v. Burke*, 334 U.S. 736 (1948) .......................................................... 20

**State**

*Blake v. State*, 971 S.W.2d 451 (Tex. Crim. App. 1998)................................. 18

*Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010)............................ 20

*Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009)...................... 19, 20, 21

*Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012)...................... 19, 20, 22

*Ex parte Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996). ............................. 20, 24

*Ex parte Ghahremani*, 332 S.W.3d 470 (Tex. Crim. App. 2011).................... 20, 24

*Ex parte Graf*, AP-77003, 2013 WL 1232197 (Tex. Crim. App. Mar. 27, 2013).. 23

*Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012) ....................... 22, 23

*Ex parte Oranday-Garcia*, 410 S.W.3d 865 (Tex. Crim. App. 2013)..................... 10

*Ex parte Robbins*, 478 S.W.3d 678 (Tex. Crim. App. 2015)................. 10, 13, 14, 23

*Ex parte Weinstein*, 421 S.W.3d 656 (Tex. Crim. App. 2014)........................... 20, 22

**Statutes**

TEX. CODE CRIM. PROC. art. 11.071 ....................................................................... 10

TEX. CODE CRIM. PRO. art. 11.073 ................................................................. 10, 12

TEX. R. EVID. 703 ................................................................................................. 15

**Other Authorities**

*Texas reviewing thousands of DNA cases that used outdated method for calculating odds*, Dallas Morning News (Jan. 31, 2016)....................................................... 7

EXHIBIT 4 Page 004

000779

## SUBSEQUENT APPLICATION FOR A WRIT OF HABEAS CORPUS

### This is a death penalty case.

## I.    INTRODUCTION

The case against Obel Cruz-Garcia was a cold case that was ostensibly "cracked" in reliance on DNA evidence that has now been debunked. Without that false, scientifically unreliable evidence, the State's case against Mr. Cruz-Garcia collapses.

Twenty-two years after the fact, on July 15, 2013, Mr. Cruz-Garcia was convicted of the 1992 capital murder of Angelo Garcia. 23 RR at 101.[1] The State's DNA evidence was the *only* physical evidence purportedly linking Mr. Cruz-Garcia to the crime. Indeed, the State presented evidence that Angelo Garcia's 1992 murder had gone unsolved until 2008, when the Houston Police Department ("HPD") obtained a DNA sample from Mr. Cruz-Garcia and compared it to evidence collected years ago at the crime scene. 20 RR at 51, 55-56.

The reputedly inculpatory DNA evidence that the State relied upon at trial has, however, proven to be false. Mr. Cruz-Garcia's conviction reflects widespread problems with the way labs nationwide had been making "DNA mixture" interpretations until recently. After the FBI blew the whistle with respect to these

---

[1] "RR" refers to the Reporter's Record in Mr. Cruz-Garcia's trial.

1

000780

EXHIBIT 4 Page 005

serious flaws in methodology, the Texas Forensic Science Commission ("FSC") took up the issue. *See* Ex. A at 1. The FSC's attention then prompted labs to revisit their calculations; in many instances, amended lab reports followed. For instance, we now know that the DNA evidence used to convict Mr. Cruz-Garcia was false. *See* Ex. B [Email from Harris County ADA Lori DeAngelo (Nov. 3, 2015)]; Ex. C at 1 [Amended Laboratory Rpt. (Nov. 3, 2015)].

According to the amended lab report at issue here, no conclusions can now be drawn with respect to one of the two reputedly inculpatory items of DNA evidence presented at trial. With respect to the second item, the amended lab report now points to a second unknown contributor to the DNA mixture—most likely belonging to the actual perpetrator. This new evidence casts considerable doubt on Mr. Cruz-Garcia's guilt and wholly undermines any confidence in the result of his capital murder trial. The amended lab report was not provided to Mr. Cruz-Garcia's counsel until after his Initial Application was filed.

This Subsequent Application raises two distinct constitutional and statutory claims for relief based on the newly available scientific evidence as follows:

- New scientific evidence establishes by a preponderance of the evidence under Article 11.073 that Mr. Cruz-Garcia would not have been convicted.

- Additionally, because the State relied on false, misleading, and scientifically invalid testimony, Mr. Cruz-Garcia's right to due process under *Ex parte Chabot* and *Ex parte Chavez* was violated.

Each of these claims entitles Mr. Cruz-Garcia to a new trial.

2

000781

EXHIBIT 4 Page 006

## II.    FACTUAL BACKGROUND

### A. The State's Evidence at Trial

At trial, the State presented both eyewitness testimony that tended to exculpate Mr. Cruz-Garcia and DNA evidence that was characterized as inculpatory.

#### 1.  The State's eyewitness testimony exculpates Mr. Cruz-Garcia

The State presented evidence from the two surviving eyewitnesses/crime victims. First, the decedent's mother, Diana Garcia, testified that, on the night of September 30, 1992, two men entered the bedroom where she, her common-law husband, Arturo Rodriguez, and her son, Angelo, were sleeping. 18 RR at 120, 144-53. Ms. Garcia testified that one of the men beat Mr. Rodriguez unconscious while the other one sexually assaulted her. *Id.* at 153-58. Second, Mr. Rodriguez testified about the incident. *Id.* at 205-219. Both Ms. Garcia and Mr. Rodriguez testified that Mr. Cruz-Garcia was a friend of theirs for whom they had sold drugs. *Id.* at 129-38, 199-205. Both testified that Mr. Cruz-Garcia frequently visited their apartment, and Ms. Garcia testified that, according to Mr. Rodriguez, Mr. Cruz-Garcia had been at their apartment earlier that day. *Id.* at 138, 144-45, 201.

Ms. Garcia and Mr. Rodriguez further testified that the men who assaulted them were wearing masks and that ***they were unable to identify them***. *Id.* at 151-62, 208-15.

Moreover, two HPD officers who responded to the scene testified that Ms. Garcia and Mr. Rodriguez described their attackers as two black males. *Id.* at 54,

3

EXHIBIT 4 Page 007

102. Yet Mr. Cruz-Garcia is a light-skinned Latino from the Dominican Republic.

3 RR at 76.

In sum, the testimony of the eyewitnesses did not inculpate Mr. Cruz-Garcia;

that evidence did the opposite. Therefore, that evidence had to be countered by other

evidence to suggest any basis for convicting Mr. Cruz-Garcia.

### 2. The State's DNA evidence seemed to inculpate Mr. Cruz-Garcia

The State also presented the testimony of Matt Quartaro, a DNA analyst at

forensic testing lab Orchid Cellmark, which conducted the DNA analysis in this case

in 2007 and 2008. Mr. Quartaro testified to Orchid Cellmark's analysis of items of

evidence that had been collected during the criminal investigation, including a cigar

that had been recovered from Ms. Garcia and Mr. Rodriguez's apartment, vaginal

swabs from a sexual assault kit that was taken from Ms. Garcia the night of the

assault, and a cutting from Ms. Garcia's panties. 21 RR at 105-20. Mr. Quartaro

testified that Orchid Cellmark's analysis resulted in a finding that Mr. Cruz-Garcia's

DNA profile matched the profile obtained from the cigar; that the sperm cell fraction

obtained from the vaginal swabs was a mixture of multiple individuals, from which

neither Mr. Cruz-Garcia nor Mr. Rodriguez could be excluded as contributors; and

that the sperm cell fraction obtained from the cutting of the panties was a mixture of

at least two individuals, to which Mr. Cruz-Garcia was a major contributor and Mr.

Rodriguez could not be excluded as a minor contributor. *Id.* at 119-20.

4

EXHIBIT 4 Page 008

000783

The State then presented the testimony of Courtney Head, a criminalist with the HPD crime lab. Ms. Head testified that in 2010 she had performed a DNA extraction on a buccal swab taken from Mr. Cruz-Garcia and compared the DNA profile she obtained of Mr. Cruz-Garcia to the DNA profiles that Orchid Cellmark had obtained from the cigar, the vaginal swabs, and the panties. 21 RR at 156-59. Ms. Head testified that based on her comparisons, Mr. Cruz-Garcia could not be excluded as a contributor to the DNA found on the cigar; that Mr. Cruz-Garcia could not be excluded as a contributor to the mixture DNA profile obtained from the sperm cell fraction of the vaginal swabs; and that the DNA profile obtained from the sperm cell fraction of the panties was a mixture of at least two individuals, to which Mr. Cruz-Garcia could not be excluded as a contributor to the major component. 21 RR at 161-62.

At trial, defense counsel suggested (but failed to substantiate) that Ms. Garcia had had a consensual sexual relationship with Mr. Cruz-Garcia; this theory was offered as an alternative explanation for the presence of his DNA on the vaginal swabs and the panties. *See, e.g.*, 19 RR at 21; 21 RR at 134-35; 23 RR at 48-50. However, the State's experts had testified that the second contributor to the DNA mixtures on these two items was Ms. Garcia's husband, Mr. Rodriguez, leaving no alternative party to point to as the actual perpetrator of the sexual assault other than Mr. Cruz-Garcia. Therefore, defense counsel's argument did not substantiate the

5

EXHIBIT 4 Page 009

000784

position that he was not guilty.  In closing argument, the State emphasized this *ipse*

*dixit*, invoking its DNA evidence as the necessary link in the chain supporting the

State's version of events:

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some
> consensual sexual encounter that they made up out of whole cloth—
> and there is no evidence of that—where is the DNA of the guy who
> raped Diana?  Where is it?  Why don't we have it?  If at some unknown
> time Obel Cruz-Garcia had a consensual relationship with Diana, again,
> that there is no evidence of, where is the DNA of the guy who raped
> her?

The only physical evidence that seemed to connect Mr. Cruz-Garcia to the crime

was the DNA evidence.

## B. Evidence Uncovered in Post-Conviction

### 1. The new scientific evidence supports the defense's theory

The DNA evidence that was used to convict Mr. Cruz-Garcia has now been

superseded by new DNA evidence.

On August 21, 2015, it became generally known in Texas that the

methodology Texas labs had been using to calculate DNA mixtures might be

problematic.  On that day, the FSC announced to members of the Texas criminal

justice community its "concerns involv[ing] the interpretation of DNA results where

multiple contributors may be present, commonly referred to as DNA mixture

interpretation."  Ex. A at 1.  Specifically, these concerns involved the widespread

failure of Texas labs to calculate the "Combined Probability of Inclusion" using the

current consensus methodology so as to determine the odds that a particular person

6

EXHIBIT 4 Page 010

had left DNA at a crime scene. *Id.* The muted announcement has since led to a scandal—and the need to revisit thousands of convictions that had hinged on DNA evidence.[2]

In the wake of the announcement, the Houston Forensic Science Center (formerly the HPD crime lab) revisited the DNA analysis that had been performed before Mr. Cruz-Garcia's trial. That query resulted in an amended laboratory report, which was sent to post-conviction counsel on November 3, 2015. *See* Ex. B; Ex. C at 1. That is, news that the specific evidence used to convict Mr. Cruz-Garcia was false reached his post-conviction attorneys over two months after his Initial Application under Article 11.071 had been filed.

The amended lab report that post-conviction counsel received reveals serious issues with the two seemingly inculpatory pieces of DNA evidence upon which the State's case depends. The amended lab report notes that, with respect to the vaginal swabs taken from Ms. Garcia, *"**No conclusions will be made given the excessive number of contributors to this DNA mixture**."* Ex. C at 2 (emphasis added). As for the sperm cell fraction of the DNA mixture taken from her panties, the amended lab report notes that, while Mr. Cruz-Garcia cannot be excluded as a possible

---

[2] *See, e.g., Texas reviewing thousands of DNA cases that used outdated method for calculating odds*, Dallas Morning News (Jan. 31, 2016), *available at http://www.dallasnews.com/news/crime/headlines/20160131-texas-reviewing-thousands-of-dna-cases-that-used-outdated-method-for-calculating-odds.ece.*

7

EXHIBIT 4 Page 011

000786

contributor to the major component of the DNA mixture, *"[n]o conclusions will be made regarding the minor component of this DNA mixture due to insufficient data."* *Id.* (emphasis added).[3]

## 2. The new scientific evidence bolsters other evidence only uncovered during the post-conviction investigation

Before receiving the amended lab report, Mr. Cruz-Garcia had uncovered new evidence during the post-conviction investigation that supports the theory that the defense had offered at trial regarding the appropriate inference suggested by the DNA evidence. New evidence, presented in his Initial Application, shows that Ms. Garcia had, in fact, been having an ongoing consensual sexual relationship with Mr. Cruz-Garcia before the crime occurred. Several lay witnesses who knew both Ms. Garcia ("Diana") and Mr. Cruz-Garcia ("Chico")[4] at the time of the crime have attested to the affair:

---

[3] As to the DNA profile obtained from the cigar that was recovered from Ms. Garcia and Mr. Rodriguez's apartment, the amended lab report is consistent with the DNA analysts' trial testimony that Mr. Cruz-Garcia cannot be excluded as a contributor. Because testimony at trial established that Mr. Cruz-Garcia was a frequent visitor to the apartment and had, in fact, visited the apartment earlier on the day of the crime, this evidence is neither inculpatory nor exculpatory. Moreover, there is no tie between the cigar and the crimes charged: neither Ms. Garcia nor Mr. Rodriguez suggested, for instance, that one of the two assailants smoked a cigar before, during, or after the assaults. In other words, that evidence is not relevant to the identity of the masked individual who sexually assaulted Ms. Garcia.

[4] Throughout trial, starting with the State's opening statement, Mr. Cruz-Garcia was referred to as "Chico." *See, e.g.,* 18 RR at 33 ("sitting in that interview room, Diana Garcia told the officers: We sold drugs for that man, Obel Cruz-Garcia; Chico, as he was known by many of his friends and associates.")

8

EXHIBIT 4 Page 012

- "Diana was also messing around with other guys, including Chico....The time period that Chico and Diana were having sex was around the same time Angelo was kidnapped." Ex. D at ¶4.

- "Around the time Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana." Ex. E at ¶3;

- "I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel." Ex. F at ¶6.

This evidence is now corroborated by the new DNA evidence.

Although Mr. Cruz-Garcia's counsel had argued at trial that Mr. Cruz-Garcia's DNA was left during a consensual sexual encounter, the jury could not have credited this theory at trial in the face of the State's unrebutted testimony that the DNA of only two men was found in Ms. Garcia's panties—the other being her husband, Mr. Rodriguez, who was allegedly being beaten during the sexual assault. Therefore, the jury could only draw one reasonable conclusion from that evidence: since, under the circumstances, Mr. Rodriguez could not have perpetrated the sexual assault, the likely perpetrator of the sexual assault was Mr. Cruz-Garcia.  But that reasonable inference becomes wholly *unreasonable* in light of the amended lab report that suggests an unknown third-party was the rapist.

## III.   LEGAL STANDARDS

Under Article 11.071, of the Texas Code of Criminal Procedure, a court can consider the merits of a subsequent application for habeas relief if:

the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously

9

EXHIBIT 4 Page 013

000788

considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application

TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(1).

Article 11.073 also provides a new legal basis for habeas relief "where the applicant can show by the preponderance of the evidence that he or she would not have been convicted if the newly available scientific evidence had been presented at trial." *Ex parte Robbins*, 478 S.W.3d 678, 690 (Tex. Crim. App. 2015). The applicant must also establish "that the facts he alleges are at least minimally sufficient to bring him within the ambit of the new legal basis for relief." *Ex parte Oranday-Garcia*, 410 S.W.3d 865, 867 (Tex. Crim. App. 2013).

Article 11.073 provides for a procedure related to certain scientific evidence that "(1) was not available to be offered by a convicted person at the convicted person's trial; or (2) contradicts scientific evidence relied on by the state at trial." TEX. CODE OF CRIM. PRO. art. 11.073(a). The Court may grant relief on an application for a writ of habeas corpus filed in the manner provided for by, *inter alia*, Article 11.071. The application must contain specific facts indicating that:

> (A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and

> (B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and

10

EXHIBIT 4 Page 014

000789

(2) the court makes the findings described by Subdivisions (1)(A) and (B) and also finds that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.

*Id.* art. 11.073(b).

Because this is a subsequent application, Mr. Cruz-Garcia must also show that "a claim or issue could not have been presented previously in an original application" because it is "based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the convicted person on or before the date on which the original application[.]" *Id.* (c). In making the determination

as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the field of scientific knowledge, a testifying expert's scientific knowledge, or a scientific method on which the relevant scientific evidence is based has changed since:

(1) the applicable trial date or dates, for a determination made with respect to an original application; or

(2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

*Id.* art. 11.073(d).

The inquiry focuses on "the State's evidence" at trial. *Ex parte Robbins*, 478 S.W.3d at 690.

11

000790

EXHIBIT 4 Page 015

## IV.   CLAIMS FOR RELIEF

Mr. Cruz-Garcia is entitled to relief on the following claims:

- New scientific evidence establishes by a preponderance of the evidence under Article 11.073 that Mr. Cruz-Garcia would not have been convicted.

- Because the State relied on false, misleading, and scientifically invalid testimony, Mr. Cruz-Garcia's right to due process under *Ex Parte Chabot* and *Ex Parte Chavez* was violated.

### A. Mr. Cruz-Garcia Is Entitled to Relief under Article 11.073

Mr. Cruz-Garcia easily satisfies the prerequisites for relief under Article 11.073.

### 1. The amended lab report was not available to Mr. Cruz-Garcia at trial, and it also contradicts scientific evidence the State relied on at trial

The scientific evidence at issue here "was not available to be offered by a convicted person at the convicted person's trial" *and* it "contradicts scientific evidence relied on by the state at trial." TEX. CODE OF CRIM. PRO. art. 11.073(a). Either of these facts are a basis for granting relief. Mr. Cruz-Garcia's trial began in June 2013, and the amended lab report was not even generated until November 2015. *See* Ex. B.

Moreover, the findings contained in the amended lab report clearly contradict the scientific evidence the State relied on at trial. At trial, the State presented testimony that Mr. Cruz-Garcia and Ms. Garcia's husband, Mr. Rodriguez, were the two contributors to the sperm cell DNA mixtures found on the vaginal swabs and on the cutting from the panties. The HPD lab has now amended its findings to state that

12

EXHIBIT 4 Page 016

000791

no conclusions can be made with respect to the DNA mixture found on the vaginal swabs and that the DNA mixture found on the cutting from the panties contains a second unknown contributor, rather than the victim's husband, Mr. Rodriguez. Accordingly, Mr. Cruz-Garcia has met the requirements of Article 11.073(a)(2). *See Ex parte Robbins*, 478 S.W.3d at 690 (finding that the requirements of Article 11.073(a)(2) were met where the medical examiner had testified for the State that the complainant's cause of death was homicide by asphyxiation but later reevaluated her opinion and found the cause of death to be undetermined).

## 2. The relevant scientific evidence was not ascertainable through the exercise of reasonable diligence as of the date Mr. Cruz-Garcia filed his Initial Application

The new scientific evidence presented in this Subsequent Application was not ascertainable through the exercise of reasonable diligence as of the date Mr. Cruz-Garcia filed his Initial Application. Mr. Cruz-Garcia filed his Initial Application on August 28, 2015; the amended lab report was not issued and sent to post-conviction counsel until November 3, 2015. Ex. B; Ex. C at 1.

In his Initial Application, Mr. Cruz-Garcia alleged that his trial counsel were ineffective for failing to retain an independent DNA expert to review the State's DNA evidence. In support of this allegation, Mr. Cruz-Garcia filed an affidavit from DNA analyst Daniel Hellwig, who attested that the second contributor to the DNA mixture found on the panties should properly have been described as unknown. The

13

EXHIBIT 4 Page 017

000792

fact that Mr. Cruz-Garcia presented this evidence from his own retained expert in support of a claim raised in his Initial Application does not mean that the findings contained in the amended lab report were "ascertainable through the exercise of reasonable diligence" at the time he filed his Initial Application. This Court recently construed Article 11.073 for the first time in *Ex parte Robbins*. The Court held that the medical examiner's changed opinion was not ascertainable for the purposes of the statute even though similar testimony was actually before the jury at trial through a retained defense expert. *Id.*, 478 S.W.3d at 692 ("The State argues Moore's re-evaluated opinion was available at trial because the same information was presented by the defense through Dr. Bux. We disagree. The relevant evidence is the State's evidence on Tristen's cause of death. It has changed."). Accordingly, the findings contained in the amended lab report were not "ascertainable through the exercise of reasonable diligence" at the time Mr. Cruz-Garcia filed his Initial Application even though he presented similar findings from his own expert in support of his Initial Application. Mr. Cruz-Garcia has thus satisfied the requirements of Article 11.073(b)(1)(A).

### 3. The new scientific evidence would be admissible under the Texas Rules of Evidence

Just as Mr. Quartaro's and Ms. Head's original findings as to the DNA analysis were admissible at Mr. Cruz-Garcia's trial, the findings contained in the amended lab report would be equally admissible, thus satisfying Article

14

EXHIBIT 4 Page 018

11.073(b)(1)(B).  *See* TEX. R. EVID. 703 (permitting qualified experts to "base an

opinion on facts or data in the case that the expert has been made aware of, reviewed,

or personally observed").

### 4. Had the new scientific evidence been presented at trial, Mr. Cruz-Garcia would not have been convicted

The new scientific evidence in the amended lab report goes to the very heart

of the sufficiency of the evidence used to convict Mr. Cruz-Garcia.

There can be little doubt that, had the findings contained in the amended lab

report been presented at Mr. Cruz-Garcia's trial, he would not have been convicted.

The false DNA evidence the State presented at trial was the only physical evidence

linking Mr. Cruz-Garcia to the crime.  More specifically, the State's case for guilt

was based on a nexus among Mr. Cruz-Garcia's semen, a sexual assault, and the

murder.  Although Mr. Cruz-Garcia's trial counsel suggested that Mr. Cruz-Garcia's

DNA was left during a consensual sexual encounter, the jury could not have credited

this defense at trial in the face of unrebutted testimony by the State's expert that the

two contributors to the sperm cell DNA mixture found on the vaginal swabs and the

cutting of the panties were Mr. Cruz-Garcia and Ms. Garcia's husband, Mr.

Rodriguez.  Mr. Quartaro's false testimony at trial rendered the defense theory of a

consensual relationship impossible.  But if the jury had been told that the sperm cell

000794

EXHIBIT 4 Page 019

DNA mixture found on the cutting from the panties contained a second unknown

contributor, Mr. Cruz-Garcia would not have been convicted.[5]

The State relied heavily on the DNA evidence—or, more accurately, it relied

on the *lack* of evidence of an unknown contributor to the DNA mixture—to argue

that Mr. Cruz-Garcia must be guilty:

> [I]f Obel Cruz-Garcia was not the one, if his DNA was there from some
> consensual sexual encounter that they made up out of whole cloth—
> and there is no evidence of that—where is the DNA of the guy who
> raped Diana? Where is it? Why don't we have it? If at some unknown
> time Obel Cruz-Garcia had a consensual relationship with Diana, again,
> that there is no evidence of, where is the DNA of the guy who raped
> her?

23 RR at 82. The State's argument rested squarely on the testimony of Mr. Quartaro,

who told the jury that the second contributor to the sperm cell DNA mixture found

on the vaginal swabs and on the panties was Ms. Garcia's husband, Mr. Rodriguez.

The amended lab report has belied this testimony. According to the amended lab

report, the second contributor to the DNA mixture found on the panties is not the

victim's husband but rather an unknown person, which supports the theory that an

unknown male raped Diana Garcia, as the defense had argued at trial.[6]

---

[5] This new evidence must be evaluated in tandem with the new evidence
presented in Mr. Cruz-Garcia's Initial Application that Mr. Cruz-Garcia had an
ongoing consensual sexual relationship with Ms. Garcia. *See* p. 9, *supra*.

[6] Moreover, in light of the fact that Ms. Garcia was having a consensual affair
with Mr. Cruz-Garcia at the time, as is now confirmed by mutual acquaintances, it
defies the imagination to suggest that Ms. Garcia would have failed to recognize him

16

EXHIBIT 4 Page 020

000795

Aside from the false testimony of Mr. Quartaro and Ms. Head, the State relied on scant corroboration. The only other evidence of Mr. Cruz-Garcia's guilt came by way of testimony from an alleged co-conspirator and convicted felon named Carmelo Martinez Santana and Mr. Cruz-Garcia's ex-wife, Angelita Rodriguez.[7] Both of these individuals were known drug dealers with substantial credibility issues. And the testimony of both of these individuals departed significantly from their prior statements to law enforcement.

These witnesses were repeatedly impeached with prior inconsistent statements and impeached by omission. For example, Ms. Rodriguez testified on direct as to a purported inculpatory statement by Mr. Cruz-Garcia, but on cross-examination she was devastatingly impeached by her complete failure to mention this purported confession in a 2008 interview with investigating police officers and an Assistant District Attorney, during which she was accompanied by her lawyer. *See* 20 RR at 110-13.

Mr. Santana, the alleged accomplice—also a convicted violent felon and unrepentant drug trafficker—did not fare any better on the witness stand. *See* 21 RR

---

as the assailant—even if he had been wearing a mask during the sexual assault. *See* Exs. D-F.

[7] The only other allegedly corroborating evidence to which the State cited in its Closing was the testimony of Linda Hernandez; she only claimed that she had received a call from Mr. Cruz-Garcia from Baytown, and the State argued that this occurred after Angelo Garcia, Jr. had been killed in Baytown. 23 RR 36-37. Such evidence is not fairly characterized as "corroborating."

17

000796

EXHIBIT 4 Page 021

at 16 (Mr. Santana implicated himself in a capital murder while acknowledging that he had not been charged with anything in relation to the offense); *id.* at 29-31 (Mr. Santana was impeached with prior federal drug and weapons convictions for which he was serving a sentence of over seventeen years, as well as a Harris County assault conviction.).[8]  Mr. Santana was also repeatedly impeached with prior inconsistent statements to law enforcement about material details about the crime. *See, e.g., id.* at 45-57, 68-75.

Moreover, the testimony of Mr. Santana was inconsistent with that of Ms. Garcia as to material details.  *Compare* 18 RR at 151 *with* 21 RR at 48-49 (Mr. Santana described masks worn by the perpetrators as being women's stockings, while Ms. Garcia described ski masks).  Thus, the DNA evidence was the only credible evidence implicating Mr. Cruz-Garcia in this twenty-two-year-old crime. The State most likely recognized this fact, which is why it expressly emphasized the significance of the DNA as corroborating evidence in its closing:

> ***Probably the most damning corroboration for the defendant in this case is the DNA evidence.*** You know that there is DNA evidence that the defendant's DNA was on the panties of Diana Garcia's the night of that sexual assault, the defendant's DNA is on the vaginal swabs taken after the rape of Diana Garcia on September 30th, 1992, the same time the kidnapping of Angelo Garcia, Jr. taking place and ultimately his death. That is corroboration that tends to connect the defendant to the commission of the offense.

---

[8] As the CCA has emphasized, the "testimony of an accomplice is inherently untrustworthy and should be viewed with caution." *Blake v. State*, 971 S.W.2d 451, 463 (Tex. Crim. App. 1998).

18

EXHIBIT 4 Page 022

23 RR at 36 (emphasis added).

If the jurors, however, had heard the new evidence contained in the amended lab report—showing that the DNA mixture found in the vaginal swab could not be associated with any particular contributor and that the DNA mixture found on the panties contained a second unknown contributor—they almost certainly would have found at least a reasonable doubt as to Mr. Cruz-Garcia's guilt. Therefore, Mr. Cruz-Garcia is entitled to relief under Article 11.073.

### B. Mr. Cruz-Garcia Is Entitled to a New Trial Because His Conviction Was Based on False, Misleading, and Scientifically Invalid Testimony

Additionally, Mr. Cruz-Garcia is entitled to a new trial under *Ex parte Chabot*, 300 S.W.3d 768, 770-71 (Tex. Crim. App. 2009) and *Ex parte Chavez*, 371 S.W.3d 200, 207-08 (Tex. Crim. App. 2012). Specifically, the State violated Mr. Cruz-Garcia's rights to a fair trial, to due process, and to avoid cruel and unusual punishment when it used false DNA evidence to secure his conviction and death sentence. *Id.* Because the factual basis—*i.e.*, the amended lab report—under which Mr. Cruz-Garcia raises this claim was unavailable at the time he filed his Initial Application, this claim meets the strictures of Article 11.071, § 5(a)(1).

### 1. The Chabot/Chavez standard

The *Chabot*/*Chavez* standard does not require proof that the State *knew* that the testimony at issue was false. An applicant must only show "whether the testimony, taken as a whole, gives the jury a false impression." *Chavez*, 371 S.W.3d

EXHIBIT 4 Page 023

at 208.  The State denies due process where, as here, the State uses false testimony to obtain a particular sentence, regardless of the State's intent.  *Estrada v. State*, 313 S.W.3d 274, 287-88 (Tex. Crim. App. 2010) (citing, *inter alia*, *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (finding death sentence based on "materially inaccurate" evidence violates Eighth Amendment); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (finding conviction based on "materially untrue" information violates due process "whether caused by carelessness or design")); *see also Chabot*, 300 S.W.3d at 771.  To be entitled to habeas relief on the basis of false evidence, an applicant must show that (1) false evidence was presented at trial; and (2) the false evidence was material to the jury's verdict.  *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014).

When evaluating claims of false evidence in the post-conviction context, the Court of Criminal Appeals has, in two scenarios both inapplicable here, required that the defendant establish an additional burden—that the error was not harmless.  *See Ex parte Ghahremani*, 332 S.W.3d 470, 481 (Tex. Crim. App. 2011) (describing the two scenarios).  If the habeas applicant was unable to raise the issue at trial or on direct appeal, this additional burden does not apply.  *Id.* at 481-82; *Chabot*, 300 S.W.3d at 770-71; *Ex parte Fierro*, 934 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

EXHIBIT 4 Page 024

000799

### 2. Chabot/Chavez standard is satisfied

#### a. The State relied on false testimony

The primary evidence against Mr. Cruz-Garcia was the testimony of the State's experts linking Mr. Cruz-Garcia's sperm to a sexual assault and then to the murder. Mr. Cruz-Garcia has now shown that the testimony the State relied on to establish this vital link was false, misleading, and scientifically invalid.

First, the State's witnesses misled the jury by claiming that Mr. Cruz-Garcia was a contributor to the DNA mixture found on the vaginal swabs. Second, Mr. Quartaro misled the jury by claiming that Mr. Rodriguez, instead of an unknown assailant, must have been the second contributor to the DNA mixture found on the cutting of the panties. This testimony was false.

In short, the DNA evidence that was reputedly inculpatory has since been amended and corrected, thereby rendering Mr. Quartaro's and Ms. Head's germane trial testimony false.

#### b. False evidence was material to the jury's verdict

The false evidence was material to the State's case, which resulted in the jury's guilty verdict. To show that the State's presentation of false testimony is material, an "applicant has the burden to prove by a preponderance of the evidence that the error contributed to his conviction or punishment." *Chabot*, 300 S.W.3d at 771 (quoting *Fierro*, 934 S.W.2d at 374-75). False testimony is material if there is a "reasonable likelihood" that it affected the judgment of the jury. "[A]n applicant

21

EXHIBIT 4 Page 025

000800

who proves, by a preponderance of the evidence, a due-process violation stemming from a use of *material* false testimony necessarily proves harm because a false statement is material only if there is a reasonable likelihood that the false testimony affected the judgment of the jury." *Weinstein,* 421 S.W. at 665 (emphasis in original). The standard of materiality is the same for knowing and unknowing use of false testimony. *See Chavez,* 371 S.W.3d at 207.[9] Thus, the question is whether it was reasonably likely that the DNA evidence affected the judgment of the jury. That effect was reasonably likely here.

---

[9] Some opinions of this Court have questioned whether this materiality standard is too lenient on the petitioner for unknowing use of false testimony claims. *See Weinstein,* 421 S.W.3d at 669 (Keller, P.J., concurring); *see also Ex parte Henderson,* 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring) (agreeing with Presiding Judge Keller that "unknowing use of . . . false testimony" should have a "mid-level standard" of materiality, between the lenient standard for knowing use of false testimony and the "Herculean task" of proving bare actual innocence claims). This view, if adopted by a majority of this Court, would make the materiality standard for unknowing use of false testimony akin to the *Brady* standard. Under *Brady,* "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain,* 132 S. Ct. 627, 630 (2012) (citing *Brady,* 373 U.S. 83, 87 (1963)). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 434 (1995)). Under either materiality standard, Mr. Cruz-Garcia was denied due process, as falsely inculpatory evidence certainly undermines confidence in the outcome of his trial.

22

000801

EXHIBIT 4 Page 026

As discussed above, the DNA evidence was the only physical, and only compelling, evidence linking Mr. Cruz-Garcia to the crime. There is a reasonable likelihood that the false DNA evidence affected the jury because that evidence suggested a degree of certainty about guilt that was otherwise absent. The false DNA evidence plainly contributed to the jury's verdict.

The Court of Criminal Appeals has found it proper to reverse convictions when a jury was misled because an expert espoused an unreliable scientific theory or other factors rendered the expert's testimony unreliable. *See, e.g., Ex parte Graf*, AP-77003, 2013 WL 1232197 (Tex. Crim. App. Mar. 27, 2013) (expert testimony is deemed false where critical aspects of the testimony are disproven); *Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring) (stating that due process is violated where a critical part of an expert's testimony is shown to be "highly questionable"); *id.* at 849-50 (Cochran, J., concurring) (stating that due process is violated where expert opinion on critical disputed issue is shown to be unreliable).

Where false testimony essentially cut off Mr. Cruz-Garcia's only defense to the murder, there is a reasonable likelihood that the false testimony could have affected the judgment of the jury, and a new trial should be granted. *See Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011).

23

EXHIBIT 4 Page 027

000802

**c. Mr. Cruz-Garcia need not prove the error was "not harmless" because this Chabot claim could not have been made at trial or on direct appeal**

Mr. Cruz-Garcia has no obligation to prove that the error in using the false DNA evidence was not harmless because he had no means to raise this claim in the trial court or on direct appeal. *See Ghahremani*, 332 S.W.3d at 481-82; *cf. Fierro*, 934 S.W.2d at 375 (expressly limiting holding to situations where the habeas applicant could have raised the issue on direct appeal because he knew about the false testimony from the outset).

Mr. Cruz-Garcia had no way of knowing at trial or during his direct appeal that the DNA evidence about which Mr. Quartaro and Ms. Head testified at trial was false. He only obtained this information when post-conviction counsel received an amended lab report from the Harris County District Attorney's Office on November 3, 2015—over two years after sentencing and over a year after the brief was filed in his direct appeal. Ex. B; Ex. C at 1.

Here, as in *Ghahremani*, Mr. Cruz-Garcia could not have raised the matter at trial or on appeal. Therefore, he need only show materiality, not that the error was harmful. And because Mr. Cruz-Garcia has established that (1) the State relied on false evidence to obtain his conviction; and (2) the false evidence was material, he is entitled to habeas relief under *Chabot*.

24

EXHIBIT 4 Page 028

000803

## V.    PRAYER FOR RELIEF

For the foregoing reasons, Mr. Cruz-Garcia prays that this Court:

1. Find that the requirements of Section 5 of Article 11.071 have been

   satisfied;

2. Issue an order remanding the case to the convicting court for an evidentiary

   hearing for the purpose of examining the merits of these claims; and

3. Grant any other relief that law or justice requires.

                                        Respectfully submitted,


DATED:    May 2, 2016                   */s/ Benjamin Wolff*
                                        Benjamin Wolff

25

000804

EXHIBIT 4 Page 029

STATE OF TEXAS                  §
COUNTY OF TRAVIS                §

VERIFICATION

    BEFORE ME, the undersigned authority, on this day personally appeared Gretchen Sween, who upon being duly sworn by me testified as follows:

    1.    I am a member of the State Bar of Texas.

    2.    I am the duly authorized attorney for Obel Cruz-Garcia, having the authority to prepare and to verify Mr. Cruz-Garcia's Subsequent Application for Post-Conviction Writ of Habeas Corpus.

    3.    I have prepared and have read the foregoing Subsequent Application for Post-Conviction Writ of Habeas Corpus, and I believe all allegations in it to be true to the best of my knowledge.

Signed under penalty of perjury:

                               Gretchen S. Sween

SUBSCRIBED AND SWORN TO BEFORE ME on May 2, 2016.

                               Notary Public, State of Texas



ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

Notary without Bond

26

000805

EXHIBIT 4 Page 030

## CERTIFICATE OF COMPLIANCE

This pleading complies with Tex. R. App. P. 9.4. According to the word count function of the computer program used to prepare the document, the brief contains 6,181 words excluding the items not to be included within the word count limit.

/s/ *Gretchen S. Sween*
Gretchen S. Sween

## CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Subsequent Application for a Writ of Habeas Corpus to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002

Harris County District Attorney
c/o Lori DeAngelo
1201 Franklin
Suite 600
Houston, TX 77002

Court of Criminal Appeals
201 W. 14th Street
Austin, Texas 78701

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

This certification is executed on May 2, 2016, at Austin, Texas.

/s/ *Gretchen S. Sween*
Gretchen S. Sween

EXHIBIT 4 Page 031

000806

# EXHIBIT A

EXHIBIT 4 Page 032

000807

Case 4:17-cv-03621   Document 18-4   Filed on 07/01/19 in TXSD   Page 33 of 52

**TEXAS FORENSIC**
## SCIENCE COMMISSION
*Justice Through Science*

1700 North Congress Ave., Suite 445
Austin, Texas 78701

August 21, 2015

Members of the Texas Criminal Justice Community:

This letter provides notification to the community regarding an issue of potential concern to judges, criminal prosecutors, criminal defense lawyers, victims and defendants in the Texas criminal justice system. The concerns involve the interpretation of DNA results where multiple contributors may be present, commonly referred to as DNA mixture interpretation. The attached document details the origin and scope of the concerns.

While the Commission assesses the issues described in the attached document, we recommend any prosecutor, defendant or defense attorney with a currently pending case involving a DNA mixture in which the results could impact the conviction consider requesting confirmation that Combined Probability of Inclusion/Exclusion (referred to as "CPI" or "CPE") was calculated by the laboratory using current and proper mixture interpretation protocols. If the laboratory is unable to confirm the use of currently accepted protocols for the results provided, counsel should consider requesting a re-calculation of CPI/CPE.

The extent to which any closed criminal cases may require re-analysis will be a subject of Commission review and subsequent notification to the stakeholder community.

If you have any questions regarding these issues, please contact the Commission's general counsel, Lynn Garcia, at 512-936-0649 or lynn.garcia@fsc.texas.gov.

Sincerely,

Vincent J.M. Di Maio, MD
Presiding Officer

EXHIBIT A Page 000808

EXHIBIT 4 Page 033

**Unintended Catalyst: the Effects of 1999 and 2001 FBI STR Population Data
Corrections on an Evaluation of DNA Mixture Interpretation in Texas**

1. FBI Data Corrections: What Do They Mean?

In May 2015, the Federal Bureau of Investigation ("FBI") notified all CODIS laboratories it had identified minor discrepancies in its 1999 and 2001 STR Population Database. Laboratories across the country have used this database since 1999 to calculate DNA match statistics in criminal cases and other types of human identification. The FBI attributed the discrepancies to two main causes: (a) human error, typically due to manual data editing and recording; and (b) technological limitations (*e.g.*, insufficient resolution for distinguishing microvariants using polyacrylamide gel electrophoresis), both of which were known limitations of the technology. The FBI has provided corrected allele frequency data to all CODIS laboratories.

In May and June 2015, Texas laboratories notified stakeholders (including prosecutors, the criminal defense bar and the Texas Forensic Science Commission) that the FBI allele frequency data discrepancies were corrected. The immediate and obvious question for the criminal justice community was whether these discrepancies could have impacted the outcome of any criminal cases. The widely accepted consensus among forensic DNA experts is the database corrections have *no impact* on the threshold question of whether a victim or defendant was *included or excluded* in any result. The next questions were whether and to what extent the probabilities associated with any particular inclusion changed because of the database errors.

The FBI conducted empirical testing to assess the statistical impact of the corrected data. This testing concluded the difference between profile probabilities using the original data and the corrected data is less than a two-fold difference in a full and partial profile. Testing performed by Texas laboratories also supports the conclusion the difference is less than two-fold. For example, in an assessment performed by one Texas laboratory, the maximum factor was determined to be 1.2 fold. In other words, after recalculating cases using the amended data, the case with the *most substantially affected* Combined Probability of Inclusion/Exclusion ("CPI")[1] statistical calculation (evaluated for a mixed sample) changed from a 1 in 260,900,000 expression of probability to a 1 in 225,300,000 expression of probability.

Amended allele frequency tables are publicly available for anyone to compare the calculations made using the previously published data and the amended allele frequencies, though expert assistance may be required to ensure effective use of the tables.[2]

2. The Impact of FBI Database Errors on DNA Mixture Interpretation Using CPI

As part of their ongoing commitment to accuracy, integrity and transparency, many Texas laboratories offered to issue amended reports to any stakeholder requesting a report using the corrected FBI allele frequency data. Some prosecutors have submitted such requests to laboratories, particularly for pending criminal cases. As expected, the FBI corrected data have not had an impact exceeding the

---

[1] The Combined Probability of Inclusion/Exclusion is commonly referred to as either "CPI" or "CPE." They are referred to jointly in this document as "CPI" for ease of reference.

[2] https://www.fbi.gov/about-us/lab/biometric-analysis/codis/amended-fbi-str-final-6-16-15.pdf

EXHIBIT 4 Page 034                                                        EXHIBIT A Page 000809

two-fold difference discussed above.  However, because analysts must issue *signed amended reports* with the new corrected data, they may only issue such reports if they believe *the analyses and conclusions in the report comply with laboratory standard operating procedures*.  For cases involving DNA mixtures, many laboratories have changed their interpretation protocols and related procedures using CPI.  To reiterate, changes in mixture interpretation protocols are unrelated to the FBI allele frequency data corrections discussed above.  However, when issuing new reports requested because of the FBI data corrections, the laboratory's use of current mixture protocols may lead to different results if the laboratory had a different protocol in place when the report was originally issued.  Changes in mixture interpretation have occurred primarily over the last 5-10 years and were prompted by several factors, including but not limited to mixture interpretation guidance issued in 2010 by the Scientific Working Group on DNA Analysis ("SWGDAM").

The forensic DNA community has been aware of substantial variance in mixture interpretation among laboratories since at least 2005 when the National Institute of Standards and Technology ("NIST") first described the issue in an international study called MIX05.  Though NIST did not expressly flag which interpretation approaches were considered scientifically acceptable and which were not as a result of the study, it has made significant efforts to improve the integrity and reliability of DNA mixture interpretation through various national training initiatives.  These efforts have ultimately worked their way into revised standard operating procedures at laboratories, including laboratories in Texas.  Based on the MIX05 study, we know there is variation among laboratories in Texas and nationwide, including differences in standards for calculation of CPI that could be considered scientifically acceptable.  However, we also know based on a recent audit of the Department of Forensic Sciences ("DFS") in Washington, DC that some of the "variation" simply does not fall within the range of scientifically acceptable interpretation.  This finding does not mean laboratories or individual analysts did anything wrong intentionally or even knew the approaches fell outside the bounds of scientific acceptability, but rather the community has progressed over time in its ability to understand and implement this complex area of DNA interpretation appropriately.

While in many cases the changed protocols may have no effect, it is also possible changes to results may be considered material by the criminal justice system, either in terms of revisions to the population statistics associated with the case or to the determination of inclusion, exclusion or an inconclusive result.  The potential range of interpretive issues has yet to be assessed, but the potential impact on criminal cases raises concerns for both scientists and lawyers.  We therefore recommend any prosecutor, defendant or defense attorney with a currently pending case involving a DNA mixture in which the results could impact the conviction consider requesting confirmation that CPI was calculated by the laboratory using current and proper mixture interpretation protocols.  If the laboratory is unable to confirm the use of currently accepted protocols for the results provided, counsel should consider requesting a re-analysis of CPI.

The Texas Forensic Science Commission is currently in the process of assembling a panel of experts and criminal justice stakeholders to determine what *guidance and support* may be provided to assist Texas laboratories in addressing the challenging area of DNA mixture interpretation.  In particular, a distinction must be made between acceptable variance in laboratory interpretation policies and protocols and those approaches that do not meet scientifically acceptable standards.  An emphasis on statewide collaboration and stakeholder involvement will be critical if Texas is to continue to lead the nation in tackling challenging forensic problems such as those inherent in DNA mixture interpretation.

# EXHIBIT B

EXHIBIT 4 Page 036

000811

**Joanne Heisey**

| | |
|---|---|
| **From:** | DeAngelo, Lori <DEANGELO_LORI@dao.hctx.net> |
| **Sent:** | Tuesday, November 03, 2015 10:02 AM |
| **To:** | Joanne Heisey |
| **Attachments:** | 105758592-2010-11899-5-DNA.PDF |

Hi Joanne. The trial prosecutor in Obel Cruz-Garcia received the attached amended DNA report earlier this morning and asked that I get it to his writ attorney.

Also, I eventually plan on filing an extension for my answer – the 120 days is up New Year's Eve. I will be asking for a 60-day extension, which would be February 29, 2016. Please let me know if you have any objection to this.

And while I'm thinking about it, our phone numbers changed office wide. My direct line is 713-274-5986.

Thank you,
Lori

EXHIBIT 4 Page 037

EXHIBIT B Page 000812

# EXHIBIT C

EXHIBIT 4 Page 038

000813



# Houston Forensic Science Center

### Forensic Analysis Division
### Biology Section
1200 Travis Street, Houston, Texas 77002
(713) 308-2600



FORENSIC TESTING
ISO/IEC 17025

| | |
|---|---|
| **Incident Number:** | 105758592 |
| **Forensic Case Number:** | 2010-11899 |

**Report Date:** November 03, 2015

## Amended Laboratory Report #5

The report dated October 18, 2010 (OLO Supplement #84) has been amended with corrections and/or additions. Under Results and Interpretations, the statistics for item HP07-0014-01 and HP07-0014-07 (sperm fraction) have been changed to reflect an update to the FBI Popstats database, and the source statement has been removed. The conclusion for Item HP07-0014-02 (sperm fraction) has changed to reflect current interpretation guidelines. A conclusion for item 3.1 has been added. The note statement for loci D2S1338 and D19S433 has been removed. The assigned analyst has changed from Courtney Head to Robin Guidry. The original report is available at the Houston Forensic Science Center upon request.

**Offense:** Murder

**Previous Analysis:** Genetic Design DNA Report dated February 4, 1993; Genetic Design DNA Report dated February 23, 1994; Orchid Cellmark DNA Report HP07-0014, dated November 27, 2007; Orchid Cellmark DNA Report HP07-0014-A, dated December 31, 2007; Orchid Cellmark DNA Report HP07-0014-B, dated July 25, 2008; Orchid Cellmark DNA Report HP07-0014-C, dated April 20, 2011; Orchid Cellmark DNA Report HP07-0014-D, dated June 15, 2011; Laboratory Reports dated November 16, 1992 (OLO Supplement #28), December 1, 1992 (OLO Supplement #31), May 13, 1993 (OLO Supplement #33), February 24, 1994 (OLO Supplement #37), December 10, 2007 (OLO Supplement #48), October 18, 2010 (OLO Supplement #84), January 13, 2011, and June 25, 2013

**Requesting Officer:** R. W. Chappell

**Lab #:** L92-10367

## ITEMS OF EVIDENCE:

3       Known buccal swabs - Obel Cruz-Garcia

3.1     Portion of known buccal swabs – Obel Criz-Garcia

The Houston Forensic Science Center is accredited by ANSI-ASQ National Accreditation Board/FQS in the following forensic testing categories: Drugs, Toxicology, Biology and Firearms.

EXHIBIT C Page 1

000814

EXHIBIT 4 Page 039

| Incident Number: | 105758592 | Houston Forensic Science Center |
| Forensic Case Number: | 2010-11899 (5) | Report Date: November 03, 2015 |

Item 3.1 was compared to the following DNA profiles previously reported by Orchid Cellmark in Report HP07-0014, dated November 27, 2007:

HP07-0014-01: Cigar
HP07-0014-02: Vaginal swabs from Diana Garcia (sperm fraction)
HP07-0014-07: Panties: crotch - red from Diana Garcia (sperm fraction)

## RESULTS AND INTERPRETATIONS:
The DNA was extracted and amplified using polymerase chain reaction (PCR). The following STR loci were analyzed: D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, and FGA, along with the sex determining marker Amelogenin.

### HP07-0014-01 (Cigar)
A full, single-source male DNA profile was obtained from this item. OBEL CRUZ-GARCIA cannot be excluded as a possible contributor to the DNA profile obtained from this item. The probability that a randomly chosen unrelated individual would be included as a possible contributor to this DNA profile is approximately 1 in 6.0 quintillion for Caucasians, 1 in 700 quintillion for African Americans, and 1 in 100 quintillion for Southwest Hispanics.

### HP07-0014-02 (Vaginal swabs from Diana Garcia (sperm fraction))
A mixture of DNA from at least three individuals, at least one of whom is male, was obtained from this item. No conclusions will be made given the excessive number of contributors to this DNA mixture.

### HP07-0014-07 (Panties: crotch - red from Diana Garcia (sperm fraction))
A mixture of DNA from at least two individuals, at least one of whom is male, was obtained from this item. OBEL CRUZ-GARCIA cannot be excluded as a possible contributor to the major component of this DNA mixture. The probability that a randomly chosen unrelated individual would be included as a possible contributor to the major component of this DNA mixture is approximately 1 in 6.0 quintillion for Caucasians, 1 in 700 quintillion for African Americans, and 1 in 100 quintillion for Southwest Hispanics. No conclusions will be made regarding the minor component of this DNA mixture due to insufficient data.

### Item 3.1 (Portion of known buccal swabs - Obel Cruz-Garcia)
A full, single-source male DNA profile was obtained from this item.

## DISPOSITION:
All DNA extracts and any remaining portions are being retained in the laboratory. Any other items will be returned to the submitting agency.

*Robin D. Guidry*
_____
Robin Guidry
Supervisor - Forensic Biology
Assigned Analyst

The prosecutor and defense counsel may obtain additional documents related to this case by submitting a request to Triage@HoustonForensicScience.org . Requests should state the requestor's connection to the case and include full contact information.

EXHIBIT C Page 000815

EXHIBIT 4 Page 040

Case 4:17-cv-03621   Document 18-4   Filed on 07/01/19 in TXSD   Page 41 of 52

| Incident Number: | 105758592 | | Houston Forensic Science Center |
| Forensic Case Number: | 2010-11899 (5) | | Report Date: | November 03, 2015 |

| Case Items | D8S1179 | D21S11 | D7S820 | CSF1PO | D3S1358 | TH01 | D13S317 | D16S539 | D2S1338 | D19S433 | vWA | TPOX | D18S51 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 Portion of known buccal swabs – Obel Cruz-Garcia | 10,16 | 30.2,31 | 8,11 | 11 | 16,18 | 6,8 | 11,12 | 9,11 | 17,20 | 13,14 | 16,17 | 8 | 13,18 |

SF=Sperm Fraction; EF=Epithelial Fraction,
NR = No interpretable result; ( ) = Minor allele; ^ = Allele below stochastic threshold
~ = Allele below stochastic threshold, but suitable for statistics, assuming single-source
INC = Inconclusive/activity that could not be confirmed as real or artifactual

EXHIBIT C Page 3

Page 3 of 3

000816

EXHIBIT 4 Page 041

# EXHIBIT D

EXHIBIT 4 Page 042

000817

## AFFIDAVIT OF JOSE MARTIN VALDEZ

I, Jose Martin Valdez, state and declare as follows:

1. My name is Jose "Joe" Valdez.  I have known Obel Cruz-Garcia since around 1989.  I have always known Obel by his nickname, Chico.

2. I was the first one in my family to meet Chico.  I met him through another friend when we all went out to eat.  That first time we hung out, we just really got along.  After that we started hanging out often.  I would say we hung out almost every day.  After I got locked up, Chico started talking to my brother Cesar.

3. In the years leading up to the kidnapping of Angelo Garcia, I was friends with Diana Garcia and Arturo Rodriguez.  I actually knew them before I met Chico.  We lived in the same apartment complex for a while.  Cesar and I would go over there sometimes and Diana would cook for us.  She'd make us breakfast, lunch, and dinner sometimes.  I did not know Chico at this time.  I met him later.

4. Diana and I would have sex together sometimes.  When I first started messing around with Diana, she was with Arturo.  What happened was that she caught him messing around with another woman.  She came to me and wanted to have sex, so we did.  After that, we would have sex any chance we got, though it was hard because Arturo was around sometimes.  Diana and I would often have sex, even though she was with Arturo.  To my knowledge, Diana was also messing around with other guys, including Chico.  I was not surprised that she was messing around with other guys.  I found out about Chico and Diana messing around from my family.  The time period that Chico and Diana were having sex was around the same time Angelo was kidnapped.

1

J.V.

EXHIBIT 4 Page 043

5. Chico was a good friend to me and my family. Back in those days, we would not like to bring our friends around our family, but Chico was different. He would come around. He treated my mom and dad with the utmost respect. I remember he would come over and tell my parents, "Let's go out to eat somewhere nice." He would take them out to eat at these nice restaurants. He would buy them gifts for Christmas. He treated my parents like they were his parents. He was really good to them and very respectful. He would tell us to be respectful to them. Whenever I was in prison, Chico would send me money for commissary. He was generous like that with everyone. I believe he paid for Diana and Arturo's phone.

6. After Angelo was kidnapped, I was interviewed by some detectives from the Houston Police Department, but I was never contacted or interviewed by anyone on Chico's defense team. Had I been interviewed by Chico's defense team, I would have told them everything that I have stated in this affidavit and would have testified if they had asked me to be a witness.

7. I have read and reviewed this two-page affidavit.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on August 20, 2015 in Harris County, Houston, Texas.

_Jose M Valdez_
Jose Martin Valdez

Subscribed and sworn to before me on August 20, 2015.

_____
Notary Public, State of Texas

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2016

Notary without Bond

2

EXHIBIT 4 Page 044

EXHIBIT D Page 000819

# EXHIBIT E

EXHIBIT 4 Page 045

000820

# AFFIDAVIT OF CESAR AMADO RIOS

I, Cesar Amado Rios, state and declare as follows:

1. My name is Cesar Amado Rios. I have known Obel Cruz-Garcia since around 1990 or so. We got to know each other through mutual friends. I have always known Obel by his nickname, Chico.

2. At the time that Angelo Garcia was kidnapped, I knew Chico well. I had lived with him and his wife, Angelita, when they lived in an apartment called the Willow Creek Apartments. I lived there for a year or two around 1992. I also knew Diana Garcia and Arturo Rodriguez and Diana's son, Angelo.

3. Around the time Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana. Other people knew about it as well. On the day Angelo was kidnapped, Chico was over at Diana's apartment earlier in the day.

4. I remember I saw Chico that morning, the day it all happened. Later that night, Chico called me and asked me to go to Diana's house. This happened before the kidnapping occurred. Chico told me to go get some stuff out of a safe and take it to a motel off of 225. When I got back to the apartment, the cops were there. Diana told me later that the kidnapping happened right after I left, because she thought it was me at the door, like I had walked out and was trying to coming back inside.

5. I heard that the people who did this ransacked Diana and Arturo's apartment, like they were looking for something. That's why I never understood why people thought Chico was involved. He knew I had already gone over and moved the stuff from the safe, so if it were him he would not have had any reason to look for something else.

CR 1

EXHIBIT 4 Page 046

EXHIBIT E Page 000821

6. Chico had a big heart and was a good friend to me. He was close to my parents and would do anything to help them out. He was really respectful and treated us like family. He bought me my first car. It was a 1983 Buick Regal that he gave me as a gift.

7. I was shot three times with a twelve gauge shotgun in 1991. I was shot in the arm and the back. I called Diana, and Diana called Chico. Diana came to pick me up at my friend's place where I had run after I got shot. Diana drove me to the hospital and Chico met us at the hospital. The first hospital said they had to amputate my arm, but Chico said no. We ended up going to Southeast Memorial Hospital, and they said they could save my arm. But I did not have insurance. Chico said he would take care of it. He put down the title of his car and went and got some money, and he told the hospital to operate.

8. After Angelo was kidnapped, I was interviewed by some detectives from the Houston Police Department. I remember talking to one person on the defense team briefly, but I never spoke with them again after that. I was around and would have been happy to help Chico. I was available to testify during Chico's trial in July 2013. Had I been interviewed by Chico's defense team, I would have told them everything that I have stated in this affidavit and would have testified to the same had I been called as a witness.

2

EXHIBIT 4 Page 047

EXHIBIT E Page 000822

9.  I have read and reviewed this three-page affidavit.


I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _August 13_, 2015 in _Harris County_, Houston, Texas.

_Cesar Amado Rios_

Cesar Amado Rios



Subscribed and sworn to before me on _August 13_, 2015.


Notary Public, State of Texas

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2016

Notary without Bond

3

EXHIBIT 4 Page 048

# EXHIBIT F

EXHIBIT 4 Page 049

000824

## AFFIDAVIT OF HECTOR SAAVEDRA

I, Hector Saavedra, state and declare as follows:

1. My name is Hector Saavedra. I was born ██████████. I am thirty-seven years old. I currently work at Pioneer Waste Services. I have been working there for about three years.

2. I knew Obel Cruz-Garcia through my brother, Cesar Rios. I first met Obel in or around 1990 when I was about thirteen years old. My brother and I always called Obel by his nickname, "Chico." I knew Obel well when I was thirteen to fifteen years old.

3. When I was about fourteen years old, in 1991, my brother Cesar got shot in the arm. I was asleep when it happened because I had school the next day. Obel was not with Cesar when he got shot, but he came with us when we took him to the hospital. At the first hospital we went to, they told us that they probably would have to amputate Cesar's arm. Obel was shocked and told us that we needed to go to a different hospital for a second opinion. Cesar and I both told Obel that, either way, we did not have the money to pay for Cesar's treatment. Obel told us not to worry about it. We went to another hospital, Memorial Hermann Southeast Hospital, off of Scarsdale Boulevard, where they were able to treat Cesar without needing to amputate. As he promised, Obel paid for Cesar's treatment and hospital bills. It was not even that he had that much money lying around – I remember Obel saying that he would sell one of his cars, if he had to, to pay for Cesar's medical bills. He just treated us like family. I remember seeing all this firsthand, as a child, in the hospital.

4. Obel was really good about helping out with our parents. For example, sometimes when Obel would go to the grocery store, he would pick up milk

EXHIBIT 4 Page 050

and food to drop off with my family. It was a way of showing respect for our parents because we were so close, like family, in the same way that my family would bring food when we would go to visit our relatives in Mexico. Obel was like a family member. He would come over and eat with us. He was very respectful and very supportive of me and my family.

5. Obel also seemed to take a personal interest in me and my wellbeing, like a little brother. He would ask me about school and football. I know he didn't have family here, so I think we were like his family while he was here. Obel would always tell me to study, and he stressed how important it was for me to pay attention and do well in school. When I got a report card, Obel would want to see it to make sure I had good grades. If I earned good grades, Obel would reward me with pocket-money or a gift. If I ever needed anything for school, like clothes or books, Obel would make sure to get it for me. Overall, I just knew Obel to be a great and generous person. He never asked for anything in return for all the good deeds he did for me and my family.

6. Also around this time, I knew of Diana Garcia, her boyfriend Arturo, and her son Angelo. I knew that Diana was sleeping with my brother, Joe, and also that she was sleeping with Obel. Diana would come see Joe at the house where I lived, and I knew they were sleeping together. When Joe went to jail, I knew that Diana and Obel were together.

7. No one from Obel's defense team ever contacted me to ask me about Obel. If they had, I gladly would have told them everything I know about what a good guy Obel was. I happily would have testified at trial, had I been asked.

8. I have read and reviewed this three-page affidavit.

2

H.S.

EXHIBIT F Page 2

000826

EXHIBIT 4 Page 051

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on August 13, 2015 in Harris County, Houston, Texas.

Hector Sevaadra

Subscribed and sworn to before me on August 13, 2015.

Notary Public, State of Texas

ADRIAN DE LA ROSA
Notary Public, State of Texas
My Commission Expires
JUNE 30, 2018

Notary without Bond

3

EXHIBIT 4 Page 052

13847940101C / Court: 337

# EXHIBIT 5



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NOS. WR-85,051-02 AND WR-85,051-03[1]

## EX PARTE OBEL CRUZ-GARCIA, Applicant

## ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS FROM CAUSE NO. 1384794 IN THE 337TH DISTRICT COURT HARRIS COUNTY

*Per curiam.*

### O R D E R

These are post conviction applications for writs of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure article 11.071.[2]

On September 30, 1992, applicant and Rogelio Aviles-Barroso (a.k.a. "Roger"),

---

[1] WR-85,051-01 was a petition for writ of mandamus which we denied leave to file. *Ex parte Cruz-Garcia*, WR-85,051-01 (Tex. Crim. App. July 27, 2016)(not designated for publication).

[2] Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

EXHIBIT 5 Page 001

donned masks and broke into the apartment of Diana Garcia and Arturo Rodriguez.  Garcia and Rodriguez had recently informed applicant that they no longer wished to sell drugs for him.  Applicant and Roger assaulted Rodriguez and sexually assaulted Garcia.  Garcia's six-year-old son █████ witnessed the assaults.  Applicant grabbed █████ and took him to his car where Carmelo Martinez Santana (a.k.a. "Rudy") was awaiting applicant's and Roger's return.

Applicant drove Roger, Rudy, and █████ to a remote area in Baytown.  Applicant then ordered Roger to kill █████  Roger and Rudy then hid █████ body in a nearby waterway while applicant looked on.

The next day, on October 1, 1992, applicant cleaned out the interior of his car and then sold it to purchase an airline ticket to Puerto Rico.  Applicant's wife Angelita said that this trip was sudden and unplanned.  Rudy drove applicant to the airport on October 2, 1992.  Applicant was scheduled to appear in a Harris County District Court on October 8, 1992 on a pending case.  Applicant failed to return for his court date and forfeited his bond.  Applicant had never missed a court date before this time.  The next time Angelita saw applicant was in the Dominican Republic when he confessed to her that he had killed █████ █████ body was recovered in November 1992.

In June 2013, a jury found applicant guilty of the offense of capital murder committed in the course of committing or attempting to commit kidnapping.  At punishment, the jury answered the special issues submitted pursuant to Article 37.071, and the trial court,

EXHIBIT 5 Page 002

accordingly, set applicant's punishment at death. This Court affirmed applicant's conviction and sentence on direct appeal. *Cruz-Garcia v. State*, No. AP-77,025 (Tex. Crim. App. Oct. 28, 2015)(not designated for publication). On August 28, 2015, applicant timely filed his initial writ in the convicting court.

Applicant presents fourteen allegations in his application in which he challenges the validity of his conviction and resulting sentence. The trial court did not hold an evidentiary hearing, and it entered findings of fact and conclusions of law and recommended that the relief sought be denied.

This Court has reviewed the record with respect to the allegations made by applicant. Claims 5 and 7 are procedurally barred because habeas is not a substitute for matters which should have been raised at trial or on direct appeal. *Ex parte De La Cruz*, 466 S.W.3d 855, 864 (Tex. Crim. App. 2015); *see also Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004) (holding that even a constitutional claim is forfeited if the applicant had an opportunity to raise the issue on appeal). Claim 9 is procedurally barred as it was raised and rejected on direct appeal. *See Cruz-Garcia*, slip op. at 53-58. *Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984).

In the following claims, applicant contends that his trial counsel were ineffective for: (claim 1) failing to present evidence from a DNA expert to challenge the DNA evidence presented at trial; (claim 2) failing to investigate and present reasonable doubt at the guilt/innocence phase of trial regarding a consensual sexual relationship between applicant

EXHIBIT 5 Page 003

and Garcia, and whether Garcia and Rodriguez continued to sell drugs for applicant; (claim 3) failing to investigate and present evidence that applicant would not be a future danger; (claim 4) failing to investigate and present mitigation evidence; (claim 6) failing to recognize the significance of applicant's foreign nationality and seek the help of the Dominican Republic consulate in defending applicant's case; and (claim 8) failing to investigate juror misconduct. In claim 7, as the underlying issue was procedurally barred, applicant contends that his appellate counsel was ineffective for failing to assert that his due process rights were violated by constitutional errors relating to the trial court's ex parte discussion with a single juror. Applicant fails to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). He fails to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Id.* at 689. In claim 10, applicant contends that trial counsels' cumulative deficient performance over the course of the trial prejudiced him. We have found no errors on the part of counsel. *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003)(holding non-errors may not in cumulative effect cause errors).

In claims 11 through 14, applicant challenges the constitutionality of various aspects of Article 37.071: that the punishment phase jury instructions restricted the evidence the jury could determine as mitigating, that the "10-12" rule is unconstitutional, that the first special issue is unconstitutionally vague, and that Texas's capital punishment scheme is arbitrarily imposed. These claims have been repeatedly rejected by this Court and applicant raises

EXHIBIT 5 Page 004

nothing new to persuade us to reconsider those holdings. *See Davis v. State*, 313 S.W.3d 317, 354-55 (Tex. Crim. App. 2010)("10-12" rule, arbitrarily imposed capital punishment scheme); *Coble v.State*, 330 S.W.3d 253, 297 (Tex. Crim. App. 2010)(vague first special issue, restriction of evidence that can be considered mitigating).

Based upon the trial court's findings and conclusions and our own review, we deny relief.

Applicant's May 2, 2016 filing is a subsequent application that must be reviewed under Article 11.071, § 5(a). In his first claim, applicant argues that he is entitled to relief under Article 11.073 because the now-revised DNA results were not previously available to him. Article 11.073 §(b) provides (1) that applicant must show that (A) the relevant scientific evidence was not previously available, and (B) the evidence would be admissible at trial, and (2) had the evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted. We have reviewed the claim. Applicant fails to meet the dictates of Article 11.073 §(b)(2).

In his second claim, applicant contends that he is entitled to a new trial because his conviction was based on false, misleading, and scientifically invalid testimony. Under "Article 11.071, an original or subsequent application for a writ of habeas corpus must state specific, particularized facts which, if proven true, would entitle him to habeas relief." *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex. Crim. App. 2005). Here, to be entitled to due process relief on the basis of false evidence, applicant must show that the new evidence is material—

EXHIBIT 5 Page 005

Case 4:17-cv-03621 Document 11-5 Filed on 10/06/19 in TXSD Page 838 of 919

Cruz-Garcia  - 6

that there is a "reasonable likelihood that the false testimony affected the applicant's conviction or sentence." *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012). Applicant fails to make a *prima facie* showing that the new evidence is material to the outcome of his case.

Accordingly, we dismiss applicant's subsequent application as an abuse of the writ under Article 11.071 §5(a)(1) without reviewing the merits of the claims raised.

IT IS SO ORDERED THIS THE 1st DAY OF NOVEMBER, 2017.

Do Not Publish

EXHIBIT 5 Page 006

13847940101C / Court: 337

# EXHIBIT 6

## AFFIDAVIT OF STEVEN SHELLIST

I, Steven Shellist, state and declare as follows:

1.  My name is Steven Shellist. I graduated from the South Texas College of Law in 2002 and was admitted to the State Bar of Texas in 2003. My Texas State Bar number is 24039172. I worked in Harris County as an Assistant District Attorney for just shy of three years. I have practiced as a criminal defense attorney in private practice since 2006. My practice consists of handling both misdemeanor and felony, state and federal criminal cases. To date, I have taken over one hundred cases to trial, including several murder and capital murder cases.

2.  In April 2010, Christian Capitaine and I were retained as counsel by Obel Cruz-Garcia to represent him in a prosecution for capital murder. Mr. Capitaine and I ultimately withdrew from the case in August 2011 after the State announced its intent to seek the death penalty, as Mr. Capitaine and I were not qualified to serve as counsel in a death penalty case.

3.  In my representation of Cruz-Garcia, it became apparent immediately that DNA was the State's key piece of evidence in this case. DNA evidence was the only physical evidence linking Cruz-Garcia to the crime. Therefore, we knew that evaluating the integrity of the DNA evidence would be crucial in determining whether or not Cruz-Garcia could be connected to the sexual assault of Diana Garcia and the kidnapping and subsequent death of her son. We learned from our investigation that when the DNA was initially handled by the Houston Police Department, a woman by the name of Dee Wallace had been involved in the process. Years later, Ms. Wallace was not only terminated from DPS, but also, I believe, sent to prison for tampering. We believed that a *review of the*

1

EXHIBIT 6 Page 001

000836

State's handling and processing of the DNA evidence by an independent forensic DNA expert was necessary to render effective assistance of counsel and to guarantee Cruz-Garcia a fair trial.

4.  To that end, Mr. Capitaine and I reached out to Dr. Elizabeth Johnson, a forensic scientist and DNA analyst, to consult with us about the DNA evidence in the case. Our intention was to have Dr. Johnson perform a review of the DNA testing already done and, if necessary, have the DNA evidence retested. We alerted the Court that we would be pursuing this angle and requested time to allow this investigation to take place. Dr. Johnson provided an affidavit in support of our Motion for Continuance, filed in January 2011, setting out the time that she herself would need to perform that work.

5.  Mr. Capitaine and I withdrew from the case before Dr. Johnson had an opportunity to perform a review of the DNA evidence. Had we remained on the case, and had Dr. Johnson conducted a review that produced helpful results, we would have used that information to attempt to suppress the DNA evidence. Alternatively, we would have either presented Dr. Johnson as a witness at trial or continued to consult with her for assistance in our cross-examination of the State's witnesses pertaining to DNA.

6.  When Mr. Capitaine and I withdrew from the case, we told Cruz-Garcia's new counsel, Skip Cornelius, that we would be happy to consult with him about the case and share our thoughts and ideas for Cruz-Garcia's defense. However, Mr. Cornelius only wanted our files and declined to consult with us about the case.

7.  I have read and reviewed this three-page affidavit.

2

EXHIBIT 6 Page 002

000837

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on July 31, 2015 in Houston, Harris County, Texas.

_____
Steven Shellist

Subscribed and sworn to before me on July 31, 2015.

_____
Notary Public, State of Texas

JENNIFER WILLIS-DAVIS
Notary Public, State of Texas
My Commission Expires
December 26, 2016

3

EXHIBIT 6 Page 003

000838

13847940101C / Court: 337

# EXHIBIT 7

County Auditor's Form 840-1C
Harris County, Texas (REV. 11/01)

**ATTORNEY FEES EXPENSE CLAIM**
**DISTRICT COURTS-CAPITAL CASE**
UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE
AS AMENDED

**INSTRUCTIONS**

Show only one defendant per claim.

Before payment can be authorized, each item must be completed legibly in in

For investigations, paid bills must be submitted by the attorney for expenses on each

Forward completed claim to the presiding judge for approval.

| Court No. 337 | Defendant Name OBEL CRUZ-GARCIA | P52 |

| CAPITAL CASE | | Number of Court Days/Hours | RATE | TOTAL (presumptive maximum) | AMOUNT (Judge Completes) |
|---|---|---|---|---|---|
| **DEATH CAPITAL 1ST CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $600/day | | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $12,000 | |
| **DEATH CAPITAL 2ND CHAIR** | Non-Trial Appearance | | $400/day | | |
| | Voir Dire | | $500/day | | |
| | Trial/Hearing with Testimony | | $700/day | | |
| | Out-of-Court Hours* | | $80/hour | $9,600 | |
| **DEATH CAPITAL FLAT RATE** | Includes all fees except investigation costs, expert witness fees, and witness travel costs. Flat rate applies only if testimony begins in the guilt/innocence phase of trial. Otherwise, the daily and hourly rates apply. | 1ST CHAIR | | $35,000 | 65,000.— see exp. 1,306. 40 |
| | | 2ND CHAIR | | $30,000 | |
| **NON-DEATH CAPITAL** | Non-Trial Appearance | | $400/day | $3,200 | |
| | Trial/Hearing with Testimony | | $800/day | | |
| | Out-of-Court Hours* | | $100/hour | $5,000 | |
| **INVESTIGATION EXPERT TESTIMONY** | Prior written court approval required. Itemized bill required. Expert expenses paid per County policy. | | | | 23,266.82 |
| MENTAL HEALTH SUPPLEMENT* | | | $50/hour | $250 | |
| BILINGUAL SUPPLEMENT | | | $50/day | $250 | |
| AFTER HOURS SUPP. (Trial/Hearing after 6:00 pm) | | | $50/hour | | |
| OTHER-Prior Approval of Fee Schedule Committee Required. | | | | | |
| *Must detail on Out-of-Court voucher form. | | | | | |
| | | | | TOTAL | 88,573.12 |

List date(s) of all Court Appearances. Attach any Out-of-Court voucher form. 88,266.82

| PERSONAL INFORMATION | | |
|---|---|---|
| Social Security Number | Telephone Number | Bar Card Number 04831500 |
| Mailing Address (Number, Street, Suite, City, State, Zip Code) 2018 Biltle Texan HT 77019 | | |

**CERTIFICATION**

I, R.P. Cornelius , Attorney at Law, swear or affirm to the Harris County Auditor that he may rely upon the information contained above make payment according to the fee schedule adopted by the Board of District Judges Trying Criminal Cases pursuant to Article 26.05 Code of Criminal Procedure effective January 1, 2002. I further swear or affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE 29th DAY OF July A.D. 20 13

Approved _Renee Magee_
Judge, Presiding

_____
Attorney at Law (Signature)

_____
District Clerk Deputy (Signature)

_____
Attorney Name (print legibly)

**COURT**

EXHIBIT 7 Page001

000840

Defendant's Name: **Obel Cruz Garcia** Cause No. **1384794** Date: **7/26/13**
Attorney Name: **R.P. Coenolius** Performed by: **P. Knox**

### ATTORNEY FEES EXPENSE CLAIM CHECK LIST
### CAPITALS, CAPITAL APPEALS, & 11.071 WRITS OF HABEAS CORPUS

| | | Yes | No | |
|---|---|---|---|---|
| 1) | Confirmed correct court number on claim? | ☑ | ☐ | |
| 2) | Confirmed correct defendant's name on claim? | ☑ | ☐ | |
| 3) | Confirmed correct cause number on claim? | ☑ | ☐ | |
| 4) | Multiple cases on claim form? | ☐ | ☑ | |
| 5) | Non-Death Capital Case? | ☐ | ☐ Please circle one: Disposed by Trial or Plea |
| 6) | Death Case? | ☑ | ☐ Please circle one: Disposed by Trial or Plea |
| 7) | Same offense throughout LQY9 history? | ☑ | ☐ | |
| 8) | Capital – Appeal? | ☐ | ☑ | |
| 9) | 11.071 Writ? | ☐ | ☑ | |
| 10) | Service dates before January 1, 2002? | ☐ | ☑ | |
| 11) | Correct claim form submitted for payment? | ☑ | ☐ | |
| 12) | Attorney Appointment Order in case history on LQY9 screen in JIMS? | ☑ | ☐ | |
| 13) | Attorney approved for capital appointment in FDAMS? | ☑ | ☐ | |
| 14) | Dates of court appearances listed on claim? | ☐ | ☑ | *Requesting flat fee* |
| 15) | a. Confirmed with history in the LQY8 screen? | ☐ | ☐ | N/A |
| | If claiming out-of-court hours, is the out-of-court hours form completed and attached? | ☐ | ☐ | |
| | a. Is it mathematically accurate? | ☐ | ☐ | 0.00 * |
| | b. Does it match days/hours listed on the claim? | ☐ | ☐ | |
| 16) | On 11.071 Writs, is the Appointed Counsel Hourly Worksheet completed detailing services performed, dates, and times attached? | ☐ | ☐ | 15,896.82 * / 7,369.59 * / 23,266.41 * |
| | a. Are the hours mathematically accurate? | ☐ | ☐ | *Total Invest Fees only* 0.00 * |
| | b. Does it match the amount requested on the claim? | ☐ | ☐ | 0.00 * |
| 17) | If an 11.071 Writ, is the claim eligible for reimbursement from the state? | ☐ | ☐ | |
| | If no, why not | | | |
| 18) | Are expenses requested on claim? | ☑ | ☐ | |
| 19) | Expense invoices attached? | ☑ | ☐ | |
| 20) | Do the expense invoices detail services performed, dates and times? | ☑ | ☐ | |
| | a. Is it mathematically accurate? | ☑ | ☐ | |
| | b. Does it match the amount requested on the claim? | ☑ | ☐ | |
| 21) | Is written court approval for expenses attached? | ☑ | ☐ | |
| 22) | Is the expense amount on the claim equal to or less than the amount approved by the court? | ☑ | ☐ | |
| 23) | Correct county mileage rate used? | ☑ | ☐ | |
| 24) | Correct claim line item used? | ☑ | ☐ | |
| 25) | Claim amounts within limits? | ☐ | ☑ | *over max - need Approval* |
| 26) | If claim is totaled, is it mathematically accurate? | ☑ | ☐ | |

Attorney Expense: $ **66,306.90**
Expert Expense: $ **21,959.51**     TOTAL REQUESTED: $ **88,266.41**

EXHIBIT 7 Page002

000841

--------- IN CAMERA ---------

NO. 1384794

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

### DEFENDANT'S MEMORANDUM FOR OUT OF COURT EXPENSE OF

### CRIMINAL INVESTIGATION

TO THE HONORABLE JUDGE OF SAID COURT:

Please find the following:

1. Invoice from investigator for mitigation investigation.      **$3,194.76**

2. Second invoice from investigator for mitigation investigation.      <u>**$4,174.83**</u>

                                           **TOTAL**     **$7,369.59**

**(These are separate invoices for expenses incurred investigating the crimes only and not for purposes of mitigation).**

Respectfully submitted,

*[signature] R P CORNELIUS*

R.P. CORNELIUS
2028 Buffalo Terrace
Houston, Texas 77019
(713) 237-8547
State Bar No. 04831500

COURT APPOINTED
ATTORNEY FOR DEFENDANT

EXHIBIT 7 Page003

000842

NO. 1384794

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

## ORDER

On this 29 day of July , 2013, came on to be heard DEFENDANT'S IN CAMERA MOTION FOR OUT OF COURT EXPENSE FOR CRIMINAL INVESTIGATION and it is the Order of the Court that said motion should be granted.

It is the Order of the Court that an amount of 7369 59 , is approved for out of court expenses consistent with this motion. If additional funds are needed trial counsel is directed to make an additional request.


Judge, 337th District Court
of Harris County, Texas

3

EXHIBIT 7 Page004

# Gradoni & Associates

Professional Investigative Services
*State License A5741*

| BILL TO |
|---|
| Skip Cornelius |
| 2028 Buffalo Terrace |
| Houston, Texas 77019 |

**Invoice**

| DATE | INVOICE # |
|---|---|
| 3/29/2013 | 17521 |

| DESCRIPTION | AMOUNT |
|---|---|
| FOR PROFESSIONAL SERVICES    TIN# ▓▓▓▓▓ | |
| | |
| Re: State of Texas vs. Obel Cruz-Garcia | |
| Cause #1289189, 1289188, 1181910, 337th District Court | |
| Our File #12-05-0266, Statement #1 | |
| | |
| Description of Activity: | |
| See Attached Affidavit | |
| | |
| Services: | |
| 71.60 hours @ $40.00 per hour | 2,864.00 |
| | |
| Expenses: | |
| 278 miles @ .555 per mile | 154.29 |
| Clerical | 12.90 |
| Long distance | 59.47 |
| Word Processing | 63.10 |
| Computerized searches | 41.00 |
| | |
| Subtotal | 3,194.76 |
| Tax Exempt | 0.00 |
| | |
| Payment due upon receipt. Thank you! | |
| **Total** | **$3,194.76** |

2611 Cypress Creek Pkwy, Suite C100  •  Houston, Texas 77068  •  (281) 440-0800  •  Fax (281) 440-0208

EXHIBIT 7 Page005

000844

HARRIS COUNTY CRIMINAL APPOINTMENT
TIME & MILEAGE LOG
Invoice #17521

Attorney: R.P. Cornelius

Defendant: Obel Cruz-Garcia

Cause #: 1289189, 1289188, 1181910 Court: 337th  Statement #:      1

| Date | Activity | Time | Miles | Park | Tolls |
|---|---|---|---|---|---|
| 5/15/12 | Initial Meeting with Attorney to Review Case Priorities, Assignments and Former Attorney's Work Product (2 Investigators) | 4.50 | 40 | | |
| 5/30/12 | Review Former Attorney Work Product to Prepare for Jail Interview with Defendant | 2.90 | | | |
| 5/30/12 | Jail Interview with Defendant, Compile Report | 3.25 | 46 | 5.00 | |
| 6/1/12 | Phone Briefing with Attorney Regarding Investigation | .50 | | | |
| 6/4/12 | Conduct Interviews with Defendant's Relatives in the Dominican Republic, Compile Reports | 5.25 | | | |
| 6/6/12 | Review Offense Report, Compile Case Overview for Attorney Detailing Witness Statements and Evidence | 5.30 | | | |
| 6/6/12 | Conduct Interviews with Defendant's Relatives in Venezuela, Compile Reports | 4.70 | | | |
| 6/8/12 | Conduct Interviews with Defendant's Relatives in the Dominican Republic, Compile Reports | 4.30 | | | |
| 6/11/12 | Attempts to Make Phone Contact with Defendant's Relatives in the Dominican Republic, Start Documentation of Defendant's Family Tree, Compile Reports | 3.90 | | | |
| 6/12/12 | Conduct Interview with Defendant's Father in the Dominican Republic, Compile Report | 3.10 | | | |
| 6/16/12 | Jail Interview with Defendant, Compile Report | 4.75 | 46 | 5.00 | |

EXHIBIT 7 Page006

000845

| | | | | | |
|---|---|---|---|---|---|
| 6/17/12 | Review Offense Report, Conduct Database Searches to Identify Current Addresses for State Witnesses, Update Reports | 4.00 | | | |
| 8/2/12 | Telephone Conference with Medical Expert Regarding Investigation, Compile Report | 1.50 | | | |
| 8/25/12 | Review Extraneous Offense Report, Compile Case Overview for Attorney Detailing Witness Statements and Evidence | 4.25 | | | |
| 12/31/12 | Review Work Product Provided by Former Attorney in Order to Identify Investigative Assignments, Update Reports for Trial | 3.25 | | | |
| 1/1/13 | Field Work, Attempts to Make Contact with Witnesses, Update Reports | 4.60 | 98 | | |
| 1/6/13 | Phone Briefings with Defendant's Psychologist | .75 | | | |
| 1/14/13 | Conduct Phone Interviews with Defendant's Relatives in the Dominican Republic, Compile Reports | 3.75 | | | |
| 2/12/13 | Field Work, Attempt to Make Contact with Witnesses | 2.75 | 48 | | |
| 3/24/13 | Review All Reports for Trial Preparation, Make Investigative Assignments to Investigators for Interviews | 4.30 | | | |
| **Totals** | | 71.60 | 278 | 10.00 | |

## AFFIDAVIT

I, James Gradoni, President of Gradoni & Associates, Inc., State of Texas licensed investigative firm, State License #A05741, do swear to and affirm, that the attached invoice/invoices, for services rendered are true and correct to the best of my belief and knowledge.

James Gradoni

EXHIBIT 7 Page007

000846

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this 29th day of _march_, 2013, to certify, which witness my hand and seal of office.

KAYLA KOENIG
My Commission Expires
September 13, 2016

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires: 9/13/16

EXHIBIT 7 Page008

2



# Gradoni & Associates

Professional Investigative Services
State License A5741

| BILL TO |
| --- |
| Skip Cornelius<br>2028 Buffalo Terrace<br>Houston, Texas 77019 |

**Invoice**

| DATE | INVOICE # |
| --- | --- |
| 5/22/2013 | 17585 |

| DESCRIPTION | AMOUNT |
| --- | --- |
| FOR PROFESSIONAL SERVICES    TIN# ▓▓▓▓▓ | |
| | |
| Re: State of Texas vs. Obel Cruz-Garcia | |
| Cause #1289189, 1289188, 1181910, 337th District Court | |
| Our File #12-05-0266, Statement #3 | |
| | |
| Description of Activity: | |
| See Attached Affidavit | |
| | |
| Services: | |
| 87.70 hours @ $40.00 per hour | 3,508.00 |
| | |
| Expenses: | |
| 916 miles @ .555 per mile | 508.38 |
| Parking | 11.00 |
| Tolls | 4.10 |
| Word Processing | 43.10 |
| Clerical | 14.25 |
| Computerized searches | 86.00 |
| | |
| Subtotal | 4,174.83 |
| Tax Exempt | 0.00 |
| | |
| Payment due upon receipt.  Thank you! | |

| | Total | $4,174.83 |
| --- | --- | --- |

2611 Cypress Creek Pkwy, Suite C100   •   Houston, Texas 77068   •   (281) 440-0800   •   Fax (281) 440-0208

EXHIBIT 7 Page009

000848

Unofficial Copy/Copie of Chris Daniel District Clerk

## HARRIS COUNTY CRIMINAL APPOINTMENT
## TIME & MILEAGE LOG
### Invoice #17585

Attorney: R.P. Cornelius

Defendant: Obel Cruz-Garcia

Cause #: 1289189, 1289188, 1181910 Court:337th Statement #: ___3___

| Date | Activity | Time | Miles | Park | Tolls |
|------|----------|------|-------|------|-------|
| 4/7/13 | Review Offense Report to Identify State Witnesses, Conduct Database Searches to Obtain Current Address & Identify Criminal History Backgrounds, Initiate Reports | 6.00 | | | |
| 4/8/13 | Contacts with U.S. Marshall Service, Federal Databases, Attempts to Locate Witness, Update Report | 1.75 | | | |
| 4/8/13 | Meeting with Attorney for Updates Regarding Guilt/Innocence & Mitigation Investigations for Trial Preparation (Two Investigators) | 3.80 | 40 | | |
| 4/9/13 | Phone Attempts to Make Contact with Witnesses from Information Previously Developed, Update Reports | 2.75 | | | |
| 4/11/13 | Contacts to Arrange Trip to Dominican Republic, Make Reservations | .80 | | | |
| 4/12/13 | Review Extraneous Offenses, Identify Witnesses, Conduct Database Searches to Locate Current Address & Criminal History, Update Reports | 3.10 | | | |
| 4/17/13 | Field Work, Attempts to Locate Witnesses, Conduct 1 Interview, Compile Report | 4.25 | 41 | | |
| 4/19/13 | Field Work, Attempts to Make Contact with Witnesses, Conduct 2 Interviews, Compile Reports | 5.30 | 69 | | |
| 5/1/13 | Field Work, Attempt to Locate Witnesses, Update Reports | 3.00 | 63 | | |

EXHIBIT 7 Page010

| Date | Description | | | | |
|------|-------------|------|------|------|------|
| 5/2/13 | Meeting with Staff to Develop New Addresses for Local Mitigation Witnesses | 1.10 | | | |
| 5/2/13 | Field Work, Attempts to Contact & Interview Witnesses, Conduct Two Interviews, Compile Reports | 6.30 | 88 | | |
| 5/2/13 | Jail Interview with Defendant, Compile Report | 3.25 | 46 | 5.00 | |
| 5/3/13 | Field Work, Conduct Interview with Translator, Compile Report (Two Investigators) | 6.40 | 51 | | |
| 5/6/13 | Field Work, Attempts to Locate Witnesses, Update Reports | 2.70 | 59 | | |
| 5/15/13 | Field Work, Attempts to Locate Witnesses, Compile Reports | 6.10 | 84 | | |
| 5/16/13 | Conduct One Interview, Compile Report | 1.60 | | | |
| 5/17/13 | Field Work, Attempts to Locate Witnesses, Conduct 2 Interviews, Compile Reports | 6.15 | 70 | | |
| 5/18/13 | Field Work, Attempts to Locate Witnesses, Update Reports | 2.25 | 80 | | |
| 5/20/13 | Field Work, Attempts to Locate Witnesses, Conduct Two Interviews, Compile Report | 6.90 | 126 | | |
| 5/20/13 | Jail Interview with Defendant, Compile Report | 2.90 | | | |
| 5/20/13 | Visit District Clerk, Review Five Files, Obtain Copies, Compile Reports | 3.75 | 46 | 6.00 | 4.10 |
| 5/21/13 | Review 17 Guilt/Innocence Reports for Attorney, Organize for Trial Preparation Meeting, Meeting with 2 Investigators to Discuss Locating Remaining Witnesses not Interviewed | 5.30 | | | |
| 5/22/13 | Field Work, Attempts to Locate Witnesses, Update Reports | 2.25 | 53 | | |
| **Totals** | | 87.70 | 916 | 11 | 4.10 |

EXHIBIT 7 Page011

000850

## AFFIDAVIT

I, James Gradoni, President of Gradoni & Associates, Inc., State of Texas licensed investigative firm, State License #A05741, do swear to and affirm, that the attached invoice/invoices, for services rendered are true and correct to the best of my belief and knowledge.

James Gradoni

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this 22nd day of May, 2013, to certify, which witness my hand and seal of office.

KAYLA KOENIG
My Commission Expires
September 13, 2016

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires: 9/13/16

EXHIBIT 7 Page012

000851

---------- IN CAMERA MOTION ----------

1384794

NO. ~~1181910~~

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

## CONTRACT FOR EMPLOYMENT OF R. P. CORNELIUS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **OBEL CRUZ-GARCIA**, the Defendant in the above-styled and numbered cause, by and through his attorney of record, R. P. CORNELIUS, and respectfully requests the Court to approve the following Contract For Employment of R. P. Cornelius and order payment by the State of same.

I.

Defendant is charged with capital murder. The State is seeking the death penalty.

II.

R. P. Cornelius, an attorney approved and qualified, and in good standing, by the Second Administrative Judicial Region of Texas, to represent defendants charged with capital murder where the State is seeking the death penalty has been appointed by the Court.

III.

The case is more than 19 years old and is very complex. It involves numerous extraneous offenses, both in Texas and in Puerto Rico.

Defendant's family lives in Puerto Rico and he has witnesses in Puerto Rico, as well as in Texas and other cities.

EXHIBIT 7 Page013

In all likelihood there will be a multitude of expert witnesses on many different elements of the various cases.

<div align="center">IV.</div>

Appointed counsel is requesting a flat fee of $65,000.00 as reasonable attorney fees to handle this matter and is requesting this Court to order payment.

WHEREFORE, PREMISES CONSIDERS, Defendant, **OBEL CRUZ-GARCIA**, prays that the Court approve this Contract For Employment in camera and order payment consistent with this motion.

Respectfully submitted,

R.P. CORNELIUS
2028 Buffalo Terrace
Houston, Texas 77019
(713) 237-8547
State Bar No. 04831500

COURT APPOINTED
ATTORNEY FOR DEFENDANT

EXHIBIT 7 Page014

NO. ~~1289188~~ 1384794

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

## ORDER

On this **29** day of _July_, 201~~3~~, came on to be heard **CONTRACT FOR EMPLOYMENT OF R. P. CORNELIUS,** and after considering same, it is the Order of the Court that the Contract For Employment Of R. P. Cornelius is approved by the Court and an amount of $65,000.00 is to be paid by the State as reasonable attorney fees in this matter.

*Plus $1,306.⁹⁰ out-of-pocket expense for witness travel.*

_Renee Magee_
Judge, 337th District Court
of Harris County, Texas

3

EXHIBIT 7 Page015

000854



MEMORANDUM

The primary allegation is a 1992 capital murder involving numerous Spanish speaking witnesses from the Dominican Republic and Puerto Rico. The defendant is from the Dominican Republic and Puerto Rico and does not speak English.

It was a cold case with DNA, both skin cell and sperm cell, handled originally by the old HPD Crime Lab which was problematic.

There were numerous extraneous offenses including a capital murder from 1989, a number sexual assaults, home invasions, and drug dealing.

At the time defendant was first charged in 2008 he was incarcerated in a Puerto Rican prison for numerous offenses, principally a double kidnaping and torture of two young victims, both of whom testified at trial, along with other Puerto Rican witnesses. Prison officials from Puerto Rico also testified as to significant jail infractions as well as Harris County jail officials and TDC officials.

It was a complex and complicated case which required work and time commitment well in excess of any normal capital murder appointment.


**Special Note**


**The clerk's file should contain ORDERS for payment of all attorney fees and expenses but additional ORDERS are contained herein for convenience and the Court can modify the ORDERS as the Court sees fit.**

EXHIBIT 7 Page016

--------- IN CAMERA ---------

NO. 1384794

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

### DEFENDANT'S MEMORANDUM FOR OUT OF COURT EXPENSE OF

### MITIGATION INVESTIGATION

TO THE HONORABLE JUDGE OF SAID COURT:

Please find the following:

1. ORDER providing mitigation expenses not to exceed $17,400.00. Signed by Judge Jay Burnett, approved by Judge Belinda Hill, Presiding Judge at the time, (and Judge Mike McSpadden). This to include consultation and evaluation by mitigation consultant and psychologist and all investigation of mitigation. **$17,400.00**

2. Invoice from mitigation consultant and psychologist Susana A. Rosen, Ph.D. To be paid directly to Dr. Rosen or to Mr. Cornelius who will reimburse her. **$1,750.00**

3. Invoice from investigator for travel to the Dominican Republic. **$6,732.69**

4. Invoice from investigator for mitigation investigation. **$6,107.23**

5. Receipt for out-of-pocket expense of Mr. Cornelius to provide airline ticket for defendant's son who testified as a mitigation witness. To be reimbursed to Mr. Cornelius along with payment for court appointment. **$1,306.90**

    **TOTAL    $15,896.82**

EXHIBIT 7 Page017

000856

Respectfully submitted,

R.P. CORNELIUS
2028 Buffalo Terrace
Houston, Texas 77019
(713) 237-8547
State Bar No. 04831500

COURT APPOINTED
ATTORNEY FOR DEFENDANT

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT 7 Page018

NO. 1384794

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

## ORDER

On this **29** day of ___July___, 2012, came on to be heard DEFENDANT'S IN

CAMERA MOTION FOR OUT OF COURT EXPENSE FOR MITIGATION INVESTIGATION

and it is the Order of the Court that said motion should be granted.

It is the Order of the Court that an amount of ___15,896 82___, is approved for out of court

expenses consistent with this motion. If additional funds are needed trial counsel is directed to make

an additional request.

_Renee Magee_
Judge, 337th District Court
of Harris County, Texas

3

EXHIBIT 7 Page019

Unofficial Copy Office of Chris Daniel District Clerk

000858



1384794

NO. 1289189

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| OBEL CRUZ-GARCIA | § | 337TH JUDICIAL DISTRICT |

<u>ORDER</u>

On this 17th day of July , 2012, came on to be heard DEFENDANT'S IN CAMERA MOTION FOR OUT OF COURT EXPENSE FOR MENTAL HEALTH AND MITIGATION and it is the Order of the Court that said motion should be granted.

It is the Order of the Court that an amount of $17,400.00, is approved for additional out of court expenses consistent with this motion. If additional funds are needed trial counsel is directed to make an additional request.

Met with presiding Judge Hilly wherein she was made aware of this approval (230TH DIST. CT.)

Jay W. Burnett

Judge, 337th District Court
of Harris County, Texas

3

EXHIBIT 7 Page020



**SUSANA A. ROSIN, PH.D.**
CLINICAL PSYCHOLOGIST
3730 KIRBY DR., SUITE 825
HOUSTON, TEXAS 77098
—
TELEPHONE (713) 523-0000

July 1, 2013

Mr. R.P. Skip Cornelius
2028 Buffalo Terrace
Houston, Texas 77010

Re: Obel Cruz Garcia ███████████)
SPN 01134368
**Statement for Services Rendered**

| Service | Date | Amount |
|---|---|---|
| Review of Collateral/Background Information reg. Mr. Cruz-Garcia (2 hours @ $250.00/hr) | 5-09-2013 | $500.00 |
| Psychological Evaluation of Mr. Cruz-Garcia at Harris County Jail (3 hrs @ $250.00/hr) | 5-15-2013 | $750.00 |
| Meeting with Mr. Cornelius (1 hr @ $250.00/hr) | 6-27-2013 | $250.00 |
| Preparation of Expert Report (1 hr @ $250.00/hr) | 7-01-2013 | $250.00 |
| Amount Charged and Due | | $1750.00 ✓ |

Dr. Rosin's Federal Tax ID #██████████
Dr. Rosin's Psychologist License # 2-2995 (Texas)

EXHIBIT 7 Page021

000860



# Gradoni & Associates

Professional Investigative Services
State License A5741

May 23, 2013

Skip Cornelius
2028 Buffalo Terrace
Houston, Texas 77019

Re:     Obel Cruz-Garcia

Dear Skip,

Please find attached the invoice for the trip to the Dominican Republic. We did exceed the budget approved by the court. I have attached an itemized list of all of the expenses, along with receipt copies.

I also cut about half of the travel time it took us to get there and back. On the return trip, we left the hotel at 10:00 AM in the morning and did not return to Houston until 3:00 AM the following day.

I'm sure the court wouldn't pay for the time we spent, although I believe it was legitimate time spent on the case.

I've also attached a second invoice, for all the investigative work that we have performed since May 7, 2013.

I have now given you three invoices for work on this case. The invoices include both Mitigation and Investigative efforts. I'm aware that you probably will not submit these invoices until trial is over, but I'd like to keep everything organized so we don't miss anything. I believe it also gives us the ability to actually know how much we've spent to date.

If there is a way you could present these invoices for payment that would be fine with me. Possibly you could just submit the one for the trip to the Dominican, since we had to outlay over $3,000 in expenses. However you decide to handle this is fine with me.

Although the Defendant has been no help whatsoever, we have developed some information that you could utilize to discredit some of the witnesses at trial.

2611 Cypress Creek Pkwy, Suite C100   •   Houston, Texas 77068   •   (281) 440-0800   •   Fax (281) 440-0208

EXHIBIT 7 Page022

000861

We certainly have more work that could be performed on this case.

I think it is imperative that you consider bringing to Houston the mother of his two sons, for the Mitigation phase of the trial. She is more than willing to come and may make a good witness. I know if you decide to do this, a great deal of planning must be done in advance.

I will await your reply.

Sincerely,

JJ Gradoni

JJG/kk

EXHIBIT 7 Page023

3

# Gradoni & Associates

Professional Investigative Services
State License A5741

| BILL TO |
|---|
| Skip Cornelius |
| 2028 Buffalo Terrace |
| Houston, Texas 77019 |

**Invoice**

| DATE | INVOICE # |
|---|---|
| 5/22/2013 | 17584 |

| DESCRIPTION | AMOUNT |
|---|---|
| FOR PROFESSIONAL SERVICES     TIN# ▬▬▬▬ | |
| | |
| Re: State of Texas vs. Obel Cruz-Garcia | |
| Cause #1289189, 1289188, 1181910, 337th District Court | |
| Our File #12-05-0266, Statement #2 | |
| | |
| Description of Activity: | |
| See Attached Affidavit | |
| | |
| Services: | |
| 90.00 hours @ $40.00 per hour | 3,600.00 |
| | |
| Expenses: | |
| Travel - Airfare | 2,005.87 |
| Meals | 228.97 |
| Gas | 63.00 |
| Parking | 85.00 |
| Hotel Miscellaneous | 72.49 |
| Car Rental | 313.86 |
| Visitor Registration | 20.00 |
| Tolls | 10.00 |
| Long Distance | 93.50 |
| Guide | 240.00 |
| | |
| Payment due upon receipt.  Thank you! | **Total** |

2611 Cypress Creek Pkwy, Suite C100  •  Houston, Texas 77068  •  (281) 440-0800  •  Fax (281) 440-0208

EXHIBIT 7 Page024

000863



# Gradoni & Associates

Professional Investigative Services
State License A5741

| BILL TO |
|---|
| Skip Cornelius<br>2028 Buffalo Terrace<br>Houston, Texas 77019 |

**Invoice**

| DATE | INVOICE # |
|---|---|
| 5/22/2013 | 17584 |

| DESCRIPTION | AMOUNT |
|---|---|
| FOR PROFESSIONAL SERVICES     TIN# ████████ | |
| Subtotal | 6,732.69 |
| Tax Exempt | 0.00 |

| | |
|---|---|
| Payment due upon receipt.  Thank you! | **Total**   $6,732.69 |

2611 Cypress Creek Pkwy, Suite C100   •   Houston, Texas 77068   •   (281) 440-0800   •   Fax (281) 440-0208

EXHIBIT 7 Page025

000864

## HARRIS COUNTY CRIMINAL APPOINTMENT
## TIME & MILEAGE LOG
### Invoice #17584

Attorney: R.P. Cornelius

Defendant: Obel Cruz-Garcia

Cause #: 1289189, 1289188, 1181910  Court:337th  Statement #: ___2___

| Date | Activity | Time | Miles | Park | Tolls |
|------|----------|------|-------|------|-------|
| 5/5/13 | Travel from Houston to Miami to Dominican Republic for Mitigation Investigation | 17.10 | | | |
| 5/6/13 | Work with Guide, Conduct 5 Interviews (Two Investigators) | 18.10 | | | |
| 5/7/13 | Work with Guide, Conduct 5 Interviews (Two Investigators) | 14.30 | | | |
| 5/8/13 | Work with Guide, Conduct 3 Interviews, Photo & Inspect Areas of Interest (Two Investigators) | 12.40 | | | |
| 5/9/13 | Travel from Dominican Republic to Miami to Houston | 17.10 | | | |
| 5/11/13 | Compile 15 Reports | 11.00 | | | |
| **Totals** | | **90.00** ✓ | | | |

### AFFIDAVIT

I, James Gradoni, President of Gradoni & Associates, Inc., State of Texas licensed investigative firm, State License #A05741, do swear to and affirm, that the attached invoice/invoices, for services rendered are true and correct to the best of my belief and knowledge.

_James Gradoni_
James Gradoni

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this 22nd day of May, 2013, to certify, which witness my hand and seal of office.

EXHIBIT 7 Page026

000865



NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires: 9/13/16

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT 7 Page027

000866

EXPENSES/TRIP TO DOMINICAN REPUBLIC
5/5/13 to 5/9/13
Mitigation Investigation (Two Investigators)

| | | |
|---|---|---|
| Airfare/Hotel | | 2,005.87 |
| Food | 35.82 (2 People) | |
| | 29.15 (2 People) | |
| | 5.00 (1 Person) | |
| | 80.00 (4 People) | |
| | 29.00 (2 People) | |
| | 12.26 (1 Person) | |
| | 37.74 (2 People) | 228.97 |
| Gas | | 63.00 |
| Parking | | 85.00 |
| Hotel Miscellaneous | 70.39 | |
| | 2.10 | 72.49 |
| Car Rental | | 313.86 |
| Visitor Registration | | 20.00 |
| Tolls | | 10.00 |
| Long Distance | | 93.50 |
| Guide | | 240.00 |
| **Total** | | **3,132.69** |

Pre-trip planning indicated that the most convenient and safest place for lodging was the Bahia Principe Cayaco Hotel. The hotel was actually situated a 2 hour drive from the main area of investigation.

In order to facilitate making contact with the potential mitigation witnesses Investigators contracted the services of a guide, who actually drove the rental car, taking Investigators to all of the locations where Investigators met people to be interviewed. The guide also took Investigators to the areas of interest which were examined and photographed.

The guide was paid $80.00 per day for the three days he assisted.

EXHIBIT 7 Page028

000867

jj@gradoni.com

| | |
|---|---|
| **From:** | Travelocity Customer Support <travelocity@travelocity.com> |
| **Sent:** | Wednesday, April 17, 2013 5:11 PM |
| **To:** | jj@gradoni.com |
| **Subject:** | Travelocity Confirmation - Santo Domingo Las Americas Airport |

 travelocity | Travel Confirmation

James,

Thank you for booking your travel with Travelocity.

**Your Travelocity Trip ID is: 4310 7170 0000**

You can view your Trip Details by logging onto
Travelocity.com

If any issues arise with your reservation before or during
your trip, please contact us immediately.

**Customer Support**
| | | |
|---|---|---|
| In the US | 1.888.872.8356 | 24 hours/7 days a week |
| Outside the US | 1.210.521.5871 | 24 hours/7 days a week |
| En Español | 1.866.828.3933 | 7am - 10pm CST |

How to change my trip
How to cancel my trip
Email Travelocity

## Flights

2 Round-Trip Tickets

All flight times are local to each city.

**Sun, May 5, 2013**                                                    Online check-in code: HAHXKW

**Depart:** 07:25 am      Houston, TX (IAH)        ᴀ̊ᴀ  American Airlines, Flight 1312
**Arrive:** 10:45 am      Miami, FL (MIA)                 Economy   Class

1 Stop - change planes in Miami,
(MIA)
Connection Time: 2 hrs 5 mins

Travel time: ${airSegment.totalTravelTime}
Seat request: 22D, 22C

**Depart:** 12:50 pm      Miami, FL (MIA)          ᴀ̊ᴀ  American Airlines, Flight 1481
**Arrive:** 03:00 pm      Santo Domingo, Dominican Republic   Economy   Class
                         (SDQ)

Total Travel Time: 6 hrs 35 mins

**Thu, May 9, 2013**                                                    Online check-in code: HAHXKW

1

EXHIBIT 7 Page029

| Depart: 04:10 pm<br>Arrive: 06:50 pm | Santo Domingo, Dominican Republic (SDQ)<br>Miami, FL (MIA) | American Airlines, Flight 1138<br>Economy Class |
|---|---|---|

1 Stop - change planes in Miami, (MIA)
Connection Time: 3 hrs 10 mins

Travel time: ${airSegment.totalTravelTime}
Seat request: 34H, 34G

| Depart: 10:00 pm<br>Arrive: 11:40 pm | Miami, FL (MIA)<br>Houston, TX (IAH) | American Airlines, Flight 1579<br>Economy Class |
|---|---|---|

Total Travel Time: 8 hrs 30 mins
Seat request: 29D, 29B

Baggage fees: In most cases, the applicable baggage fees and allowances for the entire trip will be those of the first carrier listed on your itinerary, American Airlines . However, in a limited number of multiple carrier itineraries for international travel, the first carrier may apply the fees and allowances of another carrier listed on your itinerary. For more information, including detailed baggage allowances and fees by carrier, please click here. If you need additional information regarding baggage allowance and fees, please contact the first carrier listed on your itinerary.

**Passengers**
edna velez
james gradoni

Flight policies

**Frequent Flier Information**
Add your number at the airport.
Add your number at the airport.

## Hotel

2 Rooms, 4 Nights

**Confirmation number:**
**Room 1:** 10178481468
**Room 2:** 10178481468

Contact: james gradoni

Grand Bahia Principe Cayacoa All-Inclusive Resort
Loma Puerto Excondido SN
Samana, 32000
1.809.538.3131

Check in: Sun, May 5, 2013
Check out: Thu, May 9, 2013

Hotel policies | Important Information

**Room 1:** Standard Room All Inclusive
Single Adult (0 senior)
**Room 2:** Standard Room All Inclusive
Single Adult (1 adult)

**Attention - Hotel Front Desk**
This is a pre-paid reservation. Please check your reservation system for payment information.
Pre-paid amount may not include extra fees payable to the hotel at check out.

## Pricing

2

EXHIBIT 7 Page030

Unofficial Copy Office of the Online Duval District Clerk

000869

| Flight + Hotel | $1,697.87 | |
| Taxes, Tax Recovery Charge + Airline & Agency Fees: | $308.00 | Additional baggage fees may apply |
| Total: | $2,005.87 | |

We charged a total of $2,005.87 to your MasterCard® ███████

## Complete Your Travel Plans for Santo Domingo



**Add a Car**
From compacts to SUVs, we've got cars well-suited for your time behind the wheel.

More car deals



**Add an Activity**
Altos de Chavon, Santo Domingo from $45
Fun Truck Safari, Santo Domingo from $80
Bonche Bus Night Tour, Santo Domingo from $40

More things to do

## The Travelocity Guarantee



We look out for you all trip long, and even before you go.

The Travelocity Guarantee is our commitment to you that we are here for you.

We stand behind everything we sell, everything about your booking will be right, or we'll work with our partners to make it right, right away.

Learn more



TRAVELOCITY GUARANTEE

## Additional Information

**Online Support**

▶What if my flight schedule changes?
▶What if I experience a problem during my trip?
▶How can I change or cancel my trip?
▶View all Travel Alerts
▶View Frequently Asked Questions

3

EXHIBIT 7 Page031

000870

*Food* #1

$5.00

Host: Susana        05/09/2013
T1-116              7:26 PM
                    10313

Garden Salad              5.80
Salami Provolone         10.50
Diet sprite               3.00

Subtotal                 19.30
Tax                       1.55

To Go Total              20.85
CASH                     50.00
Change                   29.15

Thank you!
Come Again!
Visit Us At:

--- Check Closed ---

Food              2.16

** TGI FRIDAY'S #2150 **
MIAMI AIRPORT, FL

25 CRIS G

Tbl 83/1    Chk 6502      Gst 2
      May05'13 10:43AM

1 CHEESEBURGER            9.29
1 STK SRLN med SLAW RICE 18.09
2 ICED TEA                5.78

********************************
Visit www.tgifsurvey.com within
48 hours, tell us about your
visit and get any appetizer up
to $9.4
*SU
up

AUTORIZACION        T54835-
Sub-Total    US$    80.00
ITBIS        US$     0.00
Monto        US$    80.00

ACEPTO PAGAR ESTE MONTO SUJETO A LOS
TERMINOS DEL CONTRATO LLEGRADO CON
EL EMISOR DE LA TARJETA

FIRMA/SIGN.

EXHIBIT 7 Page032

000871

Foal #2

COMEDOR
*Hernández*

Autopista Nagua- Sánchez Km. 3,
Tel.: 809-584-3557 · Matancitas, Nagua, R.D.
RNC: 07100207765

REGISTRO PROVEEDORES INFORMALES

**NCF. A01001001110** 0000196

Fecha: 6 de 5 del 2018

Nombre:_____

Dirección:_____ RNC/Cedula_____

Condiciónes:_____ Tel.:_____

| CODIGO | CANT. | DESCRIPCION | PRECIO SIN ITBIS | IMPORTE | ITBIS | TOTAL |
|--------|-------|-------------|------------------|---------|-------|-------|
| | 1 | hambis | 39c | | | |
| | 2 | pollos | 440 | | | |
| | 1 | Res | 230 | | | |
| | 2 | Refresco | 100 | | | |
| | | | | | | |
| | | TOTAL EXENTO | | | | |
| | | TOTAL GRABADO | | | | |
| | | ITBIS | | | | |
| | | TOTAL A PAGAR | | | 1160 | |

dolar 29

| RECIBIDO POR | DESPACHADO POR |
|--------------|----------------|

IMP. NAGUA UNIVERSAL · RNC: 056-0106874-4 · TEL: 809-584-4660· No. AUT. 01510

$ 29.00

Unofficial Copy Office of the US District Clerk

EXHIBIT 7 Page033

000872

Ford #3

Inversiones Llers
Las Americas, Aeropuerto Int.
Mangos Village
Terminal B. AILA

Server: Dilenia                          05/09/2013
Cashier: Elizabeth
Table 50/1                               3:19 PM
Guests: 1

Recinet # 1                              #20056

Seven Up 20onz (2 x3.18)                      6.36
Nachos Volcanos                              13.65
Cubano                                       14.30

Total                                        34.31
Legal Tax 10%                                 3.43
Total                                        37.74

CASH                                       $ 50.00

X____

Change                                     $ 12.26
DOP $ 0.024293                              $504.67
Euro € 1.305011                              €9.39

RNC 130-131627
Que Tenga un Buen Viaje
Regrese Pronto

--- Check Closed ---

---

Inversiones Llers
Las Americas, Aeropuerto Int.
Mangos Village
Terminal B. AILA

Server: Dilenia                          05/2013
Table 50/1                               3:15 PM
Guests: 1

                                         #20056

Seven Up 20onz (2 x3.18)                      6.36
Nachos Volcanos                              13.65
Cubano                                       14.30

Total                                        34.31
Legal Tax 10.00%                              3.43
Total                                        37.74

Balance Due        $ 37.74
DOP $ 0.024293                            $1,553.53
Euro € 1.305011                             €28.92

RNC 130-131627
Que Tenga un Buen Viaje
Regrese Pronto

EXHIBIT 7 Page034

Gas

63. 00

**RODRIGUEZ CAMPOS, S.R.L.**
**AGR. RUBEN A. RODRIGUEZ**
Narciso Minaya Esq. Altagracia • Tel.: 809-584-2261
Nagua, Rep. Dom. • RNC: 1-10-12256-1

ESSO

08 de 05 de 2013

Cliente:

| Cta. No. | | Placa No. | |
|---|---|---|---|
| Gls. Gasolina | | 2,500 | |
| Diesel-Oil | | | |
| Aceite | | | |
| Otros | | | |
| | | TOTAL RD$ | 2,500 |

Pagar antes de 30 días. Después de su vencimiento, 3% de recargo

dola 63

Recibido Conforme          Despachado por

EXHIBIT 7 Page035

000874

Parking

$85.00

www.newsouthparking-tx.com

New South Parking

P.O. Box 60751
Houston, TX 77205
(281) 233-1730

**CUSTOMER RECEIPT**

Toledo Ticket Co., Toledo, OH
www.toledoticket.com

| Tran | In Time | Out Time | Fee | CC# |
|---|---|---|---|---|
| 9465 | 05/05 05:32 | 05/10 02:48 | $85.00 | [redacted] |

Unofficial Copy Office of Chris Daniel District Clerk

# Bahia Principe Cayacoa

NH:CAYACOA

Hotel
Misc. ✗✗

## Extracto de Cuenta Corriente

USD 41.04300

| Titular | VELEZ ,EDNA | | Llegada | 05/05/2013 | | Noches | 4 |
|---------|-------------|--|---------|------------|--|--------|---|
| | | | Salida | 09/05/2013 | | | |
| Habitación | 0433 | Paxs 1 | Nº Reserva | 7108 | | Pag. 1 / 1 | |

| Fecha | Descripción | Observaciones | Valor | Descuento | Saldo |
|-------|-------------|---------------|-------|-----------|-------|
| 06/05/2013 | TFNO HABITACION | 8092985588 CAB CABINA EXT. 1276 | 0.15 | 0.00 | 0.15 |
| 06/05/2013 | TFNO HABITACION | 8092985588 CAB CABINA EXT. 1276 | 0.25 | 0.00 | 0.39 |
| 08/05/2013 | SAL+N DE BELLEZA | 1 MASAJE CARIBE-O RELAX 50 | 70.00 | 0.00 | 70.39 |

**Bahia Principe Cayacoa**                                    **NH:CAYACOA**

### Extracto de Cuenta Corriente

*Hotel
Misc #2*

USD   41.04300

| Titular | GRADONI ,JAMES | | Llegada | 05/05/2013 | Noches | 4 |
|---------|----------------|---|---------|------------|--------|---|
| | | | Salida | 09/05/2013 | | |
| Habitación | 0436 | Paxs    1 | Nº Reserva | 7723 | Pag.  1 / 1 | |

| Fecha | Descripción | Observaciones | Valor | Descuento | Saldo |
|-------|-------------|---------------|-------|-----------|-------|
| 08/05/2013 | TFNO HABITACION | 2814404706 CAB CABINA  EXT. 1276 | 2.10 | 0.00 | 2.10 |

Unofficial copy Offices of Chris Daniel District Clerk

| MAL | Marcos Ant. Ludwin | 09/05/2013 10:04 | Pagina:    1 | | Informarca Portu |
|-----|--------------------|-----------------|--------------|---|------------------|

EXHIBIT 7 Page038

*Car Rental* 313.86

# Hertz

MERCANTIL SANTO DOMINGO, SRL.        809-549-0454        RNC 101-013-303
HERTZ INTERNATIONAL LICENSEE, AEROPUERTO LAS AMERICAS
SANTO DOMINGO, DO

NCF A010020010200002948

CUSTOMER INFORMATION                                    CHECK OUT / CHECK IN

# Hertz

**MERCANTIL SANTO DOMINGO, C. x A.**        **RECIBO**
P. O. Box 109, C/ José María Heredia No. 1, Gazcue, Santo Domingo, Rep. Dom.
Tel.: 809-221-5333 • Fax: 809-221-8927 • RNC: 101-013-303        **No. 11155**

**AILA**

09 de Mayo de 20 13

Recibo de: Edna Velez

La Suma de: Doce mil ochocintos ochenta y seis con 95/100

Pesos (RD$) 12,886.95

Por Concepto de: Liquidacion RA#2022873
US$100 x 3 = 300 ; US$10 x 1 = 10 ; US$1 x 4 = 4

Depositado en Fecha: _____

Depósito No. _____

*Stephanie*
Recibido por

Renter is responsible for all damage or loss to glass
La compra de (CDW) no cubre danos en cristales, gomas
Renter please read terms and conditions on page 1.
Arrendatario favor de leer los terminos y condiciones

I have read the terms and conditions on page 1 and page2 of the re...
He leydo los terminos y condiciones en las paginas 1 y 2 de este contrato y estoy ...

EXHIBIT 7 Page039

Visa Permits @ 20.00

Unofficial Copy Office of the Daniel District Clerk

DE IMPUESTOS
INTERNOS
RNC 401-50625-4
05/05/2013 03 03 49 PM
AEROPUERTO LAS AMERICAS

Recibo de pago No. DGH0ITRT78DMW

DESCRIPCION                          VALOR

Tarjeta de Turista
No 201305-0535 0025150 14900      US$ 10 00

                    TOTAL         US$ 10 00

Cajero

EXHIBIT 7 Page040

Tolls #1

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
Atencion al usuario: 829-904-7859
autopistasdelnordeste.com
CARRETERA JUAN PABLO II
ESTACION DE PEAJE MARBELLA

Fecha 09/05/2013 02:44
Tiquete: MRB-NRB03-PAR-I-
Categoria: I Valor: 51
Carril: MARBELLA 03 Sentido: B
Forma de Pago: Particular

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
Atencion al usuario: 829-904-7859
www.autopistasdelnordeste.com
CARRETERA JUAN PABLO II
ESTACION DE PEAJE MARBELLA

Fecha: 05/05/2013 14:01:05
Tiquete: MRB-MRB03-PAR-I-295122
Categoria: I Valor: 51
Carril: MARBELLA 03 Sentido: B
Forma de Pago: Particular
Atendido

Fecha: 09/05/2013 12:33:23
Tiquete: MRB-NRB03-PAR-I-299757
Categoria: I Valor: 51
Carril: MARBELLA 03 Sentido: B
Forma Pago Particular
Atend

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
Atencion al usuario: 829-904-7859
www.autopistasdelnordeste.com
CARRETERA JUAN PABLO II
ESTACION DE PEAJE NARANJAL

Fecha: 09/05/2013 12:29:01
Tiquete: NRJ NRJ03 PAR I
Categoria: I Valor: 100
Carril: VIA-NARANJAL 03 Sentido: B
Forma de Pago: Particular
Atendido por: CLAUDIAB

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
Atencion al usuario: 829-904-7859
www.autopistasdelnordeste.com
CARRETERA JUAN PABLO II
ESTACION DE PEAJE NARAGUAO

Fecha: 09/05/2013 11:40:04
Tiquete: GSC-GSC03-PAR-I-199000
Categoria: I Valor: 105
Carril: NARAGUAO 03 Sentido: B
Forma Pago Particular
Atendido por: JEXNB

EXHIBIT 7 Page041

000880

Tolls #2

(4,060.00)
*00·060·4
40·90
×100·x
*·0

Coin Exchange

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
Atencion al usuario: 829-904-7859
www.autopistasdelnordeste.com
CARRETERA JUAN PABLO II
ESTACION DE PEAJE GUARAGUAO

05/2013 19:13:49
RG-GRG01-PAR-I-97778
I  Va   166
Carril: GUARAGUAO 01  Sentido: A
Forma de Pago: Particular
Atendido por: RI    ERMOR

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
Atencion al usuario: 829-904-7859
www.autopistasdelnordeste.com
CARRETERA JUAN PABLO II
ESTACION DE PEAJE NARANJAL

AUTOPISTAS DEL NORDESTE
RNC 1-01-86692-6
At            904-859
                 te.com

Salao 23

Fecha: 05/05/2    13:46
Tiquete: NRJ-NRJ01-PAR-I-142630
Categoria: I  Valor: 166
Carril: VIA-NARANJAL-01  Sentido: A
Forma de Pago: Particular
Atendido por: FRANCS

                  0.09:08
        NRJ-NRJ01-PAR-I-142
      egoria: I  Valor: 166
Carril: VIA-NARANJAL-01  Sentido: A

EXHIBIT 7 Page042

Unofficial Copy Office of Chris Daniel District Clerk

000881



JAMES GRADONI
2611 FM 1960 RD W STE C100
HOUSTON, TX 77068-3730

Page: 3 of 6
Bill Cycle Date: 04/11/13 - 05/10/13
Account: ▮▮▮▮▮

*Long Distance 93.50*

Visit us online at: **www.att.com**

---

### 713 306-4116
JAMES GRADONI

**Mobile Insurance Premium** - Includes Coverage for loss, theft, accidental damage, liquid damage, and out-of-warranty malfunction.

**Data Unlimited for iPhone 4S** - Includes Data Unlimited on 4G for iPhone 4S

**Monthly Charges** - May 11 thru Jun 10

| | | |
|---|---|---|
| 1. FamilyTalk Nation 1400 with Rollover | | 9.99 |
| 2. AT&T Rest of World Travel Minutes 40 | | 60.00 |
| 3. Family Messaging Unlimited with Mobile to Any Mobile Calling | | 0.00 |
| 4. International Dialing Allowed | | 0.00 |
| 5. Intl Roam LD | | 0.00 |
| 6. Mobile Protection Pack - Enhanced Support and Mobile Locate | | 3.00 |
| 7. Mobile Insurance Premium | | 6.99 |
| 8. Data Unlimited for iPhone 4S | | 30.00 |
| **Total Monthly Charges** | | **109.98** |

**Other Charges and Credits**
**Plan Changes**
Added 05/04

| | | |
|---|---|---|
| 9. AT&T Rest of World Travel Minutes 40 | | 14.00 |

*This plan is $60.00 per month. You added this plan on 05/04. You are charged at the new plan rate from 05/04 - 05/10.*

**Voice Usage Summary**
FamilyTalk Nation 1400 with Rollover

| | |
|---|---|
| Total Minutes Used | 693 |
| Plan Minutes | 1,400 |
| Mobile to Mobile Minutes | Unlimited |
| Minutes Used | 0 |
| Night & Weekend Minutes | Unlimited |
| Minutes Used | 132 |

Directory Assistance

| | | |
|---|---|---|
| 10. Calls Billed at $1.99 | 5 | 9.95 |

| | | |
|---|---|---|
| Unlimited Mobile to Any Mobile | Unlimited | |
| Minutes Used | 1,820 | |

Roaming

| | | |
|---|---|---|
| 11. Minutes Billed | 48 | 16.00 |

| | | |
|---|---|---|
| Total Voice Usage Summary | | 25.95 |

---

**Other Charges and Credits - Continued**
**Data Usage Summary**

| | |
|---|---|
| Messaging Unlimited | Unlimited |
| Used | 542 |

| | |
|---|---|
| Data Unlimited | |
| Plan KB | Unlimited |
| KB Used | 19,653 |

1 Gigabyte (GB) = 1024MB, 1 Megabyte (MB) = 1024KB

**Roaming**

| | | |
|---|---|---|
| 12. Text/Instant Msgs Billed | 67 | 33.50 |

**Surcharges and Other Fees**

| | |
|---|---|
| 13. Administrative Fee | 0.61 |
| 14. Federal Universal Service Charge | 13.20 |
| 15. Regulatory Cost Recovery Charge | 0.45 |
| 16. State Cost-Recovery Fee | 1.31 |
| 17. Texas Universal Service | 1.11 |
| Total Surcharges and Other Fees | 16.68 |

**Government Fees and Taxes**

| | |
|---|---|
| 18. 9-1-1 Service Fee | 0.50 |
| 19. 911 Equalization Surcharge | 0.06 |
| 20. City District Sales Tax | 0.33 |
| 21. TX State Sales Tax | 2.08 |
| 22. TX State Sales Tax - Telecom | 9.45 |
| Total Government Fees and Taxes | 12.42 |

**Total Other Charges & Credits**     102.55

**Total for 713 306-4116**     212.53

**Roaming Call Detail**

*Roaming Call charges reflected in Other Charges & Credits (page 3)*

| Time Charges | Place Called | Number Called | Rate Code | Feature Code | Min | Airtime Charges | LD/Add'l Charges |
|---|---|---|---|---|---|---|---|
| Charges Incurred while Roaming in Dominican Republic | | | | | | | |
| Sunday, 05/05 | | | | | | | |
| 08:30p | BLOCKED | 000-000-0000 | IRRO | | 1 | 0.00 | 0.00 |
| 08:10p | VMAIL CL | | IRRO | | 1 | 0.00 | 0.00 |
| 10:33p | DOMEST CL | ▮▮▮▮ | IRRO | | 3 | 0.00 | 0.00 |
| Monday, 05/06 | | | | | | | |
| 10:10a | DOMEST CL | | IRRO | | 1 | 0.00 | 0.00 |
| 11:51a | DOMEST CL | | IRRO | | 4 | 0.00 | 0.00 |
| 12:21p | DOMEST CL | | IRRO | | 2 | 0.00 | 0.00 |
| 08:01p | DOMEST CL | | IRRO | | 1 | 0.00 | 0.00 |
| 08:12p | DOMEST CL | | IRRO | | 3 | 0.00 | 0.00 |
| 08:53p | DOMEST CL | | IRRO | | 3 | 0.00 | 0.00 |
| Tuesday, 05/07 | | | | | | | |
| 09:48a | DOMEST CL | ▮▮ | IRRO | | 2 | 0.00 | 0.00 |
| 09:50a | DOMEST CL | ▮▮ | IRRO | | 1 | 0.00 | 0.00 |
| 09:54a | VMAIL CL | | IRRO | | 1 | 0.00 | 0.00 |

EXHIBIT 7 Page 048

000882

*4*

# Gradoni & Associates

Professional Investigative Services
State License A5741

| BILL TO |
|---|
| Skip Cornelius |
| 2028 Buffalo Terrace |
| Houston, Texas 77019 |

**Invoice**

| DATE | INVOICE # |
|---|---|
| 7/19/2013 | 17658 |

| DESCRIPTION | AMOUNT |
|---|---|
| FOR PROFESSIONAL SERVICES    TIN# ~~████~~ | |
| Re: State of Texas vs. Obel Cruz-Garcia | |
| Cause #1289189, 1289188, 1181910, 337th District Court | |
| Our File #12-05-0266, Statement #4 | |
| Description of Activity: | |
| See Attached Affidavit | |
| Services: | |
| 119.75 hours @ $40.00 per hour | 4,790.00 |
| Expenses: | |
| 1,119 miles @ .555 per mile | 621.05 |
| Parking | 48.00 |
| Word Processing | 47.20 |
| Computerized Searches | 118.00 |
| Translator | 350.40 |
| Messenger Fee (Fed-Ex 6/15/13) | 36.13 |
| Messenger Fee (Fed-Ex 6/24/13) | 39.62 |
| Messenger Fee (Fed-Ex 6/28/13) | 36.13 |
| Messenger Fee (7/8/13) | 20.70 |

| Payment due upon receipt.  Thank you! | **Total** | |
|---|---|---|

2611 Cypress Creek Pkwy, Suite C100  •  Houston, Texas 77068  •  (281) 440-0800  •  Fax (281) 440-0208

EXHIBIT 7 Page044

000883



BILL TO

Skip Cornelius
2028 Buffalo Terrace
Houston, Texas 77019

**Invoice**

| DATE | INVOICE # |
|------|-----------|
| 7/19/2013 | 17658 |

| DESCRIPTION | AMOUNT |
|-------------|--------|
| FOR PROFESSIONAL SERVICES    TIN# ▓▓▓▓▓ | |
| Subtotal | 6,107.23 |
| Tax Exempt | 0.00 |

| | |
|---|---|
| Payment due upon receipt.  Thank you! | **Total**   $6,107.23 |

EXHIBIT 7 Page045

000884

## HARRIS COUNTY CRIMINAL APPOINTMENT
## TIME & MILEAGE LOG
### Invoice #17658

Attorney: R.P. Cornelius

Defendant: Obel Cruz-Garcia

Cause #: 1289189, 1289188, 1181910  Court: 337th  Statement #:    4

| Date | Activity | Time | Miles | Park | Copies |
|------|----------|------|-------|------|--------|
| 5/23/13 | Field Work, Attempt to Locate Witness | 1.75 | 66 | | |
| 5/24/13 | Identify Potential Extraneous Offense Witnesses, Conduct Database Searches to Locate Current Addresses, Update Reports | 5.50 | | | |
| 5/28/13 | Attempt to Contact Witnesses by Phone | 1.20 | | | |
| 5/30/13 | Jail Visit with Attorney, Compile Report | 3.00 | 46 | 5.00 | |
| 5/30/13 | Field Work, Conduct Interview, Compile Report | 4.10 | 58 | | |
| 6/3/13 | Conduct Two Interviews, Compile Reports | 4.30 | | | |
| 6/6/13 | Field Work, Attempt to Locate Witness, Update Reports | 2.30 | 42 | | |
| 6/7/13 | Field Work, Attempt to Locate Witness, Update Reports | 2.90 | 37 | | |
| 6/8/13 | Field Work, Conduct One Interview, Compile Report | 3.25 | 51 | | |
| 6/10/13 | Field Work, Attempt to Locate Witnesses, Update Reports | 2.00 | 41 | | |
| 6/10/13 | Interview State Witness at 701 N. San Jacinto, Compile Report | 3.60 | 46 | 5.00 | |
| 6/10/13 | Interview Possible Witness at 701 N. San Jacinto, Compile Report | 1.20 | | | |

EXHIBIT 7 Page046

| | | | | |
|---|---|---|---|---|
| 6/11/13 | Field Work, Conduct 2 Interviews, Compile Reports | 4.75 | 62 | |
| 6/12/13 | Deliver Reports to Attorney in Jury Selection | 1.50 | 46 | 5.00 |
| 6/13/13 | Briefing with Attorney in Jury Selection, Pick-up Subpoenas to Serve, State Witness List | 1.30 | 46 | 5.00 |
| 6/14/13 | Conduct Database Searches on 9 State Witnesses to Locate Current Addresses, Set Investigative Assignments, Briefing with Investigators | 7.25 | | |
| 6/15/13 | Field Work, Attempts to Locate Witnesses, Compile Reports | 3.80 | 51 | |
| 6/16/13 | Field Work, Conduct Two Interviews, Compile Reports | 4.10 | 39 | |
| 6/15/13 | Prepare Fed-ex for Witness Subpoenas to Puerto Rico & Dominican Republic, Phone Contact with Witnesses | 1.30 | | |
| 6/19/13 | Attempts to Contact Witnesses by Phone, Update Reports | 1.25 | | |
| 6/20/13 | Briefing with Attorney, Obtain Offense Report Regarding State Witness Prior Conviction, Conduct Database Searches to Locate Witnesses, Set Investigative Assignments | 4.25 | | 2.62 |
| 6/21/13 | Contacts with Public Defender's Office Regarding Witness Travel Plans | 1.00 | | |
| 6/24/13 | Prepare Fed-ex of Travel Documents to Witnesses in Puerto Rico & Dominican Republic, Contacts with Witnesses | 1.20 | | |
| 6/24/13 | Jail Interview with Defendant & Bench Warranted State Witness, Compile Reports | 3.90 | 46 | 5.00 |
| 6/27/13 | Meeting with Attorney – Trial Preparation | 1.60 | 40 | |
| | | | | |

*Gradoni & Associates is licensed by the Texas Board of Private Investigators and Private Security Agency under License #A-5741.*

*Complaints may be directed to P.O. Box 4087, Austin, Texas 78773-0001 or emailed to RSD_Customer_Relations@dps.texas.gov*

EXHIBIT 7 Page047

000886

| | | | | | |
|---|---|---|---|---|---|
| 6/28/13 | Field Work, Conduct One Interview, Compile Report | 4.50 | 69 | | |
| 6/28/13 | Prepare Fed-ex Package to Witness in Puerto Rico | 1.00 | | | |
| 7/1/13 | Attempts to Contact Witnesses by Phone, Update Reports | 1.80 | | | |
| 7/2/13 | Jail Interview with Defendant, Trial Preparation, Compile Report | 2.75 | 46 | 5.00 | |
| 7/3/13 | Conduct Two Phone Interviews, Compile Reports | 3.10 | | | |
| 7/8/13 | Field Work, Conduct 3 Interviews, Compile Reports | 5.25 | 61 | | |
| 7/8/13 | Review Witness Reports, Messenger to Attorney for Trial Prep | 1.90 | | | |
| 7/9/13 | Conduct Two Interviews, Compile Reports | 3.40 | | | |
| 7/5/13 To 7/10/13 | Contacts with Dominican Republic Immigration, State Department, US Immigration, in Attempt to Expedite Witness Visa | 2.30 | | | |
| 7/10/13 | Monitor Trial Testimony, Meet with Attorney Regarding Visa Problems with Witness | 3.75 | 46 | 5.00 | |
| 7/14/13 | Pick Up Witness at Airport, Briefing with Witness with Translator, Drop Witness to Hotel, Numerous Calls to Dominican Republic to Arrange Travel with New Witness, Complete Travel Plans with Airline | 5.10 | 66 | 4.00 | |
| 7/15/13 | Briefing with Attorneys, Contacts with Dominican Republic | 1.20 | | | |
| 7/16/13 | Pick up Witness at Airport, Brief Witness with Translator, Drop Witness to Hotel | 3.90 | 68 | 7.00 | |
| | | | | | |
| | | | | | |

*Gradoni & Associates is licensed by the Texas Board of Private Investigators and Private Security Agency under License #A-5741.*

*Complaints may be directed to P.O. Box 4087, Austin, Texas 78773-0001 or emailed to RSD_Customer_Relations@dps.texas.gov*

EXHIBIT 7 Page048

| 7/ /13 | Transport Two Punishment Witnesses to Court, Identify New Witness, Briefing with Attorney, Transport Witnesses Back to Hotel | 7.50 | 46 | 7.00 | |
| Totals | | 119.75 | 1,119 | 48.00 | |

## AFFIDAVIT

I, James Gradoni, President of Gradoni & Associates, Inc., State of Texas licensed investigative firm, State License #A05741, do swear to and affirm, that the attached invoice/invoices, for services rendered are true and correct to the best of my belief and knowledge.

James Gradoni

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this 9th day of July, 2013, to certify, which witness my hand and seal of office.

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My Commission Expires: 9/13/16

KAYLA KOENIG
My Commission Expires
September 13, 2016

*Gradoni & Associates is licensed by the Texas Board of Private Investigators and Private Security Agency under License #A-5741.*

*Complaints may be directed to P.O. Box 4087, Austin, Texas 78773-0001 or emailed to RSD_Customer_Relations@dps.texas.gov*

EXHIBIT 7 Page049

000888



**Skip:**

**Receipt for Abel's flight charged on your card.**

**Amount was $1.306.90**

**JJ**

RP Cornelius paid out-of-pocket $1306⁹⁰ AIRLINE TICKET FOR MITIGATION WITNESS — Δ's SON ABEL PEREZ

EXHIBIT 7 Page050

| Record Locator | **GSVHLO** |

# Itinerary

| Carrier | Flight # | Departing | Arriving | Fare Code |
|---------|----------|-----------|----------|-----------|
| American<br>Abel Perez | 834<br>Seat 28E | SANTIAGO DO<br>TUE 16JUL<br>8:10 AM<br>Economy | MIAMI INTERNTNL<br>TUE 16JUL<br>10:25 AM | V<br><br>Food For Purchase |
| American<br>Abel Perez | 2245<br>Seat 26E | MIAMI INTERNTNL<br>TUE 16JUL<br>3:25 PM<br>Economy | HOUSTON GEO BUSH<br>TUE 16JUL<br>5:05 PM | V<br><br>Food For Purchase |
| American<br>Abel Perez | 1314<br>Seat 3E | HOUSTON GEO BUSH<br>SAT 20JUL<br>1:35 PM<br>First Cl | MIAMI INTERNTNL<br>SAT 20JUL<br>5:10 PM | A<br><br>Snack |
| American<br>Abel Perez | 613<br>Seat 4B | MIAMI INTERNTNL<br>SAT 20JUL<br>6:40 PM<br>Business | SANTIAGO DO<br>SAT 20JUL<br>8:40 PM | D<br><br>Dinner |

# Receipt

| Passenger | Ticket # | Fare-USD | Taxes and Carrier-<br>Imposed Fees | Ticket Total |
|-----------|----------|----------|-------------------------------------|--------------|
| Abel Perez | 0012380824959 | 977.00 | 329.90 | 1306.90 |
| American Express XXXXXXXXXX | | | | $ 1306.90 |

**Baggage Information**

Baggage charges for your itinerary will be governed by American Airlines BAG ALLOWANCE -STIIAH-01 Piece/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM BAG ALLOWANCE -IAHSTI-03 Pieces/ American Airlines /UP TO 70 LB/32 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 1STCHECKED BAG FEE-STIIAH-USD0 00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 1STCHECKED BAG FEE-IAHSTI-USD0.00/ American Airlines /UP TO 70 LB/32 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 2NDCHECKED BAG FEE-STIIAH-USD0 00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM** 2NDCHECKED BAG FEE-IAHSTI-USD0.00/ American Airlines /UP TO 70 LB/32 KG AND UP TO 62 LINEAR IN/158 LINEAR CM ADDITIONAL ALLOWANCES AND/OR DISCOUNTS MAY APPLY

You have purchased a NON-REFUNDABLE fare. The itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has no value. If the fare allows changes, a fee may be assessed for changes and restrictions may apply

Electronic tickets are NOT TRANSFERABLE. Tickets with nonrestrictive fares are valid for one year from original date of issue. If you have

EXHIBIT 7 Page051

000890

questions regarding our refund policy, please visit www.aa.com/refunds

To change your reservation, please call 1-800-433-7300 and refer to your record locator

Check-in times will vary by departure location. In order to determine the time you need to check-in at the airport, please visit www.aa.com/airportexpectations.

AA CARRY-ON BAGGAGE

American Airlines does not impose Carry-On bag fees however, restrictions do apply.   To view carry-on baggage restrictions for American Airlines or American Eagle, please visit, Carry-On luggage  Passengers who originate flights on other than American Airlines/American Eagle and need to determine applicable carry-on fees or restrictions specific to other air carriers in your itinerary, please visit INTERLINE PARTNER BAG CHARGES.

AA CHECKED BAGGAGE CHARGES

For travel within and between the US/PR/USVI and Canada the first checked bag will be charged 25 USD/25 CAD.  The second checked bag will be charged at 35 USD/ 35 CAD.

For travel between Mexico, Caribbean and Central America and the US/PR/USVI, Canada, Mexico and Central America there will be no charge for the first checked bag. The second checked bag will be charged at 40 USD/ 40 CAD (or local currency equivalent).

For travel from the US/PR/USVI, Mexico, Caribbean, Central America, South America (excluding Brazil, Chile and Peru) to/through/from Europe there will be no charge for the first checked bag. The second checked bag will be charged at 100 USD/ 100 CAD/ 75 EUR / 65 GBP (or local currency equivalent).

For travel between Mexico, Caribbean, Central America and South America (excluding Brazil, Chile and Peru) there will be no charge for the first checked bag. The second checked bag will be charged  at 70 USD/ 70 CAD (or local currency equivalent).

For travel between South America (except Brazil, Chile and Peru) and US/PR/USVI and Canada there will be no charge for the first checked bag. The second checked bag will be charged at 70 USD/ 70 CAD (or local currency equivalent).

For travel to/from/through Brazil, Chile, Peru, China, Japan and Korea there will be no charge for the first or second checked bags.

When your itinerary includes any carrier other than American Airlines, baggage charges of the various airlines may apply to the flights they operate.  Please visit INTERLINE PARTNER BAG CHARGES for applicable baggage allowances and charges specific to the interline partner in your itinerary.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's  conditions of carriage..

NOTICE OF INCORPORATED TERMS OF CONTRACT

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage.  Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention.  Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges. 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5. Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting air carrier's terms at its airport and city ticket offices.  You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers.  Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage button below.

If you have a customer service issue, please Contact AA.

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient(s).  This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient.  If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message   If you suspect you have received this email in error, please notify the sender and promptly delete this messge and its attachments from your computer.

 DealFinder™



| Conditions of Carriage | Special Assistance | Flight Check-in | Flight Status Notification |

3

EXHIBIT 7 Page052

000891

13847940101C / Court: 337

# EXHIBIT 8

Case 4:17-cv-03621 Document 89-11 Filed on 01/05/23 in TXSD Page 897 of 919



Gradoni & Associates

Professional Investigative Services
State License A5741

August 14, 2015

Adrián de la Rosa
Post-Conviction Investigator
Office of Capital Writs
1700 N. Congress Ave, Suite 460
Austin, TX 78701

Re: Obel Cruz-Garcia

Dear Mr. de la Rosa,

Please allow this letter to serve as my response to your email dated July 29, 2015, regarding our firm's efforts in the defense of Obel Cruz-Garcia.

1. The investigative work was not divided in any particular way. Polly Korzekwa, our background coordinator, did all the background research outlined in our investigative reports.

   Whoever authored the investigative report was the obvious Investigator involved. On some occasions Edna Velez interviewed Spanish speakers by herself. On other occasions we conducted the interviews together. An example of these interviews would be the ones we did in the Dominican Republic, the interviews at the jail with the defendant and the State's Spanish speaking cooperating witness, who testified at the trial.

2. The attorneys provided us with all of the offense reports and asked that we background and interview all of witnesses outlined in the reports. We also utilized the State's witness list to identify witnesses that needed to be interviewed. Since our firm has been in business for 26 years we were not informed what to look for since the subject areas on the guilt/innocence witnesses were obvious. As far as the mitigation witnesses were concerned, we were told to get as much beneficial information that we could about the defendant's upbringing, family members, etc.

3. Interaction with the defendant's family members was very cordial. Most of the family members provided as much information as they could to the best of their ability.

2611 Cypress Creek Pkwy, Suite C100 • Houston, Texas 77068 • (281) 440-0800 • Fax (281) 440-0208

EXHIBIT 8 Page 001

000893

4. I have no recollection of suggesting that we travel to Puerto Rico.

5. We did not consider interviewing personnel from the prisons in Puerto Rico since we did not have any specifics on who to interview, nor the content of the information they may possess.

6. I do not remember encountering any challenges in interviewing Houston area witnesses that we could locate.

If you should have any additional questions please feel free to email me.

Sincerely,

JJ Gradoni

JJG/kk

*Re: 12-05-0266*

EXHIBIT 8 Page 002

000894

13847940101C / Court: 337

# EXHIBIT 9



Exhibit K

## CAUSE NOS. 1181910, 1289188, 1289189

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 337th DISTRICT COURT |
| | § | |
| V. | § | OF |
| | § | |
| OBEL JULIAN CRUZ-GARCIA | § | HARRIS COUNTY, TEXAS |

### AFFIDAVIT OF ELIZABETH JOHNSON

"I, ELIZABETH JOHNSON, do solemnly say under oath that the following statements are true. I am also a witness in this matter and affirm that the statement provided below is based on my personal knowledge of the facts referred to:

### Personal Background:

1. My name is Elizabeth Johnson.

2. I am of sound mind, over the age of 18, and capable of making this affidavit.

3. I received a B.S. degree in chemistry in 1982 from Wofford College in Spartanburg, SC and a Ph.D. degree in immunology in 1987 from the Medical University of South Carolina. My formal education also includes four years of post-doctoral training in the field of molecular biology and DNA analysis at the Medical University of SC and at MD Anderson Cancer Center in Houston, Texas.

4. I have been a forensic scientist for over nineteen years. I was hired to establish the DNA laboratory within the Harris County Medical Examiners Office in Houston, Texas in 1991, and I was the director of that laboratory. I also assumed supervision of their serology laboratory in 1996. I personally implemented and validated both RFLP- (chemiluminescent detection) and PCR-based DNA analysis in this laboratory. I was a Senior Forensic Scientist at Technical Associates, Inc., Ventura, California from February 1997 until May 2003 and performed and supervised both RFLP and PCR-based testing including DQA1, Polymarker, D1S80 and various STR multiplex systems. I have performed evidence examinations in hundreds of cases and performed DNA analyses on several thousand samples. I am currently in private practice performing forensic science consultation.

EXHIBIT 9 Page 001

000896

## Statement of Facts:

1. Obel Cruz Garcia is charged with capital murder and aggravated sexual assault.

2. I have been communicated with defense attorney Steve Shellist about the facts of the case.

3. I have asked Mr. Shellist for specific DNA discovery in order to properly consult. He included my discovery language in a Motion requesting said DNA discovery from the State.

4. It is my understanding that Mr. Shellist has not yet received from the State what was requested.

5. Once it is received by me, I will need 8 weeks from the time of receiving all discoveries to work in a review and consultation. If I see a need for retesting that will take additional time as we will have to contract separately with a DNA testing lab.

6. Contingent upon prompt production of discovery from the State, I will be available to consult and testify for the Defendant beginning in May of 2011.

I declare under penalty of perjury that the foregoing is true and correct and that those matters stated upon information and belief are true to the best of my knowledge.

Executed on this 10th day of January, 2011, at Ventura County, California

Elizabeth A. Johnson, Ph.D.

2

EXHIBIT 9 Page 002

13847940101C / Court: 337

# EXHIBIT 10

000898

## AFFIDAVIT OF DANIEL HELLWIG

I, Daniel Hellwig, state and declare as follows:

1. My name is Daniel Hellwig. I am the Laboratory Director of Sorenson Forensics, a private forensic laboratory providing forensic DNA casework services for federal, state, and local crime laboratories, law enforcement agencies, and courts. Sorenson Forensics is an Internationally Accredited ASCLD/LAB (ISO/IEC 17025:2005) commercial forensic DNA laboratory.

**Education and Experience**

2. I earned a B.S. in biology and chemistry from Viterbo University in La Crosse, Wisconsin, in 1997 and a Master's degree in forensic science from Marshall University in Huntington, West Virginia, in 2003. I have twelve years of forensic DNA experience and have conducted DNA analysis in approximately 300 cases. I have also served as the Forensic DNA Technical Leader of Sorenson Forensics for two and a half years, supervising the technical operations of the DNA laboratory.

3. As the Laboratory Director of Sorenson Forensics, I direct the supervision of senior DNA staff members, overseeing a team of thirty-six people. Prior to joining Sorenson Forensics in 2009, I worked for several years as a forensic scientist performing DNA analysis for both the New Mexico Department of Public Safety and the Minnesota Bureau of Criminal Apprehension. I have also worked as an instructor of forensic science coursework at New Mexico Highlands University and at Santa Fe Community College.

4. I am a member of the American Academy of Forensic Sciences and the American Society of Crime Laboratory Directors. I also previously held membership with the International Association for Identification, and as a panel review member of the National DNA Identification System. I am certified as an FBI DNA Quality Assurance Auditor and as an ASCLD/LAB-International Assessor. I have

1

EXHIBIT 10 Page 001

presented at numerous conferences and workshops on forensic DNA analysis throughout the United States.

5. I have been qualified to testify as an expert in forensic DNA analysis in Texas, New Mexico, and Utah.

6. My C.V. is attached to this affidavit.

**Involvement in Obel Cruz-Garcia's Case**

7. Sorenson Forensics was retained in November 2014 by the Office of Capital Writs to do a case review of the DNA testing performed by various laboratories, including the Houston Police Department (HPD) crime laboratory, Genetic Design, and Orchid Cellmark related to Obel Cruz-Garcia's capital trial. For this review, we were provided with case files regarding the testing done by the HPD crime lab, Genetic Design, and Orchid Cellmark, including reports, supporting documentation, and chain of custody documents.

**DNA Case Review Findings**

8. My review of the materials provided yielded several significant concerns about the DNA testing and analysis performed in this case. Had I been retained as an expert in forensic DNA analysis at Cruz-Garcia's 2013 capital murder trial, I could have provided testimony that would have assisted the judge and the jury in evaluating the integrity and significance of the DNA evidence presented at the suppression hearing and at trial.

**Chain of Custody Problems**

9. My review of chain of custody documentation raised concerns about the integrity of the probative pieces of evidence in this case. Based on my review of chain of custody documentation provided by Orchid Cellmark, it appears the evidence bag containing the sexual assault kit that housed the vaginal swabs tested in this case was unsealed prior to laboratory processing. The laboratory noted that the "FedEx Box" that contained the evidence was sealed, but the sexual assault kit housed

2

EXHIBIT 10 Page 002

within that box was unsealed when received by the Orchid Cellmark laboratory. Given the extended timeframe between the original HPD/Genetic Design testing and the submission of this evidence to Orchid Cellmark—roughly fifteen years— the unsealed sexual assault kit raises serious concerns as to the integrity of this evidence.

10. I also noted that, although the manila envelope containing the cutting from the crotch of the red panties was identified as a sealed container, two integral pieces within that sealed package were noted as unsealed. The unsealed envelopes contained within this packaged housed the cutting from the crotch of the red panties and the liquid blood known sample from Arturo Rodriguez. An unsealed known sample housed with an unknown evidence sample is cause for concern and calls into question the integrity of this evidence.

**The Mixture DNA Profile Obtained from the Cutting of the Red Panties**

11. A mixture DNA profile was obtained from the sperm cell fraction from the cutting of the red panties. At trial, testimony was presented that Obel Cruz-Garcia was the major contributor to this mixture and that Arturo Rodriguez could not be excluded as the second contributor to the mixture.

12. In my review, I noted that no statistical evaluation was reported by Orchid Cellmark with respect to the inclusion of Arturo Rodriguez in the mixture DNA profile obtained from the cutting of the red panties. In 2010, the Scientific Working Group on DNA Analysis Methods (SWGDAM) provided guidelines that specifically state that any inclusion (or non-exclusion) must be reported along with a statistical weight to aid the trier of fact in the strength of this inclusion. The laboratory did not do a statistical calculation on this DNA mixture and, thus, should not have included Arturo Rodriguez as a possible contributor to this mixture without an associated weight.

3

EXHIBIT 10 Page 003

000901

13. Additionally, the DNA mixture obtained from the cutting of the red panties is only detected in four of fifteen DNA loci and at a very low level. It is very unlikely that any of these would be deemed suitable for statistical analysis and, thus, impossible to obtain that statistical weight. It is thus my opinion that the comparison between this item and Arturo Rodriguez should have been deemed inconclusive.

14. Testimony at trial that Arturo Rodriguez was the second contributor to the mixture DNA profile obtained from the sperm cell fraction from the cutting of the red panties was, therefore, misleading. The second contributor to the mixture should correctly have been described as an unknown source. Based on the genetic material recovered, there is insufficient information for a laboratory to conclude that Arturo Rodriguez may have been the second contributor.

**The Vaginal Swabs**

15. Regarding the sperm cell fraction of the vaginal swab, I disagree with the statistical weight provided by the Orchid Cellmark report. When utilizing the statistical method used in this analysis, the Combined Probability of Inclusion (CPI), it is essential to evaluate the DNA profile obtained to ensure that no allelic dropout (DNA information that is "missing" from the profile due to minute amounts of input DNA or DNA degradation) has occurred, as this will invalidate the CPI statistic. With regards to the sperm cell fraction of the vaginal swab, there are several DNA loci (tested locations on the DNA) that appear to be at a low enough level that the laboratory should have precluded them from statistical analysis. There are even indications of missing allele (denoted by a * in the laboratory notes) where the laboratory still improperly utilized this DNA locus for statistical analysis.

16. The SWGDAM guidelines recommend incorporation of a stochastic threshold to ensure that no allelic dropout is occurring, thus validating the CPI statistic. It does not appear that the laboratory utilized a stochastic threshold in this case. The

4

EXHIBIT 10 Page 004

000902

laboratory chose to preclude the use of only one DNA locus (FGA) from the statistical calculation when there are definite questions as to allelic dropout at several other DNA loci. Specifically, D21S11, D7S820, CSF1PO, vWA, TPOX, D18S51, D5S818 appear to have either possible alleles below analytical threshold or alleles that would fall under typical stochastic threshold for this amplification kit.

17. Additionally, the laboratory provided two separate statistical analyses for this item, one for the inclusion of Arturo Rodriguez and another for the inclusion of Obel Cruz-Garcia. It is essential that evaluation of the unknown, evidentiary DNA profile occur with no bias from the known samples that will be compared. Essentially, an unknown evidentiary profile should be evaluated for suitability for comparison as well as statistical analysis before introducing the known, potential suspect samples. That appears not to have been the case in this analysis, as the statistics were changed for the subsequent inclusion of Obel Cruz-Garcia. This is in violation of SWGDAM guidelines, and I disagree with this practice. It is a fundamental principle of forensic analysis to do all possible to remove interpretational bias toward any individual by analyzing the evidentiary DNA profiles previous to and blind to the analysis and subsequent comparison to the known sample. Orchid Cellmark's failure to do so calls into question the comparison as well as the statistics generated as a result of this comparison.

**The HPD Crime Lab's Reinterpretation of the Orchid Cellmark Data**

18. In this case, the HPD crime laboratory interpreted data/profiles that were generated by the Orchid Cellmark laboratory approximately three years prior to the issuing of the HPD report. This in itself is problematic, given that, as a best scientific practice, it is not recommended that a laboratory reanalyze the work of another forensic DNA laboratory. The analysis and interpretation of forensic DNA profiles should be done utilizing the procedures, protocols, and interpretation thresholds

5

EXHIBIT 10 Page 005

000903

(analytical, stochastic, etc.) of the laboratory that processed and created the profiles.

19. In addition to my concerns about Orchid Cellmark's initial interpretation and reporting of the DNA profile from the sperm cell fraction of the vaginal swab, I also disagree with the HPD reinterpretation of this profile. It is impossible for the HPD laboratory to evaluate for stochastic dropout when 1) the original Orchid Cellmark data did not appear to use a stochastic threshold in their original interpretation and 2) the HPD laboratory does not have a thorough understanding of the validation documentation, procedures, and thresholds specific to the Orchid Cellmark laboratory processing necessary to accurately reinterpret this profile, as it displays data that would likely be within a range of stochastic concerns. It is required by accreditation standards that every laboratory must validate the instruments, chemistries, and procedures before utilizing them within their laboratory. These lead to laboratory-specific thresholds, procedures, and specifications that are applicable to the laboratory itself. Thus, without intimate knowledge of and proper adherence to the validated procedures, thresholds, and specifications of the Orchid Cellmark laboratory at the time of their interpretation, the HPD laboratory would not be utilizing the interpretation that is unique to the laboratory that the data was created in and interpreted under.

20. Additionally, it appears that the HPD laboratory made the decision in its reinterpretation of this DNA mixture to exclude a DNA marker (D21S11) in its statistical calculations that was originally included by the Orchid Cellmark interpretation and included a DNA marker (D19S433) in its statistical calculation that was originally excluded by the Orchid Cellmark interpretation. There is no provided documentation that explains the reason behind this interpretation decision by the HPD laboratory. This is another example of the difficulties that stem from

6

EXHIBIT 10 Page 006

000904

HPD's reinterpreting data that was not generated at its own laboratory and, in my opinion, this was not an appropriate adjustment to the statistical interpretation.

21. Furthermore, while interpreting the two single source profiles (the cigar and the major component of the sperm cell fraction from the panties), the HPD laboratory increased the rarity of the profile by including two DNA loci (D2S1338 and D19S433) in its statistical calculation. These were previously not reported in the Orchid Cellmark laboratory report. While the inclusion of these two markers in the statistics is not necessarily cause for concern, it is still problematic that the original laboratory that created the profile did not denote these two markers as suitable for comparison (and thus suitable for statistical calculation) in any way. The only documentation that noted suitability for statistical calculation within the Orchid Cellmark report is the documentation of the statistics that the laboratory used, which, in both profiles, did not include these two markers. The HPD report assumes that there is no concern for utilizing these two markers in the statistical calculation. While this may be true, it is impossible to be absolutely certain as, again, the Orchid Cellmark laboratory interpreted the profiles in question and did not document the suitability of these markers for comparison sufficiently to remove any doubt. This illustrates the difficulties and concerns of HPD's interpreting data that was not generated by its own laboratory.

**Conclusions Regarding the DNA Testing Performed in This Case**

22. As stated previously, my review of the materials related to the DNA testing performed in this case yielded significant concerns regarding the reliability of the evidence tested and some of the conclusions drawn regarding this evidence.

23. First, the fact that certain chain-of-custody documents suggest that key pieces of evidence—including the sexual assault kit—were received unsealed by Orchid Cellmark calls into question the integrity of the physical evidence. It is furthermore problematic that this documentation shows that a known contributor

7

EXHIBIT 10 Page 007

sample—the blood of Arturo Rodriguez—was housed together with an unsealed unknown sample. Such practices are against best scientific practice, and call into doubt the overall reliability of the evidence handling in this case.

24. Second, it is my opinion that no conclusion should have been drawn, or could have been drawn, about Arturo Rodriguez's inclusion as a contributor to the DNA mixture present on the crotch cutting from the red panties. Based on my review of the evidence, there is insufficient information to suggest that Arturo Rodriguez, rather than an unknown additional contributor, was the source of the additional male DNA sample present on this evidence.

25. Third, I find the manner in which Orchid Cellmark rendered statistical conclusions regarding the DNA sample on the vaginal swabs to be problematic and against best scientific practices. Furthermore, Orchid Cellmark acted in violation of SWGDAM guidelines in adjusting its DNA inclusion statistics based on the introduction of the known-suspect sample from Obel Cruz-Garcia.

26. Finally, a host of problems arise from the HPD crime laboratory's decision to reinterpret Orchid Cellmark's data, rather than conducting DNA testing anew prior to trial. Such a practice necessarily compromises the statistical and scientific validity of the conclusions drawn and presented regarding the DNA evidence in this case.

27. I was available to consult and testify as an expert in forensic DNA analysis at Cruz-Garcia's 2013 capital murder trial. Had I been retained, I would have told Cruz-Garcia's counsel what is contained in this affidavit and would have testified to the same had I been called as a witness.

8

EXHIBIT 10 Page 008

28. I have read and reviewed this nine-page affidavit.

I declare under penalty of perjury under the laws of the State of Utah that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _24_ of August, 2015 in _Salt Lke City, UT_ .

_____
Daniel Hellwig

Subscribed and sworn to before me on _August 24_ , 2015.

_____
Notary Public, State of Texas

KIMBERLY MCGREGOR
Notary Public, State of Utah
Commission # 667133
My Commission Expires
May 29, 2017

9

EXHIBIT 10 Page 009

000907

# DANIEL S. HELLWIG

SORENSON FORENSICS

2511 S. WEST TEMPLE, SALT LAKE CITY, UT 84115

801-462-1486 ● ▮▮▮▮▮▮▮ (CELL) ● DHELLWIG@SORENSONFORENSICS.COM

## EDUCATION

**Bachelor of Science Degree**, Viterbo University, La Crosse, Wisconsin, 1997
Major: Biology/Chemistry

**Masters of Science Degree**, Marshall University, Huntington, West Virginia, 2003
Major: Forensic Science

## WORK EXPERIENCE

**July 2013 - Present**
**Lab Director,** Sorenson Forensics, Salt Lake City, UT
- Direct supervision of senior DNA staff members
- Manage the evaluation, interview and hiring of potential employees
- Responsible for the operation and oversight of DNA casework operations and personnel
- Budget management and oversight for DNA casework operations
- Provide both in-house and offsite technical training
- Assist with laboratory development consulting projects (Lagos, Nigeria; Dakar, Senegal)
- Consult with law enforcement, prosecutors and other forensic laboratory staff on evidence submission, testing and DNA results, conclusions and statistics
- Planning and implementation of technology upgrades, process modification and lean/six sigma quality and efficiency projects
- Establishing and maintaining business development relationships with potential partners, vendors and collaborators within the forensic community
- Provide and report forensic DNA case reviews for the defense law community

**January 2012 – July 2013**
**Associate Lab Director – Operations,** Sorenson Forensics, Salt Lake City, UT
- Direct supervision of senior DNA staff members
- Manage the evaluation, interview and hiring of potential employees
- Responsible for the operation and oversight of DNA casework operations and personnel
- Provide both in-house and offsite technical training
- Assist with laboratory development consulting projects (Lagos, Nigeria; Dakar, Senegal)
- Consult with law enforcement, prosecutors and other forensic laboratory staff on evidence submission, testing and DNA results, conclusions and statistics
- Planning and implementation of technology upgrades, process modification and lean/six sigma quality and efficiency projects
- Establishing and maintaining business development relationships with potential partners, vendors and collaborators within the forensic community
- Provide and report forensic DNA case reviews for the defense law community

**June 2009 – January 2012**
**Forensic DNA Technical Leader,** Sorenson Forensics, Salt Lake City, UT
- Responsible for the technical operation and oversight of DNA analytical operations
- Developed and evaluated all laboratory methods and protocols for forensic DNA casework
- Ensured all technical staff is properly trained on existing and new technical procedures
- Oversaw, participated in and evaluated all in-house forensic validations
- Performed forensic DNA examinations on a variety of evidentiary items and write reports regarding the result of that testing
- Responsible for testifying as an expert witness in court
- Provided and reported forensic DNA case review for the defense law community
- Consulted with law enforcement, prosecutors and other forensic laboratory staff on evidence submission, testing and DNA results, conclusions and statistics
- Provide both in-house and offsite technical training

EXHIBIT 10 Page 010

000908

**December 2008 – June 2009**
**Professor,** New Mexico Highlands University, Las Vegas, New Mexico
* Instructed forensic science related coursework in the Chemistry department of the university
* Developed class curriculum for several forensic science classes
* Assisted the department in their pursuit of a Forensic Science Education Programs Accreditation Commission (FEPAC) accredited B.S. Forensic Science degree offering
* Provided forensic DNA case review for the New Mexico defense attorney community

**July 2003 - November 2006; October 2007 - September 2008**
**Forensic Scientist - Advanced,** New Mexico Department of Public Safety, Santa Fe, New Mexico
* Performed forensic serology and DNA examinations on a variety of evidentiary items and wrote reports regarding the results of that testing
* Responsible for testifying as an expert witness in court
* Assisted with validation, development of standard operating procedures and performance checks on various new technologies
* Quality assurance and quality control laboratory duties, including FBI DNA quality assurance internal auditing
* Instructed various law enforcement personnel on forensic science and crime scene investigation techniques
* Acted as safety officer of the DNA section

**November 2006 - October 2007**
**Forensic Scientist/Crime Scene Investigator,** Minnesota Bureau of Criminal Apprehension, Bemidji, Minnesota
* Performed forensic serology and DNA examinations on a variety of evidentiary items and wrote reports regarding the results of that testing
* Responsible for testifying as an expert witness in court
* Responded to and processed homicide crime scenes as a member of the Bemidji regional Crime Scene Team.
* Quality assurance and quality control laboratory duties
* Acted as the safety officer for the Bemidji regional laboratory

**January 2004-November 2006**
**Part-time Faculty,** Santa Fe Community College
* Instructed coursework for Forensic Science I and II
* Responsible for developing and instructing the forensic science curriculum in the Criminal Justice program of the college

**May 2002 - August 2002**
**Intern,** Armed Forces DNA Identification Laboratory, Rockville Maryland
* Assisted with validation and development of several Mitochondrial DNA extraction techniques
* Assisted AFDIL staff in the compilation and reporting of findings for future publication

## COURT TESTIMONY

* Qualified as an expert in Forensic Serology/DNA Analysis on multiple occasions in several different jurisdictions throughout the state of New Mexico (2004-2008)

* Qualified as an expert in Forensic DNA Analysis in the state of Texas (2010, 2014)

* Qualified as an expert in Forensic DNA Analysis in the state of Utah (2010-2011, 2014)

## PROFESSIONAL ASSOCIATIONS

**NDIS Panel Member,** National DNA Identification System (FBI), 2008
**Member,** American Academy of Forensic Sciences, 2001-present
**Member,** International Association for Identification, 2001-2003

## CERTIFICATES

| | |
|---|---|
| **FBI DNA Quality Assurance Auditor** | March 3, 2006 |
| **ASCLD/LAB-International Assessor** | March 17, 2006 |

000909

EXHIBIT 10 Page 011

**Lean Six Sigma Green Belt Certification**          November 27, 2009
**Six Sigma Black Belt Certification**               July 29, 2013
US Synthetic Corp.                                   Orem, UT

## TRAINING

| | |
|---|---|
| **American Academy of Forensic Sciences Annual Meeting** | |
| Chicago, Illinois | February, 2003 |
| New Orleans, Louisiana | February, 2005 |
| Seattle Washington | February, 2006 |
| Seattle Washington | February, 2010 |
| Chicago, Illinois | February, 2011 |
| Washington, DC | February, 2013 |

**Reflective Ultra Violet Imaging System (R.U.V.I.S)**     January 26, 2004
Sirchie Finger Print Laboratories                          Santa Fe, NM

**Basic Forensic Serology**                   February 9-13, 2004
Serological Research Institute                Richmond, CA

**ABI Prism 310 Genetic Analyzer/AmpFLSTR training**   June 1-4, 2004
Applied Biosystems Inc.                                Foster City, CA

**Instructor Development**          July 12-16, 2004
Law Enforcement Academy            Santa Fe, NM

**ABI 3100 Capillary Electrophoresis, GeneMapper ID**
**Data Analysis and Real Time PCR Training Module**    June 12-17, 2005
Marshall University                                    Huntington, WV

**DNA Auditor Training**                 February 20-21, 2006
Federal Bureau of Investigation          Seattle, WA

**Decoding DNA: Train the Trainer**          March 8-10, 2006
Texas Regional Community Policing Institute   Salt Lake City, UT

**ASCLD/LAB Introduction to ISO/IEC 17025:2005**   March 13, 2006
Federal Bureau of Investigation                    Stafford, VA

**ASCLD/LAB-International Assessor**      March 13-17, 2006
Federal Bureau of Investigation           Stafford, VA

**Court Room Testimony**                     September 27-30, 2007
Minnesota Bureau of Criminal Apprehension    St. Paul, MN

**Bode Technologies Technical Workshop - East**   May 19-22, 2008
                                                   Captiva Island, FL

**Lean Six Sigma Laboratory Efficiency Improvement**   August 2009-November 2009
Sorenson Forensics                                     Salt Lake City, UT
Presenter: Dirk Hooiman (Lean Six Sigma Master Black Belt)

**SWGDAM Mixture Interpretation Guidelines**   August 5, 2010
Utah State Bureau of Forensic Science          Salt Lake City, UT
Presenter: Bruce Heidebrecht (SWGDAM)

**Microsoft Excel: Beyond the Basics/Advanced Excel**   August 11-12, 2010
Fred Pryor Seminar                                      Salt Lake City, UT

EXHIBIT 10 Page 012

000910

**Genemapper ID-X User Training**
Sorenson Forensics
Presenter: Catherine Caballero (Forensic Training Network)

November 3-4, 2010
Salt Lake City, UT

**National CODIS Conference**

November 15, 2010
Salt Lake City, UT

**California Association of Criminalists Spring Meeting**
DNA Workshop

May 18, 2011
Long Beach, CA

**Promega Powerplex 18D System Workshop**
Promega Campus

June 1-2, 2011
Madison, WI

**International Society for Applied Biological Sciences 2011 Meeting**

June 20-24, 2011
Bol, Croatia

**Green Mountain DNA Conference**

July 25-27, 2011
Burlington, VT

**Power to Solve Workshop**
Sorenson Forensics
Promega DNA IQ/Plexor HY/PP16HS/PP18D

August 8-9, 2011
Salt Lake City, UT

**Cold Case Conference**
Vidocq Society/Unified Police Department

September 26-30, 2011
Salt Lake City, UT

**Bullet Proof Manager**

| **Crestcom Management Training** | Salt Lake City, UT |
|---|---|
| Time Management - The 70 Minute Hour | November 18, 2010 |
| Plan Management - Effective Planning: A 7 Step Formula | December 16, 2010 |
| Customer Loyalty - How to Exceed Customer Expectations | January 20, 2011 |
| Stress Management - How to Survive and Thrive Under Stress | February 17, 2011 |
| Negotiation - Negotiating to Win | March 17, 2011 |
| Creativity - Tap the Creativity of Your Team | April 21, 2011 |
| Motivation - Increasing Productivity through Motivated People | June 16, 2011 |
| Employee Recognition - Recognition: The Key to Higher Performance | July 21, 2011 |

**Louisiana Association of Forensic Sciences Annual Meeting**
Louisiana State Crime Laboratory

April 18, 2012
Baton Rouge, LA

**International Symposium on Human Identification**
Nashville, TN

October 15-17, 2012

**Mid-Atlantic Association of Forensic Scientists Annual Meeting**
Roanoke, VA

May 6-7, 2013

# PRESENTATIONS/POSTERS/PUBLICATIONS

**Overview of Forensic DNA Techniques (presenter)**
King County Prosecuting Attorney's Office

February 27, 2010
Seattle, WA

**Y-STR Interpretation and Statistics Workshop (presenter)**
Onondaga County Crime Laboratory

April 27-28, 2010
Syracuse, NY

**Lean 6 Sigma Efficiency Improvement Project (team lead)**
Monroe County Crime Laboratory – Forensic DNA Section

August 17-18, September 14-15, 2010
Rochester New York

**Y-Screening: An alternative to Microscopic Examination (presenter)**

| Michigan State Police Laboratory Conference, Traverse City, MI | August 20, 2010 |
|---|---|
| California Association of Criminalists Conference, Long Beach, CA | May 18, 2011 |

| | |
|---|---|
| Green Mountain DNA Conference, Burlington VT | July 27, 2011 |
| Genetic Identity Webinar – Promega @cademy | August 25, 2011 |
| Louisiana Association of Forensic Sciences, Baton Rouge, LA | April 18, 2012 |

**STR Wars: A comparison of Powerplex 16HS and Identifiler Plus**     October 12, 2010
Promega International Symposium on Human Identification (poster)     San Antonio, TX

**Forensic Investigative Law Enforcement Ancestry Test (ILEAD) (presenter)**

| | |
|---|---|
| Cold Case Summit, Unified Police Department, Salt Lake City, UT | April 25, 2011 |
| International Society for Applied Biological Sciences, Bol, Croatia | June 24, 2011 |
| Green Mountain DNA Conference, Burlington VT | July 27, 2011 |
| Louisiana Association of Forensic Sciences, Baton Rouge, LA | April 18, 2012 |

**Lean 6 Sigma: Efficiency and Quality Improvement (presenter)**     June 1, 2011
Promega Powerplex 18D Workshop     Madison, WI

**Basic Y-STR Interpretation and Statistics Workshop (presenter)**

| | |
|---|---|
| New York State Police Crime Laboratory, Albany, NY | September 20-22, 2011 |
| Monroe & Erie County Crime Laboratories, Syracuse, NY | May 4, 2012 |

**SWGDAM Mixture Guidelines/Y-STR Interpretation (presenter)**     December 13-14, 2011
Massachusetts State Police Crime Laboratory     Maynard, MA

**Advanced Y-STR Interpretation Workshop (presenter)**

| | |
|---|---|
| New York State Police Crime Laboratory, Albany, NY | April 30, 2012 |
| Massachusetts State Police Crime Laboratory, Maynard MA | June 25-28, 2012 (2 days, 2 classes) |
| Oregon State Police Forensic Lab, Clackamas OR | January 15, 2013 |
| West Palm Beach County Sheriff's office | July 22-23, 2013 |

**Y-STR Interpretation and Statistics Workshop (presenter)**     May 2, 2012
OCME, Westchester, Suffolk County, Nassau County Laboratories     Westchester, NY

**Bringing Y-STRs into Your Laboratory (workshop chair/speaker)**     October 15, 2012
International Symposium on Human Identification     Nashville, TN

**Estimating Genetic Ancestry Using SNP Analysis  (presenter)**     February 8, 2013
American Academy of Forensic Sciences Annual Meeting     Washington, DC

**Y-STR Workshop (presenter)**     May 7, 2013
Mid-Atlantic Association of Forensic Scientists Annual Meeting     Roanoke, VA

**Forensic DNA 101/Trends in Forensic DNA**     May 13, 2014
2014 Cold Case Summit, Unified Police Department     Salt Lake City, Utah

**Y-STR Workshop/SWGDAM Mixture Guidelines/Statistics**     Nov 4-6, 2014
Metropolitan Nashville Police Department     Nashville, TN

EXHIBIT 10 Page 014

000912

4/9/2021 12:28 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52308860
By: T Reed
Filed: 4/9/2021 12:28 PM

*13847940101c / Court: 337*

# IN THE 337TH JUDICIAL DISTRICT COURT
## HARRIS COUNTY, TEXAS

## AND

## IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

| | | |
|---|---|---|
| | § | |
| **Ex parte OBEL CRUZ-GARCIA,** | § | |
| | § | **Writ No. _____** |
| | § | Trial Court Case No: |
| | § | 1384794 |
| | § | |
| **Applicant.** | § | **CAPITAL CASE** |
| | § | |
| | § | |
| | § | |

## SUBSEQUENT APPLICATION FOR
## POST-CONVICTION WRIT OF HABEAS CORPUS
## EXHIBITS 11 THROUGH 20

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

*13847940101c / Court: 337*

# EXHIBIT 11




# Houston Forensic Science Center

### Forensic Analysis Division
### Biology Section
1200 Travis Street, Houston, Texas 77002
(713) 308-2600

**FORENSIC TESTING**
**ISO/IEC 17025**

| | | | |
|---|---|---|---|
| **Incident Number:** | 105758592 | | |
| **Forensic Case Number:** | 2010-11899 | **Report Date:** | November 03, 2015 |

## Amended Laboratory Report #5

The report dated October 18, 2010 (OLO Supplement #84) has been amended with corrections and/or additions. Under Results and Interpretations, the statistics for item HP07-0014-01 and HP07-0014-07 (sperm fraction) have been changed to reflect an update to the FBI Popstats database, and the source statement has been removed. The conclusion for Item HP07-0014-02 (sperm fraction) has changed to reflect current interpretation guidelines. A conclusion for item 3.1 has been added. The note statement for loci D2S1338 and D19S433 has been removed. The assigned analyst has changed from Courtney Head to Robin Guidry. The original report is available at the Houston Forensic Science Center upon request.

| | | | |
|---|---|---|---|
| **Offense:** | Murder | **Previous Analysis:** | Genetic Design DNA Report dated February 4, 1993; Genetic Design DNA Report dated February 23, 1994; Orchid Cellmark DNA Report HP07-0014, dated November 27, 2007; Orchid Cellmark DNA Report HP07-0014-A, dated December 31, 2007; Orchid Cellmark DNA Report HP07-0014-B, dated July 25, 2008; Orchid Cellmark DNA Report HP07-0014-C, dated April 20, 2011; Orchid Cellmark DNA Report HP07-0014-D, dated June 15, 2011; Laboratory Reports dated November 16, 1992 (OLO Supplement #28), December 1, 1992 (OLO Supplement #31), May 13, 1993 (OLO Supplement #33), February 24, 1994 (OLO Supplement #37), December 10, 2007 (OLO Supplement #48), October 18, 2010 (OLO Supplement #84), January 13, 2011, and June 25, 2013 |
| **Requesting Officer:** | R. W. Chappell | | |
| | | **Lab #:** | L92-10367 |

## ITEMS OF EVIDENCE:

3          Known buccal swabs - Obel Cruz-Garcia

3.1        Portion of known buccal swabs – Obel Criz-Garcia

The Houston Forensic Science Center is accredited by ANSI-ASQ National Accreditation Board/FQS in the following forensic testing categories: Drugs, Toxicology, Biology and Firearms.

EXHIBIT 11 Page 001

000915