# KATHERINE TYRA

## HARRIS COUNTY DISTRICT CLERK

CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555

<div style="text-align: right">

Re: Cause No.: 632073-A
Court: 209
Appearance Date: 100592
</div>

Dear: CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555

Please be advised that due to your failure to appear in the above named Court of Harris County, Texas on the date shown above, a Judgment of Forfeiture has been issued. This Judgment will be made final unless good cause can be shown as to why you did not appear.

<div style="text-align: right">

Raymond Posado, Manager
Post Trial Systems
</div>

RP/

Unofficial Copy Office of Martha Tyra Harris District Clerk

# KATHERINE TYRA

## HARRIS COUNTY DISTRICT CLERK

CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555

███████████

Re:  Cause No.:  632073-A
Court:  209
Appearance Date:  100392

Dear: CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555

Please be advised that due to your failure to appear in the above named Court of Harris County, Texas on the date shown above, a Judgment of Forfeiture has been issued.  This Judgment will be made final unless good cause can be shown as to why you did not appear.

Raymond Posado, Manager
Post Trial Systems

RP/

Unofficial Copy Office of Martin Harris District Clerk

JUDGEMENT OF FORFEITURE OF THE   DISTRICT CRIMINAL COURT      NO. 209

OF HARRIS COUNTY, TEXAS

THE STATE OF TEXAS                    DATE DEFENDANT FAILED TO

VS. S.F. NO. 632073-A                 APPEAR: 100592

CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555

INTERNATIONAL FIDELITY INSURANCE CO.;
BY SERVING HAROLD KLEIN, ATTORNEY FOR SERVICE
5419 GOLF DRIVE              HOUSTON, TEXAS 77091     AGENT: JO BETHCOURT

     This day came the State of Texas by her attorney; and the name of the Defendant,
CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555     , who stands   charged by
INDICIMENT  being duly  and distinctly  called at the door of the  Courthouse to come
into Court to answer the  State of Texas  on the charge of a  FELONY     according to
the tenor and  effect of  his bond on file in this Court, but after a reasonable time
and the said Defendant be  and the same is, declared forfeited, and that the State of
Texas have and recover of the said Defendant,

CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555                  , as principal

the said (sureties if any);
INTERNATIONAL FIDELITY INSURANCE CO.;

the sureties on  said bond the sum of $  2000.00 dollars.  Plus prejudgment interest
at the rate of 6 percent on the face amount of the bond, plus  post judgment interest
at the  highest rate allowable by law. This judgment will be final  unless good cause
be shown why the defendant did not appear.

     It is  further ordered  that citation issue to said sureties  commanding them to
be  and appear before this  Court by filing written answer with the  District Clerk's
Office, Room 101A, 301 San Jacinto, Houston, Texas 77002 at or before 10 o'clock a.m.
of the Monday  next after the expiration of the twenty days after the date of service
of this citation and show cause why judgment of forfeiture should not  be made final.

     It is further ordered that notice to the Defendant,
CARMELO NINO SANTANA AKA CARMEO MARTINEZ (1) D-01206555       as principal, be
deposited in  the United States  mail directed to the Defendant at the address shown
on the bond.

     It is further ordered that an alias capias issue for the arrest of the Defendant.

Judgment Nisi Granted on       OCT 0 6 1992          .

                          _____
                                    Judge Presiding

          ANNEXED IN THE JUDGMENT MINUTES AT

               Vol. 72 Page 105

EXHIBIT 79 Page 025                                          0001731



EXHIBIT 79 Page 026

0001732

NO. 632073–A

| THE STATE OF TEXAS | § | IN Criminal District Court # 209 |
| --- | --- | --- |
| VS. | § | |

Carmelo Nino Santana   aka   , ET AL §   OF HARRIS COUNTY, TEXAS
               Martinez

## MOTION FOR REMITTITUR

COMES NOW, the Defendant-Surety, __Jo Betncourt   Lic. # 74303__ , in the above-entitled and numbered cause requesting the remittitur of the bond amount upon payment by him of court costs and prejudgment interest, and any costs incurred by the State in returning the Defendant-Principal to custody in Harris County, and in support of which would show the Court the following:

### I.

The bond was forfeited on the following date: __October 5th, 1992__ .

### II.

The Defendant-Principal was returned to custody in Harris County on the following date: __October 8th, 1992__ .

WHEREFORE, PREMISES CONSIDERED, the Defendant-Surety requests that he be discharged from liability on the bond upon payment of court costs, prejudgment interest, and any cost incurred by the State in returning the Defendant-Principal to custody in Harris County in accordance with Article 22.16, V.A.C.C.P.

Respectfully submitted,

SURETY/ATTORNEY FOR SURETY
         Jo Betncourt   Lic. # 74303

### VERIFICATION

I have read the foregoing Motion for Remittitur and represent to the Court that the facts set out therein are true and correct to the best of my knowledge and belief.

SURETY/ATTORNEY FOR SURETY
   Jo Betncourt   Lic. # 74303

APPROVED: _____

RETURN COSTS = $ __-0-__

NOT APPROVED: _____

Official Copy Office of Ann Bennett Burgess District Clerk

0001733

A AKA CARME

555

Principal

INSURANCE CO.

Sureties

Sureties

Sureties

Page

CRIMINAL CAUSE NUMBER: 632073-A

COURT NUMBER: 209

ATTORNEYS FOR DEFENDANT:

_____

_____

_____

ATTORNEY FOR STATE:

_____

_____

_____

DISPOSITION: _____

_____

DATE ENTERED: _____

ANNEX TO GENERAL MINUTES VOL._____ PAGE _____

PAID _____ RECEIPT NO._____

DATE MOTION FOR NEW TRIAL FILED _____

RECEIPT NO.: _____

DATE MOTION FOR NEW TRIAL OVERRULED _____

DATE MOTION FOR NEW TRIAL GRANTED _____

DATE BILL OF REVIEW FILED _____

VOLUME _____ PAGE _____

DATE NOTICE OF APPEAL _____

DATE BOND FILED _____ 30TH DAY

_____ 50TH DAY

_____ 60TH DAY

DATE MANDATE FILED _____ 19_____

OTHER ACTION:

_____

_____

_____

_____

_____

_____

_____

_____

_____

Unofficial Copy Office of Marilyn Burgess District Clerk

0001734

EXHIBIT 79 Page 028

13847940101C / Court: 337

# EXHIBIT 80

0001735

## DeAngelo, Lori

| | |
|---|---|
| **From:** | Tise, Natalie |
| **Sent:** | Friday, April 24, 2015 11:05 AM |
| **To:** | DeAngelo, Lori |
| **Cc:** | Wood, Justin; Gillie, Kerry |
| **Subject:** | RE: Obel Cruz-Garcia case |

Hi Lori,

Lynn sent me a copy of the Brady motion last week and I printed out all my saved emails on this case and gave them to her. I think Justin and Kerry Gillie did the same. I posted multiple Brady notices on this case that included everything that I could think of that might be considered Brady. This included references to the Bromwich report and some other documents pertaining to the crime lab, a report that dealt with problems with the latent fingerprint people, and some prior inconsistent statements made by my witnesses and criminal history. I listed all of that in the Brady notice I gave to the defense prior to trial. I also turned over copies of statements to the defense and had printouts of criminal history available for inspection in the State's file.

There were no offers or promises made to any witness to testify and, with regard to Rudy, that was pretty hotly debated in the trial. The simple fact is, however, that Rudy testified because ███████ s death was weighing on him, and he decided that he finally wanted to do the right thing. The defense sent their own investigator to interview him prior to trial and they were unable to uncover any "secret deal" because their simply wasn't one. Rudy never asked for anything and it was never even a topic of discussion. We ultimately did not file on Rudy because it was our position after consulting with appellate that under the facts of our case and the story that he told us, he was not a party under the law. Any conversations I had with Ray Castro were either in person or by phone and they involved setting up appointment times when he was available to go to the jail with us to meet with Rudy. We did not have discussions with him pertaining to making a deal for his client's participation in the case at any time because Rudy was adamant that he wanted to tell his story and did not ever attempt to negotiate a deal. Ray testified to this in the trial.

We never told any of our witnesses not to speak to the defense. In fact, as I said earlier, the defense sent an investigator to interview Rudy in the jail and he willingly spoke to them from my understanding without his attorney present. I know the defense also went out and interviewed other witnesses, including some of the people we did not subpoena and did not call at trial. I know Diana chose not to talk to the defense, but that was her choice not mine. I always tell my witnesses that they have a choice. We provided copies of all statements and reports to the defense whether we called the witnesses to testify or not.

I was told by the original defense team (Shellist and Capitaine) that Cruz Garcia had been a confidential informant for the FBI in Puerto Rico. I had a meeting with an FBI agent, Eric Johnson, who worked our capital case and asked him to research and verify that. He was unable to verify it. I did not find any emails that addressed this conversation and my memory is that it was only discussed in a face to face meeting that I had with him and a subsequent phone call. There are a few emails from the feds regarding getting a buccal swab from Rudy that are pretty innocuous. They basically just are passing on to me the procedure that they follow and the fact that they are in the process of getting it done.

If you need anything else, I am glad to help. Thanks for all your efforts on this case.

Natalie

EXHIBIT 80 Page 001                    1                    0001736

**From:** DeAngelo, Lori
**Sent:** Thursday, April 23, 2015 2:28 PM
**To:** Tise, Natalie
**Subject:** FW: Obel Cruz-Garcia case

Hey there. I'm going to be handling this case. The Office of Capital Writs has made a lengthy Brady request in this case. Please take a look at their attached Brady motion and see if you can think of anything regarding items 1-10 on pages 4-5. General litigation has the State's file. I should be getting it sometime late tomorrow or Monday. After you've had a chance to think about this, let me know a good time that we can talk about it. Thank you!

**From:** Hardaway, Lynn
**Sent:** Wednesday, April 22, 2015 4:32 PM
**To:** DeAngelo, Lori
**Subject:** FW: Obel Cruz-Garcia case - 90 day extension

See attached motions. I have already told habeas counsel that I do not oppose his request for a 90-day extension.

Lynn

**From:** Robert Romig [mailto:Robert.Romig@ocw.texas.gov]
**Sent:** Wednesday, April 22, 2015 3:37 PM
**To:** Hardaway, Lynn
**Subject:** RE: Obel Cruz-Garcia case - 90 day extension

Thanks Lynn. Here are the two motions put in the mail today. I would just note that on the Brady motion, we have gone ahead and asked for any potential Brady material in the files, but particularly the specific items listed in my email previously.

Best regards,
Robert

R. Romig
Post-Conviction Attorney
Office of Capital Writs
512-463-8522
robert.romig@ocw.texas.gov



**From:** Hardaway, Lynn [mailto:HARDAWAY_LYNN@dao.hctx.net]
**Sent:** Wednesday, April 22, 2015 10:59 AM
**To:** Robert Romig
**Subject:** RE: Obel Cruz-Garcia case - 90 day extension

If this is the statutory extension allowed to habeas counsel, I have no objection.

EXHIBIT 80 Page 002                    2                              0001737

Lynn

**From:** Robert Romig [mailto:Robert.Romig@ocw.texas.gov]
**Sent:** Wednesday, April 22, 2015 9:41 AM
**To:** Hardaway, Lynn
**Subject:** Obel Cruz-Garcia case - 90 day extension

Lynn,

    We are planning on filing a motion requesting a 90-day extension of time in the Obel Cruz-Garcia case. I know in the past y'all have not opposed such extensions, but I wanted to make sure that was still the case?

Best regards,
Robert


Robert Romig
Post-Conviction Attorney
Office of Capital Writs
1700 Congress Avenue, Suite 460
Austin, Texas 78701
512-463-8522
robert.romig@ocw.texas.gov



Office of Capital Writs

EXHIBIT 80 Page 003                    3

0001738

4/9/2021 1:54 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52314513
By: E Lane-Orton
Filed: 4/9/2021 1:54 PM

## 13847940101C / Court: 337

### IN THE 337TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

### AND

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

|  |  |  |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § § § § § § | **Writ No.** _____ |
|  |  | Trial Court Case No: |
|  |  | 1384794 |
| **Applicant.** |  | **CAPITAL CASE** |

### SUBSEQUENT APPLICATION FOR
### POST-CONVICTION WRIT OF HABEAS CORPUS
### EXHIBITS 81 THROUGH 90

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

13847940101C / Court: 337

# EXHIBIT 81

0001740

## DECLARACIÓN DE ELEDEMAS MERCEDES FANA

Mi nombre es Eledemas Mercedes Fana y tengo 73 años. Vivo en Puerto Rico a pies en la Republica Dominicana.

Yo conocí a Obel Cruz-Garcia cuando su familia se mudó de Santo Domingo a Boba. Era vecino de su familia y muy amigo con su papa, Valerio "Hungría" de la Cruz que fue creado en Boba.

Cuando Obel tenía como 17 años se mudo a Puerto Rico. En ese tiempo, muchas personas se iban a Puerto Rico para ganar más dinero y se lo mandaban a sus familias acá. Después que él se había ido a Puerto Rico, Hungría me pregunto si le podría ayudar a construir un almacen en su propiedad al lado de su casa. Le dije que sí y lo empezamos a construir. Solo pudimos terminar el suelo y poner cuatro columnas hasta que se nos acabó el dinero. No teníamos para comprar más materiales y lo dejamos así sin terminar.

Unos cuantos años después, cuando Obel estaba fuera del país, le empezó a mandar dinero a su papa para seguir construyendo porque tenia intenciones de regresar y vivir con su familia. Hungría me dijo que le quería construir una casa a Obel para cuando regresara a vivir en la Republica Dominicana. Obel le mandaba dinero para seguir construyendo y a veces Hungría también pagaba por los materiales con su propio dinero. Hungría extrañaba mucho a su hijo y se puso muy feliz cuando le dijo que quería regresar. En ese tiempo estaba yo viviendo en Santo Domingo. Hungría me pregunto si le podía ayudar y me regrese a Boba para ayudarlo a construir la casa. Nos tardamos años para terminar la casa.

Cuando Obel regreso, él también nos ayudó a terminar la casa. En ese tiempo él también era chofer de guagua. La ruta de Obel iba a Santo Domingo, Higuey, y Boba.

Después de terminar la casa Obel abrió una pescadería abajo. Ahí vivió hasta que Obel se fue a vivir con Mireya a Santo Domingo y después a Puerto Rico donde fue arrestado. Nunca lo volví a ver después de eso.

Hasta ahora, nadie del equipo legal de Obel me había contactado o pedido que testificara en el juicio de él. Si me hubieran preguntado, habría estado dispuesto y podría testificar en el juicio de Obel en 2013 de lo que declare arriba.

Yo declaro bajo pena de perjurio bajo las leyes de la Republica Dominicana que lo anterior es verdadero y correcto.

Ejecutado en el _____ día de _____, _____ 2018

_____
Eledemas Mercedes Fana

EXHIBIT 81 Page 001

0001741

## STATEMENT OF ELEDEMAS MERCEDES FANA

My name is Eledemas Mercedes Fana, and I am 73 years old. I live in Puerto Rico at the foot of the Dominican Republic (sic).

I met Obel Cruz-Garcia when his family moved from Santo Domingo to Boba. I was a neighbor of his family and a very close friend with his father, Valerio "Hungria" de la Cruz who was raised in Boba.

When Obel was around 17 years old he moved to Puerto Rico. During that time, a lot of people went to Puerto Rico to earn more money, and they would send it back to their families over here. After he had left to go Puerto Rico, Hungria asked me if I could help him build a shop in his property next to his house. I told him yes, and we started building it. We were able to finish only the floor and install four columns until we ran out of money. We did not have any money to buy more materials, and we left it unfinished.

A few years later, when Obel was out of the country, he started sending money to his father to continue building because he had the intention of coming back and live there with his family. Hungria told me that he wanted to build a house for Obel for him to live there when he came back to live in the Dominican Republic. Obel was sending money to him to continue building, and sometimes Hungria would also pay for the materials with his own money. Hungria missed his son very much, and he was very happy when he told him that he wanted to go back. During that time, I was living in Santo Domingo. Hungria asked me if I could help him, and I returned to Boba to help him build the house. I took us years to finish the house.

When Obel returned, he also helped us finish the house. During that time, he was also a bus driver. Obel's route went to Santo Domingo, Higuey, and Boba.

After finishing the house, Obel opened up a fish store downstairs. He lived there until Obel went to live with Mireya in Santo Domingo and later to Puerto Rico where he was arrested. I never saw him again after that.

Up to now, nobody from Obel's legal team had contacted me or asked me to testify in his trial. If they had asked me, I would have been willing and could have testified in Obel's trial in 2013 about what I stated above.

I state under penalty of perjury under the laws of the Dominican Republic that the above is true and correct.

Signed  [*illegible*] of November, 2018

_____/s/_____
Eledemas Mercedes Fana

EXHIBIT 81 Page 002

0001742

Translated [to the best of my abilities] and the statement titled "Statement of Eledemas Mercedes Fana" is true and correct to the best of my abilities.

_____          03/17/19
Alma Adriano                              Date
Certified Federal Court Interpreter

EXHIBIT 81 Page 003

0001743

13847940101C / Court: 337

# EXHIBIT 82

## DECLARACIÓN DE JUAN CARLOS ADAME MARTINEZ

Me llamo Juan Carlos Adame Martinez y tengo 34 años. Vivo en Río San Juan, en la República Dominicana.

Yo conocí a Obel Cruz Garcia cuando yo tenía 14 años. Obel ya era hombre y había regresado á la República Dominicana después de haber vivido en los Estados Unidos un tiempo. Él vino a pescar a Playa Grande, que está cerca de mi casa. Obel salió en yola para pescar. Él me contrató para ayudarle con los remos. A veces estaba muy cansado despuées de pescar y se quedaba a dormir aquí en mi pueblo de Matapuerco. Se quedaba con un señor mayor llamado Ariano Sosa y su esposa Benencia Lantigua. Obel les dejaba pescado a ellos para comer y vender y él se llevaba el resto. Obel quiera asegurar que nos les faltara comida ni dinero para arroz y cosas así. Así era con otra gente de Matapuerco. Les daba más de lo que el vendía.

La pesca era trabajo peligroso. El mar podía ser bravo, las yolas eran chicas, y a veces, se volteaban. Una yola volteada no la podíamos arreglar en el mar abierto. Teníamos que nadar hasta la playa cargando la yola. Regresar con suficiente pescado era la diferencia en comer o estar sin comida para la gente quien vivían aquí. Obel trabajaba duro para regresar con pescado. Yo estaba muy impresionado con la determinación de Obel.

El papá de Obel, Hungría, vino con él frecuentemente a Playa Grande. Porque ya era mayor, no se subía regularmente en la yola, y se quedaba en la playa a supervisar. Solo entraba en el mar sí necesitábamos consejo o ayuda. Un día, estuve pescando con Obel y su papá. Ese día, la yola se volteó como 3 veces y cada vez tuvimos que cargarla a la playa para ponerla bien de nuevo y volver al mar. La última vez que volteó la yola, el papá de Obel se quedó atorado debajo de la yola. Ya estaba demasiado cansado y no podía salir. Obel nadó debajo de la yola y rescató a su papá, jalándolo hasta la playa.

Una vez, un hombre llamado Jivo encontró un reloj en la playa. Luego otro hombre llamado Yuma, se lo robó y Obel lo encontró y le dijo que el tal vez Dios le había regalado el reloj a Jivo por si necesitaba dinero en el futuro por alguna emergencia. Obel ayudó que le volvieran el reloj a Jivo.

Durante ese tiempo, mucha gente quería salir de la República Dominicana e irse a Puerto Rico donde había trabajo y pago decente. Muchas personas de mi pueblo de Matapuerco fueron. Yo también quería ir pero mi familia me dijo que no.

Ni los abogados ni nadie más del grupo de defensa de Obel se comunicaron con migo hasta ahora. Si me hubieron pedido, yo podría haber testificado en el juicio de Obel del 2013.

He leído esta declaración de 2 páginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

*JCA*

EXHIBIT 82 Page 001

0001745

Ejecutado en el _20_ dia de _noviembre_ , 2018 en _Playa Grande_ ,
Republica Dominicana.

Juan Carlos Adame Martinez

EXHIBIT 82 Page 002

0001746

# STATEMENT OF JUAN CARLOS ADAME MARTINEZ

My name is Juan Carlos Adame Martinez, and I am 34 years old. I live in Rio San Juan, in the Dominican Republic.

I met Obel Cruz Garcia when I was 14 years old. Obel was a grown man already, and he had returned to the Dominican Republic after living in the United States for some time. He came to fish at Playa Grande, which is close to my house. Obel would go out in his yawl to fish. He hired me to help him with the paddles. Sometimes he was very tired after going fishing, and he would stay and sleep here in my town, Matapuerco. He used to stay with a man named Ariano Sosa and his wife Benencia Lantigua. Obel would leave fish for them to eat and to sell, and he would take the rest. Obel wanted to make sure that they did not lack any food nor money for rice and things like that. That's the way he was with the people in Matapuerco. He used to give them more that what he used to sell to them.

Fishing was a dangerous job. The sea used to be rough, and the yawls were small, and sometimes, they would overturn. We were not able to fix an overturned yawl in the middle of the sea. We used to have to swim to the beach carrying the yawl. Returning with enough fish made the difference as to whether or not we had food to eat, or whether the people who lived there would be without food. Obel worked hard to be able to return with fish. I was very impressed with Obel's determination.

Obel's father, Hungria, often came with him to Playa Grande. Because he was elderly, he did not get on the yawl on a regular basis, and he would stay on the beach to supervise. He would only go out into the sea if we needed advice or help. One day, I was fishing with Obel and his father. That day, the yawl overturned about 3 times, and each time we had to carry it to the beach, so that we could fix it again and return to the sea. The last time the yawl overturned, Obel's father got stuck under the yawl. He was very tired, and he was not able to get out. Obel swam under the yawl, and he rescued his father, pulling him to the beach.

On one occasion, a man named Jivo found a watch on the beach. Then, another man named Yuma, stole it from him, and Obel found him, and told him that maybe God had given that watch to Jivo as a gift, in case he needed money in the future for an emergency. Obel helped in getting the watch returned to Jivo.

During that time, a lot of people wanted to leave the Dominican Republic and go to Puerto Rico where there were jobs for decent pay. A lot of people from my town of Matapuerco went. I also wanted to go, but my family told me not to do it.

0001747

Neither the attorneys, nor anybody else from Obel's defense team got in touch with me until now. If they had asked me, I could have testified in Obel's trial in 2013.

I have read this 2-page statement. I state under penalty of perjury under to the laws of the United States that the above is true and correct.

Signed November 29, 2018 in Playa Grande, Dominican Republic.

_____/s/_____
Juan Carlos Adame Martinez

"Statement of Juan Carlos Adame Martinez" is true and correct to the best of my abilities.

_____          03/17/19
Alma Adriano                              Date
Certified Federal Court Interpreter

EXHIBIT 82 Page 005

0001749

13847940101C / Court: 337

# EXHIBIT 83

308, la Institución albergaba custodia mínima y mediana. Ha pasado tanto tiempo que no recuerdo el año. No era el sociopenal asignado al caso de Obel, pero en mi rol de supervisora y presidenta del Comité de Clasificación y Tratamiento, yo me daba la oportunidad de conocer y hablar con todos los confinados. Recuerdo especialmente el caso de Obel.

Vi a Obel frecuentemente porque la mayoría del tiempo se encontraba en las áreas comunes de la prisión, limpiando. No sé si eso era un trabajo oficial o no más que Obel estaba ayudando. Fue ubicado en la población general y podía estar fuera de su celda.

En mis conversaciones con Obel, me di cuenta que se sentía muy atribulado. El sentía el peso de las consecuencias de su pasado. Demostraba como un sufrimiento existencial. No hablamos específicamente sobre el tema de su crimen, pero era obvio que el estaba arrepentido y que tenía la intención de mejorar su vida.

En mis años de trabajar aquí, he visto muchos confinados con sentencias largas, unos se cierran perdiendo la oportunidad de cambiar, otros cambian y empiezan a ser personas diferentes y mejores, puedo reconocer la diferencia., en Obel noté que el parecía uno de los que estaba en proceso de cambiar para mejorar.

Obel hablaba mucho de Dios. Tenía una fe muy fuerte. También, hablaba sobre su amor a su mujer y sus hijos y de la tristeza por el sufrimiento que ellos tenían. Él sabía que la culpa era por las acciones de él; estaba muy avergonzado.

Yo nunca escuché ninguna queja acerca del Obel, ni de los guardias ni de los otros confinados. No recuerdo que tuvo problemas disciplinarios. Aunque estuvo preso por un delito serio y tenía una condena larga. Obel no fue considerado un riesgo de seguridad ni de otros problemas en la cárcel, que yo recuerde. En mi opinión, Obel no presentó ningún riesgo de seguridad.

Ni los abogados ni nadie más del grupo de defensa de Obel se comunicaron conmigo hasta ahora. Si me hubieran pedido, yo podría haber testificado en el juicio de Obel desde el 2013.

He leído esta declaración de una página. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el __22__ día de ___febrero___, __2019__

_Daisy Meléndez_
Daisy Meléndez

EXHIBIT 83 Page 001

0001751

## STATEMENT OF DAISY MELENDEZ

My name is Daisy Melendez.  I am 55 years old.  I live in San Juan, Puerto Rico, and I work as a supervisor of the Prison Social Work (*Socio-Penal*) Division of the Department of Corrections and Rehabilitation.  I have 30 years of service.  I started in 1989, and I am currently located at the Detention Center Bayamon 1072.

I met Obel Julian Cruz Garcia when he was confined in the Bayamon Institution 308.  The Institution was a minimum and medium security facility.  A long time has gone by, so I don't remember the year.  I was not the prison social worker assigned to Obel's case, but in my role as a supervisor and president of the Classification and Treatment Committee, I allowed myself the opportunity to meet and talk with all of the inmates.  I especially remember Obel's case.

I saw Obel frequently because most of the time he was in the common areas of the prison, cleaning.  I don't know if that was an official job or not, but Obel was helping.  He was placed with the general population, and he could be outside of his cell.

During my conversations with Obel, I noticed that he felt very troubled.  He felt the weight of the consequences from his past.  He showed something like an existential suffering.  We did not talk specifically about the topic involving his crime, but it was obvious that he was repentant, and that he had the intention of making his life better.

During my years of working here, I have seen a lot of inmates with long sentences.  Some of them close themselves up, losing the opportunity to change, some others change and start being different, better persons.  I can tell the difference; I noticed that Obel seemed to be one of the ones that was in the process of changing to better himself.

Obel used to talk about God a lot.  He had a very strong faith.  Also, he would talk about his love for his wife and his children and about the sadness due to the suffering that they were going through.  He knew it was his fault because of his actions.  He was very ashamed.

I never heard any complaints about Obel, neither from the guards, nor from the other inmates.  I don't remember him having any disciplinary problems, even though he was locked up for a serious crime, and he had a long sentence.  Obel was not considered a security risk, and he did not have any other problems in jail either, not that I remember.  In my opinion, Obel did not present any security risk.

Neither the attorneys, nor anyone else from Obel's defense group contacted me until now.  If they had asked me, I could have testified in Obel's trial since 2013.

I have read this one page statement.  I state under penalty of perjury that under the laws of the United States, the above is true and accurate.


Signed February 22, 2019


_____ /s/ _____
Daisy Melendez

EXHIBIT 83 Page 002

0001752

Translated from Spanish to English and I certify that this translation of the "Statement of Daisy Melendez" is true and correct to the best of my abilities.

_____          04/04/19
Alma Adriano                                    Date
Certified Federal Court Interpreter

EXHIBIT 83 Page 003

0001753

13847940101C / Court: 337

# EXHIBIT 84

0001754

## DECLARACIÓN DE IDALIA PEREZ DE LA CRUZ

Mi nombre es Idalia Pérez de la Cruz, y tengo 71 años de edad. Vivo en Bella Vista de Boba en la República Dominicana.

Yo conozco a Obel Cruz Garcia desde que se mudó a Boba con su papá, Valerio "Hungría" Julián de la Cruz y sus hermanos. Obel tenía como 10-12 años.

Antes que se mudaran a Boba, Hungría estuvo en el hospital en Santo Domingo mucho tiempo porque le había chocado un carro. Después que Hungría salió del hospital, su esposa, Dalia, lo dejó y se mudó a Venezuela. Hungría se mudó a Boba con sus hijos, pero Dalia eventualmente se llevó a la hembra mayor, Noemí y después a la menor, Natalia, a vivir con ella en Venezuela. No se llevó a Obel ni a su hermano menor, Joel.

Yo era la vecina de la mamá de Hungría, Ramona, y su padrastro, Enrique. Vivimos en varias casas en el pueblo de Boba porque los huracanes las destruía, pero siempre nos quedábamos cerca de la casa de Ramona. El papá de Hungría no era Enrique, era un hombre llamado Regino. Regino era el primer esposo de Ramona. Regino tuvo varios niños con varias mujeres. Ramona lo dejo porque Regino no estaba bien de la cabeza. Él se puso loco y ella lo dejaba atrancado en un cuarto. Se hacia popo y se lo comía y se ponía bravo. Le tenían que amarrar los brazos porque la quería dañar. Ramona tuvo que atenderlo y lo alimentaba. El murió antes de que se mudaran Hungría y los niños.

Cuando Obel era joven, él se calló del techo de la casa de Ramona. Agua estaba entrando a la casa y Obel se subió al techo para ver si lo podía arreglar. Obel se resbaló, se calló del techo, y se pegó bien duro en la cabeza. Era una herida a la cabeza severa y tuvo que tener ~~costillas~~ para cerrar la herida. Obel se lastimó otras veces también. *puntos de sutura* ~~xxxx~~

A Obel le gustaba compartir con la gente, trataba a todos como familia. Obel me traía comida cuando él y su papá cocinaban. Yo preparaba el arroz y ellos la sopa de pescado y compartíamos la comida.

Yo soy una hermana de la iglesia evangélica aqui en Bella Vista de Boba. Obel y su familia venian a la iglesia frecuentemente. Él era un buen niño y muy humilde. Él se encariño con mi hija, Mari. Ellos se veían en la iglesia y hablaban. Yo les dije que si se querían ver que lo tenian que hacer en mi casa porque no los quería en la calle. Obel quería mucho a Mari. Ellos tuvieron una relación muy bonita e inocente cuando estaban en Boba.

Durante ese tiempo muchos se estaban yendo a Puerto Rico de la República Dominicana. En Puerto Rico la gente encontraba más trabajo y les mandaban dinero a sus familias acá en Boba. Antes las casas estaban hechas de madera y jagua y la lluvia y los huracanes las destruían, pero ahora hay más casas de bloques de cemento por el dinero que la gente mandaba de Puerto Rico.

1

Initials: _[signature]_

EXHIBIT 84 Page 001

0001755

Mari fue unas de las primeras a irse a Puerto Rico en yola. Las yolas son unos barcos de madera y sin motor. Se usan remas en vez de motor. Yo estaba muy preocupada para Mari y oré todas las noches por ella hasta que llego a Puerto Rico varios días después. Me llamó y me dijo que había llegado bien.

Después de que se fue Mari, Obel se casó con una mujer llamada Mireya. Él después se fue a Puerto Rico en una yola, como Mari, para buscar mejor trabajo. Años después, Obel y Mari se encontraron en Puerto Rico y tuvieron una hija juntos, Stefany. Aunque Mari y Obel no se quedaron juntos, el cuidaba a Stefany. Cuando regresó a la República Dominicana, él la venia a ver y le compraba helado, juguetes, y ropa.

Sí me hubieran preguntado, habría estado dispuesta y podría testificar en el juicio de Obel en 2013.

Yo lei esta ___2- pagina declaración. Yo declaro bajo pena de perjurio bajo las leyes de la los Estado Unidos que lo anterior es verdadero y correcto.

Ejecutado en el ___28___ día de ___noviembre 2018___.

_____
Idalia Perez de la Cruz

Initials: _____

EXHIBIT 84 Page 002

0001756

## STATEMENT OF IDALIA PEREZ DE LA CRUZ

My name is Idalia Perez de la Cruz, and I am 71 years old. I live in Bella Vista de Boba in the Dominican Republic.

I've known Obel Cruz Garcia since he moved to Boba with his father, Valerio "Hungria" Julian de la Cruz and his siblings. Obel was around 10-12 years old.

Before they moved to Boba, Hungria was in the hospital in Santo Domingo for a long time because he had been hit by another car in a car crash. After Hungria got out of the hospital, his wife, Dalia, left him, and she moved to Venezuela. Hungria moved to Boba with his children, but Dalia eventually took the oldest girl with her, Noemi, and later she took the younger one, Natalia, to go live with her in Venezuela. She did not take Obel, nor his younger brother, Joel.

I was the neighbor of Hungria's mother, Ramona, and his stepfather, Enrique. We lived in several houses in the town of Boba because the hurricanes destroyed them, but we always stayed near Ramona's house. Hungria's father was not Enrique, he was a man named Regino. Regino was Ramona's first husband. Regino had several children with several women. Ramona left him because Regino was not mentally stable. He became crazy, and she would lock him up in a room. He would have a bowel movement, and he would eat it, and he would get angry. They had to tie up his arms because he wanted to hurt her. Ramona had to take care of him, and she fed him. He died before Hungria and the children moved.

When Obel was very young, he fell from the roof of Ramona's house. Water was leaking into the house, and Obel went up on the top of the roof to see if he could fix it. Obel slipped and fell from the roof, and he hit his head very hard. It was a serious injury to his head, and he had to have stitches to close the wound. Obel also got hurt on other occasions.

Obel liked to share with people, he treated everyone as family. Obel used to bring me food when he and his father cooked. I prepared the rice, and they would prepare the fish soup, and we shared the food.

I am a sister of the evangelical church here in Bella Vista de Boba. Obel and his family used to come to church often. He was a good child and very humble. He got close to my daughter, Mari. They would see each other in church, and they talked. I told them that if they wanted to see each other, it had to be in my house because I did not want them out in the street. Obel loved Mari very much. They had a very beautiful and innocent relationship when they were in Boba.

During that time, many were going to Puerto Rico from the Dominican Republic. People would find more work in Puerto Rico, and they would send money back to their families here in Boba. In the past, the houses were made out of wood and genipap trees, and the rain and the hurricanes would destroy them, but now, there are more houses made out of cement blocks due to the money

Initials: __[initialed]__                    1

EXHIBIT 84 Page 003

0001757

that the people were sending from Puerto Rico.

Mari was one of the first ones to go to Puerto Rico in a yawl. The yawls are ships made out of wood and without a motor. Paddles are used instead of a motor. I was very worried about Mari, and I prayed every night for her until she arrived in Puerto Rico several days later. She called me and told me that she had arrived and she was fine.

After Mari left, Obel married a woman named Mireya. Later, he left for Puerto Rico in a yawl, as Mari did, to look for a better job. Years later, Obel and Mari met in Puerto Rico, and they had a daughter together, Stefany. Even though Mari and Obel did not stay together, he would take care of Stefany. When he returned to the Dominican Republic, he used to come over to see her and would buy her ice cream, toys and clothes.

If they had asked me, I would have been willing, and I could have testified in Obel's trial in 2013.

I read this 2-page statement. I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed November 28, 2018.

_____/s/_____
Idalia Perez

EXHIBIT 84 Page 004

0001758

Translation to English of the Affidavit of this document entitled "Statement of Idalia Perez De La Cruz" is true and correct to the best of my abilities.

_Alma Adriano_                         _03/17/17_

Alma Adriano                               Date
Certified Federal Court Interpreter

EXHIBIT 84 Page 005

0001759

13847940101C / Court: 337

# EXHIBIT 85

0001760

## DECLARACIÓN DE JOEL CRUZ GARCIA

Yo, Joel Cruz García declaro lo siguiente:

1.      Mi nombre es Joel Cruz García. Soy el hermano menor de Obel Cruz-Garcia, quien tiene como 5 años más que yo.

2.      En 2013, testifique en el juicio de Obel en Houston. Obel y yo nos crecimos en Boba, un pueblito rural en la República Dominicana. Nacimos en el capital, Santo Domingo, pero cuando yo tenía entre 5 a 7 años, y Obel tenía entre 10 a 12, mis padres se separaron. Nuestra madre se mudó a la República de Venezuela, dejándonos solos con nuestro padre. Como adulto, yo veía a Obel de vez en cuando. Él vivía entre Puerto Rico y la República Dominicana. Obel era buen padre quien trabajaba y asistía a la iglesia. Aunque me di cuenta que Obel fue a la prisión en Puerto Rico por un secuestro, antes yo no tenía conocimiento de que Obel se había metido en drogas o actividades criminales.

3.      Cuando me di cuenta que Obel era acusado de un asesino en Houston, busqué dinero para contratar con unos abogados. El abogado que contraté se llamaba Christian Capitaine, con su socio. No era tan fácil encontrar dinero para pagar a los abogados. Tuve que pedir contribuciones de mucha gente de varias iglesias. En fin, junté como $40,000 para la defensa de Obel, la mayoría de mi propio trabajo.

4.      Yo pensé que Sr. Capitaine trabajó duro para defender a Obel y me decepcionó muchísimo cuando me dijo que no pudo seguir en el caso de Obel porque los fiscales decidieron pedir la pena de muerte. Para esa hora, ya todo el dinero que recaudamos fue gastado.

5.      Los abogados nuevos en el caso, casi no me hablaron. Ellos se comunicaron conmigo por medio de una investigadora que se llamaba Edna Vélez. Hablábamos varias veces sobre el teléfono. Aun así, ella solamente tenía interés en mi relación con Obel como adulto. Como la dije, nos vimos cuando los dos estábamos en la misma ciudad en Puerto Rico, pero cada uno tenía su vida. Recuerdo que la investigadora

1



EXHIBIT 85 Page 001

0001761

me pidió los nombres de los hijos de Obel y de las madres. Yo nunca hablé con ella sobre alguien en Puerto Rico quien pudiera haber ayudado con la defensa de Obel porque no conocía quien estuviera importante para la defensa. La investigadora nunca habló sobre las estrategias del equipo de defensa o por qué hablar con cierta gente sería importante. Entonces, le di los nombres que pidió y nada más.

6.    No conocí a la investigadora en persona; solamente hablábamos por teléfono. Que yo sepa, nadie del equipo de defensa vino a Puerto Rico. Si conocí a los abogados de Obel una vez, en Houston, inmediatamente antes de mi testimonio en el juicio.

7.    Para mí, parecía que el trabajo de los abogados se apresuró. Recuerdo que no coordinaban las cosas bien. Por ejemplo, cuando pidieron que yo testificara, me reservaron un vuelo para ir hacia Houston. Yo les dije que la hora elegida no me sirvió porque tenía que hacer un trabajo comunitario a esa hora. Por fin, yo tuve que comprar un boleto nuevo porque ellos nunca arreglaron el problema. No estaba familiarizado con la área de Houston y ellos me habían prometido ayuda la cual me la dieron de recogerme para el hotel y después al juicio a testificar. Pero de allí, desaparecieron y no me devolvieron al hotel ni al aeropuerto. Tuve que encontrar la manera yo solo.

8.    Si los abogados de Obel me hubieron pedido, les hubiera podido darles los nombres de la gente quienes querían a Obel y que le conocieron desde su niñez. También, había información del niñez de Obel que me gustaría haber compartido con el jurado; mucho mas de que me preguntaron durante me testimonio.

9.    Cuando estuve en el primer grado, mi papá tuvo un accidente horrible. Yo no estuve presente cuando pasó pero recuerdo el caos que sobrevino. A mi papá le pusieron algo de metal en su pierna y tenía una cicatriz larga en su abdomen culpa del accidente y las cirugías siguientes. También tenía una cicatriz en su brazo. Aunque recuperó del accidente, siempre tenía dolor en su pierna cuando se hacía frio y se notaba algo en su manera de caminar.

2



EXHIBIT 85 Page 002

0001762

10.    Antes del accidente, mi papá era marinero en la marina de la Republica Dominicana. También era médico. No doctor, pero practicante de medicina. Era buen trabajo y teníamos mucho orgullo de él. Pero después del accidente, tuvo que dejar a la marina.

11.    Poco después del accidente, mi madre dejó a la familia para vivir en Venezuela. Me han dicho dos versiones de porque mi mamá nos dejó. Mis abuelos en Boba dijeron que ella era mujer mala que abandonó a su familia no por ninguna razón más de que era egoísta. La familia de mi mamá dice que se fue porque todas las mujeres de mi papá vinieron al hospital después del accidente y así se dio cuenta mi mamá que había sido muy infiel. Aunque pasó mucho tiempo, mi madre nunca lo explicó. Sin embargo, Obel y yo nos sentíamos abandonados por nuestra mamá.

12.    Después de que se fue nuestra mamá, mi papá mandó a Obel, mi hermana Natalia, y yo para quedar con sus padres en Boba. Vivíamos entre la casa de mi papá en Santo Domingo y la casa de mis abuelos en Boba para un año. Perdimos un año de escuela por culpa de eso. Al fin, todos fuimos a vivir con mis abuelos en Boba. Noemí se quedó con nosotros para poco tiempo antes de que llegaron sus papeles de inmigración y ella se fue donde nuestra mamá en Venezuela.

13.    En Boba, vivimos con los padres de mi padre y algunos de nuestros tíos en una pequeña comunidad agrícola y pesquera. La casa era de dos recámaras y hecha de madera. Aunque la casa era chica, mi abuela aceptaba cualquier visitante o niño que necesitaba donde quedar. Mi abuelo y mi papá trabajaban para proveer lo necesario. En Boba hasta los niños necesitaban trabajar para hacer dinero y encontrar comida. Allí los niños jugaban menos de los de Santo Domingo. Todavía había pelota y dominó pero también había que ayudar con la siembra y la pesca.

14.    Obel trabajaba muy duro cuando nos mudamos a Boba. En las mañanas fue a pescar con los hombres para traer pescado para comer y para vender. Por eso, Obel tuvo que asistir clases en las tardes.

3



EXHIBIT 85 Page 003

0001763

15.     Obel también ayudo a nuestro papá en su trabajo de médico. Mi papá abrió una clínica rural en el pueblo porque en ese tiempo, no había ningún doctor cerca. Era el único lugar para recibir atención médica para todos los pueblos cercanos. Mi papá tenía mucha medicina y libros de medicina. Él ayudaba a las personas que fueron a la clínica o iba donde ellos si era necesario. La gente vinieron con toda enfermedad – dolores de cabeza, cortadas de machete, y enfermedad general. Mi papá ayudaba a todos. Obel y Natalia aprendieron dar inyecciones.

16.     Obel me cuidaba y se hizo encargado de asegurar que yo tenía todo lo que necesitaba. Me acuerdo que me defendía de otros niños. Él defendía personas que estaban siendo intimidados. Él me dio a mí lo mejor de todo, como comida, porque yo era el menor.

17.     Pienso que Obel tomó mucha responsabilidad en la familia después de que se fue nuestra mamá. Creció demasiado rápido. Yo notaba que le dolía que nuestra mamá y hermana se fueron. Pero él hizo lo necesario para cuidarnos y trabajaba duro para asegurar que la familia estaba bien. No hablábamos de cómo nos sentíamos cuando se fueron mamá y Noemí. Pienso que Obel se sentía abandonado, pero dejó toda la tristeza adentro de si mismo. Se quedó enfocado en trabajar fuerte para proveer para la familia. Era obvio que de muy joven, a Obel era muy importante proveer por y proteger a su familia. Eso es algo que noté cuando él era adulto con sus propios hijos.

18.     Después de estar unos años en Boba, nuestro papá volvió a casarse. Con la nueva esposa, nos mudamos a otro pueblo cercano, llamado Bella Vista de Boba. La madrastra, Dorca, nunca nos aceptó como hijos. Ella quería tener sus propios hijos, y si lo logró eventualmente. Era obvio que a Dorca no le gustaba a nosotros, especialmente después de que tuvo sus propios bebes. Diría a mi papá "¡Estos hijos tuyos!" como brava.

19.     Cuando nuestra madrastra tuvo a sus bebes, Obel, Natalia, y yo teníamos que cuidarles. Dorca era maestra y trabajaba lejos, dejando los nenes con nosotros. Obel

4



EXHIBIT 85 Page 004

0001764

cocinaba y limpiaba y hizo todo que pidió de él. Nunca era suficiente para la madrastra y, porque él era el mayor, más de la responsabilidad y más del castigo le llegó a él.

20.      Recuerdo que una vez estábamos cuidando a nuestros hermanitos, Menny y Yeli, y había chocolate calentando. Mi hermanito, Menny, se acercó y lo tumbó encima de él y se quemó. Cuando se dio cuenta Dorca, me acusó a mí y ni quiso escuchar de lo que pasó. Así siempre era ella. Otra vez, me acuerdo que Dorca se puso brava con nosotros mientras que estuvo lavando los pañales de Menny. Dorca quejaba y gritaba a mi papá. Él, para calmarla a ella, tomó el balde lleno de agua sucia y popó y lo tiró encima de Natalia y yo.

21.      Nuestro papá no quería desagrada a Dorca. Él se puso distante y menos cariñoso con nosotros después de que se casó con ella. Nos disciplinaba más frecuentemente, normalmente porque ella lo pedía, aunque de veras no hicimos nada malo. Si intentamos decirle algo diferente de lo que dijo ella, no nos escuchaba.

22.      Papá siempre tomaba mucho. No era bravo cuando era borracho, pero si era irresponsable. Frecuentemente manejaba tomado y cuando andaba tomado no nos pudo cuidar. Una vez, unos amigos de mi papá me ofrecieron alcohol. Cuando dije "no," se burlaban de me, diciendo que no era posible que yo era hijo de Hungría por el hecho de no querer tomar alcohol.

23.      Obel se casó muy joven con una mujer llamada Mireya. Es posible que se casó para poder escapar a la casa y la cólera de Dorca. No era matrimonio oficial. En este tiempo, muy poca gente se casaba oficialmente, con licencia y en la iglesia, porque costaba mucho dinero. Dos personas simplemente empezaron a vivir juntos y dijeron que eran casados. Eso es lo que hicieron Obel y Mireya.

24.      Obel se fue para Puerto Rico cuando tenía como 19 años. Era una época muy difícil económicamente en la Republica Dominicana. Un tiempo después, Mireya también fue a Puerto Rico, viviendo con otro hombre. Eventualmente, ella y Obel regresaron a vivir juntos como esposos.

5



EXHIBIT 85 Page 005

25.     Mucha gente de la República Dominicana se mudó a Puerto Rico en esa época. Bajo la administración del presidente Jorge Blanco, la economía dominicana estuvo muy malo y a la gente sufría económicamente. Obel quería hacer una vida mejor para sí mismo y tener la oportunidad de ayudar a la familia, mandando dinero hacia allá. También yo me mudé a Puerto Rico unos años después, queriendo lo mismo.

26.     En un momento en que nosotros dos estábamos en Puerto Rico, yo conocí al hombre que llamábamos "Rudy" y a su prima, Angelita. Obel y Angelita empezaron a tener una relación. Yo pienso que Angelita y Rudy ya estaban en el negocio de drogas y que ellos son los que enseñaron a Obel todo lo que era el vicio. En un momento, los tres se fueron a los Estados Unidos. Obel nunca me contó de que el andaba en vender drogas. Pienso que quería protegerme de eso. No era parte de su vida que el compartía con su familia.

27. Cuando Obel regresó a Puerto Rico en los 90, trabajaba duro para ser buen papá y proveedor. Recuerdo que viajaba entre Puerto Rico y la República Dominicana para ver a sus hijos. Tenía varios trabajos y hasta recogió latas para entregarlas por dinero cuando no había otro trabajo. Lo más importante para él era poder cuidar a sus hijos. Sea o no que participó en drogas, Obel fue respetado en la comunidad y por su familia. Aunque Obel se quedó cerrado con respecto a su vida personal - algo que aparentemente empezó a pasar cuando nuestra madre se fue – era increíblemente cariñoso y de apoyo con los demás. Le encantaba estar rodeado de gente y hacer que se sintieran bien.

28.     Yo sabía que Obel trabajaba por el gobierno de los Estados Unidos por un período de tiempo como informante. Algunas veces vi a Obel con un hombre que se llamaba Wilson Pellot. Él era agente de una agencia de los Estados Unidos. Una vez se juntaron él y Obel en mi casa. Otra vez, Obel me llamó del edificio del Departamento de Justicia de  Estados Unidos en San Juan y me pidió traerle ropa. A poco Obel había regresado de un viaje muy pesado donde había sufrido mucho. El propósito del viaje era traer a un secuestrador, Sandy Pichardo, desde la República Dominicana para enfrentar a la justicia en Puerto Rico.

6

EXHIBIT 85 Page 006

0001766

29.     Creo que el gobierno de los Estados Unidos lo pagó bien por su trabajo ayudando los agentes. Mi entendimiento era que su trabajo consistía en ayudar al gobierno obtener información para arrestar a los criminales. Pero Obel no hablaba mucho de este trabajo. No sé si es que era prohibido hablar de eso o si quiso protegernos del peligro que vino en el trabajo como informante.

30.     Si me hubieran dado más oportunidad de estar involucrado en el juicio de Obel en Houston, le habría dicho al jurado más acerca de cómo fue para nosotros cuando nuestra mamá y hermana mayor nos abandonaron. Le habría dicho al jurado que Obel tuvo que madurar demasiado rápido, y que él comenzó a actuar como un padre para mí cuando yo tenía sólo cinco años. Le habría dicho al jurado que Obel dejó de hablar acerca de sus sentimientos, y que él nunca nos dejó ver que él se sentía triste o solo. Él era muy cariñoso con y cuidaba a los demás, pero muy cerrado sobre sí mismo. A una edad muy joven, fue determinado a ayudar a la familia y nunca quería que sus hijos u otros miembros de su familia tuvieran dificultades con respecto al dinero.

31.     Aunque no sé exactamente por qué Obel se involucró con las drogas, creo que él creía que era la única manera de que un joven de un pueblo pequeño y pesquero en la República Dominicana podría alcanzar éxito en el mundo. Me hubiera gustado tener la oportunidad de explicarle más sobre esto al jurado, con la esperanza de que hubiera entendido que Obel es una persona buena que se encontró atrapado en un oficio peligroso. Las drogas estaban por todas partes en Puerto Rico y República Dominicana entre los 80 y 90. Creo que, cuando Obel maduraba, trató de cambiar su vida y compensar para los errores de su juventud. Creo que es a causa de eso que se convirtió en un informante del gobierno y porque llegó a ser tan dedicado a su fe en los últimos veinte años. Yo creo que si Obel hubiera sido condenado a la pena perpetua, pasaría el resto de sus días ayudando a otros a explorar su fe y hacer una vida mejor para sí mismos.

32.     Yo hubiera testificado a lo anterior durante mi testimonio en 2013, si los abogados de la defensa me hubieron preguntado.

7



EXHIBIT 85 Page 007

0001767

He leído esta declaración de 8 páginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el _17_ día de _febrero_ , _2019_ .

_____

Joel Cruz Garcia

8

EXHIBIT 85 Page 008

# STATEMENT OF JOEL CRUZ GARCIA

I, Joel Cruz Garcia state the following:

1. My name is Joel Cruz García. I am Obel Cruz-Garcia's younger brother, who is about 5 years older than me.

2. In 2013, I testified in Obel's trial in Houston. Obel and I grew up in Boba, a small rural town in the Dominican Republic. We were born in the capital, Santo Domingo, but when I was between 5 and 7 years old, and Obel was around 10 to 12, our parents got separated. Our mother moved to the Republic of Venezuela, leaving us by ourselves with our father. As an adult, I saw Obel once in a while. He used to live in both Puerto Rico as well as the Dominican Republic. Obel was a good father who worked and attended church. Even though I realized that Obel went to prison in Puerto Rico for kidnapping, prior to that, I did not have any knowledge of Obel getting involved with drugs or any criminal activity.

3. When I found out that Obel was being accused of being a murderer in Houston, I looked for ways to get money to hire some attorneys. The name of the attorney that I hired was Christian Capitaine and his partner. It was not easy to find money to pay for the attorneys. I had to ask for contributions from people from several churches. I was able to get around $40,000 for Obel's defense, mostly from my own job.

4. I thought that Mr. Capitaine worked hard to defend Obel, and I was very disappointed when he told me that he could not continue working on Obel's case because the State Attorneys decided to ask for the death penalty. By then, all the money that we had gathered was already spent.

5. The new attorneys in the case hardly ever talked to me. They contacted me through an investigator named Edna Vélez. We talked on the phone several times. Even so, she was only interested in my relationship with Obel as an adult. As I mentioned to

1

her, we saw each other when both of us were in the same city in Puerto Rico, but each one of us had his own life. I remember that the investigator asked me to give her the names of Obel's children and their mothers. I never talked to her about anybody in Puerto Rico who could have helped with Obel's defense because I did not know who would be important for the defense. The investigator never talked about the defense team's strategies, or about why it would be important to talk to certain people. So, I only gave her the names that she asked for and nothing else.

6. I did not meet the investigator in person; we would only talk via telephone. As far as I know, nobody from the defense team came to Puerto Rico. I did meet Obel's attorneys once, in Houston, immediately before my testimony in the trial.

7. It seemed to me that the attorneys' work was rushed. I remember that they did not coordinate things right. For instance, when they asked me to testify, they got a reservation for me for a flight to Houston. I told them that the time that they chose was not good for me because I had to do some community work at that time. I ended up having to buy the ticket because they never fixed the problem. I was not familiar with the Houston area, and they had promised to help me, which they did when they picked me up at the hotel and then later on to the trial to testify. But after that, they disappeared, and they did not take me back to the hotel, nor to the airport. I had to figure it out by myself.

8. If Obel's attorneys had asked me, I could have given them the names of people who loved Obel, and who knew him since he was a child. There was also some information about Obel's childhood that I would have liked to share with the jury; much more than what they asked me during my testimony.

9. When I was in first grade, my father had a horrible accident. I was not present when it happened, but I remember the chaos that resulted. They put something made out of metal in my father's leg, and he had a long scar on his abdomen due to the accident and the subsequent surgeries. He also had a scar on his arm. Even though he recovered

2

JCG

EXHIBIT 85 Page 010

0001770

from the accident, he always felt pain in his leg when the weather was cold, and it was somehow noticeable in the way he walked.

10. Before the accident, my father was a Marine in the Navy of the Dominican Republic. He was also a medic. Not a doctor, but would practice in the medical field. He did a good job, and we were proud of him. But after the accident, he had to leave the Navy.

11. Shortly after the accident, my mother left the family to go live in Venezuela. They have told me two versions about why my mother left us. My grandparents in Boba said that she was a bad woman who abandoned her family for no reason other than being selfish. My mother's family says that she left because when all of the women that my father had came to the hospital after the accident, that's is how my mother found out that he had been very unfaithful. Even though a lot of time went by, my mother never explained it. Nevertheless, Obel and I felt abandoned by our mother.

12. After our mother left, my father sent Obel, my sister Natalia, and me to stay with his parents in Boba. We lived in both houses, between my father's house in Santo Domingo and my grandparents' house in Boba for one year. Because of that, we lost one year of school. We all ended up living with my grandparents in Boba. Noemí stayed with us for a short period of time before her immigration papers arrived, and she left to be with our mother in Venezuela.

13. In Boba, we lived with my father's parents and with some of our aunts and uncles in a small agricultural and fishing community. The house had two bedrooms, and it was made out of wood. Even though the house was small, my grandmother welcomed any visitor or child who needed a place to stay. My grandfather and my father worked to provide for our necessities. In Boba, even the children needed to work to make money and find food. The children there played less than the ones in Santo Domingo. There were still ball games and dominoes, but it was also necessary to help with sowing the seeds and with fishing.

3

14. Obel worked very hard when we moved to Boba. In the mornings, he went fishing with the men to bring fish to eat and to sell. That is why Obel had to go to school in the afternoons.

15. Obel also helped our father in his job as a medic. My father opened a rural clinic in town because during that time, there was not a single doctor nearby. That was the only place to get medical attention for all of the nearby towns. My father had plenty of medicine and medicine books. He used to help the people who went to his clinic, or he would go visit them, if necessary. People came with all types of illnesses – headaches, cuts caused with a machete, and general illnesses. My father used to help everybody. Obel and Natalia learned how to apply injections.

16. Obel used to take care of me, and he was in charge of making sure that I had everything I needed. I remember that he used to defend me from other children. He defended people who were being intimidated. He gave me the best of everything, such as food, because I was the youngest.

17. I think that Obel acquired too much responsibility in the family after our mother left. He grew up too fast. I noticed that he was hurt when our mother and sister left. But he did whatever was necessary to take care of us, and he used to work very hard to make sure that the family was okay. We did not talk about how we felt when our mother and Noemí left. I think that Obel felt abandoned, but he kept all of the sadness inside him. He stayed focused in working hard to provide for the family. It was obvious that since a very young age, it was very important for Obel to provide for and to protect his family. That is something I noticed when he was an adult regarding his own children.

18. After some years of being in Boba, our father remarried. We moved to a nearby town called Bella Vista de Boba with the new wife. The stepmother, Dorca, never accepted us as her children. She wanted to have her own children, and she accomplished that eventually. It was obvious that Dorca did not like us, especially after she had her

own babies.  She would tell my father "these children of yours!" as if she were angry.

19. When our stepmother had her babies, Obel, Natalia, and I had to take care of them.  Dorca was a teacher, and she used to work far away, leaving the children with us.  Obel used to cook and clean; he did everything that was asked of him.  It was never enough for the stepmother, and because he was the oldest, he had more responsibility and received more of the punishment.

20. I remember one time when we were taking care of our younger siblings, Menny and Yeli, and there was some chocolate being heated.  My little brother Menny got close to it, and he knocked it over, and it fell over him, and he burned himself.  When Dorca found out, she accused me, and she did not even want to hear what happened.  She was always like that.  I remember another time when she got angry at us while she was washing Menny's diapers.  Dorca was complaining, and she was yelling at my father.  To calm her down, he took the bucket filled with dirty water and feces, and he threw it on top of Natalia and me.

21. Our father wanted to please Dorca.  He became distant and less loving with us after he married her.  He would discipline us more often, usually, because she would ask him to do so, even though we really did not do anything wrong.  If we attempted to tell him something different than what she told him, he would not listen to us.

22. Our father always used to drink a lot.  He did not get angry when he was drunk, but he was irresponsible.  He frequently drove drunk, and when he was drunk, he was not able to take care of us.  On one occasion, some of my father's friends offered me alcohol.  When I said "no," they would make fun of me, telling me that it was not possible for me to be Hungria's son due to the fact that I did not want to drink alcohol.

23. Obel got married very young to a woman named Mireya.  It is possible that he got married so that he could escape from our house and Dorca's rage.  It was not an official marriage.  During that time, very few people got married officially with a license and by

5

the church because it would cost a lot of money.  Two people would simply start living together and say that they were married.  That is what Obel and Mireya did.

24. Obel left to go to Puerto Rico when he was around 19 years old.  It was a very difficult economic period of time in the Dominican Republic during that time.  Some time later, Mireya also went to Puerto Rico, living with another man.  Eventually, she and Obel got back together to live as husband and wife.

25. A lot of people from the Dominican Republic moved to Puerto Rico during that period of time.  Under the administration of President Jorge Blanco, the Dominican economy was very bad, and the people suffered financially.  Obel wanted to make a better life for himself and have the opportunity to help the family by sending money over there. I also moved to Puerto Rico some years later, wanting to do the same.

26. At some point when both of us were in Puerto Rico, I met a man we called "Rudy" and his cousin, Angelita.  Obel and Angelita started having a relationship.  I think that Angelita and Rudy were already in the business of drugs, and that they are the ones who taught Obel everything about the vice.  At some point, the three of them went to the United States.  Obel never told me that he was selling drugs.  I think that he wanted to protect me from that.  He did not share that part of his life with his family.

27. When Obel returned to Puerto Rico in the 90's, he used to work very hard so that he could be a good father and provider.  I remember that he used to travel between Puerto Rico and the Dominican Republic to see his children.  He had several jobs, and he would even pick up cans to exchange them for money when there was not any other job.  The most important thing for him was to be able to take care of his children.  Whether he participated in drugs or not, Obel was respected in the community and by his family.  Even though Obel remained closed with respect to his personal life – something that apparently started happening when our mother left – he was incredibly loving and supportive with others.  He loved to be surrounded by people and to make them feel good.

6

28. I knew that Obel worked for the government of the United States as an informant for a period of time.  Sometimes I saw Obel with a man named Wilson Pellot.  He was an agent at an agency in the United States.  He and Obel got together at my house on one occasion.  On another occasion, Obel called me from the building of the Department of Justice of the United States in San Juan, and he asked me to bring him some clothes. Obel had just come back from a very tough trip where he had suffered a lot.  The purpose of the trip was to bring a kidnapper, Sandy Pichardo, from the Dominican Republic to face justice in Puerto Rico.

29. I think that the government of the United States paid him well for his work helping the agents.  My understanding was that his job consisted in helping the government obtain information to arrest criminals.  But Obel did not talk much about that job.  I don't know if it is prohibited to talk about that, or if he wanted to protect us from the danger that went along with working as an informant.

30. If they had given me more opportunity to be involved in Obel's trial in Houston, I would have told the jury more about how it was for us when our mother and oldest sister abandoned us.  I would have told the jury that Obel had to mature very fast, and that he started acting like a father to me when I was only five years old.  I would have told the jury that Obel stopped talking about his feelings, and that he never let us see that he felt sad or lonely.  He was very loving with everyone and took care of them, but anything that had to do with him, he kept very much to himself.  At a very young age, he was determined to help the family, and he never wanted his children or other family members to have any difficulties with respect to money.

31. Even though I don't know exactly why Obel got involved with drugs, I believe that he thought that was the only way that a young guy from a small fishing town in the Dominican Republic could be successful in this world.  I would have liked to have the opportunity to explain more about this to the jury, with the hope that they would have understood that Obel is a good person who found himself trapped in a dangerous trade. The drugs were everywhere in Puerto Rico and the Dominican Republic around the 80's

and 90's. I think that, when Obel was becoming more mature, he tried to change his life and compensate for the mistakes that he made during his youth. I believe that because of that, he became an informant for the government and why he became a firm believer in his faith during the last 20 years. I believe that if Obel had been sentenced to a life sentence, he would spend the rest of his life helping others to explore their faith and to make a better life for themselves.

32. I would have testified the above during my testimony in 2013, if the defense attorneys had asked me.

I have read this 8-page statement. I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed February 17, 2019

Joel Cruz Garcia

8

EXHIBIT 85 Page 016

0001776

Transcribed to the best of Alma Adriano's abilities, this

"Statement of Joel Cruz Garcia" is true and correct to the best of my abilities.

_____          03/12/19
Alma Adriano                              Date
Certified Federal Court Interpreter

0001777

EXHIBIT 85 Page 017

13847940101C / Court: 337

# EXHIBIT 86

0001778

## DECLARACIÓN DE MARGARITA MARTINEZ ZORRILLA

Me llamo Margarita Martinez Zorilla. Tengo 48 años de edad. Vivo en Higuey, República Dominicana.

Yo era esposa de Carmelo "Rudy" Martínez Santana. Nos conocimos y casamos en Higuey en el año 1989. Yo conocí a Angelita Rodriguez y a Obel Cruz García. Yo me crie con Angelita y Rudy aquí en Higuey. Me hice buena amiga de Obel cuando nos conocimos en Houston.

Rudy se fue en 1987 a Houston a buscar trabajo, consiguió residencia y regreso a la Republica Dominicana en 1989 para que nos casáramos. Poco después que me casé con Rudy me fui con él a Houston.

Llegué a Houston el 4 de julio del 1989. Acuerdo de la fecha exacta porque era una celebración. Ahí conocí a Obel y Angelita que también estaban casados. Rudy conoció a Obel en Puerto Rico cuando fue a visitar a su familia.

Yo, Rudy, Angelita y Obel nos fuimos a Puerto Rico a visitar un tio de Rudy. Allí salió embarazada de Junior. Nos quedamos ahi. Obel y Rudy se regresaron a Houston primero y dos meses después se fue Angelita. Yo me quede sola en Puerto Rico con el tío de Rudy por 5 meses antes de regresar a Houston. Me fui a Houston para reunirme con Rudy en el 1990. Era el día de las madres y pensamos que yo iba a tener menos problemas con la inmigración en ese día. Junior nació en Houston, en el hospital Lyndon B. Johnson, en julio del 1990.

Cuando vivíamos en Houston, Rudy estaba usando mucha cocaína y se ponía bravo por cualquier cosa. También, Rudy tomaba mucho y salía con otras mujeres. El salía a todas horas del día y me dejaba sola en nuestro apartamento en Houston con el bebe. Solamente tenía 20 años y me sentía muy sola. Era un tiempo muy difícil para mí.

La situación se puso peor y Rudy empezó a ser violento con migo. Si le preguntaba donde estaba se ponía violento conmigo. Deje de hacerle preguntas por miedo de él. El me pegaba y se iba y cuando regresaba decía que estaba arrepentido pero después volvía hacerlo. Nunca llamé a la policia porque no tenía papeles de estar en los Estados Unidos. Ahora me mostraron un reporte de la policia del 1991 que describe como yo intenté salir del apartamento con Junior cuando Rudy vino borracho un día y me pegó muy fuerte. Rudy me mordió en la espalda y los brazos. La policia vino y vieron las mordidas y los moretones en mi cara donde me pegó. Lo que está en el reporte es verdad y pasó así, pero prefiero no acordarme de eso. No pienso que fui yo quien llamó a la policia. A lo mejor era la vecina quien vio a Rudy asaltándome quien llamó a la policia.

En Houston, Angelita tenía un negocio de salón de belleza en su propio apartamento. Muchas de las mujeres dominicanas fueron con ella para arreglar su pelo. Yo no vi ningún problema entre Angelita y Obel. Si sé que tenían problemas en embarazarse.

Yo fui con Obel y Angelita por ayuda cuando Rudy se ponía violento. Obel era la única persona quien podía calmarlo. Obel era una persona excelente. Obel era muy bueno con migo, no como

EXHIBIT 86 Page 001

Rudy. Obel era maravilloso con Junior, también. Nos traía comida y pañales cuando Rudy no proveía lo necesario.

Cuando yo estaba embarazada con nuestro segundo hijo, Jonathan, Rudy me abuandonó y empezó a vivir con otra mujer en Houston. Ella era ciudadana o residente permanente. Ellos tuvieron un hijo, Enrique. Por eso, yo me fui a vivir en Nueva York con un primo mío hasta que nació Jonathan. Yo regresé a la República Dominicana cuando Junior tenía 4 años y Jonathan tenía 4 meses. No he regresado a los Estados Unidos desde entonces.

Regresé a casarme en la República Dominicana y este hombre ha sido el padre verdadero a mis hijos porque era él que los crio, no Rudy.

Mis hijos no quieran nada que ver con su papa, Rudy. Ellos como que tienen resentimiento hacia él. A veces viene porque vive con su familia al lado de nosotros pero no hablamos mucho con él.

Después de regresar a la Republica Dominicana se murió mi papa y empecé a ver a un psicólogo. Tengo dificultades durmiéndome, casi no duermo, a veces tomo lloro mucho, cosas así. Tomo medicamento que me ayuda un poco con mi depresión. Me regalaron un pero para que me ayude también. Mi hijo quiere regresar a los Estado Unidos pero no quiero que se vaya. A mi no me gusto y no quiero que se vaya. Sufrí mucho cuando vivi ahi. Siempre estaba enserada en el apartamento y Rudy no me dejaba salir.

Ni los abogados ni nadie más del grupo de defensa de Obel se comunicaron con migo hasta ahora. Si me hubieron pedido, yo podría haber testificado en el juicio de Obel del 2013.

He leído esta declaración de 2 páginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el 01 día de Diciembre 2018

_Margarita Martinez_
Margarita Martinez Zorrilla

2

EXHIBIT 86 Page 002

0001780

## STATEMENT OF MARGARITA MARTINEZ ZORRILLA

My name is Margarita Martinez Zorilla. I am 48 years old. I live in Higuey, Dominican Republic.

I used to be Carmelo "Rudy" Martinez Santana's wife. We met and got married in Higuey in 1989. I met Angelita Rodriguez and Obel Cruz Garcia. I was raised with Angelita and Rudy here in Higuey. I became good friends with Obel when we met in Houston.

Rudy left to go to Houston in 1987 to look for work. He established residency, and he returned to the Dominican Republic in 1989, so that we could get married. Shortly after I married Rudy, I went to live with him in Houston.

I arrived in Houston on July 4, 1989. I remember the exact date because there was a celebration. I met Obel and Angelita there; they were also married. Rudy met Obel in Puerto Rico when he went to visit his family.

I, Rudy, Angelita, and Obel went to Puerto Rico to visit one of Rudy's uncles. I became pregnant there with Junior. We stayed there. Obel and Rudy returned to Houston first, and two months later, Angelita left. I stayed in Puerto Rico by myself with Rudy's uncle for 5 months before returning to Houston. I left and went to Houston to be reunited with Rudy in 1990. That day was Mother's Day, and we thought that I would have less problems with Immigration that day. Junior was born in Houston at the Lyndon B. Johnson Hospital in July of 1990.

When we were living in Houston, Rudy was using a lot of cocaine, and he used to get angry at anything and everything. Rudy also used to drink a lot and went out with other women. He would go out at any time during the day and leave me at the apartment in Houston by myself with the baby. I was only 20 years old, and I felt very lonely. It was a very difficult time for me.

The situation got worse, and Rudy started being violent with me. If I asked him where he was, he would become violent with me. I stopped asking him any questions because I was afraid of him. He used to hit me and then leave, and when he came back, he used to tell me that he was sorry, but then he would do it again. I never called the police because I did not have any papers to be in the United States. They now showed me a police report from 1991 that describes how I tried to get out of the apartment with Junior when Rudy got home drunk one day, and he hit me very hard. Rudy bit my back and my arms. The police came, and they saw the bites and the bruises where he hit me on my face. What the report shows is true, and that's the way it happened, but I prefer not to think about that. I don't think it was me who called the police. Maybe the person who called the police was my neighbor who saw Rudy attacking me.

In Houston, Angelita had a beauty shop business in her own apartment. A lot of the Dominican women used to go see her to have their hair done. I did not see any problems between Angelita and Obel. I know they had problems getting pregnant.

I went to see Obel and Angelita to ask them for help when Rudy became violent. Obel was the only person who was able to calm him down. Obel was an excellent person. Obel was very good to me, not like Rudy. Obel was also wonderful with Junior. He would bring us food and

EXHIBIT 86 Page 003

M. M.

0001781

diapers when Rudy did not provide what was necessary for us.

When I was pregnant with our second child, Jonathan, Rudy abandoned me, and he started living with another woman in Houston. She was a citizen or a permanent resident. They had a son, Enrique. That is why I went to live in New York with one of my cousins until Jonathan was born. I went back to the Dominican Republic when Junior was 4 years old and Jonathan was 4 months old. I have not been back to the United States since then.

I went back to get married in the Dominican Republic, and this man has been the real father to my children because he is the one who raised them, not Rudy.

My children do not want anything to do with their father, Rudy. They kind of have some resentment towards him. Sometimes he comes by because he lives with his family next door, but we don't talk to him very much.

My father passed away after I returned to the Dominican Republic, and I started seeing a psychologist. Sometimes, I have difficulty sleeping, I hardly get any sleep; sometimes I drink, I cry a lot, things like that. I take some medicine that helps me a little with my depression. They also gave me a dog to help me. My son wants to go back to the United States, but I don't want him to go. I did not like it, and I don't want him to go. I suffered a lot when I lived there. I was always inside the apartment, and Rudy did not allow me to go out.

Neither the attorneys nor anyone else from Obel's defense group contacted me until now. If they had asked me, I could have testified in Obel's trial in 2013.

I have read this 2-page statement. I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed December 1, 2018


Margarita Martinez Zorrilla

---

*(Translator's note: Punctuation, grammar and/or spelling added or altered for clarity.)*

EXHIBIT 86 Page 004

M. M.
0001782

Translated from Spanish to English by Alma Adriano. I certify that this translation of the "Statement of Margarita Martinez Zorrilla" is true and correct to the best of my abilities.

_____                    03/17/19
Alma Adriano                                        Date
Certified Federal Court Interpreter

EXHIBIT 86 Page 005

13847940101C / Court: 337

# EXHIBIT 87

0001784

# DECLARACIÓN DE MIREYA PEREZ GARCIA

Mi nombre es Mireya Pérez García, y tengo 47 años de edad. Vivo en Bella Vista de Boba en la Republica Dominicana. Soy la mujer de Obel Cruz-Garcia y testifiqué por video en su juicio en el 2013.

Me creí en los Naranjos que queda 5km de Bella Vista de Boba. Bella Vista de Boba es un pueblo pobre. Acabamos de obtener el agua ducto hace 2 años. Todavía se usan las letrinas. Las letrinas normalmente quedan atrás o al lado de la casa. Las casimbas las ponían en frente de la casa para tratar de evitar contaminación. Cuando llueve mucho, las letrinas se desbordan y algunas veces contaminan el agua de la casimba. También teníamos que cuidar de las ratas. Las ratas se orinaban en la casimba y también contaminaban el agua. Ahora ya tenemos tanques de agua, pero unos todavía usan las casimbas.

Mis papás se llaman Reina Garcia y Efigenio Perez. Tenía 14 hermanos y hermanas, pero dos hermanas fallecieron.

Conocí a Obel en el 1986 cuando yo tenía 14 años de edad. Fui a la casa de un tío en el pueblo de Boba, donde Obel vivía y ahí vi en el funeral. Pasamos mucho tiempo juntos ese día y hasta me escondí debajo de su cama porque mi mama me estaba buscando y no me quería ir a la casa. Cuando me encontraron escondida debajo de la cama de Obel pensaron nuestros papás que habíamos tenido relaciones. Aunque no fue cierto, ellos nos dijeron que nos teníamos que casar porque ya habíamos estados juntos. Tuvimos una celebración, pero nunca nos casamos por la iglesia o civilmente.

Vivimos un rato con el papá y madrastra de Obel, pero ella era muy religiosa y no nos quería en su casa. Y aunque Obel quería mucho a su papá, ellos tenían una relación muy complicada. Hungría tenía una reputación de ser mujeriego. Cuando Obel era niño, su papá lo llevaba cuando iba a ver otras mujeres. Eso lo hizo sentirse responsable cuando su mamá los abandonó. Amaba a su mamá y quería que sus padres estén juntos, pero también se sintió atorado en el medio de los dos. Dalia y Hungría ya han fallecido. Los dos fallecieron cuando Obel estaba preso. Sé que eso fue muy difícil para Obel.

Después de que se fue Dalia a Venezuela, Hungría y sus hijos se mudaron a Boba a vivir con la mama de Hungría, Ramona. Unos años después Hungría se casó con Dorca.

Porque Dorca nos hizo sentir tan incomodos después de nuestra apresurada boda, nos mudamos a la casa de mi hermano. Ahí me embarace con nuestro primer hijo, Obelito. Mientras estaba embarazada, Obel iba a pescar todos los días para ganarnos dinero. Era bueno para hacer los chinchorros. Le gustaba pescar y estar en el mar. Después de un tiempo, Obel me preguntó si podía ir a Puerto Rico. Él dijo que quería irse para que pueda conseguir mejor trabajo y pueda proveer para su familia. Aunque me puse triste yo soporté su decisión.

En ese tiempo muchos de la República Dominicana se estaban yendo en yolas a Puerto Rico porque había trabajo en las fincas. Cuando llegaba la gente a Puerto Rico buscaban trabajo y les mandaban

1

EXHIBIT 87 Page 001

Initials: *M P*

dinero a los que estaban acá en la República Dominicana. Por eso ahora hay más casas de concreto, porque la gente mandaba dinero para construir mejores casas. Antes estaban hechas de tablas y jagua o zinc y los huracanes los destruían muy fácilmente.

Obel se fue en yola a Puerto Rico. Me llamó para decirme que había llegado y le mandó dinero a su papá, Hungría, para que me lo de a mí. Después que se fue Obel, Hungría le dijo que yo estaba con otro hombre. Creo que le dijo esa mentira porque no quería que Obel me enviara dinero esperando que le enviara más a él. Obel creyó a su papá y él y yo perdimos contacto. Después, escuché que se había casado con una mujer llamada Angelita Rodríguez Santana. A pesar de que él y yo no estábamos hablando, él todavía le enviaba dinero a Hungría para su hijo, Obelito.

Inmediatamente cuando se fue Obel me fui a vivir con mi mama, Reina. Nacio mi hijo Obelito mientras estaba viviendo con ella. Ahí conocí otro hombre de Boba, Jesús "De León" Alvarez y me junté con él. Él y yo tuvimos un hijo llamado Manuel. De León se fue a Puerto Rico primero y me dijo que me podía encontrar trabajo allá. Dejé a mis dos hijos, Obelito y Manuel, con mi mamá y me fui a buscar trabajo en Puerto Rico. En Puerto Rico, encontré trabajo limpiando casas y cuidando un anciano. De León y yo tuvimos otra hija en Puerto Rico llamada, Mariela. Él tenía el vicio de jugar y nos separamos. Él se fue a Nueva York y eventualmente se llevó a Mariela.

Mientras estaba en Puerto Rico, me enteré que Obel había regresado a la isla y estaba visitando a su hermano Joel. Fui a la casa de Joel para ver si era cierto y vi a Obel. Obel ya se había divorciado de Angelita. Obel y yo recogimos nuestra relación como lo habíamos dejado. Vivimos en Puerto Rico juntos como unos dos años y tuvimos nuestro segundo hijo, Abel. Los tres nos regresamos a vivir aquí en la Republica Dominicana. Vivimos juntos en la casa que Eledemas y Hungría le hicieron a Obel cuando Obel estaba viviendo en los Estados Unidos. La casa estaba al lado de la casa de Hungría y Dorca.

Cuando regresamos a la República Dominicana desde Puerto Rico, Obel abrió una pescadería en el primer piso de la casa. También se compró una guaguita azul y el la manejaba. Unos años después decidimos mudarnos a Santo Domingo para que los niños pudieran ir a una escuela mejor y porque había mas trabajo. Obel abrió un negocio de comprar y vender casas llamado "Abel y Asociados ~ Nuevas Raíces" en Santo Domingo. Mi hijo Manuel, visitaba frecuentemente, pero él prefería vivir con su abuelita quien lo crio en los Naranjos.

Obel era un esposo y padre muy cariñoso y detallista. Siempre nos traía regalitos. Me trajo una flor para mi cumpleaños, me compraba cremas que me gustan, me hacía aceitito para mi piel, y cosas así. Todavía tengo los ositos de peluche que me dio para nuestro aniversario. Él no se avergonzaba de ayudar en la casa como otros hombres. Él lavaba, limpiaba, le cambiaba el pañal a Abel, cocinaba, el hacía todo. Él se tuvo que ganar a Obelito porque no estaba cuando Obelito era niño, pero si se lo ganó. Obelito lo llegó a querer mucho. También era muy bueno con mi hijo Manuel. Aunque no era su hijo él le compraba de todo. Si le compraba algo a Obelito también se lo compraba a Manuel. Obel amaba a sus hijos. No me dejaba castigarlos. Nos llevaba a pasear en el monte, a montar caballos, y a caminar en la playa. Era muy cariñoso con sus hijos y les daba muchos abrazos y besos. Él no quería que sus hijos sufrieran como el sufrió cuando era niño.

0001786

Me acuerdo que una vez estábamos juntos en el carro y vimos a un niño al lado de la calle. Obel paró el carro y le preguntó al niño porque no estaba en la escuela. El niño nos dijo que su familia no tenía dinero y que necesitaba trabajar. Obel le dijo que lo llevara a su casa. Llegamos a una casita muy humilde donde estaban los papas del niño. Obel les explicó por qué era necesario que el niño fuera a la escuela y les dijo que los ayudaría económicamente si lo mandaran a la escuela. El día siguiente, Obel regreso con más ropa para el niño y su familia. Obel siguió visitando al niño y su familia y lo querían mucho.

Yo y Obel tuvimos una relación muy bonita. Él me tenía mucha confianza y yo también le tenía confianza. Me contaba mucho de su niñez y de lo que sufrió en su vida.

No he visto Obel desde que lo arrestaron en Puerto Rico. Desde entonces, no he podido dormir en la misma cama que él y yo compartimos. Tampoco me gusta ir a la playa porque me recuerda mucho de cuando íbamos a pasear como familia. Lo extraño mucho y oro por el mucho.

Si me hubieran preguntado, habría estado dispuesta y podría testificar sobre esta información en el juicio de Obel en 2013.

Yo he leído este __3__ - pagina declaración. Yo declaro bajo pena de perjurio bajo las leyes de los Estado Unidos que lo anterior es verdad y correcto.

Ejecutado en el __29__ día de __nobren__ 2018 en _Billw Rilw de BoBa_ Republica Dominicana.

_Mireya perz garcia_
Mireya Perez Garcia

EXHIBIT 87 Page 003

Initials: _m P_

0001787

Case 4:17-cv-03621 Document 13-37 Filed on 09/02/19 in TXSD Page 4 of 368

# STATEMENT OF MIREYA PEREZ GARCIA

My name is Mireya Perez Garcia, and I am 47 years old. I live in Bella Vista de Boba in the Dominican Republic. I am Obel Cruz-Garcia's wife, and I testified via video in his trial in 2013.

I was raised in Los Naranjos, which is located 5 km from Bella Vista de Boba. Bella Vista de Boba is a poor town. We just got running water 2 years ago. They still use latrines. The latrines are normally located behind the house or next to it. The water wells would be placed in front of the house in order to try to avoid contamination. When it rains a lot, the latrines overflow, and sometimes they contaminate the water in the water well. We also had to watch out for rats. The rats would urinate in the water wells, and they would also contaminate the water. Now we have water tanks, but some people still use the water wells.

My parents are Reina Garcia and Efigenio Perez. I had 14 brothers and sisters, but two of my sisters passed away.

I met Obel in 1986 when I was 14 years old. I went to an uncle's house in the town of Boba, where Obel used to live, and I saw him there at the funeral. We spent a lot of time together that day, and I even hid under his bed because my mother was looking for me, and I did not want to go home. When they found me hiding under Obel's bed, our parents thought that we had had sex. Even though it was not true, they told us that we had to get married because we had already been together. We had a celebration, but we never got married by the church or in a civil ceremony.

We lived with Obel's father and his stepmother for a while, but she was very religious, and she did not want us in her house. And even though Obel loved his father very much, they had a very complicated relationship. Hungria had a reputation of being a womanizer. When Obel was a boy, his father used to bring him along when he used to see other women. That made him feel responsible when his mother abandoned them. He loved his mother and wanted his parents to be together, but he also felt stuck in the middle. Dalia and Hungria have already passed away. Both of them died when Obel was locked up. I know that was very difficult for Obel.

After Dalia left to go to Venezuela, Hungria and his children moved to Boba to go live with Hungria's mother, Ramona. Some years later Hungria married Dorca.

Because Dorca made us feel so uncomfortable after our quick wedding, we moved to my brother's house. I got pregnant there with our first son, Obelito. While I was pregnant, Obel went out to fish every day to earn some money for us. He was good at preparing the fish to be ready to eat and selling them. He used to like going fishing and being at sea. Sometime later, Obel asked me if he could go to Puerto Rico. He told me that he wanted to go to get a better job, so that he could provide for his family. Even though I became sad, I supported him in his decision.

During that time, a lot of people in the Dominican Republic were leaving for Puerto Rico in yawls because there was work in the plantations. When the people arrived in Puerto Rico, they would look for work, and they used to send money back to the people who were over here in the

EXHIBIT 87 Page 004

Initials: M.P.

0001788

Dominican Republic. That is the reason there are now more houses made out of concrete, because people used to send money to build better houses. In the past, they were made out of wooden boards, genipap trees, or zinc, and the hurricanes would destroy them very easily.

Obel left to go to Puerto Rico in a yawl. He called me to tell me that he had arrived, and he sent money to his father, Hungria, so that he could give it to me. After Obel left, Hungria told him that I was with another man. I believe he told him that lie because he did not want Obel to send me money hoping that he would send more to him. Obel believed his father, and he and I lost contact. Later, I heard that he had married a woman named Angelita Rodriguez Santana. Even though he and I were not speaking to each other, he would still send money to Hungria for his son, Obelito.

Immediately, when Obel left, I went to live with my mother, Reina. My son Obelito was born while I was living with her. I met another man from Boba there, Jesus "De Leon" Alvarez, and I started living together with him. He and I had a son named Manuel. De Leon went to Puerto Rico first, and he told me that he could find work for me over there. I left my two sons, Obelito and Manuel, with my mother, and I went to look for work in Puerto Rico. I found work cleaning houses in Puerto Rico, and taking care of an elderly man. De Leon and I had another daughter in Puerto Rico named Mariela. He was addicted to gambling, and we got separated. He went to New York, and he eventually took Mariela.

While I was in Puerto Rico, I found out that Obel had returned to the island, and that he was visiting his brother Joel. I went to Joel's house to see if it was true, and I saw Obel. Obel had already divorced Angelita. Obel and I picked up our relationship where we left off. We lived together in Puerto Rico for about two years, and we had our second son, Abel. The three of us returned to live here in the Dominican Republic. We lived together in the house that Eledemas and Hungria built for Obel when Obel was living in the United States. The house was next door to Hungria and Dorca's house.

When we returned to the Dominican Republic from Puerto Rico, Obel opened a fish store on the first floor of the house. He also bought a little blue bus, and he used to drive it. Some years later, we decided to move to Santo Domingo so that the children could go to a better school, and because there was more work over there. Obel opened a business to buy and sell houses called "Abel y Asociados Bienes Raices" in Santo Domingo. My son, Manuel, would visit often, but he'd rather live with his grandmother who raised him in Los Naranjos.

Obel was a very loving husband and father, always taking care of the little details. He always brought us gifts. He brought me a flower for my birthday. He used to buy me the creams that I like, he would make the oil that I used for my skin, and things like that. I still have all the teddy bears that he gave me for our anniversary. Unlike other men, he was not ashamed to help around the house. He did laundry, he cleaned, he would change Abel's diapers, he used to cook, he did everything. He had to earn Obelito's love because he was not there when Obelito was a child, but he did earn it. Obelito got to love him very much. He was also very good to my son Manuel. Even though he was not his son, he would buy him basically everything. If he bought something for Obelito, he would also buy something for Manuel. Obel loved his children. He did not allow me to punish them. He used to take us out to the country, horseback riding, and for walks on the beach. He was very loving with his children, and he hugged them a lot and gave them a lot of

EXHIBIT 87 Page 005

Initials: M.P.

0001789

kisses.  He did not want his children to suffer like he suffered when he was a child.

I remember one time when we were together in the car, and we saw a child on the side of the street.  Obel stopped the car, and he asked the child why he was not in school.  The boy told us that his family did not have any money, and that he needed to work.  Obel told him that he would take him home.  We arrived at a very poor house where the child's parents were.  Obel explained to them why it was necessary for the boy to attend school, and he told them that he would help them financially, if they sent him to school.  The next day, Obel went back with more clothes for the boy and his family.  Obel continued visiting the boy and his family, and they loved him very much.

Obel and I had a very beautiful relationship.  He trusted me very much, and I also trusted him.  He would tell me a lot about his childhood and about how much he suffered in life.

I have not seen Obel since he was arrested in Puerto Rico.  Ever since then, I have not been able to sleep in the same bed that he and I shared.  I don't like to go to the beach either because it reminds me a lot about how we used to go out as a family.  I miss him very much, and I pray for him a lot.

If they had asked me, I would have been willing and could have testified about this information in Obel's trial in 2013.

I have read this 3-page statement.  I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed November 29, 2018 in Bella Vista de Boba, Dominican Republic.


_____ /s/ _____
Mireya Perez Garcia

EXHIBIT 87 Page 006

Initials:  M.P.

0001790

Translated from Spanish to English. I, Alma Adriano, hereby declare that this translation of the "Statement of Mireya Perez Garcia" is true and correct to the best of my abilities.

_____          03/17/19
Alma Adriano                              Date
Certified Federal Court Interpreter

EXHIBIT 87 Page 007

13847940101C / Court: 337

# EXHIBIT 88

0001792

## DECLARACIÓN DE MARIA ALTAGRACIA CAPELLAN

Yo, María Altagracia Capellán declaro lo siguiente:

1.      Mi nombre es María Altagracia Capellán. Me llaman "Dorca." Ahora tengo 49 año y vivo en San Juan, Puerto Rico. Soy la madre de Obeliz Juliana Cruz Capellán, hija de Obel Cruz-García.

2.      Antes de que conocí a Obel, había estado en una relación abusiva. Duré dos años antes de encontrar la fuerza de salir de ella. Despés, era muy difícil para mí tener confianza en otro hombre.

3.      Con Obel, todo cambió. Conocí a Obel en 1995 donde la casa de mi primo, quien era amigo de Obel. Obel, cuando me invito a salir, me hablaba y me escuchaba. El sacó sillas para que me sentara. Abrió la puerta del carro para que me subiera. Jamás nadie me había tratado tan bien. El me mostró respeto. En muy poco tiempo, empezamos a salir.

4.      A veces, Obel me habló de su niñez. Me dijo que era muy difícil cuando su mamá dejó a la familia. Él tuvo que ser como hombre y papá. Salió muy de mañana a pescar para asegurar que había comida para la familia. Tuvo que cuidar a sus hermanitos pequeños, hasta cambiando los pañales de Joel y cocinando. También tuvo que cuidar a su papá después del accidente. Aunque el papá era muy estricto, Obel lo amaba. Lo más importante para Obel era asegurar que su familia tenía lo suficiente para comer.

5.      Como un año después de que nos conocimos, Obel regresó a la Republica Dominicana. Volvió a Puerto Rico en como dos años, en 1998.

6.      Obel regresó a Puerto Rico inmediatamente antes de que llegó el huracán George, que era de categoría 3. El daño a la isla era tan fuerte que no podíamos trabajar para varias semanas y había pocos recursos. Obel salió diario y me trajo comida y cualquier otra cosa que necesitaba. Salía a recoger escombros para ayudar a la comunidad. También recogió latas para obtener dinero.

7.      En 1999, yo sufrí de un dolor insoportable del abdomen pero no quiso ir al doctor porque costaba mucho dinero. Obel me dijo que la enfermedad parecía serio y me prometió pagar para cualquier atención médica necesaria. El doctor me diagnosticó de un quiste en un ovario y me dijo que necesitaba cirugía de inmediata. Obel no solamente pagó para la cirugía, pero también me cuidó mientras que recuperaba. Me hizo comida, me bañó, y me llevó a la cama. Me cuidó muy bien.

8.      Decidí tener una relación con Obel aunque sabía que él ya tenía su pareja, Mireya, porque Obel me trataba tan bien. Es muy común para los hombres Dominicanos tener relaciones e hijos con varias mujeres. Yo sabía que Obel proveía bien para su familia y que iba a ser un padre cariñoso para nuestro bebé. Por eso, estaba de acuerdo estar con él y tener a su hija, aunque sabía que yo iba a ser criando el bebé bastante sola. Obel regresó a la Republica Dominicana en medio

*M.C.*

1

EXHIBIT 88 Page 001

del 1999, cuando yo tenía 2 meses de embarazo. Me llamó frecuentemente y nunca me sintió abandonada. Cuando nació Obeliz, mandé fotos a Obel. Él era muy orgulloso y hasta que mostró las fotos a Mireya.

9.      Nuestra hija, Obeliz, tenía 6 meses cuando regresó Obel a Puerto Rico. Cuando Obel se quedaba en mi casa, el hizo todo el mandado y recogió a Obeliz de la guardería. Yo vendí tarjetas del teléfono de la casa y si alguien llegó pidiendo comprar, Obel los atendió. En mis días libres, Obel nos llevó a pasear a Piñones, al lado de la playa para comer y jugar.

10.     Obel ayudaba a la gente del barrio. Si alguien necesitaba ayuda en arreglar un carro, él lo hizo. Compraba un sándwich para personas que no tenían comida. Llevó dulces en el bolsillo para dar a los niños.

11.     Visitaba a Obel casi semanal cuando estaba encarcelado en Puerto Rico. El único tiempo en que no pude visitar era cuando mudaron a Obel a la prisión en Mayagüez, que era muy lejos. Llamé a la administración de la prisión para decirles que Obeliz necesitaba poder visitar a su papá y que Mayagüez nos quedaba demasiado lejos. Después de mi llamada, Obel fue mudado más cerca.

12.     Cuando fuimos a visitar a Obel, nos sentamos en una mesa en un cuarto grande en la prisión. Había máquinas de vender sándwiches que calentábamos en la microonda. Obeliz se sentó con Obel y lo peinaba y lo acariciaba.

13.     Las guardias y las familias de los otros presos me dijeron cuanto les gustaba Obel. Hoy en día, si veo uno de las guardias en la calle, me pregunta por Obel. Siempre están tristes oír que todavía está en la prisión.

14.     Obeliz tenía 12 años cuando llevaron a Obel hacia Texas. No tuvimos ninguna noticia que le iban a llevar a Texas o que enfrentaba la pena de muerte. No vimos a Obel después de que fue llevado a Texas.

15.     Antes del juicio, nadie del equipo de defensa de Obel habló conmigo en persona. Solamente me llamó una investigadora inmediatamente antes del juicio y me hizo muy pocas preguntas en una conversación que duró no más de 10 minutos.

16.     Si me hubieran entrevistado, yo les hubiera dicho todo lo que he dicho en esta declaración. Yo podría haber testificado a lo mismo en el juicio de Obel del 2013, si me hubieran llamado como testigo.



2

EXHIBIT 88 Page 002

0001794

He leído esta declaración de 3 páginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el ___13___ día de ___Febrero___, ___2019___.

_____

María Altagracia Capellán

EXHIBIT 88 Page 003

0001795

# STATEMENT OF MARIA ALTAGRACIA CAPELLAN

I, Maria Altagracia Capellán, state the following:

1.  My name is Maria Altagracia Capellán.  They call me "Dorca."  I am now 49 years old, and I live in San Juan, Puerto Rico.  I am the mother of Obeliz Juliana Cruz Capellán, Obel Cruz-Garcia's daughter.

2.  Before meeting Obel, I had been in an abusive relationship.  I stayed for two years before finding the strength to get out of it.  Afterwards, it was very difficult for me to trust another man.

3.  Everything changed with Obel.  I met Obel in 1995 at my cousin's house; he was Obel's friend.  Obel, when he invited me to go out, would talk to me and would listen to me.  He took some chairs out for me to sit down.  He opened the car door, so that I would get in.  Nobody had ever treated me so nicely.  He showed me respect.  We started going out shortly after that.

4.  Sometimes, Obel talked to me about his childhood.  He told me that it had been very difficult when his mother abandoned the family.  He had to be a man and a father.  He used to go out very early in the morning to go fishing to ensure that his family had food.  He had to take care of his younger little siblings, from changing Joel's diapers to cooking.  He also had to take care of his father after the accident.  Even though his father was very strict, Obel loved him.  The most important thing for Obel was to make sure his family had enough to eat.

5.  About a year after we met, Obel returned to the Dominican Republic.  He returned to Puerto Rico about two years later, in 1998.

6.  Obel returned to Puerto Rico immediately before hurricane George hit, which was a category 3.  The harm to the island was so much that we could not work for several weeks, and resources were scarce.  Obel went out daily and brought me food and whatever else I needed.  I used to go out and pick up the rubble so that I could help our community.  Also, I picked up cans in order to get money.

7.  In 1999, I suffered from an unbearable pain in my abdomen area, but did not want to go to the doctor because it cost a lot of money.  Obel told me that it seemed like it was a serious illness, and he promised to pay for any medical attention that was needed.  The doctor diagnosed me with an ovarian cyst, and he told me that I needed surgery immediately.  Obel not only paid for the surgery, but he also took care of me while I was recovering.  He cooked for me, he bathed me, he would tuck me in bed.  He took very good care of me.

EXHIBIT 88 Page 004
M.C.

1

0001796

8.    I decided to have a relationship with Obel, even though I knew that he had a partner, Mireya, because Obel used to treat me so well.  It is very common for Dominican men to have relationships and children with several women.  I knew that Obel was a good provider for his family, and that he was going to be a loving father for our baby.  That is why I agreed to be with him and to have his daughter, even though I knew that I would be raising the baby mostly by myself.  Obel returned to the Dominican Republic in mid-1999, when I was 2 months pregnant. He called me frequently, and I never felt abandoned.  When Obeliz was born, I sent pictures to Obel.  He was very proud, and he even showed the pictures to Mireya.

9.    Our daughter, Obeliz, was 6 months old when Obel returned to Puerto Rico.  When Obel used to stay in my house, he did all the grocery shopping, and he picked up Obeliz at daycare.  I used to sell telephone calling cards from home, and if someone arrived at the house to make a purchase, Obel would help them.  During my days off, Obel took us to Piñones, next to the beach, to go eat and play.

10.    Obel used to help the people in the neighborhood.  If someone needed help to fix a car, he would do it.  He used to buy a sandwich for people who did not have anything to eat.  He used to carry candy in his pocket to give to children.

11.    I used to visit Obel almost every week when he was in jail in Puerto Rico.  The only time when I was not able to visit him was when they moved Obel to the prison in Mayagüez, which was very far away.  I called the administration office at the prison to tell them that Obeliz needed to be able to visit her father, and that Mayagüez was very far away for us.  After my phone call, Obel was moved closer.

12.    When we went to visit Obel, we sat at the table in a big room in the prison.  There were vending machines with sandwiches that we used to microwave.  Obeliz would sit with Obel, and she combed his hair and snuggled with him.

13.    The guards and the other inmates' families told me how much they liked Obel.  Nowadays, if I see one of the guards on the street, they ask me about Obel.  They're always sad to hear that he's still in prison.

14.    Obeliz was 12 years old when they took Obel to Texas.  We did not have any advanced notice that they were going to take him to Texas, or that he was facing the death penalty.  We did not see Obel after he was taken to Texas.

15.    Before the trial, nobody from Obel's defense team talked to me in person.  Only one investigator called me just before the trial, and she asked me very few questions in a conversation that lasted no more than 10 minutes.

EXHIBIT 88 Page 005
M.C.

2

0001797

16.     If they had interviewed me, I would have told them everything that I have said in this statement.  I could have said the same thing in my testimony in Obel's trial in 2013, if they had called me to be a witness.

I have read this 3-page statement.  I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed February 15, 2019

Maria Altagracia Capellán

EXHIBIT 88 Page 006                    3                    0001798

Translated into the best to the best of my Adriano, certify that this translation of the "Statement of Maria Altagracia Capellan" is true and correct to the best of my abilities.

_Alma Adriano_                                    03/17/19

Alma Adriano                                      Date
Certified Federal Court Interpreter

EXHIBIT 88 Page 007

0001799

13847940101C / Court: 337

# EXHIBIT 89

0001800

## DECLARACIÓN DE NILSA ELA GARCIA MARINE

Me llamo Nilsa Ela Garcia Mariñe y tengo 75 años. Vivo en Santo Domingo, República Dominicana. Mi hermana menor, Dalia Garcia, era la madre de Obel Julian Cruz Garcia. Yo soy la tía de Obel.

Tenia cinco hermanas y dos hermanos, incluyendo a Dalia. Mi hermana, Dalia, era muy emocional. Cualquier cosa la hizo llorar. Mi mamá, Nereida Garcia era muy buena con nosotros y muchos la querían. Mi papá, Jaime Mariñe Martinez era más fuerte, especialmente con nosotros. Nos castigaba si nos portábamos mal.

Dalia conoció a Valerio "Hungría" de la Cruz aquí en Santo Domingo. Él era un médico en la armada. Hungria y Dalia se casaron y tuvieron cuatro hijos juntos, dos hembras y dos barrones. Obel era el segundo hijo y el barrón mayor. La familia vivía en Santo Domingo, muy cerca de la casa mía.

Obel era un buen niño. El, Natalia, y Joel eran tranquilos. Noemí era más tremenda y a veces alborotaba a mis hijos. Me acuerdo que Obel tuvo problemas orinando su cama. Noemí y Natalia no tenían ese problema y Joel apenas era un bebe y todavía estaba usando pañales. Noemí, Natalia, Obel, y Joel venían casi todos los días a mi casa a jugar con sus primos. Mis hijos y ellos fueron a la escuela juntos en un colegio en el barrio, cerca de la casa.

Cuando Obel tenía 9-10 años, Hungría tuvo un accidente en que un vehículo se chocó con él y él fue hospitalizado por algunas semanas. Era en ese tiempo que mi hermana, Dalia, descubrió que Hungría había sido infiel y tuvo un hijo con una vecina. Sabiendo eso, Dalia dejó a sus hijos y fue a la casa de mis papas. Nuestra familia hablo sobre la situación y decidimos que sería mejor que Dalia se mude a Venezuela, donde vivía mi hermana Dulce. Dalia se quedó con mis papas hasta que llegaron los papeles de la inmigración y después se fue a Venezuela.

Después de que se fue Dalia, Hungría se mudó con los tres hijos menores a la puebla de Boba, donde vivían sus padres. Obel tenía 10-12 años cuando se mudaron.

Muy pronto después de llegar a Venezuela, Dalia aplicó para una visa para su hija mayor, Noemí Cruz Garcia. Noemí se quedó en Santo Domingo con mis padres esperando su visa para poder irse con Dalia. Noemí dejó a su mamá y hermanos y se fue con su mamá a Venezuela. Algunos años después, Dalia mandó traer la otra hermana de Obel, Natalia, a Venezuela. Dalia no aplicó para conseguirles los papeles a Obel o su hermanito, Joel. En Venezuela, creo que Dalia trabajaba en un hotel y les mandaba dinero y ropa a sus hijos aquí.

Cuando era adulto, Obel se fue a Puerto Rico y a los Estados Unidos. Cuando Obel regresó a la República Dominicana su esposa, Angelita, vino también y los dos visitaron mi casa y mi familia en varios ocasiones. Obel es un cocinero maravilloso y a veces nos hacía comida deliciosa. Obel y Angelita viajaron a Higuey para visitar a la familia de Angelita y también fueron a Boba a visitar el papá de Obel y ver la casa que él estaba construyendo para Obel. No noté problemas entre Obel y Angelita, pero me di cuenta que divorciaron después de que ya no vivían conmigo.

*N.E.G M-1*

EXHIBIT 89 Page 001

Ni los abogados ni nadie más del grupo de defensa de Obel se comunicaron con migo hasta ahora. Si me hubieron pedido, yo podría haber testificado en el juicio de Obel del 2013.

He leído esta declaración de 3 páginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el _28_ día de _Noviembre, 2018_

_Nilsa Elen Garcia_
Nilsa Garcia

EXHIBIT 89 Page 002

0001802

# STATEMENT OF NILSA ELA GARCIA MARINE

My name is Nilsa Ela Garcia Mariñe, and I am 75 years old.  I live in Santo Domingo, Dominican Republic.  My younger sister, Dalia Garcia, was Obel Julian Cruz Garcia's mother.  I am Obel's aunt.

I had five sisters and two brothers, including Dalia.  My sister, Dalia, was very sensitive.  Anything would make her cry.  My mother, Nereida Garcia was very good to us, and she was loved by many.  My father, Jaime Mariñe Martinez was stronger, especially with us.  He would punish us if we misbehaved.

Dalia met Valerio "Hungria" de la Cruz here in Santo Domingo.  He was a medic in the army.  Hungria and Dalia got married, and they had four children together, two girls, and two boys.  Obel was the second child and the oldest boy.  The family lived in Santo Domingo, very close to my house.

Obel was a good child.  He, Natalia, and Joel were calm.  Noemi was wild and sometimes would agitate my children.  I remember that Obel had problems, he used to wet his bed.  Noemi and Natalia did not have that problem, and Joel was only a baby, and he was still wearing diapers.  Noemi, Natalia, Obel, and Joel used to come to my house almost every day to play with their cousins.  They, and my children, went to school together at a neighborhood school, close to the house.

When Obel was 9-10 years old, Hungria had an accident when a vehicle crashed against him, and he was hospitalized for several weeks.  It was during that time that my sister, Dalia, found out that Hungria had been unfaithful, and he had a child with a neighbor.  Knowing that, Dalia left their children and went to my parents' house.  Our family talked about the situation, and we decided that it would best for Dalia to move to Venezuela, where my sister Dulce lived.  Dalia stayed with my parents until she got the immigration papers, and then she went to Venezuela.

After Dalia left, Hungria moved with the three minor children to the town of Boba, where his parents lived.  Obel was 10-12 years old when they moved.

Very shortly after arriving in Venezuela, Dalia applied for a visa for her oldest daughter, Noemi Cruz Garcia.  Noemi stayed in Santo Domingo with my parents awaiting her visa, so that she could go live with Dalia.  Noemi left her father and siblings, and she left with her mother for Venezuela.  Some years later, Dalia had Obel's other sister, Natalia, brought over to Venezuela.  Dalia did not apply to get papers for Obel or his little brother, Joel.  I believe Dalia used to work at a hotel in Venezuela, and she used to send them money and clothing to her children over here.

When he was an adult, Obel left and went to Puerto Rico and the United States.  When Obel returned to the Dominican Republic, his wife, Angelita, also came over, and both of them visited my home and my family on several occasions.  Obel is a marvelous cook, and sometimes he

0001803

would make delicious food for us. Obel and Angelita traveled to Higuey to visit Angelita's family, and they also went to Boba to visit Obel's father and to see the house that he was building for Obel. I did not notice any problems between Obel and Angelita, but I noticed that they got divorced after they stopped living with me.

Neither the attorneys, nor anybody else from Obel's defense group got in touch with me until now. If they had asked me, I could have testified in Obel's trial in 2013.

I have read this 2-page statement. I state under penalty of perjury according to the laws of the United States that the above is true and correct.

Signed November 28, 2018

_____ /s/ _____
Nilsa Garcia

Translated from English to Spanish by Alma Adriano. I certify that this translation of the "Statement of Nilsa Ela Garcia Marine" is true and correct to the best of my abilities.

_____          03/17/19
Alma Adriano                                              Date
Certified Federal Court Interpreter

EXHIBIT 89 Page 005

0001805

13847940101C / Court: 337

# EXHIBIT 90

0001806

## DECLARACIÓN DE NOEMI MARGARITA CRUZ GARCIA

Yo, Noemí Margarita Cruz García declaro lo siguiente:

1. Mi nombre es Noemí Margarita Cruz García. Soy la hermana mayor de Obel Cruz-García, quien tiene como 2 años menos que yo.

2. No testifiqué en el juicio de Obel en Houston en 2013. Si los abogados de Obel me hubieron comunicado, con gusto me hubiera ido a Houston para testificar y apoyar a Obel. Aunque si hablé con alguien del equipo de Obel por teléfono, fue una conversación breve y la investigadora no preguntó mucho de nuestra crianza. Ahora es la primera vez que alguien del equipo legal ha venido a verme y hablar profundamente con migo sobre la niñez de Obel.

3. Yo nací en 1965 en Santo Domingo en la República Dominicana. Obel nació aproximadamente 2 años después.

4. Nuestro padre, Valerio "Hungría" Cruz Santos, era médico en la marina de la República Dominicana. No doctor, pero practicante de medicina. Después de que terminó la guerra civil en nuestro país, nuestro papá trabajaba en un hospital militar que quedó cerca de la casa. Nuestra mamá no necesitaba trabajar fuera de la casa. Durante nuestra infancia, Obel y yo nos divertíamos mucho. Nuestro papá nos llevaba a la escuela diario y regresó a la casa casi cada noche. Cuando no estábamos en la escuela, Obel y yo teníamos tiempo para jugar. Subiríamos a los árboles de mango y coco y jugábamos canicas.

5. Obel era muy cerca a nuestra mamá. En mi opinión, ella lo mimaba. Si a Obel no le gustaba lo que ella preparaba para el almuerzo, ella haría lo que él quería. Cuando regresamos de la escuela, nuestra mamá nos daba de comer y nos bañaba.



1

EXHIBIT 90 Page 001

0001807

Después, era hora de la siesta y Obel se acurrucaba al lado de Mamá y harían una siesta juntos.

6.    De vez en cuando, nos regalaron una moneda, y Obel y yo comprábamos 5 caramelos cada uno. Obel guardaba uno para dar a nuestra mamá como regalo.

7.    Cuando yo tenía como 6 años y Obel tenía como 4, nuestro papá tuvo un accidente horrible. Se quebró su pierna en varios lugares, quebró costillas, y perdió parte de su hígado. Estuvo en el hospital para mucho tiempo.

8.    Alrededor del momento del accidente, mi papá había comenzado una relación con otra mujer. Eventualmente mi mamá se dio cuenta de eso así como otras relaciones extra matrimoniales. Aunque para los hombres dominicanos no era fuera de lo normal tener a varias mujeres, esas relaciones (y, a lo mejor, otros factores) causaron problemas en el matrimonio de mis papás. Era muy obvio que nuestra mamá era muy descontenta en el hogar.

9.    Cuando yo tenía como 8 años y Obel tenía como 6, nuestra mamá dejó a su esposo y sus hijos y se fue para Venezuela, buscando una vida nueva. Eso fue devastador para nosotros y lloré mucho. Nuestro padre intentó hacer las cosas sentir normales pero fue horrible estar sin nuestra mamá. Por un rato, Obel, yo, y mis otros hermanos seguíamos viviendo en Santo Domingo con nuestro papá. En ese entonces, a Papi lo encontraron incapaz de hacer sus tareas militares por culpa de sus heridas y lo declararon oficialmente deshabilitado. Le dieron una pensión de invalidez.

10.    Al principio, mi papá se contrató con una mujer del barrio para cuidarnos. En algún momento, ella empezó una relación con nuestro padre. Ella dejó de cuidar a la casa y a nosotros. Mi papá no hizo nada porque quería complacerla. Al fin, el trabajo de mantener la casa me llegó a mí. Yo tenía que cocinar, limpiar, y cuidar a mis hermanos menores. Obel me ayudaba, especialmente con el bebé, Joel.

11.    Cuando yo tenía como 11 años y Obel tenía como 10, nuestro papá mudó a la familia de Santo Domingo a Boba, un pueblito distante donde vivían mis abuelos. El

2



EXHIBIT 90 Page 002

cambio a Boba era muy duro. En Boba no había electricidad o plomería interior. También, no había teléfono. Solamente habían 2 casas con paredes de medio bloque. Todas las demás eran de madera. La gente que vivían allí sobrevivieron por pescar y sembrar, y hasta los niños tuvieron que trabajar para asegurar que todos tenían lo suficiente para comer.

12. Hasta la manera de hablar es diferente en Boba, como hablan un dialecto diferente. En Santo Domingo, nos habían criado en la iglesia católica. En Boba, todos eran evangélicos.

13. La escuela en Boba era menos rigurosa que la de Santo Domingo. A diferencia de Santo Domingo, no pude estudiar en la noche porque la única luz en la casa era una lámpara de aceite. Lo que hicimos en la noche era asistir a la iglesia todas las noches. Era muy oscura cuando regresábamos a la casa y yo tenía miedo de pisar zapitos.

14. La gente de Boba era muy diferente de nosotros. Eran más humildes y supersticiosos. Un día, un grupo del pueblo iban a ir a una vigilia en otro pueblo que era bastante lejos. Yo me negué a ir y por no dejarme sola nadie de nuestra familia se fue. El vehículo con la gente de Boba se salió de la carretera y algunas personas fueren heridas, hasta que el hijo del pastor perdió su ojo. Después mucha gente me preguntó si yo había recibido un mensaje de Dios avisando me no ir. Todos en el pueblo oraron y dieron gracias a Dios por haber mandado el mensaje y salvando a mi familia.

15. Una vez al mes, mi papá tenía que viajar a Santo Domingo y consultar con un doctor para verificar su discapacidad. El viaje duro 4 días y estaba fuera de la casa viernes hasta lunes. Nosotros quedábamos con nuestra abuela en Boba.

16. Después de que se fue nuestra mamá, no teníamos contacto directo con ella. Dejábamos recados con los padres de ella en Santo Domingo y ellos comunicaron



3

EXHIBIT 90 Page 003

0001809

con ella. Sé que Obel le escribió cartas. No sé si ella respondió. Yo nunca la escribí porque yo era brava que nos habían dejado.

17.     Cuando yo tenía como 14 años, mis padres hicieron un acuerdo para que Obel y yo iban a vivir con nuestra mamá en Venezuela. Obel estaba muy emocionado por dejar a Boba y vivir con Mami. Yo fui primera a Venezuela. Cuando me fui, Obel me dijo que pronto se uniría con mí.

18.     Pero era una mentira. Después de escuchar acerca de algunos jóvenes dominicanos que cayeron en delincuencia en Venezuela, mi mamá decidió dejar a Obel en Boba. Mami mintió a mi papá y le dijo que el acta de nacimiento de Obel se perdió, y por eso no era posible conseguirle una visa. Nuestro papá mandó otra copia del acta de Obel pero todavía no aplicó para una visa para él. Pasó mucho tiempo antes de que Mami dijo definitivamente que nunca iba a llevar a Obel a Venezuela. No sé si alguna vez le dijo la razón verdadera. Obel realmente extrañaba a nuestra madre y quería reunirse con ella. También, en ese tiempo, Venezuela tenía una economía buena y muchos dominicanos la consideraban la tierra de oportunidades. Imagino que el proceso de tener la ilusión y la esperanza de ir a Venezuela y estar con nuestra mamá y al fin darse cuenta que nunca sucedería era muy duro para él.

19.     Era solamente después de que Obel se había ido de la República Dominicana para Puerto Rico que mi madre envió para mi hermana menor, Natalia, a unirse a nosotros en Venezuela. Me sentí mal que mi madre solamente quería a las hembras vivir con ella y que ella nunca hizo nada para ayudar a Obel unirse con nosotros.

20.     Yo hubiera testificado a lo anterior en el juicio de Obel en 2013, si los abogados de la defensa me hubieron preguntado.

2.4.6.9

4

EXHIBIT 90 Page 004

He leído esta declaración de 5 páginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el ___03___ día de ___04___, 2019, en Aveiro, Portugal.


_____

Noemí Margarita Cruz García

5

EXHIBIT 90 Page 005

0001811

## STATEMENT OF NOEMI MARGARITA CRUZ GARCIA

I, Noemi Margarita Cruz García state the following:

1.    My name is Noemí Margarita Cruz García.  I am Obel Cruz-García's oldest sister.  He is around 2 years younger than me.

2.    I did not testify in Obel's trial in Houston in 2013.  If Obel's attorneys had contacted me, I gladly would have gone to Houston to testify and support Obel.  Even though I talked to someone from Obel's team via telephone, it was a brief conversation, and the investigator did not ask much about our upbringing.  Now, this is the first time that someone from the legal team has come over to see me and to talk to me in depth about Obel's childhood.

3.    I was born in 1965 in Santo Domingo in the Dominican Republic.  Obel was born approximately 2 years later.

4.    Our father, Valerio "Hungría" Cruz Santos, was a medic in the Navy of the Dominican Republic.  Not a doctor, but would practice in the medical field.  After the civil war ended in our country, our father was working in a military hospital that was near our house.  Our mother did not need to work outside the home.  During our childhood, Obel and I used to have a lot of fun.  Our father used to take us to school every day, and he would come back home almost every night.  When we were not in school, Obel and I would have time to play.  We used to climb the mango and coconut trees, and we would play with marbles.

5.    Obel was very close to our mother.  In my opinion, she used to spoil him.  If Obel did not like what she prepared for lunch, she would make whatever he wanted.  When we came back from school, our mother used to feed and bathe us.  Later, it was time to take a nap, and Obel would snuggle next to Mother, and they would take a nap together.

6.    Once in a while, they would give us some coins, and Obel and I would buy 5 pieces of

1

candy each.  Obel would keep one to give it to our mother as a gift.

7.      When I was around 6 years old, and Obel was around 4, our father had a horrible accident. He broke his leg in different places, he broke his ribs and lost part of his liver.  He was in the hospital for a long time.

8.      Around the time of the accident, our father had started a relationship with another woman. Eventually, my mother found out about that, and about other extra-marital relationships.  Even though it was not out of the ordinary for Dominican men to have several women, those relationships (and, maybe, other factors) caused problems in my parents' marriage.  It was very obvious that our mother was very unhappy at home.

9.      When I was around 8 years old, and Obel was around 6, our mother left her husband and her children, and she went to Venezuela, looking for a new life.  That was devastating for us, and I cried a lot.  Our father tried to make things feel normal, but it was horrible to be without our mother.  For a while, Obel, I, and my other siblings kept living in Santo Domingo with our father. During that time, it was determined that Daddy was unable to do his military duties because of his wounds, and he was officially declared disabled.  They gave him a disability pension.

10.     At the beginning, my father hired a woman from the neighborhood to take care of us.  At some point, she started to have a relationship with our father.  She stopped taking care of us and the house.  My father did not do anything about it because he wanted to please her.  In any event, the maintenance work of the house became my responsibility.  I had to cook, clean, and take care of my younger siblings.  Obel would help me, especially with the baby, Joel.

11.     When I was around 11 years old, and Obel was around 10, our father moved the family from Santo Domingo to Boba, a small town far away, where my grandparents lived.  The change to Boba was very tough.  There was no electricity or indoor plumbing in Boba.  There was no telephone either.  There were only 2 houses with half-brick walls.  All the other houses were made out of wood.  The people who lived there would survive by fishing and planting seeds for crops,

2

and even the children had to work to make sure that everybody had enough food to eat.

12.     Even the way they talk was different in Boba, because they speak a different dialect.  In Santo Domingo, we had been raised in the Catholic church.  In Boba, everyone was Evangelic.

13.     The school in Boba was less rigorous than the one in Santo Domingo.  As opposed to what I did in Santo Domingo, I was not able to study at night because the only light in the house was an oil lamp.  What we did at night was to go to church every night.  It was very dark when we got back home, and I was afraid to step on the little toads.

14.     The people in Boba were very different from us.  They were poorer and superstitious.  One day, a group from the town was going to go to a vigil in another town that was very far away.  I refused to go, and in order for me not to be left alone, none of the members of my family went.  The vehicle where the people from Boba were travelling veered off of the highway, and some people ended up being hurt, even the son of the pastor lost his eye.  Later, a lot of people asked me if I had received a message from God warning me not to go.  Everyone in town prayed and gave thanks to God for sending the message and saving my family.

15.     Once a month, my father had to travel to Santo Domingo for a doctor's consultation to verify his disability.  The trip lasted 4 days, and he was away from home from Friday through Monday.  We would stay with our grandmother in Boba.

16.     After our mother left, we did not have direct contact with her.  We would leave messages with her parents in Santo Domingo, and they would contact her.  I know that Obel wrote her some letters.  I don't know if she wrote back.  I never wrote because I was angry at her for leaving us.

17.     When I was around 14 years old, my parents made an agreement so that Obel and I would go live with our mother in Venezuela.  Obel was very excited to leave Boba and live with Mommy.  I was the first one to go to Venezuela.  When I left, Obel told me that he would join me very soon.

3

0001814

18.     But it was a lie.  After hearing about some Dominican young men that got involved in criminal behavior in Venezuela, my mother decided to leave Obel in Boba.  Mommy lied to my father, and she told him that Obel's birth certificate got lost, and for that reason it was not possible to get him a visa.  Our father sent another copy of Obel's birth certificate, but she still did not apply for a visa for him.  A lot of time went by before Mommy finally said she was definitely never going to take Obel to Venezuela.  I don't know if she ever said what the real reason was.  Obel really missed our mother, and he wanted to join her.  Also, during that time, Venezuela had a good economy, and many Dominicans consider it the land of opportunity.  I imagine that the process of looking forward to, and having the hope of, going to Venezuela and being with our mother, and at the end realizing that it was never going to happen, was very hard for him.

19.     It was only after Obel had left the Dominican Republic to go to Puerto Rico that my mother had my younger sister, Natalia, join us in Venezuela.  I felt bad that my mother only wanted the females to go live with her, and she never did anything to help Obel join us.

20.     I would have testified the above in Obel's trial in 2013, if the defense attorneys had asked me.

I have read this 5-page statement.  I state under penalty of perjury, under the laws of the United States, that the above is true and correct.

Signed on April 3, 2019, in Aveiro, Portugal.

_____

Noemí Margarita Cruz García

EXHIBIT 90 Page 009

0001815

Translated from Spanish to English and to the best of my ability, this document, the "Statement of Noemi Margarita Cruz García" is true and correct to the best of my abilities.

_Alma Adriano_                                           04/12/19
_____                    _____
Alma Adriano                                            Date
Certified Federal Court Interpreter

EXHIBIT 90 Page 010

4/9/2021 1:59 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52314904
By: E Lane-Orton
Filed: 4/9/2021 1:59 PM

## 13847940101C / Court: 337

### IN THE 337TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

### AND

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

| | |
|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** § | |
| § | **Writ No.** _____ |
| § | Trial Court Case No: |
| § | 1384794 |
| § | |
| **Applicant.** § | **CAPITAL CASE** |
| § | |
| § | |
| § | |

### SUBSEQUENT APPLICATION FOR
### POST-CONVICTION WRIT OF HABEAS CORPUS
### EXHIBITS 91 THROUGH 100

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

0001817

13847940101C / Court: 337

# EXHIBIT 91

0001818

## DECLARACIÓN DE PIRUQUINU "PIRUCA" ACOSTA

Mi nombre es Piruquinu "Piruca" Acosta y tengo 76 años de edad. Vivo en Bella Vista de Boba en la República Dominicana.

Yo conocí a Obel Cruz Garcia cuando su papá, Valerio "Hungría" y sus hijos se mudaron a Bella Vista de Boba. Obel tenía como 10 a 11 años. Era una comunidad cercana y los conocía bien. Ellos estaban viviendo con Ramona, la mama de Hungría, en la mata de Boba. Unos años después Hungría se casó con una de aquí llamada Dorca. El y Dorca se mudaron aquí en la casita al lado de mí y mi mujer, Chinin, mientras los niños se quedaron en la casa de Ramona. Después se trajeron a los niños a vivir con ellos aquí al lado de mí. En aquel tiempo, el barrio consistía de 4 o 5 casas en la carretera que va a Nagua. Mi casa era al lado de la de Hungría y Dorca. Las casas no tenían aguaduchos en ese tiempo, nuestra agua vino de las casimbas. Yo todavía uso casimba. Cuando llovía, el agua de la letrina se mesclaba con el de la casimba.

Obel me llamaba "Papá" y llamaba a mi esposa "Mamá". Cuando tuvo comida, Obel me llamó para compartirla.

El papá de Obel demandó respeto de sus hijos. Siempre tenía a Obel trabajando y recuerdo que Obel era muy trabajador. Más trabajador que sus hermanos. La madrasta de Obel era maestra y estaba muy ocupada. Obel cocinaba y pescaba con su papá todos los días para ayudar a la familia.

Como mucha gente pobre en nuestra área, Obel se fue a Puerto Rico para hacer una vida mejor. Yo me fui después de Obel por la misma razón. Yo vi a Obel de nuevo cuando nosotros dos estábamos en Rio Piedra, Puerto Rico. Obel se quedó en mi casa por un rato cuando recién llegó de la finca. Durante ese tiempo, Obel trabajó en un café en Rio Piedra como cocinero. Es allí donde conoció a su futura esposa, Angelita. Antes de eso, había trabajado en una finca de café. Obel era muy trabajador y buen compañero de casa. Después de cómo un año yo regresé a la República Dominicana para ayudar a mi mujer, Chinin, cuidar a madre quien estaba muy grave.

No vi a Obel por muchos años pero supe que él planeaba regresar a Bella Vista de Boba porque su papá le estaba construyendo una casa en nuestro barrio. Cuando Obel regresó a la Republica Dominicana con su esposa, Angelita, se quedaron aquí en la casa que le construyeron. Obel ayudó a terminar de construir la casa pero le tomó mucho tiempo terminarla.

En la República Dominicana, es común para un hombre tener a su esposa y también tener relaciones con otras mujeres. Muchos hombres tienen hijos de varias mujeres y se considera normal tanto como el hombre provee para sus hijos. Yo tengo hijos de unas relaciones fuera de mi matrimonio, igual como el papá de Obel, mi mismo papá, y Obel. El papa de Obel era muy buen hombre pero a él le gustaba sus mujeres. Era un hombre hermoso y muy mujeriego. Porque era medico él estaba fuera de la casa mucho trabajando y visitando a la gente. Así conocía a las otras mujeres. Eso causó tensión entre él y Dorca porque a ella no le gustaba que estaba fuera de casa y con otras mujeres. Pero él era buen hombre y cuando un enfermo lo necesitaba él inmediatamente iba a ver verlos y no le cobraba nada a nadie.

1

*P4 /*

Initials: _____

EXHIBIT 91 Page 001

0001819

Hasta ahora, nadie del equipo legal de Obel me había contactado o pedido que testificara en el juicio de Obel. Si me hubieran preguntado, habría estado dispuesto y podría testificar en el juicio de Obel en 2013

Yo he leído este declaración de 2 paginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estado Unidos que lo anterior es verdadero y correcto.

Ejecutado en el ___29___ día de ___noviembre___, ___2018___ en ___Bella Villa de Brrn___, Republica Dominicana.

_Piruquino acat_

Piruquinu Acosta

P 4-2

EXHIBIT 91 Page 002

0001820

# STATEMENT OF PIRUQUINU "PIRUCA" ACOSTA

My name is Piruquinu "Piruca" Acosta, and I am 76 years old. I live in Bella Vista de Boba in the Dominican Republic.

I met Obel Cruz Garcia when his father, Valerio "Hungria" and his children moved to Bella Vista de Boba. Obel was around 10 to 11 years old. It was a nearby community, and I knew them well.

They were living with Ramona, Hungria's mother, in La Mata de Boba. A few years later, Hungria got married to a local woman named Dorca. He and Dorca moved over here to a little house next door to me and my wife, Chinin, while the children remained in Ramona's house. They later brought the children over to live with them here next door to me. During that time, the neighborhood consisted of 4 or 5 houses along the highway that leads to Nagua. My house was next door to Hungria and Dorca's house. The houses did not have running water during that time. Our water came from a hole in the ground. I still use the water well. When it rained, the water from the latrine would get mixed in with the water from the well.

Obel used to call me "Papá," and he called my wife "Mamá." When he had food, Obel called me to share it with me.

Obel's father demanded respect from his children. He always had Obel working, and I remember that Obel was a very hard worker. He worked more than his siblings. Obel's stepmother was a teacher, and she was very busy. Obel used to cook, and he would fish with his father every day to help the family.

Like many poor people in our area, Obel went to Puerto Rico to make a better life. After Obel left, I left for the same reason. I saw Obel again when we were both in Rio Piedra, Puerto Rico. Obel stayed in my house for a while when he first got there from the plantation. During that time, Obel worked at a café in Rio Piedra as a cook. He met his future wife, Angelita, there. He had previously worked at a coffee plantation. Obel was a very hard worker, and a good roommate. After about a year later, I returned to the Dominican Republic to help my wife, Chinin, to take care of Mother who was very ill.

I did not see Obel for many years, but I found out that he was planning on going back to Bella Vista de Boba because his father was building a house for him in our neighborhood. When Obel went back to the Dominican Republic with his wife, Angelita, they stayed here at the house that was built for them. Obel helped finish building the house, but it took him a long time to finish it.

In the Dominican Republic, it is common for a man to have his wife and to also have relationships with other women. Many men have children with several women, and that is

Initials:  _P A 1_

EXHIBIT 91 Page 003

0001821

considered normal so much so, that the men provide for their children.  I have children from some of the relationships outside of my marriage, the same as Obel's father, my own father, and Obel.  Obel's father was a very good man, but he liked women.  He was a beautiful man and very much a ladies' man.  Because he was a medic, he spent a lot of time outside of the home working and visiting people.  That is how he met other women.  That caused tension between him and Dorca because she did not like that he was spending time outside of the home and with other women.  But he was a good man, and when a person who was ill needed him, he would go see them immediately, and he did not charge anybody anything.

Up to now, nobody from Obel's legal team had contacted me or asked me to testify in Obel's trial.  If they had asked me, I would have been willing and could have testified in Obel's trial in 2013.

I have read this 2-page statement.  I state under penalty of perjury that under the laws of the United States the above is true and correct.

Signed November 29, 2018 in Buena Vista de Boba, Dominican Republic.

_____/s/_____
Piruquinu Acosta

PA 2

EXHIBIT 91 Page 004

0001822

Translated to the best of my Abilities and to this best of my abilities the
"Statement of Piruquinu "Piruca" Acosta" is true and correct to the best of my abilities.

_____                    03/12/19
Alma Adriano                                        Date
Certified Federal Court Interpreter

EXHIBIT 91 Page 005

13847940101C / Court: 337

# EXHIBIT 92

0001824

# DECLARACIÓN DE RAMONA ALTAGRACIA MOSQUEA

Me llamo Ramona Altagracia Mosquea y me llaman Altagracia. Tengo 63 años. Ahora y para 50 años, he vivido en Boba, República Dominicana y trabajado como maestra. Ahora estoy jubilada, pero todavía trabajo con un programa del presidente para combatir el analfabetismo de adultos.

Yo tenía a Obel Cruz Garcia como estudiante para 2 años en un colegio en Boba. Era una escuela primaria de grados uno a cinco. Después, los alumnos fueron a una escuela en Las Gordas.

La escuela en Boba era la única escuela en nuestra comunidad y servía las otras pueblas cercanas. En ese tiempo, había 35-40 niños en cada clase. Algunos venían de lejos – de Los Rincones, Bella Vista, La Mata, La Zenda, y El Bambú. Los alumnos caminaban a la escuela y no importaba el clima, ni lluvia ni el calor. La mayoría tenían chancletas pero algunos venían descalzos. Había que compartir libros y partir los lápices (unos tenían la parte con goma y los otros no). La escuela no tenía mucho. La escuela recibía ayuda del gobierno en la forma de trigo y arroz para asegurar que los niños comieron por lo menos una comida buena al día. Hicimos trigo con leche, trigo con pica pica, albeja con arroz, o licuados con trigo.

Obel vino a Bob con su padre, Valerio "Hungría", y sus hermanos, Natalia y Joel. Nunca conocí a la mamá. Hungría vivía con su madre, Ramona, durante ese tiempo y recuerdo de ella. Recuerdo a la familia muy bien porque las maestras y los parientes eran una comunidad unida y nos compartíamos frecuentemente.

En Boba todos trabajaban, hasta los niños chiquitos. La comunidad no tenía mucho pero el mar y los arboles dieron comida: cangrejo, coco, y pescado. La gente ganaba dinero por hacer y vender chinchorros, cortar y vender cocos, y pescar.

Porque el pueblo de Boba vivía por el mar, a la hora en que yo llegué a la escuela, como a las 7 o 7:15 y la escuela empezaba a las 8. Algunos de los alumnos, como Obel, pescaban en la madrugada con sus papas y venían a la escuela a las 8 después de pescar. A veces se quedaban dormidos durante la clase porque estaban cansados. Cuando salían de la escuela, muchos volvían a trabajar con sus papas.

A Obel no le gustaba hablar en frente de la clase. Se ponía muy nervioso y sus palmas se ponían a sudar. Muchas veces cuando tenían presentación de grupo él se quedaba callado.

Hungría ero un practicante de medicina también. Él había prestado servicio militar antes de que la familia se mudó a Boba, cuando vivía en el capital de Santo Domingo. En nuestra comunidad, si alguien necesitaba asistencia médica, fueron con Hungría. Si la persona era muy enferma y Hungría no podía ayudar, él se fue con la persona al hospital en Nagua para asegurar que recibió lo que necesitaba.

Había una vez que Obel se calló del techo de la casa de Ramona y se partió la cabeza. Hungría lo tuvo que llevar al hospital y le pusieron puntos de sutura. Faltó la escuela como una semana porque tenía problemas de vista y le dolía la cabeza. Hungría me dijo que no quería que viniera a

EXHIBIT 92 Page 001

la escuela porque tenía que tener la cabeza levantada y no quería que leyera o escribiera porque hubiera tenido que tener la cabeza abajo. Obel no faltaba mucho de la escuela. Las veces que faltaba era porque estaba enfermo o porque sus hermanitos estaban enfermos y él los tenía que cuidar mientras Hungría estaba fuera de la casa. Obel era como otro padre para sus hermanos menores. Acuerdo que su hermanito, Joel, era muy joven. Obel era muy cariñoso con sus hermanos, dándoles de comer, bañándoles, vistiéndoles, y asegurando que estaban bien. Obel habló de su mamá y de que la hizo falta pero él amaba mucho a su papá, aunque Hungria era muy estricto con sus hijos.

Obel era un niño muy bueno. Si uno de sus compañeros de la escuela necesitaba cualquier cosa, él siempre era dispuesto de ayudar. Si uno de ellos se enfermó y tenía que irse a casa, Obel siempre ofreció llevarle. Lo que Obel tenía, siempre compartía con los de más. Yo tenía una tierra detrás de la escuela donde sembraba lechuga, tomate, y pepino y Obel siempre me ayudaba con la siembra.

A veces, Obel pescaba tiburones chicos y los colocaba en el sol a secar para hace bacalao. Él sabía que a mí me gustaba el bacalao y me lo traía. También me traía sancocho que hizo su abuela, Ramona. No había mucha carne pero era muy rico. Obel tenía buenos sentimientos. Era un niño con buenas intenciones.

Ni los abogados ni nadie más del grupo de defensa de Obel se comunicaron con migo hasta ahora. Si me hubieron pedido, yo podría haber testificado en el juicio de Obel del 2013.

He leído esta declaración de 2 página. Yo declaro bajo pena de perjurio bajo las leyes de los Estados Unidos que lo anterior es verdad y correcto.

Ejecutado en el ~~29~~ día de *Noviembre*, *2018*

*Ramona Alt Mosquea.*
Ramona Altagracia Mosquea

EXHIBIT 92 Page 002

0001826

# STATEMENT OF RAMONA ALTAGRACIA MOSQUEA

My name is Ramona Altagracia Mosquea, and they call me Altagracia. I am 63 years old. I live now, and for 50 years have lived, in Boba, Dominican Republic, and I have worked as a teacher. I am now retired, but I still work with a program from the Mayor/President to help illiterate adults.

I had Obel Cruz Garcia as a student for 2 years in a school in Boba. It was an elementary school from first grade to fifth grade. Afterwards, the students went to a school at Las Gordas.

The school in Boba was the only school in our community, and it served the other nearby towns. During that time, there were 35-40 children in each class. Some would come from far away – from Los Rincones, Bella Vista, La Mata, La Zenda, and El Bambu. The students used to walk to school, and it didn't matter how the weather was, nor the rain nor the heat. Most of them had sandals, but some used to come to school barefoot. The books had to be shared and the pencils had to be broken (some would have the part with the eraser, and some would not.) The school did not have much. The school received help from the government in the form of wheat and rice to ensure that the children had at least one good meal per day. We made wheat with milk, wheat with *pica pica* (chili powder mixed with lime), peas with rice, or wheat shakes.

Obel came to Boba with his father, Valerio "Hungria," and his siblings, Natalia and Joel. I never met his mother. Hungria lived with his mother, Ramona, during that time, and I remember her. I remember the family very well because the teachers and the parents were a united community, and we often interacted.

Everybody worked in Boba, even the small children. The community did not have much, but the sea and the trees gave us food: crab, coconut, and fish. The people used to earn money by preparing the fish to be ready to eat and selling it, cutting and selling coconuts, and fishing.

Because the town of Boba was located by the sea, by the time I arrived at school, around 7 or 7:15, and school started at 8. Some of the students, such as Obel, went fishing early in the morning with their fathers, and they would come to school at 8 after fishing. Sometimes they would fall asleep in class because they were tired. When they got out of school, many of them would go back to work with their fathers.

Obel did not like to talk in front of the class. He would get very nervous, and the palms of his hands would start sweating. Many times, when they had a group presentation, he would remain quiet.

Hungria was also a medical practitioner. He had served in the military before the family moved to Boba, when he used to live in the capital, Santo Domingo. If someone needed medical attention in our community, they would go see Hungria. If the person was very sick, and Hungria was not able to help, he would go with that person to the hospital in Nagua to make sure that he or she received what was needed.

<u>R. A. M.</u>

EXHIBIT 92 Page 003

On one occasion, Obel fell from the roof of Ramona's house, and he cracked his head. Hungria had to take him to the hospital, and they gave him some stitches. He missed school for about a week because he had vision problems, and his head hurt. Hungria told me that he did not want him to come to school because he had to have his head elevated, and he did not want him to read nor write because he would have to lower his head to do that. Obel did not miss school much. The times when he missed was because he was sick or because his siblings were sick, and he had to take care of them while Hungria was not at home. Obel was like a second father for his younger siblings. I remember that his brother, Joel, was very young. Obel was very loving with his siblings, feeding them, bathing them, dressing them, and making sure that they were okay. Obel talked about his mother, and that he needed her, but he loved his father very much, even though Hungria was very strict with his children.

Obel was a very good boy. If one of his classmates needed anything, he was always willing to help. If one of them got sick, and had to go home, Obel always offered to take him. Obel always shared with everybody what he had. I had a piece of land behind the school where I would grow lettuce, tomatoes, cucumbers, and Obel always helped me with planting the seeds.

Sometimes, Obel caught small sharks, and he would set them to dry under the sun to prepare cod fish (sic). He knew that I liked cod fish, and he used to bring it to me. He also used to bring me beef stew prepared by his grandmother, Ramona. It did not have a lot of meat in it, but it was very delicious. Obel had good feelings. He was a child with good intentions.

Neither the attorneys nor Obel's defense group contacted me until now. If they had asked me, I could have testified in Obel's trial in 2013. I have read this 2-page statement. I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed November 29, 2018

Ramona Altagracia Mosquea

*(Translator's note: Punctuation, grammar and/or spelling added or altered for clarity.)*

EXHIBIT 92 Page 004

Translation from Spanish to English of the document titled "Statement of Ramona Altagracia Mosquea" Acosta" is true and correct to the best of my abilities.

_Alma Adriano_

Alma Adriano
Certified Federal Court Interpreter

03/17/19

Date

EXHIBIT 92 Page 005

0001829

13847940101C / Court: 337

# EXHIBIT 93

0001830

## DECLARACIÓN DE SANDRA HILVANIA VAZQUEZ

Mi nombre es Sandra Hilvania "Hilvi" Vazquez, y tengo 46 años de edad. Vivo en Bella Vista de Boba en la Republica Dominicana.

Yo conocí a Obel cuando tenía 13 años en Boba, Republica Dominicana. Nos conocimos cuando mi familia estaba construyendo una casa al lado de la casa de Hungría. En ese tiempo no teníamos electricidad ni agua corriente, el agua lo sacábamos de las casimbas. A veces el agua estaba bien para tomar, pero a veces estaba muy sucia, especialmente después que llovía. Cuando llovía, la letrina se llenaba y el agua sucia se mezclaba con el agua fresca en la casimba. Hace como 5 años que trajeron el agua corriente.

Obel salvo a mi hijo, Hector "Wandy" Alexander Santos, cuando le choco un carro y estaba grave. Un día, como hace veinte años, estaba caminando con mi tía y mi hijo a la casa de mi tío. Wandy tenía 6 años. Wandy cruzo la calle con mi tía, pero yo no porque vi que venía un carro muy rápido. Mientras Wandy estaba cruzando se dio cuenta que yo no los estaba siguiendo y soltó la mano de mi tía y se empezó a regresar a donde yo estaba. Eso fue cuando el carro lo atropello. Yo no supe qué hacer. Estaba frisada. No teníamos celulares en ese tiempo y no había ambulancias. La única manera de ir al hospital fue que alguien te llevara en carro o en moto. En ese momento, Obel estaba regresando de un día de pesca con su papá en una camioneta verde. Obel vio lo que le paso a Wandy, y con la ayuda de otros, lo recogieron rápidamente y lo metieron a la camioneta. Obel lo manejo a la clínica y Wandy recibió la atención médica que necesitaba. Si no hubiera sido por Obel, Wandy se podría haber muerto. Wandy recibió 3 cirugías de la cabeza, estuvo 14 días en el intensivo en el hospital San Vincente de Paul San Francisco de Macorís, y le pusieron como un huesito en el cráneo. Estaba muy lastimado. Estamos muy afortunados que Obel estaba ahí y que nos ayudó.

I SHVM.

EXHIBIT 93 Page 001

0001831

Initials: 2 SHVM                    **Declaration of Sandra Hilvania Vasquez**

Obel también ayudo a construir la iglesia católica aquí en Bella Vista aunque él no era católico. No había muchos católicos en Bella Vista y no tenían lugar para celebrar misa. Obel les dio dinero y les ayudo a construir una iglesia con sus propias manos. Todavía la usan para misa.

Hasta ahora, nadie del equipo legal de Obel me había contactado o pedido que testificara en el juicio de Obel. Si me hubieran preguntado, habría estado dispuesta y podría testificar en el juicio de Obel en 2013.

Yo he leído esta declaración de 2 paginas. Yo declaro bajo pena de perjurio bajo las leyes de los Estado Unidos que lo anterior es verdadero y correcto.

Ejecutado en el _____ día de _____, 2018, en _____, Republica Dominicana.


*Sandra H. Vásquez M.*

Sandra Hilvania Vazquez

EXHIBIT 93 Page 002                    2                    0001832

## STATEMENT OF SANDRA HILVANIA VAZQUEZ

My name is Sandra Hilvania "Hilvi" Vazquez, and I am 46 years old. I live in Bella Vista de Boba, Dominican Republic.

I met Obel when he was 13 years old in Boba, Dominican Republic. We met each other when my family was building a house next to Hungria's house. During that time, we did not have electricity, nor running water. We used to get the water from the water wells. Sometimes the water was good for drinking, but sometimes it was very dirty, especially after it rained. When it rained, the latrine would fill up, and the dirty water would mix in with the fresh water from the water well. They brought running water over here about 5 years ago.

Obel saved my son, Hector "Wandy" Alexander Santos, when he was hit by a car, and he was seriously injured. One day, about 20 years ago, I was walking with my aunt and my son towards my uncle's house. Wandy was 6 years old. Wandy crossed the street with my aunt, but I did not, because I saw a car coming very fast. While Wandy was crossing, he realized that I was not following them, and he let go of my aunt's hand and started coming back to where I was. That's when the car ran over him. I did not know what to do. I was frozen. We did not have cellular phones at that time, and there were no ambulances. The only way to get to the hospital was if someone took you by car or motorcycle. At that moment, Obel was coming back from a day of fishing with his father in a green truck. Obel saw what happened to Wandy, and with the help of others, they picked him up right away and put him in the truck. Obel drove him to the clinic, and Wandy received the medical attention that he needed. Had it not been for Obel, Wandy could have died. Wandy underwent 3 head surgeries. He was in intensive care during 14 days in San Vincente de Paul San Francisco de Macorís Hospital, and they inserted something like a little bone in his skull. He was seriously injured. We are very fortunate that Obel was there, and that he helped us.

1 S.H.V.M.

EXHIBIT 93 Page 003

0001833

Initials: <u>2 S.H.V.M.</u>                    **Declaration of Sandra Hilvania Vasquez**

Obel also helped build the catholic church here in Bella Vista, even though he was not catholic. There were not a lot of Catholics in Bella Vista, and they did not have a place where they could celebrate mass. Obel gave them money, and he helped them build a church with his own hands. They still use it for mass.

Up to now, nobody from Obel's legal team had contacted me or asked me to testify in Obel's trial. If they had asked me, I would have been willing and could have testified in Obel's trial in 2013.

I have read this 2-page statement. I state under penalty of perjury under the laws of the United States that the above is true and correct.

Signed _____ of _____ 2018, in _____, Dominican Republic.

_____ /s/ _____
Sandra Hilvania Vazquez

EXHIBIT 93 Page 004

0001834

Translation is true to the original document and that the translation of the
"Statement of Sandra Hilvania Vazquez" Acosta" is true and correct to the best of my abilities.

_____                    02/19/19
Alma Adriano                                 Date
Certified Federal Court Interpreter

EXHIBIT 93 Page 005

0001835

13847940101C / Court: 337

# EXHIBIT 94

0001836

## DECLARACIÓN DE LEURIDES VASQUEZ FAÑA

Mi nombre es Leurides "Urí" Vásquez Faña, y tengo 61 años de edad. Vivo en Bella Vista de Boba en la República Dominicana.

Yo conozco a Obel Cruz Garcia desde que tenía 10-12 años y se mudó a Boba, República Dominica. Pasamos tiempo juntos en Boba y hablábamos mucho. Yo siento que Obel y yo realmente nos abrimos el uno al otro y nos tratábamos más como hermanos que amigos.

Obel sufrió cuando su mama, Dalia, lo abandonó. Él fue obligado a crecer y cuidar a sus hermanos menores cuando todavía era muy joven. Cuando Obel no estaba pescando estaba en su casa cocinando, cambiando los pañales de sus hermanos y cuidándolos. Cuando no había suficiente comida, Obel iba a pescar y vendia el pescado para comprarle comida a su familia. Él acompañaba a su papá, Valerio "Hungría" Cruz, por el pueblo también, haciendo visitas de casa. Hungría, era el medico del pueblo y cuidaba a todos en Boba.

De lo que yo puedo observar, Obel y su papá eran muy cercanos. Cuando Hungría no podía ir a pescar, él mandaba a Obel porque confiaba en él. Obel hizo todo lo que su papá le pedía. Hungría era muy estricto y exigía mucho de sus hijos.

Cuando Hungría se volvió a casar con Dorca, cambió. Él se hizo más distante de sus hijos y no los soportaba emocionalmente como antes. Obel sintió como su papá lo había abandonado porque no le demostró el mismo amor y empezó a castigarlo a él y a sus hermanos fisicamente. Hungría castigaba a todos sus hijos, pero era más fuerte con Obel. Era claro para mí que Obel estaba sufriendo, pero Obel no quería hablar mal de su papá. Otros en el pueblo sabían que Obel estaba sufriendo, pero Obel no hablaba mucho con otras personas sobre su sufrimiento. Yo era una de las pocas personas en la que él confiaba. Creo que fue porque él sabía que yo también había sufrido mucho en la vida y podia relacionarme con él.

Hasta ahora, nadie del equipo legal de Obel me había contactado o pedido que testificara en el juicio de Obel. Si me hubieran preguntado, habría estado dispuesta y podría testificar en el juicio de Obel en 2013.

Yo he leído este _1_ - pagina declaración. Yo declaro bajo pena de perjurio bajo las leyes de los Estado Unidos que lo anterior es verdadero y correcto.

Ejecutado en el _29_ día de _Noviembre_ _2018_ en _Bella Vista_, Republica Dominicana.

_Leurides Faña_
Leurides Vásquez Faña

1

Initials: _[signature]_

EXHIBIT 94 Page 001

0001837

Case 4:17-cv-03621 Document 89-13 Filed on 01/05/23 in TXSD Page 2 of 3

## STATEMENT OF LEURIDES VASQUEZ FAÑA

My name is Leurides "Uri" Vasquez Faña, and I am 61 years old.  I live in Bella Vista de Boba in the Dominican Republic.

I've known Obel Cruz Garcia since he was 10-12 years old, and he moved to Boba, Dominican Republic.  We spent some time together in Boba, and we used to talk a lot.  I feel that Obel and I really opened up to each other, and we treated each other more like siblings than friends.

Obel suffered when his mother, Dalia, abandoned him.  He was forced to grow up and take care of his younger siblings when he was still very young.  When Obel was not fishing, he was at home cooking, changing his siblings' diapers, and taking care of them.  When there was not enough food, Obel used to go fishing, and he would sell fish, so that he could buy food for his family.  He also accompanied his father, Valerio "Hungria" Cruz, when he was making home visits in town.  Hungria, was the medic of the town, and he would provide care to everybody in Boba.

From what I can observe, Obel and his father were very close to each other.  When Hungria was not able to go out fishing, he would send Obel because he trusted him.  Obel did everything that his father asked him to do.  Hungria was very strict, and he would be very demanding of his children.

When Hungria married again, to Dorca, he changed.  He became more distant with his children, and he did not give them emotional support like he did before.  Obel felt like his father had abandoned him because he did not show him the same love, and he started punishing him and his siblings physically.  Hungria punished all of his children, but he was harsher with Obel.  It was clear to me that Obel was suffering, but Obel did not want to say anything bad about his father.  Other people in town knew that Obel was suffering, but Obel did not talk much about his suffering with other people.  I was one of the few persons that he trusted.  I think that he knew that I had also suffered a lot in life, and I could relate to him.

Up until now, nobody from Obel's legal team had contacted me or asked me to testify in Obel's trial.  If they had asked me, I would have been willing and could have testified in Obel's trial in 2013.

I have read this one page statement.  I state under penalty of perjury according to the laws of the United States that the above is true and correct.

Signed November 29, 2018 in Bella Vista, Dominican Republic.

_____/s/_____
Leurides Vásquez Faña

Initials: [_initialed_]

EXHIBIT 94 Page 002

0001838

Translated from Spanish to English to the best of Alma Adriano's abilities. This
"Statement of Leurides Vasquez Faña" is true and correct to the best of my abilities.

_____        03/17/19
Alma Adriano                                    Date
Certified Federal Court Interpreter

EXHIBIT 94 Page 003

0001839

13847940101C / Court: 337

# EXHIBIT 95

0001840

Case 4:17-cv-03621 Document 89-135 Filed on 01/09/23 in TXSD Page 113 of 368

HE RECEIVED A CALL FROM THE DISPATCHER TO CHECK AN AGGRAVATED SEXUAL ASSAULT/
AGGRAVATED KIDNAPPING SCENE AT ███████████. OFFICER NORRIS WAS IN THE HOMICIDE
OFFICE AT THE TIME OF THE CALL AND ARRIVED ON THE SCENE AT APPROXIMATELY 0030
HOURS. UPON ARRIVAL, OFFICER NORRIS TALKED WITH SCENE PATROL OFFICERS B.K.
CARPENDER (PR 98071) AND J. DAVERUX (PR 79439) RIDING UNIT 13D13. ALSO ON THE
SCENE WERE SEVERAL MORE PATROL OFFICERS AND ARRIVING LATER WAS HOMICIDE
SGT. C. ELLIOTT AND LT. D. GAFFORD. AFTER TALKING WITH ALL OF THESE OFFICERS,
OFFICER NORRIS MADE THE FOLLOWING SCENE OBSERVATIONS.

*****SCENE SUMMARY*****

AREA OF TOWN
------------

THE ADDRESS OF ██████████ WAS OBSERVED TO BE THAT OF THE ████████
██████████ LOCATED IN THE SOUTH SECTION OF HOUSTON IN HARRIS COUNTY.
THIS ADDRESS CAN BE LOCATED ON KEY MAP ████████ AND WAS FURTHER FOUND IN THE
HOUSTON POLICE DEPARTMENTS 13D10'S BEAT. THE ████████ WAS OBSERVED
TO BE AN EAST/WEST STREET JUST SEVERAL BLOCKS SOUTHWEST OF THE MAJOR
INTERSECTION OF TELEPHONE ROAD AND THE SOUTH LOOP (610). THIS AREA OF HOUSTON
WAS OBSERVED TO BE ETHICALLY MIXED HOWEVER THIS PARTICULAR COMPLEX WAS
OBSERVED TO BE PREDOMINANTLY HISPANIC AND OF A LOW SOCIO-ECONOMIC STATURE.

OUTSIDE COMPLEX
---------------

THE PARTICULAR COMPLEX (██████████) WAS OBSERVED TO BE ONLY A THREE
BUILDING COMPLEX WITH A LONG NORTH/SOUTH CARPORT ON THE EAST SIDE, ALL
FORMING A "U" CONFIGERATION. THE CENTER OF THE COMPLEX, BETWEEN THE BUILDING
CONTAINING UNITS 1-14 WAS COMPRISED MOSTLY OF CONCRETE SLABING WITH A LARGE
OVAL CONCRETE SLAB IN THE CENTER. TOWARD THE NORTH SIDE WERE SOME GRASSY AREAS
AND THERE WERE 4 LARGE PALM TREES LOCATED IN THE NORTH/SOUTH SECTION.

THE RESIDENTIAL BUILDING TO THE WEST CONTAINED UNITS 1-14 WITH ALL ODD NUMBERS
ON THE LOWER LEVEL AND ALL EVEN NUMBERS ON THE TOP. UNITS ONE AND TWO WERE
LOCATED ON THE SOUTH END OF THE BUILDING.

THE LONG EAST/WEST BUILDING AT THE TOP OF THE "U" CONTAINED UNITS 15-26. ALL
ODD NUMBERS WERE LOCATED ON THE BOTTOM AND ALL EVEN NUMBERED UNITS ON THE TOP.
NUMBERS 15-16 WERE ON THE WEST END. THIS BUILDING WAS VACANT AND FRESH EXTERIOR
WOOD MADE IT APPEAR AS IF THE UNITS WERE BEING RENAVATED. THIS WAS ALSO TRUE OF
THE BUILDING ON THE EAST SIDE (JUST NORTH OF THE CARPORT). THIS SMALL BUILDING
CONTAINED ONLY FOUR UNITS WITH NUMBERS 27 & 29 ON THE DOWNSTAIRS AND UNITS 28
& 30 ON TOP.

FROM THE SOUTH OF THIS BUILDING TO THE STREET WAS THE AFOREMENTIONED CARPORT.
THE CARPORT ALLOWED VEHICLES TO PULL IN AT A NORTHWESTERLY DIRECTION. THE
PLATE NUMBERS NOTED UNDER THIS CARPORT WERE RECORDED FROM THE NORTH TO THE
SOUTH AS FOLLOWS;

███1MW
██PL
██QS
█7342
█3712 OREGON
█QHF
█308       EXHIBIT 95 Page 001

0001841

LLV
RF

CLOCKWISE THERE WERE NINE ADDITIONAL VEHICLES THAT PULLED IN DIRECTLY
ON THE SOUTH SIDE OF THE BUILDING, AROUND AND DOWN THE EAST SIDE OF THE
DRIVEWAY. THESE VEHICLES WERE OBSERVED FROM NORTH TO SOUTH AS FOLLOWS;

JY714SFN
8GP

3HL
ZQY
5YM
2375
31W

OUTSIDE WEATHER AND LIGHTING
----------------------------
   THE WEATHER OUTSIDE WAS CLEAR AND CONFORTABLE WITH TEMPERATURES IN THE LOW
60'S. THE WINDS WERE LIGHT AT 5-10 MPH. THERE WAS MAYBE A 1/8TH MOON.

SCENE LIGHTING ON THE OUTSIDE OF THIS COMPLEX AND WITHIN THE COURTYARD WAS
VERY GOOD AS THERE WERE A TOTAL OF FOUR MERCURY VAPOR SECURITY LIGHTS (ALL
WORKING) AROUND THE COURTYARD AREA. IN ADDITION TO THIS LIGHTING THERE WAS
A MERCURY VAPOR STREET LIGHT JUST TO THE EAST OF THE ENTRENCE DRIVEWAY TO THE
EAST PARKING AREA AND SEVERAL RESIDENTIAL 110 V. PORCH LIGHTS THAT WERE ON.

AREA IN FRONT OF COMPS APT. #3
------------------------------

THE COMPS APARTMENT WAS LOCATED ON THE LOWER LEVEL OF THE WEST BUILDING. THE
FRONT DOOR FACED THE EAST AND FACED THE COURTYARD. JUST TO THE SOUTHEAST OF THE
FRONT DOOR WAS A BROWN PICNIC TABLE. A SMALL GRILL WAS TO THE WEST OF THE TABLE
(THE GRILL WAS COLD). A CASE OF EMPTY COKE BOTTLES/MOP/1/2 OF A BROOM AND A
PAINT CAN WERE ON THE GROUND JUST TO THE WEST OF THE GRILL.

A BLUE BOYS BICYCLE WAS LAYING ON THE GROUND NEXT TO A BLACK SUPPORT POST
TO THE EAST OF THE DOORWAY. THIS BIKE HAD A LARGE CHAIN AROUND THE UPPER SUPPORT
WITH A LOCK, HOWEVER, THE CHAIN DID NOT GO AROUND THE POST AND WAS NOT SECURED.
 THERE WAS A GRAY CHAIR TO THE NORTHWEST OF THE DOORWAY AND TWO BENCH SEATS
TO THE NORTH OF THE CHAIR. THERE WAS A 110V. BULB PORCH LIGHT ON THE NORTH SIDE
OF THE DOOR BUT THE LIGHT WAS NOT ON.

THERE WERE TWO WINDOWS THAT FACED THE COURTYARD. THE WINDOW TO THE NORTH OF THE
FRONT DOOR WAS A LARGE LIVING ROOM PICTURE WINDOW. THE CURTAINS WERE CLOSED AND
CLOSEPINED TOGETHER ON THE INSIDE. THE INSIDE OF THE CURTAIN WAS PURPLE AND THE
OUTSIDE WAS WHITE. ALL OF THIS MADE IT IMPOSSIBLE TO SEE INTO THE UNIT FROM THIS
WINDOW. THE SECOND WINDOW WAS LOCATED JUST TO THE SOUTH OF THE FRONT DOOR AND
WAS MUCH SMALLER. THIS WINDOW WAS THE KITCHEN WINDOW AND WAS COVERED WITH A
WHITE CURTAIN. IT WAS ALSO IMPOSSIBLE TO VIEW INTO THE UNIT FROM THIS WINDOW.

THE FRONT DOOR TO THIS UNIT WAS BLUE ON THE OUTSIDE AND WAS A METAL FRAMED
EXTERIOR DOOR. THE NUMBER 3 WAS NOTED ON THE CENTER OF THE DOOR WITH A PEEP
HOLE JUST BELOW THE 3. THERE WAS A DEAD BOLT APPROXIMATELY 3" ABOVE THE KNOB.

EXHIBIT 95 Page 002                                                    0001842

THIS DEAD BOLT ALLOWED ACCESS WITH A KEY ON THE OUTSIDE AND A TWIST TYPE LOCK
ON THE INSIDE. THE DOOR KNOB ALLOWED ACCESS WITH A KEY ON THE OUTSIDE AND ALSO
A TWIST KNOB ON THE INSIDE.

THE DOOR FRAME WAS WHITE PAINTED WOOD. LAYING ON THE GROUND JUST TO THE
OUTSIDE OF THE DOORWAY WAS THE FRAMING COVER PLATE FOR THE DEAD BOLT BAR. THIS
WAS LAYING NEXT TO A PIECE OF WHITE NAPKIN SAID TO BE THE COMPS. THE DOOR FRAME
AT THE DEAD BOLT HEIGHT WAS CRACKED AND BROKEN BUT NOT SEPARATED FROM THE FROM
THE FRAME.

INSIDE COMPS UNIT #3
--------------------

THE FRONT DOOR WAS HINGED ON THE SOUTH SIDE AND ALLOWED ACCESS INTO THE SMALL
SECTION BETWEEN THE LIVING ROOM AND THE KITCHEN. THE LIVING ROOM WAS LOCATED
ON THE NORTHEAST CORNER OF THE UNIT. IN THE NORTHEAST CORNER OF THE ROOM WAS
A BRASS COLORED HAT RACK. HANGING ON THE RACK WERE MANY HATS INCLUDING A
BINOCULAR CASE. JUST TO THE WEST OF THIS HAT RACK WAS A SMALL STAND WITH A
WORKING VCR ON IT. TO THE WEST OF THE VCR WAS A FLOOR MODEL TV SET.

THERE WERE SEVERAL NICK NACKS ON THE TOP OF THE TV SET BUT OF INTEREST TO THIS
INVESTIGATION WAS A CIGAR THAT WAS ONLY PARTIALLY SMOKED. THE COMP STATED THAT
THIS CIGAR BELONGED TO ONE OF THE SUSPECTS.

TO THE WEST OF THE TV SET WERE MORE NICK NACKS AND A BOYS BLUE BACK PACK WAS
LEANING UP AGAINST THE WEST SIDE OF THE TV SET. TO THE WEST OF THIS AREA WAS
A UPRIGHT VACUUM CLEANER WITH A BLACK LEATHER JACKET HANGING FROM IT. IN THE
NORTHWEST CORNER OF THE ROOM WAS A TALL WICKER BOOKSHELF.

A COUCH PARTITIONED THE LIVING ROOM FROM THE WALKWAY PRIOR TO COMING TO THE
KITCHEN AREA AND A MATCHING STUFFED CHAIR WAS LOCATED IN THE SOUTHWEST CORNER
OF THE LIVING ROOM. THE LIVING ROOM FLOOR WAS DONE IN A TAN WALL TO WALL CARPET.
THIS WALL TO WALL CARPET EXTENDED THROUGHOUT THE HOUSE WITH THE EXCEPTION OF
A SECTION OF LINOLEUM IN THE KITCHEN.

THE SOUTHWEST CORNER OF THIS LARGE CENTRAL AREA WAS THE DINING ROOM. IN THE
DINING ROOM WAS A LARGE OVAL, BLACK GLASS TOPED TABLE WITH THREE CHAIRS
AROUND IT. ON THE TOP OF THE TABLE WAS A BLACK WOMANS PURSE (SAID TO HAVE BEEN
PUT THERE AFTER THE SUSPECTS LEFT). SEVERAL OTHER ITEMS AND A LSG
COMMUNICATIONS PAGER. THE NUMBER TO LSG WAS NOTED AS 713-674-8615 AND THE
PAGER SERIAL NUMBER WAS NOTED AS 555471. THERE WAS HOWEVER NO PHONE NUMBER
FOR THE PAGER NOTED ON IT.

IN THE SOUTHEAST CORNER OF THE ROOM WAS THE KITCHEN AREA. ALONG THE SOUTH WALL
WAS A COUNTER AREA WITH A DOUBLE SINK INCLOSED. ALONG THE EAST WALL WAS A STOVE
AND THEN A REFRIGERATOR TO THE NORTH (JUST SOUTH OF THE FRONT DOOR). SITING ON
THE FLOOR JUST WEST OF THE STOVE WAS THE 4TH KITCHEN CHAIR.

NORTHWEST BEDROOM
--- -------------

IN THE CENTER OF THE WEST WALL OF THE LIVING ROOM/DINING ROOM, WAS A DOORWAY
THAT LED TO THE ONLY BEDROOM IN THIS UNIT. THE DOOR TO THIS BEDROOM WAS HINGED
ON THE WEST SIDE AND SAID TO BE OPEN AT THE TIME OF THE ATTACK. LAYING

Exhibit 05 Page 003

0001843

DOORWAY WERE A PILE OF ASSORTED CLOTHING (AS IF THEY HAD BEEN DUMPED FROM A
DRAWER).

JU.  INSIDE THE DOORWAY TO THE EAST WAS A QUEEN SIZED (OR SO) BED THAT WAS
IN A CADDI CORNER POSITION WITH THE HEAD TOWARD THE NORTHEAST CORNER OF THE
ROOM. AT THE NORTHEAST CORNER OF THE BED WAS A PILLOW WITH NO PILLOW CASE ON
IT AND A ROUND POOL OF BLOOD ON THE PILLOW.

ALSO ON THE TOP OF THIS BED WERE TWO DRAWERS FROM THE SOUTH WALL DRESSER AND
ONE DRAWER FROM THE WEST WALL DRESSER, A CHILDS RED SHIRT WITH A KNOT TIED IN
IT, OTHER ASSORTED CLOTHING, A GOLD CONFORTER, TWO PILLOWS NEAR THE SOUTHWEST
CORNER AND A BROWN FITTED SHEET THAT HAD COME OUT FROM SEVERAL OF THE CORNERS.

ON THE FLOOR ON THE WEST SIDE OF THE BED WERE NOTHING BUT A FLOOR OF CLOTHING.
ON TOP OF THIS CLOTHING WERE SEVERAL SMALL POOLS OF BLOOD AND A CLOCK RADIO
WITH THE CORD TIED IN A LOOSE KNOT.

THERE WAS A DRESSER IN THE NORTHWEST CORNER OF THE ROOM. ALL OF THE DRAWERE WERE
IN PLACE BUT SOME WERE PULLED OUTWARD. IN THE TOP DRAWER OF THIS DRESSER WAS A
RAVEN .25 SEMI-AUTOMATIC PISTOL, MODEL MP 25 BEARING SERAIL NUMBER 1838778. THIS
WEAPON WAS SAID TO HAVE BEEN PICKED UP BY ONE OF THE SUSPECTS AND THEN PUT BACK
INTO THE DRAWER.

LEANING AGAINST THIS DRESSER WAS A LARGE MIRROR. AGAINST THE WEST WALL WAS A
SMALLER DRESSER WITH SEVERAL DRAWERE PULLED ALL THE WAY OUT. A LARGER DRESSER
WAS LOCATED AGAINST THE SOUTH WALL. THIS DRESSER HAD A TV SET ON TOP OF IT
THA THE COMP STATED TO THIS OFFICER PROVIDED THE ONLY LIGHTING FOR THIS
SC. E AT THE TIME OF THE ATTACK.

TO THE SOUTHWEST CORNER OF THE ROOM WAS A BUILD SHELF WITH HANGING CLOTHES UNDER
THE SHELF. ON THE TOP OF THE SHELF WERE MANY CANDLES SOME OF WHICH WERE LIT.
ALSO LAYING ON THE FLOOR AROUND THE ROOM WERE SEVERAL SUITCASES.

IN THE CENTER OF THE SOUTH WALL WAS THE DOORWAY TO THE BATHROOM. THE WEST WALL
OF THIS BATHROOM AREA WAS BUILT-IN HANGING CLOTHES TYPE AREA WITH A RED CURTAIN
COVERING MOST OF THE CLOTHING. IN THE VERY NORTHEAST CORNER OF THIS SMALL AREA
WAS A METAL SECURITY BOX WITH SEVERAL ITEMS LAYING ON TOP OF IT. THIS SAFE TYPE
BOX WAS UNLOCKED AND EMPTY.

OFFICERS NOTE
-------------

WHILE INTERVIEWING THE COMP., (DIANA GARCIA), SHE STATED THAT THE SEXUAL
ASSAULT OCCURED ON THE TAN FITTED SHEET ON THE BED AND THAT HER HANDS WERE TIED
WITH THE RED CHILDS SHIRT. SHE SAID THAT HER HUSBANDS HAND WERE TIED WITH THE
CLOCK RADIO CORD. SHE WENT ON TO SAY THAT THE CIGAR IN THE LIVING ROOM WAS
NOT THEIRS AND MUST BELONG TO THE SUSPECT. THIS CIGAR WAS NOTED TO HAVE NOT
BURNED THE TV CABINET ALTHOUGH THE LIT PORTION WAS ON THE WOOD. IT WAS THEREFORE
BELIEVED THAT THE CIGAR WAS OUT WHEN IT WAS PLACED THERE.
MS. GARCIA ALSO TOLD ME THAT ONE OF THE SUSPECT PICKED UP THE GUN FROM THE
TO  DRAWER OF THE DRESSER AND PUT IT BACK DOWN. THIS WEAPON WAS NOTED AS HAVING
FI.  LIVE .25 BULLETS IN THE CLIP BUT NONE IN THE CHAMBER.

*****CSU OFFICERS INVESTIGATION*****

EXHIBIT 95 Page 004
AFTER MAKING THE AFOREMENTIONED SCENE OBSERVATIONS, OFFICER NORRIS EXPO 0601844

ROLL OF COLOR 35MM FILM OF THE SCENE WITH THE USE OF A SUNPAK FLASH. FIELD NOTES
WERE THEN RECORDED AND EVIDENCE WAS RECOVERED AS STATED IN THE DISPOSITION OF
EVIDENCE SECTION OF THIS SUPPLEMENT. OFFICER NORRIS THEN PRINTED AREAS OF THE
APARTMENT WHERE THE SUSPECT MIGHT HAVE GONE, HOWEVER, DUE TO THE NATURE OF THE
WOOD AND FURNITURE NO LATENT PRINTS WERE FOUND. OFFICER NORRIS CLEARED THIS
SCENE AT APPROXIMATELY 0300 HOURS.


                    *****DISPOSITION OF EVIDENCE*****

#01  ONE ROLL OF COLOR 35MM FILM WAS EXPOSED BY OFFICER NORRIS OF THIS SCENE
     WITH THE USE OF A SUNPAK FLASH. THIS FILM REMAINED IN THE CARE, CUSTODY
     AND CONTROL OF OFFICER NORRIS UNTIL HE DEPOSITED IT INTO THE PHOTO LAB
     LOCK BOX ON THE 4TH FLOOR ID SECTION.

#02  THE FOLLOWING ITEMS OF EVIDENCE WERE RECOVERED BY OFFICER NORRIS AND TAGGED
     UNDER THIS CASE NUMBER INTO THE HPD PROPERTY ROOM.

     ONE TAN SHEET
     ONE CHILDS RED XL T-SHIRT WITH "TRUCKIN" LOGO ON FRONT (STILL IN TIED KNOT)
     ONE PARTIALLY SMOKED CIGAR

     OFFICER NORRIS MAINTAINED CARE, CUSTODY AND CONTROL OF ALL OF THIS
     EVIDENCE UNTIL HE TAGGED THEM INTO THE PROPERTY ROOM.

#03  THE FOLLOWING ITEMS OF EVIDENCE WERE TAGGED BY OFFICER NORRIS IN THE LATENT
     PRINT LAB;

     ONE RAVEN .25, MODEL MP 25, SERIAL NUMBER 1838778 (CLIP WAS REMOVED AND NOT
     TAGGED).
     ONE "SPARTUS" ALARM CLOCK WITH BLACK CORD TIED IN A LOOSE KNOT.

     THIS EVIDENCE REMAINED IN THE CARE, CUSTODY AND CONTROL OF OFFICER NORRIS
     UNTIL HE TAGGED THEM INTO THE LATENT PRINT LAB.


NO OTHER EVIDENCE WAS RECOVERED BY THIS INVESTIGATOR.

***************************************************************************
          END OF CRIME SCENE INVESTIGATORS SUPPLEMENT
***************************************************************************


INVESTIGATION TO CONTINUE.........................


Supplement entered by = 81421
Report reviewed by-A. ROQUEMORE          Employee number-████
Date cleared- 09/08/08

     EXHIBIT 95 Page 005                                    0001845

13847940101C / Court: 337

# EXHIBIT 96

0001846

SUPPLEMENT NARRATIVE

OFF BREDEMEYR ON UNIT 13D15N CHECKED BY AT ████████ ON THE KIDNAPPING
CALL.  OFF TRANSPRTED THE COMPLAINANT, DIANA GARCIA, TO ST JOSEPHS HOSPITAL
TO HAVE A SEXUAL ASSAULT EVIDENCE COLLECTION KIT COMPLETED.  OFF TOOK CUSTODY OF
THE KIT, AFTER IT WAS COIMPLETED, FROM NURSE GLORIA KOLOGINCZOK AT APPROX 0425
HRS.  OFF TRANSPORTED THE COMPLAINANT TO THE HOIMICIDE DIVISION AND THEN TAGGED
THE KIT IN THE PROPERTY ROOM UNDER THE LISTED CASE NUMBER.


Supplement entered by = 85206
Report reviewed by-A. ROQUEMORE        Employee number-████████
Date cleared- 09/08/08

------------------------------------------------------------------------

No-0002

Offense- BURGLARY OF RES./AGG. SEXUAL ASSAULT/AGG. ASSAULT/AGG. KIDNA
                      Street location information
Number-   ████  Name-████                  Type-        Suffix-
Apt no-██    Name-██████████         Type-BLVD  Suffix-
Date of offense-09/30/92              Date of supplement-10/01/92
Compl(s) Last-GARCIA        First-DIANA    Middle-R
                   Recovered stolen vehicles information
Recovery location-                          District-  Beat-   00
Secured-                      by-
Officer1-C.E.ELLIOTT          Emp#-████  Shift-3 Div/Station-HOMICIDE

SUPPLEMENT NARRATIVE


I#105758592-X


++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
                          INTRODUCTION
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

    I, SGT. C.E.ELLIOTT, OF THE HOMICIDE DIVISION RECEIVED A ASSIGNMENT FROM
LT. DENNIS GAFFORD TO MAKE THE "KIDNAPPING" AT ████████ ████████.
I RECEIVED THE ASSIGNMENT AT 0035HRS ON 10/1/92. I LEFT THE OFFICE AND
PROCEEDED DIRECTLY TO THE SCENE. LT. GAFFORD ACCOMPANIED ME. WE ARRIVED AT
THE SCENE AT 0050HRS.

    THE PRIMARY UNIT ON THE SCENE, 13D13N, OFF. DEVEREAUX WAS MAKING THE
ORIGINAL REPORT OF THIS INCIDENT AND WAS STILL AT THE SCENE. ALSO AT THE
SCENE WAS C.S.U. OFFICER JIM NORRIS. OFF. V.M. GARCIA, EMP.#████, RIDING
PATROL UNIT 13D83B CHECKED BY THE SCENE AND INTERPRETED FOR ME.

    UPON ARRIVING AT THE SCENE A PRELIMINARY INVESTIGATION REVEALED THAT THE

EXHIBIT 96 Page 001                                        0001847

Incident no. 105758592 X   CURRENT INFORMATION REPORT              PAGE 2.008

COMPLS. (#1-DIANA GARCIA--MOTHER, #2-ARTURO RODRIGUEZ--BOYFRIEND,  & #3-█
███████.--H/M, █YOA, CHILD) WERE INSIDE THEIR APARTMENT, ASLEEP,
WHEN THEIR FRONT DOOR WAS KICKED OPEN BY 2 BLACK MALES WHO WERE WEARING SKI
MASKS. THE SUSPECTS ENTERED THE APARTMENT AT GUNPOINT AND BOTH THE MOTHER AND
THE BOYFRIEND WERE TIED UP. THE MOTHER WAS SEXUALLY ASSAULTED AND THE
BOYFRIEND WAS STRUCK ON THE HEAD. AFTER THE SUSPECTS LEFT, THE MOTHER WAS
ABLE TO UNTIE HERSELF AND THE CHILD WAS DISCOVERED MISSING. THEIR WERE NO
DEMANDS/RANSOM REQUESTS MADE FOR THE RETURN OF THE CHILD.


++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
                              SCENE SUMMARY
++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++


LOCATION OF OFFENSE; ██████████████████████████

PATROL BEAT;    13D10

KEYMAP PAGE;    534-M


===================DESCRIPTION OF SCENE====================================

    THE LOCATION OF THIS OFFENSE IS IN SOUTHEAST HOUSTON, SOUTHWEST OF THE
INTERSECTION OF THE SOUTH LOOP EAST @ TELEPHONE. THE ███████████████   IS
A EAST/WEST STREET THAT RUNS BETWEEN TELEPHONE AND BROAD.
    THE SOUTH SIDE OF THE ████████████████████   IS BARNETT STADIUM. THE NORTH
SIDE OF THE STREET IS SINGLE FAMILY RESIDENCES AND SMALL APARTMENT COMPLEXES.

    ███████ IS A SMALL 2 STORY BRICK AND WOOD APARTMENT COMPLEX ON THE
NORTH SIDE OF ████████ IN THE MIDDLE OF THE BLOCK. THE MAIN AXIS OF THE
APARTMENTS RUN NORTH TO SOUTH WITH THE PARKING LOT FOR THE COMPLEX ON THE
EAST SIDE OF THE PROPERTY. THE APARTMENT DOORS FACE THE PARKING LOT (EAST).


    ████████████████ IS A DOWNSTAIRS APARTMENT. THE FRONT DOOR FACES EAST. THE
APARTMENT IS THE SECOND DOWNSTAIRS APARTMENT FROM THE SOUTH END (STREET END)
OF THE COMPLEX. THE APARTMENT DOOR HAS THE NUMBER "3" ON THE DOOR.
    THE APARMENT IS A ONE BEDROOM APARTMENT. ENTERING THE FRONT DOOR YOU STEP
INTO A LARGE ROOM THAT ON THE RIGHT (NORTH) SIDE IS THE LIVING AREA. THE LEFT
(SOUTH) SIDE OF THE ROOM IS THE KITCHEN AREA. ON THE WEST WALL  IS A DOORWAY
THAT ENTERS INTO THE BEDROOM. A DOOR ON THE LEFT (SOUTH) WALL OF THE BEDROOM
ENTERS INTO A BATHROOM/CLOSET COMBINATION.


    THE FRONT DOOR TO THE APARTMENT APPEARED TO OF BEEN FORCED OPEN. THE DOOR
JAM WAS BROKEN OUT AND WOOD AND SCREWS WERE LAYING ON THE FLOOR. THE LIVING
AREA APPEARED TO BE UNDISTURBED. A COLOR CONSOLE T.V. AND V.C.R. WERE AGAINST
THE NORTH WALL. A HATTREE IN THE NORTHEAST CORNER OF THE LIVING ROOM
CONTAINED NUMEROUS HATS AND A BINOCULARS AND CASE. A DINING TABLE WAS IN THE

EXHIBIT 96 Page 002
0001848

ROOM ALONG WITH A COUCH. THE ROOM DID NOT APPEAR TO BE RANSACKED.

THE KITCHEN HAD THE USUAL DIRTY DISHES, BUT THEIR WAS NOT ANY SIGN OF ANY
TY. OF RANSACKING OR SEARCHING OF THAT AREA.

THE DOOR TO THE BEDROOM WAS OPEN AND THE ROOM APPEARED TO BE RANSACKED.
THEIR WERE TWO DRESSERS IN THE ROOM AND BOTH HAD THEIR DRAWERS PULLED OUT AND
DUMPED ON THE FLOOR. THE BED WAS PULLED OUT FROM THE WALL AND THE MATTRESS
WAS PARTIALLY OFF OF ITS FRAME.

THE BATHROOM/CLOSET AREA HAD CLOTHES AND OTHER ITEMS LAYING ON THE FLOOR
BUT IT WAS UNABLE TO BE DETERMINED IF THE DISARRAY WAS CAUSED BY THE SUSPECTS
OR WAS THE USUAL BATHROOM CLUTTER.


=============================REAL EVIDENCE=============================

C.S.U. OFFICER JIM NORRIS MADE THE SCENE AND TOOK PHOTOS, LIFTED PRINTS,
AND COLLECTED PHYSICAL EVIDENCE...SEE HIS SUPPLEMENT FOR ADDITIONAL DETAILS.

THE #1 COMPL (DIANA GARCIA) WAS SEXUALLY ASSAULTED BY ONE OF THE SUSPECTS.
SHE WAS TRANSPORTED TO ST. JOSEPH HOSPITAL BY OFF. W.T. BREDEMEYER,
EMP#_____, FOR A RAPE KIT....SEE SUPPL. #1.

A CONSENT TO SEARCH FORM SIGNED FOR _____, SIGNED BY BOTH DIANA
GARCIA AND ARTURO RODRIGUEZ....TAGGED IN HOMICIDE FILE.

== ===========IDENTIFICATION OF #3 COMPL./ DRESS OF #3 COMPL.=============
=============================KIDNAP VICTIM============================

#3 COMPL; _____--H/M, _YOA, DOB---_____
                                        PH#_____

PHYSICAL DESCRIPTION: 3'6", 35LBS, BLACK HAIR, SKYBLUE EYES, BIRTHMARK ON
                      LEFT CHIN, DIAMOND SHAPED SCAR ON BACK OF HEAD (WITH
                      SHORTER HAIR).
LAST SEEN WEARING; BATMAN SHORTS, WHITE T-SHIRT WITH COLORED DESIGN ON FRONT.

                ADDITIONAL INFORMATION ABOUT THE MISSING CHILD
ATTENDS _____ ELEMENTARY SCHOOL, 1ST GRADE.
SPEAKS BOTH ENGLISH & SPANISH AND HE KNOWS HIS ADDRESS, PHONE NUMBER AND HOW
TO USE PHONE.
FATHER---ANGELO GARCIA SR...LIVES AT _____ I.P.S.
PH#_____ OR _____.
SISTER & BROTHER--ROSALINDA ADAMA--H/F, 21YOA & JAMES GARCIA--H/M 18YOA,
PH#_____.
     DIANA GARCIA TOLD THIS SGT. THAT SHE IS STILL LEGALLY MARRIED TO ANGELO
SR., BUT THAT SHE LEFT HIM 2YRS AGO AND HAS BEEN LIVING WITH ARTURO RODRIGUEZ
SINCE THEN. DIANA STATED THAT ANGELO SR. SEES/KEEPS _____ REGULARLY (AS
RECENTLY AS THIS PAST WEEK-END) AND THAT HE WOULD HAVE NO REASON TO TAKE
_____ BY FORCE.

THE ABOVE INFORMATION WAS OBTAINED FROM THE MOTHER...DIANA GARCIA
(COMPL.#1).
=============================IDENTIFICATION OF #1 & #2 COMPL============

EXHIBIT 96 Page 003                                              0001849

Incident no. 105758592 X   CURRENT INFORMATION REPORT          PAGE 2.010

COMPL.#1; GARCIA, DIANA R.--H/F, 39YOA,   DOB--███████
          HPD#210560
████  ███████   ███          PH███           DOES NOT WORK.
HAS OLD LOCAL HISTORY...NO OUTSTANDING WANTS/WARRANTS.


COMPL.#2; RODRIGUEZ, ARTURO--H/M, 37YOA,   DOB--███████
          HPD#403348
       ████████   ███████   PH████           UNEMPLOYEED.
HAS OLD LOCAL HISTORY...NO OUTSTANDING WANTS/WARRANTS.


COMPLS. VEHICLES:::::::::::::::::
(REGISTRATION DOWN)

CHEV. P.U.  LIC#12-92 TX  ████-308
BLK, STEPSIDE,NEW, HAD BRA ON FRONT, TINTED WINDOWS, CHAINED TO CARPORT.
COVERED WITH DUST....HAS NOT BEEN DRIVEN IN A WHILE.
 OLDS, 2DR,   TX LIC#██-QHF
MAROON, OLDER MODEL


================WOUNDS/APPARENT WOUNDS TO COMPLS========================

   DIANA GARCIA WAS SEXUALLY ASSAULTED.

   ARTURO RODRIGUEZ HAD BEEN STRUCK ON THE HEAD AND HE HAD LACERATIONS/KNOTS
ON HIS SKULL.

   ARTURO AND DIANA WERE CHECKED AT THE SCENE BY H.F.D. AMBULANCE #23.

===============DISORDER/LACK OF DISORDER @ SCENE/SIGNS OF STRUGGLE===========

    THE LIVING AREA AND KITCHEN DID NOT APPEAR TO BE DISTURBED. THE BEDROOM
WAS RANSACKED. THE BATHROOM/CLOSET AREA WAS IN DISARRAY BUT IT COULD NOT BE
DETERMINED IF THIS WAS A RESULT OF THIS INCIDENT OR JUST NORMAL CLUTTER.

    ALTHOUGH DIANA AND AUTURO SAID THAT THE SUSPECTS BROKE INTO THE APARTMENT
TO ROB THEM. BOTH WERE WEARING GOLD NECKLACES (AUTURO-ROPE CHAIN, NUGGET
CROSS, DIANA--2 SMALL NECKLACES WITH CROSS AND MEDALLION) AND A V.C.R., CABLE
BOX, 2 T.V.'S, SEWING MACHINE, BINOCULARS, AND OTHER SMALL ITEMS WERE
UNDISTURBED.


=========================ENTRY/EXIT=================================

   ENTRY & EXIT WAS THROUGH THE FRONT (ONLY) DOOR. THE DOOR JAM WAS
SHATTERED. THE DOOR AND LOCK WERE INTACT.

EXHIBIT 96 Page 004                                    0001850

++/+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
                           DETAILS OF OFFENSE
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

   DIANA GARCIA AND HER SON, ██████████████ LIVE WITH ARTURO RODRIGUEZ AT ██████
████████ ALL 3 HAVE LIVED IN THE APARTMENT FOR APPROXIMATELY 5 MONTHS.
NEITHER DIANA, NOR ARTURO ARE EMPLOYED.
   DIANA & ARTURO ARE IN BED IN THE BEDROOM AND ████████ IS SLEEPING ON A
PALLET NEXT TO THE BED. AT APPROXIMATELY 11;45PM ALL 3 ARE AWAKENED BY THE
FRONT DOOR BEING KICKED OPEN. ARTURO GETS OUT OF BED AND WALKS INTO THE
LIVING ROOM WHERE HE IS CONFRONTED BY 2 B/M SUSPECTS WEARING SKI MASKS AND
CARRYING PISTOLS. ARTURO IS FORCED BACK INTO THE BEDROOM WHERE HE IS TIED UP
USING A ALARM CLOCK CORD. ARTURO IS GAGGED AND HAS A T-SHIRT PUT OVER HIS
HEAD. ARTURO IS THEN PUT ON THE FLOOR, FACE DOWN AND A SUSPECT BEGINS TO
STRIKE HIM IN THE HEAD.
   WHILE THIS IS GOING ON DIANA IS FORCED TO LAY FACE DOWN ON THE BED AND
SHE HAS HER HANDS TIED BEHIND HER BACK BY A ELECTRICAL CORD. DIANA SAID A
SUSPECT THEN FELT OF HER BUTTOCKS. DIANA SAID THAT HER HANDS WERE THEN UNTIED
AND SHE WAS FORCED TO ROLL OVER AND A PILLO WAS PUT OVER HER FACE. DIANA SAID
HER HANDS WERE TIED IN FRONT OF HER AND SHE PLACED THEM ACROSS HER CHEST AS
HER PANTIES WERE REMOVED AND A SUSPECT SEXUALLY ASSAULTED HER BY INSERTING
HIS PENIS INTO HER VAGINA. DIANA SAID THE SUSPECT DID EJACULATE. DIANA SAID
THAT WHILE THIS WAS GOING ON THE SUSPECT NEVER SPOKE.
   DIANA STATED THAT WHILE SHE WAS BEING RAPED AND ARTURO BEAT, SHE COULD
HEA ██████ SCREAMING "MOMMY" AND ALL SHE COULD DO WAS TRY TO COMFORT HIM.
   DIANA TOLD THIS SGT. AFTER THE RAPE, THE SUSPECTS LEFT AND SHE WAS ABLE
TO UNTIE HERSELF. DIANA THEN UNTIED ARTURO AND THEY STARTED OUT OF THE
BEDROOM BUT THEY SAW A SUSPECT STILL IN THE APARTMENT. A MOMENT LATER THEY
HEARD A DOOR CLOSE AND THEY WENT OUT AND DISCOVERED/REALIZED THAT ██████ WAS
MISSING.
   THE ONLY PROPERTY, OTHER THAN THE CHILD, MISSING FROM THE APARTMENT WAS A
WALLET (APPROX. $60.00 CASH & A  GOLD BRACELET--$4,000.00).
   THE POLICE WERE THEN CALLED.


+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
                      INTERVIEW OF COMPL./WITNESSES
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

COMPL.#1; DIANA GARCIA---H/F, 39YOA,   DOB--████████

**********SEE WRITTEN STATEMENT TAKEN BY CHICANO SQUAD OFF. U.P. HERNANDEZ
FOR ADDITIONAL DETAILS**********

   DIANA SPEAK FLUENT ENGLISH.

   DIANA TOLD THIS SGT. THAT THE SUSPECTS KICKED THE DOOR IN, RAPED HER, BEAT
ARTURO UP AND TOOK HER SON, ██████████████. DIANA COULD OFFER NO EXPLANATION
AS TO WHY ANYONE WOULD DO THIS TO THEM. DIANA DENIED ANY DRUG INVOLVEMENT OR
DE  AT FIRST. LATER DIANA ADMITTED TO THIS SGT. THAT ARTURO MIGHT USE
POWDERED COCAINE, BUT THAT SHE NEVER HAD.
          ========================================================

EXHIBIT 98 Page 005
COMPL.#2; ARTURO RODRIGUEZ--H/M, 36YOA,   DOB--████████                0001851

***************SEE WRITTEN STATEMENT TAKEN BY CHICANO SQUAD OFF. U.P.
HERNANDEZ FOR ADDITIONAL DETAILS**********

   AUTURO DOES NOT SPEAK ENGLISH.

   AUTURO WAS INTERVIEWED AT THE SCENE BY OFF. V.M. GARCIA, EMP.#█████
RIDING UNIT #13D83B.

   AUTURO STATED THAT HE WAS IN BED ASLEEP WHEN 2 SUSPECTS KICKED IN THE
FRONT DOOR, TIED HIM UP AND BEAT HIM AND RAPED DIANA. AUTURO COULD NOT OFFER
ANY EXPLANATION AS TO WHY ANYONE WOULD DO THIS AND HE DENIED ANY DRUG
INVOLVEMENT AT FIRST BUT THEN CLAIMED THAT HE HAD DONE SOCIAL COCAINE BUT
THAT THAT HAD NOTHING TO DO WITH THIS INCIDENT.


==================ORAL INTERVIEW AT SCENE OF WITNESSES====================

CESAR M. RIOS--H/M, 2OYOA,    DOB--█████████
███████████
CLOTHING; 5'8", STOCKY, LONG HAIR, GREEN & WHITE STRIPED SHIRT, SHORTS,
BALLCAP.
   RIOS WALKED UP TO THE SCENE WHILE THIS INVESTIGATION WAS BEING CONDUCTED.
RIOS SAID THAT HE WAS A FRIEND OF ARTURO AND DIANA. RIOS ADMITTED TO BEING A
EX-CON (OUT OF PRISON 2 WEEKS FOR AUTOTHEFT).
   UPON QUESTIONING HIM ABOUT ANY INFORMATION ABOUT THIS CASE, RIOS CLAIMED
NOT TO KNOW ANYTHING. WHEN ASKED IF TIHS COULD BE POSSIBLY DRUG RELATED,
RIOS ASSURED THIS SGT. THAT IT DID NOT.

                =================================

LEONORA RUIZ--H/F, 19YOA, DOB--█████████
████████, HOUSTON TX PH█████████
WORK; PURPLE HEART  PH#921-8200

   LEONORA AND HER HUSBAND LIVE NEXT DOOR TO COMPLS. LEONORA CLAIMED TO HAVE
NO KNOWLEDGE AS TO WHY ANYONE WOULD BREAK IN , ROB THE COMPLS., AND TAKE
THEIR CHILD.
   LEONORA SAID THAT SHE HAS NEVER SEEN ANY UNUSUAL TRAFFIC IN AND OUT OF THE
APARTMENT AND WHEN ASKED ABOUT ANY POSSIBLE DRUG CONNECTION LEONORA REFUSED
TO ANSWER ONE WAY OR OTHER.

                =================================

SANDRA CASTILLO--H/F, 23YOA,    DOB--████████
█████████  ██████  PH█████████████
WK; C.A.M. ENVIORMENTAL  PH#944-7480
(SISTER; CYNTHIA LEAL @ ███████████,    PH█████████)

   SANDRA LIVES ABOVE THE COMPLS. SANDRA COULD NOT VERBALIZE ANY SPECIFIC
REASONS AS TO WHY SHE SUSPECTED IT, BUT TOLD THIS SGT. THAT SHE BELIEVED THIS
INCIDENT OCCURRED BECAUSE OF SOME TYPE OF DOPE PROBLEM.

                =================================

     EXHIBIT 96 Page 006                                      0001852

13847940101C / Court: 337

# EXHIBIT 97

0001853

Case 4:17-cv-03621 Document 80-19 Filed on 01/09/23 in TXSD Page 126 of 366
Case 4:17-cv-03621 Document 1-15 Filed on 11/09/23 in TXSD Page 5 of 266

THAT SHE RENTED AN APARTMENT IN HUMBLE FOR CHICO AND ANGELITA AND THE
APARTMENT, UTILITIES, AND PHONE WAS IN DIANA AND ARTURO'S NAME.  SHE GAVE US
THIS ADDRESS AND IT WAS CHECKED OUT BY SWAIM AND BROWN.  SEE THEIR SUPPLEMENT
FOR DETAILS.  DIANA STATED THAT SHE DID NOT KNOW CHICO'S REAL NAME AND KNEW
VERY LITTLE ABOUT HIM.  SHE ALSO SAID THAT CHICO WAS THE ONLY DARK PERSON
THAT CAME TO HER APARTMENT, AND THAT SHE WAS ONLY SELLING AROUND $400 A WEEK
OF POWDER COCAINE.

DIANA STATED THAT THEY WERE BROKE AND WERE LATE ON THEIR CAR PAYMENT AND LATE
ON THE APARTMENT RENT.  SHE ALSO SAID THAT THEY BARELY HAD ENOUGH MONEY TO
BUY GROCERIES.  SHE SHOWED US THE LATE NOTICE FOR THE CAR PAYMENT TO VERIFY
THE LATE BILL.  SHE STATED THAT THEY DID NOT KEEP A LARGE AMOUNT OF CASH ON
HAND AND THEY DID NOT STORE DOPE IN THE APARTMENT.  SHE AGAIN STATED THEY
WERE SMALL TIME DEALERS THAT SOLD BY THE GRAM.

SHE MAINTAINED THAT THEY SUSPECTS MADE ABSOLUTELY NO DEMANDS FOR MONEY,
DRUGS, OR ANYTHING ELSE.  SHE STATED THAT THEY RANSACKED THE APARTMENT'S
BEDROOM ONLY, AND THE ONLY ITEM THEY TOOK WAS A GOLD NUGGET BRACELET THAT HAD
THE NAME "ARTURO" ON THE FRONT.  BOTH DIANA AND ARTURO WERE WEARING GOLD
NECKLACES THAT WERE NOT TAKEN BY THE SUSPECTS.

WE ALSO LEARNED FROM A WITNESS THAT THERE WAS A HISPANIC MALE WHO CAME TO THE
SCENE WHO MADE A REMARK IN SPANISH REGARDING SOME CUBANS.  WE LEARNED THAT
THIS MALE IS NAMED CESAR RIOS, AND HE LIVES AT ███████████.  WE EVENTUALLY
LOCATED CESAR AND HE WAS INTERVIEWED BY SGT SWAIM.  SEE HIS SUPPLEMENT FOR
DETAILS.

OCTOBER 2, 1992........FRIDAY:
*******************************

WE,, SGTS STEPHENS, ALONZO, AND INVS BROWN AND UP HERNANDEZ, CONTINUED FOLLOW
UP ON THIS INVESTIGATION.  WE WENT BACK TO THE SCENE AND PICKED UP DIANA AND
ARTURO.... AGAIN.  IT WAS STILL OUR BELIEF THAT WE WERE NOT GETTING THE WHOLE
STORY.  THEY WERE BROUGHT TO THE HOMICIDE OFFICE AND REINTERVIEWED AND
POLYGRAPHED.

WE ALSO LEARNED A "NEW" FAMILY SECRET.  DIANA SAID THAT THE "REAL" FATHER OF
ANGELO JR WAS A MALE BY THE NAME OF PEDRO ORTIZ.  SHE GAVE US A LICENSE PLATE
NUMBER ON PEDRO'S TRUCK AND HIS PHONE NUMBER.  WE FOUND THAT HE LIVES AT ███
███████████████████████.  STEPHENS AND BROWN WENT TO THE APARTMENT AND
FOUND THAT PEDRO WAS NOT AT HOME.  WE INTERVIEWED HIS NEXT DOOR NEIGHBOR AND
WE TOLD THAT PEDRO LIVES IN THE APARTMENT ALONE, HE LEAVES EARLY IN THE
MORNING TO GO TO WORK, AND HE HAS BEEN HOME ALL WEEK AND HAS LEFT THE SAME
TIME EVERY DAY.  WE WENT TO THE OFFICE AND GOT THE FOLLOWING INFORMATION ON
PEDRO FROM THE LEASE AGREEMENT.

     PEDRO ORTIZ       SS# ███████████   VEH ██5YZ
     PAST ADDRESS: ████████████████
     WORK ADDRESS:  BEYR CONSTRUCTION  BOSS VICTOR RENDON  872-7050
     IN CASE OF EMERGENCY:  LETICIA ESQUIVEZ  WK# 777-1661  770-1023

CHECKED PEDRO F6 AND FOUND NO RECORD.  CALLED HIS JOB AND FOUND THAT HE WAS
A STEADY WORKER AND HAS BEEN AT WORK ALL WEEK.  ALSO LEARNED THAT HE IS
PRESENTLY ON A JOB NEAR THE "NASA SPACE CENTER."  ALONZO AND HERNANDEZ WENT
TO THE JOB SITE AND INTERVIEWED PEDRO.  IT IS OUR BELIEF AT THIS TIME **0001854**

EXHIBIT 97 Page 001

IS NOT INVOLVED.

ALSO TO BE NOTED THAT THE EX-HUSBAND OF DIANA GARCIA....ANGELO GARCIA SR, WAS
AL. INTERVIEWED ON THE NIGHT OF THIS INCIDENT. BASED ON THE INFORMATION
RECEIVED FROM SGT ELLIOTT, WE ALSO BELIEVE THAT HE IS NOT INVOLVED.

STEPHENS AND BROWN THEN RETURNED TO THE SCENE AND RECANVASSED.  WE WERE
PARTICULARLY INTERESTED IN THE BLACK MALES DESCRIBED BY THE UPSTAIRS
NEIGHBOR.  THESE MALES WERE STANDING BY THE WHITE CAR AND SAID THAT THEY
LIVED IN THE COMPLEX.  WE WENT TO THE OFFICE OF THE APARTMENT COMPLEX LOCATED
BEHIND THE COMPL'S APARTMENT AND TALKED WITH THE MANAGER, GENEVA GONZALES....
644-5087.  SHE STATED THAT SHE HAS A BLACK MALE RESIDENT NAMED ALLEN RANDALL
WHO LIVES IN APARTMENT NUMBER 10 AND HE OWNS A WHITE CAR THAT IS SIMILAR TO
THE ONE DESCRIBED BY THE WITNESS.  SHE ALSO SAID THAT RANDALL USUALLY PARKS
ON THE WEST SIDE OF THE BUILDING ON ████████, WHICH IS NEAR THE TELEPHONE.
BASED ON HER DESCRIPTION OF RANDALL AND HIS VEHICLE, THIS IS THE PERSON THE
WITNESS SAW ON THE NIGHT OF THIS INCIDENT. WE ALSO TALKED TO BEATRICE TORRES,
WHO LIVES IN APARTMENT 18.  SHE HAS NO HOME OR WORK NUMBER BUT SHE CAN BE
REACHED THROUGH THE MANAGER.  SHE STATED SHE WAS AWAKE ON THE NIGHT OF THIS
INCIDENT AND SHE HEARD A VEHICLE SPEED AWAY JUST PRIOR TO THE SCREAMING AND
RUNNING AROUND THAT WAS DONE BY THE COMPLS.  SHE ADDED THAT THE CAR SOUNDED
LIKE IT WAS PARKED BETWEEN THE TWO COMPLEXES ON ████████, AND THE VEHICLE SPED
AWAY WEST ON ████████ TOWARD BROAD.  BEATRICE STATED THAT SHE NEVER SAW THE
VEHICLE, SHE ONLY HEARD IT.  SHE ALSO SAID THAT THERE WAS NOTHING DESCRIPTIVE
ABOUT THIS CAR THAT SHE CAN REMEMBER.  IT HAD A NORMAL EXHAUST AND A NORMAL
SOUNDING ENGINE.  SHE ALSO SAID THAT WHEN SHE HEARD THE PEOPLE RUNNING
AROUND...THE NEIGHBOR AND DIANA AND ARTURO...SHE LOOKED OUT AND SAW DUST
ST... IN THE STREET WHERE SHE HEARD THE SPEEDING VEHICLE.

WE LOOKED AT THE AREA WHERE BEATRICE HEARD THE CAR.  THIS AREA IS ON THE
NORTH SIDE OF ████████, LOCATED BETWEEN THE TWO APARTMENT COMPLEXES.
THIS LOCATION IS NOT IN VIEW OF ANY OF THE APARTMENTS.  THE ONLY WINDOW THAT
HAS ANY VIEW WHATSOEVER OF THIS AREA IS GENEVA GONZALES'S APARTMENT.  SHE WAS
QUESTIONED ABOUT THE VEHICLE AND THE COMMOTION AND SHE SAID THAT SHE WAS NOT
UP AT THE TIME AND DID NOT HAVE A REASON TO LOOK OUT HER BACK WINDOW.  SHE
ADDED THAT SHE SAW NOTHING.  SHE WAS BELIEVABLE AND IT WAS OUR OPINION THAT
SHE WOULD HAVE TOLD US IF SHE HAD SEEN ANYTHING.

WHEN STEPHENS AND TOBY HERNANDEZ WERE BRINGING DIANA AND ARTURO TO THE
HOMICIDE OFFICE ON THURSDAY, DIANA HAD A PAGER IN HER PURSE THAT BEEPED.
WHEN SHE REMOVED THE PAGER SHE TURNED THE PAGER OFF, THERE BY ERASING ALL
NUMBERS THAT WERE STORED AND THE NUMBER OF THE PERSON CALLING.  STEPHENS THEN
ASKED DIANA IF WE COULD KEEP THE PAGER FROM THAT POINT ON.  SHE AGREED AND
THE PAGER WAS KEPT IN OUR POSSESSION AND CONTROL.  THERE WERE SEVERAL NUMBERS
THAT CAME ACROSS THE PAGER OVER THE NEXT SEVERAL DAYS....

███████     THIS NUMBER CAME BACK TO YBARRA AT ████████
            DIANA SAID THAT THIS IS A SHOPLIFTER THAT TRADES BOOTS FOR
            DOPE

███████     ROGER WARD ████████
            DIANA SAID THIS IS A WHITE MALE WITH TATOOS THAT BUYS DOPE
            FROM THEM. SAID THE W/M LIVES IN PASADENA.

WE HAVE ALSO BEEN WORKING WITH THE FBI.  THEY OFFERED ASSISTANCE AND M████████

EXHIBIT 97 Page 002                                             0001855

13847940101C / Court: 337

# EXHIBIT 98

1                    REPORTER'S RECORD

2               **VOLUME 8 OF 9 VOLUMES**

3           TRIAL COURT CAUSE NO. 1364839

4           COURT OF APPEALS NO. 14-14-00142-CR

5

6    ROGELIO AVILES-BARROSO        )  IN THE DISTRICT COURT
                                   )
7        Appellant                 )
                                   )
8                                  )
                                   )
9    VS.                           )  HARRIS COUNTY, TEXAS
                                   )
10                                 )
                                   )
11   THE STATE OF TEXAS            )
                                   )
12       Appellee                  )  337TH JUDICIAL DISTRICT

13

14

15                   * * * * * * * * * * * * * * * * * *

16              **GUILT-INNOCENCE PROCEEDINGS**

17                   * * * * * * * * * * * * * * * * * *

18

19

20        On the 4th day of February, 2014, the following

21   proceedings came on to be heard in the above-entitled

22   and numbered cause before the Honorable Renee Magee,

23   Judge presiding, held in Houston, Harris County, Texas;

24        Proceedings reported by computer-aided

25   transcription/stenograph shorthand.

EXHIBIT 98 Page 001

0001857

Case 4:17-cv-03621 Document 89-13 Filed on 01/05/23 in TXSD Page 130 of 368
Case 4:17-cv-03621 Document 89-13 Filed on 01/05/23 in TXSD Page 2 of 8

2

1                    A P P E A R A N C E S

2

3     MS. NATALIE TISE
      Assistant District Attorney
4     SBOT NO. 00795683
      1201 Franklin
5     Houston, Texas  77002
      PHONE:  713.755.5800
6     **ATTORNEY FOR THE STATE OF TEXAS**

7

8         - AND -

9

10    MR. CHARLES BROWN
      SBOT NO. 03101400
11    708 Main Street, Suite 790
      Houston, Texas  77002-3200
12    PHONE:  713.222.0733
      **ATTORNEY FOR THE DEFENDANT**

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 98 Page 002

0001858

```
 1                  I N D E X
                      VOLUME 8
 2            (GUILT-INNOCENCE PROCEEDINGS)

 3   FEBRUARY 4, 2014
                                            PAGE   VOL.
 4   Closing Argument by State's Attorney.......... 31     8
     Closing Argument by Defense Attorney.......... 36     8
 5   Closing Argument by State's Attorney.......... 52     8

 6   Jury retired for deliberations................ 73     8

 7   Testimony read back........................... 76     8

 8   Verdict Received.............................. 82     8

 9   Polling of the jury........................... 82     8

10   Punishment assessed........................... 85     8

11   Sentencing.................................... 86     8

12   Reporter's Certificate........................ 87     8

13   Word Glossary.............................End of Volume

14            ALPHABETICAL WITNESS INDEX

15            (No witnesses this volume)

16                 EXHIBIT INDEX

17            (No exhibits this volume)

18

19

20

21

22

23

24

25
```

EXHIBIT 98 Page 003

0001859

1    He didn't care about that.  He decided he wanted to tell

2    the truth and that's all he ever wanted to do.

3            I could charge Rudy tomorrow.  I could

4    charge him tomorrow.  There's no statute of limitations

5    on capital murder.  And there is nothing to stop me.

6    Yet, he came here and told you what he told you with no

7    deal.  No assurances, no promises, nothing.  And how did

8    that benefit him?  Well, you have to think about the

9    timing of all this.  He's sitting up in prison in

10    Pennsylvania doing his federal time.  And absolutely, it

11    was almost over.  He is going to get out.

12            So, what does he decide to do?  For the

13    first time in years when the police come calling:  Rudy,

14    tell us what you know about the murder of this little

15    boy.  I am almost done with my federal time, but I think

16    I will go ahead and put myself right in the big middle

17    of this capital murder case.  Never done it before, but

18    today I will.  I'm just going to tell them:  I am right

19    in the middle of this capital murder case.  Don't have a

20    lawyer.  Don't ask for any advice.  Don't know anything

21    about the law of parties.  Don't know whether I am

22    injecting myself and could become criminally responsible

23    for all the things that I say.  I'm going to put myself

24    right in the big middle of it less than a year before I

25    am due to get out of prison.

EXHIBIT 98 Page 004

0001860

1    How does that benefit Rudy?  It doesn't.

2 And guess what?  It didn't.  Because he's still sitting

3 there in that orange jumpsuit in custody when he could

4 be home in the Dominican with his family.  He could have

5 gotten on that witness stand after he got an attorney

6 here in Houston and his attorney goes:  Hey, Rudy,

7 there's some things you ought to know.  There is this

8 thing called the law of parties.  And you've already

9 given your statement and you've already put yourself in

10 the middle of this case, and you can't change that, but

11 what you can do is get on the witness stand and say:  I

12 invoke my Fifth Amendment right not to testify.  I'm not

13 going to get on the witness stand and swear under oath

14 that I was part of a criminal offense.  Could have told

15 him that and he could have not said a word from that

16 witness stand, and there wouldn't have been a damn thing

17 I could do about it.  But he didn't do that.  Even after

18 advised by his lawyer of his rights, he did not do that.

19    I cannot tell you how exceptionally rare

20 what Rudy did is.

21    MR. BROWN:  Objection.  That's outside the

22 spectrum of the case.

23    THE COURT:  That's sustained.

24    MS. TISE:  You didn't have to like him.

25 You don't have to agree with the decisions that he

EXHIBIT 98 Page 005

0001861

13847940101C / Court: 337

# EXHIBIT 99

0001862

CONCERNING THIS INCIDENT.  SPCL AGENT ERIC JOHNSON WAS GIVEN THE DIANA'S
PAGER NUMBER TO TRY AND GET A LOG OF RECENTLY REGISTERED NUMBERS.  THE PAGER
NUMBER IS ██████████ AND IS RENTED THROUGH SUGARLAND TELEPHONE COMPANY.


BOTH DIANA AND ARTURO AGREED TO TAKE A POLYGRAPH CONCERNING THIS INCIDENT.
THEY WERE ASKED SPECIFIC QUESTIONS ABOUT THE ACCOUNT OF THE INCIDENT AND IF
THEY KNEW THE WHEREABOUTS OF BABY ██████.  ACCORDING TO OUR POLYGRAPH
OPERATORS, THEY PASSED THE POLYGRAPH AND ARE BEING TRUTHFUL..

AS NOTED EARLIER THERE WAS A PURSE SEIZED AT THE SCENE BY STEPHENS AND
HERNANDEZ THAT WAS TAKEN TO THE LATENT PRINT LAB.  THIS PURSE CONTAINED
VARIOUS PAPERS BELONGING TO DIANA AND ARTURO.  INCLUDED IN THESE PAPERS WERE
LETTERS TO DIANA FROM A JOSE VALDEZ.  VALDEZ IS IN PRISON IN DIBOLL TEXAS AND
HE HAD A ROMANTIC INTEREST IN DIANA.  JOSE IS ALSO THE BROTHER OF CESAR RIOS,
THE PERSON WHO WENT TO THE SCENE THE NIGHT OF THIS INCIDENT.

STEPHENS WENT TO DIBOLL AND INTERVIEWED JOSE IN THE PRISON.
            INTERVIEW WITH:      JOSE VALDEZ      INMATE TDC
                                 ██████    HPD# 524429
                                 PRIORS FOR:  DWI  DEL COCAINE  AUTO THEFT
                                 TID# 11840712

VALDEZ STATED HE IS ON HIS 11TH MONTH OF A SENTENCE HE RECEIVED FOR AUTO
THEFT.  HE ADDED THAT HE HAS BEEN IN THE DIBOLL PRISON SINCE HE WAS
INCARCERATED AND USED TO KEEP IN CLOSE TOUCH WITH DIANA UNTIL APPROXIMATELY
2 MONTHS AGO WHEN THE PHONES WERE REMOVED FROM THE CELLS.  VALDEZ SAID THAT
HE HAS KNOWN DIANA AND ARTURO FOR SEVERAL YEARS.  HE WENT ON TO SAY THAT HE
USED TO SUPPLY THEM WITH COCAINE AND THEY SOLD FOR HIM UP UNTIL THE TIME HE
WENT TO JAIL.  JOSE ALSO SAID THAT WHEN HE WENT TO JAIL, THEY STARTED GETTING
THEIR DOPE FROM A DOMINICAN NAMED CHICO.   HE SAID THAT CHICO WAS A BIGGER
SUPPLIER THAT HE WAS, AND HE USED TO GIVE DIANA AND ARTURO ABOUT $4000
DOLLARS WORTH OF POWDER A WEEK.  JOSE SEEMED TO REALLY CARE FOR DIANA AND HE
DIDN'T HAVE MUCH TO SAY ABOUT ARTURO.

I ASKED JOSE IF HE KNEW ANY REASON WHY SOMEONE WOULD TAKE BABY ██████.  HE
REPLIED THAT HE HAD NO IDEA, AND SAID THAT THE BABY WAS A GOOD KID.  JOSE
SAID THAT DIANA AND ARTURO HAVE BEEN RIPPED OFF TWO TIMES IN THE PAST.  HE
SAID BOTH OF THE TIMES THEY LIVED IN THE APARTMENTS ON ██████.  JOSE STATED
THAT BOTH OF THE RIPS CONSISTED OF A BURGLARY, WHERE THE APPLIANCES WERE
TAKEN.  HE SAID HE DID NOT KNOW OF AN OCCASION WHERE THEY WERE ACTUALLY
ROBBED.  I TOLD JOSE THAT DIANA AND ARTURO CLAIMED THAT THEY WERE DEALING IN
VERY SMALL QUANTITIES ....$400 A WEEK.  HE LAUGHED AT THAT AMOUNT AND SAID
THEY WERE MUCH BIGGER THAN THAT.  HE ADDED THAT THEY DIDN'T DEAL IN KILOS,
BUT THEY WERE BIGGER THAN $400 A WEEK.

JOSE ALSO SAID THAT WE NEEDED TO CHECK OUT A MALE BY THE NAME OF "CHINO."  HE
SAID THAT CHINO USED TO LIVE WITH ARTURO AND DIANA AND THAT ARTURO AND CHINO
HAD A FALLING OUT AND CHINO MOVED.  JOSE STATED THAT CHINO HAS A BROTHER
NAMED JAVIER AND THAT DIANA AND ARTURO SHOULD KNOW HOW TO GET IN CONTACT WITH
CHINO.  JOSE ALSO SAID THAT DIANA AND ARTURO HAD A PROBLEM WITH A WHITE MALE
NAMED THOMAS, WHO HAS ALOT OF TATOOS AND WORKS ACROSS THE STREET FROM THE
██████████████.  HE DID NOT KNOW THE EXTENT OF THE PROBLEM BETWEEN THE
GARCIAS AND THOMAS.

EXHIBIT 99 Page 001                                              0001863

13847940101C / Court: 337

# EXHIBIT 100

0001864

Case 4:17-cv-03621 Document 89-13 Filed on 04/05/23 in TXSD Page 137 of 368
Case 4:17-cv-03621 Document 13-100 Filed on 04/07/01 in TXSD Page 1 of 1

Incident no. 105758592 X   CURRENT INFORMATION REPORT                    PAGE 2.037

ANGELO GARCIA, SR.
H/M
SS.
TDL#

MR. GARCIA STATED THAT HE HAS BEEN MARRIED TO DIANA GARCIA FOR OVER TWENTY
YEARS. HE RELATED THAT THEY SEPARATED ALMOST TWO YEARS AGO, BUT THAT THEY HAVE
NEVER GOT A DIVORCE. MR. GARCIA STATED THAT DIANA MOVED IN WITH ARTURO JUST
AFTER SHE LEFT AND THAT HE THINKS THAT THEY WERE SEEING EACH OTHER DURING THE
TIME THAT THEY WERE STILL TOGETHER.

MR. GARCIA STATED THAT HE GETS ████ ON THE WEEKENDS SOMETIMES. HE RELATED
THAT HE HAD HIM LAST WEEKEND AND THAT HE PICKED HIM UP ON FRIDAY AND TOOK HIM
HOME ON MONDAY. HE STATED THAT HE NEVER PICKS UP ████ AT THE FAIRWAY ADDRESS
THAT DIANA BRINGS HIM TO STAFFORD OR HE PICKS HIM UP OVER AT DIANA'S SISTER'S
APARTMENT. HE REVEALED THAT HE HAS NEVER BEEN OVER ON ████.

MR. GARCIA STATED THAT HE KNOWS NOTHING ABOUT DIANA AND ARTURO BEING IN THE
DRUG BUSINESS. HE RELATED THAT ████ HAS NEVER MENTIONED HIS MOTHER BEING IN
THE DRUG BUSINESS. MR. GARCIA STATED THAT HE ASKED DIANA ONE TIME WHERE THEY
GOT ALL OF THEIR MONEY AND THAT SHE TOLD HIM THAT SHE WAS WORKING TWO JOBS.
HE STATED THAT AS FAR AS HE KNOWS THAT ARTURO DOES NOT HAVE A JOB.
*****

INVESTIGATORS LEARNED THAT THE HISPANIC MALE THAT ARTURO WAS TALKING WITH AT
THE SCENE IS CESAR RIOS. THIS IS THE PERSON THAT ALICE LIMON OVERHEARD SAYING
"THOSE DAMN CUBANS"! INVESTIGATORS LEARNED THAT CESAR RIOS LIVES AT ████
AND THAT HIS PHONE NUMBER IS ████.

SGTS. SWAIM AND STEPHENS AND INV. BROWN DROVE TO THE ████ ADDRESS FOR THE
PURPOSE OF INTERVIEWING CESAR RIOS. UPON ARRIVAL, INVESTIGATORS SPOKE WITH
CESAR'S BROTHER, HECTOR SAAVEDRA, WHO RELATED THAT CESAR DOES NOT LIVE THERE,
BUT THAT HE COMES BY ALMOST EVERYDAY. SGT. SWAIM LEFT HIS BUSINESS CARD AND
ASKED HECTOR TO HAVE CESAR CALL AS SOON AS POSSIBLE.
*****

ABOUT ONE HOUR LATER, SGT. SWAIM RECIEVED A PAGE TO CALL CESAR RIOS AND ARRANGE-
MENTS WERE MADE FOR HIM TO REPORT TO THE HOMICIDE DIVISION FOR AN INTERVIEW.
INVESTIGATORS THEN RETURNED TO THE HOMICIDE DIVISION AND SGT. SWAIM INTERVIEWED
CESAR RIOS REGARDING HIS KNOWLEDGE OF THIS INVESTIGATION. THE FOLLOWING IS
A SUMMARY OF THAT ORAL INTERVIEW:

CESAR MALA RIOS
H/

CESAR STATED THAT HE HAS KNOWN DIANA AND ARTURO FOR ABOUT ONE YEAR. HE RELATED
THAT HE JUST RECENTLY GOT OUT OF JAIL AND THAT HE HAS NOT HAD MUCH CONTACT
WITH THEM SINCE. CESAR RELATED THAT THEY ARE SMALL TIME DRUG DEALERS, BUT THAT
HE DOES NOT KNOW HOW MUCH THEY SELL A WEEK OR WHO IS THEIR SUPPLIER.

CESAR STATED THAT HE IS NOT REAL CLOSE TO ARTURO BECAUSE HIS BROTHER (

4/9/2021 2:03 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52315243
By: E Lane-Orton
Filed: 4/9/2021 2:03 PM

## 13847940101C / Court: 337

IN THE 337TH JUDICIAL DISTRICT COURT
HARRIS COUNTY, TEXAS

**AND**

IN THE TEXAS COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

| | | |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § § § § § § | **Writ No.** _____ Trial Court Case No: 1384794 **CAPITAL CASE** |
| **Applicant.** | | |

**SUBSEQUENT APPLICATION FOR
POST-CONVICTION WRIT OF HABEAS CORPUS
EXHIBITS 101 THROUGH 110**

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

0001866

13847940101C / Court: 337

# EXHIBIT 101

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    05/23/2011

CARMELO NINO MARTINEZ, also known as CARMELO MARTINEZ, CARMELO SANTANA, CARMELO MARTINEZ SANTANA, CARMELO SANTANA MARTINEZ, CARMELO NINO SANTANA, and "RUDY", (Hereinafter referred to as MARTINEZ), (Hispanic; Male; Date of Birth: ███████; FEDERAL BUREAU OF PRISONS, (FBOP), Inmate Register Number 79574-079), was located at the MOSHANNON VALLEY CORRECTIONAL INSTITUTION, (MVCI), 555 Geo Drive, Philipsburg, Pennsylvania on the date of investigation.  After being brought to an interview room within the MVCI, MARTINEZ was advised, in English, of the identity of the interviewing agents and the purpose of the interview.  MARTINEZ sat in the appropriate location when directed by the investigating agents.  Present during the contact were FEDERAL BUREAU OF INVESTIGATION, (FBI), Special Agent, (SA), WILLIAM E. EBERSOLE, Philadelphia Division, Williamsport Resident Agency; and FBI SA MICHAEL J. HOCHREIN, Pittsburgh Division, Laurel Highlands Resident Agency.

MARTINEZ was orally advised of his Miranda rights in English at approximately 9:56am.  MARTINEZ advised that he understood and nodded his head up/down in a manner of affirmation.  MARTINEZ was asked if he would like to read the Miranda rights form in English or Spanish.  MARTINEZ advised that he can read and write in Spanish and was provided with a Miranda form in Spanish.  MARTINEZ appeared to be reading the form and advised, in English, that he understood at approximately 9:57am.  MARTINEZ did not sign the form at this time.

MARTINEZ was offered a cup of water and declined.

MARTINEZ was again asked if he understood English and moved his head up/down in a manner of affirmation.  MARTINEZ then said in English "Yes, I understand".

MARTINEZ wanted to know why the investigators kept questioning him about the murder of ███████████.  MARTINEZ was advised that he was identified as being the "right hand man" for CHICO, also known as OBEL JULIAN CRUZ-GARCIA.

MARTINEZ was asked if he was with CHICO on the night that the little boy was kidnaped.  MARTINEZ initially told the investigating agents that he did not know.  MARTINEZ was then asked

7A-HO-71062-4/5

Investigation on  05/23/2011  at  Philipsburg, PA

File #  7A-HO-71062                    Date dictated  05/23/2011

by  SA William E. Ebersole/wee

EXHIBIT 101 Page 001

0001868

This document contains neither recommendations nor conclusions of the FBI  It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

7A-HO-71062

Continuation of FD-302 of    CARMELO MARTINEZ    On 05/01/2011  Page  2

in Spanish if he was with CHICO on the night the little boy was kidnaped. MARTINEZ did not answer.

The interview then proceeded in English. MARTINEZ was asked if he was with CHICO on the day ████ was kidnaped. MARTINEZ admitted that he was with CHICO for some time on the day of the kidnaping. MARTINEZ advised that he "worked" for CHICO. MARTINEZ further stated that sometimes he would "work" for CHICO and sometimes he would "work" for other people. By "work" for CHICO and others, MARTINEZ clarified that he meant he trafficked drugs for CHICO and other individuals not specified.

MARTINEZ was advised that the interviewing agents were assisting in an investigation into CHICO and what happened in the apartment of DIANA and ARTURO. MARTINEZ was advised that based upon "DNA evidence" it was known that CHICO was at the apartment of ARTURO and DIANA. MARTINEZ was further told that CHICO has been charged and other investigative leads had been followed up on. MARTINEZ was told that his statement would not be the only source of information against CHICO.

MARTINEZ was asked to assist investigators. MARTINEZ was told that any cooperation he gave would be made known to the prosecutor and the presiding judge. MARTINEZ was further told that ████ and his family need to put this matter to rest.

MARTINEZ advised that he felt bad and that the parents of ████ picked their life but the little boy had not.

MARTINEZ was asked how ████ died. MARTINEZ responded by stating that he (MARTINEZ) has had nothing his whole life. MARTINEZ initially advised that CHICO told him nothing about the death of ████. MARTINEZ then relayed that ████ paid for what the parents did. MARTINEZ was asked if he was told this by CHICO. MARTINEZ then advised that he only has two (2) more years in jail. MARTINEZ then stated that CHICO told him (MARTINEZ) nothing.

After stating that CHICO had told him nothing about the disappearance and death of ████, MARTINEZ was questioned about why he, (MARTINEZ), would say that ████ paid for his parents actions or lifestyle. MARTINEZ's response was that he, (MARTINEZ), lost his whole life. He elaborated that he no longer saw his own sons, mother, or had a marriage. MARTINEZ concurred with the investigators' suggestions that it was CHICO who caused him to 'lose his life.'

EXHIBIT 101 Page 002

0001869

FD-302a (Rev. 10-6-95)

7A-HO-71062

Continuation of FD-302 of          GERARDO MARTINEZ                    On  05/03/2011    Page    3

        MARTINEZ asked if the interviewing agents knew everything
about the case.  MARTINEZ was told that the various investigators
have developed proof against CHICO but, the specifics could not be
given to MARTINEZ in order to protect the case.  MARTINEZ was
advised that the interviewing agents wanted his assistance; and
although there was scientific evidence to prove CHICO's involvement
in the invasion of the GARCIA's home as well as the rape of DIANA
GARCIA, there was a need to complete the picture of what happened
to the little boy ███████.

        MARTINEZ was asked who was with CHICO when CHICO left the
apartment of DIANA and ARTURO on the day ███████ was kidnaped.
MARTINEZ initially did not provide an answer.  He was then shown a
image of ███████ remains as presented at autopsy in 1992 and an
ante-mortem image of the boy which appeared to be a school
photograph from an unspecified year.  Both images were provided to
the investigating agents prior to the interview by the Harris
County, Texas, District Attorney's Office.

        MARTINEZ was asked how ███████ died.  MARTINEZ was told
that CHICO would go to trial for the murder of ███████ with or
without the assistance of MARTINEZ.  MARTINEZ was told that his
assistance would make for a better case against CHICO, who is not a
good person.  In response, MARTINEZ remarked that his mind is
different now and that he has spent fourteen (14) years of real
prison time.  MARTINEZ repeated that he never sees his kids nor his
mother.

        MARTINEZ was again told that the interviewing agents
could not disclose specifics.  MARTINEZ was told that his version
of the events leading to the murder of ███████ was what counted.

        MARTINEZ advised that he did not like to testify.
MARTINEZ advised that he has a criminal conviction and that he was
a "partner" (socio) with CHICO.

        MARTINEZ was advised that the interviewing agents were
not concerned with previous drug trafficking.  MARTINEZ was told
that the interviewing agents were interested in the murder of
███████ and any cooperation MARTINEZ provided would be made known to
the prosecutor and presiding judge.  He was again asked to tell the
interviewing agents about ███████.  MARTINEZ asked if the government
had enough to "get CHICO".  MARTINEZ further asked about his safety
on the compound.  He did not want to move from the prison in which

EXHIBIT 101 Page 003

0001870

FD-302a (Rev. 10-6-95)

TX-HQ-71062

Continuation of FD-302 of ___CARMELO MARTINEZ___ , On _03/23/2011_ , Page ___4___

he was incarcerated at the time of the interview. MARTINEZ advised that CHICO has hurt a lot of people. MARTINEZ further stated that in CHICO's head "it's crazy".

Again, MARTINEZ commented that he has spent fourteen (14) years in jail and does not care for his own life anymore. MARTINEZ lost his life and family. At this point in the interview MARTINEZ stated that he was not involved in the murder. MARTINEZ was advised that if he tells the truth and was not involved in the murder he could not be charged criminally just because he's a friend of CHICO.

MARTINEZ was again asked to provide details, if he knew, of how ███████ died. MARTINEZ stated that he did not see the murder of ███████. MARTINEZ was asked if he heard CHICO or others talk about the murder of ███████. The investigating agents then explained that this murder investigation will continue and that, in the future, investigators would likely question him until the case was resolved. MARTINEZ was again asked for his assistance in providing details of what went on the night ███████ was taken from his home. The investigating agent's asked MARTINEZ to consider how he might feel, as a father to two sons, if CHICO or someone else came into his home, took away one of his boys, and killed his child.

MARTINEZ then advised that he did not have a problem telling the truth and did not want an attorney present. MARTINEZ advised that he would tell the truth. At approximately 10:30am, MARTINEZ signed the Spanish version of the Advice of Rights form. This was the same form he previously appeared to read. At no time between the time he was presented with the form and signing the form, did MARTINEZ request legal counsel or imply that he wished to consult with same. Following MARTINEZ's signature of the Advice of Rights form, investigating agents EBERSOLE and HOCHREIN signed same as witnesses. That form is currently maintained as evidence by the Federal Bureau of Investigation.

MARTINEZ stated that he had come to Texas in approximately 1988 or 1989. At that time, MARTINEZ never used cocaine. MARTINEZ then "went down with cocaine". As mentioned earlier in the interview, MARTINEZ would go with various friends to "work". MARTINEZ "worked" for CHICO.

MARTINEZ first saw CHICO in Puerto Rico with ANGELITA (believed to be ANGELITA RODRIGUEZ). MARTINEZ had gone to Puerto

EXHIBIT 101 Page 004

0001871

FD-302a (Rev. 10-6-95)

7A-HO-71062

Continuation of FD-302 of ___ERNESTO MARTINEZ___ , On 05/23/2011 , Page ___5___

Rico to use the beach. CHICO was married to ANGELITA. MARTINEZ had gone to the Dominican Republic and then back to Puerto Rico. CHICO was working for VICTORIA RODRIGUEZ, the father of ANGELITA, at that time.

MARTINEZ made a second trip to Houston, Texas, and met CHICO. MARTINEZ was "working" in Houston which MARTINEZ explained meant selling drugs. MARTINEZ and CHICO began to sell drugs as partners. MARTINEZ began using cocaine more and more and was "going down hill". ANGELITA and CHICO were married and ANGELITA would help CHICO with food, apartment, health issues. MARTINEZ had no one to help him. MARTINEZ was also working with other dealers. MARTINEZ's life was deteriorating.

One evening, CHICO came to MARTINEZ and advised that he (CHICO) wanted to go see DIANA because she and ARTURO had cocaine. MARTINEZ advised that this was the night ▉▉▉▉ was kidnaped.

MARTINEZ then stated that he would tell the truth to the interviewing agents. MARTINEZ stated that only three (3) people know what happened to ▉▉▉▉ that evening: MARTINEZ, CHICO, and a Puerto Rican male named ROGELIO, also known as ROGER, also known as BORI. MARTINEZ described ROGELIO as a tall male. MARTINEZ then reiterated that he did not want to testify.

MARTINEZ was shown an image comprised of the photographs of nine (9) individuals believed associated with the Houston investigation. The image was provided to the investigating agents by Houston. Throughout the remainder of the interview, the image was on the table before MARTINEZ and he occasionally pointed to various photographs of individuals while recounting events. MARTINEZ continued by stating that CHICO ruined his (MARTINEZ's) life. CHICO was identified by the interviewee as the "boss". As detailed later in the interview by MARTINEZ, CHICO did not kill ▉▉▉▉, CHICO told someone to kill ▉▉▉▉.

MARTINEZ knew that CHICO had gone to DIANA's apartment in the past but never did anything crazy. MARTINEZ advised "this one was crazy". MARTINEZ then pointed to a photograph of ▉▉▉▉ and again stated "crazy".

MARTINEZ advised that he stayed in the car while CHICO and ROGELIO went to DIANA's apartment.

EXHIBIT 101 Page 005

0001872

FD-302a (Rev. 10-6-95)

CA-HC-71062

Continuation of FD-302 of    CARMELO MARTINEZ    , On 25/03/2011 , Page    6

    MARTINEZ was shown a photograph of a two (2) door vehicle, bronze in color, with "State's Exhibit 44" listed in the lower corner. MARTINEZ advised that this was not the vehicle that was driven to DIANA's apartment. CHICO was driving a, blue, four (4) door vehicle, ROGELIO was in the back seat, and MARTINEZ was in the front seat, passenger's side. MARTINEZ did not recall if ROGELIO was on the left side or right side.

    MARTINEZ then asked for a paper and pen so that he could draw a picture of DIANA'S and ARTURO's apartment building. He used that representation to draw, or indicate, positions and movements of CHICO, ROGELIO, and himself on the night ▇▇▇▇ was abducted. For example, MARTINEZ made a bold line to depict the position of the vehicle he, CHICO, and ROGELIO used as parked in a side street or alley next to the apartment building. On the side of the rectangle representing the building, and opposite the side on which MARTINEZ represented the vehicle was parked, he marked the position of DIANA's and ARTURO's apartment. MARTINEZ believed that the vehicle was parked in an alley since there was little traffic. MARTINEZ identified a street he believed to be Fairway Drive and then noted a football field that was in the area of DIANA's apartment as well. MARTINEZ also noted a gas station and stores in the area as well.

    Field Note: The writer made the notations on MARTINEZ's diagram for "car", "▇▇▇▇▇▇▇▇▇", "gas/stores, etc", and "football park".

    MARTINEZ did not remember the name of the street he parked on. MARTINEZ advised that he arrived at this location during the evening hours.

    MARTINEZ had lived in this neighborhood before but in a different apartment. Prior to moving to a new apartment, MARTINEZ had lived in this area with DIANA and ARTURO. MARTINEZ thought that he was in the vicinity of ▇▇▇▇▇▇▇. MARTINEZ then lived with his wife and little boy.

    MARTINEZ advised that CHICO and ROGELIO walked from the car, around the apartment building and to the front. MARTINEZ was shown a 2011 Mapquest aerial image of the ▇▇▇▇▇▇▇ ▇▇▇▇▇ environs but did not recognize the area. Instead, he returned to his hand drawn diagram and thought that ▇▇▇▇ outside of DIANA's apartment eventually lead to, or was in

EXHIBIT 101 Page 006

0001873

FD-302a (Rev. 10-6-95)

7A-HO-71001

Continuation of FD-302 of    CARMELO MARTINEZ                    , On  05/02/2011   , Page    7

the vicinity of an unspecified freeway.  MARTINEZ recalled gas
stations in the area.

MARTINEZ again stated that he was in the parked car on a
little street with very little traffic.  MARTINEZ was in a blue,
four (4) door, Chevrolet.  Later, he stated that he believed CHICO
owned that vehicle.  MARTINEZ was never told about any act of
violence, to include rape, by CHICO or ROGELIO.  MARTINEZ was told
by CHICO that CHICO wanted to go to DIANA's for "lo mio" or my
stuff.  MARTINEZ advised that CHICO had a gun with him.  MARTINEZ
thought the gun was a .45 pistol.

While MARTINEZ remained in the car, ROGELIO and CHICO
went to DIANA's apartment and apparently went inside.  Because he
stayed with the vehicle, MARTINEZ did not know what went on in the
apartment.  ROGELIO and CHICO returned approximately five (5) to
ten (10) minutes later.  CHICO was holding ███ .  At this point
in the interview, MARTINEZ stood up and held his hands across his
chest, mimicking how CHICO allegedly held ████ when he returned
to the car.  When asked if the boy was crying, MARTINEZ stated that
he was not.  He explained that ████ was familiar with CHICO as a
friend or associate of his parents.  MARTINEZ was sitting in the
driver's seat as CHICO and ROGELIO approached the car with ████ .
MARTINEZ asked CHICO "what happened" and "what are you doing".
CHICO responded with words to the effect "the little boy saw me".

Later, toward the end of the interview, MARTINEZ was
asked if he recalled whether or not CHICO smoked cigars.  He
replied that he did.  He did not recollect the brand of cigars but
described them as being "big" and not the size of cigarettes.
MARTINEZ further confirmed that on the night of ██████ abduction,
CHICO was smoking a cigar and may have taken one into DIANA's
apartment.

MARTINEZ then stated "to tell you the truth" he
(MARTINEZ) never thought this would happen.  MARTINEZ advised that
he knew the interviewing agents thought MARTINEZ was a bad guy but
he (MARTINEZ) never thought this would happen.  MARTINEZ again
looked at the photograph of ████ and advised that when he sees
this photograph he (MARTINEZ) thinks of his own little boy.
MARTINEZ advised that his little boy was similar to ██████ .  The
interviewee's eyes appeared to redden and water.  Later in the
interview, as noted below, he began to weep while speaking of what
had happened to ████ , and his situation with his own sons.

EXHIBIT 101 Page 007                                                    0001874

FD-302a (Rev. 10-6-95)

78-HO-71062

Continuation of FD-302 of   CEPHELO MARTINEZ   , On  05/03/2001  , Page   2

MARTINEZ advised that when CHICO came back with ████, MARTINEZ asked what happened and became very scared. MARTINEZ then pointed to the post-mortem photographs of ████ set before him by the investigators and stated "this is a real problem".

MARTINEZ directed CHICO to go back to DIANA and say he was sorry or try something to end the situation. MARTINEZ wanted CHICO to "fix it". CHICO responded with words to the effect "hey man, I fucked Diana". MARTINEZ then advised that he did not care and maybe things could get fixed. MARTINEZ wanted to have CHICO say he was sorry. CHICO responded in the negative.

Ultimately, CHICO and ROGELIO did walk back toward the side of the building where DIANA's and ARTURO's apartment was located. MARTINEZ believed that CHICO handed ████ to ROGELIO. However, CHICO and ROGELIO quickly returned to the car a second time with ████. This second trip to DIANA's apartment lasted five (5) minutes or less. MARTINEZ did not recall what CHICO said upon returning to the car the second time.

MARTINEZ again interjected in his responses that he did not want to go to trial. MARTINEZ was advised that his cooperation would be made known to the prosecutor and the presiding judge. MARTINEZ was further advised that the interviewing agents did not have the authority to decide who was charged or who testified.

Upon CHICO's second return to the car, MARTINEZ and the other man became very quiet. MARTINEZ then drew a picture of the car. He depicted CHICO as occupying its front seat. MARTINEZ was in the back seat positioned behind CHICO while ROGELIO was in the back seat, passenger's side. ████ sat in the middle of the rear seat. The front passenger seat was empty.

CHICO then pulled away from the ████████ apartment building. MARTINEZ was not sure if CHICO drove straight or drove in reverse to get to a street. MARTINEZ recalled heading to a street near Route 225. MARTINEZ thought this would be Freeway 45.

MARTINEZ was shown a 2011 Mapquest street map which depicted Galena Park, Pasadena, Deer Park, and Baytown. MARTINEZ was not certain but thought that the group drove on 45 to 225 to Baytown. While inside the car, nobody talked. ████ did not cry because he did not know there was a problem. All three (3) adults in the car: MARTINEZ, CHICO, and ROGELIO, knew there was a problem.

EXHIBIT 101 Page 008

0001875

FD-302a (Rev. 11-15-83)

78-HO-71962

Continuation of FD-302 of ___CHEMLO MARTINEZ___ , On __05/03/2011__ , Page ___3___

MARTINEZ did not know what CHICO would do to the little boy. MARTINEZ again advised that no one was talking. CHICO made one (1) telephone call prior to going to DIANA's apartment that evening but MARTINEZ could not recall if CHICO made any calls with █████O in the car.

MARTINEZ advised that CHICO was intelligent. After driving on 225, CHICO drove into Baytown and went down a dead end street. Although MARTINEZ was familiar with the Baytown area, having sold drugs in that area, he did not recognize the dead end street, or recall its name. MARTINEZ advised that there was no one on the street when CHICO stopped at its end and which he described as being rounded with wooded area(s) near it.

MARTINEZ advised that he had been to Baytown many times and had friends there for the purpose of dealing drugs. MARTINEZ would go to the Baytown Canteen Restaurant and would dance, drink, and engage in drug activity. MARTINEZ did not want to disclose the name of his friends in Baytown. MARTINEZ advised that these friends were involved with drugs but not the murder of ███████.

MARTINEZ advised that the road was not near the water. MARTINEZ then drew a picture of the road on the back of a MapQuest depiction of Baytown. MARTINEZ again advised that this was a real quiet neighborhood. MARTINEZ stated that the road they were on was a dead end and had some wooded area.

MARTINEZ advised that CHICO pulled over and told ROGELIO words to the effect "do it". MARTINEZ used the phrase "ya tu sabe lo que tiene que hacer" which is understood to mean "you known what you have to do". From this statement, MARTINEZ opined that ROGELIO knew all along that he (ROGELIO) would have to kill ███████.

MARTINEZ again stated that he did not know that ███████ would be taken and then murdered when he (MARTINEZ) agreed to go to DIANA's apartment. MARTINEZ advised that there was no comparison between him and ROGELIO.

MARTINEZ then drew a depiction of an automobile as he recollected it was stopped at the end of the dead end street in Baytown. He represented himself to be exiting the vehicle from the passenger's side and walking in the direction towards the front of the vehicle. MARTINEZ could not see what was happening but was able to hear the following events unfold:

EXHIBIT 101 Page 009

0001876

FD-302a (Rev. 10-6-95)

7A-HO-71062

Continuation of FD-302 of ___CARMELO MARTINEZ___ , On _25/23/2011_ , Page ___10___

     ROGELIO exited the vehicle and took ANGELO to the
driver's side, rear, area of the vehicle. MARTINEZ opined that
ROGELIO took ▬▬▬▬ to that area of the vehicle in order to take
advantage of a dome light inside the vehicle. MARTINEZ did not see
ROGELIO stab or slash ▬▬▬ but did hear ▬▬▬▬ cry one (1) time.
MARTINEZ heard ▬▬▬▬ say "uggh" and then heard ▬▬▬ hit the
ground. MARTINEZ did not see the knife at this time.

     At this time, CHICO was at the front of the car looking
around for anyone watching. CHICO still had his pistol with him.
The gun was not used to kill ▬▬▬▬ or fired during the incident.
MARTINEZ was very scared. MARTINEZ thought his life was over at
this time.

     MARTINEZ then walked back and CHICO instructed MARTINEZ
to help ROGELIO. MARTINEZ saw ▬▬▬▬ on the ground with his head
towards the front end and his feet towards the trunk. MARTINEZ
depicted this on a drawing on the same piece of paper as the
drawing of the dead end street referenced above. MARTINEZ did not
inspect ▬▬▬▬ to determine the exact nature of the wound. He did
describe the chest area of the boy's clothes as covered in blood.
The interviewee motioned toward that area of his upper chest below
his neck as the area bearing blood on ▬▬▬▬ clothing. When
asked if he noticed blood on any other part of the boy's body or
clothing, MARTINEZ stated he did not.

     Field Noted: The investigating agents marked the diagram
"Dead End in Baytown" with various identifiers to include the
positions of MARTINEZ, CHICO, ROGELIO, and ▬▬▬▬, as MARTINEZ
spoke and indicated same.

     MARTINEZ observed a large amount of blood on the chest
area of ▬▬▬▬. MARTINEZ and ROGELIO took ▬▬▬▬ body and put it
in the back seat. MARTINEZ again stated that he was very scared
and realized the consequences of ▬▬▬▬ murder for both himself
and DIANA. MARTINEZ thought about the consequences for himself and
DIANA and realized that he (MARTINEZ) would never see his own
little boy again.

     Field Note: At this point in the interview, MARTINEZ
began to tear up.

     MARTINEZ again stated that he was very scared. MARTINEZ
knew that drugs were one thing but this (understood to mean the

EXHIBIT 101 Page 010

0001877

FD-302a (Rev. 10-6-95)

7A-HO-71662

Continuation of FD-302 of    CARMELO MARTINEZ                    On 01/03/2011   Page ___11___

murder of ████) was "bull shit", MARTINEZ again stated that
████████ death was "bull shit".

        MARTINEZ noted that CHICO still had a pistol at this
time.  MARTINEZ interjected that CHICO, on another occasion, had
tied up MARTINEZ just to prove a point.  MARTINEZ then added that
he did not want the help of the interviewing agents, he only wanted
to tell the truth.

        MARTINEZ was scared of CHICO and complied with CHICO's
order to help ROGELIO load ████████ body into the car.  MARTINEZ
advised "what CHICO said" MARTINEZ had to do.  MARTINEZ had no
choice.  MARTINEZ held ██████ by the feet while ROGELIO held the
body by the head.  The back doors to the car were open at this time
so ████ was laid across the back seat.  MARTINEZ was made to sit
on the back seat with ████████.  MARTINEZ stated that ██████ was
"stretched out" on the back seat.

        ROGELIO then sat in the front passenger seat while CHICO
took his position as driver of the car.  CHICO drove away from the
area.  MARTINEZ recalled seeing a large amount of blood on the
ground.  MARTINEZ did not know where CHICO was driving to and
remained very scared.

        MARTINEZ did not see the murder weapon at this time.
MARTINEZ advised that CHICO drove around and eventually drove into
a more populated area of Baytown.  MARTINEZ described the area as
having more traffic, people, and lights.  MARTINEZ advised that
CHICO knew much more about Baytown than he (MARTINEZ) did.

        MARTINEZ advised that they traveled to a location where
the highway comes close to a river.  MARTINEZ thought this location
could be close to 225.  MARTINEZ did not know the name of the
river.  MARTINEZ was shown a photograph of a beach/water area and
could not recognize it.  MARTINEZ was again shown a map  which
depicted Galena Park, Pasadena, Deer Park, and Baytown.  MARTINEZ
thought he could have traveled on Route 146 but was not sure.
MARTINEZ was asked if he was on a large or small highway.  MARTINEZ
thought he was on a small highway with only one (1) or two (2)
lanes.  MARTINEZ again stated that he was very scared.

        MARTINEZ noted that the car was still being driven by
CHICO.  CHICO pulled over and ordered MARTINEZ and ROGELIO to dump
the body in the water.  MARTINEZ recalled that the road they were

EXHIBIT 101 Page 011                                                    0001878

FD-302a (Rev. 05-8-10)

7A-HO-71067

Continuation of FD-302 of ___CARMELO MARTINEZ___ , On 05/23/2011 , Page ___12___

on was very close to the water so they did not have to carry
███████ body too far.

ROGELIO and MARTINEZ threw ███████ into the water but
███████ body floated. ROGELIO and MARTINEZ tried to push ███████
under the water but his body still floated. MARTINEZ and ROGELIO
looked around for items to weigh down ███████ body. MARTINEZ and
ROGELIO found some rocks and used the rocks to weigh down ███████
body.

MARTINEZ was again asked for the name of the road or
roads he traveled on to dispose of ███████ body. MARTINEZ advised
that it was a long time but thought he might have been on 146.

MARTINEZ advised that he was covered in blood and
sweating. He wore a khaki colored jump suit because he was working
for a mechanic around that time. MARTINEZ advised that his khakis
were covered in blood and dirt/mud. MARTINEZ took a short break
while at the river location.

MARTINEZ again stated that he was willing to tell the
interviewing agents the truth and was not looking for compassion.
During the incident MARTINEZ was scared and did not say much.

MARTINEZ noted that ███████ body eventually went down
under water due to the weight of the rocks.

MARTINEZ recalled that CHICO still had a pistol with him
and was looking around the area. CHICO stayed at the car while
MARTINEZ and ROGELIO carried ███████ body down to the water's
edge.

Once ███████ body was submerged, all three (3)
individuals got into the car with CHICO driving. MARTINEZ thought
they might have been on 225 driving away from Baytown when a tire
blew. MARTINEZ estimated that they were twenty (20) to twenty-five
(25) minutes into the trip. A second tire then blew. MARTINEZ
recalled thinking that the flat tires were a real problem.
MARTINEZ advised that the car was off the side of the road near a
notel where MARTINEZ had stayed with ANGELITA in the past.
MARTINEZ described the hotel as being big and near a traffic light.
MARTINEZ noted that if one was traveling towards Baytown, the big
hotel would be on the right. MARTINEZ, CHICO, and ANGELITA had
rented a room at this hotel in the past to deal drugs.

EXHIBIT 101 Page 012

0001879

FD-302a (Rev. 10-6-95)

TA-RC-31061

Continuation of FD-302 of   CARMELO MARTINEZ   , On 05/11/2011   , Page   12

MARTINEZ did not remember all three (3) individuals walking to the big hotel at once. MARTINEZ recalled that the hotel may have been closed. MARTINEZ thought that he might have had to push the car to the parking lot of the big hotel. MARTINEZ also thought that CHICO may have called a tow truck to put the car into the parking lot of the big hotel.

ROGELIO obtained a hotel room that night. MARTINEZ did not remember the name of the hotel that ROGELIO stayed at. MARTINEZ and CHICO went to an apartment used by ANGELITA. MARTINEZ advised that DIANA would know this apartment as well. MARTINEZ and CHICO arrived at approximately 1:00am MARTINEZ did not speak with ANGELITA. CHICO went into sleep with ANGELITA.

MARTINEZ changed his clothes at the apartment. MARTINEZ threw out his sneakers but did not throw out his clothes. MARTINEZ did not wash his clothing. He did not recall what happened to the khaki jump suit.

MARTINEZ advised that the car now was in the parking lot of the big hotel and had blood all over the back seat. In the morning, MARTINEZ and CHICO obtained the help of a mechanic to get the two (2) tires replaced. MARTINEZ referred to the mechanic using the name "RENDON" and advised that the mechanic worked from his apartment and did not have an actual shop. MARTINEZ recalled that the mechanic lived in the Manolia (Phonetic) neighborhood. MARTINEZ noted that one could pay the mechanic with cash or drugs since the mechanic was a drug user. MARTINEZ advised that the mechanic put newer tires on the car and never looked inside the car. MARTINEZ advised that this four (4) door, Blue Chevrolet was CHICO's and not borrowed from anyone.

MARTINEZ and CHICO then went to a car wash in Manolia and tried to clean the car to clear evidence. MARTINEZ was not certain but thought that CHICO then sold the car. At this point, the investigating agents again showed MARTINEZ the above-mentioned picture of a bronze two (2) door car. MARTINEZ examined the image again and indicated he was not certain whether or not it was the vehicle he and CHICO picked up from CHARLIE. He said it was possible. MARTINEZ was certain that the car depicted in the image was not used in the abduction and murder of ███████.

MARTINEZ was asked if he told this story to anyone. MARTINEZ advised that he has never told this story to anyone else and noted that there was no way he could confide in anyone to

EXHIBIT 101 Page 013

0001880

FD-302a (Rev. 10-6-95)

TA-HO-71062

Continuation of FD-302 of    CARMELO MARTINEZ    On 05/17/2011 , Page    14

include his parents and/or other family members. While at the aforementioned hotel, CHICO, ROGELIO and MARTINEZ made a pact to never tell what had happened that night.

MARTINEZ then advised that he and CHICO picked up another car. MARTINEZ was not certain but thought the car was being used by one "CHARLIE" at the time. MARTINEZ advised that this was also CHICO's car. MARTINEZ noted that this car was not involved in the murder of ███████.

MARTINEZ was again asked when he saw the murder weapon. MARTINEZ advised that CHICO handed MARTINEZ the knife the night of the murder as they were driving away from Baytown. MARTINEZ did not see ROGELIO hand the knife to CHICO before he, (MARTINEZ) was given same. CHICO instructed MARTINEZ to throw the knife from the window of the moving car. MARTINEZ thought he might have been on 59, close to a church in an African American neighborhood. MARTINEZ advised that this neighborhood is now Hispanic. MARTINEZ advised that he may have thrown the knife out of the window prior to having the tire problems noted above. MARTINEZ described the church as a "Jesus" church.

MARTINEZ recalled being interviewed by a detective at a gas station some time after CHICO obtained the second vehicle. MARTINEZ was very scared at that time.

MARTINEZ recalled washing the first car and picking up the second car from CHARLIE, a large male, sometime in the morning after ███████ was kidnaped and killed. MARTINEZ did not recall the order of the events.

After picking up the car from CHARLIE, MARTINEZ and CHICO went somewhere else but MARTINEZ could not remember. At this point, CHICO told MARTINEZ that he (CHICO) was going away which MARTINEZ understood to mean the Dominican Republic. MARTINEZ could not go away because he did not have any money.

MARTINEZ saw ROGELIO the morning after the murder of ANGELO. MARTINEZ saw ROGELIO at a public basketball court close to Broadway Street near an airport named "Hovey" (Phonetic). MARTINEZ last saw ROGELIO approximately two (2) days after the murder of ANGELO.

MARTINEZ was asked where ROGELIO lived. MARTINEZ advised that ROGELIO was selling cocaine for an unidentified third party

EXHIBIT 101 Page 014

0001881

FD-302a (Rev 10-6-95)

7A-HO-71062

Continuation of FD-302 of ____CARMELO MARTINEZ____ , On 05/23/2011 , Page ___15___

and separated from this third party to sell drugs for CHICO.
MARTINEZ noted that ROGELIO was selling cocaine for CHICO for a
short time before ████████ was murdered.  MARTINEZ repeated that
ROGELIO was also known as "Bori".

        MARTINEZ was asked if he discussed the murder of ████████
with ROGELIO or CHICO.  MARTINEZ responded in the negative.
MARTINEZ further noted that at the hotel, the night of the murder,
all three (3) agreed to not tell anyone regarding the murder of
████████.

        When asked if he had any further details, MARTINEZ
replied that he did not.  MARTINEZ was then asked to write out a
statement in his own words of what happened.  MARTINEZ complied at
12:10p and prepared a two page, single spaced, hand-written
statement.  That written statement is currently maintained as
evidence by the Federal Bureau of Investigation.

        Field Note:  MARTINEZ wrote the first page of his
statement on the back of the diagram showing DIANA's apartment and
the occupants of CHICO's vehicle on the night of ████████ kidnaping
and murder.

        MARTINEZ was then advised of the federal search warrant
which authorized the interviewing agents to take DNA samples in the
form of buccal swabs from MARTINEZ.  MARTINEZ was advised that if
he was not in DIANA's apartment when ████████ was kidnaped, the swabs
may help to corroborate his statement.  MARTINEZ advised that he
was not in DIANA's apartment on the night in question and was happy
to provide the swabs.

        Field Note:  An original FD-302 was prepared by Special
Agent Hochrein to document the service of the search warrant.

        MARTINEZ was then provided with a cup of water but
declined to drink it, indicating he was not thirsty.

        MARTINEZ then initialed the images which he was shown by,
and discussed with, the investigating agents.  These photographs
were also retained as evidence as were the drawings made by
MARTINEZ.

        MARTINEZ asked what would happen next.  MARTINEZ was told
that his information would be provided to the prosecutor in this
matter who would review and attempt to corroborate the information

EXHIBIT 101 Page 015

0001882

FD-302a (Rev. 10-6-95)

7A-HO-71062

Continuation of FD-302 of     CARMELO MARTINEZ                    , On 05/23/2011 , Page   16

    provided by MARTINEZ.  MARTINEZ was further advised that he could
be provided with the writer's contact information in the event
MARTINEZ needed to contact the writer.  MARTINEZ was then told that
an additional meeting or meetings might occur.  MARTINEZ responded
that he did not want the writer's contact information.  MARTINEZ
also stated that if anyone provided information that was
inconsistent with MARTINEZ's statement then that individual was
lying.  MARTINEZ explained that only three (3) people know what
happened to ████: himself, CHICO, and ROGELIO.

      The interview ended and an MVCI guard escorted the inmate
away from the interview room.  At no time was MARTINEZ made any
promises with regard to charges, plea agreements, sentencing, et
cetera.

EXHIBIT 101 Page 016

0001883

13847940101C / Court: 337

# EXHIBIT 102

0001884

```
10/05/92    17:29:09    DPS RESPONSE    PAGE 01
RD

NDX V333715 LIC ███17P EXPIRES NOV/92   EWT  3000   GWT  0000
$ 40.80   TITLE 31932020 ISSUED 08/07/91 ODOMETER 092970
85  FORD   2DR   1FABP46F0FH183513  REG CLASS 01
PREVIOUS OWNER   F AND B CARTER CAR SLS INC PASADENA TX
OWNER   ANGELITA RODRIGUEZ ███████████████████████   █████
LIEN   06/15/91 FLDIS AND BOB CARTER CAR,SALES INC,2501 SO SHAVER,PAS
ADENA,TEX 77502
PLATE AGE:  0
REMARKS  ACTUAL MILEAGE.
```

EXHIBIT 102 Page 001

0001885

13847940101C / Court: 337

# EXHIBIT 104

0001886

SUPPLEMENT NARRATIVE

THIS OFFICER ASSIGNED TO THE VEH EXAM BLDG PROCESSED THE BELOW VEH ON 11/10/92
IN STALL 2.OFFICER CONTACTED HOM AND LEARNED THE DETAILS OF THE CASE.OFFICER
TOOK 1 ROLL OF COLOR 35MM FILM OF THE VEH USING A NIKON 4004S CAMERA WITH
FLASH.THE FILM WAS TAGGED IN THE PHOTO LOCK BOX IN I.D.OFFICER COLLECTED
AND TAGGED IN THE P.R.(TL7E) THE FOLLOWING EVIDENCE:
HAIR:1.TRUNK MATT-TAGGED MATT
     2.DR FRONT SEAT
     3.DR FRONT FLOOR
     4.PASS FRONT SEAT
     5.PASS FRONT FLOOR
     6.PASS REAR FLOOR
     7.PASS REAR SEAT
     8.DR REAR FLOOR
     9.DR REAR SEAT
CARPET:10.PASS FRONT FLOOR
      11.PASS REAR FLOOR
BLOOD:NONE
OFFICER PRINTED THE VEH LIFTING 19 LIFTERS OF PRINTS,SEE PRINT CARDS FOR
LOCATION.THE PRINTS WERE TAGGED IN THE LATENT LAB.THE VEH WAS RELEASED TO
THE OWNER.

VEH:86 OLDS ROYALE COLOR:BEIGE/TAN TX:█████3C VIN:1G3BY37YXF9011915


Supplement entered by = 20359
Report reviewed by-GLASS                 Employee number-████████
Date cleared- 09/08/08

--------------------------------------------------------------

No-0031

Offense~ CAPITAL MURDER / SEXUAL ASSAULT / AGG ASSAULT
                    Street location information
Number-     █████5 Name-███████          Type-          Suffix-
Apt no-█     Name-███████          Type-BLVD    Suffix-
Date of offense-09/30/92            Date of supplement-12/01/92
Compl(s) Last-GARCIA        First-DIANA      Middle-R
         Last-
                    Recovered stolen vehicles information
 Stored-                    by-                    Ph#- (000) 000-0000
Officer1-WALLACE           Emp#-████████ Shift-  Div/Station-CRIME LAB

EXHIBIT 104 Page 001
                                                            0001887

13847940101C / Court: 337

# EXHIBIT 105

0001888

## DECLARACIÓN JURADA DE IRMA IGLESIAS CRUZ

Yo, Irma Iglesias Cruz, digo y declaro lo siguiente:

1.  Mi nombre es Irma Iglesias Cruz. Yo trabajo tiempo completo como un capellán de la prisión institucional en las instalaciones de Bayamón en San Juan, Puerto Rico. Superviso a unas sesenta personas en la Instalación 448 en Bayamón, además de supervisar a capellanes en siete otras instituciones. Superviso la orientación de capellanes nuevas que vienen a trabajar en el entorno institucional. En estas orientaciones, revisamos las normas y procedimientos de ministrar en un establecimiento penitenciario. Me hago cargo también de papeles activos en diferentes clases de religión, incluyendo clases de la Biblia. Superviso los eventos en la capilla y también sirvo como predicadora y consejera. He trabajado como capellán en el Departamento de Corrección y Liberación de Puerto Rico por aproximadamente cuarenta años.

2.  La primera vez que conocí a Obel Cruz-García fue a los fines de los años 2000, cuando él se ubicaba en Bayamón. Yo llegué a conocerlo muy bien a lo largo de unos cuatro años. Obel y yo nos íbamos conociendo a través de nuestro trabajo junto en la capilla, así como asistir servicios religiosos juntos y nuestro estudio de la Biblia y sesiones de consejería.

3.  Durante el tiempo que Obel fue encarcelado en Bayamón, trabajó como mi asistente. En el tiempo que nos conocimos, fue el preso más confiado en la capilla, y me asistió en todos los asuntos de los servicios religiosos de la instalación. Limpió mi oficina y la capilla. También supervisó a otros encarcelados que asistieron los servicios religiosos de la instalación. Él tomó un papel muy activo ayudando a otras personas encarceladas, actuando como un consejero para ellos. Obel también trabajó en el

1

EXHIBIT 105 Page 001

0001889

mantenimiento general de la cárcel, ayudando asegurar que la capilla estuvo lista para los servicios. Con frecuencia, Obel se quedó solo en la instalación.

4.  Debido a las fuertes creencias y las convicciones religiosas de Obel, fue muy querido y respetado por las otras personas encarceladas, y también por el personal de la institución. Incluso al superintendente de la prisión le gustó y él confió sinceramente a Obel.

5.  Obel tuvo la confianza general del personal penitenciario. Ninguna institución correccional permitirá a cualquiera de caminar por la instalación sin supervisión. Un preso debe tener toda la confianza para tener ese grado de libertad, y tuvimos esa confianza en Obel. De hecho, Obel tuvo las llaves de mi oficina. Le di las llaves porque los necesitó para mantener y cuidar la capilla. En todo el tiempo que conocí Obel, nunca actuó de manera inapropiada, se portó mal, o quedó redactado. Nosotros capellanes, en general, somos una comunidad muy conservativa, y el hecho de que Obel ganó nuestra confianza es notable y demuestra mucho sobre su carácter. Además, como capellán de la prisión, estoy acostumbrada a tratar con muchas personas encarceladas, y creo que me he convertido en una persona que puede distinguir entre personas de buen o mal carácter. Por lo general puedo decir si un preso me está tratando de engañar o manipular. Creo que Obel fue sincero en su fe y sus creencias religiosas. Nada de lo que dijo o hizo nunca me dio una razón para dudar a él.

6.  En algún momento antes de que Obel fuera trasladado a Houston, fue trasladado a una celda segregada. Antes de este tiempo, siempre había estado en la población general. Me sorprendió que fue trasladado, ya que nunca había tenido ningunos problemas disciplinarios. Obel me dijo que fue trasladado a la segregación, ya que era sospechoso en un **caso de**

2

EXHIBIT 105 Page 002

0001890

comportamiento. Él nunca se comportó de manera inapropiada durante el tiempo que lo conocí. Por lo que yo sé, su comportamiento en la cárcel fue impecable.

7. Obel se mantuvo muy religioso a lo largo de la totalidad de su pena de prisión. Él oraba con otros encarcelados, y también les predicaba. Obel bien ayudaba que los otros presos analizaran y hablaran de las cosas que ellos experimentaban. Él les aconsejaba y los cuidaba.

8. Yo pensaba que Obel iba tener dificultades de mantener su fe y convicción después de que fue trasladado a la segregación. Por el contrario, incluso después de que Obel fue trasladado a una celda segregada, podríamos escucharlo, desde nuestra capilla, dando sermones a los demás encarcelados en segregación. Él tomó la iniciativa de dirigir los servicios. Su fe nunca lo falló. Todos estábamos muy orgullosos de él. Todo el mundo le hizo caso. Yo sabía que su fe y sus creencias eran fuertes.

9. Obel no era solo un buen oyente, sino que también era dedicado y cariñoso. A veces también me ayudó a pensar bien en mi propia fe y creencia en Dios. Estoy agradecida que Obel me diera la confianza para predicarle a él. Yo sé que Dios ha transformado a Obel, y yo siempre he estado muy impresionada con la fuerza de su creencia.

10. En mis más de cuarenta años de trabajo en las prisiones y centros de detención en Puerto Rico, he trabajado con miles de presos. Obel se destaca como uno de los presos mejores portados y más confiados que he conocido durante todo mi tiempo de trabajo en las cárceles y centros de detención.

11. Nunca fui contactada por los abogados litigantes de Obel. Si yo hubiera sido contactada, habría hecho cualquier cosa que podía para ayudarle a

EXHIBIT 105 Page 003

3

0001891

Obel. Si me hubieran llamado como testigo, habría testificado al contenido de esta declaración jurada.

12. He leído y revisado esta declaración jurada de cuatro páginas.

_Irma Iglesias Cruz_

TESTIMONIO NÚM. _____

Jurado y suscrito ante mí por **Irma Iglesias Cruz,** mayor de edad, casada, y vecina de Toa Baja, y a quien DOY FE de conocer personalmente, hoy día _21_ de _agosto_ de 20_15_, en San Juan, Puerto Rico.

**ABOGADO - NOTARIO**

RECIBO

9397
10/21/2013
$5.00
$5 Sello Asistencia Legal
52568-2013-1021-48096713

EXHIBIT 105 Page 004

0001892

# CERTIFICATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, state and declare as follows:

1. My name is A d r i á n   d e   l a   R o s a. I currently live in Austin, Texas. I am fluent in both English and Spanish.

2. I am a native Spanish speaker, born in Big Spring, Texas. Spanish was my first language, and I speak Spanish regularly with several family members. I also took formal Spanish classes for native speakers during high school and college. I am able to speak, read, and write in Spanish proficiently.

3. I am a Post-Conviction Investigator at the Office of Capital Writs (OCW) in Austin, Texas. As part of my investigation, I was asked by the OCW to translate several English-language affidavits into Spanish.

4. The attached notarized affidavit signed by Irma Iglesias Cruz is the Spanish- language affidavit I translated from an English-language affidavit provided to me by the OCW. The English-language version of the affidavit is also here attached.

5. I declare under penalty of perjury under the laws of the State of Texas that the signed document is a true and correct translation of the English-language text that I originally received.

Executed on <u>August 25, 2016</u>

<u>Adrián de la Rosa</u>

Subscribed and sworn to before me on <u>August 25</u>, 2015

_____

Notary Public, State of Texas



JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017

Notary without Bond

0001893

EXHIBIT 105 Page 005

## AFFIDAVIT OF IRMA IGLESIAS CRUZ

I, Irma Iglesias Cruz, state and declare as follows:

1.  My name is Irma Iglesias Cruz.  I work fulltime as an institutional prison chaplain at the Bayamón facility in San Juan, Puerto Rico.  I supervise about sixty people in the 448 Facility in Bayamón in addition to chaplains in seven other institutions.  I oversee the orientation of new chaplains coming to work in the institutional setting.  In these orientations, we go over the norms and procedures of ministering in a correctional facility.  I also take on active roles in different religious classes, including Bible classes.  I supervise the events in chapel and also serve as a preacher and a counselor.  I have worked as a chaplain in the Puerto Rico Department of Correction and Liberation for roughly forty years.

2.  I first met Obel Cruz-Garcia in the late 2000s when he was housed at Bayamón.  I got to know him very well over the course of about four years.  Obel and I came to know one another through our work together in the chapel, as well as through attending religious services together and our Bible study and counseling sessions.

3.  While Obel was incarcerated at Bayamón, he served as my assistant.  In the time that we knew one another, he was the most trusted inmate in the chapel, and assisted in all matters dealing with the facility's religious services.  He cleaned my office and the chapel.  He also supervised other inmates who made their way to the facility's religious services.  He took a very active role in helping with other inmates, serving as a type of counselor for them.  Obel also performed general maintenance duties, helping to ensure that the chapel was ready for services.  He was often left alone in the facility.

1

EXHIBIT 105 Page 006

0001894

4. Because of Obel's strong religious beliefs and convictions, he was extremely well-liked and respected by other inmates, as well as the institutional staff. Even the prison's superintendent was fond of and sincerely trusted Obel.

5. Obel had the overall trust and confidence of the prison staff. No correctional institution will allow just anyone to walk around the facility without supervision. An inmate must have total trust in order to have that degree of freedom, and Obel had that. In fact, Obel had keys to my office. I gave him keys because he needed them in order to maintain and take care of the chapel. In the entire time I knew Obel, he never acted inappropriately, misbehaved, or got written up. We chaplains, generally speaking, are a very conservative people, and the fact that Obel won our trust is remarkable and shows a lot about his character. Furthermore, as a prison chaplain, I am used to dealing with inmates, and I believe that I have become a good judge of character. I usually can tell if an inmate is trying to 'con' or manipulate me. I believe that Obel was sincere in his faith and his religious beliefs. Nothing he said or did ever gave me a reason to doubt him.

6. At some point before Obel was transferred to Houston, he was transferred to a segregated cell. Before this time, he had always been in general population. I was surprised when he was transferred, since he had never had any disciplinary problems. Obel told me he was transferred to segregation because he was suspected in a case from Houston. As far as I knew, he was not moved due to bad behavior. He never behaved inappropriately during the time that I knew him. As far as I know, his behavior in jail was impeccable.

2

EXHIBIT 105 Page 007

0001895

7.   Obel remained very religious throughout the entirety of his prison sentence. He would pray with and preach to other inmates. Obel was very good at helping other inmates analyze and talk about the things that they were going through. He counseled them and took care of other inmates.

8.   I thought that Obel would find it very difficult to maintain his faith and conviction after he was moved into segregation. To the contrary, even after Obel was transferred into a segregated cell, we could hear him, from our chapel, giving sermons to the other inmates in segregation. He took the initiative to lead services. His faith never failed him. We were all so proud of him. Everyone would listen to him. I knew his faith and beliefs were strong.

9.   Not only was Obel a good listener, but he was also dedicated and loving. At times, he also helped me think through my own faith and belief in God. I am grateful to Obel for giving me the confidence to preach to him. I know that God has transformed Obel, and I have always been very impressed by the strength of his belief.

10.  In my forty-plus years working in prisons and detention centers in Puerto Rico, I have worked with thousands of inmates. Obel stands out as one of the best behaved and most trusted inmates I have met during my entire time working in jails and detention facilities.

11.  I was never contacted by Obel's trial attorneys. If I had been contacted, I would have done anything I could to help Obel. Had I been called as a witness, I would have testified to the contents of this affidavit.

12.  I have read and reviewed this four-page affidavit.

3

EXHIBIT 105 Page 008

0001896

_____

Irma Iglesias Cruz


SWORN TO AND SUBSCRIBED BEFORE ME by Irma Iglesias Cruz, of legal age, married, and resident of Toa Baja, and who I know personally and I can attest, this day August 21, 2015 , in San Juan , Puerto Rico


_____

Attorney—Notary


4

EXHIBIT 105 Page 009

13847940101C / Court: 337

# EXHIBIT 106

0001898

reconocido y ordenado con una licenciatura en Teología. Estudié en el Seminario Teológico Autónomo de San Juan, Puerto Rico.

2. Durante parte de mi tenencia en el Departamento de Correcciones, supervisé a 2,000 capellanes que servían las diferentes instalaciones por unos doce años, desde 2000 hasta 2012. En mi papel actual de capellán hoy día, tiendo a las vidas espirituales de los encarcelados de todos los orígenes y credos. También ayudo a las personas con pensamientos suicidas, los que tienen problemas familiares e incluso ayudo con la inserción laboral. También tiendo a las necesidades del personal de la institución correccional, incluyendo los guardias.

3. La primera vez que conocí a Obel fue alrededor de 2005-2006 cuando fue encarcelado en la cárcel Rio Piedra 352. Creo que estaba allí desde 2005 hasta 2010. Trabajé con Obel en sesiones de asesoramiento, así como los estudios religiosos. Me relacioné con él casi todos los días. Después de eso, me trasladé a la cárcel de Bayamón, pero todavía me mantuve en contacto con Obel. Yo lo conocí hasta que fue extraditado a Houston.

4. Cuando primero conocí a Obel, fue evidente la cantidad de interés que tenía en la religión. Basado en mis experiencias anteriores interactuando con personas encarceladas, yo sabía que Obel era alguien para mirar porque él mostraba habilidades de liderazgo y sus

EXHIBIT 106 Page 001

0001899

Durante el tiempo que lo conocía, nunca escuché ninguna queja acerca de él, ni supe que tuvo problemas disciplinarios. Debido a su comportamiento y buen trabajo, Obel tenía la confianza de mí y otros miembros del personal penitenciario, tanto como la confianza de los demás individuos encarcelados.

6. Yo tenía tanta confianza en Obel que le di las llaves de mi oficina, que necesitaba para sus funciones manteniendo la capilla. Para los servicios de la capilla, Obel llegaba temprano para desbloquear y abrir la capilla, encender el aire acondicionado, y preparar la capilla para los servicios. Permítanme ser claro, no se le da a cualquiera estos tipos de deberes. Nosotros solamente los dábamos a la gente que confiábamos verdaderamente por la razón que tenían acceso a llaves muy importantes. Puedo contar en mi mano el número de individuos que he dado este nivel de responsabilidad, el nivel de responsabilidad que le di a Obel, y todavía tendría dedos sobrantes. Eso es lo mucho que confiaba en él. Nunca he tenido ninguna razón para no hacerlo.

7. Obel también se permitió la oportunidad de trabajar en la fabricación de muebles mientras que él estaba encarcelado. De nuevo, esto era un privilegio dado a las personas encarceladas que se comportaban bien y no causaban ningún problema. Especialmente teniendo en cuenta el grado de acceso de este programa a las herramientas eléctricas y otras

EXHIBIT 106 Page 002

0001900

guardias que yo conocía sentían que Obel hizo sus vidas más fáciles asegurándose de que todo el mundo prestaba atención a las reglas de la facilidad. Y, a pesar de que era tan querido por el personal penitenciario, ninguno de los otros encarcelados resentían a Obel por eso. Lo querían y respetaban también.

9. Yo bauticé a Obel en 2008, cuando aún estaba en la institución de Río Piedra. Obel a veces hablaba de haber tomado malas decisiones antes de ser encarcelado, cuando él no tenía a Dios en su vida. Antes de redescubrir su fe, a veces hablaba de un "vacío" o sensación de que algo faltaba en su vida. Yo creo que estos sentimientos se derivaron de no tener a Dios siempre en su vida.

10. Mientras encarcelado, la fe de Obel en Dios fue muy claro y evidente, tanto en la forma en que habló durante los servicios de la capilla, sino también en su alcance a otras personas encarceladas. Yo personalmente vi que Obel cambió las vidas de otras personas encarceladas con sus discusiones acerca de Dios y sus creencias. Les tocó las vidas de tantas personas con su fe y sus creencias en Dios, y yo incluiría a yo mismo como una de esas personas.

11. Movieron a Obel entre diferentes instalaciones durante el tiempo que estuvo encarcelado en Puerto Rico, pero esto es común para las

EXHIBIT 106 Page 003

0001901

13. Obel todavía me escribe cartas. A pesar de que sus circunstancias son tan difíciles en este momento, el sigue mostrando el amor y apoyo. En sus cartas siempre pregunta cómo me va y expresa interés en mi vida. Estoy, y siempre he sido, impresionado con el grado de sensibilidad que tiene Obel.

14. En mis diecisiete años de trabajar con los presos y personas encarceladas, he trabajado con miles de personas. Obel se destaca como uno de los mejores educados y más de confianza de todas las personas con las que he trabajado en los centros penitenciarios. Él ha dejado una impresión muy importante en mi vida como capellán.

15. Nunca fui contactado por abogados litigantes de Obel. Si yo hubiera sido contactada, habría hecho cualquier cosa que podía para ayudar a Obel. Habría juntado el dinero para viajar a Houston, si el equipo de defensa no tenía fondos para traerme. Si me hubieran llamado como testigo, yo habría testificado del contenido de esta declaración jurada.

EXHIBIT 106 Page 004

0001902

Iván Negrón Vera

*Aff. Num. 19-288*

Jurado y afirmado ante mi este __11__ día __Agosto__ , 2015.

_____

Firma del Notario Público

Imprimir, Escribir o Sello del Notario Público Comisionado:




9397
08/06/2015
$5.00
$5 Sello Asistencia Legal
50593-2015-0806-57483674

EXHIBIT 106 Page 005

0001903

## CERTIFICATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, state and declare as follows:

1. My name is Adrián de la Rosa. I currently live in Austin, Texas. I am fluent in both English and Spanish.

2. I am a native Spanish speaker, born in Big Spring, Texas. Spanish was my first language, and I speak Spanish regularly with several family members. I also took formal Spanish classes for native speakers during high school and college. I am able to speak, read, and write in Spanish proficiently.

3. I am a Post-Conviction Investigator at the Office of Capital Writs (OCW) in Austin, Texas. As part of my investigation, I was asked by the OCW to translate several English-language affidavits into Spanish.

4. The attached notarized affidavit signed by Iván Negrón Vera is the Spanish-language affidavit I translated from an English-language affidavit provided to me by the OCW. The English-language version of the affidavit is also here attached.

5. I declare under penalty of perjury under the laws of the State of Texas that the signed document is a true and correct translation of the English-language text that I originally received.

Executed on August 25, 2016

Adrián de la Rosa

Subscribed and sworn to before me on August 25, 2015

Notary Public, State of Texas



JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017

Notary without Bond

EXHIBIT 106 Page 006

0001904

# AFFIDAVIT OF IVÁN NEGRÓN VERA

I, Iván Negrón Vera, state and declare as follows:

1. My name is Iván Negrón Vera. I work as a prison chaplain at the Department of Corrections in San Juan, Puerto Rico. I have worked there for seventeen years. I am a recognized and ordained minister with a bachelor's degree in Theology. I studied at the Seminario Teológico Autónomo in San Juan, Puerto Rico.

2. During my tenure at the Department of Corrections, I supervised 2,000 chaplains serving the different facilities for roughly twelve years, from 2000 through 2012. In my current chaplain role, I tend to the spiritual lives of those incarcerated from all backgrounds and faiths. I also help individuals with suicidal thoughts, those having family problems and even help with job placement. I also tend to the needs of the correctional facility staff, including guards.

3. I first met Obel around 2005-2006 when he was housed at the Rio Piedra jail 352. I believe he was housed there from 2005 to 2010. I worked with Obel in counseling sessions, as well as religious studies. I interacted with him nearly every day. After that, I moved to Bayamon jail, but I still kept in contact with Obel. I knew him until he was extradited to Houston.

4. When I first met Obel, it was obvious how much interest he had in religion. Based on my prior experiences interacting with incarcerated individuals, I knew Obel was someone to watch because he showed leadership skills and his strong personal testimonies regarding religion were very impactful. He completely earned my confidence and the confidence of several other individuals at the facility, both inmates and facility staff and guards.

1

EXHIBIT 106 Page 007

0001905

5. While Obel was housed at Rio Piedra, he was housed in general population and was frequently left alone outside of his cell. During the time that I knew him, I never had any complaints about him or knew him to have any disciplinary problems. Because of his behavior and good work, Obel had the trust of myself and other prison staff, as well as the other incarcerated individuals.

6. I had so much trust and confidence in Obel, I gave him the keys to my office, which he needed for his chapel duties. For chapel, Obel would arrive early to unlock and open the chapel, turn on the air conditioning, and prepare the chapel for services. Let me be clear, not everyone is given these types of duties. We only gave them to the people we truly trusted and confided in because they were given important keys. I can count on my hand the number of individuals that I have given this level of responsibility, the level of responsibility that I gave Obel, and I would still have fingers left over. That is how much I trusted him. I never had any reason not to.

7. Obel also was allowed the opportunity to work making furniture while in jail. Again, this was a privilege given to incarcerated individuals that behaved well and did not cause any problems. Especially considering how much access this program gave to power tools and other sharp machinery, only the most trusted inmates were given this privilege.

8. Not only was Obel well behaved, but he also helped to maintain order in the prison. He was respected by other inmates as well as staff, and was able to convince other inmates to pay attention to the correctional staff and follow the rules. Many of the corrections officers that I knew felt that Obel made their lives much easier by making sure that everyone in the facility followed the rules. And, even though he was so well liked by the correctional staff,

2

EXHIBIT 106 Page 008

0001906

none of the other inmates seemed to resent him for it. They liked and respected him, too.

9. I baptized Obel in 2008, while he was still at the Rio Piedra facility. Obel sometimes talked about having made bad decisions before he was incarcerated, when he did not have God in his life. Before Obel rediscovered his faith, he sometimes talked about an "emptiness" or feeling like something was missing in his life. I believe that these feelings stemmed from his not always having God in his life.

10. While incarcerated, Obel's faith in God was very clear and evident, both in the way that he spoke during chapel services, but also in his outreach to other incarcerated individuals. I personally saw him change other inmates' lives with his discussions about God and his beliefs. He touched so many people's lives with his faith and beliefs in God, and I would include myself as one of those people.

11. Obel was moved between different facilities during the time he was incarcerated in Puerto Rico, but this is common for inmates here. As far as I know, this had nothing to do with Obel's conduct in prison.

12. I am still grateful to Obel because he did so much to help me and the rest of the prison staff. I am grateful for the positive influence that he had on other inmates at Rio Piedra during the time he was housed there.

13. Obel still writes me letters. Even though his circumstances are so difficult right now, he continues to show love and support. In his letters he always asks how I am doing and expresses interest in my life. I am, and always have been, impressed with how sensitive Obel is.

14. In my seventeen years working with prisoners and incarcerated individuals, I have worked with thousands of people. Obel stands out as one of the best behaved and most trustworthy of all the people I have worked with in

3

EXHIBIT 106 Page 009

0001907

correctional facilities.  He has left a very important impression in my life as a chaplain.

15. I was never contacted by Obel's trial attorneys.  If I had been contacted, I would have done anything I could to help Obel.  I would have raised the money to fly to Houston, if the trial team could not afford to bring me.  Had I been called as a witness, I would have testified to the contents of this affidavit.

16. I have read and reviewed this five-page affidavit.


I declare under penalty of perjury under the laws of Puerto Rico that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on ____ of August, 2015 in _____.


_____

Iván Negrón Vera


Subscribed and sworn to before me on this _____ day _____, 2015.


_____

Notary Public

EXHIBIT 106 Page 010

0001908

13847940101C / Court: 337

# EXHIBIT 107

0001909

ayudante voluntario, sirvo como consejero y predicador, y ayudo a las personas que tienen problemas como la depresión o ideas suicidas. He sido voluntario durante aproximadamente 22 años. He sido pastor durante los últimos 30 años y estudié en el Instituto Bíblico Jóvenes Cristianos.

2. La primera vez que conocí a Obel era cuando él estaba ubicado en la instalación del 352. Lo conocí unos cuatro años, durante los cuales serví como predicador y consejero. Recuerdo a Obel bien porque él cuidaba la capilla. Él ayudaba preparar la capilla para los servicios. Recuerdo también que Obel tomó parte en la parte música de nuestros servicios. Llegué a conocer a Obel muy bien durante nuestro tiempo juntos, tanto hablándonos individualmente y también de nuestro tiempo en los servicios de la iglesia. Era muy feliz y se llevaba bien con todo el mundo a su alrededor. Él era muy cariñoso y una buena persona en general. Él era amable con los condenados y también los guardias.

3. Obel era muy confiado por el personal de la prisión en la instalación del 352. No recuerdo que él tuviera jamás problemas disciplinarios; Obel no era considerado un preso peligroso o violento. Estaba ubicado en la población general. Durante el tiempo que lo conocí, nunca escuché ninguna queja sobre él. Por el contrario, recuerdo a

EXHIBIT 107 Page 001

0001910

que llamamos la "corporación". Esta era una instalación donde personas encarceladas podían construir y vender muebles. Debido a que los presos que trabajaban en la "corporación" tendrían acceso a las herramientas y otros materiales potencialmente peligrosos, solo los presos que estaban bien educados y trabajadores eran autorizados para trabajar allí. El hecho de que Obel fue permitido para trabajar allí indica la cantidad de confianza que el personal de la prisión tenía en él.

5. Después de observar a Obel y conocerlo mejor, supe que su fe en Dios era real. Él es un buen hombre con creencias honestas que lo llevan a hacer un buen trabajo para otros. No era consciente que él tenía problemas con nadie. Si tuviera algunas problemas, él nunca habría sido dado todos los privilegios que le dieron mientras estaba detenido en el 352.

6. En mis veintidós años trabajando en los centros penitenciarios y trabajando con miles de presos, Obel se destaca como uno de los presos más educados y confiados que puedo recordar. Lo veía regularmente y sé como todos en las instalaciones le tenían mucha confianza. Yo estaba extremadamente impresionado por su comportamiento en las instalaciones, sino también por su deseo de ser una mejor persona y un buen padre. Recuerdo que hacía hamacas

EXHIBIT 107 Page 002

7. Los abogados litigantes de Obel nunca me contactaron. Si me hubieran contactado, habría hecho todo lo que podía para ayudar a Obel. Si me hubieran llamado como testigo, habría testificado de los contenidos de esta declaración jurada.

8. He leído y revisado esta declaración jurada de tres páginas.

Yo declaro bajo pena de perjurio bajo las leyes _Puerto Rico,_ que lo anterior es verdadero y correcto según mi mejor conocimiento y que esta declaración jurada fue ejecutada el _11_ de _agosto_ 2015 en _San Juan, Puerto Rico_ Puerto Rico.

J.O

_A.A. Num. 19.290_                          _Jimmy Osorio_
                                                    Jimmy Osorio

Jurado y firmado ante mi este _11_ día _agosto_ , 2015.

_____
Firma del Notario Público

Imprimir, Escribir o Sello del Notario Público Comisionado

RECIBO
RECIBO
RECIBO
08574434
9397
08/06/2015
$5.00
$5 Sello Asistencia Legal
50593-2015-0806-57483683

EXHIBIT 107 Page 003                                      0001912

# CERTIFICATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, state and declare as follows:

1. My name is A d r i á n  d e  l a  R o s a.  I currently live in Austin, Texas.  I am fluent in both English and Spanish.

2. I am a native Spanish speaker, born in Big Spring, Texas. Spanish was my first language, and I speak Spanish regularly with several family members.  I also took formal Spanish classes for native speakers during high school and college.  I am able to speak, read, and write in Spanish proficiently.

3. I am a Post-Conviction Investigator at the Office of Capital Writs (OCW) in Austin, Texas.  As part of my investigation, I was asked by the OCW to translate several English-language affidavits into Spanish.

4. The attached notarized affidavit signed by Jimmy Osorio is the Spanish- language affidavit I translated from an English-language affidavit provided to me by the OCW. The English-language version of the affidavit is also here attached.

5. I declare under penalty of perjury under the laws of the State of Texas that the signed document is a true and correct translation of the English-language text that I originally received.

Executed on August 25, 2015

Adrián de la Rosa

Subscribed and sworn to before me on August 25 , 2015

Notary Public, State of Texas

EXHIBIT 107 Page 004

JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017

Notary without Bond  0001913

## AFFIDAVIT OF JIMMY OSORIO

I, Jimmy Osorio, state and declare as follows:

1. My name is Jimmy Osorio. I volunteer as an assistant prison chaplain at the Department of Corrections in San Juan, Puerto Rico. I am currently at the Bayamon facility. In my role as a volunteer assistant chaplain, I serve as a counselor and preacher, and I help people that are having problems such as depression or suicidal thoughts. I have volunteered for about 22 years. I have been a pastor for the past 30 years and I studied at the Insituto Biblico Jovenes Cristianos.

2. I first met Obel when he was housed at the 352 facility. I knew him for about four years, during which time I served as a preacher and counselor. I remember Obel well because he took care of the chapel. He assisted in getting the chapel ready for services. I also remember he took part in the music part of our services. I got to know Obel very well during our time together, both talking individually and also from our time in church services. He was very happy and he got along well with everyone around him. He was very loving and an overall good person. He was kind to both inmates and guards.

3. Obel was very much trusted by the prison staff at the 352 facility. I do not recall him ever having disciplinary problems; Obel was not considered a dangerous or violent inmate. He was housed in general population. During the time I knew him, I never heard any complaints about him. On the contrary, I remember Obel because of the tremendous privileges he had while he was housed at the 352 facility. Because of his good behavior, he was given keys to move around unsupervised, in order to get the chapel ready for services. He was well respected by the guards and other inmates.

1

EXHIBIT 107 Page 005

0001914

4. While Obel was housed at the 352, he worked in a facility that we called the "corporation." This was a facility where inmates could build and sell furniture. Because inmates who worked at the "corporation" would have access to tools and other potentially dangerous materials, only inmates who were well-behaved and hard-working were permitted to work there. The fact that Obel was permitted to work there indicates how much trust the prison staff had in him.

5. After watching Obel and getting to know him better, I knew his faith in God was real. He is a good man with honest beliefs that lead him to do good work for others. I did not know him to have any problems with anyone. If he had any problems, he would never have been given all of the privileges he was given while at the 352.

6. In my twenty-two years working in correctional facilities and working with thousands of inmates, Obel stands out as one of the best behaved and most trusted inmates I can recall. I saw him regularly and I know how trusted he was by everyone in the facility. I was extremely impressed by his behavior in the facility, but also by his desire to be a better person and a good father. I remember he would make hammocks while in jail, in order to sell them to make money for his daughter. He also counseled other inmates and encouraged and supported them to be better people. He would help them improve their behavior in jail and he would guide them through Bible studies. He worked hard to help them be better people and I respected him for that.

7. I was never contacted by Obel's trial attorneys. If I had been contacted, I would have done anything I could to help Obel. Had I been called as a witness, I would have testified to the contents of this affidavit.

8. I have read and reviewed this three-page affidavit.

2

EXHIBIT 107 Page 006

0001915

Case 4:17-cv-03621 Document 13-107 Filed on 04/05/19 in TXSD Page 7 of 1

I declare under penalty of perjury under the laws of Puerto Rico that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on _____ of August, 2015 in _____, Puerto Rico.


_____

Jimmy Osorio



Subscribed and sworn to before me on _____, 2015.



_____

Notary Public, State of Texas

3

EXHIBIT 107 Page 007

0001916

13847940101C / Court: 337

# EXHIBIT 108

0001917

capellán voluntario, durante unos veintiocho años y he trabajado en varias instalaciones correccionales diferentes. También trabajé para "El Nuevo Día", el principal diario en Puerto Rico, por unos trece años. Mantuve la maquinaria y tendía al papel para imprimir el periódico.

2. La primera vez que conocí Obel Cruz García fue cuando era un preso alojado en la cárcel 352 en el complejo penitenciario Oso Blanco. Iván Negrón era el capellán supervisor en ese tiempo. Conocí Obel por cerca de cuatro años. Yo lo conocí personalmente a través de sesiones de terapia y de trabajar con él en la capilla, así como nuestras interacciones durante los servicios religiosos. Yo fui su predicador también. Me trasladé a una instalación diferente después de esos cuatro años, pero todavía me mantenía en contacto con Obel. Recuerdo bien a Obel a causa de su fe y de su manera de hablar de su fe. También me acuerdo que él era un gran trabajador y una influencia positiva en general a todo el mundo a su alrededor. Estaba seguro de su fe, y hablaba de sus sentimientos a los demás, y eso era contagioso.

3. Obel ganó la confianza del personal penitenciario en el 352. Me pasé mucho tiempo hablando con él y trabajando con él, y nunca consideré que Obel fuera un preso peligroso o violento. En los años que yo conocía Obel, él estaba ubicado en la población general y se le dieron

EXHIBIT 108 Page 001

capellanes. Durante mi tiempo de trabajo en la instalación de 252, nunca escuché ninguna queja sobre Obel o supe que tuvo problemas disciplinarios. Obel era bien respetado por todos en las instalaciones, incluyendo los administradores de la cárcel, los guardias, y los demás confinados.

4. Una cosa que me impresionó de Obel fue la fuerza de su fe en Dios. Solo a través de hablar con él, yo mismo aprendí mucho acerca de Dios y la espiritualidad. Lo vi cambiar y transformar en un lugar donde es difícil de cambiar porque sucede tanto detrás de esas paredes. Él venció todo eso y era capaz de mantener su fe. No solo eso, él fue capaz de ayudar a otras personas, otros presos, entrar en un buen camino también. Él era muy digna y muy admirable. Estoy agradecido a Obel por pensar en mí como su amigo, su familia, y su pastor.

5. Después de mis veintiocho años de trabajo en los centros penitenciarios, he visto y trabajado con miles de presos, y Obel se destaca como uno de los individuos y los presos mejores comportados y de mayor confianza que puedo recordar.

6. Nunca fui contactado por los abogados litigantes de Obel. Si yo hubiera sido contactado, habría hecho cualquier cosa que podía para ayudar a Obel. Creo que habría sido importante que el tribunal de

EXHIBIT 108 Page 002

0001919

de esta declaración jurada.

8. He leído y revisado esta declaración jurada de tres páginas.

Yo declaro bajo pena de perjurio y bajo las leyes de *Puerto Rico* que lo anterior es verdadero y correcto según mi mejor conocimiento y que esta declaración jurada fue ejecutada el *11* de *Agosto* 2015 en *San Juan, Puerto Rico.*

*LRGM*

*A.A. Num 19-289*

_____
Luis González Martínez

Jurado y afirmado ante mi este *11* día *Agosto*, 2015.

_____
Firma del Notario Público

Imprimir, Escribir o Sello del Notario Público Comisionado:

RECIBO
09574433
9397
08/06/2015
$5,00
$5 Sello Asistencia Legal
50593-2015-0806-57483679

EXHIBIT 108 Page 003

0001920

## CERTIFICATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, state and declare as follows:

1. My name is A d r i á n  d e  l a  R o s a. I currently live in Austin, Texas. I am fluent in both English and Spanish.

2. I am a native Spanish speaker, born in Big Spring, Texas. Spanish was my first language, and I speak Spanish regularly with several family members. I also took formal Spanish classes for native speakers during high school and college. I am able to speak, read, and write in Spanish proficiently.

3. I am a Post-Conviction Investigator at the Office of Capital Writs (OCW) in Austin, Texas. As part of my investigation, I was asked by the OCW to translate several English-language affidavits into Spanish.

4. The attached notarized affidavit signed by Luis González Martínez is the Spanish- language affidavit I translated from an English-language affidavit provided to me by the OCW. The English-language version of the affidavit is also here attached.

5. I declare under penalty of perjury under the laws of the State of Texas that the signed document is a true and correct translation of the English-language text that I originally received.

Executed on August 25, 2015

Adrián de la Rosa

Subscribed and sworn to before me on August 25, 2015

Notary Public, State of Texas

EXHIBIT 108 Page 004



JEREMY SCHEPERS
Notary Public, State of Texas
My Commission Expires
MARCH 20, 2017

Notary without Bond

0001921

## AFFIDAVIT OF LUIS GONZÁLEZ MARTÍNEZ

I, Luis González Martínez, state and declare as follows:

1. My name is Luis González Martínez. I currently volunteer as a prison chaplain at several different correctional facilities in San Juan, Puerto Rico. I have volunteered as a chaplain for about twenty-eight years, and I have worked at several different facilities. I also worked at "el Nuevo Dia," the main newspaper in Puerto Rico, for about thirteen years. I maintained the machinery and tended to the paper in order to print the newspaper.

2. I first met Obel Cruz-Garcia when he was an inmate housed at the 352 jail in the Oso Blanco prison complex. Iván Negrón was the head chaplain at the time. I knew Obel for about four years. I knew him personally through counseling sessions and working with him at the chapel, as well as our interactions during church services. I was his preacher as well. I moved to a different facility after those four years, but I still kept in contact with Obel. I remember Obel well because of his faith and the way he spoke of his faith. I also remember him being a hard worker and an overall positive influence on everyone around him. He was secure in his faith, and he spoke of his feelings to others, and that was infectious.

3. Obel earned the trust of the prison staff at the 352. I spent considerable time speaking to him and working with him, and I never considered Obel to be a dangerous or violent inmate. In the years that I knew Obel, he was housed in general population and he was given tremendous privileges that not just anyone is given. He was allowed to open the chapel, which meant he had important keys and unsupervised movement within the facility. He was also given the privilege of working on furniture, which again is an important job for only the most trusted. I have to stress that he gained

1

EXHIBIT 108 Page 005

0001922

tremendous trust and confidence from the jail staff and the chaplains. During my time working at the 352 facility, I never heard any complaints about Obel or knew him to have any disciplinary problems. Obel was well respected by everyone in the facility, including jail administrators, guards, and other inmates.

4.  One thing that impressed me about Obel was the strength of his faith in God. Just through speaking with him, I myself learned a lot about God and spirituality. I saw him change and transform in a place where it is hard to change because so much happens behind those walls. He overcame all of that and was able to keep his faith. Not only that, he was able to help other people, other inmates, get on a good path as well. He was very dignified and very admirable. I am grateful to Obel for thinking of me as his friend, his family, and his pastor.

5.  After my twenty-eight years working in correctional facilities, I have seen and worked with thousands of inmates, and Obel stands out as one of the best behaved and most trusted individuals and inmates I can recall.

6.  I was never contacted by Obel's trial attorneys. If I had been contacted, I would have done anything I could to help Obel. I think it would have been important for the court in the United States to hear how successful Obel was in prison in Puerto Rico. I could have spoken to the jury about my trust in Obel and the depth of his faith in God. I think this information would have helped the jury decide to sentence him to life in prison.

7.  Had I been called as a witness, I would have testified to the contents of this affidavit.

8.  I have read and reviewed this three-page affidavit.

2

EXHIBIT 108 Page 006

0001923

I declare under penalty of perjury under the laws of Puerto Rico that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _____ of August, 2015 in San Juan, Puerto Rico.


_____

Luis Gonzalez Martinez



Subscribed and sworn to before me on _____, 2015.



_____

Notary Public

EXHIBIT 108 Page 007

0001924

13847940101C / Court: 337

# EXHIBIT 110

0001925

# EXPERT DECLARATION OF DR. CLAUDIA AHUMADA DEGRATI, PH.D.

I, Claudia Ahumada Degrati, Ph.D., declare as follows:

1. My name is Claudia Ahumada Degrati, Ph.D. I am a practicing clinical and forensic psychologist. In my practice, I assess and treat individuals, some of whom have an acquired brain injury or suffer from depression, anxiety, PTSD, and other mental disorders. My clinical experience also includes providing psychotherapy to individuals who have been exposed to domestic violence and sexual, physical, and emotional abuse. In addition, I conduct psychological and neuropsychological evaluations and assessments and provide forensic consultation on mental health issues. I am fully bilingual in English and Spanish and many of my patients are immigrants, particularly from Latin America. The factual statements I make in this declaration are true and correct to the best of my knowledge and experience.

2. Obel Cruz-Garcia is an inmate in the custody of Texas Department of Criminal Justice (TDCJ). Current counsel for Obel Cruz Garcia requested that I conduct a psychosocial assessment of Obel to identify and describe psychologically significant traumatic events in Obel's life and evaluate and explain the effects, if any, of those events on his cognitive, psychological, and emotional development and social functioning. My findings, analysis, and conclusions are set forth in this Declaration.

## EXECUTIVE SUMMARY

3. Obel's traumatic life experiences began with a childhood characterized by neglect, parentification at a young age, exposure to alcohol at a very young age, abandonment, and other traumatic and stressful events. From childhood and early adolescence to adulthood, Obel Cruz Garcia suffered chronic, repeated, trauma with its long-lasting consequences and effects on somatic, cognitive, affective, and behavioral areas of functioning.

## BACKGROUND AND QUALIFICATIONS

4. My professional qualifications are fully expressed in my curriculum vitae appended to this report. Brief highlights include the following:

   a. I am a clinical psychologist licensed to practice in the State of California. I also hold a temporary license to practice in the state of Texas. I received my Bachelor of Arts degree, with a major in liberal arts and minor in Spanish, from Prescott College in Prescott, Arizona, in 1998. I received my Master of Arts in Clinical Psychology from Ryokan College in 2000. In

2004, I received a Ph.D. in Clinical Psychology from Pacifica Graduate Institute in Santa Barbara, California. In 2017, I received a certificate in Clinical Neuropsychology from Fielding Graduate University.

b. Between 2000 and 2003, and between 2006 and 2007, I worked at the Crime Victim Counseling Center in Cerritos, California as a psychological assistant. I provided individual and family psychotherapy to child, adolescent, and adult victims of crime experiencing high-risk stressors including domestic violence and sexual, physical, and emotional abuse. I also assessed and provided treatment plans for children, adolescents, and adults exhibiting symptoms of mental disorders including anxiety, depression, and posttraumatic stress disorder (PTSD).

c. Between 2005 and 2007, I worked for Barbara Cort Counter, Ph.D., Inc., a private clinical and forensic psychological practice in Beverly Hills, California. As a psychological assistant, I provided individual psychotherapy as well as forensic consultations and evaluations for state and federal court cases.

d. I have been an approved service provider for two Regional Centers in Southern California. From 2011 until 2013, I provided services at the North Los Angeles County Regional Center in Van Nuys. From 2013 until 2015 I provided psychological services at Harbor Regional Center in Torrance. Regional centers are private, non-profit organizations contracting with the State of California for the provision of services to persons with developmental disabilities. At the regional centers, I conducted reevaluations of the regional center's clients and evaluations of regional center applicants to determine eligibility for services by assessing whether the clients or applicants have a developmental disability as defined by California law and regulations.

e. Since 2007, I have maintained a private practice in clinical and forensic psychology, until recently in Beverly Hills, and currently in Fullerton, California. In my practice, I assess and treat individuals, some of whom have an acquired brain injury or suffer from depression, anxiety, PTSD, and other mental disorders. My clinical experience also includes providing psychotherapy to individuals who have been exposed to domestic violence and sexual, physical, and emotional abuse. I also conduct psychological and neuropsychological evaluations and assessments and provide forensic consultation on mental health issues. I am fully bilingual in English and

Exhibit 110 Page 002

Spanish and many of my patients are immigrants, particularly from Latin America.

f. From 2011 until 2017, I served as an adjunct faculty member at the Pacifica Graduate Institute in Carpinteria, California. I taught and provided case consultation and supervision to doctoral-level students on multiculturalism and cultural diversity issues arising in psychotherapy.

## REFERRAL QUESTION AND SCOPE OF EVALUATION

5. Current counsel for Obel Cruz Garcia requested that I conduct a psychosocial assessment of Obel to identify and describe psychologically significant traumatic events in Obel's life and evaluate and explain the effects, if any, of those events on his cognitive, psychological, and emotional development and social functioning.

6. To perform the requested tasks, I conducted four clinical interviews of Obel in a confidential meeting room at Texas Department of Criminal Justice (TDCJ) Polunsky Unit, in Livingston, Texas on October 15, 2018; October 16, 2018; February 28, 2019 and March 1, 2019, for a total of approximately twenty three hours. In addition, I reviewed numerous declarations and court testimony of family members and other individuals who observed Obel's experiences, development, and functioning. These are the types of materials and information upon which psychologists rely to reach reliable opinions and clinical conclusions about a person's history and functioning.

## MATERIALS REVIEWED

7. In preparing this report and reaching the expert opinions contained herein, I have reviewed, among other materials:

   a. Excerpts from state writ and accompanying exhibits;

   b. Punishment phase trial transcripts (volumes 24-28);

   c. Declarations from witnesses in Dominican Republic;

   d. Declarations from witnesses in Puerto Rico;

   e. Declaration of Noemi Cruz-Garcia;

8. On the basis of my review of these materials and interviews, I provide the following opinions and conclusions.

Exhibit 110 Page 003

# MR. OBEL CRUZ-GARCIA'S LIFE HISTORY

9.  Obel Cruz Garcia was born on July 8, 1967, in Santo Domingo, Dominican Republic, to Valerio Julian de la Cruz Santos and Dalia Garcia.

## Early Childhood

10. Obel is the second of his parent's four children. In birth order they are: Noemi, Obel, Natalia and Joel. When Obel was a young child, the family lived in a house that his father built in the Maquiteria neighborhood of Santo Domingo. Valerio cleared what was at the time a small piece of scrubland and claimed it for himself and his family. Initially, the house was precariously built with wood planks. Later, Valerio re-built it with cement blocks.

11. Obel's mother, Dalia was a homemaker and his father was the sole bread winner. Valerio was a paramedic in the navy; he worked shifts at the military base and his job was well regarded. Valerio also liked to drink and had affairs with many women. Based on information obtained from multiple sources in the Dominican Republic, Obel's father's womanizing and multiple affairs were one of the cultural mores common in the Dominican Republic. Valerio's father and his father's father had many children with multiple women. Obel's great grandfather had 36 children with different women. Despite the cultural and familial underpinnings of Valerio's behavior, it still caused tremendous tension between Obel's parents and exposed him to situations that were highly inappropriate for a child.

12. Valerio's excesses were drinking and womanizing. He began sharing his drinks with Obel when Obel was a five-year-old child. Valerio would tell Obel that he was a man already and have him drink rum and sometimes whisky.

13. When Obel was about five years old, his father had an accident that was to change life Obel's and his family's life forever. Valerio was hit by a car while on the side of the road and was injured so severely that when he was taken to the hospital, they thought he was dead. Valerio was placed in the morgue until one of Obel's uncles went to identify him and realized he was not dead. Valerio had seven broken ribs, a broken leg and an injured spleen. His recovery was long and arduous. He was hospitalized for a long time and had many surgeries. Afterwards, Obel became his father's crutch. During Valerio's hospitalization, Obel would go back and forth from home to the hospital and help tend to his father. After the accident, Valerio would tell Obel he had become the man of the house now. Because of his injuries,

4

Exhibit 110 Page 004

0001929

Valerio was declared officially disabled and could no longer work for the navy.

## Abandonment by Mother

14.      After Valerio's accident, Dalia became aware of his multiple affairs. Valerio was unrepentant and made it clear that he intended to continue to see other women. With the support of her family, Dalia decided to leave her husband and children and join her older sister in Venezuela. Obel was six or seven years old when his mother abandoned the family. The loss of his mother was devastating to Obel. Valerio hired a neighborhood woman to help but the brunt of household duties fell on Obel and his older sister, Noemi. They cleaned and cooked and cared for their younger siblings, including Joel, who was still in diapers.

## Move to a Rural Village

15.      After some time, Valerio decided to move with the children to his mother's house in the small rural village of Boba, so that he could have help. Moving to Boba was another life-changing event for Obel, who was around 10 years old. He left behind life as he knew it in Santo Domingo, the capital, to live in a small fishing village in a rural area of the country. There was no electricity or running water in Boba. At night, the house was lit by an oil lamp. The family obtained water from a small well or "cacimba." A hole in the yard served as the toilet. During storms, the runoff from the latrine contaminated the cacimba. Nor were there any phones in the village. Obel brought his dog with him but in Boba the dog barked constantly and was tied outside until he set himself free and attacked a pig. Obel was devastated when his pet was sent back to Santo Domingo. Not having his dog with him felt like another tremendous loss to him.

16.      The residents of Boba fed their families by fishing and farming and everyone, even the children, were expected to help. When Obel and his family moved to Boba, they initially lived with his paternal grandmother, Ramona Santos, who lived in a small two-bedroom wooden house with her second husband. Their large extended family lived in the area and it was not uncommon for other people to stay overnight in the already crowded home. Ramona cooked using firewood and gathering wood for cooking became one of Obel's chores.

17.      Valerio frequently took Obel with him to fish in order to feed the family. They left very early in the mornings, before school. Sometimes they went fishing out to sea for three or four days. On the fishing trips they brought food such

5

Exhibit 110 Page 005

as bread, salami and sardines and alcohol to "keep warm." They fished in the deep waters off the coast and tried to keep land in sight. They were often caught in rough seas. Several people described an incident in which the boat capsized and Obel jumped in the water to rescue his father who had fallen in the water. Obel became an avid and skillful fisherman. He and his father also worked in the fields tending to and gathering rice crops. In Boba, Obel attended a small village school. He fished with his father in the morning and attended class in the afternoon. Obel's teacher, Altagracia Mosquea, remembers his nervousness and anxiety whenever he was required to speak in front of the class. He would break into a cold sweat when called upon to go up to the board. Obel would volunteer to walk a sick classmate home in order to leave school.

18.   While living in Boba, Obel and his siblings had no direct contact with their mother. Dalia sent some money back via her parents, which Valerio would collect when he made monthly medical visits to Santo Domingo. When Obel was approximately twelve, Dalia sent for his older sister, Noemi, to join her in Venezuela. She promised to send for Obel shortly thereafter and he was excited about going to live with his mother and older sister. However, according to Noemi, Dalia never really intended to bring Obel to live with her. Obel felt rejected and abandoned anew.

19.   Valerio set up a dispensary in Boba, which had previously had no place to go for medical attention. People from the area and neighboring villages went there for his services. Obel became his father's assistant of sorts and watched as his father cared for illnesses of all kinds. Valerio taught Obel how to give injections and clean wounds.

## Abandonment by Father

20.   Valerio met a local teacher named Dorca. They later married and moved to a nearby village called Bella Vista where they built a house. Like Boba, it had no running water, electricity, or telephone. Up until the time Valerio married Dorca, Obel and his father went everywhere together; Obel was his father's crutch, his right hand. They worked together; they ate and even drank together. Valerio's marriage caused tremendous change in Obel's relationship with his father and left a gaping hole in Obel's life. Dorca was jealous of Valerio's relationship with his children and in particular his relationship with Obel. When she complained about the children, Valerio disciplined them harshly to placate her. Obel felt as if Dorca had stolen his father away from

6

Exhibit 110 Page 006

0001931

him. The loss of his close relationship with his father was extremely painful for Obel. Valerio fathered two children with Dorca.

21.     When Obel was 13 years old, he was seduced by a 40-year-old woman. She lived in the village and was considered a prostitute who frequently preyed on the young men in the area.

22.     During his time in the area of Nagua, Obel worked as a fisherman, in the fields, and in construction for several years. His work in the fields included planting and gathering rice and other crops. Another of his agricultural tasks was applying pesticides on the crops. He would first fill the pump's container with pesticide using a can that he had hand-dipped into the pesticide. He then sprayed the chemicals using the pump he carried on his back. Spraying pesticides was also one of his tasks later on, when he worked in the coffee fields in Puerto Rico. Sometimes he sprayed an herbicide and other times an insecticide. In the fields, there was no water to wash off the chemicals. Using them frequently caused him a headache; sometimes he also felt nauseated.

### Forced Marriage

23.     Obel was 18 when he met Mireya Perez Garcia. She lived in a nearby village and went to Boba to attend her uncle's funeral. Although he liked her, he was not planning to start a serious relationship with her. Mireya's family forced them to move in together after one of her sisters told others they had had sex, even though they both denied it. Cultural mores in the area dictate that once a young woman has been "dishonored" the man is obliged to take her as his wife. Obel did not feel ready to take on the responsibility of starting a family of his own; he lived at home with his father. Still, he followed the tradition and took Mireya as his common-law wife. Obel's family did not approve of the relationship. His stepmother, Dorca in particular, disliked Mireya as Obel's partner. This made it very difficult for Obel to have Mireya live with him in his father's house. They went to live in a small house her family lent them in nearby Los Naranjos.

24.     Obel continued to work in whatever he could find in order to support his new wife but they had a hard time making ends meet. His friend and neighbor Piruquiru "Piruca" Acosta saw how hard Obel worked. He would go out to sea with a group of other fishermen on his father's boat. Some days the catch was very small and there was not much fish to distribute among them.  Food was very scarce for Obel in those days yet he shared his food and the fish he caught with other people such as his friends Piruca. People who knew him

7

Exhibit 110 Page 007

0001932

described Obel as generous, nice, and hardworking. He was willing to go fishing even when other fishermen would not because the sea was too rough. At one point Valerio no longer allowed Obel to take his boat fishing and with that, severely curtailed Obel's chances of making a living as a fisherman. Obel was certain his stepmother was behind his father's decision.

## Move to Puerto Rico

25. When Mireya became pregnant with their first child, they agreed Obel should leave and go to Puerto Rico in search of work, as so many other Dominican migrants did. His chances in Puerto Rico were better than in the impoverished village of Boba; from Puerto Rico he would send money for her and their baby. Obel did not have the money to go to Puerto Rico so he helped a carpenter make the "yola," the yawl that would take him and other migrants from the Dominican Republic to Puerto Rico. The journey was full of dangers.

26. Obel was 19 when the boat left Punta Cana in the Dominican Republic and crossed the Mona Passage to arrive in Puerto Rico. The passage connects the Atlantic Ocean and the Caribbean Sea. The area is fraught with variable tidal currents and strong winds. The crossing on a yola is not for the faint of heart. Locals call it el mar de los muertos, "the sea of the dead" because of the many boating accidents and deaths caused by the severe storms and currents in the shark infested waters. Despite the dangers, Dominican migrants like Obel take to the boats in hopes of reaching U.S. territory in search of a better life. Obel's plan was to work there long enough to save money to buy a small fishing boat and equipment so he could support his family in the Dominican Republic.

## Abandonment by Common-Law Wife

27. Obel was working in Puerto Rico when he learned through his father than Mireya, although still pregnant with his child, was with another man. The news completely devastated Obel. He felt as if all the dangers he had faced to make it to Puerto Rico and all the sacrifices he had made to send some money to her for his unborn child had been in vain. In that moment, he felt "everything a body can feel." His entire body felt like a gaping wound. He sought to alleviate his pain the way he had learned from his father and drank an entire bottle of Bacardi (rum) in a single long gulp. He stayed in Puerto Rico but his spirit was crushed. From then on, his drinking intensified.

8

Exhibit 110 Page 008

0001933

28. As an undocumented immigrant in Puerto Rico Obel faced discrimination and had a difficult time navigating the differences between Puerto Rican and Dominican cultures. Locals call Dominicans and other undocumented immigrants by the pejorative name of "mojados" (wetbacks). Obel felt a great sense of unease and anxiety not knowing when he might be spotted and caught by "la migra" (immigration officers). He tried hard to speak and act like a local to go undetected.

29. When Obel first arrived in Puerto Rico, one of Mireya's cousins told him he had found a job for him at a coffee plantation. Obel was required to work long hours each day, seven days a week, and to live in barracks housing on the plantation with up to 15 other workers. Obel earned 50 or 60 dollars for two weeks of grueling work. He and another 15 workers slept on a mattress on the floor of a warehouse that was used as a deposit for fertilizer, herbicides, the pumps used to spray the chemicals, and other agricultural products and equipment. The place reeked from the chemicals and the unbathed body-odor of the workers. The workday started at 6 am and ended at 3 pm. Work was exhausting, it included clearing the land by cutting down trees and loading the wood onto trucks, clearing brush and weeds using a machete, digging holes for the coffee plants, planting them, spraying pesticides and spreading fertilizer. The workers were also expected to harvest and load banana bunches onto trucks. Obel and the other workers were charged for their food such as rice and coffee. They were only given green bananas for free. They were not given gloves or any other protective equipment or supplies. The company sold them all their supplies including the boots and machetes they needed to perform their work. Obel's hands and feet were covered with blisters. Still, he needed to earn more money to send home so he asked for extra work. He often worked a couple of extra hours each day cutting guinea grass. This sometimes supplemented his income up to 80 dollars. Obel sent most of his earnings to his father with the belief that he would pass it on to Mireya. After several months of living and working under those conditions, and despondent after learning that Mireya was with someone else, Obel left the plantation and moved to Rio Piedras, Puerto Rico.

### Attempt to Start a New Life

30. From then on, during his time in Puerto Rico Obel worked in whatever he could find; as a cook at a restaurant; as a gardener; loading and unloading cargo; in construction; painting and roofing. He also gathered aluminum cans that he sold for recycling and gathered other metals that he could sell, such

9

Exhibit 110 Page 009

0001934

as copper. He would also take down, haul away and sell aluminum awnings damaged by the frequent storms that battered Puerto Rico. In Rio Piedras, Obel reunited with his neighbor from Bella Vista, Piruca. A friend of Piruca, Salome, helped Obel obtain employment as a cook in a restaurant.

31.     At the restaurant, Obel met Angelita Rodriguez. They started a relationship and eventually married. Obel went to work in construction with Angelita's father, Victoriano. Obel's job was mixing cement and building cement roofs. Obel and Angelita were together about five years. From Puerto Rico Obel moved with Angelita to Texas.

32.     In or around 1992, they moved back to the Dominican Republic. They moved in with Angelita's family in Higuey. There, they started a tourist bus company. Obel's job was driving a bus while Angelita, her mother and aunts, were in charge of administration and financial matters.

33.     Throughout his life Obel experienced many environmental stressors. He lived through several violent storms, one of them at sea, and had at least two serious car accidents. One of them was in the Dominican Republic. As he was driving a pickup truck, he tried to avoid hitting a bus head on and crushed against a palm tree instead. In this accident a metal shaft pierced his foot. The other accident happened in Puerto Rico. On a rainy day, he was the passenger in a car travelling from Rio Piedras to Santurce when they collided with another car. Obel was propelled out of the car through the windshield. People who came to the scene were surprised to see he was alive. He left running despite being hurt because he was undocumented. His eyebrow was bleeding from a cut and he had pieces of glass embedded in the skin of his forehead. Since he could not go to the hospital and seek treatment because of his legal status, a woman held the flaps of skin on both sides of the injury on his eyebrow with a drop of Crazy Glue. He had pieces of windshield glass in his forehead for a long time.

## CLINICAL OBSERVATIONS

34.     During my clinical interviews with Obel, which were conducted in Spanish, he was cooperative and polite and appeared to try to respond to my questions as best as he was able. He was well-groomed for all the interviews; it appears he expends considerable effort maintaining his cleanliness. He mentioned that it is important to him to smell and look clean. He carried with him a small towel that he took out at times to wipe perspiration from his hands or wipe his tears. When he arrived into the interview room the first time, he walked and moved with some difficulty which he attributed to using a brace on his right knee. He complained of having a

Exhibit 110 Page 010

painful right knee and reported he was being evaluated for knee replacement surgery. His movements were slowed in general throughout most of the interviews, although he became fidgety at times.

35. The cognitive and psychological impact of the deprivation, neglect and significant trauma he experienced as a child were apparent throughout the clinical interviews. He exhibited verbal problems including an impoverished vocabulary, word finding difficulties, and misuse of some words. As he had difficulty finding words, he could not think of how to say mail box, for instance. He did not seem to know the meaning of the word "season" when asked what season it was as part of the Mental Status Examination. The Mini-Mental State Examination (MMSE) is a standardized, widely used, screening instrument designed to detect gross impairment in general cognitive functioning. He mispronounced some words, such as "incienso" (incense) and said "insencio" instead. He also said "ibanos" instead of "ibamos" (we used to go/we would go) as well as "comíanos" instead of "comíamos" (we used to eat/we would eat). There were other instances of his substituting "m" with "n." However, it should be noted that this substitution in certain words is not entirely uncommon among some Spanish speakers. His vocal tone was normal and his rate of speech was somewhat rapid. The latter is likely a characteristic of his Caribbean origin.

36. During our interviews, Obel exhibited a number of symptoms associated with a traumatic response. He had darting pupils and became agitated at times. He also reported suspicion of others that reflected hypervigilance. Eye contact was initially somewhat poor until rapport was established, it became subsequently appropriate. However, he continued to cover his face sometimes, particularly in the beginning of the first interview, when the topic of conversation caused him significant distress or embarrassment. He did not appear to be responding to external stimuli during the interviews. His prevailing mood was sad in general and anxious at times. His thought content demonstrated sadness and religiosity. He reported suffering from frequent nightmares. He mentioned having flashbacks of "what happened in court" but did not explain what he meant by that despite being asked follow up questions. He appeared to not understand what flashbacks are notwithstanding attempts to explain. He indicated that his mind races sometimes but that he prays and cries out for God's help to cope. He denied suicidal or homicidal ideation.

Exhibit 110 Page 011

0001936

37.   He exhibited and reported memory and attention deficits during the clinical interviews. It is well understood that trauma has profound effects on memory. He said he used to have to write everything, such as people's names, down in a notebook because he would otherwise forget. Some of the accounts regarding his life history were lacking in detail. Even though he was cooperative during interviews, obtaining the details of his traumatic experiences required significant effort on my part.

## CONCLUSIONS

38.   Years of repeated and prolonged adverse experiences profoundly affected Obel Cruz Garcia. Chronic and repeated exposure to traumatic and stressful events throughout his life, particularly during his developmental period, shaped and substantially impaired his cognitive, psychological, and social functioning and behaviors. The most significant traumatic events in Obel's life, even among a myriad of others included the chaos, parental discord and maternal abandonment in which he grew up.

39.   Obel's father, even though Obel was only a child, made him feel complicit in his secret liaisons. His father's easy-going and friendlier attitude, compared to his mother's, made Obel idealize his father. However, Valerio's womanizing and drinking exposed Obel to sexual abuse and started him early on the road to alcohol abuse and addition. In doing so, Valerio normalized what were dangerous situations for a child.

40.   Yet the most significant turning points in Obel's life and perhaps the most traumatic experiences for him were his father's accident and his mother's abandonment not long after. Obel was still a child when Valerio had such a serious accident that medical personal thought he was dead and placed him in the hospital's morgue until they realized he was not. Later, Dalia left the country and moved to Venezuela, leaving her children without a mother. From then on, despite his young age, Obel was propelled into a parental role, forced to become a caretaker for his younger siblings. Obel also had to care for his father, who would not allow anyone other than Obel take care of his personal hygiene. From then on, Obel was to become not only his siblings' father of sorts, but his father's "crutch." The abandonment by his mother was repeated when his mother sent for his older sister to join her in Venezuela, while falsely promising to send for Obel soon. He suffered the loss of both mother and sister and was left feeling unwanted and unworthy.

12

Exhibit 110 Page 012

0001937

41. After Obel's father remarried, Obel was rejected anew by his stepmother, who treated him and his siblings harshly. She demanded that Obel's father prioritize his relationship with her and her biological children at the expense of his previously close relationship with Obel.

42. As described in detail throughout his life history above, the long list of traumatic incidents to which Obel was exposed in childhood and adolescence include: familial patterns of trauma and poverty; what appears to be maternal mental illness and stress; extreme poverty and related environmental deprivation; child labor, abandonment, and neglect; repeated exposure to pesticides and other neurotoxins, including alcohol as a child; early loss of sense of safety, loss of his father as a protector and income-earner, loss of familiar surroundings when his family moved from the capital to a rural area, etc.. Each of these traumatic events alone may detrimentally impact an individual's cognitive and behavioral development, however, the presence and interaction of multiple traumatic incidents had an exponential effect on Obel's development and subsequent functioning.

43. Research (Herman, 1997; van der Kolk, 2009) has shown that traumatic childhood experiences like those experienced by Obel Cruz Garcia are the kind of adverse childhood experiences powerfully linked to detrimental effects on adult health. The Adverse Childhood Experiences (ACE) study by Kaiser Permanente and the Center for Disease Control was based on a questionnaire regarding adverse childhood experiences including abuse, neglect, poverty, family dysfunction, and other traumatic experiences such as those of Obel Cruz Garcia. The ACE study identified factors that set the stage for illness including mental illness. The study confirmed an unequivocal and highly significant link between repeated traumatization in childhood and depression, alcoholism, drug abuse and sexual promiscuity, as well as various medical illnesses including heart disease, cancer, stroke and diabetes.

44. In late adolescence and adulthood Obel's exposure to trauma and stress continued. The experiences described above in more detail include: extreme poverty and lack of access to services and resources; many near-death experiences at sea, while fishing, his and his father's lives were at constant risk, their boat capsized at sea in shark infested waters; while helping his father tend to patients that suffered from severe illnesses, he was exposed not only to those illnesses, but also saw severe deformities; felt forced into a live-in relationship and started a family at a young age; suffered the dangers of crossing the Mona Passage on a frail boat, as he and many Dominican risk

Exhibit 110 Page 013

0001938

their lives in search of a better life in Puerto Rico; faced discrimination and fear of being detected as an undocumented alien in Puerto Rico; learned his common-law wife was being unfaithful while pregnant with their child; survived tropical storms in the Dominican Republic, Puerto Rico and at sea, and experienced at least two serious car accidents. He also continued to be exposed to neurotoxins, particularly in the form of pesticides and other agro-chemicals.

45. Exposure to such chronic, multiple and severe instances of trauma, in combination with a genetic predisposition to substance abuse, set the stage for his resorting, early on, to the coping method that is common in victims of trauma: self-soothing and self-medicating his symptoms with alcohol and ultimately, drugs. Also early on, however, he followed not only the familial and cultural mores of having multiple relationships and children with several women, but felt obliged to support them at significant personal cost to him. Despite the numerous parallel relationships, the women in his life whose declarations I read continue to describe him as a loving father and caring husband.

46. In adulthood, religion became not only a source of comfort and hope for him, but when it helped him with a severe addiction to heroin while in prison in Puerto Rico, it became his lifeline. Currently on death row, his religious faith continues to sustain him. There have been several executions since he was sentenced, a recent one was that of his friend Joey, but he still holds out hope and feels at peace. God, he said, provides him everything he needs. He believes in the power of prayer because he has seen his prayers answered. Even though on death row life is not without temptation, he remains firm in his commitment to God. He tries to inspire faith and hope in others. He, in turn, is inspired by the likes of preacher and motivational speaker Nick Vujicic who was born without arms or legs. As a result, Vujicic cannot care for himself and must rely on others for his basic needs. Obel thinks that if someone like "Nick" can remain hopeful and continue to have faith, so should he. Just remembering this makes him appreciate that he can walk, write, shower… whenever he feels his motivation is flagging he prays and praises God, sometimes out loud, and looks at Nick's photograph. He had it with him among other pictures during our last interview. On the opposite side, he had glued a picture he asked the guards to take of him with his arms raised so as to "lend them to Nick," he said. It seems as though Obel Cruz Garcia has found in religion an adaptive way of coping with the sequelae of the chronic,

Exhibit 110 Page 014

severe and repeated traumatic life experiences he has had to live through since childhood.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     July 1, 2019
          Fullerton, California

_____
Claudia Ahumada Degrati, PhD.

Exhibit 110 Page 015

0001940

# Claudia Ahumada Degrati, Ph. D.

CLINICAL AND FORENSIC PSYCHOLOGY
Bilingual Spanish/English

Tel./ Fax ███ - Mobile ███ - ███

## CURRICULUM VITAE

**LICENSURE**        Clinical Psychology, 2007 (California: PSY 21691)

**LANGUAGES**        English and Spanish

**PRIVATE PRACTICE**    Psychological Evaluations and Assessments
Neuropsychological Evaluations
Mental Health & Psychosocial Consultation
Psychosocial Histories
Victim Outreach
Psychotherapy
Clinical supervision

## EDUCATION

Ph.D., Clinical Psychology, 2004. Pacifica Graduate Institute. Carpinteria, California

Neuropsychology Postdoctoral Certificate Program, 2017.
Fielding Graduate University. Santa Ana, California

M. A., Clinical Psychology. Ryokan College, Los Angeles, California

B. A., Liberal Arts. Minor: Spanish. Prescott College, Prescott, Arizona

Interpersonal Neurobiology (IPNB) Certificate.
Mindsight Institute, Los Angeles, California

Journalism, Universidad Nacional de Cordoba. Cordoba, Argentina

Interpretation and Translation in Spanish/English Certificate.
University of California, Los Angeles (UCLA), Los Angeles, California

## PROFESSIONAL EXPERIENCE

**PRIVATE PRACTICE**                              **2007 – Present**
**Forensic and Clinical Psychology.** *Mental Health and Psychosocial Consultation*, specializing in Latino cases. *Mitigation Consultation* with emphasis on psychological functioning and mental health issues. *Psychosocial Histories*. *Victim Outreach*. Capital and Non-Capital Cases, State and Federal Courts at Trial, Sentencing, Appellate, and Habeas Levels. *Psychological and Sentencing Evaluations. Neuropsychological Evaluations. Psychological Assessments.* Regional Center approved vendor. Assess for developmental disabilities including Intellectual Disability and Autism Spectrum Disorders by administering, scoring and interpreting psychometric tests and utilizing other psychodiagnostic techniques. *Psychotherapy and Clinical Supervision.* Treatment of Depression, Anxiety, Posttraumatic Stress Disorder (PTSD), Adjustment Disorder, Domestic Violence, Sexual, Physical and Emotional Abuse. Treatment, Evaluations, Assessments and other services provided in English and Spanish.

**PACIFICA GRADUATE INSTITUTE**                  **2011 – 2017**
**Adjunct Faculty.** PhD Depth Psychology with Emphasis on Psychotherapy Program. Face to Face Consultation with Emphasis on Cultural Diversity Course. Teach and provide case consultation and supervision to doctoral students regarding multiculturalism and cultural diversity issues.

Exhibit 110 Page 016

0001941

**BARBARA CORT COUNTER, PH. D., INC. AND ASSOCIATES**          2005 – 2007
   **Psychological Assistant.**  Provided psychological consultation and evaluation as well as mitigation services in capital and non-capital, state and federal court cases, at all levels of court proceedings.  Prepared Psychosocial Histories.  Conducted research and investigation. Victim outreach services.  Provided individual psychotherapy.

**VICTIMS OF CRIME COUNSELING CENTER**          2000 – 2003   2006 – 2007
   **Psychological Assistant.**  Conducted initial evaluations and assessments.  Diagnosed and developed treatment plans.   Provided individual and family psychotherapy to children, adolescent and adult victims of crime mainly for treatment of depression, anxiety, posttraumatic stress disorder (PTSD), domestic violence, sexual, physical and emotional abuse, in Spanish and English.  Complied with documentation requirements of the State of California.  Prepared written reports for social workers, attorneys and other professionals.

**LOS ANGELES COUNTY SUPERIOR COURTS**          1994 - 2007
   **Interpreter and Translator.**   Court interpreter, certified by the State of California and the Administrative Office of the United States Courts (State and Federal certification).  Approved translator for the County of Los Angeles.

**CAREER ADVANCEMENT CENTERS - Los Angeles, CA**          1991 - 1994
   **Bilingual Vocational Rehabilitation Counselor.**  Managed a large caseload.  Provided counseling to Spanish and English speaking injured workers.  Conducted vocational testing.  Prepared vocational rehabilitation plans for state approval.  Provided job development services.  Implemented rehabilitation plans and supervised clients. Wrote periodic progress reports.  Conducted training workshops in English and Spanish.

## EDUCATIONALLY RELEVANT PUBLICATIONS

   Degrati, C. A. (2009). *Maps to the soul: Stories Latinas tell of their migration journey,* Saarbruken, Germany: VDM Publishing House Ltd.

## PRESENTATIONS AND LECTURES

   Office of the Federal Public Defender, Los Angeles, CA. "Psychological Trauma" Nov 2008

   Pacifica Graduate Institute, Carpinteria, CA. "Multicultural Issues in Psychotherapy" May 2009

   Office of the Public Defender, Los Angeles, CA. "Mitigation Investigations in Latin America" Oct 2009

   Public Defender's Office, Clark County, NV. "Mitigation with Mexican Nationals" April 2011

   Public Defender's Office, Washoe County, NV. "Mitigation with Mexican Nationals" April 2011

## PROFESSIONAL MEMBERSHIPS

   American Psychological Association (APA)  -  Division of Law and Psychology (41, APA)

   Los Angeles Psychological Association (LACPA)

   California Psychological Association (CPA)

   Global Association for Interpersonal Neurobiology Studies (GAINS)

Exhibit 110 Page 017

0001942

13847940101C / Court: 337

| | | | | |
|---|---|---|---|---|
| | Out-of-Court Hours* | | $100/hour | $12,000 |
| **DEATH CAPITAL 2ND CHAIR** | Non-Trial Appearance | | $400/day | |
| | Voir Dire | | $500/day | |
| | Trial/Hearing with Testimony | | $700/day | |
| | Out-of-Court Hours* | | $80/hour | $9,600 |
| **DEATH CAPITAL FLAT RATE** | Includes all fees except investigation costs, expert witness fees, and witness travel costs. Flat rate applies only if testimony begins in the guilt/innocence phase of trial. Otherwise, the daily and hourly rates apply. | **1ST CHAIR** | $35,000 | |
| | | **2ND CHAIR** | $30,000 | |
| **NON-DEATH CAPITAL** | Non-Trial Appearance | | $400/day | $3,200 |
| | Trial/Hearing with Testimony | | $800/day | |
| | Out-of-Court Hours* | | $100/hour | $5,000 |
| **INVESTIGATION** | Bills submitted by investigators and experts must document the dates and hours spent on the case and must be sworn to or affirmed to as accurate. Expert expenses paid per County policy. | | | |
| **EXPERT TESTIMONY** | | | | |
| **MENTAL HEALTH SUPPLEMENT*** | | | $50/hour | $250 |
| **BILINGUAL SUPPLEMENT** | | | $50/day | $250 |
| **AFTER HOURS SUPP.** (Trial/Hearing after 6:00 pm) | | | $50/hour | |
| **OTHER** MITIGATION SPECIALIST | | | | 21,902.00 |
| SEE INVOICE | | | **TOTAL** $ | |

*Must detail on Out-Of-Court Hours Log.

**List date(s) of all Court Appearances. Attach Out-of-Court Hours Log.**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

THIS VOUCHER FOR MITIGATION EXPERT ONLY

### PERSONAL INFORMATION

| Telephone Number | Bar Card Number |
|---|---|
| (713) 237 8547 | 04831520 |

Mailing Address (Number, Street, Suite, City, State, Zip Code)
2028 Buffalo Terrace   HT   77019

### CERTIFICATION

I, RP CORNELIUS , swear or affirm that the Harris County Auditor may rely upon the information contained above to make payment according to the fee schedule adopted by the Board of District Judges Trying Criminal Cases pursuant to Texas Code of Criminal Procedure Art. 26.05. I further swear or affirm that I have not received nor will I receive anything of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS THE 5 DAY OF May A.D. 20 14

Approved _____   _____
                    Judge, Presiding                    Attorney at Law (Signature)

_____                    RP CORNELIUS
District Clerk Deputy (Signature)          Attorney Name (print legibly)

0001943

6)  Death Case?  ☐ ☐ _____ Placeholder mot. ...al or Plea

7)  Same offense throughout LQY9 history?  ☐ ☐ _____

8)  Capital – Appeal?  ☐ ☐ _____

9)  11.071 Writ?  ☐ ☑ _____

10)  Service dates before January 1, 2002?  ☐ ☐ _____

11)  Correct claim form submitted for payment?  ☑ ☐ _____

12)  Attorney Appointment Order in case history on
LQY9 screen in JIMS?  ☐ ☐ _____

13)  Attorney approved for capital appointment in FDAMS?  ☐ ☐ _____

14)  Dates of court appearances listed on claim?  ☑ ☐ _____

   a.  Confirmed with history in the LQY8 screen?  ☐ ☐ N/A          262·25 x
                                                                    75· =  —
15)  If claiming out-of-court hours, is the out-of-court hours         19,668·75
form completed and attached?  ☐ ☐ N/A

   a.  Is it mathematically accurate?  ☐ ☐ N/A          19,668·75 +
                                                          2,233·27 +
   b.  Does it match days/hours listed on the claim?  ☐ ☐ N/A    21,902·02 *

16)  On 11.071 Writs, is the Appointed Counsel Hourly Worksheet
completed detailing services performed, dates, and times attached?  ☐ ☐ N/A

   a.  Are the hours mathematically accurate?  ☐ ☐ //

   b.  Does it match the amount requested on the claim?  ☐ ☐ //

17)  If an 11.071 Writ, is the claim eligible for reimbursement from the state?  ☐ ☐ N/A

   If no, why not _____

_____

18)  Are expenses requested on claim?  ☑ ☐ _____

19)  Expense invoices attached?  ☑ ☐ _____

20)  Do the expense invoices detail services performed, dates and times?  ☑ ☐ _____

   a.  Is it mathematically accurate?  ☑ ☐ _____

   b.  Does it match the amount requested on the claim?  ☑ ☐ _____

21)  Is written court approval for expenses attached?  ☑ ☐ _____

22)  Is the expense amount on the claim equal to or less than
the amount approved by the court?  ☑ ☐ _____

23)  Correct county mileage rate used?  ☑ ☐ _____

24)  Correct claim line item used?  ☑ ☐ _____

25)  Claim amounts within limits?  ☑ ☐ _____

26)  If claim is totaled, is it mathematically accurate?  ☑ ☐ _____

Attorney Expense:  $ _____

Expert Expense:  $ 21902.02          TOTAL REQUESTED: $ 21902.

---------- IN CAMERA MOTION ----------

NO. 1307219

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **V.S.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **JEFFREY KEITH PREVOST** | § | **351ST JUDICIAL DISTRICT** |

## DEFENDANT'S MOTION FOR PAYMENT OF MITIGATION SPECIALIST

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **JEFFREY KEITH PREVOST**, the Defendant in the above-styled and numbered cause, by and through his attorney of record, R. P. CORNELIUS, and respectfully requests the Court to grant this request for out of court expenses for the following good and sufficient reasons:

I.

Defendant is charged with capital murder.

II.

Defendant is in need of additional funds to cover the out of court expenses to obtain a Mitigation Specialist.

III.

This request is based on the need to obtain testimony from a material witnesses on the question of mitigation.

WHEREFORE, PREMISES CONSIDERS, Defendant, **JEFFREY KEITH PREVOST**, prays that the Court grant this motion in camera and order that such costs as are necessary be paid by the state.

**FILED**
Chris Daniel
District Clerk

MAY 1 4 2014

Time: _____
Harris County, Texas

By_____
Deputy

0001945

Respectfully submitted,

R.P. CORNELIUS
2028 Buffalo Terrace
Houston, Texas 77019
(713) 237-8547
State Bar No. 04831500

COURT APPOINTED
ATTORNEY FOR DEFENDANT

Unofficial Copy Office of Marilyn Burgess District Clerk

NO. 1307219

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| V.S. | § | HARRIS COUNTY, TEXAS |
| | § | |
| JEFFREY KEITH PREVOST | § | 351ST JUDICIAL DISTRICT |

## ORDER

On this **14** day of **MAY**, 2014, came on to be heard DEFENDANT'S

MOTION FOR PAYMENT OF MITIGATION SPECIALIST and it is the Order of the Court that

said motion should be granted.

It is the Order of the Court that an amount of **$21,902.02**, is approved for payment

to Gina T. Vitale, LMSW for out of court expenses consistent with this motion.

_____

Judge, 351st District Court
of Harris County, Texas

Unofficial Copy Office of Marilyn Burgess District Clerk

3

0001947

**Gina T. Vitale, LMSW**

███████████

Billing Date: 04/15/14

# SERVICE AND EXPENSE SUMMARY

## FROM: 9/15/12 TO: 4/15/14

# CASE NO. 1307219

# STATE OF TEXAS V JEFFERY KEITH PREVOST

## PROFFESIONAL SERVICES

| DATE | TIME | ACTION TAKEN |
|------|------|--------------|
| 09/17/12 | 0.5 | Case Review |
| 09/20/12 | 0.25 | Case Review |
| 10/01/12 | 3.75 | Record Review & Case Research |
| 11/11/12 | 3.5 | Client Interview |
| 11/14/12 | 1.75 | Case Research; Document Production; Witness Location |
| 11/15/12 | 1 | Document Production & Case Research |
| 11/19/12 | 2 | Record Requests |
| 11/21/12 | 0.5 | Records Requests |
| 11/28/12 | 0.5 | Records Requests |
| 11/30/12 | 0.25 | Records Requests |
| 02/19/13 | 0.25 | Record Requests |
| 02/20/13 | 0.5 | Record Requests |
| 02/25/13 | 0.75 | Record Request |
| 02/26/13 | 1 | Record Request |
| 02/27/13 | 1.5 | Records Management |
| 03/01/13 | 2.25 | Record Review |
| 03/03/13 | 2.25 | Reviewing Attorney Notes; Memo to Attorney |
| 03/08/13 | 1.5 | Records Management |
| 03/08/13 | 0.75 | Memo to Attorney |
| 03/13/13 | 1.0 | Records Management; Document Production |
| 03/14/13 | 1.5 | Records Management; Document Production |
| 05/14/13 | 1.5 | Records Requests & Management |
| 05/23/13 | 0.5 | Records Requests |
| 05/24/13 | 0.25 | Records Requests |
| 06/13/13 | 0.25 | Records Collection |
| 06/17/13 | 0.75 | Witness Contact; Record Collection |
| 06/18/13 | 0.75 | Record Collection |

2429 Bissonnet St. #24    31.25
Houston, Texas 77005

Phone: (832) 316-8796
Fax: (832) 550-2233

0001948

**Gina T. Vitale, LMSW**

| 06/20/13 | 0.25 | Witness Contact |
|----------|------|-----------------|
| 6/25/13 | 4.0 | Witness Interviews |
| 7/1/13 | .75 | Records Collection |
| 7/3/13 | 1.5 | Witness Interviews |
| 7/7/13 | .75 | Record Collection |
| 7/8/13 | 4.25 | Witness Interviews |
| 7/19/13 | 1 | Memo to Attorney |
| 7/25/13 | .25 | Memo to Attorney |
| 8/22/13 | .75 | Witness Location |
| 11/4/13 | 2.25 | Witness Location; Memo to Attorney |
| 11/6/13 | .25 | Memo to Attorney |
| 11/11/13 | 1.75 | Memo to Attorney |
| 11/25/13 | 1.25 | Attorney Consultation; Memo to Attorney |
| 12/2/13 | 1.25 | Attorney Consultation |
| 12/9/13 | 1.25 | Record Collection; Document Preparation for Expert Witness |
| 12/10/13 | 1 | Record Collection |
| 12/13/13 | 1.75 | Witness Location |
| 12/14/13 | .75 | Witness Interviews |
| 12/16/13 | .25 | Expert Witness Consultation |
| 12/17/13 | 1.25 | Witness Location & Contact |
| 12/19/13 | 4.25 | Witness Interviews |
| 12/20/13 | 3.5 | Witness Location & Interviews |
| 1/2/14 | 4 | Client Interview; Attorney Consultation; Record Review; Memo to Attorney |
| 1/3/14 | 1.25 | Attorney Consultation |
| 1/4/14 | 1.75 | Attorney Consultation; Expert Witness Consultation & Record Requests |
| 1/5/14 | .5 | Witness Location |
| 1/6/14 | 2.75 | Witness Location & Contact; Document Production for Expert Witness |
| 1/7/14 | 1.5 | Attorney Consultation; Record Retrieval |
| 1/8/14 | 1.25 | Witness Research; Memo to Attorney |
| 1/9/14 | .5 | Record Requests |
| 1/10/14 | .5 | Witness Correspondence |
| 1/12/14 | 1.25 | Witness Interview |
| 1/14/14 | 1.5 | Memo to Attorney; Attorney Consultation |
| 1/15/14 | .75 | Record Review; Expert Witness Consultation |
| 1/23/14 | 4 | Record Review; Record Request Follow-up; Document Production |
| 1/24/14 | 2 | Record Review; Record Request Follow-up; Document Production |

2429 Bissonnet St. #24
Houston, Texas 77005      $1.75

Phone: (832) 316-8796
Fax: (832) 550-2233

0001949

**Gina T. Vitale, LMSW**

| 1/29/14 | 5.25 | Attorney & Investigator Consultation |
| 1/30/14 | 2.5 | Witness Contact; Records Request Follow-up; Document Production |
| 1/31/14 | 4.25 | Record Request Follow-up; Record Retrieval; Document Production for Expert Witness |
| 2/4/14 | .5 | Record Retrieval |
| 2/5/14 | 1 | Witness Interview |
| 2/7/14 | 5.25 | Witness Interview; Client Interview; Witness Contact |
| 2/10/14 | 5.5 | Memos to Attorney; Document Update; Record Review |
| 2/11/14 | 3.25 | Record Request Follow-up; Memos to Attorneys; Witness Interviews; Attorney Consultation |
| 2/12/14 | 1.75 | Attorney Meeting; Witness Travel Arrangements |
| 2/13/14 | 1.75 | Witness Location; Witness Travel Arrangements |
| 2/14/14 | .5 | Attorney Consultation |
| 2/15/14 | 2.5 | Record Review |
| 2/16/14 | 5.25 | Client Interview; Witness Location & Contact; Family Contact |
| 2/17/14 | 1.5 | Attorney Consultation; Client Contact |
| 2/18/14 | 7 | Witness Location & Interviews; Record Requests & Follow-up |
| 2/19/14 | 3.25 | Witness Location & Interviews; Record Review |
| 2/20/14 | 2.25 | Document Production; Record Requests; Witness Interview |
| 2/21/14 | 4 | Document Production; Attorney Consultation; Case Research; Expert Witness Correspondence |
| 2/24/14 | 2.75 | Record Review |
| 2/25/14 | 4.25 | Record Review; Document Production; Expert Witness Correspondence |
| 2/26/14 | 1 | Record Retrieval |
| 2/27/14 | 1.5 | Expert Witness Consultation; Record Retrieval |
| 3/1/14 | 5.5 | Attorney & Expert Witness Consultation; Client Interview |
| 3/2/14 | .75 | Expert Witness Consultation |
| 3/3/14 | 2 | Record Request Follow-up |
| 3/5/14 | .75 | Record Requests |
| 3/6/14 | 4 | Video Statement Reviewed |
| 3/7/14 | .75 | Document Production |
| 03/10/14 | 1.5 | Attorney Consultation/correspondence |
| 03/12/14 | 4.25 | Record Requests; Document Production; Witness Location & Interview |
| 03/13/14 | 0.75 | Memo to Attorney & Witness Location |
| 03/14/14 | 1.25 | Memo to Attorney & Witness Research |

**Gina T. Vitale, LMSW**

| 03/15/14 | 2 | Memo to Attorney |
|---|---|---|
| 03/18/14 | 4.5 | Witness Interviews; Witness Travel Arrangements; Document Production & Correspondence w/ Expert Witness |
| 03/18/14 | 1 | TDCJ & Investigator Correspondence |
| 03/19/14 | 7.25 | Witness Travel Arrangements; Witness & Expert Correspondence; Expert Consultation |
| 03/20/14 | 3.25 | Witness Location & Travel Arrangements |
| 03/21/14 | 0.25 | Attorney Consultation/correspondence |
| 03/21/14 | 5.5 | Witness Interviews; TDCJ Correspondence; Witness Travel Arrangements; Witness Correspondence |
| 03/22/14 | 2.5 | Attorney Consultation; Memo to Attorney; Expert Witness Correspondence |
| 03/23/14 | 2.75 | Attorney Consultation; Document Production; Memo to Attorney |
| 03/25/14 | 1.75 | Witness Interview; Expert Witness Correspondence |
| 03/26/14 | 5 | Attorney & Expert Witness Consultation |
| 03/27/14 | 3.75 | Attorney Consultation; Witness Travel Arrangements; Witness Correspondence |
| 03/27/14 | 0.75 | Record Review |
| 03/28/14 | 6.0 | Court; Witness Interviews; Attorney Consultation; |
| 03/29/14 | 0.75 | Witness Correspondence |
| 03/31/14 | 7.5 | Attorney Consultation; Record Review & Document Production |
| 04/01/14 | 12.5 | Court; Attorney Consultation; Witness Interviews; Expert Witness Consultation; Witness Correspondence |
| 04/02/14 | 10.25 | Court; Witness Interviews; Expert Witness Consultation; Attorney Consultation; Witness Correspondence |
| 04/03/14 | 7.75 | Court; Attorney & Expert Witness Consultation; Witness Contact |

## Total Service hours = 262.25 @ $75.00/ Hour = $19,668.75

# EXPENSES

| DATE | EXPENSE | COST |
|---|---|---|
| 11/12/12 | .5 hours Travel | $18.75 |
| 11/12/12 | 20 miles Travel | $11.20 |
| 2/7/13 | Document Reproduction | $56.00 |
| 2/7/13 | Document Reproduction | $2.27 |
| 6/8/13 | Certified Mail | $5.65 |

2429 Bissonnet St. #24
Houston, Texas 77005

Phone: (832) 316-8796
Fax: (832) 550-2233

0001951

**Gina T. Vitale, LMSW**

| 6/25/13 | 2.25 Hours Travel | $84.75 |
|---|---|---|
| 6/25/13 | 110 Miles Travel | $61.60 |
| 7/7/13 | Postage | $6.11 |
| 7/8/13 | 3.5 Hours Travel | 131.25 |
| 7/8/13 | 170 Miles Travel | $95.20 |
| 12/10/13 | Parking | $5.00 |
| 12/19/13 | 3 hours Travel | $112.50 |
| 12/19/13 | 110 Miles Travel | $61.60 |
| 12/19/13 | Lodging | $68.41 |
| 12/20/13 | .5 hours travel | $18.75 |
| 12/20/13 | 15 Miles Travel | $8.40 |
| 1/6/14 | Postage | $24.00 |
| 1/7/14 | Parking | $5.00 |
| 1/9/14 | Document Reproduction | $20.00 |
| 1/13/14 | Document Reproduction | $59.82 |
| 1/18/14 | Postage | $39.95 |
| 1/29/14 | Parking | $7.00 |
| 1/31/14 | Parking | $5.00 |
| 2/5/14 | .75 Hours Travel | $28.13 |
| 2/5/14 | 30 Miles Travel | $16.80 |
| 2/7/14 | Parking | $2.00 |
| 2/10/14 | .25 Hours Travel | $9.38 |
| 2/12/14 | .5 Hours Travel | $18.75 |
| 2/12/14 | 15 miles Travel | $8.40 |
| 2/12/14 | Parking | $2.00 |
| 2/16/14 | .75 Hours Travel | $28.13 |
| 2/16/14 | 26 miles Travel | $14.56 |
| 2/17/14 | 1.5 Hours Travel | $56.25 |
| 2/17/14 | 70 miles travel | $39.20 |
| 2/17/14 | Parking | $7.00 |
| 2/18/14 | 2.5 Hours Travel | $93.75 |
| 2/19/14 | 6.5 Hours Travel | $293.75 |
| 2/21/14 | .5 hours Travel | 18.75 |
| 2/27/14 | Postage | $88.92 |
| 3/1/14 | .5 hours travel | $18.75 |
| 3/1/14 | 15 miles travel | $8.40 |
| 3/2/14 | .5 hours travel | $18.75 |
| 3/2/14 | 15 miles travel | $8.40 |
| 3/7/14 | Postage | $17.45 |

2429 Bissonnet St. #24
Houston, Texas 77005

Phone: (832) 316-8796
Fax: (832) 550-2233

0001952

**Gina T. Vitale, LMSW**

| 3/11/14 | Postage | $2.03 |
|---|---|---|
| 3/13/14 | .5 hours Travel | $18.75 |
| 3/14/14 | .25 hours travel | $9.38 |
| 3/14/14 | Parking | $7.00 |
| 3/17/14 | 1.25 hours travel | $46.88 |
| 3/17/14 | 25 Miles Travel | $14.00 |
| 3/19/14 | .5 hours Travel | $18.75 |
| 3/19/14 | 15 miles Travel | $8.40 |
| 3/20/14 | .25 hours travel | $9.38 |
| 3/20/14 | Postage | $7.68 |
| 3/21/14 | 1 hours travel | $37.50 |
| 3/21/14 | 35 Miles Travel | $19.60 |
| 3/25/14 | .5 hours travel | $18.75 |
| 3/26/14 | .75 hours travel | $28.13 |
| 3/26/14 | 30 Miles Travel | $16.80 |
| 3/26/14 | Parking | $5.00 |
| 3/27/14 | .5 Hours Travel | $18.75 |
| 3/27/14 | 15 Miles Travel | $8.40 |
| 3/27/14 | Parking | $7.00 |
| 3/28/14 | .5 hours Travel | $18.75 |
| 3/28/14 | 12 Miles Travel | $6.72 |
| 3/28/14 | Parking | $5.00 |
| 4/1/14 | 1 hours travel | $37.50 |
| 4/1/14 | 30 Miles Travel | $16.80 |
| 4/1/14 | Parking | $6.00 |
| 4/2/14 | .5 hours Travel | $18.75 |
| 4/2/14 | 15 Miles Travel | $8.40 |
| 4/2/14 | Parking | $6.00 |
| 4/3/14 | .5 hours Travel | $18.75 |
| 4/3/14 | 25 Miles Travel | $14.00 |
| 4/3/14 | Parking | $20.00 |
| 4/4/14 | .75 Hours Travel | $28.13 |
| 4/4/14 | 26 Miles Travel | $14.56 |
| 4/4/14 | Parking | $6.00 |

**TOTAL EXPENSES = $2,233.27**

**TOTAL TIME AND EXPENSES = $21,902.02**

2429 Bissonnet St. #24
Houston, Texas 77005

Phone: (832) 316-8796
Fax: (832) 550-2233

0001953

Gina T. Vitale, LMSW

I swear or affirm the attached invoice accurately documents the time that I spent on this case.

Gina T. Vitale, LMSW
Mitigation Specialist

SWORN TO AND SUBSCRIBED before me on the 23rd day of April , 2014.



ROBERT A. RODRIGUEZ
My Commission Expires
April 21, 2015

Payment is due upon receipt
Please make check payable to:
Gina T. Vitale
2429 Bissonnet St. #24
Houston, TX 77005

2429 Bissonnet St. #24
Houston, Texas 77005

Phone: (832) 316-8796
Fax: (832) 550-2233

0001954

# 13847940101C / Court: 337



### HARRIS COUNTY DISTRICT COURTS TRYING CRIMINAL CASES
### FAIR DEFENSE ACT
### ALTERNATIVE PLAN FOR APPOINTMENT OF COUNSEL TO INDIGENT DEFENDANTS

## FEE SCHEDULE

**Attorney's Fees**

Harris County pays attorneys appointed in district courts either per hour, per court appearance, or per court appearance plus out-of-court hours.

**Trial Level Assignment and Payment Limitations**

A term assigned lawyer can be assigned up to five clients a day. A term assigned lawyer cannot accept any other trial level appointments for the period of the term. Any cases reset beyond the term of the attorney's assignment will be paid on an individual case assignment basis.

An attorney should not sign on as a limited term attorney in one court when he has an appointed matter in another court on the same day, except that an appointed trial setting in one court will not prevent an attorney from accepting a limited term appointment in another court on the same day.

An attorney appointed to be the limited term attorney in one court who is called to trial in another court should immediately notify the first court that he will not be available the rest of the week.

An attorney can accept two individual case assignments per day.

An attorney being paid on the basis of court appearances can be paid for up to four cases per day for court appearances that occur on or after July 1, 2010. Attorneys can be paid for up to three cases per day for court appearances that occurred prior to July 1, 2010. "Cases" in this context means different defendants or a defendant with cases arising from different transactions, i.e., different offense reports.

Limits on clients and / or cases above are waived for vouchers submitted since August 28, 2017, until further notice during post-Harvey displacement of courts and dockets. Attorneys may accept two limited term assignments in one day for a morning and afternoon docket, but may not accept two limited term assignments for two morning dockets in the same day nor two afternoon dockets in the same day, during post-Harvey displacement of courts and dockets.

Two or more cases tried in a single proceeding are paid as a single case.

Two or more cases tried in one proceeding are paid as one appeal.

The attorney's pay rate is based on his certification level and the level of the offense charged, without consideration of enhancements. If the offense level drops, the attorney will be paid at the higher rate for the entire course of the representation.

Appointed attorneys and attorneys seeking public funds for investigative or expert assistance must submit a voucher to the appointing Court in the format specified by the Harris County District Courts Administrative Office, including registering to submit vouchers electronically. Appointed attorneys and attorneys seeking public funds for investigative or expert assistance must follow all procedures for payment required by the Harris County Auditor.

All vouchers must be submitted to the appointing Court within 21 days of disposition of the matter or the attorney's withdrawal, unless good cause is shown.

**Hourly**

Cases paid on an hourly basis have no presumptive maximums. Hours are billed in six-minute increments rounded to the nearest such increment. Attorneys are compensated on the basis of time spent working on the case whether that time is in or out of court. The attorney is compensated for only one case at a time. For example, if the attorney is in court on two cases, he allocates his time between those two cases for billing purposes; he does not bill for two cases. There is no bi-lingual supplement on cases paid on an hourly basis.

All district courts pay hourly for capitals, post-conviction proceedings, and argument in the Court of Criminal Appeals.

The rates are as follows:

| **$150/hour** | **$125/hour** |
|---|---|
| Capital First Chair | Capital Second Chair |

| **$100/hour** | **$75/hour** |
|---|---|
| 11.071 Writ of Habeas Corpus | DNA Motion |
| Capital Appeal | 11.07 Writ of Habeas Corpus |
| Capital Motion for New Trial | Non-Capital Appeal |
| Capital Petition for Discretionary Review | Non-Capital Motion for New Trial |
| Capital New Brief after PDR Granted | Non-Capital Petition for Discretionary Review |
| Capital Court of Appeals Oral Argument | Non-Capital New Brief after PDR Granted |
| Court of Criminal Appeals Oral Argument | Non-Capital Court of Appeals Oral Argument |

0001956

Beginning January 1, 2016, some courts will pay hourly for all individual case assignments.  The rates are as follows:

| | |
|---|---|
| 1st degree | $120 |
| 2nd degree | 95 |
| 3rd degree, state jails felonies, motions, contempt | 75 |

## Per Court Appearance

For all other cases, all district courts pay per court appearance or per court appearance plus out-of -court hours with presumptive maximums.  The courts may appoint and pay the attorney on the basis of an individual case assignment or a term assignment.  The rates are as follows:

| Individual Case Assignment | Daily Rate / Presumptive Max | Out of Court / Presumptive Max |
|---|---|---|
| **Non-Trial** | | |
| First Degree | $255 / $1275 | $120 (per hour) / $2400 |
| Second Degree | $205 / $820 | $95 (per hour) / $1140 |
| Third Degree<br>State Jail Felony<br>Motion to Revoke Probation<br>Motion to Adjudicate Guilt<br>Contempt | $155 / $465 | $75 (per hour) / $750 |
| Pre-Trial Hearing w/ Testimony<br>PSI Hearing | $350 | |
| Bilingual Supplement | $50 / $250 | |
| **Trial** | | |
| First Degree | $550 | |
| Second Degree | $450 | |
| Third Degree<br>State Jail Felony<br>Motion to Revoke Probation<br>Motion to Adjudicate Guilt | $350 | |

Effective 9/1/07; Modified 3/5/08, 7/1/10, 8/1/11, 8/27/13, 09/15/2015, 09/23/2015, 11/01/2017, 03/01/2019

0001957

| **Term Assignments  (Daily, Weekly, Term)** | Daily | Presumptive Max For Weekly/Term |
|---|---|---|
| First Degree | $440 | $2200 |
| Second Degree | $400 | $2000 |
| Third Degree State Jail Felony Motion to Revoke Probation Motion to Adjudicate Guilt | $360 | $1800 |

A request to exceed the presumptive maximum will not be considered except upon written request providing adequate justification.

**Investigators and Experts**

Investigators on non-capitals are paid at a uniform rate of $40/hour at a maximum of $600 per case, unless good cause shown.  For capital cases, investigators are paid $75/hour.

Investigators and experts must be licensed in accordance with applicable State law.

Experts are paid on a case-by-case basis per Harris County guidelines.

Bills submitted by investigators and experts must document the dates and time spent on the case and must be sworn to or affirmed as accurate.  The following oath would suffice:  "I swear or affirm that the attached invoice accurately documents the time that I spent on this case."

Investigators and Experts seeking direct payment must follow all procedures for payment required by the Harris County Auditor, including submitting a vendor identification number on invoices.

**Travel and Expenses**

Paid per Harris County guidelines.  Receipts must be provided.

Effective 9/1/07; Modified 3/5/08, 7/1/10, 8/1/11, 8/27/13, 09/15/2015, 09/23/2015, 11/01/2017, 03/01/2019

0001958

4/9/2021 2:08 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52315599
By: E Lane-Orton
Filed: 4/9/2021 2:08 PM

## 13847940101C / Court: 337

### IN THE 337TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

### AND

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

|  |  |  |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § | |
| | § | **Writ No. _____** |
| | § | Trial Court Case No: |
| | § | 1384794 |
| | § | |
| **Applicant.** | § | **CAPITAL CASE** |
| | § | |
| | § | |
| | § | |

### SUBSEQUENT APPLICATION FOR
### POST-CONVICTION WRIT OF HABEAS CORPUS
### EXHIBITS 111 THROUGH 120

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

0001959

13847940101C / Court: 337

# EXHIBIT 111

0001960



# PASAPORTE
## REPUBLICA DOMINICANA

El Secretario de Estado
de Relaciones Exteriores
de la
República Dominicana

Encarece a todas las autoridades a quienes
concierna, permitir transitar libremente al
ciudadano dominicano a cuyo favor se expide el
presente pasaporte y prestarle la asistencia y
protección que pudiera necesitar.

Número
Number of Passport     0961337
Numéro du Passeport

*Ver pag. 15*

0001961

2

3

## IDENTIFICACION DEL TITULAR
*Personal description   Identification du titulaire*

Estado Civil
*Marital status*
*Etat civil* — _Soltero_

Profesión
*Profession*
*Profession* — _Obrero_

Color
*Color*
*Couleur* — _Trigueño_

Color de los ojos
*Color of eyes*
*Couleur des yeux* — _Marrón_

Color de los cabellos
*Color of hair*
*Couleur des cheveux* — _Negro_

Estatura
*Height*
*Taille* — _5'10"_

Peso
*Weight*
*Poids* — _170 Lbs._

Señas particulares
*Peculiarities*
*Signes particuliers* — _Ninguna_

Residencia
*Residence*
*Résidence* — _Puerto Rico_

IMPRESIONES DIGITALES
**FINGERPRINTS**
***EMPREINTES DIGITALES***

Pulgar Derecho
Right Thumb
Pouce Droit

Exhibit 111 Page 804

Países para los cuales este Pasaporte es válido.
*Countries for which this Passport is valid.*
*Pays pour lesquels ce Passeport est valable.*

# TODO EL MUNDO



0001962



Exhibit 111 Page 003

0001963



Exhibit 111 Page 004

0001964



12

VISAS

3 LEH 1999

AILA

AILA 259
13 MAY 1997
República Dominicana

AILA 491
2 3 MAY 2000
República Dominicana

AILA 259
- 6 FEB 1996
República Dominicana

Exhibit 111 Page 005

0001965



14

VISAS

**REPUBLICA DOMINICANA**

5975013

CIEN PESO ORO

República Dominicana
Secretaría de Estado de Relaciones Exteriores
DIRECCION GENERAL DE PASAPORTES

REGISTRO R/R30,38 $\partial$

Renovado en la Dirección General de Pasaportes
válido hasta el 22 del mes de Sept.
de 1 $\cancel{2005}$ para que el interesado pueda dirigirse a
Todo el mundo

SANTO DOMINGO 25 de Sept. de 19 001

LUIS ERNESTO CAMILO G.
DIRECTOR GENERAL DE PASAPORTES

Exhibit 111 Page 006



Exhibit 111 Page 007

0001967



Exhibit 111 Page 008

0001968

0001969

20

VISAS

21

VISAS

Republica Dominicana

1 0 FEB 1996

AILA

Exhibit 111 Page 009

0001970



Número de salida

698566056  08     A 28 448 457

Servicio de Inmigración
y Naturalización

I-94
Registro de salida

PAROLED until: *Dec. 21, 2001*
Purpose: *significant*
          *public benefit*
SAT     09/21/01     7058
(Port)     (Date)     (Officer)

14. Apellido
C.RUZ

15. Primer nombre
OBEL

17. Ciudadania
REP. DOM

Vea el reverso                    STAPLE HERE

VISAS

25

Exhibit 111 Page 011

0001971



Exhibit 111 Page 012

0001972



30

VISAS

096 1337

31

VISAS

PAROLED u:: :: *May 25, 2001*

Purpose: *Public Interest*

*SAJ*        *11/26/200*   *265*

(Port)      (Date)      (Officer)

Exhibit 111 Page 013



42

U.S. IMMIGRATION
278 SAJ 195

JAN 2 8 1996

ADMITTED
UNTIL                    (CLASS)

43

VISAS

PROCESSED FOR (I-551)
TEMPORARY EVIDENCE OF
LAWFUL ADMISSION FOR
PERMANENT RESIDENCE
VALID UNTIL *April 28 1996*
EMPLOYMENT AUTHORIZED
A28 448 457
I-90 pending          2/20/96

Exhibit 111 Page 014

0001974



44

45

VISAS

PROCESSED FOR (I-551)
TEMPORARY EVIDENCE OF
LAWFUL ADMISSION FOR
PERMANENT RESIDENCE
VALID UNTIL
EMPLOYMENT AUTHORIZED

VISAS

I-90 Submitted
on 3/30/95

A28-448-457

PROCESSED FOR (I-551)
TEMPORARY EVIDENCE OF
LAWFUL ADMISSION FOR
PERMANENT RESIDENCE
VALID UNTIL *Nov.07.1995*
EMPLOYMENT AUTHORIZED

Exhibit 111 Page 015

0001975

13847940101C / Court: 337

# EXHIBIT 112

0001976

**Reid, Chris**

| | |
|---|---|
| **From:** | Callis, Leah (DCA) <leah_callis@justex.net> |
| **Sent:** | Thursday, December 29, 2016 11:11 AM |
| **To:** | DeAngelo, Lori |
| **Subject:** | RE: Obel Cruz-Garcia |

I believe she's working on them now.

---

**From:** DeAngelo, Lori [mailto:DEANGELO_LORI@dao.hctx.net]
**Sent:** Thursday, December 29, 2016 11:09 AM
**To:** Callis, Leah (DCA) <Leah_Callis@Justex.net>
**Subject:** Obel Cruz-Garcia

Good morning.  Do you know if Judge Magee signed our findings or did her own yet?

Exhibit A
0001977

13847940101C / Court: 337

# EXHIBIT 113

0001978

**Reid, Chris**

| | |
|---|---|
| **From:** | Tise, Natalie |
| **Sent:** | Thursday, October 6, 2016 7:16 PM |
| **To:** | Hernandez, Gloria |
| **Subject:** | Angelita letter |
| **Attachments:** | Angelita letter.docx |

Please send this letter to JC Castillo tomorrow for me.  I will leave a signed copy in your chair.

Thanks,

Natalie

1



**Belinda Hill**
**First Assistant**

**Criminal Justice Center**
**1201 Franklin, Suite 600**
**Houston, Texas 77002-1901**

# HARRIS COUNTY DISTRICT ATTORNEY
## DEVON ANDERSON

August 8, 2019

J. C. Castillo
Attorney at Law
The Lyric Center
440 Louisiana Ste 1550
Houston, TX

Re:    Angelita Rodriguez

Greetings:

I am sending this letter to acknowledge that your client, Angelita Rodriguez, served as a very important witness in the 2013  trial of a capital murder case where the death penalty was being  sought.  The defendant in that case was Ms. Rodriguez's ex-husband. Ms. Rodriguez testified against him despite the fact that he had made very credible threats to her safety and the safety of her family members in the past.  I am very appreciative of Ms. Rodriguez's willingness to testify truthfully in this case despite the fact that she had real concerns for the safety of her family.

Should you have any questions about this matter or need further information from me, please contact me at ███████████.

Best Regards,

Natalie Tise
Assistant District Attorney
Chief, Public Integrity Division

13847940101C / Court: 337

# EXHIBIT 114

```
 1                    REPORTER'S RECORD

 2                 VOLUME 6 OF 9 VOLUMES

 3              TRIAL COURT CAUSE NO. 1364839

 4            COURT OF APPEALS NO. 14-14-00142-CR

 5

 6    ROGELIO AVILES-BARROSO      )  IN THE DISTRICT COURT
                                  )
 7         Appellant             )
                                  )
 8                                )
                                  )
 9    VS.                         )  HARRIS COUNTY, TEXAS
                                  )
10                                )
                                  )
11    THE STATE OF TEXAS          )
                                  )
12         Appellee              )  337TH JUDICIAL DISTRICT

13

14

15               *******************

16            GUILT-INNOCENCE PROCEEDINGS

17               *******************

18

19

20       On the 31st day of January, 2014, the following

21    proceedings came on to be heard in the above-entitled

22    and numbered cause before the Honorable Renee Magee,

23    Judge presiding, held in Houston, Harris County, Texas;

24       Proceedings reported by computer-aided

25    transcription/stenograph shorthand.
```

```
 1                  May this witness be excused?

 2                  MS. TISE:  Yes, Your Honor.

 3                  THE COURT:  You may step down, sir.

 4                  Please call your next.

 5                  MS. TISE:  The State will call Ray Castro.

 6                  THE BAILIFF:  The witness has not been

 7   sworn, Your Honor.

 8                  THE COURT:  Thank you, Your Honor.

 9                  (Witness sworn)

10                  THE COURT:  You may proceed.

11                          RAY CASTRO,

12   having been first duly sworn, testified as follows:

13                      DIRECT EXAMINATION

14   BY MS. TISE:

15       Q.  Would you introduce yourself to the jury,

16   please, sir?

17       A.  Yes.  My name is Ray Castro.

18       Q.  And what do you do for a living?

19       A.  I'm a lawyer.

20       Q.  Okay.  What kind of law do you practice

21   specifically?

22       A.  Specifically, I practice criminal law.

23       Q.  And is your practice primarily here in the

24   Harris County courthouse?

25       A.  Yes, ma'am, it is.
```

1    Q.   And, in fact, you've known Mr. Brown for years,
2  have you not?
3    A.   We have been colleagues.
4    Q.   How long do you think you have known him?
5    A.   Twenty-five plus years.
6    Q.   And you are colleagues as members of the
7  criminal defense bar?
8    A.   That's correct.
9    Q.   And you've known me a long time?
10    A.   That's correct.
11    Q.   How long do you think you have known me?
12    A.   About the same time, if not more.
13    Q.   Okay.  And you also know Judge Magee?
14    A.   I do.
15    Q.   You are a regular here in the courthouse?
16    A.   Yes, ma'am.
17    Q.   A respected and experienced criminal defense
18  lawyer?
19    A.   Yes, ma'am.
20    Q.   I want to ask you if at some point in time you
21  were appointed to represent an individual by the name of
22  Carmelo Martinez Santana?
23    A.   Yes, I was.
24    Q.   And who appointed you?
25    A.   I believe I was appointed by Judge Guerrero.

1     Q.   Okay.  And you were going to represent him in

2  his capacity as a witness, were you not?

3     A.   That's correct.

4     Q.   Is it fair to say that you were appointed

5  almost immediately?  Pretty much as soon as he got here,

6  the Court was notified that he was here and he needed an

7  attorney?

8     A.   Yes.  To the best of my recollection, I think

9  that was the case.

10     Q.   Okay.  And what did you do after you got that

11  appointment?

12     A.   During that time, I remember I was in a trial

13  phase, so I didn't get to see him until probably at

14  least about two or three weeks later down the road, but

15  I did have an interview with him.

16     Q.   Okay.  And did you kind of apprise yourself,

17  basically, of why he was here and what was going with

18  the case prior to that time?

19     A.   Yes, I did.

20     Q.   And when you went to see him, did you go alone?

21     A.   I did.

22     Q.   Okay.  And did you talk to him, without going

23  into what you said, basically about what his rights are?

24     A.   Definitely, yes.

25     Q.   Okay.  Because you were appointed to protect

 1   his rights?

 2        A.   That's correct.

 3        Q.   And that's the sole reason you were appointed?

 4        A.   That's correct.

 5        Q.   Was he charged with a crime at the time?

 6        A.   At the time as far as I know, no.

 7        Q.   Okay.  Other than the federal time that he was

 8   completing?

 9        A.   Other than that.  He already had a conviction.

10        Q.   Has he been charged with a crime since?

11        A.   To my knowledge at this point, no.

12        Q.   Okay.  Early on you learned that he had given a

13   statement to the FBI --

14        A.   That's correct.

15        Q.   -- in Pennsylvania?

16        A.   Yes, he did.

17        Q.   Making himself a witness on this case?

18        A.   That's correct.

19        Q.   And you knew this was a capital murder case?

20        A.   That's correct.

21        Q.   And the penalties were -- are very serious?

22        A.   That's correct.

23        Q.   And I'm sure you talked to him about that?

24        A.   We did.

25        Q.   At some point during that time period do you

1    recall being contacted by me and asking if we would be

2    able to go and interview Rudy?

3         A.   Yes.

4         Q.   And did you arrange for that to happen?

5         A.   That's correct, I did.

6         Q.   And were you present during that interview?

7         A.   I was present, as far as I know, in all of the

8    interviews that we had, yes.

9         Q.   Right.  You and one or both of my investigators

10   and another attorney, Justin Wood, on some cases?

11        A.   Correct.

12        Q.   But you were always there when we would meet

13   with him?

14        A.   That's correct, yes, ma'am.

15        Q.   Prior to our meetings with him, had you kind of

16   had an opportunity, basically, to determine what Rudy's

17   intentions were as far as testifying on this case?

18        A.   I think he made that known to me immediately

19   that first time that I interviewed him as to the purpose

20   that he was here.

21        Q.   And what was his intention?

22        A.   To testify.

23        Q.   Okay.  And did you talk to him about some of

24   the consequences of him testifying?

25        A.   I did tell them the consequences of how that

1   could very well affect him down the road if, in fact,

2   charges were pending. Whatever may have happened, that

3   definitely would be held against him and it would not be

4   in his best interest.

5       Q. Okay. And did he persist in wanting to

6   testified anyway?

7       A. He did.

8       Q. Okay. In fact, was he fairly stubborn about

9   that?

10      A. He was insistent to do that.

11      Q. And did he tell you why?

12      A. Yes. He told --

13           MR. BROWN: Objection. Calls for hearsay.

14           THE COURT: That's sustained.

15      Q. (By Ms. Tise) Did you talk to him about things

16   like, when you testify in a situation like this it could

17   be dangerous for you at some point, sometimes other

18   inmate will retaliate?

19           MR. BROWN: Judge, we're going to object.

20   That's starting to get into attorney-client privilege.

21           THE COURT: I will allow a little bit of

22   it. I'll allow a little bit, as long as it doesn't call

23   for hearsay.

24           MS. TISE: May we approach on that?

25           THE COURT: Yes.

```
 1                    (At the Bench, on the record)
 2               MS. TISE:  Mr. Brown can't invoke the
 3  attorney-client privilege for him.
 4               THE COURT:  I understand.
 5               MS. TISE:  And so, I understand you are
 6  allowing me to go there, but I just want -- in case
 7  there's further objections on that point --
 8               MR. BROWN:  I think -- I'm not invoking it.
 9  I just said --
10               MS. TISE:  Mr. Castro can invoke it.
11               MR. BROWN:  My objection was that it's
12  basically hearsay and he's going into attorney-client
13  privilege.  What he talks about with his client is
14  supposedly between him and his client.
15               THE COURT:  Well, that's true as long as
16  he's waiving it.  And you may want to ask him that, if
17  he is, but I'm still not going to let you go into
18  hearsay about what the defendant said.  Okay?
19               MS. TISE:  I agree.
20                    (Open court, defendant and jury present)
21       Q.   (By Ms. Tise) I will ask you, Mr. Castro, Rudy
22  knows that you're going to testify, does he not?
23       A.   He was aware of that, yes.
24       Q.   And does he have any objection to that?
25       A.   No, he does not.
```

1     Q.  Okay.  And so, talking to you about your

2 meetings with him, what were some of the things that you

3 expressed to him -- not his responses, but what you

4 expressed to him about things that he ought to think

5 about before doing this?

6     A.  Initially, we had gone over his version.  It

7 was over a period of maybe a couple of hours or so.  And

8 soon after we met after that, we definitely would go

9 over the options, consequences, the range of punishment,

10 whatever was involved here, as well as every time I

11 always emphasized to him, you know, there's some serious

12 dangers here in you wanting to testify and proceed to

13 want to do that.  His response was constantly that he

14 wanted to do it.

15     Q.  And those dangers included possible danger from

16 retaliation from other inmates?

17     A.  If they found out about what he was doing, yes.

18     Q.  And possibly saying something that would lead

19 to him being charged with a crime?

20     A.  That was my primary concern for him, is being

21 charged with another offense, which could very well

22 happen.

23     Q.  And you explained that to him?

24     A.  Thoroughly.

25     Q.  And he persisted that he wanted to do this?

1     A.  Yes.  Yes, ma'am.

2     Q.  Why?

3     A.  Primary reason -- every time I've talked to

4  him, his primary, he wants to get it off his conscience

5  and tell the truth.  That's primarily what he was

6  saying.

7     Q.  And did he ever ask you:  Should I answer the

8  prosecutor's questions a certain way so that I won't be

9  charged?  Did he ever do that?

10     A.  No, never.

11     Q.  Did he ever ask you for advice on what's going

12  to make me, you know, get drug into this case as far as

13  the law of parties or anything like that is concerned?

14     A.  No.  Our primary conversations were mainly

15  confined to what actually had happened.

16     Q.  Right.  And his story to you was consistent?

17     A.  That's correct.

18     Q.  And you were here when he testified in the last

19  trial?

20     A.  I was.

21     Q.  And was it consistent with what he had said

22  before in our meetings?

23     A.  Yes, it was.  At the last trial and our prior

24  meetings, yes.

25     Q.  Okay.  And because you were going to testify in

1  this trial, you were unable to be present for his

2  testimony this time?

3       A.   That's correct.

4       Q.   But he's always been very consistent in his

5  story?

6       A.   Yes, ma'am.

7       Q.   And he never said:  How do I tell my story so

8  that I don't get into any trouble?

9       A.   That's correct.

10      Q.   His story was just what his story was?

11      A.   That's correct.

12      Q.   When we would come meet with him, you were

13  always present?

14      A.   Yes, ma'am.

15      Q.   Sometimes you would help translate, would you

16  not?

17      A.   Yes.

18      Q.   You are a fluent Spanish speaker?

19      A.   Yes, ma'am, I am.

20      Q.   And did you or he ever tell us that we couldn't

21  ask him anything, that there was something off limits?

22      A.   No.

23      Q.   It was always wide open?

24      A.   Yes, ma'am.

25      Q.   And was this all in accordance with the way

1   Rudy wanted it to be?

2       A.   Yes, ma'am.

3       Q.   At any point in time did you and I or you and

4   any member of the D.A.'s office ever talk about a deal

5   for Rudy in exchange for his testimony?

6       A.   No, ma'am.

7       Q.   Did Rudy ever ask you to talk to us about a

8   deal?

9       A.   No.

10      Q.   Okay.  As far as you're concerned, has there

11  ever been any assurances to you or anyone that he

12  wouldn't be charged with a crime if the evidence led us

13  that direction?

14      A.   No, ma'am.  Not even explicitly or implicitly.

15      Q.   And as far as you know, I could charge him with

16  a crime tomorrow if the evidence led me in that

17  direction?

18      A.   Which was my concern if he testified, yes.

19      Q.   Sure.  But -- and you explained that to him?

20      A.   Very much so, yes.

21      Q.   And he did not ask for or want any assurances

22  from us?

23      A.   He continued to want to -- he insisted on

24  testifying.

25      Q.   He is still in custody, correct?

```
 1      A.   Yes, ma'am.

 2      Q.   And why is that?

 3      A.   As far as I know, he was finishing out his

 4  federal sentence and I think he completed it, and he's

 5  still here.

 6      Q.   Okay.  And he's here because he is a material

 7  witness on a capital murder case?

 8      A.   That's correct.

 9      Q.   And there is a process for that called a

10  material witness bond, isn't there?

11      A.   That's correct.

12      Q.   And because he -- because he's persisting in

13  wanting to testify, we put that material witness bond in

14  place and that's keeping him in custody?

15      A.   That's correct.

16      Q.   Is it your understanding that once the material

17  witness bond is lifted then he will be deported back to

18  his homeland, the Dominican Republic?

19      A.   Immigration procedures will definitely start

20  soon thereafter.

21      Q.   And if we didn't have a witness bond in place,

22  the feds would have deported him and we wouldn't have

23  him available for trial?

24      A.   Immediately.

25      Q.   So, that's why we have to keep him in custody?
```

```
 1        A.   That's correct.

 2        Q.   Because, otherwise, the feds are going to take

 3  him and we're going to lose him?

 4        A.   Right.

 5        Q.   He wants to go back to the Dominican Republic,

 6  doesn't he?

 7        A.   He is prepared to go.  So, yes.

 8        Q.   And looking forward to being with his family

 9  and seeing them again?

10        A.   That's correct, yes, ma'am.

11        Q.   And you've explained to him, because he's been

12  willing to testify in this case, that's what's keeping

13  him in custody?

14        A.   Yes.  He's aware of that.

15        Q.   And he continues to want to testify.

16             THE COURT:  Is that a question?

17             MS. TISE:  Sorry.

18        A.   Yes.

19        Q.   (By Ms. Tise) Does he continue to want to

20  testify?

21        A.   Yes.  He will stay as long as necessary.

22        Q.   Is it fair to say that, in fact, in the last

23  trial Rudy thought he had been charged with capital

24  murder?

25        A.   Yes.
```

```
 1              MR. BROWN:  Objection, Your Honor --
 2      A.   Yes.
 3              MR. BROWN:  -- that's hearsay.
 4              THE COURT:  Hang tight a minute when one of
 5   the lawyers stand up, Mr. Castro.  I know you know that,
 6   but didn't be too quick to answer if a lawyer stands up.
 7              THE WITNESS:  Yes, ma'am.
 8              THE COURT:  Thank you.  Please proceed.
 9              MS. TISE:  I'm sorry.  I didn't hear your
10   ruling.  Did you sustain it?
11              THE COURT:  Well, he had already answered
12   the question.
13              MS. TISE:  Okay.  I'm sorry.
14              Pass the witness.
15                      CROSS-EXAMINATION
16   BY MR. BROWN:
17      Q.   What's the other reason for a material witness
18   bond?
19      A.   To assure that he's here, he stays here.
20      Q.   So, he can't run?
21      A.   That could be another reason, too.
22      Q.   If he gets deported, that's the same as
23   running, correct?
24              MS. TISE:  I'll object to that.  It's not
25   the same as running.
```

```
 1              THE COURT:  I will sustain the
 2   mischaracterization.
 3        Q.   (By Mr. Brown) If he was deported, he'd be home
 4   where he wanted to be, right?
 5        A.   That could be implied, yes.
 6        Q.   He's running, correct?
 7        A.   He is not here, not present.
 8        Q.   Now, you were appointed to be his attorney once
 9   he was brought into Houston, Harris County, Texas; is
10   that correct?
11        A.   Yes, sir.
12        Q.   You were not aware of anything that was said to
13   him in 1998 -- no -- '97 by the first investigators that
14   went to talk to him in Orlando, Florida; is that
15   correct?
16        A.   No, I was not aware of that.
17        Q.   So, you don't know if anything was said to him
18   about what could happen to him, what deals could be
19   made; you don't know any of that kind of information?
20        A.   I was not aware.
21        Q.   When he was talked to again in Pennsylvania,
22   you weren't there at that time?
23        A.   I was not present.
24        Q.   So, you don't know if any deals -- anything
25   that was said about his testimony, you weren't aware of
```

1  what his -- the transcripts of what his statement were;

2  is that correct?

3      A.   Just what happened here in Harris County and

4  what he had said.

5      Q.   Right.  But the question is:  You saw his

6  transcript of his statements made to the FBI in

7  Pennsylvania, correct?

8      A.   I think I saw it later on after I had been

9  appointed to represent him, but, initially, I was not

10  aware of that.

11      Q.   Now, you've been with him on one or many

12  occasions when the D.A. went to talk to him about his

13  testimony?

14      A.   Yes.  I believe about three times, if I'm not

15  mistaken.

16      Q.   Was that three times before Obel's trial?

17      A.   I think before Obel's trial, it might have been

18  twice.

19      Q.   And one time before this trial?

20      A.   That's correct.

21      Q.   Now, I'm just going to -- you talked to him

22  about the consequences of testifying, correct?

23      A.   Right.

24      Q.   You talked to him about the consequences of

25  changing his story, too, didn't you?

1     A.   That's correct.

2     Q.   So, if he changes his story in any way, he goes

3 to prison, correct?

4     A.   Well, I've always admonished him about perjury

5 issues also.

6     Q.   What's the difference between explicit and

7 implicit deals?

8     A.   Explicit is coming right -- forthright and

9 coming out and saying them.  Implicitly is something you

10 can read between the lines.

11     Q.   Now, he was never given an explicit deal; is

12 that correct?

13     A.   That's correct.

14     Q.   He hasn't been charged with capital murder, has

15 he?

16     A.   As far as I know, no.

17     Q.   What is the implicit deal then regarding his

18 testimony in these two trials?

19     A.   Implicitly, I don't think -- we haven't even

20 gotten close to even discussing any kind of resolution

21 as to his status other than just testifying.

22     Q.   If he testifies the way the State wants him to

23 testify and tells the story the same way and

24 consistently, does he go home?

25     A.   At this point, if -- like I said earlier, if he

1    is finished with his federal sentence, immigration -- of

2    course, assuming that he's let go from here, released

3    from Harris County, then immediately has to go under

4    immigration proceedings.

5        Q.    And the Dominican Republic is home, right?

6        A.    As far as I know, yes.

7        Q.    So, he gets to go home, right?

8        A.    That's correct.

9        Q.    All right.  Now, we've done this for many,

10   many, many, many, many, many years, correct?

11       A.    Yes, sir.

12       Q.    All right.  And a lot of what you talk to a

13   client about is privileged as to even co-defendants and

14   co-defendants' attorneys, correct?

15       A.    That's correct.

16       Q.    All right.  And it's also privileged as to the

17   D.A.'s office, correct?

18       A.    Definitely, yes.

19       Q.    Did you go over the police report with your

20   client?

21       A.    The police report meaning the incident report

22   prepared for this particular case here?  I don't recall

23   that I did go over it extensively with him.  I think

24   mainly I went over the -- his version of what happened.

25   And I think I had sort of like a synopsis of what

1  actually transpired.  I think I got probably the

2  first -- the original report.  That's basically it, but

3  as far as supplements, no.

4      Q.  Did he tell you that they were in a blue car

5  when they went and did this act on September 30th and

6  the early morning of October 1st, 1992?

7                  MS. TISE:  Objection.  Calls for hearsay.

8                  MR. BROWN:  I believe she's opened up the

9  door, Judge, as far as attorney-client privilege, as far

10 as hearsay.  I believe he has testified already -- I'm

11 just asking --

12                 THE COURT:  Well, Mr. Brown, as to hearsay

13 that is sustained.  If you are trying to impeach

14 Mr. Carmelo Martinez Santana with something that was

15 said to this witness, then just set it up for

16 impeachment and I will allow that.

17     Q.  (By Mr. Brown) Did he tell you why the gold car

18 that they used had sand and dirt in it when it was

19 returned to Charlie?

20     A.  I don't recall him saying why, but I do

21 remember him saying, yes, it did have some dirt.

22     Q.  Did he tell you that he and Obel had the knife

23 that night?

24     A.  I don't recall if he said he had it, but I do

25 remember that Obel -- he said Obel had it.

```
1        Q.   Did he tell you that Obel was the only person
2   with a weapon that night?
3        A.   I believe, yes, that is what he had told me, if
4   I remember correctly.  I'm not sure.  I can't tell you
5   for a fact.
6        Q.   Did he tell you that when he went to Diana
7   Garcia's home he knew what was going to happen?
8        A.   I don't remember if it was before or after they
9   had left Diana Garcia's home.
10        Q.   What's the definition of law of parties?
11             MS. TISE:  Objection.  That's calls for a
12   legal conclusion.
13             MR. BROWN:  He's a lawyer, Your Honor.
14             MS. TISE:  That's true, but --
15             THE COURT:  That's sustained.
16             Members of the jury, you will be instructed
17   on what the law of parties is and how it applies for you
18   to apply it to the facts in this case.
19             You may proceed.
20        Q.   (By Mr. Brown) Did you explain to your client
21   the differences between law of parties, conspiracy, and
22   any other forms of legal consequences as a person who's
23   at a criminal event?
24        A.   Yes.
25        Q.   You did talk to him about the difference
```

1  between law of parties, conspiracy, accessory,

2  unindicted co-conspirators, all those things, didn't

3  you?

4     A.   Everything was explained to him with regards to

5  how this could affect him.

6     Q.   Did you have conversations -- and I'm not

7  asking what you said, but did you have conversations

8  outside of the presence of your client with the district

9  attorney's office?

10    A.   As far as making arrangements for meetings and

11 scheduling purposes.  And I think there may have been

12 some other things, but I don't think it was very

13 relevant to the case that's being tried or any of the

14 cases that were being tried.

15    Q.   Did you ever go to the D.A.'s office and ask

16 for a deal?

17    A.   No.

18    Q.   Did they come to you and say there would be no

19 deals?

20    A.   No.

21            MR. BROWN:  Pass the witness.

22            THE COURT:  Thank you.

23            Anything further, Ms. Tise?

24            MS. TISE:  No, Your Honor.

25            THE COURT:  May the witness be excused?

```
 1                    MS. TISE:  Yes, Your Honor.

 2                    MR. BROWN:  Yes, Your Honor.

 3                    THE COURT:  Step down.  Thank you,

 4   Mr. Castro.

 5                    Please call your next.

 6                    MS. TISE:  State calls Kerry Gillie.

 7                    THE COURT:  Please raise your right hand.

 8                    (Witness sworn)

 9                    THE COURT:  Please be seated.

10                    You may proceed, Ms. Tise.

11                         KERRY GILLIE,

12   having been first duly sworn, testified as follows:

13                      DIRECT EXAMINATION

14   BY MS. TISE:

15       Q.  State your name, please, sir.

16       A.  My name is Kerry Gillie.  I'm a licensed police

17   officer investigator employed here at the Harris County

18   D.A.'s Office.

19       Q.  Can you tell the jury a little bit about your

20   background?

21       A.   I have had over 30 years of law enforcement

22   experience.  The majority of that has been in the

23   investigative side.  I retired as a detective from the

24   Deer Park P.D. and was recruited by the Attorney

25   General's Office to do fraud.  When I was there, after
```

```
 1                      REPORTER'S CERTIFICATE

 2   THE STATE OF TEXAS   )
     COUNTY OF HARRIS     )
 3

 4        I, Mary Ann Rodriguez, Official Court Reporter in

 5   and for the 337th District Court of Harris County, State

 6   of Texas, do hereby certify that the above and foregoing

 7   contains a true and correct transcription of all

 8   portions of evidence and other proceedings requested in

 9   writing by counsel for the parties to be included in

10   this volume of the Reporter's Record, in the

11   above-styled and numbered cause, all of which occurred

12   in open court or in chambers and were reported by me.

13        I further certify that this Reporter's Record of

14   the proceedings truly and correctly reflects the

15   exhibits, if any, admitted by the respective parties.

16        WITNESS MY OFFICIAL HAND this the 3rd day of March,

17   2014.

18

19

20

21   /s/ Mary Ann Rodriguez
     Mary Ann Rodriguez, Texas CSR 3047
22   Expiration Date:  12/31/2015
     Official Court Reporter
23   337th Court
     1201 Franklin
24   Houston, Texas  77002
     713.755.7746
25
```

13847940101C / Court: 337

# EXHIBIT 115

**HCDistrictclerk.com**    The State of Texas vs. RODRIGUEZ, ANGELITA    10/11/2018
SANTANA (SPN: 01190928)
Cause: 061425701010    CDI: 3    Court: 337

## ACTIVITIES

| Date | Type | Description | SNU/CFI |
|---|---|---|---|
| 10/29/1993 | SENTENCED IN | COURT 337 STARTING 10/29/93 | 999 |
| 10/29/1993 | SENTENCE TO | 2 YEARS CONFINEMENT | |
| 10/29/1993 | CREDIT GIVEN | DEFENDANT RECEIVED 78 DAYS CREDIT | |
| 10/29/1993 | DELIVERY ORDER | RETURNED EXECUTED 06/27/94 | 999 |
| 10/29/1993 | JUDGMENT | CONVICTION | 999 |
| 10/29/1993 | JUDGMENT | GUILTY PLEA-NO JURY | |
| 10/29/1993 | JUDG OFFENSE | POSS COCAINE LT 28G-CRACK LEVEL F2 | |
| 10/29/1993 | PENALTY | TDC AMOUNT 2 YEARS | |
| 09/03/1993 | SERVICE ACTIVITY | BY PLACING DEF IN JAIL ON 09/02/93 | |
| 09/03/1993 | | RECEIPTED BY CLERK | |
| 06/03/1993 | ACI/BF | TIME 1013 AMOUNT $0 | 998 |
| 06/03/1993 | | ACKNOWLEDGED BY SHERIFF | |
| 10/08/1992 | MOTIONS | MO DISCL INFOR IDENT | 998 |
| 10/08/1992 | MOTIONS | FILED CFI 337 | |
| 02/28/1992 | MOTIONS | REL PERSONAL PROPTY | 999 |
| 02/28/1992 | MOTIONS | FILED CFI 337 | |
| 02/28/1992 | ORDER | OR GRT RELEASE PERSONAL PRO | 999 |
| 02/28/1992 | OFFENSE | POSS COCAINE LT 28G-CRACK LEVEL F2 | |
| 11/20/1991 | BOND FILED | CRT 337 TIME 0148 TYPE SURETY | |
| 11/20/1991 | BOND MADE | AMT $25000 DATE 11/19/91 RCPT # 102581 | |
| 11/20/1991 | BONDSMAN | VENEZIA, PASCO BAIL BONDING | |
| 11/15/1991 | GRAND JURY ACTION | FID 11/15/91 G338 | 999 |
| 11/15/1991 | GRAND JURY ACTION | ROTATION CRT 337 OFF FREQ BND $25000 | |
| 11/15/1991 | GRAND JURY ACTION | OFFENSE POSS COCAINE LT 28G-CRAC LEVEL F2 | |
| 11/15/1991 | ORI | ******************* OFFENSE NO: | |
| 11/15/1991 | PRECEPT/SERVE IND DATE RETURNED 11/19/91 | HOW EXECUTED E | |
| | DATE SERVED | 11/17/91 | |
| 11/08/1991 | C87 ACTIVITY | BOND SET STATUS CFI 337 | 999 |
| 11/04/1991 | SERVICE ACTIVITY | BY PLACING DEF IN JAIL ON 11/02/91 | |
| 11/04/1991 | | RECEIPTED BY CLERK | |
| 11/02/1991 | CMIF | TIME 1000 AMOUNT $0 | 999 |
| 11/02/1991 | | ACKNOWLEDGED BY SHERIFF | |
| 11/01/1991 | COMPLAINT FILED | 0003 337 POSS COCAINE LT 28G-CRA LEVEL F2 | |
| 11/01/1991 | BOND SET | $0 | 999 |
| 11/01/1991 | | REVIEWED BY | |
| 11/01/1991 | ORI | HOUSTON POLICE DEPAR OFFENSE NO: 116673491 | |
| 11/01/1991 | COMPLAINANT | DAVIS | |

13847940101C / Court: 337

# EXHIBIT 116

 

# FAX TRANSMISSION
## FEDERAL PUBLIC DEFENDER
### NORTHERN DISTRICT OF TEXAS
525 Griffin Street, Suite 629
Dallas, TX 75202
Phone: (214) 767-2746          Fax: (214) 767-2886

**TO:** Chief of Police          **COMPANY:** Houston Police Department

**FAX NO.:** 713.308.1601

**FROM:** Beth Guemmer          **PAGES (including cover):** 2

January 25, 2019      Resubmission June 13, 2019

## *COMMENTS*

RE:    Request for Records  [My records reflect no response to date]

In the event a response was generated and submitted, I apologize.
Please provide to elizabeth_guemmer@fd.org
Thank you, in advance, for revisiting this request.

The following correspondence identifies the requested records. Please contact me with any questions or concerns. Thank you for your assistance.

Respectfully,

Beth Guemmer
Paralegal-Capital Habeas Unit

CONFIDENTIALITY NOTE: The documents accompanying this fax transmission contain information from the **Office of the Federal Public Defender for the Northern District of Texas.** The information is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this fax transmission is prohibited. If you have received this fax transmission in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you.

 

# Federal Public Defender
## Northern District of Texas

**JASON D. HAWKINS**
**Federal Public Defender**

**JOHN NICHOLSON**
**First Assistant**

**JEREMY SCHEPERS**
**Supervisor-Capital Habeas Unit**

525 GRIFFIN STREET
SUITE 629
DALLAS, TEXAS 75202

PHONE (214) 767-2746
FAX (214) 767-2886

January 24, 2019

Office of the Chief of Police
1200 Travis
Houston, TX 77002
Fax: 713.308.1601

Re: Open Records Request
Incident #058851589Q

Dear Chief Acevedo:

The Capital Habeas Unit of the Federal Public Defender-Northern District of Texas is submitting this interagency request for records per the directions outlined on the website.

The requested records are for the murder of Saul Cedillo Flores, assigned Incident #058851589Q, with the date of the offense as July 1, 1989. This request includes, but is not limited to, police investigation reports, supplemental narratives to the reports, Crime Scene Unit investigative activity and evidence gathering, logging, and chain of custody, identification of persons of interest, search and/or arrest warrants applied for and/or issued, handwritten notes, interagency communications, and any other records pertaining to the murder investigation not otherwise identified.

Thank you, in advance, for the attention given this matter. Please contact me with any questions or concerns at elizabeth_guemmer@fd.org.

Respectfully,

Beth Guemmer
Paralegal-CHU
Federal Public Defender-Northern District of Texas

0000010

13847940101C / Court: 337

# EXHIBIT 117

0002011



# CITY OF HOUSTON

**Houston Police Department**

Sylvester Turner, Mayor

1200 Travis  Houston, Texas 77002-6000  713/308-1600

CITY COUNCIL MEMBERS:  Brenda Stardig  Jerry Davis  Ellen R. Cohen  Dwight A. Boykins  Dave Martin  Steve Le  Greg Travis  Karla Cisneros  Robert Gallegos
Mike Laster  Martha Castex-Tatum  Mike Knox  David W. Robinson  Michael Kubosh  Amanda K. Edwards  Jack Christie  CITY CONTROLLER:  Chris B. Brown

June 27, 2019

**Act Acevedo
Chief of Police**

The Honorable Ken Paxton
Texas Attorney General
P. O. Box 12548
Austin, Texas 78711-2548

Attention:    Open Records Division

Re:    Public Information Act request received on June 13, 2019, from Beth Guemmer
requesting the case file related to HPD Incident #058851589; **OR #19-06880**

Dear General Paxton:

The Houston Police Department (the "Department") received the above-referenced request on June 13,
2019 **(Exhibit 1)**. By copy of this letter, the department is informing the requestor that the department is
seeking a decision from your office because the department believes responsive information is excepted
from public disclosure pursuant to sections 552.101 through 552.153 of the Government Code. We will
forward responsive information and our legal arguments under separate cover shortly. Please include **OR
No. 19-06880** in any future correspondence concerning this request.

Sincerely,

Jeffrey C. Monk, DBA
HPD Administration Manager

jcm:kc

Enclosures

cc:    Federal Public Defender
Attn: Beth Guemmer
252 Griffin St., Ste. 629
Dallas, TX 75202
*Sent via electronic mail: elizabath_guemmer@fd.org*
**(w/o Exhibits)**



0002012

13847940101C / Court: 337

# EXHIBIT 118

0002013



# CITY OF HOUSTON

**Houston Police Department**

Sylvester Turner, Mayor

1200 Travis   Houston, Texas 77002-6000   713/308-1600

CITY COUNCIL MEMBERS:   Brenda Stardig    Jerry Davis    Ellen R. Cohen    Dwight A. Boykins    Dave Martin    Steve Le    Greg Travis    Karla Cisneros    Robert Gallegos
Mike Laster    Martha Castex-Tatum    Mike Knox    David W. Robinson    Michael Kubosh    Amanda K. Edwards    Jack Christie    CITY CONTROLLER:    Chris B. Brown

July 3, 2019

**Art Acevedo**
**Chief of Police**



The Honorable Ken Paxton
Texas Attorney General
P. O. Box 12548
Austin, Texas 78711-2548

Attention:      Open Records Division

Re:      Public Information Act request received on June 13, 2019, from Beth Guemmer
requesting the case file related to incident #058851589; **OR #19-06880**

Dear General Paxton:

This is a follow up to my letter dated June 27, 2019. The Houston Police Department (the
"Department") received the above-referenced request on June 13, 2019 **(Exhibit 1A)**. By copy of
this letter, the Department is informing the requester that the Department believes responsive
information **(Exhibit 2)** is excepted from public disclosure under section 552.108 of the
Government Code. HPD advises that the information in **Exhibit 2** is a representative sample.

## Section 552.108 of the Government Code

Section 552.108 of the Government Code provides, in part:

(a)  Information held by a law enforcement agency or prosecutor that deals with
the detection, investigation, or prosecution of crime is excepted from the
requirements of Section 552.021 if:

(1)  release of the information would interfere with the detection, investigation, or
prosecution of crime[.]

(2)  it is information that deals with the detection, investigation, or
prosecution of crime only in relation to an investigation that did not
result in conviction or deferred adjudication.



0002014

Honorable Ken Paxton                    July 3, 2019                    Page 2

The criminal investigation, attached as **Exhibit 2**, is inactive pending additional leads. However, the statute of limitations has not run. The investigation may be reactivated once additional leads are developed. Release of the investigation would interfere with the detection and investigation of a crime. Thus, HPD believes the information contained in **Exhibit 2** should be excepted from public disclosure pursuant to section 552.108(a)(1).

The Department respectfully requests a ruling on this matter. Please do not hesitate to contact me at 713-308-3200 if you need additional information. Please include **OR #19-06880** in any future correspondence concerning this request.

Sincerely,

Jeffrey C. Monk, DBA
HPD Administration Manager

jcm:ksc

Enclosures

cc:    Federal Public Defender
       Attn: Beth Guemmer
       252 Griffin St., Ste. 629
       Dallas, TX 75202
       *Sent via electronic mail: elizabeth_guemmer@fd.org*
       **(w/o Exhibits)**

0002015

13847940101C / Court: 337

# EXHIBIT 119



KEN PAXTON
ATTORNEY GENERAL OF TEXAS

September 5, 2019

Mr. Jeffrey C. Monk
Administration Manager
Houston Police Department
1200 Travis, 21st Floor
Houston, Texas 77002-6000

OR2019-24820

Dear Mr. Monk:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID#784176 (OR No. 19-06880).

The Houston Police Department (the "department") received a request for information pertaining to a specified incident. You claim the submitted information is excepted from disclosure under section 552.108 of the Government Code. We have considered the exception you claim and reviewed the submitted representative sample of information.[1]

Section 552.108(a)(1) of the Government Code excepts from disclosure "[i]nformation held by a law enforcement agency or prosecutor that deals with the detection, investigation, or prosecution of crime . . . if: (1) release of the information would interfere with the detection, investigation, or prosecution of crime." Gov't Code § 552.108(a)(1). Generally, a governmental body claiming section 552.108(a)(1) must explain how and why the release of the requested information would interfere with law enforcement. *See id.* §§ 552.108(a)(1), .301(e)(1)(A); *see also Ex parte Pruitt*, 551 S.W.2d 706 (Tex. 1977). You state the submitted information relates to an ongoing criminal investigation, and release of that information would interfere with the investigation and prosecution of the case. Based upon this representation, we conclude the release of the submitted information would interfere with the detection, investigation, or prosecution of crime. *See Houston*

---

[1] We assume the "representative sample" of records submitted to this office is truly representative of the requested records as a whole. *See* Open Records Decision Nos. 499 (1988), 497 (1988). This open records letter does not reach, and therefore does not authorize the withholding of, any other requested records to the extent that those records contain substantially different types of information than that submitted to this office.

*Chronicle Publ'g Co. v. City of Houston*, 531 S.W.2d 177 (Tex. Civ. App.—Houston [14th Dist.] 1975) (court delineates law enforcement interests that are present in active cases), *writ ref'd n.r.e. per curiam*, 536 S.W.2d 559 (Tex. 1976). Thus, section 552.108(a)(1) is applicable to the submitted information.

However, we note section 552.108 does not except from disclosure "basic information about an arrested person, an arrest, or a crime." Gov't Code § 552.108(c). Section 552.108(c) refers to the basic "front-page" information held to be public in *Houston Chronicle. See* 531 S.W.2d at 186-187; *see also* Open Records Decision No. 127 (1976) (summarizing types of information considered to be basic information). Thus, with the exception of the basic information, you may generally withhold the submitted information under section 552.108(a)(1) of the Government Code.

However, we note the requestor is a representative of the Office of the Federal Public Defender of the Northern District of Texas (the "public defender's office"). Section 411.1272 of the Government Code provides:

> The office of capital and forensic writs and a public defender's office are entitled to obtain from the [Texas Department of Public Safety ("DPS")] criminal history record information [("CHRI")] maintained by the [DPS] that relates to a criminal case in which an attorney compensated . . . by the public defender's office has been appointed.

Gov't Code § 411.1272. In addition, section 411.087(a) of the Government Code provides:

> (a) Unless otherwise authorized by Subsection (e), a person, agency, department, political subdivision, or other entity that is authorized by this subchapter or Subchapter E-1 to obtain from the [DPS CHRI] maintained by the [DPS] that relates to another person is authorized to:
>
> . . .
>
> (2) obtain from any other criminal justice agency in this state CHRI maintained by that criminal justice agency that relates to that person.

*Id.* § 411.087(a)(2). CHRI is defined as "information collected about a person by a criminal justice agency that consists of identifiable descriptions and notations of arrests, detentions, indictments, informations, and other formal criminal charges and their dispositions." *See id.* § 411.082(2).

Accordingly, the requestor is authorized to obtain the CHRI in the information at issue from the department pursuant to sections 411.087(a)(2) and 411.1272 of the Government Code if it relates to a criminal case in which an attorney compensated by the public defender's office is appointed. *See id.* §§ 411.087(a)(2), .1272. Although the department raises section 552.108 of the Government Code for this information, we note a statutory right of access

Mr. Jeffrey C. Monk - Page 3

generally prevails over the Act's general exceptions to disclosure. *See* Open Records Decision Nos. 623 at 3 (1994), 525 at 3 (1989), 451 at 4 (1986) (specific statutory right of access provisions overcome general exception to disclosure under the Act). Therefore, if the department determines the submitted information relates to a criminal case in which an attorney compensated by the public defender's office is appointed, then the department must release the information that shows the type of allegations made and whether there was an arrest, information, indictment, detention, conviction, or other formal charges and their dispositions. In that instance, with the exception of basic information, the department may withhold the remaining information under section 552.108(a)(1). Conversely, if the department determines the submitted information does not relate to a criminal case in which an attorney compensated by the public defender's office is appointed, then the department, with the exception of basic information, may withhold the submitted information under section 552.108(a)(1). In either instance, the department must release the basic information from the submitted information.

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

Britni Ramirez
Assistant Attorney General
Open Records Division

BR/mo

Ref:    ID# 784176

Enc.    Submitted documents

c:      Requestor
        (w/o enclosures)

0002019

MC9
MC-0

**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

POST OFFICE BOX 12548
AUSTIN TEXAS 78711-2548

*Return Service Requested*

OFFICIAL BUSINESS
STATE OF TEXAS
PENALTY FOR PRIVATE USE

FEREDAL PUBLIC DEFENDER
ATTN: BETH GUEMMER
252 GRIFFIN ST STE 629
DALLAS TX 75202

7520235037 C008

RECEIVED
CAPITAL HABEAS UNIT

SEP 10 2019

Federal Public Defender

0002021

13847940101C / Court: 337

# EXHIBIT 120

## DECLARATION OF JOANNE HEISEY

I, Joanne Heisey, declare the following:

1. I graduated from the University of Texas at Austin ("UT") School of Law in Spring 2013 and successfully took the Texas bar examination that summer and was admitted to the Texas bar. During law school, I participated in the death penalty clinic and after school I obtained a fellowship at what was then known as the Office of Capital Writs ("OCW") (now known as the Office of Capital and Forensic Writs). The fellowship was funded by UT Law and began in Fall 2013.

2. After my initial months with OCW under the UT-funded fellowship, I obtained a further one-year fellowship and was then hired by OCW as a staff attorney, beginning in the Fall of 2014.

3. I worked at OCW until September 2017, when I accepted a position as a Research and Writing Specialist with the Federal Community Defender Office in Philadelphia, working in the Capital Habeas Unit. I continue to work there as an Assistant Federal Defender.

4. I was assigned to Mr. Cruz-Garcia's case, alone with another OCW attorney, Robert Romig. At the time, staff turnover at the OCW was very high. Prior to my assignment, Mr. Cruz-Garcia had been represented by another OCW attorney. Robert Romig resigned from the OCW as a staff attorney after we filed an initial application for habeas relief on behalf of Mr. Cruz-Garcia.

5. Neither myself nor Mr. Romig had any prior capital post-conviction experience before working at the OCW.

6. On August 27, 2015, Mr. Romig and I prepared and filed Mr. Cruz-Garcia's initial application for habeas relief in the 337th District Court, Harris County. On May 2, 2016,

1

0002023

I prepared and filed a successive application with Gretchen Sween, who had joined the OCW at the beginning of 2016.

7. At the time I began working on Mr. Cruz-Garcia's case, Mr. Brad Levenson was the Director of the OCW. He was the first Director OCW had ever had. The office was extremely dysfunctional. Attorneys carried a heavy case load and received minimal supervision from the Director. Most of my colleagues were inexperienced, having started as staff attorneys immediately upon graduating law school and/or without any capital post-conviction experience. This office-wide inexperience, combined with a heavy case load, meant that the only potential source of guidance was Mr. Levenson.

8. The policies in effect at the time of my representation of Mr. Cruz-Garcia severely limited the development of evidence and claims in state post-conviction proceedings. The office prohibited attorneys from petitioning trial courts for funding for investigation or expert services. This policy required us to rely solely on the office's resources, which were very limited.

9. This policy negatively impacted Mr. Cruz-Garcia's case because we were unable to conduct an effective investigation of trial counsel's performance and effectively challenge the State's case at trial.

10. A single investigator was assigned to Mr. Cruz-Garcia's case even though the investigation spanned Houston, the Dominican Republic, and Puerto Rico.

11. Mr. Cruz-Garcia was born in the Dominican Republic and critical mitigation witnesses, including family members, remained there. We also determined that Mr. Cruz-Garcia moved to Puerto Rico as a young adult and that critical mitigation and fact witnesses remained there as well.

2

0002024

12. The OCW initially resisted our request to approve our investigator to travel to the Dominican Republic and Puerto Rico. Our investigator was eventually authorized to travel for just five to six days, travel included, to cover both the Dominican Republic and Puerto Rico.

13. By the time our investigator was authorized, and able to, travel to the Dominican Republic and Puerto Rico it was already Spring 2015. Mr. Cruz-Garcia's initial application was initially due end of May 2015.

14. Due to attorneys and investigators' significant case load at OCW, we could not keep up with the cases we were assigned to. Investigations were routinely conducted, and applications prepared, very close to the filing date.

15. I do not recall that we ever discussed seeking out the expertise of a trauma expert to inform our mitigation investigation or development of claims.

16. Based on the office's limited capital post-conviction experience, we did not investigate the background of co-defendants and testifying witnesses for the prosecution. As a result, we did not attempt to obtain publicly available documents relating to federal proceedings against Mr. Santana. We likewise did not investigate Angelita Rodriguez's background.

17. Based on our lack of post-conviction experience and being rushed by our significant case-load, we did not identify a number of record-based claims implicating Mr. Cruz-Garcia's constitutional rights that are raised in his federal petition.

18. Additionally, we did not federalize claims resulting from the State's amended DNA report, which revealed that much of the DNA evidence upon which Mr. Cruz-Garcia was convicted was false, and based on which we filed an unsuccessful successive petition.

19. If called to testify, I would provide the foregoing information and any additional information I could recall concerning Mr. Cruz-Garcia's case and my work on it.

3

I declare under penalty of perjury, as provided in the laws of the United States and in the laws of the State of Texas, that foregoing  4 -page declaration is true and correct and based on my personal knowledge.

*Joanne Heisey*

Joanne HEISEY

Subscribed by me this 23rd  day of November in  Philadelphia  County, Pennsylvania.

4

0002026

4/9/2021 2:12 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 52315946
By: E Lane-Orton
Filed: 4/9/2021 2:12 PM

## 13847940101C / Court: 337

### IN THE 337TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

### AND

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

|  |  |  |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § | **Writ No.** _____ Trial Court Case No: 1384794 |
| **Applicant.** | § § § § | **CAPITAL CASE** |

### SUBSEQUENT APPLICATION FOR
### POST-CONVICTION WRIT OF HABEAS CORPUS
### EXHIBITS 121 THROUGH 130

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

0002027

13847940101C / Court: 337

# EXHIBIT 121

0002028

# DECLARATION OF ADRIÁN DE LA ROSA

I, Adrián de la Rosa, declare the following:

1. I worked at the Office of Capital Writs ("OCW") (now known as the Office of Capital and Forensic Writs) as a mitigation specialist and fact investigator from May 2014 through October 2018.

2. In the Fall 2018, I accepted a position as an investigator in the Capital Habeas Unit of the Federal Public Defender for the Western District of Texas.

3. I did not have any mitigation and fact investigation experience in the capital context before being hired by the OCW. At the time I joined the office, there were just two other mitigation specialists. There was no supervising mitigation specialist. The office was a chaotic work environment. Mitigation specialists carried a heavy case load with no dedicated supervisor and very little or no experience amongst coworkers.

4. The OCW imposed significant limitations on the investigation relating to Mr. Cruz-Garcia's case. I was allowed to conduct only one trip, which lasted one week, to cover both the Dominican Republic and Puerto Rico. Mr. Cruz-Garcia was born in the Dominican Republic, where a lot of his family still lived, and had then spent a number of years as a young adult in Puerto Rico, where he had met his second wife. I thought about asking for a second person to be authorized to travel with me because investigating in both the Dominican Republic and Puerto Rico was a herculean task, but seeing as I was barely approved to travel by myself, there was no question it would have been denied. Because these places were where Mr. Cruz-Garcia had spent his childhood and then established himself as a young adult, there were a lot of witnesses to be interviewed and from whom to get declarations, all in a short very short amount of time and having to account for travel time between the Dominican Republic and Puerto Rico.

1

0002029

5.  Although I was able to visit with several witnesses by telephone before my trip, I was not able to spend more time with folks in-person to build more rapport. I wish the office would have authorized another trip because family and friends of Mr. Cruz-Garcia's in the Dominican Republic wanted to help.

6.  My already limited time to locate and interview witnesses was further cut short by the fact that I had to interview witnesses, draft memos to Mr. Cruz-Garcia's attorneys, review declarations and send them off for translation, and finally signed by witnesses all in that single trip. This was made even more difficult because I did not consistently have access to reliable internet.

7.  I unfortunately had to cut my trip short by a day due to a family emergency that required that I travel back to Texas.

8.  The teams at OCW were so small and had to handle such a high case-load, both for attorneys and mitigation specialists, that we were not able to conduct a full investigation in our cases, including for Mr. Cruz-Garcia.

9.  If called to testify, I would provide the foregoing information and any additional information I could recall concerning Mr. Cruz-Garcia's case and my work on it.

I declare under penalty of perjury, as provided in the laws of the United States and in the laws of the State of Texas, that foregoing 2-page declaration is true and correct and based on my personal knowledge.

_____
Adrián DE LA ROSA

Subscribed by me this day of ____11/25/2020____ in ____Travis____ County, Texas.

2

0002030

13847940101C / Court: 337

# EXHIBIT 122

0002031

974

Pq

# IN THE 337th DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| EX PARTE | )    **Trial Cause No.** |
| **Obel Cruz-Garcia,** | )    **1384794** |
|     **APPLICANT** | ) |

## MOTION FOR DISCLOSURE OF *BRADY V. MARYLAND* MATERIALS

BRAD D. LEVENSON (No. 24073411)
Director, Office of Capital Writs
(E-Mail: Brad.Levenson@ocw.texas.gov)
ROBERT ROMIG (No. 24060517)
(E-Mail: Robert.Romig@ocw.texas.gov)
JOANNE HEISEY (No. 24087704)
(E-Mail: Joanne.Heisey@ocw.texas.gov)
Post-Conviction Attorneys
Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
(512) 463-8600
(512) 463-8590 (fax)

Attorneys for Applicant

For Official Governmental Use Only - Do Not Disseminate to the Public: 65309872 - Page 1 of 9

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging



FILED
Chris Daniel
District Clerk
APR 28 2015
Harris County, Texas
Time: _____
By _____ Deputy

0002032

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530987 - Page 2 of 9

# IN THE 337th DISTRICT COURT
# HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| ———————————— ) | Trial Cause No. |
| EX PARTE ) | 1384794 |
| Obel Cruz-Garcia, ) | |
| APPLICANT ) | |
| ) | |
| ———————————— ) | |

## MOTION FOR DISCLOSURE OF *BRADY V. MARYLAND* MATERIALS

Obel Cruz-Garcia ("Cruz-Garcia"), through his attorneys the Office of Capital Writs ("OCW"), seeks copies of any potentially favorable evidence in the possession of the Harris County District Attorney's Office, pursuant to *Brady v. Maryland.* 373 U.S. 83, 87 (1963).

Cruz-Garcia was convicted of capital murder and sentenced to death by this Court on July 22, 2013. The Court appointed the OCW to represent Applicant in his state habeas corpus proceedings. As part of the statutorily-mandated duty to investigate under Article 11.071 of the Texas Code of Criminal Procedure, Cruz-Garcia requests this Court order the State to disclose any information in its possession that may provide grounds for habeas corpus relief. Specifically, Cruz-Garcia requests this Court (1) order the State to submit information potentially requiring disclosure under *Brady v. Maryland* for *in camera* inspection, and (2) subsequently order any information necessitating disclosure turned over to the defense.

In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the

0002033

Case 4:17-cv-03621  Document 46-3  Filed on 11/30/20 in TXSD  Page 3 of 10

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530987-2 - Page 3 of 9

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (noting that included within this duty is the "disclosure of favorable evidence known only to the police"). This duty to disclose includes any information that could be used to impeach witnesses against Cruz-Garcia. *United States v. Bagley*, 473 U.S. 667, 684 (1985). The State's withholding of exculpatory evidence violates due process if the evidence is material to either guilt or punishment, irrespective of whether such information was knowingly withheld by the State. *Brady*, 373 U.S. at 87.

The Texas discovery statute mirrors these constitutional requirements. *See* TEX. CODE CRIM. P. art 39.14(h) ("[T]he state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged."). This statute also explicitly extends this requirement to materials not discovered by the State until after trial. TEX. CODE CRIM. P. art 39.14(k) ("If at any time before, during, or after trial the state discovers any additional document, item, or information required to be disclosed under Subsection (h), the state shall promptly disclose the existence of the document, item, or information to the defendant or the court.").

According to the Supreme Court, "[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks v. Dretke*, 540 U.S. 668, 675-76 (2004).

Keeping these requirements in mind, Cruz-Garcia requests the following categories of information in possession of the State or its agents be turned over to the defense:

3

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530872 - Page 4 of 9

1. Any information tending to show a witness's bias in favor of the government or against Cruz-Garcia or which otherwise impeaches a witness's testimony. *See United States v. Bagley*, 473 U.S. 667 (1985).

2. Any information indicating a witness's hostility towards or dislike of Cruz-Garcia. *United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004) (witness's dislike of defendant); *United States v. Sperling*, 726 F.2d 69 (2nd Cir. 1984) (tape of pre-trial conversation indicating that government witness was motivated by revenge).

3. All deals or "consideration" or promises of "consideration" given to or on behalf of all State witnesses or expected or hoped for by said State witnesses. *See Giglio v. United States*, 405 U.S. 150 (1972); *Banks v. Dretke*, 540 U.S. 668 (2004).

4. Instructions to a witness by the police, a prosecutor, a victim-witness coordinator, or any agent of the State to not speak with defense counsel or to do so only in the presence of the State's counsel. *See, e.g., Gregory v. United States*, 369 F. 2d 185 (D.C. Cir. 1966).

5. Knowledge of police intimidation of witnesses. *See, e.g., Guerra v. Johnson*, 90 F.3d 1075, 1078-80 (5th Cir. 1996) (failure to disclose police intimidation of key witnesses and information regarding suspect seen carrying murder weapon minutes after shooting is considered *Brady*).

6. Evidence or information indicating the untruthfulness of a State witness. *See, e.g., Napue v. Illinois*, 360 U.S. 264 (1959).

7. Perjury by any State witness at any time, whether or not adjudicated and whether or not in connection with this case. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935).

8. Statements of potential witnesses not called to testify. *See, e.g., United States v. Frost*, 125 F.3d 346, 383-84 (6th Cir. 1997) (*Brady* violation when government did not disclose statement of potentially exculpatory witness, but instead told defense that that witness would provide inculpatory information if called to testify).

9. Contradictory or inconsistent statements. *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87 (1963) (failure to turn over statement by co-defendant that he had planned the killing, and that co-defendant had performed actual killing); *see also Kyles v. Whitley*, 514 U.S. 419 (1995) (failure to disclose inconsistent eyewitness and informant statements, and list of license numbers compiled by police that did not show Kyles's car in supermarket parking lot); *United States v. Hanna*, 55 F.3d 1456 (9th Cir. 1995) (discrepancies between law

0002035

enforcement officers and reports and grand jury testimony); *United States v. Weintraub*, 871 F.2d 1257 (5th Cir. 1989).

10. Expert reports inconsistent with the State's case or tending to support the defense case. *See, e.g., United States v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) (*Brady* violation when government failed to disclose ballistics worksheet that showed gun defendant was accused of firing was inoperable).

Particularly relating to Cruz-Garcia, the State's case rests on two key pieces of evidence: DNA evidence and the testimony of an alleged co-conspirator (Carmelo Martinez Santana, a.k.a. "Rudy"), who was never charged in connection with this case. Thus, interactions between the District Attorney's office, and other law enforcement personnel, in collecting and testing the DNA evidence could potentially indicate exculpatory or impeachment evidence. Similarly, interactions between the District Attorney's office, or other law enforcement personnel, and the co-conspirator in securing his testimony may also reveal evidence favorable to Cruz-Garcia. Therefore, Cruz-Garcia also specifically requests the District Attorney's office disclose the following information:

1. Emails between the State and the FBI or (if applicable) other law enforcement agencies regarding the collection and testing of a DNA sample from Cruz-Garcia;

2. Emails between the State and the Houston Police Department ("HPD") crime lab regarding the storage, condition, and subsequent testing of biological material in this case.

3. Emails between the State and the FBI regarding Carmelo Martinez Santana ("Rudy"), specifically discussing:

    a. his willingness to testify;

    b. the anticipated content of his testimony;

    c. any representations made to him regarding the potential consequences of his testimony; and

    d. his transfer from federal custody in Pennsylvania to Houston to testify.

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530872 - Page 5 of 9

0002036

Case 4:17-cv-03621 Document 46-3 Filed on 11/30/20 in TXSD Page 6 of 10

4. Emails between the State internally discussing any representations made to Rudy regarding his testimony.

5. Emails between the State and Rudy's attorney, Ray Castro, regarding his client's participation in this case.

6. Emails between the State and the FBI or other law enforcement entities regarding Cruz-Garcia's use as a Confidential Informant by FBI agents in Puerto Rico.

For the foregoing reasons, Cruz-Garcia requests this Court direct the Harris County District Attorney's office to provide the identified information to the Court for *in camera* inspection. Cruz-Garcia then requests this Court order disclosed to the defense any evidence which arguably may be seen as favorable (i.e., impeaching or exculpatory) under the broad intent of *Brady v. Maryland*.

Respectfully submitted,

DATED: April 22, 2015

By _Robert Romig_
Robert Romig
Post-Conviction Attorney

By _____
Joanne Heisey
Post-Conviction Attorney

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530987 - Page 6 of 9

6

0002037

# IN THE 337th DISTRICT COURT
# HARRIS COUNTY, TEXAS

| | |
|---|---|
| **EX PARTE**<br>**Obel Cruz-Garcia,**<br>**APPLICANT** | )<br>)<br>)<br>)<br>)<br>) |

**Trial Cause No.**<br>**1384794**

## ORDER

On this date, the Court considered Applicant's Motion for Disclosure of *Brady v. Maryland* Materials.   After due consideration, Applicant's Motion is GRANTED.  The State shall provide the materials referenced in the Motion to the Court for *in camera* inspection within thirty days of this Order.

ORDERED AND SIGNED on this **28** day of April, 2015.

_____
The Honorable Judge Renee Magee
Presiding Judge, 337th District Court

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530987 - Page 7 of 9

7

0002038

# CERTIFICATE OF SERVICE

I, the undersigned, declare and certify that I have served the foregoing Motion for Disclosure of *Brady v. Maryland* Materials to:

Paula Gibson
Criminal Post-Trial
Harris County District Clerk
1201 Franklin Street, 3rd Floor
Suite 3180
Houston, TX 77002
(Original, via mail)

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002
(One courtesy copy, via mail)

Harris County District Attorney
c/o Lynn Hardaway
1201 Franklin
Suite 600
Houston, TX 77002
(One copy, via email)

Obel Cruz-Garcia
TDCJ # 999584
TDCJ Polunsky Unit
3872 FM 350 South
Livingston, TX 77351
(One copy, via mail)

This certification is executed on April 22, 2015, in Austin, Texas.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Robert Romig

8

For Official Governmental Use Only - Do Not Disseminate to the Public: 6530987.2 - Page 8 of 9

0002039



Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701

STATE OF TEXAS
PENALTY FOR
PRIVATE USE

PRESORTED
FIRST CLASS

XI 4/24/2016 $ ATX

Judge Renee Magee
337th District Court
1201 Franklin Street
15th Floor
Houston, TX 77002

CIZEAB3 77002

I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 18, 2020

Certified Document Number:      65309872 Total Pages:  9

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

0002041

13847940101C / Court: 337

# EXHIBIT 123

0002042

CAUSE NO. 1384794

| | | |
|---|---|---|
| EX PARTE | § | IN THE 337TH DISTRICT COURT |
| OBEL CRUZ-GARCIA | § | OF |
| | § | HARRIS COUNTY, TEXAS |

---

### STATE'S OBJECTIONS AND/OR REQUEST FOR RECONSIDERATION OF ORDER GRANTING DEFENDANT'S MOTION FOR DISCLOSURE

---

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

COMES NOW THE STATE OF TEXAS, through the undersigned assistant district attorney, and respectfully objects and/or requests that this Court reconsider its order granting the defendant's Motion for Disclosure. In support, the State would respectfully show the Court the following:

I.

On July 22, 2013, defendant Obel Cruz-Garcia was convicted of capital murder and sentenced to death, cause no. 1384794, in the 337th District Court of Harris County, Texas.

Direct appeal of the instant conviction is currently pending before the Court of Criminal Appeals.

The defendant has not filed his post-conviction application for writ of habeas corpus.

0002043

On April 22, 2015, counsel representing the defendant for purposes of a post-conviction habeas application filed a motion for the State to disclose "any potentially favorable evidence in the possession of the Harris County District Attorney's Office" for *in camera inspection* and possible disclosure to habeas counsel. *Defense motion at 2.*

On April 28, 2015, this Court granted the defendant's motion without argument from the parties.

## II.

The State acknowledges its ongoing obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material, exculpatory and impeachment evidence to the defense. Pursuant to his request under the Texas Open Records Act, habeas counsel has had an opportunity to review the prosecution file in the primary case and request copies of materials from that file.

## III.

Notwithstanding the State's ongoing efforts to comply with *Brady*, the State respectfully objects and asks that this Court reconsider its granting of the defendant's motion. The defendant's motion for disclosure is overly broad and unduly burdensome in that it seeks disclosure of "any potentially favorable evidence" or "any evidence which arguably may be seen as favorable." *See Thomas v. State*, 511 S.W.2d 302, 303 (Tex. Crim. App. 1974)(holding that defendant's request for "any papers, object or real evidence that is in the possession of the police or District Attorney's office which may in any way be material to the guilt or innocence of the defendant" was too broad to be effective). Also, some of the defendant's requested items are either work product or not subject to discovery.

0002044

Moreover, the defense's cited statutory authority does not support the granting of the instant motion for disclosure. The defendant relies on the current version of Texas Code of Criminal Procedure's Article 39.14(h) & (k)[Michael Morton Act], to support his motion. However, the current version of the Texas criminal discovery statute applies only to offenses committed on or after January 1, 2014, the effective date of the Act. TEX. CODE CRIM. PROC. ANN. art. 39.14 historical note (West Supp. 2014). The instant offense was committed in 1992.

Under the applicable version of Article 39.14, a defendant must show good cause, materiality, and possession of the information by the State or its agent in order to be entitled to pre-trial discovery. It should be noted that Texas post-conviction habeas proceedings are governed by TEX. CODE CRIM. PROC. art. 11.071 which provides for the use of affidavits, depositions, interrogatories, evidentiary hearings, and personal recollection to resolve "previously unresolved factual issues material to the legality of the applicant's confinement," rather than for discovery.

IV.

Accordingly, the State respectfully requests that this Court vacate its order granting the defendant's motion for disclosure. In the alternative, the State respectfully requests that this Court clarify and narrow its order in accordance with the State's objections.

0002045

V.

A copy of this instrument has been hand delivered to counsel for the defendant, Robert Romig, on the 11th day of May, 2015.

Respectfully submitted,

*Lori DeAngelo*

**LORI DEANGELO**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
SBT No. 24005167
(713) 755-6657
E-mail: deangelo_lori@dao.hctx.net

0002046

CAUSE NO. 1384794

| | | |
|---|---|---|
| EX PARTE | § | IN THE 337TH DISTRICT COURT |
| | § | |
| OBEL CRUZ-GARCIA | § | OF |
| | § | |
| | § | HARRIS COUNTY, TEXAS |

ORDER

The foregoing motion is hereby GRANTED. The Court's order granting the defendant's motion for disclosure signed on April 28, 2015, is hereby vacated and set aside.

SIGNED THIS _____ day of May, 2015.

_____
**JUDGE PRESIDING**
337th District Court
Harris County, Texas

5

13847940101C / Court: 337

# EXHIBIT 125

**Tise, Natalie**

| | |
|---|---|
| **From:** | RobinD Guidry <RobinD.Guidry@cityofhouston.net> |
| **Sent:** | Tuesday, August 02, 2011 9:24 AM |
| **To:** | Tise, Natalie |
| **Subject:** | RE: Obei Cruz Garcia case 105758592 |
| **Attachments:** | 105758592_Orchid DNA_061511.PDF |

| | |
|---|---|
| **Categories:** | Red Category |

Good morning,

I think this would qualify for cold case monies, assuming sufficient funds remain. When you know more about what may need testing, let's talk and we can decide what testing is necessary, and who will perform it.

Regarding Carmelo Martinez, attached is the latest DNA report from Orchid with his profile. I guess I thought you had received a copy - I do apologize!

Have a great week!
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 8/1/2011 6:52 PM >>>

Hi Robin,

Sorry I haven't gotten back to you sooner. It has been a busy summer for me. In May we sent in a buccal swab from a guy named Carmelo Martinez Santana. We requested that he be compared to all the evidence in the case. I have not yet received the results of that comparison. Are those available? If so, I think we are done for purposes of my case in chief.

However—due to a newly discovered witness, we are now looking at seeking the death penalty against this defendant and the trial has been postponed once again. It will probably not go until early next year. Our new witness has told us about an extraneous murder that he saw this defendant commit. We have found a 1989 unsolved cold case that matches the details provided by this witness. There are some items of evidence—fingernail scrapings, etc.-- that were collected in this case that will likely need to be compared. Would this case fall under the Cold Case Grant that we have been relying on to cover the costs of DNA analysis thus far? We have just learned of this new murder so we are still trying to put things together, but we may be contacting ya'll for more testing related to this case at some point.

Thanks for all your help,

Natalie

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Wednesday, July 13, 2011 5:00 PM
**To:** Tise, Natalie
**Subject:** RE: Obel Cruz Garcia case 105758592

Hi, Natalie,

1

0002049

Just checking in.  Is there anything outstanding from this lab, or are all of your DNA testing needs met either by us or by Orchid?

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 5/19/2011 12:48 PM >>>

Hi Robin,

The defense has told me that they plan to make an issue of the fact that one of the individuals that elimination samples were taken from back in 1992 was not re-compared to the DNA in the rape kit in 2007 because there were only extractions and there was not enough to retest.  My understanding is that we cannot rule out other contributors to the rape kit sample and I know that Rudy was likely with the defendant that night.  Everyone else has been ruled out.  I just want to be able to say that Rudy was ruled out too.  Or if not—then I might have enough information to charge him.

At trial, I plan to call both Orchid and HPD analysts to testify regarding the DNA results that were obtained by each respective agency.  For this last comparison, I am fine with whoever does the analysis.  My biggest concern is just that it be done by the trial date.  Not sure who has a quicker turn around time.  Thanks for all your help, Robin.

Natalie

**From:** Webb, Micah
**Sent:** Thursday, May 19, 2011 12:32 PM
**To:** 'RobinD.Guidry@cityofhouston.net'
**Cc:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia case 105758592

I agree. The new swab is for the guy we didn't have a full profile for (can't remember name off hand).

**From:** RobinD Guidry
**To:** Webb, Micah
**Cc:** Courtney Head ; Tise, Natalie
**Sent:** Thu May 19 12:23:58 2011
**Subject:** Re: Obel Cruz Garcia case 105758592

That should not be a problem.  However, I am curious, why is another buccal swab being collected?  For the unknown hair?  The sexual assault kit items appear to have come back to Diana Garcia, Arturo Rodriguez and Obel Cruz-Garcia.

Something to consider: we can process it in time for the July 25, 2011 trial date, assuming it is submitted in about a week.  However, you will need Orchid to testify regarding their evidence.  We would then testify to state whether the new reference matched any of the data generated by Orchid.  I think testimony would be simplified if all of the DNA testing was conducted by Orchid.  (They would issue one comprehensive report.)  Your thoughts?

Thanks,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist

2

0002050

Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/19/2011 10:07 AM >>>

We are having the FBI collect another buccal swab to be tested and compared to the rape kit of Diana Garcia and any other items
of evidence.  The trial is set for 7/25/11 and we are concerned about it getting tested in time.  Will HPD be able to test it once you
get the sample in about a week?  Or do we need to make arrangements to send it to Orchid?

Advise

**Micah K. Webb, D.A. investigator**
**262nd District Court**
**Harris County District Attorney's Office**
1201 Franklin St, Suite 600
Houston, Texas 77002-1923
713-755-0410

**This e-mail is the work product of the Harris County District Attorney's Office prepared in anticipation of or in
the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of
an attorney representing the State of Texas or her staff. This e-mail is not subject to public disclosure without
the express permission of the Harris County District Attorney or her designated representative.**

0002051

13847940101C / Court: 337

# EXHIBIT 126

**Tise, Natalie**

| | |
|---|---|
| From: | Webb, Micah |
| Sent: | Friday, May 27, 2011 9:56 AM |
| To: | 'Eric.Johnson3@ic.fbi.gov' |
| Cc: | Tise, Natalie |
| Subject: | Re: DNA Swab |

Great, thank you

**From:** Johnson, Eric L.
**To:** Webb, Micah
**Cc:** Tise, Natalie
**Sent:** Fri May 27 09:38:14 2011
**Subject:** RE: DNA Swab
Micah, I have received the swab, but will not be able to send it until Tuesday because the Orchid Cellmark is not open on the weekend. It is our evidence policy to have evidence delivered to facilities when they are open and to prevent evidence from laying around with a carrier until the facility opens. Therefore, I will be sending it out first thing on Tuesday because Monday is a holiday.

Thanks
Eric

**From:** Webb, Micah [mailto:WEBB_MICAH@dao.hctx.net]
**Sent:** Thursday, May 26, 2011 9:19 AM
**To:** Johnson, Eric L.
**Subject:** RE: DNA Swab

Thank you very much.

**From:** Johnson, Eric L. [mailto:Eric.Johnson3@ic.fbi.gov]
**Sent:** Thursday, May 26, 2011 9:18 AM
**To:** Webb, Micah
**Subject:** Re: DNA Swab

Oh yes. I will send it.

**From:** Webb, Micah <WEBB_MICAH@dao.hctx.net>
**To:** Johnson, Eric L.
**Cc:** Tise, Natalie <TISE_NATALIE@dao.hctx.net>
**Sent:** Thu May 26 10:03:19 2011
**Subject:** RE: DNA Swab

Just checking if you were going to be able to ship it directly, keeping me out of the chain. Sounds like you will be able to then?

Thank you sir for your assistance.

**From:** Johnson, Eric L. [mailto:Eric.Johnson3@ic.fbi.gov]
**Sent:** Thursday, May 26, 2011 9:01 AM

1

0002053

**To:** Webb, Micah
**Subject:** Re: DNA Swab

Hi Micah. Not ignoring you, just been very busy. We have to utilize our evidence control procedures for logging and mailing any evidence. This required the agent to package and mail the evidence to his evidence control room in Pittsburgh so they can log it in and then mail it out to me. I should receive it tomorrow or Monday. Once I receive it, I will immediaely mail it to the address you provided. Everyone knows to handle this expeditiously.

---

**From:** Webb, Micah <WEBB_MICAH@dao.hctx.net>
**To:** Johnson, Eric L.
**Sent:** Thu May 26 09:56:01 2011
**Subject:** RE: DNA Swab

I need to know about the procedures so we can get it mailed quickly.

---

**From:** Johnson, Eric L. [mailto:Eric.Johnson3@ic.fbi.gov]
**Sent:** Monday, May 23, 2011 3:55 PM
**To:** Webb, Micah
**Subject:** Re: DNA Swab

i'm not certain. I will check our procedures for mailing evidence tomorrow.

---

**From:** Webb, Micah <WEBB_MICAH@dao.hctx.net>
**To:** Johnson, Eric L.
**Sent:** Mon May 23 16:52:17 2011
**Subject:** RE: DNA Swab

Is it necessary to put me in the chain.  Can Pittsuburgh guys send it directly to Orchid?

---

**From:** Johnson, Eric L. [mailto:Eric.Johnson3@ic.fbi.gov]
**Sent:** Monday, May 23, 2011 2:22 PM
**To:** Webb, Micah
**Subject:** Re: DNA Swab

Hey Micah, after pausing on this, when it arrives, I will drive it directly to you so you can send out thru your system to them.

---

**From:** Webb, Micah <WEBB_MICAH@dao.hctx.net>
**To:** Johnson, Eric L.
**Cc:** RobinD Guidry <RobinD.Guidry@cityofhouston.net>; MQuartaro@orchid.com <MQuartaro@orchid.com>; Tise, Natalie <TISE_NATALIE@dao.hctx.net>
**Sent:** Mon May 23 15:13:43 2011
**Subject:** DNA Swab

Agent Johnson,

When you get the sample from Pittsburgh, could you forward the sample to the address below, referencing the appropriate case numbers?  I've copied Robin and Matt on the e-mail so everyone knows what is going on and that the sample be tested as quickly as possible, as the trial date is quickly approaching.

Orchid Cellmark

13988 Diplomat Drive

2

0002054

Suite 100

Dallas, TX  75234

214-271-8400

800-752-2774

Please reference their case #HP07-0014, as well as HPD Inc #105758592 and Lab #L92-10367.

I've copied Matt Quartaro from Orchid, so that they are expecting your sample.

Matt,

This case will be a cold case, for invoicing purposes.  Please compare this known to the evidence profiles previously generated for this case.

Thank you,

Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist

Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645

Email: robind.guidry@cityofhouston.net

3

0002055

13847940101C / Court: 337

# EXHIBIT 127

**Tise, Natalie**

| | |
|---|---|
| **From:** | RobinD Guidry <RobinD.Guidry@cityofhouston.net> |
| **Sent:** | Thursday, May 19, 2011 12:50 PM |
| **To:** | Tise, Natalie |
| **Cc:** | Webb, Micah |
| **Subject:** | RE: Obel Cruz Garcia case 105758592 |
| | |
| **Categories:** | Red Category |

Thanks, Natalie. That makes sense.

I think it would be easier for Orchid to manage the trial date!

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 5/19/2011 12:48 PM >>>

Hi Robin,

The defense has told me that they plan to make an issue of the fact that one of the individuals that elimination samples were taken from back in 1992 was not re-compared to the DNA in the rape kit in 2007 because there were only extractions and there was not enough to retest. My understanding is that we cannot rule out other contributors to the rape kit sample and I know that Rudy was likely with the defendant that night. Everyone else has been ruled out. I just want to be able to say that Rudy was ruled out too. Or if not—then I might have enough information to charge him.

At trial, I plan to call both Orchid and HPD analysts to testify regarding the DNA results that were obtained by each respective agency. For this last comparison, I am fine with whoever does the analysis. My biggest concern is just that it be done by the trial date. Not sure who has a quicker turn around time. Thanks for all your help, Robin.

Natalie

**From:** Webb, Micah
**Sent:** Thursday, May 19, 2011 12:32 PM
**To:** 'RobinD.Guidry@cityofhouston.net'
**Cc:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia case 105758592

I agree. The new swab is for the guy we didn't have a full profile for (can't remember name off hand).

**From:** RobinD Guidry
**To:** Webb, Micah
**Cc:** Courtney Head ; Tise, Natalie

0002057

**Sent:** Thu May 19 12:23:58 2011
**Subject:** Re: Obel Cruz Garcia case 105758592
That should not be a problem. However, I am curious, why is another buccal swab being collected? For the unknown hair? The sexual assault kit items appear to have come back to Diana Garcia, Arturo Rodriguez and Obel Cruz-Garcia.

Something to consider: we can process it in time for the July 25, 2011 trial date, assuming it is submitted in about a week. However, you will need Orchid to testify regarding their evidence. We would then testify to state whether the new reference matched any of the data generated by Orchid. I think testimony would be simplified if all of the DNA testing was conducted by Orchid. (They would issue one comprehensive report.) Your thoughts?

Thanks,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/19/2011 10:07 AM >>>

We are having the FBI collect another buccal swab to be tested and compared to the rape kit of Diana Garcia and any other items of evidence. The trial is set for 7/25/11 and we are concerned about it getting tested in time. Will HPD be able to test it once you get the sample in about a week? Or do we need to make arrangements to send it to Orchid?

Advise

**Micah K. Webb, D.A. Investigator**
**262nd District Court**
**Harris County District Attorney's Office**
1201 Franklin St, Suite 600
Houston, Texas 77002-1923
713-755-0410

**This e-mail is the work product of the Harris County District Attorney's Office prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or her staff. This e-mail is not subject to public disclosure without the express permission of the Harris County District Attorney or her designated representative.**

0002058

Marilyn Burgess - District Clerk Harris County
Envelope No. 52318129
By: E Lane-Orton
Filed: 4/9/2021 2:39 PM

## 13847940101C / Court: 337

### IN THE 337TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY, TEXAS

### AND

### IN THE TEXAS COURT OF CRIMINAL APPEALS
### AUSTIN, TEXAS

| | | |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § § | **Writ No.** _____ Trial Court Case No: 1384794 |
| **Applicant.** | § § § § | **CAPITAL CASE** |

### SUBSEQUENT APPLICATION FOR
### POST-CONVICTION WRIT OF HABEAS CORPUS
### EXHIBIT 128

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

0002059

13847940101C / Court: 337

# EXHIBIT 128

0002060

**Tise, Natalie**

| | |
|---|---|
| **From:** | Webb, Micah |
| **Sent:** | Monday, May 16, 2011 3:25 PM |
| **To:** | Tise, Natalie |
| **Subject:** | FW: RE: Obel Cruz Garcia |

No profile matches from our hairs. Still waiting on definitive response for were our "new" buccal swab will be submitted. Courtney told me that the crime lab would test the swabs. But waiting for a good answer from Robin as well.

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Monday, May 16, 2011 3:21 PM
**To:** Webb, Micah
**Subject:** RE: RE: Obel Cruz Garcia

These hairs came from a box of evidence (TL7D\TL7E) that contained both "1 trunk matt" (TL7F\TL7G) and a "plastic bag containing evidence" (TL7H\TL7I). See Biology section laboratory report dated January 13, 2011.

All of the hairs were found in individual paper folds, that were prepared prior to submission to the Crime Lab. Each of the 10 apparent hairs were examined for possible root material; those positive for possible root material were sent to Orchid for testing (the three in this DNA report).

There is nothing in our case file to suggest that there are hairs in addition to these that were tested by Orchid. Does this help?

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/16/2011 3:04 PM >>>
Were these the hairs that were in a floor mat?

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Monday, May 16, 2011 3:01 PM
**To:** Webb, Micah
**Cc:** Courtney Head
**Subject:** RE: RE: Obel Cruz Garcia

If you look mid-way down the list of exhibits on page 1 of Orchid's DNA report, you will see the three hairs. Two failed to give results, while the passenger front door hair gave a partial DNA profile that did not match anyone tested here. Were there hairs other than these?

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/16/2011 2:29 PM >>>
Robin, Thanks for the report. However, I was inquiring about some hairs that were being tested from a floor mat. Was this part of this report? Sorry, I just wanted some clarification.

Thanks

Micah Webb

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Monday, May 16, 2011 2:15 PM
**To:** Webb, Micah
**Subject:** Fwd: RE: Obel Cruz Garcia

1

Good afternoon,

Courtney asked that I forward this to you. Please don't hesitate to call or email should you have any questions.

Thank you,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> RobinD Guidry 5/12/2011 3:34 PM >>>
Good afternoon, Natalie,

Attached is the DNA report from Orchid, including the additional hairs tested. It appears that two failed to give DNA results (front and rear seats). The passenger front door sample did yield a male DNA profile, but one that does not match Arturo Rodriguez, Diana Garcia, Candido Lebron, Bienviendo Melo, Leonardo German, Carmelo Martinez, or Obel Cruz-Garcia.

Please let me know if you should have any questions.
Thanks!
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/24/2011 3:03 PM >>>
Just reread the email I sent you and I am sorry for the misspellings. I was in court and so was responding from my IPHONE and I can't ever get anything typed correctly!

---

**From:** Tise, Natalie
**Sent:** Thursday, March 24, 2011 9:28 AM
**To:** RobinD Guidry
**Subject:** Re: Obel Cruz Garcia

Wow I am glad I checked too! The trial Date has not changes and it is a preferential setting so I don't forsee any wiggle room on that. My main concern is that we get the results in time so that it can ve disclosed to defense and so that any follow up can be done.

Sent from my iPhone

On Mar 24, 2011, at 8:56 AM, "RobinD Guidry" <RobinD.Guidry@cityofhouston.net> wrote:

> Good morning, Natalie,
>
> I am so glad that you followed up on this. I have found that there was a delay in getting this stuff out to Orchid, as we had trouble locating Bill Stephens (possibly retired now?) and were

waiting to get a contact on an investigator with whom we could coordinate this request to Orchid. I have learned that this sort of request can come from the lab, even though we want Cold Case Grant monies to be used; instead of waiting to an investigator, I am making the request now. I am having the hairs sent out today, with instructions for Orchid to compare the hairs, if sufficient DNA exists, to Diana Garcia's known (to try to determine if a biological relationship exists).

I see in the communication log that there is a trial date set for July 25, 2011. Is this still the case? Please let me know if there are any other dates that we need to be aware of, to ensure that you get the results in time.

I apologize for this delay, and appreciate you following up with me, getting this case back on track.

Thank you,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/22/2011 12:11 PM >>>

I understand. Whenever you come up for air, shoot me an email. Thanks!


**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, March 22, 2011 10:51 AM
**To:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia


Hi, Natalie,

I was out last week at training, so I am buried in emails. Let me get an update and get back to you.

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/21/2011 2:34 PM >>>

Robin,

Hope all is well with you. I am just checking in with you on the hairs that were outsourced to Orchid for DNA testing on this 1992 cold case. Can you please let me know what the current status is?

Thanks,

Natalie

3

0002063

13847940101C / Court: 337

# EXHIBIT 129

0002064

**Tise, Natalie**

**From:** RobinD Guidry <RobinD.Guidry@cityofhouston.net>
**Sent:** Thursday, May 12, 2011 3:35 PM
**To:** Tise, Natalie
**Cc:** Elliott, Carless (HPD)
**Subject:** RE: Obel Cruz Garcia
**Attachments:** 105758592_Orchid DNA report.PDF

Good afternoon, Natalie,

Attached is the DNA report from Orchid, including the additional hairs tested. It appears that two failed to give DNA results (front and rear seats). The passenger front door sample did yield a male DNA profile, but one that does not match Arturo Rodriguez, Diana Garcia, Candido Lebron, Bienviendo Melo, Leonardo German, Carmelo Martinez, or Obel Cruz-Garcia.

Please let me know if you should have any questions.
Thanks!
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/24/2011 3:03 PM >>>
Just reread the email I sent you and I am sorry for the misspellings. I was in court and so was responding from my IPHONE and I can't ever get anything typed correctly!

---

**From:** Tise, Natalie
**Sent:** Thursday, March 24, 2011 9:28 AM
**To:** RobinD Guidry
**Subject:** Re: Obel Cruz Garcia

Wow I am glad I checked too! The trial Date has not changes and it is a preferential setting so I don't forsee any wiggle room on that. My main concern is that we get the results in time so that it can ve disclosed to defense and so that any follow up can be done.

Sent from my iPhone

On Mar 24, 2011, at 8:56 AM, "RobinD Guidry" <RobinD.Guidry@cityofhouston.net> wrote:

> Good morning, Natalie,
>
> I am so glad that you followed up on this. I have found that there was a delay in getting this stuff out to Orchid, as we had trouble locating Bill Stephens (possibly retired now?) and were waiting to get a contact on an investigator with whom we could coordinate this request to Orchid. I have learned that this sort of request can come from the lab, even though we want Cold Case Grant monies to be used; instead of waiting to an investigator, I am making the

request now. I am having the hairs sent out today, with instructions for Orchid to compare the hairs, if sufficient DNA exists, to Diana Garcia's known (to try to determine if a biological relationship exists).

I see in the communication log that there is a trial date set for July 25, 2011. Is this still the case? Please let me know if there are any other dates that we need to be aware of, to ensure that you get the results in time.

I apologize for this delay, and appreciate you following up with me, getting this case back on track.

Thank you,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/22/2011 12:11 PM >>>

I understand. Whenever you come up for air, shoot me an email. Thanks!


**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, March 22, 2011 10:51 AM
**To:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia


Hi, Natalie,

I was out last week at training, so I am buried in emails. Let me get an update and get back to you.

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/21/2011 2:34 PM >>>

Robin,

Hope all is well with you. I am just checking in with you on the hairs that were outsourced to Orchid for DNA testing on this 1992 cold case. Can you please let me know what the current status is?

Thanks,

Natalie

2

0002066

13847940101C / Court: 337

# EXHIBIT 130

## Tise, Natalie

| | |
|---|---|
| **From:** | Webb, Micah |
| **Sent:** | Tuesday, October 18, 2011 10:56 AM |
| **To:** | 'RobinD Guidry' |
| **Cc:** | Tise, Natalie |
| **Subject:** | RE: Obel Cruz Garcia case 105758592 |
| | |
| **Categories:** | Red Category |

Well, that HPD OR # is not really close, assuming we are talking about the right report.  Double check that this is the right report, but it should be:


058851589


Thank you


**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, October 18, 2011 10:13 AM
**To:** Webb, Micah
**Subject:** RE: Obel Cruz Garcia case 105758592


Thanks!

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 10/18/2011 10:11 AM >>>

I'll get the information in a little while.  Swamped at the moment.


**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, October 18, 2011 8:51 AM
**To:** Webb, Micah
**Subject:** RE: Obel Cruz Garcia case 105758592


Mr. Webb,

Regarding the request to test fingernail scrapings in another, possibly related homicide, what is that incident #?  OLO supplement #96 where Sgt. Peters requests the fingernail scrapings lists HPD case #585698, but our LIMS doesn't have a record of that incident #.  Is this only partial, or is there another incident # that I could use to look up the case?

1

0002068

Thanks very much,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/23/2011 8:38 AM >>>

Is this testing gonna be part of the cold case grant?  I need to figure out the logistics of the sample.  Where it needs to get sent to be tested by Orchid.

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Thursday, May 19, 2011 12:50 PM
**To:** Tise, Natalie
**Cc:** Webb, Micah
**Subject:** RE: Obel Cruz Garcia case 105758592

Thanks, Natalie.  That makes sense.

I think it would be easier for Orchid to manage the trial date!

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 5/19/2011 12:48 PM >>>

Hi Robin,

The defense has told me that they plan to make an issue of the fact that one of the individuals that elimination samples were taken from back in 1992 was not re-compared to the DNA in the rape kit in 2007 because there were only extractions and there was not enough to retest.  My understanding is that we cannot rule out other contributors to the rape kit sample and I know that Rudy was likely with the defendant that night.  Everyone else has been ruled out.  I just want to be able to say that Rudy was ruled out too.  Or if not—then I might have enough information to charge him.

At trial, I plan to call both Orchid and HPD analysts to testify regarding the DNA results that were obtained by each respective agency.  For this last comparison, I am fine with whoever does the analysis.  My biggest concern is just that it be done by the trial date.  Not sure who has a quicker turn around time.  Thanks for all your help, Robin.

Natalie

**From:** Webb, Micah
**Sent:** Thursday, May 19, 2011 12:32 PM

2

0002069

**To:** 'RobinD.Guidry@cityofhouston.net'
**Cc:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia case 105758592

I agree. The new swab is for the guy we didn't have a full profile for (can't remember name off hand).

---

**From:** RobinD Guidry
**To:** Webb, Micah
**Cc:** Courtney Head ; Tise, Natalie
**Sent:** Thu May 19 12:23:58 2011
**Subject:** Re: Obel Cruz Garcia case 105758592
That should not be a problem.  However, I am curious, why is another buccal swab being collected?  For the unknown hair?  The sexual assault kit items appear to have come back to Diana Garcia, Arturo Rodriguez and Obel Cruz-Garcia.

Something to consider: we can process it in time for the July 25, 2011 trial date, assuming it is submitted in about a week.  However, you will need Orchid to testify regarding their evidence.  We would then testify to state whether the new reference matched any of the data generated by Orchid.  I think testimony would be simplified if all of the DNA testing was conducted by Orchid.  (They would issue one comprehensive report.)  Your thoughts?

Thanks,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/19/2011 10:07 AM >>>

We are having the FBI collect another buccal swab to be tested and compared to the rape kit of Diana Garcia and any other items of evidence.   The trial is set for 7/25/11 and we are concerned about it getting tested in time.  Will HPD be able to test it once you get the sample in about a week?  Or do we need to make arrangements to send it to Orchid?

Advise

**Micah K. Webb, D.A. Investigator**
**262nd District Court**
**Harris County District Attorney's Office**
1201 Franklin St, Suite 600
Houston, Texas 77002-1923
713-755-0410

**This e-mail is the work product of the Harris County District Attorney's Office prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or her staff. This e-mail is not subject to public disclosure without the express permission of the Harris County District Attorney or her designated representative.**

0002070

Marilyn Burgess - District Clerk Harris County
Envelope No. 52316262
By: E Lane-Orton
Filed: 4/9/2021 2:16 PM

## 13847940101C / Court: 337

**IN THE 337TH JUDICIAL DISTRICT COURT
HARRIS COUNTY, TEXAS**

**AND**

**IN THE TEXAS COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS**

|  |  |  |
|---|---|---|
| **Ex parte OBEL CRUZ-GARCIA,** | § § § § § § | **Writ No. _____** Trial Court Case No: 1384794 |
| **Applicant.** | § § § § § | **CAPITAL CASE** |

## SUBSEQUENT APPLICATION FOR
## POST-CONVICTION WRIT OF HABEAS CORPUS
## EXHIBITS 131 THROUGH 137

Jeremy Schepers (Texas 24084578)
Supervisor, Capital Habeas Unit
David Currie (TX 24084240)
Naomi Fenwick (TX 24107764)
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
jeremy_schepers@fd.org
(214) 767-2746
(214) 767-2886 (fax)

*Counsel for Obel Cruz-Garcia*

0002071

13847940101C / Court: 337

# EXHIBIT 131



0002073

**Tise, Natalie**

| | |
|---|---|
| **From:** | Webb, Micah |
| **Sent:** | Tuesday, October 18, 2011 10:56 AM |
| **To:** | 'RobinD Guidry' |
| **Cc:** | Tise, Natalie |
| **Subject:** | RE: Obel Cruz Garcia case 105758592 |
| | |
| **Categories:** | Red Category |

Well, that HPD OR # is not really close, assuming we are talking about the right report.  Double check that this is the right report, but it should be:

058851589

Thank you

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, October 18, 2011 10:13 AM
**To:** Webb, Micah
**Subject:** RE: Obel Cruz Garcia case 105758592

Thanks!

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 10/18/2011 10:11 AM >>>

I'll get the information in a little while.  Swamped at the moment.

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, October 18, 2011 8:51 AM
**To:** Webb, Micah
**Subject:** RE: Obel Cruz Garcia case 105758592

Mr. Webb,

Regarding the request to test fingernail scrapings in another, possibly related homicide, what is that incident #?  OLO supplement #96 where Sgt. Peters requests the fingernail scrapings lists HPD case #585698, but our LIMS doesn't have a record of that incident #.  Is this only partial, or is there another incident # that I could use to look up the case?

1

0002074

Thanks very much,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/23/2011 8:38 AM >>>

Is this testing gonna be part of the cold case grant? I need to figure out the logistics of the sample. Where it needs to get sent to be tested by Orchid.

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Thursday, May 19, 2011 12:50 PM
**To:** Tise, Natalie
**Cc:** Webb, Micah
**Subject:** RE: Obel Cruz Garcia case 105758592

Thanks, Natalie. That makes sense.

I think it would be easier for Orchid to manage the trial date!

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 5/19/2011 12:48 PM >>>

Hi Robin,

The defense has told me that they plan to make an issue of the fact that one of the individuals that elimination samples were taken from back in 1992 was not re-compared to the DNA in the rape kit in 2007 because there were only extractions and there was not enough to retest. My understanding is that we cannot rule out other contributors to the rape kit sample and I know that Rudy was likely with the defendant that night. Everyone else has been ruled out. I just want to be able to say that Rudy was ruled out too. Or if not—then I might have enough information to charge him.

At trial, I plan to call both Orchid and HPD analysts to testify regarding the DNA results that were obtained by each respective agency. For this last comparison, I am fine with whoever does the analysis. My biggest concern is just that it be done by the trial date. Not sure who has a quicker turn around time. Thanks for all your help, Robin.

Natalie

**From:** Webb, Micah
**Sent:** Thursday, May 19, 2011 12:32 PM

2

0002075

**To:** 'RobinD.Guidry@cityofhouston.net'
**Cc:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia case 105758592

I agree. The new swab is for the guy we didn't have a full profile for (can't remember name off hand).

**From:** RobinD Guidry
**To:** Webb, Micah
**Cc:** Courtney Head ; Tise, Natalie
**Sent:** Thu May 19 12:23:58 2011
**Subject:** Re: Obel Cruz Garcia case 105758592
That should not be a problem.  However, I am curious, why is another buccal swab being collected?  For the unknown hair?  The sexual assault kit items appear to have come back to Diana Garcia, Arturo Rodriguez and Obel Cruz-Garcia.

Something to consider: we can process it in time for the July 25, 2011 trial date, assuming it is submitted in about a week.  However, you will need Orchid to testify regarding their evidence.  We would then testify to state whether the new reference matched any of the data generated by Orchid.  I think testimony would be simplified if all of the DNA testing was conducted by Orchid.  (They would issue one comprehensive report.)  Your thoughts?

Thanks,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/19/2011 10:07 AM >>>

We are having the FBI collect another buccal swab to be tested and compared to the rape kit of Diana Garcia and any other items of evidence.  The trial is set for 7/25/11 and we are concerned about it getting tested in time.  Will HPD be able to test it once you get the sample in about a week?  Or do we need to make arrangements to send it to Orchid?

Advise

**Micah K. Webb, D.A. Investigator**
**262nd District Court**
**Harris County District Attorney's Office**
1201 Franklin St, Suite 600
Houston, Texas 77002-1923
713-755-0410

**This e-mail is the work product of the Harris County District Attorney's Office prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or her staff. This e-mail is not subject to public disclosure without the express permission of the Harris County District Attorney or her designated representative.**

0002076

13847940101C / Court: 337

# EXHIBIT 132

*Timeline*

## DNA Timeline

9/30/92 11:30ish PM

Offense occurs. Cigar and other physical evidence from the scene is tagged by CSU J. Norris

10/1/92 4:25 AM (Supp. 1)

Rape Kit is completed at St. Joseph's hospital by SANE Nurse Gloria Kolginczok and transported to HPD by W.T. Bredemeyer

10/4/92 (Supp. 3)

UP Hernandez interviews Leonardo German and obtains blood and saliva samples

10/5/92 (Supp. 15)

Stephens requests that the crime lab do a DNA workup on the rape kit and compare to any blood samples submitted from male suspects

10/7/92 (Supp. 16)

Candido Lebron/Rogelio Aviles-Barroso is arrested and interviewed by AC Alonzo and obtains a DNA sample

10/15/92 (Supp. 31)

Arturo Rodriguez's DNA sample was obtained

10/16/92 (Supp. 31)

Bienvenido Melo's DNA sample was obtained

10/9/92 (Supp. 31)

Deetrice Wallace retrieves these items from the property room: rape kit containing a vaginal smear, vaginal swabs, CW's blood, hairs, nail scrapings, and panties; fuschia t-shirt, cigar, and tan sheet.

10/28/92 (Supp. 28)

BK Sharma receives blood sample from CW, vaginal swab, crotch panties, and blood samples from Arturo Rodriguez, Leonardo German, Bienvenido Melo, Candido Lebron (Roger) and found that the DNA extracted from those items was unsuitable for DNA-RFLP analysis

*Allele charts d/n exist*
*bad then*

0002079

11/9/92 (Supp. 25)

Stephens notes that samples of Arturo Rodriguez, Bienvenido Melo, and Javier Galindo have been obtained.  Notes that he spoke with Dee Wallace of the Crime Lab who stated that she will send the semen from the rape kit to be compared to the blood samples.

12/2/92 (Supp. 33)

Deetrice Wallace states that she has sent extractions only to Genetic Design.  The extractions are from German, Lebron (Roger), Melo, Arturo, Diana, and extractions from the vaginal swab and crotch of panties.  Genetic Design says that the DNA types from the male fraction of the panties are not consistent with any of the tested individuals in this analysis.

1/10/93 (Supp. 32)

Deetrice Wallace notes she has sent the rape kit and blood samples to California lab Genetic Design for DNA because the lab can do a more exclusive test—RFLP.  She says to Stephens that the semen from the vaginal vault of CW is possibly Arturo's and possibly Bienvenido Melo's and RFLP will determine.

1/17/94 (Supp. 35)

DNA was obtained by Stephens from Carmelo Martinez Santana (Rudy) who was in custody on a misdemeanor case.  Comparison with the rape kit is requested.

1/27/94 (Supp. 36)

Stephens speaks to Joe Chu who tells him that the results of the PCR analysis on the blood of Rudy could not be excluded.  Does not say what item in the rape kit he was compared to, presumably all.  Stephens requests Genetic Design do more specific tests including the AMP-FLP.  D. Wallace sends the DNA extraction from Rudy to Genetic Design for comparison with RESULTS of what was previously submitted.

2/24/94 (Supp. 37)

*24 '96*

The HLQ DQ ALPHA and D1S80 Types from Rudy are not consistent w/those previously reported on 2/4/93 from the vaginal swabs and panties of Diana.

*→ Stephens removed as Supervisor of DNA lab*

9/7/07 (Supp. 40)

Sgt. Mehl asked Cassandrea Pope to locate evidence being stored in the crime lab.  Pope initialed bag and gave to Connie Park who sealed it and gave the bag and its contents to Sgt. Mehl.  Mehl initialed and dated it and secured it in the cold case evidence storage room.

0002080

9/27/07 (Supp. 42 and 63)

Sgt. Mehl drove to the HPD property room on this date to check out the tagged cigar. It was in a separate plastic bag contained in a larger bag that had sheet and shirt.

10/1/07 (Supp. 43 and 44)

Sgt. Mehl retrieved the Rape kit from the cold case evidence storage room.  Mehl sends cigar, rape kit, and evidence from the crime lab (1 extract tube of Arturo's blood, a cutting from Diana's panties, and extractions from each of the following Arturo, Diana's panties, vaginal swab, diana's blood sample, Arturo's blood sample) to Matt Quattaro at Orchid Cellmark.  The intent was to obtain a CODIS worthy DNA profile.

11/27/07 (Supp. 46)

Orchid Cellmark's report completed.

12/5/07 (Supp. 47)

Orchid Cellmark's report indicates a full single source male DNA profile from the cigar.  Vaginal swab is mix of Arturo and the Cigar man.  Panties is a mixture and major profile is Cigar man. Diana, and Arturo cannot be excluded.

Mehl asked the Cigar man's profile to be entered into CODIS.

Noticing that the Genetic Design lab excluded Arturo and that was wrong, Mehl decides to send the other suspect's blood samples and extractions to Matt Quattaro at Orchid Cellmark to see if GD was wrong about any of those as well.  These include:  blood and the DNA extraction from Lebron (Roger), blood and the DNA extraction from Melo, blood and the DNA extraction from German, and the DNA extraction of C. Martinez (Rudy) because his orginal blood sample was not available.

1/16/08 (Supp. 48)

Mehl receives Orchid's report.  Lebron, Melo, German are excluded.  Partial profile of Martinez insufft to include or exclude from rape kit, but he is excluded from the cigar.  Cigar man has been entered into CODIS.

3/28/08 (Supp. 54)

A court order for the buccal swab of Obel Cruz Garcia was signed and sent to Agents Mark Miller and Griselle Guzman in Puerto Rico where Cruz-Garcia had been located in prison there.

5/21/08 (Supp. 52)

DNA sample requested from Obel Cruz Garcia was taken and sent to Mehl. Mehl stored in cold case storage room and never broke the seal on the envelope and sent it directly to Matt Quattaro at Orchid Cellmark on 5/27/08.

7/17/08 (Supp. 55)

Orchid returned evidence to HPD in separately sealed plastic envelopes.

7/18/08 (Supp. 56 and 57)

Mehl retrieved the following evidence from Cassandrea Pope and placed them into the property room:  cigar, rape kit, 10 extract tubes and cutting from panties, blood and extraction from Lebron, Melo, German and extraction from C. Martinez.

7/25/08 (Supp. 58)

Orchid's report is received in the lab.

7/30/08 (Supp. 59)

Mehl reviews report and learns that Orchid says that Cruz-Garcia is the single source on the cigar. The sperm fraction from the panties is a mixture and he is the major profile also, and Diana and Arturo cannot be excluded as minor contributors to the mixture.

2/4/09

Cassandrea Pope receives evidence back from Orchid

2/18/09 (Supp. 71)

Mehl inventories evidence in the Cold Case Storage Room and reseals it.

2/19/09  (Supp. 72)

Mehl takes the evidence from Cold Case Storage Room and puts it in the property room.

3/11/09 (Supp. 76 and 78)

Defendant's DNA swabs were taken from storage at lab, inventoried and stored in the Cold Case Storage room.

3/12/09 (Supp. 77)

Mehl transports Def's swabs to the HPD property room.

13847940101C / Court: 337

# EXHIBIT 133

0002083

**Tise, Natalie**

**From:** RobinD Guidry [RobinD.Guidry@cityofhouston.net]
**Sent:** Thursday, May 12, 2011 3:35 PM
**To:** Tise, Natalie
**Cc:** Elliott, Carless (HPD)
**Subject:** RE: Obel Cruz Garcia
**Attachments:** 105758592_Orchid DNA report.PDF

**Categories:** Red Category

Good afternoon, Natalie,

Attached is the DNA report from Orchid, including the additional hairs tested. It appears that two failed to give DNA results (front and rear seats). The passenger front door sample did yield a male DNA profile, but one that does not match Arturo Rodriguez, Diana Garcia, Candido Lebron, Bienviendo Melo, Leonardo German, Carmelo Martinez, or Obel Cruz-Garcia.

Please let me know if you should have any questions.
Thanks!
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/24/2011 3:03 PM >>>
Just reread the email I sent you and I am sorry for the misspellings. I was in court and so was responding from my IPHONE and I can't ever get anything typed correctly!

**From:** Tise, Natalie
**Sent:** Thursday, March 24, 2011 9:28 AM
**To:** RobinD Guidry
**Subject:** Re: Obel Cruz Garcia

Wow I am glad I checked too! The trial Date has not changes and it is a preferential setting so I don't forsee any wiggle room on that. My main concern is that we get the results in time so that it can ve disclosed to defense and so that any follow up can be done.

Sent from my iPhone

On Mar 24, 2011, at 8:56 AM, "RobinD Guidry" <RobinD.Guidry@cityofhouston.net> wrote:

> Good morning, Natalie,
>
> I am so glad that you followed up on this. I have found that there was a delay in getting this stuff out to Orchid, as we had trouble locating Bill Stephens (possibly retired now?) and were waiting to get a contact on an investigator with whom we could coordinate this request to Orchid. I have learned that this sort of request can come from the lab, even though we want Cold Case Grant monies to be used; instead of waiting to an investigator, I am making the

request now.  I am having the hairs sent out today, with instructions for Orchid to compare the hairs, if sufficient DNA exists, to Diana Garcia's known (to try to determine if a biological relationship exists).

I see in the communication log that there is a trial date set for July 25, 2011.  Is this still the case?  Please let me know if there are any other dates that we need to be aware of, to ensure that you get the results in time.

I apologize for this delay, and appreciate you following up with me, getting this case back on track.

Thank you,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/22/2011 12:11 PM >>>

I understand.  Whenever you come up for air, shoot me an email.  Thanks!

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, March 22, 2011 10:51 AM
**To:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia

Hi, Natalie,

I was out last week at training, so I am buried in emails.  Let me get an update and get back to you.

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/21/2011 2:34 PM >>>

Robin,

Hope all is well with you.  I am just checking in with you on the hairs that were outsourced to Orchid for DNA testing on this 1992 cold case.  Can you please let me know what the current status is?

Thanks,

Natalie

0002085

13847940101C / Court: 337

# EXHIBIT 134

0002086

Marin –
Orchid
DNA
Reports

**Tise, Natalie**

| | |
|---|---|
| **From:** | Webb, Micah |
| **Sent:** | Monday, May 16, 2011 3:25 PM |
| **To:** | Tise, Natalie |
| **Subject:** | FW: RE: Obel Cruz Garcia |

No profile matches from our hairs. Still waiting on definitive response for were our "new" buccal swab will be submitted. Courtney told me that the crime lab would test the swabs. But waiting for a good answer from Robin as well.

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Monday, May 16, 2011 3:21 PM
**To:** Webb, Micah
**Subject:** RE: RE: Obel Cruz Garcia

These hairs came from a box of evidence (TL7D\TL7E) that contained both "1 trunk matt" (TL7F\TL7G) and a "plastic bag containing evidence" (TL7H\TL7I). See Biology section laboratory report dated January 13, 2011.

All of the hairs were found in individual paper folds, that were prepared prior to submission to the Crime Lab. Each of the 10 apparent hairs were examined for possible root material; those positive for possible root material were sent to Orchid for testing (the three in this DNA report).

There is nothing in our case file to suggest that there are hairs in addition to these that were tested by Orchid. Does this help?

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/16/2011 3:04 PM >>>
Were these the hairs that were in a floor mat?

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Monday, May 16, 2011 3:01 PM
**To:** Webb, Micah
**Cc:** Courtney Head
**Subject:** RE: RE: Obel Cruz Garcia

If you look mid-way down the list of exhibits on page 1 of Orchid's DNA report, you will see the three hairs. Two failed to give results, while the passenger front door hair gave a partial DNA profile that did not match anyone tested here. Were there hairs other than these?

>>> "Webb, Micah" <WEBB_MICAH@dao.hctx.net> 5/16/2011 2:29 PM >>>
Robin, Thanks for the report. However, I was inquiring about some hairs that were being tested from a floor mat. Was this part of this report? Sorry, I just wanted some clarification.

Thanks

Micah Webb

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Monday, May 16, 2011 2:15 PM
**To:** Webb, Micah
**Subject:** Fwd: RE: Obel Cruz Garcia

Good afternoon,

i

0002088

Courtney asked that I forward this to you. Please don't hesitate to call or email should you have any questions.

Thank you,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> RobinD Guidry 5/12/2011 3:34 PM >>>
Good afternoon, Natalie,

Attached is the DNA report from Orchid, including the additional hairs tested. It appears that two failed to give DNA results (front and rear seats). The passenger front door sample did yield a male DNA profile, but one that does not match Arturo Rodriguez, Diana Garcia, Candido Lebron, Bienviendo Melo, Leonardo German, Carmelo Martinez, or Obel Cruz-Garcia.

Please let me know if you should have any questions.
Thanks!
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/24/2011 3:03 PM >>>
Just reread the email I sent you and I am sorry for the misspellings. I was in court and so was responding from my IPHONE and I can't ever get anything typed correctly!

---

**From:** Tise, Natalie
**Sent:** Thursday, March 24, 2011 9:28 AM
**To:** RobinD Guidry
**Subject:** Re: Obel Cruz Garcia

Wow I am glad I checked too! The trial Date has not changes and it is a preferential setting so I don't forsee any wiggle room on that. My main concern is that we get the results in time so that it can ve disclosed to defense and so that any follow up can be done.

Sent from my iPhone

On Mar 24, 2011, at 8:56 AM, "RobinD Guidry" <RobinD.Guidry@cityofhouston.net> wrote:

> Good morning, Natalie,
>
> I am so glad that you followed up on this. I have found that there was a delay in getting this stuff out to Orchid, as we had trouble locating Bill Stephens (possibly retired now?) and were waiting to get a contact on an investigator with whom we could coordinate this request to

Orchid. I have learned that this sort of request can come from the lab, even though we want Cold Case Grant monies to be used; instead of waiting to an investigator, I am making the request now.  I am having the hairs sent out today, with instructions for Orchid to compare the hairs, if sufficient DNA exists, to Diana Garcia's known (to try to determine if a biological relationship exists).

I see in the communication log that there is a trial date set for July 25, 2011.  Is this still the case?  Please let me know if there are any other dates that we need to be aware of, to ensure that you get the results in time.

I apologize for this delay, and appreciate you following up with me, getting this case back on track.

Thank you,
Robin

Robin DeVille Guidry, M.S., F-ABC
Criminalist Specialist
Houston Police Department Crime Laboratory
Phone: 713-308-2620
Fax: 713-308-2645
Email: robind.guidry@cityofhouston.net

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/22/2011 12:11 PM >>>

I understand.  Whenever you come up for air, shoot me an email.  Thanks!

**From:** RobinD Guidry [mailto:RobinD.Guidry@cityofhouston.net]
**Sent:** Tuesday, March 22, 2011 10:51 AM
**To:** Tise, Natalie
**Subject:** Re: Obel Cruz Garcia

Hi, Natalie,

I was out last week at training, so I am buried in emails.  Let me get an update and get back to you.

Thanks,
Robin

>>> "Tise, Natalie" <TISE_NATALIE@dao.hctx.net> 3/21/2011 2:34 PM >>>

Robin,

Hope all is well with you.  I am just checking in with you on the hairs that were outsourced to Orchid for DNA testing on this 1992 cold case.  Can you please let me know what the current status is?

Thanks,

Natalie

3

0002090

13847940101C / Court: 337

# EXHIBIT 135

0002091

Witness Contacts

### Meeting Notes from Jail Meeting with Rudy on 05.16.12

* Defendant = Chico;  first met him in Puerto Rico;  married cousin Angelita;  Defendant's family – one daughter and one brother in PR

* Rudy came to Houston in ~ 1989 and worked here for about one year selling drugs;  saw Defendant in PR and Defendant wanted to come to Houston;  Rudy came back to Houston and after ~ 3-4 months, Defendant called and said he wanted to come to Houston;  Defendant and Angelita eventually came to Houston.

* When Defendant came over to Houston, they started working together selling drugs;  also starting using drugs and selling;  became a problem for Rudy because he starting using too much;  Defendant used and sold too but he had more control/support because of his wife therefore he had more money and maintained the business better than Rudy;  Defendant became the boss

EXTRANEOUS MURDER

* Saw Defendant kill a person named Saul;  recognized pics of tub

* Defendant had a girlfriend that was sister of Richard;  Richard participated in killing;  the girlfriend was Elizabeth;  Elizabeth called and said Saul was making moves on her and it made Defendant mad and he said he was going over there;  Defendant picked up Saul and Richard;  took Saul to the apartment – Rudy was with them the whole time

* Rudy knows Saul because of the drug business;  Saul sold drugs for Defendant and Rudy for a short time;  doesn't remember fights between Defendant and Saul re: drugs;  thinks Saul might have taken drugs from them

* Apartment was a second floor apartment off of Winkler;  Defendant and Richard tied up his hands and feet;  put him laying down and tied him and started to inject him with cocaine;  before they tied him up, Defendant struck CW in the hands (possibly with a gun);  Defendant got on top of him and thought he broke his neck;  doesn't remember him strangling him;  does not remember Saul being hit in the face;

* Defendant told Rudy to go into the other room when they got to apartment;  Rudy didn't close the door and watched everything from the dark room;  Defendant then called him into the living room and they asked him to help put Saul in the bathtub;  they left after that and went out drinking;  went back to the apartment 2-4 hours later and Saul was still in bathtub

Ray Castro present for meetings.  No deals, no limits on what we could ask.  Rudy spoke some English & some Spanish – Ray would translate. As to details his memory seems very good.  In some instances, it was coming back to him as he talked about it.  Some thing he was not sure about but generally would say so if that was the case

0002093

- Doesn't know whose name was on apartment but they paid for the apartment; sold drugs from the apartment; no one lived there

- This all happened before the little boy was killed

- Originally met Saul through Shorty; Shorty knew Saul's family

- Rudy discussed two different people named "Robert" – both Chicanos;  The first was younger and worked for them and then Shorty started working for them; "Tina" was a Chicano female and she was girlfriend of younger Robert;  The second was older (30-35) and had a ranch.

OTHER EXTRANEOUSES

- Defendant assaulting Rudy:  happened a long time after Saul; when they weren't working together, Angelita had gone to Santo Domingo to take money; Defendant stayed here and picked Rudy up; Defendant and Cesar were going to smoke rocks and so Rudy went over to another friend's and Rudy had taken the beeper; Defendant got mad and told him to come to hotel; Defendant forced him into the room and then tied his hands and face, put him in the bathroom and said they were going to kill him

- Went over to rob a Dominican man named "Bitico"; Bitico sold drugs but did not sell for them;  located at some apartments on the edge of Loop 610;  parked in the back;  Defendant went up to the apartment with someone else;  after he came down and told Rudy about it and said he raped the man's wife;  this happened after the Saul incident

- They would also sell fake dope to people and then rob them

0002094

MAIN OFFENSE

- Defendant told Rudy that he was going to Diana and Arturo's to pick up "his stuff" (i.e. cocaine and money); didn't appear to be mad; they were in blue four-door Chevy; Defendant was driving; Roger was with them; remembers Defendant having a .45 pistol; doesn't remember if Roger had a gun; Roger had a pocket knife

- Doesn't remember if they had masks when they got out of car but does know they didn't have masks on when they came back with Angelo; knows that Defendant had used a black mask in the past during other incidents to cover his face

- Defendant and Roger went into apartment and thinks they were in there about 20 mins; Rudy could not see the door to the apartment; first thing he remembers seeing is Defendant coming up with CW in his arms; he asks Defendant what was up and Defendant said that CW "saw him"; Roger wasn't with him at this point; Rudy told Defendant to take CW back to the apartment and Defendant left with CW; he didn't stay gone very long and shortly came back with CW and Roger; didn't see them carrying anything but thinks they got some drugs because Defendant later did some drugs with Rudy and Rudy thinks the drugs came from the apartment; Defendant had the .45 in his hand and also had CW

- Defendant drove the car when they left; Angelo was in the front (?!) and Rudy and Roger were in the back; Rudy had no gun or weapon on him; Defendant drove straight to 225 towards Baytown; drove to a neighborhood in Baytown but there were no houses, etc; Defendant parked the car and they all got out; Defendant told Roger to "do what you have to do"; Rudy started walking away and defecated in his pants; next thing Rudy hears is CW making a sound; assumed that Roger killed CW; when Rudy walked back over, he saw CW had blood on him but didn't see blood on Defendant or Roger; thinks he only walked away from them for a couple of minutes; Defendant then told them to put CW back in the car; Roger and Rudy put him in the back seat; Rudy was in the back seat with CW

- Left that scene and took 146; remembers parking by some water and the road was on the other side; doesn't remember there being many lights but remembers being very close to the roadway; doesn't remember being by any apartments; when they parked, Defendant told Rudy and Roger to throw him in the water; Defendant was ordering them with the .45 in his hand; CW's body kept floating to top; Defendant ordered them to weight the body down; they then got in the car and left

0002095

- After they left, Rudy remembers having a blow out on all four tires of vehicle; thinks they may have gotten the car towed to a motel; remembers going to Charlie's; they took a taxi to Charlie's; Roger might have stayed with the car but doesn't remember; doesn't remember if Roger went with them to Charlie's; they went to Charlie's to get Defendant's car and then went to Defendant's house in Humble; Angelita was sleeping when they arrived; Defendant didn't say anything to Angelita; Defendant then used the drugs he thinks were stolen from Diana and Arturo; Rudy and Defendant didn't talk about what happened to CW

- Next day, went to Rendon Mechanic Shop and helped changed the tires on the blue car; also washed the blue car; they ended up selling the blue car and Defendant bought a plane ticket; remembers taking him to the airport early the next morning; doesn't remember taking the car back to Charlie's

- Never heard from Defendant again after he dropped him at airport

- Never had been to the location where CW's body was dumped

0002096