United States District Court
Southern District of Texas
**ENTERED**
September 25, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| OBEL CRUZ-GARCIA, | § | |
| | § | |
| Petitioner, | § | |
| v. | § | CIVIL ACTION NO. 17-cv-3621 |
| | § | |
| BOBBY LUMPKIN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division | § | |
| | § | |
| Respondent. | § | |

## <u>MEMORANDUM AND ORDER</u>

In 2013, a Texas jury convicted Obel Cruz-Garcia of capital murder for his role in the killing of six-year-old Angelo Garcia, Jr.  Cruz-Garcia was sentenced to death.  After unsuccessfully seeking Texas appellate and habeas remedies, Cruz-Garcia now petitions for federal habeas corpus relief.  Respondent Bobby Lumpkin has answered, and Cruz-Garcia has replied.  (Docket Entry Nos. 85, 86).  This matter is ripe for adjudication.

The Anti-Terrorism and Effective Death Penalty Act governs Cruz-Garcia's request for relief.  The court has already found that additional factual development is not necessary for a fair adjudication of Cruz-Garcia's claims.  (Docket Entry No. 90).  After considering the record, the parties' arguments, and the applicable law, the court denies federal habeas relief.  No certificate of appealability will issue.

The reasons for these rulings are set out below.

# BACKGROUND

## I.      The Crime

In 1992, Diana Garcia and her common-law husband, Arturo Rodriguez, had been selling drugs for Obel Cruz-Garcia, who they knew has "Chico," for about two years.  (Docket Entry No. 23-4 at 133; No. 23-5 at 9).[1]  Two to three weeks after they decided to stop selling drugs for him, he invaded the apartment where Garcia and Rodriguez lived with her six-year-old son, Angelo.

The state habeas court described what happened:

> Shortly before midnight, the couple was awakened by a loud noise; Arturo got out of bed and encountered a tall, masked man holding a gun.  This man forced Diana onto the bed, tied up Arturo with the alarm clock cord, and repeatedly kicked Arturo and hit him over the head with the handgun until he was unconscious.  A second gunman entered the room, tied up Diana, and sexually assaulted her.  Diana knew the assailant ejaculated because she felt something running down her legs.  Angelo was lying on a pallet on the floor, and Diana heard him crying while she was raped and Arturo was assaulted.
>
> After the sexual assault, the two men ransacked the bedroom and left the apartment.  Soon afterwards, Diana realized that Angelo was no longer in the apartment and ran outside while her neighbor called the police to report the sexual assault and kidnapping.  The couple needed immediate medical attention: Arturo suffered injuries to the back of his head and Diana went to the hospital for a sexual assault exam.  The sexual assault exam kit was collected as evidence.  Diana was unable to give a description of the second man who raped her, as she did not see his face or hear his voice.  However, she was able to describe the first man, the tall one who assaulted Arturo.  Diana recalled that he had a dark complexion and spoke in the Spanish language, but with a foreign accent—not a Hispanic accent that one would hear in Mexico.  Arturo described it as a Central American accent.

(Docket Entry No. 24-1 at 87-88) (citations omitted and cleaned up).

---

[1]      Citations to specific pages in the state court record will generally refer to the pagination of docket entries in the federal court case management/electronic case-filing (CM/ECF) system.

## II.      The Police Investigation

Despite the terrible crime, Diana Garcia and Arturo Rodriguez were not initially fully cooperative with law enforcement.  (Docket Entry No. 23-5 at 78).  The police investigation soon focused on how the crime related to the couple's drug trafficking.  (Docket Entry No. 24-1 at 88).  Houston Police Department Officer U.P. Hernandez questioned them about their involvement with drugs, thinking that it "was crucial to the investigation of Angelo's kidnapping."  They "initially denied being involved with drugs . . . [but] later admitted their involvement and told authorities that [Cruz-Garcia] was their drug supplier."  *Id.*  (citations omitted and cleaned up).

Law enforcement officers suspected that Cruz-Garcia was involved in the invasion, assault, rape, and kidnapping.  They went to Cruz-Garcia's apartment on October 6.  He was not there, but the officers interviewed a man who gave them a false identity.  The police later found out that the man in the apartment was Rogelio Aviles-Barroso; he later became Cruz-Garcia's co-defendant.[2]

On November 4, 1992, the body of a young boy washed up on the shore of a water basin in Baytown.  The child was wearing the Batman pajamas his parents said he had worn to bed on September 30.  Dental records confirmed that it was Angelo.  The medical examiner's office ruled his death a homicide.

---

[2]        A jury convicted co-defendant Aviles-Barroso of capital murder.  He was sentenced to life imprisonment because the State did not seek the death penalty.  *Aviles-Barroso v. State*, 477 S.W.3d 363, 368 (Tex. App.-Hous. (14 Dist.), 2015).  In the appeal from Aviles-Barroso's subsequent prosecution, the Court of Criminal Appeals explained:

> Police believed the crimes were drug-related and the perpetrators kidnapped Angelo to use him as a "bargaining chip." The FBI suspected that Cruz-Garcia was the second man who had sexually assaulted Diana; he had not entered the apartment until Diana's and Arturo's eyes were covered because Diana and Arturo would have been able to recognize Cruz-Garcia, "his voice, his stature." Very early on in the investigation, law enforcement learned that Cruz-Garcia fled Houston for Puerto Rico or the Dominican Republic. Police interviewed Cruz-Garcia's wife, Santana, and several other individuals and collected DNA samples.

*Aviles-Barroso v. State*, 477 S.W.3d 363, 369 (Tex. App. -Hous. (14 Dist.), 2015).

In October 1992, law enforcement officers sent three items to the recently established DNA Section of the Houston Police Department Crime Lab: a sexual-assault kit containing vaginal swabs taken from Diana; the underwear she was wearing the night of the attack; and an unlit cigar found in the apartment. (Docket Entry No. 23-2 at 89). "[T]he male fraction DNA was too degraded to . . . form any conclusions" about the source of the genetic materials. (Docket Entry No. 23-2 at 87). The Houston police suspected Cruz-Garcia, but because they "were unsuccessful in making contact with [him] during the initial investigation of the primary offense in 1992," HPD did not have a DNA sample from him. (Docket Entry No. 24-1 at 98). The investigation was consigned to "cold-case" status.

In November 2004, HPD created a cold-case squad. Advancements in DNA testing led HPD to reopen this case in 2007. HPD sent the cigar and the sexual-assault kit to an independent forensic lab, Orchid Cellmark, for retesting. Orchid Cellmark performed their own DNA extractions from the evidence and did not rely on what HPD had previously obtained. (Docket Entry No. 24-1 at 98). The lab found DNA from two sources. One was Diana Garcia's husband; the other was an unknown male.

In 2008, the police found Cruz-Garcia in a Puerto Rican prison. They obtained a buccal swab from Cruz-Garcia and "shipped [it] to Orchid Cellmark for analysis." (Docket Entry No. 24-1 at 98). A comparison between Cruz-Garcia's DNA and the DNA recovered after the crime confirmed his involvement:

> [his] DNA matched the profile that had been obtained from the cigar found in Diana and Arturo's apartment in September of 1992. Additionally, [his] DNA could not be excluded as a contributor to the unknown male profile found on the vaginal swabs from Diana's sexual assault kit. Lastly, [his] DNA matched the unknown male profile that was the major contributor to the DNA in the sperm-cell fraction from Diana's panties.

4

*Cruz-Garcia*, 2015 WL 6528727, at *6; *see also* Docket Entry No. 23-7 at 122-24.  Subsequent testing excluded Santana as a contributor to any of the DNA.  *Id.*

In 2010, an analyst from the new HPD crime lab obtained another DNA sample from Cruz-Garcia.  The analyst compared his DNA with the test results from Orchard Cellmark.  The 2010 testing confirmed that Cruz-Garcia was the source of the DNA found on the cigar and on Diana Garcia's vaginal swabs and her underwear.  (Docket Entry No. 23-3 at 12).

The State of Texas indicted Cruz-Garcia on November 28, 2008. Cruz-Garcia was extradited from Puerto Rico to stand trial on a charge of intending to cause the death of Angelo Garcia, Jr. while committing or attempting to commit a kidnapping.  (Docket Entry No. 22-8 at 16-20).

## III.    The Pretrial Proceedings

Cruz-Garcia was tried in the 337th District Court of Harris County, Texas, with the Honorable Judge Renee Magee presiding.  In February 2010, the trial court appointed Mike Fosher as first-chair counsel for Cruz-Garcia, and in March appointed Mario Madrid as co-counsel. (Docket Entry No. 22-8 at 22, 25).  Appointed counsel withdrew when members of Cruz-Garcia's family raised enough money to retain private counsel.  (Docket Entry No. 22-8 at 55).  When the State decided to seek the death penalty, private counsel withdrew.  (Docket Entry No. 22-9 at 108; No. 22-30 at 5-6).

On August 31, 2011, the trial court again appointed R.P. Cornelius as lead counsel and Mario Madrid as second chair.  The state habeas court later praised lead counsel's qualifications:

> Cornelius is very well-qualified to represent defendants, such as [Cruz-Garcia], facing a charge of capital murder in which the State seeks the death penalty; that Cornelius has been trying death penalty cases as a prosecutor and then as a defense

>       attorney since 1976; that Cornelius is a former Harris County Assistant District
>       Attorney and Assistant United States Attorney for the Southern District of Texas;
>       that Cornelius is board certified in criminal law; and, that Cornelius has never been
>       found ineffective, denied admission to a court, or disciplined.

(Docket Entry No. 24-1 at 97).   Defense counsel hired two investigators and retaining a clinical

psychologist.   (Docket Entry No. 24-1 at 143).   One of the investigators focused on the crime and

the other developed mitigating evidence for the penalty phase.   (Docket Entry No. 23-3 at 11-12).

Although the psychologist did not find that Cruz-Garcia had mental health issues, he advised

counsel as a "mitigation specialist."   (Docket Entry No. 23-3 at 12; No. 24-1 at 143).   Counsel

attempted to retain a specific mitigation expert but "could not find [one] . . . that would look at

[Cruz-Garcia's] case for the amount of money that the Harris County Commissioner's Court was

willing to pay."   (Docket Entry No. 24-1 at 106).

The defense team faced difficult challenges in representing Cruz-Garcia.   He "was not very

forthcoming about much of anything," "avoided answering their questions," and said "that he was

not concerned about being convicted" because "God or Jesus would deliver him[,] and the

witnesses would not testify against him . . . ."   (Docket Entry No. 24-1 at 103).   Cruz-Garcia

hampered the trial preparation by refusing to help his attorneys.   Lead counsel explained:

>       Mr. Cruz Garcia would not discuss the facts of this case with us.   At all.   He refused
>       to discuss it with us.   His statement was that God would deliver him. God would
>       send angels to protect him. God would turn the witnesses' tongues into snakes.   And
>       other things like this. He would talk with us but not about the case.   He had no
>       intention of testifying and did not want his consulate contacted, at least with respect
>       to helping defend the case.

(Docket Entry No. 24-1 at 139).[3]

---

[3]       Cruz-Garcia is a citizen of the Dominican Republic.   Trial counsel advised Cruz-Garcia of his consular rights
but he "did not want trial counsel to contact the [his] consulate" and "had no interest in receiving help of any kind
from his consulate."   (Docket Entry No. 24-1 at 108-09).

Trial counsel had nearly two years before jury selection began on June 3, 2013.  The pretrial work included filing a motion to suppress the results of all DNA testing.  (Docket Entry No. 22-10 at 5-7).  The motion to suppress focused on a report—known colloquially as the "Bromwich Report"—criticizing the HPD crime lab.  As summarized by the Fifth Circuit:

> In the early 2000s, concerns arose regarding the practices and procedures employed by the Houston Police Department's Crime Lab.  The Acting Chief appointed an investigative team, led by Michael Bromwich, to conduct an outside review of the lab and its practices, both past and present.  The team published a report in 2007 that became known as the 'Bromwich Report.'

*In re Raby*, 925 F.3d 749, 755 n.9 (5th Cir. 2019); *see also Ex parte Napper*, 322 S.W.3d 202, 22-21 (Tex. Crim. App. 2010) (describing the problems with the earlier HPD crime lab).

The trial court held a suppression hearing that focused on the problems with the old HPD crime lab documented in the Bromwich Report.  But it was a different lab—Orchid Cellmark—that had performed the tests the State was relying on, and the tests were done long after the events criticized in the Bromwich Report.  Still, the defense argued for suppression based on how the DNA evidence was stored and handled between the 1992 crime and the 2007 shipping of the material to the outside lab.  Trial counsel argued that "the Court should have no confidence in evidence that was transferred from our now closed crime lab to anywhere else for fear of contamination."  (Docket Entry No. 23-2 at 21).

After receiving evidence and hearing testimony, the trial court found that Cruz-Garcia had presented no reason to suppress the DNA evidence: "Although [Cruz-Garcia] offered evidence challenging the reliability of the old HPD crime lab as a whole, he offered no evidence that the particular evidence at issue in the instant case had been tampered with or contaminated."  *Cruz-*

7

*Garcia*, 2015 WL 6528727, at *13.[4]  The State, on the other hand, "introduced testimony to support the reliability of the evidence at issue."  *Id*.  After the hearing, the trial court denied Cruz-Garcia's motion to suppress the DNA evidence.

## IV.    The Trial

The State's tried the case on the theory that Cruz-Garcia and Roger Aviles-Barroso invaded the home while Carmel "Rudy" Martinez Santana waited outside in a car;[5] Cruz-Garcia was the man who raped Diana Garcia, kidnapped the child, and ordered Aviles Barroso to kill him.

The State based its case on the Texas law of parties.  *See* Tex. Pen. Code Ann. § 7.01; Docket Entry No. 22-10 at 50-51.  The law of parties allows for a defendant's conviction "if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."  Tex. Penal Code § 7.02(a)(2).  The State put forth a strong case that Cruz-Garcia was at least a party to capital murder because he directed or encouraged the killing.

The most critical evidence against Cruz-Garcia came from three sources: (1) his wife, who testified that he had confessed to the murder; (2) DNA evidence that established that he was the

---

[4]     Trial counsel faced a particular problem in challenging the condition of the crime lab: "it would be difficult to contaminate the evidence *with* [Cruz-Garcia's] DNA . . . ."  (Docket Entry No. 24-1 at 101).  As the State argued in the suppression hearing: "So, to believe that there is a problem with the evidence would be to believe that somehow or another the defendant's DNA popped up out of nowhere and got somehow contaminated on the evidence by employees in 1992 who simply didn't have his DNA."  (Docket Entry No. 23-2 at 25).

[5]     At trial, Santana testified that he is "called Rudy, but [he] signs a[s] Carmelo Martinez.  And Santana is [his] second name."  (Docket Entry No. 23-7 at 33).  The record at times refers to him as Martinez, but the parties' briefing in federal court calls him Santana.  Santana and Cruz-Garcia, both of whom who were originally from the Dominican Republic, moved to Houston to sell drugs in the late 1980's.  Cruz-Garcia and Santana sold drugs together until Santana's drug addiction became too severe.  Santana described Cruz-Garcia as "a violent, angry, and controlling person.  Once when [Cruz-Garcia] thought [Santana] was stealing drug customers from him, he assaulted [Santana] and threatened to kill him."  *Cruz-Garcia*, 2015 WL 6528727, at *3.

man who raped Diana Garcia; and (3) a codefendant's testimony that Cruz-Garcia had ordered the child's murder.

*Testimony from Cruz-Garcia's Ex-Wife:*  Angelita Rodriguez testified that she met Cruz-Garcia in Puerto Rico in 1985.  They married about two years later and at first had a "good relationship."  (Docket Entry No. 23-6 at 86).  That changed after they moved to Houston in 1989, and Cruz-Garcia began using and selling drugs. (Docket Entry No. 23-6 at 86, 87-89, 94-95). Cruz-Garcia became argumentative and would often not come home.  (Docket Entry No. 23-6 at 90).

Angelita Rodriguez became friends with Diana Garcia and Arturo Rodriguez, who sold drugs for Cruz-Garcia.  In September 1992, Angelita Rodriguez saw a news report that Angelo Garcia had been kidnapped.  (Docket Entry No. 23-6 at 98-99).  When she told Cruz-Garcia what she had seen on the news, "[h]e looked normal," but when she said that she was going to see her traumatized friends, Cruz-Garcia said "he was leaving at once" for Puerto Rico.  (Docket Entry No. 23-6 at 99, 100).  Angelita "asked him if he had done something, but he stayed quiet."  (Docket Entry No. 23-6 at 102).  Cruz-Garcia left.

Cruz-Garcia's hasty departure from Houston was out of character.  His wife testified that "due to his sudden departure from Houston, [Cruz-Garcia] missed a scheduled court date.  He had never missed one prior to that."  *Cruz-Garcia*, 2015 WL 6528727, at *2.  Cruz-Garcia's flight from Houston left his wife unable to pay rent, forcing her to move into a hotel.

Angelita Rodriguez thought that Cruz-Garcia was going to Puerto Rico, but he ended up in the Dominican Republic.  (Docket Entry No. 23-6 at 105).  Sometime later, Angelita Rodriguez traveled to Santo Domingo and met Cruz-Garcia because she "wanted a divorce."  (Docket Entry

9

No. 23-6 at 107).[6]   Cruz-Garcia said he "was not going to give [her] a divorce," "insulted [her]," and "told [her] that he was going to harm [her] family." (Docket Entry No. 23-6 at 108).   When Angelita Rodriguez asked him about "the problem with the boy, with the little boy," meaning Angelo, and "asked him if he had something to do with that," Cruz-Garcia said, "that he did have [something] to do with that, that he had killed him."  (Docket Entry No. 23-6 at 109).   Angelita Rodriguez did not tell the police about Cruz-Garcia's confession until much later.

*DNA Evidence*:   The police had long suspected Cruz-Garcia's involvement in this crime.  The case sat dormant until DNA science advanced.  DNA played an important role in verifying Cruz-Garcia's involvement and in corroborating testimony about what he had done.  At trial, the State assured jurors that "[p]robably the most damning corroboration for the defendant in this case is the DNA evidence."  (Docket Entry No. 23-9 at 37).  The State urged jurors to find that:

> the defendant's DNA was on the panties of Diana Garcia[] the night of that sexual assault, the defendant's DNA is on the vaginal swabs taken after the rape of Diana Garcia on September 30th, 1992, the same time the kidnapping of Angelo Garcia, Jr. taking place and ultimately his death.  That is corroboration that tends to connect the defendant to the commission of the offense.

(Docket Entry No. 23-9 at 37).

The defense renewed its pretrial strategy of challenging the DNA based on problems with the old crime lab.  The trial court, however, would not allow any testimony or evidence calling into question the earlier HPD crime lab.  The trial court held that nothing in the Bromwich Report was relevant to the DNA evidence on which the State relied.

---

[6]    There is some confusion in the record about whether Angelita Rodriguez met Cruz-Garcia in Puerto Rico or the Dominican Republic.  The evidence at trial was that she had traveled to the Dominican Republic to confront her husband and ask for a divorce.  (Docket Entry No. 23-9 at 55).

The trial court's rulings left the defense with little room to challenge the DNA evidence. Still, the defense argued that Cruz-Garcia's DNA on the cigar "didn't prove anything" because testimony established that he had been at the apartment earlier in the day.  (Docket Entry No. 23-9 at 37, 44).  Trial counsel also mocked the "absurd story" about "a man coming in with a gun and a ski mask on with a cigar."  (Docket Entry No. 23-9 at 44).

The remaining DNA evidence presented a greater challenge for the defense.  The defense team wanted to argue that Cruz-Garcia's DNA was found in the genetic material from the sexual assault because he had a consensual sexual relationship with Diana Garcia.  (Docket Entry No. 24-1 at 140).  Three problems undermined that defense.  First, DNA testing relating to the sexual assault had identified genetic material from only two sources, one of whom was Diana Garcia's husband.  Even proving that Cruz-Garcia had had a consensual relationship with Diana Garcia would not exculpate in him light of her testimony that one assailant raped her and ejaculated inside of her.  (Docket Entry No. 23-9 at 83-84) (arguing that no evidence allowed for the possibility that a third man had raped Diana Garcia).  With no evidence of an unknown man's DNA in the genetic material taken after the sexual assault, the DNA evidence strongly inculpated Cruz-Garcia whether or not he had had some kind of consensual relationship with Diana Garcia.

Second, Cruz-Garcia himself would be the best source of information about a relationship with Diana Garcia.  But Cruz-Garcia was the reason that trial counsel could not prove a consensual relationship.  Trial counsel "explained . . . to him numerous times" that "[i]f [they] had evidence of a consensual sexual relationship [it] would have been [their] best attempt to naturalize the DNA evidence."  (Docket Entry No. 24-1 at 140).  Cruz-Garcia refused to help the defense team.

Third, the DNA testing was not the only evidence that Cruz-Garcia had raped Diana Garcia. The evidence showed that Santana waited in the car while Cruz-Garcia and Aviles-Barroso invaded the home.   Santana testified that when Cruz-Garcia returned to the car, he "said that he had raped Ms. Diana and that he had beaten up Mr. Arturo." (Docket Entry No. 23-6 at 147).   The evidence put the defense in the position of have to explain why, even if Cruz-Garcia had a consensual sexual relationship with Diana Garcia, he admitted to raping her.

Trial counsel did what they could, given the evidence.   Counsel argued in summation that "[n]obody is saying he raped her. It's conceivable there was sexual relations between the two." (Docket Entry No. 23-9 at 45).   Trial counsel, however, conceded that "[t]here is nothing to show that." (Docket Entry No. 23-9 at 45).

*Santana's Testimony:*   The most specific testimony about Cruz-Garcia's role in the home invasion, kidnapping, and murder came from Santana.   When HPD reopened the case, FBI Special Agent Eric Johnson found Santana in a federal prison in Pennsylvania, where he was serving time for drug trafficking and weapons possession convictions.   Santana's testimony provided important information about the abduction and murder:

> Santana, who is Angelita's cousin and known as "Rudy," recalled that on September 30, 1992, [Cruz-Garcia] wanted to go to Diana's apartment to look for drugs and money, so he and Aviles-Barroso accompanied [him].   Santana remained in the car while [Cruz-Garcia] and Aviles-Barroso went inside the apartment.   Both [Cruz-Garcia] and Aviles-Barroso wore ski masks and had weapons.   Santana recalled that [Cruz-Garcia] had a gun and Aviles-Barroso had a knife.
>
> Santana estimated that [Cruz-Garcia] and Aviles-Barroso were in the apartment for approximately thirty minutes.   When they returned, Santana was surprised to see [Cruz-Garcia] holding a little boy in his arms.   Santana immediately asked [Cruz-Garcia] why he had taken Angelo, and [Cruz-Garcia] replied that the child had seen his face and recognized him.   Santana was unsuccessful in trying to convince [Cruz-Garcia] to take Angelo back inside to his mother.

[Cruz-Garcia] admitted to Santana that he raped Diana.

[Cruz-Garcia] put Angelo in the backseat of the vehicle and, with a gun in one hand, drove the group to Baytown.  He stopped in a secluded area, and they all got out of the vehicle; [Cruz-Garcia] stated to Aviles-Barroso, "You already know what you have to do."  Santana immediately felt nauseous and became ill; he walked away from them and defecated in the woods. During this time, [Cruz-Garcia] followed Santana to see what he was doing, and Santana heard Angelo scream and moan. When Santana returned to the vehicle, he saw that Angelo was dead and covered in blood.

Santana and Aviles-Barroso complied with [Cruz-Garcia's] command to put Angelo's body back into the vehicle.  [Cruz-Garcia] then drove to a rural area and instructed them to throw the body in a nearby river.  He further instructed them to sink the child, so Santana and Aviles-Barroso gathered some rocks and placed them on top of the body.

[Cruz-Garcia] instructed Santana to get rid of the knife and told Santana he was leaving town because of what he did that night.

The following day, [Cruz-Garcia] sold his vehicle and used the money he got from the car sale to buy a plane ticket out of the country.  Santana took [Cruz-Garcia] to the airport and never saw him again.

(Docket Entry No. 24-1 at 91-92) (citations omitted and cleaned up).

## V.    Trial Defense and Verdict

Cruz-Garcia did not call any witnesses in the guilt-innocence phase of his trial.  Instead, the defense focused on undercutting the credibility and importance of the State's witnesses.  The defense focused on the "questions that [jurors] are going to have to answer. Serious questions."

The defense would ask four questions:

The first one would be: How much credibility are you going to give witnesses that are admitted liars and drug dealers? And the second one is going to be: Can you base a capital murder conviction on the testimony of someone who is, by his admission, a co-defendant and who has everything to gain by lying? And the third one is going to be: What actually does the so-called DNA evidence prove with respect to [the victim]? And the fourth one: What does the medical evidence show? What does it show?

(Docket Entry No. 23-4 at 46).  Trial counsel vigorously challenged the State's witnesses and evidence using that framework.

The State argued that Cruz-Garcia was liable as a party because he "directed and encouraged" his codefendant "to kill the little boy."  (Docket Entry No. 29-9 at 93).  The jury found Cruz-Garcia guilty of capital murder on July 19, 2013.  (Docket Entry No. 22-10 at 57). The verdict form did not require jurors to specify whether they convicted Cruz-Garcia as the principal or a party.

## VI.    The Punishment Phase

Texas law determines a capital defendant's punishment after a separate sentencing hearing. *See* Tex. Code Crim. Pro. art. 37.071 § 2(a)(1).  In this case, the jury had to answer three questions: (1) would the defendant be a future threat to society; (2) did the defendant himself cause the murder or intend that a killing take place; and (3) did mitigating circumstances warrant a life sentence? (Docket Entry No. 85-2 at 261-65); *see also* Tex. Code Crim. Pro. art. 37.071 § 2(b)(1)-(2), (e)(1).

*The State's case*:   The State's penalty-phase case emphasized Cruz-Garcia's brutally violent lawlessness.  The State began its punishment case by recalling his codefendant, Santana, who detailed Cruz-Garcia's other criminal exploits.  Santana described Cruz-Garcia's retribution against a drug trafficking competitor that had also involved a home invasion during which Cruz-Garcia broke in, tied up the drug dealer, and raped his girlfriend.  (Docket Entry No. 23-11 at 68-74). Santana explained that he and Cruz-Garcia robbed and burglarized other drug dealers. (Docket Entry No. 23-11 at 74).  Santana also described what Cruz-Garcia did when he believed that Santana had been stealing his money and his drug customers.  Cruz-Garcia tied Santana up,

14

threw him in the bathtub, gagged him, and threatened to kill him.  He released Santana only after he paid Cruz-Garcia and promised never to betray him.  (Docket Entry No. 23-11 at 64-67).

Santana described how Cruz-Garcia had kidnapped and killed another drug associate in July 1989.  (Docket Entry No. 23-11 at 25-36, 75-88, 102, 124).  Cruz-Garcia, Santana, and another man found drug-dealer Saul Flores with Cruz-Garcia's girlfriend in her apartment.  Jealous of Flores's infatuation with his girlfriend, Santana kidnapped Flores and took him to an apartment where they sold drugs.  (Docket Entry No. 23-11 at 79-80).  Santana beat Flores with a hammer, injected him with drugs, and choked him to death.  (Docket Entry No. 23-11 at 83-85, 96-97).

Another witness said that he saw Flores's dead body when he, as a teenager, had gone to the apartment to buy drugs.  (Docket Entry No. 23-11 at 27-33).  This witness testified that Cruz-Garcia told him "to be quiet, not to say anything, that [he] didn't see anything."  (Docket Entry No. 23-11 at 38).

Cruz-Garcia's violence continued after he fled Houston.  While in Puerto Rico in October 2001, Cruz-Garcia attempted to kill a business owner and then kidnapped his adult brother and teenage son for ransom.  (Docket Entry No. 23-10 at 16-44).  The business owner testified that Cruz-Garcia pointed a gun at him and attempted to fire, but the gun did not discharge.  (Docket Entry No. 23-10 at 27, 64-85, 104).  Cruz-Garcia held the kidnapping victims for three days while demanding a ransom of two kilos of drugs.  During that time, Cruz-Garcia cruelly tortured the victims.  One of the kidnapping victims described how Cruz-Garcia had "punched him, kicked him, hit him over the head with a shower curtain, hit his feet with a mallet, and urinated on him."  (Docket Entry No. 24-1 at 94).  The other kidnapping victim described how Cruz-Garcia "physically beat him, threw him to the floor, stomped on his back, and spit on him."  (Docket Entry

15

No. 24-1 at 94).  Cruz-Garcia also hit the man "with a revolver, tied him up with the wire from a coat hanger, and held a knife to his throat, toes and penis, threatening to cut him."  (Docket Entry No. 24-1 at 94).  Cruz-Garcia was apprehended before he could carry out his threats to kill the men.  Cruz-Garcia pleaded guilty to kidnapping and possession of weapons and was sentenced to 16 years in prison. (Docket Entry No. 23-10 at 67-69).

Cruz-Garcia was not a model prisoner.  While incarcerated in Puerto Rico, he tried to escape by loosening a windowpane that opened to the outside, hiding a rope made of bed sheets, getting a map of Puerto Rico, and getting a contraband cell phone.  (Docket Entry No. 24-1 at 95).  Cruz-Garcia's poor behavior continued after he was extradited and incarcerated before the trial.  During his pretrial incarceration, he was found in possession of a weapon.  (Docket Entry No. 24-1 at 95).

The State concluded its punishment-phase case with testimony from Diana Garcia, who described how she felt that Cruz-Garcia had betrayed her and her love and grief for her dead child.

*The defense case*:  The defense faced a difficult task in seeking a sentence less than death.  Cruz-Garcia had been ruthlessly and wantonly violent for many years.  Importantly, the State had presented "the most powerful imaginable aggravating evidence": that Cruz-Garcia "had committed another murder."  *Wong v. Belmontes*, 558 U.S. 15, 28 (2009).

The defense challenged the credibility of the State's witnesses who described Cruz-Garcia's numerous cruel assaults, robberies, and murder.  The defense tried to downplay the severity of Cruz-Garcia's misconduct while incarcerated.  The defense focus, however, was on humanizing Cruz-Garcia to argue for mitigation. The defense tried to convince jurors that his

lawlessness was not the whole of his life.  The defense wanted jurors to see Cruz-Garcia as a churchgoing, hard-working family man who was a positive influence on others while incarcerated.

The defense called four penalty-phase witnesses.  Cruz-Garcia's first wife, Mireya Perez-Garcia, testified via Skype from Puerto Rico.  Perez-Garcia met Cruz-Garcia in the Dominican Republic in 1988 when she was 15.  They dated three weeks before marrying.  She was pregnant with their first child when Cruz-Garcia left for Puerto Rico.  Cruz-Garcia reappeared in 1994, when he fled Houston following the rape, kidnapping, and murder.  The couple lived together off-and-on in both the Dominican Republic and Puerto Rico.  They had another child, and  Cruz-Garcia worked in real estate.  Cruz-Garcia's wife described him as a "sincere and noble person," a hard worker who was engaged in their church community, and an active father until his incarceration in Puerto Rico.  (Docket Entry No. 24 at 95-96).

The defense called Cruz-Garcia's younger brother, Joel Cruz-Garcia, who described Cruz-Garcia's background and told jurors that he was a good brother and father.  (Docket Entry No. 24 at 96).  The defense also called Cruz-Garcia's teenage son, who testified that, before he went to prison, his father took him to church and was a good influence in his life.  A fellow inmate in Harris County Jail testified that Cruz-Garcia had acted kindly, talked about religion, and was a good friend.

The jury's answers to the Texas special issues required a death sentence.  On July 22, 2013, the trial court sentenced Cruz-Garcia to death.

## VII.   Direct Appeal and State Post-Conviction Review

On the same day as the sentencing, the trial court appointed Wayne T. Hill to represent Cruz-Garcia on direct appeal.  Hill filed a motion for new trial on August 19, 2013, which the trial

court denied.   In 2015, the Texas Court of Criminal Appeals affirmed Cruz-Garcia's conviction

and sentence on direct appeal.   *Cruz-Garcia v. State*, No. AP-77,025, 2015 WL 6528727 (Tex.

Crim. App. Oct. 28, 2015).

On July 22, 2013, the trial court also appointed the Office of Capital Writs (referred to as

"state habeas counsel") to represent Cruz-Garcia during his state habeas proceedings.   State habeas

counsel sent an investigator to both the Dominican Republic and Puerto Rico.   That investigation

resulted in numerous affidavits from individuals who provided information about Cruz-Garcia's

background.   On August 27, 2015, Cruz-Garcia filed a 181-page application for a state writ of

habeas corpus.   (Docket Entry No. 23-38 at 7-200).   Cruz-Garcia's state habeas application set out

14 grounds for relief, including several claims challenging trial counsel's representation.   State

habeas counsel attached 13 exhibits, including affidavits from experts on topics such as DNA and

the difficulties facing immigrants from the Dominican Republic.

The judge who had presided over Cruz-Garcia's trial also heard his state habeas action.[7]

The state habeas court did not hold an evidentiary hearing.   The state habeas court, however,

ordered both of Cruz-Garcia's trial attorneys to submit affidavits addressing ten specific issues.

(Docket Entry No. 23-41 at 186-88).   Cruz-Garcia's trial investigator also submitted an affidavit.

(Docket Entry No. 24-1 at 137-153).   On December 29, 2016, the state habeas court signed the

State's proposed findings of fact and conclusions of law, which recommended the denial of the

---

[7]     Cruz-Garcia unsuccessfully attempted to have the trial judge removed from his state habeas proceedings.
AEDPA's presumption of correctness for state habeas factual findings is especially strong when the same judge
presides over the trial proceedings and the state habeas action.   *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir.
2014); *Woods v. Thaler*, 399 F. App'x. 884, 891 (5th Cir. 2010); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

initial habeas application.  (Docket Entry No. 24-1 at 136).  Cruz-Garcia's attorneys unsuccessfully moved for reconsideration.  (Docket Entry No. 24-1 at 158).

Throughout the state habeas process, state habeas counsel continued investigating.  While the initial habeas application was still pending, state habeas counsel submitted a "Subsequent Application for a Writ of Habeas Corpus Filed Pursuant to Art. 11.071, § 5, and Art. 11.073 of the Texas Code of Criminal Procedure."  (Docket Entry No. 23-41 at 16-45).  Cruz-Garcia based his first successive state habeas application primarily on alleged errors in the DNA evidence that the State had relied on at trial.  Under Texas law, a successive habeas application may proceed only in limited circumstances, including when "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application . . . ."  Tex. Code Crime Pro. art. 11.071 § 5(a)(1).

On November 1, 2017, the Court of Criminal Appeals entered an order rejecting both Cruz-Garcia's initial and his successive habeas application, "Based upon the trial court's findings and conclusions and [its] own review," the Court of Criminal Appeals denied relief on the initial habeas application.  *Ex parte Cruz-Garcia*, No. WR 85,051-02 and -03, 2017 WL 4947132, at *2 (Tex. Crim. App. 2017).[8]  In doing so, the Court of Criminal Appeals made specific procedural and merits decisions.  In that same order, the Court of Criminal Appeals dismissed Cruz-Garcia's subsequent application as an abuse of the writ.

---

[8]       The Court of Criminal Appeals assigns each habeas applicant a case number and designates each subsequent application by an incrementally higher number after a dash.  Here, the action designated WR-85,051-01 was a petition for writ of mandamus which the Court of Criminal Appeals denied leave to file.  *Ex parte Cruz-Garcia*, WR-85,051-01 (Tex. Crim. App. July 27, 2016) (not designated for publication); *see* Docket Entry No. 23-31.  Cruz-Garcia petitioned for mandamus relating to his attempt to remove the trial judge from his habeas action.

## VIII.   Federal Habeas Action

Cruz-Garcia filed his federal habeas petition on October 31, 2018, and amended it on July 1, 2019.  (Docket Entry No. 12, 18).  Because Cruz-Garcia's federal petition "largely consist[ed] of factual recitations without providing legal authority, much less briefing compliant with the [AEDPA] standards for demonstrating the need for factual development or habeas relief," the court ordered him to file a legal memorandum that met his habeas burden.  (Docket Entry No. 33 at 3).[9] Cruz-Garcia did so.  (Docket Entry No. 38).

On November 20, 2000, Cruz-Garcia moved to stay this federal case while he attempted to exhaust state remedies.  (Docket Entry No. 46).  The respondent filed an answer and a motion for summary judgment.  (Docket Entry No. 47).  The court stayed and administratively closed the case for the purpose of exhaustion, and denied the respondent's summary judgment motion, without prejudice.  (Docket Entry No. 59).

On April 9, 2021, Cruz-Garcia filed his third successive state habeas application.  (Docket Entry No. 89-4).  The state courts did not allow factual development on this third application.  The Court of Criminal Appeals dismissed the application as an abuse of the writ on October 6, 2021. *See Ex parte Cruz-Garcia*, No. WR-85,051-05, 2021 WL 4571730 (Tex. Crim. App. Oct. 6, 2021).[10]

The federal court case was reopened, and Cruz-Garcia submitted a Second Amended Petition for Writ of Habeas Corpus on May 4, 2022.  (Docket Entry No. 65, 73).  Cruz-Garcia's

---

[9]     The Honorable United States District Judge Vanessa D. Gilmore initially presided over this federal habeas action.

[10]    For some reason unclear from the record, the Court of Criminal Appeals skipped the next numerical case number and designated his second successive habeas application as "-05."

second amended federal petition contains 21 grounds for relief, with sub-claims and ancillary arguments. Cruz-Garcia's second amended petition renumbered the claims he raised in his earlier petitions and raised some new issues. Cruz-Garcia's second amended petition raises the following grounds for federal habeas relief:

1. Cruz-Garcia was denied a fair and impartial trial due to juror misconduct during the punishment phase.

2. The trial court refused to allow the defense to present evidence on the unreliability of the DNA evidence.

3. Cruz-Garcia's conviction is based on inaccurate and unreliable DNA evidence.

4. Trial counsel provided deficient representation in the investigation, development, and presentation of testimony in the guilt/innocence phase.

5. The State presented false testimony at trial.

6. The State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

7. The trial court erred by engaging in an *ex parte* meeting with a holdout juror and by delivering coercive instructions during deliberations.

8. Appellate counsel provided ineffective assistance.

9. Cruz-Garcia was excluded from two critical stages of trial.

10. Cruz-Garcia's Confrontation Clause rights were violated by DNA testimony.

11. Testimony in Spanish was translated incorrectly for the jury.

12. The trial judge presiding over the case had a conflict of interest and was biased against Cruz-Garcia.

13. The trial court improperly prohibited Cruz-Garcia from presenting some mitigation evidence.

14.     Repeated emotional outbursts from the gallery violated Cruz-Garcia's constitutional rights.

15.     Prosecutors made numerous inappropriate and inflammatory comments throughout the trial.

16.     The State failed to provide Cruz-Garcia his guaranteed consular notification under the Vienna Convention on Consular Relations.

17.     Cruz-Garcia is actually innocent.

18.     The punishment phase jury instructions impermissibly restricted the evidence the jury could determine was mitigating.

19.     The Texas 10/12 Rule violated Cruz-Garcia's rights.

20.     The Texas first special issue was unconstitutionally vague.

21.     Texas utilizes an arbitrary and discriminatory system to administer the death penalty.

The respondent has filed a renewed answer, and Cruz-Garcia has replied, addressing the respondent's procedural and substantive arguments.  This matter is ripe for adjudication.

## PROCEDURAL STATUS OF CRUZ-GARCIA'S CLAIMS

Federal habeas corpus provides limited review over an inmate's conviction and sentence. Because States "hold the initial responsibility for vindicating constitutional rights," *Engle v. Isaac*, 456 U.S. 107, 128 (1982), how an inmate has litigated his claims determines the course of federal habeas adjudication.  Federalism guarantees that a State has "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted); *see also* 28 U.S.C. § 2254(b)(1).

Cruz-Garcia has exhausted all his claims in state court. That does not mean they are all fully available for federal review.

As a corollary to exhaustion, the procedural-bar doctrine respects a state court's reliance on its own law. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (recognizing that "the habeas doctrines of exhaustion and procedural default are similar in purpose and design and implicate similar concerns"); *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (stating that the exhaustion requirement "would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it."). As a "fundamental tenet[]" of "federal review of state convictions[,] . . . a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997); *see also Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

The procedural adequacy of Cruz-Garcia's claims is a threshold issue. The court's analysis groups Cruz-Garcia's federal habeas claims according to the procedural issues they present. The claims fall into three broad categories. First, Cruz-Garcia's state litigation of some claims resulted in a full merits review. Specifically, Cruz-Garcia exhausted claims one, thirteen, eighteen, nineteen, twenty, and twenty-one, and the state courts resolved these claims on the merits. These claims are reviewed under the stringent AEDPA standards.

Second, Cruz-Garcia raises two grounds for relief—claims two and four—that are only partially available for federal consideration. The court addresses the procedurally adequate part of those claims under AEDPA and then considers whether the remaining parts are available for federal review.

Third, Cruz-Garcia raises some claims that face high procedural hurdles to federal review. Cruz-Garcia raised two claims (seven and sixteen) before coming to federal court, but he did not comply with state procedural law in doing so. Cruz-Garcia raised numerous grounds for relief—claims three, five, six, nine, ten, eleven, twelve, fourteen, fifteen, seventeen and parts of claims two and four—in a successive state habeas application, which the state courts barred under well-established procedural law. A federal court may review an inmate's procedurally barred claims only if the inmate shows: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent . . . .'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Because many of Cruz-Garcia's arguments to overcome the procedural bar are common to several claims, they are considered together.

## ANALYSIS OF PROCEDURALLY PROPER CLAIMS

Only six of the claims are eligible for full federal review on the merits. When an petitioner exhausts his claims in state court, federal habeas law provides for examination "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a).  Federal review law, however, does not allow *de novo* review when a state court has already adjudicated the merits of the claims. AEDPA's limits on federal review are set out below.

## I.  AEDPA

While the modern habeas writ "plays a vital role in protecting constitutional rights," *Slack v. McDaniel*, 529 U.S. 473, 483 (2000), "[a] criminal trial is the main event at which a defendant's rights are to be determined, and the Great Writ is an extraordinary remedy that should not be employed to relitigate state trials." *McFarland v. Scott*, 512 U.S. 849, 859 (1994) (quotation omitted).  Honoring principles of comity and federalism, Congress enacted AEDPA "to impose significant limits on the discretion of federal courts to grant habeas relief." *Calderon v. Thompson*, 523 U.S. 538, 554 (1998); *see also Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (observing that the courts have "adjust[ed] the scope of the writ in accordance with equitable and prudential considerations").

If an inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner and the state courts have adjudicated the merits, AEDPA provides for a deferential federal review.  Under AEDPA's rigorous requirements, a federal court reviews "[c]laims presenting questions of law" under Section 2254(d)(1). *Neal v. Vannoy*, ___ F.4th ___, 2023 WL 5425588, at *4 (5th Cir. 2023).  Section 2254(d)(1) "is . . . divided into two categories: the 'contrary to' standard, and the "unreasonable application" standard." *Id*.  An inmate may secure relief only after showing that the state courts' rejection of his claim was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1),(2).[11]

Claims presenting questions of fact are reviewed under two sections of AEDPA.  First, a federal habeas court presumes the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").  Second, a petitioner must show that the state courts' ultimate decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see also Miller-El*, 537 U.S. at 340.  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 301 (2010).

"Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that conclusion are reviewed under Sections 2254(d)(2) and (e)(1)."  *Neal*, 2023 WL 5425588, at *4.  "[F]ocus[ing] on what a state court knew

---

[11]       Cruz-Garcia contends that the AEDPA standards should not govern his federal habeas claims because of various errors in the state habeas process.  AEDPA itself does not allow any statutory exception to its provisions based on irregularity in the state habeas process.  Cruz-Garcia does not point to federal cases creating a judicial exception to the statutory text when state habeas review fails to comply with an inmate's expectations. *See Lucio v. Lumpkin*, 987 F.3d 451, 478 n.9 (5th Cir. 2021); *Boyer v. Vannoy*, 863 F.3d 428, 446 (5th Cir. 2017); *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001).  Further, "a full and fair hearing is not a prerequisite to the operation of AEDPA's deferential scheme."  *Valdez*, 274 F.3d at 946; *see also Holberg v. Lumpkin*, 2023 WL 2474213, at *2 (5th Cir. 2023); *Lucio*, 987 F.3d at 478 n.9.  The court has considered Cruz-Garcia's challenges to the state habeas process and find that they do not justify *de novo* review.

and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires petitioners to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *see also Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). If the AEDPA "this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

In performing the AEDPA review, a federal court generally cannot "develop and consider new evidence." *Shoop v. Twyford*, ___ U.S. ___, 142 S. Ct. 2037, 2043 (2022). AEDPA limits "review of factual determinations under § 2254(d)(2)" to "'the evidence presented in the State court proceeding'" and "review of legal claims under § 2254(d)(1) . . . 'to the record that was before the state court.'" *Id.* (quoting *Pinholster*, 563 U.S. at 181). "A federal court may admit new evidence only in two limited situations: Either the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by this Court, or it must rely on 'a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Twyford*, 142 S. Ct. at 2038 (quoting 28 U.S.C. § 2254(e)(2)(A)).

The court applies these standards in analyzing claims one, thirteen, eighteen, nineteen, twenty, and twenty-one.

## II.    Outside Influence on Jurors (Claim One)

Cruz-Garcia claims that outside influences tainted the jury's deliberations. The Sixth Amendment to the Federal Constitution requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* . . . ." (emphasis added).

The Supreme Court "has unfailingly protected the jury room from juror bias in a variety of contexts" based on its "long-held view that the impartial jury is critical in determining guilt and punishment." *Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir. 2006).  Evidence that the jury was subject to external influences "subvert[s] these basic guarantees of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965).

Cruz-Garcia alleges that a juror improperly read from the Bible during jury deliberations in the punishment phase, and that jurors discussed trial evidence and sentencing issues outside their punishment deliberations.  Cruz-Garcia raised both issues in state court.

### A.     The Alleged Bible Reading

*Background*: On the second day of the jury's punishment-phase deliberations, the trial judge received a note signed by a juror, Angela Bowman, and the jury foreman, Matthew Clinger. "[T]he parties agreed that the trial judge could speak to juror Bowman privately in chambers" with a court reporter present.  (Docket Entry No. 24-1 at 110).  In chambers, juror Bowman told the trial judge that she disagreed with other jurors on the special-issue questions and felt pressured to change her opinion. (Docket Entry No. 23-13 at 5-6).  Juror Bowman said that the jury could not agree and that she did not want to be sequestered another night, and she asked the judge to replace her with an alternate.  (Docket Entry No. 23-13 at 6-8).  The trial judge reminded juror Bowman of the law contained in the jury instructions, reassured her, and instructed her to resume deliberations.  (Docket Entry No. 23-13 at 8-9).  "[T]he conversation between the trial judge and

juror Bowman was recorded and a part of the record for review on appeal if necessary." (Docket Entry No. 24-1 at 115).

The jury returned a punishment-phase verdict a little more than an hour later. The trial court polled the jury. Juror Bowman affirmed that the verdict represented her vote. (Docket Entry No. 23-13 at 12). The trial court sentenced Cruz-Garcia to death on July 22, 2013.

Cruz-Garcia's federal claim originates in a phone call that trial counsel Madrid received on the night of the jury's verdict. Madrid swore to an affidavit in which he said that juror Bowman had called him distraught over the verdict. Madrid stated in the affidavit that juror Bowman had told him that she felt pressured to change her vote, in part because she had a sick daughter. (Docket Entry No. 22-10 at 123). Madrid also stated that juror Bowman complained about the foreman (juror Clinger) improperly influencing the jury by quoting from the Bible in the jury room. Juror Bowman's phone call set up the challenge that Cruz-Garcia raised in his motion for new trial, on direct appeal, and on state habeas review.

*Motion for New Trial*: Cruz-Garcia filed a motion for new rial on August 13, 2013. (Docket Entry No. 22-10 at 109). Among other grounds for relief, Cruz-Garcia argued that the jury had engaged in misconduct. (Docket Entry No. 22-10 at 110). Both Cruz-Garcia and the State submitted affidavits to the trial court describing events in the jury room during deliberations. The affidavits presented different versions.

Cruz-Garcia submitted three affidavits. Only one, juror Bownman's affidavit, included a first-hand account of what had happened in the jury room. Juror Bowman's affidavit said that she changed her vote after receiving a phone call that her daughter was sick: "If it had not been for my concern over my daughter's health condition, I would have remained committed to voting for life

29

in prison." (Docket Entry No. 22-10 at 127-28).  While Juror Bowman felt pressure from other jurors, she did not attribute her changed decision to any Bible reading: "I changed my verdict so I could go home and take care of my child." (Docket Entry No. 22-10 at 128).

Juror Bowman mentioned only one juror, Casey Guillotte, whose vote was allegedly influenced by the Bible reading.  Juror Bowman said that juror Guillotte "said that she needed spiritual guidance to make her decision." (Docket Entry No. 22-10 at 128). At that point, juror Clinger "told the jury that he had prayed about the decision the night before" and "then pulled out his Bible." (Docket Entry No. 22-10 at 129).  Juror Bowman's affidavit stated that she "believe[d] other jurors changed their position from life to death after [juror Clinger] read scriptures from the Bible." (Docket Entry No. 22-10 at 129).

Cruz-Garcia included two affidavits that included hearsay accounts of what transpired in the jury room.  The hearsay affidavits described events that were different from juror Bowman's description.  The first affidavit was from trial counsel Madrid describing his telephone conversation with juror Bowman.  Madrid stated that:

> Ms. Bowman also explained that the jury foreman informed the jury that he had been praying about making the right decision and he took out his Bible and started quoting from the Bible during the decision-making process. The introduction of the Bible seemed to sway other jurors toward death rather than life in prison. Ms. Bowman's decision so disturbed her that she told me she had to bring these events to my attention in an effort to correct the injustice that she had participated in.

(Docket Entry No. 22-10 at 123).

Cruz-Garcia also submitted an affidavit from his investigator, J.J. Gradoni, who had interviewed jurors Bowman and Clinger.  Mr. Gradoni stated that juror Bowman had told him that:

> the jury deliberations involved the jury foreman injecting Biblical passages into the deliberations. Ms. Bowman believed that the Biblical references affected other members of the jury and caused them to vote in favor of the death penalty. Ms.

30

> Bowman further stated that a juror named Casey Guillotte commented during deliberations that she needed "spiritual guidance" to make her decision. Bowman related that at this point in the deliberations, jury foreman Matthew Clinger took out his Bible and stated that he had prayed on this the night before. After this "religious experience," Ms. Guillotte changed her vote to death. Ms. Bowman was of the opinion that other jurors changed their positions to vote for death after Mr. Clinger read scriptures from the Bible.

(Docket Entry No. 22-10 at 125).  Gradoni also stated in his affidavit that he had spoken with juror Clinger, who admitted that he had read Bible passages while other jurors were present.  Juror Clinger told Gradoni that the Bible reading contributed to juror Guillotte changing her vote. (Docket Entry No. 22-10 at 126).  In addition to the affidavits, the defense also submitted a transcript of what purported to be a conversation between defense investigators and juror Clinger. (Docket Entry No. 22-10 at 165-99).

The State submitted two affidavits in opposition to the motion for a new trial.  First, the State submitted an affidavit from juror Guillotte.  This affidavit presented an account different from that in juror Bowman's affidavit, particularly on the question of whether the Bible influenced her to change her vote.  Juror Guillotte said that, "*[a]fter [jurors] had come to a unanimous decision* on all three special issue questions," she asked the others how they would emotionally come to terms with their verdict.  (Docket Entry No. 22-10 at 148) (emphasis added).  In response, juror Clinger retrieved a Bible from his belongings and read to himself.  Juror Clinger told Guillotte her that he found comfort in a passage from the Book of Romans.  Juror Guillotte said that juror Clinger did not read the Bible to the other jurors or direct them to any verse.  Juror Guillotte said that the Bible "did not in any way influence" her decision.  (Docket Entry No. 22-10 at 148-49).

The State also submitted an affidavit from juror Clinger.  This affidavit stated that juror Guillotte had wondered aloud how they would all deal with their verdict.  After several jurors

shared their feelings, juror Clinger told juror Guillotte that he found comfort in the Bible. Juror Clinger then pulled out his Bible, but he did not read it out loud. Juror Clinger described the conversation as jurors coming to terms with the emotional ramifications of their weighty decision, not as influencing their decision. (Docket Entry No. 22-10 at 150-52).

The parties' evidence raised questions about the timing of the Bible reading and its impact, if any, on the jury's decision. But more importantly, the nature of the evidence raised serious questions about its admissibility in the first place. Texas law bars any review of juror deliberations in post-verdict proceedings. Like its federal counterpart, Texas Rule of Evidence 606(b)(1) states:

> During an inquiry into the validity of a verdict . . ., a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

The Texas rule, however, does allow that "[a] juror may testify . . . about whether an *outside influence* was improperly brought to bear on any juror . . . " Tex. R. Evid. 606(b)(2) (emphasis added). The main issue before the state courts was whether the Bible reading was an outside influence that (1) would allow the introduction of juror's affidavits into evidence and (2) improperly prejudiced the jurors' deliberations.

Cruz-Garcia requested a live hearing to probe his allegation that an outside influence tainted the jury's deliberations. (Docket Entry No. 22-10 at 131). The trial court held a hearing, allowing no live witnesses but admitting both parties' affidavits into evidence. The trial court found that an alleged transcript of a conversation with juror Clinger was inadmissible. (Docket Entry No. 23-15 at 28). The trial court found that portions of juror Bowman's affidavit were not credible because her recollection of the timeline did not match the record. (Docket Entry No. 23-

15 at 31; No. 24-1 at 113).  After considering all the evidence, the trial court summarily denied the motion for new trial.

*Direct Appeal*:  As his twelfth point of error on direct appeal, Cruz-Garcia claimed that the trial court erred by not finding "jury misconduct during the punishment deliberations where the jury foreman influenced the deliberation by quoting from his Bible about the correctness of the death penalty . . . ."  (Docket Entry No. 22-7 at 118).[12]  In the "arguments and authorities" section of his appellate brief, Cruz-Garcia relied on state evidentiary law to support his claim.  (Docket Entry No. 22-7 at 114).  His briefing, however, cited federal constitutional law, emphasizing "the integrity if all that is embraced in the constitutional concept of a trial by jury."  (Docket Entry No. 22-7 at 128).

As it was the focus of Cruz-Garcia's briefing, the heart of the Court of Criminal Appeals opinion focused on the admissibility of the parties' affidavits under state law.  Observing that an inquiry into "the deliberative processes of a jury to ferret out misconduct has been prohibited in this country, save for a few, narrow exceptions," the Court of Criminal Appeals focused on whether the circumstances involved an outside influence under Rule 606(b) that would make the juror affidavits admissible.  *See id*.

The Court of Criminal Appeals recognized that it had "never [before] determined whether reference to the Bible during jury deliberations is an outside influence."  *Cruz-Garcia*, 2015 WL 6528727, at *28.  The Court of Criminal Appeals held "that it is not."  *Id*.  "While this scripture did literally come from outside the jury room," the Court of Criminal Appeals reasoned that it

---

[12]     Cruz-Garcia did not directly rely on any federal constitutional provision in his appellate briefing.  While he briefly mentioned Supreme Court cases for general principles about the integrity of a jury's verdict, (Docket Entry No. 22-7 at 128), Cruz-Garcia did not make any argument clearly based on federal law.

nonetheless did not amount to an "outside influence." *Id*. The Court of Criminal Appeals emphasized that its precedents did not consider anything "unrelated to trial issues" to be an outside influence. *Colyer v. State*, 428 S.W.3d 117, 127 (Tex. Crim. App. 2014); *see also McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012). The Court of Criminal Appeals found that "[r]eferring to the Bible did not directly relate to a fact at issue before the jury in [Cruz-Garcia's] case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it." *Cruz-Garcia*, 2015 WL 6528727, at *29. The Court of Criminal Appeals found that the Bible was "not an outside influence under Rule 606(b) and as interpreted by" its law. *Id*. With that, the Court of Criminal Appeals held that "the affidavits describing the inner goings-on of the jury's deliberations were improperly admitted" and "any live testimony to that effect would have been inadmissible under Rule 606(b) as well." *Id*.

Without admissible evidentiary support, Cruz-Garcia's improper-influence claim was meritless. The Court of Criminal Appeals denied the merits of this claim by holding that, "although the trial court erred in admitting the affidavits, the trial court did not abuse its discretion when it overruled [Cruz-Garcia's] motion for new trial." *Id*.[13]

*State Habeas Review*: On state habeas review, Cruz-Garcia raised a similar claim based on the same evidence, arguing that "[j]urors in Cruz-Garcia's trial committed serious misconduct that violated Cruz-Garcia's right to a fair trial." (Docket Entry No. 23-38 at 158). Cruz-Garcia specifically argued that "the jury foreman read Bible passages commanding the death penalty for

---

[13]     Cruz-Garcia argues that this was not an adjudication on the merits because the Court of Criminal Appeals did not explicitly rely "on the federal Constitution or federal law." (Docket Entry No. 86 at 13). This court presumes that the state court adjudicated the merits of this claim. *See Johnson v. Williams*, 568 U.S. 289, 293 (2013). Cruz-Garcia has not persuasively shown that, by holding that the trial court did not abuse its discretion, the Court of Criminal Appeals neglected to rule on the substance of his claim in the alternative.

murderers during the punishment phase deliberations, and he and another juror indicated that his reading of scripture made the difference in changing another juror's vote from life to death." (Docket Entry No. 23-38 at 158).  Cruz-Garcia's habeas briefing more fully discussed the federal constitutional right to a trial by an impartial jury.  (Docket Entry No. 23-38 at 158, 165, 168).

Because "the Court of Criminal Appeals rejected the [same] point of error on direct appeal" and held "that the reference to the Bible during jury deliberations did not constitute an outside influence," the state habeas court found that it did not need to re-examine Cruz-Garcia's arguments.   (Docket Entry No. 24-1 at 119-20).  The state habeas court alternatively concluded that "the reference to the Bible during jury deliberations did not constitute an outside influence." (Docket Entry No. 24-1 at 130).

The state habeas court made two important fact findings.  First, the state court found that any discussion of the Bible occurred only "after the jury reached a unanimous decision on the special issues . . . ."  (Docket Entry No. 24-1 at 120).  Second, the state habeas court found that the Bible was mentioned in response to juror Guillotte's "general question about how the jury was going to . . . emotionally come to terms with their verdict . . . ."  (Docket Entry No. 24-1 at 120). The state habeas court found that the Bible "did not influence [the jurors'] decision in answering the special issues," but was only about "how they personally handled their emotions about the decision." (Docket Entry No. 24-1 at 120).  On that review, the state habeas court held that Cruz-Garcia "fail[ed] to show that he was denied a fair trial or that his right to due process was violated." (Docket Entry No. 24-1 at 130).

"Based upon the trial court's findings and conclusions and [its] own review," the Court of Criminal Appeals denied this claim.  *Cruz-Garcia*, 2017 WL 4947132, at *2.  The Court of

Criminal Appeals specifically held that the claim was "procedurally barred as it was raised and rejected on direct appeal." *Cruz-Garcia*, 2017 WL 4947132, at *1.

*Federal Habeas Review*:  Cruz-Garcia's first ground for relief renews his complaints about the influence of the Bible on jury deliberations.  Cruz-Garcia argues that "[t]he jury was exposed to an external influence when the jury foreperson brought a Bible into the deliberations room and read from it to the jury during their deliberations on punishment."  (Docket Entry No. 73 at 24).  Cruz-Garcia contends that the Bible reading amounted to juror misconduct that violated his right to trial by an impartial jury.

The state courts have twice considered and rejected this claim.  Cruz-Garcia concedes that "the state court record is contradictory on several facts, including when juror Clinger read from the Bible and whether juror Clinger's reading of scripture did influence juror Guillotte (and others) to answer the sentencing issues in such a way as to result in a death sentence."  (Docket Entry No. 73 at 26).  This court analyzes those contradictions based on the state court's evidentiary rulings and AEDPA's deference to state-court decisions.

The Court of Criminal Appeals decision that the jurors' affidavits were inadmissible was primarily based on state evidentiary law.  Generally, "federal courts sitting in habeas do not review state courts' application of state evidence law." *Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (stating that a "state court's interpretation of state law binds a federal court sitting in habeas corpus").  The federal courts honor a "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  The state courts may interpret state evidentiary law—such as whether a particular episode amounts to an "outside influence" that

36

would allow intrusion into the jurors' deliberative process—in a way that differs from federal courts. *See Smith v. Bayer Corp.*, 564 U.S. 299, 309 (2011) ("Federal and state courts, after all, can and do apply identically worded provisions in widely varying ways."); *Allen v. Vannoy*, 659 F. App'x 792, 800 (5th Cir. 2016) (assuming that the state courts correctly decided issues of its own evidentiary law).

"A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999). Cruz-Garcia has not shown that the state evidentiary ruling violated a constitutional right or was unfair. "At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 215 (2017). Most states have adopted evidentiary rules similar to "the federal approach" under which "the no-impeachment bar permitted an exception only for testimony about events extraneous to the deliberative process, such as reliance on outside evidence—newspapers, dictionaries, and the like—or personal investigation of the facts." *Id.* "[S]ince the enactment of [federal] Rule 606(b)," the United States Supreme Court has "addressed the precise question whether the Constitution mandates an exception to it" only three times. *Id.* at 219; *see Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017); *Warger v. Shauers*, 574 U.S. 40, 51 (2014) *Tanner v. United States*, 483 U.S. 107, 117 (1987)).[14] In these three cases, the Court stated that

---

[14]     In *Tanner v. United States*, 483 U.S. 107 (1987), the Supreme Court rejected a constitutional exception for evidence that jurors were intoxicated during trial. In *Warger v. Shauers*, 574 U.S. 40 (2014), the Supreme Court rejected an exception to the no-impeachment rule when the losing party in a civil case wanted to produce evidence that a juror did not express pro-defendant bias during voir dire. The Supreme Court has found an exception to the no-impeachment rule only once. In *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017), the Supreme Court found that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."

the Constitution "forbid[s] a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008). The Supreme Court has specifically found an external influence only when a juror had relied on "racial stereotypes or animus to convict a criminal defendant . . . ." *Pena-Rodriguez*, 580 U.S. at 225. The Supreme Court has not addressed whether a juror's reference to or reading of the Bible during deliberations warrants an exception to the no-impeachment bar. The Supreme Court has not addressed whether reading the Bible in the circumstances described in this record would amount to an improper influence on the jury.

The Fifth Circuit has interpreted Supreme Court precedent as meaning "that when a juror brings a Bible into deliberations and points out to her fellow jurors specific passages that describe the very facts at issue in the case, the juror has crossed an important line." *Oliver*, 541 F.3d at 339. This case does not cross that line. The state habeas court found that the incident involving the Bible reading happened after the jury had already reached a unanimous decision. (Docket Entry No. 24-1 at 119-20). [15] The Court of Criminal Appeals found that the jurors spoke about the Bible only for emotional support after they had returned their verdict, not for guidance or direction in reaching that verdict. *Cruz-Garcia*, 2015 WL 6528727, at *29. Cruz-Garcia has not cited authority that would require a holding that the circumstances of this case violated Cruz-Garcia's constitutional rights. The decision by the Texas Court of Criminal interpreting Texas Rule 606(b)

---

[15]     This factor differentiates this case from *Oliver v. Quarterman*, 541 F.3d 329, 340 (5th Cir. 2008) in which the Bible in the jury room "influenced the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry into these factual areas." *Oliver* involved a case where "several jurors collectively consulted a Bible, in the jury room, and likely compared the facts of this case to the passage that teaches that capital punishment is appropriate for a person who strikes another over the head with an object and causes the person's death." *Id*. This case presents circumstance which did not "cross[] an important line" because no "juror br[ought] a Bible into the deliberations and point[ed] out to her fellow jurors specific passages that describe the very facts at issue in the case . . . ." *Id*. at 339. Additionally, the admissibility of juror testimony was never a concern in *Oliver*, as it was in this case. The Fifth Circuit in *Oliver* did not have to consider whether the state court's assessment of its own procedural law posed any federal constitutional concern.

to exclude the jurors' affidavits is entitled to deference.  Without the inadmissible affidavits, Cruz-Garcia's claim lacks merit.  *See Austin v. Davis*, 876 F.3d 757, 791 (5th Cir. 2017) (finding that, after concluding that "the post-trial statements of the five jurors are inadmissible by virtue of Rule 606(b)," an inmate's "jury bias claim therefore fails").

The state habeas court alternatively denied this claim on the merits, finding that Cruz-Garcia "fail[ed] to show that he was denied a fair trial or that his right to due process was violated." (Docket Entry No. 24-1 at 130).  Cruz-Garcia argues that the state courts "never purported to resolve the[] contradictions" in the state court record (Docket Entry No. 86 at 19).  The state habeas court, however, made fact findings that functionally resolved the contradictions in the record.  The state habeas court credited juror Clinger's statement that none of the jury members changed their vote when he read the Bible to himself.  (Docket Entry No. 24-1 at 119-21). The state habeas court credited juror Guillotte's statement that the Bible incident happened after the jurors had concluded their deliberations.  This court must defer to the state court's explicit finding that the Bible-reading occurred only "after the jury reached a unanimous decision on the special issues . . . ." (Docket Entry No. 24-1 at 120).  *See Murphy v. Davis*, 901 F.3d 578, 595 (5th Cir. 2018) (finding that a trial court's factual findings are owed a presumption of correctness, even if not explicitly adopted by the Court of Criminal Appeals, if they are not expressly rejected nor inconsistent with the decision).  The Court of Criminal Appeals also found that "[r]eferring to the Bible did not directly relate to a fact at issue before the jury in [Cruz-Garcia's] case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it." *Cruz-Garcia*, 2015 WL 6528727, at *29.

The facts, as determined by the state courts, do not violate the Supreme Court's rule that "jurors must rely on the evidence and law presented in an open court." *Oliver*, 541 F.3d at 340 (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)); *see also Ward v. Stephens*, 777 F.3d 250, 268 (5th Cir. 2015) (finding no error when an external influence had no influence on the jury's verdict), *overruled on other grounds*, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018)).  Here, the jurors did not substitute the Bible for the facts or look to it as a guide for their verdict.  The jurors referred to the Bible for comfort after reaching their decision.  Based on these findings, the state courts were not unreasonable in finding no constitutional error.  Cruz-Garcia has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  This claim is denied.

### B.  The Elevator Incident

The trial court began the first morning of the penalty phase (July 16, 2013) by speaking with the attorneys outside the jury's presence.  The trial judge told the attorneys that a local attorney, Michael Casaretto, had approached him that morning about a conversation he overheard while waiting for the courthouse elevator.  Casaretto said that he saw two men wearing badges identifying them as jurors in Cruz-Garcia's trial.  (Docket Entry No. 23-10 at 5).  According to the trial judge, Casaretto described "what was possibly an innocuous conversation, but he wanted to alert the Court to the conversation that he overheard between the two jurors."  (Docket Entry No. 23-10 at 5).

The trial judge talked to Casaretto in chambers but on the record, which contains a transcript of the conversation.  Casaretto said that, while it was "hard to hear them," the two men "seemed to be speaking about the case" and seemed to be "speaking about people on the jury . . .

struggling with the issues." (Docket Entry No. 23-10 at 6). One of the men thanked the other "for words of encouragement" the day before. (Docket Entry No. 23-10 at 6). But Casaretto "said he could not tell if they were actually talking about evidence." (Docket Entry No. 23-10 at 6). The conversation continued for approximately five minutes and ended when the men got into the elevator. The trial judge took notes of what Casaretto told him and read them back. Casaretto told the trial judge, "Yes, that's it, that is exactly what I observed today." (Docket Entry No. 23-10 at 6).

The trial judge read the notes to the parties. (Docket Entry No. 24-1 at 118). The trial judge told the parties that he intended to, "once again, admonish[] strongly the jury not to discuss the evidence or any deliberations or any aspect of the deliberations outside the presence of the jury where they are all seated together and are supposed to be deliberating and leave it at that." (Docket Entry No. 23-10 at 6). Neither party objected nor proposed a different course of action. The trial judge instructed the jurors that they "should not talk amongst [themselves] or with anyone else on any subject connected with trial or to form or express any opinion thereon until the end of the trial." (Docket Entry No. 23-10 at 9).

Two years after the trial, Casaretto signed an affidavit with "significant differences" from the "information that he originally related to the trial judge in 2013." (Docket Entry No. 24-1 at 119). As the state habeas court summarized:

> Casaretto[] subsequently submitted an affidavit to habeas counsel on August 27, 2015, recounting his observations of the two jurors from the 337th District Court in the Harris County Criminal Courthouse on July 16, 2013, and stating that it was clear from the jurors' comments that they were talking about the case itself; that the jurors continued their conversation in the elevator; that it seemed that the jurors were discussing the content and their feelings about the testimony of a witness that they heard; that Casaretto was troubled by the "possibility" that two jurors were publicly discussing an ongoing case; that Casaretto made note of the court listed on

41

the jurors' badges, and Casaretto went to that courtroom to speak to the trial judge
in the primary case; that Casaretto reported what he observed to the trial judge
because he believed that he had witnessed an "obvious violation of the jurors'
obligations during trial;" and, that Casaretto was never contacted by the judge, the
State or the defense attorneys about the matter.

(Docket Entry No. 24-1 at 118-19).

Cruz-Garcia raised a state habeas claim based on Casaretto's second version of what he

had seen and heard. Cruz-Garcia specifically argued that his "rights to a fair trial were violated by

trial counsel's failure to investigate juror misconduct." (Docket Entry No. 23-38 at 152). Cruz-

Garcia argued that his "right to a fair trial was prejudiced by counsel's deficient performance . . .

." (Docket Entry No. 23-38 at 157).

The state habeas court focused on the credibility of Casaretto's affidavit. The state habeas

court found that, "given the two year lapse in time between the event and the affidavit," the "2015

habeas affidavit is suspect and unpersuasive . . . ." (Docket Entry No. 24-1 at 119). The state

habeas court found that "the information that Casaretto related to the trial judge in 2013 and the

judge's notes from the conversation represent a more reliable representation of what Casaretto

actually observed on the morning of July 16, 2013." (Docket Entry No. 24-1 at 119).

On federal review, Cruz-Garcia argues that "[t]he jurors' discussion of the sentence and

evidence outside of deliberations and before the close of evidence violated [his] right to a fair trial

by an impartial jury." (Docket Entry No. 73 at 29). Cruz-Garcia's claim depends on whether the

two jurors had discussed his sentence and evidence during the elevator incident. The judge who

presided over the state habeas action was the same judge who interviewed Casaretto during the

first day of the penalty phase. Relying on the record of the in-chambers discussion, the state habeas

court found that "the jurors discussed nothing specific about the issues" and "Casaretto could not

tell if the jurors were actually talking about evidence in the case . . . ."  (Docket Entry No. 24-1 at 118).  AEDPA requires deference to that finding, particularly because the state habeas judge also presided over the trial proceedings and could rely on personal recollection when adjudicating the claim.  *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The state habeas court found that Casaretto's affidavit was "suspect and unpersuasive," while the trial record and judge's notes were "a more reliable representation of what Casaretto actually observed . . . ."  (Docket Entry No. 24-1 at 119).  With those findings, Cruz-Garcia's claim that jurors discussed the issues and evidence outside deliberations lacks merit.  Because Cruz-Garcia has not shown that he can overcome the AEDPA deference owed to the state-court decision, this claim is denied.

## III.   Presentation of Mitigating Evidence (Claim Thirteen)

In his thirteenth ground for relief, Cruz-Garcia claims that the trial court violated his constitutional rights by excluding mitigating evidence in the penalty phase of his trial.  The trial court excluded two categories of evidence as hearsay: (1) certificates of Bible studies courses Cruz-Garcia took while imprisoned in Puerto Rico; and (2) testimony from a Puerto Rican police officer who had heard from other agents that Cruz-Garcia had worked as a federal informant.  (Docket Entry No. 23-12 at 58-61; 23-10 at 72-76).  Cruz-Garcia claims that these evidentiary rulings violated his right to present mitigating evidence under the Eighth and Fourteenth Amendments.

Cruz-Garcia argued on direct appeal that the exclusion of this testimony was an error under state law and that it violated his right to present a complete defense under federal law.  The Court of Criminal Appeals reviewed the applicable law, as follows:

> A criminal defendant's right to present relevant evidence is not absolute.  Instead, it is subject to reasonable restrictions that accommodate other legitimate interests

in the criminal trial process.  Where mitigating evidence comes in an objectionable form, neither the Texas nor the United States Constitutions require its admission. The Constitution is implicated only if the evidentiary rule being employed to exclude evidence is applied arbitrarily or unjustly and its application effectively precludes a defendant from putting forth a defense.

*Cruz-Garcia*, 2015 WL 6528727, at \*23.  The Court of Criminal Appeals found that Cruz-Garcia's "proffered evidence was limited by the application of the hearsay rule" because the Bible study certificates "each contained out-of-court statements that [he] was offering for their truth."  *Id*. at \*23.  The Court of Criminal Appeals also found that testimony that Cruz-Garcia was working as an informant was inadmissible because the witness had "no personal knowledge of [his] work and had learned about this alleged work only through conversations with other agents."  *Id*. at \*25.

Cruz-Garcia argued that the evidence should have been admitted under various provisions of the Texas Rules of Evidence.[16]  The Court of Criminal Appeals, however, found that the certificates did not meet any hearsay exception and "do not bear 'persuasive assurances of trustworthiness,' which weighs in favor of the trial court's exclusion."  *Cruz-Garcia*, 2015 WL 6528727, at \*24.  The Court of Criminal Appeals found that applying the hearsay rule in this instance was "a reasonable restriction on the admission of evidence that accommodates other legitimate criminal-trial interests, namely, ensuring the reliability of evidence."  *Id*.  The Court of Criminal Appeals rejected Cruz-Garcia's argument that "the hearsay rule should give way in favor of his right to put on a defense."  *Id*.

---

[16]    Cruz-Garcia argued that the trial court could have admitted the certificates as records of a religious organization under Rule 803(11), as family records under Rule 803(13), as reputation concerning personal or family history under Rule 803(19), or as a statement of personal or family history under Rule 804(b)(3). Cruz-Garcia argued that the police officer's testimony should have been admissible as evidence of his character or reputation under Rule 803(21).  The Court of Criminal Appeals found that he had not shown any basis to allow their admission.  *Id*. at \*24.

On federal habeas review, Cruz-Garcia argues that the state-court application of the hearsay rule prohibited him from presenting mitigation evidence, in violation of the Eighth and Fourteenth Amendments.  Cruz-Garcia primarily relies on two Supreme Court cases.  (Docket Entry No. 73 at 246).  First, he relies on *Lockett v. Ohio,* 438 U.S. 586, 604-05 (1978), in which the Supreme Court stated that:

> the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Second, Cruz-Garcia relies on *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973), in which the Supreme Court stated that "the hearsay rule may not be applied mechanistically to defeat the ends of justice."

The Supreme Court has held that a defendant's right to present mitigating evidence "is not unlimited, but rather is subject to reasonable restrictions."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  The Supreme Court has noted that a defendant's interest in presenting mitigating evidence may "bow to accommodate other legitimate interests in the criminal trial process." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987).   Rules ensuring the reliability of evidence that comes before a jury serve a legitimate interest in the criminal trial process.  *Scheffer*, 523 U.S. at 309.

Because "state-law evidentiary claims . . . are not cognizable in federal habeas," *Lucio v. Lumpkin*, 987 F.3d 451, 472 (5th Cir.  2021), "a federal habeas court only examines whether the petitioner's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters.  *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005).  Due process is implicated only by rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair."  *Id*.  The test is whether there is a reasonable probability that the verdict

would have been different had the trial been properly conducted. *See Guidroz v. Lynaugh*, 852 F.2d 832, 835 (5th Cir. 1988). Federal relief is warranted only when the excluded evidence "is a crucial, critical, highly significant factor in the context of the entire trial." *Johnson v. Puckett*, 176 F.3d 809, 821 (5th Cir. 1999).

Cruz-Garcia broadly claims that excluding this hearsay evidence violated his constitutional rights, but the record does not demonstrate that excluding that testimony made his trial fundamentally unfair. Cruz-Garcia argues that the trial court excluded "powerful mitigating evidence," (Docket Entry No. 86 at 88), but he does not place that evidence in the context of the evidence, as needed to show fundamental unfairness because it was excluded. In short, Cruz-Garcia rests on broad allegations of error without showing, in the context of the entire trial, that the alleged error made his trial fundamentally unfair.

The trial court relied on Texas evidence law in ruling on whether evidence was inadmissible hearsay. The Court of Criminal Appeals found that the application of its evidentiary rules did not violate state or federal law. Cruz-Garcia has not shown that the state adjudication was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). Relief on this ground is denied.

## IV.   Claims Routinely Denied By Federal Courts (Claims Eighteen through Twenty-One)

Cruz-Garcia raises four claims that federal courts have repeatedly and regularly denied. As listed in his petition, Cruz-Garcia argues that:

- The punishment phase jury instructions restricted the evidence that the jury could consider as mitigating, in violation of Mr. Cruz-Garcia's rights. (Claim Eighteen)

- The trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence, in violation of Mr. Cruz-Garcia's rights. (Claim Nineteen)

- Mr. Cruz-Garcia's death sentence was based on Texas's unconstitutionally vague first special issue, in violation of Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments. (Claim Twenty)

- Mr. Cruz-Garcia's rights under the Eighth and Fourteenth Amendments were violated based on Texas's arbitrary and discriminatory system of administering the death penalty. (Claim Twenty-One)

(Docket Entry No. 73 at 250-54).

The state courts denied the merits of those claims. (Docket Entry No. 24-1 at 130-34). The Court of Criminal Appeals found that those "claims have been repeatedly rejected by [that] Court and [Cruz-Garcia] raise[d] nothing new to persuade [it] to reconsider those holdings." *Cruz-Garcia*, 2017 WL 4947132 at *2.

In the federal courts as well, these four claims "are foreclosed by multiple, binding precedents." *Johnson v. Lumpkin*, 76 F.4th 1037, 1038 (5th Cir. 2023). Federal courts have repeatedly denied similar claims brought by other inmates. *See Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017) (finding that the Texas instructions do not limit the jury's consideration of mitigating evidence); *Blue v. Thaler*, 665 F.3d 647, 665-67 (5th Cir. 2011) (same); *Young v. Davis*, 835 F.3d 520, 527-29 (5th Cir. 2016) (finding no error in the Texas prohibition on jury instructions about holdout jurors); *Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014) (finding that the Texas first special issue is not unconstitutionally vague and finding no error in instructions about holdout jurors); *Allen v. Stephens*, 805 F.3d 617, 631 (5th Cir. 2015) (finding that the Texas death penalty scheme is not arbitrary nor discriminatory).

Cruz-Garcia acknowledges that each of these claims "is foreclosed by precedent," but he does not "concede [each] point of error" because he wishes to "preserve[] it for later review."

(Docket Entry No. 73 at 251-54; *see also* Docket Entry No. 73 at 250).  He has done so.  Cruz-Garcia's application for relief on these claims is denied.

**PARTIALLY AVAILABLE CLAIMS**

Federal habeas review is available only after an inmate has given the state courts a fair opportunity to consider the merits of his claim.  An inmate's failure to litigate his claims in compliance with state procedural law may bar federal review.  Cruz-Garcia raises two federal claims that are only partially available for federal review.  Cruz-Garcia raised claim two on direct appeal, but the Court of Criminal Appeals found that he had defaulted much of the claim.  In claim four, Cruz-Garcia combines the ineffective-assistance-of-counsel claims from his initial state habeas application with claims he defaulted by raising them in a successive habeas application.  In both cases, only part of Cruz-Garcia's claims are available for federal review, but he must overcome a procedural bar for the rest of the claims to become available.  The court addresses the claims available for federal review below, and then addresses whether he can overcome the procedural bar to federal review of the remaining claims.

## I.      Exclusion of Evidence (Claim Two)

In his second ground for relief, Cruz-Garcia claims that the trial court violated his constitutional rights by disallowing evidence and argument allegedly relating to the State's DNA evidence.  Cruz-Garcia bases this claim on his "right to present a defense and to cross-examine witnesses."  (Docket Entry No. 73 at 32).  When Cruz-Garcia raised this claim on direct appeal, the Court of Criminal Appeals found that he had defaulted insofar as the claim related to cross-examination.  *See Cruz-Garcia*, 2015 WL 65287827, at *15.  The cross-examination portion of this claim is not properly before the court, raising the issue of whether Cruz-Garcia can overcome

48

the procedural bar to federal review.  Before discussing that issue, the court turns to the meaningful-defense part of the claim, which is properly raised.

### A.    Background

DNA evidence confirmed Cruz-Garcia's presence during the home invasion and proved that he was the source of some of the DNA recovered after the sexual assault on Diana Garcia. The DNA evidence was an important factor in the prosecution's case.  Cruz-Garcia sought to discredit the DNA evidence by impugning the old HPD crime lab.  While the State did not rely on any testing conducted by the old HPD crime lab, Cruz-Garcia still objected because "[t]he evidence was originally processed and stored by the now-defunct HPD Crime Lab."  (Docket Entry No. 73 at 29).  Cruz-Garcia also wanted to present evidence that other DNA testing had produced different results.

The defense moved to suppress the DNA results before trial.  The Court of Criminal Appeals summarized this effort:

> At the hearing on [his] motion to suppress, [Cruz-Garcia] argued against the admission of forensic evidence that had been stored by the old HPD crime lab . . . [Cruz-Garcia] also argued against the admission of results from DNA testing performed on the cigar, sexual assault kit, and panties, despite the fact that the proffered test results were not generated by the old HPD crime lab. In support of his motion, [Cruz-Garcia] argued that the mere fact that the forensic evidence at issue had been stored by HPD, and subsequent to that storage the old HPD crime lab was shut down because of quality-control problems, provided sufficient indicia that the evidence had been contaminated and was therefore untrustworthy to put before a jury.

*Cruz-Garcia*, 2015 WL 6528727, at *10.[17]   The State called witnesses who testified that the evidence sent to Orchid Cellmark had not been damaged, contaminated, or tampered with in any

---

[17]    In the hearing, the defense submitted several exhibits—there designated exhibits two through nine—that the trial court would later not allow to come before the jury.  Exhibits two through seven consisted of the "Bromwich

way.  Still, Cruz-Garcia argued that "the court should have no confidence in any evidence that was transferred from the old HPD crime lab to anywhere else for fear of contamination, and that employees of the old HPD crime lab who handled evidence in [Cruz-Garcia's] case were found to have committed misconduct in their work at the lab."  (Docket Entry No. 24-1 at 98-99).

The trial court denied Cruz-Garcia's motion to suppress, finding "by clear and convincing evidence that the DNA evidence from the cigar and the sexual assault kit of Diana Garcia and the test results as determined by Orchid Cellmark Laboratory on those items is sufficiently reliable and relevant to assist the jury in accurately determining a fact issue in this case."  (Docket Entry No. 23-3 at 4-5).  The trial court noted that the "old HPD Crime Lab . . . has not handled any of the evidence in this case since 1994."  (Docket Entry No. 23-3 at 12).  There was "no evidence . . . that any of the evidence in question . . . was stored in a manner or placed in a location that is alleged to be subject to contamination, mishandling, or malfeasance by the HPD property room or the old HPD Crime Lab."  (Docket Entry No. 23-3 at 13).  The trial court found that "neither the results of the testing from the old HPD crime lab, nor the results from the Genetic Design Lab are offered and they will not be admitted."  (Docket Entry No. 23-3 at 8).  The trial court also found that "the old HPD Crime Lab results are not admissible on [any] blood samples."  (Docket Entry No. 23-3 at 9).  The trial court held that the Bromwich Report and other material criticizing the old HPD crime lab was "not admitted, not to be mentioned or alluded to or discussed, because it is irrelevant."  (Docket Entry No. 23-3 at 14).

---

Report" that "heavily criticized the [old HPD crime] lab in the areas of quality assurance, internal auditing, training, and standard operating procedure."  *Cruz-Garcia*, 2015 WL 6528727, at *14.  Exhibits eight and nine were misconduct reports and criminal histories for three former HPD crime lab employees.  Those three employees helped process the recovered DNA when it was collected in 1992, but the results from their work were not presented at trial and none of them testified.

The defense wanted to challenge the State's DNA evidence at trial using the Bromwich report, material relating to the misconduct and criminal histories of former HPD crime lab employees, and evidence that the State had sought DNA testing in 1993 from an outside organization that yielded results different from those on which the State relied at trial.[18]   The proffered evidence, however, did not challenge the testing on which the State based its case.   The trial court prohibited Cruz-Garcia from introducing the proffered evidence or referring to it at trial because it was irrelevant.   The trial court's prohibition included any mention of it during cross-examination.

When a police officer "testified that law enforcement officers did not consider the presence of DNA as evidence when they investigated crimes in 1992," the trial court allowed Cruz-Garcia "to cross-examine [him] on the fact that the existence of DNA testing was known by police agencies in 1992 and that some of the evidence relevant to the case at bar had been submitted to the old HPD crime lab for DNA analysis." *Cruz-Garcia*, 2015 WL 6528727, at *15.   At that point, "defense counsel attempted to re-urge his objection to the trial court's ruling at the hearing on his motion to suppress limiting his cross-examination on the topics of the Bromwich Report and the old HPD crime lab's closure." *Id*.   The trial court overruled the objection but allowed trial counsel to state that the old HPD crime lab had received the DNA.   The trial court did not allow any

---

[18]      Cruz-Garcia says:

At that time [in 1992], the DNA extractions were sent to Genetic Design Lab, together with DNA samples from several male individuals. 34 RR Def. Ex. 19. On February 4, 1993, Genetic Design reported its findings to the HPD Crime Lab, including that an individual named Bienvenido Melo could not be excluded as a potential contributor to the DNA extracted from the evidence. *Id*. Genetic Design also reported that Diana Garcia's boyfriend, Arturo Rodriguez, could be excluded from the DNA mixture on the panties. *Id*.

(Docket Entry No. 73 at 34)

mention before the jury about the closure of the old HPD crime lab or past employee misconduct at the lab.  (Docket Entry No. 23-3 at 20-22).

### B.   Decision on Direct Appeal

On direct appeal, Cruz-Garcia argued that the trial court's exclusion of evidence relating to the old HPD crime lab violated "the right to confront and cross examine his accusers and thus the opportunity to present a defense . . . ."  (Docket Entry No. 22-7 at 81).  Cruz-Garcia argued that the trial court erred in limiting cross-examination of witnesses testifying about the DNA evidence.  Cruz-Garcia claimed that he should have been able to explore the problems with the old HPD crime lab in cross-examining HPD Sergeant Eric Mehl from the cold-case division; Matt Quartaro, a supervisor of forensics at Orchid Cellmark; and Courtney Head, a criminalist specialist with the new HPD crime lab.  Cruz-Garcia based his arguments on Rule 61l(b) of the Texas Rules of Evidence, the Sixth Amendment rights of confrontation and cross-examination, and the Due Process Clause of the Fourteenth Amendment.

The Court of Criminal Appeals decided the state-law part of this claim by holding that "the trial court did not abuse its discretion in refusing to admit" the defense exhibits.  *Cruz-Garcia*, 2015 WL 6528727, at *14.  The Court of Criminal Appeals also held that Cruz-Garcia had defaulted the Confrontation Clause part of his claim by failing to lodge a sufficient objection at trial:

> An appellant forfeits his confrontation complaint if he fails to object at trial.  In this case, [Cruz-Garcia] never objected on the basis of the Confrontation Clause at trial or during his pretrial motion-to-suppress hearing.  We have previously emphasized the importance of specifying constitutional bases for objections because of the stricter harm analysis performed on appeal.  Because [Cruz-Garcia] failed to lodge a Confrontation Clause objection in the trial court, this claim has not been preserved and we do not reach the merits of [his] Confrontation Clause complaint as it relates

to the limitations placed on his cross-examination. [Cruz-Garcia's] second point of error is overruled.

*Cruz-Garcia*, 2015 WL 6528727, at \*16. The Court of Criminal Appeals relied on the Texas contemporaneous-objection rule, which is sufficient to bar federal review. *See Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003); *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999). The court will separately address whether Cruz-Garcia can overcome the procedural bar of his Confrontation-Clause argument. First, however, the court examines whether the Court of Criminal Appeals addressed the complete-defense portion of Cruz-Garcia's claim.

### C.    The Complete Defense Claim

While the Court of Criminal Appeals clearly found that Cruz-Garcia had defaulted consideration of constitutional questions relating to the right to confrontation and cross-examination, its decision regarding the right to present a complete defense was less clear. The Court of Criminal Appeals decision did not refer to the complete-defense argument in adjudicating Cruz-Garcia's confrontation claim. *Johnson v. Williams*, 568 U.S. 289, 298 (2013). Federal courts apply a rebuttable presumption that a state court considered a claim on the merits. *Johnson v. Williams,* 568 U.S. 289, 298 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). The Supreme Court has held that AEDPA "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'"; instead, a federal court will presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.

53

Here, two facts reinforce the presumption of adjudication.  First, the Court of Criminal Appeals "overruled" Cruz-Garcia's point of error, indicating that it intended to dispose of the entire claim.  *Cruz-Garcia*, 2015 WL 6528727, at *16.  Second, the Court of Criminal Appeals used language invoking the constitutional right to present a meaningful defense.  In a paragraph on Cruz-Garcia's appellate briefing, the Court of Criminal Appeals ended a discussion on whether the excluded evidence was relevant by stating that the exclusion of the evidence did not "prevent[] [Cruz-Garcia] from presenting a defense" because it did "not comprise the entire substance of [his] defense . . . . ."  This statement followed the precise way Cruz-Garcia had briefed the issue.[19] The Court of Criminal Appeals had used similar language in prior decisions on similar complete-defense claims.  *See Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002) (finding that excluding evidence is unconstitutional only when the defendant is "prevented from presenting the *substance of his defense to the jury*") (emphasis added).  While the Court of Criminal Appeals did not follow that statement with any legal citation, its language invoked complete-defense case law.

---

[19]     In his appellate briefing, Cruz-Garcia did not separate out his arguments about the right to present a complete defense.  In fact, Cruz-Garcia made any complete-defense argument dependent on other constitutional theories by stating that the trial court had denied him "the right to confront and cross examine his accusers and *thus* the opportunity to present a defense."  (Docket Entry No. 22-7 at 81) (emphasis added).  In his "arguments and authorities" section of his appellate brief he based his claim on "the Sixth Amendment guarantees" and then explicitly mentioned "the right of confrontation and cross examination" and also "Due Process."  (Docket Entry No. 22-7 at 85).  Cruz-Garcia did not mention a complete-defense right.  In fact, the only mention of a complete-defense claim in his appellate briefing came at the end of a discussion about the relevance of the excluded evidence under Rule 401 of the Texas Rules of Evidence.  Even then, Cruz-Garcia did not emphasize his right to a complete defense as independent from his other constitutional theories:

> Whether rooted directly in the **Due Process Clause of the Fourteenth Amendment** or in the **Compulsory Process or Confrontation Clause of the Sixth Amendment**, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" **Holmes v. South Carolina, 547 U.S. (2006); Ray v. State, 178 SW3d 833 (Tex. Crim. App. 2005).**

(Docket Entry No. 22-7 at 85) (emphasis in original).

54

The court finds that Cruz-Garcia has not overcome the presumption that the Court of Criminal Appeals adjudicated his complete-defense argument. The part of the Court of Criminal Appeals decision rejecting the claim is entitled to due deference under section 2254(d)(1).  In the end, however, this argument lacks merit under either a deferential or *de novo* review.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Chambers v. Mississippi*, 410 U.S. 284, 302-303 (1973).  "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).  Federal courts instead uphold "state courts' wide latitude to make discretionary evidentiary decisions." *Lucio*, 987 F.3d at 471; *see also Caldwell v. Davis*, 757 F. App'x 336, 339 (5th Cir. 2018) ("The Court's cases typically focus on categorical prohibitions of certain evidence and not discretionary decisions to exclude evidence under general and otherwise uncontroversial rules.").  The Constitution specifically "permits judges to exclude evidence that is . . . only marginally relevant or poses an undue risk of . . . confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 319, 32-27 (2006) (internal quotation and citations omitted).

The State did not present DNA evidence directly resulting from the old HPD crime lab. The State did not call witnesses to describe any initial efforts to test the recovered DNA. The State did not vouch for the integrity of the old HPD crime lab.  The Court of Criminal Appeals found that attacking lab processes and practices unrelated to the evidence before the jury was irrelevant. "Based on the fact that none of the old HPD crime lab employees were called to testify for the State, coupled with the fact that results from the tests each performed were not offered into

evidence, it was not outside the zone of reasonable disagreement to determine that evidence regarding these witnesses was irrelevant." *Cruz-Garcia*, 2015 WL 6528727, at *14.  As the trial court specifically held, "[n]othing in the Bromwich Report related to the specific evidence being offered by the State and, as such, was irrelevant under" Texas law. *Id.*

Cruz-Garcia has not shown a relationship between problems with the old HPD crime lab and the DNA evidence presented at trial.  Cruz-Garcia has not met the high standards for relief on a complete-defense claim, whether considered under a *de novo* review or under AEDPA's deferential standards.  The court denies relief on Cruz-Garcia's complete-defense arguments.

## II.     Effective Assistance of Counsel (Claims Four and Eight)

Cruz-Garcia's federal habeas petition alleges numerous errors in trial counsel's performance.  Courts review a trial attorney's efforts under the familiar framework established in *Strickland v. Washington*, 466 U.S. 668 (1984), which asks whether "a defense attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510, 519 (2003).  The court must first consider whether to apply AEDPA's relitigation bar to some of Cruz-Garcia's *Strickland* arguments or whether all are procedurally barred.

### A.      Federalism and Cruz-Garcia's Arguments

The parties debate how to consider Cruz-Garcia's ineffective-assistance allegations against his trial attorneys.  The debate centers on whether AEDPA deference applies to any portion of Cruz-Garcia's *Strickland* claim.  Cruz-Garcia argues that he presents "a single, unitary ineffective assistance of trial counsel . . . claim," which he exhausted in the successive habeas application that

56

the Court of Criminal Appeals dismissed as an abuse of the writ.  (Docket Entry No. 83 at 30).

From that, Cruz-Garcia argues that he can overcome the resulting procedural bar of his *Strickland*

arguments and that federal review is *de novo*.    (Docket Entry No. 83 at 30).   Cruz-Garcia's

characterization of his claims does not fairly represent how he litigated them and how they fit into

federal habeas practice.

Cruz-Garcia first challenged trial counsel's representation in his initial state habeas

application.  There, Cruz-Garcia raised several challenges to trial counsel's representation, each

as a separate ground for relief.  *See Cruz-Garcia*, 2017 WL 4947132 at *2 (listing Cruz-Garcia's

*Strickland* claims).  The state habeas court denied each of those claims on the merits.  Generally,

a federal habeas court would apply AEDPA deference to what Cruz-Garcia exhausted in his initial

state habeas application.

Cruz-Garcia's choices on how to brief his claims have set up the procedural issues before

the court.  In his initial federal petition, Cruz-Garcia rolled all his previous *Strickland* arguments

into a single claim.  Cruz-Garcia's petition raised one *Strickland* claim that included numerous

"reasons" for which "[t]rial counsel were ineffective . . . ."  (Docket Entry No. 12 at 9).  Cruz-

Garcia included among those "reasons" the claims he had raised in his initial state habeas

application.  (Docket Entry No. 12 at 9-117).  Cruz-Garcia's first amended petition added new

subcategories of alleged deficiencies. (Docket Entry No. 18 at 14-123).

Cruz-Garcia's briefing did not meet AEDPA's standards.  The court ordered Cruz-Garcia

to "identify with clear and concise language the legal and factual basis for each ground for relief"

and "specify, with precise citations to the state court record, whether [he] has exhausted each claim

in state court."  (Docket Entry No. 33 at 4).  In his response, Cruz-Garcia asserted that his

*Strickland* arguments were "not presented in [his] state post-conviction application." (Docket Entry No. 38 at 54). In his later motion to stay the federal habeas proceedings to permit exhaustion, Cruz-Garcia argued that the *Strickland* arguments were "a new, unexhausted claim that was not presented to the state court." (Docket Entry No. 46 at 13).

The respondent's briefing divided Cruz-Garcia's *Strickland* claims into 21 parts and urged the court to apply AEDPA deference to the parts Cruz-Garcia had exhausted in state court. The respondent argued that the remaining parts were "unexhausted and procedurally defaulted." (Docket Entry No. 47 at 27, 29, 31, 37, 52, 54).

The court stayed the case to allow exhaustion. (Docket Entry No. 59). Cruz-Garcia's second successive state habeas petition included the same sweeping *Strickland* claim as his federal petition. Cruz-Garcia again did not acknowledge that he had already litigated several *Strickland* claims in state court. In fact, Cruz-Garcia argued that successive state proceedings should be available because his original habeas attorneys did not "identify evidence of, and raise allegations of, trial counsel's ineffectiveness." (Docket Entry No. 89-4 at 367). It is unclear why Cruz-Garcia did not accurately describe his earlier *Strickland* claims.

Cruz-Garcia's second amended federal habeas petition—the one currently before the court—reorders the *Strickland* arguments. In wide-ranging briefing, Cruz-Garcia asserts an omnibus *Strickland* claim that extensively criticizes trial counsel's work. (Docket Entry No. 73 at 54-190). Cruz-Garcia argues the same errors he alleged in the initial state habeas application and mixes those alleged errors with other arguments that he exhausted in his second successive habeas application. Cruz-Garcia's second amended habeas petition discusses his ineffective-assistance claims as if the state courts had never addressed them.

The respondent has tracked Cruz-Garcia's *Strickland* claims and submitted a chart describing their evolution. (Docket Entry No. 85 at 106-07). The respondent's briefing breaks down Cruz-Garcia's claims by sub-heading and addresses the different procedural status of each argument.[20] The respondent argues that: Cruz-Garcia has not met the AEDPA standards for the subclaims exhausted in his initial state habeas application; others are time barred; most are procedurally defaulted; and all are meritless. The respondent argues that any parts of the *Strickland* claim that Cruz-Garcia did not raise in his initial state habeas application are procedurally barred.

Cruz-Garcia responds that he presented a "unitary" *Strickland* claim in his successive state habeas application, which this court should consider only as presented in that forum. (Docket Entry No. 86 at 30). Cruz-Garcia accuses the respondent of "improperly attempt[ing] to claim-split." (Docket Entry No. 86 at 30). Cruz-Garcia does not describe what he means by "claim splitting," much less point to federal law prohibiting the respondent's arguments. Cruz-Garcia apparently faults the respondent for separating his single omnibus claim into manageable subclaims (such as Cruz-Garcia did on initial state habeas review). Cruz-Garcia argues that federal law allows the court to ignore the adjudication of earlier *Strickland* claims because he has rolled them into a "unitary" *Strickland* with others he later defaulted in state court. Cruz-Garcia argues

---

[20]     AEDPA enacted a strict one-year limitations period. *See* 28 U.S.C. § 2244(d)(1)(A). Respondent argues AEDPA's limitations period bars subclaims 4(D), 4(E), and 4(C)(7) because Cruz-Garcia did not raise them in his initial petition. (Docket Entry No. 85 at 125-26). These subclaims involve trial counsel's communication with Cruz-Garcia, failure to request a continuance, and alleged failure to review the State's file. Cruz-Garcia mentioned issues similar to those in his initial petition, but did not necessarily designate them grounds for relief. Federal Rule of Civil Procedure 15(c)(2) instructs that an amended pleading relates back to the date of the original pleading when the claim asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Amendments do not relate back if they assert "a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005). However, if the "original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Id.* at 664. While Cruz-Garcia's briefing has made it somewhat difficult throughout to ascertain what he intends as grounds for relief, the court finds that the challenged claims are sufficiently tied to his earlier facts such that they do not run afoul of AEDPA's limitations period.

that combining his rejected claims into one ground for relief—and then interjecting new arguments—bypasses AEDPA's requirements.

It has become common for petitioners to exhaust a claim in state court and then submit a federal petition expanding the earlier legal and factual arguments. Because AEDPA defers to a state court adjudication, petitioners often argue that their expanded arguments transform an adjudicated claim into a new, undecided claim. This approach requires federal courts to decide "where to draw the line between new claims and claims adjudicated on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 n.10 (2011). Federal courts must decide whether new arguments "fundamentally alter[] the legal claim" or "place[] the claim in a significantly different legal posture" that turns it into a new claim. *See Nelson v. Davis*, 952 F.3d 651, 671 (5th Cir. 2020) (quotations omitted); *see also Broadnax v. Lumpkin*, 987 F.3d 400, 408 (5th Cir. 2021); *Ward v. Stephens*, 777 F.3d 250, 258 (5th Cir. 2015).

In this case, however, the issue is not whether Cruz-Garcia exhausted his *Strickland* claim. Cruz-Garcia raised all his *Strickland* arguments in state court. The issue is whether AEDPA deference applies to the matters which the state courts adjudicated on the merits.

Cruz-Garcia does not explain how or why this court should ignore the state court adjudication of his *Strickland* claims. AEDPA requires deference to the state court's adjudications on the merits in the initial state habeas action. If Cruz-Garcia had chosen to brief his *Strickland* arguments as he had in his initial state habeas application—raising each *Strickland* argument as a separate ground for relief—this court would apply AEDPA's relitigation bar to those arguments and then consider how the procedural-bar doctrine impacts consideration of the remaining claims. Instead, Cruz-Garcia barely mentions the earlier adjudication, much less addresses how he can

60

sidestep AEDPA review merely because he has combined the previously adjudicated arguments and the procedurally defaulted arguments into one section of his second amended petition.

Cruz-Garcia cannot escape AEDPA review because his federal habeas briefs combined the claims from his initial habeas application with claims he defaulted in his second successive state habeas application.  The Fifth Circuit has recently condemned the practice of "rais[ing] different claims at different times with different facts in the state court, then smush[ing] them all together into a single claim in federal court." *Lucio*, 987 F.3d at 480.  This practice has "no basis in law." *Id*.; *see also Nelson v. Lumpkin*, ___ F.4th ___, 2023 WL 4286171, at *6 (5th Cir. 2023) (recognizing that the Fifth Circuit has never held that "a state prisoner could avoid § 2254(d)'s limitations by presenting new evidence that fundamentally altered a claim already adjudicated in state court proceedings").  Cruz-Garcia cannot transform an adjudicated *Strickland* claim (or claims) into a procedurally barred one by ignoring what the state court "knew and did." *Pinholster*, 563 U.S. at 182.  Because Cruz-Garcia has changed his *Strickland* arguments over time, the court "must analyze each claim as it existed at the time [he] presented it to the state courts." *Lucio*, 987 F.3d at 480.

The court rejects Cruz-Garcia's arguments asserting "claim splitting" and considers the claims raised in his initial state habeas application under the AEDPA standard before deciding whether he can overcome the procedural bar as to the remaining claims.

Cruz-Garcia's initial state habeas application alleged that counsel's performance was deficient by:

- Not presenting evidence from an expert to challenge the DNA evidence at trial (federal claim (4)(F)(1)).

- Not investigating and presenting evidence in the guilt/innocence phase relating to Cruz-Garcia's alleged sexual relationship with Diana Garcia and his drug dealing with Diana Garcia and Arturo Rodriguez (federal claims (4)(F)(4), (5)).
- Not presenting evidence that Cruz-Garcia would not be a future societal danger (federal claim (4)(G)(3)).
- Insufficiently investigating and presenting mitigating evidence (federal claims (4)(G)(1), (2)).
- Failing to recognize Cruz-Garcia's foreign nationality and seek the help of the Dominican Republic consulate (federal claim (4)(K)).
- Failing to have the trial court record its conversation with juror Bowman (federal claim (4)(I)).
- Failing to adequately investigate the possibility of juror misconduct (federal claim (4)(I)).

(Docket Entry No. 23-38 at 8-9, 11-13); *see also Cruz-Garcia*, 2017 WL 4947152 at \*2 (listing his *Strickland* claims).  Cruz-Garcia also alleged that the cumulative effect of counsel's errors was prejudicial.  (Docket Entry No. 23-38 at 13).  Additionally, the state habeas court adjudicated the merits of a related complaint about appellate counsel's representation (federal claim eight).  The court applies AEDPA deference to the state court adjudications.

**B.     The State Court's Review of Counsel's Representation**

Before turning to the AEDPA review of those portions of the *Strickland* claim that the state court adjudicated, the court pauses to recognize the state court's general endorsement of trial counsel's representation.  The trial court ordered both trial attorneys (Cornelius and Madrid) to submit affidavits describing their representation.  (Docket Entry No. 24-1 at 138-44, 146-48).  The lead investigator, Gradoni, also provided an affidavit.  (Docket Entry No. 24-1 at 151-53).  With that factual development, and its own recollection of the trial proceedings, the state habeas court made specific findings about trial counsels' general level of representation.

The state habeas court was complimentary, nearly laudatory, of lead counsel's qualifications and high level of professional service.  (Docket Entry No. 24-1 at 97).  The state

habeas court heavily relied on "the credible habeas affidavit of trial counsel Cornelius," who was "very well-qualified to represent" Cruz-Garcia.  (Docket Entry No. 24-1 at 97).  The state habeas court found, "based on personal recollection, the trial record, and the affidavits submitted by trial counsel and their investigator," that trial counsel's representation "was competent under prevailing professional norms."  (Docket Entry No. 24-1 at 96).  Looking at "the totality of the representation," the state habeas court found that Cruz-Garcia "fail[ed] to demonstrate that trial counsel was deficient in the representation of [him] at either phase of trial" or "establish that [he] was harmed on the basis of any alleged deficiency in trial counsel's representation." (Docket Entry No. 24-1 at 96, 121).

The Court of Criminal Appeals concluded that Cruz-Garcia "failed to meet his burden under *Strickland*" because he "fail[ed] to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Cruz-Garcia*, 2017 WL 4947132 at *2.  With that background, the court turns to the claims Cruz-Garcia raised in his initial state habeas application.

### C.    The DNA Evidence (Claim (4)(F)(1))

Cruz-Garcia argues that trial counsel was deficient in challenging the State's DNA evidence.  (Claim (4)(F)(1)).  Cruz-Garcia faults trial counsel for "simply accept[ing] the DNA results reported by the State."  (Docket Entry No. 73 at 108).  Cruz-Garcia emphasizes that the retained attorneys he had hired before trial were concerned about the DNA evidence and had reached out to an expert in DNA testing.  The retained attorneys withdrew before the expert performed any testing.  When Cruz-Garcia's appointed attorneys took over, they did not engage an expert to do independent testing.  Cruz-Garcia alleges that, if his trial attorneys had sought

expert assistance, they could have identified problems with the storage and handling of the DNA evidence.

The claim Cruz-Garcia raised in his initial state habeas application had a specific focus: "Had trial counsel retained an independent DNA analyst to review the DNA testing performed by the State, they could have presented testimony at the suppression hearing that, in fact, the very issues endemic to the HPD crime lab in the early 1990s were present here."  (Docket Entry No. 23-38 at 36).  Cruz-Garcia also alleged that an expert could have "call[ed] into question the DNA testing and analysis performed by Orchid Cellmark."  (Docket Entry No. 23-38 at 36).

Cruz-Garcia supported his state habeas claim with affidavits from experts who did not perform any new testing.  Cruz-Garcia's state habeas experts reviewed the records to identify general concerns about the storage, handling, and testing of the DNA evidence. (Docket Entry No. 23-38 at 225-33, 275-77).  Even though Cruz-Garcia's federal petition supports this claim with new evidence, federal review is only on the evidence he presented to state court. *See Pinholster*, 563 U.S. at 185 n.7 (stating that § 2254(d) "requires an examination of the state-court decision at the time it was made").  Cruz-Garcia must show that the state determination was unreasonable or contrary to Supreme Court authority based on the evidence he put before the state courts when exhausting this claim.

Cruz-Garcia places particular reliance on the testimony of a DNA expert, Daniel Hellwig. Hellwig identified concerns about the handling and treatment of the DNA evidence, particularly from the vaginal swab and underwear.  (Docket Entry No. 23-38 at 226).  Hellwig also raised concerns about the methodology used in the DNA tests.  Importantly, Hellwig did not suggest that Cruz-Garcia had not contributed to the DNA mixture taken from the sexual assault, but he

criticized "the inclusion of Arturo Rodriguez in the mixture DNA" because "[t]he laboratory did not do a statistical calculation on this DNA mixture." (Docket Entry No. 23-38 at 227). Hellwig also would not have included Arturo Rodriguez in the DNA taken from the underwear.

The state habeas court found that trial counsel's performance was constitutionally sufficient. (Docket Entry No. 24-1 at 97). The state habeas court emphasized that trial counsel did not leave the DNA evidence unchallenged: "Trial counsel filed a pre-trial motion to suppress the results of all DNA testing which focused on problems with the old HPD crime lab and alleged that the physical evidence in [Cruz-Garcia's] case was contaminated and the DNA analysis was unreliable." (Docket Entry No. 24-1 at 97). Trial counsel supported this challenge with important information, including "the Bromwich report, the HPD internal affairs investigation summary, and internal complaint reports regarding various HPD crime lab employees." (Docket Entry No. 24-1 at 97).

The state habeas court found that trial counsel "made a reasonable trial strategy decision regarding whether to retain a DNA expert." (Docket Entry No. 24-1 at 101). The state habeas court emphasized that trial counsel had years of experience handling DNA issues in criminal trials. Trial counsel "thoroughly reviewed the DNA evidence in [Cruz-Garcia's case] and made the best record and argument that he could to suppress [the DNA evidence]." Despite his efforts, "the State's evidence at the suppression hearing demonstrated that the [DNA] evidence at issue was sufficiently preserved." (Docket Entry No. 24-1 at 101). The state habeas court found that the affidavits Cruz-Garcia submitted did not prove deficient representation. (Docket Entry No. 24-1 at 101). The state habeas court, however, did not expressly discuss Hellwig's opinion about the DNA testing methodology.

Cruz-Garcia has not shown that the state habeas findings were contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2245(d)(1). Trial counsel made a strong effort to suppress the DNA evidence in this case. The substance of Cruz-Garcia's federal argument is that a DNA expert would have helped counsel do so more effectively. This is an argument over decisions on trial strategy, decisions that are hard for courts to second guess and are entitled to deference. *See Pape v. Thaler*, 645 F.3d 281, 292 (5th Cir. 2011) ("We continue to extend highly deferential treatment to counsel's sentencing strategy and tactical decisions."). Indeed, the Supreme Court describes such choices as "virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *Strickland*, 466 U.S. at 690.

Trial counsel's efforts reflect a familiarity with the DNA evidence. With that familiarity, trial counsel formulated a strategy that did not require the assistance of a DNA expert. Trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017); *see also Richter*, 562 U.S. at 107 (observing that an effective attorney is "entitled to formulate a strategy . . . to balance limited resources in accord with effective trial tactics and strategies"). The state habeas court was reasonable in finding no deficient performance.

Cruz-Garcia has also not shown that the state habeas court was unreasonable in finding no *Strickland* prejudice. Cruz-Garcia's state habeas arguments were similar to those trial counsel had raised and would not have resulted in excluding or undermining the DNA evidence. The state habeas court emphasized that the arguments about the storage and handling of the DNA evidence did not alter the ultimate testing results: "it would be difficult to contaminate the evidence *with* [Cruz-Garcia's] DNA." (Docket Entry No. 24-1 at 101) (emphasis added). Cruz-Garcia's

arguments did not exclude him as a contributor to the DNA taken from the sexual assault.  Cruz-Garcia attempts to explain the presence of his DNA by saying that he had a consensual sexual relationship with Diana Garcia and that someone else must have raped her.  His argument, however, depends on layers of speculation.  The evidence showed that Arturo Rodriguez could not scientifically be included in the DNA results.  From that, Cruz-Garcia speculates that a third man's DNA was in the sample.  He then assumes that his DNA was there only from consensual intercourse with Diana Garcia.  But Cruz-Garcia has not produced or pointed to admissible evidence of such a relationship or evidence (including his own account) that he had consensual sexual relations with Diana Garcia on the day of the murder.  And Cruz-Garcia has not explained why he told Santana that he had raped Diana Garcia.

The state habeas court could reasonably find no reasonable probability of a different result even if counsel had called a DNA expert in the liability phase.  The court denies Cruz-Garcia relief on this claim.

### D.     The Liability Phase Investigation (Claims 4(F)(4), (5))

In the initial state habeas action, Cruz-Garcia challenged trial counsel's representation in the first phase of the trial on two grounds.  First, Cruz-Garcia alleged that trial counsel should have discovered proof that he had an on-going consensual sexual relationship with Diana Garcia.  (Docket Entry No. 23-38 at 55-57).  Second, Cruz-Garcia alleged that trial counsel should have proven that Diana Garcia and Arturo Rodriguez had not stopped selling drugs for him at the time of the crime.  (Docket Entry No. 23-38 at 57-58).  Cruz-Garcia renews those arguments as claims 4(F)(4) and (5) in his second amended petition.  Cruz-Garcia has not met AEDPA's standard as to either argument.

*Consensual sexual relationship*:   The DNA evidence placed the defense in a difficult position.  As one of the three pillars to the State's case against him, the defense would have to come up with some excuse for the evidence that Cruz-Garcia's DNA was in the genetic material preserved after the sexual assault.  Trial counsel tried to suggest that Cruz-Garcia had an ongoing consensual sexual relationship with Diana Garcia.  For instance, during the cross-examination of Arturo Rodriguez, trial counsel asked whether Cruz-Garcia was "dating" his wife.  (Docket Entry No. 23-5 at 24).  Rodriguez answered, "That I know of, no." (Docket Entry No. 23-5 at 24).  Trial counsel also asked the State's DNA analyst whether testing could differentiate between a sexual assault and consensual sex.  (Docket Entry No. 23-7 at 137-38).  Trial counsel's summation suggested that Diana Garcia and Cruz-Garcia may have been having a sexual relationship.  (Docket Entry No. 23-9 at 51).

On state habeas review, Cruz-Garcia argued that trial counsel should have supported his argument that he had had a consensual sexual relationship with Diana Garcia with testimony from three of his friends, Cesar Rios, Jose Valdez, and Hector Saavedra.  Cruz-Garcia presented affidavits from each of the men.  Valdez stated that he himself had a sexual relationship with Diana Garcia and that "[t]o my knowledge, Diana was also messing around with other guys, including Chico [Cruz-Garcia's nickname]." (Docket Entry No. 23-39 at 132).  Valdez also stated that Cruz-Garcia and Diana Garcia "were having sex was around the same time Angelo was kidnapped." (Docket Entry No. 23-39 at 132).  His affidavit, however, showed that he based his information on hearsay: "I found out about Chico and Diana messing around from my family."  (Docket Entry No. 23-39 at 132).  Rios stated in his affidavit that "[a]round the time Angelo was kidnapped, Chico was having an ongoing sexual relationship with Diana.  Other people knew about it as well.

On the day Angelo was kidnapped, Chico was over at Diana's apartment earlier in the day."
(Docket Entry No. 23-39 at 118).  Rios's brother, Hector Saavedra, stated: "I knew that Diana was
sleeping with my brother, Joe, and also that she was sleeping with Obel."  (Docket Entry No. 23-
39 at 123).

Trial counsel did not interview these three men.  Cornelius's habeas affidavit explained
why:

> We attempted to develop through cross examination and argument a consensual
> sexual relationship with Diana Garcia, however without the defendant's testimony,
> or any witnesses to support it, we could not actually offer direct proof of this. If we
> had evidence of a consensual sexual relationship this would have been our best
> attempt to naturalize the DNA evidence. We explained this to him numerous times.
> He never told us about the alleged witnesses Cesar Rios, Jose Valdez, or Hector
> Saavedra. The defendant consistently and emphatically told us that Jesus would
> deliver him. That Jesus would turn the State's witnesses tongues into snakes. He
> was not interested in testifying or calling witnesses, or contacting his consulate.
>
> I have contacted the investigative team to see if any of them ever heard one word
> about these three alleged witnesses, or any other Witnesses that could help on this
> or any other issue, and no one has ever heard of them, except as shown in the
> affidavit of JJ Gradoni, where he explains that the investigators developed a "Cesar
> Mala Rios" from the offense reports but all efforts to find him were unsuccessful;
> and further, Cesar Mala Rios was never mentioned by the defendant.

(Docket Entry No. 24-1 at 140-41).  Mr. Madrid also explained: "We attempted to do this by
arguing a consensual sexual relationship. We were hampered in our defense because our client
would not discuss any facts of the case. He insisted that God would set him free but refused to
discuss the case." (Docket Entry No. 24-1 at 3).  The trial investigator "on more than one occasion"
asked Cruz-Garcia "if he could explain how his semen was found in the rape kit," but he only
responded that "[e]verything will be revealed in the trial because God will convert their tongues
into snakes and they will only be able to tell the truth."  (Docket Entry No. 24-1 at 9).

Even without Cruz-Garcia's assistance, trial counsel tried to develop a consensual-sexual-relations defense.  Madrid explained:

> We attempted to develop[] the theory of a consensual relationship through cross examination and argument. As I stated previously, Mr. Cruz Garcia would not discuss any facts of the case with defense counsel or our investigator. We could not offer direct proof a consensual relationship. without the defendant's testimony or any witnesses to support the possible relationship.  Our investigator, J.J. Gradoni made efforts to speak with all witnesses.  However, there were no witnesses who could provide testimony of a consensual sexual relationship between Obel Cruz Garcia and Diana Garcia.

(Docket Entry No. 24-1 at 3).  One trial investigator's affidavit verified that he had identified Cesar Mala Rios as an associate of Diana Garcia from a police offense report, but Cruz-Garcia did not provide any useful information, and the investigator's efforts to find Rios were not successful. (Docket Entry No. 24-1 at 9).

The state habeas court found that defense counsel "was hampered in their efforts to develop and present evidence of a consensual sexual relationship." (Docket Entry No. 24-1 at 102).  The state habeas court based this decision on three primary factors.  First, the state habeas court found that there was an absence of "direct evidence" about the alleged consensual relationship.  Neither Cruz-Garcia nor Diana Garcia had provided an affidavit or other testimonial account describing the alleged consensual relationship.  The men who provided the affidavits on which Cruz-Garcia bases this claim did not provide any personal observations or knowledge about the alleged consensual relationship.  In fact, the state habeas court found that the affidavits from the three men did not contain "admissible evidence of an alleged consensual sexual relationship between [Cruz-Garcia] and Diana Garcia."  (Docket Entry No. 24-1 at 104).

Second, the state habeas court found that "trial counsel explained to [Cruz-Garcia] numerous times that evidence of consensual sexual relationship with Diana Garcia would have

been the best attempt to naturalize the State's DNA evidence," but Cruz-Garcia would not talk about the facts of the case.  (Docket Entry No. 21-1 at 102).  Cruz-Garcia was the best source of information about any alleged consensual sexual relationship.  Yet Cruz-Garcia "never told counsel about alleged witnesses Cesar Rios, Jose Valdez or Hector Saavedra," and did not identify them as "potentially beneficial defense witnesses."  (Docket Entry No. 21-1 at 102-03).

Third, the state habeas court found that a defense team investigator could not find any witnesses who could validate the alleged consensual relationship.  The defense had received information from police reports that a man named Cesar Rios may have information of some sort, but the defense could not locate him.  (Docket Entry No. 21-1 at 103).  Trial counsel made efforts to prove the existence of a consensual relationship but could not, largely because of Cruz-Garcia's refusal to help.

Cruz-Garcia must show that the state court's decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  The evidence developed on state habeas review plainly shows that Cruz-Garcia did not provide his defense team with information that could have led to witnesses who could have supported a consensual-sexual-relations defense.  The Supreme Court in *Strickland* recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."  466 U.S. at 691.  While an attorney has an independent duty to investigate, "[t]he scope of the attorney's duty to investigate may be limited by a defendant's lack of cooperation."  *Randle v. Scott*, 43 F.3d 221, 225 (5th Cir. 1995); *see also Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) ("In determining the reasonableness of

decisions not to investigate, information provided by the defendant is only one factor, but in some cases it may be the controlling fact. . . .").

By refusing to help his attorneys, Cruz-Garcia can prove counsel's ineffectiveness only by pointing out independent leads that a reasonable attorney could have followed without his information or cooperation. Cruz-Garcia has not shown that counsel should have known about the alleged relationship or sources of proof about it. Cruz-Garcia emphasizes that in his affidavit, Rios stated that he "remember[ed] talking to one person on the defense team briefly; but [he] never spoke with them again after that." (Docket Entry No. 23-39 at 119). With that, Cruz-Garcia speculates that the defense team contacted Rios but did not follow up to develop his information. (Docket Entry No. 86-40). Cruz-Garcia, however, does not provide enough information to overcome the presumably correct state fact findings. More than one set of attorneys represented Cruz-Garcia at trial. Cruz-Garcia's argument does not identify whether his trial attorneys and investigators were the ones who were able to contact Rios. And Rios does not describe any details of what he told any person from the defense team, much less that he said enough to lead them to know that he had information about a relationship between Diana Garcia and Cruz-Garcia. The affidavit statement does not provide a basis to overcome the state finding that counsel provided constitutionally adequate representation. The state finding of no *Strickland* deficient performance was not unreasonable.

Nor has Cruz-Garcia met the AEDPA standard on *Strickland* prejudice. Testimony that Cruz-Garcia was one of some number of men having consensual sexual relations with Diana Garcia could have been useful to the defense. Yet the evidence on which Cruz-Garcia bases his *Strickland* claim is beset with problems. The State's closing argument pointed out the difficulty

72

with the defense's theory: even testimony about a consensual sexual relationship on some prior occasion does not undermine or contradict Diana Garcia's testimony that she was raped during the home invasion; does not provide another source of DNA besides Cruz-Garcia from the rape; and does not undermine other testimony describing Cruz-Garcia's role in the home invasion, kidnapping, and murder. (Docket Entry No. 23-9 at 82-83).

The DNA evidence recovered after the rape showed genetic material from two men. One was Diana Garcia's husband. The other was Cruz-Garcia. Even if Cruz-Garcia had a consensual relationship with Diana Garcia at some point in the past, that does not contradict the evidence that he raped her on the night of the home invasion. Cruz-Garcia himself told Santana that "he had raped Ms. Diana." (Docket Entry No. 23-6 at 147). With that confession, Cruz-Garcia has not shown that the state habeas court's finding of no *Strickland* prejudice was contrary to, or an unreasonable application of, federal law. Relief on this claim is denied.

*Drug Dealing*: Cruz-Garcia challenges the "[t]he State's theory of Mr. Cruz-Garcia's motive for assaulting Ms. Garcia and Mr. Rodriguez was retaliation because they had stopped selling drugs for him." (Docket Entry No. 73 at 126). The State's opening argument stated that Diana Garcia and Arturo Rodriguez had sold drugs for Cruz-Garcia but had stopped at some point before the alleged crimes:

> And you will learn that Diana and Arturo had stopped selling for the defendant a short time before Angelo's kidnapping or by the time that Angelo went missing. They had stopped selling. They thought they were being watched by the police, so they said: No more.

(Docket Entry No. 23-4 at 37). Diana Garcia and Arturo Rodriguez testified that they sold drugs for Cruz-Garcia, but that they had stopped selling a few weeks before the crime occurred. Arturo Rodriguez testified that "[i]t had already been about a month to a month-and-a-half that [he] wasn't

73

selling anything" because the police "were watching" them.  (Docket Entry No. 23-5 at 36).  But both admitted on cross-examination that they had lied to the police about their drug dealing. (Docket Entry No. 23-4 at 194-95, 222).

Cruz-Garcia argues that trial counsel should have tried to show that Diana Garcia and Arturo Rodriguez continued to sell drugs for him.  Cruz-Garcia relies on a police report that indicates that the couple sold drugs on the day of the home invasion.  (Docket Entry No.18-24 at 1-2).  From that, Cruz-Garcia criticizes trial counsel for "failing to show that Ms. Garcia and Mr. Rodriguez *lied to the* jury about whether they *stopped* selling drugs, thereby somehow causing Mr. Cruz-Garcia to become upset with them."  (Docket Entry No. 86 at 39) (emphasis in original).

Trial counsel cross-examined both Diana Garcia and Arturo Rodriguez.  The state habeas court expressly found that "[o]n cross-examination of Diana Garcia and Arturo, trial counsel obtained admissions from both witnesses that they initially lied to police about their involvement in drug dealing." (Docket Entry No. 24-1 at 104).  There is no basis to show that additional cross-examination would have shown not only that the couple was selling drugs, but that they were still selling drugs for Cruz-Garcia.  Santana testified that Cruz-Garcia led the home invasion by telling the others involved "[l]et's go to Diana and Arturo's to seek for the drugs—to seek for my drugs and my money."  (Docket Entry No. 23-6 at 137).  But Cruz-Garcia's specific reasons for leading the home invasion and committing the subsequent crimes was not a major consideration for jurors. "[M]otive is not an element of murder or capital murder."  *Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010).  The jury did not have to determine why Cruz-Garcia orchestrated the home invasion.

74

The jury knew that Diana Garcia and Arturo Rodriguez had lied about their involvement in trafficking drugs. Cruz-Garcia has not shown that trial counsel was deficient for not presenting additional information about whether they were still selling for him or not, or that more information would lead to a reasonable probability of a different result. The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). Relief on this claim is denied.

### E.     The Future-Dangerousness Investigation (Claim 4(G)(3))

Cruz-Garcia complains that trial counsel provided deficient representation relating to the future-dangerousness special issue. One of the special issues the jurors answered asked whether there "is a probability" that he would "commit criminal acts of violence that would constitute a continuing threat to society." (Docket Entry No. 22-10 at 74). Cruz-Garcia claims that trial counsel did not do enough to convince jurors that he would not act violently in the future.

Trial counsel approached the punishment phase against the backdrop of his experience as a capital litigator. Trial counsel's affidavit voiced deep skepticism about the Texas law that relied on future dangerousness in capital sentencing and also about Harris County's prosecution of capital crimes. Trial counsel opined that jurors are "hard wired to automatically find that in a case where a defendant who commits a grisly capital murder, it is, at least, automatically probable that he or she will be a continuing threat." (Docket Entry No. 24-1 at 142). Counsel's skepticism stemmed from his experience trying numerous capital cases:

> I have not won a case on the future dangerousness question, or seen it done: I have had a few cases where the capital murder was the defendant's only crime and I felt it was a compelling argument to challenge the State on future dangerousness but, as I said, to no avail. Another reason for this is the State does not seek the death penalty on cases where the crime is an aberration or where the defendant does not

have a history. Not even in Harris County. Unless, of course, the crime itself is so
horrific that no other conclusion could be drawn.

(Docket Entry No. 24-1 at 142).  Counsel did not make a "rash decision" about his approach to the

future dangerousness issue.  Instead, he used his experience and expertise to conclude that the

evidence, including evidence of Cruz-Garcia's violent past, meant that the defense was "not going

to win on future danger" and, in fact, "an impassioned plea that he would not be a future danger"

would cause him to lose credibility with jurors.  (Docket Entry No. 24-1 at 142).  Counsel felt that

"a defense lawyer's personal credibility with a jury is the single most important factor in a

successful outcome at trial," and he "did not feel [the defense] had much of a chance on the issue

of future dangerousness in this trial."  (Docket Entry No. 24-1 at 142).  Counsel did not focus on

the future-dangerousness issue.

The record does not cast doubt on counsel's approach.  The jury had convicted Cruz-Garcia

for his role in the violent invasion, rape, and then the kidnapping and killing of a young child.  This

was not the only evidence of violent acts that Cruz-Garcia committed in furtherance of his drug

trafficking.  The penalty-phase testimony recounted various times Cruz-Garcia had viciously

assaulted others when he believed they stole drugs or money from him.  Santana testified that

Cruz-Garcia often took money and drugs from other drug dealers, often by violence.  In a similar

crime, Cruz-Garcia and others broke into a drug competitor's apartment, bound him, and then

raped his girlfriend.  On another occasion, Cruz-Garcia kidnapped another man named Saul Flores

and killed him by beating him with a hammer, strangling him, and injecting him with drugs.

Cruz-Garcia's past violence was not only toward other drug dealers.  He threatened

violence against his wife's family when she asked for a divorce. When he was arrested for this

offense, Cruz-Garcia was serving time in Puerto Rico for kidnapping a man and a teenager, beating

and torturing them, and holding them for ransom.  While incarcerated in Puerto Rico, prison officials caught him with contraband prepared for use in an escape.  While incarcerated here waiting for his trial, he was found with a weapon.  Nonetheless, Cruz-Garcia argues that trial counsel did not do enough to show jurors that he would not be a continuing threat to society.

*The State Habeas Claim*:  On state habeas review, Cruz-Garcia alleged that defense counsel did not adequately use two sources to counter the evidence of his violent history.  First, Cruz-Garcia alleged that trial counsel "fail[ed] to review the District Attorney's file and identify evidence that [he] would not be a future danger."  (Docket Entry No. 23-38 at 62).  Cruz-Garcia alleged that counsel did not review the voluminous material in the files at the District Attorney's Office because of a misunderstanding about access.  Cruz-Garcia argued that trial counsel thought the State would deliver any *Brady* material, not just open it to the defense.   Cruz-Garcia alleged that an adequate review of the State's files would have uncovered "a full banker's box worth of documents in Spanish that appeared to be records from Cruz-Garcia's incarceration," which "revealed significant evidence of [his] positive behavior while in prison."  (Docket Entry No. 23-38 at 66).  Cruz-Garcia argued that trial counsel should have used the prison records to show that he did not have any disciplinary actions or grievances filed against him and, in fact, had earned good-time credit based on his behavior and hard work.

Second, Cruz-Garcia faulted counsel for not performing an investigation in Puerto Rico that would have turned up testimony from prison officials and others.  Cruz-Garcia specifically faulted counsel for not presenting testimony from four chaplains who would have testified that he stood out as a well-behaved, responsible inmate.  The chaplains would have described Cruz-Garcia as a caring inmate who was a calming influence on others.  Cruz-Garcia also faulted trial counsel

for not discovering the testimony of a prison psychologist who would have described him as sincere in his faith.

*The Federal Claim*: In claim 4(G)(3), Cruz-Garcia again challenges the preparation and presentation of evidence relating to the future-dangerousness issue. Cruz-Garcia argues that, had counsel presented the defense he proposes on federal review, at least one juror would have answered the future-dangerousness issues in the negative. Cruz-Garcia has expanded his claim beyond the allegations and evidence he presented in state court.[21] AEDPA confines this federal consideration to what he exhausted in state court in a procedurally proper manner. The court considers the allegations he presented in his initial state habeas application.

*AEDPA Review*:   When considering future dangerousness, "it is essential . . . that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 275-76 (1976). The Court of Criminal Appeals has recognized a nonexhaustive list of factors a jury may consider in determining whether a capital defendant sentenced to prison will pose a continuing threat of violence, including:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;

---

[21]     Cruz-Garcia no longer challenges only counsel's efforts relating to his time incarcerated in Puerto Rico, but his claim proceeds along two separate paths. Cruz-Garcia now primarily emphasizes trial counsel's failure to investigate some of the extraneous offenses on which the State relied to show his future dangerousness. (Docket Entry No. 73 at 155-59). Cruz-Garcia complains that the defense could have provided jurors information about those crimes that either proved them false or at least blunted their impact. Cruz-Garcia has also obtained affidavits from (1) a classifications supervisor from a Puerto Rican prison who would testify that he was a changed man who would not pose a security threat; (2) the prison psychologist, who provided an affidavit on state habeas review; (3) an expert on the Puerto Rican penal system; and (4) his common-law wife, who could describe his life while incarcerated. (Docket Entry No. 73 at 164-67). Cruz-Garcia put these allegations before the state court only in his successive state habeas application.

4.     the existence of a prior criminal record, and the severity of the prior crimes;

5.     the defendant's age and personal circumstances at the time of the offense;

6.     whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7.     psychiatric evidence; and

8.     character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *see also Walbey v. State*, 926 S.W.2d 307, 311 (Tex. Crim. App. 1996); *Devoe v. State*, 354 S.W.3d 457, 461-62 (Tex. Crim. App. 2011). "Often, the circumstances of the crime provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the future dangerousness special issue." *Dewberry v. State*, 4 S.W.3d 735, 741 (Tex. Crim. App. 1999).

The State presented a strong case for answering the future-dangerousness issue in the affirmative. The jury found Cruz-Garcia guilty of committing a violent home invasion and a sexual assault, kidnapping, and ordering the murder of a young child who could identify him. The evidence showed that these acts were far from aberrant. Cruz-Garcia had previously committed numerous violent offenses that the evidence showed were done with calculation and in a leadership role. Cruz-Garcia's crimes spanned a lengthy period. Both in Houston and in Puerto Rico, Cruz-Garcia engaged in brutal violence, kidnapped innocent victims, and threatened to kill others. The defense faced overwhelming evidence of Cruz-Garcia's violence, including "the most powerful imaginable aggravating evidence"—that he had committed another murder. *Wong v. Belmontes*, 558 U.S. 15, 28 (2009) (quotation omitted).

Cruz-Garcia's petition faults his counsel for not proving that he "was a model inmate." (Docket Entry No. 73 at 150). But he was not. Cruz-Garcia's record in prison included

79

misconduct.  He gathered contraband in a Puerto Rican prison for what authorities considered to be an escape attempt.[22]  He possessed a weapon while awaiting trial.  Defense counsel reasonably decided not to jeopardize his credibility before the court and the jurors with easily refuted arguments about good behavior during incarceration.

Cruz-Garcia's behavior in prison was only part of a strong case for future dangerousness. Trial counsel followed a reasonable and informed trial strategy of preserving credibility with jurors by focusing on the mitigation special issue.  Given the avalanche of aggravating evidence against him, Cruz-Garcia has not shown that the evidence he presented on state habeas review would have a reasonable probability of achieving a different result.  Cruz-Garcia has not met the AEDPA standard or otherwise shown that habeas relief is required on the claim he presented in state court. Relief on this claim is denied.

## F.    The Mitigation-Evidence Investigation (Claims 4(G)(1), (2))

Cruz-Garcia alleges that trial counsel conducted a deficient punishment-phase investigation.  Trial counsel did not retain a specific mitigation specialist or present any expert testimony in the penalty phase.  Trial counsel, however, retained an investigator, who developed mitigating evidence, and a psychologist, Dr. Rosin, to consult on mitigating evidence.  The results of Dr. Rosin's work were not a part of the state habeas record.

The defense called four lay witnesses in the penalty phase.  The state habeas summarized the evidence, as follows:

> [Cruz-Garcia's] wife, Mireya Perez-Garcia, testified via Skype about how she met [him] when she was fifteen years old, and went out with him for about three weeks before getting married (XXVI R.R. at 8-12).  The couple lived with each other on

---

[22]    Cruz-Garcia curiously ignores the escape attempt and argues that he "had no disciplinary infractions during his incarceration in Puerto Rico."  (Docket Entry No. 73 at 8).

and off and had two sons (XXVI RR. at 12-14).  Perez-Garcia testified that the applicant was a "sincere and noble person"; that he participated in missions and gave money to help build a church; that he was a very spiritual Christian; and, that he was a loving father who helped his children with their homework, cooked for them, took them to church, and made sure that they were well-groomed and well-dressed. She testified that he had been in prison since his youngest son was about five years old; that she knew [Cruz-Garcia] was also married to Angelita; and, that she knew he has a daughter with a woman named Dorka (XXVI R.R. at 15-30).

 Joel Cruz-Garcia, [Cruz-Garcia's] younger brother, and Abel Cruz-Perez, [his] seventeen year old son, testified that each had a positive relationship with [him] and believed he was a good brother and father, respectively (XXVI R.R. at 33-36, 67-70). Joel also testified that [Cruz-Garcia] had four children with three different women (XXVI R.R. at 50-51).

Angel Meza, a fellow inmate at the Harris County Jail, testified that he met [Cruz-Garcia] while Meza was a trustee, and he brought [he] food while he was in lockdown (XXVI R.R. at 82). Meza and [Cruz-Garcia]  had long conversations about the Bible, and Meza believed that it helped him make better choices (XXVI R.R. at 83). Meza considered [him] a man of God and a great friend (XXVI R.R. at 84, 92).

(Docket Entry No. 24-1 at 96).

On state habeas, Cruz-Garcia faulted trial counsel for not doing more.  Cruz-Garcia alleged that, "[w]hile their testimony touched on Cruz-Garcia's life history and character, the [defense's] presentation fell far short of the kind of robust mitigation presentation anticipated in a capital case."  (Docket Entry No. 23-87 at 97).  "Numerous lay witnesses—some who had been interviewed by counsel and some who had not—were available to explain how Cruz-Garcia had gone from a poor child in the Dominican Republic to being involved in the drug trade in the United States."  (Docket Entry 23-87 at 97-98).

Cruz-Garcia based his claim on affidavits from seven family members, two of whom testified at trial.  Cruz-Garcia presented affidavits from his father, Julian de la Cruz Santos, and his stepmother, Dorca Noelia de la Cruz Fana.  Both had been interviewed by the defense team

and were willing to testify.  (Docket Entry No. 23-39 at 2-9, 36-45).   The defense had also interviewed Cruz-Garcia's half-brother, Menagen Valerio de la Cruz, by phone.  (Docket Entry No. 23-39 at 18-25).  The defense did not interview Cruz-Garcia's half-sister, Dorca Yelietza de la Cruz, or his uncle, Jose de la Cruz.  (Docket Entry No. 23-39 at 11-16; No. 23-39 at 27-34). Even though Cruz-Garcia's brother and wife testified at trial, Cruz-Garcia alleged that counsel should have elicited more information about his background.  (Docket Entry No. 23-38 at 279-90; No. 23-39 at 47-55).

In his habeas application, Cruz-Garcia described what he wanted trial counsel to present the jury in the penalty phase.  (Docket Entry No. 23-38 at 99-102).  To summarize, Cruz-Garcia's parents separated ten years after his birth in the Dominican Republic.  His mother moved back to Venezuela and the rest of his family moved to a small village near the coast.  Cruz-Garcia was a hard worker, loved by others, happy, and well-behaved.  Siblings remember him as a loving, helpful older brother.  The loss of his mother hurt Cruz-Garcia, who became more serious and devoted to family.  Cruz-Garcia once saved his father when their boat capsized while fishing.

At age 19, Cruz-Garcia went to Puerto Rico to work.  He sent money back to his family. In Puerto Rico, he met Angelita Rodriguez and her cousin Santana, who introduced him to drugs. "Despite getting involved in criminal activity and the drug trade, Cruz-Garcia continued to also maintain the side of himself that was the protective, hardworking, caregiver of his family." (Docket Entry No. 23-38 at 101).  Cruz-Garcia maintained ties to his family and would visit them in the Dominican Republic and Puerto Rico.  He was generous, engaged in his religion, and encouraging to his siblings.  He was loved and respected by others.  Taken together, the uncalled witnesses "[e]ach would have shared their disbelief that the man they knew could have been

involved in the crime—not to question the jury's guilty verdict but rather to explain that there was another side to Cruz-Garcia that was completely different than the picture being portrayed by the State." (Docket Entry No. 23-38 at 102).

Cruz-Garcia also alleged that trial counsel should have presented testimony from an expert witness. Cruz-Garcia presented an affidavit from Dr. Gina Perez, an anthropology professor. Dr. Perez placed Cruz-Garcia's involvement in the drug trade into a broader context of people emigrating from the Dominican Republic to Puerto Rico. Dr. Perez focused on detailing Dominican migration patterns across several decades and describing how migration defines the human experience. Cruz-Garcia argued that trial counsel should have presented expert testimony about "how this life trajectory was not unique to Cruz-Garcia but was explainable by an understanding of the culture and historical setting in which Cruz-Garcia developed." (Docket Entry 23-87 at 97-98).

The state habeas court found that trial counsel adequately presented information about Cruz-Garcia's background. (Docket Entry No. 24-1 at 107). The weakness of Cruz-Garcia's failure-to-present-mitigating evidence claim is made clear by comparing this case to cases in which the Supreme Court has found deficient performance in failing to present mitigating circumstances. *See Sears v. Upton*, 561 U.S. 945-952 (2010) (failure to discover verbal abuse, sexual abuse, severe learning disabilities, and significant frontal lobe abnormalities); *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (failure to present information showing an abusive childhood, heroic military service, long-term substance abuse, impaired mental health, and brain damage that could manifest in violent behavior); *Rompilla v. Beard*, 545 U.S. 374, 389, 392 (2005) (failure to present evidence of schizophrenia, extreme mental disturbance, and fetal alcohol syndrome); *Wiggins v. Smith*, 539

U.S. 510, 517, 524-525 (2003) (failing to uncover severe physical and sexual abuse); *Williams v. Taylor*, 529 U.S. 362, 395-396 (2000) (failure to uncover borderline intellectual disability, a history of head injuries, and brain damage).

By contrast, Cruz-Garcia faults counsel for not presenting more evidence about his general background and positive character traits.  The new "mitigating" evidence contained in the state habeas record is far from what the Supreme Court has found sufficient for habeas relief.  Cruz-Garcia has not exposed any disturbing fact that his attorneys failed to uncover: the evidence he faults his attorneys for not presenting is similar to the evidence that the jury did hear.  The evidence not presented is unlikely to have affected the outcome.[23]

Cruz-Garcia faults counsel for not presenting more evidence that he valued family, had a good character, was a good inmate, and was a hard worker.  But this evidence would have heightened the inconsistency with the ample evidence of his violent, unlawful, past acts.  Jurors hearing added testimony that Cruz-Garcia was a good husband would have had to contrast that

---

[23]     In doing so, Cruz-Garcia exaggerates some of the unpresented but available mitigating evidence.  For example, Cruz-Garcia says: "And, Mr. Cruz-Garcia's life story—which included being abandoned by his mother, enduring a childhood of crushing poverty in a remote Dominican fishing village, working while still a child to feed his family, and being forced into a hastily arranged marriage while still a teenager—went untold."  (Docket Entry No. 73 at 7).  The state habeas affidavits describe a life of manual labor, not "crushing poverty."  In fact, the record is unclear about the circumstances in which he grew up.  His father said that "even though we were happy, we had very little."  (Docket Entry No. 23-39 at 44).  Yet one uncle with whom Cruz-Garcia worked described comfortable circumstances:

> We would gather and grow food to eat and to sell. We also fished. We would fish for all sorts of different fish. We would sell what we did not want and we would make a good amount of money. We did well enough financially and could get loans from the bank if we needed. We were fortunate.

(Docket Entry No. 23-39 at 33).  When Cruz-Garcia was around thirteen his father married a woman who had a bachelor's degree and was the school director and the family moved in with her.  (Docket Entry No. 23-39 at 7).  Nothing in the state habeas record suggested a childhood of "crushing poverty."  Other parts of the new evidence are also contradictory.  For instance, Cruz-Garcia says that "[h]e was also brave. One time when he was out fishing with his father, the boat turned over, trapping [his father]. Cruz-Garcia pulled his father to safety even though he was only nine years old."  (Docket Entry No. 23-38 at 100).  Cruz-Garcia's father reported that he was "just a kid, only about seventeen years old."  (Docket Entry No. 23-39 at 43).

with the testimony that he had affairs during his marriage, that he had a prior sexual relationship with Diana Garcia, and that he raped her. Jurors hearing added testimony about how he valued family would have to contrast that with the testimony that he had more than once abandoned a wife. Jurors would compare additional testimony that he was a good father against the fact that they had already found him guilty of murdering someone else's child. Testimony about his good behavior during incarceration did not explain his escape attempt and possession of weapons.

The bulk of the new evidence shows that family members considered Cruz-Garcia to have a good character. A half-sister testified that "not unless God himself appeared to me, and told me that [Cruz-Garcia] was guilty, would I believe that [he] committed the crimes he has been accused of in Houston." (Docket Entry No. 23-39 at 24). But the jury had found him guilty of the crimes charged, and the jury then heard that it was only one of many violent acts he had committed in furtherance of his drug trafficking. Testimony that his family did not believe he could do the horrible acts would be heard by the same jury that believed he had done them.

Failing to present the type of anthropological testimony Cruz-Garcia points to similarly does not show deficient performance. (Docket Entry No. 24-1 at 107). This expert's report places Cruz-Garcia's actions into larger societal trends, but it does not account for his extreme and repeated acts of violence. Her report may have provided some context into how Cruz-Garcia fit into the world around him, but it is not reasonably likely that it would have changed the outcome of the future dangerousness issue.

The state habeas court cited a Fifth Circuit case for the proposition that "it is 'virtually impossible' to establish the prejudice prong of *Strickland*" when "evidence of future dangerousness [is] overwhelming in [a] death penalty case . . . ." (Docket Entry No. 24-1 at 128)

85

(quoting *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)). The State presented overwhelming evidence of Cruz-Garcia's violence and lawlessness. Testimony about his good character, family ties, and religiosity would not outweigh the testimony what he was a drug-dealing killer whose wanton violence ended in incarceration and whose lawlessness persisted while in custody. The State's evidence of Cruz-Garcia's brutality and violence would overwhelm his new evidence, just as it had the evidence he presented at trial. Cruz-Garcia has not shown a reasonable probability of a different outcome given the extent and nature of the unfavorable evidence on future dangerousness. Cruz-Garcia is not entitled to relief on this claim.

### G.    The Jurors (Claim 4(I); Claim 8)

Cruz-Garcia alleges that trial counsel made insufficient efforts to challenge two circumstances relating to the jury deliberations in the penalty-phase: when the trial court had *ex parte* communications with juror Bowman and when an attorney reported hearing jurors engage in out-of-court discussions. Cruz-Garcia also raises a related claim faulting appellate counsel for not raising a challenge to the *ex parte* hearing. The state habeas court denied both Cruz-Garcia's complaints. Cruz-Garcia must show that he merits federal habeas relief under the AEDPA standard.

*The Conversation with Juror Bowman*: As previously discussed, the trial court received a note from juror Bowman on the second day of the jury's punishment-phase deliberations. With the parties' agreement, the trial judge had an *ex parte* conversation with juror Bowman about the note. (Docket Entry No. 23-13 at 5-6). A court reporter was present for the conversation. Juror Bowman expressed concern about her disagreement with other jurors and described the pressure she felt to change her opinion. (Docket Entry No. 23-13 at 6). The trial court educated juror

Bowman on the law, reassured her, and instructed her to resume deliberations.  (Docket Entry No. 23-13 at 6-7).  Specifically, the trial court told juror Bowman: "You have to deliberate back there and try to find out whether you can reach a verdict or not.  Okay?"  (Docket Entry No. 23-13 at 9).

Cruz-Garcia complains that trial counsel should have inquired into the *ex parte* meeting, discovered what transpired, and objected.  In particular, Cruz-Garcia alleges that counsel should have objected to the allegedly coercive instructions the trial court gave juror Bowman.  From that, he speculates that juror Bowman would have held her ground and he never would have received a death sentence.

As an initial matter, Cruz-Garcia misrepresents the record evidence as to why juror Bowman changed her vote.  Cruz-Garcia states that "[j]uror Bowman told trial counsel she did not believe the State had proven its case at the punishment phase, but she had felt compelled to vote on the special issues in such a way as to result in a death sentence after the trial judge have a coercive instruction to her—and only to her—during an ex parte meeting."  (Docket Entry No. 73 at 2).  Ms. Bowman told counsel that she felt "pressured," but she did not mention the trial court's instruction as the reason.  (Docket Entry No. 22-10 at 123).  The only pressure she identified was that "her decision was complicated by virtue of the fact that her daughter was suffering from a fever . . . ."  (Docket Entry No. 20-10 at 123).

The state habeas court found no error in the *ex parte* discussion or the instructions to juror Bowman.  Based on the trial record and the affidavits provided by the habeas attorneys, the state habeas court found that "trial counsel trusted the trial judge to do what she thought was appropriate in the situation. . . ." (Docket Entry No. 24-1 at 115-16).  The state habeas court found that the trial court's "instructions to Bowman did not constitute an impermissible or coercive . . . charge."

(Docket Entry No. 24-1 at 116).  The state habeas court found that "the trial judge did not pressure Bowman into reaching a particular verdict or somehow convey the judge's opinion of the primary case." (Docket Entry No. 24-1 at 116).  The state habeas also held that "the conversation between the trial judge and juror Bowman was recorded and a part of the record for review on appeal if necessary. . . ." (Docket Entry No. 24-1 at 115).  Even in retrospect, the trial attorneys did not "consider the trial judge's actions improper." (Docket Entry No. 24-1 at 115).

Having reviewed the transcript of the *ex parte* conversation and considering the whole record, including the motion-for-new-trial hearing, the court finds that Cruz-Garcia has not shown that the state habeas determination was contrary to, or unreasonable application of, federal law. Cruz-Garcia speculates that, had counsel "objected to the *ex parte* meeting" and "objected to the coercive instruction,"there was "a strong possibility that juror Bowman would not have capitulated to the immense pressure she felt to agree with the other jurors." (Docket Entry No. 73 at 199). The record does not show that the trial court issued coercive instructions to juror Bowman or that she otherwise would have answered the special issues in his favor. *See Early v. Packer*, 537 U.S. 3, 10-11 (2002) (finding that the state trial court's comments to a deadlocked jury urging them to deliberate further with a view to reaching agreement were not coercive).

The record shows that juror Bowman wanted to end deliberations and have an alternate juror deliberate in her stead.  The trial judge urged juror Bowman to reach a decision that did not violate her conscience.  (Docket Entry No. 23-13 at 7-9).  In doing so, the trial court did not give any constitutionally problematic instruction.  "A judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer, and to give due consideration and respect to the views of their peers." *United States v. Straach*, 987 F.2d 232, 242 (5th Cir.1993) (citing *Allen v.*

*United States*, 164 U.S. 492 (1896)); *see also Lowenfield v. Phelps*, 484 U.S. 231, 238 (1988). "It is not only permissible but proper for a trial judge to ask a jury to continue deliberating if it appears that further deliberation might be fruitful in helping the jury reach a unanimous verdict." *Coleman v. Quarterman*, 456 F.3d 537, 548 (5th Cir. 2006).

Further, Cruz-Garcia's own evidence proves that juror Bowman did not vote for death because she was coerced by other jurors or pressured by a judicial instruction. Juror Bowman stated that "[i]f it had not been for my concern over my daughter's health condition, I would have remained committed to voting for life in prison." (Docket Entry No. 22-10 at 161, 162). Cruz-Garcia's own evidence shows that it was not a coercive instruction that caused juror Bowman to vote for death.

Cruz-Garcia has not shown deficient performance or prejudice in how counsel handled juror Bowman's note to the trial judge. The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

Cruz-Garcia also raises a separate claim faulting appellate counsel for not challenging the *ex parte* conversation on direct appeal (claim eight). The state habeas court denied that claim when Cruz-Garcia raised it on habeas review. For the same reasons discussed above, Cruz-Garcia has not shown that the state habeas court unreasonably found no constitutional error because appellate counsel did not raise the issue on direct appeal.

*Juror misconduct*: Cruz-Garcia's second argument relating to counsel's handling of juror deliberation issues stems from the conversation that Casaretto heard between two jurors.[24]  On

---

[24]     As the state habeas court described the situation:

On the morning of July 16, 2013, before the State began presenting evidence in the punishment phase of the trial, the trial judge related to the parties what defense attorney Casaretto had told her

state habeas review, Cruz-Garcia secured an affidavit from Casaretto in which he presented a version of the events different from that in the trial record.  Casaretto stated that "it was clear from the jurors' comments that they were talking about the case itself; that the jurors continued their conversation in the elevator; that it seemed that the jurors were discussing the content and their feelings about the testimony of a witness that they heard. . . ."  (Docket Entry No. 24-1 at 118).

The same judge who held the in-chambers conversation also adjudicated the state habeas action.  The state habeas court found that "there are significant differences between Casaretto's 2015 affidavit and the information that he originally related to the trial judge in 2013."  (Docket Entry No. 24-1 at 119).  "[G]iven the two-year lapse in time between the event and the affidavit that Casaretto provided for [Cruz-Garcia]," the state habeas court found that "Casaretto's 2015 habeas affidavit is suspect and unpersuasive" and that the information that "Casaretto related to the trial judge in 2013 and the judge's notes from the conversation represent a more reliable representation of what Casaretto actually observed . . . ."  (Docket Entry No. 24-1 at 119).

The state habeas court found that Casaretto's 2015 affidavit was not credible. His affidavit contradicted the record of what he told the trial court.  The state habeas court found that Cruz-Garcia "fail[ed] to demonstrate deficient performance, much less harm, based on the allegation" because "the trial judge gave the parties a thorough description of the event as related to her" and

---

that morning: that Casaretto was waiting for an elevator when he heard two men-both wearing badges indicating they were jurors in the 337th District Court-having what was "possibly an innocuous conversation;" that it was hard for Casaretto to hear the jurors, but they seemed to be speaking about the case and struggling with the issues; that the younger juror thanked the older juror for his words of encouragement the day before; that the jurors discussed nothing specific about the issues; that Casaretto could not tell if the jurors were actually talking about evidence in the case; and, that the conversation ceased once the jurors got on the elevator.

(Docket Entry No. 24-1 at 117-18).

"counsel considered the event insignificant while noting that the event was memorialized in the record for appellate counsel to consider on appeal." (Docket Entry No. 24-1 at 117). As Cruz-Garcia has not rebutted the state habeas court's credibility finding with clear and convincing evidence, he cannot meet the AEDPA standard. Given the circumstances before the trial attorneys, Cruz-Garcia has not shown that the state habeas court's determination was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

**H.      The Issue of Notice to the Dominican Republic Consular Office (Claim 4(K))**

Cruz-Garcia is a citizen of the Dominican Republic. The Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77, provides certain protections to noncitizens. The Vienna Convention "provides that if a person detained by a foreign country so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State of such detention, and inform the detainee of his right to request assistance from the consul of his own state." *Medellín v. Texas*, 552 U.S. 491, 499 (2008) (internal quotation omitted); *see also Vienna Convention*, Art. 36(1)(b). "In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338-39 (2006).

Cruz-Garcia was twice given probable cause warnings by a magistrate judge. Each time, Cruz-Garcia was informed of his consular rights. (Docket Entry No. 24-1 at 8-9). Nothing in the

record suggests that Texas officials told officials from the Dominican Republic about Cruz-Garcia's arrest or trial.[25]

Trial counsel knew about Cruz-Garcia's nationality. Madrid explained that Cruz-Garcia "was given his warnings about" the Vienna Convention and those warnings were "reiterated." According to Madrid, Cruz-Garcia "had no interest in having [his attorneys] contact the consulate" and "expressed no interest at all in receiving any help of any kind from his consulate." (Docket Entry No. 24-1 at 5). Cornelius stated: "He was given his warnings about this and it was reiterated by us and his response to almost everything was that Jesus would deliver him." (Docket Entry No. 24-1 at 143). Trial counsel was not asked to, and they did not act on, Cruz-Garcia's Vienna-Convention rights.

Cruz-Garcia argues that trial counsel "depriv[ed] him of all the benefits that consular involvement would have provided." (Docket Entry No. 73 at 182). Even though trial counsel was unable to receive consent from Cruz-Garcia to contact his consulate, Cruz-Garcia argues that they still should have done so. Cruz-Garcia alleges that, had counsel honored their client's Vienna Convention rights, the Consulate would have provided assistance of various types, including advocating for a plea deal that could have resulted in a life sentence. Cruz-Garcia asserts that "there is no doubt that failure to seek such assistance—especially when the obligation to do so is codified by various professional guidelines—is prejudicial." (Docket Entry No. 73 at 184-85). On state habeas review, Cruz-Garcia supported his claim with a letter from the Consul General for the

---

[25]     A form originating in Cruz-Garcia's probable cause hearing does not list his citizenship, but "the form indicates that the consulate for Dominica was to be notified." (Docket Entry No. 24-1 at 108). "[A] fax sheet indicates that notice was sent to the Dominica Embassy, and there is a handwritten notation indicating 'wrong embassy.'" (Docket Entry No. 24-1 at 108).

Dominican Republic describing what assistance the consulate could have provided.  Cruz-Garcia

also relied on an affidavit from a law professor outlining an attorney's duties when representing a

foreign national.

The state habeas court's rejection of this claim relied on several facts.  First, the state habeas

court emphasized that Cruz-Garcia was familiar with the United States legal system, that trial

counsel made clear that Cruz-Garcia had the right to have them contact his consulate, but that

Cruz-Garcia "did not want trial counsel to contact [his] consulate" and "had no interest in receiving

help of any kind from his consulate."  (Docket Entry No. 24-1 at 109).  Second, the state habeas

court found that Cruz-Garcia "fail[ed] to demonstrate prejudice on the basis of any alleged treaty

violation" because he did "not demonstrate . . . that such violation caused [him] to do something

he would not have done otherwise, or that an alleged violation affected the fairness of the [his]

capital murder trial."  (Docket Entry No. 24-1 at 109).  Third, "[g]iven the heinous nature of the

primary offense and [Cruz-Garcia's] criminal history," the state habeas court found the habeas

evidence "speculative and unpersuasive for the proposition that consular officials could have

interceded in [his] case and persuaded prosecutors not to seek the death penalty or provided

assistance that would have made a difference in the outcome of the primary case."  (Docket Entry

No. 24-1 at 109).  Fourth, the state habeas court recognized that "Article 36 of the Vienna

Convention on Consular Relations does not guarantee consular assistance or consular

intervention."  (Docket Entry No. 24-1 at 109).  Fifth,

> based on personal recollection, the trial record and habeas proceedings, that [Cruz-
> Garcia's] claims of trial counsels' ineffectiveness for failing to recognize the
> significance of  [his] foreign nationality, seek the assistance of the Dominican
> consulate in defending [his case, and preserve [his] Vienna Convention complaints
> for appeal are grounded purely in speculation; that [he] was represented by skilled
> counsel who were far more qualified to explain the Texas criminal justice system

to [him] than a representative of [his] consulate; and, that [he] fails to demonstrate deficient performance, much less harm on the basis urged.

(Docket Entry No. 24-1 at 109-10).

The state habeas court's decision was not contrary to, or an unreasonable application of, federal law.  Federal habeas "cases have established a steadfast principle—a defendant cannot direct their legal counsel to pursue a specific strategy and subsequently accuse them of providing inadequate representation for adhering to those instructions."  *Gobert v. Lumpkin*, ___ F. App'x ___, 2023 WL 4864781, at *2 (5th Cir. July 31, 2023).  Trial counsel informed Cruz-Garcia of his Vienna Convention rights.  Because Cruz-Garcia did not ask his attorneys to contact the consulate after being informed of his right to do so, or consent to his attorneys contacting the consulate, he cannot now claim that counsel was ineffective in failing to do so.  *See Nixon v. Epps*, 405 F.3d 318, 325-26 (5th Cir. 2005) ("A defendant cannot block his counsel from attempting one line of defense at trial, and then on appeal assert that counsel was ineffective for failing to introduce evidence supporting that defense."); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004) (noting that a defendant cannot claim ineffective assistance of counsel after he has blocked counsel's efforts); *see also Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) ("[A] defendant who explicitly tells his attorney not to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently.").

Moreover, Cruz-Garcia's arguments for *Strickland* prejudice from his attorneys' failure to contact the consulate are speculative.  Cruz-Garcia asks the court to assume that informing the consulate of his Vienna Convention rights would have resulted in a different trial—and perhaps a favorable plea deal—even though the most prejudicial evidence of the nature of the crimes charged and of Cruz-Garcia's criminal history would presumably be the same.  Cruz-Garcia asks the court

94

to assume that informing the consulate would have avoided the errors and deficiencies he imputes to trial counsel.  Cruz-Garcia's arguments for prejudice are speculative and unproveable.  The record falls far short of showing a reasonable probability of a different result had counsel not followed his wishes and had contacted his consulate.  Claim 4(K) is without merit; Cruz-Garcia's claim for relief on this ground is denied.

### I.     Conclusion as to the *Strickland* Claims from the Initial Habeas Petition

Cruz-Garcia raised several ineffective-assistance-of-counsel claims in his initial state habeas application.  The state habeas trial court ordered trial counsel to respond to those allegations by affidavit.  After receiving additional material, the state habeas court found that trial counsel performed with constitutional sufficiency and that there was not a reasonable probability of a different result had counsel acted differently.  The court has reviewed the allegations from the initial petition in the context of the AEDPA standard.  Cruz-Garcia has not shown any error of constitutional magnitude, much less cumulative error that requires federal relief.   Relief on the ground of ineffective assistance of counsel is denied.

### PROCEDURALLY DEFICIENT ISSUES

Cruz-Garcia's amended petition contains numerous procedurally deficient issues.  Those claims fall into two categories.  First, Cruz Garcia raised claims seven and sixteen during his initial proceedings, but the state courts found that he had defaulted consideration on the merits.  Second, Cruz-Garcia raised numerous claims (claims three, five, six, nine, ten, eleven, twelve, fourteen, fifteen, seventeen and parts of claims two and four) for the first time in his federal petition and

then exhausted them in his successive habeas application.  The Court of Criminal Appeals applied the Texas abuse-of-the-writ doctrine to bar those claims.

As to both categories of claims, the state courts applied Texas procedural law to preclude a merits review.  A federal procedural bar results when a state prisoner fails to follow well-established state procedural requirements for attacking a conviction or sentence.  *See Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A federal court may review a petitioner's unexhausted or procedurally barred claims only if the petitioner shows: (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent . . . .'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

The petitioner has the burden to overcome a procedural bar.  *See McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Cruz-Garcia, however, tries to shift this burden to the respondent.  For example, Cruz-Garcia argues that the respondent "does not argue that [he] cannot show prejudice to overcome his procedural default" of certain claims.  (Docket Entry No. 86 at 75).  Cruz-Garcia must show that full habeas review is available notwithstanding his failure to comply with well-established procedural requirements.

Cruz-Garcia makes various arguments to overcome the procedural bar.  Cruz-Garcia specifically argues that his alleged innocence should lead the court to forgive the procedural bar as to most of his claims.  He also argues that his habeas attorney's deficient representation should lead the court to forgive his failure to raise various *Strickland* arguments (claim four) in a proper manner.  Finally, Cruz-Garcia contends that he can make a specific showing of cause and prejudice

to overcome the procedural bar of claims five, six, and seven. The court discusses each argument below.

## I.      Actual Innocence

A habeas petitioner may overcome a procedural bar by showing a fundamental miscarriage of justice, which requires showing actual innocence. *See Haley*, 541 U.S. at 393. Cruz-Garcia argues that his innocence overcomes forgive the procedural bar of claims two, three, four, five, nine, ten, eleven, twelve, fourteen, fifteen, and sixteen. (Docket Entry No. 73 at 54, 190, 214, 235, 237, 241, 244, 247, 249, 250).[26] The question is whether Cruz-Garcia meets the high standard needed to show actual innocence.

When a habeas litigant reaches federal court, it is without any presumption of innocence. *See Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) ("[T]here is no presumption of innocence at a habeas proceeding."). A convicted defendant invoking federal habeas jurisdiction "comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Schlup*, 513 U.S. at 326; *see also Herrera*, 506 U.S. at 399-400; *see also Moore*, 534 F.3d at 464. The Supreme Court has commented that "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Wilkerson v. Cain*, 233 F.3d 886, 889 (5th Cir. 2000) (stating that "a substantial showing of actual innocence is extremely rare").

---

[26]      Cruz-Garcia's seventeenth claim argues that he is entitled to federal habeas relief because he is actually innocent of the crime. The Supreme Court has not accepted actual innocence as a cognizable ground for federal habeas corpus relief. In *Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. at 400. Following that reasoning, the Fifth Circuit has repeatedly and unequivocally held that the Constitution does not endorse an independent actual-innocence ground for relief. *See Kinsel v. Cain*, 647 F.3d 265, 270 n.20 (5th Cir. 2011); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003). Cruz-Garcia "acknowledges that this claim is foreclosed by precedent" but "does not concede this point of error and preserves it for later review." (Docket Entry No. 73 at 250).

"'[A]ctual innocence' means factual innocence . . . ." *Bousley v. United States*, 523 U.S. 614, 623 (1998).   A reviewing court may not find actual innocence by "usurp[ing] the jury's function by considering the same evidence the jury did" and arriving at a different result.  *See United States v. Vargas-Soto*, 35 F.4th 979, 999 (5th Cir. 2022).   A petitioner arguing actual innocence must rely on "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

The Fifth Circuit places strict requirements on what kind of evidence may support a valid actual-innocence argument.   A petitioner's "newly discovered evidence" must meet certain conditions: "(1) the evidence is newly discovered and was unknown to the defendant at the time of the trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial." *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996); *see also Sawyer v. Whitley*, 505 U.S. 333, 349, (1992) ("[L]atter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of the [witness's] account."); *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) ("Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.").

Cruz-Garcia contends that "critical evidence has come to light that undermines every aspect of the State's case against [him]."  (Docket Entry No. 73 at 47).  As previously discussed, the State's case against Cruz-Garcia rested on three factors: (1) his ex-wife's testimony that he

confessed to the crime; (2) DNA evidence; and (3) Santana's description of the crime.  Cruz-Garcia's actual-innocence argument addresses all three factors, but he primarily attacks the DNA evidence.  Cruz-Garcia's challenges to the DNA evidence have changed over time.  On state habeas review, Cruz-Garcia presented an affidavit from an expert questioning the DNA evidence based on: (1) concerns about the chain of custody; (2) the absence of a statistical evaluation with respect to Arturo Rodriguez's DNA on Diana Garcia's underwear; and (3) disagreements on the statistical weight of the sperm cell fraction of the vaginal swab.  The expert also criticized the new HPD crime lab's results because, in his opinion, a lab should not reinterpret data that it did not generate.  (Docket Entry No. 23-38 at 225-33).

The cornerstone of Cruz-Garcia's federal actual-innocence argument is the revised DNA report the issued in 2015.[27]  The Houston Forensic Science Center issued the 2015 report amending the 2010 comparison of Cruz-Garcia's DNA with the DNA extracted by the Orchid Cellmark lab.  (Docket Entry No. 18-11).  The 2015 report was not based on new testing.  The 2015 report did not rescind the earlier results showing that Cruz-Garcia was the major contributor of the DNA in

---

[27]     In his successive state habeas application, Cruz-Garcia described how HPD came to issue a revised report concerning the DNA in this case:

On August 21, 2015, it became generally known in Texas that the methodology Texas labs had been using to calculate DNA mixtures might be problematic. On that day, the [Houston Forensic Science Center] announced to members of the Texas criminal justice community its "concerns involv[ing] the interpretation of DNA results where multiple contributors may be present, commonly referred to as DNA mixture interpretation." Ex. A at 1. Specifically, these concerns involved the widespread failure of Texas labs to calculate the "Combined Probability of Inclusion" using the current consensus methodology so as to determine the odds that a particular person had left DNA at a crime scene. *Id.* The muted announcement has since led to a scandal—and the need to revisit thousands of convictions that had hinged on DNA evidence.

In the wake of the announcement, the Houston Forensic Science Center (formerly the HPD crime lab) revisited the DNA analysis that had been performed before Mr. Cruz-Garcia's trial.

(Docket Entry No. 24-15 at 10-11) (footnote omitted).

Diana Garcia's underwear and on the cigar. The 2015 report contained two departures from the State's trial evidence, both of which resulted from differences in methodology.

First, the 2015 report reached a different conclusion about DNA from the vaginal swab because it contained "[a] mixture of DNA from at least three individuals" and therefore made "[n]o conclusions . . . given the excessive number of contributors to this DNA mixture." (Docket Entry No. 18-11 at 2). Second, the 2015 report did not reach a conclusion about the "the minor component of [the] DNA mixture [from the underwear] due to insufficient data." (Docket Entry No. 18-11 at 2).

Cruz-Garcia argues that with these changes, "the only forensic evidence tying [him] to the facts of the offense, described by the State as 'the most damning' evidence against Mr. Cruz-Garcia, *has since been almost entirely recanted by the State*." (Docket Entry No. 73 at 5) (emphasis added). Cruz-Garcia grossly overstates the substance and effect of the 2015 report. The 2015 report does not exclude Cruz-Garcia as a contributor to the genetic material collected after the sexual assault. The 2015 report does not retract the evidence identifying Cruz-Garcia as the major contributor to the DNA on Diana Garcia's underwear. The 2015 report itself does not contradict the prosecution's argument that Cruz-Garcia left a cigar with his DNA on it at the crime scene.

The 2015 report does not prove Cruz-Garcia's innocence. *See Phillips v. Ferguson*, 182 F.3d 769, 774 (10th Cir. 1999) (stating that an inmate "must identify evidence that affirmatively demonstrates his innocence").[28] The 2015 report does not retract the evidence that Cruz-Garcia

---

[28] Likewise, the revised DNA result do not provide that the State relied on false testimony at trial. Cruz-Garcia has not adduced any evidence that State knew about any problems with the DNA testing methodology at the time of trial. *See In re Raby*, 925 F.3d 749, 756-57 (5th Cir. 2019) (finding that subsequent concerns about the DNA testing does not establish that the State "employees acted in bad faith").

contributed to the DNA taken after the sexual assault.  Because of the number of contributors, the 2015 report does not reach a conclusion about the DNA profile from the vaginal swab.  The 2015 report does not identify whether Arturo Rodriquez or some other person contributed the minor DNA profile.  The greatest change in the 2015 report is the possibility that, "[a]s corrected, the DNA evidence . . . leaves open the possibility of an unknown assailant."  (Docket Entry No. 73 at 48) (footnote added).  The 2015 report allows for the possibility of an unknown contributor to the DNA mixture in both the underwear and the vaginal swab.

The 2015 report may permit Cruz-Garcia to argue that some other person could also have participated in the sexual assault, but the report does not exclude Cruz-Garcia as an, if not the only, assailant.  The 2015 DNA report does not raise a reasonable doubt about Cruz-Garcia's guilt or undermine confidence in the results of the trial.  Cruz-Garcia's actual-innocence argument goes beyond the new evidence he presents on federal habeas review.

Cruz-Garcia attempts to undercut the other incriminating facts against him, primarily the testimony from Santana about Cruz-Garcia admitting that he had raped Diana Garcia and the testimony from Cruz-Garcia's ex-wife that he had admitted to murdering the child.  Santana and Cruz-Garcia's ex-wife have not recanted their trial testimony or otherwise changed their accounts of what happened.  Cruz-Garcia has not provided proof that his ex-wife lied about his confession or that Santana fabricated his description of what Cruz-Garcia said and did during and after the murder.  Instead, Cruz-Garcia's actual-innocence argument attempts to weaken the credibility of Santana and his ex-wife.

The Supreme Court has viewed actual-innocence arguments attacking a prosecution witness's credibility with skepticism.  *See Sawyer*, 505 U.S. at 349 ("[L]atter-day evidence brought

forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions.").   "[M]ere impeachment evidence is generally not sufficient to show actual innocence by clear and convincing evidence."  *Munchinski v. Wilson*, 694 F.3d 308, 335 (3d Cir. 2012); *see also Mendoza v. Lumpkin*, 2022 WL 3657188, at *3 (5th Cir. 2022) (relying on *Munchinski*); *Lucas v. Johnson*, 132 F.3d 1069, 1076 n.3 (5th Cir. 1998) (explaining that new evidence of actual innocence must be "material, not merely cumulative or impeaching" and thus capable of "produc[ing] acquittal at a new trial").  Cruz-Garcia argues that Santana must have received a deal from the State for his testimony, by which he infers that Santana made up his version of events.  But the record does not show that such a deal existed. (Docket Entry No. 73 at 49).

Similarly, Cruz-Garcia states that he has "newly uncovered evidence" that "undercut[s] the testimony of Angelita Rodriguez," his ex-wife.  (Docket Entry No. 73 at 50).  Stating that she "ha[d] been convicted of several deportable offense [sic]," Cruz-Garcia points out that a prosecutor "wrote and signed a letter in support of her bid to adjust her immigration status."  (Docket Entry No 73 at 50).  Cruz-Garcia refers to a letter written in 2019, many years after trial.  (Docket Entry No. 73-2).  The record provides no basis to find that Angelita Rodriguez made a deal to lie about her ex-husband's confession to her in return for a letter helpful to her immigration status years later.  Cruz-Garcia speculates that she received some kind of deal for her testimony, but it is only speculation.

Cruz-Garcia provides no proof that either witness received a deal or lied.  Cruz-Garcia makes other attempts at discounting those witnesses's credibility, but he relies on information he

could have presented at the time of trial.  (Docket Entry No. 73 at 49-50).  Cruz-Garcia's actual-innocence arguments that rely on "impeachment evidence provide[] no basis for finding a miscarriage of justice" because "the evidence is a step removed from evidence pertaining to the crime itself."  *Calderon v. Thompson*, 523 U.S. 538, 563 (1998).

Cruz-Garcia has not raised a strong actual-innocence argument, much less proven that his innocence should overcome his failure to litigate in accordance with state and federal procedural law. Cruz-Garcia's actual-innocence argument is little more than an argument that if the case were retried with slightly different DNA evidence, the jurors would have reached different results.  His arguments do not meet the high federal standards required for an actual-innocence claim.  Relief on this ground is denied.

## II.    State Habeas Counsel's Representation

Cruz-Garcia did not raise the greater part of his ineffective-assistance-of-trial-counsel claims in his initial state habeas application.  The state habeas court dismissed his new ineffective-assistance arguments when he raised them in his successive state habeas application. The Fifth Circuit has held that "[a] dismissal pursuant to Article 11.071 is an independent and adequate state ground for the purpose of imposing a procedural bar in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quotation omitted).  Cruz-Garcia then argues that he can overcome the procedural bar under the standards laid out in *Martinez v. Ryan*, 566 U.S. 1 (2012).

### A.    Cruz-Garcia's Briefing

In *Martinez*, the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review

collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17. Cruz-Garcia approaches his *Martinez* argument by generally attacking his state habeas counsel's representation. (Docket Entry No. 73 at 186-89; No. 86 at 58-60). The core of Cruz-Garcia's argument is that habeas counsel did not do enough.

Cruz-Garcia fails to show ineffective assistance of habeas counsel. *Martinez* is a claim-specific inquiry. *See Vasquez*, 597 F. App'x at 780 (stating that prove ineffective assistance the petitioner must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present"). Under *Martinez*, a habeas petitioner cannot win full federal review by showing the counsel could have done more, or better. The *Martinez* court set out a specific set of showings a petitioner must make to show ineffective assistance of habeas counsel as needed for full federal review. First, an inmate must show that "his claim of ineffective assistance of counsel at trial is substantial—*i.e.*, has some merit . . . ." *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016); *see also Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015); *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014). A *Strickland* claim is "insubstantial" if it "does not have any merit" or is "wholly without factual support." *Martinez*, 132 S. Ct. at 1318. This "substantiality standard [is] equivalent to the standard for obtaining a [Certificate of Appealability]." *Crutsinger v. Stephens*, 576 F. App'x 422, 430 (5th Cir. 2014).

Second, an inmate must "show that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676. In assessing whether state habeas counsel was ineffective, the court applies the *Strickland* standards, including the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In exercising the presumption, courts recognize that

104

habeas counsel "'who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000)); *see also Slater v. Davis*, 717 F. App'x 432, 438 (5th Cir. 2018) ("Cause is not satisfied just because habeas counsel failed to raise every nonfrivolous claim.  Rather, counsel has the freedom to select among the claims to maximize the likelihood of success on appeal.") (quotation omitted).

Even if a petitioner can show that habeas counsel's representation was deficient, he must demonstrate "actual prejudice."  *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013).  The question is whether the petitioner has shown "that there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings."  *Newberry v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014); *see also Wessinger v. Vannoy,* 864 F.3d 387, 391 (5th Cir. 2017); *Barbee v. Davis*, 660 F. App'x 293 (5th Cir. 2016).  "'The likelihood of a different result must be substantial, not just conceivable.'"  *Wessinger*, 864 F.3d at 391 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

Cruz-Garcia's briefing focuses on general concerns about habeas counsel's representation and only fleetingly touches on whether specific issues are substantial.  (Docket Entry No. 86 at 59-60).  To the extent Cruz-Garcia even mentions any sub-claim in his *Martinez* argument, he turns the standard on its head by faulting the respondent's briefing.  (Docket Entry No. 86 at 59-60).  For example, Cruz-Garcia alleges that the respondent's "inability to identify any way in which trial counsel's representation actually complied with the Guidelines makes clear that Mr. Cruz-

Garcia's [*Strickland*] claim—and these subparts in particular—are substantial." (Docket Entry No. 86 at 59). The burden under *Martinez* is Cruz-Garcia's, not the respondent's.

In contrast to the extensive briefing on trial counsel's failures, Cruz-Garcia addresses the "substantial" prong of the *Martinez* analysis in three conclusory paragraphs. He does not explain his basis for faulting habeas counsel's decision to select the ineffective-assistance claims that were included in the initial habeas application or the decision not to raise others. *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").

Cruz-Garcia identifies perceived failures in habeas counsel's investigation and presentation, but he does not explain whether each, or any, defaulted sub-claim is substantial or whether habeas counsel was ineffective for not raising each one. He does not explain whether he was prejudiced—whether he would have merited habeas relief had counsel raised each, or any, claim. In fact, Cruz-Garcia makes almost no effort to prove prejudice, and completely fails to show that habeas relief could have been granted if counsel had raised the omitted claims. Cruz-Garcia's *Martinez* briefing fails to demonstrate that his habeas attorney provided deficient representation or that prejudice ensued. Relief on this claim is denied.

## B.    Habeas Counsel's Representation

State habeas counsel submitted a 181-page initial habeas application raising several ineffective-assistance-of-counsel claims. Cruz-Garcia has replicated each one as a sub-claim in his federal habeas proceedings. State habeas counsel included hundreds of pages of exhibits with that application. During the habeas process, state habeas counsel uncovered new DNA evidence

and sought leave to file a successive habeas application.  Counsel aggressively litigated issues during the proceedings.  The filings show that habeas counsel acted with diligence and thoroughness, far from the negligence or ineptitude Cruz-Garcia alleges.

Cruz-Garcia has not shown that habeas counsel ignored substantive claims.  Because Cruz-Garcia's briefing does not substantially address the *Martinez* inquiry as set out in federal precedent, the court addresses his *Martinez* arguments briefly.  Some of newly raised sub-claims do not focus on trial counsel's specific omissions or acts, but instead address general concerns about his trial representation.  For example, Cruz-Garcia argues that his trial attorneys were too busy with a crushing caseload, unmotivated because of a flat-fee compensation structure, and unprepared before trial started.  Cruz-Garcia faults lead counsel for not adequately scouring the State's file or for leaving that responsibility to co-counsel or investigators.  Cruz-Garcia faults lead counsel for not communicating with him more before trial.[29]   He faults counsel for not seeking a continuance to have more time to prepare for trial.  These arguments are not stronger than the arguments that habeas counsel did emphasize in the initial state habeas application.  A reasonable state habeas attorney could reasonably decide not to include these arguments as specific grounds for relief.

There are no constitutional-law standards to support many of Cruz-Garcia's arguments. There are no preset limits on how many cases a capital attorney may handle; what tasks must be done by lead counsel and not by co-counsel; or how often, how, and through whom counsel must communicate with a capital defendant.  *See Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014)

---

[29]     Cruz-Garcia speaks Spanish.  Lead counsel does not speak Spanish, but the trial court appointed Mr. Madrid as second-chair counsel because he "is fluent in Spanish" and "is a very experienced attorney and is well respected in this court and other courts as well."  (Docket Entry No. 22-30 at 8).  Madrid was apparently the one who interfaced most with Cruz-Garcia, although the record does not disclose the extent of that communication.

(stating that a claim alleging problems with "counsel's experience and caseload" is not a claim of "circumstances [that], in and of themselves, amount to a *Strickland* violation"); *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) ("[B]revity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel."); *see also Batiste v. Davis*, 2017 WL 4155461, at *19 (S.D. Tex. 2017) (denying relief because no "clearly established federal law require[es] the States to adopt one method of compensating capital counsel"). Cruz-Garcia does not show that the state habeas courts would have granted relief had he included those issues in his initial state habeas application.

Besides these general criticisms of counsels' performance, Cruz-Garcia also alleges specific errors. Cruz-Garcia claims that trial counsel should have preserved different issues for appellate review, should have more deeply investigated the credibility of Santana and of the State's theory of the case, and should have done jury selection differently. Cruz-Garcia points out ways in which different appellate and habeas counsel attorney might have handled the case differently. Courts have long recognized that there is a broad range of strategic and tactical choices that every trial, appellate, or habeas counsel must make, and that the possibility of different approaches does not mean that the approach used was not as good, much less constitutionally deficient. Reasonable habeas attorneys may, and should, select the claims that appear most likely to maximize the likelihood of success. *Smith v. Robbins*, 528 U.S. 259, 288 (2000); *see also Smith v. Murray*, 477 U.S. 527, 536 (1986) ("The process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."). An effective attorney is "entitled to formulate a strategy . . . to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S.

at 107.  Cruz-Garcia has not provided any substantial reason to second guess counsel's choices. Cruz-Garcia has not shown that it was objectively unreasonable for counsel to forego raising the claims that he now asserts would have been better than those advanced on state habeas review.

Cruz-Garcia has also not adequately argued, much less shown, actual prejudice.  Cruz-Garcia has not shown a reasonable possibility, much less probability, that the results of the habeas proceeding would have been different if state habeas counsel had litigated the same way as federal habeas counsel.  Cruz-Garcia fails to show prejudice.

Cruz-Garcia has not shown that habeas counsel was ineffective in selecting the claims that were raised or in failing to advance the defaulted claims.  Neither set of choices merits habeas relief.  Cruz-Garcia has not met his burden of proving ineffective assistance, either in the *Strickland* or *Martinez* context.[30]  No relief is granted on this claim.

## III.    Cause and Prejudice for Specific Claims

Cruz-Garcia makes specific arguments to overcome the procedural bar of claims five, six, and seven.  As discussed below, Cruz-Garcia has not shown that this federal court can reach the merits of those claims.

### A.    False Testimony (Claim Five)

Cruz-Garcia's fifth claim argues that the State violated his due process rights by presenting false evidence and testimony. Under *Napue v. Illinois*, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. 264, 269 (1959).  A prosecutor may not knowingly use perjured testimony

---

[30]    The court has reviewed the whole of Cruz-Garcia's claims, both in the context of a *Martinez* argument and the underlying *Strickland* claims.  This court's review shows that, if the merits were fully before the court, the entire context of the trial and other proceedings indicates that he has not shown *Strickland* prejudice regarding any claim.

or allow false testimony to go uncorrected.  *See id*.  A false-testimony claim requires a petitioner

to show that: (1) the witness testimony was actually false; (2) the prosecution knew or should have

known that the testimony was false; and (3) the testimony was material.  *See Giglio v. United*

*States*, 450 U.S. 150, 153-54 (1972).  Perjured testimony is material when "there is any reasonable

likelihood that the false testimony could have affected the judgment of the jury." *Barrientes v.*

*Johnson*, 221 F.3d 741, 756 (5th Cir. 2000). "A new trial is required if the false testimony could .

. . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154

(internal quotation marks omitted); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976).

Cruz-Garcia's arguments about false testimony fall into seven categories:

(1)  *Santana:* the State adduced false testimony about the existence of a deal with Santana, his motivation for testifying, and the gender of a victim from Santana's earlier crime.  (Docket Entry No. 73 at 193-99).

(2)  *DNA:* the State knew or should have known that it relied on unreliable or incorrect DNA evidence, including testimony about the storage and handling of the DNA evidence in this case.  (Docket Entry No. 73 at 199-203).

(3)  *Angelita Rodriguez:* Angelita Rodriguez's testimony contradicted earlier statements to law enforcement, particularly because she did not disclose her husband's confession to the murder until years later and allegedly misrepresented the fact that he had not planned to leave Houston.  (Docket Entry No. 73 at 203-04).

(4)  *Diana Garcia and Arturo Rodriguez*: the victims were not honest about their drug dealing for Cruz-Garcia, about their relationship with him, and about whether they were really common-law married because Diana Garcia had never divorced her first husband. (Docket Entry No. 73 at 203-05).

(5)  *Law Enforcement Officers:* law enforcement officers provided incorrect testimony about whether they believed the victims were honest in their interaction with the police and about whether there was ever a ransom demand.  (Docket Entry No. 73 at 205-06).

(6)   *Punishment Phase Testimony*: witnesses allegedly offered misleading or incorrect testimony about the circumstances of an extraneous murder. (Docket Entry No. 73 at 206-08).

(7)   *The Puerto Rican Kidnapping:* the State allegedly presented misleading information about the kidnapping in Puerto Rico, though Cruz-Garcia provides no specifics about what testimony was false.  (Docket Entry No. 73 at 208).

Cruz-Garcia did not raise a false-evidence claim in his initial state habeas proceedings. Cruz-Garcia exhausted this claim in his second successive habeas application, which the state court dismissed as an abuse of the writ.  The respondent contends that this claim is procedurally barred and, alternatively, without merit.

*Procedural bar:* The parties debate whether a procedural bar forecloses federal review. Cruz-Garcia raised this as the first claim in his second successive state habeas application.  (Docket Entry No. 89-4 at 51-86).  Cruz-Garcia specifically argued that his "false testimony claim me[t] the requirements of Texas Code of Criminal Procedure Article 11.071 § 5(a)(2)."  (Docket Entry No. 89-4 at 70).  The Court of Criminal Appeals summarily rejected Cruz-Garcia's claim: "We have reviewed the application and find that [he] has failed to satisfy the requirements of Article 11.071, § 5(a). Accordingly, we dismiss the application as an abuse of the writ *without considering the merits of the claims*."  *Cruz-Garcia*, 2021 WL 4571730, at *1 (italics added).

Federal review is precluded when a reviewing state court "clearly and expressly [indicates] that the state court decision is . . . based on bona fide separate, adequate, and independent [state law] grounds."  *Michigan v. Long*, 463 U.S. 1032, 1041 (1983). When a state court decision is ambiguous about the ground of the decision, then a federal court must review the claim.  *Id.* at 1040-41; *Coleman*, 501 U.S. at 733 (when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law" and "[does] not clearly and expressly rely on an

111

independent and adequate state ground, a federal court may address the petition").  The parties debate whether the decision of the Court of Criminal Appeals was purely procedural or whether "the state court dismissal required a merits assessment of the federal claim."  (Docket Entry No. 86 at 61).  The respondent argues that the language of the Court of Criminal Appeals order shows that the court did not consider the merits of Cruz-Garcia's claims.  Cruz-Garcia argues that the "dismissal under § 5(a)(2) necessarily requires the [Court of Criminal Appeals] to assess the merits of the claim, therefore this dismissal involved a merits assessment of the federal claim."  (Docket Entry No. 73 at 212).

Under the Texas statutory exceptions to its abuse-of-the-writ doctrine, a petitioner may proceed on a successive habeas action only by showing that: new law applies or there are newly discovered facts (§ 5(a)(1)); the petitioner is actually innocent of the crime of conviction (§ 5(a)(2)); or the petitioner is actually innocent of the death penalty (§ 5(a)(3)).  Cruz-Garcia emphasizes that the Fifth Circuit has said that "[i]f the CCA dismisses the petition under § 5(a)(2) or § 5(a)(3), this Court *can* also review it under the standard in § 2254(d)."  *Canales v. Stephens*, 765 F.3d 551, 565 (5th Cir. 2014) (emphasis added).[31]  This language, however, does not mean that a federal court *must* reach the merits of every claim when a petitioner has invoked section 5(a)(2).

In *Canales*, Fifth Circuit stated that a Court of Criminal Appeals issues a "dismissal [that] is silent" on whether it adjudicated the merits, a federal court should "look[] to the arguments made in state court to try to determine whether the dismissal was based on independent and adequate

---

[31]     Cruz-Garcia does not argue that section 5(a)(2) is interwoven with federal law to the extent that it cannot function as an independent and adequate procedural bar.

state law or whether instead it relied on or was interwoven with federal law." *Id*.  Here, "nothing

in [the Court of Criminal Appeals] perfunctory dismissal of the claims . . . suggest[ed] that it

actually considered or ruled on the merits." *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir.

2008).

Looking at what Cruz-Garcia argued to the state court does not show that it considered the

merits of his clams.  Cruz-Garcia argued to the state courts that "false testimony impacted critical

aspects of the State's case against Cruz-Garcia such that, but for the State's reliance on false

testimony, no rational juror would have convicted Cruz-Garcia of the capital murder . . . ." (Docket

Entry No. 84-5 at 85).  Texas requires an inmate to show new evidence under section 5(a)(2).  *See*

*Ex parte Reed*, 670 S.W.3d 689, 745 (Tex. Crim. App. 2023).  For the authorization of successive

habeas proceedings, section 5(a)(2) requires that an inmate prove that "by a preponderance of the

evidence, but for a violation of the United States Constitution no rational juror could have found

the applicant guilty beyond a reasonable doubt."   Texas has "construed this language as a

"codification of the Supreme Court's *Schlup v. Delo* [513 U.S. 298 (1995)] standard."  *Reed*, 670

S.W.3d at 745 (quoting *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008)); *see also*

*Reed v. Stephens*, 739 F.3d 753, 767-68 (5th Cir. 2014).  The Texas Court of Criminal Appeals

has held:

> [T]o mount a credible claim of innocence [under section 5(a)(2)], an applicant must
> support his allegations of constitutional error with reliable evidence—whether it be
> exculpatory scientific evidence, trustworthy eyewitness accounts, or critical
> physical evidence—that was not presented at trial. The applicant bears the burden
> of establishing that, in light of the new evidence, it is more likely than not that no
> reasonable juror would have rendered a guilty verdict beyond a reasonable doubt.
> To determine whether an applicant has satisfied the burden, we must make a holistic
> evaluation of all the evidence, old and new, incriminating and exculpatory, without
> regard to whether it would necessarily be admitted under rules of admissibility that
> would govern at trial. We must then decide how reasonable jurors, who were

> properly instructed, would react to the overall, newly supplemented record. In doing so, we may assess the credibility of the witnesses who testified at the applicant's trial.

*Reed*, 271 S.W.3d at 733-34 (internal quotation marks and citations omitted).  The Court of Criminal Appeals jurisprudence is clear: "the claimant present the reviewing court with some 'new' evidence."  *Reed*, 670 S.W.3d at 745; *see also Ex parte Elizondo*, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996) (considering the *Schlup* standard and holding that "[w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim").

The Court of Criminal Appeals relied on the Texas counterpart to *Schlup* in making the procedural decision that no successive action was warranted.  *See Gable v. Williams*, 49 F.4th 1315, 1322 (9th Cir. 2022) ("[A] *Schlup* claim is procedural not substantive"); *see also Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016) (finding that a State's consideration of a *Schlup* argument is not an adjudication of the merits); *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) (same).  The Court of Criminal Appeals did not have to reach the merits of Cruz-Garcia's false-testimony claim because he did not rely on new evidence as required by section 5(a)(2).  Instead, Cruz-Garcia asked the Court of Criminal Appeals to find him actually innocent based on the "little evidence [that] remain[ed] of the State's case" after removing the "extensive allegations of State misconduct . . . ."  (Docket Entry No. 89-4 at 86).  Cruz-Garcia relied on the "subtraction of evidence infected by the State's misconduct" to establish "a cohesive theory of innocence."

(Docket Entry No. 89-4 at 86).  In essence, Cruz-Garcia forced the materiality prong of the false-evidence into an actual-innocence argument.[32]

A petitioner cannot return to state court to exhaust remedies, invoke section 5(a)(2) or section 5(a)(3) even if neither applies to the petitioner's case, and then insist on full *de novo* federal review of his claims.  The Court of Criminal Appeals explicitly stated that it did not consider the merits of Cruz-Garcia's false-testimony claim.  The Court of Criminal Appeals would not need to consider the merits of his false-evidence claim in deciding that Cruz-Garcia did not meet the section 5(a)(2) or *Schlup* standard: he did not adduce any affirmative proof of innocence.  To the contrary, he asked the Court of Criminal Appeals to *subtract* evidence and determine his evidence based on only part of the evidence the jury heard and saw. Without explicitly relying on new affirmative evidence of innocence, nothing suggests that the Court of Criminal Appeals would need to reach the merits of his constitutional claim.  *See Ex Parte Robbins*, 360 S.W.3d 446, 465 (Tex. Crim. App. 2011) (Price, J., concurring) (cautioning against "allow[ing Texas'] false evidence jurisprudence unduly to encroach upon [its] actual innocence jurisprudence").  The record shows that the Court of Criminal Appeals made a procedural determination that Cruz-

---

[32]     Cruz-Garcia asked the Court of Criminal Appeals to authorize successive review of his false-testimony claim because by improperly merging the prejudice inquiry of a false-testimony claim with the Texas standard for a procedural showing of actual innocence.  Even though both rest on due process principles, Texas law considers a claim of false evidence distinct from one of actual innocence.  As one judge on the Court of Criminal Appeals has noted:

> A bare claim of actual innocence and a claim that false evidence was inadvertently used to obtain a conviction both fall along a continuum of due process violations. At one end of the continuum is a claim that the State has knowingly used false or perjured testimony. Here, due process is primarily concerned with the fairness of the trial. Because of the State's complicity in undermining the integrity of the process, the standard for materiality is comparatively low: a reasonable possibility that the false or perjured testimony contributed to the conviction.

*Ex parte Henderson*, 384 S.W.3d 833, 835 (Tex. Crim. App. 2012) (Price, J., concurring).

Garcia had not met the statutory actual-innocence exception to the Texas abuse-of-the-writ doctrine. The state court's decision results in a federal procedural bar of this claim.

*Cause and Prejudice:* Cruz-Garcia also alleges that what he identifies as false testimony itself provides cause to overcome the procedural bar. (Docket Entry No. 73 at 213). As discussed below, the court finds that Cruz-Garcia has neither overcome the procedural bar on this claim nor shown that it merits habeas relief. *See Sparks v. Davis*, 756 F. App'x 397, 401 (5th Cir. 2018) ("Because the merits analysis of Sparks's false testimony claim largely parallels the 'cause' threshold he must clear, it is permissible to consolidate both issues into a single inquiry.").[33]

Cruz-Garcia makes the cursory argument that the allegedly false testimony was cumulatively material, but his second amended petition specifically discusses the false-evidence materiality standard only as to issues one, two, and three. (Docket Entry No. 73 at 209-12). Cruz-Garcia's reply discussed materiality as to issue six. (Docket Entry No. 86 at 69-70). Cruz-Garcia has not adequately briefed issues four, five, and seven.

Many of Cruz-Garcia's arguments involve inconsistencies between a witness's trial testimony and that witness's prior statements. For example, Cruz-Garcia argued that Santana's testimony "was riddled with falsities" when compared to "his prior statements to law enforcement" and "other witness's accounts." (Docket Entry No. 73 at 193). Cruz-Garcia similarly argues that Angelita Rodriguez's "trial testimony contradicted her numerous statements to law enforcement . . . ." (Docket Entry No. 73 at 203). A petitioner cannot succeed on a false-evidence claim merely by showing "that the testimony is challenged by another witness or is inconsistent with prior

---

[33]     Cruz-Garcia also argues that he can overcome the procedural bar of this claim by showing his actual innocence. As discussed elsewhere, Cruz-Garcia has not met the high standards required to show his innocence.

statements." *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002); s*ee also Dinh Tan Ho v. Thaler*, 495 F. App'x 488, 494 (5th Cir. 2012) ("Inconsistency is not enough to prove knowing falsity."). Cruz-Garcia's trial counsel cross examined witnesses on their prior statements. At best, Cruz-Garcia shows some inconstancy in the trial record. *See Koch*, 907 F.3d at 531. Inconsistency or disagreement in the record does not prove falsity. *See United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987) ("A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.").

Cruz-Garcia also contends that witnesses such as Santana and Angelita Rodriguez testified falsely because they received a deal from the State. Cruz-Garcia's allegations of a deal are unsupported and speculative. He points to no evidence of a "deal" or agreement that would call for them to testify falsely.

Other parts of Cruz-Garcia's false-evidence claim involve minor points or disputes that he speculates might have influenced the jury's credibility assessments. For example, Cruz-Garcia claims that Santana lied about the facts of an earlier conviction, which in turn kept the jury from considering it as a crime involving moral turpitude in the liability phase.[34] Even in that phase, the jury understood that Santana's life was full of lawlessness and violence. During cross-examination, trial counsel questioned Santana about a different misdemeanor assault conviction.

---

[34] Under Texas law, a misdemeanor simple assault generally not a crime of moral turpitude unless the offender is male and the victim female. *See Willis v. State*, 2014 WL 4854579, at *8 (Tex. App.-Hou (14th Dist.) Sept. 25, 2014, no pet.) ("[T]he Court of Criminal Appeals and many other courts have concluded that misdemeanor simple assault is not a crime of moral turpitude. An exception has developed under which misdemeanor assaults are considered crimes of moral turpitude if the aggressor is male and the victim is female.") (internal citations omitted). Santana testified that the victim of his assault was a male child when, in fact, the victim was female.

(Docket Entry No. 23-7 at 33-34). The jury knew about his "involve[ment] in the drug business" and his federal conviction. (Docket Entry No. 23-7 at 34). Given his many other bad acts, the jury's lack of knowledge about another misdemeanor assault would not have materially changed how they viewed his credibility.

Cruz-Garcia has shown that there was some other information that could have been presented to try to challenge some of the State's evidence. But he has not shown that trial testimony was false on major points, much less that the State knew or should have known that it was false. Cruz-Garcia points to the testimony relating to the DNA evidence that was recovered after Diana Garcia's rape, arguing that "the DNA evidence has since been largely recanted by the State . . . ." (Docket Entry No. 86 at 64). Not so. The DNA evidence still strongly identifies Cruz-Garcia as contributing to the DNA on the cigar in the apartment and in the genetic material recovered after the rape.

Since the trial, the State has changed its position on a part of the DNA evidence, based on advances in the science. That does not mean that the State knew of problems with the DNA evidence at the time of trial. Cruz-Garcia has not shown that the State was aware at the time of trial that it should have calculated its DNA results differently because of the number of contributors to the DNA mixture. Cruz-Garcia's other challenges to the reliability of the DNA evidence fall far short of showing that the State knowingly presented false testimony.

Cruz-Garcia's false-testimony allegations fall far short of showing "any reasonable likelihood" that there was false testimony that affected the judgment of the jury. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The court has considered the whole of Cruz-Garcia's false-testimony claim and finds that he has not shown cause or prejudice to overcome the state-imposed

procedural bar.  Alternatively, the court would deny this claim if the merits were fully available for federal review.  Relief on this claim is denied.

### B. *Brady* (Claim Six)

In his sixth claim, Cruz-Garcia argues that the State suppressed evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Cruz-Garcia procedurally defaulted his *Brady* claim by raising it in his successive state habeas application.  Cruz-Garcia claims that the suppression of evidence should excuse his failure to exhaust his *Brady* claim properly.  A *Brady* violation may establish cause to excuse procedural default.  *See Banks v. Dretke*, 540 U.S. 558, 691 (2004); *Strickler v. Greene*, 527 U.S. 263 (1999).

A *Brady* claim requires that "'[t]he evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Id*. (quoting *Strickler*, 527 U.S. at 281-82).  Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003); *see also Graves v. Cockrell*, 351 F.3d 143, 153–54 (5th Cir. 2003).  Cruz-Garcia claims that the State suppressed three categories of evidence:

1. Impeachment evidence relating to witness Santana, including information that he had received a benefit for his trial testimony, the fact that a federal court had ordered a psychiatric evaluation of Santana during his criminal proceedings, and Santana's earlier prosecution and conviction for misdemeanor assault on a girl from 1992.

2. Mitigating evidence that Cruz-Garcia had previously assisted federal law enforcement.

3. A bullet-point list of nine specific items which the defense allegedly did not receive before trial.

(Docket Entry No. 73 at 214-22).

Cruz-Garcia's claim is not that the State withheld material evidence until after trial. Instead, Cruz-Garcia's claim is based on speculation that certain facts exist and on material that was available at the time of trial.  For example, Cruz-Garcia insists that, because the State did not prosecute Santana for his involvement in the crime, they must have reached some kind of plea deal, but no evidence supports this argument.  There is no evidence shows that Santana testified because the prosecution promised him some kind of favorable treatment.  *See Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (stating that "speculation about the suppression of exculpatory evidence" cannot support a *Brady* claim); *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Murphy has failed to establish a prima facie claim under *Brady* by virtue of his having failed to demonstrate the existence or concealment of a deal between the prosecution and the witness . . . . Allegations that are merely 'conclusionary' or are purely speculative cannot support a *Brady* claim."); *Hughes v. Johnson*, 191 F.3d 607, 629-30 (5th Cir 1999) (stating that mere speculation does not adequately support a claim for relief under *Brady*).

Cruz-Garcia also faults the State for not turning over information about Santana's earlier criminal prosecutions.  In particular, Cruz-Garcia argues that the State should have informed the defense team that Santana's mental state was questioned in a separate federal criminal prosecution. In that federal case, there was a competency evaluation, but no finding of incompetency.  Cruz-Garcia argues that the competency evaluation could have helped the defense challenge Santana's testimony.  He also argues that the State should have disclosed information about Santana's earlier convictions, some of which included information different from what he testified to at trial.  All that information, however, was a matter of public record.  "A *Brady* claim fails if the suppressed

evidence was discoverable through reasonable due diligence."  *Guidry v. Lumpkin*, 2 F.4th 472, 486 (5th Cir. 2021); *see also Prible v. Lumpkin*, 43 F.4th 501, 514 (5th Cir. 2022).  An investigation by the defense into the criminal history of the State's witnesses could have easily uncovered that information.  *See United States v. Infante*, 404 F.3d 376 387 (5th Cir. 2005) (holding that no *Brady* violation occurs when the evidence at issue is a matter of public record, obtainable upon request); *United States v. Dean*, 722 F.2d 92, 95 (5th Cir. 1983) ("*Brady* rights are not denied where the information was fully available to the defendant and his reason for not obtaining and presenting such information was his lack of reasonable diligence.").  In addition, defense counsel vigorously cross-examined Santana, presenting the jury with ample information about his criminal acts.  The record does not support the argument that more information about Santana would have affected the outcome or that the trial was fundamentally unfair.

Cruz-Garcia also alleges that the State suppressed information that he had previously assisted federal law enforcement.  But the record does not suggest that the federal and state governments worked jointly on this case.  The State of Texas prosecuted Cruz-Garcia.  He cannot impute to Harris County information about his earlier work with a federal agency.  Moreover, Cruz-Garcia himself was the best source of information about his own work as an informant.  "When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

Finally, Cruz-Garcia provides a list of other material he alleges the State withheld.  As the respondent observes, "Cruz-Garcia only lists documentary evidence he claims, without explanation, was withheld, but offers no explanation of how this evidence is exculpatory or

impeaching, or how this evidence was material to the outcome of trial." (Docket Entry No. 85 at 667). On that basis, the respondent argues that the allegations "are insufficiently briefed and thus should be deemed waived." (Docket Entry No. 85 at 667). Cruz-Garcia's reply provides little additional information about his list of *Brady* material and provides few details on how it was material.

Cruz-Garcia has not made a sufficient showing to overcome the procedure bar of his *Brady* claim, much less demonstrate entitlement to relief on the merits. Relief on this ground is denied.

### C.    Coercive Jury Instructions (Claim Seven)

Relying on the conversation the trial judge had with juror Bowman when she expressed concern during deliberations, Cruz-Garcia argues that the trial court gave her an unconstitutionally coercive instruction when it told her "that she was required to attempt to reach an agreement until told to stop by the court." (Docket Entry No. 73 at 228). Cruz-Garcia raised this claim in his first state habeas application. The state court found that he had defaulted consideration of this claim because he should have raised it on direct appeal. *See Cruz-Garcia*, 2017 WL 4947132, at *1. The state court's procedural ruling bars federal review unless Cruz-Garcia can show cause and prejudice.

Cruz-Garcia does not argue that he can show prejudice to overcome the procedural bar. Instead, Cruz-Garcia attempts to shift the burden by asserting that the respondent "does not argue that Mr. Cruz-Garcia cannot show prejudice to overcome his procedural default." (Docket Entry No. 86 at 75). Cruz-Garcia is the one who must show both cause and actual prejudice to overcome the procedural bar. His failure to show actual prejudice is a sufficient reason to find that he has not overcome the procedural bar.

The court also finds that he has not shown cause. Cruz-Garcia can show cause by identifying an external impediment to raising this claim on appeal. Cruz-Garcia alleges that he can show cause because the trial judge did not divulge the full extent of the conversation with juror Bowman. Cruz-Garcia contends that the trial court "failed to give an accurate accounting of that ex parte meeting to trial counsel," and thus prevented him from preserving the claim for direct appeal. (Docket Entry No. 73 at 229). In doing so, however, he relies on information available before appellate counsel filed his brief. Cruz-Garcia relies on the affidavit trial counsel prepared to support his motion for a new trial, in which he expressed surprise that juror Bowman could not agree with other jurors because the trial judge only reported that she "questioned how long deliberations would last." (Docket Entry No. 86 at 87) (quoting Docket Entry No. 22-10 at 157).[35] In addition, the record contained the transcript of the trial judge's discussion with Juror Bowman. (Docket Entry No. 23-13 at 4-9). A review of the record would have provided Cruz-Garcia with the information necessary to raise this claim. Cruz-Garcia has not shown an external impediment that prevented his appellate attorney from raising this claim. Cruz-Garcia has not overcome the procedural bar as to this claim, and relief on this basis is denied.

## IV.    Conclusion of Procedural Discussion

Cruz-Garcia has not shown that this court can reach the merits of several claims. The state courts provided Cruz-Garcia a full opportunity to litigate constitutional claims on direct appeal and on state habeas review. Cruz-Garcia did not raise many of his federal constitutional claims in

---

[35]    Cruz-Garcia also supports this argument with information from what appears to be an email exchange between habeas counsel and trial counsel. (Docket Entry No. 86 at 75) (quoting Docket Entry No. 23-40 at 64-65). Cruz-Garcia provides no reason to find that what purports to be an email exchange is reliable, trustworthy, and admissible information.

that forum, procedurally barring those claims from federal review.  Cruz-Garcia has not shown

that he can meet the requirements for avoiding those bars and allowing federal review.[36]  Relief

cannot be granted on those claims.

**CUMULATIVE PREJUDICE ARGUMENT**

While not listed as a separate ground for relief, Cruz-Garcia argues that the cumulative

effect of the trial errors requires federal habeas relief.  (Docket Entry No. 73 at 20-22).  Cruz-

Garcia's argument presupposes constitutional error, because "[m]eritless claims or claims that are

not prejudicial or claims that are procedurally barred cannot be cumulated." *Hughes v. Dretke*,

412 F.3d 582, 597 (5th Cir. 2005) (citation omitted and cleaned up).  As the court has discussed

extensively, many of Cruz-Garcia's claims are procedurally defaulted and he has otherwise not

shown constitutional error. The court finds that Cruz-Garcia not asserted errors, separately or taken

together, which "so infected the entire trial that the resulting conviction violates due process."

*Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992).

**CERTIFICATE OF APPEALABILITY**

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment

without receiving a certificate of appealability.  *See* 28 U.S.C. § 2253(c).  Crus-Garcia has not yet

requested that this court grant him a certificate, but courts can consider the issue without a specific

motion.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  "The COA statute

---

[36]     The court has reviewed the barred claims and, if their merits were fully available for federal review, habeas relief would be denied.  Just as "[f]ederal courts have no authority to impose mandatory opinion-writing standards on state courts," nothing in federal law requires a full analysis in alternatively disposing of barred claims, especially when Cruz-Garcia should have placed his claims before the state courts in a procedurally adequate manner. *Johnson v. Williams*, 568 U.S. 289, 300 (2013) (discussing, and not disapproving, "the uniform practice of busy state courts [not] to discuss separately every single claim to which a defendant makes even a passing reference").

124

establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may issue a certificate of appealability only when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit anticipates that a federal habeas court will resolve any questions about a certificate in the death-row petitioner's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating whether to grant a certificate on claims rejected on their merits. "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  A district court that has denied habeas relief on procedural grounds should issue a certificate of appealability only "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  If the petitioner does not meet this standard, "no appeal would be warranted."  *Slack*, 529 U.S. at 484.

Cruz-Garcia has raised numerous issues.  They have been carefully reviewed and analyzed, based on the record, the AEDPA standards, and controlling precedent.  The result is that a certificate of appealability is not issued on any of Cruz-Garcia's claims.

## CONCLUSION AND ORDER

The court dismisses Cruz-Garcia's petition for a writ of habeas corpus, with prejudice.  A certificate of appealability is not issued.  The court denies all other requests for relief.  Final judgment is separately entered.

SIGNED on September 25, 2023, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

126